## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: VIOXX | : | |
| | : | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION L |
| | : | |
| *This document relates to ALL CASES* | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENAS

## I.    INTRODUCTION

On September 13, 2006, the Plaintiff's Steering Committee ("PSC") served notices of depositions and subpoenas for documents and testimony upon John S. Martin, Jr., Esq. ("Mr. Martin"), of counsel; Debevoise and Plimpton, LLP ("Debevoise"); Martin Frederic Evans ("Mr. Evans"), presiding partner or custodian of records, Debevoise; Records Custodian, Burson-Marsteller, LLP ("Burson-Marsteller"); and Marcia Silverman ("Ms. Silverman"), CEO, Ogilvy Public Relations Worldwide, Inc. ("Ogilvy").[1]  The substance of the discovery sought related to the underlying documents generated,  reviewed, or relied upon in connection with the Report of the Honorable John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co.,

---

[1] With the exception of Mr. Martin, all individuals and entities have been given the option of complying with the document requests, set forth in Exhibit A to each subpoena, in lieu of appearing at a deposition.

A copy of the notice of deposition and subpoena served on Mr. Martin ("Martin Requests") is attached hereto as Exhibit 1; a copy of the notice of deposition and subpoena served on Mr. Evans is attached hereto as Exhibit 2; a copy of the notice of deposition and subpoena served on Ms. Silverman is attached hereto as Exhibit 3; and a copy of the notice of deposition and subpoena served on the records custodian of Burson-Marsteller is attached hereto as Exhibit 4.

Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx (hereafter referred to as "Martin Report").[2]

On October 16, 2006, Mr. Martin, Mr. Evans and Debevoise collectively served a response, which is attached hereto as Exhibit 5. Both Ogilvy and Burson-Marsteller, who are represented by the same law firm, each submitted identical responses on October 17, 2006, which are attached hereto as Exhibits 6 and 7 respectively. The various responses submitted by the third-parties amount to nothing more than objections to the document requests on the grounds that the materials requested constitute work-product and/or are privileged from disclosure pursuant to the attorney-client privilege. There is no basis for the assertion of privilege objections relating to the Martin Report.[3]

## II.    BACKGROUND

On September 30, 2004, Merck withdrew Vioxx from the market. Following the withdrawal, Merck was faced with a publicity nightmare as numerous scholars, high ranking members of the FDA and members of Congress expressed outrage at what they perceived to be unethical conduct in the marketing and development of Vioxx. This criticism focused on the great lengths that Merck went to in attempting to explain away clear signs that Vioxx was cardio-toxic. Although these efforts allowed Merck to continue collecting huge profits from the sale of its blockbuster drug, as

---

[2] The Martin Report is available on Merck's website at http://www.merck.com/newsroom/vioxx/martin_report.html.

[3] The responses to the PSC's discovery requests are part of an ongoing dispute between the PSC and Merck with respect to discovery related to the widely publicized Martin Report. On October 13, 2006, Merck filed a motion for a protective order after being served with discovery requests relating to the creation, preparation and publication of the Martin Report. The PSC filed an opposition on November 1, 2006, and Merck filed a reply on November 3, 2006. The PSC subsequently filed a surreply on November 7, 2006. These pleadings are incorporated herein by reference.

a consequence of Merck's actions, thousands of individuals suffering serious cardiovascular injuries while taking Vioxx.

As the evidence suggesting that Vioxx contributed to cardiovascular injuries began to mount and became increasing difficult to refute, hundreds, if not thousands, of highly critical articles were published in medical literature and by sources in the main-stream media.  This public criticism ultimately attracted the attention of Congress, which held public hearings to explore Merck's conduct in the marketing and development of Vioxx.  As if this negative publicity were not enough to cripple the image of the drug giant, after it became clear that Vioxx played a role in causing cardiovascular injuries, thousands of individuals began filing lawsuits in both federal and state courts.  Thus, Merck's image was under siege and the specter of unprecedented civil liability was on the horizon.

In light of the tremendous backlash following the withdrawal of Vioxx, Merck needed to respond in a direct and forceful manner if it was to survive the Vioxx disaster and retain its market share with respect to the other drugs it continued to market.  Not being a company that is prone to shrink from and/or fail to meet such a challenge, Merck launched an aggressive and well-orchestrated publicity campaign that was designed to re-establish good-will and clear the names of upper management.  This publicity campaign involved the wide use of advertisements and the release of study results designed to absolve the company of responsibility.[4]

_____

[4] For instance, as outlined in the PSC's opening memorandum in opposition to Merck's motion for protective order, Merck published one study, which was later found to be tainted by a critical mathematical error, that purportedly established that the risks associated with Vioxx did not arise until 18 moths after a patient began using the drug.  Based on the results of this study, Merck argued that clinical trials, which are generally short-term and almost never approach 18 months in duration, failed to uncover the health risks associated with Vioxx.  Merck used this 18

(continued...)

3

In a further effort to re-establish its credibility and exculpate upper management, Merck's board of directors established a special committee ("Special Committee") on November 23, 2005. The special committee hired the former federal judge, Mr. Martin, a partner with Debevoise, to conduct an "independent" investigation regarding the development and marketing of Vioxx.[5] *See* Martin Report, Chronology of Actions by Special Committee of Board of Directors of Merck & Co., attached hereto as Exhibit 8.  According to Dr. William G. Bowen, a member of Merck's Board of Directors and Chairman of the Special Committee, an investigation regarding the development and marketing of Vioxx was necessary because:

> It became clear to me and the entire Board that in light of the threatened shareholder litigation, pending investigation by regulators and Congress, *and the public criticism of management* that had given rise to those investigations, the Board needed to investigate the conduct of senior management.  It was imperative to me and my colleagues on the Board that the corporate executives responsible for running the Company had *acted with integrity* and, if they had not, that the Board evaluate whether it should initiate litigation against any members of senior management.

--------

[4](...continued)
month defense in product liability litigation and to defend its image by helping to shape public opinion.

[5]Although Mr. Martin is no longer a member of the judiciary, in his report, he refers to himself as "Judge Martin".  Merck adopts this same terminology in its pleadings.  While Merck defends this practice as "customary", it is clear that Merck and Mr. Martin are improperly using this title in order to lend false credibility to the Martin Report by suggesting that Mr. Martin is above reproach.  For similar reasons courts have objected to the use of active and former judges as witnesses in ongoing litigation.  *See Joachim v. Chambers*, 815 S.W.2d 234, 239-40 (Tex. 1991)(finding canons of judicial conduct are breached when a former judge testifies as an expert witness due to the "appearance of impropriety").  These same concerns are implicated in this case since Mr. Martin and Merck use the term "Judge Martin" to suggest that greater credibility should be afforded to the Martin Report.  It is also significant that the use of this term is misleading to members of the public.  That is, many members of the public will be confused by this term since it suggests that Mr. Martin is an active member of the judiciary and further suggests a greater level of autonomy.

4

*See* Declaration of William G. Bowen at ¶¶ 1 and 5 ("Bowen Declaration"), attached hereto as Exhibit 9.

During the course of this investigation Mr. Martin and "fourteen lawyers and six legal assistants" reviewed millions of pages of documentation and interviewed Merck employees and management. *See* Martin Report, Outline of Investigative Process, attached hereto as Exhibit 10. During the investigation, Mr. Martin and his staff had virtually unfettered access to over one hundred of Merck's current and former employees and twelve Merck consultants. *Id.* at 2; *see also* Martin Report, Alphabetical List of Witnesses Interviewed, attached hereto as Exhibit 11.

After 20 months of investigation, Mr. Martin submitted his report to Merck's board of directors on or about July 26, 2006. Merck was billed approximately $22 million for the investigation and preparation of the Martin Report. *See generally*, John Carreyrou and Heather Won Tesoriero, *Merck Believed Vioxx Was Safe*, Toronto Globe and Mail, September 7, 2006, 2006 WLNR 15476265 at B14. Given this massive expenditure, it is not surprising that the report fully exonerates Merck of any wrongdoing, and that the findings therein "mirror" Merck's defenses in the personal injury actions filed against it. *See* Theresa Agovino, *Report Exonerates Merck: The 21 Million Investigation that was funded by the Maker of Vioxx*, Intelligencer, September 7, 2006, 2006 WL 16088421, at C10 ("... its conclusions mirror the company defense."). Shortly after receiving the Martin Report, Merck's board of directors approved the report and published it without any redactions on the company website effective September 6, 2006.[6] The decision to publish the Martin Report and all appendices was made by the Special Committee on August 30, 2006. *See*

---

[6] The report was also made available on the Debevoise website. *See* http://161.58.184.45/martinreport/.

Martin Report, Chronology of Actions by Special Committee of Board of Directors of Merck & Co.

The release of the Martin Report was intended to influence public opinion and to create positive publicity on the eve of critical Vioxx trials. Indeed the release of the Martin Report was such that it was made publically available less than a week before the start date of the <u>Smith</u> trial in these MDL proceedings.

That Merck intended for the Martin Report to be picked up in the main-stream news media on the eve of this trials is clear since both Merck and the law firm it hired to vindicate the company in the eyes of the American public took considerable actions designed to draw attention to the report. For example, Merck issued a press release in conjunction with Debevoise on the date the report was released. *See* Press Release, *Special Committee of the Board of Directors of Merck & Co., Inc. Releases Results of Independent 20-Month Investigation Into Integrity of Merck Senior Management in Developing, Testing and Marketing of Vioxx*, September 6, 2006, attached hereto as Exhibit 12. At the same time, Merck and Debevoise held a joint "News conference" to discuss the committee's findings. *See* Alex Berenson, *Hired Investigator Clears Merck in Vioxx case*, International Herald Tribune, September 8, 2006, 2006 WL 15589179. These methods of drawing attention to the Martin Report proved successful and its release was immediately picked up by several news sources, many of which reported that an "independent" investigation conducted by a former federal judge had concluded that Merck acted reasonably.[7] Merck also took the extraordinary action of hiring two public relations firms, Ogilvy and Burson-Marsteller, to help the company maximize the positive spin on the Martin Report. It is also curious that Merck directed all medical inquiries to an

---

[7] *See* printout of 20 News Articles, attached as Exhibit 13.

employee of a public relations firm, Burson-Marstellar.[8]

The subject of the third party subpoenas assert that the materials requested by the PSC are protected from disclosure by the work-product doctrine. In essence, they contend that Mr. Martin was retained to prepare a report in response to shareholder demands and the prospect of litigation. There is no basis to this contention as the primary purpose of the Martin investigation was for the business purpose of reestablishing good will, vindicating upper management of any responsibility for the Vioxx debacle, and influencing public opinion in such a way that it would have an impact on pending civil litigation. Under these circumstances, these other purposes prohibit application of the asserted privileges.

In addition, it is also evident from the Martin Report that Merck would have authorized the investigation even if there had been no shareholder demand since Merck intended to make the report publicly available all along. Simply stated, Merck needed an "independent" investigation clearing it of any wrongdoing to re-establish good-will and to absolve its upper management of any responsibility for any wrongdoing. This is why Merck authorized the investigation to continue for several months even after the shareholder derivative suit had been dismissed with prejudice on May 5, 2006.[9] *See In Re: Merck & Co., Inc. Derivative & ERISA Litigation*, MDL 1658 (SRC), Civil Action Nos. 05-1151 and 2368 (Dismissal Order)(May 4, 2006)(Chesler, J.), appeal pending, Docket

---

[8] *See* http://161.58.184.45/martinreport/contact.html.

[9] Since Merck asserts that the Martin Report was generated to evaluate the claims of shareholders, documents generated after the shareholder litigation was dismissed would not be covered by the privilege even assuming Merck can establish its applicability to earlier documents. *See Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 181 (S.D.Ohio 1993)("the scope of the protection is limited to that time in which a real and substantial possibility of litigation exists").

No. 06-2911 (3d Cir.).[10]

For these reasons the Martin Report and materials requested by the PSC are not within the work-product privilege since they were not prepared "in anticipation of litigation" but rather for non-litigation purposes. Additionally, even if the materials qualify as work-product and/or are subject to protection under the attorney-client privilege, Merck waived its privileges by publishing the Martin Report. Finally, assuming there has been no waiver of privilege and that the materials underlying the Martin Report qualify as work-product and/or are protected by the attorney-client privilege, the proper remedy is for this Court to shield only those materials within the attorney-client privilege or work-product doctrine, subject to redaction, as Plaintiffs have a "substantial need" for such materials.

Finally, the entities other than Merck and Debevoise have no basis for asserting the work-product and/or attorney-client privileges. As publicity firms, Ogilvy and Burson-Marstellar are not law firms and/or agents of law firms and they do not perform legal services. Accordingly, any materials that were produced by the publicity firms are not privileged. Furthermore, assuming Merck has provided the publicity firms with privileged materials, that production to a third party constituted a waiver.

## III.    <u>LEGAL ARGUMENT</u>[11]

---

[10] Merck's Reply in Support of its Motion for a Protective Order, Merck contends that the shareholder derivative litigation is ongoing. Merck has clearly waived its right to assert any privilege as to the materials requested by the PSC by voluntarily publishing the report despite the existence or potential for derivative litigation. The Martin Report goes to the heart of such litigation and its publication will undoubtedly have an influence on any derivative litigation that ensues.

[11] As a threshold matter, this Court is the proper forum for determining this motion to
(continued...)

8

As discussed below, there is no basis for the assertion of either attorney client or work product privileges as they relate to the subject subpoenas. Even assuming such privileges exist, a waiver occurred applicable either to (1) counsel, *i.e.*, Martin & Debovoise, Sections A-C, *infra.*, or (2) unrelated third parties, *i.e.*, Ogilvy & Burson-Marsteller that has vitiated any application of such privileges. *See* Section D, *infra*.

Finally, in Section E, *infra*, assuming both privileges are found and no waiver of either privilege occurred, the PSC still has a "substantial need" for such materials, which should be produced in a redacted format.

## A. The Martin Report and Related Materials Do not Qualify for Protection Under the Work-Product Doctrine

The materials requested by the PSC are not within the work-product privilege, even though the Martin Report was the result of an investigation conducted by a law firm, since the primary purpose of the report was for business, as opposed to litigation purposes.

Fed.R.Civ.P. 26(b)(3) recognizes the work product privilege which, protects from disclosure those "documents and other tangible things ... [that are] prepared in anticipation of litigation or for

---

[11](...continued)

compel. Pursuant to 28 U.S.C.A. § 1407, a district court judge who has been assigned a consolidated case by the members of the judicial panel on multidistrict litigation, "... may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated pretrial proceedings." *See In re Automotive Refinishing Paint Antitrust Litigation*, 229 F.R.D. 482, 486 (E.D.Pa. 2005)("The MDL statute thus authorizes a transferee court judge to sit as the court in " ' other districts to hear and decide motions to compel discovery from non-parties.' "), *quoting In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 596 (E.D.Pa. 1989); *In re Uranium Antitrust Litig.*, 503 F.Supp. 33, 35 (N.D.Ill. 1980)(same); *Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F.Supp.2d 270, 273 (D.D.C. 2002)(same); *see also In re Corrugated Container Antitrust Litigation*, 647 F.2d 460 (5th Cir. 1981)(judge in multi-district litigation can exercise powers of judge from another district, pursuant to 28 U.S.C.A. § 1407, and find witness in contempt for refusing to answer questions at deposition).

trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) ...".  In determining the applicability of the work product privilege, the threshold question is whether the document was prepared in anticipation of litigation rather than in the ordinary course of business.  *See Upjohn Co. v. United States.*, 449 U.S. 383, 397 (1981); *Carroll v. Praxair, Inc.*, 2006 WL 1793656, *2 (W.D.La. 2006)(Wilson, M.J.).  "The work-product doctrine does not protect materials assembled in the ordinary course of business, pursuant to regulatory requirements, or for other non-litigation purposes."  *See Carroll*, 2006 WL 1793656, * 1, *citing United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982), *cert. denied*, 466 U.S. 944; *Naquin v. Unocal Corporation*, 2002 WL 1837838, * 7 (E.D.La. 2002)(Wilkinson, M. J.)("If a party or its attorney prepares a document in the ordinary course of business, 'it will not be protected [from discovery] even if the party is aware that the document may also be useful in the event of litigation.'")(citations omitted).  Indeed, "[t]he law is settled that 'excluded from the work product doctrine are materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation.'"  *Naquin*, 2002 WL 1837838, * 7, *citing Guzzino v. Felterman*, 174 F.R.D. 59, 62 (W.D.La. 1997)(Tynes, M.J.).  Although the "involvement of an attorney is a highly relevant factor ... making materials more likely to have been prepared in anticipation of litigation ... [t]he involvement of an attorney is not dispositive of the 'in anticipation of litigation' issue."   *Carroll*, 2006 WL 1793656, *2 (citation ommitted).

A document or other item is prepared in anticipation of litigation "as long as the *primary motivating purpose* behind the creation of the document was to aid in possible future litigation."  *See United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. 1981), *cert. denied*, 454 U.S. 862, (1981) *accord In re Kaiser Alum. & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 532 U.S.

919 (2001).

The party asserting the privilege has the burden of establishing that the materials fall within the privilege, and that the privilege has not been waived. *See Carroll*, 2006 WL 1793656, \*1, *citing In re the Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274, 280 (S.D.N.Y. 1995); *Naquin*, 2002 WL 1837838, \* 7; *see also In re OM Group Securities Litigation*, 226 F.R.D. 579, 590 (N.D.Ohio 2005); *Lasalle Bank N.A. v. Mobile Hotel Properties, LLC*, 2004 WL 1238024, \* 2 (E.D.La. 2004).

Here, although the Martin Report was prepared by a law firm, the materials requested by the PSC do not qualify for protection under the work-product privilege since the primary purpose for the report's preparation was for business purposes. That is, "the fact that a defendant anticipates litigation resulting from an incident does not automatically insulate investigative reports [and other associated materials] from discovery as work product." *See Carroll*, 2006 WL 1793656, \* 2 (citation omitted). "If the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have been created in the ordinary course of business and not in anticipation of litigation." *Carroll*, 2006 WL 1793656, \* 2, *citing Electronic Data Systems Corporation v. Steingraber*, 2003 WL 21653414, \* 5 (E.D. Tex. 2003); *see also Southern Scrap Material Co. v. Fleming*, 2003 WL 21474516, \* 7 (E.D.La. 2003)(Knowles, M.J.)( "If a party or its attorney prepares a document in the ordinary course of business, it will not be protected from discovery even if the party is aware that the document may also be useful in the event of litigation." *Fleming*, 2003 WL 21474516, \* 7 (emphasis added).

In fact, several federal cases have rejected the assertion of the work product privilege and

allowed discovery in factually similar cases. *See Davis*, 636 F.2d at 1039-40 (rejecting argument that materials prepared by attorney should be subject to work-product protection where the primary motivating purpose for the preparation of the materials was not for possible future litigation); *Carroll*, 2006 WL 1793656, * 4 (finding investigative report and related documents that were prepared following an accident at a company's facility were not protected from disclosure as work-product); *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 477 (N.D.Tex. 2004)(finding materials were not protected by work-product privilege even though developed in the course of an investigation conducted by an attorney, who was asked amongst other things to "investigate possible legal causes of action", even though the materials "may be helpful in legal proceedings", since the "primary motivation in preparing these documents was the protection of its confidential information."); *see also Leslie Fay*, 161 F.R.D. at 280-81 (rejecting assertion of work product privilege and finding primary purpose of investigation conducted by outside counsel who was employed by audit committee was for business purpose despite, "ancillary existence of ongoing litigation", where the report was used to make decisions in terms of firing personnel, "to determine the magnitude of fraud and implement new financial structure, organization, reporting, and internal control systems, and, possibly most important, to reassure creditors and future lenders that the culpable parties and suspect internal policies were being vigorously sought and rooted out.").[12]

---

[12] *See also  Seibu Corporation v. KPMG LLP*, 2002 WL 87461, * 4 (N.D. Texas 2002)(finding files and document created by auditors pursuant to an internal investigation initiated by in-house counsel were not within work-product doctrine even if "KPMG reasonable anticipated litigation", where "the primary purpose of the internal investigation was to make personnel decisions regarding the termination of partners responsible for the Q-Zar audit."); *McEwen v. Digitran Systems, Inc.*, 155 F.R.D. 678 (D.Utah 1994)(Counsel's retained

(continued...)

As stated by the court in *Leslie Fay*, "[i]n the instant case, the simple fact that the Company foresaw securities fraud litigation or that the SEC had initiated its own investigation prior to the Audit Committee's investigatory efforts does not automatically qualify the Audit Committee's investigation materials as work product." *Id.* at 280 (citations omitted).

The court in *Carroll* reiterated these same concerns and ultimately rejected the assertion of the work-product privilege, where the materials would have been generated in the ordinary course of business despite the existence of pending litigation. The court summarized its conclusions as follows:

> Even if these documents were prepared with an eye towards litigation, it is evident that the RCA contains information which Praxair would be expected to compile in the ordinary course of its business after an accident has occurred in order to ascertain the cause of the accident, to evaluate equipment failures, and to implement changes in an effort to prevent similar accidents in the future.

*See Carroll*, 2006 WL 1793656, * 4, *citing Poseidon Oil Pipeline Co. v. Transocean Sedco Forex*, 2001 WL 1360434, * 4 (E.D.La. 2001) *and Occidental Chemical Corp. v. OHM Remediation Service Co.*, 175 F.R.D. 431, 435 (W.D.N.Y. 1997).

Pursuant to this line of cases, federal courts have recognized that where a company is motivated by dual purposes in retaining outside counsel to conduct an internal investigation, *i.e.*

---

[12](...continued)

accountants prepared the documents primarily to enable the re-issuance of the corporation's financial statements despite pending litigation and SEC investigation); *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher*, 1997 WL 118369 (S.D.N.Y. 1997)(the documents were primarily prepared for business purposes in order to maintain the integrity of the financial reports of the corporation); *In re OM Group Securities Litigation, supra,* (documents generated for dual litigation and business purposes would have been generated in the absence of pending or possible future litigation and thus were not protected from disclosure under the work-product doctrine).

where there is a business purpose as well as existing or potential litigation, courts will not shield documents under the work product privilege where the company would have conducted the investigation anyway had there been no ongoing or anticipated litigation.  *See Carroll*, 2006 WL 1793656, * 4 (finding investigative report and related documents that were prepared following an accident at a company's facility were not protected from disclosure as work-product where company would have conducted the investigation anyway "in the ordinary course of business"); *Leslie Fay*, 161 F.R.D. at 281 ("had there been no ongoing or anticipated litigation, Leslie Fay would have conducted an investigation anyway."); *In re OM Group Securities Litigation*, 226 F.R.D. at 597 (where documents are essentially generated for dual litigation and business purposes and such purposes are "inextricably intertwined in that neither purpose dominates the other" the issue to be determined "is whether the documents would have been generated in the absence of pending or possible future litigation."); *Amway Corp. V. The Procter & Gamble* Co., 2001 WL 1818698, * 6 (W.D.Mich. 2001)(when it is clear that documents would have been prepared independent of any anticipation of use in litigation, no work-product can attach); *Maine v. United States DOT*, 298 F.3d 60, 70 (1st Cir. 2002)(documents that would have been created in essentially similar form irrespective of the litigation are not protected even if such documents aid in the preparation of litigation); *Stout v. Illinois Farmers Ins. Co.*, 150 F.R.D. 594, 604 (S.D.Ind. 1993)(if document would have been created for non-litigation uses regardless of intended use in litigation preparation, it should not be afforded work-product protection)(Foster, M.J.), *aff'd*, 852 F.Supp. 704 (S.D.Ind. 1994)(Barker, J.).

Regardless of what may be stated in Merck's pleadings or Mr. Bowen's Declaration, it is clear from the Martin Report itself that Merck retained Mr. Martin for the "primary purposes" of

absolving upper management of any wrongdoing and re-establishing good-will with the general public. As noted above, Merck's motivation for generating the Martin Report was significantly influenced by its need to re-establish its credibility with the public and for the purpose of vindicating its senior management as in *Carroll, supra*; *Leslie Fay; supra*; *McEwen, supra*; *In re OM Group Securities Litigation, supra*; and *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher, supra*. In fact, in its earlier pleadings seeking a protective order, Merck unwittingly acknowledges that public criticism played a significant role in sanctioning the investigation by Mr. Martin and his law firm. *See* Bowen Declaration at ¶ 5 (Merck's board reached conclusion that an investigation by Mr. Martin was necessary in light of, amongst other considerations, "public criticism of management ..."). Simply stated, Merck needed the appearance of an "independent" investigation to accomplish these objectives.

To that end, the Martin Report provided Merck the cover it desired. The Martin Report expressly states that its purposes were not of a legal character. For example, the Report states: "The Special Committee's Principal concern was to determine whether senior management of the Company acted with integrity throughout the period that Vioxx was developed and marketed to the public." *See* Martin Report, Introduction, at 16, attached hereto as Exhibit 14. The determination of integrity is hardly legal in nature. Confirming its non-legal purposes, the Martin Report continues: "Second, and perhaps most important, we recognize that given the extensive controversy that has developed concerning Merck's actions with respect to Vioxx, the Board may determine to release our Report to the shareholders and the public.... Thus, it is important for the public to have as extensive a record as possible against which it can judge the conclusions we reach herein." *Id.* at 17-18 (emphasis added). Taking the expressions of purpose

15

from the Martin Report at face value, there can only be one conclusion: the most important purpose of the Martin Report was a public statement of corporate integrity. Such a statement has no privileged legal nature.

In fact, Merck's conduct following the completion of the Martin Report corroborates the publicity angle that Merck intended the Martin Report to fulfill. Merck released the Martin Report on the world-wide web without any redactions, and drew attention to the report by issuing press releases, conducting a joint news conference with Debevoise and by hiring publicity firms to help maximize the impact of the Martin Report. Publicity firms serve no role in defending derivative litigation. Also referring to the author as Judge Martin shows that the primary purpose of the report was to engender public acceptance of Merck as a drug manufacturer and not as a derivative defendant. Further, the fact that the report was issued after the shareholder action was dismissed with prejudice supports the view that there were other reasons behind this report and its publication.

Finally, even assuming the need to re-establish public integrity and to vindicate senior management were not the "primary purposes" of the report, they were at minimum "dual purposes" for the preparation of the report. Merck's public image was tarnished in the aftermath of the Vioxx debacle and a purportedly "independent" investigation by a former federal judge would go a long way in helping to rebuild the company's image. Such an investigation would accomplish the goals of Merck's publicity campaign following the withdrawal of Vioxx from the market. For these reasons, the probability is that Merck would have conducted the investigation even if there had been no actual or threatened litigation.

**B.     The Materials Underlying the Martin Report Do not
         Qualify for Protection Under the Attorney-Client Privilege**

Because the investigation by Mr. Martin and Debevoise was conducted for business as

opposed to legal purposes, the attorney-client privilege is inapplicable and does not shield the

materials underlying the Martin Report from disclosure.  In *Metalsalts Corporation v. Weiss*, 184

A.2d 435, 438-9 (N.J.Super. 1962), the court recognized that the attorney-client privilege was

only applicable where a strict relation of attorney and client existed and where communications

are made to an attorney in his or her professional capacity.  *See United Jersey Bank v. Wolosoff*,

483 A.2d 821 (N.J.Super.A.D. 1984)(for attorney-client privilege to apply, attorney must be

acting in professional capacity as a lawyer).  The court in *Weiss* determined that an attorney

conducting an internal investigation was acting as an agent of the corporation, and that the

attorney-client privilege was inapplicable since the purpose of the investigation was for the

business purpose of uncovering grounds to terminate an employee.  *Id.* at 439; *see also Leonen v.

Johns-Manville*, 135 F.R.D. 94 (D.N.J. 1990)("Communications which relate to business rather

than legal matters do not fall within the protection of the privilege.").  Since the attorney client

privilege is to be "strictly construed", and since the investigation undertaken by counsel "could

have been rendered by any corporate agent", the court found the privilege inapplicable and stated

that:

> If all activities of a lawyer are to be classified as warranting the bar
> of discovery proceedings because of the attorney-client privilege,
> then it would be appropriate for clients to retain lawyers as
> investigators, custodians of records and the like, thereby turning
> the shield of the privilege into the sword of injustice.

*Id.* at 440; *see also Payton v. New Jersey Turnpike Authority*, 691 A.2d 321, 334 (N.J.

1997)(quoting the above statement and determining that communications related to internal

investigation of sexual harassment complaints that was conducted by attorneys would not normally qualify for protection under the attorney-client privilege).

In fact, although making no ruling as to the applicability of the attorney-client privilege due to the insufficiency of the record below, the New Jersey Supreme Court discussed these same concepts at length in *Payton*. In *Payton*, the New Jersey Supreme Court observed that:

> An attorney who is not performing legal services or providing legal advice in some form does not qualify as a "lawyer" for purposes of the privilege. Thus, when an attorney conducts an investigation not for the purpose of preparing for litigation or providing legal advice, but rather for some other purpose, the privilege is inapplicable. That result obtains even where litigation may eventually arise from the subject of the attorneys activities.
>
> The key issue regarding the applicability of the privilege in this case is the purpose of the various components of the investigation that defendant initiated into plaintiff's allegations of sexual harassment. If the purpose was to provide legal advice or to prepare for litigation, then the privilege applies. However, if the purpose was simply to enforce defendant's anti-harassment policy or to comply with its legal duty to investigate and to remedy the allegations, then the privilege does not apply.

*Payton*, 691 A.2d at 334.

Because the Martin Report and related materials are not within the work-product or attorney-client privileges, it logically follows that the PSC's discovery requests similarly escape such privileges. Since these privileges are inapplicable to the Martin Report and related materials, they are also inapplicable to the materials in the possession of the third-parties resisting the PSC's discovery requests.

**C.      Even if the Materials Subpoenaed by the PSC Qualify for
         Protection Under the Attorney-Client Privilege or as Work
         Product, Merck has Waived the Privileges by Publishing
         the Report to the Public[13]**

Merck has waived any privilege applicable to the materials underlying the Martin Report by publishing the Martin Report on its website without any redactions.  Although the applicability and waiver of the work-product privilege is governed by federal law and the applicability and waiver of the attorney-client privilege is governed by New Jersey law, the standards for finding waiver have key similarities and Merck has waived both privileges by voluntarily publishing the Martin Report.

Under both New Jersey law and Fifth Circuit precedent, Merck has waived any privilege as to the Martin Report itself.  Issues regarding the scope of the waiver are governed by slightly different standards since application of both federal and state law is involved.  That is, the standard for finding a broad subject-matter waiver of the attorney-client privilege under New Jersey law is slightly different from the standard for finding such a waiver of the work-product doctrine under the law of this Circuit.  For instance, in the context of the attorney-client privilege, New Jersey often recognize broad subject-matter waiver where privileged information is disclosed.  New Jersey also recognizes the "fairness doctrine", which is similar to the standard

---

[13] In its various pleadings in relation to the Martin Report, Merck has relied upon a series of cases from other jurisdictions that are distinguishable and/or inconsistent with the law of this Circuit.  For instance, *Hollinger International Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 515 (N.D.Illinois 2005), is distinguishable since the court found no waiver of work-product doctrine where a party produced a carefully redacted version of the fact section from a report prepared following an internal investigation.  *Id*. at 515.  The fact section had been redacted to remove attorney conclusions, mental impressions, and other privileged information.  Here, the entire Martin Report was produced without any redactions and it clearly reflects the conclusions and mental impressions of counsel.

applied in the Fifth Circuit for finding subject-matter waiver of the work-product doctrine. The "fairness doctrine" is frequently invoked by courts in order to extend an otherwise narrow waiver of a privilege. As the name suggests, this doctrine is based on underlying principles of fairness.

Because mere disclosure of the Martin Report should result in broad subject-matter waiver of the attorney-client privilege under New Jersey law, this argument is addressed first. However, although it is submitted that mere disclosure of the Martin Report resulted in subject-matter waiver of the attorney-client privilege, Plaintiffs argue in the alternative that assuming the disclosure did not result in subject-matter waiver of the attorney-client privilege, the waiver of such privilege should be extended under the "fairness doctrine." Since the "fairness doctrine" is similar to the Fifth Circuit's standard for finding subject-matter waiver of the work-product privilege, these concepts are discussed in conjunction below.

### 1. By Publishing the Martin Report Merck has Waived the Attorney-Client Privilege

New Jersey recognizes a broad waiver of the attorney-client privilege when confidential information is disclosed. For instance in *Sipca North America, Inc. V. Donaldson Enterprises, Inc.*, 430 A.2d 262 (N.J.Super.L.D. 1981), the court found a waiver of the attorney-client privilege where a party disclosed a report to opposing counsel for settlement purposes with the understanding that it would not be shared with the opposing party. This broad waiver concept is set forth in N.J. R.E. 530, which provides in relevant part:

> A person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, *made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone*.

N.J. R.E. 530 (emphasis added).

Under New Jersey law, voluntary disclosure of privileged material waives such privilege with respect to materials on the same subject matter.  For instance, the court in *Sipca* determined that, "disclosure of a part of a protected communication results in a total waiver of the attorney-client privilege with respect to that communication."  *Sipca*, 430 A.2d at 265; *Perth Amboy City Council*, 2005 WL 4014435, * 4 (N.J.Super.A.D. 2006)(citing *Sipca* and acknowledging that partial waivers of privileged communications could waive the entire privilege); *see also U.S. v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998)("The waiver covers any information directly related to that which was actually disclosed."); *In re OM Group Securities Litigation*, 226 F.R.D. at 591 (scope of waiver "applies to the rest of the communications on the same subject matter."); *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1991)(same); *In re Papst Licensing*, 2001 WL 1135265, * 2 (E.D.La. 2001)("A waiver of attorney-client privilege as to a particular communication extends to all other communications relating to the same subject matter.")(citation omitted)(Judge Sear).

Under New Jersey law the voluntarily disclosure of the Martin Report on Merck's website, constitutes a broad waiver of any privilege that could be asserted as to related materials since Merck had made a disclosure of "part of a privileged matter", *i.e.*, the report itself, and the related materials involve the same subject matter as the report.  In *In re OM Group Securities Litigation*, *supra*, the Court found a broad waiver of the attorney-client privilege where privileged materials that were voluntarily disclosed, "were not brief or cryptic summaries .... [that ] merely acknowledged the existence of an investigation .... [but rather were] a substantial presentation of the investigation ... [and were] more than 30 pages in length, [and] listed detailed

conclusions and cited specific findings, interviews and documents in support."[14]   *See In re OM Group Securities Litigation*, 226 F.R.D. at 591-592.   Likewise, the Martin Report is voluminous, presents the entire investigation, lists detailed conclusions and findings, and specifically relies on several witness interviews in reaching its conclusions.

2.   **Assuming that Publication Does not Constitute a Waiver of the Attorney-Client Privilege, Application of the "Fairness Doctrine" Establishes a Waiver of Both the Attorney-Client Privilege and the <u>Work-Product Doctrine</u>**

Although the standard for finding subject-matter waiver under the work-product doctrine is more stringent, this standard is satisfied under the facts of this case, and is similar to the "fairness doctrine", which is followed by New Jersey courts and authorizes the broadening of a waiver of the attorney-client privilege under circumstances like those present here.[15]   Under this same standard, assuming the waiver of the attorney-client privilege is less broad than is suggested by the PSC, New Jersey courts would recognize broad subject-matter waiver of the

---

[14] Not surprisingly, in its prior pleadings related to the Martin Report, Merck attempted to distinguish *In re OM Group Securities Litigation*, *supra*, since the Martin Report does not directly quote privileged communications.   This argument is misplaced and inaccurate since the Martin Report actually relies upon witness interviews that Merck is attempting to shield from disclosure.   This argument further misses the point since Merck fails to account for its inconsistency in its "voluntary disclosure of purportedly privileged material [since such disclosure] is inconsistent with an assertion of privilege."   *In re OM Group Securities Litigation*, 226 F.R.D. at 590.   It is also significant that *In re OM Group Securities Litigation*, *supra*, did not rely exclusively upon the quotation of privileged communications in finding a waiver of the attorney-client privilege.   That is, the court found a waiver of the attorney-client privilege where the disclosure constituted "a substantial presentation of the investigation ... [and] listed detailed conclusions and cited specific findings, interviews and documents in support.").   *Id*. at 591-92.   The Martin Report is a substantial presentation of the investigation, lists detailed conclusions, gives specific findings, and relies upon specific witnesses interviews.

[15] Federal courts sitting in the Fifth Circuit have recognized the fairness doctrine, and in so doing have relied on cases such as *Leslie Fay*, *supra*.   *See In re Papst Licensing*, 2001 WL 1135265, * 4 (relying on *Leslie Fay* in applying the fairness doctrine).

attorney-client privilege.

Many courts are critical of self-serving disclosures of otherwise privileged materials and will recognize a waiver in such instances. New Jersey courts have frequently ordered that additional materials be disclosed where a party has selectively disclosed otherwise privileged materials. For instance, in *Sipca*, the court made the following observation with respect to a selective disclosure by a party:

> The result is the same where the client discloses, or consents to counsel's disclosure, of some of the privileged information where the purpose of such disclosure is to advance the client's own self-serving objectives. It makes no difference in such a situation that only a part of the privileged information is disclosed, as a partial waiver of a privileged communication effectively waives the entirety thereof.
>
> **********
>
> The limitation of the disclosure, for certain purposes helpful to plaintiff's interests, should not be sufficient to avoid a waiver of the privilege. A party may not insist on the protection of the privileges for damaging communications while disclosing other selected communications because they are self-serving. A client who chooses to disclose secrets within the privilege waives it and cannot later insist upon it.

*Sipca*, 430 A.2d. at 265.

Courts frequently refer to this waiver concept as the "fairness doctrine" and it is applied where a party has disclosed privileged information or materials and it would be unfair to shield other related materials involving the same subject-matter. *See Leslie Fay*, 161 F.R.D. at 283 ("Based principally on notions of fairness, courts have imposed such a "subject matter waiver" most often when the privilege-holder has attempted to use the privilege as both "a sword" and "a shield" or when the party attacking the privilege will be prejudiced at trial.")(citation omitted).

23

New Jersey courts have clearly embraced this concept.  In *Wolosoff, supra*, the court recognized the danger of permitting selective disclosure of otherwise privileged materials without ordering additional disclosures as follows:

> We note the inherent inequity in permitting [a party] to use the privilege as a sword rather than a shield.  If permitted to do so, [a party] could divulge whatever information is favorable to its position and assert the privilege to preclude disclosure of the detrimental facts.  The resulting half-truth that would be revealed might well be more disabling than a total distortion.

*Wolosoff*, 196 N.J.Super. at 567.

As noted above, the law of this Circuit with regard to the waiver of the work-product doctrine, is similar to the fairness doctrine.[16]  Fifth Circuit cases recognize that "a general subject-matter waiver of work-product immunity is warranted only when the facts relevant to a narrow issue are in dispute and have been disclosed in such a way that it would be unfair to deny the other party access to facts relevant to the same subject matter."  *See Fleming*, 2003 WL 21474516, * 8.  That is, "[C]ourts have recognized subject-matter wavier of work-product in instances where a party deliberately disclosed work product in order to gain a tactical advantage

---

[16] Under the law followed in this circuit, Merck committed a waiver of the work-product doctrine.  The Fifth Circuit recognizes that the ability of a party to assert that materials are protected by the work-product privilege is extinguished when either a party or a party's attorney discloses such information.  *See Fox v. Taylor Diving & Salvage Company, et al.*, 694 F.2d 1349, 1356 (5th Cir. 1983) (finding work-product immunity is lost where attorney voluntarily discloses information in court).  The work-product privilege is waived where materials have been disclosed in a manner that makes it likely that they will be available to an adversary.  *See Stanley v. Trinchard*, 2005 WL 399460, * 3 (E.D.La. 2005)("Only those disclosures that are inconsistent with the adversary system are deemed to waive the work product protection.  The predicate of the inquiry in the work product context is not, as it is in the attorney-client context, whether the material was disclosed, but whether the material was disclosed to an adversary.")(Shushan, M.J.), *reconsideration denied*, 2005 WL 711585 (E.D.La. 2005)(Livaudais, J.).

and in instances where a party made testimonial use of work-product and then attempted to invoke the work-product doctrine to avoid cross-examination." *Id.*, *quoting*, *Varel v. Banc One Capital Partners, Inc.*, 1997 WL 86457, * 3 (N.D.Tex. 1997).[17]

In this case, Merck has used the report in an effort to mislead the public and to influence potential jurors. If ever a tactical advantage was sought by an adversary this is it. The Martin Report wastes no time in concluding that Merck's management did not breach any duty in the development and marketing of Vioxx. Merck also made the Martin Report readily available to members of the public, including prospective jurors, by publishing it on Merck's website. Merck further drew attention to the report by issuing press releases and by holding a press conference. It is also significant that Merck released the report on the eve of two product liability trials in the hopes of influencing public opinion and with the hope of influencing the outcomes of such trials. Merck's offensive use of the Martin Report to gain a tactical advantage demands that examination of the materials requested by the PSC be permitted under the fairness doctrine.

Although Merck has suggested that further disclosures are unwarranted since it professes

---

[17] Although Merck attempted to limit the significance of *Fleming, supra*, in its reply in support of its motion for protective order by suggesting that a party must make offensive use of a document in litigation before broad subject-matter waiver of the work-product doctrine will be recognized, this novel theory was neither adopted nor discussed by the court in *Fleming*. For there to be broad subject-matter waiver of the work-product privilege, the court in *Fleming* merely required that a party use work-product materials for the purpose of "seeking a tactical advantage." *See Fleming*, 2003 WL 21474516, * 8 (citations omitted); *see also In re OM Group Securities Litigation*, 226 F.R.D. at 593 (recognizing that fairness doctrine is not limited to instances where a party attempts to affirmatively use work-product in litigation). Thus, by voluntarily disclosing the Martin Report in a well orchestrated effort to influence both the public and prospective jurors in a manner calculated to draw maximum attention to the report, Merck has waived any privilege with respect to the underlying materials pursuant to the fairness doctrine.

no interest in using the Martin Report as evidence in any litigation, the court in *In re OM Group Securities Litigation, supra*, rejected this same argument in a factually similar case.  In *In re OM Group Securities Litigation*, the defendants attempted to distinguish cases like *Leslie Fay*, wherein courts found additional disclosures warranted, where a party intended to use a report as part of its case and the report tended to exonerate upper management by implicating another party to the litigation.  Under such circumstances, cases like *Leslie Fay* determined that additional disclosures were necessary pursuant to the fairness doctrine.  In rejecting the defendant's argument, the court observed that:

> These arguments are unavailing.  Defendants attempt to restrict application of the fairness doctrine solely to whether they would gain a tactical advantage in litigation by not disclosing the underlying documents.  The Court does not interpret the fairness doctrine so narrowly.  The Court must consider, not only whether there is a tactical benefit, but whether it is fair to uphold the privilege considering the nature of the disclosure.  Here, the Court finds that the Audit Committee's disclosure of the presentation would make it unfair to protect the documents underlying the presentation.  The disclosure to OMG's Board was substantial, intentional, and deliberate.

*In re OM Group Securities Litigation*, 226 F.R.D. at 593.  The court thus determined that plaintiff was entitled to "information that would allow Plaintiff to review <u>the whole picture</u>.  *Id*. (emphasis added).[18]

_____

[18]  In suggesting that any waiver associated the disclosure of the Martin Report should be narrowly construed, Merck heavily relies upon *Ziner v. Cedar Crest College*, Civ. No. 04-3491, 2006 U.S. Dist. LEXIS 34858 (E.D. Pa. May 30, 2006), in its pleadings filed in support of its motion for a protective order.  This case is distinguishable for several reasons.  First, in *Ziner* the defendants had voluntarily disclosed a report prepared by outside counsel in an unrelated sexual harassment claim and the plaintiff was seeking production of the underlying materials used in preparing the report.  Second, the defendants had not otherwise released the report.  Finally, the defendants had not attempted any offensive or tactical use of the report.  Although the court was

(continued...)

There is no reason for determining that this case is any different than *In re OM Group Securities Litigation*. By committing a broad waiver of any privilege that Merck could have asserted as to the Martin Report, it would be unfair to limit the waiver to those documents that have already been produced.[19]   Accordingly, assuming either privilege is applicable to materials

---

[18](...continued)
willing to recognize a "partial waiver" as to the report itself, under the "fairness doctrine" the court was unwilling to order further production of the underlying materials since the report had no bearing on the reasonableness of the defendant's actions and investigation in response to the plaintiff's charges of misconduct.

The facts involving the disclosure of the Martin Report are very different.  First, the Martin Report explores the conduct of Merck's senior management with respect to the development and marketing of Vioxx.  This conduct has relevance to each and every claim that has been brought in this litigation.  Second, although Merck has not attempted to use the report itself during litigation, the Martin Report has been made publically available and was released on the eve of trial in two product liability cases.  Thus, unlike *Ziner*, the Martin Report has been made available to the public and has been used for the tactical purpose of influencing public opinion on the eve of trial.

Another case heavily relied upon by Merck, *In re Commercial Fin. Servs.*, 247 B.R. 828 (Bankr. D. Okla. 2000), is also distinguishable since it involved a Debtor's request for a protective order prior to the voluntary disclosure of a confidential report.  The protective order would have foreclosed all parties reviewing the report from arguing that there had been a broad subject matter waiver and thereby seeking the underlying materials.  Obviously, Merck did not and could not seek such an order where it intended to broadly distribute the Martin Report for public consumption.

[19] Although in its motion for protective order Merck attempts to liken the Martin Report to a pleading by arguing that submission of a pleading does not ordinarily waive any privilege as to drafts and other materials reviewed while drafting a pleading, this argument completely fails to address the concept of waiver by voluntary disclosure.  While drafts of pleadings and materials reviewed while drafting such pleadings may be privileged from disclosure, once a party submits a pleading the pleading itself is no longer privileged unless subject to a confidentiality agreement or an order of court.  In contrast to a pleading which is drafted with the intent that it will be filed and provided to opposing counsel, where a company such as Merck retains outside counsel to conduct an independent investigation, investigative reports that are prepared primarily in anticipation of litigation are generally privileged absent a waiver.  *In re the Leslie Fay Companies, Inc. Securities Litigation*, *supra*; *In re OM Group Securities Litigation*,
(continued...)

in the possession of the third-parties resisting the PSC's subpoenas, the PSC is entitled to the production of such materials since Merck has waived any privilege that may otherwise apply.

**D.     The Third-Party Publicity Firms, Ogilvy and Burson-Marsteller, Have no Basis For Asserting Privilege Regarding the Materials Requested by the PSC, and Merck has Waived any Privilege Applicable to Materials that were Voluntarily Provided to such Third-Parties**[20]

There is no basis for asserting that materials in the possession of either public relations firm are shielded from production by virtue of the work-product doctrine. For the work-product privilege to be applicable, it must be demonstrated that the third-party publicity firms prepared documents or other materials in anticipation of litigation. As noted above, publicity firms serve no role in defending derivative litigation. Additionally, since neither entity attempts to set forth any basis for the applicability of the privilege, without more, Ogilvy and Burson-Marsteller have failed to meet their burden of establishing the applicability of the work-product privilege.

Nor are there any facts supporting a finding that the attorney-client privilege is applicable to materials in the possession of the third-party publicity firms. Neither publicity firm is represented by Mr. Martin or his law firm. Nor is either publicity firm an agent of Mr. Martin or Debevoise for purposes of rendering legal services to Merck since publicity firms do not provide

---

[19](...continued)
*supra*; *McEwen v. Digitran Systems, Inc., supra*; *In re Subpoena Duces Tecum Served on Willkie Farr & Gallagher, supra.* By publishing such a report there will be a waiver that will extend to the underlying materials involving the same subject matter. N.J. R.E. 530; *Sipca, supra*; *Perth Amboy City Council, supra*; *U.S. v. Workman, supra*; *In re OM Group Securities Litigation, supra*; *In re Grand Jury Proceedings October 12, 1995, supra*; *In re Papst Licensing, supra*; *Fleming, supra*; *Kapoor, supra.* Likewise, there will be a similar waiver where a party voluntarily discloses otherwise privileged information in the text of a pleading.

[20] As with Debevoise, Mr. Martin and Mr. Evans, the third-party publicity firms have not produced a privilege log. This makes it impossible for the PSC to evaluate the scope of the waiver that resulted from the act of turning otherwise privileged materials over to such entities.

legal services.  Nor is there any evidence suggesting that either entity provided legal services or

assisted Debevoise in providing such services.  Simply stated, both Ogilvy and Burson-

Marsteller merely assisted Merck in promoting its public image in an effort to maximize the

impact of the Martin Report.  Accordingly, there is no basis for arguing that the attorney-client

privilege is applicable to documents in the possession of the third-party publicity firms.

Finally, if Merck or one of its agents provided Ogilvy or Burson-Marsteller with

materials that are otherwise privileged, the privilege has been waived and the materials must be

provided to the PSC.  The scope of such waiver can be more fully evaluated once privilege logs

have been provided.  Accordingly, the materials in the possession of Ogilvy and Burson-

Marsteller are not privileged and must be turned over to the PSC.

### E.   Assuming the Materials Requested by the PSC are Privileged and there has Been no Waiver, Plaintiffs are Entitled to the Production of Such Materials Based on "Substantial need"

Unlike many other privileges that are absolute, work-product is a qualified privilege.

Thus, even assuming Merck and the entities asserting the privilege on its behalf succeed in

meeting the burden of establishing the applicability of the privilege, and even if it can be

demonstrated that the privilege has not been waived, the PSC can still obtain the information

where they have a "substantial need" for the materials and are "unable without undue hardship to

obtain the substantial equivalent of the material by other means."  Fed.Rules Civ.Proc. Rule

26(b)(3).

Notwithstanding the obvious need to poke holes in the Martin Report and to explore the

good-faith conduct of the investigation, the PSC has a substantial need for the materials

requested since these materials have direct relevance to the development and marketing of

Vioxx, and therefore, may be useful in upcoming trials. *See Parks v. U.S.*, , 451 A.2d 591 (D.C. 1982)("Where an attorney's work product, sought at trial, contains evidentiary facts, the seeking party has, by definition, a "substantial need" for the material."), *cert. denied*, 461 U.S. 945 (1983); *see also U.S. v. Nobles*, 422 U.S. 225, 245 (1975)(White, J., concurring); *Hickman v. Taylor*, 329 U.S. 495, 515 (1947)(Jackson, J., concurring). These materials could be used to help establish Merck's knowledge of adverse event data and to evaluate the reasonableness of its conduct once evidence establishing that Vioxx was cardiotoxic became available to the company. Simply stated, this evidence goes to the heart of this litigation and the PSC has a substantial need for such production. *See Weber v. Paduano*, 2003 WL 161340 (S.D.N.Y. 2003)(plaintiff entitled to work-product materials where they went to heart of negligence claim, contained more details as to cause of fire, and since plaintiff could no longer produce an independent evaluation since it had been over a year since the fire occurred); *Cornelius v. Consolidated Rail Corp.*, 169 F.R.D. 250 (N.D.N.Y. 1996)(plaintiff established substantial need for work-product materials where such materials helped to establish defendant's knowledge of condition and availability of remedial measures).

Moreover, the PSC is "unable without undue hardship to obtain the substantial equivalent of the material by other means." During the course of the investigation Mr. Martin and his staff reviewed millions of pages of documentation. They also interviewed hundreds of Merck employees and contractors. This investigation transpired over the course of 20 months and cost in excess of $22 million dollars. The PSC cannot fairly be expected to conduct an investigation of this magnitude and of this expense in order to obtain the "substantial equivalent" of the materials being requested. *See In re International Systems and Controls Corp. Securities*

30

*Litigation*, 693 F.2d 1235, 1241 (5th Cir. 1982)(cost of obtaining materials contained in work-product from another source may be inquired into as a factor in determining whether undue hardship exists); *Resolution Trust Corp. v. Heiserman*, 151 F.R.D. 367 (D.Colo. 1993)(undue hardship established for purposes of piercing work-product privilege since it would be extremely difficult, as well as wasteful, for party to duplicate three-year investigation); *State of Fla. ex rel. Butterworth v. Industrial Chemicals, Inc.*, 145 F.R.D. 585 (N.D.Fla. 1991)(same with respect to two-year investigation). The magnitude of the investigation that would be involved and the expense that would be incurred in conducting such an investigation make this case distinguishable from cases such as *Ziner, supra*, that have been relied upon by Merck in seeking a protective order, for purposes of suggesting that Plaintiffs should be required to conduct their own investigation.[21]

The PSC would also be at a tremendous disadvantage if required to conduct a similar investigation, since they are adversaries and were not retained by Merck's board of directors. *See In re Doe*, 662 F.2d 1073 (4th Cir. 1981)(cooperation of witnesses is a factor in determining substantial need and undue hardship), *cert. denied*, 455 U.S. 1000 (1982). For this reason the PSC will be unable to replicate the information that has been uncovered by Mr. Martin. *See Payton*, 691 A.2d at 336 (finding plaintiff entitled to underlying data from investigation since plaintiff would not necessarily be in a position to replicate information uncovered by defendant

---

[21] Although Plaintiffs deny the applicability of any privilege to the materials requested, should this Court find the work-product privilege applicable and determine that certain materials contain the mental impressions or conclusions of an attorney, production of such material in a redacted form is the appropriate relief, as opposed to an outright protective order prohibiting any production whatsoever. *See Trico Marine Assets, Inc. v. Alpha Marine Service*, 1999 WL 694103, * 1-2 (E.D.La. 1999)(ordering production of attorney-work product in redacted format upon showing of substantial need and undue hardship)(Livaudais, J.).

31

during its investigation).  Additionally, some of the materials requested by the PSC cannot be

uncovered through in independent investigation.  *See* Martin Requests at request 5, 7, 8 and 21

(seeking information related to retention of publicity firms, timing of release of Martin Report,

and discussion of its likely impact on the <u>Smith</u> trial); *Id*. at requests 9, 10, 17 (seeking

information regarding past retention of Debevoise and Merck's efforts to influence the content of

the report for purposes of challenging the credibility of the report).  Finally, to the extent any

statement given by a fact witness during the investigation conducted by Mr. Martin is

inconsistent with subsequent statements or testimony by the same witness, the PSC should be

entitled to have this evidence available in order to conduct a meaningful cross-examination.  *See*

*Duck v. Warren*, 160 F.R.D. 80, 82-3 (E.D.Va. 1995); *Gargano v. Metro-North*, 222 F.R.D. 38,

40-1 (D.Conn. 2004); *Dinter v. Sears, Roebuck & Co.*, 599 A.2d 528, 536 (N.J.Super.A.D.

1991).

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the PSC's motion to compel should be granted.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: November 22, 2006                     By:/s/ Leonard A. Davis
                                            **Russ M. Herman (Bar No. 6819)**
                                            Leonard A. Davis (Bar No. 14190)
                                            Stephen J. Herman (Bar No. 23129)
                                            ***Herman, Herman, Katz & Cotlar, L.L.P.***
                                            Place St. Charles
                                            201 St. Charles Avenue, Suite 4310
                                            New Orleans, Louisiana 70170
                                            Telephone: (504) 581-4892
                                            Facsimile: (504) 561-6024
                                            **PLAINTIFFS' LIAISON COUNSEL**

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008  (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663  (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX  77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Christopher V. Tisi, Esquire **(on brief)**
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC  20036-4914
(202) 783-6400 (telephone)
(307) 733-0028  (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, as well as copies being forwarded via U.S. Mail on the following listed individuals, on this 22 nd day of November, 2006.

1.    Jesse B. Schneider
      Davis & Gilbert, LLP
      1740 Broadway
      New York, NY 10019

2.    Mark P. Goodman
      Debevoise & Plimpton, LLP
      919 Third Avenue
      New York, NY 10022

3.    Debra Todres
      Debevoise & Plimpton, LLP
      919 Third Avenue
      New York, NY 10022

/s/ Leonard A. Davis
Leonard A. Davis (Bar No. 14190)
***Herman, Herman, Katz & Cotlar, LLP***
201 St. Charles Ave., Suite 4310
New Orleans, LA  70170
PH:    (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhkc.com

34