# EXHIBIT 14

**Report of The Honorable John S. Martin, Jr.
to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management in the
Development and Marketing of Vioxx**

**September 5, 2006**

DEBEVOISE & PLIMPTON LLP

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

I.      Overview of Scientific Issues. ............................................................ 2

II.     Formation and Mandate of the Special Committee. ........................... 8

III.    Scope and Conduct of the Investigation. .......................................... 10

IV.     Materials Reviewed. ......................................................................... 12

        A.      Documents Produced by Merck in Products Liability Cases,
                Shareholder and ERISA Litigation and Government Investigations. ........... 12

        B.      Documents Submitted by Merck to the FDA in Connection with
                Advisory Committee Meetings Related to Vioxx. ..................................... 13

        C.      Documents Collected from External Sources. ........................................... 15

V.      Witnesses Interviewed and Prior Testimony. ................................... 15

VI.     The Scope and Format of This Report. ............................................. 16

OUR FINDINGS ........................................................................................... 19

VII.    The Overarching Issues. .................................................................. 19

VIII.   Review of Specific Criticisms of Merck's Conduct. ......................... 27

        A.      Summary of Principal Criticisms and Findings Concerning Merck's
                Pre-approval Knowledge. ...................................................................... 27

                1.      Allegation No. 1:  Merck Rushed Vioxx to Market Without
                        Adequate Testing. ..................................................................... 28

                2.      Allegation No. 2:  Merck Knew in 1996 that Vioxx Was
                        Dangerous to the Heart. ............................................................ 30

                3.      Allegation No. 3:  Merck Ignored Advice From Outside
                        Experts Concerning Possible Prothrombotic Risks of Vioxx. .......... 33

                4.      Allegation No. 4:  Merck Did Not Publish The FitzGerald
                        Prostacyclin Hypothesis in a Timely Manner and Did Not
                        Disclose it to the FDA. .............................................................. 42

                5.      Allegation No. 5:  Merck Cancelled a Gastrointestinal
                        Outcomes Trial in 1997 Because MRL Scientists Feared that
                        the  Cardiovascular Results Would Be Unfavorable. ...................... 46

Case 2:05-md-01657-EEF-DEK   Document 8881-19   Filed 11/22/06   Page 4 of 23

Report of John S. Martin, Jr. to the Special Committee                                      September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                               Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

B.    Summary of Principal Criticisms and Findings Concerning Merck's
      Scientific Response to VIGOR Trial Cardiovascular Data..........................48

      6.    Allegation No. 6:  Merck Tried to Design the VIGOR Trial in
            the First Instance to Avoid Creating Negative Cardiovascular
            Data.................................................................................49

      7.    Allegation No. 7:  The Head of MRL Acknowledged the
            Cardiovascular Danger of Vioxx............................................51

      8.    Allegation No. 8:  Merck's Naproxen Cardioprotection
            Hypothesis Was an Implausible Explanation for the VIGOR
            Trial Cardiovascular Data that the Scientific Community – and
            Even Some MRL Scientists – Recognized Did Not Explain the
            Between-Treatment Difference in Cardiovascular Events. ..............54

      9.    Allegation No. 9:  The Published VIGOR Trial Results
            Intentionally Omitted Important Cardiovascular Risk
            Information..........................................................................71

      10.   Allegation No. 10:  Merck Recognized that Vioxx Was
            Prothrombotic, and Secretly Tried to Reformulate It. .....................80

      11.   Allegation No. 11:  Merck's Pooled Analyses Were Flawed. ...........82

      12.   Allegation No. 12:  Merck Intentionally Withheld from the
            FDA a Meta-Analysis of Myocardial Infarctions in the Vioxx
            Program..............................................................................88

      13.   Allegation No. 13:  Merck Confirmed the Cardiovascular
            Safety of Vioxx Through Misleading Promotion............................91

      14.   Allegation No. 14:  Other Merck Studies Showed that Vioxx
            Was Dangerous, But Merck Ignored or Hid the Results. .................96

      15.   Allegation No. 15:  Merck Kept the Cardiovascular Safety
            Information Out of the Product Label. ...................................104

      16.   Allegation No. 16:  Merck Announced – Then Cancelled – a
            Cardiovascular Outcomes Trial to Avoid Revealing That
            Vioxx Was Prothrombotic. ..................................................107

      17.   Allegation No. 17:  Merck Ignored Mounting Epidemiological
            Evidence That Vioxx Was Prothrombotic. ...............................111

      18.   Allegation No. 18:  Merck Withdrew its Application Seeking
            Approval to Market Arcoxia Because MRL Scientists Knew
            That it Was Not Safe and Would Invite Further Scrutiny of
            Vioxx's Cardiovascular Profile. ...........................................113

C.    Summary of Principal Criticisms and Findings Concerning Merck's
      Marketing Practices for Vioxx. ...................................................116

      19.   Allegation No. 19:  Merck Attempted to Improve Vioxx's
            Competitive Position by "Neutralizing" Physicians Who
            Supported Celebrex or Were Critical of Vioxx.............................117

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

20.  Allegation No. 20:  Merck's Marketing Department Unduly Influenced the Scientific Research Agenda. ................................... 122

21.  Allegation No. 21:  Merck Went on the Offensive Against Doctors and Academics who Questioned Vioxx's Cardiovascular Safety. ................................................................ 124

22.  Allegation No. 22:  Merck Sales Representatives Used Misleading Promotional Aids to Sell More Vioxx and Were Trained to Dodge Questions About Cardiovascular Risks. ............. 126

D.  Summary of Principal Criticisms and Findings Concerning  Merck's Post-withdrawal Analysis and Reporting of Cardiovascular Data Arising From The APPROVe Trial. ....................................................... 130

23.  Allegation No. 23:  Merck's Claim that the Increased Risk of Cardiovascular Events on Vioxx Has Been Observed Only After 18 Months of Continuous Treatment Is Not Supported by the Data. .................................................................................. 131

24.  Allegation No. 24:  The Article in the New England Journal of Medicine About the APPROVe Trial Cardiovascular Results and Merck's Corrective Statements Were Purposefully Misleading. ................................................................................... 139

25.  Allegation No. 25:  New Data Collected from Patients Who Were Enrolled in the APPROVe Trial Indicate that the Relative Risk of a Cardiovascular Event on Vioxx Increases Almost Immediately – Not After 18 Months as Merck Has Claimed. ...................................................................................... 158

E.  Summary of Principal Criticisms and Findings Concerning Financial Interests of Merck Senior Management. ................................................... 168

26.  Allegation No. 26:  Merck Senior Managers Turned a Blind Eye to the Cardiovascular Risks of Vioxx so as not to Jeopardize Their Compensation. ...................................................... 168

27.  Allegation No. 27:  Merck Senior Executives Traded on Material, Nonpublic Information Concerning Vioxx. ..................... 173

CONCLUSION ............................................................................................ 176

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

## INTRODUCTION

This Report arises from Merck's announcement on September 30, 2004 that it was voluntarily withdrawing Vioxx from the market in light of new data from a Merck-sponsored clinical trial suggesting that Vioxx increased patients' relative risk of cardiovascular adverse events (such as heart attacks and strokes) after 18 months of continuous use. Merck's voluntary withdrawal of Vioxx – a widely used prescription pain medication – triggered immediate, extensive and often negative comments in the media and in personal injury cases against the Company suggesting that members of the Company's senior management were aware that Vioxx posed serious cardiovascular risks to patients and deliberately hid this fact from the public.

As described below, a Special Committee of the Board of Directors of Merck commissioned The Honorable John S. Martin, Jr., Of Counsel to Debevoise & Plimpton LLP, to conduct an independent investigation of senior management's conduct with respect to the cardiovascular safety profile of Vioxx during the period that Vioxx was developed and marketed.[1] Judge Martin and a team of lawyers and paralegals from Debevoise (collectively "Debevoise") spent over 53,000 hours conducting the investigation over a period of approximately twenty months.

In attempting to present the results of the investigation in a manner that is both concise and comprehensive, we have determined that it is best to limit the body of this

---

[1]   Prior to joining the litigation department of Debevoise in 2003, Judge Martin, among various other positions, served for thirteen years as a United States District Judge for the Southern District of New York and for three years as the United States Attorney for the Southern District of New York.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Report to a summary of the principal allegations of wrongdoing that have been made against Merck and our findings and conclusions with respect thereto and to attach to the Report a series of Appendices that discuss in great detail all of the key actions of Merck employees with respect to Vioxx both internally and in their communication with the United States Food and Drug Administration (the "FDA"), the scientific community and the public at large.  This Introduction (i) provides a brief overview of the scientific issues involved, (ii) discusses the formation and mandate of the Special Committee, and (iii) details the scope and conduct of our investigation, including the materials reviewed. The Report then describes the central criticisms asserted against the Company and senior management and presents our findings and conclusions with respect to each such criticism.

## I.

## OVERVIEW OF SCIENTIFIC ISSUES.

Vioxx, an anti-inflammatory agent indicated for the treatment of arthritis, acute pain, and primary dysmenorrhea, was one of a new class of drugs known as "selective Cox-2 inhibitors" that first were introduced to the market in the late 1990s.  The science behind selective Cox-2 inhibitors was new and developing when Vioxx and its leading competitor, Searle/Pfizer's Celebrex,[2] were launched, and the scientific community's understanding of how selective Cox-2 inhibitors operate has continued to evolve.

---

[2]     Searle and Pfizer co-developed Celebrex in the mid-1990s.  At the time, Searle was the pharmaceutical business unit of Monsanto Company.  In April 2000, Pharmacia & Upjohn merged with Monsanto and Searle creating Pharmacia Corporation.  Pharmacia agreed to continue Searle's agreement with Pfizer to co-promote Celebrex.  In April 2003, Pharmacia and Pfizer merged and

Report of John S. Martin, Jr. to the Special Committee                                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                            Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

Before selective Cox-2 inhibitors were developed, the leading drugs on the market

for the treatment of arthritis were non-selective non-steroidal anti-inflammatory drugs

("NSAIDs") – such as aspirin, ibuprofen and naproxen – that operated by inhibiting an

enzyme in the human body called cyclooxygenase ("Cox").  While traditional non-

selective NSAIDs were effective at relieving pain and inflammation, they often led to

gastrointestinal side-effects such as ulcers, perforations and bleeds that were associated

with thousands of deaths each year and severely compromised many patients' quality of

life.  As a result, the FDA required all NSAIDs to include a warning in the label or

package insert concerning gastrointestinal side-effects (the "NSAID-class gastrointestinal

warning").

In the early 1990s, however, scientists discovered that the human body creates

two isoforms of cyclooxygenase:  (i) Cox-1, which protects the lining of the

gastrointestinal tract from ulcers and related injury; and (ii) Cox-2, which is expressed at

sites of pain and inflammation.  Scientists theorized that a drug targeted at suppressing

Cox-2 alone would provide the relief from pain and inflammation of traditional non-

selective NSAIDs (those that inhibited both Cox-1 and Cox-2) without inhibiting Cox-1's

protective effect on the stomach lining.  This breakthrough led to the development of

selective Cox-2 inhibitors.

---

began operating as Pfizer.  http://www.pfizer.com/pfizer/history/2003.jsp.  We refer to either or both
companies as Searle/Pfizer in connection with Celebrex in this Report.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

In late 1997, before Vioxx was approved for sale in the United States, Dr. Garret FitzGerald*, a highly regarded expert on prostaglandins at the University of Pennsylvania and a long-time consultant to Merck Research Laboratories ("MRL"), raised a theoretical question about the cardiovascular safety of Vioxx and other selective Cox-2 inhibitors. The question arose from a clinical trial that Dr. FitzGerald* had conducted with Vioxx (and a similar trial that he had conducted with Celebrex) in which he found that inhibition of Cox-2 suppressed urinary excretion of a metabolite of prostacyclin, a hormone-like substance that dilates blood vessels and inhibits blood clotting. Some scientists, including Dr. FitzGerald*, theorized that this meant that suppression of Cox-2 inhibited the creation of prostacyclin in the vasculature. Scientists previously had known that Cox-1 mediates the production of thromboxane, a counterpart to prostacyclin that has the opposite effect: it constricts blood vessels and promotes clotting. Dr. FitzGerald* thus hypothesized that by inhibiting Cox-2 and not Cox-1, selective Cox-2 inhibitors might cause an imbalance between prostacyclin and thromboxane that could place patients in a prothrombotic state and thus put them at increased risk for heart attacks and strokes (the "FitzGerald prostacyclin hypothesis"). Merck's clinical outcomes data on Vioxx did not at that time provide any support for Dr. FitzGerald's* hypothesis, nor did Merck have any other evidence to suggest that Vioxx was prothrombotic in humans.

The FDA approved Vioxx in May 1999, five months after it had approved Celebrex. One of Merck's principal regulatory and marketing objectives for Vioxx was

---

*     Throughout this Report, we identify scientists and others external to Merck with an "*" following their name.

- 4 -

Report of John S. Martin, Jr. to the Special Committee                                      September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

to prove to the FDA's satisfaction that Vioxx caused fewer gastrointestinal side effects

than traditional non-selective NSAIDs and thus that the FDA should not require Vioxx to

carry the standard NSAID-class gastrointestinal warning included on all NSAID labels.

Although Merck had hoped that the FDA would agree based on then-available clinical

data that Vioxx did not require the standard warning, the FDA believed that additional

data would be required in order to eliminate the warning.

In 1999, Merck commenced a clinical trial in rheumatoid arthritis patients, called

the Vioxx Gastrointestinal Outcomes Research trial (the "VIGOR Trial"), to determine if

Vioxx provided greater gastrointestinal safety than naproxen, a traditional non-selective

NSAID. Data from the trial were blinded (meaning that MRL did not know which

patients were receiving Vioxx and which were receiving naproxen) until March 9, 2000.

The VIGOR Trial proved the Cox-2 hypothesis – that Vioxx caused fewer

gastrointestinal complications than the non-selective NSAID comparator – but a

statistically significantly greater number of patients in the Vioxx group of the trial

experienced a serious cardiovascular adverse event than in the naproxen group. Although

the absolute numbers were small – based on unadjudicated data available in March 2000,

92 of the 4,047 patients in the Vioxx arm of the study were reported to have experienced

a serious cardiovascular event compared to 46 of the 4,029 patients in the naproxen arm –

the VIGOR Trial data raised a serious, and no longer merely theoretical, question about

the cardiovascular safety of Vioxx.

After reviewing the VIGOR Trial data in detail and analyzing data from a number

of other Merck clinical trials, including two ongoing trials that tested Vioxx against

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

placebo, scientists at MRL came to the view that the between-treatment difference in the cardiovascular event rates most likely was caused not by any prothrombotic effect of Vioxx but instead by a cardioprotective effect of the comparator drug, naproxen. Traditional NSAIDs were long understood to temporarily block platelet aggregation due to their inhibition of Cox-1, although none except aspirin had been proven in large clinical trials to provide cardioprotection.  Because naproxen was one of the longest-acting traditional non-selective NSAIDs and provided a relatively high degree of platelet inhibition, MRL scientists believed that its antiplatelet effects had provided cardioprotection to patients in the naproxen arm of the trial.  In other words, they came to believe that Vioxx had not increased the incidence of cardiovascular events, but that naproxen had reduced it.

Merck submitted to the FDA complete data from the VIGOR Trial, including cardiovascular data up through the February 10, 2000 reporting cut-off date, in June 2000.  In February 2001, the FDA convened an Advisory Committee to review, among other things, results of the VIGOR Trial.  The FDA medical reviewers involved in the label negotiations did not agree with Merck that the VIGOR Trial cardiovascular data could be explained simply by a cardioprotective effect of naproxen, noting that no such protective effect of naproxen had been demonstrated in any prospectively designed clinical trial.  The FDA medical reviewers tasked with reviewing data from the VIGOR Trial and other Merck clinical trials did not think that the existing data were sufficient to show that Vioxx did not increase cardiovascular risk.  When Merck and the FDA in April 2002 reached agreement on changes to the Vioxx label to reflect data from the VIGOR

- 6 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Trial, the revised label included cardiovascular information in the "Precaution" section, but not in the "Warning" section, and did not make reference to naproxen cardioprotection as an explanation for the VIGOR Trial cardiovascular results.

From March 2000 through September 2004, the scientific community debated the meaning and importance of the VIGOR Trial cardiovascular data. Scientists, including MRL scientists, conducted a number of epidemiological (or observational) studies regarding the cardiovascular profiles of Vioxx and naproxen. These studies generated inconsistent results. MRL scientists continued to analyze pooled cardiovascular data from the Vioxx clinical program, which they believed confirmed that Vioxx did not pose a cardiovascular risk and that the cardiovascular differential seen in the VIGOR Trial was attributable to a protective effect of naproxen.

In late 2002, Merck instituted a study called Protocol 203 that would combine and analyze cardiovascular data from three placebo-controlled clinical trials – the Adenomatous Polyp Prevention on Vioxx trial (the "APPROVe Trial"), the Vioxx Prostate Cancer Prevention trial (the "ViP Trial") and the Vioxx Colorectal Cancer Therapy Optimal Regime trial (the "VICTOR Trial") – that were designed to test the efficacy of Vioxx in preventing certain cancers. In September 2004, the External Safety Monitoring Board for the APPROVe Trial noted that the difference in the incidence of cardiovascular events between the Vioxx and placebo arms of the study, which the Board members had been monitoring for some time, was statistically significant. Although the APPROVe Trial, which had enrolled patients for a 36-month period, was just weeks from completion, the External Safety Monitoring Board recommended, based on the

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

cardiovascular data, that the study be stopped and that MRL scientists be unblinded to the data.

After reviewing the cardiovascular data from the APPROVe Trial, Dr. Peter Kim, who became the President of MRL in 2002, recommended that Vioxx be withdrawn from the worldwide market, a conclusion that Merck's Management Committee and Board of Directors endorsed.

These events have given rise to a host of criticisms of and allegations against the Company and its senior management. In connection with our investigation, Debevoise has collected and reviewed such criticisms, including those expressed in newspapers, in scientific journals, in pleadings filed in personal injury and shareholder litigation, in expert reports, at trials, and by members of Congress.

## II.

## FORMATION AND MANDATE OF THE SPECIAL COMMITTEE.

Within weeks of Vioxx's withdrawal, the number of personal injury lawsuits filed against Merck soared. In addition, the United States Securities and Exchange Commission ("SEC"), the United States Department of Justice ("DOJ"), the FDA, and three separate Congressional committees began to investigate the cardiovascular risks associated with Vioxx and the Company's development, testing and marketing of the product. On October 29, 2004, Merck's Board of Directors received a letter from a lawyer representing Merck shareholders who demanded that the Board "take legal action against Raymond V. Gilmartin, the Chairman of the Board, Chief Executive Officer and

Report of John S. Martin, Jr. to the Special Committee                    September 5, 2006
of the Board of Directors of Merck & Co., Inc.                              Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

President of the Company and any other individuals responsible for causing the damage

to the Company with respect to any improper marketing of Vioxx."[3]

In light of these developments, on November 23, 2004, Merck's Board of

Directors formed a Special Committee of six outside directors to conduct an internal

investigation of senior management's conduct with respect to Vioxx.[4]  In light of "the

Board's responsibility to examine and resolve whether management properly executed its

duties with respect to the study and disclosure of the cardiovascular safety profile of

Vioxx," the Special Committee was instructed to "make recommendations to the full

Board on the appropriate disposition of shareholder demands and other requests to the

Board related to Vioxx."[5]

The Board authorized the Special Committee to retain outside counsel and other

consultants, as necessary.  On December 6, 2004, Judge Martin and Debevoise were

retained to conduct a comprehensive investigation of the actions of Merck's senior

management prior to Merck's voluntary withdrawal of Vioxx and to provide other legal

advice to the Committee.

On May 22, 2006, MRL scientists became aware of an error in an article

describing the APPROVe Trial cardiovascular data that had been published in the New

---

[3]   10/29/04 demand letter from J. Abraham* (on behalf of E. Fagin* and J. Fagin*) to the Board of
      Directors of Merck.

[4]   The Special Committee is composed of:  William G. Bowen (Chairman), Lawrence A. Bossidy,
      William N. Kelley, Rochelle B. Lazarus, Samuel O. Thier, and Peter C. Wendell.

[5]   Minutes of 11/23/04 Merck Board of Directors meeting, MRK-MIAA0004155, at 56.

- 9 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

England Journal of Medicine in February 2005.  Because the error was potentially

relevant to the accuracy of certain of the article's conclusions, it was brought to the

attention of the full Board on May 23, 2006 at a regularly scheduled meeting.  At that

meeting, the Board extended the Special Committee's mandate to include investigation of

the error in the APPROVe article and, more broadly, review of post-withdrawal analyses

and reporting of cardiovascular data arising from the APPROVe Trial.  The Special

Committee in turn directed Judge Martin and Debevoise to extend the investigation.

### III.

### SCOPE AND CONDUCT OF THE INVESTIGATION.

From the outset, the Special Committee's overarching directive to Judge Martin

was to conduct a comprehensive, independent and objective investigation.  Judge Martin

was instructed to evaluate and report on senior management's integrity with regard to the

development, testing and marketing of Vioxx and, in particular, to determine whether

management acted ethically and with scientific integrity in analyzing cardiovascular-

related clinical data, in establishing clinical trials to investigate any cardiovascular risks,

in reporting cardiovascular-related data to the FDA, in communicating the cardiovascular

data accurately to the public, and in describing the cardiovascular risk in product

labeling.

Judge Martin also was instructed to evaluate the accuracy and integrity of

Merck's press releases relating to Vioxx's cardiovascular profile, to determine whether

senior management inappropriately attempted to influence the Company's scientific

beliefs with respect to Vioxx's cardiovascular profile, and to determine whether senior

- 10 -

Report of John S. Martin, Jr. to the Special Committee                              September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                      Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

management's directions to sales and marketing personnel accurately reflected the

Company's scientific beliefs at the time.

The Special Committee further instructed Judge Martin and the Debevoise team

(i) to collect and review all relevant documents, both from within the Company and in the

possession of advisors, counsel and other third parties who might have relevant

information,[6] and (ii) to conduct interviews of Company directors, employees and others

who might have information relevant to the investigation.

In addition, the Special Committee authorized Debevoise to retain expert

consultants to assist in its evaluation and analysis of scientific and regulatory issues.

With the advice and consent of the Special Committee, Debevoise retained

(i) Dr. R. Wayne Alexander*, a prominent cardiologist who chairs the Department of

Medicine at Emory University's School of Medicine; (ii) Nancy L. Buc*, Esq., former

Chief Counsel to the FDA, a recognized expert on FDA regulatory matters and a member

of the law firm Buc & Beardsley; and (iii) Dr. Ralph B. D'Agostino, Sr.*, a leading

biostatistician who is Professor of Mathematics, Statistics and Public Health at Boston

University, Director of the Boston University Statistics and Consulting Unit, and

co-principal investigator of the Framingham Heart Study contract, with the assistance of

Dr. Michael Pencina*, who is Research Assistant Professor of Statistics at Boston

University's Statistics and Consulting Unit.

---

[6]     We have not reviewed any documents that the Company has claimed are protected by the
       attorney-client privilege or the work product doctrine.  The Special Committee retained special
       counsel to review these documents.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The Special Committee asked to be kept apprised of the progress of the

investigation and to be notified immediately of any evidence that appeared to reflect

negatively on the integrity of senior management.  The Special Committee also asked for

and received monthly progress reports.  Throughout the investigation, Judge Martin was

instructed to report all findings to the Special Committee candidly and objectively

without regard to the potential consequences to the Company or any of its current or

former directors, officers or employees.

### IV.

### MATERIALS REVIEWED.

**A.      Documents Produced by Merck in Products Liability Cases,
         Shareholder and ERISA Litigation and Government Investigations.**

As indicated above, the Special Committee's investigation did not occur in a

vacuum:  beginning prior to and continuing throughout the investigation, Merck was

engaged in products liability and shareholder litigation with thousands of plaintiffs

around the country and was the subject of investigations by the SEC, the DOJ, the FDA

and three Congressional committees:  (i) the Senate Committee on Finance, chaired by

Senator Charles E. Grassley[*]; (ii) the House Committee on Government Reform, chaired

by Congressman Tom Davis[*]; and (iii) the House Committee on Energy and Commerce,

chaired by Congressman Joseph L. Barton[*].

In responding to discovery requests by civil plaintiffs and to government and

Congressional subpoenas, the Company has produced over 23 million pages of

documents, computer files and electronic mail, including, but not limited to:  Board

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

materials; files (including electronic mail files) of current and former Merck employees who were principally involved in developing, testing or marketing Vioxx; minutes, notes and other records of all meetings of Merck's cross-disciplinary and departmental committees involved in the development, testing and marketing of Vioxx; FDA submissions and correspondence concerning Vioxx; Vioxx-related marketing and sales materials; press releases and other public statements concerning Vioxx; SEC filings made during the relevant period; published articles, clinical trial protocols, clinical trial data, standard operating procedures, data analysis plans and adverse event reports relating to Vioxx clinical trials; other internal Merck communications concerning the development, testing, marketing and withdrawal of Vioxx; communications concerning the drafting of, and subsequent correction to, the article on the APPROVe Trial published in the New England Journal of Medicine; and Merck's post-withdrawal analysis and reporting of cardiovascular data arising from the APPROVe Trial.

**B.      Documents Submitted by Merck to the FDA in Connection
with Advisory Committee Meetings Related to Vioxx.**

Between April 1999 and February 2005, the FDA convened three expert panels, consisting of outside independent experts, to review certain safety issues relating to Vioxx. These panels, called Advisory Committees, provide the FDA with the benefit of receiving outside expert recommendations. In general, the Committees invite pharmaceutical company scientists and FDA reviewers to make written submissions about the issue under review, and then hold public hearings, which are transcribed. The FDA Advisory Committees then make recommendations to the FDA.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The first such Advisory Committee meeting concerning Vioxx was held on April 20, 1999, to discuss the original New Drug Application for Vioxx. The second Advisory Committee meeting was convened on February 8, 2001, to review the data from the VIGOR Trial and Merck's supplemental New Drug Application for Vioxx. The third meeting was held from February 16 through 18, 2005, after Vioxx was withdrawn from the market, for the purpose of reviewing and evaluating the safety of the entire class of selective Cox-2 inhibitors, including whether to recommend that the FDA allow Vioxx to be marketed again.

On February 18, 2005, the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee recommended at a joint meeting by a vote of 17-to-15 that Vioxx be allowed back on the market with appropriate warnings.[7] The findings and recommendations of the joint Advisory Committee were then reviewed by the FDA, which issued a memorandum on April 6, 2005 discussing the results of its review.[8]

Debevoise reviewed all background materials submitted by Merck to the three Advisory Committees, reviewed the hearing transcripts and, in the case of the February 2005 Joint Advisory Committee, attended the hearings and reviewed the findings and position statements.

---

[7]   Minutes of 2/16/06 – 2/18/06 Joint Meeting of the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-AID0012816, at 27-28.

[8]   4/6/05 memorandum from J. Jenkins* and P. Seligman* (FDA Position Paper), MRK-AFK0222697-715.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

C.    **Documents Collected from External Sources.**

Debevoise also reviewed Vioxx-related materials collected from sources external to Merck.  These materials included (i) scientific literature concerning Vioxx, other selective Cox-2 inhibitors and non-selective NSAIDs, including journal articles published before and during the investigation, (ii) documents produced by third parties in the civil litigation, (iii) press coverage concerning Vioxx, (iv) a large sampling of the personal injury and securities-related complaints filed against Merck in state and federal court, and (v) expert reports filed in connection with civil complaints.

## V.

## WITNESSES INTERVIEWED AND PRIOR TESTIMONY.

Over the course of the investigation, Debevoise interviewed approximately 115 people, including Merck employees, former employees, directors and outside consultants to Merck, and conducted many follow-up interviews, for a total of over 150 interviews. Exhibit 2 to this Report identifies all persons interviewed by Debevoise.

In addition, Debevoise reviewed the testimony of approximately 70 Merck witnesses who testified at civil depositions, before the FDA or before Congressional committees, and reviewed all exhibits used in connection with such testimony. Debevoise also monitored closely the eight Vioxx-related personal injury trials that occurred during the course of our investigation:  Ernst v. Merck (Texas state court); Humeston v. Merck (New Jersey state court); Plunkett v. Merck (federal court in Texas); Garza v. Merck (Texas state court); McDarby/Cona v. Merck (New Jersey state court);

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Doherty v. Merck (New Jersey state court); Grossberg v. Merck (California state court);

and Barnett v. Merck (federal court in Louisiana).

As is true in any non-governmental investigation, Debevoise did not have

subpoena power and therefore was dependent upon the voluntary cooperation of persons

with relevant information.  Although the vast majority of the people we contacted took

the time to speak with us, a small number of former Merck employees, including

Drs. Carolyn Cannuscio, Laura Demopolous, Peter DiBattiste, Karen Grosser, Eve Slater

and Rhoda Sperling, were not willing to take the time.  Although interviewing these

witnesses might have enhanced our understanding of certain relevant facts and assisted

our investigation, in light of the substantial information and evidence, including

documentary evidence, to which Debevoise had access, we believe it unlikely that

interviewing any of these former employees would have revealed new or different facts

that would materially alter our conclusions.

## VI.

## THE SCOPE AND FORMAT OF THIS REPORT.

The Special Committee's principal concern was to determine whether senior

management of the Company acted with integrity throughout the period that Vioxx was

developed and marketed to the public.  Thus, the Committee directed Judge Martin and

the Debevoise team to focus on whether anyone in senior management believed that

Vioxx was prothrombotic, intentionally acted to deceive the FDA or the public

concerning the safety of Vioxx, or failed or refused to perform necessary tests or clinical

trials in order to avoid disclosing suspected or demonstrated safety risks.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The Committee did not ask us to attempt to second guess decisions concerning the development or marketing of Vioxx that were made in good faith.  This Report will not attempt, therefore, to pass judgment on the wisdom of each of the actions that Merck employees took in the course of the development and marketing of Vioxx.

We should note also that our investigation has focused on the issue of intentional wrongdoing and that we have not attempted to answer the question whether the conduct of Merck's employees should give rise to civil liability.  As the results in the Vioxx civil litigation have demonstrated, different juries under different legal instructions have reached, and may continue to reach, different conclusions concerning the same conduct.

We have set forth in exhaustive detail in the twenty Appendices to this Report all of the relevant events in the development and marketing of Vioxx for two important reasons:  First, in judging whether Merck's senior management acted with integrity with respect to any particular matter, it was important to understand the overall factual context in which they were operating.  For example, in determining whether someone deliberately attempted to hide a critical fact when that fact was not disclosed in a particular document, it is important to know whether that same person disclosed that fact in another document or in other contexts.  Similarly, whether a person's statement of an opinion was intended to deceive may depend upon the extent to which the person making the statement disclosed all of the data necessary to evaluate that opinion.

Second, and perhaps most important, we recognize that given the extensive controversy that has developed concerning Merck's actions with respect to Vioxx, the Board may determine to release our Report to the shareholders and the public.  The

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

authors of this Report have had enough experience in dealing with matters of public

concern to know that the mere fact that a particular lawyer or group of lawyers has come

to a conclusion will not put to rest the public's concern about a particular controversy.

Thus, it is important for the public to have as extensive a record as possible against which

it can judge the conclusions we reach herein.  It is our hope that by providing a very

detailed set of Appendices, we will enable all of those who have serious questions about

the conduct of Merck's management to draw their own conclusions based on the facts as

we have set them forth.  We obviously hope that they will agree with our conclusions,

but, at a minimum, we hope that they will agree that we have engaged in a rigorous and

comprehensive review of the facts and have set forth those facts in an unbiased manner

that will allow others to formulate their own conclusions.