**Dedrick v. Merck & Co., Inc.**
**Deposition Designations for Stanley**

| | Objections<br>In Dedrick | Responses<br>In Dedrick |
|---|---|---|

6:12   -   6:20     Stanley A 20061107
    6 12          Q.   Good morning, Dr. Stanley.
    6 13          A.   Good morning.
    6 14          Q.   We met a moment ago.  But for the record,
    6 15          I'm Carrie Jablonski, and I'm from Bartlit Beck, and
    6 16          I represent Merck.  Do you understand that?
    6 17          A.   Yes.
    6 18          Q.   Great.  Can you please state your full
    6 19          name for the record?
    6 20          A.   Alfred W.H. Stanley, Junior.

7:12   -   7:20     Stanley A 20061107
    7 12          Q.   And we're here to discuss a medical test
    7 13          that was conducted on Mr. Dedrick on September 27th
    7 14          2006 in these offices; is that your understanding?
    7 15          A.   Yes, ma'am.
    7 16          Q.   And that test was a nuclear stress test.
    7 17          And we'll come back to exactly what that means, but
    7 18          that's your understanding of the test that was
    7 19          conducted here?
    7 20          A.   Yes.

8:19   -   9:5      Stanley A 20061107
    8 19          Dr. Stanley, if you can, tell us a little
    8 20          bit about your background.  For instance, where did
    8 21          you graduate medical school?
    8 22          A.   I graduated from medical school at the
    8 23          University of Florida.  I did two years' training at
    8 24          Medical College of Georgia, got drafted in the
    8 25          Vietnam War, and then came back and finished my
    9  1          training at University of Alabama, stayed on the
    9  2          staff at the University of Alabama for several years
    9  3          and then came here in 1974 to start this program,
    9  4          this cardiology program.  And I'm the director of
    9  5          this program and an interventional cardiologist.

9:18   -   9:21     Stanley A 20061107
    9 18          Q.   And this program is called what, the name
    9 19          of your practice?
    9 20          A.   The name of this practice is
    9 21          Cardiovascular Consultants of Alabama.

10:7   -   10:11    Stanley A 20061107
    10  7         Q.   So where we're sitting today is
    10  8         Cardiovascular Consultants of Alabama, and that's
    10  9         located, I guess, next to the Carraway Hospital
    10 10         facility?
    10 11         A.   Yes.

12:10  -   12:17    Stanley A 20061107
    12 10         Q.   Do patients typically come to this clinic
    12 11         to get nuclear stress tests done?

|  |  |  | **Objections In Dedrick** | **Responses In Dedrick** |
|---|---|---|---|---|
| | 12 12 | A.  Yes, they do. | | |
| | 12 13 | Q.  How frequently? | | |
| | 12 14 | A.  I would say probably half of the nuclear | | |
| | 12 15 | tests done here are done on our patients, and the | | |
| | 12 16 | other half are done -- that are referred in from | | |
| | 12 17 | other patients in the area. | | |
| 12:18 - 12:21 | | Stanley A 20061107 | | |
| | 12 18 | Q.  When you say referred in from other | | |
| | 12 19 | patients in the area -- | | |
| | 12 20 | A.  Referred in, I'm sorry, from other doctors | | |
| | 12 21 | in the area, yeah. | | |
| 13:19 - 14:1 | | Stanley A 20061107 | | |
| | 13 19 | Q.  So just to briefly summarize, about half | | |
| | 13 20 | of your patients that receive nuclear stress tests | | |
| | 13 21 | here are either regular patients or new patients? | | |
| | 13 22 | A.  Right. | | |
| | 13 23 | Q.  And about half of the patients who receive | | |
| | 13 24 | a nuclear stress test here at these offices are | | |
| | 13 25 | referred by other doctors to you; is that correct? | | |
| | 14  1 | A.  Exactly, right. | | |
| 14:15 - 14:18 | | Stanley A 20061107 | | |
| | 14 15 | Q.  Is it safe to say, Doctor, that a patient | | |
| | 14 16 | usually has a nuclear stress test done when they're | | |
| | 14 17 | experiencing some sort of symptoms? | | |
| | 14 18 | A.  Yes. | | |
| 19:14 - 20:1 | | Stanley A 20061107 | | |
| | 19 14 | So the jury knows where we are today, is | | |
| | 19 15 | it correct that we're in Birmingham, Alabama? | | |
| | 19 16 | A.  Yes. | | |
| | | | **Re: [19:17-20:1]** **Pltf Obj** 401, 403; lack of personal knowledge | **Re: [19:17-20:1]** **Def Resp** Mr. Dedrick had testing done solely for purposes of litigation, and that testing was arranged and paid for by Beasley Allen. The doctor has heard of Beasley Allen, and knows that Mr. Dedrick came to his clinic by way of Beasley Allen.  It is relevant to understand the extent of his knowledge surrounding these peculiar circumstances. |
| | 19 17 | Q.  Have you ever been -- first of all, do you | | |
| | 19 18 | know what law firm represents Mr. Dedrick in this | | |
| | 19 19 | lawsuit? | | |
| | 19 20 | A.  No. | | |
| | 19 21 | Q.  Have you heard of the law firm Beasley | | |
| | 19 22 | Allen? | | |
| | 19 23 | A.  Yes, sir. | | |
| | 19 24 | Q.  Do you know that Beasley Allen is located | | |
| | 19 25 | in Montgomery, Alabama? | | |
| | 20  1 | A.  I didn't know that. | | |
| 20:5 - 20:22 | | Stanley A 20061107 | | |
| | 20  5 | Q.  And are you aware, Doctor, that | | |
| | 20  6 | Mr. Dedrick actually lives in Tennessee? | | |
| | 20  7 | A.  No.  I read about Mr. Dedrick for the | | |
| | 20  8 | first time last night. | | |
| | 20 13 | Q.  So you didn't know that Mr. Dedrick lives | **Re: [20:13-21:17]** **Pltf Obj** 401, 403; lack of personal knowledge and lack of foundation | **Re: [20:13-21:17]** **Def Resp** Dr. Stanley is the head physician at his small practice, |
| | 20 14 | over 150 miles away from this office? | | |
| | 20 15 | A.  No. | | |
| | 20 16 | Q.  Do you happen to know how Mr. Dedrick got | | |

|  | Objections<br>In Dedrick | Responses<br>In Dedrick |
|---|---|---|

```
20 17        to your offices from Tennessee?
20 18        A.  I do know how he got here.  And it's kind
20 19        of a peculiar story.  We were talking about it just
20 20        a minute ago.  But there is a nurse -- and I assume
20 21        that she works for this law firm.  I'm not sure of
20 22        that.

20:23  -  21:17   Stanley A 20061107
20 23        Q.  And law firm -- Beasley -- Beasley Allen is
20 24        the law firm you're referring to?
20 25        A.  Her name is Teresa Gober, and she's a
21  1        nurse that used to work in Carraway.  And she was a
21  2        very good nurse.  And she's a friend of the nurse
21  3        who is our office manager.  And over time -- and I
21  4        don't know how long she's not worked as a nurse.
21  5        Apparently, she works as a nurse for the law firm
21  6        now.  But over time she's called the office to have
21  7        an exercise test done or maybe to have an echo
21  8        done.  How many, I cannot tell you.  How many years,
21  9        I don't know, probably three, four, five years,
21 10        maybe longer than that.  But we can find that out.
21 11        The way that Mr. Dedrick got here, I
21 12        assume -- at least this is what my office manager
21 13        has told me -- was that we were called.  Teresa said
21 14        that she needed an exercise test done and could we
21 15        do it.  And we did it like we've done before, just
21 16        like we would for Dr. Wade or Dr. Hill that have an
21 17        office ten miles down the road.

22:10  -  22:23   Stanley A 20061107
22 10        Q.  Okay.  Dr. Stanley, are there doctors that
22 11        do what you do in Tennessee?
22 12        A.  I'm sure there are.
22 13        Q.  And are there doctors who perform nuclear
22 14        stress tests in Tennessee?
22 15        A.  I'm sure there are.
22 16        Q.  Okay.  But in this case Mr. Dedrick
22 17        traveled from Tennessee to Alabama to have a nuclear
22 18        stress test done here at your facilities in
22 19        Birmingham, Alabama; is that correct?
22 20        A.  He had it done here.  And, as I said
22 21        before, I have no idea why he came.  I just know
22 22        that he was here and he had the test done, and
22 23        that's all very well documented.

23:11  -  23:24   Stanley A 20061107
23 11        Q.  And so you've never met Mr. Dedrick?
23 12        A.  No, ma'am.
23 13        Q.  You've never had a conversation with
23 14        Mr. Dedrick?
23 15        A.  No, ma'am.
23 16        Q.  You've never examined Mr. Dedrick?
23 17        A.  No, ma'am.
23 18        Q.  You've never recommended treatment for
23 19        Mr. Dedrick?
23 20        A.  Absolutely not.
23 21        Q.  Okay.  And it's safe to say from
```

Objections column:

Re: [22:10-22:23]
**Pltf Obj** 401, 403; lack of personal knowledge and lack of foundation

Responses column:

and the supervising physician of Mr. Dedrick's test. His knowledge of how Mr. Dedrick came to his practice is highly relevant because that is evidence that this testing was conducted for purposes of litigation, as opposed to some other medical purpose (especially where Mr. Dedrick had not otherwise seen a cardiologist since 2003).  The doctor does have knowledge of this ("I do know how he got here. And it's kind of a peculiar story"), as well as this type of referral happening in the past.

Re: [22:10-22:23]
**Def Resp** Mr. Dedrick traveled to another state to get this testing done. Whether Dr. Stanley knows of doctors who perform the same procedures in Mr. Dedrick's home state is relevant to understanding the reasons why Mr. Dedrick traveled to a doctor near his lawyers' offices, as opposed to having the procedure done by his local doctors.

|  |  |  | Objections In Dedrick | Responses In Dedrick |
|---|---|---|---|---|
| 23 22 |  | everything you're saying that you're not |  |  |
| 23 23 |  | Mr. Dedrick's regular doctor? |  |  |
| 23 24 |  | A.  No, I'm not. |  |  |
| 24:23 - 25:1 | Stanley A 20061107 |  |  |  |
| 24 23 |  | Q.  Doctor, so this was not a situation in | **Re: [24:23-25:6]** **Pltf Obj** 401 | **Re: [24:23-25:6]** **Def Resp** Relevant to showing that test was not conducted in the normal course of treating a patient |
| 24 24 |  | your normal course of treating a patient where you |  |  |
| 24 25 |  | got concerned about the patient's symptoms and then |  |  |
| 25  1 |  | ordered a nuclear stress test? |  |  |
| 25:3 - 25:6 | Stanley A 20061107 |  |  |  |
| 25  3 |  | A.  No, ma'am.  I have never talked with the |  |  |
| 25  4 |  | patient.  I didn't know if the patient had symptoms |  |  |
| 25  5 |  | or not.  I didn't know if the patient had any heart |  |  |
| 25  6 |  | disease. |  |  |
| 25:17 - 25:20 | Stanley A 20061107 |  | **Re: [25:17-25:22]** **Pltf Obj** 401, 801 | **Re: [25:17-25:22]** **Def Resp** As the supervising physician of a nuclear stress test, it is relevant as to whether the doctor knew why the patient was getting the test. What the doctor -- who was responsible for the test -- knew about why the patient showed up for testing is important. Half of his patients are referred by other doctors, and that, in this case, a patient showed up at his doorstep, not referred by his treating physicians, is relevant. |
| 25 17 |  | Q.  Were you aware that it was one of |  |  |
| 25 18 |  | Mr. Dedrick's experts rather than any of his |  |  |
| 25 19 |  | treating physicians that recommended he get this |  |  |
| 25 20 |  | nuclear stress test done? |  |  |
| 25:22 - 25:22 | Stanley A 20061107 |  |  |  |
| 25 22 |  | A.  No. |  |  |
| 25:23 - 25:25 | Stanley A 20061107 |  | **Re: [25:23-26:7]** **Pltf Obj** 401, 403, 801; lack of personal knowledge and lack of foundation | **Re: [25:23-26:7]** **Def Resp** Same as above. |
| 25 23 |  | Q.  Were you aware that none of Mr. Dedrick's |  |  |
| 25 24 |  | treating physicians recommended that he get the |  |  |
| 25 25 |  | stress test done? |  |  |
| 26:2 - 26:5 | Stanley A 20061107 |  |  |  |
| 26  2 |  | A.  No, ma'am. |  |  |
| 26  3 |  | Q.  Were you aware that the nuclear stress |  |  |
| 26  4 |  | test conducted on Mr. Dedrick was conducted for the |  |  |
| 26  5 |  | purposes of litigation? |  |  |
| 26:7 - 26:7 | Stanley A 20061107 |  |  |  |
| 26  7 |  | A.  Absolutely not. |  |  |

|  |  |
|---|---|
| **Objections In Dedrick** | **Responses In Dedrick** |

```
29:6   -   29:9     Stanley A 20061107
    29  6       Q.   Doctor, are you aware of any of your
    29  7            colleagues working with the Beasley Allen law firm
    29  8            in the past?
    29  9       A.   I'm not aware of that, no.

29:19  -  29:22    Stanley A 20061107
    29 19       Q.   And it's your understanding that
    29 20            Ms. Teresa Gober was the one who called up this
    29 21            medical clinic and asked to set up an appointment
    29 22            for Mr. Dedrick for a nuclear stress test?

29:24  -  30:8     Stanley A 20061107

    29 24       A.   That's my understanding, yes.
    29 25       Q.   And is it your understanding that that
    30  1            call came out of the blue, so to speak?
    30  2       A.   Yes, yes.  And I don't -- I think it was a
    30  3            considerable time ago.  I don't think it was
    30  4            yesterday or the day before.  I think it was weeks
    30  5            to months ago, I think.
    30  6            As I've said, we've done this once or
    30  7            twice before for this nurse.  And I -- we're not
    30  8            going to do it again.  We've done it before.

30:9   -  30:14    Stanley A 20061107
    30  9       Q.   And, Doctor, I'm not suggesting that
    30 10            there's anything wrong whatsoever with evaluating
    30 11            somebody that comes to you from Teresa Gober.  I'm
    30 12            just trying to understand the circumstances here.
    30 13            Do you understand that?
    30 14       A.   I understand.  I understand.

31:10  -  31:22    Stanley A 20061107
    31 10       Q.   And you still haven't met Mr. Dedrick?
    31 11       A.   If he walked through the door, I would not
    31 12            know who he was.
    31 13       Q.   You just happened to be the doctor on call
    31 14            when Mr. Dedrick came in for his appointment?
    31 15       A.   I was the physician in the clinic
    31 16            overseeing, here for people being -- having exercise
    31 17            tests, yes.
    31 18       Q.   The day that Mr. Dedrick was in your
    31 19            clinic you were the supervising physician?
    31 20       A.   Right.
    31 21       Q.   For nuclear stress tests?
    31 22       A.   Right.

33:5   -   33:9    Stanley A 20061107
    33  5       Q.   Just to be clear did you see Mr. Dedrick
    33  6            when he was in your offices?
    33  7       A.   No, ma'am.
    33  8       Q.   So he didn't complain of any symptoms to
    33  9            you?

33:11  -  33:11    Stanley A 20061107
```

Objections / Responses for [29:19-30:8]:

**Re: [29:19-30:8]**
**Pltf Obj** 401, 403, 801; lack of personal knowledge

**Re: [29:19-30:8]**
**Def Resp** Relevant to show that this test was set up not for traditional, medical reasons. Teresa Gober is the nurse associated with Beasley Allen. Doctor's response illustrates that he views this as an abnormal situation, and that he is not comfortable with this type of practice going forward. The jury is entitled to know that this testing -- conducted two months before trial -- was done under unusual circumstances.

|  |  |  | **Objections In Dedrick** | **Responses In Dedrick** |
|---|---|---|---|---|
| | 33 11 | A.   No. | | |
| 33:14 - 33:17 | | Stanley A 20061107 | | |
| | 33 14 | Q.   Did you review any of Mr. Dedrick's | | |
| | 33 15 | medical records prior to his having the nuclear | | |
| | 33 16 | stress test done? | | |
| | 33 17 | A.   No, ma'am. | | |
| 33:23 - 34:7 | | Stanley A 20061107 | | |
| | 33 23 | You mentioned that about a half of your | | |
| | 33 24 | patients who receive a nuclear stress test are | | |
| | 33 25 | regular patients of the office or new patients and | | |
| | 34 1 | about half of the patients who receive a nuclear | | |
| | 34 2 | stress test are referred by other doctors; is that | | |
| | 34 3 | correct? | | |
| | 34 4 | A.   Yes, ma'am. | | |
| | 34 5 | Q.   Would you call Mr. Dedrick an exception to | **Re: [34:5-34:7]** | **Re: [34:5-34:7]** |
| | 34 6 | those two circumstances? | **Pltf Obj** 401 | **Def Resp** Same as |
| | 34 7 | A.   Yes, ma'am. | | above. |
| 34:8 - 34:10 | | Stanley A 20061107 | | |
| | 34 8 | Q.   So it was unusual that Mr. Dedrick had a | | |
| | 34 9 | nuclear stress test done here at your clinic that | | |
| | 34 10 | day? | | |
| 34:12 - 34:12 | | Stanley A 20061107 | | |
| | 34 12 | A.   No, it wasn't unusual.  We -- no, our | | |
| 34:13 - 34:19 | | Stanley A 20061107 | | |
| | 34 13 | laboratories are service organizations just like | | |
| | 34 14 | McDonalds, and people come by for the test.  And how | | |
| | 34 15 | they get here is a number of ways that they can get | | |
| | 34 16 | here. | | |
| | 34 17 | Q.   And the way he got here isn't how the | | |
| | 34 18 | typical patient usually gets here? | | |
| | 34 19 | A.   Right. | | |
| 36:2 - 36:6 | | Stanley A 20061107 | | |
| | 36 2 | Q.   Do you know who Anita Glover is? | | |
| | 36 3 | A.   That's our office manager. | | |
| | 36 4 | Q.   That's the office manager you've been | | |
| | 36 5 | talking about? | | |
| | 36 6 | A.   Uh-huh. | | |
| 36:17 - 36:19 | | Stanley A 20061107 | | |
| | 36 17 | Q.   Doctor, is it typical for your patients to | **Re: [36:17-36:21]** | **Re: [36:17-36:21]** |
| | 36 18 | have their lawyers or their lawyers' representatives | **Pltf Obj** 401, 403; lack | **Def Resp** That the |
| | 36 19 | accompany them to the doctor's office? | of personal knowledge | doctor doesn't see his |
| 36:21 - 36:21 | | Stanley A 20061107 | (See 35:20-35:24 – he | patients coming in |
| | | | doesn't know who came | with lawyers on a |
| | 36 21 | A.   No. | with Dedrick) | regular basis is |
| | | | | relevant to showing |
| 39:4 - 39:7 | | Stanley A 20061107 | | what was unusual |
| | 39 4 | Q.   Is it rare that you would order a nuclear | | about Mr. Dedrick's |
| | | | | situation. |

|  | Objections<br>In Dedrick | Responses<br>In Dedrick |
|---|---|---|

```
      39   5        stress test to be done when a patient is feeling
      39   6        well?
      39   7        A.   No.  There's some --

45:25  -  46:5      Stanley A 20061107
      45  25        Q.   Dr. Stanley, do you know a man named Andy
      46   1        Birchfield?
      46   2        A.   No.
      46   3        Q.   What about a woman named Leigh O'Dell?
      46   4        A.   Who?
      46   5        Q.   Leigh O'Dell.

55:12  -  55:22     Stanley A 20061107
      55  12        Q.   If you'll turn to the next page, which I
      55  13        believe is actually page four.  It says at the top,
      55  14        Cardiovascular Consultants of Alabama.  That's, again,
      55  15        your clinic, right?
      55  16        A.   Yes.
      55  17        Q.   Pre-procedure checklist.  Do you see that?
      55  18        A.   Yes.
      55  19        Q.   And then it says treadmill or
      55  20        pharmaceutical stress test.  And, again, Mr. Dedrick
      55  21        had the pharmaceutical stress test, right?
      55  22        A.   Yes, ma'am.

56:15  -  56:22     Stanley A 20061107
      56  15        So is this checklist something that you typically
      56  16        fill out for patients before you give them a nuclear
      56  17        stress test?
      56  18        A.   Yes.
      56  19        Q.   Okay.  And I just want to walk through a
      56  20        couple things on this page.  You can see here that
      56  21        when -- where it says, History of heart attack, it's
      56  22        checked, yes, right?

57:18  -  58:2      Stanley A 20061107
      57  18        Q.   Okay.  If we go down the page under, Other
      57  19        medical history, we see that high blood pressure is
      57  20        checked, correct?
      57  21        A.   Uh-huh.
      57  22        Q.   And diabetes is checked?
      57  23        A.   Uh-huh.
      57  24        Q.   And cholesterol increased is checked as
      57  25        well?
      58   1        A.   Uh-huh.  And all of his medications go
      58   2        along with that.

58:6   -  58:19     Stanley A 20061107

      58   6        Q.   And on the right-hand side under smoker,
      58   7        which box is checked?
      58   8        A.   Yes.
      58   9        Q.   And how much does it say that Mr. Dedrick
      58  10        smoked?
      58  11        A.   One pack a day for 30 years.
      58  12        Q.   Okay.  Going down two sections there's a
      58  13        section called Family History, mother, father,
```

|  |  | Objections<br>In Dedrick | Responses<br>In Dedrick |
|---|---|---|---|
| 58 14 | sister, and brother.  Do you see that section? | | |
| 58 15 | A.   Yes. | | |
| 58 16 | Q.   Is anything filled out in this section? | | |
| 58 17 | A.   No. | | |
| 58 18 | Q.   Do you know why that would be? | | |
| 58 19 | A.   No. | | |

59:20  -  59:23   Stanley A 20061107
- 59 20   Doctor, is it standard protocol before a
- 59 21   nuclear stress test to ask about family history of a
- 59 22   patient?
- 59 23   A.   It should be, yes.

67:12  -  67:20   Stanley A 20061107
- 67 12   Q.   So for one of your regular patients you
- 67 13   typically discuss the results of the nuclear stress
- 67 14   test with your patient, correct?
- 67 15   A.   Yes.
- 67 16   Q.   And for a patient that's referred to you
- 67 17   from another doctor, you'll typically discuss the
- 67 18   results of the test with that referring doctor; is
- 67 19   that correct?
- 67 20   A.   Or fax him a copy of the test, yes.

68:3  -  68:13   Stanley A 20061107

| | | | |
|---|---|---|---|
| 68  3 | Q.   Here it's safe to say since you never | **Re: [68:3-68:13]** | **Re: [68:3-68:13]** |
| 68  4 | talked to Mr. Dedrick you did not have a discussion | **Pltf Obj** 401, 403 | **Def Resp** As the supervising physician, it is relevant that he never discussed the results with Dedrick or one of Dedrick's doctors (which is his normal practice). |
| 68  5 | with Mr. Dedrick about the test results? | | |
| 68  6 | A.   No. | | |
| 68  7 | Q.   And is it safe to say that since there was | | |
| 68  8 | no doctor that referred Mr. Dedrick to you that the | | |
| 68  9 | results weren't faxed out to any referring doctor? | | |
| 68 10 | A.   Well, they were obviously faxed to the | | |
| 68 11 | attorneys.  And I didn't -- I can't answer that | | |
| 68 12 | question honestly.  I don't know.  I don't think | | |
| 68 13 | this was sent to anyone except to the attorneys. | | |

68:18  -  68:20   Stanley A 20061107
- 68 18   Q.   Would you say that's unusual in your
- 68 19   practice?
- 68 20   A.   Yes.

69:4  -  69:21   Stanley A 20061107
- 69  4   Dr. Stanley, do you know any of
- 69  5   Mr. Dedrick's regular doctors?  For instance, do you
- 69  6   know a Dr. Herrera, from Waynesboro, Tennessee?
- 69  7   A.   No, ma'am.
- 69  8   Q.   A Dr. William Coltharp from Nashville,
- 69  9   Tennessee?
- 69 10   A.   No, ma'am, I do not.
- 69 11   Q.   Dr. Mark Koenig also from Nashville,
- 69 12   Tennessee?
- 69 13   A.   No.
- 69 14   Q.   What about Dr. John McPherson, again from
- 69 15   Nashville, Tennessee?
- 69 16   A.   No.
- 69 17   Q.   And you don't have any knowledge of any of

|  |  |  | **Objections In Dedrick** | **Responses In Dedrick** |
|---|---|---|---|---|
| 69 18 |  | Mr. Dedrick's regular doctors recommending that he |  |  |
| 69 19 |  | get a stress test within the last couple of months |  |  |
| 69 20 |  | before his trial? |  |  |
| 69 21 |  | A.  No, ma'am. |  |  |
| 71:8 - 72:4 | Stanley A 20061107 |  |  |  |
| 71  8 |  | Q.  Do you recognize Exhibit 3 as a check from | **Re: [71:8-74:3]** | **Re: [71:8-74:3]** |
| 71  9 |  | the Beasley Allen law firm to your clinic, | **Pltf Obj** 401, 403 | **Def Resp** See earlier |
| 71 10 |  | Cardiology [sic] Consultants of Alabama? |  | responses. That |
| 71 11 |  | A.  Yes, ma'am. |  | Beasley Allen wrote |
| 71 12 |  | Q.  And the check is dated September 25th |  | the check for Mr. |
| 71 13 |  | 2006.  Do you see that? |  | Dedrick's testing is |
| 71 14 |  | A.  I do. |  | critical to |
| 71 15 |  | Q.  And the amount of the check is $1,491.  Do |  | understanding the |
| 71 16 |  | you see that? |  | unusual |
| 71 17 |  | A.  Uh-huh, I do. |  | circumstances |
| 71 18 |  | Q.  And this check is dated two days before |  | surrounding this |
| 71 19 |  | Mr. Dedrick received his nuclear stress test.  Do |  | testing conducted on |
| 71 20 |  | you recognize that? |  | the eve of trial. |
| 71 21 |  | A.  Uh-huh, yes, ma'am. |  |  |
| 71 22 |  | Q.  So it looks like Beasley Allen prepaid for |  |  |
| 71 23 |  | Mr. Dedrick's stress test? |  |  |
| 71 24 |  | A.  Looks that way. |  |  |
| 71 25 |  | Q.  Now, it's not your regular practice for a |  |  |
| 72  1 |  | law firm to pay for the test for one of your -- for |  |  |
| 72  2 |  | one of the patients for whom you conduct a nuclear |  |  |
| 72  3 |  | stress test? |  |  |
| 72  4 |  | A.  No. |  |  |
| 73:20 - 73:21 | Stanley A 20061107 |  |  |  |
| 73 20 |  | Q.  Okay.  Thank you.  Is it typical for a |  |  |
| 73 21 |  | patient to prepay for a test that's done? |  |  |
| 73:23 - 74:1 | Stanley A 20061107 |  |  |  |
| 73 23 |  | A.  No, ma'am. |  |  |
| 73 24 |  | Q.  So it's unusual that the payment here |  |  |
| 73 25 |  | received from Mr. Dedrick's attorneys would be dated |  |  |
| 74  1 |  | two days before the actual test was conducted? |  |  |
| 74:3 - 74:3 | Stanley A 20061107 |  |  |  |
| 74  3 |  | A.  It's unusual, yes, ma'am. |  |  |
| 74:10 - 75:8 | Stanley A 20061107 |  |  |  |
| 74 10 |  | Q.  Dr. Stanley, I'm handing you what's been | **Re: [74:10-77:13]** | **Re: [74:10-77:13]** |
| 74 11 |  | marked as Stanley Exhibit 4.  And Stanley Exhibit 4 | **Pltf Obj** 401, 403; lack | **Def Resp** The email |
| 74 12 |  | is an e-mail from Anita Glover, and that's your | of personal knowledge of | concerns an additional |
| 74 13 |  | office manager, correct? | emails and lack of | cost of the test that Dr. |
| 74 14 |  | A.  Uh-huh. | foundation | Stanley supervised. |
| 74 15 |  | Q.  To San Gray.  And I'll represent to you |  | Dr. Stanley is the lead |
| 74 16 |  | that that's somebody that I work with.  And the |  | doctor at his small |
| 74 17 |  | e-mail states, "This is the additional cost.  Jay |  | practice and is familiar |
| 74 18 |  | Parrish is at Beasley Allen.  Hope this is what you |  | with how his tests are |
| 74 19 |  | need."  Do you see that? |  | billed to patients. The |
| 74 20 |  | A.  Yes, I do. |  | email identifies the |
| 74 21 |  | Q.  And this is an e-mail dated yesterday, |  | purpose for the |

|  |  | Objections<br>In Dedrick | Responses<br>In Dedrick |
|---|---|---|---|
| 74 22 | November 6th. Do you see that there? | | additional cost of the test. |
| 74 23 | A.   Yes. | | |
| 74 24 | Q.   Okay. And then so Anita, your office | | |
| 74 25 | manager, sent us this yesterday, November 6th, and | | |
| 75  1 | she attached -- which were on page two and three, so | | |
| 75  2 | if you turn to page two, do you see that there's an | | |
| 75  3 | e-mail from Teresa Gober. And is Teresa Gober the | | |
| 75  4 | legal nurse that we discussed earlier? | | |
| 75  5 | A.   Yes. | | |
| 75  6 | Q.   And this is an e-mail from Teresa Gober to | | |
| 75  7 | Anita Glover, your office manager, correct? | | |
| 75  8 | A.   Yes. | | |
| 76:4  -  76:13 | Stanley A 20061107 | | |
| 76  4 | there's actually another e-mail from Teresa Gober on | | |
| 76  5 | the bottom dated October 19th 2006. Do you see | | |
| 76  6 | that? | | |
| 76  7 | A.   No, October 20th. Oh, I see, yes. | | |
| 76  8 | Q.   So this is an e-mail from Teresa Gober, | | |
| 76  9 | the legal nurse, and it says to Jay Parrish and | | |
| 76 10 | Leigh O'Dell. And we know from the previous page | | |
| 76 11 | that Jay Parrish is at the Beasley Allen law firm, | | |
| 76 12 | the law firm of Mr. Dedrick's lawyers, right? | | |
| 76 13 | A.   Yes. | | |
| 76:18  -  77:1 | Stanley A 20061107 | | |
| 76 18 | again, we're looking at an e-mail from Teresa Gober | | |
| 76 19 | to a couple members of Beasley Allen, Mr. Dedrick's | | |
| 76 20 | law firm. And in the e-mail she states, Could you | | |
| 76 21 | please get this invoice processed for payment to the | | |
| 76 22 | cardiology group -- and that's your group, correct? | | |
| 76 23 | A.   That's my group, yeah. | | |
| 76 24 | Q.   -- as soon as possible. Do you see that | | |
| 76 25 | first sentence? | | |
| 77  1 | A.   Yes. | | |
| 77:10  -  77:13 | Stanley A 20061107 | | |
| 77 10 | Q.   So the second sentence of Teresa Gober's | | |
| 77 11 | e-mail says, This invoice is for the additional | | |
| 77 12 | medication required for Anthony? | | |
| 77 13 | A.   Anthony due to his size. | | |
| 83:21  -  83:22 | Stanley A 20061107 | | |
| 83 21 | Did your office recommend any follow-up | | |
| 83 22 | care for Mr. Dedrick after his nuclear stress test? | | |
| 83:24  -  84:2 | Stanley A 20061107 | | |
| 83 24 | A.   No, we never saw Mr. Dedrick. | | |
| 83 25 | Q.   So you did not recommend any follow-up | | |
| 84  1 | care for Mr. Dedrick after his nuclear stress test? | | |
| 84  2 | A.   No, ma'am, I did not. | | |
| 87:7  -  87:12 | Stanley A 20061107 | | |
| 87  7 | Q.   The questioning here seems to indicate | | |
| 87  8 | there's something sinister going on with Mr. Dedrick | | |
| 87  9 | coming here for his testing. Do you see anything | | |

|  |  | **Objections**<br>**In Dedrick** | **Responses**<br>**In Dedrick** |
|---|---|---|---|
| 87 10<br>87 11<br>87 12 | sinister that's gone on in your observation of these<br>documents?<br>A.   I don't see anything sinister.  I see -- I | | |
| 89:8   -   89:10 | Stanley A 20061107 | | |
| 89  8<br>89  9<br>89 10 | Q.   And the testing that Mr. Dedrick received,<br>was the purpose of that to determine whether or not<br>his heart was functioning properly? | **Re: [89:8-89:13]**<br>**Def Obj** Leading; 602<br>(Counsel rephrases and<br>questions again at<br>89:14) | |
| 89:12  -   89:18 | Stanley A 20061107 | | |
| 89 12<br>89 13<br>89 14<br>89 15<br>89 16<br>89 17<br>89 18 | A.   That was the -- that's the reason we do<br>the test, yes.<br>Q.   Let me re-ask it.  What was the purpose of<br>the nuclear stress test that Mr. Dedrick received on<br>September the 27th 2006?<br>A.   To evaluate if he had any obstructed<br>coronary arteries.  Now, that's a total assumption | | |
| 89:24  -   90:4 | Stanley A 20061107 | | |
| 89 24<br>89 25<br>90  1<br>90  2<br>90  3<br>90  4 | about any other purpose for doing the test.  But I<br>assume that the purpose was to see if the man's<br>heart was okay.<br>Q.   Did you have any idea that Mr. Dedrick was<br>involved in litigation when he was here on the 27th<br>of September 2006? | | |
| 90:6   -   90:9 | Stanley A 20061107 | | |
| 90  6<br>90  7<br>90  8<br>90  9 | A.   Absolutely not, no.<br>Q.   Was he treated any differently than any<br>other patient on September the 27th 2006 because he<br>was involved in litigation? | | |
| 90:12  -   90:12 | Stanley A 20061107 | | |
| 90 12 | A.   No, sir. | | |
| 90:16  -   90:18 | Stanley A 20061107 | | |
| 90 16<br>90 17<br>90 18 | Q.   Was his test administered any differently<br>than it would have been for any other person because<br>Mr. Dedrick was involved in litigation? | **Re: [90:16-90:21]**<br>**Def Obj** Dr. Stanley<br>played no role in<br>administering the actual<br>test (a technician<br>administers the test). | |
| 90:21  -   90:21 | Stanley A 20061107 | | |
| 90 21 | A.   No.  Everything -- all of these things are | | |