# Exhibit E

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX® PRODUCTS LIABILITY LITIGATION | * * * * | MDL Docket No. 1657 |
| | | SECTION L |
| This document relates to | * * | JUDGE FALLON |
| ANTHONY WAYNE DEDRICK | * * | MAGISTRATE JUDGE KNOWLES |
| Plaintiff, | * * | |
| V. | * * | **MERCK'S COVER MEMORANDUM FOR DR. DAVID GRAHAM** |
| MERCK & CO., INC., | * * * | |
| Defendant. | * * | |
| Civil Action No. 2:05cv2524 | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Merck calls the Court's attention to the issue that Merck addressed with the Court in the *Dedrick* pre-trial conference on November 21, 2006 regarding Plaintiff's designations for Dr. David Graham.

Specifically, objects to Dr. Graham's testimony regarding estimates of 88,000-140,000 excess events caused by Vioxx should be excluded from this case on Rule 403 grounds. (*See* 143:3 - 144:18; 152:21-153:13; 204:13-205:6; 463:2-463:18). However, as Merck highlighted for the Court at the Pretrial conference, should the Court be inclined to allow this expansive testimony (as it did in *Smith*), Merck should also be allowed to cross Dr. Graham on the internal FDA emails that go to Dr. Graham's credibility. *See* 313:5-319:7; 325:24 – 333:6; 339:4-23. The Court allowed this testimony in *Smith*.

In *Mason*, the Court allowed testimony on two of these documents, overruling Plaintiff's objections. However, given that Plaintiff decided <u>not</u> to designate any testimony about the objectionable excess events, the Court sustained Plaintiff's objection to two additional emails. Here, Plaintiff's designations <u>do</u> include this excess events testimony (and, in fact, are more expansive than in any trial thus far). If the Court allows the testimony about his estimation of 88,000-140,000 excess deaths and incidents of serious coronary heart disease that Dr. Graham attributes to Vioxx, it is critical that Merck be able to challenge Dr. Graham's credibility and conclusions with the FDA internal emails, just as the Court allowed in *Smith*.

\* \* \*

Counsel for the Plaintiff and Dr. Graham both made several additional statements that should be excluded from this case on Rule 403 grounds:

- **118:18 – 120: 12  (95 bullets testimony)**-- Merck requests the Court re-adopt its ruling in *Barnett* and sustain Merck's objection to Dr. Graham's testimony analogizing Vioxx to a loaded gun and the FDA's use of standard confidence levels in its risk-benefit analysis to a game of Russian Roulette:

  A: [L]et's play Russian roulette. Now, we're going to put 95 bullets in the gun, so we are 95 percent certain that this drug causes whatever adverse reaction we're talking about. Let's just say this drug causes liver failure. This drug causes heart attacks. We're 95 percent certain.

  Q: That's the current test?

  A: Right. So, we put 95 bullets in, and we play Russian roulette. And at that point, the FDA says, we believe you, the gun is loaded, the drug isn't safe. Let's take five bullets out of the chamber. Now we have 90 bullets in the chamber. So there's only 90 percent chance that when I pull the trigger, a bullet is going to come out of the gun. FDA says the gun is not loaded. (Deposition of David Graham, M.D. at 119:1-23.)

2

- **120:18-124:23** – Prejudicial cartoons by Dr. Graham making fun of the FDA and the pharmaceutical industry (referencing fox, henhouses, screaming at lifeguards).

Merck's additional objections relate to testimony where (i) the Court has previously sustained Merck's objection, or (ii) where Plaintiff has never designated the testimony before in any case.

Dated: November 22, 2006

Respectfully submitted,

Phillip A. Wittman, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMAN L.L.C.
546 Carondelet Street
New Orleans, LA 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Mark S. Ouweleen
Carrie A. Jablonski
BARLIT BECK MERMAN PALENCHAR
& SCOTT LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas R. Marvin
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone:  202-434-5000
Fax:      202-434-5029

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Merck & Co.'s COVER MEMORANDUM FOR DR. DAVID GRAHAM has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, on Plaintiff's counsel Andy Birchfield, Jr. by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 22nd day of November, 2006.

/s/ *Dorothy H. Wimberly*

Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|

Plaintiff = Red

Defendant = Blue

33:24 -    34:1       Graham, David 2006-05-09

33 24          Q:  Dr. Graham, good morning.

34 1           A:  Good morning.


34:8       34:10

34 8           8      Q.   You're here under subpoena.

34 9           9   Do you understand that, sir?

34 10          10     A.   Yes.


35:13 -    38:1       Graham, David 2006-05-09

35 13          I would like to know who you

35 14          are, sir. What is your current title and

35 15          position at the FDA?

35 16          A:  I'm a medical officer and

35 17          the associate director for science and

35 18          medicine in the Office of Drug Safety.

35 19          Q:  What does that job involve,

35 20          sir?

35 21          A:  I'm the senior scientific

35 22          adviser for the office. I mentor the

35 23          scientific staff. I advise the office

35 24          director on all scientific and medical

36 1           matters. I oversee intramural and

36 2           extramural research programs within the

36 3           office and serve as a resource to the

36 4           center, the Center For Drug Evaluation on

36 5           epidemiologic matters as well.

36 6           Q:  You are an epidemiologist,

36 7           sir?

36 8           A:  Yes, I am.

36 9           Q:  And you're also a physician?

36 10          A:  That's correct.

36 11          Q:  So, you hold an M.D. degree

36 12          as well; is that correct?

36 13          A:  Yes.

36 14          Q:  And you're a long-time

36 15          employee of the FDA?

36 16          A:  Yes.

36 17          Q:  How many years, sir?

36 18          A:  About 22.

36 19          Q:  This deposition is about

36 20          many of your public statements.

36 21          One you made on November 18,

36 22          2004 to the United States Senate Finance

36 23          Committee. You said, to quote you,

36 24          Vioxx is a terrible tragedy and a

37 1           profound regulatory failure. I would

37 2           argue that the FDA as currently

37 3           configured is incapable of protecting

37 4           America against another Vioxx. We are

37 5           virtually defenseless.' Did you make

37 6           that statement?

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 37 7    A:  Yes, I did. | | |
| 37 8    Q:  You also made a statement on | | |
| 37 9    November 18 before the United States | | |
| 37 10    Senate where you said, 'Vioxx is the | | |
| 37 11    single greatest drug safety catastrophe | | |
| 37 12    in the history of this country.' Did you | | |
| 37 13    make that statement, sir? | | |
| 37 14    A:  Yes, I did. | | |
| 37 15    Q:  Do you stick by that | | |
| 37 16    statement, sir? | | |
| 37 17    A:  I do. | | |
| 37 18    Q:  You also said, 'The FDA, its | | |
| 37 19    Center for Drug Evaluation and Research, | | |
| 37 20    are broken.' Did you make that | | |
| 37 21    statement, sir? | | |
| 37 22    A:  Yes, I did. | | |
| 37 23    Q:  Do you believe that and do | | |
| 37 24    you stick to it today? | | |
| 38 1    A:  Yes, I do. | | |
| | | |
| 39:8 -    40:2    Graham, David 2006-05-09 | | |
| 39 8    Sir, within the FDA, to what | | |
| 39 9    have you devoted your entire professional | | |
| 39 10    activities and professional life? | | |
| 39 11    A:  Post-marketing drug safety | | |
| 39 12    and public health. | | |
| 39 13    Q:  What is post-marketing | | |
| 39 14    safety, sir? | | |
| 39 15    A:  It's examining the safety of | | |
| 39 16    drug products once they've been approved | | |
| 39 17    for marketing. | | |
| 39 18    Q:  Do you have any interest of | | |
| 39 19    any kind in the Vioxx litigation, sir? | | |
| 39 20    A:  No. | | |
| 39 21    Q:  Do you have any financial | | |
| 39 22    interest in any drug company or any other | | |
| 39 23    kind of conflict that you can think of | | |
| 39 24    that you would disclose here? | | |
| 40 1    A:  I have none that I can think | | |
| 40 2    of. | | |
| | | |
| 40:3 -    40:11    Graham, David 2006-05-09 | | |
| 40 3    Q:  Today, sir, are you here on | | |
| 40 4    behalf of the FDA as an FDA | | |
| 40 5    representative or are you expressing your | | |
| 40 6    own opinions? | | |
| 40 7    A:  Well, I've been -- I | | |
| 40 8    honestly don't know the answer. I've | | |
| 40 9    been subpoenaed as an FDA employee, but | | |
| 40 10    undoubtedly some of my opinions will not | | |
| 40 11    represent those of the agency. | | |
| | | |
| 40:20 -    41:13    Graham, David 2006-05-09 | | |
| 40 20    You have a Bachelor's Degree | | |
| 40 21    from Johns Hopkins; is that correct? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 40 22    A:  Yes. | | |
| 40 23    Q:  In what year, sir? | | |
| 40 24    A:  1976. | | |
| 41 1    Q:  You graduated Phi Beta | | |
| 41 2    Kappa? | | |
| 41 3    A:  Correct. | | |
| 41 4    Q:  Meaning? | | |
| 41 5    A:  That's a scholastic honorary | | |
| 41 6    society that's awarded to people who | | |
| 41 7    graduate in the top of their class. | | |
| 41 8    Q:  Then you went to medical | | |
| 41 9    school where, sir? | | |
| 41 10    A:  Johns Hopkins University. | | |
| 41 11    Q:  You graduated second in your | | |
| 41 12    class? | | |
| 41 13    A:  That's correct. | | |
| | | |
| 41:18 -    41:21    Graham, David 2006-05-09 | | |
| 41 18    Q:  You then went on to get a | | |
| 41 19    Master's Degree in public health, is that | | |
| 41 20    correct? | | |
| 41 21    A:  Yes. | | |
| | | |
| 41:22    42:16 | | |
| 41 22         22       Q.   Tell us about that.  Where | | |
| 41 23         23   did you get the Master in public health, | | |
| 41 24         24   and what did that involve? | | |
| 42 1          1        A.   I went to the Johns Hopkins | | |
| 42 2          2   University School of Public Health and | | |
| 42 3          3   spent eleven months studying | | |
| 42 4          4   epidemiology, biostatistics and computer | | |
| 42 5          5   science, as well as some course work in | | |
| 42 6          6   general public health matters.  It was | | |
| 42 7          7   part of a three-year fellowship in | | |
| 42 8          8   epidemiology with the Public Health | | |
| 42 9          9   Service. | | |
| 42 10         10       Q.   That epidemiology fellowship | | |
| 42 11         11   was actually at the Food & Drug | | |
| 42 12         12   Administration? | | |
| 42 13         13       A.   That's correct. | | |
| 42 14         14       Q.   So, that's how you got your | | |
| 42 15         15   first involvement at the FDA? | | |
| 42 16         16       A.   Yes. | | |
| | | |
| 42:17 -    43:1    Graham, David 2006-05-09 | | |
| 42 17    Q:  You're a career FDA person | | |
| 42 18    then? | | |
| 42 19    A:  Yes. | | |
| 42 20    Q:  You did an internship and | | |
| 42 21    residency at Yale first; is that correct? | | |
| 42 22    A:  Yes. | | |
| 42 23    Q:  Then you did a residency in | | |
| 42 24    neurology? | | |
| 43 1    A:  Correct. | | |
| | | |
| 43:2    43:11 | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 43 2     2    Q.   Which is a subspecialty of | | |
| 43 3     3    medicine, of course, correct? | | |
| 43 4     4      A.   Well, no.  It's independent | | |
| 43 5     5    of internal medicine.  It's a separate | | |
| 43 6     6    discipline. | | |
| 43 7     7      Q.   Yes.  In other words, you | | |
| 43 8     8    did an internship and residency in | | |
| 43 9     9    internal medicine, then you did another | | |
| 43 10    10    residency, correct? | | |
| 43 11    11      A.   Correct. | | |
| | | |
| 43:12 -   44:22      Graham, David 2006-05-09 | | |
| 43 12    Q:  A second residency? | | |
| 43 13    A:  Yes. | | |
| 43 14    Q:  That second residency being | | |
| 43 15    at the University of Pennsylvania? | | |
| 43 16    A:  Correct. | | |
| 43 17    Q:  So, you have an internship | | |
| 43 18    at Yale, residency at Penn in neurology | | |
| 43 19    and then your training in epidemiology? | | |
| 43 20    A:  Right. | | |
| 43 21    Q:  Your epidemiology training | | |
| 43 22    was three years? | | |
| 43 23    A:  Three years. | | |
| 43 24    Q:  What is the -- and if you | | |
| 44 1    could be precise, what is the study of | | |
| 44 2    epidemiology? | | |
| 44 3    A:  Epidemiology, I think, is | | |
| 44 4    the study of the causes and distribution | | |
| 44 5    of diseases in populations. And in the | | |
| 44 6    area of drug epidemiology, it is looking | | |
| 44 7    at the distribution and causes of | | |
| 44 8    drug-induced injuries, but you could also | | |
| 44 9    be looking for the patterns of the way | | |
| 44 10    drug products are used in the population. | | |
| 44 11    Q:  Okay. | | |
| 44 12    How have you used | | |
| 44 13    epidemiology during your entire | | |
| 44 14    professional life? | | |
| 44 15    A:  It's been in the practice of | | |
| 44 16    pharmacoepidemiology or drug safety. | | |
| 44 17    Q:  And what is | | |
| 44 18    pharmacoepidemiology, sir? | | |
| 44 19    A:  It's a fancy word for drug | | |
| 44 20    safety epidemiology, 'pharmaco' referring | | |
| 44 21    to drugs, 'epidemiology,' study of the | | |
| 44 22    distribution and causes of disease. | | |
| | | |
| 47:8 -   47:19      Graham, David 2006-05-09 | | |
| 47 8    Q:  Along the way, sir, in your | | |
| 47 9    career at the FDA, have you received many | | |
| 47 10    different awards? | | |
| 47 11    A:  Yes, I have. | | |
| 47 12    Q:  As well as honors? I think | | |
| 47 13    it's called in your curriculum vitae | | |
| 47 14    honors and awards; is that correct? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 47 15 A: Correct. | | |
| 47 16 MR. KLINE: I'm going to | | |
| 47 17 mark your curriculum vitae as | | |
| 47 18 Exhibit 1 so we have it as part of | | |
| 47 19 this record. | | |
| | | |
| 48:9 - 48:11 Graham, David 2006-05-09 | | |
| 48 9 Would you confirm that | | |
| 48 10 indeed that's your curriculum vitae? | | |
| 48 11 A: Yes, it is. | | |
| | | |
| 60:10 - 60:13 Graham, David 2006-05-09 | | |
| 60 10 Q: I would ask you, sir, do you | | |
| 60 11 consider yourself an expert in drug | | |
| 60 12 safety? | | |
| 60 13 A: Yes, I do. | | |
| | | |
| 61:6 - 63:7 Graham, David 2006-05-09 | | |
| 61 6 Q: In what areas of FDA do you | | |
| 61 7 consider yourself expert? | | |
| 61 8 A: I am an expert in areas of | | |
| 61 9 post-marketing drug safety. I am an | | |
| 61 10 expert in areas of interaction between | | |
| 61 11 the reviewing divisions, the preapproval | | |
| 61 12 side of FDA and the postapproval side of | | |
| 61 13 FDA. I'm an expert on the culture of | | |
| 61 14 FDA, on the ways that science is used | | |
| 61 15 within FDA for -- as it relates to drug | | |
| 61 16 safety in particular, but also as it | | |
| 61 17 relates to efficacy. I'm an expert in | | |
| 61 18 the personnel practices of FDA in the | | |
| 61 19 ways that it treats its medical officers, | | |
| 61 20 and there's probably a host of other | | |
| 61 21 areas that relate to life working within | | |
| 61 22 FDA that I've become expert in. | | |
| 61 23 Q: You're a lifer there? | | |
| 61 24 A: Thus far, yes. | | |
| 62 1 Q: Let me -- do you have any | | |
| 62 2 current intention of leaving the FDA? | | |
| 62 3 A: No, not unless I'm forced to | | |
| 62 4 leave. I love the work that I do. | | |
| 62 5 Q: Let me ask you some | | |
| 62 6 questions about your public statements. | | |
| 62 7 You testified before the | | |
| 62 8 United States Senate, Senate Finance | | |
| 62 9 Committee Hearing on drug safety and the | | |
| 62 10 worldwide withdrawal of Merck & Company, | | |
| 62 11 Inc. of Vioxx, November 18, '04; is that | | |
| 62 12 correct? | | |
| 62 13 A: Yes. | | |
| 62 14 Q: You appeared on 60 Minutes | | |
| 62 15 on February 16, '05; is that correct? | | |
| 62 16 A: Yes. | | |
| 62 17 Q: You appeared on February 17, | | |
| 62 18 05 before the joint meeting of the | | |
| 62 19 Arthritis Advisory Committee of the Drug | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 62 20 | Safety and Risk Management Advisory | | |
| 62 21 | Committee of the FDA; is that correct? | | |
| 62 22 | A:  Yes. | | |
| 62 23 | Q.  On the Today Show with Katie | | |
| 62 24 | Couric on December 21, '05 you were | | |
| 63 1 | interviewed? | | |
| 63 2 | A.  Was it '05 or '04? | | |
| 63 3 | Q.  '04.  I'm sorry.  '04? | | |
| 63 4 | A.  Yes. | | |
| 63 5 | Q.  On Good Morning America with | | |
| 63 6 | Diane Sawyer on November 19, '04? | | |
| 63 7 | A.  Yes. | | |
| | | | |
| 63:15 -   64:1 | Graham, David 2006-05-09 | | |
| 63 15 | Did you also appear on ABC | | |
| 63 16 | Nightline with Ted Koppel on December 3, | | |
| 63 17 | 04? | | |
| 63 18 | A. Yes, I did. | | |
| 63 19 | Q:  And in many other forums | | |
| 63 20 | relating to Vioxx, the withdrawal of | | |
| 63 21 | Vioxx; is that correct? | | |
| 63 22 | A:  Yes. | | |
| 63 23 | Q:  Do you believe Vioxx is an | | |
| 63 24 | unsafe drug, sir? | | |
| 64 1 | A:  Yes I, do. | | |
| | | | |
| 64:2 -   64:4 | Graham, David 2006-05-09 | | |
| 63 2 | Q.   Do you believe that Merck | | |
| 63 3 | was correct in taking it off the market? | | |
| 63 4 | A.   Yes. | | |
| | | | |
| 64:5 -   64:16 | Graham, David 2006-05-09 | | |
| 64 5 | Q:  Should it ever have been on | | |
| 64 6 | the market in the first place? | | |
| 64 7 | A:  It is my professional | | |
| 64 8 | opinion, based on the evidence that I've | | |
| 64 9 | looked at, that Vioxx should not have | | |
| 64 10 | been approved at the time that it was | | |
| 64 11 | approved, that there were substantial | | |
| 64 12 | areas of concern relating to | | |
| | | | |
| 64 13 | cardiovascular safety that should have | | |
| 64 14 | been explored more fully and more | | |
| 64 15 | thoroughly prior to consideration of an | | |
| 64 16 | approval. | | |
| | | | |
| 65:14   66:6 | | | |
| 65 14 | 14      Q.   Okay. | | |
| 65 15 | 15          Let's talk about the FDA | | |
| 65 16 | 16   itself, area number two. | | |
| 65 17 | 17          The FDA -- sir, on November | | |
| 65 18 | 18   18, '04, before the United States | | |
| 65 19 | 19   Congress you said, "The FDA culture uses | | |
| 65 20 | 20   the pharmaceutical industry as its | | |
| 65 21 | 21   client.  It overvalues the benefits of | | |
| 65 22 | 22   the drugs it approves and seriously | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 65 23    23  undervalues, disregards and disrespects | | |
| 65 24    24  drug safety." Is that a view that you | | |
| 66 1      1  stated before United States Senators | | |
| 66 2      2  appearing in the Senate finance room? | | |
| 66 3      3      A.   Yes. | | |
| 66 4      4      Q.   Is that an opinion that you | | |
| 66 5      5  still hold today? | | |
| 66 6      6      A.   More strongly now than then. | | |
| 66:22   67:11 | | |
| 66 22    22      Q.   Why do you say that, sir? | **[66:22-67:11]** | **Barnett:**  Sustained. |
| 66 23    23  What is your basis? | **Def's Obj.:**  801, 802 - | **Smith:**  Not designated. |
| 66 24    24      A.   In the course of my career, | hearsay. | **Mason:**  Not designated. |
| 67 1      1  I have participated in countless internal | | |
| 67 2      2  meetings with the portion of FDA that | | |
| 67 3      3  reviews and approves new drugs where drug | | |
| 67 4      4  safety questions that occurred either | | |
| 67 5      5  premarketing or post-marketing were | | |
| 67 6      6  brought up and many times were of a | | |
| 67 7      7  serious nature.  And the virtually | | |
| 67 8      8  uniform response was -- from these | | |
| 67 9      9  divisions was to downplay or ignore the | | |
| 67 10    10  work that we did and the statements that | | |
| 67 11    11  we made. | | |
| 69:9    69:18 | | |
| 69 9      9      Q.   Sir, from what you've | | |
| 69 10    10  observed while you, from what I heard you | | |
| 69 11    11  say, disagree with the concept that | | |
| 69 12    12  industry should be the client, is that | | |
| 69 13    13  indeed the way the FDA perceives it, that | | |
| 69 14    14  industry is the client? | | |
| 69 15    15      A.   Yes.  FDA perceives industry | | |
| 69 16    16  as its client as customer number one.  It | | |
| 69 17    17  is a point of view that I completely and | | |
| 69 18    18  totally disagree with. | | |
| 73:14   74:9 | | |
| 73 14    14      Q.   Can Americans be confident | | |
| 73 15    15  that drugs that are on the market by and | | |
| 73 16    16  large are effective in terms of the way | | |
| 73 17    17  that they're approved?  For example, if a | | |
| 73 18    18  drug is a blood pressure drug, can we be | | |
| 73 19    19  confident that that drug will lower your | | |
| 73 20    20  blood pressure? | | |
| 73 21    21      A.   I think, in general, we can | | |
| 73 22    22  be. | | |
| 73 23    23      Q.   Is there an emphasis on that | | |
| 73 24    24  aspect of approval by office of new drug? | | |
| 74 1      1      A.   Yes.  Clinical trials are | | |
| 74 2      2  designed primarily to show the efficacy | | |
| 74 3      3  of a drug.  They're not designed to show | | |
| 74 4      4  the safety of a drug.  And when FDA does | | |
| 74 5      5  its reviews, it spends most of its time | | |
| 74 6      6  reviewing the efficacy.  And that's where | | |
| 74 7      7  the largest teams of individuals are | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 74 8     8   gathered to examine the new drug | | |
| 74 9     9   application. | | |
| | | |
| 74:13    75:24 | | |
| 74 13    13      Is there this group called | | |
| 74 14    14   Office of Drug Safety? | | |
| 74 15    15     A.   Yes. | | |
| 74 16    16     Q.   Is it -- in any way, shape | | |
| 74 17    17   or form is it the size of, the shape of | | |
| 74 18    18   or funded like the Office of New Drugs? | | |
| 74 19    19     A.   No, in terms of funding for | | |
| 74 20    20   the individual staff. It has funding for | | |
| 74 21    21   sort of obligatory FDA operations such as | | |
| 74 22    22   its adverse event reporting system. And | | |
| 74 23    23   so if you were to look at budgetary | | |
| 74 24    24   allocations for our office, you'll see | | |
| 75 1     1   large chunks of money going to these | | |
| 75 2     2   various operations, but they are FDA | | |
| 75 3     3   operations that FDA is obligated to | | |
| 75 4     4   maintain. They happen to be housed in | | |
| 75 5     5   the Office of Drug Safety. The actual | | |
| 75 6     6   budget for the Office of Drug Safety for, | | |
| 75 7     7   say, travel and training, its operating | | |
| 75 8     8   budget, is small. | | |
| 75 9     9     Q.   And in terms of overall, | | |
| 75 10    10   what is the emphasis in the FDA and in | | |
| 75 11    11   CDER, as you've described it, in terms of | | |
| 75 12    12   development and approval of drugs versus | | |
| 75 13    13   drug safety? | | |
| 75 14    14     A.   The primary function of CDER | | |
| 75 15    15   is to move the freight, that is, to | | |
| 75 16    16   review and approve new drugs as quickly | | |
| 75 17    17   as possible and to as large a number as | | |
| 75 18    18   possible. | | |
| 75 19    19     Q.   Is the Office of Drug | | |
| 75 20    20   Safety, in your view, either under -- I | | |
| 75 21    21   was going to say undermanned, but it | | |
| 75 22    22   would be underpersoned or understaffed or | | |
| 75 23    23   underfunded in terms of being able to | | |
| 75 24    24   adequately assess drug safety? | | |
| | | |
| 76:5     76:7 | | |
| 76 5     5     A.   It is my opinion that the | | |
| 76 6     6   Office of Drug Safety is tremendously | | |
| 76 7     7   understaffed and underfunded. | | |
| | | |
| 77:24 -   78:8     Graham, David 2006-05-09 | | |
| 77 24    From what you've heard, my | | |
| 78 1     questions and your answers, would a | | |
| 78 2     layperson have an understanding of the | | |
| 78 3     overall mechanism of the FDA, CDER and | | |
| 78 4     then the Office of New Drugs and Office | | |
| 78 5     of Drug Safety and where they fit in? | | |
| 78 6     Would there be something to add here so | | |
| 78 7     that we understood it any better in broad | | |
| 78 8     brush terms? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 78:13 -    79:10    Graham, David 2006-05-09 | | |
| 78  13    A:  I think it would be | | |
| 78  14    important for people to understand that | | |
| 78  15    in addition to the Office of New Drugs, | | |
| 78  16    there are a number of other offices | | |
| 78  17    within CDER whose purpose is to actually | | |
| 78  18    assist in the review and approval of new | | |
| 78  19    drugs. So, you have the Office of New | | |
| 78  20    Drugs, and that may have 7 or 800 people, | | |
| 78  21    but you have these other offices, as | | |
| 78  22    well, whose primary function is to work | | |
| 78  23    on the premarketing, the preapproval side | | |
| 78  24    of FDA's house, and without them, the | | |
| 79  1    drug couldn't be approved. And when you | | |
| 79  2    take those all together, you end up with | | |
| 79  3    like about 13 or 1400 people whose focus | | |
| 79  4    is getting drugs on the market; if you | | |
| 79  5    compare that to the Office of Drug | | |
| 79  6    Safety, where we have maybe in the | | |
| 79  7    neighborhood of 100 or 110 people | | |
| 79  8    responsible for the safety and monitoring | | |
| 79  9    of the safety of all drug products in the | | |
| 79  10    country. | | |
| 80:19    81:4 | | |
| 80  19    19    Q.  I've seen in a public | | |
| 80  20    20  statement of yours that roughly says that | | |
| 80  21    21  only five percent of the FDA's funding | | |
| 80  22    22  goes into the Office of Drug Safety.  Is | | |
| 80  23    23  that what you've said? | | |
| 80  24    24    A.  Yes. | | |
| 81  1    0081 | | |
| 81  2    1    Q.  And is that correct? | | |
| 81  3    2    A.  That's what it has been in | | |
| 81  4    3  the past based on numbers that were | | |
| 81  5    4  obtained from the web. | | |
| 82:18 -    82:24    Graham, David 2006-05-09 | | |
| 82  18    Q:  What does OND largely rely | | |
| 82  19    upon in approval of drugs? | | |
| 82  20    A:  It relies on documents | | |
| 82  21    supplied to it by a drug company seeking | | |
| 82  22    approval of its drug. | | |
| 82  23    Q.  Only as good as the | | |
| 82  24    information provided? | | |
| 83:2    83:9 | **[83:2-9]** | **Barnett:**  Sustained as to |
| 83  2    THE WITNESS:  Correct. | | line 2. |
| 83  3    3  BY MR. KLINE: | **Def.'s Obj.:**  611c leading | |
| 83  4    4    Q.  Is the information | | **Smith:**  Not designated. |
| 83  5    5  largely -- | | **Mason:**  Not designated. |
| 83  6    6    In fact, is the information | | |
| 83  7    7  exclusively by and large and as the rule, | | |
| 83  8    8  not the exception, information that comes | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 83 9 | 9  from the drug company? | | |

| | | | |
|---|---|---|---|
| 83:13 | 84:10 | | | |
| 83 13 | 13    A.   Yes.  The information that | | |
| 83 14 | 14  FDA scientists base their reviews and | | |
| 83 15 | 15  decisions about approval on are based on | | |
| 83 16 | 16  information supplied to it by the | | |
| 83 17 | 17  pharmaceutical industry in an official | | |
| 83 18 | 18  submission.  FDA scientists do not | | |
| 83 19 | 19  themselves do independent studies or | | |
| 83 20 | 20  independent work relating to the approval | | |
| 83 21 | 21  of those drugs. | | |
| 83 22 | 22    Q.   What has been the problems, | | |
| 83 23 | 23  if any, with that kind of system and | | |
| 83 24 | 24  situation? | | |
| 84 1 | 1    A.   You're dependent on the | | |
| 84 2 | 2  honesty, integrity and truthfulness of | | |
| 84 3 | 3  the drug company, that it will provide | | |
| 84 4 | 4  you with all information, that | | |
| 84 5 | 5  information which helps their cause in | | |
| 84 6 | 6  getting their drug approved, information | | |
| 84 7 | 7  that may call into question the | | |
| 84 8 | 8  effectiveness, the efficacy or the safety | | |
| 84 9 | 9  of their drug.  But it's based on trust | | |
| 84 10 | 10  and -- it's based on trust. | | |

| | | | |
|---|---|---|---|
| 84:20 | 86:18 | | | |
| 84 20 | 20    Q.   You have said publicly in | | |
| 84 21 | 21  statements that there is an institutional | | |
| 84 22 | 22  bias in the FDA which prevents the FDA | | |
| 84 23 | 23  from protecting Americans against unsafe | | |
| 84 24 | 24  drugs.  Do you recall saying that? | | |
| 85 1 | 1    A.   Yes, I do. | | |
| 85 2 | 2    Q.   Is that a correct statement? | | |
| 85 3 | 3    A.   Yes. | | |
| 85 4 | 4    Q.   Tell the members of the jury | | |
| 85 5 | 5  what the basis is for that statement. | | |
| 85 6 | 6    A.   Well, all you have to do | | |
| 85 7 | 7  sort of to see it crystal clear is to | | |
| 85 8 | 8  look at the drugs that have come off the | | |
| 85 9 | 9  market.  These are drugs where FDA | | |
| 85 10 | 10  approved them, and by approving them said | | |
| 85 11 | 11  the drugs were safe and effective, and | | |
| 85 12 | 12  then at some later date they come off the | | |
| 85 13 | 13  market because, a-ha, they're not safe or | | |
| 85 14 | 14  they are not as safe as we thought they | | |
| 85 15 | 15  were.  If we examine how long it takes | | |
| 85 16 | 16  from when the signal of the problem | | |
| 85 17 | 17  emerges to when the drug comes off the | | |
| 85 18 | 18  market, you will see that that is | | |
| 85 19 | 19  measured in years, sometimes in decades. | | |
| 85 20 | 20        With phenylpropanolamine, | | |
| 85 21 | 21  PPA, a drug product present in virtually | | |
| 85 22 | 22  every cough/cold preparation in the | | |
| 85 23 | 23  country, it was in over-the-counter diet | | |
| 85 24 | 24  aids to help people lose weight, was | | |

# Dedrick v. Merck Co., Inc.

## Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 86 1 | 1 | associated with hemorrhagic stroke | | |
| 86 2 | 2 | primarily in young women, and this was | | |
| 86 3 | 3 | known since 1984.  However, it wasn't | | |
| 86 4 | 4 | until about 2000 or 2001 that FDA finally | | |
| 86 5 | 5 | removed that product from the market.  In | | |
| 86 6 | 6 | the meantime, the company that made PPA | | |
| 86 7 | 7 | or the companies that made PPA continued | | |
| 86 8 | 8 | to make profits, and patients continued | | |
| 86 9 | 9 | to be harmed. | | |
| 86 10 | 10 | Q.   I want to just provide a | | |
| 86 11 | 11 | schematic of the FDA insofar as where the | | |
| 86 12 | 12 | Office of Drug Safety fits in that you | | |
| 86 13 | 13 | actually presented in a PowerPoint | | |
| 86 14 | 14 | presentation.  There was a PowerPoint | | |
| 86 15 | 15 | presentation that you apparently gave. | | |
| 86 16 | 16 | You gave many public PowerPoint | | |
| 86 17 | 17 | presentations, correct? | | |
| 86 18 | 18 | A.   Yes. | | |
| | | | | |
| 89:12 | 89:23 | | | |
| 89 12 | 12 | (Whereupon, Deposition | | |
| 89 13 | 13 | Exhibit Graham-2, "Drug Safety in | | |
| 89 14 | 14 | America: A Nation Still at Risk," | | |
| 89 15 | 15 | (Graham) Power Point Slides, | | |
| 89 16 | 16 | DG000035 - DG000061, was marked | | |
| 89 17 | 17 | for identification.) | | |
| 89 18 | 18 | - - - | | |
| 89 19 | 19 | BY MR. KLINE: | | |
| 89 20 | 20 | Q.   Can we identify Exhibit 2, | | |
| 89 21 | 21 | please, sir? | | |
| 89 22 | 22 | A.   Yes.  This is a copy of my | | |
| 89 23 | 23 | PowerPoint presentation. | | |
| | | | | |
| 91:18 | 94:15 | | | |
| 91 18 | 18 | Q.   Now, all I want to do for | | |
| 91 19 | 19 | now is to focus everyone where we are. | | |
| 91 20 | 20 | We are on the structure of the FDA and | | |
| 91 21 | 21 | the problems within the structure.  Are | | |
| 91 22 | 22 | you with me? | | |
| 91 23 | 23 | A.   Uh-huh. | | |
| 91 24 | 24 | Q.   And I want to go to the | | |
| 92 1 | 1 | chart which we've labeled -- we've taken | | |
| 92 2 | 2 | the liberty of putting some numbers on | | |
| 92 3 | 3 | the bottom to help.  And number 40 is an | | |
| 92 4 | 4 | organizational chart.  And if we can | | |
| 92 5 | 5 | highlight in the middle, there's an | | |
| 92 6 | 6 | island in the middle.  That's the Office | | |
| 92 7 | 7 | of Drug Safety, correct? | | |
| 92 8 | 8 | A.   Correct. | | |
| 92 9 | 9 | Q.   What was the point that you | | |
| 92 10 | 10 | were making to your fellow physicians and | | |
| 92 11 | 11 | colleagues on that day that you would | | |
| 92 12 | 12 | make here upon my request? | | |
| 92 13 | 13 | A.   Everything else that is | | |
| 92 14 | 14 | circled on that organizational chart | | |
| 92 15 | 15 | plays some role in the preapproval | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 92 16 | 16  activities of the Center For Drug | | |
| 92 17 | 17  Evaluation.  And what I was trying to | | |
| 92 18 | 18  show is that the Office of Drug Safety is | | |
| 92 19 | 19  this tiny little group that's being | | |
| 92 20 | 20  swallowed by an amoeba, and so it's kind | | |
| 92 21 | 21  of a medical joke that this big sprawling | | |
| 92 22 | 22  mass is engulfing the Office of Drug | | |
| 92 23 | 23  Safety, eating it up. | | |
| 92 24 | 24      Q.   When you call it a, quote, | | |
| 93 1 | 1  medical joke, were you trying to make a | | |
| 93 2 | 2  point? | | |
| 93 3 | 3      A.   Yes. | | |
| 93 4 | 4      Q.   And the point was? | | |
| 93 5 | 5      A.   And the point is that the | | |
| 93 6 | 6  Office of Drug Safety has little in the | | |
| 93 7 | 7  way of resources, little in the -- no | | |
| 93 8 | 8  authority and really no weight or respect | | |
| 93 9 | 9  within the Center For Drug Evaluation, | | |
| 93 10 | 10  that in essence, drug safety is | | |
| 93 11 | 11  dominated -- the Center For Drug | | |
| 93 12 | 12  Evaluation for research is dominated by | | |
| 93 13 | 13  the mindset of review and approve new | | |
| 93 14 | 14  drugs.  Safety is an afterthought. | | |
| 93 15 | 15      Q.   How long have you observed | | |
| 93 16 | 16  that?  How long has that been your | | |
| 93 17 | 17  observation? | | |
| 93 18 | 18      A.   Well, I observed it even | | |
| 93 19 | 19  during my fellowship training, but it has | | |
| 93 20 | 20  accelerated in terms of how forcefully | | |
| 93 21 | 21  it's pursued and enforced by OND | | |
| 93 22 | 22  management, CDER management, since the | | |
| 93 23 | 23  introduction of the Prescription Drug | | |
| 93 24 | 24  User Fee Act in 1992, and that is | | |
| 94 1 | 1  referred to as PDUFA.  And it's by that | | |
| 94 2 | 2  means -- Congress passed a law that was | | |
| 94 3 | 3  specifically designed to speed up the | | |
| 94 4 | 4  review times of drugs that FDA was asked | | |
| 94 5 | 5  to look at by drug companies.  In return, | | |
| 94 6 | 6  drug companies would pay money to FDA so | | |
| 94 7 | 7  that FDA could hire more staff.  And so | | |
| 94 8 | 8  we now have a situation where more than | | |
| 94 9 | 9  50 percent of the Center For Drug | | |
| 94 10 | 10  Evaluation's budget comes from monies | | |
| 94 11 | 11  paid to it by regulated industry. | | |
| 94 12 | 12      Q.   What you're saying is that | | |
| 94 13 | 13  the FDA -- are you saying that the FDA is | | |
| 94 14 | 14  not funded by the citizens of the United | | |
| 94 15 | 15  States of America? | | |
| | | | |
| 94:19      95:3 | | | |
| 94 19 | 19      THE WITNESS:  I am saying | | |
| 94 20 | 20  that the majority of funding for | | |
| 94 21 | 21  the Center for Drug Evaluation and | | |
| 94 22 | 22  Research comes from industry, not | | |
| 94 23 | 23  from tax dollars. | | |
| 94 24 | 24  BY MR. KLINE: | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 95 1 | 1 | Q. Is that, to your | | |
| 95 2 | 2 | understanding, a well-known fact, sir, | | |
| 95 3 | 3 | outside of the pharmaceutical industry? | | |
| | | | | |
| 95:5 | 97:17 | | | |
| 95 5 | 5 | THE WITNESS: I suspect that | | |
| 95 6 | 6 | the public doesn't appreciate | | |
| 95 7 | 7 | who's paying the bills at FDA. | | |
| 95 8 | 8 | BY MR. KLINE: | | |
| 95 9 | 9 | Q. What is the impact on that, | | |
| 95 10 | 10 | sir? What is the impact of 50 percent of | | |
| 95 11 | 11 | the budget coming under this PDUFA act, | | |
| 95 12 | 12 | which is the physician user -- | | |
| 95 13 | 13 | A. Prescription Drug User Fee | | |
| 95 14 | 14 | Act. | | |
| 95 15 | 15 | Q. Prescription Drug User Fee | | |
| 95 16 | 16 | Act. 199 -- | | |
| 95 17 | 17 | A. 2. | | |
| 95 18 | 18 | Q. 1992? | | |
| 95 19 | 19 | A. It's been renewed, I think | | |
| 95 20 | 20 | we're on our third renewal, and they're | | |
| 95 21 | 21 | feverishly working to get the fourth | | |
| 95 22 | 22 | renewal. The impact of this in my own | | |
| 95 23 | 23 | experience has been that the preapproval | | |
| 95 24 | 24 | people look for reasons to say yes to a | | |
| 96 1 | 1 | drug. So, I've been in internal meetings | | |
| 96 2 | 2 | where a drug company wanted an approval | | |
| 96 3 | 3 | for a drug maybe for six different | | |
| 96 4 | 4 | indications. So, those would be things | | |
| 96 5 | 5 | that the drug could be officially | | |
| 96 6 | 6 | promoted for to treat conditions for. | | |
| 96 7 | 7 | And the reviewing division medical | | |
| 96 8 | 8 | officers say this drug shouldn't be | | |
| 96 9 | 9 | approved at all, and then the pressure | | |
| 96 10 | 10 | will be put on the medical officer to | | |
| 96 11 | 11 | say, well, can't we approve it for just | | |
| 96 12 | 12 | one indication, just one indication, a | | |
| 96 13 | 13 | narrow indication. Because all they want | | |
| 96 14 | 14 | to do is to be able to say yes. | | |
| 96 15 | 15 | I've been at other meetings | | |
| 96 16 | 16 | where when safety concerns were expressed | | |
| 96 17 | 17 | and people from our office raised the | | |
| 96 18 | 18 | question of having things put into the | | |
| 96 19 | 19 | label that the FDA people in the Office | | |
| 96 20 | 20 | of New Drugs who have the final | | |
| 96 21 | 21 | authority, they approve the drug and they | | |
| 96 22 | 22 | have the authority to say what happens | | |
| 96 23 | 23 | after the drug is on the market, that | | |
| 96 24 | 24 | they have said we can't do that because | | |
| 97 1 | 1 | the drug companies won't go along with it | | |
| 97 2 | 2 | or that will hurt the drug company's | | |
| 97 3 | 3 | profits. | | |
| 97 4 | 4 | These are remarks that have | | |
| 97 5 | 5 | been passed in internal meetings that I | | |
| 97 6 | 6 | have been present at. And other | | |
| 97 7 | 7 | colleagues of mine have had similar | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | | Objections | Rulings |
|---|---|---|---|---|
| 97 8 | 8 | experiences.  And since I have gone | | |
| 97 9 | 9 | public with my Senate testimony, I have | | |
| 97 10 | 10 | been approached now by probably 10 or 15 | | |
| 97 11 | 11 | medical reviewers from different | | |
| 97 12 | 12 | components of CDER with stories of being | | |
| 97 13 | 13 | pressured to change their reviews where | | |
| 97 14 | 14 | they thought a drug should not be | | |
| 97 15 | 15 | approved, but where management was | | |
| 97 16 | 16 | telling them you must now say yes to that | | |
| 97 17 | 17 | drug. | | |
| | | | | |
| 110:19 | 115:2 | | | |
| 110 19 | 19 | All right.  Now, cultural | | |
| 110 20 | 20 | issues, briefly.  A paragraph, not a | | |
| 110 21 | 21 | chapter. | | |
| 110 22 | 22 | A.   We've talked about it | | |
| 110 23 | 23 | before.  FDA views industry as its | | |
| 110 24 | 24 | primary customer, as its client.  And | | |
| 111 1 | 1 | this gets transmitted to the management. | | |
| 111 2 | 2 | That's how management gets selected, by | | |
| 111 3 | 3 | how well they get along with industry. | | |
| 111 4 | 4 | And it filters downhill.  And so as a | | |
| 111 5 | 5 | result, you have this organization that | | |
| 111 6 | 6 | seeks to work, in quotes, collegially, | | |
| 111 7 | 7 | with industry, we're going to partner | | |
| 111 8 | 8 | with industry.  These are phrases that | | |
| 111 9 | 9 | are frequently used within FDA to | | |
| 111 10 | 10 | describe the relationship that is desired | | |
| 111 11 | 11 | between the regulator and the regulated. | | |
| 111 12 | 12 | Q.   By the way, back to | | |
| 111 13 | 13 | structural issues. | | |
| 111 14 | 14 | Are there not these | | |
| 111 15 | 15 | independent Advisory Committees?  We know | | |
| 111 16 | 16 | you testified in front of an Advisory | | |
| 111 17 | 17 | Committee.  Are these truly independent | | |
| 111 18 | 18 | Advisory Committees? | | |
| 111 19 | 19 | A.   In my opinion, no.  These | | |
| 111 20 | 20 | Advisory Committees are part of the | | |
| 111 21 | 21 | structural problem.  They are selected | | |
| 111 22 | 22 | by -- the members of those committees are | | |
| 111 23 | 23 | generally selected by the division | | |
| 111 24 | 24 | directors within the Office of New Drugs, | | |
| 112 1 | 1 | whose drugs that committee will talk | | |
| 112 2 | 2 | about.  And so they pick people who they | | |
| 112 3 | 3 | know from the field and frequently can | | |
| 112 4 | 4 | talk with those people, will talk with | | |
| 112 5 | 5 | those people about upcoming Advisory | | |
| 112 6 | 6 | Committee meetings and the type of | | |
| 112 7 | 7 | direction that they wish that advisory | | |
| 112 8 | 8 | meeting to go in. | | |
| 112 9 | 9 | If you look at the Advisory | | |
| 112 10 | 10 | Committees in terms of their financial | | |
| 112 11 | 11 | attachments to industry, it's been in the | | |
| 112 12 | 12 | newspapers quite a bit that a third of | | |
| 112 13 | 13 | FDA committee members have financial ties | | |
| 112 14 | 14 | to industry, some large number.  And if | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 112 15 | 15 | you were to look at the Advisory | | |
| 112 16 | 16 | Committee meeting from February of 2005 | | |
| 112 17 | 17 | where we were talking about the | | |
| 112 18 | 18 | nonsteroidal pain relievers and the COX-2 | | |
| 112 19 | 19 | drugs including Vioxx and Celebrex and | | |
| 112 20 | 20 | Bextra and the like -- | | |
| 112 21 | 21 | Q.   Yes. | | |
| 112 22 | 22 | A.   -- the committee was asked | | |
| 112 23 | 23 | two questions.  It was asked one | | |
| 112 24 | 24 | question, should Vioxx be kept off the | | |
| 113 1 | 1 | market or allowed to remain on the | | |
| 113 2 | 2 | market? | | |
| 113 3 | 3 | And it was asked a second | | |
| 113 4 | 4 | question, should Bextra be allowed to | | |
| 113 5 | 5 | stay on the market or should it be | | |
| 113 6 | 6 | withdrawn from the market. | | |
| 113 7 | 7 | And I believe in this | | |
| 113 8 | 8 | handout, I have a slide that combines the | | |
| 113 9 | 9 | votes, it's number 42, that combines the | | |
| 113 10 | 10 | votes -- | | |
| 113 11 | 11 | MR. KLINE:  We can put it | | |
| 113 12 | 12 | up. | | |
| 113 13 | 13 | THE WITNESS:  -- from these | | |
| 113 14 | 14 | committees based on whether the | | |
| 113 15 | 15 | members of the committee had a | | |
| 113 16 | 16 | financial tie with companies that | | |
| 113 17 | 17 | make COX-2 selective NSAIDs or | | |
| 113 18 | 18 | were working to develop COX-2 | | |
| 113 19 | 19 | selective NSAIDs. | | |
| 113 20 | 20 | And what you find is that if | | |
| 113 21 | 21 | you're a committee member who had | | |
| 113 22 | 22 | such a financial tie, you were 13 | | |
| 113 23 | 23 | times more likely to vote to keep | | |
| 113 24 | 24 | Vioxx or Bextra on the market than | | |
| 114 1 | 1 | if you didn't.  And it's highly | | |
| 114 2 | 2 | statistically significant.  So, | | |
| 114 3 | 3 | the question is, well, are these | | |
| 114 4 | 4 | people being influenced -- you | | |
| 114 5 | 5 | know, is the financial tie causing | | |
| 114 6 | 6 | them to vote the way they vote.  I | | |
| 114 7 | 7 | can't answer that question.  But | | |
| 114 8 | 8 | what I can say is that the | | |
| 114 9 | 9 | financial ties, having that | | |
| 114 10 | 10 | financial relationship with the | | |
| 114 11 | 11 | company, is highly predictive of | | |
| 114 12 | 12 | how an individual will vote when | | |
| 114 13 | 13 | it comes to important decisions | | |
| 114 14 | 14 | such as should a drug stay on the | | |
| 114 15 | 15 | market or be removed from the | | |
| 114 16 | 16 | market. | | |
| 114 17 | 17 | BY MR. KLINE: | | |
| 114 18 | 18 | Q.   Let me move through -- you | | |
| 114 19 | 19 | believe you've covered -- I know we went | | |
| 114 20 | 20 | back to structural issues, and there are | | |
| 114 21 | 21 | many, as I think you're telling this | | |
| 114 22 | 22 | jury. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 114 23 | 23 | A.  Yes. | | |
| 114 24 | 24 | Q.  The Advisory Committee being | | |
| 115 1 | 1 | part of it, is that correct? | | |
| 115 2 | 2 | A.  Correct. | | |
| | | | | |
| 115:5 | 117:18 | | | |
| 115 5 | 5 | BY MR. KLINE: | | |
| 115 6 | 6 | Q.  And now cultural issues, | | |
| 115 7 | 7 | sir.  Have we covered them? | | |
| 115 8 | 8 | A.  I think we've covered those | | |
| 115 9 | 9 | fairly well. | | |
| 115 10 | 10 | Q.  Is there a presumption that | | |
| 115 11 | 11 | a drug is safe until it is, as you say in | | |
| 115 12 | 12 | this public statement, proven guilty? | | |
| 115 13 | 13 | A.  Yes.  If you look at the way | | |
| 115 14 | 14 | that drug safety is evaluated in both | | |
| 115 15 | 15 | preapproval and postapproval, the -- | | |
| 115 16 | 16 | what's called the null hypothesis, the | | |
| 115 17 | 17 | assumption is that the drug is safe.  And | | |
| 115 18 | 18 | then what is required is to have | | |
| 115 19 | 19 | overwhelming evidence that says, no, it's | | |
| 115 20 | 20 | not safe before you'll say that the drug | | |
| 115 21 | 21 | is not safe.  And this is done by using a | | |
| 115 22 | 22 | measure called the p-value, which is a | | |
| 115 23 | 23 | measure used by statisticians to talk | | |
| 115 24 | 24 | about how likely or unlikely something is | | |
| 116 1 | 1 | to have occurred by chance.  And the | | |
| 116 2 | 2 | magic number is .05.  If something has a | | |
| 116 3 | 3 | 5 percent or less chance of happening by | | |
| 116 4 | 4 | chance, that is, there's a 95 percent or | | |
| 116 5 | 5 | greater chance that it occurred because | | |
| 116 6 | 6 | of the study that you've done, that the | | |
| 116 7 | 7 | drug works or that it has safety, then | | |
| 116 8 | 8 | we'll believe it.  But if it's only -- if | | |
| 116 9 | 9 | you're only 90 percent sure, we're going | | |
| 116 10 | 10 | to say that the drug is safe. | | |
| 116 11 | 11 | So, for example, we can | | |
| 116 12 | 12 | have -- and we have examples of this in | | |
| 116 13 | 13 | actually the Vioxx NDA, in the new drug | | |
| 116 14 | 14 | application there, where the medical | | |
| 116 15 | 15 | officer saw evidence of increased | | |
| 116 16 | 16 | cardiovascular risk and said, but we | | |
| 116 17 | 17 | cannot be absolutely certain.  And so | | |
| 116 18 | 18 | it's because FDA insists on absolute | | |
| 116 19 | 19 | certainty about safety that it in my | | |
| 116 20 | 20 | estimation gives the companies a free | | |
| 116 21 | 21 | pass on safety. | | |
| 116 22 | 22 | Because no company -- here's | | |
| 116 23 | 23 | the situation.  If I'm going to get a | | |
| 116 24 | 24 | drug approved, well, the assumption that | | |
| 117 1 | 1 | FDA makes is the drug doesn't work.  If | | |
| 117 2 | 2 | I'm a drug company, well, now I have an | | |
| 117 3 | 3 | incentive to do a really good study to | | |
| 117 4 | 4 | show FDA that the drug works.  So, the | | |
| 117 5 | 5 | incentives work in the right direction. | | |
| 117 6 | 6 | The company is going to try to do a | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | | Objections | Rulings |
|---|---|---|---|---|
| 117 7 | 7 | really good job to convince FDA to change | | |
| 117 8 | 8 | its mind about the drug because FDA | | |
| 117 9 | 9 | starts off saying the drug doesn't work. | | |
| 117 10 | 10 | On safety, it's just the | | |
| 117 11 | 11 | reverse.  The bigger and better a study | | |
| 117 12 | 12 | the company does, the more likely it's | | |
| 117 13 | 13 | going to find a problem.  And so | | |
| 117 14 | 14 | companies are actually rewarded for doing | | |
| 117 15 | 15 | small studies that aren't able to show a | | |
| 117 16 | 16 | problem because the assumption is that | | |
| 117 17 | 17 | the drug is safe.  And that is the way | | |
| 117 18 | 18 | FDA misuses statistics at FDA. | | |
| 118:18   120:12 | | | | |
| 118 18 | 18 | Q.   You analogized this in front | | |
| 118 19 | 19 | of the United States Senate to bullets in | | |
| 118 20 | 20 | a gun. | | |
| 118 21 | 21 | A.   Yes. | | |
| 118 22 | 22 | Q.   Would you tell the members | [118:18-120:12] | Barnett: Sustained. |
| 118 23 | 23 | of the jury the same thing so they have | Def. Obj.:  Highly prejudicial | Smith:  Not designated. |
| 118 24 | 24 | the benefit. | (403) 401/402. | Mason:  Not designated. |
| 119 1 | 1 | A.   Right.  I was trying to get | | |
| 119 2 | 2 | the Senators to understand the statistics | | |
| 119 3 | 3 | of the matter, and I gave the analogy of | | |
| 119 4 | 4 | a gun with 100 chambers.  And I said, | | |
| 119 5 | 5 | let's play Russian roulette.  Now, we're | | |
| 119 6 | 6 | going to put 95 bullets in the gun, so we | | |
| 119 7 | 7 | are 95 percent certain that this drug | | |
| 119 8 | 8 | causes whatever adverse reaction we're | | |
| 119 9 | 9 | talking about.  Let's just say this drug | | |
| 119 10 | 10 | causes liver failure.  This drug causes | | |
| 119 11 | 11 | heart attacks.  We're 95 percent certain. | | |
| 119 12 | 12 | Q.   That's the current test? | | |
| 119 13 | 13 | A.   Right.  So, we put 95 | | |
| 119 14 | 14 | bullets in, and we play Russian roulette. | | |
| 119 15 | 15 | And at that point, the FDA says, we | | |
| 119 16 | 16 | believe you, the gun is loaded, the drug | | |
| 119 17 | 17 | isn't safe.  Let's take five bullets out | | |
| 119 18 | 18 | of the chamber.  Now we have 90 bullets | | |
| 119 19 | 19 | in the chamber.  So there's only 90 | | |
| 119 20 | 20 | percent chance that when I pull the | | |
| 119 21 | 21 | trigger, a bullet is going to come out of | | |
| 119 22 | 22 | the gun.  FDA says the gun is not loaded. | | |
| 119 23 | 23 | That's the misuse of statistics. | | |
| 119 24 | 24 | Q.   How can that be? | | |
| 120 1 | 1 | A.   It's a historical artifact, | | |
| 120 2 | 2 | but it is one that is embedded in the way | | |
| 120 3 | 3 | FDA does business. | | |
| 120 4 | 4 | Q.   How should it be, sir? | | |
| 120 5 | 5 | A.   My belief is that it is | | |
| 120 6 | 6 | possible to design studies in advance in | | |
| 120 7 | 7 | which you prespecify a level of risk that | | |
| 120 8 | 8 | you would be willing to tolerate for the | | |
| 120 9 | 9 | anticipated benefit of a drug, and then | | |
| 120 10 | 10 | you design your study large enough to | | |
| 120 11 | 11 | exclude risks greater than that maximum | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | | Objections | Rulings |
|---|---|---|---|---|
| 120 12 | | 12  tolerable risk. | | |
| | | | | |
| 120:18 | 121:1 | | [120:18-124:23] | **Barnett:**  Overruled. |
| 120 18 | | 18         MR. KLINE:  I do want to | **Def.'s Obj.:**  403 (prejudicial | **Smith:**  Not designated. |
| 120 19 | | 19     show Exhibit Number 44, if I may. | cartoons). | **Mason:**  Not designated. |
| 120 20 | | 20     And if we can put it up.  44 to | | |
| 120 21 | | 21     the PowerPoint. | | |
| 120 22 | | 22  BY MR. KLINE: | | |
| 120 23 | | 23         Q.   Now, I know, sir, this is a | | |
| 120 24 | | 24  cartoon, but you did this at a | | |
| 121 1 | | 1   professional meeting, correct? | | |
| | | | | |
| 121:13 | 122:6 | | | |
| 121 13 | | 13  BY MR. KLINE: | | |
| 121 14 | | 14         Q.   It's a cartoon.  On the left | | |
| 121 15 | | 15  side it's side effects.  On the right | | |
| 121 16 | | 16  side it says the lifeguard is the FDA, | | |
| 121 17 | | 17  "Hey, how am I supposed to hear his | | |
| 121 18 | | 18  request for a new drug approval with all | | |
| 121 19 | | 19  your screaming?"  And the pharmaceutical | | |
| 121 20 | | 20  company is to the right.  Were you making | | |
| 121 21 | | 21  a point, sir? | | |
| 121 22 | | 22         A.   Yes, I was. | | |
| 121 23 | | 23         Q.   What was the point?  Were | | |
| 121 24 | | 24  you making a serious point? | | |
| 122 1 | | 1          A.   I was making a very serious | | |
| 122 2 | | 2   point.  This, in my view, crystallizes | | |
| 122 3 | | 3   the situation that we have in the United | | |
| 122 4 | | 4   States today and why I said that the | | |
| 122 5 | | 5   United States was defenseless against | | |
| 122 6 | | 6   another Vioxx. | | |
| | | | | |
| 123:5 | 124:10 | | | |
| 123 5 | | 5   BY MR. KLINE: | | |
| 123 6 | | 6          Q.   Now, again, a cartoon, but | | |
| 123 7 | | 7   were you making a serious point to your | | |
| 123 8 | | 8   medical colleagues at that time and | | |
| 123 9 | | 9   place? | | |
| 123 10 | | 10         A.   Most definitely. | | |
| 123 11 | | 11         Q.   The cartoon shows a fox to | | |
| 123 12 | | 12  the right, and it shows the press corps | | |
| 123 13 | | 13  to the right and a lawyer, of all people, | | |
| 123 14 | | 14  apparently standing there.  And the | | |
| 123 15 | | 15  cartoon says, "Those responsible for | | |
| 123 16 | | 16  putting my client in charge of the | | |
| 123 17 | | 17  henhouse should be on trial here, not my | | |
| 123 18 | | 18  client who, as a fox, was only doing his | | |
| 123 19 | | 19  job."  Who is the fox in the cartoon as | | |
| 123 20 | | 20  you understood it? | | |
| 123 21 | | 21         A.   Is industry. | | |
| 123 22 | | 22         Q.   Pharmaceutical industry? | | |
| 123 23 | | 23         A.   Pharmaceutical industry. | | |
| 123 24 | | 24         Q.   What was the point, the | | |
| 124 1 | | 1   serious point that you were making, | | |
| 124 2 | | 2   albeit in a humorous way?  You apparently | | |
| 124 3 | | 3   have a good sense of humor. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | | Objections | Rulings |
|---|---|---|---|---|
| 124 4 | | 4    A.   I was trying to convey the | | |
| 124 5 | | 5   message that FDA is not functioning in | | |
| 124 6 | | 6   the independent and objective interests | | |
| 124 7 | | 7   of what's best for the public, that it is | | |
| 124 8 | | 8   really functioning first and foremost for | | |
| 124 9 | | 9   a service of its primary customer and | | |
| 124 10 | | 10   client, the industry. | | |
| | | | | |
| 124:17 | 124:18 | | | |
| 124 17 | | 17    Q.   Who is the one who is | | |
| 124 18 | | 18   profiting by the drug? | | |
| | | | | |
| 124:20 | 124:23 | | | |
| 124 20 | | 20        THE WITNESS:  The companies | | |
| 124 21 | | 21      who manufacture and market these | | |
| 124 22 | | 22      drugs are the ones who profit from | | |
| 124 23 | | 23      them. | | |
| | | | | |
| 129:14 - | 129:22 | Graham, David 2006-05-09 | | |
| 129 14 | | Did you find that to be the | | |
| 129 15 | | case in your experience when you had | | |
| 129 16 | | something to say about Vioxx in mid to | | |
| 129 17 | | late 2004? | | |
| 129 18 | | A:  Yes. I experienced threats, | | |
| 129 19 | | intimidation and actually what in my view | | |
| 129 20 | | appears to have been a very organized and | | |
| 129 21 | | orchestrated campaign to smear and | | |
| 129 22 | | discredit me. | | |
| | | | | |
| 133:3 - | 133:9 | | | |
| 133 3 | | By the way, if you see | | |
| 133 4 | | statistical significance in one of these | | |
| 133 5 | | small studies, does that -- is there | | |
| 133 6 | | greater significance to that?  If there's | | |
| 133 7 | | a study that's not powered to show a | | |
| 133 8 | | problem and then you show it anyway, is | | |
| 133 9 | | there more significance to that? | | |
| | | | | |
| 133:12 - | 133:19 | Graham, David 2006-05-09 | | |
| 133 12 | | THE WITNESS:  In my view, | **[133:12-15]** | **Barnett:**  Overruled. |
| 133 13 | | that is an alarming circumstance, | **Def's Obj.:**  Answer without | **Smith:**  No objections. |
| 133 14 | | one that demands intensive | a question. | Testimony played. |
| 133 15 | | scrutiny and attention. | | **Mason:**  Sustained. |
| 133 16 | | BY MR. KLINE: | | |
| 133 17 | | Q:  Did that happen here in the | | |
| 133 18 | | Vioxx story? | | |
| 133 19 | | A:  Yes, it did. | | |
| | | | | |
| 134:3 - | 137:23 | Graham, David 2006-05-09 | | |
| 134 3 | | BY MR. KLINE: | | |
| 134 4 | | Q:  Now, I want to do a topic, | | |
| 134 5 | | efficacy versus benefit. I'd like you to | | |
| 134 6 | | explain to the members of the jury in | | |
| 134 7 | | brief terms why efficacy, which is what | | |
| 134 8 | | we sometimes hear, a drug is efficacious, | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 134 9 | is different than benefit, and how those | | |
| 134 10 | two either equate, in your opinion, or | | |
| 134 11 | don't equate and what the significance | | |
| 134 12 | is, please. | | |
| 134 13 | A:  Okay. Efficacy is, does the | | |
| 134 14 | drug have a biological effect. So, if | | |
| 134 15 | the drug is supposed to treat high blood | | |
| 134 16 | pressure, the efficacy will be, does it | | |
| 134 17 | reduce your blood pressure. So, it's | | |
| 134 18 | reducing a body measurement. That's the | | |
| 134 19 | effect. And if it does that, we say that | | |
| 134 20 | it has efficacy. | | |
| 134 21 | Effectiveness is whether or | | |
| 134 22 | not that drug taken on a regular basis | | |
| 134 23 | will actually give you a health benefit | | |
| 134 24 | long-term. If the drug lowers your blood | | |
| 135 1 | pressure, but doesn't prevent you from | | |
| 135 2 | having heart attacks, strokes, kidney | | |
| 135 3 | failure or dying at a young age, well, | | |
| 135 4 | then, you've spent a lot of money to have | | |
| 135 5 | a lower blood pressure number, but have | | |
| 135 6 | derived no benefit from it. So, what you | | |
| 135 7 | want is, really, when you talk about | | |
| 135 8 | benefit/risk, is you want to look at what | | |
| 135 9 | is sort of the health benefits, the real | | |
| 135 10 | certifiable health benefit that you're | | |
| 135 11 | deriving from a drug versus what are the | | |
| 135 12 | real risks. | | |
| 135 13 | But what FDA frequently | | |
| 135 14 | does, almost always does, is it takes the | | |
| 135 15 | efficacy -- when it says benefits exceed | | |
| 135 16 | the risks, what it's really saying is in | | |
| 135 17 | our estimation, the FDA's estimation, the | | |
| 135 18 | efficacy should lead to a benefit, and we | | |
| 135 19 | say that benefit exceeds the risk. But | | |
| 135 20 | FDA has never done a formal benefit | | |
| 135 21 | analysis on any drug product to my | | |
| 135 22 | knowledge. It certainly did not do one | | |
| 135 23 | with Vioxx when it said that the benefits | | |
| 135 24 | exceeded the risks. | | |
| 136 1 | Q:  Why is it important in the | | |
| 136 2 | Vioxx story to understand that the FDA | | |
| 136 3 | did no risk/benefit analysis as you've | | |
| 136 4 | just said? | | |
| 136 5 | A:  It's because I think if you | | |
| 136 6 | look at the VIGOR study, you're | | |
| 136 7 | confronted with what at least in my read | | |
| 136 8 | is a startling revelation that for every | | |
| 136 9 | complicated perforated ulcer or bleed | | |
| 136 10 | that Vioxx prevented, there were almost | | |
| 136 11 | two thrombotic cardiovascular events that | | |
| 136 12 | were caused by the drug. And so if | | |
| 136 13 | you're talking about benefits and risks, | | |
| 136 14 | here we have a ratio of almost two to one | | |
| 136 15 | where the risks exceed the benefits. | | |
| 136 16 | Now, let's look at what the | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 136 17 | case fatality rates are. Nationally, | | |
| 136 18 | about five percent of people with GI | | |
| 136 19 | bleeds die. And I learned that by going | | |
| 136 20 | to the National Centers For Health | | |
| 136 21 | Statistics and looking at death | | |
| 136 22 | certificate data and then going to the | | |
| 136 23 | National Hospital Discharge Survey and | | |
| 136 24 | looking at how many hospitalizations | | |
| 137 1 | there are for GI bleed. So, you have a | | |
| 137 2 | five percent death rate from GI bleeding. | | |
| 137 3 | In other words, you can have a GI bleed, | | |
| 137 4 | that's a pretty serious thing, you get | | |
| 137 5 | hospitalized for it, but most of the time | | |
| 137 6 | you're not going to die. With heart | | |
| 137 7 | attack, it's about a 40 percent chance | | |
| 137 8 | that you're going to die. So, if what | | |
| 137 9 | we're really interested in is sort of | | |
| 137 10 | benefit/risk, and let's take it to what's | | |
| 137 11 | the most important thing, and that's do I | | |
| 137 12 | live or do I die, in my view, the scales | | |
| 137 13 | are tilted greatly against Vioxx in terms | | |
| 137 14 | of safety versus benefit. | | |
| 137 15 | Q: Okay. | | |
| 137 16 | That risk/benefit analysis | | |
| 137 17 | was or was not done by FDA? | | |
| 137 18 | A: It was not done by FDA. | | |
| 137 19 | Q: In your opinion, had it been | | |
| 137 20 | done, it would have come out the way you | | |
| 137 21 | suggested if it had been correctly and | | |
| 137 22 | diligently and honestly done? | | |
| 137 23 | A: Yes. | | |
| | | | |
| 138:4 -    141:6 | Graham, David 2006-05-09 | | |
| 138 4 | Q: I'm reminded to ask, was | | |
| 138 5 | that risk/benefit done by the company, by | | |
| 138 6 | Merck? | | |
| 138 7 | A: To my knowledge, it was not. | | |
| 138 8 | And I could cite as evidence of that the | | |
| 138 9 | VIGOR study. And in the VIGOR study, | | |
| 138 10 | there's no real mention of weighing the | | |
| 138 11 | benefits and the risks in that study. | | |
| 138 12 | It's kind of implied that the benefits | | |
| 138 13 | exceed the risks, but there's no formal | | |
| 138 14 | analysis of it. | | |
| 138 15 | And it's also very curious | | |
| 138 16 | that in that paper, the most likely | | |
| 138 17 | explanation for the finding wasn't | | |
| 138 18 | addressed, which is the effect of Vioxx | | |
| 138 19 | on prostacyclin, which is the chemical | | |
| 138 20 | made by the body that causes blood | | |
| 138 21 | vessels to dilate and keeps platelets | | |
| 138 22 | from clotting. And what Vioxx does is, | | |
| 138 23 | it blocks the production of prostacyclin | | |
| 138 24 | and makes it more likely that a heart | | |
| 139 1 | attack can happen. And in that VIGOR | | |
| 139 2 | study, which was published in the New | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 139 3 | England Journal of Medicine and got a lot | | |
| 139 4 | of press, there's not a single word or | | |
| 139 5 | mention or reference to this | | |
| 139 6 | pharmacologic fact that was well known | | |
| 139 7 | throughout the medical community by this | | |
| 139 8 | time and was published in the literature. | | |
| 139 9 | And it was well known to the FDA medical | | |
| 139 10 | officer in her NDA review which preceded | | |
| 139 11 | the publication of the VIGOR study. | | |
| 139 12 | Q:  Was it all the more | | |
| 139 13 | significant as to Vioxx, and I know | | |
| 139 14 | you've talked about this, sir, the fact | | |
| 139 15 | that there were, I think it's in your | | |
| 139 16 | article, the fact that there were 106 | | |
| 139 17 | million prescriptions of Vioxx during the | | |
| 139 18 | lifetime of Vioxx from '99 to '04? | | |
| 139 19 | A:  In the United States, | | |
| 139 20 | correct. | | |
| 139 21 | Q:  What is the significance -- | | |
| 139 22 | and used by how many people to your | | |
| 139 23 | understanding? | | |
| 139 24 | A:  Estimates that I've seen | | |
| 140 1 | range to about 20 million in the United | | |
| 140 2 | States. | | |
| 140 3 | Q:  What is the significance of | | |
| 140 4 | this story -- in this story, we're going | | |
| 140 5 | to go into this in detail in a moment. | | |
| 140 6 | What's the significance in terms of all | | |
| 140 7 | of that usage, both premarketing and then | | |
| 140 8 | after the drug was marketed, the fact | | |
| 140 9 | that it was going to be used by -- | | |
| 140 10 | A:  Well -- | | |
| 140 11 | Q:  -- literally over a hundred | | |
| 140 12 | million prescriptions? | | |
| 140 13 | A:  Right. The fact that the | | |
| 140 14 | drug was going to be used widely and that | | |
| 140 15 | it was used widely means that the | | |
| 140 16 | exposure to potential harm was very large | | |
| 140 17 | at a population level. So, at a | | |
| 140 18 | population level, if we were saying, oh, | | |
| 140 19 | only 1,000 people or 10,000 people got | | |
| 140 20 | this drug, well, the number of people who | | |
| 140 21 | could be injured as a result, that | | |
| 140 22 | absolute number, would be relatively | | |
| 140 23 | small. But when you give a drug to 20 | | |
| 140 24 | million people, you multiply the numbers | | |
| 141 1 | of people who can be affected. So, | | |
| 141 2 | that's -- from a public health | | |
| 141 3 | perspective, that is why I considered | | |
| 141 4 | this to be a public health catastrophe. | | |
| 141 5 | Q:  Was it indeed -- was Vioxx | | |
| 141 6 | indeed a public health catastrophe? | | |
| | | | |
| 141:8 -   143:10 | Graham, David 2006-05-09 | | |
| 141 8 | THE WITNESS:  Yes. | | |
| 141 9 | BY MR. KLINE: | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 141 10   Q: Why, sir? | | |
| 141 11   A: Vioxx, in my opinion, was a | | |
| 141 12   public health catastrophe because, A, it | | |
| 141 13   was a toxic drug that had severe | | |
| 141 14   cardiovascular effects raising -- | | |
| 141 15   increasing the risk of heart attack. | | |
| 141 16   Two, heart attack is like | | |
| 141 17   one of the leading causes of death in the | | |
| 141 18   United States, so, the rate of it is | | |
| 141 19   pretty high. If I have a drug that | | |
| 141 20   increases the rate of something that | | |
| 141 21   already happens at a high rate, I'm | | |
| 141 22   multiplying two high numbers by each | | |
| 141 23   other, and that's going to mean that lots | | |
| 141 24   of people will probably have heart | | |
| 142 1   attacks. | | |
| 142 2   Three, the typical person | | |
| 142 3   with osteoarthritis or rheumatoid | | |
| 142 4   arthritis who was going to get Vioxx is | | |
| 142 5   somebody who is older. And older people | | |
| 142 6   have other risk factors for heart | | |
| 142 7   disease. If your typical Vioxx user is | | |
| 142 8   somebody in their 60s, well, if they are | | |
| 142 9   male, they've got their gender is a risk | | |
| 142 10   factor for heart attack, their age is a | | |
| 142 11   risk factor for heart attack, and if you | | |
| 142 12   look nationally at statistics on health | | |
| 142 13   of Americans, they will also have at | | |
| 142 14   least one of the following: they'll have | | |
| 142 15   high blood pressure, high cholesterol, | | |
| 142 16   diabetes or they'll smoke. So, right off | | |
| 142 17   the bat, this drug is going to be | | |
| 142 18   marketed -- your typical patient that is | | |
| 142 19   getting this drug is going to be somebody | | |
| 142 20   who has two or three risk factors for | | |
| 142 21   heart disease already. So, you put all | | |
| 142 22   these things together and then you | | |
| 142 23   multiply it by the fact that I'm giving | | |
| 142 24   it to 20 million people, and it's just | | |
| 143 1   simple mathematics that you've got a | | |
| 143 2   formula for disaster. | | |
| 143 3   Q. Sir, you have actually | **[143:3-144:18]** | **Barnett:** Overruled at |
| 143 4   quantified what you believe to be the | **Def.'s Obj.:** Dr. Graham's | 144:2-18 only. |
| 143 5   formula in your study paper -- your | testimony regarding estimates | **Smith:** Overruled at |
| 143 6   Kaiser study paper published by Lancet. | of 88,000-140,000 excess | 144:2-18 only. |
| 143 7   Is Lancet a highly respected journal? | events caused by Vioxx | **Mason:** Not designated. |
| 143 8   A. Yes. | should be excluded from this | |
| 143 9   Q. Published in Britain? | case on Rule 403 grounds. | |
| 143 10   A. Yes. | Also, no foundation or | |
| | methodology that supports this | |
| 143:17 - 143:18 | opinion. | |
| 143 17   Q. What is it the equivalent of | | |
| 143 18   in the United States? | **Pl's Resp.:** Witness explains | |
| | methodology at p. 154-155. | |
| 143:20 - 152:10 | Estimates appear in one of | |
| | the premiere medical journals | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 143 20 | THE WITNESS:  It's the | in the world.  Paper and | |
| 143 21 | equivalent of the New England | conclusions were subject to | |
| 143 22 | Journal of Medicine or the Journal | peer-review. | |
| 143 23 | of the American Medical | | |
| 143 24 | Association. | | |
| 144 1 | BY MR. KLINE: | | |
| 144 2 | Q.    You stated there, "88,000 to | | |
| 144 3 | 140,000 excess cases of serious coronary | | |
| 144 4 | heart disease probably occurred in the | | |
| 144 5 | United States over the market life of | | |
| 144 6 | Vioxx."  Did you make that statement? | | |
| 144 7 | A.    Yes, I did. | | |
| 144 8 | Q.    Is that a true statement? | | |
| 144 9 | A.    Yes, it is. | | |
| 144 10 | Q.    Tell us why "88,000 to | | |
| 144 11 | 140,000 excess cases of serious coronary | | |
| 144 12 | heart disease probably occurred in the | | |
| 144 13 | United States over the market life of | | |
| 144 14 | Vioxx." | | |
| 144 15 | A.    It occurred because Vioxx is | | |
| 144 16 | unsafe at any dose.  In other words, all | | |
| 144 17 | doses of Vioxx can cause increased heart | | |
| 144 18 | attack risk.  Vioxx was used widely -- | | |
| 144 19 | Q.    How about the timing of it? | | |
| 144 20 | A.    The timing begins with the | | |
| 144 21 | first dose, and there is lots of evidence | | |
| 144 22 | now that points to that.  In fact, on the | | |
| 144 23 | APPROVe study, which we used to help | | |
| 144 24 | formulate our estimate of heart attacks, | | |
| 145 1 | was a study performed by Merck of | | |
| 145 2 | patients with colon polyps, and they were | | |
| 145 3 | giving them the 25 milligram strength of | | |
| 145 4 | Vioxx to see if they could prevent colon | | |
| 145 5 | polyps.  And the study found a roughly | | |
| 145 6 | twofold increase in heart attack risk in | | |
| 145 7 | patients who were treated with Vioxx | | |
| 145 8 | compared to people who are taking a sugar | | |
| 145 9 | pill, a placebo. | | |
| 145 10 | Now, in the paper that the | | |
| 145 11 | company published, they did what's called | | |
| 145 12 | a post hoc analysis.  And this is an | | |
| 145 13 | analysis that's done after the fact.  And | | |
| 145 14 | so FDA -- if this analysis had been | | |
| 145 15 | presented to FDA for an -- for some | | |
| 145 16 | statement to be put in their labeling, | | |
| 145 17 | FDA would have thrown it out because | | |
| 145 18 | they'd say it's post hoc, which means it | | |
| 145 19 | could have happened by accident.  In | | |
| 145 20 | clinical trials, you're supposed to | | |
| 145 21 | prespecify before the trial starts what | | |
| 145 22 | analyses you will do.  And the | | |
| 145 23 | prespecified analysis that Merck said | | |
| 145 24 | they would do showed a twofold increased | | |
| 146 1 | risk.  And the correct interpretation of | | |
| 146 2 | that is that the risk would be increased | | |
| 146 3 | from the start of the drug for as long as | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 146 4    you took the drug.  But Merck did a post | | |
| 146 5    hoc analysis.  And the post hoc analysis | | |
| 146 6    showed these two curves where they said | | |
| 146 7    that the risk didn't begin until after | | |
| 146 8    you are on the drug for 18 months.  And | | |
| 146 9    as a result, there was a public | | |
| 146 10    statement, a press release from Merck | | |
| 146 11    that said that the risk doesn't begin | | |
| 146 12    until after 18 months.  Newspapers put it | **[146:12-20]** | **Barnett:**  No objection. |
| 146 13    up.  It's in newspapers.  There was just | **Def's Obj.:**  Hearsay; 403. | Testimony played. |
| 146 14    an editorial commentary in the Washington | | **Smith:**  Objection not |
| 146 15    Post last week of somebody saying how on | | ruled upon. |
| 146 16    earth could a jury award money to a | | **Mason:**  Not designated. |
| 146 17    victim who had taken the drug for less | | |
| 146 18    than 18 months because we all know that | | |
| 146 19    Vioxx can't cause heart attacks before 18 | | |
| 146 20    months. | | |
| 146 21     Well, two things.  One, that | | |
| 146 22    was the approved -- that was a post hoc | | |
| 146 23    analysis, so it can't be accepted.  What | | |
| 146 24    it can be used for is to raise a | | |
| 147 1    hypothesis, a question, hmm, maybe this | | |
| 147 2    is something -- maybe it only works after | | |
| 147 3    18 months.  Then you have to go back to | | |
| 147 4    do a second study to prove that.  If you | | |
| 147 5    look -- so, that's point one. | | |
| 147 6    Point two is, if you look at | | |
| 147 7    those two curves and you look at how many | | |
| 147 8    patients they had in the study, how many | | |
| 147 9    heart attacks they had in that study at | | |
| 147 10    the time -- let's take six months, for | | |
| 147 11    example.  At six months, there were about | | |
| 147 12    five or six heart attacks total in the | | |
| 147 13    APPROVe study.  And now they don't give | | |
| 147 14    the figures in the paper, so, you've got | | |
| 147 15    to kind of make these extrapolations from | | |
| 147 16    proportions that are presented in the | | |
| 147 17    paper.  Five or six.  In order to show a | | |
| 147 18    relative risk of 2, which is what the | | |
| 147 19    overall study showed, they would have to | | |
| 147 20    have had -- | | |
| 147 21    Q.   VIGOR? | | |
| 147 22    A.   No.  We're talking APPROVe. | | |
| 147 23    Q.   I'm sorry. | | |
| 147 24    A.   This is the 18 month. | | |
| 148 1    They would have had to have | | |
| 148 2    had 95 patients, 95 heart attacks by six | | |
| 148 3    months, when all they had was five or | | |
| 148 4    six.  So, the study would have had to | | |
| 148 5    have been almost 20 times larger in order | | |
| 148 6    to have a chance of finding the problem. | | |
| 148 7    As it is, with the five or six cases that | | |
| 148 8    they had at six months, all that Merck | | |
| 148 9    could say from a statistical perspective | | |
| 148 10    is the risk of heart attack with Vioxx | | |
| 148 11    can be no higher than about 200. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 148 12    Q.   This is called power? | | |
| 148 13    A.   This is power.  And what | | |
| 148 14    we're seeing there is the absence of | | |
| 148 15    evidence is not evidence of absence. | | |
| 148 16    They're saying the truth is, we don't | | |
| 148 17    have the power.  But Merck is using that | | |
| 148 18    argument to say, ha-ha, because we don't | | |
| 148 19    have the power, therefore there isn't a | | |
| 148 20    risk, therefore, anybody with a heart | | |
| 148 21    attack before then, it's their own bad | | |
| 148 22    luck. | | |
| 148 23    But I give you an analogy, | | |
| 148 24    and the analogy is, we've got those two | | |
| 149 1    curves, and if you have a picture of | | |
| 149 2    APPROVe, you could put it up and then we | | |
| 149 3    could talk from the curve.  You've got | | |
| 149 4    these two curves that come together, and | | |
| 149 5    there's no power there in that first 18 | | |
| 149 6    months to show a difference.  And as I | | |
| 149 7    just discussed, the study would have to | | |
| 149 8    be 20 times larger in order to show a | | |
| 149 9    twofold difference.  You talk about | | |
| 149 10    stacking the deck.  That's a stacked | | |
| 149 11    deck. | | |
| 149 12    Here's the analogy.  The | | |
| 149 13    company is saying to you, to me, to the | | |
| 149 14    jury, the moon has no craters.  And they | | |
| 149 15    say, look at the APPROVe study in the | | |
| 149 16    first 18 months.  I don't see a | | |
| 149 17    difference there.  I look at the moon.  I | | |
| 149 18    don't see any craters.  I'm saying, wait | | |
| 149 19    a second, here's a pair of binoculars. | | |
| 149 20    Let's make that study 20 times bigger. | | |
| 149 21    Let me give you binoculars that raises it | | |
| 149 22    20 times.  Now you look at the moon and | | |
| 149 23    you see there are craters.  You look | | |
| 149 24    here, you would see this heart attack. | | |
| 150 1    Now, there had been 11 | | |
| 150 2    published studies, observational studies. | | |
| 150 3    So, you'll never get a clinical trial | | |
| 150 4    that's that large to study this question. | | |
| 150 5    So, it has to come from observational | | |
| 150 6    studies.  The preponderance of the | | |
| 150 7    evidence of observational studies, there | | |
| 150 8    are now 11 published observational | | |
| 150 9    studies.  Nine of those observational | | |
| 150 10    studies found that Vioxx increases the | | |
| 150 11    risk of heart attack.  Of those nine, all | | |
| 150 12    nine of them, when you look at it, you | | |
| 150 13    have to tease it out, but in the studies, | | |
| 150 14    they make it clear that the risk of heart | | |
| 150 15    attack that they found in that study | | |
| 150 16    occurred within 12 months.  So, we're | | |
| 150 17    already inside 18 months.  Seven of those | | |
| 150 18    studies have the evidence present within | | |
| 150 19    six months.  Four of those studies have | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 150 20 the evidence within the first | | |
| 150 21 prescription.  So, in other words, what | | |
| 150 22 we have is evidence that Vioxx increases | | |
| 150 23 the risk of heart attack from the first | | |
| 150 24 dose on.  And we have no evidence to | | |
| 151 1 suggest that the risk goes away with | | |
| 151 2 time. | | |
| 151 3 This follows precisely from | | |
| 151 4 what we believed the underlying mechanism | | |
| 151 5 is by which Vioxx and other COX-2 | | |
| 151 6 inhibitors might cause heart attack.  And | | |
| 151 7 that is, suppressing prostacyclin so that | | |
| 151 8 there's an excess of thromboxane. | | |
| 151 9 Thromboxane causes platelets to clot and | | |
| 151 10 can cause heart attacks.  And if you | | |
| 151 11 disturb that balance, that disturbance in | | |
| 151 12 balance is going to happen within the | | |
| 151 13 first dose, and so -- the first couple | | |
| 151 14 doses.  And so what you have is the | | |
| 151 15 expectation that the risk should begin | | |
| 151 16 early.  The only reason people don't find | | |
| 151 17 it is because they don't have 10 million | | |
| 151 18 patients in a clinical trial on the first | | |
| 151 19 day that would let them see it. | | |
| 151 20  Q.   You found it in your study? | | |
| 151 21 A.   And we found it in our | | |
| 151 22 study. | | |
| 151 23 Q.   And was your study a large | | |
| 151 24 scale observational study? | | |
| 152 1 A.   Yes. | | |
| 152 2 Q.   And do large term | | |
| 152 3 observational studies provide an | | |
| 152 4 important -- are they an important piece | | |
| 152 5 of information in the matrix of | | |
| 152 6 information about drug safety? | | |
| 152 7 A.   Yes, they are.  And in this | | |
| 152 8 situation, particularly where we're | | |
| 152 9 talking about this 18-month question, it | | |
| 152 10 is the only information available. | | |
| 152:21 -   153:13 | | |
| 152 21 I want to go back to the | [152:21-153:13} | **Barnett:**  Overruled. |
| 152 22 general question that was on the table at | **Def.'s Obj.:**  Dr. Graham's | **Smith:**  Overruled. |
| 152 23 the time, which was, as to your statement | testimony regarding estimates | **Mason:**  Not designated. |
| 152 24 about the Kaiser study, in the Kaiser | of 88,000-140,000 excess | |
| 153 1 study that 88 to 140,000 excess cases of | events caused by Vioxx | |
| 153 2 serious coronary heart disease probably | should be excluded from this | |
| 153 3 occurred in the United States over the | case on Rule 403 grounds. | |
| 153 4 life of the drug Vioxx.  And I had | Also, no foundation or | |
| 153 5 interrupted you. | methodology that supports this | |
| 153 6  What is the answer to that | opinion. | |
| 153 7 question as to why you make that | **Pl's Resp.:**  Witness explains | |
| 153 8 statement, if you haven't already | methodology at p. 154-155. | |
| 153 9 explained it? | Estimates appear in one of | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 153 10 | A.   Right. | the premiere medical journals | |
| 153 11 | Q.   You started off saying it's | in the world.  Paper and | |
| 153 12 | unsafe at any dose.  It starts at the | conclusions were subject to | |
| 153 13 | initial dose.  Are there other factors? | | |
| | | | |
| 153:18 -   155:11 | | | |
| 153 18 | A.   Just that it has wide use; | | |
| 153 19 | that lower doses and higher doses | | |
| 153 20 | increase the risk; that there's typical | | |
| 153 21 | patients who are going to get the drugs | | |
| 153 22 | have relatively high background rates for | | |
| 153 23 | heart disease.  And you take these | | |
| 153 24 | factors together and you multiply them | | |
| 154 1 | out, and you end up with large numbers. | | |
| 154 2 | Q.   While I don't want to do the | | |
| 154 3 | exact statistical computation in front of | | |
| 154 4 | the jury, have you done that to make that | | |
| 154 5 | kind of statement in the peer reviewed | | |
| 154 6 | medical literature? | | |
| 154 7 | A.   Yes, I have. | | |
| 154 8 | Q.   What is the construct there, | | |
| 154 9 | please, just briefly? | | |
| 154 10 | A.   Right.  Basically, what you | | |
| 154 11 | do is -- what we did was, we took the two | | |
| 154 12 | large published clinical trials that | | |
| 154 13 | Merck conducted, the VIGOR study, which | | |
| 154 14 | was at the higher doses of Vioxx, and the | | |
| 154 15 | APPROVe study, which was at the lower | | |
| 154 16 | doses of Vioxx, and we used those | | |
| 154 17 | studies, the relative risks from those | | |
| 154 18 | studies, five-fold increased risk in the | | |
| 154 19 | VIGOR study, a two-fold increased risk in | | |
| 154 20 | the APPROVe study for the lower dose, to | | |
| 154 21 | then apply that to the U.S. population in | | |
| 154 22 | terms of like about 18 percent of the | | |
| 154 23 | population got the high dose and 82 | | |
| 154 24 | percent got the lower dose.  And you can | | |
| 155 1 | do a series of calculations, | | |
| 155 2 | epidemiologic formulas that basically | | |
| 155 3 | just give you the answer, if you know how | | |
| 155 4 | long the prescriptions are, and we had | | |
| 155 5 | information that told us how long each | | |
| 155 6 | prescription was for. | | |
| 155 7 | Q.   You did that kind of | | |
| 155 8 | calculation? | | |
| 155 9 | A.   Yes. | | |
| 155 10 | Q.   That was your conclusion? | | |
| 155 11 | A.   Yes. | | |
| | | | |
| 158:7 -   159:8 | Graham, David 2006-05-09 | | |
| 158 7 | Q: Would you give us your | | |
| 158 8 | overview and your understanding of the | | |
| 158 9 | Vioxx story? | | |
| 158 10 | A:  Well, Vioxx was approved in | | |
| 158 11 | 1999. In November 2000, a study was | | |
| 158 12 | published in the New England Journal of | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 158 13    Medicine called VIGOR, which was a study | | |
| 158 14    performed by Merck showing that Vioxx | | |
| 158 15    reduced the occurrence of perforations, | | |
| 158 16    ulcers and bleeds in the gastrointestinal | | |
| 158 17    tract compared to naproxen therapy, but | | |
| 158 18    also that it increased the risk of heart | | |
| 158 19    attack by about a factor of five compared | | |
| 158 20    to naproxen. | | |
| 158 21    At that point then, the | | |
| 158 22    article that got published in the New | | |
| 158 23    England Journal of Medicine, rather than | | |
| 158 24    talking about Vioxx increasing the risk | | |
| 159 1     of heart attack, it actually changed the | | |
| 159 2     way it did the analysis. And I thought | | |
| 159 3     that this was really a misleading aspect | | |
| 159 4     of the way they went about things. | | |
| 159 5     When you do a scientific | | |
| 159 6     study -- | | |
| 159 7     Q:  'They' being? | | |
| 159 8     A:  'They' being Merck. | | |
| | | |
| 160:8 -    168:1     Graham, David 2006-05-09 | | |
| 160 8     Whenever you do a clinical | | |
| 160 9     trial or a study, you have what's called | | |
| 160 10    a reference group or a control group. | | |
| 160 11    Frequently in a clinical trial, that will | | |
| 160 12    be a placebo, which is a sugar pill. In | | |
| 160 13    the VIGOR study, it was naproxen, which | | |
| 160 14    is another pain reliever. When you have | | |
| 160 15    a comparator and you have an experimental | | |
| 160 16    treatment, in this case, Vioxx was the | | |
| 160 17    experimental treatment, when you do your | | |
| 160 18    analysis, you are supposed to put the | | |
| 160 19    results for the experimental treatment, | | |
| 160 20    in this case, Vioxx, in the numerator of | | |
| 160 21    a ratio, and your reference, naproxen, in | | |
| 160 22    the denominator. When the evidence was | | |
| 160 23    presented on perforations, ulcers and | | |
| 160 24    bleeds, that's the way the information | | |
| 161 1     was presented. It was presented in the | | |
| 161 2     classically accepted way, and it showed | | |
| 161 3     that the risk of ulcers, et cetera, was | | |
| 161 4     about one half, about .5, 50 percent that | | |
| 161 5     of naproxen. | | |
| 161 6     When it came to presenting | | |
| 161 7     the heart attack risks, it flipped it | | |
| 161 8     around. | | |
| 161 9     Q:  'It' being who? | | |
| 161 10    A:  The company, Merck. They | | |
| 161 11    flipped it around, and they put -- and | | |
| 161 12    now in talking about heart attacks, they | | |
| 161 13    put the risk of heart attack in naproxen | | |
| 161 14    patients, which is the comparator, the | | |
| 161 15    reference group, they put that in the | | |
| 161 16    numerator, and they put Vioxx in the | | |
| 161 17    denominator, and it should have been the | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 161 18 | other way around. But by doing this, | | |
| 161 19 | then the number that you get is .2. So, | | |
| 161 20 | what they could say was, oh, the heart | | |
| 161 21 | attack risk with naproxen is 20 percent | | |
| 161 22 | that of Vioxx, rather than having to say | | |
| 161 23 | the risk of heart attack with Vioxx is | | |
| 161 24 | five times higher than it was with | | |
| 162 1 | naproxen. | | |
| 162 2 | It may seem like a minor | | |
| 162 3 | point, but it's really, I think, | | |
| 162 4 | fundamental, at least in my | | |
| 162 5 | understanding, of the study, because by | | |
| 162 6 | misrepresenting that information, it then | | |
| 162 7 | flows into what I would call the naproxen | | |
| 162 8 | hypothesis. And in the VIGOR study, what | | |
| 162 9 | Merck proposed was that naproxen | | |
| 162 10 | protected against heart attack. Even | | |
| 162 11 | though Vioxx had five times higher rate | | |
| 162 12 | of heart attack than naproxen, what they | | |
| 162 13 | said was, is here's Vioxx, here's | | |
| 162 14 | naproxen, what they said is, well, Vioxx | | |
| 162 15 | is normal, there's no increased risk | | |
| 162 16 | here, what it is is naproxen protects | | |
| 162 17 | against heart attack. And they cited one | | |
| 162 18 | reference to support that, and it was a | | |
| 162 19 | study that Merck itself had done in 22 | | |
| 162 20 | patients where they had given them | | |
| 162 21 | naproxen, taken blood samples from them, | | |
| 162 22 | and then did experiments in test tubes to | | |
| 162 23 | see what effect it had on the way their | | |
| 162 24 | platelets worked. | | |
| 163 1 | Well, this information, | | |
| 163 2 | subsequently the FDA basically said that | | |
| 163 3 | doesn't prove anything because there are | | |
| 163 4 | no controlled clinical trials to show | | |
| 163 5 | that naproxen protects against heart | | |
| 163 6 | attack. But the argument was that | | |
| 163 7 | naproxen protects against heart attack. | | |
| 163 8 | And that was the argument in VIGOR. | | |
| 163 9 | To me, what was -- when I | | |
| 163 10 | read that, there were two things that | | |
| 163 11 | really sort of struck me. One was that a | | |
| 163 12 | five-fold difference in heart attack risk | | |
| 163 13 | is something quite high and something | | |
| 163 14 | that you really have to pay attention to | | |
| 163 15 | because heart attack is such a serious | | |
| 163 16 | disorder, and it's so very common. | | |
| 163 17 | The second thing was that | | |
| 163 18 | just on the face of it, this notion of | | |
| 163 19 | naproxen being protective, I was highly | | |
| 163 20 | skeptical of it, and as a matter of fact, | | |
| 163 21 | so were my office leadership, including | | |
| 163 22 | Peter Honig, who is now at Merck, but was | | |
| 163 23 | my office director then, and Marty | | |
| 163 24 | Himmel, who is now at Merck, but was his | | |
| 164 1 | deputy office director. We were | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 164 2 | skeptical of the naproxen hypothesis. We | | |
| 164 3 | were skeptical for the following reasons | | |
| 164 4 | -- I was skeptical for the following | | |
| 164 5 | reasons: | | |
| 164 6 | 1. Naproxen has been on the | | |
| 164 7 | market for over 30 years. | | |
| 164 8 | 2. Naproxen had been used | | |
| 164 9 | in many, many, many clinical trials, and | | |
| 164 10 | nobody had ever reported this phenomenal | | |
| 164 11 | heart-protecting effect before. | | |
| 164 12 | 3. There were -- and we | | |
| 164 13 | talk about 100 million prescriptions or | | |
| 164 14 | 106 million prescriptions for Vioxx. | | |
| 164 15 | There were probably way, way more of that | | |
| 164 16 | of naproxen over the 30 years that it's | | |
| 164 17 | been on the market, so, there's | | |
| 164 18 | widespread use. | | |
| 164 19 | And then, finally, if | | |
| 164 20 | naproxen had had that kind of protective | | |
| 164 21 | effect that Merck was claiming in the | | |
| 164 22 | VIGOR study, it would have had to have | | |
| 164 23 | been about three times better than | | |
| 164 24 | aspirin at preventing heart attacks. And | | |
| 165 1 | aspirin has been well studied in clinical | | |
| 165 2 | trials. It reduces heart attack risks | | |
| 165 3 | probably on average about 25 percent, and | | |
| 165 4 | that's viewed pretty much as sort of a | | |
| 165 5 | wonder drug. Aspirin is a wonder drug. | | |
| 165 6 | Well, here Merck comes with | | |
| 165 7 | the VIGOR study and says naproxen is | | |
| 165 8 | three times better than the wonder drug | | |
| 165 9 | aspirin. And to me it just failed the | | |
| 165 10 | straight face test and so -- | | |
| 165 11 | Q:  The straight face test? | | |
| 165 12 | A:  Yes. Does it have sort of | | |
| 165 13 | face validity? Can you believe it on its | | |
| 165 14 | face. And on the face, to me as the | | |
| 165 15 | experienced drug safety scientist, I was | | |
| 165 16 | just highly skeptical of that. | | |
| 165 17 | Plus you have the underlying | | |
| 165 18 | biology of how Vioxx works that would | | |
| 165 19 | lead one to expect that it might increase | | |
| 165 20 | the risk of heart attack. And, in fact, | | |
| 165 21 | it's really funny how the VIGOR study | | |
| 165 22 | words this. You know, the argument that | | |
| 165 23 | is sort of commonly in the literature | | |
| 165 24 | talking about heart attack risk with the | | |
| 166 1 | COX-2 inhibitors talks about prostacyclin | | |
| 166 2 | being decreased by drugs like Vioxx, | | |
| 166 3 | leaving thromboxane, which causes | | |
| 166 4 | clotting, unopposed. So, there's an | | |
| 166 5 | excess of it. There's sort of a balance, | | |
| 166 6 | and now there's too much thromboxane. | | |
| 166 7 | In VIGOR, Merck said, well, | | |
| 166 8 | we were interested in cardiovascular | | |
| 166 9 | risk, but their argument was because | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 166 10 naproxen -- because Vioxx wouldn't affect | | |
| 166 11 platelet clotting and so -- but naproxen | | |
| 166 12 would. And so we thought there might be | | |
| 166 13 a difference. So, they sort of took the | | |
| 166 14 converse of what was sort of like | | |
| 166 15 obviously on everybody -- this was | | |
| 166 16 something that everybody was talking | | |
| 166 17 about, at least in the literature. And | | |
| 166 18 subsequently it became sort of a real | | |
| 166 19 focus of research. | | |
| 166 20 In any event, it was based | | |
| 166 21 on reading that study and being highly | | |
| 166 22 skeptical of it and recognizing that if | | |
| 166 23 the high doses caused heart attack at a | | |
| 166 24 five-fold increase, well, this thing | | |
| 167 1 called dose response, well, there's a 25 | | |
| 167 2 milligram dose and a 12-and-a-half | | |
| 167 3 milligram dose. 25 milligram dose is the | | |
| 167 4 most commonly used dose. With dose | | |
| 167 5 response, if you get an effect with a | | |
| 167 6 high dose, what dose response says is, | | |
| 167 7 well, you might also have an effect with | | |
| 167 8 the lower dose. It won't be as big an | | |
| 167 9 effect. So, the question is, is there a | | |
| 167 10 heart attack risk with lower dose. And | | |
| 167 11 that was something that wasn't even | | |
| 167 12 addressed in the VIGOR study in the | | |
| 167 13 discussion. In the discussion, it was | | |
| 167 14 something that one could have brought up, | | |
| 167 15 but it wasn't brought up. In my view, | | |
| 167 16 the discussion was unbalanced. | | |
| 167 17 In any event, taking all | | |
| 167 18 those things together, I thought that it | | |
| 167 19 was important that we try to do another | | |
| 167 20 study to examine the heart attack risks | | |
| 167 21 with Vioxx. | | |
| 167 22 Q: And that's how you got | | |
| 167 23 involved? | | |
| 167 24 A: And that's how I got | | |
| 168 1 involved. | | |
| | | |
| 169:17 -   171:24   Graham, David 2006-05-09 | | |
| 169 17 Q: So, you made -- you | | |
| 169 18 presented this PowerPoint at numerous | | |
| 169 19 professional meetings, correct -- | | |
| 169 20 A: Right. This is from -- | | |
| 169 21 Q: -- including the ISPE | | |
| 169 22 conference in 2005; is that correct? | | |
| 169 23 A: That's correct. | | |
| 169 24 Q: That's the International | | |
| 170 1 Society of Pharmacoepidemiologists? | | |
| 170 2 A: Correct. | | |
| 170 3 Q: A worldwide organization; is | | |
| 170 4 that correct? | | |
| 170 5 A: Yes. | | |
| 170 6 Q: And by the way, you've been | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 170 7 | asked to publicly appear at conferences | | |
| 170 8 | like that in your professional capacity, | | |
| 170 9 | correct? | | |
| 170 10 | A:  Yes, I have. | | |
| 170 11 | Q:  A group of your colleagues, | | |
| 170 12 | international epidemiologists from all | | |
| 170 13 | over the world, would hear your views | | |
| 170 14 | that you're telling this jury, correct? | | |
| 170 15 | A:  Correct. | | |
| 170 16 | Q:  All right. | | |
| 170 17 | Now, the theoretical | | |
| 170 18 | concern. What have you publicly said | | |
| 170 19 | about that before? | | |
| 170 20 | A:  The theoretical concern was | | |
| 170 21 | that Vioxx would reduce or inhibit | | |
| 170 22 | prostacyclin and lead to an excess of | | |
| 170 23 | thromboxane, which would result in a | | |
| 170 24 | tendency for blood clots and | | |
| 171 1 | theoretically cardiovascular events such | | |
| 171 2 | as heart attack or stroke. | | |
| 171 3 | Q:  Known to Merck back in 1999? | | |
| 171 4 | A:  I would assume that it had | | |
| 171 5 | to have been. If it's known to the | | |
| 171 6 | medical officer who did this review, it | | |
| 171 7 | most certainly would have had to have | | |
| 171 8 | been known to Merck. | | |
| 171 9 | Q:  And you looked at the | | |
| 171 10 | review, and once you got into -- you | | |
| 171 11 | looked into the history of it once you | | |
| 171 12 | got interested in the subject based on | | |
| 171 13 | naproxen, correct? | | |
| 171 14 | A:  Actually, this particular | | |
| 171 15 | slide that we're looking at -- actually, | | |
| 171 16 | I began looking at this subsequent. At | | |
| 171 17 | the time that we were planning our study, | | |
| 171 18 | this wasn't something that I had focused | | |
| 171 19 | on. | | |
| 171 20 | Q:  In the early period, did the | | |
| 171 21 | FDA know and appreciate that there were | | |
| 171 22 | high-risk patients that were excluded | | |
| 171 23 | from the study? | | |
| 171 24 | A.  Yes, they did. | | |
| | | | |
| 172:3 -  172:3 | Graham, David 2006-05-09 | | |
| 172 3 | Q:  Did Merck understand that? | | |
| | | | |
| 172:6 -  173:8 | Graham, David 2006-05-09 | | |
| 172 6 | THE WITNESS:  It is clear | | |
| 172 7 | from the way the studies are | | |
| 172 8 | described that patients at high | | |
| 172 9 | risk of experiencing | | |
| 172 10 | cardiovascular events were | | |
| 172 11 | excluded from the study, and since | | |
| 172 12 | that's written in the VIGOR study, | | |
| 172 13 | I have to assume that Merck was | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 172 14 | fully aware and that it was | | |
| 172 15 | intentional. | | |
| 172 16 | - - - | | |
| 172 17 | (Whereupon, Deposition | | |
| 172 18 | Exhibit Graham-3, 'Rofecoxib | | |
| 172 19 | Diagnosis and Treatment: What | | |
| 172 20 | went wrong? Can we avoid?' | | |
| 172 21 | (Graham)  PowerPoint Slides, | | |
| 172 22 | DG000014 - DG000034, was marked | | |
| 172 23 | for identification.) | | |
| 172 24 | - - - | | |
| 173 1 | BY MR. KLINE: | | |
| 173 2 | Q:  I'm going to mark another | | |
| 173 3 | Powerpoint which you presented to the | | |
| 173 4 | International Society of | | |
| 173 5 | Pharmacoepidemiologists. They had their | | |
| 173 6 | conference in 2005 in Nashville, | | |
| 173 7 | Tennessee, correct? | | |
| 173 8 | A:  Yes. | | |
| | | | |
| 174:11 -   174:20 | Graham, David 2006-05-09 | | |
| 174 11 | Q:  And were Merck -- are Merck | | |
| 174 12 | representatives always at the | | |
| 174 13 | International Society of | | |
| 174 14 | Pharmacoepidemiology? | | |
| 174 15 | A:  Well, I know that at this | | |
| 174 16 | particular meeting, several people from | | |
| 174 17 | Merck were there because they're | | |
| 174 18 | professional colleagues. So, we had | | |
| 174 19 | conversations during the meeting, and I | | |
| 174 20 | know that they attended this session. | | |
| | | | |
| 175:1 -   176:24 | Graham, David 2006-05-09 | | |
| 175 1 | Q:  Now, in it, and I just want | | |
| 175 2 | to focus you on the slide that's entitled | | |
| 175 3 | VIGOR:  deja vu all over again,' what | | |
| 175 4 | were you telling your fellow members of | | |
| 175 5 | the International Society of | | |
| 175 6 | Pharmacoepidemiologists? | | |
| 175 7 | A:  Which slide number are you | | |
| 175 8 | on? | | |
| 175 9 | Q:  Number 24. | | |
| 175 10 | A:  Oh, here what I was talking | | |
| 175 11 | about was trying to make a little joke | | |
| 175 12 | about Yogi Berra and deja vu, but what I | | |
| 175 13 | was trying to talk about here is the | | |
| 175 14 | evidence that was accruing on Vioxx and | | |
| 175 15 | heart attack risks and FDA's response, | | |
| 175 16 | which in my experience has been to | | |
| 175 17 | downplay or ignore those risks and to let | | |
| 175 18 | things get worse in a sense to, let the | | |
| 175 19 | problem continue unabated. So, that's | | |
| 175 20 | basically what I was, I think, trying to | | |
| 175 21 | convey there. | | |
| 175 22 | Q:  Understood. | | |
| 175 23 | Now, if you'd go to slide | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 175 24    number 29, this is something I'd like to | | |
| 176 1    display. And regardless of whether the | | |
| 176 2    display is there or not, the fact of the | | |
| 176 3    matter is that you have used and you've | | |
| 176 4    given this jury an explanation of the | | |
| 176 5    naproxen and whether it was a plausible | | |
| 176 6    explanation for the VIGOR results. That | | |
| 176 7    is what you've done so far, correct? | | |
| 176 8    A:  Correct. | | |
| 176 9    Q:  What did you call it | | |
| 176 10    publicly, sir, the naproxen -- | | |
| 176 11    A:  I called it an alibi. | | |
| 176 12    Q:  What is an alibi, sir? | | |
| 176 13    A:  Well, I'm not a lawyer, but | | |
| 176 14    what I meant was, it's sort of an excuse | | |
| 176 15    to explain away an uncomfortable | | |
| 176 16    situation. | | |
| 176 17    Q:  What did you mean when you | | |
| 176 18    described -- and I assume you're talking | | |
| 176 19    about Merck's explanation later published | | |
| 176 20    in the New England Journal that naproxen | | |
| 176 21    was cardioprotective and thereby | | |
| 176 22    explained the results of the VIGOR trial. | | |
| 176 23    Is that what you were talking about? | | |
| 176 24    A:  That is correct. | | |
| | | |
| 177:5 -   178:7    Graham, David 2006-05-09 | | |
| 177 5    My question is, what in that | | |
| 177 6    context did you mean by the 'naproxen | | |
| 177 7    alibi,' sir? | | |
| 177 8    A:  What I meant was that there | | |
| 177 9    was -- it was much more likely based on | | |
| 177 10    the available evidence at the time that | | |
| 177 11    Vioxx was increasing the risk of heart | | |
| 177 12    attack than that naproxen was protecting | | |
| 177 13    against heart attack, but that pointing | | |
| 177 14    to naproxen saying it protects against | | |
| 177 15    heart attacks is an alibi. It's | | |
| 177 16    basically to say it's not Vioxx that's | | |
| 177 17    causing the heart attacks, it's naproxen | | |
| 177 18    that's protecting against heart attacks. | | |
| 177 19    What I also said at this | | |
| 177 20    meeting was that it resulted in a | | |
| 177 21    two-year wild goose chase as people in | | |
| 177 22    their research focused on addressing | | |
| 177 23    naproxen and whether it affects the risk | | |
| 177 24    of heart attack, rather than focusing on | | |
| 178 1    Vioxx and on lower-dose Vioxx, which was | | |
| 178 2    being used by increasing numbers of | | |
| 178 3    patients. | | |
| 178 4    Q.  That two-year wild goose | | |
| 178 5    chase occurred roughly in what calendar | | |
| 178 6    year? | | |
| 178 7    A.  2001/2002. | | |
| | | |
| 178:14 -   178:21    Graham, David 2006-05-09 | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 178 14 | Q:  What was going on with | | |
| 178 15 | labeling in that same period of time, | | |
| 178 16 | sir? | | |
| 178 17 | A:  Nothing was happening with | | |
| 178 18 | labeling, at least nothing visible. | | |
| 178 19 | Q:  Was it your words when you | | |
| 178 20 | described it, those two years, as a wild | | |
| 178 21 | goose chase? | | |
| | | | |
| 178:23 -   179:6 | Graham, David 2006-05-09 | | |
| 178 23 | THE WITNESS:  My reference | | |
| 178 24 | to wild goose chase was to the | | |
| 179 1 | efforts by the scientific | | |
| 179 2 | community to investigate what has | | |
| 179 3 | subsequently been shown, I think, | | |
| 179 4 | unequivocally to be an untruth, | | |
| 179 5 | which is that naproxen does not | | |
| 179 6 | protect against heart attack. | | |
| | | | |
| 179:7 -   179:13 | Graham, David 2006-05-09 | | |
| 179 7 | There are now, I think, 18 or 19 | | |
| 179 8 | published observational studies | | |
| 179 9 | that have looked at this. And | | |
| 179 10 | four of them say that naproxen is | | |
| 179 11 | protective. Four of them say it | | |
| 179 12 | increases the risk. And the | | |
| 179 13 | others say there's no difference. | | |
| | | | |
| 182:7 -   182:13 | Graham, David 2006-05-09 | | |
| 182 7 | Q:  What is the bottom line, | | |
| 182 8 | bottom, bottom line on the science of | | |
| 182 9 | whether naproxen is cardioprotective and | | |
| 182 10 | whether this was an alibi? | | |
| 182 11 | A:  Naproxen is not | | |
| 182 12 | cardioprotective, never was, and it | | |
| 182 13 | isn't. | | |
| | | | |
| 186:1   186:15 | | | |
| 186 1 | Q.   Now, did you get -- by the | | |
| 186 2 | way, in 2000, I think the 2002 report, | | |
| 186 3 | there's an FDA report -- I don't want to | | |
| 186 4 | have to dig out the document.  I hope | | |
| 186 5 | I'll be indulged here. | | |
| 186 6 | There's a report in which | | |
| 186 7 | Vioxx was -- there was a suspect drug | | |
| 186 8 | list in 2001 reported in 2002? | | |
| 186 9 | A.   Yes. | | |
| 186 10 | Q.   What drug was on the top of | | |
| 186 11 | the suspect drug list? | | |
| 186 12 | A.   Vioxx. | | |
| 186 13 | Q.   And was your study conceived | | |
| 186 14 | by you? | | |
| 186 15 | A.   Yes. | | |
| | | | |
| **186:21   -   187:17** | Graham, David 2006-05-09 | | |

**Dedrick v. Merck Co., Inc.**
**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 186: 21 | A:  I wasn't aware at the time | | |
| 186: 22 | that it was the number one drug. In my | | |
| 186: 23 | mind, it was the leading public health | | |
| 186: 24 | safety question that needed to be focused | | |
| 187: 1 | on. When we went to -- when we decided | | |
| 187: 2 | to do the study, we had a teleconference, | | |
| 187: 3 | videoconference with Merck that was | | |
| 187: 4 | attended by myself, my office director, | | |
| 187: 5 | Dr. Honig, his deputy, Dr. Himmel, both | | |
| 187: 6 | of whom are now at Merck, and then people | | |
| 187: 7 | from Kaiser. And we had a list of five | | |
| 187: 8 | or six drug safety questions that we were | | |
| 187: 9 | going to discuss which of these we | | |
| 187: 10 | thought was the most important one that | | |
| 187: 11 | needed to be studied. And the consensus, | | |
| 187: 12 | hands down, of that group was that Vioxx | | |
| 187: 13 | needed to be studied because that issue | | |
| 187: 14 | affected more lives and the impact of | | |
| 187: 15 | that was potentially greater than any of | | |
| 187: 16 | the other drug safety questions we talked | | |
| 187: 17 | about. | | |
| | | | |
| **187:23  -  188:13** | Graham, David 2006-05-09 | | |
| 187: 23 | Q:  Now, the study. It was -- | | |
| 187: 24 | tell us what you did, what you went about | | |
| 188: 1 | doing. It was funded by the FDA, | | |
| 188: 2 | correct? | | |
| 188: 3 | A:  It was funded -- this study, | | |
| 188: 4 | I've been told various estimates, that | | |
| 188: 5 | this study cost -- should have cost -- if | | |
| 188: 6 | it was being done today, it would have | | |
| 188: 7 | cost over $1 million. That's what I was | | |
| 188: 8 | told by people at the DSaRM committee in | | |
| 188: 9 | February 2005. FDA contributed a total | | |
| 188: 10 | of $60,000, which was basically good | | |
| 188: 11 | faith money, and Kaiser underwrote all | | |
| 188: 12 | the other expenses associated with the | | |
| 188: 13 | study. | | |
| | | | |
| **192:24  -  193:11** | Graham, David 2006-05-09 | | |
| 192: 24 | Q:  Now, you were the lead of | | |
| 193: 1 | the study? | | |
| 193: 2 | A:  Yes. | | |
| 193: 3 | Q:  And it was your baby; is | | |
| 193: 4 | that correct? | | |
| 193: 5 | A:  Correct. | | |
| 193: 6 | Q:  Was that known by your | | |
| 193: 7 | bosses at the FDA? | | |
| 193: 8 | A:  Oh, yes. | | |
| 193: 9 | Q:  And did they know that you | | |
| 193: 10 | were studying in particular Vioxx? | | |
| 193: 11 | A:  Yes. | | |
| 193: 12 | Q.   And were you studying other | | |
| 193: 13 | COX-2s as well? | | |
| 193: 14 | A.   We looked at Celebrex.  We | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 193: 15    were not able to look at Bextra because | | |
| 193: 16    it wasn't used in Kaiser at the time of | | |
| 193: 17    our study.  And we looked at other pain | | |
| 193: 18    relievers as well, most particularly, | | |
| 193: 19    naproxen, because we also, in addition to | | |
| 193: 20    wanting to study whether or not Vioxx | | |
| 193: 21    increased the risk of heart attack, we | | |
| 193: 22    wanted to know whether naproxen protected | | |
| 193: 23    against heart attack.  And so we were | | |
| 193: 24    going to test both of those questions. | | |
| | | |
| 194:1  -  196:21    Graham, David 2006-05-09 | | |
| 194: 1    Q:  Now, there's a story in | | |
| 194: 2    between, but at the end of the day, was | | |
| 194: 3    this study published in The Lancet? | | |
| 194: 4    A:  Yes, it was. | | |
| 194: 5    Q:  It was first on line January | | |
| 194: 6    25th of '05? | | |
| 194: 7    A:  Correct. | | |
| 194: 8    Q:  Was it peer reviewed by -- | | |
| 194: 9    did it go through a peer review process | | |
| 194: 10    and was it peer reviewed? | | |
| 194: 11    A:  It went through peer review | | |
| 194: 12    twice. A total of ten different peer | | |
| 194: 13    reviewers from The Lancet looked at this | | |
| 194: 14    paper, five on each of two occasions. On | | |
| 194: 15    each occasion, the paper was accepted for | | |
| 194: 16    publication. | | |
| 194: 17    Q:  Was that unusual, that it | | |
| 194: 18    was peer reviewed twice and by that many | | |
| 194: 19    people? | | |
| 194: 20    A:  It was unusual, but it was | | |
| 194: 21    necessitated by efforts by the FDA to | | |
| 194: 22    suppress publication of the paper. | | |
| 194: 23    Q:  Yes, I'm going to have you | | |
| 194: 24    tell that story in a minute in your own | | |
| 195: 1    words. | | |
| 195: 2    At the end of the day when | | |
| 195: 3    you published the article, the article | | |
| 195: 4    was entitled 'Risk of acute myocardial | | |
| 195: 5    infarction and sudden cardiac death in | | |
| 195: 6    patients treated with...' Is that | | |
| 195: 7    correct? That's the study? | | |
| 195: 8    A:  Yes. | | |
| 195: 9    MR. KLINE:  And we have it | | |
| 195: 10    here. We'll mark it as the next | | |
| 195: 11    Exhibit Number, 4. | | |
| 195: 12    - - - | | |
| 195: 13    (Whereupon, Deposition | | |
| 195: 14    Exhibit Graham-4, 'Risk of acute | | |
| 195: 15    myocardial infarction and sudden | | |
| 195: 16    cardiac death in patients treated | | |
| 195: 17    with cyclo-oxygenase 2 selective | | |
| 195: 18    and non-selective non-steroidal | | |
| 195: 19    anti-inflammatory drugs: nested | | |
| 195: 20    case-control study,' (Graham, et | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 195: 21 | al)  The Lancet 2-5-05 Vol. 365, | | |
| 195: 22 | 475-481, was marked for | | |
| 195: 23 | identification.) | | |
| 195: 24 | - - - | | |
| 196: 1 | BY MR. KLINE: | | |
| 196: 2 | Q:  This was the result, the | | |
| 196: 3 | fruits of your four-year labor; is that | | |
| 196: 4 | correct? | | |
| 196: 5 | A:  Correct. | | |
| 196: 6 | Q:  What was your bottom line of | | |
| 196: 7 | your findings, sir? | | |
| 196: 8 | A:  The bottom line was that | | |
| 196: 9 | Vioxx at high dose increased the risk of | | |
| 196: 10 | heart attack compared to basically nonuse | | |
| 196: 11 | of the drug; that, compared to Celebrex, | | |
| 196: 12 | which was the other leading COX-2 pain | | |
| 196: 13 | reliever on the market, that Vioxx at | | |
| 196: 14 | high dose and low dose increased the risk | | |
| 196: 15 | of heart attack. With low dose, it was | | |
| 196: 16 | just a borderline statistical | | |
| 196: 17 | significance, but the point estimate was | | |
| 196: 18 | clearly there; and that naproxen did not | | |
| 196: 19 | protect against heart attack, if | | |
| 196: 20 | anything, it increased the risk | | |
| 196: 21 | slightly. | | |
| | | | |
| **203:14  -  205:23** | Graham, David 2006-05-09 | | |
| 203: 14 | Q:  And -- okay, now. If you | | |
| 203: 15 | look at the Advisory Committee meeting, | | |
| 203: 16 | your PowerPoint number 1 -- let's see, | | |
| 203: 17 | it's 114, Page 114. We'll put it up very | | |
| 203: 18 | briefly and try to work through this | | |
| 203: 19 | stuff in our waning moments. | | |
| 203: 20 | I see here, 'Risk of AMI | | |
| 203: 21 | with Celecoxib Or Rofecoxib.' I want to | | |
| 203: 22 | focus on Vioxx, rofecoxib. Okay? | | |
| 203: 23 | A:  Uh-huh. | | |
| 203: 24 | Q:  What you did here was to | | |
| 204: 1 | collect the data from the various | | |
| 204: 2 | studies, correct? | | |
| 204: 3 | A:  Correct. | | |
| 204: 4 | Q:  At all doses, just focusing | | |
| 204: 5 | on the 'all doses,' your study showed an | | |
| 204: 6 | increased risk of -- what are you showing | | |
| 204: 7 | increased risks of here to be clear? | | |
| 204: 8 | What are you characterizing it? | | |
| 204: 9 | A:  We showed an increased risk | | |
| 204: 10 | of heart attack and sudden cardiac death | | |
| 204: 11 | as a -- sort of considering those | | |
| 204: 12 | together. | | |
| 204: 13 | Q:  By the way, sir, and I hate | [204:13-205:6] | **Barnett:**  Overruled. |
| 204: 14 | to do it this way, but I forgot earlier. | **Def.'s Obj.:**  Dr. Graham's | **Smith:**  Overruled. |
| 204: 15 | When you gave me your figures of 88,000 | testimony regarding estimates | **Mason:**  Not designated. |
| 204: 16 | to 140,000 excess cases of serious | of 88,000-140,000 excess | |
| 204: 17 | coronary heart disease in the life of | events caused by Vioxx | |
| 204: 18 | Vioxx in the United States, how many of | should be excluded from this | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 204: 19 | those -- did you do a calculation of how | case on Rule 403 grounds. | |
| 204: 20 | many of those were deaths? | Also, no foundation or | |
| 204: 21 | A:  Yes. It's about 40 percent. | methodology that supports this | |
| 204: 22 | So, if you multiply .4 by each of the | opinion. | |
| 204: 23 | numbers, you come up with a range that's | **PI's Resp.:**  Witness explains | |
| 204: 24 | somewhere in the neighborhood of 40,000 | methodology at p. 154-155. | |
| 205: 1 | to 60,000. | Estimates appear in one of | |
| 205: 2 | Q:  40,000 to 60,000 excess | the premiere medical journals | |
| 205: 3 | deaths over those that would have been | in the world.  Paper and | |
| 205: 4 | if -- | conclusions were subject to | |
| 205: 5 | A:  Patients had not used | peer-review. | |
| 205: 6 | rofecoxib, had not used Vioxx. | | |
| 205: 7 | Q:  Back to the relative risks. | | |
| 205: 8 | If we can just focus in on all doses of | | |
| 205: 9 | Vioxx, we have relative risks which are | | |
| 205: 10 | above 1 in the Graham study, is that | | |
| 205: 11 | correct? | | |
| 205: 12 | A:  Yes. | | |
| 205: 13 | Q:  The Solomon study? | | |
| 205: 14 | A:  Yes. | | |
| 205: 15 | Q:  The Kimmel study? | | |
| 205: 16 | A:  Yes. | | |
| 205: 17 | Q:  The Ingenix study? | | |
| 205: 18 | A:  Yes. | | |
| 205: 19 | Q:  And the Medi-Cal study? | | |
| 205: 20 | A:  Yes. | | |
| 205: 21 | Q:  And you were involved in the | | |
| 205: 22 | Medi-Cal study as well, correct? | | |
| 205: 23 | A:  Correct. | | |
| 222:12 -  222:14 | Graham, David 2006-05-09 | | |
| 222 12 | Q:  In your view, did the | | |
| 222 13 | benefits clearly exceed the risk or | | |
| 222 14 | exceed them at all? | | |
| 222:16 -  222:20 | Graham, David 2006-05-09 | | |
| 222 16 | THE WITNESS:  No. The | | |
| 222 17 | benefits did not exceed the risks. | | |
| 222 18 | BY MR. KLINE: | | |
| 222 19 | Q:  In fact, was it the | | |
| 222 20 | opposite? | | |
| 222:22 -  224:5 | Graham, David 2006-05-09 | | |
| 222 22 | THE WITNESS:  This drug was | | |
| 222 23 | risky. And the benefits that one | | |
| 222 24 | gained at a population level for | | |
| 223 1 | the risks just weren't worth it. | | |
| 223 2 | The juice wasn't worth the | | |
| 223 3 | squeeze, and in my view, as I said | | |
| 223 4 | before, I think that Vioxx was | | |
| 223 5 | approved prematurely, and clearly | | |
| 223 6 | if more work had been done, | | |
| 223 7 | certainly the high dose shouldn't | | |
| 223 8 | have been approved. And if it had | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 223 9    been approved, it should have been | | |
| 223 10    withdrawn with the VIGOR study. | | |
| 223 11    And at that point, intensive study | | |
| 223 12    at the lower doses should have | | |
| 223 13    been enacted with a very large | | |
| 223 14    clinical trial done in a very | | |
| 223 15    short space of time to nail down | | |
| 223 16    the question. And I'm not talking | | |
| 223 17    about an APPROVe-like study that | | |
| 223 18    takes four or five years to do and | | |
| 223 19    has only five or six heart attacks | | |
| 223 20    in six months. I'm talking about | | |
| 223 21    a really huge study that gives you | | |
| 223 22    the opportunity, the power, to | | |
| 223 23    answer the question definitively. | | |
| 223 24    And that was not done. | | |
| 224 1    BY MR. KLINE: | | |
| 224 2    Q:  Everything of what you just | | |
| 224 3    said, sir, was it within the resources | | |
| 224 4    and capability of Merck & Company? | | |
| 224 5    A:  Yes, it was. | | |
| | | |
| 227:8 -    227:13    Graham, David 2006-05-09 | | |
| 227 8    Q:  Dr. Graham, you talked a | | |
| 227 9    little bit on direct examination about | | |
| 227 10    your medical training as well as your | | |
| 227 11    training as an epidemiologist. Do you | | |
| 227 12    practice medicine now? | | |
| 227 13    A:  No, I do not. | | |
| | | |
| 228:16 -    228:21    Graham, David 2006-05-09 | | |
| 228 16    Q:  So, for the last 15 years, | | |
| 228 17    you have been focusing pretty much | | |
| 228 18    exclusively on epidemiology and drug | | |
| 228 19    safety rather than practicing medicine; | | |
| 228 20    is that correct? | | |
| 228 21    A:  Correct. | | |
| | | |
| 251:14 -    253:4    Graham, David 2006-05-09 | | |
| 251 14    Q:  Another subject that you | | |
| 251 15    discussed on direct examination is what | | |
| 251 16    you call the naproxen myth. Do you | | |
| 251 17    remember that? | | |
| 251 18    A:  Uh-huh. | | |
| 251 19    Q:  And that's a phrase that you | | |
| 251 20    used in a couple of these PowerPoints | | |
| 251 21    that were dated from 2005, right? | | |
| 251 22    A:  It's possible. I mean, I | | |
| 251 23    don't have them in front of me, but it's | | |
| 251 24    certainly possible. | | |
| 252 1    Q:  Well, you had one of them in | | |
| 252 2    front of you before -- | | |
| 252 3    A:  That said 'alibi,' not myth. | | |
| 252 4    Q:  Oh, I'm sorry, naproxen | | |
| 252 5    alibi. I stand corrected there. | | |
| 252 6    Now, when you were writing | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 252 7 | scientific articles in 2003 and 2004 and | | |
| 252 8 | you discussed this hypothesis of naproxen | | |
| 252 9 | being cardioprotective, you didn't call | | |
| 252 10 | it an alibi then, did you? | | |
| 252 11 | A:  No. It's a different | | |
| 252 12 | audience. | | |
| 252 13 | Q:  In fact, well, the audience | | |
| 252 14 | that you are writing for in scientific | | |
| 252 15 | publications are other scientists and | | |
| 252 16 | doctors, right? | | |
| 252 17 | A:  Correct. | | |
| 252 18 | Q:  And when you were writing | | |
| 252 19 | scientific publications for other | | |
| 252 20 | scientists and doctors, what you said was | | |
| 252 21 | that the naproxen hypothesis was one of | | |
| 252 22 | the possible explanations for the | | |
| 252 23 | difference that was seen in the VIGOR | | |
| 252 24 | trial between Vioxx and naproxen | | |
| 253 1 | patients, isn't that right, sir? | | |
| 253 2 | A:  A very low possibility. | | |
| 253 3 | Q:  Let's look at what you | | |
| 253 4 | actually said. | | |
| | | | |
| 253:16 -   254:14 | Graham, David 2006-05-09 | | |
| 253 16 | Q.  I'll hand you want we've | | |
| 253 17 | marked as Exhibit 8. | | |
| 253 18 | Is Exhibit 8 a 2003 | | |
| 253 19 | publication? | | |
| 253 20 | A:  Yes, based on a talk from | | |
| 253 21 | 2002 | | |
| 253 22 | Q:  And the first named author | | |
| 253 23 | on here is Wayne Ray. Do you see that? | | |
| 253 24 | A:  Yes. | | |
| 254 1 | Q:  He, I think, was the person | | |
| 254 2 | that you said you recruited to help on | | |
| 254 3 | the Kaiser Permanente study that you | | |
| 254 4 | headed up, right? | | |
| 254 5 | A:  Yes. | | |
| 254 6 | Q:  And then also you're listed | | |
| 254 7 | as an author; is that right? | | |
| 254 8 | A:  Correct. | | |
| 254 9 | Q.  If you go over to the second | | |
| 254 10 | page, I'm going to direct you down to the | | |
| 254 11 | bottom of the left-hand column, and I've | | |
| 254 12 | blown this up and put it on the board. | | |
| 254 13 | If you want to look at it on the board, | | |
| 254 14 | it might be a little easier. | | |
| | | | |
| 254:15 -   258:7 | Graham, David 2006-05-09 | | |
| 254 15 | In this 2003 article of | | |
| 254 16 | yours and Dr. Ray's and the others, I see | | |
| 254 17 | you say that 'The VIGOR trial enrolled | | |
| 254 18 | 8076 patients with rheumatoid arthritis, | | |
| 254 19 | who were randomly assigned to rofecoxib' | | |
| 254 20 | -- that's Vioxx, right? | | |
| 254 21 | A:  Uh-huh. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 254 22    Q:  -- '(50 milligrams...) or | | |
| 254 23    naproxen, an established non-selective | | |
| 254 24    NSAID.' And then do you say, 'MI' -- | | |
| 255 1     now, first of all, what does MI stand | | |
| 255 2     for? | | |
| 255 3     A:  That's myocardial | | |
| 255 4     infarction. | | |
| 255 5     Q:  Is that the same thing as a | | |
| 255 6     heart attack in common language? | | |
| 255 7     A:  Correct. Yes. | | |
| 255 8     Q:  Okay. | | |
| 255 9     So, a heart attack 'occurred | | |
| 255 10    in .4 percent of patients receiving | | |
| 255 11    rofecoxib compared to .1 percent of | | |
| 255 12    patients receiving naproxen. These data | | |
| 255 13    may reflect an increased risk of' heart | | |
| 255 14    attack 'associated with rofecoxib;' being | | |
| 255 15    Vioxx, 'a decreased risk associated with | | |
| 255 16    naproxen; or a combination of both | | |
| 255 17    effects.' | | |
| 255 18    Do you see that? | | |
| 255 19    A:  Uh-huh. | | |
| 255 20    Q:  And then did you go on to | | |
| 255 21    say that there were two recent published | | |
| 255 22    studies that looked at 'whether naproxen | | |
| 255 23    has a protective effect on the risk of | | |
| 255 24    coronary heart disease'? | | |
| 256 1     A:  Uh-huh. | | |
| 256 2     Q:  And this thing that you | | |
| 256 3     called an alibi today, back in 2003, did | | |
| 256 4     you report that both of those studies | | |
| 256 5     that you referred to there actually | | |
| 256 6     reported a reduction in the risk of heart | | |
| 256 7     attacks for people who were using | | |
| 256 8     naproxen? | | |
| 256 9     A:  Well, a couple of things. | | |
| 256 10    Q:  Did you say that or not, | | |
| 256 11    sir? | | |
| 256 12    A:  That is not what I said. | | |
| 256 13    This paper represented a combined | | |
| 256 14    distillation of, I guess it was four | | |
| 256 15    different talks presented at a symposium. | | |
| 256 16    And they frequently -- what they do is | | |
| 256 17    they have one session and they condense | | |
| 256 18    them into a single paper, and then they | | |
| 256 19    list everybody as an author. And this | | |
| 256 20    material was from someone other than me | | |
| 256 21    in the section that I was presenting on. | | |
| 256 22    Q:  Who was it from? | | |
| 256 23    A:  I'd have to go back to the | | |
| 256 24    topic headings of what the different | | |
| 257 1     people, the four different speakers had, | | |
| 257 2     what their speaking assignment was. My | | |
| 257 3     speaking assignment at this meeting was | | |
| 257 4     to talk about the association of | | |
| 257 5     high-dose rofecoxib and hypertension. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 257 6      Q: Let me ask, when your name | | |
| 257 7      is listed as an author on an article like | | |
| 257 8      this, do you have a chance to review the | | |
| 257 9      whole article and decide whether you want | | |
| 257 10      to be associated with the comments that | | |
| 257 11      are made in there? | | |
| 257 12      A: You get copies of articles | | |
| 257 13      like this. When I got it, I only really | | |
| 257 14      read the section that was my purview, and | | |
| 257 15      I really didn't read the other sections. | | |
| 257 16      Q: Is this the first time that | | |
| 257 17      you understood or knew that your name was | | |
| 257 18      on a scientific article that said that | | |
| 257 19      heart attacks may reflect a decreased | | |
| 257 20      risk associated with naproxen? | | |
| 257 21      A: Well, I mean, I knew my name | | |
| 257 22      was on the paper. I hadn't read that | | |
| 257 23      closely. The studies that are referenced | | |
| 257 24      are studies that I talked about during | | |
| 258 1      the previous part of the deposition that | | |
| 258 2      are analyzed incorrectly and so really | | |
| 258 3      don't show reductions in cardiovascular | | |
| 258 4      risk with naproxen, but in any event. | | |
| 258 5      Q: Did you ever ask that your | | |
| 258 6      name be removed from this article? | | |
| 258 7      A: No, I did not. | | |
| | | |
| 258:20 -    263:21      Graham, David 2006-05-09 | | |
| 258 20      Q: Please take a look at what | | |
| 258 21      we've marked as Exhibit 9. Is Exhibit 9 | | |
| 258 22      a copy of a scientific article that has | | |
| 258 23      your name on it as one of the authors? | | |
| 258 24      A: Yes. | | |
| 259 1      Q: Now, before we get into | | |
| 259 2      Exhibit 9, is this one -- well, Dr. Ray | | |
| 259 3      is on this one also, right? | | |
| 259 4      A: Correct. | | |
| 259 5      Q: So, a bunch of other authors | | |
| 259 6      and you and Dr. Ray. Is this one where | | |
| 259 7      everybody just gave speeches and you | | |
| 259 8      didn't read it closely? | | |
| 259 9      A: No, no. No. This was a | | |
| 259 10      real study. | | |
| 259 11      Q: This was a real study? | | |
| 259 12      A: Yes. | | |
| 259 13      Q: Okay. | | |
| 259 14      Well, looking down then at | | |
| 259 15      the first page of -- I'm sorry, we'll go | | |
| 259 16      over to the fourth page of what you | | |
| 259 17      called the real study that you and Dr. | | |
| 259 18      Ray were both authors on. | | |
| 259 19      This language that I've | | |
| 259 20      blown up here from the right-hand column | | |
| 259 21      at the bottom, did you and Dr. Ray say, | | |
| 259 22      The cause of the excess of serious | | |
| 259 23      cardiovascular events in the VIGOR trial | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 259 24 | is still a matter of debate'? Is that | | |
| 260 1 | what you said in the scientific study in | | |
| 260 2 | 2004? | | |
| 260 3 | A:  Yes. | | |
| 260 4 | Q:  And it says, 'A recent | | |
| 260 5 | observational study reported a higher | | |
| 260 6 | rate of cardiovascular events in | | |
| 260 7 | high-dose rofecoxib users.' That would | | |
| 260 8 | be the 50 milligrams; is that right? | | |
| 260 9 | A:  That's what -- well, I'm | | |
| 260 10 | just looking at the reference for that, | | |
| 260 11 | and that would be, I think, any dose that | | |
| 260 12 | was over 25 milligrams. So, there are | | |
| 260 13 | people who take 37-and-a-half milligrams. | | |
| 260 14 | Q:  Okay. | | |
| 260 15 | Are there very many people | | |
| 260 16 | who take that? | | |
| 260 17 | A:  I don't know. I don't know | | |
| 260 18 | the number. | | |
| 260 19 | Q:  Okay. | | |
| 260 20 | Anyway, over 25. | | |
| 260 21 | It says, 'A recent | | |
| 260 22 | observational study recorded a higher | | |
| 260 23 | rate of cardiovascular events in | | |
| 260 24 | high-dose rofecoxib users compared to | | |
| 261 1 | users of other NSAIDs and users of lower | | |
| 261 2 | doses of rofecoxib.' It says 'To date, | | |
| 261 3 | lower doses' -- that's talking about | | |
| 261 4 | Vioxx, right? | | |
| 261 5 | A:  Uh-huh. | | |
| 261 6 | Q:  'To date,' you and Dr. Ray | | |
| 261 7 | say, 'lower doses' of Vioxx 'have not | | |
| 261 8 | been associated with a statistically | | |
| 261 9 | significant excess of these types of | | |
| 261 10 | serious events.' | | |
| 261 11 | Is that what you said to the | | |
| 261 12 | scientific and medical community in 2004? | | |
| 261 13 | A:  It's based on the published | | |
| 261 14 | literature, yes. | | |
| 261 15 | Q:  And then you go on to say, | | |
| 261 16 | Since the 50 milligram dose has | | |
| 261 17 | clinically significant undesirable | | |
| 261 18 | effects and has not been shown to be more | | |
| 261 19 | effective than lower doses' -- that's | | |
| 261 20 | more effective than lower doses of Vioxx, | | |
| 261 21 | right? | | |
| 261 22 | A:  Uh-huh. | | |
| 261 23 | Q:  -- 'chronic use of high-dose | | |
| 261 24 | rofecoxib should be discouraged.' | | |
| 262 1 | Do you see that? | | |
| 262 2 | A:  Uh-huh. | | |
| 262 3 | Q:  Now, today what you said was | | |
| 262 4 | that back in 2004, you were clamoring | | |
| 262 5 | that 50 milligrams should be withdrawn | | |
| 262 6 | from the market. Do you remember that? | | |
| 262 7 | A:  I don't remember using the | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 262 8    word 'clamoring,' but... | | |
| 262 9    Q:  No. That was my word. | | |
| 262 10    You said you were urging | | |
| 262 11    that 50 milligrams -- what you said today | | |
| 262 12    was that back in 2004, Dr. Graham was | | |
| 262 13    urging that 50 milligrams should be | | |
| 262 14    withdrawn from the market, right? | | |
| 262 15    A:  I don't think I used the | | |
| 262 16    word 'urge,' but I thought that the | | |
| 262 17    50-milligram strength should come off the | | |
| 262 18    market, yes. | | |
| 262 19    Q:  But in the actual scientific | | |
| 262 20    publication that you and Dr. Ray authored | | |
| 262 21    in 2004, what you said, all you said | | |
| 262 22    about 50 milligrams was that chronic use | | |
| 262 23    of high-dose Vioxx should be discouraged, | | |
| 262 24    right? | | |
| 263 1    A:  Well, yes, but a couple | | |
| 263 2    things. One, the paper was published | | |
| 263 3    online in July of 2003; and, two, that | | |
| 263 4    the paper was submitted in November of | | |
| 263 5    2002. And basically -- and then the | | |
| 263 6    third thing is, is I'm not the senior | | |
| 263 7    author, and so for things like this, I | | |
| 263 8    certainly couldn't disagree with the | | |
| 263 9    statement that chronic use of high-dose | | |
| 263 10    should be discouraged. I would take it a | | |
| 263 11    step further. | | |
| 263 12    Back in 2002, I think that | | |
| 263 13    the VIGOR study provided enough evidence | | |
| 263 14    to seriously question Vioxx remaining on | | |
| 263 15    the market. | | |
| 263 16    Q:  But that's not what you said | | |
| 263 17    in the article that you published two | | |
| 263 18    years later in print and a year later | | |
| 263 19    online, is it, sir? | | |
| 263 20    A:  No, but I'm not the first | | |
| 263 21    author. | | |
| 267:2 -    267:19    Graham, David 2006-05-09 | | |
| 267 2    Q:  And on the Ray article, were | | |
| 267 3    you an author of the Ray article as well, | | |
| 267 4    just not the first author? | | |
| 267 5    A:  No. I was not a co-author | | |
| 267 6    on that article. | | |
| 267 7    Q:  Okay. | | |
| 267 8    So, your colleague, Dr. Ray, | | |
| 267 9    who you later worked with on the Kaiser | | |
| 267 10    study, he had done an epidemiologic | | |
| 267 11    study looking at the effects of taking | | |
| 267 12    Vioxx, right? | | |
| 267 13    A:  Uh-huh. | | |
| 267 14    Q:  And focusing on the 25 | | |
| 267 15    milligrams and less, basically what he | | |
| 267 16    found, when it's 1.02, a 1 would mean | | |
| 267 17    that's just the same as not taking any | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 267 18     medicine at all, right? | | |
| 267 19     A:  Right. | | |
| | | |
| 268:8 -  270:3     Graham, David 2006-05-09 | | |
| 268 8     This confidence interval is | | |
| 268 9     the thing that is in the parenthesis | | |
| 268 10     here, right? | | |
| 268 11     A:  Correct. | | |
| 268 12     Q:  And I hope that at trial | | |
| 268 13     somebody else will describe confidence | | |
| 268 14     interval because I'm not going to take | | |
| 268 15     the time to do it with you today. But | | |
| 268 16     you say it's consistent with being as | | |
| 268 17     high as 1.37? | | |
| 268 18     A:  Right. | | |
| 268 19     Or as low as .76. | | |
| 268 20     Q:  Or as low as .76. | | |
| 268 21     So that this confidence | | |
| 268 22     interval says that Vioxx 25 milligram, it | | |
| 268 23     might be better than not taking any | | |
| 268 24     medicine at all when it comes to heart | | |
| 269 1     attacks, or it might be a little worse | | |
| 269 2     than not taking any medicine at all. | | |
| 269 3     But, basically, the best analysis is, | | |
| 269 4     it's the same thing as not taking any | | |
| 269 5     medicine at all, right? | | |
| 269 6     A:  That's the appropriate | | |
| 269 7     interpretation of that study for that | | |
| 269 8     dose. | | |
| 269 9     Q:  And then in your study, the | | |
| 269 10     Graham study, what year was this from? | | |
| 269 11     A:  It was published in 2005, | | |
| 269 12     but it was completed in 2004. | | |
| 269 13     Q:  So, this is the Kaiser | | |
| 269 14     Permanente study? | | |
| 269 15     A:  This is the Kaiser | | |
| 269 16     Permanente study. | | |
| 269 17     Q:  And here you found a | | |
| 269 18     relative risk of 1.23, and then this | | |
| 269 19     confidence interval of going below 1, | | |
| 269 20     which would make it better than no | | |
| 269 21     medicine at all, up to 1.71. And from a | | |
| 269 22     statistical point of view, what this says | | |
| 269 23     is that there is not a statistically | | |
| 269 24     significant difference between a 25 | | |
| 270 1     milligram dose and not taking any | | |
| 270 2     medicine at all, correct? | | |
| 270 3     A:  Yes. But the maximum | | |
| | | |
| 270:23 -  271:20     Graham, David 2006-05-09 | | |
| 270 23     Q:  You mentioned before that | | |
| 270 24     you wrote a chapter in a book on -- what | | |
| 271 1     was the subject of the book? | | |
| 271 2     A:  Well, it's called | | |
| 271 3     Pharmacoepidemiology. | | |
| 271 4     Q:  Yeah. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 271 5    And do you know that in that | | |
| 271 6    book on pharmacoepidemiology, it is | | |
| 271 7    stated that if you have a relative risk | | |
| 271 8    of less than 2.0, that's a relatively | | |
| 271 9    weak relationship? | | |
| 271 10    A:  It's a view that I don't | | |
| 271 11    subscribe to. | | |
| 271 12    Q:  Do you know that that's the | | |
| 271 13    view that's expressed in a book that you | | |
| 271 14    wrote a chapter in? | | |
| 271 15    A:  A, I haven't read a chapter | | |
| 271 16    where that view is expressed; and, B, | | |
| 271 17    that's one chapter written by one author | | |
| 271 18    in a textbook where the editor pretty | | |
| 271 19    much lets you write what your point of | | |
| 271 20    view is. | | |
| 271 21    Q:  Do you know whether your | **Pl's Obj:**  Lack of foundation. | **Barnett:**  Sustained. |
| 271 22    colleague, Dr. Ray has said under oath | Witness has no knowledge. | **Smith:**  No objection. |
| 271 23    that if the relative risk is less than 2, | Assumes facts not in evidence. | Testimony played. |
| 271 24    then it's less likely than not for any | R. 801, R. 802. | **Mason:**  Sustained. |
| | | |
| 272:1 -    272:19    Graham, David 2006-05-09 | | |
| 272 1    particular person that Vioxx would have | | |
| 272 2    contributed to a heart attack? | | |
| 272 3    A:  I'm not aware of anything | | |
| 272 4    that Dr. Ray has said under oath. | | |
| 272 5    Q:  You spent a little bit of | | |
| 272 6    time on direct examination concerning the | | |
| 272 7    approval of Vioxx, as well as a | | |
| 272 8    subsequent label change. And I just | | |
| 272 9    wanted to make sure that we were clear on | | |
| 272 10    this. | | |
| 272 11    Did you have any personal | | |
| 272 12    role whatsoever in the FDA's review of | | |
| 272 13    the application that led to the approval | | |
| 272 14    of Vioxx? | | |
| 272 15    A:  No. | | |
| 272 16    Q:  And did you have any role | | |
| 272 17    whatsoever in reviewing proposed label | | |
| 272 18    changes for Vioxx? | | |
| 272 19    A:  No. | | |
| | | |
| 274:1   -    275:10    Graham, David 2006-05-09 | | |
| 274: 1    And that is, is it your view | | |
| 274: 2    that warning language in labels does not | | |
| 274: 3    have a significant effect on the | | |
| 274: 4    decisions by doctors and whether to | | |
| 274: 5    prescribe the medicines that the warnings | | |
| 274: 6    accompany? | | |
| 274: 7    A:  It's my view that warnings | | |
| 274: 8    as implemented by FDA have been very | | |
| 274: 9    ineffective. There are means, I believe, | | |
| 274: 10    whereby labeling could be constructed in | | |
| 274: 11    a fashion that it actually would | | |
| 274: 12    potentially influence physician behavior | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 274: 13 | and perhaps then find its way into | | |
| 274: 14 | patient behavior. | | |
| 274: 15 | Q:  Would that be a different | | |
| 274: 16 | way of going about labeling than the FDA | | |
| 274: 17 | currently does? | | |
| 274: 18 | A:  It would actually just be | | |
| 274: 19 | more straightforward about what the | | |
| 274: 20 | problems are, using very bold and frank | | |
| 274: 21 | and plain language, not sort of using | | |
| 274: 22 | adjectives that kind of downplay it and | | |
| 274: 23 | not burying it in tremendous amounts of | | |
| 274: 24 | text so that when a physician looks at | | |
| 275: 1 | the label, they're confronted by three | | |
| 275: 2 | paragraphs of warnings, and the warning | | |
| 275: 3 | that really matters is kind of buried in | | |
| 275: 4 | the midst of it. I think that there's a | | |
| 275: 5 | lot of room for experimentation where | | |
| 275: 6 | these labeling interventions might | | |
| 275: 7 | actually have an effect. But as | | |
| 275: 8 | practiced, the way FDA implements them, | | |
| 275: 9 | they are not -- have not been, until now, | | |
| 275: 10 | effective, in my view. | | |
| | | | |
| **276:12   -   277:19** | Graham, David 2006-05-09 | | |
| 276: 12 | Q:  Did you say in a written | | |
| 276: 13 | publication in 2002, co-authored with | | |
| 276: 14 | Willy, that 'The findings from this study | | |
| 276: 15 | are consistent with the results from | | |
| 276: 16 | other studies showing that product | | |
| 276: 17 | labeling may not meaningfully affect | | |
| 276: 18 | physician behavior'? | | |
| 276: 19 | A:  Yes. | | |
| 276: 20 | Q:  Did you say in a 2001 | | |
| 276: 21 | article written by you as the lead | | |
| 276: 22 | author, 'This study suggests that | | |
| 276: 23 | labeling changes, including black box | | |
| 276: 24 | warnings, and instructions to monitor | | |
| 277: 1 | patients closely, as well as repeated | | |
| 277: 2 | 'Dear Healthcare Professional' letters to | | |
| 277: 3 | physicians cannot be assumed to be | | |
| 277: 4 | effective means of risk management'? | | |
| 277: 5 | A:  Yes, I said that. | | |
| 277: 6 | Q:  I want to move now to the | | |
| 277: 7 | Kaiser study. I think you described that | | |
| 277: 8 | this is an epidemiological study, not a | | |
| 277: 9 | clinical trial, right? | | |
| 277: 10 | A:  Correct. | | |
| 277: 11 | Q:  And what that means is that | | |
| 277: 12 | you and your colleagues examined the | | |
| 277: 13 | medical records from thousands or even | | |
| 277: 14 | more patients from the HMO, and you could | | |
| 277: 15 | see what medicines they were prescribed | | |
| 277: 16 | and you could see what problems they had | | |
| 277: 17 | or didn't have in their healthcare; is | | |
| 277: 18 | that right? | | |
| 277: 19 | A:  That's correct. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 287:24 - 288:9     Graham, David 2006-05-09 | | |
| 287 24     And I've prepared a chart, | | |
| 288 1     and what I want to do is talk with you | | |
| 288 2     about different statements that you made | | |
| 288 3     in different publications about the | | |
| 288 4     significance of 25 milligrams or below, | | |
| 288 5     whether that poses a statistically | | |
| 288 6     significant increase for heart attacks, | | |
| 287 7     whether -- and whether above 25 does. | | |
| 288 8     Are you with me? | | |
| 288 9     A:  Uh-huh. | | |
| | | |
| 290:16 - 291:6     Graham, David 2006-05-09 | | |
| 290 16     Q:  Dr. Graham, what I want to | | |
| 290 17     do now is fill in these blanks on the | | |
| 290 18     chart I have on the screen for the | | |
| 290 19     relative risk and confidence intervals in | | |
| 290 20     these different categories. | | |
| 290 21     So, with the May 2004 ACR | | |
| 290 22     abstract, do I have that correct that the | | |
| 290 23     relative risk that was reported was 1.02 | | |
| 290 24     for 25 milligrams or less, with the | | |
| 291 1     confidence intervals as I've indicated up | | |
| 291 2     there? | | |
| 291 3     A:  Yes, that's correct. | | |
| 291 4     Q:  And that is not | | |
| 291 5     statistically significant, correct? | | |
| 291 6     A:  That's correct. | | |
| | | |
| 291:23 - 295:19     Graham, David 2006-05-09 | | |
| 291: 23     Q:  Okay. | | |
| 291: 24     Now, after this May 2004 | | |
| 292: 1     abstract, you went back and reclassified | | |
| 292: 2     some of the patients from the Kaiser | | |
| 292: 3     study who had been classified as low-dose | | |
| 292: 4     patients for the purposes of the analysis | | |
| 292: 5     that's shown in the abstract. I think my | | |
| 292: 6     hand just snuck across the screen. | | |
| 292: 7     Excuse me. | | |
| 292: 8     You reclassified some | | |
| 292: 9     patients who had been counted as low-dose | | |
| 292: 10     patients, and then you counted them | | |
| 292: 11     instead as high-dose patients; is that | | |
| 292: 12     right? | | |
| 292: 13     A:  Yes. And high-dose patients | | |
| 292: 14     who are reclassified as low dose. | | |
| 292: 15     - - - | | |
| 292: 16     (Whereupon, Deposition | | |
| 292: 17     Exhibit Graham-12, E-mail 5-25-04 | | |
| 292: 18     KP002153, was marked for | | |
| 292: 19     identification.) | | |
| 292: 20     - - - | | |
| 292: 21     BY MR. BECK: | | |
| 292: 22     Q:  After you reclassified | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 292: 23    patients, then I'm going to show you what | | |
| 292: 24    we marked as Exhibit 12. Did you write | | |
| 293: 1    an e-mail which is -- I'm looking for the | | |
| 293: 2    date. Can you help me with the date? | | |
| 293: 3    Oh, it is also from May. Up at the top | | |
| 293: 4    you will see your e-mail is May 25th, | | |
| 293: 5    2004? | | |
| 293: 6    A: Uh-huh. | | |
| 293: 7    Q: And then you report new | | |
| 293: 8    relative risks and confidence intervals | | |
| 293: 9    based on the reclassifications, right? | | |
| 293: 10    A: Yes. | | |
| 293: 11    Q: Okay. | | |
| 293: 12    And tell me if I have it | | |
| 293: 13    right up here. The relative risk that | | |
| 293: 14    you reported after reclassifying people | | |
| 293: 15    for the 25 milligrams or less was .98, | | |
| 293: 16    correct? | | |
| 293: 17    A: Yes. | | |
| 293: 18    Q: With the confidence | | |
| 293: 19    intervals as I've indicated there, right? | | |
| 293: 20    A: Yes. | | |
| 293: 21    Q: And that is not | | |
| 293: 22    statistically significant, correct? | | |
| 293: 23    A: Correct. | | |
| 293: 24    Q: And we're talking here about | | |
| 294: 1    Vioxx 25 milligrams or less compared to | | |
| 294: 2    people who are not taking pain | | |
| 294: 3    medication, no difference in risk, right? | | |
| 294: 4    A: Right. | | |
| 294: 5    Q: And in your analogy of | | |
| 294: 6    bullets in chambers, there would be zero | | |
| 294: 7    bullets in the chambers for people who | | |
| 294: 8    were using 25 milligrams of Vioxx, right? | | |
| 294: 9    A: Yeah. They'd be pretty | | |
| 294: 10    close to zero. There would be five or | | |
| 294: 11    six, but yes. | | |
| 294: 12    Q: Well, there would be -- | | |
| 294: 13    A: The P is .91. So, what that | | |
| 294: 14    means is that 91 out of 100 chances that | | |
| 294: 15    the answer lies between those confidence | | |
| 294: 16    intervals and that that .98 -- so, it's | | |
| 294: 17    the most likely answer. | | |
| 294: 18    Q: The most likely thing is -- | | |
| 294: 19    and when we say .98, that's actually a | | |
| 294: 20    little bit lower risk than someone who's | | |
| 294: 21    not taking any medicine at all. I mean, | | |
| 294: 22    it doesn't -- it's so little that it | | |
| 294: 23    doesn't make any difference, but we're | | |
| 294: 24    talking about Vioxx 25 milligrams is | | |
| 295: 1    basically indistinguishable from not | | |
| 295: 2    taking any medicine at all when it comes | | |
| 295: 3    to cardiovascular risk, right? | | |
| 295: 4    A: Yes. | | |
| 295: 5    Q: Okay. | | |
| 295: 6    And then after this | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 295: 7 | reclassification, the risk that you | | |
| 295: 8 | reported, the relative risk for higher | | |
| 295: 9 | dose goes up substantially, and then it | | |
| 295: 10 | is statistically significant, correct? | | |
| 295: 11 | A: Yes. | | |
| 295: 12 | Q: Now, after the e-mail, did | | |
| 295: 13 | you -- I think you said you did something | | |
| 295: 14 | called a poster, you wrote up a poster. | | |
| 295: 15 | A: Right. That was in August. | | |
| 295: 16 | Q: August of -- | | |
| 295: 17 | A: Of 2004. | | |
| 295: 18 | Q: Of 2004? | | |
| 295: 19 | A: Correct. | | |
| | | | |
| 295:24 -   296:13 | Graham, David 2006-05-09 | | |
| 295 24 | (Whereupon, Deposition | | |
| 296 1 | Exhibit Graham-13, 'Risk of Acute | | |
| 296 2 | Myocardial Infarction and Sudden | | |
| 296 3 | Cardiac Death with Use of COX-2 | | |
| 296 4 | Selective and Non-Selective | | |
| 296 5 | NSAIDs' (Graham, et al) KP001521 | | |
| 296 6 | - KP001526, was marked for | | |
| 296 7 | identification.) | | |
| 296 8 | - - - | | |
| 296 9 | BY MR. BECK: | | |
| 296 10 | Q: And I think I got it right. | | |
| 296 11 | Is it the ISPE poster that you talked | | |
| 296 12 | about on direct examination? | | |
| 296 13 | A: Yes. | | |
| | | | |
| 298:5 -   299:5 | Graham, David 2006-05-09 | | |
| 298 5 | Q: And all I want you to do is | | |
| 298 6 | confirm for me, sir, after you | | |
| 298 7 | reclassified people and then changed the | | |
| 298 8 | regression analysis, is this the relative | | |
| 298 9 | risk that you recorded for 25 milligrams | | |
| 298 10 | or less? | | |
| 298 11 | A: Yes, it is. | | |
| 298 12 | Q: And that is under | | |
| 298 13 | traditional approach not statistically | | |
| 298 14 | significant, correct? | | |
| 298 15 | A: It's elevated, that's | | |
| 298 16 | correct. | | |
| 298 17 | Q: Correct that it's not | | |
| 298 18 | statistically significant? | | |
| 298 19 | A: Yes, but -- yes. | | |
| 298 20 | Q: And then the high dose | | |
| 298 21 | numbers came down somewhat, but still | | |
| 298 22 | elevated. And after the reclassification | | |
| 298 23 | and change in methodology, they remained | | |
| 298 24 | statistically significant, right? | | |
| 299 1 | A: Yes. | | |
| 299 2 | Q: Now, finally you reported | | |
| 299 3 | these results in The Lancet article that | | |
| 299 4 | you testified about, right? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 299 5 | A: Yes. | | |

300:18 -   305:6    Graham, David 2006-05-09

| | | | |
|---|---|---|---|
| 300 18 | So, after the | | |
| 300 19 | reclassification in May and the change in | | |
| 300 20 | methodology in August, and then the | | |
| 300 21 | quality control in 2005, your final | | |
| 300 22 | result for 25 milligrams and below was a | | |
| 300 23 | relative risk of 1.23 with a confidence | | |
| 300 24 | interval from below 1 to above 1, right? | | |
| 301 1 | A: Yes. | | |
| 301 2 | Q: And under traditional | | |
| 301 3 | approach, that is not statistically | | |
| 301 4 | significant, correct? | | |
| 301 5 | A: Correct. | | |
| 301 6 | Q: And then the final numbers | | |
| 301 7 | for the high dose that you had were 3 | | |
| 301 8 | with the confidence interval as | | |
| 301 9 | indicated, right? | | |
| 301 10 | A: Yes. | | |
| 301 11 | Q: And that under this analysis | | |
| 301 12 | remains statistically significant; is | | |
| 301 13 | that right? | | |
| 301 14 | A: Yes. | | |
| 301 15 | Q: So, just sort of a summary | | |
| 301 16 | question that in all four of your reports | | |
| 301 17 | as to the outcome of your study, the 25 | | |
| 301 18 | milligrams and below, the relative risk | | |
| 301 19 | at all times remained under traditional | | |
| 301 20 | views as to statistical significance; is | | |
| 301 21 | that right? | | |
| 301 22 | A: Compared to remote use, but | | |
| 301 23 | not compared to -- well, compared to | | |
| 301 24 | remote use. | | |
| 302 1 | Q: Yeah. I'm asking about | | |
| 302 2 | comparing it to remote use, which is -- | | |
| 302 3 | A: Basically nonuse. | | |
| 302 4 | Q: Right. | | |
| 302 5 | So, in all four at 25 | | |
| 302 6 | milligrams or below, there was no | | |
| 302 7 | statistically significant difference | | |
| 302 8 | between taking that dose of Vioxx and not | | |
| 302 9 | taking any medicine at all, right? | | |
| 302 10 | A: Yes. | | |
| 302 11 | Q: I want to focus a bit on, a | | |
| 302 12 | little bit more on how these changes came | | |
| 302 13 | about from the abstract to the poster and | | |
| 302 14 | also what people within the FDA were | | |
| 302 15 | saying about your analysis, because I | | |
| 302 16 | think you testified about that this | | |
| 302 17 | morning. Do you remember that? | | |
| 302 18 | A: Uh-huh. | | |
| 302 19 | Q: The abstract itself, did you | | |
| 302 20 | have that reviewed by anybody from the | | |
| 302 21 | FDA before the abstract was published? | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 302 22   A:  What are we referring to? | | |
| 302 23   Q:  We're referring to back up | | |
| 302 24   on the screen, May of 2004 -- | | |
| 303 1   A:  The ACR abstract. | | |
| 303 2   Q:  -- ACR abstract. | | |
| 303 3   A:  What happened with the ACR | | |
| 303 4   abstract is that David Campen at Kaiser | | |
| 303 5   was the first author, and I sent him the | | |
| 303 6   quick analysis that we had done, and he | | |
| 303 7   submitted the abstract, and I did not put | | |
| 303 8   it through FDA clearance, and that was an | | |
| 303 9   oversight on my part. | | |
| 303 10   Q:  And then because there is a | | |
| 303 11   procedure that you are supposed to follow | | |
| 303 12   at FDA to show them studies and articles | | |
| 303 13   and abstracts and posters that you intend | | |
| 303 14   to have your name on, whether you're the | | |
| 303 15   first author or second, third, fourth or | | |
| 303 16   fifth, right? | | |
| 303 17   A:  Yes. | | |
| 303 18   Q:  Okay. | | |
| 303 19   And then when it came to the | | |
| 303 20   poster in August of 2004, after you've | | |
| 303 21   reclassified people and changed the | | |
| 303 22   methodology, did you submit that for | | |
| 303 23   review by folks from the FDA? | | |
| 303 24   A:  Yes, I did. | | |
| 304 1   Q:  And I think you indicated | | |
| 304 2   that your supervisor reviewed that | | |
| 304 3   poster; is that right? | | |
| 304 4   A:  Yes. | | |
| 304 5   Q:  And what was his name? | | |
| 304 6   A:  Paul Seligman. | | |
| 304 7   Q:  And at the time, was he the | | |
| 304 8   acting head of the Office of the Drug | | |
| 304 9   Safety? | | |
| 304 10   A:  I think so, yes. | | |
| 304 11   Q:  And you said something about | | |
| 304 12   how he suggested a change in the | | |
| 304 13   conclusion. Was your -- did your initial | | |
| 304 14   draft of the poster have a conclusion | | |
| 304 15   that the high dose of Vioxx, the 50 | | |
| 304 16   milligram dose should not be prescribed | | |
| 304 17   or used? | | |
| 304 18   A:  Let me see what this one | | |
| 304 19   says and then I can answer you. | | |
| 304 20   (Witness reviewing | | |
| 304 21   document.) | | |
| 304 22   Yes. | | |
| 304 23   Q:  Okay. | | |
| 304 24   And then I think you said | | |
| 305 1   that Dr. Seligman did not agree with that | | |
| 305 2   conclusion and said that you should take | | |
| 305 3   out the conclusion that high dose 50 | | |
| 305 4   milligrams should not be prescribed or | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 305 5      used; is that right? | | |
| 305 6      A:  Correct. | | |
| | | |
| 305:10 -   305:16    Graham, David 2006-05-09 | | |
| 305 10      (Whereupon, Deposition | | |
| 305 11      Exhibit Graham-14, E-mails with | | |
| 305 12      attachment 'Comments on ISPE | | |
| 305 13      Paper' FDACDER006048 - | | |
| 305 14      FDACDER006049, was marked for | | |
| 305 15      identification.) | | |
| 305 16      - - - | | |
| | | |
| 305:19 -   306:11    Graham, David 2006-05-09 | | |
| 305 19      BY MR. BECK: | | |
| 305 20      Q:  Do you recognize Exhibit 14? | | |
| 305 21      A:  Yes, I do. | | |
| 305 22      Q:  What is Exhibit 14? | | |
| 305 23      A:  It's an e-mail from Dr. | | |
| 305 24      Seligman to me with his comments on the | | |
| 306 1      poster. | | |
| 306 2      Q:  All right. | | |
| 306 3      And then the next page are | | |
| 306 4      his comments, right? | | |
| 306 5      A:  Right. | | |
| 306 6      Q:  Was Mr. -- is it Dr. | | |
| 306 7      Seligman? | | |
| 306 8      A:  Dr. Seligman. | | |
| 306 9      Q:  Dr. Seligman, is he one of | | |
| 306 10      the people that you think was out to get | | |
| 306 11      you at the FDA? | | |
| | | |
| 306:14 -   308:6    Graham, David 2006-05-09 | | |
| 306 14      THE WITNESS:  Let's put it | | |
| 306 15      this way. Dr. Seligman ordered an | | |
| 306 16      illegal criminal investigation in | | |
| 306 17      early 2004 to identify the person | | |
| 306 18      or persons who spoke to the media | | |
| 306 19      about the fact that Dr. Andrew | | |
| 306 20      Mossholder, an FDA medical officer | | |
| 306 21      who had done a study looking at | | |
| 306 22      SSRI antidepressants and | | |
| 306 23      suicidality in children, that that | | |
| 306 24      had been suppressed. | | |
| 307 1      Dr. Seligman, under oath | | |
| 307 2      before the House subcommittee on | | |
| 307 3      investigations and oversight for | | |
| 307 4      FDA, admitted under oath that he | | |
| 307 5      had ordered that illegal criminal | | |
| 307 6      investigation to identify the | | |
| 307 7      source of the leak and that he had | | |
| 307 8      named me as a suspect, although he | | |
| 307 9      had no grounds to do so, except | | |
| 307 10      that he thought that this is the | | |
| 307 11      kind of thing that I would do. | | |
| 307 12      And so there is that past history | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 307 13    with Dr. Seligman to keep in mind. | | |
| 307 14    At this point, I wasn't | | |
| 307 15    interpreting his comments in that | | |
| 307 16    regard except that the reason why | | |
| 307 17    I hadn't said in the original | | |
| 307 18    version was that high dose | | |
| 307 19    rofecoxib should be removed from | | |
| 307 20    the market was because I knew the | | |
| 307 21    type of reaction it would get, and | | |
| 307 22    toning it down a little bit still | | |
| 307 23    elicited pretty much the same | | |
| 307 24    response, and that's expressed | | |
| 308 1    here. | | |
| 308 2    BY MR. BECK: | | |
| 308 3    Q:  Well, this morning, didn't | | |
| 308 4    you testify, in effect, that there were | | |
| 308 5    several people at the FDA who were out to | | |
| 308 6    get you? | | |
| | | |
| 308:10 -   308:18    Graham, David 2006-05-09 | | |
| 308 10    THE WITNESS:  No, I never | | |
| 308 11    used those, but I can -- | | |
| 308 12    BY MR. BECK: | | |
| 308 13    Q:  No. The terms you used were | | |
| 308 14    that there was an 'organized and | | |
| 308 15    orchestrated campaign to smear and | | |
| 308 16    discredit me.' Do you remember that | | |
| 308 17    phrase? | | |
| 308 18    A:  Yes. | | |
| | | |
| 308:21 -   311:5    Graham, David 2006-05-09 | | |
| 308 21    THE WITNESS:  And we can | | |
| 308 22    talk about that in detail if you | | |
| 308 23    would like. | | |
| 308 24    BY MR. BECK: | | |
| 309 1    Q:  Okay. | | |
| 309 2    My question right now is a | | |
| 309 3    narrow one. Is Dr. Seligman one of the | | |
| 309 4    people that you were referring to this | | |
| 309 5    morning as part of this organized and | | |
| 309 6    orchestrated campaign that you thought | | |
| 309 7    existed to smear and discredit you? | | |
| 309 8    A:  Yes. He would be part of | | |
| 309 9    that group. | | |
| 309 10    Q:  Okay. | | |
| 309 11    So, let's look at what Dr. | | |
| 309 12    Seligman said when you submitted the | | |
| 309 13    poster to him. He said, 'In general an | | |
| 309 14    excellent study and analysis of a complex | | |
| 309 15    topic.' | | |
| 309 16    Do you see that? | | |
| 309 17    A:  Yes. | | |
| 309 18    Q:  And then he says, 'As you | | |
| 309 19    might expect, my only comment has to do | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 309 20    with the conclusion that 'higher-dose | | |
| 309 21    rofecoxib should not be prescribed or | | |
| 309 22    used." | | |
| 309 23    That's the conclusion that | | |
| 309 24    you and I were talking about a few | | |
| 310 1    minutes ago, right? | | |
| 310 2    A:  Right. | | |
| 310 3    Q:  Then he went on to explain | | |
| 310 4    why he was concerned with having a | | |
| 310 5    conclusion like that, didn't he? | | |
| 310 6    A:  Yes. | | |
| 310 7    Q:  And then he said, 'My | | |
| 310 8    concern is based both on the small number | | |
| 310 9    of cases (10) and the lack of information | | |
| 310 10    inherent in such a study regarding the | | |
| 310 11    time-to-event." | | |
| 310 12    Now, small number of cases | | |
| 310 13    being ten, does that mean that there were | | |
| 310 14    only ten cases in your study of thousands | | |
| 310 15    and thousands of patients where somebody | | |
| 310 16    taking high-dose Vioxx had either a heart | | |
| 310 17    attack or sudden cardiac death? | | |
| 310 18    A:  We had ten patients who were | | |
| 310 19    currently exposed to high-dose rofecoxib | | |
| 310 20    Vioxx at the time of their heart attack | | |
| 310 21    or sudden death. | | |
| 310 22    Q:  And the concern expressed by | | |
| 310 23    Dr. Seligman, whether you believe him | | |
| 310 24    today or not, was that that number is | | |
| 311 1    just too small to draw a meaningful | | |
| 311 2    conclusion from, correct? | | |
| 311 3    A:  That's what I think he's | | |
| 311 4    driving at here, but that's what a | | |
| 311 5    confidence interval is for. | | |
| | | |
| 312:2 -   314:2    Graham, David 2006-05-09 | | |
| 312 2    Q:  But in any event, Dr. | | |
| 312 3    Seligman disagreed and said the number of | | |
| 312 4    cases is just so small that you cannot | | |
| 312 5    legitimately draw such a conclusion, | | |
| 312 6    correct? | | |
| 312 7    A:  Yes. But he's not referring | | |
| 312 8    to the confidence intervals, and, you | | |
| 312 9    know, if you ask him the same questions | | |
| 312 10    you're asking me, he'd have to say that | | |
| 312 11    the confidence intervals permit it. | | |
| 312 12    Q:  Well, did others in the FDA | | |
| 312 13    express similar concerns that Dr. | | |
| 312 14    Seligman expressed about whether you | | |
| 312 15    could draw conclusions from such a small | | |
| 312 16    number -- | | |
| 312 17    A:  Yes, they did. | | |
| 312 18    Q:  -- of people who used the | | |
| 312 19    high-dose Vioxx? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 312 20 | A: Yes, they did. | | |
| 312 21 | Q: Who is Dr. John Jenkins? | | |
| 312 22 | A: He's the director of the | | |
| 312 23 | Office of New Drugs. | | |
| 312 24 | Q: And is Dr. Jenkins another | | |
| 313 1 | one of the FDA people that you think was | | |
| 313 2 | out to get you? | | |
| 313 3 | A: No. | | |
| 313 4 | - - - | | |
| 313 5 | (Whereupon, Deposition | **Pl's Obj.:** 602. Witness | **Barnett:** Sustained. |
| 313 6 | Exhibit Graham-15, E-mails | has never seen email. Lack | **Smith:** Overruled. |
| 313 7 | FDACDER011048 - FDACDER011049, | of knowledge. Speculation. | **Mason:** Overruled. |
| 313 8 | was marked for identification.) | Hearsay. | |
| 313 9 | - - - | | |
| 313: 10 | BY MR. BECK: | **Def's Rep.:** *See* Merck's | |
| 313: 11 | Q: Let me show you Exhibit 15. | cover memo. If Plaintiff is | |
| 313: 12 | A:  (Witness reviewing | allowed to play its expansive | |
| 313: 13 | document.) | version of Graham's direct, | |
| 313 14 | Q: Exhibit 15 is an e-mail | including 88,000-140,000 | |
| 313 15 | string. The last one appears to be dated | additional "excess events" | |
| 313 16 | August 11, 2004. They're all around that | testimony, it is critical that Merck | |
| 313 17 | time frame. | be allowed to question Graham's | |
| 313 18 | Do you see that the middle | credibility through these | |
| 313 19 | e-mail on Page 1 is from Dr. Jenkins? | documents. Court allowed these | |
| 313 20 | A: Yes, I see it. I've never | emails in *Smith* where Plaintiff | |
| 313 21 | seen this e-mail before, the best I can | played the excess events | |
| 313 22 | recollect. | testimony. | |
| 313 23 | Q. Let's go through what Dr. | | |
| 313 24 | Jenkins said, focusing on the second | | |
| 314 1 | paragraph of his e-mail of August 11, | | |
| 314 2 | 2004 | | |
| | | | |
| 315:4 -    319:7 | Graham, David 2006-05-09 | | |
| 315 4 | Q: So, Dr. Jenkins here, he | **Pl's Obj.:** 602. Witness | **Barnett:** Sustained. |
| 315 5 | says -- I put the little red marker where | has never seen email. Lack | **Smith:** Overruled. |
| 315 6 | I'm going to begin reading. Second | of knowledge. Speculation. | **Mason:** Sustained |
| 315 7 | paragraph, 'I would also note that I find | Hearsay. | on hearsay grounds re: |
| 315 8 | the conclusions reached in the poster to | **Def's Rep.:** Same as above. | 316:1-316:24. |
| 315 9 | be far in excess of the available data. | | |
| 315 10 | For example, 'Rofecoxib use at a dose | | |
| 315 11 | over 25 milligrams increases the risk of | | |
| 315 12 | AMI or SCD' is the primary conclusion of | | |
| 315 13 | the poster. This is a far too definitive | | |
| 315 14 | conclusion based on the data. Similar | | |
| 315 15 | language appears in other parts of the | | |
| 315 16 | poster and implies that a causal | | |
| 315 17 | relationship has been confirmed.' | | |
| 315 18 | Now, just stopping there. | | |
| 315 19 | Did you know back in 2004 that Dr. | | |
| 315 20 | Jenkins was of the same view that Dr. | | |
| 315 21 | Seligman expressed to you? | | |
| 315 22 | A: There was one e-mail from | | |
| 315 23 | sometime after this date, but in the | | |
| 315 24 | teens of August, it was like a two-line | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 316 1    e-mail in which Dr. Jenkins suggested | | |
| 316 2    what he thought different wording for our | | |
| 316 3    conclusions would be acceptable to him | | |
| 316 4    were, and that's pretty much the extent | | |
| 316 5    of what my knowledge of what Dr. Jenkins | | |
| 316 6    thought. | | |
| 316 7    Q:  Do you see where he goes on | | |
| 316 8    to say: 'This is misleading at best and | | |
| 316 9    deceptive at worst, since what has been | | |
| 316 10    demonstrated as an association between | | |
| 316 11    the use of the drug and the events in | | |
| 316 12    question. Yes, we have some priors and | | |
| 316 13    randomized controlled clinical trials | | |
| 316 14    that suggest rofecoxib may be associated | | |
| 316 15    with an increased risk of MI, but those | | |
| 316 16    priors do not support reaching such a | | |
| 316 17    definitive conclusion about the findings | | |
| 316 18    in the study'? | | |
| 316 19    Were you aware that Dr. | | |
| 316 20    Jenkins was expressing the view that the | | |
| 316 21    conclusion that you had in your draft | | |
| 316 22    poster was misleading at best and | | |
| 316 23    deceptive at worst? | | |
| 316 24    A:  Nope. No idea. | | |
| 317 1    Q:  And then he goes on to say, | | |
| 317 2    These types of overstated conclusions | | |
| 317 3    are typical of David's writing' -- David | | |
| 317 4    is you, correct? | | |
| 317 5    A:  Correct. | | |
| 317 6    Q:  -- 'and only serve to | | |
| 317 7    undermine his credibility as an objective | | |
| 317 8    evaluator of the data at hand.' | | |
| 317 9    And then he says, 'It is | | |
| 317 10    even more ridiculous for him to make | | |
| 317 11    broad recommendations about not using the | | |
| 317 12    drug based on the data from this study, | | |
| 317 13    and such sweeping clinical/regulatory | | |
| 317 14    conclusions represent the primary reason | | |
| 317 15    for difficulties in the interactions | | |
| 317 16    between David and staff in OND.' | | |
| 317 17    That would be Office of New | | |
| 317 18    Drugs, right? | | |
| 317 19    A:  Correct. | | |
| 317 20    Q:  Then before I get to the | | |
| 317 21    last couple of sentences, when you write | | |
| 317 22    articles like you talked about this | | |
| 317 23    morning and including this poster, do you | | |
| 317 24    typically have a disclaimer on there that | | |
| 318 1    says these are not necessarily the views | | |
| 318 2    of the FDA, they're just the views of the | | |
| 318 3    author, David Graham? | | |
| 318 4    A:  Oh, we're pretty much | | |
| 318 5    required to have that disclaimer. | | |
| 318 6    Q:  And do you see here where | | |
| 318 7    Dr. Jenkins says, 'Perhaps the disclaimer | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 318 8 | should read that 'The views expressed are | | |
| 318 9 | those of the author and DO NOT reflect | | |
| 318 10 | the views of the FDA.'' And 'Also, | | |
| 318 11 | perhaps, the COI statement' -- what's a | | |
| 318 12 | COI statement? | | |
| 318 13 | A: I think that's probably | | |
| 318 14 | conflict of interest. | | |
| 318 15 | Q: Okay. | | |
| 318 16 | And I think this morning you | | |
| 318 17 | said in response to questions from | | |
| 318 18 | counsel that you didn't have any | | |
| 318 19 | conflicts of interest. | | |
| 318 20 | Do you see where Dr. Jenkins | | |
| 318 21 | says that 'perhaps the conflict of | | |
| 318 22 | interest statement should say 'Dr. Graham | | |
| 318 23 | has no FINANCIAL conflicts of interest, | | |
| 318 24 | but' systemic 'bias in his viewpoints | | |
| 319 1 | cannot be excluded.' | | |
| 319 2 | Were you aware that that was | | |
| 319 3 | Dr. Jenkins' views as to the merits of | | |
| 319 4 | the poster conclusion? | | |
| 319 5 | A: Dr. Jenkins is entitled to | | |
| 319 6 | his opinions. I wasn't aware of them. | | |
| 319 7 | The same could be said of the FDA. | | |
| | | | |
| 320:22 - 326:9 | Graham, David 2006-05-09 | | |
| 320 22 | BY MR. BECK: | | |
| 320 23 | Q: Who is Sharon Hertz? | | |
| 320 24 | A: I think she's a deputy | | |
| 321 1 | division director for the analgesic and | | |
| 321 2 | anti-inflammatory reviewing division, and | | |
| 321 3 | that would be the reviewing division | | |
| 321 4 | responsible for NSAID drugs, both | | |
| 321 5 | naproxen and drugs like Vioxx. | | |
| 321 6 | - - - | | |
| 321 7 | (Whereupon, Deposition | | |
| 321 8 | Exhibit Graham-16, E-mails | | |
| 321 9 | FDACDER006056 - FDACDER006058, | | |
| 321 10 | was marked for identification.) | | |
| 321 11 | - - - | | |
| 321 12 | BY MR. BECK: | | |
| 321 13 | Q: I'm handing you what we've | | |
| 321 14 | marked as Exhibit 16, which I will put up | | |
| 321 15 | on the screen. This is a document that | | |
| 321 16 | you've seen before, correct? | | |
| 321 17 | A: That is correct. | | |
| 321 18 | Q: And it's from Sharon Hertz. | | |
| 321 19 | Is it Dr. Hertz? | | |
| 321 20 | A: Yes, it is. | | |
| 321 21 | Q: And Dr. Hertz, and it's to | | |
| 321 22 | you and your boss, Dr. Seligman, right? | | |
| 321 23 | A: Correct. | | |
| 321 24 | Q: And it copies Dr. Bull, who | | |
| 322 1 | we just read an e-mail from, as well as | | |
| 322 2 | Dr. Jenkins and some others, right? | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 322 3 A: Yes. | | |
| 322 4 Q: Did Dr. Hertz say to you | | |
| 322 5 that 'There is information to suggest | | |
| 322 6 that use of aspirin may mitigate possible | | |
| 322 7 CV risk associated with COX-2 | | |
| 322 8 inhibitors,' and go on to ask 'why would | | |
| 322 9 you choose to study CV risk from a | | |
| 322 10 database that does not collect | | |
| 322 11 information on something as relevant as | | |
| 322 12 aspirin use'? | | |
| 322 13 A: She said it, but she didn't | | |
| 322 14 understand the study, the methods, or why | | |
| 322 15 her question actually is not pertinent to | | |
| 322 16 the analysis that we did because we | | |
| 322 17 showed that aspirin is not a confounder | | |
| 322 18 of any association between NSAID use and | | |
| 322 19 heart attack risk. And because she | | |
| 322 20 doesn't understand epidemiology, she | | |
| 322 21 wrote this, but this is a statement | | |
| 322 22 that's coming from her lack of | | |
| 322 23 understanding of epidemiology. | | |
| 322 24 Q: And she also referred to | | |
| 323 1 your conclusion concerning high-dose | | |
| 323 2 Vioxx and the fact that that represented | | |
| 323 3 a very small subgroup of a large | | |
| 323 4 population,' correct? | | |
| 323 5 A: She says that, but high-dose | | |
| 323 6 Vioxx represented 18 percent of all the | | |
| 323 7 Vioxx use in the country. So, it has | | |
| 323 8 public health importance. | | |
| 323 9 Q: And did she tell you that | | |
| 323 10 drawing conclusions about this subgroup | | |
| 323 11 at all is inappropriate because of the | | |
| 323 12 small size of it? | | |
| 323 13 A: She says that, but her | | |
| 323 14 statement is incorrect, because the | | |
| 323 15 confidence intervals permit that. And it | | |
| 323 16 was stated a priori at the beginning of | | |
| 323 17 our study that we would do that analysis, | | |
| 323 18 that we would take a look as best we | | |
| 323 19 could at the effect of dose of rofecoxib, | | |
| 323 20 of Vioxx, on heart attack risk. So, she | | |
| 323 21 can use words like it's inappropriate for | | |
| 323 22 us to do that but the fact is that, she's | | |
| 323 23 mistaken. There's nothing inappropriate | | |
| 323 24 about it. | | |
| 324 1 Q: And you'll see at the bottom | | |
| 324 2 of the paragraph she said, 'This is | | |
| 324 3 simply bad science.' | | |
| 324 4 A: She's entitled to her | | |
| 324 5 opinion. | | |
| 324 6 Q: I forgot to ask you. Is | | |
| 324 7 Dr. Hertz one of the people at the FDA | | |
| 324 8 that you think was out to get you? | | |
| 324 9 A: I didn't use those terms, | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 324 10 | but, no, she is not one of those people. | | |
| 324 11 | Q:  Is she one of the people, | | |
| 324 12 | who, to use your terms, was part of the | | |
| 324 13 | very organized and orchestrated campaign | | |
| 324 14 | to smear and discredit you? | | |
| 324 15 | A:  She is not a member of that | | |
| 324 16 | group. | | |
| 324 17 | Q:  She just disagreed with you | | |
| 324 18 | and thought you were using bad science, | | |
| 324 19 | right? | | |
| 324 20 | A:  That's what she says here. | | |
| 324 21 | But she's not an epidemiologist, and I'm | | |
| 324 22 | not sure that she would recognize good | | |
| 324 23 | epidemiology if she saw it. | | |
| 324 24 | Q:  And Dr. Jenkins, who we | | |
| 325 1 | talked about a minute ago, who commented | | |
| 325 2 | on what he thought was the invalidity of | | |
| 325 3 | your analysis, do you think he knows what | | |
| 325 4 | he's talking about when it comes to | | |
| 325 5 | epidemiology? | | |
| 325 6 | A:  I think that Dr. Jenkins is | | |
| 325 7 | not an epidemiologist. He's a | | |
| 325 8 | pulmonologist. I think that he has broad | | |
| 325 9 | responsibilities for the approval of | | |
| 325 10 | drugs, and that it's his office, Office | | |
| 325 11 | of New Drugs, that approved Vioxx, and | | |
| 325 12 | that going back to the conflict of | | |
| 325 13 | interest that we talked about before, | | |
| 325 14 | that FDA has a vested interest in | | |
| 325 15 | maintaining the decisions that it's made | | |
| 325 16 | previously. And that their biggest | | |
| 325 17 | concern here was that they had, in | | |
| 325 18 | quotes, done a labeling change in 2002, | | |
| 325 19 | and that solved the problem. But I | | |
| 325 20 | contend that it didn't really accomplish | | |
| 325 21 | very much at all. | | |
| 325 22 | - - - | | |
| 325 23 | (Whereupon, Deposition | | |
| 325 24 | Exhibit Graham-17, E-mails | **Pl's Obj.:**  602.  Witness | **Barnett:** Sustained. |
| 326 1 | FDACDER021810 - FDACDER021811, | has never seen document. | **Smith:** Overruled. |
| 326 2 | was marked for identification.) | Lack of knowledge. | **Mason:** Sustained |
| 326 3 | - - - | Hearsay.  Speculation. | on hearsay grounds as to |
| 326 4 | BY MR. BECK: | **Def's Rep.:**  *See* Merck's | 326:5-9. |
| 326 5 | Q:  I'm going to hand you what | cover memo.  If Plaintiff is | |
| 326 6 | we've marked as Exhibit 17. Have you | allowed to play its expansive | |
| 326 7 | seen Exhibit 17 before? | version of Graham's direct, | |
| 326 8 | A:  No. I have never seen this | including 88,000-140,000 | |
| 326 9 | before. | additional "excess events" | |
| | | testimony, it is critical that | |
| 326:17 - 328:20 | Graham, David 2006-05-09 | Merck be allowed to question | |
| 326 17 | Q:  Lourdes Villalba. Who is | Graham's credibility through | |
| 326 18 | Lourdes Villalba? | these documents.  Court | |
| 326 19 | A:  She was the medical officer | allowed these emails in Smith | |
| 326 20 | who was responsible for Vioxx. She may | where Plaintiff played the | |
| 326 21 | have been the medical officer who | excess events testimony. | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 326 22 | reviewed the original Vioxx NDA, but that | **[326:17-328:20]** | **Barnett:** Sustained. |
| 326 23 | I'm not absolutely certain about, but she | **Pl's Obj.:** 602. Witness | **Smith:** Overruled. |
| 326 24 | had responsibility for it as the primary | has never seen document. | **Mason:** Sustained |
| 327 1 | medical officer in the reviewing division | Lack of knowledge. | on hearsay grounds for |
| 327 2 | of the Office of New Drugs at this time. | Hearsay. Speculation. | 326:17 - 328:10 only. |
| 327 3 | So, she's the one who would | **Def's Rep.:** Same as above. | |
| 327 4 | review -- well, actually, she did the | | |
| 327 5 | original review that we showed on the | | |
| 327 6 | slide. So, any supplements or any | | |
| 327 7 | submissions from Merck regarding Vioxx, | | |
| 327 8 | they would come to her desk. | | |
| 327 9 | Q: Was she one of the people | | |
| 327 10 | that was part of the organized and | | |
| 327 11 | orchestrated campaign to smear and | | |
| 327 12 | discredit you that you think existed at | | |
| 327 13 | the FDA? | | |
| 327 14 | A: No, she was not. | | |
| 327 15 | Q: At the bottom of this e-mail | | |
| 327 16 | string, Lourdes writes, 'I learned of | | |
| 327 17 | this study a couple of weeks ago when | | |
| 327 18 | Jonca requested my opinion about the | | |
| 327 19 | abstract that was going to be presented | | |
| 327 20 | in France. This study is not a good | | |
| 327 21 | study to address the cardiovascular | | |
| 327 22 | question. The conclusions are not well | | |
| 327 23 | supported by the data.' | | |
| 327 24 | Did you learn back in 2004 | | |
| 328 1 | that Lourdes Villalba felt that your | | |
| 328 2 | conclusions were not supported? | | |
| 328 3 | A: No. I was never told that, | | |
| 328 4 | but I'm not surprised. This is the | | |
| 328 5 | typical response of people in the Office | | |
| 328 6 | of New Drugs to studies that are done in | | |
| 328 7 | the Office of Drug Safety that we talked | | |
| 328 8 | about earlier where -- and that would | | |
| 328 9 | lead Dr. Galson to say that our office | | |
| 328 10 | doesn't add value to the center. | | |
| 328 11 | Q: Who is Anne Trontell? | | |
| 328 12 | A: Dr. Trontell is the deputy | | |
| 328 13 | director for the Office of Drug Safety. | | |
| 328 14 | Q: And is Dr. Trontell one of | | |
| 328 15 | the people that you were referring to | | |
| 328 16 | this morning when you said that within | | |
| 328 17 | the FDA there was a very organized and | | |
| 328 18 | orchestrated campaign to smear and | | |
| 328 19 | discredit you? | | |
| 328 20 | A: Yes. | | |
| | | | |
| 329:3 -   329:5 | Graham, David 2006-05-09 | | |
| 329 3 | BY MR. BECK: | **Pl's Obj.:** 602. Witness | **Barnett:** Sustained. |
| 329 4 | Q: Please take a look at | has never seen document. | **Smith:** Overruled. |
| 329 5 | Exhibit 18. | Lack of knowledge. | **Mason:** No objection. |
| | | Hearsay. Speculation. | |
| 329:24 -   333:6 | Graham, David 2006-05-09 | **Def's Rep.:** Same as below. | |
| 329 24 | Q: Do you remember whether | **Pl's Obj.:** Same. | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 330 | 1 | you've seen this document before? | Def's Rep.:  See Merck's | |
| 330 | 2 | A.  No, I don't think that I | cover memo.  If Plaintiff is | |
| 330 | 3 | have seen this document before. | allowed to play its expansive | |
| 330 | 4 | Q:  Do you see that Dr. Trontell | version of Graham's direct, | |
| 330 | 5 | is writing to Dr. Seligman in the e-mail | including 88,000-140,000 | |
| 330 | 6 | on the top? | additional "excess events" | |
| 330 | 7 | A:  Yes. | testimony, it is critical that | |
| 330 | 8 | Q:  Starting with the second | Merck be allowed to question | |
| 330 | 9 | paragraph, she says, 'I understand John's | Graham's credibility through | |
| 330 | 10 | consternation, but let us all acknowledge | these documents.  Court | |
| 330 | 11 | the problem arose when David Graham | allowed these emails in Smith | |
| 330 | 12 | overstepped the bounds of what anyone can | where Plaintiff played the | |
| 330 | 13 | conclude from a brief poster of a complex | excess events testimony. | |
| 330 | 14 | study. He ignored advice from multiple | | |
| 330 | 15 | FDA sources by making a blind conclusion | | |
| 330 | 16 | without giving enough information or time | | |
| 330 | 17 | to others in FDA to evaluate it | | |
| 330 | 18 | rigorously.' | | |
| 330 | 19 | Did Dr. Trontell communicate | | |
| 330 | 20 | those views to you even though you didn't | | |
| 330 | 21 | see this particular e-mail? | | |
| 330 | 22 | A:  She communicated views | | |
| 330 | 23 | similar to this. She never said that I | | |
| 330 | 24 | overstepped my bounds, and she didn't use | | |
| 331 | 1 | words like I ignored advice. And at the | | |
| 331 | 2 | end of the day, the poster was cleared by | | |
| 331 | 3 | FDA, so that they can complain all they | | |
| 331 | 4 | want, but I didn't -- I stuck to what I | | |
| 331 | 5 | believed based on the data, and they | | |
| 331 | 6 | cleared it at the end of the day. So, we | | |
| 331 | 7 | had honest disagreements about the data | | |
| 331 | 8 | and how to interpret it. | | |
| 331 | 9 | Q:  And as part of that | | |
| 331 | 10 | disagreement, do you see here where she | | |
| 331 | 11 | says that you 'subverted FDA review as | | |
| 331 | 12 | well as the normal standards of peer | | |
| 331 | 13 | review by stating an | | |
| 331 | 14 | inadequately-supported conclusion based | | |
| 331 | 15 | upon the limited data' you 'made | | |
| 331 | 16 | available for review'? Again, did she | | |
| 331 | 17 | express those views to you in substance? | | |
| 331 | 18 | A:  No. And that statement | | |
| 331 | 19 | actually makes absolutely no sense to me | | |
| 331 | 20 | as it's stated. If she's talking about | | |
| 331 | 21 | the differences between the ACR abstract | | |
| 331 | 22 | and the ISPE abstract, those things I | | |
| 331 | 23 | described to both Dr. Seligman and Dr. | | |
| 331 | 24 | Trontell between the end of May and | | |
| 332 | 1 | August, as we came upon each of the | | |
| 332 | 2 | problems and had to deal with them. And | | |
| 332 | 3 | she doesn't recall that. | | |
| 332 | 4 | We had many, many | | |
| 332 | 5 | conversations. And I had them with Dr. | | |
| 332 | 6 | Seligman as well. And so looking at | | |
| 332 | 7 | this, that's the only thing that I can | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 332 8 | guess she is -- she's saying from that, | | |
| 332 9 | but that's just a guess. | | |
| 332 10 | Q:  She says here, 'To publicize | | |
| 332 11 | findings that have not been fully vetted | | |
| 332 12 | is irresponsible and professionally | | |
| 332 13 | suspect.' | | |
| 332 14 | A:  Where are you? | | |
| 332 15 | Q:  If you look up on the | | |
| 332 16 | screen, I'm in the middle of the next | | |
| 332 17 | paragraph. | | |
| 332 18 | A:  Uh-huh. | | |
| 332 19 | Q:  Did she communicate those | | |
| 332 20 | views to you? | | |
| 332 21 | A:  No. But the fact is, is | | |
| 332 22 | that I didn't communicate anything to the | | |
| 332 23 | public that hadn't been cleared by FDA. | | |
| 332 24 | So, this statement really, in my mind, is | | |
| 333 1 | inaccurate and, you know, she's using a | | |
| 333 2 | lot of pejorative terms towards me, so, | | |
| 333 3 | she can be very critical of me, but the | | |
| 333 4 | fact is, is that the document was | | |
| 333 5 | cleared, and I have the signed clearance | | |
| 333 6 | form, and so she can have her opinion. | | |
| 333:7 - | 333:13 | Graham, David 2006-05-09 | | |
| 333 7 | Q.   She refers in here to an | **[333:7-13]** | **Barnett:** Not designated. |
| 8 | internal peer review process at the FDA. | **Pl's Obj.:** The answer to the | **Smith:** Not designated. |
| 9 | A.   Where are you now? | question at lines 10-13 has | **Mason:** Not designated. |
| 10 | Q.   Up in the first paragraph | not been designated. | |
| 11 | right after she says you "subverted FDA | | |
| 12 | review."  It says, "as well as the normal | | |
| 13 | standards of peer review." | | |
| 335:19 - | 336:8 | Graham, David 2006-05-09 | | |
| 335 19 | Q.   And did the folks at the FDA | **[335:19-336:8]** | **Barnett:** Not designated. |
| 335 20 | ask you for suggestions as to people who | | |
| 335 21 | could serve as good peer reviewers, | **Pl's Obj.:** Answer continues | **Smith:** Not designated. |
| 335 22 | people that you would respect and trust? | to line 15.  Regardless, | **Mason:** Not designated. |
| 335 23 | A.   Yes.  And they were the same | irrelevant.  R. 401, 402. | |
| 335 24 | names that they would have come up with | | |
| 336 1 | as well. | | |
| 336 2 | Q.   And what were those names? | | |
| 336 3 | A.   Robert O'Neill, who is the | | |
| 336 4 | director of the office of biostatistics | | |
| 336 5 | at FDA.  Bruce Stadel, Dr. Bruce Stadel | | |
| 336 6 | who's, in my view, the best | | |
| 336 7 | epidemiologist at FDA and who is retired | | |
| 336 8 | now.  And then, I believe I had mentioned | | |
| 337:16 - | 337:20 | Graham, David 2006-05-09 | | |
| 337 16 | Q:  I'm going to hand you | | |
| 337 17 | Exhibit 19 here, which is a memorandum | | |
| 337 18 | from Dr. Trontell to Dr. Seligman. Have | | |
| 337 19 | you seen this document before? | | |
| 337 20 | A:  Yes, I have. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 339:4 -   339:23   Graham, David 2006-05-09 | **Pl's Obj.:** Hearsay. | **Barnett:** Not designated. |
| 339 4   Q: Does Dr. Trontell in this | 801, 802. | **Smith:** Overruled. |
| 339 5   memorandum raise concerns with the | | **Mason:** Overruled. |
| 339 6   methodology used in the study that you | | |
| 339 7   had done? | | |
| 339 8   A: She raises a number of | | |
| 339 9   questions which we've actually discussed | | |
| 339 10   and have the answers to, yes. | | |
| 339 11   Q: Over on Page 2 in the last | | |
| 339 12   paragraph of the executive summary, did | | |
| 339 13   Dr. Trontell state: 'My review notes | | |
| 339 14   several unexplained inconsistencies in | | |
| 339 15   the conduct of the study and the | | |
| 339 16   reporting of results. Before the | | |
| 339 17   findings and conclusions of the study | | |
| 339 18   report can be accepted, the authors must | | |
| 339 19   address all inconsistencies with adequate | | |
| 339 20   documentation that clearly explains how | | |
| 339 21   they occurred, in order to address the | | |
| 339 22   potential appearance of data manipulation | | |
| 339 23   and post hoc analyses.' | | |
| 340:14 -   345:16   Graham, David 2006-05-09 | | |
| 340 14   BY MR. BECK: | | |
| 340 15   Q: Is a post hoc analysis where | | |
| 340 16   somebody, after a study is conducted, | | |
| 340 17   goes back and changes the rules of the | | |
| 340 18   study, and the concern then is that the | | |
| 340 19   results are invalid? I'm not asking | | |
| 340 20   whether you did it. I'm asking whether | | |
| 340 21   that's what the post hoc analysis is. | | |
| 340 22   A: When people talk about a | | |
| 340 23   post hoc analysis, what they mean is | | |
| 340 24   they're referring to an analysis that | | |
| 341 1   wasn't prespecified before the study | | |
| 341 2   began or before the analysis began. | | |
| 341 3   So, for example, in our | | |
| 341 4   study, I know that Dr. Trontell kept | | |
| 341 5   insisting that our comparison of Vioxx to | | |
| 341 6   Celebrex was a post hoc analysis. But it | | |
| 341 7   was there from the beginning of our | | |
| 341 8   protocol. And so -- and I had explained | | |
| 341 9   that to her multiple times. But that's | | |
| 341 10   what a post hoc analysis is. | | |
| 341 11   Q: And data manipulation, | | |
| 341 12   again, not focusing on her concerns about | | |
| 341 13   you, but what data manipulation is | | |
| 341 14   generally is basically rigging the | | |
| 341 15   numbers to come out the way you want | | |
| 341 16   them? | | |
| 341 17   A: It's scientific misconduct. | | |
| 341 18   Q: And please turn over two | | |
| 341 19   more pages. Under, at the bottom, | | |
| 341 20   Recommendations,' do you see where Dr. | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 341 21 Trontell says, 'The authors should | | |
| 341 22 document their methods in detail and | | |
| 341 23 respond to questions raised in this | | |
| 341 24 review in particular the noted | | |
| 342 1 inconsistencies in the study objectives, | | |
| 342 2 results and statistical findings of | | |
| 342 3 significance of their published ACR | | |
| 342 4 abstract and the August 2004 ISPE | | |
| 342 5 poster.' So, do you see there where | | |
| 342 6 she's expressing concern that you've come | | |
| 342 7 up with different conclusions and | | |
| 342 8 different methodologies between that | | |
| 342 9 original ACR abstract, and then your | | |
| 342 10 later poster, like we saw in the chart | | |
| 342 11 that I showed on the screen? Is that the | | |
| 342 12 subject that's being addressed here? | | |
| 342 13 A: Uh-huh. Yes. | | |
| 342 14 Q: And, in particular, what | | |
| 342 15 she's saying is that before you submit | | |
| 342 16 this article for publication, that you | | |
| 342 17 should address these issues and explain | | |
| 342 18 them, right? | | |
| 342 19 A: Dr. Trontell is saying that, | | |
| 342 20 but Dr. Trontell is not my supervisor. | | |
| 342 21 She wrote this to Dr. Seligman. Dr. | | |
| 342 22 Seligman, I believe, e-mailed it to me | | |
| 342 23 with basically no instructions. And so | | |
| 342 24 Dr. Trontell can have her opinions about | | |
| 343 1 what it is I should do, but she's not my | | |
| 343 2 supervisor, and, in fact, has never been | | |
| 343 3 someone who reviews any of the work that | | |
| 343 4 I do. | | |
| 343 5 Q: In any event, you submitted | | |
| 343 6 the article to the Lancet without making | | |
| 343 7 the responses that Dr. Trontell said you | | |
| 343 8 should make, right? | | |
| 343 9 A: The responses were actually | | |
| 343 10 included in the manuscript, A; B, we | | |
| 343 11 submitted the manuscript with the | | |
| 343 12 approval of my supervisors. Because I | | |
| 343 13 sent multiple e-mails to Dr. Seligman and | | |
| 343 14 to Dr. Trontell giving them my | | |
| 343 15 interpretation of FDA's clearance | | |
| 343 16 policies and asking them to instruct me | | |
| 343 17 if I had misinterpreted them in any way, | | |
| 343 18 because I was anxious to -- I wanted to | | |
| 343 19 be sure that I followed all of FDA's | | |
| 343 20 rules and procedures. And that if they | | |
| 343 21 didn't get back to me, then I would | | |
| 343 22 assume that I had interpreted them | | |
| 343 23 correctly and that it is all right for me | | |
| 343 24 to submit it. | | |
| 344 1 Dr. Trontell consulted with | | |
| 344 2 the head lawyer for the Center for Drug | | |
| 344 3 Evaluation and Research, Jane Axelrod, | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 344 4    who basically said to Dr. Trontell by way | | |
| 344 5    of e-mail that it was fine, that I could | | |
| 344 6    submit it. And so Anne did not have a | | |
| 344 7    written response to these questions, but | | |
| 344 8    I had -- my understanding was I had the | | |
| 344 9    permission of FDA to submit the paper. | | |
| 344 10    And it was never my understanding, quite | | |
| 344 11    honestly, that I was required to give | | |
| 344 12    written responses to these questions, and | | |
| 344 13    I tried to express that in an e-mail to | | |
| 344 14    Dr. Paul Seligman somewhere around | | |
| 344 15    November 10th or 9th or somewhere in that | | |
| 344 16    neighborhood, because I was about to go | | |
| 344 17    on a four-day weekend, because Veterans' | | |
| 344 18    Day, which is November 11th, is a Federal | | |
| 344 19    holiday, and I was going to take off the | | |
| 344 20    12th and then I would have a four-day | | |
| 344 21    weekend. | | |
| 344 22    And on the 9th, Dr. Seligman | | |
| 344 23    said that I could take leave on Friday, | | |
| 344 24    but before I left, he needed written | | |
| 345 1    responses to these questions. And I | | |
| 345 2    e-mailed back that I hadn't understood | | |
| 345 3    that that's what he wanted. And he never | | |
| 345 4    came back. He had an entire day, | | |
| 345 5    November 10th, Wednesday, the entire day | | |
| 345 6    he had to disabuse me of my understanding | | |
| 345 7    if he wanted to, and he never said to me | | |
| 345 8    that, no, I misunderstood, I really do | | |
| 345 9    want you to give a written response. And | | |
| 345 10    so I think that I acted reasonably and | | |
| 345 11    tried to get management to communicate | | |
| 345 12    with me, and management, in this case, | | |
| 345 13    did not answer my e-mails, did not come | | |
| 345 14    back to me to communicate with me in | | |
| 345 15    clear, unambiguous instructions about | | |
| 345 16    what it is that they wanted me to do. | | |
| | | |
| 353:2 -    353:18    Graham, David 2006-05-09 | | |
| 353 2    Q: And who is Dr. Steven | | |
| 353 3    Galson? | | |
| 353 4    A: He is the Center director | | |
| 353 5    for CEDR. | | |
| 353 6    Q: And I think you described | | |
| 353 7    this morning that CDER, both the Office | | |
| 353 8    of New Drugs and the Office For Drug | | |
| 353 9    Safety are underneath CDER, which is the | | |
| 353 10    Center for Drug Evaluation and Research, | | |
| 353 11    right? | | |
| 353 12    A: Right. | | |
| 353 13    Q: And is Dr. Galson one of the | | |
| 353 14    people that you think is part of this | | |
| 353 15    very organized and orchestrated campaign | | |
| 353 16    to smear and discredit you? | | |
| 353 17    A: Yes, he was. He may have | | |
| 353 18    been an unwitting participant. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|

361:23 -   363:2      Graham, David 2006-05-09

361  23      (Whereupon, Deposition
361  24      Exhibit Graham-23, E-mails,
362  1       TOPOLE0000333, was marked for
362  2       identification.)
362  3       - - -
362  4       BY MR. BECK:
362  5       Q:  What's Exhibit 23?
362  6       A:  It looks like an e-mail
362  7       dated November 1st from me to Dr. Eric
362  8       Topol at the Cleveland Clinic. And it's
362  9       -- it looks like it's kind of like in
362  10      response to an e-mail that he had sent to
362  11      me. And there are several other e-mails
362  12      that went back and forth between Dr.
362  13      Topol and myself, dating back, I think,
362  14      to like the end of October when he first
362  15      telephoned me to ask if I knew who was in
362  16      FDA he could talk to about COX-2 pain
362  17      relievers and heart attack risk. And I
362  18      referred him to Shari Targum, whose
362  19      review I spoke about earlier.
362  20      Q:  You referred to Dr. Topol as
362  21      at the Cleveland Clinic. Is he still at
362  22      the Cleveland Clinic?
362  23      A:  My understanding is that
362  24      he's now at Case Western, but I'm not
363  1       really -- it's basically what I read in
363  2       the newspaper.

367:19 -   368:15      Graham, David 2006-05-09

367  19      Now, are you saying here
367  20      that you thought that Merck decided to
367  21      withdraw Vioxx on September 30 because
367  22      people at FDA management gave them a
367  23      heads up that your article was going to
367  24      be published, and Merck said we'd better
368  1       get Vioxx off the market before that
368  2       article was published?
368  3       A:  No. I was just pointing to
368  4       the coincidence of the dates.
368  5       Q:  Well, you said it wasn't a
368  6       coincidence, didn't you?
368  7       A:  Well, I don't think it was a
368  8       coincidence, but...
368  9       Q:  So, that's my question.
368  10      Do you think that Merck's
368  11      withdrawal on September 30 was timed
368  12      because people at the FDA told Merck that
368  13      Dr. Graham is going to publish an
368  14      article, and so Merck said we'd better
368  15      get this drug off the market?

368:17 -   369:1      Graham, David 2006-05-09

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 368 17    THE WITNESS:  No, I don't. | | |
| 368 18    BY MR. BECK: | | |
| 368 19    Q:  That's what you told Dr. | | |
| 368 20    Horton -- | | |
| 368 21    A:  I know that. | | |
| 368 22    Q:  -- though, isn't it? | | |
| 368 23    A:  That's what I -- and at the | | |
| 368 24    time, I think under the duress that I was | | |
| 369 1    under, that is what I believed. | | |
| | | |
| 369:11 -  369:20    Graham, David 2006-05-09 | | |
| 369 11    Q:  That was kind of a wild and | | |
| 369 12    crazy charge you made to the editor of | | |
| 369 13    Lancet concerning -- | | |
| 369 14    A:  No. | | |
| 369 15    Q:  -- FDA management, don't you | | |
| 369 16    agree? | | |
| 369 17    A:  It's not wild and crazy. If | | |
| 369 18    you experienced what I experienced, you | | |
| 369 19    would understand -- you would understand | | |
| 369 20    better. | | |
| | | |
| 370:14 -  374:21    Graham, David 2006-05-09 | | |
| 370 14    Q:  Dr. Graham, as an | | |
| 370 15    epidemiologist, do you deal with the | | |
| 370 16    concept of incidence rates? | | |
| 370 17    A:  Yes, I do. | | |
| 370 18    Q:  And in a sentence or two, | | |
| 370 19    can you describe what an incidence rate | | |
| 370 20    is? | | |
| 370 21    A:  It's the occurrence of an | | |
| 370 22    outcome, a disease, in a defined | | |
| 370 23    population over a specified period of | | |
| 370 24    time. So, you might express something as | | |
| 371 1    10 per 100,000 per year would be an | | |
| 371 2    incidence rate. | | |
| 371 3    Q:  I have created a chart that | | |
| 371 4    I want to go over with you, and I want to | | |
| 371 5    look at some numbers from the Kaiser | | |
| 371 6    study that you did, and I understand that | | |
| 371 7    an adjustment was applied for a | | |
| 371 8    cardiovascular risk score that I'll get | | |
| 371 9    to later in the examination, but I want | | |
| 371 10    to look at the kind of raw numbers about | | |
| 371 11    incidence rates of heart attacks and | | |
| 371 12    sudden cardiac death for Vioxx and | | |
| 371 13    Celebrex as you saw them in your study. | | |
| 371 14    Okay? | | |
| 371 15    So, if you will take out | | |
| 371 16    Exhibit 4, which is your 2005 Lancet | | |
| 371 17    publication, and if you'll look over at | | |
| 371 18    the third page in the right column under | | |
| 371 19    Results,' tell me if the numbers I | | |
| 371 20    filled in on the screen there for number | | |
| 371 21    of users for Vioxx of something over | | |
| 371 22    26,000, and then for Celebrex, something | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 371 23    over 40,000, are those accurate numbers | | |
| 371 24    -- | | |
| 372 1    A:  Yes. | | |
| 372 2    Q:  -- from your study? | | |
| 372 3    A:  Yes. | | |
| 372 4    Q:  And then if you'll look at | | |
| 372 5    Table 3 on that same page or is -- Table | | |
| 372 6    3, I guess it's the next page. If you'll | | |
| 372 7    look at Table 3, do I have it right that | | |
| 372 8    the number of heart attacks and sudden | | |
| 372 9    cardiac deaths, Vioxx was 68 and for | | |
| 372 10    Celebrex was 126? | | |
| 372 11    A:  Yes. | | |
| 372 12    Q:  And when we're talking about | | |
| 372 13    Vioxx here, that includes both low dose | | |
| 372 14    and high dose, right? | | |
| 372 15    A:  Correct. | | |
| 372 16    Q:  And so just taking the | | |
| 372 17    numbers that you report before the | | |
| 372 18    adjustments are made, is this correct | | |
| 372 19    that the incidence rate of heart attacks | | |
| 372 20    and sudden cardiac deaths for Vioxx would | | |
| 372 21    be about .25 percent, whereas for | | |
| 372 22    Celebrex, it would actually be a little | | |
| 372 23    higher, .31 percent? | | |
| 372 24    A:  No. That's not an incidence | | |
| 373 1    rate. That is a proportion. An | | |
| 373 2    incidence rate would take into account | | |
| 373 3    the amount of time that each of the users | | |
| 373 4    was on the drug, and so then what you'd | | |
| 373 5    end up having is years of exposure to | | |
| 373 6    Vioxx in the denominator and number of | | |
| 373 7    cases in the numerator and the same for | | |
| 373 8    Celebrex. So, these are proportions, but | | |
| 373 9    they are not incidence rates. | | |
| 373 10    Q:  Okay. | | |
| 373 11    So, proportions. | | |
| 373 12    And the proportions of | | |
| 373 13    Celebrex users who experienced heart | | |
| 373 14    attacks or sudden cardiac deaths was | | |
| 373 15    actually slightly higher than the | | |
| 373 16    proportion of Vioxx users, correct? | | |
| 373 17    A:  That is correct. | | |
| 373 18    Q:  And you said that in order | | |
| 373 19    to do an incidence rate, you'd want to | | |
| 373 20    know how long they were using the drugs, | | |
| 373 21    so you'd take into account patient years; | | |
| 373 22    is that right? | | |
| 373 23    A:  Correct. | | |
| 373 24    MR. BECK:  Let me mark for | | |
| 374 1    you, please, Exhibit 25. | | |
| 374 2    - - - | | |
| 374 3    (Whereupon, Deposition | | |
| 374 4    Exhibit Graham-25, Chart | | |
| 374 5    FDACDER005940, was marked for | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 374 6 | identification.) | | |
| 374 7 | - - - | | |
| 374 8 | BY MR. BECK: | | |
| 374 9 | Q:  And this Exhibit 25, do you | | |
| 374 10 | recognize this as a document or a page of | | |
| 374 11 | a longer document that was created as | | |
| 374 12 | part of your study? | | |
| 374 13 | A:  Yes. I don't recall, | | |
| 374 14 | though, at what stage in the study that | | |
| 374 15 | this run was done, and so I don't know if | | |
| 374 16 | it included sort of the modifications | | |
| 374 17 | that we had to make because of | | |
| 374 18 | eligibility problems and the like. But | | |
| 374 19 | it is from our study. I'm not able here | | |
| 374 20 | to read the column on the right-hand side | | |
| 374 21 | because of it being smudged. | | |
| | | | |
| 375:5 -   386:13 | Graham, David 2006-05-09 | | |
| 375 5 | In the right-hand column, | | |
| 375 6 | while we may have to struggle with the | | |
| 375 7 | exact numbers, it does say, does it not, | | |
| 375 8 | incidence rate per 1,000 patient years'? | | |
| 375 9 | A:  That's what it looks like it | | |
| 375 10 | says to me, yes. | | |
| 375 11 | Q:  Okay. | | |
| 375 12 | I mean, there's no doubt it | | |
| 375 13 | says this? | | |
| 375 14 | A:  Right, no. This table is | | |
| 375 15 | set up to calculate incidence rates, so, | | |
| 375 16 | there's no question about that. | | |
| 375 17 | Q:  Okay. | | |
| 375 18 | So, and then if we look down | | |
| 375 19 | at rofecoxib, that's Vioxx as we know, | | |
| 375 20 | correct? | | |
| 375 21 | A:  Right. | | |
| 375 22 | Q:  And then the rofecoxib | | |
| 375 23 | number is 7. something, right? | | |
| 375 24 | A:  Right. | | |
| 376 1 | Q:  Again, we'll just blow it | | |
| 376 2 | up. And does that look like 7.49 to you | | |
| 376 3 | once it's been blown up? | | |
| 376 4 | A:  Yes. When I was looking at | | |
| 376 5 | this (indicating), I would have said | | |
| 376 6 | 7.48, but it looks like 7.49 there | | |
| 376 7 | (indicating). | | |
| 376 8 | Q:  Okay. | | |
| 376 9 | Well, close enough for | | |
| 376 10 | government work. It's 7.48 or 7.49, | | |
| 376 11 | right? | | |
| 376 12 | A:  Right. | | |
| 376 13 | Q:  And then if we look up at | | |
| 376 14 | Celebrex, celecoxib, it is like 7.8 | | |
| 376 15 | something? | | |
| 376 16 | A:  Yes. It looks like 7.84 to | | |
| 376 17 | me, but... | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 376 18     Q: Okay. | | |
| 376 19     Whatever it is, it's | | |
| 376 20     actually the incidence rate taking into | | |
| 376 21     account the patient years, as you said, | | |
| 376 22     the incidence rate for heart attacks and | | |
| 376 23     sudden cardiac death for Celebrex is | | |
| 376 24     actually higher than the incidence rate | | |
| 377 1     for sudden cardiac death in heart attacks | | |
| 377 2     for Vioxx, correct? | | |
| 377 3     A: It's a crude incidence rate, | | |
| 377 4     and the number is higher. They're | | |
| 377 5     probably at this point with crude rates | | |
| 377 6     not statistically different, but Celebrex | | |
| 377 7     rate is higher than the rofecoxib or | | |
| 377 8     Vioxx rate. | | |
| 377 9     Q: Yeah. And I didn't mean to | | |
| 377 10     suggest that there was a statistically | | |
| 377 11     significant difference, but the Lancet | | |
| 377 12     article, one of the conclusions is that | | |
| 377 13     there is a statistically significant | | |
| 377 14     difference between Vioxx and Celebrex and | | |
| 377 15     that Vioxx has a statistically | | |
| 377 16     significant higher risk of serious | | |
| 377 17     coronary heart disease, right? | | |
| 377 18     A: Right. And that's based on | | |
| 377 19     odds ratios as opposed to incidence | | |
| 377 20     rates. | | |
| 377 21     Q: But the incidence rates | | |
| 377 22     would be basically the same? | | |
| 377 23     A: Yes. The incidence rates | | |
| 377 24     form the base of the data, but this is | | |
| 378 1     before adjustments have been done for the | | |
| 378 2     types of patients that are given these | | |
| 378 3     different drugs. | | |
| 378 4     Q: And that's what I want to | | |
| 378 5     get to now. | | |
| 378 6     So, you start out with | | |
| 378 7     actual numbers of users and how long they | | |
| 378 8     use the drug and how many of them had | | |
| 378 9     heart attacks, and Vioxx and Celebrex | | |
| 378 10     look basically identical. And then in | | |
| 378 11     your analysis, you applied adjustments to | | |
| 378 12     the Vioxx users and Celebrex users, and | | |
| 378 13     the end result of those adjustments was | | |
| 378 14     that Vioxx ended up appearing to have a | | |
| 378 15     higher risk, right? | | |
| 378 16     A: Yes. | | |
| 378 17     Q: And the person who -- first | | |
| 378 18     of all, these adjustments, at least one, | | |
| 378 19     a significant one is called a cardiac | | |
| 378 20     risk score, cardiovascular risk score, | | |
| 378 21     right? | | |
| 378 22     A: Right. | | |
| 378 23     Q: Is that the main adjustment | | |
| 378 24     that was applied? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 379 1  A:  That was the main | | |
| 379 2  adjustment, and it represented basically | | |
| 379 3  a collapsing of 25 or 30 other variables | | |
| 379 4  into a single measure. | | |
| 379 5  Q:  And the cardiovascular risk | | |
| 379 6  score, basically that says, well, people | | |
| 379 7  who take one type of medicine might have | | |
| 379 8  a whole bunch of other factors that make | | |
| 379 9  them prone to have heart attacks more | | |
| 379 10  than people who take a different | | |
| 379 11  medicine, and we want to take that into | | |
| 379 12  account? | | |
| 379 13  A:  Right. They have to be | | |
| 379 14  differential distribution of risk | | |
| 379 15  factors. | | |
| 379 16  Q:  And the person who developed | | |
| 379 17  the methodology to come up with the | | |
| 379 18  cardiovascular risk scores for Celebrex | | |
| 379 19  and Vioxx in your study was Dr. Wayne | | |
| 379 20  Ray, who you mentioned before, right? | | |
| 379 21  A:  Well, actually, we reference | | |
| 379 22  him as having used it, but the use of | | |
| 379 23  this -- it's basically -- it's a | | |
| 379 24  confounder's score. The use of a | | |
| 380 1  confounder's score in case control | | |
| 380 2  studies has been well described by Jim | | |
| 380 3  Schlesselman in his textbook on case | | |
| 380 4  control studies and then by Norman | | |
| 380 5  Breslow in his textbook on case control | | |
| 380 6  studies. And so this is a technique | | |
| 380 7  that's been described before. It's a | | |
| 380 8  technique that Dr. Ray has used, but he's | | |
| 380 9  not the person who created it, developed | | |
| 380 10  it. | | |
| 380 11  Q:  Well, he didn't invent the | | |
| 380 12  idea of a cardiovascular risk score, but | | |
| 380 13  he's the one who came up with the formula | | |
| 380 14  to account for all of these variables, | | |
| 380 15  and he's the one who did the statistical | | |
| 380 16  heavy lifting in order to implement that | | |
| 380 17  idea in this case, right? | | |
| 380 18  A:  In this case, he taught me | | |
| 380 19  how to do it. I was the one who did it, | | |
| 380 20  working with him by telecon. | | |
| 380 21  Q:  And Dr. Ray and you ended up | | |
| 380 22  assigning a higher cardiovascular risk | | |
| 380 23  score to the Celebrex users to the Vioxx | | |
| 380 24  users, correct? | | |
| 381 1  A:  That's correct. | | |
| 381 2  Q:  And the result of that then | | |
| 381 3  was that even though the incidence rate | | |
| 381 4  was the same -- | | |
| 381 5  A:  The crude incidence rate. | | |
| 381 6  Q:  -- when you applied the | | |
| 381 7  cardiovascular risk score that the two of | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 381 8     you came up with, that's what accounts | | |
| 381 9     for the difference in your paper between | | |
| 381 10     risks of Vioxx and risks of Celebrex, | | |
| 381 11     right? | | |
| 381 12     A: It's not just the | | |
| 381 13     cardiovascular risk score. It's | | |
| 381 14     adjusting for these risk factors. And in | | |
| 381 15     our paper, we showed that using all of | | |
| 381 16     the variables, all of the risk factors in | | |
| 381 17     our study to adjust for cardiovascular | | |
| 381 18     risk or using the cardiovascular risk | | |
| 381 19     score gave us virtually identical | | |
| 381 20     answers. But use of this confounder's | | |
| 381 21     score was a more efficient, statistically | | |
| 381 22     efficient way to deal with the data. | | |
| 381 23     Q: And, of course, Dr. Ray was | | |
| 381 24     involved heavily in the confounder's | | |
| 382 1     score also, right? | | |
| 382 2     A: He was the person who worked | | |
| 382 3     with me in showing me how to derive that | | |
| 382 4     score. | | |
| 382 5     Q: Okay. | | |
| 382 6     And here I've put up on the | | |
| 382 7     screen a copy of the article, the Lancet | | |
| 382 8     article that's already been marked as an | | |
| 382 9     exhibit. | | |
| 382 10     When people write articles | | |
| 382 11     in scientific journals, are they supposed | | |
| 382 12     to disclose any financial conflicts of | | |
| 382 13     interest that they have? | | |
| 382 14     A: They should, and I believe | | |
| 382 15     that Dr. Ray did. | | |
| 382 16     Q: Okay. | | |
| 382 17     Let's take a look at that. | | |
| 382 18     If you'd go to Page 6. The person who | | |
| 382 19     came, who taught you how to make these | | |
| 382 20     adjustments that resulted in Vioxx | | |
| 382 21     looking like it had a higher risk than | | |
| 382 22     Celebrex, he had two significant | | |
| 382 23     conflicts of interest, didn't he? | | |
| 382 24     A: Well, he has two potential | | |
| 383 1     conflicts of interest, and I was unaware | | |
| 383 2     of these when I invited him to | | |
| 383 3     participate in our study, and I was | | |
| 383 4     actually unaware of them until it came | | |
| 383 5     time to do our poster, at which time then | | |
| 383 6     you need to put on it, you know, the | | |
| 383 7     conflict of interest statement, and it | | |
| 383 8     had never crossed my mind to ask people | | |
| 383 9     about it. So, that was when I learned | | |
| 383 10     about it. And -- | | |
| 383 11     Q: And I want you to complete | | |
| 383 12     this, but before you do, this 'WAR,' this | | |
| 383 13     thing I have up on the screen, that's | | |
| 383 14     Wayne A. Ray, right? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 383 15 A: Yes. | | |
| 383 16 Q: And he's a consultant to | | |
| 383 17 Pfizer, it says in this disclosure, | | |
| 383 18 correct? | | |
| 383 19 A: Yes. | | |
| 383 20 Q: Who is it that makes | | |
| 383 21 Celebrex? | | |
| 383 22 A: Pfizer. | | |
| 383 23 Q: And so he's got a financial | | |
| 383 24 interest in making Celebrex look good, | | |
| 384 1 right? | | |
| 384 2 A: You could argue that he | | |
| 384 3 does, but that didn't operate in our | | |
| 384 4 study. | | |
| 384 5 Q: And then he's also -- under | | |
| 384 6 the conflict of interest, they say that | | |
| 384 7 he's a consultant to plaintiffs' | | |
| 384 8 attorneys regarding Vioxx, right? | | |
| 384 9 A: Yes. | | |
| 384 10 Q: And did you know that he's | | |
| 384 11 actually served as an expert witness in | | |
| 384 12 Vioxx trials? | | |
| 384 13 A: I learned about that only | | |
| 384 14 like within the last month or so, but I | | |
| 384 15 didn't know that beforehand. | | |
| 384 16 Q: So, anyway, here is Dr. Ray | | |
| 384 17 teaching you how to make these | | |
| 384 18 adjustments, and these adjustments were | | |
| 384 19 made by the time your poster was | | |
| 384 20 published, right? | | |
| 384 21 A: Yes. | | |
| 384 22 Q: And it wasn't until after he | | |
| 384 23 taught you how to make the adjustments | | |
| 384 24 and all the adjustments were made that | | |
| 385 1 you even found out that he was a paid | | |
| 385 2 consultant to the maker of Celebrex and | | |
| 385 3 was being paid by plaintiffs' lawyers who | | |
| 385 4 were suing Merck in Vioxx cases? Is that | | |
| 385 5 right? | | |
| 385 6 A: Yes. But that didn't impact | | |
| 385 7 the methodology that was used to derive | | |
| 385 8 this adjustment, this confounder's score. | | |
| 385 9 This is a way of adjusting for a | | |
| 385 10 difference in distribution of risk | | |
| 385 11 factors across exposure groups. And so | | |
| 385 12 he may have these associations, but that | | |
| 385 13 doesn't -- | | |
| 385 14 Q: 'May have,' what do you mean | | |
| 385 15 may have'? | | |
| 385 16 A: Well, he has those | | |
| 385 17 associations. They don't affect the way | | |
| 385 18 statistics work. They don't affect the | | |
| 385 19 way, the methods of how one derives a | | |
| 385 20 confounder's score. They don't affect | | |
| 385 21 the way one does a regression model and | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 385 22    what happens after the computer program | | |
| 385 23    spits out the results. | | |
| 385 24    Q:  Is there a book you can go | | |
| 386 1    to or an article that says, here's the | | |
| 386 2    formula, here's the exact way to | | |
| 386 3    implement this idea of a confounder's | | |
| 386 4    score in your study, or did it require | | |
| 386 5    some judgment by Dr. Ray as to how he was | | |
| 386 6    going to implement this idea when coming | | |
| 386 7    up with a confounder's score and the | | |
| 386 8    cardiovascular risk score? | | |
| 386 9    A:  It's described in | | |
| 386 10    Schlesselman's textbook and in Breslow's | | |
| 386 11    textbook. I don't recall that all the | | |
| 386 12    methods are described there, but the | | |
| 386 13    notion of how to do this is. | | |
| | | |
| 388:14 -    388:23    Graham, David 2006-05-09 | | |
| 388 14    Q:  And you did say that the | | |
| 388 15    fellow who taught you how to do it was | | |
| 388 16    Dr. Ray, the guy with the two conflicts, | | |
| 388 17    right? | | |
| 388 18    A:  Yes, that is correct. | | |
| 388 19    Q:  And I think you said this | | |
| 388 20    morning that there are 'lies, damned lies | | |
| 388 21    and statistics,' right? | | |
| 388 22    A:  I said that, too. It | | |
| 388 23    doesn't apply here, but I did say that. | | |
| | | |
| 389:2 -    400:18    Graham, David 2006-05-09 | | |
| 389 2    We talked about how from the | | |
| 389 3    original abstract to the poster, the | | |
| 389 4    number of high-dose patients changed. Do | | |
| 389 5    you remember that? | | |
| 389 6    A:  Uh-huh. | | |
| 389 7    Q:  So, you had a smaller number | | |
| 389 8    of high-dose patients in the abstract | | |
| 389 9    when you said there was no statistically | | |
| 389 10    significant difference between high-dose | | |
| 389 11    Vioxx and basically no use of medicine. | | |
| 389 12    And then some people got changed, and the | | |
| 389 13    net result was that there was a larger | | |
| 389 14    number of high-dose patients when it came | | |
| 389 15    time to write up the poster. Do you | | |
| 389 16    remember that? | | |
| 389 17    A:  Yes. | | |
| 389 18    Q:  And we looked at Dr. | | |
| 389 19    Trontell's memo where she expressed | | |
| 389 20    concern about that. Do you recall that? | | |
| 389 21    A:  Yes. | | |
| 389 22    Q:  To try to save time, because | | |
| 389 23    you may remember the numbers, I suspect | | |
| 389 24    you do, in the abstract when you were | | |
| 390 1    talking about high-dose people, am I | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 390 2    right that you had five people who had | | |
| 390 3    experienced -- five so-called cases and | | |
| 390 4    seven so-called controls? | | |
| 390 5    A:  Correct. | | |
| 390 6    Q:  And in one sentence, what is | | |
| 390 7    a case and what's a control? | | |
| 390 8    A:  A case is someone who had a | | |
| 390 9    heart attack or sudden death. And a | | |
| 390 10   control was someone who was randomly | | |
| 390 11   selected to compare to that person, who | | |
| 390 12   on that date had not, as of that date, | | |
| 390 13   had a heart attack or sudden death. | | |
| 390 14   Q:  Okay. | | |
| 390 15   And then sort of going | | |
| 390 16   forward to by the time your article was | | |
| 390 17   published in The Lancet, instead of five | | |
| 390 18   cases with the same population group | | |
| 390 19   after the reclassification, you now have | | |
| 390 20   ten cases, right? | | |
| 390 21   A:  Yes. | | |
| 390 22   Q:  So, the number of heart | | |
| 390 23   attacks and sudden cardiac deaths that | | |
| 390 24   you were ascribing to the high-dose Vioxx | | |
| 391 1    users doubled from when you did the | | |
| 391 2    abstract to when you did the article, | | |
| 391 3    right? | | |
| 391 4    A:  Correct. | | |
| 391 5    Q:  And then you also, instead | | |
| 391 6    of seven controls, you had eight | | |
| 391 7    controls, right? | | |
| 391 8    A:  Correct. | | |
| 391 9    Q:  And was it your idea to do | | |
| 391 10   this reclassification? | | |
| 391: 11  A:  What I noticed when we were | | |
| 391: 12  looking -- | | |
| 391: 13  Q:  Before you say what you | | |
| 391: 14  noticed -- | | |
| 391: 15  A:  Yes. | | |
| 391: 16  Q:  -- can you answer, was it | | |
| 391: 17  your idea to do the reclassification? | | |
| 391 18   A:  Yes. | | |
| 391 19   Q:  And then before -- I think | | |
| 391 20   this is clear, but I want to make sure. | | |
| 391 21   Before you did the | | |
| 391 22   reclassification, even the high-dose | | |
| 391 23   Vioxx users, the difference in risk | | |
| 391 24   between them and people who didn't use | | |
| 392 1    any medicine was not statistically | | |
| 392 2    significant, and then after you did the | | |
| 392 3    reclassification, then it became | | |
| 392 4    statistically significant, right? | | |
| 392 5    A:  That's correct. | | |
| 392 6    Q:  Now, did any of the authors, | | |
| 392 7    your co-authors, express concern about | | |
| 392 8    whether this reclassification was proper? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 392 9    A:  Dr. Craig Cheetham from | | |
| 392 10    Kaiser did express reservations about the | | |
| 392 11    reclassification. His concern was | | |
| 392 12    primarily that it be adequately | | |
| 392 13    described, and that eventually was done | | |
| 392 14    to his satisfaction, and he was a | | |
| 392 15    co-author on the published paper. | | |
| 392 16    - - - | | |
| 392 17    (Whereupon, Deposition | | |
| 392 18    Exhibit Graham-26, E-mail | | |
| 392 19    10-23-04 KP002315, was marked for | | |
| 392 20    identification.) | | |
| 392 21    - - - | | |
| 392 22    BY MR. BECK: | | |
| 392 23    Q:  Please take a look at | | |
| 392 24    Exhibit 26. Have you seen Exhibit 26 | | |
| 393 1    before? | | |
| 393 2    A:  Yes, I have. | | |
| 393 3    Q:  And this is a -- is this an | | |
| 393 4    e-mail from doctor -- how do you | | |
| 393 5    pronounce his last name? | | |
| 393 6    A:  Cheetham. | | |
| 393 7    Q:  -- Cheetham to you and other | | |
| 393 8    co-authors in the study? | | |
| 393 9    A:  Yes, it is. | | |
| 393 10    Q:  Does Dr. Cheetham say here | | |
| 393 11    in the first paragraph, 'I have never | | |
| 393 12    been comfortable with the recoding of | | |
| 393 13    Vioxx patients into the high dose | | |
| 393 14    category. However, it was done with the | | |
| 393 15    full participation of five investigators. | | |
| 393 16    The process by which this was done needs | | |
| 393 17    to be fully disclosed in the methods | | |
| 393 18    section. Therefore, the methods section | | |
| 393 19    needs to be clear on three points.' And | | |
| 393 20    then his first point is the coding 'was | | |
| 393 21    done post hoc.' Do you see that? | | |
| 393 22    A:  Uh-huh. | | |
| 393 23    Q:  And that 'post hoc,' did you | | |
| 393 24    understand that to mean that that was | | |
| 394 1    after the fact? | | |
| 394 2    A:  The fact that I think he's | | |
| 394 3    talking about here is, is that we hadn't | | |
| 394 4    planned on doing this at the start of the | | |
| 394 5    study. | | |
| 394 6    Q:  Okay. | | |
| 394 7    So, this was something that | | |
| 394 8    was not part of the original study plan, | | |
| 394 9    but then the reclassification took place | | |
| 394 10    after -- in fact, it was after you | | |
| 394 11    learned of the results reported in the | | |
| 394 12    abstract of no statistically significant | | |
| 394 13    difference, right? | | |
| 394 14    A:  That coincidence in timing | | |
| 394 15    is correct. | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 394 16 | Q: Okay. | | |
| 394 17 | So, you learned no | | |
| 394 18 | statistically significant difference | | |
| 394 19 | based on the planned classification, and | | |
| 394 20 | then you changed the plan and | | |
| 394 21 | reclassified, right? | | |
| 394 22 | A: We did that, and for a good | | |
| 394 23 | reason, because we had misclassification | | |
| 394 24 | of the exposure. And to leave that | | |
| 395 1 | misclassification of exposure in the | | |
| 395 2 | study would be to misrepresent the study, | | |
| 395 3 | and so it became necessary -- we were | | |
| 395 4 | trying to use a computerized algorithm to | | |
| 395 5 | classify dose. And what we discovered | | |
| 395 6 | was that just because somebody was | | |
| 395 7 | getting a 50-milligram tablet didn't mean | | |
| 395 8 | they were taking 50 milligrams a day. | | |
| 395 9 | Sometimes it was cheaper for patients to | | |
| 395 10 | take the 50 milligram tablet and break it | | |
| 395 11 | in half and actually take 25 milligrams a | | |
| 395 12 | day or to take two 25s instead of 50. | | |
| 395 13 | So, we were obligated to correct that | | |
| 395 14 | misclassification once we discovered that | | |
| 395 15 | it was present. | | |
| 395 16 | Q: And the second point he | | |
| 395 17 | makes is, 'All five investigators | | |
| 395 18 | participated.' And then he has the | | |
| 395 19 | initials of the five investigators, | | |
| 395 20 | including 'DG,' and that's David Graham, | | |
| 395 21 | you, right? | | |
| 395 22 | A: That's right. And I was | | |
| 395 23 | part of the call that this took place in, | | |
| 395 24 | but I was not a voting member whose votes | | |
| 396 1 | would determine whether or not | | |
| 396 2 | reclassification occurred. For | | |
| 396 3 | reclassification to occur, these other | | |
| 396 4 | four people had to agree that based on | | |
| 396 5 | the evidence that they saw about how | | |
| 396 6 | Vioxx was being used, that the patients | | |
| 396 7 | should be reclassified. | | |
| 396 8 | Q: And then his third point | | |
| 396 9 | was, 'David Graham was not blinded to | | |
| 396 10 | cases and controls when the recoding was | | |
| 396 11 | done.' | | |
| 396 12 | Now, you talked about cases | | |
| 396 13 | being -- that's where somebody had a | | |
| 396 14 | heart attack and controls being somebody | | |
| 396 15 | did not have a heart attack. And when he | | |
| 396 16 | says that you were 'not blinded to cases | | |
| 396 17 | and controls,' does that mean that at the | | |
| 396 18 | time that individual patients were | | |
| 396 19 | reclassified from short-term users to | | |
| 396 20 | long-term users, you had access to the | | |
| 396 21 | information that would tell you whether, | | |
| 396 22 | in fact, patient A had a heart attack or | | |

Dedrick v. Merck Co., Inc.

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 396 23   did not have a heart attack? | | |
| 396 24   A:  That's correct, and that's | | |
| 397 1    why I wasn't a voting member. | | |
| 397 2    Q:  So, what Dr. Cheetham said | | |
| 397 3    was that, fine, we made these | | |
| 397 4    adjustments, but our article needs to set | | |
| 397 5    forth what we did and how we did it and | | |
| 397 6    needs to say that it was not part of the | | |
| 397 7    original plan, that all five | | |
| 397 8    investigators, including Dr. Graham, | | |
| 397 9    participated, and when Dr. Graham was | | |
| 397 10   participating, he knew which patients had | | |
| 397 11   heart attacks and which ones didn't. | | |
| 397 12   That's what he wanted to be put forth in | | |
| 397 13   the article as published in Lancet, | | |
| 397 14   right? | | |
| 397 15   A:  That's what he says in this | | |
| 397 16   e-mail. | | |
| 397 17   Q:  And, you didn't do -- in | | |
| 397 18   fact, he says at the bottom of this | | |
| 397 19   e-mail, 'From my perspective this issue | | |
| 397 20   is not negotiable,' right? | | |
| 397 21   A:  Yes. | | |
| 397 22   Q:  But you did not make the | | |
| 397 23   disclosure that Dr. Cheetham felt was | | |
| 397 24   necessary, and, in fact, not even | | |
| 398 1    negotiable, did you? | | |
| 398 2    A:  We placed in the methods, | | |
| 398 3    had a description of the process that we | | |
| 398 4    used to reclassify these cases. It | | |
| 398 5    didn't meet with Dr. Cheetham's -- his | | |
| 398 6    personal requirements, but the other | | |
| 398 7    co-authors were quite comfortable, and | | |
| 398 8    there's a lot of e-mail traffic about | | |
| 398 9    that. | | |
| 398 10   I will add that after this, | | |
| 398 11   I had a conversation, after we submitted | | |
| 398 12   the paper to the Lancet, with the editor | | |
| 398 13   of the Lancet, Dr. Horton, in which I | | |
| 398 14   described in detail all of these things. | | |
| 398 15   And Dr. Horton had no problem with the | | |
| 398 16   way that we had conducted this, and when | | |
| 398 17   Dr. Cheetham learned that, his | | |
| 398 18   reservations went away. | | |
| 398 19   Q:  Well, when you say that it | | |
| 398 20   wasn't done exactly the way he said it | | |
| 398 21   should be done, the way that it was | | |
| 398 22   actually done, the disclosures that were | | |
| 398 23   made in the Lancet, they left you out | | |
| 398 24   when it described who did the recoding, | | |
| 399 1    isn't that true? | | |
| 399 2    A:  Because I didn't vote on the | | |
| 399 3    recoding. The recoding required the | | |
| 399 4    unanimous vote to change of the four | | |
| 399 5    people listed, and if even one of them | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 399 6    said that the case should not be recoded, | | |
| 399 7    it wasn't recoded. And -- | | |
| 399 8    Q:  Did the Lancet article | | |
| 399 9    disclose that you were the one who | | |
| 399 10    suggested the reclassification after you | | |
| 399 11    already knew which patients had heart | | |
| 399 12    attacks and which ones didn't? | | |
| 399 13    A:  No. But that wasn't -- the | | |
| 399 14    editor didn't feel that that was | | |
| 399 15    necessary. | | |
| 399 16    Q:  Did the Lancet article | | |
| 399 17    disclose that even though you say you | | |
| 399 18    didn't have a vote, you wrote memos to | | |
| 399 19    the other authors saying here's the | | |
| 399 20    people I think ought to be reclassified? | | |
| 399 21    A:  I did send a list of patient | | |
| 399 22    IDs that I thought that there was a | | |
| 399 23    question about the reclassification, and | | |
| 399 24    each of the members of the study team | | |
| 400 1    were asked to come up with a similar | | |
| 400 2    list. And then that composite list was | | |
| 400 3    what the group voted on together, and | | |
| 400 4    there were 29 or 30 patients in that | | |
| 400 5    group that the four participants voted | | |
| 400 6    upon. | | |
| 400 7    Q:  Did the Lancet article | | |
| 400 8    disclose that even though you didn't have | | |
| 400 9    a vote, that you, knowing who had heart | | |
| 400 10    attacks and who didn't, came up with a | | |
| 400 11    list of people that you wanted the others | | |
| 400 12    to look at and you suggested should be | | |
| 400 13    reclassified? Did the Lancet article | | |
| 400 14    disclose that? | | |
| 400 15    A:  No, it didn't. But the | | |
| 400 16    editor was fully aware of it and believed | | |
| 400 17    that the process, the voting process was | | |
| 400 18    sufficient and stringent enough. | | |
| | | |
| 402:20  -  403:6    Graham, David 2006-05-09 | | |
| 402: 20    Q:  Before our break, Dr. | | |
| 402: 21    Graham, we started to discuss this | | |
| 402: 22    estimate of yours of excess heart attacks | | |
| 402: 23    and sudden cardiac deaths, your number of | | |
| 402: 24    88,000 to 139,000. | | |
| 403: 1    And I think we covered this, | | |
| 403: 2    but am I correct that even though you | | |
| 403: 3    published this in your Kaiser study, the | | |
| 403: 4    numbers did not come from the work that | | |
| 403: 5    you did with the Kaiser information? | | |
| 403: 6    A:  That's correct. | | |
| | | |
| 403:7 -    405:1    Graham, David 2006-05-09 | | |
| 403 7    Q.   And did you say that they | | |
| 403 8    came from the VIGOR study and the APPROVe | | |
| 403 9    study? | | |
| 403 10    A.   Correct. | | |
| 403 11    Q.   In fact, you had to take | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 403 12 | some numbers from VIGOR and APPROVE and | | |
| 403 13 | then apply them to other numbers from | | |
| 403 14 | still other studies in order to come up | | |
| 403 15 | with this estimate, didn't you? | | |
| 403 16 | A.   We took the numbers from | | |
| 403 17 | VIGOR and APPROVe, which were the risks, | | |
| 403 18 | the estimates of relative risk, the five | | |
| 403 19 | for the high dose and two for the low | | |
| 403 20 | dose, and we applied that to the | | |
| 403 21 | estimates of how many people had high | | |
| 403 22 | dose or low dose.  And in the formula | | |
| 403 23 | that you use, you also need background | | |
| 403 24 | rates for what is the background rate in | | |
| 404 1 | the population that you are dealing with. | | |
| 404 2 | Q.   When you did the background | | |
| 404 3 | rates, you took background rates from | | |
| 404 4 | still other studies, some of which didn't | | |
| 404 5 | have anything to do with Vioxx, right? | | |
| 404 6 | A.   We took background rates | | |
| 404 7 | from the CLASS study, using their control | | |
| 404 8 | group because they had an unexposed | | |
| 404 9 | control group, and so what we could do | | |
| 404 10 | is, is by doing that, we could get a | | |
| 404 11 | handle on the types of patients who might | | |
| 404 12 | be prescribed a COX-2 inhibitor and look | | |
| 404 13 | to see what their experience of heart | | |
| 404 14 | attacks were. | | |
| 404 15 | We didn't have that in the | | |
| 404 16 | VIGOR study, because the VIGOR study | | |
| 404 17 | compared two active treatments. | | |
| 404 18 | We also, because people who | | |
| 404 19 | get enrolled in clinical trial are, as a | | |
| 404 20 | rule, healthier than the patients who | | |
| 404 21 | ultimately get the drugs, we also took a | | |
| 404 22 | background incidence rate from another | | |
| 404 23 | study with a somewhat sicker population, | | |
| 404 24 | and so then we had a range.  And it was | | |
| 405 1 | because of the range in those two | | |
| | | | |
| 405:2 - 405:4 | Graham, David 2006-05-09 | | |
| 405 2 | background rates that we end up with | **[405:2-4]** | |
| 405 3 | ultimately the 88,000 and the 139 or the | **Def.'s Obj.:**  Dr. Graham's | |
| 405 4 | 40,000, that they relate to those rates. | testimony regarding estimates | |
| | | of 88,000-140,000 excess | |
| | | events caused by Vioxx | |
| | | should be excluded from this | |
| 405:19  -  406:16 | Graham, David 2006-05-09 | case on Rule 403 grounds. | |
| 405: 19 | Q:  Now, when you submitted your | Also, no foundation or | |
| 405: 20 | article to the FDA peer reviewers, you | methodology that supports this | |
| 405: 21 | had a much different estimate of excess | opinion. | |
| 405: 22 | cardiovascular events than you ended up | **Pl's Resp.:**  Witness explains | |
| 405: 23 | putting in the Lancet publication, | methodology at p. 154-155. | |
| 405: 24 | correct? | Estimates appear in one of | |
| 406: 1 | A:  That's correct. | the premiere medical journals | |
| 406: 2 | MR. BECK:  I'm going to mark | in the world.  Paper and | |
| 406: 3 | the draft as it was submitted to | conclusions were subject to | |
| 406: 4 | the FDA reviewers. This is | peer-review. | |
| 406: 5 | Exhibit 27. | | |
| 406: 6 | - - - | | |
| 406: 7 | (Whereupon, Deposition | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 406: 8    Exhibit Graham-27, Memo 9-30-04 | | |
| 406: 9    'Risk of acute myocardial | | |
| 406: 10    infarction and sudden cardiac | | |
| 406: 11    death in patients treated with | | |
| 406: 12    COX-2 selective and non-selective | | |
| 406: 13    NSAIDs,' FDACDER022369 - | | |
| 406: 14    FDACDER022388, was marked for | | |
| 406: 15    identification.) | | |
| 406: 16    - - - | | |
| | | |
| 407:9   -   407:13    Graham, David 2006-05-09 | | |
| 407: 9    So, this is a report to the | | |
| 407: 10    FDA, and the manuscript reflected the | | |
| 407: 11    same information that's in this report? | | |
| 407: 12    A:  Right. But it had to be | | |
| 407: 13    more concise and the like. | | |
| | | |
| 407:19   -   408:3    Graham, David 2006-05-09 | | |
| 407: 19    And did you say in the | | |
| 407: 20    report to the FDA, as well as the | | |
| 407: 21    manuscript that you submitted for their | | |
| 407: 22    review, that combining -- that when you | | |
| 407: 23    looked at all of the data of Vioxx versus | | |
| 407: 24    Celebrex, that you came up with the | | |
| 408: 1    excess of adverse cardiovascular events | | |
| 408: 2    of 27,785 cases? | | |
| 408: 3    A:  That's correct. | | |
| | | |
| 410:1   -   410:17    Graham, David 2006-05-09 | | |
| 410: 1    Q:  You indicated before that | | |
| 410: 2    there were two specific FDA employees | | |
| 410: 3    that you had suggested as peer reviewers, | | |
| 410: 4    right? | | |
| 410: 5    A:  Correct. | | |
| 410: 6    Q:  And I think it was Dr. Bruce | | |
| 410: 7    Stadel and Dr. Bob O'Neill? | | |
| 410: 8    A:  Stadel, yes. | | |
| 410: 9    Q:  Stadel is how to pronounce | | |
| 410: 10    it? | | |
| 410: 11    A:  Yes. | | |
| 410: 12    Q:  And they, in fact, looked at | | |
| 410: 13    your manuscript, the one that had the | | |
| 410: 14    27,000 number in it, Vioxx versus | | |
| 410: 15    Celebrex, as part of their peer review, | | |
| 410: 16    right? | | |
| 410: 17    A:  Correct. | | |
| | | |
| 411:23   -   413:2    Graham, David 2006-05-09 | | |
| 411: 23    BY MR. BECK: | | |
| 411: 24    Q:  Is this an e-mail from you | | |
| 412: 1    to Dr. Seligman and Dr. Trontell of the | | |
| 412: 2    FDA, as well as your co-authors dated | | |
| 412: 3    October 22nd, 2004? | | |
| 412: 4    A:  Yes, it is. | | |
| 412: 5    Q:  And the very first thing you | | |
| 412: 6    say is, 'I reviewed the comments of Bob | | |
| 412: 7    and Bruce' -- that's Dr. Bruce Stadel | | |
| 412: 8    and Dr. Bob O'Neill, right? | | |
| 412: 9    A:  Yes. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 412: 10    Q:  -- 'and discussed them with | | |
| 412: 11    the co-authors. We' -- that's you and | | |
| 412: 12    the co-authors, right? | | |
| 412: 13    A:  Right. | | |
| 412: 14    Q:  'We changed the paper to | | |
| 412: 15    exclude our estimate of the actual number | | |
| 412: 16    of excess cases of heart attacks and | | |
| 412: 17    sudden cardiac deaths, suggested by both | | |
| 412: 18    Bob and Bruce,' right? | | |
| 412: 19    A:  Yes. | | |
| 412: 20    Q:  Okay. | | |
| 412: 21    So, the manuscript that you | | |
| 412: 22    submitted to the Lancet took out that | | |
| 412: 23    27,000 estimate that the two peer | | |
| 412: 24    reviewers you suggested said was | | |
| 413: 1    scientifically unsound, right? | | |
| 413: 2    A:  That's correct. | | |
| | | |
| 413:20  -  414:21    Graham, David 2006-05-09 | | |
| 413: 20    (Whereupon, Deposition | | |
| 413: 21    Exhibit Graham-29, E-mail with | | |
| 413: 22    attachment 'Risk of Acute | | |
| 413: 23    Myocardial Infarction and Sudden | | |
| 413: 24    Cardiac Death in Patients Treated | | |
| 414: 1    with COX-2 Selective and | | |
| 414: 2    Non-Selective NSAIDs,' (Graham, | | |
| 414: 3    et al)   KP001133; KP001133A - | | |
| 414: 4    KP001133X, was marked for | | |
| 414: 5    identification.) | | |
| 414: 6    - - - | | |
| 414: 7    BY MR. BECK: | | |
| 414: 8    Q:  Is Exhibit 29 a copy of an | | |
| 414: 9    e-mail from you to the Lancet folks | | |
| 414: 10    attaching a revised manuscript? And all | | |
| 414: 11    of this is dated November 11, 2004. | | |
| 414: 12    A:  Yes. | | |
| 414: 13    Q:  Let me put that on the | | |
| 414: 14    screen here. | | |
| 414: 15    And so you say here on the | | |
| 414: 16    first page, 'Dear Richard and Stuart, | | |
| 414: 17    Attached is our revised-revised | | |
| 414: 18    manuscript,' right? | | |
| 414: 19    A:   (Witness nods.) | | |
| 414: 20    Q:  Correct? | | |
| 414: 21    A:  Yes. | | |
| | | |
| 415:6  -  415:17    Graham, David 2006-05-09 | | |
| 415: 6    Q:  So, when Lancet says we kind | | |
| 415: 7    of like that comparison that the peer | | |
| 415: 8    reviewer said was scientifically unsound, | | |
| 415: 9    you put it back in, but this time you | | |
| 415: 10    increased it by 10,000 cases, right? | | |
| 415: 11    A:  That is -- I'm just trying | | |
| 415: 12    to look for -- oh, it's because -- | | |
| 415: 13    Q:  First, before you get to the | | |
| 415: 14    reason why -- | | |
| 415: 15    A:  Yes. | | |
| 415: 16    Q:  -- is it true? | | |
| 415: 17    A:  Yes. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 416:5   -   416:18   Graham, David 2006-05-09 | | |
| 416: 5   Q:  Now, did Dr. Stadel and | | |
| 416: 6   Dr. O'Neill, the two peer reviewers that | | |
| 416: 7   you said you trusted, and who said that | | |
| 416: 8   the 27,000 figure was scientifically | | |
| 416: 9   unsound, did they have a chance to review | | |
| 416: 10   this 37,000 figure that you came up with | | |
| 416: 11   after you submitted the manuscript to | | |
| 416: 12   Lancet? | | |
| 416: 13   A:  No. Once a paper goes into | | |
| 416: 14   a journal and you're dealing with the | | |
| 416: 15   journal and its peer reviewers, what | | |
| 416: 16   happens is between the author and the | | |
| 416: 17   journal. So, there was no requirement | | |
| 416: 18   to, and I didn't. | | |
| | | |
| 417:23   -   418:4   Graham, David 2006-05-09 | | |
| 417: 23   Q:  And did you ever give your | | |
| 417: 24   peer reviewers who told you that your | | |
| 418: 1   27,000 number was scientifically unsound, | | |
| 418: 2   did you ever give those peer reviewers | | |
| 418: 3   whom you recommended the chance to take a | | |
| 418: 4   look at these new comparison -- | | |
| | | |
| 418:6   -   419:2   Graham, David 2006-05-09 | | |
| 418: 6   BY MR. BECK: | | |
| 418: 7   Q:  -- and new numbers of 88,000 | | |
| 418: 8   to 139,000? | | |
| 418: 9   A:  No. There was no | | |
| 418: 10   requirement to. Lancet has a very | | |
| 418: 11   extensive and exhaustive peer review | | |
| 418: 12   process. Our paper was reviewed by five | | |
| 418: 13   peer reviewers, which is two more than | | |
| 418: 14   normally happens with the medical | | |
| 418: 15   journal. And those peer reviewers and | | |
| 418: 16   the editors of the journal didn't happen | | |
| 418: 17   to agree with those two people from the | | |
| 418: 18   FDA. | | |
| 418: 19   Q:  Just so that we're clear, | | |
| 418: 20   nobody from the FDA during the peer | | |
| 418: 21   review process ever got a chance to look | | |
| 418: 22   at this new comparison that you did for | | |
| 418: 23   the first time and the revised-revised | | |
| 418: 24   manuscript, correct? | | |
| 419: 1   A:  That's correct, and it | | |
| 419: 2   wasn't required. | | |
| | | |
| 419:8   -   420:3   Graham, David 2006-05-09 | | |
| 419: 8   Q:  Can you just tell me whether | | |
| 419: 9   you included the 37,000 number in the | | |
| 419: 10   Lancet article? | | |
| 419: 11   A:  No. | | |
| 419: 12   Q:  And, in fact, by the time we | | |
| 419: 13   finally get to the published article in | | |
| 419: 14   Lancet, the only numbers that you include | | |
| 419: 15   were these 88 to 139,000 numbers that you | | |
| 419: 16   first came up with in the revised-revised | | |
| 419: 17   manuscript, right? | | |

Dedrick v. Merck Co., Inc.

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 419: 18    A: That's correct. | | |
| 419: 19    Q: Now, I want to see if we can | | |
| 419: 20    understand a little better how you came | | |
| 419: 21    up with them. I think you said that you | | |
| 419: 22    used the relative risks from the VIGOR | | |
| 419: 23    study and the APPROVe study, right? | | |
| 419: 24    A: That is correct. | | |
| 420: 1    Q: And the relative risk for | | |
| 420: 2    VIGOR was 5, right? | | |
| 420: 3    A: Correct. | | |
| | | |
| 420:11 - 420:13    Graham, David 2006-05-09 | | |
| 420: 11    Q: And the relative risk from | | |
| 420: 12    APPROVe was 2.0, right? | | |
| 420: 13    A: Correct. | | |
| | | |
| 421:5 - 422:11    Graham, David 2006-05-09 | | |
| 421: 5    Q: Well, in your article, you | | |
| 421: 6    state that 'The background rate for acute | | |
| 421: 7    myocardial infarction among control | | |
| 421: 8    groups from studies of cardiovascular | | |
| 421: 9    risk and NSAID users varied from 7.9 per | | |
| 421: 10    1,000 person years in CLASS,' one of the | | |
| 421: 11    studies you referred to, to 12.4 per | | |
| 421: 12    1,000 person years in what was called the | | |
| 421: 13    TennCare study, right? | | |
| 421: 14    A: Correct. | | |
| 421: 15    Q: So, the background rate that | | |
| 421: 16    you used when doing your calculation was | | |
| 421: 17    this range of 7.9 to 12.4, right? | | |
| 421: 18    A: Correct. | | |
| 421: 19    Q: And by 'background rate,' | | |
| 421: 20    what we mean is people who aren't taking | | |
| 421: 21    any medicine at all. For every 1,000 | | |
| 421: 22    person years of people not taking | | |
| 421: 23    medicine, 7.9 to 12.4 people are going to | | |
| 421: 24    have an adverse cardiovascular event, | | |
| 422: 1    right? | | |
| 422: 2    A: Right. Within the age | | |
| 422: 3    groups that those populations came from, | | |
| 422: 4    right. | | |
| 422: 5    Q: So, that's sort of what | | |
| 422: 6    you'd expect from someone taking no | | |
| 422: 7    medicine at all, is somewhere between 8 | | |
| 422: 8    to 12 or so people per thousand are going | | |
| 422: 9    to have heart attacks just because that's | | |
| 422: 10    what happens in life, right? | | |
| 422: 11    A: That's what happens. Right. | | |
| | | |
| 424:17 - 424:24    Graham, David 2006-05-09 | | |
| 424: 17    Q: So, the rate for myocardial | | |
| 424: 18    infarctions, heart attacks -- | | |
| 424: 19    A: Uh-huh. | | |
| 424: 20    Q: -- for people who were | | |
| 424: 21    taking the high-dose Vioxx in the VIGOR | | |
| 424: 22    study was 7.4 per hundred -- per thousand | | |
| 424: 23    person years, right? | | |
| 424: 24    A: Yes. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 426:12  -  426:18    Graham, David 2006-05-09 | | |
| 426: 12          Q:  Let's now talk about | | |
| 426: 13          APPROVe. | | |
| 426: 14          What's the equivalent number | | |
| 426: 15          here for the APPROVe study which involved | | |
| 426: 16          a 25 milligram dose of Vioxx? | | |
| 426: 17          A:  You'll have to show me the | | |
| 426: 18          paper and we can derive that number. | | |
| | | |
| 427:5        427:15 | | |
| 427: 5          BY MR. BECK: | | |
| 427: 6          Q:  Have you seen Exhibit 31 | | |
| 427: 7          before? | | |
| 427: 8          A:  Yes, I have read this paper | | |
| 427: 9          before. | | |
| 427: 10         Q:  And I'll put it on the | | |
| 427: 11         screen. Well, let's just you and I go to | | |
| 427: 12         Table 2 over on the fourth page. | | |
| 427: 13         Is this a paper that deals | | |
| 427: 14         with the APPROVe study? | | |
| 427: 15         A:  Yes. | | |
| | | |
| 428:8  -  428:20    Graham, David 2006-05-09 | | |
| 428: 8          Q:  And when you did it the | | |
| 428: 9          right way, you would come up with an | | |
| 428: 10         event rate in APPROVe of 6.9; is that | | |
| 428: 11         right? | | |
| 428: 12         A:  I'll trust your arithmetic. | | |
| 428: 13         Q:  And, again, the real life | | |
| 428: 14         heart attack rate in both VIGOR and | | |
| 428: 15         APPROVe was lower than what you say is | | |
| 428: 16         the normal background rate for people who | | |
| 428: 17         are not taking any medicine at all, | | |
| 428: 18         right? | | |
| 428: 19         A:  That's correct. But | **Pl's Obj.:**  Entire answer should be included. | **Barnett:**  Court ruled that testimony be added. |
| 428 20          background rates vary from study to | Remainder of answer at 428: 23-430:15. | R. 106. |
| | | **Smith:**  No objection. Testimony not added. |
| 430:16  -  432:6    Graham, David 2006-05-09 | | **Mason:**  Testimony not designated. |
| 430: 16         Q:  Now, the patients involved | | |
| 430: 17         in the VIGOR study, these were rheumatoid | | |
| 430: 18         arthritis patients, right? | | |
| 430: 19         A:  Yes. | | |
| 430: 20         Q:  And rheumatoid arthritis | | |
| 430: 21         patients have a higher risk of heart | | |
| 430: 22         attack, all other things being equal, | | |
| 430: 23         than people who don't have rheumatoid | | |
| 430: 24         arthritis, right? | | |
| 431: 1          A:  Some studies have found | | |
| 431: 2          that, and other studies have found that | | |
| 431: 3          there's no increase in risk. | | |
| 431: 4          Q:  Now, you mentioned that | | |
| 431: 5          CLASS was one of the studies that you | | |
| 431: 6          used to come up with your range. Those | | |
| 431: 7          people had osteoarthritis, right? | | |
| 431: 8          A:  That's correct. | | |
| 431: 9          Q:  And that is not associated | | |
| 431: 10         with a higher heart attack risk, right? | | |
| 431: 11         A:  Not that we're aware of. | | |
| 431: 12         Q:  And the other study that you | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 431: 13    used for the background rate was | | |
| 431: 14    TennCare? | | |
| 431: 15    A: Yes. | | |
| 431: 16    Q: And that's short for | | |
| 431: 17    Tennessee Care, right? | | |
| 431: 18    A: Right. It's a Medicaid | | |
| 431: 19    program. | | |
| 431: 20    Q: And that's anybody who used | | |
| 431: 21    a prescription NSAID, regardless of what | | |
| 431: 22    their condition was, right? | | |
| 431: 23    A: Right, but these were the | | |
| 431: 24    nonusers. | | |
| 432: 1    Q: So, these were nonusers in | | |
| 432: 2    Tenn Care, but they didn't have | | |
| 432: 3    rheumatoid arthritis or anything like | | |
| 432: 4    that? | | |
| 432: 5    A: Some of them did, but most | | |
| 432: 6    of them didn't. | | |
| | | |
| 432:22  -  433:1    Graham, David 2006-05-09 | | |
| 432: 22    Q: But even with all of that, | | |
| 432: 23    VIGOR and APPROVe both had lower rates | | |
| 432: 24    than your background rates, correct? | | |
| 433: 1    A: Yes. | | |
| | | |
| 434:11  -  437:11    Graham, David 2006-05-09 | | |
| 434: 11    Q: Do you know that Dr. Graham | | |
| 434: 12    has estimated the United States | | |
| 434: 13    background rate to be approximately 6 per | | |
| 434: 14    thousand? | | |
| 434: 15    A: And that is in people who | | |
| 434: 16    are 15 and older. And one-third of the | | |
| 434: 17    population is between the ages of 15 and | | |
| 434: 18    40, and the occurrence of myocardial | | |
| 434: 19    infarction in that group is almost zero. | | |
| 434: 20    So, if you were to truncate those people | | |
| 434: 21    out and then calculate what the actual | | |
| 434: 22    rate is among the people who are most | | |
| 434: 23    likely to get the Vioxx, the number ends | | |
| 434: 24    up smack in the middle of that range. | | |
| 435: 1    Q: And I've referred to you in | | |
| 435: 2    the third person. I'm sorry. I'm trying | | |
| 435: 3    to get through. | | |
| 435: 4    A: I took no offense. | | |
| 435: 5    Q: I did not intend any. I was | | |
| 435: 6    actually thinking of Dr. Topol when I | | |
| 435: 7    referred to Dr. Graham. | | |
| 435: 8    Dr. Topol, are you | | |
| 435: 9    acquainted with his publication where he | | |
| 435: 10    uses a placebo rate of 5.2? | | |
| 435: 11    A: Yes. And that was from | | |
| 435: 12    randomized clinical trials. And | | |
| 435: 13    randomized clinical trials, no matter | | |
| 435: 14    what they are, they select patients who | | |
| 435: 15    are healthier than the real world | | |
| 435: 16    patients that get the drugs after they go | | |
| 435: 17    on the market. | | |
| 435: 18    Q: And in APPROVe, as I just | | |
| 435: 19    put up there, the people who took | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 435: 20 | placebos in the APPROVe study, their rate | | |
| 435: 21 | was only 2.7, right? | | |
| 435: 22 | A:  Yes. And they were younger | | |
| 435: 23 | patients without cardiovascular disease, | | |
| 435: 24 | but yes. | | |
| 436: 1 | Q:  And so when you have these | | |
| 436: 2 | relative risks that come from VIGOR and | | |
| 436: 3 | APPROVe, and you are taking the VIGOR | | |
| 436: 4 | heart attacks number of 7.4 and you're | | |
| 436: 5 | comparing it with this super low number | | |
| 436: 6 | of naproxen, 1.5, and that's how you come | | |
| 436: 7 | up with the -- that's how that high | | |
| 436: 8 | number of relative risk of 5 is derived, | | |
| 436: 9 | correct? | | |
| 436: 10 | A:  Those are the results from | | |
| 436: 11 | the VIGOR study. | | |
| 436: 12 | Q:  And the same thing with | | |
| 436: 13 | APPROVe. The relative risk is 2, but it | | |
| 436: 14 | is not because a lot of people had heart | | |
| 436: 15 | attacks on Vioxx, it is because not very | | |
| 436: 16 | many people had them on the placebo, | | |
| 436: 17 | right? | | |
| 436: 18 | A:  That I don't know the -- I | | |
| 436: 19 | don't know the answer to that question. | | |
| 436: 20 | If you have an odd placebo group that's | | |
| 436: 21 | been selected that has an unusually low | | |
| 436: 22 | background rate, that's a possibility. I | | |
| 436: 23 | can't answer that question. I don't know | | |
| 436: 24 | the answer to that question. | | |
| 437: 1 | Q:  You never looked into that | | |
| 437: 2 | when doing your estimate? | | |
| 437: 3 | A:  No. Realize at the time | | |
| 437: 4 | that we did our estimate, what we had to | | |
| 437: 5 | work on were press announcements, because | | |
| 437: 6 | none of these data -- | | |
| 437: 7 | Q:  If the answer is no, that's | | |
| 437: 8 | fine. I only have about ten minutes | | |
| 437: 9 | left. | | |
| 437: 10 | A:  Okay. | | |
| 437: 11 | I'm sorry. | | |
| | | | |
| 440:20 -   440:24 | Graham, David 2006-05-09 | | |
| 440  20 | You talked about how you | | |
| 440  21 | made a presentation in February of 2005 | | |
| 440  22 | to the FDA Advisory Committee. Do you | | |
| 440  23 | remember that? | | |
| 440  24 | A:  Yes, I do. | | |
| | | | |
| 441:1 -   442:2 | Graham, David 2006-05-09 | | |
| 441: 1 | Q:  And that was one of the | | |
| 441: 2 | exhibits that you went over with Mr. | | |
| 441: 3 | Kline with some of the pages from the | | |
| 441: 4 | presentation that you made to the | | |
| 441: 5 | Advisory Committee, right? | | |
| 441: 6 | A:  Correct. | | |
| 441  7 | Q:  Then the Advisory Committee | | |
| 441  8 | made recommendations to the FDA, and the | | |
| 441  9 | FDA, in turn, reached some conclusions | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 441 10 concerning the safety of COX-2 | | |
| 441 11 inhibitors; is that correct? | | |
| 441 12 A:  I believe it is. | | |
| 441 13 MR. BECK:  We'll mark as | | |
| 441 14 Exhibit 32 the April 6, 2005 | | |
| 441 15 memorandum. | | |
| 441 16 - - - | | |
| 441 17 (Whereupon, Deposition | | |
| 441 18 Exhibit Graham-32, Memo 4-6-05 | | |
| 441 19 Analysis and recommendations for | | |
| 441 20 Agency action regarding | | |
| 441 21 non-steroidal anti-inflammatory | | |
| 441 22 drugs and cardiovascular risk,' | | |
| 441 23 (19 pages),   was marked for | | |
| 441 24 identification.) | | |
| 442 1 - - - | | |
| 442 2 BY MR. BECK: | | |
|  | | |
| 442:15 -    448:1     Graham, David 2006-05-09 | | |
| 442 15 Is this the memorandum we've | | |
| 442 16 been talking about? | | |
| 442 17 A:  Yes, it is. | | |
| 442 18 Q:  Okay. | | |
| 442 19 And then on the bottom of | | |
| 442 20 Page 3 where it lists the different | | |
| 442 21 offices, did the division of | | |
| 442 22 anti-inflammatories participate in this | | |
| 442 23 review? | | |
| 442 24 A:  Yes, it did. | | |
| 443 1 Q:  Did the -- | | |
| 443 2 A:  They were probably the major | | |
| 443 3 participant, because they are the ones | | |
| 443 4 who ultimately regulate these products. | | |
| 443 5 Q:  Anti-inflammatories includes | | |
| 443 6 NSAIDs and COX-2 inhibitors, right? | | |
| 443 7 A:  Correct. | | |
| 443 8 Q:  And the Division of | | |
| 443 9 Over-the-Counter Drug Products also | | |
| 443 10 participated, correct? | | |
| 443 11 A:  Yes, because they're | | |
| 443 12 over-the-counter NSAIDs. | | |
| 443 13 Q:  And the Office of Drug | | |
| 443 14 Evaluation II and V participated, right? | | |
| 443 15 A:  Right. Those are the parent | | |
| 443 16 organizations of these other divisions. | | |
| 443 17 Q:  And the Office of New Drugs | | |
| 443 18 participated? | | |
| 443 19 A:  Right. That's the super | | |
| 443 20 office over them. | | |
| 443 21 Q:  Office of Drug Safety, | | |
| 443 22 that's your office, right? | | |
| 443 23 A:  Correct. | | |
| 443 24 Q:  Office of Biostatistics. | | |
| 444 1 Does that include epidemiologists? | | |
| 444 2 A:  No. Epidemiologists are in | | |
| 444 3 the Office of Drug Safety. The Office of | | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 444 4    Biostatistics is exclusively | | |
| 444 5    statisticians. | | |
| 444 6    Q:  And the Office of | | |
| 444 7    Pharmacoepidemiology and Statistical | | |
| 444 8    Science participated, right? | | |
| 444 9    A:  Right. That's the office | | |
| 444 10   that contains both drug safety and | | |
| 444 11   statistics. | | |
| 444 12   Q:  The Office of Medical Policy | | |
| 444 13   participated? | | |
| 444 14   A:  Right, yes. | | |
| 444 15   Q:  And the Office of Regulatory | | |
| 444 16   Policy? | | |
| 444 17   A:  Yes. | | |
| 444 18   Q:  And the Office of the Center | | |
| 444 19   Director, right? | | |
| 444 20   A:  Correct. | | |
| 444 21   Q:  And they looked at all kinds | | |
| 444 22   of materials, including your PowerPoint | | |
| 444 23   and your, I don't know if it's testimony | | |
| 444 24   or remarks that were delivered to the | | |
| 445 1    Advisory Committee, correct? | | |
| 445 2    A:  Presumably. I wasn't part | | |
| 445 3    of the internal decision-making, but | | |
| 445 4    presumably that was part of what they | | |
| 445 5    considered. | | |
| 445 6    Q:  Then focusing on the first | | |
| 445 7    page here, in terms of who authored this | | |
| 445 8    memorandum from the FDA, I think you've | | |
| 445 9    already identified John Jenkins, Dr. John | | |
| 445 10   Jenkins, of the Office of New Drugs, | | |
| 445 11   right? | | |
| 445 12   A:  Correct. | | |
| 445 13   Q:  And then also you've | | |
| 445 14   identified your boss, Paul Seligman, | | |
| 445 15   right? | | |
| 445 16   A:  Correct. | | |
| 445 17   Q:  And then it says 'Through: | | |
| 445 18   Steven Galson.' What does it mean when | | |
| 445 19   it is from Drs. Jenkins and Seligman | | |
| 445 20   through Dr. Galson? | | |
| 445 21   A:  What it typically means is, | | |
| 445 22   is the 'froms' have written the report. | | |
| 445 23   It goes to the 'through' person, who can | | |
| 445 24   edit it and ask for modifications and the | | |
| 446 1    like. And then after they've signed off | | |
| 446 2    on it, it is sent off to whomever the | | |
| 446 3    to' is. | | |
| 446 4    Q:  All right. | | |
| 446 5    And the 'to' is the NDA | | |
| 446 6    files and has all these numbers, right? | | |
| 446 7    A:  Correct. | | |
| 446 8    Q:  So, if I understand it | | |
| 446 9    correctly, they got input from all these | | |
| 446 10   different groups, and then the head of | | |
| 446 11   the Office of New Drugs and the director | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | | | Objections | Rulings |
|---|---|---|---|---|
| 446 | 12 | of the Office of Pharmacoepidemiology and | | |
| 446 | 13 | Statistical Science got together and | | |
| 446 | 14 | wrote a draft that then was approved by | | |
| 446 | 15 | the director of the entire Center for | | |
| 446 | 16 | Drug Evaluation and Research, right? | | |
| 446 | 17 | A:  Correct. | | |
| 446 | 18 | Q:  Then I just want to go | | |
| 446 | 19 | through with you the first five bullet | | |
| 446 | 20 | points, and then I'll be done. | | |
| 446 | 21 | In the executive summary | | |
| 446 | 22 | here, do you see where the FDA says that | | |
| 446 | 23 | Following a thorough review of the | | |
| 446 | 24 | available data we have reached the | | |
| 447 | 1 | following conclusions regarding currently | | |
| 447 | 2 | approved COX-2 selective and | | |
| 447 | 3 | non-selective non-steroidal | | |
| 447 | 4 | anti-inflammatory drugs and the risk of | | |
| 447 | 5 | adverse cardiovascular events.' So | | |
| 447 | 6 | that's their setup. | | |
| 447 | 7 | Then the first point they | | |
| 447 | 8 | make is: 'The three approved COX-2 | | |
| 447 | 9 | selective NSAIDS (i.e. celebrex,' Vioxx, | | |
| 447 | 10 | and what's the third one, 'valdecoxib'? | | |
| 447 | 11 | A:   That would be Bextra. | | |
| 447 | 12 | Q:   So, they say that three | | |
| 447 | 13 | COX-2 selective NSAIDs 'are associated | | |
| 447 | 14 | with an increased risk of serious adverse | | |
| 447 | 15 | CV events compared to placebo. The | | |
| 447 | 16 | available data do not permit a rank | | |
| 447 | 17 | ordering of these drugs with regard to CV | | |
| 447 | 18 | risk.' Now, what they're saying here is | | |
| 447 | 19 | that any one of these COX-2 inhibitors | | |
| 447 | 20 | can increase CV risk, but there's no | | |
| 447 | 21 | basis on which to say that one is riskier | | |
| 447 | 22 | than another, right? | | |
| 447 | 23 | A:  What they're saying is, is | | |
| 447 | 24 | that the absence of evidence is evidence | | |
| 448 | 1 | of absence. They're basing -- | | |
| 449:14 - | 449:21 | Graham, David 2006-05-09 | | |
| 449 | 14 | Does it mean that the people | | |
| 449 | 15 | who wrote this memo and the person who | | |
| 449 | 16 | approved it, whether you agree with them | | |
| 449 | 17 | or not, what they're saying is that you | | |
| 449 | 18 | cannot draw a distinction between the | | |
| 449 | 19 | cardiovascular risks of Vioxx versus | | |
| 449 | 20 | Celebrex versus Bextra? | | |
| 449 | 21 | A:  That's what they are saying. | | |
| 450:16 - | 453:17 | Graham, David 2006-05-09 | | |
| 450 | 16 | Q:  Your article, one of its | | |
| 450 | 17 | core conclusions, is that there is a | | |
| 450 | 18 | difference, statistically significant | | |
| 450 | 19 | difference between the risk of using | | |
| 450 | 20 | Vioxx versus Celebrex, correct? | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 450 | 21 | A:  Correct. | | |
| 450 | 22 | Q:  And they disagree with you, | | |
| 450 | 23 | right? | | |
| 450 | 24 | A:  They're saying there are no | | |
| 451 | 1 | clinical trials to show that, and so they | | |
| 451 | 2 | disagree. | | |
| 451 | 3 | Q:  Then the next point says, | | |
| 451 | 4 | Data from large long-term controlled | | |
| 451 | 5 | clinical trials that have included a | | |
| 451 | 6 | comparison of COX-2 selective and | | |
| 451 | 7 | non-selective NSAIDs do not clearly | | |
| 451 | 8 | demonstrate that the COX-2 selective | | |
| 451 | 9 | agents confer a greater risk of serious | | |
| 451 | 10 | adverse...events than non-selective | | |
| 451 | 11 | NSAIDs.' | | |
| 451 | 12 | Now, again, whether you | | |
| 451 | 13 | disagree or agree with them, are they | | |
| 451 | 14 | saying here that according to the | | |
| 451 | 15 | long-term controlled clinical trials, we | | |
| 451 | 16 | cannot say that COX-2 inhibitors have any | | |
| 451 | 17 | different risk than traditional NSAIDs? | | |
| 451 | 18 | A:  They're saying based on the | | |
| 451 | 19 | evidence they have from clinical trials | | |
| 451 | 20 | that they can't distinguish the two. | | |
| 451 | 21 | What one should recognize, however, is | | |
| 451 | 22 | that there's virtual absence of real | | |
| 451 | 23 | long-term data. There's really very | | |
| 451 | 24 | small numbers for any of these things, | | |
| 452 | 1 | and so if you have low power, you're not | | |
| 452 | 2 | going to be able to show things. That's | | |
| 452 | 3 | why observational data is needed to | | |
| 452 | 4 | complement what is inadequate about | | |
| 452 | 5 | controlled clinical trials. | | |
| 452 | 6 | Q:  And then on the next page, | | |
| 452 | 7 | do they say on this first bullet, | | |
| 452 | 8 | Long-term placebo controlled clinical | | |
| 452 | 9 | trial data are not available to | | |
| 452 | 10 | adequately assess the potential for the | | |
| 452 | 11 | non-selective NSAIDs to increase the risk | | |
| 452 | 12 | of serious adverse CV events.' Is that | | |
| 452 | 13 | the point you just made? | | |
| 452 | 14 | A:  Yes. | | |
| 452 | 15 | Q:  So, they recognized that, | | |
| 452 | 16 | didn't they? | | |
| 452 | 17 | A:  Yes, they did. | | |
| 452 | 18 | Q:  The next point they say, | | |
| 452 | 19 | Pending the availability of the | | |
| 452 | 20 | additional long-term controlled clinical | | |
| 452 | 21 | trial data, the available data are best | | |
| 452 | 22 | interpreted as being consistent with a | | |
| 452 | 23 | class effect of an increased risk of | | |
| 452 | 24 | serious...cardiovascular events for COX-2 | | |
| 453 | 1 | selective and non- selective NSAIDs.' | | |
| 453 | 2 | Now, does that mean that, | | |
| 453 | 3 | again, whether you agree or disagree, | | |
| 453 | 4 | that they're saying that the best | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 453 5 | conclusion you can draw based on the data | | |
| 453 6 | that's available now is that all of these | | |
| 453 7 | medications, whether it's Vioxx, Celebrex | | |
| 453 8 | or the nonselective NSAIDs, all have the | | |
| 453 9 | same basic cardiovascular risk? | | |
| 453 10 | A:  They're saying that, and | | |
| 453 11 | they're also saying that observational | | |
| 453 12 | data is not something they're -- | | |
| 453 13 | they're willing to consider. | | |
| 453 14 | Q:  Where do they say that? | | |
| 453 15 | A:  Because there is a plethora | Pl's Obj.:  Cuts off answer | **Barnett:** No objection. |
| 453 16 | of existing observational data that | which continues to 454:21. | **Smith:**  No objection. |
| 453 17 | show -- | | **Mason:**  Sustained. |
| 454:22 -   455:5 | Graham, David 2006-05-09 | | |
| 454 22 | Q:  You're aware, aren't you, | Pl's Obj.:  602.  Lack of | **Barnett:**  Sustained. |
| 454 23 | that there are six published | foundation.  Assumes facts | **Smith:**  No objection. |
| 454 24 | epidemiological studies that find no | not in evidence. | Testimony played. |
| 455 1 | difference between Celebrex and Vioxx? | | **Mason:**  No objection. |
| 455 2 | A:  No. I mean, you could show | | Testimony played. |
| 455 3 | me the articles and I'm sure I'm familiar | | |
| 455 4 | with the articles, but I have not thought | | |
| 455 5 | about them in that way. | | |
| 455:14 -   457:19 | Graham, David 2006-05-09 | | |
| 455 14 | MR. BECK:  Last point. | | |
| 455 15 | BY MR. BECK: | | |
| 455 16 | Q:  'Short-term use of NSAIDs to | | |
| 455 17 | relieve acute pain, particularly at low | | |
| 455 18 | doses, does not appear to confer an | | |
| 455 19 | increased risk of serious adverse CV | | |
| 455 20 | events (with the exception of' -- what | | |
| 455 21 | was that one again? | | |
| 455 22 | A:   That's 'valdecoxib,' that's | | |
| 455 23 | Bextra. | | |
| 455 24 | Q:  -- Bextra. | | |
| 456 1 | So, what the authors of this | | |
| 456 2 | paper and the reviewer concluded was that | | |
| 456 3 | Short-term use of NSAIDs' including | | |
| 456 4 | Vioxx 'particularly at low doses, does | | |
| 456 5 | not appear to confer an increased risk of | | |
| 456 6 | serious adverse CV events.' Isn't that | | |
| 456 7 | correct? | | |
| 456 8 | A:  That's what they're saying. | | |
| 456 9 | But once again, they have zero | | |
| 456 10 | statistical power to actually make this | | |
| 456 11 | statement. What they really have is, is | | |
| 456 12 | uncertainty, because they haven't | | |
| 456 13 | adequately studied it. | | |
| 456 14 | Q:  I think you said that these | | |
| 456 15 | senior people from the FDA who wrote and | | |
| 456 16 | reviewed this consulted with lots and | | |
| 456 17 | lots of people from the FDA, but they | | |
| 456 18 | didn't consult with you, right? | | |
| 456 19 | A:  No. That's not what I'm -- | | |
| 456 20 | I wasn't part of the discussions that | | |

**Dedrick v. Merck Co., Inc.**

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | Objections | Rulings |
|---|---|---|
| 456 21    happened internally. What I would note | | |
| 456 22    is, is that people from the Office of New | | |
| 456 23    Drugs approved these drug products. And | | |
| 456 24    that if you look at the organizations | | |
| 457 1    that you have represented there, most of | | |
| 457 2    them fall into the amoeba that I | | |
| 457 3    described earlier and that are part of | | |
| 457 4    the review and approval process and that | | |
| 457 5    our own management in drug safety answers | | |
| 457 6    to the people in the Center for Drug | | |
| 457 7    Evaluation who have the controlling | | |
| 457 8    power. So, the Office of New Drugs is | | |
| 457 9    the gorilla in the room. So, in any | | |
| 457 10    event, I'm not saying that at all. I'm | | |
| 457 11    not saying that I wasn't hurt. What I'm | | |
| 457 12    saying is that in constructing this | | |
| 457 13    report, what FDA has done is, has said | | |
| 457 14    that because we don't have data from | | |
| 457 15    control trials, we can't be forced to say | | |
| 457 16    that the drugs are different, even though | | |
| 457 17    there's observational data that would | | |
| 457 18    suggest that there are some differences | | |
| 457 19    that can be made. | | |
| | | |
| 458:17 -    459:22    Graham, David 2006-05-09 | | |
| 458 17    Q:  My question is the senior | | |
| 458 18    people at the FDA, when they asked for | | |
| 458 19    input from all of those groups that we | | |
| 458 20    saw on Page 3, including drug safety | | |
| 458 21    people, right, one person they didn't ask | | |
| 458 22    for input from was Dr. David Graham. Is | | |
| 458 23    that true or false? | | |
| 458 24    A:  They're listing offices | | |
| 459 1    here. I can't tell you who the | | |
| 459 2    individuals are that they asked for input | | |
| 459 3    in this. I was a participant in an open | | |
| 459 4    public Advisory Committee meeting, and so | | |
| 459 5    presumably that material is part of the | | |
| 459 6    record. I wrote an FDA report that I'm | | |
| 459 7    sure is part of the record. So, I would | | |
| 459 8    imagine that the work that I did was | | |
| 459 9    under consideration there. But in the | | |
| 459 10    actual writing of this memorandum, I | | |
| 459 11    can't tell you who actually was consulted | | |
| 459 12    to write it except John Jenkins and Paul | | |
| 459 13    Seligman because they're the only -- oh, | | |
| 459 14    and Steven Galson, because those are the | | |
| 459 15    only names that appear. | | |
| 459 16    Q:  Lastly, I just can't | | |
| 459 17    remember, are all three of those | | |
| 459 18    individuals included in the group that | | |
| 459 19    you think was conspiring to smear your | | |
| 459 20    name? | | |
| 459 21    A:  No. Dr. Jenkins was not | | |
| 459 22    part of that group. | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | | Objections | Rulings |
|---|---|---|---|---|
| 463:2 | 463:13 | | | |
| 463 2 | 2 | The estimates that you have, | **[463:2-463:18]** | **Barnett:** Overruled. |
| 463 3 | 3 | 88,000 to 140,000? | **Def.'s Obj.:** Dr. Graham's | **Smith:** Sustained -- asked |
| 463 4 | 4 | A. Yes. | testimony regarding estimates | and answered; restating |
| 463 5 | 5 | Q. First of all, are they lower | of 88,000-140,000 excess | direct; already covered. |
| 463 6 | 6 | than some other folks' estimates of the | events caused by Vioxx | **Mason:** Not designated. |
| 463 7 | 7 | number of increased cardiovascular, both | should be excluded from this | |
| 463 8 | 8 | deaths and incidents, that have occurred | case on Rule 403 grounds. | |
| 463 9 | 9 | as a result of the drug Vioxx? | Also, no foundation or | |
| 463 10 | 10 | A. Yes, they are. | methodology that supports this | |
| 463 11 | 11 | Q. Is yours a conservative | opinion. | |
| 463 12 | 12 | estimate compared to others in the | **Pl's Resp.:** Witness explains | |
| 463 13 | 13 | published medical literature? | methodology at p. 154-155. | |
| | | | Estimates appear in one of | |
| 463:16 | 463:18 | | the premiere medical journals | |
| 463 16 | 16 | THE WITNESS: I wouldn't say | in the world. Paper and | |
| 463 17 | 17 | that it is conservative. I would | conclusions were subject to | |
| 463 18 | 18 | say that it is realistic. | peer-review. | |
| | | | | |
| 509:13 | 511:6 | | | |
| 509 13 | 13 | Q. And, sir, the labeling, two | **[509:13] - [511:6]** | **Barnett:** Sustained |
| 509 14 | 14 | years you had mentioned about the | **Def't Obj.:** Outside scope | (outside scode of |
| 509 15 | 15 | labeling, and you discussed labeling at | of redirect. | redirect) |
| 509 16 | 16 | length with Mr. Beck, and I want to talk | | **Smith:** Not designated. |
| 509 17 | 17 | to you a little bit about labeling in a | | **Mason:** Not designated. |
| 509 18 | 18 | minute. | | |
| 509 19 | 19 | The labeling, two years. Is | | |
| 509 20 | 20 | there anyone in those two years in | | |
| 509 21 | 21 | particular who dragged their feet? | | |
| 509 22 | 22 | MR. BECK: Object to the | | |
| 509 23 | 23 | form of the question. It's also | | |
| 509 24 | 24 | improper redirect. | | |
| 510 1 | 1 | MR. KLINE: Yes, sir. Go | | |
| 510 2 | 2 | ahead. | | |
| 510 3 | 3 | MR. BECK: I didn't get into | | |
| 510 4 | 4 | this subject at all. | | |
| 510 5 | 5 | THE WITNESS: The two-year | | |
| 510 6 | 6 | period for coming up with the | | |
| 510 7 | 7 | revised label for a problem as | | |
| 510 8 | 8 | serious as high risk of heart | | |
| 510 9 | 9 | attacks with Vioxx, this is an | | |
| 510 10 | 10 | extraordinary long period of time, | | |
| 510 11 | 11 | and the only explanation based on | | |
| 510 12 | 12 | my long experience at FDA is that | | |
| 510 13 | 13 | there was foot dragging by the | | |
| 510 14 | 14 | company. I've seen this countless | | |
| 510 15 | 15 | times with other companies with | | |
| 510 16 | 16 | other serious drug-related adverse | | |
| 510 17 | 17 | reactions where FDA comes in | **[510:17-19]** | **Barnett:** Sustained on |
| 510 18 | 18 | saying we want to put a boxed | **Def's Obj.:** Testimony about | other grounds. |
| 510 19 | 19 | warning on a drug, and the company | black box warning -- 401/402; | **Smith:** Not designated. |
| 510 20 | 20 | says basically no way, Jose, and | 403. Graham implies that the | **Mason:** Not designated. |
| 510 21 | 21 | then FDA sort of banters back and | FDA told Merck it wanted a | |
| 510 22 | 22 | forth with the company, and things | black box warning , which is | |
| 510 23 | 23 | just go on for months and months | untrue. | |

Dedrick v. Merck Co., Inc.

Plaintiff's and Defendant's Designations of David Graham, M.D.

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 510 24 | 24 | | |
| | and months and months. | | |
| 511 1 | 1    At the same time, companies | **[ 511:1-6]** | **Barnett:** Sustained on |
| 511 2 | 2   are free to voluntarily implement | **Def's Obj.:** Testimony about | other grounds. |
| 511 3 | 3   labeling changes such as boxed | black box warning: 403; also | **Smith:** Not designated. |
| 511 4 | 4   warnings, and in this case, I | Graham provides expert | **Mason:** Not designated. |
| 511 5 | 5   imagine FDA would have gone along | testimony on whether | |
| 511 6 | 6   with it. | companies are free to | |
| | | voluntarily implement black | |
| 515:10   -   516:6 | Graham, David 2006-05-09 | box warnings, which is not | |
| 515: 10 | Q:  Let's talk about your | accurate, but more importantly, | |
| 515: 11 | testimony, sir. | this is clearly an undisclosed | |
| 515: 12 | In response to questions by | expert opinion that Graham | |
| 515: 13 | Mr. Beck, you said -- I want to talk | opines on in redirect (and | |
| 515: 14 | label for a minute, labeling in response | Merck does not have a chance | |
| 515: 15 | to the questions that he asked you. | to adequately cross-examine | |
| 515: 16 | First of all, sir, you testified earlier | him on this opinion). | |
| 515: 17 | about how labels can make a difference. | | |
| 515: 18 | You said that a straightforward -- I | | |
| 515: 19 | actually have from Mrs. Golkow's | | |
| 515: 20 | transcription here today instant access | | |
| 515: 21 | to it on real time. And it says here, | | |
| 515: 22 | 'It would actually just be more | | |
| 515: 23 | straightforward about what the problems | | |
| 515: 24 | are, using very bold and frank and plain | | |
| 516: 1 | language, not sort of using adjectives | | |
| 516: 2 | that downplay it and not burying it in | | |
| 516: 3 | tremendous amounts of text.' Your words. | | |
| 516: 4 | Do you recall saying that to the jury | | |
| 516: 5 | here today? | | |
| 516: 6 | A:  Yes, I do. | | |
| | | | |
| 516:7   -   517:12 | Graham, David 2006-05-09 | | |
| 516: 7 | Q:  Now, sir, can a | | |
| 516: 8 | straightforward, bold, frank, plain | | |
| 516: 9 | language label warning make a difference | | |
| 516: 10 | in prescribing of drugs as you see and | | |
| 516: 11 | know and understand it? | | |
| 516: 12 | A:  It certainly can. In the | | |
| 516: 13 | case of Vioxx, I think had the warning | | |
| 516: 14 | been very clear, had it been boxed, the | | |
| 516: 15 | number of patients exposed to the drug | | |
| 516: 16 | would have probably been much reduced, | | |
| 516: 17 | and this would have resulted in a | | |
| 516: 18 | substantial reduction in the number of | | |
| 516: 19 | people who were injured by heart attacks | | |
| 516: 20 | or killed by heart attacks. | | |
| 516: 21 | Q:  Sir, in your testimony | | |
| 516: 22 | before the United States Senate Finance | | |
| 516: 23 | Committee before Senator Grassley and his | | |
| 516: 24 | committee, you were asked the question -- | | |
| 517: 1 | you were saying -- you were asked the | | |
| 517: 2 | question by Senator Graham (sic): 'A | | |
| 517: 3 | black box will catch everybody's | | |
| 517: 4 | attention.' You said, 'As I pointed out | | |
| 517: 5 | before, I think the most effective thing | | |
| 517: 6 | that this black box would have done is it | | |

**Dedrick v. Merck Co., Inc.**

**Plaintiff's and Defendant's Designations of David Graham, M.D.**

| Designated Testimony of David Graham, M.D. | | Objections | Rulings |
|---|---|---|---|
| 517: 7 | would have given prominence to the heart | | |
| 517: 8 | attack risk of Vioxx and it would have | | |
| 517: 9 | stopped direct-to-consumer advertising.' | | |
| 517: 10 | Do you recall making that | | |
| 517: 11 | statement, sir, before the Congress? | | |
| 517: 12 | A: Yes, I do. | | |
| | | | |
| 517:16   517:20 | Graham, David 2006-05-09 | | |
| 517 16 | Q.   My question is, do you abide | | |
| 517 17 | by and agree with that particular public | | |
| 517 18 | statement which was made then today? | | |
| 517 19 | A.   Oh, definitely.  There's no | | |
| 517 20 | question about that. | | |
| | | | |
| 517:21   518:14 | | | |
| 517 21 | 21    Could I add one other thing | [517:21-518:4] | **Barnett:** Sustained. |
| 517 22 | 22   since we're talking about labeling. | **Def's Obj.:** 801/802; 403. | **Smith:** Not designated. |
| 517 23 | 23   Shari Targum, whose review we talked | | **Mason:** Not designated. |
| 517 24 | 24   about earlier, in the very conclusion of | | |
| 518 1 | 1   her review, I was really stunned, I only | | |
| 518 2 | 2   saw this recently in rereading the | | |
| 518 3 | 3   review, she wrote basically that this -- | | |
| 518 4 | 4   that Vioxx should have warnings.  And she | | |
| 518 5 | 5   said "at least warnings."  And so I think | | |
| 518 6 | 6   reading that and looking at her review, | | |
| 518 7 | 7   the fact that here's the expert who | | |
| 518 8 | 8   reviewed the drug, thought that it should | | |
| 518 9 | 9   have been in warnings, and then | | |
| 518 10 | 10   eventually we have it came out that it's | | |
| 518 11 | 11   sort of, you know, buried in the fine | | |
| 518 12 | 12   print, I was actually fairly surprised | | |
| 518 13 | 13   because I hadn't realized that Dr. Targum | | |
| 518 14 | 14   had actually stated that. | | |
| | | | |
| 564:19   565:1 | | | |
| 564 19 | 19   BY MR. KLINE: | | |
| 564 20 | 20    Q.   Is there anything, sir, | | |
| 564 21 | 21   having been subjected to lawyers' | | |
| 564 22 | 22   questions here, sir, for over seven, | | |
| 564 23 | 23   pushing eight hours that changes the | | |
| 564 24 | 24   opinion that you gave publicly to the | | |
| 565 1 | 1   senators in that hearing? | | |
| | | | |
| 565:5   565:6 | | | |
| 565 5 | 5      THE WITNESS:  Nothing | | |
| 565 6 | 6     whatsoever. | | |