**IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| BRANDY GIBSON | |
| v. | CIVIL ACTION NO. 05-5548 |
| MERCK & CO., INC.; | |

|  |  |
|---|---|
| In Re: VIOXX<br>    Products Liability Litigation | MDL No. 1657 |
| | SECTION: L |
| This Document Relates to:<br>    BRANDY GIBSON | JUDGE FALLON<br>MAG. JUDGE KNOWLES |

## PLAINTIFF BRANDY GIBSON'S 1st AMENDED COMPLAINT

### TRIAL BY JURY IS REQUESTED

Plaintiff BRANDY GIBSON ("Plaintiff") brings this civil action against Defendant MERCK & CO., INC. and in support shows the following:

### I.
### PARTIES

1.    Plaintiff BRANDY GIBSON is a resident and citizen of the Boise, Ada County, Idaho.

2.    Defendant MERCK & CO., INC. has answered and is properly before this court.

### II.
### JURISDICTION & VENUE

3.    Pursuant to Pre-Trial Order #11, In Re: Vioxx Products Liability Litigation, MDL 1657, Plaintiff files this cause of action directly into MDL 1657.  Upon completion of all pretrial proceedings applicable to this case, this Court will transfer this case to a federal district court of proper jurisdiction and venue.  Upon completion of pre-trial matters, the

United States District Court of the District of New Jersey has jurisdiction over this cause of action. Plaintiff is a citizen and resident of the Boise, Ada County, Idaho and Defendant is a New Jersey corporation with citizenship in the State of New Jersey. Moreover, the amount in controversy exceeds the sum of $75,000.00, excluding interests and costs.

### III.
### FACTS

4.    BRANDY GIBSON, age 59,  was  prescribed Vioxx (25 mg once per day) on or about February 5, 2002 for arthritis by Dr. Theresa Weiland of Boise, Idaho. BRANDY GIBSON ingested Vioxx until approximately October 2004 when she suffered from an cerebral vascular accident causing permanent and disabling injuries. Plaintiff was treated by Dr. Mary E. Rivers of Boise, Idaho for injuries associated with the stroke.

5.    This case involves Merck's failure to warn Plaintiff, her physicians and the FDA of potential serious cardiovascular side effects of Vioxx. Vioxx is a non-steroidal anti-inflammatory drug (NSAID). Non-steroidal anti-inflammatory drugs are prescribed for the treatment of various conditions requiring analgesia and anti-inflammatory activity. NSAIDs act by preventing the formulation of cyclooxygenases, enzymes that produce prostaglandins which are natural chemicals that cause and inflammation.  When cyclooxygenases are inhibited they reduce prostaglandin production in inflamed tissue and reduce inflammation which results in pain relief.

6.    There are two types of cyclooxygenases, COX-1 and COX-2. COX-1 is involved in the production of protective prostaglandins responsible for the maintenance of normal

gastrointestinal mucosa, and the production of thromboxane, which promotes aggregation and blood vessel constriction.  COX-2, a major source of prostacyclin, is primarily found in inflamed tissue, brain, reproductive organs, and the kidneys and inhibits platelet aggregation and promotes blood vessel opening or dilation.  By inhibiting only COX-2, Vioxx causes an imbalance between the enzymes that promote platelet aggregation and blood vessel constriction without the mediating effect of platelet inhibition and dilation.  This imbalance leads to serous cardiovascular and neurovascular problems, including heart attach, stroke and thromboembolic events.

7.     Vioxx is different from traditional NSAIDs in that it only inhibits COX-2.   The chemical rationale for Vioxx is that if COX-1 is unaltered the patient with experience fewer gastrointestinal complications, while the inhibition of COX-2 will decrease inflammation and resultant pain.  Merck marketed Vioxx as a safe drug with few side effects.  However, since the release of Vioxx, there has been evidence that Vioxx can have dangerous cardiovascular side effects.  Merck ignored the evidence and for almost five (5) years insisted that the drug was safe despite strong evidence to the contrary.

8.     Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets (at does for 12.5 mg and 25 mg) for: (1) relief of the signs and symptoms of osteoarthritis; (2) the management of acute pain; and (3) the treatment of primary dysmenorrhea.  This application was denoted as NDA 21-042 by the FDA.

9.     Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the FDA on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for: (1) relief of the signs and symptoms of osteoarthritis; (2) the

management of acute pain; and (3) the treatment of primary dysmenorrhea.   This application was denoted as NDA 21-052 by the FDA.

10.    On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib for: (1) relief of the signs and symptoms of osteoarthritis; (2) the management of acute pain; and (3) the treatment of primary dysmenorrhea.

11.    The dangers of Vioxx were first discovered during the FDA approval process.  The FDA doctor who reviewed heart and kidney safety data of the original clinical trials noted that at the highest daily dose of 50 milligrams, the drug more often caused high blood pressure, edema and other kidney-related adverse effects than ibuprofen.  Merck offered no explanations for the results.  Merck's only concern was the successful launch of Vioxx and safety issues about hypertension, thrombosis, edema, and cardiovascular events would have severely impacted Merck's positioning in the market compared to its competitors.   Merck downplayed the findings and engaged in misleading promotions advertising the safety of Vioxx.  As a result, just two (2) months after its approval, the FDA warned Merck to desist from using advertising that "in its entirety" made misrepresentation about Vioxx and failed to provide adequate information about side effects.

12.    Coincident with the approval of Vioxx in 1999, a University of Pennsylvania cardiologist, Garret A. FitzGerald, MD, presented research hypothesizing that by treating patients with selective COX inhibitors instead of traditional NSAIDs patients would spare the stomach at the expense of the heart.[1]  According to FitzGerald, inhibiting COX-2 would

---

[1]Garret A. Fitzgerald G., *et. al, Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, 289 JPET 735-741 (1999).

lead to the prevention of production of prostaglandin, the primary cyclooxygenase product in endothelium, a slick layer of cells that prevents interaction between blood cells and vessel wall to help regulate blood flow, coagulation, and smooth vascular tissue.[2]   Prior to 1999 it was believed that prostaglandin was produced by COX-1; therefore, the inhibition of COX-2 by Vioxx or similar drugs would have no effect on the heart.[3]  However, according to the research, COX-2 is the dominant source of prostaglandin and by only limiting COX-2 Vioxx raised the risk of causing high blood pressure, hardening of the arteries, and clotting.[4]  At this point, Merck had the second (2nd) major indication that Vioxx might cause cardiothrombotic events, but the company did nothing to disprove the potential serious consequence of ingesting the drug.

13.     Merck was confronted with the serious side-effects a third time in 1999, when the company's third-party consultants confirmed and identified adverse cardiovascular deaths and injuries among Vioxx users with an attached table identifying a relative risk ratio greater than 2 in all categories.  More cardiovascular problems were observed in a study presented at the European United League against Rheumatism conference in 2002.[5]  The study showed Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.[6]  A prescription monitoring study in England found Vioxx could cause

---

[2] Id.

[3] Garrett A. Fitzgerald, Coxibs and Cardiovascular Disease, 353:357 NEW ENGLAND JOURNAL OF MEDICINE 1709-1711 (2004).

[4] Id.

[5] Pharmacy Today (2002), Abstract, A. Whelton, et. al.

[6] Id.

serious lower and upper gastrointestinal problem and should be prescribed with caution.[7] Despite the serious side effects found by these studies, none of this information was disseminated to prescribing physicians or the consuming public, and Merck failed to do anything to disprove the risks or prove the safety of Vioxx.

14.     In June 2000, industry-sponsored studies presented at the European United League Against Rheumatism (EULAR) (an organization in which Merck is a member and corporate sponsor) showed that Vioxx use resulted in a statistically significant increase in hypertension and stroke.  Not only did Merck do nothing to further accurately publish these studies or warn consumers, but in August of 2000, it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials*.

15.     As a result, by early 2001, over a hundred (100) cases of adverse reactions associated with Vioxx use were reported to the FDA through the agency's Adverse Event Reporting System (AERS).   The FDA found ninety-nine (99) of these cases were unduplicated thrombotic or embolic events associated with Vioxx.[8]  However, according to the FDA, the actual number of thrombotic events was probable higher due to under reporting.[9]  Fifteen (15) of the reported incidents resulted in a patient's death, and sixty-four (64) patients required hospitalization.

---

[7] Deborah Layton *et. al., Safety Profile of Rofecoxib as used in General Practice in England: Results of a Prescription Monitoring Study,* 55 JOURNAL OF CLINICAL PHARMACOLOGY 166 (2002)(Study tracked 15,268 NSAID patients between February and November 2000, and found that one month after ending treatment numerous patients, including Vioxx users, suffered from serious gastrointestinal events, thromboembolic events, and renal failure).

[8] Memorandum, Department of Health and Human Services Public Health Service Food and DAC for Drug Eval. and Research www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_11_thrombo.pdf (Feb. 2001).

[9] *Id.*

16.     The continued existence of thrombotic events should have been important in Merck's post-marketing phase, but again Merck ignored the concerns and advertised Vioxx's safety.[10]

17.     Merck eventually sponsored several studies to show the efficacy and safety of the drug, but ignored the results when all confirmed Vioxx had potentially serious cardiovascular side effects.

18.     Study 85 was conducted to compare Vioxx to nabumetone.[11]  One thousand and forty-two (1042) patients were enrolled in the six-week (6wk) study.  Patients were either taking 12.5 mg of Vioxx or 1000 mg of nabumetone.[12]  At the conclusion of the study, only one (1) cardiovascular event was attributed to the drug during the trial.[13]  Merck attempted to claim the study proved the safety of Vioxx but the FDA prohibited this claim.  Because Merck conducted the trial on a small sample of patients taking only half the recommended dosage, Merck could not claim there was no safety issue with Vioxx.  Study 90, with a similar design to 85, but enrolling 978 patients, reported a total of six (6) serious cardiovascular events associated with patients using Vioxx compared with only two (2) in the nabumetone group.[14]  The results of the smaller study provided Merck with another warning that Vioxx had a clear potential for serious cardiovascular injury.

---

[10] *Id.*

[11] Food and Drug Administration.  Cardiovascular safety review of Rofecoxib., 24-28 (2001), at www.fda.gov/ohrms/dockets/ac/01/briefing/3667b2_06_cardio.pdf,

[12] *Id.*

[13] *Id.*

[14] *Id.*

19.    Merck's largest study, VIGOR, was conducted to obtain information regarding clinically meaningful gastrointestinal events and to develop a large controlled database for overall safety assessment.  The study compared patients who took Vioxx with patients who took Naproxen (an over the counter non-steroidal anti-inflammatory drug).  The results of VIGOR, released by Merck in 2001, provided alarming results and showed there was a high degree of potential injuries to Vioxx users.  The study reported serious cardiovascular events occurred in 101 patients who took Vioxx, compared to only 46 patients who took Naproxen.   Additionally,  myocardial infarctions occurred in 20 patients in the Vioxx treatment group compared to only 4 patients in the Naproxen treatment group.  The study's authors, including Merck scientists, acknowledged the cardiovascular findings were "statistically significant."    However, instead of admitting Vioxx could cause serious cardiovascular problems, Merck alleged the results reflected the cardio-protective property of Naproxen and not a side effect of Vioxx.

20.    The absurdity in Merck's claim is revealed by the fact that no manufacturer of Naproxen has ever claimed such properties.  Naproxen manufacturers would have every incentive to advertise the cardio-protective quality of the product, but there is no scientific evidence to make such a claim.  The FDA has never approved Naproxen as cardio-protective.

21.    On September 17,2001, the FDA cited Merck for minimizing the potentially serious cardiovascular findings that were observed in the VIGOR study.  In its letter, the FDA warned Merck was selectively presenting hypothetical explanations for the observed increases in myocardial infarctions, instead of warning Vioxx could have pro-thrombotic properties.   It warned Merck's promotional activities and materials were false, lacking in

fair balance, and misleading because patients on Vioxx were observed to have a "four to five-fold" increase in heart attacks, compared to patients on Naproxen. The falsity of Merck's allegation was further proved by several articles. A study published in <u>The Lancet</u> found Naproxen was not cardio-protective even for patients who took large doses, 1000 mg, for sixty (60) consecutive days.[15] Meanwhile, the <u>Archives of Internal Medicine</u> reported in a population based on retrospective cohort study on patients taking Naproxen, there was no evidence of short-term reduction of acute myocardial infarction.[16] Merck had no scientific evidence to allege Naproxen had any cardio-protective propensities, yet it did so without regard to the harm its false advertisements would cause.

22.    Since the release of Vioxx, the scientific community has examined Vioxx's potential for injury. For example, doctors in Spain suggested that Vioxx could cause acute tubulointerstitial nephritis after completing a case study on a patient taking Vioxx and urged further studies.[17] An epidemiologic study conducted by the Cleveland Clinic Foundation found the annualized myocardial infarction rates for Vioxx users when compared to placebo was a statistically significant increased rate among Vioxx users.[18] Researchers reviewed the results of two large studies, including VIGOR, and two smaller studies published between 1998 and 2001 related to COX-2 inhibitors.[19] They found patients

---

[15] Wayne A. Ray, *et. al*, "Non-steroidal anti inflammatory drugs and risk of serious coronary heart disease: an observational cohort study," 359 THE LANCET 118-123 (2003).

[16] Muhammad Mamdani, *et. al*, "Effect of Selective Cyclooxygenase 2 Inhibitors and Naproxen on Short-term Risk of Acute Myocardial Infarction in the Elderly," 163 481-486 (2003).

[17] Jose L. Roch, *et. al, Acute Tubulointerstitial Nephritis Associated with Selective COX-2 Enzyme Inhibitor, Rofecoxib,* 357 THE LANCET 9272 (2001).

[18] Debabrata Mukherjee, M.D. *et. al, Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,* 286 JOURNAL OF AMERICAN MEDICAL ASSOCIATION 954 (2001).

[19] *Id.*

taking Vioxx had more than twice as many heart attacks and strokes as patients who took Naproxen.[20] Researchers warned Merck to conduct further investigations to test the safety of Vioxx, but the request was ignored.[21]

23.     Additional studies confirmed Vioxx could have serious cardiovascular effects.[22] Researchers at Vanderbilt University found patients taking high doses of Vioxx had double the risk of heart attack or stroke.[23]

24.     This study tracked patients who were part of Tennessee's Medicaid system taking any NSAID as of July 1, 2001.[24] Nearly 10,000 of the study participants were taking Vioxx, and more than 1,000 of those were "high-dose" Vioxx users, with 30-day supplies of 50-milligram pills.[25] Fifteen percent (15%) of these high dose patients had to be treated for congestive heart failure and twenty-two percent (22%) were treated for other forms of heart disease.[26]   In addition, SUCCESS VI, a multi-center, parallel group, double-blind, randomized controlled trial comparing Celebrex and Vioxx on patients over the age 65 found nearly twice as many Vioxx patients experienced cardiorenal events such as edema and elevations in systolic blood pressure.[27]

---

[20] *Id.*

[21] *Id.*

[22] Debabrata Mukherjee, *Selective Cyclooxygenase-2 (COX-2) Inhibitors and Potential Risk of Cardiovascular Events*, 63 BIOCHEMICAL PHARMACOLOGY 817-821 (2002).

[23] Wayne A. Ray, *et. al, supra. n / 4,.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Andrew Whelton, *et. al, Cyclooxygenase-2-Specific Inhibitors and Cardiorenal Function: a Randomized, Controlled Trial of Celecoxib and Rofecoxib in Older Hypertensive Osteoarthritic Patients,* 8 AMERICAN JOURNAL OF THERAPEUTICS 85 (2001).

25.     Despite the results of the VIGOR study, AERS, and other published scientific materials, Vioxx was widely advertized and marketed in a way that created the image, impression, and belief by conscientious physicians that the use of Vioxx was safe.  In the year 2001, Vioxx was the most heavily advertised drug to consumers in the United States–$135 million was spent by Merck to promote the drug.  The heavy advertising paid off, and Merck earned revenue of $2.6 billion that same year.  Throughout Vioxx's product life Merck had made billions of dollars while it intentionally disregarded information supporting Vioxx's propensity to cause cardiovascular problems.

26.     In August, 2004, at the 20th annual meeting of the International Society for the Pharmacoepidemiology Conference, a principal investigator for the FDA presented research which proved that in doses greater than twenty-five milligrams (25mgs), Vioxx increased the risk of heart attack and sudden cardiac death by more than three times (3x). At the recommended twenty-five milligram (25mg) dose, the risk of acute myocardial infarction and sudden cardiac death was greater by 50 percent for Vioxx than Celebrex, another leading COX-2 inhibitor.  Once again, contrary to Merck's claim, Naproxen has cardio-protective characteristics, the research showed Naproxen actually increases the risk of heart problems by 18 percent..  According to the research, it is estimated Vioxx is associated with more than 27,000 heart attacks or deaths linked to cardiac problems.[28]

27.     In September 2004, Vioxx was finally pulled off the market after Merck's own clinical trial, APPROVe, confirmed what researchers had been saying for years, i.e., Vioxx significantly increases the risk of thrombotic events.  APPROVe was a multi-center, randomized, placebo-controlled, double-blind study to determine the effects of three years

---

[28] See, Graham, et. al, Abstract, Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of Cox-2 Selective and Non-Selective NSAIDS (2004).

of treatment with Vioxx.  The trial started in 2000, enrolled 2,600 patients and compared patients taking 25 mg of Vioxx to patients taking placebo.  The trial was intended to last three (3) years, but was stopped after eighteen months.

28.     By the eighteenth month, forty-five (45) patients taking Vioxx had already experienced a confirmed serious thrombotic event, compared with only twenty-five (25) patients taking placebo.  Of similar concern, blood pressure rates were elevated among Vioxx patients long before the incidence of myocardial infarctions and thrombotic strokes became plain.

29.     Merck's claim that it had no evidence to believe that Vioxx had serious side effects until the eighteenth month of the APPROVe study.  However, researchers reviewing all controlled trials and observational studies conducted between 1998 and 2001 (comparing Vioxx with other NSAIDs) found the increased risk of myocardial infarction was evident from 2000.[29]  According to the researchers, by the end of 2000, Vioxx's cardiovascular effects were obvious from both long <u>and</u> short-term clinical trials; thus, they were unlikely to be a chance finding.[30]  This information confirms Merck purposely chose to ignore these findings to hide the potential risks associated with Vioxx in order to continue increasing its sales.  Further, in 1998, Merck sought and subsequently obtained patent protection for a way to reduce cardiovascular problems in COX-2 Inhibitors from the World Intellectual Property Organization.  This fact illustrates the extent of Merck's knowledge regarding cardiovascular dangers associated with Vioxx.  This information confirms Merck purposely chose to ignore these findings to hide the potential risks associated with Vioxx in order to

---

[29] Peter Juni, et. al, Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-analysis, THE LANCET, published online November 5, 2004 http://image.thelancet.com/extras/04art10237web.pdf.

[30] Id.

continue increasing its sales.

30.    The study also debunks Merck's contention the cardio-thrombotic side effects of Vioxx are minimal for patients taking the medication for less than eighteen (18) months.[31] The scientific evidence shows any patient using Vioxx is at risk of a cardiovascular event regardless of whether Vioxx is taken for a short period or eighteen months as Merck alleges.[32]

**IV.**
**COUNT 1 - NEGLIGENCE**

31.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

32.    Defendant Merck & Co., Inc. negligently manufactured, designed, tested, labeled, packaged, distributed, promoted, marketed, advertised and sold Vioxx, which Merck knew or should have known was harmful to Plaintiff.

33.    At all times relevant to this suit, Merck had a duty to Plaintiff to exercise care in the design, testing, labeling, packaging, distribution, promotion, marketing, advertising, sampling and sale of Vioxx.   Merck breached its duty to Plaintiff by committing the following, but not limited to, particulars:

  (a)    failing to include adequate warnings with its product that would alert Plaintiff and other consumers to the potential risks and serious thrombatic and cardiovascular side effects of Vioxx consumption;

  (b)    failing to include adequate information and/or warnings with its product that would alert the consuming public, including Plaintiff and the health care community, to refrain the use of Vioxx without first prescribing traditional NSAIDs such as naproxen or ibuprofen;

---

[31] *Id.*

[32] *Id.*

(c)     failing to adequately and properly test Vioxx before and after placing in the market;

(d)     failing to conduct sufficient testing on Vioxx, which if properly performed would have shown that Vioxx had serious side effects, including, but not limited to gastrointestinal and cardiovascular events described above;

(e)     failing to adequately warn the consuming public, including Plaintiff and the health care community, that use of Vioxx carried a risk of cardiovascular events and death, along with other serious side effects;

(f)     failing to provide adequate post-marketing warnings or instructions after Merck knew or should have known of the significant risks of personal injury and death as identified herein from the use of Vioxx;

(g)     failing to adequately warn Plaintiff that Vioxx should not be used in conjunction with any risk factors for these adverse effects;

(h)     failing to adequately disclose and warn Plaintiff that she undertook the risk of adverse events and possible death as described above; and

(i)     failing to adequately and timely inform the health care industry of the risk of serious personal injury and death from Vioxx consumption as described herein.

34.     Defendant knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects, including death, which Plaintiff was not aware. Despite knowledge of safer methods and products, Defendant continued advertising, marketing, selling and distributing Vioxx as a safe pharmaceutical treatment option. As a direct and proximate result of Merck's negligence, Plaintiff sustained injuries.

## V.
## COUNT 2 – DESIGN DEFECT (N.J.S.A. 2A:58C-2, *ET. SEQ.*)

35.     Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

36.     Vioxx is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its purpose.  Vioxx is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other non-steroidal anti-inflammatory medicines and similar drugs on the market and is more dangerous than ordinary consumers can reasonably foresee.

37.     Defendant's product was unreasonably dangerous and this defect was present at the time Merck released Vioxx into the stream of commerce.  Vioxx was expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

38.     The unreasonable dangers associated with the consumption of Vioxx was more dangerous than would be reasonably contemplated by an ordinary user.  Plaintiff was unaware of the unreasonably dangerous defects and hazards associated with consuming Vioxx.  Moreover, Plaintiff's use of Vioxx was for a purpose intended by Defendant.  At the time Plaintiff received and consumed Vioxx, Merck represented the product to be safe and free from latent defects.

39.     Defendant is strictly liable to Plaintiff for defectively designing and subsequently providing a product that was unreasonably dangerous for its intended use at the time it left Merck's control.

40.    Merck knew or should have known of dangers associated with Vioxx. Despite this knowledge, Merck continued to profit from the sale of Vioxx until September of 2004. Defendant's malicious conduct was in conscious disregard to the health and safety of Plaintiff and the general public.

41.    Earlier removal of Vioxx would have prevented Plaintiff's injury and continuing impairment. Merck's conduct in defectively designing its product was a direct and proximate cause of Plaintiff's injuries as alleged herein.

### VI.
### COUNT 3 – MARKETING DEFECT
### FAILURE TO WARN (N.S.J.A. 2A:58C-2 ET. SEQ.)

42.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

43.    The pharmaceutical Vioxx aggressively marketed and promoted by Merck was defectively marketed with inadequate warnings and/or instructions.  These marketing defects arose directly from Merck's aggressive marketing campaign to the consuming public and indirectly to physicians through drug sales representatives.

44.    Merck directly advertised and marketed Vioxx to the FDA, consumers and/or persons/entities responsible for consumers and physicians, and therefore had a duty to warn of risks associated with the use of its product.

45.    Merck failed to provide warnings regarding gastrointestinal and cardiovascular side effects associated with the use of Vioxx.  Defendant's failure to provide timely warnings promoted the prescription of Vioxx by health care providers who otherwise would not have prescribed in treating patients.

46.    Defendant failed to perform or otherwise facilitate adequate testing that would have revealed that the use of Vioxx created serious and potentially life-threatening side effects

and complications.  Moreover, Merck failed to provide the health care community and general public with a full and complete disclosure on studies/tests conducted on its product before and after entering the market place.

47.     At a minimum, Merck failed to provide timely and adequate post-marketing warnings and/or instructions to the general public, health care community and FDA after it knew of dangers associated with Vioxx which were discovered through test results/data from post-marketing studies.

48.     Merck's conduct in marketing and promoting Vioxx was a direct and proximate cause of Plaintiff's injuries as alleged herein.

## VII.
## COUNT 4 – BREACH OF EXPRESS
## WARRANTIES (N.S.J.A. 12A:2-313 *ET SEQ.*)

49.     Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

50.     Defendant Merck had a duty to exercise reasonable care in the research, development, design, testing, manufacturing, inspection, labeling, distribution, marketing, promotion, sale and release of Vioxx, including a duty to:

   (a)     Ensure that its product did not cause the user unreasonably dangerous side effects and/or complications;

   (b)     Warn providers, suppliers, actual consumers and potential consumers of potentially dangerous and/or life-threatening side effects and/or complications arising from the use of its product; and

   (c)     Disclose adverse material facts regarding the use of its products when making representations to physicians, the FDA, Plaintiff and the general public.

51.     Both Plaintiff and her physician reasonably relied upon Defendant to provide a full and complete disclosure of all known defects, risks, dangers, complications and side

effects arising from the use of Vioxx.

52.     Neither Plaintiff, her physician(s) or the FDA had knowledge of the misrepresentations and incomplete nature of statements made by Merck regarding the use of Vioxx.  Plaintiff justifiably and detrimentally relied on warranties and representations of Defendant when purchasing and consuming Vioxx.

53.     As the designer, manufacturer, marketer, promoter and distributor of Vioxx, Defendant had exclusive access and control to material facts pertaining to dangers associated with using its product.  As such, Merck knew that physicians, the FDA, Plaintiff and the general public could not have reasonably obtained information revealing dangers associated with Vioxx.

54.     Through its conduct, Merck warranted to Plaintiff and her physician(s) that Vioxx was merchantable and fit for its intended purpose.  Vioxx does not conform to the express representations made by Merck and its agents.  Defendant's conduct in this manner was a direct and proximate cause of Plaintiff's injuries as alleged herein.

## VIII.
## COUNT 4 – MISREPRESENTATIONS & FRAUD (N.S.J.A. 56:8-2 *ET SEQ.*)

55.     Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

56.     Defendant Merck negligently, recklessly, intentionally and fraudulently made material misrepresentations about the safety of Vioxx.  Merck represented the use of Vioxx was safe for the purpose of inducing the consuming public, including Plaintiff, to rely upon its representations when purchasing its product.

57.     Prior to and following the introduction of Vioxx to the general public, Merck set in motion a public relations and advertising/marketing campaign marketing Vioxx through

press releases, print and mass mail out advertisements and television advertising. Defendant's representations that Vioxx was a safe and effective drug were made so that Plaintiff and the general consuming public would rely on said representations and seek prescriptions from treating physicians for its product.   Plaintiff relied on these representations.

58.    Defendant made misrepresentations and actively concealed adverse information at a time when Defendant knew, or should have known, that Vioxx had defects, dangers and characteristics that were other than what Merck had represented to the consuming public, including Plaintiff, the FDA and the health care industry.  Specifically, Defendant misrepresented and/or actively concealed the following information:

(a)    Vioxx consumption causes a statistically significant increase in cardiovascular side effects, including without limitation, thrombosis, myocardial infarction and sudden onset death, as identified herein, resulting in serious injury and/or death;

(b)    there had been insufficient and/or company-spun stories regarding the safety and efficacy of Vioxx before and after its release into the market;

(c)    Vioxx was not fully and adequately tested for the cardiovascular side effects at issue herein;

(d)    other testing and studies showed increased risk of or actual serious adverse risks; and/or

(e)    Vioxx had never been shown to be safer or more efficacious than other NSAIDs on measures of overall safety.

59.    At the time Merck made these representations, it was aware that the statements were false and/or made the representations with reckless disregard to their truth and/or accuracy.  Defendant's conduct in this manner was a direct and proximate cause of Plaintiff's injuries as alleged herein.

---

## IX.
## DAMAGES

60.    Plaintiff BRANDY GIBSON respectfully requests the following damages to be
considered separately and individually for the purpose of determining the sum of money
that will fairly and reasonably compensate her:

(a)    The physical pain and suffering she has suffered in the past and will
continue to suffer in the future;

(b)    The mental anguish she has suffered in the past and will continue to
suffer in the future;

(c)    The amount of reasonable medical expenses necessarily incurred in
the treatment of her injuries in the past, and those that will be
reasonably incurred in the future;

(d)    The loss of any earnings sustained by her in the past, and the loss or
reduction of her earning capacity in the future;

(e)    The physical incapacity and impairment suffered by Plaintiff and the
resulting inability to do those tasks and services the she ordinarily
would have been able to perform for the past and future;

(f)    The disfigurement she has suffered from the date of the occurrence
in question in the past, and those she will continue to suffer in the
future;

(g)    The shortening of her life-span and longevity due to the injuries
sustained by her; and

(h)    attorneys fees and costs.

## X.
## EXEMPLARY DAMAGES

61.    Defendant Merck's choice to intentionally and consciously refuse to enter into the
stream of commerce a reasonably safe product, when viewed from the standpoint of the
actor at the time of the occurrence, involved an extreme degree of risk, considering the
probability and magnitude of the potential harm to others constitutes malicious conduct.

62.     Furthermore, Defendant's intentional refusal to provide a reasonably safe product and/or disclosure of information regarding known dangers associated with Vioxx illustrates an attitude not only of conscious indifference for the safety of others, but shows Defendant's actual and subjective awareness of dangers associated with its product, while nevertheless proceeding its conduct with a conscious indifference to the rights, safety or welfare of others.  As such, Defendant Merck & Co., Inc. is liable for exemplary/punitive damages pursuant to N.J.S.A. 2A:58C-1.

## XI.
## FRAUDULENT CONCEALMENT / DISCOVERY RULE

63.     Merck's conduct constitutes fraudulent concealment of material facts necessary in supporting Plaintiff's cause of action.  As such, Merck is equitably estopped from asserting a defense of limitations in this case.

64.     As a pharmaceutical manufacturer, Merck had a duty to disclose known risks and dangers associated with Vioxx.  Merck had actual knowledge of dangers associated with using its product.  Despite this knowledge, Merck knowingly withheld this information from Plaintiff, the general public, the health care community and governmental regulatory agencies.  Merck continued to deny Vioxx caused cardiovascular events and withheld this material information for the fixed purpose of receiving a financial windfall from the sale of Vioxx.  For these reasons, Plaintiff did not know, or have reason to know, of facts supporting a cause of action until such time Merck withdrew Vioxx from the market in September of 2004.  Therefore, Plaintiff's claims were tolled until September of 2004.

## XII.
## PRAYER

65.     For the above reasons, Plaintiff BRANDY GIBSON prays Defendant MERCK & CO.,

INC. be cited to appear and answer herein, that upon final trial and hearing, Plaintiff has

her judgment against Defendant with interest on the judgment at the legal rate,

prejudgment interest, costs of court and for such other further relief, both in law and equity,

to which the Plaintiff may show herself justly entitled.

Respectfully submitted,

## SHELTON SMITH & ASSOCIATES
A PROFESSIONAL CORPORATION

 /s/ Russell W. Endsley
Russell W. Endsley
SBOT # 24026824
Shawn P. Fox
SBOT # 24040926
Shelton Smith
SBOT # 18578500
909 Fannin, Suite 3850
Houston, Texas 77010
Tele:  (713) 659-2727
Fax:   (713) 659-2813

## ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The hereby certify that the above and foregoing Plaintiff Brandy Gibson's First Amended Complaint has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and email or by hand delivery and email and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States for the Eastern District of Louisiana by using CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this _____ day of _____, 2006.

/s/ Russell W. Endsley
Russell W. Endsley
SBOT # 24026824
rendsley@smith-gibson.com
Shawn P. Fox
SBOT # 24040926
sfox@smith-gibson.com
909 Fannin, Suite 3850
Houston, Texas 77010
Tele:  (713) 659-2727
Fax:   (713) 659-2813

**ATTORNEYS FOR PLAINTIFF**