**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No.  05-2524 | * | |
| | * | MAGISTRATE |
| ANTHONY WAYNE DEDRICK, | * | JUDGE KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**MOTION OF MERCK & CO., INC.**
**("MERCK") FOR JUDGMENT AS A MATTER OF LAW**

Defendant Merck, through undersigned counsel, and pursuant to Federal Rule of Civil

Procedure 50(a), hereby moves for entry of judgment in its favor on all claims.  In the

alternative, Merck moves for judgment as a matter of law on each of the claims plaintiff has

failed to prove in his case.  The facts and law supporting this motion are set forth in the

accompanying memorandum, which is incorporated as if fully set forth herein.

Dated:  December 6, 2006                    Respectfully submitted,

                                            s/ Dorothy H. Wimberly
                                            Phillip A. Wittmann, 13625
                                            Dorothy H. Wimberly, 18509

STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Mark Ouweleen
Carrie Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Douglas Marvin
Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

And

Brian S. Currey
A. Patricia Klemic
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No.  05-2524 | * | |
| | * | MAGISTRATE |
| ANTHONY WAYNE DEDRICK, | * | JUDGE KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC, | * | |
| | * | |
| Defendant | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC.
("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Because plaintiff has rested without proving his case, Merck is entitled to judgment as a matter of law.  But even if the Court disagrees, this is an excellent time to eliminate extraneous claims – such as fraud, breach of warranty, and design defect.  Plaintiff failed to include any mention of fraud or breach of warranty in the joint pretrial order submitted by the parties.  Under Fifth Circuit law, plaintiff has therefore waived these claims.  *Valley Ranch Dev. Co. v. Fed. Deposit Ins. Corp.*, 960 F.2d 550, 554 (5th Cir. 1992).  Additionally, plaintiff's design defect claim is both duplicative of his failure to warn claims and otherwise unsupported by Tennessee law.  At a minimum, the Court should enter judgment on these claims.  Keeping them in the case only invites juror confusion and potential error with respect to the jury charge and jury interrogatories.

# I.     THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50). "[A] party has been fully heard when he rests his case." *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004). At that time, the court "may grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, cannot be maintained or defeated." FED. R. CIV. P. 50(a)(1). "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999). Instead, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.* (internal quotation marks and citations omitted).

# II.    MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S COMMON LAW FRAUD AND BREACH OF WARRANTY CLAIMS.

## A.     **Plaintiff Has Abandoned His Fraud And Breach Of Warranty Claims.**

It is well settled that the parties can proceed at trial only on the claims and defenses that they included in the pretrial order. "Once the [pretrial] order is entered, it controls the scope and course of the trial. If a claim or issue is omitted from the order, it is waived. The claim is waived even if it appeared in the complaint. The law is plain." *Valley Ranch Dev. Co.*, 960 F.2d at 554 (internal citations and quotation marks omitted); *see also Branch-Hines v. Herbert*, 939 F.2d 1311, 1319 (5th Cir. 1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.")

Illustrating the strict application of this rule, the Fifth Circuit in *Valley Ranch* affirmed the district court's dismissal of plaintiff's claims for securities fraud, breach of oral partnership agreements, Racketeer Influenced and Corrupt Organizations Act (RICO) violations, common law fraud, and deceptive trade practices because they had left these claims out of the pretrial order and instead included only a claim for breach of a settlement contract that arose out of these claims. The court's explanation for disallowing the plaintiffs to proceed on these causes of action was simple: "Plaintiffs omitted their underlying claims from the pretrial order, and they are waived." *Valley Ranch Dev. Co.*, 960 F.2d at 554; *see also Allen v. United States Steel Corp.*, 665 F.2d 689, 696 (5th Cir. 1982) (finding no abuse of discretion for concluding that a separate Title VII claim regarding discriminatory restroom facilities was waived when such a claim was omitted from the pretrial order, despite the fact that evidence to support such a claim was introduced for background purposes).

Here, the joint pretrial order submitted by the parties on November 10, 2006 ("PTO") is devoid of any reference to fraud, misrepresentation, or breach of express or implied warranty. (*See* Nov. 10, 2006, Pre-Trial Order, ¶ 5 ("Plaintiff's Claims"), ¶ 9 (Plaintiff's "Contested Issues of Law".) Plaintiff likewise failed to mention in the PTO any of the elements necessary to support these claims. *Id.*

Plaintiff's intent to abandon his fraud and warranty claims is further demonstrated by the fact that plaintiff's counsel made no reference to these claims during opening statement. In fact, he announced to the jurors that the entire case "boil[s] down" to only three questions: "Does Vioxx® significantly increase the risk of a heart attack? Did Merck fail to adequately warn doctors of the heart attack risks? Was Vioxx a substantial contributing factor in Tony Dedrick's heart attack?" (Nov. 27, 2006 Tr. at 98:2-9.) None of these questions has anything to do with

claims for fraud or breach of warranty (or design defect for that matter).  Because plaintiff has demonstrated a clear intent to abandon these causes of action, the Court should enter judgment for Merck on these claims as a matter of law.

**B.      Plaintiff's Fraud And Breach Of Warranty Claims Are Incompatible With The Learned Intermediary Doctrine.**

Tennessee is a "learned intermediary" state, meaning that a prescription drug manufacturer's duty to warn runs only to the prescribing physician. *Pitmann v. Upjohn Co.*, 890 S.W.2d 425, 430-32 (Tenn. 1994).   Application of the learned intermediary rule requires dismissal of claims for fraud and breach of warranty under Tennessee law when, as here, plaintiff fails to show that his physician relied on the alleged misrepresentation.  *See, e.g.,* *Spence v. Danek Med., Inc.*, No. 96C-1004, 1998 WL 665760, at *2 -6 (Tenn. Cir. Ct. 1998) (analyzing plaintiff's fraud and warranty claims in a medical product case under the learned intermediary doctrine). *Bradley v. Danek Med., Inc.*, 1999 U.S. Dist. LEXIS 6449, *18-20 (W.D. Tenn. 1999) (same); *Ponthieux v. Danek Med., Inc.*, No. 96-341, 95-2542, 1999 WL 33486689, *8 (W. D. Tenn. May 28, 1999) (same);  *Watts v. Sofamor*, SNC No. 96-3248, 95-2542, 1999 WL 1866407, *4 (W. D. Tenn. Apr. 19, 1999) (same).   Similarly, courts in other jurisdictions applying the learned intermediary have rejected consumer fraud claims against drug manufacturers as an improper end-run around the learned intermediary doctrine.  As one court put it, "the only valid claim in a prescription drug suit is th[at] defendants failed to adequately warn the plaintiff's prescribing physician about the drug, which caused the plaintiff's injuries." *Hackett v. G.D. Searle & Co.*, No. A-01-CA-399-SS, 2002 U.S. Dist. LEXIS 16246, at *7 (W.D. Tex. June 25, 2002) (in a personal injury suit involving Celebrex, granting summary judgment on claims of breach of express and implied warranties, intentional and negligent misrepresentation, fraud, and intentional infliction of emotional distress on this ground).

6

The barring effect of the learned intermediary doctrine on such claims was illustrated in *Burton v. American Home Products Corp. (In re Norplant Contraceptive Products Liability Litigation)*, 955 F. Supp. 700, 710 (E.D. Tex. 1997).  In that case, plaintiffs brought suit against the makers of Norplant under theories of strict liability, negligence, misrepresentation, breach of implied warranty of merchantability, and alleged violations of the Texas Deceptive Trade Practices Act ("DTPA").  *Id.* at 702-03.  The court explained that all of these claims "collapsed" into a single failure to warn claim:

> The gravamen of all of Plaintiffs' causes of action, including misrepresentation and violations of the DTPA, is that Wyeth failed to adequately warn of or disclose the severity of Norplant's side effects.  Therefore, the learned intermediary doctrine applies to all of Plaintiffs' causes of action. . . . [W]hether the failure to warn is couched as an affirmative misrepresentation or a misrepresentation by concealment, the allegation collapses into a charge that the drug manufacturer failed to warn.

*Id.* at 709.  The court reasoned, in part, that "[i]f the [learned intermediary] doctrine could be avoided by casting what is essentially a failure to warn claim under a different cause of action … then the doctrine would be rendered meaningless."  *Id*; *see also*, *e.g.*, *Talley v. Danek Med., Inc*., 179 F.3d 154, 162-63 (4th Cir. 1999);  *Catlett v. Wyeth, Inc*., 379 F. Supp. 2d 1374, 1381 (M.D. Ga. 2004);  *Alexander v. Danek Med., Inc*., 37 F. Supp. 2d 1346, 1350 (M.D. Fla. 1999).

So, too, in this case.  To allow plaintiff to avoid application of the doctrine by recasting his failure to warn claim under alternate theories such as fraud and breach of warranty would defeat the important purposes of the doctrine.  The Court should thus follow the other courts that have considered this issue, and should reject plaintiff's fraud and warranty claims.  *See Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 94 (Tex. App.–Texarkana 2000–no pet.) (applying the learned intermediary doctrine to "all of [plaintiff's] causes of action" against the manufacturer of Norplant); *Talley*, 179 F.3d at 162-63 (fraud claims barred because the learned intermediary doctrine applied); *Catlett*, 379 F. Supp. 2d at 1381 (learned intermediary doctrine

encompasses any fraud, fraudulent concealment or misrepresentation claim related to prescription drugs); *Alexander*, 37 F. Supp. 2d at 1350 (approving of defendant's argument that failure to warn claims brought under the theories of negligence, strict liability and fraud fail because of the application of the learned intermediary doctrine).

### C.   Plaintiff's Fraud Claims Suffer From A Failure Of Proof.

Even if Tennessee were to cast aside the learned intermediary rule in order to allow a fraud claim by a consumer against a pharmaceutical company for failure to warn, plaintiff's claim suffers from a complete lack of proof.  To prove a fraud case under Tennessee law, plaintiff must establish (1) a misrepresentation of an existing or past material fact; (2) that the misrepresentation was false; (3) that it was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity; (4) reasonable reliance by his physician on the misrepresentation; and (4) that he suffered damage as a result of the misrepresentation.  *Carter v. Danek Med., Inc.*, No. CV96-3243-G, 1999 WL 33537317, at *4 (W.D. Tenn. June 3, 1999)*; Holt v. Am. Progressive Life Ins. Co*., 731 S.W.2d 923, 927 (Tenn. Ct. App. 1987); *Edwards v. Travelers Ins. of Hartford, Conn*., 563 F.2d 105, 113 (6th Cir. 1977).  Similarly, to prove a case of negligent misrepresentation under Tennessee law, plaintiff must establish that "the defendant was acting in the course of his business…; the defendant supplied faulty information meant to guide others in their business transaction; the defendant failed to exercise reasonable care in obtaining or communicating the information;  [] the plaintiff justifiably relied upon the information" and that plaintiff suffered damages that were proximately caused by the misrepresentation. *Ritter v. Custom Chemicides*, 912 S.W.2d 128, 131 (Tenn. 1995); *see also ARC LifeMed, Inc. v. AMC-Tennessee, Inc*., 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005) (finding plaintiff's cause of action for negligent misrepresentation failed because plaintiff did not offer any proof that misrepresentation was the cause of his damages); *Prudential Botts & Assocs.*

*Realtors, Inc. v. R & E Props., LLC*, No. E2002-01827-COAR3CV, 2003 WL 21493792, at *1

(Tenn. Ct. App. June 25, 2003) (dismissing negligent misrepresentation claims because plaintiff

failed to show that defendant's misrepresentation was the proximate cause of its financial loss).

     Mr. Dedrick has failed to introduce sufficient evidence to establish any of these elements,

but the Court need focus only on two: whether (1) Merck made a material misrepresentation (2)

upon which Dr. Herrera relied.  Plaintiff spent hours – perhaps days – of his trial time presenting

evidence of supposed misrepresentations without ever proving that Dr. Herrera was aware of

them, let alone relied on them.  For example, there is no evidence that Dr. Herrera ever saw a

single Merck press release, attended an audio conference by Dr. Holt, was present at a pharmacy

convention, saw the CV card, or saw the Demopoulos video news release.

     What Dr. Herrera did receive from Merck was a PIR enclosing the VIGOR study (and

advising of the three additional heart attacks), the 1999 FDA approved label, and the April 2002

letter quoting from the FDA approved label and enclosing a highlighted copy of that label. (Dec.

5, 2006 Tr. at 1792:24-1793:5, 1831:10-24 (Test. of Dr. Herrera).)  Those communications

contained the relevant data known to Merck, and cannot constitute misrepresentations.  *See, e.g.,*

*Bradley v. Danek Medical, Inc.*, 1999 U.S. Dist. LEXIS 6449, *21-22 (W.D. Tenn. 1999)

(granting summary judgment to defendant on fraud and negligent misrepresentation claims in

products liability case because physician had knowledge of the risk and used his own medical

judgment to decide whether to use the device on plaintiff).  Any claim that the labels, or

language derived from the labels, constitutes actionable fraud is preempted.[1]

     Nor can plaintiff base his fraud and misrepresentation claims on presentations by Merck's

professional sales representatives to Dr. Herrera.  As the testimony of Mrs. McAllister

---

[1] Preemption is discussed in Part VI.

demonstrated, Merck sales representatives were required to limit their presentations to information contained in or consistent with the label.  (Dec. 5, 2006 Tr. at 1676:10-19 (Test. of Ms. McAllister).) So any claim based on their presentations would be preempted.  And, in any event, Dr. Herrera could not recall any specific communication from Merck sales representatives.  (Dec. 5, 2006 Tr. at 1844:14-22 (Test. of Dr. Herrera).)   The most he could say is that none disclosed a heart attack risk to him.  (*Id.* at 1844:14-18.)   Dr. Herrera had the VIGOR articles and the 2002 label, however, so plaintiff cannot base a fraud claim on the sales representatives' presentations.  Because there is no evidence that any communications were "misleading", they cannot form the basis of a fraud claim or a negligent misrepresentation claim under Tennessee law.[2]

Plaintiff also cannot show that Dr. Herrera relied on any supposed misrepresentation.  Dr. Herrera tried to claim that he would not have prescribed Vioxx to Mr. Dedrick if only he had known of the VIGOR data.  (*Id.* at 1811:3-6.)   But, of course, Merck repeatedly disclosed this information to Dr. Herrera.  The evidence shows that Dr. Herrera does not pay any attention to the drug labels:  he was unaware that many drugs he now prescribes have black box cardiovascular labels.  (*Id.* at 1841:6-1842:19.)

Accordingly, the Court should enter judgment on behalf of Merck on Mr. Dedrick's common law fraud claims.

---

[2] Similarly, plaintiff cannot prevail on his fraud claim by pointing to Merck's marketing message that it "[s]tands behind the cardiovascular safety of Vioxx" or that "Vioxx is as safe as placebo." (Dec. 1, 2006 Tr. at 1123:24-1124:12) (Test. of Dr. Pechmann).  First, plaintiff has failed to show that either of these statements was communicated to or read by Dr. Herrera, let alone relied on by him.  Furthermore, as discussed below, any claim that the FDA label, statements derived from the label, or statements that Vioxx is safe are fraudulent or constitute misrepresentations are preempted by federal law.

### D.    Plaintiff's Breach of Express Warranty Claim Suffers From A Failure Of Proof.

In order to prove his express warranty claim, plaintiff must show: (1) the existence of warranty; (2) a breach of that warranty; and (3) that the breach proximately caused plaintiff's injury.  *See* Uniform Commercial Code Comment TENN. CODE ANN. § 47-2-714.  To establish proximate cause in this case, plaintiff must be able to establish that Dr. Herrera specifically relied on such alleged warranty.  *See Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 973 (D. Tenn. 2002) (granting summary judgment when plaintiff could not establish that he "ever read or specifically relied on [the defendant's] affirmations").

Plaintiff has presented no evidence that Merck made any express warranties, that it breached any warranties, or that such breach was the proximate cause of any injury to plaintiff.  *Dunkin v. Sytex Lab., Inc.*, 443 F. Supp. 121, 126 (W.D. Tenn. 1977) (granting defendant drug manufacturer's motion for summary judgment where "the only representations made by defendants . . . regarding the safety of Norinyl were contained in the tablet dispenser leaflets.  It is clear no express warranty was made that cerebrovascular accidents would not occur in some Norinyl users as a side effect.")  As a result, Merck is entitled to judgment in its favor on plaintiff's express warranty claim.

## III.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S NEGLIGENT DESIGN DEFECT CLAIM.

Tennessee has adopted "comment k" to section 402A of the Restatement (Second) of Torts and has held that all prescription drugs are considered "unavoidably unsafe" for the purpose of application of comment k.  *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 428 (Tenn. 1994).

The only claim consistent with comment k is a failure to warn claim, as has been recognized by the Tennessee Supreme Court.  *Id.*  Under comment k, prescription drugs are

11

considered "unavoidably unsafe," in that they are "incapable of being made safe for their intended and ordinary use" but have benefits that outweigh the hazards of their use. RESTATEMENT (SECOND) OF TORTS § 402A cmt. k.  An "unavoidably unsafe product" is not "unreasonably dangerous" *per se.  Id.*  To the contrary, "[s]uch a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous." *Id.* (emphasis removed).  Therefore, "[t]he seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with known but apparently reasonably risk."  *Id.*  Under "comment k," so long as the manufacturer adequately warned of the risks associated with its prescription drug, the design of the actual product cannot be held to be "defective."  Allowing plaintiff to recover under a claim for defective design would be contrary to the Tennessee courts' adoption of comment k. [3]

For the same reason, a claim for negligent design must fail also because it is duplicative of plaintiff's failure to warn claims.  Because comment k imports a knowledge requirement in determining liability for such products, the analysis under strict liability and negligence becomes identical.  *Witherspoon v. Ciba-Geigy Corp.*, No. C.A. 1023, 1986 WL 2138, at *2 (Tenn. Ct. App. Feb. 2, 1986) ("With an unavoidably dangerous drug . . . the standard for liability under negligence and strict liability is essentially the same;  namely, did the manufacturer provide an

---

[3] Even if plaintiff's strict liability design defect claim was viable under Tennessee law, it would still fail because plaintiff has not offered legally sufficient evidence to satisfy the essential elements of his claim. As explained below, plaintiff has failed to proffer any legally sufficient evidence to show Vioxx was so "unreasonably dangerous" as to qualify as a "defective" product under the Tennessee Products Liability Act ("TPLA").

adequate warning?"); *see also Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980) (when

comment k applies, "[t]he standard for liability under strict liability and negligence is essentially

the same"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1353-54 (3d Cir. 1992) (analysis of liability

under comment k is the same for strict liability and negligence); *Klem v. E.I. DuPont De

Nemours & Co.*, 19 F.3d 997, 1003 (5th Cir. 1994); *Chambers v. G.D. Searle & Co.*, 441 F.

Supp. 377, 381 (D. Md. 1975); *Basko v. Sterling Drug. Inc.*, 416 F.2d 417, 426 (9th Cir. 1969);

*Feldman v. Lederle*, 479 A.2d 374 (N.J. 1984); *Smith v. E.R. Squibb & Son, Inc.*, 273 N.W.2d

476 (Mich. 1979); *Ortho Pharm. Corp. v. Champman*, 388 N.E.2d 541 (Ind. App. 1979).

Thus, Tennessee holds that a pharmaceutical manufacturer discharges its duties under the

negligence standard by providing an adequate warning:

> Drug manufacturers have a duty to exercise ordinary and reasonable care not to
> expose the public to an unreasonable risk of harm from the use of their products.
> Manufacturers of prescription drugs, like the manufacturers of any other
> unavoidably dangerous product, have a duty to market and distribute their
> products in a way that minimizes the risk or danger. They may discharge their
> duty by distributing the drugs with proper directions and adequate warnings to
> those who foreseeably could be injured by the use of their products.

*Pittman*, 890 S.W.2d at 428-429 (citing Restatement (Second) of Torts, § 402A cmt. k (1965);

internal citation omitted.)

## IV.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FAILURE TO WARN, NEGLIGENCE, AND BREACH OF IMPLIED WARRANTY CLAIMS.

The Tennessee Products Liability Act ("TPLA") governs all "product liability action[s]"

in Tennessee.  TENN. CODE ANN. § 29-28-102.[4]  To prevail on a product liability action, the

---

[4]  "Product liability action[s]" include "all actions based upon the following theories:  strict
liability in tort; negligence; breach of warranty, express or implied; breach of or failure to
discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation,
concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive
legal theory in tort or contract whatsoever."  TENN. CODE ANN. § 29-28-102.

TPLA requires plaintiff to prove that the product was either in a "defective condition" or "unreasonably dangerous".[5]  Tenn. Code Ann. § 29-28-105(a);  *Harwell v. Am. Med. Sys.*, 803 F. Supp. 1287, 1296 (M.D. Tenn. 1992) ("[I]t makes no difference whether the complaint is couched in terms of negligence, strict liability or breach of [implied] warranty, it has generally been held in the State of Tennessee that in order for a plaintiff to recover under any theory of product liability, the plaintiff must establish that the product was defective or unreasonably dangerous at the time the product left the control of the manufacturer.");  *Zobrist v. Sofamor, S.N.C.*, 1999 U.S. Dist. LEXIS 6489, *26-27 (W.D. Tenn. 6489) (requiring a showing of "defective condition" or "unreasonably dangerous condition" to prevail on inadequate testing claim).

Because, as noted above, Tennessee has adopted comment k to the Restatement, plaintiff in a pharmaceutical case bears the burden of establishing that the drug was defective or unreasonably dangerous by reasons of the manufacturer's failure to provide an adequate warning.  *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 911 (Tenn. Ct. App.1993);  *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991).  Additionally, because Tennessee is a learned intermediary state, manufacturers who have a duty to warn may reasonably rely on intermediaries to transmit their warnings and instructions.  *Pittman*, 890 S.W.3d at 429.  Stated succinctly, "to recover for failure to warn under the learned intermediary doctrine, plaintiff must show:  (1) that the defendant failed to warn the physician of a risk associated with the use of the product not otherwise known to the physician; and (2) that the failure to warn the physician was both a cause in fact and proximate cause of the plaintiff's injury."  *Harden v. Danek Medical*,

---

[5] Express warranty and misrepresentation claims are not subject to this requirement under the TPLA.  Tenn. Code Ann. § 29-28-105(b).

985 S.W.2d 449, 451 (Tenn. App. 1998).  Here, plaintiff has failed to satisfy either element, and thus, Merck is entitled to judgment as a matter of law on plaintiff's strict liability, negligence and breach of implied warranty claims.

> **A.**     **Plaintiff Has Failed To Prove That Merck Failed To Warn.**

Under comment k, a manufacturer of an "unavoidably unsafe" product will not be held liable if it has provided adequate warnings of potential risks that are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge. *See* RESTATEMENT (SECOND) OF TORTS § 402A, cmt. j (1965); *see also Carlin v. Super. Ct. (Upjohn Co.)*, 13 Cal. 4th 1104, 1112 (1996); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (5th Cir. 1984)[6].

Additionally, Tennessee has tweaked comment k in an important respect.  In determining whether the product was in a defective condition or unreasonably dangerous, the state of scientific and technological knowledge available to the manufacturer or seller "at the time the product was placed on the market" controls.   TENN. CODE ANN. § 29-28-105.  Additionally, consideration must given to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products. *Id.*

Moreover, as noted above, the sufficiency of the warning in this case must be evaluated under the "learned intermediary doctrine."  *Pittman*, 890 S.W.2d at 432; 2 MADDEN & OWEN ON PRODUCTS LIABILITY § 22:9 at 568 (3d ed. 2000) ("the learned intermediary doctrine has gained virtually unanimous adoption").  This doctrine recognizes the reality that doctors are in a better

---

[6] Further support for this proposition is found in the fact that when Tennessee first adopted "comment k" the court of appeals relied heavily on the reasoning of *Brooks*, thus adding further support to the court's intention to adopt the full scope of the reasoning expressed in that case. *See Laws v. Johnson*, 799 S.W.2d at 254-55.

position than pharmaceutical manufacturers to evaluate the suitability of a drug for a particular patient. *Laws v. Johnson*, 799 S.W. 2d 249, 252 (Tenn. Ct. App. 1990). As a result, the manufacturer's duty to warn extends only to the prescribing physician and not to the ultimate consumer. *Id.* The warnings are adequate if they indicate the dangers and risks associated with the use of the product not otherwise known to the physician. *Pittman*, 890 S.W.2d at 429.

Mr. Dedrick has failed to prove that Merck failed to adequately warn Dr. Herrera as a matter of law. Merck fulfilled its duty to warn of known or reasonably scientific knowable risks because it warned Dr. Herrera of a potential risk of heart attack by including the VIGOR results in its label and providing him with information about that study.

### 1.    Merck Warned Of The Potentially Knowable Heart Attack Risk.

Mr. Dedrick claims that Merck failed to warn that Vioxx could cause heart attacks. The post-VIGOR label, however, fully disclosed the potential risk of heart attack by including the VIGOR results. (April 2002 Vioxx Label (Def.'s Ex. 453).) In addition, Merck provided both the VIGOR study and the 2002 label to Dr. Herrera. (Dec. 5, 2006 Tr. at 1792:24-1793:5, 1831:10-24 (Test. of Dr. Herrera); Pl.'s Ex. 1.2832.) Finally, the patient information sheet ("PIR") provided to Dr. Herrera stated unequivocally, and in plain language that "Heart attacks and similar serious events have been reported in patients taking Vioxx." (*Id.*)

### 2.    There Is Insufficient Evidence That The Warning Was Inadequate.

Under Tennessee law, warnings for prescription drugs "generally are adequate when there is a full and complete disclosure of the potential adverse reactions to the drug." *Pittman*, 890 S.W.2d at 429. An adequate warning must be "calculated to bring home . . . the nature and the extent of the danger involved in using the product." *Harwell*, 803 F. Supp. at 1297 (quoting *Young v. Reliance Elec. Co.*, 584 S.w.2d 663, 668 (Tenn. Ct. App. 1979).) When "the instructions are accurate and unambiguous," the question of whether a warning was adequate is a

"question of law." *Pittman*, 890 S.W.2d at 429.

Merck's warnings were sufficient to apprise physicians of the heart attack risk.  As noted above, the 2002 label disclosed the significant clinical data then available.  This included VIGOR, which had the highest relative risk for Vioxx of any study conducted to date.  Moreover, Merck brought the warning "home" to Dr. Herrera.  It provided him with a highlighted copy of the label, a letter outlining the label, and a copy of the VIGOR article.  (Dec. 5, 2006 Tr. at 1792:24-1793:5, 1831:10-24 (Test. of Dr. Herrera).)  Under Tennessee law, the warning is adequate if potential side effects are disclosed, as was the case here.  *Dunkin v. Syntex*, 443 F. Supp. 121, 124 (W.D. Tenn. 1987).  "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *Evridge v. Honda Motor Co., Inc.*, 685 S.W.2d 632, 636 (Tenn. 1985) (citing Restatement Second Torts, § 402a, cmt. j).

Consistent with the vote of the FDA Advisory Committee, the FDA-approved label contained a statement that the significance of the cardiovascular findings from the clinical trials was "unknown."  (April 2002 Vioxx Label (Def.'s Ex. 453).)  But the label also contained the relevant data so that physicians could draw their own conclusions.  It is difficult to understand what more Merck should have been required to put in the label.  After all, before 2004, there were no clinical trials that showed that Vioxx had a statistically significant increased risk of heart attack compared to a placebo or other comparator when the dose is 25 mg.  Mr. Dedrick cannot complain about a failure to warn of risks that the drug did not cause and that did not harm him. *See In re Rezulin Prods. Liab. Litig.*, 331 F. Supp. 2d 196, 200 (D.N.Y. 2004) (explaining in a failure to warn case that "[w]here, as here . . . the plaintiff suffered no injury of which the

manufacturer failed to warn, there is no claim"); *see also* Dobbs, THE LAW OF TORTS 1018 (2001) ("[T]he injury suffered must be within the class of injury that the warning requirement was meant to avoid.")  Thus, the fact that Merck did not warn about the all-cause mortality data in the Alzheimer's studies is irrelevant.  The cardiovascular risk and cardiovascular mortality data *was* in the label.  (April 2002 Vioxx Label (Def.'s Ex. 453).)

Moreover, it cannot matter that the cardiovascular risk information was not in the "warnings" section of the label.  Under Tennessee law, all that is required to discharge a manufacturer's duty to warn is that the physical location of the warning must be sufficient to alert a reasonably prudent doctor to the danger.  In fact, the Tennessee Supreme Court held in *Pittman* that the defendant drug manufacturer had "discharge[d] its . . . duty to warn" even though it had placed risk information about its prescription drug, Micronase, in the "precautions" section of the label.  *Pittman*, 890 S.W.2d at 431.  Similarly, the Tennessee Court of Appeal has recognized that information in the "precautions" section of a label is a "warning."  *Richardson v. Miller*, 44 S.W. 3d 1, 18 (Tenn. Ct. App. 2000).  As a medical doctor, Dr. Herrera was well aware of the fact that important information concerning pharmaceuticals may be found throughout the label.  He admitted he "should" have read the precaution section.  (Dec. 5, 2006 Tr. at 1835:4-7 (Test. of Dr. Herrera).)  As such, the physical placement of the warning, which was dictated by the FDA, cannot be grounds for finding that the warning was inadequate.  As explained below, any claim that it can would be preempted.

### B.    There Is Insufficient Evidence Of Warning Causation.

Under Tennessee law, "even if a plaintiff is able to establish that a product is unreasonably dangerous by reason of a defective warning, this alone is not enough to establish liability.  The plaintiff must also prove that the inadequate labeling proximately caused the claimed injury."  *Goins*, 926 F.2d at 561 (applying Tennessee law; citing *Browder v. Pettigrew*,

541 S.W.2d 402, 405 (Tenn. 1976).) Thus, even if Merck's warnings were inadequate, Mr. Dedrick could not prevail unless he established that Dr. Herrera would have prescribed a different course of treatment if a different warning had been given – that is that the faulty warning itself caused the injury. *See King v. Danek Med.*, *Inc.*, 37 S.W.3d 429, 453 (Tenn. Ct. App. 2000) (dismissing plaintiff's failure to warn claim for failing to prove that had additional warnings been given that his physician would have changed his treatment decision); *Whitehead v. Dycho Co.*, *Inc.*, 775 S.W.2d 593, 599-600 (Tenn. 1989) (concluding that plaintiff must establish that she would not have sustained her injuries had the manufacturer provided additional warnings).

Dr. Herrera's testimony was inconsistent.  At times he said that he had not read the label, and at other times, he said he "scanned" it.  (*Compare* Dec. 5, 2006 Tr. at 1805:23-25 (Test. of Dr. Herrera) (testifying that he had not read the label), *with id.* at 1831:22-1832:2 (testifying that he had scanned the label).)  Obviously, if he did not read the label, or did not read it carefully, it really does not matter what Merck did or did not put in it, because it would not have affected Dr. Herrera's prescribing decision.  *See Evridge*, 685 S.W.2d at 636 (under Tennessee law, there is no liability if an adequate warning is given but not read).  Regardless of what warning Merck had placed on the label, Dr. Herrera would have not changed his decision to prescribe Vioxx to Mr. Dedrick.  Merck therefore cannot be liable for Dr. Herrera's failure to read the information provided.  Notably, he also testified that he continues to prescribe drugs to his patients that now have black box cardiovascular warnings, apparently because he never bothered to familiarize himself with their labels.  (*Id.* at 1839:1-1842:19.)

Thus, the alleged failure to warn (whether grounded in strict liability, negligence, or implied warranty) did not happen and did not cause Mr. Dedrick's injuries. Merck is entitled to judgment as a matter of law.

## V.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF DID NOT PROFFER LEGALLY SUFFICIENT EVIDENCE TO PROVE MEDICAL CAUSATION.

In order to prevail on any of his claims, Mr. Dedrick was required to establish that without the use of Vioxx at the 25 mg dose for approximately six months, his injury would not have occurred. *King*, 37 S.W.3d at 450. Plaintiff has failed to meet this burden. Because there is no legally sufficient evidence to show that Vioxx was the proximate cause of Mr. Dedrick's alleged injuries, the Court should enter judgment for Merck as a matter of law.

Proving medical causation is a two-step process: plaintiff must prove both general and specific causation. General causation requires proof that Vioxx *can* cause heart attacks, while specific causation requires proof that Vioxx *did* cause Mr. Dedrick's heart attack. *See, e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005). Under Tennessee law, causation must be proved to a reasonable medical probability with expert medical testimony. *Jackson v. Allen*, No. M2000-01673-COA-R3CV, 2002 WL 661930, at *2 (Tenn. Ct. App. Apr. 23, 2002).

Although plaintiff was required to prove both general and specific causation, he proved neither. Instead, he offered the speculative and unreliable testimony of expert witnesses who opined, without reliable foundation, that "it is now universally agreed the Vioxx causes heart attacks" (Nov. 28, 2006 Tr. at 363:11-12 (Test. of Dr. Avorn), and that Vioxx was a "substantial contributing factor" of Mr. Dedrick's heart attack (Dec. 4, 2006 Tr. at 1510:11-12) (Test. of Dr. Furman).)  Yet, it is well-established that "[a] mere possibility of . . . causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at

20

best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." PROSSER ON TORTS 245 (3d ed. 1964); *accord Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982). Because plaintiff proffered no legally sufficient evidence to show that Vioxx both could have and did cause his alleged injuries, all of his claims necessarily fail.

## A.    The Record Contains No Legally Sufficient Evidence of General Causation.

Plaintiff has failed to satisfy his burden to prove general causation for two reasons. First, he has introduced no relevant and reliable studies to show that use of Vioxx at the 25 mg dose for approximately six months causes heart attacks. The studies upon which his experts rely do not and cannot show a statistically significant association between Vioxx and increased risk. Second, as discussed below, plaintiff was also required to prove a biologically plausible mechanism by which Vioxx caused his claimed injury. He did not do so.

### 1.    Plaintiff Introduced No Evidence Of A Statistically Significant Study Showing That Vioxx, At The Same Dose And Duration As Taken By Mr. Dedrick, Is Capable of Causing CV Events.

Plaintiff's causation experts opine that the use of Vioxx at the 25 mg dose can cause heart attacks, but the data on which they rely do not support their opinions. There is no reliable, statistically significant data from *any* study relied upon by plaintiff's experts that using 25 mg Vioxx for six months can increase the risk of CV event.

First, to be meaningful, the study must be statistically significant, meaning that the confidence interval does not include a value of 1.0 or below. *See, e.g.*, *Brock*, 874 F.2d at 313, *modified on reh'g*, 884 F.2d 166, 167 (reversing verdict in Bendectin litigation given plaintiff's failure to present statistically significant epidemiological proof); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant [] epidemiological studies"); *Chambers v.*

21

*Exxon Corp.*, 81 F. Supp. 2d 661, 664-66 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant epidemiological proof").

Second, an epidemiologic study cannot establish causation unless it also shows that the drug more than doubles the relative risk of injury. *See, e.g., Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) ("[A] relative risk of '2' means that, on the average, there is a fifty per cent likelihood that a particular case of the disease was caused by the event under investigation and a fifty per cent likelihood that the disease was caused by chance alone."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 718-23 (Tex. 1997) (statistically significant epidemiological studies showing doubling of risk required to prove causation); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 539.

As explained below, none of the studies referenced by plaintiff's experts meet these standards. Indeed, plaintiff's expert epidemiologist, Dr. Arnett, admitted that just months before trial, she evaluated the same data upon which she now relies to support her opinion that "heart attacks appear at any dose and duration" (Nov. 30, 2006 Tr. at 975:9-12), and came to the exact opposite conclusion:

> Q.   When you said you agreed with the conclusions, did you include conclusion bullet number 3 that says "the data from Vioxx clinical trials shows no difference in the incidence of thrombotic cardiovascular events with rofecoxib 25 milligrams versus placebo over the first 18 months of continuous usage or from non-naproxen NSAIDs"? Was that a conclusion that you, in fact, agreed with?
>
> A.   In January of 2005, based on the data provided to me in the document by Merck, having no other data to go on.
>
> Q.   Then you have to say yes or no at the end of that. Did you or did you not, based on the data available to you, provided to you by Merck, with nothing else to go on, all I'm asking you is whether that highlighted conclusion is one of them that you agreed with?

A.      I, at that time reviewing what they provided in my -- in
        my letter, here, agreed with what they had provided to me.  I
        have subsequently spent 200 hours looking at FDA documents,
        papers --

The Court:  No.  We've got that ma'am.  I understand
        it.  He's asking you whether you agreed with it at that time.
        That's the question.

The witness:  Oh.

By Mr. Beck:
Q.      Yes.  Did you agree, when you wrote your letter with that
        highlighted conclusion --

A.      I was basing my conclusions on what I --
The Court:  He just wants to know yes or no, did you
        or didn't you?

A.      I stated yes, but what I was --

The Court:  all right.  That's fine.  You say "yes,"
        and then you want to the explain it.

The witness:  Okay.

By Mr. Beck:
Q.      All I wanted to hear was the yes or no.  I've heard the
        explanation several times now.  Is the answer yes?

A.       The answer for that, yes, is "yes."  The conclusions,
        however, I was agreeing with are detailed more in my letter.

(Dec. 1, 2006 Tr. at 1052:11-1053:22.)

### a.      VIGOR.

Although plaintiff purports to use VIGOR[7] to establish causation, VIGOR involved a 50

mg dose Vioxx – twice the dose taken by Mr. Dedrick.  Because "[d]ose is the single most

important factor to consider in evaluating whether an alleged exposure caused a specific adverse

---

[7] Bombardier C, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000 Nov 23;343:1520-1528.

effect," *McClain*, 401 F.3d at 1242 (internal citations and quotation marks omitted), the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use of Vioxx at the 25 mg dose was capable of causing Mr. Dedrick's alleged heart attack.

Second, Dr. Furman's reliance on VIGOR to support his specific causation opinion is misplaced because, as he admitted, he made a "mistake" in his analysis, and applied the wrong VIGOR group to Mr. Dedrick.  (Dec. 4, 2006 Tr. at 1605:8-16 (Test. Dr. Furman).)   More specifically, Mr. Dedrick was not taking aspirin at the time he was taking Vioxx (Dec. 4, 2006 Tr. at 1581:4-6), and yet Dr. Furman applied the relative risk ratio from the aspirin-indicated group in VIGOR, which was 4.89, as opposed to the *correct* non-aspirin indicated group, which only 1.89.  (Dec. 4, 2006 Tr. at 1589:9-17  (Test. of Dr. Furman).)

Third, VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at increased risk of CV problems.  Here, Mr. Dedrick did not have rheumatoid arthritis and cannot be described as elderly.

Fourth, VIGOR did not compare Vioxx against a placebo; rather, it compared it with naproxen.  Thus, it is impossible to determine based on the results of VIGOR whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (1) a cardiovascular risk associated with high-dose Vioxx; (2) a cardio-protective effect associated with naproxen; (3) chance, either in whole or in part; or (4) or some combination of these factors.

Accordingly, VIGOR cannot support a finding that Vioxx taken for six months at the 25 mg dose increases the risk of heart attack.

###### b.    APPROVe.

Nor can plaintiff's experts rely on the results of the APPROVe[8] study.  The study did *not* associate a statistically significant risk of heart attacks or sudden cardiac death with under seven months of use of 25 mg Vioxx.  Thus, regardless of what opinions APPROVe purportedly supports concerning a longer duration of Vioxx use, its results cannot establish to a reasonable degree of medical and scientific certainty that Mr. Dedrick's short-term use of Vioxx was capable of causing a thrombotic cardiovascular event.  *See*, *e.g.*, *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) ("If the . . . duration of exposure to [substance is] the type[] of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate . . . duration data."); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider either the length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).

---

[8] Bresalier R, et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 2005 Mar 17;352(11):1092-1102.

### c.    Solomon.

Plaintiff also identifies a retrospective, observational study conducted by Dr. D.H. Solomon in 2004, which was based on a review of patient records in a Medicare database.[9]  This study, however, does not support plaintiff's claim that his alleged six months of Vioxx use increased his CV risk.  The only short-term risk Solomon found involved a comparison between Vioxx and Celebrex, both active drugs, during the first 90 days of therapy.  The risk for acute heart attacks for Vioxx versus Celebrex was nearly identical after 90 days of therapy, the only duration of therapy relevant here.[10]  Further, contrary to plaintiff's claims, the study found *no* excess risk of acute heart attacks with Vioxx versus no-NSAID use, much less a doubling of the risk.

### d.    Protocol 090.

Plaintiff also purports to rely on Protocol 090.[11]  In Protocol 090, however, there was no statistically significant difference in the rate of adverse cardiovascular events in patients taking Vioxx versus placebo or Vioxx versus the comparator drug, Nabumetone.  Indeed, the study's conclusion was that "the number of patients with cardiovascular events was *too few to support any meaningful comparison*."  Accordingly, it is impossible for Protocol 090 to support plaintiff's theory of causation.

---

[9] Daniel Solomon et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May; 109:2068-2073.

[10] *Id.* at 2071.

[11] Weaver A., et al. *Treatment of Patients With Osteoarthritis With Rofecoxib Compared With Nabumetone*, J. CLIN. RHEUMATOL. 2006 Feb;12(1):17-25.

e.     **ADVANTAGE.**

Although plaintiff also purports to rely upon ADVANTAGE,[12] the study itself makes clear that it does not support causation. It provides:

> *The rofecoxib [Vioxx] and naproxen groups did not differ significantly in the number of cardiovascular events*, as defined by the combined Antiplatelet Trialists' Collaboration end points (10[0.4%] vs. 7 [0.3%]; P>0.2). Five myocardial infarctions occurred in the rofecoxib group, and 1 occurred in the naproxen group (P>0.2). No strokes occurred in the rofecoxib group and 6, all thrombotic, occurred in the naproxen group (P=0.015).

ADVANTAGE at 543.

f.     **VICTOR.**

Plaintiff also purports to rely on VICTOR, a trial in patients with colon cancer that was terminated prematurely when Merck voluntarily withdrew Vioxx from the market. Only incomplete, interim data from this study are available, which cannot provide a scientifically reliable basis for an opinion that Vioxx is capable of causing cardiovascular events. *See, e.g., Christophersen.*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data). Moreover, the available data are not statistically significant. There were fourteen confirmed thrombotic cardiovascular events in the Vioxx arm, versus five confirmed thrombotic cardiovascular events in the patients receiving placebo. VICTOR is thus not sufficient to prove plaintiff's theory of causation.

g.     **Alzheimer's Studies.**

Finally, plaintiff's experts rely on two long-term clinical trials that were conducted by Merck to determine the efficacy of Vioxx in preventing or slowing the progression of Alzheimer's disease.[13]

---

[12] Lisse JR et al., *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis*, ANN. INTERN. MED. 2003 Oct 7;139:539-546 ("ADVANTAGE").

Given that Mr. Dedrick has alleged a cardiovascular injury, the only data relevant to this case are data pertaining to the alleged cardiovascular risks associated with Vioxx.  On this score, the Alzheimer's studies actually *contradict* plaintiff's causation theory. As plaintiff's own experts concede, neither study showed a statistically significant difference in the rates of adverse cardiovascular events experienced by patients in the Vioxx and placebo groups of the studies.  (*See* Nov. 28, 2006 Tr. at 459:1-3 (Test. of Dr. Avorn) (admitting "there was no difference [in cardiovascular events] between Vioxx and placebo in the Alzheimer's trials").

Implicitly conceding this point, plaintiff attempts to minimize this data or to confuse the issue by focusing not on the cardiovascular data from the Alzheimer's trials, but on the "all-cause" mortality data from these same studies.  Yet, as Dr. Avorn readily concedes, the Alzheimer's data on which he relies in support of his opinion includes death from all causes, whether or not related to Vioxx or even to cardiovascular events:

> Q:     And all-cause mortality means that people died, and regardless of what somebody thinks about the cause of the death, more people died in the Vioxx group than in the placebo group, right?
>
> A:     That's correct.

(Nov. 28, 2006 Tr. at 454:6-10 (Test. of Dr. Avorn).)

In other words, this data has no conceivable relevance to Mr. Dedrick's claims. More importantly, there is no proof that Vioxx caused an excess rate of death.  Mr. Dedrick's claims are predicated on an alleged cardiovascular event – not electrocution, or cancer, or pneumonia.  Deaths from

---

[13] Aisen PS et al., *Effects of rofecoxib or naproxen vs placebo on Alzheimer disease progression: a randomized controlled trial*,  JAMA 2003 Jun 4;289(21):2819-26; *Reines SA, et al., Rofecoxib: No Effect on Alzheimer's Disease in a 1-Year, Randomized, Blinded, Controlled Study*, NEUROLOGY 2004;62:66-71; Thal LJ et al., *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, NEUROPSYCHOPHARMACOLOGY 2005 Jun;30(6):1204-15.

such disparate causes, which are reflected in the Alzheimer's "all-cause" mortality data, cannot support plaintiff's allegation that Vioxx could have and did cause his heart attack.

### 2. Plaintiff Presented No Evidence Of Any Biologically Plausible Mechanism By Which Vioxx Could Cause A Heart Attack.

In a drug or toxic tort case, a statistical association between injury and exposure cannot prove causation absent proof of a biologically plausible mechanism by which exposure to the drug or suspected toxin causes injury. *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999). Biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 522 (emphasis added). As the Fifth Circuit said in *Food Lion*:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Food Lion*, 171 F.3d at 314. As this Court put it:

> In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable.

*Propulsid*, 261 F. Supp. 2d at 617; *accord McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]"). Without proof of *how* an agent can cause a disease, there can be no proof that the agent in fact *does* cause the disease. *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently

compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

In this case, plaintiff's expert, Dr. Furman, proposed three theories for how Mr. Dedrick's Vioxx use could have caused his heart attack:  (1) acceleration of atherosclerosis; (2) destabilization of plaque; and (3) imbalance or, as he calls it, "the decreased prostacyclin" theory.  (Dec. 4, 2006 Tr. at 1499:11-19, 1510:13-1511:2 (Test. of Dr. Furman).)

None of these theories are supported by reliable scientific evidence. The first two were barely discussed by Dr. Furman and therefore will be discussed here only briefly.  There is no scientifically reliable evidence to support either of these theories.  In fact, Dr. Furman conceded on cross-examination that no studies demonstrate that Vioxx causes either atherogenesis or plaque rupture in humans.  (*Id.* at 1533:19-1534:1, 1541:12-1542:5.) [14]

Finally, Dr. Furman testified that Vioxx caused Mr. Dedrick's heart attack because in a person like Mr. Dedrick with preexisting cardiovascular disease, the suppression of COX-2 leads to an "decrease" in prostacylin in the vasculature, which in turn means any plaque rupture event is much more likely to become more significant and more obstructive.  Dr. Furman's opinion that Vioxx causes a decrease in prostacylin production in the vasculature is scientifically unreliable and insufficient to meet plaintiff's burden to show general causation.

As the Court knows, Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels *in blood vessels* – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased CV risks since they do not simultaneously interfere with the normal production of

---

[14] Merck incorporates by reference its Memorandum in Support of Motion to Exclude Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis or Causes Plaque Rupture, which it filed on November 15, 2006.

thromboxane, a known vasoconstrictor.[15]   But, as Dr. FitzGerald has recognized on multiple

occasions since the 1999 publication, his hypothesis remains just that – a hypothesis – that

remains unproven.   In a follow-up article published in 2002, Dr. FitzGerald further explained

that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant

inhibition of [thromboxane] *are not currently clear*" and that "for the present, the *perception* of a

cardiovascular hazard in humans exceeds the evidential basis for this notion."[16]

Nor is Dr. FitzGerald alone in conceding that his hypothesis remains unproven.   After

observing that selective COX-2 inhibitors were associated with an increased risk of adverse CV

events, the FDA confirmed this fact in April 2005:

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.*   As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (*i.e.*, ibuprofen, diclofenac) in studies of substantial size and duration.   Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible.   *Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*

Thus, the FitzGerald hypothesis remains speculative and cannot form the basis for Dr. Furman's

opinion that the prostacyclin/thromboxane imbalance was capable of causing or did cause Mr.

Dedrick's heart attack.

---

[15] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. & EXP. THERP. 1999; 289:735-741.

[16] FitzGerald, GA, *Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations*," AM J CARDIOL 2002; 89 (suppl):26D, 32D (emphasis added).

B.    <u>Plaintiff Failed to Prove Specific Causation.</u>

Finally, plaintiff has failed to prove specific causation by a preponderance of the evidence.  There is no scientifically valid evidence for Dr. Furman's specific causation opinion that Vioxx caused Mr. Dedrick's heart attack.  Dr. Furman admitted that he has no medical basis on which to conclude that Vioxx caused Mr. Dedrick's heart attack.  (Dec. 4, 2006 Tr. at 1537:21-1539:16 (Test. of Dr. Furman).)  Thus, plaintiff failed to satisfy the requirement under Tennessee law that specific cause be proved by competent medical expert testimony.  *See Richardson*, 412 F. Supp. 2d at 869.  Instead, he claimed that Vioxx caused Mr. Dedrick's heart attack because (1) Mr. Dedrick took Vioxx; (2) the relative risk exceeds 2; and (3) there is a plausible mechanism.  (Dec. 4, 2006 Tr. at 1525:8-21 (Test. of Dr. Furman).)  The most obvious defect in this testimony is that it conflates general cause (relative risk) with specific cause.  Proving that Vioxx *can* cause heart attacks is not sufficient to prove that Vioxx caused Mr. Dedrick's heart attack.

Moreover, Merck is entitled to judgment as a matter of law because Dr. Furman failed to eliminate other possible causes of Mr. Dedrick's heart attack.  To establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than Vioxx.  *Richardson*, 412 F. Supp. 2d at 871 (requiring plaintiff to prove that the drug was a substantial, predominate, or significant factor in causing the injury and not caused by another factor to succeed in his pharmaceutical liability case); *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (upholding judgment as a matter of law because plaintiff failed to prove that decedent had not contracted hepatitis from a source other then defendant's pharmaceutical); *Brock*, 874 F.2d at 313; *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to "rule out" other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of Commerce of El*

32

*Dorado v. Associated Milk Producers, Inc.,* 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998), *aff'd,* 191

F.3d 858 (8th Cir. 1999) (recognizing that an expert must "rule in" the suspected cause as well as

"rule out" other possible causes); *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1209 (8th Cir.

2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff

"failed to 'rule out' all other possible causes"); *Magistrini v. One Hour Martinizing Dry*

*Cleaning,* 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he

defendants pointed to some likely alternative cause and the expert offered no reasonable

explanation as to why he or she still believed that defendant's actions were a substantial factor in

bringing about plaintiff's illness").

Plaintiff failed to carry this burden.  More specifically, it is undisputed that Mr. Dedrick

had vascular disease and multiple risk factors that could have caused his heart attack.  (Dec. 4,

2006 Tr. at 1519:8-1520:23 (Test. of Dr. Furman).)  These risk factors include:

- *Age*: Mr. Dedrick was 47 years old at the time of his heart attack;
- *Pre-exiting cardiac conditions*:  Dr. Furman agreed that Mr. Dedrick had preexisting CAD;
- *Family History*: Mr. Dedrick's mother had a heart attack at the age of 63 or 63, and his younger brother had premature CAD and a heart attack at an early age;
- *Smoking*: Mr. Dedrick has smoked 2 packs of cigarettes a day for 35 years and is a current smoker;
- *Alcohol Use*: Mr. Dedrick admits that he abused alcohol;
- *Cocaine Use*: Mr. Dedrick admits to having used cocaine;
- *Obesity:* Mr. Dedrick was overweight at the time of his heart attack;
- *Rheumatic Fever in childhood*;
- *Diabetes*: Mr. Dedrick was diagnosed with diabetes in 1999 but refused, despite his doctor's recommendation, to start insulin until 2004;
- *Stress*: Mr. Dedrick admitted to being under severe stress for a period of two-and-a-half years prior to his heart attack;
- *Gender*:  Mr. Dedrick is male; and

- *Hypertension:*  Mr. Dedrick was diagnosed with high blood pressure in 1997.

It is not enough for an expert to proclaim that he thinks that Vioxx caused Mr. Dedrick's heart attack.  Rather "[w]here, as in the instant case, two or more possible causes for an injury are identified, the plaintiff must establish with reasonable certainty that his injury resulted from a cause for which the defendant would be liable."  *Richardson*, 412 F. Supp. at 871 (requiring plaintiff to prove that the drug was a substantial, predominate, or significant factor in causing the injury) (citations omitted).  Dr. Furman did not even attempt to rule out other possible causes during his testimony.  Indeed, he openly admitted that each of his risk factors can independently cause a prothrombotic state.  (Dec. 4, 2006 Tr. at 1551:17-21 (Test. of Dr. Furman).)  Moreover, the relative risk of these other risk factors grossly exceeded that of Vioxx.  Thus, Merck is entitled to judgment as a matter of law.[17]

## VI.    PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Plaintiff's witnesses challenge the FDA's approval of Vioxx and the content of the post-VIGOR label approved by the FDA.  Such claims are preempted by federal law.  For example, Dr. Moye opined that Vioxx "cannot be labeled for safe and effective use and, therefore, [the 2002 label] does not provide adequate warning" (Nov. 29, 2006 Tr. at 581:2-4), and Dr. Avorn opined that the 2002 label was inadequate because, *inter alia*, it lists all the VIGOR information in the "Precautions" section of the label instead of the "Warnings" section. (Nov. 28, 2006 Tr. at 324:12-325:13.)

In *Buckman Company  v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the Supreme Court recognized the importance of allowing the FDA to police its regulatory process to achieve

---

[17] Merck filed a number of challenges to expert testimony before trial under Rule 702 and *Daubert*, as well as other grounds.  Testimony admitted in error is unreliable and does not constitute substantial evidence of causation.

the difficult balance between the various competing goals of the FDCA, and it held that the FDCA impliedly preempts state law tort claims alleging that a pharmaceutical company defrauded FDA or violated FDCA disclosure requirements.  *Id.* at 350, 353 (preempting claims that the defendant made fraudulent statements to the FDA to obtain approval to market a medical device and that, had the misrepresentations not been made, the devices would not have been approved and plaintiff would not have been injured).[18]  The federal regulatory scheme empowers the FDA to control the details of the approval process and to punish and deter fraud where it occurs.  *See id*. at 348.  This balance is important as "the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals."  *Id*. at 350.

In making the arguments about the 2002 label, plaintiff ignores that the contents of the label reflect the balance the FDA struck in approving the post-VIGOR label.  The FDA has determined that because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations.  *See* 71 Fed. Reg. at 3923-35 (preemption applies, *inter alia*, to claims like plaintiff's that are "based on the failure to include in labeling or advertising a statement the substance of which the FDA has prohibited").  *See also Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538 (E.D. Pa. 2006) (plaintiff's state-law failure to warn claims were preempted because the drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'"); *In re Bextra*

---

[18] Although *Buckman* involved medical devices, its reasoning and holding apply with equal force to cases involving pharmaceuticals.  *See, e.g., Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

*& Celebrex Mkttg. Sales Practices & Prods. Liab. Litig.*, No. M: 05-1699 CRB, 2006 WL
2374742 (N.D. Ca. Aug. 16, 2006).  Plaintiff does *not* allege that Merck failed to warn of any
risk that first became known or knowable *after* the FDA approved the revised label.  For these
reasons, Merck is entitled to judgment as a matter of law.

## VII.    CONCLUSION.

For the reasons stated above, the Court should enter judgment in favor of Merck,
pursuant to Rule 50 of the Federal Rules of Civil Procedure.  In the alternative, the Court should
enter judgment on each of the causes of action plaintiff has failed to prove in his case.

Dated:  December 6, 2006                                  Respectfully submitted,


                                                         s/ Dorothy H. Wimberly
                                                         Phillip A. Wittmann, 13625
                                                         Dorothy H. Wimberly, 18509
                                                         STONE PIGMAN WALTHER
                                                         WITTMANN L.L.C.
                                                         546 Carondelet Street
                                                         New Orleans, Louisiana  70130
                                                         Phone:  504-581-3200
                                                         Fax:     504-581-3361

                                                         Defendants' Liaison Counsel

                                                         Philip S. Beck
                                                         Mark Ouweleen
                                                         Carrie Jablonski
                                                         BARTLIT BECK HERMAN PALENCHAR
                                                         & SCOTT LLP
                                                         54 West Hubbard Street, Suite 300
                                                         Chicago, Illinois  60610
                                                         Phone:  312-494-4400
                                                         Fax:     312-494-4440

                                                         Douglas Marvin
                                                         Elaine Horn
                                                         WILLIAMS & CONNOLLY LLP
                                                         725 Twelfth Street, N.W.

Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Brian S. Currey
A. Patricia Klemic
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion and Memorandum In Support Of Motion Of Merck For Judgment As A Matter Of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Mr. Dedrick, Andy Birchfield, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 6th day of December, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel