## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

| Designated Testimony | Objections | Responses |
|---|---|---|
| Red = Plaintiff<br>Blue = Defendant | | *Overruled* |
| **[6:5] 11/1/2006 Melissa McAllister**<br><br>page 6<br>5   Q.      Good morning, Ms. McAllister.  I'm | | |
| **[6:6] - [6:11] 11/1/2006 Melissa McAllister**<br><br>page 6<br>6 Andy Birchfield.  We met just a moment ago before<br>7 we started the deposition, is that right?<br>8   A.      Uh-huh, yes.<br>9   Q.      Have you ever given a deposition<br>10 before?<br>11   A.      No, I haven't. | **Pl. Obj.:**  R. 401, R. 402.<br>Not relevant. | **Deft's Resp:** Relevant to<br>show to jury that witness<br>is not familiar with the<br>deposition process and to<br>set in context the passage<br>designated by plaintiff's<br>that follows. |
| **[6:22] - [7:1] 11/1/2006 Melissa McAllister**<br><br>page 6<br>22   Q.      You're currently employed with Merck;<br>23 is that right?<br>24   A.      Yes, I am currently with Merck.<br>25   Q.      And when were you first employed?<br>page 7<br>1   A.      I started with Merck in April 1998. | | |
| **[7:2] - [7:14] 11/1/2006 Melissa McAllister**<br><br>page 7<br>2   Q.      Okay.  And when you started in April<br>3 of 1998, what was your position?<br>4   A.      I was a professional representative.<br>5   Q.      Okay.  And what's your title now?<br>6   A.      I'm currently senior vaccine<br>7 representative.<br>8   Q.      Tell me what a professional<br>9 representative does.<br>10   A.      A professional representative presents<br>11 information to the physician, educates them on<br>12 our products and complete and accurate with fair<br>13 balance, everything that's within the product<br>14 label. | | |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[8:6] - [8:8] 11/1/2006 Melissa McAllister

page 8
6    Q.     It's important that you present the
7  fair and balanced information about a product to
8  the physicians; is that right?


[8:10] - [8:13] 11/1/2006 Melissa McAllister

page 8
10          THE WITNESS:  In my training, that's
11   how we were trained to always present the
12   information on one of our products fair and
13   balanced, yeah.


[8:15] - [8:17] 11/1/2006 Melissa McAllister

page 8
15    Q.     And fair and balanced, does that mean
16  that you present not only the good stuff about a
17  product but also the bad stuff?


[8:19] - [8:22] 11/1/2006 Melissa McAllister

page 8
19          THE WITNESS:  In my experience with
20   Merck, I've -- you know, we present the
21   information, the benefits of the medication,
22   the limitations of the medicine.


[8:24] - [8:25] 11/1/2006 Melissa McAllister

page 8
24    Q.     Okay.  When you say limitations, do
25  you mean the risk?


[9:2] - [9:6] 11/1/2006 Melissa McAllister

page 9
2           THE WITNESS:  Limitations can be as
3  far as the dosing of it, you wouldn't want to
4  overdose on a medicine or maybe a type of
5  patient would not be a candidate for a
6  medication.


[9:8] - [9:10] 11/1/2006 Melissa McAllister

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 9
8    Q.    Well, would you say that you have a
9  responsibility to the physician to present fair
10  and balanced information about a product?


[9:12] - [9:16] 11/1/2006 Melissa McAllister


page 9
12         THE WITNESS:  As a Merck
13     representative, I was trained and continually
14     trained to present medication, our products
15     within the product label and that include our
16     approved messages.


[9:18] - [9:21] 11/1/2006 Melissa McAllister

page 9
18    Q.    Can you answer this question yes or
19  no? Do you have a responsibility as a Merck
20  representative to present fair and balanced
     information to a physician on a product?


[9:23] - [10:1] 11/1/2006 Melissa McAllister

page 9
23         THE WITNESS:  I think I've answered,
24     yes, I have a responsibility to present the
25     information completely and accurately within
page 10
1    the product label.


[10:3] - [10:15] 11/1/2006 Melissa McAllister

page 10
3    Q.    And as a Merck representative, is that
4  a responsibility that you took seriously?
5    A.    I always take that seriously in my
6  sales -- discussions with physicians, healthcare
7  providers.
8    Q.    And you told us that that includes
9  taking -- presenting the benefits and the
10  limitations on a product; is that correct?
11    A.    That is correct, as far as presenting
12  them the complete, you know, product circular for
13  a certain medication.

**Deft's Obj.:** Calls for legal
conclusion as to what
responsibility Ms.
McAllister has to a
physician; lacks foundation
and calls for expert
testimony (sales reps are
limited to discussing
on-label information and
witness is not in a position
to opine on whether the info
in the label is fair and
balanced)

**Deft's Obj.:** Same; also
argumentative and asked
and answered

**Pl's Resp.:**  Witness
testifies that she was
trained to present fair
and balanced information
during other portions
of testimony.  Witness
clearly understands
what the terms mean.
Does not call for a legal
conclusion.  This
term of art is clearly
used widely in the sales
and marketing arm of
Merck of which the
witness is a part as a
professional sales
representative.

**Pl's Resp.:**  Same.
Counsel is entitled to an
answer to the question.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

14    Q.    Would the limitations include the side
5    effects and risks associated with a product?


[10:17] - [10:22] 11/1/2006 Melissa McAllister

page 10
17          THE WITNESS:  In presenting
18    information to a physician education, the
19    approved messages are going to be about
20    efficacy but they also included
21    contraindications, warnings, precautions, side
22    effects.


[10:24] - [11:2] 11/1/2006 Melissa McAllister

page 10
24    Q.    When was your first involvement with
25    Vioxx?
page 11
1    A.    When it was first launched in the
2    spring in 1999.


[11:3] - [11:7] 11/1/2006 Melissa McAllister

page 11
3    Q.    And prior to the product being
4    launched, were you -- were you trained regarding
5    Vioxx?
6    A.    Yes, prior to the launch, we were
7    trained on Vioxx and the disease state.


[12:8] - [12:24] 11/1/2006 Melissa McAllister

page 12
8    Q.    And so you -- when Vioxx was launched,
9    did you begin at that point talking to doctors
10    and physicians about Vioxx?
11    A.    Within my scope of responsibilities
12    with my products, it wasn't the first product I
13    discussed.  It was a secondary responsive
14    reactive type product.
15    Q.    So you didn't have primary
16    responsibility for Vioxx?
17    A.    When it was first launched, I did not
18    have primary responsibility.
19    Q.    Now, sales representatives -- you will
0    talk -- you would have several products in your
21    bag, so to speak, that you would talk to doctors

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

22 about; is that right?
23   A.    At that time, I had several different
24 products.


[13:6] - [13:9] 11/1/2006 Melissa McAllister

page 13
6   Q.    But when Vioxx was first launched in
7 the United States, you did have it in your bag
8 and you would talk to your physicians about the
9 benefits and risks of Vioxx; is that correct?


[13:11] - [13:13] 11/1/2006 Melissa McAllister

page 13
11        THE WITNESS:  When Vioxx was
12    launched, I was trained on it and it was part
13    of my responsibility in a secondary position.


[13:15] - [13:19] 11/1/2006 Melissa McAllister

page 13
15   Q.    Okay.  And did you start talking to
16 physicians in May of 1999 about Vioxx?
17   A.    From my experience, that was a new
18 product and, yes, I had discussions with
19 physicians regarding Vioxx.


[14:21] - [15:4] 11/1/2006 Melissa McAllister

page 14
21   Q.    Did you keep Vioxx in your bag and
22 talking with physicians the entire time that it
23 was on the market?
24   A.    Yes, in different capacities, I
25 carried Vioxx throughout.
page 15
1   Q.    Okay.  So from May of 1999 to
2 September of 2004, day in and day out, you would
3 have discussions with doctors about Vioxx,
4 correct?


[15:6] - [15:8] 11/1/2006 Melissa McAllister

page 15
6        THE WITNESS:  During my -- my -- as a
7 professional representative, I would have

*overruled*

**Deft's Obj.:**
Mischaracterizes prior
testimony; witness did not
testify that "day in and day
out" she had discussions
about Vioxx

**PI's Resp.:** Witness
testified that she was
responsible for detailing
Vioxx and that it

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

18    discussions about my products including Vioxx.

*overruled*

[15:10] - [15:12] 11/1/2006 Melissa McAllister

page 15

| | | |
|---|---|---|
| 10   Q.    Okay. What is your -- what's your<br>11   understanding of the heart attack risk associated<br>12   with Vioxx? | **Deft's Obj.:** Calls for expert<br>testimony; assumes facts<br>not in evidence; lacks<br>foundation | **Pl's Resp.:** Witness as<br>a sales representative<br>represented to doctors<br>including Dr. Herrera<br>the risks and benefits<br>of Vioxx. Witness<br>was trained in pharmacology<br>and other relevant<br>areas of science.<br>Asking witness what<br>her understanding was<br>of the heart attack risk<br>associated with Vioxx<br>does not call for expert<br>opinion in the legal sense. |

[15:14] - [15:16] 11/1/2006 Melissa McAllister

page 15
14        THE WITNESS:  Merck and myself, I
15   have never thought that there was risk
16   regarding Vioxx and heart attacks.

[15:18] - [15:21] 11/1/2006 Melissa McAllister

page 15
18    Q.    Okay.  So even today, you say that
19   there is -- it's your understanding that there is
20   no risk, no heart attack risk associated with
21   Vioxx; correct?

[15:23] - [15:25] 11/1/2006 Melissa McAllister

page 15
23        THE WITNESS:  I don't know.  I
24   haven't kept up with the Vioxx but I still
25   believe that Vioxx is a safe product.

[16:2] - [16:5] 11/1/2006 Melissa McAllister

page 16
2    Q.    And I just want to make sure I
3   understood you correctly.  You said that it's
4   your understanding even today that there is no
5   heart attack risk associated with Vioxx?

[16:7] - [16:16] 11/1/2006 Melissa McAllister

page 16
7        THE WITNESS:  I can only speak for
8   myself and the issues of what happened in

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

*overruled*

| | | |
|---|---|---|
| 9    September, the APPROVe study came out and Merck<br>0    saw some differences and decided to voluntarily<br>11   remove that after that point, but I personally<br>12   still think Vioxx is a safe product.<br>13 BY MR. BIRCHFIELD:<br>14   Q.    Okay. See if you can answer this<br>15 question yes or no. Is there heart attack risk<br>16 associated with Vioxx? | **Deft's Obj.:** Argumentative;<br>calls for expert testimony;<br>lacks foundation; asked<br>and answered. | **PI's Resp.:** Witness as<br>a sales representative<br>represented to doctors<br>including Dr. Herrera<br>the risks and benefits<br>of Vioxx. Witness<br>was trained in pharmacology<br>and other relevant<br>areas of science.<br>Asking witness what<br>her understanding was<br>of the heart attack risk<br>associated with Vioxx<br>does not call for expert<br>opinion in the legal sense.<br>Witness refuses to answer<br>question. |

[16:19] 11/1/2006 Melissa McAllister

page 16
19          THE WITNESS:  No, I do not.

[16:21] - [16:23] 11/1/2006 Melissa McAllister

page 16
21     Q.      And have you done any independent
22 research regarding Vioxx or do you rely solely on
3 what Merck executives tell you about the product?

[17:1] - [17:4] 11/1/2006 Melissa McAllister

page 17
1          THE WITNESS:  I'm a Merck
2 representative.  I'm not a scientist, you know,
3 I'm not a part of any of the discussions that
4 the scientists have.

[17:6] - [17:7] 11/1/2006 Melissa McAllister

page 17
6     Q.      And well, do you receive information
7 about your products from Merck scientists?

[17:9] - [17:13] 11/1/2006 Melissa McAllister

page 17
9          THE WITNESS:  I, as a Merck
10 representative, receive information via
11 bulletins regarding our products and have to
2 stay within product circulars as far as how I
13 have discussions with physicians.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[17:15] - [17:17] 11/1/2006 Melissa McAllister

page 17
15   Q.      And so you rely on the information
16   that's provided to you by others at Merck; is
17   that correct?

[17:19] - [17:24] 11/1/2006 Melissa McAllister

page 17
19        THE WITNESS:  As a representative,
20   that's how we receive our information is
21   through bulletins from whoever is, you know,
22   sending them.  I don't know if it's the --
23   sometimes it's scientists, marketing,
24   regulatory, but we follow the bulletins.

[18:1] 11/1/2006 Melissa McAllister

page 18
1   Q.      And you rely on that information?

[18:3] - [18:5] 11/1/2006 Melissa McAllister

page 18
3        THE WITNESS:  As a Merck employee,
4   yes, I -- I'm a conscientious employee and I
5   follow the bulletins.

_overruled_

[18:13] - [18:15] 11/1/2006 Melissa McAllister

page 18
13   Q.      You rely on the information that you
14   receive from Merck about your products, correct?
15   A.      I trust --

**Deft's Obj.:** Asked and answered

**Pl's Resp.:** Counsel establishing clearly the source of the witness's information which was not clear from the witness's other answers.

[18:17] - [18:18] 11/1/2006 Melissa McAllister

page 18
17        THE WITNESS:  I trust the information
18   that I receive from Merck regarding products.

[18:25] - [19:11] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 18
6   Q.      Do you rely on the information that
page 19
1   you get from Merck to guide your discussions with
2   doctors?
3   A.      Well, as I say, I get the bulletins
4   from Merck and that's the direction that I go
5   with because we have to stay within the product
6   label and when we have discussions with Merck --
7   with physicians.
8   Q.      When you are -- when you're selling
9   your product, do you limit the information that
10  you talk to doctors about to what you receive
11  from Merck?

| | **Deft's Obj.:** 403 ("selling"); Assumes facts not in evidence | **Pl's Resp.:** The fact that was expending millions of dollars to sell Vioxx through sales representatives like this witness is undisputed. |

[19:13] - [19:21] 11/1/2006 Melissa McAllister

page 19
13      THE WITNESS:  When I have discussions
14  with physicians regarding our Merck products, I
15  follow what has been issued in bulletins and I
16  stay within the product circular to give
17  complete accurate information that's either on
18  the label or consistent with the label.  If a
19  doctor asks about something that is off the
20  label, we have the professional information
21  requests, PIR.

[19:23] - [20:8] 11/1/2006 Melissa McAllister

page 19
23  Q.      It's important that -- that the
24  information that you get from Merck about your
25  products be accurate; right?
page 20
1   A.      Yes.  It should be accurate
2   information within the product circular that
3   should always be -- I should always be accurate
4   about the product circular.
5   Q.      And if there are serious risks
6   associated with the drug, it's important that you
7   as a Merck representative know about that
8   information; is that correct?

| | **Deft's Obj.:** Improper hypothetical; calls for speculation | **Pl's Resp.:** Question goes to the heart of witness's testimony. Question is neither improper or calls for speculation. |

[20:10] - [20:14] 11/1/2006 Melissa McAllister

page 20
10      THE WITNESS:  As a Merck
11  representative, I always try to bring up the

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

12   limitations of a product, whether it was, you
13   know, down the list of contraindications,
14   warnings, precautions, side effects.

[20:16] - [20:18] 11/1/2006 Melissa McAllister

page 20
16   Q.      It's important that you -- that you
17   have accurate information about the risks
18   associated with a drug; right?

[20:20] - [20:23] 11/1/2006 Melissa McAllister

page 20
20          THE WITNESS:  I truly believe that I
21   should always have the correct information
22   regarding our product, product label and
23   disseminate that information to the physicians.

[20:25] - [21:1] 11/1/2006 Melissa McAllister

page 20
25   Q.      And the -- and the physicians rely on
page 21
1   you as a Merck representative to be truthful?

*overruled*

| | **Deft's Obj.:** Lacks foundation; calls for speculation | **Pl's Resp.:** Question goes to the heart of witness's testimony. Question is neither improper or calls for speculation. |

[21:3] - [21:9] 11/1/2006 Melissa McAllister

page 21
3          THE WITNESS:  The physicians see us
4   as one of the resources to get information, and
5   yes, they do see us as one of those resources
6   and I personally see myself as a resource and I
7   want to always be trustworthy to them to give
8   them the information completely about the
9   prescribing information.

[21:11] 11/1/2006 Melissa McAllister

page 21
11   Q.      And doctors do trust you, don't they?

*Sustained "This asks what doctor does believe. Would be admissible if Q asked what she expect doctors to trust you, don't you. Q. You expect doctors to trust you, don't you as to what she expects. But that is not what Q. is.*

| | **Deft's Obj.:** Lacks foundation; Calls for speculation | **Pl's Resp.:** Question goes to the heart of witness's testimony. Question is neither improper or calls for |

[21:13] - [21:17] 11/1/2006 Melissa McAllister

**Dedrick v. Merck Co.**
Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

speculation.

page 21
13        THE WITNESS:  I think doctors
14   understand that I'm a truthful person and I
15   present the information regarding my product as
16   far as the features and the -- or the benefits
17   and the limitations.

[21:19] - [22:1] 11/1/2006 Melissa McAllister

page 21
19   Q.     And you have -- you've received
20  training, extensive training from Merck; correct?
21   A.  ..  I've had many different training
22  classes regarding our products and disease
23  states.
24   Q.     And you've received -- you've received
25  extensive training about sales techniques from
page 22
1  Merck; correct?

[22:3] - [22:5] 11/1/2006 Melissa McAllister

page 22
3        THE WITNESS:  I've had training
4   regarding disease state, our products and ways
5   of engaging with the physician.

[22:7] - [22:12] 11/1/2006 Melissa McAllister

page 22
7   Q.     Have you had sales training from
8  Merck?
9   A.     I've had training on how to have
10  interactions with physicians as far as how to
11  disseminate the information and interact with the
12  physician.

[22:13] - [23:6] 11/1/2006 Melissa McAllister

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

age 22
13   Q.    And part of that training includes how
14  to gain the physician or the doctor's trust;
15  right?
16   A.    Well, one thing about it is Merck has
17  great products and when you deliver the
18  information based on those products, you build a
19  lot of trust with the physician as far as always
20  staying within the labels and always presenting
21  all the information in a complete accurate way.
22   Q.    Okay.  And I appreciate that, but that
23  really wasn't my question.  You have received
24  training from Merck, sales training, on how to
25  gain a physician or a doctor's trust; correct?
page 23
1   A.    I honestly -- I don't think I'm
2  following where you're going as far as training
3  on gaining trust.  I kind of think that's just a
4  thing that you have innately, hopefully as a
5  person that you build trust or respect for
6  others.


[23:7] - [23:8] 11/1/2006 Melissa McAllister


page 23
7   Q.    Have you received training on selling
8  techniques from Merck?


[23:10] - [23:14] 11/1/2006 Melissa McAllister


page 23
10        THE WITNESS:  We've had training on
11  techniques on dealing with physicians, the
12  interactions that we have, understanding how
13  they like to have information presented to
14  them.


[23:16] - [23:18] 11/1/2006 Melissa McAllister


page 23
6   Q.    Any -- any training on techniques
17  about how to even subconsciously raise the level

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

18 of a doctor's trust?

[23:20] - [23:24] 11/1/2006 Melissa McAllister

page 23
20        THE WITNESS: No, not subconsciously,
21   pretty black and white. This is the medication
22   and here are the benefits and limitations. You
23   make the choice to be the appropriate
24   medication for the appropriate patient.

[24:1] - [24:2] 11/1/2006 Melissa McAllister

page 24
1    Q.      Well, I mean, as a representative,
2  you're actually selling the product; aren't you?

[24:4] - [24:11] 11/1/2006 Melissa McAllister

page 24
4        THE WITNESS: No. Actually, my role
5   as a representative is to educate. It is an
6   education process because, especially with a
7   new product, they don't much about it. We're
8   here to say, let's go through the product
9   circular. Let's have a discussion about, you
10   know, where you can see patients benefiting
11   from this.

[24:13] - [25:4] 11/1/2006 Melissa McAllister

page 24
13   Q.      So it's not a sales role?
14   A.      I don't really see it as a sales role
15  because my interactions, personally, my
16  interactions with physicians is to disseminate
17  information to them regarding our product.
18   Q.      To educate them.
19   A.      Yeah, absolutely, to educate so they
20  know information about the product.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

21    Q.    Good information, information about
22  the benefits; right?
23    A.    Information about benefits, the
24  efficacy and the limitations as far as side
25  effect profile, dosing of it, warnings,
page 25
1  precautions, contraindications.
2    Q.    And in educating those physicians,
3  it's important that you tell them the good and
4  the bad; right?


[25:6] - [26:4] 11/1/2006 Melissa McAllister


page 25
6        THE WITNESS:  I think I've said this.
7  We talk about -- because there's no perfect
8  drug out there ever.  There's not -- I don't
9  think there's ever been one out there, you
10   don't see it in terms of good and bad.  It's
11   here are the benefits of the product.  Here are
12   the limitations.
13  BY MR. BIRCHFIELD:
14    Q.    And would you consider a heart attack
15  risk or the risk -- an increased risk of heart
16  attacks, would you see that as a serious side
17  effect?
18    A.    Well, hypothetically speaking, that's
19  something that you would not want.
20    Q.    Do you see it as a serious side
21  effect, heart attack risk?
22    A.    Well, if we're talking about Vioxx, I
23  still -- I don't see a risk with heart attack.
24    Q.    All right.  Well, let's put Vioxx
25  aside for a minute.  If one of your products
page 26
1  significantly increased the risk of heart
2  attacks, that's something you would want to
3  educate the doctor about; right?
4    A.    Well, if it was --


[25:6] - [26:4] 11/1/2006 Melissa McAllister


page 25
6        THE WITNESS:  I think I've said this.
We talk about -- because there's no perfect
drug out there ever.  There's not -- I don't

**Deft's Obj.:** Lacks
foundation; improper
hypothetical; calls for
speculation

**Deft's Obj.:** same; also
asked and answered

**Deft's Obj.:** Improper
hypothetical; lacks
foundation; and calls for
speculation

**Pl's Resp.:** Witness's
understanding of whether
a heart attack is a serious
side effect is relevant to
Plaintiff's failure to warn
claim.  No foundation is
necessary.  Counsel is
not asking a hypothetical
question.  "Hypothetically"
is the witness's word.

Overruled as a resource if.
She sees herself as a resource if.
info it is relevant to determine
So what she knows about the
risks + benefits of the
drug as well as what
she told doctors.

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

9    think there's ever been one out there, you
10   don't see it in terms of good and bad.  It's
11   here are the benefits of the product.  Here are
12   the limitations.
13   BY MR. BIRCHFIELD:
14   Q.    And would you consider a heart attack
15   risk or the risk -- an increased risk of heart
16   attacks, would you see that as a serious side
17   effect?
18   A.    Well, hypothetically speaking, that's
19   something that you would not want.
20   Q.    Do you see it as a serious side
21   effect, heart attack risk?
22   A.    Well, if we're talking about Vioxx, I
23   still -- I don't see a risk with heart attack.
24   Q.    All right.  Well, let's put Vioxx
25   aside for a minute.  If one of your products
page 26
1   significantly increased the risk of heart
2   attacks, that's something you would want to
3   educate the doctor about; right?
4   A.    Well, if it was --


[26:7] 11/1/2006 Melissa McAllister


page 26
7         THE WITNESS:  Repeat the question.


[26:9] - [26:12] 11/1/2006 Melissa McAllister


page 26
9   Q.    If one of your products significantly
10   increases the risk of heart attacks, that's
11   something that you would want to educate your
12   doctors about; right?


[26:14] - [26:19] 11/1/2006 Melissa McAllister


page 26
14        THE WITNESS:  I haven't had that
15   experience, and so, I probably would want to
16   hear what our Merck scientists had to say
17   because in the context that you're presenting

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

18   it, I would want all the information as far as
19   from Merck to talk to physicians.


[26:21] - [26:25] 11/1/2006 Melissa McAllister


page 26
21   Q.     Okay.  Well, if Merck scientists knew
22   that one of your products significantly increased
23   the risk of heart attacks, that's something that
24   you would want to educate your doctors about;
25   right?


[27:2] - [27:3] 11/1/2006 Melissa McAllister


page 27
2          THE WITNESS:  I would want all the
3   information to discuss with physicians.


[27:5] - [27:10] 11/1/2006 Melissa McAllister


page 27
5    Q.    Well, including heart attack risk,
6   that would be one you'd want to talk to?
7    A.    Limitations, benefits, the whole thing
8   within the product label.  I mean, FDA regulates
9   everything that we do and I have to stay by what
10  the FDA regulates.


[27:11] - [27:13] 11/1/2006 Melissa McAllister


page 27
11   Q.    It's safe to say that you never, never
12  ever discussed heart attack risk associated with
13  Vioxx with a doctor; correct?


[27:15] - [27:16] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 27
16      THE WITNESS:  Can you put that in a
time frame?

[27:18] - [28:7] 11/1/2006 Melissa McAllister



page 27
18   Q.      You never ever told a doctor that
19   there is a potential increased risk of heart
20   attack associated with Vioxx?
21   A.      No, I did not ever mention there was
22   increased risk of heart attack.
23   Q.      And so from May of 1999 to September
24   30th, 2004, day in and day out, you were talking
25   to doctors about Vioxx; correct?
page 28
1    A.      Yes, I had discussions regarding
2    Vioxx.
3    Q.      And never in any of those discussions
4    did you ever tell a doctor that there's a
5    potential increased risk of heart attacks with
6    Vioxx?
     A.      No, I did not.

| **Deft's Obj.:** Mischaracterizes prior testimony ("day in and day out") | **PI's Resp.:** Witness's job was to detail Vioxx to doctors on a daily basis.  Counsel did not mischaracterize her testimony. |

[28:8] - [28:10] 11/1/2006 Melissa McAllister

page 28
8    Q.      And that's because the information
9    that you received from Merck was that there was
10   no increased risk in heart attacks; right?

| **Deft's Obj.:** Assumes facts not in evidence | **PI's Resp.:** Witness has testified previously -- p. 18 that she received her information from Merck. |

[28:12] - [28:16] 11/1/2006 Melissa McAllister

page 28
12      THE WITNESS:  We received bulletins
13   regarding this and, you know, there's -- the
14   Merck scientists study this and we were given
15   information in a bulletin and I felt confident
16   in discussing Vioxx with my physicians.

[28:18] - [28:22] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 28
18   Q.    Okay. And not only did you not tell
19   doctors about an increased risk in heart attack,
20   it was part of your job to convince the doctors
21   that there was not an increased risk of heart
22   attack with Vioxx; correct?

[28:24] - [30:3] 11/1/2006 Melissa McAllister

page 28
24          THE WITNESS: As a sales
25    representative, discussions regarding Vioxx, it-
page 29
1    depended on the time frame of that. I mean, if
2    you would like to elaborate because there were
3    specific times on different things that we
4    could discuss.
5    BY MR. BIRCHFIELD:
6    Q.    Oh, okay, all right. I'm sorry. I
7    thought that you said that from the entire time
8    it was on the market, you never thought that
9    there was an increased risk of heart attack?
10   A.    Well, let me reiterate that, yes, I
11   did not ever say that there was a risk of heart
12   attacks. But we also, the VIGOR study was out.
13   At different times, there was different things
14   that we could talk about, depending on the
15   bulletins, the direction from Merck. So we had
16   discussions but it was about, okay, you've heard
17   this. I can give a verbal statement on the VIGOR
18   before it was actually put in our PI that I could
19   address if they wanted information on cardiac
20   safety with the CV card or submit a PIR.
21   Q.    All right. And what I'm getting at, I
22   just want to make sure that we're clear here, you
23   never told a doctor that there was an increased
24   risk of heart attack with Vioxx?
25   A.    No, I did not.
page 30
1    Q.    And in fact, your job, part of your
2    job was to convince doctors that there was not an
3    increased risk of heart attack with Vioxx?

[30:5] - [30:8] 11/1/2006 Melissa McAllister

*Overruled*

**Deft's Obj.:** Asked and
answered (multiple times)

**Pl's Resp.:** Counsel is
trying to clarify the
witness's testimony.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 30
5        THE WITNESS:  As a representative, my
6    job, my responsibility was to talk to the
7    physicians about the benefits and limitations
8    of Vioxx.


[30:10] - [30:12] 11/1/2006 Melissa McAllister

*Overruled the witness, cross.*

page 30
10    Q.    Yes or no, did your job include
11    convincing doctors that there was no increased
12    risk of heart attack with Vioxx?

**Deft's Obj.:** Argumentative;
asked and answered;
badgering

**Pl's Resp.:**  Counsel is
trying to clarify the
witness's testimony.

[30:15] - [30:17] 11/1/2006 Melissa McAllister

page 30
15        THE WITNESS:  I think that's -- like
16    I said, my job is to discuss the product within
17    the product circular.


[30:19] - [30:20] 11/1/2006 Melissa McAllister

page 30
19    Q.    So you can't answer that question yes
20    or no?


[30:24] - [31:3] 11/1/2006 Melissa McAllister

page 30
24    Q.    Can you answer this question yes or
25    no?  Part of your training in your job as a Merck
page 31
1    representative was to convince doctors that there
2    was no increased risk of heart attack associated
3    with Vioxx?


[31:6] - [31:21] 11/1/2006 Melissa McAllister

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 31
6        THE WITNESS:  Like I said, I'm not
7    out there to convince doctors.  I'm out to
8    educate physicians about the products.
9  BY MR. BIRCHFIELD:
10    Q.    Well, after the VIGOR study -- you're
11  familiar with the VIGOR study; is that right?
12    A.    Yes, I am.
13    Q.    The VIGOR study showed a five fold
14  increase in heart attacks with Vioxx versus
15  naproxen; correct?
16    A.    The VIGOR study came up with -- there
17  was increased numbers of cardiac events with the
18  Vioxx versus naproxen.
19    Q.    Was there a five fold increase in
20  heart attacks between Vioxx and naproxen in
21  VIGOR?

[31:23] - [31:25] 11/1/2006 Melissa McAllister

page 31
23        THE WITNESS:  I can't remember the
24    specific number, I just know that there was an
25    increased number.

[32:2] - [32:4] 11/1/2006 Melissa McAllister

page 32
2     Q.    Was there a significant difference in
3   the heart attack rate Vioxx versus naproxen in
4   the VIGOR study?

[32:6] - [32:8] 11/1/2006 Melissa McAllister

page 32
6        THE WITNESS:  I don't recall if it
7    was a significant -- I just don't remember the
8    specifics.

[32:10] - [32:12] 11/1/2006 Melissa McAllister

_overruled witness says she is familiar w/ VIGOR study at least from her vantage point_

**Deft's Obj.:** Lacks
foundation; calls for expert
testimony; vague with
respect to "significant"

**Pl's Resp.:**  Witness
detailed Vioxx after VIGOR
came out and after the
VIGOR data was put into
the label.  Witness is
fully qualified to answer
this simple question in
light of her former
responsibilities to
convey this information
to physicians and her
training.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 32
10   Q.     Tell me what you remember about the
11   VIGOR study as it pertains to heart attack risk
12   in Vioxx.

[32:14] - [32:22] 11/1/2006 Melissa McAllister

page 32
14          THE WITNESS:  The VIGOR study was a
15   GI outcome study and it did show -- it did
16   further prove the -- what the scientists
17   believed that Vioxx was going to be safer on
18   the stomach.  There was also findings that the
19   cardiac event number was higher with Vioxx
20   versus naproxen but at the same time, we got
21   all this information in a bulletin when it was
22   published in 2000.

[32:24] - [33:9] 11/1/2006 Melissa McAllister

page 32
24   Q.     Okay.  A bulletin from Merck?
25   A.     Merck bulletin that there was an
page 33
1   explanation for that.
2   Q.     And what was the explanation that
3   Merck gave you?
4   A.     The scientists, after studying the
5   information, their scientific judgment on this
6   was that naproxen had cardio protective qualities
7   and that was the reason why.
8   Q.     And so what did you do with that
9   information?

[33:11] - [33:14] 11/1/2006 Melissa McAllister

page 33
11          THE WITNESS:  Well, the bulletin,
12   from what I can remember, that part of it was
13   background information for background use only

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

14    not to disseminate to physicians.

[33:16] - [33:19] 11/1/2006 Melissa McAllister

page 33
16    Q.    While you were in the doctor's office
17  following the VIGOR study, were you ever asked by
18  a physician, wasn't there an increased risk in
19  heart attack seen in the VIGOR study?

[33:22] - [35:1] 11/1/2006 Melissa McAllister

page 33
22    Q.    Was that issue ever raised?
23    A.    The time frame from when it was first
24  published and after?
25    Q.    At any point.
page 34
1    A.    Well, I'll talk about when it was
2  first published because it was not part of our
3  product label and depending on the time and
4  when -- what bulletin, the direction that we had,
5  we could give an oral statement in questions in
6  regards to if they had heard something because it
7  was very much out there.  It was in the press
8  reports.  It was in the Celebrex representatives
9  talking about it.  Merck had press releases.  I
10  mean, there was just -- there was a lot of
11  information about it so we did get questions, but
12  there was a way of addressing this.
13          The first was to have an oral
14  statement and it just depended on the time if we
15  could give specific rates, and then if they
16  wanted information that was within the label, we
17  could address it by the OA studies, our CV card
18  talked about that, that was in our label
19  information, or -- and/or you could submit a PIR
20  regarding VIGOR.
21    Q.    Well, did you ever have a doctor ask
22  you about the VIGOR study?
23    A.    I mean, yeah.  I mean, I remember it
24  was a big topic of discussion.
25    Q.    And so what did you tell them was the
page 35
explanation for the difference in heart attacks?

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[35:3] - [35:14] 11/1/2006 Melissa McAllister

page 35
3          THE WITNESS: Because it was not part
4    of our product label and we are trained, we are
5    expected, because we're regulated by policies,
6    that I followed the bulletin that was in place
7    and pretty much was -- you didn't -- didn't,
8    you know, duck it or anything. You had an oral
9    statement to say, yes, you must be talking
10   about Vioxx -- I mean VIGOR and then we either
11   proceeded to show them the CV card with on
12   label information with our OA studies or --
13   and/or if they wanted more information about
14   VIGOR, we could submit a PIR.


[35:16] - [36:5] 11/1/2006 Melissa McAllister

She mentions the
CV card + connects it
to VIGOR

Overruled

page 35
16   Q.    And you've mentioned the CV card
17   several times. Was that a sales -- a sales aid
18   piece?
19   A.    It was considered one of our pieces
20   with approved messages regarding if a physician
21   brought up CV questions, that we could use that.
22   Q.    All right. Let me show you what's
23   marked as plaintiff's Exhibit P 1.0008.
24         Do you recognize that as a copy
25   of the CV card that you're talking about?
page 36
1    A.    Yes, it is.
2    Q.    And the purpose of this sales aid was
3    for you to use visiting with a doctor to allay
4    any of his fears, to put aside any of his fears
5    about Vioxx causing heart attacks; is that right?


[36:7] - [36:10] 11/1/2006 Melissa McAllister


page 36
7          THE WITNESS: Well, this piece was
8    given to us as far as responding to questions
9    they had regarding Vioxx with information that
10   was actually consistent with our product label.

**Deft's Obj.:** Relevance-
CV Card was not used with
the prescriber during the
relevant period. *See* 197:20-
198:16. Further, Ms.
McAllister has no knowledge
of *ever* using the CV Card
with the prescriber. See
195:3-6.


**Deft's Obj.:** Lacks
foundation; calls for
speculation

**Pl's Resp.:** Witness
testifies at 193:24-194:1-9
that it was her practice
to use the CV Card
with doctors and that
because it was her
practice she would have
used the CV Card with
Dr. Herrera. The CV
card misrepresented the
CV mortality rate
associated with Vioxx
in comparison to
other NSAIDs. Relevant
to Plaintiff's failure to warn
claim.

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

[36:12] - [36:15] 11/1/2006 Melissa McAllister

page 36
12   Q.     And did you use this -- this piece,
13   this CV card in a way to convince doctors that
14   there was no increased risk of heart attack with
15   Vioxx?

[36:18] - [37:3] 11/1/2006 Melissa McAllister

page 36
18         THE WITNESS:  I use this as a
19   representative to have a discussion about,
20   let's talk about what we can -- I can discuss
21   with you as a representative, what I'm allowed
22   to talk to you within the product circular
23   because these are from studies from our product
24   circular to keep things in context as far as,
     you know, I can talk about this.  If this
page 37
1    doesn't address what you're looking for, I can
2    submit a PIR because the VIGOR study is not
3    part of our label.

[37:5] - [37:16] 11/1/2006 Melissa McAllister

page 37
5    Q.     And did you have doctors ask for a
6  PIR?
7    A.     I would think that I did.
8    Q.     Tell the jury that what a PIR is.
9    A.     A PIR stands for professional
10   information request and it's an unsolicited
11   request from a physician about a topic that's not
12   part of our product label.
13   Q.     And the PIR that was designed by Merck
14   to respond to the cardiovascular or the heart
15   attack risk in VIGOR, do you know -- did you ever
16   see that, that PIR response?

[37:18] - [37:24] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

THE WITNESS: I don't know, you know,
19  they only come across electronically and I
20  can't remember for certain if I looked at it.
21  Most likely, I looked at it because I like to
22  see what was being sent to my physicians but
23  the policy's that we delete PIRs within 60
24  days.

[38:1] - [38:4] 11/1/2006 Melissa McAllister

page 38
1   Q.    Well, following the VIGOR study, you
2   said that there were press releases and you said
3   that there were Celebrex representatives talking
4   to doctors about the heart attack risk; right?

[38:6] - [38:8] 11/1/2006 Melissa McAllister

page 38
        THE WITNESS: Well, the information
7   was out there regarding VIGOR as far as the
8   whole aspect of the study.

[38:10] - [38:18] 11/1/2006 Melissa McAllister

page 38
10  Q.    Okay.
11  A.    You know, the benefit that it showed
12  and then also the findings with cardiac --
13  cardiovascular.
14  Q.    All right.  Do this for me, let's say
15  that I'm -- that you're visiting a doctor and he
16  says, what about the heart attack risk associated
17  with Vioxx?  Tell the jury what you would say to
18  him.

[38:20] - [39:8] 11/1/2006 Melissa McAllister

page 38

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

20        THE WITNESS: I would ask the
21   physician, are you referring to the VIGOR
22   study, and depending on at that time -- the
23   time frame before it was part of our label, I
24   could give an oral statement as far as the
25   event, the numbers of event or maybe the
page 39
1   percentage, I think is how it was. I'm not a
2   hundred percent sure as far as, you know,
3   each -- it just changed over time is all I can
4   remember on that, and then we can also say,
5   well, I can talk to you about cardiovascular
6   information in our PI with this CV card and if
7   they still wanted information regarding VIGOR
8   that I could submit a PIR.


[39:10] - [39:11] 11/1/2006 Melissa McAllister



page 39
10   Q.      And so that's what you told the
11   doctors?


[39:13] - [39:15] 11/1/2006 Melissa McAllister



page 39
13        THE WITNESS: Yes. That's how I
14   would handle that if a physician brought up
15   that subject.


[39:17] - [39:21] 11/1/2006 Melissa McAllister



page 39
17   Q.      If a physician said -- looks at you as
18   the representative of Merck and the person who
19   has gained his trust in visiting his office and
20   he asked you, is there a heart attack risk with
21   Vioxx, what do you say?


[39:23] - [40:16] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 39
8         THE WITNESS:  Like I said, the
24    previous question, yes, the same answer would
25    be, are you talking about the VIGOR study, and
page 40
1     that's what they would be talking about and,
2     you know, as a Merck representative based on
3     policy and bulletins, I had, you know -- had a
4     pretty limited amount of what I could go into
5     because of being what's on product circular and
6     what's not on product circular.  So again, they
7     get an oral statement about VIGOR about the
8     numbers that I would be able to go into the CV
9     card because it was on the label which is what
10    I can discuss and if they wanted further
11    information on VIGOR, I would gladly send out a
12    PIR.
13 BY MR. BIRCHFIELD:
14    Q.     All right.  So all of the information
15    that's included in the CV card was also included
16    in the product label; is that what you're saying?


[40:18] - [40:21] 11/1/2006 Melissa McAllister


page 40
18         THE WITNESS:  It was part of --
19    consistent with the product label, the OA
20    studies that were part of the OA studies that
21    were in product circular.


[40:23] - [41:6] 11/1/2006 Melissa McAllister


page 40
23    Q.    All right.  Let's look at the first
24    page of the CV card.  This is the CV card, this
25    plaintiff's Exhibit 8; is that right?
page 41
1     A.    Uh-huh (affirmative response).
2     Q.    Okay.
3     A.    Yes.
4     Q.    And the first page of that card, it
5 lists the base line cardiovascular
6 characteristics; is that right?


[41:9] - [41:17] 11/1/2006 Melissa McAllister

**Deft's Obj.:** Relevance-v Card was not used with the prescriber during the relevant period. *See* 197:20-198:16.  Further, Ms. McAllister has no knowledge of <u>ever</u> using the CV Card with the prescriber. *See* 195:3-6.

**Pl's Resp.:** Witness testifies at 193:24-194:1-9 that it was her practice to use the CV Card with doctors and that because it was her practice she would have used the CV Card with Dr. Herrera.  The CV card misrepresented the CV mortality rate associated with Vioxx in comparison to

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

other NSAIDs.  Relevant
to Plaintiff's failure to warn
claim.

page 41
9         MR. BIRCHFIELD:  Yes.  I mean you've
10    got the cover page and then the first page of
11    the material.
12  BY MR. BIRCHFIELD:
13    Q.    Do you see that?
14    A.    Yes, I do.
15    Q.    And it has the -- is that the base
16  line cardiovascular characteristics of those OA
17  studies that you're talking about?

**Deft's Obj.:** Lacks
foundation

**PI's Resp.:**  Counsel is
asking a specific question
about a table in the CV
Card which is being viewed
by the witness.  Sufficient
foundation.

[41:19] - [42:13] 11/1/2006 Melissa McAllister

page 41
19         THE WITNESS:  It's been a while since
20    I've looked at this so, I mean, from reading
21    the chart and information that's present, these
22    were -- these were the patients had a base
23    line.
24  BY MR. BIRCHFIELD:
25    Q.    And it has hypertension 39 percent;
page 42
1  right?
2    A.    Yes.
3    Q.    Do you know how that compared to the
4  hypertension population in the VIGOR study?
5    A.    No, I do not.
6    Q.    And then it has hypercholesterolemia
7  11 percent; right?
8    A.    Uh-huh (affirmative response).
9    Q.    And then smoker 14 percent, do you see
10  that?
11    A.    Yeah.
12    Q.    Diabetes, seven percent.  All of these
13  are cardiovascular risk factors; right?

**Deft's Obj.:** Lacks
foundation; calls for expert
testimony

**PI's Resp.:**  Counsel is
asking a specific question
about a table in the CV
Card which is being viewed
by the witness.  Sufficient
foundation.

[42:15] - [43:10] 11/1/2006 Melissa McAllister

page 42
15         THE WITNESS:  I don't -- I mean, I
16    don't know that they're risk factors or not.
17    As far as, I mean, within the context of the
18    study, how the study was developed,

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

19  BY MR. BIRCHFIELD:
20    Q.    Do you know one way or another whether
21  hypertension is a cardiovascular risk factor?
22    A.    From my knowledge of selling
23  cardiovascular products, yeah, hypertension is a
24  risk factor.
25    Q.    And what about hypercholesterolemia?
page 43
1    A.    Yes, it would be.
2    Q.    And diabetes?
3    A.    Yes, it would be.
4    Q.    And then history of angina coronary
5  artery disease; right?
6    A.    Uh-huh (affirmative response).
7    Q.    And this has five percent of the
8  population in the OA studies had a history of
9  angina and coronary artery disease; correct?
10   A.    Yes.


[43:11] - [43:23] 11/1/2006 Melissa McAllister


page 43
11         MR. HOURIHAN:  And sorry to interrupt
12  you, I just want to say for the benefit of the
13  jury that the reason the witness is looking
14  down at the end of the table is because we have
15  that document also blown up on a screen in
16  front of the room.
17         MR. BIRCHFIELD:  Right.  It's the
18  same document -- the one on the screen is the
19  same document that you have in front of you;
20  correct?
21         MR. HOURIHAN:  It's probably easier
22  to refer to the document in front of you, Ms.
23  McAllister.

**Pl. Obj.:**  Object to improper Attorney sidebar.

**Deft's Resp:** Statement necessary because on video witness is looking off to the side of the room while answering questions; without statement jury would not understand that she was viewing the document projected by counsel on a screen at end of table; witness does this more than once in deposition and jury will wonder why.


[43:25] - [44:12] 11/1/2006 Melissa McAllister


page 43
25   Q.    Then we have a history of myocardial
page 44
1  infarction.  Is that another word for heart
2  attack?
3    A.    Yes, it is.
4    Q.    And then three percent of the
5  population in the OA studies had a history of

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

| | | |
|---|---|---|
| 6  heart attack; right? | | |
| A.  Excuse me? | | |
| 8  Q.  Had a history of heart attacks? | | |
| 9  A.  From what this says, yes. | | |
| 10  Q.  What about in the VIGOR study? What | **Deft's Obj.:** Lacks | **Pl's Resp.:** Witness |
| 11  percentage of the people in the VIGOR study had a | foundation | detailed Vioxx after VIGOR |
| 12  history of heart attacks? | | came out and after the |
| | | VIGOR data was put into |
| | | the label. Witness is |
| [44:14] - [45:1] 11/1/2006 Melissa McAllister | | fully qualified to answer |
| | | this simple question in |
| | | light of her former |
| | | responsibilities to |
| page 44 | | convey this information |
| 14  THE WITNESS: I don't have it in | | to physicians and her |
| 15  front of me. I'd have to look at it. | | training. |
| 16  BY MR. BIRCHFIELD: | | |
| 17  Q.  And then the last category is | | |
| 18  congestive heart failure, one percent; correct? | | |
| 19  A.  Yes. | | |
| 20  Q.  And then we see just below that the | | |
| 21  mean age is 63 years? | | |
| 22  A.  Uh-huh (affirmative response). | | |
| 23  Q.  Is that correct? | | |
| 24  A.  Yes. | | |
| 25  Q.  What was the mean age in the VIGOR | | |
| page 45 | | |
| 1  study? | | |
| | | |
| [45:3] - [45:4] 11/1/2006 Melissa McAllister | | |
| | | |
| page 45 | | |
| 3  THE WITNESS: I'd have to look at the | | |
| 4  study. I don't remember. | | |
| | | |
| [45:6] - [45:7] 11/1/2006 Melissa McAllister | | |
| | | |
| page 45 | | |
| 6  Q.  And you talked to doctors about the | | |
| 7  VIGOR study, though; right? | | |
| | | |
| [45:9] - [45:11] 11/1/2006 Melissa McAllister | | |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 45

10        THE WITNESS: I talked to doctors
10   regarding VIGOR once it became part of our
11   product label.

[45:13] - [45:22] 11/1/2006 Melissa McAllister

page 45
13   Q.    And when was that?
14   A.    Well, it was in the spring of 2002.
15   Q.    April 2002, does that sound right?
16   A.    2002.
17   Q.    And but you don't remember the age or
18  the mean age in the VIGOR study?
19   A.    I don't remember right now.
20   Q.    Do you know if it was a younger
21  population or an older population than what we
22  see in the OA studies?

| | **Deft's Obj.:** Lacks foundation | **Pl's Resp.:** Witness's responsibility was to convey the risks and benefits about Vioxx to physicians which regularly involved detailing physicians with journal articles and the results of studies. Sufficient foundation for simple question about the OA studies which witness has already testified she was familiar with in relation to the CV Card. |

[45:24] 11/1/2006 Melissa McAllister

page 45

24       THE WITNESS: I don't know.

| | **Pl.'s Obj.:** Misleading. Document on screen was the same document she was questioned about. | **Deft's Resp.:** Plaintiff cannot object to a witness's answer on the ground that it is "misleading." Witness is simply stating that she does not know the answer to a question which cannot be "misleading." The issue has nothing to do with the document projected on the screen. |

[46:1] - [46:6] 11/1/2006 Melissa McAllister

page 46
1   Q.    And then we see gender, that 70
   percent of this population is female; is that
3  correct?

*[Handwritten annotation: "Sustained. This is too specific for Nov Dr. + adds nothing"]*

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

| | | |
|---|---|---|
| 4   A.   Yes.<br>5   Q.   And is there a higher risk of heart<br>6 attacks with males or females? | **Deft's Obj.:** Lacks<br>foundation; calls for expert<br>testimony | **Pl's Resp.:** Witness's<br>responsibility was to<br>convey the risks and<br>benefits about Vioxx to<br>physicians which regularly<br>involved detailing physicians<br>with journal articles and<br>the results of studies.<br>Thus, question has<br>sufficient foundation and<br>is relevant. |

[46:8] - [46:9] 11/1/2006 Melissa McAllister

page 46
8        THE WITNESS: I'm not a doctor. I
9   don't know.

[46:17] - [47:18] 11/1/2006 Melissa McAllister

page 46
17   Q.   Is there -- is there any mention of a
18 heart attack risk there?
19   A.   As far as under selected safety
20 information?
21   Q.   Yes.
22   A.   Is that right? No, there's not.
23   Q.   Okay. Is there any mention of a
24 stroke risk?
25   A.   No, there's not.
page 47
1   Q.   Is there any mention of a concern
2 about Vioxx being prothrombotic?
3   A.   No, there's not.
4   Q.   And do you know what prothrombotic
5 means?
6   A.   Yes, I do.
7   Q.   Tell the jury what prothrombotic
8 means.
9   A.   Well, it just means that -- I mean,
10 from what I -- from what I understand, like
11 aspirin is cardio protective, has no effect on,
12 you know, platelets and that type of thing. I
13 mean, I'm not a doctor so...
14   Q.   Prothrombotic, does that mean like it
15 would cause a clot?
16   A.   I would think so, yeah.
17   Q.   Were you ever told by anybody at Merck
18 whether or not Vioxx could be prothrombotic?

[47:20] - [47:21] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

Page 47
20       THE WITNESS:  No, I don't think I was
21   told that.

[47:23] - [47:25] 11/1/2006 Melissa McAllister

_Overruled_

page 47
23   Q.   So if the Merck scientists knew that
24   Vioxx could be prothrombotic, they never conveyed
25   that information to you; correct?

**Deft's Obj.:** Assumes facts
not in evidence; lacks
foundation; improper
hypothetical

**Pl's Resp.:**  No foundation
necessary.  Plaintiff has
right to ask witness what
she knew about the
safety profile of Vioxx.

[48:2] - [48:9] 11/1/2006 Melissa McAllister

page 48
2       THE WITNESS:  The information that
3   was conveyed to us was, like I said, we got the
4   information on VIGOR and they also included in
5   the background information that the difference
6   was because of the naproxen being
7   cardioprotective and that was -- that was their
8   conclusion and they're scientists and I believe
9   them.

[48:11] - [48:14] 11/1/2006 Melissa McAllister

page 48
11   Q.   If the Merck scientists told you that
12   Vioxx could increase the risk of heart attacks,
13   is that something that you would tell the doctors
14   that trust you?

**Deft's Obj.:** Improper
hypothetical; assumes
facts not in evidence

**Pl's Resp.:**  No foundation
necessary.  Plaintiff has
right to ask witness what
she knew about the
safety profile of Vioxx.

[48:16] - [48:23] 11/1/2006 Melissa McAllister

page 48
16       THE WITNESS:  Well, the scientists,
17   from my experience and the information that I
18   received, that that was not -- it wasn't a risk
19   for getting heart attack or being
20   prothrombotic.  So, you know, it's kind of a --

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister



21  that was not information that was given to us.
22  It was not what they believed.  It's not what I
23  believe.  So...

[48:25] - [49:4] 11/1/2006 Melissa McAllister

page 48
25  Q.   But that's -- if a drug significantly
page 49
1  increases the risk of heart attack, I mean,
2  that's important information for a doctor to know
3  when he's making a decision about prescribing a
4  drug; do you agree with that?

**Deft's Obj.:** Lacks foundation; improper hypothetical; calls for expert testimony

**Pl's Resp.:** No foundation necessary.  Plaintiff has right to ask witness what she knew about the safety profile of Vioxx.

[49:6] - [50:3] 11/1/2006 Melissa McAllister

page 49
6        THE WITNESS:  Well, in the context of
7  any product that's out there anywhere in the
8  world, if there is a -- it's substantiated with
9  studies and I would hope that Merck would say,
10  you know, based on their scientific judgment,
11  if that was the case, yes.  But in this case
12  that we're talking about, the scientists --
13  their conclusion was this was a great drug.
14  The benefits were phenomenal and the cardiac
15  protection that was seen with naproxen was the
16  reason for the difference.
17 BY MR. BIRCHFIELD:
18  Q.   At least that's what they were telling
19  you; correct?
20  A.   And I believe them.
21  Q.   That's what they were telling you?
22  A.   Their scientific information.  Their
23  conclusions, that's what their conclusions were.
24  That was issued into the bulletin.
25  Q.   And they were telling you that the
page 50
1  heart attack risk, the difference seen in VIGOR
2  was explained because naproxen protects the
3  heart; right?

**Deft's Obj.:** Assumes facts not in evidence; vague

**Pl's Resp.:** Nothing vague about question. Counsel is asking if Merck management is conveying the naproxen hypothesis to witness and other sales reps.

[50:5] - [50:13] 11/1/2006 Melissa McAllister

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 50
5         THE WITNESS:  The way that, you know,
6   the bulletin was written, from what I can
7   recall, was that the reason why there was a
8   difference in event numbers was because of the
9   cardio protective qualities of naproxen.
10 BY MR. BIRCHFIELD:
11   Q.    Well, besides bulletins, you get
12 information from Merck executives in other ways;
13 right?


[50:15] - [50:19] 11/1/2006 Melissa McAllister


page 50
15         THE WITNESS:  No, bulletins are
16   pretty much the way that we receive
17   information.  We might get voice mails but
18   bulletins are -- they're sent out to us and
19   that's what we follow.


[50:21] - [51:6] 11/1/2006 Melissa McAllister


page 50
21   Q.    And voice mails, I mean, a Merck
22 executive has the capability of issuing a
23 voicemail that goes to all the sales reps for
24 Merck; correct?
25   A.    After Merck legal reviews everything.
page 51
1   Q.    And do you remember getting a
2 voicemail message from David Anstice about Vioxx?
3   A.    I don't remember getting a specific --
4 I don't remember specific voice mails back then.
5   Q.    All right.  Now, you receive training
6 on how to use sales pieces; correct?


[51:8] - [51:23] 11/1/2006 Melissa McAllister


page 51
8         THE WITNESS:  We had training on
9   pieces that had the approved messages on our
10   products.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

11  BY MR. BIRCHFIELD:
12      Q.      And would you have sales meetings
13  where you would receive training on how to use
14  sales pieces like the CV card?
15      A.      We had district regional meetings
16  where we would discuss not -- it wasn't just --
17  you know, we had a lot of things to go over, but
18  a lot of times, we had -- if we had a new piece
19  from our marketing team that we would go over it.
20      Q.      What does a 2S '01 mean?  Tell me what
21  that is.
22      A.      2S, second semester meeting of 2001, I
23  guess.


[51:24] - [52:18] 11/1/2006 Melissa McAllister


page 51
24      Q.      So would you have -- each semester,
25  would the sales representatives have meetings to
page 52
1  discuss various issues?
2      A.      I think for the most part, we had
3  usually two meetings a year.
4      Q.      And where would those meetings be
5  held?
6      A.      The first meeting in the beginning of
7  the year was usually a larger group so I know
8  when I was in Tennessee, we had meetings in
9  Atlanta because it was a central point.  In
10  Oklahoma, Tulsa or Dallas, you know, a place that
11  was close to where the majority of people could
12  fly into.
13      Q.      All right.  I want to show you --
14  well, at these training meetings, would you have
15  videos that were shown to the sales
16  representatives?
17      A.      There were some times that some videos
18  but it wasn't a common occurrence.


[53:7] - [53:12] 11/1/2006 Melissa McAllister

page 53
7      Q.      All right.  I want to show you a video
8  that was used at the sales meetings in the second
9  semester of '01 and I want you to watch this
10  video and then I'll ask you some questions about
11  it, okay?
12      A.      Okay.

[53:6] - [54:18]
Deft's Obj.:  "Be the Power"
video lacks relevance
(witness testified that she
did not recall whether she
attended relevant meeting
and does not remember
seeing the video); lacks

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

[53:20] - [55:16] 11/1/2006 Melissa McAllister

| | foundation; counsel testifying; assumes facts not in evidence (e.g., that video was ever played or that witness ever saw it) | |
|---|---|---|

page 53
20   Q.     On the video that was just shown, it
21  talked about obstacles.  Will you tell the jury
22  in terms of Merck sales, what are obstacles?
23   A.     Well, obstacles as far as how Merck
24  sees them, I think most people think of as a wall
25  that, you know, you can't get through and -- but
page 54
1  it's more of an issue or a concern or question
2  that a physician has on one of our products and
3  the way that, you know, I've handled it was to
4  reconfirm what they're saying to make sure that
5  we're on the same page, that we're talking about
6  the same issue or whatever, and then, you know,
7  the information that I have at hand that was in
8  the product label, to go over that to make sure
9  that he understood or she understood, you know --
10  addressed that and then, you know, did I answer
11  your questions and if yes, then, you know, go on
12  to another subject or if it was something that
13  was beyond the scope of PI, then I could offer to
14  submit a PIR.  But it was -- it was to address a
15  concern.  It wasn't -- it was to really say, you
16  know, what are your issues.  You know, let's talk
17  about it so we can all -- you know, have an equal
18  understanding.
19   Q.     So an obstacle would be like a concern
20  that a physician or a doctor would raise;
21  correct?
22   A.     Yeah, a concern, yeah, question, you
23  know, it's anything that they were -- you know, I
24  want to know more about this.
25   Q.     And it's important to address that
page 55
1  concern head on; right?
2   A.     Absolutely.  I mean, that's part of,
3  you know, my job.  I take it seriously, that --
4  if there's something that they need to know, I
5  want to be able to tell them within the scope of
6  what I can do, you know, what the FDA allows me
7  to do.
8   Q.     So you would want to answer their
9  concern and make sure they have a clear answer to
10  that concern before you moved on to something
11  else; right?
12   A.     That's the mission, yes.
13   Q.     It's important that in -- that when

[55:13] - [56:1]          PI's Resp.:  Witness

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

14  you deal with an obstacle or concern that a
15  physician has that he get a clear answer to his
16  concern?

[55:18] - [56:5] 11/1/2006 Melissa McAllister

page 55
18        THE WITNESS:  Well, I mean, as clear
19  as that I can give within the product circular.
20  I mean, it's an open book.  I mean, that's the
21  product circular.  It's what Merck has
22  submitted to the FDA and I have to go by that,
23  but if there was something that was -- you
24  know, a question that concerned something that
25  was not consistent with the PI or was outside
page 56
1  the PI, we always could offer a PIR.
2 BY MR. BIRCHFIELD:
3    Q.    And one of the concerns, one of the
4  obstacles involving Vioxx was the heart attack;
5  right?

[56:7] - [56:9] 11/1/2006 Melissa McAllister

page 56
7        THE WITNESS:  One of the concerns we
8  got was they just wanted information on
9  cardiovascular information regarding Vioxx.

[56:11] - [56:18] 11/1/2006 Melissa McAllister

page 56
11    Q.    Okay.  And another thing that we saw
12  in the video was targeting top physicians.  What
13  are top physicians for a sales representative?
14    A.    Well, physicians that, you know, that
15  we -- that we had as far as targeted physician
16  was someone that had a large practice with
17  patients that potentially could benefit from our
18  product.

[56:19] - [56:20] 11/1/2006 Melissa McAllister

**Deft's Obj.:** Lacks foundation; vague

has defined obstacle above. Sufficient foundation for question.

*Overruled*

[56:3] - [56:9]
**Deft's Obj.:** Assumes facts not in evidence; vague with respect to "the heart attack"

**Pl's Resp.:**  Concerns regarding Vioxx causing heart attacks has been established in this deposition and other witnesses.

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 56
9    Q.    And how would you identify your top
20   physicians?


[56:22] - [57:3] 11/1/2006 Melissa McAllister

22        THE WITNESS:  Well, you kind of, you
23   know, when you have -- if you've called on them
24   for a long time, you kind of can see what their
25   patient base is or we would get lists from
page 57
1    headquarters as far as doctors identified as
2    having patients that would benefit from the
3    product.


[57:5] - [58:3] 11/1/2006 Melissa McAllister


page 57
5    Q.    Wait a minute.  You'd get list from
6    headquarters about physicians?
7    A.    Sometimes we'd get lists from
8    headquarters but a lot of times, we had
9    information database on our computers that we
10   could run information on.
11   Q.    Did you get lists from headquarters --
12   and you're talking about Merck headquarters;
13   right?
14   A.    Yes, Merck.
15   Q.    Did you get lists from Merck
16   headquarters that showed a doctor's prescribing
17   habits, drugs that he was actually prescribing?
18   A.    Well, Merck has contracted with IMS, I
19   don't know what that stands for, but it's
20   background information.  We don't talk about this
21   information to physicians.  It's just, you know,
22   for our background information.
23   Q.    Okay. So you would have information
24   about the drugs that a particular doctor would
25   prescribe; correct?
page 58
1    A.    Yes.
2    Q.    But you wouldn't let the doctor know
3    that you had that information; correct?


[58:5] - [58:24] 11/1/2006 Melissa McAllister

*Overruled*

[58:2] - [58:6]
Deft's Obj.: Relevance

PI's Resp.:  IMS data and
the manner in which
physician prescribing
habits were tracked was
a critical part of Merck's
integrated marketing
campaign for Vioxx and is
relevant to Plaintiff's