## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 58
6        THE WITNESS:  You could not discuss.
6    We could not show outside of Merck.
7  BY MR. BIRCHFIELD:
8    Q.    So you could look at these lists that
9  you get from headquarters and see how much of
10  Vioxx a particular doctor was prescribing; right?
11    A.    Well, I could see if they had
12  prescribed Vioxx or other medications.
13    Q.    So not only Merck drugs, but you had
14  information about how much he was prescribing of
15  your competition; right?
16    A.    Yes, I had that information.
17    Q.    So you would know when you went to see
18  a doctor if he was prescribing more Celebrex than
19  he was Vioxx; right?
20    A.    Yes, I could see that.
21    Q.    And then you would use that
22  information but you wouldn't let the doctor know
23  that you were tracking his prescribing habits;
24  right?

[59:1] - [59:9] 11/1/2006 Melissa McAllister

page 59
1        THE WITNESS:  I would use that
2    information as my background information
3    because we have to sign a contract.  I mean,
4    it's part of our policies that that information
5    is confidential and it's background use only.
6  BY MR. BIRCHFIELD:
7    Q.    And then in the video that we just saw
8  about Vioxx, it talked about the GI risk and
9  emphasizing the GI risk.  Tell us about that.

[59:11] - [59:21] 11/1/2006 Melissa McAllister

page 59
11        THE WITNESS:  You know, I don't
12    remember seeing the video.  All I know is

13    from -- in the beginning when we were first
14    starting to talk about Vioxx, it was a new

failure to warn claim.

*Overrule*

[59:7] - [59:21]
**Deft's Obj.:** Relevance
(witness testified that she
did not recall whether she
attended relevant meeting
and does not remember
seeing the video); lacks
foundation; counsel
testifying; calls for
speculation; calls for
narrative

**Pl's Resp.:** Witness
testified that she attended
meeting where the video
was played but didn't know
if she saw it because
we had training videos on
"other issues."  Goes to
witness's credibility.
Plaintiff will add p. 60:2-8.

60

2    Q.    Now, you
attended the 2S '01 meeting;
3  right?

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

15  class and, you know, the whole reason for it

16  coming out was that it was -- you know, it was

17  to be safer on the stomach because of the COX-2

18  inhibitions as opposed to the generic older
19  NSAIDs and that's just one of the things in the
20  approved message because it was a COX-2, we're
21  looking at a safer profile as far as GI.


[59:23] - [60:1] 11/1/2006 Melissa McAllister


page 59
23  Q.     Are you saying that you never saw this
24  video?
25  A.     I just don't remember seeing it.  I
page 60
really don't.


[61:4] - [61:11] 11/1/2006 Melissa McAllister


page 61
4  Q.     Ms. McAllister, can you tell me what
5  training videos or what videos you've seen
6  regarding Vioxx, period, in your training, in
7  your tenure with Merck?
8  A.     I really -- I can't recall a
9  specific -- I mean, we've had training videos on
10  other -- other issues.  I really can't remember
11  specific one.  I'm sorry.


[61:12] - [62:6] 11/1/2006 Melissa McAllister


page 61
12  Q.     Okay.  So you know that you've seen
13  training videos, you just can't remember them
14  specifically?
15  A.     Right.

4        MR. HOURIHAN:
Object to form.

5        THE WITNESS:
If I was there and it

6  was shown, I probably
did see it but I don't
7  remember.  I don't
remember it specifically.  I
8  don't.

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

16   Q.   Now, I want to show you the next
17 segment of the Be the Power video that we watched
18 earlier and then I want to ask you questions
19 about this segment; okay?
20     (WHEREUPON THE VIDEO WAS PLAYED.)
21 BY MR. BIRCHFIELD:
22   Q.   After seeing that segment, do you
23 specifically remember whether you saw this back
24 in 2001 or at any time while you were --
25   A.   I don't remember seeing -- seeing this
page 62
1 but like I said, if it was shown, I probably did
2 see it. I just -- it's been a long time.
3   Q.   But what you saw here, I mean, that
4 was -- it's consistent with what Merck was
5 telling you about the safety risk and stuff of
6 Vioxx; is that right?

[62:8] - [64:4] 11/1/2006 Melissa McAllister

page 62
8     THE WITNESS: As far as that -- I'm
9 not real easily influenced, I guess, by
10 something like that. What I went by was what
11 bulletins that were issued to us as far as how
12 to address the issue, cardiovascular
13 information came up in the call and depending
14 on when -- you know, when that was, if it was
15 prior to VIGOR being put in the product label,
16 then I could make a verbal statement, oral
17 statement on it; and if the doctor wanted to
18 know about QA information or -- excuse me,
19 information in the prescribing information, I
20 could go to the CV card.
21     If they wanted information on VIGOR,
22 on the other hand, I could go to a PIR and that
23 was how we were to address those issues.
24 BY MR. BIRCHFIELD:
25   Q.   Okay. And the lady in this little
page 63
1 skit that was representing safety concerns and
2 MIs, do you recall that?
3   A.   Yeah, from what I just saw.
4   Q.   Okay. And she was kind of a whiny
5 little -- puny little woman; is that right?
6   A.   From the character she portrayed, it
7 appears so.
8   Q.   And when she was asked about safety
concerns and she's asked, I'm afraid Vioxx causes

**[61:16] - [65:16]**
**Deft's Obj.:** Relevance
(witness testified that she
did not recall whether she
attended relevant meeting
and does not remember
seeing the video); lacks
foundation; counsel
testifying

**[62:3] - [62:23]**
**Deft's Obj.:** Vague;

**[63:4] - [63:7]**
**Deft's Obj.:** 403; Lacks
foundation; counsel
testifying

*Overruled*

**Pl's Resp.:** Same as
above.

**Pl's Resp.:** Discussing
video which was recorded
with separate camera.
Not vague in context.
Witness agrees with
description.

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

10  Mis, do you recall -- do you remember seeing
11  that?
12     A.     Yes, I remember seeing that just then.
13     Q.     Now, Mis, that's heart attacks; right?
14     A.     That's what it does stand for.
15     Q.     And in this skit, she says that -- the
16  sales representative for Merck says that's not
17  true; remember?
18     A.     I don't remember exactly what --
19  there's a lot going on there, but from my
20  experience -- what is your question as far as --
21  is that what physicians --
22     Q.     No, my question is the sales rep in
23  this skit told the lady that was portraying the
24  safety concerns in the MI risk, she told them
25  it's not true that Vioxx causes heart attacks;
page 64
1  right?
2     A.     Well, from that skit, which is kind of
3  a make believe setting, that's what happened on
4  there.

[64:5] - [64:6] 11/1/2006 Melissa McAllister

page 64
5     Q.     And that's consistent with what Merck
6  was telling you about the heart attack risk?

[64:8] - [65:4] 11/1/2006 Melissa McAllister

page 64
8            THE WITNESS:  I would disagree.  That
9   was not how it was portrayed to us in bulletins
10   and how we had interactions with healthcare
11   professionals.  Like I've stated before, if the
12   CV issue came up with healthcare professional
13   prior to VIGOR being in the label, you know, I
14   had a certain thing that I could say, okay, are
15   you referring to VIGOR and if yes, you know,
16   that's usually what they were talking about
17   because it was everywhere out there.  So many
18   other resources of information that a doctor
19   has, conferences, journal articles,
20   competition, colleagues.  I mean, they talk
21   amongst themselves.
22            So, you know, before it became part

[63:15] - [64:4]                    Pl's Resp.:  Same.
Deft's Obj.: Lacks
foundation; counsel
testifying

Overruled

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

23    of the label, I can make an oral statement.
24    Then I could either provide what was on the
25    label because that's policy with Merck or with
page 65
1    the CV card or I could go and say if you're
2    wanting additional information on VIGOR, it's
3    outside of the product label, I can send you a
4    PIR.

[65:7] - [66:13] 11/1/2006 Melissa McAllister



page 65
7    that wasn't my question. My question was Merck
8    was telling you that it's not true that Vioxx
9    causes heart attacks.
10    A.    Merck issued bulletins giving us all
11    of the information on VIGOR with the background
12    information in there. After their studies, after
13    their scientific research on this, their
14    scientific conclusion, judgment was that the
15    difference was caused by naproxen cardio
16    protective qualities.
17    Q.    After the VIGOR results came out and
18    there was all of this attention that you're
19    talking about from the press releases and
20    competition talking about safety concerns, didn't
21    you want to know as a Merck representative, is it
22    true? Does Vioxx cause heart attacks? Didn't
23    you want to know the answer to that?
24    A.    Well, when the information came out
25    with all of the -- with, you know, of course, you
page 66
1    know, the great news was, yeah, we had the GI
2    information that, you know, solidified what we
3    had thought. You know, obviously the questions
4    that came out with the cardiovascular events,
5    well, yeah, there's going to be a concern.
6    You're like, well, what is that? What is this
7    about and I trust the scientists at Merck to
8    fully go into that, to look at the possibilities
9    and I trust that their decision was the correct
10    conclusion answer to why this had happened.
11    Q.    And you trusted the Merck scientist to
12    tell you the truth about the heart attack risks?
13    A.    And I believe they did.

[66:14] - [67:1] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 66
14    Q.    And they told you, no, Vioxx does not
15  cause heart attacks; correct?
16    A.    Their information that they sent to us
17  from their research -- I'm not a scientist, I'm
18  not part of MRL, Merck Research Laboratories but
19  the information that was given to us in bulletins
20  as background information, you know, keep it in
21  the context of the situation, that I trusted them
22  to give me the correct information.
23    Q.    When you were visiting doctors and
24  talking about Vioxx and they raise the safety
25  concerns, did you give them that clear of an
page 67
1  answer about whether Vioxx causes heart attacks?

[67:3] - [67:4] 11/1/2006 Melissa McAllister

page 67
3        THE WITNESS:  I gave them the answer
4    that I could give within the product label.

[67:6] - [67:7] 11/1/2006 Melissa McAllister

page 67
6    Q.    So you never told them yes or no,
7  Vioxx causes heart attacks?

[67:9] - [67:10] 11/1/2006 Melissa McAllister

page 67
9        THE WITNESS:  No, I did not talk
10   about that.

[67:12] - [67:14] 11/1/2006 Melissa McAllister

page 67
12   Q.    And you used the CV card to persuade

| | |
|---|---|
| **[66:23] - [68:9]**<br>**Deft's Obj.:** Assumes facts not in evidence; lacks foundation; calls for speculation | **Pl's Resp.:** Witness testifies that CV concerns after VIGOR were raised frequently by physicians. |



**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

13  doctors that there was not a heart attack risk;
14  right?


[67:17] - [68:9] 11/1/2006 Melissa McAllister


page 67
17          THE WITNESS:  Well, if an issue came
18  up about cardiovascular safety, like I said
19  before, I'm limited in what I can do as a
20  professional rep with Merck.  We have
21  guidelines.  We have policies.  I can give an
22  oral statement.  I could use the CV card and I
23  did use the CV card because it was information
24  that was consistent with our product label
25  which is what, defined as my job
page 68
1  responsibility, that's what I can do.  That's
2  what I can do.  And then if they wanted further
3  information regarding VIGOR so they could read
4  about it and form their own -- their own
5  conclusions.  I wasn't trying to convince them
6  of anything.  I just gave them the information
7  that was provided to me.  If they wanted
8  information on VIGOR, I could respond with a
9  PIR.


[68:11] - [68:23] 11/1/2006 Melissa McAllister


page 68
11    Q.      So you had a number of tools at your
12  disposal that Merck provided in dealing with
13  heart attack concerns raised by physicians;
14  right?
15    A.      I had -- yeah.  I had -- I was able to
16  respond verbally.
17    Q.      All right.
18    A.      And I was able to have a CV card.  I
19  had the PI and I was able to submit a PIR.
20    Q.      So you had the CV card at your
21  disposal; correct?
22    A.      During the time from when it was
23  published until it became part of our PI.


[68:24] - [69:19] 11/1/2006 Melissa McAllister

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 68
24    Q.    And you had PIRs at your disposal;
25 correct?
page 69
1    A.    Yes.  We had PIRs.
2    Q.    And you had other sales aids; correct?
3    A.    We had other -- yeah, other sales
4 aids.
5    Q.    And you had -- you had training on how
6 to handle the obstacle of safety or MI concerns;
7 right?
8    A.    We had training on all kinds of
9 aspects.  You know, like I said, we know the
10 complete and accurate information that's
11 contained in the PI and we are always trained on
12 that and whether it's, you know, we go over the
13 benefits and limitations, that's part of the full
14 circle of the -- of discussing it with the
15 physician.
16    Q.    And the -- all of these training
17 tools, these training aids that you had were
18 consistent in that Vioxx does not increase the
19 risk of heart attack; right?

[69:22] 11/1/2006 Melissa McAllister

page 69
22    Q.    It was a consistent message; right?

[69:24] - [70:2] 11/1/2006 Melissa McAllister

page 69
24          THE WITNESS:  It was part of the
25    bulletins that they sent out that that was --
page 70
1    their scientists conclusion was that Vioxx did
2    not cause heart attacks.

[70:4] - [70:8] 11/1/2006 Melissa McAllister

page 70

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

| | | |
|---|---|---|
| 4    Q.    Well, were these tools -- were you able to effectively use these tools to dismiss the concerns or convince the doctors that had concerns about Vioxx that there was no heart attack risk? | [70:4] - [70:24]<br>**Deft's Obj.:** Assumes facts not in evidence | **Pl's Resp.:** Witness testifies that CV concerns after VIGOR were raised frequently by physicians and that she was trained to neutralize those concerns. |

[70:10] - [71:1] 11/1/2006 Melissa McAllister

page 70
10        THE WITNESS:  Well, in the context of
11    being a representative, physicians know that we
12    have to stay within the product circular so the
13    information that I received from Merck, I had
14    the product circular.  I had the CV card so I
15    could talk as far as on label information
16    regarding cardiovascular safety, and then
17    Merck, you know, they -- the other resource was
18    if you wanted or if they needed more
19    information on VIGOR, we could submit it, but
20    until it became part of our PI, I can't --
21    can't disseminate the information.  It has to
22    come from a professional information request.
23 BY MR. BIRCHFIELD:
24        Q.    After the VIGOR results came out, were
25    you able to convince doctors that there was no
page 71
1    heart attack risk with Vioxx?

| | | |
|---|---|---|
| | [70:24] - [72:7]<br>**Deft's Obj.:** Assumes facts not in evidence; asked and answered; argumentative; badgering | **Pl's Resp.:** Same. |

[71:3] - [71:7] 11/1/2006 Melissa McAllister

page 71
3        THE WITNESS:  Again, like I said, --
4 BY MR. BIRCHFIELD:
5        Q.    Can you answer yes or no?  Were you
6    able to convince doctors, assure doctors that
7    there was no heart attack risk with Vioxx?

[71:10] - [71:11] 11/1/2006 Melissa McAllister

page 71
10        MR. BIRCHFIELD:  It's a
11    straightforward question.

*Overruled Witness is under cross + she is able to explain her position.*

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

71:12] - [71:15] 11/1/2006 Melissa McAllister

page 71
12        THE WITNESS:  I think it's not a yes
13    or no question.  It's a question of you're
14    asking before it became part of the product
15    label?

[71:17] - [72:10] 11/1/2006 Melissa McAllister

page 71
17    Q.    At any time.
18    A.    Well, I was able to give them the
19    information, the information that I had provided
20    to me that I could talk about depending on if it
21    was before label inclusion or after labor
22    inclusion.  You know, I don't convince
23    physicians.  I educate them.  I give them
24    everything.  I lay it out on the table.  You make
25    the decision.  You went to medical school.  I
page 72
1    don't have MD behind my name.  That's not what
2    I'm about as a representative for Merck.  We
3    believe in our products.  We have great products
4    that have done a lot of good.  A lot of patients
5    have benefited but like every product, you've got
6    benefits and limitations and we lay it out on the
7    table and they make the decisions themselves.
8    Q.    When you say you lay it out on the
9    table, you only lay out on the table what the
10   Merck scientists are telling you?

[72:12] - [73:6] 11/1/2006 Melissa McAllister

page 72
12        THE WITNESS:  Well, when I give out
13    the information, it was prior to label
14    inclusion.  I gave out what I could do because
15    it was part -- you know, oral statement, the CV
16    card, if they wanted more information
17    regarding -- well, what do you have that's, you
18    know, within your label.  We want to see some
19    those studies.  Well, no, I really want more

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

20    information on VIGOR.  Doctor, it's not on the
21    PI.  I can offer to send a PIR.
22  BY MR. BIRCHFIELD:
23    Q.    All right.  Let's look at the last
24  segment of this training video.
25        (WHEREUPON THE VIDEO WAS PLAYED.)


page 73
1  BY MR. BIRCHFIELD:
2    Q.    In the last segment of the -- of this
3  video skit that we saw, the sales reps used --
4  they kept saying data.  Do you remember that --
5  to fight off those obstacles?  Do you remember
6  that?


[73:8] - [73:13] 11/1/2006 Melissa McAllister


page 73
8        THE WITNESS:  From just watching it,
9  yes.
10 BY MR. BIRCHFIELD:
11   Q.    Is that what you were talking about
12 when you said, you know, that you would just lay
13 everything out on the tables for the doctors?


[73:16] 11/1/2006 Melissa McAllister


page 73
16   Q.    Lay the data out on the table?


[73:18] - [74:3] 11/1/2006 Melissa McAllister


page 73
18       THE WITNESS:  Depending on what issue
19 they came up, like I said, we would talk
20 about -- make sure we were on the same page.
21 Have you seen this and then look in the PI as
22 far as talking about to find out, you know,
23 what the prescribing information says using
24 approved resources, approved messages and if it
25 was something that was outside the product

| | |
|---|---|
| **[72:23] - [74:3]** | **PI's Resp.:** Witness |
| **Deft's Obj.:** Relevance | testified that she attended |
| (witness testified that she | meeting where the video |
| did not recall whether she | was played but didn't know |
| attended relevant meeting | if she saw it because |
| or whether she ever saw | we had training videos on |
| video); lacks foundation; | "other issues."  Goes to |
| counsel testifying | witness's credibility. |
| **[73:2] - [73:9]** | Plaintiff will add p. 60:2-8. |
| **Deft's Obj.:** Counsel | Relevant to failure to |
| testifying; lacks foundation; | warn claim. |
| mischaracterizes the | |
| evidence (actors did not | |
| "ke[ep] saying data") | |

**[73:11] - [74:3]**
**Deft's Obj.:** Vague with
respect to "that"; lacks
foundation

**PI's Resp.:**  Not vague
in context of video.

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 74
label, then I could send a PIR, so I had a lot
2   of resources to hopefully address their
3   concern.

[74:5] - [74:9] 11/1/2006 Melissa McAllister

page 74
5   Q.   Okay. Now, the CV card that you have
6   in front of you that's plaintiff's Exhibit
7   1.0008, that's the same -- I mean, this is just a
8   black and white copy of the CV card that was used
9   in that skit; right?

[74:11] - [74:24] 11/1/2006 Melissa McAllister

page 74
11        THE WITNESS:  I don't know.  I
12   couldn't see that far away.  I guess if that's
13   what was being used.
14   BY MR. BIRCHFIELD:
15   Q.   I mean, the actual CV card that you
16   used with doctors was a fold out -- a multi
17   colored fold out; right?
18   A.   From what I can remember, yes.
19   Q.   And it had the information that's
20   contained in plaintiff's Exhibit 8; right?
21   A.   Uh-huh (affirmative response).
22   Q.   All right.  And did you use data from
23   the CV card in addressing the cardiovascular
24   concerns with doctors?

[75:2] - [75:10] 11/1/2006 Melissa McAllister

page 75
2        THE WITNESS:  Well, before it became
3   the VIGOR study -- before VIGOR, before it was
4   in our product label; this was one of the
5   resources that Merck gave to us.
6   BY MR. BIRCHFIELD:
7   Q.   And did you use it, though?
8   A.   Yes, I used it.

**[74:5] - [93:20]**
**Deft's Obj.:** Relevance-
CV Card was not used with
the prescriber during the
relevant period. *See* 197:20-
198:16. Further, Ms.
McAllister has no knowledge
of <u>ever</u> using the CV Card
with the prescriber. *See*
195:3-6.
**[74:5] - [74:13]**
**Deft's Obj.:** Lacks
foundation; calls for
speculation.

**PI's Resp.:** Witness
testifies at 193:24-194:1-9
that it was her practice
to use the CV Card
with doctors and that
because it was her
practice she would have
used the CV Card with
Dr. Herrera.  The CV
card misrepresented the
CV mortality rate
associated with Vioxx
in comparison to
other NSAIDs.  Relevant
to Plaintiff's failure to warn
claim.


*Overruled*

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

| | | |
|---|---|---|
| 9   Q.   And you used the data from the CV card 10 to address the heart attack risk with doctors? | [75:9] - [75:16] Deft's Obj.: Assumes facts not in evidence; lacks foundation; vague with respect to "the heart attack risk" | PI's Resp.:  Same. |

[75:12] - [75:16] 11/1/2006 Melissa McAllister

page 75
12        THE WITNESS:  I used this as -- in
13   response to if they had a question about
14   cardiovascular concerns prior to VIGOR being
15   part of our label because this was part of our
16   label.

[76:8] - [76:10] 11/1/2006 Melissa McAllister

page 76
| | | |
|---|---|---|
| 8   Q.   Tell us the data from the CV card that 9  you would use with doctors in addressing heart 10  attack concerns. | [76:8] - [78:21] Deft's Obj.: Lacks foundation; assumes facts not in evidence; calls for speculation | PI's Resp.:  Same. |

[76:13] - [76:17] 11/1/2006 Melissa McAllister

page 76
13        THE WITNESS:  You know, in using this
14   piece to have a discussion with a physician
15   about questions they had about cardiovascular
16   with Vioxx, this first table, from what I can
17   remember --

[76:19] - [77:17] 11/1/2006 Melissa McAllister

page 76
19   Q.   Let me make sure that we're on the
20   same page.
21   A.   Uh-huh (affirmative response).
22   Q.   And that the jury is able to follow
23   us.  So you're on the first page, the one that we
24   looked at earlier, is that correct?
25   A.   Uh-huh, percentage of patients at base
page 77
line.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

```
12   Q.    Okay.
     A.    I probably would go over this table
4    and talking about the percentages and that the
5    mean age was 63.  So, you know, Doctor, is this
6    what a lot of your patients that you're thinking
7    about maybe prescribing Vioxx to?  Do they have
8    similar characteristics?  Do they have
9    hypertension?  Do some of them have high
10   cholesterol?  Are they around the age of 63, so
11   kind of see if this looks -- because, you
12   know, -- you know, these were patients that had
13   had some issues as far as hypertension, blood
14   pressure, smokers.
15   Q.    And would you use this to assure the
16   doctor that for high risk patients, heart attack
17   risk patients that Vioxx is safe?
```

[77:19] - [78:6] 11/1/2006 Melissa McAllister

```
page 77
19         THE WITNESS:  No, I wouldn't use this
20   as a way to assure.  I would just say, you
21   know, this is information from our OA studies
22   and this is the patient mix that was in there.
23   Hopefully, you can see that it wasn't, you
24   know, someone that was 25 without any problems
25   at all, that this had a good representation of
page 78
1    maybe that would be seen in your patient
2    population.  I don't know, what do you think,
3    Physician?
4    BY MR. BIRCHFIELD:
5    Q.    Okay.  All right.  Anything else?  Any
6    other data that you would use?
```

[78:9] - [79:21] 11/1/2006 Melissa McAllister

```
page 78
9          THE WITNESS:  As far as -- you know,
10   maybe I would only have time for this page.
11   You know, it just depended on, you know,
12   obviously a physician, what they were asking,
13   but we always had the selected safety
14   information and that was, you know, a great way
15   to bring in fair balance into the discussion,
16   just talking about starting at the lowest dose,
```

17   that within said most spontaneous reports of
18   fatal GI events are in elderly or debilitated
19   patients so special care should be used, just
20   information the doctor needs to make the best
21   choice for the patient.
22 BY MR. BIRCHFIELD:
23   Q.   And when you say -- you talked about
24 the selected safety information, you talked about
25 a fair and balanced presentation; right?
page 79
1   A.   Right.
2   Q.   Okay.  And there's not anything in
3 here that would suggest that there have been any
4 studies that would raise a concern about heart
5 attack risk, is there?
6   A.   Well, this card, this resource that we
7 had was used before VIGOR was part of our product
8 label and so anything that's, you know, given to
9 us as a resource that's approved by the FDA and
10 it has to be either on or consistent with the
11 product label.
12   Q.   Is it your understanding that the FDA
13 just tells Merck what goes in the label and Merck
14 just does exactly what the FDA says?
15   A.   I'm not part of the regulatory -- I
16 don't work at the FDA and I don't know how all of
17 that works but it's -- I mean, FDA gives the
18 final approval on what is put in our PI and then
19 that translates into what approved messages and
20 resources we have.
21   Q.   But it's Merck's label, isn't it?


[79:23] - [79:24] 11/1/2006 Melissa McAllister



page 79
23   THE WITNESS:  Well, it's a -- are you
24   referring to the product label?


[80:1] - [80:8] 11/1/2006 Melissa McAllister



page 80
1   Q.   Yes.
2   A.   It's the product label that Merck, you
3 know, puts in the information but the FDA gives
4 final approval.  They have the final say as far
5 as what is printed and what's put in, say, the

[79:2] - [79:21]
**Deft's Obj.:** Lacks
foundation; calls for
speculation; calls for expert
testimony

**PI's Resp.:**  Same
response in regard to
CV card.


Overruled

**Dedrick v. Merck Co.**

**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

6  PDR.
    Q.     That's the way Merck's trained you
8  about how the label comes about?


[80:10] - [80:13] 11/1/2006 Melissa McAllister


page 80
10        THE WITNESS:  That's as limited as
11  knowledge I have but I do know that the FDA
12  approves the label before it becomes approved
13  as a product in the United States.


[81:10] - [81:14] 11/1/2006 Melissa McAllister


page 81
10   Q.     All right.  Looking at the -- at the
11  CV card, is there any other data that you would
12  use with a physician if you had time?
13   A.     If I had time?
14   Q.     Yes, about the heart attack risk?


[81:16] - [82:7] 11/1/2006 Melissa McAllister


page 81
16        THE WITNESS:  Like I said, this was
17  in response to if they have a question about
18  cardiovascular profile.  This was within the
19  PI, so this is -- you know, this is what's
20  contained in before this card was discontinued,
21  from what can I remember, once VIGOR became
22  part of the label in 2002.  So up until that
23  point, this is what we used because this was
24  what was in our PI or consistent with the PI.
25        So if they asked what studies can you
page 82
1  show me about cardiovascular event profile and
2  here's a great resource because it talks about,
3  you know, please, you know, look at this first
4  chart as far as cardiovascular thromboembolic
5  events, adverse events per hundred patient
6  years and go through every single one of those
    products.

| | |
|---|---|
| [81:14] - [82:7] | **PI's Resp.:**  Same |
| **Deft's Obj.:**  Calls for | response in regard to |
| speculation; assumes | CV card. |
| facts not in evidence | |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

82:9] - [83:13] 11/1/2006 Melissa McAllister


page 82
9    Q.    I'm sorry. Tell us were you are. Are
10 you still on the first page?
11    A.    No, I'm on the second page.
12    Q.    On the second page, okay. All right.
13 And you're talking about that first -- the first
14 table there that's cardiovascular thromboembolic
15 adverse events; right?
16    A.    Yes, in the OA clinical study so this
17 is part of our product label.
18    Q.    Now, thromboembolic, what does that
19 mean?
20    A.    It means clot, clotting, and, you
21 know, just, Doctor, would you please look at this
22 table and the incidence events was similar among
23 the groups and that's the information I would
24 convey.
25    Q.    And so this is the -- you would use
page 83
1 this information from these OA studies to assure
2 doctors that there was no heart attack risks with
3 Vioxx; right?
4    A.    I would use this information to say,
5 look, if you have concerns about cardiovascular
6 safety, I have a resource that I can use which is
7 the cardiovascular event card. Let's please look
8 at this which is concerning our OA studies which
9 are part of our product label.
10    Q.    And so this data that's included in
11 here, this table that you just pointed out,
12 that's favorable for Merck in regards to the
13 heart attack risk with Vioxx; right?


[83:15] - [83:23] 11/1/2006 Melissa McAllister


page 83
15         THE WITNESS: This information is
16 just the information that was part of our OA
17 studies. It doesn't say it's favorable or not.
18 It just said it was similar and that's part of
19 the label and that's what I can discuss with
20 physicians, just show them this information.
21 BY MR. BIRCHFIELD:
22    Q.    Well, look at it. Does it look

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

23  favorable to you or not?


[83:25] - [84:4] 11/1/2006 Melissa McAllister


page 83
25          THE WITNESS:  It doesn't say
page 84
1   favorable.  It says similar among these groups.
2  BY MR. BIRCHFIELD:
3    Q.    All right.  So would you consider that
4  to be favorable for Vioxx or not?


[84:6] - [84:12] 11/1/2006 Melissa McAllister


page 84
6          THE WITNESS:  I'm not a scientist but
7  from my experience, I would just say, Doctor,
8  these are incidents.  These were similar among
9  the groups.  That's the information I can
10  provide.  If they wanted further information
11  that was off label regarding VIGOR, then I
12  would have to go and offer a PIR.


[85:1] - [85:3] 11/1/2006 Melissa McAllister


page 85
1    Q.    Did Merck scientists ever tell you
2  that there were studies that showed an increase
3  risk of heart attacks?


[85:5] - [85:10] 11/1/2006 Melissa McAllister


page 85
5          THE WITNESS:  I'm not aware of these.
6  BY MR. BIRCHFIELD:
7    Q.    Okay.  But you agree with me that
8  there's not any studies in this CV card that
9  would raise concern about a heart attack risk
10  with Vioxx, correct?

| | |
|---|---|
| **[85:1] - [85:5]** | **Pl's Resp:**  Relevant |
| **Deft's Obj.:** Assumes facts | question since witness |
| not in evidence; foundation | testifies that she |
| | received all safety |
| | information from Merck |
| | scientists and she relied |
| | upon it when speaking with |
| | physicians. |

| | |
|---|---|
| **[85:7] - [85:15]** | **Pl's Resp.:**  Witness |
| **Deft's Obj.:** Lacks | used CV Card in |
| foundation; assumes facts | detailing doctors including |
| not in evidence; calls for | Dr. Herrera.  Sufficient |
| speculation | foundation. |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[85:12] - [85:15] 11/1/2006 Melissa McAllister

page 85
12      THE WITNESS:  The information
13  included in this card was consistent with our
14  PI and there was no -- there's no information
15  regarding that.

[85:17] - [85:19] 11/1/2006 Melissa McAllister

page 85
17   Q.    All right.  Any other data that you
18  would -- that you would use if you had time in
19  talking with doctors?

[85:21] - [86:18] 11/1/2006 Melissa McAllister

page 85
21      THE WITNESS:  You know, going through
22  this piece, as far as on the chart below what
23   we were just discussing on that same page.
24  BY MR. BIRCHFIELD:
25   Q.   Right.
page 86
1   A.   Talking about specific cardiovascular
2  thromboembolic events, the chart distinguishes
3  between MI, CVA, TIA and angina, unstable angina.
4   Q.   Uh-huh?
5   A.   That might be something else I would
6  talk about and just the fact that, you know,
7  just, Doctor, you know, Doctor, look at the
8  information, the incidence events was similar in
9  all the groups.
10   Q.   And these -- and this is based on the
11  OA studies; right?
12   A.   That's correct.
13   Q.   And OA, that's osteoarthritis, right?
14   A.   Osteoarthritis.
15   Q.   And the osteoarthritis studies that
16  are -- that make up this data in this table, were
17  they designed to look at heart attack risk?
18   A.   To my --

Overruled

[86:15] - [87:23]
**Deft's Obj.:** Lacks
foundation; calls for expert
testimony; vague

**Pl's Resp.:** Not vague in
context.  Referring to CV
Card.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

86:20] - [87:4] 11/1/2006 Melissa McAllister

page 86
20          THE WITNESS:  To my knowledge, I
21    don't know how exactly the design -- they were
22    OA studies, and these were the findings from
23    that study.  I don't know.  I'm not -- I wasn't
24    one of the scientists that developed the study.
25  BY MR. BIRCHFIELD:
page 87
1     Q.     In evaluating how much information or
2  how important a study is for a particular issue,
3  do you know if it makes a difference if the study
4  was actually designed for that purpose or not?

[87:6] - [87:11] 11/1/2006 Melissa McAllister

page 87
6          THE WITNESS:  I'm not one of those --
7    I'm not part of the group that decides the
8    protocol on studies so, you know, and like I
9    said, I would always preface it, this is from
10    our OA information and this was -- these are
11    results that were seen.

[87:13] - [87:16] 11/1/2006 Melissa McAllister

page 87
13    Q.     So whether these studies that are in
14  this CV card are actually good, valid information
15  to alleviate concerns of heart attack risks, you
16  don't know one way or the other, do you?

[87:18] - [88:1] 11/1/2006 Melissa McAllister

page 87
18          THE WITNESS:  I'm not a scientist so
19    I really don't have the expertise to comment on
20    something like that.  All I know is this is --
21    these are -- this is information that came out

# Dedrick v. Merck Co.
## Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

22   as far as side effects or other issues as part
23   of the label and this is how I discussed it.
24   BY MR. BIRCHFIELD:
25   Q.    You're just relying on the information
page 88
1   that Merck and Merck folks give you; right?


[88:3] - [88:16] 11/1/2006 Melissa McAllister


page 88
3          THE WITNESS:  I trust the information
4    that they give us and it's part of the PI that
5    the FDA has approved, yes, I totally trust it.
6   BY MR. BIRCHFIELD:
7    Q.    And -- all right.  You count on that
8    being good, reliable information to use with
9    doctors; right?
10    A.    I trust that it's scientifically based
11   and researched and I have full respect for our
12   scientists.
13    Q.    All right.  Any other -- any other
14   data that you would use from the CV card in
15   dealing with doctors about the safety concerns of
16   Vioxx?


[88:18] - [89:3] 11/1/2006 Melissa McAllister


page 88
18          THE WITNESS:  Well, like I've
19   mentioned before in previous answers, this was
20   in response to before VIGOR was part of our
21   label, and so I was able to use this if there
22   were questions about cardiovascular safety and
23   there's several different topics in here so I
24   think we've -- I mean, I...
25   BY MR. BIRCHFIELD:
page 89
1    Q.    Anything else in here, any other data
2   that you would use in talking with doctors about
3   safety concerns, if you had time?


[89:5] - [89:21] 11/1/2006 Melissa McAllister

[88:13] - [89:12]
Deft's Obj.: Assumes
facts not in evidence

PI's Resp.:
Referring to CV
Card which is being is
being discussed.

*overrule*

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 89

6        THE WITNESS:  If I had time to
7    address cardiovascular questions before this
8    was -- VIGOR was put in our label, I would have
9    gone over the overall mortality rates, and that
10   included mortality -- overall mortality and
11   cardiovascular mortality and the fact that
12   Vioxx traditional NSAIDs and placebo were all
13   very similar.
14   BY MR. BIRCHFIELD:
15   Q.     Now, if we look at the total mortality
16   table and it has Vioxx .1, is that correct?
17   A.     .1.
18   Q.     And then it has NSAIDs, 1.1?
19   A.     Uh-huh (affirmative response).
20   Q.     And so that -- does that say that
21   there's 11 times the rate of mortality on NSAIDs
     than Vioxx?

[89:24] - [89:25] 11/1/2006 Melissa McAllister

page 89

24   Q.     Versus Vioxx?
25   A.     No.

[90:4] - [90:20] 11/1/2006 Melissa McAllister

page 90

4    Q.     Okay.
5    A.     No, that's not how I see it.  In
6    presenting this, I can only speak for myself.  I
7    don't know what anybody else has done but with
8    this type of data, you don't get into discussions
9    like that with physicians.  I think that's --
10   this is just saying, you know, here's the
11   information.  It's very similar.  You make the
12   choice.  What's best for your patient based on
13   this information.
14   Q.     So you would just show the physician
15   this information?
16   A.     Yeah.  I'd say, you know, look.  What
17   are your thoughts on this?
18   Q.     And you would -- if you had time, you
19   would show him this overall mortality rates;
20   right?

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

90:22] - [91:5] 11/1/2006 Melissa McAllister

page 90
22      THE WITNESS:  Well, I mean, if I had
23  time and this was a subject that they wanted to
24  go over, I would say we have information from
25  our OA studies that are consistent with our
page 91
1  product label and this is what I can go over.
2  This is what I can show you based on, you know,
3  what I can within the product label and this --
4  you know, look at the numbers and let them make
5  the decision.

[91:7] - [91:18] 11/1/2006 Melissa McAllister

page 91
7   Q.     Now, when we're talking about
8  mortality, we're talking about death rates;
9  right?
10   A.     Death rates.
11   Q.     And so if we're talking about total
12  mortality, we're talking about the total number
13  of people that died in that study; right?
14   A.     That's correct.
15   Q.     Okay. And if we're talking about the
16  second column, second row there is cardiovascular
17  mortality and that's talking about deaths related
18  to the heart; right?

[91:20] - [92:3] 11/1/2006 Melissa McAllister

page 91
20      THE WITNESS:  I don't know exactly
21  how they -- how they specified, you know, just
22  from my experience as a rep, total mortality
23  could mean everything from someone committing
24  suicide in a study to being in a car wreck.
25  It's everything that happens within that study.
page 92
1  Cardiovascular mortality is obviously anything
   that's cardiovascular, maybe not heart. It
   could be other vascular issues.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[92:11] - [93:1] 11/1/2006 Melissa McAllister

page 92
11   Q.    Well, in your experience -- you've
12  been dealing with doctors for years; right?
13   A.    That's correct.
14   Q.    In your experience in dealing with
15  doctors, is mortality rates for drugs -- is that
16  something that's important to them?
17   A.    Well, when you're discussing a
18  product, you go over the information from studies
19  in the product label.  I mean, they want to know
20  what, you know, what are the side effects and,
21  you know, how -- you know, if there were any
22  mortality.  Yeah, absolutely, you would talk
23  about that.
24   Q.    Okay.  And the -- and you could talk
25  to doctors and you would actually show them all
page 93
1  of this data; right?

[93:3] - [93:10] 11/1/2006 Melissa McAllister

page 93
3         THE WITNESS:  Well, during the time
4  period when VIGOR was published and, you know,
5  put in the product label, this is what we used
6  to talk about the cardiovascular safety of
7  Vioxx within the product label.
8 BY MR. BIRCHFIELD:
9   Q.    And was all of this information in the
10  product label?

[93:12] - [93:24] 11/1/2006 Melissa McAllister

page 93
12         THE WITNESS:  Well, as part of the OA
13  studies that were part of the label, you know,
14  our policy states that, you know, we have to
15  be, you know, consistent with the PI or, you
16  know, within label of the PI.  Now, how they
17  distinguish that, I'm not part of that decision

*Overruled*

[93:9] - [93:19]
**Deft's Obj.:** Lacks
foundation; calls for expert
testimony

**Pl's Resp.:**  Witness
testified that she is to
be fully conversant in the
information provided in the
label to perform her job.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

18   process. So this is what Merck was -- allowed
9   us to discuss.
20 BY MR. BIRCHFIELD:
21   Q.    Let me show you what's marked as
22 plaintiff's Exhibit P 1.0464.
23          Can you tell us if that is a
24 copy of the product label for Vioxx?


[93:25] 11/1/2006 Melissa McAllister


page 93
25   A.    Yes, it appears to be.


[94:3] - [94:16] 11/1/2006 Melissa McAllister


page 94
3  BY MR. BIRCHFIELD:
4   Q.    The product label -- this is the same
5  information that is printed in a PDR; correct?
6   A.    Yes, it is. It's printed in the PDR.
7   Q.    And a PDR is a big book, Physician's
8  Desk Reference that doctors typically have in
9  their office and they can look up information
10 about a drug; correct?
11   A.    Yeah, they can look up that.
12   Q.    So during this deposition when we've
13 talked about a product label or a product
14 circular, this is what we're talking about, this
15 exhibit; right?
16   A.    That's correct.


[94:20] - [95:17] 11/1/2006 Melissa McAllister


page 94
20   Q.    And if you'll look at the -- at the
21 back -- back page, the very last page down at the
22 bottom, there is a -- an issued date, the bottom
23 right-hand column, do you see that?
24   A.    Uh-huh (affirmative response).
25   Q.    And is this the product label that was
page 95
in effect in July of 2000?
A.    Well, based on the date, I would

*Overruled*

[94:12] - [94:16]
**Deft's Obj.:** Vague and
incorrect. Counsel is
presently showing witness
the 2000 label, but has not
made it clear that all other
questions pertain to this
particular label

**Pl's Resp.** 2002 label
discussed in deposition.

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

3 assume that that was what was being used.
   Q.   Okay.  And so this would have been a
5 product label that would have been in effect
6 after the VIGOR results were released but before
7 any information about VIGOR was included in the
8 product label; correct?
9   A.   I would think so.
10   Q.   Okay.  Well, I think we established
11 earlier that the label for Vioxx was changed to
12 include some information about VIGOR in April of
13 2002.
14   A.   April 2002.
15   Q.   Okay.  So before April 2002, the Vioxx
16 label did not include any information about
17 VIGOR; correct?

[95:19] - [95:22] 11/1/2006 Melissa McAllister

page 95
19       THE WITNESS:  Well, as far as, you
20 know, from what I can remember that the VIGOR
21 information was put into the Vioxx label in
22 2002.

[96:18] - [96:19] 11/1/2006 Melissa McAllister

page 96
18   Q.   Well, is there a difference in the
19 warning section versus the precaution section?

[96:21] - [97:3] 11/1/2006 Melissa McAllister

page 96
21       THE WITNESS:  Well, based on my
22 training, we're back in basic training as far
23 as the description of the PI and each one.
24 BY MR. BIRCHFIELD:
25   Q.   Basic training at Merck?
page 97
1   A.   Yeah, basic training.  The warning
2 section had -- there was a stronger warning as
3 versus the precautions.

*overruled*

**[96:18] - [97:3]**
**Deft's Obj.:** Lacks
foundation; calls for expert
testimony

**PI's Resp.:** Witness
testified that she is to
be fully conversant in the
information provided in the
label to perform her job.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[98:7] - [98:96] 11/1/2006 Melissa McAllister

page 98
7    Q.    And the stronger the warning, the less
8  doctors will prescribe a drug as a general rule;
9  correct?

[98:11] - [99:6] 11/1/2006 Melissa McAllister

11        THE WITNESS:  I'm not a doctor.  I
12   don't know how they make that decision as far
13   as, you know, the benefits versus the
14   limitations of the drug.  It's a -- it's their
15   call on an individual basis.
16  BY MR. BIRCHFIELD:
17   Q.    Well, you've been dealing with doctors
18  day in and day out on drugs and product labels
19  for about eight years now; right?
20   A.    Yes, I have.
21   Q.    Have you observed any effect that a
22  warning or a boxed warning would have on doctors
23  in prescribing a drug?
24   A.    Yes, I have experience because I've
25  sold Singulair for a long time.  It's one of our
page 99
1  asthma allergic rhinitis medications and out of
2  the competitors out there is Advair and it did
3  get a black box warning and it had no effect.
4    Q.    It had no effect?
5    A.    It was very minimal.  Doctors were --
6  they still used it.

Overruled

[99:17] - [99:20] 11/1/2006 Melissa McAllister

page 99
17   Q.    Is there anything in there that gives
18  the mortality rate or the cardiovascular
19  mortality rate in those studies?
20   A.    In that paragraph, there's no mention.

[100:4] - [100:12] 11/1/2006 Melissa McAllister

[99:17] - [100:23]
**Deft's Obj.:** Relevance- the
2000 label was not in effect
when Plaintiff was taking
Vioxx; nor was the CV card
use with the prescriber
during the relevant period

**Pl's Resp.:**  Dr. Herrera
was detailed by Witness
before and after label
change.  The information
provided to Dr. Herrera
through the label and
sales reps is relevant to
Plaintiff's failure to warn
claim since Dr. Herrera
testified had he known of

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 100
5    Q.   The paragraph is -- that is now on the screen, Ms. McAllister, is that the paragraph
6 that you were reviewing?
7    A.   Yes, it is.
8    Q.   Okay. And in that paragraph, there is
9 no mention of the mortality rate or the
10 cardiovascular mortality rate seen in the OA
11 studies; right?
12    A.   The label doesn't have that in there.

the CV risks he would not have prescribed the drug.

[100:13] - [100:15] 11/1/2006 Melissa McAllister

page 100
13    Q.   Yet that's the information that you
14 would use with doctors in presenting the CV card
15 data to them?

**[100:13] - [100:23]**
**Deft's Obj.:** Assumes facts not in evidence

**Pl's Resp.:** Details regarding CV card are have already been introduced into evidence.

[100:17] - [100:23] 11/1/2006 Melissa McAllister

*overruled*

page 100
17    THE WITNESS: Well, based on
18 resources Merck has given me, this OA study is
19 part of the product label and as my experience,
20 you know, eight years, sometimes you can
21 resubmit PIRs on information that might be
22 consistent but, you know, you want to have more
23 information on it.

[101:7] - [101:17] 11/1/2006 Melissa McAllister

page 101
7    Q.   You relied on Merck to give you the
8 good, valid information that you can present to
9 doctors; right?
10    A.   I trusted Merck as far as giving me
11 the information to provide to physicians.
12    Q.   And you didn't got back behind Merck
13 and check the information that they were giving
14 you making sure that it was appropriate and
15 accurate, did you?
16    A.   I trusted what they gave me and as far
17 as what's in the product label.

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

[106:22] - [107:11] 11/1/2006 Melissa McAllister

page 106
22   Q.     In addition to sales aids like the CV
23   card that we've talked about in detail, would
24   Merck sales representatives also be provided
25   copies of press releases that Merck did regarding
page 107
1   their drugs?
2     A.     I don't really recall if they gave us
3   press releases.  I can't think of a circumstance
4   right off the top of my head.
5     Q.     Well, you mentioned that following
6   VIGOR that there were press releases regarding --
7   regarding that study; correct?
8     A.     I'm *aware of them, yes.*
9     Q.     And you're aware that Merck issued
10   press releases confirming the cardiovascular
11   safety of Vioxx; correct?

[107:13] - [107:16] 11/1/2006 Melissa McAllister

page 107
13          THE WITNESS:  I'm aware that Merck
14   had press releases from, White House station is
15   where they come from, regarding the VIGOR
16   study.

[107:18] - [109:25] 11/1/2006 Melissa McAllister

page 107
18   Q.     And you mentioned earlier that Merck
19   would issue bulletins; correct, to their sales
20   reps dealing with different issues and there was
21   a bulletin about the CV card; correct?
22     A.     Yes, I'm sure there probably was a
23   bulletin regarding the CV card.
24   Q.     Let me show you what's marked as
25   plaintiff's Exhibit 1.0062 and ask if you can
page 108
1   identify that as a bulletin that was issued by
2   Merck regarding the CV card that we've been

*overruled*

| [107:24] - [108:3] | PI's Resp.: As outlined |
|---|---|
| **Deft's Obj.:** Relevance- | at p.193 of deposition |
| v Card was not used with | witness would have used |
| the prescriber during the | CV Card with Dr. Herrera |
| relevant period. *See* 197:20- | because it was her |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

3  talking about.
      MR. HOURIHAN:  Thank you.
5      THE WITNESS:  This is a bulletin that
6  is regarding cardiovascular card.
7  BY MR. BIRCHFIELD:
8    Q.    And you received this bulletin; right?
9    A.    If it was sent to all field personnel,
10  yes, I would have received that.
11    Q.    Let's look at the first paragraph
12  there where it says background.  Are you
13  following me?
14    A.    Yes.
15    Q.    It says the presentation of
16  information regarding the VIGOR, that's the VIGOR
17  study we've been talking about; correct?
18    A.    That's the VIGOR study.
19    Q.    And class trials, do you know what
20  class is?
21    A.    I only remember it was a study with
22  Celebrex but I don't remember details.
23    Q.    That it has led to some
24  misunderstanding in the field as well as with
25  physicians regarding cardiovascular effects of
page 109
1  Vioxx; correct?
2    A.    That's what the bulletin says.
3    Q.    What was the misunderstanding in the
4  field about the cardiovascular effects of Vioxx?
5      MR. HOURIHAN:  Object to the form.
6      THE WITNESS:  I don't remember.  I
7  don't remember a misunderstanding in the field.
8  I mean, if it there was, my experience was I
9  didn't have any misunderstanding.
10  BY MR. BIRCHFIELD:
11    Q.    Is there a reference to there being a
12  misunderstanding that Vioxx actually causes heart
13  attacks and Merck saying that's a
14  misunderstanding?
15      MR. HOURIHAN:  Object to the form.
16      THE WITNESS:  I don't know what came
17  before this or what came after it, so I don't
18  know what the misunderstanding is, what it
19  regards to.
20  BY MR. BIRCHFIELD:
21    Q.    Well, when you got this bulletin, did
22  you -- did you talk to your supervisors, what's
23  the misunderstanding?
24    A.    I don't -- I don't remember if I had a
25  conversation with my manager about this.

[111:24] - [112:5] 11/1/2006 Melissa McAllister

---

198:16.  Further, Ms.
McAllister has no knowledge
of ever using the CV Card
with the prescriber. See
195:3-6.

---

practice to do so.  Bulletin
issued to explain CV
Card to witness and other
sales reps is relevant.

---

Sustained
witness not familiar
Had no misunderstanding
So adds nothing

---

[109:3] - [109:9]
**Deft's Obj.:** Lacks
foundation; calls for
speculation

**Pl's Resp.:**  Question
relates to specific language
in Bulletin.

[109:11] - [109:19]
**Deft's Obj.:** Lacks
foundation; calls for
speculation

**Pl's Resp.:**  Question
relates to specific language
in Bulletin.

---

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 111
24   Q.    And who is -- who's Ed Scolnick?
25   A.    I don't know.  I don't know Ed
page 112
1  Scolnick.  I've heard of him.
2   Q.    Okay.
3   A.    Just up in the upper echelon of Merck.
4   Q.    The president of Merck research labs.
5  Does that sound right?


[112:7] - [112:9] 11/1/2006 Melissa McAllister


page 112
7         THE WITNESS:  I don't remember who
8  exactly he was, but he was -- he was high up in
9  Merck.


[112:18] - [112:25] 11/1/2006 Melissa McAllister

*Sustained*

page 112
18   Q.    Do you know what his response was to
19  the VIGOR study?
20   A.    I'm not part of his discussions.  I
21  don't know him.  No, I don't.
22   Q.    If Ed Scolnick said in writing that in
23  the VIGOR study, the CV events are clearly there
24  and that they are mechanism based and as we
25  worried it was, would that disturb you?


| [112:18] - [114:9] | PI's Resp.: Specific |
| **Deft's Obj.:** Lacks | question relates to Dr. |
| foundation; assumes facts | Scolnick's understanding. |
| not in evidence; improper | Not a hypothetical. |
| hypothetical; asks multiple | |
| times | |

[113:2] - [113:10] 11/1/2006 Melissa McAllister


page 113
2         THE WITNESS:  Again, I never saw any
3  communication like that.  I don't know the
4  context of what that was all said or written.
5  You know, I don't know -- I don't know anything
6  about that.
7  BY MR. BIRCHFIELD:
8   Q.    I mean, that's just the opposite of
9  what you were told by Merck about the heart

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

10  attack risk with Vioxx, isn't it?

[113:12] - [113:23] 11/1/2006 Melissa McAllister

page 113
12          THE WITNESS:  Well, like I said, I
13   don't know of this whatever you're referring
14   to.  I'm not -- I've never met him.  I don't --
15   I don't have any basis for knowledge of it.
16  BY MR. BIRCHFIELD:
17     Q.     Well, let me just, I mean, just ask
18   you, if Ed Scolnick was the president of Merck
19   research labs and one of the top scientists at
20   Merck, if he were to review the VIGOR study and
21   say that the CV events are clearly there and the
22   problem is mechanism based as we worried it was,
23   how would you react to that?

[113:25] - [114:9] 11/1/2006 Melissa McAllister

page 113
25          THE WITNESS:  I mean, I'd have to
page 114
1   know the whole -- the whole story.  I mean, I'd
2   probably want to talk to him personally about
3   it before I had any type of -- because, you
4   know, that sounds like it's a one snapshot
5   thing what came before and what came after it.
6   I don't know.  I don't know what that's based
7   on.  I don't know anything about that subject
8   based on my personal experience, I'm not
9   involved at that level at all.

[114:11] - [114:13] 11/1/2006 Melissa McAllister

page 114
11     Q.     So Merck scientist coming to that
12   conclusion, just knowing that, doesn't bother
13   you?

[114:15] - [114:19] 11/1/2006 Melissa McAllister

*Sustained*
*she doesn't know*
*what he said + what*
*context it was in and said*
*said she would have to*
*"talk to him personally"*
*about it - [ok] & body*
*type ... [opinion out]*

[114:11] - [114:19]
**Deft's Obj.:** Argumentative;
asked and answered;
assumes facts not in
evidence

**Pl's Resp.:**  Valid question
to ask Witness if she is
bothered that Merck
scientists had serious
*concerns* about the CV
safety of Vioxx when those
concerns were not

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

communicated to sales reps.

*Sustained*

page 114
15        THE WITNESS: From my experience, the
16   information that I got from Merck was through
17   the bulletin was that from the VIGOR study, the
18   differences were from naproxen having
19   cardioprotective qualities.


[114:21] - [115:7] 11/1/2006 Melissa McAllister

*Overruled*

page 114
21   Q.     And have you talked to anyone about
22   what the Merck scientists knew about Vioxx before
23   it was pulled off of the market?
24   A.     No.
25   Q.     You met with many, many physicians
page 115
1  about Vioxx while it was on the market; correct?
2   A.     Yeah, I had -- they were part of my
3  call deck. I saw them regularly.
4   Q.     And you provided them with information
5  that Merck had given you to assure them that
6  there was no cardiovascular risk with Vioxx;
7  correct?


[115:13] - [115:16] 11/1/2006 Melissa McAllister


page 115
13   Q.     While Vioxx was on the market, you
14   used the information that Merck gave you to
15   assure doctors that there was no cardiovascular
16   risk associated with Vioxx; correct?


[115:18] - [116:9] 11/1/2006 Melissa McAllister


page 115
18        THE WITNESS: While I sold Vioxx,
19   while I was promoting it with physicians, the
20   thing was was to educate the physicians on the
21   product and the information contained in the
22   product label. Before it became part of the
23   product label, I could say, are you referring

**[115:4] - [116:25]**
**Deft's Obj.:** Relevance (witness testified she did not recall if she had such discussions with prescriber); question asked 2x
**[115:4] - [116:19]**
Deft's Obj.: Assumes facts not in evidence; lacks foundation

**PI's Resp.:** Witness testified that she relied on information given to her in detailing doctors, including Dr. Herrera.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

```
24   to VIGOR. Let me give you an oral statement
25   that I can provide depending on when the
page 116
1    bulletin was issued direction and I could —
2    depending on what the doctor was wanting, you
3    know, what about on label? What is, you know,
4    something that, you know, you can talk about?
5    Well, let's took over the CV card. If the
6    physician wanted information on VIGOR, well,
7    I — you know, I couldn't discuss it. I mean,
8    I couldn't disseminate it. It wasn't part of
9    the product label so I would request a PIR.
```

[116:11] - [116:14] 11/1/2006 Melissa McAllister

```
page 116
11   Q.    You said that you promoted it to
12   doctors. You promoted it not knowing that it had
13   cardiovascular risk or a heart attack risk;
14   correct?
```

[116:16] - [116:19] 11/1/2006 Melissa McAllister

```
page 116
16        THE WITNESS: I've never and Merck
17   has never thought that it had a cardiovascular
18   risk associated with it, so I presented the
19   information that I had.
```

[116:21] - [116:22] 11/1/2006 Melissa McAllister

```
page 116
21   Q.    At least that's what Merck told you;
22   correct?
```

[116:24] - [116:25] 11/1/2006 Melissa McAllister

```
page 116
24        THE WITNESS: I have to follow the
25   policies of Merck.
```

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

[117:2] - [117:23] 11/1/2006 Melissa McAllister

page 117
2   Q.      Are you aware that -- well, let me
3   back up.  Who is Ray Gilmartin?
4   A.      Ray Gilmartin was the CEO of Merck.
5   Q.      And are you aware that the FDA issued
6   a warning letter to Merck about the promotion
7   activities regarding Vioxx?
8   A.      I remember information regarding that.
9   Q.      And you received a copy of that
10  letter; correct?
11  A.      I would assume I would have if it was
12  sent to all Vioxx representatives.
13  Q.      Do you know if it was sent to all
14  Vioxx representatives?
15  A.      Well, I mean, it would -- usually
16  that's -- from my experience, they send a
17  bulletin to all representatives who have
18  responsibility -- promotional responsibility for
19  Vioxx is probably what it would have said.
20  Q.      And do you remember getting a copy of
21  that warning letter?  Let me show you what's
22  marked as plaintiff's Exhibit -- there are two
23  copies there, plaintiff's Exhibit 1.0006.

[118:2] - [118:7] 11/1/2006 Melissa McAllister

page 118
2   Q.      Do you remember getting a copy of this
3   warning letter that's marked as plaintiff's
4   Exhibit 1.0006?
5   A.      I would probably have to see the
6   bulletin because I don't remember if it was
7   included as an attachment or not.

[118:21] - [119:11] 11/1/2006 Melissa McAllister

page 118
21  Q.      You see that the letter's addressed to
22  Ray Gilmartin -- Raymond V. Gilmartin, president
23  and CEO of Merck and Company; right?

[117:5] - [131:23]
**Deft's Obj.:** Ms. McAllister
testified that she did not
receive the Warning Letter
and does not remember
ever seeing a copy of it.
Further, the allegations
in the Warning Letter have
nothing to do with this
witness.  She has no
personal knowledge of the
Warning Letter and
counsel uses her as a prop
to pu the Warning Letter
in front of the jury.  Counsel
did not establish that the
letter came from the
witness's custodial file, as
it now claims.

**Pl's Resp.:**  A copy of
the Warning Letter was
found in the Witness's
custodial file. Witness
testified she was aware of
the letter and its contents.
p. 129:8-20 which appears
below.

*Overruled*

*This witness later
admits that she knew
about warning letter
also, it was in her file,
she is the one who (educates)
communicates to
Drs. so it is fair to
ask her what she was
communicating to comment
she was trained to commun-
icate + how + what*

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

24   A.   Uh-huh (affirmative response).
25   Q.   And in the center there, big bold
page 119
1   letters, it says warning letter; right?
2   A.   Yes.
3   Q.   And it's addressed to Mr. Gilmartin.
4   In that first paragraph says that this warning
5   letter concerns Merck and Company's promotional
6   activities and materials for the marketing of
7   Vioxx rofecoxib tablets; right?
8   A.   Yes.
9   Q.   And that's what you were involved in
10  were the promotional activities, marketing for
11  Vioxx; correct?


[119:16] - [121:20] 11/1/2006 Melissa McAllister


page 119
16   Q.   No, in general terms, you were
17  involved in the promotional activities of Vioxx;
18  correct?
19   A.   Well, it was one of my product
20  responsibilities as far as educating physicians
21  and providing patient resources and that type of
22  thing.
23   Q.   You promoted it to doctors?
24   A.   I talked to them about it.  I educated
25  them on it.
page 120
1   Q.   Just a few minutes ago in your answer,
2   you said that you promoted it to doctors.  Was
3   there something about promoting that causes you
4   some concern?
5   A.   No.
6   Q.   Okay.  You promoted it to doctors?
7   A.   Well, I promote but, you know, that
8   encompasses educating the physician.
9   Q.   Okay.  And let me continue,
10  specifically refer to promotional audio
11  conferences given on behalf of Merck by Peter
12  Holt, MD a press release and oral representations
13  made by Merck sales representatives to promote
14  Vioxx; correct?
15   A.   That's what it states.
16   Q.   Okay.  And then it continues, as part
17  of its routine monitoring and surveillance
18  program, the division of drug marketing
19  advertising and communication, that's DDMAC, is
20  that right?

*overruled*

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

21    A.    Uh-huh.
22    Q.    Has reviewed your promotional
23 activities and materials and has concluded that
24 had they are false, lacking in fair balance or
25 other misleading in violation of the Federal Food
page 121
1 Drug and Cosmetic Act and applicable regulations;
2 is that correct?
3    A.    That's what it states.
4    Q.    Okay. Would you consider that a
5 serious charge?
6    A.    Well, a warning letter from the FDA is
7 a serious matter and I'm sure Merck...
8    Q.    And do you remember -- do you remember
9 learning that Merck received a warning letter
10 from the FDA regarding its promotional activities
11 for Vioxx?
12    A.    Yes, I remember that.
13    Q.    And then the letter continues, you
14 have engaged in a promotional campaign for Vioxx
15 that minimizes the potentially serious
16 cardiovascular findings that were observed in the
17 Vioxx gastrointestinal outcomes research, VIGOR
18 study; right? That's the VIGOR study we've been
19 talking about; correct?
20    A.    That's what it says.



[121:21] - [123:3] 11/1/2006 Melissa McAllister


page 121
21    Q.    And thus, misrepresents the safety
22 profile for Vioxx. Specifically, your
23 promotional campaign discounts the fact that in
24 the VIGOR study, patients on Vioxx were observed
25 to have a four to five fold increase in
page 122
1 myocardial infarctions, MI -- that's heart
2 attacks; right?
3    A.    Yes.
4    Q.    Compared to the patients on the
5 comparator nonsteroid antiinflammatory drug,
6 NSAIDs, napersin or naproxen; right?
7    A.    That's what it says.
8    Q.    And that's consistent with what you
9 have been describing for us, the information that
10 Merck was providing to you about Vioxx; correct?
11        MR. HOURIHAN:  Object to form.
12        THE WITNESS:  I don't think I follow
13    you. What are you saying?

14  BY MR. BIRCHFIELD:
15    Q.    Merck was telling you that there was
16  no increased risk in heart attack risk with
17  Vioxx; correct?
18    A.    We just -- we got the information that
19  Vioxx -- there was an increased number of cardiac
20  events seen in that study but for our background
21  information, the belief or the -- they -- what
22  they decided was that naproxen had cardiac
23  protective qualities but that was background
24  information.
25    Q.    And Merck -- I mean, Merck is being
page 123
1  told by the FDA that that type of promotion is --
2  misrepresents the safety profile for Vioxx;
3  correct?

[123:5] - [123:10] 11/1/2006 Melissa McAllister

page 123
5         THE WITNESS:  Well, I can only
6  speak --
7  BY MR. BIRCHFIELD:
8    Q.    I'm just asking you what this
9  paragraph -- you agree that that's what this
10  paragraph reflects?

[123:12] - [124:7] 11/1/2006 Melissa McAllister

page 123
12        THE WITNESS:  That's what the
13  paragraph -- the words say.
14  BY MR. BIRCHFIELD:
15    Q.    And then in the -- the next paragraph,
16  although the exact reason for the increased rate
17  of MIs observed in the Vioxx treatment group is
18  unknown, your promotional campaign selectively
19  presents the following hypothetical explanation
20  for the observed increase in MIs.  You assert
21  that Vioxx does not increase the risk of MIs and
22  that VIGOR -- that the VIGOR finding is
23  consistent with naproxen's ability to block
24  platelet aggregation like aspirin; correct, I
25  read that correctly?
page 124
1    A.    That's what it says.

[122:25] - [123:6]
**Deft's Obj.:** Vague;
mischaracterizes the
evidence; lacks foundation;
hearsay

**Pl's Resp.:**  Question
uses same words as
contained in the Warning
Letter.  Warning Letter
falls within R.803(8)
exception to the hearsay
rule as the Court has
already ruled.



### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of *Melissa McAllister***

2    Q.    That is a possible explanation but you
3  failed to disclose that your explanation is
4  hypothetical, has not been demonstrated by
5  substantial evidence and that there is another
6  reasonable explanation that Vioxx may have
7  prothrombotic properties; correct?


[124:14] - [124:16] 11/1/2006 Melissa McAllister


page 124
14    Q.    And did Merck ever tell you that there
15  was no substantial evidence to demonstrate a
16  cardio protective effect of naproxen?


[124:18] - [124:22] 11/1/2006 Melissa McAllister


page 124
18        THE WITNESS:  I'm not part of the --
19    those discussions.
20  BY MR. BIRCHFIELD:
21    Q.    And again, Merck never told you that
22  Vioxx may have a prothrombotic effect; correct?

[124:21] - [125:4]
**Deft's Obj.:** Asked and answered

[124:24] - [126:1] 11/1/2006 Melissa McAllister


page 124
24        THE WITNESS:  The information that
25    was issued in bulletins was there was an
page 125
1    increased number of events but as the
2    background information in the bulletin stated,
3    it was seen from the naproxen cardio protective
4    properties.
5  BY MR. BIRCHFIELD:
6    Q.    And if you look on Page 2 in the
7  second paragraph, second sentence there, states
8  that your misrepresentation of the safety profile
9  for Vioxx -- and again, this is the FDA letter to
10  Merck; correct?
11    A.    Can you show me -- tell me again where
12  you are?
13    Q.    Yes, the second paragraph, second
14  sentence.



# Dedrick v. Merck Co.
## Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

15   A.   Okay.
16   Q.   Your misrepresentation of the safety
17 profile for Vioxx is particularly troublesome
18 because we have previously in an untitled letter
19 objected to promotional materials for Vioxx that
20 also misrepresented Vioxx's safety profile.  Did
21 I read that correctly?
22   A.   That's what the letter states.
23   Q.   Were you aware that the FDA had
24 previously objected to similar promotional
25 material that misrepresented Vioxx safety
page 126
1 profile?


[126:3] - [126:19] 11/1/2006 Melissa McAllister


page 126
3       THE WITNESS:  I'm not part of the
4   legal team of Merck, so I don't know of that.
5 BY MR. BIRCHFIELD:
6   Q.   So you're not aware?
7   A.   Yeah, I didn't know about it.
8   Q.   And then if you'll look at the last
paragraph on Page 3, where the FDA states in the
10 bottom paragraph, second sentence, there are no
11 adequate and well-controlled studies of naproxen
12 that support your assertion that naproxen's
13 transient inhibition of platelet aggregation is
14 pharmacodynamically comparable to aspirin or
15 clinically effective in decreasing the risk of
16 MIs.
17       Were you aware that there were
18 no adequate and well-controlled studies showing
19 the cardio protective effect of naproxen?


[126:21] - [127:9] 11/1/2006 Melissa McAllister


page 126
21       THE WITNESS:  I'm not one of the
22   scientists, so I'm not part of those
23   discussions.
24 BY MR. BIRCHFIELD:
25   Q.   Do you remember receiving a copy this
page 127
1 letter and becoming very alarmed about a
potential heart attack risk with Vioxx, a drug

| | |
|---|---|
| [125:23] - [126:7] | Pl's Resp.:  Counsel |
| Deft's Obj.: Assumes facts | is asking questions based |
| not in evidence; foundation | on the Warning Letter. |
| | Foundation is sufficient. |

*Overruled*

| | |
|---|---|
| [126:8] - [126:23] | Pl's Resp.:  Counsel |
| Deft's Obj.: Assumes facts | is asking questions based |
| not in evidence; hearsay; | on the Warning Letter. |
| foundation; calls for expert | Foundation is sufficient. |
| opinion | |

*Overruled*

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

3  that you were promoting?
4     A.    I mean, obviously any time a
5  pharmaceutical company is going to get a warning
6  letter, you want to see what it's about, but the
7  information that I had gotten from Merck stated
8  the opposite and I believed in it. I believed in
9  that information.


[127:10] - [127:11] 11/1/2006 Melissa McAllister


page 127
10    Q.    So you just thought the FDA just got
11  it wrong?


[127:13] - [128:11] 11/1/2006 Melissa McAllister


page 127
13         THE WITNESS: I don't know what the
14   FDA was thinking.
15  BY MR. BIRCHFIELD:
16    Q.    All right. But when the VIGOR study
17  came out, I mean, you knew that there was --
18  there was five times as many heart attacks on
19  Vioxx as there were on naproxen; correct?
20    A.    Number showed higher numbers cardiac
21  events versus naproxen.
22    Q.    And so one possible explanation is
23  that Vioxx is causing more heart attacks;
24  correct?
25    A.    There can be always other explanations
page 128
1  to a situation but Merck scientists looked at
2  this information and decided that this was the
3  reason and that was their scientific judgment on
4  it.
5    Q.    And Merck's scientists were telling
6  you it's not that Vioxx is causing heart attacks,
7  it's that naproxen is protecting the heart.
8  That's the explanation for the difference; right?
9    A.    The information that we received in
10  the bulletins, that's how it was described, but
11  it was considered background information for us.


[128:23] - [128:25] 11/1/2006 Melissa McAllister

overruled

[127:10] - [127:14]
**Deft's Obj.:** Lacks
foundation; hearsay

**Pl's Resp.:** Counsel
is asking questions based
on the Warning Letter.
Foundation is sufficient.
No hearsay.