### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 128
23    Q.    The FDA is telling Merck that there is
24  no adequate well-controlled studies supporting
25  your naproxen explanation; correct?


[129:2] - [130:3] 11/1/2006 Melissa McAllister



page 129
2          THE WITNESS:  I'm not a scientist.  I
3   look towards our scientists for what they said
4   and, you know, I don't know what happened after
5   this -- this warning letter.  Do you?  I mean,
6   what was the final resolution on it?
7  BY MR. BIRCHFIELD:
8     Q.    After this warning letter, you
9  continued to promote Vioxx to doctors believing
10  that there was no increased risk of heart
11  attacks; correct?
12    A.    Well --
13          MR. HOURIHAN:  Object to form.  Go
14  ahead.
15          THE WITNESS:  After this -- I mean,
16  the letter was issued out.  I mean, all of --
17  we knew of it, but we still -- I mean, as a
18  company, we still believed in that, there was
19  an increased number but it was based on
20  naproxen.
21  BY MR. BIRCHFIELD:
22    Q.    You believed that it was safe because
23  that's what Merck was telling you; correct?
24    A.    I believed it was a safe product based
25  on what the scientists said.
page 130
1     Q.    So you went into doctor's offices and
2  told doctors that it was safe because you
3  believed what Merck was telling you; right?


[130:5] - [130:18] 11/1/2006 Melissa McAllister



page 130
5          THE WITNESS:  I went to visit with
6  physicians.  We had discussions about this, and
7  like I said before, if it was prior to VIGOR
being in the label, I could make a verbal

**[128:23] - [129:6]**
**Deft's Obj.:** Lacks
foundation; hearsay

**PI's Resp.:**  Counsel
is asking questions based
on the *Warning Letter.*
Foundation is sufficient.
R. 803(8).

*Overruled*

**[130:1] - [130:14]**
**Deft's Obj.:** Assumes
facts not in evidence;
misrepresents prior
testimony

**PI's Resp.:**  No response
necessary.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

9    statement on the numbers of events seen in
10   VIGOR and if the physician wanted information
11   that was contained in the label, I had the CV
12   card as a resource or if they wanted
13   information regarding the VIGOR study, I could
14   give them that.
15   BY MR. BIRCHFIELD:
16      Q.    But you could never give a doctor a
17   yes or no answer as to whether or not Vioxx
18   increased the risk of heart attacks?


[130:20] - [131:23] 11/1/2006 Melissa McAllister


page 130
20         THE WITNESS:  Well, I couldn't give
21   them an information on that because the
22   information they were requesting was in regards
23   to VIGOR and because it wasn't part of our
24   product label or consistent with the product
25   label, I couldn't go into that so I could say,
page 131
1    let me send you some information, please read
2    it and you make your decision.  It's all up to
3    the physician.  It's not my convincing.  I
4    mean, you know, what a great world if we all
5    had the power of that, but you know, it doesn't
6    work that way.  It's called free will.
7    Physician gets the information, they make the
8    decision.  It wasn't me convincing.  Giving
9    them the information, what I could, what I
10   could send to them in a PIR.  They make the
11   decision for that patient.
12   BY MR. BIRCHFIELD:
13      Q.    And in making that decision, do you
14   think that it's important for the doctor to have
15   complete and truthful information?
16      A.    When I present information, I want it
17   to be complete and truthful from what -- from the
18   boundaries of what I have as far as what's in the
19   product label.
20      Q.    Because safety -- patient safety hangs
21   in the balance; right?
22      A.    Safety is one of the biggest elements
23   as far as when you're talking about medication.

[131:20] - [131:23]
**Deft's Obj.:** Vague; calls
for speculation; 403

**Pl's Resp.:**  Questions
about patient safety are
not unduly prejudicial
since Merck claims
Vioxx was and is safe.

[135:14] - [136:4] 11/1/2006 Melissa McAllister

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

page 135
14   Q.     Okay.  And when was your next
15 promotion after your professional representative
16 two in 2000?
17   A.     I think it was in 2003, I became
18 senior professional representative.  It was the
19 spring.
20   Q.     And the territory that you had when
21 you were based in Jackson, Tennessee, did that
22 include Waynesboro, Tennessee?
23   A.     It included Waynesboro.  When I first
24 started, there were some question if that was
25 part of our territory so I think after a few
page 136
1 months after I started, it -- we decided it was.
2 Management said, yeah, that we would cover it.
3 And then I think we stopped calling on them early
4 part of 2004.


[136:5] - [137:18] 11/1/2006 Melissa McAllister



page 136
5   Q.     When you say we, who are you talking
6 about?
7   A.     Our cluster, our group that was based
8 in Jackson, Tennessee.
9   Q.     And so the -- in the sales
10 organization, the smallest group is called a
11 cluster; is that right?
12   A.     Yeah.  The town that we were based in
13 is called a cluster.
14   Q.     And the cluster -- does that
15 include -- is that grouped by products or is it
16 just grouped geographically?
17   A.     It's grouped geographically.
18   Q.     So all of the Merck representatives
19 that worked out of Jackson, Tennessee would be
20 considered one cluster?
21   A.     Yes, we would be.
22   Q.     And then the next step up in the sales
23 organization is a district; is that correct?
24   A.     Yes, it would be a district.
25   Q.     And who was your district manager
page 137
1 while you were here in Tennessee?
2   A.     The majority of the time was Darrell
3 Baker, and then Keith Irwin was my manager from
like -- well, the beginning of 2004 until the

| [136:5] - [137:18] | Deft's Resp:  136:5 - 136:21 |
|---|---|
| Pl. Obj.:  137:6 - 137:18 | Relevant because |
| R. 401, R. 402. When Mrs. | necessary to explain the |
| McAllister last talked to Mr. | term "cluster," which is |
| Baker or Mr. Irwin is | used repeatedly sub- |
| irrelevant. | sequently.  136:22-137:18 - |
| | agree to remove. |

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

5 time I left, six months.
6 Q. Okay. When's the last time you talked
7 to Darrell Baker?
8 A. It was before I moved back to Oklahoma
9 City, so over two years ago.
10 Q. Is he still with Merck?
11 A. No, he's retired, I believe.
12 Q. When's the last time you talked with
13 Keith Irwin?
14 A. It was probably that June of 2004.
15 Q. Is there a supervisor for the cluster?
16 Does a cluster have any supervisor or management
17 below the district manager?
18 A. No.


[137:19] - [137:23] 11/1/2006 Melissa McAllister


page 137
19 Q. Okay. And so would Darrell Baker --
20 would he have been the district manager for
21 clusters other than the Jackson, Tennessee
22 office?
23 A. Yeah. He had basically my partner Lee


[139:5] - [139:25] 11/1/2006 Melissa McAllister


page 139
5 Q. In Waynesboro -- let me back up. From
6 the time that you moved to Jackson, Tennessee,
7 that was March 2001; correct?
8 A. Yes, that's correct.
9 Q. Until July of 2004?
10 A. Until June of 2004, through June 2004.
11 Q. Now, did you cover Waynesboro up until
12 June or did you stop in like January of 2004?
13 A. Yeah, I think we stopped, yeah, in
14 January.
15 Q. So from March 2001 to January 2004,
16 you covered the Waynesboro area?
17 A. Yes, we did.
18 Q. What doctors do you remember dealing
19 with in Waynesboro?
20 A. There was about five physicians there.
21 I don't know if I remember their names. There
22 was Dr. Herrera and Dr. Armeta in the one story,
23 single story and then there was three physicians

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

24  in the hospital, top floor of the hospital and I
25  can't remember their names.


[140:1] - [140:6] 11/1/2006 Melissa McAllister



page 140
1    Q.      Do you recall -- do you specifically
2  recall any conversations that you had with Dr.
3  Herrera or Dr. Armeta about Vioxx?
4    A.      I know I had discussions but specific,
5  I don't remember specifics of anything I
6  discussed with them.


[140:11] - [142:1] 11/1/2006 Melissa McAllister



page 140
11          THE WITNESS:  You mean just any
12    conversation or specific conversation?
13  BY MR. BIRCHFIELD:
14    Q.      Tell me any conversation you remember
15  with these doctors.
16    A.      Like I said, I can't remember -- I
17  mean, it's just kind of like bits and pieces in
18  my mind as far as having discussions with them,
19  but, you know, at the time based on my
20  experience, I mean, I would have had discussions
21  with them regarding Vioxx and Zocor and
22  Singulair.
23    Q.      And all I'm trying to do is
24  distinguish between what you know that you did
25  just because it's your habit, it was your
page 141
1  practice.
2    A.      Right.
3    Q.      Versus what you actually remember
4  about a conversation or an interaction that you
5  had with Dr. Herrera or Dr. Armeta or any of the
6  other doctors at Waynesboro.
7    A.      Uh-huh (affirmative response).  Well,
8  I mean, my day-to-day responsibilities, I
9  remember calling on them.  I remember the drive.
10  It was a very long drive and I remember being in
11  their offices and, you know, visiting with them,
12  but as far as recalling a specific, no, I don't.
13    Q.      Did you ever have any conversations --
14  do you specifically remember any conversations

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

15  that you had with any of those doctors in
16  Waynesboro about heart attack risk with Vioxx?
17      A.      No, we didn't have discussions
18  about -- if they brought up, you know, about
19  cardiovascular safety or wanting more
20  information, I would obviously go through what
21  the bulletins at that time allowed me to do.
22      Q.      Okay.  So you don't remember any
23  interaction that you had with Dr. Herrera, Dr.
24  Armeta or any of the doctors in Waynesboro that
25  would be different in any way from what we've
page 142
1  talked about all morning?


[142:3] - [142:8] 11/1/2006 Melissa McAllister


page 142
3           THE WITNESS:  What do you mean as far
4   as being -- I mean different?
5  BY MR. BIRCHFIELD:
6      Q.     In following the bulletins in the
7  training that you received from Merck about
8  dealing with cardiovascular issues and Vioxx?


[142:10] - [142:16] 11/1/2006 Melissa McAllister


page 142
10          THE WITNESS:  I mean, my dealings --
11  I speak for myself.  I'm trying to remember
12  back, you know, that that was what -- that was
13  my job was to discuss those products and, you
14  know, that was what I did on a regular basis so
15  I wouldn't have done anything differently there
16  than I would have elsewhere.


[142:17] - [143:6] 11/1/2006 Melissa McAllister


page 142
17  BY MR. BIRCHFIELD:
18      Q.     When you visited a doctor on a sales
19  call or a visit, did you make a note about what
20  took place during that visit?
         A.     Well, at some point early on with

**[141:22] - [142:16]**
**Deft's Obj.:** Vague and overbroad (e.g., "different in any way to what we've talked about all morning")

**Pl's Resp.:** Witness testified that she dealt with Dr. Herrera in her normal procedure for detailing doctors.  Prior testimony establishes what her normal practices were in detailing Vioxx.

Overruled

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

22 Merck, we had call notes. Is that what you're
23 referring to?
24    Q.    Right.
25    A.    Call notes were kind of -- if you
page 143
1 wanted them, you could. They weren't required
2 and I obviously -- I didn't -- I know I didn't
3 always put in call notes and they were just maybe
4 something I thought I'd put down but it was just
5 bits and pieces. It wasn't encompassing of the
6 whole interaction.


[145:16] - [147:2] 11/1/2006 Melissa McAllister


page 145
16    Q.    When you were in Jackson, Tennessee,
17 how many doctors did you actually call on?
18    A.    Oh, probably in the ballpark of 130 to
19 150.
20    Q.    And how often would you see a
21 particular doctor?
22    A.    Usually -- we were on a three week
23 route. So once every three weeks.
24    Q.    And if you were calling on Dr.
25 Herrera, would you be the only Merck
page 146
1 representative who was calling on Dr. Herrera?
2    A.    No, we would all call on him.
3    Q.    When you say all, who are you talking
4 about?
5    A.    The entire cluster.
6    Q.    How many representatives were in the
7 Jackson, Tennessee cluster?
8    A.    I believe it was eight.
9    Q.    So you would see -- you would see Dr.
10 Herrera once every three weeks?
11    A.    Yeah.
12    Q.    Generally?
13    A.    Generally, that would be the case.
14    Q.    Okay. And the -- and the seven other
15 representatives in the Jackson, Tennessee cluster
16 would also see Dr. Herrera every three weeks;
17 correct?
18    A.    I mean, that was the plan for the
19 cluster, yes.
20    Q.    And typically, how long would a visit
21 with a doctor last?
22    A.    Depends on the time. I mean, they're
23 very busy and a minute to two minutes.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

24   Q.     What about Dr. Herrera?
25   A.     I'd say about a minute to two minutes.
page 147
1    Q.     Anything different about Dr. Herrera
2    that stands out in your mind?


[147:4] - [147:8] 11/1/2006 Melissa McAllister



page 147
4          THE WITNESS:  Well, I mean, I call on
5    a lot of doctors.  You know, there really was
6    nothing unusual about him.  We usually would go
7    back to his office to talk to him so we weren't
8    out in the hallway.


[147:10] - [147:22] 11/1/2006 Melissa McAllister



page 147
10   Q.     In your experience as a professional
11   representative, have you -- have you observed
12   that some doctors rely or trust sales
13   representatives more than other doctors?
14          MR. HOURIHAN:  Object to form.
15          THE WITNESS:  I don't know how
16   doctors -- everybody's got different opinions.
17   I think it depends on where they like to get
18   their information as far as -- I mean, yeah,
19   they see us as one of their resources for Merck
20   information but, you know, we live in
21   information age.  They get information from a
22   lots of different resources.


[148:19] - [149:2] 11/1/2006 Melissa McAllister



page 148
19   Q.     Did you strive to be trustworthy and
20   to earn Dr. Herrera's trust?
21   A.     Well, I hope I did because I brought
22   him information.  I had -- you know, able to talk
23   to him, had patient resources for him and samples
24   so he could have trials for his patients so I
25   hope I was a good resource for him.
page 149

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

1   Q.    Well, it's important for you to have
2   the trust of the doctors you deal with, isn't it?


[149:4] - [149:6] 11/1/2006 Melissa McAllister


page 149
4        THE WITNESS:  I would hope that
5   that's what they would -- you know, human
6   nature to be able to trust someone.


[150:13] - [151:5] 11/1/2006 Melissa McAllister


page 150
13   Q.     And would that be submitted to your
14   district manager?
15   A.     Sent to our district manager and the
16   region office administrator.
17   Q.     Who was the regional manager while you
18   were here in Jackson, Tennessee?
19   A.     Darrell Baker.
20   Q.     I'm sorry, I thought Darrell was your
21   district manager.
22   A.     What did you say?
23   Q.     Who's regional manager?
24   A.     Oh, we don't have a regional manager.
25   When you say manager, you mean our director.
page 151
1   Q.     All right.  Who's the regional
2   director?
3   A.     Jude Dinges.
4   Q.     Jude?
5   A.     Jude, J-U-D-E, Dinges, D-I-N-G-E-S.


[160:11] - [162:23] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 160
11   Q.     Good afternoon, Mrs. McAllister.  As
12   you know, my name is Paul Hourihan and I
13   represent Merck and Company in this action and I
14   have some questions that I want to ask you both
15   to follow up on questions Mr. Birchfield asked
16   you earlier as well as to fill in a little more
17   information about your experience regarding

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

18  Vioxx.
19          First, can you please tell us a
20  little bit about yourself starting with where you
21  grew up?
22      A.      I was born and raised in Lawton,
23  Oklahoma and went to University of Oklahoma, my
24  bachelor's arts and letters and went on to school
25  of economics for my masters science in European
page 161
1  studies.  From there, I went to -- for employment
2  to WilTel and primarily in the event
3  coordination.
4      Q.      Okay.  Let me just break that down a
5  little.
6      A.      Uh-huh (affirmative response).
7      Q.      So where did you get your
8  undergraduate degree and when?
9      A.      University of Oklahoma in 1991.
10      Q.      You said you received a graduate
11  degree, as well?
12      A.      Yes, graduate degree in London School
13  of Economics in England and it was in -- a
14  masters in European studies.
15      Q.      And when was that?
16      A.      I received that in 1992.
17      Q.      And then you said you worked a company
18  called WilTel?
19      A.      WilTel.
20      Q.      And what kind of company was that?
21      A.      WilTel was telecommunications.
22      Q.      And we're in Memphis, Tennessee today,
23  correct?
24      A.      Yes, we are.
25      Q.      Where do you live now?
page 162
1      A.      I currently live in Oklahoma City,
2  Oklahoma.
3      Q.      How old are you, ma'am?
4      A.      37.
5      Q.      And are you married?
6      A.      Yes, I'm married.
7      Q.      Do you have children?
8      A.      I have one child, Claire.  She's 20
9  months.
10      Q.      And you are currently a Merck
11  employee?
12      A.      Yes, currently work for Merck.
13      Q.      Could you tell us what your current
14  job title is?
15      A.      I currently am a senior vaccine
16  representative.
17      Q.      And what are your responsibilities as

**[161:17] - [161:24]**
**Pl's Obj.:** R. 401, R. 402

**Deft's Resp.:** General
background of witness;
relevant to refute
contention that reps were
from sales backgrounds.

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

18 a senior vaccine representative?
19   A.   Responsibilities are to educate
20 physicians on Merck vaccines, the disease states
21 that incorporate those vaccines and I call on
22 physicians, nurses, county health departments so
23 theirs public health, as well.


[163:11] - [172:15] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 163
11   Q.   For what vaccine products are you
12 currently responsible?
13   A.   I'm currently responsible for
14 Gardasil, that's spelled G-A-R-D-A-S-I-L and it's
15 for -- it's indicated for prevention of cervical
16 cancer and genital warts in girls and women. I
17 also have responsibility for Vaqta, V-A-Q-T-A and
18 that's for hepatitis A and also Singulair which
19 is a tablet for allergies, seasonal allergic
20 rhinitis asthma and then I have secondary
21 responsibility for several vaccines, measles,
22 mumps and rubella, chicken pox vaccine, Hep-B,
23 hepatitis B, so all of the vaccines that Merck.
24   Q.   And before you became a vaccine
25 representative, what was your position with
page 164
1 Merck?
2   A.   Before that, I was a senior
3 professional representative.
4   Q.   And as a -- well, when did you first
5 join Merck?
6   A.   I first joined Merck on, I believe it
7 was April 19th of 1998.
8   Q.   And how was it that you came to work
9 for Merck?
10   A.   I had done research on the company and
11 had always thought it would be an incredible
12 place for a career and I came to employment
13 through a friend of the family that was a
14 business manager and submitted my resume and went
15 through the interview process.
16   Q.   What was it that made you want to work
17 for Merck?
18   A.   Well, Merck has always been known to
19 have incredible medications and vaccines, helped
20 a lot of people as far as preventing disease and
21 treating disease and strong ethical background,
22 very fluent type company that I really thought I
23 would enjoy working.

| | |
|---|---|
| [163:11] - [163:23]<br>Pl's Obj.: R. 401, R. 402 | Deft's Resp.: General background of witness; relevant to explain why witness might not now recall all the details of her Vioxx responsibilities. |
| [164:8] - [164:15]<br>Pl's Obj.: R. 401, R. 402 | Deft's Resp.: Relevant to refute notion that reps were motivated by money. |
| [164:16] - [164:23]<br>Pl's Obj.: Improper character evidence.<br>R. 404(a). | Deft's Resp.: Not character evidence; to the extent it is, not offered for purpose of proving action in conformity therewith (Fed.R.Evid.404 (a); relevant to refute contention that reps were |

*Overruled* (handwritten)

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

24   Q.     Presently, what geographic area are
25 you responsible for as a vaccine representative?
page 165
1   A.     As vaccine representative, I'm in
2 Oklahoma. I have western Oklahoma, southern
3 Oklahoma City and I30 divides Oklahoma in half so
4 I basically have the western part of the state.
5   Q.     At one point, were you a professional
6 representative for Merck in the state of
7 Tennessee?
8   A.     Yes, I was.
9   Q.     When was that?
10   A.     I started in Jackson, Tennessee March
11 of 2001 through June of 2004.
12   Q.     And how did you come to work in
13 Tennessee?
14   A.     My future husband, we gotten engaged
15 and he was actually in working in Jackson,
16 Tennessee.
17   Q.     So you were a professional
18 representative for Merck in Oklahoma?
19   A.     In Oklahoma.
20   Q.     And you came to Tennessee?
21   A.     Uh-huh (affirmative response).
22   Q.     Did you return to Oklahoma after that?
23   A.     Yes, I returned to Oklahoma.
24   Q.     How did that come about?
25   A.     We loved Tennessee, enjoyed it but had
page 166
1 family here and we really wanted to be back with
2 our family.
3   Q.     With Mr. Birchfield earlier today, you
4 discussed, to some extent, the training that you
5 received when you first joined Merck. Do you
6 remember that?
7   A.     Yes.
8   Q.     Can you elaborate on what the nature
9 of that basic training, I think you referred to
10 it as, was?
11   A.     Uh-huh (affirmative response). Basic
12 training when I went through was ten weeks long
13 and it was a very intense training because we had
14 to learn a great deal about pharmacology, medical
15 terms, the disease state of the product that we
16 would be representing. So, you know, the disease
17 state, the product label, the class of
18 medications, the other medications on the market.
19 We also were studying and were tested on policies
20 so it incorporated a lot of different aspects.
21   Q.     Where did that ten week training take
22 place?
23   A.     It was in Dallas, Texas.

**[165:22] - [166:2]**
**Pl's Obj.:** R. 401, R. 402

motivated by money.

**Deft's Resp.:** General
background of witness;
relevant to explain reason
rep no longer calls on
prescriber.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

| | | |
|---|---|---|
| 24    Q.    So did you actually stay down in<br>5  Dallas during the training?<br>page 167<br>1    A.    At some points, yeah, I would stay<br>2  down in Dallas and then we had some home study.<br>3    Q.    What were you actually doing while you<br>4  were at the training session? Where were you<br>5  located and what kinds of things were going on?<br>6    A.    I think it was Homewood Suites. I'm<br>7  not real sure but it was a place like that<br>8  because we were there for long periods of time<br>9  but we would -- I think there was 21 people in my<br>10  class and you would just be -- we were in<br>11  sessions all day long and then we had study<br>12  periods, you know. We had binders that were<br>13  rather large on the disease state that we were<br>14  studying and we would be tested almost on an<br>15  every other day basis.<br>16    Q.    Let me ask you about the testing.<br>17  What subject areas were you tested on?<br>18    A.    Well, it would correspond with the<br>19  products that I represented. I had Zocor which<br>20  is a cholesterol medicine so we learned about<br>21  hyperlipidemia, it's a medical term for high<br>22  cholesterol. I had Cozaar and Hyzaar which is<br>23  hypertension blood pressure medicine, Maxalt<br>4  which is a migraine medicine. Singulair which,<br>25  at the time, it had asthma indications so those<br>page 168<br>1  were the disease states that I learned about.<br>2    Q.    And were you tested on anything<br>3  besides disease states?<br>4    A.    Well, we were tested on the disease<br>5  state, the prescribing information and, like I<br>6  said, policies, pharmacology information, medical<br>7  terms.<br>8    Q.    And what did you have to get to pass<br>9  the test?<br>10    A.    You had to achieve 90 percent or<br>11  better.<br>12    Q.    And what happens if you didn't achieve<br>13  90 percent?<br>14    A.    Well, it was communicated to us that<br>15  if you failed or received below 90 percent for<br>16  three exams, that you could be terminated from<br>17  the program.<br>18    Q.    And other than that initial ten week<br>19  training period, have you received any other<br>20  training from Merck regarding products and<br>21  policies and all the other topics you described?<br>22    A.    Yeah, if new indications came out,<br>say, for instance, Singulair, we had allergic | **[167:3] - [169:9]**<br>**Pl's Obj.:** R. 401, R. 402<br>Location of training<br>irrelevant. Neither training<br>or testing related to Vioxx. | **Deft's Resp.:** Plaintiff<br>designated cross<br>examination testimony on<br>nature of training generally<br>(e.g.,21:20-23:25);<br>testimony re initial training<br>encompasses training on<br>Merck policies, which is<br>clearly relevant (see 171:<br>12-177:1); testimony<br>generally relevant to<br>showing that reps were<br>highly trained in science<br>issues and were trained to<br>educate doctors, not<br>manipulate them; 168:<br>4-9 necessary to explain<br>use of term "PI"<br>elsewhere.<br><br>Overruled |

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

24  rhinitis and so we could get disease background
5  on that and be tested and certified to talk about
page 169
1  that. New indications -- we were continually
2  required to take tests and to study and were
3  periodically just PI examined, as well.
4     Q.     Okay. You've used the term PI, I
5  think, a couple times. What does that
6  abbreviation stand for?
7     A.     It stands for product insert so it's
8  the product label for a product that's been
9  approved by FDA.
10    Q.     Okay. So when you use the term PI or
11 product insert or product label, that's all
12 referring to the same thing?
13    A.     Yes, it is.
14    Q.     And does prescribing information also
15 refer to the same thing?
16    A.     Yes, yes.
17    Q.     So when we're talking about those
18 different terms, be it label or product insert --
19 oh, excuse me. Is product circular another term
20 for the same thing?
21    A.     Yes, it is.
22    Q.     So regardless of whether we're using
23 the term PI or prescribing information or product
24 insert or product circular or label, those all
25 refer to the same --
page 170
1     A.     Yes.
2     Q.     -- thing?
3     A.     Same thing.
4     Q.     And what is that thing physically? I
5  mean, what does it look like?
6     A.     It's a document that has all the
7  information that Merck has submitted to FDA and
8  FDA has approved as part of what we can discuss
9  about that product. So it includes the
10 description, the pharmacology of it, indication,
11 contraindication, warning, precautions, adverse
12 events, dosage administration.
13    Q.     And who receives the copy of the
14 product label?
15    A.     Everybody receives a copy of the
16 product label. Once the product is approved,
17 that's what we use to educate our physicians with
18 and other healthcare professionals.
19    Q.     Well, do physicians have access to
20 that?
21    A.     Yes, they do. You know, we leave
22 copies of the PI when we are visiting with the
23 physicians. They have access to it on handheld

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

24  personal device software I've seen them use.
25  They have old fashioned PDR which is the
page 171
1  physician drug reference book, huge book with all
2  prescribing information in it.  Now -- I think
3  for a while on the internet, each drug has its
4  own web-site so there's several resources to
5  obtain the prescribing information.
6    Q.    The training that you had, both
7  initial basic training as well as the follow up
8  training, have you found it to be challenging or
9  easy?
10    A.    Oh, it's very challenging.  It's very
11  in-depth.  They really cover all the bases.
12    Q.    I think you said that the training
13  also covers policy?
14    A.    Yes, yeah.
15    Q.    What basic policies were you trained
16  on that govern your interactions with physicians?
17    A.    I think the main, you know, concept is
18  that we always provide complete and accurate
19  information about our product and that we always
20  have fair balance within a discussion.
21    Q.    And with respect to the complete and
22  accurate information you described, what is --
23  what's your source of that information?
24    A.    The prescribing information.
25    Q.    The label?
page 172
1    A.    The label, circular, PI, uh-huh
2  (affirmative response).
3    Q.    What's your understanding of who
4  determines what goes into a product label?
5    A.    I'm not part of that process.  I don't
6  know who comes up with that.  Someone at Merck
7  and the FDA and how that happens, I don't know.
8    Q.    What's your understanding of what the
9  FDA's role is with respect to product labels?
10    A.    I think it's very rudimentary as far
11  as what I know what the FDA looks for.  I think
12  they look at all the information.
13    Q.    And then what?
14    A.    They either approve the product or
15  they don't.

[172:18] - [173:9] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 172

In response to several questions

| [171:6] - [171:20] | Deft's Resp.: Relevant to |
| PI's Obj.: R. 401, R. 402. | showing that reps were |
| Self-serving R. 404 (a) | highly trained on science |
| testimony. | and on policies; 171:12-20 |

**[171:6] - [171:20]**
PI's Obj.: R. 401, R. 402.
Self-serving R. 404 (a)
testimony.

**Deft's Resp.:** Relevant to
showing that reps were
highly trained on science
and on policies; 171:12-20
particularly relevant to
explain what rules
governed reps'
interactions with doctors
and to set context for
subsequent discussions
terms "complete and
accurate" and "fair
balance;" in regard to
Fed.R.Evid.404(a), not
character evidence;to the
extent it is, not offered for
purpose of proving action
in conformity therewith
(Fed.R.Evid.404(a)).



Overruled

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

19 from Mr. Birchfield earlier today, you said that
20 in responding to physicians, you had to deliver
21 information on or consistent with the product
22 label. Do you remember that?
23    A.    Yes, I do.
24    Q.    What's your understanding as to why
25 you as a sales representative were constrained by
page 173
1 the information that was -- constrained to the
2 information that was on or consistent with the
3 label?
4    A.    It was, you know, based on the
5 policies that Merck has set up that we stay
6 within the product label and it has to be in the
7 product label or consistent with and that --
8 those were the policy that was set forth from day
9 one of basic training.


[173:20] - [181:7] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 173
20    Q.    How did -- how did Merck ensure that
21 the messages that you were delivering were on or
22 consistent with the product label?
23    A.    Well, the policy was to send out
24 bulletins specific to the products that we had
25 responsibility for, and in those bulletins, it
page 174
1 contained, you know, direction as far as what we
2 could discuss with physicians and then, you know,
3 to stay within the product circular.
4    Q.    Are you familiar with the term
5 approved message?
6    A.    Yes, I am.
7    Q.    And what does that term mean as used
8 at Merck?
9    A.    Merck would send out bulletins with
10 approved messages that would be encompassing
11 efficacy, safety, dosing, that type of thing.
12    Q.    Okay. In addition to what kinds of
13 things were approved messages, what was the
14 definition of that term?
15    A.    Well, an approved message was a
16 message that was taken from the product label or
17 consistent with the product label.
18    Q.    And were you also given certain
19 written materials that were approved for your use
20 with physicians?
       A.    Yes, we had pieces that were given to

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

22 us from Merck.
3     Q.     And what's your understanding of the
24 FDA's role with respect to whether or not you
25 could use certain written materials?
page 175
1     A.     From my understanding, when Merck
2 would come up with a piece for us to use, they
3 had to send it to the FDA for approval.
4     Q.     And what, if anything, were you
5 trained regarding deviation from the approved
6 messages and approved materials?
7     A.     Well, that was being -- that would be
8 inconsistent with policy and that was -- you
9 weren't -- you weren't allowed to do that.
10    Q.     What would happen if you did?
11    A.     Well, get in trouble, I mean, as far
12 as, you know, different disciplinary actions, I
13 suppose that they could take including
14 termination.
15    Q.     Now, you also mentioned a policy of
16 providing fair balance?
17    A.     That's correct.
18    Q.     What does the term fair balance mean?
19    A.     Well, fair balance is, you know,
20 you've got benefits and limitations to a
21 medication and you don't just -- all you talk is
22 about all the benefits. You also talk about the
23 limitations of the medication to a doctor.
24    Q.     And what are some examples of the
25 categories of information that would be part of
page 176
1 the limitation?
2     A.     A limitation would be maybe a type of
3 patient that you would need to make sure you
4 start with the lowest dose.
5     Q.     Let me ask a different question.
6 Where would you look on the label to find the
7 type of information that constitutes limitations
8 of the product?
9     A.     Well, it would be -- it can be under
10 the contraindications, warnings, precautions,
11 adverse events and even dosing. I mean, that
12 would constitute.
13    Q.     How often were you supposed to include
14 fair balance in your discussions with physicians?
15    A.     On every sales call.
16    Q.     Based on your eight and a half years
17 at Merck, how important are these policies
18 staying on or consistent with the label and
19 providing fair balance?
20    A.     Very important. I mean, that was
always instilled from the very beginning of my

**[174:23] - [175:3]**
**Pl's Obj.:** R. 602. Witness lacks personal knowledge. She is speculating as to whether Merck sends all sales pieces to FDA. Her lack of knowledge is clear as it relates to the CV Card. The witness testified that the CV Card was approved by the FDA when it was neither submitted or approved by the FDA.

**Deft's Resp.:** Witness testifying as to her own understanding; plaintiff's statement regarding CV card is both irrelevant and factually incorrect.



**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

22 career with Merck.
23   Q.   And did anybody ever tell you that was
24 okay to violate those policies in certain
25 circumstances?
page 177
1   A.   No.
2   Q.   How often are you retrained on those
3 policies of delivering approved messages and
4 providing fair balance?
5   A.   Well, as far as the first part, as far
6 as policies, we are on a quarterly or
7 semester-type basis.  We have to be tested on a
8 group of policies and so that, you know, revolves
9 each year and then as far as fair balance, that's
10 always a continual education, as well.
11   Q.   What do you mean by that?
12   A.   Just that, you know, we're always
13 making sure that we're always delivering the
14 complete story of the product.
15   Q.   During your details or your calls on
16 physicians, are there ever situations where a
17 doctor asks a question that you can't answer?
18   A.   Oh, absolutely.  That comes up quite
19 often because they're inquisitive people and they
20 want to know different information, if it's
21 something that's beyond the product label.
22   Q.   Let me interrupt you for a second.
23 First before you get to that, why is it that you
24 can't answer certain questions?
25   A.   Because their questions are referring
page 178
1 to something that is not part of the product
2 label.
3   Q.   Why can't you answer those questions?
4   A.   Because they're not part of the
5 product label and those conversations, we can't
6 have because they're not part of the FDA approved
7 product label.
8   Q.   And if a doctor asks you a question
9 that calls for information that's not from or
10 pertaining to the FDA approved product label,
11 what do you do?
12   A.   We ask them -- we tell them, you know,
13 I can't go into that because that's not part of
14 our product label but I can send for professional
15 information request, a PIR, to address the
16 question that he or she would have.
17   Q.   Okay.  And exactly how does the PIR or
18 professional information request process work?
19   A.   Well, it's an unsolicited request from
20 a physician, so in having a discussion, they
21 bring up a question or subject that's not part of

**[177:11] - [177:14]**
**Pl's Obj.:** R. 401, R. 402.
Self-serving. R. 404(a)
testimony.

**Deft's Resp.:** Not
character evidence;to the
extent it is, not offered for
purpose of proving action
in conformity therewith
(Fed.R.Evid. 404(a);
witness is explaining
preceding testimony;
statement that reps were
trained to "deliver[] the
complete story" clearly
relevant as it goes to the
key issues in the case.



**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

22  the PI. I asked if they would like one. They
23  say yes, so in -- it's a computer based, so when
24  I'm going in to my call information, I can go
25  into a subject of PIR and submit a PIR and it's
page 179
1  sent to them in the mail.
2      Q.      And what, if anything, is a
3  representative's responsibility after the PIR is
4  sent to the physician? Actually, before I ask
5  that, will the rep receive a copy of the PIR
6  that's sent to the physician in response?
7      A.      We are sent an electronic file
8  attachment that's downloaded into our computers
9  and it's a read only text and policy is that we
10  delete them after 60 days.
11      Q.      Back to my earlier question now. What
12  is the responsibility of the representative once
13  the PIR letter gets sent out to a physician?
14      A.      Really, the only thing that we can do
15  is, you know, did you get that because you want
16  to make sure that they did get because you
17  offered and you say you were going to do that and
18  hopefully that addressed their question.
19      Q.      And what, if anything, could a
20  physician do if he or she had a question about a
21  product for which he or she wanted an immediate
22  answer?
23          MR. BIRCHFIELD: Object to form.
24          THE WITNESS: In some instances, we
25  had to do a faxable PIR or if they wanted an
page 180
1  answer right then, I would give them the number
2  for the national call -- service call center
3  which is a big call center that has operators
4  and account type people that can help address
5  questions so depending on what they needed to
6  know, they could route them to the appropriate
7  person because in that case, like the PIR, it's
8  a physician to physician response.
9  BY MR. HOURIHAN:
10      Q.      That was my next question. Who is it
11  that actually sends the responsive letters when a
12  PIR comes in on behalf of a physician?
13      A.      It would be the Merck medical
14  services.
15      Q.      And are those doctors?
16      A.      Yes.
17      Q.      During the time that Vioxx was on the
18  market and I think you established with Mr.
19  Birchfield this morning, that was roughly spring
20  or May of 1999 through September of 2004.
21      A.      Uh-huh (affirmative response).

**[179:19] - [180:8]**
**Pl's Obj.:** R.401, R. 402.
There is no evidence that
Dr. Herrera made any
request for immediate
information from Merck.

**Deft's Resp.:** Explanation
necessary for jury to
understand that Merck
provided this option to Dr.
Herrera, even if he did not
use it, to refute contention
that Merck tried to hide or
withhold off-label VIGOR
data.

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

22   Q.      What was your job title and
23 responsibilities?
24   A.      During that time?
25   Q.      Yes.
page 181
1   A.      Well, when I first started in Lawton,
2 Oklahoma, I was a professional rep,
3 representative and as far as having
4 responsibility for Vioxx, it was -- when I was in
5 Oklahoma, it was a secondary product and then
6 when I moved to Jackson, Tennessee in March of
7 2001, it shifted into more of a primary product.


[182:11] - [185:23] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 182
11   Q.      Now, I think you said earlier that
12 Vioxx was a COX-2 inhibitor?
13   A.      Yes.
14   Q.      What is your understanding of what
15 COX-2 inhibitors are?
16   A.      COX-2 inhibitors are different from
17 the traditional NSAIDs that they provided the
18 pain relief but that they were -- they didn't
19 have COX-1 which is just that protective quality
20 for the stomach.
21   Q.      Let's break that down a little bit
22 maybe in nonmedical terms.
23   A.      Okay.
24   Q.      First off, what general, in layman's
25 terms, what type of drug is a COX-2 inhibitor
page 183
1 like Vioxx?
2   A.      Well, the class -- it's a pain
3 reliever and it's a different class than what had
4 been out before.
5   Q.      Okay. You said -- you used the term
6 NSAID?
7   A.      NSAID.
8   Q.      Is that nonsteroidal antiinflammatory
9 drug?
10   A.      Uh-huh (affirmative response).
11   Q.      And what kinds of drugs are NSAIDs?
12   A.      Like Ibuprofen, Aleve, I mean, those
13 kind of -- the ones that are on the market that
14 you can buy.
15   Q.      Kind you can buy at a drugstore?
16   A.      Yes.
17   Q.      And again, in layman's terms, what was

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

18 your understanding of what the basic difference
19 was between COX-2 inhibitor pain relievers as
20 compared to the traditional types of pain
21 relievers?
22    A.    Traditional pain relievers, they took
23 care of the pain but they also could cause
24 ulcers, bleeding ulcers in the stomach, GI issues
25 whereas the COX-2 inhibitors, because they were
page 184
1 more specific, more targeted in what they did,
2 they targeted the pain but they didn't also
3 target the stomach.
4    Q.    Now, based on your experience while
5 you were responsible for Vioxx, were the doctors
6 that you were seeing interested in learning about
7 COX-2 inhibitors?
8    A.    Oh, absolutely.
9    Q.    Why was that?
10    A.    Any time a new class comes out,
11 they're very interested in knowing about the
12 medication and in this case, because -- it was
13 different than anything they had had before and
14 they were very interested in the GI safety it
15 would offer.
16    Q.    Now, Vioxx was not the only COX-2
17 inhibitor on the market; correct?
18    A.    That's correct.
19    Q.    What other drug in that class was
20 available, at least in 1999 when Vioxx first came
21 into the market?
22    A.    Celebrex.
23    Q.    And who sold Celebrex?  Who
24 manufactured Celebrex?
25    A.    Phizer.
page 185
1    Q.    Was there competition between Phizer
2 and Merck with respect to these two drugs?
3    A.    Yeah, I would say there was
4 competition.
5    Q.    And how did that effect your job as a
6 professional representative?
7    A.    Well, I think you take it in stride as
8 far as, you know, knowing that that's out there
9 and that's -- that could be an issue but, you
10 know, we were really trying to -- we were new on
11 the market and just trying to explain what our
12 product offered for a physician's patients.
13    Q.    Were the Celebrex or Phizer
14 representatives talking to doctors about Vioxx as
15 well as about Celebrex?
16    A.    I would think they would have.
17    Q.    What makes you say that?

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

18   A.      It's just a competitive environment
19   and doctors routinely how do you rate against
20   Celebrex or they might ask the Celebrex rep how
21   do you rate with Vioxx.  They were trying to kind
22   of understand the differences in the drugs or,
23   you know, whatever.


[187:23] - [188:5] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 187
23   Q.      Was there any change in the policies
24   with respect to how you should interact with
25   physicians when you took on Vioxx in 1999?
page 188
1    A.      No.
2    Q.      Did anybody at Merck ever tell to you
3    deviate from the policies of staying consistent
4    with the label and providing fair balance with
5    respect to Vioxx?

|  |  |
|---|---|
| **[188:2] - [188:5]**<br>**Pl's Obj.:** R. 611 | **Deft's Resp.:** Objection to form waived at deposition (Fed.R.Civ.P. 32(d)(3)(B)). |


[188:7] - [188:13] 10/25/2006 McAllister, Melissa

Defendant's Affirmative Depo Designations

page 188
7            THE WITNESS:  No, they did not.
8  BY MR. HOURIHAN:
9    Q.      And with respect to Vioxx, did you --
10   well, with respect to Vioxx, were there ever any
11   instances in which you disregarded those
12   policies?
13   A.      No.

|  |  |
|---|---|
| **[188:7]**<br>**Pl's Obj.:** R. 611 | **Deft's Resp.:** See above. |


[188:16] - [193:18] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 188
16           You referred earlier today to
17   bulletins?
18   A.      Yes.
19   Q.      And you told Mr. Birchfield that from
20   time to time, you received bulletins from Merck
21   pertaining to Vioxx; is that right?
22   A.      Yes, I did.
23   Q.      What did those bulletins communicate
24   to you?

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

25  A.     Well, you know, it depended on, you
page 189
1  know, the time frame.
2  Q.     Okay. I don't want to know the
3  specifics but generally, what was the purpose
4  of -- what was your understanding of what the
5  bulletins were being sent to you for?
6  A.     Well, giving us direction on Vioxx and
7  as far as when VIGOR was published, had direction
8  and then once VIGOR was put in our PI, we had
9  direction on that.
10  Q.     Did any of the bulletins give you
11  instructions on how to respond to specific types
12  of questions from physicians?
13  A.     Yes.
14  Q.     And did some of the bulletins address
15  how to respond to questions about VIGOR or
16  cardiovascular safety issues?
17  A.     Yes, they did.
18  Q.     You answered a number of questions
19  earlier today from Mr. Birchfield about VIGOR.
20  What is your general recollection as to what
21  the -- what that study showed?
22  A.     Well, VIGOR was a study that was
23  looking at GI safety.
24  Q.     And GI is gastrointestinal?
25  A.     Gastrointestinal, stomach safety and
page 190
1  it looked at Vioxx versus naproxen.
2  Q.     What kind of drug is naproxen?
3  A.     It's an NSAID.
4  Q.     Does that have a brand name that folks
5  would recognize?
6  A.     Oh, I can't think of the name. I
7  guess Aleve, yeah, Aleve is that. So anyway, it
8  was looking at how -- the safety on the stomach
9  and at the end of the study, it did show that
10  there were fewer perforations, ulcers and bleeds
11  or basically that Vioxx did show it was safer on
12  the stomach. Then there were also findings as
13  far as cardiovascular. There was a higher
14  cardiovascular number of MIs or cardiac events
15  versus -- with Vioxx versus naproxen.
16  Q.     And I think we established just a
17  moment ago, that study was first disclosed to the
18  public when?
19  A.     In 2000, spring of 2000.
20  Q.     And what -- do you remember how Merck
21  disclosed those results in spring of 2000?
22  A.     I can only think of how -- I remember
23  how it was disclosed to us as through a bulletin.
     Q.     Do you remember whether it was

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

25  disclosed in any other manner in the year 2000?

page 191

1 For example, let me ask a more specific question.
2 Do you remember whether there was ever any
3 studies published pertaining to VIGOR?
4    A.    Yeah, I mean, I think there were
5 studies published and Merck issued press
6 releases, as well.
7    Q.    During that period immediately after
8 VIGOR was disclosed to the public in the spring
9 of 2000, were you as a professional
10 representative allowed to initiate discussions
11 about VIGOR?
12    A.    No, we weren't allowed to initiate
13 discussions.
14    Q.    And why not?
15    A.    Because it wasn't consistent or on the
16 product label.
17    Q.    Notwithstanding the fact that you
18 couldn't initiate discussions, did VIGOR
19 nevertheless come up in any of your conversations
20 with physicians?
21    A.    Yes, it did come up.
22    Q.    How frequently?
23    A.    Probably on a daily basis.
24    Q.    And if physicians weren't learning
25 about VIGOR through you initiating conversations

page 192

1 about it, did they tell you how they were
2 learning about it?
3    A.    I think a lot of it came from the
4 Phizer representatives bringing it up as part of
5 their call on a physician. It was being spoken
6 at conventions, conferences, that type of thing;
7 and there was a lot of press reports about it.
8 So several different avenues of information.
9    Q.    Now, I think we established a second
10 ago that the VIGOR data did not actually go into
11 the Vioxx label until April 2002. Prior to that,
12 did you receive bulletins instructing you how to
13 respond to questions about cardiovascular safety?
14    A.    Yes, we did.
15    Q.    And what -- generally speaking, what
16 was your instruction with respect to how to
17 approach doctors' questions about cardiovascular
18 safety?
19    A.    Well, we received different bulletins
20 and depending on the time frame and what the
21 direction was, that if we were asked about
22 cardiovascular safety, we could proactively, you
23 know, then say -- have a verbal statement
24 regarding the VIGOR study and then depending on

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

25  what the doctor wanted, we could say, would you

page 193
1  like for me to show you information that isn't on
2  product label or consistent with our product
3  label, the OA studies and cardiovascular event
4  card and/or if they wanted information regarding
5  VIGOR, then I would send a PIR.
6    Q.    Okay.  So you may have already
7  explained this, but just so it's clear, what
8  distinguished whether you used -- after you gave
9  your oral statement.
10   A.    Right.
11   Q.    What determined whether you utilized
12 the cardiovascular card or PIR or both?
13   A.    It's really what the physician was
14 wanting.  What information did they want?  Did
15 they want to see what had already been in our PI
16 or were they wanting to know about the VIGOR
17 study which was not part of the PI?  So it
18 depended on what they wanted.


[193:19] - [193:23] 11/1/2006 Melissa McAllister


page 193
19   Q.    Let me focus on the cardiovascular
20 card for a moment because you were asked a number
21 of questions about that by Mr. Birchfield
22 earlier.
23   A.    Uh-huh (affirmative response).


[193:24] - [194:9] 11/1/2006 Melissa McAllister


page 193
24   Q.    First off, do you know whether or not
25 you ever used the cardiovascular card with Dr.
page 194
1 Herrera?
2    A.    You know, it was my practice during
3 that time that, you know, when issues would come
4 up, that was the direction that I took, that is
5 was how we used that cardiovascular card so I
6 probably did but, you know, specific, I can't
7 remember specific exact time but it was my
8 general policy to use that if that's what the --
9 you know, physician wanted information on.

| | |
|---|---|
| [193:24] - [194:19]<br>**Deft's Obj.:** Relevant (witness testified CV card was not used with prescriber during relevant period) | **PI's Resp.:** As outlined at p.193 of deposition witness would have used CV Card with Dr. Herrera because it was her practice to do so.  Relevant to Plaintiff's failure to warn claim. |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

94:10] - [194:19] 11/1/2006 Melissa McAllister

page 194
10   Q.    Okay. And do you know whether or not
11  Dr. Herrera ever asked you for the type of
12  information that would cause you to utilize the
13  cardiovascular card as you sit here today?
14   A.    I can't recall a specific -- specific
15  time but it was -- you know, that was the
16  direction that we got was to address those
17  concerns if that, you know, occurred and if that
18  would have happened, I would have -- you know, I
19  would have used the cardiac card.

[194:20] - [194:21] 11/1/2006 Melissa McAllister

page 194
20   Q.    But is that speculation on your part
21  or are you testifying from memory?

[194:23] - [195:10] 11/1/2006 Melissa McAllister

page 194
23         THE WITNESS: I'm just saying that it
24   was my general practice at that time that if it
25   was -- if it were to come up, that's how I
page 195
1   would have handled the situation.
2  BY MR. HOURIHAN:
3   Q.    Okay. And just again, do you know
4  whether it came up with Dr. Herrera?
5   A.    I don't know if it came up with Dr.
6  Herrera.
7   Q.    Was the CV card the type of approved
8  material that you had referenced earlier that was
9  provided to you by Merck?
10   A.    Yes, it was.

[195:17] - [196:25] 11/1/2006 Melissa McAllister

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

page 195
17     Q.     Let me ask you to pull from the pile
18  of exhibits that Mr. Birchfield showed you
19  plaintiff's Exhibit 62 which I think is on the
20  top there.  It's the April 28th, 2000 bulletin
21  concerning the cardiovascular card.
22             In the middle of the second full
23  paragraph under the heading of background in bold
24  is the following sentence:  Cardiovascular card
25  is an obstacle handling piece and should only be
page 196
1  used with physicians in response to their
2  questions regarding cardiovascular effects of
3  Vioxx.  Do you see that?
4     A.     Yes, I do.
5     Q.     What did you understand that
6  instruction to mean?
7     A.     This wasn't something that we
8  proactively brought up.  It was in response to if
9  a physician brought up cardiovascular safety
10  regarding Vioxx, saying, you know, give them the
11  oral statement based on the direction of the
12  bulletin about VIGOR and if they wanted to have
13  information that was consistent with the product
14  label, this is when we'd use this.
15     Q.     Was the VIGOR data, the data that
16  wasn't yet in Vioxx's label contained in the
17  cardiovascular card?
18     A.     No, it was not.
19     Q.     Did you ever tell physicians that it
20  was contained in the cardiovascular card?
21     A.     No, I didn't.
22     Q.     Did you ever indicate to physicians
23  that the cardiovascular card contained all the
24  clinical data pertaining to cardiovascular
25  safety?


[197:2] - [197:16] 11/1/2006 Melissa McAllister


page 197
2             THE WITNESS:  No, I didn't.
3  BY MR. HOURIHAN:
4     Q.     What did you tell physicians was in
5  the cardiovascular card?
6     A.     Cardiovascular card, you know, had it
7  in black and white.  This is from our OA studies
8  which are part of the product label and here's
9  the information that I can disseminate to you.
10     Q.     And again, if a physician was

| | Pl. Obj.:  197:14 - 197:16 | Deft's Resp:  Agree to |
|---|---|---|
| | R. 611. Leading Question. | remove **197:14-16**. |
| | Witness is Merck | |
| | employee. Leading is | |
| | improper. | |

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

| | | |
|---|---|---|
| 11  interested in data, not from the OA studies but<br>12  from the VIGOR study, what would you do?<br>13  A.     Then I could offer to send a PIR.<br>14  Q.     Did you ever utilize the<br>15  cardiovascular card to try to withhold the data<br>16  from VIGOR from any physicians? | | |

[197:18] - [198:13] 11/1/2006 Melissa McAllister

| | | |
|---|---|---|
| page 197<br>18        THE WITNESS:  No, I didn't.<br>19  BY MR. HOURIHAN:<br>20  Q.     Did there come a time when you were<br>21  instructed to stop using the cardiovascular card?<br>22  A.     Well, when -- in spring of 2002 when<br>23  VIGOR became part of the product label for Vioxx,<br>24  then we discontinued using that card because the<br>25  product label had both what was on the<br>page 198<br>1  cardiovascular card and the VIGOR study.  It was<br>2  all together.<br>3  Q.     So at least from the point of April<br>4  2002 forward, did you -- is there any doubt in<br>5  your mind as to whether or not you used the<br>6  cardiovascular card with any physician?<br>7  A.     I wouldn't have used this card after<br>8  that.  It was, you know, to be discontinued,<br>9  destroyed or whatever that, you know, they said<br>10  but why would I --<br>11  Q.     Is there any doubt in your mind as to<br>12  whether or not you used the cardiovascular card<br>13  with Dr. Herrera after April 2002? | **[197:18] - [198:13]**<br>**Pl. Obj.:  197:18** R. 611.<br>Leading Question. Witness<br>is Merck employee.<br>Leading is improper. | **Deft's Resp:**  Agree to<br>remove **197:18**. |

[198:15] - [198:16] 11/1/2006 Melissa McAllister

| | | |
|---|---|---|
| page 198<br>15        THE WITNESS:  There's no doubt in my<br>16  mind.  I wouldn't have used that with him. | | |

[198:18] - [199:12] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

| | | |
|---|---|---|
| page 198<br>18  Q.     After April 2002, if Dr. Herrera had | **[198:18] - [198:25]** | **Deft's Resp.:**  Testimony |

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

| | | |
|---|---|---|
| 19  asked a question about the cardiovascular safety<br>20  of Vioxx, how would you have responded to such a<br>21  question?<br>22     A.     I would have gone over the information<br>23  in the product information including, you know,<br>24  data from the OA study and the data from the<br>25  VIGOR study. | **Pl's Obj.:** R. 602. Witness is speculating.  There is no evidence that Dr. Herrera asked for information. Improper hypothetical. | goes to habit or routine practice (Fed.R.Evid.406); also goes to allegation that Merck systematically withheld information re VIGOR. |
| page 199<br>1   Q.     Was there a bulletin that governed how<br>2  to respond to questions about cardiovascular<br>3  safety after the label changed?<br>4   A.     Yes.  It was a bulletin I can remember<br>5  because it was -- it was a mandatory -- it was<br>6  you must go out and talk about all aspects of the<br>7  new label change.<br>8   Q.     Was it your regular practice with all<br>9  physicians to deliver the approved messages that<br>10  were set forth in the bulletins that were in<br>11  effect at the time?<br>12   A.     Yes. | *Sustained*<br>*speculating.* | |

[199:13] - [199:20] 11/1/2006 Melissa McAllister

| | | |
|---|---|---|
| page 199<br>13   Q.     In your experience as a professional<br>14  representative and as a vaccine representative,<br>15  is it unusual for there to be a situation where<br>16  there is information about a drug available out<br>17  in the public but not yet incorporated into the<br>18  drug's label and, therefore, not something that<br>19  you as a representative can affirmatively<br>20  discuss? | **[199:13] - [199:20]**<br>**Pl. Obj.:** R. 611. Leading Question. Witness is Merck employee. Leading is improper. | **Deft's Resp:**  Necessary to develop the witness's testimony (Fed. R. Evid. 611c)) because (a) foundational question, and (b) subject matter not in controversy. |

*Overruled*

[199:22] - [201:24] 11/1/2006 Melissa McAllister

| | | |
|---|---|---|
| page 199<br>22          THE WITNESS:  Yes.  There are<br>23   circumstances where that happens.<br>24  BY MR. HOURIHAN:<br>25   Q.     And in those situations, how do you<br>page 200<br>1  find out -- how do you as a Merck representative<br>2  find out about the public information that's not<br>3  in the label?<br>4     A.     Well, Merck sends out bulletins in<br>regards to the products that we have | **Pl. Obj.:**  199:22 - 199:23<br>R. 611. Leading Question. Witness is Merck employee. Leading is improper. | **Deft's Resp:**  199:22 - 199:23 - see above. |

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

6  responsibility for and in bold letters, it says
background, for background use only.
8    Q.    And you used that term background with
9  Mr. Birchfield several times today. Can you just
10  elaborate a little bit on what background
11  information means as used at Merck?
12    A.    Well, at Merck, background information
13  would involve information that's about the
14  product but it's not in the product circular,
15  hasn't been FDA approved and it's just for our
16  background knowledge to keep things in the
17  context of the situation.
18    Q.    And when you say that to keep things
19  in the context of the situation, what do you mean
20  by that?
21    A.    Just I think for us to have a better
22  understanding of the product that we have
23  responsibility for.
24    Q.    And Mr. Birchfield asked you several
25  questions about Merck's scientist's conclusion
page 201
1  that the cardiovascular event rates in VIGOR were
2  the result of naproxen having cardio protective
3  effects and not the result of Vioxx causing heart
4  attacks. Do you remember those questions?
5    A.    Yes.
6    Q.    Was that conclusion of Merck
7  scientists background information?
8    A.    Yes, it was.
9    Q.    Was it ever an approved message?
10    A.    No, it was not.
11    Q.    And so what does that mean as with
12  respect to whether or not it was something that
13  you were ever authorized to say to physicians?
14    A.    I was never authorized to say that
15  because it was background information.
16    Q.    Mr. Birchfield showed you a copy of a
17  document that he referred to as the warning
18  letter?
19    A.    Yes.
20    Q.    And I think you said that -- well, let
21  me ask you again. Do you know whether or not you
22  ever saw a copy of that letter prior to today?
23    A.    I don't think I've ever seen a copy of
24  the actual warning letter.

[202:4] - [203:1] 11/1/2006 Melissa McAllister

Page 202

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

| | | |
|---|---|---|
| 4    Q.    Now, I think as Mr. Birchfield covered with you earlier, the warning letter addresses 6 several things including statements made by two 7 professional representatives at different 8 conferences and one speaker retained by Merck 9 regarding naproxen being cardio protective. 10 First, do you happen to know how many 11 professional representatives had responsibility 12 for Vioxx back in 2001? 13    A.    Probably in the thousands. 14    Q.    And do you happen to know how many 15 speakers were being utilized by Merck back in 16 2001? 17    A.    Probably in the hundreds. 18    Q.    So now focusing on the statements 19 regarding these two professional representatives 20 and this one speaker, did you ever tell any 21 physicians in a promotional setting that the 22 different cardiovascular adverse event rates in 23 VIGOR were explained by naproxen being cardio 24 protective? 25    A.    I personally did not. page 203 1    Q.    Did you ever tell Dr. Herrera that? | **Pl. Obj.: 203:1** R. 602. Witness does not have personal knowledge; she does not remember. | **Deft's Resp:** Witness did not testify that she remembered *nothing* about her interactions with Dr. Herrera; she testified that she did not remember specific conversations. She can still testify as to her custom/habit, and she previously testified (200:24 - 201:15; 202:18 - 202:25) that she did not discuss "background information" like the naproxen hypothesis with physicians. |

[203:3] - [203:8] 11/1/2006 Melissa McAllister

| | | |
|---|---|---|
| page 203 3        THE WITNESS: I mean, I wouldn't have 4 brought that up with any physician. 5 BY MR. HOURIHAN: 6    Q.    Did any of your colleagues ever tell 7 you that they had said something along those 8 lines to Dr. Herrera? | **Pl. Obj.: 203:3 - 203:4** R. 602. Witness does not have personal knowledge; she does not remember. **203:6 - 203:8** R. 801, R. 802. Hearsay. R. 602. Lack of foundation. | **Deft's Resp: 203:3 - 203:4** - see above. **206:6 - 203:8** - not hearsay because question goes to what witness was told; witness clearly has factual basis to testify as to what she was told. |

[203:10] - [203:15] 11/1/2006 Melissa McAllister

| | | |
|---|---|---|
| page 203 10        THE WITNESS: I have no reason to 11 believe they would bring that up. 12 BY MR. HOURIHAN: 13    Q.    Okay. But my question is, did any of 14 your colleagues ever tell you that they had? 15    A.    Tell me, no, they had not. | **[203:10] - [203:15] Pl. Obj.:** R. 801, R. 802. Hearsay. R. 602. Lack of foundation. | **Deft's Resp:** See above. |

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

[203:18] - [204:14] 10/25/2006 McAllister, Melissa

Defendant's Affirmative Depo Designations

page 203
18  Q.     What did you say to physicians with
19  respect to what was the correct explanation for
20  the cardiovascular adverse event rates in VIGOR?
21  A.     I didn't give an explanation either
22  way.
23  Q.     What did you do?
24  A.     Well, depending on if it was in the
25  label, the VIGOR study, like I said, I could give
page 204
1  an oral statement about it depending on the
2  bulletin at that time.  If they wanted
3  information on the OA studies that was in the
4  prescribing information, I could do that, but if
5  they are wanting to know about the VIGOR
6  information, that's what I could do is to submit
7  the PIR.
8  Q.     Okay.  How about after the label
9  changed in April 2002?
10  A.     I still didn't make a comment either
11  way.
12  Q.     What did you do?
13  A.     Just go over the information that was
14  part of the product label.


[204:25] - [209:4] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 204
25  Q.     Ms. McAllister, do you recall a Dr.
page 205
1  Esmereldo Herrera who practiced in Waynesboro,
2  Tennessee?
3  A.     Yes, I remember him.
4  Q.     Did you call on Dr. Herrera while you
5  were a professional representative with
6  responsibility for Vioxx?
7  A.     Yes, when I was in Jackson, I did call
8  on him.
9  Q.     Where was Dr. Herrera located?
10  A.     In Waynesboro, Tennessee.
11  Q.     And how far away is that from Jackson,
12  Tennessee where you were based?
13  A.     Probably a little over two hours.
14  Q.     And did you call on Dr. Herrera more
15  or less frequently than other doctors that you

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

16  called on?
17    A.    No, I didn't.
18    Q.    What was your relationship with Dr.
19  Herrera like?
20    A.    It was -- I he thought it was a, you
21  know, good relationship as far as between a
22  pharmaceutical rep and a physician.
23    Q.    Did he seem to you like he tried to
24  stay up to date on medical issues?
25    A.    Yes, I think so.
page 206
1    Q.    And did you have discussions with Dr.
2  Herrera about Vioxx?
3    A.    Yes, I did have discussions.
4    Q.    I think you testified to Mr.
5  Birchfield earlier that you don't recall any
6  specific conversations with Dr. Herrera about
7  Vioxx; is that right?
8    A.    That's true, nothing specific.
9    Q.    Do you have a -- what's your general
10  recollection as to whether or not you would have
11  had discussions about VIGOR or cardiovascular
12  safety with Dr. Herrera?
13    A.    If it came up, I mean, I promoted
14  Vioxx. It was a responsibility for Vioxx and so,
15  yeah, I would -- it would have been my routine to
16  talk to him about that.
17    Q.    How frequently were those sorts of
18  questions coming up when you were in Tennessee?
19  Let's talk about when you first arrived in
20  Tennessee sort of mid 2001.
21    A.    From what I can remember, you know,
22  issues came up with Vioxx.
23    Q.    How frequently? Let me make the
24  question more specific first. How frequently
25  were you getting questions about VIGOR or
page 207
1  cardiovascular safety in 2001?
2    A.    Probably daily.
3    Q.    And did you have any reason to believe
4  that those sorts of questions did not come up
5  with Dr. Herrera?
6    A.    I don't have any reason not to believe
7  they wouldn't.
8    Q.    Let me ask you to take a look at what
9  I'm going to mark as McAllister Exhibit 4, which
10  is a bulletin dated May 23rd, 2001.
11        (WHEREUPON, THE ABOVE-MENTIONED
12        DOCUMENT WAS MARKED AS EXHIBIT NO. 4
13        TO THE TESTIMONY OF THE WITNESS AND
14        IS ATTACHED HERETO.)
15  BY MR. HOURIHAN:

**[206:9] - [206:16]**
Pl's Obj.: R. 602. Witness
has no memory of any
conversation with Dr.
Herrera and is speculating.

**Deft's Resp.:** Testimony
goes to habit or routine
practice (Fed.R.Evid.406).

**[207:3] - [207:7]**
Pl's Obj.: Same as above.

**Deft's Resp.:** Testimony
goes to habit or routine
practice (Fed.R.Evid.406).

This is speculation
could bar on what
your general practice
But here it's couched
to Dr. Herrera + she
has no recollection
of talking w him

**Dedrick v. Merck Co.**
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

16    Q.      Do you have a copy McAllister Exhibit
17   4 in front of you, ma'am?
18    A.      Yes, I do.
19    Q.      Is this a -- can you identify what
20   this document is?
21    A.      It's a bulletin in regards to Vioxx.
22    Q.      And is this a bulletin that you
23   received?
24    A.      Yes, I would have received this
25   bulletin.
page 208
1    Q.      Is this the bulletin -- is this the
2   bulletin that would have been in effect in summer
3   of 2001 when you were first calling on Dr.
4   Herrera?
5    A.      Yes, I believe it would.
6    Q.      The title of this bulletin is action
7   required response to New York Times article. Do
8   you have a recollection about a New York Times
9   article that pertained to Vioxx that came out
10   around this time?
11    A.      Yes, I do remember this.
12    Q.      And what do you recall?
13    A.      Just that there was a lot of
14   information going on about it, a lot of talk.
15    Q.      A lot of information and talk about
16   what?
17    A.      As far as physicians bringing up this
18   article and news reports and that type of thing.
19    Q.      And what was the subject of the
20   article?
21    A.      Well, the subject was about the VIGOR
22   study.
23    Q.      In any particular aspect of VIGOR?
24    A.      I think it was talking about the
25   cardiovascular information involving VIGOR.
page 209
1    Q.      And so this bulletin was sent to you
2   all in the field to instruct you how to respond
3   to those sorts of questions?
4    A.      Yes.


[210:10] - [211:2] 11/1/2006 Melissa McAllister



page 210
10    Q.      Were you ever trained to avoid or
11   dodge doctor's questions about a product?
12    A.      No, we were not.
13    Q.      Did you ever do that, in fact, try to

### Dedrick v. Merck Co.
**Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister**

14  duck a question from a doctor?
15  A.    No, I did not.
16  Q.    What -- based on your experience, what
17  would happen if you as a professional
18  representative ducked or dodged or avoided a
19  question that a physician had about one of your
20  products?
21  A.    A physician would not find you as a
22  trustworthy source of information.
23  Q.    And how, if at all, would that effect
24  your job?
25  A.    Probably wouldn't get back to talk to
page 211
1  them.  They wouldn't -- they just would dismiss
2  you.


[213:25] - [215:23] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 213
25  Q.    And you said in your responses to Mr.
page 214
1  Birchfield that sometimes you could actually give
2  the actual cardiovascular event rates pertaining
3  to VIGOR?
4  A.    Yes.
5  Q.    Is that right?
6  A.    Uh-huh (affirmative response).
7  Q.    And is that contained somewhere in
8  this paragraph that you just pointed out?
9  A.    Yes, it has it in here.
10  Q.    Could you read the sentence that
11  you're talking about?
12  A.    Uh-huh (affirmative response).  It
13  says in the Vioxx GI outcomes trial, VIGOR, the
14  incidence of MI was .5 percent with Vioxx and .1
15  percent with naproxen.
16  Q.    So that's something you would have
17  said in response to a doctor who asked you a
18  question about cardiovascular at that time this
19  bulletin was in effect?
20  A.    Yes, that was the oral statement I
21  could give as of May 23rd, 2001.
22  Q.    So if Dr. Herrera asked you a question
23  along those lines in mid 2001 when you were first
24  calling on him, this was the first thing you
25  would say to him in response, this statement in
page 215
    here in paragraph that includes the sentence in
    Vioxx GI outcomes trial, the incidence of MI was

**[213:25] - [214:9]**
Pl's Obj.: Lack of foundation

*Overruled* (handwritten)

**Deft's Resp.:** Witness identified document she is testifying about; witness clearly has basis to testify about what she was permitted to say in response to questions about CV safety; testimony goes to habit or routine practice (Fed.R. Evid.406).

*This is close but when taken in abg it gets by. overruled* (handwritten)

**[214:22] - [215:5]**
Pl's Obj.: R. 602. Witness remembers no sales calls with Dr. Herrera and is speculating.

**Deft's Resp.:** Testimony goes to habit or routine practice (Fed.R.Evid.406).

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

3  0.5 percent with Vioxx and 0.1 percent with
4  naproxen?
   A.    That's correct.
6  Q.    And then you also referenced the
7  potential use of a PIR and/or cardiovascular
8  card?
9  A.    Uh-huh (affirmative response).
10  Q.    And how would that flow after you've
11  given this oral statement that we see here?
12  A.    Well, after giving the oral statement
13  in regards to VIGOR, you know, it -- you know,
14  what did the doctor want?  Ask them do you --
15  would you like more information than what's on
16  the product label, our OA studies that I can go
17  over or are you wanting information in regards to
18  VIGOR which I will send a PIR.
19  Q.    Did you feel that this particular
20  obstacle response that you were given was
21  responsive to the types of questions that you
22  were getting from physicians in 2001?
23  A.    Yes, I did.


[217:13] - [220:18] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 217
13  Q.    Mrs. McAllister, do you have a copy of
14  what's been marked as McAllister Exhibit 5 in
15  front of you?
16  A.    Yes, I do.
17  Q.    Can you identify that document,
18  please?
19  A.    It's a PIR, professional information
20  request.
21  Q.    Is it a request from -- well, who is
22  this letter from and who is it to?
23  A.    Well, it's from Merck Medical Services
24  and it's addressed to Esmereldo Herrera, Dr.
25  Herrera in Waynesboro, Tennessee and it was a
page 218
1  request given to Lee English and he obviously
2  submitted it in.
3  Q.    Okay.  So this is an example of the
4  responsive letter from Merck medical doctors to a
5  physician?
6  A.    Yes.
7  Q.    And it is in response to a PIR?
8  A.    Yes, a PIR.
9  Q.    And this particular document, which is
10  dated June 8th, 2001, was sent from Merck to Dr.

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

11  Herrera?
12  A.    Yes.
13  Q.    According to the first paragraph of
14  the document, it was sent in response to a PIR
15  submitted by Lee English; is that right?
16  A.    Yeah.
17  Q.    Do you know who Lee English is?
18  A.    Yes, Lee English was one of my
19  colleagues in Jackson, Tennessee.
20  Q.    He was another professional
21  representative?
22  A.    Yes.
23  Q.    Did he call on Dr. Herrera?
24  A.    Yes, he did call on Dr. Herrera.
25  Q.    Did he promote Vioxx to Dr. Herrera?
page 219
1   A.    Yes, he did.
2   Q.    So he would have had discussions with
3   Dr. Herrera about Vioxx; right?
4   A.    Yes, he would.
5   Q.    And he would have fielded questions
6   from Dr. Herrera about Vioxx?
7   A.    Yes.
8   Q.    Just like you?
9   A.    Just like me.
10  Q.    Is this the kind of PIR -- well, let's
11  talk about the PIR for just a second. Could you
12  read the first and second sentences of this
13  letter to Dr. Herrera?
14  A.    It says Dear Dr. Herrera --
15  Q.    Let me just ask you to read slowly
16  because it's hard sometimes to get all the words
17  down.
18  A.    Okay.
19  Q.    If you read quickly.
20  A.    Okay.
21  Q.    So if you would, Mrs. McAllister,
22  please read the first two sentences of this PIR
23  letter from Merck to Dr. Herrera.
24  A.    Our medical representative Lee English
25  has referred your request for information
page 220
1   regarding Vioxx (rofecoxib tablets and oral
2   suspension) your inquiry concerned a request for
3   a reprint of the Vioxx gastrointestinal outcomes
4   research trial (VIGOR).
5   Q.    Based on what you just read, what is
6   your understanding of the question that Dr.
7   Herrera was asking Mr. English that led to this
8   letter?
9   A.    Well, I mean, I don't know what the
10  exact question is but it had to have been in

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

11  regards to VIGOR.
12    Q.    Okay.
13    A.    And the PIR was sent.
14    Q.    And if you look at the very last line
15  on the first page of this PIR.
16    A.    Uh-huh (affirmative response).
17    Q.    It begins with the words the enclosed
18  reprint?


[221:2] - [222:2] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 221
2    A.    ... The enclosed reprint of the
3  VIGOR study should be reviewed for complete
4  information.
5    Q.    And then if you flip it over to the
6  very last page underneath the signature block, it
7  says that enclosed with the letter is a circular
8  and reference?
9    A.    Uh-huh (affirmative response).
10    Q.    And what does the term circular mean?
11    A.    That would mean the product label,
12  product information, PI.
13    Q.    What does the term reference refer to?
14    A.    I would assume that that would be the
15  VIGOR study.
16    Q.    The reprint?
17    A.    The reprint, yeah.
18    Q.    And again, just to tie it in with your
19  testimony earlier about your general instructions
20  regarding how to respond to questions about
21  cardiovascular safety, if you had a physician who
22  asked you about cardiovascular safety and wanted
23  additional information on the VIGOR study, is
24  this the kind of PIR, at least one of the PIRs,
25  that would have been submitted on behalf of such
page 222
1  physician?
2    A.    Yes, that's what I would have done.


[222:25] - [227:21] 10/25/2006 McAllister, Melissa

* Defendant's Affirmative Depo Designations

page 222
25    Q.    Well, now let's shift the time frame
page 223
    to the label change.  Do you remember the label

## Dedrick v. Merck Co.
### Plaintiff's and Defendant's Designations of Testimony of Melissa McAllister

2 change in April 2002?
A.    Yes, I do.
4    Q.    Do you recall receiving bulletins from
5 Merck concerning the label change?
6    A.    Yes, I do remember those.
7    Q.    Let's take a look at those bulletins
8 and let me hand you now what I'm marking at
9 McAllister Exhibit 6.
10            (WHEREUPON, THE ABOVE-MENTIONED
11        DOCUMENT WAS MARKED AS EXHIBIT NO. 6
12        TO THE TESTIMONY OF THE WITNESS AND
13        IS ATTACHED HERETO.)
14 BY MR. HOURIHAN:
15    Q.    Ask you to take a moment and
16 familiarize yourself with that document.  Do you
17 have McAllister 6 in front of you, ma'am?
18    A.    Yes, I do.
19    Q.    Can you identify that document,
20 please?
21    A.    It's a bulletin for Vioxx.
22    Q.    And was this a bulletin that you
23 received as a member of the field personnel with
24 responsibility for Vioxx?
25    A.    Yes, I received this.
page 224
1    Q.    And you would have received this on
April 11th, 2002?
3    A.    That's -- yeah, that's the day it has
4 on it.
5    Q.    Okay.  Have you had an opportunity to
6 kind of review the first page of this exhibit?
7    A.    Can I have another minute?
8    Q.    Sure.
9    A.    Okay.
10    Q.    What is the overall purpose of this
11 communication to you?
12    A.    Overall is to -- I mean, the words
13 here, diligently follow all actions with, you
14 know, physicians and customers and to proactively
15 review all changes to the PI.
16    Q.    Okay.  Let's read together the section
17 of this bulletin under the heading introduction.
18    A.    Uh-huh (affirmative response).
19    Q.    It says as previously communicated in
20 June 2000, Merck submitted a supplemental MDA for
21 Vioxx based on the Vioxx GI outcome's research
22 study, VIGOR.  On April 11th, 2002, the FDA
23 issued the following label revisions based upon
24 the VIGOR results.  Simultaneously, the FDA
25 issued a new indication for Vioxx for treatment
page 225
of signs and symptoms of rheumatoid arthritis in