Case 2:05-md-01657-EEF-DEK Document 9235-8 Filed 12/04/06 Page 1 of 15
Merck v. Merck Co., Inc.
Plaintiff's and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| Plaintiff = Red | | | | |
| Defendant = Blue | | | | |
| 11:8 - 14:6 | Fries, James 2006-06-16 | 00:02:36 | | |
| 11: 8 | Q. Could you state your name | | | |
| 11: 9 | for the jury, please, Doctor. | | | |
| 11: 10 | A. James Franklin Fries. | | | |
| 11: 11 | Q. You are a medical doctor, | | | |
| 11: 12 | correct? | | | |
| 11: 13 | A. That's correct. | | | |
| 11: 14 | Q. We're here at Stanford | | | |
| 11: 15 | University to take your deposition today. | | | |
| 11: 16 | Is this where you're currently employed? | | | |
| 11: 17 | A. That's right. | | | |
| 11: 18 | Q. And what is your current | | | |
| 11: 19 | position here? | | | |
| 11: 20 | A. I'm a professor of medicine, | | | |
| 11: 21 | emeritus active. | | | |
| 11: 22 | Q. Okay. | | | |
| 11: 23 | And how long have you been a | | | |
| 11: 24 | professor of medicine here at Stanford? | | | |
| 12: 1 | A. At one grade or another, a | | | |
| 12: 2 | professor since 1971. | | | |
| 12: 3 | Q. Okay. | | | |
| 12: 4 | Do you have a particular | | | |
| 12: 5 | specialty? | | | |
| 12: 6 | A. I'm a rheumatologist. I | | | |
| 12: 7 | also do work in clinical epidemiology, in | | | |
| 12: 8 | aging research and health public policy | | | |
| 12: 9 | and in information technology. | | | |
| 12: 10 | Q. Okay. | | | |
| 12: 11 | In terms of your specialty, | | | |
| 12: 12 | rheumatology, have you done particular | | | |
| 12: 13 | research in regards to NSAIDs? | | | |
| 12: 14 | A. Yes. I should probably give | | | |
| 12: 15 | you a little bit of background because it | | | |
| 12: 16 | will be important probably for everything | | | |
| 12: 17 | that happens. | | | |
| 12: 18 | Q. Sure. | | | |
| 12: 19 | A. 30 years ago, about 30 years | | | |
| 12: 20 | ago, I founded ARAMIS, that's | | | |
| 12: 21 | A-R-A-M-I-S, the Arthritis, Rheumatism & | | | |
| 12: 22 | Aging Medical Information System. And | | | |
| 12: 23 | we've tracked some 17,000 people in total | | | |
| 12: 24 | from when we get ahold of them until they | | | |
| 13: 1 | die or just say good-bye to us in another | | | |
| 13: 2 | way. And we follow them for everything | | | |
| 13: 3 | that happens to them medically. We get | | | |
| 13: 4 | their clinical information, we go to them | | | |
| 13: 5 | with questionnaires about health status | | | |
| 13: 6 | each six months. We collect information | | | |
| 13: 7 | at that time on the drugs that they've | | | |
| 13: 8 | taken, the disability level that their | | | |
| 13: 9 | arthritis has inflicted on them, the pain | | | |
| 13: 10 | they have, their use of medical care | | | |
| 13: 11 | services, the drugs they're taking and | | | |
| 13: 12 | any side effects that they've had for | | | |
| 13: 13 | those drugs, whether they're symptoms | | | |
| 13: 14 | side effects or side effects that cause | | | |
| 13: 15 | hospitalizations or that cause death. | | | |
| 13: 16 | We tally these and we write | | | |
| 13: 17 | papers with regard to the comparative | | | |

Case 2:05-md-01657-EEF-DEK   Document 8935-3   Filed 12/04/06   Page 2 of 15

Plaintiff's and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 13: 18 | toxicity of different drugs. So, this is | | |
| | 13: 19 | the first chronic disease databank system | | |
| | 13: 20 | that has existed. It's also the longest | | |
| | 13: 21 | in duration. There are about 1,000 | | |
| | 13: 22 | papers that have emerged from it on a | | |
| | 13: 23 | series of different subjects. Probably | | |
| | 13: 24 | my guesstimate would be around 20 on the | | |
| | 14: 1 | subject that we're discussing today, | | |
| | 14: 2 | which are side effects of the -- side | | |
| | 14: 3 | effects assessment in general and side | | |
| | 14: 4 | effects of the nonsteroidal | | |
| | 14: 5 | anti-inflammatory drugs in particular, | | |
| | 14: 6 | so... | | |
| 16:9 - 16:15 | | | | |
| | 16: 9 | October 28, 2000, did you | | |
| | 16: 10 | have a conversation with Dr. Sherwood? | | |
| | 16: 11 | A. Well, now you're going to | | |
| | 16: 12 | have to apologize for my memory of dates | | |
| | 16: 13 | and sequences five years ago. Anything | | |
| | 16: 14 | that's in the written record I would | | |
| | 16: 15 | prefer to refer to than to my memory. | | |
| 17:4 - 17:11 | | Fries, James 2006-06-16 | 00:00:18 | |
| | 17: 4 | Q. I'm going to go ahead and | | |
| | 17: 5 | hand you what's been marked as | | |
| | 17: 6 | Plaintiff's Exhibit 1.0176, which is a | | |
| | 17: 7 | copy of the letter on Stanford University | | |
| | 17: 8 | letterhead addressed to Dr. -- or, I'm | | |
| | 17: 9 | sorry, Mr. Ray Gilmartin, and you can | | |
| | 17: 10 | feel free to refer to this. | | |
| | 17: 11 | A. Yeah. Thank you. | | |
| 18:3 - 18:15 | | Fries, James 2006-06-16 | 00:00:19 | |
| | 18: 3 | Q. So, getting back, on October | | |
| | 18: 4 | 28, 2000, did you receive a call from Dr. | | |
| | 18: 5 | Sherwood? | | |
| | 18: 6 | A. Yes. | | |
| | 18: 7 | Q. Okay. | | |
| | 18: 8 | And at that time, did he | | |
| | 18: 9 | identify himself as being with Merck? | | |
| | 18: 10 | A. Yes, I believe so. | | |
| | 18: 11 | Q. And during that | | |
| | 18: 12 | conversation, where did you -- where did | | |
| | 18: 13 | you receive the phone call? | | |
| | 18: 14 | A. Well, I received that call | | |
| | 18: 15 | at home. | | |
| 18:16 - 18:22 | | Fries, James 2006-06-16 | 00:00:07 | |
| | 18: 16 | Q. Okay. | | |
| | 18: 17 | Had you ever received a call | | |
| | 18: 18 | from a pharmaceutical company like that | | |
| | 18: 19 | at home before? | | |
| | 18: 20 | A. No. | | |
| | 18: 21 | Q. Did you find that unusual? | | |
| | 18: 22 | A. Yes. | | |
| | - 19:23 | Fries, James 2006-06-16 | 00:00:54 | |
| | 19: 2 | Q. Was it during the week or on | | |
| | 19: 3 | a weekend? | | |
| | 19: 4 | A. It was on a Saturday. | | |
| | 19: 5 | Q. On a Saturday. Okay. | | |

Case 2:05-md-01657-EEF-DEK   Document 9235-5   Filed 12/04/06   Page 3 of 15
Dedrick v. Merck Co., Inc.
Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 19: 6 | What was Dr. Sherwood | | |
| | 19: 7 | calling to discuss with you at that time? | | |
| | 19: 8 | A. He was concerned that a | | |
| | 19: 9 | doctor, research associate on my staff, | | |
| | 19: 10 | Gurkipal Singh, had been giving talks in | | |
| | 19: 11 | public which were critical of Merck's | | |
| | 19: 12 | Vioxx, and in particular, had emphasized | | |
| | 19: 13 | the potential cardiovascular toxicity of | | |
| | 19: 14 | Vioxx. | | |
| | 19: 15 | Q. In particular, what was he | | |
| | 19: 16 | complaining about, Dr. Sherwood? | | |
| | 19: 17 | A. He believed that the talks | | |
| | 19: 18 | in question were unbalanced and that this | | |
| | 19: 19 | was something that I, as his immediate | | |
| | 19: 20 | supervisor, should know about and take | | |
| | 19: 21 | some action. And he also contacted the | | |
| | 19: 22 | chairman of the department and the | | |
| | 19: 23 | chairman of our division. | | |
| 20:9 | - 20:12 | Fries, James 2006-06-16 | 00:00:10 | |
| | 20: 9 | What did Dr. Sherwood say at | | |
| | 20: 10 | that time? Did he imply to you any | | |
| | 20: 11 | consequences if -- or what did he want | | |
| | 20: 12 | you to do in regards to Dr. Singh? | | |
| 20:18 | - 20:20 | Fries, James 2006-06-16 | 00:00:06 | |
| | 20: 18 | A. Yeah. He wanted Dr. Singh | | |
| | 20: 19 | to stop making the kinds of statements | | |
| | 20: 20 | that he had been making -- | | |
| | - 21:11 | Fries, James 2006-06-16 | 00:00:25 | |
| | 20: 22 | A. -- and he wanted, you know, | | |
| | 20: 23 | me to assist him in that task. | | |
| | 20: 24 | Q. Okay. | | |
| | 21: 1 | And did he indicate to you | | |
| | 21: 2 | that there would be any kind of | | |
| | 21: 3 | consequences if you didn't or if Dr. | | |
| | 21: 4 | Singh did not? | | |
| | 21: 5 | A. Well, he did, and I wrote | | |
| | 21: 6 | up, when I was much closer to the time, | | |
| | 21: 7 | some of the things that he said, that Dr. | | |
| | 21: 8 | Singh would flame out if he didn't change | | |
| | 21: 9 | his behavior and that there would be | | |
| | 21: 10 | consequences for Stanford, and he implied | | |
| | 21: 11 | that there might be consequences for me. | | |
| 21:13 | - 21:23 | Fries, James 2006-06-16 | 00:00:21 | |
| | 21: 13 | At that time, did you take | | |
| | 21: 14 | that to mean that Stanford or yourself | | |
| | 21: 15 | would not be receiving research funds if | | |
| | 21: 16 | that didn't stop? | | |
| | 21: 17 | A. Well, that was never stated. | | |
| | 21: 18 | Q. Is that what you -- | | |
| | 21: 19 | A. And it's always a question, | | |
| | 21: 20 | sort of an implied thing. When you say | | |
| | 21: 21 | how would it be bad for Stanford, I guess | | |
| | 21: 22 | it would be bad for Stanford if the | | |
| | 21: 23 | research funding dried up. | | |
| 22:12 | - 23:21 | Fries, James 2006-06-16 | 00:01:29 | |
| | 22: 12 | After that conversation with | | |
| | 22: 13 | Dr. Sherwood, did you contact Dr. Singh? | | |
| | 22: 14 | A. Yes. I took this the same | | |

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 22: 15 way that I think anybody should who hears | | | |
| | 22: 16 about it. You want to determine if it's | | | |
| | 22: 17 true or not. And so I did ask Dr. Singh, | | | |
| | 22: 18 and I told Dr. Sherwood that I would do | | | |
| | 22: 19 this, that I would ask Dr. Singh what had | | | |
| | 22: 20 transpired and I would check out. And if | | | |
| | 22: 21 there was action that was required, I | | | |
| | 22: 22 would take the action. And I did that. | | | |
| | 22: 23 Q. When you say you "did that," | | | |
| | 22: 24 did you actually review the -- or did you | | | |
| | 23: 1 talk to Dr. Singh specifically about his | | | |
| | 23: 2 presentation? | | | |
| | 23: 3 A. I talked with him about the | | | |
| | 23: 4 presentation. He felt that it was a | | [23:4-23:6] | Barnett: Sustained. |
| | 23: 5 balanced presentation. That's what he | | Deft's Obj.: 801/802 | Smith: Sustained |
| | 23: 6 maintained. And I said, well, can I see | | Dr. Fries' conversation | Mason: Sustained |
| | 23: 7 the slides? And so I looked at the | | with Dr. Singh is hearsay | |
| | 23: 8 PowerPoint slides that he had. There | | and should be excluded. | Sustained |
| | 23: 9 were, I don't remember, maybe 30 of them. | | Also irrelevant and | |
| | 23: 10 I counted up the ones which were pro -- | | prejudicial. | |
| | 23: 11 much of the talk was on -- much of his | | | |
| | 23: 12 talks were on GI NSAID safety in general | | | |
| | 23: 13 not connected with a particular product. | | | |
| | 23: 14 But there was mention of both the VIGOR | | | |
| | 23: 15 trial and the CLASS trial and of | | | |
| | 23: 16 celecoxib and of rofecoxib during that | | | |
| | 23: 17 talk. And I counted the slides for | | | |
| | 23: 18 rofecoxib and for celecoxib, and there | | | |
| | 23: 19 were the same number, and they were both | | | |
| | 23: 20 from similar studies and were really | | | |
| | 23: 21 quite parallel. | | | |
| 24:9 | - 25:8 Fries, James 2006-06-16 | 00:00:51 | | |
| | 24: 9 Q. Did you find the | | | |
| | 24: 10 presentation to be balanced? | | | |
| | 24: 11 A. It looked to me to be | | | |
| | 24: 12 reasonably balanced. You can't tell by | | | |
| | 24: 13 looking at a set of slides what someone | | | |
| | 24: 14 is saying when they have those slides on. | | | |
| | 24: 15 So, I went a little bit further and I | | | |
| | 24: 16 checked with three people who had been in | | | |
| | 24: 17 the audience of the most offending of | | | |
| | 24: 18 these, and none of them were particularly | | | |
| | 24: 19 offended or thought it particularly | | | |
| | 24: 20 unbalanced. | | | |
| | 24: 21 So, it was a funny | | | |
| | 24: 22 situation, because the data that were of | | | |
| | 24: 23 interest were on something that would | | | |
| | 24: 24 almost automatically unbalance a balanced | | | |
| | 25: 1 presentation, because there was negative | | | |
| | 25: 2 information on one product of different | | | |
| | 25: 3 degrees of certainty, and there wasn't | | | |
| | 25: 4 any balancing information. So, if you | | | |
| | 25: 5 really were explaining things at that | | | |
| | 25: 6 point, one would tend to probably | | | |
| | 25: 7 overemphasize or emphasize more the Vioxx | | | |
| | 25: 8 data. | | | |
| | - 27:3 Fries, James 2006-06-16 | 00:00:08 | | |
| | 26: 22 When you say the American | | | |
| | 26: 23 College of Rheumatology or ACR, when was | | | |
| | 26: 24 that? Was that in November of 2000, | | | |
| | 27: 1 Page 27 | | | |

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 27: 2 | approximately? | | |
| | 27: 3 | A. It must have been, yes. | | |
| 34:5 | - 34:11 | Fries, James 2006-06-16  00:00:47 | | |
| | 34: 5 | You also reference in these | | |
| | 34: 6 | -- or during that time of the ACR | | |
| | 34: 7 | meeting, did it also come to your | | |
| | 34: 8 | attention that other doctors had | | |
| | 34: 9 | complaints of Merck contacting either | | |
| | 34: 10 | themselves or their bosses in an effort | | |
| | 34: 11 | to intimidate them? | | |
| 34:14 | - 35:1 | | | |
| | 34: 14 | THE WITNESS: Yes. It was | | |
| | 34: 15 | kind of at that time that the | | |
| | 34: 16 | rumor mill was going, and once | | |
| | 34: 17 | people started talking about this, | | |
| | 34: 18 | there were other people that had | | |
| | 34: 19 | similar experiences. And they | | |
| | 34: 20 | reported them, and a number of | | |
| | 34: 21 | them had the same reaction that I | | |
| | 34: 22 | did, that this was a way of | | |
| | 34: 23 | influencing academic debate, which | | |
| | 34: 24 | was not appropriate and could not | | |
| | 35: 1 | continue. | | |
| 35:20 | - 36:1 | Fries, James 2006-06-16  00:00:13 | | |
| | 35: 20 | Did you actually talk with | | |
| | 35: 21 | Dr. Sherwood about these different | | |
| | 35: 22 | allegations prior to writing your letter? | | |
| | 35: 23 | A. Yes. But my recollection is | | |
| | 35: 24 | that was a telephone call after the | | |
| | 36: 1 | meetings. | | |
| 36:3 | - 36:20 | Fries, James 2006-06-16  00:00:42 | | |
| | 36: 3 | Tell me about that telephone | | |
| | 36: 4 | call. | | |
| | 36: 5 | A. We'd gone backwards and | | |
| | 36: 6 | forwards and got a connection, and then | | |
| | 36: 7 | we discussed these issues much as they're | | |
| | 36: 8 | laid out there. I put some quotes in | | |
| | 36: 9 | that letter that were not recorded | | |
| | 36: 10 | quotes, but they were ones that I had | | |
| | 36: 11 | remembered from the -- from one | | |
| | 36: 12 | discussion. | | |
| | 36: 13 | One ironic one was that he | | |
| | 36: 14 | had said that the side effects didn't | | |
| | 36: 15 | occur at all, they had internal data to | | |
| | 36: 16 | indicate that they didn't occur, but that | | |
| | 36: 17 | anyway it was only at high doses. I | | |
| | 36: 18 | thought that that was an interesting way | | |
| | 36: 19 | to put an affirmation and a denial into | | |
| | 36: 20 | the same sentence. | | |
| 37:9 | - 37:17 | Fries, James 2006-06-16  00:00:22 | | |
| | 37: 9 | So, after having the phone | | |
| | 37: 10 | conversation on October 28, 2000, seeing | | |
| | 37: 11 | Dr. Sherwood at the ACR meeting, seeing | | |
| | 37: 12 | the VIGOR posters at the ACR meeting, | | |
| | 37: 13 | talking with Dr. Sherwood again on the | | |
| | 37: 14 | phone, you then wrote this letter on | | |
| | 37: 15 | January -- or sent the letter on January | | |

Case 2:05-md-01657-EEF-DEK Document 8235-5 Filed 12/04/06   Page 6 of 15

Plaintiff's and Defendant's Designations of James Fries, M.D.

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 37: 16 | 9, 2001, correct? | | |
| | 37: 17 | A. Yes. | | |
| 37:19 | - 38:9 | Fries, James 2006-06-16    00:00:18 | | |
| | 37: 19 | And you wrote this letter to | | |
| | 37: 20 | Mr. Raymond Gilmartin, correct? | | |
| | 37: 21 | A. Yes. | | |
| | 37: 22 | Q. Had you ever met Mr. | | |
| | 37: 23 | Gilmartin before? | | |
| | 37: 24 | A. No. | | |
| | 38: 1 | Q. He is the -- or at the time | | |
| | 38: 2 | was the Chief Executive Officer of Merck, | | |
| | 38: 3 | correct? | | |
| | 38: 4 | A. Yes. | | |
| | 38: 5 | Q. Okay. | | |
| | 38: 6 | Had you ever written a | | |
| | 38: 7 | letter to the CEO of a pharmaceutical | | |
| | 38: 8 | company before? | | |
| | 38: 9 | A. No. | | |
| 38:11 | - 38:14 | Fries, James 2006-06-16    00:00:09 | | |
| | 38: 11 | Had you ever written a | | |
| | 38: 12 | letter with these kind of allegations in | | |
| | 38: 13 | them to a pharmaceutical company before? | | |
| | 38: 14 | A. No. | | |
| 54:21 | - 54:24 | Fries, James 2006-06-16    00:00:43 | | |
| | 54: 21 | The contact that you had | | |
| | 54: 22 | from Dr. Sherwood and from Merck in | | |
| | 54: 23 | regards to Vioxx, did you feel that was | | |
| | 54: 24 | at all appropriate? | | |
| 55:3 | - 55:21 | | | |
| | 55: 3 | THE WITNESS: I felt that | | |
| | 55: 4 | belief in the scientific | | |
| | 55: 5 | marketplace where you have freedom | | |
| | 55: 6 | of expression on all sides without | | |
| | 55: 7 | overt intimidation, let alone this | | |
| | 55: 8 | kind of thing, really was a threat | | |
| | 55: 9 | to academic freedom. And I saw it | | |
| | 55: 10 | and phrased my position in terms | | |
| | 55: 11 | of the academic freedom issues, | | |
| | 55: 12 | not in terms of is it toxic or is | | |
| | 55: 13 | it not toxic issues. That was | | |
| | 55: 14 | irrelevant to the question that | | |
| | 55: 15 | they would come down on people | | |
| | 55: 16 | that said something they didn't | | |
| | 55: 17 | like. And if everybody did that, | | |
| | 55: 18 | we would not have a scientific | | |
| | 55: 19 | process. So, I became incensed on | | |
| | 55: 20 | academic freedom issues, and that | | |
| | 55: 21 | was my real motivating factor. | | |
| 59:17 | - 59:23 | Fries, James 2006-06-16    00:00:39 | | |
| | 59: 17 | Let me just very quickly ask | | |
| | 59: 18 | you one question backing up. | | |
| | 59: 19 | During the conversation of | | |
| | 59: 20 | October 28, 2000 with Dr. Sherwood, did | | |
| | 59: 21 | he ever tell you that the data that Dr. | | |
| | 59: 22 | Singh was relying upon or presented by | | |
| | 59: 23 | Dr. Singh was incorrect? | | |
| 60:1 | - 60:2 | | | |

Case 2:05-md-01657-EEF-DEK Document 8735-8 Filed 12/04/06 Page 7 of 15

Dedrick v. Merck & Co., Inc.
Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 60: 1  THE WITNESS: No, I don't | | | |
| | 60: 2  believe so. | | | |
| 68:19 - 69:15 | Fries, James 2006-06-16 | 00:00:39 | | |
| | 68: 19  Why did you write Ray | | | |
| | 68: 20  Gilmartin a letter? | | | |
| | 68: 21  A. I was concerned with some | | | |
| | 68: 22  internal practices at Merck which I felt | | | |
| | 68: 23  infringed on academic freedom, and I felt | | | |
| | 68: 24  it was not in Merck's interest to | | | |
| | 69: 1  continue those. I attempted to make that | | | |
| | 69: 2  case to them, and it concerned, in | | | |
| | 69: 3  particular, a lot of allegations around | | | |
| | 69: 4  the Vioxx drug. | | | |
| | 69: 5  Q. Had you had some | | | |
| | 69: 6  interactions with Merck at this point? | | | |
| | 69: 7  A. No. Prior to the Sherwood | | | |
| | 69: 8  call, I had no interactions whatsoever | | | |
| | 69: 9  with Merck. | | | |
| | 69: 10  Q. Now, by "Sherwood call," are | | | |
| | 69: 11  you talking about Louis Sherwood? | | | |
| | 69: 12  A. Yes. | | | |
| | 69: 13  Q. The Merck vice president? | | | |
| | 69: 14  A. Yes. He was vice president | | | |
| | 69: 15  for medical affairs or some such title. | | | |
| 80:12 - 81:2 | Fries, James 2006-06-16 | 00:00:21 | | |
| | 80: 12  Q. Did you go to a lot of care | | | |
| | 80: 13  to make sure it was accurate? | | | |
| | 80: 14  A. Yes. | | | |
| | 80: 15  Q. Did you write it and rewrite | | | |
| | 80: 16  it and rewrite it? | | | |
| | 80: 17  A. Yes. | | | |
| | 80: 18  Q. How long did it take you to | | | |
| | 80: 19  finally get that in final form? | | | |
| | 80: 20  A. Well, we saw a draft a | | | |
| | 80: 21  little while ago which was back in | | | |
| | 80: 22  November I think, and then it came out on | | | |
| | 80: 23  January 9. | | | |
| | 80: 24  Q. About six weeks? | | | |
| | 81: 1  A. So, I'd say six weeks or so, | | | |
| | 81: 2  yes. | | | |
| 81:9 - 82:5 | Fries, James 2006-06-16 | 00:00:44 | | |
| | 81: 9  Q. I want you to focus on that | | | |
| | 81: 10  for a minute because I want to ask you, | | | |
| | 81: 11  did you get a followup phone call or two | | | |
| | 81: 12  from people at Merck after you sent your | | | |
| | 81: 13  letter? | | | |
| | 81: 14  A. Yes. | | | |
| | 81: 15  Q. Do you remember anything at | | | |
| | 81: 16  all about those conversations and what | | | |
| | 81: 17  was said? | | | |
| | 81: 18  A. Yes, a little bit. One was | | | |
| | 81: 19  from a vice president who offered to show | | | |
| | 81: 20  me any data that I wanted to see. That | | | |
| | 81: 21  wasn't my major thing. I knew the data | | | |
| | 81: 22  would come out, so, I had other things to | | | |
| | 81: 23  do, so, I declined that. | | | |
| | 81: 24  A. second one was from Dr. | | | |
| | 82: 1  Anstice, and he told the -- of a | | | |
| | 82: 2  four-part plan that Merck had to remedy | | | |
| | 82: 3  the problem and that they were taking | | | |

Case 2:05-md-01657-EEF-DEK   Document 9235-6   Filed 12/04/06   Page 8 of 15
Dedrick v. Merck Co., Inc.
Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 82: 4 | action in terms of changing their | | |
| | 82: 5 | internal operations -- | | |
| 82:9 - 83:13 | | Fries, James 2006-06-16 | 00:00:46 | |
| | 82: 9 | Q. -- first of all, there is a | | |
| | 82: 10 | David Anstice who is the head at the time | | |
| | 82: 11 | of Merck health, the whole Merck health | | |
| | 82: 12 | end. | | |
| | 82: 13 | A. Yes. | | |
| | 82: 14 | Q. He's not actually a doctor, | | |
| | 82: 15 | though, so when you say Dr. Anstice, you | | |
| | 82: 16 | may have assumed he was a doctor -- | | |
| | 82: 17 | A. I may have assumed that -- | | |
| | 82: 18 | Q. All right. | | |
| | 82: 19 | That's the same David | | |
| | 82: 20 | Anstice? | | |
| | 82: 21 | A. It is the same person. | | |
| | 82: 22 | Q. Okay. | | |
| | 82: 23 | Now, David Anstice has | | |
| | 82: 24 | testified in this case, and David Anstice | | |
| | 83: 1 | has said that he was charged with | | |
| | 83: 2 | investigating your letter by Ray | | |
| | 83: 3 | Gilmartin. | | |
| | 83: 4 | A. Yes. | | |
| | 83: 5 | Q. Are you aware of that? | | |
| | 83: 6 | A. Well, Dr. Gilmartin said | | |
| | 83: 7 | that he was going to do that in his | | |
| | 83: 8 | letter to me. | | |
| | 83: 9 | Q. I don't mean to interrupt | | |
| | 83: 10 | you, but you call him Dr. Gilmartin, and | | |
| | 83: 11 | I know he's the head of all of Merck, but | | |
| | 83: 12 | he wasn't a doctor, either. He's an | | |
| | 83: 13 | M.B.A. from Harvard in the business -- | | |
| 83:16 - 83:17 | | | | |
| | 83: 16 | THE WITNESS: Yes, I am | | |
| | 83: 17 | positive you are correct. | | |
| 89:1 - 89:9 | | Fries, James 2006-06-16 | 00:00:17 | |
| | 89: 1 | Q. Well, by the way, are you | | |
| | 89: 2 | the Dr. Fries who is behind the longest | | |
| | 89: 3 | running, largest arthritis study there | | |
| | 89: 4 | is, the ARAMIS study? | | |
| | 89: 5 | A. Yes. | | |
| | 89: 6 | Q. How many people in that | | |
| | 89: 7 | study? | | |
| | 89: 8 | A. In the various data banks, | | |
| | 89: 9 | about 17,000. | | |
| 89:12 - 89:14 | | Fries, James 2006-06-16 | 00:00:03 | |
| | 89: 12 | Q. How long has that been going | | |
| | 89: 13 | on? | | |
| | 89: 14 | A. 30 years. | | |
| 89:15 - 89:23 | | Fries, James 2006-06-16 | 00:02:00 | |
| | 89: 15 | Q. 30 years. A lot of those | | |
| | 89: 16 | people take naproxen? | | |
| | 89: 17 | A. Yes. | | |
| | 89: 18 | Q. Have you written up any | | |
| | 89: 19 | papers or anybody else written up any | | |
| | 89: 20 | papers from the largest, longest running | | |
| | 89: 21 | study that says naproxen is five times | | |
| | 89: 22 | better than aspirin at stopping heart | | |

| Designated Testimony | | Objections | Rulings |
|---|---|---|---|
| 89: 23 | attacks? | | |
| - 92:8 | | | |
| 90: 1 | THE WITNESS: Our research | | |
| 90: 2 | is not -- the data banks aren't | | |
| 90: 3 | set to answer that specific | | |
| 90: 4 | question. But we have studied the | | |
| 90: 5 | general overall toxicities, and | | |
| 90: 6 | certainly nothing jumped out with | | |
| 90: 7 | regard to cardiovascular events | | |
| 90: 8 | being protective. Internally at | | |
| 90: 9 | what was then Syntex, who had | | |
| 90: 10 | developed naproxen -- | | |
| 90: 11 | BY MR. LANIER: | | |
| 90: 12 | Q. Syntex is a company? | | |
| 90: 13 | A. Syntex was a company which | | |
| 90: 14 | is now, if I'm correct, it has, in a | | |
| 90: 15 | series of big fish eating littler fish, | | |
| 90: 16 | arrived as a part of Pfizer. | | |
| 90: 17 | Q. Oh, okay. All right. | | |
| 90: 18 | So, the company that started | | |
| 90: 19 | naproxen, go ahead. | | |
| 90: 20 | A. Yes, yes. | | |
| 90: 21 | Q. What happened with them and | | |
| 90: 22 | naproxen? | | |
| 90: 23 | A. Well, Syntex. Well, they | | |
| 90: 24 | were looking for indications of it, and | | |
| 91: 1 | one obvious indication was that you could | | |
| 91: 2 | prevent heart attacks, because the then | | |
| 91: 3 | theory of how aspirin prevented heart | | |
| 91: 4 | attacks, which was known, was that it was | | |
| 91: 5 | an action on the platelets. And the | | |
| 91: 6 | action of the platelets by aspirin is | | |
| 91: 7 | irreversible, so that for the entire life | | |
| 91: 8 | of the platelet, it -- | | |
| 91: 9 | Q. Will never clump. | | |
| 91: 10 | A. -- will never clump. Okay. | | |
| 91: 11 | And naproxen has a similar effect on the | | |
| 91: 12 | platelet, but it lasts only while the | | |
| 91: 13 | drug is still circulating in the | | |
| 91: 14 | bloodstream, not for the life of the | | |
| 91: 15 | platelet. So, it's called reversible | | |
| 91: 16 | inhibition of cyclooxygenase in the | | |
| 91: 17 | platelets. Okay. | | |
| 91: 18 | But nevertheless, because | | |
| 91: 19 | it's longer acting, one could make the | | |
| 91: 20 | case that it would prevent heart attacks, | | |
| 91: 21 | and so they did a lot of internal | | |
| 91: 22 | speculation because it would be a big | | |
| 91: 23 | market if they could make the case that | | |
| 91: 24 | it prevented heart attacks, and they | | |
| 92: 1 | never could make that case. And the | | |
| 92: 2 | studies both before and after, if you | | |
| 92: 3 | take them in the aggregate, indicate that | | |
| 92: 4 | this is not the case. | | |
| 92: 5 | Q. Naproxen is not the -- | | |
| 92: 6 | A. It does not prevent heart | | |
| 92: 7 | attacks to any degree which is measurable | | |
| 92: 8 | in any studies. | | |
| 94:21 - 95:10 | Fries, James 2006-06-16   00:00:30 | | |
| 94: 21 | Q. In fact, when he said -- | | |
| 94: 22 | when you specifically told him -- or did | | |

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 94: 23  you specifically tell him that you had | | | |
| | 94: 24  never heard of harassment of | | | |
| | 95: 1   investigators through their institutions | | | |
| | 95: 2   before this, what was his response to | | | |
| | 95: 3   you? | | | |
| | 95: 4   A. Well, it was clear that his | | | |
| | 95: 5   response was that he believed this to be | | | |
| | 95: 6   an appropriate action. And at the | | | |
| | 95: 7   closing sentence of that telephone | | | |
| | 95: 8   conversation, I said, "Lou, you ought to | | | |
| | 95: 9   be ashamed of yourself," and then hung | | | |
| | 95: 10  up. | | | |
| 99:7 - 99:7 | Fries, James 2006-06-16 | 00:00:01 | | |
| | 99: 7   Q. Good afternoon, Dr. Fries. | | | |
| 99:13 - 100:4 | Fries, James 2006-06-16 | 00:00:44 | | |
| | 99: 13  I want to follow up on | | | |
| | 99: 14  questions about your reasons for writing | | | |
| | 99: 15  the letter to Mr. Gilmartin. I think you | | | |
| | 99: 16  said that you wanted to deal with some | | | |
| | 99: 17  things in a private way? | | | |
| | 99: 18  A. That's right. I started, | | | |
| | 99: 19  and I tried to indicate in the letter my | | | |
| | 99: 20  great approval of Merck as a company, and | | | |
| | 99: 21  I followed it over the years with, you | | | |
| | 99: 22  know, top five respected companies in the | | | |
| | 99: 23  United States and so forth. And I | | | |
| | 99: 24  respected a lot of the things that they | | | |
| | 100: 1  did, respected their previous chairman | | | |
| | 100: 2  immensely, who I now know a little bit, | | | |
| | 100: 3  Roy Vagelos, who did extraordinary things | | | |
| | 100: 4  for Merck from the scientific side. | | | |
| 100:21 - 101:13 | Fries, James 2006-06-16 | 00:00:38 | | |
| | 100: 21 Q. You received a letter from | | | |
| | 100: 22 Mr. Gilmartin in response to your letter? | | | |
| | 100: 23 A. Yes. | | | |
| | 100: 24 Q. What was your reaction to | | | |
| | 101: 1   receiving that letter? | | | |
| | 101: 2   A. Well, I think any of us -- I | | | |
| | 101: 3   was pleased that rather promptly a | | | |
| | 101: 4   response had come which had taken the | | | |
| | 101: 5   letter seriously and which had promised | | | |
| | 101: 6   some action. I recognized that it was -- | | | |
| | 101: 7   that I was going to be running into | | | |
| | 101: 8   damage control types of activities, so, I | | | |
| | 101: 9   interpreted that and subsequent | | | |
| | 101: 10  conversations as having in part some | | | |
| | 101: 11  degree of damage control. People wanted | | | |
| | 101: 12  me to be happy with the actions that were | | | |
| | 101: 13  being taken. | | | |
| 102:20 - 103:2 | Fries, James 2006-06-16 | 00:00:16 | | |
| | 102: 20  Were you satisfied with | | | |
| | 102: 21  Merck's response to your concerns? | | | |
| | 102: 22  A. Yes. And I thought about -- | | | |
| | 102: 23  I mean, they didn't say specifically what | | | |
| | 102: 24  they were going to do with Dr. Sherwood, | | | |
| | 103: 1   but they said that something was going to | | | |
| | 103: 2   happen. | | | |
| 104:6 - 104:24 | Fries, James 2006-06-16 | 00:00:47 | | |

Case 2:05-md-01657-EEF-DEK   Document 9236-8   Filed 12/04/06   Page 11 of 15

Redrick v. Merck & Co., Inc.
Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 104: 6  Q. Sir, did you receive the | | | |
| | 104: 7  data relating to Vioxx that you had | | | |
| | 104: 8  requested? | | | |
| | 104: 9  A. I didn't request data per se | | | |
| | 104: 10  for me. I requested the data be made | | | |
| | 104: 11  available to others. I wasn't | | | |
| | 104: 12  specifically studying -- | | | |
| | 104: 13  Q. Were you satisfied that | | | |
| | 104: 14  Merck made that data available to others? | | | |
| | 104: 15  A. I believe so, yes. | | | |
| | 104: 16  Q. Is it fair to say then that | | | |
| | 104: 17  as of about March of 2001, as far as you | | | |
| | 104: 18  were concerned, the matter was closed? | | | |
| | 104: 19  A. My job here was done. | | | |
| | 104: 20  Q. Dr. Fries, I take it that | | | |
| | 104: 21  Merck chose not to rebut the points in | | | |
| | 104: 22  your letter, but, rather, to address your | | | |
| | 104: 23  concerns. Is that a fair assessment? | | | |
| | 104: 24  A. That's true. | | | |
| 105:4  -  105:5 | | | [105:4-105:5] Pl's obj.: Asked & answered. | overruled |
| | 105: 4  Q. Yes? | | | |
| | 105: 5  A. Yes. | | | |
| 105:24  -  106:9 | Fries, James 2006-06-16 | 00:00:21 | | |
| | 105: 24  Q. Dr. Fries, I want to talk to | | | |
| | 106: 1  you a little bit about, you referred to | | | |
| | 106: 2  an investigation that you did into things | | | |
| | 106: 3  that you had heard in the rumor mill. Do | | | |
| | 106: 4  you remember that? | | | |
| | 106: 5  A. Yes. | | | |
| | 106: 6  Q. I take it that you didn't | | | |
| | 106: 7  have firsthand knowledge about the | | | |
| | 106: 8  matters that you've testified about in | | | |
| | 106: 9  your letter. Is that fair to say? | | | |
| 106:12  -  107:7 | Fries, James 2006-06-16 | 00:00:46 | | |
| | 106: 12      THE WITNESS: I believe | | | |
| | 106: 13      that's probably true. That was | | | |
| | 106: 14      one reason I tried to be as | | | |
| | 106: 15      careful and as balanced as I | | | |
| | 106: 16      could, because I was getting | | | |
| | 106: 17      dangerously toward what I would | | | |
| | 106: 18      even call hearsay if I got too | | | |
| | 106: 19      far. | | | |
| | 106: 20  BY MR. RABER: | | | |
| | 106: 21  Q. And, of course, you can't be | | | |
| | 106: 22  expected to have firsthand knowledge of | | | |
| | 106: 23  all these things with the different | | | |
| | 106: 24  doctors that you were writing about, | | | |
| | 107: 1  right? | | | |
| | 107: 2  A. That's right. | | | |
| | 107: 3  Q. And is it fair to say that | | | |
| | 107: 4  certain doctors and Dr. Singh told you | | | |
| | 107: 5  things, and then you relayed that | | | |
| | 107: 6  information to Merck? | | | |
| | 107: 7  A. Yes. | | | |
|  -  115:17 | Fries, James 2006-06-16 | 00:00:26 | | |
| | 115: 11      Let me go back to your | | | |
| | 115: 12  letter. You've told us that you relied | | | |
| | 115: 13  on what you were told by doctors and Dr. | | | |
| | 115: 14  Singh. Did you talk to any third parties | | | |

Case 2:05-md-01657-EEF-DEK Document 8235-8 Filed 12/04/06 Page 12 of 15
In re Vioxx Products Liability, Inc.
Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 115: 15 | to confirm or verify what you had been | | |
| | 115: 16 | told by any of those doctors? | | |
| ● | 115: 17 | A. No. | | |
| 115:18 - 116:5 | | | [115:18-116:5] Pl's Obj.: Discussions with doctors were not allowed previously in Plaintiff's designations. Discussions with this doctor were not allowed in Plaintiff's direct. If Pl's objection denied, Pl. counter-designates 116:6-21. | Barnett: Sustained. Smith: Not included by Defendant. Mason: Denied as Moot.<br><br>Sustained |
| | 115: 18 | Q. So, for example, if we look | | |
| | 115: 19 | at Exhibit P 1.0176, which is your | | |
| | 115: 20 | January 9, 2001 letter, on the third page | | |
| | 115: 21 | of that letter, towards the top, it says, | | |
| | 115: 22 | "Dr. McMillen believes that his VCF | | |
| | 115: 23 | appointment at Hershey was revoked | | |
| | 115: 24 | because of these accusations." Do you | | |
| | 116: 1 | see that? | | |
| | 116: 2 | A. Yes. | | |
| | 116: 3 | Q. Now, is that something that | | |
| | 116: 4 | Dr. McMillen told you? | | |
| | 116: 5 | A. That's right. | | |
| 116:22 - 117:2 | | | Pl's Obj.: Same | Barnett: Sustained. Smith: Not included by Defendant. Mason: Testimony was played. No objection. |
| | 116: 22 | Q. Sir, the question was, did | | |
| | 116: 23 | you speak with anybody from the Hershey | | |
| | 116: 24 | Medical Center to verify what Dr. | | |
| | 117: 1 | McMillen had told you? | | |
| | 117: 2 | A. No. | | |
| 117:20 - 119:21 | | | Pl's Obj.: Discussions with doctors were not allowed previously in Plaintiff's designations. Discussions with this doctor were not allowed in Plaintiff's direct. If Pl's objection denied, Pl. counter-designates 116:6-21. | Barnett: Sustained. Smith: Not included by Defendant. Mason: Testimony was played; objection to 119:12-21 was Denied as Moot. |
| ● | 117: 20 | Q. Dr. Fries, you have in front | | |
| | 117: 21 | of you Defense Exhibit Number 952. Does | | |
| | 117: 22 | this appear to be a letter from the | | |
| | 117: 23 | Hershey Medical Center dated February | | |
| | 117: 24 | 1st, 2000? | | |
| | 118: 1 | A. Yes. | | |
| | 118: 2 | Q. From a -- | | |
| | 118: 3 | A. I'm familiar with this | | |
| | 118: 4 | letter. | | |
| | 118: 5 | Q. Okay. | | |
| | 118: 6 | This letter was among the | | |
| | 118: 7 | documents that Dr. McMillen gave to you? | | |
| | 118: 8 | A. Probably. | | |
| | 118: 9 | Q. It was in your file? | | |
| | 118: 10 | A. Yes. | | |
| | 118: 11 | Q. And does this letter | | |
| | 118: 12 | describe Dr. McMillen's status with the | | |
| | 118: 13 | Hershey Medical Center? | | |
| | 118: 14 | A. Yes. It purports to. | | |
| | 118: 15 | Q. Okay. | | |
| | 118: 16 | And it says in the second | | |
| | 118: 17 | paragraph, "Dr. McMillen held an | | |
| | 118: 18 | appointment as Clinical Assistant | | |
| | 118: 19 | Professor of Medicine from" July 1st, | | |
| | 118: 20 | 1978 to December 31st, 1999, "at the | | |
| | 118: 21 | Milton S. Hershey Medical Center of the | | |
| | 118: 22 | Pennsylvania State University College of | | |
| | 118: 23 | Medicine," correct? | | |
| ● | 118: 24 | A. Yes. | | |
| | 119: 1 | Q. All right. | | |
| | 119: 2 | At the bottom of the first | | |
| | 119: 3 | page, it says, "Dr. McMillen currently | | |
| | 119: 4 | has an intensive and ongoing commitment | | |
| | 119: 5 | to clinical studies and a very active | | |

Case 2:05-md-01657-EEF-DEK Document 8735-3 Filed 12/04/06 Page 13 of 15

Plaintiff's and Defendant's Designations of James Fries, M.D.

| | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|
| | 119: 6 | speaking schedule," true? | | |
| | 119: 7 | A. Yes. That's what it says. | | |
| | 119: 8 | Q. And that speaking schedule | | |
| | 119: 9 | you understood was on behalf of Pfizer? | | |
| | 119: 10 | A. I have no knowledge of what | | |
| | 119: 11 | components of his speaking schedule are. | | |
| | 119: 12 | Q. Then the letter from the | | |
| | 119: 13 | Hershey Medical Center states, | | |
| | 119: 14 | "Recognizing his past teaching | | |
| | 119: 15 | contributions but acknowledging that he | | |
| | 119: 16 | has not been actively involved in | | |
| | 119: 17 | teaching our students or housestaff in | | |
| | 119: 18 | recent years, his clinical faculty | | Sustained |
| | 119: 19 | position has not been renewed." Do you | | |
| | 119: 20 | see that? | | |
| | 119: 21 | A. Yes. | | |
| 125:17 | - 126:18 | | | |
| | 125: 17 | Q. Dr. Fries, let's go back to | Pl's Obj.: Discussions | Barnett: Sustained. |
| | 125: 18 | your letter. On Page 3 of your letter, | with doctors were not | Smith: Not included by |
| | 125: 19 | you state near the top that "Dr. Simon | allowed previously in | Defendant. |
| | 125: 20 | believes that one of his two academic | Plaintiff's designations. | Mason: Testimony was |
| | 125: 21 | appointments has been jeopardized." Do | Discussions with this | played. No objection. |
| | 125: 22 | you see that? | doctor were not allowed | |
| | 125: 23 | A. Yes. | in Plaintiff's direct. If | |
| | 125: 24 | Q. Is that something Dr. Simon | Pl's objection denied, Pl. | |
| | 126: 1 | told you? | counter-designates | |
| | 126: 2 | A. Yes. | 116:6-21. | |
| | 126: 3 | Q. Did you talk with Dr. | | |
| | 126: 4 | Simon's boss or anybody to verify that? | | |
| | 126: 5 | A. No. | | |
| | 126: 6 | Q. No? | | |
| | 126: 7 | A. And I tried when I wrote | | |
| | 126: 8 | this to be as careful as I could with | | |
| | 126: 9 | words. So, it was me, not you, that said | | |
| | 126: 10 | Dr. Simon believes. He did believe that. | | |
| | 126: 11 | I know that for sure. But I don't know | | |
| | 126: 12 | that his belief was correct, and I tried | | |
| | 126: 13 | to indicate that. | | |
| | 126: 14 | Q. Is it possible that his | | |
| | 126: 15 | belief was incorrect? | | |
| | 126: 16 | A. Of course. Just like it was | | |
| | 126: 17 | possible that Dr. McMillen's belief was | | |
| | 126: 18 | incorrect. | | |
| 149:6 | - 149:14 | | 00:00:24 | |
| | 149: 6 | Q. And you talk about in your | | |
| | 149: 7 | letter, it was your experience that | | |
| | 149: 8 | certainly your mindset in 2001 was that | | |
| | 149: 9 | the COX-2 inhibitors looked like a | | |
| | 149: 10 | significant "medical advance" for dealing | | |
| | 149: 11 | with the serious GI problems from | | |
| | 149: 12 | traditional pain relievers? | | |
| | 149: 13 | A. Yes. I even took credit for | | |
| | 149: 14 | having created them. | | |
| 150:6 | - 150:6 | Fries, James 2006-06-16 | 00:00:02 | |
| | 150: 6 | Q. Sir, at the time -- | | |
| 150:9 | - 150:18 | Fries, James 2006-06-16 | 00:00:26 | |
| | 150: 9 | Q. -- though, if you look at | | |
| | 150: 10 | Page 3 of your letter, in the middle of | | |
| | 150: 11 | the page you say, "These drugs should on | | |

Case 2:05-md-01657-EEF-DEK Document 8235-8 Filed 12/04/06 Page 14 of 15

Plaintiff's and Defendant's Designations of James Fries, M.D.

| | | Designated Testimony | | Objections | Rulings |
|---|---|---|---|---|---|
| | 150: 12 | balance, save a substantial number of | | | |
| | 150: 13 | lives." | | | |
| | 150: 14 | A. Yeah, that was actually my | | | |
| | 150: 15 | mindset. That's fair. | | | |
| | 150: 16 | Q. Okay. | | | |
| | 150: 17 | Back in 2001. | | | |
| | 150: 18 | A. Yes. | | | |
| 155:4 | - 155:16 | Fries, James 2006-06-16 | 00:00:27 | | |
| | 155: 4 | Q. Dr. Fries, we've put in | | | |
| | 155: 5 | front of you Defense Exhibit 245. Can | | | |
| | 155: 6 | you identify this? | | | |
| | 155: 7 | A. Yes. We've spoken to this | | | |
| | 155: 8 | before. This is a letter from Mr. | | | |
| | 155: 9 | Gilmartin to me. | | | |
| | 155: 10 | Q. Dated January 23rd, 2001? | | | |
| | 155: 11 | A. Yes. | | | |
| | 155: 12 | Q. And I think this is the | | | |
| | 155: 13 | letter that you've described as a | | | |
| | 155: 14 | "thoughtful" and positive letter? | | | |
| | 155: 15 | A. Yes, it was a response to my | | | |
| | 155: 16 | letter of January 9th. | | | |
| 156:4 | - 156:17 | Fries, James 2006-06-16 | 00:00:30 | | |
| | 156: 4 | Q. Dr. Fries, I'm putting in | | | |
| | 156: 5 | front of you a document marked as Defense | | | |
| | 156: 6 | Exhibit 264. Can you tell us what that | | | |
| | 156: 7 | is? | | | |
| | 156: 8 | A. It's a letter to me from | | | |
| | 156: 9 | David Anstice, the copy to Doug Greene. | | | |
| | 156: 10 | Q. Dated February 16th, 2001? | | | |
| | 156: 11 | A. February 16th, 2001. | | | |
| | 156: 12 | Q. And is this the letter that | | | |
| | 156: 13 | came with the data that you received from | | | |
| | 156: 14 | Merck? | | | |
| | 156: 15 | A. Yes. I don't remember | | | |
| | 156: 16 | receiving any data. There must have been | | | |
| | 156: 17 | some. There are attachments noted here. | | | |
| 157:5 | - 158:6 | Fries, James 2006-06-16 | 00:00:52 | | |
| | 157: 5 | And by this time, there had | | | |
| | 157: 6 | been an Advisory Committee concerning | | | |
| | 157: 7 | Vioxx and Celebrex. Do you recall that | | | |
| | 157: 8 | in February of 2001? | | | |
| | 157: 9 | A. Yeah. As I say, | | | |
| | 157: 10 | reconstructing these dates and what order | | | |
| | 157: 11 | they are is really hard for me, but there | | | |
| | 157: 12 | was one roughly around there. Yeah. So, | | | |
| | 157: 13 | these data had already in that interval | | | |
| | 157: 14 | been, I guess, released pretty generally. | | | |
| | 157: 15 | Q. And have you been on FDA | | | |
| | 157: 16 | Advisory Committees before? | | | |
| | 157: 17 | A. Yes. | | | |
| | 157: 18 | Q. And has it been your | | | |
| | 157: 19 | experience that data from studies before | | | |
| | 157: 20 | the Advisory Committee are discussed at | | | |
| | 157: 21 | those meetings? | | | |
| | 157: 22 | A. The data are discussed, yes, | | | |
| | 157: 23 | at the meeting. I don't recall the exact | | | |
| | 157: 24 | details. Sometimes it's long, and | | | |
| | 158: 1 | sometimes it's short. | | | |
| | 158: 2 | Q. Has it been your experience | | | |
| | 158: 3 | that members of FDA Advisory Committees | | | |

| Designated Testimony | | | Objections | Rulings |
|---|---|---|---|---|
| | 158: 4 | are respected scientists in the relevant | | |
| | 158: 5 | fields? | | |
| | 158: 6 | A. Yes, for the most part. | | |
| 168:13 - 168:22 | | Fries, James 2006-06-16    00:00:23 | | |
| | 168: 13 | Q. Are you familiar, just in | | |
| | 168: 14 | your 40 years of medicine, with the idea | | |
| | 168: 15 | of drug companies choosing to neutralize | | |
| | 168: 16 | and discredit doctors? | | |
| | 168: 17 | A. I was amazed earlier when we | | |
| | 168: 18 | saw something that said somebody was | | |
| | 168: 19 | going to control me as part of -- that's | | |
| | 168: 20 | hard to do. So, no, I've never seen | | |
| | 168: 21 | anything like this. This is really | | |
| | 168: 22 | unprecedented in my experience. | | |
| 170:23 - 171:6 | | Fries, James 2006-06-16    00:00:23 | | |
| | 170: 23 | Q. You believe in safety first? | | |
| | 170: 24 | A. No. I believe that you have | | |
| | 171: 1 | a balance with pharmaceutical treatments | | |
| | 171: 2 | between the good and the harm that they | | |
| | 171: 3 | do. Things that do a whole lot of good, | | |
| | 171: 4 | they can do quite a bit of harm. And you | | |
| | 171: 5 | still would say that on balance, they're | | |
| | 171: 6 | good drugs. So, it's a balance issue. | | |