Plaintiffs Scolnick.txt

ID:                 Scolnick Part 1 (3-22-05)

ID:                 Scolnick 1505
Page Range:         15:5-15:7

      15: 5          Q.    Are you Dr. Ed Scolnick?
      15: 6          A.    Yes, I'm Dr. Edward
      15: 7   Scolnick.


ID:                 Scolnick 2213
Page Range:         22:13-22:18

      22:13          Q.    Are you the Edward M.
      22:14   Scolnick, President of Merck Research
      22:15   Labs and then the Executive Vice
      22:16   President Science and Technology for
      22:17   Merck & Company?
      22:18          A.    Yes, I am.


ID:                 Scolnick 47.2-48.2
Page Range:         47:2-48:2

      47: 2          Q.    Well, let me suggest it to
      47: 3   you if you'll look at Exhibit Number 4.
      47: 4                I'll bet you've seen this
      47: 5   e-mail lately getting ready for your
      47: 6   deposition, haven't you?
      47: 7          A.    I don't recall seeing this
      47: 8   e-mail before right now.
      47: 9          Q.    You don't recall seeing this
      47:10   e-mail before?
      47:11          A.    I do not recall seeing this
      47:12   e-mail before.
      47:13          Q.    All right.  Well, if you'll
      47:14   look down at your message dated December
      47:15   5th, 2001, it's about an analyst who is
      47:16   going to stand up in public and say
      47:17   something negative about Vioxx.  And
      47:18   you're the fellow who wrote, "David if he
      47:19   says this I will boil him in oil at the
      47:20   meeting."  That's what you said, isn't
      47:21   it?
      47:22          A.    That is the e-mail you're
      47:23   referring to, yes.
      47:24          Q.    Does that mean, yes, you
      47:ESQUIRE DEPOSITION SERVICES
      48: 48
      48: 1   said it?
      48: 2          A.    That is my e-mail.


ID:                 Scolnick 49.1-49.10
Page Range:         49:1-49:10

      49: 1                So, you were saying you were
      49: 2   going to boil this fellow in oil because
      49: 3   this was an analyst who was going to
      49: 4   stand up and suggest that maybe Vioxx
      49: 5   causes CV events, heart attacks, strokes,
      49: 6   things like that; right?

Plaintiffs Scolnick.txt

```
49: 7          A.    I don't recall the details
49: 8     of his report.  I have not seen this
49: 9     e-mail, and I don't recall the details of
49:10     this at all.
```

```
ID:                Scolnick 52.2-52.21
Page Range:        52:2-52:21
```

```
52: 2          Q.    Well, if you'll look behind
52: 3     you'll see what it is that upset you.
52: 4     It was this fellow named somebody, hang
52: 5     on, his name is at the end, Richard
52: 6     Stover, who prepared a reanalysis of
52: 7     Merck's meta-analysis.  Do you see where
52: 8     it says that?
52: 9          A.    That is the title for the
52:10     article that you're referring to.
52:11          Q.    Now, those are a lot of big
52:12     words for nonscientist people.  But just
52:13     between you and me, what this really is
52:14     is it's a stock analyst, someone who
52:15     advises the investment community on
52:16     whether to buy or sell stock, and he's
52:17     basically examining some of what you guys
52:18     had been telling people about the safety
52:19     of your drug, isn't he?
52:20          A.    He's talking about the VIGOR
52:21     study and Vioxx, yes.
```

```
ID:                Scolnick 58.17-58.24
Page Range:        58:17-58:24
```

```
58:17          Q.    Okay.  And that's why you
58:18     said "David if he says this I will boil
58:19     him in oil at the meeting."  You didn't
58:20     want that kind of talk out there, did
58:21     you?
58:22          A.    I didn't want -- having read
58:23     this memo, I didn't want an inaccurate
58:24     statistical analysis of our data.
```

```
ID:                Scolnick 6803
Page Range:        68:3-68:4
```

```
68: 3          Q.    I want to show you Scolnick
68: 4     Exhibit Number 7.  We're going to come
```

```
ID:                Scolnick 6811
Page Range:        68:11-68:18
```

```
68:11          Q.    Do you see your June 1, 1998
68:12     e-mail?
68:13          A.    Yes, I do.
68:14          Q.    You did threaten to quit,
68:15     didn't you?
68:16          A.    I was upset with a
68:17     particular marketing person.  I was --
68:18     and that is the thrust of this e-mail.
```

Plaintiffs Scolnick.txt

ID:              Scolnick 69.01-69.15
Page Range:      69:1-69:15

69: 1            Q.    Well, when you said "If you
69: 2    lose I will leave, because I will not be
69: 3    able to have any respect for this
69: 4    company," that's threatening to quit,
69: 5    isn't it?
69: 6            A.    The e-mail is accurate.
69: 7            Q.    No.  That wasn't my
69: 8    question.
69: 9            I said, when you say in your
69:10    e-mail, "If you lose I will leave,
69:11    because I will not be able to have any
69:12    respect for this company," you're
69:13    threatening to quit, aren't you?
69:14            A.    I accept that
69:15    interpretation.


ID:              Scolnick 069.23-071.12
Page Range:      69:23-71:12

69:23            Q.    You're saying "Merck
69:24    marketing for once has to compete and
69:ESQUIRE DEPOSITION SERVICES
70: 70
70: 1    win.  If you do not beat Pfizer," which
70: 2    is who Searle was at the time; right?  If
70: 3    you don't beat Celebrex, that's what it
70: 4    means; right?
70: 5            A.    Yes, that's correct.
70: 6            Q.    "If you do not beat PFIZER
70: 7    2/1 MERCK should throw in the towel and
70: 8    just give up and hand the company over to
70: 9    someone else.  If YOU," all capitals,
70:10    "lose I will leave, because I will not be
70:11    able to have any respect for this
70:12    company."  You didn't threaten them to
70:13    boil them in oil, but you were pretty
70:14    upset with them, weren't you?
70:15            A.    It is a pointed e-mail.
70:16            Q.    Because you were upset;
70:17    weren't you?
70:18            A.    That is correct.
70:19            Q.    You were upset also because
70:20    of some study issues, research issues;
70:21    weren't you?
70:22            A.    I don't recall what you're
70:23    referring to.
70:24            Q.    Look at what it says at the
70:ESQUIRE DEPOSITION SERVICES
71: 71
71: 1    start.  You're saying that the reason
71: 2    y'all were three months behind Searle,
71: 3    the reason you were losing the race is
71: 4    because people in marketing "demanded a
71: 5    label that said we cause no ulcers."
71: 6    And then the budgets were so high that
71: 7    nobody could get the money that they
71: 8    needed for the study.  And that's why
71: 9    y'all were behind?  That's what you say;
Page 3

Plaintiffs Scolnick.txt

```
71:10  isn't it?
71:11       A.    That is what the memo says,
71:12  yes.
```

```
ID:            Scolnick 7807
Page Range:    78:7-78:12
```

```
78: 7       Q.    Bottom line is, you were
78: 8  saying marketing needs to stop their
78: 9  demands and just get out there and
78:10  compete and win for once; right?
78:11       A.    That's what my memo
78:12  indicates.
```

```
ID:            Scolnick 7906-7911
Page Range:    79:6-79:11
```

```
79: 6       Q.    Sir, y'all weren't ready to
79: 7  go to market with your product, with
79: 8  Vioxx, when Celebrex hit the market?
79: 9  Y'all got beat; right?
79:10       A.    Celebrex got to the market
79:11  first.  That is correct.
```

```
ID:            Scolnick 9623
Page Range:    96:23-97:5
```

```
96:23       Q.    Well, we looked at an
96:24  exhibit a few minutes ago, the 1998 one
96:ESQUIRE DEPOSITION SERVICES
97: 97
97: 1  . where you said that y'all were killing
97: 2  basic research again at Merck, once
97: 3  again.  That's because y'all needed more
97: 4  money.  You didn't have enough money in
97: 5  the budget; right?
```

```
ID:            Scolnick 9803
Page Range:    98:3-98:9
```

```
98: 3       Q.    All right.  So, now you'll
98: 4  agree with me in 1998 y'all didn't have
98: 5  enough money in your budget to do all the
98: 6  research you wanted to do.  True?
98: 7       A.    That is true.  That is
98: 8  always true of any really productive
98: 9  research laboratory.
```

```
ID:            Scolnick 10113
Page Range:    101:12-101:20
```

```
101:12  BY MR. LANIER:
101:13       Q.    Well, sir, you weren't in
101:14  marketing yourself, were you?
101:15       A.    No.
101:16       Q.    Well, why did you keep
101:17  . dabbling in the marketing end?  Why were
101:18  you sending broadside e-mails to people,
```

Page 4

                              Plaintiffs Scolnick.txt
101:19    because y'all were too slow on the
101:20    marketing?


ID:                Scolnick 10123
Page Range:        101:23-102:3

   101:23                 THE WITNESS:  I was
   101:24         competitive, and we had a terrific
   101:ESQUIRE DEPOSITION SERVICES
   102: 102
   102: 1          drug, and I wanted the company to
   102: 2          present that drug well to
   102: 3          physicians.


ID:                Scolnick 11503
Page Range:        115:3-115:10

   115: 3          Q.   So, you had all the
   115: 4    resources you needed to do the right
   115: 5    studies, and if the studies weren't done,
   115: 6    it was your fault for not doing them
   115: 7    because you had the money.  Is that what
   115: 8    you're telling me?
   115: 9          A.   We had sufficient resources
   115:10    to study Vioxx.


ID:                Scolnick 11805
Page Range:        118:5-118:11

   118: 5          Q.   If you thought that there
   118: 6    was an issue that needed debunking, you
   118: 7    certainly knew how to order to get a
   118: 8    study immediately to debunk the issue and
   118: 9    destroy credibility, didn't you?
   118:10          A.   And to find out if we were
   118:11    wrong.


ID:                Scolnick 11818
Page Range:        118:18-119:3

   118:18          Q.   That wasn't my question,
   118:19    sir.  I said, you could have done a
   118:20    study, and you could have ordered one to
   118:21    be done with speed on the issue of
   118:22    cardiovascular problems, heart attacks
   118:23    and strokes, couldn't you?
   118:24          A.   There was no reason to do
   118:ESQUIRE DEPOSITION SERVICES
   119: 119
   119: 1    such a study before Vioxx went to market
   119: 2    based on all of the data, huge NDA, over
   119: 3    5,000 patients studied.


ID:                Scolnick 11910
Page Range:        119:10-119:23

   119:10    question.  My question is simple.  You
   119:11    certainly could have ordered a study for
                              Page 5

Plaintiffs Scolnick.txt

```
119:12   risks of heart attacks and strokes before
119:13   you put the Vioxx drug on the market,
119:14   couldn't you?
119:15            A.    If there had been a reason
119:16   to do that, I could have done that.
119:17            Q.    By the same token, any day
119:18   that Vioxx had been on the market, the
119:19   second it occurred to you that there
119:20   might be a problem with heart attacks and
119:21   strokes, you could have ordered
119:22   immediately a speed study to be done,
119:23   couldn't you?
```

```
ID:              Scolnick 12002
Page Range:      120:2-120:5
```

```
120: 2            THE WITNESS:  I could have
120: 3   asked or ordered a study to be
120: 4   done if I had thought there was a
120: 5   cardiovascular risk with Vioxx.
```

```
ID:              Scolnick 12023
Page Range:      120:23-121:23
```

```
120:23   to justify selling the drug.  I'm asking
120:24   you, did you ever order a specific study
120:ESQUIRE DEPOSITION SERVICES
121: 121
121: 1   about heart attacks and strokes?
121: 2            A.    I did not order a specific
121: 3   study.  I urged the group to come up with
121: 4   study designs after VIGOR to further
121: 5   examine the question that was raised by
121: 6   the VIGOR study.
121: 7            Q.    Well, sir, what about VALOR,
121: 8   did you have anything to do with talk
121: 9   about doing the VALOR study?
121:10            A.    VALOR?
121:11            Q.    Yes, sir.
121:12            A.    I don't recognize the term.
121:13   I'm sorry.
121:14            Q.    Did you know that your
121:15   company at one point contemplated and
121:16   actually went pretty far in designing the
121:17   idea of doing a study specifically to
121:18   look at heart attack, strokes, CV risks?
121:19            A.    Yes.  Several study designs
121:20   were considered.
121:21            Q.    And one of them had approval
121:22   and was about to be done when it was
121:23   cancelled.  Did you know that?
```

```
ID:              Scolnick 12201
Page Range:      122:1-122:3
```

```
122: 1            THE WITNESS:  One of the
122: 2   studies that I'm aware of was not
122: 3   given final approval.
```

Plaintiffs Scolnick.txt

ID:              Scolnick 12205
Page Range:      122:5-122:9

122: 5          Q.    Why not?
122: 6          A.    Because when the study was
122: 7   reviewed, several people objected to the
122: 8   design of the study, that it was not a
122: 9   good scientific study to do.


ID:              D ES  12210
Page Range:      122:10-122:15

122:10          Q.    So, you had the need for the
122:11   study, you just didn't design a good one.
122:12   Is that fair to say?
122:13          A.    We considered many study
122:14   designs before the approved design was
122:15   conceptualized.


ID:              Scolnick 12801
Page Range:      128:1-128:22

128: 1          Q.    Well, the truth is, the
128: 2   essential study that needed to be done
128: 3   for Vioxx was an outcomes study for heart
128: 4   attacks and strokes; right?
128: 5          A.    The study that would
128: 6   measure, as a predefined endpoint, heart
128: 7   attacks and strokes was an important
128: 8   study for Vioxx.
128: 9          Q.    Not an important.  It was,
128:10   at least in the world of things back in
128:11   2001, the only essential study for Vioxx,
128:12   wasn't it?
128:13          A.    It was an essential study to
128:14   do for Vioxx.
128:15          Q.    That wasn't my question.
128:16          The only essential study;
128:17   true?
128:18          A.    It wasn't the only essential
128:19   study to do.  It was --
128:20          Q.    That's what you said.
128:21          A.    It was a very important
128:22   study.


ID:              Scolnick 13609
Page Range:      136:9-136:12

136: 9          Q.    Well, certainly by the year
136:10   2000 you knew that there was an issue
136:11   about heart attacks and strokes, weren't
136:12   you?


ID:              Scolnick 13615
Page Range:      136:15-136:17

136:15          THE WITNESS:  The VIGOR
136:16   study was available in the year
136:17   2000.

Plaintiffs Scolnick.txt

ID:              Scolnick 14109
Page Range:      141:9-142:7

141: 9                  MR. LANIER:  We're marking
141:10          that as Exhibit Number 13.
141:11  BY MR. LANIER:
141:12          Q.    If you'll look down at the
141:13  third question, that's the one I want you
141:14  to look at.
141:15          A.    Uh-huh.
141:16          Q.    "why did Merck undertake
141:17  the," APPROVe, "trial?"
141:18          A.    Uh-huh.
141:19          Q.    Merck prepared an answer to
141:20  that.  Nowhere in that answer does it say
141:21  to see if people are having heart attacks
141:22  and strokes, does it?
141:23          A.    The answer to the question
141:24  does not refer to the cardiovascular
141:ESQUIRE DEPOSITION SERVICES
142: 142
142: 1  outcome part of the study.
142: 2          Q.    I'm sorry.  That's a long
142: 3  answer.  Are you just saying, yes, you're
142: 4  right, it doesn't say heart attacks and
142: 5  strokes?
142: 6          A.    There's nothing about heart
142: 7  attacks and strokes in that answer.


ID:              Scolnick 14602
Page Range:      146:2-146:5

146: 2                  You, Dr. Scolnick, knew
146: 3  Vioxx was causing heart attacks and
146: 4  strokes by the time of March 2000; true?
146: 5          A.    Not true.


ID:              D ES  14606
Page Range:      146:6-146:10

146: 6          Q.    Well, we at least know that
146: 7  you're getting reports of it, that you're
146: 8  having summarized out of thousands of
146: 9  reports, right, Exhibit 10?
146:10          A.    Again, I've --


ID:              D ES  14613
Page Range:      146:13-147:4

146:13                  THE WITNESS: -- tried to
146:14          explain to you the fact that when
146:15          a drug goes on the market, adverse
146:16          experience reports are reported on
146:17          every drug, including Vioxx.  And
146:18          the challenge for analyzing those
146:19          reports is to try to figure out
146:20          whether they're happening by
146:21          chance associated with the drug or

Page 8

Plaintiffs Scolnick.txt
```
146:22              whether the drug is actually
146:23              causing the adverse experiences
146:24              reported in the reports.
146:ESQUIRE DEPOSITION SERVICES
147: 147
147: 1                  And we did this -- we did
147: 2              this routinely and very, very
147: 3              carefully for every drug we ever
147: 4              brought on the market.


ID:              Scolnick 14707
Page Range:      147:7-147:12

147: 7     jury, as of March 2000, you, Edward
147: 8     Scolnick, knew that the CV events, the
147: 9     heart attacks and strokes, were clearly
147:10     there, and you, Edward Scolnick, knew
147:11     that they were mechanism-based with
147:12     Vioxx?


ID:              Scolnick 14716
Page Range:      147:16-147:21

147:16         Q.    True?
147:17         A.    That was my very first
147:18     reaction when I saw the data from the
147:19     VIGOR trial.
147:20         Q.    You knew it from the get-go.
147:21  . It was your first reaction; right?


ID:              Scolnick 14724
Page Range:      147:24-148:2

147:24             THE WITNESS:  It was my
147:ESQUIRE DEPOSITION SERVICES
148: 148
148: 1          first reaction before other data
148: 2    .      was available.


ID:              Scolnick 14817
Page Range:      148:17-148:24

148:17         Q.    Sir, it is in March of 2000;
148:18     isn't it?
148:19         A.    Yes, it is.
148:20         Q.    And you said to everybody,
148:21     Alan Nies, Alise Reicin and Deborah
148:22     Shapiro certain things, didn't you?
148:23         A.    I did.  It says, "I just
148:24     received and went through the data."


ID:              Scolnick 14908
Page Range:      149:8-150:2

149: 8         Q.    And you don't step out and
149: 9     say something unless you know it's true
149:10     and right.  Do you remember that?
149:11         A.    I don't remember saying what
```

Plaintiffs Scolnick.txt

```
149:12    you've just quoted me as saying.
149:13         Q.    I think your exact words
149:14    were, you hold yourself to a very high
149:15    standard.  Do you remember that?
149:16         A.    Yes, I do remember that.
149:17         Q.    And so you sent this e-mail
149:18    to everybody, and you said that you
149:19    received and you went through the data;
149:20    right?
149:21         A.    Uh-huh.  That's what it
149:22    says.
149:23         Q.    And I'm sure you did that
149:24    thoroughly.  You didn't do a half slop
149:ESQUIRE DEPOSITION SERVICES
150: 150
150: 1    job; did you?
150: 2         A.    I don't think so.
```

ID:           Scolnick 15105
Page Range:   151:5-151:12

```
151: 5              THE WITNESS:  Excuse me.  If
151: 6         I can just look at the memo for
151: 7         one second.  "Pubs" in this
151: 8         context is talking about
151: 9         perforations, ulcers and bleeds
151:10         associated with the study.
151:11    BY MR. LANIER:
151:12         Q.    Okay.  Thank you.
```

ID:           Scolnick 15113
Page Range:   151:13-151:22

```
151:13              "There is no doubt about
151:14    the" perforations, ulcers and bleeds
151:15    "data."  Then look at your next sentence.
151:16    "The CV events are," what's that word?
151:17         A.    The sentence reads, "The
151:18    cardiovascular events are clearly there."
151:19         Q.    They're clearly there.  That
151:20    was your choice of words; wasn't it?
151:21         A.    This is my e-mail.  That is
151:22    correct.
```

ID:           Scolnick 15123
Page Range:   151:23-152:16

```
151:23         Q.    So, after you studied the
151:24    data, you went through it, you sent a
151:ESQUIRE DEPOSITION SERVICES
152: 152
152: 1    memo out to everybody, even though you
152: 2    hold yourself to a high standard, telling
152: 3    everybody that the CV events are clearly
152: 4    there, and that was March of 2000, wasn't
152: 5    it?
152: 6         A.    Yes, it is.
152: 7         Q.    And you never sent out an
152: 8    order at that point in time for a CV
152: 9    outcomes study, did you?
```

Page 10

Plaintiffs Scolnick.txt

```
152:10           A.    We -- I did not send out an
152:11  order for a CV outcomes study.  We took
152:12  many immediate actions to try to
152:13  understand the cardiovascular events,
152:14  since we couldn't conclude what was going
152:15  on in the trial because there was no
152:16  placebo in the trial.
```

```
ID:              Scolnick 15607
Page Range:      156:7-156:10
```

```
156: 7                   1999, I wrote, "Push Vioxx
156: 8  to market by May 22nd or" Merck will be
156: 9  "'a different company.'"  That's what you
156:10  said in 1999; right?
```

```
ID:              Scolnick 15613
Page Range:      156:13-156:19
```

```
156:13           THE WITNESS:  It accurately
156:14           reflects our earlier discussion.
156:15  BY MR. LANIER:
156:16           Q.    Then also in 1999 you sent
156:17  out the e-mail that said if we can't beat
156:18  Celebrex two to one, you're going to quit
156:19  or leave the company.  True?
```

```
ID:              Scolnick 156.21-156.23
Page Range:      156:21-156:23
```

```
156:21           THE WITNESS:  You reflected
156:22           my e-mail and some of my
156:23           sentiments in that e-mail.
```

```
ID:              Scolnick 157.10-157.14
Page Range:      157:10-157:14
```

```
157:10           The drug Vioxx did go to
157:11  market in 1999, and y'all marketed it
157:12  before the VIGOR study was finished;
157:13  true?
157:14           A.    Yes, that's correct.
```

```
ID:              D ES  15715
Page Range:      157:15-158:14
```

```
157:15           Q.    You couldn't afford to wait
157:16  for that VIGOR study to get done; could
157:17  you?
157:18           A.    No, that's not true.  That
157:19  was a study that was planned for being
157:20  done after the drug was approved and was
157:21  going to provide additional data about
157:22  gastrointestinal safety for the drug.
157:23           Q.    But, sir, the VIGOR study,
157:24  you could not afford to wait until it was
157:ESQUIRE DEPOSITION SERVICES
158: 158
```

Plaintiffs Scolnick.txt

```
158: 1    over to market your drug, because if you
158: 2    waited, Merck would be a different
158: 3    company.  You never would have made May
158: 4    22nd of '99; right?
158: 5            A.    The VIGOR study was not
158: 6    required to market the drug.
158: 7            Q.    I'm not asking did the FDA
158: 8    require it.  I'm talking about, did you
158: 9    market the drug before you got the VIGOR
158:10    results in?
158:11            A.    .Yes, we did.  The VIGOR
158:12    trial was never planned as part of the
158:13    very large NDA for the initial approval
158:14    of Vioxx.
```

```
ID:                D ES  15918
Page Range:        159:18-159:20
```

```
159:18            Q.    Then also in the year 2000,
159:19    you never ordered or had done a CV
159:20    specific study; true?
```

```
ID:          .     D ES  15923
Page Range:        159:23-160:6
```

```
159:23                    THE WITNESS:  We
159:24    immediately, upon having the VIGOR
159:ESQUIRE DEPOSITION SERVICES
160: 160
160: 1    results, did many additional data
160: 2    analyses on studies that we had to
160: 3    try to interpret the meaning of
160: 4    the VIGOR results.  And we did, in
160: 5    the end, come up with a study to
160: 6    measure cardiovascular outcomes.
```

```
ID:                Scolnick 16010
Page Range:        160:10-160:13
```

```
160:10            Q.    I said, very simple
160:11    question, sir.  It's a simple note.
160:12    2000, you never did a CV specific study;
160:13    true?
```

```
ID:                Scolnick 16016
Page Range:        160:16-160:23
```

```
160:16   .                THE WITNESS:  We did not do
160:17    a study where cardiovascular
160:18    outcomes were a primary endpoint.
160:19    We did do a study where
160:20    cardiovascular outcomes were a
160:21    predefined endpoint in our studies
160:22    to gather additional
160:23    cardiovascular outcomes data.
```

```
ID:          .     Scolnick 16120
Page Range:        161:20-161:23
```

Plaintiffs Scolnick.txt

```
161:20          Q.    Okay.  That's my point.  So,
161:21   you never did, never, one single study
161:22   where the primary outcome was, does it
161:23   cause heart attacks or strokes; right?
```

ID:              Scolnick 16202
Page Range:      162:2-162:3

```
162: 2               THE WITNESS:  You're
162: 3        correct.
```

ID:              Scolnick 16223
Page Range:      162:23-163:8

```
162:23          Q.    Sir, simple question.  Did
162:24   you change your warning label and tell
162:ESQUIRE DEPOSITION SERVICES
163: 163
163: 1   people about the VIGOR results in the
163: 2   year 2000?  Yes or no?
163: 3          A.    We told people about the
163: 4   VIGOR results immediately after they
163: 5   became available to us.
163: 6          Q.    Okay.
163: 7          A.    And we submitted an NDA to
163: 8   the FDA to change our label.
```

ID:              Scolnick 22606
Page Range:      226:6-226:10

```
226: 6          Q.    Do you have Exhibit 18 in
226: 7   front of you?
226: 8          A.    Yes, I do.
226: 9          Q.    It's the day before your "to
226:10   do" list, isn't it, the 13th?
```

ID:              Scolnick 22615
Page Range:      226:15-226:17

```
226:15               THE WITNESS:  Yes.  It's the
226:16        day before this memo on the "to
226:17        do" list.
```

ID:              Scolnick 22707
Page Range:      227:7-227:9

```
227: 7          Q.    Four days away from your
227: 8   initial conclusion that Vioxx was causing
227: 9   heart attacks and strokes; right?
```

ID:              Scolnick 22711
Page Range:      227:11-228:14

```
227:11               THE WITNESS:  Four days from
227:12        my initial memo with my initial
227:13        conclusion, yes.
```

Plaintiffs Scolnick.txt

```
227:14   BY MR. LANIER:
227:15           Q.    All right.
227:16           Now, already by four days
227:17   later, you have got Ms. Reicin scouring
227:18   the medical literature trying to find a
227:19   study somewhere that indicates that
227:20   NSAIDs helped your heart; right?
227:21           A.    That was one of the
227:22   questions that I asked the team when they
227:23   suggested that NSAIDs could be
227:24   cardioprotective.
227:ESQUIRE DEPOSITION SERVICES
228: 228
228: 1           Q.    And the only study she was
228: 2   able to find -- by the way, it is
228: 3   singular, there was only one study she
228: 4   could find; true?
228: 5           A.    That's what the e-mail says,
228: 6   yes.
228: 7           Q.    In fact, why don't you read
228: 8   that sentence where I've highlighted
228: 9   "Only study."
228:10           A.    "Alan and Ed:  Below is
228:11   attached the abstract from the only study
228:12   I could find which assessed the potential
228:13   cardioprotective effects of an NSAID.
228:14   Alise."
```

```
ID:             Scolnick 22902
Page Range:     229:2-229:8
```

```
229: 2           Q.    Did it occur to you that
229: 3   people were taking the drug that could be
229: 4   having these heart attacks, or is that
229: 5   what you meant when you said it's sad or
229: 6   it's a shame, but it's a low incidence,
229: 7   you just didn't figure there would be
229: 8   that many of them?
```

```
ID:             Scolnick 22911
Page Range:     229:11-229:19
```

```
229:11           THE WITNESS:  As I've
229:12   stated, my initial conclusion was
229:13   that Vioxx was causing heart
229:14   attacks in patients.  After
229:15   discussions of this article and
229:16   extensive other data that we had
229:17   available to ourselves in our own
229:18   trials, I concluded that I was not
229:19   correct in my initial conclusion.
```

```
ID:             Scolnick 23021
Page Range:     230:21-230:23
```

```
230:21           Q.    I'm going to hand you a
230:22   document marked Exhibit 19.  Do you have
230:23   it in front of you?
```

Page 14

Plaintiffs Scolnick.txt
ID:          Scolnick 23120
Page Range:  231:20-233:5

```
231:20          Q.    First of all, this
231:21  well-respected Carlo Patrono said that he
231:22  does not think that you can attribute the
231:23  increase in heart attacks and strokes to
231:24  the fact that the other people were
231:ESQUIRE DEPOSITION SERVICES
232: 232
232: 1  taking naproxen, and it must be good for
232: 2  your heart.  Fair to say?
232: 3          A.    That's what he writes, yes.
232: 4  That's what the person reflects on his
232: 5  comments.
232: 6          Q.    And then there are a number
232: 7  of reasons given why it can't be that
232: 8  naproxen is good; right?
232: 9          A.    What it says is, he
232:10  questions whether the magnitude of the
232:11  effects seen in VIGOR is consistent with
232:12  naproxen being cardioprotective.
232:13          Q.    Well, he said, first of all,
232:14  "There is a weak pharmacological basis."
232:15  Do you see where it said that?
232:16          A.    Yes, I do.
232:17          Q.    What that means to you and
232:18  me and folks who read this stuff more
232:19  than we probably should is that there's
232:20  really not a good medical science
232:21  pharmacy reason for saying it's naproxen.
232:22  That's what that means, doesn't it?
232:23          A.    It refers to the
232:24  pharmacology of the drug, and that's his
232:ESQUIRE DEPOSITION SERVICES
233: 233
233: 1  interpretation.
233: 2          Q.    And then it says, "No
233: 3  epidemiological evidence."  Do you see
233: 4  where it says that?
233: 5          A.    Yes, I do.
```

ID:          Scolnick 23314
Page Range:  233:14-234:3

```
233:14          Q.    Well, do you see the word
233:15  "no"?
233:16          A.    I do see that.
233:17          Q.    How many are there, if it
233:18  says there's no evidence?  How much
233:19  evidence is there?
233:20          A.    I see his comment.  I don't
233:21  know the details of his review that he
233:22  refers to here.
233:23          Q.    Well, when he says there's
233:24  no evidence, don't you think that means
233:ESQUIRE DEPOSITION SERVICES
234: 234
234: 1  zero?
234: 2          A.    I think that's a plausible
234: 3  explanation, yes.
```

Plaintiffs Scolnick.txt

ID:              Scolnick 23404
Page Range:      234:4-234:18

234: 4          Q.   Otherwise you think he'd use
234: 5    the word "some" or "a little" or "few" or
234: 6    "lots"?
234: 7          A.   He's talking about
234: 8    conventional nonsteroidals as part of his
234: 9    sentence.  And we actually agree with
234:10    that except for naproxen.
234:11          Q.   So, but you agree with the
234:12    statement even for naproxen, that there's
234:13    no epidemiological evidence that naproxen
234:14    is safe; right?  I mean, not safe, good
234:15    for the heart?
234:16          A.   There had been no prior data
234:17    to suggest that naproxen was
234:18    cardioprotective.


ID:              Scolnick 23420
Page Range:      234:20-235:5

234:20    next sentence.  He says, "Additionally"
234:21    which I guess means another reason, yet
234:22    another reason; right?
234:23          A.   Yes.
234:24          Q.   "Additionally the magnitude
234:ESQUIRE DEPOSITION SERVICES
235: 235
235: 1    of the effect," in other words, how many
235: 2    more heart attacks you were causing,
235: 3    "would not be plausible even if" you'd
235: 4    been comparing it to aspirin.  He says
235: 5    that; doesn't he?


ID:              Scolnick 23507
Page Range:      235:7-235:17

235: 7               THE WITNESS:  He talks about
235: 8          the aspirin, yes, the comparator
235: 9          to aspirin.
235:10    BY MR. LANIER:
235:11          Q.   He says, "In fact,
235:12    in...three different trials, aspirin has
235:13    shown no effect on the primary prevention
235:14    of stroke, while we have seen a 50% lower
235:15    incidence of stroke in the naproxen arm
235:16    of VIGOR"; right?
235:17          A.   That's what he says.


ID:              Scolnick 23613
Page Range:      236:13-236:23

236:13          Q.   Well, you were hoping
236:14    naproxen helped the heart just like
236:15    aspirin did; right?
236:16          A.   We weren't hoping anything.
236:17    We were concluding based on this study
236:18    that you've referred to and all the other

Plaintiffs Scolnick.txt
```
236:19   analysis versus placebo and other NSAIDs,
236:20   that except for this naproxen study,
236:21   there was no evidence for an imbalance of
236:22   cardiovascular events attributable to
236:23   Vioxx.
```

```
ID:              Scolnick 23703
Page Range:      237:3-237:7
```

```
237: 3           Q.    Sir, what y'all were putting
237: 4   forth there as an idea was that naproxen
237: 5   helps the heart just like aspirin does;
237: 6   right?
237: 7           A.    Or -- yes, that's correct.
```

```
ID:              D ES  23708
Page Range:      237:8-239:3
```

```
237: 8           Q.    But the truth be told, even
237: 9   aspirin, if you'd used aspirin, even
237:10   aspirin couldn't help the heart as much
237:11   as naproxen would have to to come up with
237:12   these results; right?
237:13           A.    Aspirin, to my knowledge,
237:14   had never been studied in this kind of
237:15   patient population.
237:16           Q.    That wasn't my question,
237:17   sir.
237:18           My point is, y'all had so
237:19   many more heart attacks and strokes in
237:20   your Vioxx group than the naproxen, that
237:21   if the real reason why is because
237:22   naproxen was helpful, that naproxen would
237:23   have to be two, three, four times better
237:24   for you than even aspirin; right?
237:ESQUIRE DEPOSITION SERVICES
238: 238
238: 1           A.    I can't conclude that.
238: 2   Aspirin has not been studied in patients
238: 3   with rheumatoid arthritis in this kind of
238: 4   trial.  There was no way to make that
238: 5   quantitative comparison.
238: 6           Q.    Well, naproxen hadn't been
238: 7   studied in any other trials to show that
238: 8   it was cardioprotective.  It never had
238: 9   been shown that in any of the testing
238:10   ever done; true?
238:11           A.    That is true, and I've tried
238:12   to explain to you why that study could
238:13   not have been done.
238:14           Q.    Well, sir, that study is
238:15   going to be an end result of every study
238:16   with naproxen.  You're always going to --
238:17   when you study naproxen, you're going to
238:18   compare the favorable outcomes on a
238:19   cardio basis with those that don't;
238:20   right?
238:21           A.    Not compared to placebo to
238:22   really be able to answer that question.
238:23           Q.    Fine.  Compared to other
238:24   NSAIDs; true?
```

Page 17

Plaintiffs Scolnick.txt
238:ESQUIRE DEPOSITION SERVICES
239: 239
239: 1          A.    If naproxen had been studied
239: 2    that way, then some day it could have
239: 3    been achieved.


ID:              Scolnick 268.13-268.17
Page Range:      268:13-268:17

268:13          Q.    Just make sure we're on the
268:14    same page.  If we look at Exhibit 23, you
268:15    even sent a memo to this to the CEO and
268:16    to the president of Merck back in January
268:17    of 2001, didn't you?


ID:              Scolnick 26901a
Page Range:      269:1-269:21

269: 1          A.    Yes.
269: 2          Q.    You said you "want to point
269: 3    out to all of you at one time that, 1.
269: 4    there is no way to prove that in patients
269: 5    with rheumatoid arthritis that ALL of the
269: 6    difference between Vioxx and naproxen is
269: 7    due to the benefit of naproxen."  That's
269: 8    what you said, isn't it?
269: 9          A.    That's right.  And all is
269:10    capitalized.
269:11          Q.    And then you capitalize this
269:12    whole next phrase.  "IT IS IMPOSSIBLE TO
269:13    PROVE THIS."  Didn't you?
269:14          A.    That's what the e-mail says.
269:15          Q.    That's what you said, isn't
269:16    it?
269:17          A.    Yes, it is.  It is.
269:18          Q.    Then you capitalize for
269:19    emphasis this next sentence.  "IT IS
269:20    IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."
269:21          A.    That's exactly what I said.


ID:              Scolnick Part 2 (4-29-05)


ID:              Scolnick 1014
Page Range:      10:14-10:16

10:14          Q.    You retired from Merck Research Labs
10:15    in 2003; correct?
10:16          A.    That is correct.


ID:              Scolnick 2714a
Page Range:      27:14-27:17

27:14                 In the late '80s and early '90s, you
27:15    were also the president of Merck Research Labs;
27:16    right?
27:17          A.    Yes.


ID:              Scolnick 2824

Page 18

Plaintiffs Scolnick.txt
Page Range:       28:24-29:2

28:24          Q.      At that point in time you did have
28:25      some concerns about what the prospects would be for
28:ESQUIRE DEPOSITION SERVICES
29: Confidential - Subject to Protective Order  29
29: 1      Merck in the late '90s and 2000 as several drugs
29: 2      were coming off patent; right?


ID:              Scolnick 2904
Page Range:      29:4-29:6

29: 4                    THE WITNESS:  I had concerns.  It was
29: 5      a way off, but, yes, I certainly remember vague
29: 6      thoughts about that.


ID:              Scolnick 2913
Page Range:      29:13-29:16

29:13          Q.      You have to anticipate that drugs
29:14      would be coming off patent maybe ten years down the
29:15      road and seek to have new drugs to fill the drugs
29:16      that were once proprietary of the company?


ID:              Scolnick 2918a
Page Range:      29:18-30:4

29:18                    THE WITNESS:  That is correct.
29:19      BY MR. BUCHANAN:
29:20          Q.      Because once a drug becomes generic
29:21      or goes off patent, then other competitors can enter
29:22      the market and seek to take market share; correct?
29:23          A.      That's correct.
29:24          Q.      Okay.  So, in the early '90s you knew
29:25      that beginning in 2000 and 2001, Merck would have
29:ESQUIRE DEPOSITION SERVICES
30: Confidential - Subject to Protective Order  30
30: 1      several drugs going off patent; correct?
30: 2          A.      The one that comes to mind
30: 3      immediately is Mevacor, but I don't recall the other
30: 4      drugs at this point.


ID:              Scolnick 3213
Page Range:      32:13-33:20

32:13                    All these drugs were significant
32:14      drugs for Merck?
32:15          A.      Yes.
32:16          Q.      Several of these were blockbuster
32:17      drugs for Merck; right?
32:18          A.      They were large selling drugs, yes.
32:19          Q.      Well, "blockbuster" has a meaning or
32:20      a connotation in the industry, doesn't it?
32:21          A.      "Blockbuster" means usually a very
32:22      large drug, very large sales drug.
32:23          Q.      Traditionally it meant more than a
32:24      billion dollars in sales; true?
32:25          A.      That is one interpretation given to
32:ESQUIRE DEPOSITION SERVICES
                        Page 19

Plaintiffs Scolnick.txt

33: Confidential - Subject to Protective Order   33
33: 1     it.
33: 2              Q.      So, several of these drugs were
33: 3     blockbuster drugs.  You'd agree with that?
33: 4              A.      Yes.
33: 5              Q.      Okay.
33: 6                      Several of these drugs, even if you
33: 7     can't remember all of them, were going off patent in
33: 8     2000, 2001, 2002; correct?
33: 9              A.      I'm not sure which ones, but some
33:10     drugs were going off patent at that point.
33:11             Q.      Well, you recall being concerned
33:12     about what the future will hold in 2000/2001 when
33:13     all these drugs were going off patent; correct?
33:14             A.      Yes.
33:15             Q.      You were concerned about that in the
33:16     early '90s?
33:17             A.      Yes.
33:18             Q.      And you were trying to design new
33:19     drugs to fill the void that would be left by these
33:20     drugs when they went off patent?

ID:            Scolnick 3324
Page Range:    33:24-33:25

33:24              THE WITNESS:  We were trying to
33:25     develop and discover new drugs that would do that.

ID:            Scolnick 3408a
Page Range:    34:8-34:17

34: 8              Q.      One of the drugs that was going to be
34: 9     filling the void left by these other drugs when they
34:10     went off patent was Vioxx; true?
34:11             A.      Vioxx was going to fill the void, but
34:12     in the early '90s, Vioxx -- I believe Vioxx was not
34:13     even on the Merck radar screen.  I don't even think
34:14     we had thought of the project at that point.  I
34:15     don't -- I don't recall the date when the Vioxx
34:16     project started.
34:17                                  -  -  -

ID:            Scolnick 3613a
Page Range:    36:13-36:18

36:13             Q.      There's a reference to Dr. Peppi
36:14     Prasit.  Do you see that?
36:15             A.      Dr. Peppi Prasit.
36:16             Q.      Prasit.  He was a scientist at your
36:17     labs in Montreal; correct?
36:18             A.      Yes, a chemist.

ID:            Scolnick 3711
Page Range:    37:11-37:18

37:11             Q.      You see the date referenced here.
37:12     It's July 1992; correct?
37:13             A.      Yes, I do.
37:14             Q.      Does that refresh your recollection
                          Page 20

Plaintiffs Scolnick.txt

```
37:15  .  as to when Merck started considering investigating
37:16     selective NSAIDs?
37:17        A.     Yes, it does.  I had not recalled we
37:18     started this project this early.
```

```
ID:              Scolnick 4206
Page Range:      42:6-42:9
```

```
42: 6                    So, you put a lot of resources within
42: 7   ·Merck Research Labs onto this particular project;
42: 8   correct?
42: 9        A.     Yes, that is correct.
```

```
ID:              Scolnick 43.11
Page Range:      43:11-43:19
```

```
43:11        Q.     And you encouraged Dr. Prasit and his
43:12   staff to pursue the Vioxx project with all resources
43:13   that were available at Merck Frosst; true?
43:14        A.     That is correct.
43:15        Q.     Okay.
43:16               You knew how important this drug
43:17   could be for the company; right?
43:18        A.     I knew that this could be a very
43:19   important project, yes.
```

```
ID:              Scolnick 47.06
Page Range:      47:6-47:8
```

```
47: 6        Q.     You wanted to be the ·first to market
47: 7   with this selective COX-2 inhibitor; correct?
47: 8        A.     Yes.
```

```
ID:              Scolnick 8703
Page Range:      87:3-87:9
```

```
87: 3        Q.     All right, sir.  I want to get back
87: 4   to something.  I want to turn back to 1998.  I want
87: 5   to talk about the period prior to the time when
87: 6   Merck had Vioxx approved.  Okay?  Do you remember
87: 7   when Vioxx was approved?
87: 8        A.     I believe it was late 1999, middle of
87: 9   1999.
```

```
ID:              ES 9803
Page Range:      98:3-98:5
```

```
98: 3        A.     I don't recall seeing this particular
98: 4   document.
98: 5        Q.     Okay.
```

```
ID:              Scolnick 9806
Page Range:      98:6-98:10
```

```
98: 6                For the record, it is an e-mail from
98: 7   you to a series of individuals, Alan Nies, Beth
98: 8   Seidenberg, Tom Simon, Robert Silverman.  Sir, are
```

Plaintiffs Scolnick.txt
```
98: 9    all of those people Merck employees?
98:10         A.    Yes, they were.


ID:           Scolnick 9922a
Page Range:   99:22-100:13

  99:22         Q.    So, what you did here was you sent
  99:23    these folks on your Vioxx development team and some
  99:24    regulatory personnel an analyst report; correct?
  99:25         A.    That appears to be correct.
  99:ESQUIRE DEPOSITION SERVICES
 100: Confidential - Subject to Protective Order 100
 100: 1         Q.    Okay.
 100: 2               You sent it with high importance?
 100: 3         A.    That's what it's marked.
 100: 4         Q.    It was real important they saw this
 100: 5    analyst report?
 100: 6         A.    It's marked high importance.
 100: 7         Q.    Do you make it a practice, sir, to
 100: 8    send Wall Street analyst reports to employees who
 100: 9    are on projects within Merck?
 100:10         A.    I sent a variety of information to
 100:11    them, sometimes analyst reports which had relevant
 100:12    information, sometimes scientific articles.  I send
 100:13    a variety of things to my employees.


ID:           Scolnick 11222
Page Range:   112:22-112:24

 112:22               So, it is, in fact, accurate to state
 112:23    that in 1998 Merck had declining sales in several of
 112:24    its key franchises; correct?


ID:           Scolnick 11301
Page Range:   113:1-113:13

 113: 1               THE WITNESS:  I've answered your
 113: 2    question.
 113: 3    BY MR. BUCHANAN:
 113: 4         Q.    I would like you to answer that
 113: 5    question, please.
 113: 6         A.    Some of its franchises had declining
 113: 7    sales.
 113: 8         Q.    And they were key franchises?
 113: 9         A.    And some of them were key.
 113:10         Q.    Okay.
 113:11               You also had several drugs going off
 113:12    patent in the near future; right?
 113:13         A.    Correct.


ID:           D ES  11512
Page Range:   115:12-115:16

 115:12         Q.    Well, when you sent this, were you
 115:13    sending it as a scientist, sir?
 115:14         A.    Yes, because it was in my capacity as
 115:15    head of the research laboratories to these people
 115:16    who reported to the research laboratories.
```

Plaintiffs Scolnick.txt

ID:              Scolnick 11517a
Page Range:      115:17-116:11

```
115:17          Q.      You thought it was important to tell
115:18   your employees that Merck's base business was
115:19   eroding?
115:20          A.      Yes.
115:21          Q.      You thought it was important to tell
115:22   them that Merck had several products going off
115:23   patent?
115:24          A.      They knew that.  This was to
115:25   reemphasize that.
115:ESQUIRE DEPOSITION SERVICES
116: Confidential - Subject to Protective Order 116
116: 1          Q.      You thought it was important to tell
116: 2   them that several of the recently launched products
116: 3   had not been as successful as anticipated?
116: 4          A.      I wanted to provide them the
116: 5   information in this document, yes, that's correct.
116: 6          Q.      You thought it was important to tell
116: 7   them that several of the recently launched products
116: 8   weren't as successful as you anticipated they'd be;
116: 9   right?
116:10          A.      That's what's in here, and I wanted
116:11   to provide them that information.
```

ID:              Scolnick 11718
Page Range:      117:18-118:3

```
117:18          Q.      They are the people who you would
117:19   hope would be able to facilitate a speedy approval
117:20   of your drug; correct?
117:21          A.      That is part of their responsibility.
117:22   Part of their jobs, yes.
117:23          Q.      And that's part of why you provided
117:24   this e-mail to them; right?
117:25          A.      Yes.
117:ESQUIRE DEPOSITION SERVICES
118: Confidential - Subject to Protective Order 118
118: 1          Q.      You wanted them to know how important
118: 2   it was that this drug proceed quickly through the
118: 3   regulatory approval process; right?
```

ID:              Scolnick 11806
Page Range:      118:6-118:9

```
118: 6                  THE WITNESS:  Yes.
118: 7   BY MR. BUCHANAN:
118: 8          Q.      It was essential to the financial
118: 9   success of the firm; right?
```

ID:              Scolnick 11811
Page Range:      118:11-118:18

```
118:11                  THE WITNESS:  It was essential to
118:12   Merck.  It was important to Merck, yes.
118:13   BY MR. BUCHANAN:
118:14          Q.      Okay.
118:15                  And, in fact, it was not only
```

Page 23

Plaintiffs Scolnick.txt

```
118:16    essential, but Vioxx's success was necessary to
118:17    preserve Merck and Merck Research Labs period;
118:18    correct?


ID:              Scolnick 11821
Page Range:      118:21-118:22

  118:21                   THE WITNESS:  That is what I said in
  118:22    my e-mail.


ID:              Scolnick 11824
Page Range:      118:24-119:1

  118:24         Q.       That's true; right?
  118:25         A.       I believe it is an exaggeration, but
118:ESQUIRE DEPOSITION SERVICES
119: Confidential - Subject to Protective Order 119
119: 1    it has some truth.


ID:              Scolnick 12217
Page Range:      122:17-123:7

  122:17                   Well, at this point in time, October
  122:18    1998, what did you know about Vioxx's potential to
  122:19    cause cardiovascular risks or cardiovascular
  122:20    problems?
  122:21         A.       I don't recall exactly what we knew
  122:22    at this point.  There was no evidence at all in the
  122:23    Vioxx development program at this point that Vioxx
  122:24    caused cardiovascular risks.
  122:25         Q.       What do you mean by that, "caused
122:ESQUIRE DEPOSITION SERVICES
123: Confidential - Subject to Protective Order 123
123: 1    cardiovascular risks"?
123: 2         A.       There was no evidence to say that
123: 3    Vioxx caused a cardiovascular risk.
123: 4         Q.       Well, you're not saying that in
123: 5    individual trials preapproval that you didn't see
123: 6    imbalances between cardiovascular risks in Vioxx and
123: 7    the comparator drugs, are you?


ID:              Scolnick 12309a
Page Range:      123:9-123:14

  123: 9                   THE WITNESS:  Before the drug was
  123:10    approved?
  123:11    BY MR. BUCHANAN:
  123:12         Q.       Yes.
  123:13         A.       I don't recall any such data.  So, if
  123:14    it was there, I certainly don't recall it.


ID:              D ES  12911
Page Range:      129:11-129:21

  129:11                   THE WITNESS:  No, actually, that is
  129:12    not the conclusion that anyone drew or was certain
  129:13    of.  The question was raised as to what the source
  129:14    of that metabolite was in the source of the
```

Plaintiffs Scolnick.txt

```
129:15   prostacyclin and whether it was systemic or whether
129:16   it was not systemic.
129:17   BY MR. BUCHANAN:
129:18        Q.    I see.  So, if it was systemic, that
129:19   would mean that prostacyclin that was produced
129:20   ordinarily in the vasculature was being suppressed
129:21   by Vioxx; true?
```

```
ID:              D ES  12923
Page Range:      129:23-130:3
```

```
129:23                THE WITNESS:  I don't think anyone
129:24   had any evidence nor felt that prostacyclin was
129:25   produced in the vasculature.  No one really knew
129:ESQUIRE DEPOSITION SERVICES
130: Confidential - Subject to Protective Order 130
130: 1   where prostacyclin was produced exactly, in what
130: 2   organs, and the relationship of any of that to the
130: 3   metabolite in the urine.  None of that was known.
```

```
ID:              Scolnick 13005
Page Range:      130:5-130:11
```

```
130: 5        Q.    But you did conduct a clinical trial
130: 6   in 1997 with an individual named Garret FitzGerald;
130: 7   correct?
130: 8        A.    Yes.
130: 9        Q.    And he ran a clinical trial that
130:10   showed that Vioxx suppressed the urinary metabolites
130:11   of prostacyclin; correct?
```

```
ID:              Scolnick 13013
Page Range:      130:13-130:17
```

```
130:13                THE WITNESS:  Yes.
130:14   BY MR. BUCHANAN:
130:15        Q.    One of the conclusions that was drawn
130:16   by your consultants was that Vioxx was suppressing
130:17   systemic prostacyclin; correct?
```

```
ID:              Scolnick 13020a
Page Range:      130:20-130:22
```

```
130:20                THE WITNESS:  I don't believe they
130:21   drew that conclusion.  I think they raised that
130:22   question.
```

```
ID:              Scolnick 13109
Page Range:      131:9-131:11
```

```
131: 9                And if that was happening, there was
131:10   a risk that Vioxx could cause thrombotic events in
131:11   humans; true?
```

```
ID:              Scolnick 13113a
Page Range:      131:13-131:20
```

Plaintiffs Scolnick.txt

```
131:13                THE WITNESS:  There was a theory that
131:14   that could occur with no evidence ever garnered to
131:15 . substantiate or refute that theory.
131:16   BY MR. BUCHANAN:
131:17          Q.      Now, that theory was put forth after
131:18   the drug was marketed or before the drug was
131:19   marketed?
131:20          A.      Long before Vioxx ever existed.


ID:              Scolnick 13406
Page Range:      134:6-134:7

134: 6          Q.      If you wanted a cardiovascular study
134: 7   done, you could have ordered that; right?


ID:              Scolnick 13409
Page Range:      134:9-134:17

134: 9                THE WITNESS:  I would ask people to
134:10   design a protocol to do it, yes.
134:11   BY MR. BUCHANAN:
134:12          Q.      And you could have ordered that it be
134:13   done; right?
134:14          A.      I could order it to be done.  I
134:15   couldn't design the protocols.  My people would then
134:16   have to, which they frequently did, say we have to
134:17   find a way to do this.


ID:              Scolnick 14123
Page Range:      141:23-142:1

141:23          Q.      You weren't allowed to go out and
141:24   tell doctors through your sales representatives that
141:25   Vioxx reduced the serious clinical side effects
141:ESQUIRE DEPOSITION SERVICES
142: Confidential - Subject to Protective Order 142
142: 1   .associated with traditional NSAIDs; right?


ID:              Scolnick 14205
Page Range:      142:5-142:9

142: 5                THE WITNESS:  Serious
142: 6   gastrointestinal side effects?
142: 7   BY MR. BUCHANAN:
142: 8          Q.      Yes.
142: 9          A.      That is correct.


ID:              D Scolnick 14315
Page Range:      143:15-144:7

143:15          Q.      So, the VIGOR trial was designed to
143:16   test the safety of Vioxx 50 milligrams and
143:17   rheumatoid arthritics over long-term use; correct?
143:18          A.      Yes.
143:19          Q.      Okay.
143:20                  That trial completed, what, in, March
143:21   of 2000?
143:22          A.      Yes, that's correct.
                        Page 26
```

```
                          Plaintiffs Scolnick.txt
143:23              Q.       And when -- let's see.
143:24                       Did you have access to the data from
143:25         the VIGOR trial prior to March of 2000?
143:ESQUIRE DEPOSITION SERVICES
144: Confidential - Subject to Protective Order 144
144: 1              A.       I did not.
144: 2              Q.       You had no access to any data?
144: 3              A.       None.
144: 4              Q.       But you sought access to it, didn't
144: 5         you?
144: 6              A.       I wanted to see the data the minute
144: 7         the trial was over and everything was calculated.


ID:               D Scolnick 14424
Page Range:       144:24-145:3

144:24              Q.       So, you first received the data,
144:25         what, March 9, 2000 when you got the data?
144:ESQUIRE DEPOSITION SERVICES
145: Confidential - Subject to Protective Order 145
145: 1              A.       I believe that date is correct.  I
145: 2         don't recall the date at this point that I saw the
145: 3         data.


ID:               Scolnick 14513
Page Range:       145:13-145:18

145:13              Q.       And your conclusion was that the CV
145:14         events are clearly there; right?
145:15              A.       I stated that.
145:16              Q.       Okay.
145:17                       You also conclude that the effect was
145:18         mechanism based; true?


ID:               Scolnick 14520
Page Range:       145:20-145:24

145:20                       THE WITNESS:  I made that statement.
145:21         BY MR. BUCHANAN:
145:22              Q.       And you, in fact, acknowledged that
145:23         you'd previously worried about that particular
145:24         mechanism-related problem with Vioxx; right?


ID:               Scolnick 14601a
Page Range:       146:1-146:9

146: 1                       THE WITNESS:  I wrote an e-mail note
146: 2         containing all of the information that you're
146: 3         talking about.
146: 4         BY MR. BUCHANAN:
146: 5              Q.       Well, you were truthful in your
146: 6         e-mail; right?
146: 7              A.       That is an accurate rendition of that
146: 8         e-mail.  Those were my initial thoughts when I saw
146: 9         the VIGOR data.


ID:               D ES 14610
Page Range:       146:10-146:14
```

Plaintiffs Scolnick.txt

```
146:10        Q.      I understand that, sir.
146:11                And you had worried about Vioxx's
146:12   potential to cause CV events prior to March 9, 2000;
146:13   true?
146:14        A.      I had --
```

```
ID:            D ES 14616
Page Range:    146:16-146:23
```

```
146:16                THE WITNESS:  The question had been
146:17   raised about the imbalance of prostacyclin based on
146:18   what you talked about, and we had worried about
146:19   that, but there was no data in our database, which
146:20   we analyzed carefully, to show any evidence that
146:21   Vioxx caused cardiac problems.
146:22   BY MR. BUCHANAN:
146:23        Q.      Okay.
```

```
ID:            Scolnick 14708
Page Range:    147:8-147:11
```

```
147: 8        Q.      When were you first worried about the
147: 9   potential that Vioxx could cause cardiovascular
147:10   events?
147:11        A.      I was first --
```

```
ID:            Scolnick 14713
Page Range:    147:13-148:8
```

```
147:13                THE WITNESS: -- made aware of the
147:14   theory when the prostacyclin metabolite data came
147:15   up.  We looked carefully at all of the data
147:16   preclinically and clinically, could not find any
147:17   evidence to support there was a risk, and until the
147:18   VIGOR study, I didn't worry about it again.
147:19                       -   -   -
147:20                (Whereupon, Deposition Exhibit
147:21                 Scolnick-3, E-mail, 3-9-00,
147:22                 MRK-ABH0016219, was marked for
147:23                 identification.)
147:24                       -   -   -
147:25   BY MR. BUCHANAN:
147:ESQUIRE DEPOSITION SERVICES
148: Confidential - Subject to Protective Order 148
148: 1        Q.      Let me pass over to you what we
148: 2   marked as exhibit, I think, Exhibit 3 to your
148: 3   deposition, sir.  It is the March 9th, 2000 e-mail
148: 4   from yourself to Deborah Shapiro, Alise Reicin and
148: 5   Alan Nies, Bates stamped MRK-ABH0016219.  The
148: 6   subject is VIGOR.  You copied yourself on this.  Do
148: 7   you see that?
148: 8        A.      I do.
```

```
ID:            D Scolnick 14809
Page Range:    148:9-148:23
```

```
148: 9        Q.      Why did you send it to yourself?
148:10        A.      I don't recall.
```

Page 28

Plaintiffs Scolnick.txt

148:11     Q.     Important e-mail?
148:12     A.     I don't recall.
148:13     Q.     Did you make a practice of sending
148:14  important e-mails to yourself, sir?
148:15     A.     I sometimes wanted things copied and
148:16  sometimes didn't.  I don't recall why I sent this to
148:17  myself.  I didn't even remember I had copied myself.
148:18     Q.     It is not something your computer did
148:19  on its own; right?
148:20     A.     No, it didn't.
148:21     Q.     So, you had to specifically type your
148:22  name in there as a cc?
148:23     A.     That is correct.


ID:             Scolnick 14903
Page Range:     149:3-149:8

149: 3            Looking through this, and I guess
149: 4  it's about two-thirds down, you say, "It is a shame
149: 5  but it is a low incidence and it is mechanism based
149: 6  as we worried it was."  "It is a shame," you're
149: 7  referring to the cardiovascular events?
149: 8     A.     Yes, I am.


ID:             D Scolnick 14909
Page Range:     149:9-149:18

149: 9     Q.     That's what you had worried about
149:10  prior to approval of the drug?
149:11     A.     That's the question that had been
149:12  raised with no evidence to support it.
149:13     Q.     Right.
149:14            Well, at that point in time when you
149:15  were worried about cardiovascular events
149:16  preapproval, you could have ordered a CV trial to
149:17  see whether Vioxx was safe from a cardiovascular
149:18  perspective; true?


ID:             D Scolnick 14920
Page Range:     149:20-149:23

149:20            THE WITNESS:  We took many actions to
149:21  see if Vioxx was safe in the cardiovascular and
149:22  concluded that at that point it was not necessary to
149:23  do an additional CV trial.


ID:             D Scolnick 15101
Page Range:     151:1-151:3

151: 1            If you had done a CV trial, ordered a
151: 2  CV trial to be done, that would have slowed down the
151: 3  approval process for Vioxx; true?


ID:             D Scolnick 15106
Page Range:     151:6-151:8

151: 6            THE WITNESS:  At what time would we
151: 7  have done that?  And we wouldn't have even known

Page 29

Plaintiffs Scolnick.txt
151: 8     what kind of trial to do.


ID:             Scolnick 15110a
Page Range:     151:10-152:4

151:10          Q.     Well, an issue was identified in 1997
151:11   by Garret FitzGerald, a consultant to your company;
151:12   correct?
151:13          A.     Yes.
151:14          Q.     It was an issue that raised potential
151:15   cardiovascular concerns with Vioxx; correct?
151:16          A.     Theoretical concerns.
151:17          Q.     If you had conducted a CV outcomes
151:18   trial in 1998, started it in 1998, that would have
151:19   slowed down the approval process for the drug; true?
151:20          A.     That is true.
151:21          Q.     If you had told the FDA, we're
151:22   concerned, we may have a potential cardiovascular
151:23   .issue with the drug, we'd want to do a CV safety
151:24   study, that would have slowed down the approval
151:25   process?
151:ESQUIRE DEPOSITION SERVICES
152: Confidential - Subject to Protective Order 152
152: 1          A.     That would have.  We gave the FDA all
152: 2   of the data, including Garret FitzGerald's data, in
152: 3   the NDA and all the other analyses we did
152: 4   preapproval.


ID:             D ES  15205
Page Range:     152:5-152:9

152: 5          Q.     You didn't give him the result of a
152: 6   CV outcomes trial preapproval; right?
152: 7          A.     We gave them an analysis of all the
152: 8   cardiovascular events in our NDA, which showed no
152: 9   evidence that Vioxx caused CV events.


ID:             Scolnick 15212
Page Range:     152:12-152:13

152:12          Q.     You didn't give them the results from
152:13   a CV outcomes trial preapproval, did you?


ID:             Scolnick 15215a
Page Range:     152:15-152:24

152:15                 THE WITNESS:  There was no -- we did
152:16   not do a separate CV outcomes trial preapproval.
152:17   BY MR. BUCHANAN:
152:18          Q.     So, you couldn't give them the data
152:19   from such a trial?
152:20          A.     I've answered your question.
152:21          Q.     You couldn't give them the data from
152:22   such a trial? Could you answer that?
152:23          A.     Yes.
152:24          Q.     Thank you.


ID:             Scolnick 15225
                                 Page 30

Plaintiffs Scolnick.txt
Page Range:      152:25-153:12

152:25                    You state in that sentence that I
152:ESQUIRE DEPOSITION SERVICES
153: Confidential - Subject to Protective Order 153
153: 1    read a few minutes ago where you say, "it is a low
153: 2    incidence and it is mechanism based as we worried it
153: 3    was," you use the phrase, "mechanism based."  What
153: 4    does that mean?
153: 5           A.     What it generally means is that it
153: 6    has something to do with the mechanism of action of
153: 7    the drug.
153: 8           Q.     Okay.
153: 9                  And what was the mechanism of action
153:10    of this drug that you believed on March 9th was
153:11    causing the cardiovascular events that you saw in
153:12    the data from the VIGOR trial?


ID:                  Scolnick 15314a
Page Range:          153:14-153:22

153:14                    THE WITNESS:  I was alluding to the
153:15    thromboxane/prostacyclin data that had been
153:16    published earlier.
153:17    BY MR. BUCHANAN:
153:18           Q.     That's the thromboxane/prostacyclin
153:19    theory that had been raised long before you had even
153:20    identified a molecule to test in people?
153:21           A.     Long before even COX-2 was ever
153:22    discovered.


ID:                  Scolnick 17405
Page Range:          174:5-174:17

174: 5    what's the Data Safety Monitoring Board, sir, in
174: 6    general terms?
174: 7           A.     In general terms, it's an external
174: 8    group that monitors the safety of the Merck trials,
174: 9    for all trials or many trials.
174:10           Q.     And you have a different group for
174:11    each trial or the same group for all trials?
174:12           A.     I think it's a different group for
174:13    each trial because the clinical expertise is --
174:14    different clinical trials, different clinical
174:15    expertise.
174:16           Q.     Did the VIGOR trial have a DSMB?
174:17           A.     Yes, it did.


ID:                  Scolnick 17421
Page Range:          174:21-175:9

174:21           Q.     To be clear in the DSMB's function,
174:22    the DSMB has access to unblinded data during the
174:23    conduct of clinical trials if they want it; correct?
174:24           A.     Yes, I believe that's true.
174:25           Q.     Because their function is to ensure
174:ESQUIRE DEPOSITION SERVICES
175: Confidential - Subject to Protective Order 175
175: 1    the safety of patients in those clinical trials, at
175: 2    least one of their functions; true?

Page 31

Plaintiffs Scolnick.txt

175: 3          A.      Yes.
175: 4          Q.      Okay.
175: 5                  Do you recall that the DSMB in the
175: 6  VIGOR trial sent a letter to Merck stating that they
175: 7  wanted the cardiovascular events in the VIGOR trial
175: 8  separately analyzed as compared to other safety
175: 9  analyses the company was doing?


ID:              Scolnick 17516a
Page Range:      175:16-175:17

175:16                  THE WITNESS:  I became aware of that
175:17  memo long after it was sent to people at MRL.


ID:              Scolnick 17804
Page Range:      178:4-178:7

178: 4          Q.      When you saw that letter from Dr.
178: 5  Weinblatt to Dr. Reicin, did that letter suggest to
178: 6  you that Merck may have a cardiovascular issue with
178: 7  Vioxx?


ID:              Scolnick 17809a
Page Range:      178:9-178:13

178: 9                  THE WITNESS:  When I saw that letter,
178:10  I wondered what had been in Dr. Weinblatt's mind
178:11  when he sent the letter, and that's what I wondered.
178:12  I hadn't seen the letter.  I don't know what was in
178:13  his mind.


ID:              Scolnick 17902
Page Range:      179:2-179:12

179: 2          Q.      You've never spoken to him?
179: 3          A.      I don't recall speaking to Dr.
179: 4  Weinblatt.
179: 5          Q.      Never called him up after you got the
179: 6  results of the VIGOR trial and asked what concerned
179: 7  you and the data you were looking at during the
179: 8  conduct of the trial?
179: 9          A.      No, I never called Dr. Weinblatt.
179:10          Q.      Never asked Dr. Weinblatt why you
179:11  allowed the trial to continue in the face of the
179:12  cardiovascular events in the trial?


ID:              Scolnick 17914
Page Range:      179:14-179:16

179:14                  THE WITNESS:  No.  I didn't.  I
179:15  didn't know what data he had.  I never dealt
179:16  directly with DSMBs.


ID:              Scolnick 20322
Page Range:      203:22-204:20

203:22          Q.      Before our break, we were talking
                        Page 32

Plaintiffs Scolnick.txt

203:23    about -- at least a few moments before our break we
203:24    were talking about your March 9, 2000 e-mail.  Do
203:25    you recall that testimony?
203:ESQUIRE DEPOSITION SERVICES
204: Confidential - Subject to Protective Order 204
204: 1            A.      Yes, I do.
204: 2            Q.      That was the e-mail where you
204: 3    identified that the CV events were "clearly there."
204: 4    Right?
204: 5            A.      Yes.
204: 6            Q.      That it appeared to be "mechanism
204: 7    based" as you "worried it was."  Right?
204: 8            A.      That's what the e-mail says, yes.
204: 9            Q.      And you said it was also "real."
204:10    Right?
204:11            A.      Yes.
204:12            Q.      Then we talked about what Merck and
204:13    you did in response to your initial concerns about
204:14    the CV issues with Vioxx; right?
204:15            A.      Yes.
204:16            Q.      Now, over a period of weeks, you
204:17    reached the conclusion, contrary to your March 9th
204:18    e-mail, that it wasn't Vioxx that was causing the
204:19    problems, it was naproxen that was protecting
204:20    against the problems; is that right?

ID:              Scolnick 20422
Page Range:      204:22-205:10

204:22                    THE WITNESS:  That's correct.
204:23    BY MR. BUCHANAN:
204:24            Q.      You reached that conclusion in, what,
204:25    18 days?
204:ESQUIRE DEPOSITION SERVICES
205: Confidential - Subject to Protective Order 205
205: 1            A.      Within that period of time.
205: 2            Q.      Well, Merck issued a press release to
205: 3    the public on March 27, 2000 letting them know about
205: 4    the CV events in the trial as well as the GI events
205: 5    in the trial; correct?
205: 6            A.      Yes.
205: 7            Q.      And you stated at that point in time
205: 8    that you believed that the explanation for the
205: 9    difference between the two arms was the
205:10    cardioprotective effect of naproxen; correct?

ID:              Scolnick 20517
Page Range:      205:17-205:18

205:17                    THE WITNESS:  Yes, that's basically
205:18    what the press release said.

ID:              Scolnick 20706
Page Range:      207:6-207:8

207: 6            Q.      So, within 18 days, you had made a
207: 7    complete 180 in your view as to the cause of the CV
207: 8    events in the VIGOR trial; right?

Page 33

Plaintiffs Scolnick.txt

ID:              Scolnick 207.12-207.15
Page Range:      207:12-207:15

207:12          A.      Yes.  I thought the explanation which
207:13  best explained the results was naproxen's
207:14  cardioprotective activity based on data analysis,
207:15  literature analysis, as I've stated.


ID:              Scolnick 20908
Page Range:      209:8-209:11

209: 8          Q.      Did you bring in anybody who wasn't
209: 9  on the Merck payroll to look at the data from the
209:10  VIGOR trial before you reached the decision that
209:11  naproxen was cardioprotective?


ID:              Scolnick 20914a
Page Range:      209:14-210:3

209:14          THE WITNESS:  As I've stated, I
209:15  didn't bring in an outside consultant.  I do not
209:16  know who the team might have consulted as outside
209:17  investigators.
209:18  BY MR. BUCHANAN:
209:19          Q.      But you're pretty sure, though, if
209:20  you had told your team, I want to get this data
209:21  looked at by somebody independent of Merck, they
209:22  could have done that; right?
209:23          A.      They could have done it.  I don't
209:24  know whether -- I don't that they didn't do it.
209:25          Q.      But you do know you didn't tell them
209:ESQUIRE DEPOSITION SERVICES
210: Confidential - Subject to Protective Order 210
210: 1  to do it?
210: 2          A.      I did not.  I did not, that is
210: 3  correct.


ID:              D ES  23104
Page Range:      231:4-231:8

231: 4          Q.      Sir, did you ever just do a
231: 5  calculation to figure out what the implication to
231: 6  the public could be that were using your drug if
231: 7  your drug really was cardiotoxic, as you thought on
231: 8  March 9?


ID:              D ES  23112
Page Range:      231:12-231:15

231:12          THE WITNESS:  The answer to your
231:13  question, I didn't make that calculation.  I
231:14  considered patient safety, as I always have, and all
231:15  the data supported our hypothesis.


ID:              Scolnick 231.17
Page Range:      231:17-232:4

231:17          Q.      Did you consider the implications to
                        Page 34

Plaintiffs Scolnick.txt
```
231:18    the sales of the drug if your initial conclusion was
231:19    the final conclusion?
231:20         A.     Of course.  And that was not part of
231:21  · my reason for reaching my conclusion.
231:22         Q.     What was the implication to sales of
231:23    the drug if your initial conclusion was, in fact,
231:24    the final conclusion?
231:25         A.       Sales of the drug would be
231:ESQUIRE DEPOSITION SERVICES
232: Confidential - Subject to Protective Order 232
232: 1    significantly curtailed.  The sales of the drug
232: 2    would be curtailed.  Even with the publicly
232: 3    available information, sales of the drug would be
232: 4   ·curtailed.
```

```
ID:                D ES  23205
Page Range:        232:5-232:7
```

```
232: 5         Q.     So, you knew --
232: 6         A.     And we made all of the data available
232: 7    instantly anyway.
```

```
ID:                Scolnick 23208
Page Range:        232:8-232:11
```

```
232: 8         Q.     Did you ever tell the public your
232: 9    initial conclusion?
232:10         A.       I did not because I thought it was an
232:11  · error.
```

```
ID:                D ES  23212
Page Range:        232:12-232:14
```

```
232:12         Q.     Did you ever send an e-mail out to
232:13    the people on this e-mail list and let them know,
232:14    guys, I think I made a mistake?
```

```
ID:                D ES  23216
Page Range:        232:16-232:19
```

```
232:16              THE WITNESS:  Substantial period of
232:17    time later with even more analysis, I told them that
232:18    I thought they had done a great job and that I was
232:19    confident in the safety of the drug.
```

```
ID:                Scolnick 23221a
Page Range:        232:21-233:9
```

```
232:21         Q.     Did you ever send an e-mail at the
232:22    end of March 2000 saying, boy, I was way off on
232:23    this --
232:24         A.     No, I did --
232:25         Q.     -- I feel very comfortable with the
232:ESQUIRE DEPOSITION SERVICES
233: Confidential - Subject to Protective Order 233
233: 1    data now?
233: 2         A.       I did not send that in an e-mail like
233: 3    that, no.
```

Plaintiffs Scolnick.txt

```
233: 4          Q.     In fact, at the end of March, you
233: 5    were still worried, weren't you?
233: 6          A.     Yes, I was, even though I had reached
233: 7    what I thought was the right conclusion.  I always
233: 8    worried about the safety of our drugs, and I
233: 9    continued to worry about it.
```

```
ID:             D ES  23310
Page Range:     233:10-233:19
```

```
233:10          Q.     But you weren't so worried to tell
233:11    the FDA, were you?
233:12          A.     The FDA had all the data.  The FDA
233:13 ·  has competent scientists and can judge the data for
233:14    themselves.  They knew that this was a new finding
233:15    potentially for naproxen.  They could interpret the
233:16    data for themselves, and had they been concerned,
233:17    they would have expressed that to us and told us if
233:18    they were that concerned with the aggregate of data,
233:19    do something differently.
```

```
ID:             Scolnick 23323
Page Range:·    233:23-234:2
```

```
233:23          Q.     Did you tell the FDA you were
233:24    worried?
233:25          A.     I didn't speak to the FDA, and I
233:ESQUIRE DEPOSITION SERVICES
234: Confidential - Subject to Protective Order 234
234: 1    don't know what the regulatory affairs people told
234: 2    the FDA.
```

```
ID:             Scolnick 23523
Page Range:     235:23-236:1
```

```
235:23                 You don't think the FDA or the
235:24    medical community would have been interested in what
235:25    you, Ed Scolnick, were worried about with respect to
235:ESQUIRE DEPOSITION SERVICES
236: Confidential - Subject to Protective Order 236
236: 1    Vioxx?
```

```
ID:             Scolnick 23603
Page Range:     236:3-236:8
```

```
236: 3                 THE WITNESS:  If the FDA had wanted
236: 4    to ask me, they would have asked me, and I
236: 5 ·  communicated with members of the medical community
236: 6    in consultants' meetings.  I don't know what the
236: 7    medical community as a whole or the public as a
236: 8    whole would have liked to know.
```

```
ID:             Scolnick 23618
Page Range:     236:18-236:24
```

```
236:18          Q.     So, you're saying that if the FDA had
236:19    wanted to figure out what you were thinking in terms
236:20    of concerns about Vioxx, they could have asked you?
```

Plaintiffs Scolnick.txt

```
236:21    Is that it?
236:22         A.    The FDA could have asked me any time
236:23    if they wanted to.  They had all the data available
236:24    to them.


ID:            D ES  23625
Page Range:    236:25-237:5

236:25         Q.    And if they asked you, you would have
236:ESQUIRE DEPOSITION SERVICES
237: Confidential - Subject to Protective Order 237
237: 1    told them you were worried?
237: 2         A.    I would have told them my concerns,
237: 3    what we did, what conclusions we reached.
237: 4         Q.    Would you have told them you were
237: 5    worried?


ID:            D ES 23709
Page Range:    237:9-237:10

237: 9              THE WITNESS:  I would have told them
237:10    my concerns --


ID:            D ES  23713
Page Range:    237:13-237:18

237:13              THE WITNESS:  -- or my worries and
237:14    what the data was and what our conclusions were and
237:15    had a dialogue with them if they had asked me.  My
237:16    regulatory affairs people routinely have discussions
237:17    like that with the FDA.  They are my instrument for
237:18    dealing with the FDA.


ID:            Scolnick 23720b
Page Range:    237:20-238:8

237:20         Q.    Well, ultimately there was an
237:21    Advisory Committee held in February 2001; right?
237:22         A.    I think that date is correct.
237:23         Q.    And it was to consider certain of the
237:24    clinical trial data from VIGOR; right?
237:25         A.    Yes.
237:ESQUIRE DEPOSITION SERVICES
238: Confidential - Subject to Protective Order 238
238: 1         Q.    And in particular, GI safety; right?
238: 2         A.    Yes.
238: 3         Q.    As well as CV safety; true?
238: 4         A.    Correct.
238: 5         Q.    GI being gastrointestinal?
238: 6         A.    Yes.
238: 7         Q.    CV being cardiovascular?
238: 8         A.    Correct.


ID:            D Scolnick 23809
Page Range:    238:9-238:18

238: 9         Q.    Did you tell the FDA, you, Ed
238:10    Scolnick, in February 2001 that you were worried
```

Page 37

Plaintiffs Scolnick.txt

238:11    about the safety of Vioxx from a cardiovascular
238:12    perspective?
238:13          A.      In February '01 I was not worried
238:14    about the cardiovascular safety of Vioxx. Our team
238:15    presented the Merck Research Labs view of Vioxx and
238:16    all of the data to the FDA at that meeting, answered
238:17    all the questions, and they represented me. I was
238:18    not directly involved in that meeting.


ID:              Scolnick 24004
Page Range:      240:4-240:14

240: 4          Q.      You never told the FDA at any point
240: 5    in time to the best of your knowledge that your
240: 6    initial conclusion was that the CV events seen in
240: 7    the VIGOR trial were mechanism based and
240: 8    attributable to Vioxx?
240: 9          A.      I never told them that.
240:10          Q.      To the best of your knowledge, did
240:11    anybody at Merck ever tell FDA that Ed Scolnick,
240:12    president of Merck Research Labs' initial conclusion
240:13    was that the CV events seen in the VIGOR trial were
240:14    due to Vioxx?


ID:              Scolnick 24016a
Page Range:      240:16-240:19

240:16                  THE WITNESS:  I don't know whether
240:17    people did or didn't. To the best of my knowledge,
240:18    it was not done. It could have been done, I don't
240:19    know.


ID:              D Scolnick 24021
Page Range:      240:21-241:5

240:21          Q.      You don't think the FDA would have
240:22    wanted to know that?
240:23          A.      I think the FDA knew that for
240:24    themselves.
240:25          Q.      Do you think the FDA figured that out
240:ESQUIRE DEPOSITION SERVICES
241: Confidential - Subject to Protective Order 241
241: 1    on their own?
241: 2          A.      I think the FDA figured out that
241: 3    there might be a mechanism base to the events and
241: 4    that vioxx might have caused it because they had all
241: 5    the data, and they knew the literature.


ID:              Scolnick 24106
Page Range:      241:6-241:10

241: 6          Q.      They didn't have any way to figure
241: 7    out, though, that the president of Merck Research
241: 8    Labs, when he first saw the data, concluded that
241: 9    Vioxx was the most likely cause of the CV events
241:10    seen in the VIGOR trial; right?


ID:              Scolnick 24112

Plaintiffs Scolnick.txt
Page Range:      241:12-241:13

241:12                      THE WITNESS:  They would not have
241:13    known that single fact, that is correct.


ID:               Scolnick 24115
Page Range:      241:15-242:7

241:15              Q.    Sir, do you respect the FDA?
241:16              A.    Yes, I do.  I have great respect for
241:17    the FDA.
241:18              Q.    You respect their ability?
241:19              A.    Yes, I do.  Many people at the FDA
241:20    are really excellent scientists.
241:21              Q.    Do you respect their power?
241:22              A.    Absolutely.
241:23              Q.    Do you respect their role in the
241:24    system for drug approval?
241:25              A.    I do indeed.
241:ESQUIRE DEPOSITION SERVICES
242: Confidential - Subject to Protective Order 242
242: 1              Q.    Do you respect their role in the
242: 2    labeling process?
242: 3              A.    I do.
242: 4              Q.    You respect the role they play in
242: 5    protecting the public?
242: 6              A.    I do.
242: 7              Q.    Then why did you fight them so hard?


ID:               Scolnick 24209
Page Range:      242:9-242:21

242: 9                      THE WITNESS:  we didn't fight them so
242:10    hard.  We wanted -- we submitted our data rapidly to
242:11    them.  We were interested in a rapid review and
242:12    rapid labeling discussions and wanted them to
242:13    consider all the data in the label, the GI data, the
242:14    Alzheimer's data, the VIGOR data.  And that's not
242:15    fighting them hard.  That's just asking them to
242:16    consider all the data and not just part of the data.
242:17    BY MR. BUCHANAN:
242:18              Q.    Merck submitted a proposed label to
242:19    FDA sometime in 2000; right?
242:20              A.    Yes.  I believe within three months
242:21    of having the VIGOR data.


ID:               Scolnick 24322
Page Range:      243:22-244:14

243:22                      So, at the end of March of 2000,
243:23    Merck issues a press release and tells the world the
243:24    favorable properties of Vioxx found in the VIGOR
243:25    trial as it relates to GI effects; correct?
243:ESQUIRE DEPOSITION SERVICES
244: Confidential - Subject to Protective Order 244
244: 1              A.    That is correct.
244: 2              Q.    Also discloses that there's an
244: 3    increased number of -- excuse me -- a decreased
244: 4    number of cardiovascular effects in the naproxen arm
244: 5    of the VIGOR trial; right?
                        Page 39

Plaintiffs Scolnick.txt

```
244: 6          A.      That's correct.
244: 7          Q.      You didn't tell the public that there
244: 8     was an increased number of cardiovascular events in
244: 9     the Vioxx arm; right?
244:10          A.      The press release was not worded that
244:11     way, that is correct.
244:12          Q.      Okay.  Because that would have
244:13     suggested that Vioxx had actually increased the
244:14     risk; right?
```

```
ID:              Scolnick 24416
Page Range:      244:16-244:17
```

```
244:16                    THE WITNESS:  It might have suggested
244:17     that, and we didn't believe that.
```

```
ID:              D ES  24419
Page Range:      244:19-244:25
```

```
244:19          Q.      You were trying to convey to people
244:20     that it was, in fact, naproxen that was reducing the
244:21     risk?  That's why you reported the numbers that way?
244:22          A.      We were -- had concluded that it was
244:23     naproxen which had lowered the risk, and the press
244:24     release expressed our view, and it stated this was a
244:25     new finding for naproxen.
```

```
ID:              Scolnick 24504
Page Range:      245:4-245:7
```

```
245: 4          Q.      You were trying to convey to people
245: 5     that it was, in fact, naproxen that was reducing the
245: 6     risk of cardiovascular events in the VIGOR trial;
245: 7     true?
```

```
ID:              Scolnick 24509
Page Range:      245:9-245:10
```

```
245: 9                    THE WITNESS:  True.  That's the way
245:10     the press release was worded, as I stated before.
```

```
ID:              Scolnick 24517
Page Range:      245:17-245:25
```

```
245:17          Q.      Doctor, before we go on, even two
245:18     weeks after you issued the press release, you,
245:19     Merck, issued the press release announcing the VIGOR
245:20     results, Dr. Ed Scolnick was still personally
245:21     worried about what the results from VIGOR really
245:22     meant; true?
245:23          A.      That's correct.
245:24          Q.      And you were worried that Vioxx was
245:25     actually causing cardiovascular events; true?
```

```
ID:              Scolnick 24602
Page Range:      246:2-247:19
```

Plaintiffs Scolnick.txt

246: 2                    THE WITNESS:  I was worried that we
246: 3     couldn't exclude an effect of Vioxx, although the
246: 4     major effect, I was convinced, was due to naproxen.
246: 5     BY MR. BUCHANAN:
246: 6          Q.        And you actually told your staff that
246: 7     you personally were actually in minor agony over the
246: 8     issue; true?
246: 9          A.        True.
246:10          Q.        And you told your staff that we're
246:11     not going to know the answer until we do an outcomes
246:12     trial; right?
246:13          A.        That we were not going to know -- we
246:14     were not going to be able to exclude an effect of
246:15     Vioxx until we did an outcomes trial.
246:16          Q.        You told your staff, your project
246:17     team, we will not know for sure what is going on
246:18     until we do an outcomes trial; true?
246:19          A.        True.
246:20          Q.        And you wanted to do a big outcomes
246:21     trial; right?
246:22          A.        Yes.  That's correct.
246:23          Q.        Not some pooled analysis; right?
246:24          A.        That's correct.
246:25          Q.        You wanted to do a 10,000 patient
246:ESQUIRE DEPOSITION SERVICES
247: Confidential - Subject to Protective Order 247
247: 1     study on Vioxx, 10,000 people on a comparator agent;
247: 2     true?
247: 3          A.        True.  That's correct.
247: 4          Q.        You were advocating using Tylenol as
247: 5     the comparator agent; right?
247: 6          A.        That was my idea, yes.
247: 7          Q.        You wanted to do a 20,000 person
247: 8     study in April of 2000 to evaluate the
247: 9     cardiovascular safety of Vioxx; right?
247:10          A.        Correct.
247:11          Q.        It was going to be a head-to-head
247:12     trial, Tylenol on one arm, Vioxx on the other;
247:13     right?
247:14          A.        That's correct.
247:15          Q.        And when did you run that trial?
247:16          A.        The project team told me that was a
247:17     trial that could not be done because patients
247:18     couldn't be kept on Tylenol who had osteoarthritis
247:19     for that long a period of time.


ID:            D ES  24720
Page Range:    247:20-248:9

247:20          Q.        Is that right?
247:21          A.        That's what --
247:22          Q.        You can't --
247:23          A.        Tylenol is not sufficient as a
247:24     painkiller to patients with osteoarthritis, and,
247:25     therefore, the trial could not be done, and I had to
247:ESQUIRE DEPOSITION SERVICES
248: Confidential - Subject to Protective Order 248
248: 1     accept that because they felt that way unanimously,
248: 2     very strongly, that you couldn't do the trial, and
248: 3     if the alternative was to do it against another
248: 4     comparator nonsteroidal, it might not give as clear
248: 5     an answer.  And so we were in a conundrum about what

Plaintiffs Scolnick.txt
```
248: 6   .trial to do at that point.
248: 7          Q.      Well, you were the boss; right?
248: 8          A.      I never asked them to do a trial that
248: 9   they thought was undoable.


ID:              Scolnick 24810
Page Range:      248:10-248:15

248:10          Q.      You were the boss at that point in
248:11   time; right?
248:12          A.      Yes, I was.
248:13          Q.      On matters of science, the buck
248:14   stopped with you; right?
248:15          A.      I was the boss.


ID:              Scolnick 24816
Page Range:      248:16-248:18

248:16          Q.      You had ultimate authority to compel
248:17   a study to be done if you wanted an outcomes study
248:18   to be done; true?


ID:              Scolnick 24820
Page Range:      248:20-248:23

248:20                  THE WITNESS:  I never had ultimate
248:21   authority to compel a study to be done that was an
248:22   undesignable study.  I respected my staff in that
248:23   respect -- in that regard enormously.


ID:              Scolnick 25209a
Page Range:      252:9-253:18

252: 9                  Let's look at this e-mail, then, from
252:10   April 12, 2000 from you to Dr. Reicin.  You wrote
252:11   this late at night; right?
252:12          A.      Yes.  It's dated 10:42 p.m.
252:13          Q.      You sent it with high importance;
252:14   true?
252:15          A.      True.
252:16          Q.      And you wrote: "Hi Alise.  I have
252:17   been trading e-mails with Doug Greene in real time."
252:18   Who is Doug Greene?
252:19          A.      Doug Greene at the time was head of
252:20   the clinical, regulatory and statistics department
252:21   at Merck, which is usually referred to as
252:22   development.
252:23          Q.      "We all are online too late.  I will
252:24   tell you my worry quotient is high.  I actually am
252:25   in minor agony."  Do you see that?
252:ESQUIRE DEPOSITION SERVICES
253: Confidential - Subject to Protective Order 253
253: 1          A.      I do.
253: 2          Q.      You wrote that?
253: 3          A.   ·  I did.
253: 4          Q.      You meant it?
253: 5          A.      I did.
253: 6          Q.      "What I really want to do is a 10000
253: 7   versus 10000 patient study in mild - moderate OA
```
                            Page 42

Plaintiffs Scolnick.txt

```
253: 8    Tylenol versus Vioxx with PRN" -- is that
253: 9    preventative?
253:10         A.    No.  It means use if you need.
253:11         Q.    "With PRN low dose ASA,"  Is that
253:12    aspirin?
253:13         A.    Yes.
253:14         Q.    "For those judged to need it."
253:15         Sir, are you telling me that you
253:16    couldn't do a long-term study in patients with even
253:17    mild osteoarthritis, Tylenol versus Vioxx?
253:18         A.    That's what my team told me.
```

```
ID:              Scolnick 25325
Page Range:      253:25-254:4
```

```
253:25         Q.    You continue.  "WE WILL NOT KNOW FOR
253:ESQUIRE DEPOSITION SERVICES
254: Confidential - Subject to Protective Order 254
254: 1    SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.
254: 2    PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC
254: 3    MEETING."  You wrote that in all caps; right?
254: 4         A.    I did.
```

```
ID:              D ES  25405
Page Range:      254:5-254:8
```

```
254: 5         Q.    When did you do a CV outcomes study
254: 6    of any design comparing Vioxx to a comparator agent
254: 7    with the primary endpoint being cardiovascular
254: 8    events?
```

```
ID:              D ES  25410
Page Range:      254:10-254:18
```

```
254:10         THE WITNESS:  After debating many
254:11    protocols, we decided that we wanted -- the only way
254:12    we would answer any lingering doubt was to do it
254:13    against placebo and finally came up with a protocol
254:14    for doing that.
254:15    BY MR. BUCHANAN:
254:16         Q.    Right.  You didn't design a specific
254:17    trial with a predetermined endpoint to monitor
254:18    cardiovascular events, though; did you?
```

```
ID:              D ES  25420
Page Range:      254:20-254:23
```

```
254:20         THE WITNESS:  We did not do that.  We
254:21    aggregated three large trials with a predefined
254:22    endpoint to be cardiovascular mortality with an
254:23    ample power to look for cardiovascular events.
```

```
ID:              Scolnick 26323
Page Range:      263:23-264:8
```

```
263:23         Q.    Sir, I'm passing you over what we
263:24    just marked as exhibit, I think it's 7, to your
263:25    deposition.  It's entitled, "VIOXX Outcomes Study
```

Page 43

Plaintiffs Scolnick.txt
263:ESQUIRE DEPOSITION SERVICES
264: Confidential - Subject to Protective Order 264
264: 1     Potential Designs."  For the record, it is
264: 2     MRK-ABT0014818 to 827.  Do you recognize this as a
264: 3     slide set, sir?
264: 4          A.     That's what it looks like it is.
264: 5          Q.     Okay.  It's entitled, "VIOXX Outcomes
264: 6     Study Potential Designs."  It is a PowerPoint
264: 7     printout.  Is that what it looks like to you?
264: 8          A.     More or less.


ID:              Scolnick 26421
Page Range:      264:21-265:13

264:21          Q.     This document summarizes several
264:22     different outcomes studies concerning cardiovascular
264:23     issues that were being considered in or around April
264:24     of 2000; true?
264:25          A.     Yes.
264:ESQUIRE DEPOSITION SERVICES
265: Confidential - Subject to Protective Order 265
265: 1          Q.     One of the outcomes studies that was
265: 2     being considered was the Vioxx versus Tylenol study;
265: 3     true?
265: 4          A.     Yes.
265: 5          Q.     There's some pros and cons listed
265: 6     there; right?
265: 7          A.     Yes.
265: 8          Q.     One of the pros is, "This study
265: 9     directly addresses the question of the CV safety of
265:10     COX-2 inhibitors."  Do you see that?
265:11          A.     Yes.
265:12          Q.     I read that right; correct?
265:13          A.     Yes.


ID:              Scolnick 26625
Page Range:      266:25-267:17

266:25          Q.     Okay.  There's two cons that are
266:ESQUIRE DEPOSITION SERVICES
267: Confidential - Subject to Protective Order 267
267: 1     listed here; right?
267: 2          A.     Yes.
267: 3          Q.     One is, "Demonstration of a CV
267: 4     difference would likely be due to a COX-2 CLASS
267: 5     effect but would put VIOXX at extreme disadvantage
267: 6     to celebrex and negate existing OA and Alzheimers
267: 7     data."  Do you see that?
267: 8          A.     I do.
267: 9          Q.     The next point was there was a
267:10     possibility that you detect "small differences from
267:11     Tylenol in GI safety," and that would be of concern;
267:12     true?
267:13          A.     That's what it says.
267:14          Q.     Okay.  You were concerned that if you
267:15     went head-to-head Vioxx versus Tylenol, you might
267:16     highlight some favorable GI safety properties of
267:17     Tylenol.  Isn't that right?


ID:              Scolnick 26719

Plaintiffs Scolnick.txt

Page Range:      267:19-268:1

267:19                    THE WITNESS:  That's what this says.
267:20    I wasn't concerned about that.  That's what this
267:21    says.
267:22    BY MR. BUCHANAN:
267:23         Q.     Okay.
267:24                    There was also a possibility that you
267:25    might be wrong, and the cardiovascular effects seen
267:ESQUIRE DEPOSITION SERVICES
268: Confidential - Subject to Protective Order 268
268: 1    in VIGOR was really due to Vioxx; right?


ID:              Scolnick 26803b
Page Range:      268:3-268:4

268: 3                    THE WITNESS:  That's what this says
268: 4    as a con for the study.


ID:              Scolnick 26816
Page Range:      268:16-268:21

268:16                    So, it wouldn't have been unethical
268:17    to do a trial of Vioxx versus Tylenol?
268:18         A.     What I said is it would be undoable
268:19    based on other input people gave me because Tylenol
268:20    would not relieve pain enough to be monotherapy in
268:21    such a trial.


ID:              D ES  26822
Page Range:      268:22-269:10

268:22         Q.     So, someone was speculating that if
268:23    you did Vioxx versus Tylenol, people may fall out of
268:24    the Tylenol arm over time because it was
268:25    ineffective; is that right?
268:ESQUIRE DEPOSITION SERVICES
269: Confidential - Subject to Protective Order 269
269: 1         A.     Yes.  Not speculating, but saying it
269: 2    just as in -- the same manner as on this slide, that
269: 3    was another point brought up many times during the
269: 4    discussion.
269: 5         Q.     Well, that's what I'm wondering.  I
269: 6    don't see it on this slide.  Do you see that point
269: 7    raised on this slide, sir?
269: 8         A.     I do not, but it was something people
269: 9    talked about.  Not all points of meetings are on our
269:10    slides.


ID:              Scolnick 27002a
Page Range:      270:2-270:17

270: 2                    Now, apart from just asking your
270: 3    internal folks and thinking about yourself what type
270: 4    of CV study could be done, you actually consulted
270: 5    with some people from outside Merck; right?
270: 6         A.     Several.
270: 7         Q.     Okay.  You asked them whether a CV
270: 8    study could be designed to evaluate the
                        Page 45

Plaintiffs Scolnick.txt

270: 9   cardiovascular safety of Vioxx, didn't you?
270:10        A.    I asked them what kind of study could
270:11   be designed, yes.
270:12        Q.    You actually spoke with a John Oates
270:13   about whether a trial could be done to test the CV
270:14   safety of Vioxx; right?
270:15        A.    I don't remember all the people that
270:16   our group talked to.  Dr. Oates was one of our
270:17   consultants on our board of advisors.


ID:              Scolnick 27110
Page Range:      271:10-271:24

271:10        Q.    Wasn't it Dr. Oates' view right after
271:11   the VIGOR data was released that you had to do
271:12   another trial comparing Vioxx with aspirin and
271:13   naproxen to see whether Vioxx was cardiotoxic?
271:14        A.    I don't remember.  I really don't
271:15   remember.
271:16        Q.    Do you remember that study design
271:17   being proposed?
271:18        A.    I remember that among several study
271:19   designs, yes.
271:20        Q.    Did you ever do that study?
271:21        A.    That study was not done.
271:22        Q.    You never did a study like that;
271:23   right?
271:24        A.    That study was not done.


ID:              Scolnick 27521
Page Range:      275:21-275:25

275:21        Q.    Do you remember Merck dealing with
275:22   Dr. Topol in 2001 concerning the design of a CV
275:23   outcome trial?
275:24        A.    I believe Merck research scientists
275:25   dealt with Dr. Topol, yes.


ID:              Scolnick 27606
Page Range:      276:6-276:11

276: 6        Q.    You'd agree he's a respected
276: 7   cardiologist?
276: 8        A.    He has a significant reputation in
276: 9   cardiology.
276:10        Q.    He's a respected cardiologist, sir?
276:11        A.    He has a significant reputation.


ID:              Scolnick 27620
Page Range:      276:20-276:22

276:20        Q.    Do you respect Dr. Topol?
276:21        A.    I think there are some things he's
276:22   done in science which have not held up to be true.


ID:              D ES  27702
Page Range:      277:2-277:3

Plaintiffs Scolnick.txt

```
277: 2        Q.        Do you respect Dr. Topol?  Yes or no?
277: 3        A.        I think he --
```

ID:              D ES  27707
Page Range:      277:7-277:17

```
277: 7        Q.        Can you answer my question yes or no,
277: 8    sir?
277: 9        A.        I have mixed thoughts about his
277:10    publication record, so, I can't answer your
277:11    question.
277:12        Q.        Did you have mixed thoughts about his
277:13    publication record back in 2001?
277:14        A.        I can't recall.
277:15        Q.        Did you only have a mixed view of his
277:16    publication record after he started to publish
277:17    articles negative to Vioxx?
```

ID:              D ES  27719
Page Range:      277:19-278:2

```
277:19        THE WITNESS:  No.  No.
277:20    BY MR. BUCHANAN:
277:21        Q.        Well, what are you referring to then
277:22    concerning Dr. Topol's mixed publication record?
277:23        A.        I'm referring, one, to his
277:24    meta-analysis of the Vioxx data, which was, I've
277:25    been told by statisticians I respect, a completely
277:ESQUIRE DEPOSITION SERVICES
278: Confidential - Subject to Protective Order 278
278: 1    flawed analysis, and some of his genetics work which
278: 2    has been proven to be wrong.
```

ID:              Scolnick 27804
Page Range:      278:4-278:6

```
278: 4                  So, one of the things that you based
278: 5    your mixed view of Dr. Topol on is the negative
278: 6    study he published concerning Vioxx; correct?
```

ID:              Scolnick 27808a
Page Range:      278:8-279:5

```
278: 8                  THE WITNESS:  Base it not on the
278: 9    negative study, base it on the methods which he used
278:10    to do the methods -- the negative study.
278:11    BY MR. BUCHANAN:
278:12        Q.        Let's be clear about what we're
278:13    talking about.
278:14                  In August of 2001, Dr. Topol
278:15    published a study in the Journal of the American
278:16    Medical Association; true?
278:17        A.        True.
278:18        Q.        That study was raising caution about
278:19    the potential for COX-2 inhibitors like Vioxx and
278:20    Celebrex to cause cardiovascular events; true?
278:21        A.        That's what that study claimed to
278:22    have shown.
278:23        Q.        And you're saying that you have
```

Page 47

Plaintiffs Scolnick.txt

```
278:24     spoken to statisticians that challenge the work of
278:25     Dr. Topol in terms of its statistical rigor.  Is
278:ESQUIRE DEPOSITION SERVICES
279: Confidential - Subject to Protective Order 279
279: 1     that what you're saying?
279: 2              A.    That's exactly what I'm saying.
279: 3              Q.    Did you tell Dr. Topol that?
279: 4              A.    I've never discussed anything
279: 5     directly with Dr. Topol.
```

```
ID:            Scolnick 27910
Page Range:    279:10-279:12
```

```
279:10              Q.    Well, did you know that some of your
279:11     scientists went out to talk to Dr. Topol about that
279:12     article even before it was published?
```

```
ID:            Scolnick 27914a
Page Range:    279:14-279:23
```

```
279:14                   THE WITNESS:  I believe that Dr.
279:15     Reicin told me that she and Dr. Demopoulos, who was
279:16     a cardiologist by training, were going out to see
279:17     him to discuss the article.
279:18     BY MR. BUCHANAN:
279:19              Q.    And they went out to see him before
279:20     the article in the Journal of the American Medical
279:21     Association was published; right?
279:22              A.    I believe they did.  I believe that's
279:23     what Dr. Reicin told me.
```

```
ID:            Scolnick 28009
Page Range:    280:9-280:14
```

```
280: 9              Q.    And the objective was that Dr. Topol
280:10     would not publish the article in the form it
280:11     currently existed because that was negative to
280:12     Vioxx; true?
280:13              A.    Because it was inaccurately done
280:14     statistically.
```

```
ID:            Scolnick 28202
Page Range:    282:2-282:16
```

```
282: 2              Q.    Well, the Journal of the American
282: 3     Medical Association has editors; right?
282: 4              A.    Yes, it does.
282: 5              Q.    I mean, Dr. Topol just didn't just
282: 6     publish this article in JAMA by himself; right?
282: 7              A.    That is correct.
282: 8              Q.    There were editors at JAMA who
282: 9     reviewed the article; right?
282:10              A.    I don't know who reviewed the
282:11     article.
282:12              Q.    Well, in your experience, sir, in the
282:13     peer-reviewed medical literature, there are editors
282:14     at medical journals; true?
282:15              A.    There are, but I don't know how that
282:16     article was reviewed or who reviewed it.
```

Plaintiffs Scolnick.txt

ID:            Scolnick 28301
Page Range:    283:1-283:5

  283: 1          Q.      You would agree, sir, that it would
  283: 2    be unusual for a journal like JAMA not to have an
  283: 3    article like that peer reviewed?
  283: 4          A.      It would be unusual, but I don't know
  283: 5    what they did.


ID:            Scolnick 28311
Page Range:    283:11-283:13

  283:11              In fact, Merck actually issued a
  283:12    press release preemptively to challenge the results
  283:13    from that JAMA article, didn't they?


ID:            Scolnick 28316a
Page Range:    283:16-283:17

  283:16              THE WITNESS:  I don't recall at all
  283:17    whether that was done.


ID:            Scolnick 28405
Page Range:    284:5-284:17

  284: 5    if we can get that out.  The peer-reviewed medical
  284: 6    literature is the vehicle through which -- is a
  284: 7    vehicle through which scientific opinion is
  284: 8    exchanged; true?
  284: 9          A.      Correct.
  284:10          Q.      And the standard way of responding to
  284:11    scientific opinion expressed in scientific
  284:12    literature is to respond in scientific literature to
  284:13    that particular issue raised; true?
  284:14          A.      True.
  284:15          Q.      It is not standard practice to
  284:16    respond to an opinion in a medical article with a
  284:17    press release disparaging an article; true?


ID:            Scolnick 28420
Page Range:    284:20-285:15

  284:20              THE WITNESS:  That's not the usual
  284:21    practice.  I don't recall what Merck did.
  284:22    BY MR. BUCHANAN:
  284:23          Q.      Is that a practice you endorse?
  284:24          A.      Absolutely not.
  284:25          Q.      The appropriate way to respond is in
  284:ESQUIRE DEPOSITION SERVICES
  285: Confidential - Subject to Protective Order 285
  285: 1    the medical journal itself; true?
  285: 2          A.      That is an appropriate way to
  285: 3    respond.
  285: 4          Q.      You could write a letter to the
  285: 5    editor; right?
  285: 6          A.      Yes, correct.
  285: 7          Q.      You can submit your own article?
                        Page 49