```
                              Plaintiffs Scolnick.txt
285: 8          A.      Correct.
285: 9          Q.      Or you can publish a competing
285:10   article in another journal; right?
285:11          A.      Correct.
285:12          Q.      But one of the things that you think
285:13   would be unusual is to issue a press release to
285:14   respond to an article in the medical literature;
285:15   true?


ID:             Scolnick 28517
Page Range:     285:17-285:20

285:17                  THE WITNESS:  It would be unusual.
285:18   BY MR. BUCHANAN:
285:19          Q.      And just not right?
285:20          A.      It would be --


ID:             Scolnick 28522
Page Range:     285:22-286:1

285:22                  THE WITNESS:  It is not a standard
285:23   way of doing it.
285:24   BY MR. BUCHANAN:
285:25          Q.      And certainly nothing you'd endorse?
285:ESQUIRE DEPOSITION SERVICES
286: Confidential - Subject to Protective Order 286
286: 1          A.      That is correct.


ID:             Scolnick 29311
Page Range:     293:11-293:20

293:11          Q.      But May of 2001, you were still
293:12   interested in a trial to evaluate the CV safety of
293:13   Vioxx; true?
293:14          A.      That is true.  I constantly wanted to
293:15   garner additional data to what we already had to
293:16   further prove what we had concluded.
293:17          Q.      And nobody had come up with an idea
293:18   by 2001 of a CV study that could be done to evaluate
293:19   the cardiovascular safety of Vioxx?  That's your
293:20   testimony?


ID:             Scolnick 29323
Page Range:     293:23-294:2

293:23                  THE WITNESS:  As the discussions
293:24   evolved, what everybody focused on was a study
293:25   versus placebo, and no placebo-controlled trial had
293:ESQUIRE DEPOSITION SERVICES
294: Confidential - Subject to Protective Order 294
294: 1   yet been brought forth that people were satisfied
294: 2   with the design on.


ID:             Scolnick 29608
Page Range:     296:8-296:9

296: 8          Q.      Do you remember the VALOR trial, sir?
296: 9          A.      I don't remember that name, no.
                              Page 50
```

Plaintiffs Scolnick.txt

ID:            Scolnick 29625
Page Range:    296:25-297:19

```
296:25          Q.       Dr. Scolnick, I just passed you over
296:ESQUIRE DEPOSITION SERVICES
297: Confidential - Subject to Protective Order 297
297: 1     what we marked as Exhibit 10 to your deposition.  It
297: 2     is Bates stamped MRK-ABA0003490 to 3491.  It is a
297: 3     letter from a Carlo Patrono; correct?
297: 4          A.       Yes.  It's from Dr. Patrono.
297: 5          Q.       Ever seen this before?
297: 6          A.       I don't recall.
297: 7          Q.       Who is Dr. Braunwald?
297: 8          A.       Braunwald is a well-known
297: 9     cardiologist at Peter Bent Brigham Hospital.
297:10          Q.       Here in Massachusetts?
297:11          A.       Yes.
297:12          Q.       That's affiliated with Harvard; is
297:13     that right?
297:14          A.       Yes, it is.
297:15          Q.       Merck was actually speaking to
297:16     Dr. Braunwald about running a VALOR trial; right?
297:17          A.       That's what this letter suggests.  I
297:18     remember Dr. Braunwald making suggestions, but I
297:19     don't remember the details involved.
```

ID:            Scolnick 29824
Page Range:    298:24-299:11

```
298:24          Q.       Well, do you recall at the end of
298:25     2001 there was increased urgency to do a
298:ESQUIRE DEPOSITION SERVICES
299: Confidential - Subject to Protective Order 299
299: 1     cardiovascular study; true?
299: 2          A.       There was, because a number of
299: 3     people, scientists and others, still were
299: 4     questioning whether Vioxx had been a contributor in
299: 5     the VIGOR trial as opposed to naproxen being
299: 6     beneficial.
299: 7          Q.       People were still worried about
299: 8     whether Vioxx was causing cardiovascular events;
299: 9     true?
299:10          A.       There were some people who still were
299:11     raising that question.
```

ID:            Scolnick 30012
Page Range:    300:12-301:10

```
300:12                   I may have asked you this, but did
300:13     you run the VALOR trial?
300:14          A.       No, I don't think the VALOR trial was
300:15     run.
300:16          Q.       Why not?
300:17          A.       I don't remember why the VALOR trial
300:18     wasn't run.  This sounds like a pretty complicated
300:19     trial to me, and I don't remember why it wasn't run.
300:20          Q.       Was money an issue?
300:21          A.       I don't remember why the VALOR trial
300:22     wasn't run.  As I said, this seems like a fairly
```

Plaintiffs Scolnick.txt

300:23 · complicated paragraph here from Dr. Patrono to Dr.
300:24     Braunwald, so, I'm not able to figure this out
300:25     quickly.
300:ESQUIRE DEPOSITION SERVICES
301: Confidential - Subject to Protective Order 301
301: 1          Q.     Do you see the third paragraph?  It
301: 2     reads, "I have serious reservations about the role
301: 3     of the Sponsor."  The sponsor would be Merck?
301: 4          A.     Presumably.
301: 5          Q.     "I have serious reservations about
301: 6     the role of the Sponsor in monitoring and
301: 7     termination of the study, as well as in the
301: 8     statistical analysis of the results."  Do you see
301: 9     that?
301:10          A.     I do.


ID:              Scolnick 30515a
Page Range:      305:15-305:19

305:15                    Following the Advisory Committee in
305:16     2001, a series of negotiations took place with FDA
305:17     concerning the label for Vioxx; right?
305:18          A.     Yes, a very long time before we
305:19     actually got a label from them.


ID:      ·       Scolnick 31121
Page Range:      311:21-313:3

311:21          Q.     I want to pass you over what we just
311:22     marked as Exhibit 11 to your deposition.  It's an
311:23     e-mail dated January 31st, 2001 from you to Mr.
311:24     Gilmartin and Mr. Anstice.  The subject is "Monday
311:25     MC."  Do you see that?
311:ESQUIRE DEPOSITION SERVICES
312: Confidential - Subject to Protective Order 312
312: 1          A.     Yes.
312: 2          Q.     "MC" refers to management committee?
312: 3          A.     Yes.
312: 4          Q.  .   It is Bates stamped MRK-ACR0008985.
312: 5                 You write, I guess it's the second
312: 6     sentence or so:  "The Vigor meeting is next
312: 7     thursday.  On Monday I will show you the essence, an
312: 8     update, of the data that supports Vioxx is safe in
312: 9     the Cv sense.  But I want to point out to all of you
312:10     at one time that 1. there is no way to prove that in
312:11     patients with rheumatoid arthritis that," and you
312:12     put this in all caps, "ALL of the difference between
312:13     Vioxx and naproxen is due to the benefit of
312:14     naproxen."  Do you see that.
312:15          A.     I do.
312:16          Q.     Then you continue.  "IT IS IMPOSSIBLE
312:17     TO PROVE THIS."  That's all caps; right?
312:18          A.     Yes.
312:19          Q.     And you continue further.  "IT IS
312:20     IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."  That's
312:21     what you wrote; right?
312:22          A.     I did.
312:23          Q.     And that was -- that was your feeling
312:24     as of January 31st, 2001?
312:25          A.     Yes.  That's just what I've just told
312:ESQUIRE DEPOSITION SERVICES
                       Page 52

Plaintiffs Scolnick.txt
313: Confidential - Subject to Protective Order 313
313: 1 .  you again.
313: 2          Q.       A week before the Advisory Committee?
313: 3          A.       Yes.


ID:             Scolnick 31325a
Page Range:     313:25-314:15

313:25          Q.       You continue, "Knowing what is about
313:ESQUIRE DEPOSITION SERVICES
314: Confidential - Subject to Protective Order 314
314: 1      to happen, managing the short term fall out, and
314: 2      facing and managing any longer term consequences."
314: 3      "Short term fall out," what are you thinking about
314: 4      there?
314: 5          A.       When all the data is presented again,
314: 6      people will raise questions whether we can prove the
314: 7      negative completely and, therefore, will question
314: 8      whether they should use Vioxx or not.
314: 9          Q.       "Short term fall out" also refers to
314:10      potential impact on Merck stock; right?
314:11          A.       I don't know.  I think I had in mind
314:12      just the effects on Vioxx.
314:13          Q.       Well, the effects of Vioxx would
314:14      include decreased sales of Vioxx; true?
314:15          A.       Yes.


ID:             Scolnick 31511
Page Range:     315:11-315:24

315:11          Q.       Well, did you think that negative
315:12      labeling for Vioxx would have an adverse effect on
315:13      Vioxx sales?
315:14          A.       Certainly.
315:15          Q.       Did you think that if there was a CV
315:16      warning for Vioxx, that that would have a negative
315:17      effect on Vioxx sales?
315:18          A.       Certainly, but I didn't expect a CV
315:19      warning based on the data.
315:20          Q.       Did you think that if there was a CV
315:21      warning on Vioxx, that would also have an effect on
315:22      Merck stock?
315:23          A.       Certainly.  But as I've said, I did
315:24      not expect a CV warning.


ID:             Scolnick 32206
Page Range:     322:6-325:17

322: 6          Q.       And you really thought it was a
322: 7      challenge in your team to convince the FDA and the
322: 8      Advisory Committee that Vioxx didn't have a
322: 9      cardiovascular problem; true?
322:10          A.       We had all the data which said that
322:11      we didn't have a problem, and we wanted to make sure
322:12      we could present all that data, sure.
322:13          Q.       But it wasn't just a challenge, it
322:14      was almost impossible; right?
322:15          A.       It was impossible to prove the
322:16      negative, which I pointed out in my e-mail note.  It
322:17      was possible to present all the data which supported
                          Page 53

Plaintiffs Scolnick.txt

```
322:18   our position.
322:19            Q.      Well, the Advisory Committee went
322:20   well from your perspective; true?
322:21            A.      Yes.  Quite well.
322:22            Q.      Your team did a fantastic job; true?
322:23            A.      Yes.
322:24            Q.      And they made the FDA look like
322:25   "grade d high school students."  Isn't that what you
322:ESQUIRE DEPOSITION SERVICES
323: Confidential - Subject to Protective Order 323
323: 1 · said?
323: 2            A.      I did in an e-mail note, yes.  I
323: 3   regret those words, but we did a good job.
323: 4            Q.      You meant them when you wrote it?
323: 5            A.      It was -- I meant them.  It was an
323: 6   allusion to something that had happened a few years
323: 7   ago, but I did write those words.
323: 8            Q.      This is the same FDA that you
323: 9   respect?
323:10            A.      Yes.
323:11            Q.      This is the same FDA that's
323:12   responsible for the public safety?
323:13            A.      That's correct.
323:14            Q.      This is the same FDA that's
323:15   responsible for evaluating the cardiovascular data
323:16   concerning your drug?
323:17            A.      Yes.
323:18            Q.      And you were proud that your team
323:19   made the FDA look like grade D high school students;
323:20   true?
323:21            A.      I wrote those words.  I regret the
323:22   choice of words.  I wrote those words.
323:23                    MR. BUCHANAN:  Let's mark as Exhibit
323:24   12, I think, the e-mail you were referring to, sir.
323:25                       -  -  -
323:ESQUIRE DEPOSITION SERVICES
324: Confidential - Subject to Protective Order 324
324: 1 ·          (Whereupon, Deposition Exhibit
324: 2                    Scolnick-12, E-mails, MRK-ACT0018064,
324: 3                    was marked for identification.)
324: 4                       -  -  -
324: 5                    THE WITNESS:  Yes.
324: 6   BY MR. BUCHANAN:
324: 7            Q.      Dr. Scolnick, I just passed you over
324: 8   Exhibit 12 to your deposition.  It is an e-mail, two
324: 9   e-mails, the earliest of which is an e-mail from you
324:10   to several folks, subject, "Today."  It's Bates
324:11   stamped MKR-ACT0018064.  It's dated Thursday,
324:12   February 8, 2001, 9:10 p.m. is the time.  Do you see
324:13   that?
324:14            A.      Yes, I do.
324:15            Q.      You wrote this the day of the
324:16   February 2001 Advisory Committee?
324:17            A.      I don't remember the date of the
324:18   meeting.
324:19            Q.      You wrote "To ALL" --
324:20            A.      It looks like it is the same day.
324:21            Q.      "To ALL:  I bit my nails all day."
324:22   You're referring to you listening to the Advisory
324:23   Committee?
324:24            A.      Either listening or being there.  I
324:25   don't remember whether I was there or I viewed it.
324:ESQUIRE DEPOSITION SERVICES
```

Page 54

Plaintiffs Scolnick.txt
325: Confidential - Subject to Protective Order 325
325: 1          Q.      If you didn't go, you did listen?
325: 2          A.      Yes.
325: 3          Q.      You said, "You all were FANTASTIC."
325: 4    You wrote that in all caps; right?
325: 5          A.      Yes.
325: 6          Q.      You then wrote that "You made them
325: 7    look like grade d high school students."  Right?
325: 8          A.      That's what the memo says.
325: 9          Q.      You say, "and you won big huge and
325:10    completely."  True?
325:11          A.      That's what I said.
325:12          Q.      You wrote that?
325:13          A.      Yes.
325:14          Q.      You note at the end of this that your
325:15    team should, "enjoy and bask in the warmth of having
325:16    done an impossible job superbly."  Is that right?
325:17          A.      That's what I wrote.


ID:             Scolnick 32607
Page Range:     326:7-326:10

326: 7                  You agree it is not very flattering
326: 8    to refer to the agency responsible for protecting
326: 9    the public health as it relates to drugs as "grade d
326:10    high school students."


ID:             Scolnick 32612a
Page Range:     326:12-326:16

326:12                  THE WITNESS:  No, it is not
326:13    flattering.  As I said, it came from an allusion to
326:14    an earlier event related to the crux of an Advisory
326:15    Committee meeting, and it was inappropriate in this
326:16    context.


ID:             Scolnick 32910a
Page Range:     329:10-329:24

329:10          Q.      So, after this Advisory Committee in
329:11    February of 2001, you got a letter from the FDA
329:12    saying that they were conditionally approving
329:13  . Merck's supplemental new drug application; right?
329:14          A.      At some point we got a letter back
329:15    from them, yes.
329:16          Q.      You didn't like the tone of the
329:17    letter, though, did you?
329:18          A.      We didn't like the tone, and we
329:19    didn't like the content.  As I said earlier, they
329:20    ignored all the GI data.  They completely left it
329:21    out.  They left out the Alzheimer's data, and they
329:22    had a warning, despite what had happened at the
329:23    Advisory Committee, where no warning was suggested
329:24    based on all the data, or voted for.


ID:             Scolnick 33112
Page Range:     331:12-331:18

331:12          Q.      For the record, Dr. Scolnick, I've
                                 Page 55

Plaintiffs Scolnick.txt

```
331:13    just passed you what we've marked as Exhibit 13 to
331:14    your deposition.  It's a two-page series of e-mails
331:15    Bates stamped MRK-ACR0009151 to 9152.  Doctor, you
331:16    are, in fact, an author and recipient on several of
331:17    these e-mails; true?
331:18         A.    Yes.
```

ID:            Scolnick 33209
Page Range:    332:9-332:25

```
332: 9         Q.    You didn't like the tone of the
332:10    approvable letter you got from Merck's supplemental
332:11    NDA; true?
332:12         A.    That's correct.  I don't remember
332:13    what was in it at this point, so, it's very hard to
332:14    respond to your question.
332:15         Q.    I'll just read the first sentence.
332:16    "To ALL:  I am sure you imagine my reaction to the
332:17    tone of the letter.  The open ended request for
332:18    safety updates is a filibuster."  Do you see that?
332:19         A.    Yes.
332:20         Q.    What's a filibuster?
332:21         A.    It's a delaying tactic.
332:22         Q.    So, you thought the FDA was trying to
332:23    delay approval of your supplemental NDA request to
332:24    get safety information?
332:25         A.    That's what I wrote.
```

ID:            Scolnick 33311
Page Range:    333:11-334:12

```
333:11         Q.    You viewed this is as a delay tactic
333:12    by the FDA?  Is that your testimony?
333:13         A.    That's what I was worried about.
333:14         Q.    Then you state, "when will you find
333:15    out what they have done for our competitor?  If by
333:16    any chance they get a better label now and we are
333:17    asked for this much more data, I will be in Janet's
333:18    office the next day."  Do you see that?
333:19         A.    Yes.
333:20         Q.    Your competitor would be Celebrex?
333:21         A.    Yes.
333:22         Q.    The manufacturer of Celebrex?
333:23         A.    Yes.
333:24         Q.    Okay.
333:25               You were concerned that the
333:ESQUIRE DEPOSITION SERVICES
334: Confidential - Subject to Protective Order 334
334: 1    manufacturers of Celebrex were going to get an
334: 2    approved label before Vioxx was going to get an
334: 3    approved label?
334: 4         A.    For GI outcomes, yes, that's what I
334: 5    think I was concerned about.
334: 6         Q.    And if that happened, you were going
334: 7    to go down there to the FDA and see Janet the next
334: 8    day; is that right?
334: 9         A.    That is what I said in the memo.
334:10         Q.    Who is Janet?
334:11         A.    Janet was Janet Woodcock, who was, I
334:12    believe, the head of the drug part of the FDA.
```

Page 56

Plaintiffs Scolnick.txt

ID:              Scolnick 33420
Page Range:      334:20-334:24

334:20          Q.      So, you felt you could go down there
334:21     to Janet's office, and you could tell her to
334:22     straighten things out and make sure that Merck's
334:23     label got approved on the terms you wanted it
334:24     approved on?


ID:              Scolnick 33501
Page Range:      335:1-335:4

335: 1                  THE WITNESS:  I don't know exactly
335: 2     what I was thinking.  I certainly wanted to advocate
335: 3     on Merck's behalf if this were to happen.  That's
335: 4     what this memo says.


ID:              Scolnick 33512
Page Range:      335:12-335:15

335:12          Q.      Sir, is that the way it's supposed to
335:13     work, when you want to address a labeling request
335:14     with the FDA, you go down, and you go into Janet
335:15     Woodcock's office to address it?


ID:              Scolnick 33518
Page Range:      335:18-335:25

335:18                  THE WITNESS:  The head of the drug
335:19     office can be involved in labeling negotiations.
335:20     BY MR. BUCHANAN:
335:21          Q.      Is that who Janet Woodcock was?
335:22          A.      I believe at the time she was head of
335:23     the drug approval part of the FDA as opposed to
335:24     vaccines and other parts of the FDA, I believe, but
335:25     I'm not certain.


ID:              Scolnick 33601a
Page Range:      336:1-336:8

336: 1          Q.      So, in other words, if the FDA
336: 2     perchance decided to give the Celebrex manufacturers
336: 3     the label they had sought before you got it, you
336: 4     were going to go down to the, what's this, the head
336: 5     of drug approval and complain?  Is that your
336: 6     testimony?
336: 7          A.      That was -- that's what this note
336: 8     implies.


ID:              Scolnick 33620
Page Range:      336:20-336:22

336:20          Q.      It's your view, though, that the FDA
336:21     scientists aren't really kept up to date on medical
336:22     developments, sir?

Page 57

Plaintiffs Scolnick.txt
```
ID:              Scolnick 33624
Page Range:      336:24-338:19

336:24            THE WITNESS:  The purpose for this
336:25  ·  science advisory board, which I was a member of, was
336:ESQUIRE DEPOSITION SERVICES
337: Confidential - Subject to Protective Order 337
337: 1    something actually that the FDA started in order to
337: 2    ask outside scientists how their scientists could
337: 3    keep up to date better than they were currently
337: 4    doing.
337: 5    BY MR. BUCHANAN:
337: 6            Q.       So, at this point in time, 2001, the
337: 7    FDA convened a science advisory board to address a
337: 8    ·problem within the FDA; true?
337: 9            A.       That's my recollection.  That's the
337:10    best of my recollection.
337:11            Q.       And the problem was that the FDA
337:12    scientists weren't keeping up to date with
337:13    scientific developments in the medical community?
337:14            A.       As well as the FDA felt that they
337:15    might.  I know that was the purpose for the board.
337:16    I don't recall all the details about how it got set
337:17    up.
337:18            Q.       You then continue.  "I have already
337:19    told them I think their review system is an" --
337:20    that's a big word.  What's that say?
337:21            A.       "Anachronism."
337:22            Q.       What's that mean?
337:23            A.       It's out of date.
337:24            Q.       So, you say, "I have already told
337:25  · them I think their review system is" out of date
337:ESQUIRE DEPOSITION SERVICES
338: Confidential - Subject to Protective Order 338
338: 1    "because they cannot possibly keep up with science
338: 2    given their hiring constraints."  Do you see that?
338: 3            A.       I do.
338: 4            Q.       What are the hiring constraints
338: 5    you're referring to?
338: 6            A.       They always have limits on the number
338: 7    of persons they can hire because of government
338: 8    ·ceilings and the salary constraints they have in
338: 9    hiring scientists compared to universities and
338:10    industry.
338:11            Q.       So, the FDA doesn't have as many
338:12    people working on the review of a drug than, say,
338:13    Merck does in preparing the data for the FDA to look
338:14    at; right?
338:15            A.       I don't know that.  I don't know how
338:16    many people are assigned to review a given drug.
338:17    I'm making a general statement about the problems
338:18    that the FDA have in keeping up with the volume of
338:19    applications and the staff they need to do that.


ID:              Scolnick 34024
Page Range:      340:24-341:5

340:24  ·        Q.       You said that you weren't just going
340:25    to stop with Janet; right?
340:ESQUIRE DEPOSITION SERVICES
341: Confidential - Subject to Protective Order 341
341: 1            A.       That's what this says.
                        Page 58
```

Plaintiffs Scolnick.txt

```
341: 2          Q.       You said you'd go beyond if you
341: 3     needed to with other contacts you'd made in HHS;
341: 4     right?
341: 5          A.       That's what this says.
```

```
ID:              Scolnick 34117
Page Range:      341:17-341:20
```

```
341:17                   So, you'd go over Janet's head if you
341:18     needed to?
341:19          A.       In order to make scientific points
341:20     which I felt strongly about.
```

```
ID:              D ES  34121
Page Range:      341:21-342:5
```

```
341:21          Q.       I understand.
341:22                   If you felt strongly and Janet didn't
341:23     give you the answers you wanted, you would go above
341:24     Janet's head; right?
341:25          A.       I would argue the science that we
341:ESQUIRE DEPOSITION SERVICES
342: Confidential - Subject to Protective Order 342
342: 1     based our -- particularly, I think, talking about
342: 2     the GI labeling of the drug.  We had pristine data
342: 3     about the GI safety -- the improved GI safety of
342: 4     Vioxx which had not been acknowledged in the
342: 5     approvable letter, to the best of my knowledge.
```

```
ID:              Scolnick 34301
Page Range:      343:1-343:11
```

```
343: 1                   I see the last sentence here you say,
343: 2     "I have never seen being nice to the FDA-except on
343: 3     rare occasions-pay off."  You wrote that?
343: 4          A.       Yes.
343: 5          Q.       You meant it?
343: 6          A.       Yes.
343: 7          Q.       It's a true statement?
343: 8          A.       It was my feeling.
343: 9          Q.       True statement when you wrote it,
343:10     sir?
343:11          A.       It is my feeling when I wrote it.
```

```
ID:              Scolnick 35312a
Page Range:      353:12-353:25
```

```
353:12          Q.       Then you say, "One cannot deal with
353:13     them in a rational way."  Right?
353:14          A.       That's what I said.
353:15          Q.       And rational way was your way; right?
353:16          A.       No.  Rational way was the way we had
353:17     been trying to deal with them when we submitted the
353:18     supplemental NDA, with all of the data that was
353:19     supported at the Advisory Committee meeting.
353:20          Q.       Right.
353:21                   To be clear, what the FDA was asking
353:22     for was additional safety information in their
353:23     approvable letter; true?
```

Page 59

Plaintiffs Scolnick.txt
```
353:24         A.      That's what the memo implies.  I do
353:25    not know nor recall what was in that request.


ID:              Scolnick 35415
Page Range:      354:14-354:19

353:14    BY MR. BUCHANAN:
354:15         Q.      The bottom line is that the FDA,
354:16    looking for additional data on Vioxx in connection
354:17    with your supplemental NDA request, jeopardized your
354:18    ability to get the label you wanted in the
354:19    marketplace; true?


ID:              Scolnick 35421
Page Range:      354:21-355:5

354:21                 THE WITNESS:  They were retarding the
354:22    process in my opinion.
354:23    BY MR. BUCHANAN:
354:24         Q.      And you needed that process to move
354:25    quickly; right?
354:ESQUIRE DEPOSITION SERVICES
355: Confidential - Subject to Protective Order 355
355: 1         A.      That was our goal.  We wanted it to
355: 2    move quickly.  We had submitted our application very
355: 3    quickly, and it still had been almost a year after
355: 4    the application was submitted, and we didn't yet
355: 5    have a label back.


ID:              D ES  35506
Page Range:      355:6-355:8

355: 6         Q.      Because you were concerned that in
355: 7    the COX-2 market, the drug with the better label
355: 8    would sell more drug; true?


ID:              D ES  35510
Page Range:      355:10-355:13

355:10                 THE WITNESS:  We had substantially
355:11    better gastrointestinal safety data than our
355:12    competitor, and I wanted that to be represented in
355:13    our label.


ID:              Scolnick 35516
Page Range:      355:16-355:19

355:16                 You were concerned that in the COX-2
355:17    market, the company that had the better label for
355:18    its drug would sell more of that drug; true?
355:19         A.      True, if the data supported that.


ID:              Scolnick 35523a
Page Range:      355:23-356:10

355:23         Q.      You did get a label at some point in
355:24    time in connection with your supplemental new drug
```
                          Page 60

Plaintiffs Scolnick.txt
```
355:25    application for Vioxx; true?
355:ESQUIRE DEPOSITION SERVICES
356: Confidential - Subject to Protective Order 356
356: 1          A.       Yes.
356: 2          Q.       You got that in the fall of 2001?
356: 3          A.       I don't recall the exact date.  It
356: 4   was certainly after this in 2001.
356: 5          Q.       Had a CV warning?
356: 6          A.       Yes.
356: 7          Q.       CV means cardiovascular; right?
356: 8          A.       Yes.
356: 9          Q.       In the warnings section of the label?
356:10          A.       Yes.


ID:              Scolnick 35704
Page Range:      357:4-357:17

357: 4          Q.       The label you got from the FDA had a
357: 5   cardiovascular warning in the warnings section;
357: 6   true?
357: 7          A.       I believe so.
357: 8          Q.       You thought it was ugly?
357: 9          A.       I did.
357:10          Q.       You thought it was ugly cubed?
357:11          A.       I did.
357:12          Q.       That's ugly times ugly times ugly;
357:13   right?
357:14          A.       Ugly cubed is exactly what you've
357:15   stated.
357:16          Q.       Ugly three times over; right?
357:17          A.       Right.


ID:              D Scolnick 35718
Page Range:      357:18-357:20

357:18          Q.       What's so ugly about telling doctors
357:19   about the cardiovascular data that was received by
357:20   Merck in the VIGOR trial?


ID:              D Scolnick 35723
Page Range:      357:23-358:8

357:23                   THE WITNESS:  It is not ugly to tell
357:24   doctors about that.  We had wanted to do that and
357:25   had been doing that.  What was ugly was the way it
357:ESQUIRE DEPOSITION SERVICES
358: Confidential - Subject to Protective Order 358
358: 1   was presented, given that it wasn't clear that Vioxx
358: 2   caused it, in fact, it was much clearer that
358: 3   naproxen had protected the heart, and all of the
358: 4   other data in our Alzheimer's trial had been left
358: 5   out of the label that they had sent us.  And the GI
358: 6   section of the label had not been changed to reflect
358: 7   our GI data.  And that was my response to that
358: 8   preliminary label we got from them.


ID:              Scolnick 35810
Page Range:      358:10-359:8
```

Plaintiffs Scolnick.txt

```
358:10          Q.      So, you got this draft label from the
358:11   FDA in, what, October 2001?  Does that sound right?
358:12          A.      I don't recall the exact date.  As I
358:13   told you, it was somewhere later than this, May --
358:14   it was later than May.  I don't remember exactly
358:15   when we got it.
358:16          Q.      You sent it off to David Anstice?
358:17          A.      I don't think I -- I don't know
358:18   whether I sent the label to David Anstice or he
358:19   received it from somebody else and communicated with
358:20   me.  I don't -- I don't remember.
358:21          Q.      You told David, "David Be assured"
358:22   there's no way we will "accept this label."  Right?
358:23          A.      Yes, I did.
358:24          Q.      You had the ability to do that;
358:25   right?
358:ESQUIRE DEPOSITION SERVICES
359: Confidential - Subject to Protective Order 359
359: 1          A.      We had the ability to sit down with
359: 2   the FDA and argue our position vigorously based on
359: 3   our data.
359: 4          Q.      You had --
359: 5          A.      The label did not reflect that.
359: 6          Q.      You had the ability to not accept the
359: 7   warning that the FDA told you you should put on
359: 8   Vioxx; true?
```

ID:              Scolnick 35911
Page Range:      359:11-359:25

```
359:11                  THE WITNESS:  If the FDA had
359:12   absolutely wanted that warning, they had the ability
359:13   to impose that on Merck.  What I was saying was that
359:14   unless that happened, I would not accept the label
359:15   that they had sent us because it didn't accurately
359:16   reflect our data.
359:17   BY MR. BUCHANAN:
359:18          Q.      Well, in fact, what you said was you
359:19   wouldn't accept that label, and if the FDA didn't
359:20   relent and give you the label you wanted, you'd
359:21   insist on an Advisory Committee; true?
359:22          A.      I did say that.  I would have been
359:23   happy to take it back to an Advisory Committee
359:24   because they had already said the data didn't
359:25   justify that.
```

ID:              Scolnick 36022
Page Range:      360:22-361:4

```
360:22          Q.      Sir, I'm going to pass over what
360:23   we've just marked as Exhibit 14 to your deposition.
360:24   It is a series of e-mails, three of them in
360:25   particular, from October 2001.  For the record, it
360:ESQUIRE DEPOSITION SERVICES
361: Confidential - Subject to Protective Order 361
361: 1   is Bates stamped MRK-ABW0004799.
361: 2                  Sir, you've seen this document
361: 3   before; right?
361: 4          A.      Yes, I have.
```

Page 62

Plaintiffs Scolnick.txt

ID:              Scolnick 36114
Page Range:      361:14-362:12

361:14          Q.      It is from October 15th, 2001?
361:15          A.      Yes.
361:16          Q.      You said --
361:17          A.      October 16th.
361:18          Q.      You said, "David."  That's David
361:19  Anstice; right?
361:20          A.      Yes.
361:21          Q.      He's the president of U.S. human
361:22  health?
361:23          A.      Yes.
361:24          Q.      That was the group within Merck
361:25  responsible for all the marketing of Vioxx?
361:ESQUIRE DEPOSITION SERVICES
362: Confidential - Subject to Protective Order 362
362: 1          A.      The domestic marketing of Vioxx.
362: 2          Q.      You told him, "Be assured we will not
362: 3  accept this label."  Right?
362: 4          A.      That's what my memo says.
362: 5          Q.      David was concerned about this label;
362: 6  right?
362: 7          A.      Yes.
362: 8          Q.      Okay.
362: 9                  Thought it put you at a competitive
362:10  disadvantage; right?
362:11          A.      Yes.  And it didn't accurately
362:12  reflect our data.


ID:              Scolnick 36213
Page Range:      362:13-363:2

362:13          Q.      You were telling David that I'm going
362:14  to do what I can to make sure we don't get that
362:15  label; right?
362:16          A.      Yes.
362:17          Q.      I'm going to do what I can to make
362:18  sure there's no CV warning in the Vioxx label;
362:19  right?
362:20          A.      That isn't what this says.  It says,
362:21  "we will not accept this label" and "if we need to
362:22  we will go to an Advisory Committee meeting" to get
362:23  them to review what our label should like, a
362:24  scientific process to resolve the potential -- a
362:25  potential disagreement between the FDA and Merck.
362:ESQUIRE DEPOSITION SERVICES
363: Confidential - Subject to Protective Order 363
363: 1          Q.      So, you rejected the label you got
363: 2  from the FDA that had the CV warning; true?


ID:              Scolnick 36304a
Page Range:      363:4-363:18

363: 4                  THE WITNESS:  We rejected this label
363: 5  in its totality.  It had a CV warning, and it
363: 6  ignored the GI data that we had garnered in VIGOR.
363: 7  BY MR. BUCHANAN:
363: 8          Q.      David responded to you, "We knew it
363: 9  would be UGLY and it is."  Right, he said that to
363:10  you?

Plaintiffs Scolnick.txt

```
363:11          A.      Yes.
363:12          Q.      He also said, "We'll fight back and
363:13   see where we get."  Right?
363:14          A.      Yes.  That's what he said.
363:15          Q.      And he again said, we'll "ask for an
363:16   advisory committee" if we can't make headway with
363:17   the FDA; right?
363:18          A.      That's what he said.
```

ID:             Scolnick 36412
Page Range:     364:12-365:12

```
364:12          Q.      You then say here in the final one,
364:13   your final e-mail from October 16, 2001, "It is ugly
364:14   cubed."  Right?
364:15          A.      Yes.
364:16          Q.      You say, "thye," that should be they;
364:17   right?
364:18          A.      Yes.
364:19          Q.      "Thye are bastards."  True?
364:20          A.      That's what the e-mail says.
364:21          Q.      That's what you wrote?
364:22          A.      That's what I wrote.
364:23          Q.      You meant it when you wrote it?
364:24          A.      I was very upset when I wrote the
364:25   e-mail.
364:ESQUIRE DEPOSITION SERVICES
365:Confidential - Subject to Protective Order 365
365: 1          Q.      So, this particular group within the
365: 2   FDA was devious and antagonistic; true?
365: 3          A.      That's what I wrote.
365: 4          Q.      They were bastards?
365: 5          A.      That reflected my emotional
365: 6   unhappiness with their label.
365: 7          Q.      They had the ability of grade D high
365: 8   school students; true?
365: 9          A.      That's what I wrote.
365:10          Q.      And if you wanted to get anything
365:11   done with them, you couldn't treat them with
365:12   respect; true?
```

ID:             Scolnick 36514
Page Range:     365:14-365:22

```
365:14          THE WITNESS:  I wrote all of these
365:15   things, and I felt that we were not getting a fair
365:16   process from this division.
365:17   BY MR. BUCHANAN:
365:18          Q.      The FDA was pretty insistent this
365:19   drug needed a cardiac warning, weren't they?
365:20          A.      They presented this label to us, so,
365:21   they must have felt that way.  This division felt
365:22   that way.
```

ID:             Scolnick 36603
Page Range:     366:3-366:9

```
366: 3          Q.      You took from that that the FDA at
366: 4   least was concerned about the potential
366: 5   cardiovascular implications of your drug; true?
```

Page 64

Plaintiffs Scolnick.txt

366: 6        A.      Yes.
366: 7        Q.      And they wanted to warn the American
366: 8    public about the potential cardiovascular
366: 9    implications of Vioxx; true?


ID:             D Scolnick 36611
Page Range:     366:11-366:19

366:11                  THE WITNESS:  Yes, despite the
366:12    Advisory Committee meeting, which had not felt that
366:13    way.
366:14    BY MR. BUCHANAN:
366:15         Q.      Did you interview the Advisory
366:16    Committee members?
366:17         A.      The Advisory Committee members voted
366:18    and saw the cardiovascular safety.  They did not
366:19    suggest a warning for this drug.


ID:             Scolnick 36620
Page Range:     366:20-367:4

366:20         Q.      Well, let me ask you this.
366:21                  Did you show them the mortality data
366:22    from the Alzheimer's trials?
366:23         A.      I cannot recall all the data that we
366:24    presented.  All of the data on Vioxx is submitted to
366:25    the Advisory Committee and the FDA in a background
366:ESQUIRE DEPOSITION SERVICES
367: Confidential - Subject to Protective Order 367
367: 1    package long before the meeting.  So, the FDA has
367: 2    the ability to take any of that data in their
367: 3    presentation to the Advisory Committee, show it to
367: 4    them.


ID:             Scolnick 36811
Page Range:     368:11-368:14

368:11         Q.      You'd agree, though, that a study
368:12    finding that Vioxx doubled the rate of death in
368:13    elderly patients taking it should be shared with the
368:14    FDA as soon as you have those results; right?


ID:             Scolnick 36816
Page Range:     368:16-368:19

368:16                  THE WITNESS:  It should be part of
368:17    the data package that's shared with the FDA.
368:18    BY MR. BUCHANAN:
368:19         Q.      You shouldn't sit on it; right?


ID:             Scolnick 36821
Page Range:     368:21-368:25

368:21                  THE WITNESS:  It should be submitted
368:22    to the agency, I agree with you.
368:23    BY MR. BUCHANAN:
368:24         Q.      Promptly?
368:25         A.      Promptly.
                        Page 65

Plaintiffs Scolnick.txt

```
ID:              D Scolnick 37001
Page Range:      370:1-370:3

   370: 1               Q.      And, in fact, that's the type of
   370: 2       information that even after an Advisory Committee
   370: 3       you'd want to get to the FDA quickly; right?


ID:              D Scolnick 37005
Page Range:      370:5-370:7

   370: 5               THE WITNESS:  That would be part of
   370: 6       any submission to the FDA or safety update on the
   370: 7       drug.


ID:              Scolnick 37115a
Page Range:      371:15-371:23

   371:15                Dr. Scolnick, I just passed you what
   371:16       we marked as Exhibit 15 to your deposition.  It's a
   371:17       three e-mail sequence from November 8, 2001.  The
   371:18       subject here says "History lesson."  Do you see
   371:19       that?
   371:20       A.      Uh-huh, yes, I do.
   371:21       Q.      It's an exchange between initially
   371:22       from you to Doug Greene and Bonnie Goldmann; true?
   371:23       A.      Yes.


ID:              Scolnick 37218
Page Range:      372:18-373:3

   372:18       Q.      You said, "Doug and Bonnie twice in
   372:19       my life I've had to say to FDA 'That label is
   372:20       unacceptable, we will not under any circumstances
   372:21       accept it.'"  Do you see that?
   372:22       A.      Yes, I do.
   372:23       Q.      You continue there and you say, "You
   372:24       WILL," in all caps, will, "have to do that on the
   372:25       cardiac warning for Vioxx.  I assure you that you
   372:ESQUIRE DEPOSITION SERVICES
   373: Confidential - Subject to Protective Order 373
   373: 1       will."  That's what you wrote; right?
   373: 2       A.      I did.  You skipped an intervening
   373: 3       sentences.


ID:              Scolnick 37312a
Page Range:      373:12-374:2

   373:12       Q.      Paragraph continues where I was
   373:13       before, "You WILL," in all caps will, "have to do
   373:14       that on the cardiac warning for Vioxx.  I assure you
   373:15       that you will."  Did I read that right?
   373:16       A.      Yes, you did.
   373:17       Q.      You put "will" in emphasis to these
   373:18       people; right?
   373:19       A.      Yes, I did.
   373:20       Q.      And these were the people who were
   373:21       dealing with the FDA in connection with the label
```

Page 66

Plaintiffs Scolnick.txt
373:22      negotiations; right?
373:23          A.      Yes.
373:24          Q.      You told them, "And I assure you I
373:25      will NOT," and again in all caps, "NOT sign off on
373:ESQUIRE DEPOSITION SERVICES
374: Confidential - Subject to Protective Order 374
374: 1      any label that had a cardiac warning."   True?
374: 2          A.      That's what the e-mail says.


ID:              Scolnick 37610
Page Range:      376:10-376:15

376:10          Q.      So, you negotiated with the FDA over
376:11      this label concerning cardiac and GI warnings from
376:12      October of 2001 until April of 2002; true?
376:13          A.      That's correct.  Because we believed
376:14      that the drug did not justify having a cardiac
376:15      warning based on our data.


ID:              D ES  37616
Page Range:      376:16-376:24

376:16          Q.      Does the drug justify a cardiac
376:17      warning today?
376:18          A.      No.
376:19          Q.      It doesn't?
376:20          A.      It does not justify a cardiac warning
376:21      based on this data.  And the new data that you're
376:22      referring to is in very different context and
376:23      completely consistent with all the data we had here
376:24      where we didn't believe it justified a warning.


ID:              Scolnick 381.11-382.02
Page Range:      381:11-382:2

381:11          Q.      Doctor, I passed you over what we
381:12      marked as Exhibit 16 to your deposition.  It is a
381:13      relatively brief e-mail, Bates stamped
381:14      MRK-ACR0009297 dated February 25th, 2002 from you
381:15      again to this same team of people working on the
381:16      negotiations over the Vioxx label; true?
381:17          A.      Yes.
381:18          Q.      You wrote, "To ALL:  If you can get
381:19      this label it will be an Al Michaels quote:  'Do you
381:20      believe in miracles?'"   What are you referring to
381:21      there?
381:22          A.      I'm referring to Al Michael's quote
381:23      when the U.S. Olympic team beat the Russians in
381:24      whatever year it was in ice hockey.
381:25          Q.      It was like an impossible task;
381:ESQUIRE DEPOSITION SERVICES
382: Confidential - Subject to Protective Order 382
382: 1      right?
382: 2          A.      It certainly appeared to be.


ID:             Scolnick Part 3 (5-17-05)

ID:              Scolnick 41512
Page Range:      415:12-415:15
                          Page 67

Plaintiffs Scolnick.txt

```
415:12              Q.      Sir, passing over what we just marked
415:13      as Exhibit 18 to your deposition.  For the record,
415:14      it's a January 28, 2001 e-mail from yourself to Eve
415:15      Slater.


ID:             Scolnick 41524
Page Range:     415:24-416:1

415:24              Q.      Okay.  Do you see your e-mail at the
415:25   .   top?
416: page 416
416: 1              A.      Yes, I do.


ID:             Scolnick 416.06-416.12
Page Range:     416:6-416:12

416: 6              Q.      Then you continue, "This Fries
416: 7      incident is a disaster for Merck."  Do you see that?
416: 8              A.      Yes, I do.
416: 9              Q.      You wrote that?
416:10              A.      I did.
416:11              Q.      You believed it at the time?
416:12              A.      I did.


ID:             Scolnick 41621
Page Range:     416:21-417:5

416:21              Q.      Then you continued.  "Worse than
416:22      Vigor results themselves."  Do you see that?
416:23              A.      Yes.
416:24              Q.      The VIGOR results were also a
416:25      disappointment for Merck; true?
417: page 417
417: 1              A.      Some of them were surprising, as you
417: 2      know, and some of them were excellent.
417: 3              Q.      Okay.
417: 4                      And the ones that were surprising
417: 5      were the cardiovascular effects of Vioxx; true?


ID:             Scolnick 41708
Page Range:     417:8-418:6

417: 8                      THE WITNESS:  The difference between
417: 9      naproxen and Vioxx was surprising in the VIGOR
417:10      results.
417:11      BY MR. BUCHANAN:
417:12              Q.      Well, you said, "Worse than Vigor
417:13      results themselves."  That's what you wrote; right,
417:14      sir?
417:15              A.      I did.
417:16              Q.      You were implying that the VIGOR
417:17      results were disappointing in some way; true?
417:18              A.      I was implying that the difference
417:19      between the Vioxx and naproxen arms were surprising
417:20      and created an issue which we had dealt with and
417:21      come up with what we thought was the best
417:22      explanation based on all the other data.
417:23              Q.      Well, sir, you didn't write "more
```
                            Page 68

Plaintiffs Scolnick.txt
```
417:24      surprising" than the VIGOR results themselves when
417:25      you wrote this e-mail, did you?
418: page 418
418: 1              A.      No, I did not.
418: 2              Q.      You wrote, "Worse than VIGOR
418: 3      results"?
418: 4              A.      That's what I wrote.  It's a very
418: 5      short e-mail.  That's what I wrote.
418: 6              Q.      I understand.
```

```
ID:             Scolnick 46512
Page Range:     465:12-465:22
```

```
465:12              Q.      You'd agree with me, sir, wouldn't
465:13      you, that if you were wrong in your final conclusion
465:14      about Vioxx, and the problem was mechanism based,
465:15      that there could have been horrible public health
465:16      consequences to the folks who were taking Vioxx in
465:17      the general population; true?
465:18              A.      If we had been wrong, there would
465:19      have been serious consequences, yes.
465:20              Q.      Tens of thousands of people in the
465:21      general population taking Vioxx could have suffered
465:22      heart attacks as a result of your drug; true?
```

```
ID:             Scolnick 46601
Page Range:     466:1-466:3
```

```
466: 1              THE WITNESS:  If we had been wrong,
466: 2      there would have been negative consequences for
466: 3      public health.  We did not believe we were wrong.
```

```
ID:             D ES  46612
Page Range:     466:12-466:22
```

```
466:12              THE WITNESS:  I've read newspaper
466:13      reports of those.  I do not have any independent way
466:14      of assessing that evidence or the validity of those
466:15      reports.
466:16      BY MR. BUCHANAN:
466:17              Q.      Well, you've seen the FDA reports as
466:18      well; right?
466:19              A.      I've seen newspaper reports of the
466:20      FDA reports of incidences in trials.  I don't
466:21      understand the calculations made from those based on
466:22      the data I've seen.
```

```
ID:             Scolnick 46722
Page Range:     467:22-467:25
```

```
467:22              Q.      Merck has the skilled employees
467:23      necessary to estimate what the public health
467:24      consequences could be of a drug that it made that
467:25      caused cardiovascular side effects; true?
```

```
ID:             Scolnick 46802
Page Range:     468:2-468:9
```

Page 69

Plaintiffs Scolnick.txt

```
468: 2                    THE WITNESS:  Merck can estimate what
468: 3     the consequences would be if the drug were thought
468: 4     by Merck to cause cardiovascular consequences.
468: 5     BY MR. BUCHANAN:
468: 6               Q.        And in March of 2000, no such
468: 7     analysis was done?
468: 8               A.        Correct.  Because we didn't believe
468: 9     the drug caused those events.


ID:             Scolnick 46915
Page Range:     469:15-469:18

469:15                         You agree with the decision by Merck
469:16     not to analyze the potential public health
469:17     consequences to continuing to sell Vioxx in March of
469:18     2000?


ID:             Scolnick 46921
Page Range:     469:21-469:22

469:21                    THE WITNESS:  Yes, I do, because we
469:22     believed the drug was safe.


ID:             Scolnick 47101a
Page Range:     471:1-472:11

471: 1                    Q.        Sir, I just passed you a document we
471: 2     marked as Exhibit 19 to your deposition.
471: 3
471: 4                    (Whereupon, Deposition Exhibit
471: 5                    Scolnick-19, "Vioxx Preliminary
471: 6                    Cardiovascular Meta-Analysis," Slide
471: 7                    Set, 10-18-00 (Shapiro), MRK-NJ0070364 -
471: 8                    MRK-NJ0070397, was marked for
471: 9                    identification.)
471:10
471:11     BY MR. BUCHANAN:
471:12               Q.        For the record, it's a document by
471:13     Deborah Shapiro.  Who is Deborah Shapiro?
471:14               A.        Deborah Shapiro was a statistician in
471:15     the Merck Research Laboratories.
471:16               Q.        She was the unblinded statistician in
471:17     the VIGOR trial; right?
471:18               A.        Yes, she was.
471:19               Q.        She's the statistician you contacted
471:20     to get an early look at the VIGOR data; right?
471:21               A.        To look at the data first when the
471:22     trial is completed.  That is correct.
471:23               Q.        For the record, the document is
471:24     entitled "Vioxx Preliminary Cardiovascular
471:25     Meta-Analysis," and it is Bates stamped
472: page 472
472: 1     MRK-NJ0070364 through 397.
472: 2                    So, your testimony is that the
472: 3     company conducted a meta-analysis preapproval?  That
472: 4     was the first time; right?
472: 5               A.        Yes.
472: 6               Q.        In March of 2000; right?
472: 7               A.        Yes.
472: 8               Q.        And then again in October of 2000;
```
                              Page 70

                         Plaintiffs Scolnick.txt
    472: 9      correct?
    472:10              A.      As I said, I don't remember the dates
    472:11      of all the other meta-analyses.


ID:              Scolnick 47322
Page Range:      473:22-474:16

    473:22              Q.      Okay.  I would like to direct your
    473:23      attention to Page NJ0070394.
    473:24              A.      (Witness reviewing document.)
    473:25              Yes.
    474: page 474
    474: 1              Q.      This is a "meta-analysis" that
    474: 2      describes the "Relative Risk of MIs," that's heart
    474: 3      attacks?
    474: 4              A.      Yes.
    474: 5              Q.      The "MI Endpoint with 95% CI."
    474: 6       What's "CI" mean?
    474: 7              A.      Confidence interval.
    474: 8              Q.      what does confidence interval
    474: 9      represent, sir?
    474:10              A.      It's a term that describes the bounds
    474:11      in which to analyze statistical significance.
    474:12              Q.      And if the confidence interval is
    474:13      greater than 1 or if the confidence -- if the
    474:14      confidence interval doesn't encompass 1, it
    474:15      indicates that the finding is statistically
    474:16      significant; true?


ID:              Scolnick 47419a
Page Range:      474:19-474:19

    474:19                      THE WITNESS:  I believe that's true.


ID:              Scolnick 47512
Page Range:      475:12-476:13

    475:12                      At the bottom of the page it says
    475:13      "Total Cohort."  Do you see that?
    475:14              A.      Yes, I do.
    475:15              Q.      What's a cohort?
    475:16              A.      A cohort is a group of patients
    475:17      that's been studied in this meta-analysis.
    475:18              Q.      And then to the right it says "2.02."
    475:19      Do you see that?
    475:20              A.      Uh-huh.
    475:21              Q.      That's the relative risk --
    475:22              A.      Yes, I do, I'm sorry.
    475:23              Q.      That's the relative risk of heart
    475:24      attacks among all studies for NSAIDs versus Vioxx;
    475:25      true?
    476: page 476
    476: 1              A.      That is, I think, what this plots,
    476: 2      non-naproxen and naproxen NSAIDs.
    476: 3              Q.      That's right.
    476: 4                      And the confidence interval, again,
    476: 5      is what, sir?
    476: 6              A.      The confidence interval for 2.0?
    476: 7              Q.      For the 2.02.
    476: 8              A.      Is 1.14 to 3.55.
                         Page 71

Plaintiffs Scolnick.txt

476: 9   Q.  And the fact that the confidence
476:10 interval does not go below 1 indicates that the 2.02
476:11 relative risk is statistically significant; true?
476:12   A.  Yes. This, I believe, aggregates
476:13 both naproxen and non-naproxen NSAIDs.

ID:    Scolnick 47618
Page Range: 476:18-477:5

476:18   Q.  what does statistical significance
476:19 refer to, sir?
476:20   A.  That 95 times out of 100, the result
476:21 is an accurate one and not by chance. There's only
476:22 a 5 percent chance that the result is a fluke.
476:23   Q.  Okay.
476:24   And a relative risk of 2.02 in this
476:25 total cohort indicates a doubling of the risk of
477: page 477
477: 1 heart attacks among all of Merck's studies --
477: 2   A.  What you --
477: 3   Q.  -- comparing NSAIDs to Vioxx; true?
477: 4   A.  Comparing all NSAIDs including
477: 5 naproxen to Vioxx. That's what this plots, yes.

ID:    Scolnick 47707
Page Range: 477:7-477:18

477: 7     If you'd turn the page, sir, you see
477: 8 an additional chart. Again, "MI Endpoint," that's
477: 9 heart attack endpoint; right?
477:10   A.  Yes.
477:11   Q.  It says "Rofecoxib versus NSAIDs."
477:12 Vioxx is rofecoxib; right?
477:13   A.  Yes.
477:14   Q.  And again reflects 2.02 being the
477:15 relative risk for all patients compared rofecoxib to
477:16 NSAIDs; true?
477:17   A.  To all NSAIDs. As I've said,
477:18 naproxen and non-naproxen.

ID:    Scolnick 47821a
Page Range: 478:21-478:25

478:21   Q.  Well, sir, would you endorse a
478:22 decision not to give an MI-only meta-analysis to the
478:23 FDA?
478:24   A.  That should be part of any
478:25 submission.

ID:    Scolnick 48009
Page Range: 480:9-480:18

480: 9   Q.  And you wouldn't endorse a decision
480:10 not to give unfavorable safety data to the FDA,
480:11 would you?
480:12   A.  I would endorse that all of the data
480:13 be submitted to the FDA.
480:14   Q.  Did you become aware of the results
480:15 of Merck's meta-analysis?

Plaintiffs Scolnick.txt

```
480:16          A.      I was shown summaries of
480:17     meta-analyses, yes, but I don't recall the details
480:18     of what was in those summaries at this point.


ID:             Scolnick 48115
Page Range:     481:15-482:8

481:15          Q.      Okay.  Sir, let me pass over to you
481:16     what we just marked as Exhibit 20 to your
481:17     deposition.
481:18                       -  -  -
481:19                  (Whereupon, Deposition Exhibit
481:20     Scolnick-20, Letter 1-8-01, with
481:21     attachment, "IND 46,894: VIOXX
481:22     (rofecoxib)" "Interim Cardiovascular
481:23     Meta-Analysis," MRK-NJ0267715 -
481:24     MRK-NJ0267777, was marked for
481:25     identification.)
482: page 482
482: 1                       -  -  -
482: 2     BY MR. BUCHANAN:
482: 3          Q.      For the record, sir, I just passed
482: 4     you what we've marked as Exhibit 20 to your
482: 5     deposition.  It's a January 8, 2001 letter from a
482: 6     Robert Silverman, Senior Director of Regulatory
482: 7     Affairs to somebody at the FDA; is that right, sir?
482: 8          A.      Yes, correct.


ID:             Scolnick 48301
Page Range:     483:1-483:9

483: 1          Q.      It's a transmittal of information to
483: 2     the FDA?
483: 3          A.      Yes, it is.
483: 4          Q.      Transmittal of information to the FDA
483: 5     concerning Vioxx?
483: 6          A.      Yes.
483: 7          Q.      Transmittal of the "Interim
483: 8     Cardiovascular Meta-Analysis" for Vioxx; true?
483: 9          A.      Yes.  Yes, that's correct.


ID:             Scolnick 48517
Page Range:     485:17-487:4

485:17          Q.      Is there an MI meta-analysis in the
485:18     submission to the FDA?
485:19          A.      The meta-analysis done in this
485:20     document I do not see in this document.  I do see,
485:21     and it is important to point out, all of the data on
485:22     the four pages I cited to you.
485:23          Q.      And what you're trying to highlight,
485:24     sir, is that certain MI information was encompassed
485:25     within the APTC endpoint; right?
486: page 486
486: 1          A.      That is what I'm trying to point out,
486: 2     yes.
486: 3          Q.      But Merck did a specific analysis
486: 4     looking at the incidence of heart attacks across all
486: 5     of its trials; true?
486: 6          A.      That is indicated in this document,
                        Page 73
```

Plaintiffs Scolnick.txt

```
486: 7      in the first document that you showed me in this
486: 8      discussion.
486: 9              Q.      That document is Exhibit 19; right?
486:10              A.      Yes, it is.
486:11              Q.      Merck did an MI meta-analysis in
486:12      October 2000; true?
486:13              A.      Yes, that's true.
486:14              Q.      And didn't give it to the FDA in
486:15      January 2001; true?
486:16              A.      The specific figures are not included
486:17      in the submission to the FDA.  The data is included.
486:18              Q.      Well, not only the figures, sir, the
486:19      MI meta-analysis is not in that submission to the
486:20      FDA; correct?
486:21              A.      That is correct.
486:22              Q.      There might be some heart attack data
486:23      in that submission to the FDA; right?
486:24              A.      There is heart attack data in this
486:25      submission.
487: page 487
487: 1              Q.      But there's not an MI meta-analysis
487: 2      in Exhibit 20; right?
487: 3              A.      Not that I could find, no.  It does
487: 4      not -- it's not there.
```

ID:              Scolnick 48712
Page Range:      487:11-487:20

```
487:11      BY MR. BUCHANAN:
487:12              Q.      Is it your testimony that you were
487:13      never consulted by regulatory within Merck Research
487:14      Labs as to whether to give the MI meta-analysis or
487:15      not to give it to the FDA?
487:16              A.      That is my testimony.  I was never
487:17      consulted on that point.
487:18              Q.      Do you endorse the decision not to
487:19      give that MI meta-analysis to the FDA in January
487:20      2001?
```

ID:              Scolnick 48723a
Page Range:      487:23-487:25

```
487:23              THE WITNESS:  I would have had no
487:24      objection to their submitting all of the
487:25      meta-analyses.
```

ID:              Scolnick 48802
Page Range:      488:2-488:7

```
488: 2              Q.      Sir, should the MI meta-analysis have
488: 3      been given to the FDA in January 2001?
488: 4              A.      I would have given it to them.  It is
488: 5      perfectly reasonable to give it them.  There is an
488: 6      abundance of data in this document which we haven't
488: 7      covered.
```

ID:              Scolnick 48810
Page Range:      488:10-488:14

Plaintiffs Scolnick.txt

```
488:10                    THE WITNESS:  Yes, it should have
488:11    been given, including all the data in this document.
488:12    BY MR. BUCHANAN:
488:13           Q.        You were the boss?
488:14           A.        I was not consulted in this matter.
```

```
ID:             Scolnick 48903
Page Range:     489:3-489:14
```

```
489: 3           Q.        So, if your group didn't consult --
489: 4    if your group didn't submit this information to the
489: 5    FDA, they disregarded your standard operating
489: 6    procedure?
489: 7           A.        The standard operating procedure in
489: 8    the labs is to submit all data to the FDA.  All the
489: 9    data is in here.  The specific meta-analysis is not
489:10    included in this document.
489:11           Q.        You say all the data is in there,
489:12    sir, but there's not an MI meta-analysis in that
489:13    document; right?
489:14           A.        That is correct.
```

```
ID:             Scolnick 49006
Page Range:     490:6-490:9
```

```
490: 6           Q.        Yeah, but the one thing we can agree
490: 7    is, there's not an MI meta-analysis reflected in
490: 8    that particular document, the January 2001
490: 9    submission to the FDA; right?
```

```
ID:             Scolnick 49012
Page Range:     490:12-490:17
```

```
490:12                    THE WITNESS:  There's no -- there's
490:13    no MI meta-analysis that I can find in the January
490:14    8th document.
490:15    BY MR. BUCHANAN:
490:16           Q.        And you didn't give it to the
490:17    Advisory Committee in February 2001 either, did you?
```

```
ID:             Scolnick 49021
Page Range:     490:21-491:2
```

```
490:21                    THE WITNESS:  I don't recall what was
490:22    in the presentation.  I don't recall ever having
490:23    seen this first document, Exhibit 19, and I don't
490:24    recall ever having seen the second document which
490:25    was submitted.  I had an excellent group, and they
491: page 491
491: 1    handled the submissions to the FDA and the
491: 2    preparation for the Advisory Committees.
```

```
ID:             Scolnick 49918a
Page Range:     499:18-499:25
```

```
499:18                    The company ultimately published a
499:19    meta-analysis concerning cardiovascular events in
499:20    the peer-reviewed literature, didn't it?
```

Page 75

Plaintiffs Scolnick.txt

```
499:21          A.       Yes.  I believe it did in Circulation
499:22   or another cardiovascular journal.
499:23          Q.       Fall of 2001.  Does that sound right?
499:24          A.       Sounds approximately right.  I don't
499:25   remember the date.
```

```
ID:              Scolnick 50011
Page Range:      500:11-500:22
```

```
500:11          Q.       Dr. Scolnick, I just passed you over
500:12   what we marked as Exhibit 21 to your deposition.  Is
500:13   this the publication of the meta-analysis you were
500:14   just referring to?
500:15          A.       I think it was the one you were just
500:16   referring to.  It is one of the ones I recall.  It
500:17   is one I recall.  I don't recall whether others were
500:18   published.
500:19          Q.       And to be clear, this is an October
500:20   2001 article published in the journal Circulation;
500:21   correct?
500:22          A.       Yes.  Correct.
```

```
ID:              Scolnick 50716
Page Range:      507:16-507:18
```

```
507:16          Q.       So, you were testing the drug in
507:17   Alzheimer's patients; right?
507:18          A.       Yes.
```

```
ID:              Scolnick 50902b
Page Range:      509:3-509:10
```

```
509: 3          Q.       When your team was before the
509: 4   Advisory Committee that was convened to evaluate the
509: 5   safety of Vioxx in February 2001, that team cited
509: 6   the Alzheimer's data as data that was reassuring on
509: 7   the safety of the drug; true?
509: 8          A.       Yes.  The Advisory Committee was
509: 9   convened to go over the gastrointestinal data, and
509:10   as part of that, all of the data on Vioxx.
```

```
ID:              Scolnick 51607a
Page Range:      516:7-516:12
```

```
516: 7          Q.       Sir, I'm passing you over what we
516: 8   just marked as Exhibit 22 to your deposition.  For
516: 9   the record, it's Bates stamped MRK-ABP016650.  It
516:10   runs through Page 677.  It is a document entitled
516:11   "Vioxx AD Program."  Do you see that heading, sir?
516:12          A.       Yes, I do.  Yes.
```

```
ID:              Scolnick 51907
Page Range:      519:7-519:8
```

```
519: 7          Q.       "AD" is Alzheimer's disease?
519: 8          A.       Yes.
```

Page 76

Plaintiffs Scolnick.txt

ID:                 Scolnick 52302
Page Range:         523:2-523:11

523: 2              Q.       Now, if the company had a drug that
523: 3      would prevent the onset of Alzheimer's disease, that
523: 4      would be a significant medical discovery.  You would
523: 5      agree with that?
523: 6              A.       Yes, it would.
523: 7              Q.       And a significant revenue opportunity
523: 8      for the company; correct?
523: 9              A.       They would go together.  It would be
523:10      a magnificent discovery for medical and for
523:11      patients.


ID:                 Scolnick 52914
Page Range:         529:14-529:21

529:14              Q.       Okay.  That's the APPROVe trial
529:15      that's being referenced there, isn't it?
529:16              A.       Yes, I believe so.
529:17              Q.       You'd agree with me, sir, that those
529:18      three paragraphs don't say anything about that trial
529:19      being conducted to test the cardiovascular safety of
529:20      Vioxx?
529:21              A.       Yes, I'd agree with that.


ID:                 Scolnick 53020
Page Range:         530:20-531:2

530:20              Q.       Sir, the page continues and it
530:21      discusses the Alzheimer's disease trials; true?
530:22              A.       Yes.
530:23              Q.       Okay.
530:24              Merck is telling its shareholders
530:25      here that it is in the process of testing Vioxx in
531: page 531
531: 1      Alzheimer's patients; true?
531: 2              A.       Yes.


ID:                 D ES  53109
Page Range:         531:9-531:10

531: 9      saying that we're studying it.  It really doesn't
531:10      state whether it will or won't work.  It outlines


ID:                 Scolnick 53113a
Page Range:         531:13-531:20

531:13              Q.       Okay.
531:14              And just getting back now to where we
531:15      were, a treatment for Alzheimer's disease presented
531:16      a significant revenue opportunity for Merck if Vioxx
531:17      was able to demonstrate a reduction in the incidence
531:18      of Alzheimer's disease; true?
531:19              A.       Yes.  And as we said, an important
531:20      medical finding.


ID:                 Scolnick 53815

Plaintiffs Scolnick.txt
Page Range:      538:15-538:16

538:15              Q.      Okay.  Let's take a step forward and
538:16      understand the death data in the Alzheimer's trials.


ID:             Scolnick 53901a
Page Range:      539:1-539:9

539: 1              Q.      Sir, I'm passing over what we just
539: 2      marked as Exhibit 24 to your deposition.  It is a
539: 3      multi-page memo to you from a Dr. Gilbert Block.
539: 4              For the record, it is Bates stamped
539: 5      MRK-NJ0333225 to 35.  I don't know if I indicated
539: 6      this, but it is dated March 21st, 2001?
539: 7              Doctor, have you seen this before?.
539: 8              A.      I don't recall seeing it.  It is
539: 9      addressed to me.


ID:             Scolnick 54308
Page Range:      543:8-543:18

543: 8              Q.      I think what we're looking at here,
543: 9      sir, right, is that 14 people died on Vioxx, 3 died
543:10      in placebo in this trial; true?
543:11              A.      Yes, that's true.
543:12              Q.      And 95 times out of 100, when you ran
543:13      this trial, you'd get the same result; right?
543:14              A.      That's what statistical significance
543:15      implies, yes.
543:16              Q.      So, 95 out of 100 times, if you reran
543:17      this trial, 14 would die on Vioxx, 3 would die on
543:18      placebo?


ID:             Scolnick 54324
Page Range:      543:24-544:6

543:24              Q.      So, in this particular trial, 11
543:25      people died on Vioxx more than died on placebo;
544: page 544
544: 1      true?
544: 2              A.      Yes, that's correct.
544: 3              Q.      Did you tell old people around the
544: 4      country who were taking this drug, we have this
544: 5      trial, 11 excess deaths were found in this trial,
544: 6      sir?


ID:             Scolnick 54408a
Page Range:      544:8-544:9

544: 8              THE WITNESS:  I don't recall what
544: 9      information was disseminated on the trial.


ID:             Scolnick 54604
Page Range:      546:4-546:7

546: 4              Q.      So, the 11 patients who died
546: 5      unnecessarily in protocol 091 as compared to the
546: 6      placebo arm, died and they got no benefit from Vioxx
                              Page 78

Plaintiffs Scolnick.txt

546: 7      in this trial; true?


ID:             Scolnick 54610
Page Range:     546:10-546:13

546:10                  THE WITNESS:  There were 11 patients
546:11      who died in the trial more than in placebo.  The
546:12      aggregate group did not benefit from Vioxx based on
546:13      the statistical efficacy of the trial.


ID:             Scolnick 55115
Page Range:     551:15-552:15

551:15                  Apart from the 091 trial, we also
551:16      know there was a second progression trial, that's
551:17      the 126 trial.  We established that this morning;
551:18      right?
551:19          A.      Yes.
551:20          Q.      Okay.
551:21                  There was also an Alzheimer's disease
551:22      prevention trial; true?
551:23          A.      Yes.
551:24          Q.      Okay.
551:25                  The folks in Merck Research Labs
552: page 552
552: 1      looked at the incidence of death in that trial, too,
552: 2      didn't they?
552: 3          A.      I don't recall the categories they
552: 4      looked at.  Death would be collected in any trial.
552: 5          Q.      Well, you see in the memo we were
552: 6      just looking at from Dr. Block, it says, "All deaths
552: 7      in the ongoing prevention trial...and the terminated
552: 8      second progression trial...will be unblinded and
552: 9      evaluated."  Do you see that?
552:10          A.      Yes, I do.
552:11          Q.      Okay.
552:12                  So, it's your understanding that the
552:13      deaths in the other trials were also looked at;
552:14      true?
552:15          A.      That's what this implies.


ID:             Scolnick 55304a
Page Range:     553:4-553:5

553: 4          Q.      Sir, I've just passed you over what
553: 5      we have marked as Exhibit 25 to your deposition.


ID:             Scolnick 55321
Page Range:.    553:21-556:14

553:21                  Do you agree with me, sir, that this
553:22      document is a combined intention to treat and
553:23      on-drug analysis of the death data in both protocol
553:24      091 and protocol 078?
553:25          A.      Yes, that's what the summary document
554: page 554
554: 1      -- the summary page on the front page states, yes.
554: 2          Q.      Okay.
554: 3                  If you'd turn to the next page, sir,
                        Page 79

Plaintiffs Scolnick.txt

554: 4    it identifies the mortality analysis or the death
554: 5    analysis for the 091 and 078 trials on an
554: 6    intent-to-treat basis.  Do you see that at the
554: 7    bottom of the first page?
554: 8         A.       It does it for both protocols, yes.
554: 9         Q.       Number of deaths on Vioxx, 13.  Do
554:10    you see that?
554:11        A.       Yes.
554:12        Q.       Number of deaths on placebo, 3?
554:13        A.       Yes.  That's the trial we were
554:14    looking at.
554:15        Q.       Okay.
554:16                 It is about what, four times as high,
554:17    a little more than four?
554:18        A.       Yes.
554:19        Q.       Okay.  Go down to the ITT analysis
554:20    for protocol 078.  Do you see that below it?
554:21        A.       Yes.
554:22        Q.       Okay.
554:23                 Number of deaths on Vioxx, 21; right?
554:24        A.       Yes.
554:25        Q.       Number of deaths on placebo, 9;
555: page 555
555: 1    right?
555: 2         A.       Yes.
555: 3         Q.       And there's a rate next to each of
555: 4    those numbers; right?
555: 5         A.       There is.
555: 6         Q.       And the rate for Vioxx is what, a
555: 7    little under two-and-a-half times greater than the
555: 8    rate for placebo?
555: 9         A.       Yes.
555:10        Q.       And what that means is that
555:11    two-and-a-half times as many people died taking
555:12    Vioxx in the 078 trial as of this point in time as
555:13    compared to placebo; true?
555:14        A.       Yes.
555:15        Q.       Okay.
555:16                 If you'd turn to Page 755, internal
555:17    numbering, 4, Bates number, 755.
555:18        A.       Just a moment, please.
555:19        Q.       Feel free.
555:20        A.       (witness reviewing document.)
555:21                 Okay.  Thank you.
555:22                 Where do you want me to turn, 755?
555:23        Q.       I'm sorry.  756.
555:24        A.       Excuse me, I want to look at one
555:25    other thing.
556: page 556
556: 1         Q.       There's calculations of something
556: 2    called a "hazard ratio."  Do you see that?
556: 3         A.       Just a moment.
556: 4                 (Witness reviewing document.)
556: 5                 On 756.  756?
556: 6         Q.       Yeah.  There's a paragraph in between
556: 7    the charts.  It says, "From the mortality frequency
556: 8    and incident rate charts for protocol 091."  Do you
556: 9    see that?
556:10        A.       Yes, yes.
556:11        Q.       And there's a hazard ratio
556:12    calculation in the last sentence for the 091 trial.
556:13    Do you see that?
556:14        A.       Yes, I do.
                        Page 80

Plaintiffs Scolnick.txt

ID:             Scolnick 55707
Page Range:     557:7-558:2

557: 7                      4.43 would be the relative increased
557: 8   risk of death on Vioxx compared to placebo; true?
557: 9              A.      The relative increase in risk, yes.
557:10              Q.      Okay.
557:11                      So, folks on Vioxx in the 091 trial
557:12   were 4.4 times more likely to die compared to those
557:13   on placebo; true?
557:14              A.      It's a hazard ratio.  I think that's
557:15   true.
557:16              Q.      Okay.
557:17                      If you'd turn the page, sir, you look
557:18   at the results for the 078 trial, paragraph
557:19   beginning, "From the mortality frequency and
557:20   incident rate charts for protocol 078."  Do you see
557:21   that?
557:22              A.      Yes.
557:23              Q.      Then it says at the end, "After
557:24   adjusting for Age and Gender, the hazard ratio
557:25   between" Vioxx "and placebo was 2.55."  Do you see
558: page 558
558: 1   that sentence?
558: 2              A.      Yes.

ID:             Scolnick 558.9-558.22
Page Range:     558:9-558:22

558: 9              Q.      That indicates that folks on Vioxx
558:10   were 2.55 times more likely to die than patients on
558:11   placebo; true?
558:12              A.      Yes.
558:13              Q.      Okay.  So, let me understand, sir.
558:14   As of this point in time, April 8, 2001, the company
558:15   has two independent placebo-controlled trials
558:16   demonstrating a statistically significant increase
558:17   in the risk of death; true?
558:18              A.      Yes.
558:19              Q.      Okay.  In the one trial, 091, there
558:20   was a four times greater risk of death on Vioxx
558:21   compared to placebo; true?
558:22              A.      Yes.

ID:             Scolnick 56025
Page Range:     560:25-561:13

560:25                      Well, you'd agree that mortality data
561: page 561
561: 1   is important; right?
561: 2              A.      Yes, it is.
561: 3              Q.      That's the kind of data that a
561: 4   physician should know; right?
561: 5              A.      Yes, they should.
561: 6              Q.      Any doubt in your mind that
561: 7   physicians would like to know whether your drug,
561: 8   Merck's drug, increased the risk of death?
561: 9              A.      It's data that should have -- a
561:10   physician should know.

Page 81

Plaintiffs Scolnick.txt

561:11          Q.     Any doubt that the FDA would have
561:12   wanted to know right after you knew this that Vioxx
561:13   increased the risk of death?


ID:              Scolnick 56118
Page Range:      561:18-561:20

561:18              THE WITNESS:  I don't know when -- I
561:19   don't know that this data was not submitted to the
561:20   FDA.  I don't know what was done with this data.


ID:              Scolnick 56122
Page Range:      561:22-562:4

561:22             Q.     Well, you'd agree, sir, that this
561:23   data should have been promptly shared with the FDA;
561:24   true?
561:25             A.     I don't know that this data wasn't
562: page 562
562: 1   promptly shared with the FDA.
562: 2             Q.     Sir, my question is, you'd agree with
562: 3   me that this data should have been promptly shared
562: 4   with FDA; right?


ID:              Scolnick 56206
Page Range:      562:6-562:7

562: 6                 THE WITNESS:  The data should have
562: 7   been reported to the FDA, yes.


ID:              Scolnick 56221
Page Range:      562:21-562:25

562:21                 The conclusions that were reached
562:22   within Merck concerning the statistically
562:23   significant increased risk of death should have been
562:24   shared with FDA no later than 15 days after this
562:25   analysis; right?


ID:              Scolnick 56302
Page Range:      563:2-563:13

563: 2                 THE WITNESS:  That's the usual
563: 3   reporting time for data like this.
563: 4   BY MR. BUCHANAN:
563: 5             Q.     Did Merck send out a "Dear Doctor"
563: 6   letter telling physicians around the country that
563: 7   we've got these two trials, and we've got a
563: 8   statistically significant increased risk of death?
563: 9             A.     I don't recall them sending out a
563:10   "Dear Doctor" letter, no.
563:11             Q.     Did Merck issue a press release
563:12   telling doctors the same information?
563:13             A.     I don't recall a press release.


ID:              Scolnick 56316
Page Range:      563:16-564:2
                        Page 82

Plaintiffs Scolnick.txt

563:16                    Did Merck publish a letter in the New
563:17   England Journal of Medicine telling physicians about
563:18   the findings from these two trials?
563:19          A.     I don't recall such a letter.
563:20          Q.     Publish a letter anywhere in the
563:21   medical literature to get word out promptly that old
563:22   people are at a substantially increased risk of
563:23   death on the drug?
563:24          A.     I don't recall a letter being written
563:25   about these trials in the way you're asking the
564: page 564
564: 1   question.
564: 2          Q.     This was all on your watch; right?


ID:              Scolnick 56404
Page Range:      564:4-565:4

564: 4                    THE WITNESS:  This occurred while I
564: 5   was president of research, yes.
564: 6   BY MR. BUCHANAN:
564: 7          Q.     Right.  And the responsibility for
564: 8   communicating the scientific messages learned from
564: 9   clinical trials in Merck Research Labs was
564:10   ultimately yours; true?
564:11          A.     Yes.  I was not shown this data.
564:12          Q.     Is that your position now, you were
564:13   not shown this data?
564:14          A.     I don't recall having seen this data.
564:15          Q.     Are you disavowing you had any
564:16   knowledge of the statistically significant increased
564:17   risk in death in the 078 and 091 trials in April of
564:18   2001?
564:19          A.     I don't recall anything about 078.
564:20   What I've told you I recall about 091 is what I've
564:21   said, that there was an imbalance of events and that
564:22   they weren't due to cardiovascular -- an excess of
564:23   cardiovascular events.  That is all I recall about
564:24   the Alzheimer's data.
564:25          Q.     Well, the one thing we do know and
565: page 565
565: 1   you know now looking at this memo is that there were
565: 2   statistically significant increased numbers of
565: 3   deaths on Vioxx compared to placebo as of April
565: 4   2001; true?


ID:              Scolnick 56506
Page Range:      565:6-565:10

565: 6                    THE WITNESS:  The analyses that are
565: 7   here indicate that, yes.
565: 8   BY MR. BUCHANAN:
565: 9          Q.     And you don't think that was due to
565:10   chance?


ID:              Scolnick 56515
Page Range:      565:15-565:17

565:15          A.     It was statistically significant.
565:16          Q.     And you don't think that was due to
                        Page 83

Plaintiffs Scolnick.txt

565:17          chance?


ID:              Scolnick 56519a
Page Range:      565:19-565:20

565:19                       THE WITNESS:  Therefore, it was not
565:20          likely due to chance.


ID:              Scolnick 56612
Page Range:      566:12-566:21

566:12                  Q.       Sir, I'm passing you over what we
566:13          just marked as Exhibit 26 to your deposition.  It's
566:14          an e-mail, a series of e-mails beginning with an
566:15          e-mail to you from Dr. Gilbert Block.  Do you see
566:16          that?
566:17                  A.       Where are we?  We are starting at the
566:18          bottom?
566:19                  Q.       Starting at the bottom.  That would
566:20          be the earliest in time e-mail; correct?
566:21                  A.       Yes.


ID:              Scolnick 56806
Page Range:      568:6-568:9

568: 6                  Q.       And you wrote, "Doug, when I read
568: 7          this note about 30 minutes ago I tried to call you
568: 8          at home."  Do you see that?
568: 9                  A.       I do.


ID:              Scolnick 56818
Page Range:      568:18-568:22

568:18                  Q.       You were upset that Dr. Block shared
568:19          this information before a committee meeting before
568:20          he shared it with you; isn't that right?
568:21                  A.       I don't remember what I was upset
568:22          about.


ID:              Scolnick 56912
Page Range:      569:12-570:7

569:12                       You then get a response from Dr.
569:13          Greene; right?
569:14                  A.       Yes.
569:15                  Q.       He notes in the middle of his
569:16          response that you're going to be before the FDA on
569:17          April 11th to discuss labeling issues; right?
569:18                  A.       Yes.
569:19                  Q.       He then notes, "I expect that we will
569:20          need to inform them of this in some way since we
569:21          have included the CV events from the AD trials."  Do
569:22          you see that?
569:23                  A.       Yes.
569:24                  Q.       CV events are cardiovascular events?
569:25                  A.       Yes.
570: page 570
570: 1                  Q.       And the AD trials, that's Alzheimer's
                                Page 84

Plaintiffs Scolnick.txt

570: 2    disease again; right?
570: 3          A.    Yes.
570: 4          Q.    And what he's saying is, you're going
570: 5    to have to talk to the FDA about the mortality data;
570: 6    right?
570: 7          A.    He says cardiovascular events, yes.


ID:          Scolnick 57123
Page Range:  571:23-572:3

571:23                Well, sir, is it your testimony that
571:24    the folks in regulatory who went down to talk to the
571:25    FDA on April 11th about labeling issues would not
572: page 572
572: 1    have checked with you before going to determine what
572: 2    message should be communicated about Alzheimer's
572: 3    data?


ID:          Scolnick 57206
Page Range:  572:6-572:19

572: 6                THE WITNESS:  Yes.  They wouldn't
572: 7    necessarily have discussed with me the details of
572: 8    what they talked to with FDA.
572: 9    BY MR. BUCHANAN:
572:10          Q.    So, if the folks from Merck who went
572:11    down and talked to FDA on labeling issues on April
572:12    11th didn't disclose any of the mortality data, that
572:13    was their decision and not yours?  That's what
572:14    you're saying?
572:15          A.    I don't know what they disclosed, but
572:16    I did not give them any instructions, to the best of
572:17    my recollection, on what to disclose or not to
572:18    disclose to the FDA.  And I think most of the
572:19    content of this e-mail indicates that.


ID:          Scolnick 57304
Page Range:  573:4-574:7

573: 4          Q.    Sir, I'm going to pass you over what
573: 5    we're marking as Exhibit 27 to your deposition.  For
573: 6    the record, it's a document titled, "FDA - MRL
573: 7    Meeting."  "MRL," that's Merck Research Labs?
573: 8          A.    Yes.
573: 9          Q.    Okay.
573:10                Then it's got an NDA number.  That's
573:11    the NDA number for VIGOR?
573:12          A.    That's what it seems to indicate.
573:13          Q.    Okay.
573:14                April 11, 2001.  Do you see that?
573:15          A.    Yes, I do.
573:16          Q.    That's the date Doug Greene was
573:17    stating that you were going to be -- excuse me,
573:18    Merck was going to be before the FDA to discuss
573:19    labeling issues; right?
573:20          A.    Yes.
573:21          Q.    Take a quick look at the document,
573:22    sir.  Do you see any reference to two trials
573:23    demonstrating statistically significant increased
573:24    rates of death in the report of this particular
                            Page 85

Plaintiffs Scolnick.txt

573:25      meeting?
574: page 574
574: 1            A.       (Witness reviewing document.)
574: 2                     I don't see a comment about that in
574: 3      this summary.
574: 4            Q.       So, folks from Merck Research Labs
574: 5      and the regulatory group within Merck went down to
574: 6      the FDA on April 11, 2001 to talk about labeling for
574: 7      Vioxx; true?

ID:              Scolnick 57410
Page Range:      574:10-574:15

574:10                     THE WITNESS:  There was a meeting on
574:11      labeling of Vioxx on April 11th, yes.
574:12      BY MR. BUCHANAN:
574:13            Q.       That was the meeting where Doug
574:14      Greene suggested we should report this Alzheimer's
574:15      death data from the 091 trial; right?

ID:              Scolnick 57418
Page Range:      574:18-575:2

574:18                     THE WITNESS:  I haven't had a chance
574:19      to read his e-mail to me, so, he says in the e-mail,
574:20      "I expect that we will need to inform them of this
574:21      in some way since we have included the CV events
574:22      from the AD trials."  Yes, I think he is suggesting
574:23      that.
574:24      BY MR. BUCHANAN:
574:25            Q.       Well, did you tell him not to do
575: page 575
575: 1      that?
575: 2            A.       Absolutely not.

ID:              Scolnick 57512
Page Range:      575:11-575:15

575:11      BY MR. BUCHANAN:
575:12            Q.       Do you endorse the decision not to
575:13      disclose two trials that have statistically
575:14      significant doubling in the rates of death to the
575:15      FDA?

ID:              Scolnick 57520
Page Range:      575:20-575:21

575:20                     THE WITNESS:  I do not endorse that
575:21      decision, if that's what was done.

ID:              Scolnick 59501
Page Range:      595:1-595:14

595: 1            Q.       Dr. Scolnick, we're going to shift
595: 2      gears a little bit.  I want to talk about your role
595: 3      in the marketing of Vioxx.  Okay?
595: 4            A.       Uh-huh.
595: 5            Q.       You did have a role in the marketing
                                Page 86

Plaintiffs Scolnick.txt

```
595: 6     of Vioxx; correct, sir?
595: 7            A.      Not a direct role, no.
595: 8            Q.      You assisted the marketing function
595: 9     within Merck in connection with the marketing of
595:10     Vioxx; true?
595:11            A.      Only in the initial data discussions
595:12     with marketing about what the data was in the file.
595:13     I did not prepare marketing information or approve
595:14     it or see it before it was used.
```

```
ID:              Scolnick 59614
Page Range:      596:14-597:12
```

```
596:14                    Well, the document I just passed you
596:15     and we marked as Exhibit 30 to your deposition is a
596:16     memo from Wendy Dixon to you dated May 8th, 2000;
596:17     right?
596:18            A.      Yes.
596:19            Q.      Bates stamped MRK-ABI0002126 to 2128.
596:20     I take it you've seen this before, sir?
596:21            A.      I don't remember.  Perhaps.  I don't
596:22     specifically recall it.
596:23            Q.      Well, sir, do you have any reason to
596:24     doubt that you received the memo from Wendy Dixon
596:25     from May of 2000 that was sent to your attention and
597: page 597
597: 1     your attention alone?
597: 2            A.      No, I don't have any reason to doubt
597: 3     it, but I don't recall at the moment, except I'm
597: 4     reading it now.
597: 5            Q.      The subject line of this particular
597: 6     memo is, "Renal and Cardiovascular Issues for
597: 7     VIOXX." True?
597: 8            A.      Yes.
597: 9            Q.      Okay.
597:10                    In fact, Wendy Dixon was in charge of
597:11     the marketing effort for Vioxx; true?
597:12            A.      Yes, I believe that's true.
```

```
ID:              Scolnick 59802
Page Range:      598:2-598:10
```

```
598: 2            Q.      Well, if you'd turn to the last page
598: 3     of the document, sir, it's Bates stamped ABI
598: 4     0002128.  Do you see the paragraph beginning, "David
598: 5     mentioned"?
598: 6            A.      Last page?  Oh, yes, I do.
598: 7            Q.      In fact, you offered to Mr. Anstice
598: 8     to assist in developing responses to the competitive
598: 9     messages that were out on the market concerning
598:10     Vioxx and Celebrex; true?
```

```
ID:              Scolnick 59812
Page Range:      598:12-598:13
```

```
598:12                    THE WITNESS:  That's what the memo
598:13     says, yes.
```

```
ID:              Scolnick 59910
```

Page 87

Plaintiffs Scolnick.txt

Page Range:      599:10-599:24

599:10                    In particular, you were going to
599:11    assist in responding to the cardiovascular issues
599:12    being addressed by Pfizer as it related to Vioxx;
599:13    true?
599:14          A.     That's what she requests at the
599:15    beginning of the first page of the memo.
599:16          Q.     If you'd look at the third numbered
599:17    paragraph on Page 2 -- well, let me take a step
599:18    back.
599:19                    This document is describing in
599:20    particular the steps that are being taken by Wendy
599:21    Dixon on behalf of the marketing department of Merck
599:22    to respond to the competitive challenges that are
599:23    being raised by Pfizer against Vioxx; true?
599:24          A.     That's what it appears to be.


ID:              Scolnick 60018
Page Range:      600:18-601:18

600:18                    So, she's telling you what materials
600:19    the sales force has to respond to the cardiovascular
600:20    issues concerning Vioxx; right?
600:21          A.     Yes.
600:22          Q.     The third item there is "A
600:23    cardiovascular card to handle the thromboembolic
600:24    events issue."  Do you see that?
600:25          A.     Yes, I do.
601: page 601
601: 1          Q.     It says, "It compares cardiovascular
601: 2    thromboembolic AEs for VIOXX comparator NSAIDs...and
601: 3    placebo."  Do you see that?
601: 4          A.     Yes.
601: 5          Q.     And then a bunch of the NSAIDs that
601: 6    are compared across the nine osteoarthritis trials
601: 7    are referenced there; right?
601: 8          A.     Correct.
601: 9          Q.     You've seen that cardiovascular card,
601:10    haven't you?
601:11          A.     I don't recall it.
601:12          Q.     Okay.  Well, the next paragraph says,
601:13    "Copies of the renal card, cardiovascular card, and
601:14    the Rossat paper are attached."  Do you see that?
601:15          A.     I do.  I still don't recall.
601:16          Q.     Any reason to doubt that Ms. Dixon
601:17    was telling the truth when she said she was giving
601:18    you these things for your review?


ID:              Scolnick 60120
Page Range:      601:20-601:25

601:20                    THE WITNESS:  She was giving them to
601:21    me.  I don't think I was given them for review.  I
601:22    think she says in the paragraph that the
601:23    representatives already have this information.  I
601:24    don't recall these cards, and I don't recall
601:25    discussing the cards with her at all.


ID:              Scolnick 63216

Page 88

Plaintiffs Scolnick.txt
Page Range:     632:16-632:20

632:16              Q.      Mortality information, total
632:17    mortality.information is important information that
632:18    should have been included in the CV card that was
632:19    used by sales representatives to respond to
632:20    physician inquiries concerning the drug; true?


ID:              Scolnick 63222a
Page Range:      632:22-633:5

632:22                   THE WITNESS:  I think a CV card
632:23    should have contained all cardiovascular-related
632:24    information from the variety of data sources Merck
632:25    has, and --
633: page 633
633: 1   BY MR. BUCHANAN:
633: 2              Q.      Would --
633: 3              A.      -- if there was mortality data
633: 4    associated with those trials, each of the trials and
633: 5    what the data was in each of the trials.


ID:              Scolnick 63417
Page Range:      634:17-634:20

634:17              Q.      My question, sir, was whether the CV
634:18    card should have included all the mortality data the
634:19    company had in its possession and had analyzed at
634:20    the point in time when it released the CV card?


ID:              Scolnick 63506
Page Range:      635:6-635:8

635: 6              A.      I think an ideal card would have had
635: 7    CV data, CV mortality, total mortality, for all the
635: 8    studies available.


ID:              Scolnick 69925
Page Range:      699:25-700:9

699:25              Q.      Okay.  I want to start with you a
700: page 700
700: 1    section on the labeling of the drug and the
700: 2    progression of the labels of the drug.  You were
700: 3    intimately involved in that process; correct, sir?
700: 4              A.      I certainly knew what was going on,
700: 5    yes.
700: 6              Q.      When the drug was first brought on
700: 7    the market, it had a standard NSAID GI warning;
700: 8    correct?
700: 9              A.      I believe that's correct.


ID:              Scolnick 70221
Page Range:      702:21-703:9

702:21                   Now, here we have a label which
702:22    appears to me anyway to be Merck's proposal to the
702:23    FDA post-VIGOR.  Am I correct that that's what this
Page 89

Plaintiffs Scolnick.txt

```
702:24         document represents, Exhibit 39, sir?
702:25                A.      What's the date of this?
703: page 703
703: 1                Q.      It says, "Original Label Submission."
703: 2   I'm working with documents that were produced by
703: 3   Merck, so, I can tell you Bates Numbers and I can
703: 4   tell you what it says, and it says "Original Label
703: 5   Submission for VIGOR."
703: 6                A.      Well, if that's what it says, I
703: 7   assume it is the original submission for VIGOR.  The
703: 8   VIGOR study is referenced in this label, so, that's
703: 9   probably what it is.
```

ID:                Scolnick 70322
Page Range:        703:22-704:1

```
703:22                        There's no cardiovascular warning
703:23   that's given on the drug relative to risks of
703:24   cardiovascular events or increase of risk of
703:25   cardiovascular events as was proven in the VIGOR
704: page 704
704: 1   study; correct, sir?
```

ID:                Scolnick 70406
Page Range:        704:6-704:9

```
704: 6                        THE WITNESS:  The VIGOR study, as I
704: 7   told you, we did not believe indicated Vioxx
704: 8   increased CV events and, therefore, there was no
704: 9   warning in this label.  That is correct.
```

ID:                Scolnick 70417
Page Range:        704:17-704:18

```
704:17                Q.      When the FDA got this proposal, was
704:18   that their view of the data?
```

ID:                Scolnick 70425
Page Range:        704:25-705:13

```
704:25                        THE WITNESS:  The data was presented
705: page 705
705: 1   in an Advisory Committee.  That was their view of
705: 2   the data.  It was Merck's view of the data.  And the
705: 3   FDA chose, I think in their first resubmission to
705: 4   us, to take a different interpretation, yes.
705: 5   BY MR. KLINE:
705: 6                Q.      They did.
705: 7                        Did they suggest that there be a
705: 8   warning on the drug, sir, based on the VIGOR data?
705: 9                A.      Yes, they did.
705:10                Q.      And did Merck say, certainly we're
705:11   interested in public safety, and a warning would be
705:12   a good idea on a drug where there might be a
705:13   problem?  Is that what Merck said, sir?
```

ID:                Scolnick 70516
Page Range:        705:16-705:19

Plaintiffs Scolnick.txt

```
705:16              THE WITNESS:  Merck did not believe
705:17    there was a cardiovascular risk associated with
705:18    Vioxx, and as this warning indicates, there is
705:19    cardiovascular risk, we objected to that label.


ID:            Scolnick 76713
Page Range:    767:13-767:24

767:13          Q.     Well, do you know, I can only ask you
767:14    what you know today, do you know of any label change
767:15    that was made between March of 2000 and April of
767:16    2002 reporting the VIGOR results in a label to the
767:17    prescribing physicians of this country and around
767:18    the world?
767:19          A.     No, I do not.
767:20          Q.     So, prescribing physicians who were
767:21    going by the label of your drug between March of
767:22    2000 and April of 2002, they're just looking at the
767:23    label, they wouldn't know anything about the VIGOR
767:24    results; correct?


ID:            Scolnick 76802
Page Range:    768:2-768:5

768: 2                     THE WITNESS:  If they were looking
768: 3    only at the label?
768: 4    BY MR. KLINE:
768: 5          Q.     Yes.


ID:            Scolnick 76807
Page Range:    768:7-768:14

768: 7                     THE WITNESS:  I don't know what they
768: 8    would be thinking.  The label was not changed on
768: 9    VIGOR until, as you pointed out, April 2002.
768:10    BY MR. KLINE:
768:11          Q.     There is an obligation by a
768:12    responsible pharmaceutical company to keep the label
768:13    both clear and accurate and to timely update it;
768:14    correct?


ID:            Scolnick 76816
Page Range:    768:16-768:16

768:16              THE WITNESS:  Yes.


ID:        Scolnick Part 4 (8-16-05)

ID:            Scolnick_8-16_1138.3-1138.8
Page Range:    1138:3-1138:8

1138: 3          Q.     You said in writing, sir, in an
1138: 4    e-mail that for Vioxx, the CV outcomes study is the
1138: 5    only essential study, and you were saying that as of
1138: 6    September 17, 2001, long after the VIGOR results
1138: 7    were known; correct?
1138: 8          A.     That is correct.  And a study to get
                      Page 91
```

Plaintiffs Scolnick.txt

ID:              ES 124912
Page Range:      1249:12-1249:17

1249:12        Q.      Did Merck Research Labs or Merck ever
1249:13 do a study to evaluate adverse events of most
1249:14 concern, heart attacks and unstable angina, prior to
1249:15 approval, where they gave people aspirin?
1249:16        A.      I'm not aware that that study was
1249:17 done.


ID:              ES 124922
Page Range:      1249:22-1250:9

1249:22 ·      Q.      Did you ever do it?
1249:23        A.      Did we evaluate Vioxx in the presence
1249:24 of aspirin?
1249:25        Q.      Yes.
1250: Page 1250
1250: 1        A.      Yes, we did endoscopy studies with
1250: 2 that.
1250: 3        Q.      When?
1250: 4        A.      After the VIGOR trial.
1250: 5        Q.      You did it after approval; right?
1250: 6        A.      Yes.
1250: 7        Q.      Prior to approval, you didn't let
1250: 8 people take aspirin in your endoscopy studies, did
1250: 9 you?


ID:              Scolnick_8-16_1250.11-1250.17
Page Range:      1250:11-1250:17

1250:11              THE WITNESS:  No.  Because we thought
1250:12 aspirin would cloud the results of the endoscopy
1250:13 studies --
1250:14 BY MR. BUCHANAN:
1250:15        Q.      It was worse --
1250:16        A.      -- because aspirin is gastric
1250:17 irritative.


ID:              Scolnick_8-16_1250.25-1251.02
Page Range:      1250:24-1251:2

1250:24 BY MR. BUCHANAN:
1250:25        Q.      You didn't want to give people
1251: Page 1251
1251: 1 aspirin because you knew it would eliminate the GI
1251: 2 benefit to the drug?


ID:              Scolnick 125104
Page Range:      1251:4-1251:7

1251: 4              THE WITNESS:  We did not think --
1251: 5 certainly I didn't think that it would eliminate the
1251: 6 complete GI benefit of the drug.  It would simply
1251: 7 make the studies very complicated to interpret.


Page 92

Plaintiffs Scolnick.txt

ID:              D Scolnick 126413
Page Range:      1264:13-1264:14

1264:13         Q.      That's a relative risk of serious GI
1264:14 events, isn't it, sir?


ID:              D Scolnick 126416
Page Range:      1264:16-1264:19

1264:16              THE WITNESS:  I don't know what she's
1264:17 referring with regard to the twofold increase,
1264:18 whether it is ulcers or serious GI events.  I don't
1264:19 know what she's referring to.  She doesn't say.


ID:              Scolnick 126421
Page Range:      1264:21-1264:25

1264:21         Q.      That means if you give people --
1264:22 allow people in the trial to have low-dose aspirin,
1264:23 there's a two to four-fold increased risk of serious
1264:24 GI events.  That's what you were trying to avoid by
1264:25 keeping aspirin out of that trial, isn't that true?


ID:              Scolnick 126502
Page Range:      1265:2-1265:9

1265: 2              THE WITNESS:  The people who were
1265: 3 designing the trial, as stated, were concerned that
1265: 4 adding low-dose aspirin would mask the benefit of --
1265: 5 some of the benefit of the lack of gastric ulcers
1265: 6 with Vioxx, and they were debating this, I was aware
1265: 7 of that.  They finally decided not to include it and
1265: 8 to exclude people who needed low-dose aspirin from
1265: 9 the trial.


ID:              Scolnick 126623
Page Range:      1266:23-1267:9

1266:23         Q.      Well, let's go through this then,
1266:24 sir.
1266:25              It continues, "Yet, the possibility
1267: Page 1267
1267: 1 of increased CV events is of great concern."  Do you
1267: 2 see that?
1267: 3         A.      Yes, I see her comments, yes.
1267: 4         Q.      Then it states, "(I just can't wait
1267: 5 to be the one to present those results to senior
1267: 6 management!)"  She gave us another exclamation
1267: 7 point, didn't she?
1267: 8         A.      Yes, she did.
1267: 9         Q.      That's you?


ID:              Scolnick_8-16_1267.12-1267.17
Page Range:      1267:12-1267:17

1267:12              THE WITNESS:  I am a member of senior
1267:13 management, yes.  I'm one of senior management.
1267:14 BY MR. BUCHANAN:
                        Page 93

Plaintiffs Scolnick.txt

1267:15        Q.        It wouldn't have made you happy to
1267:16 have an outcomes trial that showed that Vioxx
1267:17 increased the rate of CV events, would it?


ID:            Scolnick_8-16_1267.19-1268.01
Page Range:    1267:19-1268:1

1267:19                  THE WITNESS:  Obviously not.  If I
1267:20 had known -- obviously, not.  No one wanted to see a
1267:21 result where -- a question whether Vioxx elevated or
1267:22 naproxen lowered the rate of events.
1267:23 BY MR. BUCHANAN:
1267:24        Q.        So, we have a solution, right, in the
1267:25 next sentence?  She says how we solve this dilemma,
1268: Page 1268
1268: 1 doesn't she?


ID:            Scolnick_8-16_1268.04-1268.15
Page Range:    1268:4-1268:15

1268: 4        Q.        Do you see the next sentence, sir?
1268: 5        A.        I see the next sentence.
1268: 6        Q.        What's she say?
1268: 7        A.        "what about the idea of excluding
1268: 8 high risk CV patients - ie those that have already
1268: 9 had MI, CABG or PTCA?  This may decrease the CV
1268:10 event rate so that a difference between the two
1268:11 groups would not be evident.  The only problem would
1268:12 be - would we be able to recruit any patients?"
1268:13 That's the rest of the paragraph.
1268:14        Q.        Her solution is to exclude high risk
1268:15 CV patients, isn't it?


ID:            Scolnick_8-16_1268.17-1269.12
Page Range:    1268:17-1269:12

1268:17                  THE WITNESS:  That's correct, so they
1268:18 wouldn't require low-dose aspirin.
1268:19 BY MR. BUCHANAN:
1268:20        Q.        So you wouldn't see a CV effect?
1268:21        A.        So there wouldn't be a
1268:22 cardioprotective effect of the NSAID that was going
1268:23 to be compared to because it blocked COX-1 and Vioxx
1268:24 did not because aspirin blocks COX-1.  That's what
1268:25 she's talking about.
1269: Page 1269
1269: 1        Q.        Why don't we look at the document,
1269: 2 sir?
1269: 3        A.        That's what she's talking about.
1269: 4        Q.        "This may decrease the CV event rate
1269: 5 so that a difference between the two groups would
1269: 6 not be evident."  Do you see that?
1269: 7        A.        Yes, I do, and I understand what she
1269: 8 meant by that.
1269: 9        Q.        So, what you're doing here is you're
1269:10 excluding aspirin so that you can see a GI benefit
1269:11 from your outcomes trial; true?
1269:12        A.        That is correct.


Page 94

```
                      Plaintiffs Scolnick.txt
ID:             Scolnick_8-16_1271.04-1271.07
Page Range:     1271:4-1271:7

1271: 4          Q.      I'm asking you, sir, that in
1271: 5 aspirin-using patients, the results from the VIGOR
1271: 6 trial don't present a GI benefit that extends to
1271: 7 them; isn't that right?


ID:             Scolnick_8-16_1271.09-1273.14
Page Range:     1271:9-1273:14

1271: 9                  THE WITNESS:  You cannot extrapolate
1271:10 the magnitude of the benefit from the nonlow-dose
1271:11 aspirin-using population to a low-dose aspirin
1271:12 population.  That is correct.
1271:13 BY MR. BUCHANAN:
1271:14          Q.      In fact, you actually did do a test,
1271:15 Vioxx plus aspirin, compared to traditional NSAIDs
1271:16 after the VIGOR trial, didn't you?
1271:17          A.      We did.  We did an endoscopy study.
1271:18          Q.      It didn't show any benefit, did it?
1271:19          A.      The study showed that using aspirin
1271:20 in the presence of Vioxx elevated the rate over
1271:21 aspirin alone, that subsequent studies showed that
1271:22 that rate was still lower than standard NSAID used
1271:23 with low-dose aspirin.
1271:24          Q.      Sir --
1271:25          A.      It still showed a benefit, although
1272: Page 1272
1272: 1 not as great a benefit as in the absence of aspirin.
1272: 2                          - - -
1272: 3                  (Whereupon, Deposition Exhibit
1272: 4          Scolnick-66, E-mails, MRK-ACR0009295 -
1272: 5          MRK-ACR0009296, was marked for
1272: 6          identification.)
1272: 7                          - - -
1272: 8 BY MR. BUCHANAN:
1272: 9          Q.      Sir, I'm passing you over what we
1272:10 just marked as Exhibit 66.  I would like you to look
1272:11 at the earliest in time e-mail.  This is November
1272:12 19, 2001, the bottom of the first page.
1272:13          A.      Yes.
1272:14          Q.      It's from you to, who is that to?
1272:15          A.      Raymond Gilmartin and David Anstice.
1272:16          Q.      Okay.
1272:17                  Mr. Gilmartin is your boss; right?
1272:18          A.      Yes, he was.
1272:19          Q.      You sent it with high importance?
1272:20 You will see it on the next page.
1272:21          A.      Okay.  Yes.
1272:22          Q.      It says, "Ray" and it says "dn" you
1272:23 meant "and"?
1272:24          A.      Yes.  I don't type well.
1272:25          Q.      "Ray and David.  Not a good result.
1273: Page 1273
1273: 1 Low dose aspirin and Vioxx equal almost ibuprofen."
1273: 2 That's Advil; right?
1273: 3          A.      Yes.
1273: 4          Q.      "Higher than ASA alone"?
1273: 5          A.      Yes.
1273: 6          Q.      "It is clear why their class study
1273: 7 failed now."  That's with the Celebrex study; right?
                      Page 95
```

Plaintiffs Scolnick.txt

1273: 8        A.      Yes.
1273: 9        Q.      What you're saying here is in the
1273:10 Celebrex study, the manufacturers of Celebrex
1273:11 allowed aspirin users in their study; right?
1273:12        A.      Yes, I believe that's true.
1273:13        Q.      And they showed no GI benefit in
1273:14 terms of PUBs in that outcomes study; right?


ID:             Scolnick_8-16_1273.16-1274.25
Page Range:     1273:16-1274:25

1273:16                THE WITNESS:  I think they showed a
1273:17 quantitative benefit, but they did not get
1273:18 statistical significance.
1273:19 BY MR. BUCHANAN:
1273:20        Q.      And if they don't have statistical
1273:21 significance, that's not good enough for the FDA, is
1273:22 it?
1273:23        A.      It will not allow them to make a
1273:24 conclusion that the PUBs are reduced.  That is
1273:25 correct.
1274: Page 1274
1274: 1        Q.      So, what you're saying here is the
1274: 2 reason why they didn't show a statistically
1274: 3 significant benefit on PUBs is because they allowed
1274: 4 aspirin users in; right?
1274: 5        A.      That was how I interpreted their
1274: 6 results seeing our result in this endoscopy study.
1274: 7        Q.      Then you continue and say: "I do not
1274: 8 think we should announce the CV outcomes study now
1274: 9 since now I am not at all sure what the design
1274:10 should be."  Do you see that?
1274:11        A.      I do.
1274:12        Q.      How do they tie together, sir?
1274:13        A.      I'm not sure what I was thinking
1274:14 because -- I don't know what the design was at this
1274:15 time.  I really can't remember what I was thinking
1274:16 at this point because we went through many, many
1274:17 discussions about different trial designs.
1274:18        Q.      What you were concerned about, sir,
1274:19 is if you did what you wanted to do in your CV
1274:20 outcome trial and allowed aspirin in that trial,
1274:21 there would be a Merck-sponsored clinical trial that
1274:22 would show that Vioxx, in fact, does not prevent
1274:23 PUBs in a population of high risk CV users using
1274:24 aspirin?  That's what you were concerned about,
1274:25 isn't it?


ID:             Scolnick_8-16_1275.02-1275.10
Page Range:     1275:2-1275:10

1275: 2                THE WITNESS:  I am not sure what I
1275: 3 was thinking because I don't know what trial designs
1275: 4 were being considered.
1275: 5 BY MR. BUCHANAN:
1275: 6        Q.      Well, you'd agree, sir, that if you
1275: 7 were considering a CV outcome trial that was going
1275: 8 to allow aspirin users, that would also have a
1275: 9 potential negative effect of revealing that Vioxx
1275:10 did not prevent the incidence of PUBs?

Plaintiffs Scolnick.txt

ID:              Scolnick_8-16_1275.12-1275.20
Page Range:      1275:12-1275:20

1275:12              THE WITNESS:  No.  I think that the
1275:13 data without aspirin would show what the maximal
1275:14 potential benefits of Vioxx would be, and that in
1275:15 the presence of aspirin, what the diminution of
1275:16 those benefits would be, and in the subsequent
1275:17 endoscopy studies we did, the magnitude of the ulcer
1275:18 incidence was still less than it was if you used
1275:19 aspirin with another drug, another nonsteroidal that
1275:20 was not selected.


Total Length - 02:28:05