UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  12-6-06
LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| In re: VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L - DIVISION 3 |
| | * | |
| This document relates to<br>CASE NO. 2:05CV2524 | * | JUDGE FALLON |
| | * | |
| ANTHONY WAYNE DEDRICK,<br>an Individual, | * | MAG. JUDGE KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |

### NOTICE OF FILING DEPOSITION TESTIMONY
### OF MARY ELIZABETH BLAKE

Plaintiff Anthony Wayne Dedrick, by and through his attorneys, hereby gives notice of filing the final transcript of the deposition testimony of Mary Elizabeth Blake. This testimony was played during the trial of this cause on December 5, 2006. A transcript is attached as Exhibit "A."

___ Fee___
___ Process___
_X_ Dktd
___ CtRmDep
___ Doc. No.

Respectfully submitted this 5th day of December, 2006.

_____
**ANDY BIRCHFIELD**
P. LEIGH O'DELL
Attorney for Plaintiff
*BEASLEY, ALLEN, CROW,*
*METHVIN, PORTIS & MILES, P.C.*
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343 telephone
(334) 954-7555 facsimile

**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
**Plaintiffs' Liaison Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

**Christopher A. Seeger**, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337) 494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Notice of Filing Deposition Testimony of Mary Elizabeth Blake has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by U.S. Mail and e-mail or by hand delivery and e-mail, on Merck's Counsel, Douglas R. Marvin and Philip S. Beck, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 5th day of December, 2006.

_____
P. Leigh O'Dell
Attorney for Plaintiff
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.

# EXHIBIT A

```
                          Blake.txt
ID:            Blake Direct

     ID:              Blake 1112
     Page Range:      11:12-11:13

        11:12     Q.      Okay.  Good morning, Mrs. Blake.
        11:13     A.      Good morning.  How are you?


     ID:              Blake 1319
     Page Range:      13:19-13:21

        13:19     Q.      All right.  You are currently working
        13:20 for Merck, correct?
        13:21     A.      Yes, I am.


     ID:              D Blake 1322
     Page Range:      13:22-13:24

        13:22     Q.      What is your current title?
        13:23     A.      I am senior director for Merck
        13:24 Vaccines, Public Affairs.


     ID:              Blake 1605
     Page Range:      16:5-16:8

        16: 5     Q.      Okay.  And when you were hired as a
        16: 6 full-time Merck employee, what were you hired as?
        16: 7     A.      I was hired as a public affairs
        16: 8 associate.


     ID:              Blake 1614
     Page Range:      16:14-16:16

        16:14     Q.      And that was specifically what date?
        16:15     A.      December 1993.  I think it might have
        16:16 been the 19th.  I can check on that.


     ID:              Blake 1818
     Page Range:      18:18-19:2

        18:18     Q.      So from, say '9 -- what was your job
        18:19 title from 1997 through 2001?
        18:20     A.      It varied, but for most of that time,
        18:21 I was a manager of public affairs.
        18:22     Q.      Manager.  Okay.  And who did you work
        18:23 for?
        18:24     A.      There I worked for a number of
        18:25 people.  Primarily Jan Weiner, who was the head of
        19: Page 19
        19: 1 that group.  Sometimes I worked directly for her,
        19: 2 other times I worked for other people in between.


     ID:              Blake 2214
     Page Range:      22:14-23:2

        22:14             When is the first time you became
                                    Page 1
```

```
                                Blake.txt
22:15 involved with the drug Vioxx or its predecessor,
22:16 while working for Merck?
22:17      A.     I started work on Vioxx, I did some
22:18 help when I wasn't directly responsible for it, in
22:19 the middle of 1999.
22:20      Q.     Okay.
22:21      A.     Sometime in the spring, early summer
22:22 of 1999. And I was assigned Vioxx in the fall of
22:23 1999.
22:24      Q.     So in the fall of 1999, you say you
22:25 were "assigned Vioxx". What does that mean?
23: Page 23
23: 1      A.     Um-hmm. I became the manager with
23: 2 responsibility for Vioxx.


ID:             D Blake 2303
Page Range:     23:3-23:4

   23: 3    Q.    In the United States only or --
   23: 4    A.    In the United States only.


ID:             Blake 2318
Page Range:     23:18-23:22

   23:18            As it related to Vioxx, what was your
   23:19 exact title?
   23:20    A.    Manager.
   23:21    Q.    Manager?
   23:22    A.    U.S.H.H. Public Affairs.


ID:             Blake 2605
Page Range:     26:5-26:19

   26: 5    Q.    All right. Epidemiology. Did you
   26: 6 manage epidemiologic issues related to Vioxx?
   26: 7    A.    I worked with Merck Research Labs as
   26: 8 well as others on epidemiological studies, as I --
   26: 9 in terms of drafting public affairs materials. Yes,
   26:10 I did that.
   26:11    Q.    Okay. And what people within Merck
   26:12 Research Laboratories did you deal with concerning
   26:13 those issues?
   26:14    A.    It could range based on the
   26:15 individual study. If it was an epidemiological
   26:16 study, it would gen -- I would generally speak with
   26:17 Nancy Santanello and Alise Reicin, as well as
   26:18 perhaps others in their department, but it depended
   26:19 on the situation.


ID:             Blake 2709
Page Range:     27:9-27:20

   27: 9    Q.    Before I get to that, describe for me
   27:10 generally what your job responsibilities were as
   27:11 manager, U.S.H.H., of public affairs for Vioxx.
   27:12    A.    Essentially in that position I had
   27:13 responsibility for interactions with the news media
   27:14 related to Vioxx and also for public affairs
   27:15 programs related to disease awareness.
                                Page 2
```

```
                              Blake.txt
27:16        Q.        What does that mean, the last part?
27:17        A.        The disease awareness part?  we
27:18 worked with third-party groups to implement programs
27:19 that encouraged consumers to talk to their doctor
27:20 about osteoarthritis, if they had it.


ID:               Blake 3302
Page Range:       33:2-33:6

    33: 2        Q.        When you worked for public affairs,
    33: 3 there would be various tools that you would use to
    33: 4 get the word out when you needed to concerning
    33: 5 Vioxx, correct?
    33: 6        A.        Yes.


ID:               Blake 3311
Page Range:       33:11-33:19

    33:11        Q.        Who was in charge of press releases
    33:12 for Vioxx?
    33:13        A.        Well, ultimately the public affairs
    33:14 department is responsible for developing and getting
    33:15 the appropriate approvals and issuing news releases
    33:16 in consultation with the various reviewers,
    33:17 including medical/legal board.
    33:18        Q.        But who was in charge?  Where did the
    33:19 buck stop --


ID:               Blake 3325
Page Range:       33:25-34:7

    33:25                  THE WITNESS:  In terms of where the
    34: Page 34
    34: 1 buck stopped, ultimately Merck Research Labs and
    34: 2 legal have the final say in terms of whether or not
    34: 3 a news release is issued.
    34: 4 BY MR. PLACITELLA:
    34: 5        Q.        Who is responsible for drafting the
    34: 6 press releases and putting them in final form?
    34: 7        A.        Public affairs.


ID:               D Blake 3418
Page Range:       34:18-34:24

    34:18        Q.        Could the press releases go out
    34:19 without your approval?
    34:20        A.        Without my approval?
    34:21        Q.        Um-hmm.
    34:22        A.        Ultimately, the final sign-off of
    34:23 press releases is really Merck Research Labs and
    34:24 legal.


ID:               Blake 3514
Page Range:       35:14-36:4

    35:14        Q.        What is a standby statement?
    35:15        A.        Standby statements are documents that
    35:16 we create if we anticipate getting questions about
                              Page 3
```

```
                              Blake.txt
35:17 something that we would need to respond to within
35:18 public affairs.
35:19      Q.    And who was it intended that the
35:20 standby statements would be used by?
35:21      A.    Standby statements are intended to be
35:22 used by public affairs people in their interactions
35:23 with the news media as well as investor relations
35:24 for their interactions with analysts.
35:25      Q.    Were they ever given to people within
36: Page 36
36: 1 Merck for responding to interviews?
36: 2      A.    With the news media?
36: 3      Q.    Correct.
36: 4      A.    Yes.
```

ID:              Blake 3621
Page Range:      36:21-37:21

```
36:21      Q.    What about video news releases, were
36:22 they a tool used for getting the word out?
36:23      A.    Yes, we used video news releases as
36:24 well.
36:25      Q.    And the video news releases, who was
37: Page 37
37: 1 the person primarily responsible within public
37: 2 affairs for the video news releases related to
37: 3 Vioxx?
37: 4      A.    Well, that too could vary based on
37: 5 who had responsibility for a given project.  Often,
37: 6 I had responsibility, and it would always go through
37: 7 medical/legal board.  They had the final say.
37: 8      Q.    In fact, you were involved with media
37: 9 training for the video news releases and interviews
37:10 at various points in time related to Vioxx, true?
37:11      A.    Yes, I did media training.
37:12      Q.    And interviews with spokespersons for
37:13 Merck, was that a tool that was used for getting the
37:14 word out related to Vioxx?
37:15      A.    Merck people participated in
37:16 interviews about Vioxx, yes.
37:17      Q.    What about spokespersons versus --
37:18 did you have spokespersons that you hired that were
37:19 non-Merck employees to get the word out related to
37:20 Vioxx?
37:21      A.    Yes.
```

ID:              Blake 3808
Page Range:      38:8-38:23

```
38: 8      Q.    Okay.  Did you use websites as a
38: 9 vehicle for getting the word out related to Vioxx?
38:10      A.    Within public affairs?
38:11      Q.    Um-hmm.
38:12      A.    Yes, we did.
38:13      Q.    And what websites did you use?
38:14      A.    Some -- if I'm remembering correctly,
38:15 and I apologize, it was a long time ago, we had a
38:16 disease awareness website in conjunction with the
38:17 Arthritis Foundation around the Speaking of Pain
38:18 program.  And I can't remember the URL for that.
38:19 The content was also on the Arthritis Foundation's
                              Page 4
```

```
                              Blake.txt
38:20 website. It might even still be there.
38:21               And then, in addition to that, some
38:22 of the public affairs materials, I believe, were on
38:23 Vioxx.com.


ID:            Blake 4107
Page Range:    41:7-41:20

41: 7     Q.    Did marketing have -- did marketing
41: 8 also have to approve your press releases before they
41: 9 were sent out?
41:10     A.    They were reviewed again.
41:11     Q.    And who was that? Who approved your
41:12 press releases in marketing?
41:13     A.    That would also vary by the news
41:14 release. My primary point of contact for many
41:15 things was Carrie Bourdow on the marketing team, but
41:16 some things would also be reviewed by her bosses as
41:17 well as the vice president of the marketing team.
41:18     Q.    Did that include Wendy Dixon?
41:19     A.    Yes, Wendy was the vice president at
41:20 the time, if I remember correctly.


ID:            Blake 4123
Page Range:    41:23-42:17

41:23              Public affairs was really responsible
41:24 for communications concerning Vioxx to the general
41:25 public, correct?
42: Page 42
42: 1     A.    No, to the news media.
42: 2     Q.    Only to the news media?
42: 3     A.    The news media is the primary
42: 4 audience. The programs that we work on and the
42: 5 materials we create are intended for use by the news
42: 6 media. Now, we talked before about the disease
42: 7 education program. That involves working with
42: 8 consumer groups and also had a media component to it
42: 9 as well.
42:10     Q.    Well, you call it public affairs,
42:11 correct?
42:12     A.    That is the name of our department,
42:13 yes.
42:14     Q.    Meaning that you understood that the
42:15 messages that you were issuing would ultimately --
42:16 were ultimately intended to reach the public,
42:17 correct?


ID:            Blake 4220
Page Range:    42:20-43:2

42:20              THE WITNESS: Our news releases go to
42:21 the news media who then communicate to the public.
42:22 BY MR. PLACITELLA:
42:23     Q.    The purpose of your reaching the news
42:24 media wasn't so they took the press releases and
42:25 video materials home and put them on -- in a shelf,
43: Page 43
43: 1 right?
43: 2     A.    That is correct.
                              Page 5
```

Blake.txt

```
ID:                Blake 4323
Page Range:        43:23-44:13

    43:23      Q.      The -- you understood that the
    43:24 messages that you were delivering were ultimately
    43:25 intended for the public to see, correct?
    44: Page 44
    44: 1      A.      Well -- I apologize, it's hard to
    44: 2 answer the question that way just because, I mean,
    44: 3 the materials that we create go to the news media,
    44: 4 who then are responsible for the stories that they
    44: 5 write, and they have other sources besides Merck.
    44: 6              So it would be exceedingly rare for a
    44: 7 news release just to go -- to be seen by the general
    44: 8 public.  It goes to the news media, who then writes
    44: 9 their stories.  So, but, yes, ultimately they go to
    44:10 the public --
    44:11      Q.      All right.  I'll --
    44:12      A.      The story is seen by the public, but
    44:13 the news release is not necessarily.

ID:                Blake 4414
Page Range:        44:14-44:16

    44:14      Q.      But the purpose of the news tools
    44:15 that we've discussed is to communicate Merck's
    44:16 message to the public ultimately, true?

ID:                Blake 4418
Page Range:        44:18-45:6

    44:18              THE WITNESS:  Yes.
    44:19 BY MR. PLACITELLA:
    44:20      Q.      Okay.  And, in fact, you issued your
    44:21 press releases online as well, didn't you?
    44:22      A.      We distribute our news releases
    44:23 through various news wire services.  We change them
    44:24 during the course of time.  And they also appeared
    44:25 on Merck.com.
    45: Page 45
    45: 1      Q.      Right.
    45: 2      A.      So --
    45: 3      Q.      So if somebody was searching for
    45: 4 Vioxx, let's say, they could very well see your
    45: 5 press releases on Merck.com, correct?
    45: 6      A.      They could, yes.

ID:                Blake 4520
Page Range:        45:20-45:23

    45:20      Q.      Okay.  And as somebody who worked in
    45:21 the office of medical/legal, you recognized, did you
    45:22 not, that all of the tools that we've discussed were
    45:23 governed by the FDA labeling law, true?

ID:                Blake 4601
Page Range:        46:1-46:17
```

Blake.txt

```
46: 1                   THE WITNESS:  Yes, I'm familiar with
46: 2 that.
46: 3          BY MR. PLACITELLA:
46: 4          Q.      Okay.  In other words -- and labeling
46: 5 includes not just a package insert, it includes your
46: 6 press releases, your video news releases, anything
46: 7 you'd give out to the public, right?
46: 8          A.      Well, when I said labeling before, I
46: 9 was referring specifically to the product
46:10 information.
46:11          Q.      You're aware that your press releases
46:12 and other tools were governed by the FDA labeling
46:13 law, true?
46:14          A.      Yes, I'm aware that public affairs
46:15 materials are governed by FDA regulations.
46:16          Q.      Okay.  And that law required that all
46:17 of your materials be fairly balanced, correct?
```

ID:            Blake 4620
Page Range:    46:20-46:21

```
46:20                   THE WITNESS:  Within FDA regulations,
46:21 yes, there's an expectation for fair and balanced.
```

ID:            Blake 4623
Page Range:    46:23-47:2

```
46:23          Q.      Okay.
46:24          A.      But, ultimately -- I just do want to
46:25 clarify that -- you know, as part of the
47: Page 47
47: 1 medical/legal board review process, I mean, that's
47: 2 where those decisions get made.
```

ID:            Blake 4707
Page Range:    47:7-47:11

```
47: 7          Q.      Well, you were part of the
47: 8 medical/legal review, so you had some knowledge
47: 9 about the regulations that pertain to what was
47:10 necessary to comply with the FDA's laws, correct?
47:11          A.      With -- yes.  Within --
```

ID:            Blake 4805
Page Range:    48:5-48:12

```
48: 5          A.      -- what my job was within the office
48: 6 of medical/legal.
48: 7                  I was the liaison to the FDA in terms
48: 8 of sending them promotional materials for their
48: 9 pre-review, for example, for the products that I
48:10 worked on.  I reviewed those materials as they came
48:11 through, but that was once they had already gone
48:12 through medical/legal board.
```

ID:            Blake 4813
Page Range:    48:13-48:15

```
                            Blake.txt
     48:13       Q.       Okay.
     48:14       A.       I was not a sign-off on any
     48:15 materials.

ID:             Blake 4818
Page Range:     48:18-49:2

     48:18                You were generally aware of what the
     48:19 FDA rules were concerning labeling and public
     48:20 affairs materials, correct?
     48:21       A.       Generally. But, again, I'm not a
     48:22 lawyer or doctor.
     48:23       Q.       But that was part of your job to
     48:24 know, correct?
     48:25       A.       It was part of my job to be familiar
     49: Page 49
     49: 1 with, but I would not call myself an expert in any
     49: 2 way.

ID:             Blake 4906
Page Range:     49:6-49:10

     49: 6       Q.       It was part of your job to know and
     49: 7 understand what the rules were concerning what you
     49: 8 could say and not say in public affairs materials,
     49: 9 true?
     49:10       A.       To understand, yes.

ID:             Blake 5214
Page Range:     52:14-52:20

     52:14       Q.       Well, you understand as the director
     52:15 or manager of public affairs that it's your
     52:16 responsibility to make sure, from your perspective,
     52:17 that the information that's contained in your
     52:18 materials that's sent out into the public, that it
     52:19 contains the truth and the whole truth, not half the
     52:20 truth, correct?

ID:             Blake 5223
Page Range:     52:23-52:24

     52:23                THE WITNESS: Yes, our materials are
     52:24 truthful. I recognize that as our responsibility.

ID:             Blake 5417
Page Range:     54:17-54:19

     54:17                MR. PLACITELLA: Let me have this
     54:18 marked as P-1. This is the only one I don't have
     54:19 multiple copies of, so I apologize.

ID:             Blake 5424
Page Range:     54:24-55:1

     54:24       Q.       I'm going to show you what's been
                              Page 8
```

```
                              Blake.txt
54:25 marked P-1 for identification and ask you if you
55: Page 55
55: 1 have ever seen this before?


ID:              Blake 5502
Page Range:      55:2-55:6

  55: 2    A.      Okay.  I believe that this is a field
  55: 3 communication document, but I may be wrong.
  55: 4    Q.      Have you ever seen it before?
  55: 5    A.      I believe so.
  55: 6    Q.      Okay.  Can you turn to Page 44.


ID:              Blake 5507
Page Range:      55:7-55:13

  55: 7    A.      Um-hmm.  Yes.
  55: 8    Q.      See where it says, "General
  55: 9 Principles of Promotion"?
  55:10    A.      Um-hmm.
  55:11    Q.      This is a Merck document, by the way,
  55:12 correct?
  55:13    A.      Yes.


ID:              Blake 5601a
Page Range:      56:1-56:5

  56: 1    Q.      Okay.  And here it says, "General
  56: 2 Principles of Promotion.  FDA regulations impose
  56: 3 five main principles on promotion."
  56: 4            Do you see that?
  56: 5    A.      Yes, I do.


ID:              Blake 5716
Page Range:      57:16-58:10

  57:16    Q.      It says, "A promotional claim may not
  57:17 be interpreted in a false or misleading manner by a
  57:18 significant minority of prescribers."
  57:19            Did I read that correctly?
  57:20    A.      Yes.
  57:21    Q.      Okay.  It then says, "Inclusion of
  57:22 proper balance.  There must be appropriate weight
  57:23 given to all clinically relevant information, that
  57:24 is, the risks and benefits, that can affect a
  57:25 physician's prescribing practices."
  58: Page 58
  58: 1            Did you understand that to be the
  58: 2 case?
  58: 3    A.      That's what it says, yes.
  58: 4    Q.      Okay.  Then it says, "Absence of
  58: 5 omissions of relevant information.  Promotional
  58: 6 material, when taken as a whole, is inadequate if it
  58: 7 does not tell the whole truth, i.e., unfavorable
  58: 8 information may not be omitted."
  58: 9            Correct?
  58:10    A.      Yes.

                              Page 9
```

```
                            Blake.txt
ID:              Blake 5817
Page Range:      58:17-59:2

   58:17         Q.      "Support by adequate clinical
   58:18 studies.  Promotion may not promote the product in a
   58:19 light more favorable than shown by data obtained
   58:20 from clinical experience."
   58:21         Did I read that correctly?
   58:22         A.      Yes.
   58:23         Q.      Did you understand that these were
   58:24 the general principles that guided you in
   58:25 constructing promotional materials for the product
   59: Page 59
   59: 1 Vioxx?
   59: 2         A.      Yes, I'm familiar with those.


ID:              Blake 6012
Page Range:      60:12-60:16

   60:12         Q.      So in terms of your understanding, if
   60:13 a company indicates that a drug does not have side
   60:14 effects, when there's credible scientific evidence
   60:15 to the contrary, that would be false and misleading,
   60:16 from your understanding?


ID:              Blake 6019
Page Range:      60:19-60:22

   60:19                 THE WITNESS:  From my understanding?
   60:20 BY MR. PLACITELLA:
   60:21         Q.      Yes.
   60:22         A.      Yes.


ID:              Blake 6217
Page Range:      62:17-62:19

   62:17                 One of your missions as it related to
   62:18 the drug Vioxx was to minimize the attention given
   62:19 to heart attack issues, correct?


ID:              Blake 6222
Page Range:      62:22-63:7

   62:22                 THE WITNESS:  One of my
   62:23 responsibilities as the -- one of the public affairs
   62:24 people responsible for Vioxx was once the VIGOR
   62:25 results came out and the media reported again and
   63: Page 63
   63: 1 again on the cardiovascular findings of VIGOR was to
   63: 2 -- there was so much coverage on the cardiovascular
   63: 3 findings, to bring that essentially back into
   63: 4 balance, because that's what they reported on all
   63: 5 the time, and MRL, based on their analysis, didn't
   63: 6 believe that to be the case.  It was my job to talk
   63: 7 about that to the news media.


ID:              Blake 6312
Page Range:      63:12-63:14
```

Blake.txt

```
    63:12         Q.      Your mission, yes or no, that you
    63:13 were to accomplish was to minimize the attention
    63:14 given to heart attack issues as it related to Vioxx?


ID:             Blake 6317
Page Range:     63:17-64:2

    63:17                 THE WITNESS:  I apologize, I wouldn't
    63:18 characterize that as my mission.
    63:19 BY MR. PLACITELLA:
    63:20         Q.      One of your jobs was to convince the
    63:21 world that there was no reason to believe that Vioxx
    63:22 caused heart attacks, true?
    63:23         A.      Based on Merck Research Labs'
    63:24 assessment, because, you know, they're the ones who
    63:25 know the data and understand the data.  That was my
    64: Page 64
    64: 1 job to communicate that to the news media, my
    64: 2 interactions, but it was based on their assessment.


ID:             Blake 6424
Page Range:     64:24-65:2

    64:24         Q.      To convince -- it was your job to
    64:25 tell the news media that there was no reason to
    65: Page 65
    65: 1 believe that Vioxx caused heart attacks, can we
    65: 2 agree on that?


ID:             Blake 6505
Page Range:     65:5-65:12

    65: 5                 THE WITNESS:  It was -- well, I mean,
    65: 6 it's important to keep in mind that the news media
    65: 7 are a highly independent body, and it was my job to
    65: 8 convey to them Merck's perspective.  Sometimes I did
    65: 9 that directly, sometimes we had people from Merck
    65:10 Research Labs who did that, and ultimately reporters
    65:11 put together a complete story based on our
    65:12 perspective as well as others.  And that included --


ID:             Blake 6524
Page Range:     65:24-65:24

    65:24         Q.      Can you answer that question?


ID:             Blake 6602
Page Range:     66:2-66:3

    66: 2                 THE WITNESS:  Yes.  With Merck
    66: 3 Research Labs.


ID:             Blake 6702
Page Range:     67:2-67:3

    67: 2                 MR. PLACITELLA:  Can we have this
```

Page 11

```
                         Blake.txt
  67: 3 marked P-2 or P-Blake-2, however you want it.


ID:              Blake 6802
Page Range:      68:2-68:11

  68: 2                   THE WITNESS:  My responsibility was
  68: 3 to interact with the news media, which throughout
  68: 4 most of 2000 was a lot of discussion about the
  68: 5 cardiovascular findings in the VIGOR trial.
  68: 6 BY MR. PLACITELLA:
  68: 7       Q.     You keep saying the news media, but
  68: 8 your whole point was to get the information that you
  68: 9 wanted out to the public, you didn't do it just so
  68:10 the news media was going to take it home and put it
  68:11 on a shelf, right?


ID:              Blake 6814
Page Range:      68:14-69:7

  68:14                   THE WITNESS:  As a public affairs
  68:15 person, I mean, the news media is who I interact
  68:16 with.  I don't interact with the general public.
  68:17 So, I mean, that's -- that's where interactions
  68:18 were.  Yes, they communicate to the broader public,
  68:19 but they are the ones who have complete control over
  68:20 what it is that they report.  It's my job to convey
  68:21 to them Merck's perspective.
  68:22 BY MR. PLACITELLA:
  68:23       Q.     Right.  And that's my point.  But
  68:24 your hope was that in communicating to the news
  68:25 media, they would communicate your message, in turn,
  69: Page 69
  69: 1 to the public, true?
  69: 2       A.     Yes.
  69: 3       Q.     Okay.  Now, I want to show you P-2.
  69: 4 This is your performance review form?
  69: 5       A.     Um-hmm.
  69: 6       Q.     Do you recognize this?
  69: 7       A.     Yes.


ID:              Blake 6919
Page Range:      69:19-69:22

  69:19       Q.     Here it says that for the year 2000,
  69:20 your accomplishments concerning the VIGOR study were
  69:21 -- included minimizing the attention to heart attack
  69:22 issues, correct?


ID:              Blake 7008
Page Range:      70:8-70:19

  70: 8       Q.     See where it says, "Accomplishments
  70: 9 include" and then underneath it, it says "VIGOR"?
  70:10 Do you see where it says "VIGOR"?
  70:11       A.     Yes.  I'm sorry, that was the
  70:12 paragraph I was reading.
  70:13       Q.     Okay.  And part of your
  70:14 accomplishment, which meant your mission, right, was
  70:15 to minimize the attention to heart attack issues,
                         Page 12
```

Blake.txt
```
70:16 correct?
70:17      A.    Well, it does include that language,
70:18 yes, but this is done at the end of the year, not at
70:19 the beginning of the year.
```

ID:            Blake 7021
Page Range:    70:21-71:6

```
70:21      A.    So when -- well, when you talk about
70:22 mission, that implies that it started at the
70:23 beginning of the year.  And this was written at the
70:24 end of 2000, after almost all of the media coverage
70:25 was around the cardiovascular findings from the
71: Page 71
71: 1 VIGOR trial.
71: 2           So it was my job to include Merck's
71: 3 perspective in those stories based on what Merck
71: 4 Research Labs said, bringing it from the point of
71: 5 overemphasis.  So I think where it talks about
71: 6 balanced coverage, I mean, that was really the goal.
```

ID:            D Blake 7107
Page Range:    71:7-71:14

```
71: 7      Q.    All right.  Let me ask the question
71: 8 again this way.  The ultimate success in your job as
71: 9 it related to heart attack issues and Vioxx was to
71:10 keep it out of the news altogether, correct?
71:11      A.    No, I wouldn't characterize it in
71:12 that way, no.
71:13      Q.    Okay.  So one of your accomplishments --
71:14      A.    I'm sorry, can I finish?
```

ID:            D Blake 7118
Page Range:    71:18-71:25

```
71:18      Q.    Go ahead.
71:19      A.    Because almost all of the media
71:20 coverage about Vioxx in the year 2000 was around the
71:21 cardiovascular findings from VIGOR.  I often tried
71:22 to talk to reporters about the GI findings from
71:23 VIGOR, but really their attention was all on the
71:24 cardiovascular findings.  So it was getting it
71:25 balanced.
```

ID:            Blake 7201
Page Range:    72:1-72:12

```
72: 1      Q.    Okay.  And every time they asked you
72: 2 a question, your job was to tell them no, Vioxx does
72: 3 not cause heart attacks, and we have the proof,
72: 4 right?
72: 5      A.    Based on Merck Research Labs'
72: 6 assessment.
72: 7      Q.    Correct?
72: 8      A.    That was Merck Research Labs'
72: 9 assessment, yes.
72:10      Q.    So -- and do you track, by the way,
72:11 for the first year the number of media impressions
```
Page 13

```
                              Blake.txt
    72:12 where the Merck message got out?


ID:              Blake 7215
Page Range:      72:15-72:24

    72:15                THE WITNESS:  It's hard to track.  We
    72:16 do sometimes try and track that type.  Certainly for
    72:17 the year 2000, for Vioxx, that would have been very
    72:18 hard because there was so much coverage of the VIGOR
    72:19 study.
    72:20 BY MR. PLACITELLA:
    72:21      Q.    You had never heard that there were
    72:22 at least a million -- a billion media impressions
    72:23 related to Vioxx with Merck's message in the year
    72:24 2000?


ID:              Blake 7301
Page Range:      73:1-73:9

    73: 1                THE WITNESS:  Well, actually, it
    73: 2 wouldn't -- most of the media coverage in 2000 was
    73: 3 around cardiovascular findings from VIGOR, if I
    73: 4 remember correctly.  That's certainly what it felt
    73: 5 like.
    73: 6 BY MR. PLACITELLA:
    73: 7      Q.    A billion impressions, had you ever
    73: 8 heard that?
    73: 9      A.    I've heard that before, yes.


ID:              Blake 7402
Page Range:      74:2-74:5

    74: 2      Q.    In fact, it was the Merck message for
    74: 3 the billion media impressions, whenever asked, that
    74: 4 Vioxx does not cause heart attacks, correct?
    74: 5      A.    That was Merck Research Labs, yes.


Total Length - 00:22:45
```