# EXHIBIT A

ID: Fries Combined

ID: Fries 1108
Page Range: 11:8-14:6

Q. Could you state your name for the jury, please, Doctor.
A. James Franklin Fries.
Q. You are a medical doctor, correct?
A. That's correct.
Q. We're here at Stanford University to take your deposition today. Is this where you're currently employed?
A. That's right.
Q. And what is your current position here?
A. I'm a professor of medicine, emeritus active.
Q. Okay.
And how long have you been a professor of medicine here at Stanford?
A. At one grade or another, a professor since 1971.
Q. Okay.
Do you have a particular specialty?
A. I'm a rheumatologist. I also do work in clinical epidemiology, in aging research and health public policy and in information technology.
Q. Okay.
In terms of your specialty, rheumatology, have you done particular research in regards to NSAIDs?
A. Yes. I should probably give you a little bit of background because it will be important probably for everything that happens.
Q. Sure.
A. 30 years ago, about 30 years ago, I founded ARAMIS, that's A-R-A-M-I-S, the Arthritis, Rheumatism & Aging Medical Information System. And we've tracked some 17,000 people in total from when we get ahold of them until they die or just say good-bye to us in another way. And we follow them for everything that happens to them medically. We get their clinical information, we go to them with questionnaires about health status each six months. We collect information at that time on the drugs that they've taken, the disability level that their arthritis has inflicted on them, the pain they have, their use of medical care services, the drugs they're taking and any side effects that they've had for those drugs, whether they're symptoms side effects or side effects that cause

hospitalizations or that cause death.

We tally these and we write papers with regard to the comparative toxicity of different drugs. So, this is the first chronic disease databank system that has existed. It's also the longest in duration. There are about 1,000 papers that have emerged from it on a series of different subjects. Probably my guesstimate would be around 20 on the

Page 14

subject that we're discussing today, which are side effects of the -- side effects assessment in general and side effects of the nonsteroidal anti-inflammatory drugs in particular, so...

ID: D Fries 1609
Page Range: 16:9-16:15

October 28, 2000, did you have a conversation with Dr. Sherwood?

A. Well, now you're going to have to apologize for my memory of dates and sequences five years ago. Anything that's in the written record I would prefer to refer to than to my memory.

ID: Fries 1704
Page Range: 17:4-17:11

Q. I'm going to go ahead and hand you what's been marked as Plaintiff's Exhibit 1.0176, which is a copy of the letter on Stanford University letterhead addressed to Dr. -- or, I'm sorry, Mr. Ray Gilmartin, and you can feel free to refer to this.

A. Yeah. Thank you.

ID: Fries 1803
Page Range: 18:3-18:15

Q. So, getting back, on October 28, 2000, did you receive a call from Dr. Sherwood?

A. Yes.

Q. Okay.

And at that time, did he identify himself as being with Merck?

A. Yes, I believe so.

Q. And during that conversation, where did you -- where did you receive the phone call?

A. Well, I received that call at home.

ID: Fries 1816

Page Range: 18:16-18:22

Q. Okay.
Had you ever received a call from a pharmaceutical company like that at home before?
A. No.
Q. Did you find that unusual?
A. Yes.

ID: Fries 1902
Page Range: 19:2-19:23

Q. Was it during the week or on a weekend?
A. It was on a Saturday.
Q. On a Saturday. Okay.
What was Dr. Sherwood calling to discuss with you at that time?
A. He was concerned that a doctor, research associate on my staff, Gurkipal Singh, had been giving talks in public which were critical of Merck's Vioxx, and in particular, had emphasized the potential cardiovascular toxicity of Vioxx.
Q. In particular, what was he complaining about, Dr. Sherwood?
A. He believed that the talks in question were unbalanced and that this was something that I, as his immediate supervisor, should know about and take some action. And he also contacted the chairman of the department and the chairman of our division.

ID: Fries 2009
Page Range: 20:9-20:12

What did Dr. Sherwood say at that time? Did he imply to you any consequences if -- or what did he want you to do in regards to Dr. Singh?

ID: Fries 2018
Page Range: 20:18-20:20

A. Yeah. He wanted Dr. Singh to stop making the kinds of statements that he had been making --

ID: Fries 2022
Page Range: 20:22-21:11

A. -- and he wanted, you know, me to assist him in that task.
Q. Okay.
Page 21
And did he indicate to you

that there would be any kind of consequences if you didn't or if Dr. Singh did not?
A. Well, he did, and I wrote up, when I was much closer to the time, some of the things that he said, that Dr. Singh would flame out if he didn't change his behavior and that there would be consequences for Stanford, and he implied that there might be consequences for me.

ID: Fries 2113
Page Range: 21:13-21:23

At that time, did you take that to mean that Stanford or yourself would not be receiving research funds if that didn't stop?
A. Well, that was never stated.
Q. Is that what you --
A. And it's always a question, sort of an implied thing. When you say how would it be bad for Stanford, I guess it would be bad for Stanford if the research funding dried up.

ID: Fries 2212
Page Range: 22:12-23:3

After that conversation with Dr. Sherwood, did you contact Dr. Singh?
A. Yes. I took this the same way that I think anybody should who hears about it. You want to determine if it's true or not. And so I did ask Dr. Singh, and I told Dr. Sherwood that I would do this, that I would ask Dr. Singh what had transpired and I would check out. And if there was action that was required, I would take the action. And I did that.
Q. When you say you "did that," did you actually review the -- or did you
Page 23
talk to Dr. Singh specifically about his presentation?
A. I talked with him about the

ID: Fries 2307
Page Range: 23:7-23:21

the slides? And so I looked at the PowerPoint slides that he had. There were, I don't remember, maybe 30 of them. I counted up the ones which were pro -- much of the talk was on -- much of his talks were on GI NSAID safety in general not connected with a particular product. But there was mention of both the VIGOR trial and the CLASS trial and of celecoxib and of rofecoxib during that

talk. And I counted the slides for rofecoxib and for celecoxib, and there were the same number, and they were both from similar studies and were really quite parallel.

ID: Fries 2409
Page Range: 24:9-25:8

Q. Did you find the presentation to be balanced?

A. It looked to me to be reasonably balanced. You can't tell by looking at a set of slides what someone is saying when they have those slides on. So, I went a little bit further and I checked with three people who had been in the audience of the most offending of these, and none of them were particularly offended or thought it particularly unbalanced.

So, it was a funny situation, because the data that were of interest were on something that would almost automatically unbalance a balanced

Page 25

presentation, because there was negative information on one product of different degrees of certainty, and there wasn't any balancing information. So, if you really were explaining things at that point, one would tend to probably overemphasize or emphasize more the Vioxx data.

ID: Fries 2622
Page Range: 26:22-27:2

When you say the American College of Rheumatology or ACR, when was that? Was that in November of 2000,

Page 27

approximately?

A. It must have been, yes.

ID: Fries 3405
Page Range: 34:5-34:11

You also reference in these -- or during that time of the ACR meeting, did it also come to your attention that other doctors had complaints of Merck contacting either themselves or their bosses in an effort to intimidate them?

ID: Fries 3414
Page Range: 34:14-35:1

THE WITNESS: Yes. It was kind of at that time that the rumor mill was going, and once people started talking about this, there were other people that had similar experiences. And they reported them, and a number of them had the same reaction that I did, that this was a way of influencing academic debate, which was not appropriate and could not continue.

ID: Fries 3520
Page Range: 35:20-36:1

Did you actually talk with Dr. Sherwood about these different allegations prior to writing your letter?
A. Yes. But my recollection is that was a telephone call after the meetings.

ID: Fries 3603
Page Range: 36:3-36:20

Tell me about that telephone call.
A. We'd gone backwards and forwards and got a connection, and then we discussed these issues much as they're laid out there. I put some quotes in that letter that were not recorded quotes, but they were ones that I had remembered from the -- from one discussion.
One ironic one was that he had said that the side effects didn't occur at all, they had internal data to indicate that they didn't occur, but that anyway it was only at high doses. I thought that that was an interesting way to put an affirmation and a denial into the same sentence.

ID: Fries 3709
Page Range: 37:9-37:17

So, after having the phone conversation on October 28, 2000, seeing Dr. Sherwood at the ACR meeting, seeing the VIGOR posters at the ACR meeting, talking with Dr. Sherwood again on the phone, you then wrote this letter on January -- or sent the letter on January 9, 2001, correct?
A. Yes.

ID: Fries 3719
Page Range: 37:19-38:9

And you wrote this letter to Mr. Raymond Gilmartin, correct?
A. Yes.
Q. Had you ever met Mr. Gilmartin before?
A. No.
Page 38
Q. He is the -- or at the time was the Chief Executive Officer of Merck, correct?
A. Yes.
Q. Okay.
Had you ever written a letter to the CEO of a pharmaceutical company before?
A. No.

ID: Fries 3811
Page Range: 38:11-38:14

Had you ever written a letter with these kind of allegations in them to a pharmaceutical company before?
A. No.

ID: Fries 5421
Page Range: 54:21-54:24

The contact that you had from Dr. Sherwood and from Merck in regards to Vioxx, did you feel that was at all appropriate?

ID: Fries 5503
Page Range: 55:3-55:21

THE WITNESS: I felt that belief in the scientific marketplace where you have freedom of expression on all sides without overt intimidation, let alone this kind of thing, really was a threat to academic freedom. And I saw it and phrased my position in terms of the academic freedom issues, not in terms of is it toxic or is it not toxic issues. That was irrelevant to the question that they would come down on people that said something they didn't like. And if everybody did that, we would not have a scientific process. So, I became incensed on academic freedom issues, and that was my real motivating factor.

ID: Fries 5917
Page Range: 59:17-59:23

Let me just very quickly ask you one question backing up.
During the conversation of October 28, 2000 with Dr. Sherwood, did he ever tell you that the data that Dr. Singh was relying upon or presented by Dr. Singh was incorrect?

ID: Fries 6001
Page Range: 60:1-60:2

THE WITNESS: No, I don't believe so.

ID: Fries 6819
Page Range: 68:19-69:15

Why did you write Ray Gilmartin a letter?
A. I was concerned with some internal practices at Merck which I felt infringed on academic freedom, and I felt it was not in Merck's interest to continue those. I attempted to make that case to them, and it concerned, in particular, a lot of allegations around the Vioxx drug.
Q. Had you had some interactions with Merck at this point?
A. No. Prior to the Sherwood call, I had no interactions whatsoever with Merck.
Q. Now, by "Sherwood call," are you talking about Louis Sherwood?
A. Yes.
Q. The Merck vice president?
A. Yes. He was vice president for medical affairs or some such title.

ID: Fries 8012
Page Range: 80:12-81:2

Q. Did you go to a lot of care to make sure it was accurate?
A. Yes.
Q. Did you write it and rewrite it and rewrite it?
A. Yes.
Q. How long did it take you to finally get that in final form?
A. Well, we saw a draft a little while ago which was back in November I think, and then it came out on January 9.
Q. About six weeks?

Page 81
A. So, I'd say six weeks or so, yes.

ID: Fries 8109
Page Range: 81:9-82:5

Q. I want you to focus on that for a minute because I want to ask you, did you get a followup phone call or two from people at Merck after you sent your letter?
A. Yes.
Q. Do you remember anything at all about those conversations and what was said?
A. Yes, a little bit. One was from a vice president who offered to show me any data that I wanted to see. That wasn't my major thing. I knew the data would come out, so, I had other things to do, so, I declined that.
A second one was from Dr.
Page 82
Anstice, and he told the -- of a four-part plan that Merck had to remedy the problem and that they were taking action in terms of changing their internal operations --

ID: Fries 8209
Page Range: 82:9-83:13

Q. -- first of all, there is a David Anstice who is the head at the time of Merck health, the whole Merck health end.
A. Yes.
Q. He's not actually a doctor, though, so when you say Dr. Anstice, you may have assumed he was a doctor --
A. I may have assumed that --
Q. All right.
That's the same David Anstice?
A. It is the same person.
Q. Okay.
Now, David Anstice has testified in this case, and David Anstice
Page 83
has said that he was charged with investigating your letter by Ray Gilmartin.
A. Yes.
Q. Are you aware of that?
A. Well, Dr. Gilmartin said that he was going to do that in his letter to me.
Q. I don't mean to interrupt you, but you call him Dr. Gilmartin, and I know he's the head of all of Merck, but

he wasn't a doctor, either. He's an M.B.A. from Harvard in the business --

ID: Fries 8316
Page Range: 83:16-83:17

THE WITNESS: Yes, I am positive you are correct.

ID: Fries 8901
Page Range: 89:1-89:9

Q. Well, by the way, are you the Dr. Fries who is behind the longest running, largest arthritis study there is, the ARAMIS study?
A. Yes.
Q. How many people in that study?
A. In the various data banks, about 17,000.

ID: Fries 8912
Page Range: 89:12-89:14

Q. How long has that been going on?
A. 30 years.

ID: Fries 8915
Page Range: 89:15-89:23

Q. 30 years. A lot of those people take naproxen?
A. Yes.
Q. Have you written up any papers or anybody else written up any papers from the largest, longest running study that says naproxen is five times better than aspirin at stopping heart attacks?

ID: Fries 9001
Page Range: 90:1-92:8

THE WITNESS: Our research is not -- the data banks aren't set to answer that specific question. But we have studied the general overall toxicities, and certainly nothing jumped out with regard to cardiovascular events being protective. Internally at what was then Syntex, who had developed naproxen --
BY MR. LANIER:
Q. Syntex is a company?
A. Syntex was a company which

is now, if I'm correct, it has, in a series of big fish eating littler fish, arrived as a part of Pfizer.

Q. Oh, okay. All right.

So, the company that started naproxen, go ahead.

A. Yes, yes.

Q. What happened with them and naproxen?

A. Well, Syntex. Well, they were looking for indications of it, and

Page 91

one obvious indication was that you could prevent heart attacks, because the then theory of how aspirin prevented heart attacks, which was known, was that it was an action on the platelets. And the action of the platelets by aspirin is irreversible, so that for the entire life of the platelet, it --

Q. Will never clump.

A. -- will never clump. Okay. And naproxen has a similar effect on the platelet, but it lasts only while the drug is still circulating in the bloodstream, not for the life of the platelet. So, it's called reversible inhibition of cyclooxygenase in the platelets. Okay.

But nevertheless, because it's longer acting, one could make the case that it would prevent heart attacks, and so they did a lot of internal speculation because it would be a big market if they could make the case that it prevented heart attacks, and they

Page 92

never could make that case. And the studies both before and after, if you take them in the aggregate, indicate that this is not the case.

Q. Naproxen is not the --

A. It does not prevent heart attacks to any degree which is measurable in any studies.

ID: Fries 9421
Page Range: 94:21-95:10

Q. In fact, when he said -- when you specifically told him -- or did you specifically tell him that you had never heard of harassment of

Page 95

investigators through their institutions before this, what was his response to you?

A. Well, it was clear that his response was that he believed this to be an appropriate action. And at the closing sentence of that telephone conversation, I said, "Lou, you ought to

be ashamed of yourself," and then hung up.

ID: D Fries 9907
Page Range: 99:7-99:7

Q. Good afternoon, Dr. Fries.

ID: D Fries 9913
Page Range: 99:13-100:4

I want to follow up on questions about your reasons for writing the letter to Mr. Gilmartin. I think you said that you wanted to deal with some things in a private way?

A. That's right. I started, and I tried to indicate in the letter my great approval of Merck as a company, and I followed it over the years with, you know, top five respected companies in the United States and so forth. And I respected a lot of the things that they

Page 100

did, respected their previous chairman immensely, who I now know a little bit, Roy Vagelos, who did extraordinary things for Merck from the scientific side.

ID: D Fries 10021
Page Range: 100:21-101:13

Q. You received a letter from Mr. Gilmartin in response to your letter?

A. Yes.

Q. What was your reaction to

Page 101

receiving that letter?

A. Well, I think any of us -- I was pleased that rather promptly a response had come which had taken the letter seriously and which had promised some action. I recognized that it was -- that I was going to be running into damage control types of activities, so, I interpreted that and subsequent conversations as having in part some degree of damage control. People wanted me to be happy with the actions that were being taken.

ID: D Fries 10220
Page Range: 102:20-103:2

Were you satisfied with Merck's response to your concerns?

A. Yes. And I thought about -- I mean, they didn't say specifically what they were going to do with Dr. Sherwood,

103: Page 103
103: 1 but they said that something was going to
103: 2 happen.

ID: D Fries 10406
Page Range: 104:6-104:24

104: 6 Q. Sir, did you receive the
104: 7 data relating to Vioxx that you had
104: 8 requested?
104: 9 A. I didn't request data per se
104:10 for me. I requested the data be made
104:11 available to others. I wasn't
104:12 specifically studying --
104:13 Q. Were you satisfied that
104:14 Merck made that data available to others?
104:15 A. I believe so, yes.
104:16 Q. Is it fair to say then that
104:17 as of about March of 2001, as far as you
104:18 were concerned, the matter was closed?
104:19 A. My job here was done.
104:20 Q. Dr. Fries, I take it that
104:21 Merck chose not to rebut the points in
104:22 your letter, but, rather, to address your
104:23 concerns. Is that a fair assessment?
104:24 A. That's true.

ID: D Fries 10504
Page Range: 105:4-105:5

105: 4 Q. Yes?
105: 5 A. Yes.

ID: D Fries 10524
Page Range: 105:24-106:9

105:24 Q. Dr. Fries, I want to talk to
106: Page 106
106: 1 you a little bit about, you referred to
106: 2 an investigation that you did into things
106: 3 that you had heard in the rumor mill. Do
106: 4 you remember that?
106: 5 A. Yes.
106: 6 Q. I take it that you didn't
106: 7 have firsthand knowledge about the
106: 8 matters that you've testified about in
106: 9 your letter. Is that fair to say?

ID: D Fries 10612
Page Range: 106:12-107:7

106:12 THE WITNESS: I believe
106:13 that's probably true. That was
106:14 one reason I tried to be as
106:15 careful and as balanced as I
106:16 could, because I was getting
106:17 dangerously toward what I would
106:18 even call hearsay if I got too
106:19 far.

106:20 BY MR. RABER:
106:21 Q. And, of course, you can't be
106:22 expected to have firsthand knowledge of
106:23 all these things with the different
106:24 doctors that you were writing about,
107: Page 107
107: 1 right?
107: 2 A. That's right.
107: 3 Q. And is it fair to say that
107: 4 certain doctors and Dr. Singh told you
107: 5 things, and then you relayed that
107: 6 information to Merck?
107: 7 A. Yes.

ID: D Fries 11511
Page Range: 115:11-115:17

115:11 Let me go back to your
115:12 letter. You've told us that you relied
115:13 on what you were told by doctors and Dr.
115:14 Singh. Did you talk to any third parties
115:15 to confirm or verify what you had been
115:16 told by any of those doctors?
115:17 A. No.

ID: D Fries 14906
Page Range: 149:6-149:14

149: 6 Q. And you talk about in your
149: 7 letter, it was your experience that
149: 8 certainly your mindset in 2001 was that
149: 9 the COX-2 inhibitors looked like a
149:10 significant "medical advance" for dealing
149:11 with the serious GI problems from
149:12 traditional pain relievers?
149:13 A. Yes. I even took credit for
149:14 having created them.

ID: D Fries 15006
Page Range: 150:6-150:6

150: 6 Q. Sir, at the time --

ID: D Fries 15009
Page Range: 150:9-150:18

150: 9 Q. -- though, if you look at
150:10 Page 3 of your letter, in the middle of
150:11 the page you say, "These drugs should on
150:12 balance, save a substantial number of
150:13 lives."
150:14 A. Yeah, that was actually my
150:15 mindset. That's fair.
150:16 Q. Okay.
150:17 Back in 2001.
150:18 A. Yes.

ID: D Fries 15504

Page Range: 155:4-155:16

Q. Dr. Fries, we've put in front of you Defense Exhibit 245. Can you identify this?
A. Yes. We've spoken to this before. This is a letter from Mr. Gilmartin to me.
Q. Dated January 23rd, 2001?
A. Yes.
Q. And I think this is the letter that you've described as a "thoughtful" and positive letter?
A. Yes, it was a response to my letter of January 9th.

ID: D Fries 15604
Page Range: 156:4-156:17

Q. Dr. Fries, I'm putting in front of you a document marked as Defense Exhibit 264. Can you tell us what that is?
A. It's a letter to me from David Anstice, the copy to Doug Greene.
Q. Dated February 16th, 2001?
A. February 16th, 2001.
Q. And is this the letter that came with the data that you received from Merck?
A. Yes. I don't remember receiving any data. There must have been some. There are attachments noted here.

ID: D Fries 15705
Page Range: 157:5-158:6

And by this time, there had been an Advisory Committee concerning Vioxx and Celebrex. Do you recall that in February of 2001?
A. Yeah. As I say, reconstructing these dates and what order they are is really hard for me, but there was one roughly around there. Yeah. So, these data had already in that interval been, I guess, released pretty generally.
Q. And have you been on FDA Advisory Committees before?
A. Yes.
Q. And has it been your experience that data from studies before the Advisory Committee are discussed at those meetings?
A. The data are discussed, yes, at the meeting. I don't recall the exact details. Sometimes it's long, and
Page 158
sometimes it's short.
Q. Has it been your experience that members of FDA Advisory Committees

are respected scientists in the relevant fields?

A. Yes, for the most part.

ID: Fries 16813
Page Range: 168:13-168:22

Q. Are you familiar, just in your 40 years of medicine, with the idea of drug companies choosing to neutralize and discredit doctors?

A. I was amazed earlier when we saw something that said somebody was going to control me as part of -- that's hard to do. So, no, I've never seen anything like this. This is really unprecedented in my experience.

ID: D Fries 17023
Page Range: 170:23-171:6

Q. You believe in safety first?

A. No. I believe that you have
Page 171
a balance with pharmaceutical treatments between the good and the harm that they do. Things that do a whole lot of good, they can do quite a bit of harm. And you still would say that on balance, they're good drugs. So, it's a balance issue.

Total Length - 00:23:39