# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX** | ) **MDL NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | ) |
| | ) **SECTION: L** |
| **THIS DOCUMENT RELATES TO ALL** | ) |
| **CASES** | ) **JUDGE FALLON** |
| | ) **MAG. JUDGE KNOWLES** |

## MERCK'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENAS

# TABLE OF CONTENTS

Page

BACKGROUND ............................................................................................................................ 3

ARGUMENT ................................................................................................................................. 7

I.   THE MATERIALS UNDERLYING THE MARTIN REPORT ARE
     PROTECTED FROM DISCOVERY UNDER THE WORK-PRODUCT
     DOCTRINE ........................................................................................................................ 7

II.  THE THIRD-PARTY DISCOVERY SOUGHT BY PLAINTIFFS IS ALSO
     PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE ...................................... 12

III. RELEVANT MATERIALS CREATED BY OR IN THE POSSESSION OF
     DEBEVOISE'S PUBLIC RELATIONS CONSULTANTS ARE SUBJECT TO
     THE SAME PROTECTION AS MATERIALS CREATED BY ATTORNEYS ........... 13

CONCLUSION ............................................................................................................................ 18

**Page**

## Cases

*Calvin Klein Trademark Trust v. Wachner,*
198 F.R.D. 53 (S.D.N.Y. 2000) ........................................................................................ 14, 16

*Conforti & Eisele, Inc. v. Division of Bldg. & Constr., Dep't of Treasury,*
170 N.J. Super. 64 (Law Div. 1979) ................................................................................. 16, 17

*Cornelius v. Consolidated Rail Corp.,*
169 F.R.D. 250 (N.D.N.Y. 1996) ........................................................................................... 10

*Fox v. Taylor Diving & Salvage Co.,*
694 F.2d 1349 (5th Cir. 1983) ................................................................................................. 9

*Haugh v. Schroder Investment Management North America Inc.,*
2003 WL 21998674 (S.D.N.Y. 2003) ...................................................................................... 15

*In re Grand Jury Subpoenas,*
265 F. Supp. 2d 321 (S.D.N.Y. 2003) .............................................................................. 13, 17

*In re Int'l Sys. and Controls Corp. Sec. Litig.,*
693 F.2d 1235 (5th Cir. 1982) ................................................................................................ 11

*Metalsalts Corp. v. Weiss,*
184 A.2d 435 (N.J. Super. Ch. Div. 1962) .............................................................................. 12

*Stanley v. Trinchard,*
2005 WL 399460 (E.D. La. Feb. 16, 2005) .............................................................................. 9

*United States v. Kovel,*
296 F.2d 918 (2d Cir. 1961) .................................................................................................... 17

*Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.),*
200 F.R.D. 213 (S.D.N.Y. 2001) ..........................................................................14, 16, 17

*Weber v. Paduano,*
2003 WL 161340 (S.D.N.Y. 2003) .......................................................................................... 10

Plaintiffs' Motion to Compel the Honorable John S. Martin, Jr. ("Judge Martin"),

Debevoise & Plimpton LLP ("Debevoise"), Burson-Marsteller LLP ("Burson-Marsteller") and

Ogilvy Public Relations Worldwide, Inc. ("Ogilvy") to comply with third-party subpoenas

related to their work in connection with the Martin Report repeats many of the same arguments

that plaintiffs have already placed before the Court in connection with Merck's Motion for a

Protective Order – *i.e.*, that the materials underlying the Martin Report are not subject to

protection under either the attorney work-product doctrine or the attorney-client privilege. As

Merck explained in its prior briefing in support of its motion for a protective order covering these

materials (incorporated herein and attached as Exs. 1 and 2), the Martin Report is the

culmination of an investigation that was irrefutably conducted for litigation purposes and thus

entitled to work-product protection, and plaintiffs have no unique need for these materials that

would justify vitiating that protection. (*See* Mem. In Supp. Of Merck's Motion For Protective

Order at 5-15 (Ex. 1); Merck's Reply Mem. at 2-10 (Ex. 2).) Moreover, to the extent any

materials reveal the substance of Debevoise's communications with Merck employees,

executives, officers and directors, they are also protected by the attorney-client privilege. (*See*

Mem. In Supp. Of Merck's Motion For Protective Order at 15-17; Merck's Reply Mem. at 10-

12.)

The main twist in plaintiffs' latest submission – that any materials created by or shared

with public relations consultants retained by Debevoise are discoverable – is no basis for

granting them access to any of these materials. As set forth below, any responsive materials in

the possession of Burson-Marsteller, a public relations consultant retained by Debevoise to

provide the law firm with communications advice related to the Report, are protected by the

work-product doctrine and/or attorney-client privilege because the communications consultants were acting under the direction of attorneys.

## BACKGROUND

As Merck has previously explained, Merck's Board of Directors formed a Special Committee ("the Special Committee") to investigate the conduct of senior Merck management with regard to Vioxx in November 2004 – shortly after receiving a demand from shareholders that the Board take legal action against any directors or officers responsible for any corporate wrongdoing related to Vioxx (*see* Letter from Jeffrey Abraham to the Merck Board of Directors, Oct. 29, 2004 ("Demand Letter") (attached as Ex. 3)) and after learning that regulatory agencies were investigating the Company's conduct with respect to Vioxx. The Special Committee retained Judge Martin of Debevoise to conduct that independent investigation and to report regularly to the Special Committee regarding their findings. (*See* Report of the Honorable John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx ("Martin Report") at 1-2 (relevant portions attached as Ex. 4).)

The Special Committee tasked Debevoise with investigating corporate executive conduct with regard to Vioxx and presenting its conclusions to the Special Committee, so that the full Board could then make an informed decision concerning potential shareholder and regulatory litigation. (*See* Declaration of Dr. William G. Bowen ("First Bowen Decl.") ¶ 8, Oct. 13, 2006 (attached as Ex. 5); Declaration Of Debbie Todres In Support Of Merck & Co., Inc.'s Opp. To Pls.' Mot. To Compel Compliance With Third Party Subpoenas ("Todres Decl.") ¶ 3, Dec. 8, 2006 (attached as Ex. 6).) The investigation conducted by Judge Martin was intended to be, and was carried out as, a wholly independent review. As William Bowen, chair of the Special

3

Committee, has attested, "the Special Committee commissioned a thorough and completely independent investigation and a candid assessment of whether members of senior management had acted with integrity, or breached their fiduciary duties to the Company in connection with the development and marketing of Vioxx." (Declaration Of Dr. William G. Bowen In Opp. To Pls.' Mot. To Compel Compliance With Third Party Subpoenas And In Further Support Of Merck & Co. Inc.'s Mot. For A Protective Order Prohibiting Discovery Of Attorney Work Product And Privileged Communications Related To The Martin Report ("Second Bowen Decl.") ¶ 3, Dec. 8, 2006 (attached as Ex. 7).) While Merck paid the costs of Judge Martin's investigation, this payment "in no way influenced the manner in which the investigation was conducted." (*Id.* ¶ 4.) Instead, Merck's Board "instructed Merck's management to cooperate fully with Judge Martin and Debevoise in terms of making witnesses available, which was the extent of Merck management's involvement until the investigation was complete." (*Id.*)

In order to advise the Special Committee regarding the possible public relations impact of its investigation and Report, Debevoise retained Howard Paster, Executive Vice President for Public Relations/Public Affairs of WPP, a global media communications company that is the parent corporation of Burson-Marsteller, to act as an "advisor" to counsel. (*See* April 13, 2006 Letter from Mark P. Goodman to Howard G. Paster ("Retention Letter") at 1 (attached as Ex. 8).) According to Mr. Paster, he was retained to provide the "attorneys at Debevoise with advice concerning the form of the Martin Report and other publication considerations, including probable public reaction to relevant information so that Debevoise could provide legal advice to the Special Committee of the Board of Directors of Merck & Co., Inc." (*See* Declaration of Howard G. Paster In Support Of Merck & Co., Inc.'s Opp. To Pls.' Mot. To Compel Compliance With Third Party Subpoenas ("Paster Decl.") ¶ 7, Dec. 8, 2006 (attached as Ex. 9).) Debevoise

was Mr. Paster's "client for the purposes of this engagement, and all work performed by [Mr. Paster] in connection with this engagement" was to be done at Debevoise's "request" and "direction." (Retention Letter at 1.) Mr. Paster has confirmed that he was "retained by Debevoise to act as their agent and advisor in connection with their internal investigation" (Paster Decl. ¶ 5), and that all of his substantive work "was performed under the direction and at the request of Debevoise" (id. ¶ 6).

Under the terms of the parties' retention agreement, Mr. Paster acted as an "agent" of Debevoise while performing his work in connection with Judge Martin's investigation and report. (Retention Letter at 2 ("People who act as our consultants are considered to be 'agents' of our firm, which has a professional obligation to preserve the confidences and communications of our clients.").) As a result, all of the work done by Mr. Paster, as well as all communications between Mr. Paster and the attorneys at Debevoise, were subject to strict confidentiality. (Id.) Moreover, the parties' retention agreement explicitly states that Debevoise "expect[ed] that any confidential communications between [Mr. Paster] and [Debevoise be] protected both as work product and as an attorney-client communication." (Id.) In order to "ensure that [Mr. Paster's] assistance to [Debevoise] is fully protected from disclosure," Debevoise instructed Mr. Paster not to "prepare any written materials unless [Mr. Paster] first discussed doing so" with a Debevoise attorney. (Id.) In addition, all materials prepared by Mr. Paster, after consulting with Debevoise, were labeled "PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT." (Id.) Moreover, the agency agreement between Debevoise and Mr. Paster explicitly provided that:

> If access to or disclosure of any of the materials in your possession relating to this engagement is sought by a third party, [Mr. Paster] agree[s] promptly to notify [Debevoise], tender to [Debevoise]

5

> responsibility for responding to such a request and cooperate with
> [Debevoise] concerning [Debevoise's] response.

(*Id.*)

In connection with his engagement as an agent of Debevoise, Mr. Paster enlisted "employees of Burson-Marsteller, a WPP company, to provide support." (Paster Decl. ¶ 8.) Mr. Paster informed all Burson-Marsteller employees working on the project that they were subject to the strict agency and confidentiality obligations included in Mr. Paster's retention agreement. (*Id.*)[1]

Judge Martin and Debevoise completed their investigation of the issues concerning the conduct of senior management in August 2006. (*See* Second Bowen Decl. ¶ 8.) Debevoise presented the Martin Report to the Special Committee, which adopted the Report and its Appendices on August 30, 2006. (*Id.*) The Special Committee decided to release the Martin Report to the public one week later on "the first business day that public release could be effected." (*Id.* ¶ 9.)

On September 13, 2006, the PSC served deposition notices and subpoenas on Judge Martin, Debevoise, Burson-Marsteller, and Ogilvy. Each of these parties responded to plaintiffs' requests, explaining that, as set forth in Merck's Motion for a Protective Order, the documents and testimony requested were protected from discovery as attorney work product and privileged attorney-client communications. (*See* Pls.' Exs. 5, 6, 7.)

---

[1]      Ogilvy, the other public relations entity from which plaintiffs seek discovery, did not perform any communications consulting services with regard to the Martin Report and thus possesses no responsive documents. (*See* Oct. 17, 2006 Letter from Jesse B. Schneider, Counsel to Ogilvy PR, to Christopher V. Tisi, at 6 ("After performing a diligent search of its records, Ogilvy PR represents that it does not have any documents responsive to the Subpoena.") (attached as Ex. 10).)

**ARGUMENT**

As set forth in Merck's prior briefing, plaintiffs' efforts to obtain discovery with regard to the Martin Report should be prohibited because: (1) they seek access to the protected work product of outside counsel as to which no waiver has been made, and for which plaintiffs can make no showing of "substantial need"; and (2) plaintiffs' requests demand disclosure of communications protected from disclosure under the attorney-client privilege. (*See* Merck's Mot. For Protective Order; Merck's Reply.) Additionally, as explained below, Debevoise's disclosure of the draft report and certain other work product to its retained communications consultants did not waive the protection afforded those documents. Moreover, any relevant documents created by or in the possession of Debevoise's public relations consultants are similarly protected under the work-product doctrine and the attorney-client privilege. For these reasons, plaintiffs are not entitled to discovery of the documents and information they seek in the third-party subpoenas.

## I.  THE MATERIALS UNDERLYING THE MARTIN REPORT ARE PROTECTED FROM DISCOVERY UNDER THE WORK-PRODUCT DOCTRINE.

The third-party subpoenas issued to Judge Martin, Debevoise, Burson-Marsteller and Ogilvy, like the discovery sought from Merck itself, request production of confidential documents related to the investigation and preparation of the Martin Report, including attorney interview notes and memoranda developed in preparation of the Report, prior drafts of the Report, and other protected communications regarding counsel's investigation of executive conduct at Merck. As set forth in Merck's prior briefing, the materials underlying the Martin Report qualify for work-product protection because the "primary purpose" for their creation was related to threatened shareholder and regulatory litigation. (Merck's Mot. for Protective Order at 7-9.)

7

Merck has easily satisfied this standard for the reasons set forth in its prior briefing, and plaintiffs do not present a single shred of new evidence in support of their contention that the Special Committee's retention of Judge Martin was conducted for publicity, rather than litigation, purposes. (Pls.' Mem. at 7.) For example, there is no evidence to support plaintiffs' suggestion that Judge Martin and Debevoise did not act independently when conducting their investigation of executive conduct. (Pls.' Mem. at 16.) In fact, as explained above, Dr. Bowen has affirmatively testified that the Special Committee "understood that independence was essential in order to satisfy [Merck's] responsibilities to shareholders and the consuming public and for the investigation to have credibility." (Second Bowen Decl. ¶ 3; *see also* Todres Decl. ¶ 2 ("The purpose of the investigation was to pursue thoroughly and objectively all allegations that went to the integrity of senior management in the Vioxx matter.").)

Nor is there evidence to support plaintiffs' suggestion that Merck timed the release of the Report to affect products liability trials. (Pls.' Mem. at 6.) To the contrary, Dr. Bowen has affirmatively stated that "[t]he timing of the release of the Martin Report was not influenced in any respect by Merck's products liability litigation schedule." (Second Bowen Decl. ¶ 11.) Instead, Dr. Bowen has testified that the Special Committee decided to release the Martin Report on Wednesday, September 6, 2006, because the Committee "wanted to release the Report as soon as was practicable after its completion and adoption," and September 6 was "the first business day that public release could be effected." (Second Bowen Decl. ¶ 9.) In addition, both Dr. Bowen and Judge Martin had out-of-town commitments beginning September 7, 2006, making September 6 the only feasible date to release the Report. (*Id.* ¶ 10.)

Plaintiffs' latest briefing also fails to refute Merck's showing that the Company did not waive work-product protection by disclosing Judge Martin's final conclusions to the public.

(Merck's Mot. For Protective Order at 9-11.)  As Merck has previously explained, the cases relied upon by plaintiffs in support of their waiver argument do not support their position.  (*See* Merck's Reply at 7.)  While plaintiffs cite a few new cases in support of their waiver argument here, those cases merely confirm Merck's argument that extra-judicial disclosure of the Martin Report does not compel disclosure of the underlying attorney work product.  For example, in *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir. 1983) (Pls.' Mem. at 24 n.16), the court held that work-product protection over communications between an attorney and expert witness "was extinguished when the attorney himself requested the witness to disclose the information" in court and "made no objection when it was offered."  *Id.*  In this case, however, neither the Martin Report nor the materials underlying the Report have been put at issue in products liability trials.  Moreover, in *Stanley v. Trinchard*, No. Civ. A. 02-1235, 2005 WL 399460, at *3 (E.D. La. Feb. 16, 2005) (Pls.' Mem. at 24 n.16), the court actually found that a party *did not* waive work-product protection by disclosing attorney materials to a third party. According to the court, documents created by a party's attorney, which had been shared with individuals outside the litigation who were pursuing similar claims in other jurisdictions, were still subject to work-product protection.  *Id.*  Specifically, the court held that "[t]he work-product protection for the documents authored by [a party] or his counsel protects those documents from discovery whether they are sought in this litigation from" the party himself or the third-parties with whom the documents were shared.  *Id.*  Thus, plaintiffs are still unable to point to even one case that supports their position that Merck waived work-product protection over the attorney materials created in connection with Judge Martin's investigation.

In addition, plaintiffs' latest brief still fails to show that they have a substantial need for the materials at issue, given that the materials were not created in relation to the instant litigation

9

and have not been referred to or admitted in any products liability suits. Once again, the new cases plaintiffs cite in support of this argument are no more persuasive than the cases cited in their original briefing. For example, in *Weber v. Paduano*, No. 02 Civ. 3392(GEL), 2003 WL 161340 (S.D.N.Y. Jan. 22, 2003) (Pls.' Mem. at 30), the court found that insurer reports regarding the cause of a fire *directly at issue in the litigation* did not constitute work product in the first place, but if they had, plaintiff would be entitled to discovery because the reports "contain information that is *essential* to her theory of why the fire occurred and why the defendants are responsible." *Id.* at *14 (emphasis added). *Cornelius v. Consolidated Rail Corp.*, 169 F.R.D. 250 (N.D.N.Y. 1996) (Pls.' Mem. at 30) is similarly inapposite. There, the court found that a plaintiff-employee alleging violations of the Federal Employers' Liability Act had substantial need to discover a list of all other employees who had previously filed similar claims against the employer because the information was *directly relevant* to the issue of notice. *Id.* at 252. Here, in contrast to *Weber* and *Cornelius*, the Martin Report is not even relevant, let alone essential, to plaintiffs' products liability claims. As Merck previously explained, it has not put the existence or conclusions of the Martin Report at issue in products liability cases and does not intend to do so. Thus, while plaintiffs may wish to "poke holes in the Martin Report and to explore the good-faith conduct of the investigation," such a diversion would not in any way advance the products liability litigation. (Pls.' Mem. at 29.)

Moreover, even if plaintiffs could prove substantial need for the materials underlying the Martin Report, plaintiffs would face no "undue burden" in obtaining the substantial equivalent of this information themselves and thus would still not be entitled to the work-product materials. Unable credibly to argue that they have had no opportunity to obtain information from the individuals interviewed during Judge Martin's investigation – a showing they could not make

10

insofar as so many of those individuals have already been deposed in this litigation – plaintiffs argue instead that it would impose substantial hardship for them to recreate the Martin investigation.  According to plaintiffs, they cannot be expected to conduct an investigation that "transpired over the course of 20 months and cost in excess of $22 million dollars."  (Pls.' Mem. at 30.)  However, plaintiffs have no need to reconstruct the investigation for the reasons previously stated – *i.e.*, the credibility of the Report is not at issue in the products liability litigation.  Furthermore, the case on which plaintiffs rely, *In re Int'l Sys. and Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1241 (5th Cir. 1982) (Pls.' Mem. at 30), does not support their argument. There, the Fifth Circuit actually declined to order production of work-product materials related to an investigation conducted by the defendant that cost approximately $1.5 million, noting that the "plaintiff may be able to discover much of this information at much lower expense to itself."  *Id.* The same is true here.

Finally, plaintiffs do not even attempt to refute Merck's showing that, regardless of whether plaintiffs can show "substantial need" and "undue hardship," the majority of the materials in question are subject to almost absolute protection because they reflect the Debevoise attorneys' opinion work product.  *See In re Sealed Case*, 676 F.2d 793, 809-10 (D.C. Cir. 1982) ("to the extent that work product reveals the opinions, judgments, and thought processes of counsel, it receives some higher level of protection, and a party seeking discovery must show extraordinary justification").  As Debbie Todres of Debevoise has stated in her sworn declaration, the documents sought "reflect the internal thought processes, opinions and mental impressions of Debevoise lawyers concerning the legal assessment of good faith."  (Todres Decl. ¶ 8.)  Thus, even a showing of "substantial need" would not entitle plaintiffs to discovery of such materials.

11

In short, as Merck has explained in its prior briefing, the materials plaintiffs seek are entitled to work-product protection because they were created in anticipation of litigation and are not essential to the preparation of plaintiffs' products liability cases, and because Merck did not waive work-product protection by publishing the Martin Report.

## II.   THE THIRD-PARTY DISCOVERY SOUGHT BY PLAINTIFFS IS ALSO PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.

As explained in Merck's prior briefing, the documents underlying the Martin Report that reveal the substance of Debevoise's communications with Merck employees, executives, officers and directors, and former employees concerning matters within the scope of their employment are subject to protection not only as work product, but also as privileged attorney-client communications. (*See* Merck's Mot. For Protective Order at 15-17; Merck's Reply at 10-12.)

While plaintiffs again argue that the attorney-client privilege is inapplicable here because Judge Martin was motivated by "business as opposed to legal purposes" (Pls.' Mem. at 17), plaintiffs present no new, persuasive support for their claim. Specifically, plaintiffs' reliance on *Metalsalts Corp. v. Weiss*, 184 A.2d 435 (N.J. Super. Ch. Div. 1962) (Pls.' Mem. at 17) is misplaced. In *Weiss*, the court found that an investigation conducted by inside counsel for the sole purpose of "procuring [ ] sufficient facts . . . to warrant [the] discharge [of] an employee" was not protected by privilege. *Id*. at 439. However, in reaching that conclusion, the court specifically found that the attorney "was not undertaking the investigation as part of *any* litigation then pending between the parties, nor was he being called upon to render *legal* advice." *Id*. at 440 (first emphasis added). By contrast, in this case, the uncontested record establishes that Judge Martin was retained by the Special Committee "to conduct a comprehensive investigation of the actions of Merck's senior management . . . and *to provide legal advice* to the Special Committee concerning threatened shareholder litigation and on-going regulatory

12

investigations." (First Bowen Decl. ¶ 8 (emphasis added); *see also* Todres Decl. ¶ 4 ("As part of our mandate, Debevoise provided legal advice to the Special Committee with regard to the derivative litigation.").)

Nor does plaintiffs' latest briefing add anything to their argument that Merck waived attorney-client privilege over these communications by publishing the final version of the Martin Report itself. (Pls.' Mem. at 20.) As explained in Merck's prior briefing, under New Jersey law, a party does not waive protection of communications made during a privileged investigation merely by disclosing the eventual *conclusions* reached as a result of that investigation. (*See* Merck's Mot. For Protective Order at 16-17; Merck's Reply at 11-12.) Plaintiffs' claim that Merck's "voluntary disclosure of purportedly privileged material . . . is inconsistent with an assertion of privilege" (Pls.' Mem. at 22 n.14) misses the point. The Martin Report, which summarizes the final conclusions reached by Judge Martin based upon his investigation, does not contain any privileged information. Accordingly, plaintiffs' argument that they are entitled to all of the communications underlying the Report based on a "subject matter" waiver theory (Pls.' Mem. at 21) is without basis. For this reason too, plaintiffs cannot meet their burden of proving that they are entitled to the privileged communications that underlie the Martin Report.

## III.   RELEVANT MATERIALS CREATED BY OR IN THE POSSESSION OF DEBEVOISE'S PUBLIC RELATIONS CONSULTANTS ARE SUBJECT TO THE SAME PROTECTION AS MATERIALS CREATED BY ATTORNEYS.

The main new argument advanced by plaintiffs in their latest briefing is the claim that, even if the majority of the materials underlying the Martin Report are subject to work-product and attorney-client protection, any documents created by or shared with Debevoise's public relations advisors fall outside that protection and are thus discoverable. (Pls.' Mem. at 28.) Once again, however, plaintiffs' arguments are refuted by the relevant caselaw, which recognizes that material shared by a law firm with public relations consultants *does* merit attorney-client and

13

attorney work-product protection. *See In re Grand Jury Subpoenas Dated March 24, 2003*, 265
F. Supp. 2d 321, 326 (S.D.N.Y. 2003) ("privilege in appropriate circumstances extends to
otherwise privileged communications that involve persons assisting the lawyer in the rendition of
legal services").

*First*, materials created by or shared with a public relations agency advising a law firm to
assist the law firm in its litigation-related work are protected as attorney work product. *See, e.g.*,
*Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.)*, 200 F.R.D. 213 (S.D.N.Y.
2001). In *In re Copper Mkt. Antitrust Litig.*, for example, the court rejected plaintiffs' motion to
compel the production of documents in the possession of a public relations firm retained by
defendants to provide consulting services regarding "issues relating to publicity arising from
high profile litigation" on both work product and privilege grounds. *Id.* at 215. Because the
record in that case indicated that the materials at issue were "prepared in collaboration with
[defendant's] counsel . . . in the context of the litigation," and the public relations "services were
provided initially because of the prospect of [regulatory] investigation and then because of the
actual litigation which ensued thereafter," the court found that work-product protection clearly
applied. *Id.* at 221. In so holding, the court acknowledged that "[o]nce it is established that a
document was prepared in anticipation of litigation, work-product immunity protects documents
prepared by or for a representative of a party, including his or her agent." *Id.*

Similarly, in *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y.
2000), the court held that an attorney's assertion of work-product protection extends to those
materials provided to "a public relations consultant whom he has hired and who maintains the
attorney's work-product in confidence." *Id.* The court explained that "[t]his is especially so if
. . . the public relations firm needs to know the attorney's strategy in order to advise as to public

14

relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to
whether or not to take a contemplated step in the litigation itself and, if so, in what form." *Id.*;
*see also Haugh v. Schroder Investment Management North America Inc.*, No. 02 Civ. 7955 DLC,
2003 WL 21998674, at *5 (S.D.N.Y. Aug. 25, 2003) (holding that work-product protection
extends to cover communications sent to a public relations consultant engaged by party's counsel
because the documents "were all prepared by a party, her agent, attorney or consultant in
anticipation of litigation").

That is precisely the case here. As the retention agreement between Debevoise and Mr.
Paster makes clear, the public relations consultants were retained to provide "attorneys at
Debevoise with advice concerning the form of the Martin Report and other publication
considerations, including probable public reaction to relevant information so that Debevoise
could provide legal advice to the Special Committee of the Board of Directors of Merck & Co.,
Inc." (*See* Paster Decl. ¶ 7.) Specifically, Burson-Marsteller needed information surrounding
the investigation and preparation of the Martin Report in order to advise Debevoise regarding the
manner of the public release of the Martin Report and the necessary communications to
accompany such release. Similarly, Debevoise needed the guidance provided by Mr. Paster to
advise the Special Committee regarding the statements that should accompany the Report and
how the Board's responses to likely questions by the press could affect the litigation purposes of
the Martin investigation.

Moreover, Burson-Marsteller maintained Debevoise's work product in strict confidence.
As set forth above, both Mr. Paster and Burson-Marsteller worked as "agents" of Debevoise, and
Debevoise "expect[ed] that any confidential communications between" the law firm and its
public relations agents would be "protected both as work product and as an attorney-client

15

communication." (Retention Letter at 2.)  Finally, Mr. Paster was instructed not to create any

materials without first consulting with Debevoise, and to label any materials he did create as

"PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT." (*Id.*)  As a result,

just as in *In re Copper Mkt. Antitrust Litig.* and *Calvin Klein*, the materials produced by and

shared with Burson-Marsteller relating to Judge Martin's investigation and Report are subject to

work-product protection.

   ***Second***, to the limited extent that the documents in Burson-Marsteller's possession reveal

the substance of any communications between Debevoise – or Burson-Marsteller acting as

Debevoise's agent – and Merck employees, executives, officers and directors, these documents

are also subject to protection as privileged attorney-client communications. *See Conforti &*

*Eisele, Inc. v. Div. of Bldg. & Constr., Dep't of Treasury*, 170 N.J. Super. 64, 69 (Law Div.

1979).  In *Conforti*, the court found that an engineering firm retained by a party's lawyer was an

"agent for the purpose of applying the attorney-client privilege." *Id.*  The court based its

decision on the fact that the "attorney-client privilege, set out in N.J.S.A. 2A:84A-20, protects

not only communications between an attorney and his client but also extends to communications

made to any agent of the attorney." *Id.* at 67.  According to the court,

> [T]he policy behind extending the attorney-client privilege to an
> agent of the attorney should apply regardless of the capacity in
> which the agent acts.  The policy behind the privilege is to promote
> full and free discussion between a client, his attorney and the
> attorney's agents in order to prepare one's case.  To further that
> policy, the privilege should enable a client to take appropriate
> action to protect such discussions from disclosure to his adversary.

*Id.* at 69.

   Contrary to plaintiffs' unsupported assertion that privilege does not apply to

communications shared with Burson-Marsteller because a public relations firm is not "an agent

of [Judge] Martin . . . for purposes of rendering legal services" (Pls.' Mem. at 28), other courts

facing nearly identical facts have found that public relations firms retained to advise counsel

regarding publicity concerns related to litigation are entitled to the protection of the attorney-

client privilege. For example, in *In re Grand Jury Subpoenas*, the court extended attorney-client

protection to confidential communications among a client, its lawyer, and a public relations

consultant engaged by the lawyer to provide public relations advice. *In re Grand Jury*

*Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d at 331. In so holding, the court

acknowledged that:

> In some circumstances, the advocacy of a client's case in the
> public forum will be important to the client's ability to achieve a
> fair and just result in pending or threatened litigation. Nor may
> such advocacy prudently be conducted in disregard of its potential
> legal ramifications. Questions such as whether the client should
> speak to the media at all, whether to do so directly or through
> representatives, whether and to what extent to comment on specific
> allegations, and a host of others can be decided without careful
> legal input only at the client's extreme peril.

*Id.* at 330. As a result, the court found that "(1) confidential communications (2) between

lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing with

the media in cases such as this (4) that are made for the purpose of giving or receiving advice (5)

directed at handling the client's legal problems *are* protected by the attorney-client privilege."

*Id.* at 331 (emphasis added). *See also In re Copper Market*, 200 F.R.D. at 215 (holding that

disclosure of confidential communications to "crisis management" public relations firm hired by

a corporation to deal with "issues relating to publicity arising from high profile litigation" did not

vitiate the attorney-client privilege); *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)

(communications between client, attorney and accounting consultant retained by the attorney are

covered by the attorney-client privilege if they are "made in confidence for the purpose of

obtaining legal advice from the lawyer").

17

In this case, just as in *Conforti*, *In re Grand Jury Subpoenas* and others, the facts make clear that the attorney-client privilege extends to communications shared in confidence with or created by Debevoise's retained public relations consultants. First, Mr. Paster and other employees of Burson-Marsteller working at his direction were retained to assist Debevoise on "strategic communications issues" related to the law firm's work with regard to a prominent legal controversy. More specifically, the consultants were hired to advise Debevoise regarding "the form of the Martin Report and other publication considerations, including probable public reaction" so that the law firm could in turn "provide legal advice to the Special Committee." (Paster Decl. ¶ 7.) In addition, according to the very terms of Debevoise's retention agreement with Mr. Paster, the public relations consultants were to act as Debevoise's "agents," performing their duties at Debevoise's direction and acting on Debevoise's behalf. (Retention Letter at 2.) Finally, all communications related to their work regarding the Martin Report were to be confidential. (*Id.*; *see also* Paster Decl. ¶ 8 (Mr. Paster "assumed the responsibility to make certain that [his employees] understood the confidentiality" that attached to his agency agreement with Debevoise).) Accordingly, documents that reflect communications between Debevoise and its retained public relations consultants regarding the Martin Report are subject to attorney-client privilege, and Debevoise did not waive any privilege by disclosing confidential communications to Mr. Paster and Burson-Marsteller's employees.

## CONCLUSION

For the reasons stated above, and for all of the additional reasons set forth in Merck's prior briefing, the Court should deny plaintiffs' Motion to Compel and instead grant Merck's Motion for a Protective Order prohibiting discovery of all attorney work-product and privileged communications materials underlying the Martin Report.

Respectfully submitted,

s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
Carmelite M. Bertaut, 3054
STONE PIGMAN WALTHER WITTMANN
L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:   504-581-3361

Defendants' Liaison Counsel

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 11th day of December, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel