# EXHIBIT 4

Report of the Honorable John S. Martin, Jr. to the Special Committee of the Board of
Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the
Development and Marketing of Vioxx
("The Martin Report")

Executive Summary

After Merck & Co., Inc. voluntarily withdrew Vioxx from the worldwide market on

September 30, 2004 based on the results of a long-term clinical trial (called the APPROVe Trial)

in which there was an increased risk of cardiovascular adverse events on Vioxx compared to

placebo, there ensued investigations by Congressional committees, shareholder demand letters, a

proliferation of civil lawsuits, and widespread critical stories in the news media.  Although the

particulars varied, critics generally charged that members of Merck senior management knew or

believed long before the results of the APPROVe Trial were available that Vioxx could cause

cardiovascular problems but that they failed to disclose that risk.

On November 23, 2004, Merck's Board of Directors established a Special Committee

composed of six outside directors to conduct a comprehensive and independent investigation

concerning the conduct of Merck senior management in the development, testing and marketing

of Vioxx.  The Special Committee was chaired by Dr. William G. Bowen, former President of

Princeton University and, until recently, President of the Andrew W. Mellon Foundation.  The

other members were Mr. Lawrence A. Bossidy, Dr. William N. Kelley, Ms. Rochelle B. Lazarus,

Dr. Samuel O. Thier and Mr. Peter C. Wendell.

Retention of Judge Martin and Conduct of Investigation

In December 2004, the Special Committee retained The Honorable John S. Martin, Jr., of

Debevoise & Plimpton LLP, to conduct the investigation.  Judge Martin is a former United

States District Judge for the Southern District of New York and former United States Attorney

for the Southern District of New York.  The Special Committee investigation spanned 20 months, during which time Judge Martin and the Debevoise team of lawyers reviewed millions of pages of documents and conducted 150 witness interviews, including interviews of current and former Merck employees and third-party consultants to Merck.  The Debevoise team also reviewed deposition and trial testimony of witnesses in Vioxx litigation and other proceedings.

Debevoise retained the services of three consultants to assist with the medical, scientific, statistical and regulatory issues involved in the investigation:  Dr. R. Wayne Alexander, Chair of the Department of Medicine at Emory University's School of Medicine; Nancy A. Buc, Esq., former Chief Counsel to the FDA and a member of the law firm Buc & Beardsley; and Dr. Ralph B. D'Agostino, Sr., Professor of Mathematics, Statistics and Public Health at Boston University, Director of the Boston University Statistics and Consulting Unit, and co-principal investigator of the Framingham Heart Study contract, with the assistance of Dr. Michael Pencina, Research Assistant Professor of Statistics at the Boston University Statistics and Consulting Unit.

Judge Martin and Debevoise prepared a 179-page Report – "the Martin Report" – that summarizes the principal allegations that critics have made about Merck senior management's conduct and sets forth Judge Martin's findings and conclusions with respect to each.  The Report is accompanied by a set of 20 Appendices comprising over 1,400 pages that set forth in detail the evidence concerning the development, testing and marketing of Vioxx.  Merck's full Board of Directors voted unanimously to "accept and adopt" the Report and Appendices, and, acting with Board approval, the Special Committee decided to release them to the public in their entirety, totaling over 1,700 pages.

Principal Findings of the Martin Report

The Report addresses four broad categories of conduct that have given rise to allegations against the Company:  (i) Merck's alleged knowledge of cardiovascular risks of Vioxx before FDA approval; (ii) Merck's response to cardiovascular data from the VIGOR Trial (a clinical trial completed in March 2000 in which there was an increased incidence of cardiovascular events on Vioxx as compared to naproxen); (iii) Merck's marketing efforts relating to Vioxx; and (iv) Merck's presentation and analysis of cardiovascular data arising from the APPROVe Trial. Some of the Martin Report's principal findings are summarized below.

•     No early evidence of a possible cardiovascular safety problem

The Debevoise investigation did not find any evidence to support allegations that senior Merck officials knew or believed during the development of Vioxx that the drug might be prothrombotic (i.e., that it might cause cardiovascular adverse events).  As noted in the Martin Report, these allegations are based primarily on a 1996 internal memorandum (the "Musliner Memorandum") and/or the 1997 hypothesis of a prominent outside scientist and Merck consultant (the "FitzGerald prostacyclin hypothesis") (pages 30-31, 33-35), both of which are discussed below and in detail in Appendix A.

At the time when Vioxx was being developed, the leading drugs on the market for the relief of pain and inflammation associated with arthritis were non-steroidal anti-inflammatory drugs ("NSAIDs"), such as ibuprofen.  Traditional NSAIDs operate by inhibiting two isoforms of an enzyme known as cyclooxygenase ("Cox"):  Cox-1 and Cox-2.  Suppressing Cox-2 provided relief from pain and inflammation, but suppressing Cox-1 – which, among other things, protected the stomach – left patients vulnerable to ulcers and other gastrointestinal problems. Vioxx was one of a new generation of NSAIDs known as selective Cox-2 inhibitors that, it was

3

hoped, would provide all the pain relief associated with traditional non-selective NSAIDs without the same gastrointestinal side effects by inhibiting Cox-2 but not Cox-1.

The Musliner Memorandum was prepared in 1996 by a Merck scientist in connection with internal discussions about the design of a clinical trial that would test the gastrointestinal safety of Vioxx against that of traditional non-selective NSAIDs. A key issue in the design of the trial was whether patients enrolled in the trial should be allowed to take low-dose aspirin for cardiovascular prophylaxis (page 29). Aspirin, a traditional non-selective NSAID, was known to provide cardioprotection – as well as gastrointestinal irritation – by virtue of its suppression of Cox-1. The Musliner Memorandum expressly presumed that Vioxx was cardio-neutral because it did not suppress Cox-1 and that the traditional non-selective NSAID comparators under consideration for the trial – which, like aspirin, suppressed Cox-1 as well Cox-2 – might prove in the course of such a trial to confer cardioprotection similar to that provided by low-dose aspirin (pages 31-32).

The Musliner Memorandum stated that excluding aspirin – a known gastrointestinal irritant – would make it easier to assess the gastrointestinal safety of Vioxx. The memorandum expressed concern, however, that excluding aspirin from the trial could lead to there being fewer cardiovascular events in the non-selective NSAID arms of the trial than in the Vioxx arm, due not to any prothrombotic effect of Vioxx but rather to the potential cardioprotective effects of the non-selective NSAID comparators. The memorandum did not state, and the Special Committee investigation found no evidence, that anyone at Merck believed in 1996 that Vioxx was or might be prothrombotic (pages 31-32).

With respect to the 1997 FitzGerald prostacyclin hypothesis, the Martin Report makes clear that the science behind selective Cox-2 inhibitors such as Vioxx was new and developing in

4

the late 1990s. Scientists had advanced a number of hypotheses about the positive or negative effects that such drugs might have on the cardiovascular system, including the hypothesis by Dr. Garret FitzGerald, a renowned scientist at the University of Pennsylvania, that selective Cox-2 inhibitors such as Vioxx might be prothrombotic.

Dr. FitzGerald's prostacyclin hypothesis arose from a Merck-sponsored study that he conducted which found that Vioxx suppressed urinary excretion of a metabolite of prostacyclin, a substance that dilates blood vessels and inhibits clotting, but did not suppress urinary excretion of a metabolite of thromboxane, a substance that constricts blood vessels and promotes clotting. According to Dr. FitzGerald, who was interviewed in connection with the investigation, this research suggested that selective Cox-2 inhibitors might predispose patients toward thrombotic events. A key assumption of Dr. FitzGerald's hypothesis was that the prostacyclin metabolite measured in his study reflected the production of prostacyclin in the blood vessels (as opposed to the metabolism of prostacyclin or its production in other tissues), although the actual source of prostacyclin metabolite in the urine was not known with any certainty. According to critics, the FitzGerald prostacyclin hypothesis should have been a red flag with regard to the cardiovascular safety of Vioxx (page 34).

As detailed in the Martin Report, although Merck scientists questioned the premise of Dr. FitzGerald's hypothesis (i.e., whether the prostacyclin metabolite that was suppressed in the urine of patients in the small study that Dr. FitzGerald conducted for Merck meant that prostacyclin was suppressed in blood vessels), they nonetheless "took several affirmative steps to investigate the hypothesis before Vioxx was approved for sale" (page 36) and analyzed existing clinical data to determine if there was any cause for concern. The data did not seem to bear out Dr. FitzGerald's hypothesis. Moreover, Dr. FitzGerald himself was quoted in 1999 as stating

5

that he did not believe that his hypothesis should delay approval of this class of pain reliever (pages 40-41). Likewise, Merck's outside Board of Scientific Advisors – a distinguished group of 25 scientists – did not view Dr. FitzGerald's hypothesis as a reason to prevent or delay the commercial distribution of Vioxx (page 38).

In addition, the Report notes that the New Drug Application ("NDA") that Merck submitted to the FDA for Vioxx included data on a large number of patients from numerous clinical trials and was one of the largest such applications ever filed by Merck (page 29). The analysis of cardiovascular data in the NDA showed no statistically significant difference between Vioxx, non-selective NSAID comparators (ibuprofen, diclofenac and nabumetone) and placebo (pages 28-29).

- <u>Merck scientists responded appropriately to receipt of cardiovascular data from the VIGOR Trial</u>

The results of the VIGOR Trial, a gastrointestinal safety trial that tested Vioxx 50 mg against naproxen (a non-selective NSAID) in rheumatoid arthritis patients, became available in March 2000. The trial showed that Vioxx – even at the high dose used in the trial – caused fewer gastrointestinal side effects than naproxen, but there were statistically significantly more cardiovascular events in the Vioxx arm of the trial than in naproxen arm: Based on the unadjudicated data available in March 2000 (i.e., events that had been reported but not yet confirmed as cardiovascular events), 92 of the 4,047 patients in the Vioxx arm experienced a serious cardiovascular event (21 myocardial infarctions, 15 strokes) compared to 46 of the 4,029 patients in the naproxen arm (9 myocardial infarctions, 7 strokes). Because the trial did not have a placebo arm to establish a neutral "baseline" against which the results could be measured, the cardiovascular data raised a number of questions internally at Merck, including whether the

event rate difference had been caused by a prothrombotic effect of Vioxx, a cardioprotective effect of naproxen, chance, or some combination thereof.

The evidence set forth in the Martin Report and Appendices reveals that Merck scientists conducted numerous analyses to understand the meaning of the VIGOR Trial cardiovascular data, including a review of existing data from other clinical trials of Vioxx (pages 57-64). Those data did not reveal a higher incidence of cardiovascular events among patients on Vioxx versus those on other non-selective NSAID comparators, and they demonstrated that the absolute incidence of cardiovascular events in patients taking Vioxx in the VIGOR Trial was similar to the absolute incidence of cardiovascular events in patients taking Vioxx in other trials (pages 57-60). The Report notes that witnesses placed particular emphasis on the fact that in two ongoing trials testing Vioxx against placebo in Alzheimer's patients, no increased cardiovascular risk was evident (page 60).

At the same time, Merck scientists also investigated the antiplatelet effects of naproxen. Merck scientists concluded that naproxen provided a relatively high degree of platelet inhibition and could, if regularly dosed, provide cardioprotection akin to that provided by aspirin. Some Merck scientists found the adverse event data on nose bleeds in the VIGOR Trial particularly compelling as there were significantly more such events in the naproxen arm (27) than in the Vioxx arm (7), which suggested that the antiplatelet properties of naproxen had a clinical effect in the VIGOR Trial (Appendix E at page 25). Because the VIGOR Trial was not designed to detect cardiovascular risk and did not include a placebo arm, it was impossible to determine with certainty whether the cardiovascular event difference was caused by Vioxx, naproxen, chance, or some combination thereof. The Martin Report concludes, however, that Merck scientists believed that the most likely explanation for the cardiovascular differential in the VIGOR Trial

was that naproxen had provided cardioprotection and that Vioxx was cardioneutral (pages 56-57, 71).

- <u>Merck did not attempt to mislead in the presentation of the VIGOR Trial data in the New England Journal of Medicine</u>

The Martin Report also addresses criticisms made by the editors of the <u>New England Journal of Medicine</u> that the November 2000 article about the VIGOR Trial, which included two Merck scientists among the 13 authors, was intentionally misleading. The Report finds no evidence of any intent to deceive in connection with the publication of the VIGOR Trial cardiovascular data (pages 75, 78). The Report notes that while the cardiovascular data summarized in the article were based on a reporting cut-off date that was not mentioned in the article, the cut-off date was set by Merck before any VIGOR Trial data were unblinded and was established to avoid delay in the schedule for submission of those data to the FDA. The Report states that, while it may have been prudent to disclose the cut-off date in the text of the article, Dr. Alise Reicin, one of the Merck authors, believed that the additional cardiovascular events reported after the cut-off date did not materially alter the article's conclusions (pages 75, 77-78). In a letter to the editor of the <u>New England Journal of Medicine</u>, the non-Merck authors stated that they stand behind the article as written (page 79). The Report further notes that, contrary to the editors' assertion, Merck's pre-submission deletion of a chart reporting raw numbers of cardiovascular events was not intended to mislead, as data on the events at issue were reported in the article in percentage form (page 78). Finally, there is no basis for the assertion in some press reports that the deleted chart had contained updated data.

- <u>Merck did not delay label negotiations with the FDA to avoid including cardiovascular data</u>

The Special Committee investigation found no evidence to support a claim that Merck officials delayed negotiations with the FDA in an effort to keep a cardiovascular warning out of the Vioxx label (page 104 and Appendix N).  To the contrary, the Report notes that Merck submitted all VIGOR Trial data to the FDA and asked the FDA to review on an expedited six-month basis the Company's June 2000 proposed revisions to the Vioxx label based on the results of the VIGOR Trial.  The FDA denied expedited review and scheduled an Advisory Committee meeting to discuss the VIGOR Trial data for February 2001.

After the Advisory Committee meeting, during which the VIGOR Trial cardiovascular data were discussed in detail, Merck submitted to the FDA a revised proposed label that presented the VIGOR Trial cardiovascular data in the "Precautions" section of the label.  The FDA responded with a counterproposal that placed the cardiovascular data in the "Warnings" section of the label.  Merck scientists, including regulatory personnel, did not believe that the cardiovascular data warranted a Warning and again proposed that those data be described in the Precautions section, a recommendation which the FDA accepted.  The timeline included in Appendix N to the Report lists the various proposals and FDA counterproposals and makes clear that Merck did not attempt to delay the label negotiations.

- <u>Merck did not try to reformulate Vioxx based on a belief that it was prothrombotic</u>

The Martin Report also addresses the allegation that Merck attempted to reformulate Vioxx after the VIGOR Trial in response to cardiovascular safety concerns.  The Report notes that Merck's efforts to develop a compound that would combine the therapeutic benefits of Vioxx with a cardioprotective agent were prompted by a desire to enable patients in need of cardioprophylaxis to receive it without compromising the gastrointestinal-sparing effect of Vioxx

9

(page 81 and Appendix L).  The Report concludes that Merck's objective was to develop a combination drug "with properties superior to those of any other drug, including Vioxx, not to protect against a known prothrombotic effect of Vioxx" (page 82).

- <u>Merck scientists designed a cardiovascular outcomes study to answer the question whether Vioxx caused adverse cardiovascular events</u>

The Martin Report notes that although Merck scientists reasonably did not believe that Vioxx was prothrombotic, beginning in late 2001 they worked diligently to design a cardiovascular outcomes trial to answer head-on the question whether Vioxx increased the risk of cardiovascular adverse events (page 109 and Appendix M).  The evidence set forth in the Report and Appendices reveals that conducting a simple trial of Vioxx versus placebo for the purpose of proving that Vioxx did not present a cardiovascular risk was neither ethical nor feasible (pages 109-110).  Merck scientists and outside consultants developed several other design options involving active comparators, but using another drug (rather than placebo) in the study design would make it difficult to determine unambiguously whether Vioxx itself was prothrombotic because any differential seen in the results would be difficult to interpret, as was the case with the VIGOR Trial.  Ultimately, Merck scientists decided to combine cardiovascular data from three placebo-controlled trials in cancer patients and called this study Protocol 203 (page 111).  One of the trials included in Protocol 203 was the APPROVe Trial, the results of which led Merck to withdraw Vioxx.

- <u>Merck senior management worked to ensure compliance with federal regulations and Merck policies, and there is no evidence that they condoned any inappropriate marketing or sales efforts</u>

The Martin Report finds no evidence that Merck senior management condoned any improper marketing conduct (page 116). However, according to the Martin Report, certain individuals within the Marketing and Sales Departments engaged in practices that were inconsistent with Merck's policies and at times proposed dealing with critics or perhaps dealt with critics (referred to in internal documents as "neutralizing" them) through means that senior management viewed as unacceptable – for example, by offering grants or other incentives (page 119). The Report notes that "throughout the period that Vioxx was marketed, Merck expected all Company representatives to adhere to Merck's policies and procedures, which were designed to ensure compliance with federal regulations and which also, in many instances, went beyond what the law required" (page 120). The Report also references the Culture of Compliance, which it describes as an initiative voluntarily adopted by Merck management in late 2001 "to ensure that all Company employees understood the policies governing marketing and sales practices and to enhance accountability" (page 120 and Appendix K).

- <u>The incorrect description in the APPROVe article published in the New England Journal of Medicine of the statistical test used to test the constancy of the cardiovascular hazard ratio in the APPROVe base study was inadvertent</u>

There is no evidence to support the contention that Merck purposefully misidentified in the APPROVe article published in published in the <u>New England Journal of Medicine</u> the statistical test used to evaluate the constancy of the hazard ratio in the APPROVe base study (<u>i.e.</u>, whether the risk of an event on Vioxx relative to placebo remained constant over the course of the trial). As fully explained in Appendix R, a common method for testing the constancy of the hazard ratio is to use either the Logarithm of Time Test or the Linear Time Test (as defined

on page 133).  The relevant outcome of these proportional hazards tests is a p-value of between 0

and 1.0 that indicates whether sufficient evidence exists to reject the assumption built into the

Cox proportional hazards model that the hazard rates are proportional over time.

The APPROVe article stated that the Logarithm of Time Test had been performed but

reported the result of the Linear Time Test, which provided slightly stronger evidence of non-

constant hazards (p=0.01) than the Logarithm of Time Test (p=0.07).  The Report finds that this

misidentification resulted from events that occurred months before the APPROVe article was

drafted.  In the summer of 2004, the unblinded MRL statistician charged with analyzing

preliminary APPROVe Trial cardiovascular data on behalf of the APPROVe Trial External

Safety Monitoring Board while the trial was still ongoing had switched the relevant statistical

program from the Logarithm of Time Test – MRL's default means of testing the constancy of the

hazard ratio – to the Linear Time Test (believing that the latter was more appropriate under the

circumstances), but had not documented that switch and later failed to recall that the switch had

been made.  As a result, after Vioxx had been withdrawn from the market, the MRL statisticians

involved in drafting and reviewing the APPROVe article assumed that the Logarithm of Time

Test had been performed (as was standard at MRL) and that it was that test that generated the p-

value of 0.01 that was reported in the APPROVe article.

- <u>Merck reasonably concluded that the cardiovascular hazard ratio in the APPROVe base study was non-constant</u>

The Martin Report notes that many biostatisticians using a Cox proportional hazards

model to test the constancy of the hazard ratio would deem results as high as p=0.10, in

conjunction with graphical analysis, to be sufficient evidence to reject the assumption of

proportional hazards because such tests have low power, and would see no meaningful difference

between p=0.01 and p=0.07.  As a result, the Report concludes that the totality of the APPROVe

base study data and post-hoc analyses supported MRL scientists' conclusion that the hazard ratio in the APPROVe base study changed over time, whether the proportionality of hazards is tested using the Logarithm of Time Test or the Linear Time Test.

- <u>Not every action by Merck employees with respect to Vioxx was above reproach, but there is no evidence of an intent on the part of Merck senior management to mislead</u>

The Martin Report includes criticism of actions with respect to Vioxx, but concludes on the basis of all the evidence that these instances were not deliberate and that Merck senior management did not deliberately mislead the public or regulatory authorities about Vioxx. Specific criticisms that are mentioned in the Martin Report and fully described in the Appendices include:

- Merck senior management received a complaint as early as January 2001 from an academic scientist who criticized the manner in which Merck employees had treated certain academic scientists who were critical of Merck and Vioxx.

- Certain of Merck's public disclosures about the APPROVe Trial lacked clarity.

- The Cardiovascular Card, a promotional aid used by sales representatives with physicians after the VIGOR Trial cardiovascular data were unblinded, did not, standing alone, provide all of the available cardiovascular data on Vioxx.

\*          \*          \*

The Martin Report makes several other notable findings in addition to those summarized above, including that there is no evidence that Merck scientists ignored any credible evidence or hypothesis that suggested that Vioxx was prothrombotic; that Merck did not hide relevant data from the FDA; and that Merck's post-hoc analyses of data on cardiovascular events that occurred after discontinuation of treatment in the APPROVe Trial raise the possibility that an increased relative risk on Vioxx emerges before the 18-month mark but do not, standing alone, form the basis for any firm conclusions (pages 26, 45, 136). The Report concludes that Merck's senior management acted with integrity in the development, testing and marketing of Vioxx. The

Report further concludes that Merck's conduct in voluntarily withdrawing Vioxx from the market upon receiving the APPROVe Trial cardiovascular data, notwithstanding advice from certain outside advisors that the drug be kept on the market with a stronger warning, "is not consistent with the view that Merck's corporate culture put profits over safety" (page 179).

Following submission of the Report to the Special Committee, Dr. Bowen, Special Committee Chairman, commended Judge Martin and his colleagues for the comprehensiveness and clarity of the Report and stated that "the Board is reassured by the fact that, in reviewing numerous allegations of wrongdoing, the Martin Report concludes that management acted with integrity and had legitimate reasons for making the decisions that it made, in light of the knowledge available at the time."

The full Martin Report and Appendices are available online at www.debevoise.com/martinreport.