UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 05-2524 | * | |
| | * | MAGISTRATE |
| ANTHONY WAYNE DEDRICK, | * | JUDGE KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RENEWED MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Mr. Dedrick received his first Vioxx® prescription on July 8, 2002. (Dec. 5, 2006 Tr. at 1781:12-17 (Test. of Dr. Herrera).) Six months later, on January 8, 2003, he suffered a non-fatal heart attack. As his own physicians and experts acknowledge, Mr. Dedrick had virtually every "classic" risk factor for heart disease known to medicine: he was a heavy smoker, had diabetes, high blood pressure, high cholesterol, obesity, and a family history of heart disease. (Dec. 4, 2006 Tr. at 1519:8-23 (Test. of Dr. Furman); Dec. 7, 2006 Tr. at 2247:15-2249:18 (Test. of Dr. Koenig); Dec. 7, 2006 Tr. at 2301:2-16; 2314:7-11, 2316:10-25 (Test. of Dr. Coltharp).) He was also inactive, an alcoholic, and a cocaine abuser. These are additional risk factors for coronary artery disease ("CAD"). (Dec. 4, 2006 Tr. at 1519:17-18 (Test. of Dr. Furman); Dec. 5, 2006 Tr. at 1743:2-8 (Test. of Mr. Dedrick).) In the face of these and other risk factors,

3

Mr. Dedrick brought this lawsuit, claiming that the 25 mg of Vioxx he allegedly took for six months caused his heart attack. But he has failed to prove his case. Because no reasonable jury could hold in Mr. Dedrick's favor, Merck is entitled to judgment as a matter of law.

Mr. Dedrick's treating physicians admit that his heart attack was just like any other they have seen many times in their practice. (Dec. 7, 2006 Tr. at 2331:2-15 (Test. of Dr. Koenig); Dec. 7, 2006 Tr. at 2329:3-6, 2329:23-2330:5 (Test. of Dr. Coltharp).) His catheterization film showed that he had triple vessel "severe" CAD that likely started years or decades before he ever took Vioxx. (Dec. 7, 2006 Tr. at 2269:7-14, 2256:11-2257:10 (Test. of Dr. Koenig); 2329:16-22 (Test. of Dr. Coltharp).)  Just like the majority of people that suffer heart attacks in the United States every day, his heart attack was the result of a plaque rupture, which then turned into a clot. (Dec. 6, 2006 Tr. at 2109:23-2110:6; Dec. 7, 2006 Tr. at 2261:4-12 (Test. of Dr. Koenig).) His cardiologist and cardiovascular surgeon both testified that given his risk factors and extensive CAD, there was nothing surprising about the fact that he had a heart attack. (Dec. 7, 2006 Tr. at 2272:21-24 (Test. of Dr. Koenig); 2328:15-2329:2 (Test. of Dr. Coltharp).)  His specific cause expert likewise testified that Mr. Dedrick would likely have had a heart attack without ever taking Vioxx. (Dec. 4, 2006 Tr. at 1586:8-18 (Test. of Dr. Furman).)  Not a single witness offered  a medical basis for concluding that Vioxx caused the heart attack.

Even Dr. Furman admitted that he has no medical basis on which to conclude that Vioxx caused Mr. Dedrick's heart attack. (Dec. 4, 2006 Tr. at 1537:21-1539:16 (Test. of Dr. Furman).) Instead, he claimed that Vioxx caused Mr. Dedrick's heart attack because (1) Mr. Dedrick took Vioxx; (2) based on APPROVe, the relative risk exceeds 2; and (3) there is a plausible mechanism. (*Id.* at 1525:8-21.)  Similarly, Dr. Herrera could offer no reasonable basis for his specific cause opinion, other than to say that he had read the highlighted copies of the VIGOR

and APPROVe studies that were supplied to him by plaintiff's attorneys, and that he reviewed the opinion of some of plaintiff's experts to the same effect. (Dec. 5, 2006 Tr. at 1810:2-16; 1819:12-22; 1822:17-21 (Test. of Dr. Herrera).) Neither opinion is sufficient to prove specific causation, however, because showing that Vioxx *can* cause heart attacks is not sufficient to prove that Vioxx *did* cause plaintiff's heart attack. Moreover, neither eliminated other possible causes of Mr. Dedrick's heart attack, which plaintiff's cardiologist and cardiovascular surgeon testified fully explain his heart disease and resultant heart attack. Finally, even if general causation could provide the sole basis for a reliable specific cause opinion, Mr. Dedrick failed to present scientifically reliable evidence establishing general causation.

At the end of his case, only one of plaintiff's claims remains: failure to warn. He waived his fraud and breach of warranty claims by failing to include any mention of them in the joint pretrial order submitted by the parties. *Valley Ranch Dev. Co. v. Fed. Deposit Ins. Corp.*, 960 F.2d 550, 554 (5th Cir. 1992). And under Tennessee law, all of his other claims, including but not limited to his negligent design and breach of implied warranty claims, collapse into a failure to warn claim. More specifically, under Tennessee law, it is not sufficient to show that a product caused an injury. *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 911-12 (Tenn. Ct. App. 1993). Instead, plaintiff must prove that the product was "defective." *Id.* (holding that proof of injury is not proof of a defect, and proof that a product is defective is required to recover under Tennessee law); *see also* TENN. CODE ANN. § 29-28-105. Because Tennessee has adopted comment k to the Restatement, under which a prescription drug is only defective if it includes an inadequate warning, plaintiff cannot separately maintain his claims for design defect, marketing defect, inadequate testing, or breach of implied warranty.

5

Plaintiff's failure to warn claim, however, also fails as a matter of law because the evidence shows that Merck adequately warned Dr. Herrera of the known or potentially knowable risks associated with Vioxx. Each of these points, explained in further detail below, leads to the same conclusion. Because plaintiff failed to introduce evidence raising a triable issue on any of his claims, the Court should enter judgment in favor of Merck. In the alternative, Merck requests that the Court enter judgment on each of the claims plaintiff has failed to prove.

## I.     THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'" *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50). "[A] party has been fully heard when he rests his case." *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004). At that time, the court "may grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, cannot be maintained or defeated." FED. R. CIV. P. 50(a)(1). "A mere scintilla of evidence is insufficient to present a question for the jury." *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999). Instead, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.* (internal quotation marks and citations omitted).

## II.    MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL CLAIMS BECAUSE PLAINTIFF DID NOT INTRODUCE LEGALLY SUFFICIENT EVIDENCE OF MEDICAL CAUSATION.

In order to prevail on any of his claims, Mr. Dedrick was required to establish that without the use of Vioxx at the 25 mg dose for approximately six months, his injury would not have occurred. *King v. Danek Med., Inc.*, 37 S.W.3d 429, 450 (Tenn. Ct. App. 2000). Plaintiff has failed to meet this burden. Because there is no legally sufficient evidence to show that Vioxx

6

was the proximate cause of Mr. Dedrick's alleged injuries, the Court should enter judgment for Merck as a matter of law.

Proving medical causation is a two-step process: plaintiff must prove both general and specific causation. General causation requires proof that Vioxx *can* cause heart attacks, while specific causation requires proof that Vioxx *did* cause Mr. Dedrick's heart attack. *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005). Under Tennessee law, causation must be proved to a reasonable medical probability with expert medical testimony. *Jackson v. Allen*, No. M2000-01673-COA-R3CV, 2002 WL 661930, at *2 (Tenn. Ct. App. Apr. 23, 2002).

Although plaintiff was required to prove both general and specific causation, he proved neither. Instead, he offered the speculative and unreliable testimony of expert witnesses who opined, without reliable foundation, that "it is now universally agreed the Vioxx causes heart attacks" (Nov. 28, 2006 Tr. at 363:11-12 (Test. of Dr. Avorn), and that Vioxx was a "substantial contributing factor" of Mr. Dedrick's heart attack (Dec. 4, 2006 Tr. at 1510:11-12) (Test. of Dr. Furman).) Unsupported opinions, however, do not constitute substantial evidence. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005). "A mere possibility of . . . causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." PROSSER ON TORTS 245 (3d ed. 1964); *accord Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982). Because plaintiff introduced no legally sufficient evidence to show that Vioxx both could have and did cause his alleged injuries, all of his claims necessarily fail.

## A.      The Record Contains Insufficient Evidence of General Causation.

Plaintiff has failed to satisfy his burden to prove general causation for two reasons. First, he has introduced no relevant and reliable studies to show that use of Vioxx at the 25 mg dose

for approximately six months causes heart attacks. The studies upon which his experts rely do not and cannot show a statistically significant association between Vioxx and increased risk. Second, as discussed below, plaintiff was also required to prove a biologically plausible mechanism by which Vioxx caused his claimed injury. He did not do so.

> ### 1.   Plaintiff Introduced No Evidence Of A Statistically Significant Study Showing That Vioxx, At The Same Dose And Duration As Taken By Mr. Dedrick, Is Capable of Causing Heart Attacks.

Plaintiff's causation experts opine that the use of Vioxx at the 25 mg dose can cause heart attacks, but the data on which they rely do not support their opinions. There is no reliable, statistically significant data from *any* study relied upon by plaintiff's experts that using 25 mg Vioxx for six months causes heart attacks.

First, to be meaningful, the study must be statistically significant, meaning that the confidence interval does not include a value of 1.0 or below. *See, e.g., Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) *modified on reh'g*, 884 F.2d 166, 167 (reversing verdict in Bendectin litigation given plaintiff's failure to present statistically significant epidemiological proof); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant [] epidemiological studies"); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664-66 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant epidemiological proof").

Second, an epidemiological study cannot be used to establish general causation unless it shows that the drug more than doubles the relative risk of injury. (Dec. 4, 2006 Tr. at 1587:19-1588:3 (Test. of Dr. Furman).)

As explained below, none of the studies referenced by plaintiff's experts meet these standards. Indeed, plaintiff's expert epidemiologist, Dr. Arnett, admitted that just months before

trial, she evaluated the same data upon which she now relies to support her opinion that "heart attacks appear at any dose and duration" (Nov. 30, 2006 Tr. at 975:9-12 (Test. of Dr. Arnett)), and came to the exact opposite conclusion:

> Q.    When you said you agreed with the conclusions, did you include conclusion bullet number 3 that says "the data from Vioxx clinical trials shows no difference in the incidence of thrombotic cardiovascular events with rofecoxib 25 milligrams versus placebo over the first 18 months of continuous usage or from non-naproxen NSAIDs"?  Was that a conclusion that you, in fact, agreed with?
>
> A.    In January of 2005, based on the data provided to me in the document by Merck, having no other data to go on.
>
> Q.    Then you have to say yes or no at the end of that.  Did you or did you not, based on the data available to you, provided to you by Merck, with nothing else to go on, all I'm asking you is whether that highlighted conclusion is one of them that you agreed with?
>
> A.    I, at that time reviewing what they provided in my -- in my letter, here, agreed with what they had provided to me.  I have subsequently spent 200 hours looking at FDA documents, papers --
>
> The Court:  No.  We've got that ma'am.  I understand it.  He's asking you whether you agreed with it at that time.  That's the question.
>
> The witness:  Oh.
>
> By Mr. Beck:
> Q.    Yes.  Did you agree, when you wrote your letter with that highlighted conclusion --
>
> A.    I was basing my conclusions on what I --
> The Court:  He just wants to know yes or no, did you or didn't you?
>
> A.    I stated yes, but what I was --
>
> The Court:  All right.  That's fine.  You say "yes," and then you want to the explain it.

9

The witness: Okay.

By Mr. Beck:
Q.   All I wanted to hear was the yes or no. I've heard the explanation several times now. Is the answer yes?

A.   The answer for that, yes, is "yes." The conclusions, however, I was agreeing with are detailed more in my letter.

(Dec. 1, 2006 Tr. at 1052:11-1053:22 (Test. of Dr. Arnett).)

In addition, plaintiff's experts' opinions are undermined by the 2005 FDA advisory memorandum, which concludes that "short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events." (Feb. 2005 FDA Memorandum, Def. Ex. 338.)

### a.   VIGOR.

Although plaintiff purports to use VIGOR[1] to establish causation, VIGOR involved a 50 mg dose Vioxx – twice the dose taken by Mr. Dedrick. Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain*, 401 F.3d at 1242 (internal citations and quotation marks omitted), the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use of Vioxx at the 25 mg dose was capable of causing Mr. Dedrick's heart attack.

Second, Dr. Furman's reliance on VIGOR to support his specific causation opinion is misplaced because, as he admitted, he made a "mistake" in his analysis, and applied the relative risk from the wrong VIGOR sub-group to Mr. Dedrick. (Dec. 4, 2006 Tr. at 1605:8-16 (Test. of Dr. Furman).) More specifically, although Mr. Dedrick was not taking aspirin at the time he was

---

[1] Bombardier C, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N. ENGL. J. MED. 2000 Nov 23;343:1520-1528.

taking Vioxx (*id.* at 1581:4-6), Dr. Furman applied the relative risk ratio from the aspirin-indicated group in VIGOR, which was 4.89, as opposed to the *correct* non-aspirin indicated group, which was only 1.89. (*id.* at 1589:9-17 .)

Third, VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at increased risk of CV problems. Mr. Dedrick did not have rheumatoid arthritis and cannot be described as elderly.

Fourth, VIGOR did not compare Vioxx against a placebo; rather, it compared it with naproxen. Thus, it is impossible to determine based on the results of VIGOR whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (1) a cardiovascular risk associated with high-dose Vioxx; (2) a cardio-protective effect associated with naproxen; (3) chance, either in whole or in part; or (4) some combination of these factors. (Dec. 9, 2006 Tr. at 2515:19-2516:1 (Test. of Dr. Pratt).) And although medical science still has not been able to definitively determine which of these possible explanations is correct (*id.* at 2516:2-11), placebo-controlled information suggests that the likely explanation for the difference in the VIGOR results is the cardio-protective quality of naproxen combined with the play of chance (*id.* at 2516:12-17).

Accordingly, VIGOR cannot support a finding that Vioxx taken for six months at the 25 mg dose increases the risk of heart attack.

### b.   APPROVe.

Nor can plaintiff's experts rely on the results of the APPROVe[2] study. The study did *not* associate a statistically significant risk of heart attacks with under seven months of use of 25 mg

---

[2] Bresalier R, et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 2005 Mar 17;352(11):1092-1102.

11

Vioxx. (*Id.* at 2526:18-25.)  Thus, regardless of what opinions APPROVe purportedly supports concerning a longer duration of Vioxx use, it cannot establish to a reasonable degree of medical and scientific certainty that Mr. Dedrick's short-term use of Vioxx was capable of causing a thrombotic cardiovascular event.  *See, e.g., Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) ("If the . . . duration of exposure to [substance is] the type[] of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate . . . duration data."); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider either the length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).

### c.      Solomon.

Plaintiff also identifies a retrospective, observational study conducted by Dr. D.H. Solomon in 2004, which was based on a review of patient records in a Medicare database.[3]  This study, however, does not support plaintiff's claim that his alleged six months of Vioxx use increased his CV risk.  The only short-term risk Solomon found involved a comparison between Vioxx and Celebrex, both active drugs, during the first 90 days of therapy.  The risk for acute

---

[3] Daniel Solomon et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May;109:2068-2073.

heart attacks for Vioxx versus Celebrex was nearly identical after 90 days of therapy, the only duration of therapy relevant here.[4]  Further, contrary to plaintiff's claims, the study found *no* excess risk of acute heart attacks with Vioxx versus no-NSAID use, much less a doubling of the risk.

### d.     Protocol 090.

Plaintiff also purports to rely on Protocol 090.[5]  In Protocol 090, however, there was no statistically significant difference in the rate of adverse cardiovascular events in patients taking Vioxx versus placebo or Vioxx versus the comparator drug, Nabumetone. (Dec. 9, 2006 Tr. at 2525:2-15 (Test. of Dr. Pratt).)  Indeed, the study's conclusion was that "the number of patients with cardiovascular events was *too few to support any meaningful comparison*." (Id. at 2526:14-19.)  Accordingly, it is impossible for Protocol 090 to support plaintiff's theory of causation.

### e.     ADVANTAGE.

Although plaintiff also purports to rely upon ADVANTAGE,[6] the study itself makes clear that it does not support causation. It provides:

> *The rofecoxib [Vioxx] and naproxen groups did not differ significantly in the number of cardiovascular events*, as defined by the combined Antiplatelet Trialists' Collaboration end points (10[0.4%] vs. 7 [0.3%]; P>0.2). Five myocardial infarctions occurred in the rofecoxib group, and 1 occurred in the naproxen group (P>0.2). No strokes occurred in the rofecoxib group and 6, all thrombotic, occurred in the naproxen group (P=0.015).

---

[4] *Id.* at 2071.

[5] Weaver A., et al. *Treatment of Patients With Osteoarthritis With Rofecoxib Compared With Nabumetone*, J. CLIN. RHEUMATOL. 2006 Feb;12(1):17-25.

[6] Lisse JR et al., *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis*, ANN. INTERN. MED. 2003 Oct7;139:539-546.

ADVANTAGE at 543. On its face, the differences between the Vioxx and Naproxen arms was not statistically significant. And because there was no placebo arm, the study suffers from the same shortcoming in terms of proving causation as VIGOR.

### f.   VICTOR.

Plaintiff also purports to rely on VICTOR, a trial in patients with colon cancer that was terminated prematurely when Merck voluntarily withdrew Vioxx from the market. Only incomplete, interim data from this study are available, which cannot provide a scientifically reliable basis for an opinion that Vioxx is capable of causing cardiovascular events. *See, e.g., Christophersen*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data). Moreover, the available data are not statistically significant. There were fourteen confirmed thrombotic cardiovascular events in the Vioxx arm, versus five confirmed thrombotic cardiovascular events in the patients receiving placebo. (Dec. 9, 2006 Tr. at 2537:20-2539:7 (Test. of Dr. Pratt).) VICTOR is thus not sufficient to prove plaintiff's theory of causation.

### g.   Alzheimer's Studies.

Finally, plaintiff's experts rely on two long-term clinical trials that were conducted by Merck to determine the efficacy of Vioxx in preventing or slowing the progression of Alzheimer's disease.[7] Given that Mr. Dedrick has alleged a cardiovascular injury, the only data relevant to this case are data pertaining to the alleged cardiovascular risks associated with Vioxx.

---

[7] Aisen PS et al., *Effects of rofecoxib or naproxen vs placebo on Alzheimer disease progression: a randomized controlled trial*, JAMA 2003 Jun 4;289(21):2819-26; *Reines SA, et al., Rofecoxib: No Effect on Alzheimer's Disease in a 1-Year, Randomized, Blinded, Controlled Study*, NEUROLOGY 2004;62:66-71; Thal LJ et al., *A Randomized, Double-Blind, Study of Rofecoxib in Patients with Mild Cognitive Impairment*, NEUROPSYCHOPHARMACOLOGY 2005 Jun;30(6):1204-15.

14

On this score, the Alzheimer's studies actually *contradict* plaintiff's causation theory. As plaintiff's own experts concede, neither study showed a statistically significant difference in the rates of adverse cardiovascular events experienced by patients in the Vioxx and placebo groups of the studies. (*See* Nov. 28, 2006 Tr. at 459:1-3 (Test. of Dr. Avorn) (admitting "there was no difference [in cardiovascular events] between Vioxx and placebo in the Alzheimer's trials").

Implicitly conceding this point, plaintiff attempts to minimize this data or to confuse the issue by focusing not on the cardiovascular data from the Alzheimer's trials, but on the "all-cause" mortality data from these same studies. Yet, as Dr. Avorn readily concedes, the Alzheimer's data on which he relies in support of his opinion includes death from all causes, whether or not related to Vioxx or even to cardiovascular events:

> Q:    And all-cause mortality means that people died, and regardless of what somebody thinks about the cause of the death, more people died in the Vioxx group than in the placebo group, right?
>
> A:    That's correct.

(Nov. 28, 2006 Tr. at 454:6-10 (Test. of Dr. Avorn).)  In other words, this data has no conceivable relevance to Mr. Dedrick's claims. More importantly, there is no proof that Vioxx caused an excess rate of death.  Mr. Dedrick's claims are predicated on an alleged cardiovascular event – not electrocution, or cancer, or pneumonia. Deaths from such disparate causes, which are reflected in the Alzheimer's "all-cause" mortality data, cannot support plaintiff's allegation that Vioxx could have and did cause his heart attack. (*See* Dec. 11, 2006 Tr. at 2716:9-2725:9 (Test. of Dr. Reicin).)

### 2.    Plaintiff Presented Insubstantial Evidence Of Any Biologically Plausible Mechanism By Which Vioxx Could Cause A Heart Attack.

In a drug or toxic tort case, a statistical association between injury and exposure cannot prove causation absent proof of a biologically plausible mechanism by which exposure to the drug or suspected toxin causes injury. *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir.

1999). (*See also* Dec. 8, 2006 Tr. at 2469:819 (Test. of Dr. Flavahan).)  Biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 522 (emphasis added).  As the Fifth Circuit said in *Food Lion*:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur.  Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Food Lion*, 171 F.3d at 314.  As this Court put it:

> In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause.  They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable.

*In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 617 (E.D. La. 2003); *accord McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]").  Without proof of *how* an agent can cause a disease, there can be no proof that the agent in fact *does* cause the disease.  *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

In this case, plaintiff's expert, Dr. Furman, proposed three theories for how Mr. Dedrick's Vioxx use could have caused his heart attack: (1) acceleration of atherosclerosis;

16

(2) destabilization of plaque; and (3) imbalance or, as he calls it, "the decreased prostacyclin" theory. (Dec. 4, 2006 Tr. at 1499:11-19, 1510:13-1511:2 (Test. of Dr. Furman).)

None of these theories are supported by reliable scientific evidence. The first two were barely discussed by Dr. Furman and therefore will be discussed here only briefly. There is no scientifically reliable evidence to support either of these theories. Indeed, Dr. Furman conceded on cross-examination that no studies demonstrate that Vioxx causes either atherogenesis or plaque rupture in humans. (*Id.* at 1533:19-1534:1, 1541:12-1542:5.)[8]  Furthermore, as Dr. Flavahan testified, studies show that Vioxx actually *decreases* atherosclerosis. (Dec. 8, 2006 Tr. at 2471:17-20 (Test. of Dr. Flavahan).)

Finally, Dr. Furman testified that Vioxx caused Mr. Dedrick's heart attack because in a person like Mr. Dedrick with preexisting cardiovascular disease, the suppression of COX-2 leads to a "decrease" in prostacyclin in the vasculature, which in turn means any plaque rupture event is much more likely to become more significant and more obstructive. Dr. Furman's opinion that Vioxx causes a decrease in prostacyclin production in the vasculature, however, is scientifically unreliable and insufficient to meet plaintiff's burden to show general causation.

As the Court knows, Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels *in blood vessels* – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased CV risks since they do not simultaneously interfere with the normal production of

---

[8] Merck incorporates by reference its Memorandum in Support of Motion to Exclude Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis or Causes Plaque Rupture, which it filed on November 15, 2006.

17

thromboxane.[9]  But, as Dr. FitzGerald has recognized on multiple occasions since the 1999 publication, his hypothesis remains just that – a hypothesis – that remains unproven.  In a follow-up article published in 2002, Dr. FitzGerald further explained that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant inhibition of [thromboxane] *are not currently clear*" and that "for the present, the *perception* of a cardiovascular hazard in humans exceeds the evidential basis for this notion."[10]  And in 2004, Dr. FitzGerald along with some of his colleagues concluded that "[w]hile the cause of the apparent excess risk of MI in the Vioxx GI outcome research trial cannot be conclusively established, a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings.  While other mechanisms cannot be discounted, there is currently little evidence in humans to support a prothrombotic effect for coxibs." (Def. Ex. 635.)

Dr. Morrison, who was one of the participants in the clinical trial that gave rise to the FitzGerald hypothesis, echoed these sentiments when he testified that "the preponderance of the data that the people have tried to confirm his hypothesis [sic] has been unable to confirm it." (Dec. 6, 2006 Tr. at 2082:11-2083:4 (Test. of Dr. Morrison).  In fact, the data resulting from a host of studies – including a Tylenol study, a rabbit aorta study and a bleeding time study – are "not consistent with the FitzGerald hypothesis."  (*Id.* at 1998:7-12; 2075:19-2076:5.)  More specifically, these studies showed that prostacyclin in blood vessels comes from COX-1 not

---

[9] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. & EXP. THERP. 1999; 289:735-741.

[10] FitzGerald, GA, *Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations*," AM J CARDIOL 2002; 89 (suppl):26D, 32D (emphasis added).

COX-2, (*id.* at 2006:23-2007:6), that Vioxx does not affect the prostacyclin in blood vessels (*id.* at 2015:7-22), and that Vioxx does not shorten bleeding time, which is something it would be expected to do if the FitzGerald hypothesis was correct and Vioxx created an imbalance that promoted clotting (*id.* at 2021:11-2022:15). Dr. Flavahan similarly testified that because studies show that prostacyclin comes from COX-1, not COX-2, "the notion that Vioxx causes an imbalance that leads to a clot and a heart attack is incorrect." (Dec. 8, 2006 Tr. at 2479:8-2482:9 (Test. of Dr. Flavahan).)

Moreover, after observing that selective COX-2 inhibitors were associated with an increased risk of adverse CV events, the FDA stated in April 2005 that:

> It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized. As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (i.e., ibuprofen, diclofenac) in studies of substantial size and duration. Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible. Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.

(April 6, 2005 Decision Memorandum of the Food and Drug Administration, p. 8.) Thus, the FitzGerald hypothesis remains speculative and cannot form the basis for Dr. Furman's opinion that the prostacyclin/thromboxane imbalance was capable of causing or did cause Mr. Dedrick's heart attack.

### B.   Plaintiff Failed to Prove Specific Causation.

Plaintiff has also failed to prove specific causation by a preponderance of the evidence. There is no scientifically valid evidence for Dr. Furman or Dr. Herrera's specific causation opinions that Vioxx caused Mr. Dedrick's heart attack. In fact, Dr. Furman himself admitted that

he has no medical basis on which to conclude that Vioxx caused Mr. Dedrick's heart attack. (Dec. 4, 2006 Tr. at 1537:21-1539:16 (Test. of Dr. Furman).) Thus, plaintiff failed to satisfy the requirement under Tennessee law that specific cause be proved by competent medical expert testimony. *See Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863, 869 (D. Tenn. 2006). Instead, Dr. Furman claimed that Vioxx caused Mr. Dedrick's heart attack because (1) Mr. Dedrick took Vioxx; (2) the relative risk exceeds 2; and (3) there is a plausible mechanism. (Dec. 4, 2006 Tr. at 1525:8-21 (Test. of Dr. Furman).) Similarly, the only bases for Dr. Herrera's testimony that Vioxx caused Mr. Dedrick's heart attack are the VIGOR and APPROVe studies. (Dec. 5, 2006 Tr. at 1810:2-16; 1819:12-22; 1822:17-21 (Test. of Dr. Herrera).) The most obvious defect in this testimony is that it conflates general cause (relative risk) with specific cause. Even if plaintiff proved that Vioxx *can* cause heart attacks (which he did not), that is not sufficient to prove that Vioxx *did* cause Mr. Dedrick's heart attack.

Moreover, Merck is entitled to judgment as a matter of law because plaintiff failed to eliminate other possible – and more likely – causes of his heart attack. To establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than Vioxx. *Richardson*, 412 F. Supp. 2d at 871 (requiring plaintiff to prove that the drug was a substantial, predominate, or significant factor in causing the injury and not caused by another factor); *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (upholding judgment as a matter of law because plaintiff failed to prove that decedent had not contracted hepatitis from a source other then defendant's pharmaceutical); *Brock*, 874 F.2d at 313; *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to "rule out" other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F.

Supp. 2d 942, 963 (E.D. Ark. 1998), *aff'd,* 191 F.3d 858 (8th Cir. 1999) (recognizing that an expert must "rule in" the suspected cause as well as "rule out" other possible causes); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff "failed to 'rule out' all other possible causes"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he defendants pointed to some likely alternative cause and the expert offered no reasonable explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness").

Plaintiff failed to carry this burden. More specifically, it is undisputed that Mr. Dedrick had multiple risk factors. (Dec. 4, 2006 Tr. at 1519:8-1520:23 (Test. of Dr. Furman).) These risk factors include:

- *Age*: Mr. Dedrick was 47 years old at the time of his heart attack;
- *Pre-exiting cardiac conditions*: Dr. Furman and plaintiff's treating physicians agreed that Mr. Dedrick had preexisting CAD;
- *Family History*: Mr. Dedrick's younger brother had premature CAD and a heart attack at an early age;
- *Smoking*: Mr. Dedrick has smoked 2 packs of cigarettes a day for 35 years and is a current smoker;
- *Alcohol Use*: Mr. Dedrick admits that he abused alcohol;
- *Cocaine Use*: Mr. Dedrick admits to having used cocaine;
- *Obesity:* Mr. Dedrick was overweight at the time of his heart attack;
- *Diabetes*: Mr. Dedrick was diagnosed with diabetes in 1999 but refused, despite his doctor's recommendation, to start insulin until 2004;
- *Stress*: Mr. Dedrick had been under severe stress for a period of two-and-a-half years prior to his heart attack;
- *Gender*: Mr. Dedrick is male; and
- *Hypertension:* Mr. Dedrick was diagnosed with high blood pressure in 1997.

It is not enough for an expert to proclaim that he thinks that Vioxx caused plaintiff's heart attack. Rather "[w]here, as in the instant case, two or more possible causes for an injury are

identified, the plaintiff must establish with reasonable certainty that his injury resulted from a cause for which the defendant would be liable." *Richardson*, 412 F. Supp. at 871 (requiring plaintiff to prove that the drug was a substantial, predominate, or significant factor in causing the injury) (citations omitted).  Dr. Furman did not even attempt to rule out other possible causes during his testimony.  Indeed, he openly admitted that each of Mr. Dedrick's risk factors can independently cause a prothrombotic state.  (Dec. 4, 2006 Tr. at 1551:17-21 (Test. of Dr. Furman).)  Moreover, the relative risk of these other risk factors grossly exceeded that of Vioxx.

Mr. Dedrick's cardiologist and cardiovascular surgeon both testified that given his risk factors and extensive CAD, there was nothing surprising about the fact that he had a heart attack. (Dec. 7, 2006 Tr. 2272:21-24 (Test. of Dr. Koenig); 2328:15-2329:2 (Test. of Dr. Coltharp).) Dr. Koenig testified that Mr. Dedrick's risk factors accounted for his atherosclerosis:

> Q.  Assuming the history that your group was given on Mr. Dedrick was true, do you have an opinion as to whether those risk factors caused the progression, development and progression of Mr. Dedrick's atherosclerosis?
>
> A.  Yes, I presume that those are the typical risk factors we normally see in people that start the initiation of blockages and cause them to progress.

(Dec. 7, 2006 Tr. at 2270:15-21 (Test. of Dr. Koenig).)  He also testified that Mr. Dedrick's heart attack was like any other he sees in his day-to-day practice, and that his risk factors were likely the reason for his heart attack:

> Q.  Based upon what you knew about Mr. Dedrick, do you have an opinion as to what caused his heart attack?
>
> A.  We have the risk factors there.  We see a ruptured plaque with a blood clot, blood vessel in the coronary artery.  This is the stuff we see pretty much on a daily basis.
>
> Q.  Based upon that, what would you say as one of the treating physicians, was the cause of his heart attack?

22

A.    He had a lot of risk factors for coronary disease. I can't tell you which one. I think they all contributed -- to the plaque rupture. I think every one of them was a contributing factor.

Q.    Based upon what you know about Mr. Dedrick's history and what you saw in his heart, is it any surprise he had a heart attack?

A.    No, sir.

Q.    Is there anything about what you saw in his heart that indicated to you that it was something other than -- his heart attack was caused by something other than the normal aging process and his known risk factors.

A.    No, sir, not that I could tell.

(*Id.* at 2272:10-2273:4.)

Similarly, Dr. Coltharp testified that Mr. Dedrick's risk factors put him at the "highest level of risk for coronary artery disease and heart attacks," (Dec. 7, 2006 Tr. at 2317:20-2318:2 (Test. of Dr. Coltharp)), and that there is no reason to believe that Mr. Dedrick's CAD and heart attack were the result of anything other than his risk factors. (*Id.* at 2331:8-15.) Like Dr. Koenig, Dr. Coltharp also testified that Mr. Dedrick's risk factors fully accounted for his heart disease and resulting heart attack:

Q.    Today, as you see the chart and you now recall Mr. Dedrick, is it fair to say that his traditional risk factors are sufficient to fully explain his coronary artery disease?

A.    Yes.

Q.    Are his traditional risk factors, the ones that we've discussed, sufficient to fully explain and account for his heart attack?

A.    Yes.

(*Id.* at 2353:20-2354:6.) Because plaintiff's expert failed to rule out plaintiff's numerous factors,

23

which plaintiff's cardiologist and cardiovascular surgeon testified fully explained his heart disease and heart attack, he cannot show specific causation, and Merck is entitled to judgment as a matter of law.[11]

## III.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S NEGLIGENT DESIGN DEFECT CLAIM.

Plaintiff's negligent design defect claim is not viable under Tennessee law.   In Tennessee, it is not sufficient for plaintiff merely to show that a product caused an injury. *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 911-12 (Tenn. Ct. App. 1993).   Instead, under the Tennessee Products Liability Act ("TPLA"), plaintiff must prove that the product was in a "defective condition." *Id.* (holding that proof of injury is not proof of a defect and proof that a product is defective is required to recover under Tennessee law); *see also* TENN. CODE ANN. § 29-28-105.   The Tennessee Supreme Court has also adopted "comment k" to section 402A of the Restatement (Second) of Torts, holding that because prescription drugs are "incapable of being made safe for their intended and ordinary use" but have benefits that outweigh the hazards of their use, they are considered "unavoidably unsafe." *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 428 (Tenn. 1994); RESTATEMENT (SECOND) OF TORTS § 402A cmt. k.

An "unavoidably unsafe product" is not "unreasonably dangerous" *per se.* RESTATEMENT (SECOND) OF TORTS § 402A cmt. k. To the contrary, "[s]uch a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous." *Id.* (emphasis removed).   Thus, under "comment k," so long as the manufacturer adequately warned of the risks associated with its prescription drug, the design of

---

[11] Merck filed a number of challenges to expert testimony before trial under Federal Rule of Evidence 702 and *Daubert*, as well as other grounds.   Merck incorporates those motions here. Testimony admitted in error is unreliable and does not constitute substantial evidence of causation.

the actual product cannot be held to be "defective." As a result, plaintiff's negligent design defect claims is not viable under the TPLA and comment k. [12] Instead, the claim collapses into a failure to warn claim.

For the same reason, a claim for negligent design must fail also because it is duplicative of plaintiff's failure to warn claim. Because comment k imports a knowledge requirement in determining liability for such products, the analysis under strict liability and negligence becomes identical. *Witherspoon v. Ciba-Geigy Corp.*, No. C.A. 1023, 1986 WL 2138, at *2 (Tenn. Ct. App. Feb. 2, 1986) ("With an unavoidably dangerous drug . . . the standard for liability under negligence and strict liability is essentially the same; namely, did the manufacturer provide an adequate warning?"); *see also Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980) (when comment k applies, "[t]he standard for liability under strict liability and negligence is essentially the same"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1353-54 (3d Cir. 1992) (analysis of liability under comment k is the same for strict liability and negligence); *Klem v. E.I. DuPont De Nemours & Co.*, 19 F.3d 997, 1003 (5th Cir. 1994); *Chambers v. G.D. Searle & Co.*, 441 F. Supp. 377, 381 (D. Md. 1975); *Basko v. Sterling Drug. Inc.*, 416 F.2d 417, 426 (9th Cir. 1969); *Feldman v. Lederle*, 479 A.2d 374 (N.J. 1984); *Smith v. E.R. Squibb & Son, Inc.*, 273 N.W.2d 476 (Mich. 1979); *Ortho Pharm. Corp. v. Champman*, 388 N.E.2d 541 (Ind. App. 1979).

Thus, Tennessee holds that a pharmaceutical manufacturer discharges its duties under the negligence standard by providing an adequate warning:

---

[12] Even if plaintiff's strict liability design defect claim was viable under Tennessee law, it would still fail because plaintiff has not offered legally sufficient evidence to satisfy the essential elements of his claim. As explained below, plaintiff has failed to proffer any legally sufficient evidence to show Vioxx was so "unreasonably dangerous" as to qualify as a "defective" product under the Tennessee Products Liability Act ("TPLA").

> Drug manufacturers have a duty to exercise ordinary and reasonable care not to expose the public to an unreasonable risk of harm from the use of their products. Manufacturers of prescription drugs, like the manufacturers of any other unavoidably dangerous product, have a duty to market and distribute their products in a way that minimizes the risk or danger. They may discharge their duty by distributing the drugs with proper directions and adequate warnings to those who foreseeably could be injured by the use of their products.

*Pittman*, 890 S.W.2d at 428-429 (citing Restatement (Second) of Torts, § 402A cmt. k (1965); internal citation omitted.) Accordingly, Merck is entitled to judgment as a matter of law on plaintiff's negligence claim.

## IV.   MERCK IS ALSO ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FAILURE TO WARN AND BREACH OF IMPLIED WARRANTY CLAIMS.

Even if plaintiff had introduced sufficient evidence to show medical causation – which he did not – his failure to warn claims would still fail as a matter of law. As noted above, the TPLA governs all "product liability action[s]" in Tennessee. TENN. CODE ANN. § 29-28-102.[13] To prevail on a product liability action, the TPLA requires plaintiff to prove that the product was either in a "defective condition" or "unreasonably dangerous".[14] TENN. CODE ANN. § 29-28-105(a); *Harwell v. Am. Med. Sys.*, 803 F. Supp. 1287, 1296 (M.D. Tenn. 1992) ("[I]t makes no difference whether the complaint is couched in terms of negligence, strict liability or breach of [implied] warranty, it has generally been held in the State of Tennessee that in order for a plaintiff to recover under any theory of product liability, the plaintiff must establish that the

---

[13] "Product liability action[s]" include "all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever." TENN. CODE ANN. § 29-28-102.

[14] Express warranty and misrepresentation claims are not subject to this requirement under the TPLA. TENN. CODE ANN. § 29-28-105(b).

product was defective or unreasonably dangerous at the time the product left the control of the manufacturer."); *Zobrist v. Sofamor, S.N.C.*, 1999 U.S. Dist. LEXIS 6489, *26-27 (W.D. Tenn. 6489) (requiring a showing of "defective condition" or "unreasonably dangerous condition" to prevail).

Two other legal principles bear on the analysis of plaintiff's failure to warn claims. First, because Tennessee has adopted comment k to the Restatement, plaintiff must prove that the drug was defective or unreasonably dangerous by reason of the manufacturer's failure to provide an adequate warning. *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 911 (Tenn. Ct. App.1993); *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). Additionally, because Tennessee is a learned intermediary state, manufacturers who have a duty to warn may reasonably rely on physicians to transmit their warnings and instructions. *Pittman*, 890 S.W.3d at 429. Stated succinctly, "to recover for failure to warn under the learned intermediary doctrine, plaintiff must show: (1) that the defendant failed to warn the physician of a risk associated with the use of the product not otherwise known to the physician; and (2) that the failure to warn the physician was both a cause in fact and proximate cause of the plaintiff's injury." *Harden v. Danek Medical*, 985 S.W.2d 449, 451 (Tenn. App. 1998). Here, plaintiff has failed to satisfy either element, and thus, Merck is entitled to judgment as a matter of law on plaintiff's failure to warn and breach of implied warranty claims.

## A.   Because Merck Warned Of The Potentially Knowable Heart Attack Risk In the April 2002 Vioxx Label, There Is Insufficient Evidence That The Warning Was Inadequate.

Mr. Dedrick claims that Merck failed to warn that Vioxx could cause heart attacks. But he has not proved his claim. Under comment k, a manufacturer of an "unavoidably unsafe" product will not be held liable if it has provided adequate warnings of potential risks that are

27

known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge. *See* RESTATEMENT (SECOND) OF TORTS § 402A, cmt. j (1965); *see also Carlin v. Super. Ct. (Upjohn Co.)*, 13 Cal. 4th 1104, 1112 (1996); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (5th Cir. 1984).

Tennessee has tweaked comment k in an important respect. In determining whether the product was in a defective condition or unreasonably dangerous, the state of scientific and technological knowledge available to the manufacturer or seller "at the time the product was placed on the market" controls. TENN. CODE ANN. § 29-28-105.[15]  Additionally, consideration must given to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products. *Id.*

Mr. Dedrick has failed to introduce legally sufficient evidence that Merck failed to adequately warn Dr. Herrera. Vioxx was approved by the FDA and placed on the market in 1999. (Dec. 6, 2006 Tr. at 1995:18-1997:15 (Test. of Dr. Morrison).) At that time, the results of VIGOR were unknown. (Nov. 28, 2006 Tr. at 230:16-231:2 (Test. of Dr. Avorn).) Thus, under the TPLA, Merck properly discharged its duty to warn as of 1999.

Nor can plaintiff show that Merck failed to warn of known or knowable risks at the time of manufacture and distribution (dates he never established) or even at the date of his prescription. The April 2002 label includes the results of VIGOR, which had the highest relative

---

[15]Although the Tennessee courts have not analyzed this section of the TPLA in the pharmaceutical context, the language of the statute indicates that the time the manufacturer "placed [the product] on the market" (the term used in section 29-28-105(b)) must mean something different than the time "it left control of the manufacturer" (the phrase used in section 29-28-105(a)). "[T]he usual rule [of statutory construction is] that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) (quoting SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 46:6 (6th ed. 2000).)

risk for Vioxx of any study conducted to date. This warning was adequate as well. Under Tennessee law, warnings for prescription drugs "generally are adequate when there is a full and complete disclosure of the potential adverse reactions to the drug." *Pittman*, 890 S.W.2d at 429. An adequate warning must be "calculated to bring home . . . the nature and the extent of the danger involved in using the product." *Harwell*, 803 F. Supp. at 1297 (quoting *Young v. Reliance Elec. Co.*, 584 S.w.2d 663, 668 (Tenn. Ct. App. 1979).) When "the instructions are accurate and unambiguous," the question of whether a warning was adequate is a "question of law." *Pittman*, 890 S.W.2d at 429.

Merck fulfilled its duty to warn of known or reasonably scientific knowable risks because it warned Dr. Herrera of a potential risk of heart attack. First, the post-VIGOR label fully disclosed the potential risk of heart attack by including the VIGOR results. (April 2002 Vioxx Label (Def.'s Ex. 453).) Among other things, it provided that "[t]he VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events." *Id.* Consistent with the vote of the FDA Advisory Committee, the FDA-approved label contained a statement that the significance of the cardiovascular findings from the clinical trials was "unknown." (April 2002 Vioxx Label (Def.'s Ex. 453).) But the label also contained the relevant data so that physicians could draw their own conclusions.

Second, Merck brought the warning "home" to Dr. Herrera by providing him with both the VIGOR study and the 2002 label. (Dec. 5, 2006 Tr. at 1792:24-1793:5, 1831:10-24 (Test. of Dr. Herrera); "Dear Healthcare Provider" Letter to Dr. Herrera (Def. Ex. 0453); Dr. Herrera PIR (Def. Ex. 2136).) Although plaintiff's label expert, Dr. Moye, opined that "older doctors . . . may not appreciate the relationship between thrombosis and a heart attack," (Nov. 29, 2006 Tr. at 618:17-25, 620:17-621:3 (Test. of Dr. Moye), that opinion should be disregarded because the

29

evidence presented in this case shows that Dr. Herrera *did* understand that relationship.[16]   *See Guile v. U.S.*, 422 F.3d at 227 (in upholding district court's grant of judgment as a matter of law based on the fact that the expert's opinion was inconsistent with the evidence and unsupported by scientific studies, the court explained that: "We must remember . . . that evidence sufficient to support a jury verdict must be substantial evidence.  An expert's opinion must be supported to provide substantial evidence; we look to the basis of the expert's opinion, and not the bare opinion alone") (internal citations and quotations omitted.)

Here, Dr. Herrera testified that that he understood the language in the label discussing thrombotic events:

> Q.   When you see the phrase "adjudicated serious cardiovascular thrombotic events," do you know from your medical training that that includes a heart attack?
>
> A.   That includes everything.
>
> Q.   Including a heart attack?
>
> A.   Including a heart attack.

(Dec. 5, 2006 Tr. at 1833:14-20.)   Moreover, upon recognizing that Mr. Dedrick was having a heart attack, Dr. Herrera administered a "thrombolytic," or clot-dissolving, drug to Mr. Dedrick (Dec. 5, 2006 Tr. at 1742:6-17 (Test. of Mr. Dedrick); Dec. 7, 2006 Tr. at 2245:7-15 (Test. of Dr. Koenig), further demonstrating that he understood the relationship between thrombosis and heart attacks. Finally, even if Dr. Herrera did not understand the terminology of the label, the patient

---

[16] Dr. Moye also opined that the Vioxx label was inadequate and in fact, could *never* be adequate because in his view, "[i]f the drug can't be used safely and effectively, then you can't write a label for it."   (Nov. 29, 2006 Tr. 579:9-23).   This opinion should also be disregarded for two reasons.   First, it flies in the face of comment k, which recognizes that despite the risks associated with prescription drugs, such drugs are not legally "defective" so long as they contain a warning of those risks.   Second, as discussed below, this opinion is preempted by the FDA's approval of both Vioxx and the label.

30

information sheet ("PIR") provided to Dr. Herrera stated unequivocally, and in plain language that "Heart attacks and similar serious events have been reported in patients taking Vioxx." (*Id.*)

Although Dr. Herrera's testimony is unclear about whether he actually read the label or other information provided to him by Merck, under Tennessee law, the warning is adequate so long as potential side effects are disclosed, as was the case here. *Dunkin v. Syntex*, 443 F. Supp. 121, 124 (W.D. Tenn. 1987). "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *Evridge v. Honda Motor Co., Inc.*, 685 S.W.2d 632, 636 (Tenn. 1985) (citing Restatement Second Torts, § 402a, cmt. j).

It is difficult to understand what more Merck should have been required to put in the label. After all, before 2004, there were no clinical trials that showed that Vioxx had a statistically significant increased risk of heart attack compared to a placebo or other comparator when the dose is 25 mg. Mr. Dedrick cannot complain about a failure to warn of risks that the drug did not cause, and that did not harm him. *See Rezulin Prods. Liab. Litig.,* 331 F. Supp. 2d 196, 200 (D.N.Y. 2004) (explaining in a failure to warn case that "[w]here, as here . . . the plaintiff suffered no injury of which the manufacturer failed to warn, there is no claim"); *see also* Dobbs, THE LAW OF TORTS 1018 (2001) ("[T]he injury suffered must be within the class of injury that the warning requirement was meant to avoid.") Thus, the fact that Merck did not warn about the all-cause mortality data in the Alzheimer's studies is irrelevant. The cardiovascular risk and cardiovascular mortality data *was* in the label. (April 2002 Vioxx Label (Def.'s Ex. 453).)

Moreover, it cannot matter that the cardiovascular risk information was not in the "warnings" section of the label. Under Tennessee law, all that is required to discharge a manufacturer's duty to warn is that the physical location of the warning must be sufficient to alert a reasonably prudent doctor to the danger. In fact, the Tennessee Supreme Court held in *Pittman* that the defendant drug manufacturer had "discharge[d] its . . . duty to warn" even though it had placed risk information about its prescription drug Micronase in the "precautions" section of the label. *Pittman*, 890 S.W.2d at 431. Similarly, the Tennessee Court of Appeal has recognized that information in the "precautions" section of a label is a "warning." *Richardson v. Miller*, 44 S.W. 3d 1, 18 (Tenn. Ct. App. 2000). Also, the FDA recently conducted physician surveys and focus groups on the subject and determined that physicians do not see any meaningful difference between the warnings and precaution sections. (Dec. 7, 2006 (Test. of Dr. Arrowsmith-Lowe).) As a result, the FDA collapsed the two sections in the label into one. (*Id.*)

As a medical doctor, Dr. Herrera was well aware of the fact that important information concerning pharmaceuticals may be found throughout the label. He admitted he "should" have read the precaution section. (Dec. 5, 2006 Tr. at 1835:4-7 (Test. of Dr. Herrera).) As such, the physical placement of the warning, which was dictated by the FDA, cannot be grounds for finding that the warning was inadequate. As explained below, any such claim is preempted.

## B.    There Is Insufficient Evidence Of Warning Causation.

Under Tennessee law, "even if a plaintiff is able to establish that a product is unreasonably dangerous by reason of a defective warning, this alone is not enough to establish liability. The plaintiff must also prove that the inadequate labeling proximately caused the claimed injury." *Goins*, 926 F.2d at 561 (applying Tennessee law; citing *Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn. 1976).) Thus, even if Merck's warnings were inadequate, Mr. Dedrick could not prevail unless he established that Dr. Herrera would have prescribed a

32

different course of treatment if a different warning had been given – *i.e.*, that the faulty warning itself caused the injury. *See King*, 37 S.W.3d at 453 (dismissing plaintiff's failure to warn claim for failing to prove that, had additional warnings been given, his physician would have changed his treatment decision); *Whitehead v. Dycho Co., Inc.*, 775 S.W.2d 593, 599-600 (Tenn. 1989) (concluding that plaintiff must establish that she would not have sustained her injuries had the manufacturer provided additional warnings).

Dr. Herrera's testimony was inconsistent. At times he said that he had not read the label, and at other times, he said he "scanned" it. (*Compare* Dec. 5, 2006 Tr. at 1805:23-25 (Test. of Dr. Herrera) (testifying that he had not read the label), *with id.* at 1831:22-1832:2 (testifying that he had scanned the label).) Obviously, if he did not read the label, or did not read it carefully, it really does not matter what Merck did or did not put in it, because it would not have affected Dr. Herrera's prescribing decision. *See Evridge*, 685 S.W.2d at 636 (under Tennessee law, there is no liability if an adequate warning is given but not read); *Laws v. Johnson*, 799 S.W. 2d 249, 254 (Tenn. Ct. App. 1990) ("It is the physician's duty to remain abreast of product characteristics . . ."); *Richardson*, 44 S.W. 3d at 11 ("The instructions and warnings contained in a prescription drug's labeling and its parallel PDR reference are the primary way of insuring the drug's safe use. Physicians are expected to take the information into account when prescribing the drug"). Regardless of what warning Merck had placed on the label, Dr. Herrera would not have changed his decision to prescribe Vioxx to Mr. Dedrick. Merck therefore cannot be liable for Dr. Herrera's failure to read the information provided. Notably, he also testified that he continues to prescribe drugs to his patients that now have black box cardiovascular warnings, but he never bothered to familiarize himself with their labels. (Dec. 5, 2006 Tr. at 1839:1-1842:19 (Test. of Dr. Herrera).)

33

Thus, the alleged failure to warn (whether grounded in strict liability, negligence, or implied warranty) did not happen and did not cause Mr. Dedrick's injuries. Merck is entitled to judgment as a matter of law.

## V.    MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S COMMON LAW FRAUD AND BREACH OF WARRANTY CLAIMS.

### A.    Plaintiff Has Abandoned His Fraud And Breach Of Warranty Claims.

It is well settled that the parties can proceed at trial only on the claims and defenses that they included in the pretrial order. "Once the [pretrial] order is entered, it controls the scope and course of the trial. If a claim or issue is omitted from the order, it is waived. The claim is waived even if it appeared in the complaint. The law is plain." *Valley Ranch Dev. Co.*, 960 F.2d at 554 (internal citations and quotation marks omitted); *see also* FED. R. CIV. PROC. 16; *Branch-Hines v. Herbert*, 939 F.2d 1311, 1319 (5th Cir. 1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.")

Illustrating the strict application of this rule, the Fifth Circuit in *Valley Ranch* affirmed the district court's dismissal of plaintiff's claims for securities fraud, breach of oral partnership agreements, Racketeer Influenced and Corrupt Organizations Act (RICO) violations, common law fraud, and deceptive trade practices because they had left these claims out of the pretrial order and instead included only a claim for breach of a settlement contract that arose out of these claims. The court's explanation for disallowing the plaintiffs to proceed on these causes of action was simple: "Plaintiffs omitted their underlying claims from the pretrial order, and they are waived." *Valley Ranch Dev. Co.*, 960 F.2d at 554; *see also Allen v. United States Steel Corp.*, 665 F.2d 689, 696 (5th Cir. 1982) (finding no abuse of discretion for concluding that a separate Title VII claim regarding discriminatory restroom facilities was waived when such a

34

claim was omitted from the pretrial order, despite the fact that evidence to support such a claim was introduced for background purposes).

Here, the joint pretrial order submitted by the parties on November 10, 2006 ("PTO") is devoid of any reference to fraud, misrepresentation, or breach of express or implied warranty. (*See* Nov. 10, 2006, Pre-Trial Order, ¶ 5 ("Plaintiff's Claims"), ¶ 9 (Plaintiff's "Contested Issues of Law".) Plaintiff likewise failed to mention in the PTO any of the elements necessary to support these claims. *Id.*

Plaintiff's intent to abandon his fraud and warranty claims is further demonstrated by the fact that plaintiff's counsel made no reference to these claims during opening statement. In fact, he announced to the jurors that the entire case "boil[s] down" to only three questions: "Does Vioxx® significantly increase the risk of a heart attack? Did Merck fail to adequately warn doctors of the heart attack risks? Was Vioxx a substantial contributing factor in Tony Dedrick's heart attack?" (Nov. 27, 2006 Tr. at 98:2-9.) None of these questions has anything to do with claims for fraud or breach of warranty (or design defect for that matter). Because plaintiff has demonstrated a clear intent to abandon these causes of action, the Court should enter judgment for Merck on these claims as a matter of law.

## B.     Plaintiff's Fraud Claims Suffer From A Failure Of Proof.

To prove a fraud case under Tennessee law, plaintiff must establish (1) a misrepresentation of an existing or past material fact; (2) that the misrepresentation was false; (3) that it was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity; (4) reasonable reliance by his physician on the misrepresentation; and (5) that he suffered damage as a result of the misrepresentation. *Carter v. Danek Med., Inc.*, No. CV96-3243-G, 1999 WL 33537317, at *4 (W.D. Tenn. June 3, 1999); *Holt v. Am. Progressive*

*Life Ins. Co.*, 731 S.W.2d 923, 927 (Tenn. Ct. App. 1987); *Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105, 113 (6th Cir. 1977). Similarly, to prove a case of negligent misrepresentation under Tennessee law, plaintiff must establish that "the defendant was acting in the course of his business…; the defendant supplied faulty information meant to guide others in their business transaction; the defendant failed to exercise reasonable care in obtaining or communicating the information; [] the plaintiff justifiably relied upon the information" and that plaintiff suffered damages that were proximately caused by the misrepresentation. *Ritter v. Custom Chemicides*, 912 S.W.2d 128, 131 (Tenn. 1995); *see also ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005) (finding plaintiff's cause of action for negligent misrepresentation failed because plaintiff did not offer any proof that misrepresentation was the cause of his damages); *Prudential Botts & Assocs. Realtors, Inc. v. R & E Props., LLC*, No. E2002-01827-COAR3CV, 2003 WL 21493792, at *1 (Tenn. Ct. App. June 25, 2003) (dismissing negligent misrepresentation claims because plaintiff failed to show that defendant's misrepresentation was the proximate cause of its financial loss).

Mr. Dedrick has failed to introduce sufficient evidence to establish any of these elements, but the Court need focus only on two: whether (1) Merck made a material misrepresentation (2) upon which Dr. Herrera relied. Plaintiff spent hours – perhaps days – of his trial time presenting evidence of supposed misrepresentations without ever proving that Dr. Herrera was aware of them, let alone relied on them. For example, there is no evidence that Dr. Herrera ever saw a single Merck press release, attended an audio conference by Dr. Holt, was present at a pharmacy convention, saw the CV card, or saw the Demopoulos video news release.

What Dr. Herrera did receive from Merck was a PIR enclosing the VIGOR study (and advising of the three additional heart attacks), the 1999 FDA approved label, and the April 2002

36

letter quoting from the FDA approved label and enclosing a highlighted copy of that label. (Dec. 5, 2006 Tr. at 1792:24-1793:5, 1831:10-24 (Test. of Dr. Herrera).) Those communications contained the relevant data known to Merck, and cannot constitute misrepresentations. *See, e.g., Bradley v. Danek Medical, Inc.*, 1999 U.S. Dist. LEXIS 6449, *21-22 (W.D. Tenn. 1999) (granting summary judgment to defendant on fraud and negligent misrepresentation claims in products liability case because physician had knowledge of the risk and used his own medical judgment to decide whether to use the device on plaintiff). Additionally, any claim that the labels, or language derived from the labels, constitutes actionable fraud is preempted.[17]

Nor can plaintiff base his fraud and misrepresentation claims on presentations by Merck's professional sales representatives to Dr. Herrera. As the testimony of Mrs. McAllister demonstrated, Merck sales representatives were required to limit their presentations to information contained in or consistent with the label. (Dec. 5, 2006 Tr. at 1676:10-19 (Test. of Ms. McAllister).) So any claim based on their presentations would be preempted. And, in any event, Dr. Herrera could not recall any specific communication from Merck sales representatives. (Dec. 5, 2006 Tr. at 1844:14-22 (Test. of Dr. Herrera).) The most he could say is that none disclosed a heart attack risk to him. (*Id.* at 1844:14-18.) Dr. Herrera had the VIGOR article and the 2002 label, however, so plaintiff cannot base a fraud claim on the sales representatives' presentations. Because there is no evidence that any communications were "misleading," they cannot form the basis of a fraud claim or a negligent misrepresentation claim under Tennessee law.[18]

---

[17] Preemption is discussed in Part VI.

[18] Similarly, plaintiff cannot prevail on his fraud claim by pointing to Merck's marketing message that it "[s]tands behind the cardiovascular safety of Vioxx" or that "Vioxx is as safe as

*(footnote continued next page)*

Plaintiff also cannot show that Dr. Herrera relied on any supposed misrepresentation. Dr. Herrera tried to claim that he would not have prescribed Vioxx to Mr. Dedrick if only he had known of the VIGOR data. (*Id.* at 1811:3-6.)   But, of course, Merck repeatedly disclosed this information to Dr. Herrera. The evidence shows that Dr. Herrera does not pay any attention to drug labels: he was unaware that many drugs he now prescribes have black box cardiovascular labels. (*Id.* at 1841:6-1842:19.)

Accordingly, the Court should enter judgment on behalf of Merck on Mr. Dedrick's common law fraud claims.

## C.   Plaintiff's Breach of Express Warranty Claim Also Suffers From A Failure Of Proof.

In order to prove his express warranty claim, plaintiff must show:  (1) the existence of warranty; (2) a breach of that warranty; and (3) that the breach proximately caused plaintiff's injury. *See* Uniform Commercial Code Comment TENN. CODE ANN. § 47-2-714. To establish proximate cause in this case, plaintiff must be able to establish that Dr. Herrera specifically relied on such alleged warranty. *See Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 973 (D. Tenn. 2002) (granting summary judgment when plaintiff could not establish that he "ever read or specifically relied on [the defendant's] affirmations").

Plaintiff has presented no evidence that Merck made any express warranties, that it breached any warranties, or that such breach was the proximate cause of any injury to plaintiff. *Dunkin v. Sytex Lab., Inc.*, 443 F. Supp. 121, 126 (W.D. Tenn. 1977) (granting defendant drug manufacturer's motion for summary judgment where "the only representations made by

_____

placebo." (Dec. 1, 2006 Tr. at 1123:24-1124:12) (Test. of Dr. Pechmann). First, plaintiff has failed to show that either of these statements was communicated to or read by Dr. Herrera, let alone relied on by him. Furthermore, as discussed below, any claim that the FDA label, statements derived from the label, or statements that Vioxx is safe are fraudulent or constitute misrepresentations are preempted by federal law.

defendants . . . regarding the safety of Norinyl were contained in the tablet dispenser leaflets.  It is clear no express warranty was made that cerebrovascular accidents would not occur in some Norinyl users as a side effect.")  As a result, Merck is entitled to judgment in its favor on plaintiff's express warranty claim.

## VI.   PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Plaintiff's witnesses challenge the FDA's approval of Vioxx and the content of the post-VIGOR label approved by the FDA.  Such claims are preempted by federal law.  For example, Dr. Moye opined that Vioxx "cannot be labeled for safe and effective use and, therefore, [the 2002 label] does not provide adequate warning" (Nov. 29, 2006 Tr. at 581:2-4), and Dr. Avorn opined that the 2002 label was inadequate because, *inter alia*, it lists all the VIGOR information in the "Precautions" section of the label instead of the "Warnings" section. (Nov. 28, 2006 Tr. at 324:12-325:13.)

In *Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the Supreme Court recognized the importance of allowing the FDA to police its regulatory process to achieve the difficult balance between the various competing goals of the FDCA, and it held that the FDCA impliedly preempts state law tort claims alleging that a pharmaceutical company defrauded FDA or violated FDCA disclosure requirements.  *Id.* at 350, 353 (preempting claims that the defendant made fraudulent statements to the FDA to obtain approval to market a medical device and that, had the misrepresentations not been made, the devices would not have been approved and plaintiff would not have been injured).[19]  The federal regulatory scheme empowers

---

[19] Although *Buckman* involved medical devices, its reasoning and holding apply with equal force to cases involving pharmaceuticals.  *See, e.g., Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

the FDA to control the details of the approval process and to punish and deter fraud where it occurs. *See id.* at 348. This balance is important as "the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals." *Id.* at 350.

In making the arguments about the 2002 label, plaintiff ignores that the contents of the label reflect the balance the FDA struck in approving the post-VIGOR label. The FDA has determined that because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations. *See* 71 Fed. Reg. at 3923-35 (preemption applies, *inter alia*, to claims like plaintiff's that are "based on the failure to include in labeling or advertising a statement the substance of which the FDA has prohibited"); *see also Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538 (E.D. Pa. 2006) (plaintiff's state-law failure to warn claims were preempted because the drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'"); *In re Bextra & Celebrex Mkttg. Sales Practices & Prods. Liab. Litig.*, No. M: 05-1699 CRB, 2006 WL 2374742 (N.D. Ca. Aug. 16, 2006). Plaintiff does *not* allege that Merck failed to warn of any risk that first became known or knowable *after* the FDA approved the revised label. For these reasons, Merck is entitled to judgment as a matter of law.

## VII.   CONCLUSION.

For the reasons stated above, the Court should enter judgment in favor of Merck, pursuant to Rule 50 of the Federal Rules of Civil Procedure. In the alternative, the Court should enter judgment on each of the causes of action plaintiff has failed to prove in his case.

Dated:  December 12, 2006

Respectfully submitted,

s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Mark Ouweleen
Carrie Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Brian S. Currey
A. Patricia Klemic
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

41

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Renewed Motion and Memorandum In Support Of Renewed Motion Of Merck For Judgment As A Matter Of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon counsel for Mr. Dedrick, Andy Birchfield, by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 12th day of December, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel