UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS
LIABILITY LITIGATION

MDL No.: 1657

SECTION: L

This document relates to:

Civil Action No. 06-CV-8325

RALPH GREENLEE, as Personal Representative
of the Estate of THOMAS GREENLEE, and
on behalf of ESTHER GREENLEE, surviving spouse
of THOMAS GREENLEE,

       Plaintiffs,
vs.

JUDGE FALLON
MAG. JUDGE KNOWLES

MERCK & CO., INC.,

       Defendant.
_____/

## AMENDED COMPLAINT

Plaintiff, RALPH GREENLEE, as Personal Representative of the Estate of THOMAS GREENLEE, and on behalf of ESTHER GREENLEE, surviving spouse of THOMAS GREENLEE, sues Defendant, MERCK & CO., INC., and allege as follows:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $50,000.00.

2.     Plaintiff, RALPH GREENLEE, is the son of THOMAS GREENLEE, and is Personal Representative of the Estate of THOMAS GREENLEE (hereafter "Plaintiff") and, at all times material hereto, was a resident of Hillsborough County, Florida. Plaintiff is authorized pursuant to Florida Statute, section 768.20 to bring this wrongful death action against the


EXHIBIT A

Defendants on behalf of the Estate of THOMAS GREENLEE, and on behalf of ESTHER GREENLEE, the surviving spouse of THOMAS GREENLEE.

3. On or about October 15, 2006, Plaintiff THOMAS GREENLEE, (hereafter "Decedent"), died as a result of complications of a Vioxx-induced stroke that he suffered on September 13, 2003.

4. This action arises out of the Defendant's manufacturing, selling, distributing, marketing and/or otherwise promoting Vioxx without proper warnings as to the dangers associated with its use.

5. The pharmaceutical drug Vioxx, manufactured by MERCK & CO., INC., is defective, dangerous to human health, and unfit and unsuitable to be marketed and sold in commerce.

6. MERCK & CO., INC. (hereafter referred to as "MERCK") is a New Jersey Corporation with its principal place of business located in Whitehouse Station, New Jersey.

7. At all times material hereto, MERCK was authorized and did conduct business within the State of Florida and New York.

8. At all times material, MERCK was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting Vioxx (rofecoxib) for consumer use by prescription. MERCK did develop, manufacture, design, package, market, sell and distribute Vioxx in the States of Florida and New York at all times relevant to this action, but withdrew Vioxx from the market on September 29, 2004.

9. Vioxx is among a class of pain medication called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

2

10. NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase (COX-1 and COX-2). COX enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins. Prostaglandins are important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

11. Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

12. Traditional NSAIDs like aspirin, ibuprofen, and naproxen inhibit both COX-1 and COX-2 enzymes simultaneously, providing relief from the inflammation and pain, but at the cost of potential adverse gastrointestinal effects. The prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus which protects the stomach wall from the hydrocholoric acid present in the stomach. By blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and, as a result, can cause harmful gastrointestinal side effects, including stomach ulcerations and bleeding.

13. MERCK and other pharmaceutical companies sought to remedy these side effects suffered by some NSAID users by developing "selective" inhibitors, called coxibs, which targeted only COX-2 production; thus (allegedly) allowing for proper maintenance of gastric tissue while still reducing inflammation. Their development was based on the hypothesis that COX-2 was the source of prostaglandins E2 and I2, which mediate inflammation, and that COX-1 was the source of the same prostaglandins in the stomach lining. By not inhibiting COX-1, whose products provide cytoprotection in the gastric epithelium, these coxibs were thought to decrease the incidence of gastric side effects when compared to traditional NSAIDs that inhibit

3

both COX-1 and COX-2.

14. In making this decision, however, MERCK either intentionally ignored and/or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostaglandin I2 levels, the predominant COX-2 product responsible for preventing platelet aggregation and clotting, while leaving thromboxane A2, the potent COX-1 platelet aggregator and vasoconstrictor, unaffected. By selectively inhibiting prostaglandin I2 without similarly suppressing its COX-1 counterpart, Vioxx and other coxibs expose their users to a host of blood clot-related cardiovascular risks, including heart attack, stroke, and unstable angina.

15. In the late 1980s and early 1990s, MERCK was facing a business crisis because patents on several of its best-selling drugs, including Vasotec, Prinivil, Mevacor, Pepcid, and Prilosec were expiring. Never had a pharmaceutical company faced the loss of so many million dollar patents at the same time. MERCK management even feared that MERCK might not survive as a company.

16. In or about the summer of 1992, MERCK began a Cox-2 research program at the MERCK Frosst Centre for Therapeutic Research in Quebec, Canada. MERCK scientists explored the hypothesis that the therapeutic utilities of NSAIDs were due to inhibition of Cox-2, whereas much of the gastrointestinal toxicity of traditional NSAIDs were due to the inhibition of Cox-1.

17. At the time, MERCK management realized that the development of an NSAID that operated by selectively blocking Cox-2 could produce a much-needed "blockbuster" for the company. As the company has acknowledged, the race was on to find a selective inhibitor of Cox-2.

18. During 1992, MERCK became aware that both DuPont and Taisho, a Japanese pharmaceutical company, had selective Cox-2 inhibitors in development. Almost every one of the more than three hundred scientists and support staff at MERCK-Frosst Centre for Therapeutic Research worked on the discovery and development of Vioxx. After discarding one compound because it lacked sufficient selectivity for Cox-2, and another because metabolic studies raised questions of possible drug-to-drug interactions, MERCK continued to research and develop the compound that eventually became known as Vioxx.

19. On or about December 20, 1994, MERCK filed its first investigational new drug (IND) application with the FDA to conduct clinical trials of Vioxx on humans. The intended use of the drug identified in the IND was the treatment of osteoarthritis and acute pain.

20. MERCK sought to market Vioxx as an alternative to earlier NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects. As early as November 1996, years before FDA approval of Vioxx in May of 1999, MERCK recognized that unless taken in conjunction with aspirin, Vioxx posed a "substantial risk" of "significantly higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes and transient ischemic attacks because, as a selective Cox-2 inhibitor, it lacked aspirin's "anti-platelet [i.e. anti-clotting] effect".

21. In fact, early in the development program for Vioxx, to demonstrate that it selectively inhibited Cox-2, MERCK used a platelet aggregation assay to assess the drug's effect on Cox-1. That research established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit Cox-1. In addition, a MERCK-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

5

22. Two months later, in February of 1997, Vioxx researcher Briggs Morrison conceded that "without Cox-1 inhibition you will get more thrombotic events and kill drug."

23. Responding to this observation, on February 25, 1997, MERCK's Vice President of Clinical Research, Alise Reicin, complained:

> I hear you! This is a no win situation. The relative risk of [adverse GI events with] even low dose aspirin is 2-4 fold. Yet, the possibility of increased CV [cardiovascular] events of great concern-(I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – ie (sic) those that have already had an MI, CABG, PTCA.? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be would we be able to recruit any patients?

24. In December of 1997, MERCK appointed a "Task Force" to investigate the incidence of cardiovascular serious adverse events in the ongoing Vioxx clinical trials. The reason for the investigation was the unexpected results of an early clinical trial which showed a decline in the levels of PGI-2, the most potent of all inhibitors of platelet aggregation, but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx. This imbalance triggered a concern over the potential for thrombotic events.

25. By early 1998, MERCK's own clinical investigators, [based on findings from a MERCK-sponsored study (protocol 023)] advised the company that by inhibiting Cox-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin (a Cox-2 platelet inhibitor that dilates blood vessels) and thromboxane (a Cox-1 platelet activator that constricts blood vessels) such that it would provoke the creation of blood clots.

26. The Task Force agreed to investigate the incidence of thrombotic events by analyzing the ongoing osteoarthritis (OA) trials. Because the trials were still blinded as to

treatment groups, it could not be determined whether the adverse events in the database had occurred in the Vioxx, placebo or "compared to" drug populations. Therefore, the Task Force designed a study in which cardiovascular events from all arms of the OA trials would be added together, and the combined group's incidence rate would be compared to placebo patients from trials of other MERCK drugs. An expedited time frame was established for completion of the analysis, in light of the rush to get Vioxx to market ahead of its competitors.

27. In January of 1998, the analysis pursuant to the Task Force plan showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by MERCK for comparison. These results constituted a clear signal of cardiovascular toxicity that should have triggered immediate investigation and concern. Instead, MERCK made an after-the-fact claim that the placebo comparison group must have had an "atypically low" incidence of cardiovascular events, such that the higher rate in the Vioxx group was downplayed. MERCK further downplayed this important safety signal by deciding to compare the rate in the Vioxx group to a so-called "background" rate, even though no such comparison was stated in the plan for the study. MERCK intentionally chose an inappropriate "background" rate for comparison, from a published study of older patients at high risk of cardiovascular disease. Based upon the result of this comparison, MERCK incorrectly dismissed the signal as of no concern. MERCK failed to disclose the results of this pre-marketing analysis, and instead has misrepresented that it had no indication of cardiovascular risks before Vioxx was marketed.

28. MERCK submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets at doses of 12.5 mg and 25 mg, for relief of the signs and