symptoms of osteoarthritis, the management of acute pain, and the treatment of dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

29.     MERCK also submitted a NDA for rofecoxib to the FDA on November 23, 1998, for oral suspension at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted as NDA 21-052 by the FDA.

30.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for the relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

31.     At the time that Vioxx was approved by the FDA, the labeling for rofecoxib (in the section entitled "Special Studies- Upper Endoscopy in Patients with Osteoarthritis") stated "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

32.     The "Warnings" section of the labeling for rofecoxib at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) effects—Risk of GI Ulceration, Bleeding and Perforation."

33.     MERCK submitted a Supplemental New Drug Application ("sNDA") with the goal of establishing a gastrointestinal safety claim for rofecoxib. In conjunction with the sNDA, MERCK conducted a study known as the VIGOR (VIOXX GI Outcomes Research) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-09 or Naproxen in Patients With

8

Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was conducted from January 6, 1999, through March 17, 2000.

34. The objectives of the VIGOR study were to "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking Vioxx 50mg daily compared to patients in the group taking naproxen 1000 mg/day" and to "study the safety and tolerability" of Vioxx in patients with rheumatoid arthritis.

35. The VIGOR study demonstrated that Vioxx is associated with a lower incidence of serious upper gastrointestinal adverse events of major bleeding, perforation, and obstruction compared to naproxen.

36. However, the VIGOR study also showed a higher cumulative rate of serious cardiovascular thromboembolic adverse events (such as heart attacks, angina pectoris, and peripheral vascular events) in the Vioxx group compared to the naproxen group.

37. On or about November 19, 1999, MERCK's senior biostatistician, Deborah Shapiro, provided a tightly controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board ("DSMB"), which showed that almost twice as many serious cardiovascular events were occurring among patients taking Vioxx as among those taking Naproxen.

38. On or about March of 2000, MERCK released the results of the VIGOR study. The study data revealed, among other things, that Vioxx users suffered five times as many heart attacks than their Naproxen counterparts. In addition, serious cardiovascular events (including ischemic strokes, unstable angina, and sudden unexplained deaths) were reported for more than twice as many Vioxx as Naproxen patients.

39. Despite the results of the VIGOR study, MERCK failed to include in its Vioxx label a cardiovascular warning that Vioxx was contraindicated in high risk CV patients or to warn physicians of this enhanced risk.

40. An FDA report, written by Shari L. Targum, M.D., a Project Manager for the FDA's Division of Anti-Inflammatory Drug Products, dated February 1, 2000, states: "By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from MERCK, the sponsor, had become concerned over the "excess deaths and cardiovascular events experienced in Group A [Vioxx] compared to Group B [naproxen]."

41. On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, former president of MERCK Research Laboratories, concluded that "the CV [cardiovascular] events are clearly there" and stated that MERCK should be prepared to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e. an effect of all of the selective Cox-2 inhibitors and not a risk that was associated only with Vioxx) that is "mechanism based as we worried it was" and as some of the company's consultants had maintained.

42. MERCK continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian pharmacologist Carlo Patrono, one of MERCK's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom MERCK regarded as "the world's most respected and knowledgeable" scientist in his field), advised MERCK in March of 2000 that the dramatic cardiovascular effects observed in the VIGOR study could not plausibly be attributed to Naproxen for several reasons.

43. Furthermore, on or about March 24, 2000, University of Pennsylvania pharmacologist Garrett Fitzgerald, then acting as a MERCK consultant, advised MERCK of a scientific paper about to be published that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first nonfatal myocardial infarctions in females in an epidemiological study, providing further notice to MERK that its insistence that Naprosen was cardioprotective was a fallacy.

44. In June of 2000, in connection with industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which MERCK is a member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did MERCK do nothing to accurately publish these studies, or warn consumers and prescribing doctors, MERCK also denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge from COX-2 Trials,* in August of 2000.

45. MERCK concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for the success of MERCK as a company. Safety concerns over hypertension, thrombosis, edema, and/or cardiovascular events would have negatively impacted MERCK's positioning in the market as compared to its competitor drug, Vioxx (celecoxib), which had been placed into the market by Pharmacia and Pfizer three months prior to the launch of Vioxx.

46. MERCK continued to deny the ill health effects associated with Vioxx while at the same time reaping benefits obtained through its non-disclosure and concealment. MERCK engaged in a massive physician and direct-to-consumer advertising and sampling program and gained continued increases in the market share, which enhanced MERCK's financial stability to

the detriment of its consumers. As a result of MERCK's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and garnered approximately a 23% share of the market.

47.     The FDA sent a letter to MERCK dated December 16, 1999, stating that certain Vioxx promotional pieces "are false and misleading because they contain representations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

48.     On June 22, 1999, MERCK contracted with Peter Holt, M.D., to conduct Vioxx promotional audio conferences, using content provided by MERCK, which were to be presented to health care professionals as educational programs. The conferences (one on June 8, 2000; one on June 13, 2000; one on June 16, 2000, and three on June 21, 2000) were arranged by MERCK, presented on behalf of MERCK, and moderated by MERCK employees. Some of the content of these conferences was later found by the FDA to be "false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen."

49.     Further, in it's January 23, 2001, 8-K filing with the Securities and Exchange Commission, MERCK fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, Vioxx, Zocor, Cozaar/Hyzaar, Fosamax, and Singular, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.
>
> "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. Vioxx, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinary successful 1999 launch, Vioxx has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, Vioxx now accounts for approximately 50% of the new prescriptions in the COX-2 class, despite being second to market in this class in

12

the United States. Vioxx achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR study, in which Vioxx reduced the risk of serious gastrointestinal outcomes research study, in which Vioxx reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that Vioxx significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

50. In response to the growing public expressions of concern over the cardiovascular safety profile of Vioxx, MERCK issued a press release entitled "MERCK Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001. This press release states that Vioxx has a "favorable cardiovascular safety profile." The FDA would later tell MERCK:

> Your claim in the press release that Vioxx has a "favorable cardiovascular profile" is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group…as in the naproxen treatment group… in the VIGOR study.

51. Despite admonishments from the FDA for its fraudulent marketing, MERCK continued to increase sales of Vioxx and profits by withholding information from Plaintiffs, prescribing doctors, the consuming public, and the health care industry. For example, in November of 2000, MERCK orchestrated the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

52. On or about August 29, 2001, the Journal of American Medical Association (JAMA) published a peer reviewed epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, showing that MERCK had concealed the risk of developing a "confirmed

adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in MERCK's clinical trials, including VIGOR. The study found a statistically increased risk (of the magnitude of a four to five-fold increase) for developing serious cardiovascular events, including heart attacks, in Vioxx users over placebo and naproxen.

53. In the JAMA study, the authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events."

54. On September 17, 2001, Thomas W. Abrams, R. Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of MERCK, relating to "promotional activities and materials for the marketing of Vioxx (refecoxib) tablets."

55. The Warning Letter, MERCK's ***third*** such letter from the FDA concerning Vioxx, stated that MERCK had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

56. The eight-page Warning Letter outlines, in detail, the conduct of MERCK that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions":

14