The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

> Immediately ceasing all violative promotional activities, and the dissemination of all violative promotional materials for Vioxx.

> Issuing a "Dear Healthcare Provider" letter to correct false or misleading impressions and information. The proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

57.     MERCK knew the warnings contained in the label were ineffective and used its sales force and other marketing efforts to downplay (rather to improve) its communication of the risks posed by Vioxx. For example, in its 2001 annual report, MERCK states: "The Company also noted that a number of state and federal lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx....these lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are without merit and will vigorously defend them." Sales representatives were instructed not to discuss cardiovascular risks of Vioxx and were trained to "dodge" physicians' Vioxx-related safety concerns.

58. In response to a growing body of evidence of Vioxx's safety problems, MERCK attempted to obfuscate this negative information by authoring and sponsoring reviews that set forth the unsubstantiated claim that naproxen had a cardioprotective effect and therefore accounted for the cardiovascular risks among its Vioxx users. However, this theory was debunked in January of 2002, by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in *The Lancet*. The *Lancet* article concluded that there is an absence of a protective effect of naproxen or other non-aspirin, non-steroidal anti-inflammatory drugs on the risk of coronary heart disease.

59. An article entitled "Why Do Cyclooxygenase-2 Inhibitors Cause Cardiovascular Events?' authored by Dr. Bing, Dr. Lomnicka, and others at the Department of Experimental Cardiology at the Huntington Medical Research Institute was published in the journal *Pharmacology* on February 6, 2002. The authors explained that a selective Cox-2 inhibitor, such as Vioxx, can promote adverse cardiovascular events by tipping the balance of prostacyclin and thromboxane in favor of thromboxane. This imbalance promotes both platelet aggregation and vasoconstriction, which can lead to catastrophic cardiovascular events, including stroke, heart attack, and pulmonary embolism.

60. In October of 2001, MERCK learned of the publication of an article stating that there was a higher reporting rate for adverse events relating to renal and cardiovascular effects for Vioxx compared to Vioxx,. MERCK responded by conducing an internal analysis of reported adverse events for Vioxx and Vioxx. MERCK's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx in comparison to Vioxx. Once again, MERCK disregarded yet another signal of cardiovascular toxicity and failed to disclose it to the public. Instead, MERCK blamed the adverse result on an

alleged discrepancy in the number of events entered into the regulatory database for the two drugs. As was the case with the Task Force analysis of 1997 and VIGOR study of 2000, MERCK once again searched for and found a reason to exonerate Vioxx and keep it on the market rather than provide accurate information about safety risks to physicians and patients.

61. In approximately April of 2002, MERCK was required to place cardiovascular warnings on its Vioxx labeling based on the results of the VIGOR study. In addition, MERCK was required to place new label warnings relaying that Vioxx 50 mg per day is not recommended for chronic use.

62. An article by Dr. Solomon and others at Harvard Medical School, entitled "Relationship between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults," was published in the April 2004 edition of the journal *Circulation*. The Harvard authors concluded the following from their study: "[R]ofecoxib [Vioxx] use was associated with an elevated relative risk of AMI [acute myocardial infarction] compared with celecoxib [Vioxx] use and no NSAID use. Dosages of rofecoxib [greater than] 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg."

63. An article by H.K. Choi in the May 2004 edition of the *American Journal of Medicine*, entitled "Effects of Rofecoxib and Naproxen on Life Expectancy Among Patients with Rheumatoid Arthritis: A Decision Analysis," concludes the following: "Our analysis suggests a longer life expectancy with naproxen than rofecoxib [Vioxx] ....except those at low risk for myocardial infarction or at a high risk for gastrointestinal toxicity."

64. David Graham, M.D., an employee of the Food & Drug Administration, made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs" at the 20th International Conference

on Pharmacoepidemiology and Therapeutic Risk Management, held from August 22-25, 2004, in Bordeaux, France. The data for the presentation was taken from a study done by Kaiser Permanente under a contract funded by the FDA, and concluded that Vioxx taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the Kaiser Permanente study.

65. On August 26, 2004, Peter Kim, President of MERCK Research Laboratories, issued a press release stating the following: "MERCK strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international meeting this week . . . . MERCK stands behind the efficacy and safety, including cardiovascular safety of Vioxx."

66. On September 27, 2004, MERCK informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the APPROVe study, had recommended that the study be stopped early for safety reasons.

67. The APPROVe study was not intended to be a cardiovascular risk assessment study. It was commissioned by MERCK to look at the effect of Vioxx on people at risk for developing recurrent colon polyps.

68. The APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study. Defendant Merck has falsely claimed that the APPROVe data only showed an increased risk for people taking Vioxx for more than 18 months. Merck's claim has since been discredited.

69. MERCK representatives informed the FDA in a September 28, 2004, meeting that MERCK would withdraw Vioxx from the United States market.

70.     MERCK and the FDA each announced the withdrawal of Vioxx from the United States market on September 30, 2004. MERCK also announced worldwide withdrawal on the same day.

71.     An FDA analysis, based on data from the Kaiser Permanente study, projects that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Vioxx, another Cox II inhibitor, been used instead of Vioxx.

72.     Approximately 20 million people in the United States took Vioxx between its introduction in 1999 and its withdrawal in 2004, and, during this time period, MERCK engaged in a common scheme in marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as Plaintiffs.

73.     At all times relevant to this litigation, MERCK enjoyed a significant market share based upon false claims of Vioxx's efficacy, safety, and superiority which resulted a result of the actions of Defendants, including a very aggressive marketing program which included financial incentives to sales teams, the hiring of 700 new sales representatives, significant payments and other benefits to high-prescribing physicians, and a massive direct-to-consumer advertising and physician sampling program. MERCK encouraged the prescription and use of Vioxx through aggressive marketing campaigns, including detailing of physicians by Defendants and others as well as direct-to-consumer advertising. As such, Defendants had a duty not only to provide Plaintiff THOMAS GREENLEE's prescribing physician with adequate warnings but also to provide Plaintiffs with adequate warnings regarding Vioxx and the safety risks associated with ingestion of the drug.

74.     In an elaborate and sophisticated manner, MERCK aggressively marketed Vioxx directly to consumers and medical professionals (including physicians and leading medical

scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Vioxx on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from MERCK's successful advertising and marketing blitz, third party payors were compelled to add Vioxx to their formularies. MERCK's marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Vioxx.

75.     MERCK knew of the cardiovascular risks before the U.S. Food and Drug Administration (the "FDA") approved Vioxx for sale, but they ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Vioxx. MERCK's omission, suppression, and concealment of this important information enabled Vioxx to be sold to, and purchased, or paid for by the consumers at a grossly inflated price.

76.     Because MERCK engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Vioxx as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Vioxx, MERCK was able to justify pricing Vioxx significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had MERCK disclosed the truth about Vioxx, MERCK would not and could not have reaped the billions of dollars in Vioxx sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

77.     MERCK intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Vioxx from Plaintiffs, the public, the medical community, and

others. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Vioxx, and prevented Plaintiffs from obtaining all the material information that would be important to his decision as a reasonable person to purchase, pay for, and/or use Vioxx.

78. MERCK's systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiffs to purchase, pay for, and/or use Vioxx; and caused Plaintiffs losses and damages as asserted herein.

79. Had MERCK performed adequate testing prior to approval and "market launch," the scientific data would have revealed significant increases in stroke and myocardial infarctions amongst the intended population of Vioxx consumers. Adequate testing would have shown that Vioxx possessed serious side effects. MERCK should have taken appropriate measures to ensure that their defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings that accurately and fully reflected the scope and severity of adverse effects associated with Vioxx.

80. In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but MERCK intentionally suppressed this information in order for them to gain significant profits from continued Vioxx sales.

81. MERCK's failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for MERCK and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

82. At the time that MERCK manufactured, advertised, and distributed VIOXX to consumers including Plaintiffs, MERCK intentionally or recklessly ignored and/or withheld