# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | ) | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION: L |
| THIS DOCUMENT RELATES TO ALL | ) | |
| CASES | ) | JUDGE FALLON |
| | ) | MAG. JUDGE KNOWLES |

**PSC'S RESPONSE TO THE JOINT MOTION OF MERCK & CO, INC.  AND INSURERS TO QUASH AND/OR FOR PROTECTIVE ORDER PREVENTING IRRELEVANT AND INAPPROPRIATE INSURANCE RELATED DISCOVERY**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     MERCK AND THE INSURERS BEAR THE BURDEN OF PROOF, MERCK'S
        BOILERPLATE OBJECTIONS ARE INADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    INSURANCE-RELATED DISCOVERY IS REASONABLY EXPECTED TO PROVIDE
        INFORMATION NECESSARY TO UNDERSTAND MERCK'S KNOWLEDGE OF THE
        RISKS ASSOCIATED WITH VIOXX AND MERCK'S INSURANCE SYSTEM. . . . . 8

        A.      Insurance-Related Discovery Is Reasonably Likely to Provide Relevant Evidence 8

        B.      Case Law Supports Discovery About Prior Claims Brought Against Merck and
                Insurance Experience with Such Claims.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.      Insurance-Related Matters Receive No Special Discovery Protection. . . . . . . . 14

                1.      Normal Rules of Discovery Apply to Insurance Policies. . . . . . . . . . . . 14
                2.      Insurance-Related Discovery Will Enable Plaintiffs to Understand Merck's
                        Insurance System.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        D.      Merck Has Violated Rule 26(a)(1)(D) Insurance Policy Discovery
                Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        E.      Merck's and the Insurers' Precedents Do Not Support Their Position . . . . . . . 23

IV.     CONFIDENTIALITY DOES NOT PRECLUDE DISCOVERY OF RELEVANT
        INFORMATION FROM THE INSURANCE ARBITRATIONS. . . . . . . . . . . . . . . . . . 25

        A.      Neither the Confidentiality Orders Nor UK Law Prohibit Disclosure in this Case 26

        B.      Federal Decisions Support Disclosure in this Case.  . . . . . . . . . . . . . . . . . . . . . 29

                1.      Arbitration Cases Support Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                2.      Cases Allowing Discovery Despite Pre-Existing Protective Orders Support
                        Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                3.      U.S. and UK Case Law Balance Interests in Assessing Pre-Existing
                        Confidentiality Orders.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
                4.      Merck's and the Insurers' Precedents Do Not Support Their Position.  . 36

V.    DISCOVERY FROM THE INSURERS IS APPROPRIATE AND DIRECT ACTIONS
      AGAINST INSURERS MAKE INSURANCE-RELATED DISCOVERY CRITICAL TO
      FULFILLING THIS MDL'S MISSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      A.    Discovery From the Insurers is Appropriate and Not Overly Burdensome  . . . . 38

      B.    Discovery From the Insurers is Critical to Fulfilling This MDL's Mission  . . . . 40

            1.    Authority for Direct Actions Against the Insurers . . . . . . . . . . . . . . . . . 40
            2.    Precluding Insurer Discovery Is Inconsistent with This MDL's Purpose  44

VI.   REQUIRING MERCK TO PRODUCE RELEVANT INFORMATION FROM DOJ AND
      SEC INVESTIGATIONS WOULD NOT IMPLICATE ATTORNEY-CLIENT PRIVILEGE
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Ali Shipping Corp. v. Shipyard Trogir*
[1998] 1 Lloyd's Rep. 643, 650-651 (Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*All AT&T Corp. Fiber Optic Plaintiffs v. All AT&T Corp. Fiber Optic Defendants*
MDL Docket No. 1313, 2002 U.S. Dist. LEXIS 11219 (S.D. Ind. June 5, 2002) . . . 23, 24

*Associated Elec. & Gas Ins. Servs. Ltd. [AEGIS] v. European Reinsurance Co. of Zurich*
[2003] 1 All.E.R. (Comm.) 253, 1 W.L.R. 1041 (Privacy Counsel) . . . . . . . . . . . . . . . . 37

*Ballard v. Allegheny Airlines, Inc.*
54 F.R.D. 67 (E.D. Pa. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Bennett v. Krupkin*
1999-2702 (La.App. 1st Cir. 12/22/00), 779 So.2d 923,
*writ denied*, 2001-0193 (La.3/30/01), 788 So.2d 1190 . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Blockbuster Entertainment Corp. v. McComb Video, Inc.*
145 F.R.D. 402 (M.D. La 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Boyer v. Riverhead Central School Dist.*
No. CV 05-4955, 2006 WL 3833040, at *2 (E.D.N.Y. Dec. 29, 2006) . . . . . . . . . . . . 21

*Burns v. CLD, Inc.*
886 So.2d 607, 614 (La. App. 2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Calabro v. Stone*
224 F.R.D. 532, 533-34 (E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Caringal v. Karteria Shipping, Ltd.*
No.  Civ.  A  99-3159, 2001 WL 874705,
2001 A.M.C.1236 (E.D. La. Jan. 24, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Contship ContainerLines Ltd.*, *v. P.P.G. Industries, Inc.*
No. 00 Civ. 0194 RCCHBP, 2003 WL 1948807 (S.D.N.Y. Apr. 23, 2003) . . . . . . . . . 30

*Covey v. Simonton*
No. 04CV3273NG, 2005 WL 483439 at *1 (E.D.N.Y. Feb. 23, 2005) . . . . . . . . . . . . . 21

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page**

*Dollar v. Long Mfg., N.C., Inc.*
    561 F.2d 613, (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978) . . . . . . . . . . . . . . . . . . 12

*Dolling-Baker v. Merrett*
    [1991] 2 All E.R. 890, 899 (Ct. App) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28, 34

*Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.*
    136 F.R.D. 334, 335-36 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Edwards v. Royal Indem. Co.*
    182 La. 171, 161 So. 191 (La. 1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Excelsior College v. Frye*
    223 F.R.D. 583 (S.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Florida ex rel. Butterworth v. Jones Chemicals, Inc.*
    148 F.R.D. 282 (M.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Grubbs v. Gulf Int'l Marine, Inc.*
    625 So.2d 495 (La. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hassneh Insurance Co. of Israel and Others v. Steuart J. Mew*
    [1993] 2 Lloyd's Rep. 243 (Q.B.), 1993 (W.L. 963287) . . . . . . . . . . . . . . . . . . . . . 29, 37

*Hedgepeth v. Guerin*
    96-1044 (La.App. 1st Cir. 3/27/97), 691 So.2d 1355, *writ denied*, 97-1377 (La. 9/26/97), 701
    So.2d 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hickman v. Taylor*
    450 F.3d at 1196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re AirCrash Disaster Near Roselawn, Ind. Oct. 31, 1994*
    172 F.R.D. 295 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*
    293 F.3d 289, 291 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Enercons Virginia, Inc.*
    812 F. 2d 1469 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

iv

**TABLE OF AUTHORITIES**
**(cont'd)**

Page

*In re Martin Marietta Corp.*
856 F.2d 619, 622-24 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Qwest Commc'n Int'l, Inc.*
450 F.3d 1179, 1186-96 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Terra International, Inc.*
134 F.3d 302, 306 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In the Matter of Talbott Bigfoot, Inc.*
887 F.2d 611 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Jackson v. Firestone Tire & Rubber Co.*
788 F.2d 1070, 1083 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jones & Laughlin Steel Corp. v. Matherne*
348 F.2d 394, 401 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Josephs v. Harris Corp.*
677 F.2d 985, 991-992 (3rd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lawrence E. Jaffe Pension Plan v. Household International, Inc.*
No. Civ.A 04-N-1228 (CBS, 04X-0057),
2004 WL 1821968 (D. Colo. Aug.13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*LeBlanc v. Broyhill*
123 F.R.D. 527 (W.D.N.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lewis v. Allstate Ins. Co.*
730 So. 2d 65, 71 (Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*London & Leeds Estates Ltd. v. Parabas Ltd.*
[1995] 02 EG 134, [1995] 1 EGLR 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*
894 F.2d 1482, 1485 (5th Cir. 1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Missouri Pacific R. Co. v. Aetna Cas. & Sur. Co.*
No. 3-93-CV-1898-D, 1995 WL 861146 (N.D. Tex. May 17, 1995) . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES
## (cont'd)

Page

*Mitchell v. Fruehauf Corp.*
568 F.2d 1139, 1147 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Morales-Melendez v. S.S. Mut. Underwriting Ass'n.*
763 F. Supp. 1174, 1179 (D.P.R. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Native American Arts, Inc. v. Bundy-Howard, Inc.*
No. 01 C 1618, 2003 WL 1524649,
2003 U.S. Dist. LEXIS 4393 (N.D. Ill. March 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . 23

*Nguyen v. Excel Corp.*
197 F.3d 200 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Odfjell Asa v. Celanese AG*S
F. Supp. 2d 283 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Oklahoma Pub. Co. v. Continental  Ins. Co.*
No. CIV-90-1251-A, 1991 WL 323804 (W.D. Okla. Nov. 5, 1991) . . . . . . . . . . . . . . . 24

*Panola Land Buyers Ass'n v. Shuman*
762 F.2d 1550, 1559 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Quinlan v. Liberty Bank and Trust Co.*
575 So.2d 336, 352 (La. 1991) (on rehearing) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ramos v. Liberty Mut. Ins. Co.*
615 F.2d 334, *decision clarified*, 620 F.2d 464
(5th Cir. 1980), *cert. denied sub nom.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Roesberg v. Johns-Manville Corp.*
85 F.R.D. 292, 296-97 (E.D.Pa.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rucker Co. v. Shell*
449 U.S. 1112 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*S.E.C. v. Brady*
No. 3:05CV-1416-M, 2006 WL 3301865, at *9 (N.D. Tex. Oct. 16, 2006) . . . . . . . . . 48

*Simon v. G.D. Searle & Co.*
816 F.2d 397, 404 (8th Cir.)., *cert. denied* 484 U.S. 917 (1987) . . . . . . . . . . . . . . . . . . . 15

**TABLE OF AUTHORITIES**
**(cont'd)**

Page

*Sun Life Assurance Co. Of Canada v. Lincoln National Life Ins. Co.*
    [2004] EWCA Civ. 1660, [2006] 1 All E.R.
    (Comm) 675, [2005] 1 Lloyd's Rep 606 (Ct. App.), at ¶ 67 . . . . . . . . . . . . . . . . . . . . . . 34

*Tajik Aluminum Plant v. Ermatov*
    [2006] All E.R. (D) 448, at ¶ 83 (Q.B.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Tucker v. Ohtsu Tire & Rubber Co., Ltd.*
    191 F.R.D. 495, 497-98 (Md. 2000) . . . . . . . . . . . . . . . . . . . . . . . 13, 30, 31, 32, 33, 34, 35

*United Oil Co., Inc. v. Parts Associates, Inc.*
    227 F.R.D. 404, 411 (D. Md. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Garrett*
    571 F.2d 1323, 1326 n.3 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. King*
    536 F.Supp. 253 (C.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Mass Inst. Of Tech*
    129 F.3d 681, 686 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Vertex Data Science Ltd. v. Powergen Retail Ltd.*
    2006 WL 2629805 (Q.B.), [2006] 2 Lloyd's Rep. 591 . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Westinghouse Elec. Corp. v. Republic of Philippines*
    951 F.2d 1414, 1424 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Zimmerman v. Intl. Companies & Consulting, Inc.*
    107 F.3d 344, 346 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

**Statutes**

22 Guam Code Ann., § 18305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

La. Rev. Stat. Ann., § 22:55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

La. Rev. Stat. 22:655 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## TABLE OF AUTHORITIES
### (cont'd)

**Page**

26 P.R. Laws Ann., tit. 26, § 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

R.I. Gen. Laws § 27-7-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

11 U.S.C. § 548 (a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UFTA § 4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UFTA § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wis. Stat., § 632.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

### Regulations

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9, 21

Fed. R. Civ. P. 26(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P. 26(a)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 26(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14, 15

Fed. R. Civ. P. 26(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13, 14, 15, 30

Fed. R. Civ. P. 26(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 21

Fed. R. Civ. P. 26(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fed. R. Civ. P. 26© . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 36

Fed. R. Civ. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5, 25

Fed. R. Civ. P. 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**TABLE OF AUTHORITIES**
**(cont'd)**

Page

Fed. R. Civ. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 40, 45

Fed. R. Evid. 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**Other Authorities**

Laurie Kratky Doré
     *Public Courts Versus Private Justice: It's Time to Let Some Sun Shine In on Alternative*
     *Dispute Resolution*, 81 CHI-KENT.L.Rev. 463, 510 n.252 (2006) . . . . . . . . . . . . . . . . 37

Olivier Oakley-White, *Confidentiality Revisited: Is International Arbitration Losing One of its*
     *Major Benefits*, 6 INTERNAT'L ARB. L.Rev. 29, 31 (2003) . . . . . . . . . . . . . . . . . 27, 28

The Plaintiffs' Steering Committee (PSC) files this brief in opposition to the Joint Motion of Merck & Co., Inc. And Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-Related Discovery.  The PSC seeks to compel production of discovery it issued to Merck related to insurance matters of Merck and its Insurers and further seeks to compel Merck and its Insurers to designate corporate representatives to testify regarding the insurance-related issues identified in Plaintiffs' Notices of Rule 30(b)(6) Deposition, and compelling Merck and its Insurers to respond to Plaintiffs' associated Requests for Production of Documents.  This Memorandum is filed in support of this Motion, in opposition to the *Joint Motion of Merck & Co., Inc. and Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-Related Discovery*, and in Reply to (1) the *Memorandum in Support of Joint Motion of Merck & Co., Inc. and Insurers to Quash and/or for Protective Order Preventing Irrelevant and Inappropriate Insurance-related Discovery* ("Joint Mem."), filed Jan. 16, 2007, and (2) *Merck & Co., Inc.'s Motion and Incorporated Memorandum for A Protective Order Preventing Corporate Deposition on Duplicative, Irrelevant and Privileged Topics* ("Merck Mem."), filed Nov. 16, 2006.

## I.     Introduction and Background.

Information about insurance-related issues in this case is vital because the disputes between Merck and its Insurers relate to liability issues and to Merck's financial condition and insurance status.  Key elements of both Plaintiffs' claims and the Insurers' coverage denials are what Merck knew about the health risks of Vioxx and when the company knew it.  Consequently, information about Merck's insurance coverage, Merck's communications about risk to its Insurers, and claims experience are reasonably expected to lead to admissible evidence.  Plaintiffs' discovery requests

therefore cannot be dismissed, as Merck and its Insurers do, with boilerplate claims and objections of irrelevance.

Merck has violated FRCP 26(a)(1)(D)'s basic requirement that all possibly relevant insurance polices be produced. Despite admitting that Vioxx was in development and/or clinical trials since at least 1991, Merck has refused to provide insurance policies prior to 1996. The insurance policies that Merck has provided contain insufficient information to understand Merck's complex insurance system and its volatile changes during the Vioxx era. The discovery to date has been only policies with allegedly unknown numbers and there has not been a full explanation of how Merck or its Insurers interpret the policies' relations to each other. Testimony from knowledgeable insurance representatives of Merck and its Insurers are needed to provide Plaintiffs a reasonable understanding of Merck's insurance coverage.

Merck's and the Insurers' irrelevancy claim is inconsistent with their assertion of confidentiality. The premise of the confidentiality order they invoke is that information in the arbitration would be valuable to Plaintiffs. The confidentiality order thus shows the relevance of arbitration documents and testimony to this MDL. Such information is therefore presumptively discoverable. Merck's fabricated conflict between the confidentiality order and discovery in this case does not exist. The order expressly waives confidentiality to comply with court orders. Merck and the Insurers also misrepresent the legal rules governing UK arbitration confidentiality. Neither UK law nor U.S. law precludes reasonable discovery of testimony and documents presented in the arbitration proceedings. Both legal systems reject the ironclad confidentiality principle that Merck and the Insurers misleadingly claim to be governing law. Both legal systems balance the interest

2

in confidentiality against the need for fair adjudication.  That balancing clearly supports Plaintiffs on the facts of this case.

Merck's Insurers claim that responding to straightforward inquiries about Vioxx-related information is unduly burdensome on them as non-parties.  Discovery principles entitle Plaintiffs to discovery from non-parties with information as directly and obviously relevant as that possessed by the Insurers.  What Merck was telling all stakeholders about Vioxx risks is critical evidence in this MDL.  And while Merck's Insurers are formally non-parties, discovery from them is critical to successfully conducting this MDL.  Thousands of Plaintiffs have the right to bring direct actions against the Insurers.  Discovery from the Insurers will occur against them either now in a unified fashion or piecemeal in dozens of scattered forums.  Unified discovery from the Insurers is necessary for this MDL to fulfill its mission of efficiently processing Vioxx-related pretrial discovery.

*Plaintiffs' Diligent Pursuit of Insurance-Related Discovery*.  In an effort to understand insurance-related issues, the PSC issued discovery to Merck, consisting of a Notice of 30(b)(6) deposition and related Requests for Production of Documents, and similar discovery to the Insurers.  Merck initially identified a number of insurance policies in its Rule 26(a)(1)(D) production. This production was limited to policies dating back to 1996 and did not include policies covering the full period of Merck's involvement with Vioxx.  Nor was the Rule 26(a)(1)(D) production accompanied by any meaningful explanation of how the various policies fit together.  Thus, some of the deposition topics and requests sought the basic information necessary to explain the complicated relationship between Merck and its Insurers.

Additional discovery was directed specifically at obtaining information relevant to the coverage issues that have taken center stage in this litigation.  The PSC asked for testimony and

3

documents relating to coverage investigations, coverage defenses, and coverage determinations made by Merck or any of its insurers.  The PSC also requested information on the representations that Merck made regarding its coverage to regulatory agencies such as the SEC during the investigations that ensued after Merck withdrew Vioxx.  The PSC also sought information relating to the insurance coverage arbitrations underway in London.

*Merck's and the Insurers' Responses.*  Merck and the Insurers responded to the discovery requests with boilerplate objections and filed for a protective order rather than designate corporate representatives to appear at the Rule 30(b)(6) depositions.[1]  After receiving Merck's responses and motion, the PSC requested a conference with Merck's lawyers in the hope of resolving at least some of these issues.  That meeting took place on December 22, 2006, in Washington, D.C.  Although Merck's lawyers finally provided the PSC with an insurance coverage chart at that meeting, the vast majority of discovery issues remain unresolved and, as shown below in Part III, raised as many questions as it answered.

At the discovery conference, Merck explained how Merck's various insurance policies fit together to create layers of insurance–totaling $1billion in coverage--above Merck's $25 million self-insured-retention level.  But Merck refused to provide the PSC with any additional insurance-related information.  Merck argued, incredibly, that none of the discovery that the PSC requested would be relevant or lead to the discovery of admissible evidence.  Merck also relied on the alleged confidentiality of its London arbitrations, as well as the confidentiality of U.S. government investigations, as excuses to refuse further production.  At the conclusion of the meeting, Merck's

---

[1]  See Merck's discovery responses, attached as Exhibit "B" to Merck's Motion and Memorandum For Protective Order filed November 16, 2006; see Insurer's Discovery Responses, attached to the Omnibus filing as Exhibits "L" parts 1 and 2.

lawyers made it clear that they would not voluntarily comply with any of the PSC's remaining discovery requests.  Subsequently, the Insurers' filed responses to discovery issued by the PSC on January 10, 2007 and these responses also consist of little more than boilerplate objections.

## II.    Merck and the Insurers Bear the Burden of Proof; Merck's Boilerplate Objections Are Inadequate.

The Federal Rules of Civil Procedure support liberal discovery and allow parties to obtain discovery regarding any matter, not privileged, as long as it is relevant to either the claim or defense of any party. FRCP 26(b)(1).   The Rules state that "relevant" information does not have to be admissible at trial as long as it is reasonably calculated to lead to the discovery of admissible evidence. *Id*.

As the party resisting discovery, Merck and the Insurers must show specifically how the PSC's Notice of 30(b)(6) Deposition and Requests for Production are not relevant, or how each question is vague, overly broad, unduly burdensome, or otherwise improper.  *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir. 1990) ("party resisting discovery 'must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive,'" *quoting Josephs v. Harris Corp.,* 677 F.2d 985, 991-992 (3rd Cir. 1982) (in turn *quoting Roesberg v. Johns-Manville Corp.,* 85 F.R.D. 292, 296-97 (E.D.Pa.1980)). Similarly the Joint Motion for Protective Order must meet Rule 26(c)'s requirement of showing "good cause." The burden is therefore on Merck and the Insurers to show the necessity of its issuance, which again, "contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra International, Inc.,* 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett,* 571 F.2d 1323, 1326 n. 3 (5th Cir.1978)).

Contrary to Rule 26's requirements and interpretive case law, Merck's and the Insurers' response contained little more than the repetitive, conclusory statements and objections that federal courts have consistently rejected as grounds for opposing discovery.  For example, seventeen of Merck's twenty-two responses read essentially as follows:

> Merck objects to this Request on the grounds that is vague and ambiguous, overly broad and unduly burdensome, ans seeks information or documents that are not relevant to the claims or defenses of any party or to the subject matter involved in this action nor reasonably calculated to lead to the discovery beyond that contemplated by Federal Rule of Civil Procedure 26 regarding insurance coverage in so far as it seeks documents or information beyond the existence and contents of policies that may be applied to satisfy a judgement in this matter.  Subject to and without waiving its objections, Merck respectfully refers the PSC to its response to Request Nos. 1 and 2, *supra*.[2]

Merck's and the Insurers' remaining responses were similarly conclusory and demonstrated no good-faith effort to comply with the PSC's requests for information.

The Eleventh Circuit considered similar responses as the basis of a motion for protective order in *Panola Land Buyers Ass'n v. Shuman*,762 F.2d 1550, 1559 (11th Cir. 1985).  There a party objected to production requests and interrogatories by stating that they were "unnecessary, too long, too broad, require too much time, are expensive to complete, are irrelevant, are improperly timed, and entail unreasonable geographic compliance." *Id.*  After considering the objections, the court held that "No mention of the Rule 26(b) factors is made in sufficient specificity to allow the magistrate and the district court, absent an abuse of discretion, to grant the motion for a protective order. The recitation of expense and burdensomeness are merely conclusory." *Id.*

---

[2] *See* Merck's responses to request for production numbers 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 19, 20, 21, 22 in Exhibit "B" to Merck's Motion and Memorandum for Protective Order filed November 16, 2006.

The pat objections that Merck and the Insurers repeatedly invoked in response to the PSC's discovery requests do not satisfy the burden in opposing the PSC's discovery requests or the burden of supporting the Joint Motion for Protective Order.   Merck's and the Insurers' inadequate objections, standing alone, support an order compelling Merck and the Insurers to designate corporate representatives for deposition and to respond fully to the Requests for Production.

Merck's and the Insurers' boilerplate objections of undue burden and repetitive discovery are an excuse to not provide plainly discoverable information.   They have chosen to interpret discovery requests in the most extreme and unfavorable fashion, and then used the extreme interpretation to refuse to supply plainly discoverable information.   For example, Merck and the Insurers claim that a request for "any and all" insurance policies includes "workers' compensation, automobile, employee benefits and travel insurance . . .."  Joint Mem. at 13.   Plaintiffs' request, even if overbroadly phrased, was not meant to include such irrelevant  insurance policies.   Merck and the Insurers have used their caricature interpretation to avoid disclosing liability policies in effect during the Vioxx era and to avoid any explanation of Merck's complex insurance system.  *See* Part III *infra*.  If Merck had furnished the appropriate information relative to Vioxx product liability policies, one cannot seriously believe that Plaintiffs would contest not disclosing the irrelevant insurance policies.

Merck's and the Insurers' claim of repetitious discovery is a similar subterfuge.  Plaintiffs are of course uninterested in receiving and wading through the same information twice.  But Merck and its Insurers would have the Court believe that no document or testimony in the London arbitrations disputing coverage, and no document in Merck's or its Insurers' insurance files have any relevance to these proceedings.   That is not credible.

III.    **Insurance-Related Discovery Is Reasonably Expected to Provide Information Necessary to Understand Merck's Knowledge of the Risks Associated With Vioxx and Merck's Insurance System.**

Merck and the Insurers claim that economic and legal reasons establish the irrelevance of insurance-related discovery. Their economic argument is not rational. Merck and the Insurers claim that Merck is pursuing the full limits of coverage under all policies and that "Merck's payments and reserves for Vioxx-related defense costs to date already exceed the full limits of Merck's liability insurance program." Joint Mem. at 3. Merck concludes from these assertions that "whether every insurance dollar within the limits of Merck's liability policies will be obtained by Merck is a matter that will have no foreseeable, practical impact on any MDL plaintiff's potential recovery . . .." *Id*. With one billion dollars of insurance claimed by Merck on its General Liability Coverage insurance coverage chart, Exh. "A"(the "Chart"), this position is unfathomable. It defies economic logic to claim that the availability of one billion dollars is utterly irrelevant to every MDL claimant. With tens of thousands of known Vioxx claimants, and a total possible liability exposure of many billions of dollars, the claim that the availability of a billion dollars is irrelevant to this MDL is not worth serious consideration.

**A. Insurance-Related Discovery Is Reasonably Likely to Provide Relevant Evidence.**

As a legal matter, Merck and the Insurers claim that "information regarding the nature or extent of Merck's insurance coverage and claims is wholly irrelevant to the issue of Merck's liability for Vioxx-related personal injury claims," Merck Mem. at 6, and that many insurance-related matters are "inappropriate subjects for discovery because these issues are irrelevant . . .." Joint Mem. at 11. This is incorrect. Insurance-related discovery is directly relevant to the underlying

merits of Vioxx cases.  This is because Plaintiffs' claims against Merck and the Insurers' efforts to cancel Merck's policies likely turn on some of the same information.

Plaintiffs' claims against Merck include failure to warn, negligent concealment, misrepresentation, and fraud.  Merck has acknowledged that its insurers have denied all coverage for Vioxx-related losses and sought to void their obligations to indemnify Merck against Plaintiffs' claims.[3]  It is inconceivable that the basis for the insurers' denials of coverage are completely unrelated to the Plaintiffs' claims.  Coverage is not being denied, for example, because Merck failed to pay its premiums.  Rather, claims against Merck in both this MDL and in the arbitration proceedings hinge on related issues such as what Merck knew about the health risks associated with Vioxx and when the company knew it.  The coverage issues and liability issues are not merely related; they likely are inseparable.  Absent  proof to the contrary, common sense dictates that information in Merck's insurance files, in its Insurers' files, and in the arbitration proceedings satisfies the Rule 26 discoverability standard.

Merck and the Insurers may be correct that, "the dealings between Merck and its Insurers do not concern whether Merck "failed to warn" or engaged in consumer protection violations . . .." Joint Mem. at 12.  But those dealings indisputably concern what Merck knew about Vioxx's risks and when Merck knew it, and not merely, as the Joint Mem. sanitizes, "whether specific insurance claims submitted by Merck to its Insurers are covered by the specific terms of the contracts between them." *Id*.  Furthermore, what Merck told its Insurers is directly relevant.  If Merck conveyed information to Insurers about Vioxx risks that differed from the information it conveyed to doctors, patients, the FDA, or the public, such inconsistent statements would be admissible evidence.

---

[3]Merck & Co. 2006 10-Q SEC Filing attached as Exhibit "B".

Without knowing what Merck told its Insurers and when these Insurers were told, Plaintiffs cannot assess the consistency of Merck's Vioxx communications.

Even a cursory review of the PSC's discovery requests shows that they were designed to elicit information relating to Merck's current coverage disputes with its insurers. For example, in Request No. 4, the PSC asked for, inter alia, information regarding Merck's notifications of claims to its insurers. Merck itself admitted the relevancy of this request during the recent discovery conference when its lawyers advised the PSC that the company had provided notice of "integrated loss" to its insurers as much as three years before it actually removed Vioxx from the marketplace. The timing of this notice corresponds with a marked increase in Merck's responsibility for losses under its insurance system. *See* Part III.C.2 *infra*. Some communications transpired between Merck and its insurers during this notification period are relevant to Merck's knowledge of risk, and thus relevant to Plaintiffs' allegations against Merck.

As another example, Request No. 7 sought information regarding any coverage determinations made with respect to claims for Vioxx. This request and others like it could provide admissible evidence of negligence or other fault of Merck. Any denial of coverage would be accompanied by an explanation of the denial that would reflect the insurer's investigation of the timeliness of Merck's notice of loss. Again, any such evidence would be relevant to Plaintiffs to establish the level of Vioxx-associated risk appreciated by Merck at the time of coverage determinations.

A final example is Request No. 12, which asked for information relating to the Vioxx insurance claims files that Merck maintained. This production would establish when Merck began receiving claims for personal injuries relating to Vioxx, how the seriously the company treated those

10

claims, and what corrective actions, if any, it took as a result of the claims.  Once again, this evidence would be directly relevant to establishing negligence or some other level of fault of Merck.

Merck and the Insurers, when not arguing against insurance-related discovery, candidly admit that insurance matters, expressly including the London arbitrations, are relevant to Plaintiffs' claims.  The Confidentiality Order in the London arbitrations states:

> WHEREAS, Merck and the Insurers have a common interest in preventing the disclosure of information and documents that could jeopardize the defense and resolution of underlying claims against Merck;

Confidentiality Order at 2.[4]  This passage speaks volumes.  It establishes that Merck and its Insurers acknowledge that "information and documents" "could jeopardize" Merck's defense against Plaintiffs' claims.  Since utterly irrelevant information could not jeopardize that defense, Merck and its Insurers recognize the relevance of at least some arbitration information and documents to Plaintiffs' claims.  The Joint Mem. confirms that this MDL and other tort proceedings are the target of the Confidentiality Order.  It "is plainly intended to insulate the insurance matters from the underlying tort litigation . . .."  Joint Mem. at 19.

Discovery with respect to the insurance-related information is not a "fishing expedition," Joint Mem. at 6, 15,  in which the likelihood of discovering relevant evidence is small or uncertain. Merck's Insurers have triggered arbitration proceedings in which they deny coverage for Vioxx claims.  Merck's insurance coverage patterns have shown wild fluctuations during the Vioxx era. Part III.C.2. *infra*.  Information in the arbitration proceedings, including documents and witness testimony, and information about Merck's insurance coverage patterns, cannot help but address what

---

[4]  See SRI Confidentiality Order attached to Defendant's Omnibus Motion as Exhibit "P"

Merck knew about Vioxx and when Merck knew it.  The likelihood of discovering relevant evidence is substantial.

> **B.  Case Law Supports Discovery About Prior Claims Brought Against Merck and Insurance Experience with Such Claims.**

This Circuit's settled case law establishes the relevance of prior Vioxx claims brought against Merck, and the PSC's right to information about both insurance experience with respect to such claims and Insurers' efforts to deny coverage for such claims.  Vioxx-related incidents brought to Merck's attention and insurer's efforts to void Merck policies based on misrepresentations or other information communicated by Merck plainly may lead to relevant evidence.

It is axiomatic in the Fifth Circuit that evidence of incidents similar to those at issue in an action are capable of constituting relevant evidence.  For example, *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978), involved a backhoe accident.  In discussing a discovery dispute over whether similar incidents could be discovered, the Fifth Circuit stated:

> The information sought by the plaintiff as to the existence and details of other injuries and deaths resulting from the use of Long backhoes of the 1200 model and other similar models clearly was "reasonably calculated to lead to the discovery of admissible evidence."

561 F.2d at 617.  The Fifth Circuit therefore stated that, "the trial court should have compelled the defendant to answer that part of the interrogatory evaded."  *Id*.  The failure to require the defendant to respond to discovery requests constituted an abuse of discretion that warranted a new trial.  *Id*. at 618.

Similarly, in *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, *decision clarified*, 620 F.2d 464 (5th Cir. 1980), *cert. denied sub nom.  Rucker Co. v. Shell*, 449 U.S. 1112 (1981), the Fifth Circuit

held that a trial court erroneously excluded evidence of similar incidents.  The accident in *Ramos* involved an allegedly defectively designed mast and plaintiff sought to introduce evidence of the collapse of a similar mast.  The Fifth Circuit listed the ways in which evidence of similar incidents could be relevant.

> Evidence of similar accidents might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation.

615 F.2d at 338-39.  The Fifth Circuit cited more than half a dozen cases in support of its position. *Id*. at 339.

It is self-evident that evidence of prior Vioxx-related insurance claims, and information about Vioxx exchanged between Merck and its Insurers, may lead to relevant evidence on one or more of the grounds recognized by the Fifth Circuit.  *See also Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 401 (5th Cir. 1965) (evidence of prior similar incident "cannot be held inadmissible under either the federal or the state [Louisiana] rule"); *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1083 (5th Cir. 1986) (evidence of other accidents involving similar wheel rims was admissible for "purposes of proving other accidents in order to show defendants' awareness of a dangerous condition"; exclusion of evidence required reversal and new trial); *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1147 (5th Cir. 1978) ("evidence of other accidents involving the same product" can be admissible).  Other courts concur.[5]

---

[5]  E.g., *United Oil Co., Inc. v. Parts Associates, Inc.*, 227 F.R.D. 404, 411 (D. Md. 2005) ("Rule 26 and the core principles of relevancy and discovery and existing case law suggest that discovery of [defendant's ] knowledge of the dangers of exposure to xylene and ethyl benzene to the liver through claims, complaints, and lawsuits regarding other products containing these chemical compounds is probative of what R & H knew or should have known about the liver toxicity of the dyes at issue here and may also provide admissible evidence on causation."); *Tucker v. Ohtsu Tire & Rubber Co., Ltd.*, 191 F.R.D. 495, 497-98 (Md. 2000) ("the plaintiffs in the Hernandez case [a case with an order protecting confidentiality and based on which defendants opposed discovery] alleged the same defect as is alleged in this case . . . .  Accordingly, I am convinced that the Hernandez documents, if otherwise discoverable, are relevant to this case and may lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1).").

### C. Insurance-Related Matters Receive No Special Discovery Protection.

Merck and the Insurers thus cannot seriously contest that the PSC's discovery requests can lead to admissible evidence. They instead rely on a misstatement of the scope of discovery with respect to insurance and an unsupportable claim of arbitration-based confidentiality. In fact: (1) discovery is not constrained with respect to insurance policies, (2) the limited disclosure of policies that Plaintiffs have received already establishes the relevance of Merck's policies, and (3) the case law Merck relies on does not support limiting policy disclosure.

### 1. Normal Rules of Discovery Apply to Insurance Policies.

Contrary to the insinuations in Merck's Mem. and the Joint Mem., insurance-related matters are not afforded special protection from discovery by the Federal Rules of Civil Procedure. Rule 26 does not limit insurance discovery to the policies. In *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 404 (8th Cir.), cert. denied, 484 U.S. 917 (1987), a case Merck cites in its Memorandum, the Eighth Circuit rejected Merck's argument in reference to Rule 26(a)(1)(D)'s precursor.[6] Searle, a drug manufacturer, sought to protect certain insurance-related documents from discovery by arguing that the former Rule 26(b)(2) contained an implicit limitation on the discovery of insurance information beyond the insurance agreement itself. 816 F.2d at 404. Like Merck, Searle argued that it had produced all of its insurance policies and that any additional insurance information was non-discoverable. *Id.* The Court disagreed, holding that any relevant insurance information must be produced:

> We cannot agree with Searle that Rule 26(b)(2) forecloses discovery of any insurance document beyond the agreement. First, the language of the rule itself

---

[6] In 1993, the FRCP shifted insurance agreements from discovery under Rule 26(b) to disclosure under Rule 26(a), but no change to the scope of discovery was intended.

14

> plainly is not preclusive. Second, the advisory committee expressed concern, at least as to indemnity agreements that Rule 26(b)(2) not be interpreted to protect insurance information from discovery when that information is relevant under Rule 26(b)(1). . . . We hold, therefore, that insurance documents that are not discoverable under 26(b)(2) remain discoverable in accordance with the provisions of Rule 26(b)(1).

*Id.*

Rule 26(b) treats insurance matters the same as other matters for purposes of general discovery. Consequently, information about insurance coverage beyond the policies themselves is discoverable whenever "relevant to the claim or defense of any party." FRCP 26(b)(1). Relevance for discovery purposes is broadly construed and encompasses any material that bears on, or that reasonably could lead to any other matter that could bear on, any issue that is or may be in the case and is not limited to the issues raised by the pleadings. *E.g., In re AirCrash Disaster Near Roselawn, Ind. Oct. 31, 1994,* 172 F.R.D. 295 (N.D. Ill. 1997).

### 2.  Insurance-Related Discovery Will Enable Plaintiffs to Understand Merck's Insurance System.

The Rule 26(a)(1)(D) insurance policy disclosure requirement and other insurance discovery principles serve at least one common purpose: to allow a plaintiff to understand a defendant's insurance status. In most ordinary litigation, supplying the plaintiff with a single insurance policy serves that purpose. Further explanation is not needed. In this MDL, however, disclosure of Merck's insurance policy establishes that Plaintiffs are not confronted with a single policy or even a handful of comprehensible policies. Merck is covered not so much by a policy as by an insurance system in which Merck itself serves as a key insurer. *E.g.*, Multiline Multiyear Catastrophe Excess Line Insurance Agreement, executed in 2002, at v, MRK-ANJ0000581, ANJ0000588 (listing Merck as a co-insurer with a 50.82% share). The skeletal structure of that system appears to be outlined,

15

for some years, in the General Liability Coverage chart that Merck has supplied.  *See* Chart, Exh. "A".

The Chart contains entries for more than 50 items, each with its own set of per occurrence losses payable, excess amounts, and other information.  For some years over 20 insurance entries on the Chart are at issue.  One can assume that Merck's attorneys made a good faith effort to explain the relations among the dozens of Chart entries, including when one policy would "kick in" and other matters.

But good-faith attorney explanation is not a substitute for information that can be legally binding evidence of information that allows the PSC to explain to thousands of Plaintiffs Merck's actual insurance status.  Since the purpose of insurance discovery is not merely to turn over pieces of paper, but to communicate a defendant's insurance status, Plaintiffs are entitled to ask a competent corporate representative to obtain an understanding of Merck's complex insurance system.  That system is sufficiently complex, *see* Chart, that one reasonably expects only senior insurance personnel can reliably explain Merck's understanding of the policies in the system and their relation to one another.  Merck's attorneys are neither authorized nor qualified to do so.  Indeed, the insurance Chart provided so far has unacceptable gaps.  Several of the entries in the chart, rather than including relevant data, simply state "unknown."  Unknown information appears to include policy numbers.  These examples and other gaps in Merck's production raise serious questions about the sufficiency of Merck's disclosures related to its insurance status.[7]

---

[7] Indeed, it would appear that Merck has simply failed to produce a large number of the policies shown by its own coverage chart to be relevant.  The PSC has prepared its own coverage chart, which is attached as Exhibit "C", and it shows the policies that Merck has not yet produced.

16

The Chart also suggests a dramatic change in Merck's insurance system when awareness of Vioxx's risks was growing. At least three dramatic changes appear on the face of the Chart. First, the Chart appears to indicate that, prior to 2001, Merck's own share of its liability coverage for claims in excess of $150 million never exceeded more than $150 million. In fact, from 1998 to 2000 Merck's share of its high-end excess liability coverage decreased from $150 million to $77.875 million. Sometime in 2001, however, Merck's share exploded to over $300 million, an increase of about 300% over the prior period. That is about the time when Merck provided a notice of "integrated loss" to its Insurers. Second, the Chart shows that, prior to some time in 1998, Merck's general liability coverage terminated at $75 million. In 1998, the Chart shows general liability coverage soaring to $1 billion. Third, the Chart shows "Monoline Policy" providing about $200 million in coverage from 1998 to 2001. In 2001, "Monoline Policy" coverage plummets to $20 million, ten percent of its prior level. In light of Merck's disputes with its insurers, these wild insurance coverage fluctuations may not be routine policy changes. This Vioxx era insurance volatility,[8] combined with the Insurers' actions against Merck, require the PSC to explore the reasons for the changes with those responsible for Merck's insurance decisions and those supplying Merck insurance.

Of course, Merck's understanding of its insurance system may differ from that of its Insurers. The existence of the London arbitrations establishes that Merck and its Insurers do not agree on an

---

[8] While Merck's insurance coverage pattern was wildly fluctuating, Merck took of the extraordinary step of seeking to frustrate any New York State public policy that might limit insuring against punitive damages. E.g., Multiline Multiyear Catastrophe Excess Line Insurance Agreement, executed in 2002, at 17 ¶ 22, MRK-ANJ0000581, ANJ0000606 (providing for New York law to govern "except insofar as such law (1) may prohibit payment in respect of punitive damages hereunder . . . ."); Policy XLRKS-00298-98, dated July 30, 1998, at 16, MRK-ANJ0000538, ANJ0000569.

important feature of Merck's insurance system, coverage for Vioxx claims.  An insured-insurer dispute is not a feature of everyday litigation and discovery from insurers is therefore not at issue in routine litigation.  This clearly is not routine litigation and it equally clearly does not involve routine insurance.

The PSC cannot hope to communicate to Vioxx Plaintiffs a useful portrait of Merck's insurance status, and the uncertainties relating to it, without obtaining Merck's official corporate position about its insurance system, reasons for changes in that system that are about the time of key Vioxx developments, and Merck's Insurers' interpretation of that system.  Merck and its Insurers are entitled to disagree with one another; but the PSC cannot fulfill its duties without sufficient information to allow it to understand both their positions.  On the complex insurance matters attending this case, barebones disclosure of Merck's complex, disputed insurance policies, without access to knowledgeable insurance personnel, does not "enable counsel . . . to make [a] realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation."  Advisory Committee's Note to FRCP 26(b)(2) (1970).

   **D.    Merck Has Violated Rule 26(a)(1)(D) Insurance Policy Discovery Requirements.**

FRCP 26(a)(1)(D) requires, as an initial disclosure prior to discovery, the production of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."  Merck produced several insurance policies in accord with this Rule.  Merck has not, however, complied with the initial insurance disclosure requirement because it did not produce all potentially relevant policies for the time period during which it developed, manufactured, and marketed Vioxx.

The Joint Mem. asserts that there "is no basis for plaintiffs' requests for insurance materials that date back to 1990, many years before Vioxx was even in development, let alone on the market." Joint Mem. at 13 n.9.  The claim that 1990 is "many years before Vioxx was even in development" is untrue.  The Vioxx timeline that Merck has furnished shows that Merck invented Vioxx in 1992 based on basic science that occurred in 1991 and 1992.  Merck Timeline, Exh. "D".  In fact, 1991-1995 are years when Merck conducted Vioxx-related research, conducted animal and test tube studies of Vioxx, and conducted Phase I and Phase II clinical trials of Vioxx.  Plaintiffs are entitled to the requested policies since the insurers "*may* be liable to satisfy part or all of a judgment which may be entered . . .."  FRCP 26(a)(1)(D) (emphasis added).

As more fully discussed in Part 4 *infra*, Merck has put at issue questions of confidentiality. The issue of confidentiality makes it even more important that Merck fully disclose all possibly relevant insurance policies under Rule 26(a)(1)(D).  Merck's and the Insurers' discovery resistance on the issue of confidentiality has made requested policies relevant to pretrial discovery.  The policies that Merck has disclosed contain relevant information about Merck's opposition to disclosing insurance coverage, and it is almost certain that the policies which have <u>not</u> been disclosed will contain equally relevant information.  Merck and the Insurers claim that arbitration, and the confidentiality of arbitration, are of critical concern to Merck.  But Merck's insurance policies show that Merck and the Insurers often regard neither arbitration, nor the confidentiality of arbitration, as essential to protect insurance information.   For example, in SRI Policy 901/LK9601639, dated May 5, 1998, beginning at MRK-ANJ0000048, between Merck and SR International Business Insurance Company Limited (SRI, referred to in the policy as "Underwriters"), Merck and its Insurers forego arbitration completely.  They agree to submit to U.S.

court jurisdiction. "It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States" *Id.* at 27, MRK-ANJ0000077. SRI also preserved its right to commence actions in U.S. courts. "Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States . . .." *Id.* This pattern of clauses preserving access to courts appears in several policies disclosed so far.[9]

Merck policies that do contain arbitration clauses impose no confidentiality requirement. For example, Policy XLRKS-00298-98, dated July 30, 1998, at 15-16, MRK-ANJ0000538, ANJ0000568-569, provides for arbitration but makes no provision for confidentiality. Other policies contain the same features.[10] Merck's and its Insurers' failure to provide expressly for arbitration confidentiality is noteworthy because many contracts requiring arbitration in London contain detailed information about confidentiality. *E.g.*, *Vertex Data Science Ltd. v. Powergen Retail Ltd.*, 2006 WL 2629805 (Q.B.), [2006] 2 Lloyd's Rep. 591, at ¶ 26 (clause 19.4.5, requiring confidentiality). Plaintiffs' prosecution of pretrial discovery is assisted by knowledge that Merck and its Insurers have only selectively sought to cloak their relations in confidentiality. Merck's pre-1996 pattern of dispute resolution clauses in its insurance agreements are plainly relevant to Merck's and its Insurers' motivation in seeking to invoke confidentiality.

---

[9] Lexington Ins. Co. Policy 901/LK9601639, dated Feb. 26, 1998, at 27, MRK-ANJ0000149, ANJ0000178; SRI Policy 901/LK9802419, at 28, MRK-ANJ0000257, ANJ0000286. Policy 901/LK9802419, at 28, MRK-ANJ0000351, ANJ0000379.

[10] Multiline Multiyear Catastrophe Excess Lines Insurance Agreement, executed Feb. 2, 2002, at 16, MRK-ANJ0000451, ANJ0000469; AAIC Multiline Multiyear Catastrophe Excess Lines Insurance Agreement, Policy 01-A2-FF-0000005-00, issued Apr. 11, 2001, at 15, MRK-ANJ0000334, ANJ0000335.

The post-1995 policy production was also apparently incomplete as Merck did not even produce all of the policies since 1996 that it later identified in the discovery conference.  After the recent discovery conference, however, Merck has continued to refuse to provide any additional policies, claiming that none would be "relevant" to Plaintiffs' claims.   Merck's conclusion is not binding on the PSC, which must determine what insurance coverage may be available in order to properly discharge its duties.  The plain language of FRCP 26 provides that all policies that "may" provide coverage must be turned over without awaiting a discovery request.  Thus, as part of its initial disclosures, Merck should have provided the PSC with all general liability policies, regardless of type, dating back to the time at which the company began its first research and development of Vioxx.

Merck's unilateral decision to impose a temporal limitation on its initial insurance disclosures contravenes Rule 26(a)(1)(D), which does not support such limitations. Courts look with disfavor on attempts to limit discovery of agreements to a time period.  *Calabro v. Stone,* 224 F.R.D. 532, 533-34 (E.D.N.Y. 2004).   Merck's temporal limitation is based on Merck's unilateral interpretation of undisclosed insurance contracts.  Courts do not require parties entitled to disclosure of insurance policies to accept interested parties' summaries of those policies in lieu of full disclosure of the policies.  *Boyer v. Riverhead Central School Dist.*, No. CV 05-4955, 2006 WL 3833040, at *2 (E.D.N.Y. Dec. 29, 2006) ("The summaries [of insurance policies] provided to Plaintiff's counsel fall short of the requirements under Fed.R.Civ.P. 26(a)(1)(D)."); *Calabro v. Stone*, *supra*, 224 F.R.D. at 533 ("while counsel may be correct that the policies sought contain enforceable provisions excluding from their coverage the accident at issue here, plaintiff is not limited to counsel's say-so in making this determination"); *Covey v. Simonton*, No. 04CV3273NG,

2005 WL 483439, at *1 (E.D.N.Y. Feb. 23, 2005) (objection to disclosure on the assumption that an insurance policy offered no coverage did not excuse failure to produce the policy).   Merck's effort to impose its interpretation of the relevant policies on Plaintiffs also directly conflicts with the avowed purpose of Rule 26(a)(1)(D), which is to "enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation."[11]  Speculating as to the existence of additional insurance coverage is all the PSC will be able to do without the best evidence of that coverage–the policies themselves.

Merck has thus unilaterally concluded that no conceivable theory could lead to insurance coverage under any policy prior to 1996.  Merck has unilaterally concluded that no general liability or other policy could conceivably support a claim relating to any Plaintiff's cause of action. Whether to pursue claims against insurance companies is one of the important matters with respect to which the PSC is charged with gathering information.

Given the critical nature of the coverage issue to all claims in the MDL, the PSC cannot accept Merck's take-our-word-for-it approach to discovery.  The PSC would be in derogation of its duties if it did not insist on (1) concrete evidence of any and all potential funds available to pay Vioxx claims, and (2) the actual policies covering the entire Vioxx-related time period. The PSC therefore respectfully requests that the Court order Merck to produce all general liability policies dating back to 1990, as Plaintiffs have requested.

### E.        Merck's and the Insurers' Precedents Do Not Support Their Position.

Since discovery relating to Merck's insurance policies, relating to Merck's experience under those policies, and relating to information developed in the London arbitrations disputing the

---

[11]Advisory Committee Notes to the former FRCP 26(b)(2).

enforceability of those policies may lead to admissible evidence, the case law Merck relies on to limit insurance-related disclosure is inapplicable to this case.  Merck and the Insurers first rely on *Excelsior College v. Frye*, 233 F.R.D. 583 (S.D. Cal. 2006).  Merck Mem. at 4; Joint Mem. at 8. But that case merely holds that some non-policy insurance information is not covered by Rule 26(a)(1)(D).  The court expressly recognized that discovery methods other than Rule 26(a)(1)(D) could be used to obtain additional insurance information.  "The Court recognizes there may be other procedural mechanisms for obtaining information or documentation from a party regarding its insurance. *See e.g.* Fed.R.Civ.P. Rule 30, 31, 33 and 34." 233 F.R.D. at 585 n.1.  The plaintiff's discovery effort in *Excelsior College* did not include requests for insurance information through these other discovery means.  The court stated, "Plaintiff, however, has not requested the information through one of these means, so the question as to whether the information Plaintiff seeks is discoverable is beyond the purview of this order."  *Id*.  In this case, the PSC has invoked other procedural mechanisms for insurance information discovery and *Excelsior College* therefore does not support Merck's discovery stonewalling.

Similarly, Merck's and the Insurers' reliance on *Native American Arts, Inc. v. Bundy-Howard, Inc.* No. 01 C 1618, 2003 WL 1524649, 2003 U.S. Dist. LEXIS 4393 (N.D. Ill. March 20, 2003) (cited at  Merck Mem. at 4; Joint Mem. at 9), is misplaced.  That case held that an insurer's reservation of rights was not required to be disclosed under Rule 26(a)(1)(D).  The court expressly distinguished other, more material insurance events by stating that "an actual denial of coverage . . . would surely have to be disclosed . . ." 2003 U.S. Dist. LEXIS 4393, at *6.  And, like *Excelsior*

23

*College*, the court did not address the discoverability of insurance-related information pursuant to discovery routes other than Rule 26(a)(1)(D).[12]

The Joint Mem.'s reliance on *Oklahoma Pub. Co. v. Continental Ins. Co.,* No. CIV-90-1251-A, 1991 WL 323804 (W.D. Okla. Nov. 5, 1991), Joint Mem. at 9, is erroneous because the case denied discovery of drafting history, claims manuals, underwriting materials, reserves, and reinsurance agreements on the ground that there had not yet been a finding of ambiguity in the insurance policy. Given the Insurers' refusal to acknowledge coverage in this case, Merck and the Insurers cannot seriously contend that no insurance policy ambiguity exists in this case. Merck's and the Insurers' own description of *Missouri Pacific R. Co. v. Aetna Cas. & Sur. Co.*, No. 3-93-CV-1898-D, 1995 WL 861146 (N.D. Tex. May 17, 1995) shows that it too turns on the absence of a showing of ambiguity in the policy. Joint Mem. at 9.[13]

Merck has offered no coherent argument or precedent against the relevance of the insurance-related deposition testimony or requests for production. For each of the PSC requests, Merck used the same boilerplate response filled with the same conclusory objections. And Merck's arguments in its Memorandum were no more persuasive. Merck simply repeated, without explanation or justification, that the PSC's discovery requests were irrelevant and outside the scope of permissible

---

[12] Merck's and the Insurers' reliance on *All AT&T Corp. Fiber Optic Plaintiffs v. All AT&T Corp. Fiber Optic Defendants*, MDL Docket No. 1313, 2002 U.S. Dist. LEXIS 11219 (S.D. Ind. June 5, 2002), Merck Mem. at 4; Joint Mem. at 9, is also unpersuasive. That case is solely a ruling on the scope of initial disclosure under Rule 26(a)(1)(D) and provides no support for refusing disclosure sought pursuant to the other mechanisms properly invoked by the PSC. Furthermore, the court in *All AT&T* had satisfied itself through personal inspection of the document sought to be discovered that the insurance companies had "no potential liability that is contingent upon the outcome of these cases." 2002 U.S. Dist. LEXIS 11219, at *5. The court did not accept the discovery opponents bare assertion that the document sought was irrelevant.

[13] *Ballard v. Allegheny Airlines, Inc.*, 54 F.R.D. 67 (E.D. Pa. 1972), Joint Mem. at 10-11, contains no evidence that the terms of insurance coverage were in dispute. It, too, therefore does not apply to the facts of this case, in which insurance is disputed.

24

discovery.  Merck stated, "Merck's insurance coverage . . . has absolutely nothing to do with the claims or defenses of any party in this case."  Merck Mem. at 6; *see also* Joint Mem. at 11 (insurance-related matters are "inappropriate subjects for discovery because these issues are irrelevant . . .").  There may be grounds on which the insurers sought to void Merck's coverage that do not relate to Plaintiffs' claims.  But it was incumbent on Merck and the Insurers to articulate those grounds to support their Motion.  Silence about the grounds asserted by the Insurers is telling. The deposition and production requests are likely to provide Plaintiffs with previously withheld details relevant to the merits of Plaintiffs' claims.

**IV.   Confidentiality Does Not Preclude Discovery of Relevant Information from the Insurance Arbitrations.**

Merck reports that two insurance coverage arbitrations are pending in London, England, *SR International Business Insurance, Ltd. v. Merck & Co., Inc.* and *Merck &Co., Inc. v. XL Insurance (Bermuda) Ltd.*  In both proceedings, Merck's Insurers seek to void policies that they sold to Merck. Evidence in the arbitration proceedings is reasonably likely to be relevant to issues in this case.  Part III *supra*.  The PSC therefore requested production with respect to those proceedings and served FRCP 30(b)(6) notices relating to those proceedings.  During the December discovery conference, Merck's lawyers refused to discuss any aspect of the arbitration proceedings, including those as fundamental as the grounds on which the Insurers challenge coverage.  Merck and the Insurers continue to assert that the arbitration proceedings are completely beyond discovery and discussion. "Merck and the Insurers are not permitted to answer questions relating to the details of the arbitration, or to produce arbitration materials, in this product liability litigation."  Joint Mem. at 19.

The confidentiality claim is inconsistent with the London confidentiality orders on which Merck and the Insurers rely.  Merck and the Insurers also misstate the relevant doctrines.  Neither

UK law, nor U.S. law, nor principles of comity preclude reasonable discovery of evidence presented

in the arbitration proceedings.  Neither legal system endorses the draconian confidentiality principle

Merck and the Insurers proffer.  Both legal system adopt a balanced view, under which the interests

in confidentiality are weighed against the need for fair adjudication.  That balanced approach

supports discovery of arbitration proceeding testimony and documentary evidence.

A.     **Neither the Confidentiality Orders Nor UK Law Prohibit Disclosure in this Case.**

Merck and the Insurers claim that Confidentiality Orders issued by the London Arbitration

Tribunal[14] prevent discovery of information relating to the arbitrations. Joint Mem. at 17-23.  Both

the plain wording of the Confidentiality Orders, however, and UK law contradict this claim.  The

Orders expressly authorize disclosing arbitration-related information.   Paragraph four of both

Confidentiality Orders acknowledges a court's authority to order discovery:

> Nothing in this Order shall prohibit a Party from disclosing Confidential Information
> to the extent that such disclosure is required by court order or other applicable law.

Thus, contrary to Merck's suggestion, this is not an issue that requires the Court to assess principles

of international comity.  The arbitration tribunal expressly recognized that information in the

arbitrations could be disclosed in court proceedings.  And the language of the Orders leaves no

doubt that in such a circumstance the tribunal does not regard its purportedly private proceedings

as sheltering information otherwise discoverable in duly constituted court proceedings.  The claim

to be "expressly prohibited from revealing [arbitration-related] information under the terms of the

---

[14]See SRI Confidentiality Order and XL Confidentiality Order attached to Defendant's Omnibus Motion as Exhibits "P" and "Q" respectively.

confidentiality orders," Merck Mem. at 7; *see* Joint Mem. at 19, is thus incorrect except to the extent

Merck and the Insurers may need a court order to validate disclosure.[15]

UK law provides Merck and the Insurers no greater shelter than do the Confidentiality

Orders.  As shown in Part III *supra*, the insurance policies given to Plaintiffs that contain arbitration

clauses do not contain confidentiality clauses.  The English Arbitration Act of 1996, under which

Merck and its Insurers are arbitrating,[16] also contains no provision for confidentiality.[17]  The

confidentiality of the arbitrations is thus an implied and limited requirement, *see Dolling-Baker v.

Merrett*, [1991] 2 All E.R. 890, 899 (Ct. App.) ("some implied obligation on both parties not to

disclose"), not one that Merck and its Insurers felt necessary even to state until Merck was

threatened with Vioxx-based liability.

The implied confidentiality of materials in UK arbitration proceedings is far from absolute.

It is expressly subject "to an order or leave of the court."  *Id.* at 899.[18]  The UK approach leaves

substantial discretion in a subsequent court proceeding to order disclosure notwithstanding the

implied confidentiality.  Documents achieve no special status by virtue of their use in an arbitration:

---

[15] Paragraph four may suggest why Merck felt a duty to resist discovery in order to generate a court order to protect it from any adverse consequences before the arbitration tribunal. But once a court discovery order issues, the tribunal's own order precludes the imposition of adverse consequences on Merck based on disclosure pursuant to the court order.

[16] E.g., Multiline Multiyear Catastrophe Excess Line Insurance Agreement, executed in 2002, at 16, MRK-ANJ0000581, ANJ0000605 (disputes shall be determined "under the provisions of the Arbitration Act of 1966").

[17] Olivier Oakley-White, *Confidentiality Revisited: Is International Arbitration Losing One of its Major Benefits*, 6 Internat'l Arb. L.Rev. 29, 31 (2003) ("it is noteworthy that the English Arbitration Act 1996 contains no provision for confidentiality").

[18]
> As between the parties to an arbitration . . ., their very nature is such that there must, in my judgment, be some implied obligation on both parties not to disclose . . . save with the consent of the other party, or pursuant to an order or leave of the court.

2 All E.R. at 899.

> It must be perfectly apparent that, for example, the fact that a document is used in an arbitration does not *confer* on it any confidentiality or privilege which can be availed of in subsequent proceedings.  If it is a relevant document, its relevance remains . . . .

*Id.*  If a document has a "sufficient likelihood" of being relevant to the fair disposal of a case, UK courts do not regard implied arbitration confidentiality as precluding discovery.  "If [the court] is satisfied that, despite the implied obligation, disclosure and inspection is necessary for the fair disposal of the action, that consideration *must* prevail." *Id*. at 899 (emphasis added).  If necessary, disclosure can be initially limited to supplying the information to the court–sufficient likelihood of relevance may "warrant the document being produced to the court . . . so that the learned judge may make his own assessment whether its production is necessary for the fair disposal of the action." *Id*. at 900.[19]

In addition to the general exception when disclosure promotes fair disposal of a subsequent case, UK law recognizes exceptions to confidentiality to assure the consistency of evidence in proceedings subsequent to the arbitration. *Tajik Aluminum Plant v. Ermatov*, [2006] All E.R. (D) 448, at ¶ 83 (Q.B.)  ("Hydro won [a previous arbitration] and . . . TadAZ was ordered to pay Hydro more than US$125 million. TadAZ and Rusal . . . have steadfastly refused to make available a copy of the award. Its relevance to the present proceedings is obvious. Previously Blackburne J had ordered TadAZ to produce parts of the evidence. There are very many discrepancies between what TadAZ's employees told the arbitrators and what TadAZ had told the court in the freezing order application.");  *London & Leeds Estates Ltd. v. Parabas Ltd.*, [1995] 02 EG 134, [1995] 1 EGLR 102 (confidentiality not required where inconsistent views were expressed).  Thus, UK law

---

[19] Commentators recognize that the UK principle of implied confidentiality is not absolute and can be overridden by court order or other exceptions.  Oakley-White, supra note 15, at 30.  Interestingly, Merck and the Insurers did not see fit to refer the Court to the well-established exceptions to UK arbitration confidentiality.  Joint Mem. at 20-21.

precludes Merck or its Insurers from using confidentiality to shelter taking positions in court that are inconsistent with their positions in the arbitrations.  Such inconsistency could be in the Insurers' interests because they could seek to deny Merck coverage on grounds of misbehavior and then come to court and seek to deny payments to Plaintiffs on the ground that Merck did nothing wrong.  Like the general fairness exception to confidentiality, the inconsistency exception prevents parties from using confidentiality to promote unfairness.

### B.    Federal Decisions Support Disclosure in this Case.

On analogous facts, federal courts, including those of this Circuit, consistently uphold disclosure of arbitration-related materials.  More broadly, federal courts consistently hold on facts similar to these that the confidentiality or protective order agreed to in one proceeding does not preclude discovery of otherwise discoverable information in another proceeding.

### 1.    Arbitration Cases Support Disclosure.

In *Caringal v. Karteria Shipping, Ltd.*, No. Civ.A. 99-3159, 2001 WL 874705, 2001 A.M.C. 1236 (E.D. La. Jan. 24, 2001), the U.S. District Court for the Eastern District of Louisiana specifically addressed whether documents produced in connection with a London arbitration proceeding were subject to production in a U.S. civil proceeding.  Karteria Shipping contended that no documents pertaining to a London arbitration could be produced without breaching the duty of confidentiality which attaches to an arbitration.  In support, Karteria Shipping cited the decision of the Queen's Bench Division of Commercial Court in *Hassneh Insurance Co. of Israel and Others v. Steuart J. Mew*.[20]  Upon review of *Hassneh* and its progeny, the court stated, "nothing in this line of cases from Great Britain undermines the principle that the Court may order disclosure when

---

[20] 2 Lloyd's Rep. 243 (1993), 1993 WL 963287.

appropriate.  Even if documents are confidential, a Court may order disclosure if (1) the documents are relevant and (2) 'disclosure is necessary for disposing fairly of the cause or matter or for saving costs.'" 2001 WL 874705, at *1.  The Court upheld the magistrate judge's ruling ordering production of the documents.  *Id.* at *2.[21]

A similar issue arose in *Contship ContainerLines Ltd.*, *v. P.P.G. Industries, Inc.,* No. 00 Civ. 0194 RCCHBP, 2003 WL 1948807 (S.D.N.Y. Apr. 23, 2003), a case involving a lawsuit over a fire aboard a charter vessel.  The plaintiffs had previously been involved in a British arbitration dealing with the same accident. *Id*. at *1. The defendant sought detailed documentation from the arbitration proceeding.  Plaintiffs objected on the ground that English law imposed a confidentiality obligation as part of the agreement to arbitrate.  *Id.* at *1.  The origin of the alleged confidentiality duty was unclear but the court assumed that a confidentiality requirement existed.  *Id*.  The court nevertheless ordered the plaintiff to produce the requested arbitration proceeding documents.  *Id.* at *2.  Citing *Caringal*, the court reasoned that the arbitration documents were relevant in that they related to the incident that was at issue in the case.  In this case, the information from the arbitration proceedings would clearly be relevant to the substance of Plaintiffs' tort claims.

---

[21] Merck's and the Insurers' effort to distinguish *Caringal* is unpersuasive. They acknowledge, as they must, that the federal court ordered disclosure despite a London arbitration confidentiality order.  Joint Mem. at 22-23.  This establishes that Merck's and the Insurers' overreaching argument that comity commands nondisclosure without any balancing of interests is incorrect.  While Plaintiffs do not argue that Caringal always mandates disclosure, *Caringal* is fully consistent with Plaintiffs' view of UK and U.S. case law—that both require a balancing of interests rather than unquestioning adherence to a confidentiality order.  Merck's claim that *Caringal* is distinguishable because the arbitration at issue here cannot contain any relevant information is not credible.  The Confidentiality Order that Merck and the Insurers rely on acknowledges that the arbitration proceeding includes information that "could jeopardize" Merck's litigation defense.  Part III *supra*.

2.  **Cases Allowing Discovery Despite Pre-Existing Protective Orders Support Disclosure.**

Even antecedent *judicial* protective orders do not bar discovery of otherwise discoverable evidence.  In *Tucker v. Ohtsu Tire & Rubber Co., Ltd.*, 191 F.R.D. 495, 497-98 (Md. 2000), plaintiffs in a subsequent case sought relief from a protective order in a prior case in which the same defect had been alleged.  Notwithstanding the protective order, the court, after carefully balancing the interests, ordered disclosure because the "documents, if otherwise discoverable, are relevant to this case and may lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1)."

Similarly, in *LeBlanc v. Broyhill*, 123 F.R.D. 527 (W.D.N.C. 1988), a state civil case, since dismissed, shared common questions of law and fact with a subsequent federal case.  Defendants in the federal case invoked a state court protective order to oppose disclosure of discovery materials "generated in connection with" the state court case.  123 F.R.D. at 531. The court, "while sensitive to the values of Federalism and judicial comity," *Id.*, nevertheless ordered disclosure.  Plaintiffs had tried to intervene in the state court action.

3.  **U.S. and UK Case Law Balance Interests in Assessing Pre-Existing Confidentiality Orders.**

The UK arbitration cases, U.S. arbitration cases, and U.S. protective order cases share a common, sensible approach when disclosure is sought of information characterized as confidential in another proceeding.  While the other proceeding is always entitled to comity, courtesy, and respect, *Tucker*, *supra,* at 499, these "principles, while unquestionably important, are not absolute, and courts asked to issue discovery orders in litigation pending before them" do so when the circumstances so justify.  *Id.* at 499-500.  This is so even when important principles of federalism are called into play by the protective order having been entered by a state court.  *Id.*

31

Neither UK cases in which a party seeks related arbitration-proceeding information, nor U.S. cases seeking such information, nor U.S. cases in which a party seeks related litigation-proceeding information, endorse Merck's and the Insurers' blanket assertion of privilege. Instead, as suggested by the above case law, UK and U.S. law in all three classes of cases carefully balance the interests at stake.  That balancing process in this case supports Plaintiffs' discovery requests.

*Tucker*, *supra,* presents a helpful set of factors to consider in that balancing process.  First, the implied confidentiality of the UK arbitration proceedings is analogous to U.S. protective orders "frequently issued in products liability and commercial cases." 191 F.R.D. at 498. "It is more in the nature of an agreement between the parties as to how discovery . . . will be handled without court intervention." *Id.*  Confidentiality is routinely granted "without any hearing on the merits of the assertion of confidentiality . . . or the appropriateness of the restrictions on use of the documents covered by the order." *Id.* at 498-99.  As such, the implied confidentiality does not reflect "any conclusion" by an adjudicative body "regarding the appropriateness of designating particular documents as confidential . . .." *Id.* at 499.  In this case, as in the situation of U.S. cases granting relief from party-generated protective orders, no considered deliberation by the UK arbitration tribunal has occurred.  The information sought in this case has not actually been reviewed by the tribunal.  The tribunal merely and mechanically implemented a private agreement.  This absence of actual consideration of the requested information surely affects the degree of comity, domestic or international, that this Court should adopt with respect to the Confidentiality Order.

> Thus, the [protective order] court's role was after the fact, as an instrument to implement what the parties already had agreed to. This is quite a different situation than that presented when a discovery dispute is raised before a court and, after a full hearing, it issues an order reflecting its deliberative process and decision.  There is less need for deference and comity when the order involved is really an agreement

> by counsel approved, almost as a ministerial act, by the court, than an action directed
> by the court after a full consideration of the merits of a fully briefed dispute.

*Id.* at 501.

Another characteristic of this case complements the absence of detailed tribunal deliberation. Merck and its Insurers did not agree to confidentiality as a matter of normal business practice. The Confidentiality Order on which they rely provides one, and only one, reason for their desired confidentiality—an intentional effort to deny Plaintiffs' what the Order concedes to be relevant information. As noted above, the Confidentiality Order acknowledges that "information and documents" in the arbitration "could jeopardize the defense . . . of underlying claims against Merck . . .." Confidentiality Order at 2. The passage unambiguously shows the actual motivation for obtaining the Confidentiality Order—to keep material information from Plaintiffs' lest it "jeopardize [Merck's] defense." The arbitration's confidentiality has not been triggered to protect trade secrets or commercial information from competitors, interests that could lead to protective orders under the Federal Rules. Confidentiality was invoked solely "to insulate the insurance matters from the underlying tort litigation." Joint Mem. at 19. That is not an interest that supports denying access to otherwise discoverable information and may in fact violate U.S. law.[22]

Second, the Merck-Insurer approach leads to an extreme result. Information that common sense and the Confidentiality Order suggest must be relevant to questions of Merck's knowledge of

---

[22] The Confidentiality Order obligation incurred by Merck and the Insurers to maintain confidentiality was incurred after the fact of their contracting, solely in the face of lawsuits, and expressly to keep information from creditors. It thus appears to be an intentional act to hinder or delay bona fide creditors, tort victims. As such, the confidentiality obligation is akin to a secret lien, also designed to hinder creditors by keeping information from them. Incurring obligations to hinder or delay creditors constitutes a fraudulent conveyance under U.S. state and federal law, Uniform Fraudulent Transfer Act (UFTA) § 4(a)(1) ("obligation incurred" is fraudulent "if the debtor . . . incurred the obligation . . . with actual intent to hinder, delay . . . any creditor"); 11 U.S.C. § 548(a)(1)(A) (similar language in Bankruptcy Code). Fraudulent conveyances entitle creditors to appropriate relief. UFTA § 7 (action against an obligation incurred may include "any . . . relief the circumstances may require . . .").

Vioxx's risks will be "forever . . . insulated from production] . . . by virtue of having once [been] produced . . . in a protected fashion . . .." *Id.* at 501.  Only Merck's unsupported assertion that no additional relevant information is at issue in the arbitrations provides assurance that discoverable information is not being shielded by the Confidentiality Order.  With all due respect to Merck, this Court has been down a similar road before.  Merck made massive assertions of privilege that, when purportedly privileged information was reviewed by this Court, turned out to be largely unfounded.

Third, it is reasonable under U.S. and UK law to consider whether alternative means exist to obtain the requested information.  *Id.* at 501; *see also Dolling-Baker v. Merrett*, *supra,* [1991] 2 All E.R. at 899 ("the Court [in assessing an arbitration-based confidentiality claim] should consider . . . whether there are other and possibly less costly ways of obtaining the information which is sought").  In the case of a prior state, federal, or foreign court protective order, an alternative route might exist.  The plaintiff in the subsequent proceeding can seek to intervene in the proceeding affording protection and/or can request the protective-order court to modify its order.  *Id.*  These alternatives are not realistically available to Plaintiffs.  Requiring Plaintiffs to try to intervene in a London arbitration proceeding "imposes a substantial hardship on the plaintiffs forced to seek such relief." *Id.*  And, under UK law, it would be a fruitless effort because the arbitration is intended to preclude third-party participation.

> Arbitration is in contrast a consensual, private affair between the particular parties to a particular arbitration agreement. The resulting inability to enforce the solutions of joinder of parties or proceedings in arbitration . . . is well-recognized . . ..

*Sun Life Assurance Co. of Canada v. Lincoln National Life Ins. Co.*, [2004] EWCA Civ. 1660, [2006] 1 All E.R. (Comm) 675, [2005] 1 Lloyd's Rep. 606 (Ct. App.), at ¶ 67;  *Ali Shipping Corp. v. Shipyard Trogir* [1998] 1 Lloyd's Rep. 643, 650-51 (Ct. App.) ("strangers shall be excluded from

the hearing and conduct of the arbitration").  Thus, joinder or intervention are not available to Plaintiffs.[23]

Fourth, the Court should assess the degree to which it can preserve the confidentiality sought in the arbitration proceeding.  *See Tucker*, *supra*, 191 F.R.D. at 501 ("court should consider whether it is possible to incorporate terms in its own order which will further the protections originally ordered by the Texas court").  In this case, the Court can limit the degree to which arbitration confidentiality is qualified by imposing on the Plaintiffs "the same obligations and restrictions that were originally imposed on the" parties to the arbitration.  *Id*.  Plaintiffs do not wish to unnecessarily compromise the confidentiality of information and can be given access to discoverable information without it necessarily being made public.  If the Court deems it advisable, it can review any information before disclosing it to Plaintiffs.

A reasoned balancing process, with due comity and respect, thus strongly supports the requested discovery.  While Plaintiffs offer precedents that allow disclosure despite arbitration confidentiality orders, Merck and the Insurers offer no case in which London arbitration confidentiality orders precluded U.S. discovery.  Aside from their utter lack of precedent, Merck and its Insurers did not secure confidentiality after due tribunal deliberation or to preserve trade secrets.  They did so to keep relevant information from Plaintiffs.  Merck and its Insurers offer Plaintiffs no other realistic route to the information sought, except the unverifiable bare assertion that Plaintiffs already have what they are entitled to.  And sustaining Merck's and its Insurers' position means that

---

[23] The ability of a party in a subsequent case who sought information subject to an earlier case's protective order to seek relief from the court issuing the order distinguishes this case from *Dushkin Pub. Group, Inc. v. Kinko's Serv. Corp.*, 136 F.R.D. 334, 335-36 (D.D.C. 1991) ("To the extent that the plaintiff should desire to obtain those additional documents, that request should be addressed to the issuing court in the Southern District of New York"), relied on by Merck and the Insurers.  Joint Mem. at 21-22.

information they submit in the arbitrations is forever inaccessible to thousands of seriously injured

Plaintiffs.  Comity and respect require reasoned deference, not naive, unbalanced acceptance.

### 4.      Merck's and the Insurers' Precedents Do Not Support Their Position.

Merck offers no relevant authority to support its confidentiality theory or to balance the

relevant factors in favor of its position.  Merck and the Insurers first cite *Odfjell Asa v. Celanese*

*AG*S, 348 F.Supp.2d 283 (S.D.N.Y. 2004), in support of their position. Joint Mem. at 19; Merck

Mem. at 9.  But that case involved a federal court's authority to enforce subpoenas issued by an

arbitration panel requiring appearances before the panel.  The federal court held that claims of

privilege and confidentiality could be presented to the arbitration panel.  It nowhere held that

arbitration proceeding confidentiality orders precluded federal court discovery.  Federal court

discovery was not even at issue in the case.  And Merck and its Insurers are not seriously contending

that the arbitration panel even has authority to consider a third party request, much less grant it.

Merck's and the Insurers' reliance on *Lawrence E. Jaffe Pension Plan v. Household*

*International, Inc.*, No. Civ.A 04-N-1228 (CBS, 04-X-0057), 2004 WL 1821968 (D. Colo. Aug. 13,

2004), Joint Mem. at 19, is remarkable.  The *Jaffe* court expressly states that an arbitration

confidentiality order would *not* support issuance of a protective order.

> It bears noting that such a blanket protective [confidentiality] order would not be
> controlling in the context of a civil lawsuit and would not relieve the court of its
> obligation to find "good cause" for a protective order under Fed.R.Civ.P. 26©.

*Id.* at *1.  The case further states that protection of allegedly confidential information produced in

an arbitration was accomplished by a litigation stipulation, similar to this Court's Pretrial Order #13,

limiting the dissemination of purportedly confidential information. *Id*. at *3 (confidentiality was

adequately protected by court order stating that, "all Discovery Material will be deemed confidential

36

and may be disclosed only to counsel to the parties in the litigation . . . and to their employees and contractors").[24]  A published analysis of *Jaffe* suggests that it supports Plaintiffs, not Merck and the Insurers.  *See* Laurie Kratky Doré, *Public Courts Versus Private Justice: It's Time to Let Some Sun Shine In on Alternative Dispute Resolution*, 81 CHI.-KENT. L.REV. 463, 510 n.252 (2006) (summarizing *Jaffe* as follows: "relying on court's authority to modify protective orders to permit disclosure of documents produced in arbitration").

Merck's and the Insurers' summary of *Associated Elec. & Gas Ins. Servs. Ltd. [AEGIS] v. European Reinsurance Co. of Zurich*, [2003] 1 All E.R. (Comm.) 253, 1 W.L.R. 1041 (Privy Council), Joint Mem. at 21, fails to report that the case in fact *granted* relief from an arbitration confidentiality order to allow the prevailing party to use the arbitration award to stop its opponent from re-adjudicating an issue in a subsequent arbitration.  Consistent with Plaintiffs' view of UK and U.S. law, AEGIS effectively balanced the need to respect confidentiality with the unfairness resulting from mechanical adherence to confidentiality.[25]

---

[24] Merck's reliance on *Florida ex rel. Butterworth v. Jones Chemicals, Inc.*, 148 F.R.D. 282 (M.D. Fla. 1993), Merck's Incorporated Memorandum at 9, is also misplaced.  In that case, the court granted a motion to intervene in the proceeding issuing the protective order, an option not available to Plaintiffs here, but refused to modify the protective order because the "Court must presume its Order [ordering return or destruction of confidential information] has been complied with fully . . . ." *Id.* at 288.  The court also noted that alternative ways of obtaining the confidential information were available.  *Id.*

[25] Merck's and the Insurer's reliance on the UK case of *Hassneh Ins. v. Steuart J. Mew* [1993] 2 Lloyd's Rep. 243 (Q.B.), Joint Mem. at 21, is clearly misplaced because in that case one of the parties to the confidential arbitration sought to disclose information.  No third party interests were at stake. Reliance on Hassneh was rejected in Caringal.

Merck's and the Insurers' reliance on *In re Enercons Virginia, Inc.*, 812 F.2d 1469 (4th Cir. 1987), Joint Mem. at 22, is near-frivolous.  That case recognized an Italian court's appointment of a bankruptcy trustee on the ground that Italy had a basically fair legal system.  No evidence existed that recognizing the foreign decision would materially or unfairly prejudice any party's substantive interests, that the foreign proceeding was designed to preclude an injured party's access to relevant information, that the foreign proceeding would deprive a litigant of access to relevant evidence, or otherwise affect case outcomes.

Merck's claims of confidentiality ring hollow in light of the plain wording of the London tribunal orders on which it has relied and the federal jurisprudence that has considered similar issues of confidentiality.

## V. Discovery From the Insurers Is Appropriate and Direct Actions Against Insurers Make Insurance-Related Discovery Critical to Fulfilling This MDL's Mission.

Two separate bases support discovery against Merck's Insurers despite their abbreviated FRCP 45 objection. Joint Mem. at 23-25. First, normal principles of discovery entitle Plaintiffs to information from non-parties with information as directly and obviously relevant as that possessed by the Insurers. Second, in light of the thousands of Plaintiffs who have the right to bring direct actions against the Insurers, discovery from the Insurers is necessary for this MDL to fulfill its mission of efficiently processing national Vioxx-related pretrial discovery.

### A. Discovery From the Insurers is Appropriate and Not Overly Burdensome.

Part III establishes that Plaintiffs' requests for insurance-related information satisfy the normal liberal discovery standard. As discussed there, insurance-related information is reasonably likely to lead to obtaining admissible evidence, especially information about what Merck knew about Vioxx and when Merck knew it. Plaintiffs are entitled to learn about what Merck knew and when Merck knew it from those reasonably expected to have information about those topics. Plaintiffs are not limited to accepting Merck's version of all material events.

The Insurers are key actors who likely have material information not only about what Merck claimed to know, but also about other topics central to this MDL. Part III establishes that Merck's system of insurance is sufficiently complex that the PSC can only reliably assess Merck's insurance situation with the assistance of both Merck and its Insurers. The Federal Rules unequivocally entitle Plaintiffs to information enabling the PSC to reasonably assess Merck's insurance status. Plaintiffs

are not required to assess insurance coverage on the basis of the partially "unknown" policy information Merck has furnished and in the absence of the many policies Merck has wrongfully failed to disclose.  Part III *supra*.  Plaintiffs are entitled to information related to why, in the Vioxx era, Merck and its Insurers negotiated coverage that varied from Merck having minimal high-end exposure to Merck being deemed an insurer of over 50% of the high-end exposure and Merck moved from $75 million in coverage to $1 billion in coverage.  Part III *supra*.

Plaintiffs thus have made more than a *prima facie* showing of a legitimate need for information from the Insurers, information that is not merely duplicative of information available from Merck.  So the Insurers' FRCP 45 objection can only be sustained if the burden of discovery on the Insurers outweighs Plaintiffs' legitimate needs.  The Insurers object to breadth of discovery against them.  Joint Mem. at 24.  But the requests they quote— "all documents relating to Vioxx," "all claim files related to Vioxx," and "all documents reviewed in making coverage determinations"— plainly target Plaintiffs' legitimate informational needs.  The Insurers invoke no general, inappropriate requests that might support a finding of undue burden.

The burden of Vioxx-related information-gathering by the Insurers is further reduced by the Insurers' themselves having commenced adversary proceedings against Merck in London.  Presumably, before commencing those proceedings, the Insurers duly considered and investigated the bases for their action.  The Insurers thus likely already have assembled files containing substantial amount of Vioxx-related information that include most of what Plaintiffs request.  The actual additional burden cannot be presumed to be other than minimal.

The reasonable probability that insurance-related discovery, together with the Insurers already active engagement in adjudication with Merck, suggests that the Insurers' claim to undue burden under FRCP 45 should be rejected.

**B.      Discovery From the Insurers is Critical to Fulfilling This MDL's Mission.**

An additional aspect of this case further supports discovery from the Insurers.  Statutes and case law in several states establish that thousands of Vioxx victims may bring actions against the Insurers as parties.  Discovery of Insurer information relevant to cases in this MDL is fully authorized in such actions.  The Insurers will be parties and cannot plausibly claim non-party intrusiveness of discovery.  Given the thousands of pending cases in which full Insurer discovery is appropriate, the Insurers' resistance to insurance-arbitration discovery threatens to undermine this MDL's achievements.  A core purpose of an MDL is to conclude non-case-specific pretrial discovery to allow cases to proceed efficiently in their scattered venues.  Avoiding duplicative discovery and coordinating with other state and federal proceedings have been hallmarks of this MDL.  That the Insurers are not parties to this MDL provides no persuasive reason to excuse them from complying with proper discovery requests seeking relevant information.

**1.      Authority for Direct Actions Against the Insurers.**

Direct action statutes in some states give Vioxx Plaintiffs the right to recover from insurers even under circumstances that would preclude an insured from recovering against an insurer.  This is one of the core results of having a direct action statute.  For example, in *Edwards v. Royal Indem. Co.*, 182 La. 171, 161 So. 191 (La. 1935), the defendant failed to give timely notice to the insurer and that failure would have precluded recovery by the defendant against the insurer.  In the plaintiff's direct action against the insurer, however, the insurer's defense against the defendant did

40

not preclude recovery.  The Louisiana Supreme Court stated, "the policy of public liability not only

protects the insured from loss caused by his negligence, but is also in favor of the party who sustains

damages through the insured's fault."  161 So. at 195.[26]  Direct actions against the Insurers may be

brought by hundreds or thousands of victims.  Wisconsin, Louisiana, Puerto Rico, and the territory

of Guam have direct action statutes that make insurers directly liable to Plaintiffs.[27]

Other states without traditional direct action statutes expressly contemplate insurers as

parties to actions by injured plaintiffs.[28]  Still other states allow direct actions against insurers when

a plaintiff has died,[29] a circumstance present in many Vioxx cases.

Detailed considered of Louisiana law, standing alone, establishes the additional direct

relevance of Insurer discovery to this MDL.  Approximately one thousand of the claims pending in

this MDL originated either in state or federal court in Louisiana.  All of the insurance issues in those

---

[26] See also *Hedgepeth v. Guerin*, 96-1044 (La.App. 1st Cir.3/27/97) (policy "limiting the liability of [insurer] to those claims which occurred and were reported while the policy was in force, are unenforceable and without effect . . . ."), 691 So.2d 1355, *writ denied*, 97-1377 (La.9/26/97), 701 So.2d 983; *Bennett v. Krupkin*, 1999-2702 (La.App. 1st Cir.12/22/00), 779 So.2d 923, *writ denied*, 2001-0193 (La.3/30/01), 788 So.2d 1190.  But see *Burns v. CLD, Inc.*, 886 So.2d 607, 614 (La. App. 2d Cir. 2004) (rejecting *Hedgepeth and Bennett*).

[27] Wis. Stat., § 632.24 ("Any . . . policy of insurance covering liability to others for negligence makes the insurer liable . . . to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured."); La. Rev. Stat. Ann., § 22:55; 26 P.R. Laws Ann., tit. 26, § 2003; 22 Guam Code Ann. § 18305.  See *Morales-Melendez v. S.S. Mut. Underwriting Ass'n*, 763 F. Supp. 1174, 1179 (D.P.R. 1991) (Puerto Rico direct action statute authorizes action).

[28] *E.g., Lewis v. Allstate Ins. Co.*, 730 So.2d 65, 71 (Miss. 1998) ("if an insurance company can conduct a declaratory action regarding coverage prior to resolution of an underlying wrongful death trial, then the insureds and third party beneficiaries should be able to raise the coverage question in the underlying lawsuit as well. Pursuant to our rules of civil procedure, a hearing to determine coverage may be conducted if necessary. . . . Accordingly, if a question of insurance coverage exists, a party should be able to bring the insurer into a lawsuit and have the coverage question resolved by the judge.").

[29] R.I. Gen. Laws § 27-7-2 ("where before suit has been brought and probate proceedings have not been initiated the insured has died . . . the injured party, and, in the event of that party's death, the party entitled to sue for that death, may proceed directly against the insurer.").

claims would be affected by the provisions of the Louisiana Direct Action Statute.[30]  By law, the statute is read into and becomes a part of the every policy of insurance, even though the policy may not contain the language required by the statute, or contains language prohibited by the statute.[31]

Actions against the Insurers will proceed under discovery rules favoring insurance-related production.  For example, in *Blockbuster Entertainment Corp. v. McComb Video, Inc.,* 145 F.R.D. 402 (M.D. La 1992), the court considered the scope of discovery in a direct action claim in which the insurer denied coverage.  Plaintiff sought to depose the insurer on several topics including insurance claims and coverage, processing of insurance claims, interpretation of policy language, and approving a reservation of rights. 145 F.R.D. at 403.  Plaintiff also sought production of documents including correspondence, claim forms, manuals, and other materials related to coverage, claims, processing of claims and the claims made in that particular case. *Id.*  The defendant insurer asserted that the requests were overbroad, the information sought was irrelevant, and that it was protected by the attorney-client and work-product privileges. *Id.*  In ruling that the requested discovery was permissible, the Court stated:

> Unless American wishes to stipulate that coverage exists, i.e., it will not claim that any conditions or exclusions in the policy are applicable to defeat coverage, the plaintiffs are entitled to know the basis for any denial of coverage. . . Thus, any denial of coverage entitles the plaintiffs to explore during discovery the basis for denying coverage.  If the denial is based on interpretation of policy language, the plaintiffs are entitled to learn whether that policy interpretation derives from some manual, internal memoranda, report, or other source, and whether the interpretation has been consistently applied.

145 F.R.D. at 404-05.

---

[30] La. Rev. Stat. 22:655.

[31] *Zimmerman v. Intl. Companies & Consulting, Inc.*, 107 F.3d 344, 346 (5th Cir. 1997), citing, *Grubbs v. Gulf Int'l Marine, Inc.* 625 So.2d 495 (La. 1993); *Quinlan v. Liberty Bank and Trust Co.*, 575 So.2d 336, 352 (La. 1991) (on rehearing).

Actions against Insurers clearly expand insurance discovery beyond that which would ordinarily be allowed in some jurisdictions. But the effect of direct Insurer actions on this case is even broader than that. It renders the ongoing insurance arbitrations meaningless in any respect that would limit the rights of direct action plaintiffs. *In the Matter of Talbott Bigfoot, Inc.,* 887 F.2d 611 (5th Cir. 1989); *Zimmerman v. Intl. Companies & Consulting, Inc.*, 107 F.3d 344, 346 (5th Cir. 1997). These two Fifth Circuit cases have considered the effect that an insurance arbitration could have on a direct action plaintiff's rights against the insurer while the arbitration was pending. Both cases held that the arbitration could not limit the plaintiffs rights vis-a-vis the insurer.

The specific issue in both *Talbott* and *Zimmerman* was whether an insurer was entitled to a stay of an injured plaintiff's suit against the insurer under the Louisiana Direct Action Statute during the pendency of arbitration. The answer was "no" in both cases. This is because any condition of a policy that has the effect of defeating the purpose of the Direct Action Statute, such as the "no-action" clauses at issue in *Talbott* and *Zimmerman* are annulled and superseded by the statute. *See Zimmerman*, 107 F.3d at 346. If the arbitration clause in a policy could not limit the plaintiff's rights against the insurer, then it stands to reason that a confidentiality order executed as part of that arbitration likewise could not limit the plaintiff's right to discovery. Consequently, even if the confidentiality order is determined to limit the rights of other plaintiffs around the country, the same cannot be true for those Plaintiffs from Louisiana or from other states in which the Insurers can be named as defendants.

## 2.    Precluding Insurer Discovery Is Inconsistent with This MDL's Purpose.

Since several states' laws permit insurers to be party defendants, with all the discovery scope that formal party status entails, dozens of state and federal courts will have to address pretrial

discovery issues that precisely parallel those before this Court, and that can be resolved by this Court. Thousands of Plaintiffs, as well as Merck and the Insurers, will then bear the time and cost of additional discovery that this Court could have overseen. Discovery is destined to proceed on insurance in some forum; it will proceed, inefficiently, in many fora unless this MDL addresses the topic.

Thus, independent of the obvious relevance of the Merck-Insurer arbitration and other documents, see Part III, discovery of the Insurers is necessary for this MDL to fulfill its core mission— concluding pretrial discovery on issues common to thousands of Vioxx cases. Merck and its Insurers are prime beneficiaries of this core MDL efficiency function. They should not be permitted to derail the MDL with respect to particular issues about which they fear complete discovery.

Unless insurance-related discovery can proceed against Merck and its Insurers, pretrial discovery likely will have to be repeated in hundreds or thousands of individual Vioxx cases. Pretrial discovery will be continuously repeated because the question is not whether detailed, relevant insurance discovery will occur. Rather, it is where and when it will occur. Too many states' laws allow making insurers parties to Vioxx actions to realistically believe that the Insurers can forever avoid providing reasonable discovery about information relevant to this litigation. Thus, at a minimum the Court should allow the PSC's discovery to go forward with respect to Plaintiffs with claims governed by the law of states allowing direct actions against the Insurers, including Louisiana.

Merck's statement that it would "strongly oppose" any actions brought directly against insurers, Joint Mem. at 17 n.12, simply overlooks the goals of an MDL.[32] Whether or not Merck and the Insurers would oppose direct actions, discovery in this MDL is needed now to assess the larger Vioxx litigation picture.  The PSC must seek pretrial discovery information from the Insurers or the efficiency goal of this MDL will be compromised.  In the FRCP 45 balancing calculus, the MDL's existence and direct action opportunities weigh heavily in favor of supporting discovery.

## VI.  Requiring Merck to Produce Relevant Information From DOJ and SEC Investigations Would Not Implicate Attorney-Client Privilege.

The PSC's discovery initiative also covered materials relating to the investigations that the Department of Justice (DOJ) and the SEC commenced after Merck withdrew Vioxx from the market.[33]  Merck claimed that it had already provided the PSC with all non-privileged information relating to these investigations. Incorporated Memorandum at 12.  It appears that Merck's primary objection to producing any further information and/or testimony in response to the PSC requests is based on attorney-client privilege.  "Further discovery related to the investigation would necessarily involve information that is protected by attorney-client privilege."  *Id*.  The gist of Merck's argument seems to be that it cannot designate a representative to testify about these investigations because its only representatives with sufficient knowledge of the facts are attorneys and any

---

[32]  Although Merck and the Insurers claim to have "numerous grounds of both law and practicality" on which to oppose actions against the Insurers, Joint Mem. at 17 n.12, they cite no authority.  In fact, as Plaintiffs demonstrate, there are no direct barriers to naming insurers under the laws of several states.

[33]  Merck claims to have been under the impression that DOJ/SEC issues were "off the table" for purposes of the upcoming hearing.  Joint Mem. at 4 n.5.  Mr. Ranier made clear that any offer to separately treat the DOJ/SEC issues had expired with the failed effort to settle insurance discovery issues. [see Defendants' brief as Exhibit O].  Mr. Ranier offered Merck a deadline of Jan. 19, 2007 so that Merck could respond on DOJ/SEC issues.  Merck rejected the offer and has declined to brief DOJ/SEC issues.

statements that they made would necessarily violate the attorney-client privilege.  Apparently, Merck also claims that all relevant documents would be covered by the attorney-client privilege.

Merck's reliance on the privilege is misplaced because the PSC does not seek privileged information and because materials provided by or on behalf of Merck to the DOJ or SEC are not protected by the attorney-client privilege.

The PSC did not request any attorney's deposition and it is not seeking any privileged attorney-client communications.  But even if Merck felt that it was necessary to designate one of its lawyers for the deposition, the attorney-client privilege would not come into play.  The PSC is not asking for testimony about the advice that Merck's lawyers gave to the company during the governmental investigations.  It is only seeking testimony regarding the communications made on behalf of the company to the regulatory agencies.  Similarly, the PSC only wants those documents that Merck exchanged with the agencies and those in-house documents that do no reflect the advice of counsel.

One of the logical confines of the privilege has long been that when communications and information are relayed to a third party that is not rendering legal services on the client's behalf, they cannot be considered confidential.[34]  All of the information that the PSC is seeking from Merck was already provided to a third party regulatory agency, or never fell under the aegis of the attorney-client privilege in the first place.  Under the circumstances no privilege can attach to the testimony or document production whether or not Merck chooses to designate one of its attorneys as its corporate representative to explain these matters.  And to the extent that any of the requested

---

[34] *Nguyen v. Excel Corp.*, 197 F.3d 200 (5th Cir. 1999); *United States v. King*, 536 F.Supp. 253 (C.D. Cal. 1982).

discovery may run afoul of the privilege, Merck's proper course of action would be to file a detailed privilege log and allow the Court to conduct an in camera inspection of the materials so that it could determine the validity of the privilege claims.

Case law overwhelmingly supports the PSC's access to the materials and information communicated to the DOJ and SEC. When a party discloses information to a government agency conducting an investigation, the majority view is that the privilege is waived. *See, e.g., In re Qwest Commc'n Int'l, Inc.,* 450 F.3d 1179, 1186-96 (10th Cir.2006) (disclosure of information to SEC and DOJ waived attorney-client privilege). Merck seems to seek to avail itself of a principle of selective waiver whereby it can choose to disclose information to some parties such as the SEC and DOJ but not to others, such as the PSC. That claim of privilege has been widely rejected. "The only conclusion from the federal case law is that the federal circuits have not expanded wither the attorney-client privilege under Federal Rule of Evidence 501 or the non-opinion work-product doctrine under Fed.R.Civ.P. 26(b)(3) or *Hickman v. Taylor* by applying selective waiver." 450 F.3d at 1196. *See also In re Columbia/HCA Healthcare Corp. Billing Practices Litigation,* 293 F.3d 289, 291 (6th Cir.2002) (producing otherwise privileged documents to the DOJ and other government agencies "waived any privilege associated with the documents"); *Westinghouse Elec. Corp. v. Republic of Philippines,* 951 F.2d 1414, 1424 (3rd Cir.1991) ("numerous cases have applied the traditional waiver doctrine to communications disclosed to government agencies"); *United States v. Mass. Inst. of Tech.,* 129 F.3d 681, 686 (1st Cir.1997) (disclosure of documents to one government agency waived privilege with respect to another government agency); *In re Martin Marietta Corp.,* 856 F.2d 619, 622-24 (4th Cir.1988) (other privileged materials disclosed to the U.S. Attorney and the Department of Defense waived attorney-client privilege).

In line with the vast bulk of authority, selective waiver of the privilege in connection with disclosure to government agencies has been rejected in this Circuit. *See S.E.C. v. Brady*, No. 3:05-CV-1416-M, 2006 WL 3301865, at *9 (N.D. Tex. Oct. 16, 2006) (materials provided to the SEC waived attorney-client privilege; "an overwhelming amount of authority has . . . rejected the selective waiver doctrine").

To the extent that any documents requested would be subject to the attorney client privilege, or any other evidentiary privilege, there is still no excuse for Merck to refuse production. Merck's proper course of action for any documents that it considers to be privileged would be to prepare and file a detailed privilege log identifying each such documents and the perceived grounds for privilege. The Court could then conduct an *in camera* inspection of these documents to determine whether any such privilege exists.

Once again, Merck has no valid excuse for its refusal to respond.

## VII.    Conclusion.

Merck's and the Insurers' boilerplate opposition to discovery is insufficient as a matter of law. Substantively, the connection between the issues in Merck's insurance coverage disputes and Plaintiffs' claims against the manufacturer supports the requested discovery. Discovery relating to insurance information and the London arbitration proceedings is reasonably likely to produce admissible evidence. Merck's and the Insurers' claims of ironclad, draconian confidentiality are inconsistent with the Confidentiality Order on which they rely, as well as with UK and U.S. law. The requested discovery to understand Merck's insurance system and to obtain all insurance policies relevant to the Vioxx era are necessary to allow the PSC to understand Merck's insurance situation.

Given thousands of Plaintiffs' standing to directly sue the Insurers, the PSC's request for insurance-related information is all the more compelling and necessary to successfully prosecute this MDL. Merck's claim of attorney-client privilege with respect to material supplied to the SEC and DOJ rests on a selective waiver theory rejected by virtually every court that has considered it.

The PSC therefore respectfully requests that this Honorable Court deny Merck and its Insurers' Joint Motion to Quash and/or for Protective Order. The Court should order the production of the discovery and depositions sought by the PSC relating to Merck insurance matters.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**


Date:  January 22, 2007

By:/s/ Leonard A. Davis
**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
Place St. Charles
201 St. Charles Avenue, Suite 4310
New Orleans, Louisiana 70170
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**


Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA  71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

49

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008  (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire
Fred S. Longer, Esquire
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663  (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028  (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

## CERTIFICATE OF SERVICE

———

     I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 22nd day of January, 2007.


                 /s/ Leonard A. Davis
                 Leonard A. Davis (Bar No. 14190)
                 ***Herman, Herman, Katz & Cotlar, LLP***
                 201 St. Charles Ave., Suite 4310
                 New Orleans, LA  70170
                 PH:   (504) 581-4892
                 FAX:  (504) 561-6024
                 ldavis@hhkc.com