10-Q

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2006

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 1-3305

# MERCK & CO., INC.

P. O. Box 100
One Merck Drive
Whitehouse Station, N.J. 08889-0100
(908) 423-1000

Incorporated in New Jersey

I.R.S. Employer Identification
No. 22-1109110

The number of shares of common stock outstanding as of the close of business on October 31, 2006:

| Class | Number of Shares Outstanding |
|---|---|
| Common Stock | 2,171,002,669 |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑          No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☑

# TABLE OF CONTENTS

Part I — Financial Information
    Item 1. Financial Statements
    Item 2. Management's Discussion and Analysis of Financial Condition and Results of
    Operations
    Item 4. Controls and Procedures
PART II — Other Information
    Item 1. Legal Proceedings
    Item 2. Unregistered Sales of Equity Securities and Use of Proceeds
    Item 6.Exhibits
Signatures
EXHIBIT INDEX
EX-12: COMPUTATION OF RATIOS OF EARNINGS TO FIXED CHARGES
EX-31.1: CERTIFICATION
EX-31.2: CERTIFICATION
EX-32.1: CERTIFICATION
EX-32.2: CERTIFICATION

**Table of Contents**

Part I — Financial Information

Item 1. Financial Statements

MERCK & CO., INC. AND SUBSIDIARIES
INTERIM CONSOLIDATED STATEMENT OF INCOME
THREE MONTHS AND NINE MONTHS ENDED SEPTEMBER 30, 2006 AND 2005
(Unaudited, $ in millions except per share amounts)

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2006 | 2005 | 2006 | 2005 |
| Sales | $5,410.4 | $5,416.2 | $16,591.9 | $16,246.0 |
| Costs, Expenses and Other |  |  |  |  |
| Materials and production | 1,544.1 | 1,238.8 | 4,332.0 | 3,670.9 |
| Marketing and administrative | 2,370.6 | 1,661.4 | 5,819.6 | 5,016.4 |
| Research and development | 945.4 | 942.6 | 3,059.9 | 2,736.0 |
| Restructuring costs | 49.6 | 79.8 | 86.5 | 93.4 |
| Equity income from affiliates | (595.4) | (480.1) | (1,710.2) | (1,130.5) |
| Other (income) expense, net | (134.7) | (24.7) | (305.4) | 15.8 |
|  | 4,179.6 | 3,417.8 | 11,282.4 | 10,402.0 |
| Income Before Taxes | 1,230.8 | 1,998.4 | 5,309.5 | 5,844.0 |
| Taxes on Income | 290.2 | 577.5 | 1,349.6 | 2,332.4 |
| Net Income | $ 940.6 | $1,420.9 | $ 3,959.9 | $ 3,511.6 |
| Basic Earnings per Common Share | $ 0.43 | $ 0.65 | $ 1.82 | $ 1.60 |
| Earnings per Common Share Assuming Dilution | $ 0.43 | $ 0.65 | $ 1.81 | $ 1.59 |
| Dividends Declared per Common Share | $ 0.38 | $ 0.38 | $ 1.14 | $ 1.14 |

The accompanying notes are an integral part of this consolidated financial statement.

- 2 -

**Table of Contents**

MERCK & CO., INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
SEPTEMBER 30, 2006 AND DECEMBER 31, 2005
(Unaudited, $ in millions)

|  | September 30, 2006 | December 31, 2005 |
|---|---|---|
| **Assets** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 6,222.1 | $ 9,585.3 |
| Short-term investments | 2,864.9 | 6,052.3 |
| Accounts receivable | 3,081.4 | 2,927.3 |
| Inventories (excludes inventories of $447.8 in 2006 and $753.8 in 2005 classified in Other assets — see Note 5) | 1,870.7 | 1,658.1 |
| Prepaid expenses and taxes | 1,185.1 | 826.3 |
| Total Current Assets | 15,224.2 | 21,049.3 |
| Investments | 6,443.7 | 1,107.9 |
| Property, Plant and Equipment, at cost, net of allowance for depreciation of $10,731.0 in 2006 and $9,315.1 in 2005 | 13,412.8 | 14,398.2 |
| Goodwill | 1,085.7 | 1,085.7 |
| Other Intangibles, net | 631.8 | 518.7 |
| Other Assets | 6,920.9 | 6,686.0 |
|  | $ 43,719.1 | $ 44,845.8 |
| **Liabilities and Stockholders' Equity** | | |
| Current Liabilities | | |
| Loans payable and current portion of long-term debt | $ 1,195.8 | $ 2,972.0 |
| Trade accounts payable | 362.6 | 471.1 |
| Accrued and other current liabilities | 5,504.9 | 5,277.8 |
| Income taxes payable | 3,255.6 | 3,691.5 |
| Dividends payable | 828.8 | 830.0 |
| Total Current Liabilities | 11,147.7 | 13,242.4 |
| Long-Term Debt | 4,789.5 | 5,125.6 |
| Deferred Income Taxes and Noncurrent Liabilities | 6,059.6 | 6,092.9 |
| Minority Interests | 2,437.0 | 2,407.2 |
| Stockholders' Equity | | |
| Common Stock | | |
| Authorized - 5,400,000,000 shares | | |
| Issued     - 2,976,223,337 shares | 29.8 | 29.8 |
| Other paid-in capital | 7,105.9 | 6,900.0 |
| Retained earnings | 39,447.6 | 37,980.0 |
| Accumulated other comprehensive income | 50.1 | 52.3 |
|  | 46,633.4 | 44,962.1 |
| Less treasury stock, at cost | | |
| 803,664,097 shares — September 30, 2006 | | |
| 794,299,347 shares — December 31, 2005 | 27,348.1 | 26,984.4 |

| | | |
|---|---:|---:|
| Total Stockholders' Equity | 19,285.3 | 17,977.7 |
| | $ 43,719.1 | $ 44,845.8 |

The accompanying notes are an integral part of this consolidated financial statement.

- 3 -

**Table of Contents**

MERCK & CO., INC. AND SUBSIDIARIES
INTERIM CONSOLIDATED STATEMENT OF CASH FLOWS
NINE MONTHS ENDED SEPTEMBER 30, 2006 AND 2005
(Unaudited, $ in millions)

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2006 | 2005 |
| **Cash Flows from Operating Activities** | | |
| Net income | $ 3,959.9 | $ 3,511.6 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 1,725.4 | 1,202.2 |
| Deferred income taxes | (226.1) | 183.6 |
| Equity income from affiliates | (1,710.2) | (1,130.5) |
| Dividends and distributions from equity affiliates | 1,372.5 | 752.0 |
| Share-based compensation | 246.0 | 33.5 |
| Acquired research | 296.3 | — |
| Other | 34.5 | 391.3 |
| Net changes in assets and liabilities | (709.2) | 400.0 |
| Net Cash Provided by Operating Activities | 4,989.1 | 5,343.7 |
| | | |
| **Cash Flows from Investing Activities** | | |
| Capital expenditures | (684.7) | (996.1) |
| Purchase of securities, subsidiaries and other investments | (15,983.2) | (88,103.8) |
| Proceeds from sale of securities, subsidiaries and other investments | 13,480.0 | 86,616.0 |
| Other | (1.5) | (2.1) |
| Net Cash Used by Investing Activities | (3,189.4) | (2,486.0) |
| | | |
| **Cash Flows from Financing Activities** | | |
| Net change in short-term borrowings | (1,606.6) | 523.1 |
| Proceeds from issuance of debt | 5.1 | 1,000.0 |
| Payments on debt | (505.6) | (1,014.2) |
| Purchase of treasury stock | (751.0) | (764.0) |
| Dividends paid to stockholders | (2,494.0) | (2,516.5) |
| Proceeds from exercise of stock options | 340.8 | 114.6 |
| Other | (172.5) | (33.4) |
| Net Cash Used by Financing Activities | (5,183.8) | (2,690.4) |
| | | |
| Effect of Exchange Rate Changes on Cash and Cash Equivalents | 20.9 | (128.1) |
| | | |
| Net (Decrease) Increase in Cash and Cash Equivalents | (3,363.2) | 39.2 |
| | | |
| Cash and Cash Equivalents at Beginning of Year | 9,585.3 | 2,878.8 |
| Cash and Cash Equivalents at End of Period | $ 6,222.1 | $ 2,918.0 |

The accompanying notes are an integral part of this consolidated financial statement.

- 4 -

Table of Contents

Notes to Consolidated Financial Statements

## 1. Basis of Presentation

The accompanying unaudited interim consolidated financial statements have been prepared pursuant to the rules and regulations for reporting on Form 10-Q. Accordingly, certain information and disclosures required by accounting principles generally accepted in the United States for complete consolidated financial statements are not included herein. The interim statements should be read in conjunction with the financial statements and notes thereto included in the Company's latest Annual Report on Form 10-K.

The results of operations of any interim period are not necessarily indicative of the results of operations for the full year. In the Company's opinion, all adjustments necessary for a fair presentation of these interim statements have been included and are of a normal and recurring nature.

Certain reclassifications have been made to prior year amounts to conform with the current year presentation.

Effective January 1, 2006, the Company began recognizing revenue from the sale of vaccines to the Federal government for placement into stockpiles related to the Pediatric Vaccine Stockpile in accordance with Securities and Exchange Commission (SEC) Interpretation, *Commission Guidance Regarding Accounting for Sales of Vaccines and BioTerror Countermeasures to the Federal Government for Placement into the Pediatric Vaccine Stockpile or the Strategic National Stockpile.* The Company retrospectively applied the impacts of adopting the Interpretation to the Company's consolidated financial statements by reducing Accrued and other current liabilities by $103.4 million and increasing Income taxes payable by $42.3 million and Retained earnings by $61.1 million, respectively, in its December 31, 2005 consolidated balance sheet. There was no impact to the Company's results of operations for the nine months ended September 30, 2006 and 2005, respectively.

## 2. Restructuring

In November 2005, the Company commenced the initial phase of its global restructuring program designed to reduce the Company's cost structure, increase efficiency and enhance competitiveness. As part of this program, the Company plans to sell or close five manufacturing sites and two preclinical sites by the end of 2008 and eliminate approximately 7,000 positions company-wide. To date, manufacturing operations have ceased at one site, one other site has been sold, and the two preclinical sites have been closed. The Company has also sold certain other facilities and related assets in connection with the restructuring program. Through the end of 2008, when the initial phase of the global restructuring program is expected to be substantially complete, the cumulative pre-tax costs are expected to range from $1.8 billion to $2.2 billion. Approximately 70% of the cumulative pre-tax costs are estimated as non-cash, relating primarily to accelerated depreciation for those facilities scheduled for closure. Since the inception of the global restructuring program through September 30, 2006, the Company has recorded total pre-tax accumulated costs of $1.1 billion and eliminated approximately 3,900 positions which are comprised of employee separations and the elimination of contractors and vacant positions.

The following table summarizes the charges related to restructuring activities by type of cost for the three and nine months ended September 30, 2006:

|  | ($ in millions) | | | | | | | |
|  | Three Months Ended September 30, 2006 | | | | Nine Months Ended September 30, 2006 | | | |
|  | Separation Costs | Accelerated Depreciation | Other | Total | Separation Costs | Accelerated Depreciation | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Materials and production | $ — | $ 187.4 | $ 12.2 | $199.6 | $ — | $ 549.0 | $ 23.1 | $572.1 |
| Research and development | — | — | — | — | — | 55.4 | — | 55.4 |
| Restructuring costs | 37.8 | — | 11.8 | 49.6 | 87.4 | — | (0.9) | 86.5 |
|  | $ 37.8 | $ 187.4 | $ 24.0 | $249.2 | $ 87.4 | $ 604.4 | $ 22.2 | $714.0 |

For the three and nine months ended September 30, 2006, the Company recorded total pre-tax restructuring costs of $249.2 million and $714.0 million, respectively, and eliminated approximately 2,800 positions during 2006 primarily related to the global restructuring program. The global restructuring program includes the following costs:

(1) Separation costs related to Company-wide position eliminations,

- 5 -

**Table of Contents**

Notes to Consolidated Financial Statements (continued)

    (2) Accelerated depreciation related to manufacturing and preclinical facilities expected to be sold or closed by the end of 2008,

    (3) Other activity related to the Company's pension and other postretirement plans, asset impairments, and other exit costs as well as pre-tax gains of $39.5 million for the nine months ended September 30, 2006 resulting from the sales of facilities in the second quarter in connection with the global restructuring program.

The following table summarizes the charges and spending relating to restructuring activities for the nine months ended September 30, 2006:

| | ($ in millions) | | | |
| | Separation Costs | Accelerated Depreciation | Other | Total |
|---|---|---|---|---|
| Restructuring accrual as of January 1, 2006 [1] | $ 240.3 | $ — | $ — | $ 240.3 |
| Expense | 87.4 | 604.4 | 22.2 | 714.0 |
| (Payments) receipts, net | (154.1) | — | 7.0 [2] | (147.1) |
| Non-cash activity | — | (604.4) | (29.2) | (633.6) |
| Restructuring accrual as of September 30, 2006 | $ 173.6 | $ — | $ — | $ 173.6 |

    [1] The restructuring accrual at January 1, 2006 includes separation costs associated with the global restructuring program as well as amounts from previously announced restructuring programs. The previously announced restructuring programs were substantially complete as of the end of the first quarter.

    [2] Includes proceeds from the sales of facilities in the second quarter in connection with the global restructuring program.

The Company recorded Restructuring costs for the three and nine months ended September 30, 2005 of $79.8 million and $93.4 million, respectively, associated with earlier restructuring programs.

### 3. Share-Based Compensation

The Company has share-based compensation plans under which employees, non-employee directors and employees of certain of the Company's equity method investees may be granted options to purchase shares of Company common stock at the fair market value at the time of grant. In addition to stock options, the Company grants performance share units (PSUs) and restricted stock units (RSUs) to certain management level employees. These plans were approved by the Company's shareholders. At September 30, 2006, 187.3 million shares were authorized for future grants under the Company's share-based compensation plans. The Company settles employee share-based compensation awards primarily with treasury shares.

Employee stock options are granted to purchase shares of Company stock at the fair market value at the time of grant. These awards generally vest one-third each year over a three-year period, with a contractual term of 10 years. RSUs are stock awards that are granted to employees and entitle the holder to shares of common stock as the awards vest, as well as non-forfeitable dividend equivalents. The fair value of the awards is determined and fixed on the grant date based on the Company's stock price. PSUs are stock awards where the ultimate number of shares issued will be contingent on the Company's performance against a pre-set objective or set of objectives. The fair value of each PSU is determined on the date of grant based on the Company's stock price. Over the performance period, the number of shares of stock that are expected to be issued will be adjusted based on the probability of achievement of a performance target and final compensation expense will be recognized based on the ultimate number of shares issued. Both PSU and RSU payouts will be in shares of Company stock after the end of a three-year period, subject to the terms applicable to such awards.

Effective January 1, 2006, the Company adopted Financial Accounting Standards No. 123R, *Share-Based Payments* (FAS 123R). Employee share-based compensation expense was previously recognized using the intrinsic value method which measures share-based compensation expense as the amount at which the market price of the stock at the date of grant exceeds the exercise price. FAS 123R requires the recognition of the fair value of share-based compensation in net income, which the Company recognizes on a straight-line basis over the requisite service period. Additionally, the Company elected the modified prospective transition method for adopting FAS 123R, and therefore, prior periods were not restated. Under this method, the provisions for FAS 123R apply to all awards granted or modified after January 1, 2006. In addition, the unrecognized expense of awards that have not yet vested at the date of adoption are recognized in net income in the relevant period after the date of adoption. Also effective January 1, 2006, the Company adopted

Financial Accounting Standards Board Staff Position 123R-3, *Transition Election Related to Accounting for the Tax Effects of Share-Based Payment Awards*, which provides the Company an optional short cut method for calculating the historical pool of windfall tax benefits upon adopting FAS 123R.

- 6 -

**Table of Contents**

Notes to Consolidated Financial Statements (continued)

The following table provides amounts of share-based compensation cost recorded in the Consolidated Statement of Income (substantially all of the 2005 amount was related to RSUs):

| | ($ in millions) | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Pre-tax share-based compensation expense | $ 63.7 | $ 11.8 | $246.0 | $ 33.5 |
| Income tax benefits | (20.0) | (4.1) | (76.3) | (11.7) |
| Total share-based compensation expense | $ 43.7 | $ 7.7 | $169.7 | $ 21.8 |

As a result of the adoption of FAS 123R, effective January 1, 2006, the incremental impact on the Company's share-based compensation expense reduced the Company's results of operations as follows:

| | ($ in millions) | |
| | Three Months | Nine Months |
| | Ended September 30, | |
| | 2006 | 2006 |
|---|---|---|
| Income Before Taxes | $42.3 | $182.8 |
| Net Income | 29.5 | 127.6 |
| Earnings per Common Share Assuming Dilution | $0.01 | $ 0.06 |

FAS 123R requires the Company to present pro forma information for periods prior to the adoption as if the Company had accounted for employee share-based compensation under the fair value method of that Statement. For purposes of pro forma disclosure, the estimated fair value of awards at the date of grant, including those granted to retirement-eligible employees, is amortized to expense over the requisite service period. The following table illustrates the effect on net income and earnings per common share if the Company had applied the fair value method for recognizing employee share-based compensation for the three and nine months ended September 30, 2005:

| | ($ in millions) | | | |
| | Three Months | | Nine Months | |
| | Ended September 30, | | | |
| | 2005 | | 2005 | |
|---|---|---|---|---|
| Net income, as reported | $ | 1,420.9 | $ | 3,511.6 |
| Compensation expense, net of tax: | | | | |
| Reported | | 7.7 | | 21.8 |
| Fair value method | | (83.8) | | (272.6) |
| Pro forma net income | $ | 1,344.8 | $ | 3,260.8 |
| | | | | |
| Earnings per common share: | | | | |
| Basic — as reported | $ | 0.65 | $ | 1.60 |
| Basic — pro forma | $ | 0.61 | $ | 1.48 |
| | | | | |
| Assuming dilution — as reported | $ | 0.65 | $ | 1.59 |
| Assuming dilution — pro forma | $ | 0.61 | $ | 1.48 |

The pro forma amounts and the fair value of each option grant were estimated on the date of grant using the Black-Scholes option pricing model. Upon the adoption of FAS 123R, compensation expense is being recognized immediately for awards granted to retirement-eligible employees or over the period from the grant date to the date retirement eligibility is achieved. This approach is known as the non-substantive vesting period approach. If the Company had been applying this approach for stock options granted to retirement-eligible employees, the effect on

Table of Contents

Notes to Consolidated Financial Statements (continued)

pro forma earnings per share assuming dilution for the three and nine months ended September 30, 2005, as provided in the above table, would not have been significant.

The Company continues to use the Black-Scholes option pricing model for option grants after adoption of FAS 123R. In applying this model, the Company uses both historical data and current market data to estimate the fair value of its options. The Black-Scholes model requires several assumptions including expected term of the options, risk-free rate, volatility, and dividend yield. The expected term represents the expected amount of time that options granted are expected to be outstanding, based on historical and forecasted exercise behavior. The risk-free rate is based on the rate at grant date of zero-coupon U.S. Treasury Notes with a term equal to the expected term of the option. Expected volatility is estimated using a blend of historical and implied volatility. The historical component is based on historical monthly price changes. The implied volatility is obtained from market data on the Company's traded options.

The weighted average fair value of options granted in the first nine months of 2006 was $9.80 per option, determined using the following assumptions:

| | |
|---|---|
| Expected dividend yield | 3.84% |
| Risk-free interest rate | 4.58% |
| Expected volatility | 31.13% |
| Expected life (years) | 5.8 |

Summarized information relative to the Company's stock option plans (options in thousands) is as follows:

| | Number of Options | Average Price [1] | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value ($000s) |
|---|---|---|---|---|
| Balance at December 31, 2005 | 250,088.0 | $54.52 | | |
| Granted | 30,704.3 | 35.21 | | |
| Exercised | (11,340.1) | 30.05 | | |
| Forfeited | (13,170.1) | 57.32 | | |
| Outstanding at September 30, 2006 | 256,282.1 | $53.14 | 5.31 | $575,804.9 |
| Exercisable at September 30, 2006 | 194,375.0 | $58.48 | 4.21 | $149,722.3 |

[1] Weighted average exercise price.

Additional information pertaining to the Company's stock option plans is provided in the table below:

| | ($ in millions) | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
| Total intrinsic value of stock options exercised | $10.6 | $ 2.2 | $ 55.6 | $ 55.4 |
| Fair value of stock options vested | $21.1 | $24.6 | $840.4 | $917.8 |
| Cash received from the exercise of stock options | $28.9 | $ 4.1 | $340.8 | $114.6 |

- 8 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

A summary of the Company's nonvested RSUs and PSUs (shares in thousands) at September 30, 2006, is as follows:

|  | RSUs | | PSUs | |
|---|---|---|---|---|
|  | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Nonvested at December 31, 2005 | 4,765.1 | $ 35.93 | 1,022.2 | $ 39.73 |
| Granted | 1,541.4 | 35.15 | 520.7 | 35.09 |
| Vested | (49.7) | 36.40 | — | — |
| Forfeited | (205.2) | 35.21 | (113.7) | 34.70 |
| Nonvested at September 30, 2006 | 6,051.6 | $ 35.75 | 1,429.2 | $ 38.44 |

At September 30, 2006, there was $374.9 million of total pre-tax unrecognized compensation expense related to nonvested stock options, RSU and PSU awards which will be recognized over a weighted average period of 2.3 years.

**4.   Research Collaborations, Acquisitions and License Agreements**

Merck continues its strategy of establishing strong external alliances to complement its substantial internal research capabilities, including targeted acquisitions, research collaborations, licensing pre-clinical and clinical compounds and technology transfers to drive both near- and long-term growth.

In September 2006, the Company announced that it will expand the scope of its existing strategic collaboration with FoxHollow Technologies, Inc. (FoxHollow) for atherosclerotic plaque analysis and that Merck will acquire a stake in FoxHollow with the purchase of $95 million in common stock, subject to customary closing conditions and clearance under the Hart-Scott-Rodino Antitrust Improvements Act. Merck will acquire newly-issued shares of FoxHollow common stock at $29.629 per share, representing approximately an 11% stake. Under the terms of the expanded collaboration agreement, Merck will pay $40 million to FoxHollow over four years in exchange for FoxHollow's agreement to collaborate exclusively with Merck in specified disease areas. Merck will also provide a minimum of $60 million in funding to FoxHollow over the first three years of the four year collaboration program term, for research activities to be conducted by FoxHollow under Merck's direction. FoxHollow will receive milestone payments on successful development of drug products or diagnostic tests utilizing results from the collaboration, as well as royalties. This transaction is expected to close in the fourth quarter of 2006.

In June 2006, the Company acquired all of the outstanding equity of GlycoFi, Inc. (GlycoFi) for approximately $373 million in cash ($400 million purchase price net of $25 million in shares already owned and net transaction costs). GlycoFi was a privately-held biotechnology company that was a leader in the field of yeast glycoengineering, which is the addition of specific carbohydrate modifications to the proteins in yeast, and optimization of biologic drug molecules. GlycoFi's technology platform is used in the development of glycoprotein, as well as the optimization of a glycoprotein target. In connection with the acquisition, the Company recorded a charge of $296.3 million for acquired research associated with GlycoFi's technology platform to be used in the research and development process, for which, at the acquisition date, technological feasibility had not been established and no alternative future use existed. This charge is not deductible for tax purposes. The Company expects this technology to be fully developed over the next one to two years. The charge was recorded in Research and development expense in the second quarter and was determined based upon the present value of expected future cash flows of new product candidates resulting from this technology adjusted for the probability of its technical and marketing success utilizing an income approach reflecting the appropriate risk-adjusted discount rate. The Company also recorded a $99.4 million intangible asset ($57.6 million net of deferred taxes) in the second quarter related to GlycoFi's developed technology that can be used immediately in the research and development process and has alternative future uses. This intangible asset will be amortized to Research and development expense on a straight-line basis over a five year useful life. The remaining net assets acquired in this transaction were not material. Because GlycoFi was a development stage company that had not commenced its planned principal operations, the transaction was accounted for as an acquisition of assets rather than as a business combination and, therefore, goodwill was not recorded. GlycoFi's results of operations have been included with the Company's consolidated financial results since the acquisition date.

- 9 -

**Table of Contents**

Notes to Consolidated Financial Statements (continued)

In May 2006, the Company acquired all of the equity of Abmaxis, Inc. (Abmaxis) for approximately $80 million in cash. Abmaxis was a privately-held biopharmaceutical company dedicated to the discovery and optimization of monoclonal antibody (MAb) products for human therapeutics and diagnostics. Abmaxis developed and validated a breakthrough antibody engineering technology platform, Abmaxis *in-silico* Immunization, which has alternative future uses to the Company with no significant technological or engineering risks at the date of acquisition. In connection with the acquisition, the Company allocated substantially all of the purchase price to Abmaxis' technology platform and recorded an intangible asset of $135.3 million ($78.5 million net of deferred taxes). This intangible asset will be amortized to Research and development expense on a straight-line basis over a five year useful life. The remaining net assets acquired in this transaction were not material. Because Abmaxis was a development stage company that had not commenced its planned principal operations, the transaction was accounted for as an acquisition of assets rather than as a business combination and, therefore, goodwill was not recorded. Abmaxis' results of operations have been included with the Company's consolidated financial results since the acquisition date.

In March 2006, Merck and Paratek Pharmaceuticals, Inc. (Paratek) announced they entered into an exclusive, worldwide collaborative development and license agreement for PTK 0796 (MK-2764), a novel, broad-spectrum aminomethylcycline (AMC) antibiotic with oral and intravenous (IV) formulations currently in Phase I clinical testing. Under the terms of the agreement, Merck provided upfront funding, will assume primary responsibility for clinical development of the IV and oral formulations of PTK 0796 and has the right to market such products worldwide. Paratek will participate in clinical development and be eligible to receive payments upon achievement of certain milestones; these payments could total as much as $127 million once PTK 0796 is approved for marketing. Paratek will also receive royalties on net sales and have the opportunity to co-promote the IV formulation of PTK 0796 in the United States.

In March 2006, Neuromed Pharmaceuticals Ltd. (Neuromed) and Merck signed a research collaboration and license agreement to research, develop and commercialize novel compounds for the treatment of pain and other neurological disorders, including Neuromed's lead compound, NMED-160 (MK-6721), which is currently in Phase II development for the treatment of pain. Under the terms of the agreement, Neuromed received an upfront payment of $25 million which the Company recorded as Research and development expense. The successful development and launch of NMED-160 for an initial single indication on a worldwide basis would trigger milestone payments totaling $202 million. Milestones could increase to approximately $450 million if a further indication for NMED-160 is developed and approved and an additional compound is developed and approved for two indications. Neuromed would also receive royalties on worldwide sales of NMED-160 and any additional compounds developed under this agreement.

Also in March 2006, Merck signed an agreement with NicOx S.A. (NicOx) to collaborate on the development of new antihypertensive drugs using NicOx's proprietary nitric oxide-donating technology. Under the terms of the agreement, NicOx received an upfront payment of approximately $11.2 million, which the Company recorded as Research and development expense, and is eligible for potential further milestone payments of approximately $340.2 million. Merck will also pay NicOx royalties on the sales of all products resulting from the collaboration.

- 10 -

**Table of Contents**

Notes to Consolidated Financial Statements (continued)

## 5. Inventories

Inventories consisted of:

| | ($ in millions) | |
|---|---|---|
| | September 30, 2006 | December 31, 2005 |
| Finished goods | $ 448.8 | $ 400.0 |
| Raw materials and work in process | 1,780.0 | 1,929.8 |
| Supplies | 89.7 | 82.1 |
| Total (approximates current cost) | 2,318.5 | 2,411.9 |
| Reduction to LIFO cost for domestic inventories | — | — |
| | $ 2,318.5 | $ 2,411.9 |
| | | |
| Recognized as: | | |
| Inventories | $ 1,870.7 | $ 1,658.1 |
| Other assets | $ 447.8 | $ 753.8 |

Amounts recognized as Other assets are comprised entirely of raw materials and work in process inventories, which include inventories for products not expected to be sold within one year, principally vaccines and *Arcoxia*, and, as of December 31, 2005, inventories produced in preparation for product launches.

## 6. Debt and Financial Instruments

In July 2006, $500 million of 5.25% notes, along with an associated pay-floating, receive-fixed interest rate swap, matured and were retired.

In April and May 2006, respectively, the Company entered into pay-floating, receive-fixed interest rate swap contracts each effectively converting $250 million of its $1.0 billion, 4.75% fixed-rate notes to floating rate instruments. The interest rate swaps are designated as hedges of the fair value changes in the notes attributable to changes in the benchmark London Interbank Offered Rate (LIBOR) swap rate and will mature in 2015. The fair value changes in the notes are fully offset in interest expense by the fair value changes in the swap contract.

In April 2006, the Company extended the maturity date of its $1.5 billion, 5-year revolving credit facility from 2010 to 2011. The facility provides backup liquidity for the Company's commercial paper borrowing facility and is to be used for general corporate purposes. The Company has not drawn funding from this facility.

## 7. Contingencies

The Company is involved in various claims and legal proceedings of a nature considered normal to its business, including product liability, intellectual property, and commercial litigation, as well as additional matters such as antitrust actions.

*Vioxx* **Litigation**
*Product Liability Lawsuits*
As previously disclosed, federal and state product liability lawsuits involving individual claims, as well as putative class actions, have been filed against the Company with respect to *Vioxx*. As of October 9, 2006, the Company had been served or was aware that it had been named as a defendant in approximately 23,800 lawsuits filed on or before September 30, which include approximately 41,750 plaintiff groups, alleging personal injuries resulting from the use of *Vioxx*. Of these lawsuits, approximately 7,450 lawsuits representing approximately 21,950 plaintiff groups are or are slated to be in the federal MDL (discussed below) and approximately 13,850 lawsuits

- 11 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

representing approximately 13,850 plaintiff groups are included in a coordinated proceeding in New Jersey Superior Court before Judge Carol E. Higbee. Certain of these lawsuits include allegations regarding gastrointestinal bleeding, cardiovascular events, thrombotic events or kidney damage. The Company has also been named as a defendant in approximately 275 putative class actions alleging personal injuries or seeking (i) medical monitoring as a result of the putative class members' use of *Vioxx*, (ii) disgorgement of certain profits under common law unjust enrichment theories, and/or (iii) various remedies under state consumer fraud and fair business practice statutes, including recovering the cost of *Vioxx* purchased by individuals and third-party payors such as union health plans (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Product Liability Lawsuits"). The actions filed in the state courts of California, Texas, and New Jersey, and in the counties of Philadelphia, Pennsylvania, and Clark County, Nevada have been transferred to a single state court in each location for coordinated proceedings.

In addition to the *Vioxx* Product Liability Lawsuits discussed above, the claims of over 3,000 plaintiff groups have been dismissed to date. Of these, there have been over 1,100 plaintiff groups whose claims were dismissed with prejudice (i.e., they can not be brought again) either by plaintiffs themselves or by the courts. Over 2,000 additional plaintiff groups have had their claims dismissed without prejudice (i.e., they can be brought again).

On February 16, 2005, the Judicial Panel on Multidistrict Litigation (the "JPML") transferred all *Vioxx* Product Liability Lawsuits pending in federal courts nationwide into one Multidistrict Litigation ("MDL") for coordinated pre-trial proceedings. The MDL has been transferred to the United States District Court for the Eastern District of Louisiana before District Judge Eldon E. Fallon.

In July 2005, Judge Fallon indicated that he would schedule for trial a series of cases during the period November 2005 through 2006, in the following categories: (i) heart attack with short term use; (ii) heart attack with long term use; (iii) stroke; and (iv) cardiovascular injury involving a prescription written after April 2002 when the labeling for *Vioxx* was revised to include the results of the VIGOR trial. These trials began in November 2005 and the trials that took place since June 30, 2006 are described in further detail below.

Merck has entered into a tolling agreement (the "Tolling Agreement") with the MDL Plaintiffs' Steering Committee that establishes a procedure to halt the running of the statute of limitations (tolling) as to certain categories of claims allegedly arising from the use of *Vioxx* by non-New Jersey citizens. The Tolling Agreement applies to individuals who have not filed lawsuits and may or may not eventually file lawsuits and only to those claimants who seek to toll claims alleging injuries resulting from a thrombotic cardiovascular event that results in a myocardial infarction or ischemic stroke. The Tolling Agreement provides counsel additional time to evaluate potential claims. The Tolling Agreement requires any tolled claims to be filed in federal court. As of October 9, 2006, approximately 15,000 claimants had entered into Tolling Agreements on or before September 30, 2006.

The Company has previously disclosed the outcomes of several *Vioxx* Product Liability Lawsuits that were tried prior to June 30, 2006.

In July 2006, in Doherty v. Merck, in Superior Court of New Jersey, Law Division, Atlantic County, a jury returned a verdict in favor of the Company on all counts. The jury rejected a claim by the plaintiff that her nearly three years of *Vioxx* use caused her heart attack. The jury also found in Merck's favor on the plaintiff's consumer fraud claim.

In August 2006, in the first case to go to trial in the California coordinated proceeding, Grossberg v. Merck, the jury in Los Angeles, California returned a verdict for Merck on all counts.

In August 2006, in Barnett v. Merck, a case before Judge Fallon in the MDL, a jury in New Orleans, Louisiana returned a plaintiff verdict in the second federal *Vioxx* case to go to trial. The jury awarded $50 million in compensatory damages and $1 million in punitive damages. On August 30, 2006, Judge Fallon overturned as excessive the damages portion of the verdict and ordered a new trial on damages. The Company is seeking a new trial on all issues.

On September 26, 2006, in Smith v. Merck, the third case to go to trial in the federal MDL, a jury returned a verdict in favor of Merck on all counts.

The Company previously disclosed that in April 2006, in Garza v. Merck, a jury in Rio Grande City, Texas returned a verdict in favor of the plaintiff. In September 2006, the Texas state court granted the Company's request to investigate possible jury bias because a juror admitted that he had, prior to the trial, on several occasions borrowed money from the plaintiff.

- 12 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

In August 2006, Judge Fallon granted the Company's motion to dismiss two *Vioxx* class action claims previously filed in the federal court; one claim filed by plaintiffs from France and the other claim by plaintiffs from Italy.

In August 2006, Judge Higbee set aside the November 2005 jury verdict in favor of Merck in Humeston v. Merck and ordered a new trial on the grounds of newly discovered evidence. The Company has filed a motion for reconsideration of Judge Higbee's decision to re-try the case.

On September 19, 2006, Merck filed a notice of appeal of the previously disclosed August 2005 jury verdict in favor of the plaintiff in the Texas state court case, Ernst v. Merck. Among several independent grounds for reversal, the Company will argue that there was insufficient evidence that Mr. Ernst suffered an injury due to *Vioxx* and that it was improper to allow testimony by a previously undisclosed witness midway through the trial. In the interim, as required under Texas law, the Company has posted an appeal bond.

On September 28, 2006, the New Jersey Superior Court, Appellate Division, heard argument on plaintiffs' appeal of Judge Higbee's dismissal of the Sinclair v. Merck case. This putative class action was originally filed in December 2004 and sought the creation of a medical monitoring fund. Judge Higbee had granted the Company's motion to dismiss in May 2005.

On October 5, 2006, Judge Higbee dismissed the United Kingdom plaintiffs from the New Jersey Coordinated Proceeding.

The first case scheduled for trial in the Texas coordinated proceeding, Rigby v. Merck, was scheduled to begin trial on November 7, 2006. The Rigby case was voluntarily dismissed on October 23, 2006 when the plaintiff filed a non-suit with the Court.

The trial in Mason v. Merck, a case in federal court in Louisiana, started on October 30, 2006. On October 31, 2006 in California Superior Court in Los Angeles, a consolidated trial began in the cases Appell v. Merck and Arrigale v. Merck.

The next trial in New Jersey is currently scheduled to start on January 16, 2007, and the Court has stated that it will be a consolidated trial including multiple plaintiffs. Plaintiffs proposed eight cases to be joined together for a consolidated trial. Merck filed motions opposing the concept of a consolidated trial proceeding and challenging the propriety of plaintiffs' proposed cases.

Merck voluntarily withdrew *Vioxx* from the market on September 30, 2004. Many states have a two-year statute of limitations for product liability claims, requiring that claims must be filed within two years after the plaintiffs learned or could have learned of their potential cause of action. As a result, some may view September 30, 2006 as a deadline for filing *Vioxx* cases. It is important to note, however, that the law regarding statutes of limitations can be complex, varies from state to state, can be fact-specific, and in some cases, might be affected by the existence of pending class actions. For example, some states have three year statutes of limitations and, in some instances, the statute of limitations is even longer. Merck expects that there will be legal arguments concerning the proper application of these statutes, and the decisions will be up to the judges presiding in individual cases in state and federal proceedings. As referred to above, as of September 30, 2006, Merck has also entered into agreements with approximately 15,000 claimants to toll the statute of limitations, so the September 30, 2006 date would not apply in those instances.

*Other Lawsuits*

As previously disclosed, on July 29, 2005, a New Jersey state trial court certified a nationwide class of third-party payors (such as unions and health insurance plans) that paid in whole or in part for the *Vioxx* used by their plan members or insureds. The named plaintiff in that case seeks recovery of certain *Vioxx* purchase costs (plus penalties) based on allegations that the purported class members paid more for *Vioxx* than they would have had they known of the product's alleged risks. Merck believes that the class was improperly certified. The trial court's ruling is procedural only; it does not address the merits of plaintiffs' allegations, which the Company intends to defend vigorously. On March 31, 2006, the New Jersey Superior Court, Appellate Division, affirmed the class certification order. On July 19, 2006, the New Jersey Supreme Court decided to exercise its discretion to hear the Company's appeal of the Appellate Division's decision. On August 24, 2006, the Appellate Division ordered a stay of the proceedings in Superior Court pending a ruling by the Supreme Court.

As previously reported, the Company has also been named as a defendant in separate lawsuits brought by the Attorneys General of Alaska, Louisiana, Mississippi, Montana, Texas and Utah. These actions allege that the Company misrepresented the safety of *Vioxx* and seek (i) recovery of the cost of *Vioxx* purchased or reimbursed by

- 13 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

the state and its agencies; (ii) reimbursement of all sums paid by the state and its agencies for medical services for the treatment of persons injured by *Vioxx*; (iii) damages under various common law theories; and/or (iv) remedies under various state statutory theories, including state consumer fraud and/or fair business practices or Medicaid fraud statutes, including civil penalties.

*Shareholder Lawsuits*

As previously disclosed, in addition to the *Vioxx* Product Liability Lawsuits, the Company and various current and former officers and directors are defendants in various putative class actions and individual lawsuits under the federal securities laws and state securities laws (the "*Vioxx* Securities Lawsuits"). All of the *Vioxx* Securities Lawsuits pending in federal court have been transferred by the JPML to the United States District Court for the District of New Jersey before District Judge Stanley R. Chesler for inclusion in a nationwide MDL (the "Shareholder MDL"). Judge Chesler has consolidated the *Vioxx* Securities Lawsuits for all purposes. Plaintiffs request certification of a class of purchasers of Company stock between May 21, 1999 and October 29, 2004. The complaint alleges that the defendants made false and misleading statements regarding *Vioxx* in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and seeks unspecified compensatory damages and the costs of suit, including attorneys' fees. The complaint also asserts a claim under Section 20A of the Securities and Exchange Act against certain defendants relating to their sales of Merck stock. In addition, the complaint includes allegations under Sections 11, 12 and 15 of the Securities Act of 1933 that certain defendants made incomplete and misleading statements in a registration statement and certain prospectuses filed in connection with the Merck Stock Investment Plan, a dividend reinvestment plan. Defendants have filed a motion to dismiss the complaint, which is pending.

As previously disclosed, on August 15, 2005, a complaint was filed in Oregon state court by the State of Oregon through the Oregon state treasurer on behalf of the Oregon Public Employee Retirement Fund against the Company and certain current and former officers and directors. The complaint, which was brought under Oregon securities law, alleges that plaintiff has suffered damages in connection with its purchases of Merck common stock at artificially inflated prices due to the Company's alleged violations of law related to disclosures about *Vioxx*. The current and former officers and directors have entered into a tolling agreement and, on June 30, 2006, were dismissed without prejudice from the case. On July 19, 2006, the Court denied the Company's motion to dismiss the complaint, but required plaintiff to amend the complaint. Plaintiff filed an amended complaint on September 21, 2006. Merck intends to file a motion to dismiss the amended complaint.

As previously disclosed, various shareholder derivative actions filed in federal court were transferred to the Shareholder MDL and consolidated for all purposes by Judge Chesler (the "*Vioxx* Derivative Lawsuits"). The consolidated complaint arose out of substantially the same factual allegations that are made in the *Vioxx* Securities Lawsuits. The derivative suits, which were purportedly brought to assert rights of the Company, assert claims against certain members of the Board past and present and certain executive officers for breach of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control and gross mismanagement. On May 5, 2006, Judge Chesler granted defendants' motion to dismiss and denied plaintiffs' request for leave to amend their complaint. Plaintiffs appealed the District Court's decision refusing them leave to amend to the United States Court of Appeals for the Third Circuit.

As previously disclosed, on October 29, 2004, two individual shareholders made a demand on the Board of Directors of the Company to take legal action against Mr. Raymond Gilmartin, former Chairman, President and Chief Executive Officer and other individuals for allegedly causing damage to the Company with respect to the allegedly improper marketing of *Vioxx*. In July 2006, the Board received another shareholder letter demanding that the Board take legal action against the Board and management of Merck for allegedly causing damage to the Company relating to the Company's allegedly improper marketing of *Vioxx*. These requests remain under consideration.

As previously announced, the Board of Directors appointed a Special Committee to review the Company's actions prior to its voluntary withdrawal of *Vioxx*, to act for the Board in responding to shareholder litigation matters related to the withdrawal of *Vioxx*, and to advise the Board with respect to any action that should be taken as a result of the review. In December 2004, the Special Committee retained the Honorable John S. Martin, Jr. of Debevoise & Plimpton LLP to conduct an independent investigation of senior management's conduct with respect to the cardiovascular safety profile of *Vioxx* during the period *Vioxx* was developed and marketed. The review was completed in the third quarter of 2006 and the full report (including appendices) was made public in September 2006.

In addition, as previously disclosed, various putative class actions filed in federal court under the Employee Retirement Income Security Act ("ERISA") against the Company and certain current and former officers and

- 14 -

10-Q

Notes to Consolidated Financial Statements (continued)

directors (the "*Vioxx* ERISA Lawsuits" and, together with the *Vioxx* Securities Lawsuits and the *Vioxx* Derivative Lawsuits, the "*Vioxx* Shareholder Lawsuits") have been transferred to the Shareholder MDL and consolidated for all purposes. The consolidated complaint asserts claims on behalf of certain of the Company's current and former employees who are participants in certain of the Company's retirement plans for breach of fiduciary duty. The lawsuits make similar allegations to the allegations contained in the *Vioxx* Securities Lawsuits. On October 7, 2005, defendants moved to dismiss the ERISA complaint. On July 11, 2006, Judge Chesler granted in part and denied in part defendants' motion to dismiss.

*International Lawsuits*
As previously disclosed, in addition to the lawsuits discussed above, the Company has been named as a defendant in litigation relating to *Vioxx* in various countries (collectively, the "*Vioxx* Foreign Lawsuits") in Europe as well as Canada, Brazil, Australia, Turkey, and Israel.

*Additional Lawsuits*
Based on media reports and other sources, the Company anticipates that additional *Vioxx* Product Liability Lawsuits, *Vioxx* Shareholder Lawsuits and *Vioxx* Foreign Lawsuits (collectively, the "*Vioxx* Lawsuits") will be filed against it and/or certain of its current and former officers and directors in the future.

*Insurance*
As previously disclosed, the Company has product liability insurance for claims brought in the *Vioxx* Product Liability Lawsuits with stated upper limits of approximately $630 million after deductibles and co-insurance. This insurance provides coverage for legal defense costs and potential damage amounts that have been or will be incurred in connection with the *Vioxx* Product Liability Lawsuits. The Company believes that this insurance coverage extends to additional *Vioxx* Product Liability Lawsuits that may be filed in the future. The Company has Directors and Officers insurance coverage applicable to the *Vioxx* Securities Lawsuits and *Vioxx* Derivative Lawsuits with stated upper limits of approximately $190 million. The Company has fiduciary and other insurance for the *Vioxx* ERISA Lawsuits with stated upper limits of approximately $275 million. Additional insurance coverage for these claims may also be available under upper-level excess policies that provide coverage for a variety of risks. There are disputes with certain insurers about the availability of some or all of this insurance coverage and there are likely to be additional disputes. At this time, the Company believes that its insurance coverage with respect to the *Vioxx* Lawsuits will not be adequate to cover its defense costs and any losses.

As previously disclosed, the Company's upper level excess insurers (which provide excess insurance potentially applicable to all of the *Vioxx* Lawsuits) have commenced an arbitration seeking, among other things, to cancel those policies, to void all of their obligations under those policies and to raise other coverage issues with respect to the *Vioxx* Lawsuits. A second arbitration against one of the Company's upper level excess insurers has also been commenced. Merck intends to contest vigorously the insurers' claims and will attempt to enforce its rights under applicable insurance policies. The amounts actually recovered under the policies discussed in this section may be less than the amounts specified in the preceding paragraph.

*Investigations*
As previously disclosed, in November 2004, the Company was advised by the staff of the SEC that it was commencing an informal inquiry concerning *Vioxx*. On January 28, 2005, the Company announced that it received notice that the SEC issued a formal notice of investigation. Also, the Company has received subpoenas from the U.S. Department of Justice (the "DOJ") requesting information related to the Company's research, marketing and selling activities with respect to *Vioxx* in a federal health care investigation under criminal statutes. In addition, as previously disclosed, investigations are being conducted by local authorities in certain cities in Europe in order to determine whether any criminal charges should be brought concerning *Vioxx*. The Company is cooperating with these governmental entities in their respective investigations (the "*Vioxx* Investigations"). The Company cannot predict the outcome of these inquiries; however, they could result in potential civil and/or criminal dispositions.

As previously disclosed, the Company has received a number of Civil Investigative Demands ("CID") from a group of Attorneys General from 31 states and the District of Columbia who are investigating whether the Company violated state consumer protection laws when marketing *Vioxx*. The Company is cooperating with the Attorneys General in responding to the CIDs.

*Reserves*
The Company currently anticipates that a number of *Vioxx* Product Liability Lawsuits will be tried in the last quarter of 2006 and throughout 2007. The Company anticipates that the trial in the Oregon securities case will be held in 2007, but the Company cannot predict whether this trial will proceed on schedule or the timing of any of the other *Vioxx* Shareholder

10-Q

Lawsuit trials. The Company believes that it has meritorious defenses to the *Vioxx* Lawsuits and will

- 15 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

vigorously defend against them. In view of the inherent difficulty of predicting the outcome of litigation, particularly where there are many claimants and the claimants seek indeterminate damages, the Company is unable to predict the outcome of these matters, and at this time cannot reasonably estimate the possible loss or range of loss with respect to the *Vioxx* Lawsuits. The Company has not established any reserves for any potential liability relating to the *Vioxx* Lawsuits or the *Vioxx* Investigations, including for those cases in which verdicts or judgments have been entered against the Company, and are now in post-verdict proceedings or on appeal. In each of those cases the Company believes it has strong points to raise on appeal and therefore that unfavorable outcomes in such cases are not probable. Unfavorable outcomes in the *Vioxx* Litigation (as defined below) could have a material adverse effect on the Company's financial position, liquidity and results of operations.

Legal defense costs expected to be incurred in connection with a loss contingency are accrued when probable and reasonably estimable. As of December 31, 2005, the Company had established a reserve of $685 million solely for its future legal defense costs related to the *Vioxx* Litigation.

During the first nine months of 2006, the Company spent $325 million in the aggregate in legal defense costs worldwide related to (i) the *Vioxx* Product Liability Lawsuits, (ii) the *Vioxx* Shareholder Lawsuits, (iii) the *Vioxx* Foreign Lawsuits, and (iv) the *Vioxx* Investigations (collectively, the "*Vioxx* Litigation"). In the third quarter, the Company recorded a charge of $598 million to increase the reserve solely for its future legal defense costs related to the *Vioxx* Litigation to $958 million at September 30, 2006. In increasing the reserve, the Company considered the same factors that it considered when it previously established reserves for the *Vioxx* Litigation. Management now believes it has a better estimate of the Company's expenses and can reasonably estimate such costs through 2008. Some of the significant factors considered in the establishment and ongoing review of the reserve for the *Vioxx* legal defense costs were as follows: the actual costs incurred by the Company; the development of the Company's legal defense strategy and structure in light of the scope of the *Vioxx* Litigation; the number of cases being brought against the Company; the costs and outcomes of completed trials and the anticipated timing, progression, and related costs of pre-trial activities and trials in the *Vioxx* Product Liability Lawsuits. Events such as scheduled trials, that are expected to occur throughout 2007 and into 2008, and the inherent inability to predict the ultimate outcomes of such trials, limit the Company's ability to reasonably estimate its legal costs beyond the end of 2008. The Company will continue to monitor its legal defense costs and review the adequacy of the associated reserves and may determine to increase its reserves for legal defense costs at any time in the future if, based upon the factors set forth, it believes it would be appropriate to do so.

**Governmental Proceedings**
As previously disclosed, the Company has received a subpoena from the DOJ in connection with its investigation of the Company's marketing and selling activities, including nominal pricing programs and samples. The Company has been advised that the activities being investigated by the DOJ are also the subject of a *qui tam* complaint. As previously disclosed, the Company has received CIDs from the Attorney General of Texas regarding the Company's marketing and selling activities relating to Texas. In April 2004, the Company received a subpoena from the office of the Inspector General for the District of Columbia in connection with an investigation of the Company's interactions with physicians in the District of Columbia, Maryland, and Virginia. In November 2004, the Company received a letter request from the DOJ in connection with its investigation of the Company's pricing of *Pepcid*. In September 2005, the Company received a subpoena from the Illinois Attorney General seeking information related to repackaging of prescription drugs.

As previously disclosed, the Company has received a letter from the DOJ advising it of the existence of a *qui tam* complaint alleging that the Company violated certain rules related to its calculations of best price and other federal pricing benchmark calculations, certain of which may affect the Company's Medicaid rebate obligation. The DOJ has informed the Company that it does not intend to intervene in this action and has closed its investigation. The lawsuit continues, however.

The Company is cooperating with all of these investigations. The Company cannot predict the outcome of these investigations; however, it is possible that unfavorable outcomes could have a material adverse effect on the Company's financial position, liquidity and results of operations. In addition, from time to time, other federal, state or foreign regulators or authorities may seek information about practices in the pharmaceutical industry or the Company's business practices in inquiries other than the investigations discussed in this section. It is not feasible to predict the outcome of any such inquiries.

Table of Contents

Notes to Consolidated Financial Statements (continued)

**8. Taxes on Income**

As previously disclosed, the Internal Revenue Service (IRS) has substantially completed its examination of the Company's tax returns for the years 1993 to 1996. The IRS is now in the process of concluding its examination for years 1996 through 2001. The Company and the IRS anticipate that the examination will be completed by the end of the year. The following significant open items have yet to be resolved; however the Company is attempting to resolve the items through the IRS administrative processes.

On September 26, 2006, in connection with its examination, the IRS issued a notice of proposed adjustment (the "2006 Notice") for the years 1994-2001 with respect to a partnership transaction entered into in 1993. As previously reported, the Company had previously received a final notice of deficiency with respect to the transaction for the 1993 tax return. The 2006 Notice disallowed certain royalty and other expenses claimed as deductions on the tax returns for 1994 through 2001. If the IRS ultimately prevails in its positions, the Company's income tax due for year 1993 would increase by approximately $60 million plus interest of approximately $70 million and penalties of approximately $12 million. For the years 1994-2001, the tax would increase by approximately $1,150 million plus interest of approximately $700 million. The IRS will likely make similar claims for years subsequent to 2001 with respect to this transaction. The potential disallowance for these later years, computed on a similar basis to the 1993-2001 disallowances, would be approximately $300 million plus interest of approximately $30 million. The IRS has proposed penalties on the Company with respect to 1993 through 2001 and the Company anticipates the IRS would seek to impose penalties on years subsequent to 2001.

On September 25, 2006, the Company received a notice of proposed adjustment relating to a 1995 minority interest equity financing. The notice proposes a disallowance of a capital loss which would increase the tax due for 1995 to 1998 by approximately $330 million plus interest of $150 million. In addition, the IRS proposes recharacterizing a loan from a foreign subsidiary to the Company as a taxable distribution resulting in an additional $330 million of tax due plus interest of $210 million.

In addition, on September 25, 2006, the Company received a notice of proposed adjustment relating to a minority interest equity financing entered into in 2000. The IRS proposes to include as income certain loans made by a foreign subsidiary to the Company. Such an adjustment would increase the tax due for 2000 and 2001 by approximately $160 million plus interest of $40 million. Similarly, the Company anticipates that the IRS' position would increase the Company's US income for 2002-2004 resulting in additional tax due for 2002 through 2004 by approximately $250 million plus interest of $30 million. The IRS has proposed penalties on the Company with respect to all periods that were the subject of the preliminary notice of adjustment with respect to this transaction and the Company anticipates the IRS would seek to impose penalties on all other periods.

The Company disagrees with the proposed adjustments and intends to pursue these matters through applicable IRS and judicial procedures, as appropriate. The Company has provided for the best estimate of the probable tax liability for these matters. While the resolution of these issues may result in tax liabilities which are significantly higher or lower than the reserves established for this matter, management currently believes that the resolution will not have a material adverse effect on the Company's financial position or liquidity. However, an unfavorable resolution could have a material adverse effect on the Company's results of operations in the quarter in which an adjustment is recorded and any settlement is likely to have a material adverse effect on the Company's cash flows in the quarter that such payment is made.

As previously disclosed, Merck's Canadian tax returns for the years 1998 through 2004 are being examined by the Canada Revenue Agency (CRA). On October 10, 2006, CRA issued the Company a notice of reassessment containing adjustments related to certain intercompany transfer pricing matters which result in additional tax due of approximately $ 1.4 billion (US dollars) plus interest of $360 million (US dollars). The Company disagrees with the positions taken by CRA and believes they are without merit. The Company may be required to post a deposit of up to one half the tax and interest assessed which could have a material adverse effect on the Company's cash flows in the quarter in which the deposit is made. The Company intends to contest the assessment through the CRA appeals process and the courts if necessary. Management believes that resolution of these matters will not have a material adverse effect on the Company's financial position or liquidity. However, an unfavorable resolution could have a material adverse effect on the Company's results of operations or cash flows in the quarter in which an adjustment is recorded or the tax is due.

As previously disclosed, in October 2004, the American Jobs Creation Act of 2004 (the AJCA) was signed into law. The AJCA created temporary incentives for U.S. multinationals to repatriate accumulated income earned outside the United States as of December 31, 2002. In accordance with the AJCA, the Company recorded an income tax charge of $740 million in Taxes on Income in the second quarter of 2005 related to the $15.9 billion repatriated

- 17 -

Table of Contents


Notes to Consolidated Financial Statements (continued)

during 2005. This charge was partially offset by a $100 million benefit with a decision to implement certain tax planning strategies. The Company has not changed its intention to indefinitely reinvest accumulated earnings earned subsequent to December 31, 2002. No provision will be made for income taxes that would be payable upon the distributions of such earnings and it is not practicable to determine the amount of the related unrecognized deferred income tax liability. In addition, the Company has subsidiaries operating in Puerto Rico and Singapore under tax incentive grants that expire in 2015 and 2026, respectively.

### 9. Pension and Other Postretirement Benefit Plans

The Company has defined benefit pension plans covering eligible employees in the United States and in certain of its international subsidiaries. The net cost of such plans consisted of the following components:

| | ($ in millions) | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Service cost | $ 89.2 | $ 81.0 | $ 269.5 | $ 242.1 |
| Interest cost | 85.5 | 77.6 | 255.6 | 234.8 |
| Expected return on plan assets | (110.3) | (99.2) | (327.6) | (300.4) |
| Net amortization | 42.0 | 37.9 | 126.9 | 114.5 |
| Termination benefits | 2.1 | 5.6 | 18.3 | 10.2 |
| Curtailments | — | — | 0.2 | — |
| Settlements | 15.0 | — | 15.0 | — |
| | $ 123.5 | $ 102.9 | $ 357.9 | $ 301.2 |

The Company provides medical, dental and life insurance benefits, principally to its eligible U.S. retirees and similar benefits to their dependents, through its other postretirement benefits plans. The net cost of such plans consisted of the following components:

| | ($ in millions) | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Service cost | $ 24.6 | $ 22.1 | $ 66.5 | $ 66.2 |
| Interest cost | 26.9 | 26.3 | 77.1 | 79.1 |
| Expected return on plan assets | (30.6) | (25.8) | (87.0) | (77.5) |
| Net amortization | 0.6 | 5.4 | 2.4 | 16.2 |
| Termination benefits | 0.4 | 0.8 | 2.6 | 1.6 |
| | $ 21.9 | $ 28.8 | $ 61.6 | $ 85.6 |

In connection with restructuring actions (see Note 2), the Company recorded termination charges for the three and nine months ended September 30, 2006 and 2005, on its pension plans and its other postretirement benefit plans related to expanded eligibility for certain employees exiting the Company. Also, in connection with these restructuring actions, the Company recorded curtailment losses for the nine months ended September 30, 2006 on its pension plans.

The Company also recorded settlement losses on certain of its domestic pension plans primarily resulting from employees electing to receive their pension benefits as lump sum payments.

The Company expects contributions to its defined benefit pension plans will total approximately $430 million during 2006.

- 18 -