**Table of Contents**

Notes to Consolidated Financial Statements (continued)

## 10.  Other (Income) Expense, Net

Other (income) expense, net, consisted of:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | ($ in millions) | | | |
|  | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Interest income | $(195.0) | $(122.3) | $(564.6) | $(314.8) |
| Interest expense | 87.7 | 99.6 | 277.8 | 277.2 |
| Exchange gains | (11.5) | (7.4) | (4.5) | (16.5) |
| Minority interests | 30.7 | 30.9 | 90.7 | 91.6 |
| Other, net | (46.6) | (25.5) | (104.8) | (21.7) |
|  | $(134.7) | $ (24.7) | $(305.4) | $  15.8 |

The increase in interest income reflects interest income generated from the Company's investment portfolio derived from higher interest rates and higher average investment portfolio balances.

Interest paid for the nine months ended September 30, 2006 and 2005, was $317.8 million and $288.2 million, respectively.

## 11.  Earnings Per Share

The weighted average common shares used in the computations of basic earnings per common share and earnings per common share assuming dilution (shares in millions) are as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Average common shares outstanding | 2,175.2 | 2,194.0 | 2,180.1 | 2,200.9 |
| Common shares issuable[1] | 10.5 | 3.0 | 8.4 | 3.4 |
| Average common shares outstanding assuming dilution | 2,185.7 | 2,197.0 | 2,188.5 | 2,204.3 |

[1]  Issuable primarily under share-based compensation plans.

For the three and nine months ended September 30, 2006, 194.7 million and 222.8 million, respectively, and for the three and nine months ended September 30, 2005, 247.5 million common shares issuable under the Company's share-based compensation plans were excluded from the computation of earnings per common share assuming dilution because the effect would have been antidilutive.

## 12.  Comprehensive Income

Comprehensive income representing all changes in stockholders' equity during the period other than changes resulting from the Company's stock for the three months ended September 30, 2006 and 2005, was $971.4 million and $1,466.0 million, respectively. Comprehensive income for the nine months ended September 30, 2006 and 2005 was $3,957.7 million and $3,607.9 million, respectively.

## 13.  Segment Reporting

The Company's operations are principally managed on a products basis. The Merck Pharmaceutical segment includes products marketed either directly or through joint ventures. These products consist of therapeutic and preventive agents, sold by prescription, for the treatment of human disorders. Other segment revenues include non-reportable human and animal health segments.

Table of Contents

Notes to Consolidated Financial Statements (continued)

Revenues and profits for these segments are as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | ($ in millions) | | | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Segment revenues: | | | | |
| Merck Pharmaceutical | $4,764.3 | $5,054.6 | $15,173.8 | $15,293.1 |
| Other segment revenues | 562.9 | 351.8 | 1,189.4 | 845.4 |
| | $5,327.2 | $5,406.4 | $16,363.2 | $16,138.5 |
| | | | | |
| Segment profits: | | | | |
| Merck Pharmaceutical | $3,222.3 | $3,266.1 | $10,479.9 | $ 9,663.4 |
| Other segment profits | 381.6 | 378.9 | 887.1 | 883.5 |
| | $3,603.9 | $3,645.0 | $11,367.0 | $10,546.9 |

A reconciliation of total segment revenues to consolidated sales is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | ($ in millions) | | | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Segment revenues | $5,327.2 | $5,406.4 | $16,363.2 | $16,138.5 |
| Other revenues | 83.2 | 9.8 | 228.7 | 107.5 |
| | $5,410.4 | $5,416.2 | $16,591.9 | $16,246.0 |

Other revenues are primarily comprised of miscellaneous corporate revenues, sales related to divested products or businesses and other supply sales.

Sales [1] of the Company's products were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | ($ in millions) | | | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Singulair | $ 868.0 | $ 692.5 | $ 2,619.1 | $ 2,157.0 |
| Zocor | 371.0 | 1,049.9 | 2,424.1 | 3,307.4 |
| Fosamax | 770.5 | 777.3 | 2,345.0 | 2,401.9 |
| Cozaar/Hyzaar | 813.3 | 751.4 | 2,298.1 | 2,255.1 |
| Primaxin | 181.8 | 181.9 | 523.6 | 548.1 |
| Cosopt/Trusopt | 190.9 | 156.3 | 517.8 | 449.7 |
| Proscar | 127.3 | 185.9 | 498.5 | 549.1 |
| Vasotec/Vaseretic | 134.5 | 149.2 | 410.8 | 471.3 |
| Cancidas | 127.1 | 142.3 | 397.1 | 412.5 |
| Maxalt | 105.1 | 92.3 | 295.2 | 254.2 |
| Propecia | 88.9 | 66.9 | 249.0 | 205.8 |
| Vaccines/Biologicals | 555.4 | 338.4 | 1,176.1 | 809.5 |
| Other | 1,076.6 | 831.9 | 2,837.5 | 2,424.4 |
| | $5,410.4 | $5,416.2 | $16,591.9 | $16,246.0 |

[1]   Presented net of discounts and returns.

- 20 -

**Table of Contents**

Notes to Consolidated Financial Statements (continued)

Other primarily includes sales of other human pharmaceuticals, pharmaceutical and animal health supply sales to the Company's joint ventures and revenue from the Company's relationship with AstraZeneca LP primarily relating to sales of *Nexium* and *Prilosec*.

A reconciliation of segment profits to Income Before Taxes is as follows:

|  | ($ in millions) | | | |
|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Segment profits | $ 3,603.9 | $3,645.0 | $11,367.0 | $10,546.9 |
| Other profits | 56.9 | 17.3 | 163.0 | 129.4 |
| Adjustments | 110.4 | 170.1 | 375.6 | 419.9 |
| Unallocated: |  |  |  |  |
| Interest income | 195.0 | 122.3 | 564.6 | 314.8 |
| Interest expense | (87.7) | (99.6) | (277.8) | (277.2) |
| Equity income from affiliates | 37.7 | 68.0 | 175.6 | 141.7 |
| Depreciation and amortization | (521.5) | (386.3) | (1,599.9) | (1,086.3) |
| Research and development | (945.4) | (942.6) | (3,059.9) | (2,736.0) |
| Other expenses, net | (1,218.5) | (595.8) | (2,398.7) | (1,609.2) |
|  | $ 1,230.8 | $1,998.4 | $ 5,309.5 | $ 5,844.0 |

Segment profits are comprised of segment revenues less certain elements of materials and production costs and operating expenses, including components of equity income from affiliates and depreciation and amortization expenses. For internal management reporting presented to the chief operating decision maker, the Company does not allocate the vast majority of indirect production costs, research and development expenses and general and administrative expenses, as well as the cost of financing these activities. Separate divisions maintain responsibility for monitoring and managing these costs, including depreciation related to fixed assets utilized by these divisions and, therefore, they are not included in segment profits.

Other profits are primarily comprised of miscellaneous corporate profits as well as operating profits related to divested products or businesses and other supply sales. Adjustments represent the elimination of the effect of double counting certain items of income and expense. Equity income from affiliates includes taxes paid at the joint venture level and a portion of equity income that is not reported in segment profits. Other expenses, net, includes expenses from corporate and manufacturing cost centers and other miscellaneous income (expense), net.

- 21 -

**Table of Contents**

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

*Acquisitions*

On October 30, 2006, Merck and Sirna Therapeutics, Inc. (Sirna) announced they had entered into a definitive agreement under which Merck will acquire through a merger 100% of the equity of Sirna for $13 per share in cash. The transaction has a cash value of approximately $1.1 billion. Sirna is a publicly held biotechnology company that is a leader in developing a new class of medicines based on RNA interference (RNAi) technology, which could significantly alter the treatment of disease. RNAi-based therapeutics selectively catalyze the destruction of the RNA transcribed from an individual gene. The acquisition is subject to clearance under the Hart-Scott-Rodino Antitrust Improvements Act and approval by the stockholders of Sirna and other customary closing conditions. The companies expect to complete the acquisition in the first quarter of 2007.

In May 2006, Merck acquired Abmaxis, Inc. (Abmaxis), a privately-held biopharmaceutical company dedicated to the discovery and optimization of monoclonal antibody (MAb) products for human therapeutics and diagnostics, for $80 million in cash. In June 2006, Merck acquired GlycoFi, Inc. (GlycoFi), a privately-held biotechnology company that was a leader in the field of yeast glycoengineering, that is the addition of specific carbohydrate modifications to the proteins in yeast, and optimization of biologic drug molecules, for $373 million in cash ($400 million purchase price net of $25 million of shares already owned and net transaction costs). The Company recorded a $296.3 million charge for acquired research in connection with the acquisition which is not deductible for tax purposes. While each of the acquisitions has independent scientific merits, the combination of the GlycoFi and Abmaxis platforms is potentially synergistic, giving Merck the ability to operate across the entire spectrum of therapeutic antibody discovery, development and commercialization (see Note 4).

*Global Restructuring Program*

In November 2005, the Company commenced the initial phase of its global restructuring program designed to reduce the Company's cost structure, increase efficiency, and enhance competitiveness. As part of this program, Merck plans to sell or close five manufacturing sites and two preclinical sites by the end of 2008, and eliminate approximately 7,000 positions company-wide. To date, manufacturing operations have ceased at one site, one other site has been sold, and the two preclinical sites have been closed. The Company has also sold certain other facilities and related assets in connection with the restructuring program. There have been approximately 3,900 positions eliminated throughout the Company since inception of the program (approximately 2,800 of which were eliminated during the nine months ended September 30, 2006). Through the end of 2008, when the initial phase of the global restructuring program is expected to be substantially complete, the cumulative pre-tax costs are expected to range from $1.8 billion to $2.2 billion. The Company expects to record charges of approximately $900 million to $1 billion during 2006, based on estimated time of completion, as the sales/closures of the facilities occur. Cumulative pre-tax savings are expected to be $4.5 to $5.0 billion from 2006 through 2010. The Company recorded pre-tax restructuring costs of $249.2 million ($165.9 million after tax or $0.08 per share) and $714.0 million ($463.3 after tax or $0.21 per share) for the three and nine months ended September 30, 2006, respectively. These costs related primarily to the global restructuring program which was comprised primarily of accelerated depreciation and separation costs, partially offset by gains on sales of facilities in connection with this restructuring action (see Note 2).

*Share-Based Compensation*

Effective January 1, 2006, the Company adopted Financial Accounting Standards No. 123R, *Share-Based Payments* (FAS 123R). Employee stock option expense was previously recognized using the intrinsic value method which measures share-based compensation expense as the amount at which the market price of the stock at the date of grant exceeds the exercise price. FAS 123R requires the recognition of the fair value of share-based compensation in net income, which the Company will recognize on a straight-line basis over the requisite service period. Additionally, the Company elected the modified prospective transition method for adopting FAS 123R, and therefore, prior periods were not restated. Under this method, the provisions for FAS 123R apply to all awards granted or modified after January 1, 2006. In addition, the unrecognized expense of awards that have not yet vested at the date of adoption shall be recognized in net income in the periods after the date of adoption. The Company recorded share-based compensation cost in the amount of $63.7 million and $246.0 million for the three and nine months ended September 30, 2006, respectively, of which $42.3 million and $182.8 million, respectively, was incremental due to the adoption of FAS 123R (see Note 3). Incremental share-based compensation expense for full year 2006 is expected to be approximately $220 million.

At September 30, 2006, there was $374.9 million of total pre-tax unrecognized compensation expense related to nonvested awards which will be recognized over a weighted average period of 2.3 years. For segment reporting, share-based compensation expense is recorded in unallocated expense.

Table of Contents

*American Jobs Creation Act of 2004 — Repatriation*
As previously disclosed, in October 2004, the American Jobs Creation Act of 2004 (the AJCA) was signed into law. The AJCA created temporary incentives for U.S. multinationals to repatriate accumulated income earned outside the United States as of December 31, 2002. In accordance with the AJCA, the Company recorded an income tax charge of $740 million in Taxes on income in the second quarter of 2005 related to the $15.9 billion repatriated during 2005. This charge was partially offset by a $100 million benefit in connection with a decision to implement certain tax planning strategies. The Company has not changed its intention to indefinitely reinvest accumulated earnings earned subsequent to December 31, 2002. No provision will be made for income taxes that would be payable upon the distributions of such earnings and it is not practicable to determine the amount of the related unrecognized deferred income tax liability. In addition, the Company has subsidiaries operating in Puerto Rico and Singapore under tax incentive grants that expire in 2015 and 2026, respectively.

*Operating Results*
*Summary*
Earnings per share assuming dilution (EPS) for the three and nine months ended September 30, 2006 were $0.43 and $1.81, respectively, compared with $0.65 and $1.59 for the three and nine months ended September 30, 2005, respectively. Net income for the three and nine months ended September 30, 2006 was $940.6 million and $3.96 billion, respectively, compared with $1.42 billion and $3.51 billion for the three and nine months ended September 30, 2005, respectively.

EPS and Net income for the three and nine months ended September 30, 2006 were negatively affected by an additional reserve solely for future *Vioxx* legal defense costs, charges related to the global restructuring program, as well as the impact of adopting FAS 123R. Additionally, EPS and Net income for the nine months ended September 30, 2006 were negatively impacted by the acquired research charge related to the GlycoFi acquisition in the second quarter of 2006. EPS and Net income for the nine months ended September 30, 2005 were negatively impacted by the net tax charge primarily related to the repatriation of foreign earnings in accordance with the AJCA.

Worldwide sales were $5.41 billion for the third quarter of 2006, compared with $5.42 billion for the third quarter of 2005. Global sales performance included a 1% volume increase, 1% favorable effect from foreign exchange, and a 2% unfavorable effect from price changes for the quarter. Worldwide sales were $16.59 billion for the first nine months of 2006, compared with $16.25 billion for the first nine months of 2005, representing an increase of 2%. Global sales performance for the first nine months of 2006 included a 2% volume increase, a 1% favorable effect from price changes, and a 1% unfavorable effect from foreign exchange.

Materials and production costs were $1.54 billion for the third quarter of 2006, an increase of 25% from.the third quarter of 2005, including $199.6 million recorded in the current quarter primarily for accelerated depreciation and asset impairment costs associated with the global restructuring program. The increase also reflects $4.5 million related to the expensing of stock options. For the nine months ended September 30, 2006, Materials and production costs were $4.33 billion, which includes the impact of $572.1 million in restructuring costs and $19.7 million related to the expensing of stock options.

The gross margin was 71.5% in the third quarter of 2006 compared with 77.1% in the third quarter of 2005. The 2006 gross margin reflects a 3.7 percentage point unfavorable impact relating to the costs associated with the global restructuring program. Changes in the product mix also had an unfavorable impact for the third quarter of 2006. For the first nine months of 2006, the gross margin was 73.9%, including a 3.4 percentage point unfavorable impact relating to the costs associated with the global restructuring program, compared with 77.4% for the comparable prior year period.

Marketing and administrative expenses were $2.37 billion, an increase of 43% in the third quarter of 2006. Marketing and administrative expenses includes an additional $598 million reserve solely for future legal defense costs for *Vioxx* litigation, as well as the impact of $25.3 million related to the expensing of stock options. For the nine months ended September 30, 2006, Marketing and administrative expenses increased 16%, which includes the impact of the additional reserve solely for future legal defense costs for *Vioxx* litigation, as well as the impact of $113.2 million related to the expensing of stock options. The results also reflect the increase in the level of activity to support three recently-approved vaccines and the launch of *Januvia* in the United States.

Research and development expenses totaling $945.4 million for the third quarter of 2006 were comparable to the third quarter of 2005 and included $11.1 million for the expensing of stock options. For the nine months ended September 30, 2006, Research and development expenses increased 12%, which reflected the $296.3 million acquired research charge associated with the GlycoFi acquisition, $55.4 million related to the global restructuring program, and the impact of $46.6 million related to the expensing of stock options.

- 23 -

Table of Contents

Restructuring costs were $49.6 million for the quarter, representing separation and other related costs associated with the global restructuring program. For the nine months ended September 30, 2006, Restructuring costs were $86.5 million and included the impact of gains on the sales of facilities in connection with the program (see Note 2).

Equity income from affiliates for the three and nine months ended September 30, 2006 was $595.4 million and $1.71 billion, respectively, compared with $480.1 million and $1.13 billion for the three and nine months ended September 30, 2005, respectively. The increases in 2006 primarily reflect the successful performance of *Zetia* and *Vytorin* through the Merck/Schering-Plough partnership and the higher year-to-date partnership returns from AstraZeneca LP (AZLP).

The change in Other (income) expense, net for the three and nine months ended September 30, 2006 as compared with the same periods of 2005 primarily reflects an increase in interest income generated from the Company's investment portfolio derived from higher interest rates and higher average investment portfolio balances.

The effective tax rate was 23.6% for the third quarter of 2006 and 28.9% for the third quarter of 2005. The effective tax rate was 25.4% and 39.9% for the first nine months of 2006 and 2005, respectively. The 2006 effective tax rate reflects the impact of the second quarter acquired research charge, the third quarter additional reserve solely for future *Vioxx* legal defense costs, as well as costs associated with the global restructuring program. The 2005 effective tax rate reflects the net tax charge primarily related to the AJCA.

*Sales*

Sales of the Company's products were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| ($ in millions) | 2006 | 2005 | 2006 | 2005 |
| Singulair | $ 868.0 | $ 692.5 | $ 2,619.1 | $ 2,157.0 |
| Zocor | 371.0 | 1,049.9 | 2,424.1 | 3,307.4 |
| Fosamax | 770.5 | 777.3 | 2,345.0 | 2,401.9 |
| Cozaar/Hyzaar | 813.3 | 751.4 | 2,298.1 | 2,255.1 |
| Primaxin | 181.8 | 181.9 | 523.6 | 548.1 |
| Cosopt/Trusopt | 190.9 | 156.3 | 517.8 | 449.7 |
| Proscar | 127.3 | 185.9 | 498.5 | 549.1 |
| Vasotec/Vaseretic | 134.5 | 149.2 | 410.8 | 471.3 |
| Cancidas | 127.1 | 142.3 | 397.1 | 412.5 |
| Maxalt | 105.1 | 92.3 | 295.2 | 254.2 |
| Propecia | 88.9 | 66.9 | 249.0 | 205.8 |
| Vaccines/Biologicals | 555.4 | 338.4 | 1,176.1 | 809.5 |
| Other | 1,076.6 | 831.9 | 2,837.5 | 2,424.4 |
| | $5,410.4 | $5,416.2 | $16,591.9 | $16,246.0 |

Sales by product are presented net of discounts and returns. The provision for discounts includes indirect customer discounts that occur when a contracted customer purchases directly through an intermediary wholesale purchaser, known as chargebacks, as well as indirectly in the form of rebates owed based upon definitive contractual agreements or legal requirements with private sector and public sector (Medicaid) benefit providers, after the final dispensing of the product by a pharmacy to a benefit plan participant. These discounts, in the aggregate, reduced revenues by $656.8 million and $1,245.7 million for the three months ended September 30, 2006 and 2005, respectively, and by $2,909.2 million and $3,406.7 million for the nine months ended September 30, 2006 and 2005, respectively. Other primarily includes sales of other human pharmaceuticals, pharmaceutical and animal health supply sales to the Company's joint ventures and revenue from the Company's relationship with AZLP. Inventory levels at key wholesalers for each of the Company's major products are generally less than one month.

Worldwide sales were strong for *Singulair*, a once-a-day oral medicine indicated for the chronic treatment of asthma and the relief of symptoms of allergic rhinitis, reaching $868.0 million for the third quarter of 2006, representing growth of 25% over the third quarter of 2005. Sales for the first nine months of 2006 were $2.62 billion, a 21% increase over the comparable 2005 period. *Singulair* continues to be the number one prescribed product in the U.S. respiratory market.

Table of Contents

Global sales of Merck's antihypertensive medicines, *Cozaar* and *Hyzaar\**, were $813.3 million for the third quarter of 2006, representing an increase of 8% from the third quarter of 2005. Sales for the first nine months of 2006 were $2.30 billion, a 2% increase compared with the first nine months of 2005.

Global sales for *Fosamax* and *Fosamax Plus D* (marketed as *Fosavance* throughout the European Union (EU)) were $770.5 million for the third quarter of 2006, representing a decrease of 1% compared to the third quarter of 2005. U.S. sales for the quarter increased 7%. Sales outside the United States were affected by the availability of other alendronate sodium products in several key markets. Global sales for the first nine months were $2.34 billion, a 2% decrease over the comparable 2005 period. *Fosamax* and *Fosamax Plus D* together remain the most prescribed medicine worldwide for the treatment of postmenopausal, male and glucocorticoid-induced osteoporosis.

In August 2006, *Fosamax* (marketed as *Fosamac*) became the first once-weekly, oral medicine for osteoporosis to be launched in Japan, the second largest pharmaceutical market in the world and home to approximately 10 million women with the disease.

In September 2006, Merck presented data from two studies at the 28th Annual Meeting of the American Society for Bone Mineral Research (ASBMR) which showed that higher persistency rates were seen among osteoporosis patients taking *Fosamax* Once Weekly (alendronate) therapies than were seen among patients taking ibandronate once monthly or once weekly risedronate therapies. The data were based on studies conducted by the Company comparing the persistency rates of weekly versus monthly oral bisphosphonate dosing frequency. Both studies were based on a review of two prescription drug databases containing prescription records from a total of over 300,000 patients in the United States.

*Zocor*, Merck's statin for modifying cholesterol, achieved worldwide sales of $371.0 million in the third quarter of 2006, representing a decrease of 65% over the third quarter of 2005. Sales for the first nine months of 2006 were $2.42 billion, a 27% decrease compared with the first nine months of 2005. Merck's U.S. marketing exclusivity for *Zocor* expired on June 23, 2006.

The Company's previously signed authorized generic agreement with Dr. Reddy's Laboratories went into effect subsequent to the *Zocor* patent expiration in the United States. During the third quarter of 2006, Merck recorded $82.0 million in Other revenue associated with the Dr. Reddy's arrangement for simvastatin. Merck continues to offer branded *Zocor* and to manufacture simvastatin for branded *Zocor*, *Vytorin*, the Company's investigational compound MK-0524B and Dr. Reddy's authorized generic.

Total sales of Merck's other promoted medicines and vaccines were $1.79 billion for the third quarter of 2006, representing growth of 15% as compared with the third quarter of 2005. Sales for the first nine months of 2006 were $4.85 billion compared with $4.42 billion for the same period of 2005. These products treat or prevent a broad range of medical conditions, including glaucoma, migraine, and pain in addition to infectious disease, cervical cancer, rotavirus disease and shingles.

Vaccine sales were $555.4 million for the third quarter of 2006, representing strong growth of 64%. Sales of vaccines for the first nine months of 2006 were $1.18 billion compared with $809.5 million for the comparable period of 2005. The results benefited from the launch of three new vaccines, *RotaTeq*, *Zostavax* and *Gardasil*, and the strong performance of *ProQuad*.

Total sales for *Gardasil*, Merck's vaccine to prevent cervical cancer and vulvar and vaginal pre-cancers caused by human papillomavirus (HPV) types 16 and 18 and to prevent low-grade and pre-cancerous lesions and genital warts caused by HPV types 6, 11, 16 and 18, were $70.0 million for the third quarter of 2006. Managed care plans representing more than 90% of covered lives of girls and women aged 9-26 have added *Gardasil* to their respective formularies. On November 1, 2006, the Company announced that the U.S. Centers for Disease Control and Protection (CDC) added *Gardasil* to the CDC's Vaccines for Children contract for girls and women aged 9 to 18.

---

\*     *COZAAR and HYZAAR are registered trademarks of E.I. DuPont de Nemours & Company, Wilmington, Delaware.*

Table of Contents

In late September 2006, *Gardasil* was approved as the first and only vaccine in the EU for use in children and adolescents aged 9 to 15 years and in adult females aged 16 to 26 years for the prevention of cervical cancer, high-grade cervical dysplasias/precancers [cervical intraepithelial neoplasia (CIN 2/3)], high-grade/precancerous vulvar dysplastic lesions (VIN 2/3) and external genital warts (condyloma acuminata) caused by HPV types 6, 11, 16 and 18. *Gardasil* will be marketed by Sanofi Pasteur MSD, a joint venture between Sanofi Pasteur and Merck & Co., Inc., in 19 European countries, including 15 in the EU. In the remaining Central and Eastern European countries, *Gardasil* will be marketed by Merck Sharp & Dohme as either *Gardasil* or *Silgard*.

Clinical studies to evaluate the efficacy of *Gardasil* in females 27-45 years of age and males 16-26 years of age continue in more than 30 countries around the world. Merck is also conducting ongoing clinical studies to assess the potential for cross-protection against HPV types related to HPV 16 and 18, including HPV 31 and 45. Cross-protection, if proven, could potentially expand the vaccine's prevention coverage against cervical cancer.

*RotaTeq*, Merck's vaccine to help protect children against rotavirus gastroenteritis, achieved total sales of $61.8 million for the third quarter of 2006. Within the United States, health insurance plans representing more than 80% of covered lives in the eligible age group of infants and young children between six and 32 weeks of age have added *RotaTeq* to their formularies. Applications for licensure of *RotaTeq* have been filed in more than 100 countries. In Nicaragua, where *RotaTeq* was recently approved, Merck will provide the vaccine free for all infants born in the country over a three-year period through a joint demonstration project with the Nicaraguan Ministry of Health.

On October 25, 2006, the Company announced that the U.S. Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices (ACIP) voted unanimously to recommend that adults 60 years of age and older be vaccinated with *Zostavax* (Zoster Vaccine Live (Oka/Merck)) to help prevent shingles (herpes zoster), a frequently painful disease marked by a blistering rash. *Zostavax* was approved by the U.S. Food and Drug Administration (FDA) on May 25, 2006 for the prevention of shingles in individuals 60 years of age and older. *Zostavax* is not a treatment for shingles or postherpetic neuralgia (long-term nerve pain that can be a complication of shingles).

Merck earns ongoing revenue based on sales of products that are associated with its alliances, the most significant of which is AstraZeneca LP. Revenue from AstraZeneca LP recorded by Merck was $442.5 million in the third quarter of 2006 and $1.24 billion for the first nine months of 2006, which were comparable to the corresponding prior year periods.

Combined global sales of *Zetia* and *Vytorin*, as reported by the Merck/Schering-Plough partnership, were $1.03 billion for the third quarter of 2006 and were $2.80 billion for the first nine months of 2006.

Global sales of *Zetia*, the cholesterol-absorption inhibitor also marketed as *Ezetrol* outside the United States, reached $501.9 million in the third quarter of 2006, an increase of 41% compared with the third quarter of 2005. Sales for the first nine months of 2006 were $1.39 billion, an increase of 39% over the comparable 2005 period.

Global sales of *Vytorin*, marketed outside the United States as *Inegy*, reached $526.6 million in the third quarter of 2006. Sales for the first nine months of 2006 were $1.40 billion. On October 5, 2006, the Merck/Schering-Plough partnership announced that the FDA had approved the inclusion of new data in the product label showing that *Vytorin*, a cholesterol-absorption inhibitor combined with simvastatin, is more effective than Crestor at lowering LDL cholesterol at all compared doses, ranging from the usual starting recommended doses (*Vytorin* 10/20 mg, Crestor 10 mg) to the maximum approved doses (*Vytorin* 10/80 mg, Crestor 40 mg). *Vytorin* now has been shown in clinical studies to provide greater LDL cholesterol lowering efficacy versus Lipitor, Crestor and Zocor at all study dose comparisons.

The Company records the results from its interest in the Merck/Schering-Plough partnership in Equity income from affiliates.

*Research and Development*

On October 16, 2006, *Januvia* was approved by the FDA, and is now the first and only dipeptidyl peptidase-4 (DPP-4) inhibitor available in the United States for the treatment of type 2 diabetes. DPP-4 inhibitors represent a new class of prescription medications that improve blood sugar control in patients with type 2 diabetes by enhancing a natural body system called the incretin system. *Januvia* has been approved as monotherapy and as add-on therapy to either of two other types of oral diabetes medications, metformin or thiazolidinediones (TZDs), to improve blood sugar (glucose) control in patients with type 2 diabetes when diet and exercise are not enough.

Clinical studies show that *Januvia* provides significant A1C (a measure of average blood glucose level over a two- to three-month period) reductions in both monotherapy and when added to commonly used diabetes drugs such as metformin and TZDs. Treatment with *Januvia* was not associated with weight gain or an increased risk of

Table of Contents

hypoglycemia. The recommended dose of *Januvia* is 100 mg once daily. *Januvia* has already launched in Mexico, and other regulatory filings around the world are moving ahead as planned.

*Januvia* also is being investigated as part of a single tablet combination with metformin, known as MK-0431A. The FDA has accepted Merck's filing for standard review, and FDA action is anticipated by the end of March 2007.

On October 6, 2006, Merck announced that the FDA had approved *Zolinza* for the treatment of cutaneous manifestations in patients with cutaneous T-cell lymphoma (CTCL) who have progressive, persistent or recurrent disease on or following two systemic therapies. The approval of *Zolinza* represents the first anticancer treatment approved for CTCL since 1999.

Merck presented interim 24-week data on MK-0518, the Company's investigational HIV integrase inhibitor, from the Phase II dose-ranging study in previously untreated patients at the 16th International AIDS Conference in August 2006. The data showed that MK-0518 twice daily, when used in combination with tenofovir and lamivudine, achieved a comparable viral load reduction to efavirenz combined with the same agents.

At the American Society for Microbiology's 46th Annual International Conference on Antimicrobial Agents and Chemotherapy in September 2006, Merck presented additional analyses from this study that demonstrated no increase in lipid levels in treatment-naive patients taking MK-0518 with tenofovir and lamivudine. Also presented at the conference were the interim 24-week data from another ongoing study that showed MK-0518 maintaining viral load regression in treatment-experienced patients who failed antiretroviral therapy and who were resistant to drugs in all three classes of oral antiretroviral drugs.

On September 29, 2006, Merck announced it will not file a worldwide marketing application in 2007 for MK-0524B, its investigational fixed-dose combination of MK-0524A (a DP-1 selective inhibitor coupled with extended-release niacin) and simvastatin, because of an unresolved formulation issue. A new filing date has not been determined. Phase III clinical studies supporting MK-0524B continue with MK-0524A co-administered with simvastatin. In addition, the clinical development program for MK-0524A remains on track, and the Company plans to file MK-0524A with the FDA in 2007.

On October 13, 2006, Merck and H. Lundbeck A/S of Denmark announced that the submission of a New Drug Application (NDA) for gaboxadol with the FDA will no longer occur in the first quarter of 2007. The companies plan to submit the application to the FDA in mid-2007. The delay in the NDA submission for gaboxadol, a novel investigational drug in Phase III development for the treatment of insomnia, resulted from slower than anticipated enrollment in ongoing trials.

Merck has initiated a targeted Phase III program with its investigational compound for the treatment of obesity, MK-0364, which is an investigational cannabinoid-1 receptor (CB1R) inverse agonist. The Company is not in a position at this time to provide a potential product profile or a filing date.

Merck continues its strategy of establishing strong external alliances to complement our substantial internal research capabilities, including research collaborations, licensing pre-clinical and clinical compounds and technology transfers to drive both near- and long-term growth. Through the third quarter of 2006, Merck has entered into 24 such transactions.

On October 12, 2006, Merck and Ambrilia Biopharma Inc. (Ambrilia), a biopharmaceutical company developing innovative therapeutics in the fields of cancer and infectious diseases, announced they entered into an exclusive licensing agreement granting Merck the worldwide rights to Ambrilia's HIV/AIDS protease inhibitor program. Under the terms of the agreement, Ambrilia granted Merck the exclusive worldwide rights to its lead compound, PPL-100, which has completed a Phase I single-dose pharmacokinetic study and is currently in a Phase I repeat dose pharmacokinetic study. In return, Ambrilia received an upfront licensing fee of $17 million on signing and is eligible for cash payments totaling up to $215 million upon successful completion of development, clinical, regulatory and sales milestones. Ambrilia will receive royalties on all future product sales.

On September 27, 2006, the Company announced that it will expand the scope of its existing strategic collaboration with FoxHollow Technologies, Inc. (FoxHollow) for atherosclerotic plaque analysis and that Merck will acquire a stake in FoxHollow with the purchase of $95 million in common stock, subject to customary closing conditions and clearance under the Hart-Scott-Rodino Antitrust Improvements Act. Merck will acquire newly-issued shares of FoxHollow common stock at $29.629 per share, representing approximately an 11% stake. Under the terms of the expanded collaboration agreement, Merck will pay $40 million to FoxHollow over four years in exchange for FoxHollow's agreement to collaborate exclusively with Merck in specified disease areas. Merck will also provide a minimum of $60 million in funding to FoxHollow over the first three years of the four year collaboration program term, for research activities to be conducted by FoxHollow under Merck's direction. FoxHollow will receive milestone payments on successful

**Table of Contents**

development of drug products or diagnostic tests utilizing results from the collaboration, as well as royalties. This transaction is expected to close in the fourth quarter of 2006.

On August 11, 2006, Merck and Gilead Sciences, Inc. established an agreement for the distribution of Atripla, a once-daily, single tablet regimen for the treatment of HIV-1 infection in adults, in developing countries around the world. Atripla contains 600 mg of efavirenz, a non-nucleoside reverse transcriptase inhibitor, 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate, both nucleoside reverse transcriptase inhibitors. Efavirenz is marketed by Merck under the tradename *Stocrin* in all territories outside of the United States, Canada and certain European countries (where it is commercialized by Bristol-Myers Squibb under the tradename Sustiva). Emtricitabine and tenofovir disoproxil fumarate are commercialized by Gilead Sciences under the tradenames Emtriva and Viread, respectively. The compounds are commonly prescribed together as a once-daily, fixed-dose tablet, marketed under the tradename Truvada for use as part of combination therapy.

On October 9, 2006, Bristol-Myers Squibb Company, Gilead Sciences, Inc. and Merck, announced the submission of a Marketing Authorisation Application (MAA) for Atripla in the EU to the European Medicines Agency (EMEA). The MAA will be reviewed by the Committee for Medicinal Products for Human Use, subject to validation by the EMEA. The MAA for Atripla in the EU was filed jointly by the three companies through a newly established three-way joint venture based in Ireland, Bristol-Myers Squibb Gilead Sciences And Merck Sharp & Dohme Limited. Review of the MAA will be conducted by the EMEA under the centralized licensing procedure, which, when finalized, provides one marketing authorization in all member states of the EU. Discussions among the three companies regarding agreements for manufacturing, commercialization and distribution of Atripla in the EU are ongoing.

*Liquidity and Capital Resources*

| ($ in millions) | September 30, 2006 | | December 31, 2005 | |
|---|---|---|---|---|
| Cash and investments | $ | 15,530.7 | $ | 16,745.5 |
| Working capital | $ | 4,076.5 | $ | 7,806.9 |
| Total debt to total liabilities and equity | | 13.7% | | 18.1% |

The decrease in working capital primarily reflects a change in the mix of the Company's investments from short-term to long-term. The decrease in the ratio of total debt to total liabilities and equity primarily reflects the repayment of commercial paper in the first half of 2006.

Cash provided by operations continues to be the Company's primary source of funds to finance operating needs and capital expenditures. Net cash provided by operating activities totaled $5.0 billion and $5.3 billion for the nine months ended September 30, 2006 and 2005, respectively. In 2005, the Company repatriated $15.9 billion in connection with the AJCA and recorded an income tax charge of $766.5 million ($740.0 million recorded in the second quarter of 2005) related to this repatriation, $185.0 million of which was paid in the fourth quarter of 2005 and the remainder was paid in the first quarter of 2006 (see Note 8).

As more fully described in Note 8, the Company is currently addressing certain tax matters with applicable taxing authorities. While the ultimate resolutions of these matters are not expected to have material adverse effects on the Company's liquidity or financial condition, any payments made or deposits paid in conjunction with these matters are likely to have a material adverse effect on the Company's cash flows in the quarter such payments or deposits are made.

Capital expenditures totaled $684.7 million and $996.1 million for the first nine months of 2006 and 2005, respectively. Capital expenditures for the full year 2006 are expected to approximate $1.1 billion.

Dividends paid to stockholders were $2.5 billion for the first nine months of both 2006 and 2005. In May and July 2006, the Board of Directors declared a quarterly dividend of $0.38 cents per share on the Company's common stock for the third and fourth quarters of 2006, respectively.

The Company purchased $751.0 million of its common stock (20.8 million shares) for its Treasury during the first nine months of 2006. The Company has approximately $6.8 billion remaining under the July 2002 treasury stock purchase authorization.

In July 2006, $500 million of 5.25% notes, along with an associated pay-floating, receive-fixed interest rate swap, matured and were retired.

**Table of Contents**

In April 2006, the Company extended the maturity date of its $1.5 billion, 5-year revolving credit facility from 2010 to 2011. The facility provides backup liquidity for the Company's commercial paper borrowing facility and is to be used for general corporate purposes. The Company has not drawn funding from this facility.

*Critical Accounting Policies*
The Company's significant accounting policies, which include management's best estimates and judgments, are included in Note 2 to the consolidated financial statements of the 2005 Annual Report on Form 10-K for the year ended December 31, 2005. Certain of these accounting policies are considered critical as disclosed in the Critical Accounting Policies and Other Matters section of Management's Discussion and Analysis in the Company's 2005 Annual Report on Form 10-K because of the potential for a significant impact on the financial statements due to the inherent uncertainty in such estimates. Other than the adoption of FAS 123R, as discussed in Note 3, there have been no significant changes in the Company's critical accounting policies since December 31, 2005.

*Recently Issued Accounting Standards*
In September 2006, the Financial Accounting Standards Board (FASB) issued Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 106 and 132R* (FAS 158), which is effective December 31, 2006, except for the requirement to measure plan assets and benefit obligations as of the company's fiscal year-end balance sheet which is effective as of December 31, 2008. Retrospective application is not permitted. Among other provisions, FAS 158 requires companies to fully recognize the funded or unfunded status of their benefit plans as an asset or liability, as well as recognize any previously unrecognized gains and losses and unrecognized prior service costs as a component of accumulated other comprehensive income, net of taxes, on the balance sheet. Since the Company measures plan assets and obligations on an annual basis, it cannot estimate the impact of FAS 158 in advance of the Company's December 31, 2006 measurement date. If the Company had been required to adopt the provisions of FAS 158 as of December 31, 2005, the Company estimates that Stockholders' equity would have decreased by approximately 10%. However, the impact of adoption on December 31, 2006 could differ significantly as it will reflect asset performance through the end of 2006 as well as interest rates and other factors which are applicable as of December 31, 2006. The adoption of FAS 158 is not expected to impact the Company's results of operations and cash flows, or any of the Company's financial agreements or covenants.

Also in September 2006, the Securities and Exchange Commission (SEC) issued Staff Accounting Bulletin No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* (SAB 108), which will be effective for the year ended December 31, 2006. The objective of SAB 108 is to eliminate diversity in practice surrounding how public companies quantify financial statement misstatements. SAB 108 requires quantification of financial statement misstatements based on the effects of the misstatements on the consolidated statement of income and the consolidated balance sheet and related financial statement disclosures. The adoption of SAB 108 is not expected to have an impact on Merck's financial position or results of operations.

Additionally in September 2006, the FASB issued Statement No. 157, *Fair Value Measurements* (FAS 157), which will be effective January 1, 2008. This Statement clarifies the definition of fair value, establishes a framework for measuring fair value, and expands the disclosures on fair value measurements. The effect of adoption of FAS 157 on the Company's financial position and results of operations is not expected to be material.

In July 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109* (FIN 48), which is effective January 1, 2007. FIN 48 clarifies the accounting for the uncertainty in tax positions by requiring companies to recognize in their financial statements, the impact of a tax position, if that position is more likely than not of being sustained on audit based on the technical merits of the position. Among other provisions, FIN 48 also requires expanded disclosures at the end of each annual period presented. The adoption of FIN 48 may result in the cumulative effect of the change in accounting principle recorded as an adjustment to opening retained earnings. The effect of adoption of FIN 48 on the Company's financial position and results of operations has not yet been determined.

**Legal Proceedings**
The Company is involved in various claims and legal proceedings of a nature considered normal to its business, including product liability, intellectual property, and commercial litigation, as well as additional matters such as antitrust actions. The following discussion is limited to recent developments concerning legal proceedings and should be read in conjunction with Note 7 to the consolidated financial statements of this report and the Company's 2005 Annual Report on Form 10-K for the year ended December 31, 2005, and the Company's Form 10-Q for the quarters ended March 31, 2006 and June 30, 2006.

Table of Contents

*Vioxx* **Litigation**
*Product Liability Lawsuits*
As previously disclosed, federal and state product liability lawsuits involving individual claims, as well as putative class actions, have been filed against the Company with respect to *Vioxx*. As of October 9, 2006, the Company had been served or was aware that it had been named as a defendant in approximately 23,800 lawsuits filed on or before September 30, which include approximately 41,750 plaintiff groups, alleging personal injuries resulting from the use of *Vioxx*. Of these lawsuits, approximately 7,450 lawsuits representing approximately 21,950 plaintiff groups are or are slated to be in the federal MDL (discussed below) and approximately 13,850 lawsuits representing approximately 13,850 plaintiff groups are included in a coordinated proceeding in New Jersey Superior Court before Judge Carol E. Higbee. Certain of these lawsuits include allegations regarding gastrointestinal bleeding, cardiovascular events, thrombotic events or kidney damage. The Company has also been named as a defendant in approximately 275 putative class actions alleging personal injuries or seeking (i) medical monitoring as a result of the putative class members' use of *Vioxx*, (ii) disgorgement of certain profits under common law unjust enrichment theories, and/or (iii) various remedies under state consumer fraud and fair business practice statutes, including recovering the cost of *Vioxx* purchased by individuals and third-party payors such as union health plans (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Product Liability Lawsuits"). The actions filed in the state courts of California, Texas, and New Jersey, and in the counties of Philadelphia, Pennsylvania, and Clark County, Nevada have been transferred to a single state court in each location for coordinated proceedings.

In addition to the *Vioxx* Product Liability Lawsuits discussed above, the claims of over 3,000 plaintiff groups have been dismissed to date. Of these, there have been over 1,100 plaintiff groups whose claims were dismissed with prejudice (i.e., they can not be brought again) either by plaintiffs themselves or by the courts. Over 2,000 additional plaintiff groups have had their claims dismissed without prejudice (i.e., they can be brought again).

On February 16, 2005, the Judicial Panel on Multidistrict Litigation (the "JPML") transferred all *Vioxx* Product Liability Lawsuits pending in federal courts nationwide into one Multidistrict Litigation ("MDL") for coordinated pre-trial proceedings. The MDL has been transferred to the United States District Court for the Eastern District of Louisiana before District Judge Eldon E. Fallon.

In July 2005, Judge Fallon indicated that he would schedule for trial a series of cases during the period November 2005 through 2006, in the following categories: (i) heart attack with short term use; (ii) heart attack with long term use; (iii) stroke; and (iv) cardiovascular injury involving a prescription written after April 2002 when the labeling for *Vioxx* was revised to include the results of the VIGOR trial. These trials began in November 2005 and the trials that took place since June 30, 2006 are described in further detail below.

Several *Vioxx* Product Liability Lawsuits are currently scheduled for trial in the fourth quarter of 2006. The Company has provided a list of such trials at its website at www.merck.com which it will periodically update as appropriate. The Company has included its website address only as an inactive textual reference and does not intend it to be an active link to its website nor does it incorporate by reference the information contained therein.

Merck has entered into a tolling agreement (the "Tolling Agreement") with the MDL Plaintiffs' Steering Committee that establishes a procedure to halt the running of the statute of limitations (tolling) as to certain categories of claims allegedly arising from the use of *Vioxx* by non-New Jersey citizens. The Tolling Agreement applies to individuals who have not filed lawsuits and may or may not eventually file lawsuits and only to those claimants who seek to toll claims alleging injuries resulting from a thrombotic cardiovascular event that results in a myocardial infarction or ischemic stroke. The Tolling Agreement provides counsel additional time to evaluate potential claims. The Tolling Agreement requires any tolled claims to be filed in federal court. As of October 9, 2006, approximately 15,000 claimants had entered into Tolling Agreements on or before September 30, 2006.

The Company has previously disclosed the outcomes of several *Vioxx* Product Liability Lawsuits that were tried prior to June 30, 2006.

In July 2006, in Doherty v. Merck, in Superior Court of New Jersey, Law Division, Atlantic County, a jury returned a verdict in favor of the Company on all counts. The jury rejected a claim by the plaintiff that her nearly three years of *Vioxx* use caused her heart attack. The jury also found in Merck's favor on the plaintiff's consumer fraud claim.

In August 2006, in the first case to go to trial in the California coordinated proceeding, Grossberg v. Merck, the jury in Los Angeles, California returned a verdict for Merck on all counts.

Table of Contents

In August 2006, in Barnett v. Merck, a case before Judge Fallon in the MDL, a jury in New Orleans, Louisiana returned a plaintiff verdict in the second federal *Vioxx* case to go to trial. The jury awarded $50 million in compensatory damages and $1 million in punitive damages. On August 30, 2006, Judge Fallon overturned as excessive the damages portion of the verdict and ordered a new trial on damages. The Company is seeking a new trial on all issues.

On September 26, 2006, in Smith v. Merck, the third case to go to trial in the federal MDL, a jury returned a verdict in favor of Merck on all counts.

The Company previously disclosed that in April 2006, in Garza v. Merck, a jury in Rio Grande City, Texas returned a verdict in favor of the plaintiff. In September 2006, the Texas state court granted the Company's request to investigate possible jury bias because a juror admitted that he had, prior to the trial, on several occasions borrowed money from the plaintiff.

In August 2006, Judge Fallon granted the Company's motion to dismiss two *Vioxx* class action claims previously filed in the federal court; one claim filed by plaintiffs from France and the other claim by plaintiffs from Italy.

In August 2006, Judge Higbee set aside the November 2005 jury verdict in favor of Merck in Humeston v. Merck and ordered a new trial on the grounds of newly discovered evidence. The Company has filed a motion for reconsideration of Judge Higbee's decision to re-try the case.

On September 19, 2006, Merck filed a notice of appeal of the previously disclosed August 2005 jury verdict in favor of the plaintiff in the Texas state court case, Ernst v. Merck. Among several independent grounds for reversal, the Company will argue that there was insufficient evidence that Mr. Ernst suffered an injury due to *Vioxx* and that it was improper to allow testimony by a previously undisclosed witness midway through the trial. In the interim, as required under Texas law, the Company has posted an appeal bond.

On September 28, 2006, the New Jersey Superior Court, Appellate Division, heard argument on plaintiffs' appeal of Judge Higbee's dismissal of the Sinclair v. Merck case. This putative class action was originally filed in December 2004 and sought the creation of a medical monitoring fund. Judge Higbee had granted the Company's motion to dismiss in May 2005.

On October 5, 2006, Judge Higbee dismissed the United Kingdom plaintiffs from the New Jersey Coordinated Proceeding.

The first case scheduled for trial in the Texas coordinated proceeding, Rigby v. Merck, was scheduled to begin trial on November 7, 2006. The Rigby case was voluntarily dismissed on October 23, 2006 when the plaintiff filed a non-suit with the Court.

The trial in Mason v. Merck, a case in federal court in Louisiana, started on October 30, 2006. On October 31, 2006 in California Superior Court in Los Angeles, a consolidated trial began in the cases Appell v. Merck and Arrigale v. Merck.

The next trial in New Jersey is currently scheduled to start on January 16, 2007, and the Court has stated that it will be a consolidated trial including multiple plaintiffs. Plaintiffs proposed eight cases to be joined together for a consolidated trial. Merck filed motions opposing the concept of a consolidated trial proceeding and challenging the propriety of plaintiffs' proposed cases.

Merck voluntarily withdrew *Vioxx* from the market on September 30, 2004. Many states have a two-year statute of limitations for product liability claims, requiring that claims must be filed within two years after the plaintiffs learned or could have learned of their potential cause of action. As a result, some may view September 30, 2006 as a deadline for filing *Vioxx* cases. It is important to note, however, that the law regarding statutes of limitations can be complex, varies from state to state, can be fact-specific, and in some cases, might be affected by the existence of pending class actions. For example, some states have three year statutes of limitations and, in some instances, the statute of limitations is even longer. Merck expects that there will be legal arguments concerning the proper application of these statutes, and the decisions will be up to the judges presiding in individual cases in state and federal proceedings. As referred to above, as of September 30, 2006, Merck has also entered into agreements with approximately 15,000 claimants to toll the statute of limitations, so the September 30, 2006 date would not apply in those instances.

*Other Lawsuits*
As previously disclosed, on July 29, 2005, a New Jersey state trial court certified a nationwide class of third-party payors (such as unions and health insurance plans) that paid in whole or in part for the *Vioxx* used by their plan members or insureds. The named plaintiff in that case seeks recovery of certain *Vioxx* purchase costs (plus penalties)

- 31 -

Table of Contents

based on allegations that the purported class members paid more for *Vioxx* than they would have had they known of the product's alleged risks. Merck believes that the class was improperly certified. The trial court's ruling is procedural only; it does not address the merits of plaintiffs' allegations, which the Company intends to defend vigorously. On March 31, 2006, the New Jersey Superior Court, Appellate Division, affirmed the class certification order. On July 19, 2006, the New Jersey Supreme Court decided to exercise its discretion to hear the Company's appeal of the Appellate Division's decision. On August 24, 2006, the Appellate Division ordered a stay of the proceedings in Superior Court pending a ruling by the Supreme Court.

As previously reported, the Company has also been named as a defendant in separate lawsuits brought by the Attorneys General of Alaska, Louisiana, Mississippi, Montana, Texas and Utah. These actions allege that the Company misrepresented the safety of *Vioxx* and seek (i) recovery of the cost of *Vioxx* purchased or reimbursed by the state and its agencies; (ii) reimbursement of all sums paid by the state and its agencies for medical services for the treatment of persons injured by *Vioxx*; (iii) damages under various common law theories; and/or (iv) remedies under various state statutory theories, including state consumer fraud and/or fair business practices or Medicaid fraud statutes, including civil penalties.

*Shareholder Lawsuits*
As previously disclosed, in addition to the *Vioxx* Product Liability Lawsuits, the Company and various current and former officers and directors are defendants in various putative class actions and individual lawsuits under the federal securities laws and state securities laws (the "*Vioxx* Securities Lawsuits"). All of the *Vioxx* Securities Lawsuits pending in federal court have been transferred by the JPML to the United States District Court for the District of New Jersey before District Judge Stanley R. Chesler for inclusion in a nationwide MDL (the "Shareholder MDL"). Judge Chesler has consolidated the *Vioxx* Securities Lawsuits for all purposes. Plaintiffs request certification of a class of purchasers of Company stock between May 21, 1999 and October 29, 2004. The complaint alleges that the defendants made false and misleading statements regarding *Vioxx* in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and seeks unspecified compensatory damages and the costs of suit, including attorneys' fees. The complaint also asserts a claim under Section 20A of the Securities and Exchange Act against certain defendants relating to their sales of Merck stock. In addition, the complaint includes allegations under Sections 11, 12 and 15 of the Securities Act of 1933 that certain defendants made incomplete and misleading statements in a registration statement and certain prospectuses filed in connection with the Merck Stock Investment Plan, a dividend reinvestment plan. Defendants have filed a motion to dismiss the complaint, which is pending.

As previously disclosed, on August 15, 2005, a complaint was filed in Oregon state court by the State of Oregon through the Oregon state treasurer on behalf of the Oregon Public Employee Retirement Fund against the Company and certain current and former officers and directors. The complaint, which was brought under Oregon securities law, alleges that plaintiff has suffered damages in connection with its purchases of Merck common stock at artificially inflated prices due to the Company's alleged violations of law related to disclosures about *Vioxx*. The current and former officers and directors have entered into a tolling agreement and, on June 30, 2006, were dismissed without prejudice from the case. On July 19, 2006, the Court denied the Company's motion to dismiss the complaint, but required plaintiff to amend the complaint. Plaintiff filed an amended complaint on September 21, 2006. Merck intends to file a motion to dismiss the amended complaint.

As previously disclosed, various shareholder derivative actions filed in federal court were transferred to the Shareholder MDL and consolidated for all purposes by Judge Chesler (the "*Vioxx* Derivative Lawsuits"). The consolidated complaint arose out of substantially the same factual allegations that are made in the *Vioxx* Securities Lawsuits. The derivative suits, which were purportedly brought to assert rights of the Company, assert claims against certain members of the Board past and present and certain executive officers for breach of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control and gross mismanagement. On May 5, 2006, Judge Chesler granted defendants' motion to dismiss and denied plaintiffs' request for leave to amend their complaint. Plaintiffs appealed the District Court's decision refusing them leave to amend to the United States Court of Appeals for the Third Circuit.

As previously disclosed, on October 29, 2004, two individual shareholders made a demand on the Board of Directors of the Company to take legal action against Mr. Raymond Gilmartin, former Chairman, President and Chief Executive Officer and other individuals for allegedly causing damage to the Company with respect to the allegedly improper marketing of *Vioxx*. In July 2006, the Board received another shareholder letter demanding that the Board take legal action against the Board and management of Merck for allegedly causing damage to the Company relating to the Company's allegedly improper marketing of *Vioxx*. These requests remain under consideration.

As previously announced, the Board of Directors appointed a Special Committee to review the Company's actions prior to its voluntary withdrawal of *Vioxx*, to act for the Board in responding to shareholder litigation matters related to the withdrawal of *Vioxx*, and to advise the Board with respect to any action that should be taken as a result of the review. In

Table of Contents

December 2004, the Special Committee retained the Honorable John S. Martin, Jr. of Debevoise & Plimpton LLP to conduct an independent investigation of senior management's conduct with respect to the cardiovascular safety profile of *Vioxx* during the period *Vioxx* was developed and marketed. The review was completed in the third quarter of 2006 and the full report (including appendices) was made public in September 2006. The Company has provided a copy of the full report and appendices at its website at www.merck.com/newsroom/vioxx/martin_report.html. The Company has included its website address only as an inactive textual reference and does not intend it to be an active link to its website nor does it incorporate by reference the information contained therein.

In addition, as previously disclosed, various putative class actions filed in federal court under the Employee Retirement Income Security Act ("ERISA") against the Company and certain current and former officers and directors (the "*Vioxx* ERISA Lawsuits" and, together with the *Vioxx* Securities Lawsuits and the *Vioxx* Derivative Lawsuits, the "*Vioxx* Shareholder Lawsuits") have been transferred to the Shareholder MDL and consolidated for all purposes. The consolidated complaint asserts claims on behalf of certain of the Company's current and former employees who are participants in certain of the Company's retirement plans for breach of fiduciary duty. The lawsuits make similar allegations to the allegations contained in the *Vioxx* Securities Lawsuits. On October 7, 2005, defendants moved to dismiss the ERISA complaint. On July 11, 2006, Judge Chesler granted in part and denied in part defendants' motion to dismiss.

*International Lawsuits*
As previously disclosed, in addition to the lawsuits discussed above, the Company has been named as a defendant in litigation relating to *Vioxx* in various countries (collectively, the "*Vioxx* Foreign Lawsuits") in Europe as well as Canada, Brazil, Australia, Turkey, and Israel.

*Additional Lawsuits*
Based on media reports and other sources, the Company anticipates that additional *Vioxx* Product Liability Lawsuits, *Vioxx* Shareholder Lawsuits and *Vioxx* Foreign Lawsuits (collectively, the "*Vioxx* Lawsuits") will be filed against it and/or certain of its current and former officers and directors in the future.

*Insurance*
As previously disclosed, the Company has product liability insurance for claims brought in the *Vioxx* Product Liability Lawsuits with stated upper limits of approximately $630 million after deductibles and co-insurance. This insurance provides coverage for legal defense costs and potential damage amounts that have been or will be incurred in connection with the *Vioxx* Product Liability Lawsuits. The Company believes that this insurance coverage extends to additional *Vioxx* Product Liability Lawsuits that may be filed in the future. The Company has Directors and Officers insurance coverage applicable to the *Vioxx* Securities Lawsuits and *Vioxx* Derivative Lawsuits with stated upper limits of approximately $190 million. The Company has fiduciary and other insurance for the *Vioxx* ERISA Lawsuits with stated upper limits of approximately $275 million. Additional insurance coverage for these claims may also be available under upper-level excess policies that provide coverage for a variety of risks. There are disputes with certain insurers about the availability of some or all of this insurance coverage and there are likely to be additional disputes. At this time, the Company believes that its insurance coverage with respect to the *Vioxx* Lawsuits will not be adequate to cover its defense costs and any losses.

As previously disclosed, the Company's upper level excess insurers (which provide excess insurance potentially applicable to all of the *Vioxx* Lawsuits) have commenced an arbitration seeking, among other things, to cancel those policies, to void all of their obligations under those policies and to raise other coverage issues with respect to the *Vioxx* Lawsuits. A second arbitration against one of the Company's upper level excess insurers has also been commenced. Merck intends to contest vigorously the insurers' claims and will attempt to enforce its rights under applicable insurance policies. The amounts actually recovered under the policies discussed in this section may be less than the amounts specified in the preceding paragraph.

*Investigations*
As previously disclosed, in November 2004, the Company was advised by the staff of the SEC that it was commencing an informal inquiry concerning *Vioxx*. On January 28, 2005, the Company announced that it received notice that the SEC issued a formal notice of investigation. Also, the Company has received subpoenas from the U.S. Department of Justice (the "DOJ") requesting information related to the Company's research, marketing and selling activities with respect to *Vioxx* in a federal health care investigation under criminal statutes. In addition, as previously disclosed, investigations are being conducted by local authorities in certain cities in Europe in order to determine whether any criminal charges should be brought concerning *Vioxx*. The Company is cooperating with these governmental entities in their respective investigations (the "*Vioxx* Investigations"). The Company cannot predict the outcome of these inquiries; however, they could result in potential civil and/or criminal dispositions.

- 33 -

Table of Contents

As previously disclosed, the Company has received a number of Civil Investigative Demands ("CID") from a group of Attorneys General from 31 states and the District of Columbia who are investigating whether the Company violated state consumer protection laws when marketing *Vioxx*. The Company is cooperating with the Attorneys General in responding to the CIDs.

*Reserves*
The Company currently anticipates that a number of *Vioxx* Product Liability Lawsuits will be tried in the last quarter of 2006 and throughout 2007. The Company anticipates that the trial in the Oregon securities case will be held in 2007, but the Company cannot predict whether this trial will proceed on schedule or the timing of any of the other *Vioxx* Shareholder Lawsuit trials. The Company believes that it has meritorious defenses to the *Vioxx* Lawsuits and will vigorously defend against them. In view of the inherent difficulty of predicting the outcome of litigation, particularly where there are many claimants and the claimants seek indeterminate damages, the Company is unable to predict the outcome of these matters, and at this time cannot reasonably estimate the possible loss or range of loss with respect to the *Vioxx* Lawsuits. The Company has not established any reserves for any potential liability relating to the *Vioxx* Lawsuits or the *Vioxx* Investigations, including for those cases in which verdicts or judgments have been entered against the Company, and are now in post-verdict proceedings or on appeal. In each of those cases the Company believes it has strong points to raise on appeal and therefore that unfavorable outcomes in such cases are not probable. Unfavorable outcomes in the *Vioxx* Litigation (as defined below) could have a material adverse effect on the Company's financial position, liquidity and results of operations.

Legal defense costs expected to be incurred in connection with a loss contingency are accrued when probable and reasonably estimable. As of December 31, 2005, the Company had established a reserve of $685 million solely for its future legal defense costs related to the *Vioxx* Litigation.

During the first nine months of 2006, the Company spent $325 million in the aggregate in legal defense costs worldwide related to (i) the *Vioxx* Product Liability Lawsuits, (ii) the *Vioxx* Shareholder Lawsuits, (iii) the *Vioxx* Foreign Lawsuits, and (iv) the *Vioxx* Investigations (collectively, the "*Vioxx* Litigation"). In the third quarter, the Company recorded a charge of $598 million to increase the reserve solely for its future legal defense costs related to the *Vioxx* Litigation to $958 million at September 30, 2006. In increasing the reserve, the Company considered the same factors that it considered when it previously established reserves for the *Vioxx* Litigation. Management now believes it has a better estimate of the Company's expenses and can reasonably estimate such costs through 2008. Some of the significant factors considered in the establishment and ongoing review of the reserve for the *Vioxx* legal defense costs were as follows: the actual costs incurred by the Company; the development of the Company's legal defense strategy and structure in light of the scope of the *Vioxx* Litigation; the number of cases being brought against the Company; the costs and outcomes of completed trials and the anticipated timing, progression, and related costs of pre-trial activities and trials in the *Vioxx* Product Liability Lawsuits. Events such as scheduled trials, that are expected to occur throughout 2007 and into 2008, and the inherent inability to predict the ultimate outcomes of such trials, limit the Company's ability to reasonably estimate its legal costs beyond the end of 2008. The Company will continue to monitor its legal defense costs and review the adequacy of the associated reserves and may determine to increase its reserves for legal defense costs at any time in the future if, based upon the factors set forth, it believes it would be appropriate to do so.

**Other Product Liability Litigation**
The Company is a defendant in product liability lawsuits in the United States involving *Fosamax*. As of September 30, 2006, approximately 70 cases have been filed against Merck either in state or federal court, including four cases which seek class action certification, as well as damages and medical monitoring. In these actions, plaintiffs allege, among other things, that they have suffered osteonecrosis of the jaw, generally subsequent to invasive dental procedures such as tooth extraction or dental implants, and/or delayed healing, in association with the use of *Fosamax*. On August 16, 2006, the JPML ordered that the *Fosamax* product liability cases pending in federal courts nationwide should be transferred and consolidated into one multidistrict litigation (the "*Fosamax* MDL") for coordinated pre-trial proceedings. The *Fosamax* MDL has been transferred to Judge John Keenan in the United States District Court for the Southern District of New York. Since the JPML order, over 55 cases have been transferred to Judge Keenan. The Company will defend against these lawsuits.

**Governmental Proceedings**
As previously disclosed, the Company has received a subpoena from the DOJ in connection with its investigation of the Company's marketing and selling activities, including nominal pricing programs and samples. The Company has been advised that the activities being investigated by the DOJ are also the subject of a *qui tam* complaint. As previously disclosed, the Company has received CIDs from the Attorney General of Texas regarding the Company's marketing and selling activities relating to Texas. In April 2004, the Company received a subpoena from the office of the Inspector General for the District of Columbia in connection with an investigation of the Company's interactions with physicians in the District of Columbia, Maryland, and Virginia. In November 2004, the Company received a letter request from the

- 34 -

Table of Contents

DOJ in connection with its investigation of the Company's pricing of *Pepcid*. In September 2005, the Company received a subpoena from the Illinois Attorney General seeking information related to repackaging of prescription drugs.

As previously disclosed, the Company has received a letter from the DOJ advising it of the existence of a *qui tam* complaint alleging that the Company violated certain rules related to its calculations of best price and other federal pricing benchmark calculations, certain of which may affect the Company's Medicaid rebate obligation. The DOJ has informed the Company that it does not intend to intervene in this action and has closed its investigation. The lawsuit continues, however.

The Company is cooperating with all of these investigations. The Company cannot predict the outcome of these investigations; however, it is possible that unfavorable outcomes could have a material adverse effect on the Company's financial position, liquidity and results of operations. In addition, from time to time, other federal, state or foreign regulators or authorities may seek information about practices in the pharmaceutical industry or the Company's business practices in inquiries other than the investigations discussed in this section. It is not feasible to predict the outcome of any such inquiries.

**Patent Litigation**
From time to time, generic manufacturers of pharmaceutical products file ANDAs with the FDA seeking to market generic forms of the Company's products prior to the expiration of relevant patents owned by the Company. Generic pharmaceutical manufacturers have submitted ANDAs to the FDA seeking to market in the United States a generic form of *Fosamax, Prilosec, Nexium, Propecia, Trusopt* and *Cosopt* prior to the expiration of the Company's (and AstraZeneca's in the case of *Prilosec* and *Nexium*) patents concerning these products. The generic companies' ANDAs generally include allegations of non-infringement, invalidity and unenforceability of the patents. Generic manufacturers have received FDA approval to market a generic form of *Prilosec*. The Company has filed patent infringement suits in federal court against companies filing ANDAs for generic alendronate (*Fosamax*), finasteride (*Propecia*), dorzolamide (*Trusopt*) and dorzolamide/timolol (*Cosopt*), and AstraZeneca and the Company have filed patent infringement suits in federal court against companies filing ANDAs for generic omeprazole (*Prilosec*) and esomeprazole (*Nexium*). Similar patent challenges exist in certain foreign jurisdictions. The Company intends to vigorously defend its patents, which it believes are valid, against infringement by generic companies attempting to market products prior to the expiration dates of such patents. As with any litigation, there can be no assurance of the outcomes, which, if adverse, could result in significantly shortened periods of exclusivity for these products.

In June 2006, the Company filed lawsuits against Barr Laboratories, Inc. and Teva Pharmaceutical Industries Ltd. asserting that their respective manufacturing processes for making their alendronate products would infringe one or more process patents of the Company. In September 2006, the International Trade Commission agreed to investigate whether Cipla Ltd. would infringe one or more of Merck's process patents with its proposed supply of generic alendronate to the US market.

In the case of omeprazole, the trial court in the United States rendered an opinion in October 2002 upholding the validity of the Company's and AstraZeneca's patents covering the stabilized formulation of omeprazole and ruling that one defendant's omeprazole product did not infringe those patents. The other three defendants' products were found to infringe the formulation patents. In December 2003, the U.S. Court of Appeals for the Federal Circuit affirmed the decision of the trial court. With respect to the Company's patent infringement claims against certain other generic manufacturers' omeprazole products, the trial concluded in June 2006 and a decision is pending.

**Other Litigation**
On July 27, 2005, Merck was served with a further shareholder derivative suit filed in the New Jersey Superior Court for Hunterdon County against the Company and certain current and former officers and directors. This lawsuit sought to recover or cancel compensation awarded to the Company's executive officers in 2004, and asserts claims for breach of fiduciary duty, waste and unjust enrichment. Plaintiff filed an amended complaint in February 2006. Defendants moved to dismiss plaintiff's amended complaint on April 7, 2006. On July 21, 2006, the Court granted defendants' motion to dismiss based on plaintiff's failure to make pre-suit demand on Merck's Board of Directors and denied plaintiff's request for leave to amend. Plaintiff has filed a notice of appeal with the Appellate Division of the New Jersey Superior Court.

**Environmental Matters**
On June 13, 2006, potassium thiocyanate was accidentally discharged from the Company's plant in West Point, Pennsylvania through the Upper Gwynedd Township Authority's wastewater treatment plant into the Wissahickon Creek, causing a fishkill. Federal and State agencies are investigating the discharge and the Company is currently cooperating with the investigations.

**Table of Contents**

Item 4. Controls and Procedures

Management of the Company, with the participation of its Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures. Based on their evaluation, as of the end of the period covered by this Form 10-Q, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) are effective. There have been no changes in internal control over financial reporting, for the period covered by this report, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, except as indicated below.

During the third quarter of 2006, management of employee payroll data and payroll processing for the Company's Japanese subsidiary was transitioned to new system applications. This change was not initiated in response to any deficiency or weakness in internal controls.

CAUTIONARY FACTORS THAT MAY AFFECT FUTURE RESULTS

This report and other written reports and oral statements made from time to time by the Company may contain so-called "forward-looking statements," all of which are based on management's current expectations and are subject to risks and uncertainties which may cause results to differ materially from those set forth in the statements. One can identify these forward-looking statements by their use of words such as "expects," "plans," "will," "estimates," "forecasts," "projects" and other words of similar meaning. One can also identify them by the fact that they do not relate strictly to historical or current facts. These statements are likely to address the Company's growth strategy, financial results, product development, product approvals, product potential and development programs. One must carefully consider any such statement and should understand that many factors could cause actual results to differ materially from the Company's forward-looking statements. These factors include inaccurate assumptions and a broad variety of other risks and uncertainties, including some that are known and some that are not. No forward-looking statement can be guaranteed and actual future results may vary materially.

The Company does not assume the obligation to update any forward-looking statement. One should carefully evaluate such statements in light of factors, including risk factors, described in the Company's filings with the Securities and Exchange Commission, especially on Forms 10-K, 10-Q and 8-K. In Item 1 of the Company's Annual Report on Form 10-K for the year ended December 31, 2005, as filed on March 13, 2006, the Company discusses in more detail various important factors that could cause actual results to differ from expected or historic results. The Company notes these factors for investors as permitted by the Private Securities Litigation Reform Act of 1995. One should understand that it is not possible to predict or identify all such factors. Consequently, the reader should not consider any such list to be a complete statement of all potential risks or uncertainties.

- 36 -

**Table of Contents**

PART II — Other Information

Item 1. Legal Proceedings

Information with respect to certain legal proceedings is incorporated by reference from Management's Discussion and Analysis of Financial Condition and Results of Operations contained in Part I of this report.

Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

Issuer purchases of equity securities for the three months ended September 30, 2006 were as follows:

### ISSUER PURCHASES OF EQUITY SECURITIES

| | | | ($ in millions) |
| --- | --- | --- | --- |
| Period | Total Number of Shares Purchased[1] | Average Price Paid Per Share | Approximate Dollar Value of Shares That May Yet Be Purchased Under the Plans or Programs[1] |
| July 1 - July 31, 2006 | 2,115,300 | $37.73 | $6,950.0 |
| August 1 - August 31, 2006 | 2,252,200 | $40.73 | $6,858.0 |
| September 1 - September 30, 2006 | 1,917,500 | $41.44 | $6,779.0 |
| Total | 6,285,000 | $39.94 | $6,779.0 |

[1]  All shares purchased during the period were made as part of a plan announced in July 2002 to purchase $10 billion in Merck shares.

Item 6. Exhibits

| Number | Description |
| --- | --- |
| 3.1 | Restated Certificate of Incorporation of Merck & Co., Inc. (October 1, 2004) – Incorporated by reference to Form 10-Q Quarterly Report for the period ended September 30, 2004 |
| 3.2 | By-Laws of Merck & Co., Inc. (as amended effective May 24, 2005) – Incorporated by reference to Current Report on Form 8-K dated May 24, 2005 |
| 10.1 | Merck & Co., Inc. Separation Benefits Plan for Nonunion Employees (amended and restated effective as of July 11, 2006) – Incorporated by reference to Current Report on Form 8-K dated July 11, 2006 |
| 10.2 | Letter Agreement between Merck & Co., Inc. and Per Wold-Olsen, dated July 19, 2006 – Incorporated by reference to Current Report on Form 8-K dated July 28, 2006 |
| 10.3 | Merck & Co., Inc. Deferral Program (amended and restated as of September 28, 2006) – Incorporated by reference to Current Report on Form 8-K dated September 28, 2006 |
| 12 | Computation of Ratios of Earnings to Fixed Charges |
| 31.1 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Executive Officer |
| 31.2 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |

**Table of Contents**

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MERCK & CO., INC.

Date: November 7, 2006                    /s/ Kenneth C. Frazier
                                          KENNETH C. FRAZIER
                                          Executive Vice President and General
                                          Counsel


Date: November 7, 2006                    /s/ John Canan
                                          JOHN CANAN
                                          Vice President, Controller


-38-

**Table of Contents**

EXHIBIT INDEX

| Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of Merck & Co., Inc. (October 1, 2004) – Incorporated by reference to Form 10-Q Quarterly Report for the period ended September 30, 2004 |
| 3.2 | By-Laws of Merck & Co., Inc. (as amended effective May 24, 2005) – Incorporated by reference to Current Report on Form 8-K dated May 24, 2005 |
| 10.1 | Merck & Co., Inc. Separation Benefits Plan for Nonunion Employees (amended and restated effective as of July 11, 2006) – Incorporated by reference to Current Report on Form 8-K dated July 11, 2006 |
| 10.2 | Letter Agreement between Merck & Co., Inc. and Per Wold-Olsen, dated July 19, 2006 – Incorporated by reference to Current Report on Form 8-K dated July 28, 2006 |
| 10.3 | Merck & Co., Inc. Deferral Program (amended and restated as of September 28, 2006) – Incorporated by reference to Current Report on Form 8-K dated September 28, 2006 |
| 12 | Computation of Ratios of Earnings to Fixed Charges |
| 31.1 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Executive Officer |
| 31.2 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |

- 39 -