## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS
LIABILITY LITIGATION

This document relates to:

RALPH GREENLEE, as Personal Representative
of the Estate of THOMAS GREENLEE, and
on behalf of ESTHER GREENLEE, surviving spouse
of THOMAS GREENLEE,

        Plaintiffs,

vs.

MERCK & CO., INC.,

        Defendant.

_____/

MDL No.: 1657

SECTION: L

Civil Action No. 06-CV-8325

JUDGE FALLON
MAG. JUDGE KNOWLES

### AMENDED COMPLAINT

Plaintiff, RALPH GREENLEE, as Personal Representative of the Estate of THOMAS GREENLEE, and on behalf of ESTHER GREENLEE, surviving spouse of THOMAS GREENLEE, sues Defendant, MERCK & CO., INC., and allege as follows:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $50,000.00.

2.    Plaintiff, RALPH GREENLEE, is the son of THOMAS GREENLEE, and is Personal Representative of the Estate of THOMAS GREENLEE (hereafter "Plaintiff") and, at all times material hereto, was a resident of Hillsborough County, Florida. Plaintiff is authorized pursuant to Florida Statute, section 768.20 to bring this wrongful death action against the

 EXHIBIT A

Defendants on behalf of the Estate of THOMAS GREENLEE, and on behalf of ESTHER GREENLEE, the surviving spouse of THOMAS GREENLEE.

3.      On or about October 15, 2006, Plaintiff THOMAS GREENLEE, (hereafter "Decedent"), died as a result of complications of a Vioxx-induced stroke that he suffered on September 13, 2003.

4.      This action arises out of the Defendant's manufacturing, selling, distributing, marketing and/or otherwise promoting Vioxx without proper warnings as to the dangers associated with its use.

5.      The pharmaceutical drug Vioxx, manufactured by MERCK & CO., INC., is defective, dangerous to human health, and unfit and unsuitable to be marketed and sold in commerce.

6.      MERCK & CO., INC. (hereafter referred to as "MERCK") is a New Jersey Corporation with its principal place of business located in Whitehouse Station, New Jersey.

7.      At all times material hereto, MERCK was authorized and did conduct business within the State of Florida and New York.

8.      At all times material, MERCK was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting Vioxx (rofecoxib) for consumer use by prescription. MERCK did develop, manufacture, design, package, market, sell and distribute Vioxx in the States of Florida and New York at all times relevant to this action, but withdrew Vioxx from the market on September 29, 2004.

9.      Vioxx is among a class of pain medication called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

10.     NSAIDs reduce pain and inflammation by blocking the body's production of pain transmission enzymes called cyclooxygenase (COX-1 and COX-2).  COX enzymes trigger the sequential oxidation of various fatty acids to create prostaglandins.  Prostaglandins are important cogs in the physiology of pain, igniting hormone-like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain, and fever.

11.     Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the synthesis of prostaglandins by cells of injured tissue becomes a reasonable target for pain-management drugs.

12.     Traditional NSAIDs like aspirin, ibuprofen, and naproxen inhibit both COX-1 and COX-2 enzymes simultaneously, providing relief from the inflammation and pain, but at the cost of potential adverse gastrointestinal effects.  The prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus which protects the stomach wall from the hydrocholoric acid present in the stomach.  By blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and, as a result, can cause harmful gastrointestinal side effects, including stomach ulcerations and bleeding.

13.     MERCK and other pharmaceutical companies sought to remedy these side effects suffered by some NSAID users by developing "selective" inhibitors, called coxibs, which targeted only COX-2 production; thus (allegedly) allowing for proper maintenance of gastric tissue while still reducing inflammation.  Their development was based on the hypothesis that COX-2 was the source of prostaglandins E2 and I2, which mediate inflammation, and that COX-1 was the source of the same prostaglandins in the stomach lining.  By not inhibiting COX-1, whose products provide cytoprotection in the gastric epithelium, these coxibs were thought to decrease the incidence of gastric side effects when compared to traditional NSAIDs that inhibit

3

both COX-1 and COX-2.

14.     In making this decision, however, MERCK either intentionally ignored and/or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostaglandin I2 levels, the predominant COX-2 product responsible for preventing platelet aggregation and clotting, while leaving thromboxane A2, the potent COX-1 platelet aggregator and vasoconstrictor, unaffected. By selectively inhibiting prostaglandin I2 without similarly suppressing its COX-1 counterpart, Vioxx and other coxibs expose their users to a host of blood clot-related cardiovascular risks, including heart attack, stroke, and unstable angina.

15.     In the late 1980s and early 1990s, MERCK was facing a business crisis because patents on several of its best-selling drugs, including Vasotec, Prinivil, Mevacor, Pepcid, and Prilosec were expiring. Never had a pharmaceutical company faced the loss of so many million dollar patents at the same time. MERCK management even feared that MERCK might not survive as a company.

16.     In or about the summer of 1992, MERCK began a Cox-2 research program at the MERCK Frosst Centre for Therapeutic Research in Quebec, Canada. MERCK scientists explored the hypothesis that the therapeutic utilities of NSAIDs were due to inhibition of Cox-2, whereas much of the gastrointestinal toxicity of traditional NSAIDs were due to the inhibition of Cox-1.

17.     At the time, MERCK management realized that the development of an NSAID that operated by selectively blocking Cox-2 could produce a much-needed "blockbuster" for the company. As the company has acknowledged, the race was on to find a selective inhibitor of Cox-2.

4

18.     During 1992, MERCK became aware that both DuPont and Taisho, a Japanese pharmaceutical company, had selective Cox-2 inhibitors in development. Almost every one of the more than three hundred scientists and support staff at MERCK-Frosst Centre for Therapeutic Research worked on the discovery and development of Vioxx. After discarding one compound because it lacked sufficient selectivity for Cox-2, and another because metabolic studies raised questions of possible drug-to-drug interactions, MERCK continued to research and develop the compound that eventually became known as Vioxx.

19.     On or about December 20, 1994, MERCK filed its first investigational new drug (IND) application with the FDA to conduct clinical trials of Vioxx on humans. The intended use of the drug identified in the IND was the treatment of osteoarthritis and acute pain.

20.     MERCK sought to market Vioxx as an alternative to earlier NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects. As early as November 1996, years before FDA approval of Vioxx in May of 1999, MERCK recognized that unless taken in conjunction with aspirin, Vioxx posed a "substantial risk" of "significantly higher rates" of cardiovascular adverse events such as myocardial infarctions, strokes and transient ischemic attacks because, as a selective Cox-2 inhibitor, it lacked aspirin's "anti-platelet [i.e. anti-clotting] effect".

21.     In fact, early in the development program for Vioxx, to demonstrate that it selectively inhibited Cox-2, MERCK used a platelet aggregation assay to assess the drug's effect on Cox-1. That research established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit Cox-1. In addition, a MERCK-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

5

22.     Two months later, in February of 1997, Vioxx researcher Briggs Morrison conceded that "without Cox-1 inhibition you will get more thrombotic events and kill drug."

23.     Responding to this observation, on February 25, 1997, MERCK's Vice President of Clinical Research, Alise Reicin, complained:

> I hear you! This is a no win situation. The relative risk of [adverse GI events with] even low dose aspirin is 2-4 fold. Yet, the possibility of increased CV [cardiovascular] events of great concern-(I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – ie (sic) those that have already had an MI, CABG, PTCA.? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be would we be able to recruit any patients?

24.     In December of 1997, MERCK appointed a "Task Force" to investigate the incidence of cardiovascular serious adverse events in the ongoing Vioxx clinical trials. The reason for the investigation was the unexpected results of an early clinical trial which showed a decline in the levels of PGI-2, the most potent of all inhibitors of platelet aggregation, but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx. This imbalance triggered a concern over the potential for thrombotic events.

25.     By early 1998, MERCK's own clinical investigators, [based on findings from a MERCK-sponsored study (protocol 023)] advised the company that by inhibiting Cox-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin (a Cox-2 platelet inhibitor that dilates blood vessels) and thromboxane (a Cox-1 platelet activator that constricts blood vessels) such that it would provoke the creation of blood clots.

26.     The Task Force agreed to investigate the incidence of thrombotic events by analyzing the ongoing osteoarthritis (OA) trials. Because the trials were still blinded as to

treatment groups, it could not be determined whether the adverse events in the database had occurred in the Vioxx, placebo or "compared to" drug populations.  Therefore, the Task Force designed a study in which cardiovascular events from all arms of the OA trials would be added together, and the combined group's incidence rate would be compared to placebo patients from trials of other MERCK drugs.  An expedited time frame was established for completion of the analysis, in light of the rush to get Vioxx to market ahead of its competitors.

27.     In January of 1998, the analysis pursuant to the Task Force plan showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by MERCK for comparison.  These results constituted a clear signal of cardiovascular toxicity that should have triggered immediate investigation and concern.  Instead, MERCK made an after-the-fact claim that the placebo comparison group must have had an "atypically low" incidence of cardiovascular events, such that the higher rate in the Vioxx group was downplayed.  MERCK further downplayed this important safety signal by deciding to compare the rate in the Vioxx group to a so-called "background" rate, even though no such comparison was stated in the plan for the study.  MERCK intentionally chose an inappropriate "background" rate for comparison, from a published study of older patients at high risk of cardiovascular disease.  Based upon the result of this comparison, MERCK incorrectly dismissed the signal as of no concern.  MERCK failed to disclose the results of this pre-marketing analysis, and instead has misrepresented that it had no indication of cardiovascular risks before Vioxx was marketed.

28.     MERCK submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets at doses of 12.5 mg and 25 mg, for relief of the signs and

symptoms of osteoarthritis, the management of acute pain, and the treatment of dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

29.     MERCK also submitted a NDA for rofecoxib to the FDA on November 23, 1998, for oral suspension at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted as NDA 21-052 by the FDA.

30.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for the relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

31.     At the time that Vioxx was approved by the FDA, the labeling for rofecoxib (in the section entitled "Special Studies- Upper Endoscopy in Patients with Osteoarthritis") stated "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

32.     The "Warnings" section of the labeling for rofecoxib at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) effects—Risk of GI Ulceration, Bleeding and Perforation."

33.     MERCK submitted a Supplemental New Drug Application ("sNDA") with the goal of establishing a gastrointestinal safety claim for rofecoxib.  In conjunction with the sNDA, MERCK conducted a study known as the VIGOR (VIOXX GI Outcomes Research) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-09 or Naproxen in Patients With

Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was conducted from January 6, 1999, through March 17, 2000.

34.     The objectives of the VIGOR study were to "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking Vioxx 50mg daily compared to patients in the group taking naproxen 1000 mg/day" and to "study the safety and tolerability" of Vioxx in patients with rheumatoid arthritis.

35.     The VIGOR study demonstrated that Vioxx is associated with a lower incidence of serious upper gastrointestinal adverse events of major bleeding, perforation, and obstruction compared to naproxen.

36.     However, the VIGOR study also showed a higher cumulative rate of serious cardiovascular thromboembolic adverse events (such as heart attacks, angina pectoris, and peripheral vascular events) in the Vioxx group compared to the naproxen group.

37.     On or about November 19, 1999, MERCK's senior biostatistician, Deborah Shapiro, provided a tightly controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board ("DSMB"), which showed that almost twice as many serious cardiovascular events were occurring among patients taking Vioxx as among those taking Naproxen.

38.     On or about March of 2000, MERCK released the results of the VIGOR study. The study data revealed, among other things, that Vioxx users suffered five times as many heart attacks than their Naproxen counterparts. In addition, serious cardiovascular events (including ischemic strokes, unstable angina, and sudden unexplained deaths) were reported for more than twice as many Vioxx as Naproxen patients.

39.    Despite the results of the VIGOR study, MERCK failed to include in its Vioxx label a cardiovascular warning that Vioxx was contraindicated in high risk CV patients or to warn physicians of this enhanced risk.

40.    An FDA report, written by Shari L. Targum, M.D., a Project Manager for the FDA's Division of Anti-Inflammatory Drug Products, dated February 1, 2000, states: "By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from MERCK, the sponsor, had become concerned over the "excess deaths and cardiovascular events experienced in Group A [Vioxx] compared to Group B [naproxen]."

41.    On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, former president of MERCK Research Laboratories, concluded that "the CV [cardiovascular] events are clearly there" and stated that MERCK should be prepared to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e. an effect of all of the selective Cox-2 inhibitors and not a risk that was associated only with Vioxx) that is "mechanism based as we worried it was" and as some of the company's consultants had maintained.

42.    MERCK continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian pharmacologist Carlo Patrono, one of MERCK's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom MERCK regarded as "the world's most respected and knowledgeable" scientist in his field), advised MERCK in March of 2000 that the dramatic cardiovascular effects observed in the VIGOR study could not plausibly be attributed to Naproxen for several reasons.

43.    Furthermore, on or about March 24, 2000, University of Pennsylvania pharmacologist Garrett Fitzgerald, then acting as a MERCK consultant, advised MERCK of a scientific paper about to be published that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first nonfatal myocardial infarctions in females in an epidemiological study, providing further notice to MERK that its insistence that Naprosen was cardioprotective was a fallacy.

44.    In June of 2000, in connection with industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which MERCK is a member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did MERCK do nothing to accurately publish these studies, or warn consumers and prescribing doctors, MERCK also denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge from COX-2 Trials,* in August of 2000.

45.    MERCK concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for the success of MERCK as a company. Safety concerns over hypertension, thrombosis, edema, and/or cardiovascular events would have negatively impacted MERCK's positioning in the market as compared to its competitor drug, Vioxx (celecoxib), which had been placed into the market by Pharmacia and Pfizer three months prior to the launch of Vioxx.

46.    MERCK continued to deny the ill health effects associated with Vioxx while at the same time reaping benefits obtained through its non-disclosure and concealment. MERCK engaged in a massive physician and direct-to-consumer advertising and sampling program and gained continued increases in the market share, which enhanced MERCK's financial stability to

11

the detriment of its consumers.   As a result of MERCK's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and garnered approximately a 23% share of the market.

47.     The FDA sent a letter to MERCK dated December 16, 1999, stating that certain Vioxx promotional pieces "are false and misleading because they contain representations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

48.     On June 22, 1999, MERCK contracted with Peter Holt, M.D., to conduct Vioxx promotional audio conferences, using content provided by MERCK, which were to be presented to health care professionals as educational programs.  The conferences (one on June 8, 2000; one on June 13, 2000; one on June 16, 2000, and three on June 21, 2000) were arranged by MERCK, presented on behalf of MERCK, and moderated by MERCK employees.  Some of the content of *these conferences was later found by the FDA to be* "false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and an unapproved dosing regimen."

49.     Further, in it's January 23, 2001, 8-K filing with the Securities and Exchange Commission, MERCK fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

"Our results reflect the strength of our growth strategy," Mr. Gilmartin said.  "Our five key products, Vioxx, Zocor, Cozaar/Hyzaar, Fosamax, and Singular, drove Merck's performance for the year and created a powerful platform for growth."  These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

"Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said.  Vioxx, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain.  Since its extraordinary successful 1999 launch, Vioxx has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine.  In the United States, Vioxx now accounts for approximately 50% of the new prescriptions in the COX-2 class, despite being second to market in this class in

the United States. Vioxx achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR study, in which Vioxx reduced the risk of serious gastrointestinal outcomes research study, in which Vioxx reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that Vioxx significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

50.     In response to the growing public expressions of concern over the cardiovascular safety profile of Vioxx, MERCK issued a press release entitled "MERCK Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001. This press release states that Vioxx has a "favorable cardiovascular safety profile." The FDA would later tell MERCK:

> Your claim in the press release that Vioxx has a "favorable cardiovascular profile" is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group…as in the naproxen treatment group… in the VIGOR study.

51.     Despite admonishments from the FDA for its fraudulent marketing, MERCK continued to increase sales of Vioxx and profits by withholding information from Plaintiffs, prescribing doctors, the consuming public, and the health care industry. For example, in November of 2000, MERCK orchestrated the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

52.     On or about August 29, 2001, the Journal of American Medical Association (JAMA) published a peer reviewed epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, showing that MERCK had concealed the risk of developing a "confirmed

adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in MERCK's clinical trials, including VIGOR.  The study found a statistically increased risk (of the magnitude of a four to five-fold increase) for developing serious cardiovascular events, including heart attacks, in Vioxx users over placebo and naproxen.

53.     In the JAMA study, the authors stated that "by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events."

54.     On September 17, 2001, Thomas W. Abrams, R. Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of MERCK, relating to "promotional activities and materials for the marketing of Vioxx (refecoxib) tablets."

55.     The Warning Letter, MERCK's ***third*** such letter from the FDA concerning Vioxx, stated that MERCK had "engaged in a promotional campaign for Vioxx that *minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.*"  The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

56.     The eight-page Warning Letter outlines, in detail, the conduct of MERCK that supports the FDA's issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions":

The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

> Immediately ceasing all violative promotional activities, and the dissemination of all violative promotional materials for Vioxx.

> Issuing a "Dear Healthcare Provider" letter to correct false or misleading impressions and information. The proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

57.    MERCK knew the warnings contained in the label were ineffective and used its sales force and other marketing efforts to downplay (rather to improve) its communication of the risks posed by Vioxx.  For example, in its 2001 annual report, MERCK states: "The Company also noted that a number of state and federal lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx....these lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events.  The Company believes that these lawsuits are without merit and will vigorously defend them." Sales *representatives were instructed not to discuss cardiovascular risks of Vioxx and were trained to "dodge" physicians' Vioxx-related safety concerns.*

58.     In response to a growing body of evidence of Vioxx's safety problems, MERCK attempted to obfuscate this negative information by authoring and sponsoring reviews that set forth the unsubstantiated claim that naproxen had a cardioprotective effect and therefore accounted for the cardiovascular risks among its Vioxx users.   However, this theory was debunked in January of 2002, by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in *The Lancet*.  The *Lancet* article concluded that there is an absence of a protective effect of naproxen or other non-aspirin, non-steroidal anti-inflammatory drugs on the risk of coronary heart disease.

59.     An article entitled "Why Do Cyclooxygenase-2 Inhibitors Cause Cardiovascular Events?" authored by Dr. Bing, Dr. Lomnicka, and others at the Department of Experimental Cardiology at the Huntington Medical Research Institute was published in the journal *Pharmacology* on February 6, 2002.  The authors explained that a selective Cox-2 inhibitor, such as Vioxx, can promote adverse cardiovascular events by tipping the balance of prostacyclin and thromboxane in favor of thromboxane.  This imbalance promotes both platelet aggregation and vasoconstriction, which can lead to catastrophic cardiovascular events, including stroke, heart attack, and pulmonary embolism.

60.     *In October of 2001*, MERCK learned of the publication of an article stating that there was a higher reporting rate for adverse events relating to renal and cardiovascular effects for Vioxx compared to Vioxx,.  MERCK responded by conducing an internal analysis of reported adverse events for Vioxx and Vioxx.  MERCK's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx in comparison to Vioxx.  Once again, MERCK disregarded yet another signal of cardiovascular toxicity and failed to disclose it to the public.  Instead, MERCK blamed the adverse result on an

alleged discrepancy in the number of events entered into the regulatory database for the two drugs.  As was the case with the Task Force analysis of 1997 and VIGOR study of 2000, MERCK once again searched for and found a reason to exonerate Vioxx and keep it on the market rather than provide accurate information about safety risks to physicians and patients.

61.     In approximately April of 2002, MERCK was required to place cardiovascular warnings on its Vioxx labeling based on the results of the VIGOR study.   In addition, MERCK was required to place new label warnings relaying that Vioxx 50 mg per day is not recommended for chronic use.

62.     An article by Dr. Solomon and others at Harvard Medical School, entitled "Relationship between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults," was published in the April 2004 edition of the journal *Circulation*.  The Harvard authors concluded the following from their study:   "[R]ofecoxib [Vioxx] use was associated with an elevated relative risk of  AMI [acute myocardial infarction] compared with celecoxib [Vioxx] use and no NSAID use.  Dosages of rofecoxib [greater than] 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg."

63.     An article by H.K. Choi in the May 2004 edition of the *American Journal of Medicine*, entitled "Effects of Rofecoxib and Naproxen on Life Expectancy Among Patients with Rheumatoid Arthritis: A Decision Analysis," concludes the following:  "Our analysis suggests a longer life expectancy with naproxen than rofecoxib [Vioxx] ....except those at low risk for myocardial infarction or at a high risk for gastrointestinal toxicity."

64.     David Graham, M.D., an employee of the Food & Drug Administration, made a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs" at the 20th International Conference

17

on Pharmacoepidemiology and Therapeutic Risk Management, held from August 22-25, 2004, in Bordeaux, France.  The data for the presentation was taken from a study done by Kaiser Permanente under a contract funded by the FDA, and concluded that Vioxx taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300% in those enrolled in the Kaiser Permanente study.

65.   On August 26, 2004, Peter Kim, President of MERCK Research Laboratories, issued a press release stating the following: "MERCK strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international meeting this week . . . . MERCK stands behind the efficacy and safety, including cardiovascular safety of Vioxx."

66.   On September 27, 2004, MERCK informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as the APPROVe study, had recommended that the study be stopped early for safety reasons.

67.   The APPROVe study was not intended to be a cardiovascular risk assessment study.   It was commissioned by MERCK to look at the effect of Vioxx on people at risk for developing recurrent colon polyps.

68.   The APPROVe study demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study.  Defendant Merck has falsely claimed that the APPROVe data only showed an increased risk for people taking Vioxx for more than 18 months.   Merck's claim has since been discredited.

69.   MERCK representatives informed the FDA in a September 28, 2004, meeting that MERCK would withdraw Vioxx from the United States market.

70.     MERCK and the FDA each announced the withdrawal of Vioxx from the United States market on September 30, 2004. MERCK also announced worldwide withdrawal on the same day.

71.     An FDA analysis, based on data from the Kaiser Permanente study, projects that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Vioxx, another Cox II inhibitor, been used instead of Vioxx.

72.     Approximately 20 million people in the United States took Vioxx between its introduction in 1999 and its withdrawal in 2004, and, during this time period, MERCK engaged in a common scheme in marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as Plaintiffs.

73.     At all times relevant to this litigation, MERCK enjoyed a significant market share based upon false claims of Vioxx's efficacy, safety, and superiority which resulted a result of the actions of Defendants, including a very aggressive marketing program which included financial incentives to sales teams, the hiring of 700 new sales representatives, significant payments and other benefits to high-prescribing physicians, and a massive direct-to-consumer advertising and physician sampling program.  MERCK encouraged the prescription and use of Vioxx through aggressive marketing campaigns, including detailing of physicians by Defendants and others as well as direct-to-consumer advertising.  As such, Defendants had a duty not only to provide Plaintiff THOMAS GREENLEE's prescribing physician with adequate warnings but also to provide Plaintiffs with adequate warnings regarding Vioxx and the safety risks associated with ingestion of the drug.

74.     In an elaborate and sophisticated manner, MERCK aggressively marketed Vioxx directly to consumers and medical professionals (including physicians and leading medical

19

scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Vioxx on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from MERCK's successful advertising and marketing blitz, third party payors were compelled to add Vioxx to their formularies. MERCK's marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Vioxx.

75.    MERCK knew of the cardiovascular risks before the U.S. Food and Drug Administration (the "FDA") approved Vioxx for sale, but they ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Vioxx. MERCK's omission, suppression, and concealment of this important information enabled Vioxx to be sold to, and purchased, or paid for by the consumers at a grossly inflated price.

76.    Because MERCK engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Vioxx as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Vioxx, MERCK was able to justify pricing Vioxx significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had MERCK disclosed the truth about Vioxx, MERCK would not and could not have reaped the billions of dollars in Vioxx sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

77.    MERCK intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Vioxx from Plaintiffs, the public, the medical community, and

others. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Vioxx, and prevented Plaintiffs from obtaining all the material information that would be important to his decision as a reasonable person to purchase, pay for, and/or use Vioxx.

78.     MERCK's systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiffs to purchase, pay for, and/or use Vioxx; and caused Plaintiffs losses and damages as asserted herein.

79.     Had MERCK performed adequate testing prior to approval and "market launch," the scientific data would have revealed significant increases in stroke and myocardial infarctions amongst the intended population of Vioxx consumers. Adequate testing would have shown that Vioxx possessed serious side effects. MERCK should have taken appropriate measures to ensure that their defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings that accurately and fully reflected the scope and severity of adverse effects associated with Vioxx.

80.     In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but MERCK intentionally suppressed this information in order for them to gain significant profits from continued Vioxx sales.

81.     MERCK's failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for MERCK and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

82.     At the time that MERCK manufactured, advertised, and distributed VIOXX to consumers including Plaintiffs, MERCK intentionally or recklessly ignored and/or withheld

information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because MERCK knew that if such increased risks were adequately disclosed, consumers would not purchase Vioxx, but instead would purchase other cheaper and safer NSAID drugs.

83.     Defendants misrepresented the safety and effectiveness of Vioxx to prescribing physicians, Plaintiffs, scientific journals, and the consuming public, and concealed or understated the dangerous side effects associated with ingestion of Vioxx.  Defendants also engaged in such aggressive, improper, and dishonest promotion to certain physicians such that the prescribing physicians were no longer able to make independent decisions as a learned intermediary on behalf of their patients.

84.     As a proximate result of Decedent's untimely death caused by the tortious acts of Defendants and the defective condition of Defendants' prescription drug Vioxx that was ingested by Thomas Greenlee, Plaintiff ESTHER GREENLEE, individually, as the surviving spouse of Decedent, has suffered loss of Decedent's companionship, society, services, and protection since October 15, 2006, and will continue to suffer the loss of companionship, society, services, consortium, and protection that Plaintiff ESTHER GREENLEE could have reasonably expected to receive from Decedent during Decedent's lifetime had he lived.  In addition, Plaintiff ESTHER GREENLEE has also endured mental pain and suffering and will continue to endure such mental pain, suffering, and anguish for the rest of her lifetime.

85.     In addition, as a direct and legal result of the tortious acts of Defendants and the defective condition of Defendants' prescription drug Vioxx that was ingested by Thomas Greenlee, Plaintiff RALPH GREENLEE, as Personal Representative on behalf of the Estate of Thomas Greenlee, has incurred medical expenses, funeral expenses, loss of net accumulations, and other damages and losses due to Decedent's wrongful death.

## COUNT I

### STRICT LIABILITY

Plaintiffs adopt by reference all of the General Allegations contained in Paragraphs 1 through 85 above, each inclusive, as though fully set forth herein, pursuant to Rule 1.130(b), Florida Rules of Civil Procedure.

86.     The Vioxx ingested by Plaintiff THOMAS GREENLEE was defective and unreasonably dangerous when it left the possession of the MERCK in that:

a.      When placed in the stream of commerce, Vioxx contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting Plaintiff THOMAS GREENLEE to risks which exceeded the benefits of the drug;

b.      When placed in the stream of commerce, Vioxx was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with Plaintiff THOMAS GREENLEE's ailment;

c.      Vioxx contained insufficient warnings to alert Plaintiffs, consumers, and prescribing physicians of severe and life threatening complications and side effects including, but not limited to arterial thrombus;

d.      There was misleading advertising and promotion concerning the benefits of using Vioxx;

e.      There were inadequate post-marketing warnings or instructions for Vioxx because, after MERCK knew or should have known of the significant risks associated with the use of Vioxx, MERCK failed to provide adequate warnings to Plaintiffs, consumers, and prescribing physicians, and continued to aggressively promote and advertise direct-to-consumers the sale and use of Vioxx; and

f.      The Vioxx ingested by Plaintiff THOMAS GREENLEE had not been materially altered or modified prior to use.

87.     Plaintiff THOMAS GREENLEE used the drug for its intended purpose of pain management.

88.    MERCK, as a manufacturer of a prescription drug, is held to the level of knowledge of an expert in the field.

89.    Plaintiff THOMAS GREENLEE's prescribing physician did not have substantially the same knowledge as MERCK, or that would have been gleaned from an adequate warning from MERCK.

90.    The warnings that were given by MERCK to prescribing physicians, consumers, and Plaintiff THOMAS GREENLEE were not accurate, clear, and/or unambiguous.

91.    MERCK had a continuing duty to warn THOMAS GREENLEE, consumers and prescribing physicians of the dangerous risks and reactions associated with Vioxx.

92.    Plaintiff THOMAS GREENLEE could not have discovered any defect in the product through the exercise of care.

93.    As a direct and proximate result of THOMAS GREENLEE'S ingestion of Vioxx, Mr. Greenlee died on October 15, 2006, as a result of complications of a Vioxx-induced stroke that he suffered on September 13, 2003.   Plaintiff, RALPH GREENLEE, on behalf of Decedent's estate and his survivors, seeks all damages allowed under the law.

WHEREFORE, Plaintiffs demand judgment against MERCK for damages, as well as costs of this action and a trial by jury of all issues to be tried.

## COUNT II

### NEGLIGENCE

Plaintiffs adopt by reference all the General Allegations contained in Paragraphs 1 through 85 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

94.    At all times material hereto, Defendants had a duty to Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, assembling, packaging, distribution and sale of Vioxx.

95.    Defendants were negligent in its actions, misrepresentations, and omissions toward Plaintiffs and Plaintiff THOMAS GREENLEE's prescribing physician in the following ways:

a.    They failed to include adequate warnings with the drug that would have alerted consumers and physicians to the potential risks and serious side effects of Vioxx;

b.    Failed to adequately and properly test Vioxx before placing the drug on the market;

c.    Failed to provide adequate post-marketing warnings or instructions after the Defendants knew of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

d.    Failed to adequately warn Plaintiffs that Vioxx should not be used by patients with any risk factors for these adverse effects such as family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease;

e.    Failed to adequately disclose and warn Plaintiffs that Plaintiff THOMAS GREENLEE undertook the risk of adverse events and death by ingesting Vioxx; and

f.    Failed to adequately and timely inform the health care industry of the risks of serious personal injury and death resulting from Vioxx ingestion as described therein.

96.    Defendants knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects of which Plaintiffs were unaware.   Defendants nevertheless aggressively advertised, marketed, sold and distributed Vioxx knowing that there were safer products and options for treatment of pain due to inflammation.

97.    As a direct and proximate result of Thomas Greenlee's ingestion of Vioxx, Mr. Greenlee died on October 15, 2006, as a result of complications of a Vioxx-induced stroke that he suffered on September 13, 2003.  Plaintiff, RALPH GREENLEE, on behalf of Decedent's estate and his survivors, seeks all damages allowed under the law.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as costs of this action and a trial by jury of all issues to be tried.

COUNT III

NEGLIGENT MISREPRESENTATION

Plaintiffs adopt by reference all of the General Allegations contained Paragraphs 1 through 85 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

98.    Defendants negligently misrepresented to Plaintiff THOMAS GREENLEE's and his prescribing physician the safety and effectiveness of Vioxx and/or negligently misrepresented material information regarding Vioxx and/or negligently misrepresented adverse information regarding the safety and effectiveness of the drug Vioxx.

99.    Defendants negligent misrepresentations were communicated to Plaintiff THOMAS GREENLEE's prescribing physician with the intent that they reach the Plaintiff, and that the effect of such representations would be that prescriptions would be written for Vioxx for the consuming public, including Plaintiff THOMAS GREENLEE.

100.    Defendants misrepresented safety information regarding Vioxx with the intention and specific desire that Plaintiffs, Plaintiff THOMAS GREENLEE's prescribing physician, other dispensing entities, and the consuming public would rely on such information in selecting, requesting, or prescribing treatment.

26

101.    Defendants misrepresented material, adverse information regarding the safety and effectiveness of Vioxx.

102.    Defendants made these misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that Vioxx had defects, dangers, and characteristics that were other than what the Defendants had represented to prescribing doctors, other dispensing entities, the FDA and the consuming public, including the Plaintiff herein.

103.    The misrepresentations of the Defendants were perpetuated directly and/or indirectly by the Defendants' employees, agents and/or other detail persons.

104.    The misrepresentations of the Defendants constitute a continuing tort.

105.    Through the Vioxx product inserts, advertising, detailing, promotional materials, and aggressive marketing, Defendants continued to misrepresent the potential risks and benefits associated with Vioxx both before and after Plaintiff THOMAS GREENLEE's ingestion of the drug.

106.    Defendants had a post-sale duty to warn Plaintiffs, the consuming public, and prescribing physicians about the potential risks and complications associated with Vioxx in a timely manner.

107.    Defendants misrepresented the safety and efficacy of Vioxx in their labeling, advertising, product inserts, promotional materials, or other marketing efforts.

108.    Plaintiff THOMAS GREENLEE, his prescribing physician, and other dispensing entities justifiably relied on and/or were induced by the misrepresentations of Defendants to Plaintiffs' detriment.

109.    As a direct and proximate result of Thomas Greenlee's ingestion of Vioxx, Mr. Greenlee died on October 15, 2006, as a result of complications of a Vioxx-induced stroke that he suffered on September 13, 2003.  Plaintiff, RALPH GREENLEE, on behalf of Decedent's estate and his survivors, seeks all damages allowed under the law.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

## COUNT IV

### FRAUD

Plaintiffs adopt by reference all of the General Allegations contained Paragraphs 1 through 85 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

110.    Defendants fraudulently or intentionally misrepresented to Plaintiff THOMAS GREENLEE and his prescribing physician the safety and effectiveness of Vioxx and/or fraudulently or intentionally concealed material information regarding the drug and/or fraudulently or intentionally misrepresented adverse information regarding the safety and effectiveness of Vioxx.

111.    Defendants fraudulent or intentional misrepresentations were communicated to Plaintiff THOMAS GREENLEE's prescribing physician with the intent that they reach the Plaintiff.

112.    Defendants knew that their representations were false.

113.    Defendants made the fraudulent or intentional misrepresentations and/or actively concealed information about the risks and efficacy of Vioxx with the intention and specific desire that the Plaintiffs, the Plaintiff THOMAS GREENLEE's prescribing physician, dispensing

entities and the consuming public would rely on such false information in selecting treatment for pain and inflammation.

114.     Defendants intentionally concealed material, adverse information regarding the safety and effectiveness of their products.

115.     Defendants made these fraudulent or intentional misrepresentations and actively concealed adverse information at a time when the Defendants knew that Vioxx had defects, dangers, and characteristics that were other than what the Defendants had represented to the prescribing doctors or other dispensing entities, the FDA and the consuming public, including the Plaintiff herein.  Specifically, the Defendants fraudulently or intentionally misrepresented to and/or actively concealed from Plaintiffs, Plaintiff THOMAS GREENLEE's prescribing physician, other dispensing entities, the FDA and the consuming public the following adverse information regarding the Vioxx ingested by the Plaintiff:

  a.     Failed to advise Plaintiffs, Plaintiff THOMAS GREENLEE's prescribing physician, and others that Vioxx carried risks of serious adverse effects;

  b.     Failed to advise Plaintiff, Plaintiff THOMAS GREENLEE's prescribing physician, and others that there were serious risks of thrombotic events associated with Vioxx, and, instead, Defendants aggressively marketed, promoted, advertised directly to consumers, and/or sold Vioxx as if there was no risk; and

  c.     Failed to advise Plaintiffs, Plaintiff THOMAS GREENLEE's prescribing physician, and others that prior studies, research, reports and/or testing had been conducted linking Vioxx to serious adverse actions.

116.     The fraudulent or intentional misrepresentations and/or active concealment by the Defendants were perpetuated directly and/or indirectly by the Defendant and their employees, agents and/or other detail persons.

117.     The fraudulent or intentional misrepresentations and/or concealment by the Defendants constitute a continuing tort.

118.    Through the Defendants' product insert, advertising, detailing, promotional materials, and aggressive marketing efforts, Defendants continued to fraudulently or intentionally misrepresent the potential risks associated with Vioxx.

119.    Defendants had a post-sale duty to warn Plaintiffs, consumers, and prescribing physicians of the risks of Vioxx in their labeling, advertising, product inserts, promotional materials, detailing, and other marketing efforts.

120.    Defendants fraudulently or intentionally misrepresented the safety and efficacy of Vioxx in their labeling, advertising, product insert, promotional materials, detailing, or other marketing efforts.

121.    Plaintiffs, Plaintiff THOMAS GREENLEE's prescribing physician, and other dispensing entities justifiably relied on and/or were induced by the fraudulent or intentional misrepresentations and/or active concealment of Defendants to Plaintiffs' detriment.

122.    As a direct and proximate result of Thomas Greenlee's ingestion of Vioxx, Mr. Greenlee died on October 15, 2006, as a result of complications of a Vioxx-induced stroke that he suffered on September 13, 2003.  Plaintiff, RALPH GREENLEE, on behalf of Decedent's estate and his survivors, seeks all damages allowed under the law.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

**JURY TRIAL DEMANDED ON ALL ISSUES**

Dated this 16th day of Jan, , 2006.

By: ___/s/ Brenda S. Fulmer_____
         BRENDA S. FULMER, Esq.
         Fla. Bar No. 999891
         ALLEY, CLARK, GREIWE & FULMER
         701 E. Washington Street
         P.O. Box 3127
         Tampa, FL 33601-3127
         Tele: (813) 222-0977
         Fax: (813) 224-0373
         *bfulmer@tampatriallawyers.com*
         Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Plaintiff's Unopposed Motion to Amend Complaint has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 16th day of Jan. , 2006.

By: ___/s/ Brenda S. Fulmer_____
         BRENDA S. FULMER, Esq.
         Fla. Bar No. 999891
         ALLEY, CLARK, GREIWE & FULMER
         701 E. Washington Street
         P.O. Box 3127
         Tampa, FL 33601-3127
         Tele: (813) 222-0977
         Fax: (813) 224-0373
         Attorneys for Plaintiff
         *bfulmer@tampatriallawyers.com*

## SERVICE LIST

**Wilfred P. Coronato, Esq.**
Hughes, Hubbard & Reed, LLP
101 Hudson Street, Suite 3601
Jersey City, NJ 07302-3918
Tele: (201) 946-5700
Fax: (201) 536-0799
*Email: Coronato@hugheshubbard.com*

**Phillip A. Wittmann, Esquire**
Stone, Pigman, Walther, Wittmann, LLC
546 Carondelet St.
New Orleans, LA 71030
Tele: (504) 581-3200
Fax: (504) 581-3361
*Email: pwittmann@stonepigman.com*
Defendant's Liaison Counsel

**Aretha Delight Davis, Esquire**
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
Tele: (215) 994-2423
Fax: (215) 994-2222
*Email: Aretha.davis@dechert.com*

**Susan Giamportone, Esq.**
Womble, Carlyle, Sandridge & Rice
2530 Meridian Parkway, Suite 400
Durham, NC 27713
Tele: (919) 316-4243
Fax: (919) 484-2061
*Email: SGiamportone@wcsr.com*

**Barbara Bolton Litten, Esquire**
**Patricia E. Lowry, Esquire**
**John B.T. Murray, Jr., Esquire**
**Dori K. Stibolt, Esquire**
Squire, Sanders & Dempsey
1900 Phillips Point West
777 S. Flagler Drive
West Palm Beach, FL 33401
Tele: (561) 650-7200

Fax: (561) 655-1509
Email: *blitten@ssd.com*
Email: *plowry@ssd.com*
Email: *jbmurray@ssd.com*
Email: *dstibolt@ssd.com*
Local Counsel for Merck

**Russ Herman, Esquire**
Herman, Herman, Katz & Cotlar, LLP
201 St. Charles Ave., Suite 4310
New Orleans, LA 70170
Tele: (504) 581-4892
Fax: (504) 561-6024
Email: *VIOXX@hhkc.com*
Plaintiff's Liaison Counsel