**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In Re:  VIOXX | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| *This document relates to ALL MEDICAL* **MONITORING COMPLAINTS** | JUDGE FALLON<br>MAG. JUDGE KNOWLES |

**THE PSC'S RESPONSE IN OPPOSITION TO MERCK'S MOTION**
**TO STRIKE CLASS ACTION ALLEGATIONS IN PLAINTIFF'S**
**MEDICAL MONITORING MASTER CLASS ACTION COMPLAINT**

I.      **INTRODUCTION**

PTO 16 was filed on June 2, 2005.  That order (as amended) governs pleading and motions

practice regarding class actions in this MDL.  Consistent with that order, Plaintiffs filed their

Medical Monitoring Master Class Action Complaint on August 2, 2005.  Defendant Merck & Co.,

Inc., rather than answer that complaint, filed a motion to dismiss.[1]  Merck argued that the complaint

failed to state a cause of action for most jurisdictions and in those states where Merck's arguments

were untenable, it argued that plaintiffs failed to plead with sufficient specificity.  Briefing on

Merck's motion was completed on December 8, 2005.  The motion remains pending.

Ordinarily, Fed.R.Civ.P. 12(f) restricts the filing of motions to strike to the 20 day period

following the service of any pleading.  However, PTO 16, ¶IV (D),  provided that Merck could file

a motion to strike allegations "at any time."  For reasons known only to Merck, after waiting 17

---

[1]In contrast, Merck answered the PSC's Master Class Action Complaint re: Personal
Injury and Wrongful Death.  Briefing on the merits of class certification occurred in the Fall of
2005 and on November 22, 2006, this Court ruled that the standards for certifying a national
personal injury class action had not been satisfied.  *In re Vioxx Products Liability Litigation*, 239
F.R.D. 450 (E.D.La. 2006).  The court deferred ruling on whether individual state classes could
be certified.

months since the filing of its motion to dismiss the entire complaint, it has chosen now to assert that only the class allegations of the Medical Monitoring Master Class Action Complaint should be stricken.  This motion is oddly staged given the pendency of Merck's motion to dismiss.  More importantly, given the materiality of the class allegations to the claims asserted, the motion is bereft of any virtue.   It is a classic example of placing the cart before the horse.

The most current scientific findings, including results from Merck's APPROVe follow-up study adduced through discovery, confirm that Vioxx users are at a significantly increased risk of cardiovascular injury, even after cessation of their drug use.  Coupled with the ongoing potential for harm from undiagnosed heart attacks, Vioxx users are in substantial need of medical monitoring, a classic form of injunctive relief that lends itself to class treatment.  Medical monitoring lends itself to the class action procedure because few claimants without a present physical injury could afford or obtain legal representation on a medical monitoring claim without the ability to aggregate claims using the class device.  Given these factual circumstances and the legal standard applicable to Merck's motion, the motion should be denied.

## II.   FACTUAL BACKGROUND

There is no legitimate doubt that Vioxx is cardiotoxic.  By a vote of 32 to 0, an Advisory Committee ("AC") to the U.S. Food and Drug Administration ("FDA") determined that Vioxx significantly increases the risk of serious cardiovascular events.  Merck's own press release on September 30, 2004, stated that Vioxx was withdrawn because the APPROVe study showed a doubling of the risk of heart attacks and strokes.  A consensus exists that Vioxx causes harm to the cardiovascular system.  Discovery in the underlying Vioxx litigation to date has demonstrated that risk of cardiovascular harm caused by Vioxx, and discovery is similarly essential before the Court

2

rules on the merits of the medical monitoring claim.

There are two primary grounds for medical monitoring of patients who used Vioxx.  First, as set forth in Plaintiffs' Master Amended Complaint (¶ 143) unrecognized myocardial infarctions ("UMIs") constitute a substantial risk to Vioxx users.  Thus, successful detection of unrecognized MI provides clinical benefit to the patient by triggering appropriate treatment to reduce risk factors, thereby lowering the risk of further MIs.  (*Id.*, at ¶¶ 145-149).  Peer-reviewed studies have estimated that Vioxx caused tens of thousands of excess heart attacks; discovery will show that about 40% of all MIs are unrecognized by the patient or doctor.  (Bertolet, "Unrecognized Myocardial Infarction," *Cardiovascular Clinician*, 1989, Ch. 8 at 180).  These figures make clear that literally thousands of victims of Vioxx-induced MI do not know that the MI occurred, and they will therefore remain unable to obtain treatment appropriate to their medical status, unless the prior MI is detected through medical screening.

A second basis for medical monitoring is the substantial and growing body of scientific research which supports the conclusion that Vioxx promotes atherosclerosis, the main cause of heart attacks and other cardiovascular events.  Such persistent effects of Vioxx increase the risk of future heart attacks and strokes, which can be reduced through screening and appropriate treatment.

Chronic and latent effects of Vioxx are supported by Merck's own research.  Discovery would show that, in May 2006, Merck released the results of the APPROVe Extension Study, which followed patients for a year or more after they discontinued taking Vioxx in the basic APPROVe study.  According to Merck's own report to the FDA, a statistically significant increased risk of MI (31 v. 15 events, $p = 0.017$) and ischemic stroke (17 v. 6 events, $p = 0.024$) among Vioxx patients compared to placebo, including events that occurred while on Vioxx and after discontinuation.

During the off-drug period alone, there were 28 thrombotic events among Vioxx users v. 16 among placebo patients, Relative Risk = 1.64 (a 64% higher risk), p = 0.11.  Merck claims that there is no post-drug risk, but the data referenced above have been interpreted to indicate a likely persistent, harmful effect on the cardiovascular system after discontinuing Vioxx use, by highly respected academics not affiliated with Vioxx litigation.  Such analysts include two members of the FDA AC that considered and voted on Vioxx risks in 2005 (Drs. Nissen and Furberg):

(a)    Steven Nissen, M.D., in reviewing the Extension data cited above, stated, "You have to look at the big picture.  The big picture is that the hazard stays the same." (Wall Street Journal, 5/12/06, p. A16).  Dr. Nissen further stated, "Merck misrepresented the results of this study." (AP Press Release, 5/12/06).  The 64 percent higher risk in the extension study "has rather important scientific implications, because it suggests that there was some kind of permanent or longstanding injury to the artery that makes it susceptible to these kinds of continuing events. (*New York Times*, May 13, 2006; emphasis added).

(b)    According to Curt Furberg, M.D., a member of the U.S. FDA Drug Safety and Risk Management Safety Committee, "It may be that Vioxx is causing permanent damage to the cardiovascular system, accelerating atherosclerosis or a sustained increase in blood pressure." Reuters, May 18, 2006.  Dr. Furberg stated, "for a while we assumed Vioxx caused temporary problems, and here it is more than that," referring to the occurrence of 7 strokes and 2 "mini strokes" or TIAs in the Vioxx group after discontinuing treatment, compared with no such incidents in the placebo group during one year off-drug.  (*Id.*; emphasis added).

(c)    Bruce Psaty, M.D., a distinguished cardiologist from University of Washington who testified before Congress on the risks of COX-2 inhibitors, stated that the 64%

higher overall event rate among Vioxx patients after discontinuing the drug was "closer to a persistent finding than not." (*New York Times*, May 13, 2006).

Scientific evidence supporting Vioxx' promotion of atherogenesis was set forth at length in the testimony of Douglas Zipes, M.D., during the *Barnett v. Merck* MDL trial in August 2006.[2] (*See* Tr., 8/8/06 at 1686-92). Dr. Zipes' expert report of May 22, 2006 (pp. 36-42) summarized the literature on this subject. Dr. Zipes' report and trial testimony noted that only two studies have analyzed post-discontinuation event rates (APPROVe and Alzheimer's), and that both reported higher event rates for Vioxx patients than for the placebo group. These results support the risk of long-term effects and the propriety of medical monitoring. Merck strongly disagreed with plaintiffs' positions in the *Barnett* case, but the verdict indicates that Dr. Zipes' testimony was accepted by the jury. At minimum, the evidence on long-term, post-Vioxx risk is sufficiently substantive to refute Merck's view that a medical monitoring claim can be determined on a motion to strike.

Additional research on Vioxx as a cause of atherosclerosis continues to be published. For example, a 2007 article reported results of animal studies showing blood vessel damage with rofecoxib and celecoxib, but not with naproxen or controls, which "supports the hypothesis that Cox-2 selective inhibitors promote the initiation of atherosclerosis." Metzner, *The Effects of COX-2 Selective and NonSelective NSAIDs on the Initiation and Progression of Atherosclerosis in ApoE-/- Mice*, J Mol Med 2007; DOI 10.1007/s00109-007-0162-9, at 10.

The PSC submits that these references support the conclusion that substantial factual issues

---

[2]Dr. Zipes quoted an authoritative article by Grosser and FitzGerald, which stated, "A substantial body of evidence has accumulated that one mechanism, suppression of COX-2-dependent prostacyclin formation . . . can both augment the response to thrombotic and hypertensive stimuli . . . and accelerate atherogenesis." (Barnett Trial Tr., 8/8/06 at 1692:24-20).

exist as to the merits of the medical monitoring claim, which cannot be properly ruled upon on a motion to strike.  Instead, the issues should be considered after discovery has been conducted on the merits of a properly framed motion for class certification.

## III.   ARGUMENT

### A.   Motions to Strike Are Disfavored and Routinely Denied Absent a Showing of Prejudice by the Moving Party

The Fifth Circuit has adopted a very antagonistic approach to motions to strike.  In *Augustus v. Board of Public Instruction*, 306 F.2d 862, 868 (5th Cir. 1962), the court incorporated the Sixth Circuit's standard on motions to strike as its own:

> As well said by the Sixth Circuit: "Partly because of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used by the courts. * * * It is a drastic remedy to be resorted to only when required for the purpose of justice. * * * The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 6 Cir., 1953, 201 F.2d 819, 822.

The Fifth Circuit in *Augustus* went further and held that questions of fact are beyond the reach of a motion to strike.  *Id.*  *Augustus* also held that without a showing of prejudice by the moving party substantial questions of law or fact should not be decided on a motion to strike.  *Id.*  When such attacks are raised, *Augustus* held that the district court "should defer action on the motion and leave the sufficiency of the allegations for determination on the merits."  *Id.*

In *Global ADR, Inc. v. City of Hammond,* 2003 WL 21146696, at *1 (E.D.La. May 15, 2003), Judge Engelhardt ruled that "the granting of a Rule 12(f) motion is within the discretion of the court."  But the court's discretion is informed by the delay such motions cause and the paradigm interest of the court in addressing the merits of the dispute.  In light of the stringent standard

6

imposed upon such motions, courts only strike pleadings if "the challenged allegations are prejudicial to the defendant or immaterial to the lawsuit." *Alton Ochsner Medical Foundation v. Servicemaster Home Health Care Services, Inc.*, 2002 WL 553499, *1 (E.D.La. 2002)(Zainey, J.). It is the moving party's burden to "show that the challenged allegations have no possible bearing upon the subject matter of the litigation." *Id*.

This announced standard has serious ramifications  for the instant motion as questions involving the class allegations, like the determination of class certification, involve mixed questions of law and fact. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)("Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry"); *In re Initial Public Offering Securities Litigation*, 471 F.3d 24, 40 (2d Cir. 2006)("the ultimate issue as to each requirement [of Rule 23], is really a mixed question of law and fact."). Under *Augustus*, the sufficiency of the factual underpinnings to the class allegations can not be addressed on a motion to strike and should be deferred until a ruling on the merits.  Moreover, as Merck's motion is silent on the subject of any prejudice that it will suffer if the allegations are retained, it has utterly failed to satisfy its burden.

Instead, Merck seeks to shift its burden onto the plaintiffs.  It argues that its motion should be granted purportedly because medical monitoring class actions are not certifiable and that no discovery is likely to produce substantiation of plaintiffs' allegations.  Merck Brf. at 5-6.  *Contra In re Diet Drugs Products Liability Litigation (Jeffers),* 1999 WL 673066 (E.D.Pa. 1999) (certifying a nationwide class action for medical monitoring in a pharmaceutical case)[hereafter "Jeffers"]; discussion *supra* at 2-6 (addressing findings derived through discovery that support Plaintiffs' medical monitoring allegations).  Even under Merck's Ninth Circuit authority, all that is required

of plaintiffs' complaint to overcome a motion to strike is a prima facie showing or indicia that discovery could substantiate the class allegations. *See Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985).[3] *See also In re Phenylpropanolamine (PPA) Products Liability Litigation*, 208 F.R.D. 625, 629 n. 2 (W.D.Wash. 2002)(court did not employ a Rule 12 standard but instead ruled on the merits of class certification after the plaintiffs declined to engage in discovery and directly briefed the merits of class certification under Rule 23). Plaintiffs have met this burden. Here, there is no doubt that Vioxx is a dangerous substance that increases the risk of cardiovascular events warranting diagnostic surveillance for those asymptomatic persons that used the drug. Indeed, discovery has borne out that a latent risk of injury exists that directly bears on the materiality of plaintiffs' class allegations. Even under the inopposite standard spelled out by *Mantolete*, the motion to strike can not be granted as discovery can, in fact, substantiate plaintiffs' claims.

## B.      Plaintiffs' Class Allegations Seeking A National Medical Monitoring Class Action Have Prima Facie Support

Merck's motion to strike memorandum reads like an opposition to a motion for class certification that Plaintiffs have not yet made, and that this Court's case management orders do not

---

[3]Merck also relies upon *General Telephone Co. v. Falcon*, 457 U.S. 147 (1982). That case did not involve a motion to strike and only addressed the general standards applicable to the determination of a Rule 23 motion for class certification. For purposes of the present motion, the case is inapposite.

Merck's reliance on *Thompson v. Merck & Co., Inc.*, 2004 WL 62710 (E.D.Pa. 2004), is similarly misplaced. In that employment discrimination case, Merck moved to strike the class allegations in four companion cases filed by the same counsel to a related case in which the district court denied a motion for class certification on the merits. Employing the identical reasoning for denying class certification in the one adjudicated case, the court struck the class allegations in the four companion cases as an administrative matter. This ruling actually supports plaintiffs' contention that this Court must first reach the substantive merits of the class allegations and that a motion to strike is inappropriate without such a substantive determination following full briefing on a motion for class certification.

yet call for.  The motion to strike is a preemptive strike against the fulsome consideration and developed evidentiary record that Fed. R. Civ. P. 23 requires, and the Manual for Complex Litigation recommends.  This preemptive strike presumes contours of medical monitoring without benefit of this Court's anticipated ruling on the motion to dismiss the Medical Monitoring Master Class Action Complaint, and which, as the previous section of this Opposition demonstrates, does not take into account the medical and scientific developments that have occurred since that complaint was filed.  *See* discussion *supra* at 2-6.  While these developments may call for an amendment of the Master Complaint to conform the factual predicate of class certification to this new and highly material evidence, they negate any justification for a motion to strike.

While Merck's memorandum purports to be a comprehensive treatment of medical monitoring jurisprudence—indeed, it would have to be, to serve as straight-faced support for the categorical obliteration of medical monitoring class actions which Defendant contends—tellingly, it neither mentions important opinions in which medical monitoring class certification was granted by federal judges in other MDL proceedings (including the *Diet Drugs*, *Telectronics*, and *Albuterol* MDLs) but likewise fails to cite important appellate decisions, including opinions by the United States and California Supreme Courts, which make it clear that there are no categorical bars in class action jurisprudence, either with respect to medical monitoring claims in particular, or product liability/mass tort claims in general.

In short, both procedurally and substantively, a motion to strike cannot, consonant with due process, fairness, or practical case management, substitute for the class certification discovery, briefing, hearing, and decision process that prevailing interpretation of the procedural requirements of Rule 23 requires.  Accordingly, this opposition brief should not, and does not, constitute a fully

developed brief in support of Plaintiffs' as-yet-to-be-filed motion for class certification. Should this Court wish to accelerate its consideration of medical monitoring class certification, we respectfully request that the Court meet with counsel, and establish a meaningful briefing and hearing schedule on this important issue.

Merck's stated rationale for its extreme posturing of a motion to strike on Plaintiffs' medical monitoring class allegations is, essentially, that all federal courts have rejected medical monitoring class certification, and this Court must therefore do the same. Such a position is palpably false. It fails to account for the fact that several respected MDL transferee judges have certified nationwide and multi-state medical monitoring claims, each accompanied by choice of law analyses, and have found such certification to be eminently manageable. Three such recent examples should suffice, at this stage, to disprove Merck's premise.

In *In Re: Copley Pharmaceutical, Inc. "Albuterol" Products Liability Litigation*, (MDL 1013), 161 F.R.D. 456 (D. Wyoming), Transferee Judge Brimmer denied Defendant's motion to decertify the class in that products liability/medical monitoring MDL, carefully considering, and ultimately rejecting, the same *Rhone Poulenc* derived arguments Merck makes here. In *Albuterol*, the MDL Transferee Court's thorough decision rejecting Defendants' decertification motion and affirming the certification of medical monitoring claims included a comprehensive class trial plan, which called for a bench trial on the equitable remedy of medical monitoring, and the Court's determination of the relevant state's laws in fashioning the remedy. *Id.*, 161 F.R.D. at 468-469. The *Albuterol* litigation was settled 40 days into the classwide trial of common issues.

In *In Re Telectronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation*, (MDL 1057), 172 F.R.D. 271 (S.D. Ohio 1997), Transferee Judge Spiegel utilized

subclasses to address state law differences with respect to the medical monitoring claim, and certified a medical monitoring class under Rule 23(b)(3).  *Id*. at 284-287.  Subsequent events bore out Judge Spiegel's assessment that the class treatment of medical monitoring claims was helpful and manageable in the litigation.  His lengthy decision recounting events in the *Telectronics* MDL, culminating in the court-approved class action settlement of that litigation, included observations about the key role the medical monitoring claim played at the summary jury trial, and in assisting the parties to assess the strengths and weaknesses of their claims for trial and settlement.  *See In Re Telectronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation*, 137 F.Supp.2d 985, 994 (S.D. Ohio 2001).

In *Diet Drugs*, the MDL Transferee Court was well aware of differences in the states' medical monitoring laws, and also of the state-wide class certification of a number of diet drugs medical monitoring class actions, including class certifications by state courts in West Virginia, New Jersey, Texas, Pennsylvania, and Washington.  Indeed, the pendency of trial on the medical monitoring class claims in the New Jersey State Court demonstrated "Plaintiffs' willingness and ability to litigate their claims should negotiations fail", and constituted substantial "leverage" satisfying the *Amchem* criteria for class action settlements, as the MDL Transferee Court observed in its decision granting class action settlement approval, *In Re:  Diet Drugs Products Liability Litigation (Brown),* 2000 WL 1222042, *5 (E.D.Pa. 2000).  In the pre-settlement context of the *Diet Drugs* litigation, when the parties were preparing for trial and medical monitoring class certification was sought for trial purposes, the Transferee Court certified such claims, recognizing the distinction between those states that required a manifest physical injury as a prerequisite to the medical monitoring claim, and the majority of states, which (like New Jersey, California, and many other

11

populous states) do not.  Rather than crafting a comprehensive medical monitoring class/subclass structure, as the *Telectronics* court had done, *see* 172 F.R.D. at 284-287, the *Diet Drugs* court addressed the variance of state law not by selecting a single law to apply to the entire class, but by granting conditional certification, requiring additional briefing, and anticipating  "that it will create a number of subclasses based upon the variance of both medical monitoring law and variances in the underlying claims of strict liability, negligence and breach of warranty.  Further, to the extent that a different legal standard may apply to certain members of the class, the fact finder at trial could make alternate findings in accordance with those standards.  Thus, the court finds that the variance in state law does not render the class claims non-cohesive." *Jeffers,* 1999 WL 673066 at *17.

It is clear from the context of cases such as *Jeffers, Albuterol*, and *Telectronics*, as well as from the pendency of recently-reinstated medical monitoring claims for a nationwide (or, alternatively, a New Jersey statewide) class in the New Jersey *Vioxx* proceedings' *Sinclair v. Merck* case, that a fulsome exploration and analysis of choice of law, class and subclass structure, and trial plans for certification and adjudication with the equitable medical monitoring claim are an entitlement of both sides (whether Defendant wishes to waive it or not), a requirement of due process, and an opportunity and a case management for this Court, which should not be foreclosed or given short shrift via a motion to strike.

We need look no farther than the United States Supreme Court for a refutation of Merck's premise that the categorical denial of any class treatment (nationwide or statewide, with or without subclasses) of a medical monitoring claim is a foregone legal conclusion, irrespective of the particular circumstances of this case, the facts adduced through discovery, or the current state of the medicine and science, and that it may thus permissibly be barred via a motion to strike.  In its

landmark *Amchem Products, Inc. v. Windsor* decision, which Merck does not cite, the same Supreme Court that set strict standards for the settlement of mass tort and product liability class actions was likewise careful to state that there could be no categorical bar to the class treatment of such actions. "But the text of the rule does not categorically exclude mass tort cases from class certification . . . ." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997). "Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Id*. The common cause here is ingestion of only one substance: Vioxx. The circumstances giving rise to the need for, efficacy of, and manageability of a medical monitoring remedy are entitled to be explored via discovery, briefing, and hearing attuned to Rule 23's procedural guidelines, rather than a motion to dismiss.

At the appointed time, Plaintiffs will move for certification of a nationwide medical monitoring class and present a choice of law analysis that enables the Court to employ its discretion to certify the claims of Vioxx consumers under a single state's law, that of New Jersey or, in the alternative, permit individual state class actions. There are three New Jersey decisions that are crucial to this process, none of which Merck cites, two of which are being appealed by Merck, and all of which predestine Merck's motion to strike for denial as premature.

The first, *Rowe v. Hoffmann-LaRoche, Inc.,* 383 N.J. Super. 442, 892 A.2d 694 (N.J. App. 2006), applies New Jersey's choice of law doctrine in a pharmaceutical failure-to-warn case.[4]  In *Rowe*, a Michigan resident claimed injuries from Accutane, manufactured by Hoffmann-LaRoche in New Jersey. Hoffmann-LaRoche obtained summary judgment under Michigan Law, which

---

[4] Rowe is currently on appeal to the New Jersey Supreme Court and was submitted following oral argument on January 3, 2007.

immunized manufacturers from liability on FDA-approved warnings.  On appeal, the court applied New Jersey law under New Jersey's governmental interest analysis choice of law rule, and reversed the judgment, enabling plaintiff to proceed under New Jersey law.  *Id.*, 892 A.2d at 701.  *Rowe* concluded that the quality of New Jersey's contacts in the case, combined with its strong governmental interest in deterring the manufacture of unsafe products within its borders, substantially outweighed the countervailing Michigan contacts and interests.  *Rowe* determined that defendants' conduct "with respect to the Accutane warning occurred largely in New Jersey," *Id.*, 892 A.2d at 703, where Accutane was manufactured, "whereas the injury, which could have occurred anywhere in the world, occurred in Michigan."  *Id.* at 704.  Application of all <u>Restatement</u> and New Jersey choice-of-law factors culminated, in a fact scenario directly analogous to that of Merck and Vioxx here, in the application of New Jersey law.  *Id.* at 704-708.

The *Rowe* decision was reinforced by the second New Jersey case that Merck avoids, and one that involves Merck and Vioxx, *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, 384 N.J. Super. 275, 894 A.2d 1136 (N.J. App. 2006), which Plaintiffs have previously brought to this Court's attention, and which affirmed Judge Higbee's certification, under New Jersey choice of law and substantive law, of a nationwide class of Vioxx third party payors.

*Local #68* is on appeal to the New Jersey Supreme Court, and oral argument was heard on Monday, March 19, 2007.  Together, *Local #68* and *Rowe* demonstrate the propriety of applying New Jersey consumer and products liability law to Vioxx purchasers and users nationwide, and *Local #68*, if affirmed, would likewise support the class certification of a nationwide medical monitoring class under New Jersey law.  Plaintiffs thus anticipate asking this Court to consider, in

14

the context of a full-fledged Rule 23 motion, the nationwide certification of a medical monitoring

class under New Jersey law, should the third action in the New Jersey trilogy ignored by Merck,

*Sinclair v. Merck & Co., Inc.*, 913 A.2d 832 (N.J. App.  2007), which recognizes a potential claim

for Vioxx users under New Jersey medical monitoring law, likewise withstand Merck's current

challenge.

Merck's procedural foray is particularly inappropriate given the New Jersey courts' recent

recognition that a medical monitoring claim cannot be categorically barred in connection with the

Vioxx litigation.  In *Sinclair, supra*, Judge Higbee's decision dismissing the *Sinclair* class action's

medical monitoring claims was reversed, for precisely the reason that Merck's motion to strike must

be denied here.  As the *Sinclair* appellate decision observes:

> Here, we are faced with bare pleadings, and having rejected the
> bright-line basis for decision advocated by Merck, we lack a factual
> foundation for making a determination as to what, if any, relief is
> reasonable and necessary in the circumstances . . . .  We thus decline
> to affirm the trial court at this stage and remand the matter for
> discovery and an evidentiary hearing that can supply a foundation for
> a determination, as a matter of law, as to the availability of
> compensation for medical surveillance.  A sufficient evidential
> foundation must be developed so that the factors deemed significant
> in <u>Ayers</u>, together with other factors specifically relevant to
> Plaintiffs' claims, can be reasonably evaluated.

*Sinclair*, 913 A.2d at 842.

Merck has petitioned the New Jersey Supreme Court for review of the *Sinclair* decision, and

that petition is pending.  Any further action on the class treatment of medical monitoring claims,

either here or in the New Jersey proceedings themselves, should await this outcome, as it will impact

the choice of law determination that this Court must make, in the context of class certification

briefing and disposition, as well as the appropriate class structure.

15

Plaintiffs here intend to utilize *Rowe, Local #68,* and *Sinclair* (once all three are final) as the foundation of the Rule 23 motion to certify a nationwide medical monitoring class under New Jersey choice-of-law principles and the application of a single state's law, thus facilitating the fulfillment of applicable Rule 23 requirements.

Should New Jersey fail to uphold a medical monitoring claim in the pharmaceutical context (the issue presented for review in *Sinclair*) Plaintiffs will seek the certification of stand-alone statewide classes – not subclasses – for each state whose substantive law recognizes medical monitoring as a claim or remedy.  This structure eliminates the complications with which the Transferee Courts contended (successfully) in *Albuterol, Telectronics,* and *Diet Drugs* by recognizing that the Transferee Courts, given their familiarity with the local forum law, will be more facile in their application of that law if any of the state-wide classes are certified by this Court and remanded for further proceedings and trial.

While prudence thus dictates awaiting the New Jersey Supreme Court's rulings in *Rowe* and *Local #68*, and its decision whether to review *Sinclair*, before framing the Rule 23 motion on medical monitoring claims in this Court, we need not await the outcome of *Sinclair* to demonstrate the invalidity of Merck's motion to strike premise:  that the class treatment of medical monitoring claims, under either federal jurisprudence or any state's law, can be categorically barred.  The California Supreme Court, for example, recently spoke to this very issue, in *Lockheed Martin Corp. v. Superior Court,* 29 Cal.4th 1096 (2003), a case affirming the reversal of a grant of class certification in a toxic pollution case involving decades of exposure to a wide array of toxic chemicals.  *Lockheed* presented medical monitoring and class certification issues far more complicated than the relatively straightforward Vioxx litigation, in which one manufacturer's

16

prescription drug is involved, and the fact and level of ingestion of the risk-enhancing product may be readily determined. In *Lockheed*, the issues of whether, when, and in what amounts the class members were exposed to the toxins at issue persuaded the court not to grant class treatment in that case. At the same time, however, the California Supreme Court flatly rejected Defendants' argument that such issues rendered medical monitoring claims legally incapable of class treatment under California law. As *Lockheed* concludes "in sum, no per se or categorical bar exists to a court's finding medical monitoring claims appropriate for class treatment, so long as any individual issues the claims present are manageable. Accordingly, we shall review the certification ruling before us in light of the established standards for class certification generally." *Lockheed*, 29 Cal. 4th at 1105-1106.

The Sixth Circuit reached a similar conclusion in *Sutton v. St. Jude Medical, S.C., Inc.,* 419 F.3d 568 (6th Cir. 2005). Defendant contended that a proposed class of cardiac implant surgery patients lacked standing to assert claims for the imposition of a medical monitoring fund to be used to send notice to implantees of the potential harm of the device; to conduct periodic medical examinations, studies, and tests; to educate physicians about the diagnosis and treatment of scarring that could result from utilizing the device; and to fund medical treatment to remove the device from implantees. In short, plaintiffs sought a broad array of medical monitoring relief, without demonstration that the class members had already manifested injury from the device.

Defendant claimed lack of standing, on grounds that, as a matter of law, such claims were not cognizable. In response, the Sixth Circuit's *Sutton* decision reviewed a comprehensive body of caselaw and legal commentary on medical monitoring (including such cases as Merck cites in its motion), together with other important medical monitoring decisions which Merck *does not* cite

17

herein, for example, the landmark *Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984), a decision authored by then-circuit judge Kenneth Starr.  Defendants in *Sutton* did not simply ignore *Friends For All Children* and other authorities, as Merck does herein, but more forthrightly attempted to distinguish them, a position the *Sutton* court nonetheless rejected: "nor do we see fit to deny standing to Sutton and other class members because of any differences between exposure to toxins and implantation of purportedly beneficial medical devices.  A defective medical device imbedded in an individual's body can pose just as serious a threat as exposure to toxic substances.  Indeed, such devices may be even more dangerous given the fact that an individual with such an implant will continuously be exposed to its increased risks." *Sutton*, 419 F.3d at 572.

The same can be said with respect to a pharmaceutical drug, such as Vioxx, which is ingested continuously for substantial periods of time, and which may cause injury at a later time (or undetected injury during its period of use).  The *Sutton* court was similarly unimpressed with attempts to distinguish among jurisdictions or decisions that categorize medical monitoring as a cause of action, or as damages.  Such differences in tort taxonomy do not create barriers to standing, or to classwide relief.  *Sutton* viewed medical monitoring in purely functional terms: "we note that medical monitoring is more properly considered one of a number of possible remedies to an underlying tort, rather than a separately actionable tort." *Id*.  One can argue whether the *Sutton* court's description of medical monitoring is entirely correct, and that is precisely the point here.  Unless and until the particular circumstances surrounding the claim are explored in the action asserting them, categorical rulings such as Merck seeks in its strike motion are bound to produce error.

*Vioxx* is not a generic medical monitoring case.  It is not *PPA*, or *Baycol*, or other cases cited by Merck, in which medical monitoring class certification was denied; it is also not necessarily *Diet Drugs*, or *Telectronics*, *Albuterol*, or any of the other cases Merck failed to cite, in which medical monitoring class certification was granted.  The parties can, and should be allowed a full opportunity to, argue which of these cases presents the better analogy.  Moreover, class certification motions are not won or lost by analogy or by reference to purported trends in favor of, or against, the class certification of a particular category of claims.  *See Amchem, supra*.  Instead, they must be based on a full consideration of the undisputed and disputed facts, as these bear on each of the Rule 23 requirements, or due process is not satisfied.

As the Second Circuit recently concluded in *Initial Public Offering, supra,* a district judge may decide the class certification issue only after making determinations as to whether each of the Rule 23 requirements has been met, and "such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met . . . ."  *Id*., 471 F.3d at  41.  As *Initial Public Offering* demonstrates, such cannot be done on the basis of the pleadings alone.  If Plaintiffs may not properly obtain class certification based upon their pleadings only, likewise class certification may not be denied without any evaluation of the relevant scientific and medical facts, as they exist in the present, as they bear upon each of Rule 23's requirements, and as they serve to reinforce, or dismantle, analogies to and applicability of other cases that other class certification decisions that the parties may argue support their positions.  In short, an incomplete roster of medical monitoring class certification decisions by other courts cannot serve as the basis

19

of a preemptive strike against class certification before a motion has even been made, or a hearing been set.

The *Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004) ("*Manual*") includes a detailed and nuanced discussion of the timing of the certification decision, the precertification discovery that may be appropriate, and the care that the court must take to obtain the information, briefing, and argument "necessary to permit an informed ruling on the class certification motion." *Manual*, § 21.133. The *Manual*'s § 21.21 specifically addresses the class certification hearing, observing that "an evidentiary hearing may be necessary in a challenge to the factual basis for a class action." While "disputed facts material to deciding certification may be narrowed or eliminated by stipulations, requests for admission, affidavits, or declarations", no such declarations, *id.*, have been adduced here. After such a hearing, of course "the court should enter findings of fact and conclusions of law addressing each of the applicable standards of Rule 23." *Id.*

In short, while the *Manual* takes care to note an array of procedural and evidentiary options for the court to consider, in its discretion, the *Manual*'s discussion as a whole underscores the importance of discovery, information, evidence, and a case-specific factual and legal inquiry if the class certification decision is to be informed, practical, and fair. Merck's motion to strike attempts an end run around all of these procedural necessities and safeguards, in favor of a categorical bar on medical monitoring class actions that controlling jurisprudence rejects. Accordingly, Merck's motion must be denied. It has been brought under the wrong rule, for the wrong reasons, at the wrong time, under the particular factual allegations, legal issues, and procedural posture that exists in the Vioxx litigation itself.

20

**C.      Plaintiffs' Class Allegations Seeking State-wide Medical Monitoring
         Class Actions Have Prima Facie Support**

In the Response in opposition to Merck & Co., Inc.'s motion to dismiss Plaintiffs' Medical

Monitoring Master Class Action Complaint, the PSC proved that the various states in which

plaintiffs seek individual state-wide class certification (as an alternative to certification of a national

class) recognize claims for medical monitoring.   Federal courts that have been confronted with a

factual pattern justifying medical monitoring have afforded the remedy to plaintiffs.[5]   Only a few

state courts have declined to recognize the claim or restricted the claim to those already physically

injured.  In an era where exposures to proven hazardous man-made substances are common and their

latent injuries detectable, and sometimes preventable, providing the remedy of diagnostic

surveillance to address these wrongs makes sense.  Being sensitive to these circumstances, numerous

state judiciaries have readily provided such a remedy often in familiar terms that echo earlier

decisions affording the right to seek medical monitoring, even for exposure to pharmaceutical drugs.

*See, e.g., In re: West Virginia Rezulin Litig.*, 585 S.E. 2d 52 (W.Va. 2003); *Petito v. A.H. Robbins

Co., Inc.*, 750 S.2d 103, 106 (Fla. App.  2000); *Redland Soccer Club, Inc. v. Department of the

Army*, 696 A.2d 137, 145-46 (Pa. 1997); *Sinclair v. Merck & Co., Inc.*, *supra*; *Burns v. Jaquays

Mining Corp.*, 752 P.2d 28 (Ariz. App. 1987); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970

(Utah 1993).  Merck disputes the essential holdings of these cases, which is the subject of its earlier

motion.

---

[5]Federal courts sitting in diversity have frequently predicted the decisions of state high
courts on the subject of medical monitoring.  *See Friends for All Children v. Lockheed Aircraft
Corp.*, 746 F.2d 816 (D.C.Cir. 1984)(Judges Starr, Bork and Mikva made *Erie* prediction of D.C.
law); *In re Paoli Railroad PCB Litig.*, 916 F.2d 829 (3d Cir. 1990)(Judge Becker made *Erie*
prediction of Pennsylvania law), *cert. denied,* 499 U.S. 961 (1991); *Bocook v. Ashland Oil, Inc.*,
819 F.Supp. 530 (S.D.W.Va. 1993)(Judge Staker made *Erie* prediction of Kentucky law).

Merck made five (5) principle arguments in its earlier motion to dismiss the medical monitoring claims:

1)      New Jersey's choice of law analysis would not lead to the uniform application of New Jersey law in a manner sufficient to permit certification of a national class under that uniform law;

2)      Following Judge Higbee's erroneously decided opinion in *Sinclair v. Merck & Co., Inc.*, 2005 WL 1278364, at *1 (N.J. Super. May 19, 2005)(Higbee, J.), *rev'd*,   913 A.2d 832 (N.J. App.  2007), for those states whose appellate courts have already accepted medical monitoring, Merck contends that medical monitoring claims are limited only to industrial chemicals (environmental exposures) and require that the plaintiffs must manifest an actual injury in a direct exposure case;

3)      States in which neither the legislature nor the courts have addressed the viability of a medical monitoring claim, would refuse to recognize monitoring claims;

4)      States that are predisposed to recognize medical monitoring claims because certain inferior courts have already recognized the claims, would nevertheless reject the claim; and

5)      In those states whose Supreme Courts have already rejected the above arguments, plaintiffs failed to plead with specificity the dose and duration of their Vioxx use.

The PSC responded to each of these arguments with cogent reasons why they were attenuated, incorrect and insufficient to dismiss any of the claims asserted in the Master Complaint. In particular, Plaintiffs explained why Judge Higbee's opinion in *Sinclair* was unfounded (indeed, it has since been reversed) and that medical monitoring is permitted for claims involving asymptomatic injuries from direct exposure to pharmaceutical chemicals. *See generally, In re: West Virginia Rezulin Litig.*, *supra*.  The PSC further explained that because courts are inclined to do equity, the intrinsic fairness of a medical monitoring claim would be recognized in those jurisdictions requiring an *Erie* prediction.

In this motion, Merck practically "doubles-down" its stake by arguing that the class allegations must be stricken because the proposed statewide medical monitoring class actions are

22

not certifiable.  Empirical evidence proves otherwise.  Numerous courts have certified state-wide class actions for medical monitoring in situations just like this case, involving exposure to medications.  *See, e.g., In re Pennsylvania Diet Drugs Litigation*, 1999 WL 962583 (Pa.Com.Pl. 1999) (certifying statewide medical monitoring class); *Lewis v. Bayer AG*, 2004 WL 1146692 (Pa.Com.Pl. 2004) (certifying a statewide medical monitoring class); *Earthman v. American Home Products*, No. 97-10-0390-CV (Dist. Ct. Texas, Oct. 14, 1998) (same); *St. John, et al. v. American Home Products*, No. 97-2-06368-4 (Wash. 1998) (same); *Vadino v. American Home Products*, MDL-L0425-98 (N.J.Super. 1998) (same); *Burch v. American Home Products Corp*., Civil Action No. 97-C-204(1-11)(W.Va.Cir.Ct. 1999) (same); *Rhyne v. American Home Products Corp*., No. 98 Ch 04099 (Ill.Cir.Ct. 1999) (same); *In re New York Diet Drugs Litigation*, No. 70000198 (N.Y.Sup. Ct. 1999) (same); *Lamping v. American Home Products, Inc*., No. Dv-97-85786 (Dist. Ct. Montana 2000) (same); *Scott v. American Tobacco Co.*, 725 So.2d 10 (La.App., 4th Cir. 1998) (affirming certification of statewide medical monitoring class).[6]  *See also Lockheed Martin*, 63 P.3d at 1111 ("the Court of Appeal erred to the extent it stated or implied that no action in which plaintiffs seek medical monitoring as a remedy may ever appropriately be certified for class treatment ...").   Each of these opinions disprove Merck's principal argument that medical monitoring cases are incapable of meeting Rule 23's standards.  This authority also lends prima facie support to the propriety of a medical monitoring class being certified.  Given this support, the class allegations should <u>not</u> be stricken.

---

[6]The opinions in *Earthman, St. John, Vadino, Burch, Rhyne, In re New York Diet Drugs Litigation*, and *Lamping*, were all previously provided to the Court as exhibits to the PSC's response in opposition to Merck's motion to dismiss the Medical Monitoring Master Complaint.

Absent a factual record it is improper to delve much further into Merck's motion. *See Augustus*, 306 F.2d at 868. At this early pleading stage, plaintiffs are loath to engage in a merits-oriented analysis of the Rule 23 criteria applicable to such classes. Nevertheless, even a cursory response to Merck's arguments reveals that the much contested nature of the factual and legal matters applicable to class certification warrant denial of the instant motion. Suffice it to say, the above authority proves that Merck's observation that "state and federal courts around the country – including this Court – have uniformly rejected medical monitoring classes in similar circumstances," is not accurate. Merck Brf. at 1-3. Merck fails to reference even a single state court opinion for this proposition[7] and completely ignores the litigated, nation-wide medical monitoring class certified by Judge Bechtle on behalf of the 6 million persons that ingested American Home Products' diet drugs. *Jeffers, supra.*

These opinions stand in marked contrast to Merck's arguments that 1) predominating common issues are not present in state-wide medical monitoring class actions, or that plaintiffs will be incapable of establishing certain common elements of medical monitoring claims, *i.e.,* 2)

---

[7]Merck only references opinions of federal courts confronted with nationwide class actions to speak for state courts confronted with only state-wide class actions. *See* Merck Brf. at 1-3, *citing*, *In re Propulsid, supra*; *In re Prempro Products Liability Litigation*, 230 F.R.D. 555, 570 (E.D.Ark. 2005); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262 (S.D.Fla. 2003); *In re St. Jude Med., Inc.,* 425 F.3d 1116 (8th Cir. 2005); *Sanders v. Johnson & Johnson,* 2006 WL 1541033 (D.N.J. 2006); *In re Baycol Products Liability Litigation*, 218 F.R.D. 197 (D. Minn. 2003); *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002); *Lewallan v. Medtronic USA*, 2002 WL 31300899 (N.D.Cal. 2002). Obviously, Merck's analysis has missed its mark.

exposure, 3) increased risk, and 4) whether the proposed monitoring regime differs from that ordinarily required.[8]  Each of these arguments are addressed below.

### 1.      Common Issues Easily Predominate in State-wide Medical Monitoring Class Actions

A class action limited to the confines of one particular jurisdiction can not suffer from the maladies that afflicted the prominent class actions that are frequently referenced to defeat certification of national class actions.  By definition, a state-wide class will employ only one state's laws to the class.  None of the variations of multiple state laws will exist to make the jury instruction overly complicated or unmanageable, as was found in virtually every case relied upon by Merck. *See e.g., Castano v. The American Tobacco Co.*, 84 F.3d 734, 741-44 (5th Cir. 1996)(variations in state law can defeat predominance and manageability of nation-wide class); *In re Propulsid Products Liability Litigation*, 208 F.R.D. 133, 146 (E.D.La. 2002)(same).  *See also* footnote 7, *supra*.  Absent this impediment, the largest anti-predominance hurdle is easily cleared.

Once beyond the variance of state law issue, the court's predominance focus will be directed towards the overarching elements of the medical monitoring claim.  Courts that have reached the merits have found that the elements of the medical monitoring claims present predominating common questions.  For example, the *Jeffers* case involved the certification of a nation-wide class

---

[8] Merck presents "proof of injury" as a fourth element that plaintiffs can not prove.  This is a false argument.  The Master Complaint does not assert claims in those jurisdictions where medical monitoring is only available for plaintiffs claiming to have already sustained a physical injury.  Those jurisdictions, Alabama, Kentucky, Louisiana, Nevada and Virginia, were segregated from the others and those claims are separately addressed in the Master Class Action Complaint – Personal Injury and Wrongful Death.  To the extent Merck is arguing that all the other jurisdictions require this element in plaintiffs' claims, that issue of law is already the subject of Merck's motion to dismiss.  Under *Augustus*, the issue is not appropriately addressed in a motion to strike.

of users of diet drugs made by American Home Products ("AHP").  After a rigorous analysis of the

Rule 23 criteria, Judge Bechtle concluded that a Rule 23(b)(2) class was cohesive and warranted

"based on Plaintiffs' allegations that AHP acted in such a way as to create liability to the class as a

whole." *Jeffers*, 1999 WL 673066 at *10. [9]  Like Merck's argument addressing the components of

an individual, personal injury  plaintiff's failure to warn claim,  Merck Brf. at 17, AHP contended

that individual issues prevailed over the common issues:

> The primary individual issues AHP raises include: (1) differences in
> the class members' duration of, amounts of and combinations of the
> drugs ingested; (2) AHP's varying knowledge of alleged side effects
> and the changing contents of warning labels over the times of
> ingestion; (3) differences in the prescribing physicians' knowledge,
> conditions and warnings under which the drugs were prescribed; (4)
> differences in class members' actual need for the form of monitoring
> requested; (5) differences among class members involving pre-
> existing injuries or non-Diet Drug related conditions that already
> require the monitoring requested; and (6) differences in affirmative
> defenses available to AHP against individual class members. (AHP
> Mem. Opp. at 68.) AHP believes that these issues will present
> grounds for it to challenge, on an individual basis, either liability or
> the need for the equitable relief requested and that class treatment

---

[9]Cohesion is Rule 23(b)(2)'s sister to Rule 23(b)(3)'s predominance requirement.  The two are very similar, if not synonymous. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 - 12 (5th Cir. 1998); *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998), *cert. denied* 526 U.S. 1114 (1999).

Judge Bechtle was well aware of Barnes's cohesion requirements when he ruled that the *Diet Drugs* national medical monitoring class could be certified.  The court distinguished the tobacco addiction cases, like those Merck relies upon here, by recognizing the more manageable factual situation uniquely presented by the pharmaceutical case before him. *Compare Jeffers* at *12 ("there are only two related chemical compounds, fenfluramine and dexfenfluramine, which were sold as only two brands, Pondimin and Redux, which Plaintiffs allege cause the illnesses for which they request monitoring. . . . there are no claims of addiction in the Jeffers action as there were in Barnes. The court finds that the claims of the proposed Jeffers class are far more cohesive claims than those found in Barnes.") *with Barnes, supra* (Determination of addiction created individual issues that impaired cohesive nature of class).

would prevent AHP from having the opportunity to make such challenges.

*Id*. at \*11.  After expressing initial concern about these issues, the court nevertheless rejected the defendant's arguments.  Judge Bechtle stated: " the court is presently of the view that these difficulties are not insurmountable and could be dealt with through either the development of subclasses or through exclusions to the class."  *Id.*  Because the remedy in a medical monitoring claim is a surveillance program funded by the defendant which is not dependent on determinations of individual causation of any injury, nor calculation of compensatory damages, the sorts of defenses (including affirmative defenses) presented by AHP in *Jeffers*, and by Merck in this case, are not "insurmountable".

For example, Merck's argument regarding the culpable conduct element of a medical monitoring claim is misguided.  Merck contends that plaintiffs have asserted culpability only under a failure to warn theory.  Merck Brf. at 15.   However, the Medical Monitoring Master Class Complaint ¶172 expresses numerous facets by which to measure Merck's culpable conduct, be it marketing, testing or warning.  As Merck has already acknowledged, medical monitoring requires some underlying legal theory but it is not inextricably linked to a strict liability failure to warn theory and could encompass simple negligence or even fraud claims.  A jury could be queried about whether it was reasonable for a major pharmaceutical company, like Merck, to misrepresent its clinical studies to the FDA or to the New England Journal of Medicine to further its sales of Vioxx.  Because these culpable actions led to the classes' exposure to Vioxx, a proven dangerous substance, the causal nexus for medical monitoring is established without reference to the Vioxx package insert (label).  These actions, being common for all class members, prove the availability of the class device irrespective of label changes.

27

A similar presentation just occurred in the Vioxx litigation taking place before Judge Higbee in New Jersey.  In a phased trial, the jury was presented the claims of two individual plaintiffs with only liability as the initial subject of Phase I.  The jury evaluated Merck's conduct and the labeling of Vioxx during the relevant period it was being marketed and reached a verdict on these common issues.  *See, e.g., Hummeston/Herman* verdict of March 2, 2007 in Atlantic County, New Jersey.  Based on similar evidence a jury could make findings regarding Merck's culpability or any of the other elements of a medical monitoring claim or remedy challenged by Merck.

Trial courts confronting similar situations in similar *Fen Phen* and *Baycol* medical monitoring class actions found that common questions of law and fact predominate over individual issues.  These courts recognized that plaintiffs' claims arise out of similar conduct by the defendants, and the elements of plaintiffs' medical monitoring claim are common to each class member.  *See Lewis v. Bayer AG*, 2004 WL 1146692 at * 16 (the predominating common issues included "the Defendants alleged failure to disclose adverse side effects ... and the research and data which will be presented to determine whether Baycol is a hazardous substance ...".);  *In re Pennsylvania Diet Drugs Litigation*, 1999 WL 962583 at * 21 ("Defendants' arguments are really aimed at the extent and duration of the diagnostic monitoring plaintiffs may ultimately receive.  This issue will be decided by medical professionals and handled by a claims administrator.").

As the above discussion reflects, when the proper time arrives, the PSC will be prepared to show that common issues predominate for each state class.

### 2.      Exposure to Vioxx is Readily Ascertainable

Unlike medical monitoring claims involving environmental exposures, a class exposed to a pharmaceutical drug is readily proven through medical records and other evidence.  *Jeffers*, 1999

WL 673066 at * 13. (levels of exposure are "discrete and ascertainable."). Merck, however, makes the factual argument that plaintiffs will be unable to prove that class members were "significantly" exposed to a proven hazardous substance. This argument fails for several reasons.

First, as a factual argument it is not properly raised in a motion to strike. *See Augustus, supra.*

Second, there should be no dispute that Vioxx is a proven hazardous substance. *See* discussion *supra* at 2-6.

Third, Exposure to greater than normal background levels is easily established since there are "no background levels" for prescription medications. *In re Pennsylvania Diet Drugs Litigation*, 1999 WL 962583, * 13; *see also Lewis*, 2004 WL 1146692, * 16.  Merck simply confects an obstacle where none exists. Merck's references to cases where the level of exposure to a particular toxin was difficult to ascertain, have no bearing here. *See Ball v. Union Carbide Corp.,* 385 F.3d 713 (6th Cir. 2004) (involving exposure to unmeasured emissions from a nuclear weapons facility); *Perez v. Metabolife Int'l, Inc.,* 218 F.R.D. 262, 275 (S.D.Fla. 2002) (involving exposure to non-prescription diet pill where no reliable records of ingestion exist).  In comparison to those cases, a prescription medication's exposure levels are well supported through medical records. *See Jeffers, supra.*

### 3.      Whether the Class is at an Increased Risk of Developing a Latent Injury Is a Common Question

Merck asserts that proving that the class is at an increased risk of developing a latent injury as a consequence of its exposure to Vioxx is not possible on a class basis.  In truth, the proofs necessary are not individualized.

In *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 788 (3rd Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995), the court addressed the types of proofs necessary to show a significantly increased risk.  The court held:

> [W]here experts individualize their testimony to a group of individuals with a common characteristic (*i.e.*, levels of exposure to chemical X above Y amount), we do not think there is a need for greater individualization so long as they testify that the risk to each member of the group is significant.  We fail to see the purpose of greater individualization.  Nor do we think that an expert must quantify the increased risk.

*Id*.  This reasoning has evolved into the common parlance of medical monitoring practice.  In *Pa. Diet Drugs,* the court permitted the significantly increased risk element to be established on a class-wide basis.  The trial court accepted the use of expert testimony and the development of "risk ratios" to determine the percentage of risk caused by the defendant's conduct and the risk caused by factors other than defendant's actions.  *See In re Pennsylvania Diet Drugs Litigation*, 1999 WL 962583 at * 14.

Merck's reliance on cases like *Weirlein v. United States,* 746 F.Supp. 887 (D.Minn. 1990), is unavailing.  The *Werlein* court ruled that a class action was not available for medical monitoring based upon a misunderstanding of the claim.  In *Werlein*, the court predicted under Minnesota common law that medical monitoring is only available for persons that are presently injured.  *Id.* at 904, *citing, Hagerty v. L& L Marine Services, Inc.*, 788 F.2d 315, 319 (5th Cir. 1986).  *Hagerty*, however, imposes no such requirement.  *Hagerty*, 788 F.2d at 318 ("The physical injury requirement, like its counterpart, the physical impact requirement, was developed to provide courts with an objective means of ensuring that the alleged mental injury is not feigned.  We believe that

notion to be unrealistic.").[10]  Given the district court's erroneous impression that a present physical injury was necessary, it carried forward that mistake into its class ruling, by holding:  "To recover medical monitoring damages, a plaintiff will have to prove that he or she is at an increased risk of future harm.  Such proof is not workable in a class action format."  *Id*. at 912.  This flawed analysis should not be propagated any longer.  The *Werlien* court's reasoning was incorrect.  More importantly, its analysis has no factual predicate in this case –  those jurisdictions that require a present physical injury to obtain medical monitoring damages are not present in the Master Complaint.

Merck's factual contention is equally unfounded.  Merck contends that different durations of exposure create insurmountable individual issues, citing to the Master Complaint's reference to "significantly increased risk" of UMI with exposures of 6 weeks or longer.  (Def. Mem. at 18; Master Complaint ¶ 144).  However, the reference to increased risk after 6 weeks' exposure is based on Merck's VIGOR study, in which the incidence of Vioxx-associated thrombotic events exceeded naproxen from about 6 weeks until the end of the study.  Whether that increased risk becomes even greater with longer exposure does not negate the common fact of demonstrated increased risk.  Discovery will show that the six-weeks' use criterion is a reasonable factor to identify class members for whom monitoring is appropriate.

### 4.    The Proposed Monitoring Regime's Characteristics Are Subject to Expert Opinions That Are Yet to be Rendered

Merck asserts that each class member must come forward to prove that the proposed monitoring regime would differ from their ordinary care.  In essence, Merck reiterates its essential

---

[10]For a better reasoned analysis of Minnesota law *see* The PSC's Response in Opposition to Merck's Motion to Dismiss at 47 n. 63.

argument that a class action may never be certified.  The fact that numerous courts have provided medical monitoring relief on a class basis, however, proves that Merck's argument overreaches.

The therapeutic regime of every absent class member could not possibly be the evidential proof in a medical monitoring class action.[11]  Even in the class trial of a medical monitoring case, the class representative's particular medical regime is not the focus of the class trial, nor is it a basis for denying class certification.  *See In re Pennsylvania Diet Drugs Litigation*, 1999 WL 962583, * 13 ("*Redland* requires that the recommended monitoring program be compared with what is normally recommended for the general population, not a particular individual ... plaintiffs' experts' monitoring regimen for the entire class must be compared with what is recommended for asymptomatic persons who have not been exposed ...".), *citing Redland Soccer Club, Inc. v. Department of the Army and Dept. Of Defense for the U.S.*, 696 A.2d 137, 146-47 (Pa. 1997).[12] Merck's reference to failed national class actions for state by state medical monitoring class actions is unavailing.

Because Merck's argument raises factual matters that will be the subject of expert opinions, it is inappropriate for resolution on a motion to strike.  *See Augustus, supra.*   However, the PSC

---

[11] *See, e.g., Wilson v. Valley Electric Membership Corp.*, 141 B.R. 309, 314-15 (E.D.La.1992)(The obligation of a class representative to complete a class proof of claim cannot extend beyond the representative to answer for all possible class members).  *See generally* Manual for Complex Litigation (Fourth) §21.41 (2004)("One of the principal advantages of class actions over massive joinder or consolidation would be lost if all class members were routinely subjected to discovery.").

[12] Although the court in *In re Pennsylvania Diet Drugs Litigation* did recognize that some members of the class may not be entitled to medical monitoring because the "recommended protocol does not differ from the program they received before exposure", such "individual questions [are] essential to a class member's recovery [but] not necessarily fatal to the class." *Id*. at * 14.

represents to the Court that the electrocardiogram (ECGs), a central procedure in the monitoring program to detect previously unrecognized MI, is <u>not</u> routinely administered to the vast majority of patients. *See also*, Master Complaint at ¶ 146, specifically alleging that the requested monitoring procedures "are different from those normally recommended in the absence of exposure to Vioxx, . . . ." On a motion to strike, this allegation must be accepted as true.

## IV.    <u>CONCLUSION</u>

While granted license to file its motion to strike allegations "at any time," Merck's motion raises significant factual and legal issues that are not appropriately addressed through such a motion. There is no sound basis for accepting the motion given the current procedural posture of the litigation.  The motion should be denied.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

**Dated:  March 19, 2007**

By: /s/ Leonard A. Davis
     **Russ M. Herman (Bar No. 6819)**
     Leonard A. Davis (Bar No. 14190)
     Stephen J. Herman (Bar No. 23129)
     ***Herman, Herman, Katz & Cotlar, L.L.P.***
     830 O'Keefe Avenue
     New Orleans, Louisiana 70113
     Telephone: (504) 581-4892
     Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

33

Andy D. Birchfield, Jr., Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire **(on brief)**
Donald C. Arbitblit, Esquire **(on brief)**
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008  (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Matthew C. Gaughan, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663  (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA  92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC  20036-4914
(202) 783-6400 (telephone)
(307) 733-0028  (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis-Nexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 19th day of March, 2007.

/s/ Leonard A. Davis
Leonard A. Davis (Bar No. 14190)
*Herman, Herman, Katz & Cotlar, LLP*
830 O'Keefe Avenue
New Orleans, LA  70113
PH:    (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhkc.com