# EXHIBIT G

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2
 3   ***************************************************************
 4   IN RE:  VIOXX PRODUCTS
         LIABILITY LITIGATION
 5                              MDL DOCKET NO. 1657
                                NEW ORLEANS, LOUISIANA
 6                              MARCH 8, 2007, 10:40 AM
 7   ***************************************************************
 8
                     TRANSCRIPT OF PROCEEDINGS
 9          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
10
11   APPEARANCES:
12   FOR THE PLAINTIFF:      LIEFF CABRASER HEIMANN & BERNSTEIN
                             BY:  DONALD C. ARBITBLIT, ESQUIRE
13                           EMBARCADERO CENTER WEST
                             275 BATTERY STREET, SUITE 3000
14                           SAN FRANCISCO CA 94111
15
                             HERMAN HERMAN KATZ & COTLAR
16                           BY:  LEONARD A. DAVIS, ESQUIRE
                             201 ST. CHARLES AVENUE, SUITE 4310
17                           NEW ORLEANS LA 70170
18
     FOR THE DEFENDANT:      BARTLIT BECK HERMAN
19                           PALENCHAR & SCOTT
                             BY:  PHILIP S. BECK, ESQUIRE
20                                ANDREW GOLDMAN, ESQUIRE
                             54 W. HUBBARD STREET, SUITE 300
21                           CHICAGO IL 60601
22
     OFFICIAL REPORTER:      CATHY PEPPER, CRR, RPR, CRR
23                           500 POYDRAS STREET, ROOM B-406
                             NEW ORLEANS LA   70130
24                           (504) 589-7779
25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer.
```

Page 2

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2                  MARCH 8, 2007
 3                  (IN CHAMBERS)
 4
 5         THE COURT: This matter is before the Court in
 6   connection with a deposition which is now being taken, as I
 7   understand, of Dr. John Farquhar. The parties have an
 8   evidentiary issue that has caused the Court to set this
 9   conference. The parties are on the line, the ones who are taking
10   the deposition, and I'll hear from the parties at this time.
11         MR. ARBITBLIT: Thank you, Your Honor. This is
12   Don Arbitblit. During the closing portion of yesterday
13   afternoon's deposition of Dr. Farquhar, defense counsel
14   introduced or attempted to introduce a document to the witness
15   bearing a stamp of DX-3529, known as the Agenda for August 19,
16   2005 Vioxx MDL Science Committee Conference Call. It's a 26-page
17   document to which is attached a Confidential Attorney Work
18   Product stamped document consisting of a three-page memo from
19   plaintiffs' counsel Michelle Tarfit (spelled phonetically) to
20   others of the Plaintiffs Steering Committee in the MDL. Every
21   page of the document is stamped Confidential Attorney Work
22   Product.
23         I was unaware that this document was in defense
24   counsel's possession until it was presented yesterday, and I
25   immediately objected to its use and asked to call the Court.
```

Page 3

```
 1   Your Honor was not present because it was after hours in
 2   New Orleans, we're two hours earlier here, and so we set up this
 3   call to address issues relating to whether the document can be
 4   used before we can continue with the deposition.
 5         Now, the document is stamped Confidential Attorney
 6   Work Product, and we believe there is no question that it is
 7   Confidential Attorney Work Product since it lays out the thoughts
 8   and impressions of counsel and their plans for the Vioxx
 9   litigation in great detail.
10         The document was apparently produced to Mr. Beck
11   inadvertently as a single document in very large production of
12   approximately 12 CDs' worth of expert reliance materials by
13   experts MoyT and Plunkett, who are identified in the documents
14   sent to the Court with Mr. Beck's e-mail yesterday evening.
15         The two experts in question were referred to
16   plaintiff counsel in certain cases by an entity known as
17   Scientific Evidence, which acts as a liaison between attorneys
18   and experts. And in this particular case, based upon the
19   deposition testimony of Dr. MoyT and Plunkett, Scientific
20   Evidence prepared the list of reliance materials along with the
21   sets of documents that were produced, rather than those being
22   prepared by the attorneys or their employees themselves.
23         The documents produced by Mr. Beck, specifically
24   Items 2 and 5, indicate that the lists do not identify the
25   document as a Confidential Attorney Work Product but simply state
```

Page 4

```
 1   "Vioxx Science Committee, August 19, 2005," which would not put
 2   anyone on notice that a confidential document was involved.
 3         At the deposition of Dr. Plunkett in a California case
 4   on June 1, 2006, of which I have obtained a copy of the
 5   transcript since yesterday to review it in preparation for this
 6   conference call, Dr. Plunkett was specifically asked whether she
 7   had reviewed all the documents in this massive production. She
 8   testified that she had reviewed a majority, at least in a cursory
 9   fashion.
10         When she was specifically asked by defense counsel at
11   her deposition, "What is the Vioxx Science Committee August 19,
12   2005, document?" She answered, quote, "I don't know. We have to
13   open it up." And then in the same answer, she said, "We can do
14   that, if you would like." But I don't believe that was done at
15   the deposition, and certainly no one from the plaintiffs' counsel
16   that I received e-mails from or spoken to since yesterday when
17   this came up had any knowledge that there was a Confidential
18   Attorney Work Product document in the possession of defense
19   counsel since the production last May.
20         Further asked at the same deposition, "What is the
21   Vioxx Science Committee?" Dr. Plunkett answers, "I don't know."
22   And so there is no evidence that Dr. Plunkett specifically
23   reviewed or relied upon the document. There is no identification
24   of it in the reliance material as a confidential document. The
25   attorneys for the plaintiff did not know that it was produced,
```

Page 5

```
 1   and based on our investigations, there is not a single
 2   plaintiffs' attorney who knew that this confidential document was
 3   in the possession of defense counsel since last May.
 4         We believe that the production was inadvertent,
 5   that it should be returned to counsel, that it should not be used
 6   for any purpose, and that there should be a report to the Court
 7   by defense counsel as to every person to whom the document has
 8   been disseminated and that every person to whom it has been
 9   disseminated should likewise return the document and have no use
10   of it for any purpose.
11         And I would like to turn it over to Lennie Davis
12   for further comment.
13         THE COURT: Wait just a minute. Before you do that, let
14   me ask, has Dr. Farquhar seen this document?
15         MR. ARBITBLIT: It was put in front of him at the close
16   of the deposition. It is not a document he has ever seen before.
17         MR. BECK: How do we know that?
18         MR. ARBITBLIT: I can tell you that he never saw it
19   before.
20         MR. BECK: You weren't allowed to ask him that. You
21   weren't allowed to talk to him about it. What happened, Judge --
22         THE COURT: Wait.
23         MR. ARBITBLIT: It is not disclosed on any reliance
24   materials of Dr. Farquhar. I am personally responsible for what
25   was given to him, and I did not give it to him.
```

Page 6

1    THE COURT: All right. Let me hear from Lennie at this
2    time.
3    MR. DAVIS: Your Honor, this is Lennie. I appreciate
4    you taking this call. I can tell you that both Russ and I have
5    spent all night last night and this morning on the phone and on
6    e-mails addressing this issue. Russ asked me specifically to
7    partake in this matter. He is in depositions, which I believe
8    Your Honor is aware that he's in Houston, but I've been on the
9    phone with him and interrupted him several times in his
10   deposition.
11   THE COURT: What's your position?
12   MR. DAVIS: What's that?
13   THE COURT: What's your position?
14   MR. DAVIS: Your Honor, we believe that this is a very
15   serious matter. This is internal work product that's at issue
16   and an inadvertent production. Defense counsel, in our opinion,
17   has a duty to bring this to our attention. They've had this
18   document for almost a year, and the PSC did not know that they
19   had it.
20   I cite you to Federal Rule of Civil Procedure 26,
21   which has recently been amended to deal with inadvertent
22   disclosures, and I believe everybody is aware of that rule. In
23   addition, we have Pretrial Order Number 13, Section 19 in this
24   case, that says, "If a receiving party," which would be the
25   defendant, "learns of any unauthorized disclosure of confidential

Page 7

1    information, the party shall immediately, upon learning of such
2    disclosure, inform the supplying party of all pertinent facts
3    relating to such disclosures and shall make all reasonable
4    efforts to prevent disclosure by each unauthorized person who
5    receives such information."
6    In addition, there is Pretrial Order Number 17,
7    Section D that says, "Inadvertent production or disclosure is
8    deemed not to waive any privilege or work product protection that
9    would otherwise apply to documents or information," and I will
10   tell the Court -- and I know that there is no disagreement as to
11   this -- that there have been inadvertent disclosures by defense
12   in this matter, and without any question whatsoever or any issue,
13   they have been returned or destroyed when requested.
14   We're extremely upset that this matter would even
15   come to the attention of the Court like this. We think it goes
16   back to Pretrial Order Number 1 with professionalism and courtesy
17   that Your Honor is well aware of that asked be done throughout
18   this litigation.
19   We are extremely concerned about the ethics and any
20   violation of ethics in this matter. We would like -- the PSC
21   would like an investigation and the Court to do an investigation
22   immediately with respect to this document.
23   Number 1, who has the document? We would like to
24   know who has this document.
25   Number 2, who has it been disseminated to?

Page 8

1    Number 3, that all copies of or any copies of this
2    document be returned immediately.
3    That there be no use, Number 4, of the document
4    whatsoever by the defendant or anyone that they might have
5    distributed it to.
6    And Number 5, that any information disseminated
7    from the document be retrieved.
8    We think that it is critical that something be done
9    immediately. It is very apparent that this document has no
10   bearing on anything other than work product of the PSC. We're
11   concerned how it was released. We want an investigation as to
12   the state court matter so that we can understand how
13   Scientific Evidence or anyone else may have gotten the
14   information. We can tell the Court what we know since last night
15   when we have been involved in this. And we don't think that
16   there should be any use, at least at this time, of this document.
17   THE COURT: Thank you. Let me hear from the defendant.
18   MR. BECK: Yes, Your Honor. As Your Honor has
19   emphasized many times in these trials, the credibility of expert
20   witnesses is extremely important. Yesterday Mr. Arbitblit spent
21   a full hour on the qualifications of Dr. Farquhar before he
22   turned him over for traverse, during which time, Dr. Farquhar --
23   they talked about how he's the greatest doctor in the world, how
24   he has no bias against Merck, and how he calls everything as he
25   sees it, and is not influenced in any way by plaintiffs' counsel.

Page 9

1    Dr. Farquhar denied yesterday that the plaintiff
2    lawyers played any role whatsoever in crafting his reports or had
3    input into his opinions. He said it was a hundred percent his
4    work.
5    We're entitled to adduce evidence on this key
6    opinion where he says that the Watson analysis back in 1998 was
7    some sort of signal that should have alerted Merck to a problem.
8    We're entitled to adduce the evidence that this key opinion of
9    his was, in fact, a coached one, and he is doing the bidding of
10   the plaintiffs' lawyers when he offers that opinion.
11   Here, he's offering it in response to questions by
12   Mr. Arbitblit. We know from the traverse yesterday that
13   Mr. Arbitblit is the one who hired him in this litigation. He's
14   been paid over $300,000. He was paid over $200,000 after
15   Mr. Arbitblit hired him in Baycall (spelled phonetically). He
16   was paid an unknown sum after Mr. Arbitblit hired him in the
17   Fanfan litigation.
18   Now, the evidence here is that, from this document,
19   it says clearly that one of Mr. Arbitblit's purposes was to find
20   experts who would say that the Watson analysis was some sort of a
21   signal of increased cardiovascular risks, and that was the word
22   that the lawyers used, a signal, and then the lawyers, the
23   plaintiffs' lawyers who communicated that purpose to at least two
24   other experts, Dr. MoyT and Dr. Plunkett.
25   Now, what they say is that, well, we did so -- they

Page 10

1  say that, "Well, it was Scientific Evidence who did it." Well,
2  Scientific Evidence -- that's one of these expert brokers --
3  Scientific Evidence isn't getting their documents from me.
4  Scientific Evidence is provided documents by the plaintiffs'
5  lawyers to get experts and to give to experts so that the
6  plaintiffs' lawyers have experts who say what they want them to
7  say.
8            So there was no inadvertent disclosure of these
9  documents to the defendants here. What there was was purposeful
10 disclosure of this document to Scientific Evidence, their agent,
11 who turned around and gave it to the experts so that the experts
12 would know what to say.
13           And it was given to at least MoyT and Plunkett, and
14 in terms of privilege, obviously, if they had never disseminated
15 their work product to third parties for distribution to experts
16 and for reliance on by experts, then their work product would be
17 their work product.
18           But once -- and I'm not saying that if they had
19 accidentally given me a copy that that would constitute a waiver.
20 I agree that that would not, but they did not accidentally give
21 me a copy. They gave a copy on purpose to their expert broker,
22 who then, in turn, gave the copy to the experts.
23           And whether he was supposed to do that or not, the
24 experts have relied on this document. And however it got to
25 them, it certainly wasn't by us. And so if they want to

Page 11

1  investigate Scientific Evidence, go let them do it, but however
2  the document made its way to the experts, the experts clearly
3  relied on it.
4            Now, they say that, "Well, Dr. Plunkett couldn't
5  remember one way or the other." Well, Dr. MoyT did. Dr. MoyT
6  testified twice that he reviewed every single document on that
7  list. And this is, after all, Judge, the first document on both
8  lists. And in his deposition on June 2, 2006, Page 72, he said
9  that he looked at every document on the list, and in the
10 Grossberg trial in California, he said he looked at every
11 document on the list.
12           And so what we have is a situation where the
13 plaintiffs, they now say via Scientific Evidence, so I'll take
14 them at their word on that, but the plaintiffs, through an expert
15 broker, provided basically a script to the experts for what the
16 experts are supposed to say about the Watson memo, and the
17 experts listed as materials that they reviewed and Dr. MoyT says
18 that he reviewed every single document. And in fact, the experts
19 did rely on what's in the lawyer's memo.
20           When you look at these expert reports -- Judge, I
21 hope you go back as far as I do and saw the original version of
22 the Manchurian Candidate, but I was struck that every single
23 expert who writes a paragraph about the Watson analysis, every
24 single one of them uses the word that Mr. Arbitblit in the memo
25 says or the memo says Mr. Arbitblit wanted the experts to say,

Page 12

1  signal. So every single one of them come up with the word signal
2  just like the script says they are supposed to.
3            And we were ready -- let me say, Judge, we were
4  prepared to use this document at the MDL trial with Dr. MoyT,
5  because Dr. MoyT, in his report, called Watson a signal, but they
6  never asked Dr. MoyT about the Watson analysis at any of the
7  trials, so we had no occasion to use the document there.
8            Judge, it's no answer for Mr. Arbitblit to
9  represent that Dr. Farquhar will deny having seen the document.
10 First of all, I wasn't allowed to ask him if he had seen the
11 document. When I put the document in front of him, Mr. Arbitblit
12 stopped the deposition immediately before I could ask
13 Dr. Farquhar whether he had seen the document, and what
14 Mr. Arbitblit said on the record in front of the witness was that
15 he, Mr. Arbitblit, had never seen the document. So now the
16 witness has been signaled, of course, that he's supposed to say
17 he hadn't seen the document.
18           So Mr. Arbitblit made a statement that he had never
19 seen the document, which if we're going to have an investigation,
20 of course, he would have to be put under oath because that can't
21 be true, since he's on the Science Committee, but in any event,
22 the witness has been signaled by his counsel, by the person who
23 is listed in this document as his handling lawyer, to say he's
24 never seen this document before.
25           That's a credibility question about whether

Page 13

1  Dr. Farquhar has been coached to say signal, whether by this
2  document or by Mr. Arbitblit in other communications or by any
3  other plaintiffs' lawyer. That's a credibility question about
4  whether his key opinion is something he reached independently or
5  whether that was something that was spoon-fed to him like it was
6  to Dr. MoyT and to Dr. Plunkett.
7            And what we have here is powerful evidence on that.
8  We have that Mr. Arbitblit has retained him in three different
9  drug litigations where he's been paid greatly in excess of over
10 half a million dollars. Mr. Arbitblit is listed in this document
11 as his handling attorney. The document says that Mr. Arbitblit's
12 purpose is to get an expert who will say that the Watson analysis
13 was a signal.
14           The memo was provided to at least two other
15 experts, both of whom relied on it and produced it as materials
16 they relied on, and both followed the script that's in the
17 document. Both said in their reports that the Watson analysis
18 was a signal, and then when Dr. Plunkett was asked under oath
19 about the Watson analysis, sure enough, she volunteers it's a
20 signal. And then Dr. Farquhar also followed the script. He said
21 in his report that we sent you, Judge, that it's a signal, and
22 yesterday, in testimony elicited by Mr. Arbitblit, he says, "Oh,
23 yes, the Watson analysis, my conclusion is that was a signal."
24           So, Your Honor, this is a guy that they are holding
25 out as an independent, world-class, esteemed expert and a key

Page 14

1  opinion about what they say was, you know, early notice to Merck
2  that there was a problem here that should have been followed up
3  and wasn't followed up. He says it was a signal and he testified
4  about that at length on direct examination, and we've got proof
5  that that opinion was spoon-fed to him, whether through this
6  document or otherwise.
7        And we're entitled to put that in because the
8  credibility of this evidence, just like the credibility of
9  Dr. MoyT, when he cut and pasted his opinion, the credibility of
10 that epidemiologist who they brought in the last time, the woman
11 who had written a letter to us directly contradicting the opinion
12 that she gave at trial, these are key credibility questions when
13 it's a battle of experts, and we're entitled to pursue them.
14       And, Judge, if they had -- let me just say since
15 there's been more than a suggestion of somehow misconduct on our
16 part -- if they had, in a document production to us, produced
17 anything with a work product stamp on it or anything like that,
18 we would have just given it -- first of all, I never even would
19 have seen it because somebody else, before it would get to me,
20 would have given it back to them. But if I had seen it, I would
21 have given it back to them.
22       This wasn't produced to us by the plaintiffs'
23 lawyers. This is not an inadvertent production to us. This was
24 a purposeful production by them to the expert broker, and the
25 expert -- according to them, this is how it worked -- and then

Page 15

1  the expert broker gave it to the experts so that the experts
2  would know what to say.
3        Even if the expert broker was not supposed to do
4  that under his instructions from their lawyers, he did it. And
5  once the -- once the experts see the material and rely on it and
6  then follow the script, the fact that it might have started out
7  as privileged, it's not privileged anymore. And it loses its
8  privilege not because of inadvertent waiver to us, it loses its
9  privilege because it's turned over to experts, experts read it
10 and rely on it and then parrot it in their reports and in their
11 sworn testimony.
12       And you can't shield work product if you give it to the
13 experts and the experts read it, rely on it and then repeat it in
14 their report and sworn testimony. The privilege is gone there
15 because we're entitled to cross-examine experts on what they
16 relied on and the basis of their opinions.
17       THE COURT: I understand your position. Any rebuttal?
18       MR. ARBITBLIT: Yes, Your Honor. I have a number of
19 things I need to respond to about that.
20       THE COURT REPORTER: Excuse me, who is this?
21       MR. ARBITBLIT: This is Don Arbitblit, for the court
22 reporter and for the Court, for the record. First of all, I have
23 in front of me an excerpt from Dr. MoyT's deposition of June 2,
24 2006, in which defense counsel asked them about a series of
25 documents listed on the reliance materials with the apparent

Page 16

1  purpose of showing that he couldn't possibly have read it all,
2  and he never asked him about the Vioxx Science Committee memo.
3  Never asked him about that. Never gave him an opportunity to say
4  whether he knew it was in it or didn't. It was not included in
5  the examination.
6        As to another document, for example, here is a
7  question and answer: "Question: For example, the one -- the
8  entry right above it, hearing on exhibits."
9        MR. BECK: What page are you talking about?
10       MR. ARBITBLIT: I am looking at page 73 of the June 2nd
11 deposition. And Dr. MoyT says, "Yes:
12       And the question: "That's a transcript of a court
13 trial?"
14       "Answer: That's right. That's right."
15       "Question: Do you know why that would have been of
16 interest to you?"
17       "Answer: No. For that -- what I did was look at
18 it to see first, cursorily, to see if it was going to be directly
19 relevant, and if it wasn't going to be relevant to my opinion,
20 then I put it down and moved on to something else," end of quote.
21       And so, Your Honor --
22       MR. BECK: Your Honor, it was on a prior page, on
23 Page 72.
24       MR. ARBITBLIT: I did not interrupt you. Please let me
25 finish my presentation to the Court.

Page 17

1        Dr. MoyT never testified that he relied on a work
2  product document, nor was he given the opportunity to say whether
3  he was familiar with it or simply glanced at it and put it down
4  because it wasn't relevant to his opinions as he had done with
5  other materials.
6        Dr. Plunkett specifically testified that she did
7  not know what the document was. She did not say I don't remember
8  one way or the other, as Mr. Beck stated. She said, "I don't
9  know what the document is. I don't know what the Vioxx Science
10 Committee is."
11       Now, whether the document was provided to Mr. Beck
12 by plaintiffs' counsel or by Scientific Evidence is completely
13 irrelevant to the question of whether the production was
14 inadvertent. The production was clearly inadvertent because
15 plaintiffs' counsel did not know it was presented, did not see
16 any evidence on the reliance list of a reference to a
17 confidential document, and objected as soon as it was made known.
18       Now, in response to Mr. Beck's assertion that I was
19 attempting to coach the witness yesterday, I will tell the Court
20 in all candor that when this document stamped Confidential
21 Attorney Work Product was put across the table to me, I was very
22 upset about it, and I did not recognize it immediately as
23 something that I had previously seen.
24       After the deposition, in looking at it, absolutely,
25 I was copied on that e-mail and I did see it in August 2005 and

Page 18

1  that's the last time I saw it. And it was circulated to me, and,
2  yes, I am mentioned in it.
3       And what Mr. Beck is implying that the witness was
4  creating testimony to comply with my wishes is insulting and
5  false. None of these witnesses needed any coaching to review
6  those documents and determine independently that this analysis
7  constituted a signal.
8       And, in fact, that's exactly why Merck did the
9  analysis was to determine if there was a signal, and when it came
10 out against them, they didn't disclose it, and they basically
11 changed their plan so they could whitewash the signal.
12      And one of the senior authors of the study, of the
13 program that Mr. Beck hasn't referenced at Page 9 of his first
14 document, Dr. Kronmal, who he's never alleged has seen this work
15 product, was a senior author of the comparison study Merck used
16 and said that its usage by Merck was ridiculous as a comparison.
17 That's a quote, in quotes, "ridiculous" at Page 9 of the first
18 exhibit.
19      So -- finding experts who agree with the positions
20 that plaintiffs take is somehow procuring them to put words in
21 their mouth is simply insulting and false. The experts reached
22 their conclusions independently based on their review of the
23 documents.
24      Nowhere does it say my objective was to find
25 experts to put words in their mouth. It says, "My objective was

Page 19

1  to prove that our objective as a committee was to prove the
2  Watson epidemiologic analysis of 1997, '98 constituted a signal
3  of excess CV adverse events.
4       Why would it be surprising they would all use the
5  same word? Signal is the word used in the pharmaceutical
6  industry to determine when there is the knowledge of a risk. Why
7  would it be surprising that those experts used the same words?
8  It has nothing to do with the Manchurian Candidate or being
9  brainwashed. It's the term of art in the industry.
10      And if you looked at defense counsel's experts,
11 they would say there was no signal. They all use the word
12 signal. They would either say that it's there or it's not. It's
13 no -- it's of no import whatsoever that they all said that it
14 constituted a signal.
15      MR. BECK: Your Honor, I need to respond to a couple
16 things.
17      THE COURT: Wait. Let him finish first.
18      MR. BECK: I thought he had finished.
19      MR. ARBITBLIT: I am not finished. I do not believe
20 that this document can be used for any purpose, let alone to ask
21 Dr. Farquhar whether he's seen it or been influenced by it. It
22 should be withdrawn and I can tell the Court it was never
23 provided to him. I have provided all the documents to
24 Dr. Farquhar that he reviewed, and I certainly never provided it.
25      And in Mr. Beck's submission to the Court, if he

Page 20

1  found a reliance production in which Dr. Farquhar had seen that
2  document, you could bet it would have been attached as one of the
3  exhibits along with Plunkett and MoyT.
4       Now I am finished. One more thing: Dr. Farquhar's
5  income is certainly fair game, and we've provided the bills to
6  Mr. Beck so he can make the argument, and he's got all the
7  legitimate means available to him to attack credibility but using
8  a confidential document is not one of them.
9       THE COURT: I understand it. I know everybody is very
10 enthused about this issue, but let's keep an even strain on it.
11      MR. BECK: Your Honor, I will keep an even strain on
12 this and make three points and I'll be done.
13      First, on Dr. MoyT's testimony on the page before
14 Mr. Arbitblit was reading on page 72, lines 9 through 13 --
15 actually, I'll move up to line 4 through 13, "Question: Is it
16 your understanding that all of the materials that's contained on
17 Exhibit 2 is on the CDs that we have been provided?"
18      "Answer: Yes, sir."
19      He's talking about materials reviewed.
20      "Question: Now, you haven't read all this stuff;
21 is that right?"
22      "Answer: I think in fairness I can say yes, I
23 have, but I don't remember all of it."
24      So he said he read all of it, Point Number 1.
25      Point Number 2, Mr. Arbitblit just went into an

Page 21

1  impassioned attack on the analysis on the Watson piece and how
2  important it is in the case, and used words like whitewashed and
3  things like that. What that does is it highlights the importance
4  of the expert testimony on this, and it highlights the importance
5  of the credibility of the experts who are making the same
6  speeches that Mr. Arbitblit just made.
7       And third, my last point, Mr. Arbitblit says,
8  "Well, you know that the experts weren't coached because
9  Dr. Kronmal said it was a signal, and we don't have anything --
10 any materials reviewed list from Dr. Kronmal."
11      Well, Judge, if you'll turn to the document at
12 issue, DX-3529, and turn over to Page 8, the very paragraph that
13 we asked the judge -- the Court to focus on, Paragraph 4 says,
14 "Epidemiology proof of causation in clinical trials," then it
15 says, "Don Arbitblit," and then underneath that it says,
16 "Objective," so it says Mr. Arbitblit's objective, and it says,
17 "Prove Watson epidemiological analysis in 1997, '98 constituted a
18 signal of excess CV adverse events 10 months before submission to
19 the NDA which was never disclosed to the FDA.
20      And this it goes on to the next subparagraph. "In
21 the past couple of weeks, Don," that would be Arbitblit, "has
22 worked with Buchanan," that's another of the plaintiffs' lawyers,
23 "and Dr. Kronmal and Kronmal signed a report for New Jersey this
24 past week. THERE WAS," in all capitals, "a signal based on
25 Merck's data. The, quote, 'signal,' end quote, was whitewashed."

Page 22

1  It's the same phrase that Don used -- Mr. Arbitblit used a few
2  minutes ago. "The signal was whitewashed, comparing it to a
3  community study involving a different population."
4       So the thought that Dr. Kronmal may not have been
5  given a copy of this memo and his materials reviewed list, the
6  reason for it is is this memo wasn't generated until after
7  Mr. Arbitblit had already met with Dr. Kronmal and after he had
8  communicated his objective to Dr. Kronmal and after Dr. Kronmal
9  had signed a report saying it was a signal, just like all the
10 other ones did when they either saw the report or conferred with
11 plaintiffs' counsel later.
12      So, Your Honor, we agree that the Watson analysis
13 has become a key issue for the plaintiffs in the case, and
14 Mr. Arbitblit has made his speech and laid out his position, and
15 that's the same script that the experts followed. And we're
16 entitled, with materials they distributed whether directly or
17 indirectly to their experts, even if they didn't intend the
18 experts to see them, the experts did, and we're entitled to show
19 that and to show -- and that is also evidence, Your Honor, that
20 whether Dr. Farquhar will now agree that he saw this or not,
21 having heard Mr. Arbitblit say he never saw it, he still -- we
22 still have a question of whether he was coached in his opinions,
23 and the fact that everybody magically reaches the same opinion
24 and uses the same phrase that the plaintiffs' lawyers use in the
25 materials they distributed is highly relevant to credibility.

Page 23

1  That's all I have.
2       THE COURT: Okay. I thank all of you. You have
3  succinctly stated the issue. I'll tell you how I see it. There
4  are really two issues that are before me, as I see it, listening
5  to you. The first issue is whether or not this document should
6  be used at or during the present deposition of Dr. John Farquhar.
7  The second issue is whether or not the grab-back provisions of
8  the Federal Rules of Civil Procedure and/or the Court's pretrial
9  orders should be activated to allow the plaintiffs to get the
10 document back.
11      In both areas, both issues, the question seems to
12 me is not whether or not this is a work product or
13 attorney-client privilege. It's clearly a work product, clearly
14 would be covered by the attorney-client privilege. The issue
15 really is whether or not there is waiver of this attorney-client
16 privilege or work product or whether it matters.
17      In the time that I have listened to you, we were
18 also able to put pull a case or two. In re: Pioneer, a case out
19 of the Federal Circuit, 238 F.3d 1370, the appellate court
20 observed the district court also found that the attorney-client
21 privilege and any work product protection had been waived by
22 disclosure of confidential communications to expert witnesses and
23 the Court of Appeals says, "We agree."
24      The analysis begins with a focus on the advisory
25 committee note the Federal Rules. The advisory committee note

Page 24

1  says that the expert has the duty to disclose the data and other
2  information considered by the experts. "Given this obligation of
3  disclosure, litigants should no longer be able to argue that
4  materials furnished to their experts to be used in forming their
5  opinions, whether or not ultimately relied upon the experts, are
6  privileged or otherwise protected from disclosure when such
7  persons are testifying or being deposed."
8       And the issue, as I see it, is whether or not, as I
9  say, a waiver should be given in this particular case. Frankly,
10 it seems to me that there is an answer potentially for both of
11 those issues, but the answer may be different for each of these
12 issues.
13      I first address the first issue, the use in this
14 deposition. There is no evidence that Dr. Farquhar has relied on
15 this document, read the document, even seen the document. So I
16 think that it's both a question of 401 or 403 in this particular
17 situation. I know credibility is at issue, but the issue of
18 waiver as to him, I think, is problematic, and I don't see it
19 being used against him.
20      With regard to second issue, namely, the grab-back
21 and whether or not there is waiver, whether or not the parties
22 are entitled to get it back, that I can't speak to at this point
23 because I don't know who gave it or when it was given or whether
24 it was inadvertent, whether they had authorization to give it.
25      It was obviously not given by plaintiffs' counsel,

Page 25

1  but it was given, apparently, by plaintiffs' counsel's agent.
2  And if an expert received that document from that agent and
3  reviewed it, then it is one of the things that that expert had in
4  his material to read and did read it, then it seems a strong
5  argument can be made that for that expert that privilege has been
6  waived or at least that that expert can be asked about it.
7       But I think it has to do with whether or not the
8  person who gave the information was authorized to or whether it
9  was inadvertently given and matters of that sort. So I'm not
10 going to decide the second issue.
11      With regard to the first issue, I feel that that
12 material should not be used with this particular witness.
13      With regard to the second issue, I'm going to give
14 counsel an opportunity to brief it, and if there is any evidence
15 or testimony that needs to be taken regarding this, or affidavits
16 obtained, I will entertain that. I'll set the hearing in this
17 matter for the next status conference, April 12th. If we need to
18 massage it because of counsels' schedule, I'll be willing to talk
19 to you on that.
20      MR. DAVIS: Your Honor, this is Lennie. Rule 26, as it
21 presently exists, requires that the receiving party promptly
22 present the information to the Court under seal for a
23 determination, and if the receiving party disclosed the
24 information before being notified, it must take reasonable steps
25 to retrieve it.

Page 26

1    We would ask that they retrieve whatever they have
2 done with it and that we get information at least under seal to
3 the Court as to who has the document, who it's been disseminated
4 to, all copies returned, and no use of the document.
5    THE COURT: Well, the issue is whether or not it was
6 inadvertent or whether it was intentional, so I'm going to deny
7 that request.
8    MR. BECK: Your Honor, this is Phil Beck. So far, I
9 haven't been allowed to ask him whether he's seen it or not, and
10 so I at least need to be able to --
11    THE COURT: That's fair.
12    MR. BECK: -- to ask him whether he's seen it.
13    THE COURT: I got it. That's fair.
14    MR. BECK: And, Your Honor, I am going to go through
15 with him, you know, whether he had discussions with Mr. Arbitblit
16 about using the word signal, or any other plaintiff counsel, and
17 I am going to go through the fact that all these other experts
18 somehow used the same phrase that he does.
19    THE COURT: I think that's fair. You're entitled to do
20 that whether or not this material is waived or gotten back.
21 You've got other depositions in which they've used it.
22    As all of us know, one witness is not able to
23 comment on another witness' testimony. The exception is experts
24 because it goes to what they've relied on and also deals with
25 credibility or the accuracy of their reports. So I think that's

Page 27

1 appropriate to ask one expert witness about his knowledge of
2 another expert witness' testimony. That's the rules.
3    MR. TISI: This is Chris Tisi. I was going to be silent
4 but I want to ask at least one question. Until the Court holds a
5 hearing on the issue, as you indicated that you would, can we
6 have an agreement that counsel would not use the document such
7 that we don't have any misuse of it until the Court makes any
8 kind of decision?
9    THE COURT: Well, is there any other experts that we're
10 dealing with?
11    MR. BECK: Well, Your Honor, I've got a trial scheduled
12 in Texas in May, and they listed Plunkett as, I think, as -- I'm
13 not sure whether they've listed her or not. They might have
14 listed Plunkett as an expert, but if Plunkett or MoyT shows up in
15 Texas and I'm in state court in Texas, of course I'm going to ask
16 them about it.
17    MR. GOLDMAN: This is Andy. Dr. MoyT is identified as
18 an expert in a California case that is set to start trial in
19 April in California state court.
20    MR. TISI: He is somebody who has admitted to having --
21    THE COURT: The issue, Chris, is not from the standpoint
22 of somebody who has read the report or read the information. The
23 issue no longer is whether or not it's privileged or not. If
24 he's read it, whether or not it's privileged. It may be
25 admissible because he's used it in formulating his opinion.

Page 28

1    MR. TISI: I understand, Your Honor. I understand. My
2 understanding, quite frankly, is that Your Honor was going to
3 have the issue briefed and argued in early April. My
4 understanding is that those -- that event will be before the two
5 events that Mr. Goldman and Mr. Beck indicated, and if there is a
6 grab-back -- and I think that when the evidence comes out you
7 will probably find that there is evidence that this was
8 inadvertent -- that at least we have a moratorium until you have
9 an opportunity to address that issue.
10    And, Your Honor, I am concerned, because this is
11 not in the air, I have a deposition coming up with Mr. Beck, I
12 believe, at the end of the month and for Dr. Ray. This was not
13 on Dr. Ray's report. It was not in his reliance list. It would
14 never -- it was never an issue there, and I want to make sure
15 that we're not going to be before you again at that point.
16    THE COURT: The only problem is that I'm trying to deal
17 with my bailiwick, the MDL now. If you're doing trials in
18 California or Texas and you're taking depositions there, I'm not
19 going to be able to tell these other judges what to do. I'm
20 going to give them the benefit of what my thinking is, but that's
21 going to be up to them.
22    MR. DAVIS: But, Your Honor, what concerns us is this is
23 a PSC work product, and it has apparently been disclosed to some
24 entity that, quite frankly, I'm not familiar with. And we have
25 claimed that there has been an inadvertent disclosure and a

Page 29

1 callback should apply. As I read the Federal Rules, "After being
2 notified, a party must promptly return, sequester or destroy the
3 specific information and any copies it has and may not use or
4 disclose the information until the claim is resolved."
5    THE COURT: I think the problem that you're faced with
6 in this particular case is that the material wasn't given to the
7 defendants.
8    MR. DAVIS: But I can tell you that how they got the
9 material is the question, and until we resolve that, I don't
10 think it should be able to be utilized.
11    MR. BECK: One way we got it -- it has never been
12 designated in the MDL.
13    MR. DAVIS: That's my point.
14    MR. BECK: If I could finish.
15    MR. DAVIS: I'm sorry.
16    MR. BECK: You know, we're defending ourselves all
17 around the country, not just in the MDL. And we have
18 Dr. Plunkett, who is a state court witness and, to my knowledge,
19 has never been designated in the MDL, and she's providing us a
20 copy of the document as Item Number 1 on matters that she
21 reviewed.
22    And so it wasn't produced, at least as far as
23 Dr. Plunkett. It wasn't even produced in federal litigation.
24 It's produced in all these state court litigation, and she's a
25 witness in state court trials, and now all of a sudden -- and

Page 30

1  whether it's inadvertently produced to their expert is not
2  implicated in the Federal Rules. The Federal Rules have nothing
3  to do with this.
4      MR. DAVIS: But that's exactly my point. And I can tell
5  you -- and so we don't know about Plunkett in the MDL. With
6  respect to MoyT, I have an e-mail from Leigh O'Dell that came in
7  to me this morning that said, "Andy and I were not aware that the
8  agenda had been disclosed." So --
9      MR. BECK: I don't care about Andy. MoyT said he read
10 it.
11     MR. TISI: The question that I raised was a procedural
12 one. It's my understanding that neither Dr. MoyT nor
13 Dr. Plunkett will take the stand in any state case before
14 Your Honor has an opportunity to rule on the document in early
15 April. And my -- my -- I have not heard anything from Mr. Beck
16 or Mr. Goldman that would in any way implicate their right to
17 effectively cross-examine these witnesses at trial should
18 Your Honor conclude that this is not an issue -- that you should
19 not pull the document back.
20     MR. BECK: You haven't even bothered to address that,
21 but if I go to Texas and Texas state court and they've got an
22 expert that they call in Texas state court who has never been
23 designated in the MDL, and the expert lists as Item Number 1
24 items reviewed, I've got to cross-examine her like crazy on that.
25     THE COURT: Look, folks --

Page 31

1      MR. TISI: Your Honor, I just want to say we have a
2  witness waiting for his deposition.
3      THE COURT: That's when I'm saying. I can't help any
4  more than I've helped, folks. If you can't stipulate, that's my
5  ruling. We've got to get on with the deposition.
6      MR. ARBITBLIT: I want to know about how long this
7  deposition could go on, but I would ask that it be completed
8  today.
9      MR. BECK: Your Honor, he took all day yesterday until
10 four o'clock on direct examination after he told the Court he was
11 going to be finished by noon.
12     MR. ARBITBLIT: That's an exaggeration. You took an
13 hour for traverse.
14     MR. BECK: No, that's false. I had a half an hour and
15 then you spent 20 minutes looking for bills.
16     THE COURT: Let's see where it goes and I'll deal with
17 it if you have to get back to me. Thank you.
18         (END OF PROCEEDINGS IN CHAMBERS)
19              * * *
20
21
22
23
24
25

Page 32

1           REPORTER'S CERTIFICATE
2
3      I, Cathy Pepper, Certified Realtime Reporter, Registered
4  Professional Reporter, Certified Court Reporter, Official Court
5  Reporter, United States District Court, Eastern District of
6  Louisiana, do hereby certify that the foregoing is a true and
7  correct transcript, to the best of my ability and understanding,
8  from the record of the proceedings in the above-entitled and
9  numbered matter.
10
11
12
13          Cathy Pepper, CCR, RPR, CRR
14          Official Court Reporter
15          United States District Court