# EXHIBIT I

1

1                      REPORTER'S RECORD

2                 CAUSE NO. 2005-59499

3

4   IN RE:                 *     IN THE DISTRICT COURT OF
                       *

5   TEXAS STATE VIOXX    *
   LITIGATION          *     HARRIS COUNTY, T E X A S

6                       *
   THIS DOCUMENT RELATES  *

7   TO ALL CASES       *    157TH JUDICIAL DISTRICT

8   **********************************************************

9                     HEARING
               MARCH 26, 2007

10   **********************************************************

11

12

13         On the 26th day of March, 2007, the

14  following proceedings came on to be heard in the

15  above-entitled and numbered cause before the Honorable

16  Randy Wilson, Judge presiding, held in Houston, Harris

17  County, Texas:

18

19         Proceedings reported by machine shorthand

20  method.

21

22

23

24              **COPY**

25

1                    A P P E A R A N C E S

2

3          Mr. David P. Matthews
           Mr. Jason Webster
4          Ms. Julie Rhodes
           MATTHEWS & ASSOCIATES
5          2905 Sackett
           Houston, Texas 77098
6          713-222-8080

7          ATTORNEYS FOR CERTAIN PLAINTIFFS

8

9

10         Mr. Kenneth Fibich
           FIBICH, HAMPTON & LEEBRON, L.L.P.
11         1401 McKinney
           Suite 1800
12         Five Houston Center
           Houston, Texas 77010
13         713-751-0025

14         ATTORNEY FOR CERTAIN PLAINTIFFS

15

16         Mr. Jimmy Williamson
           WILLIAMSON & RUSNAK
17         4310 Yoakum Boulevard
           Houston, Texas 77006
18         713-223-3330

19         ATTORNEY FOR CERTAIN PLAINTIFFS

20

21         Mr. Daniel Allen Hossley (via telephone)
           HOSSLEY & EMBRY, L.L.P.
22         313 E. Charnwood
           Tyler, Texas 75701
23         903-526-1772

24         ATTORNEY FOR CERTAIN PLAINTIFFS

25

1               A P P E A R A N C E S

2


3        Mr. Richard L. Josephson
         Mr. Travis J. Sales
4        BAKER BOTTS, L.L.P.
         One Shell Plaza
5        910 Louisiana Street
         Houston, Texas 77002-4995
6        713-229-1460

7        *** and ***

8        Ms. Gerry Lowry
         Ms. Julie Hardin
9        FULBRIGHT & JAWORSKI, L.L.P.
         Suite 5100
10       1301 McKinney Street
         Houston, Texas 77010-3095
11       713-651-5151

12       *** and ***

13       Mr. Benjamin R. Barnett
         DECHERT, L.L.P.
14       Cira Centre
         2929 Arch Street
15       Philadelphia, Pennsylvania 19104-2802
         215-994-4000

16

17       ATTORNEYS FOR DEFENDANT MERCK & CO., INC.

18

19

20

21

22

23

24

25

```
 1    together.
 2                    MR. WEBSTER:  Not a problem, Your Honor.
 3                    MR. BARNETT:  Thank you, Your Honor.
 4                    THE COURT:  Now, the inadvertent
 5    production.
 6                    MR. MATTHEWS:  Judge, David Matthews.
 7               Your final motion has to do with an
 8    inadvertent production, information that was produced and
 9    sent to an expert, Dr. Lem Moye, who is an
10    epidemiologist.
11               What happened in this case is there was a
12    witness, Dr. Furquhar, I believe it's pronounced, who was
13    questioned about a document.
14                    THE COURT:  And who is he?
15                    MR. MATTHEWS:  He is an expert in another
16    case.  He was an MDL expert, a Federal MDL expert.
17                    THE COURT:  An expert for?
18                    MR. MATTHEWS:  The plaintiffs.
19                    THE COURT:  Okay.
20                    MR. MATTHEWS:  I just found out about this
21    on March 8th, I think through Mr. Fibich, that he was
22    questioned about this document and was questioned where
23    this document -- how this document was produced, how
24    Merck has this document.  And since, I have found exactly
25    how that happened.
```

1          When we were producing documents for our

2     expert, Dr. Moye, I personally, with Jason Webster, went

3     through what documents were being produced to him to

4     review as an expert witness.  In the process of getting

5     those documents to him, Merck wanted all the documents

6     and we decided to put it on a CD.

7          For whatever reason, however it happened,

8     a mistake was made in my office.  The document was

9     actually electronically stored in a place it shouldn't

10    have been; and that is, we have procedures that documents

11    that are being produced to experts are electronically

12    stored in a particular area and documents that were work

13    product documents somewhere else.

14          And it was inadvertently -- this very

15    document that has been --

16          THE COURT:  So are you saying this

17    document was not actually shown to Dr. Moye?

18          MR. MATTHEWS:  No.  The document was put

19    on a disk and the document was sent to Dr. Moye.

20          THE COURT:  I see.  The disk was provided.

21          MR. MATTHEWS:  The disk was provided to

22    Dr. Moye.  And Dr. Moye has testified -- by affidavit, at

23    least, that you have in front of you -- that this was not

24    relied upon by him.  This is the type of information

25    that's not relied upon by him.  Once he saw what it was,

```
 1   it had nothing to do with his testimony.
 2              This clearly was an inadvertent production
 3   to Dr. Moye by my office and we are now asking for that
 4   document to be destroyed or returned to the plaintiffs.
 5   And we are also asking an order from this Court not to
 6   permit questions --
 7              THE COURT:  And Exhibit B is the document
 8   in question?
 9              MR. MATTHEWS:  Yes, Your Honor.
10              THE COURT:  Sealed so that Merck can't see
11   it, even though Merck has it and has marked it as a
12   deposition exhibit?
13              MR. MATTHEWS:  Right, in case somebody
14   else wants to look for it.
15              MR. JOSEPHSON:  May I proceed, Your Honor?
16              THE COURT:  Give me just a second to take
17   a look at it.
18              MR. JOSEPHSON:  Sure.
19              MR. MATTHEWS:  And again, it's a pretty
20   thick document, Judge, but what that is is minutes from a
21   meeting with the science committee from Vioxx.  Those are
22   all plaintiffs' lawyers, discussions between plaintiffs'
23   lawyers concerning Vioxx and strategy, clearly work
24   product.
25              THE COURT:  All right, Mr. Josephson.
```

1           MR. JOSEPHSON:  Your Honor, the story

2   about this particular document is far more complicated

3   than -- it involves the question of whether a document

4   which is normally work product is inadvertently produced,

5   whether that objection on privileged grounds can be -- or

6   work product grounds can be waived, if, in fact, the

7   expert actually reviews the document, testifies under

8   oath that he reviewed it.  And that's essentially what

9   happened here.

10          This matter, interestingly enough, was

11  argued on March 8 before Judge Fallon, the same

12  additional matter.  Judge Fallon has asked the parties to

13  to fully brief this issue and to be prepared to argue it,

14  even though it was already argued.

15          We've attached the transcript so the Court

16  can get the entire background of this to our response.

17  And he is actually hearing on April 12th and will rule on

18  this very issue.  He's already heard, it looks like, 31

19  pages of argument.

20          But essentially what happened was that

21  Dr. Moye, who is one of plaintiffs' experts, testified --

22  and we have cited the pages, on Page 71 and 72 of his

23  sworn deposition, which was taken in this matter and in

24  the federal --

25          THE COURT:  Do you have a copy of that?

1          MR. JOSEPHSON:  I have the page.  I can

2    get you a copy of the deposition.

3          THE COURT:  Let me just see the pages

4    where Dr. Moye testified about these documents.

5          MR. JOSEPHSON:  Well, I have -- this is

6    his testimony.  It's a page.  It's got some of my

7    comments.  And then that's what we gave you.

8          THE COURT:  I will not look at your

9    comments.

10          MR. FIBICH:  Do you have another copy?

11          THE COURT:  He's showing me Page 71 and

12    72.

13          MR. FIBICH:  What proceeding?  What case?

14    What state?

15          MR. JOSEPHSON:  It was the June 2006

16    deposition of Moye that I believe was taken in your

17    office, David.  I was there, as was Joe Piorkowski.

18          Do you remember the Joe Piorkowski

19    deposition?

20          THE COURT:  I'm handing it back to you and

21    you can show it to plaintiffs' counsel.

22          MR. JOSEPHSON:  All right.  Please don't

23    look at my comments on the other side.

24          MR. MATTHEWS:  Fair enough.

25          THE COURT:  All right.  Go ahead.

1              MR. JOSEPHSON:  There is also a trial that

2      took place in California called Grossberg, where he was

3      asked -- I'm at least getting this from the transcript of

4      March 8 in Judge Fallon's court, which is attached to our

5      response, in which he testified essentially to the same

6      thing, that he had read -- he had read virtually all of

7      the documents that were given to him, which would have

8      included this particular document.

9              So this morning, the plaintiffs submitted

10     an affidavit which essentially contradicts, I guess, some

11     of his earlier sworn testimony in two other proceedings.

12             Here is the reason for the issue:

13     Dr. Moye, having said that he actually reviewed these

14     materials twice, is -- the Dr. Furquhar testimony, as I

15     understand it, there is one notation in this document in

16     which Merck argues that the strategy is to inform experts

17     that, in fact, a certain analysis done by a Dr. Doug

18     Watson early on showed a signal which Merck should have

19     responded to.

20             And at least according to the transcript

21     which was attached in Judge Fallon's court, the argument

22     was made that it looked like the strategy involved

23     instructing plaintiffs' experts to all look at this

24     Watson analysis and then say it was a signal, that it

25     constituted an early signal to Merck of potential dangers

1    to Vioxx.  And therefore, it looked like that's what the

2    plaintiffs had advised their experts to do.

3              Now, in the proceeding of Dr. Furquhar,

4    Dr. Furquhar had said exactly, "I thought this -- I

5    looked at this analysis of Dr. Watson and I believed it

6    was a signal."

7              And Merck argued in front of Judge Fallon,

8    almost following the exact language of the document which

9    was produced to Dr. Moye, saying that that document was a

10   signal.

11             Now, I didn't see Dr. Furquhar's

12   testimony.  All I have is, of course, what was argued in

13   the MDL.

14             The plaintiffs agree that Dr. Furquhar

15   said it was a signal, but they deny he relied upon this

16   document for making that statement.

17             So Judge Fallon, having heard that

18   discourse and seeing the direct linkage between that

19   document and a specific Watson memo and whether it's a

20   signal or not, decided that he wanted further briefing in

21   the MDL and argument and that he would either decide the

22   issue on April 12 or let the parties argue some more

23   after he had had an opportunity to review all this.

24             My only point here is that not

25   participating in Dr. Furquhar's deposition but

 1    acquainting the Court with the fact that there was some

 2    direct nexus between statements in this document where

 3    Merck contends that there has been a waiver of work

 4    product and an expert's -- expert testimony, I simply

 5    suggested in my motion to the Court that in light of the

 6    fact that Judge Fallon is looking at this issue --

 7              THE COURT:  Well, except that he

 8    doesn't -- I mean, he's under a different set of rules.

 9              MR. JOSEPHSON:  He is.

10              THE COURT:  Refresh me.  What's the

11    snapback rule, the Texas snapback rule?  I just can't

12    remember.

13              MR. JOSEPHSON:  I think it's in our

14    letter.

15              MR. WEBSTER:  193.3, Your Honor.

16              MR. MATTHEWS:  The party that

17    inadvertently produced --

18              THE COURT:  193.3?

19              MR. WEBSTER:  Yes, Your Honor.

20              MR. JOSEPHSON:  .3(d).

21              MR. WEBSTER:  (d), yeah.

22              THE COURT:  Right, 193.3(d).

23              MR. JOSEPHSON:  I will tell the Court, it

24    was not -- you know, with that date of April 12, it is

25    not our intention to use this document in depositions if

1  the witnesses -- but here would be where the issue comes

2  up.

3          If, in fact, any of their experts say that

4  the Watson memo constitutes a signal, then I think we

5  would be in a similar situation to the deposition of

6  Dr. Furquhar, because there is a memo out there which

7  seems at least arguably -- I'm not saying that this was

8  the intent, but it does seem arguably to dictate the

9  Watson memo and the date of it to be some sort of a

10  signal, or it uses those words.

11          Mr. Matthews, to my knowledge, didn't

12  write that memo, but that's what the memo says.

13          MR. MATTHEWS:  Can I respond to his signal

14  argument, Judge?  I think this is a red herring.

15          The signal on whether an adverse event is

16  a signal is term of art.  Epidemiologists, doctors of

17  public health, all types of experts in any drug case I've

18  ever been involved in, which has been at least a half a

19  dozen different drugs, all use the same term, "signal."

20  This is -- they're making something out of nothing.

21          And what this is is simply this:  There is

22  a document that has been marked and stamped confidential,

23  attorney work product, that my office -- not the Federal

24  MDL, not anybody on the PSC -- but my office

25  inadvertently produced.

1    We have a provision in the State of Texas
2 that allows for the snap back of that document and the
3 destruction of that document that was inadvertently
4 produced.  It's clearly work product.  It says it on the
5 document.

6    Dr. Moye testified when he saw that, this
7 is the type of information he does not rely on and did
8 not rely on it.  And they are trying to take a document
9 from Dr. Furquhar -- who did not see the document, by the
10 way -- and they're trying to cross him on that in other
11 litigation.

12    And quite frankly, my office made the
13 mistake.  Someone has been reprimanded in my office, but
14 this is a Texas issue with our expert.

15    MR. FIBICH:  Judge, if I may add to that,
16 here is how this deal is going to play out, if you want
17 to see what's going to happen.

18    No. 1, Mr. Matthews is exactly right.
19 Every drug litigation there is, the plaintiffs want to
20 say that something happened that should have been a
21 signal to the defendant that they had a defective product
22 for which they should have taken some action.  That's
23 every single piece of drug litigation that I am familiar
24 with, because you always go back when you don't have
25 causation but you have a red flag or what is now known as

 1   a signal.

 2              What you have in this case, as I

 3   understand it, is you have a Plaintiffs Science Steering

 4   Committee in the Federal MDL and they have these meetings

 5   on the telephone where they can all keep their time for

 6   common benefit applications later and somebody made a

 7   note of all this and those thought processes and

 8   strategies of the PSC found its way to the Matthews law

 9   firm.

10              Now, Dr. Moye has testified -- and first

11   of all, with respect to these experts, the experts that

12   are real experts truly review hundreds and hundreds and

13   thousands of documents.  What Dr. Moye said was yes, he

14   looked at everything on the list.  What his affidavit

15   says is that when he saw what this was, he knows from his

16   experience involved in litigation that it's not something

17   that he could rely upon or should rely upon, and he

18   disregarded it.

19              So what would happen if we had a trial and

20   we called Dr. Moye and I put Dr. Moye on the stand and I

21   said, "Dr. Moye, did you read, review, look at this?  Did

22   it make any determination in your mind as to the opinions

23   you are going to give here today," and he's going to say

24   no.  That's what his affidavit says.

25              Now, if the Court is inclined to allow

1   this into evidence, here is how it is used.  We start

2   trying the plaintiff lawyers.  And the case becomes about

3   the plaintiff lawyers and their strategies.  And they're

4   going to use this and blow it and say this is a plaintiff

5   lawyer issue.  And that's what I want to avoid.

6           I want to try this on the facts and the

7   evidence and the basis of the opinions and not get into

8   trying the lawyers.

9           MR. JOSEPHSON:  Your Honor, in fairness, I

10  understand the concern of the plaintiffs, but the fact of

11  the matter is this issue has already come up in a

12  specific case.  I don't know that the 193 rule standard

13  in the federal proceeding is any different.  You probably

14  still have to meet a burden.  I think the judge still has

15  to look at all the evidence.

16          I am simply asking that the Court -- I

17  think it would help the Court immeasurably -- and I know

18  Your Honor has not had an opportunity to read the

19  transcript of the proceedings which are attached to our

20  response to their motion.  And I would simply ask the

21  Court if the Court may want to look at that testimony to

22  get -- because I think it gives a firsthand idea of

23  exactly what the issue is, what the memo said, and

24  precisely what occurred.  And I don't see how that harms

25  the plaintiffs if the Court has the opportunity to read

```
1    all of the evidence.
2                The second thing would be to perhaps --
3    I'll be glad to get the Court the federal rule to let the
4    Court know if there is any difference this afternoon and
5    we could just --
6                THE COURT:  I do have my own copy.
7                MR. JOSEPHSON:  All right.  We could write
8    a short letter.
9                THE COURT:  And once a upon time, I even
10   actually knew the Federal Rules.
11               MR. JOSEPHSON:  Right.  And again, I
12   wasn't involved in this particular issue, but it did come
13   up in a real live expert deposition and it is ripe for a
14   decision on that.  And it may -- look, if Judge Fallon
15   says he's not persuaded by Merck's position, then that
16   may end the issue here.  That's all.
17               THE COURT:  Well, I do agree with
18   Mr. Josephson and I want to look at that transcript of
19   the hearing before Judge Fallon.  The question is:  What
20   do we do in the interim?  I need to rule on this very
21   quickly.
22               Technically, under 193.3(d), it needs to
23   be returned.  I suspect this document, given the
24   complexity of this case, has been disseminated to so many
25   different people both in hard copy and in ones and zeros
```

1   that return of it would be essentially impossible at this

2   point, but maybe I am wrong.

3                    MR. MATTHEWS:  Returned or destroyed.

4                    MR. FIBICH:  But that's really not the

5   issue, Your Honor.

6                    THE COURT:  And I know it's not.  I'm just

7   trying to deal with this.  I'm just thinking out loud as

8   to what to do until I rule in the next few days.

9                    Mr. Josephson says he's not going to be

10  using this document in any depositions for the

11  foreseeable future.  And so based on that, I think what

12  makes sense is not to order its immediate snapback, but

13  rather let me just rule on the inadvertent production

14  issue and the privilege after I have looked at the

15  hearing before Judge Fallon and make a ruling.

16                   MR. FIBICH:  Well, Your Honor,

17  respectfully, it seems to me, though, that the real issue

18  is whether it was relied upon by the witnesses for its

19  admissibility purposes.  I think we're really talking

20  about two different things:  Is it privileged?  Has there

21  been a waiver?  Does snapback apply?

22                   And the next question comes, assuming that

23  you found that it was not, then does it come into

24  evidence in some fashion?

25                   Now, there is no doubt with anybody in

1   this courtroom that thinks that Merck hasn't written its

2   experts and said, "Hey, can you testify in the Fowler

3   case as to alternative causation?"

4           I mean, that's what lawyers do.  We deal

5   with our experts and try to get them to take the

6   positions that we would like them to take.

7           That's not what happened with respect to

8   Dr. Moye.  To the extent that those notes of a bunch of

9   lawyers talking on the telephone somehow found its way to

10  him, he has said he didn't rely on them.

11          THE COURT:  Mr. Fibich, I will tell you

12  right now, my inclination is to say that it was an

13  inadvertent production and to sustain your objection and

14  to require its non use and destruction, return.  All

15  right?  That's my inclination right now.

16          MR. FIBICH:  In that case, I'm going to

17  sit down.

18          MR. JOSEPHSON:  Keep talking.

19          THE COURT:  I'm going to look at this

20  hearing to see if there is some issue or some nuances I

21  am missing, but that's my inclination at this point.  And

22  there is no question but that Dr. Moye would have

23  testified, "Yeah, I looked at everything," as he did in

24  the global fashion that Mr. Josephson handed me, but I

25  mean, my review of the document indicates it's clearly a

1  work product document.  It's clearly otherwise

2  privileged.  Mr. Matthews has persuaded it was

3  inadvertently produced.  To me, the only question is is

4  it somehow different because it was inadvertently

5  produced to a witness and it has this, quote, "linkage,"

6  close quote, that Mr. Josephson referenced.  I want to

7  look at that issue a little.  But for right now, that's

8  just where I'm leaning.

9            MR. JOSEPHSON:  Your Honor, we would

10 also -- and I would very much like to do this.  Since

11 we're clearly not going to use this document -- we

12 wouldn't use it at all if the Court obviously rules

13 against us.  But if the Court defers until I can at least

14 submit the briefing in the Federal MDL, which I obviously

15 believe has to be submitted in the next week or so, I

16 would think it would be, I would like to submit that.  I

17 don't how see how the plaintiffs are prejudiced.  We've

18 already agreed that until Your Honor rules, we will

19 certainly not use the document when we depose the experts

20 from Texas.

21           THE COURT:  Well, the problem we've

22 got -- and candidly, I don't know how to deal with it.

23 I'm not sure I'm smart enough to know the answer to this.

24 But when you've got 50,000 cases nationwide, you've got a

25 California, New Jersey, Federal and Texas MDL, and I'm

1    sitting here presiding over a case and my little thousand

2    cases and I determine that a document was, quote,

3    "inadvertently produced" and should be returned, I'm not

4    just real sure what effect that has to some plaintiff's

5    lawyers sitting in Trenton, New Jersey, you know, or

6    cases that I have no jurisdiction over.  I'm not sure how

7    to deal with that.

8         I think all I can do -- I'm not sure I can

9    order Merck to return that document to everybody, you

10   know, from every case.  I can sure as heck order that it

11   not be used in these cases, but I'm not sure what

12   jurisdiction I have when we have these overlapping MDLs.

13        MR. JOSEPHSON:  And part of the issue is,

14   I mean, as the Court knows, in many thousands of cases,

15   Judge Fallon will presumably rule.  If he rules that the

16   document was inadvertently produced and sustains the

17   plaintiff's objection, then at least in those thousands,

18   that will be the end.  But if he decides that there has

19   been a waiver --

20        THE COURT:  I'm not sure where that leaves

21   us.

22        MR. MATTHEWS:  So I'm clear, though ---

23        MR. JOSEPHSON:  -- and allows in all the

24   federal cases that document to be used, then my only

25   point is I would think that his reasoning and his logic

1  in an effort to try to achieve uniformity, even if it's

2  against Merck, would be something that would be helpful

3  to the Court in getting an understanding of why this

4  document, even if it's not relevant in Dr. Moye's

5  deposition, might be relevant in a number of other

6  experts' depositions.

7           MR. FIBICH:  Well, here is my concern, is

8  that he has asked that we now wait for Judge Fallon to

9  rule.  You know, if I wanted Judge Fallon to rule on my

10  cases, I would have filed them in the MDL.  I don't want

11  to wait.  If this Court is --

12           THE COURT:  Well, I didn't say I was going

13  to wait.

14           MR. FIBICH:  No, no, but he's asking you

15  to wait.

16           THE COURT:  I'm not doing that.

17           MR. FIBICH:  Okay.  But here is my point

18  again -- and I'm sorry if I've made it repetitively, but

19  this is a big issue to me.

20           If there is a waiver or whatever -- and

21  we're kind of confusing or I think we're talking around

22  different issues.  Admissibility is another question.  I

23  mean, if they've got our document on our strategy and how

24  we think and what we want, that's one thing.

25  Admissibility is another thing, because if the Court

1   rules that somehow this can be used against Dr. Moye who

2   has given a sworn affidavit that he's never seen it, then

3   I've got to rethink whether I'm going to call Dr. Moye,

4   because I don't want a jury to be judging the plaintiffs'

5   lawyers, particularly a bunch of lawyers that are the PSC

6   on the telephone taking notes of what they thought the

7   evidence is going to be.  There is no nexus between that

8   and the opinions that are going to be rendered by --

9          THE COURT:  Mr. Fibich, all I have said at

10   this point is, A, I want to hear read this hearing

11   transcript that Mr. Josephson has referenced; and B, if I

12   rule in your favor, I am not sure mechanically how that

13   affects other cases around the country.  And I really do

14   not know the answer to that second question.  That is a

15   bit of an enigma to me.  Particularly if I determine that

16   it is privileged, it was an inadvertent production,

17   should be returned and Judge Fallon rules a different

18   way, I'm not quite sure where that leaves us, except that

19   I think it would mean pretty clearly I would not be

20   allowing the use of the document in Texas cases.  And if

21   Judge Fallon wishes to use it in federal cases, that's

22   his prerogative.

23          Anything further on the issue?

24          MR. JOSEPHSON:  No, Your Honor.

25          THE COURT:  All right.

1          Okay.  So where that leaves us then is, A,

2  in a week, you are going to get a more rifleshot request

3  for documents you wish to have reviewed en camera; B, you

4  are going to get new profile forms in about a week and we

5  will set up a hearing for me to review those five.  I

6  need to review the briefing on Judge Fallon's hearing

7  vis-a-vis the inadvertent production document.

8          MS. LOWRY:  Two more quick things.

9          MS. HARDIN:  Your Honor, one more other --

10  I'm sorry.

11          I have the Plaintiff's Agreed Scheduling

12  Order, which we'd supply for your signature.

13          THE COURT:  Okay.

14          MS. LOWRY:  I have two more quick things,

15  with the Court's permission.

16          THE COURT:  Yeah.

17          MS. LOWRY:  One is -- this was brought up

18  at the last hearing, Your Honor, just to update the

19  Court.  We mentioned at that time that we thought there

20  were going to be significant problems going forward with

21  with Kelly case due to the late service of that case and

22  the fact that we were missing significant records.

23          Her deposition was taken last week and we

24  learned some surprising things that were different from

25  what we were told.  We still think there are significant

1  issues with going forward and getting that case ready by

2  May 14, but we would just suggest that if we're going

3  to --

4          THE COURT:  What number in the batting

5  order was Kelly?

6          MS. LOWRY:  Three.  And so we were going

7  to suggest if we take up perhaps moving Fowler or putting

8  it at the end, that we take up Kelly at the same time, if

9  that makes sense to the Court.

10          THE COURT:  Yes.

11          MS. LOWRY:  All right.  Second thing is,

12  we do have our list of stroke cases.

13          THE COURT:  I was going to ask about that

14  before we all scattered.

15          MS. LOWRY:  We do have it, Your Honor.

16          THE COURT:  Where are the plaintiffs on

17  stroke cases?

18          MR. MATTHEWS:  We just had a brief meeting

19  before with some lawyers from around the state and we

20  will have it by 5:00 o'clock today.

21          THE COURT:  Fine.

22          Okay.  I think that's all I can think of

23  for today.

24          MS. LOWRY:  Your Honor, just one note.  We

25  did put on the stroke list the case you have already

```
 1    selected, the Molten case, but we just included it in the
 2    six.
 3                    THE COURT:  All right.
 4                    MS. LOWRY:  Thank you.
 5                    THE COURT:  Off the record.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CAUSE NO. 2005-59499


IN RE:                          *        IN THE DISTRICT COURT OF
                                *
TEXAS STATE VIOXX               *
LITIGATION                      *        HARRIS COUNTY, T E X A S
                                *
THIS DOCUMENT RELATES           *
TO ALL CASES                    *        157TH JUDICIAL DISTRICT

*************************************************************


        I, SHERI M. ULLRICH, Court Reporter in and for

the 157th Judicial District Court of Harris County,

State of Texas, do hereby certify that the above and

foregoing contains a true and correct transcription of

all portions of evidence and other proceedings requested

in writing by counsel for the parties to be included in

this volume of the Reporter's Record, in the

above-styled and numbered cause, all of which occurred

in open court or in chambers and were reported by me.


        I further certify that this Reporter's Record

of the proceedings truly and correctly reflects the

exhibits, if any, admitted by the respective parties and

requested to be included in this volume.


        I further certify that the total cost for the

preparation of this Reporter's Record is $630.00 and was

1    paid/will be paid by Ms. Julie Hardin.

2

3         WITNESS MY OFFICIAL HAND this the 28th day of

4    March, 2007.

5

6

7

8

9
                    _____
10                  Sheri M. Ullrich, Texas CSR #1918
                    Expiration Date:  12-31-08
11                  Court Reporter, 157th District Court
                    201 Caroline, 11th Floor
12                  Houston, Texas 77002
                    713-368-6242
13

14

15

16

17

18

19

20

21

22

23

24

25