# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ASHLEY BARNHILL, | ) | |
| Plaintiff | ) | |
| v. | ) | CIVIL ACTION NO. 06-0282-CB-M |
| TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES, LED., and ELI LILLY & COMPANY, | ) ) ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on a motion to dismiss the complaint for failure to state a claim upon which relief can be granted filed by defendant Teva Pharmaceuticals USA, Inc. (Teva USA). (Doc. 17.) The primary issue presented is whether federal statutes and regulations governing labeling of generic drugs preempt plaintiff's state law causes of action against Teva USA, a generic drug manufacturer. For reasons discussed below, the Court finds that plaintiff's claims are not preempted.

**Factual Background**[1]

In 1998, when plaintiff Ashley Barnhill was 12 years old, she developed strep throat. Her doctor prescribed an antibiotic, Cephalexin, which was manufactured by defendant Teva Ltd. and distributed by defendant Teva USA.[2] After taking Cephalexin, plaintiff developed a

---

[1] For purposes of a motion to dismiss, the Court must accept all the allegations of the complaint as true and construe the facts asserted in the light most favorable to the plaintiff. *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993).

[2] Although the complaint alleges that both Teva USA and Teva Ltd. "designed, licensed, manufactured, marketed, distributed and/or sold" Cephalexin, evidence regarding the role of these related corporations was presented by Teva Ltd. in support of its motion to dismiss for lack

severe skin rash and difficulty in swallowing and breathing. She was diagnosed with severe Stevens-Johnson-Syndrome (SJS), a condition characterized by the disintegration of her skin, underlying tissues, internal organs and teeth. Plaintiff was hospitalized for several weeks during which she received treatments for burn-like symptoms. The effects of the SJS were long-lasting, resulting in several hospitalizations and continued treatment.

SJS is a side-effect of Cephalexin, which was or should have been known to the defendants in 1997 or 1998. However, neither the "Warnings" nor the "Precautions" sections of the Cephalexin label contained warnings about SJS. The only mention of SJS was in the "Adverse Reactions" section where SJS was listed as one of several possible results of "hypersensitivity" to the drug.

On May 5, 2006, Barnhill, an Alabama citizen, filed the instant action against Teva USA, a corporation with its principal place of business in Pennsylvania, Teva Pharmaceutical Industries, Ltd. (Teva Ltd.), an Israeli company, and Eli Lilly & Company, a corporation with its principal place of business in Indiana.[3] The complaint, which invokes the Court's diversity jurisdiction under 28 U.S.C. § 1332, asserts claims for: (1) strict liability under § 402B, Restatement (Second) of Torts, (2) negligent failure to test and warn; (3) negligent "design, testing, advertising, warning, marketing and sale of Cephalexin" by (a) failing to use reasonable care in formulating and manufacturing; (b) failing to provide proper warnings regarding adverse

---

of personal jurisdiction. According to that evidence, which has not been disputed by plaintiff, Teva Ltd. manufacturers Cephalexin, which it then distributes in the United States through its wholly-owned subsidiary, Teva USA.

[3]Eli Lilly & Company (Lilly) is the manufacturer of Keflex. Cephalexin is the generic bioequivalent of Keflex. Lilly has filed a motion for summary judgment. That motion also will be addressed in a separate order.

2

effects; (c) failing to conduct pre-clinical and clinical testing and post marketing surveillance; (d) failing to provide adequate training and information to physicians; and (e) failing to warn consumers of the specific risk of skin rash and SJS; (4) breach of express warranty; and (5) breach of implied warranty of merchantability.[4]

**Issues Presented**

First and foremost, Teva USA asserts that all of plaintiff's claims are due to be dismissed because the manufacture and sale of Cephalexin is regulated by federal law and FDA regulations. Consequently, defendant argues, the doctrine of federal preemption precludes liability under state law. In the alternative, Teva USA contends that specific claims are due to be dismissed, or re-pled, under the applicable state law. Plaintiff strongly opposes Teva USA's preemption argument and also opposes most, but not all, of Teva USA's arguments in favor of dismissal under state law. Below, the Court addresses first the preemption issue and, upon finding that preemption does not apply, addresses the issues of state law raised in Teva USA's motion to dismiss.

**Legal Analysis**

**Preemption**

    **Conflict Preemption[5]**

---

[4]The complaint borders on the type of shotgun pleading that Judge Tjoflat has warned against on many occasions. *See, e.g., Strategic Income Fund L.L.C. v. Spear Leeds & Kellogg Co.*, 305 F.3d 1293, 1294 n. 9 (11th Cir. 2002) (and cases cited therein). Even though each claim is not stated in a separate cause of action, the claims are stated clearly enough that the Court has chosen not to require the plaintiff re-plead at this stage.

[5]Federal preemption of state laws comes in many forms. *Hillsborough County v. Automated Med.l Lab., Inc.*, 471 U.S. 707, 713 (1985). Congress may preempt state law expressly by so stating in the statute. *Id.* Preemption may be implied by Congress' enactment of

3

Teva USA's dismissal motion is based on conflict preemption–specifically, the purported impossibility of providing prescription drug warnings that comply with both state and federal law. Under the doctrine of conflict preemption, state law is preempted "to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility, . . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County v. Automated Med. Lab.*, 471 U.S. 707, 713 (1985) (internal quotations and citations omitted).

The preemption analysis begins with a simple truth. In our federalist system, Congress does not "cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Because matters of public health and safety traditionally fall within the domain of the states, it must be presumed that Congress did not intend to supersede the states' powers to regulate. *Hillsborough County*, 471 U.S. at 715. "Historically, common law liability has formed the bedrock of state regulation, and common law tort claims have been described as 'a critical component of the States' traditional ability to protect the health and safety of their citizens.'" *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 544 (1992) (Blackmun, J., concurring in part and dissenting in part)). The presumption against preemption in these areas also applies to regulations issued by a federal agency. *Hillsborough*, 471 U.S. at 716. Consequently, to prevail on its preemption argument

---

regulations so comprehensive that there is no room for state regulation or it may be implied where the federal interest is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (quoting *Rice v. Santa Fe Elevator Corp*, 331 U.S. 218, 230 (1947)).

4

Teva USA must demonstrate a conflict between state tort law and federal labeling requirements "that is strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." *Id.* To satisfy that burden, Teva USA points to labeling requirements for generic drugs found in the FDCA and in FDA regulations and argues that a generic drug manufacturer *cannot* deviate from the label initially approved by the FDA.

**Labeling Requirements--The FDCA, the FDA & Generic Drugs**

The Food, Drug and Cosmetics Act (FDCA) 21 U.S.C. § 301, *et seq.* was enacted to protect public health. To that end, Congress implemented a stringent new drug application "NDA" procedure that a drug manufacturer must satisfy before it may introduce any new drug for sale in this country. 28 U.S.C. § 355. Congress also gave broad powers to the FDA (via the Secretary of Health and Human Services) to regulate the application and approval process. *Id.* In 1984, Congress amended the FDCA to streamline the approval process for generic drugs.[6] At that time, the FDA applied two different sets of rules for generic drug approval, depending on whether the listed drug upon which the generic is based was approved before or after 1962. For the latter, the generic manufacturer was required to duplicate the testing done by the manufacturer of the original drug. For the former, duplicate testing was not required. The result was that "the FDA rules on generic drug approval for drugs approved after 1962 [ ] had serious anti-competitive effects. The net result of these rules [w]as [ ] the practical extension of the monopoly position of the patent holder beyond the expiration of the patent." H.R. Rep. 98-857 (II) (Aug. 1, 1984) 1984 U.S.C.C.A.N. 2686, 2687. To rectify the problem, Congress established

---

[6]Generic drugs are drugs that are bioequivalent to drugs already approved by the FDA.

5

an abbreviated new drug application (ANDA) procedure for generic drugs.

The applicable statute, 21 U.S.C. § 355, sets out certain requirements an ANDA must meet before the FDA can approve a generic drug. Important for our purposes is the labeling requirement. The ANDA must contain

> information . . to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(c) or because the drug and the listed drug are produced and distributed by different manufacturers.

21 U.S.C. § 355(j)(2)(A)(v); *see also* 21 U.S.C. § 355(j)(4)(G). In other words, for a generic drug to be *approved*, it must have the same labeling as the listed drug

Two FDA regulations regarding labeling also come into play. The FDA has put in place a mechanism–21 C.F.R. § 314.70-- whereby warning labels may be changed, unilaterally, by the manufacturer. Pursuant to § 314.70(c)(6)(iii), an applicant (*i.e.*, a manufacturer) may make changes in labeling that "add or strengthen a contraindication, warning, precaution or adverse reaction." These changes do not require prior approval from the FDA but do require a supplemental submission to the FDA 30 days in advance of the changes. This regulation applies to any "approved applications", 21 C.F.R. § 314.70(a) and does not distinguish between NDA's and ANDA's (*i.e.*, listed drugs and generic drugs). Also, the FDA may withdraw approval of an ANDA if the generic label "is no longer consistent with that for the listed drug ." 21 C.F.R. § 314.150(b)(10)

**Why Labeling Requirements do not Conflict with State Failure to Warn Claims**

Beginning with the presumption that Congress did not intend to preempt state law in this area, this Court first examines what Congress has done. Congress enacted a law requiring that in

6

order for a generic drug to obtain initial approval its label must be essentially identical to the label of its listed counterpart. 21 U.S.C. § 355(j)(2)(A)(v). Congress could have said that this label was the only warning necessary, but it did not. Hence, other warnings may be required by state law. This might be the end of the discussion, but federal regulations have something to say about labeling, and federal regulations may sometimes preempt state law.

The FDA regulations quite clearly permit manufacturers to make unilateral changes in labeling to add new warnings or strengthen existing ones. 21 C.F.R. § 314.70(c)(6)(iii). Consequently, as numerous courts have held, it is possible to comply with the FDA's labeling requirements *and* provide additional warnings that might be necessitated by state law. *See, e.g., Weiss v. Fujisawa Pharmaceutical Co.*, 464 F. Supp. 2d 666, (E.D. Ky. 2006) (state-law failure-to-warn claim not preempted to extent it required additional warnings); *Perry v. Novartis Pharmaceutical Co.*, 456 F. Supp. 2d 678 (E.D. Pa. 2006) (failure-to-warn claim not preempted; additional warning would have forced manufacturer to choose between compliance with state and federal law); *Jackson v. Pfizer, Inc.*, 432 F. Supp. 2d 964 (D. Neb. 2006) (failure-to-warn claim not preempted); *Laisure-Radke v. Par Pharmaceutical, Inc.*, 2006 WL 901657 (W.D. Wash. Mar. 29, 2006) (same); *McNellis ex rel DeAngelis v. Pfizer, Inc*, 2005 WL 3752269 (D.N.J. Dec. 29, 2005) (same); *Madden v. Wyeth*, 2005 WL 2278081 (N.D. Tex. Sept. 14, 2005) (failure to warn include warning about SJS not preempted); *but see Colacicco v. Apotex, Inc.* 432 F.Supp. 2d 514 (E.D. Pa. 2006) (FDA regulations preempt state-law failure to warn claims). But Teva USA argues that our case is different because it involves a generic drug, and the FDA *may* revoke approval if the generic label no longer conforms to the label of the listed drug.

Teva USA points to 21 C.F.R. § 314.150(b)(10) which permits the FDA to withdraw

7

approval of an ANDA if its labeling is no longer consistent with the labeling for the listed drug. However, the purpose of this regulation was not to prevent a generic manufacturer from improving or strengthening its warnings. It was, instead, to ensure that the FDA could require a generic manufacturer "to modify its labeling to match labeling changes in the reference listed drug." 57 Fed. Reg. 17970. In other words, if the manufacturer of the listed drug changes its labeling, the FDA can require the generic manufacturer to do so as well. This is the only harmonious interpretation of the two regulations. Otherwise, the FDA permits a generic manufacturer to strengthen or modify its labeling, on one hand, only to suspend its approval because the new label does not conform to the label for the listed drug.

Teva USA also purports to find support for its preemption argument in comments found in the implementing regulations. Those comments do state that the ANDA label should not deviate from the listed drug's label, 57 Fed. Reg. 17957, 17961, but that is the same thing that Congress said in 21 U.S.C. § 355(j)(2)(A)(v) about *initial* labeling requirements. Like the statute, the comments cited by Teva USA address labeling requirements necessary for *initial* approval, not changes to labels for approved ANDA's.[7]

### Why the FDA's Current Position on Labeling & Preemption is Not Binding

Teva USA's purported trump card is the FDA's Preamble to the 2006 implementing regulations, wherein the FDA, in effect, advocates for preemption. In that nonbinding advisory

---

[7]The comments address proposed changes to 21 C.F.R. § 314.93, which sets out the procedure a drug manufacturer must follow to submit an ANDA for a generic that deviates from the original in a specific aspect--route of administration, dosage form, strength or active ingredient–and 21 C.F.R. § 314.94, which merely prescribes the content and form of an ANDA.

opinion,[8] the FDA says that it "believes that under existing preemption principles, FDA approval of labeling under the [FDCA] . . . preempts conflicting or contrary State law." 71 Fed. Reg. 3934. In other words, the FDA's position is that its approval of any label absolves the manufacturer–generic or original--of liability for state-law failure-to-warn claims. Teva USA argues that the Court should give deference to the agency's interpretation of the preemptive effect of its own regulations. Several courts recently have been confronted with this same argument and all, save one, have soundly rejected it. *See Weiss v. Fujisawa Pharm. Co.*, 464 F. Supp. 2d 666 (W.D. Ky. 2006) (concluding that courts are not bound by FDA position in Preamble); *McNellis ex rel. DeAngelis v. Pfizer, Inc.*, 2006 WL 2819046 (D.N.J. Sept. 29, 2006)(same);[9] *Jackson v. Pfizer, Inc.*, 432 F. Supp.2d 964, 968 n. 3 (D. Neb. 2006); *see also Laisure-Radke v. Par Pharm., Inc.*, 2006 WL 901657 (W.D. Wash. Mar. 29, 2006) (rejecting defendant's preemption argument and acknowledging Preamble's existence but not addressing its effect). Perhaps the best reason for rejecting the Preamble was set forth by the Second Circuit in *Desiano*: "[W]hatever deference would be owed to an agency's view in contexts where a presumption against federal preemption does apply, an agency cannot supply on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption." *Desiano*, 467 F.3d at 97 n. 9. Nevertheless, because agency interpretations are entitled to some level of deference, the Court explains its reasons for rejecting the FDA's position set forth in the Preamble.

---

[8]21 C.F.R. § 10.85(d)(1) identifies as the Preamble portion of a Federal Register notice as an advisory opinion.

[9]In its September 2006 opinion, the *McNellis* court granted an interlocutory appeal on the preemption issue.

An agency's advisory opinion is entitled to deference only to the extent it has the power to persuade. *Christensen v. Harris County,* 529 U.S. 576, 587 (2000). For several reasons, he FDA's position is not persuasive. First, it represents an about-face from the agency's position–until 2001–that the FDA labeling rules were not intended to preempt state law. *See Weiss,* 464 F. Supp. 2d at 672 (detailing history of FDA's position on preemption). Second, its reasoning is flawed and leads to a result contrary to the purpose of the FDCA. If an FDA-approved label establishes, as the Preamble asserts, both a floor and a ceiling for a manufacturer's duty to warn, 71 Fed. Regis. 3935, then the manufacturer has no incentive ever to disclose risk information it may subsequently discover. Furthermore, the FDA's Preamble position would nullify its own regulations which place an affirmative duty upon drug manufacturers to revise a drug's label to include a warning 'as soon as there is reasonable evidence of an association of serious hazard with a drug...'" *McNellis,* 2006 WL 2819046, * 7 (D.N.J. 2006) (citing 21 C.F.R. 201.80(e)). The Preamble points to a concern about the potential hazards of "overwarning" caused by warning labels expanded "to include speculative risks." *Id.* However, the FDA has a mechanism in place by which it may require a manufacturer to correct or change its label. *See* 21 C.F.R. § 314.70(c)(7) (agency may disapprove supplemental application and order manufacturer to cease distribution of the product with labeling change). In fact, in the next breath the FDA argues that manufacturers do, in fact, "typically" consult the FDA prior to changing a label precisely because of the potential that FDA could disagree with the label change and take action against the manufacturer. *Id.* at 3934. Implicit in this argument is that the informal practice somehow indicates a conflict between state law and FDA regulation. Whatever the current *practice* may be, it is not a *requirement.* Under

10

current laws and regulations, a manufacturer can make a change without prior FDA approval, and the FDA may choose to accept it.[10] The conflict is, at most, a *potential* one; that is, a manufacturer might strengthen a warning label and, if the warning is found to be false or misleading, the FDA may undertake an enforcement action against the manufacturer.[11] Finally, the FDA's broad-sweeping preemption argument is not convincing because the FDA itself is not convinced. The Preamble's preemption argument concludes with the statement that "the FDA believes that at least the following [six] claims would be preempted by its regulation of prescription drug labeling[.]" *Id.* at 3936. In other words, the FDA is that all that all failure-to-warn claims are preempted, while at the same time recognizing that perhaps *all* does not mean every such claim. Because the FDA's position is equivocal, contradictory, and a represents a marked change of course from its longstanding views, it is not entitled to deference.

The amount of deference given to the FDA's Preamble position explains how the court in *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514 (E.D. Pa. 2006), reached a different result. The *Colaccico* opinion is thorough, and in some respects well-reasoned but, in this Court's opinion, affords too much deference to the FDA. Citing the Supreme Court's opinions in *Hillsborough County* and *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000). *Colacicco* concludes that the FDA's "preemptive intent . . . communicated [by the agency] in *amicus* briefs, preambles and interpretive statements." *id.* at 530, . . . must [be] respect[ed]" and therefore

---

[10]The FDA's argument about potential enforcement actions seems a bit exaggerated. The Preamble contains no data to suggest that unsubstantiated warnings requiring FDA enforcement actions have actually occurred.

[11]That manufacturers currently attempt to satisfy both state and Federal law by bringing potential changes to the FDA surely demonstrates that compliance with both is possible.

11

deferred completely to the FDA's "expert judgment that a[ ] . . . warning label other than approved by the FDA would have been in direct, actual conflict with federal law." While the Supreme Court in *Hillsborough County* did grant significant deference to an FDA advisory opinion, that opinion was issued at the same time the initial regulations were implemented and had not changed over time. *Hillsborough County*, 471 U.S. 716-17. Furthermore, that case was decided before *Christensen*, wherein the Court held that *Chevron*-type deference does not apply to agency positions found in policy statements, manuals, guidelines and letters. *Christensen,* 529 U.S. at 587. In *Geier* the Court, finding a conflict between the regulation at issue and state law, stated: "One final point: We place *some weight* upon DOT's interpretation of [the regulation] and [its preemptive effect]." *Id.* at 884 (emphasis added). Whatever weight the Court gave the agency's opinion, it did so because, unlike the FDA's position on labeling, the DOT's position *had been consistent over time. Geier*, 529 U.S. at 883.

**Other Claims**

    **Strict Liability**

In the complaint, plaintiff has asserted a strict liability claim pursuant to §§ 402A and 402B of the Restatement (Second) of Torts. As defendant points out, Alabama has not adopted the no-fault concept embodied in the Restatement but, instead, has retained a negligence-based concept of liability in products liability cases. *Griggs v. Combe, Inc.,* 456 So. 2d 790, 792 (Ala. 1984). Plaintiff appears to concede this point, as she has not addressed strict liability issue in her response. Therefore, the strict liability claim is due to be **dismissed**.

    **Misrepresentation**

12

Defendant argues that any misrepresentation claim premised on communications other than the product label should be dismissed for failure to plead fraud with particularity. Plaintiff responds that (1) failure to reveal the entire truth amounts to fraudulent concealment and (2) a manufacturer has a duty to provide an adequate warning. The former argument fails because nowhere in the complaint is a fraudulent concealment claim mentioned. The latter argument fails because it relates to a claim for failure to warn, not to one for misrepresentation. Indeed the only specific mention of a misrepresentation in the complaint that the Court can find is plaintiff's claim that the defendants are "strictly liable for misrepresentations" in product literature disseminated to prescribing physicians. (Compl., Doc. 1, ¶ 19.) Since the strict liability claim fails, this misrepresentation claim is also due to be **dismissed**

### Breach of Implied Warranty of Merchantability

Defendant argues that plaintiff cannot prove a cause of action for breach of implied warranty of merchantability under Ala. Code § 7-2-314(c), but its argument is based on facts outside the pleadings, *i.e.*, the number of people who have suffered an adverse reaction to the drug at issue. Consequently, it is not appropriate for resolution in a motion to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 56.

### Conclusion

For the reasons discussed, it is hereby **ORDERED** that the motion to dismiss filed by defendant Teva Pharmaceuticals USA, Inc. be and hereby is:

> **DENIED** as to defendant's argument that all claims are preempted;
>
> **GRANTED** as to plaintiff's claims based on strict liability and misrepresentation;

13

    **DENIED** as to plaintiff's claim for breach of implied warranty of merchantability.

**DONE** this the 24th day of April, 2007.

              <u>*s/Charles R. Butler, Jr.*</u>
              **Senior United States District Judge**