UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF LOUISIANA

VICKIE ROBERTS and JACKIE            ]
AMMONS, PLAINTIFFS                   ]
C0-Executrixes of the Estate of      ]
MARY ROBERTS, Deceased,              ]
  Plaintiffs,              ]
VS.                                  ]  CAUSE  NO.  07-2007[1]
          ]
MERCK & CO., INC., JEANNA            ]  JURY TRIAL DEMAND
DAMPIER and DOES 1-5,                ]
  Defendants.                 ]

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF REMAND

### I.  FACTS SUPPORTING REMAND

  This is an action brought by Vickie Roberts and Jackie Ammons, as the legal representatives

of the estate of Mary Roberts, Dec. for damages resulting to their Mother, Mary Roberts fo as a result

of her ingestion of the non-steroidal, anti-inflammatory pain medication, VIOXX® (chemical name

"Rofecoxib").    Mrs. Roberts was given   VIOXX® samples by her physician in Greenwood,

Mississippi, and ingested the drug on a regular basis beginning on May 7, 2001 , and ending or about

August 1, 2004.  As a result of such ingestion, Mrs.  Roberts suffered physical injuries, including,

but not limited to, an acute myocardial infarction, on May 28, 2001.  (Complaint. ¶ 8)

  Merck develops, markets and sells pharmaceutical drugs.  Merck is one of the country's

largest drug manufacturers and is a dominate player in both the United States and world markets.

In order to maintain its market position, Merck must continuously research and develop new drugs,

seek their approval by appropriate governmental agencies, and aggressively market these drugs to

---

[1] Plaintiffs' Memorandum in Support of Motion to Remand was previously filed in the
United States District Court for the Northern District of Mississippi; Civil Action No.:
3:07CV034-M-A

health care professionals and the general public (a) through its sales representatives such as Defendant, Jeanna Dampier, (b) "direct-to-consumer" print and video advertising, and (c) subsidized medical meetings. Merck's revenues are dependent on the sales of the drugs which it has developed. (Complaint, ¶ 9)

Like many major pharmaceutical companies, Merck relies on the success of so called "blockbuster" drugs to generate the huge revenues necessary to maintain its leading position in a very competitive industry. "Blockbusters" are typically defined in the trade as medications that account for more than one billion dollars in annual sales, and are most often still under full patent protection from relatively inexpensive competing generic versions of the drugs. It is of paramount importance for pharmaceutical companies like Merck to make as much money from these blockbuster drugs as it can while Merck still maintains full patent protection, thereby owning the market. (Complaint, ¶ 10)

Beginning in February 2000, and continuing through June of 2001, five major drugs manufactured by Merck were going to lose patent protection, namely: Vasotec, February 2000; Pepcid, April 2000; Prilosec, April 2001; Prinivil, December 2001; Mevacor, June 2001. (Complaint, ¶ 11)

During this time, the drug VIOXX® was one of the drugs being developed by Merck for introduction into the market. Faced with impending loss of significant market share, VIOXX® became the blockbuster drug recognized by Merck to be the critical component to Merck's future financial success. (Complaint, ¶ 12)

VIOXX® is the brand name of a pain killer developed by Merck. Traditional pain killers, such as aspirin and Naproxen (non-steroidal anti-inflammatory drugs, or "NSAIDs"), cause

significant gastrointestinal problems. Merck represented that VIOXX® would relieve pain while avoiding serious gastrointestinal health effects. When attempting to position VIOXX® in the market, Merck repeatedly emphasized the serious health risks and fatalities that could be caused by prolonged use of NSAIDs that could be avoided through use of the drug VIOXX®. Merck's marketing plan of VIOXX® depended upon a multi-million dollar advertising campaign through direct-to-consumer advertising and to potential prescribing physicians through its sales representatives, including Jeanna Dampier. (Complaint, ¶ 13)

As marketed by Merck, the value of VIOXX® did not lie in its effectiveness for treatment of pain. VIOXX®'s value lay in its purported "safety" as represented and marketed by Merck. (Complaint, ¶ 14)

In May of 1999, Merck began the distribution and sale of VIOXX®. Once distribution and sales began, Merck wasted no time in dispatching its pre-programmed sales force, including its drug representatives, to insure VIOXX®'s availability on the market. Although VIOXX® would not arrive in pharmacies until early June 1999, Merck had already begun to dispatch a sales force of over four thousand individuals to pitch "the safe drug VIOXX®" to doctors, and healthcare organizations. By June of 1999, Merck's sales force had been successful in placing VIOXX® in more than 40,000 pharmacies across the United States. (Complaint, ¶ 15)

As Jeanna Dampier and other members of Merck's sales force were taunting the safety of the drug VIOXX®, they, at the same time, were aware that VIOXX® posed a substantial risk of heart attacks, strokes, and other serious cardiovascular events. These serious risks posed by VIOXX® were known to Merck as far back as 1996 when Merck's scientists began to notice that VIOXX® did not possess the same protection against heart attacks recognized in other pain killers, i.e., aspirin and

Naproxen.  Because VIOXX® did not have this similar affect, this could explain studies suggesting that VIOXX® would **increase** the risk of heart attacks.  (Complaint, ¶ 16)

As early as 1998, Merck began to conduct clinical randomized trial studies designed to evaluate the safety of VIOXX®.  These studies, Study 085 and 090 in 1988, the VIGOR Study in 1999, and ADVANTAGe in 2000, all revealed that patients taking VIOXX® faced a significantly increased risk of serious cardiovascular events.  However, Merck either misrepresented the results of these studies or did not publish the actual results until shortly before VIOXX® was removed from the market in September, 2004.  (Complaint, ¶¶ 17 -21)

Even Merck's last attempt to come clean by releasing the data from its APPROVe study was just one more attempt by Merck to present false and misleading information regarding VIOXX®.  Shortly after the data was published, a well-respected member of the medical community obtained the previously confidential 107 page raw data from the APPROVe study.  After examining the study, it was learned that the raw data confirmed that patients were at high risk of heart problems and stroke almost as soon as they started taking VIOXX®.  Further, the raw data confirmed that the risks from VIOXX® persisted for at least a year after patients stopped taking the drug.  (Complaint, ¶ 34)

These findings, based upon the raw data from Merck's own study, contradicted Merck's public announcement that the data showed no adverse effects within the first eighteen (18) months of taking the drug, and no indication that patients were at a greater risk of heart problems after they stopped taking the drug.  (Complaint, ¶ 34)

As safety questions about the adverse cardiovascular effects of VIOXX® continued to be raised in the medical community, Merck pushed forward with its estimated $500 million dollar plus advertising and training program.  As part of its training program, Merck had produced  training

videotapes and training brochures and coached sales representatives, including Jeanna Dampier, to try to avoid questions about the risks of heart attacks. One such video contained an actress posing as a physician presenting "an obstacle" to a VIOXX® sales representative. The actress/physician poses the question "I'm afraid VIOXX® causes myocardial infarctions." As a response, another actress playing a Merck sales representative coaches representatives to respond "That's not true." (Complaint, ¶ 35)

Merck also authored a 1999 training guide which was presented to sales representatives, such as Jeanna Dampier, at a VIOXX® workshop. The workshop training materials form indicated that one of the core messages that should be communicated to VIOXX® sales representatives, such as Jeanna Dampier, and by them to prescribing physicians, was that VIOXX® was a safe product. One of the planned goals of the workshop was to insure that VIOXX® sales representatives could handle "obstacles" in the nature of questions from physicians about the cardiovascular safety of VIOXX®. (Complaint, ¶ 36)

As part of its workshops, Merck developed the game of "**Dodge Ball VIOXX®**", and "**JeopardXX**" as teaching tools. In the game of **Dodge Ball VIOXX®**, Merck sales representatives had to overcome "obstacles" in the form of physicians' questions in order to advance to the next round. However, players were rewarded if they turned over the "**DODGE!**" card allowing them to advance to the next round without having to answer the physician's question. Merck, through this training exercise, was able to send a clear message to Jeanna Dampier and its sales representatives, namely, "You never have to answer a hard question from a physician if you're able to **DODGE** it." (Complaint, ¶ 37)

In the game of **JeopardXX**, **VIOXX<sup>B</sup>** sales representatives were awarded points for avoiding direct answers to physicians' questions regarding concerns about the cardiovascular effects of VIOXX<sup>B</sup>, specifically, questions posed by a physician "About a potential increase in the risk of myocardial infarctions."  (Complaint, ¶ 38)

Armed with this information, Jeanna Dampier and other members of Merck's pre-program sales force would visit pharmacists, doctors and other health care professionals to promote the sale and use of VIOXX<sup>B</sup> by individuals such as Mary Roberts.  This information was provided to Mary Roberts' prescribing physician, Dr. Harold Wheeler by Jeanna Dampier with the knowledge and understanding that Dr. Wheeler would rely on this "misinformation" when determining the dose, duration and need to prescribe VIOXX<sup>B</sup> for Mary Roberts' medical condition.  Jeanna Dampier was one of the most direct and effective contacts between Merck and the prescribing medical community. (Complaint, Count III)

The efforts of Merck, Jeanna Dampier, and other Merck sales representatives were successful in keeping VIOXX<sup>B</sup> on the market for over 5 1/2 years.  During this 5 1/2 year  period, approximately 20 million Americans took the drug VIOXX<sup>B</sup>.  With annual sales of approximately $2.5 billion, VIOXX<sup>B</sup> resulted in one of the most successful marketing campaigns ever for a new drug introduced into the American market.  However, despite knowledge from clinical trials, post-marketing reports, studies, and other information relating to adverse cardiovascular affects, Merck knowingly, aided and abetted by Jeanna Dampier and other Merck's sales representatives, promoted and continued to market VIOXX<sup>B</sup> as safe up until the public announcement of its worldwide withdrawal on September 30, 2004.  (Complaint, ¶ 39)

Plaintiffs Vickie Roberts and Jackie Ammons, as the legal representatives of the estate of Mary Roberts, Dec. filed this action in the Circuit Court of Montgomery County, Mississippi, against Merck, Jeanna Dampier, and John Does 1 - 5 on February 16, 2007. Plaintiff, Vickie Roberts alleged that she was an adult resident citizen of the State of Mississippi, domiciled therein and in no other state, and Jackie Ammons alleged that she was an adult resident citizen of the State of Georgia, domiciled therein and in no other state.    Dampier is an adult resident citizen of the State of Mississippi, domiciled in Madison  County, Mississippi, and in no other state.  Merck is a New Jersey corporation whose principal place of business is located in the State of New Jersey and in no other state.

The Plaintiffs specifically alleged in their Complaint that no assertion by any party of federal diversity jurisdiction would be proper in that Plaintiffs were and are resident citizens of the State of Mississippi and Dampier was and is a resident of the State of Mississippi.  (Complaint, ¶ 5(b)(2)(C); See copy of original Complaint attached to Plaintiffs' Motion to Remand marked "Exhibit 1").

Merck was served with Summons, along with a copy of the Complaint attached, on February 16, 2006.  (See copy of executed Summons attached to Plaintiffs' Motion to Remand marked "Exhibit 2"). Dampier was served with Summons, along with a copy of the Complaint attached, on March 6, 2007. (See copy of executed Summons attached to Plaintiffs' Motion to Remand marked "Exhibit 3").

On March 8, 2006, Merck filed its Notice of Removal in this Court. (See USDC Civil Cover Sheet marked "Exhibit 5" to Plaintiffs' Motion to Remand and ECF Notice of filing of Notice of Removal on March 8, 2006, marked "Exhibit 6" to Plaintiffs' Motion to Remand).

In its Notice of Removal, Merck claims that this Court has original jurisdiction of this action pursuant to the provisions of 28 *U.S.C.*, § 1332 in that all properly joined and served parties are of diverse citizenship to the Dampier and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs. Merck bases its claim of complete diversity on the allegation that even though Dampier is a non-diverse Defendant to the Plaintiffs, diversity exists nonetheless because Dampier was improperly joined in this cause and, therefore, the non-diverse Defendant's Mississippi residence should not be considered for purposes of diversity jurisdiction under 28 *U.S.C.*, § 1332.

## II.  ARGUMENT

**A.     Standard for Determination of Improper Joinder:**

Federal Courts are courts of limited jurisdiction resulting in a presumption that jurisdiction does not exist. Indeed, under our federal constitutional scheme, state courts are assumed to be equally capable of deciding both state and federal issues. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Further, where Congress has given federal courts jurisdiction over certain controversies, "due regard for the rightful independence of state governments, which should actuate federal courts, requires that they [federal courts] scrupulously confine their own jurisdiction to the precise limits which 'a federal' statute has defined." *Victory Carriers, Inc., v. Law*, 404 U.S. 202, 212 (1971), quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934), *see also, Stockman v. Federal Election Commission*, 138 F.3d 144, 150-152 (5th Cir. 1998).

Merck, as the party seeking to remove this matter to federal court, has the heavy burden of complying with the requirements for establishing federal jurisdiction. *Marathon Oil Company v. Ruhrgas*, 115 F.3d 315, 318-19 (5th Cir. 1997); *Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th

-8-

Cir. 1993), *cert. denied* 510 U.S. 868 (1993); *Laughlin v. Prudential Ins. Co.*, 882 F.2d 187, 190 (5th Cir. 1989).  Merck must meet this heavy burden imposed upon a removing party when it claims that a resident Defendant has been joined for the purpose of defeating diversity jurisdiction of the Court.

A district court "must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits." *B., Inc. v. Miller Brewing Company*, 663 F.2d 545, 549 (5th Cir. 1981). Whether a case is removable and whether it states a cognizable claim against an in-state Defendant is determined by reference to the allegations made in the original pleadings. *Tedder v. F.N.C. Corp.*, 590 F.2d 115, 116 (5th Cir. 1979); *Gray v. United States Fidelity and Guaranty Company*, 646 F.Supp. 27, 29 (S.D. Miss. 1986).  The court must then evaluate those allegations in the light most favorable to the party opposing removal, resolving all contested issues of law and fact in favor of the non-moving party. *B., Inc.*, 663 F.2d at 549.  *See also, Dotson v. Spiliada Maritime Corp.*, 951 F.2d 40 (5th Cir. 1992); *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172 (5th Cir. 1968); *Howard v. General Motors Corp.*, 287 F.Supp. 646 (N.D. Miss. 1968).

The purpose of a improper joinder inquiry is to determine whether an in-state resident Defendant was properly joined.  *Smallwood v. Illinois Central Railroad Company,* 385 F.3d 568, 573 (5th Cir., 2004).  The focus of the inquiry must be on the joinder, not the merits of the plaintiff's case and the motive or purpose of the joinder of an in-state Defendant is not relevant. *Id.* at 573-74. Given this focus, the Court recognizes only two ways to establish improper joinder: (1) actual fraud in the pleading of jurisdictional facts or (2) inability of the Plaintiffs to establish a cause of action against the non-diverse party in state court. *Gary v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 405 (5th Cir., 2004; *Smallwood,* 385 F.3d at 573)

The Defendant must establish improper joinder, if any it can, by demonstrating that there is no reasonable possibility of recovery by the Plaintiffs against the in-state Defendant which, stated differently, means that there is no reasonable basis for the District Court to predict that the Plaintiffs might be able to recover against an in-state Defendant. *Id.*

In deciding an improper joinder on a Motion to Remand, all disputed questions of fact and all ambiguities in state law must be resolved in favor of the plaintiff. *Gary*, 390 F.3d at 405.

Merck and Dampier make no allegation of actual fraud by Plaintiffs in their pleadings of the jurisdictional facts but rather pin their hopes on Plaintiffs' alleged inability to establish a cause of action against Dampier. As Merck and Dampier should know, the decisions of the United States District Court make clear that the removing parties must do much more than merely allege improper joinder. *See, Horton v. Scripto-Tokai Corporation*, 878 F.Supp.2d 902 (S.D. Miss., 1995). Mere allegations of improper joinder, standing alone, are not sufficient to divest the State Court of jurisdiction. A claim of improper joinder must be asserted with particularity and supported by clear and convincing evidence. *Id.* at 906. The removing Defendant must show **by clear and convincing evidence that there is no arguable, reasonable basis for predicting that state law might impose liability on the non-diverse Defendant.** *Tedder v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir. 1979); *Horton*, 878 F.Supp.2d at 906. If there is any doubt as to whether the Plaintiffs have stated a claim against the non-diverse Defendant, the joinder is not improper and the case must be remanded. *Id.*

**B.    Plaintiffs' Complaint States Valid Causes of Action against Dampier.**

1.    The Law:

A Motion to Remand is normally analyzed with reference to the well-pleaded allegations of the Complaint which is read leniently in favor of remand. *Boone v. CitiGroup, Inc.*, 416 F.3d 382,

388 (5th Cir., 2005).  When read in context with the facts set forth in the claim against Dampier, the Dampier' Complaint meets this pleading test.

Mississippi substantive law recognizes the existence of causes of action against a drug salesperson of the manufacturer of the drug for: (1) actively participating in any manner in the commission of a tort or who aided or abetted in its commission. *Hutto v. Kremer*, 76 So.2d 204, 208 (Miss. 1954), citing § 85 of *Cooley on Torts* (4th Ed); RESTATEMENT (SECOND) OF TORTS § 876; and (2) intentionally or negligently misrepresenting by omission the dangers of the drug being pushed to the prescribing physician.

      2)      Aiding and Abetting:

Mississippi recognizes that an agent for a disclosed principal can be held personally liable for the agent's tortious acts that are committed within the scope of the agent's employment. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 (5th Cir., 2000); *Turner v. Wilson*, 620 So.2d 545, 548 (Miss. 1993).  *See also*, RESTATEMENT (SECOND) OF TORTS § 876 which provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he:
>
>       a)      does a tortious act in concert with the other or pursuant to a common design with him, or
>
>       b)      knows that the other's conduct constitutes a breach of duty and give substantial assistance or encouragement to the other so to conduct himself . . .

As more fully set forth in paragraph 2 of this section of this Brief, the *allegations of the recognized tort of aiding and abetting* amply meet the notice pleading requirements of Rule 8(a), *M.R.C.P.*, and would reasonably survive a Rule 12(b)(6), *M.R.C.P.*, motion to dismiss.  In that

posture, Merck cannot meet its heavy burden to establish improper joinder, and this action should be remanded to the State Court.

      b)     Intentional or Negligent Misrepresentation by Omission:

Merck bases its assertion of improper joinder of Dampier on the claim that the Complaint does not allege that Dampier made a representation or omission of fact to the  decedent  upon which the decedent subsequently reasonably relied. (Notice of Removal, ¶¶ 19).  This argument fails when Mississippi law is correctly applied.

In *Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d 688, 691-692 (Miss., 1988), the Mississippi Supreme Court addressed the application of the "learned intermediary" doctrine.  The rulings pertinent to the issue before this Court addressed by the *Fortenberry* Court are:

      1.     We hold that the drug manufacturer has a **duty to accurately warn** the prescribing physician of any known adverse effects which might result from use of its prescription drugs.  (emphasis added) *Id.* at 691.

      2.     There is no physician in the role of "learned intermediary," then the drug manufacturer has a duty to accurately warn the consumer.  *Id.* at 692.

      3.     The issue of a warning's accuracy is factual and usually will be resolved by the trier of fact.  *Id.*

The Plaintiffs' Complaint sufficiently alleges that Dampier, acting for Merck, failed to accurately warn Dr.  Wheeler, Mary Roberts' prescribing physician, of the danger known to Merck and Dampier of cardiac dangers.  This Court cannot, in the posture of this case, make the factual finding as to the accuracy of Roberts' warning to Dr. Wheeler.

Further, in *Walker v. Medtronic, Inc.*, 203 WL 21517997 (N. D. Miss., June 4, 2004) (cited and relied upon by Merck in its Notice of Removal), Chief Judge Davidson denied the plaintiff's Motion to Remand based upon primarily the fact that the Complaint against the non-diverse drug representative was in "very general and non-specific terms." As to the representative's failure to provide adequate warnings concerning the pacemaker to the plaintiff's treating physician, Judge Davidson did, however, recognize that:

> Under Mississippi law, an agent for a disclosed principal can be held personally liable for her own tortious acts committed within the scope of her employment and a tort claim can be maintained against that agent so long as the foundation of the agent's liability is her own individual wrongdoing. (Citations omitted). In other words, the agent is subject to personal liability only when she "directly participates in, or authorizes, the commission of a tort."

*Walker* at pp. 2 - 3.

As reflected below the allegations of the Complaint as to the claim for intentional or negligent misrepresentation by omission to a learned intermediary is not set forth in "very general and non-specific terms." but rather meet the notice pleading requirements of Rule 8, *F.R.Civ.P.*

2.      The allegations of the Complaint:

The allegations of jurisdictional facts set forth in the Complaint as to Dampier are not fraudulent or improper. Further, there exists, at the least, an arguably reasonable possibility that the Plaintiffs would be able to establish a cause of action against Dampier in state court. The following allegations set forth in the Complaint against Dampier raise a reasonable possibility in this regard:

- Paragraph 9: "In order to maintain its market position, Merck must continuously research and develop new drugs, seek their approval by appropriate government agencies, and aggressively market these drugs to health care professionals and the general public (a) **through Dampier** and its other sales representatives, . . ." (emphasis added)

- Paragraph 13: ". . . Merck's marketing plan of VIOXX depended upon a multi-million dollar advertising campaign through direct-to-consumer advertising and **to potential prescribing physicians through its sales representatives, including Jeanna Dampier.** (emphasis added)

- Paragraph 15:  "In May of 1999, Merck began the distribution and sale of VIOXX.  Once distribution and sale began, Merck wasted no time in dispatching **its pre-programmed sales force** to insure VIOXX's availability on the market.  Although VIOXX would not arrive in pharmacies until early June 1999, Merck had already begun to dispatch a sales force of over four thousand individuals to pitch 'the safe drug VIOXX' to doctors, and healthcare organizations. . . . (emphasis ours)

- Paragraph 16 through 21: Merck's awareness of the danger of VIOXX.

- Paragraph 22: "Even though Merck was aware of the increased risk of serious cardiovascular events, Merck continued to press ahead with unbridled abandon after VIOXX's May 1999 approval.  Shortly after it's release, Merck instituted a marketing blitz with intensive sales representative training.  Both the marketing blitz, and the sales representative training, were geared toward positioning VIOXX as a safer alternative to existing NSAIDs, as well as its primary COX-2 competitor, Celebrex.  This marketing blitz, the promotional materials distributed by Merck, and the information passed to physicians by Merck's sales representatives, did not refer in any way to knowledge of adverse cardiovascular events involving VIOXX patients."

- Paragraph 35: "As safety questions about the adverse cardiovascular effects of VIOXX continued to be raised in the medical community, Merck pushed forward with its estimated $500 million dollar plus advertising and training program.  As part of its training program, Merck had produced training videotapes, and training brochures and coached sales representatives, including Jeanna Dampier, to try to avoid questions about the risks of heart attacks.  On July 21, 2005, the *New York Times* reported on the contents of one of Merck's training videos produced in 2000.  The video, never shown to doctors or consumers, contained an actress posing *as a physician* presenting 'an obstacle' to a VIOXX sales representative.  The actress poses the question 'I'm afraid VIOXX causes myocardial infarctions.'  As a response, an actress playing a Merck sales representative coaches representatives to respond 'That's not true.'"

- Paragraph 36: "Merck also authored a 1999 training guide which was presented to sales representatives at a VIOXX workshop.  The workshop training materials form indicated that one of the core messages that should be communicated to VIOXX sales representatives was that VIOXX was a safe

product.  One of the planned goals of the workshop was to insure that VIOXX sales representatives could handle 'obstacles' in the nature of questions from physicians about the cardiovascular safety of VIOXX.

- Paragraph 37: "As part of its workshops, Merck developed the game of 'Dodge Ball VIOXX', and 'JeopardXX' as teaching tools. In the game of Dodge Ball VIOXX, Merck sales representatives had to overcome 'obstacles' in the form of physicians' questions in order to advance to the next round. However, players were rewarded if they turned over the '**DODGE!**' card allowing them to advance to the next round without having to answer the physician's question. Merck, through this training exercise, was able to send a clear message to its sales representatives, 'You never have to answer a hard question from a physician if you're able to **DODGE** it.'"

- Paragraph 38: "In the game of JeopardXX, VIOXX sales representatives were awarded points for avoiding direct answers to physicians' questions regarding concerns about the cardiovascular effects of VIOXX, specifically, questions posed by a physician 'about a potential increase in the risk of myocardial infarctions.'"

## Count I: Strict Liability in Tort:

- Paragraph 41 c.: "Defendants breached express warranties or failed to conform to other express factual representations made to Mary Roberts' physician regarding the safety of the drug VIOXX upon which Mary Roberts justifiably relied when electing to use the drug VIOXX."

## Count III: Intentional/Negligent Misrepresentation to a Learned Intermediary:

- Paragraph 47: "Merck, Jeanna Dampier, * * * had a duty to adequately warn Mary Roberts' physician of any known adverse effects which might result from his use of VIOXX. In the exercise of this duty, Merck, Jeanna Dampier, * * * knew or should have known that as a medical expert, Mary Roberts' prescribing physician would take into account representations made by Merck, Jeanna Dampier, * * * in determining whether or not to prescribe the drug VIOXX to Mary Roberts at all, and/or in making a determination regarding dosage amount, and length of use.  Because VIOXX was administered as a prescription drug, Merck, Jeanna Dampier, * * * were required to warn the prescribing physician, who was to act as a learned intermediary between Merck, Jeanna Dampier, * * * and Mary Roberts.  In violation of this duty, Merck, Jeanna Dampier, * * * acted as follows:

"a.  Defendants made representations to Mary Roberts' physician about VIOXX, and it's effects, and side effects, which Defendants knew and/or should have known were false, inaccurate, and/or misleading;

"b.  Defendants knew or should have known that the false, inaccurate, and/or misleading information which they provided to the prescribing physician regarding VIOXX was material in nature;

"c.  Defendants knew or should have known that the physician would rely on and act upon the false, inaccurate, and/or misleading information by prescribing the drug VIOXX to Mary Roberts, and those patients of his physician similarly situated;

"d.  Defendants knew or should have known that Mary Roberts' physician would rely on the false, inaccurate, and/or misleading representations made by Defendants when determining whether or not and/or how to prescribe the drug VIOXX to him and other patients . . .

"e.  Defendants knew and/or should have known that Mary Roberts' physician had a right to rely on the representations made by Defendants regarding the propensities of the drug VIOXX when determining whether or not to prescribe VIOXX to Mary Roberts, . . .

"f.  Defendants knew and/or should have known that Mary Roberts had a right to rely on the medical recommendations of his physician, and accept his advice to take the drug VIOXX as treatment for his medical condition.

• Paragraph 48: "Merck, Jeanna Dampier, * * * acted intentionally in making the false, inaccurate, and misleading representations, described more fully above, to Plaintiff's prescribing physician."

• Paragraph 50: "As a direct and proximate result of the misrepresentations of Merck, Jeanna Dampier, * * * described more fully above, Plaintiffs have sustained injury and damages, . . ."[2]

---

[2]Counts VI and VII, respectively, allege the tort of Common Law Fraud and Fraud by Omission wherein specific facts are set forth establishing a *prima facie* basis for the claims alleged in these Counts.

**Count VIII, Aiding and Abetting by Jeanna Dampier and John Does 1 - 5[3]**

- Paragraph 73: "As has been alleged in this Complaint, Merck has committed torts based on both intentional, and negligent conduct, resulting in injury and damage to the Plaintiffs. Jeanna Dampier, and Does 1-5 knew or should have known that the actions of Merck were tortious, and were a breach of Merck's legal duties, as have been described more fully herein."

- Paragraph 74: "Jeanna Dampier, and Does 1-5 provided substantial assistance and/or encouragement to the tortious conduct of Merck, including, but not limited to:

    "a.    Misrepresenting to Mary Roberts' physicians that Vioxx was a safe and effective product, which could be prescribed to him in the manner determined by his physician to be appropriate to address his medical concerns.

    "b.    Engaging in gamesmanship with Mary Roberts' physician by avoiding providing the physician with information regarding the known adverse safety characteristics of Vioxx.

    "c.    By engaging in such other additional conduct, known and/or unknown, some of which has been described more fully herein."

- Paragraph 75: "As a direct and proximate result of Defendants' misrepresentations, as set forth herein above, Plaintiff sustained injuries and damages, . . ."

**C.    Jeanna Dampier owed a duty to Mary Roberts to fully disclose the known risks of VIOXX® to Dr. Wheeler, Mary Roberts' prescribing physician.**

In its Notice of Removal at paragraph 18, Merck raises its primary argument in support of

its improper joinder claim. Merck correctly recognizes that Plaintiffs have asserted claims of strict

liability in tort, intentional/negligent misrepresentation to a learned intermediary, fraud, breach of

---

[3]Count VIII incorporates specifically or by permissible inference the allegations of the Complaint.

warranty, common law fraud, fraud by omission, and aiding and abetting against Jeanna Dampier.[4]

Merck's argument fails, under Mississippi law, when Merck suggests that these representation or omissions of fact must have been made to Mary Roberts.  Mississippi law allows a plaintiff such as Mary Roberts to assert a cause of action against a sales representative such as Dampier when it is shown that the misrepresentations and/or omissions of fact were made to the plaintiff's prescribing physician.  In each Count asserted against Jeanna Dampier in the Complaint, Dampier have sufficiently alleged that Jeanna Dampier made such misrepresentations and/or omissions of fact to Mary Roberts,  prescribing physician.

The basis for holding an individual or entity liable to a patient for failure to adequately warn the patient's physician of the known adverse effects of a prescription drug was discussed by the Mississippi Supreme Court in *Wyeth Laboratories, Inc. v. Billy Joe Fortenberry*, 530 So.2d 688 (Miss. 1988).  In *Wyeth*, the Mississippi Supreme Court discussed the duty as follows:

> We hold that the drug manufacturer has a duty to adequately warn the prescribing physician of any known adverse effects which might result from use of its prescription drugs. (Citations omitted). . . .

> The general rule is "that where prescription drugs are concerned, a manufacturer's duty to warn only extends to physicians and not to laymen." (Citation omitted)  "If the language of the warning is adequate, then the drug manufacturer ordinarily is free from liability." (Citation omitted)

*Id.*

---

[4]If any one of these claims against Dampier would prevail over a Motion to Dismiss under state law, this Court does not possess subject matter jurisdiction. At the very least, the claim against Dampier for the tort of aiding and abetting Merck passes muster.

The *Wyeth* Court further discussed that a physician should be required to take into account the disclosed propensities of the drug, as well as the characteristic of his patient, in making choices regarding use of prescription medication. *Id.*

The basis for extending this duty to a sales representative for purposes of holding a sales representative liable was addressed by the District Court in *Walker v. Medtronic, Inc.*, 2003 WL 21517997 (N.D. Miss., June 4, 2003), a case cited by Merck at page 8, paragraph 22 of its Notice of Removal. Although the Court in *Walker* found that the medical product sales representative was improperly joined, the Court did recognize that, under Mississippi law, the sales representative would be subject to personal liability when she "directly participates in or authorizes the commission of a tort." *Id.* at paragraph 3. The Court in *Walker* dismissed the claims against the medical product representative due to the plaintiff's failure to include specific factual allegations in the Complain concerning the representative's participation in the fraud in anything other than "very general terms." *Id.* at paragraph 4. Clearly, if the plaintiff in *Walker* had pled her case, as the Plaintiffs have pled their case against Jeanna Dampier, the Court would have reached a different result.

VIOXX® is a prescription drug. Therefore, Jeanna Dampier owed a duty to Mary Roberts to fully disclose the known risks of adverse cardiovascular events to Dr. Wheeler so that he could pass that information on to Mary Roberts. The tortfeasors here were and are Jeanna Dampier and Merck. Jeanna Dampier exercised her training and use of games created by Merck and intentionally participated in by Dampier, to insure that the known risks of adverse cardiovascular events were denied and/or not made known to Dr. Wheeler.

**D.     Diversity jurisdiction does not exist.**

The Fifth Circuit Court of Appeals has acknowledged the following standard in determining whether or not improper joinder has occurred:

> [I]n order to establish that an in-state Defendant has been fraudulently joined, the removing party must show either that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state Defendant in state court, or that there has been an outright fraud in the plaintiff's pleading of jurisdictional facts.

*B., Inc. v. Miller Brewing Company*, 663 F.2d at 549.[5] *See also, Ironworks Unlimited v. Purvis*, 798 F.Supp. 1261, 1263 (S.D. Miss. 1992) and *Green*, 707 F.2d at 205, holding that if there was even a possibility that a state court would find a cause of action against any one of the named in-state Defendants, the Court would be obligated to find that the in-state Defendant had been properly joined and the case remanded to the State Courts. Now, *B., Inc.; Ironworks Unlimited; and Green* standards must be applied by this Court using the standard that if there exists a **reasonable possibility** that a state court would find a cause of action against any one of the named in-state Defendants, then that Defendant has been properly joined and the case must be remanded to the State Court.

The Plaintiffs and Defendant, Jeanna Dampier, are Mississippi residents. Therefore, the sole inquiry is whether there is a reasonable possibility that the Dampier have set forth a valid cause of action against Jeanna Dampier under which the Dampier could recover under state law. When faced with a claim of improper joinder, the District Court is not to decide whether the plaintiff will actually

---

[5]Since the rendition of the opinion in *B., Inc.*, the Fifth Circuit Court of Appeals has pronounced that the standard which the removing party must meet is **that there is no reasonable possibility** that the plaintiff would be able to establish a cause of action against the in-state Defendant. (*Smallwood v. Illinois Central Railroad Company*, 385 F.2d 568 (5th Cir., 2004). Therefore, those decisions of the Fifth Circuit which utilize the *B., Inc.* standard before *Smallwood* will be addressed in accord with the new standard.

prevail on the merits of the claims against the resident Defendant.  The Court is to look only for a reasonable possibility that the plaintiff may prevail under Mississippi law.

It is not sufficient for a Defendant to merely label a joinder as improper.  *Chesapeake & Ohio Railway Company v. Cockrell*, 232 U. S. 146, 152, 34 S.Ct. 278, 280, 58 L.Ed. 544 (1914).  A claim for improper joinder must be pleaded with particularity and supported by clear and convincing evidence.  *Parks v. New York Times Company*, 308 F.2d 474, 478 (5th Cir. 1992), *cert. denied,* 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964); *see also, Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir. 1999).  When considering motions to remand based on the viability of state law claims, the District Court must resolve all disputed questions of fact and all ambiguities in the state law in favor of the non-moving party.  *Dotson*, 951 F.2d at 42.  If there is arguably a reasonable basis for predicting that state law might impose liability on the facts alleged, then there is no fraudulent joinder.  *Jernigan v. Ashland Oil Company,* 989 F.2d at 815.  Under the narrow construction mandated by 28 *U.S.C.,* § 1441, "any doubts should be resolved in favor of non-removability." *Gober v. Allstate Insurance Company,* 855 F.Supp. 158, 160 (S.D. Miss. 1994).

The existence of a viable claim against Jeanna Dampier defeats diversity jurisdiction and requires remand of this case to the Circuit Court of Montgomery County, Mississippi.  At this stage, the Plaintiffs here placed Dampier & Merck on reasonable notice of the claims against Dampier and have demonstrated that they have alleged a recognized cause of action under state law upon which, *under some set of facts, they might prevail.  Therefore, the Motion to Remand must be granted.  See, Michael A. Catchot, et al. v. Nationwide Insurance Company,* U.S.D.C., S.D., Miss., Case No. 1:06cv00667-LTS, decided November 14, 2006; *Children's Medical Group, P.A. v. Robert Phillips, et al.*, 940 So.2d, 931, 2006 WL 3026406 (Miss., 2006); *Ralph Walker, Inc. v. Gallagher,*

926 So.2d 890, 893 (Miss. 2006); *Poindexter v. United Fire Insurance Company*, 838 So.2d 964, 966 (Miss. 2003); *Cook v. Brown,* 909 So.2d 1075, 1078 (Miss. 2005); *Little v. Miss. Dep't of Human Servs.*, 835 So.2d 9, 11 (Miss. 2002).

The above allegations in the Complaint against Dampier are sufficient to withstand Rule 12(b)(6), *M.R.C.P.*, dismissal when tested under the notice pleading requirements of the *Federal Rules of Civil Procedure. See, Fed.R.Civ.P.*, Rules 8, 9(b); *see* also, *Lovick v. Rightmoney, Ltd.*, 378 F.3d 433, 438 (5th Cir., 2004). ("Rule 8(a) does not require that the pleadings specify  facts in support of each element of plaintiff's *prima facie* case.")

The Plaintiffs' allegations against Dampier amply meet the objective of Rule 8 to "give the Defendant fair notice of what the Plaintiffs claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). Simplified notice pleadings standards apply in determining questions of improper joinder. *Conley v. Gibson*, 355 U.S. 41 (1957). *See* also, Wright & Miller, *Federal Practice and Procedure*, Civil 3d, ¶ 1219, citing *Swierkiewics v. Sorma, N.A.,* 435 U.S. 506, 512-13 (2002) (holding that "[P]leadings need not state with precision all of the elements that are necessary to give rise to a legal basis for recovery as long as notice of the nature of the action is provided to the opposing party."

Both the District Court for the Southern District of Mississippi and the Mississippi Supreme Court have recently addressed the sufficiency of notice pleadings when tested by Rule 12(b)(6) Motions to Dismiss. In *Catchot, supra,* Judge Senter, in passing on a Motion, granted the Motion to Remand on the basis of his finding that the Complaint charging the non-diverse Defendant was sufficient to withstand a Motion to Dismiss under Rule 12(b)(6) holding that, "and this is essentially

the same legal standard I must apply in ascertaining whether a fraudulent or improper joinder has occurred." *Id.* Memorandum Opinion at page 3.

The Mississippi Supreme Court, speaking through Justice Dickerson, in *Children's Medical Group, P.A., supra,* was called upon to pass on the denial of one of the Defendant's Motion to Dismiss on the basis that the Dampier' Complaint failed to state a claim upon which relief could be granted. The moving party argued (1) the tort of alienation of affections requires intentional acts of misconduct and Robert [the plaintiff] failed to allege any intentional conduct by CMG [co-Defendant]; (2) CMG owed no duty to Robert to prevent Dr. Freeman [the co-Defendant] from pursuing a consensual affair with another employee; and (3) CMG was not vicariously liable for its employees' consensual sexual relationships, as those activities were beyond the employee's course and scope of employment. *Id.* at Slip.O., p. 2. CMG sought and was granted an interlocutory appeal to the Mississippi Supreme Court. The Court held that,

> "**[I]n order to reverse, it must be such that no set of facts would entitle the opposing party to relief.**" and "there must appear to a *certainty* that the plaintiff is entitled to *no relief under any set of facts that could be proved in support of the claim.* (emphasis ours)

*Id.* The Court further held that its inquiry on a Rule 12(b)(6) Motion to Dismiss was not limited to the specific allegations in Roberts's Complaint, which "we [the Court] must accept as true." But rather the Court was charged to consider only whether *any* set of facts could support Robert's action for alienation of affections against CMG.

Finally, in *Children's Medical Group, P.A.,* the Court observed and held that:

> It is true that Robert fails to specify CMG's conduct that directly and intentionally interfered with his marriage. However, under our rule, Robert is not required to plead the specific wrongful conduct. At the pleading stage, he is required only to place CMG on reasonable notice of the claims against it and to demonstrate that he

-23-

has alleged a recognized cause of action upon which, *under some set of facts*, he might prevail.

### III.   CONCLUSION

For the reasons stated in the Plaintiffs' Motion to Remand and this Memorandum Brief, this Court must remand this case to the Circuit Court of Montgomery County, Mississippi, because Jeanna Dampier has not been improperly joined as a Defendant in this cause for the purpose of defeating diversity jurisdiction.

DATED: May 3, 2007.

DRUG LITIGATION LIABILITY GROUP, PLLC

By:    s/William H. Liston
       s/Alan D. Lancaster
       WILLIAM H. LISTON (MB # 1277)
       ALAN D. LANCASTER (MB # 1792)
       126 North Quitman Avenue
       Post Office Box 645
       Winona, MS 38967

       ATTORNEYS FOR PLAINTIFFS

OF COUNSEL TO RECEIVE
PLEADINGS:

William H. Liston (MB # 1277)
Alan D. Lancaster (MB # 1792)
LISTON/LANCASTER, PLLC
126 North Quitman Avenue
Post Office Box 645
Winona, MS 38967
Tel:   662/283-2132
Fax:  662/283-3742
E-Mail: bliston@listonlancaster.com
E-Mail: dlancaster@listonlancaster.com

Mary E. McAlister (MB # 2170)
DAVID H. NUTT & ASSOCIATES, P.C.
605 Crescent Blvd., Suite 200
Ridgeland, MS 39157
Tel:    601/898-7302
Fax:    601/898-7304
E-Mail:  mcalister@davidnutt.com

C. Victor Welsh III (MB # 7107)
PITTMAN, GERMANY, ROBERTS & WELSH, L.L.P.
410 South President Street (39201)
Post Office Box 22985
Jackson, MS 39225-2985
Tel:    601/948-6200
Fax:    601/948-6187
E-Mail:  vcs@pgrwlaw.com

### Certificate of Service

I, Alan D. Lancaster, one of the attorneys for the Plaintiffs herein, do hereby certify that on

the 3rd day of May, 2007, I electronically filed the foregoing with the Clerk of the Court using the

ECF system which sent notification of such filing to the following:

Christye D. Jones, Esquire
Charles C. Harrell, Esquire
Anita Modak-Truran, Esquire
J. Kennedy Turner III, Esquire
Alyson B. Jones, Esquire
Butler, Snow, O'Mara, Stevens & Cannada, PLLC
17th Floor, AmSouth Plaza
210 East Capitol Street
Post Office Box 22567
Jackson, MS 39225
Phone: 601-948-5711
Fax: 601-985-4500
        Counsel for Defendants

Russ M. Herman
Leonard A. Davis
Herman, Katz & Collar, LLP
829 O'Keefe Avenue
New Orleans, LA 70113
Phone: 504-581-4892
Fax: 504-561-6024
      Plaintiffs' Liason Counsel

Phillip A. Wittman
Dorothy H. Wimberly
Stone, Pigman, Walther, Wittman, L.L.C.
One United Plaza
4041 Essen Lane, Suite 501
Baton Rouge, LA 70809
Phone: 225-490-8900
Fax: 228- 490-8960
      Defendants' Liason Counsel


      s/Alan D. Lancaster
      ALAN D. LANCASTER

H:\04-110\MDL CLIENTS - documents - comp., ans., ppfs, etc\STATE TO MDL - ROBERTS, MARY\EDLA - MDL Roberts Brief M-Remand.wpd