

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
STATE OF MISSISSIPPI

| | |
|---|---|
| VICKIE ROBERTS and JACKIE AMMONS, Co-Executrixes of the Estate of MARY ROBERTS, Deceased,<br>    PLAINTIFFS,<br>VS.<br><br>MERCK & CO., INC., JEANNA DAMPIER AND DOES 1- 5,<br>    DEFENDANTS. | CAUSE NO: 2007-0028CVM |

## COMPLAINT FOR DAMAGES

COME S NOW the Plaintiffs, Vickie Roberts and Jackie Ammons, Co-Executrixes of the Estate of Mary Roberts, Deceased, by and through their attorneys of record, and files this their Complaint for damages against the Defendants, Merck & Co., Inc., Jeanna Dampier, and Does 1-5, and in support thereof, would show unto the Court the following:

### *I. PARTIES*

1. Plaintiff, Vickie Roberts is an adult resident citizen of the State of Mississippi, who resides in Montgomery County, at 493 Bluff Spring Road, Winona, Mississippi 39759. Plaintiff, Jackie Ammons is an adult resident citizen of the State of Georgia, who resides in Cobb County, at 5691 Tracey Drive, Mableton, Georgia 30126.

2. Defendant Merck & Co., Inc. (hereafter referred to as "Merck"), is a New Jersey corporation, whose address and principal place of business is One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 8889-100, doing business in the State of Mississippi, and can be served with

EXHIBIT 1

process of this Court by serving a copy of the Summons and Complaint in this case on its registered agent, CT Corporation System, 645 Lakeland East Dr., Suite 101, Flowood, MS 39232.

3. Defendant, Jeanna Dampier is an adult resident citizen of the State of Mississippi, residing in Madison County at 517 Silverstone Drive, Mississippi 39110-7646, who may be served with process of this Court by delivering a copy of the Summons and Complaint to her personal address. In this Complaint, when Plaintiffs refer to "Merck sales representatives", or "sales representatives", Plaintiffs will be referring generally to all Merck sales representatives, and specifically, upon information and belief, to Defendant, Jeanna Dampier.

4. The identities of Defendants John Does 1-5 are unknown at this time. The identities of these individual defendants will be made known to all parties in this action, in a timely manner, in compliance with the Mississippi Rules of Civil Procedure. In this Complaint, when Plaintiffs refer to "Merck sales representatives", or "sales representatives", Plaintiffs will be referring generally to all Merck sales representatives, and specifically to Defendants John Does 1-5.

## II. JURISDICTION

5. (a) This Court has subject matter jurisdiction of this cause pursuant to the provisions of *M.C.A.*, § 9-7-81 (1972), in that the subject matter of this litigation is not made exclusively cognizable in some other Court by the Constitution and Laws of this State and the principal amount in controversy exceeds the sum of Two Thousand Five Hundred ($2,500.00) Dollars.

(b) This Court has *in personam* jurisdiction of the defendants in that:

1. Merck is qualified to do business and is doing business in the State of Mississippi and has appointed an agent for service of process in the State for service of process.

2. Jeanna Dampier is an adult, resident citizen of the State of Mississippi and may be served with the process of this Court therein.

(c) Plaintiffs' claims are brought solely under Mississippi Law, and Plaintiffs state they do not bring any causes of action pursuant to Federal law. Further, Plaintiffs disclaim any and all causes of action under any federal laws, statutes and/or regulations. Plaintiffs do not assert, either expressly or implicitly, any claims arising out of any federal statute, any federal regulation or any provision of federal common law. Rather, Plaintiffs hereby disallows and repudiates any such claims. Consequently, there is no basis for any assertion of federal jurisdiction on the basis of a "federal question". Furthermore, no assertion by any party of federal diversity jurisdiction would be proper in that Plaintiff, Vickie Roberts is a resident citizen of the State of Mississippi, Plaintiff, Jackie Ammons is a resident citizen of the State of Georgia and Defendant, Jeanna Dampier is a resident of the State of Mississippi. Further, upon information and belief, John Does 1-5 are residents of the State of Mississippi.

### *III. VENUE*

6. This Court has venue of this action in that a substantial alleged act or omission occurred in Montgomery County, Mississippi, where Mrs. Mary Roberts ingested VIOXX samples from her physician. As a result, of such ingestion, she suffered a myocardial infarction.

### *IV. FACTS*

7. This is an action brought by the Plaintiffs for damages resulting in her mother's ingestion of the non-steroidal anti-inflammatory pain medication VIOXX (chemical name "rofecoxib").

8. Mrs. Roberts received VIOXX samples which she began ingesting on a regular basis around May 7, 2001. As a result of such ingestion, she suffered physical injuries, including, but not limited to, an acute myocardial infarction, around May 28, 2001.

**A. Merck's Business and Marketing Strategy**

9. Merck develops, markets, and sells pharmaceutical drugs. Merck is one of the Country's largest drug manufacturers, and is a dominant player in both the United States and World markets. In order to maintain its market position, Merck must continuously research and develop new drugs, seek their approval by appropriate government agencies, and aggressively market these drugs to healthcare professionals and the general public (a) through Jeanna Dampier and its other sales representatives, (b) "direct-to-consumer" print and video advertising and (c) subsidized medical meetings. Merck's revenues are dependent on the sales of the drugs which it has developed.

10. Like many major pharmaceutical companies, Merck relies on the success of so called "blockbuster" drugs to generate the huge revenues necessary to maintain its leading position in a very competitive industry. "Blockbusters" are typically defined as medications that account for more than

one billion dollars in annual sales, and are most often still under full patent protection from relatively inexpensive competing generic versions of the drugs. It is of paramount importance for pharmaceutical companies, like Merck, to make as much money from these blockbuster drugs while Merck still maintains full patent protection, thereby owning the market.

**B.    The Tipping Point**

11.    Beginning in February 2000, and continuing through June of 2001, five major drugs manufactured by Merck were going to lose patent protection: Vasotec, February 2000; Pepcid, April 2000; Prilosec, April 2001; Prinivil, December 2001; Mevacor, June 2001.

12.    During this time, the drug VIOXX was one of the drugs being developed by Merck for introduction into the market. Faced with impending loss of significant market share, VIOXX became the blockbuster drug recognized by Merck to be the critical component to Merck's future financial success.

13.    VIOXX is the brand name of a pain killer developed by Merck (chemical name rofecoxib). VIOXX is a member of the family of pain killing medications known as COX-2 inhibitors. Traditional pain killers, such as aspirin, and naproxen (non-steroidal anti-inflammatory drugs, or "NSAIDs") block two enzymes known as "COX-1" and "COX-2." Painkillers that function by blocking COX-1 enzymes can cause significant gastrointestinal problems. Merck would ultimately market VIOXX as a drug which blocked only COX-2 enzymes, responsible for pain and inflammation. Merck marketed VIOXX as a drug that did not effect the COX-1 enzyme. Therefore, Merck represented that VIOXX would relieve pain while avoiding the serious health effects threatened by the COX-1 inhibitors. When attempting to position VIOXX in the market, Merck repeatedly emphasized the serious health risks and fatalities that could be caused by prolonged use

of NSAIDs that could be avoided through use of the drug VIOXX. Merck's marketing plan of VIOXX depended upon a multi-million dollar advertising campaign through direct-to-consumer advertising and to potential prescribing physicians through its sales representatives, including Jeanna Dampier.

14. As marketed by Merck, the value of VIOXX did not lie in its effectiveness for treatment of pain, VIOXX value lay in its purported "safety."

15. In May of 1999, Merck began the distribution and sale of VIOXX. Once distribution and sale began, Merck wasted no time in dispatching its pre-programmed sales force to insure VIOXX's availability on the market. Although VIOXX would not arrive in pharmacies until early June 1999, Merck had already begun to dispatch a sales force of over four thousand individuals to pitch "the safe drug VIOXX" to doctors, and healthcare organizations. By June of 1999, Merck's sales force had been successful in placing VIOXX in more than 40,000 pharmacies across the United States.

C.  **Signs of Danger: Merck's Knowledge of Blockbuster Drug VIOXX Danger**

16. As Merck and its sale force were touting the safety of the drug VIOXX, they, at the same time, were aware that VIOXX posed a substantial risk of heart attacks, strokes, and other serious cardiovascular events. The serious risks posed by VIOXX were known to Merck as far back as 1996. In testimony provided to the Senate Finance Committee in connection with it's investigation into Merck's marketing of VIOXX, Dr. Gurkirpal Singh, Stanford University School of Medicine, Chief Science Officer, Institute of Clinical Outcomes Research and Education, testified that as early as 1996, Merck scientists' discussions focused on the fact that other pain killers, i.e. aspirin, naprosen, protected against heart attacks by inhibiting platelets. Because VIOXX did not

have this similar effect, this might explain results in studies seeming to indicate that VIOXX would increase the risk of heart attacks. Dr. Singh testified that "this was a serious concern because the entire reason for the development of VIOXX was safety." Further Dr. Singh recognized that if this risk were made known, "patients may not be willing to make this trade off" and purchase the drug. Merck should have started, but failed to start, a public discussion about this potential trade off, and design studies that would have more carefully evaluated the risk benefit ratio of VIOXX. Merck made no such efforts. In 1998, a Merck scientist presented an analysis of serious heart problems with VIOXX compared to patients enrolled in studies of other Merck drugs. According to Dr. Singh's testimony before Congress, these findings should have caused a public scientific discussion of the risks and benefits of the drug VIOXX. However, Merck did not make this information about VIOXX public until many years later, all the time while it was aggressively marketing it's drug as a safe alternative to other pain killers.

17.   In 1998, Merck conducted a clinical trial called "Study 090." Study 090 was a randomized controlled study designed to evaluate the safety of a 12.5 mg dosage of VIOXX during a six week period in patients with osteoarthritis of the knee. A total of 978 patients were randomly placed into three groups: one group taking VIOXX 12.5mg, a second group taking the drug of a competitor, and third group taking a placebo. This 1998 study indicated nearly a seven fold increase in heart attack risk with low dose VIOXX. These results were evaluated by Dr. Eric J. Topol, Chief of Cardiovascular Medicine at the Cleveland Clinic, who determined that the occurrence of increased cardiovascular events in Study 090 was statistically significant. Another Merck study, known as "Study 085,", also a randomized control test, reflected similar results. Additional testimony

provided to the Senate Finance Committee indicated that these increased occurrences of cardiovascular events represented a clear basis for concern.

18. In the face of these two studies, known to Merck, but not released to the public, Merck, by the Fall of 1998, was touting both the efficacy and the safety of VIOXX. In a Newswire released on November 12, 1998, Merck specifically announced the results of its trials and studies as indicating that VIOXX was at least as effective as other NASIDs, that it was effective in treating rheumatoid arthritis, that it did not damage the gastrointestinal tract, and that Merck planned to file for approval of VIOXX. In subsequent press releases and announcements, Merck continued to discuss the efficacy of VIOXX, and continued to discuss safety issues, without any mention of adverse cardiovascular events. Unknown to prescribing physicians, to their patients, or to the general public, by the time Merck had filed for FDA approval of VIOXX, in 1999, Merck had access to several studies confirming that thomboembolic events, such as heart attack and stroke, were more frequent in patients receiving VIOXX than placebo. Merck knew from these studies that VIOXX was likely to promote heart attacks directly.

19. In January 1999, Merck sponsored the VIOXX Gastrointestinal Outcomes Research study, "the VIGOR study." VIGOR was a double blind, randomized, stratified parallel group study of over 8,000 patients to evaluate the efficacy of VIOXX 50mg dose. Patients were excluded from the study if they required aspirin for cardiovascular protection. Also excluded from VIGOR were patients with angina or congestive heart failure, and certain patients with myocardial infarction or coronary bypass grafting, stroke, transischemic attack or uncontrolled hypertension. Essentially, the parameters of VIGOR study sought to exclude any possibility of including patients with cardiovascular issues. However, the raw data from the VIGOR study revealed to Merck that patients

taking VIOXX suffered five times as many cardiovascular events as patients taking Naproxen, an older NSAID.

20. While the VIGOR study did demonstrate that VIOXX reduced the incidents of serious gastrointestinal side effects as compared Naproxen, the data from the VIGOR study did not demonstrate an improved safety profile for VIOXX. The VIGOR study data revealed that:

a. Patients on VIOXX were five times more likely to suffer a heart attack as compared to patients on Naproxen;

b. Patients on VIOXX were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on Naproxen; and

c. Patients on VIOXX actually suffered more cases of serious disease (either gastrointestinal or cardiovascular) than did Naproxen users (61 and 57 cases respectively).

21. Another Merck clinical trial named "ADVANTAGE" was completed in April 2000. Like similar trials, results from the ADVANTAGE clinical trial revealed to Merck that patients taking VIOXX faced a significantly increased risk of serious cardiovascular events. Although the trial was completed in April 2000, Merck did not publish the results from the trial until 3 years later in 2003 when they appeared in the *Annals of Internal Medicine*.

## D. Merck's Disregard of Danger and Institution of Multi-Million Dollar Marketing Campaign:

22. Even though Merck was aware of the increased risk of serious cardiovascular events, Merck continued to press ahead with unbridled abandon after VIOXX's May 1999 approval. Shortly after it's release, Merck instituted a marketing blitz with intensive sales representative training. Both the marketing blitz, and the sales representative training, were geared toward positioning VIOXX

as a safer alternative to existing NSAIDs, as well as its primary COX-2 competitor, Celebrex. This marketing blitz, the promotional materials distributed by Merck, and the information passed to physicians by Merck's sales representatives, did not refer in any way to knowledge of adverse cardiovascular events involving VIOXX patients.

23. Ignoring the imperical data, and the evidence of a causal relationship between VIOXX and increased rate of cardiovascular events, Merck tried to explain the results of the studies as an anomaly. Merck publically claimed that Naproxen had "cardio-protective effects" thus resulting in lower incidents of heart attacks in the group taking Naproxen. If pressed to answer, this information would reluctantly be provided directly by Merck sales representatives to physicians seeking to prescribe VIOXX to their patients. This position of Merck, and its sales representatives, was contradicted directly by a private internal Merck e-mail authored by Merck's research chief, Dr. Edward Scolnick. On March 9, 2000, Dr. Scolnick indicated in an e-mail that Merck knew that its reliance on alleged "protective" features of Naproxen was misplaced. Further, the e-mail explicitly recognized that the evidence of enhanced risk of cardiovascular events in VIOXX consumers "is clearly there" and called it a "shame".

24. Scientists and physicians later confirmed that Merck had manipulated the results of the ADVANTAGE study in order to conceal the truth about VIOXX's cardiovascular risks. Specifically, they found that during the ADVANTAGE trial, 8 people taking VIOXX had suffered heart attacks or sudden cardiac death, compared to just one person taking Naproxen. Critics recognized that this difference was statistically significant. However, Merck never disclosed the data that way. Instead of being truthful, Merck classified the cause of some of these deaths as "unknown" even though Merck's scientist had specifically found that the most likely cause of some

-10-

of the deaths was a heart attack. In another e-mail, Merck scientist, Dr. Scolnick, complained that the deaths in the ADVANTAGE study put Merck in a terrible situation. Further, Dr. Schonick in his email expressed his worries to other senior Merck scientists that the ADVANTAGE results, if disclosed, would encourage the FDA to demand that VIOXX place on its label warnings highlighting cardiac risks.

25. Merck also manipulated and/or obscured the VIGOR results which were "disclosed" by Merck in 2000. As reported by the *New England Journal of Medicine* in a December 8, 2005 editorial posted on its website, when Merck published the results of VIGOR in November 2000, two out of the three authors knew about, but intentionally concealed, three additional myocardial infarctions in the group taking VIOXX. As its basis for this claim, the *New England Journal of Medicine* referred to a July 5, 2000, internal Merck memorandum confirming that at least two of the authors of the VIGOR study knew about three additional myocardial infarctions at least two weeks before the author submitted the first of two revisions, and four and one half months before publication of the final article. The *New England Journal of Medicine* went on to explain that the fact that these myocardial infarctions were not included made conclusions in the article incorrect. Most startling was the *Journal's* revelation that it had determined from a computer diskette that some of the data were intentionally deleted from the VIGOR manuscript, two days before the manuscript was initially submitted to the *Journal* on May 18, 2000.

26. In an August 22, 2001 article published in the *Journal of the American Medical Association* ("*JAMA*"), 3 noted physicians challenged Merck's spin on its VIGOR results. The article reported that both Celebrex and VIOXX appeared to increase the risk of heart attack and

-11-

stroke, but that the danger from VIOXX appeared higher. The article immediately called for trials to specifically determine whether the drugs increased cardiovascular risks.

27. Merck responded to the *JAMA* article in usual fashion. Indeed, it was later learned that even before the 2001 negative report appeared in *JAMA*, the authors were approached by Merck representatives in an effort to pressure them and *JAMA* to down play the cardiac issue. Later, Merck's senior director of cardiovascular clinical research vigorously rejected the findings in the *JAMA* article stating: "We already have additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." Another Merck consultant rejected the *JAMA* conclusions stating that: "I don't think there are any sound conclusions that can be drawn from this study." Merck's consultant further stated that he personally had performed a more extensive analysis of Merck's VIOXX data and had concluded that "there is no suggestion of a cardiovascular risk" from VIOXX. Merck's VIOXX smoke and mirror campaign continued.

28. During the Fall of 2001, the American Heart Association, the National Stroke Association, and the Arthritis Foundation urged Merck to conduct further tests to see if VIOXX increased the risk of heart attack and stroke. Merck initially stated that it was unconvinced that the requested trials were necessary. However, in 2002, Merck was prepared to undertake a clinical study to evaluate VIOXX's cardiovascular risks. According to an article published in 2005 in the New York Times, Merck's extensively planned project, named "VALOR" was abruptly dropped before it started, and just days before Merck's protocol was schedule to be submitted to the FDA. Data from the VALOR study was scheduled to be released in March of 2004. However, as stated in the article, the result may have provided answers about VIOXX's cardiovascular risks even sooner if

-12-

31.     On August 25, 2004, *Bloomberg Business News* reported that a study of the patient records of 1.4 million Californians disclosed that "the difference in heart risk was statistically significant between a recommended dose of VIOXX 25mg a day or less, and Celebrex." Testimony before the Senate Finance Committee indicated that the study "also found that VIOXX doses in excess of 25mg a day more than tripled the risk compared with patients who hadn't taken pain killers within the past two months." Consistent with previous actions, Merck disputed the results claiming that conclusions from these types of studies don't carry much weight.

32.     On November 5, 2004, *The Lancet*, a British Medical Journal, released a study that showed VIOXX should have been pulled from the market "as early as 2000 because studies of the drug had clearly shown that it doubled the risk of heart attacks among users." The authors of *The Lancet* study pooled data from earlier studies involving VIOXX. On the same date that the study released, authors in *The Lancet* wrote that the risks of VIOXX were evident "a full four years before the drug was finally withdrawn from the market by its manufacturer, Merck." The authors also indicated their belief that Merck's intervention in pulling the drug was "overdue."

### E.     Withdrawal of VIOXX from the Market

33.     Finally, in the face of overwhelming evidence confirming the cardiovascular risks associated with VIOXX, on September 28, 2004, at an emergency meeting with FDA upper management, requested by Merck, Merck shared data from its "APPROVe study showing increased risks of myocardial infarction and stroke for the 12.5mg and 25mg doses as compared to placebo after eighteen months of treatment." Upon the sharing of this data, Merck announced its intent to withdraw VIOXX from the market. Worldwide product withdrawal of VIOXX occurred on September 30, 2004.