34.    Even this last effort by Merck to come clean by releasing data from its approved study has shown to be yet another attempt to present false and misleading information regarding VIOXX. On May 18, 2006, National Public Radio broadcast an interview with Dr. Kurt Furberg, clinical trial expert, Wake Forest University, regarding his analysis of the data from the APPROVe study, recently obtained by NPR. Dr. Furberg's review of the data contained in the previously confidential 107 page report confirmed that Merck had stopped the four year APPROVe study just before it was scheduled to end. Dr. Furberg criticized Merck's method of analyzing the raw data. Dr. Furberg was supported by cardiologist Dr. Steve Nissen of the Cleveland Clinic, who also reviewed the report for NPR. Both Dr. Furberg and Nissen confirmed that raw data from the study indicated that patients were at high risk of heart problems and strokes almost as soon as they started taking VIOXX. These experts also agreed that the raw data from the APPROVe study confirmed that the risk from VIOXX persisted for at least a year after patients stopped taking the drug. These findings, based upon the raw data from Merck's study, contradicted Merck's public announcement that the data showed no adverse affects within the first eighteen months of taking the drug, and no indication that patients were at a greater risks of heart problems after they stopped the drug.

E.    **The Cover-up**

35.    As safety questions about the adverse cardiovascular effects of VIOXX continued to be raised in the medical community, Merck pushed forward with its estimated $500 million dollar plus advertising and training program. As part of its training program, Merck had produced training videotapes, and training brochures and coached sales representatives, including Jeanna Dampier, to try to avoid questions about the risks of heart attacks. On July 21, 2005, the *New York Times* reported on the contents of one of Merck's training videos produced in 2000. The video, never

shown to doctors or consumers, contained an actress posing as a physician presenting "an obstacle" to a VIOXX sales representative. The actress poses the question "I'm afraid VIOXX causes myocardial infarctions." As a response, an actress playing a Merck sales representative coaches representatives to respond "That's not true."

36.     Merck also authored a 1999 training guide which was presented to sales representatives at a VIOXX workshop. The workshop training materials form indicated that one of the core messages that should be communicated to VIOXX sales representatives was that VIOXX was a safe product. One of the planned goals of the workshop was to insure that VIOXX sales representatives could handle "obstacles" in the nature of questions from physicians about the cardiovascular safety of VIOXX.

37.     As part of its workshops, Merck developed the game of "Dodge Ball VIOXX", and "JeopardXX" as teaching tools. In the game of Dodge Ball VIOXX, Merck sales representatives had to overcome "obstacles" in the form of physicians' questions in order to advance to the next round. However, players were rewarded if they turned over the "**DODGE!**" card allowing them to advance to the next round without having to answer the physician's question. Merck, through this training exercise, was able to send a clear message to its sales representatives, "You never have to answer a hard question from a physician if you're able to **DODGE** it."

38.     In the game of JeopardXX, VIOXX sales representatives were awarded points for avoiding direct answers to physicians' questions regarding concerns about the cardiovascular effects of VIOXX, specifically, questions posed by a physician "About a potential increase in the risk of myocardial infarctions."

-16-

F.    **Results of Merck's Cover-up**

39.    The efforts of Merck and its sales representatives were successful in keeping VIOXX on the market for over 5 1/2 years. During this 5 1/2 year   period, approximately 20 million Americans took the drug VIOXX. With annual sales of approximately $2.5 billion, VIOXX resulted in one of the most successful marketing campaigns ever for a new drug introduced into the American market. However, despite knowledge from clinical trials, post-marketing reports, studies, and other information relating to cardiovascular related adverse affects, Merck knowingly, aided and abetted by Jeanna Dampier and Merck's sales representatives, promoted and continued to market VIOXX as safe up until the public announcement of its world wide withdrawal on September 30, 2004.

## *V.   CAUSES OF ACTION*

### *COUNT  I*

### *STRICT LIABILITY IN TORT CLAIM AGAINST MERCK*

40.    Plaintiffs reallege all prior paragraphs of this as  if fully set out  herein.

41.    Merck at all times relevant hereto, were engaged in the design, manufacture, marketing, promotion, distribution and/or sale of VIOXX.  Merck is strictly liable in tort to the Plaintiffs, pursuant to Miss.Code Ann. § 11-1-63, for the following reasons:

a.    VIOXX was defective because it failed to contain adequate warnings and/or instructions regarding dangers that were known or should have been known to Merck.

b.    VIOXX was defective, unsafe, and unreasonably dangerous for its intended and/or foreseeable uses.

-17-

c.  Merck breached express warranties or failed to conform to other express factual representations made to Mary Roberts' physician regarding the safety of the drug VIOXX upon which Mrs. Roberts justifiably relied upon when electing to use the drug VIOXX.

d.  The defective conditions, as described above, rendered VIOXX unreasonably dangerous to Mary Roberts.

42.  As a direct and proximate result of the defective and unreasonably dangerous condition of VIOXX, Mary Roberts incurred injuries and damages, which are more fully described hereinafter.

## COUNT II.

### NEGLIGENCE OF DEFENDANT MERCK

43.  Plaintiffs reallege all prior paragraphs of this as if fully set out herein.

44.  Merck is liable to the Plaintiffs for negligence in one or more of the following particulars:

a.  Merck was negligent for carelessly manufacturing, compounding, testing, inspecting, packaging, labeling, distributing, marketing, examining, selling, prescribing, and/or preparing VIOXX in such a manner that it was likely to cause harm to Mary Roberts.

b.  Merck was negligent in manufacturing, compounding, testing, packaging, labeling, prescribing, and/or distributing VIOXX in such a manner that the drug was unsafe when it reached the hands of the consuming public, including Mary Roberts.

c. Merck was negligent in failing to warn Mary Roberts' physician of the unreasonable dangerous defects associated with VIOXX after Merck knew and/or should have known of such dangerous defects, thereby breaching Merck's duty to warn.

d. Merck was negligent in representing and/or misrepresenting the benefits and safety risks of VIOXX and in failing to warn or adequately warn of the known risks.

e. VIOXX was negligently designed in a defective manner in that it did not possess the safety aspect for which it was marketed.

f. Merck was negligent in placing VIOXX on the market in May of 1999 in the face of overwhelming tests results which confirmed that VIOXX did not possess the pharmacological characteristics for which it was marketed, and, in fact, posed a serious health risk to individuals taking the drug, such as Mary Roberts.

g. Merck was negligent in failing to withdraw VIOXX from the market, earlier than September 28, 2004, in the face of overwhelming evidence that VIOXX did not possess the pharmacological characteristics for which it was marketed, and, in fact, posed a serious health risk to individuals taking the drug, such as Mary Roberts.

45. As a direct and proximate result of the negligence of Merck, as set forth above, Mary Roberts sustained injuries and damages, as set forth more fully herein.

-19-

## COUNT III.

### *INTENTIONAL/NEGLIGENT MISREPRESENTATION TO A LEARNED INTERMEDIARY*

46.     Plaintiffs reallege all prior paragraphs of this as if fully set out herein.

47.     Merck, Jeanna Dampier, and Does 1-5, had a duty to adequately warn Mary Roberts' physician of any known adverse effects which might result from her use of VIOXX. In the exercise of this duty, Merck, Jeanna Dampier, and Does 1-5 knew or should have known that as a medical expert, Mrs. Roberts' prescribing physician would take into account representations made by Merck, Jeanna Dampier, and Does 1-5, in determining whether or not to prescribe the drug VIOXX to Jeanna Dampier at all, and/or in making a determination regarding dosage amount, and length of use. Because VIOXX was administered as a prescription drug, Merck, Jeanna Dampier, and Does 1-5, were required to warn the prescribing physician, who was to act as a learned intermediary between Merck, Jeanna Dampier, Does 1-5, and Mrs. Roberts. In violation of this duty, Merck, Jeanna Dampier, and Does 1-5, ("Defendants"), acted as follows:

a.     Defendants made representations to Mary Roberts' physician about VIOXX, and it's effects, and side effects, which Defendants knew and/or should have known were false, inaccurate, and/or misleading;

b.     Defendants knew or should have known that the false, inaccurate, and/or misleading information which they provided to the prescribing physician regarding VIOXX was material in nature;

c.     Defendants knew or should have known that the physician would rely on and act upon the false, inaccurate, and/or misleading information by

-20-

prescribing the drug VIOXX to Mary Roberts, and those patients of her physician similarly situated;

d.     Defendants knew or should have known that Mary Roberts' physician would rely on the false, inaccurate, and/or misleading representations made by Defendants when determining whether or not and/or how to prescribe the drug VIOXX to her and other patients of her physician similarly situated;

e.     Defendants knew and/or should have known that Mary Roberts' physician had a right to rely on the representations made by Defendants regarding the propensities of the drug VIOXX when determining whether or not to prescribe VIOXX to Mrs. Roberts, and other patients of her physician similarly situated; and

f.     Defendants knew and/or should have known that Mary Roberts had a right to rely on the medical recommendations of her physician, and accept his advice to take the drug VIOXX as treatment for her medical condition.

48.     Merck, Jeanna Dampier, and Does 1-5 acted intentionally in making the false, inaccurate, and misleading representations, described more fully above, to Mary Roberts' prescribing physician.

49.     In the alternative, Merck, Jeanna Dampier , and Does 1-5 were negligent in that they should have known that representations, described more fully above, which they made to Mary Roberts' physician were false, inaccurate, and misleading.

50.     As a direct and proximate result of the misrepresentations of Merck, Jeanna Dampier, and Does 1-5, described more fully above, Mary Roberts sustained injury and damages, as set forth fully hereinafter.

## COUNT IV

### FRAUD

51.     Plaintiffs reallege all prior paragraphs of this as if fully set out herein.

52.     Merck, Jeanna Dampier, and Does 1-5 made false, inaccurate, and misleading statements regarding the efficacy and safety of the drug VIOXX to Mary Roberts, her prescribing physician, and the public at large.  The specific actions of these Defendants are described more fully in paragraphs 46 through 50 above.  In summary, these Defendants committed fraud when they manipulated data from various studies, and/or represented that data from various studies indicated that there were no cardiovascular risks associated with taking the drug VIOXX.

53.     As a direct and proximate result of the fraud committed by Merck, Jeanna Dampier, and Does 1 - 5, Mary Roberts, Deceased, sustained injury and damages as set forth more fully herein.

## COUNT V

### BREACH OF WARRANTY

54.     Plaintiffs reallege all prior paragraphs of this as if fully set out herein.

55.     At all times material herein, Merck marketed, sold and distributed VIOXX and knew of the use for which the aforesaid drug was being used by Mary Roberts, Deceased and impliedly warranted that the aforesaid drug was of merchantable quality and safe for its intended use.

-22-

56.     Further, Merck and its sales representatives represented to the treating physicians. the population of VIOXX consumers, and to the public at large and thus to Mary Roberts and her doctors that VIOXX was safe to prescribe and ingest.

57.     Such representations by Merck constituted an express warranty and/or an express factual representation upon which Mary Robert's justifiably relied in ingesting VIOXX.

58.     Merck breached its warranties to Mary Roberts described above because VIOXX is not safe to prescribe or to ingest.

59.     Mary Roberts was damaged by Merck's breach of warranty because she suffered physical injuries as a result of her reliance on the representations made by the Defendants.

60.     As a direct and proximate result of Defendants breach of warranties, as set forth herein above, Mary Roberts sustained injuries and damages, as set forth more fully hereinafter.

### COUNT VI

### COMMON LAW FRAUD

61.     Plaintiffs reallege all prior paragraphs of this as if fully set out herein.

62.     Merck, Jeanna Dampier, and John Does 1-5 misrepresented to treating physicians. the population of VIOXX consumers, and the public at large, and thus to Mary Roberts and her doctors, that VIOXX was safe to prescribe and take by falsely minimizing the cardiovascular risks associated with VIOXX, which risks were known to there Defendants.

63.     At the time they made these misrepresentations, Merck, Jeanna Dampier, and John Does 1-5 knew or should have known that these statements were false.

64.     These statements were made with the intent that those to whom they were directed would rely on them to their detriment; and Mary Roberts and her physicians did so.

-23-

65.    As a result of Merck's, Jeanna Dampier's, and John Does 1-5's misrepresentations as above alleged, Mary Roberts suffered the damages alleged in paragraphs above.

### *COUNT VII*

### *FRAUD BY OMISSION*

66.    Plaintiffs reallege all prior paragraphs of this Complaint as if fully set out herein.

67.    Merck, Jeanna Dampier, and John Does 1-5 were in a position of superior knowledge as to the information above alleged when compared with the Mary Roberts' physician. Merck, Jeanna Dampier, and John Does 1-5 knew that Mrs. Roberts, and other members of the consuming public who were suffering from arthritis or other pain causing conditions, did not possess the knowledge and information necessary to enable them to appreciate the risks and dangers to which they were subjecting themselves by taking VIOXX to relieve the symptoms of these conditions rather than taking other available effective products. As a result of the relationship between Merck, Jeanna Dampier, John Does 1-5 and Mary Robert's treating physicians, Merck, Jeanna Dampier, and John Does 1-5 had a duty to inform physicians of these risks and dangers.

68.    Merck, Jeanna Dampier, and John Does 1-5 violated the duties owed to Mary Roberts' physician by remaining silent or issuing misleading statements when they had a duty to warn.

69.    Mary Roberts' physician reasonably relied upon these misleading statements as indicating that VIOXX continued to be safe to use. Merck thereby obtained an advantage at the expense of Mary Roberts as they continued to sell VIOXX as safe when it in fact was not.

70.    These failures to so advise, as herein alleged, constituted fraud by omission.

-24-

71.     As a direct and proximate result of Defendants remaining silent or issuing misleading information, as set forth herein above, Mary Roberts sustained injuries and damages, as set forth hereinafter.

### COUNT VIII

#### AIDING AND ABETTING BY JEANNA DAMPIER AND JOHN DOES 1-5

72.     Plaintiffs allege all prior paragraphs of this Complaint as if fully set out herein.

73.     As has been alleged in this Complaint, Merck has committed torts based on both intentional, and negligent conduct, resulting in injury and damage to Mary Roberts. Jeanna Dampier, and Does 1-5 knew or should have known that the actions of Merck were tortious, and were a breach of Merck's legal duties, as have been described more fully herein.

74.     Jeanna Dampier, and Does 1-5 provided substantial assistance and/or encouragement to the tortious conduct of Merck, including, but not limited to:

a.      Misrepresenting to Mary Roberts' physician that Vioxx was a safe and effective product, which could be prescribed to him in the manner determined by her physician to be appropriate to address his medical concerns.

b.      Engaging in gamesmanship with Mary Roberts' physician by avoiding providing the physician with information regarding the known adverse safety characteristics of Vioxx.

c.      By engaging in such other additional conduct, known and/or unknown, some of which has been described more fully herein.

75.     As a direct and proximate result of Defendants misrepresentations, as set forth herein above, Mary Roberts' sustained injuries and damages, as set forth hereinafter.

-25-

## *IX.  DAMAGES*

### *COMPENSATORY DAMAGES*

76.     As a direct and proximate result of the wrongful and tortious conduct of Merck.

Jeanna Dampier, and John Does 1 - 5, as set forth hereinabove, Mary Roberts  sustained special

damages consisting of medical expenses for the treatment of conditions arising as a result of her

ingestion of VIOXX in an amount in excess of $24,250.97.

77.     Mary Roberts sustained the following non-economic damages as a direct and

proximate result of the conduct of the Defendants as follows:

a.     Pain and  Suffering;

b.     Mental anguish; and

c.     Loss of enjoyment of life.

### ***PUNITIVE DAMAGES***

78.     Merck, Jeanna Dampier, and John Does 1-5 acted with actual malice, and gross

negligence which evidences a willful, wanton, or reckless disregard for the safety of Mary Roberts

and also committed actual fraud.

79.     An award of punitive damages against Merck, Jeanna Dampier , and John Does 1-5

is necessary and appropriate to deter Merck, Jeanna Dampier, John Does 1-5 and others similarly

situated from engaging in similar conduct in the future.

## AD DAMNUM

WHEREFORE, Plaintiffs bring these actions against Defendants herein above named and demand judgment of and against said Defendants, jointly and severally, in an amount sufficient to reasonably and fully compensate the Plaintiffs in an amount in excess of the jurisdictional limit of this Court and for punitive damages to serve as an example to those who so act in the future, pre- and post-judgment interest and all costs of court.

DRUG LITIGATION LIABILITY GROUP, PLLC
Comprised of:

Liston/Lancaster, PLLC
126 North Quitman Avenue
Post Office Box 645
Winona, MS 38967

David H. Nutt & Associates, P.C
605 Crescent Blvd., Suite 200
Ridgeland, MS 39157

Pittman, Germany, Roberts & Welsh, L.L.P.
Post Office Box 22985
Jackson, MS 39225-2985

By: _____

ATTORNEYS FOR PLAINTIFFS

H:\04-110\P&O\Roberts Complaint.wpd

-27-