**FILED**

MAR 0 8 2007

DAVID CREWS, CLERK
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

*Docket action To Remand*
*04/07/07*

| | |
|---|---|
| VICKIE ROBERTS and JACKIE AMMONS,<br>Co- Executrixes of the Estate of<br>MARY ROBERTS, Deceased,<br><br>       Plaintiffs,<br><br>vs.<br><br>MERCK & CO., INC.,<br>JEANNA DAMPIER, and<br>DOES 1-5,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 3:07cv634H-A

**JURY TRIAL DEMAND**

## NOTICE OF REMOVAL

TO: The United States District Court for the Northern District of Mississippi:

PLEASE TAKE NOTICE that Defendant Merck & Co., Inc. ("Merck") hereby removes this action pursuant to 28 U.S.C. § 1441 from the Circuit Court of Montgomery County, Mississippi, to the United States District Court for the Northern District of Mississippi, and respectfully states to this Court as follows:

1.      This is one of numerous personal injury cases that have been filed recently in both federal and state courts around the country concerning the pharmaceutical Vioxx® ("Vioxx"). On February 16, 2005 the Judicial Panel on Multidistrict Litigation (the "Panel") issued a transfer order, establishing MDL Proceeding No. 1657, *In re VIOXX Products Liability Litigation*. The Transfer Order directed that 148 cases subject to original motions be transferred and coordinated for pretrial proceedings in the United States District Court for the Eastern District of Louisiana, before the Honorable Eldon E. Fallon. The 148 cases subject to the Transfer Order, while involving different and distinct facts, raise certain overlapping factual



EXHIBIT

4

issues and allege similar legal theories. On March 4, 2005, the Panel issued Conditional Transfer Order No. 1 transferring additional federal district court cases, including nine pending in Mississippi, to the United States District Court for the Eastern District of Louisiana, pending opposition from any party. Merck intends to provide notice to the Panel, pursuant to J.P.M.L. Rule 7.5, of the pendency of this "tag-along" action.

      2.      On or about February 16, 2007, Vickie Roberts and Jackie Ammons, Co-Executors of the Estate of Mary Roberts, deceased ("Plaintiffs") commenced a civil action by filing a Complaint, bearing cause number 2007-0028 CVM, in the Circuit Court of Montgomery County, Mississippi. Merck now timely removes this action pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

      3.      For the reasons described below, removal of this action is proper because (1) Merck has satisfied the procedural requirements for removal and (2) this Court has jurisdiction over the State Court action pursuant to 28 U.S.C. § 1332.

## I.     MERCK HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL

      4.      Merck was served with the Complaint on February 16, 2007. This Notice of Removal, filed within 30 days of service on Merck, is timely pursuant to 28 U.S.C § 1446(b).

      5.      Upon information and belief, no further proceedings have been had in the State Court Action. A copy of the state court complaint is attached hereto as Exhibit 1.

      6.      The United States District Court for the Northern District of Mississippi, Western Division embraces the county in which the state court action is now pending. Therefore, removal to this Court is proper pursuant to 28 U.S.C. § 104(b)(1) & 1441(a).

2

7.    Merck is the only properly joined defendant and therefore no other consent to this removal is required[1].

8.    No previous application has been made for the relief requested herein.

9.    Pursuant to 28 U.S.C. § 1446(d), defendant Merck is filing written notice of this removal with the Clerk of the State Court in which the action is currently pending. Copies of the Notice of Filing Notice of Removal, together with this Notice of Removal, are being served upon plaintiffs' counsel pursuant to 28 U.S.C. § 1446(d).

## II.    REMOVAL IS PROPER IN THIS CASE BASED ON DIVERSITY JURISDICTION.

10.    As set forth below, this Court has subject matter jurisdiction over the State Court action pursuant to 28 U.S.C. §§ 1332 and 1441 because it is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity between plaintiffs and the only properly joined defendant, Merck.

### A.        The Amount In Controversy Exceeds $75,000.

11.    It is apparent on the face of the Complaint that plaintiffs seek recovery of an amount in excess of $75,000, exclusive of costs and interest.  Plaintiffs seek compensatory and punitive damages. Complaint at ¶¶ 76-77, 79.  Courts considering similar alleged injuries arising of the plaintiffs' alleged use of the same drug – Vioxx - have found the amount in controversy requirement of 28 U.S.C. § 1332 (diversity jurisdiction) to be satisfied and thus denied motions to remand. *See, e.g., Morgan v. Merck & Co.*, No. 3:03cv435WS, Order Denying Plaintiffs' Motion To Remand And Granting Defendants' Pending Motions (S.D. Miss.

---

[1] 28 U.S.C. § 1441(b) does not bar removal. It is well settled that co-defendants who are fraudulently joined need not consent to removal. *See Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815 (5th Cir. 1993); *Getty Oil Corp. v. Insurance Co. of N. Am.*, 841 F.2d 1254, 1261 n.9 (5th Cir. 1988). The only other named defendant, Dampier, is fraudulently joined, infra ¶¶ 16-20, and therefore, her consent is not required.

May 29, 2004); *Omobude v. Merck & Co.*, No. 3:03CV528LN, Memorandum and Order at 3 (S.D. Miss. Oct. 3, 2003); *Porter v. Merck & Co.*, No. 4:03CV12LN, Memorandum and Order at 2 (S.D. Miss. June 17, 2003).[2]

**B.    There Is Complete Diversity Between Plaintiffs And The Only Arguably Properly Joined Defendant-Merck.**

12.    Upon information and belief, plaintiffs were, at the time this suit was filed, citizens of the State of Mississippi.[3]   Complaint at ¶ 1.

13.    Merck is, and was at the time of the filing of this lawsuit, a corporation organized under the laws of the State of New Jersey with its principal place of business in New Jersey.   Complaint at ¶ 2.   Therefore, Merck is a citizen of New Jersey for purposes of determining diversity.   28 U.S.C. § 1332(c)(1).

14.    Defendants Does 1-5 have been sued under fictitious names. Complaint at ¶ 4. Accordingly, the citizenship of Does 1-5 "shall be disregarded" for purposes of removal. 28 U.S.C. § 1441(a).

15.    For the reasons set forth below, the remaining defendant, Jeanna Dampier ("Dampier"), is fraudulently joined.   Therefore, her citizenship must be ignored for removal purposes. *See Heritage Bank v. Redcom Labs, Inc.*, 250 F.3d 319, 323 (5th Cir. 2001) (fraudulent joinder of a non-diverse defendant will not operate to defeat diversity jurisdiction).

---

[2] Copies of the unpublished decisions in *Morgan, Omobude,* and *Porter,* along with their respective complaints, are attached hereto as Exhibits 2, 3, and 4, respectively.

[3] Plaintiff Vickie Roberts alleges that she is an adult resident citizen of Montgomery County, Mississippi. Complaint at ¶ 1.   Plaintiff Jackie Ammons alleges that she is an adult resident citizen of the State of Georgia. Complaint at ¶ 1. Plaintiffs further allege that Plaintiffs' decedent, Mary Roberts, was an adult resident of the State of Mississippi at the time of her alleged injury. Complaint at ¶ 6. Plaintiff, as the legal representative of the estate of a decedent, is deemed to be a citizen only of the same state as the decedent. *See* 28 U.S.C. 1332(c)(2). Thus, plaintiffs are citizens of the State of Mississippi for purposes of determining diversity.

4

**C.    Defendant Jeanna Dampier is Fraudulently Joined.**

16.    For the reasons set forth below, the remaining defendant, Dampier, identified as a Mississippi resident and Merck professional representative, is improperly joined.[4] *See Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 323 (5th Cir. 2001) (fraudulent joinder of a non-diverse defendant will not operate to defeat diversity jurisdiction). Pursuant to the fraudulent joinder doctrine, a court should disregard the citizenship of in-state defendants where, as here, "there is no reasonable basis for predicting that plaintiffs might establish liability . . . against the in-state defendants." *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 393 (5th Cir. 2000).

17.    The fraudulent joinder of employees has become a common tactic in pharmaceutical litigation by plaintiffs who seek to avoid federal court and – in cases like this – inclusion in an MDL proceeding. As the United States Supreme Court has long recognized, however, a defendant's "right to removal cannot be defeated by a fraudulent joinder of a residential defendant . . . ." *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). Thus, plaintiffs cannot name parties of the same citizenship merely to avoid removal of an action to federal court. *See Pensinger v. State Farm Fire & Cas. Co.*, 347 F. Supp. 2d 1101, 1105 (M.D. Ala. 2003). As the Eleventh Circuit recently reaffirmed, "the federal courts should not sanction devices intended to prevent removal to a federal court where one has that right, and should be equally vigilant to protect the right to proceed to federal court." *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005) (quoting *Wecker v. Nat'l Enameling and Stamping Co.*, 204 U.S. 176, 186 (1907)).

---

[4] The United States Court Of Appeals For The Fifth Circuit has recently adopted the term "improper joinder" in place of "fraudulent joinder." *Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 571 (5th Cir. 2004).

18.    Here, plaintiffs' complaint asserts claims for intentional/negligent misrepresentation to a learned intermediary, fraud, breach of warranty, common law fraud, fraud by omission, and aiding and abetting against Dampier, Complaint at Counts III, IV, V, VI, VII, VIII. there is no reasonable basis to predict that plaintiffs could prevail on the claims against Dampier and Dampier is fraudulently joined because plaintiffs have not alleged even a minimally sufficient factual basis for the claims asserted against Dampier. *See, e.g., Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999) (finding in-state defendant fraudulently joined where plaintiff refers to the in-state defendant only in passing and directs specific allegations towards the diverse defendants); *Strong v. First Family Fin. Services, Inc.*, 202 F. Supp. 2d 536, 545 (S.D. Miss. 2002) (denying remand; non-diverse defendant fraudulently joined where plaintiff asserted mere conclusory allegations "unaccompanied by any factual allegation); *Howard v. CitiFinancial, Inc.*, 195 F. Supp. 2d 811, 818 (S.D. Miss. 2002) (denying remand where complaint contained only "conclusory or generic allegations of wrongdoing on the part of non-diverse defendant").

19.    First, there is no reasonable basis to predict that plaintiffs could prevail on any of their causes of action against Dampier because each requires that Dampier actually have made a representation or omission of fact to the plaintiff and/or Mary Roberts on which the plaintiffs subsequently reasonably relied. *See Skemetta v. Baywatch Yacht Club, Inc*, 806 So. 2d 1120, 1124 (Miss. 2002) (defining the elements of negligent misrepresentation to include a misrepresentation or omission of fact by the defendant that the plaintiff reasonably relied on); *Johnson v. Black Brothers, Inc.*, 879 So. 2d 525, 529 (Miss. Ct. App. 2004) (defining fraudulent misrepresentation as a false representation by the defendant with the intent that the "hearer" act on in reliance of its truth). Here, plaintiffs do not allege that Dampier made any representations

6

directly to plaintiffs, but rather, made representations to Mary Roberts' physician. Complaint at ¶ 56 ("sales representatives represented to the treating physicians, the population of Vioxx consumers, and to the public at large and thus to Mrs. Roberts and her doctors that Vioxx was safe to prescribe and ingest"). As there are no allegations that Dampier made any representations to plaintiffs and/or Mary Roberts, plaintiffs have failed to allege even a minimally sufficient factual basis for the claims asserted against Dampier. Thus, Dampier is improperly joined. *See, e.g., Griggs*, 181 F.3d at 699.

20.     Moreover, plaintiffs fail to make any specific factual allegations regarding Dampier's conduct with respect to Mrs. Roberts' physician; indeed, plaintiffs never even *identify* Mrs. Roberts' physician. Instead, plaintiffs' allegations regarding the conduct of Merck sales representatives are general, broad, and conclusory. Such vague and uncertain assertions are not sufficient to state a factual basis for any claim *against Dampier. See, e.g., Tillman v. RJ Reynolds Tobacco*, 253 F.3d 1302, 1305 (11th Cir. 2001) (non-diverse employee defendants fraudulently joined "where plaintiff failed to tie these defendants to the underlying allegations of the complaint"); *Banger ex rel. Freeman v. Magnolia Nursing Home, L.P.*, 234 F. Supp. 2d 633, 637-38 (S.D. Miss. 2002) (collective, conclusory and generic allegations of wrongdoing on the part of all defendants are insufficient to show that individual defendant was not fraudulently joined) (citing *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 392-93 (5th Cir. 2000)); *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 140 (S.D.N.Y. 2001) ("Rezulin II") (pharmaceutical representatives fraudulently joined due to general collective allegations regarding "defendants"); *Lyons v. American Tobacco Co.*, No. Civ. A. 96-0881-BH-S, 1997 WL 809677, at *5 (S.D. Ala. Sept. 30, 1997) (holding that there is "no better admission of fraudulent joinder of [the resident

7

defendants]" than the failure of the plaintiff "to set forth any specific factual allegations" against them).

21.     Plaintiffs' misrepresentation and fraud claims are deficient for the additional reason that plaintiffs have not pleaded fraud with particularity as required by Mississippi law. *See* Fed. R. Civ. P. 9. Nowhere in the Complaint do plaintiffs identify with the requisite particularity material misrepresentations of past or present fact made by Dampier. To the contrary, the claims against Dampier do not even meet basic pleading standards, much less the heightened standard for pleading fraud. Plaintiffs do not make any specific allegations as to what Dampier said, or to whom, and does not even identify his prescribing physician(s). Accordingly, there is no reasonable basis to predict that plaintiffs could prevail on their misrepresentation and fraud claims against Dampier.

22.     Plaintiffs fail to assert sufficient allegations to establish claims of breach of warranties against the professional representatives for the following reasons. First, the professional representatives are not "warrantors" of Vioxx, but instead the seller of the product is the manufacturer, Merck. Additionally, plaintiffs fail to allege that their physicians purchased or even received Vioxx from the named professional representatives. Therefore, plaintiffs' allegations against the professional representatives for breach of implied and express warranties fail. *See Johnson v. Parke-Davis*, 114 F. Supp. 2d 522, 525 (S.D. Miss. 2000).

Plaintiffs' breach of warranty claim fails against Dampier for the further reason that Alabama's adoption of the U.C.C. requires that the accused party be a "seller" to be liable for breach of warranty. *See* Miss. Code Ann. §75-2-103(1)(d) (defining "seller" as "a person who sells or contracts to sell goods"); *see also* Miss. Code Ann. §§75-2-313, 75-2-314 & 75-2-315 (both express and implied warranty claims refer to the creation of warranties by the "seller"); (*See* e.g.

8

*Wellcraft Marine v. Zarzour*, 577 So. 2d 414 (Ala. 1990) (noting that Alabama statutes which are identical to the Mississippi statues, defining the warranties of merchantability and fitness for a particular purpose both apply to the "seller"); *Bloodsworth v. Smith & Nephew*, 2005 WL 3470337, at *7 (M.D. Ala. Dec. 19, 2005) (concluding that there can be no breach of warranty claims against a sales representative because sales representatives are not "sellers" of goods).

    23. Lastly, Dampier is improperly joined for the further reason that, to the extent plaintiffs' claims rely on a duty of Dampier to warn the plaintiffs directly, no such duty exists. *Gulotta v. GE Capital Modular Space*, No. Civ.A. 03-1669, 2003 WL 21991717, at *2 (E.D. La. Aug. 19, 2003) (denying remand where non-diverse employee/agent defendant had "no personal duty of care" to plaintiff and was fraudulently joined) attached hereto as exhibit 5; *Walker v. Medtronic, Inc.*, No. 1:03CV74-D-D, 2003 WL 21517997, at *3-*4 (N.D. Miss. June 4, 2003) (denying remand and dismissing claims against sales representative because under Mississippi law a sales representative has no duty to warn (applying learned intermediary doctrine) and there were "no specific factual allegations" of fraudulent misrepresentation against these non-diverse defendants) attached hereto as exhibit 6; *Hardy v. Ducote*, No. 02-1520 (Section "A"), 2003 U.S. Dist. LEXIS 2940, at *6-*9 (W.D. La. Jan. 20, 2003) (denying remand where employer had not "delegated" to the non-diverse employee-defendant a duty of care owed to the plaintiff; finding fraudulent joinder) attached hereto as exhibit 7.

    WHEREFORE, Defendant Merck respectfully removes this action from the Circuit Court of the State of Mississippi for Montgomery County, bearing cause number 2007-0028 CVM, to this Court, pursuant to 28 U.S.C. § 1441.

    DATED this 8th day of March, 2007.

9

Respectfully submitted,

BUTLER, SNOW, O'MARA, STEVENS &
CANNADA, PLLC

*allyson jones*
CHRISTY D. JONES (MB #3192)
CHARLES C. HARRELL (MB #3135)
ANITA MODAK-TRURAN (MB #99422)
J. KENNEDY TURNER, III (MS #8140)
ALYSON B. JONES (MB # 101456)

BUTLER, SNOW, O'MARA,
STEVENS & CANNADA, PLLC
17th FLOOR, AMSOUTH PLAZA
210 EAST CAPITOL STREET
PO BOX 22567
JACKSON, MS 39225
Telephone: (601) 948-5711
Facsimile: (601) 985-4500

Counsel for Defendant Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via 1st-

Class U.S. Mail, postage prepaid, upon the following counsel of record:

Drug Litigation Liability Group, PLLC
Comprised of:

Liston/Lancaster, PLLC
P.O. Box 645
Winona, MS 38967-0645

David H. Nutt & Associates, P.C.
605 Cresent Blvd., Suite 200
Ridgeland, MS 39157

Pittman, Germany, Roberts & Welsh, L.L.P.
P.O. Box 22985
Jackson, MS 39225-2985

**ATTORNEYS FOR THE PLAINTIFFS**

SO CERTIFIED this _8th_ day of March, 2007.

ALYSON B. JONES

Jackson 1939615v.1

11

**FILED**

MAR 0 8 2007

DAVID CREWS, CLERK

By _____ Deputy

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
## STATE OF MISSISSIPPI

VICKIE ROBERTS and JACKIE
AMMONS, *Co-Executrixes of the*
**Estate of MARY ROBERTS,**
Deceased,

            **PLAINTIFFS,**

VS.

MERCK & CO., INC., JEANNA
DAMPIER AND DOES 1- 5,
            **DEFENDANTS.**

CAUSE NO. 2007-028

NDMS: 3:07cv034-M-4

---

### COMPLAINT FOR DAMAGES

---

COME S NOW the Plaintiffs, Vickie Roberts and Jackie Ammons, Co-Executrixes of the Estate of Mary Roberts, Deceased, by and through their attorneys of record, and files this their Complaint for damages against the Defendants, Merck & Co., Inc., Jeanna Dampier, and Does 1-5, and in support thereof, would show unto the Court the following:

#### *I. PARTIES*

1.     Plaintiff, Vickie Roberts is an adult resident citizen of the State of Mississippi, who resides in Montgomery County, at 493 Bluff Spring Road, Winona, Mississippi 39759. Plaintiff, Jackie Ammons is an adult resident citizen of the State of Georgia, who resides in Cobb County, at 5691 Tracey Drive, Mableton, Georgia 30126.

2.     Defendant Merck & Co., Inc. (hereafter referred to as "Merck"), is a New Jersey corporation, whose address and principal place of business is One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 8889-100, doing business in the State of Mississippi, and can be served with



DEFENDANT'S EXHIBIT

MDOCS10881

process of this Court by serving a copy of the Summons and Complaint in this case on its registered agent, CT Corporation System, 645 Lakeland East Dr., Suite 101, Flowood, MS 39232.

3.    Defendant, Jeanna Dampier is an adult resident citizen of the State of Mississippi, residing in Madison County at 517 Silverstone Drive, Mississippi 39110-7646, who may be served with process of this Court by delivering a copy of the Summons and Complaint to her personal address. In this Complaint, when Plaintiffs refer to "Merck sales representatives", or "sales representatives", Plaintiffs will be referring generally to all Merck sales representatives, and specifically, upon information and belief, to Defendant, Jeanna Dampier.

4.    The identities of Defendants John Does 1-5 are unknown at this time. The identities of these individual defendants will be made known to all parties in this action, in a timely manner, in compliance with the Mississippi Rules of Civil Procedure. In this Complaint, when Plaintiffs refer to "Merck sales representatives", or "sales representatives", Plaintiffs will be referring generally to all Merck sales representatives, and specifically to Defendants John Does 1-5.

## II.  JURISDICTION

5.    (a)    This Court has subject matter jurisdiction of this cause pursuant to the provisions of M.C.A., § 9-7-81 (1972), in that the subject matter of this litigation is not made exclusively cognizable in some other Court by the Constitution and Laws of this State and the principal amount in controversy exceeds the sum of Two Thousand Five Hundred ($2,500.00) Dollars.

(b)    This Court has *in personam* jurisdiction of the defendants in that:

-2-

M00C510882

1.  Merck is qualified to do business and is doing business in the State of Mississippi and has appointed an agent for service of process in the State for service of process.

2.  Jeanna Dampier is an adult, resident citizen of the State of Mississippi and may be served with the process of this Court therein.

(c)  Plaintiffs' claims are brought solely under Mississippi Law, and Plaintiffs state they do not bring any causes of action pursuant to Federal law. Further, Plaintiffs disclaim any and all causes of action under any federal laws, statutes and/or regulations. Plaintiffs do not assert, either expressly or implicitly, any claims arising out of any federal statute, any federal regulation or any provision of federal common law. Rather, Plaintiffs hereby disallows and repudiates any such claims. Consequently, there is no basis for any assertion of federal jurisdiction on the basis of a "federal question". Furthermore, no assertion by any party of federal diversity jurisdiction would be proper in that Plaintiff, Vickie Roberts is a resident citizen of the State of Mississippi, Plaintiff, Jackie Ammons is a resident citizen of the State of Georgia and Defendant, Jeanna Dampier is a resident of the State of Mississippi. Further, upon information and belief, John Does 1-5 are residents of the State of Mississippi.

-3-

M00C510883

### *III. VENUE*

6.      This Court has venue of this action in that a substantial alleged act or omission occurred in Montgomery County, Mississippi, where Mrs. Mary Roberts ingested VIOXX samples from her physician . As a result, of such ingestion, she suffered a myocardial infarction.

### *IV. FACTS*

7.      This is an action brought by the Plaintiffs for damages resulting in her mother's ingestion of the non-steroidal anti-inflammatory pain medication VIOXX (chemical name "rofecoxib").

8.      Mrs. Roberts received VIOXX samples which she began ingesting on a regular basis around May 7, 2001. As a result of such ingestion, she suffered physical injuries, including, but not limited to, an acute myocardial infarction, around  May 28, 2001.

A.      **Merck's Business and Marketing Strategy**

9.      Merck develops, markets, and sells pharmaceutical drugs.  Merck is one of the Country's largest drug manufacturers, and is a dominant player in both the United States and World markets.  In order to maintain its market position, Merck must continuously research and develop new drugs, seek their approval by appropriate government agencies, and aggressively market these drugs to healthcare professionals and the general public (a) through Jeanna Dampier  and its other sales representatives, (b) "direct-to-consumer" print and video advertising and (c) subsidized medical meetings. Merck's revenues are dependent on the sales of the drugs which it has developed.

10.     Like many major pharmaceutical companies, Merck relies on the success of so called "blockbuster" drugs to generate the huge revenues necessary to maintain its leading position in a very competitive industry.  "Blockbusters" are typically defined as medications that account for more than

-4-

M00C510884

one billion dollars in annual sales, and are most often still under full patent protection from relatively inexpensive competing generic versions of the drugs. It is of paramount importance for pharmaceutical companies, like Merck, to make as much money from these blockbuster drugs while Merck still maintains full patent protection, thereby owning the market.

**B.    The Tipping Point**

11.    Beginning in February 2000, and continuing through June of 2001, five major drugs manufactured by Merck were going to lose patent protection: Vasotec, February 2000; Pepcid, April 2000; Prilosec, April 2001; Prinivil, December 2001; Mevacor, June 2001.

12.    During this time, the drug VIOXX was one of the drugs being developed by Merck for introduction into the market. Faced with impending loss of significant market share, VIOXX became the blockbuster drug recognized by Merck to be the critical component to Merck's future financial success.

13.    VIOXX is the brand name of a pain killer developed by Merck (chemical name rofecoxib). VIOXX is a member of the family of pain killing medications known as COX-2 inhibitors. Traditional pain killers, such as aspirin, and naproxen (non-steroidal anti-inflammatory drugs, or "NSAIDs") block two enzymes known as "COX-1" and "COX-2." Painkillers that function by blocking COX-1 enzymes can cause significant gastrointestinal problems. Merck would ultimately market VIOXX as a drug which blocked only COX-2 enzymes, responsible for pain and inflammation. Merck marketed VIOXX as a drug that did not effect the COX-1 enzyme. Therefore. Merck represented that VIOXX would relieve pain while avoiding the serious health effects threatened by the COX-1 inhibitors. When attempting to position VIOXX in the market, Merck repeatedly emphasized the serious health risks and fatalities that could be caused by prolonged use

-5-

MODCS10855

of NSAIDs that could be avoided through use of the drug VIOXX. Merck's marketing plan of VIOXX depended upon a multi-million dollar advertising campaign through direct-to-consumer advertising and to potential prescribing physicians through its sales representatives, including Jeanna Dampier.

14.      As marketed by Merck, the value of VIOXX did not lie in its effectiveness for treatment of pain, VIOXX value lay in its purported "safety."

15.      In May of 1999, Merck began the distribution and sale of VIOXX. Once distribution and sale began, Merck wasted no time in dispatching its pre-programmed sales force to insure VIOXX's availability on the market. Although VIOXX would not arrive in pharmacies until early June 1999, Merck had already begun to dispatch a sales force of over four thousand individuals to pitch "the safe drug VIOXX" to doctors, and healthcare organizations. By June of 1999, Merck's sales force had been successful in placing VIOXX in more than 40,000 pharmacies across the United States.

## C.    Signs of Danger: Merck's Knowledge of Blockbuster Drug VIOXX Danger

16.      As Merck and its sale force were touting the safety of the drug VIOXX, they, at the same time, were aware that VIOXX posed a substantial risk of heart attacks, strokes, and other serious cardiovascular events. The serious risks posed by VIOXX were known to Merck as far back as 1996. In testimony provided to the Senate Finance Committee in connection with it's investigation into Merck's marketing of VIOXX, Dr. Gurkirpal Singh, Stanford University School of Medicine, Chief Science Officer, Institute of Clinical Outcomes Research and Education, testified that as early as 1996, Merck scientists' discussions focused on the fact that other pain killers, i.e. aspirin, naprosen, protected against heart attacks by inhibiting platelets. Because VIOXX did not

M00C510886

have this similar effect, this might explain results in studies seeming to indicate that VIOXX would increase the risk of heart attacks. Dr. Singh testified that "this was a serious concern because the entire reason for the development of VIOXX was safety." Further Dr. Singh recognized that if this risk were made known, "patients may not be willing to make this trade off" and purchase the drug. Merck should have started, but failed to start, a public discussion about this potential trade off, and design studies that would have more carefully evaluated the risk benefit ratio of VIOXX. Merck made no such efforts. In 1998, a Merck scientist presented an analysis of serious heart problems with VIOXX compared to patients enrolled in studies of other Merck drugs. According to Dr. Singh's testimony before Congress, these findings should have caused a public scientific discussion of the risks and benefits of the drug VIOXX. However, Merck did not make this information about VIOXX public until many years later, all the time while it was aggressively marketing it's drug as a safe alternative to other pain killers.

17.     In 1998, Merck conducted a clinical trial called "Study 090." Study 090 was a randomized controlled study designed to evaluate the safety of a 12.5 mg dosage of VIOXX during a six week period in patients with osteoarthritis of the knee. A total of 978 patients were randomly placed into three groups: one group taking VIOXX 12.5mg, a second group taking the drug of a competitor, and third group taking a placebo. This 1998 study indicated nearly a seven fold increase in heart attack risk with low dose VIOXX. These results were evaluated by Dr. Eric J. Topol, Chief of Cardiovascular Medicine at the Cleveland Clinic, who determined that the occurrence of increased cardiovascular events in Study 090 was statistically significant. Another Merck study, known as "Study 085,", also a randomized control test, reflected similar results. Additional testimony

-7-

M00C510687

provided to the Senate Finance Committee indicated that these increased occurrences of cardiovascular events represented a clear basis for concern.

18.    In the face of these two studies, known to Merck, but not released to the public, Merck, by the Fall of 1998, was touting both the efficacy and the safety of VIOXX. In a Newswire released on November 12, 1998, Merck specifically announced the results of its trials and studies as indicating that VIOXX was at least as effective as other NASIDs, that it was effective in treating rheumatoid arthritis, that it did not damage the gastrointestinal tract, and that Merck planned to file for approval of VIOXX. In subsequent press releases and announcements, Merck continued to discuss the efficacy of VIOXX, and continued to discuss safety issues, without any mention of adverse cardiovascular events. Unknown to prescribing physicians, to their patients, or to the general public, by the time Merck had filed for FDA approval of VIOXX, in 1999, Merck had access to several studies confirming that thromboembolic events, such as heart attack and stroke, were more frequent in patients receiving VIOXX than placebo. Merck knew from these studies that VIOXX was likely to promote heart attacks directly.

19.    In January 1999, Merck sponsored the VIOXX Gastrointestinal Outcomes Research study, "the VIGOR study." VIGOR was a double blind, randomized, stratified parallel group study of over 8,000 patients to evaluate the efficacy of VIOXX 50mg dose. Patients were excluded from the study if they required aspirin for cardiovascular protection. Also excluded from VIGOR were patients with angina or congestive heart failure, and certain patients with myocardial infarction or coronary bypass grafting, stroke, transischemic attack or uncontrolled hypertension. Essentially, the parameters of VIGOR study sought to exclude any possibility of including patients with cardiovascular issues. However, the raw data from the VIGOR study revealed to Merck that patients

-8-

taking VIOXX suffered five times as many cardiovascular events as patients taking Naproxen, an older NSAID.

20.     While the VIGOR study did demonstrate that VIOXX reduced the incidents of serious gastrointestinal side effects as compared Naproxen, the data from the VIGOR study did not demonstrate an improved safety profile for VIOXX. The VIGOR study data revealed that:

a.     Patients on VIOXX were five times more likely to suffer a heart attack as compared to patients on Naproxen;

b.     Patients on VIOXX were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on Naproxen; and

c.     Patients on VIOXX actually suffered more cases of serious disease (either gastrointestinal or cardiovascular) than did Naproxen users (61 and 57 cases respectively).

21.     Another Merck clinical trial named "ADVANTAGE" was completed in April 2000. Like similar trials, results from the ADVANTAGE clinical trial revealed to Merck that patients taking VIOXX faced a significantly increased risk of serious cardiovascular events. Although the trial was completed in April 2000, Merck did not publish the results from the trial until 3 years later in 2003 when they appeared in the *Annals of Internal Medicine*.

D.     **Merck's Disregard of Danger and Institution of Multi-Million Dollar Marketing Campaign:**

22.     Even though Merck was aware of the increased risk of serious cardiovascular events, Merck continued to press ahead with unbridled abandon after VIOXX's May 1999 approval. Shortly after it's release, Merck instituted a marketing blitz with intensive sales representative training. Both the marketing blitz, and the sales representative training, were geared toward positioning VIOXX

M00C510089

as a safer alternative to existing NSAIDs, as well as its primary COX-2 competitor, Celebrex. This marketing blitz, the promotional materials distributed by Merck, and the information passed to physicians by Merck's sales representatives, did not refer in any way to knowledge of adverse cardiovascular events involving VIOXX patients.

    23.    Ignoring the imperical data, and the evidence of a causal relationship between VIOXX and increased rate of cardiovascular events, Merck tried to explain the results of the studies as an anomaly. Merck publically claimed that Naproxen had "cardio-protective effects" thus resulting in lower incidents of heart attacks in the group taking Naproxen. If pressed to answer, this information would reluctantly be provided directly by Merck sales representatives to physicians seeking to prescribe VIOXX to their patients. This position of Merck, and its sales representatives, was contradicted directly by a private internal Merck e-mail authored by Merck's research chief, Dr. Edward Scolnick. On March 9, 2000, Dr. Scolnick indicated in an e-mail that Merck knew that its reliance on alleged "protective" features of Naproxen was misplaced. Further, the e-mail explicitly recognized that the evidence of enhanced risk of cardiovascular events in VIOXX consumers "is clearly there" and called it a "shame".

    24.    Scientists and physicians later confirmed that Merck had manipulated the results of the ADVANTAGE study in order to conceal the truth about VIOXX's cardiovascular risks. Specifically, they found that during the ADVANTAGE trial, 8 people taking VIOXX had suffered heart attacks or sudden cardiac death, compared to just one person taking Naproxen. Critics recognized that this difference was statistically significant. However, Merck never disclosed the data that way. Instead of being truthful, Merck classified the cause of some of these deaths as "unknown" even though Merck's scientist had specifically found that the most likely cause of some

-10-

MXDC510890

of the deaths was a heart attack. In another e-mail, Merck scientist, Dr. Scolnick, complained that the deaths in the ADVANTAGE study put Merck in a terrible situation. Further, Dr. Schonick in his email expressed his worries to other senior Merck scientists that the ADVANTAGE results, if disclosed, would encourage the FDA to demand that VIOXX place on its label warnings highlighting cardiac risks.

25.     Merck also manipulated and/or obscured the VIGOR results which were "disclosed" by Merck in 2000. As reported by the *New England Journal of Medicine* in a December 8, 2005 editorial posted on its website, when Merck published the results of VIGOR in November 2000, two out of the three authors knew about, but intentionally concealed, three additional myocardial infarctions in the group taking VIOXX. As its basis for this claim, the *New England Journal of Medicine* referred to a July 5, 2000, internal Merck memorandum confirming that at least two of the authors of the VIGOR study knew about three additional myocardial infarctions at least two weeks before the author submitted the first of two revisions, and four and one half months before publication of the final article. The *New England Journal of Medicine* went on to explain that the fact that these myocardial infarctions were not included made conclusions in the article incorrect. Most startling was the *Journal's* revelation that it had determined from a computer diskette that some of the data were intentionally deleted from the VIGOR manuscript, two days before the manuscript was initially submitted to the *Journal* on May 18, 2000.

26.     In an August 22, 2001 article published in the *Journal of the American Medical Association* ("*JAMA*"), 3 noted physicians challenged Merck's spin on its VIGOR results. The article reported that both Celebrex and VIOXX appeared to increase the risk of heart attack and

-11-

M00C510891

stroke, but that the danger from VIOXX appeared higher. The article immediately called for trials to specifically determine whether the drugs increased cardiovascular risks.

27.     Merck responded to the *JAMA* article in usual fashion. Indeed, it was later learned that even before the 2001 negative report appeared in *JAMA*, the authors were approached by Merck representatives in an effort to pressure them and *JAMA* to down play the cardiac issue. Later, Merck's senior director of cardiovascular clinical research vigorously rejected the findings in the *JAMA* article stating: "We already have additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." Another Merck consultant rejected the *JAMA* conclusions stating that: "I don't think there are any sound conclusions that can be drawn from this study." Merck's consultant further stated that he personally had performed a more extensive analysis of Merck's VIOXX data and had concluded that "there is no suggestion of a cardiovascular risk" from VIOXX. Merck's VIOXX smoke and mirror campaign continued.

28.     During the Fall of 2001, the American Heart Association, the National Stroke Association, and the Arthritis Foundation urged Merck to conduct further tests to see if VIOXX increased the risk of heart attack and stroke. Merck initially stated that it was unconvinced that the requested trials were necessary. However, in 2002, Merck was prepared to undertake a clinical study to evaluate VIOXX's cardiovascular risks. According to an article published in 2005 in the New York Times, Merck's extensively planned project, named "VALOR" was abruptly dropped before it started, and just days before Merck's protocol was schedule to be submitted to the FDA. Data from the VALOR study was scheduled to be released in March of 2004. However, as stated in the article, the result may have provided answers about VIOXX's cardiovascular risks even sooner if

-12-

MMWC10982

patients taking the drugs had begun to show adverse effects. Clearly, results from the VALOR study could have completely destroyed VIOXX's commercial appeal. However, this result would only come later, after results from APPROVE were published.

29.     According to a May 5, 2005 Memorandum issued by the minority members of the House Government Reform Committee, which was prepared based upon documents produced by Merck, Merck continued to train and instruct its sales Representatives to avoid providing answers and, if necessary, to misrepresent to physicians VIOXX's cardiovascular risks. According to the House Memorandum, Merck's sales representatives were specifically **prohibited** from initiating discussion on any new cardiovascular data. Further, these same representatives were instructed to emphasize "uncertainty about the cardiovascular risks of the drug [VIOXX]."

30.     In October of 2003, *The Wall Street Journal* reported that research presented at the American College of Rheumatology meeting in Orlando, Florida "suggests that VIOXX . . .may increase the risk of heart attacks in patients taking the pill." The *Journal* went on to describe a Merck funded study by Harvard University affiliated Brigham and Woman's Hospital in Boston "that found an increased risk of heart attack or acute myocardial infarction," in patients taking VIOXX as "compared with patients taking a competing pain killer," and that VIOXX "was linked to an increased heart-attack risk compared with patients not taking any pain killers." In the first 30 days, researchers found, VIOXX was linked to a 39% increased heart attack risk compared with Celebrex. Between 30 and 90 days, that increased relative risk was 37%. Merck responded vigorously rejecting these results, stating that, in their trials, they had "found no significant difference between VIOXX and placebo." Merck further attempted to discount the study by, removing from the list of authors the name of one of Merck's own epidemiologists.

-13-

M0OC510803

31.     On August 25, 2004, *Bloomberg Business News* reported that a study of the patient records of 1.4 million Californians disclosed that "the difference in heart risk was statistically significant between a recommended dose of VIOXX 25mg a day or less, and Celebrex." Testimony before the Senate Finance Committee indicated that the study "also found that VIOXX doses in excess of 25mg a day more than tripled the risk compared with patients who hadn't taken pain killers within the past two months." Consistent with previous actions, Merck disputed the results claiming that conclusions from these types of studies don't carry much weight.

32.     On November 5, 2004, *The Lancet*, a British Medical Journal, released a study that showed VIOXX should have been pulled from the market "as early as 2000 because studies of the drug had clearly shown that it doubled the risk of heart attacks among users." The authors of *The Lancet* study pooled data from earlier studies involving VIOXX. On the same date that the study released, authors in *The Lancet* wrote that the risks of VIOXX were evident "a full four years before the drug was finally withdrawn from the market by its manufacturer, Merck." The authors also indicated their belief that Merck's intervention in pulling the drug was "overdue."

E.     **Withdrawal of VIOXX from the Market**

33.     Finally, in the face of overwhelming evidence confirming the cardiovascular risks associated with VIOXX, on September 28, 2004, at an emergency meeting with FDA upper management, requested by Merck, Merck shared data from its "APPROVe study showing increased risks of myocardial infarction and stroke for the 12.5mg and 25mg doses as compared to placebo after eighteen months of treatment." Upon the sharing of this data, Merck announced its intent to withdraw VIOXX from the market. Worldwide product withdrawal of VIOXX occurred on September 30, 2004.

-14-

M00C510994

34.     Even this last effort by Merck to come clean by releasing data from its approved study has shown to be yet another attempt to present false and misleading information regarding VIOXX. On May 18, 2006, National Public Radio broadcast an interview with Dr. Kurt Furberg, clinical trial expert, Wake Forest University, regarding his analysis of the data from the APPROVe study, recently obtained by NPR. Dr. Furberg's review of the data contained in the previously confidential 107 page report confirmed that Merck had stopped the four year APPROVe study just before it was scheduled to end. Dr. Furberg criticized Merck's method of analyzing the raw data. Dr. Furberg was supported by cardiologist Dr. Steve Nissen of the Cleveland Clinic, who also reviewed the report for NPR. Both Dr. Furberg and Nissen confirmed that raw data from the study indicated that patients were at high risk of heart problems and strokes almost as soon as they started taking VIOXX. These experts also agreed that the raw data from the APPROVe study confirmed that the risk from VIOXX persisted for at least a year after patients stopped taking the drug. These findings, based upon the raw data from Merck's study, contradicted Merck's public announcement that the data showed no adverse affects within the first eighteen months of taking the drug, and no indication that patients were at a greater risks of heart problems after they stopped the drug.

E.     The Cover-up

35.     As safety questions about the adverse cardiovascular effects of VIOXX continued to be raised in the medical community, Merck pushed forward with its estimated $500 million dollar plus advertising and training program. As part of its training program, Merck had produced training videotapes, and training brochures and coached sales representatives, including Jeanna Dampier, to try to avoid questions about the risks of heart attacks. On July 21, 2005, the *New York Times* reported on the contents of one of Merck's training videos produced in 2000. The video, never

-15-

M00C510995

shown to doctors or consumers, contained an actress posing as a physician presenting "an obstacle" to a VIOXX sales representative. The actress poses the question "I'm afraid VIOXX causes myocardial infarctions." As a response, an actress playing a Merck sales representative coaches representatives to respond "That's not true."

36.     Merck also authored a 1999 training guide which was presented to sales representatives at a VIOXX workshop. The workshop training materials form indicated that one of the core messages that should be communicated to VIOXX sales representatives was that VIOXX was a safe product. One of the planned goals of the workshop was to insure that VIOXX sales representatives could handle "obstacles" in the nature of questions from physicians about the cardiovascular safety of VIOXX.

37.     As part of its workshops, Merck developed the game of "Dodge Ball VIOXX", and "JeopardXX" as teaching tools. In the game of Dodge Ball VIOXX, Merck sales representatives had to overcome "obstacles" in the form of physicians' questions in order to advance to the next round. However, players were rewarded if they turned over the "**DODGE!**" card allowing them to advance to the next round without having to answer the physician's question. Merck, through this training exercise, was able to send a clear message to its sales representatives, "You never have to answer a hard question from a physician if you're able to **DODGE** it."

38.     In the game of JeopardXX, VIOXX sales representatives were awarded points for avoiding direct answers to physicians' questions regarding concerns about the cardiovascular effects of VIOXX, specifically, questions posed by a physician "About a potential increase in the risk of myocardial infarctions."

-16-

M00C510896

6cb1a2c5194ceaab

F.    Results of Merck's Cover-up

39.    The efforts of Merck and its sales representatives were successful in keeping VIOXX

on the market for over 5 1/2 years.  During this 5 1/2 year   period, approximately 20 million

Americans took the drug VIOXX.  With annual sales of approximately $2.5 billion, VIOXX resulted

in one of the most successful marketing campaigns ever for a new drug introduced into the American

market.  However, despite knowledge from clinical trials, post-marketing reports, studies, and other

information relating to cardiovascular related adverse affects, Merck knowingly, aided and abetted

by Jeanna Dampier and Merck's sales representatives, promoted and continued to market VIOXX

as safe up until the public announcement of its world wide withdrawal on September 30, 2004.

## V.  CAUSES OF ACTION

## COUNT 1

## STRICT LIABILITY IN TORT CLAIM AGAINST MERCK

40.    Plaintiffs reallege all prior paragraphs of this as  if fully set out  herein.

41.    Merck at all times relevant hereto, were engaged in the design, manufacture,

marketing, promotion, distribution and/or sale of VIOXX.  Merck is strictly liable in tort to the

Plaintiffs, pursuant to Miss.Code Ann. § 11-1-63, for the following reasons:

a.    VIOXX was defective because it failed to contain adequate warnings and/or
       instructions regarding dangers that were known or should have been known
       to Merck.

b.    VIOXX was defective, unsafe, and unreasonably dangerous for its intended
       and/or foreseeable uses.

-17-

M00C510897

    c.    Merck breached express warranties or failed to conform to other express factual representations made to Mary Roberts' physician regarding the safety of the drug VIOXX upon which Mrs. Roberts justifiably relied upon when electing to use the drug VIOXX.

    d.    The defective conditions, as described above, rendered VIOXX unreasonably dangerous to Mary Roberts.

42.    As a direct and proximate result of the defective and unreasonably dangerous condition of VIOXX, Mary Roberts incurred injuries and damages, which are more fully described hereinafter.

## COUNT II.

### NEGLIGENCE OF DEFENDANT MERCK

43.    Plaintiffs reallege all prior paragraphs of this as if fully set out herein.

44.    Merck is liable to the Plaintiffs for negligence in one or more of the following particulars:

    a.    Merck was negligent for carelessly manufacturing, compounding, testing, inspecting, packaging, labeling, distributing, marketing, examining, selling, prescribing, and/or preparing VIOXX in such a manner that it was likely to cause harm to Mary Roberts.

    b.    Merck was negligent in manufacturing, compounding, testing, packaging, labeling, prescribing, and/or distributing VIOXX in such a manner that the drug was unsafe when it reached the hands of the consuming public, including Mary Roberts.

-18-

M00C510698

c.   Merck was negligent in failing to warn Mary Roberts' physician of the
unreasonable dangerous defects associated with VIOXX after Merck knew
and/or should have known of such dangerous defects, thereby breaching
Merck's duty to warn.

d.   Merck was negligent in representing and/or misrepresenting the benefits and
safety risks of VIOXX and in failing to warn or adequately warn of the
known risks.

e.   VIOXX was negligently designed in a defective manner in that it did not
possess the safety aspect for which it was marketed.

f.   Merck was negligent in placing VIOXX on the market in May of 1999 in the
face of overwhelming tests results which confirmed that VIOXX did not
possess the pharmacological characteristics for which it was marketed, and,
in fact, posed a serious health risk to individuals taking the drug, such as
Mary Roberts.

g.   Merck was negligent in failing to withdraw VIOXX from the market, earlier
than September 28, 2004, in the face of overwhelming evidence that VIOXX
did not possess the pharmacological characteristics for which it was
marketed, and, in fact, posed a serious health risk to individuals taking the
drug, such as Mary Roberts.

45.   As a direct and proximate result of the negligence of Merck, as set forth above, Mary
Roberts sustained injuries and damages, as set forth more fully herein.

-19-