# EXHIBIT B

48

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.  SUPERIOR COURT
CIVIL ACTION NO. 2003-3314F

JANET KELLY and another[1]
Plaintiffs

vs.

WYETH, f/k/a AMERICAN HOME PRODUCTS CORP. et al.[2]
Defendants

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant, Teva Pharmaceuticals USA, Inc.'s (Teva) motion for summary judgment, pursuant to Mass. R. Civ. P. 56, against Plaintiffs Janet Kelly (Kelly) and Richard Sullivan, M.D. (Sullivan).[3] On August 8, 2003, Kelly filed suit with this Court, in which she alleged the following claims against Teva: negligence (count one); breach of warranty (count two); and violations of G. L. c. 93A (count three). Teva is the only remaining defendant in the law suit. Teva now seeks summary judgment on all three counts. For the reasons set forth below, Teva's motion for summary judgment is **ALLOWED** in part, and **DENIED** in part.

### BACKGROUND

In May 2000, Dr. Andrew Warner, a gastroenterogologist, treated Kelly because she

---

[1] Richard Sullivan, M.D.

[2] A.H. Robins Company, Inc., Wyeth-Ayerst Laboratories Company, Wyeth Laboratories Inc., Teva Pharmaceuticals USA, Inc., Teva Pharmaceuticals, LTD, Lahey Clinic Foundation, Inc., Andrew S. Warner, M.D.

[3] Sullivan is Kelly's husband.

exhibited symptoms of delayed gastrointentional function. Dr. Warner prescribed Reglan® and the pharmacy provided Kelly with its generic equivalent, metoclopramide.[4] Teva manufactures the generic product, metoclopramide. When Dr. Warner prescribed treatment for Kelly, he knew that extrapyramidal symptoms and depression occurred in some patients who took metoclopramide.

Kelly took metoclopramide for about twelve weeks until August 8, when she reported symptoms of depression to Dr. Warner. Dr. Warner told Kelly to stop using the product, and she complied with his instruction. Hours after she stopped taking metoclopramide, Kelly experienced symptoms of akathisia[5], and those symptoms allegedly continued over the course of twelve to eighteen months.

Prescription drugs marketed in the United States must first be approved by the Food and Drug Administration (FDA). To market a brand new product, a drug company must submit a "new drug application" (NDA) to the FDA. See 21 U.S.C. § 355(a), (b). The NDA must demonstrate that the product is safe and effective through clinical trials, and it must propose labeling for the product. See *id.* at § 355(b), (d). In order for the FDA to approve the label, the NDA must include contraindications, warnings, precautions, and adverse reactions. See 21 C.F.R. §§ 201.56, 201.57. After the new drug loses its patent protection, another drug company may petition the FDA to market a generic version of the NDA-approved drug by submitting an

---

[4] Metoclopramide is the bio-equivalent product to Reglan®, a Wyeth product.

[5] Akathisia is a movement disorder, or extrapyramidal symptom, which produces motor restlessness. "[A]kathisia may follow a single dose [of metoclopramide] or prolonged dose. . . . Before a doctor prescribes Metoclopramide to a patient, there is no way to know whether that patient is going to experience akathisia induced by metoclopramide." (W. Leigh Thompson, M.D. Dep.)

2

"abbreviated new drug application" (ANDA). See 21 U.S.C. § 355(j).

The Hatch-Waxman amendments to the Food, Drug, and Cosmetic Act (FDCA) enabled generic manufacturers to submit an ANDA instead of an NDA to the FDA to reduce costs and make prescription drugs more affordable. See id. Unlike name brand drug manufacturers, generic manufacturers do not need to conduct independent clinical studies to demonstrate the safety and effectiveness of the drug. See id. The generic manufacturers must only demonstrate that their product is the bio-equivalent of the referenced name brand drug to receive FDA approval. See id. In the ANDA, the generic manufacturer must include a label proposal for the generic product that is the same as the label which was approved for the name brand drug. See id. at § 355(j)(2)(A)(v). After name brand and generic manufacturers receive approval from the FDA, they must continue to revise their labels "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a casual relationship need not have been established." 21 C.F.R. §§ 201.80(e), 314.97. Therefore, manufacturers have a continuing obligation to safeguard against misbranding drugs.[6] See 21 U.S.C. § 331(a), (b), (k).

The FDA provides two mechanisms for labeling changes: (1) for major changes, a drug company must obtain prior approval from the FDA before altering the label; (2) for moderate changes, a drug manufacturer may make the changes after notifying the FDA, unless the FDA disapproves. See 21 C.F.R. § 314.70(b), (c). If a drug manufacturer seeks to "add or strengthen a contraindication, warning, precaution, or adverse reaction," the change may be made through

---

[6] Under the FDCA, 21 U.S.C. § 301 et seq., a drug is unlawfully misbranded when its labeling is false or misleading, or does not provide adequate directions for use or adequate warnings against any use dangerous to health. See 21 U.S.C. § 352; *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 522 (E.D. Pa. 2006).

3

the "moderate changes" procedure. See 21 C.F.R. § 314.70(c)(6)(iii)(A).

In 1985, Teva's predecessor first acquired approval from the FDA in an ANDA for metoclopramide. In 2000, when Dr. Warner prescribed metoclopramide for Kelly, the product's label provided several warnings and instructions. In pertinent part, the "Warnings" section stated:

> Extrapyramidal symptoms, manifested primarily as acute dystonic reactions, occur in approximately 1 in 500 patients treated with the usual adult dosages of 30 to 40 mg/day of metoclopramide. These usually are seen during the first 24 to 48 hours of treatment with metoclopramide, occur more frequently in pediatric patients and adult patients less than 30 years of age and are even more frequent at higher dosages. . . . Mental depression has occurred in patients with and without prior history of depression. Symptoms have ranged from mild to severe and have included suicidal ideation and suicide.

The Teva Package Insert from November 1999 and July 2002 stated under the "Adverse Reactions" section:

> Extrapyramidal Reactions (EPS)
>
> Acute dystonic reactions, the most common type of EPS associated with metoclopramide, occur in approximately 0.2% of patients (1 in 500) treated with 30 to 40 mg of metoclopramide per day. . . . Motor restlessness (akathisia) may consist of feelings of anxiety, agitation, jitteriness, and insomnia, as well as inability to sit still, pacing, foot tapping. These symptoms may disappear spontaneously or respond to a reduction in dosage.

Kelly alleges that the risk of extrapyramidal reactions is actually greater than that which was represented on the metoclopramide label.[7] In addition, Kelly argues that Teva never made or

---

[7] Leigh Thompson, Ph.D, M.D., Sc.D. testified that literature published in the 1980s and 1990s reported that Reglan® and metoclopramide produced extrapyramidal symptoms more frequently than one in five hundred patients. J. Michael Nicholas, Ph.D, Teva's Neurosciences' Senior Director of Regulatory Affairs and Pharmacovigilance, testified that literature existed, which concluded that the frequency with which metoclopramide induced extrapyramidal symptoms was approximately one hundred times more than reported on the label. Further, Dr. Thompson and Professor Ronald B. Stewart represented that acute dystonic reactions are not the most common form of extrapyramidal symptoms from metoclopramide, but that akathisia is the

proposed changes to the FDA to strengthen the warnings on metoclopramide's label despite the indications that such warnings were appropriate.

## DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c); *Cassesso v. Comm'r of Corr.*, 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. *Pederson v. Time, Inc.*, 404 Mass. 14, 17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809 (1991); *Kourouvacilis v. Gen. Motors Corp.*, 410 Mass. 706, 716 (1991).

### I. Preemption

The Supremacy Clause of Article VI of the United States Constitution grants Congress the power to preempt state law, thereby rendering state law that conflicts with a federal statute to be "without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992), quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). In the preemption analysis, there is a presumption against preemption because "the historical powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Id.* Federal preemption arises under three circumstances: (1) express preemption by explicit

---

most common.

Congressional intent; (2) field preemption, where Congress intends the federal government to occupy a field exclusively or where the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject; and (3) conflict preemption, where a private party finds it impossible to comply with both federal and state law requirements. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

Teva contends that conflict preemption is at issue because it is impossible for it, as a generic drug manufacturer, to comply with the FDA's express requirements, and with Massachusetts state tort law. "[C]onflict preemption will be found only if the need for it is clear. . . . In fact, consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Colacicco*, 432 F. Supp. 2d at 523-524 (citation and quotation omitted), quoting *Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993). Teva argues that Kelly's claims are impliedly preempted by federal law, which instructs that generic manufacturers cannot make labeling changes to their products independent of the name brand manufacturer and/or FDA. See 21 C.F.R. § 314.70(c). Teva also highlights the "Preemption Preamble," the FDA's amicus brief which was submitted in *Colacicco*, and case law. Kelly claims that there is no conflict between federal and state law, deference should not be afforded to the Preemption Preamble, and case law dictates that her claims should survive summary judgment.

Kelly also argues that Teva should have made labeling changes through the FDA's procedures for major or moderate changes to warn of the heightened risks of akathisia. Teva claims that the FDA prohibits such labeling modifications, as most recently articulated in the FDA's amicus brief in *Colacicco*. The amicus brief stated:

6

> For a generic drug manufacturer, there is no statutory or regulatory provision permitting the manufacturer to make a labeling change to its generic drug without prior FDA approval. To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug. See 21 C.F.R. § 314.150(b)(10); see also 57 Fed. Reg. 17,950, 17,961 (1992). If a generic drug manufacturer believes that new safety information should be added to the label for the drug, the manufacturer must contact FDA with "adequate supporting information." 57 Fed. Reg. at 17,961. The FDA will consider this information and will make a determination whether the labeling for both the generic drug *and* the innovator drug should be revised. *Id.*

The FDA amicus brief proceeded to refute the proposition held by several courts that the FDCA only establishes minimum standards for drug manufacturers to abide by. See *Cartwright* v. *Pfitzer, Inc.*, 369 F. Supp. 2d 876, 882 (E.D. Tex. 2005); see also *Hill* v. *Searle Labs., Inc.*, 884 F.2d 1064, 1068 (8th Cir. 1989); *Wells* v. *Ortho Pharm. Corp.*, 788 F.2d 741, 746 (11th Cir. 1986). The amicus brief articulated the agency's policy concerning labeling instructions and stated:

> [T]he plaintiff's assertion that "[f]ederal prescription drug labeling regulations are merely 'minimum standards,'" . . . is erroneous. Rather than set minimum standards for warnings in drug labeling, FDA seeks to encourage the optimal level of use in light of reasonable safety concerns, by requiring scientific evidence of an association between a drug and a particular hazard before warning of that association on a drug's labeling.

The "Preemption Preamble" that Teva cites in support of preemption refers to:

> the preamble to a Final Rule regarding "Requirements on Content and Format of Labelling [sic] for Human Prescription Drug and Biological Products," in which the FDA states that it "believes that State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated." *In re Bextra and Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2006 U.S. Dist. LEXIS 95500, *54 (N.D. Cal. 2006), quoting 71 Fed. Reg. 3935 (2006).

This Court finds Teva's claims unavailing. The "Preemption Preamble" and the FDA amicus brief are not entitled to the heightened deference afforded to an agency's rules. See

7

*Chevron U.S.A.* v. *Natural Res. Def. Council*, 467 U.S. 837 (1984). While an agency's interpretation of its own statute warrants deference, an agency may not supply clear legislative intent on Congress's behalf, which is required to overcome the presumption against preemption. *Desiano* v. *Warner-Lambert & Co.*, 467 F.3d 85, 97 n.9 (2d Cir. 2006). Furthermore, when an agency's interpretation has changed frequently, the persuasive force of the argument diminishes. *Perry* v. *Novartis Pharm. Corp.*, 456 F. Supp. 2d 678, 683 (E.D. Pa. 2006) (noting FDA's reversal in interpreting its labeling standards and treating the preamble as an advisory opinion, not a binding portion of the regulations); *McNellis* v. *Pfizer, Inc.*, 2005 U.S. Dist. LEXIS 37505, *29 (D. N.J.2005)(declining to treat statements from amicus briefs as declarations to be afforded the preemptive force of law); *Witczak* v. *Pfizer, Inc.*, 377 F. Supp. 2d 726, 730 (D. Minn. 2005) (declining to afford FDA's amicus legal briefs the preemptive force of law); but see *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) (factoring in agency's view of preemption as articulated in its amicus brief); *Hillsborough Cty* v. *Automated Medical Labs., Inc.*, 471 U.S. 707, 718 (1985) (deferring to agency when intentions are clearly articulated through "regulations, preambles, interpretative statements, and responses to comments").

In *Foster* v. *Am. Home Prods. Corp.*, the Fourth Circuit asserted that generic manufacturers may simply adopt the warnings utilized by name brand manufacturers, however, they nevertheless have their own independent obligation to warn users about the dangers associated with the use of their products. 29 F.3d 165, 169-171 (4th Cir. 1994). The *Foster* court further stated: "When a generic manufacturer adopts a name brand manufacturer's warnings and representation without independent investigation, it does so at the risk that such warnings and representations may be flawed. Manufacturers of generic drugs, like all other

8

manufacturers are *responsible* for the representations they make regarding their products." *Id.* at 169-170 (emphasis in original). While the *Foster* court's discussion about generic manufacturer's duties to warn may be dicta, it is still persuasive on this Court. Other courts have notably rejected a drug manufacturer's attempt to evade liability because of its alleged inability to deviate from the name brand manufacturer's label without triggering preemption. See *Laisure-Radke* v. *Par Pharm., Inc.*, 426 F. Supp. 2d 1163, 1169 (W.D. Wash. 2006) (holding that a generic manufacturer with an approved ANDA can add or strengthen a contraindication, warning, precaution, or adverse reaction at any time without prior FDA approval); *Witczak*, 377 F. Supp. 2d at 729 (holding that 21 C.F.R. § 314.70(c) was promulgated to allow drug-makers to quickly strengthen label warnings when evidence of new side effects is discovered); *Perry*, 456 F. Supp. 2d at 685 (state law requires the addition of warnings so long as the FDA has not made a specific determination as to the sufficiency of the scientific evidence to support a particular warning). Even if the Court were to assume that Teva could not unilaterally make changes to its label through the moderate changes procedure, Teva still had the option and the obligation to apply for a labeling change through the major changes procedure, through which the FDA provides a prompt determination regarding the sufficiency of the link between a drug and the reported problem. See 21 C.F.R. § 314.70(c).

Moreover, the preamble, amicus brief, and case law are in agreement that when the FDA makes a determination and "has considered and found [a label change] scientifically unsubstantiated," preemption applies. 71 Fed. Reg. 3935 (2006); see also *Perry*, 456 F. Supp. 2d at 685-686 (holding "it is more in keeping with the narrow scope of preemption to allow state law to require the addition of warnings so long as there has been no specific FDA determination

9

as to the sufficiency of the scientific evidence to support a particular warning"); *Ackermann v. Wyeth Pharms.*, 2006 U.S. Dist. LEXIS 64499, *18 (E.D. Tex. 2006) ("Of note is the FDA's view that a claim is preempted if the FDA determined that the warning is not supported by the evidence before the FDA"); *Colacicco*, 432 F. Supp. 2d at 527 ("FDA *specifically and repeatedly rejected claims* [for a labeling change] . . . [and found] no reasonable evidence to support . . . any such warning") (emphasis added); *Dowal v. Smithkline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 920 (Cal. 2004) (plaintiff's case preempted by federal law when defendant asked the FDA for permission to change the label and the FDA denied the request). In this case, however, Teva never proposed any changes before the FDA, therefore, the FDA never had the opportunity to accept or reject a labeling change.[8] Because the labeling change was never before the FDA, there is no conflict between state and federal law and preemption does not apply.

---

[8] Several district courts have determined that preemption does not apply to state tort claims when a plaintiff alleges that a drug manufacturer failed to adequately warn users of potential side effects. See *Laisure-Radke*, 426 F. Supp. 2d at 1169 (once a generic drug manufacturer holds an approved ANDA, it can strengthen the warning on the label); *Peters v. Astrazeneca, LP.*, 417 F. Supp. 2d 1051, 1056 (W.D. Wis. 2006) (holding that "the mere fact that the FDA does not require a warning on a product label does not necessarily create a conflict"); *McNellis*, 2005 U.S. Dist. LEXIS 37505 at *34 (if defendant had knowledge of heightened risk of suicidality which should have resulted in a heightened warning on the drug label beyond the FDA-approved warning, then the FDCA does not preempt plaintiff's state law claims); *Zikis v. Pfizer, Inc.*, 2005 U.S. Dist. LEXIS 9591, *10-11 (N.D. Ill. 2005) (defendant made no showing that it was impossible to comply with both federal law and Illinois law); *Witczak*, 377 F. Supp. 2d at 728-730 (drug manufacturer not required to use FDA's label "verbatim," and could therefore strengthen its warning); *Madden v. Wyeth*, 2005 U.S. Dist. LEXIS 19989, *10 n.6 (N.D. Tex. 2005) (FDA approval does not alleviate drug manufacturer of its obligation to strengthen its warnings). But see *Needleman v. Pfizer, Inc.*, 2004 U.S. Dist. LEXIS 15495, *1 (N.D. Tex. 2004) (where FDA actually considered risk of increased warning, plaintiff's failure to warn claim was preempted); *Ehlis v. Shire Richwood, Inc.*, 233 F. Supp. 2d 1189, 1198 (D. N.D. 2002) (state negligent failure to warn claim preempted by federal law); *In re Bextra and Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2006 U.S. Dist. LEXIS 95500 at *4-8 (deferring to FDA's interpretation of preemption).

## II.     Failure to Warn

Generally, "a manufacturer of a product, which the manufacturer knows or should know is dangerous by nature or is in a dangerous condition," is under a duty to give warning of those dangers to "persons who it is foreseeable will come in contact with, and consequently be endangered by, that product." *MacDonald* v. *Ortho Pharm. Corp.*, 394 Mass. 131, 135 (1985), quoting *H.P. Hood & Sons* v. *Ford Motor Co.*, 370 Mass. 69, 75 (1976). With prescription drugs, a drug manufacturer has a duty to warn a prescribing physician, who acts as a "learned intermediary" between the manufacturer and the patient. *Id.* "[T]he duty of the ethical drug manufacturer is to warn the doctor, rather than the patient, [although] the manufacturer is directly liable to the patient for a breach of such duty." *Id.* at 136, quoting *McEwen* v. *Ortho Pharm. Corp.*, 528 P.2d 522, 528-530 (Ore. 1974).

The common law duty to warn requires a warning that is comprehensible to the average user, which conveys a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person. *Id.* at 140 (quotation and citation omitted). "Whether a particular warning measures up to this standard is almost always an issue to be resolved by a jury; few questions are 'more appropriately left to a common sense lay judgment than that of whether a written warning gets its message across to an average person.'" *Id.* (quotation and citations omitted).

Here, Teva argues that the metoclopramide label warned of the exact side effects that Kelly suffered. The "Warnings" section and the "Adverse Reactions" section together warned of depression and akathisia, and Dr. Warner knew of these potential side effects when he prescribed the treatment for Kelly. Kelly does not dispute that these warnings were present. Instead, she

11

argues that the warnings did not convey a fair indication of the nature and extent of the danger because according to experts and the literature, the risk of akathisia was much greater than that which was represented on the label. In viewing the facts in the light most favorable to Kelly, as this Court must, I find that a genuine issue of material fact exists concerning the adequacy of the warning on the metoclopramide label.

Moreover, there is a genuine dispute as to the causation element of Kelly's negligence claim. Kelly contends that had Dr. Warner been apprised of the more serious warning, he would not have prescribed metoclopramide, or, had she been better informed, she would have sought different treatment. Kelly highlights the deposition testimony of herself, Dr. Warner, Dr. Thompson, Dr. Nicholas, and Professor Stewart to support these contentions. Because of these material disputes, summary judgment is inappropriate at this time.

### III. Breach of Warranty

Kelly alleges in her complaint that Teva "expressly and impliedly warranted to the general public, the FDA, the medical community and the plaintiff's physicians, that their metoclopramide product was labeled in a manner that would adequately inform physicians about all of the material risks associated with the use of their metoclopramide product and that their metoclopramide product was safe and effective for the use for which it was indented if used in the manner that was indicated." (Compl. para. 57). As a consequence, Kelly argues that Teva has breached its express and implied warranties relating to merchantability, marketability, and fitness for a particular and intended use and purpose because the risks of akathisia are significantly greater than the label represents.

A claim for breach of an express warranty requires proof that the defendant promised the

plaintiff a specific result that was not achieved. See *Anthony's Pier Four v. Crandall Dry Dock Eng'rs*, 396 Mass. 818, 823 (1986). To allege a claim for breach of an implied warranty of merchantability, a plaintiff must show the defendant failed to warn or to provide instructions about risks that were reasonably foreseeable at the time of sale or could have been discovered by way of reasonable testing prior to marketing the product. *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 22-23 (1998). A manufacturer is held to the standard of knowledge of an expert in the appropriate field, and will remain subject to a continuing duty to warn of risks discovered after the sale of the product. *Id.* at 23. There is no duty to warn where the danger is obvious or where the plaintiff appreciated the danger substantially to the same extent that the warning provided. See *Carey v. Lynn Ladder & Scaffolding Co.*, 427 Mass. 1003, 1003 (1998).

Kelly points to no language in the label expressly guaranteeing that metoclopramide would produce a specific result. The label indicates potential results and potential side affects, but it does not promise or warrant a specific result. Furthermore, Teva warned users of the potential side effects of depression and akathisia, which Kelly experienced. While Kelly asserts that these warnings do not adequately represent the true dangers, the label does not explicitly or implicitly promise that her symptoms would not occur. Because Kelly has failed to allege sufficient facts to substantiate her breach of warranty claim, summary judgment will be allowed on count two.

### IV.     Chapter 93A

Kelly argues that Teva committed an unfair and deceptive trade practice under G. L. c. 93A, § 2(a), 940 C.M.R. § 3.08(2), for selling a defective and dangerous product, metoclopramide, which Teva held out to be safe, merchantable, and fit for its intended use and

13

purpose. General Laws, chapter 93A, § 2(a) states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The Code of Massachusetts Regulations provides further: "<u>Warranties</u>. It shall be an unfair and deceptive act or practice to fail to perform or fulfill promises or obligations arising under a warranty. The utilization of a deceptive warranty is unlawful." 940 C.M.R. § 3.08(2).

Kelly's c. 93A claim is premised on the same facts and circumstances as her breach of warranty claim. As a consequence, Kelly has failed to establish facts to support her c. 93A claim and summary judgment will be granted on count three.

## ORDER

For the reasons stated above, it is hereby **ORDERED** that Teva's motion for summary judgment is **ALLOWED** with respect to count two (breach of warranty) and count three (G. L. c. 93A), and is **DENIED** with respect to count one (negligence).

*[signature]*
Bonnie H. MacLeod-Mancuso
Justice of the Superior Court

DATE: April __ 2007

14