UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2007 MAY 15   AM 10: 23

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| IN RE: VIOXX® PRODUCTS LIABILITY LITIGATION | ) )  MDL Docket No. 1657 |
| | )  Section: L |
| | )  JUDGE FALLON |
| | )  MAG. JUDGE KNOWLES |
| | ) |

*This document relates to:*
*Ronald Luers Soelzer and*
*Paula Maurine Soelzer*
*v. Merck & Co, Inc.*
*No. 06-9818*

## AMENDED COMPLAINT

Plaintiffs, for their Complaint, aver as follows:

## SUMMARY OF ACTION

1.      Ronald Soelzer, a 55 year old gentleman, began taking Vioxx® in April of 2003 and continued to take it until September of 2003 to treat arthritis in his back and neck.  In December of 2003, Mr. Soelzer suffered a myocardial infarction. Mr. Soelzer recently discovered that this condition was caused by taking the drug Vioxx®.  This is information that Merck, the maker of the drug, had within its possession.  Merck failed to share this information and knowledge about the dangers associated with the use of Vioxx® with doctors or consumers.

2.      Jurisdiction and venue are proper under 28 U.S.C. §1332 and 15 U.S.C. § 3301 *et seq.* The jurisdiction is proper under 28 U.S.C. §1391(a)(2), because a substantial part of the events or omissions giving rise to this claim occurred in South Dakota.

3.      The amount in controversy exceeds the sum of $75,000, exclusive of interest and cost.

___ Fee_____
___ Process_____
_X_ Dktd _____
___ CtRmDep_____
___ Doc. No_____

4.      This Court has personal jurisdiction over Merck because it conducts business throughout South Dakota, including in this District.

## PARTIES

5.      Ronald Soelzer is 55 years old.   Paula Maurine Soelzer, the newly added Plaintiff, is the spouse of Mr. Soelzer.  Plaintiffs were married on January 5, 1978, and are residents of Piedmont, South Dakota.

6.      Defendant Merck & Company, Inc. (Hereafter "Merck" or "Defendant") is a corporation organized under and by virtue of the laws of the state of New Jersey, with a principal place of business in New Jersey.  Merck manufactures, markers and produces the drug Vioxx®.  Vioxx® is marketed as significantly reducing joint pain.

## SUBSTANTIVE ALLEGATIONS

7.      At all times relevant and material hereto, Defendant has conducted continuous and substantial business in South Dakota.

8.      At all times relevant and material hereto, the Defendant acted and gained knowledge itself by and through its various agents, servants, employees and/or ostensible agents.

9.      At all relevant times, Merck was in the business of developing, researching, selling, distributing, designing, manufacturing, testing, evaluating, licensing, labeling and/or marketing, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx®.

10.      At all relevant times, Merck did in fact develop, research, sell, distribute, design, manufacture, test, evaluate, license, label and/or market, either directly or indirectly through third parties or related entities, pharmaceutical drugs including Vioxx®.

2

11.     In 2003, Plaintiff Ronald Luers Soelzer was prescribed, and took as directed, Defendant's drug Vioxx® for treatment of arthritis in his back and neck.

12.     As a direct and proximate result of the liability-producing conduct of Defendant and the defective and unreasonably dangerous conditions of its product Vioxx®, Plaintiff Ronald Luers Soelzer has suffered physical injury and damage including, but not limited to, a myocardial infarction.

13.     As more particularly pleaded below, Plaintiffs maintain that the pharmaceutical drug Vioxx® is defective, dangerous to human health, unfit and unsuitable to be marked and sold in commerce, and lacked proper warning as to the dangers associated with its use.

14.     As a direct and proximate result of Defendant's liability-producing conduct and defective product Vioxx®, Plaintiff Ronald Luers Soelzer has in the past and will in the future experience physical injuries, pain and suffering, loss of enjoyment of life, lost wages, lost earning capacity, medical expenses, medical monitoring expenses, embarrassment and humiliation, fright and apprehension, emotional distress and other damages, all of which are believed to be permanent.

15.     Vioxx® is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

16.     Vioxx® is a COX-2 inhibitor designed to produce prostaglandins at inflammatory sites and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

17.     Merck submitted an Application to Market a new Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg. and 25 mg. for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-042 by the FDA.

18.     Merck also submitted an NDA for rofecoxib to the FDA on November 23, 1998 for oral suspension, at doses of 12.5 mg./ml. and 25 mg./ml. for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-052 by the FDA.

19.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereafter the "NDA") for rofecoxib to be prescribed for the relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

20.     At the time the drug was approved by the FDA, the labeling for rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment with Vioxx® 25 mg. daily or 50 mg. daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg. daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing Vioxx® to placebo."

21.     The "warnings" section of the label for rofecoxib, at the time the drug was approved by the FDA, contained a section "Gastrointestinal (GI) Effects – Risk of CI Ulceration, Bleeding, and Perforation."

22.     Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI")

4

safety claim for rofecoxib.  In conjunction with the sNDA performed the Vioxx® GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment with MK-0966 or Naproxen in Patients with Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

23.     The objective of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MD-0966 50 mg. daily compared to patients in the group taking Naproxen 1000 mg./day" and (2) "study the safety and tolerability of MK-0996 in patients with rheumatoid arthritis."

24.     In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR) (an organization of which Merck is a member and corporate sponsor) in June of 2000, it was shown that Vioxx® use resulted in a statistically significant increase in hypertension and stroke.  Not only did Merck do nothing to further accurately publish these studies or to warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, "Spin War Aside, Lessons Emerge from COX-2 Trials," in August 2000, page three.

25.     Merck continued to deny the ill health effects associated with Vioxx® while at the same time reaping profits obtained through its non-disclosure and concealment.  Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated an approximately 23% share of the market.

26.     Merck continued to profit from its scheme by withholding information from the Plaintiffs, the consuming public and the healthcare industry.  For example, in November 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx® consumption over naproxen consumption.

27.     On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation in Cleveland Ohio, Dr. D. Mukhisjee, et al., showing that Merck had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx® users in Merck's trials, including VIGOR, at 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-induced patients. See Mukhisjee, D., *et al.*, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx® users compared to placebo revealed a statistically significant increase among Vioxx® users.

28.     In the JAMA study, the authors stated that "by decreasing PG12 productions [Vioxx] may tip the natural balance between prothrombotic thromboxanne A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at 957.  In a follow-up peer reviewed study report in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cos-2

inhibitor "tips the balance of prostacyclin/thromboxanne in favor of thromboxanne, leading to increased vascular and thrombotic events." Bing, R., & Lomnick, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng. Y., *et al. Role of Prostacyclin in the Cardiovascular Response to Thromboxanne A2*, Journal of Science, V, 296:539-541, Apr. 19, 2002.

29. On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Merck, relating to "promotional campaign for Vioxx® (rofecoxib) tablets."

30. The Warning Letter stated that Merck had "engaged in a promotional campaign for Vioxx® that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx® Gastrointestinal Outcomes Research (VIGOR) study, and thus misrepresents the safety profile for Vioxx®." The letter further states:

> Specifically, your promotional campaign discounts the fact that, in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID) Naprosyn (naproxen).

31. The Eight-page Warning Letter outlines, in detail, the conduct of Merck that supports the FDA's issuance of the Warning Letter and makes the following "Conclusions and Requested Actions:"

> The promotional activities and materials described above minimized the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimized the Vioxx/coumadin drug interaction, omitted crucial risk information associated with Vioxx therapy, contained unsubstantiated comparative claims and promoted unapproved uses. On December 16, 1999, we also objected to your dissemination of

promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx® has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading. This corrective action plan should also include:

Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

Issuing a "Dear Healthcare Provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

A written statement of your intent to comply with "1" and "2" above.

32.    On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx® (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of VIGOR study.

33.    The revised labeling further states that the administration of Vioxx® 50 mg. was associated with a higher incidence of gastrointestinal symptoms as follows:

**Clinical Studies in OA and RA with Vioxx® 50 mg. (Twice the highest dose recommended for chronic use.)**

In OA and RA clinical trials which contained Vioxx® 12.5 or 25 mg. as well as VIOXX® 50 mg., VIOXX 50 mg. OD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious* adverse experiences and discontinuation due to clinical adverse experience compared to the recommended chronic doses of 12.5 and 25 mg. [See DOSAGE AND ADMINISTRATION].

34.     Further, the "Dear Doctor" letter approved in conjunction with the revisions to the Vioxx® labeling outlines the change to the Vioxx® labeling.

35.     The revised "Patient Information" sheet does not add any information about the results of the VIGOR study.

36.     The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx® is prescribed.

37.     Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal and prothrombotic side effects of Vioxx®.

38.     Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx® may cause serious side effects, Merck concealed and/or downplayed the dangers associated with Vioxx® and continued to market the drug in the United States and aboard. In its 2001 Annual Report, for example, Merck states:

The Company also notes that a number of the federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx® . . . The lawsuits includes allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

39.     Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Merck fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

"Our results reflect the strength of our growth strategy, "Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 5.7% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

"Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounted for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to the market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested bases on the strong results of the VIGOR study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

40.     Despite the foregoing, Merck continued to represent to consumers that Vioxx® was safe, and that any cardiovascular and/or cardiothrombotic side effects were not associated with the drug. Merck also downplayed any potential gastrointestinal side effects of the drug, promoting that it was safer and more efficacious than other medications approved for treatment of similar conditions.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT I - NEGLIGENCE

41.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth in full herein.

42.     With regard to the averments above, Merck was negligent in knowing same, having reason to know same, should have known same and/or in otherwise being in possession of facts which would have caused a reasonable person or company to inquire and, with due diligence, discover same, but:

a.      failed to use reasonable care to design an arthritis drug (Vioxx®) that was safe for its intended and foreseeable uses, not defective, and not unreasonably dangerous;

b.      failed to use reasonable care in designing and manufacturing Vioxx® so as to make it safe for its intended uses, not defective and not unreasonably dangerous;

c.      failed to use reasonable care to adequately warn foreseeable users such as Plaintiff of the dangers of using Vioxx®, including, but not limited to, adverse cardiac events;

d.      failed to use reasonable care to make reasonable tests, inspections, drug trials, and/or evaluations necessary to discover such defects and unreasonably dangerous conditions associated with Merck's Vioxx®;

e.      failed to comply with and/or to use reasonable care to comply with standards of care, including accepted industry standards, FDA recommendations, government regulations, statutes, in the design, manufacture, affixing of warnings, and other production and distribution of Merck's Vioxx®;

f.      failed to reasonable care to timely remove and/or recall from the market, retrofit, and/or otherwise prevent the continued contact of Plaintiff and persons like Plaintiff with such defects and distribution of Merck's Vioxx®;

g.      failed to use reasonable care to investigate and/or use known and/or knowable reasonable alternative designs, manufacturing processes, and/or materials for Vioxx®;

h.      failed to use reasonable care to warn Plaintiff of dangers known and/or reasonably suspected to defendant to be associated with Vioxx®;

I.      failed to use reasonable care to make Vioxx® safe; and/or

j.      failed to timely use reasonable care to discover the dangerous conditions or character of Merck's Vioxx®.

43.      As a direct and proximate result of Merck's negligence, Plaintiff was harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT II - STRICT PRODUCTS LIABILITY

44.      Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

45.      At all relevant times, Merck was the researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of Vioxx® which, at all relevant times, was defective and unreasonably dangerous to consumers.

46.      At all relevant times, Merck's Vioxx® was defective in its design and/or formulation in that it was not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceeded the benefits associated with its design and formulations. Vioxx® was defective in design and/or formulation in that it lacked efficacy and/or it posed a greater likelihood of injury than other

12

nonsteroidal anti-inflammatory medicines and similar drugs on the market and was more dangerous than ordinary consumers can reasonably foresee.

47.    At all relevant times, the defective conditions of Vioxx® rendered it unreasonably dangerous and Vioxx® was in this defective condition at the time it left the hands of the Defendant. Vioxx® was expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

48.    At all relevant times, Plaintiff Ronald Luers Soelzer was unaware of the significant hazards and defects in Vioxx®. Vioxx® was unreasonably more dangerous than would be reasonably contemplated by the ordinary user. During the period that Plaintiff was taking Vioxx®, the medication was being utilized in a manner that was intended by Defendant. At the time Plaintiff received and consumed Vioxx®, it was represented to be safe and free from latent defects.

49.    At all relevant times, Defendant knew or should have known of the danger associated with the use of Vioxx®, as well as the defective nature of it, but continued to design, manufacture, sell, distribute, market, promote and/or supply Vioxx® so as to maximize sales and profits at the expense of the public's health and safety, in conscious disregard of the foreseeable harm caused by Vioxx®.

50.    At all relevant times, Defendant's Vioxx® was in a defective and unreasonably dangerous condition which would not be recognized or contemplated by a reasonable person among the expected users and consumers at the time it left the control of the defendant.

51.    At all relevant times, Defendant's Vioxx® was defective and unreasonably dangerous when used in reasonably expected ways of handling and/or consumption.

52.     At all relevant times, the Defendant's Vioxx® was expected to reach, and did reach, the ultimate user or consumer without substantial change in the condition in which it was sold and/or distributed by Defendant.

53.     At all relevant times, Defendant's Vioxx® was defective and unreasonably dangerous under §402(A) Restatement (Second) of Torts 402.

54.     Defendant Merck is strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce a product which was defective and unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Defendant.

55.     As a direct and proximate result of Defendant's defective and unreasonably dangerous product, Plaintiff was harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## <u>COUNT III - FAILURE TO WARN</u>

56.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

57.     At all relevant times, Defendant Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical Vioxx® and, in the course of same, directly advertised or marketed the product to the FDA, consumers or persons responsible for consumers, and therefore has a duty to warn of the risk associated with the use of Vioxx®.

58.     At all relevant times, Vioxx® was under the exclusive control of the Defendant as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side

14

effects and complications associated with the use of Vioxx®, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

59.     At all relevant times, Defendant Merck failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx® so that no medical care provider would have prescribed or no consumer would have used Vioxx® if those facts had been made known to such providers and consumers.

60.     At all relevant times, Defendant Merck failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx® posed serious and potentially life-threatening side effects and complications with respect to which full and proper warning accurately and fully reflecting these symptoms, the scope and severity, should have been made known to medical care providers, the FDA and the public, including the Plaintiffs.

61.     At all relevant times, Vioxx®, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce by Defendant, was defective due to inadequate post-marketing warning and/or instruction because, after Merck knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx®, Defendant failed to provide adequate warnings to medical care providers, the FDA and the consuming public, including the Plaintiffs, and continued to promote Vioxx® aggressively.

62.     As a direct and proximate result of Defendant's defective and unreasonably dangerous product and its failure to warn Plaintiff Ronald Luers Soelzer and others like him of same, the Plaintiffs were harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT IV - BREACH OF THE
## IMPLIED WARRANTY OF MERCHANTABILITY

63.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

64.     Defendant's Vioxx® was not of merchantable, quality and was not fit for the ordinary purpose for which such a product is used.

65.     As a direct and proximate result of Defendant's defective and unreasonably dangerous Vioxx® and its breach of the implied warranty of merchantability, the Plaintiffs were harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT V - BREACH OF THE
## IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

66.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

67.     Defendant's Vioxx® was not fitted for its particular purpose of safety treating arthritis pain.

68.     Defendant Merck actually and/or constructively knew of the purpose to which its Vioxx® was to be used.

69.     Plaintiffs relied upon Defendant to furnish Vioxx® in a condition suitable for its particular purpose.

70.     As a direct and proximate result of Defendant's defective and unreasonably dangerous Vioxx® and its breach of the implied warranty of fitness for a particular purpose, the Plaintiffs were harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT VI - BREACH OF EXPRESS WARRANTY

71.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

72.     At all relevant times, Defendant warranted that its Vioxx® was safe and not defective and/or unreasonably dangerous as stated above.

73.     At all relevant times, Merck placed Vioxx® into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff, of the risks associated with the use of Vioxx®.

74.     At all relevant times, Defendant had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspections, labeling, distribution, marketing, promotion, sale and release of Vioxx®, including a duty to:

a.      ensure that the product did not cause the user unreasonably dangerous side effects;

b.      warn of dangerous and potentially fatal side effects; and

c.      disclose adverse material facts when making representations to physicians, the FDA and the public at large, including the Plaintiff.

17

75.     When Plaintiff Ronald Luers Soelzer's physician prescribed Vioxx® and Plaintiff made the decision to use Vioxx®, both Plaintiff and his physicians reasonably relied upon the Defendant and its agents to disclose known defects, risks, dangers, and side effects of Vioxx®.

76.     Plaintiff Ronald Luers Soelzer's physician, the FDA and/or Plaintiff had no knowledge of the falsity or incompleteness of the Defendant's statement and representations concerning Vioxx® when Plaintiff's physician prescribed and/or otherwise provided Vioxx®; and Plaintiff purchased and used Vioxx® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce by the Defendant. Plaintiff justifiably and detrimentally relied on the warranties and representations of Defendant in the purchase and use of Vioxx®.

77.     At all relevant times, Merck was under a duty to disclose the defective and unsafe nature of Vioxx® to physicians, the FDA, consumers and users, such as Plaintiff. Defendant had sole access to material facts concerning the defects, and Merck knew that physicians, the FDA and users, such as Plaintiff, could not have reasonably discovered such defects.

78.     By the conduct alleged, Merck, its agents and employees expressly warranted to Plaintiff Ronald Luers Soelzer and Plaintiff's physician that the products were merchantable and fit for the purpose intended.

79.     This warranty was breached because Vioxx® was not safe and effective as a medication for arthritis and pain, as Defendant had represented, and Plaintiff Ronald Luers Soelzer was injured.

80.    As a direct and proximate result of Defendant's defective and unreasonably dangerous Vioxx® and its breach of the implied warranty of fitness for a particular purpose, the Plaintiffs were harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT VII - MISREPRESENTATION

81.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

82.    Defendant fraudulently, intentionally, willfully, and wantonly, purposefully, knowingly, recklessly, negligently, and/or in fact materially misrepresented both affirmatively and by omission that its Vioxx® was of good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purposes.

83.    Defendant intended, knew, and/or should have known that Plaintiff would be included, by the aforesaid misrepresentations, to use Merck's Vioxx®.

84.    In using Merck's Vioxx®, Plaintiff justifiably relied upon Defendant's representations that its Vioxx® was good quality, non-defective, safe for its intended use, merchantable, and fit for its particular purpose.

85.    Defendant's Vioxx® was, in fact, defective and unreasonably dangerous, as recited above.

86.    As a direct and proximate result of Defendant's defective and unreasonably dangerous Vioxx®, as well as its affirmative misrepresentations and omissions, Plaintiffs were harmed as aforesaid.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

## COUNT VIII - VIOLATION OF UNFAIR TRADE PRACTICE/CONSUMER PROTECTION LAWS

87.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

88.     At all relevant times, Merck knew or should have known that the use of Vioxx® causes serious and life-threatening injuries, but failed to warn the public, including the Plaintiff, of the same.

89.     At all relevant times, Merck made untrue, deceptive or misleading representations of material facts to and omitted and/or concealed material facts from Plaintiff in product packaging, labeling, medical advertising, direct-to-consumer advertising, promotional campaigns and materials, among other ways, regarding the safety use of Vioxx®. Moreover, Merck downplayed and/or understated the serious nature of the risks associated with Vioxx® in order to increase the sales of Vioxx® and to secure a greater share of the COX-2 market.

90.     At all relevant times, Merck's statements and omissions were undertaken with the intent the FDA, physicians and consumers, including the Plaintiff, would rely upon the Defendant's statements and/or omissions.

91.     At all relevant times, Merck knew of the growing public acceptance of the misinformation and misrepresentations regarding the safety and efficacy of Vioxx®, but remained silent because Defendant's appetite for significant future profits far outweighed its concern for the Plaintiff and others like her.

20

92.    Plaintiff's physician prescribed and/or otherwise provided Plaintiff with Vioxx®, and Plaintiff consumed Vioxx®, and suffered ascertainable losses of money as a result of Merck's use or employment of the methods, acts or practiced alleged herein.

93.    The aforesaid promotion and releases of Vioxx® into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentation, and/or the knowing concealment, suppression, or omission of material facts with the intent that others would rely upon such concealment, suppression or omission in connection with the sale or advertisement of such merchandise or services by Merck.

94.    At all relevant times, Merck concealed, omitted, or minimized the side effects of Vioxx® or provided misinformation about adverse reactions, risks and potential harm from Vioxx® and succeeded in persuading consumers, including Plaintiff Ronald Luers Soelzer, to purchase and ingest Vioxx® despite the lack of safety and the risk of adverse medical reactions, including cardiovascular events and gastrointestinal effects.

95.    At all relevant times, Merck's practice of promoting and marketing Vioxx® created and reinforced a false impression as to the safety of Vioxx®, thereby placing consumers, including the Plaintiffs, at risk of serious and potentially lethal effects.

96.    At all relevant times, Vioxx® lacked appropriate warnings, and the packaging and labels used by Merck were misleading, inaccurate, incomplete and/or untimely.

97.    Merck violated its post-manufacture duty to warn which arose when Merck knew, or with reasonable care should have known, that Vioxx® was injurious and sometimes fatal.

98.    At the time when consumers purchased and ingested Vioxx®, Merck intended that others would rely upon the concealment, suppression or omission of the risks of ingesting Vioxx®.

99.     Merck's actions in connection with manufacturing, distributing, and marketing of Vioxx® as set forth herein evidences a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices.

100.    Merck acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when committing these acts of consumer fraud.

101.    As a proximate result of the act of consumer fraud set forth above, Plaintiff Ronald Luers Soelzer purchased an unsafe product and incurred monetary expense and the risk to himself from consuming Vioxx® and thereby suffered an increase risk of harm as previously set forth herein.

102.    The conduct of Merck, as set forth herein, constitutes unfair, deceptive, unlawful, and/or unconscionable acts and/or practices prohibited under the State of South Dakota's Consumer Protection Law.

WHEREFORE, Plaintiffs bring this suit against Defendant to recover compensatory and punitive damages.

## COUNT IX - PUNITIVE DAMAGES

103.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

104.    Based upon the above, a jury could conclude that the Defendant knew of facts that created a high degree of risk of physical harm to the Plaintiff and that the Defendant deliberately proceeded to act in conscious disregard or indifference to that risk, and therefore that an award of punitive damages is warranted.

WHEREFORE, Plaintiffs bring this suit against Defendant to recover compensatory and punitive damages.

## COUNT X - CONSORTIUM

105.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth in full herein.

106.    At all times relevant and material hereto, Plaintiff Spouse, Paula Maurine Soelzer, was the lawful wife of Plaintiff Ronald Luers Soelzer.

107.    As a direct and proximate result of the acts, omissions, negligence and/or carelessness of the Defendant, as set forth herein above, Plaintiff Spouse, Paula Maurine Soelzer, has been deprived of the love, services, society, advice, companionship and/or consortium of her husband, Ronald Luers Soelzer, and will continue to be deprived of the same to her great detriment and loss in the future.

WHEREFORE, Plaintiffs demand the following:

1.    Judgment in their favor and against the Defendant;

2.    Compensatory damages in an amount in excess of the jurisdictional limit, trebled on applicable Counts;

3.    Exemplary and punitive damages in an amount in excess of the jurisdictional limit, trebled on applicable Counts;

4.    All elements of interest, including, but not limited to pre- and post-judgment interest;

5.    All Bill of Cost elements, including attorney's fees and expert witness fees;

6.    Such other and further relief as the Court may deem just expert proper; and

7.    A trial by jury on all issues of the case.

WHEREFORE, Plaintiffs bring this suit against the Defendant to recover compensatory and punitive damages.

23

Dated this 19th day of April, 2007.

SPECTER SPECTER EVANS
& MANOGUE, P.C.

By: _____ PA ID #80250

John C. Evans, Esquire, PA ID #49351
The 26th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219
Phone: (412) 642-2300
Fax: (412) 642-2309

GUNDERSON, PALMER, GOODSELL
& NELSON, LLP
G. Verne Goodsell, Esquire
440 Mt. Rushmore Road, 3rd Floor
P.O. Box 8045
Rapid City, SD 57709
Phone: (605) 342-1078
Fax: (605) 342-9503

*ATTORNEYS FOR PLAINTIFFS*

**TRIAL BY JURY DEMANDED**

Plaintiff hereby demands a trial by jury on all issues.

By: _____