**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
| | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : | |
|     **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
| | : | |
| | : | **JUDGE FALLON** |
| | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO**
    *Plunkett v. Merck & Co., Inc.*, 05-4046

**<u>ORDER & REASONS</u>**

    Before the Court is the Plaintiff Evelyn Irvin Plunkett's Motion for New Trial (Rec. Doc. 3674).  The Court heard oral argument and took this motion under submission.  Due to a misrepresentation by one of Merck's primary witnesses that prevented Ms. Plunkett from fully and fairly presenting her case, the Plaintiff's motion for a new trial is now GRANTED and the Judgment in favor of Merck (Rec. Doc. 3483) is hereby VACATED.

## I.       BACKGROUND

On August 23, 2005, Ms. Plunkett filed suit in this Court against Merck & Co., Inc.

("Merck") on behalf of herself and both the minor children and the estate of her late husband

Richard ("Dickie") Irvin.[1]  Mr. Irvin suffered a fatal heart attack on May 15, 2001 at the age of

fifty-three, allegedly as a result of his use of Vioxx.

With the consent of the parties, Ms. Plunkett's case was selected to be the first bellwether

trial in this multidistrict litigation.  On November 29, 2005, a jury trial in this matter was

commenced in Houston, Texas.[2]  On December 12, 2005, due to the failure of the jury to reach a

unanimous verdict, the Court declared the proceeding a mistrial.  The re-trial of the case

commenced in New Orleans on February 6, 2006.  The jury returned a verdict in favor of Merck

on February 18, 2006, and final judgment was entered on February 23, 2006.  The Plaintiff's

instant motion for a new trial followed.

In her motion, the Plaintiff relies on Rule 59 of the *Federal Rules of Civil Procedure* and

contends that the Court abused its discretion and committed prejudicial error (1) by ruling that

Dr. Thomas Baldwin, the Plaintiff's cardiologist, and Dr. Michael Graham, the Plaintiff's

pathologist, could not testify that Vioxx was a contributing cause of Mr. Irvin's death; and (2) by

denying the Plaintiff's motion for a continuance of the re-trial following the Court's *Daubert*

decisions involving Dr. Baldwin and Dr. Graham.  In a supplemental brief filed in support of her

motion for a new trial, the Plaintiff also seeks relief from the final judgment in this case pursuant

---

[1]  The Plaintiff originally filed her suit in a Florida state court in 2003.  However, that suit was dismissed and subsequently re-filed in this Court pursuant to Pretrial Order No. 11.  For a discussion of Pretrial Order No. 11 and the use of direct filing in this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897 (E.D. La. 2007).

[2]  The Court was forced to temporarily relocate to Houston following Hurricane Katrina.

2

to Rule 60(b)(3) of the *Federal Rules of Civil Procedure*, contending that Merck's expert

cardiologist, Dr. Barry Rayburn, misrepresented his credentials to the Court and to the jury

during the trial by testifying that he is a board-certified cardiologist, when in fact he is not.

## II.    LAW & ANALYSIS

Different legal standards govern the Court's analysis of the Plaintiff's arguments in

support of her motion for a new trial.

The Plaintiff's initial motion was filed within ten days of the entry of judgment and seeks

relief on two grounds pursuant to Rule 59, which provides that a new trial may be granted "on all

or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons

for which new trials have heretofore been granted in actions at law in the courts of the United

States."  Fed. R. Civ. P. 59(a).  Although Rule 59(a) does not list specific grounds for a new trial,

the United States Court of Appeals for the Fifth Circuit has held that a new trial may be granted

if "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial

was unfair, or prejudicial error was committed in its course."  *Smith v. Transworld Drilling Co.*,

773 F.2d 610, 613 (5th Cir. 1985) (citations omitted); *see also McFadden v. Wal-Mart Stores*,

No. 04-2547, 2006 WL 3087164, at *2 (E.D. La. Oct. 27, 2006).  There is no dispute that Rule

59 governs the Plaintiff's arguments (1) that the Court abused its discretion and committed

prejudicial error by preventing Dr. Baldwin and Dr. Graham from testifying that Vioxx was a

contributing cause of Mr. Irvin's death, and (2) that the Court abused its discretion and

committed prejudicial error by denying the Plaintiff's motion for a continuance of the re-trial

following the Court's *Daubert* decisions involving Dr. Baldwin and Dr. Graham.

However, the Plaintiff's supplemental brief was filed within one year of the entry of

judgment and seeks relief on one new ground pursuant to Rule 60(b)(3), which provides that "the

court may relieve a party . . . from a final judgment . . . for the following reasons: . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party."  Fed. R. Civ. P. 60(b)(3).[3]  "A party making a Rule 60(b)(3) motion must establish (1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting [her] case."  *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005).  With respect to the first factor, the Plaintiff "has the burden of proving the misconduct by clear and convincing evidence."  *Id.* With respect to the second factor, the Plaintiff need not show that "the information withheld be such that it can alter the outcome of the case."  *Id.*  Indeed, Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect."  *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978); *see also Atchinson, Toreka, & Sante Ry. Co. v. Barrett*, 246 F. 2d 846, 849 (5th Cir. 1957) ("[Rule 60(b)] is remedial and should be liberally construed.").[4]

### A.     *Daubert* Rulings

In the instant motion for a new trial, the Plaintiff re-urges her previous arguments concerning Dr. Thomas Baldwin and Dr. Michael Graham.  The Plaintiff continues to contend

---

[3] The alleged misrepresentation was not discovered until after the Plaintiff had filed her original motion.

[4] In its opposition, Merck did not address the law applicable to the Plaintiff's third argument concerning Dr. Rayburn's testimony, but suggested that Rule 61's harmless error analysis should control.  During oral argument, Merck shifted its reliance to Rule 60(b)(2) standards, and construed the Plaintiff's argument as one based upon "newly discovered evidence."  The Court rejects both of Merck's attempts to re-frame the issue presented in the Plaintiff's supplemental brief, and finds that her misrepresentation argument is controlled by Rule 60(b)(3).  *See, e.g., Diaz v. Methodist Hosp.*, 46 F.3d 492 (5th Cir. 1995) (applying different legal standards where the plaintiff asserted multiple grounds for post-trial relief).

that the Court abused its discretion by preventing these expert witnesses from offering opinion testimony on specific causation.

Prior to the first trial in Houston, the Court issued an omnibus Order and Reasons resolving numerous *Daubert* challenges. *See In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005). In that decision, the Court held as follows with respect to Dr. Baldwin, the Plaintiff's cardiologist:

> Merck's challenge to Dr. Baldwin is quite similar to its challenge of Dr. Gandy. Like Dr. Gandy, Dr. Baldwin's expert report is quite short and conclusory. It is only twelve pages long. The first seven pages concern his qualifications, background, and materials reviewed. The last five pages consist of a recitation of the facts and seven paragraphs of conclusions. Furthermore, Dr. Baldwin's deposition testimony also reveals his lack of understanding. During repeated points in his deposition testimony, Dr. Baldwin made assertions that certain studies supported his position, but was unable to name or describe the studies he was relying on. At other points in his deposition, Dr. Baldwin admitted that he did not understand how to interpret certain studies.
>
> Similar to Dr. Gandy, however, the Court acknowledges that Dr. Baldwin is a cardiologist and is qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death. Moreover, Dr. Baldwin did review all the relevant materials and is entitled to rely on pharmacological and epidemiological experts. As such, his methodology was proper. Merck will be allowed to attack Dr. Baldwin's understanding during cross-examination, but will not be able to entirely exclude him based on it.

*Id.* at 592-93. Accordingly, during the first trial, the Court did not allow the Plaintiff to elicit opinion testimony from Dr. Baldwin on specific causation. The Court denied the Plaintiff's request to reconsider this ruling, and further explained its reasoning in writing. *See In re Vioxx Prods. Liab. Litig.*, 2005 WL 3541045 (E.D. La. Dec. 6, 2005). Prior to the re-trial of this case, the Court followed its earlier ruling and held that Dr. Baldwin could not testify as to specific causation. *See* Order & Reasons dated Jan. 30, 2006 (Rec. Doc. 3019).

The Court reached a similar conclusion with respect to Dr. Graham, the Plaintiff's pathologist:

> Dr. Graham is not qualified to opine on either general causation or specific causation. Furthermore, his methodology is not scientifically reliable. Throughout his deposition testimony, Dr. Graham makes a litany of critical admissions. By self-admission, Dr. Graham has no training in pharmacology; is not qualified to explain how Vioxx could lead to thrombosis; has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx; has never prescribed Vioxx or any other COX-2 inhibitors to a patient; has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture. To compensate for his lack of education, experience, and training, Dr. Graham spent approximately eight hours reviewing sixty-seven scientific medical articles, nine depositions, four expert reports, and three days' worth of trial transcripts—far less than this Court or any attorney in this case has spent reviewing Vioxx related materials. In fact, most of these eight hours were spent reviewing Dr. Wayne Ray's expert report. While the Court could further explain Dr. Graham's lack of qualifications or his lack of a reliable scientific basis, it is enough to say that he is not qualified to render an opinion as to whether Vioxx can cause a thrombotic cardiovascular event or whether Vioxx did cause Mr. Irvin's death.
>
> Notwithstanding Dr. Graham's lack of qualifications as to causation, Dr. Graham is qualified to testify as to the existence of a thrombus and its role in Mr. Irvin's death. He just is not qualified to testify that Vioxx can cause a thrombus and did cause Mr. Irvin's thrombus.

*See* Order & Reasons dated Feb. 3, 2006 (Rec. Doc. 3116). The Court also discussed the scope of Dr. Graham's testimony during the pretrial conference on February 3, 2006. *See* Transcript dated Feb. 3, 2006. Lastly, the Court heard argument on a motion to reconsider, but declined to change its ruling with respect to Dr. Graham and further explained its reasoning on the record. *See* Transcript dated Feb. 8, 2006.

For all of the reasons previously expressed both in writing and on the record, the Court finds that the Plaintiff's first argument in support of a new trial lacks merit.

### B.    Refusal to Continue the Re-Trial

Following the above *Daubert* rulings prior to the re-trial of this case, the Plaintiff requested a thirty- or sixty-day continuance to allow her to locate an expert witness to testify on specific causation. The Court denied the request on the record during the pretrial conference:

> This is the second trial in this case.  I dealt with [*Daubert*] challenges, made rulings [in] the first trial in advance of the trial, we went through the trial, and now it's the same issue.

*See* Transcript dated Feb. 3, 2006.  The Plaintiff's request came on the eve of the re-trial, almost two months after the parties had completed the first trial of this complex case, and was in response to *Daubert* rulings consistent with those made during the first trial.  Accordingly, the Court finds that it did not abuse its discretion, nor commit prejudicial error, by refusing to continue the re-trial of this case.

### C.  Dr. Rayburn's Testimony

In her supplemental memorandum, the Plaintiff asserts a third basis for relief, this time relying upon Rule 60(b)(3).  The Plaintiff contends that Merck's cardiology expert, Dr. Barry Rayburn, misrepresented his credentials to the Court and to the jury by testifying during the re-trial of this case that he was board certified in internal medicine and cardiovascular disease, when in fact he was not, as his certifications had expired.  Moreover, the Plaintiff argues that this is not a trite matter,[5] and that in light of the importance of his opinions on causation, Dr. Rayburn's misrepresentation prevented her from fully and fairly presenting her case.  Indeed, Dr. Rayburn was one of two witnesses called by Merck to testify to causation, the other being Dr.

---

[5] The Plaintiff points to the policies of the American Board of Internal Medicine:

> Diplomats of the Board must accurately state their certification status at all times.  This includes descriptions in curriculum vitae, advertisements, publications, directories, and letterheads.  Diplomats with expired time-limited certification may not claim board certification and must revise all descriptions of their qualifications accordingly.  When a physician misrepresents certification status, the Board may notify credentialing bodies, licensing boards, law enforcement agencies, and others.

*See* American Board of Internal Medicine - Requirements & Policies, http://www.abim.org/moc/maintenance.shtm (last visited May 21, 2007).

Tom Wheeler, a pathologist.  However, Dr. Rayburn was the only witness called by Merck to offer express opinions as to the role Vioxx played in Mr. Irvin's death.  Thus, the Plaintiff argues that Dr. Rayburn's testimony, left unimpeached due, at least in part, to his misrepresentation, was critical in this case.  The Court agrees and concludes that a new trial is warranted.

On October 3, 2005, prior to the first trial of this case, Merck provided the Plaintiff with Dr. Rayburn's expert report in which the witness states that he has "passed boards in internal medicine and cardiovascular disease."  Dr. Rayburn's curriculum vitae ("CV") was attached to the report, and it too indicates that the witness is certified by the American Board of Internal Medicine in both internal medicine and cardiovascular disease.  The CV notes a certification date of September 12, 1990 for internal medicine, and February 14, 1994 for cardiovascular disease.  The CV does not list ending dates for either certification.  Prior to the re-trial of this case, Merck provided an updated expert report and revised CV that contain the same information with respect to Dr. Rayburn's certification status.

During the re-trial of this case, Merck called Dr. Rayburn to the stand and he was asked the following questions by Merck's counsel about his qualifications prior to being offered as an expert cardiologist:

> Q.    Good afternoon, Dr. Rayburn.  Sir, you're a medical doctor; is that correct?
>
> A.    That's correct.
>
> Q.    You're also a professor of medicine at the University of Alabama; is that also correct?
>
> A.    That's correct.
>
> Q.    Sir, have you been asked to investigate some of the medical and scientific issues as it relates to the drug Vioxx and also as it relates to the death of Mr. Irvin?

A.      Yes, I have.

Q.      Have you formed opinions with regard to that, to those questions, both as to the drug Vioxx and as to Mr. Irvin?

A.      Yes, I have.

Q.      Are you prepared to give those opinions to the jury today?

A.      Yes, I'll do that.

Q.      Doctor, before we get to your opinions, let's review your background.  What is your field of speciality?

A.      Cardiologist.

Q.      Are you board-certified, sir?

A.      Yes.  I passed boards in internal medicine and cardiovascular disease.

*See* Transcript dated Feb. 14, 2006, at 1723-26.  Dr. Rayburn went on to discuss with counsel his clinical and research experiences and was eventually accepted by the Court as an expert witness in cardiology.  Thereafter, Dr. Rayburn testified that in his opinion, Vioxx was not a substantial contributing cause of Mr. Irvin's fatal heart attack.  During closing arguments, Merck's counsel began his summation by focusing on Dr. Rayburn's expert testimony that Vioxx was not a cause of Mr. Irvin's death.  *See* Transcript dated Feb. 17, 2006, at 2365-67.  As noted, the jury eventually returned a verdict in favor of Merck.

Forty-two days later in a different Vioxx lawsuit in New Jersey state court, Merck again called Dr. Rayburn as an expert cardiologist.  The New Jersey case was a joint trial in which the claims of two separate plaintiffs, Thomas Cona and John McDarby, were tried together.  In response to questions by Mr. Cona's attorney, Dr. Rayburn first explained that in fact he was no longer a board-certified cardiologist:

Q.      Are you a board certified cardiologist?

9

A.      No.  My boards are currently being renewed, but that's not my certification.

Q.      Your board certification was lost in cardiology years ago, true?

A.      My board certification expired.

Q.      That's what "lost" means.  It is not valid anymore, true?

A.      I think there was an implication that I lost it through something I did and it expired in 10 years.

Q.      I'm not suggesting that you butchered somebody and lost it because you did something bad.  I'm just saying it is gone.  It ran out.  You knew it was going to run out.  It is only good for 10 years and it ran out, didn't it?

A.      Yes, and I'm in the process now of renewing it.

Q.      Years later?

A.      Well, two years later.

Q.      And your internal medicine board certification ran out over five years ago, right?

A.      I think that's correct and I'm actually going to renew that, I'm in the process of renewing that, as well.

*See* Transcript of *Cona/McDarby v. Merck & Co.*, dated Mar. 29, 2006, at 3520-21 (Exhibit G to the Plaintiff's supplemental memorandum in this case).  In response to questions by Mr. McDarby's attorney, Dr. Rayburn then attempted to explain the testimony he previously gave in this Court that is the subject of the instant motion:

Q.      . . . Remember you testified six weeks ago to a jury in New Orleans?

A.      Yes.

Q.      You were sworn in as a witness?

A.      Yes.

Q.      And about a minute later, seven questions into the exam by a Merck lawyer

they said, "Are you board certified, sir"?  You answered, "Yes.  I passed boards in internal medicine and cardiovascular disease."  That wasn't true, was it?

A.      Well, actually, I wouldn't put a period after the yes, I made it very clear I passed my boards internal medicine and cardiovascular disease, I did.

Q.      But the question is: "Are you board certified, sir"?  And you told a jury under oath, yes, and you are not board certified.

A.      I absolutely in no way intended to misrepresent the currency of my certification, absolutely not.

Q.      But you may not have intended it, but it was wrong, and you told a jury it was wrong.

A.      No, sir, I did not intend to represent that I wasn't lapsed or expired at all.

Q.      Are you board certified or not?

A.      My boards have lapsed.  I'm not currently board certified.  I have been very clear about that.

Q.      So you think that was clear to the jury in New Orleans?

A.      Yes, I believe so.

*See id.* at 3787-91.

Rule 60(b)(3) provides that a Court may relieve a party from final judgment because of "a fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party."  Fed. R. Civ. P. 60(b)(3).  As noted, "[a] party making a Rule 60(b)(3) motion must establish (1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting [her] case."  *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005).

First, the Court finds that the Plaintiff has demonstrated by clear and convincing evidence that Dr. Rayburn misrepresented his certification status during the re-trial of this case.  The

11

Court cannot accept Merck's argument that the Plaintiff's "allegations of 'fraud' and 'misrepresentation' are pure fantasy."  By responding "yes" when asked if he was board certified, when in fact he was not, Dr. Rayburn clearly misrepresented his certification status to both this Court and to the jury.  Moreover, Dr. Rayburn's subsequent testimony six weeks later in New Jersey demonstrates that he was not merely unaware that his certifications had lapsed.  Rather, it reveals that Dr. Rayburn sought to avoid admitting that he was no longer board certified by adding a caveat to his answer in this case:

> Q.     Are you board-certified, sir?
>
> A.     Yes.  I passed boards in internal medicine and cardiovascular disease.

*See* Transcript dated Feb. 14, 2006, at 1724.  Regardless of how Dr. Rayburn views his testimony, the Court must conclude that he misrepresented his status as a board-certified cardiologist.[6]

Second, the Court finds that Dr. Rayburn's misrepresentation prevented the Plaintiff from fully and fairly presenting her case to the jury.  Dr. Rayburn was a central witness in this case, and he offered expert opinions on specific causation, arguably the central issue in this entire litigation.  As the Plaintiff notes, the process of maintaining one's board certification is rigorous and involves verification of credentials, completion of a self-evaluation, and completion of a secure examination.  *See* American Board of Internal Medicine - Requirements & Policies, http://www.abim.org/moc/maintenance.shtm (last visited May 21, 2007).  Indeed, the Board

---

[6]  Merck's contention that Plaintiff's counsel would have immediately recognized the misrepresentation had counsel engaged in proper diligence beforehand conflates, as noted above, the legal standards that govern a Rule 60(b)(2) challenge with those that control the instant Rule 60(b)(3) motion.  Moreover, the Court finds that Merck's argument lacks merit because even defense counsel was unaware of Dr. Rayburn's expired certification status at the time the misrepresentation was made.

proclaims that:

> The ABIM certificate is recognized throughout the world as signifying excellence in the practice of Internal Medicine and its subspecialties. It demonstrates that a doctor has met vigorous standards through intensive study, self-assessment, and evaluation.
>
> Certification is designed to assure the public that a medical specialist has successfully completed an approved educational program and an evaluation, including a secure examination designed to assess the knowledge, experience, and skills requisite to the provision of high quality patient care.

*See* American Board of Internal Medicine - About Certification,

http://www.abim.org/cert/index.shtm (last visited May 21, 2007). Not only does Dr. Rayburn's

misrepresentation call into question the Court's acceptance of him as an expert witness, it also

sheds an unfavorable light upon his propensity for truthfulness. Moreover, the misrepresentation

prevented the Plaintiff from cross-examining the witness about his failure to maintain his

certifications and the importance of such certifications. These matters are not trivial, especially

in this litigation where experts often disagree on critical issues such as causation. Dr. Rayburn's

misrepresentation undoubtably affected the Plaintiff's ability impeach him and thus to fully and

fairly present her case to the jury. Whether or not the ultimate result of the trial would have been

different is irrelevant, as Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not

at those which are factually incorrect." *Rozier*, 573 F.2d at 1339. Accordingly, the Court finds

that the Plaintiff has demonstrated that she is entitled to a new trial pursuant to Rule 60(b)(3).

## III.    CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Plaintiff's Motion for New Trial

(Rec. Doc. 3674) is GRANTED.

IT IS FURTHER ORDERED that the Judgment in favor of Merck (Rec. Doc. 3483) is

hereby VACATED. The Court will schedule a status conference with the parties to discuss how

to proceed with this matter.

New Orleans, Louisiana, this 29th day of May, 2007.

_____

UNITED STATES DISTRICT JUDGE