# EXHIBIT A



**FILED**

JUN 0 8 2007

Carol E. Higbee, P.J.Cv.

15164854
E-SERVICE
Jun 8 2007
4:41PM

<u>**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS**</u>

**SUPERIOR COURT OF NEW JERSEY**
COUNTIES OF
ATLANTIC AND CAPE MAY

CAROL E. HIGBEE, J.S.C.

1201 Bacharach Boulevard
Atlantic City, NJ 08401-4527
(609) 343-2190

<u>MEMORANDUM OF DECISION ON MOTION</u>
<u>Pursuant to Rule 1:6-2(f)</u>

*CASE:*           **Cona v. Merck & Co., Inc.**
                **McDarby v. Merck & Co., Inc.**

*DOCKET #:*      **ATL-L-3553-05-MT**
                **ATL-L-1296-05-MT**

*DATE:*          **June 8, 2007**

*MOTION:*        **New Trial**

*ATTORNEYS:*     **Christy D. Jones – Defendant**
                **Richard D. Meadow – Plaintiff**
                **Ellen Relkin – Plaintiff**
                **Jerry Krystal – Plaintiff**

Having carefully reviewed the papers submitted and any response filed, I have ruled on the above Motion as follows:

The court has received and reviewed the motions for a new trial in the Cona and McDarby cases. These cases were consolidated for trial. Most of the issues raised are the same for both plaintiffs. The court, therefore, addresses the issues in one memorandum of decision. The verdict sheets contained the following questions and answers:

*"The Judiciary of New Jersey is an equal Opportunity/Affirmative Action Employer"*

## JURY VERDICT FORM

Thomas & Joyce Cona v. Merck & Co., Inc.

Docket No. ATL-L-3553-05

Failure to Warn

1.  Did Merck fail to provide an adequate
    warning of an association between VIOXX®
    and an increased risk of serious cardiovascular
    events that the defendant either knew or should
    have known about prior to Mr. Cona's heart attack?        YES 8 NO 0

    If your answer is "YES", proceed to
    Question No. 2.

    If your answer is "NO", proceed to Consumer
    Fraud section.

2.  Was VIOXX® a substantial contributing
    factor in causing Thomas Cona's heart attack?            YES 1 NO 7

    If your answer is "YES", proceed to
    Question Nos. 3 & 4.

    If your answer is "NO", proceed to
    Consumer Fraud section.

3.  What amount of money would fairly &
    reasonably compensate plaintiff Thomas
    Cona for his pain, suffering,
    disability & loss of enjoyment of life as a
    result of his heart attack?                              $ 0
                                                            VOTE 7-1

4.  What amount of money would fairly &
    reasonably compensate Joyce Cona
    for her loss of society and for
    services of her husband as a result of his
    heart attack?                                           $ 0
                                                            VOTE 7-1

2

Consumer Fraud

1. Did Merck commit consumer fraud by using unconscionable commercial practices when marketing VIOXX® to prescribing physicians?

YES 1 (NO) 7

2. Did Merck make misrepresentations that had the capacity to mislead concerning the cardiovascular risk of VIOXX® while marketing the drug to prescribing physicians?

(YES) 7 NO 1

3. Did Merck intentionally suppress, conceal or omit material information about an association between VIOXX® and an increased risk of cardiovascular events from prescribing physicians?

(YES) 7 NO 1

If your answer to #1, 2 or 3 is "YES", proceed to Question No. 4.

If your answer to #1, 2 and 3 is "NO", cease deliberations.

4. Did Mr. Cona sustain an ascertainable loss of money as a result of Merck's consumer fraud?

(YES) 8 NO 0

5. What was the amount of his loss?

$ 45⁰⁰

VOTE 8-0

3

**JURY VERDICT FORM**

John & Irma McDarby v. Merck & Co., Inc.

Docket No. ATL-L-3553-05

### Failure to Warn

1. Did Merck fail to provide an adequate warning of an association between VIOXX® and an increased risk of serious cardiovascular events that the defendant either knew or should have known about prior to Mr. McDarby's heart attack?

   (YES) 8   NO 0

   If your answer is "YES", proceed to Question No. 2.

   If your answer is "NO", proceed to Consumer Fraud section.

2. Was VIOXX® a substantial contributing factor in causing John McDarby's heart attack?

   (YES) 7   NO 1

   If your answer is "YES", proceed to Question Nos. 3 & 4.

   If your answer is "NO", proceed to Consumer Fraud section.

3. What amount of money would fairly & reasonably compensate plaintiff John McDarby for his pain, suffering, disability & loss of enjoyment of life as a result of his heart attack?

   $ 3,000,000
   VOTE 7-1

4. What amount of money would fairly & reasonably compensate Irma McDarby for her loss of society and for services of her husband as a result of his heart attack?

   $ 1,500,000
   VOTE 7-1

4

## Consumer Fraud

1. Did Merck commit consumer fraud by using unconscionable commercial practices when marketing VIOXX® to prescribing physicians?

   YES 1 NO 7

2. Did Merck make misrepresentations that had the capacity to mislead concerning the cardiovascular risk of VIOXX® while marketing the drug to prescribing physicians?

   YES 7 NO 1

3. Did Merck intentionally suppress, conceal or omit material information about an association between VIOXX® and an increased risk of cardiovascular events from prescribing physicians?

   YES 7 NO 1

   If your answer to #1, 2 or 3 is "YES", proceed to Question No. 4.

   If your answer to #1, 2 and 3 is "NO", cease deliberations.

4. Did Mr. McDarby sustain an ascertainable loss of money as a result of Merck's consumer fraud?

   YES 8 NO 0

5. What was the amount of his loss?

   $ 3968 .36
   VOTE 8-0

5

Merck moves for a new trial under R. 4:49-1 and/or a renewal of request for a judgment notwithstanding the verdict under R. 4:40-2.  These cases are two of thousands of cases filed against Merck assigned by the Supreme Court to this court for coordinated management.  The court addresses the primary arguments presented by Merck to support its motions.  Both Mr. McDarby and Mr. Cona were New Jersey residents so New Jersey law applies.

## I.  Was There Sufficient Evidence to Support the Verdicts?

During the trial, both plaintiffs and the defendant presented extremely qualified expert witnesses.  Both plaintiffs and the defendant presented substantial evidence in support of their positions.  For every point that the plaintiffs' witnesses made, the defense witnesses had a counter argument.

In assessing defendants' motion for judgment under R. 4:40-2 the court must accept as true all the evidence which supports the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced therefrom.  If reasonable minds could differ, the motion must be denied.  Therefore, the court may grant Merck's motion for judgment only if, accepting as true all the evidence supporting plaintiffs' position and according plaintiff all legitimate inferences which can be deduced therefrom, reasonable minds could not differ.  As to the motion for a new trial, under R. 4:49-1(a), the court shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.

The evidence was presented over several weeks.  The issues were complicated.  There were twenty-two witnesses and over one hundred fifty exhibits introduced into evidence.  In

addition, numerous research studies, tests and learned treatises were discussed by experts on both sides.

The following is a summary of what the jury could believe was true based on facts presented in evidence which were most favorable to plaintiffs to support their finding of failure to warn and consumer fraud in both cases and punitive damages in the McDarby case.

Before VIOXX® went on the market, there were over 30 different non-narcotic pain killers manufactured and sold. These drugs are used to inhibit inflammation and thus decrease pain. These were known as NSAIDs (non-steroidal anti-inflammatory drugs). NSAIDs include Aleve (naproxen), Advil and Motrin (ibuprofen) and numerous other drugs. These drugs reduce pain by inhibiting cyclooxygenase, an enzyme that makes prostaglandins, chemicals that cause pain and inflammation in the body.

The primary concern of doctors prescribing traditional NSAIDs was that, like aspirin, they caused gastrointestinal problems. The discovery that cyclooxygenase was actually two separate isoenzymes called cox-1 and cox-2 led to a race by Merck and rival Pfizer to develop medications that inhibited cox-2 only. This was because it was believed cox-1 was protective of the stomach and cox-2 contributed to inflammation. The goal was to produce a cox-2 inhibitor that did not inhibit cox-1. These new cox-2 inhibiting drugs included VIOXX®, developed by the defendant Merck, and Celebrex® and Bextra®, developed by Pfizer.

Before VIOXX® was on the market, it was known to the scientific community that there were two important substances in the body that affected blood clotting, thromboxane and prostacyclin. Thromboxane acts to induce clotting, while prostacyclin acts to break up clots.

In the years prior to VIOXX® going on the market, the Merck Manual contained a section that described the roles of thromboxane and prostacyclin. The Merck Manual called

7

prostacyclin the "most potent" anti-clotting substance in the body. In addition, the manual described the two substances as creating "a balance" in the body. The plaintiffs' experts testified that VIOXX® disrupted this balance. The section of the Merck Manual that explained the role of prostacyclin in the body was removed by Merck from editions of its manual. Plaintiffs allege this is evidence of Merck's knowledge of and attempt to hide the thrombotic risk of VIOXX®.

The plaintiffs' evidence shows there were concerns about VIOXX® and cardiovascular risks even before the drug was approved for market. When Merck was still doing studies on VIOXX®, one of their own consultants, Dr. Garrett Fitzgerald, did animal studies with VIOXX®. Fitzgerald was a scientist/researcher at University of Pennsylvania. Fitzgerald found that metabolites in the urine showed that cox-2 drugs appeared to substantially reduce prostacyclin in the body. He published his findings. His concern was that inhibiting prostacyclin would destroy the balance in the body between prostacyclin, the anti-clotting substance, and thromboxane, which assisted clotting. His hypothesis, which is still called the "Fitzgerald Hypothesis," was that cox-2 drugs appeared to upset this balance and therefore could cause an increase in thrombotic (clotting) events such as heart attacks and strokes. His paper revealed the need to conduct a clinical trial with evaluation of cardiovascular risks as a primary endpoint according to plaintiffs.

The Fitzgerald hypothesis and the urine tests he conducted were presented by plaintiffs' primary experts as red flags that should have caused Merck to set up at least one large clinical trial including the evaluation of cardiovascular risks as one preset endpoint. The evidence showed many clinical trials (more than usual) were conducted by Merck before the drug went on the market, but none had the evaluation of cardiovascular risks as a specific endpoint and

8

plaintiffs witnesses argued that these trials were not *powered* to properly develop this information.

It was undisputed that VIOXX® was never proven to be more effective than older NSAIDs in relieving pain. It was the general belief of the scientific community that cox-2's such as VIOXX® and Celebrex® would prove to be safer for the gastrointestinal tract but this was not proven to the satisfaction of the FDA to put in the first VIOXX® label. This belief was later supported by the results of a large clinical trial called VIGOR. VIGOR was a study designed to prove that VIOXX® was in fact safer for the gastrointestinal tract than other traditional NSAIDs.

The plaintiffs presented evidence from which the jury could infer that VIGOR was designed in such a way to minimize cardiovascular events. Plaintiffs presented internal Merck documents that showed there were discussions and concerns about cardiovascular risks of VIOXX® by Merck scientists before the VIGOR results were known. The study was designed to exclude most people who took low-dose aspirin. The jury was able to infer that those patients whose doctors were concerned about their cardiovascular risks would be on low-dose aspirin. Thus, those likely to have a heart attack based on their medical profile would be excluded from the study. At the same time, while low-dose aspirin might help prevent heart attacks, it also might cause gastrointestinal problems (a known side effect of aspirin). Permitting patients who took low-dose aspirin to participate in the study might prevent VIGOR from proving that VIOXX® was safer on the gastrointestinal tract.

VIGOR did in fact exclude most patients on low-dose aspirin and showed that VIOXX® caused fewer gastrointestinal problems, although it did not reduce serious stomach bleeds that result in hospitalization and death.

9

VIGOR was a blinded clinical trial so Merck did not see the results until the study was unblinded, except for one of Merck's biostatistician who worked on the trial.  When the results came out in 2000, the gastrointestinal benefit was shown, but so was a cardiac risk.  VIGOR demonstrated five times as many heart attacks in those taking VIOXX® as those taking the comparator drug.  It was a number that had "statistical significance" which, from a statistical view, means there is a 95% confidence rate and less than a 5% chance the results are the result of chance.

The plaintiffs put into evidence an e-mail from Dr. Scolnick, the President Merck Research Labs, who said the following on getting the VIGOR results: "The CV events are clearly there. . . . it is mechanism based on as we worried it was. . . ."[1]  The jury could reasonably infer that the mechanism referred to by Dr. Scolnick was the "Fitzgerald Hypothesis."

The VIGOR clinical trial results were published November 23, 2000 in the New England Journal of Medicine (NEJM).  The article described a four times increased risk of heart attack.  There was a discrepancy between the complete results which showed five times the number of heart attacks on VIOXX® as on the comparative drug and the four times rate that was published.  Plaintiffs argued that Merck chose an artificial cut-off date after the trial started and should have reported the higher rate.[2]

In addition, plaintiffs argued that the article underplayed the significance of the cardiovascular risk by putting emphasis on the "Naproxen Theory."  Naproxen was another traditional NSAID.  In VIGOR the patients took either Naproxen or VIOXX®.  Merck's scientists and their marketing department attempted to downplay the cardiovascular risks

---

[1] Plaintiffs' Exhibit 15, e-mail from Edward M. Scolnick to Deborah R. Shapiro, Alise S. Reicin and Alan A. Nies dated March 9, 2000, subject: vigor.
[2] NEJM on December 8, 2005 published what they called an Expression of Concern that they believed they were mislead and in fact the article should have included the five times increased rate of heart attacks.

displayed in the VIGOR trial by presenting the theory that Naproxen's cardio-protective properties explained the discrepancy between heart attack rates in patients taking VIOXX® and patients taking Naproxen. Plaintiffs' experts testified this was a false and misleading argument since even if Naproxen was to some degree cardio-protective, this could never explain the four- or five-fold discrepancy between the heart rates unless Naproxen was a miracle drug.

The plaintiffs' experts' position was that Merck had an obligation after the VIGOR results were received to revise their label and warn of cardiovascular risks. Instead they downplayed the risks and resisted FDA efforts to provide an adequate warning of the dangers of the product.

The way Merck marketed VIOXX® was a major part of the plaintiffs' evidence. The evidence showed that VIOXX® was a drug with huge sales that was marketed to physicians extensively as well as advertised directly to the public through television commercials and other ads.

Through the 1990s Merck was in a race to develop VIOXX® before Pfizer could develop Celebrex. Merck's internal documents describe this race. Merck lost and Celebrex® was approved for sale first. The evidence showed Merck still believed they would capture a larger share of the market with aggressive marketing. They held a huge, expensive two-day "launch" party for all sales representatives. They trained sales reps who went throughout the country to doctors' offices with more samples of VIOXX® for doctors to give patients than they ever distributed before. The evidence showed all sales reps across the country were basically trained the same way and instructed in the same things they could and should tell doctors as well as what not to say. The company hired Dorothy Hamill to be their spokesperson in ads and developed

11

several ads that played in TV markets around the country to consumers.  Merck also advertised in national magazines and publications targeted to doctors.

Merck's marketing department controlled the sales reps who visited doctors.  The evidence showed doctors questions were called "obstacles" by Merck in training sales reps.  The sales reps were taught how to handle these obstacles.  One game used to test some Merck sales reps on proper responses to doctor questions was called "Dodge Ball."  The jury could infer from the evidence that sales reps were trained to downplay cardiovascular risks.  In particular there was a sales tool known as "Be the Power," a video shown to sales reps that outlined things that would be obstacles to physicians using VIOXX®, one of which were fears of cardiovascular risks.  The video showed Merck sales reps using V power to wipe out a character who was wringing her hands whimpering about CV risks of VIOXX®.

There was evidence Merck paid a service to track doctors prescribing habits.  Specific doctors that were seen as obstacles by Merck to sales were targeted by their marketing department.  The internal records show some of these doctors were offered the opportunity to participate in trials or getting funding and then listed as "neutralized."  For one doctor, the Merck list stated "show him the money," for other specific doctors it listed things that could be used to "neutralize" them.  Other doctors were listed as "discredited" by Merck.

There was also evidence that one of Merck's top executives received a letter complaining that one of Merck's scientists was making calls to intimidate other research scientists who were questioning the safety of VIOXX®.  Merck's officials never contacted any of those alleged to have complained about these actions.

The FDA sent a warning letter to Merck concerning their use of the "Naproxen Theory" in their marketing.  In a letter dated September 17, 2001 the FDA warned Merck about a

12

"promotional campaign" that Naproxen could explain the excess VIOXX® heart attacks. The FDA stated:

> "You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).
>
> Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."[3]

The FDA, after the VIGOR results were out, proposed that Merck revise their VIOXX® label to put cardiovascular risks in the "Warning" section of the label. In an e-mail exchanged dated October 16, 2001, Dr. Scolnick, the President of Merck Research Laboratories who was responsible for overseeing science and research, and David Anstice, President of Human Health for North America and responsible for overseeing sales and marketing, called the FDA proposed label "ugly" and "ugly cubed."[4] In that email exchange, Dr. Scolnick said Merck would never accept this label and Mr. Anstice makes clear that Merck will fight it. The jury could have believed based on the evidence that Merck spent the next eighteen months trying to avoid the stronger warning proposed by the FDA.

A new label with the cardiovascular information placed under the "Precautions" section, not the "Warnings" section, of the label did not go on VIOXX® until April 11, 2002,

---

[3] Plaintiffs' Exhibit 15, FDA Warning Letter dated September 17, 2001.
[4] Plaintiffs' Exhibit 17, e-mail from Edward M. Scolnick to David W. Anstice dated October 16, 2001, subject: vioxx label.

approximately 18 months later.  When it did, it not only left cardiovascular risk out of the "Warnings" section, and placed it in the "Precautions" section of the label, but basically recommended that caution be used with patients who have "a history of ischemic heart disease." Plaintiffs argued that this was not nearly as strong as the FDA proposed label or as was needed to make the warning adequate.

One of the strongest pieces of evidence on both the "failure to warn" cause of action and the punitive damages claim was that the company had an internal document comparing how much money Merck would lose if (1) there was no change in the label, (2) if the cardiovascular risk information was put in the 'Precautions' section, and (3) if the cardiovascular risk information was put in the "Warnings" section.[5]  The document contains a chart that shows that Merck forecast roughly $2.5 million in sales if the CV labeling contained milder language regarding the risk, $2 million in sales from VIOXX® if the CV info remained in the "Precautions" section of the label, and $1.5 million in sales if the CV risk was placed in the "Warnings" section instead of in the "Precautions" section.  These figures contradicted Merck's position at trial that prescribing physicians would read the whole label, and that it really did not matter where the risks were located in the label.

Merck's witnesses tried repeatedly to suggest they could not change the label to strengthen the warning without prior FDA approval.  This is contrary to Federal statutes and Federal regulations.  Merck's attorneys were warned not to argue this to the jury repeatedly before and during the trial by the court.  They were instructed this was a legal point and the court would charge on it.  The warnings of the court were disregarded and, contrary to specific court instructions, this mistaken statement of the law was repeatedly suggested to the jury resulting in the court being forced to instruct the jury on the issue during the trial.

---

[5] Plaintiffs' Exhibit 2000 (Transcript 3/24/06-page 2886).

14

The evidence that VIOXX® could and did increase the risk of heart attacks for those who consumed it was supported by the APPROVe study.  APPROVe was the clinical trial conducted by Merck which ultimately was stopped because of what the safety monitors of the studies perceived as evidence of increased risk of heart attacks in patients taking VIOXX®.  APPROVe, which compared VIOXX® to a placebo, could not be explained by the Naproxen Theory.  VIOXX® was taken off the market right after APPROVe, so there were no further trials by Merck.

There was ample evidence to support the plaintiffs' liability verdicts on failure to warn, consumer fraud and on punitive damages.  The evidence on the specific proximate cause question was also sufficient to support the verdict on causation and damages in favor of Mr. McDarby based on the testimony and opinions of plaintiffs' experts.

The jury verdict in favor of the defense on the causation question as to Mr. Cona also could be supported by the evidence.  There was substantial evidence presented by the defense that called into question the credibility of Mr. Cona's claim that he took VIOXX® for the period he claimed.  The prescriber's credibility was also called into question by the defense as to when the plaintiff took VIOXX®.

The above does not set forth all the evidence presented by plaintiffs that could have resulted in a verdict for plaintiff on "failure to warn" and on "consumer fraud," nor does it outline the evidence the defense relied upon to contradict plaintiffs' proofs.  As stated for each argument plaintiffs set forth on liability, the defense countered with a proffered explanation and/or other contrary expert opinions.  The court finds that there was more than sufficient evidence which could support the decision the jury made.  The role of the court is not to decide the case.  This is the jury's role.

15

The same principle applies to the no cause verdict the jury gave to Mr. Cona because the jury did not find sufficient proof that VIOXX® was a substantial factor in causing his heart attack. The evidence produced at trial was sufficient to support that finding. Mr. Cona's credibility was clearly an issue and it is not for this court to rule on whether he was or was not credible, but just that there was more than sufficient evidence to support the verdict, depending on what the jury believed.

## II. Merck's Motion for Judgment or Alternatively for a New Trial on Plaintiffs' Consumer Fraud Act Claims

Merck argues that it is entitled to judgment, or alternatively to a new trial, on plaintiffs' consumer fraud claims. Merck contends that plaintiffs' claims under the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1, et seq., are miscast product liability claims and that the exclusive remedy for plaintiffs' injuries is provided by the New Jersey Products Liability Act ("PLA"), N.J.S.A. 2A:58C-1, et seq. Merck further argues that plaintiffs have failed to prove, as the CFA requires, that (1) Merck engaged in conduct that constitutes a violation of the Act, (2) that plaintiffs suffered any ascertainable loss or (3) that there is a causal nexus between Merck's fraud and any loss to plaintiffs.

At trial the jury found that Merck made misrepresentations that had the capacity to mislead concerning the cardiovascular risk of VIOXX®, and that Merck intentionally suppressed, concealed or omitted material information about an association between VIOXX® and an increased risk of cardiovascular events. The jury also found that both plaintiffs Mr. Cona and Mr. McDarby sustained an ascertainable loss of money as a result of Merck's wrongful misrepresentations or omissions. As previously outlined, there was evidence presented that could support the jurors' decision.

16

**A.  Plaintiffs' Consumer Fraud Claims Are Not Subsumed by the Products Liability Act**

The CFA was enacted to protect against fraudulent and unconscionable practices in the sale of consumer goods and services.  The CFA holds liable any person who engages in "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission [of a material fact with the intent that others rely on the misrepresentation or omission.]"  N.J.S.A. 56:8-2.  The CFA "has three main purposes: to compensate the victim . . .; to punish the wrongdoer through the award of treble damages . . .; and, by way of the counsel provisions, to attract competent counsel to counteract the community scourge of fraud[.]"  Int'l Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc., 384 N.J. Super. 275, 287 (App. Div. 2006), citing Lettenmaier v. Lube Conn., 162 N.J. 134, 139 (1999).

The CFA characterizes the harm it is designed to remedy as "any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."  N.J.S.A. 56:8-19.  The CFA is designed not to provide a remedy for harm caused by products but rather to protect the consumer from fraudulent practices and to deter such wrongful conduct.  See Sprenger v. Trout, 375 N.J. Super. 120, 135-136 (App. Div. 2005).

The PLA was enacted to "establish clear rules with respect to certain matters relating to actions for damages for harm caused by products."  N.J.S.A. 2A:58C-1.  The PLA governs "any product liability action," which the Act defines as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty."  N.J.S.A. 2A:58C-1(b)(3).  Under the PLA:

"Harm" means
    (a) physical damage to property, other than to the product itself;
    (b) personal physical illness, injury or death;
    (c) pain and suffering, mental anguish or emotional harm; and
    (d) any loss of consortium or services or other loss deriving from any type of
        harm described in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. 2A:58C-1(b)(2). Thus, although the PLA states that it governs product liability actions

"irrespective of the theory underlying the claim," it is limited by the statute's definition of harm.

Each statute addresses a distinct type of harm. The PLA is designed to remedy harm of

physical damage and personal injury caused by products, while the CFA seeks to remedy

economic harm to consumers caused by fraud. This court agrees with the Superior Court's

decision in Jones v. Sportelli, which recognized that "[i]n light of the possibility that a

manufacturer might engage in unlawful practices regardless of whether it has a duty to warn, the

principle of law does not serve to exclude the sale of a prescription-legend product from the

protection afforded by the [CFA]." 166 N.J. Super. 383, 389 (Law Div. 1979).

There are decisions which hold that the PLA creates the exclusive cause of action for

claims alleging personal injury caused by a product. These are distinguishable. These decisions

address common law product liability claims for personal injury and hold that the PLA is the sole

method to prosecute a product liability action in these circumstances. For example, the U.S.

Court of Appeals for the Third Circuit found that the PLA effectively creates an "exclusive

statutory cause of action for claims falling within its purview." Repola v. Morbank Indus., Inc.,

934 F.2d 483, 492 (3d Cir. 1991). Repola predicts that the New Jersey Supreme Court would

hold that the PLA generally subsumes common law product liability claims so that the PLA

would be the "sole basis of relief" available under New Jersey law to consumers injured by

defective products. Id. This court agrees with that conclusion, but only as to personal injury

claims. This is distinguishable from a CFA claim for an economic injury. There was no claim of

fraud made in that case, under either the common law or the CFA.  See also Tirrell v. Navistar, Int'l, Inc., 248 N.J. Super. 399 (App. Div. 1991) (affirming dismissal of all common law product liability claims and negligence claim because PLA provides exclusive cause of action for personal injury claim).

There are also two decisions in which the U.S. District Court for the District of New Jersey found that the PLA precluded product liability claims for personal injury recast as common law fraud claims.  In Walus v. Pfizer, the plaintiff sought to recover for emotional distress after viewing a television program that caused him to fear that his normally-functioning heart valve might fail at some future time. 812 F. Supp. 41 (D.N.J. 1993).  The plaintiff asserted theories of negligence, strict liability, failure to warn, fraud, misrepresentation and negligent and intentional infliction of emotional distress.  Id. at 42.  In a second case, the plaintiff sued cigarette manufacturers for the wrongful death of her husband resulting from years of smoking. Brown v. Phillip Morris Inc., 228 F. Supp. 2d 506 (D.N.J. 2002).  In addition to claims under the PLA and for common law strict liability and negligence, plaintiff claimed fraudulent concealment and intentional and fraudulent misrepresentation.  Id. at 509.

The District Court viewed both Walus[6] and Brown[7] as cases in which a plaintiff sought to avoid the physical harm requirement for a claim under the PLA by bringing the suit as a fraud claim.  Therefore, the District Court's finding that the plaintiffs' fraud claims were subsumed by the PLA was based on the nature of the harm—the claims were in fact claims for personal injury, the mental or emotional suffering caused by the defendants' products, but without physical harm.

---

[6] "Plaintiffs cannot avoid the physical harm requirement by recasting their product liability claims as fraud claims." Walus, supra, 812 F. Supp. at 45.
[7] In Brown, the plaintiff told the court that the claim was "indeed based on the assertion that [decedent] contracted fatal cancer from smoking cigarettes." 228 F. Supp. 2d at 517.  The Brown court made its decision "in light of that frank statement, the dearth of argument and authority supplied by plaintiff and the persuasive authority supplied by defendants," and ruled that the PLA subsumes plaintiffs' common law fraud claim.  Id.  The Brown opinion explains that plaintiff left an "argument vacuum" on the issue of whether the PLA subsumed the fraud claim.  Id.

19

These cases do not hold that fraud claims solely for economic loss not covered by the PLA are in fact barred by the PLA.

Whether the CFA claims brought by Mr. Cona and Mr. McDarby are properly cast as product liability or consumer fraud claims depends on the type of harm alleged. In addition to their claims of heart attacks caused by VIOXX®, plaintiffs claimed, and the jury found, a separate economic loss from the purchase of the drug caused by misrepresentations or omissions by Merck about the safety and efficacy of the drug. That harm is of the type contemplated by the CFA. See N.J.S.A. 56:8-19; see also discussion, infra, Section II. B. (explaining the "ascertainable loss" requirement of the CFA). Therefore, this court stands by its prior ruling[8] and finds that plaintiffs' CFA claims are not subsumed by the PLA as long as they are claims for economic losses not directly associated with personal injury.

### B. Plaintiffs' Consumer Fraud Claims

The CFA was enacted to protect against fraudulent and unconscionable practices in the sale of consumer goods and services. The CFA vests private citizens with a cause of action to enforce its provisions. The statute provides, in pertinent part: "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action . . . in any court of competent jurisdiction." N.J.S.A. 56:8-19. The Act, "in allowing for private suits in addition to actions instituted by the Attorney General, contemplates that consumers will act as 'private attorneys general.'" Int'l Union, supra, 382 N.J. Super. at 302,

---

[8] In Humeston v. Merck & Co., Inc., this court found that there was no case law supporting Merck's contention that claims under the CFA are precluded by the PLA. Docket No. ATL-L-2272-03 (Law Div. September 9, 2005) (slip op at 22). Both claims were permitted to proceed in Humeston.

citing Lemelledo v. Benefit Mgmt. Corp., 150 N.J. 255, 268 (1997) (noting the "strong and

sweeping legislative remedial purpose apparent in the CFA."). As the Appellate Division found:

> The CFA was enacted to "protect [the consumer] against fraudulent and
> unconscionable practices in the sale of goods and services." The purposes of
> the Act are: (1) to compensate the victim for his or her actual loss; (2) to
> punish the wrongdoer through the award of treble damages; and (3) to attract
> competent counsel to counteract the "community scourge" of fraud by
> providing an incentive for an attorney to take a case involving a minor loss to
> the individual. The Act is "remedial legislation and should be liberally
> construed to accomplish its dual objectives of deterrence and protection.

Sprenger v. Trout, 375 N.J. Super. 120, 135-136 (App. Div. 2005) (internal citations omitted).

"The Act has been hailed as "one of the strongest consumer protection laws in the nation[.]'"

Weinberg v. Sprint Corp., 173 N.J. 233, 257 (2002) (citing Governor's Press Release for

Assembly Bill No. 2402, at 1 (June 29, 1971)). "The history of the Act is one of constant

expansion of consumer protection." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997).

To state a claim under the CFA, a plaintiff must allege each of three elements: (1)

unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3)

a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable

loss. New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12-13, 842

(App.Div.), certif. denied, 178 N.J. 249 (2003) (citing Cox v. Sears Roebuck & Co., 138 N.J. 2,

24 (1994)).

### C.  Whether Plaintiffs Proved Merck Committed Violations of the CFA

A claim of fraud under the CFA requires proof that a person committed an "unlawful

practice" as defined by the Act. Unlawful practices fall into three general categories: affirmative

acts and knowing omissions, both found in N.J.S.A. 56:8-2, and regulation violations, found in

the language of N.J.S.A. 56:8-4. Cox, supra, 138 N.J. at 17.

21

At trial, the jury found based on the evidence that 1) Merck made misrepresentations that had the capacity to mislead concerning the cardiovascular risk of VIOXX® in marketing to prescribing physicians, and 2) Merck intentionally suppressed, concealed or omitted material information about an association between VIOXX® and an increased risk of cardiovascular events from prescribing physicians.

Merck argues that the jury finding was in error.  The argument states that plaintiffs cannot claim that Merck engaged in any conduct which might constitute fraud under the CFA because, as in the context of the failure to warn claim, compliance with federal labeling requirements and prompt corrective action in response to FDA warnings create a presumption that Merck did nothing unlawful.  Def. Merck & Co., Inc.'s Mot. for Judgment as to the Claims of Thomas Cona and John McDarby, March 21, 2006, at 35-36 [hereinafter Merck's March 21, 2006 Mot. for Judgment].  Merck cites no authority which supports application of such a presumption in the context of the CFA.  Even if such a presumption did exist, as it does in a failure to warn claim under the PLA, there was ample evidence in the record for the jury to find any such presumption was rebutted based on the above summary of evidence that supported plaintiffs' claims.

### D. Whether Plaintiffs Proved They Suffered an Ascertainable Loss.

The CFA requires proof that the plaintiff suffered "any ascertainable loss of moneys or property, real or personal" as a result of the alleged fraud. N.J.S.A. 56:8-19.  "Ascertainable loss" means "either out-of-pocket loss or a . . .loss in value[.]" Int'l Union, supra, 384 N.J. Super. at 290-91, citing Theidemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248 (2005).  Ascertainable loss encompasses situations where "a consumer receives less than what was

promised." Id., citing Union Ink Co. v. AT&T Corp., 352 N.J. Super. 617, 646 (App. Div. 2002) (internal citations omitted).

In Int'l Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc., 384 N.J. Super. 275, 287 (App. Div. 2006), the Appellate Division found that the plaintiffs in that case could show that the purchase price paid for the drug constituted ascertainable loss. Because Merck allegedly made misrepresentations about the safety and efficacy of VIOXX® to consumers and physicians and the third-party payor plaintiffs in that case, plaintiffs suffered a "loss in value" when they paid for a drug with undisclosed serious health risks.

> Merck represented to doctors, patients, third-party payors, and health care plans alike, that Vioxx was not only safe, but superior to other available pain-killers because of its improved gastrointestinal protection. In reality, Vioxx was not appreciably better than other, less expensive, competitors and actually posed significant additional cardiovascular risks. Plaintiff thus suffered a "loss in value" when, on behalf of its participants, it paid for a drug with serious health risks that Merck did not disclose, rather than choosing, based on full and truthful information, to select competitors' products instead. In short, when third-party payors paid for Vioxx, they got something less valuable than what was paid for and what had been promised.

Int'l Union, supra, 384 N.J. Super. at 291.

Mr. Cona and Mr. McDarby argued, and the jury found, that they experienced a loss of their bargain when they purchased VIOXX® and should get a return of their portion of the payment. The plaintiffs presented evidence that Merck misrepresented and suppressed or omitted facts about the adverse effects of VIOXX® in order to get plaintiffs and others to purchase the drug. As a result, plaintiffs bought a drug they would otherwise not have purchased that carried more risks than they were told. This court finds that, just as the Appellate Division in Int'l Union and Union Ink, Co., supra, found, plaintiffs can satisfy the "ascertainable loss" requirement of the CFA by demonstrating a loss in value because they received less than what

23

was promised.[9]   The jury found that plaintiffs suffered a loss in the amount spent by each

plaintiff to purchase VIOXX®.   The court finds that the evidence at trial was sufficient to

support the jury's verdict.

### E. Whether Plaintiffs Proved a Causal Nexus Between Merck's Conduct and Plaintiffs' Ascertainable Loss

To succeed in a claim under the CFA, a plaintiff must prove that there is a causal

relationship between the defendant's violation of the CFA and the plaintiff's ascertainable loss.

The Act itself states that plaintiff's loss must have occurred "as a result of the use or employment

by another person of any method, act, or practice declared unlawful under this act[.]" N.J.S.A.

56:8-19.   The Appellate Division explained this element of a CFA claim:

> While common law fraud "requires proof of reliance[,] consumer fraud requires only proof of a causal nexus between the [misrepresentation or] concealment of the material fact [by a defendant] and the loss," suffered by "any person." It is not necessary to prove that each class member specifically relied upon Merck's omissions or misrepresentations. Plaintiff must prove only that its ascertainable loss was "attributable to conduct made unlawful by the [Act]." It is not necessary that the wrongful conduct be the sole cause of the loss, but merely that it be a cause.

Int'l Union, supra, 384 N.J. Super. at 288-89.

---

[9]Merck argues that the decision of the United States District Court for the District of New Jersey in Heindel v. Pfizer, 381 F. Supp. 2d 362, 380 (D.N.J. 2004) should persuade this court that plaintiffs cannot claim the purchase price of Vioxx as their "ascertainable loss" since they received a benefit, pain relief, from the drug.  Def. Merck & Co., Inc.'s Renewed Mot. for Judgment or, in the Alternative, for a New Trial or Remittitur (Compensatory Damages), April 25, 2006, at 18.  It does not appear that the cited language from Heindel addresses either New Jersey law or the specific CFA requirement of "ascertainable loss." Merck further claims that Plaintiffs' failure to submit evidence showing that they would not have purchased another pain reliever if not VIOXX® or that they paid too much for VIOXX® mandates a finding that they sustained no loss.  In other words, they cannot claim that the purchase price is an ascertainable loss because they would have spent the money on another drug anyway.  That argument persuades the court that the exact opposite conclusion is correct.  As discussed previously, the CFA seeks to both deter fraud and protect consumers.  If Merck made fraudulent misrepresentations or concealed important safety information in order to induce consumers or physicians to purchase/prescribe Vioxx instead of alternative drugs on the market, the fact that plaintiffs chose VIOXX® over other drugs means that Merck should be more likely, not less likely, to be required to compensate plaintiffs for the loss of the purchase price.  The fact that plaintiffs received the pain relief they "bargained for" does not change this conclusion.  Plaintiffs did *not* "bargain for" the increased risk of injury by the product that Merck marketed by, as plaintiffs argue and the jury found, concealing information about the risk of heart attacks caused by the drug.  That is exactly the kind of wrongful conduct the CFA seeks to deter.

24

Merck argues that, because plaintiffs' heart attacks occurred after VIOXX® labeling was changed to reflect the VIGOR study results, plaintiffs must prove that the warnings by Merck were inadequate in 2003, when Mr. Cona's heart attack occurred, and in 2004, when Mr. McDarby's heart attack occurred. This argument states that because Merck complied with federal labeling requirements, plaintiffs must rebut the "virtually dispositive" presumption that the manufacturer's duty to warn has been satisfied. In other words, Merck claims that because they complied with the FDA's requirements for the VIOXX® warning label, they did not commit any actionable fraud under the CFA that could have caused plaintiffs' loss. This argument improperly imports principles from the product liability aspect of the lawsuit to the consumer fraud discussion.[10] While both claims are based on the same facts and are indisputably intertwined, the claim under the CFA is distinct from the products liability claim and requires proof of distinct elements. Just as the loss claimed under the CFA is different (monetary loss vs. injury caused by a product), the requirement of proof of misrepresentations or omissions that amount to fraud under the CFA are different from the proof required for the failure to warn claim. However, even the FDA presumption in the PLA only offers Merck protection. It can be rebutted. As previously stated, plaintiffs presented sufficient evidence for a jury to find any such presumption was in fact rebutted.

Merck characterizes the plaintiffs' argument on causation as follows: the plaintiffs claim they were induced to take VIOXX® and/or their physicians were induced to prescribe it by Merck's allegedly inadequate product warnings; Merck did not reveal the true increased risk of heart attack derived from the VIGOR study, and in fact, minimized it to doctors and omitted it in ads directly sent to consumers; and the alleged misrepresentation and intentions omission

---

[10] The more general issue of whether FDA approval of a warning label preempts any claim for failure to warn or consumer fraud under principles of Federal Preemption is addressed later in section IV of this decision.

25

resulted in both plaintiffs' use of the drug and in turn led to their heart attacks.   Merck goes on

to dispute a causal relationship between any alleged fraud and plaintiffs' heart attacks, which

"took place long after Merck had already made complete disclosures about the VIGOR

results[.]" Id. First, plaintiffs' experts testified Merck intentionally downplayed and suppressed

the true cardiovascular risks.   Second, plaintiffs are not required to prove a causal nexus between

the alleged fraud and their heart attacks.   Instead, they must prove that Merck's

misrepresentations or omissions led to loss under the CFA.   The CFA seeks, as discussed above,

to remedy monetary harm.   In this case, as the previous discussion of "ascertainable loss"

explains, plaintiffs claim monetary harm attributable to the purchase of the drug.

Merck further argues that, in order to establish the required causal nexus, plaintiffs must

show that they sought out VIOXX® based on Merck's advertising or that their physicians were

induced by misleading materials to prescribe VIOXX®.   However, this describes reliance, which

is more difficult to establish than the causal nexus requirement of the CFA.

> Unlike other states that require plaintiff to prove reliance under their consumer protection
> statutes, the proof requirements that the New Jersey statute places on its claimants [are]
> less burdensome. "The causes of action differ, however, in that common law fraud
> requires proof of reliance while consumer fraud requires only proof of a causal nexus
> between the concealment of the material fact and the loss." Gennari v. Weichert Co.
> Realtors, 148 N.J. 582, 607-608 (1997). In Varacallo v. Massachusetts Mut. Life Ins. Co.,
> 332 N.J. Super. 31, 43 (App. Div. 2000), the court interpreted the decision in Gennari to
> hold that, ". . . reliance is not required in suits under the Consumer Fraud Act because
> liability results from 'misrepresentations whether 'any person has in fact been misled,
> deceived or damaged thereby'" (quoting N.J.S.A. 56:8-2). The "causal nexus" referred to
> in Gennari is one of proximate cause. Varacallo explains that: "Plaintiffs are required to
> prove only that defendant's conduct was a cause of damages. They need not prove that
> Mass Mutual's conduct was the sole cause of loss." Id. at 48.

Fink v. Ricoh, 365 N.J. Super. 520, 540-541 (LawDiv. 2003).

In its review of the class certification of third-party payors, the Appellate Division found

that it would not be necessary to prove that each individual plaintiff was induced to purchase

VIOXX® based on Merck's alleged fraud:  Int'l Union, supra, 384 N.J. Super. at 290.  Instead,

plaintiffs could satisfy the causal nexus requirement by showing that Merck's overarching

scheme of omissions and misrepresentations about VIOXX® allowed the company to achieve a

more favorable placement on the drug formularies, which are essentially lists of drugs that the

plan covers.  Id.

The same applies to the individual plaintiffs in this case.  At trial, plaintiffs introduced

evidence that Merck engaged in deceptive behavior to cover up what it knew to be the adverse

side effects of VIOXX® in order to convince physicians to prescribe the drug and to convince

the public as a whole that the drug was superior to other pain relievers on the market.  The causal

nexus requirement can be satisfied by a showing that the omissions and misrepresentations about

VIOXX® contributed to the universe of information that consumers and physicians had at their

disposal as they made decisions about which drug to take/prescribe for pain relief.  This

misinformation or omitted information tilted prescribers' and consumers' decisions in favor of

VIOXX® because they were led to believe that VIOXX® had increased gastrointestinal-

protective effect over other pain relievers *and* because they were not informed of the additional

cardiovascular risks of which, plaintiffs claim, Merck was aware.  More importantly here, the

plaintiffs testified they wouldn't have purchased VIOXX® if they knew of the actual risks.

At trial, the jury charge on the issue of causal nexus was as follows:

> The plaintiffs' claim is for what they paid for the purchase of VIOXX®.  They claim if
> the consumer fraud had not occurred they wouldn't have purchased VIOXX®.  In order
> to prove a causal nexus plaintiffs must prove that the consumer fraud had a causal effect
> on their physicians' decision to prescribe VIOXX® and on Mr. Cona's and Mr.
> McDarby's decision to purchase it, and they sustained an ascertainable loss.

There was sufficient evidence at trial to persuade a reasonable jury that Merck knowingly

concealed, suppressed or omitted material facts (namely, that VIOXX® had an elevated

27

cardiovascular risk over competing drugs) with the intent that consumers rely on the ads by purchasing VIOXX® instead of other pain relievers.  The court does not find, when all evidence supporting plaintiffs' position is accepted as true, that judgment should be in Merck's favor notwithstanding the jury's verdict.  Nor does the court does not find that this verdict clearly and convincingly constituted a miscarriage of justice requiring a new trial under R. 4:49-1(a).  See Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).  Therefore, Merck's motion for a judgment or for a new trial on the issue of plaintiffs' CFA claims is denied.

### III.  Remittitur of Compensatory Damages in the McDarby Case

Merck seeks a substantial remittitur of the compensatory damages awarded on the McDarbys' failure to warn claim.  The jury awarded $3 million dollars to Mr. McDarby for his pain, suffering, disability and loss of enjoyment of life as a result of his heart attack; Mrs. McDarby was awarded $1.5 million to compensate for the loss of society and services of her husband as a result of his heart attack.  Merck argues that this award is excessive and unsupported by the evidence presented at trial.

The object of a compensatory award is to make the plaintiff whole, compensating only for the tortious injury and resulting damages.  In this case, the jury found that Merck's conduct caused plaintiffs' pain and suffering.  These damages are by their nature difficult to quantify.  "Assigning a monetary value to pain-and-suffering compensation is difficult because that kind of harm is not gauged by any established graduated scale." Caldwell v. Haynes, 136 N.J. 422, 442 (1994) (internal citation omitted).

Courts face a corresponding challenge in reviewing the reasonableness of juries' pain-and-suffering verdicts and more importantly in Mr. McDarby's case, loss of quality of life.  It is not proper for the court to interject its own subjective view of the appropriate measure of damages.  The New Jersey Supreme Court has made clear that "[a] trial judge should not interfere with the quantum of

28

damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." Sweeney v. Pruyne, 67 N.J. 314, 315 (1975) (citing Taweel, et al v. Starn's Shoprite Supermarket, 58 N.J. 227, 236 (1971). The judge cannot validly intrude unless the verdict clearly and convincingly appears to constitute a miscarriage of justice under the law. Baxter v. Fairmont Food Co., 74 N.J. 588, 596 (1977) (citing R. 4:49-1(a)). Thus, the court is empowered to review to jury's verdict to ensure that it is fair and reasonable and, if necessary, to adjust the verdict to bring damages awarded by a jury to the level the court knows is within the limits of a proper verdict." See Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 491 (2001).

The evidence presented at trial included extensive testimony about the impacts on Mr. McDarby's health and quality of life that resulted from his heart attack. The heart attack caused damage to his heart, characterized as "severe" by Dr. DePace, and resulted in risk of future heart failure, stroke and other cardiovascular problems. Mr. McDarby also experienced a fall that testimony attributed to his heart attack. The plaintiff's expert's opinion was that he fell while having a heart attack and during the fall, he sustained a broken hip. Both the heart attack and hip injury required surgery and hospital stays and resulted in pain, postoperative ailments and difficulty in rehabilitation. Upon his return home after hospitalization, Mr. McDarby was unable to get up out of bed on his own, could not get out of a chair by himself, and required extensive care and assistance in many aspects of his life. Merck presented contrary evidence arguing that while the heart attack may have caused damage to Mr. McDarby's heart, it did not cause him to fall or lead to the other complications and quality-of-life consequences of the hip injury and therefore did not result in Mr. McDarby's confinement to a wheelchair and other significant limits on his mobility and quality of life. Based on the evidence presented by both sides, the jury

29