concluded that VIOXX® did proximately cause Mr. McDarby's heart attack, and apparently his fall and resulting injuries, and awarded compensation accordingly.

At trial, both Mr. and Mrs. McDarby presented testimony of a greatly diminished quality of life. The plaintiff appeared at trial in his wheelchair. His description and his wife's description of their life before and after the heart attack and fall presented a picture of a greatly diminished quality of life.

Merck urges that the excessiveness of the verdict "gives rise to a strong inference" that the jury intended the damage awards to punish, not merely to compensate. It is not readily apparent from the amount of the award or the evidence presented that this is what happened here. While this award may be generous, it does not rise to the level of a shock to this court's conscience. See, e.g., Baxter, supra, 74 N.J. at 603 (affirming Appellate Division decision that trial judge mistakenly exercised discretion in remitting a portion of the compensatory damage award where "[t]he award, although admittedly generous, was not so disproportionate to the injuries and resulting disabilities shown as to shock the conscience of this court"); Brodsky v. Grinnell Haulers, Inc., 362 N.J. Super. 256, 282-83 (App. Div. 2003) (affirming emotional distress wrongful death awards which "may appear generous" but were nonetheless justified by the evidence presented), aff'd in part and rev'd in part on other grounds, 181 N.J. 102 (2004); McRae v. St. Michael's Med. Ctr., 349 N.J. Super. 583, 601 (App. Div. 2002) (affirming jury award for pain and suffering that was generous but "not so disproportionate to the injury or resulting disability to constitute a miscarriage of justice").

The court does not find that the compensatory awards amount to the manifest injustice that would necessitate judicial adjustment of the jury's verdict.

**IV.  Federal  Preemption of Failure to Warn Claim and Punitive Damages Under New Jersey Products Liability Act Preemption**

In the matter at hand, Defendant Merck moves for a new trial on the grounds that Plaintiffs' claim for failure to warn and award of punitive damages should have been deemed preempted.

**A.  Federal Preemption of State Law**

According to Article VI of the United States Constitution, the Supremacy Clause, when there is an inconsistency between a federal law and a state law, the federal law preempts the state law.  Feldman v. Lederle Laboratories, 125 N.J. 117, 133 (1991).  This preemptive effect applies to federal statutes and regulations and does not distinguish between state statutory law and state common law.  Id.  However, the founding fathers were very concerned about preserving the rights of States to maintain their own laws except where Federal law was needed.

In the Federalist Papers No. 45, James Madison wrote:

"The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."

The Tenth Amendment directly addressed this concern of maintaining State powers.  It states:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The U.S. Supreme Court has held that preemption:

is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Absent explicit preemptive language, [the United States Supreme Court] has recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or

31

where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383, 120 L. Ed. 2d 73, 84 (1992) (quoted in Gonzalez v. Ideal Tile Importing Co., 184 N.J. 415, 419 (2005)). These categories are not "rigidly distinct" from one another and can often overlap. Gade, 505 U.S. at 103 n.2, 112 S.Ct. at 2386 n.2, 51 L.Ed.2d at 88; see R.F. v. Abbott Laboratories, 162 N.J. 596, 618-619 (2000).

Express preemption occurs when the explicit language of Congress states that the federal statute preempts state law. Gonzalez v. Ideal Tile Importing Co., 184 N.J. 415, 419 (2005) (citing Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S. Ct. 1305, 1309, 51 L. Ed. 2d 604, 613 (1977)).  Where express preemption exists the state law will be preempted.

When there is no express preemption, the court must then test for implied preemption. There are two forms of implied preemption: field preemption and conflict preemption.  Field preemption occurs "where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Gonzalez, supra, 184 N.J. at 420 (quoting Gade, supra, 505 U.S. at 98, 112 S. Ct. at 2383, 120 L. Ed. 2d at 84)).  Conflict preemption occurs "where 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Gonzalez, supra, 184 N.J. at 421 (quoting Gade, supra, 505 U.S. at 98, 112 S. Ct. at 2383, 120 L. Ed. 2d at 84)).

Further, it must be noted that the Supreme Court of the United States has held that there is a presumption against preemption. New York Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995) (stating that

32

"the historic police power of the States were not to be superseded by the Federal Acts unless that was the clear and manifest purpose of Congress."). The presumption against preemption:

> is rooted in the concept of federalism. It recognizes that when Congress legislates "in a field which the States have traditionally occupied . . . [,] we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. <u>The signal virtues of this presumption are its placement of the power of pre-emption squarely in the hands of Congress, which is far more suited than the Judiciary to strike the appropriate state/federal balance (particularly in areas of traditional state regulation), and its requirement that Congress speak clearly when exercising that power.</u> In this way, the structural safeguards inherent in the normal operation of the legislative process operate to defend state interests from undue infringement. In addition, the presumption serves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- *i.e.*, that state law is pre-empted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

Geier v. American Honda Motor Company, Inc., 529 U.S. 861, 907 (2000) (Stevens, J., dissenting) (emphasis added) (internal citations omitted).

In this matter, defendant asserts that both the failure to warn claim and the punitive damage awards were preempted by federal law. Each will be discussed individually below.

### B. Failure to Warn Claim

Defendant contends that Plaintiffs' failure to warn claims should be preempted. It is important to note that, failure to warn claims "have long been a part of traditional state tort law," and therefore, the traditional presumption against preemption adheres to this case. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255 (1984); see also Bates v. Dow Agrosciences L.L.C., 125 S.Ct. 1788, 1801 (2005) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'"); and Feldman, supra, 125 N.J. at 137 (finding that tort compensation, including failure to warn claims, "concern rights and remedies traditionally defined by state law.")

33

Federal regulation of prescription drugs is governed by the Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C.A. 301, et seq. Defendant contends that Congress has granted the FDA "pervasive and complete" control over the labeling of a pharmaceutical drug. Defendant's Motion for Judgment as to the Claims of Thomas Cona and John McDarby at 9 (quoting American Home Products Corp. v. Johnson & Johnson, 672 F. Supp. 135, 146 (S.D.N.Y. 1987)). Defendant asserts that the final approved label comes after the manufacturer supplies extensive preclinical and clinical data in support of its application and that the FDA oversees every step in the process and has the final word in regulating the contents of the labeling.

Further, defendant contends that manufacturers cannot deviate from a previously approved label without submitting an application supplement to the FDA that provides the basis for the change. Defendant also alleges that marketing a product with new labeling that has not been approved by the FDA violates provisions against marketing an unapproved drug, rendering the drug "misbranded" under 21 U.S.C.A. 352(f). Defendant contends that since changes to a label are governed by the FDCA and its accompanying regulations, a state law cause of action based upon the warnings would conflict with the federal law and, therefore, must be preempted.

Defendant also supports its argument by reference to the preamble of a Final Rule issued by the FDA. Specifically, Defendant points to a section concluding that "[i]f State authorities, including judges and juries applying state law were permitted to reach conclusions about the safety and effectiveness of information disseminated with respect to drugs for which FDA has already made a series of regulatory determinations based on its considerable institutional expertise and comprehensive statutory authority, the federal system for regulation of drugs would be disrupted." Preamble Final Rule, Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 17 Fed. Reg. 3922, 3969 (Jan. 24, 2006).

34

For the reasons expressed below, the court finds these arguments without merit.  In this matter, preemption must come though either field or conflict preemption, because Congress has not taken any step to explicitly preempt state law as to the labeling of prescription drugs. Therefore, this court must determine that either Congress intended to overtake the entire field of lawsuits stemming from the labeling of prescription drugs, something it has never said despite decades of state tort law dealing with prescription drugs, or that plaintiffs' claim "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as set out in the FDCA.  Gade, supra, 505 U.S. at 98, 112 S. Ct. at 2383, 120 L. Ed. 2d at 84.

The fact is that following the withdrawal of VIOXX® from the market, congressional hearings were held specifically to address the concerns of some members of Congress about the failure of the FDA to provide adequate drug safety protection to the public.  These hearings resulted in proposed changes in statutes governing the FDA itself, but no decision by Congress to preempt prescription drug tort law.

In fact, when the Class Action Fairness Act was passed by Congress, it was noted in the legislative history that it would not impact pending VIOXX® lawsuits.  See 151 Cong. Rec. H753 (daily ed. Feb. 17, 2005) (cited in Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1096 (10th Cir. 2005)).  Despite the large number of lawsuits filed, Congress has not moved to expressly preempt State law governing "failure to warn," but has instead placed its focus on changing laws governing the FDA.  Thus, the presumption against preemption in this type of case is strong.

As to Congress's intent not to call for preemption in the cases of prescription drugs, other courts have noted that the Medical Device Act of 1976 ("MDA") provides express preemption of state law by the FDA in the regulation of medical devices, but not in the regulation of

35

prescription drugs.  The Honorable Jerome Simandle in <u>McNellis v. Pfizer Inc.</u>, No. 05-1286,

2006 U.S. Dist. LEXIS 70844 (D.N.J. Dec. 29, 2005), said "[t]he express preemption language

of the MDA thus demonstrates that where Congress means to explicitly preempt the laws of

various states, it knows how to do so."

This is particularly true because of the recent spotlight on the FDA and state tort

litigation involving prescription drug labeling.  The court will address below the FDA's attempt

to create preemption where it does not exist without Congressional action or even appropriate

administrative law action.

As a final point on Congress' intent regarding preemption, the court notes the finding of

the Supreme Court of Vermont in <u>Levine v. Wyeth</u>, 2006 <u>VT</u> 107 (2006), when it stated:

> ¶ 26.  In fact, Congress has expressed its purposes clearly, not only in the general
> sense that the statute was intended to 'protect the public,' but also more
> specifically, with respect to the FDCA's preemptive effect.  In the 1962
> amendments to the FDCA, Congress included a clause expressly limiting the
> preemptive effect of the statute:  'Nothing in the amendments made by this Act to
> the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any
> provision of State law . . . unless there is a direct and positive conflict between
> such amendments and such provision of State law."  Drug Amendments of 1962
> (Harris Kefauver Act), Pub. L. No. 87 781, ¶ 202, 76 Stat. 780, 793 (1962).

> ¶ 27.  This amendment essentially removes from our consideration the question of
> whether common-law tort claims present an obstacle to the purposes and
> objectives of Congress.

The FDA has been granted the power by Congress to determine the content of labels on

prescription pharmaceuticals.  The process for approval of a prescription drug begins with the

manufacturer filing a New Drug Application (NDA).  Regulations promulgated by the FDA

control the various aspects of the application process including the general format and content

for the labels to be provided with each prescription drug.  If the FDA determines that a change in

the manufacturer's proposed labeling is necessary, final approval of the NDA will be

"conditioned upon the applicant incorporating the specified labeling changes exactly as directed, and upon the applicant submitting to FDA a copy of the final printed label prior to marketing." 21 C.F.R. § 314.105(b).

Once the NDA has been approved, a manufacturer generally must provide a Supplemental NDA to the FDA in order to request labeling changes. There are, however, exceptions to this rule. The controlling statute, 21 C.F.R. 314.70(c)(6), provides in part that:

> (6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved application may commence distribution of the drug product involved upon receipt by the agency of a supplement for the change. These changes include, but are not limited to:
>
> . . .
>
> (iii) Changes in the labeling to accomplish any of the following:
>
> (A) To add or strengthen a contraindication, warning, precaution, or adverse reaction;

Federal law provides a way for a prescription drug manufacturer to alter the label without prior FDA approval. See 21 C.F.R. 314.70(c)(6)(iii). These regulations specifically allow for the manufacturer to provide additional warnings to the original label "to add or strengthen a warning." Further, the regulations do not require that the FDA act upon the changed warning. After the manufacturer changes the warning, the FDA can choose to do nothing and allow the warning to stay as modified, notify the manufacturer it doesn't agree with the label change in which case the manufacturer would likely comply, or the FDA could theoretically go to court to have the drug be found to be "misbranded." "The FDA's approved label . . . can therefore be said to set the minimum labeling requirement, and not necessarily the ultimate label where a

37

manufacturer improves the label to promote greater safety." <u>McNellis</u>, <u>supra</u>, 2005 WL

3752269, at *5.

Defendant pharmaceutical companies have repeatedly argued to courts that if they

changed their warning labels and made them stronger without prior permission by the FDA, they

risk having their product being labeled "misbranded." Merck asserts that argument here. Courts

have repeatedly rejected this argument as having no credibility. The idea that the FDA would

drag a manufacturer into Federal Court and accuse it of "misbranding" its product when it has

given the public a new or strengthened warning about what is considers a serious risk of their

drug simply has not happened and is unlikely to ever happen except in fantasy land. In

<u>McNellis</u>, <u>supra</u>, Judge Simandle refers to the testimony of an ex-Deputy Director of the FDA

that he was not aware of any case where the FDA brought an action "for misbranding" because

of a stricter warning and states this is consistent with Judge Rosenbaum's opinion in <u>Witczak v.</u>

<u>Pfizer, Inc.</u>, 377 <u>F. Supp.2d</u> 726, 729 (D. Minn. 2005), where the Court said:

> The FDA's regulations do grant it the power to later disapprove a label
> strengthened pursuant to §314.70. 21 C.F.R. § 314.7(c)(7). But the regulation
> 'does not require that FDA take any action when a manufacturer' makes a change
> pursuant to [ §314.70(c) ]; if the FDA Fed. Reg. 59290 (Nov. 25, 1991). Further,
> even if exercised, the power to disapprove does not label a violation of any law.
> Rather, if the FDA exercises its power to disapprove, the manufacturer simply
> stops distributing the new label. 21 C.F.R. §314.70(c)(7)

This Court cannot accept the assertions in any amicus curiae briefs filed by the FDA in

other cases indicating that any label change is a violation of the FDCA's provisions when the

regulations specifically allow for unilateral changes.

Further, the FDA's recent assertion in the Preamble to a final rule that its regulations

must preempt state law is not persuasive to this court. In the present motion, through reference

38

to its previous Motion for Judgment, Defendant points to a part of the "Supplementary

Information" section providing that

> If State authorities, including judges and juries applying State law, were permitted
> to reach conclusions about the safety and effectiveness information disseminated
> with respect to drugs for which FDA has already made a series of regulatory
> determinations based on its considerable institutional expertise and
> comprehensive statutory authority, the federal system for regulation of drugs
> would be disrupted.

Ordinarily, deference is due to an agency's interpretation; however, where a statute is not silent

or ambiguous with respect to the specific issue to the issue under consideration, "the court, as

well as the agency, must give effect to the unambiguously expressed intent of Congress."

Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 842-43 (1984).

Here, Congress has provided clear and unambiguous evidence that it intended to allow

state common law claims to remain viable along with the FDCA.  In an amendment to the FDCA

promulgated in 1962, Congress stated that "[n]othing in the amendments made by this Act to the

Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State

law . . . unless there is a direct and positive conflict between such amendments and such

provision of State law."  Drug Amendments of 1962, Pub. L. No. 87 871, ¶ 202, 76 Stat. 780,

793 (1962).  This language shows that "Congress intended that the FDCA would leave state law

in place except where it created a 'direct and positive conflict' between state and federal law . . .

In other words, under any circumstances where it is possible to comply with both state law and

the FDCA, the state law in question is consistent with the purposes and objectives of Congress."

Levine v. Wyeth, 2006 VT 107, at ¶ 27 (VT 2006).[11]

---

[11] The Vermont Supreme Court rendered its decision on October 27, 2006 and it has not yet been produced in its
final form for the Vermont Reporter.  The current form can be found at
*http://dol.state.vt.us/gopher_root3/supct/current/2004-384.op.*

The FDA in the early 2006 preamble to a rule change almost viciously attacks state courts as undermining its authority. The fact that tort lawsuits proceed in Federal courts which recognize and apply state law where applicable is ignored. U.S. District Court Judge Bataillon points out in his opinion in Jackson v. Pfizer Inc., 432 F. Supp. 2d 964 (D. Neb. 2006), addressing the FDA preamble, the FDA claim of preemption is not persuasive. First, it was not even adopted under appropriate administrative law policies. There were no hearings, no public input, just a bureaucratic fiat. As Judge Bataillon points out in a footnote to his decision in Jackson v. Pfizer Inc., supra:

> The FDA failed to comply with its requirements to communicate with the states and to allow the states an opportunity to participate in the proceedings prior to a preemption decision. Executive Order 13132, Section 4(c) (regulatory preemption must be kept to a minimum level). 4(d) (agency shall consult to extent practicable with the state and local officials to avoid the conflict). 4(e)(if agency acts through adjudication or rulemaking to preempt the law of the state, it shall provide state and local officials with notice and an opportunity to participate)."

432 F. Supp. 2d at 968 n.3.

The FDA, while under great pressure and while under attack from some of the leading scientific medical journals and from its own scientists, has attempted to make a statement in a preamble to a rule that fundamentally changes the delicate balance between state and federal law without input from Congress, the states or the public.

Since the federal statute and the FDA regulations allow the manufacturer to unilaterally strengthen a warning when necessary, there is no conflict between the state common law and the federal requirements. Since the manufacturer can comply with both the federal law and New Jersey law, the failure to warn claim is consistent with the purposes and objectives of Congress and, therefore, is not preempted.

40

### C. Punitive Damages Under New Jersey Law

The purpose of punitive damages is to deter egregious conduct and to punish the offender. Lockley v. Dep't of Corr., 177 N.J. 413, 427 (2003). Originally, punitive damages for products liability claims were provided for under the PLA, N.J.S.A. 2A:58C-5, however in 1995 most of this statute was repealed and replaced with the Punitive Damages Act. The New Jersey Punitive Damages Act ("NJPDA"), N.J.S.A. 2A:15-5.9, et seq., codifies New Jersey law for punitive damages. Specifically it provides in part:

> a. Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

> b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
> (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
> (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
> (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
> (4) The duration of the conduct or any concealment of it by the defendant.

N.J.S.A. 2A:15-5.2

The portion of N.J.S.A. 2A:58C-5 that was not repealed by the NJPDA is at issue here because it provides limitations on punitive damages for manufacturers of products approved by the FDA. It provides:

> Punitive damages shall not be awarded if a drug or device or food or food additive which caused the claimant's harm was subject to premarket approval or licensure by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. 301 et seq. or the "Public Health Service Act," 58 Stat. 682, 42 U.S.C. § 201 et seq. and was approved or licensed; or is generally recognized as safe and effective pursuant

41

> to conditions established by the federal Food and Drug Administration and applicable regulations, including packaging and labeling regulations. **However, where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question, punitive damages may be awarded.** For purposes of this subsection, the terms "drug," "device," "food," and "food additive" have the meanings defined in the "Federal Food, Drug, and Cosmetic Act." (emphasis added).

This statute is a defense to the general rule that allows for punitive damages in products liability cases provided that the requisite conduct has been established. Within this defense, there is an exception "for situations where the manufacturer knowingly withheld or misrepresented material information required to be submitted under FDA regulation, if that information was material and relevant to the particular harm on which the claim is based." William A. Drier, Eric D. Katz & Hannah H. Goldman, New Jersey Products Liability & Toxic Torts Law (Gann, 2001).

Merck contends that N.J.S.A. 2A:58C-5(c) is impliedly preempted by federal law based upon the United States Supreme Court decision in Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2001). Buckman involved a plaintiff who sued a consulting company that assisted a manufacturer in getting FDA approval of the medical device. The plaintiff alleged that but for the defendant's fraudulent representations to the FDA; the product would not have been on the market and injuries would not have been sustained. Id. at 344.

The screws at issue were governed by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 52 Stat. 1040, as amended by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 301. The Court went into significant detail in reviewing the regulations the FDA had in place that medical devices, including the screws, were subjected to.[12] Buckman, supra, 531 U.S. at 344-345.

---

[12] The Buckman facts involved a medical device under an explicit preemption clause, 21 U.S.C. § 360k, that provides in relevant part:

42

Addressing the issue of the presumption against preemption, the Court in Buckman noted that the States have not traditionally occupied the field of "[p]olicing fraud against federal agencies." Id. at 347. It stated "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." Id. Consequently, the Court found that the presumption against preemption did not apply to that case. Id. at 348. The key factor is this case did not involve product liability tort law as developed by states. Instead it dealt with only a claim of fraud on the agency itself, not a traditional product liability claim against a manufacturer.

The Court discusses the federal statutory scheme that allows the FDA to punish and deter fraud against the Administration. Id. at 348-49. The Court ultimately held that the plaintiffs' fraud-on-the-FDA claims were impliedly preempted by the FDCA. Id. at 348. This conclusion was reached because the Court had determined that "State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." Id. at 350. The Court also discussed several policy reasons why allowing state fraud-on-the-FDA claims would conflict with federal regulations. Id. at 350-51. This very distinct and distinguishable short decision cannot be read as changing decades of prior law on product liability claims.

---

(a) General rule. Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement--
   (1) which is different from, or in addition to, any requirement applicable under this Act to the device, and
   (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

The statute does not apply to prescription drugs.

The United States Supreme Court has previously held that state claims for punitive damages were allowed for exposure-related injuries that had occurred even at a Federally regulated nuclear power plant. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 258 (1984). In Silkwood, the Court found that the plant, which was heavily regulated by the National Regulatory Commission ("NRC") could be held liable for punitive damages because there was no evidence that the federal regulations were intended to eliminate claims for punitive damages, whether through state claims or otherwise. Id. at 255-256. Similarly, in Medtronic, Inc. v. Lohr, the Court had to determine whether a provision of the MDA preempted state law claims that the plaintiff brought for injuries allegedly sustained as a result of a defective pace-maker. 518 U.S. 470, 474 (1996). The Court determined that the MDA did not expressly or impliedly preempt state common law claims for design defect and failure to warn. Id. at 503 (finding that the pre-emptive language of 21 U.S.C. § 360k did not apply to traditional common law claims).

The Buckman Court, distinguished its holding from Silkwood because Silkwood, "was not based on any sort of fraud-on-the-agency theory, but on traditional state tort law principles of the duty of care owed by the producer of plutonium fuel pins to an employee working in its plant." Buckman, supra, 531 U.S. at 352. Additionally, Buckman noted that Silkwood was decided because there was statutory evidence that Congress did not intend to exclusively enforce the industry pertaining to atomic energy. Ibid.

The Buckman Court also distinguished its holding from Medtronic. The Court stated that "it is clear that the Medtronic claims arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the FDCA requirements...In [Buckman], however, the fraud claims exist solely by virtue of the FDCA disclosure requirements." Buckman, supra, 531 U.S. at 352-353.

44

Ultimately, the Buckman Court found that the FDCA as amended by the MDA impliedly preempted the plaintiff's claims. The express preemption provision of the MDA was not the basis of the decision; however, the Court indicated that the extensive regulations for medical devices *coupled with* the preemption provision of the MDA indicated sufficient intent of Congress to preempt fraud on the FDA claims. Ibid.

In the matter at hand, there is no express preemption provision in the FDCA pertaining to prescription drugs that would correspond with the provision in the MDA and more importantly, the claims in this case "have long been a part of traditional state tort law" and, therefore, the traditional presumption against preemption adheres to this case. Silkwood, supra, 464 U.S. at 255; see also Bates v. Dow Agrosciences L.L.C., 125 S.Ct. 1788, 1801 (2005) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'"); and Feldman, supra, 125 N.J. at 137 (1991) (finding that tort compensation, including failure to warn claims, "concern rights and remedies traditionally defined by state law.") Thus, this court's analysis that the PLA is not preempted by federal law does not conflict with the Buckman decision.

Here, the manufacturer of VIOXX® has been accused of violating certain provisions of the NJPLA and the NJCFA. While these allegations include that the FDA may have been deceived by Merck, they involve traditional state tort law and common law punitive damages. The principles at issue in this matter are more fundamentally directed to "traditional state tort law principles of the duty of care" than were present in Buckman. Id. at 352.

Defendant argues that N.J.S.A. 2A:58C-5 is difficult to resolve with the preemption concerns expressed in Buckman because it specifically requires a showing that the drug manufacturer knowingly withheld or misrepresented information required to be submitted to the

45

FDA. Such language makes a proof of a misrepresentation on the FDA an essential element of the claim. This court recognizes the nearly identical statutory language was found to be preempted in the cases of Garcia and Kobar, supra, relied upon by Merck here, because of Buckman. The Garcia court concluded that such language converted the claims into fraud on the FDA claims. See Garcia, supra, 385 F.3d at 965-66. The Kobar court found that based upon the regulatory scheme and policy rationales set forth in Buckman, that the punitive damages statute of Arizona was preempted.

Neither Garcia nor Kobar addressed the issue of the presumption of preemption. Additionally neither of those cases addressed the fact that the MDA contained an express preemption provision that indicated an intent of Congress to preempt such claims that is absent for cases involving prescription drugs. These two decisions do not recognize the nature of the claim in Buckman which did not involve a product liability state tort action. Taking these issues into account clearly indicates that a different outcome is appropriate. To find preemption, despite the fact that there is no express preemption provision in the FDCA for prescription drugs when Congress specifically included one as an amendment within the MDA and further when taking into consideration the presumption against preemption, would be inappropriate. Further, to give so broad an interpretation to the decision in Buckman would far exceed the scope of the Supremacy Clause.

To be certain there are strong policy reasons for having regulation of particular industries consolidated under one agency. These agencies also need the freedom and authority to enforce there designated charges. However, there are also strong policy reasons for maintaining distinctly separate causes of tort actions under state and federal law. These fundamentally strong policy reasons have given rise to the well established presumption against preemption. Unless

46

there is a "clear and manifest" intention of Congress to preempt, the state law should stand. See Rice v. Santa Fe Elevator Corp., 331 U.S. at 230.

This court does not believe that the Buckman Court intended to have such a sweeping effect in its ruling from that case. This finding is supported by the language in Buckman where the holding is distinguished from the Silkwood decision because Silkwood was decided not "on any sort of fraud-on-the-agency theory, but on traditional state tort law principles ..." Buckman, supra, 531 U.S. at 352. This finding is also supported by other courts where preemption of traditional state tort law principles was at issue. See Caraker v. Sandoz Pharmaceuticals Corp., 172 F. Supp.2d 1018, 1032 (S.D. Ill. 2001) (finding that when the presumption against preemption is applied, the finding in Buckman did not justify granting defendant's motion for summary judgment and the plaintiff's state claims for failure to warn were not preempted by federal law); Dawson v. Ciba-Geigy Corp., 145 F.Supp.2d 565, 572-573 (finding that Buckman did not preempt the plaintiff's state law tort claims). Thus, even though N.J.S.A. 2A:58C-5 may make misrepresentation to the FDA an essential element of establishing a punitive damages claim, it is distinct from the claim brought in Buckman. It is a claim belonging traditionally to the state's inherent police power. Merck has made no showing of Congressional intent here.[13]

The court further notes that if the New Jersey statute that requires misrepresentation to the FDA before punitive damages are allowed is preempted, that may not necessarily preempt a punitive damage claim. The New Jersey statute actually provides a defense to Merck and is designed to provide protection to the pharmaceutical industry in New Jersey that is not offered in

---

[13] Indeed, the court in Caraker, supra, noted "[i]n fact, there is evidence that the FDA has seen the utility of state products liability claims despite their approval of the prescription drug in question." Caraker, supra, 172 F.Supp. 2d at 1036 (citing 59 Fed.Reg. 3944, 3948 (1994) (codified at 21 C.F.R. § 20.63(f) ("FDA recognizes the sophistication and complexity of private tort litigation in the United States and the proposed preemption action is not intended to frustrate or impede tort litigation in this area. Indeed, FDA recognizes that product liability plays an important role in consumer protection."))

most other states or to other industries.  If N.J.S.A. 2A:58c-5 was found to be preempted by Buckman, then this would eliminate a safeguard that limits punitive damages.  There would then be a question of whether a claim for punitive damages under N.J.S.A. 2A:15-5.12 would be appropriate.  Since the court finds no preemption, the decision as to what the effect would be of a finding of preemption does not need to be made at this time.

For all of the foregoing reasons neither the failure to warn nor punitive damages provisions of the NJPLA are preempted by federal law.

## V.  Heeding Presumption

Merck contends that the Court's decision to direct a verdict for plaintiffs on the warning causation issue due to the heeding presumption was in error because an issue of fact had been created for the jury to consider.

In Coffman v. Keane Corp., the New Jersey Supreme Court determined that a "heeding presumption" should be applied in products liability cases.  The heeding presumption, as applied by the New Jersey Supreme Court, is a presumption that the plaintiff would have "heeded" or followed a warning had the defendant provided one.  133 N.J. 581, 595 (1993).  The case of a prescription drug, while still falling under the heeding presumption, is slightly different from the ordinary case however.  In New Jersey, the learned intermediary doctrine has been adopted in conjunction with prescription drug cases.  This doctrine recognizes that a "warning to the medical profession is in such cases the only effective means by which a warning could help the patient."  Baccardi v. Holzman, 182 N.J. Super. 422, 425 (App. Div. 1981).  Specifically, in a pharmaceutical product liability case, "[a] heeding presumption will serve to shift to [the drug manufacturer] the burden of going forward with evidence on the issue of whether a physician armed with appropriate risk information concerning the possibility of" the risk asserted by the

48

plaintiff would still have prescribed the drug.  Brigman v. Wyeth, Inc. (In re Diet Drug Litig.), 384 N.J. Super. 525 (Law Div. 2005).

Even though the physician is given the power to choose whether or not to prescribe the particular drug to the patient, the decision to take the drug ultimately rests with the patient.  See In re: Diet Drug Litig., 384 N.J. Super. at 538.  The prescription drug manufacturer must provide sufficient information to the prescribing physician of the risks so that he or she can convey to the patient the risks and benefits before making a decision regarding whether to take the medication.[14]  Id.

It is important to note that the heeding presumption is not absolute.  If the defendant provides adequate evidence to show that the physician would have prescribed the drug notwithstanding the warning, the presumption will vanish and the plaintiff will bear the ultimate burden on the proximate cause issue.  Id. (citing Sharpe v. Bestop, Inc., 314 N.J. Super. 54, 68-69, 713 A.2d 1079 (App.Div.1998), aff'd o.b., 158 N.J. 329, 730 A.2d 285 (1999)).  In Sharpe v. Bestop, Inc. the court noted that there are generally two types of rebuttal evidence: 1) knowledge of the risk that the absent or defective warning was supposed to address and 2) plaintiff's indifference to safety warnings.  314 N.J. Super. 54, 74 (App. Div. 1998).  With regard to indifference to warnings, the defendant must demonstrate a level of non-observance sufficient to show that plaintiff is the type of person to ignore warnings.  Id. at 75.

In the current motion, Merck argues that an issue of fact was created for the jury to consider and, therefore, that adequate evidence was provided to rebut the heeding presumption.  This court disagrees.  Merck first alleges that at trial it created an issue of fact for the jury to

---

[14] The court in In re: Diet Drug Litig., stated that "[w]hile the law leaves the health care provider free to decline to prescribe the pharmaceutical product, the doctrine of informed consent requires the patient to determine whether he or she wishes to take the drug product in the first place. [The drug manufacturer's] desire to leave the prescribing decision solely in the hands of the learned intermediary runs afoul of New Jersey's public policy."

consider by presenting evidence that plaintiff McDarby's doctor, Dr. Braun, continued to prescribe VIOXX® even though his "diabetes rendered him the medical equivalent of a patient with ischemic heart disease." The jury clearly found the precaution about "ischemic heart disease" was not an adequate warning.

There was never a warning on the label to warn the doctor about prescribing the drug to a diabetic patient due to an increased risk of heart attack. If Merck knew of the dangers of prescribing VIOXX® to diabetic patients, then it had the opportunity to and should have provided a warning specifically tailored to notify both doctors and patients of the risk. Here, the jury found this warning was inadequate. The plaintiff was not alleged, even by the defense, to have had ischemic heart disease and there was no warning regarding heart attacks in diabetic patients. Further, the package insert that was allegedly not provided to plaintiff by Dr. Braun also did not indicate the potential risk to diabetic users. Therefore, even if provided with the package insert, the plaintiff would still not have been in any position to realize the harm that taking VIOXX® as a diabetic person could have caused. Clearly since the jury found the second label was not adequate up to the time of Mr. McDarby's heart attack, his physician had no ability to heed an adequate warning.

Defendant also asserts that an issue of fact was created because evidence showed that plaintiff is the type of person to ignore warnings and, therefore, even if a warning was provided, that plaintiff would have disregarded it anyway. In support of this assertion, defendant points out that plaintiff missed some scheduled follow-up visits and had an early history of smoking. The Court is not persuaded that this was adequate evidence to indicate that plaintiff is the type of person to ignore warnings and take risks. Defendant cites Theer v. Philip Carey Co., in support of its assertion the plaintiff's cigarette smoking is probative of whether he would heed warnings.

50

This case is easily distinguishable from the present matter.  In <u>Theer</u>, the plaintiff was exposed to asbestos as an asbestos mixer and asbestos insulator for almost 29 years.  <u>Theer v. Philip Carey Co.</u>, 133 N.J. 610, 615 (N.J. 1993).  Only after being diagnosed with asbestosis and asbestosis related pulmonary disease did the plaintiff quit smoking cigarettes.  <u>Id</u>.  He had been smoking cigarettes for nearly the entire time he was working with asbestos.  <u>Id</u>.  Here, plaintiff quit smoking cigarettes twenty years before the trial.  He was first prescribed VIOXX® in 2000, approximately 14 years after he had quit smoking cigarettes.  There was no evidence of what warnings existed when he started or stopped smoking.  Smoking cigarettes 14 years before taking VIOXX® is far too removed to link plaintiffs actions in the year 2000 to be a chain of disregarded warnings by the plaintiff or to render him the type of person that would ignore warnings.  In fact, the evidence he chose to quit smoking and did not resume it could be evidence of heeding risks in the past.

In this matter, defendant did not provide evidence indicating that Dr. Braun was given a precaution not to prescribe VIOXX® to diabetic patients.  Further, there was no evidence produced showing that had a warning specific to diabetic patients been provided that Dr. Braun would have ignored the warning and prescribed the drug to plaintiff anyway.  No evidence was provided to indicate that if the warning was given, that plaintiff would have ignored it.

For these reasons, the Court finds that the heeding presumption was not overcome and therefore a directed verdict on that issue was appropriate.

## VI.  Merck's Challenges to Instructions and Evidentiary Rulings

### A. The Jury Charge

Merck's brief suggests that the jury charge given by the court committed the same error identified by the Supreme Court in <u>Feldman v. Lederle Laboratories</u>, 257 <u>N.J. Super.</u> 163 (App.

51

Div. 1992) ["Feldman II"].  To the extent that Merck's reference suggests that the court's jury

instruction in this case, as in Feldman, essentially directed a verdict on the questions of whether

Merck owed or breached a duty to warn, the court completely disagrees.

The Feldman cases considered whether Lederle conveyed adequate warnings of the

tooth-discoloration caused by its tetracycline drug Declomycin.  The jury charge with respect to

the relevance of the FDA regulations in Feldman stated:

> Now for legal reasons, with which you need not concern yourselves, this Court has ruled
> that defendant, Lederle Laboratories, was not required to obtain the prior approval of the
> Federal Food and Drug Administration before issuing a warning concerning the side
> effect of tooth discoloration in Declomycin between 1960 and 1963.  The Federal Food
> and Drug Administration regulations and requirements are minimal standards and **the
> defendant still owes a duty to warn its users in the exercise of reasonable care.**
> However, the exchange of correspondence and other communications between the
> Federal Food and Drug Administration and the defendant, Lederle Laboratories, have
> been admitted into evidence and may be considered by you on the issue of the
> reasonableness of defendant's conduct.

Feldman, supra, 257 N.J. Super. at 167-68 (emphasis added).

The Supreme Court found that this instruction left no room for a finding that there was no

duty to warn during the time period *before* Lederle arguably knew about the risk of tooth

discoloration from its product.  Feldman v. Lederle Laboratories, 132 N.J. 339, 347 (1993)

["Feldman III"].  The time frame issues were critical to the Feldman analysis and do not apply to

this case.  The Supreme Court explained the duty and breach analysis in a failure to warn case:

"the manufacturer's duty on learning of [a drug's] dangerous side effects was to warn 'as soon as

reasonably feasible,' and once knowledge of the danger is imputed to the manufacturer, the focus

is on the reasonableness of the defendant's conduct just as in an ordinary negligence case." Id.

The trial court's instruction in Feldman directed the jury that the drug maker had a duty

to warn instead of allowing the jury to make the factual determination of when the drug maker

acquired the knowledge that gave rise to its duty to warn.  Id.  The effect was that the jury did

52

not first have to determine that the drug maker knew of the risk; the court instructed the jury to

bypass this prerequisite determination and proceed to assess the reasonableness of the drug

maker's conduct. Id. Since the court left no room for a jury determination that the drug maker

did not know of the risk at the time in question, and since the drug maker did not take any action

(because, as it claimed, it did not yet know of the risk), the jury could not reasonably have

concluded that Lederle's conduct was reasonable. Id. Therefore, the only possible jury decision

was that the drug maker breached its duty to warn. Id.

The jury charge in this case did not contain the same error. The jury was charged as

follows:

> Under the Product Liability Act of New Jersey which sets forth the law for "failure to
> warn" claims, there is a provision that states that in the case of a claim for "failure to
> warn" involving a prescription drug that there is a rebuttable presumption that a label
> approved by the FDA is adequate.

> Therefore, we start with the presumption that if the FDA approved a drug label, then the
> warnings on the label are adequate.

> However, if plaintiffs produce substantial evidence that the approved label is not an
> adequate warning, then the presumption can be overcome.  If the plaintiffs produce such
> evidence, then you, the jury, must weigh all the evidence produced by both the plaintiffs
> and the defendant on the issue of the adequacy of the warning and decide if plaintiffs
> have met its burden of proving that Merck failed to provide an adequate warning to
> physicians.

> This presumption applies only to the label and only where the FDA has approved the
> label as adequate.  However, if you find that plaintiffs have proven by a preponderance of
> the evidence that after a label was approved there was new information that changed the
> known or knowable cardiovascular risks of VIOXX® then under FDA regulations,
> Merck had a duty to warn physicians of any newly discovered risks of the drug.

> The FDA requires a drug manufacturer to warn the medical community as soon as there
> is reasonable evidence of an association of a serious hazard with a drug.

> There need not be proof of causation, only association in other words, if there is
> reasonable evidence of association between taking the drug and certain harm occurring
> without proof of exactly how the drug causes the harm, the FDA still requires warning be
> given to the physicians of the risk.

Merck could, if it chooses to without prior FDA approval, send letters to physicians, take out ads, publish in journals, or send out sales representatives in order to advise physicians of newly known risks of VIOXX®. There is a procedure under the regulations where a manufacturer of a drug like Merck can change their label to add risk information and submit it to the FDA for approval within 30 days. If the FDA doesn't object to the change in that time, the new warning can be used.

The FDA will not allow this procedure to be used for claims for a new use of the drug or to claim a new safety benefit. Therefore, Merck could not, for example, amend the VIOXX® label with claims of gastrointestinal safety or that VIOXX® dosage could be increased or it could be used for new purposes or a new patient population without a formal FDA approval process.

**It is up to you to decide what Merck knew or should have known about whether there were potential cardiovascular risks of VIOXX® based upon reasonable evidence and when. It is up to you to then determine whether in light of all the information that Merck knew or should have known it acted reasonably and adequately warned physicians of any serious cardiovascular risks that they should have been warned about based on all the facts you find to be true in the time period where they could have gotten the information to the prescribing physician before the plaintiffs' heart attacks.**

The court stands by this charge as an accurate reflection of the law. It does not direct the jury to find that Merck had a duty to add a warning; instead, it explicitly states that the jury is to decide what Merck knew or should have known about potential cardiovascular risks of VIOXX® and then to determine whether Merck acted reasonably on that knowledge. This effectively instructs the jury that the duty to warn would arise based on Merck's knowledge of risk. If it found that Merck owed a duty to warn, the jury was instructed to decide whether, in light of what Merck knew or should have known, Merck acted reasonably in trying to warn physicians of known cardiovascular risks at the time it learned of the risks. This is just the type of "if . . . then" analysis that was missing from the Feldman charge.[15]

---

[15] In its decision, the Appellate Division focused on the court's interpretation of the FDA's regulations. Merck has argued that this focus indicates that the Appellate Division's decision effectively precludes the court from instructing the jury on its interpretation of the FDA regulations. Bench Brief of Merck & Co., Inc., ("Merck") on the Role of FDA Regulations at Trial, Doherty v. Merck, Docket # ATL-L-638-05-MT (June 25, 2006). However, if the jury is properly instructed, as it was here, that the existence of a duty depends on when the duty to warn of

54

### B. Statements by the Court During Testimony of Merck Witnesses

At certain points during the trial, witnesses testified to an understanding of Merck's obligations under the FDA regulations that differed from the court's instruction to the jury regarding governing law. In effect, these witnesses were testifying that Merck did not, under FDA regulations, have an obligation to change or add warnings to the VIOXX® label prior to receiving FDA approval to do so.[16] This was a direct violation of the court's pretrial ruling that this was a misstatement of the law and that Merck's witnesses should not testify contrary to the statute and FDA regulations. On those occasions where the court's order was violated the court did explain to the jury that those statements contradicted the law, as the court had repeatedly warned Merck it would. Merck maintains that this was error by the court. If the defendants did not violate the court's order, no statements would have been necessary.

During plaintiffs' examination of David Anstice, Mr. Anstice indicated that he did not think Merck was allowed to make changes to the label prior to the FDA's approval of a Supplemental New Drug Application.[17] Therefore, in order to eliminate jury confusion on that point, the court interjected as follows:

> THE COURT: ... Ladies and gentlemen, I want to make two points clear. It is up to you to make decisions on the facts, and you alone decide the facts, but I decide what the law is, and I tell you what the law is at the end of the case. And sometimes I may tell what you the law is during the case just so you're not confused.
>
> I just wanted to advise you that the law under the FDA regulations does allow a company to change their warnings or to warn consumers and physicians about the dangers of a

newly-discovered risks arises, neither this court's nor the Feldman trial court's jury instruction precludes consideration of whether the attempts to comply with FDA regulations constituted reasonable care under the circumstances. This is consistent with the statement of the Supreme Court in Feldman III, that "even though we held in Feldman II . . . that as a matter of law nothing in the federal statutes and regulations prevented Lederle from placing a warning on Declomycin while awaiting FDA approval in 1962 and 1963, Lederle's attempt to comply with existing FDA regulations still bears on the reasonableness of its conduct." Feldman III, supra, 132 N.J. at 347.

[16] Prior to trial, the court granted an order precluding Merck from arguing to the jury or presenting evidence that there could be no change to the warning on a drug's label prior to FDA approval.

[17] In fact, the court had admonished Mr. Anstice at the previous Humeston Vioxx trial that this testimony was not appropriate.

drug that they find after there's been a label approved.  In other words, if there's a label approved they then find additional information about warnings they're allowed to make those changes through a special procedure without prior FDA approval.  There is a procedure in place for them to do that.

. . .

And the testimony of the witness concerning the fact that sales reps can't say anything that's not consistent with the label, the law would not allow them to say anything that was inconsistent with the label to the effect that a product worked better than the label says or works better than another drug, if that's not been approved for the label, but, again, Merck is allowed to represent to people , to physicians and to consumers safety information if they feel that there's a problem with the product.

Mar. 7, 2006 Tr. at 436:25-437:10.

This was an accurate statement of the law, properly given to the jury.  Later during the

testimony of Dr. Reicin, another Merck witness, another instruction was given:

THE COURT: The law is clear, and the FDA, in fact, uses – and I'll give you the exact language, but a warning should be provided as soon as there's reasonable evidence of an association.  The causal relationship need not be proven or established, and a drug company does have the right to change their label, and, in fact, are required to change their label as soon as there's reasonable evidence of an association of their drug to a risk.

Mar 27, 2006 Tr. at 3192:20-3193:3.

Again, this was a clear, accurate statement of the law.

The purpose of these clarifying instructions was to advise the jury that regardless of what

Merck's employees thought about their obligations under the FDA regulations, the law required

an adequate warning be given "as soon as reasonably feasible" upon acquiring actual or

constructive knowledge of a danger.[18]  Feldman v. Lederle Laboratories, 97 N.J. 429, 456 (1984)

("Feldman I").  Merck maintains that these instructions had the effect of precluding it from

explaining why its conduct under the circumstances was reasonable.  This is not so.  The

---

[18] As previously discussed, the New Jersey Supreme Court has agreed with numerous other courts that the FDA regulations do not preempt state tort claims for failure to warn of risks associated with pharmaceuticals regulated by the FDA.  See discussion, supra, Section IV (discussing preemption).

56

instruction sought to prevent the jury from being confused by witnesses' and defense counsel's statements that were contrary to the law. The instructions did not prevent witnesses from explaining why Merck took the steps it took upon the revelation of risk information in VIGOR and other clinical studies. Merck was not allowed to use as a defense that it could not warn or that the FDA would not let them warn when FDA regulations and the law say exactly the opposite.

### C.  Certain Excluded Opinions of Merck's Expert Witness, Dr. Lisa Rarick

Merck protests that it was unfair for the court to prevent Merck's expert witness, Dr. Lisa Rarick, from offering opinions about whether Merck could or should have sought to change its warning for VIOXX® via the CBE procedure, or about whether Merck acted reasonably in its interactions with the FDA concerning label changes.

Dr. Rarick is a former FDA official who worked in several positions at FDA, ultimately attaining a position in the Office of the Commissioner. Her field was obstetrics and women's health.

As previously pointed out, although New Jersey law creates a presumption that an FDA-approved warning is adequate, the FDA regulations do not prevent a drug maker from taking steps to warn once it learns of the need to do so. Dr. Rarick was not permitted to testify that Merck's compliance with FDA requirements conclusively meant that the VIOXX® label was appropriate and the warning sufficient. This was completely in conformance with the law.

Among the opinions that Merck sought to have Dr. Rarick present was that the negotiations over 18 months with the FDA for a label change was reasonable, and that an attempt to change the label via the CBE[19] procedure would have been rejected by the FDA. The court

---

[19] The name of the procedure by which a manufacturer can unilaterally change a drug's warning label – "Changes Being Effected" – comes from the FDA regulations at 21 C.F.R. 314.70(c)(3). That section provides that a

supplement to a drug application, submitted under paragraph (c)(6) of the same section would be labeled "Supplement – Changes Being Effected." Section (c)(6) provides for CBE label changes to "add or strengthen a contraindication, warning, precaution, or adverse reaction." Numerous courts, including the New Jersey Supreme Court, have found that this section of the regulations permits drug makers to take unilateral steps to warn patients and physicians about newly-discovered risks of their drugs, even prior to FDA approval of a new warning label that incorporates the change. See Feldman v. Lederle Laboratories, 97 N.J. 429, 458-59 (1984).

Until recently, FDA's position comported with this interpretation. In the publication of a 1979 FDA Final Rule on Labeling and Prescription Drug Advertising; Content and Format for Labeling for Human Prescription Drugs, the FDA responded to a comment requesting that the regulations state that the finding of a panel of experts be required before an association between a drug and a serious hazard would require a warning (in the period before a causal relationship between the hazard and the drug was established). The FDA response stated:

> The Commissioner rejects these comments. A serious hazard must be included in the "Warnings" section of the labeling of a drug when evidence exists on the basis of which experts qualified by scientific training and experience can reasonably conclude that the hazard is associated with the use of the drug. A causal relationship need not be proved. . . [The Act] requires labeling to include warnings about both potential and verified hazards. Accordingly, when medical information justifies a warning, the act requires that it be included in drug labeling.

> The Commissioner also advises that these labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g. "Dear Doctor" letters containing such information) is not prohibited by these regulations. [The Act] and FDA regulations require a warning in drug labeling as soon as a hazard is associated with the use of a drug. . . . In considering these regulations in a product liability case, at least one court has held that an NDA holder may have a duty to add a warning before FDA approval of a supplemental application. See McEwen v. Ortho Pharmaceutical Corp., 528 P.2d 522 (Ore. 1974).

44 Fed. Reg. 37,434 at 37,447 (1979). Thus, the FDA's former position that it was when "medical information justifies a warning," not "when the FDA approves a warning" that the manufacturer's duty to make changes to a drug's warning label or otherwise advise medical practitioners arises.

A recent statement by the FDA conflicts with this position. In a comment accompanying its 2006 Final Rule on Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, suggested that efforts by manufacturers to make CBE changes are discouraged. Even this new FDA position doesn't relieve a manufacturer of its duty to warn as soon as reasonably possible of hazards it learns about associated with the drug.

71 Fed. Reg. 3922, 3934 (Jan. 24, 2006). The document goes on to indicate that the FDA believes that federal law preempts efforts by state courts and legislatures to impose warning requirements on drug manufacturers.

A recent decision of the U.S. District Court for the District of New Jersey determined that this FDA statement, originally made in the preamble to the Final Rule, "did not affect the regulatory language in 21 C.F.R. 314.70(c)(6), which explicitly allows manufacturers to add or strengthen warnings without prior FDA approval. To the extent that the Preamble purports to forbid a manufacturer from enhancing the warning when reasonable evidence of an association of a serious hazard emerges, the Preamble is squarely contradicted by the plain language of [21 C.F.R. 314.70]." McNellis v. Pfizer, 2006 U.S. Dist LEXIS 70844 (D.N. J. 2006).

Other courts have found that the FDA's regulations do not preclude drug makers from strengthening warning labels prior to approval by the FDA. See, e.g., Witczak v. Pfizer, Inc., 377 F.Supp.2d 726 (D. Minn. 2005) ("the particular regulation [21 C.F.R. 314.70(c)(6))iii)] was promulgated precisely to allow drug-makers to quickly strengthen label warnings when evidence of new side effects are discovered."); Cartwright v. Pfizer, Inc., 269 F.Supp.2d 876 (E.D. Tex. 2005) (rejecting argument that state failure to warn claims were preempted by federal law, reading FDA regulations to state that a manufacturer "could and should provide a stronger warning as soon as such a warning is warranted."); Madden v. Wyeth, 2005 U.S. Dist. LEXIS 19989 (N.D. Tex. Sept. 14, 2005) (rejecting defendant's argument that "its warning label is adequate because it was approved by the FDA." Federal regulations do not prohibit a manufacturer from "add[ing to] or strengthen[ing] a contraindication, warning, precaution, or

58

has stated repeatedly that it would not allow the use of defense that Merck had to get FDA

approval of a new label before warning the public of known risks.

Merck argues that Dr. Rarick's opinion that a CBE label change would have been

rejected is supported by Merck's prior experience with another CBE label change attempt. FDA

rejected Merck's earlier effort to strengthen the Precautions section of the VIOXX® label to add

information from post-marketing experience with concurrent administration of VIOXX® and

Warfarin, a blood thinner. FDA said that was "not the type of change permitted by regulation to

be put into effect prior to approval of a supplement." The court does not accept Merck's position

that the same reasoning would apply to a CBE change to strengthen the VIOXX® label to warn

of increased risk of heart attacks. This CBE label change they refer to mentioned another

manufacturer's product and this creates a different issue for the FDA. This would be a very

different litigation if Merck had tried to make a label change to add a stronger warning and the

FDA rejected it. That didn't happen. Merck made no attempt to use CBE to change the warning

on cardiovascular risks. Now after making no attempt to use the procedure outlined in the

regulations, Merck wanted a witness to say the FDA wouldn't have agreed with it. Their

argument is meritless, both legally because of the Federal law and regulations, and factually as

the FDA proposed a stronger warning in the Warning section much earlier and Merck resisted it.

Dr. Rarick opined that Merck appropriately investigated the safety profile of VIOXX®

and conducted extensive pre-clinical and clinical studies both before and after FDA approved

VIOXX®; and that Merck's post-marketing investigation of the safety profile of VIOXX® was

responsible and appropriate. Further, she opines:

---

adverse reaction."); Caraker v. Sandoz Pharmaceuticals Corp., 172 F.Supp.2d 1018, 1033-34 (S.D. Ill. 2001)
(manufacturer was explicitly authorized by the FDA's regulations to add or strengthen its warnings without prior
FDA approval).

> FDA and the medical community expect that additional safety information will be
> identified and investigated in post-marketing studies and through post-marketing
> experience. Had FDA concluded at the time Merck filed its NDA for Vioxx that
> additional clinical studies were warranted or needed before it could approve Vioxx, it
> would have required such studies. FDA did not require additional clinical studies prior to
> approving Vioxx, nor did FDA, unlike with many new drugs, require Merck to commit to
> any post-marketing clinical studies to further investigate the safety of Vioxx. This
> indicates that FDA concluded from the information in the NDA for Vioxx that there were
> no specific safety concerns that required investigating.

Expert Report of Lisa D. Rarick, MD (Feb. 13, 2006).

The Court determined that Dr. Rarick could testify that Merck submitted everything that
the FDA required, but she could not testify to her own conclusions about FDA's reasons for the
action it took or did not take. All opinions that Merck complied with the FDA were acceptable.
Inferences about why the FDA did what it did or that an FDA decision to approve a warning
meant that it was conclusively appropriate were not allowed.

In sum, Dr. Rarick was permitted to testify to information in her knowledge about what
Merck submitted and what steps FDA took in response to those submissions. Dr. Rarick was not
qualified to testify about the adequacy of the clinical studies Merck conducted that she did not
personally review. She was not a cardiologist, and she could not be qualified to assess the
adequacy of the studies as far as cardiovascular safety is concerned. Nor would it be proper for
her to discuss what the FDA's thinking was at the time. While there were several areas
appropriate for Dr. Rarick to address, there were others that the court properly would not permit.

### D. The Court's Decision to Exclude the FDA Memorandum

Merck objects to the court's decision to exclude from evidence the FDA's April 6, 2005
Memorandum concerning the cardiovascular risks of other NSAIDs. In the Memorandum, the
FDA announced a series of proposed changes regarding the marketing and labeling of NSAIDs,
including COX-2 selective NSAIDs like VIOXX®. The Memorandum indicated that Bextra, a

COX-2 selective NSAID produced by Pfizer, was to be voluntarily withdrawn from the market at FDA's request. Additionally, the Memorandum states that all other prescription NSAID manufacturers were to add a black box warning to highlight the potential for increased risk of cardiovascular events and gastrointestinal bleeding. This permitted Celebrex, another COX-2 selective NSAID, to stay on the market with the heightened warning. The Memorandum addressed the reexamination of cardiovascular risks of NSAIDs based on a review of the available data regarding both COX-2 selective and non-selective NSAIDs and the risk of adverse cardiovascular events.

New Jersey Evidence Rule 403(a) specifically allows that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by risk of undue prejudice, confusion of issues, or misleading the jury. Here, Merck sought to introduce the FDA Memorandum for the proposition that VIOXX® was no more dangerous than other NSAIDs. However, Merck had no expert witness who would agree with this scientific conclusion that all NSAIDs increase the risk of cardiovascular events. The court advised the defense it would admit the Memorandum into evidence if Merck put forth an expert who, based on a review not just of the FDA's Memorandum but of relevant clinical studies, held the opinion that *all* NSAIDS, including VIOXX®, increased the risk of heart attacks. The validity of the FDA statements were unknown at that time. The memorandum did not explain the scientific basis for its opinion and no expert at that time was produced who could support the opinion. It was not just the validity of the FDA's conclusions that led the court to condition admission of the document; rather, in order for the jury to properly weigh the information contained in the Memorandum, it had to be used by an expert who could explain it and be cross examined on it.

61

The jury was thoughtful and attentive throughout this long and complicated trial.  In the end, the evidence was such that there was clearly a jury issue as to each question.  The jury made their decision and the court finds no reason to disturb it based on the court's review of the evidence.  The court does not find that there was a miscarriage of justice on any of the issues decided by the jury.  The evidence at trial was more than sufficient to support the jury's finding.

Motion for a new trial or a verdict NOV is denied.

_____

CAROL E. HIGBEE, P.J.Cv.

<u>XXXX</u>   Plft's counsel shall submit the
appropriate Order.

62