# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re: ZYPREXA PRODUCTS LIABILITY
LITIGATION

-------------------------------------------------------x

MONTY SOUTHER,
ROBERT CUSELLA,
JUDITH NEW,
BEVERLY PEARSON,
DONNA WORTHINGTON,

           Plaintiffs,

    -against-

ELI LILLY & COMPANY,

         Defendant.

-------------------------------------------------------x

MEMORANDUM, ORDER,
& JUDGMENT

04-MD-1596

06-CV-1729

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 11 2007 ★

P.M.
TIME A.M.

JACK B. WEINSTEIN, Senior United States District Judge:

TABLE OF CONTENTS

I. Introduction................................................................................................4
  A. History of Litigation..............................................................................4
  B. Some General Considerations................................................................7
    1. Preemption........................................................................................10
    2. Benefits and Roles of Others Reducing Damages.............................13
    3. Protections Available to Plaintiffs Through Sources Such as Available
      Experts' Information and Treating Physicians.....................................18
    4. Appropriate Recoveries and Payments.............................................20
  C. Motions for Summary Judgment...........................................................23
II. Facts......................................................................................................25
  A. Nature of Zyprexa................................................................................25
  B. FDA Labeling......................................................................................25
    1. September 2003 Label Change..........................................................25
    2. Consensus Statement of American Diabetes Association and Other
      Learned Groups.................................................................................26
    3. FDA March 2007 Letter....................................................................28
  C. International Zyprexa Labeling.............................................................28
    1. Japan................................................................................................28
    2. European Union, Australia, and Canada............................................29
  D. Lilly's Promotion of Zyprexa...............................................................29

1

    1. Pre-September 2003 Label.................................................................29
    2. Post-September 2003 Label...............................................................30
E. Plaintiffs.........................................................................................33
    1. Robert Cusella................................................................................33
        a) Patient History............................................................................33
        b) Prescribing Physician's State of Knowledge.................................34
        c) Representations Made by Lilly Salespeople..................................36
    2. Judith New....................................................................................37
        a) Patient History............................................................................37
        b) Prescribing Physician's State of Knowledge.................................38
        c) Representations Made by Lilly Salespeople..................................39
    3. Monty Souther...............................................................................42
        a) Patient History............................................................................42
        b) Prescribing Physicians' State of Knowledge................................42
        c) Representations Made by Lilly Salespeople..................................45
    4. Donna Worthington.........................................................................45
        a) Patient History............................................................................45
        b) Prescribing Physician's State of Knowledge.................................46
        c) Representations Made by Lilly Salespeople..................................47
III. Summary Judgment..........................................................................47
    A. Law..............................................................................................47
    1. Summary Judgment Standard.............................................................47
        a) Generally...................................................................................47
        b) Right to a jury.............................................................................49
    2. Choice of Law................................................................................51
        a) Substance...................................................................................51
        b) Statute of Limitations...................................................................52
    3. Florida Law....................................................................................52
        a) The Learned Intermediary Doctrine................................................52
        b) Adequacy of Warning...................................................................55
        c) Statute of Limitations...................................................................55
    4. Pennsylvania Law............................................................................56
        a) The Learned Intermediary Doctrine................................................56
        b) Adequacy of Warning...................................................................58
        c) Statute of Limitations...................................................................59
    5. North Carolina Law.........................................................................59
        a) The Learned Intermediary Doctrine................................................59
        b) Adequacy of Warning...................................................................61
        c) Statute of Limitations...................................................................61
    6. Application of Federal Law................................................................62
        a) Preemption.................................................................................62
            i) FDA Preamble...........................................................................62
            ii) FDA Regulation of Prescription Drug Warning Labels..........64

2

iii) Deference Due FDA's Interpretation......................................65
iv) FDCA Preemption of State Law Causes of Action..............66
b) Preemption of State Failure to Warn Claims.........................67
i) The Preamble Does Not Control the Question of Preemption.67
ii) State Law Failure to Warn Claims are Not Preempted..........70
7. Damages Issues...................................................................................75
B. Application of Law to Facts......................................................................76
1. Robert Cusella...................................................................................76
a) Choice of Law..........................................................................76
b) Statute of Limitations..............................................................76
c) Adequacy of Warning Post-September 2003 Label Change...............77
d) Deposition of Treating Physician.............................................77
e) Summary Judgment Decision....................................................77
2. Judith New.........................................................................................77
a) Choice of Law..........................................................................77
b) Statute of Limitations..............................................................78
c) Adequacy of Warning Post-September 2003 Label Change...............78
d) Deposition of Treating Physician.............................................78
e) Summary Judgment Decision....................................................78
3. Monty Souther....................................................................................78
a) Choice of Law..........................................................................78
b) Statute of Limitations..............................................................79
c) Adequacy of Warning Post-September 2003 Label Change...............79
d) Deposition of Treating Physician.............................................79
e) Summary Judgment Decision....................................................79
4. Donna Worthington.............................................................................79
a) Choice of Law..........................................................................79
b) Statute of Limitations..............................................................80
c) Adequacy of Warning Post-September 2003 Label Change...............80
d) Deposition of Treating Physician.............................................80
e) Summary Judgment Decision....................................................80
5. Adequacy of September 2003 Warning Label......................................80
IV. Admissibility of Expert Opinions at Trial.................................................82
A. Motions Regarding Admissibility of Expert Reports...................................82
B. Rules 702 and 703 of the Federal Rules of Evidence.................................82
C. Qualifications of Expert Witnesses...........................................................84
D. Helpfulness and Relevance......................................................................84
E. Reliability...............................................................................................86
F. Individual Experts' Reports......................................................................89
1. Challenges to Plaintiffs' Experts........................................................89
a) Dr. Carol Levy, M.D................................................................89
b) Dr. Stefan P. Kruszewski, M.D................................................91
c) Dr. Arvin P. Shroff, Ph.D........................................................94

3

2. Challenges to Defendant's Expert Dr. Robert R. Henry, M.D.........................98
V. Conclusion..................................................................................................................100
A. Cusella....................................................................................................100
B. New.........................................................................................................100
C. Souther...................................................................................................100
D. Worthington...........................................................................................100

## I. Introduction

### A. History of Litigation

Some 30,000 cases have been brought against Eli Lilly & Company ("Lilly") by plaintiffs

suffering from serious psychiatric problems who were treated with the Lilly antipsychotic drug

Zyprexa.  They allege that Zyprexa caused deleterious side effects of excessive weight gain,

hyperglycemia, and diabetes; that Lilly misled them and their physicians about the likelihood of

these side effects; and that, had they or their attending physicians been aware of the risk, they

would not have taken Zyprexa.

Litigation against Lilly for injuries allegedly caused by Zyprexa was initiated in this court

in March 2004. *See Benjamin v. Eli Lily & Co.*, Docket No. 04-CV-00893.  Thousands of cases

were then transferred here from federal district courts throughout the United States pursuant to an

order of the Judicial Panel on Multidistrict Litigation. *See* Letter from Multidistrict Litigation

Panel to Clerk of the Eastern District of New York, No. 04-MD-1596 (Apr. 14, 2004).  In

addition, similar cases are pending in state courts. *See In re Zyprexa Prods. Liab. Litig.*, 239

F.R.D. 316 (E.D.N.Y. Jan. 18, 2007) ("Memorandum on Cooperation Between Federal and State

Judges").

The litigation has been administered as a quasi-class action. *See In re Zyprexa Prods.

Liab. Litig.*, 467 F. Supp. 2d 256, 262 (E.D.N.Y. 2006) ("The court, magistrate judge and special

4

masters will continue to administer this litigation as a quasi-class action."); *In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458, 477 (E.D.N.Y.2006) ("Recognizing its obligation to exercise careful oversight of this national 'quasi-class action,' the court has already utilized its equitable power to limit attorneys' fees and costs ...") (citation omitted); *In re Zyprexa Prods. Liab. Litig.*, 433 F.Supp.2d 268, 271 (E.D.N.Y.2006) (finding that case "may be characterized properly as a quasi-class action subject to the general equitable power of the court"); *In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 491 (E.D.N.Y.2006) (same); *In re Zyprexa Prods. Liab. Litig.*, 233 F.R.D. 122, 122 (E.D.N.Y.2006) (same).

Cooperation between federal and state courts has been encouraged at all stages of the Zyprexa litigation. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 262 (E.D.N.Y. 2006) ("Cooperation with state courts will continue to be stressed."); *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-01596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 16, 2006) ("Coordination and cooperation between state and federal courts has been encouraged."); *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-01596, 2006 WL 197151 (E.D.N.Y. Jan. 30, 2006) (letter to state judges with Zyprexa cases from federal MDL judge suggesting coordination and cooperation); *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-01596, 2004 WL 3520248, at *4 (E.D.N.Y. Aug. 18, 2004) (directing defendant Lilly and PSC I to "confer regarding procedures for coordination of state court discovery with discovery in this MDL").

An attorneys' fee structure for many cases has been ordered, capping fees at 20% of recovery in smaller, lump-sum claims, and at 35% of recovery in other claims. *See In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y.2006). Costs related to the individual cases and charged to the individual settling plaintiffs were limited. *See In re Zyprexa Prods. Liab.*

5

*Litig.*, No. 04-MD-01596, 2006 WL 2443248 (E.D.N.Y. Aug. 24, 2006). The magistrate judge

allocated funds from a first common benefit fund after reviewing the first Plaintiffs' Steering

Committee's ("PSC") applications. *See In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-01596,

2007 WL 805793 (E.D.N.Y. March 15, 2007). A second common benefit fund is presently being

established to compensate members of a second PSC for their work. *See In re Zyprexa Prods.

Liab. Litig.*, 467 F. Supp. 2d 256, 262 (E.D.N.Y. 2006).

    A national system for resolving Medicare and Medicaid liens has been approved. *See In

re Zyprexa Prods. Liab. Litig.*, 451 F. Supp. 2d 458 (E.D.N.Y. 2006). All states and the federal

government have agreed to modify their lien demands to provide a national equitable system.

*See In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2006 WL 3501263 (E.D.N.Y. Dec. 4,

2006) ("In compliance with this court's instructions . . . all fifty states as well as the federal

government have resolved their Medicare and Medicaid liens.") (citation omitted).

    After discovery and negotiations, overseen in part by a court-appointed special discovery

master and four special settlement masters, in November 2005 the defendant, without conceding

liability, entered into a settlement covering some 8,000 individual plaintiffs. *See In re Zyprexa

Prods. Liab. Litig.*, No. 04-MD-1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005). The

settlement resolved virtually all cases then pending in the MDL, along with some state cases and

some claims not yet filed. *See id.*

    Following an influx of thousands of new cases, in January of 2007 the parties announced

another round of settlements. Approximately 1,000 claims remain unresolved in the MDL cases.

Four of those cases are slated to be tried beginning July 9, 2007; a number of the cases originally

scheduled for trial on that date have been settled or withdrawn. Lilly has moved for summary

judgment in these four cases, which are the subject of this memorandum.

A separate motion for summary judgment has been filed by Lilly against plaintiff Rickie Dickerson, who alleges that he developed acute pancreatitis as a result of his ingestion of Zyprexa. That motion will be dealt with in a separate memorandum and order.

B. Some General Considerations

Discussed in this section I.B. are developing general issues of liability and damages that may substantially reduce any recovery for plaintiffs should they obtain judgments in their favor. All the states whose substantive law is operative incorporate these general considerations in their laws.

Suits alleging injury resulting from the ingestion of pharmaceuticals designed for huge populations present more complicated liability and damages issues than traditional one-on-one tort suits such as those resulting from people stepping into potholes. The medical and scientific communities — and necessarily tort law — accept the reality that there can usually be no benefit without some cost in possible side effects in use of prescription drugs. Unlike the classic tort pothole situation, elimination of all risk is almost impossible in medicine. Health improvements, especially in the area of pharmaceuticals, have benefits and risks. Treatment, especially of the kind of serious debilitating mental diseases suffered by present plaintiffs, often necessitates a choice between imperfect options.

Developers of medicines are under social and economic pressure to put their products on the market quickly and spread their uses as widely as benefits allow. They may not rely on fraud. But they and the public are entitled to some guidance and limitations from other controlling entities.

7

Modern American jurisprudence suggests that a jury will have to consider a number of legal-equitable causal vectors, apart from those involving the named defendant and plaintiff, in determining whether liability of defendant has been proven, and, if so, what damages should be assessed against a pharmaceutical designer-manufacturer of a drug intended to alleviate serious psychiatric and physical problems.

As one commentator has put the matter:

> It is not surprising, then, that courts now employ tort law to address the long-term social ramifications that a finding of liability will engender. For instance, most judges recognize that product liability judgments do not merely censure a single, random act of carelessness, but amount to a condemnation of an entire product line or way of doing business. In cases like this, therefore, courts applying tort principles routinely consider the interests of individuals other than those involved in the dispute. On the one hand, they might use the law as a shield to protect not only the private litigant who has already been harmed, but all others who are subject to the same hazard. On the other hand, they may wield the law as a sword to discourage both the wrongdoer and other enterprises from creating and disseminating similar risks in the future. Perhaps more importantly, they often employ it to diffuse the private impact of injurious transactions by distributing their costs to other members of society.

Alan Calnon, Justice and Tort Law, 4 (1997). "[T]he fault system as it operates today, with comparative responsibility, is a very different system than the generally all-or-nothing regime that [Guido Calabresi] criticized in The Costs of Accidents [1970]." Donald G. Gifford, Forward, Calabresi's *The Costs of Accidents: A Generation of Impact on Law and Scholarship*, 64 Md. L. Rev. 1, 11 (2005); *see also, e.g.,* Keith N. Hylton, *Calabresi and the Intellectual History of Law and Economics*, 64 Md. L. Rev. 85, 110 (2005) ("an evolutionary path of comparative causation in tort law"); *id.* at 112 (history of comparative causation); *id.* at 129 ("comparative causation is a more 'precise' term than comparative fault"); *id.* at 135 (comparative causation rules approximate a "social optimum").

8

What has been said about latent diseases by one distinguished commentator applies as

well to a case such as the instant one dealing with causation and pharmaceuticals:

> [T]he activities of parties other than product manufacturers often are necessary
> contributing causes to the victims' latent diseases. The manufacture of cigarettes
> is a cause of the smoker's lung cancer, but so is the smoker's unwillingness to quit
> smoking after she becomes aware that smoking is dangerous. The manufacture of
> lead-based paint is an actual cause of a child's developing lead poisoning eighty years
> later, but so is the landlord's failure to prevent painted surfaces from deteriorating.
> In traditional tort terms, such issues were analyzed under the rubrics of contributory
> and comparative negligence, assumption of risk, and superseding cause.

Donald G. Gifford, *The Peculiar Challenges Posed by Latent Diseases Resulting from Mass

Products,* 64 Md. L. Rev. 613, 617-18, (2005); *see also id.* at 667-68, 672, 674, 689 (situations

where best "cost avoider" may be liable as in tobacco, lead, and guns); Guido Calabresi & Jeffrey

O. Cooper, *New Directions in Tort Law,* 30 Valparaiso U. L. Rev. 859, 883 (1996) ("Given the

advent of splitting rules, it would not take much of a doctrinal leap for splitting to spread into

some . . . new areas.").

In making its determination of fault and damages the trier will need to consider in the

larger legal and factual context the contribution to damage resulting from failures in a variety of

systems designed to protect users of pharmaceuticals. They include: lack of adequate federal

Food and Drug Administration ("FDA") supervision of the pharmaceutical industry; lack of

sufficient testing by the manufacturer and failure to reveal risks in a timely manner, as well as

circulating misleading information, *see* Restatement of the Law, Second, § 310, Conscious

Misrepresentation Involving Risk of Physical Harm; *id.* § 311, Negligent Misrepresentation

Involving Risk of Physical Harm; lack of sufficient information on risks and benefits of the drug

and competing drugs available to the medical field because the usual medical publications and

scientific sources other than the manufacturer or the FDA have not published necessary studies;

failures of treating doctors to adequately inform themselves, to discuss risk and benefits with

patients, and to exercise sound medical judgment in treating patients; failures of insurance

companies, administrators of drug plans and government agencies to monitor drugs they are

paying for, *see, e.g.*, Dan B. Dobbs, The Law of Torts, § 256 (2001) (liability of managed care

associations for failure to protect clients); *but cf. Aetna Health Inc. v. Davida*, 542 U.S. 200

(2004) (claims under state law protecting patients' right to sue their HMOs for negligent

utilization review superceded by ERISA) (*criticized in* Note, *The Supreme Court 2003 Term:*

*Leading Cases*, 118 Harv. L. Rev. 456, 462-66 (2004)); and failures of the plaintiffs to pay

attention to warnings they should have been aware of, to take up with treating physicians

problems that became obvious — here such as weight gain — and to heed physicians' advice

with respect to diet, exercise, and the like. These confounding factors may require the jury to

limit any award of damages against a defendant manufacturer. The failure of each of the

protective screens society relies upon to protect users of pharmaceuticals makes each screener's

failure a "cause" of damages — that is to say if the manufacturer, the FDA, the scientific

community, the insurer, the doctor, and the patient had each done their work well damages would

have been less or nonexistent.

### 1. *Preemption*

A reasonable national public policy — in the absence of fraud — would give a

pharmaceutical manufacturer protection against tort liability for failure to warn when the FDA

had approved the accused warnings. *See generally* Part III.6.a, *infra*. Were that the law, Lilly

would be liable at most for injuries caused by its failure to warn up to the time of either the first

FDA-approved warning label ordered in October 1996, or the time of the new warning label

ordered on September 11, 2003, or the distribution of "Dear Doctor" letters in March 2004 giving widespread notice of the September 2003 warnings.  Preemption is best instituted by Congress, since it should  provide national uniformity of liability and responsibility of the manufacturer, the doctor, other screeners, and the patient, and define the scope of state and federal substantive law protecting consumers of pharmaceuticals.

Here the law on preemption is ambiguous.  Under such circumstances, a federal court should take the law's default position, honoring the traditional state control of tort law. *See generally* John C. P. Goldberg & Benjamin C. Zipursky, *Accidents of the Great Society*, 64 Md. L. Rev. 364 (2005).

Were the courts in a position to rely on the adequacy and candor of representations to the FDA and of robustness of inquiry and decisions of the FDA, a desirable result would be to apply preemption, excluding the state tort law relied upon by present plaintiffs.  It is apparent, however, that the FDA's own research is limited and that it relies heavily on self-motivated representations and studies by the pharmaceutical industry.  The FDA's attempts to keep abreast of and inform the public about dangerous side effects discovered only after a drug has been approved have been decried by many in the medical community as inadequate. *See, e.g.*, Editorial, *Rosiglitazone and Cardiovascular Risk*, 356 New Eng. J. Med. __ (2007) ("The FDA frequently requires phase 4 trials to address some of the unanswered efficacy or safety questions at the time of approval.  But [manufacturers] propose the designs, which sometimes compare their products with inferior treatments or doses.  During the period from 1998 through 2003, only about a quarter of the required phase 4 trials were completed . . . This desultory approach to postmarketing studies necessarily leads to an incomplete evaluation in the postapproval setting."); David B. Ross, *The*

11

*FDA and the Case of Ketek*, 356 New Eng. J. Med. 1601 (2007) ("The postmarketing data submitted by Sanofi-Aventis were reviewed by the FDA without any verification of their accuracy or completeness . . . .").

The divergence among the risk-benefit conclusions about Zyprexa and other drugs between, on the one hand, the FDA and the pharmaceutical industry, and, on the other, independent associations of scientists such as the American Diabetes Association, as well as alleged misleading by salespersons of Lilly arguably provides a murky mix of inadequate information and misinformation to doctors. While the much stronger Zyprexa labeling requirements in Japan and the European Union are not decisive, they do suggest the controversial nature of FDA supervision of drug warning labels. *See* Part II.C, *infra; see, e.g.,* Gardiner Harris, *Potentially Incompatible Goals at F.D.A.: Critics Say a Push to Approve Drugs is Compromising Safety*, N.Y. Times, June 11, 2007, at A14; Gardiner Harris, *F.D.A. Remains Unsettled in Wake of New Questions*, N.Y. Times, May 31, 2007, at A14 (discussing pervasive criticism of FDA's handling of pharmaceutical safety concerns).

The work of the medical staffs, particularly psychiatrists, who prescribed Zyprexa for the current plaintiffs was in general extraordinarily good. The label warnings were meant for doctors. But even fine doctors have to rely on, and could have been misled by, the incomplete and possibly misleading information available to them as a result of lack of adequate warnings on the label and Lilly's overselling. *Cf.* Richard Horton, Book Review, *What's Wrong With Doctors*, The New York Review, 16 (May 31, 2007) (Review of "How Doctors Think" by Jerome Groopman) ("there can never be a purely rational or exact mathematical solution to a patient's predicament").

Given the high quality of treatment by plaintiffs' physicians and aides, their general knowledge, and their candid discussions with patients regarding risks and dangers, the summary judgment decision in all these cases is a close one. The experts for both sides are excellent and come to different conclusions on the key issues of adequacy of warning and causation.

State tort laws that are applicable provide substantial reliance on the protective nature of the treating physicians through the "learned intermediary" rule. *See, e.g.,* Part III.A.3.a, *infra.* Given the alleged inadequacy of the warnings provided by Lilly to doctors, for most of the cases the learned intermediate defense is not sufficient to entirely block a judgment of liability.

### 2. *Benefits and Roles of Others Reducing Damages*

In the case of at least some of its users who were leading dismal, hazardous and burdensome lives as a result of their mental problems, Zyprexa provided a greatly improved quality of life. The trier may choose to weight the cost to the plaintiff in increase weight and diabetes against the gain in quality of life with Zyprexa; this consideration would be expected to reduce any damage awards.

Supporting reduction of damages when an injured plaintiff gained substantial benefit from the allegedly harmful activity of the defendant is a strong legal substratum upholding proportionality in damages and punishment based upon Benthamite pragmatic balancing of benefits and harms to society as well as to the parties. The law is cognizant of the real world complexity of causation with many "causes" for each event. A defect in an alarm clock may "cause" a passenger to take a later train with defective brakes, and a tired engineer, that falls off a faulty trestle. *Compare, e.g., Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339 (1928) ("proximate cause" limiting "but for" cause). Some division of liability and sharing of damages

can be expected in multiple causation cases.

Developing tort law is based on consideration of economic theory, such as who can best bear the cost of harms, *see e.g.*, Guido Calabresi, The Costs of Accidents: A Legal and Economic Analysis (1970);  English development of the writ system and American legal history, *see e.g.*, 1 Fowler Harper and Fleming James, Jr., The Law of Torts xxvii-xliv (1956); Julius Goebel, Jr., Cases and Materials on the Development of Legal Institutions 139 ff. (1946); Oliver Wendell Holmes, Jr., The Common Law (1881); and classical theory, *see, e.g.*, John C. P. Goldberg & Benjamin C. Zipursky, Accidents of the Great Society, 64 Md. L. Rev. 364 (2005).  But it also incorporates considerations of fairness as among the injured and others as well as an understanding of the myriad causes of harm to individuals in a complex modern society that has had to development of rules of proportionality. *See Customs & Excise v. Barclays Bank*, 4 All E.R. 256, ¶ 82 (House of Lords 2006) (Lord Mance) ("The conceptual basis on which courts decide whether a duty of care exists in particular circumstances has been repeatedly examined. Three broad approaches have been suggested, involving consideration (a) whether there has been an assumption of responsibility, (b) whether a three-fold test of foreseeability, proximity and 'fairness, justice and reasonableness' has been satisfied or (c) whether the alleged duty would be 'incremental' to previous cases . . . . All three approaches operate at a high level of abstraction. What matters is how and by reference to what lower-level factors they are interpreted in practice.") (citation omitted).

As the Supreme Court has noted in a punitive damages opinion:

The Due Process Clause of its own force prohibits the States from imposing "grossly excessive" punishments on tortfeasors . . . . [W]e expressly noted that the courts of appeals must review the proportionality determination 'de novo.'

14

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434-35 (2001).  *But cf.*

*Norfolk & Western Ry. Co. v. Ayers*, 538 U.S. 135, 159-66 (1997) (refusing to require

apportionment of damages among firms contributing to asbestos disease of railroad employee in

order to facilitate employee's recovery, but noting that indemnification was available).

There is a need for a jury instruction that will restrict the jury's discretion in these

polycentric multiple "blame-causation" pharmaceutical cases by providing a standard of

"justice."  Excessive flexibility in applying views of individual jurors of "the" just result can

reduce necessary predictability and uniformity required by the rule of law.  As Professor Warren

A. Seavey put it in his *Mr. Justice Cardozo and the Law of Torts*, 48 Yale L.J. 390, 401 (1938)

(footnote omitted):

> [T]he judge cannot . . . leave the whole matter to the jury without further statement
> than that a negligent defendant is liable if he was the legal cause of the harm.  The
> result sought by Cardozo, Andrews [who wrote the dissenting opinion in *Palsgraf*],
> and all the others is a formula which with a fair degree of definiteness will mark the
> boundary between liability and nonliability and be consistent with our sense of justice
> as this has been developed in imposing liability in negligence cases.

Articulation of the appropriate controlling charge to the jury can await the trial of the instant

cases.  That charge will take account of some aspect of the need for proportionality in liability,

damages or both.

Society's current sense of justice has required modification of ancient all-or-nothing

liability-damages principles.  In tort law, contributory negligence which once blocked all

damages has been replaced by comparative fault and apportionment of liability.  *See, e.g.*, ALI

Restatement of the Law Third, Economic Torts and Related Wrongs Prel. Draft No. 3 (April 12,

2007), § 16, Contributory Negligence and Proportionate Responsibility (not yet adopted by ALI);

*id.* § 8, Factors for Assigning Shares of Responsibility; *id.* § 26, Apportionment of Liability

When Damages Can be Divided by Causation; *id.* § 18, Liability of Multiple Tortfeasors for

Individual Harm; Restatement of the Law, Torts, Apportionment of Liability, § 7, comment a

(comparative responsibility "replaces the rule of contributory negligence as an absolute bar to a

plaintiff's recovery . . ."). In capital crimes, the cruel 18[th] century all-encompassing felony-death

rule has been replaced by one considering mitigating factors. *See* 18 U.S.C. § 3592 (mitigating

and aggravating factors to be considered in determining whether a death sentence is justified).

The rule that there can be no recovery for emotional harm is now often negated when the harm is

serious and there are other confounding circumstances. *See* Restatement of the Law Third Torts:

Liability for Physical and Emotional Harm, Tent. Draft No. 5, April 4, 2007, Reporters Note p.

4ff (not yet adopted by ALI). "An actor may be absolved from liability for harm forseeably

resulting from the actor's negligence when the liability would be unfairly disproportionate to the

actor's fault and compensation." Restatement of the Law Third of Economic Torts and Related

Wrongs, Prel. Draft No. 3 (April 12, 2007) p. 17 (not yet adopted by ALI); *id.* at p. 78, § 18

Damages ("Responsibility is apportioned for that part of the damages the claimant could have

[reasonably] avoided without undue risk or burden"); *id.* at p. 112 ("estoppel will lie only if

necessary to avoid injustice and only when it does not stultify the policies of the law").

Sentencing increasingly considers restorative needs of the criminal and victim rather than rigid

"just desserts." *See* Model Penal Code Sentencing, Tent. Draft No. 1 (April 9, 2007) (not yet

adopted by ALI), p. 27 ("The goal of proportionality in punishment is ubiquitous. . . ."). In the

area of unjust enrichment, the availability of a remedy is qualified to avoid unfair hardship. *See*

Restatement of the Law Third Restitution and Unjust Enrichment Tent. Draft No. 5 (March 12,

2007) (not yet adopted by ALI), p. 117, *id.* p. 119 ("the remedial spectrum"). The good

16

samaritan's responsibility for negligence in rescue may be forgiven or minimized because of good intentions. *See, e.g.*, Dan B. Dobbs, The Law of Torts 663 (2001); N.Y. Education Law § 6527(2) (good samaritan immunity for licensed physicians). The "measure of a recipient's unjust enrichment may depend on the recipient's degree of fault." ALI Draft Restitution and Unjust Enrichment § 49(3), Measures of Enrichment; Classes of Recipient. In protection of civilians under the laws of war, proportionality is central. *See In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 79 (E.D.N.Y. 2005) (Part XI.D.3, Proportionality). In admiralty, shared damages based upon degrees of fault is enforced. *See, e.g.*, 46 U.S.C. § 762(a) ("fair and just compensation," "apportioned" in proportion to the loss they may have suffered).

The current trend towards reasonableness is illustrated by the following hypothetical situations: (1) A motorist hits a pedestrian causing damage to three ribs, lacerations, and out-of-pocket losses for which the jury awards $100,000,000. (2) A pedestrian is drowning when a good samaritan saves his life, but does it negligently so that the victim suffers the same harm due to the negligence as in (1). Would the same jury award the pedestrian $100,000,000 against his rescuer? It seems doubtful. Yet, that would be the result of the traditional all or nothing rule. *See, e.g., Beasley & MacDonald Eng'g Co.*, 249 S.2d 844, 847 (Ala. 1971); Mark Turner, *Dial 911: Emergency Medical Care Providers, Gross Negligence, and the Loophole in the Connecticut Good Samaritan Statute*, 19 Q L Rev. 419, 445-46 (2000); Marc A. Franklin & Mathew Ploeger, *Of Rescue and Report: Should Tort Law Impose a Duty to Help Endangered Persons or Abused Children*, 40 S. C. L. Rev. 991, 996-99 (2000).

The present cases, of course, do not involve a good samaritan. But the example illustrates why current law reflects a sense of multiple causes, shared responsibility, intention, and

17

proportionality in finding liability and in assessing damages. The governing tort law in each of the instant cases includes the learned intermediary defense — an aspect of proportionality that shifts at least some of the burden of protecting patients from pharmaceutical manufacturers to treating physicians *See, e.g.,* Part III.A3.a, *infra.* In a case such as the present one the learned intermediary rule cannot be viewed as an all-or-nothing regulation that absolves the manufacturer, shifting the onus entirely to the treating physician, but its force in ameliorating liability for damages of the manufacturers cannot be ignored.

### 3. *Protections Available to Plaintiffs Through Sources Such as Available Experts' Information and Treating Physicians*

The conclusions of specialized medical and scientific panels, selected on as unbiased a basis as practicable, is particularly important in evaluating relevant studies and gaps in data and such documents as peer-reviewed articles. These panels often are not capable of, or interested in, declaring — in a form equivalent to civil litigation's "more probable than not" standard — a statistically-based probability of the adverse side affects or the benefits of pharmaceuticals and toxic substances with respect to general causation, specific causation, or other relevant legal issues. Such panels can, however, by meta-analysis of extant studies and other information, provide the best available estimates on such factors as risks and benefits to a doctor, a patient, or a jury. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and the Rules of Evidence do not require more than a scientist's rational conclusions drawn from reasonably reliable available data. *See* Part IV, *infra.* Predicting adverse side effects or benefits in the early stages of the use of a new pharmaceutical is as much art as science. Precise quantification is not a prerequisite to admissible opinion testimony. To utilize *Daubert* to exclude useful scientific evidence is to

18

distort both science and the constitutional right to a jury trial. Medical science — less perhaps than "soft" sciences like sociology, and more perhaps than "hard" sciences like chemistry or physics — requires the judgment of the individual researcher and physician.

Epidemiologists and other scientists will be called to testify at the trial. The trained judgments of such scientists may in good faith differ when analyzing the same available data.

Despite the many drug safety and efficacy screens in this country — the manufacturers' own revealed tests, medical scientists and their peer-reviewed studies, the FDA, the competitive marketplace, self-interest of the patient, the general body of medical knowledge available to the public and to physicians, checks by managed care and insurance institutions, and the deterrent threat of tort law — ultimately it is the treating physician that we rely upon as the guardian of individual health.

Where summary judgment motions are pending in the instant individual cases, a reasonable juror could find that by the time a reasonably informed treating physician should have been aware of the label warning required by FDA, each plaintiff's treating physician already knew that Zyprexa was associated with weight gain and diabetes, and believed that the benefits of the particular seriously ill patient being treated warranted assuming the risks and benefits of Zyprexa as against the risks and benefits of other drugs and modes of treatment.

In each of the instant claims, the treating physician made a judgment, after balancing the potential benefits and risks of other drugs and methods of treatment, that Zyprexa should be prescribed for the patient at the time it was administered. *See* Parts II.E.1.b, 2.b, 3.b, 4.b, *infra*; Appendices A, B, C, and D, *infra*. Despite possible overselling by some Lilly salespeople, the evidence is strong that, for the most part, the individual physicians and physicians aides here

19

were in a position to knowingly exercise their obligation to their patients and that they were sufficiently aware of Zyprexa's relative dangers. A jury could find that the latest date beyond which it was unreasonable for the doctor not to have been aware was when Dear Doctor letters were sent on March 1, 2004, at the FDA's direction, many months after the new warnings were published. Because, however, of the claim, that has some support, that Lilly salespeople might have been misleading at least some treating medical staff, the issue of a cutoff date is best left for the jury except in one case. *See* Part III.B.1.e, *infra*.

### 4. *Appropriate Recoveries and Payments*

In a mass pharmaceutical injury case such as this one — as well as in toxic tort cases exemplified by asbestos, breast implants and Agent Orange — it is important that all those who are entitled to damages, as a result of the facts and law, have an opportunity to file timely claims and have them prosecuted by competent lawyers. A powerful plaintiffs' bar is available to prospective claimants, utilizing advertising, references of cases from originating attorneys to specialists, contingency fee arrangements and substantial capital to investigate claims, retain suitable experts, and conduct complex discovery, motion practice, settlement negotiations and, when needed, trials.

Despite this effective civil prosecution network, there are usually a substantial number of potential harmed plaintiffs who never press their claims. There also are usually a substantial number of claims that are marginal or unfounded, but hyped and prosecuted using a variety of questionable techniques.

Even for a defendant, such as Lilly, which has decided to settle and pay reasonable Zyprexa user claims, the problem of totally disposing of a massive potential litigation, so that its

20

main business can be conducted with emphasis on research and production of useful medicines rather than on costly litigation distractions, remains difficult. There is to be expected a massive infusion of new claims — many possibly ill-founded — when news of a willingness to pay hits the legal Rialto. The class action's capacity to protect against unfounded current and future claims has now been restricted, at least in the estimate of some courts and litigators, by decisions of the Supreme Court and Courts of Appeals. *See generally In re Zyprexa Prods. Liab. Litig.*, 238 F.R.D. 539 (E.D.N.Y. 2006).

Faced with small elements of the legal community which may appear rapacious, industry looks to the courts to separate the worthy from the unworthy claims. Yet, the normal tools for excluding non-meritorious claims — summary judgment, trials and appeals — remain expansive and consuming of executive energy and capital availability while the litigation drags on.

In the present litigation, the first eight thousand or so claims were settled using a discovery master, magistrate judge, and efficient national assembly of documents collected by a Plaintiffs' Steering Committee; fees were controlled; liens were compromised on a national basis; and four special masters, using a matrix, passed on the validity of the claims, assigning appropriate values to each of them.

In the second phase involving many thousand of subsequent individual claims, settlements were made individually, without any check of fairness by the court or its designees. The present four summary judgment motions are examples of those cases.

Whatever the advantages to available court procedures limiting the "piling on" phenomena in mass tort cases, the process involves substantial transactional costs. The substitute

opted for by most attorneys is settlement — the acceptance of proportionality and reasonableness in demands for compensation.

The danger of "piling on" in the instant litigation is exacerbated by the substantial Medicare and Medicaid liens of the states and federal government, which lead to pressure for higher settlement so that the plaintiffs — and their attorneys — can gain some compensation for their alleged suffering. In addition, some states are now claiming reimbursement directly from Lilly for their purchases of Zyprexa. And private unions, insurers and the like are seeking third-party reimbursement for their purchases of Zyprexa on behalf of those they were insuring. Shareholder suits based on alleged misleading of investors about Zyprexa are also pending. While somewhat different from the catastrophic costly litigation that led to so many bankruptcies in the asbestos and breast implant industries, all of the actual and potential Zyprexa-based claims increase the stakes for both plaintiffs and defendants, and place added pressure on the legal system to provide rational and affordable compensation schemes.

In almost every conglomerate litigation - - including class actions and quasi-class actions such as the instant one - - the claimants with the best claims receive somewhat less than they would have obtained in individual suits, while the less worthy claimants receive somewhat more. The advantages to all plaintiffs and defendants in predictability and reduced transaction costs usually more than offsets the disadvantages of these disparities. In the present settlement phase of the user-Zyprexa cases, in addition to the good sense and bona fides of plaintiffs' attorneys, some counsel have retained neutral advisors to ensure a proper division of damages among their clients. For ethical as well as tort law conceptualizations, substantial efforts to provide a reasonable and proportionate division of payments between defendant and plaintiffs, and among

22

plaintiffs, is necessary and justified.

When all is said and done, however, the gold standard for deciding the value of any case for settlement purposes is what juries have awarded in similar cases. Since no jury trials have taken place in the Zyprexa litigation, despite the maturity of the dispute, currently scheduled jury trials will be observed with considerable interest in connection with future settlements.

### C. Motions for Summary Judgment

Lilly has moved for summary judgment in the four cases discussed in this memorandum, primarily on the theory that the prescribing physician was aware, or should have been aware, of the risks of weight gain and diabetes associated with Zyprexa. In September of 2003, a new warning about the risks of which plaintiffs complain was directed by the FDA to be placed on Zyprexa package inserts. Lilly argues that, as a matter of law, knowledge of these possible side effects was attributable to plaintiffs' prescribing physicians on or after that date. The applicable state laws provide that FDA approval does not automatically make a prescription drug warning adequate as a matter of law, and most federal courts have refused to hold that the federal Food Drug and Cosmetic Act ("FDCA") preempts state law failure to warn claims in cases where the pharmaceutical warning label is approved by the FDA. *See* Part III.A.6, *infra.*

Lilly's contention that these four plaintiffs' prescribing physicians were as a matter of fact aware of the risks of weight gain and diabetes posed by Zyprexa *before* the September 2003 label change is based on the particular facts of each of these four cases. Lilly has attempted to demonstrate that the four prescribing physicians' knowledge of the risks of weight gain and diabetes is indisputable. While the facts relating to the four physicians' state of knowledge supports Lilly's claim, plaintiffs have barely — but sufficiently under summary judgment

23

standards — demonstrated that reasonable minds may differ on this point.

The strong constitutional right to a jury precludes a pretrial finding that no reasonable juror could find for any plaintiff except when a reasonable treating physician must have been fully aware of Zyprexa's dangers and those of competing drugs. Genuine issues exist as to material facts regarding the prescribing physicians' state of knowledge about the risks of diabetes and excessive weight gain associated with Zyprexa in three of the cases defendant moves to dismiss.

As to plaintiff Robert Cusella the record shows he was fully advised of Zyprexa's dangers, discussed the matter repeatedly with his doctor, and developed diabetes in close conjunction with the taking of Zyprexa. The state statute of limitations ran before he commenced his suit. *See* Appendix A; Part II.E.1, III.B.1, *infra.*

The following chart summarizes the conclusions described in more detail in Part III.B, *infra.*

| Plaintiff | Date of First Use | Date of Last Use | Result |
|---|---|---|---|
| Robert Cusella | May 1997 | April 2005 | **Case dismissed.** Case was commenced more than two years after plaintiff learned he had diabetes and was aware that Zyprexa was a potential cause of his diabetes. |
| Judith New | April 2003 | July 2005 | **Summary judgment denied.** |
| Monty Souther | June 1997 | May 2005 | **Summary judgment denied.** |
| Donna Worthington | Aug 2003 | Dec 2003 | **Summary judgment denied.** |

## II. Facts

### A. Nature of Zyprexa

Zyprexa's active ingredient is olanzapine, one of a class of medications known as "atypical" or "second generation" antipsychotics. It was approved for use in treating schizophrenia and acute manic episodes associated with bipolar disorder by the FDA in 1996. In 2004, the FDA also approved Zyprexa for the treatment of bipolar disorder.

### B. FDA Labeling

#### 1. *September 2003 Label Change*

In May of 2000, the FDA undertook an analysis of the incidence of diabetes and hyperglycemia in patients using atypical antipsychotics. The director of the FDA's Division of Neuropharmalogical Drug Products ("DNDP") wrote to Lilly requesting additional safety information about Zyprexa. In its letter, the FDA cited post-marketing reports of diabetes-related adverse events associated with Zyprexa use. In response, Lilly provided the FDA with clinical studies, data analysis, and case report reviews. The parties disagree about whether the information given by Lilly to the FDA was complete and accurate.

On September 11, 2003, the FDA required a warning about risks of hyperglycemia and diabetes mellitus and treating precautions to appear in the package insert of all atypical antipsychotics, including Zyprexa. Designed for prescribing doctors, the label noted that epidemiological studies and other information indicated the relationship between the drug and hyperglycemia and diabetes were not yet fully understood. It reads:

> WARNINGS
> Hyperglycemia and Diabetes Mellitus
> Hyperglycemia, in some cases extreme and associated with
> ketoacidosis or hypersomolar coma or death has been reported in

25

patients treated with atypical antipsychotics including Zyprexa. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available . . . .
Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing.

Curiously, the label did not mention weight gain or diabetes in the "warning to patients" section.

Lilly added the FDA required language to the Zyprexa label on September 16, 2003. It issued a press release announcing the label change on September 17, 2003. At the FDA's request, on March 1, 2004, Lilly sent a "Dear Doctor" letter to physicians in the United States informing them of the 2003 label change.

2. *Consensus Statement of American Diabetes Association and Other Learned Groups*

In November of 2003, the American Diabetes Association, American Psychiatric Association, American College of Clinical Endocrinologists, and the North American Association for the Study of Obesity convened a consensus development conference (the "ADA

26

consensus conference") on the subject of the association between antipsychotic drugs and

diabetes. An eight member panel heard presentations from 14 experts drawn from the fields of

psychiatry, obesity, and diabetes; FDA representatives; and atypical antipsychotic drug

manufacturers. The panel reviewed most of the relevant peer-reviewed English language

scientific articles.

The ADA consensus conference concluded that Zyprexa and Clozaril posed an increased

risk of diabetes as compared to other atypical antipsychotic drugs The consensus statement

declared that these relative risks as well as advantages of the individual drugs for individual

patients in a heterogeneous population "should . . . influence drug choice." In part its report

concluded:

> There is considerable evidence, particularly in patients with schizophrenia, that
> treatment with [atypical antipsychotics] can cause a rapid increase in body weight in
> the first few months of therapy that may not reach a plateau even after 1 year of
> treatment. There is, however, considerable variability in weight gain among the
> various [atypical antipsychotics] . . . . Clozapine [Clozaril] and olanzapine [Zyprexa]
> . . . produce the greatest weight gain.
>
>                                            \*\*\*
>
> Despite limitations in study design, the data consistently show an increased risk for
> diabetes in patients treated with clozapine [Clozaril] or olanzapine [Zyprexa]
> compared with patients not receiving treatment with [first general antipsychotics] or
> with other [atypical antipsychotics]. The risk in patients taking risperidone and
> quetiapine is less clear; some studies show an increased risk for diabetes, while
> others do not. The two most recently approved [atypical antipsychotics], aripiprazole
> and ziprasidone, have relatively limited epidemiological data, but available clinical
> trial experience with these drugs has not shown an increased risk for diabetes.
>
>                                            \*\*\*
>
> [T]he risks of obesity, diabetes, and dyslipidemia have considerable clinical
> implications in this patient population and should . . . influence drug choice. Even
> for those medications associated with an increased risk of metabolic side effects, the
> benefit to specific patients could outweigh the potential risks. For example,

clozapine [Clozaril] has unique benefits for treatment-refractory patients and those
at significant risk for suicidal behavior. Since treatment response in many psychiatric
conditions is heterogeneous and unpredictable, physicians and patients can benefit
from the availability of a broad array of different therapeutic agents.

***

These three adverse conditions [obesity, diabetes, and dyslipidemia] are closely
linked, and their prevalence appears to differ depending on the [atypical
antipsychotic] used. Clozapine [Clozaril] and olanzapine [Zyprexa] are associated
with the greatest weight gain and highest occurrence of diabetes and dyslipidemia.
Risperidone and quetiapine appear to have intermediate effects. Aripiprazole and
ziprasidone are associated with little or no significant weight gain, diabetes, or
dyslipidemia, although they have not been used as extensively as other agents.
The choice of [atypical antipsychotic] for a specific patient depends on many factors.
The likelihood of developing severe metabolic disease should also be an important
consideration.

### 3. FDA March 2007 Letter

On March 28, 2007, the FDA raised concerns about the adequacy of Zyprexa's warning

label in a letter to Lilly.

[W]e are concerned that the labeling is deficient with regard to information about
weight gain, hyperglycemia, and hyperlipidemia that is associated with olanzapine
[Zyprexa] use . . . . Our overall goal is to improve labeling with regard to these
findings so that clinicians will be better informed on what the risks are for their
patients. They cannot make reasonable treatment decisions until they have such
information. We do not feel that current labeling for . . . Zyprexa provides sufficient
information on these risks, and we fully intend to insure that . . . labels are enhanced
with the best available information to characterize these risks.

### C. International Zyprexa Labeling

#### 1. Japan

Lilly began marketing Zyprexa in Japan in 2001. In April of 2002, after reports of 9

serious cases of hyperglycemia and diabetic ketoacidosis among Zyprexa users in Japan, the

Japanese Ministry of Health Labor and Welfare required Lilly to issue to physicians an

"Emergency Safety Information" letter about Zyprexa's risks. The Japanese agency further

28

required that Zyprexa's warning be adjusted to include a contraindication against use of Zyprexa by diabetics and instructions to monitor patients' blood glucose with an initial fasting blood glucose test and periodic tests thereafter while they were using Zyprexa.

### 2. *European Union, Australia, and Canada*

Before the September 2003 change, Zyprexa's label contained more strongly-asserted warnings about the risk of developing diabetes in the European Union, Australia, and Canada than in the United States. The European Union's Agency for the Evaluation of Medicinal Products required Lilly to discuss the risks of hyperglycemia and diabetes in Zyprexa's label in 1999. Unlike the American label, the European Union label contained an explicit warning regarding diabetes, and the Australian and Canadian labels contained explicit precautions regarding diabetes.

### D. Lilly's Promotion of Zyprexa

#### 1. *Pre-September 2003 Label*

Lilly sales representatives marketed and promoted Zyprexa directly to physicians. In the late nineteen nineties, as scientific studies began to posit a link between Zyprexa and hyperglycemia and diabetes, the sales department struggled to find an appropriate way to address those risks with physicians. In one internal email exchange in November 1998 within Lilly's medical marketing group, a salesperson suggested the following points be made in response to "recent reports linking the use of olanzapine [Zyprexa] and the development of diabetes": "Use of antipsychotics may result in weight gain . . . . Patients who gain weight may develop insulin resistance which may lead to hyperglycemia and diabetes."

In response to that suggestion, a senior executive within the medical group stated the

29