following: "I do have concerns regarding making any connections between olanzapine [Zyprexa]-induced weight gain and hyperglycemia. Therefore, in my opinion, I would not include your following statement: 'Patients who gain weight may develop insulin resistance which may lead to hyperglycemia and diabetes.'"

Zyprexa was approved by the FDA for treating schizophrenia and bipolar disorder, two conditions usually managed by psychiatrists. In late 2000, however, Lilly decided to begin directing its Zyprexa marketing efforts towards primary care physicians ("PCPs"). This strategy was outlined by the company as follows:

> Following several months of study by the LillyUSA Zyprexa Brand Team, the affiliate approved the recommendation that Lilly actively promote Zyprexa to selected current primary care prescriber targets . . . . We believe there to be significant unmet medical need among office-based primary care physicians . . . . Zyprexa's profile is ideal for primary care (safe, simple, well-tolerated, effective, versatile). Zyprexa would enjoy first mover advantage in this segment . . . .
> ***
> Challenges: Most PCPs currently prescribe a low volume of antipsychotics and mood stabilizers. Many PCPs will refer patients in need to psychotropic treatment to a specialist rather than treat the patient. Key barriers to uptake include PCP's lack of training in this category, limited time with patients, and an aversion to perceived risk. Zyprexa's primary indications — schizophrenia and bipolar — are not viewed as PCP-treated conditions, so there's not a specific indication for Lilly reps to promote in the PCP segment
> ***
> Position: Zyprexa: The safe, proven solution in mood, thought, and behavioral disorders. We will emphasize safety to address barriers to adoption . . . . The word 'solution' speaks to unmet medical need, and enables the PCP to take control of clinical situations that previously had led to referrals and/or poor outcomes. 'Mental disorders' is intentionally broad and vague, providing latitude to frame the discussion around symptoms and behaviors rather than specific indications.

### 2. Post-September 2003 Label

After the September 2003 label change, *see supra* Part III.B.1, and the ADA Consensus Conference, *see supra* Part III.B.2, Lilly sales representatives remained reluctant to discuss the

risk of diabetes with physicians.  An internal Lilly presentation about Zyprexa and diabetes to sales representatives instructed: "This is a highly competitive driven issue.  Therefore, we will NOT proactively address the diabetes concern, but rather only when it arises from an MD." (emphasis in original).

Lilly salespeople apparently still continue to deny to physicians that Zyprexa "causes" weight gain and diabetes.  For example, Lilly sales representative Susan Kay Schuler gave the following deposition testimony on this subject in February of 2007:

Q: . . . . [W]hen would you have first detailed Zyprexa?

A: July of 1999.

Q: Okay.  And are you detailing Zyprexa today?

A. Yes.

***

Q: If you were to detail Zyprexa this week and a doctor was to ask you, Do I need to be concerned with Zyprexa causing diabetes, what would be your response?

A: It does not cause diabetes.  There isn't any information or scientific information regarding Zyprexa causing diabetes.

***

Q: And can I ask what training you would have received that would have led you to that answer?

A: Direct meeting training.

Q: Training that was provided by Eli Lilly?

A: Correct.

***

Q: If the doctor were to ask you during your detailing this week, I need a yes or no answer, does Zyprexa cause weight gain, what would be your answer?

A: No.

***

Q: Since you started detailing in 1999, would the answer you just gave me about Zyprexa's connection with weight gain, would it have remained the same over the

31

course of time?

A: Yes.

\*\*\*

Q: A minute ago I asked you if a doctor were to ask you this week, while detailing, Does Zyprexa cause diabetes . . . . Would an answer to that question have remained the same over time since 1999?

A: Yes.

\*\*\*

Q: Would you be surprised to hear Zyprexa is 12 times more likely to cause weight gain than the other anti-typical psychotics?

\*\*\*

A: Yes.

\*\*\*

Q: Has anyone ever told you or have you learned through your study of Zyprexa that an average person gained 24 pounds in 12 months while on Zyprexa?

A: No.

\*\*\*

Q: Did anyone ever tell you or did you know that there were warnings in Japan over weight gain and the risk of diabetes with the use of Zyprexa a year-and-a-half prior to the warnings were [sic] received here in the United States?

\*\*\*

A: No.

Q: Do you have an understanding that weight gain causes diabetes?

\*\*\*

A: No.

Q: As we sit here today, do you believe that Zyprexa affects blood sugar levels?

A: No.

\*\*\*

Q: Are you familiar with the March 2004 'Dear Doctor' letter concerning diabetes and Zyprexa?

\*\*\*

A: There have been many Dear Doctor letters, and I am not familiar with any one in particular because there have been more than one.

Q: Do Dear Doctor letters affect the message you present to the doctors while detailing?

A: No. The Dear Doctor letters typically come from the company. And we provide

32

that letter.  And if they have any questions, we're able to answer them.

Schuler Deposition, 13-62 (February 1, 2007).

Lilly salespeople generally do not admit that other atypical antipsychotic drugs may

provide lesser risk of diabetes than Zyprexa.  The Schuler deposition continued:

> Q: If a doctor were to ask you that question in regard to Zyprexa, would — in light
> of Zyprexa, would you agree that treatment-emergent diabetes is comparable across
> agents?
>
> A: Yes.
>
> Q: Is that a statement that you could find anywhere currently in your — in your sell
> sheets or any other documents you carry?
>
> A: Yes.

*Id.*

This response is contrary to the conclusion of the ADA Consensus Conference.  *See* Part

II.B.2, *supra.*

E. Plaintiffs

1. *Robert Cusella*

a) Patient History

Cusella is a fifty-six year old Pennsylvania resident who was diagnosed with

schizophrenia in 1973.  Def. Statement of Undisputed Material Facts for Robert Cusella, Ex. 1, 2

(hereinafter "Def. Stat. Cusella"); *Id.*, Ex. 2, 20-21.  Zyprexa was first prescribed for him  in May

of 1997.  *Id.*, Ex. 2, 57-58.

He was diagnosed with Type 2 non-insulin-dependent diabetes mellitus in or around

September of 1996, before he first took Zyprexa.  *Id.*, Ex. 8, 12.  He began to be treated with

insulin in August of 1999.  *Id.*, Ex. 6, CUSELLAR_NFP_0066.  Cusella alleges that Zyprexa

caused a worsening in his condition so that he went from having non-insulin-dependent diabetes mellitus to having insulin-dependent diabetes mellitus. *Id.*, Ex. 1, 12. He stopped taking Zyprexa in April of 2005. *Id.*, Ex. 2, 121.

This plaintiff commenced an action against Lilly on April 12, 2006, in the Eastern District of New York.

### b) Prescribing Physician's State of Knowledge

Cusella's psychiatrist, Dr. Peter Ganime, prescribed Zyprexa. Pl.'s Opp'n to Def.'s Mot. for Summ. J.Cusella, Ex. 51, 57-58 (hereinafter "Pl. Opp. Cusella"). Dr. Ganime has practiced psychiatry for forty years and is a Clinical Assistant Professor of Psychiatry at Robert Wood Johnson University of Medicine. *See* Appendix A, *infra.*

Dr. Ganime knew that Cusella had non-insulin-dependent diabetes before he prescribed Zyprexa. *Id.*, Ex. 51, 56-57. The doctor was aware of the various prescription drugs Cusella had used and other available drugs. Over the course of his treatment Cusella and his psychiatrist thoroughly discussed the problems of weight gain and the ongoing management of his diabetes by his primary care physician.

In September of 2002 Dr. Ganime raised with Cusella "recent controversies about Zyprexa and blood sugar elevation." *Id.*, Ex. 51, 89-93. Dr. Ganime describes his conversation with Cusella as follows:

> I talked to him about the fact that concerns had been raised about diabetes and blood sugar elevation . . . . discussed recent controversies about Zyprexa and blood sugar elevation. He was telling me that he was diabetic, and I told him that Zyprexa, you know, there were concerns about these medicines perhaps causing weight gain, perhaps raising blood sugar, and that we need to think about that. He told me a little bit about his current diabetes meds . . . . He said he wasn't losing weight. He admits to cheating on diet. And that when – that's when his blood sugar goes up, when he cheats on his diet. I know it's my fault, it's not the Zyprexa, he said.

34

***

Q: [D]id you disagree with Mr. Cusella?

A [Dr. Ganime]: No, I had to accept his reasoning.  It seemed rational to me.  It seemed reasonable.

Q: And if you had thought that continuation on Zyprexa was not rational and reasonable, I take it you wouldn't have continued to prescribe it?

A: I would have told him that.  I also, you know, would have expected to hear something from the doctor who was treating him for diabetes, also.  It's not unusual for a family doctor or another physician to call a psychiatrist and say, I really think this person shouldn't be taking his medication.  And, of course, one would defer to that.  I never received any communications like that.

*Id.*

In a subsequent deposition, Dr. Ganime elaborated on the information in his possession

concerning the link between Zyprexa and weight gain and diabetes during the time he was

treating Cusella:

Q: Now, Doctor, at no time did any representative from Eli Lilly tell you that the drug Zyrpexa is four times mores likely to cause diabetes than any of the other atypicals?  Did they ever tell you that?
***
A [Dr. Ganime]: I don't have any recollection of anybody coming, tell me that, no
.
Q: Were you ever advised by Eli Lilly representatives when you prescribed Zyprexa to Mr. Cusella that a patient would be 12 times more likely to have clinically significant weight gain on Zyprexa over placebo?  Were you ever told that?
***
A: Eli Lilly had sent out information about the issues we're talking about, maintaining proper weight, eating properly, monitoring people who do have diabetes. I've never had a representative sitting there telling me twelve times this and four times that.  Eli Lilly ultimately issued, as you know, a Dear Doctor warning letter sometime in March of 2004.  And I don't recall the letter being that clear.
***
Q: Do you ever remember being told by an Eli Lilly representative during 1997 to 2000 time period that the average weight gain on Zyprexa was 24 pounds in 12 months?
***
A: I don't remember what the representatives told me.

35

Q: Were you ever advised by an Eli Lilly representative not to administer Zyprexa to patients who have diabetes?

\*\*\*

A: I never had an Eli Lilly representative tell me what to prescribe and what not to prescribe.

Q: All right. In 1997, that was the year that you first prescribed Zyprexa to Mr. Cusella, you were advised by the Eli Lilly pharmaceutical representatives that Lilly had already received 200 reports of increased blood sugar from adverse event reports from the use of Zyprexa?

A: The answer is no.

Q: Were you ever advised by Lilly representatives that in July of '00 in Europe warnings were given by Lilly concerning the risk of hyperglycemia?

\*\*\*

A: No.

*Id.* Ex. 52, 21-23.

This treating psychiatrist was deposed at length. His deposition reflects an experienced physician knowledgeable about available medicines, sensitive to the needs of the patient, and committed to fully discussing relative benefits, risks and dangers with the patient. *See* Exhibit A, *infra*.

### c) Representations Made by Lilly Salespeople to Dr. Ganime

Dina Bray was the Lilly sales representative assigned to Dr. Ganime. Neither Dr. Gamine nor Bray appear to remember any specific conversation between them. Bray has described generally the information she possessed and conveyed to doctors regarding Zyprexa's risks and side effects. She denied Zyprexa causes diabetes. Her deposition in part is as follows:

Q: If a doctor said to you, in the context of your detailing visit, "Zyprexa is associated with hyperglycemia," how would you respond?

A [Bray]: That's [sic] it's a class labeling, and that's in our package insert.

\*\*\*

Q: Okay. Does Zyprexa cause diabetes?

36

A: Not to my knowledge, it doesn't.

\*\*\*

Q: Do you believe that Zyprexa can affect blood sugar levels?

\*\*\*

A: No.

\*\*\*

Q: . . . Do you believe as you sit here today that there's a relationship between diabetes and Zyprexa?

A: No.

\*\*\*

Q: At any time did Eli Lilly ever tell you that Zyprexa or olanz [sic] was one of the worst offenders for weight gain among atypical antipsychotics?

A: Independent of it, no, no.

*Id.*, 90-186.

Bray is currently employed by Lilly as a senior sales representative. *Id.* at 10. Her work had little if any effect on Dr. Ganime's treatment of Cusella.

### 2. *Judith New*

#### a) Patient History

Plaintiff Judith New is a forty-nine year old Florida resident who was diagnosed with schizophrenia around 2000 and 2001. Def. Statement of Undisputed Material Facts for Judith New, Ex. 3, 79 (hereinafter "Def. Stat. New"). Zyprexa was first prescribed for her in April of 2003. *Id.*, Ex. 10, 23-25. She was diagnosed with type 2 diabetes mellitus in September of 2004, though her physician was unsure whether New then suffered from diabetes mellitus or impaired glucose tolerance, which is a precursor to diabetes mellitus. *Id.*, Ex. 9, 29-30, 38.

New stopped taking Zyprexa in July of 2005. *Id.*, Ex. 2, JN-04-000055. She subsequently resumed treatment with Zyprexa in October of 2005. *Id.*, Ex. 6, 23-24. She finally discontinued use of Zyprexa in August of 2006. Pl.'s Opp'n to Def.'s Mot. for Summ. J. New,

37

Ex. 55, NEWJ_ACI_0015.

This plaintiff commenced an action against Lilly on April 12, 2006, in the Eastern

District of New York.

### b) Prescribing Physician's State of Knowledge

No evidence has been presented regarding the doctor who first prescribed Zyprexa for

New in April 2003. She began seeing the psychiatrist Dr. Nunez-Hinestrosa ("Dr. Nunez") in

January of 2004. He continued her Zyprexa treatment. *See* Def. Stat. New, Ex. 6, 22. Dr. Nunez

described his familiarity with Zyprexa's side effects and decision to continue Ms. New on the

medication, partly because the patient did not wish to stay on an alternate drug he tried:

> Q: During the time that you treated Judith New and prescribed Zyprexa for her, were
> you familiar with the contents of the Zyprexa insert that relate to certain metabolic
> issues?
>
> A [Dr. Nunez]: Yes.
>
> Q: And during that period of time, were you familiar with the contents of the insert
> as related to weight gain associated with Zyprexa use?
>
> A: Yes.
>
> Q: Were you familiar with the contents of the label relating to elevation in blood
> glucose levels?
>
> A: Yes . . . . That change [sic] over time. When Zyprexa first came, it didn't have
> that. I don't think that we were aware of that during that —
>                                    ***
> Q: All right. And in Miss New's case, why did you prescribe Zyprexa for her?
>
> A: When I took up her case, she was already on Zyprexa. And she was doing well, is
> what she would say, and she liked Zyprexa. Sometime in 2004 or beginnings of '05,
> I took her off, in part because of her weight gain and these things, and also because
> Medicare had some kind of problem with Zyprexa . . . . So we switched her to a
> different medication. She was on that medication for a while. And one day she came
> and told me that she didn't want that medication anymore. We tried to adjust it in a
> way that was helping her. But she didn't like it, complained of side effects. And one

38

> day [October 11, 2005] . . . . [s]he came and told me that she wanted to go back on
> Zyprexa . . . . That same day we agreed to discontinue the Seroquel, that she conveyed
> that she would not continue taking, and we resumed Zyprexa 15 milligrams and
> specifically . . . I explained . . . again the possible side effects, excessive weight gain,
> diabetes, hyperlipidemia of Zyprexa, and she insisted that's what she wanted.

*Id.* at 21-25 (quotation marks omitted).

Dr. Nunez was aware of the risks and benefits of Zyprexa.  He believed the benefits to

this patient outweighed the risks, as indicated by his deposition testimony.

> Q: And in your opinion, with respect to this patient, do you believe that the benefits
> of Zyprexa outweigh the risks in terms of treating her illness?
>
> A: Yes.

*Id.* at 25.  For further parts of the Nunez and other treating physicians' depositions, *see* Appendix

B, *infra.*

### c) Representations Made by Lilly Salespeople

Ronnie Taylor was the Lilly sales representative assigned to promote Zyprexa to Dr.

Nunez between 2000 and 2003.  Taylor insisted to all the doctors he spoke to that the risks of

weight gain and diabetes were comparable across all atypical antipsychotics:

> Q: In the time frame 2000 to 2003 did any physician ever say to you, [y]our
> competition is saying Zyprexa is the worst offender for weight gain?
>
> A: Every day.
>
> Q: And how did you respond to that physician?
>
> A: Well, Eli Lilly, at that point they had a detail piece that showed a comparison
> between Risperdal, Zyprexa, Depakote, Clozaril.  It just showed basically a
> comparison between the two of weight gain and increase in the risk of that.  And
> that's what you showed.  I just went over it.  I didn't focus on it.  It's a class effect
> and the doctors knew it was a class effect; they was just trying to pull your chain.  I
> didn't waste my time on that to these doctors.
> 			\* \* \*
> Q: What was your understanding, in the class of atypical antipsychotics, where

39

Zyprexa ranked in terms of being an offender for weight gain?

\*\*\*

A: Yes, rank it either one, two, or three. It was pretty much — you know, according to the studies of what we had, it basically caused it no more than Clozaril or any of the rest of them. It was a class effect.

\*\*\*

Q: Do you believe that Zyprexa can affect blood sugar levels?

\*\*\*

A: Yes, I think it could, as a class.

Q: I'm sorry?

A: As well as the drugs in that class, yes, it could.

Q: What was your understanding of the risks regarding Zyprexa?

A: It was no more than any of the rest of them when you looked at the material that Lilly provided you to show to the physicians.

Q: And that is — and those risks would be weight gain and diabetes?

\*\*\*

A: Well, it was according to what the material was and it would show a comparison between Zyprexa and the other drugs as compared to weight gain and as compared to the risk of diabetes. So, again, we are talking about two separate issues, and the company provided the material to show the physicians.

\*\*\*

Q: You testified a few times in your deposition that diabetes was comparable for all atypical antipsychotics?

A: Yes.

Q: Do you remember saying that?

A: I sure do, yes.

Deposition of R. Taylor (Dec. 26, 2006), 64-65, 87-88, 95-97, 173.

Taylor continues to believe that Zyprexa does not cause diabetes.

A: I would not sit here and tell you that Zyprexa causes diabetes. I would sit here and tell you that schizophrenia as a group, or mental illness as a group, the incidence of diabetes is greater in those particular groups than it is in general population.

*Id.* at 89.

40

Taylor left his position at Lilly on December 31, 2005.

From 2004 onwards, Michael Bolinder was the Lilly sales representative assigned to Dr. Nunez. He does not believe there is a causal relationship between Zyprexa and diabetes:

> Q: Okay. I take it that at some point in time, and we've kind of talked about this already, the issue of the association between Zyprexa and diabetes or causing diabetes came to your attention and was something that you were taught about and learned about and talked to doctors about; is that correct?
>
> ***
>
> A: What I would say is with regard to Zyprexa, quote/unquote, causing diabetes, I don't think that I've ever seen any material that shows a direct connection between Zyprexa causing diabetes. However, as we've talked about previously, we did have a body of evidence that suggested that chronic severe mentally ill patients tend to be in a population or a subpopulation of a general population that are more prone to higher instances of hyperglycemia and diabetes.
>
> Q: And would that fact be one of the responses that you would talk to a doctor about if you were discussing whether there was a relationship between diabetes and Zyprexa.
>
> ***
>
> A: I think similar to what I said earlier with regard to if somebody said they had a concern about diabetes and Zyprexa, I would share with them, like I mentioned earlier, the data that we had suggested, that while it's an epidemic — while diabetes is an epidemic in the general population, it appeared that this particular subset of the population tend to be prone to increased risk of diabetes. But we never, at least the data that we had at our disposal didn't show any particular increased risk for patients on any given atypical antipsychotic.
>
> ***
>
> Q: And then after the label change, did you ever say to a doctor that one of the risks of Zyprexa is that your patient may develop diabetes?
>
> ***
>
> A: My recollection — I don't have a specific recollection of ever stating it necessarily in the way that you state the question. However, my recollection is that we proactively discussed the fact that that patient subset or that population — subset of the population of these patients that were treated on atypical antipsychotics were at an increased risk for developing diabetes. And, you know, we didn't see a correlation between any one particular agent, or at least the FDA didn't see a correlation in the data they observed, and when they worded that warning, there was no direct correlation between any one agent.

Deposition of Michael Bolinder (Dec. 15, 2006), 83-89.

3. *Monty Souther*

a) Patient History

Plaintiff Monty Souther is a 50-year old resident of North Carolina who suffers from

bipolar disorder, among other psychiatric illnesses. Def. Statement of Undisputed Material Facts

for Monty Souther, Ex. 9, 6, 11 (hereinafter "Def. Stat. Souther"). Zyprexa was prescribed for

him in June of 1997. *Id.*, Ex. 9, 17.

Souther contends that he was diagnosed with diabetes in May of 2003. His physician's

memory of the precise diagnosis is hazy:

> Q: And so at that time in May of 2003, Doctor, . . . were you actually
> diagnosing him with diabetes or not?
>
> A: Sort of, kind of, probably not.
>
> Q: Probably not?
>
> A: But headed that way. I would say right now he had — impaired
> glucose metabolism is what I would call it now, although at that time
> the term wasn't around. That descriptive term wasn't used yet.

*Id.*, Ex. 8, 30-31.

Souther stopped taking Zyprexa around May of 2005. *Id.*, Ex. 1; Pl.'s Opp'n to Def.'s

Mot. for Summ. J. Souther, Ex. 50, 128 (hereinafter "Pl. Opp. Souther"). He commenced an

action against Lilly on April 12, 2006, in the Eastern District of New York.

b) Prescribing Physicians' State of Knowledge

Souther was first prescribed Zyprexa by Dr. Thaddeus Kostrubala in July of 1997. Pl.

Opp. Souther, Ex. 51, 17. Dr. Kostrubala has described his knowledge of Zyprexa's risks, and

discussion of those risks with Souther, as follows:

> Q: . . . . there anything particular about Zyprexa at that time that set it apart from any

of the other ones?

A [Dr. Kostrubala]: . . . My recollection of it, it was considered a safe medication .
. .

Q: Okay. And what about the side effects? What do you recall were the side effects
that were —

A: I don't recall now. I would have to have the data in front of me . . . . But
basically, the information I used would coming from other data [besides that
communicated by Lilly sales representatives]. And what I'm talking about is such
— for example, the PDR, the information provided explicitly by the drug company,
conferences, as well as discussions with other physicians and psychiatrists.

Q: All right. Do you recall whether you had the opportunity back then to read any
studies that had been done about Zyprexa?

A: I don't recall.

Q: All right. And can I assume that you were busy practicing psychiatrist, and were
not doing your own independent research on Zyprexa?

A: No, I was not.
                                   ***
Q: . . . Doctor, when you discussed the risks and benefits of Zyprexa with Mr.
Souther, did you — do you recall discussing with him that Zyprexa carried with it a
risk of weight gain, hyperglycemia and diabetes?
                                   ***
A: I don't recall that at all.

Q: Do you recall whether you were aware that Zyprexa carried with it a risk of the
development of weight gain, hyperglycemia and diabetes?
                                   ***
A: It does not stand out in my mind, no.
                                   ***
Q: But if you had been aware back in 1997, when you were prescribing Zyprexa to
Mr. Souther, that Zyprexa carried a risk four times greater than any of the other what
I'll call atypical antipsychotic medications, would you have discussed that fact with
Mr. Souther before prescribing it to him?
                                   ***
A: If I had known that, I certain would have.

Q: Okay. And if you had known that there were other drugs available at that time
that were equally effective to Zyprexa, but did not carry that type of a risk for

43

hyperglycemia, weight gain and diabetes, would you have started him out on the other medication?

***

A: Yes.

*Id.*, Ex. 51, 24-29.

In November 1998, Souther began seeing Dr. Lynda Weston, a psychiatrist, who continued to treat him with Zyprexa. Dr. Weston does not recall specifically the knowledge she had of the risks of weight gain, hyperglycemia, and diabetes posed by Zyprexa during the period between 1998 and 2002, the time she treated Souther. *Id.*, Ex. 52, 18-20, 24. She described what she does remember as follows:

Q: And what were the other salespeople saying back in '96 and '97 with regard to Zyprexa? The non-Lilly salespeople . . . . what were they saying?

A: Well, they would primarily point out the positive points of their medication.

Q: . . . But would they touch on weight — relative weight gain?

A: That came later . . . . After it was out for a little while, that became in issue. And that was one of the selling points for some of the other products.
. . . .
Q: And [Souther's] weight gain, did you attribute that to the use of the Zyprexa?

A: It's hard to say whether I did at that time or not. Whether were — we were probably beginning to notice that some with Zyprexa, but weight gain in psychiatric patients has always been a concern.

***

Q: . . . . Were you aware that Zyprexa was causing more weight gain than other atypical antipsychotics?

A: It appeared to be the case.

Q: And the information where you learned that from, you did that on your own; is that a fair statement?

A: Well, we observed it in patients.

***

Q: Do you agree with me that the diabetes rates are not the same for all atypicals?

44

A: I don't know.

Q: Is that something you would want to know when you're prescribing a drug?

A: It would certainly be nice to know.

*Id.*, Ex. 53, 46, 51.

From September 2002 until May 2005, Souther was treated by Dr. Michael Nunn, a

psychiatrist, who continued to prescribe Zyprexa. *See* Appendix D, *infra*.

### c) Representations Made by Lilly Salespeople

Susan Kay Schuler was the Lilly sales representative assigned to Dr. Nunn. Schuler's

deposition testimony is referred to in Part II.D.2, *supra*.

### 4. *Donna Worthington*

#### a) Patient History

Plaintiff Donna Worthington is a fifty-seven year old North Carolina resident who was

diagnosed with bipolar disorder in October of 2001. *See* Def. Statement of Undisputed Material

Facts for Donna Worthington, Ex. 1, 1 (hereinafter "Def. Stat. Worthington"); *Id.*, Ex. 6,

WORTHINGTOND_DGHI_0003. She was first prescribed Zyprexa to treat her bipolar disorder

in on August 5, 2003. *Id.*, Ex. 7, WORTHINGTOND_OBHH_0013.

In December 2003, Worthington's glucose level was tested and found to be above the

normal range. In light of the high level, and potential association between Zyprexa and diabetes,

Worthington's physician discontinued her Zyprexa treatment. Pl.'s Opp'n to Def.'s Mot. for

Summ. J. Worthington, Ex. 53, 27-29 (hereinafter "Pl. Opp. Worthington") ("Given the risk of

elevated glucose with Zyprexa, we decided to discontinue this medication."); Worthington was

diagnosed with diabetes on April 13, 2004. *Id.*, Ex. 9, WORTHINGTOND_POWELLL-0008.

45

Worthington commenced this action against Lilly on April 12, 2006, in the Eastern District of New York.

### b) Prescribing Physician's State of Knowledge

Worthington was first prescribed Zyprexa by Dr. Deborah Ross in August of 2003. Dr. Ross has testified that she was not aware of a connection between Zyprexa and diabetes at that time:

> Q: . . . . I asked you before did you advise [Worthington] of the increased risk of diabetes and you said . . . . you did not the first time . . . did you at discharge or at –
>
> A [Dr. Ross]: No.
>
> Q: – any other time?
>
> A: No. It wasn't that clear then that that was a risk for this drug.
>
> ***
>
> Q: All right. And do you have any recollection of reading anything in the PDR [Physicians' Desk Reference] about the risks of diabetes from taking Zyprexa?
>
> A: I don't — I don't remember at that time reading it.
>
> Q: Okay.
>
> A: I think it was sometime later.
>
> Q: Okay. All right. Had you known, had it been written in the PDR . . . . that Zyprexa carried with it a four times greater risk of weight gain, hyperglycemia and diabetes than any of the other atypical antipsychotics . . . . would you have considered that in your making your decision as to whether or not to prescribe Zyprexa?
>
> ***
>
> A: I consider all risk factors for all drugs, but at the time . . . of the drugs that were available, I felt this was going to be the most effective to getting her mania controlled, and that was the primary problem she came to me with.
>
> Q: All right. Well, how about answer — the question is would — would that information have affected the way that you assess your risk/benefit analysis.
>
> A: Oh, sure.
>
> ***
>
> Q: [W]hen you had the risk/benefit discussion with the patient . . . . prior to

46

prescribing it, would that be something you would have told the patient?

A: Yeah, I'm sure.

Q: And if you had that information and if you went ahead and prescribed Zyprexa anyway, do you think would have perhaps monitored the . . . blood sugar levels of the patients?

A: Down the road, not within five days. They're not going to change that quickly.

Q: Okay. But at some point if they're –

A: Yeah.

Q: – still on the drug, you want to –

A: Yes.

Q: – do that?

A: And we do that now.

Pl. Opp. Worthington, Ex. 51, 63-64. *See* Appendix E, *infra*.

### c) Representations Made by Lilly Salespeople

It can be assumed for purposes of this motion that representations were made by Lilly's salespeople to Dr. Ross, similar to those described in Part II.D.2, *supra*.

## III. Summary Judgment

### A. Law

#### 1. *Summary Judgment Standard*

##### a) Generally

Summary judgment is appropriate only if "there is no genuine issue as to any material fact . . . [in which case] the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *see also Mitchell v.*

47

*Washingtonville Central School District*, 190 F.3d 1, 5 (2d Cir. 1999).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Fund.*, 51 F.3d 14, 18 (2d Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed. R. Civ. P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture[.]" *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("Conclusory allegations will not suffice to create a genuine issue.").

Peripheral factual disputes will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

In deciding the motion, all inferences from, and ambiguities in, the underlying facts are to be resolved in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348 (1986). Only when reasonable minds could not differ as to the import of the proffered evidence is summary judgment proper. *See Anderson*, 477 U.S. at 250-52; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

"In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). Critical is recognition of the jury's fact-finding primacy:

48

> It is well established that credibility assessments, choices between
> conflicting versions of the events, and the weighing of evidence are
> matters for the jury, not for the court on a motion for summary
> judgment. If, as to the issue on which summary judgment is sought,
> there is any evidence in the record from which a reasonable
> inference could be drawn in favor of the opposing party, summary
> judgment is improper.

*Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (quotation marks omitted).

b) Right to a Jury

The Seventh Amendment of the Constitution protects the right to a jury trial. It reads: "In suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

The Seventh Amendment "was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." *See Galloway v. United States*, 319 U.S. 372, 392, 63 S. Ct. 1077 (1943); *Ex parte Peterson*, 253 U.S. 300, 309-12, 40 S. Ct. 543 (1920). The late Chief Justice Rehnquist nonetheless observed that whatever procedural changes are made, they cannot be allowed to invade the "jury's province"—its fact-finding power. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 345-46, 99 S. Ct. 645 (1979) (Rehnquist, J., dissenting).

Yet, the jury has had some of its fact-finding authority attenuated indirectly through various evolving "procedural devices." Fed. R. Evid. 104(a) (judicial discretion to bar evidence that fails conditional relevancy); Fed. R. Evid. 403 (judicial discretion to bar cumulative, irrelevant, prejudicial information); Edward J. Imwinkelried, *Trial Judges—Gatekeepers or*

49

*Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert Testimony Without Invading the Jury's Province to Evaluate The Credibility and Weight of the Testimony?*, 84 Marq. L. Rev. 1, 7 (2000) (*Daubert* may limit jury's fact finding role); Lisa S. Meyer, *Taking the "Complexity" Out of Complex Litigation: Preserving the Constitutional Right to a Civil Jury Trial*, 28 Val. U. L. Rev. 337 (1993) (juries replaced by bench trials in complex cases). The increasing use of bench trials, *Daubert* hearings, summary judgments, and directed verdicts—as authorized by rules of practice and appellate courts—to limit jury fact finding and set aside verdicts poses a threat to the continued viability of the Seventh Amendment jury trial. *See* Suja A. Thomas, *Why Summary Judgment is Unconstitutional*, 93 Va. L. Rev. 139 (2007); Adam Liptak, *Cases Keep Flowing In, But the Jury Pool is Idle*, N.Y. Times, April 30, 2007, at A14 ("Jury trials may be expensive and time-consuming, but the jury, local and populist, is a counterweight to central authority and is as important an element in the constitutional balance as the two houses of Congress, the three branches of government and the federal system itself.").

Prematurely disposing of a case before the jury can pass on it generally favors defendants, who do not have the burden of proof on most issues, leading not only to a violation of the Constitution, but a tilting of the scales of justice away from injured plaintiffs. *See, e.g.,* Samuel Issacharoff & George Lowenstein, *Second Thoughts About Summary Judgment*, 100 Yale L.J. 73, 75 (1990) ("[L]iberalized summary judgment inhibits the filing of otherwise meritorious suits and results in a wealth transfer from plaintiffs as a class to defendants as a class."); Jeffrey W. Stempel, *A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict, and the Adjudication Process*, 49 Ohio St. L.J. 95, 99 (1988) (describing Supreme Court's 1986 trilogy of summary judgment cases as "faulty and ill-conceived in light of

the purposes for which the civil litigation system exists"); John Caher, *Court Seen As Slow In Expanding Tort Claims, Criminal Defendant's Rights*, N.Y.L.J., Jul. 24, 2001, at 1 (describing trend against private litigants in decisions by New York Court of Appeals); Kevin M. Clermont & Theodore Eisenberg, *Appeal from Jury or Judge Trial: Defendants' Advantage*, 3 Am. L. & Econ. Rev. 125, 128 (2001) (appellate courts are more inclined to overturn plaintiff's verdicts because of perceived pro-plaintiff bias by juries); Kevin M. Clermont & Theodore Eisenberg, *Anti-Plaintiff Bias in the Federal Appellate Courts*, 84 Judicature 128 (2000) (same). Courts must ensure that this anti-jury trend does not go so far as to bar deserving plaintiffs from relief in federal court.

### 2. *Choice of Law*

A number of states' laws as well as general American rules are discussed below to provide context, and because of the other pending cases, even though the precedents are not controlling in the four cases before the court on summary judgment motions.

### a) Substance

Federal courts sitting in diversity jurisdiction apply the forum state's choice of substantive law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 4878 (1941). The first step in any choice of law inquiry is to determine whether there is an actual conflict between the laws invoked by the parties. *Booking v. General Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir.2001). If there is a conflict, the a district court sitting in New York must classify the conflicting laws by subject matter with reference to New York law. *Id.* at 420. In general, New York law requires courts to apply the law of the jurisdiction having "the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954).

### b) Statute of Limitations

A court sitting in diversity applies the statute of limitations of the state in which it sits. "Where a cause of action accrues outside New York in favor of a nonresident, the foreign statute of limitations is borrowed." *Besser v. E.R. Squibb & Sons, Inc.*, 539 N.Y.S.2d 734, 737 (N.Y. App. Div. 1989) (internal quotations marks omitted). Codified in section 202 of New York's Civil Practice Law and Rules, this rule is primarily intended to prevent forum shopping by nonresident plaintiffs. *See* N.Y.C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."); *Antone v. General Motors Corp.*, 473 N.E.2d 742, 745 (N.Y. 1984) ("The primary purpose of CPLR 202 and its predecessors is to prevent forum shopping by a nonresident seeking to take advantage of a more favorable Statute of Limitations in New York."); *National Surety Co. v. Ruffin*, 152 N.E. 246, 247 (N.Y. 1926) ("The obvious purpose of the provision as a whole is to prevent a nonresident claimant from coming into this state and prosecuting a claim whether against a resident or a nonresident under our statutes of limitations if they are more favorable to him than the statutes prevailing in the state where the cause of action arose.") (discussing CPLR 202's predecessor).

### 3. *Florida Law*

#### a) The Learned Intermediary Doctrine

The learned intermediary doctrine is discussed under the law of each state whose law is applicable. As in Florida, it is one recognized generally throughout the county. *See, e.g.,* J.D.

Lee and Barry A. Lindahl, Modern Tort Law § 27:45 (2d ed. 2002).  Prosser and Keeton put the

special problems of pharmaceuticals and treating physicians as follows:

> The marketing situation as regards prescription drugs and vaccines is a unique one.
> The ultimate purchaser for use and the person for whose benefit the drug or vaccine
> is utilized is not the person who selects and orders the drug.
>
> This is the prescribing physician who is an expert.  There is another unique feature
> or circumstance and this is the role of the federal government through the Federal
> Drug Administration.   In the process, other agencies have been given the
> responsibility of establishing standards for a general class of products of like kind,
> but here the drug approval process involves a complex and often *ad hoc* balancing
> of imponderable and incommensurate factors related to danger and utility of
> marketing a specific new drug. This is because of the substantial risk of serious harm
> or death from the use of prescription drugs for the prevention and treatment of
> diseases.  Virtually all courts have agreed that there can be no breach of duty to warn
> on any theory — negligence or strict liability for breach of warranty or in tort — until
> such time as a producer or other seller knew or should have known in the exercise of
> ordinary care of the risk or hazard not warned about.   The producer's basic
> responsibility in this area is to provide adequate warnings to physicians.  It is the
> physician who is in the best position to decide when to use and how and when to
> inform his patient regarding risks and benefits pertaining to drug therapy.

Prosser and Keeton on the Law of Torts, 688 (5th ed. 1984) (footnote omitted).

The doctor has the obligation to be informed about the risks and benefits of the drugs

prescribed and must inform the patient of known risks and benefits.  *See Foister v. Purdue*

*Pharma. LLP*, 295 F. Supp. 2d 693, 706 (E.D. Ky. 2003) (finding that the learned intermediary

doctrine severs the liability of a pharmaceutical company where the prescribing doctor has been

adequately warned of risks).  One writer has noted:

> It is sometimes said that the physician should disclose the diagnosis, the general
> nature of the contemplated procedure, the material risks involved in the procedure,
> the probability of success associated with the procedure, the prognosis if the
> procedure is not carried out, and the existence and risks of any alternatives to the
> procedure.

Dan B. Dobbs, The Law of Torts, 659 (2001).  The list is not exclusive.

Under Florida law, the manufacturer of a product has a general duty to warn users of any dangers inherent in or associated with its use. *See Zanzuri v. G.D. Searle & Co.*, 748 F. Supp. 1511, 1514 (S.D. Fla. 1990) (applying Florida tort law to suit brought against manufacturer of an intrauterine copper contraceptive). "One exception to this rule, however, is the 'learned intermediary' doctrine, whereby the manufacturer of a prescription drug discharges its duty to warn by providing an adequate warning to the prescribing physician." *Zanzuri*, 748 F. Supp at 1514; *see also Upjohn Co. v. MacMurdo*, 562 So.2d 680, 683 (Fla. 1990) ("The manufacturer's duty to warn of the drug's dangerous side effects is directed to the physician rather than the patient."); *Buckner v. Allergan Pharms, Inc.*, 400 So.2d 820, 822 (Fla. App. 1981) ("A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs.").

A prescribing physician who has been adequately warned about the drugs' risks breaks "the causal link between the manufacturer and the plaintiff, thereby insulating the manufacturer from tort liability for harm caused by the drug." *Zanzuri*, 748 F. Supp at 1515. Florida courts base this rule on the following rationale: "the prescribing physician, acting as a 'learned intermediary' between the manufacturer and the consumer, weighs the potential benefits against the dangers in deciding whether to recommend the drug to meet the patient's needs." *Felix v. Hoffman-LaRoche, Inc.*, 540 So.2d 102, 104 (Fla. 1989).

An adequate prescription drug label warning to physicians is sufficient to break the causal link between the patient and drug manufacturer. "Whether the physician in fact reads the

54

warning, or passes its contents along to the recipient of the drug is irrelevant." *E. R. Squibb & Sons, Inc. v. Farnes*, 697 So.2d 825, 827 (Fla. 1997).

### b) Adequacy of Warning

The question of whether a prescription drug warning adequately informs prescribing physicians of the risks inherent in the drug is one of fact, ordinarily determined by a jury. *See Upjohn*, 562 So.3d at 683 ("the adequacy or inadequacy of the warning to inform a physician must, except in the more obvious situations, be proved by expert testimony"); *Felix*, 540 So.2d at 105 ("whether a warning is adequate is usually a jury question"). Where the warning is "accurate, clear, and unambiguous," its adequacy becomes a question of law. *See Felix*, 540 So.2d at 105 ("While in many instances the adequacy of warnings concerning drugs is a question of fact, we hold that it can become a question of law where the warning is accurate, clear, and unambiguous.").

### c) Statute of Limitations

Florida allows a plaintiff with a cause of action, such as the one here, founded in negligence, four years to commence suit. *See* Fla. Stat. Ann. § 95.11(3). Under Florida law, the "delayed discovery doctrine" postpones the accrual date of a cause of action "until the plaintiff knows or reasonably should know of the tortious act giving rise to the cause of action." *Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000); *Ryan v. Lobo De Gonzalez*, 841 So. 2d 510, 516-17 (Fla. Dist. Ct. App. 2003). The purpose of tolling is to protect "blameless ignorance," and to uphold "the traditional purposes of statutes of limitations," which "require the assertion of claims within a specified period of time *after* notice of the invasion of legal rights." *Hearndon*, 767 So. 2d at 1184 (quoting *Urie v. Thompson*, 337 U.S. 163, 170 (1949) (emphasis

supplied)).

In Florida, there is a statutory basis for application of the delayed discovery doctrine. *See Davis v. Monahan*, 832 So. 2d 708, 711 (Fla. 2002). Under the applicable Florida statute, "[a]n action for products liability . . . must be begun within the period prescribed in this chapter, with the period running from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence." Fla. Stat. Ann. § 95.031(3).

### 4. *Pennsylvania Law*

#### a) The Learned Intermediary Doctrine

Pennsylvania "imposes strict liability on the seller of any product 'in a defective condition unreasonably dangerous to the user or consumer.'" *Incollingo v. Ewing*, 282 A.2d 206, 219 (Pa. 1971) (*quoting* Restatement (Second) of Torts § 402A); *see also* Part III.A.3.a, *supra*. Products whose risks can be ameliorated by an adequate warning are considered to be "in a defective condition" only when sold without such a warning. *See Incollingo*, 282 A.2d at 219 ("The seller of such products . . . with the qualification that they are properly prepared and properly marketed and proper warning is given . . . is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product attended with a known but apparently reasonable risk."); *Brecher v. Cutler*, 578 A.2d 481, 485 (Pa. Super. 1990) ("A manufacturer will be held liable only if he fails to exercise reasonable care to inform the one for whose use the product is supplied of the facts which make it likely to be dangerous.").

"It is clear that the manufacturer of a prescription drug known to be dangerous for its intended use, has a duty to exercise reasonable care to inform those for whose use the article was

supplied of the facts which make the product likely to be dangerous." *Makripodis v. Merrell-Dow Pharm., Inc.*, 523 A.2d 374, 378 (Pa. Super. 1987) (quotation omitted). The intended user of a prescription drug is considered to be the prescribing physician. *See, e.g., Rosci v. Acromed, Inc.*, 669 A.2d 959, 969 (Pa. Super. 1995). "In the case of prescription drugs, the warning required is not to the general public or to the consumer but rather to the prescribing doctor." *Makripodis*, 523 A.2d at 377; *see also Incollingo*, 282 A.2d at 220 ("Since the drug was available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor.").

> [T]he warnings which are required to be given by the manufacturer must be directed to the physician, not the patient-consumer. This is so because it is the duty of the prescribing physician to be fully aware of (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug.

*Makripodis*, 523 A.2d at 378; *see also Liebowitz v. Ortho Pharm. Co.*, 307 A.2d 449 (Pa. Super. 1973) ("It is for the prescribing physician to use his own independent medical judgment, taking into account the data supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug.").

A prescribing physician is "expected to make an *independent* medical judgment in determining whether a given drug is appropriate for a particular patient." *Brecher*, 578 A.2d at 485 (emphasis supplied). Thus, "[u]nder the learned intermediary doctrine, as it is applied in Pennsylvania, a [prescription drug] manufacturer will be held liable only where it fails to

57

exercise reasonable care to inform [the prescribing physician] of the facts which make the product likely to be dangerous." *Rosci*, 669 A.2d at 969.

### b) Adequacy of Warning

"Whether a product is defective because of a failure to give an adequate warning is initially a question of law to be decided by the trial court." *Fletcher v. Raymond Corp.*, 623 A.2d 845, 848 (Pa. Super. 1993); *see also Demmler v. Smithkline Beecham Corp.*, 671 A.2d 1151, 1154 (Pa. Super. 1996). A warning should not be deemed inadequate because of revelations subsequent to its issuance. *Leibowitz*, 307 A.2d at 458. Where proof exists, however, that the manufacturer "was ignorant in obtaining information readily ascertainable to it, a package insert or label will be considered inadequate, and liability accordingly imposed." *Id.* at 459.

In the case of prescription drugs, expert medical testimony is often relied upon "to determine whether the drug manufacturer's warning to the medical community is adequate because prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect." *Demmler*, 671 A.2d at 1154.

Pennsylvania has "recognized a cause of action against drug manufacturers for the overpromotion of a drug that nullify [sic] otherwise adequate warnings." *Baldino v. Castagna*, 478 A.2d 807, 810 (Pa. 1984). Manufacturers who promote prescription drugs in a manner that neutralizes  printed warnings breach their duty of reasonable care. *Id.* In order to defeat a motion for summary judgment, an assertion of overpromotion must be well-supported factually. *See Brecher*, 578 A.2d at 486 ("appellants failed to factually support their assertion that the aggressive promotion of the Cu-7 nullified the warnings as to Dr. Cutler, therefore, appellants' arguments against entry of summary judgment must fail").

### c) Statute of Limitations

Pennsylvania imposes a two year statute of limitations on negligence claims. *See* 42 Pa. C.S.A. § 5524(7). That statute begins running "as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983). The Pennsylvania statute is strictly construed to bar an action unless an applicable exception to the rule acts to toll its running. *Id.*

Pennsylvania recognizes a "discovery rule" exception to its two-year statute of limitations for negligence actions. Under the discovery rule, where a plaintiff is unable, despite exercising due diligence, to discover her injury or its cause, the statute of limitations is tolled. *See Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005); *Pocono Int'l Raceway*, 468 A.2d at 471; *Ayers v. Morgan*, 154 A.2d 788, 791-92 (Pa. 1959); *see also Calle v. York Hosp.*, 232 F. Supp. 2d 353, 357-58 (M.D. Pa. 2002). The burden is on the party seeking application of the discovery rule to prove inability to gain knowledge of the injury despite the exercise of due diligence. *See Dalrymple v. Brown*, 701 A.2d 164, 167 (Pa. 1997). "The very essence of the discovery rule in Pennsylvania is that it applies only to those situations where the nature of the injury itself is such that no amount of vigilance will enable a plaintiff to detect an injury." *Id.* at 170; *Pocono Int'l Raceway*, 468 A.2d at 471 (discovery rule designed to protect "blameless ignorance"). "It is not relevant to the discovery rules [sic] application whether or not the prescribed period has expired . . . ." *Fine*, 870 A.2d at 859.

### 5. *North Carolina Law*

#### a) The Learned Intermediary Doctrine

Products liability claims in North Carolina are governed by section 99B of the North Carolina General Statutes, which provides that "no manufacturer or seller of a product shall be held liable in any product liability action for a claim based upon inadequate warning or instruction unless the claimant proves that the manufacturer or seller acted unreasonably in failing to provide such warning or instruction . . . ." N.C. Gen. Stat. § 99B-5(a); *see also* Part III.A.3.a, *supra.*  In the case of prescription drugs, manufacturers have a duty to warn the prescribing physician, rather than the patient, about the risks associated with the particular drug. *See Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir. 1975) ("A manufacturer of an ethical drug must exercise reasonable care, commensurate with the risk, to warn physicians effectively of the drug's inherent dangers.") (applying North Carolina law); *Foyle by and through McMillan v. Lederle Labs.*, 674 F. Supp. 530, 535-36 (E.D.N.C. 1987) ("[W]hen prescription drugs are used, the manufacturer's duty to warn does not extend to the patient."); *Holley v. Burroughs Wellcome Co.*, 330 S.E.2d 228, 233 (N.C. Ct. App. 1985) ("[T]he standard of care or duty allegedly owed by defendants to [plaintiff] was to warn the personnel responsible for his [treatment] of the risk[s]" attending the treatment.)

Under the learned intermediary doctrine, patients of an adequately warned prescribing physician cannot maintain a products liability action against a drug manufacturer because "a manufacturer or seller of a prescription drug has no legal duty to warn a patient of the dangerous tendencies of its drug, as long as sufficient warnings are provided to the prescribing physician." *Dellinger v. Pfizer, Inc.*, No. 03-CV-95, 2006 WL 2057654, *6 (W.D.N.C. July 19, 2006).  This common law doctrine has been codified by the state legislature:

> [N]o manufacturer or seller of a prescription drug shall be liable in a products liability action for failing to provide a warning or instruction

> directly to a consumer if an adequate warning or instruction has been
> provided to the physician or other legally authorized person who
> prescribes or dispenses that prescription drug for the claimant . . . .

N.C. Gen. Stat. § 99B-5(c)

### b) Adequacy of Warning

A seller or manufacturer must act unreasonably to be held liable for failure to provide

adequate warning under North Carolina law. *See* N.C. Gen. Stat. § 99B-5(a). "No manufacturer

or seller of a product shall be held liable in any product liability action for failing to warn about

an open and obvious risk or a risk that is a matter of common knowledge." *See id.* § 99B-5(b).

Where the evidence that the prescribing physician was adequately warned is not contradicted, the

drug manufacturer has satisfied its duty to warn the learned intermediary and summary judgment

may be granted. *See Baraukas v. Danek Medical, Inc.*, No. 6:97cv00613, 2000 WL 223508, *4

(M.D.N.C. Jan. 13, 2000); *Foyle*, 674 F. Supp. at 536.

### c) Statute of Limitations

In North Carolina, "where bodily injury or a defect in property is an 'essential element of

the plaintiff's cause of action,' N.C. Gen. Stat. § 1-52(16) is the appropriate statute of

limitations." *Humble v. Sara Lee Corp.*, 608 S.E.2d 416, 416 (N.C. Ct. App. 2005) (quoting

*Bernick v. Jurden*, 293 S.E.2d 405, 411-12 (N.C. 1982)). Section 1-52(16) of the North Carolina

General Statutes imposes a three-year statute of limitations on products liability actions. A cause

of action for negligence, in North Carolina, "shall not accrue until bodily harm to the claimant or

physical damage to his property becomes apparent or ought reasonably to have become apparent

to the claimant, whichever event occurs first. Provided that no cause of action shall accrue more

than 10 years from the last act or omission of the defendant giving rise to the cause of action."

61

*Id.*; *Moore v. Coachman Indus., Inc.*, 499 S.E.2d 772, 777-78 (N.C. Ct. App. 1998) (claim

against manufacturer of recreational vehicle that was destroyed in a fire accrued on date of fire).

This statutory "discovery rule" extends the statute of limitations, and "is intended to apply in

situations where the injury becomes apparent only after some delay, or the claimant might be

somehow prevented from realizing the injury." *Schenkel & Shultz, Inc. v. Herman F. Fox &*

*Assocs.*, 636 S.E.2d 835, 840 (N.C. Ct. App. 2006).

> 6. *Application of Federal Law*

> > a) Preemption

> > > i) FDA Preamble

On January 24, 2006, the FDA issued a final rule governing the "Requirements on

Content and Format of Labeling for Human Prescription Drug and Biological Products." 71 Fed.

Reg. 3922 (Jan. 24, 2006) (hereinafter "Final Rule"). The Final Rule adds new labeling

requirements meant to "make it easier for health care professionals to access, read, and use

information in prescription drug labeling" and "enhance the safe and effective use of prescription

drug products and reduce the number of adverse reactions resulting from medication errors due to

misunderstood or incorrectly applied drug information." 71 Fed. Reg. at 3922. The Final Rule

became effective on June 30, 2006. *Id.*

In the Preamble to the Final Rule (the "Preamble"), the FDA expressed great concern

over the recent spate of products liability actions against prescription drug manufacturers and the

impact of those cases on its own regulation of prescription drugs:

> State law actions . . . threaten FDA's statutorily prescribed role as the expert Federal
> agency responsible for evaluating and regulating drugs. State actions are not
> characterized by centralized expert evaluation of drug regulatory issues. Instead, they
> encourage, and in fact require, lay judges and juries to second-guess the assessment

of benefits versus risks of a specific drug to the general public – the central role of FDA – sometimes on behalf of a single individual or group of individuals. That individualized reevaluation of the benefits and risks of a product can result in relief – including the threat of significant damage awards or penalties – that creates pressure on manufacturers to attempt to add warnings that FDA has neither approved nor found to be scientifically required. This could encourage manufacturers to propose "defensive labeling" to avoid State liability, which, if implemented, could result in scientifically unsubstantiated warnings and underutilization of beneficial treatments.

*Id.* at 3935. In view of these concerns, the FDA declared in the Preamble that state law causes of action based upon a theory of inadequate warning where the warning has been approved by the FDA are preempted by federal law. This conflict preemption is not limited to claims brought against manufacturers: the Preamble states that conflict preemption analysis applies with equal force to actions "against health care practitioners for claims related to dissemination of risk information to patients beyond what is included in the labeling." *Id.* at 3935-36.

Nearly every court to have considered the issue of federal preemption before the Preamble was issued has rejected the FDA's current position. The agency maintains that this results from a "misunderstanding of the act encouraged by State law actions . . . that FDA labeling requirements represent a minimum safety standard." *Id.* at 3934. According to the FDA, the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), 21 U.S.C. § 301 *et seq.*, establishes both a floor and ceiling as to the adequacy of warning labels.

Lilly argues that, irrespective of the factual merits of plaintiffs' state law claims, it is entitled to summary judgment as a matter of law on the theory that the Final Rule and accompanying Preamble preempt any and all state law causes of action based upon failure to adequately warn, where the warning label has been approved or directed by the FDA, as is the case with Zyprexa. Lilly maintains that allowing states to impose liability for failure to warn

despite FDA approval of the warning label would force drug manufacturers to add language to their warning labels that could expose them to liability for misbranding under the FDCA. *See* 21 U.S.C. § 352.

### ii) FDA Regulation of Prescription Drug Warning Labels

Pursuant to the FDCA, the FDA is charged with the obligation to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner." 21 U.S.C. § 393(b)(1). Encompassed within such products are prescription drugs intended for human consumption. *Id.* § 393(b)(2)(B). The powers to (1) approve proposed warning labels to ensure that drugs are safe and effective, *see id.* § 355, and (2) institute enforcement actions against manufacturers for issuing false or misleading labels, *see id.* § 352, are included within the FDA's delegated authority.

FDA regulations require that prescription drug manufacturers meet a series of stringent labeling requirements. *See* 21 C.F.R. §§ 201.56 to 201.57. The manufacturer must indicate among other things warnings and precautions, contraindications, dosage information, adverse reactions, and interactions with other prescription drugs. *Id.* § 201.56. When new information regarding the risks associated with a drug is available to the manufacturer, the drug's labeling must be changed, regardless of whether a causal link between the drug and a newly-discovered risk has been definitively proved. *See id.* § 201.57(c)(6)(i) ("the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established.").

Once a label has been approved, the FDA permits two types of labeling changes. Major changes require the prior approval of the FDA. *Id.* §§ 314.70(b), 601.12(f)(1). Manufacturers are permitted to unilaterally change warning labels in a "minor" way without prior approval, so long as the agency is notified of the changes. Such changes are specifically defined to include strengthening language regarding warnings, contraindications, precautions, or adverse reactions. *See id.* § 314.70(c)(6)(iii)(A) (labeling changes may be made without prior approval "[t]o add or strengthen a contraindication, warning, precaution or adverse reaction.").

### iii) Deference Due FDA's Interpretation

An administrative agency's interpretations of the statutory scheme it administers are entitled to substantial deference, unless Congress has directly spoken on the issue. *See Chevron USA, Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The agency's interpretation of the law is entitled to *Chevron* deference only if "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). An agency's statements clarifying ambiguities in its own regulations are entitled to the level of deference described by the Supreme Court in *Auer v. Robbins*, rather than the *Chevron* standard. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.").

If an agency interpretation lacks the "power to control" — because it was not promulgated in the exercise of congressionally-delegated authority under *Chevron*, or does not resolve an ambiguity in a previously issued regulation under *Auer* — it serves as guidance for

litigants, but will only be respected by the court to the extent that it has the "power to persuade":

> [R]ulings, interpretations and opinions of the [administrative agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity in its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See also Mead*, 533 U.S. at 228. When an agency's regulations directly conflict with its own prior interpretations the deference due decreases significantly. *See Skidmore*, 323 U.S. at 140.

### iv) FDCA Preemption of State Law Causes of Action

In fields traditionally occupied by the states, such as health and safety regulation, there is a strong presumption against federal preemption. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995); *Hillsborough County v. Automated Med. Labs. Inc.*, 471 U.S. 707, 715 (1985). To overcome the presumption, the party urging preemption must show that either (1) Congress or an agency with delegated authority has expressly stated that preemption is intended ("express preemption"), *see Medtronic*, 518 U.S. at 484-85; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992); or (2) Congress intended to occupy the field ("field preemption"), *see Travelers*, 514 U.S. at 654; or (3) state causes of action conflict with federal objectives to such a large degree that harmony between the two becomes impossible ("conflict preemption"). *Hillsborough County*, 471 U.S. at 715.

"[A]n agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption." *Desiano v. Warner-Lambert*

66

& Co., 467 F.3d 85, 97 n.9 (2d Cir. 2006) (citations omitted). *See also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption. If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly."); *Medtronic*, 518 U.S. at 487 ("It is, to say the least, difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.") (quotations omitted). As Justice Scalia has noted, "[a]gencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). *Cf.* Matthew C. Stephenson, *The Strategic Substitution Effect: Textual Plausibility, Procedural Formality, and Judicial Review of Agency Statutory Interpretations*, 120 Harv. L Rev. 529, 536 (2006) (suggesting that an administrative agency such as the federal Food and Drug Administration would want to enhance its power to nationalize control of pharmaceuticals, implying a reduction of state tort interjections into the process, thus introducing doubt about the neutrality of its preemption conclusion).

b) Preemption of State Failure to Warn Claims

i) The Preamble Does Not Control the Question of Preemption

The Preamble accompanying the Final Rule is not entitled to deference under *Chevron* or *Auer*, and controls this court only insofar as it has the "power to persuade." The FDA lacks the authority to supply the legislative intent required to overcome the presumption against preemption in this case, removing it from those agency interpretations that receive deference under *Chevron*. *See Bates*, 544 U.S. at 449; *Medtronic*, 518 U.S. at 487; *Desiano*, 467 F.3d at 97 n.9.

67

The Preamble's assertion of preemption is not persuasive. First, prior interpretations of the FDCA by the FDA contradict the current view adopted by the agency. In a 2000 Proposal of the same amendments at issue in this case, *see* 65 Fed. Reg. 81082 (Dec. 22, 2000), the FDA explicitly stated that it "ha[d] determined that this proposed rule does not contain policies that have federalism implications or that preempt State law." *Id.* at 81103. Similarly, in a 1998 Final Rule relating to the provision of labeling directly to patients for certain prescription drugs and other biological products, the FDA noted:

> Some comments contended that the provision of patient labeling would adversely affect the legal liability of manufacturers, physicians, pharmacists, and other prescribers or dispensers of prescription drug products by abrogating the "learned intermediary doctrine." Some comments urged that FDA provide for Federal preemption of State regulation with respect to civil tort liability claims and other labeling requirements. The comment claimed that without preemption, FDA would encourage "failure to warn" claims and challenges to patient labeling, especially compared to professional labeling.
>
> Tort liability can not be a major consideration for FDA which must be guided by the basic principles and requirements of the act in its regulatory activities. Nevertheless, FDA does not believe this rule would adversely affect civil tort liability . . . .
>
> ***
>
> FDA does not believe that the evolution of state tort law will cause the developments of standards that would be at odds with the agency's regulations.

63 Fed. Reg. 66378, 66383-84 (Dec. 1, 1998). There is a lack of harmonization between the 1998-2000 interpretation and the 2006 Preamble. Even those courts persuaded by the FDA's current position have noted that the prior interpretations are "difficult to reconcile [with] the FDA's current position." *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 531 (E.D. Pa. 2006). The inconsistency undercuts *Chevron* deference and attenuates persuasiveness under *Skidmore*.

Courts have generally rejected the argument that the FDA labeling approval process

somehow preempts state law adequacy of warning claims. *See, e.g., Desiano*, 467 F.3d 97 & n.9;

*Tobin v. Astra Pharm. Prods.*, Inc., 993 F.2d 528, 537-38 (6th Cir. 1993); *Hill v. Searle Labs.*,

884 F.2d 1064, 1068 (8th Cir. 1989); *Brochu v. Ortho Pharm. Corp.*, 642 F.2d 652, 658 (1st Cir.

1981); *Perry v. Novartis Pharm. Corp.*, 456 F. Supp. 2d 678, 685 (E.D. Pa. 2006); *Adesina v.*

*Aladan Corp.*, 438 F. Supp. 2d 329, 337-38 (S.D.N.Y. 2006); *Witczak v. Pfizer, Inc.*, 377 F.

Supp. 2d 726, 731-32 (D. Minn. 2005); *Motus v. Pfizer, Inc.*, 127 F. Supp. 2d 1085 (C.D. Cal.

2000); *Jones by Jones v. Lederle Labs.*, 695 F. Supp. 700, 709-11 (E.D.N.Y. 1988); *Stevens v.*

*G.D. Searle & Co.*, 602 F. Supp. 379, 382 (E.D. Mich. 1985); *MacDonald v. Ortho Pharm.*

*Corp.*, 475 N.E.2d 65, 70-71 (Mass. 1985).

A majority of courts have held that the FDA's labeling requirements represent only

minimum safety standards and do not absolve prescription drug manufacturers of liability. *See,*

*e.g., Hill*, 884 F.2d at 1068 ("FDA approval is not a shield to liability."); *Wells v. Ortho Pharm.*

*Corp.*, 788 F.2d 741, 745-46 (11th Cir. 1986); *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359,

1362 (4th Cir. 1975); *Caraker v. Sandoz Pharm. Corp.*, 172 F. Supp. 2d 1018, 1033 (S.D. Ill.

2001) ("[T]he FDA's drug labeling decisions impose only 'minimum' standards that are open to

supplementation by state law through a jury's verdict enforcing a manufacturer's common law

duty to warn.") (citations omitted); *Motus*, 127 F. Supp. 2d at 1092; *Kociemba v. G.D. Searle &*

*Co.*, 680 F. Supp. 1293, 1299 (D. Minn. 1988) ("FDA regulation of prescription drugs

establishes minimum standards, both as to design and warning.") (citations omitted); *Edwards v.*

*Basel Pharm.*, 933 P.2d 298, 302 (Okla. 1997); *Savina v. Sterling Drug, Inc.*, 795 P.2d 915, 931

(Kan. 1990). The FDA's position that the Preamble "represents the government's long standing

views on preemption," 71 Fed. Reg. at 3934, is inconsistent with the fact that the FDA earlier