echoed the many courts' decisions rejecting preemption.

FDA regulations themselves militate against deferring to the Preamble's statement of the Final Rule's preemptive effect. The 2006 Preamble is, by regulation, an advisory opinion, binding only on the agency and changeable at any time without notice and comment. *See* 21 C.F.R. § 10.85(d)(1), (e), (g). The Supreme Court has ruled that internal agency guidelines which are not promulgated subject to notice and comment procedures are entitled only to "some deference." *See Reno v. Koray*, 545 U.S. 50, 61 (1995).

ii) State Law Failure to Warn Claims are Not Preempted

The regulation of public health is an area traditionally occupied by the states, supporting a presumption against preemption in this case. *See Travelers*, 514 U.S. at 654-55. That presumption has not been overcome in this case. Plaintiffs' state-law adequacy of warning claims are not preempted.

The required clear statement of legislative intent to preempt is lacking . *Bates*, 544 U.S. at 449; *Medtronic*, 518 U.S. at 487; *Desiano*, 467 F.3d at 97 n.9. Despite repeated urging by Lilly to dismiss the Second Circuit Court of Appeals' discussion of the Preamble in *Desiano* as *obiter dictum*, the reasoning in that case remains persuasive. In *Desiano*, the Court of Appeals addressed a Michigan law that immunizes drug manufacturers from liability for drugs approved by the FDA, but excepts them from that immunity if they make misrepresentations to or withhold information from the agency. *See* Mich. Comp. Laws § 2946(5); *Desiano*, 467 F.3d at 87-88. Defendant Warner-Lambert & Co., manufacturer of Rezulin (a diabetes drug linked to liver damage that has been withdrawn from the United States market), claimed that portions of the FDCA and Medical Device Amendments of 1976, 21 U.S.C. § 360c *et seq.* ("MDA"), preempted

70

the fraud exception to Michigan's immunity statute. Plaintiffs maintained that their state-law tort claims remained viable. *Id.* at 88-89. The court rejected preemption, noting that "[t]he Michigan legislature's desire to rein in state-based tort liability falls squarely within its prerogative to regulate matters of health and safety, which is a sphere in which the presumption against preemption applies, indeed, stands at its strongest." *Id.* at 94 (internal citations and quotation marks omitted). Although not relied upon by the defendant in *Desiano,* the appellate court nonetheless took notice of the Preamble at issue here, and expressed doubt over its preemptive force:

> [W]hatever deference would be owed an agency's view in contexts where a presumption against preemption does apply, it is arguable that an agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption. Because we find that a presumption against preemption applies in the instant case, it may also be argued that even in the face of an FDA statement asserting preemption, the common law claims preserved by Michigan's immunity exception cannot be preempted by federal law absent a clear statement from Congress.

*Id.* at 97 n.9. The need for a "clear statement from Congress" is imperative where, as in this case, a finding of preemption "will foreclose a remedy that was traditionally available and for which federal law provides no substitute." *Perry,* 456 F. Supp. 2d at 684. *See also Bates,* 544 U.S. at 449-50. The FDA cannot be allowed to usher in such a sweeping change in substative law through the back door. *Cf. Jackson v. Pfizer, Inc.,* 432 F. Supp. 2d 964, 968 n.3 (D. Neb. 2006) ("The FDA failed to comply with its requirements to communicate with the states and to allow the states an opportunity to participate in the proceedings prior to a preemption decision." (citing Executive Order 13132 § 4(c)-(e))).

Where Congress has preempted the states' traditional regulation of public health, it has done so explicitly. Two federal statutes passed in this area contain express preemption

71

provisions, in clear contrast to the FDCA. The Medical Device Amendments to the FDCA, passed to regulate medical devices "from bedpans to brainscans," *Medtronic*, 518 U.S. at 467 (internal citations and quotations omitted), includes an express preemption provision. *See* 21 U.S.C. § 360k(a) ("Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue with respect to a device intended for human use any requirement (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."). Similarly, the National Childhood Vaccine Injury Compensation Act of 1986 ("Vaccine Act"), 42 U.S.C. § 300aa-1 *et seq.*, was enacted to "provide compensation for victims of childhood vaccines" and to promote the development and availability of vaccines by "offset[ing] the vicissitudes of the tort system." *Sykes v. Glaxo-SmithKline*, — F. Supp. 2d —, 2007 WL 957337, at *5 (E.D. Pa. Mar. 28, 2007) (holding failure to warn claims relating to brain damage to child, allegedly suffered due to vaccination with defendant's product, expressly preempted by Vaccine Act); *Jones v. Lederle Laboratories*, 785 F. Supp. 1123 (E.D.N.Y. 1992) (vaccine not defective since no safer drug was available). To effectuate this goal, Congress included an express supersedure clause within the Vaccine Act. *See* 42 U.S.C. § 300aa-22.

Congress has not spoken on the issue of preemption as related to prescription drugs, and this silence is telling. While a direct statement of legislative intent is not essential for preemption, it would be odd for Congress to include express preemption provisions in amendments to the FDCA regarding state-law tort claims in certain contexts (i.e. for medical devices) if it intended <u>all</u> FDCA claims to be preempted.

72

There is no actual conflict between plaintiffs' claims and federal law. FDA labeling regulations and state law adequacy of warning claims have existed harmoniously from the time the FDCA was first enacted. Where a state law requirement necessitated violation of the FDCA, a direct conflict would exist and the state law could be preempted under the theory of conflict preemption. For example, if a state, by positive law, required a drug manufacturer to include a warning within the labeling for its product that the FDA had previously rejected as scientifically unsubstantiated, that inclusion could expose the manufacturer to liability for misbranding, *see* 21 U.S.C. § 352. A direct conflict would then result between state and federal law, something impermissible under the FDCA or any other act of Congress. *See Perry*, 456 F. Supp. 2d at 685-86 ("Where, however, the FDA has made a conclusive determination, positive or negative, as to the existence of a link between the drug at issue and some adverse health consequence, state law cannot mandate that a manufacturer include additional warning beyond those that the FDA has determine to be appropriate to the risk."). *See also Bates*, 544 U.S. at 453-54 (discussing whether Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, preempts state-law adequacy of warning claims against herbicide manufacturer) ("For example, were the Court of Appeals to determine that the element of falsity in Texas' common-law definition of fraud imposed a broader obligation than FIFRA's requirement that labels not contain false or misleading statements, that state-law cause of action would be pre-empted . . . .").

By contrast, a jury verdict finding Lilly negligent for failure to warn of Zyprexa's risks would not compel the company to do anything. *Cf. Bates*, 544 U.S. at 444 ("None of these common-law rules requires that manufacturers label or package their products in any particular way."). Jury verdicts do not impose mandatory labeling requirements on drug manufacturers;

73

rather, they impose damages for negligence in particular cases. The manufacturer can change its labels through FDA procedure in response to such a verdict, or it can choose to leave the label as-is despite the verdict.

Jury verdicts and adequacy of warning claims serve an important regulatory role in the tort system. State law adequacy of warning claims may alert the FDA to potential inadequacies in product labeling. The current litigation against Lilly may be a testament to that fact. *See* Letter from FDA to Eli Lilly & Co. (Mar. 28, 2007).

In any event, the type of failure to warn claim at issue here may not even fall within the Preamble's ambit of purportedly preempted claims. Of the six categories of preempted state-law listed in the Preamble, the one pertinent here includes "claims that a drug sponsor breached an obligation to warn by failing to include a statement in labeling or in advertising, *the substance of which had been proposed to FDA for inclusion in labeling*, if that statement was not required by FDA at the time plaintiff claims the sponsor had an obligation to warn." 71 Fed. Reg. at 3934 (emphasis supplied). This language suggests that the FDA would consider preempted only those state-law adequacy of warning claims which seek to impose liability for failure to include labeling language already rejected by the FDA. *See Perry*, 456 F. Supp. 2d at 684. Lilly has not proposed statements for inclusion in labeling relating to the increased risks of hyperglycemia and diabetes associated with Zyprexa. Lilly, and other manufacturers of atypical antipsychotics, were compelled by the FDA to include such statements by the September 2003 labeling directive. Even if the Preamble had preemptive force, plaintiffs' failure to warn claims are arguably not the type contemplated by the FDA as preempted.

The lesson of prescription drug tort litigation cautions against permitting the FDA to

74

sweepingly remove adequacy of warning claims from the prescription drug regulatory landscape:

> Notwithstanding the structural inability of the FDA to carefully investigate and monitor drug safety, drug makers assert a preemption defense premised on the notion that FDA approval of a drug indicates a validation of the drug's safety. This position shirks the responsibility of drug manufacturers to carefully monitor the adverse effects of their products. One could reasonably assume that Vioxx might still be on the market if Merck had not been concerned about its financial exposure in products liability lawsuits.
>
> The availability of courts to redress injuries provides the public powerful leverage against negligent drug manufacturers. The threat of litigation reduces the risk of misconduct by drug makers, providing the public with necessary protections against the effects of dangerous pharmaceuticals. If courts extended federal preemption to drug claims . . . manufacturers would have little incentive to conduct post-approval clinical studies to examine a drug's safety. The FDA would also lose one of its few bargaining chips in pressuring companies to amend labels to warn of newly discovered risks.

Jonathan V. O'Steen & Van O'Steen, *The FDA Defense: Vioxx and the Argument Against Federal Preemption of State Claims for Injuries Resulting from Defective Drugs*, 48 Ariz. L. Rev. 67, 94 (2006). As the Supreme Court has noted, "labels will evolve over time, as manufacturers gain more information about their products' performance in diverse settings. . . . [T]ort suits can serve as a catalyst in this process." *Bates*, 544 U.S. at 451 (rejecting preemption challenge to state-law claims that warnings on herbicide labeling were inadequate, despite presence of an express preemption clause).

### 7. *Damages Issues*

It is contemplated that the normal charges on damages from failure to warn of dangers of a product either neligently or deliberately will be given to the jury. They will be modified by explaining the role of the jury in applying the rules of proportionality. *See* Part I.B.2 and I.B.3, *supra.*

Epidemiological and other relevant scientific factors are subject to good faith differing

conclusions. *See* Part IV, *infra.* Under these circumstances, punitive damages appear not to be available. This issue has not been briefed and may be raised by motion before the trial begins.

### B. Application of Law to Facts

#### 1. *Robert Cusella*

##### a) Choice of Law

Cusella, a Pennsylvania resident, was diagnosed with Type 2 non-insulin dependent diabetes mellitus in September 1996. Afflicted with mental heath problems for the majority of his adult life, Cusella was prescribed Zyprexa by Dr. Ganime, a well-qualified Pennsylvania psychiatrist. The plaintiff had been hospitalized for acute paranoia, delusions, and psychosis in May 1997. *See* Def. Stat. Cusella, ¶¶ 2-11, 34. Cusella developed insulin-dependent diabetes in August of 1999, and alleges that this worsening of his condition was a direct result of his Zyprexa use. *Id.* ¶ 35. Because Pennsylvania has the most significant contacts with Cusella's claims, the law of that state controls Lilly's motion for summary judgment on those claims. *See Auten*, 308 N.Y. at 160.

##### b) Statute of Limitations

Diabetes developed and Zyprexa was prescribed years before the September 2003 label change. At least from the date of March 2004 Dear Doctor letter, the causal connection between Zyprexa and diabetes was known to Dr. Ganime, Cusella's treating physician. Since Lilly's duty to warn ran to Dr. Gamine rather than Cusella, it became Dr. Ganime's duty from that point onwards to disclose to Cusella that Zyprexa might exacerbate his diabetes, and that it may have been the impetus behind Cusella's insulin-dependancy in the first place.

Dr. Ganime's medical records and deposition testimony, *see* Ex. A, show that Cusella

76

was warned numerous times about the link between Zyprexa and diabetes. While the pre-label change warnings Dr. Ganime received from Lilly may not have been adequate to absolve Lilly of liability to Cusella, those warnings Cusella received from Dr. Ganime following the label change placed him on notice that use of Zyprexa might have worsened his diabetes and caused him to become insulin-dependent.

Measured either against the date Cusella developed diabetes — August 1999 — or the latest possible date Dr. Gamine was aware of the potential causal connection between Zyprexa and diabetes — March 2004 — Pennsylvania's two year statute of limitations had run on Cusella's claim before he filed this suit in April of 2006. Cusella's suit is time barred.

### c) Adequacy of Warning Post-September 2003 Label Change

For a full discussion of whether Mr. Cusella's physician was adequately warned of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, *see* Part II.E.1.b *supra;* Part III.B.5, and Appendix A, *infra.*

### d) Deposition of Treating Physician.

*See* Appendix A, *infra.*

### e) Summary Judgment Decision

The motion for summary judgment against Robert Cusella is granted.

### 2. *Judith New*

### a) Choice of Law

Judith New was prescribed Zyprexa and developed diabetes in Florida. *See* Def. Stat. New ¶¶ 24, 39. Because the state of Florida has the most significant contacts with New's claims, Florida tort law governs her product liability action against Lilly. *See Auten,* 308 N.Y. at 160.

### b) Statute of Limitations

New was diagnosed with diabetes in September 2004.  She commenced this action against Lilly on April 12, 2006, well within Florida's four-year limitations period for negligence claims.  *See* Part III.A.3.c., *supra*.  New's claim is not time-barred.

### c) Adequacy of Warning Post-September 2003 Label Change

For a discussion of whether Ms. New's physician was adequately warned of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, *see* Part II.E.2.b, *supra;* Part III.B.5, and Appendix B, *infra*.

### d) Deposition of Treating Physician

*See* Appendix B, *infra*.

### e) Summary Judgment Decision

Summary judgment is denied.  Disputed material questions of fact exist concerning the issue of whether the warning provided by Lilly to New's physician was adequate, particularly when viewed in light of the position its salespeople were taking, to convey the risks of weight gain, hyperglycemia, and diabetes.

## 3. *Monty Souther*

### a) Choice of Law

Monty Souther's diagnosis with bipolar disorder and other psychiatric illnesses, his treatment for those illnesses with Zyprexa, and his development and diagnosis of diabetes all occurred in North Carolina.  *See* Pl's Ex. 60, Aff. of Monty Souther, at ¶¶ 2-6.  Because North Carolina has the most significant contacts with Souther's claims, the law of that state controls Lilly's motion for summary judgment on those claims.  *Auten*, 308 N.Y. at 160.

b) Statute of Limitations

Souther began taking Zyprexa in 1997. He was diagnosed with diabetes on in May of
2003, *see* Def. Stat. Souther, Ex. 8. He commenced this action against Lilly on April 12, 2006,
before North Carolina's three-year statute of limitations for negligence actions had run. *See* Part
III.A.5.c, *supra.* Souther's claim is not time-barred.

c) Adequacy of Warning Post-September 2003 Label Change

For a full discussion of whether Souther's physician was adequately warned of the
diabetes and weight gain risks posed by Zyprexa upon reading the language of the new
September 2003 label, *see* Part II.E.3.d, *supra*; Part III.B.5, and Appendix C, *infra.*

d) Deposition of Treating Physician.

*See* Appendix C, *infra.*

e) Summary Judgment Decision

Summary judgment is denied. Disputed material questions of fact exist concern the issue
of whether the warning provided by Lilly to Souther's physician was adequate, particularly when
viewed in light of the position its salespeople were taking, to convey the risks of weight gain,
hyperglycemia, and diabetes.

4. *Donna Worthington*

a) Choice of Law

Donna Worthington's treatment with Zyprexa and diagnosis with diabetes both occurred
in North Carolina. *See* Def. Stat. Worthington ¶¶ 11, 18. Since North Carolina has the most
significant contacts with Worthington's claims, the law of that state controls Lilly's motion for
summary judgment as to Worthington. *See Auten*, 308 N.Y. at 160

b) Statute of Limitations

Worthington was diagnosed with diabetes on April 13, 2004, *see* Def. Stat. Worthington ¶ 11. She commenced this action against Lilly on April 12, 2006, before North Carolina's three-year statute of limitations for negligence actions had run. *See* Part III.A.5.c, *supra*. Worthington's claim is not time-barred.

c) Adequacy of Warning Post-September 2003 Label Change

For a full discussion of whether Ms. Worthington's physician was adequately warned of the diabetes and weight gain risks posed by Zyprexa upon reading the language of the new September 2003 label, *see* Part II.E.4.d *supra*; Part III.B.5, and Appendix D, *infra*.

d) Deposition of Treating Physician.

*See* Appendix D, *infra*.

e) Summary Judgment Decision

Summary judgment is denied. Disputed material questions of fact exist concern the issue of whether the warning provided by Lilly to Worthington's physician was adequate, particularly when viewed in light of the position its salespeople were taking, to convey the risks of weight gain, hyperglycemia, and diabetes.

5. *Adequacy of the September 2003 Label*

The adequacy of the Zyprexa warning label approved by the FDA in September of 2003 is a question of fact for the jury. *See, e.g., Felix v. Hoffman-LaRoche, Inc.*, 540 So.2d 102, 105 (Fla. 1989) ("whether a warning is adequate is usually a jury question"). In the absence of a finding that the warning provided by Lilly about Zyprexa's risks was adequate, no state's tort law insulates Lilly from liability under the learned intermediary doctrine. *See, e.g., Ziglar v. E.I. Du*

80

*Pont De Nemours and Co.*, 53 N.C. App. 147, 155 (N.C. 1981) ("It is well-established that a

product is defective if it is not accompanied by adequate warnings of the dangers associated with

its use . . . ."); *Liebowitz v. Ortho Pharmaceutical Corp.*, 307 A.2d 449, 459 (Pa. 1973) ("a drug

manufacturer may not escape liability by merely ignoring existing reports of side-effects or

dangers in the use of its product"); *Incollingo v. Ewing*, 282 A.2d 206, 220 (Pa. 1971)

(describing the issue of prescription drug manufacturer liability as centering on "whether the

warning that was given to the prescribing doctors was proper and adequate"); *Rosci v. Acromed,

Inc.*, 669 A.2d 959, 969 (Pa. Super. 1995) ("Under the learned intermediary doctrine, as it is

applied in Pennsylvania, a manufacturer will be held liable only where it fails to exercise

reasonable care to inform the one for whose use the product is supplied of the facts which make

the product likely to be dangerous . . . . The intended 'user' in a case involving a prescription

drug . . . is . . . the prescribing physician."); *Zanzuri v. G.D. Searle & Co.*, 748 F. Supp. 1511,

1515 (S.D. Fla. 1990) ("[I]n Florida, the manufacturer of a prescription drug must provide the

prescribing physician with an adequate warning.  The properly warned physician then becomes a

'learned intermediary' operating to break the causal link between the manufacturer and plaintiff,

thereby insulting the manufacturer from tort liability for harm caused by the drug."); *Buckner v.

Allergan Pharmaceuticals, Inc.*, 400 So.2d 820, 822 (Fla. App. 1981) ("A manufacturer of a

dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a

prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those

members of the medical community lawfully authorized to prescribe, dispense, and administer

prescription drugs.").

    In evaluating the adequacy of the September 2003 warning label, the jury may be guided

by the parties' experts as well as the more neutral expert opinion of the FDA, which approved the warning. *See, e.g., Upjohn Co. v. MacMurdo*, 562 So.2d 680, 683 (Fla. 1990) ("the adequacy or inadequacy of the warning to inform a physician must, except in the more obvious situations, be proved by expert testimony"); *Demmler v. Smithkline Beecham Corp.*, 671 A.2d 1151, 1154 (Pa. Super. 1996) ("Generally, expert medical testimony is required to determine whether the drug manufacturer's warning to the medical community is adequate because prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect."); *Liebowitz*, 307 A.2d at 457 ("In approving a drug for marketing purposes, the F.D.A. is ever mindful of risks inherent in the use of a proposed drug. It also approves same because of the benefit said drug may have for the public as a whole.").

## IV. Admissibility of Expert Evidence

### A. Motions Regarding Admissibility of Expert Reports

Each side has opposed the admissibility of some of the opponent's expert opinions on *Daubert* grounds. None of these challenges has merit.

### B. Rules 702 and 703 of the Federal Rules of Evidence

The key provisions are rules 702 and 703 of the Federal Rules of Evidence, embodying the basic principles of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). They are:

Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

Rule 703:

> The facts or data in the particular case upon which an expert bases an opinion or
> inference may be those perceived by or made known to the expert at or before the
> hearing. If of a type reasonably relied upon by experts in the particular field in
> forming opinions or inferences upon the subject, the facts or data need not be
> admissible in evidence in order for the opinion or inference to be admitted. Facts
> or data that are otherwise inadmissible shall not be disclosed to the jury by the
> proponent of the opinion or inference unless the court determines that their
> probative value in assisting the jury to evaluate the expert's opinion substantially
> outweighs their prejudicial effect.

In some instances the experts are also fact witnesses, requiring satisfaction of Rule 701 of the

Federal Rules of Evidence covering opinions of non-experts. *See, e.g., Asplundh Div. V. Benton*

*Harbor Eng.,* 57 F.3d 1190 (3d Cir. 1995) (lay and expert witness on design of product); Daniel

J. Capra, Distinguishing Between Lay Witnesses and Experts, N.Y.L.J., March 13, 1998, p. 3.

While a detailed analysis for such *in limine* matters is not required, a gatekeeping

function is conferred upon the district court by the Rules of Evidence. *Daubert,* and the

guidelines set forth in Rule 104(a) governing decisions on witness qualifications and

admissibility of evidence, suggest a preliminary determination that the testimony of experts

expected to testify is or is not helpful to the trier of fact, reliable from an evidentiary standpoint,

and relevant to the issues in the case. The method for determining the reliability of such

testimony is within the discretion of the district court. *See Kumho Tire Co. v. Carmichael,* 526

U.S. 137, 152, 119 S. Ct. 1167 (1999). It should make a suitable inquiry before reaching its

determinations. *Id.* The inquiry may be a "flexible one," with the ultimate goal of assuring that

proffered expert testimony is scientifically acceptable and relevant, as well as otherwise reliable

from an evidentiary standpoint. *See Daubert,* 509 U.S. 594-95. Since "Rule 702 embodies a

liberal standard of admissibility for expert opinions," *Nimely v. City of New York,* 414 F.3d 381,

395 -396 (2d Cir. 2005), the assumption the court starts with is that a well qualified expert's testimony is admissible. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and "are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert*, 509 U.S. at 596. The party who presents an expert bears the burden of proving each element necessary to the admissibility of that expert's testimony and report. *See Daubert*, 509 U.S. at 592; Fed. R. Evid. 702 advisory committee note (2000).

C. Qualifications of Expert Witnesses

Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, or education. *See* Fed. R. Evid. 702. In keeping with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony," *Daubert*, 509 U.S. at 588-89, the standard for qualifying expert witnesses is liberal. Assertions that the witness lacks particular educational or other experiential background, "go to the weight, not the admissibility, of [the] testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent. *See, e.g., Stagl v. Delta Airlines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (expert witness qualified when experience, knowledge, or training related to general area, not to specific question before trier of fact).

D. Helpfulness and Relevance

In deciding whether to allow the witness to give expert testimony the primary issue is whether the expertise provides the witness with the ability to assist the finder of fact in deciding the issues before it. This inquiry is subsumed within the broader "relevance" analysis governed by Rule 401. The *Daubert* court described this consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. *Daubert*, 509 U.S. at 591-92. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "[T]he Rules' basic standard of relevance . . . is a liberal one," *Daubert*, 509 U.S. at 587. The decision to admit or exclude on these grounds is within the trial court's discretion. *See United States v. Aminy*, 15 F.3d 258, 261 (2d Cir. 1994).

In inquiring into the potential helpfulness of the proffered expert testimony, the court decides whether it concerns matters requiring assistance to the kind of people expected to sit on the jury. *See United States v. Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001). The evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. *See also Daubert*, 509 U.S. at 591.

Expert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their summations. Neither should it include conclusory testimony that "undertakes to tell the jury what result to reach . . . [or] attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Freely admitted is expert testimony that is likely to substantially assist the average person in understanding the case—even if it simply explains facts and evidence

already in the record. *See Mulder*, 273 F.3d at 101-02.

After determining that the requirements of general helpfulness and specific "fit" are met, the court engages "in a balancing . . . to determine whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice." *United States v. Jakobetz*, 955 F.2d 786, 794 (2d Cir. 1992); Fed. R. Evid. 403. Because "expert evidence can be both powerful and quite misleading," the court, in weighing possible prejudice against probative force under Rule 403, "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. *See also Nimely*, 414 F.3d at 397 ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."). In deciding possible probative value of the expert's proposed testimony against the potential for confusion or over-reliance by the jury, it cannot be assumed that a jury of this district "will be so dazzled or swayed as to ignore evidence suggesting that an experiment was improperly conducted or that testing procedures have not been established." *Jakobetz*, 955 F.2d at 797.

E. Reliability

The most challenging and controversial gatekeeping role, as set out in *Daubert* and elaborated in *Kumho*, is that of ascertaining the reliability of proffered testimony, or "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592. This is partly because "[u]nlike an ordinary witness [governed by Rule 701], an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. 590. The exception made for such experts "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge

and experience of his discipline." *Id.*

The *Daubert* court supplied the following nonexhaustive guidelines for analysis of the reliability of expert testimony: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance" within the scientific community. *Daubert*, 509 U.S. 593-94. These guidelines are not to be construed as a "definitive checklist." *Id.* at 593. The applicability of any one factor will depend "upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 137.

While, preferably, the content of the expert's testimony will grow "naturally and directly out of research [the expert or others have] conducted independent of the litigation," *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 (9th Cir. 1995), testimony based on research conducted solely for litigation is admissible as long as the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

Of primary importance in determining reliability of expert testimony is the methodological soundness of the expert's study. *See Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y. 1996). Each step of the expert's analysis is examined, including "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. National R. R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir, 2002). Ideally, the scientific methodology or technique will have been tested or the findings published and peer reviewed, *see Daubert*, 509 U.S. 592-93, but "[i]t might not be surprising in a particular case . . . that a claim made by a

scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." *Kumho*, 526 U.S. at 151.

To be considered is whether there is "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions," *Nimely*, 414 F.3d at 397, and whether the scientific principles and methods have been reliably applied by the expert to the facts of the case. Unfounded extrapolations not supported by, or sufficiently related to, scientific data or expertise should be rejected; opinion that "is connected to existing data only by the *ipse dixit* of the expert" need not be admitted. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512 (1997). Expert opinions based on insufficient facts or data, or on unsupported suppositions is not acceptable. *See* Fed. R. Evid. 702(1). Anecdotal evidence and "generalized assumptions" are inadequate bases for an expert report. *United States v. Tin Yat Chin*, 371 F.3d 31, 40-41 (2d Cir. 2004).

Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony. *See, e.g., O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105-07 (7th Cir. 1994); *Guidroz-Brault v. Missouri Pacific R. R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001). Sound scientific methodology requires a scholar to make some effort to account for alternative explanations for the effect whose cause is at issue. *See, e.g., Kudabeck v. Kroger Co.*, 338 F.3d 856, 860-61 (8th Cir. 2003); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256-57 (11th Cir. 2002).

The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility. *See* Fed. R. Evid. 702 advisory committee note

(2000) ("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."). If two contradictory expert opinions meet the requisite threshold of reliability, it is the function of the factfinder, utilizing the "conventional devices" of "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," to determine which is the more trustworthy and credible. *Daubert*, 509 U.S. at 596. It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial.

When considering reliability factors under Rule 702 and *Daubert*, it is important to recall the Supreme Court's caution that the analytical focus should be on principles and methodology. *See Liriano*, 949 F. Supp. at 177. Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable. *See Daubert*, 509 U.S. at 594.

It is critical that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Jakobetz*, 955 F.2d at 797. Any more rigorous approach would deny the jury's constitutional role.

F. Individual Experts' Reports

    1. *Challenges to Plaintiffs' Experts*

Each of plaintiffs' proposed experts is highly qualified. Each can present testimony that meets requirements for admissibility described in Parts IV.B., C, D, and E, *supra*.

        a) Dr. Carol Levy, M.D.

89

Dr. Carol Levy is a practicing endocrinologist.  Eminent experts on both sides of this litigation acknowledge the difficulty of pinpointing the specific cause of diabetes in any individual.  Dr. Levy opines that she can do so.  It is defendant's position that Dr. Levy overlooks parts of the medical records as follows:

- For Robert Cusella, contrary to her regular practice, she did not consider any of Mr. Cusella's substantial pre-Zyprexa weight swings and said that such variations might not necessarily be important to her evaluation of his claims.

- For Judith New, she could not say whether plaintiff's pre-Zyprexa history of elevated blood-sugar readings, of which she was unaware, was significant to a diagnosis of diabetes.

- For Monty Souther, she assumed, in the absence of evidence in the medical records, that plaintiff had gained weight while on Zyprexa.  Blood glucose readings were all normal while on Zyprexa.

- For Donna Worthington, she did not review medical records that, by her own admission, precluded her conclusion that Zyprexa caused the plaintiff's diabetes.

Def. Mot. to Exclude Testimony of Dr. Carol Levy, 1 (May 29, 2007).

Plaintiffs' [other] experts described at most, an indirect causal chain between Zyprexa and diabetes: Zyprexa may cause weight gain, which may cause insulin resistance, which may cause diabetes.

*Id.* at 5-6.

While the predicates for Dr. Levy's proposed specific causation testimony may appear to be weak, her distinguished background and clinical experience warrant permitting her to testify. Her credibility will be subject to attack by both cross-examination and the contrary testimony of

other experts. The jury may well find it useful on appropriate scientific grounds. Her

professional background includes the following: She is presently an assistant Professor of

Medicine at Weill Medical College, a consulting physician at Cole-Goldwater Hospital, a

Lecturer at Cornell Medical School, an Attending Physician at the Endocrine Clinic, Obstetrics

Clinic and Endocrine Consult Service at New York Presbyterian Hospital, part of the Endocrine

Fellowship interviewing/evaluation team and the Internal Medicine Residency interviewing team,

and co-director of the Endocrine Fellowship Program at Weill Medical College. Dr. Levy is a

member of the American Diabetes Association, the American College of Physicians and the

Endocrine Society, and board certified in Internal Medicine, Endocrinology, Diabetes and

Metabolism. Dr Levy has treated patients who have ingested Zyprexa and have diabetes. Report

of Dr. Carol Levy, M.D., 1-2 (hereinafter "Levy Report").

This expert's written opinion indicates a thorough understanding of diabetes. Id. passim.

She also has read widely in relevant fields. *Id.*, Index to Zyprexa Literature (attached to Levy

Report). Her opinion will be admitted.

b) Dr. Stefan P. Kruszewski, M.D.

Lilly moves to exclude the opinions offered by plaintiffs' proposed expert witness Stefan

P. Kruszewski, M.D. on the ground that they are factually flawed and include matters on which

he is not qualified to testify. Dr. Kruszewski's testimony is inadmissible, according to Lilly, for

the following reasons:

- Dr. Kruszewski's opinions concerning the supposed flaws of clinical research that
  supported Zyprexa are factually incorrect, speculative, and not relevant. His
  contentions have been dispelled by the FDA's own analysis of the data he cites.

- Dr. Kruszewski is not qualified to offer his opinion disputing the increased risk of diabetes associated with serious mental illness, a link addressed in literature published over decades.

Def. Mot. to Exclude Testimony of Stefan Kruszewski, 1-2 (May 29, 2007).

Dr. Kruszewski is offered to testify to two main opinions:

- The clinical research that has supported Zyprexa's pre-approval and post-approval status is tainted because the data from clinical trials that supported Zyprexa included the work of scientific researchers who have been sanctioned and/or indicted for research misconduct unrelated to Zyprexa.

- The extensive medical literature over the past several decades which had discussed an increased risk for diabetes among those with serious mental illness has little scientific basis to support it.

Dr. Kruszewski will not be permitted to testify to the fact that some Zyprexa studies included work of researchers sanctioned or indicted. This information is likely to inflame the jury and is not useful since those studies, if offered, will probably be discounted by opposing experts who will testify. He can testify on all other aspects of his report.

This distinguished expert's analysis of the relevant literature may be useful to the jury. Dr. Kruszewski's experience provides an adequate basis for his opinion and proposed testimony. His curriculum vitae includes the following: He has 28 years of clinical practice (including internship and residency) in which he treated several thousand patients with a wide variety of psychiatric and neuropsychiatric conditions to whom he prescribed numerous drugs for psychiatric and neuropsychiatric indications. He witnessed the side effects of drugs that

predispose an individual to neuropsychiatric complications. During this time and with this population, he monitored the effects of various antipsychotics, including Zyprexa.

Dr. Kruszewski has expertise in psychopharmacology, including education in medical school, internship, residency, post-graduate work and continuous reading and updating through Continuing Medical Education (CME) work. He has been an educator regarding basic and applied psychiatric and neuropsychiatric psychopharmacology, including metabolic dysfunction, at several institutions, including Harvard Medical School (1974-77), specifically, the epidemiology of obesity), UMDNJ-Rutgers Medical School/Robert Wood Johnson for several years as a member of their residency program and faculty (1980-83) and University of Pittsburgh School of Medicine, Western Psychiatric Institute and Clinic (1988-1991), Allegheny General Hospital and related Medical Schools, (1991-92), University of North Texas Medical School (1992-93) and, as a member of the Clinical Faculty of Penn State College of Medicine-Hershey Medical School (1999-2004). As part of those academic teaching appointments, he lectured on epidemiology, psychiatry, neuropsychiatry and related-fields, including factors that affect and illness of individuals and populations to identify risk factors for disease and to determine optimal treatment approaches to clinical practice. His work has been published as solo and primary author in peer-reviewed journals, including the *BMJ* (previously titled, British Medical Journal), *American Journal of Psychiatry, Neurology, Journal of the American Medical Association, the New England Journal of Medicine, Annals of Clinical Psychiatry, Journal of Clinical Psychiatry* (as of Spring 2007) and others. Those publications have covered a wide spectrum of issues pertaining to drugs (including antipsychotics), side-effects, conflicts of interest and the validity and consistency of research.

This expert is on the Board or Directors of the Alliance for Human Research Protection. In that capacity, he reviews and analyzes information from national and international peer-reviewed and edited sources related to clinical research on issues pertaining to drugs and device side-effects. That work includes his ongoing study of effects and side-effects of anticonvulsants, antidepressants, antipsychotics, stimulants, sedatives, drugs of abuse and mood-stabilizing drugs. In 2001-2003, he provided psychiatric expertise regarding behavioral access to care for a white paper designed for the NCQA (National Committee on Quality Assurance, Washington D.C.) and to be used a guide for nationwide behavioral health programs. He participated in the design and implementation of drug trials, including Zyprexa. He performed extensive research of peer- and non-peer-reviewed scientific literature, including an in-progress review of Zyprexa New Drug Application (NDA) documents concerning the mechanism of action, efficacy and safety features of olanzapine. Report of Stefan Kruszewski, M.D., 1-4 (March 21, 2007).

c) Dr. Arvin P. Shroff, Ph.D.

Plaintiffs' FDA regulatory expert Arvin P. Shroff, Ph.D. proposes to testify that Lilly (1) failed to provide sufficient safety information to the FDA, including information required by its post-marketing adverse event reporting obligations; (2) failed to make appropriate and timely labeling changes; (3) delayed communicating the September 2003 labeling change; and (4) failed to warn physicians and patients about weight gain, hyperglycemia, and diabetes.

In addition, Dr. Shroff proposes to offer general opinions to the effect that the FDA's review of prescription medications is limited by the information provided by the sponsor; that the performance goals of the Prescription Drug User Free Act limit the FDA's review of prescription drugs; that the FDA lacks the authority to dictate product labeling; and that Lilly had an

obligation to distribute medical literature to physicians.

Lilly points out that although he purports to be an FDA regulatory expert, Dr. Shroff has only two years of experience in product labeling, gained more than thirty years ago. Lilly asserts that this proposed expert has neither looked at any key data nor conducted any independent analysis of the issues on which he testifies. For example, Lilly claims:

- Dr. Shroff has not looked at any data related to Lilly's interactions with the FDA. He acknowledges that he has no evidence that Lilly failed to communicate the adverse events of Zyprexa to the FDA or in any other way failed to fulfill its post-marketing safety reporting responsibilities under the FDCA.

- Instead of performing his own analysis of the facts of this litigation, Dr. Shroff relied on facts reported in two articles about Lilly that he read in the New York Times.

- Dr. Shroff reviewed only the warnings section of one Zyprexa label, from a copy of the Physician's Desk Reference he had at home. Apart from this one label, he has not reviewed any of the Zyprexa labeling as it has evolved over the time Zyprexa has been on the market. Dr. Shroff does not know when Lilly first included information about weight gain, hyperglycemia, or diabetes in the Zyprexa labeling.

- Dr. Shroff has not determined when Lilly knew or should have known that there reasonable evidence of an association between Zyprexa and weight gain, hyperglycemia, or diabetes that would have necessitated adding a warning to the Zyprexa labeling.

- Dr. Shroff prepared his report in less than three days, largely copying it from reports he has submitted in litigation involving other pharmaceuticals.

Def. Mot. to Exclude Testimony of Arvin Shroff, 1-2 (May 29, 2007).

Dr. Shroff has a good general knowledge of how the FDA operates. He can testify as to this. He may not testify as to the specifics of how Zyprexa regulatory issues were processed by the FDA; he has no specific knowledge of this matter.

As to general knowledge, Dr. Shroff's background qualifies him to be helpful to the jury. It includes the following: He is the President of Arvin Shroff Associates, LLC, a consulting firm specializing in FDA regulatory, enforcement and compliance issues including submissions of various types of applications and documents to FDA. The firm provides advice to pharmaceutical manufacturers, biotechnology companies, medical device firms, biological industry, and food firms (including dietary supplement companies). He spent 26 years with the Food and Drug Administration (FDA) employed in various capacities before retirement on June 30, 2000 as the Deputy Director of the Office of Enforcement.

He began his career with the FDA in 1974 at the Center for Drug Evaluation and Research ("CDER") in the Office of New Drug Evaluation as a Review Chemist. His main responsibilities included reviewing Investigational New Drug Applications (INDs), New Drug Applications (DMFs), as well as supplements and amendments associated with these applications. He also reviewed Abbreviated New Drug Applications (ANDA) and Abbreviated Antibiotic Drug Applications (AADAs) on occasion. During his tenure in this position, he reviewed and evaluated numerous different types of drug products. He was a member of many FDA technical committees the prepared guidance documents for the regulated industry in various

96

drug-related subject areas such as Stability, Packaging, Chemistry and Manufacturing Controls. He was also an FDA liaison with the United States Pharmacopoeia, a scientific standard-setting organization, recognized in the Food, Drug and Cosmetic Act (Act).

In 1976, he was promoted to Chief, Product Surveillance Branch, Division of Drug product Quality, Office of Compliance, CDER, with primary responsibilities to help determine the quality of imported and domestic drugs distributed in the United States. In 1981, he was promoted to Director, Division of Field Science, Office of Regulatory Affairs ("ORA"). In that role, he directed and managed the scientific efforts and methods development research for ORA laboratories (there were 19 laboratories and 7 Research Centers in ORA at that time) for all program areas (food, drugs, devices, biologics and veterinary medicine). In 1985, he became the Deputy Director, Office of Regional Operations, ORA. He supervised and coordinated FDA's regulatory activities, such as inspections, imports, surveillance and emergency operations, as well as recall activities dealing with district and regional offices. These activities involved all FDA program areas, including drugs and biologics. In 1992, he became Deputy Director, Office of Enforcement, ORA. In that role he evaluated and coordinated proposed legal actions to ascertain compliance with regulatory policy and enforcement objectives, including GMP issues, recalls and other enforcement and compliance issues. The recall unit was transferred from Office of Regional Operations to the Office of Enforcement, where he oversaw hundreds of recalls each year in all program areas.

Prior to working at the FDA, this expert was employed as a Group Leader and Senior Research Chemist at Ortho Pharmaceutical Corporation, a Johnson & Johnson subsidiary, where he was involved in both synthetic organic chemistry and analytical chemistry. He received his

97

Ph.D in Pharmaceutical Chemistry from the School of Pharmacy, University of Maryland in 1962. Report of Alvin Shroff, Ph.D., 1-3 (March 25, 2007). He has authored a considerable number of publications on FDA practice. *Id.* at appendix III.

2. *Challenges to Defendant's Expert Dr. Robert R. Henry, M.D.*

Plaintiffs challenge the report and proposed testimony of Dr. Robert R. Henry on the grounds that:

- A significant number of important mechanistic and non-mechanistic studies were not reviewed or considered by Dr. Henry in formulating his opinion.

- Dr. Henry criticizes existing mechanistic studies but does not cite to any studies to show divergence in the scientific community.

- Dr. Henry's opinion does not conform with the "consensus" opinion of his peers.

- Dr. Henry's clamp study revealed an increase of weight gain as well as insulin change accompanied with Zyprexa use, suggesting a strong link between Zyprexa and diabetes.

Pl. Mot. to Exclude Testimony of Dr. Robert R. Henry (May 29, 2007).

None of these objections warrant *Daubert* exclusion, particularly in view of the expert's distinguished career which fully qualifies him to give his proposed opinions that available scientific data do not establish a causal relationship between Zyprexa and type 2 diabetes. The opinion may be helpful to the jury.

His background includes the following: He holds an M..D. from the University of Manitoba Medical School, and is board certified by the American Boards of Internal Medicine and Endocrinology and Metabolism. Currently he is employed as Professor of Medicine at the University

of California, San Diego, and Chief of the Section of Endocrinology, Metabolism and Diabetes and the Special Diagnostic and Treatment Unit at the Veterans Administration Medical Center, San Diego. The Special Diagnostic and Treatment Unit functions primarily as a clinical center of research in diabetes and obesity. He is also Director of the Center for Metabolic Research, which administers all aspects of the clinical research conducted at the Special Diagnostic and Treatment Unit. At the University of California, San Diego, he regularly teach courses in endocrinology and diabetes, and he supervises the education and clinical training of medical students, residents and fellows in the treatment of diabetes and other endocrinologic and metabolic disorders. In his clinical practice at the VA Medical Center, San Diego, he treats patients with metabolic disorders. About 80% of his patients have diabetes. They include people who have serious mental disorders, including patients with schizophrenia and bipolar disorders, who are being treated with atypical antipsychotics.

This expert's research focuses on abnormalities of glucose and fat metabolism in patients with obesity, as well as those with type 1 and type 2 diabetes and those who are prediabetic. A focus of his research involves studies directed at understanding the interaction between obesity and type 2 diabetes. He regularly designs, conducts, and evaluates mechanistic studies of glucose and fat metabolism, including vivo studies such as glucose clamp technique and in vitro studies of human fat and muscle tissues. This research includes studies directed at elucidating the mechanisms by which atypical antipsychotics, including Zyprexa, may influence glucose and fat metabolism. He has also been an investigator in a number of national diabetes-related research studies, including the Diabetes Prevention Program and the VA Co-Operative Studies Program diabetes trial of glycemic control and complications in diabetes mellitus type 2. His activities include service to the American

Diabetes Association.  In the past five years, he served on the ADA's Board of Directors, Research Policy Committee (chair), and National Legal Advocacy Subcommittee, and also served as a Meeting Abstract Reviewer for the ADA National Meeting.  He is a reviewer of manuscripts for many of the leading endocrinology and medical journals and of grant applications submitted to many organizations, including the ADA, the Veterans Administration, and the National Institute of Health. Report of Robert R. Henry, 1-2 (May 9, 2007).

**V. Conclusion**

In view of the extensive briefing, oral submissions, and clarity of the law and facts, no further argument is required.

**A. Robert Cusella**

Summary judgment against Robert Cusella is granted with costs and disbursements. Either party may submit a judgment.

**B. Judith New**

Summary judgment against Judith New is denied.

**C. Monty Souther**

Summary judgment against Monty Souther is denied.

**D. Donna Worthington**

Summary judgment against Donna Worthington is denied.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   June 11, 2007
        Brooklyn, N.Y.