# EXHIBIT B

Westlaw.

--- S.Ct. ----  
--- S.Ct. ----, 2007 WL 1660910 (U.S.)  
**(Cite as: --- S.Ct. ----)**

Page 1

**H**  
Watson v. Philip Morris Companies, Inc.  
U.S.,2007.  
Only the Westlaw citation is currently available.  
Supreme Court of the United States  
Lisa WATSON, et al., Petitioners,  
v.  
PHILIP MORRIS COMPANIES, INC., et al.  
No. 05-1284.

Argued April 25, 2007.  
Decided June 11, 2007.

**Background:** Consumers brought putative class action in state court against cigarette manufacturer, alleging that manufacturer designed its cigarettes to deliver more tar and nicotine to smokers than its use of the labels "light" and "lowered tar and nicotine" would suggest, in violation of the Arkansas Deceptive Trade Practices Act. Action was removed to federal court. The United States District Court for the Eastern District of Arkansas, Eisele, J., 2003 WL 23272484, upheld the removal and the United States Court of Appeals for the Eighth Circuit affirmed. Certiorari was granted.

**Holding:** The Supreme Court, Justice Breyer, held that cigarette manufacturer did not fall within the terms of the federal officer removal statute in its testing and advertising of tar and nicotine levels in its cigarettes, and thus claim brought by consumers was not removable.

Reversed and remanded.

**[1] Removal of Cases 334** ⚖═21

334 Removal of Cases  
   334II Origin, Nature, and Subject of Controversy  
     334k21 k. Actions Against or for Acts of United States Officers. Most Cited Cases  
Federal officer removal statute's basic purpose is to protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority. 28 U.S.C.A. § 1442(a)(1).

**[2] Removal of Cases 334** ⚖═21

334 Removal of Cases  
   334II Origin, Nature, and Subject of Controversy  
     334k21 k. Actions Against or for Acts of United States Officers. Most Cited Cases  
The help or assistance necessary to bring a private person within the scope of federal officer removal statute does not include simply complying with the law. 28 U.S.C.A. § 1442(a)(1).

**[3] Removal of Cases 334** ⚖═21

334 Removal of Cases  
   334II Origin, Nature, and Subject of Controversy  
     334k21 k. Actions Against or for Acts of United States Officers. Most Cited Cases  
A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official" as required to fall under the Federal Officer Removal Act. 28 U.S.C.A. § 1442(a)(1).

**[4] Removal of Cases 334** ⚖═21

334 Removal of Cases  
   334II Origin, Nature, and Subject of Controversy  
     334k21 k. Actions Against or for Acts of United States Officers. Most Cited Cases  
Cigarette manufacturer did not fall within the terms of the federal officer removal statute in its testing and advertising of tar and nicotine levels in its cigarettes, and thus claim brought by consumers was not removable to federal court, notwithstanding Federal Trade Commission's (FTC) detailed supervision of the cigarette testing process. 28 U.S.C.A. § 1442(a)(1).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----  
--- S.Ct. ----, 2007 WL 1660910 (U.S.)  
**(Cite as: --- S.Ct. ----)**

Page 2

*Syllabus* [FN*]

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** Petitioners filed a state-court suit claiming that respondents (Philip Morris) violated Arkansas unfair business practice laws by advertising certain cigarette brands as "light" when, in fact, Philip Morris had manipulated testing results to register lower levels of tar and nicotine in the advertised cigarettes than would be delivered to consumers. Philip Morris removed the case to Federal District Court under the federal officer removal statute, which permits removal of an action against "any officer (*or any person acting under that officer*) of the United States or of any agency thereof," 28 U.S.C. § 1442(a)(1) (emphasis added). The federal court upheld the removal, ruling that the complaint attacked Philip Morris' use of the *Government's* method of testing cigarettes and thus that petitioners had sued Philip Morris for "acting under" the Federal Trade Commission. The Eighth Circuit affirmed, emphasizing the FTC's detailed supervision of the cigarette testing process and likening the case to others in which lower courts permitted removal by heavily supervised Government contractors.

*Held:* The fact that a federal agency directs, supervises, and monitors a company's activities in considerable detail does not bring that company within § 1442(a)(1)'s scope and thereby permit removal. Pp. --- - ----3-14.

(a) Section 1442(a)(1)'s words "acting under" are broad, and the statute must be "liberally construed." *Colorado v. Symes,* 286 U.S. 510, 517, 52 S.Ct. 635, 76 L.Ed. 1253. But broad language is not limitless. And a liberal construction nonetheless can find limits in a text's language, context, history, and purposes. The statute's history and this Court's cases demonstrate that its basic purpose is to protect the Federal Government from the interference with its "operations" that would ensue were a State able, for example, to "arres[t]" and bring "to trial in a State cour[t] for an alleged offense against the law of the State," "officers and agents" of the Government "acting ... within the scope of their authority." *Willingham v. Morgan,* 395 U.S. 402, 406, 89 S.Ct. 1813, 23 L.Ed.2d 396 (internal quotation marks omitted). State-court proceedings may reflect "local prejudice" against unpopular federal laws or officials, *e.g., Maryland v. Soper,* 270 U.S. 9, 32, 46 S.Ct. 185, 70 L.Ed. 449, and States hostile to the Government may impede enforcement of federal law, see, *e.g., Tennessee v. Davis,* 100 U.S. 257, 263, 25 L.Ed. 648, or deprive federal officials of a federal forum in which to assert federal immunity defenses, see, *e.g., Willingham, supra,* at 407, 89 S.Ct. 1813. The removal statute applies to private persons "who lawfully assist" a federal officer "in the performance of his official duty," *Davis v. South Carolina,* 107 U.S. 597, 600, 2 S.Ct. 636, 27 L.Ed. 574, but "only" if the private parties were "authorized to act with or for [federal officers or agents] in affirmatively executing duties under ... federal law," *City of Greenwood v. Peacock,* 384 U.S. 808, 824, 86 S.Ct. 1800, 16 L.Ed.2d 944. Pp. --- - ----3-7.

(b) The relevant relationship here is that of a private person "*acting under*" a federal "officer" or "agency." § 1442(a)(1) (emphasis added). In this context, "under" must refer to what the dictionaries describe as a relationship involving acting in a certain capacity, considered in relation to one holding a superior position or office, and typically includes subjection, guidance, or control. Precedent and statutory purpose also make clear that the private person's "acting under" must involve an effort to *assist,* or to help *carry out,* the federal superior's duties or tasks. See, *e.g., Davis v. South Carolina, supra,* at 600, 2 S.Ct. 636. Such aid does *not* include simply *complying* with the law. When a company complies with a regulatory order, it does not ordinarily create a significant risk of state-court "prejudice." Cf. *Soper, supra,* at 32, 46 S.Ct. 185. A state-court suit brought against such a company is not likely to disable federal officials from taking necessary action designed to enforce federal law, cf. *Tennessee v. Davis, supra,* at 262-263, nor to deny a federal forum to an individual entitled to assert a federal immunity claim, see, *e.g., Willingham, supra,* at 407, 89 S.Ct. 1813. Thus, a private firm's compliance (or noncompliance) with federal laws, rules, and

regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official," even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored. A contrary determination would expand the statute's scope considerably, potentially bringing within it state-court actions filed against private firms in many highly regulated industries. Nothing in the statute's language, history, or purpose indicates a congressional intent to do so. Pp. --- - ----7-9.

*2 (c) Philip Morris' two arguments to the contrary are rejected. First, it contends that if close supervision is sufficient to turn a Government contractor into a private firm "acting under" a Government "agency" or "officer," as lower courts have held, it is sufficient to transform a company subjected to intense regulation. The answer to this argument is that the assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps the officers fulfill other basic governmental tasks. Second, Philip Morris argues that it is "acting under" FTC officers when it conducts cigarette testing because, after initially testing cigarettes for tar and nicotine, the FTC *delegated authority* for that task to the tobacco industry in 1987 and has thereafter extensively supervised and closely monitored testing. This argument contains a fatal flaw of omission. Although it uses the word "delegation," there is no evidence of any delegation of legal authority from the FTC to the tobacco industry to undertake testing on the Government agency's behalf, or evidence of any contract, payment, employer/employee relationship, or principal/agent arrangement. The existence of detailed FTC rules indicates regulation, not delegation. The usual regulator/regulated relationship cannot be construed as bringing Philip Morris within the statute's terms. Pp. --- - ----9-14.

420 F.3d 852, reversed and remanded.

*3 BREYER, J., delivered the opinion for a unanimous Court.

David C. Frederick, Washington, D.C., for petitioners. Irving G. Gornstein, for United States as amicus curiae, by special leave of Court, supporting petitioners.
Theodore B. Olson, Washington, D.C., for respondents.
Steven Eugene Cauley, James Allen Carney, Marcus N. Bozeman, Cauley, Bowman, Carney & Williams, PLLC, Little Rock, Arkansas, David C. Frederick, Counsel of Record, Mark L. Evans, Kelly P. Dunbar, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for Petitioners.
Murray R. Garnick, James M. Rosenthal, Arnold & Porter LLP, Washington, D.C., Kenneth S. Geller, Mayer, Brown, Rowe & Maw LLP, Washington, D.C., Theodore B. Olson, Counsel of Record, Mark A. Perry, Amir C. Tayrani, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Respondents.For U.S. Supreme Court briefs, see:2007 WL 579304 (Pet.Brief)2007 WL 966518 (Resp.Brief)2007 WL 1156119 (Reply.Brief)
Justice BREYER delivered the opinion of the Court.
The federal officer removal statute permits a defendant to remove to federal court a state-court action brought against the

"United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office ...." 28 U.S.C. § 1442(a)(1) (emphasis added).

The question before us is whether the fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail brings that company within the scope of the italicized language ("*acting under*" an "*officer*" of the United States) and thereby permits removal. We hold that it does not.

I

Lisa Watson and Loretta Lawson, the petitioners, filed a civil lawsuit in Arkansas state court claiming that the Philip Morris Companies, the respondents, violated state laws prohibiting unfair and deceptive business practices. The complaint focuses upon advertisements and packaging that describe certain Philip Morris brand cigarettes (Marlboro and Cambridge Lights) as "light," a term indicating lower tar and nicotine levels than those present in other cigarettes. More specifically, the complaint refers to the design and performance of Philip Morris cigarettes that are tested in accordance

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1660910 (U.S.)
**(Cite as: --- S.Ct. ----)**

Page 4

with the Cambridge Filter Method, a method that "the tobacco industry [uses] to 'measure' tar and nicotine levels in cigarettes." App. to Pet. for Cert. 63a-64a. The complaint charges that Philip Morris "manipulat[ed] the design" of its cigarettes, and "employ[ed] techniques that" would cause its cigarettes "to register lower levels of tar and nicotine on [the Cambridge Filter Method] than would be delivered to the consumers of the product." Id., at 63a-65a. The complaint adds that the Philip Morris cigarettes delivered "greater amounts of tar and nicotine when smoked under actual conditions" than the adjective "light" as used in its advertising indicates. Id., at 65a. In view of these and other related practices, the complaint concludes that Philip Morris' behavior was "deceptive and misleading" under Arkansas law. Id., at 64a, 66a.

Philip Morris, referring to the federal officer removal statute, removed the case to Federal District Court. That court, in turn, held that the statute authorized the removal. The court wrote that the complaint attacked Philip Morris' use of the *Government's* method of testing cigarettes. For this reason (and others), it held that the petitioners had sued Philip Morris for "act[s]" taken "under" the Federal Trade Commission, a federal agency (staffed by federal "officer[s]").

*4 The District Court certified the question for interlocutory review. And the United States Court of Appeals for the Eighth Circuit affirmed. Like the District Court, it emphasized the FTC's detailed supervision of the cigarette testing process. It also cited lower court cases permitting removal by heavily supervised Government contractors. See 420 F.3d 852, 857 (2005); *Winters v. Diamond Shamrock Chemical Co.,* 149 F.3d 387 (C.A.5 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange). The Eighth Circuit concluded that Philip Morris was "acting under" federal "officer[s]," namely the FTC, with respect to the challenged conduct. 420 F.3d, at 854.

We granted certiorari. 549 U.S. ----, 127 S.Ct. 1055, 166 L.Ed.2d 797 (2007). And we now reverse the Eighth Circuit's determination.

II

The federal statute permits removal only if Philip Morris, in carrying out the "act[s]" that are the subject of the petitioners' complaint, was "acting under" any "agency" or "officer" of "the United States." 28 U.S.C. § 1442(a)(1). The words "acting under" are broad, and this Court has made clear that the statute must be "liberally construed." *Colorado v. Symes,* 286 U.S. 510, 517, 52 S.Ct. 635, 76 L.Ed. 1253 (1932); see *Arizona v. Manypenny,* 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981); *Willingham v. Morgan,* 395 U.S. 402, 406-407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). But broad language is not limitless. And a liberal construction nonetheless can find limits in a text's language, context, history, and purposes.

Beginning with history, we note that Congress enacted the original federal officer removal statute near the end of the War of 1812, a war that was not popular in New England. See *id.,* at 405, 89 S.Ct. 1813. Indeed, shipowners from that region filed many state-court claims against federal customs officials charged with enforcing a trade embargo with England. See Wiecek, The Reconstruction of Federal Judicial Power, 1863-1875, 13 Am. J. Legal Hist. 333, 337 (1969). Congress responded with a provision that permitted federal customs officers and "*any other person aiding or assisting* " those officers to remove a case filed against them "in any state court" to federal court. Customs Act of 1815, ch. 31, § 8, 3 Stat. 198 (emphasis added). This initial removal statute was "[o]bviously ... an attempt to protect federal officers from interference by hostile state courts." *Willingham,* 395 U.S., at 405, 89 S.Ct. 1813.

In the early 1830's, South Carolina passed a Nullification Act declaring federal tariff laws unconstitutional and authorizing prosecution of the federal agents who collected the tariffs. See *ibid.* Congress then enacted a new statute that permitted "any officer of the United States, *or other person* " to remove to federal court a lawsuit filed against the officer "for or on account of any act done under the revenue laws of the United States." Act of Mar. 2, 1833, ch. 57, § 3, 4 Stat. 633 (emphasis added). As Senator Daniel Webster explained at the time, where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----  
--- S.Ct. ----, 2007 WL 1660910 (U.S.)  
**(Cite as: --- S.Ct. ----)**

Page 5

state courts might prove hostile to federal law, and hence to those who enforced that law, the removal statute would "give a chance to the [federal] officer to defend himself where the authority of the law was recognized." 9 Cong. Deb. 461 (1833).

*5 Soon after the Civil War, Congress enacted yet another officer removal statute, permitting removal of a suit against any revenue officer "on account of any act done under color of his office" by the revenue officer and "*any person acting under or by authority of any such officer.*" Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171 (emphasis added). Elsewhere the statute restricted these latter persons to those engaged in acts "for the collection of taxes." § 67, *id.,* at 172.

In 1948, Congress again revised the statute, dropping its limitation to the revenue context. And it included the rewritten statute within its 1948 recodification. See Act of June 25, 1948, ch. 646, § 1442(a), 62 Stat. 938, 28 U.S.C. § 1442(a). It is this version of the statute that, with the exception of a modification in response to this Court's decision in *International Primate Protection League v. Administrators of Tulane Ed. Fund,* 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991), is now before us. While Congress expanded the statute's coverage to include all federal officers, it nowhere indicated any intent to change the scope of words, such as "acting under," that described the triggering relationship between a private entity and a federal officer.

Turning to precedent, we point to three cases, all involving illegal liquor, which help to illustrate the need for, and the workings of, the pre-1948 removal statutes. In 1878, a federal revenue officer, James Davis, raided an illegal distillery in Tennessee; was ambushed by several armed men; returned the ambushers' gunfire; and shot one of his attackers dead. See *Tennessee v. Davis,* 100 U.S. 257, 261, 25 L.Ed. 648 (1880). Tennessee indicted Davis for murder. The Court held that the statute permitted Davis to remove the case to federal court, reasoning that the Federal Government "can act only through its officers and agents, and they must act within the States." *Id.,* at 263. Removal, the Court found, would help to prevent hostile States from "paralyz [ing]" the Federal Government and its initiatives. *Ibid.*

About the same time, a U.S. Army corporal (also called Davis, Lemuel Davis) along with several other soldiers helped a federal revenue officer try to arrest a distiller for violating the internal-revenue laws. The soldiers surrounded the house; the distiller escaped through a hole in a side wall; Corporal Davis shot the suspect; and South Carolina indicted Davis for murder. Davis removed the case, and this Court upheld the removal. The Court acknowledged that, although Davis was not a revenue officer, he was a person "who lawfully assist[ed]" a revenue officer "in the performance of his official duty." *Davis v. South Carolina,* 107 U.S. 597, 600, 2 S.Ct. 636, 27 L.Ed. 574 (1883).

*6 In the 1920's, Maryland charged a group of prohibition agents and a private person acting as their driver with a murder committed during a distillery raid. See *Maryland v. Soper,* 270 U.S. 9, 46 S.Ct. 185, 70 L.Ed. 449 (1926). The prohibition agents and their driver sought to remove the state murder trial to federal court. This Court ultimately rejected their removal efforts for reasons not relevant here. But in doing so it pointed out that the private person acting "as a chauffeur and helper to the four officers under their orders and ... direction" had "the same right to the benefit of" the removal provision as did the federal agents. *Id.,* at 30, 46 S.Ct. 185.

[1] Apart from demonstrating the dangers associated with working in the illegal alcohol business, these three cases-*Tennessee v. Davis, Davis v. South Carolina,* and *Maryland v. Soper*-illustrate that the removal statute's "basic" purpose is to protect the Federal Government from the interference with its "operations" that would ensue were a State able, for example, to "arres[t]" and bring "to trial in a State cour[t] for an alleged offense against the law of the State," "officers and agents" of the Federal Government "acting ... within the scope of their authority." *Willingham,* 395 U.S., at 406, 89 S.Ct. 1813 (internal quotation marks omitted). See also *ibid.* (noting that the "purpose" of the statute "is not hard to discern"). State-court proceedings may reflect "local prejudice" against unpopular federal laws or federal officials. *Soper, supra,* at 32, 46 S.Ct. 185; see

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Manypenny,* 451 U.S., at 242, 101 S.Ct. 1657 (noting that removal permits trials to occur free from "local ... prejudice"). In addition, States hostile to the Federal Government may impede through delay federal revenue collection or the enforcement of other federal law. See *Tennessee v. Davis, supra,* at 263; cf. *Findley v. Satterfield,* 9 F. Cas. 67, 68 (No. 4,792) (CC ND Ga. 1877). And States may deprive federal officials of a federal forum in which to assert federal immunity defenses. See *International Primate Protection League, supra,* at 86-87, 111 S.Ct. 1700; *Willingham, supra,* at 407, 89 S.Ct. 1813 ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court"); *Jefferson County v. Acker,* 527 U.S. 423, 447, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) (SCALIA, J., concurring in part and dissenting in part) (noting that "the main point" of the federal officer removal statute "is to give officers a federal forum in which to litigate the merits of immunity defenses").

Where a private person acts as an assistant to a federal official in helping that official to enforce federal law, some of these same considerations may apply. Regardless, in *Davis v. South Carolina* the Court wrote that the removal statute applies to private persons "who lawfully assist" the federal officer "in the performance of his official duty." 107 U.S., at 600, 2 S.Ct. 636. And in *City of Greenwood v. Peacock,* 384 U.S. 808, 824, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), in interpreting a related removal provision, the Court repeated that the statute authorized removal by private parties "only" if they were "authorized to act with or for [federal officers or agents] in affirmatively executing duties under ... federal law." All the Court's relevant post-1948 federal officer removal cases that we have found reflect or are consistent with this Court's pre-1948 views. See *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989); *Manypenny, supra; Willingham, supra; Peacock, supra.*

III

*7 With this history and precedent in mind, we return to the statute's language. The relevant relationship is that of a private person *"acting under"* a federal "officer" or "agency." 28 U.S.C. § 1442(a)(1) (emphasis added). In this context, the word "under" must refer to what has been described as a relationship that involves "acting in a certain capacity, considered in relation to one holding a superior position or office." 18 Oxford English Dictionary 948 (2d ed.1989). That relationship typically involves "subjection, guidance, or control." Webster's New International Dictionary 2765 (2d ed.1953). See also Funk & Wagnalls New Standard Dictionary of the English Language 2604 (1942) (defining "under" as meaning "[s]ubordinate or subservient to," "[s]ubject to guidance, tutorship, or direction of"); 18 Oxford English Dictionary, *supra,* at 949 ("[s]ubject to the instruction, direction, or guidance of"). In addition, precedent and statutory purpose make clear that the private person's "acting under" must involve an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior. See, *e.g., Davis v. South Carolina, supra,* at 600, 2 S.Ct. 636; see also *supra,* at ---- - ----5-7.

[2] In our view, the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law. We recognize that sometimes an English speaker might say that one who complies with the law "helps" or "assists" governmental law enforcement. Taxpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking, for that matter well-behaved federal prisoners, all "help" or "assist" federal law enforcement authorities in some sense of those words. But that is not the sense of "help" or "assist" that can bring a private action within the scope of this statute. That is in part a matter of language. One would usually describe the behavior of the taxpayers, airline passengers, and prisoners we have described as *compliance* with the law (or *acquiescence* to an order), not as "acting under" a federal official who is giving an order or enforcing the law. It is also in part a matter of the history and the precedent we have discussed. See *supra,* at ---- - ----3-7.

Finally, it is a matter of statutory purpose. When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court "prejudice." Cf. *Soper,* 270 U.S., at 32, 46 S.Ct. 185;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Manypenny, supra,* at 241-242, 101 S.Ct. 1657. Nor is a state-court lawsuit brought against such a company likely to disable federal officials from taking necessary action designed to enforce federal law. Cf. *Tennessee v. Davis,* 100 U.S., at 262-263. Nor is such a lawsuit likely to deny a federal forum to an individual entitled to assert a federal claim of immunity. See, *e.g., Willingham,* 395 U.S., at 407, 89 S.Ct. 1813.

*8 [3] The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored. A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries. See, *e.g.,* Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136a (2000 ed. and Supp. IV) (mandating disclosure of testing results in the context of pesticide registration). Neither language, nor history, nor purpose lead us to believe that Congress intended any such expansion.

IV

[4] Philip Morris advances two important arguments to the contrary. First, it points out that lower courts have held that Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision. See, *e.g., Winters,* 149 F.3d 387. And it asks why, if close supervision is sufficient to turn a private contractor into a private firm "acting under" a Government "agency" or "officer," does it not do the same when a company is subjected to intense regulation.

The answer to this question lies in the fact that the private contractor in such cases is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of *Winters,* for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

These circumstances distinguish *Winters* from this case. For present purposes that distinction is sufficient. And we need not further examine here (a case where private contracting is not at issue) whether and when particular circumstances may enable private contractors to invoke the statute.

*9 Second, Philip Morris argues that its activities at issue here did not consist simply of compliance with regulatory laws, rules, and orders. It contends that the FTC, after initially testing cigarettes for tar and nicotine, *"delegated authority"* for that task to an industry-financed testing laboratory in 1987. *E.g.,* Brief for Respondents 31 (emphasis added). And Philip Morris asserts that (along with other cigarette companies) it was acting pursuant to that delegation. It adds that ever since this initial "delegation" the FTC has "extensive[ly] ... supervis[ed]" and "closely monitored" the manner in which the laboratory tests cigarettes. *Id.,* at 37, 30, 39. Philip Morris concludes that, given all these circumstances, just as Dow was "acting under" officers of the Department of Defense when it manufactured Agent Orange, see *Winters, supra,* at 399, so Philip Morris is "acting under" officers of the FTC when it conducts cigarette testing. See Brief for Respondents 38.

For argument's sake we shall overlook the fact that the petitioners appear to challenge the way in which Philip Morris "designed" its *cigarettes,* not the way in which it (or the industry laboratory) conducted cigarette testing. We also shall assume the following testing-related facts that Philip Morris sets forth in its brief:
(1) In the 1950's, the FTC ordered tobacco companies to stop advertising the amount of tar and nicotine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1660910 (U.S.)
**(Cite as: --- S.Ct. ----)**

Page 8

contained in their cigarettes. See *id.,* at 3.

(2) In 1966, the FTC altered course. It permitted cigarette companies to advertise "tar and nicotine yields" provided that the company had substantiated its statement through use of the Cambridge Filter Method, a testing method developed by Dr. Clyde Ogg, a Department of Agriculture employee. *Id.,* at 4-5.

(3) The Cambridge Filter Method uses "a smoking machine that takes a 35 milliliter puff of two seconds' duration on a cigarette every 60 seconds until the cigarette is smoked to a specified butt length." *FTC v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 37 (C.A.D.C.1985). It then measures the amount of tar and nicotine that is delivered. That data, in turn, determine whether a cigarette may be labeled as "light." This method, Dr. Ogg has testified, "will not tell a smoker how much tar and nicotine he will get from any given cigarette," but it "will indicate" whether a smoker "will get more from one than from another cigarette if there is a significant difference between the two and if he smokes the two in the same manner." Brief for Respondents 5-6 (internal quotation marks omitted).

(4) In 1967, the FTC began to use its own laboratory to perform these tests. See *id.,* at 6. And the Cambridge Filter Method began to be referred to as "the 'FTC Method.'" *Id.,* at 4.

*10 (5) The FTC published the testing results periodically and sent the results annually to Congress. See *id.,* at 7.

(6) Due to cost considerations, the FTC stopped testing cigarettes for tar and nicotine in 1987. Simultaneously, the tobacco industry assumed responsibility for cigarette testing, running the tests according to FTC specifications and permitting the FTC to monitor the process closely. See *ibid.*

(7) The FTC continues to publish the testing results and to send them to Congress. See *ibid.*

(8) The tobacco industry has followed the FTC's requirement that cigarette manufacturers disclose (and make claims about) tar and nicotine content based exclusively on the results of this testing. See id., at 8-9.

Assuming this timeline, Philip Morris' argument nonetheless contains a fatal flaw-a flaw of omission. Although Philip Morris uses the word "delegation" or variations many times throughout its brief, we have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf. Nor is there evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement.

We have examined all of the documents to which Philip Morris and certain supporting *amici* refer. Some of those documents refer to cigarette testing specifications, others refer to the FTC's inspection and supervision of the industry laboratory's testing, and still others refer to the FTC's prohibition of statements in cigarette advertising. But none of these documents establish the type of formal delegation that might authorize Philip Morris to remove the case.

Several former FTC officials, for example, filed an *amicus* brief in which they state that "[i]n 198[7] the FTC delegated testing responsibility to the private Tobacco Industry Testing Lab (the 'TITL')." Brief for Former Commissioners and Senior Staff of the FTC 11. But in support of this proposition the brief cites a single source, a letter from the cigarette manufacturers' lawyer to an FTC official. That letter states:

"[M]ajor United States cigarette manufacturers, who are responsible for the TITL's operations and on whose behalf we are writing, do not believe that Commission oversight is needed .... Nevertheless, as an accommodation and in the spirit of cooperation, the manufacturers are prepared to permit Commission employees to monitor the TITL testing program ... ." Letter from John P. Rupp to Judith P. Wilkenfeld (June 30, 1987), online at http://tobaccodocuments. org/nysa_ti_s1/TI57900738.html (as visited June 7, 2007, and available in Clerk of Court's case file).

Nothing in this letter refers to a delegation of authority. And neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so.

*11 Without evidence of some such special relationship, Philip Morris' analogy to Government contracting breaks down. We are left with the FTC's detailed rules about advertising, specifications for testing, requirements about reporting results, and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1660910 (U.S.)
**(Cite as: --- S.Ct. ----)**

like. This sounds to us like regulation, not delegation. If there is a difference between this kind of regulation and, say, that of Food and Drug Administration regulation of prescription drug marketing and advertising (which also involve testing requirements), see <u>Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1316 (C.A.D.C.1998)</u>, that difference is one of degree, not kind.

As we have pointed out, however, differences in the degree of regulatory detail or supervision cannot by themselves transform Philip Morris' regulatory *compliance* into the kind of assistance that might bring the FTC within the scope of the statutory phrase "*acting under*" a federal "officer." *Supra,* at ----8. And, though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship. This relationship, as we have explained, cannot be construed as bringing Philip Morris within the terms of the statute.

For these reasons, the judgment of the Eighth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

U.S.,2007.
Watson v. Philip Morris Companies, Inc.
--- S.Ct. ----, 2007 WL 1660910 (U.S.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.