IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: VIOXX | * | MDL NO. 1657 |
| PRODUCT LIABILITY | * | |
| LITIGATION | * | SECTION "L" |
| | * | |
| | * | SPECIAL MASTER PAUL RICE |

* * * * * * * * * * * * *

# SECOND SPECIAL MASTER'S REPORT AND RECOMMENDATIONS – MERCK DOCUMENTS CIRCULATED TO THIRD PARTIES

## A. Introduction

This is the Second Report and Recommendations of the Special Master in the Consolidated Vioxx Cases. In the first report,[1] I outlined the fundamentals of the attorney-client privilege and developed Guidelines following my in camera examination of 2000 sample documents chosen by both the plaintiffs and the defendant Merck & Co. [Merck]. It is anticipated that these Guidelines will direct the resolution of privilege claims on approximately 60,000 pages of additional documents as to which Merck has asserted privilege.

The principles outlined in that first report are incorporated by reference in this report and have been applied to the documents addressed herein. The new issue presented in these communications is the circulation of allegedly privileged documents to third party consultants. The question presented is whether this circulation outside the corporate structure (and to those usually seen as personifying the corporate client) destroyed attorney-client confidentiality, and thereby the privilege protection, that may have been applicable to the communications.

Specifically, the issue raised by the dissemination of potentially privileged documents to outside consultants is whether the definition of the corporate client can and should be expanded to encompass those who are only temporarily retained by the client for a limited purpose.[2]

## B. Attorney-Client Privilege and the Corporate Client

---

[1] Special Master's Report and Recommendations, dated July 2, 2007.
[2] Merck did not make these document part of the original sampling process in which representative types of communications were reviewed by the Special Master, initial assessment of privilege claims were made, and Merck was permitted to supplement the record with additional supporting evidence.

NO.99800774.2

1

The rationale for the attorney-client privilege is to encourage open and candid communications from a client seeking legal advice from an attorney. Through openness and candor the attorney is better informed, the client receives more accurate advice, and society gains by clients more successfully conforming their conduct to the requirements of the law.[3] When promulgated, this rationale envisioned only individuals as clients because corporate entities did not exist.

When the Supreme Court reaffirmed the application of the attorney-client privilege to corporations in *Upjohn v. United States*, 449 U.S. 383, 389 (1981), it continued to insist that its purpose "is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[4]

The logical problem with extending the privilege to corporate entities has been that the privilege protection is given to a fictitious legal entity that cannot talk, and the individuals who personify that entity (its officers and employees) and speak for it are given no direct protection by the privilege. As a consequence, those employees do not control either its assertion or waiver. Therefore, it is questionable whether the goal of more candid communications is achieved through the corporate privilege protection.[5] Regardless of its logic, however, the corporate privilege exists, and its scope has been expanded from communications between corporate lawyers and members of the corporate "control group"– those who make decisions based on the advice received from legal counsel[6] – to communications between corporate attorneys and all employees on subjects that are within the scope of their corporate

---

[3] Paul R. Rice, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 2.3, *Purpose, Rationale and General Construction*, (ThomsonWest 2d ed. 1999)

[4] The Supreme Court first extended the attorney-client privilege to corporations in *United States v. Louisville & Nashville Railroad*, 236 U.S. 318 (1915). The application of the privilege to corporations was not contested in *Louisville & Nashville*. The Court stated:

> The desirability of protecting confidential communications between attorney and client as a matter of public policy is too well known and has been too often recognized by textbooks and courts to need extended comment now. If such communications were required to be made the subject of examination and publication, such enactment would be a practical prohibition upon professional advice and assistance.

Id. at 336. The privilege was extended to fictitious legal entities with no consideration of the dynamics of how it would work in a context where only the entity that cannot speak is given the protection. The assumption on which *Louisville & Nashville* was premised was converted into a rule of law in *Upjohn* with no consideration to the implications of the action.

[5] Paul R. Rice, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 4:10, *Should the Attorney-Client Privilege be Available to Corporation?* (West Group 2nd ed. 1999). The applicability of the privilege to corporations has been questioned by one court. In *Radiant Burners, Inc. v. American Gas Assoc.*, 207 F. Supp. 771, 774 (N.D. Ill. 1962) Judge Clark held that the privilege was not applicable to corporations because members of their boards of directors served on other corporate boards. In his opinion, this overlap in board membership destroyed the confidentiality of communications in each corporation. Therefore, he refused to recognize the corporate attorney-client privilege. This decision was immediately reversed by the Seventh Circuit, *Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314 (7th Cir. 1963) without directly addressing Judge Clark's confidentiality concerns.

[6] This control group test was promulgated in *City of Philadelphia v. Westinghouse Elec. Corp.*, 210 F. Supp. 483, 485 (E.D. Pa. 1962).

responsibilities.[7]

## C. Outside Consultants and the Corporate Client

The issue of circulating internal corporate communications to third party consultants is arising with much greater frequency as specialty services increase and as companies are streamlining operations and hiring outside consultants to supply services that previously may have been provided in-house by corporate employees – outsourcing to save taxes, obligations for insurance and other financial commitments. Merck employed a public relations agency, Ogilvy Public Relationship Worldwide, Inc., "Ogilvy," and a marketing and advertising agency, Communications Group, Inc., "DDB." The documents I have examined *in camera* involve communications involving these consultants which make reference to communication with Merck attorneys or advice given by Merck attorneys.

The first form of communications were e-mails between Merck employees and in-house lawyers, to which outside consultants had been added to the headers as either addressees or copyees. The second form of communication was direct e-mail exchanges between Merck's in-house lawyers and employees of the consulting firms. A third form of communication was employees of Merck communicating with employees of the third parties and relating legal concerns previously communicated to Merck. Finally, there were multiple communications between employees of consultants which referenced communications with or advice given by Merck in-house or outside counsel.

Under classic common law principles, the first form of communication would have waived the privilege protection. Because of the strict application of the confidentiality requirement, and the limited definition of who personified the corporate client, advice would first have to have been sought from legal counsel, and then other corporate employees would have had to transmit whatever limitations the company was advised to follow by the lawyer, and corporate executives (those who make up the corporation's control group) agreed to adopt. The third parties could not be copied on the attorney-client communications and the content of the attorney's advice could not be directly disclosed in the subsequent communications (although the general tenor of the advice may have been obvious from the content of the decisions communicated to third parties).

The second type of communication could not have been protected absent the outside consultants being agents of either the attorney or the client, assisting in either the obtaining or rendering of legal advice. In such circumstances, in-house corporate counsel's correspondence with third parties would likely have been seen as the equivalent of any other corporate employee communicating with a third party regarding limitations the corporation wished to impose on the services being sought.

---

[7] This subject matter test was promulgated in *Harper & Row Publishers Inc. v. Decker*, 423 F.2d 487, 491-92 (7th Cir. 1970). A decade later it apparently was adopted by the Supreme Court in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), although the Court refused to explicitly adopt any test.

Clearly, both methods of communicating with outside consultants by Merck were more efficient, and perhaps even more effective, because they were more direct. But neither convenience nor efficiency has ever been a sufficient justification for creating or extending privilege protections.

The most fundamental principle of all privilege law is that privileges should not be created or expanded unless their protection is necessary to achieve a desired social end that otherwise would not be possible without the protection.[8] Here, it is questionable whether the existence of even the corporate privilege can be justified under this standard, but it seems without reasonable question that the substance of these communications with the outside public relations and advertising consultants would have been transmitted, albeit indirectly, regardless of the applicability of the attorney-client privilege.[9] Consequently, it is inappropriate to expand the scope of the privilege to encompass communications with them.

Therefore, if a court were writing on a clean slate, communications between corporate clients and third party consultants should not be protected by the attorney-client privilege. Indeed, a court might even refuse to recognize the corporate privilege that gives rise to this problem with outside consultants. However, the reality is that the corporate privilege exists with its warts, blemishes, inconsistencies, and illogic and the question about Merck's communication with its third party consultants must be evaluated in light of those established principles and their application.

### D. The Expanding Corporate Client

A number of cases have considered, and many have accepted, the relaxation of the confidentiality requirement by sanctioning the application of the attorney-client privilege to communications disseminated to outside consultants. *See, In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994); *DE Technologies, Inc. v. Dell, Inc.*, 2006 WL 2548203, at *2 (W.D. Va. 2006); *Residential Constructors, LLC v. Ace Property & Cas. Ins. Co.*, 2006 WL 3149362, at *15 (D. Nev. 2006); *Neighborhood Dev. Collaborative v. Murphy*, 2005 WL 3272711, at *5 (D. Md. 2005); *Expert-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005); *Freeport McMoran Sulphur, LLC v. Mick Mullen Energy Equip. Resource, Inc.*, 2004 WL 1237450 (E.D. La. June 2, 2004); *In re Bristol-Myers Squibb Securities Litig.*, 2003 U.S. Dist. LEXIS 26985, *12-15 (D.N.J. June 25, 2003); In re Currency Conversion Fee, 2003 WL 22389169, at *2 (S.D.N.Y. 2003); *In re Copper Market Antitrust Litig.*, 200 F.R.D.

---

[8] As the Supreme Court stated in United States v. Nixon, 418 U.S. 683, 710 (1974), "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." Most courts have accepted Professor Wigmore's pronouncement that because the '"benefits [of the privilege] are all indirect [and] it obstruction is plain and concrete . . . [the privilege] ought to be strictly confined within the narrowest possible limits consistent with the logic of its principles.' 8 Wigmore, EVIDENCE § 2291 at 554 (McNaughton rev. ed. 1961).

[9] While many of these communications from legal counsel were indirect, in that corporate employees were relating what counsel had previously advised, the communications should not have referred to what legal counsel actually said, or summarized the substance of counsel's opinions.

213, 218 (S.D.N.Y. 2001); and *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).

The opinions in *Bieter* and *Copper Market* have been widely cited. *Bieter* established the standards and *Copper Market* applied them in a factual setting closest to the circumstances involved in the communications before this Court.

In *Bieter* a real estate partnership retained a consultant to assist in a real estate development. The consultant was involved in the subject of the litigation arising from the venture, his duties were "varied and extensive," he spoke confidentially with the company's attorney about matters relating to both the venture and the litigation, and he attended meetings for Bieter as its sole representative. Citing the court's opinion in *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990), the court concluded that there was "no principled basis for distinguishing [Bieter's] consultant . . . from the kind of employee to whom the Supreme Court extended the protection of the privilege in *Upjohn*." The court went on to note that because of his involvement in the subject of the litigation, he is "precisely the sort of person with whom the lawyer would wish to confer confidentially in order to understand Bieter's reasons for seeking representation." As a consequence, as in *McCaugherty*, the *Bieter* court concluded that the consultant was a functional employee.

In *Copper Market* the outside consultant to whom communications were circulated was a "crisis management" public relations firm. Sumitomo Corporation ("Sumitomo") and others were accused of conspiring to manipulate global copper prices. After the filing of this antitrust action, and in anticipation of an investigation by the Commodities Futures Trading Commission, Sumitomo retained Robinson Lerer & Montgomery ("RLM") to handle public relations matter arising from the scandal. In this action Merck was facing no comparable fact pattern because it had not yet withdrawn Vioxx from the market and, since Merck claims it was not aware of the dangers in using Vioxx, it could not have been anticipating both civil actions by former users of the drug and an investigation by the Food and Drug Administration. All of the communications I examined *in camera* predate the withdrawal of Vioxx from the market. In addition, here, unlike in *Copper Market*, the outside consultants' duties did not appear to include preparing statements for public release that were closely tied to the legal issues being litigated and therefore had to be vetted with both in-house and outside legal counsel.

While Merck has claimed that because it is involved in a pervasively regulated industry far more communications with in-house counsel are protected by the attorney-client privilege, that pervasive regulation theory is not a reason for Merck violating the confidentiality of the communications it has withheld from discovery. Indeed, following the logic of that theory, pervasive regulation has permitted Merck employees to be so pervasively educated in previous communications about regulatory matters there is less need for Merck's in-house attorneys to be directly advising third parties working with Merck. Other corporate employees should have screened the legal advice and related legal concerns to those third parties to the extent that they needed to be informed.

There are other differences between *Copper Market* and the facts in this case. Unlike

NO.99800774.2

5

Sumitomo, Merck had experience in dealing with issues relating to publicity arising from high profile cases, did not lack experience in dealing with the Western media, and had no language difficulties. Also different was the fact that RLM was given authority to make decisions on behalf of Sumitomo concerning public relations strategy. By contrast, the public relations and advertising firms retained by Merck were closely supervised, given considerable direction, and, like all decisions within the Merck enterprise, everything they proposed doing was subject to review and approval.

This absence of special circumstances creating an apparent need to include consultants in confidential communications prompted another court in the Eastern District of Louisiana to not extend the protection of the privilege to communications with third party consultants. *Freeport-McMoran Sulphur, LLC v. Mike Mullen Energy Equipment Resource, Inc.*, 2004 WL 1237450 (E.D. La. June 2, 2004). But as noted in the *Copper Market* opinion, relative to distinctions between the fact patterns of *Copper Market* and *Bieter*, "although the immediate context of the *Bieter* court's decision was factual communications with a consultant who had, in effect, functioned as a principal with respect to the events underlying the litigation, the principles to be gleaned from the decision are not so limited." The Court went on to note that the consultant had been "incorporated into the client's staff to perform a corporate function," 200 F.R.D. at 219, which may have been what occurred with Merck and both DDB and Ogilvy. As a consequence, except for the special positions the consultants held in both *Bieter* and *Copper Market*, the outside consultants could be seen as the "functional equivalent" of employees and treated as employees relative to the limited roles they played in the Vioxx matter.

Extending the corporate privilege only to persons on the corporation's payroll, rather than those employed as independent contractors may make no more sense than extending the corporate privilege to members of the corporation's control group (those who make decisions based on the legal advice sought) and not those whose information is necessary for informed advice being obtained or those who need the advice to carryout the corporation's affairs, which, of course, was rejected by the Supreme Court in *U.S. v. Upjohn*. While this may be true, some "bright line" restrictions must be placed on the ability of corporation's to share privileged communications with outsiders without waiving the privilege because without limitations, sharing would become the rule, rather than the exception, and the concept of confidentiality that the client is supposed to be preserving will be meaningless.[10]

This is why the court in *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) refused to broaden the privilege to encompass employees of a public relations firm. The court based its decision on three factors. First, the communications from the Calvin

---

[10] While the confidentiality requirement may already be meaningless, and, perhaps, should be abolished, *see* Paul R. Rice, *Attorney-Client Privilege: The Eroding Concept of Confidentiality Should Be Abolished*, 47 Duke L. J. 101 (1998), it is a concept that the courts claim to enforce because it is essential to the attorney-client privilege. *See generally*, 8 Wigmore, EVIDENCE, § 2285, p. 527 (McNaughton rev. 1961). In his influential treatise,, Wigmore asserted that confidentiality is one of four "fundamental conditions . . . necessary to the establishment of a privilege against the disclosure of communications." He goes on to assert that "[t]his element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties." He concludes that without this condition *no privilege*, attorney-client or otherwise, should be recognized.

6

Klein attorneys did not appear to "contain or reveal confidential communications from the underlying client." Id. at 54. That is generally true of the comments of the Merck lawyers in the documents under review. Second, even if the documents revealed confidences of the client, disclosure to a third party waived the privilege protection because assisting with public relations matters did not make them agents of either the client or the attorney relative to either the seeking or the giving of legal advice. Therefore, as in this instance, confidentiality was destroyed. Third, because the attorney-client privilege "stands in derogation of the search for truth so essential to the effective operation of any system of justice" it must be "narrowly construed." Id. Since the firm had not "been performing functions materially different from those that any ordinary public relations firm would have performed" the court concluded that the privilege should not be expanded to encompass communications shared with them. Id. at 55. Merck has failed to demonstrate, and the content of the documents do not reveal, that the outside public relations and advertising firms were performing any services that justifies them being given access to confidential attorney-client communications that Merck was supposed to jealously guard.[11]

### E. Recommendation

I recommend (1) that the standard employed in *Calvin Klein* be adopted by the court and (2) that all claims be denied. Employees of the marketing and advertising agency, DDB, and the public relations agency, Ogilvy, should *not* be treated as "functional" or "de facto" employees" of Merck because Merck has not demonstrated that the relationship between Merck and these entities was significantly different than a relationship it would normally have had with entities retained to provide advertising and public relations services.

Those entities did not have primary responsibility for key corporate jobs, or possess information possessed by no one else at the company, as in *Bieter*. Their participation in Merck's confidential attorney-client communications was not necessary to either the client's obtaining legal advice or to the lawyers' ability to render legal assistance.[12] While necessity may not be an appropriate standard for determining the applicability of the attorney-client privilege *after* one is considered the equivalent of a corporate employee and his services are relevant to the advice sought (either in providing important information upon which advice could be given, or in employing the advice that the corporation obtained), something beyond mere convenience must

---

[11] See also *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 2002 WL 1334821, at *2-3 (S.D.N.Y. June 19, 2002) where the court refused to apply the "functional employee" exception to communications between an insurance broker and attorneys for the insured. Other courts, however, have extended the label to third parties because they performed the same functions as in-house employees. *See, e.g., In Residential Constructors, LLC v. Ace Property & Cas. Ins. Co.*, 2006 WL 3149362 (D. Nev. Nov. 1, 2006) where the label was applied to an outside insurance adjuster. Nevertheless, after a survey of the case law relative on the acceptability of circulating confidential attorney-client communications to third party consultants, the only thing that is clear is that there is no common standard.

[12] In all of the communications that I have reviewed, circulation has been to DDB and Ogilvy. On the face of many communications, however, the identity of recipients was not revealed. However, since they either came from the files of those third parties, or have been denoted as recipients by Merck through this submission, they have been accepted as such.

NO.99800774.2

be demonstrated by Merck before it should be given the right to expand the scope of a privilege and thereby suppress relevant evidence.[13]

In the event that the Court does not accept the recommendation that all claims be denied because confidentiality has been breached through circulation to third parties who have not been shown to be "functional employees" of Merck, the circulation to these third parties has two additional confidentiality problems. First, many of the documents do not identify any of the third party employees who received the communications. The documents apparently circulated to Ogilvy identify no one within the company as a recipient. Second, none of the employees of DDB or Ogilvy (whether listed in the headers or not) have been identified and circulation to them justified because of their corporate responsibilities within each company.[14] In addition, there has been no evidence offered by Merck that the secondary distribution policies within these companies was restricted, thereby preserving the confidentiality of each communication. It would be strange, indeed, that the circulation within Merck would have to be justified under the "subject matter" test for the corporate attorney-client to apply, while circulation to "functional employees" outside the company would not have to meet the same standard. Having failed to satisfy this burden of persuasion, all of Merck's claims should be denied on this ground as well.

Reviewing each document individually revealed an additional ground for denying many of the claims independent of the problems discussed above. In many instances the references to opinions of Merck's legal counsel were indirect and infused with the opinions of the authors relating their interpretation of those legal concerns as they related to promotional issues being addressed. For example, referring to M/L (Medical/Legal/Legal Review Committee) as having expressed this or that concern about a particular matter and then stating that this is the way we will now proceed. While the conclusions of M/L may or may not be a reflection of legal advice from an attorney (since doctors are also on the Committee), in approximately half of the documents in which the attorney-client privilege protection might have been applicable, its protection would have been limited to selected portions. While many of the documents were, in fact, redacted, many were not. In those portions that were redacted, not everything that had been excised reflected legal advice that had been received by the company, as opposed to decisions that company executive had made based on that advice. The latter clearly is not protected by the attorney-client privilege. See United States v. Freeman, 619 F.2d 1112, 1119-20 (5th Cir. 1980) ("An attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction."); Stout v. Illinois Farmers ins. Co., 150 F.r.D. 594, 611 (S.D. Ind. 1994) ("the attorney-client privilege is not so broad as to cover all the

---

[13] As the Eleventh Circuit noted in *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) it must be remembered that "the privilege is not a favored evidentiary concept in the law since it serves to obscure the truth, and it should be construed as narrowly as is consistent with its purpose."

[14] Under the "subject matter" test employed by federal courts in determining who personifies the corporate client in confidential communications with legal counsel, the subject of each communication must be shown to relate to the corporate responsibilities of each person privy to those communications. While the "subject matter" test was not explicitly adopted by the Supreme Court in *Upjohn v. United States*, 449 U.S. 383 (1981), the optional "control group" test was explicitly rejected. Therefore, the subject matter test implicitly became the standard after *Upjohn*. Paul R. Rice, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 4:14, n32 (ThomsonWest 2nd ed. 1999).

client's actions taken as 'result[] of communications between attorney and client.' If counsel advise [the defendant] that based upon the law, a good faith evaluation of a claim like [the plaintiffs] would require that certain minimum steps be taken, all of [the defendant's] document produced in order to implement that advice would not be privilege as attorney-client communications."). In the majority of documents in which the attorney-client privilege protection may have been applicable, its protection would have been limited to selected portions. While some of the documents were, in fact, appropriately redacted, many were not.

Because of the limited probability that any of these claims will ultimately be upheld by the court (for the reasons discussed above), the expense involved in the Special Master making and refining these redactions was not thought to be justified in light of the enormous expenses already incurred in this privilege review process. Therefore, individual privilege claims have not been addressed in this opinion.

I submit these recommendations to the Court this 31st day of July, 2007.

_____
Paul R. Rice, Special Master