UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| **This document relates to** | * | **MAGISTRATE JUDGE KNOWLES** |
| | * | |
| **Gerald Barnett v. Merck & Co, Inc.** | * | **CASE NO.  02:06CV00485** |

**PLAINTIFF GERALD BARNETT'S MEMORANDUM IN OPPOSITION TO MOTION OF MERCK & CO., INC. ("MERCK") FOR A NEW TRIAL**

# TABLE OF CONTENTS

INTRODUCTION. ..................................................................................................................... 1

1.  MERCK'S RENEWED MOTION FOR NEW TRIAL IS AN IMPROPER MOTION
    FOR RECONSIDERATION, AND IS BASED SOLELY UPON ARGUMENTS
    PREVIOUSLY RAISED IN THE BRIEFING AND ARGUMENT ON ITS
    PREVIOUS MOTION FOR NEW TRIAL. ......................................................................2

2.  THERE WAS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD
    FOR THE COURT TO INVOKE ITS DISCRETION IN GRANTING
    REMITTITUR. .............................................................................................................6

3.  THE COURT CORRECTLY EXERCISED ITS DISCRETION IN CALCULATING
    AN APPROPRIATE AMOUNT FOR A REMITTED AWARD. ...................................10

CONCLUSION.......................................................................................................................... 17

## TABLE OF AUTHORITIES

**CASES**

*Betancourt v. J.C. Penney Co.*,
554 F.2d 1206, 1209 (1st Cir. 1977)................................................................3, 13

*Boan v. Blackwell*,
343 S.C. 498, 541 S.E. 2d 242 (S.C. 2001) ..................................................... 10

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*,
312 F.3d 1292, 1296 n. 3 (10th Cir. 2002) ...................................................... 4

*Bonura v. Sea Land Service, Inc.*,
505 F.2d 665, 669 (5th Cir.1974) ..................................................................... 11

*Daves v. Cleary*,
355 S.C. 216, 584 S.E.2d 423, 430 (S.C. App. 2003) ..................................... 11

*De Centeno v. Gulf Fleet Crews, Inc.*,
798 F.2d 138, 142-143 (5th Cir.1986) .............................................................. 12

*Denton v. Morgan*,
136 F.3d 1038, 1046 (5th Cir.1998) ................................................................. 11

*Edwards v. Lawton*,
244 S.C. 276, 136 S.E.2d 708, 710 (1964) ...................................................... 15

*Gautreaux v. Insurance Company of North America*,
811 F.2d 908 (5th Cir.1987) ........................................................................3, 14

*Harris v. Gusman*,
*Slip Copy*, 2007 WL 1812613, *1 E.D.La., June 18, 2007
(Civil Action No. 05-4992) ............................................................................... 4

*In re Vioxx Products Liability Litigation*,
230 F.R.D. 473, 474-475 E.D.La., July 22, 2005 (No. MDL 1657)................ 4

*Iwai Co. v. Occidental Crude Sales, Inc.*,
729 F.2d 1530, 1547-48 (5th Cir. 1984)........................................................... 13

*King v. Ames*,
179 F.3d 370 n. 8 (5th Cir. 1999) ..................................................................... 11

*Knight v. Texaco, Inc.,*
    786 F.2d 1296, 1299-1300 (5th Cir. 1986)........................................................................12

*LeClerc v. Webb,*
    419 F.3d 405 n. 13 (5th Cir. 2005) ...................................................................................4

*Lowe v. General Motors Corp.,*
    624 F.2d 1373, 1383 (5th Cir. 1980) ...............................................................................10

*Maxey v. Freightliner Corp.,*
    722 F.2d 1238,1242 (5th Cir. 1984) ...............................................................................12

*Mims v. Florence Co. Ambulance Serv. Comm'n,*
    296 S.C. 4, 370 S.E.2d 96 (S.C. App. 1988) ...................................................................15

*Murray v. Bank of America, N.A.,*
    354 S.C. 337, 345, 580 S.E.2d 194 (S.C.App. 2003) ......................................................15

*Osburn v. Anchor Laboratories, Inc.,*
    825 F.2d 908, 919 (5th Cir. 1987) ...............................................................................14-15

*Shu-Tao Lin v. McDonnell Douglas Corp.,*
    742 F.2d 45, 49 (2d Cir. 1984) .................................................................................3, 12

*Templet v. HydroChem Inc.,*
    367 F.3d 473, 479 (5th Cir. 2004) ....................................................................................4

*United States v. Flores,*
    981 F.2d 231, 237 (5th Cir. 1993) ....................................................................................5

*Vogler v. Blackmore,*
    352 F.3d 150,156 (5th Cir. 2003) ...................................................................................11


**STATUTES**

Federal Rule of Civil Procedure 59 .............................................................................2, 4

## INTRODUCTION

For the second time Merck has filed a motion for new trial on all issues. Realizing that this recent motion is just a rehash of arguments previously made in briefing and oral argument on its first motion, Merck has attempted to rephrase its arguments regarding the propriety of remittitur to make it appear that this renewed motion is somehow based upon circumstances unforeseen prior to the Court's order of June 5, 2007, which denied Merck's motion in part and issued a remittitur.

However, on closer analysis the Defendant's argument is essentially that Merck did not anticipate the Court would not accept the arguments it made the first time around.  Merck was well aware during briefing and argument on the first motion that Plaintiff has contended all along that a remittitur is appropriate, and that while the Court found the verdict to be excessive, it did not find it to be the result of passion or prejudice.  Merck has been aware of those arguments since at least last October. That is why Merck chose to argue in the briefing on the first motion, and in oral argument, that the Court had insufficient facts upon which to base the amount of a remittitur- the same argument which forms the basis of the current motion. ("A court cannot remit an award when there is insufficient evidence on which to base the amount of remittitur. ... Thus, the Court has no basis upon which to decide what damages Mr. Barnett suffered, let alone what they are worth.  (Reply of Merck in support of motion for new trial on all issues, 3/8/07, at 6-7))

There is nothing about the Court's order of June 5, 2007 which changes those arguments, nor which raises new issues.  What Merck is left with is an improper motion for reconsideration of arguments which have already been briefed, argued and ruled upon.  The Court's decision was entirely correct, and in view of the fact Merck was successful in reducing a $51 million verdict to

1

$1.6 million, the Court was more than fair to the Defendant.  Merck's motion should therefore be summarily denied.

**1.     MERCK'S RENEWED MOTION FOR NEW TRIAL IS AN IMPROPER MOTION FOR RECONSIDERATION, AND IS BASED SOLELY UPON ARGUMENTS PREVIOUSLY RAISED IN THE BRIEFING AND ARGUMENT ON ITS PREVIOUS MOTION FOR NEW TRIAL.**

For the second time Merck moves for a new trial on all issues, pursuant to Federal Rule of Civil Procedure 59.  Although styled as a "Motion for New Trial," Merck's motion is clearly a motion for reconsideration, as it is simply repeating arguments made in its first motion for new trial on all issues.  Merck is forced to concede this fact in its brief when it says, "A new trial on all issues is warranted for the reasons articulated in Merck's September 5, 2006 motion for a new trial on all issues - and, in that sense, this motion seeks reconsideration of the Court's June 5, 2007 Order denying in part and deferring ruling in part on Merck's September 5, 2006 motion." (Motion at 2.)

However, Merck attempts to skirt around the fact this is a motion for reconsideration and merely a rehash of prior arguments, by implying that the Court's recent order somehow raises new issues or changes the scope of the previous arguments.  It does neither.  Merck's brief has one heading and essentially makes one argument- an argument which it already made in the briefing and in oral argument on its first motion- "Because the jury's compensatory damages award cannot be separated into 'reasoned' and 'excessive' portions, the Court's remittitur was inappropriate."  (Motion at 3.)

Specifically, Merck contends that "there is insufficient evidence in the record on which to base a remitted compensatory damages award" and therefore it is impossible for the Court to remove the excess portion of the verdict.  (Motion at 7)

2

Merck also contends that "Because the jury's findings did not specify which injuries it intended to compensate, let alone the amount of compensation it awarded for each injury, the Court had no basis upon which to decide what damages Mr. Barnett suffered, or what they were worth," (Id.) and that "Because there is no way to determine what damages the jury concluded Mr. Barnett suffered, let alone what compensation it awarded for each component of his damages, there is no way to lop off - or even calculate - the "excessive" part of the jury's award. Nor is there any way to justify a reduction of the award to $600,000 by reference to the evidence in the record or the jury's findings." (Motion at 5)

Although it has rephrased them, Merck made these identical arguments before, citing the same cases, (e.g.. *Gautreaux v. Insurance Company of North America*, 811 F.2d 908 (5th Cir.1987); *Betancourt v. J. C. Penney Co.*, 554 F.2d 1206, 1209 n.5, 1210 (1st Cif. 1977); *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)) in its reply filed 3/8/07:

> "Even if remittitur were a proper remedy under these circumstances - which it is not - there is no principled basis upon which the award should be reduced to plaintiff's suggested figure of $10 million dollars, as opposed to any other number. A court cannot remit an award when there is insufficient evidence on which to base the amount of remittitur. …
>
> Barnett made no effort to quantify his damages at trial, and the jury made no findings on either the extent or quantum of his damages, other than the excessive $50 million award. In particular, the jury did not specify which of Mr. Barnett's claimed damages (first heart attack, increased atherosclerosis, second alleged heart attack, alleged reduced life expectancy, etc.) it ascribed to Merck. Which, if any, of these damages is attributable to Merck was hotly contested. Thus, the Court has no basis upon which to decide what damages Mr. Barnett suffered, let alone what they are worth. Under the circumstances, remittitur is prohibited.." (Reply of Merck at 6-7)

As can be seen, these are issues which were thoroughly briefed and argued by counsel, and which Merck is now seeking to rehash and re-debate, after the Court has already rejected the

3

same arguments.  Merck has advanced no reason why the Court should entertain this motion.

The Federal Rules of Civil Procedure do not expressly recognize a motion for reconsideration.

See *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, 312 F.3d 1292, 1296 n. 3 (10th

Cir. 2002).  If the court has entered a final order or judgment, then a motion for reconsideration is

considered a motion to alter or amend the judgment under rule 59(e). See id. at 1296.

"Reconsideration of a judgment after its entry is an extraordinary remedy that should be

used sparingly."  *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004); A motion for

reconsideration may not be used to rehash rejected arguments or introduce new arguments.")

*LeClerc v. Webb*, 419 F.3d 405, n.13 (5th Cir. 2005) "[R]econsideration … should not be used to

relitigate old matters, raise new arguments, or present evidence that could have been raised prior

to the entry of judgment."  *Harris v. Gusman, Slip Copy*, 2007 WL 1812613, *1 E.D.La., June

18, 2007 (Civil Action No. 05-4992.) "[M]otions for reconsideration are not to be used "to re-

debate the merits of a particular motion."  *In re Vioxx Products Liability Litigation*, 230 F.R.D.

473, 474-475 E.D.La., July 22, 2005 (No. MDL 1657).

As the court stated in *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir.2004):

> "A Rule 59(e) motion "calls into question the correctness of a judgment." In re
> Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir.2002). This Court has held
> *479 that such a motion is not the proper vehicle for rehashing evidence, legal
> theories, or arguments that could have been offered or raised before the entry of
> judgment. Simon v. United States, 891 F.2d 1154, 1159 (5th Cir.1990). Rather,
> Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest
> errors of law or fact or to present newly discovered evidence." Waltman v. Int'l
> Paper Co., 875 F.2d 468, 473 (5th Cir.1989) (internal quotations omitted).
> Reconsideration of a judgment after its entry is an extraordinary remedy that
> should be used sparingly. Clancy v. Employers Health Ins. Co., 101 F.Supp.2d
> 463, 465 (E.D.La.2000) (citing 11 CHARLES A. WRIGHT, ARTHUR R.
> MILLER & MARY KAY KANE, Federal Practice & Procedure § 2810.1, at 124
> (2d ed.1995))."

*United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993), cited by Merck, is inapposite, and in fact, supports denial of the present motion. (Affirming trial court's dismissal of second motion to vacate heroin distribution sentence as abusive, where motion "primarily rehashed" claims asserted in prior motion.)

Merck concedes that it "has addressed the propriety of remittitur before, in its reply brief in support of its September 5, 2006 motion for a new trial on all issues." However, Merck argues that it "did not make the precise argument presented in this brief - because, at the time, it understood the Court's August 30, 2006 ruling to be, in relevant part, that the jury's compensatory damages award was the result of passion or prejudice."

This is a distinction without a difference. First of all Merck has not explained, and cannot explain, how the Court's ruling of June 5, 2007 raises any new issues which were not already covered in the briefing and argument on Merck's motion for new trial. The parties addressed the issue of passion or prejudice at length, as well as the import of the Court's statements in its August 30, 2006 order.  Plaintiff contended from the very outset of his opposition to the first motion for a new trial that the verdict was not the result of passion or prejudice, that the Court found the award to be merely excessive, and that remittitur was the appropriate remedy.

Merck acts as if it is surprised by the remittitur and the Court's finding that the award was excessive but not "passionate," when Plaintiff made it very clear that the Court was merely quoting a case in the August 2006 order and not actually making a finding of passion or prejudice.  This was addressed not only in the briefing on original motion, but in oral argument as well.  In short, Merck's motion is based upon nothing more than the patently meritless claim that it somehow could not have anticipated the Court would accept the Plaintiff's position.

5

The June 5 order merely confirms that Plaintiff was correct and that the Court rejected Merck's arguments on that issue. Merck is simply reasserting arguments it has already made, and the Court's recent order clarifying its earlier ruling does not change Merck's argument, as is evident form the fact the Defendant continues to assert that "even with that clarification, remittitur is impermissible in this case." (Motion at 20) Merck has advanced no sound reason why it should be permitted to reassert arguments about issues which it has already briefed and argued, and which the Court has already ruled upon.

**2. THERE WAS MORE THAN SUFFICIENT EVIDENCE IN THE RECORD FOR THE COURT TO INVOKE ITS DISCRETION IN GRANTING REMITTITUR**

Merck argues that "[t]here is scant evidence of damages in the record." The record shows just the opposite. There is in fact ample evidence to support a remitted award of $600,000 in compensatory damages. Not only does the record provide proof that as a result of taking Vioxx Mr. Barnett suffered a heart attack in September 2002 requiring a 5-way open-heart CABG surgery, but it also provides evidence of the related sequelae, including an accelerated development of atherosclerosis, a second heart attack resulting in occluded veins, further angiogram and stent placement, decreased exercise tolerance, the possibility of future surgical intervention and a loss of life expectancy of nine to ten years.

Over and above the medical expenses incurred to undergo these surgical procedures, the pain and suffering the Plaintiff has endured from any one of these conditions, let alone a combination of them, alone justify an award of $600,000 in damages. A brief review of the trial record indicates that before Mr. Barnett began taking Vioxx in January 2000, he had five non-occluded coronary vessels. As Dr. Popma testified, a Cardiolite exam taken on January 24, 2000,

showed that Mr. Barnett had only one small area in his heart that had a reduction in blood flow –

the rest of his heart was functioning normally. (8/7/06 Tr. at 1344:19-1345:5)  Dr. Zipes testified

that in 2000, Mr. Barnett had only a 1-2% risk of having a heart attack over the following three

years (8/8/06 Tr. at 1716:18-1717:1).  Yet despite his low risk in 2000, Mr. Barnett suffered a

heart attack just a short time later on September 6, 2002, after taking Vioxx for 31 months.

Dr. Mark Karavan, Mr. Barnett's treating cardiologist, testified that the catheterization

performed during the Plaintiff's hospitalization showed six-vessel stenosis and he therefore

recommended a CABG surgery.  (8/4/06 Tr. at 1001:1-18)  Compared with his January 2000

Cardiolite exam, Mr. Barnett's rapid progression of atherosclerosis in such a short period of time

was a phenomenon that Dr. Zipes stated he had never seen happen in his career.  (8/8/06 Tr. at

1715:10-24)  After considering all of Mr. Barnett's possible risk factors, Dr. Zipes concluded that

this accelerated atherosclerosis could only have been caused by Vioxx.  (Id. at 1716:18-1717:1;

1734:25-1735:14)

Mr. Barnett's resulting open-heart CABG surgery was a painful, invasive procedure.  At

trial, Mr. Barnett's cardiac surgeon, Dr. Bryan, described the surgery in detail:

```
                              2200
       25   Doctor, if you could kindly for the jury explain

                              2201
        1   what you did during the surgery?
        2   A.   Well, basically what we do during the surgery is make an
        3   incision down the middle of the chest, starts a little bit
        4   below the notch in your neck and goes just to the end of your
        5   chest where you feel the little bit of cartilage at the end of
        6   your chest.  At the same time that is going on, typically, the
        7   physician assistant is taking vein out of one of the legs.  And
        8   back in 2002 that would have been done with an open incision
        9   all the way up and down the leg.
```

. . .

7

2201

15  A.  While he's doing that, I would take the mammary artery off
16  the chest wall.  We lifted the left side of the sternum up a
17  little bit with a retractor and then take down the artery off
18  the chest wall.
19       Then, typically, after I have all of the conduit vein
20  artery harvested, we will go on the heart/lung machine by
21  putting a canula in their aorta and a canula in their right
22  atrium so that we can stop their heart.  And we put a clamp on
23  their aorta, stop the heart, and then we're going to sew on
24  these grafts beyond the blockage.  We don't do anything to the
25  blockage.  We go beyond it.

2202

1  Q.  So you don't remove these vessels?
2  A.  No.  We don't remove any of the plaque.  Typically, we
3  don't do that.  Typically we don't do that.
4       Then after we finish making all of the connections to
5  restore blood flow.  We take the clamp off the aorta and the
6  heart starts beating, and we put some drains in, typically put
7  little some wires on the surface of the heart to keep the – if
8  their heart rate is a little slow, so we can keep them a little
9  faster and – and then close their chest up and take them back
10 to the ICU.

(8/11/06 Tr. at 2200:25-2201:9; 2201:15-2202:10)

Because of the serious nature of open-heart surgery and its effect on his body, it took Mr.

Barnett six weeks to sufficiently heal from the incisions in his chest and down the entire length of

his leg.  Once healed, he participated in a program of rehabilitation to build up the muscles in his

chest and legs, and his overall endurance.  (8/8/07 Tr. at 1582:22-1583:17)

Initially, the September 9, 2002 CABG surgery helped to re-open the vessels in Mr.

Barnett's heart.  However, in the months following and as Mr. Barnett continued to take Vioxx,

he experienced further injuries to his heart.  Both Dr. Popma and Dr. Zipes testified that two of

the Plaintiff's vein grafts which had been open in September 2002 after the CABG surgery, had

re-occluded.  (8/7/06 Tr. at 1377:7-14; 1388:8-1389:9 and 8/8/06 Tr. at 1726:10-20)  Dr.

8

Karavan performed a stent placement in one of the occluded vein grafts in 2006.  (8/7/06 Tr. 1481:8-16)  Dr. Popma testified that between 2002 and 2006, there were four areas of Mr. Barnett's heart that occluded.  (Id. at 1388:8-1389:6)  These blockages occurred even though Mr. Barnett had lowered his cholesterol to the point where, as Dr. Popma stated, "the plaque should be getting – regressing, going away." (Id. at 1389:7-9)

In addition to the occluded vein grafts, Dr. Zipes determined from a set of May 2006 physical examinations of Mr. Barnett's heart, that he more likely than not suffered a second heart attack between 2003 and 2006.  (8/8/06 Tr. at 1726:16-1727:1).  Dr. Popma and Dr. Zipes added that there was scarring and damage to the heart muscle, a new abnormality that was not present in 2003, and was consistent with a second heart attack.  (8/7/06 Tr. at 1379:20-1382:25 and 8/8/07 Tr. at 1730:17-1731:18)

The effect of these injuries on Mr. Barnett is an overall decrease in energy level. (8/7/06 Tr. at 1519:23-1520:6; 1525:23-1526:10)  He also suffers from an increased plaque burden that is worrisome to Dr. Karavan, who stated that Mr. Barnett's prognosis is not the same as someone with less diffuse disease.  (8/5/06 Tr. at 1153:15-1154:11)  Even though Mr. Barnett was extremely diligent in modifying his risk factors – Dr. Karavan stated that Mr. Barnett did more than 99% of his patients in terms of modifying risk factors (Id. at 1153:6-10) – he still experienced multiple, ongoing, and severe injuries due to Vioxx.  Dr. Zipes testified that because of all of the damage to Mr. Barnett's heart, his life expectancy has been reduced by nine or ten years. (8/8/06 Tr. at 1733:24-1734:16; 1734:25-1735:14)

In sum, the record contains an abundance of evidence to justify a compensatory damage award of $600,000.  Neither side disputes that Mr. Barnett had the September 2002 heart attack. The general damages from this injury alone justify the award.  In describing the heart attack, Dr.

9

Popma testified that a blood clot "stopped the flow, caused the chest pain, caused part of his heart muscle tissue to die, and cut off the circulation to the distal portion of this vessel." (Tr. 8/7/06 at 1366:13-15)  Dr. Bryan confirmed that once heart muscle tissue has died, it cannot ever be healed (Tr. 8/11/06 at 2202:11-15)

Moreover, Mr. Barnett's damages are not confined to physical injuries.  He understandably fears a future heart attack and premature death, and will always carry with him this significant emotional burden.  *Boan v. Blackwell*, 343 S.C. 498, 541 S.E. 2d 242 (S.C. 2001) ("Loss of enjoyment of life" is a compensable element of damages.)  At trial, Mr. Barnett testified that the fear of further injury and death causes him concern over leaving his wife and family behind were he to die prematurely.  (Tr. 8/8/06 at 1594:11-17)  Evidence of this apprehension and anxiety unquestionably supports the Court's remitted award.

### 3.     THE COURT CORRECTLY EXERCISED ITS DISCRETION IN CALCULATING  AN APPROPRIATE AMOUNT FOR A REMITTED AWARD.

Merck is correct that the 5th Circuit applies the maximum recovery rule.  The rule provides that the trial court fix the remitted amount based upon what the court feels is appropriate from the record.  *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (5th Cir. 1980):

> "In proceeding to fix the remittitur, then, the Court will be guided by the principle that the plaintiff who has been awarded an excessive amount by one jury should have the option of taking the maximum amount that the jury could properly have awarded or of taking a new trial before another one.  In determining this, it appears proper first to fix the amount that (the District) Court thinks a properly functioning jury would have awarded, and this may be merely another way of saying that the starting point is the amount of damages the Court itself thinks proper on the record under the mandate of the Court of Appeals. After that, the maximum recovery rule requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial."

This is exactly what this Court has correctly and appropriately done. "In calculating the amount of remittitur and the maximum amount a reasonable jury could have awarded under the 'maximum recovery rule,' the court looks not only to actual awards, but may also apply a multiplier of fifty percent to past similar awards, so long as no multiplier was used in calculating those past awards." *Vogler v. Blackmore*, 352 F.3d 150,156 (5th Cir. 2003)  With that in mind, this Court's compensatory damages remittitur of $600,000 is not only consistent with other awards for similar injuries, but well within the ballpark and below the maximum recovery.  See e.g. *Daves v. Cleary*, 355 S.C. 216, 584 S.E.2d 423, 430 (S.C. App. 2003)(Affirming a $500,000 jury verdict in a medical malpractice action under South Carolina law, to a man who suffered a heart attack while in a hospital.)  The plaintiff in *Daves* (who had had a previous heart attack 10 years earlier), required two heart catheterizations, three thoracentesis procedures and a triple bypass operation, and incurred medical expenses totaling approximately $140,000. Id. at 221-222.

The decision to grant a remittitur is in the sound discretion of the trial judge and is reviewed for abuse of discretion.  See *Denton v. Morgan*, 136 F.3d 1038, 1046 (5th Cir.1998). "Like the decision to alter or amend judgment, the trial court's decision to grant or deny a remittitur rests within the sound discretion of the trial judge." *King v. Ames*, 179 F.3d 370, n. 8 (5th Cir. 1999) "The standard for review, however, is strict; and the trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge. (citations)  The reason for this strict standard is that the court's power to condition a denial of a new trial upon consent to a remittitur is founded upon its power to grant a new trial for excessiveness of verdict." *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665, 669 (5th Cir.1974)  A

11

trial court "abuses its discretion if it requires remission of a sum that would reduce the verdict below the maximum award that is reasonably supported by the evidence." *Maxey v. Freightliner Corp.*,722 F.2d 1238, 1242 (5th Cir. 1984)

In the 5th Circuit significant deference is afforded to the trial court's decision in granting remittitur. As the Court stated in *Knight v. Texaco, Inc.*, 786 F.2d 1296, 1299-1300 (5th Cir. 1986)(affirming remittitur):

> "Finally, Texaco attacks the damage award as excessive by arguing that the district court erred in granting too small a remittitur. The rule is firmly established in this Circuit that this Court will not reverse a jury verdict for excessiveness except on the strongest of showings. Dixon, 754 F.2d at 590; Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983); Shows, 671 F.2d at 934. In addition, where, as here, "the trial court already has invoked its discretion in granting a remittitur, our scope of review is even narrower than usual." Stapleton v. Kawasaki Heavy Industries, Ltd., 608 F.2d 571, 574 n. 7 (5th Cir.1979), modified on other grounds, 612 F.2d 905 (5th Cir.1980);…"

Merck has completely misread *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984). While the court there found that remittitur was inappropriate, it was not because of a lack of information to guide the court, but rather, because the "defendants did not have a fair trial. Numerous errors occurred in the course of the trial." Id. at 49. "We need not choose among these various rules, however, for these formulations are not appropriate for use in the instant case. These formulations are designed for circumstances in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award. They are not designed for a case such as the present one, in which prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss." Id. at 50.

*De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142-143 (5th Cir.1986) is similarly inapposite. The Court there elected to remand for a new trial on damages only, because of

improper arguments by counsel in a Jones Act death claim that the jury should award damages for "loss of love and affection" which were not legally recoverable, and counsel's misstatements as to earnings loss which were contrary to uncontroverted evidence . ("In this circumstance where we cannot determine the reason the verdict is excessive-because it is unclear whether the jury improperly awarded sums for loss of love and affection or whether it simply awarded excessive sums for legally recoverable items of damage-we elect to remand this case for a new damage trial.")

In the present case, there was no such improper argument by counsel as to earnings loss, nor as to any element of damages, nor was there argument for unrecoverable items of damages. The jury simply awarded what this Court believed were excessive sums for legally recoverable items of general damage.  The other cases relied upon by Merck are readily distinguishable, and involved clearly dissimilar circumstances.  *Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1547-48 (5th Cir. 1984) (Action by oil purchaser against producer for breach of agreement to provide crude oil involved only economic losses.)  *Betancourt v. J.C. Penney Co.*, 554 F.2d 1206, 1209 (1st Cir. 1977)(Estimation of proper awards for the plaintiffs would rest solely on speculation because there was no evidence of  damages regarding four minor plaintiffs other than their mother's testimony.)

Merck argues, as it did before, that "[b]ecause we cannot determine which injuries the jury ascribed to Merck, we also cannot know which if any of Mr. Barnett's medical expenses the jury intended to award as part of verdict, or whether it included general damages with respect to some or all of the alleged injuries."  First of all, even assuming arguendo that the jury found Merck responsible only for Mr. Barnett's first heart attack, and not for reduced life expectancy, nor the second heart attack- in other words the smallest quantum of injury that is consistent with

13

the jury's findings on the special verdict- the Court's remitted amount is entirely reasonable.  The

sequelae and medical bills from this heart attack alone support an award of at least $600,000.

More importantly, Merck ignores the fact that, as this Court pointed out, Mr. Barnett's

damages were primarily noneconomic in nature.  The decision in *Gautreaux v. Insurance*

*Company of North America*, 811 F.2d 908 (5th Cir.1987), cited by Merck now and in its first

motion, hinged upon the court's inability to determine economic damages resulting from lost

earning capacity.  However, Mr. Barnett had no lost wages or lost earning capacity.  Directly on

point is *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 919 (5th Cir. 1987), cited by this

Court, which distinguished *Gautreaux* for that very same reason and pointed out that general

damages awards are "somewhat amalgamated by their very nature":

> "Where the district court used a general verdict interrogatory and instructed on
> several elements of damages, it is sometimes impossible to determine the reason
> the verdict was excessive.  In that event, an appellate court may elect to grant a
> new trial without providing the option of remittitur. …
> In this case, however, we think a mandatory new trial on damages is unnecessary
> and that a remittitur is preferable.  The jury verdict separated Mr. and Mrs.
> Osburn's damages.  Although Mr. Osburn's award lumped together a number of
> elements, the amount the jury could properly have awarded--and very likely did
> award--for loss of earning capacity and past medical expenses can be easily
> calculated on the basis of the evidence in the record. [FN17] Under the facts of
> this case, the other damages items upon which the jury was instructed--pain and
> suffering, mental anguish, and loss of physical capacity-- are somewhat
> amalgamated by their very nature. For purposes of applying our maximum
> recovery rule, we are therefore able to consider them together. Since we can
> determine the proper amount for a remittitur in this case despite the district court's
> failure to submit special interrogatories to the jury on the individual items of
> damages, we elect not to require a new damages trial.
> FN17. We believe that this case is properly distinguished from Gautreaux, for
> there we noted that "on the record before us we cannot determine to what extent
> or in what amount Gautreaux's injury impairs his future earnings" and "we are
> completely unable to determine loss of future earnings." 811 F.2d at 915, 916."

14

Just like the plaintiffs in *Osburn*, the bulk of Mr. Barnett's damages were noneconomic in nature. There was no lost earning capacity, and medical expenses relating to the heart attack were easily calculated. Noneconomic damages by their very nature are incapable of precise calculation, and this is clear not only from 5th Circuit authority, but under South Carolina law as well. *Mims v. Florence Co. Ambulance Serv. Comm'n*, 296 S.C. 4, 370 S.E.2d 96 (S.C. App. 1988)("The amount of damages a jury may award for physical pain and suffering and for mental pain and suffering is incapable of exact measurement and is therefore left for determination by the jury.")

As with most states, South Carolina law recognizes this fact and does not require mathematical precision in calculation of damages. As the South Carolina Supreme Court stated in *Edwards v. Lawton*, 244 S.C. 276, 136 S.E.2d 708, 710 (1964):

> "Damages for pain and suffering are unliquidated and indeterminate in character and the assessment of unliquidated damages must rest in the sound discretion of the jury, controlled by the discretionary power of the trial Judge. Wright v. Gilbert et al., 227 S.C. 334, 88 S.E.2d 72. Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Hence, the amount of damages to be awarded for pain and suffering must be left to the judgment of the jury, subject on to correction by the courts for abuse.' Harper v. Bolton, supra, 239 S.C. 541, 124 S.E.2d 54."

The same is true of future damages. See Haltiwanger v. Barr, 258 S.C. 27, 32-33, 186 S.E.2d 819 (1972) "The rule is not always easy to apply. Future damages in personal injury cases need not be proved to a mathematical certainty. Oftentimes a verdict involving future damages must be approximated. A wide latitude is allowed the jury."

In *Murray v. Bank of America, N.A.*, 354 S.C. 337, 345, 580 S.E.2d 194 (S.C.App. 2003) a woman brought an action for negligence against a bank for allowing an imposter to open an account in her name and write fraudulent checks. The plaintiff was arrested for 12 hours and

15

forced to attend 3 criminal court hearings, and although she was exonerated, she sought damages for embarrassment and discomfort, including numbness in her face "prompting a visit to the doctor," and because "due to her acute embarrassment of being arrested in front of her neighbors, she moved to a more expensive apartment, which strained her finances and caused more stress." Although the Plaintiff had no physical injury, the court affirmed a jury award of $300,000 in damages, stating:

> "Most of the damages Murray suffered were intangible. "One cannot easily or with any mathematical certainty place a value on the amount of a person's pain and suffering."  Smalls v. South Carolina Dep't of Educ., 339 S.C. 208, 218, 528 S.E.2d 682, 687 (Ct.App.2000). We find the jury's verdict of $300,000 is not so shocking to the conscience of the court that it clearly indicates the verdict was the result of improper motive. Thus, we hold the trial court did not err in denying the Bank's motion for a new trial absolute."

In light of the evidence in the record and the substantial injury suffered by Mr. Barnett, under these circumstances a reduction in the award of $50,000,000 to $600,000 in compensatory damages is more than fair to Merck, and is an appropriate exercise of this Court's discretion.

16

## CONCLUSION

For the reasons stated above, as well as the reasons previously set forth in response to Merck's first motion, Plaintiff respectfully requests that the Court deny Merck's motion in its entirety.

Date: August _10_, 2007                  Respectfully submitted,

                                          By: _Mark P. Robinson, Jr._
                                              Mark P. Robinson, Jr.
                                              Kevin F. Calcagnie
                                              Ted B. Wacker
                                              Lexi W. Myer
                                              ROBINSON, CALCAGNIE & ROBINSON
                                              620 Newport Center Dr., 7th Floor
                                              Newport Beach, California  92660
                                              Telephone:  (949) 720-1288
                                              Facsimile: (949) 720-1292

                                              Andy D. Birchfield, Jr.
                                              P. Leigh O'Dell
                                              BEASLEY, ALLEN, CROW,
                                              METHVIN, PORTIS & MILES, P.C.
                                              P.O. Box 4160
                                              234 Commerce Street
                                              Montgomery, Alabama  36103-4160
                                              Telephone:  (334) 269-2343
                                              Facsimile: (334) 954-7555

                                              Donald C. Arbitblit
                                              LIEFF, CABRASER, HEIMANN and
                                              BERNSTEIN, LLP
                                              275 Battery Street, 30th Floor
                                              San Francisco, California   94111
                                              Telephone:  (415) 956-1000
                                              Facsimile:  (415) 956-1008

                                              Counsel for Plaintiff

17

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No.

8B, and that the foregoing was electronically filed with the Clerk of the Court of the United

States District Court for the Eastern District of Louisiana by using the CM/ECF system which

will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657

on this _10_ day of August , 2007.

By: _Mark P. Robinson, Jr._
        MARK P. ROBINSON, JR.
        State Bar No. 054426
        Attorney for Plaintiff
        Robinson, Calcagnie & Robinson
        620 Newport Center Drive, Suite 700
        Newport Beach, California   92660
        Telephone:  (949) 720-1288
        Facsimile:  (949) 720-1292