```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


IN RE: VIOXX PRODUCTS              *   MDL DOCKET NO. 1657
LIABILITY LITIGATION               *
                                   *
                                   *
THIS DOCUMENT RELATES TO           *   AUGUST 4, 2006, 8:30 A.M.
                                   *
                                   *
GERALD BARNETT V. MERCK            *   CASE NO. 06-CV-485-L
   & CO., INC.                     *
* * * * * * * * * * * * * * *


                            VOLUME V
                    JURY TRIAL BEFORE THE
                 HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                            BY:  MARK P. ROBINSON JR., ESQ.
                            620 NEWPORT CENTER DRIVE
                            NEWPORT BEACH, CALIFORNIA 92660

FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                               PORTIS & MILES
                            BY:  ANDY D. BIRCHFELD, JR., ESQ.
                            234 COMMERCE STREET
                            POST OFFICE BOX 4160
                            MONTGOMERY, ALABAMA 36103

FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                               PALENCHAR & SCOTT
                            BY:  PHILIP S. BECK, ESQ.
                                 ANDREW L. GOLDMAN, ESQ.
                            54 W. HUBBARD STREET, SUITE 300
                            CHICAGO, ILLINOIS 60601
```

Page 1001

1  Q.   AND TELL THE JURY WHAT A CARDIAC CATHETERIZATION IS.

2  A.   THAT'S A TEST WHERE WE SLIDE TUBES FROM THE GROIN UP INTO

3  THE HEART AND INJECT CONTRAST DYE INTO THE BLOOD VESSELS OF THE

4  HEART AND FEED BLOOD TO THE HEART AND ASSESS FOR BLOCKAGE.

5  Q.   AND BLOCKAGE IS -- IS -- YOU'LL GIVE A PERCENTAGE OF THE

6  BLOCKAGE; IS THAT RIGHT?

7  A.   YES, SIR, WE GIVE --

8  Q.   WE'LL COME TO THAT.

9  A.   YES, SIR.

10 Q.   COULD YOU READ INTO THE RECORD WHAT YOU SAY IN YOUR

11 HANDWRITING ON 9/9/02 ON EXHIBIT 12.

12 A.   CATH WITHOUT COMPLICATION.  LVEF APPROXIMATELY 50 PERCENT.

13 LVEDP 16.  LEFT MAIN, 50 PERCENT DISTAL.  LAD, MILD PROXIMAL

14 IRREGULARITIES, MID VESSEL 80 PERCENT.  D1 SMALL 80 PERCENT.

15 D2 MODERATE, MILD IRREGULARITIES.  CIRCUMFLEX, SMALL DIFFUSE,

16 HIGH-GRADE DISEASE.  RAMUS, LARGE, PROXIMAL 80 PERCENT LESION.

17 RCA HUNDRED PERCENT PDA WITH COLLATERALS.  POSTEROLATERAL

18 BRANCH 80 PERCENT.  RECOMMENDATION, CABG.

19 Q.   NOW, JUST TO GO THROUGH THAT, THE FIRST VESSEL IS BLOCKED

20 50 PERCENT?

21 A.   THE LEFT MAIN CORONARY WAS 50 PERCENT STENOSED, OR

22 BLOCKED.

23 Q.   AND THE LAD WAS BLOCKED 80 PERCENT?

24 A.   YES, SIR.

25 Q.   IN ONE PORTION OF IT; RIGHT?  WHAT PORTION WAS THAT?  MID

```
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF LOUISIANA
 3
 4
 5   IN RE: VIOXX PRODUCTS          *   MDL DOCKET NO. 1657
     LIABILITY LITIGATION           *
 6                                  *
                                    *
 7   THIS DOCUMENT RELATES TO       *   AUGUST 5, 2006, 8:30 A.M.
                                    *
 8                                  *
     GERALD BARNETT V. MERCK        *   CASE NO. 06-CV-485-L
 9     & CO., INC.                  *
     * * * * * * * * * * * * * * *
10
11
                           VOLUME VI
12                   JURY TRIAL BEFORE THE
                  HONORABLE ELDON E. FALLON
13               UNITED STATES DISTRICT JUDGE
14
     APPEARANCES:
15
16   FOR THE PLAINTIFF:         ROBINSON, CALCAGNIE & ROBINSON
                                BY:  MARK P. ROBINSON JR., ESQ.
17                              620 NEWPORT CENTER DRIVE
                                NEWPORT BEACH, CALIFORNIA 92660
18
19   FOR THE PLAINTIFF:         BEASLEY ALLEN CROW METHVIN
                                   PORTIS & MILES
20                              BY:  ANDY D. BIRCHFELD, JR., ESQ.
                                234 COMMERCE STREET
21                              POST OFFICE BOX 4160
                                MONTGOMERY, ALABAMA 36103
22
23   FOR THE DEFENDANT:         BARTLIT BECK HERMAN
                                   PALENCHAR & SCOTT
24                              BY:  PHILIP S. BECK, ESQ.
                                     ANDREW L. GOLDMAN, ESQ.
25                              54 W. HUBBARD STREET, SUITE 300
                                CHICAGO, ILLINOIS 60601
```

1  YOU SEE THAT?
2  A.   YES, I DO.
3  Q.   THERE ARE OTHER MEDICAL RECORDS WHICH INDICATE THAT HE
4  WASN'T WORKING AS HARD ON HIS RISK FACTORS AS HE USED TO.  DO
5  YOU REMEMBER THAT?
6  A.   NO.  HE'S ALWAYS -- IF HE WASN'T EXERCISING, IT WAS
7  USUALLY AN EXPLANATION FOR IT.  HE ALWAYS WAS A VERY
8  CONSCIENTIOUS PATIENT.  HE DID MORE THAN 99 PERCENT OF THE
9  PATIENTS I KNOW AS FAR AS TRYING TO MODIFY ANY RISK FACTORS HE
10 HAD.  HE'S BEEN A GOOD PATIENT AS FAR AS THAT GOES.
11            MR. BECK:  NOW WE GO BACK INTO THE TENNIS MATCH AND
12 BACK-AND-FORTH.
13                       REDIRECT EXAMINATION
14 BY MR. ROBINSON:
15 Q.   GIVEN THE AMOUNT OF PLAQUES THAT HE'S GOT, CAD, WOULD YOU
16 BE ABLE TO COMPARE HIS PROGNOSIS VERSUS A PERSON WHO DOES NOT
17 HAVE THIS LEVEL OF PLAQUE?
18 A.   I THINK HE -- CLINICALLY, THE THING THAT WOULD BE THE MOST
19 WORRISOME IS THAT HE HAS SOMEWHAT OF A DIFFUSE PROCESS AND
20 PROGRESSION OF THAT PROCESS WOULD BE -- MORE PROGRESSION OF IT
21 IS THE MAIN CONCERN TO ME.
22            AGAIN, GIVEN THE FACT THAT HIS HEART PUMPS NORMALLY
23 AND THE OVERALL BLOOD FLOW IS PROBABLY NORMAL NOW -- IT WAS
24 ONLY MILDLY DIMINISHED -- THAT STILL WOULD, OVERALL, GIVE HIM A
25 GOOD PROGNOSIS, BUT I AM CONCERNED ABOUT HIS TOTAL PLAQUE

1   BURDEN AND THAT PROGRESSION.
2   Q.   DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THAT TOTAL
3   PLAQUE BURDEN COULD SHORTEN HIS LIFE EXPECTANCY?
4   A.   WELL, ONE OF THE HARDEST THINGS, IN MY MIND, IS TO TELL
5   SOMEONE HOW LONG THEY'RE GOING TO LIVE OR HAVE TO LIVE AND
6   THE -- BUT THE AMOUNT OF PLAQUE BURDEN WOULD BE ONE OF THE
7   THINGS I'D BE CONCERNED ABOUT.   HE CERTAINLY, FROM A CARDIAC
8   STANDPOINT, WOULD NOT HAVE THE SAME PROGNOSIS OF SOMEONE THAT
9   HAD MORE SIMPLE, YOU KNOW, LESS DIFFUSE DISEASE.   I THINK HE
10  HAS A DIFFERENT PROGNOSIS THAN SOMEONE LIKE THAT.   I WOULD NOT
11  PUT A NUMBER ON IT.
12  Q.   WOULD IT BE A SHORTER LIFE, WITHOUT PUTTING A NUMBER ON
13  IT?
14  A.   I THINK THAT, AGAIN, PEOPLE THAT HAVE MORE DISCRETE
15  LESIONS, LESS DIFFUSE DISEASE, HAVE A BETTER PROGNOSIS THAN
16  SOMEONE THAT HAS THE AMOUNT OF DIFFUSE PLAQUING THAT HE HAS.
17  Q.   COUNSEL ASKED YOU SOME QUESTIONS REGARDING STRESS.   I
18  MEAN, WHEN WE WERE TALKING ABOUT CHEST PAIN BEFORE YOU DID THE
19  STENT, DO YOU HAVE AN OPINION AS TO THE MOST LIKELY SOURCE OF
20  HIS CHEST PAIN BEFORE YOU DID THE STENT?
21  A.   I THINK, LOOKING BACK -- AND I THINK HE WAS HAVING SOME
22  DEGREE OF ANGINA DISCOMFORT.   OKAY.
23  Q.   WHAT WAS THAT DUE TO?
24  A.   I THINK THE CULPRIT LESION IS GOING TO BE THIS CIRCUMFLEX
25  RAMUS INTERMEDIUS THAT WAS STENTED.   HE HAS SOME SMALL BRANCH

Page 1344

1      MR. ROBINSON: YOU GOT THAT. I SENT IT TO YOU AT THE
2  HOTEL.
3      THE COURT: ALL RIGHT. LET'S PROCEED.
4      MR. ROBINSON: NOW THEY HAVE EVERYTHING.
5      THE COURT: WHAT'S YOUR QUESTION? WHAT IS THIS?
6  BY MR. ROBINSON:
7  Q.  IF WE COULD GO BACK -- GO BACK TO THE LAST SLIDE, PLEASE.
8  IF YOU COULD FLIP BACK. CAN WE GO TO THE CONCLUSION, PLEASE.
9      UNDER "CONCLUSIONS," IT SAID -- YOU SEE WHERE -- WILL
10 YOU READ NUMBER 3 INTO THE RECORD, PLEASE.
11 A.  OF COURSE. "PERFUSION IMAGES WITH A SMALL AREA OF LATERAL
12 ISCHEMIA."
13 Q.  WHAT DOES THAT MEAN?
14 A.  SO I'LL SHOW YOU WHAT THE IMAGES -- WHAT THAT MEANS A
15 SMALL AREA IN THE BACK PORTION OF THE HEART THAT, WITH THIS
16 MAXIMUM EXERCISE, MAY HAVE HAD A GREATER THAN OR EQUAL TO
17 50 PERCENT NARROWING IN IT. JUST ONE SMALL AREA IN THE BACK,
18 IN THE BACK PORTION OF THE HEART.
19 Q.  NOW, CAN YOU TELL FROM THE RESULTS OF THIS TEST WHETHER
20 THE BLOCKAGE IS CONFINED TO THAT ONE AREA?
21 A.  AGAIN, I'M GOING TO TRY TO QUALIFY THE STATEMENT
22 "BLOCKAGE." I THINK THAT THERE IS BLOCKAGES IN THE ARTERIES.
23 BUT WHAT I WANT TO DIFFERENTIATE IS: ARE THERE IMPORTANT
24 BLOCKAGES, MORE THAN 50 PERCENT NARROWINGS, THAT WITH MAXIMUM
25 EXERCISE -- AND THIS ISN'T JUST MAXIMUM EXERCISE; THIS IS

1  RATHER HEROIC EXERCISE -- THAT WITH THIS MAXIMUM EXERCISE, WITH
2  THE HEART PUMPING, GETTING TO 92 PERCENT OF HIS MAXIMUM
3  PREDICTED HEART RATE, THAT ONLY ONE AREA RIGHT OVER HERE HAD
4  ANY IMPORTANT REDUCTION OF THE BLOOD FLOW.  THE REST OF THE
5  HEART WAS FUNCTIONING NORMALLY.
6  Q.   SO, TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, DO YOU
7  HAVE AN OPINION AS TO WHAT THE LEVEL OF HIS REDUCTION OF BLOOD
8  FLOW WAS IN HIS CORONARY VESSELS?
9  A.   I BELIEVE IT WAS MILD.  I MEAN, BUT WE ALSO HAVE TREATMENT
10 GUIDELINES THAT WE WOULD RECOMMEND WITH THAT DEGREE OF EXERCISE
11 TESTING, AND THAT IS THAT ALL OF OUR GUIDELINES, VIRTUALLY ALL
12 OF THEM, FROM THE AMERICAN COLLEGE OF CARDIOLOGY, ELSEWHERE,
13 WOULD SUGGEST THAT IF YOU HAVE A SMALL AREA OF -- OF ISCHEMIA
14 LIKE THIS, THAT THE BEST THING TO DO, IN THE ABSENCE OF ONGOING
15 SYMPTOMS, THE BEST THING TO DO IS JUST LOWER ALL OF THE RISK
16 FACTORS THAT WE TALKED ABOUT.  JUST GIVE MEDICINES AND JUST
17 LOWER THE RISK FACTORS, BUT NOT TO MOVE FORWARD WITH A HEART
18 CATHETERIZATION AND NOT TO MOVE FORWARD WITH A ANGIOPLASTY.
19 Q.   THERE WERE SOME ISSUES RAISED IN ONE OF THE DEPOSITIONS BY
20 MR. GOLDMAN -- ACTUALLY, IT WAS DR. MIKOLA -- REGARDING
21 MR. BARNETT NOT HAVING A CATHETERIZATION AT THIS TIME BUT
22 HAVING A CARDIOLITE.  DID YOU HAVE AN OPINION AS TO WHETHER OR
23 NOT A CATHETERIZATION WOULD HAVE BEEN NECESSARY AT THAT TIME?
24 A.   BY MY REVIEW OF THE RECORDS, I WOULDN'T HAVE REVIEWED
25 ONE -- PERFORMED ONE.  AND I'M NOT SURE THAT FROM MY READING OF

Page 1366

1  WE'LL TALK ABOUT THESE POSTEROLATERAL BRANCHES.  I'LL GIVE YOU
2  MY OPINION ABOUT IT, AND I THINK IT'S CORRECT.  BUT THIS IS THE
3  POSTEROLATERAL BRANCH THAT CONTINUES OFF THE RIGHT CORONARY
4  ARTERY, GOES TO THE BACK PORTION OF THE HEART.
5            THEN THERE IS A STUMP RIGHT HERE.  THERE IS AN ARTERY
6  THAT SHOULD BE OUT HERE.  THAT'S CALLED THE POSTERIOR
7  DESCENDING ARTERY.  IT SHOULD BE THROWING OUT HERE LIKE THAT,
8  BUT THERE IS A STUMP.
9  Q.   AND WHAT'S THAT STUMP?
10 A.   THAT STUMP IS A COMBINATION OF THE CHOLESTEROL BUILDUP AND
11 BLOOD CLOT.
12           AND THE BLOOD CLOT, WHICH IS DYNAMIC, WHICH JUST CAME
13 ON AND FORMED A BLOOD CLOT, STOPPED THE FLOW, CAUSED THE CHEST
14 PAIN, CAUSED PART OF HIS HEART MUSCLE TISSUE TO DIE, AND CUT
15 OFF THE CIRCULATION TO THE DISTAL PORTION OF THIS VESSEL.
16 Q.   AND WHAT IS THAT CALLED?
17 A.   IN THIS PARTICULAR CASE, IT WAS CALLED A NON Q-WAVE
18 MYOCARDIAL INFARCTION.
19 Q.   IS THAT ANOTHER TERM FOR A HEART ATTACK?
20 A.   YES, EXACTLY.
21 Q.   SO IS THIS SHOWING --
22 A.   THIS IS THE AREA RIGHT HERE THAT CAUSED THE HEART ATTACK.
23 RIGHT THERE.  SO THERE SHOULD BE A BLOOD VESSEL THAT GOES LIKE
24 THAT, THAT FILLS UP THE -- WHERE WE ARE ON THE HEART ANATOMY IS
25 THAT THERE'S RIGHT UP -- LET ME TAKE THIS OFF.  RIGHT ON THE

Page 1377

1  EXPERT, YOU CAN GIVE AN OPINION. YOU CANNOT SPECULATE. IF YOU
2  HAVE AN OPINION, GIVE THE OPINION AND EXPLAIN WHY YOU FEEL THAT
3  WAY.
4         THE WITNESS: YES, SIR.
5  BY MR. ROBINSON:
6  Q.   I'M GOING TO LAY A FOUNDATION BEFORE I ASK YOU THE OPINION
7  QUESTION. WOULD YOU TELL US, AT SOME TIME AFTER THE
8  SEPTEMBER 9 CATH AND THE SEPTEMBER 10 BYPASS OPERATION, DO YOU
9  HAVE AN OPINION AS TO WHETHER OR NOT HIS GRAFTS OCCLUDED?
10 A.   YES, I DO.
11 Q.   AND WHAT IS THAT OPINION?
12 A.   THE SAPHENOUS VEIN GRAFT THAT WENT TO THE RAMUS BRANCH
13 OCCLUDED, AND ONE OF THE SEQUENTIAL LIMBS OF THE GRAFT THAT
14 WENT TO THE BOTTOM PORTION OF THE HEART ALSO OCCLUDED.
15 Q.   AND TO A REASONABLE MEDICAL CERTAINTY, DO YOU HAVE AN
16 OPINION AS TO WHEN THE MOST LIKELY TIME WHEN THAT OCCLUSION OR
17 THOSE OCCLUSIONS OCCURRED?
18 A.   I DO.
19 Q.   AND WHEN WAS THAT?
20 A.   THIS IS WHAT WE DO IN MEDICINE IN CLINICAL PRACTICE EVERY
21 DAY. WHEN WE SEE A GRAFT OCCLUSION, WE HAVE TO MAKE A DECISION
22 AT THE TABLE, WHEN THE PATIENT IS ON THE TABLE, WHETHER WE'RE
23 GOING TO PROCEED AND TRY TO OPEN UP THIS OCCLUDED GRAFT.
24         MR. GOLDMAN: OBJECTION, YOUR HONOR. THIS IS
25 NONRESPONSIVE.

1   THE DECISION I TRY TO MAKE.

2   Q.   BUT IS THAT YOUR BEST OPINION AS TO WHEN THESE OCCLUSIONS

3   OCCURRED?

4   A.   THAT'S WHAT I WOULD USE ON A PATIENT I WOULD BE TREATING.

5   Q.   NOW, AT SOME POINT IN TIME, DID MR. BARNETT HAVE ANOTHER

6   ANGIOGRAM DONE BY DR. KARAVAN AFTER SEPTEMBER 9, '02?

7   A.   HE DID.

8   Q.   AND CAN YOU TELL US BRIEFLY, WHAT WERE THE CIRCUMSTANCES

9   THAT LED UP TO THAT CALCULATION OF INJURY?

10  A.   I BELIEVE THAT HE HAD RECURRENT PAIN WHEN HE WAS

11  EXERCISING AND THEN A COUPLE OF EPISODES OF PAIN THAT WERE MORE

12  SEVERE TO THE POINT THAT HE WAS ADMITTED, I THINK, TO THE

13  HOSPITAL AND THEN THE REPEAT ANGIOGRAM WAS PERFORMED.

14  Q.   NOW, AT SOME POINT IN TIME, APPROXIMATELY IN MAY OF 2006,

15  DID DR. ZIPES, ONE OF THE EXPERTS IN THE CASE, HAVE SOME TESTS

16  PERFORMED ON MR. BARNETT THAT YOU READ AND RELIED UPON?

17  A.   HE DID.

18           MR. GOLDMAN:   OBJECTION, LEADING QUESTION.

19           THE COURT:   OKAY.   I'LL ALLOW IT.

20  BY MR. ROBINSON:

21  Q.   TELL US ABOUT THOSE TESTS THAT YOU RELIED UPON.

22  A.   SO THERE WERE THREE TESTS -- WHICH I'LL JUST GO THROUGH

23  VERY BRIEFLY BECAUSE THEY ARE IN THE RECORD AND WE CAN TALK

24  ABOUT THEM -- THERE WERE THREE TESTS THAT DR. ZIPES PERFORMED?

25  Q.   WHAT'S THE DATE OF THE TESTS, FOR THE JURY?

1  A.   SO THE FIRST TEST IS AN ECHOCARDIOGRAM, AND THE
2  ECHOCARDIOGRAM WAS PERFORMED ON 5/2/06.  ECHOCARDIOGRAM IS A
3  SOUNDWAVE TEST THAT ALLOWS US TO LOOK, WITHOUT GOING INTO THE
4  HEART, THROUGH THE PROCEDURES THAT I PERFORM, HOW WELL THE
5  HEART CONTRACTS AND ARE THERE ANY AREAS OF SCAR AND WHAT'S THE
6  OVERALL FUNCTION.
7         NOW, ALTHOUGH MR. BARNETT'S OVERALL FUNCTION OF HIS
8  HEART WAS GOOD, WAS NORMAL, WHAT WAS NOTED ON THAT TEST WAS
9  THAT THERE WAS INCOMPLETE CONTRACTION IN THE LATERAL AND THE
10 BASAL SECTION OF THE HEART DOWN HERE.  IT JUST DIDN'T SQUEEZE
11 NORMALLY.  AND THERE WAS SEVERELY REDUCED WALL MOTION THAT WAS
12 IN THE BASAL POSTERIOR AND INFERIOR PORTION.
13         I'M JUST SHOWING YOU ON THE HEART WHERE THIS IS.  SO
14 THIS IS KIND OF THIS AREA, IN THIS SAME ZONE THAT HE HAD HIS
15 HEART ATTACK PREVIOUSLY; BUT ALSO, AS WE'LL SEE IN JUST A
16 MINUTE, IN A ZONE WHERE ONE OF THE VEIN GRAFTS ALSO OCCLUDED.
17 AND IMPORTANTLY, IT WASN'T MOVING, WHICH IMPLIES THERE IS
18 ACTUALLY A SCAR THAT IS THERE.
19         SO THE NEXT TEST THAT HE HAD WAS A CT ANGIO.  SORRY.
20 LET ME JUST SAY THAT -- A CT ANGIOGRAM.
21 Q.   QUICKLY, WHAT IS A CT?
22 A.   A CT ANGIOGRAM IS ANOTHER WAY WE INJECT DYE INTO THE VEINS
23 AND WE CAN IMAGE, WITHOUT OUR CORONARY ANGIOGRAPHY, WHAT THE
24 STATE OF THE VESSELS ARE.
25         ON THAT, JUST VERY BRIEFLY, IT APPEARED THAT ONE OF

1   THE MAIN GRAFTS THAT WENT TO THE RAMUS BRANCH HAD OCCLUDED.
2   AND FINALLY, HE HAD AN EXERCISE STRESS TEST THAT WAS PERFORMED
3   ON MAY 2, AND HE COULD NO LONGER EXERCISE WITH THE SAME
4   CAPACITY THAT HE COULD DO BEFORE.
5   Q.   HOW MANY MINUTES DID HE DO IN THAT EXAM?
6   A.   I THINK HE GOT TO NINE MINUTES AND 30 SECONDS. SO RATHER
7   THAN BEING 17.2 AND 17.5 MINUTES, WHICH IS PHENOMENAL
8   EXERCISE --
9   Q.   THE METS, YOU MEAN?
10  A.   THE METS, YES, THAT HE'S ACTUALLY DOWN TO 13.1 METS.
11  Q.   AND HOW MANY MINUTES DID HE DO BEFORE ON THE FIRST
12  CARDIOLITE?
13  A.   15 MINUTES AND NOW WE'RE DOWN TO 9 MINUTES. SO A MARKED
14  REDUCTION IN HIS EXERCISE TOLERANCE.
15  Q.   AND WHAT OPINION DO YOU HAVE REGARDING THE CHANGE?
16  A.   WELL, WE'LL PUT THIS IN AGGREGATE, BUT I THINK THAT THERE
17  IS EVIDENCE, WHICH WE'LL SEE WITH THE ANGIOGRAM, THAT THERE WAS
18  MORE HEART DISEASE, EITHER BY OCCLUSIONS OF THESE GRAFTS OR BY
19  PROGRESSION OF HIS NATIVE DISEASE.
20          AND INTERESTINGLY, IT'S ALL IN THE SETTING WHEN HE
21  SHOULD BE HAVING ADDITIONAL PLAQUE FORMATION BECAUSE HIS LDL
22  CHOLESTEROL HAS BEEN SO WELL CONTROLLED.
23          NOW, JUST THE FINAL PIECE WHICH I'LL MENTION AGAIN.
24  IT'S A SESTAMIBI SCAN.
25  Q.   WHAT IS A SESTAMIBI SCAN?

1  A.   SORRY.  CARDIOLITE.  A CARDIOLITE SCAN.  THANK YOU VERY
2  MUCH.
3  Q.   IS THE OLD NAME FOR IT SESTAMIBI?
4  A.   IT IS.  THANK YOU.  YES.  AND ON THAT PARTICULAR SCAN,
5  THERE WAS AN AREA OF REDUCED PERFUSION -- I'M READING FROM THE
6  REPORT -- IN THE INFERIOR AND INFERO -- AND BASAL INFEROLATERAL
7  SEGMENTS.
8  Q.   WHAT DOES THAT MEAN?
9  A.   THAT AREA DOWN HERE, THAT, WITH EXERCISE, STARTS TO FALL
10 OUT.  BUT THE IMPORTANT PART OF THIS IS THAT, DURING REST, IT
11 DOESN'T COME BACK ALL IN TOWARDS NORMAL.  THERE IS STILL A
12 RESIDUAL PROBLEM, AND THAT IMPLIES THAT THERE HAS BEEN SOME
13 HEART MUSCLE DAMAGE; A HEART ATTACK IN THAT AREA.
14 Q.   AND CAN YOU TELL ME WHETHER, IN YOUR OPINION, WAS THAT THE
15 SAME?  WAS THAT THE RESIDUE FROM THE ORIGINAL HEART ATTACK, OR
16 WAS THAT A RESIDUE FROM A NEW ONE?
17 A.   I BELIEVE THAT IT'S NEW.  AND THE REASON I SAY THAT,
18 ALTHOUGH IT'S IMPOSSIBLE TO PREDICT THESE THINGS, THE REASON I
19 SAY THAT IS BECAUSE HIS CARDIOLITE TEST THAT HE HAD BACK IN
20 2003 --
21 Q.   JULY.
22 A.   -- DIDN'T SHOW THIS PROBLEM.  SO IF THE OLD HEART ATTACK
23 HEALED UP, HAD BYPASS SURGERY, EVERYTHING GOT FIXED, THERE IS
24 NOW A NEW ABNORMALITY, A NEW PROBLEM, TO THE BACK PORTION THAT
25 WASN'T THERE IN 2003.

1  A.   SEPTEMBER 9, 2002.  FROM THIS AREA TO RIGHT HERE.  THERE

2  IS A LITTLE BIT OF A -- THERE'S A NARROWING THAT'S RIGHT THERE.

3         BUT BY THE TIME JULY 10 OCCURRED, NEARLY FOUR YEARS

4  LATER, NOW THAT AREA IS TOTALLY BLOCKED, AND WHAT HAS TO HAPPEN

5  INSTEAD IS THERE HAS TO BE BLOOD FLOW THERE COMING AROUND FROM

6  OTHER CHANNELS.  SO THIS IS A FOURTH AREA OF OCCLUSION THAT

7  OCCURRED DURING THAT PERIOD OF TIME.

8  Q.   SO ADD IT UP.  BETWEEN SEPTEMBER 9, '02, AND JULY 10, '06,

9  DID YOU LIST OR CALCULATE HOW MANY AREAS OF ACTUAL OCCLUSION OR

10 TOTAL BLOCKAGE?

11 A.   TOTAL BLOCKAGES, YES.

12 Q.   HOW MANY?

13 A.   FOUR.

14 Q.   TELL THE JURY WHERE THEY WERE.

15 A.   OH, SO FROM THAT PERIOD OF TIME, 2002 TO 2006, THERE WERE

16 FOUR AREAS THAT BECAME TOTALLY BLOCKED.

17         AND AS I'VE INTIMATED, DIFFERENT, I MEAN, DIFFERENT

18 CARDIOLOGISTS WILL CONVINCE ABOUT HOW NARROW SOMETHING IS,

19 BETWEEN 50 AND 70, AND 70 AND 80.  BUT TOTAL IS TOTAL.  WE

20 CAN'T ARGUE WITH THE FACT THAT IT'S TOTALLY BLOCKED.

21         AND SO WE HAVE THE VEIN GRAFT THAT WENT TO THE RAMUS

22 BRANCH TOTALLY BLOCKED THAT WAS LIKELY OPEN IN JULY OF 2003.

23         THE SEQUENTIAL LIMB -- I THINK THE SEQUENTIAL LIMB TO

24 THE POSTEROLATERAL BRANCH -- OTHERS WOULD SAY IT'S TO THE PDA,

25 BUT ONE OF THE SEQUENTIAL LIMBS -- 100 PERCENT BLOCKED; THE

1  DISTAL PORTION OF THE CORONARY ARTERY, A BIG VESSEL, TOTALLY
2  BLOCKED; AND FINALLY THIS LIMB RIGHT HERE OF THIS SEGMENT RIGHT
3  THERE, "PATENT AND OPEN NOW," SEPTEMBER 9, NOW TOTALLY BLOCKED.
4       SO THESE ARE NOT SUBTLETIES. THIS IS -- WE CAN ARGUE
5  ABOUT THE SUBTLETIES, BUT THESE ARE JUST -- WERE OPEN, NOW
6  CLOSED. AND WE HAVE FOUR DIFFERENT AREAS.
7       AND THIS IS AT A TIME WHEN, AT LEAST THE AMOUNT OF
8  DATA WE HAVE AVAILABLE, THE PLAQUE SHOULD BE GETTING --
9  REGRESSING, GOING AWAY.
10 Q. WOULD YOU GO TO THE NEXT SLIDE, PLEASE. IS THAT MORE OF
11 THE SAME?
12 A. MORE OF THE SAME. THIS IS JUST A -- THE BLOCKED GRAFT TO
13 THE RAMUS BRANCH.
14 Q. NEXT SLIDE, PLEASE.
15 A. THEN I DON'T WANT TO GO INTO DETAIL, THIS IS JUST A
16 REPRESENTATION ABOUT WHY IT'S THE VEIN GRAFT TO THE POSTERIOR
17 DESCENDING ARTERY THAT'S OPENED. AND WE CAN COME BACK WITH
18 CROSS-EXAMINATION FOR ME TO DO THAT.
19 Q. AND NEXT SLIDE PLEASE?
20 A. WE CAN SKIP ONE, YES.
21 Q. OKAY. WHAT IS THIS SLIDE SHOW?
22 A. WELL, THIS IS JUST A DEPICTION, AS WE TRY TO QUANTITATE
23 THE AMOUNT OF BLOCKAGES IN DIFFERENT BLOOD VESSELS THAT
24 OCCURRED BY THESE DIFFERENT PERIODS OF TIME.
25 Q. DID YOU DO SOME MEASUREMENTS OF THE ANGIOGRAMS?

Case 2:05-md-01657-EEF-DEK   Document 12007-1   Filed 08/10/07   Page 16 of 17

Page 1481

1  Q.  THE RESULTS OF THAT CATHETERIZATION WAS THAT MR. BARNETT'S
2  WALL MOTION WAS NORMAL; CORRECT?
3  A.  THAT'S THE RESULT OF THAT VENTRICULOGRAM, WHICH SHOWS THE
4  ANTERIOR INFERIOR WALL.
5  Q.  HIS EJECTION FRACTION, ACCORDING TO THE CATHETERIZATION,
6  WAS 55 PERCENT; TRUE?
7  A.  RIGHT.  YES, IT IS.
8  Q.  HE THEN HAD A STENT INSERTED BY DR. KARAVAN WHILE HE WAS
9  IN THE HOSPITAL; RIGHT?
10 A.  THAT'S ONE -- YES.
11 Q.  THE STENT WAS INSERTED INTO THE ARTERY CALLED THE RAMUS?
12 A.  THAT'S CORRECT, BECAUSE THE VEIN GRAFT TO THAT RAMUS
13 BRANCH HAD CLOSED.
14 Q.  WE'LL TALK ABOUT THAT.  THE RAMUS WAS ONE OF THE ARTERIES
15 THAT HAD BEEN BYPASSED IN 2002; TRUE?
16 A.  THAT'S CORRECT.
17 Q.  DO YOU AGREE, SIR, THAT THE STENT PROCEDURE WAS
18 SUCCESSFUL?
19 A.  I DO.
20 Q.  AFTER THE STENT, HE HAD ZERO PLAQUE IN HIS RAMUS; TRUE?
21 A.  NO, I DON'T THINK THAT'S TRUE.  I'LL SAVE YOU PULLING UP
22 THE DEPOSITION.  HE MAY HAVE HAD NO RESIDUAL STENOSIS, BUT I
23 STILL THINK THERE'S PLAQUE WITHIN THE VESSEL.
24 Q.  THIS HAS BEEN ADMITTED AS EXHIBIT 2088.  THIS IS THE
25 ANGIOPLASTY REPORT.  DO YOU SEE UP HERE, ANGIOPLASTY REPORT?

1  Q.  DID YOU TRY AND STAY AROUND THERE FOR A WHILE?
2  A.  OH, YEAH.  I WENT UP THE ROOM WITH HIM.  I DON'T REMEMBER
3  EXACTLY -- IT WAS DAYLIGHT.  I DON'T REMEMBER EXACTLY WHAT TIME
4  IT WAS THAT I LEFT TO GO HOME TO KIND OF FRESHEN UP A LITTLE
5  BIT, BUT IT COULD HAVE BEEN EARLY IN THE MORNING; IT COULD HAVE
6  BEEN LATER IN THE MORNING.  I JUST CAN'T RECALL.
7  Q.  DO YOU KNOW WHETHER OR NOT HE HAD A PROCEDURE AT SOME TIME
8  DURING THAT HOSPITALIZATION, A SURGICAL KIND OF PROCEDURE?
9  A.  YES.  THAT WAS LIKE A SATURDAY AND THEN SUNDAY -- I THINK
10 THEY DID TESTS SATURDAY AND SUNDAY, AND THEN I BELIEVE IT WAS
11 MONDAY THEY DID THE CATHETERIZATION.
12 Q.  DO YOU KNOW WHAT --
13 A.  WELL, THEY DID THE CATHETERIZATION AND TOLD ME STAY IN THE
14 ROOM.
15          MR. GOLDMAN:  OBJECTION, HEARSAY.
16          THE COURT:  CAN'T WE GET THIS FROM ANOTHER WITNESS?
17          MR. ROBINSON:  YES, WE'LL GET IT.
18 BY MR. ROBINSON:
19 Q.  I'M TRYING TO DO IT WITHOUT GETTING COMMUNICATION HERE.
20 IN ANY EVENT, WERE YOU THERE TO TAKE HIM HOME AT THAT TIME.
21 A.  YEAH.  I WAS THERE WHEN THE HEART DOCTOR THAT DID THE
22 CATHETERIZATION CAME IN AND TALKED TO ME.
23 Q.  DURING THE LAST MONTH, HAVE YOU SEEN JERRY; AND, IF SO,
24 CAN YOU TELL US WHAT HIS CONDITION HAS BEEN AS YOU OBSERVED IT?
25 A.  IN THE LAST MONTH?