# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | ) |
| PRODUCTS LIABILITY LITIGATION | ) MDL NO. 1657 |
| | ) |
| | ) SECTION: L |
| THIS DOCUMENT RELATES TO ALL | ) |
| CASES | ) JUDGE FALLON |
| | ) MAG. JUDGE KNOWLES |
| | ) SPECIAL MASTER RICE |
| | ) |

**MERCK & CO., INC.'S OBJECTIONS TO THE SPECIAL
MASTER'S SECOND REPORT AND RECOMMENDATIONS**

888973v.1

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................ 2

ARGUMENT ................................................................................................................... 6

I.     THE SPECIAL MASTER CORRECTLY RECOGNIZED THAT ATTORNEY-CLIENT PRIVILEGE EXTENDS TO LEGAL COMMUNICATIONS WITH OUTSIDE CONSULTANTS THAT FUNCTION ESSENTIALLY AS COMPANY EMPLOYEES ........................................................................................ 6

II.    THE SPECIAL MASTER ERRED IN CONCLUDING THAT MERCK'S COMMUNICATIONS WITH DDB AND OGILVY FALL OUTSIDE THE SCOPE OF PRIVILEGE ............................................................................................ 11

     A.     Merck's Legal Communications With Its Public Relations And Advertising Consultants Were Made In The Context Of Threatened And Existing Litigation ............................................................................. 11

     B.     Merck's Experience In Addressing Public Relations Issues Should Not Vitiate The Attorney-Client Privilege ................................................. 14

     C.     The Fact That Merck's Consultants Acted At The Company's "Direction" Supports Merck's Claim Of Privilege ................................. 15

III.    MERCK SHOULD HAVE THE OPPORTUNITY TO RESPOND TO THE SPECIAL MASTER'S RULINGS ON A DOCUMENT-BY-DOCUMENT BASIS AND PROVIDE INFORMATION RELATING TO THE BASIS FOR ITS PRIVILEGE CLAIMS ............................................................................... 17

CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*FTC v. GlaxoSmithKline,*
  294 F.3d 141 (D.C. Cir. 2002) ...............................................................10, 13, 15

*In re Bieter Co.,*
  16 F.3d 929 (8th Cir. 1994)........................................................... *passim*

*In re Copper Mkt. Antitrust Litig.,*
  200 F.R.D. 213 (S.D.N.Y. 2001).............................................................8, 13, 17

*Ross v. UKI Ltd.,*
  2004 WL 67221 (S.D.N.Y. Jan. 15, 2004) ................................... 8, 15

*Twentieth Century Fox Film Corp. v. Marvel Enter. Inc.,*
  2002 WL 31556383 (S.D.N.Y. Nov. 15, 2002) ........................... 8, 15

*Upjohn Co. v. United States,*
  449 U.S. 383 (1981) ...................................................................... 9

*W. Res., Inc. v. Union Pac. R.R. Co.,*
  2002 WL 181494 (D. Kan. Jan. 31, 2002)......................................... 10

**Rules and Regulations**

21 C.F.R. § 314.81(b)(3) .......................................................................... 4

**Other Authorities**

Paul R. Rice, *Attorney Client Privilege In The United States* § 2:2 (2d ed. West 1999) ............. 12

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:  VIOXX | ) |
| PRODUCTS LIABILITY LITIGATION | ) |
|  | ) |
| THIS DOCUMENT RELATES TO ALL | ) |
| CASES | ) |
|  | ) |
|  | ) |
|  | ) |

MDL NO. 1657

SECTION: L

JUDGE FALLON
MAG. JUDGE KNOWLES
SPECIAL MASTER RICE

## MERCK & CO., INC.'S OBJECTIONS TO THE SPECIAL
## MASTER'S SECOND REPORT AND RECOMMENDATIONS

Defendant Merck & Co., Inc. ("Merck") respectfully submits its objections to the Special

Master's Second Report and Recommendations ("SM Second Rep.") on privilege issues.

The Special Master erroneously determined that the small number of legal

communications on Merck's privilege log that involve, or were shared with, Merck's advertising

and public relations consultants, DDB Communications Group, Inc. ("DDB") and Ogilvy Public

Relations Worldwide, Inc. ("Ogilvy") (collectively, "the consultants") are not privileged.[1]  As

the Special Master himself recognized, however, attorney-client privilege extends to legal

communications between a company and its independent consultants where those consultants are

the "functional equivalent[s]" of employees.  (SM Second Rep. at 6.)  While the Special Master

determined that neither DDB nor Ogilvy functioned in this capacity while providing public

relations services for Merck, this ruling is incorrect.  As Merck explained in its prior briefing, the

---

[1]     Merck has asserted privilege claims over a very small percentage of Vioxx-related documents in the
possession of its advertising and public relations consultants.  Indeed, Merck has withheld as privileged only 0.37%
of the over 20,000 documents produced to plaintiffs from the files of its advertising consultant DDB, and only
0.16% of the over 9,000 documents produced from the files of Ogilvy, its public relations consultant.  Thus,
plaintiffs already have access to a substantial amount of information related to Merck's interactions with these
independent consultants.

Company's communications with its advertising and public relations consultants are subject to privilege because these individuals worked with Merck employees, as part of a single public relations team, to develop and disseminate a public relations strategy for the Company that complied with all applicable regulations.  Moreover, because actions taken by the consultants – just like actions taken by Merck employees – would be attributed to Merck and could potentially subject the Company to enforcement proceedings, it was essential for the consultants to seek legal advice from Merck's lawyers to ensure that all information released to the public was legally acceptable.  Such communications are clearly subject to privilege.

In addition, while the Special Master stated that many of the DDB/Ogilvy documents are not privileged for document-specific reasons and/or are too liberally redacted, Merck has not had the opportunity to inform the Special Master's view of the communications at issue.  As the Court is well aware, the Special Master's initial assessments of Merck's privileged documents have, in the past, changed dramatically as a result of Merck's explanations regarding the privileged nature of its documents.  Thus, Merck should be given the opportunity to provide the Special Master or the Court with document-by-document explanations of the DDB/Ogilvy privilege claims.

## BACKGROUND

Beginning in 1998, Merck contracted with DDB and Ogilvy to provide advertising and public relations services, respectively, for the pharmaceutical company, in connection with Vioxx.  (*See* Declaration of Molly Bucholz ("Bucholz Decl.") ¶ 5 (attached as Exhibit 1); Declaration of Sherry Pudloski ("Pudloski Decl.") ¶ 5 (attached as Exhibit 2).)  DDB was retained by Merck "to create advertising and promotional programs for Vioxx" and was "tasked with creating a multi-pronged campaign which included, but was not limited to, newspaper,

2

magazine and broadcast advertisements." (Bucholz Decl. ¶ 5.) Ogilvy was retained by the

company to assist in developing and implementing public relations plans for Vioxx. (Pudloski

Decl. ¶ 5.)

     In carrying out their contractual obligations related to Vioxx, both DDB and Ogilvy were

in the same position, in all relevant respects, as Merck employees. The two companies'

employees worked as members of Merck's advertising and public relations "teams" and

interacted with Merck employees on a regular basis. (Bucholz Decl. ¶ 10 ("DDB employees

worked alongside Merck employees as members of Merck's advertising team for the drug

Vioxx."); Pudloski Decl. ¶ 9 ("In my experience, Ogilvy employees worked alongside and under

the direction of Merck employees as a part of the Vioxx public affairs team.").) DDB and

Ogilvy personnel attended Vioxx-related meetings at Merck offices. (*See* Bucholz Decl. ¶ 9

("With respect to the day-to-day interactions between DDB and Merck, DDB employees

participated in meetings at Merck's offices on a regular basis and communicated with members

of Merck's Medical/Legal Board via senior Merck employees regarding Vioxx on a regular

basis."); Pudloski Decl. ¶ 9.) Like company employees, the two independent contractors also

worked under Merck's close supervision. For example, "DDB was not permitted to act with

respect to any advertising plan without Merck's prior approval, and was always understood to be

operating at Merck's direction and instruction." (*See* Bucholz Decl. ¶ 5.) Similarly, "[i]t was

understood that Merck retained the right to, at any time and in its sole discretion, terminate its

relationship with Ogilvy and direct Ogilvy to cease work on any communications, materials,

projects, or initiatives." (Pudloski Decl. ¶ 6.)

     The contractors' work product was subject to close supervision by Merck's legal

department because of the dense regulatory framework governing the labeling and promotion of

888973v.1

prescription drugs like Vioxx.  In order to ensure that the media advertisements, releases and

reports created and disseminated by DDB and Ogilvy complied with relevant federal regulations,

these materials were often submitted to the FDA's Division of Drug Marketing, Advertising and

Communications ("DDMAC").  21 C.F.R. § 314.81(b)(3).  The independent contractors

routinely sought legal advice from Merck's legal department ("Merck legal"), via their Merck

corporate contacts, regarding these submissions to DDMAC, including how to implement

DDMAC's suggested changes to proposed materials.  (*See* Bucholz Decl. ¶ 6; Pudloski Decl. ¶

6.)  "DDB employees needed the approval of the Merck team assigned to deal with Vioxx-

related advertising issues that were completely intertwined with the highly technical regulatory

and legal issues that accompany the marketing and advertising of prescription drugs."  (*See*

Bucholz Decl. ¶ 11.)  Similarly, "the [Merck] attorneys were ultimately responsible for making

sure that the materials Ogilvy created were consistent with all relevant laws and regulations."

(Pudloski Decl. ¶ 8.)  Both DDB and Ogilvy "received feedback from Merck legal and other

confidential information from Merck so that they could accomplish their work on the Vioxx

project and would understand the various legal and regulatory issues facing Merck."  (Pudloski

Decl. ¶ 10; *see also* Bucholz Decl. ¶ 11.)  In addition, the independent contractors were sources

of important advertising and marketing information ultimately provided to Merck legal.  (*See*

Pudloski Decl. ¶ 10 ("Ogilvy was tasked with providing Merck employees with relevant

information that was ultimately conveyed to Merck legal to inform them of the company's public

affairs strategies for Vioxx."); *see also* Bucholz Decl. ¶ 11.)

     Merck also maintained a strict relationship of confidentiality with both DDB and Ogilvy.

(Bucholz Decl. ¶ 7; Pudloski Decl. ¶ 7.)  Merck's relationship with each of these entities was

formalized by agreements explicitly providing that all Merck information was to be kept strictly

888973v.1

confidential and to be used only in furtherance of their duties as Merck consultants.  (*See* Ogilvy Public Relations Agency Agreement ("Ogilvy Agreement") ¶ 8 (attached as Exhibit 3); DDB Advertising Agency Agreement ("DDB Agreement") ¶ 15 (attached as Exhibit 4).)  The two companies complied strictly with these confidentiality provisions.  (*See* Bucholz Decl. ¶ 7 ("DDB employees were explicitly instructed not to disclose confidential information to persons outside Merck without receiving prior, written permission from Merck."); Pudloski Decl. ¶ 7 ("Ogilvy kept confidential all feedback from Merck legal, generally relayed to Ogilvy by other Merck employees.").)

Other provisions of the contracts at issue support a finding that DDB and Ogilvy consultants acted as the functional equivalent of Merck employees.  Merck's contractual agreements with DDB specify that:  (a) DDB may not disclose any Merck confidential information to a third party without Merck's written consent; (b) Merck has a right to examine all information in DDB's files that relates to Merck; (c) all advertising materials prepared by DDB are the exclusive property of Merck; and (d) all information regarding advertising materials is to be made available to Merck at the termination of the agreement.  (DDB Agreement ¶¶ 7(a), 11, 12(d), 15.)  Similarly, the Ogilvy Agreement provides that:  (a) Ogilvy shall not disclose any Merck confidential information to any third party without Merck's prior written consent; (b) all documents made or received by Ogilvy are Merck's property and "shall be delivered to Merck by [Ogilvy] immediately upon demand"; and (c) Ogilvy is to deliver to Merck all work product and documents or other property of Merck at the termination of the agreement.  (Ogilvy Agreement ¶¶ 8, 9, 11.)

In accordance with this Court's May 24, 2006 Order, Merck provided plaintiffs and the Court with a privilege log listing the documents in the possession of DDB and Ogilvy that are

888973v.1

subject to protection under the attorney-client privilege.  Merck also submitted copies of the

actual documents to the Court *in camera*.  In response to a ruling by the Fifth Circuit Court of

Appeals, the Court requested that the Special Master review the DDB and Ogilvy documents

instead.  (*See* July 31, 2007 Order at 2.)  After reviewing the documents listed on the

DDB/Ogilvy privilege log, the Special Master issued his Second Report and Recommendations

pertaining to Merck's communications with DDB and Ogilvy.  In his Report, the Special Master

recommended that all privilege claims regarding the DDB/Ogilvy documents should be denied

because Merck did not establish "that the relationship between Merck and these entities was

significantly different than a relationship it would normally have had with entities retained to

provide advertising and public relations services."  (SM Second Rep. at 7.)  However, the

Special Master did not issue any document-specific recommendations as to the DDB and Ogilvy

privilege logs.

## ARGUMENT

In his Second Report, the Special Master recognized that many courts have applied the

attorney-client privilege to communications disseminated to outside consultants.  (SM Second

Rep. at 4.)  However, the Special Master incorrectly determined that the privilege should not be

extended to legal communications shared with Merck's public relations and advertising

consultants in this case.  The Special Master is incorrect.  Contrary to the Special Master's

findings, Merck's public relations and advertising consultants functioned as the equivalent of

Merck employees when working to develop and implement the Company's public relations and

marketing strategies.  As a result, communications between Merck's in-house counsel and

Merck's public relations and advertising consultants, as well as legal communications shared

with the consultants by Merck employees, are entitled to privilege to the extent that they reveal

6

requests for – or the provision of – legal advice related to Merck's public relations and advertising strategies and materials.  In addition, to the extent that the Special Master has indicated that document-specific problems bar the application of privilege to certain documents, Merck should be given the opportunity to explain, *in camera*, its privilege claims as to those communications.

I. **THE SPECIAL MASTER CORRECTLY RECOGNIZED THAT ATTORNEY-CLIENT PRIVILEGE EXTENDS TO LEGAL COMMUNICATIONS WITH OUTSIDE CONSULTANTS THAT FUNCTION ESSENTIALLY AS COMPANY EMPLOYEES.**

A "number of cases have considered, and many have accepted . . . the application of the attorney-client privilege to communications disseminated to outside consultants."  (SM Second Rep. at 4 (citing, among others, *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994) (protecting communications shared with outside contractors where the relationship between client and contractor is "of the sort that justifies application of the privilege").)  These cases generally hold that outside consultants should be included within the scope of the corporate privilege in cases where the consultants act as the "functional equivalent" of corporate employees, the consultants require legal advice to carry out contractual obligations, and the consultants are expected to preserve the confidential nature of the privileged information.  (*See* SM Second Rep. at 4-6.)  As the Special Master himself recognized, such a rule is important in the modern corporate context – where the market often requires companies to obtain advice and services from outside consultants whose actions may subject that company to legal obligations and liability.  (*See id.* at 3.)  Under such circumstances, it is essential that these consultants be entitled to seek privileged legal advice from corporate counsel.

The seminal case addressing this issue is *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994). (*See* SM Second Rep. at 5.)  In *Bieter*, the U.S. Court of Appeals for the Eighth Circuit held that

7

the attorney-client privilege extended to an independent contractor retained to provide advice and guidance regarding a commercial and retail development, finding that there was no principled basis to differentiate corporate employees from third-party contractors who are the "functional equivalent" of employees. *Id.* at 940. In reaching this conclusion, the *Bieter* court focused on the fact that the independent contractor at issue in that case functioned as part of the corporate development team, working with corporate employees on a day-to-day basis, often attending meetings with corporate counsel, receiving communications from counsel, and taking direction from corporate leadership as to his duties and responsibilities. *Id.* at 934-39. Many other courts have agreed. *See*, *e.g.*, *Twentieth Century Fox Film Corp. v. Marvel Enter. Inc.*, No. 01 Civ. 3016 (AGS), 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002) (extending the attorney-client privilege to individuals under contract to provide Fox with production-related services because the independent contractors worked on the same team as Fox employees and had similar access to the same privileged information); *Ross v. UKI Ltd.*, No. 02 Civ. 9297 (WHP)JCF, 2004 WL 67221, at *5 (S.D.N.Y. Jan. 15, 2004) (concluding that real estate management services company "act[ed] as the functional equivalent" of employees of a holding company with respect to certain real estate transactions for purposes of the attorney-client privilege).

As the Special Master noted in his opinion, courts have reached the same conclusion with regard to public relations consultants retained by a corporation. (SM Second Rep. at 5 (citing *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001)).) In *Copper Market*, for example, the court held that communications with a "crisis management" public relations firm hired by a corporation to deal with "issues relating to publicity arising from high profile litigation" did not vitiate the attorney-client privilege. 200 F.R.D. at 215. There, the court based the application of privilege on a number of factors. First, the court noted that the public relations

8

firm "was, essentially, incorporated into [the corporation's] staff to perform a corporate function that was necessary in the context of" various litigations.  *Id.* at 219.  In addition, the public relations firm "possessed authority to make decisions on behalf of [the corporation] concerning its public relations strategy."  *Id.*  Finally, the court noted that the public relations firm often consulted the corporation's attorneys in formulating this strategy.  *Id.*  As a result, the court held that there was "no basis for excluding the [consultants'] communications with [corporate] counsel from the protection of the attorney-client privilege."  *Id.*

The policy behind these decisions is well reasoned.  In order to provide informed legal advice to its corporate client, inside counsel must be entitled to communicate freely with all individuals working within or on behalf of the company to ensure that the company's legal interests are protected.  As a result, it is improper to construe the scope of privilege narrowly in the corporate context.  The United States Supreme Court recognized as much in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), by expanding the scope of the attorney-client privilege in the corporate context, holding that corporate counsel's legal communications with all employees acting within the scope of their duties were subject to attorney-client protection.  In *Upjohn*, the Court explained that "privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client."  *Id.* at 389.  Thus, the attorney-client privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."  *Id.*  As a result, the Court found that it is improper to limit the corporate attorney-client privilege only to a small group of individuals within the organization.  Instead, the application of privilege should turn on whether the communications at issue were made by employees who possessed relevant information that would enable in-house

9

counsel to render sound legal advice.  *Id.* at 391.

The basic principles of privilege set forth in *Upjohn* support the application of privilege to legal communications with independent consultants whose actions could potentially subject the company to legal obligations or liability and who possess information necessary for corporate counsel to provide informed legal advice.  *See Bieter*, 16 F.3d at 937 ("when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors") (internal quotation omitted); *FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) ("*GSK*") (concluding with respect to public relations independent contractors that "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice") (internal citation and punctuation omitted); *W. Res., Inc. v. Union Pac. R.R. Co.*, 2002 WL 181494, at *7 (D. Kan. Jan. 31, 2002) (holding that the privilege applies to independent contractor hired to advise corporate client on technical, non-litigation issues in the coal industry and noting that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with non-employees who, due to their relationship [with] the client, possess the very sort of information that the privilege envisions flowing most freely") (quoting *Bieter*, 16 F.3d at 932-38).  Even the Special Master conceded that

> [e]xtending the corporate privilege only to persons on the corporation's payroll, rather than those employed as independent contractors may make no more sense than extending the corporate privilege to members of the corporation's control group (those who make decisions based on legal advice sought) and not those whose information is necessary for informed advice being obtained or those who need the advice to carry out the corporation's affairs,

10

which, of course, was rejected by the Supreme Court in *U.S. v. Upjohn*.

(SM Second Rep. at 6.)

In sum, it is well established that the corporate attorney-client privilege should – and does – extend to independent consultants hired by a company to act as the "functional equivalent" of corporate employees and assist the company in carrying out its business objectives. The application of privilege to legal communications with these individuals is both essential to allowing in-house counsel to collect information necessary to provide legal advice and critical to ensuring that individuals acting on behalf of a corporation receive the legal advice necessary to protect the company's interests and comply with applicable law.

## II.     THE SPECIAL MASTER ERRED IN CONCLUDING THAT MERCK'S COMMUNICATIONS WITH DDB AND OGILVY FALL OUTSIDE THE SCOPE OF PRIVILEGE.

Despite acknowledging that independent consultants retained to act as the "functional equivalents" of employees in promoting the corporation's interests *do* fall within the scope of the attorney-client privilege, the Special Master incorrectly determined that privilege does not extend to legal communications with, or disclosed to, Merck's public relations and advertising consultants. According to the Special Master, there are three key facts that distinguish Merck's relationship with its public relations and advertising consultants from the relationship between the corporation and public relations advisers at issue in *Copper Market*, and therefore preclude the application of privilege to the consultants in this case: (1) the lack of pending litigation at the time the communications were made; (2) Merck's familiarity with public relations issues; and (3) the fact that the consultants at issue worked at Merck's direction and their work was subject to Merck's approval. (SM Second Rep. at 5-6.) The Special Master is wrong on all counts.

11

### A.   Merck's Legal Communications With Its Public Relations And Advertising Consultants Were Made In The Context Of Threatened And Existing Litigation.

The Special Master's first ground for denying privilege – that Merck's communications with its public relations and advertising consultants are not privileged because the communications were made before Merck withdrew Vioxx from the market (SM Second Rep. at 5) – is wrong as a matter of law and as a matter of fact.

The Special Master stated that the court in *Copper Market* applied privilege to communications with public relations consultants because they were retained "in anticipation of an investigation by the Commodities Futures Trading Commission;" by contrast, the Special Master concluded, "Merck was facing no comparable fact pattern because it had not yet withdrawn Vioxx from the market and . . . could not have been anticipating both civil actions by formers users of the drug and an investigation by the Food and Drug Administration." (SM Second Rep. at 5.) However, nothing in the *Copper Market* decision indicates that attorney-client privilege only applies to corporate consultants when litigation is pending. Indeed, it is a general principle of privilege law, recognized in the Special Master's privilege treatise, that "privilege applies regardless of whether litigation is pending." *See* Paul R. Rice, *Attorney Client Privilege In The United States* § 2:2, at 11 (2d ed. West 1999).

In any event, it is simply untrue that Merck was not "anticipating civil actions" (SM Second Rep. at 5) at the time the DDB and Ogilvy documents were created. The vast majority of the documents at issue involve communications that took place after 2001, when the current litigation regarding Vioxx began.[2] As a result, at the time these legal communications were made, the company was already facing litigation regarding the safety of Vioxx. Because any

---

[2]     Forty-one of the 79 documents at issue are dated *after* May 2001 – the date that the first class action complaint was filed in the Vioxx litigation – and a large number of additional, undated documents appear to have been created after that date.

public statement made by Merck about the benefits or risks of Vioxx could have been used against the Company in pending product liability suits – or could have encouraged other plaintiffs to bring claims – it was essential for the company's attorneys to be in close communication with those individuals responsible for developing the Company's public relations and marketing materials. *See Copper Market*, 200 F.R.D. at 219 (noting that the "legal ramifications and potential adverse use of [public relations] communications were material factors in the development of [those] communications").

Moreover, as Merck has made clear in previous submissions to the Court regarding its privilege claims, attorney review of materials created by public relations and marketing personnel is important in the pharmaceutical context regardless of whether litigation is pending because drug manufacturers must ensure that their public statements comply with FDA regulations. Notably, other courts have held that privilege extends to a pharmaceutical company's communications with its public relations and government affairs consultants regarding the promotion of a drug – even where no litigation concerning the drug was pending. In *GSK*, for example, the D.C. Circuit reversed the district court's holding that a pharmaceutical company waived the attorney-client privilege by sharing confidential documents with its independent public relations and government affairs consultants in connection with the marketing, regulatory approval, and sale of a prescription drug. *See GSK*, 294 F.3d at 148. The circuit court held that the privilege extended to the contractors because they "needed to provide input to the [corporate client's] legal department and/or receive the legal advice and strategies formulated by counsel." *Id*. at 147.

In *GSK*, just as in the present case, the independent contractors served as marketing and public relations consultants to a pharmaceutical drug company operating within the strict

13

confines of FDA regulation.  (*See* Bucholz Decl ¶ 6; Pudloski Decl. ¶ 6.)  In addition, the

consultants in *GSK* needed advice from the corporate legal department to effectively perform

their duties while complying with the dense regulatory framework of the pharmaceutical drug

industry.[3]  The same is true with regard to Merck's consultants.  As noted above, Merck's

"Medical/Legal Board . . . was ultimately responsible for reviewing and approving the content of

proposed advertising and promotional materials that DDB created for Vioxx."  (*See* Bucholz

Decl. ¶ 8.)  Moreover, both DDB and Ogilvy routinely received, and were directed to follow,

advice from Merck legal regarding the development of advertisements and other public

statements for submission to DDMAC, the relevant regulatory body.  (*See* Bucholz Decl. ¶¶ 6, 8;

Pudloski Decl. ¶ 6.)  In addition, both DDB and Ogilvy employees "received feedback from

Merck legal and other confidential information from Merck so that they could accomplish their

work on the Vioxx project and would understand the various legal and regulatory issues facing

Merck."  (Pudloski Decl. ¶ 10; *see also* Bucholz Decl. ¶ 11.)  Finally, the independent

contractors were often the source of important advertising and marketing information provided to

---

[3]    Both the Special Master and the Court have recognized that prescription drug advertising and promotional
materials are subject to extensive federal regulation and, as a result, have already upheld the great majority of
Merck's privilege claims as to documents containing legal advice on these subjects.  The same rationale requires the
application of privilege to the documents at issue here.  DDB and Ogilvy employees were responsible for the
creation of advertising and promotional materials intended to be released to the public and therefore subject to strict
regulation.  As a result, it was essential that these individuals receive legal advice from Merck attorneys informing
them of what the Company can and cannot say, as a legal matter, in its public statements.  In light of the special
circumstances – where highly-specialized consultants worked side-by-side with company employees as part of a
team developing strategies that turn on a variety of legal considerations – the Court should recognize that protecting
the documents at issue here serves the purpose of the attorney-client privilege.

    In his Second Report, the Special Master rejected this argument out of hand, suggesting that such pervasive
regulation actually reduces the need for legal review because lay employees should be familiar enough with the
applicable regulations to provide guidance to consultants.  (SM Second Rep. at 5.)  However, this is illogical.  The
fact that Merck is subject to stringent federal regulation – and that employees may be aware of those regulations –
does not mean that "there is less need for Merck's in-house attorneys to be directly advising third parties working
with Merck."  (*Id.* at 5.)  While Merck's non-lawyer employees may be familiar with federal regulations governing
the marketing and sale of prescription drugs, they are obviously not qualified to provide legal advice as to the
intricate details of those regulations or the most legally effective way to deal with regulators.

888973v.1

Merck legal.  (*See* Bucholz Decl. ¶ 11 ("DDB was the source of relevant information ultimately provided to Merck legal, which informed the company's marketing and advertising strategies for Vioxx."); *see also* Pudloski Decl. ¶ 10.)  Thus, even if Merck had not been facing litigation risks at the time of these communications – which it was with regard to most of the communications – Merck's consultants would still have needed to engage in privileged legal communications with Merck's legal counsel, and to be informed of privileged advice from Merck's legal counsel.

**B.      Merck's Experience In Addressing Public Relations Issues Should Not Vitiate The Attorney-Client Privilege.**

The Special Master also mistakenly determined that privilege does not apply in this case because Merck, unlike the company in *Copper Market*  has "experience in dealing with issues relating to publicity arising from high profile cases" and therefore does not need public relations consultants.  (SM Second Rep. at 6.)  While the Special Master is correct that the company in *Copper Market* initially hired its public relations consultant because it lacked "experience dealing with the Western media" and had "language difficulties" in formulating public relations strategies (*id*.), nothing in the *Copper Market* decision supports the Special Master's suggestion that privilege is ***limited*** to independent consultants retained to advise a company on foreign matters or in an area with which the company is completely unfamiliar.  Indeed, many courts have applied privilege to communications with independent consultants retained to advise U.S. corporations on business matters with which the company has experience.

For example, the court in *GSK* specifically held that privilege extends to public relations consultants retained by a prescription drug company regarding regulatory approval of a drug.  *See GSK*, 294 F.3d at 148.  There is no basis for differentiating the public relations savvy of Merck versus GSK – and no court has ***ever*** suggested that the existence of privilege turns on this issue.  Indeed, in *Beiter*, 16 F.3d at 936-38, the court held that attorney-client privilege extended

to a real-estate development firm's legal communications with an independent contractor

retained to provide advice and guidance regarding a commercial and retail development, a

subject with which the company was obviously familiar.  *See also, e.g.*, *Ross*, 2004 WL 67221,

at *5 (privilege applies to real estate management services company retained by holding

company with respect to certain real estate transactions); *Twentieth Century Fox Film Corp.*,

2002 WL 31556383, at *2 (privilege applies to film studio's legal communications with its film

production contractors).  Thus, the mere fact that Merck is generally familiar with marketing and

public relations issues does not bar Merck's lawyers from engaging in privileged

communications with trained marketing consultants hired for the specific purpose of advising the

Company on that subject.

C.    **The Fact That Merck's Consultants Acted At The Company's "Direction"
      Supports Merck's Claim Of Privilege.**

The Special Master also incorrectly assumed that privilege does not apply to Merck's

consultants because, unlike the company in *Copper Market*, Merck did not give its public

relations consultants "authority to make decisions on behalf of [the Company] concerning public

relations strategy."  (SM Second Rep. at 6.)  The Special Master's suggestion that an

independent consultant does not fall within the scope of corporate privilege if it acts at the

"direction" of the company and its actions are "subject to review and approval" by the company

(*id*.), is precisely backwards.  In fact, in *Bieter*, the very case that the Special Master notes

"established the standards" for applying corporate privilege to outside consultants (*id*. at 5), the

court expressly noted that corporate privilege applies to outside consultants who work at the

direction of the corporation and its principals.

In *Bieter*, the court based its decision that corporate privilege applied to an independent

contractor on the fact that the independent contractor functioned as part of the corporate

888973v.1

development team, working with corporate employees on a day-to-day basis, often attending meetings with corporate counsel, receiving communications from counsel, and *taking direction from corporate leadership as to his duties and responsibilities*.  *Id*. at 934-39.  The court specifically noted that the fact that the independent consultant "was a member of the Bieter development team, [and] received direction from Ronald Cornwell, a principal of Bieter Company, as to his duties and responsibilities" supported the claim of privilege.  *Id*. at 939 (internal quotations omitted).  Here, Merck's consultants were similarly dependent upon Merck to define the scope of their employment and direct their actions – just like regular employees of the Company.  (*See* Bucholz Decl. ¶ 5; Pudloski Decl. ¶ 6.)  As a result, the consultants were "functional employees" of Merck for the purposes of developing and implementing Merck's public relations and marketing strategies.  Indeed, as set forth in the Second Report, the *Copper Market* decision specifically notes that in *Bieter*, the consultant at issue had been "incorporated into the client's staff to perform a corporate function."  (SM Second Rep. at 6 (quoting 200 F.R.D. at 219).)  According to the Special Master himself, this "may have been what occurred with Merck and both DDB and Ogilvy."  (*Id*.)  Thus, the consultants in this case should clearly fall within the scope of the corporate privilege.

*          *          *

In sum, the Special Master's attempt to distinguish this case from the many cases extending the attorney-client privilege to independent consultants retained to assist a company in carrying out corporate business is misguided.  Because Merck's public relations and marketing consultants worked closely with Merck employees to develop and implement Merck's public relations and marketing strategies – which were subject to intense scrutiny by both regulators and potential plaintiffs – and therefore needed to communicate with Merck's lawyers to protect the

17

Company's legal interests, these consultants fall within the scope of Merck's corporate privilege.

III.   **MERCK SHOULD HAVE THE OPPORTUNITY TO RESPOND TO THE SPECIAL MASTER'S RULINGS ON A DOCUMENT-BY-DOCUMENT BASIS AND PROVIDE INFORMATION RELATING TO THE BASIS FOR ITS PRIVILEGE CLAIMS.**

The Special Master also found that even if privilege extends to cover legal communications made to or shared with Merck's public relations and advertising consultants as a legal matter, many of the documents at issue are not privileged because they: (1) suffer from "additional confidentiality problems" precluding the application of privilege; and/or (2) are subject to other document-specific grounds for denying privilege claims. (SM Second Rep. at 8.) These findings should be rejected for multiple reasons.

*First*, the Special Master's concerns regarding the confidentiality of the documents at issue are unjustified. The contractual terms of Merck's agreements with each of the independent contractors – which were set forth in prior briefing and are available to the Special Master – are sufficient to establish that Merck's confidential communications were disclosed only to those DDB and Ogilvy consultants who needed the information in connection with their work for Merck. For example, the terms of the DDB and Ogilvy contracts explicitly note that the contractors would not disclose Merck's confidential information "to anyone other than the [contractor's] employees who need to know the same in performance of [their duties]," and that the contractors shall use the Confidential Information only in connection with the performance [of their duties] and for no other purpose. (Ogilvy Agreement ¶ 8; *see also* DDB Agreement ¶ 15 ("The Agency shall not, at any time, without [Merck's] prior written consent, disclose to any third-party any of [Merck's] Confidential Information.").) Accordingly, it is clear that the privileged communications Merck shared with its independent contractors were intended to – and did – remain confidential.

18

**Second**, Merck should be given the opportunity to present document-specific arguments to explain the additional grounds for denying privilege alluded to in the Special Master's Second Report – either to the Special Master or the Court. (SM Second Rep. at 8.)   The Special Master notes – without referring to any specific documents – that many of Merck's privilege claims fail because "the references to opinions of Merck's legal counsel were indirect and infused with the opinions of the authors" (*id.*), or because the redacted portions of the documents reflected "decisions that company executive[s] had made based on [legal] advice," not legal advice itself (*id.*).  Merck contends that the Special Master's document-specific concerns regarding Merck's privilege claims should be addressed in the same manner in which the Special Master resolved document-specific issues on the initial 2000 documents reviewed.  Specifically, Merck should be given the opportunity to submit document-by-document explanations of its privilege claims to better inform the Special Master's recommendations.  As the Court is aware, this approach was used very effectively in the Special Master's initial review – allowing the Special Master to reverse his initial privilege assessments for a majority of the documents for which Merck provided additional document-specific information.

## <u>CONCLUSION</u>

For the foregoing reasons, Merck respectfully requests that the Court reject the conclusions of the Special Master's Second Report and Recommendations and either undertake a document-by-document review of the documents listed in the DDB and Ogilvy privilege logs to determine whether they are privileged, or ask the Special Master to do so.

Dated:  August 17, 2007                           Respectfully submitted,

                                                  */s/ Phillip A. Wittmann*
                                                  Phillip A. Wittmann
                                                  STONE PIGMAN WALTHER
                                                  WITTMANN L.L.C.
                                                  546 Carondelet Street
                                                  New Orleans, Louisiana 70130
                                                  Phone:  (504) 581-3200
                                                  Fax:  (504) 581-3361

                                                  Charles W. Cohen
                                                  HUGHES HUBBARD & REED, LLP
                                                  One Battery Park Plaza
                                                  New York, N.Y. 10004-1482

                                                  John H. Beisner
                                                  Jessica D. Miller
                                                  O'MELVENY & MYERS, LLP
                                                  1625 Eye Street, N.W.
                                                  Washington, D.C. 20009

                                                  Douglas R. Marvin
                                                  WILLIAMS & CONNOLLY LLP
                                                  725 Twelfth St., N.W.
                                                  Washington, DC 20005
                                                  Attorneys for Merck & Co., Inc.

888973v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Merck & Co., Inc.'s Objections to the Special Master's Second Report and Recommendations has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 17th day of August, 2007.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

888973v.1