# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO** | * | |
| **ALL CASES** | * | |
| | * | |
| | * | **MAG. JUDGE KNOWLES** |

* * * * * * * * * * * * * * * * * * * * * * * * *

### DECLARATION OF MOLLY E. BUCHHOLZ

I, Molly Buchholz, declare and state as follows:

1. Except as otherwise stated, I am familiar with the matters stated herein from personal knowledge.

2. I am currently employed by DDB Communications Group Inc. ("DDB") as Account Director. I have worked at DDB for four years. I served as the Management Supervisor for DDB's work for Merck and Co., Inc. ("Merck") to develop creative strategies for marketing and advertising Vioxx® ("Vioxx") in compliance with applicable federal regulations. In that capacity, I was responsible for coordinating the development of marketing strategies and materials for Merck on Vioxx. Although I started working for DDB in 2002, I became familiar with DDB's prior work for Merck as part of my responsibilities as Management Supervisor.

3. It is my understanding that plaintiffs are challenging the nature of the relationship between DDB and Merck with regard to documents that reflect legal advice sought from Merck's attorneys by DDB in the course of performing its Vioxx-related duties for Merck.

4. During my employment at DDB, the relationship between DDB and Merck was one of trust and confidence and required routine interaction and communication. At all times while I was employed at DDB, DDB operated to provide its best efforts to promote Merck's interests. It

is my understanding that this was the case from the beginning of DDB's servicing of the Merck account.

5. I understand through a review of the contract between DDB and Merck that the relationship between DDB and Merck was formalized by written agreement dated December 18, 1998 (the "Agreement"). At that time, DDB was retained by Merck to create advertising and promotional programs for Vioxx. DDB was tasked with creating a multi-pronged consumer campaign which included, but was not limited to, newspaper, magazine and broadcast advertisements. DDB offered general marketing advice to Merck and formulated and submitted a proposed Vioxx-advertising plan to Merck. At all times DDB was required to obtain Merck's approval before placing any advertisements and was a disclosed agent for Merck with respect to such advertising. Indeed, DDB was not permitted to act with respect to any advertising plan without Merck's prior approval, and was always understood to be operating at Merck's direction and instruction. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

6. Under the Agreement, Merck retained the right to, at any time and in its sole discretion, terminate its relationship with DDB and direct DDB to cease work on any advertising materials. Merck, at all times, reserved the right to revise advertising materials to comply with applicable laws and regulations related to product labeling and advertising. Because all Vioxx advertising was subject to review by the Department of Health and Human Services Division of Drug Marketing, Advertising and Communications ("DDMAC"), DDB routinely communicated with Merck's legal department ("Merck legal") via senior Merck employees to develop submissions to DDMAC and to implement DDMAC's suggested changes to proposed ads. This arrangement necessitated regular communication between DDB and Merck employees relaying instruction and clarification from Merck's legal department regarding applicable laws and regulations. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

M006720702

7. Moreover, DDB rendered its undivided loyalty and allegiance to Merck. DDB employees were explicitly instructed not to disclose confidential information to persons outside Merck without receiving prior, written permission from Merck. Under the agreement, there was a contractual duty of confidentiality between DDB and Merck. Accordingly, DDB kept confidential all communications from Merck, including advice from Merck counsel relayed to DDB by senior Merck employees. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

8. In my dealings with Merck, Merck had a Medical/Legal Board that was ultimately responsible for reviewing and approving the content of proposed advertising and promotional materials that DDB created for Vioxx. To the best of my knowledge, the Medical/Legal Board included a physician and a regulatory attorney. The regulatory attorney was ultimately responsible for making sure that the materials DDB created in connection with its Vioxx-related work complied with the product labeling and all relevant laws and regulations. DDB employees were routinely directed by senior Merck employees to follow advice from the Medical/Legal Board with regard to Vioxx advertising strategies in order to ensure corporate compliance. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

9. In my dealings with Merck, with respect to the day-to-day interactions between DDB and Merck, DDB employees participated in meetings at Merck's offices on a regular basis and communicated with members of Merck's Medical/Legal Board via senior Merck employees regarding Vioxx on a regular basis. As a result of their interactions with the members of Merck's Medical/Legal Board, senior Merck employees provided DDB employees with legal advice to ensure that Merck's efforts to develop and market Vioxx complied with federal regulations. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

3

M00672O703

10. In my dealings with Merck, DDB also worked routinely with Merck legal via interactions with other Merck employees. Employees of DDB were copied on communications by and between Merck's in-house attorneys and other Merck employees. In my experience, DDB employees worked alongside Merck employees as members of Merck's advertising team for the drug Vioxx. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

11. In short, since I have been employed by DDB, and it is my understanding that this was the case from the beginning of the Agreement, DDB employees were in regular contact with full-time senior Merck employees regarding the Vioxx advertising initiative. DDB employees needed the approval of the Merck team assigned to deal with Vioxx-related advertising issues that were completely intertwined with the highly technical regulatory and legal issues that accompany the marketing and advertising of prescription drugs. In addition, DDB was the source of relevant information ultimately provided to Merck legal, which informed the company's marketing and advertising strategies for Vioxx. Thus, DDB employees received copies of legal communications and other confidential information so that they could accomplish their work on the Vioxx project and would know the various legal and regulatory issues facing them. This is how the relationship was since I began working at DDB and it is my understanding that this is how the relationship was since the beginning of DDB's servicing of the Merck account.

12. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2006.

*Molly Buchholz*

4