# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| THIS DOCUMENT RELATES TO ALL CASES | * | JUDGE FALLON |
| | * | MAG. JUDGE KNOWLES |

## DECLARATION OF SHERRY PUDLOSKI

I, Sherry Pudloski, declare and state as follows:

1. Except as otherwise stated, I am familiar with the matters stated herein from personal knowledge.

2. I am currently employed by Ogilvy Public Relations Worldwide, Inc. ("Ogilvy") as Managing Director, Global Healthcare Practice. I have worked at Ogilvy for over eleven years. In my role as Team Leader for Vioxx and Merck Relationship Manager, I served as the manager for Ogilvy's partnership with Merck and Co., Inc. ("Merck") and I was responsible for developing and implementing public relations plans for Vioxx® ("Vioxx"). Ogilvy would work with its public affairs contacts at Merck and their respective colleagues to ensure compliance with applicable federal regulations. In that capacity, I was responsible for coordinating efforts to assist Merck in developing public affairs materials.

3. I have been informed that plaintiffs are challenging the nature of the relationship between Ogilvy and Merck with regard to documents that came into Ogilvy's possession and/or were created by Ogilvy that reflect legal advice from Merck's attorneys in the course of performing its Vioxx-related duties for Merck.

4. The relationship between Ogilvy and Merck was one of trust and confidence, required routine interaction and communication, and was designed to foster a creative, mutually beneficial

relationship between the two organizations, resulting in successful communications plans for Merck's products. At all times, Ogilvy operated to provide its best efforts to promote Merck's interests.

5. The relationship between Ogilvy and Merck for Vioxx was formalized by agreement dated 1998. Ogilvy was retained by Merck to assist in developing and implementing public relations plans for Vioxx. To carry out its mission on behalf of Merck, Ogilvy reviewed Vioxx studies provided by Merck, offered general public relations advice to Merck, and formulated and submitted proposed communications strategies to Merck for Vioxx. Ogilvy was not permitted to act with respect to any communications plan without Merck's prior approval, and was always understood to be operating at Merck's direction and instruction.

6. It was understood that Merck retained the right to, at any time and in its sole discretion, terminate its relationship with Ogilvy and direct Ogilvy to cease work on any communications materials, projects, or initiatives. Ogilvy was aware that Merck, at all times, reserved the right to change communications, materials and strategies to comply with applicable laws and regulations. Because some Vioxx marketing materials were submitted to the Department of Health and Human Services Division of Drug Marketing, Advertising and Communications ("DDMAC") for review and comment, Ogilvy received advice from Merck's legal department ("Merck legal") through senior Merck employees regarding the content of submissions to DDMAC for review and comment and to implement DDMAC's suggested changes to proposed public statements and public affairs materials in accordance with instructions from Merck's public affairs department. Ogilvy worked with Merck's senior public affairs employees, who obtained legal clearance to develop submissions. Ogilvy employees were routinely directed by Merck senior public affairs staff to follow advice from Merck legal on regulatory matters to ensure corporate compliance.

7. Moreover, Ogilvy rendered its undivided loyalty and allegiance to Merck. Ogilvy employees were explicitly instructed not to disclose confidential information to persons outside Merck without receiving prior, written permission from Merck. There was a contractual duty of

2

M003353994

confidentiality between Ogilvy and Merck. Accordingly, Ogilvy kept confidential all feedback from Merck legal, generally relayed to Ogilvy by other Merck employees.

8. It is my understanding that Merck's in-house lawyers and doctors were ultimately responsible for reviewing and approving the content of proposed communications materials that Ogilvy created for Vioxx. The doctors were ultimately responsible for making sure that the materials Ogilvy created were scientifically accurate, and the attorneys were ultimately responsible for making sure that the materials Ogilvy created were consistent with all relevant laws and regulations.

9. With respect to the day-to-day interactions between Ogilvy and Merck, Ogilvy employees participated in Vioxx-related meetings taking place at Merck's offices. Occasionally, Ogilvy attended meetings with Merck lawyers and received Vioxx-related communications by and between Merck's in-house lawyers and other Merck employees. In my experience, Ogilvy employees worked alongside and under the direction of Merck employees as part of the Vioxx public affairs team.

10. In short, Ogilvy employees acted as part of a team with full-time Merck employees regarding the Vioxx public relations initiatives and, thus, the Ogilvy associates became integral to the Merck team assigned to deal with public relations. In addition, Ogilvy was tasked with providing Merck employees with relevant information that was ultimately conveyed to Merck legal to inform them of the company's public affairs strategies for Vioxx. Thus, Ogilvy employees received feedback from Merck legal and other confidential information from Merck so that they could accomplish their work on the Vioxx project and would understand the various legal and regulatory issues facing Merck.

11. I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2006.

Sherry Pudloski

3