# Exhibit 4

Merck & Co., Inc
P.O. Box 4
West Point PA 19486-0004

# ADVERTISING AGENCY AGREEMENT 

AGREEMENT entered into as of this 1st day of September, 1998, by and between U.S. Human Health, Division of Merck & Co., Inc., a New Jersey corporation (hereinafter called the "Advertiser"), with offices at West Point, Pennsylvania 19486, and DDB Needham Communications Group, Inc., 437 Madison Avenue, New York, NY, 10022 (hereinafter called the "Agency"), a New York corporation:

## 1. APPOINTMENT

The Advertiser hereby retains the Agency, and the Agency hereby agrees to serve the Advertiser, in connection with the creative development of a Direct-to-Consumer advertising plan for the products listed in Addendum A which shall include, but not be limited to, the development of Advertiser's journal advertisements, broadcast advertisements, and any other advertising materials (referred hereinafter to as "Advertising Material") used to promote the Advertiser's Products. For purposes of this Agreement, "Products" shall mean those products and services, as the Advertiser may from time to time notify the Agency in writing to promote.

## 2. DUTIES OF THE AGENCY

The Agency shall perform the following services:

(a) Study the Products assigned by the Advertiser by reviewing, from an advertising point-of-view, all of the literature provided by the Advertiser that is related to the Products and the Products' uses;

(b) Offer general marketing consultation to the Advertiser with respect to the Products;

(c) Utilize its knowledge of distribution and sales in the promotion of the Products;

(d) Advise the Advertiser of available media that can be used to promote the Products;

(e) Employ the information received through its study of the Products and its consultation with the Advertiser to formulate and submit to the Advertiser a

MRK-AIG0000031

M0067207756

comprehensive advertising plan within the scope of the budget previously authorized by the Advertiser and set forth in Addendum A attached hereto;

(f) The Agency shall obtain approval in writing from the Advertiser of the advertising plans submitted by the Agency before incurring any liability to third parties in connection with such advertising plans. Furthermore, the Agency shall place no Advertising Material related to the Products or the Advertiser in any media without the prior written approval of the Advertiser of the text and designs of such Advertising Material and the media in which it is proposed to be placed;

(g) When the services of a third party are required to produce the Advertising Materials, the Agency shall contract for that work with the Advertiser's authorized contract vendors or other third parties previously approved of by the Advertiser. The Advertiser will provide a list of authorized contractors to the Agency. In the event that a contractor previously approved of by the Advertiser cannot be utilized, the Agency shall obtain estimates and written proposals in accordance with Merck's procurement policy and the Advertiser's written approval before selecting a contractor to work on production related to this Agreement.

Any electronic prepress requirements should be directed to the Advertiser's selected Pre-Press Supplier. The pre-press supplier is responsible for final preparation of all materials related to printed promotional materials. Subsequent to Advertiser approval, the Agency shall be responsible for delivering the appropriate files to the supplier via either electromagnetic media (ZIP, JAZ, SyQuest, etc.) or acceptable electronic file transfer (WamNET, ISDN, Internet-PDF, etc). Any exceptions to utilization of the Advertiser supplier requires the written approval of the Manager of Promotional Operations (Harold Rupell).

The Agency is responsible for the integrity of the files supplied to the Advertiser. In the event that the files supplied to the Advertiser require manipulation by the Advertiser or Advertiser assigns, due to cause by the Agency, the Agency shall issue a credit to the Advertiser for any time spent to rework said files. The credit shall consist of the total for all time spent by client charged at the Agency studio rate. In lieu of this credit, Agency shall reserve the right to rework the files, at no additional charge for time, until the specifications of the Merck Studio Manager (Maria Bambi) are obtained.

If the promotional material is a printed piece to be inserted into a magazine or periodical, the agency shall direct this work through the Advertiser's select supplier identified. The appropriate Advertiser production contact will facilitate the steps necessary to allow for this to occur.

(h) Upon written approval by the Advertiser of the advertising plan submitted by the Agency, the Agency shall, at the Advertiser's direction and instruction, as confirmed in writing by the Advertiser on the Action Memo form provided as Addendum B hereto, perform tasks that may include, but not be limited to, the following:

-2-

MRK-AIG0000032

M006720757

(1) Conceive, draft, design and illustrate the Advertising Material for the Products;

(2) Supervise the necessary preparation of the Advertising Material from the integration of copy and art through production to the delivery of materials;

(3) Enter into contracts in the Agency's name, at the most favorable rates available, for the work necessary for the preparation of the Advertising Material;

(4) Provide general account supervision for the handling and development of all agreements with third parties related to the Advertising Material;

(5) Retain custody of the Advertiser's property and, when deemed necessary by the Advertiser or Agency, obtain its return from third parties.

(i) The Agency shall submit six (6) copies of all finalized and approved Advertising Materials to Advertiser at the time of publication.

(j) Projects produced by Agency. All promotion materials developed by Advertiser or an Agency contracted by Advertiser, are required to be submitted by Advertiser to the FDA within 5 days of intended first use. For projects that the Agency has been given the responsibility of producing, the Agency shall be required to send 10 samples and actual first use date of said projects immediately upon completion of project to:

> Merck & Co. Inc.
> P.O. Box 4
> Attn: Gail Ryan, Office of Medical/Legal, WP37C-116
> West Point Pa, 19486-0004

(k) In addition, a complete and accurate electronic copy of each project which includes all print, CBD, Internet and Intranet programs, journal ads, TV ads, video tapes, slides, audiotapes, must be submitted in an electronic format as defined and acceptable by Advertiser to:

> Merck & Co. Inc.
> P. O. Box 4
> Attn: Maria Bambi, WP 37B-116
> West Point Pa, 19486-0004

## 3. COOPERATION

The Agency agrees to devote its best efforts to the promotion of Advertiser's interest, and the Advertiser agrees to assist the Agency in doing so by making available to it required information pertaining to the Products and to cooperate with the Agency in expediting its review of all advertising plans and Advertising Material submitted to it for

MRK-AIG0000033

M0067207S8

approval by the Agency. The Agency agrees to use its best efforts to submit Advertising Materials to the Advertiser's Promotion Manager on a timely basis, reasonably in advance of meetings scheduled for the review of such Advertising Materials. The Agency will endeavor to the best of its ability to guard against any loss to the Advertiser due to the failure of media or suppliers properly to execute their commitments, but the Agency shall not be held responsible for failures of performance on the part of media or suppliers that are not within the control of the Agency.

4. COMPENSATION

For the services to be rendered to the Advertiser hereunder, the Agency shall invoice the Advertiser, and the Advertiser shall pay the Agency as follows:

(a) As compensation for the Agency's professional services, the Advertiser shall pay to the Agency an amount to be determined in accordance with Addendum A, based on an annual fee, which is the product of an agreed upon scope of work, percentage of time staffing plan and the agency's cost multiplier  The annual fee shall be divided into twelve (12) monthly payments, provided the Agency meets all of its duties under this Agreement.

The Agency shall provide the Advertiser with a quarterly reporting of percentage of time staffing plan by name, title and discipline, comparing the actual to date with the original projected staffing plan . The Agency shall provide the Advertiser with a quarterly reconciliation, using the forms provided as Addendum D hereto, comparing actual hours and expenses with projected hours, expenses and monthly fee. After six and nine months of the contractual period, the Agency shall provide an amended staffing plan for the entire year (actuals to date and amended projected staffing plan for the remainder of the year.)  The Agency will bill or credit the Advertiser the difference between the actual fee and projected fee at the end of the contract period should it vary more than ten percent of the annual fee. The agency must obtain written approval from the Advertiser prior to the fee amount exceeding the contracted amount.

(b) Charges for Agency's Studio time will be invoiced at the hourly rate listed in Addendum C.

(c) The Agency will serve as the agent for production and principle for media when requested by the Advertiser in writing in accordance with Section 2 (g) of this Agreement. The Agency will advise the Advertiser, in a timely fashion, and shall obtain the Advertiser's written approval, in the event that the estimated out-of-pocket expenses for any Product is likely to deviate from the projected cost by more than five percent (5%).

(d) The Advertiser shall reimburse the Agency for separately itemized reasonable travel expenses (transportation, lodging and meals) incurred by the Agency at the written request of the Advertiser upon receipt by the Advertiser of evidence of the actual charge

MRK-AIG0000034

M006720759

or cost to the Agency with no mark-up or overhead adjustment. It is expected that expenses for lodging, meals and transportation shall be at reasonable rates and that the Agency will exercise prudence in incurring such expenses. The Advertiser shall not reimburse the costs of first class travel unless pre-authorized and expects that travel arrangements will take advantage of any available cost-effective discounts or special rates. The Advertiser shall not reimburse the Agency for travel time of its employees or agents.

(e)  The Advertiser shall also reimburse the Agency for any extraordinary costs for long distance telephone, telefax charges and authorized mail expenses that are above and beyond the normal course of account services. All receipts must be submitted to the Advertiser as evidence of such expenses.

(f)  The Advertiser will not reimburse the Agency for telephone charges, travel expenses and travel time between the Agency's office in New York and the Advertiser's office in West Point, Pennsylvania.

(g)  Two months prior to the end of the contractual period, the Advertiser and the Agency will review the hours spent in servicing the Advertiser's account and mutually agree on hours and fees for the following year, and Addendum A and Addendum B hereto shall be amended in writing accordingly.

(h)  The pricing established in Addenda A and B shall be considered fixed until amended via an addendum to the original contract. An addendum to the original pricing will be added by mutual consent of the Advertiser and the Agency at such a time that each party determines that such is required. Up until the time that nay such addenda are put in place, invoicing shall continue at the existing contracted rates.

5.  BILLINGS TO THE ADVERTISER

(a)  The Advertiser shall pay to the Agency an amount equal to the out-of-pocket cost to the Agency, with no mark-up or overhead adjustment, of externally provided advertising production and preparation as authorized in writing by the Advertiser including, but not limited to, the following items:

(1)  For Broadcast Advertising:

(i)  Talent and production for radio and television commercials and programs, motion pictures, slides, and slide films and videotapes;

(ii)  Jingles, musical arrangements and production, recordings, special writers, production, supervisors, kinescopes and filmed videotapes;

-5-

MRK-AIG0000035

M006720760

(iii) Expenses incurred in securing testimonials, and the right to use names or likenesses of individuals and copyrighted materials;

(iv) All other costs incurred in the production of broadcast advertising;

(2) For Printed and Personal Computer-Based Advertising:

(i) All costs for externally provided artwork, whether done manually or by use of a computer, including semi-comps; comps; special but not rough layouts; storyboards; finished art and mechanical production; photographs; photostats; typesetting and proofs; engraving; mats; mechanicals; printing; photocopying; viewgraphs; slides; and similar items;

(ii) Expenses incurred in securing testimonials, and the right to use names or likenesses of individuals and copyrighted materials.

(b) For the production of collateral materials, which includes, but is not limited to, brochures, banners, statement stuffers, posters, signage, and other similar materials, the Advertiser will be billed for all out-of-pocket costs for such materials prepared or purchased for it, pursuant to its authorization, at cost of such materials to the Agency with no mark-up or overhead adjustment.

(c) Invoices submitted by the Agency to the Advertiser covering all out-of-pocket expenses (non-media expenses) incurred by the Agency on the Advertiser's behalf shall be accompanied by copies of the itemized invoices submitted by third parties to the Agency for such expenditures or all invoices and media tear sheets be made available upon request of the Advertiser. Invoices from the Agency for expenses shall itemize all such expenses.

(d) The Agency shall submit invoices to the Advertiser on a monthly basis, which shall cover fees for the Agency's services under this Agreement, as well as all out-of-pocket expenses, for the preceding month. All out of pocket costs shall be tracked on a project basis. All hourly charges shall be supported by accurate time records maintained by the Agency and shall be available for inspection by the Advertiser in accordance with Section 11 hereof. If requested by the Advertiser, the Agency agrees to participate in a third party audit of fees and charges. If an audit is requested, the Advertiser will bear the costs of such audits. Payment of all invoices shall be net (30) days from date of invoice.

(e) The Agency will refund or credit to the Advertiser any and all discounts, rebates, commissions, differentials and similar items received by the Agency including, but not limited to, any discounts received by the Agency as a result of quantity or special purchases provided the Agency receives the Advertiser's payments in accordance with contract payment terms in this Agreement.

MRK-AIG0000036

M0067207761

(f)  The Advertiser expects to be charged a reasonable fee for the Agency's professional services. The fee shall be based upon an agreed annual fee to be paid on a monthly basis. The Agency executive who is in charge of the Advertiser's account will personally review the Agency's bill (and review and approve the bill of any third party engaged by the Agency to perform work related to this Agreement) and determine that the fee is consistent with these guidelines before forwarding it to the Advertiser. Time spent in preparing or reviewing bills is not chargeable to the Advertiser.

Invoices should be submitted to the attention of:

> Merck & Co. Inc.
> P.O. Box 307
> Financial Services Department WP39-427A
> West Point, PA   19486-0004

Please include purchase order number as assigned and job number which have been assigned to this agreement. The assigned purchase order number will remain in effect through the entire term of the contract.

6.  RIGHTS RESERVED TO THE ADVERTISER

(a)  The Advertiser expressly reserves the right, in its sole discretion, and for any reason deemed by it to be sufficient, to modify or reject any schedules, plans or Advertising Materials submitted by the Agency, whether or not such schedules, plans or Advertising Materials had been previously approved by the Advertiser, and to direct the Agency, with confirmation in writing, to cease work thereon. The Agency, upon receipt from the Advertiser of a directive to cease work, shall immediately notify, with confirmation in writing, all publishers, printers, engravers, artists, designers, or third parties engaged in carrying out such schedules, plans or Advertising Materials to cease work thereon. It is expressly agreed that the Advertiser shall reimburse the Agency for all reasonable costs and expenses incurred by the Agency up to the time of receipt of such notice to cease work if such costs and expenses are noncancellable or nonrefundable and for all charges and liabilities incurred by the Agency in canceling the work pursuant to the Advertiser's directions.

(b)  All Advertising Materials are subject to written approval by the Advertiser. The Advertiser reserves the right to make changes to the Advertising Materials as the Advertiser deems necessary to conform those materials to the Product labeling, applicable laws and regulations and the Advertiser's policy. It is expected that all Agency employees involved in the production of Advertising Material will have a working knowledge of the Product labeling, applicable laws and regulations, and the Advertiser's policy. Advertiser reserves the right not to pay for multiple drafts of Advertising Materials if the need for such drafts is caused by the Agency's lack of familiarity with the Product labeling, applicable laws and regulations, or the Advertiser's policy.

-7-

MRK-AIG0000037

M0067207<br>62

7. OWNERSHIP OF PROPERTY AND COPYRIGHTS

(a) All advertising plans, preliminary sketches, layouts, copy, "commercial" material, films, and Advertising Materials prepared by the Agency under the terms of this Agreement shall become the exclusive property of the Advertiser including any division, subsidiary or associated company of the Advertiser, provided Agency has been paid in full therefore, and the Agency acknowledges that it shall have no rights with respect to such property.

(b) All work prepared by the Agency under this Agreement shall be considered a work made for hire for the Advertiser. All right, title, interest and copyrights worldwide in and to the ideas, writings designs, artwork and other work prepared by the Agency under this Agreement (the "Developments"), including all rights in and to any renewal and extension of copyrights, shall as between the Agency and the Advertiser become and remain the sole and exclusive property of the Advertiser subject only to reserved third party rights. The Agency further agrees that it shall, upon the request and at the expense of the Advertiser, execute and deliver any and all instruments, documents and papers, give evidence and do any and all other acts which, in the opinion of the Advertiser, are or may be necessary or desirable to enable the Advertiser to acquire, maintain and enforce any and all trademark registrations and copyrights under the United States or foreign law with respect to any such Developments or obtain any extension, validation, reissue, continuance or renewal of any such trademark or copyright. If the Agency is unable to provide such copyrights and trademarks, the Advertiser will be notified in writing.

8. LIABILITY

(a) The Agency shall be solely responsible to third parties with whom it may deal in carrying out the terms of this Agreement, and the Agency shall hold the Advertiser harmless from, and against any loss or expenses, including reasonable attorneys' fees, the Advertiser may sustain or incur as a result of any claim, suit or proceeding ("Claim") made, brought or threatened by third parties including, but not limited to, any Claim based upon contracts made between the Agency and such third parties except as set forth in Section 8(b), invasions of privacy, libel, slander, unfair competition or defamation of character or product. The provisions of this Section 8(a) shall not apply to (1) the contents of Advertising Materials that have been specifically approved in writing by the Advertiser in advance of publication, unless the Claim arises because of the Agency's material failure to perform its obligations under this Agreement, or (2) Claim that arises as a result of the sole negligence of the Advertiser.

(b) The Advertiser agrees to indemnify the Agency from and against any loss or expenses, including reasonable attorneys' fees, the Agency may sustain or incur as the result of any Claim, made, brought, or threatened against the Agency, arising 1) out of assertions made in Advertising Materials that the Agency prepared for the Advertiser and which the Advertiser approved prior to publication, 2) any Claim arising out of the use of any Products, unless such Claims arise because of the Agency's material failure to

-8-

MRK-AIG0000038

M006720763

perform its obligations under this Agreement and 3) financial obligations of third party contracts entered into by Agency for and on behalf of Advertiser except to the extent that Agency has previously received payment from Advertiser as is properly allocable to such contract.

The provisions of this Section 8 shall survive the termination of this Agreement.

## 9. THIRD PARTY APPROVALS AND RELEASES

The Agency shall secure all necessary written consents, authorizations, and approvals from third parties for use of approved Advertising Material worldwide, and the Agency shall obtain a valid and binding written release from any and all persons whose likenesses, names or photographs are utilized in Advertising Materials and shall provide the Advertiser with a copy of each such written release. If the Agency is unable to obtain such valid and binding written release, the Agency must notify the Advertiser with a written statement.

## 10. ADVERTISER'S LIABILITY POLICY

The Agency agrees throughout the period of this Agreement to maintain in full force and effect, as its sole cost and expense, an Advertiser's Liability Policy in an amount not less than One Million Dollars ($1,000,000) per incident. The Agency shall provide the Advertiser with a certificate from the insurer evidencing insurance coverage and agreeing to notify the Advertiser at least thirty (30) days in advance of any cancellation or modification of such insurance coverage.

## 11. EXAMINATION OF AGENCY RECORDS

Information in the Agency's files that relates directly to the business of the Advertiser, including but not limited to, invoices received from media and suppliers, payment of third party invoices, time records of the Agency covering billing for work authorized by the Advertiser on an hourly basis and expense records covering costs billed to the Advertiser, shall be open for inspection and examination by an authorized representative of the Advertiser at all reasonable times provided that the Advertiser gives the Agency reasonable prior notice. Payroll and other compensation related data for individuals are excluded from examination, however, general compensation data and compensation data by title shall be made available upon request. All examinations of records shall take place at the site at which the records are regularly kept and shall be at the Advertiser's sole expense.

## 12. TERM OF AGREEMENT

(a) This Agreement shall continue in effect until terminated by either party hereto by the giving of sixty (60) days prior written notice of termination.

MRK-AIG0000039

M006720764

(b) The rights, duties and responsibilities of the Agency and the Advertiser shall continue in full force and effect during the period of time between the date when a party to this Agreement gives such written notice of termination and sixty (60) days after such notice is given (the "Notice Period").

(c) After the expiration of the Notice Period, neither party shall have any rights or obligations under this Agreement, regardless of any plans that have been made for future advertising, except for claims and liabilities arising out of the performance of this Agreement during its lifetime and except for any indemnification obligation that arises pursuant to Section 8 hereof.

(d) Upon termination of this Agreement, and provided that all sums required in accordance with this Agreement to be paid by the Advertiser to the Agency have been paid in full, the Agency shall transfer and make available to the Advertiser all property and materials in the Agency's possession or control belonging to the Advertiser, all information regarding the Advertiser's Advertising Material, and if approved by third parties in interest, shall assign all reservations, contracts and arrangements with advertising media or others for advertising space, time, materials or services yet to be used, and all rights and claims thereto and therein, and no compensation shall be paid to the Agency for its service in connection with this such assignment.

(e) Upon termination of this Agreement, any uncompleted work previously authorized by the Advertiser, either specifically or as part of an advertising plan, will be paid for, to the extent of commitments made by the Agency with the knowledge and written consent of the Advertiser in accordance with the provisions of this Agreement.

### 13. BILLING UPON TERMINATION

Upon termination of this Agreement, the Agency shall bill the Advertiser for, and the Advertiser shall then pay, all amounts not previously billed or paid and for which the Agency is entitled to claim reimbursement from the Advertiser under the terms of this Agreement.

### 14. PERSONAL SERVICE CONTRACT

Neither party shall assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party.

### 15. CONFIDENTIAL INFORMATION

The Agency shall render undivided loyalty and allegiance to the Advertiser in relation to its obligations under this Agreement. The Agency shall not, at any time, without Advertiser's prior written consent, disclose to any third party any of the Advertiser's Confidential Information. The Agency shall keep such information secret and confidential and cause its employees and representatives to keep such information

MRK-AIG0000040

M006720765

secret and confidential and shall take reasonable precautions to prevent any unauthorized use or disclosure of the Confidential Information. For purposes of this Agreement, "Confidential Information" means any information of the Advertiser, whether of a technical, business or other nature, including but not limited to, information which relates to the Advertiser's trade secrets, Products, Advertising Materials, Developments, proprietary rights or business affairs. Confidential Information does not include any information that:

(a) the Agency can prove was known to it prior to the date of this Agreement and any other agreement between the parties hereto;

(b) the Agency can prove it independently developed without the use of the Advertiser's Confidential Information;

(c) the Agency can prove was lawfully obtained from a third party without any obligation of confidentiality; or

(d) is or becomes part of the public domain through no act or violation of any obligation of the Agency.

Notwithstanding the foregoing, Agency may disclose confidential information to the extent that such disclosure is required by a court or governmental agency of competent jurisdiction.

16. APPROVALS

It is Merck policy that no Agency can include references to Merck as a client or references to any of Merck products, including but not limited to, advertisements, interviews, presentations to prospective clients, articles, or advertising materials, without the prior written approval of Merck. Any breach of this provision shall be grounds for immediate termination of this Agreement by Merck.

17. CONFLICT OF INTEREST

The Agency agrees that, during the period in which it renders service to the Advertiser, it will not contemporaneously render services to a third party relating to medicinal treatments for the same product category or disease entity for which it is rendering services to the Advertiser.

18. ENFORCEMENT

Each party shall have the right at all times to enforce the provisions of this Agreement in strict accordance with the terms hereof notwithstanding any conduct or custom on its part in refraining from doing so at any time. The failure of any party at any time to enforce its rights hereunder strictly in accordance with the same shall not be

MRK-AIG0000041

M0067206

construed as having created a custom contrary to the specific provisions hereof or as having in any way modified or waived the same.

## 19. GOVERNING LAW

This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed under the laws of the Commonwealth of Pennsylvania without reference to principles of conflicts of laws.

## 20. ARBITRATION

Any controversy, claim or dispute arising out of or relating to the performance, construction, interpretation or enforcement of this Agreement, including disputes as to the scope of this clause, shall be resolved through good faith negotiations between the parties. If such efforts prove unsuccessful, all such controversies, claims or disputes shall be submitted to binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq. Arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration award shall be final and binding and it may be confirmed and enforced in any court of competent jurisdiction. The arbitration proceeding shall commence no later than forty-five (45) days from the date of the selection of the arbitrator. The arbitrator shall issue the Award no later than thirty (30) days from the close of the hearing. Each party shall pay for all attorney fees it incurred in connection with the arbitration. Each party shall share equally in the costs of the arbitration.

## 21. NOTICES

Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent by a telegram or a telefax (with transmission confirmed) or by registered or certified mail, return receipt requested and postage prepaid, or by Federal Express or an equivalent overnight delivery service, addressed to the parties at their respective addresses first set forth above or to such other addresses at which notice of change shall have been given. Such notice, request, demand, waiver, consent, approval or other communication shall be deemed to have been given as of the date so delivered, telegraphed or telefaxed, or on the fifth day after deposit in the United States mail, or on the second day after deposit with Federal Express or an equivalent overnight delivery service.

## 22. HEADINGS

The headings in this Agreement are for convenience only and do not in any way limit or amplify the terms or conditions in this Agreement.

## 23. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and all prior agreements with respect thereto are superseded hereby. No amendment or modifications hereof shall be binding unless in writing and duly executed by authorized representatives of both parties.

## 24. SEVERABILITY

The provisions of this Agreement shall be severable, and if any provision of this Agreement is held to be invalid or unenforceable, it shall be construed to have the broadest interpretation which would make it valid and enforceable. Invalidity or unenforceability of one provision shall not affect any other provision of this Agreement.

## 25. NO BENEFIT TO OTHERS

The provisions set forth in this Agreement are for the sole benefit of the parties hereto and their successors and assigns, and they shall not be construed as conferring any rights on any other persons.

## 26. COUNTERPARTS

This Agreement may be executed in one or more counterpart copies, each of which shall be deemed an original and all of which shall together be deemed to constitute one agreement.

## 27. STANDARD OPERATING PROCEDURES

Upon award of business, Agency is to contact Harold Rupell at (215) 652-8697 to review Merck's production and electronic communications standards.

*[Handwritten annotation: Omit paragraph 29 (all)]*

## 29. CENTURY DATE CHANGE REQUIREMENTS

(a) Agency represents and warrants the services under the Duties of the Agency listed above will, under normal use and service, record, store, process, and present calendar dates falling on or after January 1, 2000, in the same manner, and with the same functionality, as the services under the Duties of the Agency listed above records, stores, processes, and presents calendar dates on or before December 31, 1999. Agency warrants that the services included under the Duties of the Agency will lose no functionality with respect to the introduction of records containing dates falling on or after January 1, 2000 and ensures that the services included in the Duties of the Agency will be interoperable with other software used by Merck which may deliver records under the Duties of the Agency, receive records from the Duties of the Agency, or interact with the Duties of the Agency listed above in the course of processing dates.

-13-

MRK-AIG0000043

M006720768

(b) In the event of a breach of the Century Date Change Requirements representation and warranty referred to in paragraph a) above, which precludes Advertiser from successful operation of its data processing system and/or an application or component critical to operation of such data processing system, Agency will begin work within one hour after telephonic notice by Advertiser on rectifying Advertiser's problems. Agency will continue working (with as many workers as are necessary) on such problems on an around-the-clock basis until such problems are rectified. Advertiser shall not be charged for any work done in connection with this paragraph.

(c) In the event of a breach of the Century Date Change Requirements representation and warranty contained in paragraph a) above, Agency will be responsible for all damages (including but not limited to consequential, incidental and indirect damages) sustained by Advertiser up to the amount of five times the amount of the fees paid by the Advertiser to the Agency (including predecessors of the Agency) pursuant to the Agreement (including any prior Amendments or Addenda).

IN WITNESS WHEREOF, the parties hereto, each by a duly authorized representative, have executed this Agreement as of the date first written above.

MERCK & CO., INC.

_____  12/18/98
Vincent E. Colarusso
Director
Global Media Management Procurement

LEGAL APPROVAL

DDB NEEDHAM COMMUNICATIONS GROUP, INC.

_____
Peter Tate
President - New York

41350001AGENCY1.DOC/cs

-14-

MRK-AIG0000044

M006720769