*UNITED STATES DISTRICT COURT*
*EASTERN DISTRICT OF LOUISIANA*

| | |
|---|---|
| IN RE:  VIOXX<br>         **Products Liability Litigation** | **MDL No. 1675** |
| **This Document Relates To:** | **SECTION:  L** |
| **07-CV-02939**<br>**Marion Cummings v. Merck & Co., et al.** | **JUDGE:  FALLON**<br>**MAGISTRATE:  KNOWLES** |

**MARION CUMMINGS, INDIVIDUALLY**
**AND ON BEHALF OF THE WRONGFUL DEATH**
**BENEFICIARIES OF CARMAN CUMMINGS**                              **PLAINTIFF**

**VERSUS**                              **CIVIL ACTION NO. 2:07-CV-02939**

**MERCK & CO., INC. AND JOHN DOES 1-10**                              **DEFENDANTS**

**AMENDED COMPLAINT**
**(JURY TRIAL DEMANDED)**

PLAINTIFF Marion Cummings, through undersigned counsel, hereby files this Amended

Complaint against Defendants Merck & Co., Inc. ("Merck") and John Does 1-10.  In support

thereof, the Plaintiffs allege the following:

66458.1

## PARTIES

1.      Plaintiff Marion Cummings is an adult resident citizen of Belzoni, Humphreys County, Mississippi.  Marion Cummings is the widow of Carman Cummings, the Deceased, and brings this suit pursuant to Miss. Code § 11-7-13.  Carman Cummings was an adult resident citizen of Belzoni, Humphreys County, Mississippi, at the time of his death.

2.      Defendant Merck & Co., Inc. ("Merck") is a New Jersey Corporation with its principal place of business in New Jersey.

3.      Defendants John Does 1-10 are employees of Merck of whom the Plaintiff is ignorant of their identity.  John Does 1-10 marketed the drug Vioxx to prescribing doctors and their employees as sales representatives or detail men for Merck.  John Does 1-10 citizenship is unknown to the Plaintiffs at this time but is believed to be in Mississippi.

## JURISDICTION AND VENUE

4.      This lawsuit was originally filed in the Circuit Court of Humphreys County, Mississippi, and is solely based on state law.  Service of process on Defendant Merck was proper in that Court under Miss. Code § 13-3-57.  Merck & Co. does business within the state of Mississippi, committed the torts described herein within that state, and has consummated sales contracts with numerous individuals within that state, including the sale of the drug Vioxx to the Decedent.  Merck is also registered to do business in Mississippi.

5.      Venue was proper in Humphreys County under Miss. Code § 11-11-3 because a substantial act or omission occurred there or a substantial event that caused the injury occurred

66458.1                                                2

there.  Carman Cummings lived in Covington County, took the drug there, and suffered the heart attack that ultimately caused his death there.

6.     Defendant Merck removed this case pursuant to 28 U.S.C. § 1332 to the United States District Court for the Northern District of Mississippi, Greenville Division.  The case was subsequently transferred to the Vioxx Multi-District Litigation in this Court.  Plaintiff denies that diversity of citizenship exists in this case.

## BACKGROUND

7.     Beginning in approximately November of 2000, Carman Cummings began taking Vioxx prescribed by his physician Mack Gorton, M.D.  While taking Vioxx, in March 2002, Mr. Cummings suddenly and unexpectedly suffered from his first Cerebrovascular Accident ("CVA"), or stroke.  Without proper warnings, and not realizing the risks, Mr. Cummings continued to take Vioxx and suffered additional CVA's in July of 2002 and March of 2003.  Mr. Cummings also suffered from a Transient Ischemic Attack ("TIA"), or mini-stroke, during this time.  These multiple strokes left him severely weakened and incapacitated in addition to making him highly susceptible to subsequent cerebrovascular problems.  Ultimately, on December 24, 2006, Cummings succumbed to his injuries and died after suffering yet another stroke.  Carman Cummings's ingestion of Vioxx and the Defendants' tortious conduct described herein were the direct and proximate cause of these strokes and ultimate death.

8.     Traditional non-steroidal anti-inflammatory drugs (NSAIDs) inhibit both forms of the coxclooxygenase (COX) enzyme, called COX-1 and COX-2.  Vioxx is a selective COX-2

inhibitor.  As early as the early nineties, scientists at Merck knew the COX enzymes to generate the prostaglandins prostacyclin and thromboxane.  Furthermore, these scientists knew these substances were major compounds involved in the blood clotting process.  Prostacyclin was a known inhibitor of platelet aggregation and vascular dilator while thromboxane was a known platelet aggregator and vasoconstrictor.  The COX-1 enzyme generates thromboxane while the COX-2 enzyme generates prostacyclin.  The 1992 edition of The Merck Manual describes these properties of thromboxane and prostacyclin.  Merck omitted this information from the 1999 edition.

9.     However, these two substances also have other duties in the body.  Prostacyclin is critical to the gastrointestinal (GI) mucosal defenses.  Thromboxane mediates inflammation and pain.  Thus, traditional NSAIDs, which inhibit both enzymes, mediate inflammation while weakening the GI mucosal defenses.  Accordingly, long-term users of traditional NSAIDs such as aspirin tended to suffer from adverse GI effects such as ulcers.  Merck postulated that a selective COX-2 inhibitor would alleviate pain while preserving the GI mucosal defenses.

10.     The problem with COX-2 inhibitors, such as Vioxx, is that they tip the scales toward platelet aggregation and lead to increased blood clotting.  Thus, persons taking Vioxx have an increased risk of suffering from a thrombotic event, an adverse event caused when a blood clot blocks a vessel.  Examples are heart attacks and strokes.  Merck knew of this potential when it developed the drug.

66458.1                                    4

11.     Nevertheless, Merck developed the drug and attempted to design its studies to hide the potential of thrombotic events, especially heart related events such as myocardial infarctions.  For example, in a study designed to show the positive GI effect of Vioxx, the VIGOR study, Merck scientists wrestled with allowing users regularly taking aspirin to participate.  As one of the traditional NSAIDs, which also inhibit the COX-1 enzyme, aspirin had been shown to have a positive anti-clotting effect.  However, like other traditional NSAIDs, aspirin can lead to adverse GI effects.  Merck scientists knew that allowing users who take aspirin to be included in the study would harm their GI results.  However, they also knew that not including aspirin takers, who benefited from the anti-clotting effect, might lead to more cardiovascular events.  The scientists ultimately elected to exclude aspirin takers and others at high risk of cardiovascular events.  Nevertheless, the VIGOR study still showed a five-fold increase in the chance of myocardial infarction amongst those taking the drug Vioxx.

12.     Despite the pharmacology of the drug, which indicated the possibility of an increased likelihood of thrombotic events such as heart attacks and strokes, Merck publicly attributed the increase in myocardial infractions observed in the VIGOR study to a previously unobserved positive cardiovascular effect in naproxen, the traditional NSAID Vioxx was compared to in the study.  Were this true, naproxen would have been the most potent and effective cardio-protectant currently known.

13.     Furthermore, in a second study designed to show the positive GI effect of Vioxx, which one Merck scientist considered a redundant and unnecessary marketing exercise, a 73-

5

year-old woman taking Vioxx died of a myocardial infarction.  In fact, eight individuals taking Vioxx in the study suffered cardiovascular events compared to one for Naproxen.  These results raised concerns at Merck that the FDA may ask it to put a cardiovascular warning in Vioxx's package insert.

14.     Scientists who spoke out against Vioxx were subjected to pressure to recant, threats to pull funding, and even threats to ruin their careers.  When Eric Topol, M.D., Chief of Cardiovascular Medicine at the Cleveland Clinic, was preparing to publish a paper in the Journal of the American Medical Association, Merck employees visited him and attempted to dissuade publication.  When he refused, Merck attempted to get the journal to print a rebuttal piece. When Dr. Gurkipal Singh of Stanford University, a frequent lecturer on behalf of Merck, expressed concern that he was not receiving cardiovascular information from Merck, Merck canceled many of his scheduled presentations.  Merck warned Stanford that if Singh continued, his career would suffer and there would be consequences for the university.

15.     In the face of these known dangers, Merck aggressively marketed the drug to the public.  However, Merck did not market Vioxx just to arthritis sufferers on long-term use of traditional NSAIDs that suffered from GI problems.  Instead, Merck marketed Vioxx to the entirety of the pain killer market.  In 2000, Merck spent an unprecedented $161 million dollars on direct-to-consumer advertising for Vioxx alone; never mentioning any increased risk of thrombotic or cardiovascular events.   Merck marketed Vioxx as a lifestyle drug when it had no

capability of preserving life or preventing life threatening events.  Vioxx actually caused those events.

16.     At the same time, Merck conducted a campaign to mislead prescribing physicians and dodge their concerns regarding cardiovascular events.  While Merck's scientists were debating Merck's cardiovascular effects, and the VIGOR study showed a five-fold increase in myocardial infarctions, Merck sales representatives, including John Does 1-10, were assuring doctors that Vioxx had a favorable cardiovascular profile.  First, Merck never advised doctors that the concurrent use of aspirin would eviscerate the superior GI safety of Vioxx.  Second, and perhaps most disturbing of all Merck's actions, it trained its reps in a program named "Dodge Ball" designed to help them dodge questions from doctors.  For example, if a doctor were to say something such as, "I am concerned about the cardiovascular effects of Vioxx," representatives were trained how to address this "obstacle."  Merck's response?  "Dodge!"

17.     In addition, Merck recruited opinion leaders to give lavish medical conferences for physicians.  The FDA found that the content of these conferences was "[f]alse or misleading in that they minimized the MI results of the VIGOR study … omitted important risk information, made unsubstantiated superiority claims, and promoted VIOXX for unapproved uses and an unapproved dosing regimen."    Additionally, the FDA warned Merck that certain Vioxx promotional pieces were "false and misleading because they contain misrepresentations of VIOXX's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

66458.1                                              7

18.    These reactions by the FDA are even more significant when considered in the context of Merck's considerable influence over the organization.  Dr. David Graham, an FDA researcher who published a study regarding the cardiovascular effects of Vioxx, testified before Congress that "the FDA as currently configured is incapable of protecting America against another Vioxx."

19.    At no time relevant to this Complaint did Vioxx contain a warning that it could cause thrombotic events or should not be used by individuals at risk of thrombotic events such as heart attacks or strokes.  Any precautions listed in the label were inadequate to protect the ultimate user or inform doctors of the risk, especially when viewed in conjunction with Merck's direct-to-consumer advertising and marketing campaign to doctors.

20.    However, the mounting evidence against Vioxx notwithstanding, as late as one month before taking the drug off the market, Merck published a press release refuting Dr. Graham's study, stating that it "stands behind the efficacy, overall safety and cardiovascular safety of Vioxx."

## COUNT ONE -- STRICT LIABILITY (DEFECTIVE DESIGN)

21.    Plaintiff repeats and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

22.    Merck was at all times relevant to this lawsuit in the business of manufacturing and selling the drug Vioxx.  Merck designed, manufactured, and put into the stream of commerce

the drug Vioxx with the intention that Carman Cummings and others like him would use the drug.

23.     Carman Cummings was prescribed and used the drug Vioxx as intended by Merck and in a condition substantially unchanged from when it left Merck's control.

24.     Vioxx, by its design, was unreasonably dangerous. Because it selectively inhibited the COX-2 enzyme, Vioxx induced a pro-thrombotic state, which led to increased risk of cardiovascular events such as heart attacks and strokes.

25.     A patient taking Vioxx would expect the drug to stop pain safely and not cause such cardiovascular events when used as prescribed.

26.     Further, any benefits Vioxx may have over traditional NSAIDs are outweighed by the increased risk of serious events caused by a thrombosis including heart attacks, strokes, and renal failure.  Accordingly, traditional NSAIDs provide a superior alternative design to Vioxx.

27.     Unaware of the dangers posed by Vioxx, Carman Cummings took the drug and suffered several strokes, ingesting the drug without any changes or alterations.

28.     Carman Cummings was injured as a direct and proximate result of the defective design of Vioxx.

29.     At the time Carman Cummings was prescribed and took the drug, Merck knew of the unreasonably dangerous condition of its product and failed to act to reduce the risk.

## COUNT TWO – STRICT LIABILITY (FAILURE TO WARN)

30.     Plaintiff repeats and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

31.     Merck was at all times relevant to this lawsuit in the business of manufacturing and selling the drug Vioxx.  Merck designed, manufactured, and put into the stream of commerce the drug Vioxx with the intention that Carman Cummings and others like him would use the drug.

32.     Carman Cummings was prescribed and used the drug Vioxx as intended by Merck and in a condition substantially unchanged from when it left Merck's control.

33.     Furthermore, Vioxx was unreasonably dangerous because at no time relevant to this lawsuit did Vioxx's warning label warn of these risks.  Further, at all times relevant to this cause of action, Vioxx's warning label was inadequate as it failed to accurately specify the risks associated with the drug.

34.     Additionally, at all times relevant to this lawsuit, Vioxx's warning label was inadequate in that it did not provide warnings consistent with the advertised use of the drug, was unable to perform the intended function of risk reduction, and did not reach the intended users.

35.     Had Merck provided an adequate warning to either Carman Cummings or his doctor, he would not have been prescribed or taken the drug.

36.     Without an adequate warning, Carman Cummings ingested the drug Vioxx and suffered from several strokes as a result.  Merck's failure to provide an adequate warning

rendered the drug unreasonably dangerous and proximately caused Carman Cummings's injuries and death.

37.     At the time Carman Cummings was prescribed and took the drug, Merck knew of the unreasonably dangerous condition of its product and failed to act to reduce the risk.

## COUNT THREE – NEGLIGENT DESIGN

38.     Plaintiff repeats and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

39.     Merck had a duty to design Vioxx in a reasonably safe manner.

40.     Merck breached that duty by manufacturing and putting into the stream of commerce a drug that was unreasonably dangerous for its intended purpose because of its propensity to cause thrombotic cardiovascular events.

41.     As a result, Carman Cummings ingested Vioxx, suffered several strokes, and ultimately died.

42.     Carman Cummings's ingestion of Vioxx was a direct and proximate cause of his injuries and death.

43.     At the time Carman Cummings was prescribed and took the drug, Merck knew of the defective design of its product and failed to act to reduce the risk.

## COUNT FOUR – NEGLIGENT FAILURE TO WARN

44.     Plaintiff repeats and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

66458.1                             11

45.     Merck had a duty to users of Vioxx to warn both prescribing physicians and the public through their advertising of dangers of which it knew or should have known.

46.     John Does 1-10 had a duty to warn prescribing physicians of dangers of which they knew or should have known.

47.     Based on the pharmacology of the drug along with studies published at the time of Carman Cummings's heart attack, including studies performed by Merck, Merck either knew or should have known of the increased risk of thrombotic events, such as Carman Cummings's strokes.  Merck possessed superior unequal knowledge of the dangerous propensities of Vioxx and the increased risk of the exact harm suffered by Carman Cummings.

48.     John Does 1-10 knew or should have known of the increased risks associated with Vioxx based on the openly deceptive nature of Merck's sales materials, their training to avoid addressing the issue, and Merck's constant effort to turn the marketing emphasis away from the potential risks.

49.     Merck breached its duty to warn prescribing physicians and the public by refusing to add adequate warnings to its warning label, by repeatedly relying on junk science to mislead doctors and the public, and by conducting an unprecedented media blitz which completely ignored the potential threats.

50.     John Does 1-10 breached their duty to warn prescribing physicians by participating in Merck's openly deceptive marketing practices and by purposefully avoiding

addressing safety issues of the drug they marketed and thereby hiding the risks from prescribing physicians.

51.     Carman Cummings was not and could not be aware of the risks of Vioxx.

52.     As a result, Carman Cummings ingested Vioxx, suffered several strokes, and ultimately died.

53.     Carman Cummings's ingestion of Vioxx was a direct and proximate cause of his injuries and death.

54.     At the time Carman Cummings was prescribed and took the drug, Merck and John Does 1-10 knew of the dangerous condition of its product and failed to act to reduce the risk.

## COUNT FIVE – BREACH OF IMPLIED WARRANTIES

55.     Plaintiff repeats and re-alleges the allegations of the prior paragraphs as if fully set forth herein.

56.     Merck is a merchant with respect to pharmaceuticals, in particular the drug Vioxx.

57.     As its manufacturer, Merck knew of the particular purpose for which Vioxx was bought, i.e. as a pain reliever.

58.     Although Carman Cummings did not buy Vioxx directly from Merck, under Mississippi law privity is not required to maintain an action for an implied warranty pursuant to the UCC.

59.     Merck breached the implied warranties of merchantability and fitness for a particular purpose pursuant to Miss. Code §§ 75-2-314 and 75-2-315.

66458.1                                                   13

60.     Vioxx was not merchantable because the defective nature of the drug as described herein rendered it not fit for the ordinary purpose for which it was used.

61.     Further, Vioxx was not merchantable because of the inadequate nature of the warning label and packaging of Vioxx as described herein and its performance did not conform to the promises or affirmations of fact made on the container or label.

62.     Because of the defective nature of the drug Vioxx as described herein, it was not fit for the particular purpose for which it was sold.

63.     Carman Cummings relied upon Merck's superior knowledge, skill, and judgment to furnish suitable goods for their intended particular purpose.

64.     These breaches of the implied warranties of merchantability and fitness for a particular purpose were a direct and proximate cause of Carman Cummings's injuries and death.

## COUNT SIX – FRAUD / FRAUDULENT CONCEALMENT

65.     Plaintiff repeats and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

66.     The basic pharmacology of Vioxx indicated an increased risk of thrombotic events.  Indeed, Merck scientists recognized this risk and predicted increases in cardiovascular events.  Later studies performed throughout the life cycle of the drug, some by Merck itself, affirmed this dangerous propensity of the drug.

67.     Merck intentionally concealed this dangerous propensity of the drug from the FDA during the drug's approval process, from doctors through its marketing, and from the public

66458.1                                    14

through its direct-to-consumer advertising.  This concealment was intended to keep sales of the drug from suffering and to stop those who suffered the drug's effects from realizing they had been injured by Merck's product.

68.     Merck sales representatives, including John Does 1-10, underwent extensive and detailed training in how to sell drugs to doctors.  Merck focused its training regimen for its representatives entirely on sales and marketing techniques designed to maximize the positive aspects of their drugs while minimizing and even hiding the negative and sometimes dangerous propensities of their drugs.

69.     Merck trained its representatives to use reprints of medical journal articles in their sales discussions, but only those that provided solid evidence that Doctors should prescribe Merck's products.  Such articles were on the "approved" list.  Other articles were on the "background" list.  Merck explicitly instructed its sales representatives, including John Does 1-10, not to provide or discuss background articles with physicians, who they were to refer to the medical services department.

70.     Merck compiled prescription data for doctors, including what percentage of their prescriptions were Merck products.  Merck based the bonuses of sales representatives, including John Does 1-10, directly on these statistics.

71.     Merck sales representatives, including John Does 1-10, also participated in elaborate simulations intended to train them to get Merck's drugs into hospital formularies. Merck instructed their sales force that they could help ambitious doctors attend symposia if those

doctors would sponsor their drugs, such as Vioxx.  The recurring theme in Merck's training of its representatives was marketing and sales, not science and education.

72.     Whenever the risks of Vioxx started becoming public, either through published studies or from stories published by media outlets, Merck instructed its highly trained sales force in responding to these developments.   The instruction had a common theme: use highly questionable information to reassure physicians.

73.     Internal Merck emails reveal that Merck researchers attempted to design the VIGOR study, intended to show the improved gastrointestinal effects of Vioxx, in such a way that it would minimize their predicted cardiovascular risks.

74.     After the VIGOR study was released in 2000, showing an increased risk of cardiovascular events in patients taking Vioxx, Merck issued to its sales force a cardiovascular card for use in marketing to doctors.  The cardiovascular card did not contain any information from the VIGOR study, and presented data with little or no scientific validity that did not meet the standards normally used in medical communications.  Merck designed this resource to ensure that sales representatives, including John Does 1-10, were well prepared to deflect concerns regarding the cardiovascular risks of Vioxx.

75.     Merck based the cardiovascular card on pre-approval studies designed to test the efficacy of the drug, not to assess whether the drug caused thrombotic events.  The studies involved few patients taking Vioxx linked to heart problems and overstated the amount of data used for the mortality analysis when compared with an abstract of a Merck presentation based on

the same data.   These studies varied widely, involved different doses, different patient populations, and different comparator drugs.   Indeed, prior to Vioxx's approval, the FDA had expressed serious concerns about combining these disparate studies into a single safety analysis. The FDA again expressed concerns about the validity of these studies at an Advisory Committee meeting in February of 2001.

76.     In the face of Merck's knowledge, the design of the cardiovascular card amounted to an intentional deception.

77.     Merck instructed its sales representatives, including John Does 1-10, not to leave the cardiovascular card with doctors in order to hide its deceptive nature.

78.     The results of the VIGOR study notwithstanding, Merck gave its sales representatives, including John Does 1-10, new sales incentives for Vioxx in spring of 2000. Merck instructed its sales force to avoid discussing Vioxx's cardiovascular safety and focus instead on the efficacy of the drug.   This approach was solidified in Merck's later marketing campaign called "Project A&A XXceleration" designed to focus the marketing on arthritis and analgesia, two clinical indications for Vioxx.

79.     In February of 2000, after the Advisory Committee meeting, Merck advised its representatives not to initiate discussions on the meeting or the VIGOR study.   Further, Merck told its representatives to tell doctors that they could not discuss the study because it was not on the label.   This representation was an inaccurate statement of FDA regulations.   Merck also instructed them to advise physicians to submit written questions to the medical services

department, which would then provide a version of the data from the cardiovascular card. Ultimately, they were to refer back to the deceptive cardiovascular card.

80.     After the publishing of the VIGOR study, Dr. Gurkipal Singh of Stanford University, a frequent lecturer on behalf of Merck, requested further information regarding the cardiovascular effects so that he could better educate doctors.  In response, Merck canceled many of his scheduled presentations.  Merck warned Stanford that if Singh continued, his career would suffer and there would be consequences for the university.  Stanford officials determined that Merck's conduct amounted to a persistent pattern of intimidation and complained to Merck's top officials.

81.     Near the time the VIGOR study was released, Merck also sought to reformulate Vioxx to reduce the cardiovascular risks.  Realizing that the observed increases in cardiovascular events were mechanism based, Merck sought to patent a combination of Vioxx and a thromboxane inhibitor.  Although the benefit, technological advancement, and novelty of a selective COX-2 inhibitor combined with a COX-1 inhibitor is certainly questionable, Merck's internal attempts to fix Vioxx clearly evidence its knowledge of Vioxx's defective state and runs counter to its continued representations that Vioxx had a favorable cardiovascular profile.

82.     On May 22, 2001, the New York Times published an article raising questions about the safety of Vioxx.  The article quoted an Advisory Committee member who stated "[t]he marketing of these drugs is unbelievable" and "I'm sure there are many people out there who are taking these drugs and should not be."

66458.1                                        18

83.     In response, Merck issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety of Vioxx."  In a warning letter sent several months later, the FDA called this press release "simply incomprehensible" in the face of the data and the VIGOR study.

84.     Furthermore, Merck ratcheted up its marketing campaign.  It instructed its sales force not to initiate discussions on the VIGOR study or any recent articles about Vioxx.  They were to continue to respond with the cardiovascular card, and explicitly instructed to tell doctors that Vioxx had a better cardiovascular profile than traditional NSAIDs.  The data relied upon by Merck to form this conclusion was scientifically unsound and had been rejected by the FDA twice.

85.     On August 22, 2001, a study published in the Journal of the American Medical Association raised serious concerns about the safety of Vioxx.  This study was co-authored by Eric Topol, who had been pressured by Merck to retract his article and refused.  Further evidence notwithstanding, Merck continued to instruct its sales representatives, including John Does 1-10, to stick with the duplicitous cardiovascular card.  Merck had begun referring to these studies as "obstacles" that its sales force must overcome.

86.     At about this time, Merck began training its representatives with a document called "Dodge Ball Vioxx," which instructs Merck sales representatives, including John Does 1-10, how to dodge the cardiovascular concerns of doctors.  The manual consists of a list of obstacles.  It lists a question that a doctor could pose, such as "I am concerned about the cardiovascular effects of Vioxx?"  Merck trained representatives to stick to its position that

66458.1                                        19

Naproxen had a cardio-protective effect, a conclusion wholly without scientific support.  The FDA says there is no conclusive evidence that Naproxen protects the heart.  Merck's response to questions about Vioxx's dangerous propensities: "Dodge!"

87.     Subsequently, despite the mounting evidence of Vioxx's dangerous defective design, Merck embarked upon another marketing campaign, called "Project Offense" intended to keep doctors prescribing the drug.

88.     Throughout this timeframe, Merck was resisting the FDA's suggestions regarding changes to its warning label.  The FDA wanted Merck to insert a cardiovascular warning.  Merck refused, ultimately inserting a precaution.  Furthermore, Merck also insisted on including the statement, "the significance of the cardiovascular findings of these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown."  Merck also sought to have the misleading data from its cardiovascular card inserted into the warning label.  Unfortunately for consumers, once a drug is approved, the FDA has little power to change its label.  The FDA was unable protect the American people from Merck's fraud.

89.     After April 22, 2002, when the new label was published, Merck was forced to alter its instructions to sales representatives, including John Does 1-10, regarding their promotion of Vioxx.   Instead of relying on the cardiovascular card, Merck instructed its sales representatives, including John Does 1-10, to rely instead on the uncertainty surrounding cardiovascular events emphasized in the label.  By this point, Merck's concessions to the label language, in the face of their knowledge of the risks, amounted to an intentional deception.

90.     In 2003, Merck embarked on its new sales promotional campaign called "Project Power Play."  Ultimately, Merck's strategies worked.  They were able to maintain robust sales despite the dangerous nature of their drug.

91.     As litigation ensued, Merck began purposefully spreading false interpretations of the statistical data from the APPROVe study it funded.  Early in this litigation, Merck began to represent that the APPROVe study only showed an increased risk of serious thrombotic events after 18 months of Vioxx use.  However, the authors of the study did not make this finding; they merely observed that the increased risk only became apparent after 18 months.  The rate of thrombotic events in patients taking Vioxx remained relatively steady throughout the trial; fluctuations in the rate of thrombotic events in those taking the placebo caused the apparent divergence at 18 months.  Clearly, fluctuations in rate of thrombotic events in the placebo group must be attributable to solely chance and do not support any hypothesis regarding risks associated with Vioxx.  Subsequently, Merck found that it could no longer maintain this falsehood.

92.     This pattern of behavior demonstrates a concerted effort to hide Vioxx's risks while focusing on marketing.  Merck explicitly intended its marketing campaign to induce the public to ask their doctors about Vioxx and doctors to prescribe the drug to their patients.  Carman Cummings, the public, and prescribing physicians relied on Merck's deceptions regarding the safety of Vioxx and Carman Cummings suffered physical injury and death as a result.

93.     Merck and John Does 1-10 further intended to hide from patients taking Vioxx the cause of thrombotic events, such as heart attacks and strokes, from which they suffered.  This resulted in many patients continuing to take a drug very dangerous for them, suffering further injuries, and in being unaware of potential claims against Merck.  Because of Merck's fraudulent concealment, potential claimants such as Carman Cummings and his wife Marion Cummings could not have known about their claims until at least the time of the drug's withdrawal from the market.

94.     Had Merck been open about the risks of Vioxx, Carman Cummings would not have taken the drug and died as a result.   Carman Cummings relied upon Merck's misrepresentations and suffered physical injury and death as a result.

95.     This pattern of conduct, to employees with knowledge of Merck's marketing schemes, including John Does 1-10, marked a clear intention to deceive prescribing physicians. This deception notwithstanding, John Does 1-10 continued to market the drug, taking advantage of Merck's deceptive marketing materials and junk science; all the while earning sales incentives.  John Does 1-10 were knowing participants in Merck's fraudulent campaign whose financial incentives were aligned with the company to hide risks and increase sales.

## COUNT EIGHT – PUNITIVE DAMAGES

96.     Plaintiff repeats and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

97.     Merck, with reckless indifference to the consequences, consciously and intentionally hid the dangers of the drug Vioxx and failed to disclose warnings of dangers of which they were clearly aware.  This failure was a direct and proximate cause of Carman Cummings injury and death.

98.     The basic pharmacology of the drug Vioxx indicated a possible risk of thrombotic events such as heart attacks and strokes.  Nevertheless, Merck failed to disclose this possible risk at any point during the drug's life cycle.  Instead, Merck attempted to hide the risks with junk science, prevent prescribing physicians from learning of the risks, and train its workforce to increase sales of the drug despite their knowledge of the risks.  This conduct amounted to an intentional deception, actual fraud, and clearly indicated a reckless disregard for the health and safety of patients taking the drug.

## DAMAGES

99.     The Plaintiff is entitled to all damages available under Miss. Code § 11-7-13. These damages include, but are not limited to, medical bills, loss of companionship and society, loss of earnings of the deceased, loss of services of the deceased, and the present net cash value of Carman Cummings's life expectancy.

100.     Plaintiff is further entitled to punitive damages due to the wanton behavior, actual malice, and gross negligence of the Defendant.  Their actions evidence a willful, wanton or reckless disregard for the safety of others, and constitute actual fraud.

101.    Because the Defendant acted with a willful, wanton or reckless disregard for the safety of others, and committed actual fraud, Plaintiff is entitled to recover reasonable attorney's fees and expenses in bringing and prosecuting this lawsuit.

102.    Plaintiff is also entitled to pre-judgment interest on any earnings and other sums they would have been entitled to prior to the filing of this lawsuit.

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands (1) judgment against the Defendant in a sum calculated to compensate them for their wrongful death damages, (2) judgment against the Defendant for punitive damages, (3) reasonable attorney's fees and expenses in bringing and prosecuting this lawsuit, and (4) pre-judgment interest.  Plaintiffs demand judgment in excess of the jurisdictional limits of this Court, pray that their case be tried by a jury, and for all other relief proper in the premises.

RESPECTFULLY SUBMITTED, this the _____ day of _____, 2007.


s/Donald Alan Windham, Jr.
Attorney for Plaintiff,
Marion Cummings

**OF COUNSEL:**

Donald Alan Windham, Jr. (MS 100909)
BALCH & BINGHAM LLP
401 East Capitol Street
Suite 200
Jackson, MS 39201
Telephone: (601) 961-9900
Facsimile: (601) 961-4466


66458.1                              24

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this _____ day of _____, 2007.

/s/Donald Alan Windham, Jr.
Donald Alan Windham, Jr.
MS Bar # 100909
Attorney for Plaintiff
BALCH & BINGHAM LLP
401 East Capitol Street, Suite 200
Jackson, MS 39201
Telephone: 601-961-9900
Facsimile: 601-961-4466
awindham@balch.com

66458.1