# FILED

OCT 2 3 2006

SHELLY ASHLEY-PALMERTREE, CIRCUIT CLERK

BY_____D.C.

IN THE CIRCUIT COURT OF WARREN COUNTY
STATE OF MISSISSIPPI

ROSIE JOAN TRAHAN and
CHARLES C. TRAHAN, SR.                                                    **PLAINTIFFS**

VS.                                              CAUSE NO. _06, 0211-CF_

MERCK & CO., INC., DARLENE ROBERSON
AND DOES 1- 5                                                            **DEFENDANTS**

---

## *COMPLAINT FOR DAMAGES*

---

COME NOW Plaintiffs, Rosie Joan Trahan and Charles C. Trahan, Sr., by and through their attorneys of record, and file this their Complaint for damages against the Defendants, Merck & Co., Inc., Darlene Roberson and Does 1-5, and in support thereof, would show unto the Court the following:

## *I. PARTIES*

1.      Plaintiffs are adult resident citizens of the State of Mississippi, who reside at 311 Cain Ridge Road, Vicksburg, Warren County, Mississippi 39180.

2.      Defendant Merck & Co., Inc. (hereafter referred to as "Merck"), is a New Jersey corporation, whose address and principal place of business is One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 8889-100, doing business in the State of Mississippi, and can be served with process of this Court by serving a copy of the Summons and Complaint in this case on its registered agent, CT Corporation System, 645 Lakeland East Dr., Suite 101, Flowood, MS 39232.

3.      Defendant Darlene Roberson is an adult resident citizen of the State of Mississippi, residing at 4133 Greenland Road, Little Rock, Newton County, Mississippi 39337, who may be

**EXHIBIT**

tabbies®

**"3"**

served with process of this Court by delivering a copy of the Summons and Complaint to her

personal address. In this Complaint, when Plaintiffs refer to "Merck sales representatives", or "sales

representatives", Plaintiffs will be referring generally to all Merck sales representatives, and

specifically to Defendant Darlene Roberson.

4.      The identities of Defendants John Does 1-5 are unknown at this time.  The identities

of these individual defendants will be made known to all parties in this action, in a timely manner,

in compliance with the Mississippi Rules of Civil Procedure.  In this Complaint, when Plaintiffs

refer to "Merck sales representatives", or "sales representatives", Plaintiffs will be referring generally

to all Merck sales representatives, and specifically to Defendants John Does 1-5.

## II.  *JURISDICTION*

5.      (a)      This Court has subject matter jurisdiction of this cause pursuant to the

provisions of *M.C.A.*, § 9-7-81 (1972), in that the subject matter of this litigation is not made

exclusively cognizable in some other Court by the Constitution and Laws of this State and the

principal amount in controversy exceeds the sum of Two Thousand Five Hundred ($2,500.00)

Dollars.

(b)      This Court has *in personam* jurisdiction of the defendants in that:

1.      Merck is qualified to do business and is doing business in the State

of Mississippi and has appointed an agent for service of process in the State for

service of process.

2.      Roberson is an adult, resident citizen of the State of Mississippi and

may be served with the process of this Court therein.

3.      Plaintiffs' claims are brought solely under Mississippi Law, and Plaintiffs state they do not bring any causes of action pursuant to Federal law. Further, Plaintiffs disclaim any and all causes of action under any federal laws, statutes and/or regulations. Plaintiffs do not assert, either expressly or implicitly, any claims arising out of any federal statute, any federal regulation or any provision of federal common law. Rather, Plaintiffs do hereby disallow and repudiate any such claims. Consequently, there is no basis for any assertion of federal jurisdiction on the basis of a "federal question". Furthermore, no assertion by any party of federal diversity jurisdiction would be proper in that Plaintiffs are resident citizens of the State of Mississippi and Defendant Darlene Roberson is a resident of the State of Mississippi. Further, upon information and belief, John Does 1-5 are residents of the State of Mississippi.

### III.  VENUE

6.      This Court has venue of this action in that a substantial alleged act or omission occurred in Warren County, Mississippi, where Mrs. Trahan was prescribed VIOXX by her physician in Warren County, Mississippi, where she filled said VIOXX prescriptions, where she ingested VIOXX as prescribed, and where, as a result of such ingestion, she suffered an acute myocardial infarction.

### IV.  FACTS

7.      This is an action brought by the Plaintiffs for damages resulting to Mrs. Trahan from her ingestion of the non-steroidal anti-inflammatory pain medication VIOXX (chemical name "rofecoxib") and for damages sustained by Mr. Trahan for loss of consortium.

-3-

8.      Mrs. Trahan purchased VIOXX and ingested the drug on a regular basis beginning on August 1999.  As a result of such ingestion, she suffered physical injuries, including, but not limited to, acute myocardial infarction, on February 8, 2001.

## A.      Merck's Business and Marketing Strategy

9.      Merck develops, markets, and sells pharmaceutical drugs.  Merck is one of the Country's largest drug manufacturers, and is a dominant player in both the United States and World markets.  In order to maintain its market position, Merck must continuously research and develop new drugs, seek their approval by appropriate government agencies, and aggressively market these drugs to healthcare professionals and the general public (a) through Roberson and its other sales representatives, (b) "direct-to-consumer" print and video advertising and (c) subsidized medical meetings.  Merck's revenues are dependent on the sales of the drugs which it has developed.

10.      Like many major pharmaceutical companies, Merck relies on the success of so called "blockbuster" drugs to generate the huge revenues necessary to maintain its leading position in a very competitive industry. "Blockbusters" are typically defined as medications that account for more than one billion dollars in annual sales, and are most often still under full patent protection from relatively inexpensive competing generic versions of the drugs.  It is of paramount importance for pharmaceutical companies, like Merck, to make as much money from these blockbuster drugs while Merck still maintains full patent protection, thereby owning the market.

## B.      The Tipping Point

11.      Beginning in February 2000, and continuing through June of 2001, five major drugs manufactured by Merck were going to lose patent protection: Vasotec, February 2000; Pepcid, April 2000; Prilosec, April 2001; Prinivil, December 2001; Mevacor, June 2001.

12.     During this time, the drug VIOXX was one of the drugs being developed by Merck for introduction into the market.  Faced with impending loss of significant market share, VIOXX became the blockbuster drug recognized by Merck to be the critical component to Merck's future financial success.

13.     VIOXX is the brand name of a pain killer developed by Merck (chemical name rofecoxib).   VIOXX is a member of the family of pain killing medications known as COX-2 inhibitors.  Traditional pain killers, such as aspirin, and naproxen (non-steroidal anti-inflammatory drugs, or "NSAIDs") block two enzymes known as "COX-1" and "COX-2."  Painkillers that function by blocking COX-1 enzymes can cause significant gastrointestinal problems.  Merck would ultimately market VIOXX as a drug which blocked only COX-2 enzymes, responsible for pain and inflammation. Merck marketed VIOXX as a drug that did not effect the COX-1 enzyme. Therefore, Merck represented that VIOXX would relieve pain while avoiding the serious health effects threatened by the COX-1 inhibitors.  When attempting to position VIOXX in the market, Merck repeatedly emphasized the serious health risks and fatalities that could be caused by prolonged use of NSAIDs that could be avoided through use of the drug VIOXX.   Merck's marketing plan of VIOXX depended upon a multi-million dollar advertising campaign through direct-to-consumer advertising and to potential prescribing physicians through its sales representatives, including Darlene Roberson.

14.     As marketed by Merck, the value of VIOXX did not lie in its effectiveness for treatment of pain, VIOXX value lay in its purported "safety."

15.     In May of 1999, Merck began the distribution and sale of VIOXX. Once distribution and sale began, Merck wasted no time in dispatching its pre-programmed sales force to insure

VIOXX's availability on the market.  Although VIOXX would not arrive in pharmacies until early June 1999, Merck had already begun to dispatch a sales force of over four thousand individuals to pitch "the safe drug VIOXX" to doctors, and healthcare organizations.  By June of 1999, Merck's sales force had been successful in placing VIOXX in more than 40,000 pharmacies across the United States.

**C.    Signs of Danger:  Merck's Knowledge of Blockbuster Drug VIOXX Danger**

16.    As Merck and its sale force were touting the safety of the drug VIOXX, they, at the same time, were aware that VIOXX posed a substantial risk of heart attacks, strokes, and other serious cardiovascular events.  The serious risks posed by VIOXX were known to Merck as far back as 1996.  In testimony provided to the Senate Finance Committee in connection  with it's investigation into Merck's marketing of VIOXX, Dr. Gurkirpal Singh, Stanford University School of Medicine, Chief Science Officer, Institute of Clinical Outcomes Research and Education, testified that as early as 1996, Merck scientists' discussions focused on the fact that other pain killers, i.e. aspirin, naprosen, protected against heart attacks by inhibiting platelets.  Because VIOXX did not have this similar effect, this might explain results in studies seeming to indicate that VIOXX would increase the risk of heart attacks.  Dr. Singh testified that "this was a serious concern because the entire reason for the development of VIOXX was safety."  Further Dr. Singh recognized that if this risk were made known, "patients may not be willing to make this trade off" and purchase the drug. Merck should have started, but failed to start, a public discussion about this potential trade off, and design studies that would have more carefully evaluated the risk benefit ratio of VIOXX.  Merck made no such efforts.  In 1998, a Merck scientist presented an analysis of serious heart problems with VIOXX compared to patients enrolled in studies of other Merck drugs.  According to Dr.

Singh's testimony before Congress, these findings should have caused a public scientific discussion of the risks and benefits of the drug VIOXX. However, Merck did not make this information about VIOXX public until many years later, all the time while it was aggressively marketing it's drug as a safe alternative to other pain killers.

17.     In 1998, Merck conducted a clinical trial called "Study 090." Study 090 was a randomized controlled study designed to evaluate the safety of a 12.5 mg dosage of VIOXX during a six week period in patients with osteoarthritis of the knee. A total of 978 patients were randomly placed into three groups: one group taking VIOXX 12.5mg, a second group taking the drug of a competitor, and third group taking a placebo. This 1998 study indicated nearly a seven fold increase in heart attack risk with low dose VIOXX. These results were evaluated by Dr. Eric J. Topol, Chief of Cardiovascular Medicine at the Cleveland Clinic, who determined that the occurrence of increased cardiovascular events in Study 090 was statistically significant. Another Merck study, known as "Study 085,", also a randomized control test, reflected similar results. Additional testimony provided to the Senate Finance Committee indicated that these increased occurrences of cardiovascular events represented a clear basis for concern.

18.     In the face of these two studies, known to Merck, but not released to the public, Merck, by the Fall of 1998, was touting both the efficacy and the safety of VIOXX. In a Newswire released on November 12, 1998, Merck specifically announced the results of its trials and studies as indicating that VIOXX was at least as effective as other NASIDs, that it was effective in treating rheumatoid arthritis, that it did not damage the gastrointestinal tract, and that Merck planned to file for approval of VIOXX. In subsequent press releases and announcements, Merck continued to discuss the efficacy of VIOXX, and continued to discuss safety issues, without any mention of

adverse cardiovascular events. Unknown to prescribing physicians, to their patients, or to the general public, by the time Merck had filed for FDA approval of VIOXX, in 1999, Merck had access to several studies confirming that thomboembolic events, such as heart attack and stroke, were more frequent in patients receiving VIOXX than placebo. Merck knew from these studies that VIOXX was likely to promote heart attacks directly.

19.     In January 1999, Merck sponsored the VIOXX Gastrointestinal Outcomes Research study, "the VIGOR study." VIGOR was a double blind, randomized, stratified parallel group study of over 8,000 patients to evaluate the efficacy of VIOXX 50mg dose. Patients were excluded from the study if they required aspirin for cardiovascular protection. Also excluded from VIGOR were patients with angina or congestive heart failure, and certain patients with myocardial infarction or coronary bypass grafting, stroke, transischemic attack or uncontrolled hypertension. Essentially, the parameters of VIGOR study sought to exclude any possibility of including patients with cardiovascular issues. However, the raw data from the VIGOR study revealed to Merck that patients taking VIOXX suffered five times as many cardiovascular events as patients taking Naproxen, an older NSAID.

20.     While the VIGOR study did demonstrate that VIOXX reduced the incidents of serious gastrointestinal side effects as compared Naproxen, the data from the VIGOR study did not demonstrate an improved safety profile for VIOXX. The VIGOR study data revealed that:

a.      Patients on VIOXX were five times more likely to suffer a heart attack as compared to patients on Naproxen;

b.      Patients on VIOXX were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on Naproxen; and

    c.      Patients on VIOXX actually suffered more cases of serious disease (either gastrointestinal or cardiovascular) than did Naproxen users (61 and 57 cases respectively).

21.     Another Merck clinical trial named "ADVANTAGE" was completed in April 2000. Like similar trials, results from the ADVANTAGE clinical trial revealed to Merck that patients taking VIOXX faced a significantly increased risk of serious cardiovascular events. Although the trial was completed in April 2000, Merck did not publish the results from the trial until 3 years later in 2003 when they appeared in the *Annals of Internal Medicine*.

**D.    Merck's Disregard of Danger and Institution of Multi-Million Dollar Marketing Campaign:**

22.     Even though Merck was aware of the increased risk of serious cardiovascular events, Merck continued to press ahead with unbridled abandon after VIOXX's May 1999 approval. Shortly after it's release, Merck instituted a marketing blitz with intensive sales representative training. Both the marketing blitz, and the sales representative training, were geared toward positioning VIOXX as a safer alternative to existing NSAIDs, as well as its primary COX-2 competitor, Celebrex. This marketing blitz, the promotional materials distributed by Merck, and the information passed to physicians by Merck's sales representatives, did not refer in any way to knowledge of adverse cardiovascular events involving VIOXX patients.

23.     Ignoring the imperical data, and the evidence of a causal relationship between VIOXX and increased rate of cardiovascular events, Merck tried to explain the results of the studies as an anomaly. Merck publically claimed that Naproxen had "cardio-protective effects" thus resulting in lower incidents of heart attacks in the group taking Naproxen. If pressed to answer, this information would reluctantly be provided directly by Merck sales representatives to physicians seeking to

prescribe VIOXX to their patients. This position of Merck, and its sales representatives, was contradicted directly by a private internal Merck e-mail authored by Merck's research chief, Dr. Edward Scolnick. On March 9, 2000, Dr. Scolnick indicated in an e-mail that Merck knew that its reliance on alleged "protective" features of Naproxen was misplaced. Further, the e-mail explicitly recognized that the evidence of enhanced risk of cardiovascular events in VIOXX consumers "is clearly there" and called it a "shame".

24.     Scientists and physicians later confirmed that Merck had manipulated the results of the ADVANTAGE study in order to conceal the truth about VIOXX's cardiovascular risks. Specifically, they found that during the ADVANTAGE trial, 8 people taking VIOXX had suffered heart attacks or sudden cardiac death, compared to just one person taking Naproxen. Critics recognized that this difference was statistically significant. However, Merck never disclosed the data that way. Instead of being truthful, Merck classified the cause of some of these deaths as "unknown" even though Merck's scientist had specifically found that the most likely cause of some of the deaths was a heart attack. In another e-mail, Merck scientist, Dr. Scolnick, complained that the deaths in the ADVANTAGE study put Merck in a terrible situation. Further, Dr. Schonick in his email expressed his worries to other senior Merck scientists that the ADVANTAGE results, if disclosed, would encourage the FDA to demand that VIOXX place on its label warnings highlighting cardiac risks.

25.     Merck also manipulated and/or obscured the VIGOR results which were "disclosed" by Merck in 2000. As reported by the *New England Journal of Medicine* in a December 8, 2005 editorial posted on its website, when Merck published the results of VIGOR in November 2000, two out of the three authors knew about, but intentionally concealed, three additional myocardial

infarctions in the group taking VIOXX. As its basis for this claim, the *New England Journal of Medicine* referred to a July 5, 2000, internal Merck memorandum confirming that at least two of the authors of the VIGOR study knew about three additional myocardial infarctions at least two weeks before the author submitted the first of two revisions, and four and one half months before publication of the final article. The *New England Journal of Medicine* went on to explain that the fact that these myocardial infarctions were not included made conclusions in the article incorrect. Most startling was the *Journal's* revelation that it had determined from a computer diskette that some of the data were intentionally deleted from the VIGOR manuscript, two days before the manuscript was initially submitted to the *Journal* on May 18, 2000.

26.    In an August 22, 2001 article published in the *Journal of the American Medical Association* ("*JAMA*"), 3 noted physicians challenged Merck's spin on its VIGOR results. The article reported that both Celebrex and VIOXX appeared to increase the risk of heart attack and stroke, but that the danger from VIOXX appeared higher. The article immediately called for trials to specifically determine whether the drugs increased cardiovascular risks.

27.    Merck responded to the *JAMA* article in usual fashion. Indeed, it was later learned that even before the 2001 negative report appeared in *JAMA,* the authors were approached by Merck representatives in an effort to pressure them and *JAMA* to down play the cardiac issue. Later, Merck's senior director of cardiovascular clinical research vigorously rejected the findings in the *JAMA* article stating: "We already have additional data beyond what they cite, and the findings are very, very reassuring. VIOXX does not result in any increase in cardiovascular events compared to placebo." Another Merck consultant rejected the *JAMA* conclusions stating that: "I don't think there are any sound conclusions that can be drawn from this study." Merck's consultant further stated that

he personally had performed a more extensive analysis of Merck's VIOXX data and had concluded that "there is no suggestion of a cardiovascular risk" from VIOXX. Merck's VIOXX smoke and mirror campaign continued.

28.     During the Fall of 2001, the American Heart Association, the National Stroke Association, and the Arthritis Foundation urged Merck to conduct further tests to see if VIOXX increased the risk of heart attack and stroke. Merck initially stated that it was unconvinced that the requested trials were necessary. However, in 2002, Merck was prepared to undertake a clinical study to evaluate VIOXX's cardiovascular risks. According to an article published in 2005 in the New York Times, Merck's extensively planned project, named "VALOR" was abruptly dropped before it started, and just days before Merck's protocol was schedule to be submitted to the FDA. Data from the VALOR study was scheduled to be released in March of 2004. However, as stated in the article, the result may have provided answers about VIOXX's cardiovascular risks even sooner if patients taking the drugs had begun to show adverse effects. Clearly, results from the VALOR study could have completely destroyed VIOXX's commercial appeal. However, this result would only come later, after results from APPROVE were published.

29.     According to a May 5, 2005 Memorandum issued by the minority members of the House Government Reform Committee, which was prepared based upon documents produced by Merck, Merck continued to train and instruct its sales Representatives to avoid providing answers and, if necessary, to misrepresent to physicians VIOXX's cardiovascular risks. According to the House Memorandum, Merck's sales representatives were specifically **prohibited** from initiating discussion on any new cardiovascular data. Further, these same representatives were instructed to emphasize "uncertainty about the cardiovascular risks of the drug [VIOXX]."

30.     In October of 2003, *The Wall Street Journal* reported that research presented at the American College of Rheumatology meeting in Orlando, Florida "suggests that VIOXX . . .may increase the risk of heart attacks in patients taking the pill." The *Journal* went on to describe a Merck funded study by Harvard University affiliated Brigham and Woman's Hospital in Boston "that found an increased risk of heart attack or acute myocardial infarction," in patients taking VIOXX as "compared with patients taking a competing pain killer," and that VIOXX "was linked to an increased heart-attack risk compared with patients not taking any pain killers." In the first 30 days, researchers found, VIOXX was linked to a 39% increased heart attack risk compared with Celebrex. Between 30 and 90 days, that increased relative risk was 37%. Merck responded vigorously rejecting these results, stating that, in their trials, they had "found no significant difference between VIOXX and placebo." Merck further attempted to discount the study by, removing from the list of authors the name of one of Merck's own epidemiologists.

31.     On August 25, 2004, *Bloomberg Business News* reported that a study of the patient records of 1.4 million Californians disclosed that "the difference in heart risk was statistically significant between a recommended dose of VIOXX 25mg a day or less, and Celebrex." Testimony before the Senate Finance Committee indicated that the study "also found that VIOXX doses in excess of 25mg a day more than tripled the risk compared with patients who hadn't taken pain killers within the past two months." Consistent with previous actions, Merck disputed the results claiming that conclusions from these types of studies don't carry much weight.

32.     On November 5, 2004, *The Lancet*, a British Medical Journal, released a study that showed VIOXX should have been pulled from the market "as early as 2000 because studies of the drug had clearly shown that it doubled the risk of heart attacks among users." The authors of *The*

*Lancet* study pooled data from earlier studies involving VIOXX.  On the same date that the study released, authors in *The Lancet* wrote that the risks of VIOXX were evident "a full four years before the drug was finally withdrawn from the market by its manufacturer, Merck." The authors also indicated their belief that Merck's intervention in pulling the drug was "overdue."

**E.      Withdrawal of VIOXX from the Market**

33.      Finally, in the face of overwhelming evidence confirming the cardiovascular risks associated with VIOXX, on September 28, 2004, at an emergency meeting with FDA upper management, requested by Merck, Merck shared data from its "APPROVe study showing increased risks of myocardial infarction and stroke for the 12.5mg and 25mg doses as compared to placebo after eighteen months of treatment." Upon the sharing of this data, Merck announced its intent to withdraw VIOXX from the market.  Worldwide product withdrawal of VIOXX occurred on September 30, 2004.

34.      Even this last effort by Merck to come clean by releasing data from its approved study has shown to be yet another attempt to present false and misleading information regarding VIOXX. On May 18, 2006, National Public Radio broadcast an interview with Dr. Kurt Furberg, clinical trial expert, Wake Forest University, regarding his analysis of the data from the APPROVe study, recently obtained by NPR. Dr. Furberg's review of the data contained in the previously confidential 107 page report confirmed that Merck had stopped the four year APPROVe study just before it was scheduled to end. Dr. Furberg criticized Merck's method of analyzing the raw data. Dr. Furberg was supported by cardiologist Dr. Steve Nissen of the Cleveland Clinic, who also reviewed the report for NPR. Both Dr. Furberg and Nissen confirmed that raw data from the study indicated that patients were at high risk of heart problems and strokes almost as soon as they started taking VIOXX. These experts

also agreed that the raw data from the APPROVe study confirmed that the risk from VIOXX persisted for at least a year after patients stopped taking the drug. These findings, based upon the raw data from Merck's study, contradicted Merck's public announcement that the data showed no adverse affects within the first eighteen months of taking the drug, and no indication that patients were at a greater risks of heart problems after they stopped the drug.

**E.     The Cover-up**

35.     As safety questions about the adverse cardiovascular effects of VIOXX continued to be raised in the medical community, Merck pushed forward with its estimated $500 million dollar plus advertising and training program. As part of its training program, Merck had produced training videotapes, and training brochures and coached sales representatives, including Darlene Roberson, to try to avoid questions about the risks of heart attacks. On July 21, 2005, the *New York Times* reported on the contents of one of Merck's training videos produced in 2000. The video, never shown to doctors or consumers, contained an actress posing as a physician presenting "an obstacle" to a VIOXX sales representative. The actress poses the question "I'm afraid VIOXX causes myocardial infarctions." As a response, an actress playing a Merck sales representative coaches representatives to respond "That's not true."

36.     Merck also authored a 1999 training guide which was presented to sales representatives at a VIOXX workshop. The workshop training materials form indicated that one of the core messages that should be communicated to VIOXX sales representatives was that VIOXX was a safe product. One of the planned goals of the workshop was to insure that VIOXX sales representatives could handle "obstacles" in the nature of questions from physicians about the cardiovascular safety of VIOXX.

-15-

37.     As part of its workshops, Merck developed the game of "Dodge Ball VIOXX", and "JeopardXX" as teaching tools. In the game of Dodge Ball VIOXX, Merck sales representatives had to overcome "obstacles" in the form of physicians' questions in order to advance to the next round. However, players were rewarded if they turned over the "**DODGE!**" card allowing them to advance to the next round without having to answer the physician's question.  Merck, through this training exercise, was able to send a clear message to its sales representatives, "You never have to answer a hard question from a physician if you're able to **DODGE** it."

38.     In the game of JeopardXX, VIOXX sales representatives were awarded points for avoiding direct answers to physicians' questions regarding concerns about the cardiovascular effects of VIOXX, specifically, questions posed by a physician "About a potential increase in the risk of myocardial infarctions."

**F.     Results of Merck's Cover-up**

39.     The efforts of Merck and its sales representatives were successful in keeping VIOXX on the market for over 5 ½ years.  During this 5 ½ year  period, approximately 20 million Americans took the drug VIOXX.  With annual sales of approximately $2.5 billion, VIOXX resulted in one of the most successful marketing campaigns ever for a new drug introduced into the American market. However, despite knowledge from clinical trials, post-marketing reports, studies, and other information relating to cardiovascular related adverse affects, Merck knowingly, aided and abetted by Darlene Roberson and Merck's sales representatives, promoted and continued to market VIOXX as safe up until the public announcement of its world wide withdrawal on September 30, 2004.

-16-

## *V.  CAUSES OF ACTION*

### *COUNT  I*

### *STRICT LIABILITY IN TORT*

40.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 39 of this Complaint, as if set forth fully herein.

41.    Merck, Darlene Roberson, and Does 1-5, at all times relevant hereto, were engaged in the design, manufacture, marketing, promotion, distribution and/or sale of VIOXX.  These Defendants are strictly liable in tort to the Plaintiff, pursuant to Miss.Code Ann. § 11-1-63, for the following reasons:

a.    VIOXX was defective because it failed to contain adequate warnings and/or instructions regarding dangers that were known or should have been known to these Defendants.

b.    VIOXX was defective, unsafe, and unreasonably dangerous for its intended and/or foreseeable uses.

c.    Defendants breached express warranties or failed to conform to other express factual representations made to Mrs. Trahan's physician regarding the safety of the drug VIOXX upon which the Mrs. Trahan justifiably relied when electing to use the drug VIOXX.

d.    The defective conditions, as described above, rendered VIOXX unreasonably dangerous to Mrs. Trahan.

-17-

42.    As a direct and proximate result of the defective and unreasonably dangerous condition of VIOXX, Plaintiff has incurred injuries and damages, which are more fully described hereinafter.

## COUNT  II.

### NEGLIGENCE OF DEFENDANT MERCK

43.    Plaintiff realleges each and every allegation of paragraphs 1 - 39 above, as if set forth fully herein.

44.    Merck is liable to the Plaintiffs for negligence in one or more of the following particulars:

a.    Merck was negligent for carelessly manufacturing, compounding, testing, inspecting, packaging, labeling, distributing, marketing, examining, selling, prescribing, and/or preparing VIOXX in such a manner that it was likely to cause harm to the Plaintiff.

b.    Merck was negligent in manufacturing, compounding, testing, packaging, labeling, prescribing, and/or distributing VIOXX in such a manner that the drug was unsafe when it reached the hands of the consuming public, including the Plaintiff.

c.    Merck was negligent in failing to warn Mrs.Trahan's physician of the unreasonable dangerous defects associated with VIOXX after Merck knew and/or should have known of such dangerous defects, thereby breaching Merck's duty to warn.

d.   Merck was negligent in representing and/or misrepresenting the benefits and safety risks of VIOXX and in failing to warn or adequately warn of the known risks.

e.   VIOXX was negligently designed in a defective manner in that it did not possess the safety aspect for which it was marketed.

f.   Merck was negligent in placing VIOXX on the market in May of 1999 in the face of overwhelming tests results which confirmed that VIOXX did not possess the pharmacological characteristics for which it was marketed, and, in fact, posed a serious health risk to individuals taking the drug, such as Plaintiff.

g.   Merck was negligent in failing to withdraw VIOXX from the market, earlier than September 28, 2004, in the face of overwhelming evidence that VIOXX did not possess the pharmacological characteristics for which it was marketed, and, in fact, posed a serious health risk to individuals taking the drug, such as the Plaintiff.

45.   As a direct and proximate result of the negligence of Merck, as set forth above, Plaintiff has sustained injuries and damages, as set forth more fully herein.

## COUNT   III.

### INTENTIONAL/NEGLIGENT MISREPRESENTATION TO A LEARNED INTERMEDIARY

46.   Plaintiff realleges each and every allegation contained in paragraphs 1 - 39 and 44, as if set forth fully herein.

-19-

47.   Merck, Darlene Roberson, and Does 1-5, had a duty to adequately warn Mrs. Trahan's physician of any known adverse effects which might result from his use of VIOXX. In the exercise of this duty, Merck, Darlene Roberson, and Does 1-5 knew or should have known that as a medical expert, Mrs. Trahan's prescribing physician would take into account representations made by Merck, Darlene Roberson, and Does 1-5, in determining whether or not to prescribe the drug VIOXX to Mrs. Trahan at all, and/or in making a determination regarding dosage amount, and length of use. Because VIOXX was administered as a prescription drug, Merck, Darlene Roberson, and Does 1-5, were required to warn the prescribing physician, who was to act as a learned intermediary between Merck, Darlene Roberson, Does 1-5, and Mrs. Trahan. In violation of this duty, Merck, Darlene Roberson, and Does 1-5, ("Defendants"), acted as follows:

a.   Defendants made representations to Mrs. Trahan's physician about VIOXX, and it's effects, and side effects, which Defendants knew and/or should have known were false, inaccurate, and/or misleading;

b.   Defendants knew or should have known that the false, inaccurate, and/or misleading information which they provided to the prescribing physician regarding VIOXX was material in nature;

c.   Defendants knew or should have known that the physician would rely on and act upon the false, inaccurate, and/or misleading information by prescribing the drug VIOXX to Mrs. Trahan's, and those patients of her physician similarly situated;

d.   Defendants knew or should have known that Mrs. Trahan's physician would rely on the false, inaccurate, and/or misleading representations made by

-20-

Defendants when determining whether or not and/or how to prescribe the drug VIOXX to her and other patients of her physician similarly situated;

e.   Defendants knew and/or should have known that Mrs. Trahan's physician had a right to rely on the representations made by Defendants regarding the propensities of the drug VIOXX when determining whether or not to prescribe VIOXX to Mrs. Trahan, and other patients of Plaintiff's physician similarly situated; and

f.   Defendants knew and/or should have known that Mrs. Trahan had a right to rely on the medical recommendations of her physician, and accept his advice to take the drug VIOXX as treatment for her medical condition.

48.   Merck, Darlene Roberson, and Does 1-5 acted intentionally in making the false, inaccurate, and misleading representations, described more fully above, to Plaintiff's prescribing physician.

49.   In the alternative, Merck, Darlene Roberson, and Does 1-5 were negligent in that they should have known that representations, described more fully above, which they made to Mrs. Trahan's physician were false, inaccurate, and misleading.

50.   As a direct and proximate result of the misrepresentations of Merck, Darlene Roberson, and Does 1-5, described more fully above, Plaintiffs have sustained injury and damages, as set forth fully hereinafter.

## COUNT IV

### FRAUD

51.     Plaintiff realleges each and every allegation contained in paragraphs 1-39 and 47-50 above, as if set forth fully herein.

52.     Merck, Darlene Roberson, and Does 1-5 made false, inaccurate, and misleading statements regarding the efficacy and safety of the drug VIOXX to Mrs. Trahan, her prescribing physician, and the public at large.  The specific actions of these Defendants are described more fully in paragraphs 46 through 50 above.  In summary, these Defendants committed fraud when they manipulated data from various studies, and/or represented that data from various studies indicated that there were no cardiovascular risks associated with taking the drug VIOXX.

53.     As a direct and proximate result of the fraud committed by Merck, Darlene Roberson, and Does 1 - 5 Plaintiff has sustained injury and damages as set forth more fully herein.

## COUNT V

### BREACH OF WARRANTY

54.     Plaintiffs reallege each and every allegation of paragraphs 1 - 57 of this Complaint, as if fully set forth herein.

55.     At all times material herein, Merck marketed, sold and distributed VIOXX and knew of the use for which the aforesaid drug was being used by Mrs. Trahan and impliedly warranted that the aforesaid drug was of merchantable quality and safe for its intended use.

56.     Further, Merck and its sales representatives represented to the treating physicians, the population of VIOXX consumers, and to the public at large and thus to Mrs. Trahan and her doctors that VIOXX was safe to prescribe and ingest.

-22-

57.    Such representations by Merck constituted an express warranty and/or an express factual representation upon which the Plaintiffs justifiably relied in ingesting VIOXX.

58.    Merck breached its warranties to Plaintiffs described above because VIOXX is not safe to prescribe or to ingest.

59.    Plaintiffs have been damaged by Merck's breach of warranty because she has suffered physical injuries as a result of her reliance on the representations made by the Defendants.

60.    As a direct and proximate result of Defendants breach of warranties, as set forth herein above, Plaintiffs sustained injuries and damages, as set forth more fully hereinafter.

### *COUNT VI*

### *COMMON LAW FRAUD*

61.    Plaintiffs reallege each and every allegation of paragraphs 1 - 60 of this Complaint, as if set forth fully herein.

62.    Merck, Darlene Roberson, and John Does 1-5 misrepresented to treating physicians, the population of VIOXX consumers, and the public at large, and thus to Mrs. Trahan and her doctors, that VIOXX was safe to prescribe and take by falsely minimizing the cardiovascular risks associated with VIOXX, which risks were known to there Defendants.

63.    At the time they made these misrepresentations, Merck, Darlene Roberson, and John Does 1-5 knew or should have known that these statements were false.

64.    These statements were made with the intent that those to whom they were directed would rely on them to their detriment; and Mrs. Trahan and his physicians did so.

65.    As a result of Merck's, Darlene Roberson's, and John Does 1-5's misrepresentations as above alleged, Plaintiffs suffered the damages alleged in paragraphs above.

## *COUNT VII*

## *FRAUD BY OMISSION*

66.     Plaintiffs reallege each and every allegation of paragraphs 1 - 65 of this Complaint, as if set forth fully herein.

67.     Merck, Darlene Roberson, and John Does 1-5 were in a position of superior knowledge as to the information above alleged when compared with the Mrs. Trahan's physician. Merck, Darlene Roberson, and John Does 1-5 knew that Mrs. Trahan, and other members of the consuming public who were suffering from arthritis or other pain causing conditions, did not possess the knowledge and information necessary to enable them to appreciate the risks and dangers to which they were subjecting themselves by taking VIOXX to relieve the symptoms of these conditions rather than taking other available effective products. As a result of the relationship between Merck, Darlene Roberson, John Does 1-5 and Mrs. Trahan's treating physicians, Merck, Darlene Roberson, and John Does 1-5 had a duty to inform physicians of these risks and dangers.

68.     Merck, Darlene Roberson, and John Does 1-5 violated the duties owed to Plaintiff's physician by remaining silent or issuing misleading statements when they had a duty to warn.

69.     Mrs. Trahan's physician reasonably relied upon these misleading statements as indicating that VIOXX continued to be safe to use. Merck thereby obtained an advantage at the expense of Plaintiff as they continued to sell VIOXX as safe when it in fact was not.

70.     These failures to so advise, as herein alleged, constituted fraud by omission.

71.     As a direct and proximate result of Defendants remaining silent or issuing misleading information, as set forth herein above, Plaintiffs sustained injuries and damages, as set forth hereinafter.

## COUNT VIII

### MEDICAL MONITORING

72.     Plaintiffs reallege each and every allegation of paragraphs 1 - 75 of this Complaint, as if set forth fully herein.

73.     Mrs. Trahan, as a result of her ingestion of VIOXX, has a greatly increased risk of an adverse health event from hypertension, elevated cholesterol, or other cardiovascular conditions, requiring that Merck be ordered to institute and fund a Medical Monitoring Program sufficient to minimize the additional risks of such an event Mrs. Trahan may suffer in the future as a result of taking VIOXX.

74.     Plaintiffs pray that the Court enter a mandatory injunction requiring Merck to undertake such a program as requested.

### COUNT IX

### AIDING AND ABETTING BY DARLENE ROBERSON AND JOHN DOES 1-5

75.     Plaintiffs reallege each and every allegation contained paragraphs 1- 53 above, as if set forth fully herein.

76.     As has been alleged in this Complaint, Merck has committed torts based on both intentional, and negligent conduct, resulting in injury and damage to the Plaintiffs.   Darlene Roberson, and Does 1-5 knew or should have known that the actions of Merck were tortious, and were a breach of Merck's legal duties, as have been described more fully herein.

77.     Darlene Roberson, and Does 1-5 provided substantial assistance and/or encouragement to the tortious conduct of Merck, including, but not limited to:

a.   Misrepresenting to Mrs. Trahan's physicians that Vioxx was a safe and
     effective product, which could be prescribed to her in the manner determined
     by her physician to be appropriate to address her medical concerns.

b.   Engaging in gamesmanship with Mrs. Trahan's physician by avoiding
     providing the physician with information regarding the known adverse safety
     characteristics of Vioxx.

c.   By engaging in such other additional conduct, known and/or unknown, some
     of which has been described more fully herein.

78.   As a direct and proximate result of Defendants misrepresentations, as set forth herein
above, Plaintiff sustained injuries and damages, as set forth hereinafter.

## VI.   DAMAGES

### A.

### COMPENSATORY DAMAGES

79.   As a direct and proximate result of the wrongful and tortious conduct of Merck,
Darlene Roberson, and John Does 1 - 5, as set forth hereinabove, Mrs. Trahan sustained special
damages consisting of medical bills and medical monitoring in the following amounts:

a.   Medical expenses for the treatment of conditions arising as a result of her
     ingestion of VIOXX in am amount in excess of $90,000.00;

b.   Medical expenses incurred by herfor continuing medical monitoring  in an
     amount in excess of $10,000.00 to date;

c.   Future medical expenses to be incurred by her for the balance of her life
     expectancy.

-26-

80.     Mrs. Trahan sustained the following non-economic damages as a direct and proximate result of the conduct of the Defendants as follows:

a.      Past, present and future pain and suffering;

b.      Mental anguish for the balance of his life expectancy;

c.      Loss of enjoyment of life.

81.     At all times prior to the occurrence complained of herein, Charles C. Trahan, Sr. And Rosie Joan Trahan lived happily together as husband wife.  Charles derived comfort, aid, and assistance from Rosie and they engaged in the customary marital acts with normal and usual frequency.  As a result of the injuries alleged herein to Rosie, Charles has been deprived of the full comfort, aid, assistance and enjoyment of his wife and which he ought to have had, and otherwise would have had, but for said occurrence; and Charles during all of such time, suffered and will suffer, in addition to the loss and deprivation of the full comfort, aid, assistance and enjoyment of his wife, Charles, great mental distress, agony, and anguish.

### B.

### PUNITIVE DAMAGES

82.     Merck, Darlene Roberson, and John Does 1-5 acted with actual malice, and gross negligence which evidences a willful, wanton, or reckless disregard for the safety of Plaintiff and also committed actual fraud.

83.     An award of punitive damages against Merck, Darlene Roberson, and John Does 1-5 is necessary and appropriate to deter Merck, Darlene Roberson, John Does 1-5 and others similarly situated from engaging in similar conduct in the future.

## AD DAMNUM

WHEREFORE, Plaintiffs bring these actions against Defendants herein above named and demand judgment of and against said Defendants, jointly and severally, in an amount sufficient to reasonably and fully compensate the Plaintiffs in an amount in excess of the jurisdictional limit of this Court and for punitive damages to serve as an example to those who so act in the future, pre- and post-judgment interest and all costs of court.

DRUG LITIGATION LIABILITY GROUP, PLLC
Comprised of:

Liston/Lancaster, PLLC
126 North Quitman Avenue
Post Office Box 645
Winona, MS 38967

David H. Nutt & Associates, P.C
605 Crescent Blvd., Suite 200
Ridgeland, MS 39157

Pittman, Germany, Roberts & Welsh, L.L.P.
Post Office Box 22985
Jackson, MS 39225-2985


By: _____
ATTORNEYS FOR PLAINTIFFS

OF COUNSEL TO RECEIVE PLEADINGS:

C. Victor Welsh, III (MSB #7107)
PITTMAN, GERMANY, ROBERTS & WELSH, LLP
P. O. Box 22985
Jackson, MS 39225-2985
(601) 948-6200 - phone
(601) 948-6187 - fax

-28-