IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

ROSIE JOAN TRAHAN and
CHARLES C. TRAHAN, SR.                                            PLAINTIFFS

VS.                                         CAUSE NO. : 5:06cv149 DCB-JMR

MERCK & CO., INC., DARLENE ROBERSON
AND DOES 1- 5                                                     DEFENDANTS

## *PLAINTIFFS' MEMORANDUM IN SUPPORT OF REMAND*

### *I. FACTS SUPPORTING REMAND*[1]

This is an action brought by the Plaintiffs for damages resulting to Mrs. Trahan from her ingestion of the non-steroidal anti-inflammatory pain medication VIOXX (chemical name "rofecoxib") and for damages sustained by Mr. Trahan for loss of consortium.

Mrs. Trahan purchased VIOXX and ingested the drug on a regular basis beginning in August 1999. As a result of such ingestion, she suffered physical injuries, including, but not limited to, acute myocardial infarction, on February 8, 2001.

Merck develops, markets, and sells pharmaceutical drugs. Merck is one of the Country's largest drug manufacturers, and is a dominant player in both the United States and World markets. In order to maintain its market position, Merck must continuously research and develop new drugs, seek their approval by appropriate government agencies, and aggressively market these drugs to healthcare professionals and the general public (a) through its sales representatives, such as Defendant Darlene Roberson, (b) "direct-to-consumer" print and video

---

[1] Additional facts supporting Plaintiffs' Motion to Remand can be found in Plaintiffs' Complaint at paragraphs 7 through 39.



advertising and (c) subsidized medical meetings. Merck's revenues are dependent on the sales of the drugs which it has developed.

Like many major pharmaceutical companies, Merck relies on the success of so called "blockbuster" drugs to generate the huge revenues necessary to maintain its leading position in a very competitive industry. "Blockbusters" are typically defined as medications that account for more than one billion dollars in annual sales, and are most often still under full patent protection from relatively inexpensive competing generic versions of the drugs. It is of paramount importance for pharmaceutical companies, like Merck, to make as much money from these blockbuster drugs while Merck still maintains full patent protection, thereby owning the market.

Beginning in February 2000, and continuing through June of 2001, five major drugs manufactured by Merck were going to lose patent protection: Vasotec, February 2000; Pepcid, April 2000; Prilosec, April 2001; Prinivil, December 2001; Mevacor, June 2001.

During this time, the drug VIOXX was one of the drugs being developed by Merck for introduction into the market. Faced with impending loss of significant market share, VIOXX became the blockbuster drug recognized by Merck to be the critical component to Merck's future financial success.

VIOXX is the brand name of a pain killer developed by Merck (chemical name rofecoxib). Traditional pain killers, such as aspirin, and naproxen (non-steroidal anti-inflammatory drugs, or "NSAIDs") cause significant gastrointestinal problems. Merck represented that VIOXX would relieve pain while avoiding serious gastrointestinal health effects. When attempting to position VIOXX in the market, Merck repeatedly emphasized the serious health risks and fatalities that could be caused by prolonged use of NSAIDs that could be avoided

through use of the drug VIOXX. Merck's marketing plan of VIOXX depended upon a multi-million dollar advertising campaign through direct-to-consumer advertising and to potential prescribing physicians through its sales representatives, including Darlene Roberson.

As marketed by Merck, the value of VIOXX did not lie in its effectiveness for treatment of pain, VIOXX value lay in its purported "safety."

In May of 1999, Merck began the distribution and sale of VIOXX. Once distribution and sale began, Merck wasted no time in dispatching its pre-programmed sales force to insure VIOXX's availability on the market. Although VIOXX would not arrive in pharmacies until early June 1999, Merck had already begun to dispatch a sales force of over four thousand individuals to pitch "the safe drug VIOXX" to doctors, and healthcare organizations. By June of 1999, Merck's sales force had been successful in placing VIOXX in more than 40,000 pharmacies across the United States.

As Darlene Roberson and other members of Merck's sales force were touting the safety of the drug VIOXX, they, at the same time, were aware that VIOXX posed a substantial risk of heart attacks, strokes, and other serious cardiovascular events. These serious risks posed by VIOXX were known to Merck as far back as 1996 when Merck's scientists began to notice that VIOXX did not possess the same protection against heart attacks recognized in other pain killers, i.e., aspirin and naproxen. Because VIOXX did not have this similar affect, this could explain studies suggesting that VIOXX would **increase** the risk of heart attacks.

As early as 1998, Merck began to conduct clinical randomized trial studies designed to evaluate the safety of VIOXX. These studies, Study 085 and 090 in 1998, the VIGOR study in 1999, and ADVANTAGe in 2000, all revealed that patients taking VIOXX faced a significantly

-3-

increased risk of serious cardiovascular events. However, Merck either misrepresented the results of these studies, or did not publish the actual results until shortly before VIOXX was removed from the market in September of 2004. Even Merck's last attempt to come clean by releasing data from it's APPROVe study was just one more attempt by Merck to present false and misleading information regarding VIOXX. Shortly after the data was published, a well respected member of the medical community obtained the previously confidential 107 page raw data from the APPROVe study. After examining the study, it was learned that the raw data confirmed that patient's were at high risk of heart problems and strokes almost as soon as they started taking VIOXX. Further, the raw data confirmed that the risk from VIOXX persisted for at least a year after patients stopped taking the drug. These findings, based upon the raw data from Merck's own study, contradicted Merck's public announcement that the data showed no adverse affects within the first eighteen months of taking the drug, and no indication that patients were at a greater risk of heart problems after they stopped taking the drug.

As safety questions about the adverse cardiovascular effects of VIOXX continued to be raised in the medical community, Merck pushed forward with its estimated $500 million dollar plus advertising and training program. As part of its training program, Merck had produced training videotapes and brochures, and coached sales representatives, including Darlene Roberson, to try to avoid questions about the risks of heart attacks. One such video contained an actress posing as a physician presenting "an obstacle" to a VIOXX sales representative. The actress/physician poses the question "I'm afraid VIOXX causes myocardial infarctions." As a response, another actress playing a Merck sales representative coaches representatives to respond "That's not true."

Merck also authored a 1999 training guide which was presented to sales representatives such as Darlene Roberson at a VIOXX workshop. The workshop training materials form indicated that one of the core messages that should be communicated to VIOXX sales representatives such as Darlene Roberson was that VIOXX was a safe product. One of the planned goals of the workshop was to insure that VIOXX sales representatives could handle "obstacles" in the nature of questions from physicians about the cardiovascular safety of VIOXX.

As part of its workshops, Merck developed the game of "Dodge Ball VIOXX" and "JeopardXX" as teaching tools. In the game of Dodge Ball VIOXX, Merck sales representatives had to overcome "obstacles" in the form of physicians' questions in order to advance to the next round. However, players were rewarded if they turned over the "**DODGE!**" card allowing them to advance to the next round without having to answer the physician's question. Merck, through this training exercise, was able to send a clear message to Darlene Roberson and its other sales representatives; "You never have to answer a hard question from a physician if you're able to **DODGE** it!"

In the game of JeopardXX, VIOXX sales representatives were awarded points for avoiding direct answers to physicians' questions regarding concerns about the cardiovascular effects of VIOXX, specifically, questions posed by a physician "About a potential increase in the risk of myocardial infarctions."

Armed with this information, Darlene Roberson, and other members of Merck's preprogrammed sales force, would visit pharmacies, doctors, and other healthcare professionals, to promote the sale and use of VIOXX by individuals such as Rosie Trahan. This information was provided to Mrs. Trahan's physician, Dr. Linda J. Rockhold, by Darlene Roberson with the

knowledge and understanding that Dr. Rockhold would rely on this "misinformation" when determining the dose, duration, and need to prescribe VIOXX for Mrs. Trahan's medical condition. Darlene Roberson was one of the most direct and effective contacts between Merck and the prescribing medical community.

The efforts of Merck, Darlene Roberson, and other Merck sales representatives were successful in keeping VIOXX on the market for over 5 ½ years. During this 5 ½ year period, approximately 20 million Americans took the drug VIOXX. With annual sales of approximately $2.5 billion, VIOXX resulted in one of the most successful marketing campaigns ever for a new drug introduced into the American market. However, despite knowledge from clinical trials, post-marketing reports, studies, and other information relating to adverse cardiovascular affects, Merck, knowingly aided and abetted by Darlene Roberson and other Merck's sales representatives, promoted and continued to market VIOXX as safe up until the public announcement of its world wide withdrawal on September 30, 2004.

### III. ARGUMENT

#### A.  *Standard of Removal*

Federal courts are courts of limited jurisdiction, resulting in a presumption that jurisdiction does not exist. Indeed, under our federal constitutional scheme, state courts are assumed to be equally capable of deciding both state and federal issues. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Further, where Congress has given federal courts jurisdiction over certain controversies, "due regard for the rightful independence of state governments, which should actuate federal courts, requires that they [federal courts] scrupulously confine their own jurisdiction to the precise limits which [a federal] statute has defined." *Victory Carriers, Inc. v.*

*Law*, 404 U.S. 202, 212 (1971), *quoting, Healy v. Ratta*, 292 U.S. 263, 270 (1934). *See also, Stockman v. Federal Election Commission*, 138 F.3d 144, 150-152 (5th Cir. 1998).

Merck, as the party seeking to remove this matter to Federal Court, has the heavy burden of establishing federal jurisdiction. *Marathon Oil Co. v. Ruhrgas*, 115 F.3d 315, 318-19 (5th Cir. 1997); *Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th Cir. 1993), *cert. denied* 510 U.S. 868 (1993); *Laughlin v. Prudential Ins. Co.*, 882 F.2d 187, 190 (5th Cir. 1989).

A district court "must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits." *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. 1981). Whether a case is removable and whether it states a cognizable claim against an in-state defendant is determined by reference to the allegations made in the original pleadings. *See Tedder v. F.M.C. Corp.*, 590 F.2d 115, 116 (5th Cir. 1979); *Gray v. United States Fidelity & Guaranty*, 646 F.Supp. 27, 29 (S.D. Miss. 1986). The Court must then evaluate those allegations in the light most favorable to the party opposing removal, resolving all contested issues of law and fact in favor of the non-removing party. *B., Inc.*, 663 F.2d at 549. *See also Dodson v. Spiliada Maritime Corp.*, 951, F.2d 40 (5th Cir. 1992); *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172 (5th Cir. 1968); *Howard v. General Motors Corp.*, 287 F.Supp. 646 (N.D. Miss. 1968).

**B.    *Diversity Jurisdiction Does Not Exist***

Title 28 of the U. S. Code requires complete diversity between the parties before jurisdiction can exist in the Federal District Court. *See*, 28 U.S.C. §1332. Since Merck is asserting diversity jurisdiction as a basis for removal, then the jurisdiction which this court must consider is more limited and must be more strictly construed than either removal jurisdiction based on federal question or jurisdiction in a diversity case originally brought in Federal Court.

*Wright, Miller* and *Cooper*, Jurisdiction 2nd §3723, at p. 308. *See also Ziegler v. Champion Mortgage Co.*, 913 F.2d 228, 230 (5th Cir. 1990) (reasoning that the scope of removal jurisdiction was narrower than that of other subject matter jurisdiction); *Hurt v. Dow Chemical Co.*, 963 F.2d 1142, 1145 (8th Cir. 1992) (holding 28 U.S.C. §1441(b) makes diversity jurisdiction in removal cases narrower than if the case was originally filed in federal court). The Unites States Supreme Court has opined that such strict construction is necessary in order to preserve the power reserved for the states to resolve controversies within their courts. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-109 (1941).

It is clear that Federal Courts must be mindful of reviewing challenges to subject matter jurisdiction before considering requests for other relief. On this point, the Fifth Circuit, in *Marathon Oil Co. v. Ruhrgas*, 115 F.3d 315 (5th Cir. 1997) stated as follows:

> As courts of limited jurisdiction, federal courts may adjudicate a case or controversy only if there is both constitutional and statutory authority for federal jurisdiction . . . we must be ever mindful that any rule or decision allowing a federal court to act without subject matter jurisdiction conflicts irreconcilably with basic principals of federal court authority. On several occasions, we have sounded the caution that 'where a federal court proceeds in a matter without first establishing that the dispute is within the province of controversies assigned to it by the Constitution and statutes, the federal tribunal poaches upon the territory of a coordinate judicial system, and it decisions, opinions, and orders are of no affect.' (citations omitted). . . The appropriate course is to examine for subject matter jurisdiction constantly, and if it is found lacking, to remand to state court if appropriate, and otherwise dismiss. (citations omitted). Such a course respects the proper balance of federalism.

*Marathon Oil Co.*, 115 F.3d at 317-318.

It is well established that Merck, as the removing party, bears the burden of proving that

the Federal District Court has jurisdiction to hear the claim. *Dodson v. Spiliada Maritime Corp*, 951 F.2d 40, 42 (5th Cir. 1992). *See also Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th Cir. 1993). "[T]he burden of proving that plaintiffs fraudulently joined non diverse defendants is heavy." *Green v. Amerada Hess Corp.*, 707 F.2d 201, 205 (5th Cir. 1983), *cert. denied*, 464 U.S. 1039, 104 S. Ct. 701, 79 L.Ed. 2d 166 (1984). The Fifth Circuit Court of Appeals has acknowledged the following standard in determining whether or not fraudulent joinder has occurred:

> [i]n order to establish that an in-state defendant has been fraudulently joined, **the removing party must show either that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant** in state court, or that there has been an outright fraud in the plaintiffs' pleading of jurisdictional facts.

*B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. 1981) (emphasis added); *See also Ironworks Unlimited v. Purvis*, 798 F.Supp. 1261, 1263 (S.D. Miss. 1992) (holding that *"if there is even a possibility* that a state court would find a cause of action against any one of the named in-state defendants . . . then the federal court may find that the in-state defendants have been properly joined, that is incomplete diversity, and that the case must be remanded to the state courts.") (emphasis added). "The removing party must prove that there is absolutely *no possibility* that the plaintiff will be able to establish a cause of action against the in-state defendant in state court." *Green*, 707 F.2d at 205. (emphasis added).

The Trahans and Defendant, Darlene Roberson are Mississippi residents. Therefore, the sole inquiry is whether there is a possibility that the Plaintiffs have set forth a valid cause of action against Darlene Roberson. When faced with a claim of fraudulent joinder, the district

court is not to decide whether the plaintiff will actually or even probably prevail on the merits of the claims against the resident defendants. *Dodson*, 951 F.2d at 42. The Court is to look only for a possibility that the plaintiff may prevail under Mississippi law "as it stands today." *Tedder v. F.M.C. Corp., et al.*, 590 F.2d 115, 117 (5th Cir. 1979).

It is not sufficient for a defendant to merely label the joinder as fraudulent. *Chesapeake & Ohio Railway Co. v. Cockrell*, 232 U.S. 146, 152, 34 S. Ct. 278, 280, 58 L.Ed. 544 (1914). *A **claim for fraudulent joinder must be pleaded with particularity and supported by clear and convincing evidence and proven with certainty.** Parks v. New York Times Co.*, 308 F.2d 474, 478 (5th Cir. 1962), *cert. denied*, 376 U.S. 949, 84 S. Ct. 964, 11 L. Ed. 2d 969 (1964) (emphasis added); *See also Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999); *Burden v. General Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995); Wright, Miller & Cooper, Federal Practice and Procedure § 3723.

When considering motions to remand based on the viability of state law claims, the district court must resolve all disputed questions of fact and all ambiguities in the state law in favor of the non-removing party. *Dodson*, 951 F.2d at 42. If there is arguably a reasonable basis for predicting that state law might impose liability on the facts involved, then there is no fraudulent joinder. *Jernigan v. Ashland Oil Co.*, 989 F.2d 812, 815 (5th Cir. 1993). Under the narrow construction afforded to 28 U.S.C.S. §1441 "any doubt should be resolved in favor of non-removability." *Gober v. Allstate Insurance Co.*, 855 F.Supp. 158, 160 (S.D. Miss. 1994); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) (finding "[d]efendant's right to remove and plaintiff's right to choose his forum are not on equal footing . . . removal statutes are construed narrowly, where plaintiff and defendant clash about jurisdiction, uncertainties are

resolved in favor of remand.") The existence of a viable claim against Darlene Roberson defeats diversity jurisdiction and requires remand of this case to the Circuit Court of Warren County, Mississippi. *See Buchner v. F.D.I.C.*, 981 F.2d 816, 819 (5th Cir. 1993) (remanding of case is required where subject matter jurisdiction does not exist).

C.   *Darlene Roberson owed a duty to Rosie Trahan to fully disclose the known risks of VIOXX to Dr. Rockhold, Trahan's prescribing physician.*

In it's Notice of Removal, at paragraph 18, Merck raises it's primary argument in support of it's fraudulent joinder claim. In paragraph 18, Merck correctly recognizes that Plaintiffs have asserted claims of strict liability in tort, intentional/negligent misrepresentation to a learned intermediary, fraud, breach of warranty, common law fraud, fraud by omission, and aiding and abetting against Darlene Roberson. Merck is also correct in that each of these causes of action requires that Roberson actually make a representation or omission of fact. Merck's argument fails, under Mississippi law, when Merck suggests that these representations or omissions of fact must have been made to Rosie Trahan. Mississippi law allows a Plaintiff, such as Rosie Trahan, to assert a cause of action against a sales representative, such Darlene Roberson, when it is shown that the misrepresentations and/or omissions of fact were made to the Plaintiff's prescribing physician. In each count asserted against Darlene Roberson, Plaintiff has sufficiently alleged that Darlene Roberson made such misrepresentations and/or omissions of fact to Darlene Roberson's prescribing physician. Remand of this case is required.

The basis for holding an individual or entity liable to a patient for failure to adequately warn the patient's physician of the known adverse effects of a prescription drug was discussed by the Mississippi Supreme Court in *Wyeth Laboratories, Inc. v. Billy Joe Fortenberry*, 530 So.2d

-11-

688 (Miss. 1988). In *Wyeth*, the Mississippi Supreme Court discussed the duty, as follows:

> We hold that the drug manufacturer has a duty to adequately warn the prescribing physician of any known adverse effects which might result from use of it's prescription drugs. (citations omitted) . . .
>
> The general rule is "that where prescription drugs are concerned, a manufacturer's duty to warn only extends to physicians and not to laymen." (citation omitted) "If the language of the warning is adequate, then the drug manufacturer ordinarily is free from liability." (citation omitted) The "learned intermediary" doctrine is the basis for this rule.

*Wyeth*, 530 So.2d at 688. *See*, also, *Moore v. Memorial Hospital of Gulfport*, 825 So.2d 658, 662 (Miss. 2002) (pharmaceutical companies are required to warn only the prescribing physician of the dangers inherent in its products). The *Wyeth* Court further discussed that a physician would be required to take into account the disclosed propensities of a drug, as well as the characteristics of his patient, in making choices regarding use of the prescription medication. *Id.* The Court further recognized that in cases involving non-prescription drugs, the duty to adequately warn would be owed directly to the patient/consumer. *Id.* at 692.

The basis for extending this duty to a sales representative for purposes of holding a sales representative liable was discussed by the Federal District Court in *Walker v. Medtronic, Inc.*, 2003 WL 21517997 (N.D. Miss. June 4, 2003), a case cited by Merck at page 8, paragraph 22, of its Notice of Removal. Although the court in *Walker* found that the medical product sales representative was fraudulently joined, the court did recognize that, under Mississippi law, the sales representative would be subject to personal liability when she "directly participates in or authorizes the commission of a tort." *Id.* at ¶ 3. The court in *Walker* dismissed the claims against the medical product representative due to the plaintiff's failure to include specific factual allegations in the complaint concerning the representative's participation in the fraud in anything

other than "very general terms." *Id.* at ¶ 4. Clearly, if the plaintiff in *Walker* had pled her case, as Rosie Trahan has pled her case against Darlene Roberson, the court would have reached a different result.

VIOXX is a prescription drug. Therefore, Darlene Roberson owed a duty to Rosie Trahan to fully disclose the known risks of a adverse cardiovascular events to Dr. Rockhold. Instead, Darlene Roberson, exercised her training and use of games such as Dodge Ball VIOXX, and JeopardXX, to insure that the known risks of adverse cardiovascular events were denied and/or not made known to Dr. Rockhold. The failure to adequately discharge this duty forms the basis of Plaintiff's claims against Darlene Roberson and requires remand of this case.

### *IV. CONCLUSION*

For the reasons stated above, this Court must remand this case to the Circuit Court of Warren County, Mississippi.

DATED this the __29th__ day of __November__, 2006.

Respectfully submitted,

DRUG LITIGATION LIABILITY GROUP, PLLC
Comprised of:

Liston/Lancaster, PLLC
126 North Quitman Avenue
Post Office Box 645
Winona, MS 38967

David H. Nutt & Associates, P.C
605 Crescent Blvd., Suite 200
Ridgeland, MS 39157

Pittman, Germany, Roberts & Welsh, L.L.P.
Post Office Box 22985
Jackson, MS 39225-2985

By: _____
ATTORNEYS FOR PLAINTIFFS

OF COUNSEL TO RECEIVE PLEADINGS:

C. Victor Welsh, III (MSB #7107)
PITTMAN, GERMANY, ROBERTS & WELSH, LLP
P. O. Box 22985
Jackson, MS 39225-2985
(601) 948-6200 - phone
(601) 948-6187 - fax

## CERTIFICATE OF SERVICE

I, C. Victor Welsh, III, do hereby certify that a true and correct copy of *Plaintiffs' Memorandum in Support of Motion to Remand* has been served by United States mail, postage prepaid, and by electronic filing with the Clerk of Court using the ECF system:

Christy D. Jones
Charles C. Harrell
Anita Modak-Truran
Alyson B. Jones
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
210 East Capitol Street
Post Office Box 22567
Jackson, MS 39225-2567
(601) 948-5711 - phone
(601) 985-4500 - fax

DATED this the 29th day of November, 2006.

_____
C. VICTOR WELSH, III