# Exhibit 1

BEFORE THE JUDICIAL PANEL ON MULTIDISTRCT LITIGATION

| | |
|---|---|
| IN RE: VIOXX | MDL DOCKET NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | JUDGE FALLON |

| | |
|---|---|
| CHARLES M. FLIPPIN and KATHERINE C. FLIPPIN | |
| Plaintiffs, | |
| | MDL CASE NO. CA 05-1797 L (3) |
| vs. | |
| MERCK & CO., INC.; NICHOLAS TERRY WARREN, DPH; STEVE C. JACKSON, DPH; RICHARD W. HAYES, DPH; STEPHANIE B. (BUCK) ISON; COURTNEY SHAY (INGRAM) McMAKIN; VINAY KRISHAN SOOD; MELISSA CAROL (McALLISTER) BARNES; MICHAEL RICHARDS; PATRICIA BLASINGAME and SCOTT EVANS, | Removed from the Circuit Court for Carroll County, Tennessee at Huntingdon, Civil Action No. 05CV#6 Jury Demand |
| Defendants | |

*SUPPLEMENTAL AFFIDAVIT OF CHARLES FLIPPIN*

Before me, the undersigned notary, on this day personally appeared Charles Flippin, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

1.     "My name is Charles Flippin. I am capable of making this affidavit. The facts in this affidavit are within my personal knowledge and are true and correct.

Exhibit 1

2.      On October 12, 2005, I executed an affidavit in support of Plaintiffs' Supplemental Motion to Remand. As described in my prior affidavit, I continue to suffer from significant financial and medical hardships today.

3.      Specifically, I am still disabled from the injuries I sustained from my heart attack in February 2004 after taking Vioxx.   I cannot work and still have no income or medical insurance. The only income to my household remains my wife's disability payments, which are now $670.00 per month, an increase of only $46.00 since October 2005. I have been trying to obtain Social Security Disability benefits since 2005, yet I have not been approved.  I initially applied for Social Security Disability benefits in April 2005, however, I went through the process twice and was denied twice.  In summer 2006, I employed an attorney to help me with the Social Security Administration.  I have been granted a hearing, but it will not occur until sometime in 2008 due to a backlog at the Social Security office.

4.      On the positive side, I have been able to obtain free medications for my heart through the patient assistance programs of several drug companies, but because there is a lot of red tape involved, I still have been unable to take all of my medications as prescribed.  While I feel fortunate to be receiving some medications, the programs require me to reapply for each 30-day supply of drugs, which involves filling out applications for each drug and taking these applications to my physician for his signature. Currently, I take Lipitor, Plavix, Renexa, Coreg and Altace for my heart. Each of these drugs is from a different manufacturer, so I am required to send separate applications to each company each month, all requiring doctor approval. Due to the paperwork, the need for doctor approval, processing time, and delays in receiving these drugs through the mail, I often run out of these medications before the next 30-day supply arrives.  I

am supposed to take these medications daily, but I am not always able to ensure that I have a consistent supply.

5.      I remain unable to afford to see Dr. Lui, my cardiologist, on a regular basis to monitor my condition. I see him only once a year. He has previously asked me to see him every two or three months for monitoring. I remain worried about my lack of follow-up care.

6.      Furthermore, because I am disabled from my heart attack and have no medical insurance, I have been unable to get medical attention for a large hernia I have developed at the site of my prior surgery for colon cancer. The hernia has grown over the past year, and is now very large, making me appear as if I am nine months pregnant. In addition to the severe physical limitations resulting from my heart attack, such as fatigue and exhaustion, the hernia further restricts my ability to function day to day. I cannot do simple tasks like picking things up off the floor and am constantly uncomfortable. Prior to my heart attack, the insurance I had through my job would have paid for the hernia to be fixed. Now, I cannot afford to have a stress test that is needed to monitor my cardiac condition before the surgery, much less afford the surgery itself. While I feel fortunate to not have had any additional cardiac events since my last affidavit, I concerned my hernia will rupture and worry about the strain it puts on my heart.

7.      Apart from my continuing medical hardships, my financial condition has continued to deteriorate. Of the $670.00 my wife receives, we continue to pay $235.00 for our mortgage. We are left with only $435.00 each month to cover groceries, utilities, gas and other necessities. At the time I executed my prior affidavit, we had exhausted our savings. Since that time, in emergency situations such as when we run out of food stamps, we have been forced to rely on credit cards to buy necessities such as food and household items. Even with our limited

use of our credit cards, we have reached our maximum credit limits and certain cards have been sent to collection agencies."

Further affiant saith not.

_Charles M. Flippin_
CHARLES M. FLIPPIN

SWORN TO and SUBSCRIBED
before me this 4th day of
September , 2007.

_Shelia A. Bland_
Notary Public

My Commission Expires:

08-20-08

# Exhibit 2

BEFORE THE JUDICIAL PANEL ON MULTIDISTRCT LITIGATION

| | |
|---|---|
| IN RE: VIOXX ) | MDL DOCKET NO. 1657 |
| ) | |
| PRODUCTS LIABILITY LITIGATION ) | JUDGE FALLON |
| ) | |

| | |
|---|---|
| CHARLES M. FLIPPIN and ) | |
| KATHERINE C. FLIPPIN ) | |
| ) | |
| Plaintiffs, ) | |
| ) | MDL CASE NO. CA 05-1797 L (3) |
| vs. ) | |
| ) | |
| MERCK & CO., INC.; NICHOLAS TERRY ) | |
| WARREN, DPH; STEVE C. JACKSON, ) | Removed from the Circuit Court for |
| DPH; RICHARD W. HAYES, DPH; ) | Carroll County, Tennessee at Huntingdon, |
| STEPHANIE B. (BUCK) ISON; COURTNEY ) | Civil Action No. 05CV#6 |
| SHAY (INGRAM) McMAKIN; VINAY ) | Jury Demand |
| KRISHAN SOOD; MELISSA CAROL ) | |
| (McALLISTER) BARNES; MICHAEL ) | |
| RICHARDS; PATRICIA BLASINGAME and ) | |
| SCOTT EVANS, ) | |
| ) | |
| Defendants ) | |
| ) | |

## AFFIDAVIT OF VICTORIA J. PIKE, ATTORNEY

Before me, the undersigned notary, on this day personally appeared Victoria J. Pike, a person whose identity is known to me. After I administered an oath to her, upon her oath, she said:

"My name is Victoria J. Pike. I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

I am the attorney representing Charles M. Flippin in his claim for Social Security Disability benefits. The medical evidence in Mr. Flippin's Social Security Disability case indicates that Mr. Flippin was hospitalized in February 2004 after suffering a myocardial infarction. During the course of this hospitalization, he underwent a left heart catheterization with percutaneous transluminal

**Exhibit 2**

coronary angioplasty (PTCA) with the insertion of three stents. Since that time, Mr. Flippin has continued to experience episodes of shortness of breath and chest pain, especially with any sort of exertion. He has been treated by Dr. Henry Lui, a cardiologist, concerning his heart disease. Since the initial cardiac event, Dr. Lui has obtained several diagnostic studies, all of which show that Mr. Flippin's cardiac function is significantly abnormal. For example, cardiac testing in April 2004 showed "ischemic cardiomyopathy with moderate to severe decreased left ventricular function." In October 2005, Dr. Lui opined that Mr. Flippin is having significant Class III CHF with barely walking 20 to 30 yards before having to stop due to being short of breath. Dr. Lui also noted recurrent chest pain and testing that revealed total occlusion of two coronary vessels; therefore, he opined that Mr. Flippin is functionally a Class IV angina and that he is not a good candidate for bypass surgery due to "poor target vessels." Dr. Lui concluded that it is his belief that Mr. Flippin is "totally disabled."

Mr. Flippin's hearing before an Administrative Law Judge was requested in July 2006 and will adjudicated through the Office of Disability Adjudication and Review in Nashville, Tennessee, which is currently running a 24-month backlog. It is my belief that Mr. Flippin's hearing will likely not be scheduled before mid-2008.

Further affiant sayeth not.

VICTORIA J. PIKE

SWORN and SUBSCRIBED
before me this 30 day of
August , 2007.

Notary Public

My Commission Expires:
4/19/2011

SUZANNE JACK
STATE
OF
TENNESSEE
NOTARY
PUBLIC
MADISON COUNTY

My Commission
Expires
April 19, 2011

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ELDA DEL BOSQUE, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | |
| | § | |
| | § | Civil Action |
| MERCK & CO., INC., JANET L. | § | No. C-06-510 |
| FERGUSON, STEPHANIE HANNIGAN, | § | |
| SCOTT A. FAUVER, CHRISTOPHER | § | |
| LYNN DAVIS, MARK K. JORDAN, | § | |
| SUSAN R. KERR, FRANCISCO | § | |
| RODRIGUEZ, DJEBI LOFTON, JACK | § | |
| PAUL JUDGE and CHRISTOPHER L. | § | |
| BLANKS, | § | |

Defendants.

## ORDER OF REMAND

On this day came on to be considered the Court's <u>sua sponte</u> review of its subject matter jurisdiction in the above-styled action. For the reasons stated herein, the Court finds that subject matter jurisdiction is lacking, and the Court hereby REMANDS this action pursuant to 28 U.S.C. § 1447(c) to the 229th Judicial District Court of Duval County, Texas, where it was originally filed and assigned Cause No. DC-06-268.

## I.   Factual and Procedural Background

Plaintiff Elda Del Bosque filed her Original Petition in state court on September 29, 2006. (D.E. 1, Notice of Removal, ¶ 1; Exh. B to Notice of Removal, Plaintiff's Original Petition ("Petition")). Plaintiff sued Merck & Co., Inc. ("Merck") and Merck sales representatives Janet L. Ferguson, Stephanie Hannigan, Scott A. Fauver, Christopher Lynn Davis, Mark K. Jordan, Susan R.

Exhibit 3

Kerr, Francisco Rodriguez, Djebi Loftin, Jack Paul Judge and Christopher L. Blanks (together, "Sales Representatives"). The Petition alleges that Plaintiff "suffered from serious and permanent injuries" as a result of taking Vioxx, a prescription medication manufactured by Defendant Merck. (Petition, ¶¶ V-VII). Plaintiff alleges several causes of action against Merck and the Sales Representatives, including negligence, fraud and breach of warranties. (Petition, ¶¶ VII-XII).

Merck was served with Plaintiff's Original Petition on October 12, 2006. (Notice of Removal, ¶ 2). On November 13, 2006, Merck removed the action to this Court, alleging diversity jurisdiction. (Id. at ¶ 3). Merck claims that the amount in controversy exceeds the jurisdictional requirement of $75,000, and the parties are diverse because Plaintiff is a citizen of Texas and Merck is a citizen of New Jersey.[1] (Id. at ¶¶ 3, 9-13). Merck acknowledges that the Defendant Sales Representatives are, like Plaintiff, citizens of Texas, but Merck alleges that the Sales Representatives were improperly joined to defeat diversity. (Id. at ¶¶ 1, 13). For the reasons stated below, the Court finds that the Sales Representatives were properly joined, and that the Court lacks subject-matter jurisdiction over this action.

---

[1] Merck is a corporation organized under the laws of New Jersey and has its principal place of business in New Jersey. (Petition, ¶ 2; Notice of Removal, ¶ 12). Merck is accordingly a citizen of New Jersey for diversity purposes, pursuant to 28 U.S.C. § 1332(c)(1).

## II. Discussion

### A. Improper Joinder

"The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper." Smallwood v. Illinois Cent. R.R. Co., 385 F.3d 568, 574 (5th Cir. 2004) (en banc). The removing party proves improper joinder by demonstrating: (1) actual fraud in the pleading of jurisdictional facts, or (2) the inability of the plaintiff to establish a cause of action against the non-diverse defendant in state court. See Crockett v. R.J. Reynolds Tobacco Co., 436 F.3d 529, 532 (5th Cir. 2006) (citing Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003)); see also Boone v. Citigroup, Inc., 416 F.3d 382, 388 (5th Cir. 2005). As there is no allegation of actual fraud in Plaintiff's Original Petition, Merck establishes improper joinder by demonstrating that there is no possibility of recovery by Plaintiff against the non-diverse Sales Representatives. See Crockett, 436 F.3d at 532. The Court resolves this matter by conducting an analysis under a rule similar to that of Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court "must evaluate all of the factual allegations in the light most favorable to the plaintiff, resolving all contested issues of substantive fact in favor of the plaintiff." Guillory v. PPG Indus., Inc., 434 F.3d 303, 308 (5th Cir. 2005) (citing B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. 1981)); see also Boone, 416 F.3d

at 388; Smallwood, 385 F.3d at 573. The Court does "not determine whether the plaintiff will actually or even probably prevail on the merits of [his or her state law] claim, but look[s] only for a possibility that the plaintiff might do so." Guillory, 434 F.3d at 308. Ordinarily, if the plaintiff can survive the Rule 12(b)(6) type challenge, there is no improper joinder. See Smallwood, 385 F.3d at 573. If Merck fails to establish improper joinder, then there is not complete diversity of citizenship among the parties, and the Court must remand the action for lack of subject-matter jurisdiction. See 28 U.S.C. §§ 1332, 1447(c).

## B. Plaintiff Pleads a Possible Cause of Action Against the Sales Representatives

Under Texas products liability laws, a non-manufacturing seller can be held liable for injuries caused by a product if (1) the seller actually knew of a defect to the product at the time the seller supplied the product; and (2) the plaintiff's injuries resulted from the defect. See Tex. Civ. Prac. & Rem. Code § 82.003(a)(6) (Vernon 2003); see also Goss v. Schering-Plough Corp., 2006 WL 2546494, *2-3 (E.D. Tex. 2006). Moreover, in a lawsuit involving failure to provide adequate warnings, a distributor of a pharmaceutical product can be held liable if the distributor "withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the

[plaintiffs'] injury[.]" See id. § 82.007(b)(1).

The Court reiterates that the party seeking removal bears a heavy burden of proving improper joinder, and that the Court must find proper joinder if there is any possibility that the Plaintiff has stated a cause of action against the in-state defendants. See Smallwood, 385 F.3d at 573-74. Plaintiff alleges that the Sales Representatives, who may fall within the definition of non-manufacturing sellers under Texas Civil Practice & Remedies Code § 82.001, knew or should have known about risks associated with Vioxx. See Petition, ¶ VII (stating "Defendants ... promoted, marketed, advertised, or sold, and placed in the stream of commerce Vioxx, which [they] knew, or ... should have known was highly harmful to Plaintiff's health and well being."); see also Tex. Civ. Prac. & Rem. Code § 82.001(3) ("'Seller' means a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."). Plaintiff further alleges that the risks associated with Vioxx were not made known to her, and that Defendants' failure to warn caused the Plaintiff's injuries. (Petition, ¶ VII). Construing these allegations liberally in the light most favorable to Plaintiff, the Court concludes that Plaintiff could conceivably recover against the in-state Sales Representatives pursuant to Tex. Civ. Prac. &

Rem. Code § 82.003(a)(6).[2] Thus, Plaintiff survives the Rule 12(b)(6) type challenge, and as long as Plaintiff could conceivably recover damages from the Sales Representatives, the Court must remand this action. See Smallwood, 385 F.3d at 573.

## C. The Learned Intermediary Doctrine

Merck argues that because of the learned intermediary doctrine, the Sales Representatives did not owe a legal duty to warn the Plaintiff of the risks associated with Vioxx. (Notice of

[2]The Court notes that while Merck's Notice of Removal sets forth numerous arguments as to why Plaintiff cannot recover against the Sales Representatives under various theories, Merck makes no attempt to show that Plaintiff cannot recover from the Sales Representatives under Texas' products liability laws. Further, the Court notes that it finds unpersuasive Merck's argument that Plaintiff has not plead sufficient factual allegations against the Sales Representatives in her Petition. To the contrary, Plaintiff makes numerous factual allegations against the Sales Representatives, including allegations (1) that the Sales Representatives marketed, advertised, sold, or placed into the stream of commerce drugs they knew or should have known were harmful to Plaintiff's health; (2) that the Sales Representatives misrepresented and/or actively concealed Vioxx's problems from Plaintiff, the health care industry, and the consuming public; and (3) that the Sales Representatives were in the business of profiting from the sales of Vioxx. (Petition, ¶¶ VII, IX, XI). Finally, the Court also finds unpersuasive Merck's argument that Plaintiff cannot recover against the Sales Representatives because their alleged actions were made in the scope of their employment for Merck. The very case cited by Merck in support of its argument states that in Texas, an individual employee can be held liable for negligence when that individual "owes an independent duty of reasonable care to the injured party apart from the employer's duty." Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 315 (5th Cir. 2002) (citing Leitch v. Hornsby, 935 S.W.2d 114, 117 (Tex. 1996)). As detailed above, pursuant to Texas Civil Practice & Remedies Code § 82.003(a)(6), the Sales Representatives may have been under an independent duty to warn Plaintiff of Vioxx's dangers.

- Page 6 of 9 -

Removal, ¶ 16).[3]  The Court finds this argument unpersuasive.

Under the Texas learned intermediary doctrine, a pharmaceutical manufacturer is excused from warning each patient who receives the medication when the manufacturer properly warns the prescribing physician of the medication's dangers. See Porterfield v. Ethicon, Inc., 183 F.3d 464, 467-68 (5th Cir. 1999). The rationale is that the pharmaceutical manufacturer can rely on the prescribing physician -- the learned intermediary -- to pass on its warnings to the patient. See id. at 468. However, even assuming that the Texas learned intermediary doctrine does apply to pharmaceutical sales representatives, when the warning to the learned intermediary -- the prescribing physician -- is inadequate or misleading, the manufacturer and its sales representatives remain liable for injuries sustained by the patient who is prescribed the medication. See Porterfield, 183 F.3d at 468.

Examining allegations in the Petition in the light most favorable to the Plaintiff, the Court concludes that the learned intermediary doctrine does not preclude the Plaintiff from seeking damages from the Sales Representatives. Plaintiff alleges that all

_____

[3]In support of its argument, Defendant Merck indicates that the United States District Court for the Eastern District of Pennsylvania found that pharmaceutical "sales representatives were fraudulently joined in a suit against the pharmaceutical manufacturer." (Notice of Removal, ¶ 16, citing In re Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002)). However, this case dealt with a different drug, and it addressed Mississippi, rather than Texas law. The case is not binding on this Court, and this Court finds it distinguishable from the instant case.

Defendants (*including the Sales Representatives*) "made misrepresentations and actively concealed adverse information when Defendants knew, or should have known" of the dangers associated with Vioxx. (Petition, ¶ IX). Plaintiff also alleges that all Defendants, again including the Sales Representatives, made these misrepresentations and concealed information from "Plaintiff, the health care industry, and the consuming public". (Id.). These allegations put the Sales Representatives outside the protective realm of the learned intermediary doctrine, because misrepresentations to the health care industry mean inadequate warnings to health care providers, including doctors, and the learned intermediary doctrine is applicable *only when adequate warnings were provided.*[4] Accordingly, in this case, the Court finds that the learned intermediary doctrine does not preclude potential liability of the Sales Representatives, based upon the failure to warn allegations Plaintiff makes in her Petition.

## III. Conclusion

For the reasons stated above, Defendant Merck has not met its heavy burden of showing improper joinder. Therefore, there is not complete diversity between the parties, and the Court does not have subject-matter jurisdiction over this action. See 28 U.S.C. § 1332. This action is hereby REMANDED pursuant to 28 U.S.C. §

---

[4]See Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., 413 F.3d 897, 901 (8th Cir. 2005) (finding that doctors are health care providers).

- Page 8 of 9 -

1447(c) to the 229th Judicial District Court of Duval County, Texas, where it was originally filed and assigned Cause No. DC-06-268.

SIGNED and ENTERED this 1st day of December, 2006.

Janis Graham Jack

United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ANTONIO SALAZAR and | § | |
| ELDA SALAZAR, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 05-445 |
| vs. | § | |
| | § | |
| MERCK & CO., INC., | § | |
| JAN FERGUSON and | § | |
| SCOTT LAWLER, | § | |
| | § | |
| Defendants. | § | |

## ORDER OF REMAND

The Court remands the instant action to the 319th Judicial District Court of Nueces County, Texas, on the basis that Defendant Merck & Co. has failed to demonstrate complete diversity of citizenship among the parties such that this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332.

## I.    Background

On June 17, 2005, Plaintiffs Antonio and Elda Salazar, husband and wife, commenced a personal injury action against three defendants–Merck & Co., Jan Ferguson and Scott Lawler–in the 319th Judicial District Court of Nueces County, Texas. The Complaint alleges that Plaintiff Antonio Salazar suffered a heart attack on June 18, 2003, and other subsequent injuries as a result of taking Vioxx, a prescription medication manufactured, designed, packaged, marketed, sold and distributed by Defendant Merck & Co. (Compl. §§ VI-VII.) Defendants Jan Ferguson and Scott Lawler were Merck & Co.'s sales representatives who called doctors and hospitals and represented to them that Vioxx was a safe and effective medication. The plaintiffs alleged that Merck & Co. and its sales representatives "were aware that these representations were false and/or made these representations

with reckless disregard to their truth." (Compl. § IX.) The defendants' actions caused the plaintiffs injuries for which the plaintiffs seek to recover damages.

Defendant Merck & Co., a foreign defendant,[1] was served with a copy of the Complaint on August 12, 2005. On September 2, 2005, within 30 days after service, Defendant Merck & Co. removed the action to this Court, asserting improper joinder of Defendants Jan Ferguson and Scott Lawler, who, like the plaintiffs, are citizens of Texas; Defendant Merck & Co. maintains that this Court has subject matter jurisdiction over the lawsuit because "[t]here is complete diversity between Plaintiffs and Merck [& Co.]" (Notice of Removal § II(B)(10).) The plaintiffs opposed the removal and on September 30, 2005, motioned the Court to remand the action.

The issue before the Court now is whether the plaintiffs have improperly joined in-state Defendants Jan Ferguson and Scott Lawler. If they have, then their Motion to Remand must be denied and the action must proceed in this Court, because complete diversity of citizenship exists between the plaintiffs, citizens of Texas, and the remaining defendant, Merck & Co., a citizen of New Jersey. If the plaintiffs have not improperly joined in-state Defendants Jan Ferguson and Scott Lawler, then the Motion to Remand must be granted and the action must proceed in the 319th Judicial District Court of Nueces County, Texas, where the action was commenced, because this Court lacks subject matter jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332.

## II.   Discussion

Defendant Merck & Co., the party seeking removal, bears a heavy burden of proving improper joinder. Smallwood v. Illinois Cent. R.R. Co., 385 F.3d 568, 574 (5th Cir. 2004) (en banc).

---

[1] Defendant Merck & Co. is a corporation organized under the laws of New Jersey and has its principal place of business in New Jersey. Therefore, it is a citizen of New Jersey under 28 U.S.C. § 1332(c)(1). (See Compl. § III.)

Improper joinder can be proven by demonstrating (1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiffs to establish a cause of action against the in-state defendants. Id. at 573 (citing Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003)). As there is no allegation of actual fraud in the pleading, Defendant Merck & Co. establishes improper joinder by demonstrating that there is no possibility of recovery by the plaintiffs against the two in-state defendants. See id.

The Court resolves this matter by conducting an analysis under a rule similar to that of Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court essentially examines allegations in the Complaint in the light most favorable to the plaintiffs to determine if the Complaint states a claim against the in-state defendants. Boone v. Citigroup, Inc., 416 F.3d 382, 388 (5th Cir. 2005); see also Smallwood, 385 F.3d at 573. Ordinarily, if the plaintiffs can survive the Rule 12(b)(6) type challenge, there is no improper joinder. Smallwood, 385 F.3d at 573. In some cases, the Court may allow limited remand-related discovery, and conduct a summary judgment type inquiry; such inquiry, however, is appropriate only to identify the presence of discrete and undisputed facts that would preclude the plaintiffs' recovery against the in-state defendants. Id. at 573-74. If Defendant Merck & Co. fails to establish improper joinder, then there is not complete diversity of citizenship among the parties, Defendant Merck & Co. is not entitled to removal, and the plaintiffs' Motion to Remand must therefore be granted. See 28 U.S.C. § 1332(a).

## A.    Limitation of Liability based on the Learned Intermediary Doctrine

Defendant Merck & Co., relying on the learned intermediary doctrine, argues that the plaintiffs have no reasonable possibility of prevailing on any claims against the two in-state sales representatives, because the sales representatives do not owe a legal duty to warn the plaintiffs of risks associated with prescription medication Vioxx. (Notice of Removal § II(C)(16).) The Court

- Page 3 of 6 -

finds this argument unpersuasive.

Under the Texas learned intermediary doctrine, a pharmaceutical manufacturer is excused from warning each patient who receives the medication when the manufacturer properly warns the prescribing physician of the medication's dangers. Porterfield v. Ethicon, Inc., 183 F.3d 464, 467-68 (5th Cir. 1999). The rationale is that the pharmaceutical manufacturer can rely on the prescribing physician—the learned intermediary—to pass on its warnings to the patient. Id. at 468. Defendant Merck & Co. indicates that some courts outside the jurisdiction of the United States Court of Appeals for the Fifth Circuit have extended this doctrine to include pharmaceutical sales representatives. (See Notice of Removal § II(C)(16) (citing In re Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002); In re Rezulin Prods. Liab. Litig., 133 F. Supp. 2d 272, 282 (S.D.N.Y. 2001); Johnson v. Parke-Davis, 114 F. Supp. 2d 522, 524-25 (S.D. Miss. 2000)).) According to Defendant Merck & Co., these courts have concluded that the learned intermediary doctrine precludes failure to warn claims against a pharmaceutical manufacturer as well as its sales representatives, because the manufacturer and sales representatives only owe a duty to warn the prescribing physician. (Notice of Removal § II(C)(16).) However, even assuming the Texas learned intermediary doctrine applies to pharmaceutical sales representatives, when the warning to the learned intermediary—the prescribing physician—is inadequate or misleading, the manufacturer and its sales representatives remain liable for injuries sustained by the patient who is prescribed the medication. See Porterfield, 183 F.3d at 468.

Examining allegations in the Complaint in the light most favorable to the plaintiffs, the Court concludes that the learned intermediary doctrine does not preclude the plaintiffs from seeking damages from in-state Defendants Jan Ferguson and Scott Lawler. The plaintiffs allege that "Merck [& Co.], through its . . . sales representatives, made representations regarding the safety and efficacy

- Page 4 of 6 -

of its product . . . [that constituted] misrepresentations and negligent misrepresentations resulting in Plaintiffs' injuries and damages for which Plaintiffs sue." (Compl. § VIII.) The plaintiffs allege that the sales representatives knew or should have known about risks associated with prescription medication Vioxx, but made misrepresentations about them nonetheless. These allegations put the in-state defendants outside the protective realm of the learned intermediary doctrine, because misrepresentations to the prescribing physician mean inadequate warnings to the physician, and the learned intermediary doctrine is applicable only when adequate warnings were provided. Thus, Defendant Merck & Co.'s argument that the plaintiffs have no reasonable possibility of prevailing against the two in-state sales representatives under the learned intermediary doctrine fails, as the doctrine is inapplicable based on the allegations made in the Complaint.

## B.  Liability of a Non-Manufacturing Seller under Texas Products Liability Laws

Additionally, under Texas products liability laws, a non-manufacturing seller can be held liable for injuries caused by a product if (1) the seller actually knew of a defect to the product at the time the seller supplied the product, and (2) the plaintiffs' injuries resulted from the defect. Tex. Civ. Prac. & Rem. Code Ann. § 82.003(a)(6) (Vernon 2003). In a lawsuit involving failure to provide adequate warnings, a distributor of a pharmaceutical product can be held liable if the distributor "withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the [plaintiffs'] injury[.]" See id. § 82.007(b)(1).

The Court reiterates that the party seeking removal bears a heavy burden of proving improper joinder and that the Court must find proper joinder if there is any possibility the plaintiffs have stated a cause of action against the in-state defendants. See Smallwood, 385 F.3d at 573-74. The plaintiffs

- Page 5 of 6 -

alleged that the sales representatives, who might be considered non-manufacturing sellers under Tex. Civ. Prac. & Rem. Code Ann. § 82.001, knew or should have known about risks associated with prescription medication Vioxx. They further alleged that these risks were not made known to them and the failure to warn caused the plaintiffs injuries. Construing these allegations liberally in the light most favorable to the plaintiffs, the Court concludes that the plaintiffs might be able to establish a cause of action against in-state Defendants Jan Ferguson and Scott Lawler under Tex. Civ. Prac. & Rem. Code Ann. § 82.003(a)(6). Thus, the plaintiffs survive the Rule12(b)(6) type challenge. Defendant Merck & Co. has made no attempts to show the plaintiffs' inability to recover from the two in-state defendants under Texas products liability laws.

**III.     Conclusion**

Defendant Merck & Co. has not met its heavy burden of showing that in-state Defendants Jan Ferguson and Scott Lawler were improperly joined. Therefore, there is not complete diversity among the parties, and this Court lacks subject matter jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332.

The plaintiffs' Motion to Remand is GRANTED. The instant action is hereby REMANDED pursuant to 28 U.S.C. § 1447(c) to the 319th Judicial District Court of Nueces County, Texas, where the action was commenced and assigned Cause No. 05-03092-G.

SIGNED and ENTERED the 2nd day of November, 2005.

Janis Graham Jack

United States District Judge

- Page 6 of 6 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| DAVID VARGAS, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | |
| | § | |
| | § | Civil Action |
| MERCK & CO., INC., JANET L. | § | No. C-06-501 |
| FERGUSON, STEPHANIE HANNIGAN, | § | |
| SCOTT A. FAUVER, CHRISTOPHER | § | |
| LYNN DAVIS, MARK K. JORDAN, | § | |
| SUSAN R. KERR, FRANCISCO | § | |
| RODRIGUEZ, DJEBI LOFTON, JACK | § | |
| PAUL JUDGE and CHRISTOPHER L. | § | |
| BLANKS, | | |

Defendants.

## ORDER OF REMAND

On this day came on to be considered the Court's sua sponte review of its subject matter jurisdiction in the above-styled action. For the reasons stated herein, the Court finds that subject-matter jurisdiction is lacking, and the Court hereby REMANDS this action pursuant to 28 U.S.C. § 1447(c) to the 79th Judicial District Court of Brooks County, Texas, where it was originally filed and assigned Cause No. 06-09-13699-CV.

## I. Factual and Procedural Background

Plaintiff David Vargas filed his Original Petition in state court on September 29, 2006. (D.E. 1, Notice of Removal, ¶ 1; Exh. B to Notice of Removal, Plaintiff's Original Petition ("Petition")). Plaintiff sued Merck & Co., Inc. ("Merck") and Merck sales representatives Janet L. Ferguson, Stephanie Hannigan, Scott A. Fauver, Christopher Lynn Davis, Mark K. Jordan, Susan R.

Kerr, Francisco Rodriguez, Djebi Loftin, Jack Paul Judge and Christopher L. Blanks (together, "Sales Representatives"). The Petition alleges that Plaintiff "suffered from serious and permanent injuries" as a result of taking Vioxx, a prescription medication manufactured by Defendant Merck. (Petition, ¶¶ V-VII). Plaintiff alleges several causes of action against Merck and the Sales Representatives, including negligence, fraud and breach of warranties. (Petition, ¶¶ VII-XII).

Merck was served with Plaintiff's Original Petition on October 12, 2006. (Notice of Removal, ¶ 1). On November 7, 2006, Merck removed the action to this Court, alleging diversity jurisdiction. (Id. at ¶ 3). Merck claims that the amount in controversy exceeds the jurisdictional requirement of $75,000, and the parties are diverse because Plaintiff is a citizen of Texas and Merck is a citizen of New Jersey.[1] (Id. at ¶¶ 3, 8-12). Merck acknowledges that the Defendant Sales Representatives are, like Plaintiff, citizens of Texas, but Merck alleges that the Sales Representatives were improperly joined to defeat diversity. (Id. at ¶ 12). For the reasons stated below, the Court finds that the Sales Representatives were properly joined, and that the Court lacks subject-matter jurisdiction over this action.

---

[1] Merck is a corporation organized under the laws of New Jersey and has its principal place of business in New Jersey. (Petition, ¶ 2; Notice of Removal, ¶ 11). Merck is accordingly a citizen of New Jersey for diversity purposes, pursuant to 28 U.S.C. § 1332(c)(1).

## II. Discussion

### A. Improper Joinder

"The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper." Smallwood v. Illinois Cent. R.R. Co., 385 F.3d 568, 574 (5th Cir. 2004) (en banc). The removing party proves improper joinder by demonstrating: (1) actual fraud in the pleading of jurisdictional facts, or (2) the inability of the plaintiff to establish a cause of action against the non-diverse defendant in state court. See Crockett v. R.J. Reynolds Tobacco Co., 436 F.3d 529, 532 (5th Cir. 2006) (citing Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003)); see also Boone v. Citigroup, Inc., 416 F.3d 382, 388 (5th Cir. 2005). As there is no allegation of actual fraud in Plaintiff's Original Petition, Merck establishes improper joinder by demonstrating that there is no possibility of recovery by Plaintiff against the non-diverse Sales Representatives. See Crockett, 436 F.3d at 532. The Court resolves this matter by conducting an analysis under a rule similar to that of Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court "must evaluate all of the factual allegations in the light most favorable to the plaintiff, resolving all contested issues of substantive fact in favor of the plaintiff." Guillory v. PPG Indus., Inc., 434 F.3d 303, 308 (5th Cir. 2005) (citing B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. 1981)); see also Boone, 416 F.3d

- Page 3 of 9 -

at 388; Smallwood, 385 F.3d at 573. The Court does "not determine whether the plaintiff will actually or even probably prevail on the merits of [his state law] claim, but look[s] only for a possibility that the plaintiff might do so." Guillory, 434 F.3d at 308. Ordinarily, if the plaintiff can survive the Rule 12(b)(6) type challenge, there is no improper joinder. See Smallwood, 385 F.3d at 573. If Merck fails to establish improper joinder, then there is not complete diversity of citizenship among the parties, and the Court must remand the action for lack of subject-matter jurisdiction. See 28 U.S.C. §§ 1332, 1447(c).

## B. **Plaintiff Pleads a Possible Cause of Action Against the Sales Representatives**

Under Texas products liability laws, a non-manufacturing seller can be held liable for injuries caused by a product if (1) the seller actually knew of a defect to the product at the time the seller supplied the product; and (2) the plaintiff's injuries resulted from the defect. See Tex. Civ. Prac. & Rem. Code § 82.003(a)(6) (Vernon 2003); see also Goss v. Schering-Plough Corp., 2006 WL 2546494, *2-3 (E.D. Tex. 2006). Moreover, in a lawsuit involving failure to provide adequate warnings, a distributor of a pharmaceutical product can be held liable if the distributor "withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the

[plaintiffs'] injury[.]" Tex. Civ. Prac. & Rem. Code § 82.007(b)(1).

The Court reiterates that the party seeking removal bears a heavy burden of proving improper joinder, and that the Court must find proper joinder if there is any possibility that the Plaintiff has stated a cause of action against the in-state defendants. See Smallwood, 385 F.3d at 573-74. Plaintiff alleges that the Sales Representatives, who may fall within the definition of non-manufacturing sellers under Texas Civil Practice & Remedies Code § 82.001, knew or should have known about risks associated with Vioxx. See Petition, ¶ VII (stating "Defendants ... promoted, marketed, advertised, or sold, and placed in the stream of commerce Vioxx, which [they] knew, or ... should have known was highly harmful to Plaintiff's health and well being."); see also Tex. Civ. Prac. & Rem. Code § 82.001(3) ("'Seller' means a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."). Plaintiff further alleges that the risks associated with Vioxx were not made known to him, and that Defendants' failure to warn caused the Plaintiff's injuries. (Petition, ¶ VII). Construing these allegations liberally in the light most favorable to Plaintiff, the Court concludes that Plaintiff could conceivably recover against the in-state Sales Representatives pursuant to Tex. Civ. Prac. &

Rem. Code § 82.003(a)(6).[2]   Thus, Plaintiff survives the Rule 12(b)(6) type challenge, and as long as Plaintiff could conceivably recover damages from the Sales Representatives, the Court must remand this action.   See Smallwood, 385 F.3d at 573.

## C.    The Learned Intermediary Doctrine

Merck argues that because of the learned intermediary doctrine, the Sales Representatives did not owe a legal duty to warn the Plaintiff of the risks associated with Vioxx. (Notice of

---

[2]The Court notes that while Merck's Notice of Removal sets forth numerous arguments as to why Plaintiff cannot recover against the Sales Representatives under various theories, Merck makes no attempt to show that Plaintiff cannot recover from the Sales Representatives under Texas' products liability laws. Further, the Court notes that it finds unpersuasive Merck's argument that Plaintiff has not plead sufficient factual allegations against the Sales Representatives in his Petition. To the contrary, Plaintiff makes numerous factual allegations against the Sales Representatives, including allegations (1) that the Sales Representatives marketed, advertised, sold, or placed into the stream of commerce drugs they knew or should have known were harmful to Plaintiff's health; (2) that the Sales Representatives misrepresented and/or actively concealed Vioxx's problems from Plaintiff, the health care industry, and the consuming public; and (3) that the Sales Representatives were in the business of profiting from the sales of Vioxx.  (Petition, ¶¶ VII, IX, XI). Finally, the Court also finds unpersuasive Merck's argument that Plaintiff cannot recover against the Sales Representatives because their alleged actions were made in the scope of their employment for Merck.  The very case cited by Merck in support of its argument states that in Texas, an individual employee can be held liable for negligence when that individual "owes an independent duty of reasonable care to the injured party apart from the employer's duty."  Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 315 (5th Cir. 2002) (citing Leitch v. Hornsby, 935 S.W.2d 114, 117 (Tex. 1996)).  As detailed above, pursuant to Texas Civil Practice & Remedies Code § 82.003(a)(6), the Sales Representatives may have been under an independent duty to warn Plaintiff of Vioxx's dangers.

- Page 6 of 9 -

Removal, ¶ 17).[3] The Court finds this argument unpersuasive.

Under the Texas learned intermediary doctrine, a pharmaceutical manufacturer is excused from warning each patient who receives the medication when the manufacturer properly warns the prescribing physician of the medication's dangers. <u>See</u> <u>Porterfield v. Ethicon, Inc.</u>, 183 F.3d 464, 467-68 (5th Cir. 1999). The rationale is that the pharmaceutical manufacturer can rely on the prescribing physician -- the learned intermediary -- to pass on its warnings to the patient. <u>See</u> <u>id.</u> at 468. However, even assuming that the Texas learned intermediary doctrine does apply to pharmaceutical sales representatives, when the warning to the learned intermediary -- the prescribing physician -- is inadequate or misleading, the manufacturer and its sales representatives

---

[3]In support of its argument, Defendant Merck indicates that the United States District Court for the Eastern District of Pennsylvania found that pharmaceutical "sales representatives were fraudulently joined in a suit against the pharmaceutical manufacturer." (Notice of Removal, ¶ 17, citing <u>In re Diet Drugs Prods. Liab. Litig.</u>, 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002)). However, this case dealt with a different drug, and it addressed Mississippi, rather than Texas law. The case is not binding on this Court, and this Court finds it distinguishable from the instant case. Merck also cites to <u>Air Shields, Inc. v. Spears</u>, 590 S.W.2d 574, 582 (Tex. Civ. App.--Waco 1979) for the proposition that "the duty to adequately warn is that of Merck, not of the Sales Representative Defendants." (Notice of Removal, ¶ 17). However, the <u>Air Shields</u> case has nothing to do with the learned intermediary doctrine, and there are no sales representatives or comparable parties involved in the case. Rather, the case deals with an infant who became blind after being exposed to too much oxygen in an incubator, and the court found that the incubator's manufacturer had a duty to warn the hospital of the incubator's dangers.

- Page 7 of 9 -

remain liable for injuries sustained by the patient who is prescribed the medication. See Porterfield, 183 F.3d at 468.

Examining allegations in the Petition in the light most favorable to the Plaintiff, the Court concludes that the learned intermediary doctrine does not preclude the Plaintiff from seeking damages from the Sales Representatives. Plaintiff alleges that all Defendants (*including the Sales Representatives*) "made misrepresentations and actively concealed adverse information when Defendants knew, or should have known" of the dangers associated with Vioxx. (Petition, ¶ IX). Plaintiff also alleges that all Defendants, again including the Sales Representatives, made these misrepresentations and concealed information from "Plaintiff, the health care industry, and the consuming public". (Id.). These allegations put the Sales Representatives outside the protective realm of the learned intermediary doctrine, because misrepresentations to the health care industry mean inadequate warnings to health care providers, including doctors, and the learned intermediary doctrine is applicable *only when adequate warnings were provided.*[4] Accordingly, in this case, the Court finds that the learned intermediary doctrine does not preclude potential liability of the Sales Representatives, based upon the failure to warn allegations Plaintiff makes in his Petition.

---

[4]See Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., 413 F.3d 897, 901 (8th Cir. 2005) (finding that doctors are health care providers).

## III. Conclusion

For the reasons stated above, Defendant Merck has not met its heavy burden of showing improper joinder. Therefore, there is not complete diversity between the parties, and the Court does not have subject-matter jurisdiction over this action. See 28 U.S.C. § 1332. This action is hereby REMANDED pursuant to 28 U.S.C. § 1447(c) to the 79th Judicial District Court of Brooks County, Texas, where it was originally filed and assigned Cause No. 06-09-13699-CV.

SIGNED and ENTERED this 1st day of December, 2006.

Janis Graham Jack
United States District Judge

# Exhibit 4



No. COX 00-019
Mar 27, 2000

### Bulletin for VIOXX®:
### VIOXX® Gastrointestinal Outcomes Research Study

**TO:**

All field personnel with responsibility for VIOXX®          Action Required

***DO NOT INITIATE DISCUSSIONS ON THE PRELIMINARY RESULTS OF THE VIOXX® GI OUTCOMES TRIAL. YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW. SHOULD YOU RESPOND TO QUESTIONS BY DIRECTLY PROVIDING THE ENCLOSED PIR, YOU MUST ALSO PROVIDE PRESCRIBING INFORMATION AND DOCUMENT THIS AS INSTRUCTED AT THE CONCLUSION OF THIS BULLETIN.***

**PURPOSE:**

To provide you with important information on the VIOXX® Gastrointestinal Outcomes Research study:

1. Overview : Key Points and summary of public communication.
2. Approved PIR for distribution by you in response to questions from your physicians regarding the study results.
3. Answers to questions we anticipate you'll have relative to this study. This set of questions and answers is for your background information only and is not to be used in discussions with doctors.
4. Key background information from the Medical Backgrounder on VIOXX® and the Clinical Data Overview.
5. Previously provided obstacle responses revised based on the study results.
6. Specifics for the <u>National Teleconferences scheduled for March 28 and 29</u> to review the study. NOTE: *You do not need to pre-register. Call-in instructions listed below.*

**BACKGROUND**

**1. Overview of the VIOXX® Gastrointestinal Outcomes Research study**

*Key Points:*

- Among patients treated with VIOXX®, there was a significantly reduced incidence of serious gastrointestinal events [including perforations, ulcers, obstructions, and bleeds] compared to patients treated with naproxen.

- In addition, significantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen.

- VIOXX®, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.

MRK-MCDAA0000505

### Exhibit 4

- As a result, Merck is notifying investigators, who are conducting other Merck studies with VIOXX® or another investigational medicine in the same class, of protocol amendments to allow the addition of low-dose aspirin where appropriate. Patients using low-dose aspirin, which also blocks platelet aggregation, were excluded from the GI outcomes study.

### Additional Messages:

- An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX®, showed no indication of a difference in the incidence of thromboembolic events between VIOXX®, placebo and comparator NSAIDs.

- These results are preliminary. Further analyses are ongoing and final results of the GI outcomes study will be presented at peer-reviewed medical meetings this year.

### Press Release

This morning, at approximately 8:00 a.m., Merck issued a press release announcing the preliminary results of the study. The press release is summarized below:

Merck today informed its investigators of a preliminary analysis from a large gastrointestinal (GI) outcomes study that compared VIOXX® (rofecoxib) with naproxen in patients with rheumatoid arthritis. Among patients treated with VIOXX®, there was a significantly reduced incidence of serious gastrointestinal events compared to patients treated with naproxen. Merck plans to submit the information to the U.S. Food and Drug Administration (FDA) and other regulatory agencies worldwide in the next few months.

In addition, significantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen. VIOXX®, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects. As a result, Merck is notifying investigators, who are conducting other Merck studies with VIOXX® or another investigational medicine in the same class, of protocol amendments to allow the addition of low-dose aspirin where appropriate. Patients using low-dose aspirin, which also blocks platelet aggregation, were excluded from the GI outcomes study. VIOXX® does not interfere with the ability of low-dose aspirin to block platelet aggregation.

The completed study, called VIGOR (Vioxx Gastrointestinal Outcomes Research), compared the GI safety of VIOXX® (50 mg once daily) to prescription-strength naproxen (500 mg twice a day) in approximately 8,000 patients with rheumatoid arthritis. The study specifically assessed the incidence of certain types of clinically significant upper GI events, including perforations, ulcers, obstructions and bleeds. Naproxen is a commonly used non-steroidal anti-inflammatory drug (NSAID) indicated for the treatment of a number of arthritic diseases, including rheumatoid arthritis. VIOXX® is not approved for the treatment of rheumatoid arthritis, nor is an application for this use under review.

VIOXX® is approved in the U.S. for the relief of the signs and symptoms of osteoarthritis, management of acute pain in adults and treatment of menstrual pain.

Researchers believe that NSAIDs work by inhibiting two related enzymes: COX-1, the enzyme that helps maintain the stomach lining and promotes platelet aggregation, and COX-2, the enzyme that triggers pain and inflammation. At therapeutic doses, VIOXX® works by selectively inhibiting COX-2 without inhibiting COX-1; non-selective NSAIDs like naproxen inhibit both COX-1 and COX-2. Medicines like aspirin and naproxen that significantly inhibit COX-1 block platelet aggregation and therefore have the potential to provide cardioprotection.

An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX®, showed no indication of a difference in the incidence of thromboembolic events between VIOXX®, placebo and comparator NSAIDs.

Further analyses are ongoing, and final results of the GI outcomes study with VIOXX® will be presented at peer-reviewed medical meetings this year.

2. **Approved PIR for you to distribute only upon request of your physicians.** You may print this PIR and provide it, along with full prescribing information for VIOXX®, to physicians who make unsolicited requests for information regarding the VIOXX® GI Outcomes study. See below for specific directions on doing this. Additional PIRs, which are more detailed, are available from West Point Medical Services through the normal request process.


PIR GI Outcomes
Research Study.pdf

3. **Question and Answer Guide:**

As a Representative, you may have a number of questions related to the VIOXX® GI Outcomes Research study. The attached answers are being provided in anticipation of your questions. This information is provided for your background information only and is not to be used in discussions with physicians.


"Q&A GI Outcomes
Research Study.doc"

4. Key Background Information:

- Refer to pages 8, 9, 12, 13, 14, 15, 43 and 44 in Module 5 of your training book for background information to reinforce your knowledge of the specific roles of selected prostaglandins and to review the graphic of the theoretical sites and roles of COX-1 and COX-2 and the prostaglandins they produce. Pages 43 & 44 focus on the *Hematological Effects* section of NSAIDs and their effect on platelet aggregation.
- Refer to pages 34 to 44 in the Clinical Data Overview (included in your VIOXX® Reference Binder) or to bulletin COX99-099 for a review of the PUBs data included in the current VIOXX® package circular from our Osteoarthritis studies.

5. Previously provided obstacle responses revised based on the study results:


*GI Obstacle
Response Update_.d(

6. National Teleconferences:

Please plan to participate in one of the mandatory National Teleconferences at which time Dr. Greg Bell will provide an overview of the VIOXX® Gastrointestinal Outcomes Research study. For your convenience, we've scheduled 9 different teleconferences over a two-day period to give you the flexibility to choose a time that best fits your busy schedule. Each call will be approximately sixty minutes in duration. You will **not** preregister for these calls. **You will dial directly into the National Teleconference using the call-in and confirmation numbers provided below.** Due to the call volume of these teleconferences, you **must call-in at least fifteen minutes before the start time of the Teleconference.**

(Note: **Do not call 800/MerckOL.** The reservationist will not be able to preregister you for a call nor will he/she be able to connect you to a call. **You must use the call-in information provided below to gain access to the Teleconference.**)

**TUESDAY, MARCH 28**

⇒ Teleconference A:  **8 AM ET**
- Call-In Number:  PRIVACY –
- Confirmation Code  Redacted –

⇒ Teleconference B  **9 AM ET**
- Call-In Number  PRIVACY –
- Confirmation Code  Redacted – privac

⇒ Teleconference C  **10:30 AM ET**
- Call-In Number  PRIVACY –
- Confirmation Code  Redacted – privac





⇒ Teleconference D    **5 PM ET**
  - Call-In Number    PRIVACY --
  - Confirmation Code  Redacted --

⇒ Teleconference E    **7 PM ET**
  - Call-In Number    PRIVACY --
  - Confirmation Code  Redacted -- privac

**WEDNESDAY, MARCH 29**

⇒ Teleconference F    **7 AM ET**
  - Call-In Number    PRIVACY --
  - Confirmation Code  Redacted --

⇒ Teleconference G    **9 AM ET**
  - Call-In Number    PRIVACY --
  - Confirmation Code  Redacted --

⇒ Teleconference H    **10:30 AM ET**
  - Call-In Number    PRIVACY --
  - Confirmation Code  Redacted --

⇒ Teleconference I    **6:00 PM ET**
  - Call-In Number    PRIVACY --
  - Confirmation Code  Redacted -- privacy

**ACTION REQUIRED:**

- Stay focused on the current strategy for VIOXX® using the Top 5 Messages for VIOXX®.
- Do not proactively promote the VIOXX® Gastrointestinal Outcomes Research Study. Respond to questions about the study with a PIR (either directly or through Medical Services) and in accordance with the obstacle handling guide.
- Do not discuss or respond to questions about the treatment of rheumatoid arthritis with VIOXX®. You can offer to submit a PIR in response to questions.
- Take some time to reinforce your knowledge of VIOXX® using the key sections provided from the Clinical Data Overview and Medical Backgrounder above.
- Review the Question and Answer Guide provided above.
- Review the revised Obstacle Responses provided above and be prepared to effectively and confidently handle these issues and transition back to your Top 5 Messages for VIOXX®.

MRK-MCDAA0000509

## ACTION REQUIRED – DOCUMENTATION OF RESPONSES TO CUSTOMER INQUIRIES:

- If a physician initiates a discussion on the study or requests additional information on the study, you may provide the physician with a printed copy of the PIR included in this bulletin or request a more detailed PIR from Medical Services. If you choose to directly provide this PIR, you **must also** leave a copy of the full prescribing information for VIOXX®. Also, <u>following your call, you are required to record the physician's request for information on the study by making the following notations in Insight</u>:
  - ⇒ In the Customer View, select Factoids tab.
  - ⇒ To select a Factoid, click the "New" button in the bottom right corner.
  - ⇒ The new Factoid window will open. When prompted with "Which category of Factoid would you like to view?", open the drop down box and select "Was a response provided to the customer for VIOXX®?"
  - ⇒ To enter your response to this statement, open the "What is the value" drop down box and select "Yes." [Note: If "Yes" is already selected, there is no need to select it again.]
  - ⇒ Click OK
  - ⇒ If for some reason you have difficulty entering this information into Insight, you **must** maintain a written record of the physicians who requested the PIR. You will be given instructions at a later date on how to communicate this information to West Point.
  - ⇒ You may **not** provide any other written information – including any other PIRs – to a physician on the VIOXX® GI Outcomes Study.

## ACTION REQUIRED: RESPONSE TO QUESTIONS

If asked a question by a physician about the VIOXX® GI outcomes study, respond as follows:

"Merck just completed its GI Outcomes Study for VIOXX®, and fortunately, I have a copy of the Physician's Information Request letter to provide you which reviews these preliminary results."

IF YOU HAVE ANY QUESTIONS CONCERNING THIS BULLETIN, PLEASE CONTACT THE MERCK NATIONAL SERVICE CENTER AT 1-800-NSC-MERCK.

MRK-MCDAA0000510



No. COX 00-029
May 01, 2000

**Bulletin for VIOXX®:**
**New Obstacle Response**

<u>TO:</u>
All field personnel with responsibility for VIOXX®          Action Required

<u>PURPOSE:</u>

To provide you with a new obstacle response relating to the press release and
Searle/Pfizer's promotion that VIOXX has an increased incidence of heart attacks
compared to Celebrex, based on the VIOXX GI Outcomes Trial compared to Celebrex
in the CLASS trial.

<u>Obstacle Response #38:</u>



"Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a
result, you cannot compare the drugs and conclude that one drug had fewer events than the other. What
you may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI
Outcomes Trial (VIGOR), the incidence of MI was 0.5% with VIOXX and 0.1% with naproxen. In a
separate GI outcomes trial of Celebrex, the CLASS study, Searle has reported that the incidence of MI was
0.5% with Celebrex, 0.3% with diclofenac, and 0.5% with ibuprofen. Again, doctor, I want to emphasize
that the results of two different studies can't be compared, and that's particularly true here when you have
studies of differing duration and in different patient populations."

If needed, continue to address the physicians concerns with the cardiovascular effects of VIOXX by
guiding them through the Cardiovascular Card as outlined in Roadmap for the CV Card.

Return to the appropriate HI NSAID or HI COXIB Top 5 Messages for VIOXX.

NOTE: There will be an additional PIR to address these issues available shortly.

**If the doctor asks you further for the incidence of MI from the OA studies presented in the package
insert for VIOXX tell them:**

"In the clinical OA trials for VIOXX reported in our package insert, the incidence of MI was less than
0.1% with VIOXX."

If needed, continue to address the physician's concerns with the cardiovascular effects of VIOXX by
guiding them through the Cardiovascular Card as outlined in Roadmap for the CV Card.

Return to the appropriate HI NSAID or HI COXIB Top 5 Messages for VIOXX.

Remember to provide appropriate balancing information as part of all product discussions.

### ACTION REQUIRED:

1. Review and practice this obstacle response and use it in appropriate discussions on VIOXX® with your physicians;

2. Print the response provided, and add it to your Obstacle Response Guide.  As with all other Obstacle Responses, the Response itself should not be shown to or left with physicians.

NOTE:  All responses are available under the Obstacle Response Guide on the website for VIOXX® on the FSNet.

Remember to provide appropriate balancing information as part of all product discussions.

**IF YOU HAVE ANY QUESTIONS CONCERNING THIS BULLETIN, PLEASE CONTACT THE MERCK NATIONAL SERVICE CENTER AT 1-800-NSC-MERCK.**

MRK-MCDAA0000533



No. COX 00-046
May 24, 2000

### Bulletin for VIOXX:
### VIOXX Gastrointestinal Outcomes Research Study
### and CLASS Study for Celebrex

**TO:**

All field personnel with responsibility for VIOXX          Action Required

**PURPOSE:**

To provide you with important information on the VIOXX GI Outcomes Research Study
and the CLASS Study on Celebrex:

1. Overview of GI Outcomes Research Study.
2. A brief overview of the VIOXX GI Outcomes Research Study and the CLASS study
   on Celebrex.
3. Updated PIRs with the results of the studies available from Medical Services
   effective Wednesday, May 24, at 1:00 PM EDT
4. Response to anticipated obstacle.
5. National Teleconferences scheduled between May 30 and June 7.

**ACTION REQUIRED:**

Take the lead by:
- Staying focused on delivering the Top 5 messages for VIOXX for HI NSAID and HI
  COXIB physicians.
- Respond to questions only as outlined below.
- Use your available resources.
- Request a faxable PIR if a physician asks you an unsolicited question about the
  VIOXX GI Outcomes Research Study.  (See section below for instructions on
  requesting faxable PIRs.)
- Review the following materials:
  ⇒     Side-by-side study comparison (provided for your background information
        only)
  ⇒     Question and Answer Guide (provided for your background information
        only)
  ⇒     Obstacle Response
- Participate in a National Teleconference planned to prepare you to effectively and
  confidently handle and respond to an obstacle relative to the information presented
  at DDW and to help you implement the 2T segmentation strategy.

**DO NOT INITIATE DISCUSSIONS ON the VIOXX GI Outcomes Research Study OR
CLASS. You can respond to unsolicited questions only as outlined in this bulletin
and the accompanying obstacle handling guide. DO NOT GIVE OR SHOW ANY
WRITTEN MATERIALS ON THE VIOXX GI OUTCOMES RESEARCH STUDY OR
CLASS STUDY FOR CELEBREX TO ANYONE OUTSIDE THE COMPANY.**

MRK-MCDAA0000547

1. <u>Background information:</u> Overview of VIOXX GI Outcomes Research Study

This morning, Merck & Co., Inc. issued the following press release:

**VIOXX significantly reduced the risk of serious gastrointestinal side effects by more than half compared to naproxen in a new study.**

In a study of more than 8,000 patients, VIOXX significantly reduced the risk of serious gastrointestinal side effects such as ulcers and bleeding, achieving all endpoints of study.

SAN DIEGO, May 24, 2000 -- VIOXX (rofecoxib), the osteoarthritis and acute pain medicine developed and marketed by Merck & Co., Inc., significantly reduced the risk of serious gastrointestinal side effects by 54 percent compared to the non-steroidal anti-inflammatory drug (NSAID) naproxen, researchers reported today at Digestive Disease Week, the nation's largest annual meeting of gastrointestinal (GI) specialists. VIOXX is the first medicine that selectively inhibits COX-2 to achieve its pre-specified primary and all other secondary endpoints in a GI outcomes study.

The worldwide study, called VIGOR (VIOXX Gastrointestinal Outcomes Research), compared VIOXX 50 mg once daily (n=4,047), which is two-to-four times higher than the daily dose for chronic use in osteoarthritis patients (VIOXX 12.5 mg – 25 mg), to prescription-strength naproxen (500 mg twice daily; n=4,029) in patients with rheumatoid arthritis. VIOXX is not approved for the treatment of rheumatoid arthritis. Most patients remained in the study for more than nine months; some patients participated for as long as 13 months. The study assessed the incidence of serious GI events.

The results of this 13-month study are:
- Primary endpoint: VIOXX reduced the risk of symptomatic ulcers and complicated GI events (ulcers, perforations, obstructions and bleeding in the upper GI tract) by 54 percent (p< 0.001), compared to naproxen. The rate of these events was 4.5 percent per year among patients taking naproxen, compared to 2.1 percent per year among patients taking VIOXX.[i]
- Secondary endpoint: VIOXX reduced the risk of complicated GI events (perforations, obstructions and bleeding in the upper GI tract) by 57 percent (p=0.005), compared to naproxen. The rate of these events was 1.4 percent per year among patients taking naproxen, compared to 0.6 percent per year among patients taking VIOXX.[ii]

In this study, VIOXX also reduced bleeding from the GI tract by 62 percent (p<0.001). Among patients taking naproxen, the rate of bleeding was 3.0 percent per year compared to 1.2 percent per year among patients taking VIOXX.[iii] In addition, fewer patients taking VIOXX stopped taking their medicine because of GI side effects, such as abdominal pain, compared to naproxen, with 5.3 percent of patients on naproxen discontinuing for these side effects, compared to 3.7 percent of patients taking VIOXX.

"In this 8,000-patient study, VIOXX significantly decreased the chance of getting these potentially dangerous gastrointestinal problems, such as ulcers or ulcer bleeding," said Loren Laine, M.D., professor of medicine, University of Southern California and co-chair of the study steering committee. "The risk was reduced by over half compared to the NSAID naproxen, and VIOXX also reduced the risk of GI damage on all measures studied, regardless of patients' risk factors."

MRK-MCDAA0000548

Reductions in risk by VIOXX for GI damage were seen early and lasted throughout the study. Dr. Laine said that the significant reductions in risk for serious GI side effects in this study with VIOXX were seen at four weeks and were maintained throughout the entire duration of the study. He also noted that the reduction in GI events was seen in all patient groups in the study, including patients considered to be at higher risk because of individual risk factors such as age, prior history of a GI side effect, use of steroids and H. pylori presence. No individual risk factor predicted which patients would have a serious GI side effect.

The average age of patients was 58, more than half of the patients were taking chronic steroids and 46 percent had a history of cardiovascular disease.

While the VIOXX GI Outcomes Study was primarily a GI safety study, patients and physicians were also asked to evaluate the effect of therapy on the symptoms of rheumatoid arthritis. Both VIOXX and naproxen reduced the severity of rheumatoid arthritis to the same degree on all measures evaluated in the study. Efficacy studies of VIOXX for rheumatoid arthritis are ongoing. Merck plans to submit the data from this GI safety study to the U.S. Food and Drug Administration (FDA) in the next few months.

Study Rationale
This new GI Outcomes Study with VIOXX was conducted to assess whether VIOXX reduced the risk of experiencing the serious GI problems that can be associated with non-selective NSAIDs. These serious GI side effects of NSAIDs are associated with more than 100,000 hospitalizations and more than 16,500 deaths each year in the U.S. and often occur without any warning signs." Study demonstrated overall safety, tolerability of VIOXX.

Study demonstrated overall safety, tolerability of VIOXX
Overall, VIOXX was well tolerated in this study. The most common reasons for discontinuation from the study were dyspepsia, abdominal pain, upper abdominal pain, nausea and heartburn. There were significantly fewer discontinuations for these side effects among patients taking VIOXX.

In the VIOXX GI Outcomes Research Study, there was no difference in cardiovascular mortality and the incidence of strokes between the groups treated with VIOXX or naproxen. As previously reported, significantly fewer heart attacks were seen in patients taking naproxen (0.1 percent) compared to the group taking VIOXX (0.4 percent) in this study."

The reduction in heart attacks is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1. This effect on platelet aggregation is similar to low-dose aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events. Patients taking low-dose aspirin did not participate in the VIOXX GI Outcomes Study although 4 percent of patients enrolled in the study did meet the criteria for use of aspirin to prevent second cardiac events. Among the 96 percent of patients in the VIOXX GI Outcomes Research Study who were not candidates for low-dose aspirin for such cardioprotection, there was no significant difference in heart-attack rates -- 0.1 percent among patients taking naproxen and 0.2 percent among patients taking VIOXX.

In the completed osteoarthritis trials that compared VIOXX to other NSAIDs such as ibuprofen and diclofenac, which are less potent inhibitors of platelet aggregation than

MRK-MCDAA0000549

naproxen and aspirin, there was no difference in the incidence of cardiovascular events.  In addition, in the ongoing clinical trials with VIOXX, as well as post-marketing experience with VIOXX, there is no difference in the incidence of cardiovascular events, such as heart attack, among patients taking VIOXX, placebo or other NSAIDs.

VIOXX does not block platelet aggregation and should not be used as a substitute for aspirin to prevent cardiac events.  VIOXX does not interfere with the ability of low-dose aspirin to block platelet aggregation.  Administration of low-dose aspirin with Vioxx® may result in an increased rate of GI ulcers or other complications compared to use of VIOXX alone.

How VIOXX works:
In his presentation, Dr. Laine said that researchers believe that non-selective NSAIDs inhibit two related enzymes:  COX-1, the enzyme that helps maintain the stomach lining, and COX-2, the enzyme that triggers pain and inflammation.  The analgesic and anti-inflammatory effects of NSAIDs are believed to be caused by the inhibition of COX-2, while the GI side effects of NSAIDs -- which range from upset stomach to ulcers and internal bleeding -- are attributed to the inhibition of COX-1.

At therapeutic doses, VIOXX selectively inhibits COX-2 without inhibiting COX-1.  Naproxen is a widely used NSAID that inhibits both COX-1 and COX-2.

Important information about VIOXX:
VIOXX is approved in the United States for the relief of the signs and symptoms of osteoarthritis, management of acute pain in adults and treatment of menstrual pain.  The recommended dose of VIOXX for the treatment of osteoarthritis is 12.5 mg once daily.  Some patients may receive additional benefit by increasing the dose to 25 mg once daily, the maximum recommended dose for osteoarthritis.

Serious stomach problems, such as bleeding, can occur without warning symptoms.  Physicians and patients should remain alert for signs and symptoms of gastrointestinal bleeding.

Common side effects reported in other clinical trials with VIOXX were upper-respiratory infection, diarrhea, nausea and high blood pressure.  People who have had an allergic reaction to VIOXX, aspirin or other NSAIDs should not take VIOXX.  Safety and effectiveness in children below the age of 16 have not been studied.

Merck & Co., Inc. is a global, research-driven pharmaceutical company that discovers, develops, manufactures and markets a broad range of human and animal health products, directly and through its joint ventures, and provides pharmaceutical benefit services through Merck-Medco Managed Care.

2. <u>Background Information:</u>  A brief overview of the VIOXX GI Outcomes
   Research Study and the CLASS study for Celebrex:



background
Information_PDF

3. <u>Background Information:</u> Question and Answer Guide:

   As a Representative, you may have a number of questions related to the VIOXX  GI
   Outcomes Research Study and CLASS study for Celebrex.  The attached answers
   are being provided in anticipation of your questions.  **This information is provided
   for your background information only and is not to be used in discussions
   with physicians.**



"DDW QA-Final.doc"

4. <u>**Responding to Questions:**</u> .

   We anticipate that doctors will ask you about the VIOXX GI Outcomes Research
   Study in one of two ways.  You can respond to those questions only as outlined
   below.  If a doctor has other questions about the Study that you cannot answer by
   using the responses below, you are to offer to submit a PIR.  You are not to discuss
   the details of the Study, ever, in response to questions.

   QUESTION:  I just heard about your GI safety study.  Can you tell me about it?
   ANSWER:  Doctor, I assume that you are referring to the VIOXX GI Outcomes
   Research Study, presented at DDW on May 24.  This was an 800-patient study
   designed to evaluate the GI safety of VIOXX compared to the NSAID naproxen.  All
   of the primary and second endpoints of the Study were met.  Because the Study is
   not in the label, I cannot discuss the details with you.  However, I would be happy to
   submit your question to our Medical Services department.

   QUESTION:  I hear you announced the results of your RA Study.
   ANSWER:  Doctor, I assume that you are referring to the VIOXX GI Outcomes
   Research Study, presented at DDW on May 24.  This was an 8000-patient study
   designed to evaluate the GI safety of VIOXX compared to the NSAID naproxen.  All
   of the primary and second endpoints of the Study were met.  While the study was
   conducted in patients with RA, it was not primarily designed to evaluate the efficacy
   of VIOXX in RA.  VIOXX is not indicated for RA and because the study is not in the
   label, I cannot discuss the details with you.  However, I would be happy to submit
   your question to our Medical Services department.  (Note: Also refer to Obstacle
   Response  #5 on why VIOXX does not have an indication for RA.)

MRK-MCDAA0000551

5. **Updated PIRs available from Medical Services:**

Effective Wednesday, May 24, at 12:15 PM Eastern Daylight Time, Medical Services will have updated PIRs that will include the results from the VIOXX GI Outcomes Research Study as presented at DDW.

In response to unsolicited questions about the VIOXX GI Outcomes Research Study, the PIRs listed below (see FAX 1, 2, 3) will be available from Medical Services via the interactive voice response (IVR) same day fax service and provided as a 'nonpersonalized' PIR.

You may submit a request for a PIR(s) listed below by simply calling the Medical Services PIR IVR toll free number. Please follow detailed instructions below for requesting a faxable PIR(s):

- Use a touch tone phone and dial the following toll free number: 877-372-7064 (8am – 10pm EST)  NOTE: Since this line is an IVR system, a touch tone phone must be used in order to provide the pertinent information needed as prompted in the system.
- Be prepared to provide the following pertinent information as prompted by the system:
  ⇒ Your 8 digit RDT
  ⇒ Physician's 5 digit ZIP code
  ⇒ Physician's full name and professional degree
  ⇒ Physician's full mailing address
  ⇒ Physician's phone number with area code
  ⇒ Physician's FAX number with area code
  ⇒ Select the requested PIRs entitled:
    - *FAX 1* = 5 page overview of VIOXX GI Outcomes Study with tables and graphs. Provides in-depth review of the Study with supporting graphs and tables to be used if your physician asks more detailed questions about the results of the Study.
    - *FAX 2* = 3 page *brief* summary of VIOXX GI Outcomes Study. Provides abbreviated overview of the Study.
    - *FAX 3* = 2 page data to address a patient's concern about COX-2 inhibitors.  Provides a brief description of results from the Study including data around incidence of MIs in the Study as well as around the CLASS study for Celebrex.

    These three PIRS can be faxed directly to the requesting physician's office as a "nonpersonalized letter." Most of thse faxes will arrive within 20 minutes of the request.  You will need to leave a copy of the circular for VIOXX with the physician.

    If you experience difficulty with the IVR system, please call the following toll free phone number established only for this process:  IVR help line 888-721-7204 (8am – 8pm EST).  A staff member will be available to help you.

MRK-MCDAA0000552

As with all other products, there are PIRs to address key issues which are available through the Medical Services traditional PIR request channels or either INSIGHT; or the Merck National Service Center (if the doctor wants to speak with a Medical Team Member); or by calling the Internal Medical Services number for Merck field personnel at 800/MERCK66 (8:30am-4:30pm EST); or by faxing your request to Medical Services at 800/MERCK68. You may also submit a request for a PIR to address a specific issue.

6.  Response to anticipated obstacle:

Because we anticipate the Searle and Pfizer Representatives promoting Celebrex will attempt to continue using the Studies to create an obstacle for VIOXX around CV events, we're providing you with an updated version of Obstacle Response #38 to prepare you to confidently address this issue and transition back to your Top 5 Messages for VIOXX for HI NSAID and HI COXIB physicians.


Obstacle#38-Revise
d.doc

7.  National Teleconferences:

Please plan to participate in one of the National Teleconferences scheduled between May 30 and June 7 (refer to Bulletin COX00-045 (REVISED) for specifics on the teleconference).  During this teleconference, Dr. Gregory Bell will review the VIOXX GI Outcomes Research Study and the CLASS Study for Celebrex and address anticipated questions and obstacles you may receive from physicians.   We will also review the segmentation strategy and the implementation of it.

Please keep in mind, you do need to preregister for the teleconference, of your choice, at least 24 hours prior to the start time.

**IF YOU HAVE ANY QUESTIONS CONCERNING THIS BULLETIN, PLEASE CONTACT THE MERCK NATIONAL SERVICE CENTER AT 1-800-NSC-MERCK.**

---

[i]  Because patients participated in the study for varying lengths of time, these rates reflect events per 100 patient years.
[ii]  See note 1 above.
[iii]  See note 1 above.
[iv]  Singh, G. Recent considerations in NSAID gastropathy, American Journal of Medicine, July 1998.
[v]  On the basis of preliminary analyses, Merck previously reported that significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to patients taking Vioxx (0.5 percent).  Final adjudication of all events in the study has now been completed.  Final results show that the rate among Vioxx patients was 0.4 percent.

MRK-MCDAA0000553



No. COX 01-007
Feb 09, 2001

### Bulletin for VIOXX®:
### FDA Arthritis Advisory Committee Meeting for VIOXX®

**TO:**

All field personnel with responsibility for VIOXX®          Action Required
National Account Executives                                 Background Information
and Customer Managers (All Segments)

*DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY
COMMITTEE (ADVISORY COMMITTEE) REVIEW OR THE RESULTS OF THE
VIOXX® GI OUTCOMES RESEARCH (VIGOR) STUDY. YOU MAY RESPOND TO
CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW.*

#### Introduction:

As previously communicated in June 2000; Merck submitted a supplemental NDA for
VIOXX based upon the VIOXX GI Outcomes Research study (VIGOR). In this study,
VIOXX 50mg daily significantly reduced the risk of serious gastrointestinal side effects
by 54% vs. naproxen 1000mg daily. On Thursday, Feb 8, Merck and the FDA reviewed
the study with the FDA's Arthritis Advisory Committee.

The purpose of this bulletin is to provide you with important, updated background
information based on the results of this meeting and actions required by you.

#### Action Required:

1. Stay focused on the EFFICACY messages for VIOXX
2. Utilize the PIR system to respond to unsolicited physician inquiries
3. Review the updated background Q&A
4. Review the updated obstacles and responses for your physicians
5. Do not initiate discussions or respond to questions, except as outlined below

#### Stay Focused on Efficacy

It is critical that we remain focused on the 1S HI NSAID and HI COXIB messages for
VIOXX with our targeted physicians. As discussed at your 1S District Meetings, both the
OA efficacy data and the new acute pain narcotic efficacy data for VIOXX will continue to
solidify the efficacy perception of VIOXX. Use the new core visual aid for VIOXX and the

OA Efficacy Stock Bottle Challenge program to challenge physicians to gain experience with the 24 hour efficacy of VIOXX.

### Physician Inquiries:

In response to <u>unsolicited</u> requests for information regarding VIGOR, Medical Services will make a personalized, faxable PIR available for your customers within 24 hours.  In addition, for those customers who request additional information, a separate, more comprehensive PIR packet can be Federal Expressed within 2 days.

Medical Services has made arrangements to extend the hours for the PIR hotline. Representatives should submit unsolicited PIR requests by either telephone or fax options from **2/9 through 2/23** by calling the PIR hotline **800MERCK66** (800-637-2566) during extended hours of **8:30 am to 6:30pm ET**.  During these hours, a staff member will verbally request the following information from you to process the PIR request from the HCP  [After this time, the usual method options of INSIGHT, PIR hotline (800MERCK 66 -- hours: 8:30 – 4:30pm ET) and fax can be followed].

### Faxable PIR Instructions:

- <u>Your name, field title and RDT</u>
- <u>The requesting HCP's full name and professional degree</u>
- <u>HCP's full mailing address</u>
- <u>HCP's phone number</u>
- <u>HCP's FAX number</u>
- <u>Provide the question(s) asked by the HCP.</u>

PIR Requests may also be sent to Medical Services from 4:30 pm -- 8:30am ET by leaving a voice message at 800MERCK66.  The information as listed above should be provided in your voice message to Medical Services staff. Additionally, PIR requests may be submitted to Medical Services in writing by sending a fax to 800MERCK66.  The information listed above should be included on your fax to Medical Services.

### In Summary:

- If requested, a summary of the PIR will be faxed within 24 hours of receiving the request.
- If the physician requests more comprehensive information on the VIGOR study, you may request the comprehensive PIR.  This will be sent via Fed EX within 2 days.
- Transition your discussion to the current strategy and messages for VIOXX®.
- <u>Do not proactively discuss the Advisory Committee Meeting or VIGOR</u>.  Respond to questions about the study by requesting a PIR and in accordance with the obstacle-handling guide.

### Updated Q&A Guide:

This is background information only.

MRK-MCDAA0000658



"VIGOR QA.doc"

**Updated Obstacle Responses:**



Obstacles.doc

These updated obstacles are provided for your reference and preparation for questions asked by your physicians.

**This information is provided for your background information *only* and is not to be used in discussions with physicians.**

**Background Information:**

Merck issued a press release summarizing the FDA Advisory Committee Meeting held on Feb 8. The press release is attached below for your background information only:

GAITHERSBURG, Md., Feb. 8, 2001 -- The Arthritis Advisory Committee of the Food and Drug Administration today reviewed Merck & Co., Inc.'s application for changes to the prescribing information for Vioxx® (rofecoxib), Merck's medicine for osteoarthritis and acute pain, to reflect results from the Vioxx Gastrointestinal Outcomes Research (VIGOR) study.

The Advisory Committee agreed with Merck and the FDA that results from the study should be included in the labeling for Vioxx. The FDA is not obligated to follow the advice of the Advisory Committee, but usually does. The FDA noted that it will consider all available information, including the information reported and advice received at today's Advisory Committee meeting, before any final decisions are made on Merck's application and other issues discussed by the Committee.

"Merck is confident that the data presented today support the excellent safety profile of Vioxx, and we look forward to further discussions with the FDA to complete the review of our application to modify the labeling for Vioxx," said Eve Slater, M.D., senior vice president, Clinical and Regulatory Development, Merck Research Laboratories.

Vioxx was approved by the FDA in May 1999 to treat osteoarthritis and acute pain. The prescribing information for Vioxx currently contains the standard NSAID Warning about GI side effects. Merck's application to the FDA was based on the 8,000-patient VIGOR

MRK-MCDAA0000659

study, which evaluated the GI profile of Vioxx 50 mg compared to the non-selective NSAID naproxen, and on other studies with Vioxx.

In VIGOR, Vioxx 50 mg, a dose two-times the highest chronic dose approved for osteoarthritis, significantly reduced serious GI side effects by half compared to a commonly used dose of naproxen (1,000 mg) in rheumatoid arthritis patients. The Committee recommended that these results be included in the labeling. Vioxx is not indicated for rheumatoid arthritis.

Although the VIGOR study was a GI outcomes study and was not designed to show differences in cardiovascular effects, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking Vioxx 50 mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen. Patients taking aspirin did not participate in VIGOR.

In extensive discussions, the Advisory Committee explored this finding, other studies of Vioxx and possible explanations for this result in VIGOR. In the completed osteoarthritis trials and on-going clinical trials with Vioxx 12.5 mg, 25 mg and 50 mg in 30,000 patients, there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo.

Merck scientists said the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events. This is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study. Other explanations were advanced by the FDA reviewer and were discussed with the Advisory Committee. The Committee recommended that the data on cardiovascular events in VIGOR be included in the labeling for Vioxx.

In addition, the Committee agreed that the prescribing information for both Vioxx and Celebrex® (celecoxib) should reflect the fact that neither of these selective NSAIDs confer cardioprotective benefits and are not a substitute for low-dose aspirin. The Committee also recommended that other studies be conducted to further explore the safety of concomitant use of selective NSAIDs and low-dose aspirin.

**Focus:**

**Remain focused on your efficacy messages for VIOXX. Remember that the primary attribute that physicians and patients are seeking is pain relief.**

For questions regarding this bulletin please contact your Business
Manager.  For product and service information, call the Merck National
Service Center at 1-800-NSC MERCK (1-800-672-6372).

MRK-MCDAA0000661



No. COX 01-030
May 23, 2001

### Bulletin for VIOXX®:
#### Action Required: Response to New York Times Article

**TO:**

| | |
|---|---|
| All Field Representations with Responsibility for VIOXX | Action Required |
| All Hospital Representatives | Action Required |
| A & A Specialty Representatives | Action Required |
| A & A HSAs | Action Required |
| Urology Representatives | Action Required |
| Neurology Representatives | Action Required |
| Managed Care NAEs and Customer Managers (all segments) | Background Information |

*DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE VIOXX® GI OUTCOMES RESEARCH (VIGOR) STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX. YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW.*

**PURPOSE:**

To provide you with important background information, obstacle responses and faxable PIR instructions in the event that you are questioned by customers about the CV effects of VIOXX.

**ACTIONS REQUIRED:**
**Obstacle Response #38: (originally issued in Bulletin COX 00-029)**



"Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a result, you cannot compare the drugs and conclude that one drug had fewer events than the other. What you may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI Outcomes Trial (VIGOR), the incidence of MI was 0.5% with VIOXX and 0.1% with naproxen. In a separate GI outcomes trial of Celebrex, the CLASS study, Searle has reported that the incidence of MI was 0.5% with Celebrex, 0.3% with diclofenac, and 0.5% with ibuprofen. Again, doctor, I want to emphasize that the results of two different studies can't be compared, and that's particularly true here when you have studies of differing duration and in different patient populations."

**If the doctor asks you further for the incidence of MI from the OA studies presented in the package insert for VIOXX tell them:**

MRK-MCDAP0000897

"In the clinical OA trials for VIOXX reported in our package insert, the incidence of MI was less than 0.1% with VIOXX."

Use your **CV Card** to show the data on studies involving VIOXX and various NSAIDs (ibuprofen, diclofenac, and nabumetone) on overall mortality and CV mortality rates

"Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was **VIOXX .1 vs. NSAIDs .8 vs. Placebo 0.**"

### Physician Inquiries:

*In response to <u>unsolicited</u> requests for information regarding the recent press releases, Medical Services will make a personalized, faxable PIR available for your customers within 24 hours. In addition, for those customers who request more detailed information, a separate, more comprehensive PIR packet can be Federal Expressed within 2 days.*

Medical Services has made arrangements to extend the hours for the PIR hotline. Representatives should submit unsolicited PIR requests by either telephone or fax options by calling the PIR hotline **800MERCK66** (800-637-2566) during extended hours of **8:30 am to 6:30pm ET**. During these hours, a staff member will verbally request the following information from you to process the PIR request from the HCP [After this time, the usual method options of INSIGHT, PIR hotline (800MERCK 66 -- hours: 8:30 -- 4:30pm ET) and fax can be followed].

*Faxable PIR Instructions:*

- <u>Your name, field title and RDT</u>
- <u>The requesting HCP's full name and professional degree</u>
- <u>HCP's full mailing address</u>
- <u>HCP's phone number</u>
- <u>HCP's FAX number</u>
- <u>Provide the question(s) asked by the HCP.</u>

*PIR Requests may also be sent to Medical Services from 4:30 pm – 8:30am ET by leaving a voice message at 800MERCK66. The information as listed above should be provided in your voice message to Medical Services staff. Additionally, PIR requests may be submitted to Medical Services in writing by sending a fax to 800MERCK68. The information listed above should be included on your fax to Medical Services.*

- If requested, a PIR will be faxed within 24 hours of receiving the request.
- If the physician requests more comprehensive information on the cardiovascular safety profile of VIOXX, you may request the comprehensive PIR. This will be sent via Fed EX within 2 days.
- Transition your discussion to the current strategy and messages for VIOXX®.

Do not proactively discuss any of the recent press stories.  Respond to questions by requesting a PIR and In accordance with the obstacle-handling guide.

**This information is provided for your background information *only* and is not to be used in discussions with physicians.  The following press release was issued in response to an article in Tuesday's New York Times on the cardiovascular effects of VIOXX.**

**Background Information:**

Tuesday May 22, 1:21 pm Eastern Time

Press Release

SOURCE: Merck & Co., Inc.

Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx(R)

UPPER GWYNEDD, Pa., May 22 /PRNewswire/ -- In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx® (rofecoxib), its medicine that selectively inhibits COX-2. Vioxx was approved by the Food and Drug Administration in May 1999 for the management of osteoarthritis and the relief of acute pain in adults based on efficacy and safety studies involving nearly 4,000 patients. More than 33 million prescriptions have been written for Vioxx in the United States since its introduction.

The results of the Vioxx Gastrointestinal Research study were first released in March 2000. Since that time, the data have been widely reported, published in The New England Journal of Medicine and discussed extensively by an FDA Advisory Committee.

In VIGOR, Vioxx 50 mg, a dose two-times the highest chronic dose approved for osteoarthritis, significantly reduced the risk of serious GI side effects by half compared to a commonly used dose of naproxen (1,000 mg) in rheumatoid arthritis patients. The Advisory Committee recommended that these results be included in the labeling for Vioxx. Vioxx is not indicated for rheumatoid arthritis.

Although the VIGOR study was a GI outcomes study and was not designed to show differences in cardiovascular effects, significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking Vioxx 50 mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen. Patients taking aspirin did not participate in VIGOR.

In extensive discussions, the Advisory Committee explored this finding, other studies of Vioxx and possible explanations for this result in VIGOR. In the completed osteoarthritis trials and on-going clinical trials with Vioxx 12.5 mg, 25 mg and 50 mg in 30,000 patients, there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs and placebo.

At the Advisory Committee meeting, Merck scientists said the VIGOR finding is consistent with naproxen's ability to block platelet aggregation by inhibiting COX-1 like aspirin, which is used to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events. This is the first time this effect of naproxen on cardiovascular events has been observed in a clinical study. Other potential explanations were advanced by the FDA reviewer and were discussed with the Advisory Committee. The Committee recommended that the data on cardiovascular events in VIGOR be included in the labeling for Vioxx.

In addition, the Committee agreed that the prescribing information for both Vioxx and Celebrex® (celecoxib) should reflect the fact that neither of these selective NSAIDs confer cardioprotective benefits and are not a substitute for low-dose aspirin. The Committee also recommended that other studies be conducted to further explore the safety of concomitant use of selective NSAIDs and low-dose aspirin.

In a separate GI outcomes study in osteoarthritis and rheumatoid arthritis patients, celecoxib, another agent that selectively inhibits COX-2, was compared to the NSAIDs diclofenac and ibuprofen. Pharmacia, maker of celecoxib, has indicated that there were no differences among celecoxib, ibuprofen and diclofenac on these cardiovascular events. In Pharmacia's background package submitted to the FDA for the Advisory Committee meeting, the incidence of patients taking celecoxib who experienced a heart attack was cited as 0.5 percent, 0.3 percent among diclofenac patients, and 0.5 percent among patients taking ibuprofen.

**Focus:**
**Remain focused on your efficacy messages for VIOXX. Remember that the primary attribute for physicians and patients is pain relief.**

**For product and service information, call the Merck National Service Center at 1-800-NSC MERCK (1-800-672-6372).**

No. COX 01-052
Aug 21, 2001

EXHIBIT
1/2606
Rivas-58
RC

## Bulletin for VIOXX®:
## Action Required: Response to Journal of the American Medical Association (JAMA) article, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors"

### TO:

| | |
|---|---|
| All Field Representations with Responsibility for VIOXX | Action Required |
| All Hospital Representatives | Action Required |
| A & A Specialty Representatives | Action Required |
| A & A HSAs | Action Required |
| HIV Specialty Representatives | Action Required |
| Urology Representatives | Action Required |
| Neurology Representatives | Action Required |
| Managed Care NAEs and Customer Managers (all segments) | Background Information |

*DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE VIOXX® GI OUTCOMES RESEARCH (VIGOR) STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX. YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW.*

### PURPOSE:

To provide you with important background information, obstacle responses and faxable PIR instructions to use when posed with questions from customers on the article in the August 22 issue of JAMA.

### ACTIONS REQUIRED:

#### Obstacle Response #38: (originally issued in Bulletin COX 00-029)

#38: The competition has been in my office telling me that the incidence of heart attacks/cardiovascular events is greater with VIOXX than Celebrex.
OR
I just read (or heard) a news story stating that VIOXX has a higher incidence of heart attacks than Celebrex.

"Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a result, you cannot compare the drugs and conclude that one drug had fewer events than the other. What you may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI Outcomes Trial (VIGOR), the incidence of MI was 0.5% with VIOXX and 0.1% with naproxen. In a separate GI outcomes trial of Celebrex, the CLASS study, Searle has reported that the incidence of MI was 0.5% with Celebrex, 0.3% with diclofenac, and 0.5% with ibuprofen. Again, doctor, I want to emphasize that the results of two different studies can't be compared, and that's particularly true here when you have studies of differing duration and in different patient populations."

If the doctor asks you further for the incidence of MI from the OA studies presented in the package insert for VIOXX tell them:

"In the OA clinical trials for VIOXX reported in our package insert, the incidence of MI was less than 0.1% with VIOXX."

Use your **CV Card** to show the data on studies involving VIOXX and various NSAIDs (ibuprofen, diclofenac, and nabumetone) on overall mortality and CV mortality rates

"Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients in OA studies was reported as events per 100 patient years,
**VIOXX .1 vs. NSAIDs .8 vs. Placebo 0."**

## Physician Inquiries:

> *Reminder: In accordance with policy letters 110, 118, and 131, Field Personnel, including Professional Representatives, HSAs, Hospital Tablet Representatives, Specialty Representatives and NAEs may not discuss or respond to questions about off-label information about VIOXX. In accordance with policy letter 104A, Field Personnel may submit PIRs to Medical Services only when a Health Care Professional has an <u>unsolicited</u> request for such information. You must not prompt or solicit any questions or requests for off-label information.*

**Make sure to review and follow directions in General Bulletin: GEN 01-039 regarding unsolicited inquiries from Health Care Professionals.**

Below are toll free phone numbers for the one Fax PIR available from Medical Services in response to unsolicited requests for information from HCPs regarding **VIOXX** and a recent article about **cardiovascular adverse events**.

In response to <u>unsolicited</u> questions from HCPs, you may request PIRs from Medical Services by using EITHER the interactive voice response (IVR) same day fax service, or by using the usual PIR request methods as stated in policy 104A. PIRs requested via the IVR same day fax service will be provided as a "nonpersonalized" Dear Doctor Letter. Specific steps for using the IVR fax service are outlined below.

## OVERVIEW:

**1. IVR FAX METHOD --**
Effective Wednesday, August 22 at 8am ET through close of business Friday, September 14, with the possibility of extension--the field will be notified if such extension occurs (Mon-Fri, excluding holidays). Medical Services will have one PIR available via fax to respond to the following type of inquiry:

## <u>Fax  = VIOXX and a recent article about cardiovascular adverse events</u>

In response to <u>unsolicited</u> questions about the above topics, the PIR  -- <u>VIOXX and a recent article about Cardiovascular Adverse Events</u> will be available from Medical Services via the interactive voice response (IVR) same day fax service and provided as a "nonpersonalized" Dear Doctor Letter.

**Toll Free Fax PIR Request Telephone Number:**

<u>You may submit a HCPs request for a faxed PIR(s) by simply calling 1-877-372-7064.</u>

MRK-MCDAC0000289

- This toll free phone number will be made available from 8:00am – 11:00pm (ET). Since this line is an IVR system, a touch tone phone must be used in order to provide the pertinent information needed as prompted in the system.

Please follow the detailed instructions outlined below for requesting the faxable "nonpersonalized" Dear Doctor Letter in response to an unsolicited inquiry from the requesting HCP.

You should be prepared to provide the following pertinent information as prompted by the system:
- Your Region, District, and Territory Identifier
- Requesting HCP's 5 digit ZIP code
- Requesting HCP's full name and professional degree (speak, may need to spell if complex)
- Requesting HCP's full mailing U.S. office address (speak)
- Requesting HCP's office phone number with area code
- Requesting HCP's office FAX number with area code
Select the fax requested by the HCP:
**FAX = VIOXX and a recent article about cardiovascular adverse events**

## IMPORTANT NOTE: PIRs ARE NOT TO BE REPRODUCED IN ANY FORM!

This one fax will be sent directly to the requesting physician's office as "nonpersonalized" Dear Doctor Letter. This fax should arrive as soon as 15 minutes from the time of the request. You must leave a copy of the circular for VIOXX with the fax letter to the requesting HCP. (Note: For pharmacists, nurses, and physician assistants, you may also want to send the 'Dear Doctor' letter.)

You also have the option to follow the usual procedure established for processing a PIR using the methods through Medical Services as stated in Policy 104A.

**Toll Free IVR HELPLINE Telephone Number:**
<u>If you experience difficulty with the FAX IVR system or if there is difficulty receiving the fax to the HCP's office, representatives should call the FAX IVR HELPLINE at 1-888-721-7204  (9:00 am to 7:00 pm ET)</u>
- This number will be on the cover sheet of the faxed letter available to the requesting HCP.
- This number is staffed from 9:00 am to 7:00 pm ET.

## 2. ADDITIONAL OTHER PIRS FOR VIOXX ARE AVAILABLE FROM MEDICAL SERVICES IN RESPONSE TO <u>UNSOLICITED</u> INQUIRIES FROM HCPS BY USING THE USUAL METHODS TO SUBMIT PIRS AS STATED IN POLICY LETTER 104A.

The usual PIR request methods are (note: choose only <u>one</u> method for each request) as in Policy 104A:
- INSIGHT and processing using the PIR screen;
- PIR hotline at 800-MERCK66 (8:30 am to 6:00 pm ET as extended hours) in Medical Services. This phone number is NOT to be given to an HCP, but is for Merck Field Personnel use only to verbally submit the questions asked by HCPs. PIR inquiries may be submitted to Medical Services 24 hours a day, 7 days a week with voice message available after hours (6:30pm to 8:30am ET).
- Faxing your request to Medical Services at 800-MERCK66.

If the HCP requests to speak with a Merck health care professional, the Merck National Service Center should be called at 800-NSCMERCK (business hours of 8:00 am to 7:00 pm ET; For emergency issues, Medical Services after-hours Call Coverage is 24 hours a day/ 7 days a week.)

MRK-MCDAC0000290

Remember to always provide appropriate balancing information consistent with the health care provider's knowledge of the product and the product prescribing information. Please continue to provide competitive and promotional feedback to the National Service Center (NSC). The NSC is staffed Monday through Friday, 8:00am to 7:00pm Eastern Time, Please contact the NSC at 1-800-NSC-MERCK or 1-800-672-6372.

<u>Do not proactively discuss any of the recent press stories.</u> Respond to questions by requesting a PIR and in accordance with the obstacle-handling guide.

## BACKGROUND INFORMATION:

This information is provided for your background information *only* and is not to be used in discussions with physicians or customers. The following press release was issued Tuesday, August 21st.

### Press Release:

#### Merck Stands Behind the Cardiovascular Safety Profile of Vioxx®

UPPER GWYNEDD, Pa., Aug. 21, 2001 – In response to an article published in this week's *Journal of the American Medical Association* containing data from selected previously released studies of Vioxx (rofecoxib) and Pharmacia's Celebrex, Merck & Co., Inc. today said the Company stands behind the overall and cardiovascular safety profile and the favorable GI profile of Vioxx. Merck believes Vioxx is an appropriate and efficacious therapy for the relief of the signs and symptoms of osteoarthritis and the management of acute pain in adults.

Merck concurs with statements made in the article by Mukherjee *et al* that selective "COX-2 inhibitors show less propensity for gastrointestinal toxicity" than non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and that "aspirin and naproxen show greater potential for gastrointestinal toxicity but have a cardioprotective effect." Merck also agrees with the authors' statement that their analysis "has several significant limitations".

The authors say more data are needed on the cardiovascular profile of COX-2 inhibitors. However, Merck believes that extensive cardiovascular data already exist on Vioxx and that these data – which were not incorporated into the authors' analysis – suggest that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx.

These cardiovascular data are from a meta-analysis of data from 19 controlled clinical studies with Vioxx involving more than 28,000 patients and showed the relative risks of serious cardiovascular events were similar with Vioxx and placebo, and with Vioxx and the widely prescribed NSAIDs ibuprofen, diclofenac and nabumetone. This analysis was presented in February at the FDA Advisory Committee meeting and in Europe in June at the annual meeting of the European League Against Rheumatism.

Patient safety is of paramount importance to Merck. As is the case with all of our products, Merck is interested in helping to answer important questions that could help further the scientific understanding of Vioxx and other medicines that selectively inhibit COX-2. We routinely review data from completed studies and clinical use of our products, and consistent with this approach, we will continue to evaluate data from ongoing studies with Vioxx and relevant emerging studies on COX-2 inhibitors to enhance our understanding of these medicines and assess the potential value of future trials.

Cardiovascular event rate reduced with naproxen in VIGOR

Merck's gastrointestinal (GI) outcomes study of over 8,000 patients, called VIGOR (Vioxx Gastrointestinal Outcomes Research study), was a GI study that was not designed to show differences in cardiovascular effects. In the study, however, significantly fewer heart attacks were observed in patients taking naproxen 1,000 mg (0.1 percent) compared to patients taking Vioxx 50 mg (0.5 percent) – a dose two times the highest chronic dose approved for osteoarthritis. This is the first time this result has been observed. This finding is consistent with the ability of naproxen to inhibit platelet aggregation in a manner similar to aspirin. The authors of the JAMA article also acknowledged this potential cardioprotective benefit of naproxen. Aspirin is indicated to prevent second cardiac events in patients with a history of heart attack, stroke or other cardiac events, but was not taken by patients in VIGOR. There was no difference in cardiovascular mortality between the two groups. In VIGOR, there was no correlation between renal effects and cardiovascular events.

In VIGOR, Vioxx 50 mg significantly reduced serious GI side effects by half compared to a commonly used dose of naproxen (1,000 mg) in rheumatoid arthritis patients. Vioxx is not indicated for rheumatoid arthritis. The results of the study were first released in March 2000. Since that time, the data have been widely reported, published in *The New England Journal of Medicine* and discussed extensively by an FDA Advisory Committee.

Vioxx is a once-a-day NSAID that selectively inhibits COX-2. For several decades, the prescribing information for NSAIDs such as ibuprofen has contained language that states that NSAID medications should be used with caution in patients with fluid retention, hypertension or heart failure. The prescribing information for both Vioxx and Celebrex, which are NSAIDs, contains similar language.

Authors concede "several significant limitations" to their analysis

The authors concede their analysis "has several significant limitations." These limitations included:

➤ The analysis looked only at three of the many available studies of Vioxx and one study of Celebrex.

> The authors borrowed a "placebo" arm for their analysis from four older, separate aspirin studies that did not involve Vioxx or Celebrex, and compared data from that "placebo" group to data from separate studies of Vioxx or Celebrex. It is widely understood that an essential component in determining the validity of such an analysis is the similarity of the studies being compared.

> Specifically, none of the aspirin studies used by the authors to estimate the "placebo" rate of cardiovascular events included patients with rheumatoid arthritis. The authors acknowledge this limitation in their article because rheumatoid arthritis is a disease that may increase one's risk of cardiovascular events. Therefore, to compare a group of patients taking Vioxx for rheumatoid arthritis with a "placebo" group of patients who do not have rheumatoid arthritis is inappropriate and misleading because one would expect a higher rate of cardiovascular events in the rheumatoid arthritis group, regardless of any medications. In fact, two of the aspirin studies cited by the authors involved healthy male physicians (Physicians' Health Study and Doctors' Study) who likely had lower risk for cardiovascular events than those studied in the COX-2 inhibitor studies cited in the article.

Based on the authors' analyses and the data from Merck's large-scale placebo-controlled clinical trials, Merck does not believe the authors' conclusions in the article are scientifically supported by the totality of the data available.

For product and service information, call the Merck National Service Center at 1-800-NSC MERCK (1-800-672-6372).

Case 2:05-md-01657-EEF-DEK   Document 12158-1   Filed 09/04/07   Page 65 of 65



No. COX 01-059
Sep 25, 2001

### Bulletin for VIOXX®:
### Action Required: Response to Inquiries about FDA Warning Letter

**TO:**

| | |
|---|---|
| All Field Representatives with Responsibility for VIOXX | Action Required |
| All Hospital Representatives | Action Required |
| A & A Specialty Representatives | Action Required |
| A & A HSAs | Action Required |
| HIV Specialty Representatives | Action Required |
| Urology Representatives | Action Required |
| Neurology Representatives | Action Required |
| Managed Care NAEs and Customer Managers (all segments) | Background Information |

**PURPOSE:**

To provide you with a response for customers who inquire about the recent Warning Letter issued to Merck for VIOXX.

**ACTION REQUIRED:**

**YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW**

If a customer asks, "I heard Merck got a Warning Letter for VIOXX. What was it for?"

Respond:

The Warning Letter is from FDA's Advertising Division and relates to VIOXX. We are in the process of developing our response to FDA. Consistent with our usual approach to regulatory agencies, Merck will provide the company's response to FDA first. Merck continues to stand behind the overall and cardiovascular safety of VIOXX.

**BACKGROUND:**

On September 17, 2001, Merck received a Warning Letter from the FDA regarding VIOXX. The Warning Letter cited three separate activities:
- A specific set of Remote Speaker Audio conferences
- One Press Release
- Oral presentations allegedly made by Merck Representatives at two different professional meeting exhibits

Among the issues identified by FDA are discussions of VIGOR. We are in the process of developing our response to the FDA and will respond by Oct. 1, as the Agency requested.

Thank you for your prompt attention to this matter and your continued adherence to all Merck policies and appropriately balanced messages. This recent development is likely to make an already competitive environment increasingly more competitive. Please continue to report competitive activity to the National Service Center as appropriate

For product and service information, call the Merck National Service Center at 1-800-NSC MERCK (1-800-672-6372).

MRK-MCDAA0000786