REVISED September 4, 2007

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION:  L (3) |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**


<u>**ORDER & REASONS**</u>

Before the Court are Special Master Paul R. Rice's Report and Recommendations (Rec.

Docs. 11566 & 11882) on a representative sampling of documents as to which Merck & Co., Inc.

has asserted privilege in this multidistrict litigation ("MDL"), and Merck's Motions to Adopt in

Part the Special Master's Report and Recommendations and Merck's Objections Thereto (Rec.

Docs. 11729 & 12020), which have been filed under seal.

This discovery dispute has dragged on for over a year and at times has seemed hopelessly

endless.  Although Merck has produced over two million documents in this MDL, the company

has also asserted attorney-client privilege as to approximately 30,000 documents which it

contends need not be produced.  The majority of the withheld documents are print-outs of

electronic communications, primarily internal company e-mails and attachments.  Following an

initial individualized review by the Court of every single withheld document, and a subsequent

decision by the United States Court of Appeals for the Fifth Circuit, it is the Court's hope that a

detailed expert analysis of a representative sample of these documents can potentially resolve all of Merck's privilege claims and put an end to a time consuming and expensive saga that has spiraled out of control in this case.  Because the administrative and organizational travails that this Court has experienced are sure to recur with increasing regularity in similar cases, particularly at this time, at the dawn of the age of electronic discovery, and because the sample resolution process ultimately employed suggests that all hope may not be lost, the Court will relate this matter in considerable detail.

## I.       BACKGROUND

This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.  Vioxx remained available to the public until September 30, 2004, at which time Merck withdrew it from the market when data from a clinical trial indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes.[1]

Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, failure-to-warn, fraud, and warranty claims.  It is estimated that 105 million prescriptions for

---

[1]  For a more detailed factual and medical background, see *In re Vioxx Prods. Liab. Litig.*, ___ F. Supp. 2d ___, 2007 WL 1952964 (E.D. La. July 3, 2007) (denying Merck's motion for summary judgment on federal preemption grounds).

Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407.  *See* 360 F. Supp. 2d 1352.[2]  Shortly thereafter, the Court appointed committees of counsel to represent the parties and discovery in this litigation commenced.

Discovery has progressed simultaneously on two parallel tracks in this multidistrict litigation.  First, the Plaintiffs' Steering Committee ("PSC") and the Defendants' Steering Committee ("DSC") have been charged with initiating, conducting, and coordinating all non-case-specific discovery.  In this regard, the PSC has established and organized a document depository to house materials produced by Merck and has made these materials available to plaintiffs' counsel in individual cases.  Second, in an effort to streamline case-specific discovery in thousands of individual cases, the Court has required every plaintiff who alleges a cardiovascular injury to submit to Merck both a Plaintiff Profile Form, which contains certain biographical and medical information, and authorizations for the release of medical records.  Upon receipt of these materials, Merck is then required to provide a Merck Profile Form, which discloses contacts Merck has had with plaintiffs' doctors and any other relevant information Merck may have about individual plaintiffs.

---

[2]  Section 1407 provides that "[w]hen civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings" if the JPML determines "that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).

Although this MDL was constituted in early 2005, many cases involving similar claims had been previously filed in state courts throughout the country, including in Louisiana. Some of these cases had been pending in state court for several years prior to the creation of this MDL, and case-specific discovery was essentially completed in some instances. With the consent of the parties, several of these cases were re-filed directly into this MDL so that bellwether trials could also commence immediately. Initially, the PSC and DSC were each permitted to designate for trial five bellwether cases involving myocardial infarctions in which case-specific discovery was complete. Each side was given two veto strikes. The remaining cases were then set for trial on a rotating basis, starting with one of the plaintiffs' selections. To date, the Court has conducted six bellwether trials (in five individual cases).[3]

Meanwhile, non-case-specific discovery continued. On August 22, 2005, in response to a PSC request for production, Merck asserted attorney-client privilege on a large number of documents and provided the PSC with its first MDL privilege log. A revised privilege log was provided on November 4, 2005. Shortly thereafter, the Court ordered Merck to submit for *in camera* review all documents as to which it claimed privilege. *See* Rec. Doc. 1337. In response to that Order, Merck delivered 81 boxes to the Court containing approximately 30,000 documents, amounting to nearly 500,000 pages, as to which privilege was asserted. The documents were not categorized or grouped together in any logical or organized fashion. Thus, the Court proceeded to review each document individually. Throughout April of 2006, the Court

---

[3] For further details concerning the management and progress of this MDL, see *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897 (E.D. La. 2007) (discussing the use of direct filing in this multidistrict litigation) and *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) (denying the plaintiffs' motion for certification of a nationwide personal injury class action).

went through each box and removed those documents that it felt were privileged and then instructed the parties to confer on the method by which the PSC would receive and/or copy the remaining non-privileged documents.

Merck sought review of the Court's privilege rulings via a petition for a writ of mandamus.  On May 26, 2006, the United States Court of Appeals for the Fifth Circuit declined to issue a writ on jurisdictional grounds, but suggested that this Court (or its designee) re-examine 2,000 representative documents, that Merck would select, pursuant to a different review protocol.  *See In re Vioxx Prods. Liab. Litig.*, 2006 WL 1726675 (5th Cir. May 26, 2006).  The Fifth Circuit did not rule on the merits of any individual privilege ruling, but simply concluded that this Court should devise a new procedure for reviewing the representative documents.  *Id.* at *3.

Pursuant to the Fifth Circuit's direction, Merck provided this Court with 10 additional boxes containing approximately 2,000 documents that Merck believes are representative of all the documents in question.  On April 25, 2007, after giving notice and allowing the parties an opportunity to be heard, the Court appointed Professor Paul R. Rice of American University's Washington College of Law as Special Master pursuant to Rule 53 of the *Federal Rules of Civil Procedure*.  *See* Rec. Doc. 10872.  The Court requested that Special Master Rice review the 2,000 representative documents, as well as approximately 600 additional documents selected by the PSC and believed to be relevant to upcoming trial preservation depositions, and make recommendations as to whether or not Merck's claims of privilege should be upheld.  On May 1, 2007, the Court also appointed Mr. Brent B. Barriere of the firm Phelps Dunbar LLP as Special Counsel to assist the Special Master by providing logistical support and local facilities and by

managing the Special Master's operating account.  *See* Rec. Doc. 10908.  The Court confidently made both of these appointments based on the considerable experience these individuals were able to bring to this dispute and in light of their impeccable reputations.[4]

Professor Rice graduated from the West Virginia University College of Law in 1968 with high honors and then clerked for the Honorable Herbert S. Boreman at the United States Court of Appeals for the Fourth Circuit.  Following his clerkship, he returned to Yale Law School and received an LL.M. in 1972, and has been teaching at American University's Washington College of Law since 1974.  Professor Rice is widely recognized as a leading scholar on the law of evidence, and particularly attorney-client privilege, having published several respected treatises and numerous articles and papers on the topic.  Professor Rice also has considerable practical experience, having served as Special Master or Special Counsel in the following complex cases: from 1978 to 1981 he served as Special Master in *United States v. AT&T*, No. 74-1698 (D.D.C.); from 1981 to 1983 he served as Special Master in *In re Amoxicillin Patent & Antitrust Litigation*, MDL No. 328 (D.D.C.); from 1981 to 1982 he served as Special Master in *Southern Pacific Communication Co. v. AT&T*, No. 78-0545 (D.D.C.); and from 2002 to 2004 he served as Special Counsel in *In re Microsoft Corp. Antitrust Litigation*, MDL No. 1332 (D. Md.).  In these various posts Professor Rice has been called upon to, among other things, review thousands of attorney-client privilege claims.

---

[4]  Although the parties consented to these appointments, Special Master Rice and Special Counsel Barriere nevertheless provided affidavits pursuant to Rule 53(b) disclosing that there were no grounds for their disqualification under 28 U.S.C. § 455 that would prevent them from performing their duties.  *See* Rec. Docs. 11096 & 11097.

Mr. Barriere graduated from Tulane Law School in 1981 with high honors and is now a partner at Phelps Dunbar LLP, one of the oldest and most respected law firms in New Orleans and, indeed, across the region and the nation.  Mr. Barriere represents clients in a wide variety of commercial disputes and has been named one of Louisiana's top ten litigators by the *National Law Journal*.  He has also been recognized by *The Best Lawyers in America* and *Chambers USA* publications.  Moreover, his firm has the administrative capability to support this endeavor.

On July 2, 2007, Special Master Rice and Special Counsel Barriere completed their review of the initial representative documents and delivered to the Court the Special Master's Report, including recommendations for each individual document (Appendix I), and the full record created during the sample resolution process (Appendix II).  The Special Master's recommendations in Appendix I are divided into two parts:  Part A addresses Merck's 2,000 sample documents and Part B addresses the 600 documents selected by the PSC.  In his Report, the Special Master describes the sample resolution process that was employed in this case:

> Immediately following the appointment of Special Master Rice and Special Counsel Barriere, two meetings were held with the parties on May 4, 2007 in Washington, D.C. and May 11, 2007 in New Orleans, Louisiana.  The Special Master discussed a range of problems that he had identified with the privilege log and some of the privilege claims asserted on documents that he had examined.  He discussed most of these problems with both plaintiffs' and defendant's counsel present.  With the consent of plaintiffs' counsel, when confidential information about particular documents was addressed, ex parte discussions were held with defendant's counsel.  Among the problems discussed were concerns about inadequate descriptions in the privilege log, erroneous descriptions of e-mail threads in the privilege log, the need for documentation of the elements of each claim of privilege or work product immunity, issues of confidentiality and the need for internal corporate policies about preserving confidentiality plus an affidavit from a knowledgeable person that those

confidentiality policies are communicated throughout the company and scrupulously followed, and the general absence of supporting affidavits for all privilege claims.

As previously noted, approximately 2,000 sample documents (contained in 10 boxes) had been selected by Merck for review in this process. Because depositions sought by Merck were awaiting the resolution of privilege claims relating to specific individuals, the plaintiffs were permitted to identify 600 additional documents to which immediate attention needed to be given. These were added to the universe of samples upon which the Special Master would initially make recommendations to Judge Fallon.

The examination process began immediately. After the Special Master had examined the Merck selected documents in the ten boxes, and subsequently re-examined them as he entered his initial assessments or tentative decisions in the word processor, the Special Counsel examined the decisions of the Special Master. Differences of opinion were discussed over joint re-examinations of the documents and the Special Master made a final tentative decision. Paralegals entered the decisions and reasons in an excel spreadsheet created for this process. During the data entry process conflicts in decisions on the same or similar types of documents were identified and the Special Master re-examined those collective decisions still again. These final tentative decisions identified as "initial assessments" were issued to Merck and the plaintiffs' counsel in 5 sets – each set containing initial assessments for two boxes – between May 17 and June 5, 2007.

Following issuance of the first set of initial assessments, Merck was given two weeks to respond because of the novelty of the process and the fact that additional issues had to be briefed. These additional issues were the confidentiality issues identified by the Special Master and a new theory announced by Merck for expanding the scope of the attorney-client privilege protection. Thereafter as each set of initial assessments were issued, Merck had one week to respond with objections and supporting evidence that had not been supplied in the initial submission.

During this process, the Special Master and Special Counsel promulgated substantive guidelines that they followed in the resolution of privilege claims to ensure consistency in decisions by each individual and between the two. While these guidelines are discussed later in this report, it is important to note that they were

-8-

disseminated in advance of this report to facilitate litigants' understanding of our recommendations.

Because of the exigencies presented in this case, the Special Master agreed to complete his initial review of the documents contained in the 10 boxes by the end of May. While this was accomplished, it was not until June 5, 2007 that the entire sample could be screened by Special Counsel Barriere, data input by the staff of paralegals, headed by Nancy Heater, proof read by Barbara Arras, conflicts resolved by the Special Master, and the initial assessment issued electronically to the parties. Without the assistance of these individuals through exceptionally long days, nights, and weekends, this expedited undertaking would not have been possible.

When Merck disputed an initial assessment, the paralegals pulled the relevant documents and the Special Master reviewed them for the third or fourth time. When decisions were changed in light of the subsequent documentation and explanations from Merck, those documents were also examined again by the Special Counsel. The recommendations offered in this report are the culmination of that laborious process.

*See* Special Master's Report at 3-4 (Rec. Doc. 11566-2).

On July 3, 2007, the Court issued an Order filing the Special Master's Report and recommendations into the record and allowing fifteen days during which any objections could be filed. *See* Rec. Doc. 11566.[5] Subsequently, with the approval of the Court, Merck sent a letter to the Special Master on July 16, 2007 requesting clarification on certain alleged factual errors and inconsistencies in his recommendations. The Special Master re-examined these documents and has submitted a supplemental report and amended recommendations addressing Merck's

---

[5] Appendix II has been filed into the record under seal and contains the following materials: Orders of the Court, the Special Master's initial assessments of privilege claims, Merck's responses to the initial assessments, correspondence discussing concerns about redacted responses provided to the PSC, briefs and other supporting material filed by Merck, order of Judge Higbee and sealed transcript of Joanne Lahner's testimony, e-mail correspondence with the parties, and other written correspondence.

concerns.[6]  On August 2, 2007, the Court entered the Special Master's supplemental report and Amended Appendix I into the record and allowed ten days for any additional objections to be filed.  *See* Rec. Doc. 11882.  While the PSC makes no objection to the Special Master's recommendations, Merck has timely filed a number of objections.

## II.     SPECIAL MASTER'S REPORT

In addition to providing written recommendations on a document-by-document basis, Special Master Rice issued a twenty-one page Report that discusses the law of attorney-client privilege both in general and in the context of this multidistrict litigation.  This comprehensive discussion of the law demonstrates the Special Master's expertise in the field and provides a framework for understanding his individual recommendations on each representative document.  Accordingly, the Court will now reproduce the substantive portion of the Special Master's Report, which reads as follows:[7]

### A.     Basics of the Attorney-Client Privilege

The attorney-client privilege is an exception to the general rule that the law is entitled to every man's evidence.  The privilege protects communications from the client to the attorney, and responsive communications from the attorney to the client.

---

[6]  The Court also referred to the Special Master a related matter concerning whether or not certain documents Merck provided to third-party consultants are privileged.  *See* Rec. Docs. 4849 & 11826.  The Special Master has delivered his Second Report and Recommendations on this issue, which the Court will address in a separate order.

[7]  The Court has taken the liberty of modifying the numbering of the various sections of the Special Master's Report to ensure that they conform with the headings used in this Order & Reasons.  The numbering of the footnotes has also necessarily been modified, such that each footnote's number has increased by a factor of six.  For example, footnote number two in the original Report is footnote number eight herein, footnote number three in the original Report is now footnote number nine, etc.  Other than some additional cosmetic modifications, the following is a complete reproduction of the substantive portion of the Special Master's Report.  As noted, the original version of the Report was filed into the public record on July 3, 2007 and may be consulted in its original form and in its entirety.  *See* Rec. Doc. 11566-2.

A widely quoted definition of the attorney-client privilege appears in *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950):

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

This definition was adopted by the Fifth Circuit Court of Appeals in 1975 in *In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir. 1975).

Many other courts have adopted the definition of the privilege in Proposed Rule 502(b) of the *Federal Rules of Evidence* that was never enacted:

> General rules of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative, (2) between his lawyer and the lawyer's representative, (3) by him or his lawyer to a lawyer representing another in a matter of common interest, (4) between a representative of the client or between the client and a representative of the client, or (5) between a lawyer representing the client.

Five elements are common to all definitions of the attorney-client privilege: (1) an attorney, (2) a client, (3) a communication, (4) confidentiality anticipated and preserved, and (5) legal advice or assistance being the purpose of the communication.

For the lawyer's responsive communication, the accepted theory has been that only a *derivative protection* is afforded. The responsive communication from the attorney to the client is protected only to the extent that the response reveals the content of the client's prior confidential communication. Many judges, however, tend to interpret this restriction as giving a protection to the attorney's advice (either regardless of what it reveals from prior communications from the client, or on the

-11-

assumption that it will always disclose such confidences) and enforcing the derivative rule only for factual communications (for example, the lawyer revealing to the client what third parties had told him).[8]

Here, we attempted to follow the wisdom of the Court in *Garner v. Wolfinbarger*, 430 F.2d 1093, 1096 n.7 (5th Cir. 1970), where it was stated that since "[t]he parties make no distinction between the client's communications to the attorney and the attorney's communications to the client, . . . it is not necessary that we do so." While we generally ignored the distinction, we applied it in two instances: (1) when the attorney had conveyed information to the client that the attorney had acquired from third parties (e.g., previously published articles and discussions with third parties like a U.S. attorney), and (2) when in-house lawyers were electronically rendering their advice (in the form of line edits) on a non-privileged attachment to non-privileged client communications and then Merck claimed that the non-privileged attachment became privileged because of the advice its lawyers chose to place on it.[9]  As further explained later in this report, we denied those claims because

---

[8]     *See, e.g.*, *In re LTV Securities Litig.*, 89 F.R.D. 595, 602-03 (N.D. Tex. 1981) ("In theory, the client states facts and the attorney gives advice; and in the theory, if the advice to the client does not reveal what the client told him it is not privileged. . .  Whatever the conceptual purity of this 'rule,' it fails to deal with the reality that lifting the cover from the advice will seldom leave covered the client's communication to his lawyer.  Nor does it recognize the independent fact gathering role of the attorney.  Finally enforcement of the rule would be imprecise at best, leading to uncertainty as to when the privilege will apply. . .  A broader rule . . . protects from forced disclosure any communication from an attorney to his client when made in the course of giving legal advice. . .  [W]e think the broader rule better serves the interests underlying the attorney-client privilege and is not inconsistent with the principle that the attorney-client privilege should be applied narrowly."); *United States v. Mobil Corp.*, 149 F.R.D. 533, 536 (N.D. Tex. 1993) ("The attorney-client privilege protects two related, but different, communications:  (1) confidential communications made by a client to his lawyer for the purpose of obtaining legal advice; and (2) any communication from an attorney to his client when made in the course of giving legal advice, whether or not that advice is based on privileged communications from the client.").  *See generally* Paul R. Rice, 1 Attorney-Client Privilege in the United States, § 5:2 (Thomson West 2d ed. 1999).

[9]     Theoretically, the fact that Merck regularly revealed on the face of discoverable communications among non-legal personnel that copies of the communications

-12-

Merck cannot be permitted to manipulate the discovery process by the manner in which their in-house attorneys render their advice.

It is well-accepted, of course, that the attorney-client privilege applies to corporations. *See Upjohn Co. v. United States*, 449 U.S. 383 (1981); *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970). The fictitious legal entity is the client that cannot speak, but that entity is personified by the employees who represent its interests and speak on its behalf. Consequently, it protects communications between those employees and corporate legal counsel on matters within the scope of their corporate responsibilities, as well as communications between corporate employees in which prior advice received is being transmitted to those who have a need to know in the scope of their corporate responsibilities.[10]

### B.     Legal Advice Must be the Primary Purpose

In the Vioxx action, one element of the privilege has been particularly troublesome. That is the requirement that legal advice or assistance must be sought and given for the privilege to apply. While this element is often problematic vis-à-vis internal corporate communications, the problem is exacerbated here because of the uniquely regulated nature of the drug industry in which Merck is involved and the role that in-house counsel has been given in the Merck decision-making process relative to the publication of corporate generated communications.

It is often difficult to apply the attorney-client privilege in the corporate context to communications between in-house corporate counsel and those who personify the corporate entity because modern corporate counsel have become involved in all facets of the enterprises for which they work. As a consequence, in-house legal counsel participates in and renders decisions about business, technical, scientific, public relations, and advertising issues, as well as purely legal issues.

---

had also been sent to in-house counsel destroyed the confidentiality of the initial communications upon which the derivative protection for the lawyers' responses is dependent. As a consequence, Merck could have been found to have waived the privilege protection for all responsive communications. We chose, however, to ignore this "conceptual purity" and granted the privilege to the extent that Merck produced attachments without the lawyers' superimposed electronic comments.

[10]     *See generally* PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, §§ 4:11-14 (Thomson West 2d ed. 1999).

[I]ntent problems arise most frequently in a corporate or other business context when the attorney is in-house counsel. In-house counsel often have responsibilities which extend beyond the mere rendering of legal advice – for example, in-house counsel might also act as an executive vice president with designated business responsibilities. The responsibilities as vice-president and lawyer may overlap significantly and the purpose of various communications with others within the organization may begin to blur. Many courts fear that businesses will immunize internal communications from discovery by placing legal counsel in strategic corporate positions and funneling documents through counsel (*viz*, addressing documents to the lawyers with copies being sent to the employees with whom communications were primarily intended). As a result, courts require a clear showing that the attorney was acting in his professional legal capacity before cloaking documents in the privilege's protection.[11]

The intent problem relative to the element of legal advice is usually focused on the client, because the attorney-client privilege belongs to the client, and the client cannot reasonably be held responsible for the type of assistance the attorney might voluntarily provide. This distinction, however, is only compelling in the context of an individual client and his retained attorney. In the corporate context where in-house counsel is both an employee/agent of the client, as well as the client's attorney, it has no meaningful application. No less than any other agent of the corporation, in-house attorneys personify the entity and the entity must assume responsibility for their actions that are reasonably within the scope of their corporate responsibilities. *See In re CFS-Related Securities Fraud Litigation*, 223 F.R.D. 631 (N.D. Okla. 2004) ("Business advice, unrelated to legal advice, is not protected by the privilege even though conveyed by an attorney to the client."). Consequently, in the context of Merck's privilege claims we had to determine the purpose behind both the seeking of the assistance from in-house counsel and the responsive services that were rendered by in-house counsel.[12]

---

[11]    PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 7:2, pp. 24-25 (Thomson West 2d ed. 1999).

[12]    In the few communications that were to and from Merck outside counsel (Hughes Hubbard & Reed), we assumed that legal advice was being sought and given unless the content of the communications indicated otherwise. We thought this

This problem of determining the type of services being rendered by in-house counsel has been exacerbated by the advent of e-mail that has made it so convenient to copy legal counsel on every communication that might be seen as having some legal significance at some time, regardless of whether it is ripe for legal analysis.[13] As a consequence, counsel is brought into business communications at a much earlier stage than she was in the past when communications were through hard-copy memoranda.  This, of course, has been beneficial for corporations because the lawyers are some of the most intelligent and informed people within corporations. Lawyers not only help corporate clients avoid legal problems before they arise, their business, technical, scientific, promotional, and public relations judgment has frequently proven invaluable.  In addition, because they are part of a word crafting profession, more often than not, they are excellent writers and editors.  The benefit from this expanded use of lawyers, however, comes at a cost.  This cost is in the form of differentiating between the lawyers' legal and business work when the attorney-client privilege is asserted for their communications within the corporate structure. The privilege is only designed to protect communications seeking and rendering legal services.

Legal counsel does not always render, and is not always expected to render, exclusively legal assistance.  Often business advice needs to be mixed with legal advice so that the legal advice is fully understood and followed by the client.

---

logical inference was justified absent evidence of a continuing relationship between the corporation and the law firm in the company's business affairs.  *See generally* PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 7:28, pp. 113-14 (Thomson West 2d ed. 1999) ("Apparently on the basis of probability, some courts operate under a presumption that a client who consults outside counsel with no non-legal responsibilities to the client (e.g., holding a corporate office) sought legal advice from that attorney.  Although not clear from their opinions, the courts appear to apply this presumption to both the client's purpose in consulting with the attorney – to obtain advice or assistance – and the nature of the advice sought – legal as opposed to business or other types of advice.  The status of the attorney in relation to the client (outside rather than in-house) establishes these facts by a prima facie standard.").

[13]   PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 7:2.1, pp. 156-61, *E-mail technology changes everything* (Thomson West 2d ed. 1999 & Supp. 2007).

Similarly, when legal documents are reviewed by a lawyer, it is common for the lawyer to correct grammatical mistakes and propose alternative language that will best serve the client's interests. When these non-legal services are mixed with legal services it does not render the legal services any less protected by the privilege. In fact, they both are protected when they are inextricably intertwined.

The test for the application of the attorney-client privilege to communications with legal counsel in which a mixture of services are sought is whether counsel was participating in the communications primarily for the purpose of rendering legal advice or assistance. Therefore, merely because a legal issue can be identified that relates to on-going communications does not justify shielding them from discovery. The lawyer's role as a lawyer must be primary to her participation. As explained by the court in *Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 147 (D. Del. 1977), "[o]nly if the attorney is 'acting as a lawyer' – giving advice with respect to the legal implications of a proposed course of conduct – may the privilege be properly invoked. In addition, if a communication is made primarily for the purpose of soliciting legal advice, an incidental request for business advice does not vitiate the attorney-client privilege."

While this expanded role of legal counsel within corporations has increased the difficulty for judges in ruling on privilege claims,[14] it has concurrently increased

---

[14]     *See, e.g., Lugosch v. Congel*, 2006 WL 931687, at *14 (N.D.N.Y. Mar. 7, 2006) ("Because of the duality of the advice, a court must assume the very complicated task of inquiring into the subject matter of the communications in order to determine its true character. . . .  To this extent, a court may have to parse not only the words but their intent in order to glean the authentic purpose of the communication."); *MSF Holdings, Ltd. v. Fiduciary Trust Co. Int'l*, 2005 WL 3338510, at *1 (S.D.N.Y. Dec. 7, 2005) ("In-house counsel often fulfill the dual role of legal advisor and business consultant. . . .  Accordingly, to determine whether counsel's advice is privileged, 'we look to whether the attorney's performance depends principally on [her] knowledge of or application of legal requirements or principles, rather than [her] expertise in matters of commercial practice.'. . .  In this case, the analysis is complicated slightly by the fact that the business decision of whether to honor the letter of credit necessarily occurs against the background of any legal obligation to do so. . . .  Nevertheless, the e-mails at issue here reflect the exercise of a predominantly commercial function. Susan Garcia, the author of the communications and the FTCI's Senior Vice President and Deputy Corporate Counsel, never alluded to a legal principle in the documents nor engaged in legal analysis.  Instead, she collected facts just as any

-16-

the burden that must be borne by the proponent of corporate privilege claims relative to in-house counsel. The burden of persuasion on all elements of claims privileges is exclusively the proponent's.[15]

In this regard, it should be noted that the number of lawyers or non-lawyers to whom a communication was disseminated is not dispositive. A communication could be to several lawyers and one non-lawyer and lose its primary legal purpose gloss if the non-lawyer were sent the communication for non-legal purposes. The idea of primary purpose is a bit like a prior inconsistent statement. No matter how many consistent statements you have made, the inconsistent statement still has probative value relative to credibility. If the primary purpose is mixed, it does not

---

business executive would do in determining whether to pay an obligation. In doing so, she evidently relied on her knowledge of commercial practice rather than her expertise in the law. The documents are therefore not privileged."); *Heaton v. Monogram Credit Card Bank of Georgia*, 2004 U.S. Dist. LEXIS 4065, *15-16 (E.D. Ga. Mar. 16, 2004) ("The FDIC correctly notes that the privilege is applicable to confidential communications made for the primary purpose of securing a legal opinion, services, or assistance in a legal proceeding. Although the FDIC correctly asserts that the privilege also extends to advice or opinions of the attorney, it appears that the FDIC requests and receives opinions and advice from attorneys in the normal course of its business. As part of its daily business activities, the FDIC's legal staff reviews applications for federal deposit insurance. In addition, the FDIC creates regulations and statutes. Although the FDIC contends that each document sought by the plaintiff embodies advice, legal opinions, or confidential communications, because the legal staff is inextricably entwined with the daily business activities of the FDIC, arguably many of the FDIC's daily business documents could contain such information. However, after reviewing the documents in camera, this Court has determined that the primary purpose of most of the documents was not to secure legal opinions, services, or assistance in a legal proceeding. Instead, the primary purpose of the communications involved the daily business activities of the FDIC.").

[15]   "The attorney-client privilege is an exception to the general rule that the law is entitled to every man's evidence. Therefore, courts construe the privilege narrowly, and place the burden of establishing each element of the privilege by a preponderance of the evidence on the proponent, regardless of whether the proponent is the client, the client's attorney, or a third party. 'Neither the existence of an attorney-client relationship nor the mere exchange of information with an attorney make out a presumptive claim.'" PAUL R. RICE, 2 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 11:9, pp. 78-79 (Thomson West 2d ed. 1999).

become less mixed because of the number of one type of recipient over another. To be sure, this could be evidence of primacy, but it also could be little more than a direct distribution to lawyers who otherwise would have indirectly received the same communication under different circumstances. Factual questions like this were what Merck was expected to explain and document through affidavits, if necessary, from individuals with personal knowledge of the communications in question. This type of evidence, however, was not forthcoming in Merck's responses to our tentative denials of their claims. The Special Master was only provided with explanations from Merck's attorneys.[16] This, in part, may have been due to Merck's reliance on an argument about the pervasive regulation of the drug industry and legal counsel's inherent role in that process.

### C.   "Pervasive Regulation" Theory

Merck has argued that because the drug industry is so extensively regulated by the FDA, virtually everything a member of the industry does carries potential legal problems vis-à-vis government regulators. In support of its claim, Merck submitted hundreds of pages of materials consisting of a brief; a Declaration of Joanne Lahner, Assistant General Counsel for Merck with five exhibits; a copious Medical/Legal Reference Manual by which Merck operates; and an article published in the *Food and Drug Law Journal* in which the pervasive nature of governmental regulation was explored.[17] In addition to these extensive submissions, we were provided and read a transcript of a deposition of Joanne Lahner taken in one of the New Jersey Vioxx actions.[18] Through these voluminous materials, we have come to

---

[16]   One of Merck's attorneys, Charles Cohen, informed us that his representations in materials filed in response to our tentative rulings were based on either his personal knowledge or information supplied to him by individuals within the company who were privy to the communications and possessed knowledge of the reasons for their creation.

[17]   William W. Vodra, Nathan G. Cortez & David E. Korn, *The Food and Drug Administration's Evolving Regulation of Press Releases: Limits and Challenges*, 61 F.D.L.J. 623 (2006).

[18]   *In re Vioxx*, Superior Court of New Jersey, Case No. 619, Sept. 15, 2006, before Judge Carol Higbee. By Order dated June 19, 2007, Judge Higbee also provided the Special Master and Special Counsel with the sealed portion of the deposition of Joanne Lahner taken by the Judge ex parte and in camera on September 15,

appreciate how services that initially appear to be non-legal in nature, like commenting upon and editing television ads and other promotional materials could, in fact, be legal advice within the context of the drug industry.  However, that does not resolve the question of whether legal advice was the primary purpose behind comments and edits by Merck's in-house lawyers of specific scientific reports, articles accepted for publication in noted journals, and research proposals.

Without question, the pervasive nature of governmental regulation is a factor that must be taken into account when assessing whether the work of the in-house attorneys in the drug industry constitutes legal advice, but those drug companies cannot reasonably conclude from the fact of pervasive regulation that virtually everything sent to the legal department, or in which the legal department is involved, will automatically be protected by the attorney-client privilege.  While such an argument is intriguing because it would minimize the time and expense involved in both corporations asserting and documenting privilege claims and judges ruling upon those claims, the theory is unrealistic.

Accepting such a theory would effectively immunize most of the industry's internal communications because most drug companies are probably structured like Merck where virtually every communication leaving the company has to go through the legal department for review, comment, and approval.  The fact that the industry is so pervasively regulated does not justify dispensing with each company's burden of persuasion on the elements of attorney-client privilege.  Indeed, many of the documents that we examined appeared to reflect far more technical, scientific, promotional, marketing, and general editorial input from lawyers than would be expected of a legal department primarily concerned about legal advice and assistance.  While we acknowledge that in many of these instances what appears not to be legal assistance may, in fact, fall within the protection of the attorney-client privilege, it was Merck's burden to successfully establish this on a document-by-document basis.[19]

_____

2006.

[19]     Drawing an analogy to a more traditional context where legal advice and assistance is often rendered, the comments of lawyers in the communications that we examined seemed a bit like a real estate settlement attorney communicating with her client who is purchasing a home about matters relating to landscaping or

-19-

In its responses to our tentative rulings, Merck appears to have misconstrued many of the instances in which we denied privilege claims in our tentative recommendations.  Often, in these initial assessments we acknowledged that legal advice was being sought through communications to the legal department, in general, and Joanne Lahner,[20] in particular, but denied the privilege claims for the lawyers' responses because of our concern that the scope of "assistance" had gone beyond legal.  We denied claims in anticipation that Merck would provide document-by-document explanations by the authors of how the primacy of services being rendered was still legal in nature.  It must be remembered that in this action, inconsistent with practices and procedures in all other cases in which we have participated, Merck had not filed a single piece of evidence to support individual privilege claims and provided no independent explanations of how individual documents were providing legal assistance in a highly regulated industry.  As a consequence, like Judge Fallon before us, we initially were required to rule on privilege claims with nothing before

---

color choices for the exterior of the building.  Such details might be relevant to legal advice if the client were purchasing an historic building, but normally would not be considered legal assistance worthy of protection by the attorney-client privilege.  The relationship of the comments by in-house counsel to the services they are allegedly rendering in this highly regulated drug industry must generally be explained by Merck on a document-by-document basis.

[20]   Ms. Lahner is a Vice President & Assistant General Counsel in the Office of the General Counsel of Merck & Co., Inc.  Within the Merck organization she has rendered services relating to regulatory and product liability matters and has been the primary regulatory lawyer for Vioxx since 1998.  In the various positions she has held within the company since 1992, she has served on a number of committees responsible for ensuring compliance with regulatory schemes.  She has been, and continues to be, a central figure in the screening of publications for compliance with Merck policies and FDA regulations prior to their dissemination.  She has the power to stop publications that she does not find to be legally acceptable by making "mandatory comments" on drafts that must either be complied with or her concerns otherwise satisfied.  In her review of articles, letters, reports, memoranda, agendas, labels, contracts, and proposals, and based on her broad regulatory experience, she proposes scientific, technical, legal, editorial, and grammatical revisions with occasional commentary.  *See* Declaration of Joanne Lahner (June 1, 2007); Merck & Co., Inc.'s Background Submission Concerning Privilege (June 4, 2007).

us to explain the nature of the documents being examined *in camera* and how the elements of the attorney-client privilege were satisfied.

Ultimately meeting their burden, Merck filed responsive briefs to our recommended denials of privilege claims with explanations of the nature of individual documents and how they fit within the scope of legal assistance that in-house counsel would be expected to provide in a heavily regulated industry. This resulted in many claims initially denied in the tentative recommendations being changed. Had these explanations been provided earlier, the sample process would have been much less costly and time-consuming. Indeed, the sample process itself would likely have been unnecessary had this information been presented to Judge Fallon in April 2006 before he first examined and ruled upon the 30,000 Merck documents claimed to be privileged.[21]

In attempting to make an assessment of the nature of a lawyer's services, we generally concluded that when lawyers are examining and commenting upon a *legal instrument*, like a patent application, contract for a study, or the retention of experts, lawyers historically have assisted with clarity, grammar, consistency, and organization. We had a particular problem, however, when lawyers made extensive grammatical, editorial, and word choice comments on non-legal type communications like scientific reports, articles, and study proposals. Often, paragraphs of a report were deleted and new materials were added. We could not see the legal significance of these comments and changes and insisted that Merck explain how the lawyers were primarily rendering legal advice on the document as a whole. Of course, when only portions of a lawyer's communications were excised, each comment was judged on its own merits relative to its legal nature.[22]

When warning letters were received by Merck from the FDA, in which alleged violations of FDA regulations were cited, we accepted the argument that the company's preparation of its responses to those warnings were the equivalent of

---

[21]  By the time that the resolution of privilege claims was delegated to the Special Master, the volume of documents claimed to be privileged had increased to 60,000.

[22]  The primary purpose doctrine can focus on the communication as a whole or on segregable portions of communications if the proponent chooses to redact rather than make a universal claim. PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 7:8, pp. 59-62 (Thomson West 2d ed. 1999).

preparing pleadings in a legal proceeding. As a consequence, we recommended the granting of the privilege to (1) the attorney's drafts of those responses, (2) communications in which the attorney sought information from corporate employees in her efforts to prepare those drafts, and (3) the responsive comments solicited from the corporate employees on the drafts. Following the trigger of the warning letter,[23] every communication to and from the attorney and among corporate employees that were primarily in furtherance of legal assistance on that matter were considered privileged, even if the initial draft of the response was prepared for the lawyer by a non-lawyer.[24]

Under its "pervasive regulation" theory, Merck next argues that e-mails addressed to multiple legal and non-legal people within the company are protected by the attorney-client privilege even though the distribution pattern circumstantially indicates that the communications served both legal and non-legal purposes, and therefore were not *primarily* for legal advice or assistance. Its argument is that the distribution to every department of the company is part of a "collaborative effort to accomplish a legally sufficient draft." Therefore, by this argument, through the responsive commentary of every other department within the company, Merck's in-house attorneys are using the other departments as their necessary agents in their attempt to give the most effective legal assistance. As a consequence, so the argument goes, the dissemination of proposed letters, reports, proposals, or articles to departments specializing in such diverse things as science, technology, public relations, or marketing are all primarily for legal advice or assistance. We reject Merck's argument for a number of reasons.

First, in every company all departments are part of a "collaborative effort." If a product were not scientifically or medically valid it would not be marketable.

---

[23]    We did not consider FDA questions propounded to Merck as the equivalent of warning letters. We did not consider the preparation of responses to those questions the equivalent of pleadings in legal actions or preparation for litigation under the work product immunity.

[24]    "So long as the purpose of the communications is to seek legal advice or assistance, it doesn't matter whether the client's communication was self-initiated or in response to a request for information by the attorney." PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 5:1, p. 8 (Thomson West 2d ed. 1999).

If a good product does not obtain necessary government approval it cannot be placed on the market.  If public relations does not effectively increase the company's name recognition and good will, doctors will not prescribe the product or consumers will gravitate to a competing name.  To say that wide dissemination to non-lawyers within a company for their technical input is still primarily legal, makes no more sense than saying that communicating with in-house counsel is primarily scientific because scientific validity is at the heart of FDA regulations and, as a consequence, of what lawyers must be concerned about in public statements, advertisements, and labels.

Second, this "collaborative effort" argument, if successful, would effectively immunize all  internal communications of the drug industry, thereby defeating the broad discovery authorized in the *Federal Rules of Civil Procedure*.  This would preclude plaintiffs from discovering communications that might be vital to claims of knowledge, failure to timely warn, and intentional misrepresentation.  To permit the attorney-client privilege to have such an impact on the discovery process would be allowing the tail to wag the dog.

Taking the pervasive regulation argument a step further, Merck appeared to claim throughout its objections to our tentative rulings that legal advice had been provided by in-house attorneys because they had examined and commented upon items pursuant to dictates of a Merck-created Medical Legal Reference Manual that, in Merck's view, reflected those pervasive federal regulations.  Suffice it to say, the advice envisioned by the attorney-client privilege is advice about the laws imposed on us by society, not the rules that we impose on ourselves through guidelines, manuals, or otherwise.  The interpretation and application of the latter does not require either a law degree or admission to a bar association.  While the principles and policies that prompted the creation of this Medical Legal Reference Manual may have been laws, both statutory and regulatory, their interpretation and application must stand on their own, outside their characterization in a Manual.  Consequently, we interpreted Merck's references to its Manual as illustrating regulatory principles to which it believed it was bound, but not as a basis for applying the privilege protection.

### D.    The "Reverse Engineering" Theory

Complicating matters even further,  Merck argues, under a theory it has dubbed "reverse engineering," that even communications with attached studies,

articles, abstracts, and proposals that typically would not be protected by the attorney-client privilege (because the communications are among non-lawyers or among both lawyers and non-lawyers but not for the primary purpose of obtaining legal advice) should also be protected by the privilege because indirectly, adversaries can discern the content of the legal advice that was subsequently offered. This, Merck argues, is possible if (1) initial drafts are discoverable from the files of the non-lawyers, (2) adversaries isolate the recommendations made by the non-lawyers on those drafts, and (3) compare those changes to the final version approved for publication. Merck argues that the remaining changes would be the substance of the advice the Legal Department offered.

　　　　While there may be some truth in the claim that Merck makes about reverse engineering, the argument is not compelling for a number of reasons. First, the fact that legal departments recommend that certain actions be taken by their corporations does not mean that the corporations must follow that advice. Second, alterations can be made in the absence of recommendations from the legal department. Third, all recommendations prompting revisions are not necessarily proposed in writing. Fourth, if all proposed revisions had to be proposed in writing, and the legal departments were given control over public dissemination of communications, in that in-house lawyers could require that their revisions be incorporated (which apparently is true of Merck's legal department because it has the power to place holds on dissemination until its recommendations are incorporated or its concerns are otherwise satisfied), the role of legal counsel would change from *legal advisor* to corporate *decision-maker*. This is a role that the corporation does not have the right to delegate to attorneys and then insist that the decisions they make are immune from discovery.[25] The tobacco industry attempted to do that with departments engaging

---

[25]　　In Merck, Ms. Lahner has been given broad powers to compel revisions (in the form of additions and deletions), through "mandatory comments" that serve as holds on letters, advertisements, presentations, labels, articles, television commercials, media inquiries, scientific reports, contracts, and research proposals. None of these communications can be published without her comments being incorporated or her concerns otherwise satisfied. As a consequence, her general role in the company appears to have become more like an executive officer, rather than a legal advisor to those who make publication decisions. As a consequence, a court might be justified in denying claims concerning many of her responsive communications that contained substantive

in scientific research on its product and was unsuccessful.[26]

Certainly, when a corporate executive makes a decision after consulting with an attorney, his decision is not privileged whether it is based on that advice or even mirrors it.  As the Court noted in *United States v. Freeman*, 619 F.2d 1112, 1119-20 (5th Cir. 1980), "[a]n attorney's involvement in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents of such a transaction."[27] This cannot be gotten around by the simple expedient of putting a lawyer in the shoes of the executive or, as Merck has done, giving the legal department the power of the corporate executive.

### E.      The Corporation's Choices Have Consequences

The structure of Merck's enterprise, with its legal department having such broad powers, and the manner in which it circulates documents, has consequences that Merck must live with relative to its burden of persuasion when privilege is asserted.  When, for example, Merck simultaneously sends communications to both lawyers and non-lawyers, it usually cannot claim that the primary purpose of the communication was for legal advice or assistance because the communication served both business and legal purposes.  *See United States v. Chevron Corp.*, 1996 WL 444597 (N.D. Cal. 1996) ("When a document is prepared for simultaneous review by non-legal as well as legal personnel, it is not considered to have been prepared

---

edits to documents that are not legal instruments.  Instead, we chose to preliminarily deny the claims in anticipation that questions about primary purpose would be addressed by Merck in its subsequent filings.

[26]     *See, e.g.*, *Schwab v. Philip Morris USA, Inc.*, 2006 U.S. Dist. LEXIS 73208, *32-33, 42 (E.D.N.Y. Sept. 25, 2006); *United States v. Tobacco-Free Kids Action Fund,* 2006 U.S. Dist. LEXIS 61412 (D.D.C. Aug. 17, 2006) (cases discussed therein).

[27]     "The privilege does not extend to decisions made by the client based on the legal advice the client received.  Since the actions taken by the client do not have to be consistent with the advice given, an extension of the privilege to client decisions would be unwarranted.  Revealing client actions or decisions would disclose neither the substance of the recommendation nor the content of the client's privileged communications upon which the decisions/actions were based. Disclosure of the client's action, therefore, would not discourage the conduct that the privilege was designed to encourage."  PAUL R. RICE, 1 ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES, § 5:15, p. 113 (Thomson West 2d ed. 1999).

primarily to seek legal advice and the attorney-client privilege does not apply."); *United States v. International Business Machines Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y. 1974) ("If the document was prepared for purposes of simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the document is to secure legal advice.").  As a consequence, the privilege does not protect the communications.  When these simultaneous conveyances for mixed purposes are through an e-mail message that lists the lawyers' names in the header of the e-mail message, Merck is revealing the contents of the single message that may have been conveyed to its lawyer primarily for legal assistance.  In that circumstance, the single message could have been withheld as a privileged communication had Merck sent blind copies to the lawyers, instead of electing this format.  Through a blind copy, the content of what was communicated to its attorney would have remained confidential after future discovery of the document from the other recipient's files, its purpose would have been primarily legal, and the privilege would have been applicable.  Similarly, if Merck had sent a wholly separate e-mail communication with the same materials to the lawyer, the same claim could be successfully made for that single communication even though it otherwise served mixed purposes.  In modern vernacular, Merck, in a variety of instances, "could have had a V-8," but it chose another format and manner of document circulation and cannot now be heard to complain about the consequences of those choices.  Otherwise, Merck would be able to limit the scope of what adversaries can discover by the way in which it chooses to communicate.

Similarly, after a communication with its attachment has been sent to both lawyers and non-lawyers in the same e-mail communication, and its primary purpose is determined not to have been for obtaining legal advice, the lawyer's independent response can only be protected if the derivative nature of the privilege is ignored.  Theoretically, the lawyer's response should be protected only if it reveals the content of prior confidential communications from the client.  Since those communications are no longer confidential, nothing the lawyer discloses in her edits reveals protected communications of the client.  But aside from the derivative theory, the means by which Merck attorneys have responded to requests for advice created an additional problem.

Modern technology has made it possible for the attorneys to electronically respond with their advice on the non-privileged attachments to the original mixed

purpose communications.  This is done through electronic line edits that reveal the lawyers' proposed additions and deletions with explanatory comments where desired.  Through the line edits, Merck has claimed that what was otherwise discoverable, as a mixed purpose communication, is now made non-discoverable because of the manner in which its lawyers *chose* to reveal their advice.  This is not acceptable.  Merck cannot be permitted to deprive adversaries of discovery by voluntarily *choosing* to electronically superimpose that legal advice on the non-privileged and, therefore, discoverable communications.  Of course, where the client's communications were found to be privileged, the line edits on those documents were found to be privileged also, when the other elements of the privilege, namely "primarily for legal advice," were found to be satisfied.

There are instances, of course, where legal advice is the primary purpose behind lawyers' comments and where these comments are complemented by grammatical and editorial changes that could reasonably be considered inextricably intertwined with the advice.[28]  It is Merck's burden, however, to demonstrate this,

---

[28]   *In re OM Group Sec. Litig.*, 226 F.R.D. 579, 590 (N.D. Ohio 2005) (Advice given to Audit Committee by attorneys occasionally was business in nature.  Court held privilege appliable because the legal and business concerns were inextricably intertwined.); *Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136 (D. Del. 1977) ("The problem remains, however, of separating business from legal advice.  An important responsibility of most patent attorneys, especially those employed by corporate patent departments, is to assess the business implications of the company's patent position.  Many of the communications between the patent attorney and non-legal personnel of the corporation would therefore predominately reflect business concerns, such as the competitive position of the company, marketing strategy, licensing policy, etc.  The Court recognizes that business and legal advice may often be inextricably interwoven.  A single proposed course of conduct such as patenting and licensing of an invention will have both legal and business ramifications, and the lawyer may advise as to both in a single communication.  As was pointed out in *Jack Winter, Inc. v. Koratron Inc.* [54 F.R.D. 44 (N.D. Cal. 1971)], it is necessary to separate the two, in the interest of preserving the integrity of the privilege itself:  'As is not infrequently the case in patent matters, the problem of classification here was particularly troublesome as the attorneys for Koratron performed virtually every task incident to filing for and obtaining a patent or trademark registration.  They were so closely associated with the activities of Koratron that picking out from the mass of documents presented to the court those which involved non-legal transactions not soliciting or offering legal advice, and the separating of these from documents

-27-

and that burden is made more difficult by the fact that often the legal department's comments seem to be exclusively editorial. While limited editorial and grammatical changes are an expected part of a lawyer's services (particularly in a corporate context where the client is this amorphous legal entity, and the various departments and employees who man those departments rely on one another in the development of a product for public dissemination), too often we discovered lawyers inserting new paragraphs, introducing references to different drugs, or eliminating entire sections of proposed articles, reports, and presentations. In these instances, in particular, we concluded that Merck had a responsibility to explain how this related to legal services allegedly being provided. When non-legal departments of a corporation primarily concerned with technology, science, public relations or marketing make comments among themselves about matters within their corporate responsibilities, those communications are not protected by the attorney-client privilege. When lawyers make the same comments about technology, science, public relations, or marketing, a different result is not warranted unless Merck demonstrates that those comments are *primarily* related to legal assistance. When it failed to do this on a document-by-document basis, its claims were denied. Merck cannot reasonably expect judicial officers to make this assessment for it on either a document-by-document basis or universally through a presumption that everything in-house counsel comments upon is legal advice.[29]

---

which did involve the exercise of the attorney's art, became at times an arduous and complex exercise. Yet we have sought to not lose sight of the importance of the distinction, for it is important that the attorney-client privilege not be downgraded in the interests of expedient result.' 54 F.R.D. at 47. . . . If the primary purpose of a communication is to solicit or render advice on non-legal matters, the communication is not within the scope of the attorney-client privilege. Only if the attorney is "acting as a lawyer" – giving advice with respect to the legal implications of a proposed course of conduct – may the privilege be properly invoked. In addition, if a communication is made primarily for the purpose of soliciting legal advice, an incidental request for business advice does not vitiate the attorney-client privilege.").

[29] An example of a non-privileged communication involving Merck's in-house counsel was a communication with a corporate employee discussing a conference at which participants were to be given gifts, and the question being discussed was whether items like sweat bands, water bottles, and towels were appropriate for the occasion. While there certainly are restrictions on bribing individuals, this could

-28-

F.        Application of Privilege Principles

Before beginning our examination and evaluation of the 2,000 sample documents presented to us by Merck, and the 600 documents chosen by the plaintiffs from Merck's privilege log, we asked Merck to provide certain information to us to make that decision more informed. Significantly, at this late point in the privilege resolution process, Merck indicated that it had not prepared affidavits to support its privilege claims. This, therefore, created significant problems in the reviewing process because we were left with only the documents themselves to find a basis upon which a privilege determination could be made. Relative to attorney-client privilege claims, none of the individuals authoring or receiving the documents had been identified, their relationships to the content of the documents were not explained, how the documents evolved, and what they substantively related to could not be discerned. Relative to work product immunity claims, the litigation allegedly being prepared for was not identified and there was no indication of when it reasonably could have been anticipated. In a few instances, Merck attached an explanation to the folders in which the documents were submitted for judicial review, but in none of these instances was the identity of the individual or the basis of his knowledge revealed (as would normally be the case when a supporting affidavit is filed).

To address the element of confidentiality that must be present and maintained for attorney-client privilege claims to be valid, we asked Merck to provide us with: (1) all company policies on the preservation of confidentiality and restrictions on the secondary circulation of confidential communications both within and without the corporate structure; (2) an affidavit from a knowledgeable individual who could attest to the fact that those guidelines had been made known to corporate employees and followed by them;[30] and (3) directories of corporate personnel, both alphabetical

_____

not reasonably be argued as falling into that realm. The only question was their appropriateness in light of the circumstances in which they were being given. The claim was denied.

[30]    This was supplied to the Special Master on 6/6/07 through an affidavit of Serena Conway, a Senior Internal Auditor in the Corporate Audit and Assurance Services Department of Merck and copies of company policies requiring the preservation of confidences within the organization. While Merck's policies do not specifically address the issue of attorney-client privilege, their requirements are

and by job titles, with descriptions of each position so that proper distribution of documents within the corporation could be evaluated.[31]   To assist in the determination of whether in-house lawyers were primarily involved in rendering legal advice, we also had Merck provide us with a list of employees in its Legal Department with job descriptions for each position, the credentials of each individual and a listing of additional titles and responsibilities of each lawyer (particularly

---

sufficiently broad to cover attorney-client communications and the information they contain, particularly when those communications are labeled "Confidential" or "Protected by the Attorney-Client Privilege" and circulation of confidential information is limited only on a "need to know" basis.  In addition, all employees receive training, which includes discussions of their responsibilities to maintain confidentiality, and all policies relating to confidentiality are made available to them electronically.

[31]   The affidavit filed in support of each document should identify all recipients and explain their need to receive the communication.  As recently explained in *Muro v. Target Corp.*:

> Whether in the form of supporting affidavits or additional detail in the privilege log [the privilege proponent is] required to provide additional facts as to the identity and function of those individuals included in the communication to establish that the "employee ma[de] the communication at the direction of his superiors in the corporation" or that "the subject matter upon which the attorney's advice [was] sought by the corporation and dealt with in the communications [was] the performance by the employee of the duties of his employment."  A name and ambiguous or undefined job title do little to substantiate that the confidentiality of the communications was not compromised by disclosure to individuals outside the attorney-client relationship.

2007 U.S. Dist. LEXIS 41442, *18-20 (N.D. Ill. June 7, 2007) (internal citations omitted). Because this initially was not provided to the Court with the privilege claims asserted by Merck, time was consumed and expenses unnecessarily incurred because the Special Master had to check the recipients and deny claims with delineated reasons when questionable circulation was discovered, and then re-examined those documents after explanations were provided by Merck, after which the paralegals had to correct the spreadsheets when new recommendations were required.

Joanne Lahner, who allegedly was the source for the vast majority of attorney-client privilege claims).

As noted above, in our assessment of claims, we established guidelines to ensure consistency in rulings for recurring types and formats of communications. After the sample ruling process was well under way, and the guidelines had adequately evolved, we decided to provide these guidelines to the parties before our final report and recommendations to the Court so that both Merck and the plaintiffs could more easily understand the reasoning behind our tentative recommendations, without having to extrapolate from those results. It was hoped that through this disclosure of our evolving guidelines, Merck might accept that certain claims are not legitimate and withdraw them from the process. Similarly, it was anticipated that the plaintiffs might concede that certain types of communications are not going to be discoverable and withdraw their demands for them.

### G.      Special Master's Substantive Guidelines

1.      If a memorandum was addressed solely to an attorney with apparently limited circulation and an identifiable legal question was raised by the author (whether or not it was answered by the attorney), it was found to be a classical example of when the attorney-client privilege is applicable.

2.      When e-mail messages were addressed to both lawyers and non-lawyers for review, comment, and approval, we concluded that the primary purpose of such communications was not to obtain legal assistance since the same was being sought from all. Neither the messages nor their attachments were found to be protected by the attorney-client privilege because, as previously noted, while the disclosure of such e-mail messages reveals the content of what had been communicated to the lawyer (and might otherwise be privileged because the single copy sent to the attorney could have been primarily for the purpose of obtaining legal assistance), revealing this information on the face of discoverable documents (these documents would be discoverable from the files of the other recipients) breaches the confidentiality of that communication to the attorneys and thereby destroys the attorney-client privilege protection. A corporation's choices of means and format in the communications between their lawyers and employees cannot limit their adversaries' right to discovery of what otherwise is non-privileged and discoverable.

We accepted the possibility that addressing communications to both lawyers and non-lawyers could reflect the seeking of legal advice from the lawyers and that

the non-lawyers were simply being notified about the nature of the legal services sought. Facially, however, it appeared far more probable that the non-lawyers were being seen the communications for separate business reasons. Therefore, it was the burden of Merck to overcome the logical inference created by the pattern of distribution.

Relative to the circulation of legal advice within a corporate structure, it is not acceptable for a corporation to take a document and attachment that are privileged, because they were sent primarily to an attorney for legal advice, and then subsequently send the same document and attachment to other corporate personnel for non-legal purposes (here for general review and comment – the same purpose for which they initially could have been placed in the header when circulation was initially to the attorney) and successfully claim that the document and attachment are privileged because they originally had been sent to the attorney and contain handwritten comments or electronic line edits by the attorney. We recommended that Merck be permitted to redact the comments of the attorney as privileged legal advice (assuming the elements of the privilege would otherwise be established), but concluded that the presence of the advice did not convert the document and attachment into privileged communications. The subsequent conveyance of the documents to other corporate personnel can only be privileged when those additional recipients are being sent the documents *only* to apprise them of the legal advice that was sought and received. As the initial conveyance of the documents and attachments to both lawyers and non-lawyers for both legal and non-legal purposes prevents them from being primarily for legal advice and assistance, and therefore from being protected by the privilege, the subsequent, albeit indirect, conveyance for the same purpose cannot change the result. Otherwise, corporations would be given a simple means for getting around their discovery obligations by funneling documents through legal counsel for comment before sending them to everyone else within the corporate structure. Courts should never permit the imprimatur and protection of the privilege to be acquired so easily.

3.      When communications and attachment were found to serve mixed purposes because they were sent to both lawyers and non-lawyers for both legal and non-legal purposes (and therefore not primarily for legal assistance, as explained above), the edits by attorneys on those non-privileged communications could not be privileged under the derivative theory for responsive attorney communications. Even

if the derivative theory had not made the attorneys' responses non-privileged, the manner in which Merck lawyers rendered their advice would have.  On these non-privileged electronic attachments, the attorneys usually gave their advice in electronic line edits on the discoverable documents.  Merck then claimed privilege on those attachments.  Having chosen the electronic format, Merck cannot convert discoverable documents into non-discoverable privileged documents by the format in which they chose to render the advice.  Ignoring the technical violation of the derivative rule, we recommended the denial of privilege claims for those attachments but permitted Merck to redact only the electronic edits and comments of the attorneys.[32]  Of course, when the original attachments were privileged, the legal advice provided through line edits on them were privileged too, and it was recommended that the privilege be granted for the whole communication.  If, however, as discussed above, the subsequent circulation of the documents was perceived by us as not being primarily for the purpose of apprising the recipients of the advice received on them, but to solicit, in the normal course of business, further review and comment on the attachment, we recommended that the privilege be denied for the attachment, but that Merck be permitted to redact the advice given.

4.      If a memorandum was written only to an attorney within the corporation's legal department, with an attachment for examination, review, comment, and approval, we found that the communication and attachment were sent *primarily* for the purpose of obtaining legal advice, and therefore, were protected by the attorney-client privilege.   Even when these communications to the legal department were compelled by company policy, we concluded that since the company was the client, the legal assistance was necessary, and we would not try to discern what was in the minds of the employees/authors of those communications.

The lawyer's response (often appearing electronically on the attachment) was accepted as legal advice, along with minor grammatical and editorial comments, unless the document on which comments and changes were being proposed was not

---

[32]      Merck occasionally noted that the attachments had previously been produced to the plaintiffs in response to other discovery demands.  This, however, did not resolve the question before us because the attachments may have had other additions, deletions, edits, and comments since they were produced.  Consequently, redactions were permitted only for the last attorney's electronic line edits.

a typical legal instrument and the response had changes and commentary that were extensive or related purely to technical, scientific, promotional, management, or marketing matters that did not appear to be related to legal assistance. In these instances, we denied the claims and insisted that Merck satisfy its burden of proving that the primary purpose of the responses were providing *legal* assistance. If the memorandum and attachment related to identifiable legal instruments like a proposed contract, these generally were found to be privileged, even with extensive editorial and grammatical revisions, because they are the types of instruments that one reasonably expects more extensive input and guidance from reviewing attorneys.

Often, however, the e-mail covers to which the proposed contract was attached originated in e-mail messages to which no lawyers were copied and legal advice was not the purpose of the communications. As a consequence, they would not independently be protected by the attorney-client privilege. However, those messages and their attachments could appropriately be part of a confidential communication to an attorney for legal assistance. Therefore, when they were attached to communications sent only to an attorney for the apparent purpose of obtaining legal assistance, they were found to be privileged on the assumption that the original messages and attachments were produced from the files of the original authors and recipients. If, however, the integration of an attorney in the e-mail thread was through a communication that was sent to many for review and comment, including an attorney, the primary purpose of that subsequent communication was found not to be for legal assistance, and the attachment was found not to be protected by the privilege. The privilege protects what independently is not privileged only if it is attached to, or incorporated in, a communication that is protected by the privilege.

5.     At the end of the messages described above, we occasionally encountered e-mail threads that were sent to others after the initial interaction with the lawyer ended. This additional dissemination of the e-mail thread was found not to be privileged when the conveyance was by a non-lawyer recipient, unless it was clear that legal advice previously obtained was being circulated to those within the corporate structure who needed the advice in order to fulfill their corporate responsibilities. When the conveyance was by the lawyer and it appeared that it was for the purpose of acquiring more information upon which more informed legal

advice or assistance could be rendered, the additional conveyance and response were also found to be privileged.

6.      E-mails addressed to an attorney with many being *copied* to non-lawyers throughout the company raised a question as to whether the primary purpose of the communication was for legal advice or assistance.  This issue may be no different from when the communications were *addressed* to both lawyers and non-lawyers, except that in the instance of copies to non-lawyers, the possibilities were greater that copies were being sent simply to inform those recipients of the nature of the legal advice being sought, and not for review and comment in the normal course of business.  This, however, appeared to be unlikely when the communications were part of a mandatory process of company-wide review, comment, and approval.

The only thing that we found questionable about communications sent to the legal department was the nature of the services ultimately provided – often appearing to be more technical, scientific, editorial, and promotional than legal in nature.  As noted above, however, we were receptive to evidence ultimately provided by Merck that demonstrated that in the highly regulated drug industry these comments and edits were part of the rendering of legal assistance.  In this regard, we insisted that Merck provide us with more than general assertions about the nature of the drug industry.  We required specific assertions about each document, preferably from individuals with personal knowledge about their nature and purpose.

7.      With regard to e-mails that were either to or from an attorney but did not reveal the substance of what either the client was communicating (for example attaching a study, report, article, etc.) or the attorney was advising (because the comments appeared on the attachment), the privilege claim was denied for the e-mail messages, regardless of what the disposition was on the attachments.  While the e-mails may have been the means for obtaining legal advice or assistance, the e-mails themselves did not reveal confidential information about the attorney-client relationship that was protected by the privilege.

8.      E-mail threads (a series of e-mail messages) in which attorneys were ultimately involved were usually inappropriately listed on the privilege log as one message.  When this occurred, it was usually noted in our decision.  Some of these threads involved ten to fourteen messages that preceded the direct or limited exchanges with the attorneys.  Each of these e-mail communications should have been assigned separate bates numbers and identified in the privilege log.  Simply

because technology has made it possible to physically link these separate communications (which in the past would have been separate memoranda) does not justify treating them as one communication and denying the demanding party a fair opportunity to evaluate privilege claims raised by the producing party.[33]  Earlier in the process Merck might have been required to correct its privilege log to disclose these messages and further explain other ambiguous descriptions that were employed.  However, at this late stage of the pretrial process, and in the limited role that we were asked to play in the sampling process sanctioned by the Fifth Circuit Court of Appeals, we asked Merck only to inform us and the plaintiffs whether those portions of the e-mail threads previously unacknowledged in the logs had been produced with their attachments.  This did not appear to be the case on the face of the privilege log since privilege had been claimed on the "entire document," which, of course, included the earlier messages.  A subsequent report from Merck did not assure us that all non-privileged threads had been produced.  Therefore, it was necessary that we note this over-assertion of privilege on a document-by-document basis in our report.  Of course, as discussed above, the entirety of the threads were found to be privileged when they were subsequently integrated into privileged communications solely to attorneys for legal advice and, therefore, not otherwise discoverable.

9.     The doctrine of work product was created by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1943), to preserve the adversarial nature of the trial process.  It gives a qualified immunity to communications that are created in preparation for litigation.  Therefore, the application of the immunity requires (1) that the litigation anticipated be identified, and (2) that it be proven that the communication in question was in preparation for that litigation.  When litigation was identified in the Merck sample documents, but the communications related only

---

[33]     The privilege logs filed in this litigation by Merck for e-mail threads were deficient in the same way the privilege logs were deficient in the consolidated Microsoft cases in which the Special Master in this case previously served in the same role.  Merck, like Microsoft, asserted privilege for an entire e-mail thread but only described the last message in the thread – substantively often the least important of the string of messages.  The reasons why this type of privilege log entry is both inappropriate and unfair are discussed in PAUL R. RICE, ELECTRONIC EVIDENCE - LAW AND PRACTICE, Chapter 3, pp. 166-168 (ABA 2005).

to things like news releases, work product claims were denied.  Many of those communications, however, were still protected by the attorney-client privilege.

*See* Special Master's Report at 4-21 (Rec. Doc. 11566-2).

## III.   REVIEW OF THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS AND RESOLUTION OF OBJECTIONS

Under Rule 53 of the *Federal Rules of Civil Procedure*, as amended in 2003, a district court must decide *de novo* all objections to findings of fact and conclusions of law made or recommended by a special master.  *See* Fed. R. Civ. P. 53(g)(3)-(4).  In addition, though not mandated by Rule 53, a court may nevertheless review *de novo* a special master's findings of fact and conclusions of law as to which there are no objections.  *See* Fed. R. Civ. P. 53 advisory committee's note (2003); *see also Luma Corp. v. Stryker Corp.*, 2006 WL 285973, at *3 (S.D. W. Va. Feb. 3, 2006).

First, and perhaps most importantly, the parties do not object to the procedures employed by the Special Master in this case.  Given the Fifth Circuit's concern that the Court's prior individualized review of every single document "proved to be inadequate" and potentially could have become "an abuse of discretion," *In re Vioxx Prods. Liab. Litig.*, 2006 WL 1726675, at *2 (5th Cir. May 26, 2006), the parties' satisfaction with the sample resolution process ultimately employed cannot be understated.  Indeed, Merck notes in its motion that the "Special Master's review process, while mindful of the time pressures in this litigation, was thorough, fair, and complete."  The PSC concurs in a recent letter to the Court, noting that they "appreciate[] the effort and time that Special Master Rice and Special Counsel Barriere have spent in connection with the privilege issues."  The Court agrees with the parties and finds that the sample resolution

-37-

process faithfully implemented by Special Master Rice and Special Counsel Barriere has provided adequate procedural protections.

Second, Merck requests that the Court only accept those parts of the Special Master's Report that directly address Merck's specific privilege assertions.  Merck contends that the Court should reject certain portions of the Report that go beyond analysis of the privilege claims at issue.  Specifically, Merck asks the Court to reject (1) certain statements suggesting that Merck's in-house counsel function at times as corporate officers rather than attorneys, (2) certain statements suggesting that Merck may have attempted to manipulate the discovery process, and (3) certain statements that Merck failed to provide affidavits or other evidentiary support for its privilege claims.  However, the Court sees no reason to reject any portion of the narrative provided in the Special Master's Report, as it merely provides context for his individualized recommendations on each document.  Indeed, the Report is both learned and comprehensive, and undoubtedly has allowed the Court to reach a more informed decision on each of Merck's individual claims of privilege.

Third, Merck has made a number of objections to specific recommendations contained in Appendix I to the Special Master's Report.  These objections generally involve:  (1) legal advice related to public relations materials; (2) attorney review of draft written and oral materials to ensure regulatory compliance; (3) information related to the interaction between outside litigation counsel and Merck employees; and (4) various other document-specific issues.  Merck has organized its objections to specific recommendations into three indices.  Merck's Index I addresses certain recommendations contained in Appendix I - Part A.  Merck's Index II addresses certain recommendations contained in Appendix I - Part B.  Merck's Index III

addresses certain recommendations that the Special Master refused to modify in response to Merck's July 16 letter seeking clarification.

The Court has now completed an independent review of those documents as to which Merck objects to the Special Master's recommended ruling.  In some instances, the Court is in complete agreement with the Special Master and adopts his recommendations without explanation.  However, recognizing that "classifying documents containing communications of employees and attorneys of large corporations for entitlement to the attorney-client privilege frequently calls for close, tough judgment calls," *In re Vioxx Prods. Liab. Litig.*, 2006 WL 1726675, at *9 (5th Cir. May 26, 2006) (Dennis, J., concurring in part and dissenting in part), the Court has modified a number of the Special Master's recommendations and issued modified rulings.  The Court's resolution of Merck's specific objections are set forth, document-by-document, in the three attached charts, which correspond to Merck's three indices.[34]

## IV.    CONCLUSION

The emergence of the internet and electronic methods of communication present significant challenges for traditional discovery practices.  These challenges are exacerbated in MDL proceedings and otherwise complex cases where, because of their vastness, no one counsel can be expected to keep up with everything that transpires.  Discovery is often handled by a discovery committee in such cases, and trial preparation by a separate committee.  This presents opportunities for disconnects.

---

[34]  In the attached charts, the Court has included the following information for each objection:  both the initial and final document numbers assigned by the Special Master, the Bates number assigned by Merck, the Special Master's final recommendation and explanation, and the Court's final ruling and reasoning.

With the ever-expanding use of, if not dependence on, e-mail technology, courts will increasingly be called upon to review electronic communications to determine whether they are protected by the attorney-client privilege.  A primary challenge for the courts in this area is one of organization and administration.  For example, it is essential that all e-mail threads be grouped together, rather than dispersed throughout several boxes of documents when produced for *in camera* inspection by the courts.  Another challenge is created by the sheer volume of documents that must be reviewed in complex cases.  The number of potentially relevant documents often reaches into the millions.  It takes a legion of attorneys and paralegals to cull through the documents and recommend or decide whether each document is responsive to a request and should be produced, or whether it is instead non-responsive or privileged.  In such a milieu, there is a strong bias in favor of non-production.  Such circumstances also create opportunities for the attorney who concludes that delay is strategically desirable.

When privilege is claimed on 30,000 documents, amounting to nearly 500,000 pages, as occurred in this case, the courts are severely taxed.  When the task of review is shifted to outside experts, costs mount.[35]  In the long run, such a situation is detrimental to the litigants, the courts, and our system of justice.  Some acceptable solution must be devised, one which fully protects the rights of the litigants to claim privilege and at the same time is more feasible for the courts, less expensive for the parties, and less time consuming for everyone involved.

While this Court has experienced significant fits and starts in struggling with these issues, the sample resolution process suggested by the Fifth Circuit and ultimately employed in this

---

[35]  To date, Special Master Rice and Special Counsel Barriere have incurred over $400,000.00 in fees and expenses in reviewing approximately 2,500 representative documents over the course of three months.  These costs have been paid equally by the parties.

case, along with the appropriate "packaging" of withheld documents, may be able to streamline such discovery disputes in future cases. It may be desirable to issue a pretrial order setting forth an appropriate method of organizing documents to be submitted for *in camera* review and establishing mandatory guidelines for the creation of a detailed privilege log that identifies the individuals that author and receive each document and explains their relationship to the document and to the party asserting the privilege. Moving forward in this case, the Court expects the parties to extrapolate meaningful guidance from the sample resolution process. Indeed, this discovery dispute must ultimately come to an end.

Accordingly, for the foregoing reasons, IT IS ORDERED that Merck's Motions to Adopt in Part the Special Master's Report and Recommendations and Merck's Objections Thereto (Rec. Docs. 11729 & 12020) are GRANTED IN PART and DENIED IN PART as follows:

First, IT IS ORDERED that the Special Master's Report is hereby ADOPTED, that the Special Master's recommendations on individual representative documents as to which no objections have been filed are also hereby ADOPTED, and that the Special Master's recommendations on individual representative documents as to which Merck has filed objections are ADOPTED IN PART and MODIFIED IN PART, as set forth in the attached charts.

Second, IT IS FURTHER ORDERED that Merck shall begin producing documents in accordance with this Order & Reasons immediately, starting with the documents to which there was no objection to the Special Master's recommendations, and that all documents held to be discoverable (both sample documents reviewed by the Special Master and similar documents in the remaining census) shall be produced no later than September 15, 2007. In its motion, Merck requests that it not be required to produce redacted versions of certain documents if exact

duplicates of such documents have already been given to the plaintiffs.  This request is well-founded.  Merck need not produce redacted versions of documents to the extent that "identical" versions (missing only those specific comments found to be privileged) have already been produced, but these documents should be noted and an explanation given as to when and where the "identical" documents were previously produced.[36]


New Orleans, Louisiana, this 14th day of August, 2007.

_____
UNITED STATES DISTRICT JUDGE

---

[36] In extrapolating from these sample rulings, the parties should bear in mind that the Court may, in the future, require justifications for any assertions of privilege on documents in the remaining census.  Should the need arise, the Court anticipates requesting that the Special Master review a random sample of the remaining documents ultimately withheld to determine whether or not this Order & Reasons has been complied with in good faith.  If such a "check" by the Special Master reveals documents that should have been produced given their substantial similarity to sample documents found not to be privileged, the Court will require Merck to construct a detailed privilege log, in accordance with the guidelines set forth by the Special Master, containing all remaining privilege claims.  The Special Master will then begin reviewing all withheld documents individually, and the Court will consider shifting the cost of this review onto Merck entirely.