BEFORE THE JUDICIAL PANEL ON MULTIDISTRCT LITIGATION

| | |
|---|---|
| IN RE: VIOXX<br><br>PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1657<br><br>JUDGE FALLON |
| CHARLES M. FLIPPIN and<br>KATHERINE C. FLIPPIN<br><br>      Plaintiffs,<br><br>vs.<br><br>MERCK & CO., INC.; NICHOLAS TERRY WARREN, DPH; STEVE C. JACKSON, DPH; RICHARD W. HAYES, DPH; STEPHANIE B. (BUCK) ISON; COURTNEY SHAY (INGRAM) McMAKIN; VINAY KRISHAN SOOD; MELISSA CAROL (McALLISTER) BARNES; MICHAEL RICHARDS; PATRICIA BLASINGAME and SCOTT EVANS,<br><br>      Defendants | MDL CASE NO. CA 05-1797 L (3)<br><br>Removed from the Circuit Court for Carroll County, Tennessee at Huntingdon, Civil Action No. 05CV#6<br>Jury Demand |

*PLAINTIFFS' REPLY TO DEFENDANT MERCK'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND DEFENDANT PHARMACISTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND SUPPORTING MEMORANDUM OF LAW*

### 1. Plaintiffs have continued to suffer severe economic hardship and irreparable harm

Because it has been almost two years since the Court was provided with factual information concerning the Plaintiffs' economic and medical plight, updated information is contained in two affidavits: a Supplemental Affidavit of Charles Flippin, attached hereto as Exhibit 1, and the Affidavit of Victoria Pike, attached hereto as Exhibit 2, both of which are incorporated herein in full. They establish that:

- Mr. Flippin remains disabled, cannot work and still has no income or medical insurance.

- The only income to his household remains his wife's disability payments, which are now $670.00 per month, an increase of only $46.00 since October 2005. The Flippins continue to pay $235.00 for their mortgage, leaving only $435.00 each month to cover groceries, utilities, gas and other necessities. At the time of the prior affidavit, the Flippins had exhausted their savings. In emergency situations such as when they run out of food stamps, they have been forced to rely on credit and have reached their maximum credit limits; accounts on certain credit cards have been sent to collection agencies.

- Mr. Flippin has tried to obtain Social Security Disability benefits since 2005, but has been denied twice. After he retained counsel to assist him, the Social Security Administration granted a hearing to Mr. Flippin, but it will not occur until sometime in mid-2008 due to a backlog at the Social Security office.

- Although Mr. Flippin has been able to obtain certain medications at no cost through the patient assistance programs of several drug companies, he still is unable to take his medications as prescribed due to the overwhelming amount of red tape required of participants in the program. Separate applications must be sent to each of five drug companies each month, all requiring doctor approval. Due to the paperwork, the need for doctor approval, processing time, and delays in receiving these drugs through the mail, Mr. Flippin often runs out of these medications before the next 30-day supply arrives.

- Mr. Flippin remains unable to afford to see Dr. Lui, his cardiologist, on a regular basis to monitor his condition, and sees him only once a year instead of every two or three months for monitoring. Mr. Flippin has been unable to get medical attention for a large hernia he developed at the site of his prior surgery for colon cancer. He cannot afford to

have a stress test to obtain cardiac clearance for the surgery, much less afford the surgery itself.

### 2. Defendants have failed to meet their burden of establishing that Plaintiffs have no possibility of recovering against the Defendant Sales Representatives. Moreover, virtually identical <u>arguments for removal by Merck continue to be rejected by other courts.</u>

In its opposition, Defendant Merck argues that the sales representatives cannot be liable for any misrepresentations to Plaintiffs because they had no independent duty to warn Plaintiffs of any dangers associated with the drugs. According to Defendant Merck, the only duty to warn was between the manufacturer and the physician, and because Merck warned the physicians, Merck, and therefore its sales representatives, are protected by the learned intermediary doctrine. However, to the extent that the learned intermediary doctrine is applicable to the sales representatives—and Merck has cited no Tennessee case law to support this position—the argument is inapposite because here the warnings provided by the manufacturer were inadequate, and therefore the learned intermediary doctrine does not apply. *Harden v. Danek Medical, Inc.* 985 S.W.2d 449, 451 (Tenn. App. 1999).

As stated in Plaintiffs' original motion, Tennessee law recognizes that sales representatives, as agents of Merck, are individually liable for their <u>own</u> tortious conduct. *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 821 (Tenn. App. 1995) ("an agent cannot escape liability for tortious act, including fraud or misrepresentation, against third persons simply because the agent was acting within the scope of the agency or at the direction of the employer"), quoting *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. App. 1980). Tortious conduct clearly includes claims of negligence and negligent misrepresentation such as is present here, where the sales representatives knew or should have known the cardiovascular risks of Vioxx,

but chose instead to muffle any discussion of risks and divert physician's attention away from safety concerns to efficacy.

In other cases where Defendant Merck has removed a Vioxx claim and opposed remand, Merck has made substantially similar arguments, and the arguments have been rejected by other courts. In addition to those cases cited in Plaintiffs' original motion, Plaintiffs refer the Court to three separate orders of remand from the U.S. District Court for the Southern District of Texas. In *Del Bosque v. Merck, et al., Salazar, et al. v. Merck, et al.* and *Vargas v. Merck, et al.*, the Court rejected Merck's claims in each of these cases that the sales representatives were fraudulently joined, and specifically noted that claims against the sales representatives, including failure to warn claims, were not precluded. The Orders of Remand from these cases, which include detailed reasoning of the Court's decisions, are attached hereto as Exhibit 3, and are incorporated by reference.

Clearly, the sales representatives engaged in independent conduct that would support a negligence or negligent misrepresentation claim under Tennessee law. The sales representatives' misrepresentations to physicians are evident in documents such as the "Bulletins for Vioxx" and FDA Warning Letter dated September 2001. From these documents, it is clear that Merck used the sales representatives as a conduit to mislead doctors about the results of studies concerning the adverse cardiovascular effects of Vioxx.

Prior to Plaintiff Charles Flippin's initial prescription for Vioxx in December 2002, Merck issued numerous documents to sales representatives called "Bulletins for VIOXX." The subject of these bulletins was how to respond to physician's questions regarding the cardiovascular safety of Vioxx and how to overcome "obstacles" wherein physicians were concerned about safety. The intent of these bulletins appeared to be to train the sales

representatives to dodge specific questions about cardiovascular safety raised by published reports and to minimize such risks. In each of these documents, Merck instructed sales representatives not to initiate discussion about cardiovascular issues, and to refocus any inquiries on efficacy issues.

Importantly, these bulletins typically referenced a published report in the news media or medical literature; in reading the bulletin and the related published report, the sales representatives should have become aware of the very risks that they were misrepresenting. These "Bulletins for Vioxx," certain of which are attached hereto as Exhibit 4 and incorporated by reference, include but are not limited to:

| | |
|---|---|
| March 27, 2000: | Response to inquiries about VIGOR study showing CV risks |
| May 1, 2000: | Response to inquiries about Vioxx CV safety profile versus Celebrex |
| May 24, 2000: | Response to inquiries about VIGOR's Vioxx findings and competing drug Celebrex |
| February 9, 2001: | Response to inquiries about Vioxx label changes regarding CV risks |
| May 23, 2001: | Response to inquiries about New York Times Article on Vioxx CV risks |
| August 21, 2001: | Response to inquiries about JAMA article on VIGOR and CV risks |
| September 25, 2001: | Response to inquiries about FDA Warning Letter |

See Exhibit 4.

As data and published reports of cardiovascular risks mounted between 2000 and 2002, the sales representatives knowledge of the risks certainly grew as they reviewed the bulletin itself and the published report referenced in the bulletin. However, despite this knowledge, the sales representatives continued to mislead physicians.

In fact, at the time the FDA issued its Warning Letter in September 2001, the FDA specifically stated the sales representatives were making misrepresentations. The Warning Letter

specifically states, in relevant part, "Merck's sales representatives have engaged in **false or misleading** promotional activities that also **minimize** the potentially serious MI results observed in the VIGOR trial." See FDA Warning Letter, Exhibit 5. (Emphasis added.)

Despite the FDA Warning Letter, Merck and the sales representatives continued to misrepresent the cardiovascular safety profile of Vioxx to physicians, including Daniel Sumrok, M.D., Plaintiff's physician. According to documents produced by Merck, sales representatives visited Dr. Sumrok 231 times between July 1999 and September 2004. See Detail of Sales Representatives Visits to Dr. Sumrok, attached hereto as Exhibit 6 and incorporated by reference. Of these visits, which occurred approximately 4-5 times per month, 146 visits occurred before Mr. Flippin was prescribed Vioxx. On at least three separate visits by sales representatives to Dr. Sumrok's office, Dr. Sumrok's raised questions regarding the cardiovascular safety of Vioxx. On each of these occasions, consistent the Bulletins for Vioxx discussed above, instead of directly answering Dr. Sumrok's inquiries, the sales representatives initiated PIRs from Merck, who in turn, issued three separate responses to Dr. Sumrok's concerns. These letters to Dr. Sumrok, dated September 11, 2001, October 3, 2001 and June 7, 2002, were all sent to him before he first prescribed Vioxx for Mr. Flippin in early December 2002. They are attached hereto as Exhibit 7. In each of these letters, Merck minimizes the cardiovascular risks associated with Vioxx, completing the cycle of misrepresentation begun by the sales representatives in failing to provide forthright answers to the physician at the time he was asked. At any point prior to December 2002, and certainly as the sales representatives continued to gain knowledge about the cardiovascular "controversy" after the September 2001 FDA warning letter, Dr. Sumrok could have been fully informed of these risks, and in all likelihood, Plaintiff would have been spared the disabling, permanent injuries from which he continues to suffer.

Defendant Merck's argument that Plaintiffs have no possibility of establishing a cause of action against the sales representatives is not supported by Tennessee law, not supported by the pleadings and not supported by the facts of this case. Consistent with the FDA's finding of misrepresentations by sales representatives, and the rulings of other courts, this Court should find the Defendants have failed to meet their burden of fraudulent joinder in all respects alleged, and should remand this case to the state trial court from which it was inappropriately removed.

### 3. Defendants have failed to meet their burden of showing by clear and convincing evidence that Plaintiffs have no possibility of making a recovery against the Defendant pharmacists under Tennessee law.

The Defendant pharmacists' assertions that they have no duty to warn ignores clear Tennessee case law indicating that pharmacists have independent duties to their customers. As stated in Plaintiffs' original motion, under Tennessee law, pharmacists have an independent duty to their customers to exercise that same degree of care as would be employed by a pharmacist of reasonable prudence in the same or a similar community. *Dooley v. Everitt*, 805 S.W.2d 380, 385-386 (Tenn. App. 1991) ("whether the duty to warn of potential drug interaction is included within the pharmacist's duty to his customer is a disputed issue of fact preventing the granting of summary judgment."); *Pittman v. Upjohn Company*, 890 S.W.2d 425, 434 (Tenn. 1999) (holding that the "pharmacy, as well as the physician owed ... the duty to warn."); Laizure, K., *The Pharmacist's Duty to Warn When Dispensing Prescription Drugs: Recent Tennessee Developments*, 22 Mem. St. U. L. Rev. 517, 519-20 (1992) ("Tennessee [has] joined a minority of jurisdictions rejecting the premise that the pharmacist has no duty, as a matter of law, to warn or intervene in the face of a questionable drug prescription.")

The Supreme Court of Tennessee has stated some of its reasons for holding pharmacists accountable as follows:

> The increased complexity of pharmacotherapeutics and the accompanying adverse reactions to drugs and interactions between drugs have resulted in an expanded role for pharmacists as drug therapy counselors. A pharmacist's formal education stresses patient counseling as an integral role in health care. Leadership within the profession advocates continued expansion into new areas of patient education. A trend toward patient-oriented clinical pharmacy practice, which was opposed initially by many pharmacists, now appears to have firmly taken hold.

*Pittman*, 890 S.W.2d at 434, quoting, Brushwood, The *Informed Intermediary Doctrine and the Pharmacist's Duty to Warn*, 4 J.Legal Med. 349, 351 (1983). Likewise Tennessee's Board of Pharmacy's regulations state that when filling a prescription pharmacists are to provide patient counseling that "shall cover matters, which in the exercise of the pharmacist's professional judgment, the pharmacist deems significant including: ... common side effects or adverse effects or interactions and therapeutic contraindications that may be encountered." TENN. COMP. R. & REGS. 1140-3-.01 (1)

Pharmacists could or should have learned of the dangers of Vioxx from various sources, including studies regarding the dangerous side effects of Vioxx had been made available well before Mr. Flippin first was prescribed Vioxx in December 2002 that should have put pharmacists on notice to inform their customers of the dangers of that drug. *See, e.g.*, Mukherjee, D., Nissen, S., Topol, E., *Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors*, 286(8) JAMA 954, 954 (2001)("myocardial infarction rates for COX-2 Inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo"); Bombardier, C. et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343(21) NEJM 1520, 1526 (2000) ("The rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group.")

Furthermore, information was also available at the FDA website and in the popular press, among other sources. On October 5, 2004, *The Wall Street Journal*, published an article entitled

"Lawsuits May Focus on FDA Warning in 2001" regarding the FDA warning letter to Merck discussed previously. The article, attached hereto as <u>Exhibit 8</u> and incorporated by reference, states:

> In the eight-page letter, the FDA says Merck engaged "in a promotional campaign for Vioxx that, minimizes the potentially serious cardiovascular findings that were observed" in a clinical trial comparing Vioxx to naproxen, a less-expensive painkiller. "Your promotional campaign discounts the fact" that in the trial, 'patients on Vioxx were observed to have a four to five-fold increase" in heart attacks, compared with patients on naproxen, the letter said.
>
> ... The FDA letter, which also chastised Merck for suggesting to physicians that the reason patients taking Vioxx had a higher incidence of heart attacks in the study was that naproxen has heart benefits. Merck has maintained that the reason it didn't know earlier of a link between Vioxx and heart attacks is because naproxen is "heart protective." But the FDA's letter says, "You fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties," the clinical term for causing blood clots that could lead to heart attacks.
>
> * * * * Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI [myocardial infarction, or heart attack] and serious cardiovascular events compared to naproxen.

<u>As Plaintiffs noted in their original motion, the district court must resolve all disputed question of fact and ambiguities in the controlling state law in favor of the non-removing party.</u> See Plaintiffs' Motion at p. 13, citing *Coyne v. American Tobacco Co.*, 183 F.3d 488 (6th Cir. 1999) and *Alexander v. Electronic Data Sys. Corp.*, 13 F.3d 940 (6th Cir. 1994). Applying those principles here, it is clear that Defendants have wholly failed to establish that there is no possibility Plaintiff can establish that the decedent's pharmacists, Nicholas Terry Warren, Steve C. Jackson, and Richard W. Hayes, are partly responsible for her injuries. Plaintiff has pled a plausible case against these pharmacists under Tennessee law and should be permitted to pursue that state law claim in a state court.

### 4. Conclusion

For the reasons stated above, Plaintiffs respectfully pray that their Motion to Remand be granted and that the Court remand this case to the Circuit Court for Carroll County, Tennessee, and for such other and further relief to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

*[signature]*

Tommy Jacks
Tx. Bar No. 10452000
Mark Guerrero
Tx. Bar No. 24032377
**JACKS LAW FIRM**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
512-478-4422
512-478-5015 fax

James L. "Larry" Wright,
Tx. Bar No. 22038500
Tn. BPR No. 024215
**WATTS LAW FIRM**
111 Congress, Suite
Austin, Texas 78701
(512) 479-0500

T. Robert Hill
Tn. BPR No. 008141
**HILL BOREN, P.C.**
1269 N. Highland Avenue
Jackson, Tennessee 38301
731-723-3300

Richard Mithoff
Tx. Bar No. 14228500
Joseph R. Alexander, Jr.,
Tx. Bar No. 00995150
**MITHOFF LAW FIRM**
One Allen Center Penthouse
500 Dallas Street
Houston, TX 77002
713-654-1122
713-739-8085 fax

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PLAINTIFFS' REPLY TO DEFENDANT MERCK'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND DEFENDANT PHARMACISTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND AND SUPPORTING MEMORANDUM OF LAW has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File and Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 4th day of September, 2007.

Tommy Jacks
Tx. Bar No. 10452000
Mark Guerrero
Tx. Bar No. 24032377
**JACKS LAW FIRM**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
512-478-4422
512-478-5015 fax