UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: VIOXX | MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| This document relates to All Actions | JUDGE FALLON |
| | MAG. JUDGE KNOWLES |

**PLAINTIFF'S STEERING COMMITTEE'S RESPONSE
TO MERCK & CO., INC.'S OBJECTIONS TO THE SPECIAL
MASTER'S SECOND REPORT AND RECOMMENDATIONS**

I.   **INTRODUCTION**

The PSC submits this response to Merck & Co., Inc.'s ("Merck") objections to Special Master Paul Rice's Second Report and Recommendation regarding the applicability of the attorney-client privilege to documents in the possession of Merck's consultants, Ogilvy and DDB. The Special Master essentially ruled that the attorney-client privilege should not be granted as to any of the Ogilvy or DDB documents at issue, for several different reasons:

a)   "Merck has not demonstrated that the relationship between Merck and these entities was significantly different than a relationship it would normally have had with entities retained to provide advertising and public relations services."[1]

b)   Ogilvy and DDB "...did not have primary responsibility for key corporate jobs, or

---

[1] Second Special Master's Report and Recommendations – Merck Documents Circulated to Third Parties at p. 7 (July 31, 2007).

1

        possess information possessed by no one else at the company..."[2]

   c)    "...[M]any of the documents do not identify any of the third party employees who received the communications. The documents apparently circulated to Ogilvy identify no one within the company as a recipient."[3]

   d)    "...[N]one of the employees of DDB or Ogilvy (whether listed in the headers or not) have been identified and circulation to them justified because of their corporate responsibilities within each company."[4]

   e)    "...[T]here has been no evidence offered by Merck that the secondary distribution policies within these companies was restricted, thereby preserving the confidentiality of each communication."[5]

Simply put, there are several different and mutually exclusive reasons for the Special Master's findings. The PSC submits below some of the facts and factors which provide further support for the Special Master's multiple reasons for denying Merck's privilege claims.

## II.   FACTUAL BACKGROUND

When the PSC issued subpoenas on Ogilvy, DDB and Millward Brown back on February 7, 2006, there was no expectation that it would bring on this maelstrom of a discovery dispute. However, the dispute is well known and since March 22, 2006 Merck has had every chance to develop as full a record to contest the matter as it desired. Indeed, in its motion to quash this

---

[2] *Id.*

[3] *Id.* at p. 8.

[4] *Id.*

[5] *Id.*

discovery, Merck presented certain contracts and affidavits that it has recycled for present purposes. What those supporting documents still prove today (Merck attaches some to its objections) is that these consultants were not retained for litigation purposes but primarily for the business purpose of advertising Vioxx. It is evident that the independent contractors were not utilized as extensions of Merck's in-house counsel's legal strategies but as third parties that were engaged primarily to promote the drug.[6] *See* Second Report at 7. Communications, if there were any with legal counsel, were done through surrogates, *i.e.*, other Merck employees to further the primary business purpose of advertising a commercial product. The secondary purpose, which can only be assumed since the PSC still lacks access to the documents, is that some regulatory compliance may be implicated but not entirely. *See* Second Report at 8-9.

Immediately distancing itself from its consultants, Merck's contracts confirm that the agencies were not authorized to act as employees on behalf of the company. For example, the Ogilvy Contract states:

> The Agency and its employees shall <u>not</u> be construed for any purposes to be an employee subject to the control and direction of Merck.[7]

Ogilvy Contract ¶6 (emphasis added). Specifically, the agency contracted with Merck that it would

---

[6] *Compare FTC v. GlaxoSmithKline* ("GSK"), 294 F.3d 141 (D.C. Cir. 2002)(the "consultants became integral members of the team assigned to deal with issues that were completely intertwined with GSK's litigation and legal strategies."); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 215 (S.D.N.Y. 2001)(Public relationship agency hired because the defendant "had no prior experience in dealing with issues related to publicity arising from high profile litigation").

[7] This contractual provision directly contradicts the self-serving Pudlowski Declaration ¶5, which states: "Ogilvy was not permitted to act with respect to any communications plan without Merck's prior approval, and <u>was always understood to be operating at Merck's direction and instruction.</u>" (emphasis added).

3

not be an employee of Merck for "any purpose".

Ironically, the Ogilvy Contract provides that Ogilvy is obliged to defend and indemnify Merck from any allegations that it is so closely associated with Merck and/or that its employees are functional equivalents of Merck employees. Specifically, the Ogilvy contract states:

> The Agency shall indemnify and hold harmless Merck from any and against any and all claims, liabilities, demands . . . arising out of or in connection with: (iv) any determination or allegation that the Agency or any its employees is an employee of Merck.

Id. ¶12.

The DDB contract is silent on this point. Nevertheless, it does recognize that DDB must comply with this Court's subpoena without any reference to attorney-client privileged documents. *See* DDB contract ¶16 ("Notwithstanding the forgoing, Agency may disclose confidential information to the extent that such disclosure is required by a court or governmental agency of competent jurisdiction.").

Plainly, Merck's contracts dispel any notion that it intended for its consultants to be treated as the functional equivalent of employees. Merck had no interest in incurring tax liability for these independent contractors. Merck advocates before this Court that it treated its agencies as virtual employees but what status did it ascribe to them in its dealings with the Internal Revenue Service? The standard for determining whether one is an employee is provided by *Nationwide Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992). Under *Darden*, the Supreme court has ruled that employment status is determined by looking at "the hiring party's right to control the manner and means by which the product is accomplished," and through the use of a multi-factorial test that considers: 1) the skill required, 2) source of the instrumentalities and tools, 3) location of work, 4) duration of the relationship between the parties, 5) whether the hiring party has the right to assign additional

4

projects to the hired party, 6) the extent of the hired party's discretion over whether and how long to work, 7) the method of payment, 8) the hired party's role in hiring and paying assistants, 8) whether the work is part of the regular business of the hiring party, 9) whether the hiring party is in business, 11) the provision of employee benefits, and 12) the tax treatment of the hired party. *Id.*

Even a cursory review of the *Darden* factors proves that the agencies were not Merck employees. Merck had no control over the skill of the agencies' workers, their workplaces, whether and how long they worked, or whether they hired assistants. Further, Merck could not without engaging in a separate contract assign the agencies additional work on other projects. Merck's contract determined that it would only pay the agencies on their invoices, and the contracts made no provision for employee benefits. Finally, as mentioned before, Merck most assuredly provided its Agencies a form-1099 for tax purposes, not a W-2. Having failed the *Darden* factors, Merck should not be heard to say that these agencies were virtual employees. They clearly were not.

Even assuming that the *Beiter* standard applied here,[8] the factual circumstances do not support its application. Merck can not seriously contend that its agencies were working day to day with the principals at Merck seeking legal advice.[9] DDB's Account Director, Molly Buchholz confirms this separation from Merck principals in both her affidavit and deposition. For example, in her declaration Ms. Buchholz alludes to the infrequent communications, "DDB routinely communicated with Merck's legal department ("Merck Legal") via [undisclosed] senior Merck

---

[8]*In re Beiter Co.*, 16 F.3d 929 (8th Cir. 1994).

[9]The Special Master found these relations attenuated by noting that, "references to opinions of Merck's legal counsel were indirect and infused with the opinions of the authors relating their interpretation of those legal concerns as they related to promotional issues being addressed." Second Report at 8.

employees." Buchholtz Decl. ¶6 & ¶¶8, 12 ("routinely directed by senior Merck employees" & "day-to-day interactions" occurred on a "regular basis"). Truth be told at her deposition, DDB's Account Director <u>never</u> worked with a Merck attorney. *See* Buchholz Deposition March 14, 2006 at 73 ("Q: Would you from time to time interact while working on this Vioxx account with Merck attorneys? A: No. I never interacted directly.")[Attached hereto as Exhibit "A"]. Whether legal advice was even sought from Merck by DDB was questioned by Ms. Buchholz who testified that DDB's work was simply reviewed by a medical/legal board to assure compliance with "Merck standards and guidelines." *Id.* at 74. Although Ogilvy's affiant, Sherry Pudloski, the Team Leader for Vioxx and Merck Relationship Manager, has not yet been deposed her credibility has already proven to be suspect. *See supra* footnote 3. She too confirms a separation between Ogilvy and Merck's principals, including Merck lawyers, that calls into question whether legal advice was ever sought from Merck by Ogilvy. *See* Pudloski Declaration ¶6 ("Ogilvy employees were <u>routinely</u> directed by Merck senior public affairs <u>staff</u> to follow advice from Merck legal on regulatory matters to ensure corporate compliance.") (emphasis added).

  Merck's contention that the agencies were dependent on Merck's legal department to properly do their job is not supported by the evidence. For example, while Merck reserved the right to change Ogilvy's public relations work, Ogilvy was always understood to be competent on its own to comply with legal requirements. The Ogilvy contract specifically states: "It is expected that the Agency will have a working knowledge of any applicable product labeling, laws and regulations and Merck policy." Ogilvy contract ¶14(a).

  Given the distance between Merck's lawyers and its consultants' staffs there should be no doubt that Merck has failed to demonstrate that it intended for any legal confidences to be

maintained by the numerous consultants that may have become privy to advices received from Merck's counsel. Too many discrepancies, too many people given access and not enough confidences being guarded, warrant extending the attorney-client privilege to Merck's consultants.

## III. ARGUMENT

### A. MERCK OVERSTATES THE SPECIAL MASTER'S ENDORSEMENT THAT THE ATTORNEY-CLIENT PRIVILEGE SHOULD BE APPLIED

The Special Master extensively analyzed the history underlying the attorney-client privilege and the corporate client. Whereas the Special Master challenges some of the underlying rationale adopted by several courts that have extended the privilege to corporations, Second Report at 2-4, he nevertheless engaged in the analysis employed by federal courts when considering expanding application of the privilege to outside consultants.[10] Even after putting aside his trepidations about relaxing the attorney-client privilege standard when such communications are disseminated to outside consultants, the Special Master still resolved that Merck's actions resulted in the waiver of the privilege because it failed to "screen the legal advice and related legal concerns" before passing the information along to those third parties. Second Report at 5.

Merck contends that the Second Report determined that it is well established that the attorney-client privilege should extend to independent consultants that act as the "functional equivalent" of a company employee. What the Special Master found was that the cases relied upon by Merck are laden with "warts, blemishes, inconsistencies and illogic." Second Report at 4.

---

[10]Notably, the Special Master did not appear to take into consideration the earlier arguments of the PSC to the effect that as these cases are before this Court based upon diversity of citizenship, Fed.R.Evid. 501 requires that state privilege law applies. The PSC earlier argued that Merck's contracts with its consultants demanded the application of the law of Pennsylvania and that Pennsylvania would not recognize the rationale of *Beiter* or its progeny. Instead, the Special Master only considered federal precedent.

However, even when evaluated under these cases' standards, the Special Master recognized that Merck had not met its burden of establishing a privilege.

In particular, the Special Master factually distinguished both *Beiter* and *In re Copper Mkt. Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001). As to *Beiter*, the Special Master noted that the moniker of "functional equivalent" was applied to a consultant whose duties "were varied and extensive, he spoke confidentially with the company's attorney about matters relating both to the venture and the litigation, and he attended meetings for Beiter as its sole representative." Second Report at 5. Because *Beiter*'s consultant acted more as a "principal" he was labeled a "functional equivalent." *Id.* at 6, *quoting, Freeport-McMoran Sulphur, LLC v. Mike Mullen Energy Equipment Resource, Inc.*, 2004 WL 1237450 (E.D.La. June 2, 2004). These characteristics do not apply to Merck's consultants.

Not surprisingly, the Special Master focused on *Copper Market*, having found it to be more similar factually. In *Copper Market*, Sumitomo Corporation hired a "crisis management" public relations consultant in connection with an actually existing litigation dispute because it had no experience with PR issues in high profile litigation. The Special Master found that the facts of *Copper Market* were again distinguishable from Merck's situation with Vioxx. The Special Master found that because Merck had not yet withdrawn Vioxx from the market and because it claimed that "it was not aware of the dangers in using Vioxx", *Id.* at 5., it could not have anticipated the onslaught of litigation represented by this MDL.[11] Further, he found no communications that

---

[11] Mr. Rice's Treatise recognizes the application of the privilege "regardless of whether litigation is pending," provided that the advice was sought in anticipation of litigation or to avoid litigation. Paul R. Rice, Attorney Client Privilege in the United States §2.2 at 11-12 & fn. 22.

predated the withdrawal of Vioxx from the market,[12] nor any related to crisis management press releases similar to those in *Copper Market*. *Id*. The Special Master also found that unlike the special circumstances attendant to Sumitomo, Merck was experienced with western media relations, had no language difficulties, and that Merck had not granted authority to its public relations firms to speak for the company. *Id*. at 6.

Merck's objection to the Special Master's findings challenges his factual distinctions. Merck contends that the privilege can not be limited to situations where the company lacks familiarity. Ironically, it is Merck that is narrowly interpreting the Special Master's report. It seems obvious that the Second Report is not limited to foreign situations but the constellation of circumstances attendant to the relationship between the corporation and its consultant. Where the corporation lacks experience in a situation with actual litigation pending or anticipated and where it surrenders responsibility to the consultant (as in the case of both *Beiter* and *Copper Market*), it appears that the Special Master could find that the privilege applies. In Merck's case, none of these fact were presented and therefore the Special Master ruled against Merck.

That determination should be upheld.

**B.    MERCK SHOULD NOT BE PERMITTED UNLIMITED CHALLENGES <u>OF THE SPECIAL MASTER'S REPORT AND RECOMMENDATION</u>**

Merck argues that it should be afforded the opportunity to again explain why its privilege log and documents should be considered privileged by the Special Master. Merck has had multiple

---

[12]Because these documents were only presented *in camera* to the Special Master, the PSC can only presume that Merck's argument that 41 of the 79 documents are dated after May 2001 attempts to distinguish between documents that actually reflect attorney-client communications and those that may simply reveal information considered privileged by Merck. It should be noted that the Special Master was adverting to documents post-dating the drug's withdrawl in September 2004. *See* Second Report at 5.

9

opportunities to provide supporting evidence to the Special Master consistent with the Fifth Circuit's directive in *In re Vioxx Products Liability Litigation*, 2006 WL 1726675 (May 26, 2006). Merck's request at this late date to supply "evidence" such as the same affidavits provided from its Motion to Quash Discovery appended to its Objections, should be denied. There is no new information within this material that was not already available to the Special Master. Merck appears to be requesting a "second bite at the apple." That request is untimely, without merit and should be denied. Merck's repeated demands of the Special Master based upon unfounded claims of privilege have needlessly escalated the expense of this litigation. The PSC submits that these expenses are unjustified and, if permitted, should be borne alone by Merck entirely.

### IV.   CONCLUSION

There are several different and mutually exclusive reasons for the Special Master's findings. The PSC submits that there are many different facts and factors which provide further support for the Special Master's multiple reasons for denying Merck's privilege claims. Accordingly, the PSC respectfully suggests that the Special Master's decision should be ratified as none of Merck's objections warrant extending the privilege to Merck's outside consultants.

          Respectfully submitted,

          **PLAINTIFFS' STEERING COMMITTEE**

Date: September 5, 2007    By: /s/ Leonard A. Davis
          **Russ M. Herman (Bar No. 6819)**
          Leonard A. Davis (Bar No. 14190)
          Stephen J. Herman (Bar No. 23129)
          ***Herman, Herman, Katz & Cotlar, L.L.P.***
          820 O'Keefe Avenue
          New Orleans, Louisiana 70113
          Telephone: (504) 581-4892
          Facsimile: (504) 561-6024
          **PLAINTIFFS' LIAISON COUNSEL**

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

11

| | |
|---|---|
| Mark Robinson, Esquire<br>ROBINSON, CALCAGNIE & ROBINSON<br>620 Newport Center Drive<br>7th Floor<br>Newport Beach, CA 92660<br>(949) 720-1288 (telephone)<br>(949) 720-1292 (telecopier) | Christopher V. Tisi, Esquire<br>ASHCRAFT & GEREL<br>2000 L Street, N.W., Suite 400<br>Washington, DC 20036-4914<br>(202) 783-6400 (telephone)<br>(307) 733-0028 (telecopier) |

## CERTIFICATE OF SERVICE

    I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 5th day of September, 2007.

                                        /s/ Leonard A. Davis
                                        Leonard A. Davis (Bar No. 14190)
                                        ***Herman, Herman, Katz & Cotlar, LLP***
                                        820 O'Keefe Avenue
                                        New Orleans, LA 70113
                                        PH:   (504) 581-4892
                                        FAX:  (504) 561-6024
                                        ldavis@hhkc.com