IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | ) MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | ) |
| | ) SECTION: L |
| THIS DOCUMENT RELATES TO ALL | ) |
| CASES | ) JUDGE FALLON |
| | ) MAG. JUDGE KNOWLES |
| | ) SPECIAL MASTER RICE |
| | ) |

## MERCK & CO., INC.'S REPLY IN SUPPORT OF ITS OBJECTIONS TO THE SPECIAL MASTER'S SECOND REPORT AND RECOMMENDATIONS

# TABLE OF CONTENTS

Page

I.    COMMUNICATIONS WITH CONSULTANTS WHO OPERATE AS
      THE FUNCTIONAL EQUIVALENTS OF EMPLOYEES ARE
      PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE ............................ 1

II.   MERCK'S INDEPENDENT CONTRACTORS DO FALL WITHIN THE
      SCOPE OF THE ATTORNEY-CLIENT PRIVILEGE ........................................ 5

III.  MERCK SHOULD BE ALLOWED TO EXPLAIN THE PRIVILEGE
      DESIGNATIONS ON A DOCUMENT-BY-DOCUMENT BASIS..................... 9

CONCLUSION.......................................................................................................... 11

892456v.1

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*FTC v. GlaxoSmithKline,*
  294 F.3d 141 (D.C. Cir. 2002).............................................................................. 5, 7

*In re Bieter,*
  16 F.3d 929 (8th Cir. 1994) ......................................................................... 2, 3, 4, 7

*In re Copper Mkt. Antitrust Litig.,*
  200 F.R.D. 213 (S.D.N.Y. 2001) ................................................................. 2, 3, 7, 9

*In re Vioxx Prods. Liab. Litig.,*
  2006 WL 1726675 (5th Cir. May 26, 2006) ............................................................ 10

*Nationwide Mut. Ins. Co. v. Darden,*
  503 U.S. 318 (1992)................................................................................................. 4

*Ross v. UKI Ltd.,*
  2004 WL 67221 (S.D.N.Y. Jan. 15, 2004) ............................................................... 3

*Twentieth Century Fox Film Corp. v. Marvel Enter. Inc.,*
  2002 WL 31556383 (S.D.N.Y. Nov. 15, 2002)...................................................... 2, 7

*Upjohn Co. v. United States,*
  449 U.S. 383 (1981)................................................................................................. 5

**State Cases**

*Schenck v. Twp. of Ctr.,*
  2006 Pa. Commw. LEXIS 88 (Pa. Commw. Ct. 2006) .............................................. 3

*Whitehead v. Allstate Ins. Co.,*
  3 Pa. D. & C.3d 56 (Pa. Ct. Com. Pl. 1977) ............................................................ 3

**Other Authorities**

Paul R. Rice, *Attorney Client Privilege In The United States* § 2:2 (2d ed. West 1999)................ 9

892456v.1

## MERCK & CO., INC.'S REPLY IN SUPPORT OF ITS OBJECTIONS TO THE SPECIAL MASTER'S SECOND REPORT AND RECOMMENDATIONS

Plaintiffs' Response to Merck's Objections to the Special Master's Second Report and Recommendations ("SM Second Rep.") fails to rebut Merck's arguments that the documents at issue – which contain legal advice shared with Merck's third-party consultants – fall well within the attorney-client privilege. *First*, plaintiffs veer from the legal standard set forth in the Special Master's Report, apparently recognizing that under the Special Master's own articulation of the standard, the privilege does extend to third-party consultants like those at issue here. *Second*, plaintiffs distort the factual record of Merck's relationship with its contractors in an effort to minimize the relationship between them. And *third*, plaintiffs urge the Court to deny Merck the opportunity to provide the Special Master or the Court with document-by-document explanations of the DDB/Ogilvy privilege claims, presumably because the last time that process was employed, the vast majority of documents were ultimately upheld as partially or fully privileged.

None of these arguments supports the Special Master's conclusions. Because actions taken by Merck's consultants – just like actions taken by Merck employees – potentially subject the Company to enforcement proceedings, it was essential for the consultants to seek legal advice from Merck's lawyers to ensure that all information released to the public was legally acceptable. Such communications are clearly subject to privilege. As a result, Merck should be given the opportunity to provide the Special Master or the Court with explanations of its privilege claims as to the documents listed on its DDB and Ogilvy privilege logs.

## I.   COMMUNICATIONS WITH CONSULTANTS WHO OPERATE AS THE FUNCTIONAL EQUIVALENTS OF EMPLOYEES ARE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.

Apparently aware that the "functional equivalent" test applied by the Special Master actually supports the extension of privilege to Merck's public relations and marketing

consultants, plaintiffs assert that a different standard should apply. According to plaintiffs, the Court should limit Merck's corporate privilege only to those individuals who are *actual* employees of the Company – and not to functional employees. (Pls' Opp. at 5.) Plaintiffs' arguments are without merit.

Plaintiffs' first argument on that score – that the Special Master categorically rejected application of the attorney-client privilege to consultants who serve as the "functional equivalents" of Merck employees – is simply wrong. (Pls.' Opp. at 7.) In his Report, the Special Master explicitly (and correctly) acknowledged, under the test established in *In re Bieter*, 16 F.3d 929 (8th Cir. 1994), that the attorney-client privilege extends to legal communications between a company and its independent consultants where those consultants are the "functional equivalent[s]" of employees. (SM Second Rep. at 6.) Indeed, the Special Master noted that a "number of cases have considered, and many have accepted . . . the application of the attorney-client privilege to communications disseminated to outside consultants." (SM Second Rep. at 4 (citing, *inter alia*, *Bieter*, 16 F.3d at 929; *In re Copper Mkt. Antitrust Litig. ("Copper Mkt.")*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001); *Twentieth Century Fox Film Corp. v. Marvel Enter. Inc.*, No. 01 Civ. 3016 (AGS), 2002 WL 31556383, at *2 (S.D.N.Y. Nov. 15, 2002)).)

According to plaintiffs, the Special Master's statement that the "cases relied upon by Merck are laden with 'warts, blemishes, inconsistencies and illogic" (Pls.' Opp. at 7 (citing SM Second Rep. at 4)), indicates that he rejected the "functional equivalent" standard set forth in *Bieter* and other similar rulings. Plaintiffs' argument is disingenuous. While the Special Master indicated that, if he were a jurist working with a "clean slate" he might not choose to adopt the *Bieter* test, he also acknowledged that the slate was not clean and that the Court is bound by applicable law. In the Special Master's words, the "reality is that the *corporate privilege* exists

with its warts, blemishes, inconsistencies and illogic and the question about Merck's

communication with its third party consultants *must be evaluated in light of those established*

*principles* and their application." (SM. Second Rep. at 4 (emphasis added).) That is a far cry

from rejecting Merck's caselaw. The fact that the Special Master would prefer that the law were

different does not change what the law is, and under well-established law, the attorney-client

privilege clearly extends to independent contractors who act as the "functional equivalents" of

corporate employees.[1]  *See Bieter*, 16 F.3d at 940 (protecting communications shared with

outside contractors and finding that there was no principled basis to differentiate corporate

employees from third-party contractors who are the "functional equivalent" of employees);

*Copper Mkt.*, 200 F.R.D. at 219 (communications with a "crisis management" public relations

firm hired by a corporation to deal with "issues relating to publicity arising from high profile

litigation" were subject to privilege because the public relations firm "was, essentially,

incorporated into [the corporation's] staff to perform a corporate function that was necessary in

the context of" various litigations); *Ross v. UKI Ltd.*, No. 02 Civ. 9297 (WHP), 2004 WL 67221,

at *5 (S.D.N.Y. Jan. 15, 2004) (concluding that real estate management services company

---

[1]     Plaintiffs suggest in a footnote that the Special Master erred in applying the "functional equivalent"
standard employed by federal courts when addressing the application of privilege to outside consultants because the
Federal Rules of Evidence require "the application of the law of Pennsylvania" and "Pennsylvania would not
recognize the rationale of *Bieter* or its progeny." (Pls.' Opp. at 7 n.10.)  However, as Merck has explained in prior
briefing, this argument is both inconsistent – as both parties have briefed privilege issues throughout this litigation
based on federal law – and ultimately unhelpful to plaintiffs. Even if a choice-of-law analysis were to reveal that
Pennsylvania law governs the question whether privilege extends to Merck's independent consultants, the
"functional equivalent" test embraced by federal courts would likely still apply.  Pennsylvania courts routinely rely
on federal precedent on privilege issues where, as here, Pennsylvania courts have not yet addressed the specific
privilege question at issue.  *See, e.g.*, *Schenck v. Twp. of Ctr.*, 2006 Pa. Commw. LEXIS 88 (Pa. Commw. Ct. 2006)
(relying on federal precedent addressing the applicability of the attorney-client privilege in the context of discovery
disputes where "[t]he specific question presented . . . has not been decided by our appellate courts"); *Whitehead v.
Allstate Ins. Co.*, 3 Pa. D. & C.3d 56, 58 (Pa. Ct. Com. Pl. 1977) (basing privilege ruling on federal precedent where
the Pennsylvania court was "able to find no Pennsylvania state decision dealing with the issue"). Thus, even if
plaintiffs are correct that Pennsylvania law governs, the federal precedent relied on by both Merck and the Special
Master would remain highly persuasive.

-3-

"act[ed] as the functional equivalent" of employees of a holding company with respect to certain real estate transactions for purposes of the attorney-client privilege).

Plaintiffs' own dissatisfaction with the prevailing law is no more availing than the Special Master's. According to plaintiffs, corporate privilege should only extend to *actual* employees and not consultants who serve as functional employees. Thus, plaintiffs point to the fact that Merck's contract with Ogilvy specifically states that Ogilvy is not an "employee" of Merck (Pls.' Opp. at 4) as proof positive that the privilege does not apply. The problem with plaintiffs' argument is that it is premised on an ERISA case – not a privilege case.

Plaintiffs base their argument on *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), in which the Supreme Court enunciated the test for determining who qualifies as an "employee" for the purpose of entitlement to employment benefits. The specific issue in *Darden* was the construction of "the term 'employee' as it appears in § 3(6) of the Employee Retirement Income Security Act of 1974 (ERISA)." *Id.* at 319. There, the Court adopted "a common-law test for determining who qualifies as an 'employee' under ERISA." *Id.* at 323.

Based on the *Darden* test, plaintiffs argue that DDB and Ogilvy were not Merck employees and, thus, the privilege should not extend to the communications between these entities and the Company. However, this argument misses the point entirely. Merck has never contended that the high-level consultants at DDB and Ogilvy were Merck employees. Instead, as Merck argued in detail in its prior briefing and the Special Master specifically acknowledged in his Report, the question before the Court is whether Merck's "outside consultants could be seen as the '*functional equivalent*' of employees" and therefore covered by Merck's corporate privilege. (SM Second Rep. at 6 (emphasis added).) As a result, plaintiffs' argument that Merck's consultants were not actual employees of the Company is wholly irrelevant. *See Bieter*,

16 F.3d at 933-34 (finding privilege applied to independent consultant even though contract stated that contractor "was expressly *not an agent, employee, or partner of Bieter*") (emphasis added).

Moreover, as set forth in Merck's prior briefing, important policy considerations support the application of privilege beyond actual employees of a company. In order to provide informed legal advice to a corporate client, inside counsel must be able to communicate freely with all individuals working within or on behalf of the company to ensure that the company's legal interests are protected – including independent consultants. As the United States Supreme Court recognized in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), "privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client." *Id.* at 389. These policy considerations are heightened in the case of public relations consultants, who can expose the company to liability through their statements. *See FTC v. GlaxoSmithKline ("GSK")*, 294 F.3d 141, 147 (D.C. Cir. 2002) (privilege extended to public relations contractors because they "needed to provide input to the [corporate client's] legal department and/or receive the legal advice and strategies formulated by counsel" in performing their duties for the company). Thus, plaintiffs' proposed legal standard is contrary to both law and logic.

## II.  MERCK'S INDEPENDENT CONTRACTORS DO FALL WITHIN THE SCOPE OF THE ATTORNEY-CLIENT PRIVILEGE.

Plaintiffs also argue in their brief that even if the "functional equivalent" test does apply, Merck cannot satisfy it because: (1) the consultants at issue here had no direct or day-to-day contact with Merck's attorneys (Pls.' Opp. at 5-6); (2) the consultants did not depend on legal advice from Merck's attorneys in order to carry out their duties (*id.* at 6); and (3) there was no

-5-

pending litigation at the time the communications were made (*id*. at 9). Plaintiffs' arguments are without merit.

*First*, plaintiffs' assertion that the privilege does not extend to Merck's communications with its public relations and advertising consultants because the consultants at issue here had no direct or even day-to-day contact with Merck's attorneys understates the degree to which DDB and Ogilvy interacted with Merck lawyers. For example, plaintiffs assert that Molly Bucholz "never worked with a Merck attorney." (Pls.' Opp. at 6 (emphasis in original).) But the PSC's selective quotation of Ms. Bucholz's deposition testimony for the proposition that she did not interact directly with Merck lawyers fails to include Ms. Bucholz's further explanation in that deposition detailing DDB's regular contact with the attorney on Merck's Medical/Legal Board. (*See* Deposition of Molly Bucholz ("Bucholz Dep.") at 74-75, Mar. 16, 2006 (clarifying that she and other DDB employees had "regular interaction" with the attorney on Merck's Medical/Legal Board).) Plaintiffs also conveniently ignore Ms. Bucholz's subsequent declaration, in which Ms. Bucholz stated that "DDB routinely communicated with Merck's legal department ("Merck legal") via senior Merck employees to develop submissions to [the Department of Health and Human Services Division of Drug Marketing, Advertising and Communications (DDMAC)], and to implement DDMAC's suggested changes to proposed ads." (Declaration of Molly Bucholz ("Bucholz Decl.") ¶ 6, March 22, 2006.) Moreover, Ms. Bucholz further declared that "DDB employees participated in meetings at Merck's offices on a regular basis and communicated with members of Merck's Medical/Legal Board via senior Merck employees regarding Vioxx on a regular basis." (Bucholz Decl. ¶ 9.) Thus, it is simply not true, as plaintiffs assert, that these consultants were not "working day to day with the principals at Merck seeking legal advice." (Pls.' Opp. at 5.) To the contrary, as Merck has explained in its prior filings, it was essential that

-6-

DDB and Ogilvy be in regular contact with Merck employees and lawyers because drug manufacturers must ensure that their public statements comply with the myriad FDA regulations for prescription drugs.

Plaintiffs are wrong about the law as well. There is no basis whatsoever for plaintiffs' suggestion that privilege only extends to independent consultants who are in "day-to-day" contact with the company's attorneys. (Pls.' Opp. at 5-6.) As the case law makes clear, the application of privilege to outside consultants turns on whether the consultant was "essentially, incorporated into [the corporation's] staff to perform a corporate function," *Copper Mkt.*, 200 F.R.D. at 210, not on the consultant's day-to-day interactions with attorneys. Indeed, it would make little sense to condition the application of privilege to consultants on direct and daily contact with attorneys. In the corporate context, most employees do not have the need to interact directly with counsel on a day-to-day basis. Rather, many employees receive advice from in-house counsel through their supervisors or other employees. And that advice is subject to privilege regardless of how it is relayed. The same rationale applies to consultants who act as the "functional equivalents" of employees and whose actions could subject the Company to legal liability. *See Twentieth Century Fox*, 2002 WL 31556383, at *1; *Bieter*, 16 F.3d at 937 ("when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors").

***Second***, contrary to plaintiffs' argument, privilege clearly applies in this case because DDB and Ogilvy "needed to provide input to the [corporate client's] legal department and/or receive the legal advice and strategies formulated by counsel." *GSK*, 294 F.3d at 147.

According to plaintiffs, the communications at issue were not privileged because the consultants were not dependent on advice from Merck's attorneys in order to carry out their duties and obligations. (Pls.' Opp. at 6 ("Merck's contention that the agencies were dependent on Merck's legal department to properly do their job is not supported by the evidence.").) Once again, however, the record belies plaintiffs' arguments. Like Merck employees, Merck's consultants were dependent upon Merck to define the scope of their employment and direct their actions, and worked under Merck's close supervision. For example, "DDB was not permitted to act with respect to any advertising plan without Merck's prior approval, and was always understood to be operating at Merck's direction and instruction." (Bucholz Decl. ¶ 5.) Similarly, "[i]t was understood that Merck retained the right to, at any time and in its sole discretion, terminate its relationship with Ogilvy and direct Ogilvy to cease work on any communications, materials, projects, or initiatives." (Declaration of Sherry Pudloski ("Pudloski Decl.") ¶ 6, Mar. 22, 2006.) Moreover, the mere fact that Ogilvy was expected to "have a working knowledge of any applicable product labeling, laws and regulations (Pls.' Opp. at 6 (quoting Ogilvy contract ¶ 14a)), does not mean, as plaintiffs assert, that "Ogilvy was always understood to be competent on its own to comply with legal requirements." (Pls.' Opp. at 6.) Plainly, Merck – and Merck alone – was required to ensure that all of its promotional materials complied at all times with relevant federal regulations. As Ms. Bucholz explained, "DDB employees needed the approval of the Merck team assigned to deal with Vioxx-related advertising issues that were completely intertwined with the highly technical regulatory and legal issues that accompany the marketing and advertising of prescription drugs." (*See* Bucholz Decl. ¶ 11.)

Plaintiffs' *third* argument – that Merck's communications with its public relations and

-8-

advertising consultants are not privileged because of the lack of pending litigation at the time the communications were made (Pls.' Opp. at 9) – is also erroneous. It is a general principle of privilege law, recognized in the Special Master's privilege treatise, that "privilege applies regardless of whether litigation is pending." *See* Paul R. Rice, *Attorney Client Privilege In The United States* § 2:2, at 11 (2d ed. West 1999). That principle applies all the more so in the case of pharmaceutical products. As Merck has repeatedly explained, attorney review of materials created by public relations and marketing personnel is essential in the pharmaceutical context because of the FDA's pervasive regulation of that industry.

In any event, plaintiffs are simply incorrect that there was no "actual litigation pending or anticipated" at the time the DDB and Ogilvy documents were created. (Pls.' Opp. at 9.) As set forth in Merck's opening brief, the vast majority of the documents at issue involve communications that took place *after* 2001, when the current litigation regarding Vioxx began. Accordingly, it was all the more essential for the Company's attorneys to be in close communication with the individuals responsible for developing public relations and marketing materials, since any public statements made by the Company would inevitably be scrutinized by plaintiffs' attorneys and potentially be used against the Company in litigation. *See Copper Mkt.*, 200 F.R.D. at 219 (noting that the "legal ramifications and potential adverse use of [public relations] communications were material factors in the development of [those] communications").

For all of these reasons, plaintiffs are simply unable to dispute that privilege should extend to Merck's sharing of legal advice with its public relations and marketing consultants.

## III.   MERCK SHOULD BE ALLOWED TO EXPLAIN THE PRIVILEGE DESIGNATIONS ON A DOCUMENT-BY-DOCUMENT BASIS.

Finally, plaintiffs assert that Merck is not entitled to provide the Special Master with

additional, document-specific information to support its privilege claims because Merck "should not be permitted unlimited challenges" of the Special Master's privilege recommendations. (Pls.' Opp. at 9.) However, plaintiffs' argument ignores the fact that Merck has never been given the opportunity to explain its privilege claims as to the documents listed on its DDB and Ogilvy privilege logs.

Plaintiffs' claim that "Merck has had multiple opportunities to provide supporting evidence to the Special Master consistent with the Fifth Circuit's directive" (Pls.' Opp. at 10) is wrong. While Merck has now been given the opportunity to provide document-specific evidence in response to the Special Master's initial privilege assessments as to representative documents from Merck's *general* privilege log, the same is not true for the documents on the *DDB and Ogilvy* privilege logs. Thus, Merck is not, as plaintiffs suggest, "requesting a 'second bite at the apple.'" (Pls.' Opp. at 10.) Merck never had a "first bite."

As the Special Master made clear in his Report, he did not addresses "individual privilege claims" set forth with regard to the legal communications shared with Merck's independent contactors because of his conclusion that Merck's relationship with these contractors did not satisfy the "functional equivalent" test. For all the reasons stated, that decision was incorrect. As a result, Merck should – consistent with the Fifth Circuit's ruling and the Special Master's practice in assessing the representative sample of Merck's general privilege log – be given the opportunity to explain the basis for its privilege claims.[2]

---

[2]     In addition, plaintiffs' assertion that Merck alone should bear the cost of the Special Master's document-by-document review of the documents on the DDB and Ogilvy privilege logs (Pls.' Opp. at 10) is unfounded. In appointing the Special Master to conduct his review, the Court specifically ordered that "[p]laintiffs and Merck shall share [the cost of the review] equally." (Order Appointing Special Master (April 26, 2007), at 4.) There is simply no reason to deviate from that Order with regard to reviewing the documents listed on Merck's DDB and Ogilvy privilege logs. As the Fifth Circuit's Order makes clear, Merck is justified in seeking to provide document-specific evidence to support its privilege claims. *See In re Vioxx Prods. Liab. Litig.*, Nos. 06-30378 & 06-30379, 2006 WL 1726675, at *3 (5th Cir. May 26, 2006) (noting that "Merck should have the opportunity to support its claim of

-10-

## CONCLUSION

For the reasons set forth above and in Merck's prior briefing on this issue, the Special Master was incorrect in concluding that attorney-client privilege does not extend to Merck's public relations and marketing contractors. Accordingly, Merck should be afforded the opportunity to provide document-by-document explanations for its privilege claims set forth on the DDB and Ogilvy privilege logs.

Dated: September 14, 2007

Respectfully submitted,

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: (504) 581-3200
Fax: (504) 581-3361

Charles W. Cohen
HUGHES HUBBARD & REED, LLP
One Battery Park Plaza
New York, N.Y. 10004-1482

John H. Beisner
Jessica D. Miller
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20009

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

Attorneys for Merck & Co., Inc.

---

privilege when it is necessary to do so"). The Court should not punish Merck for asserting its right to attorney-client protection by requiring Merck alone to bear the cost of a document-by-document review.

-11-

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Reply Brief has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 14th day of September, 2007.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

-12-