# Ex. B

# DEFENDANT MERCK & CO. INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS FIRST-FILED CLAIM AND CROSS-MOTION TO DISMISS PLAINTIFFS' DUPLICATIVE CLAIM

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **RONALD DOOLEY AND**<br>**JULIA DIANNE DOOLEY,** | | |
| | | |
| *Plaintiffs,* | | **CASE NO.** _____ |
| | | |
| **VS.** | | **PLAINTIFFS' COMPLAINT** |
| | | |
| **MERCK & COMPANY, INC.,** | | **JURY TRIAL DEMANDED** |
| | | |
| *Defendant.* | | |

COMES NOW, Plaintiffs RONALD DOOLEY and JULIA DIANNE DOOLEY, who file their Complaint against the Defendant, MERCK & COMPANY, INC., and in support thereof allege as follows:

### I.

### PARTIES

1.  The Plaintiffs, RONALD DOOLEY (hereinafter "Plaintiff" when used in the singular) and JULIA DIANNE DOOLEY bring this action to recover damages for personal injuries suffered as a direct and proximate result of Defendant MERCK & COMPANY, INC.'s wrongful conduct including, but not limited to, the design, manufacturing, distribution, testing, labeling, failure to warn of harmful side effects, warranting, and selling of the prescription drug VIOXX™. Plaintiffs are citizens and residents of the State of Colorado.

2.  Defendant, MERCK & COMPANY, INC. ("Defendant" and/or "Merck"), was and is an American pharmaceutical company incorporated under the laws of the State of New Jersey authorized to do and doing business in the State of Colorado and in the State of Minnesota, with its principal place of business at One Merck Drive, P. O. Box 100,

Whitehouse Station, New Jersey, and has committed a tort within the State of
Colorado and may be served with process of this Court, in accordance with Rule 4
of the Federal Rules of Civil Procedure.

II.

## JURISDICTION AND VENUE

3.    This Honorable Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332,
as the amount in controversy exceeds $75,000 exclusive of interest and costs and
because this action is brought by an individual who is a citizen of a state other than
the Defendant.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because Merck &
Company, Inc. is a corporation maintaining sufficient minimum contacts with this
judicial district to establish personal jurisdiction.

III.

## FACTUAL ALLEGATIONS

5.    At all times relevant hereto, Defendant was engaged in the business of testing,
developing, manufacturing, distributing, licensing, labeling and marketing, either
directly or indirectly through third parties or related entities, the brand-name
prescription drug VIOXX™ (Rofecoxib).  Defendant marketed and distributed
VIOXX™ throughout the world, including the States of Colorado and Minnesota.

6.    Plaintiff RONALD DOOLEY was prescribed, purchased and/or otherwise obtained
VIOXX™ which he ingested as directed by his prescribing physician(s). As a result,
Plaintiff RONALD DOOLEY suffered various coronary, arterial, vascular, pulmonary,
cerebral, gastro-intestinal and/or renal conditions with resulting physical injury.

7.    At all times relevant herein, Plaintiffs were unaware of the serious side effects and

dangerous properties of the drug as set forth herein.

8.    VIOXX™ was designed, formulated, patented, manufactured, marketed, sold, tested, warranted, and ultimately distributed by MERCK & COMPANY, INC.

9.    VIOXX™ is in a class of drugs called non-steroidal anti-inflammatory drugs ("NSAIDs") with selective cyclooxygenase 2 inhibitory properties (COX-2 Inhibitor).

10.   Defendant obtained FDA approval for VIOXX™ in approximately May of 1999 and began its distribution and sale throughout the United States, including the State of Colorado and the State of Minnesota in approximately May of 1999. VIOXX™ is the brand name used by Merck to market and distribute *rofecoxib.*

11.   Plaintiff RONALD DOOLEY was given a prescription and/or samples of VIOXX™ for arthritis pain and neuropathy. Plaintiff RONALD DOOLEY ingested VIOXX™ as directed from approximately August 2000 to April 2004 during which time Plaintiff RONALD DOOLEY suffered a stroke while taking VIOXX™ in February 2002.

12.   Defendant Merck distributed and sold VIOXX™ to consumers similar to Plaintiff. VIOXX™ was approved for marketing based on information in the New Drug Application, which was on a fast-track, six-month approval process through the FDA. Despite knowledge in its clinical trials and post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Defendant promoted and marketed VIOXX™ as safe and effective for persons such as the Plaintiff.

13.   From approximately 1993 to the present and/or significant portions thereof, Defendant Merck conducted studies in humans prior to and material to Merck's initial marketing and continued marketing of VIOXX™. Such studies, including without limitation protocols 058 and 121, were integral to the launching of VIOXX™ and form

the basis for representations by Merck and/or its agents to the relevant medical and consumer community regarding VIOXX™.

14. Defendant Merck concealed the serious cardiovascular risks associated with VIOXX™ because a successful launch of VIOXX™ was viewed as critical for Merck and safety concerns over hypertension, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market as compared to its competition drug, Celebrex (celecoxib), placed into the market by Merck's competitors, Pharmacia and Pfizer, some three (3) months prior to the launch of VIOXX™.

15. Merck knowingly chose to place these adverse health risks on its consumers despite its knowledge at product launch and in post-marketing data thereafter that use of VIOXX™ carried significant risk factors. These adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among VIOXX™ users including strokes and heart attacks.

16. In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that VIOXX™ use resulted in a statistically significant increase in hypertension, and myocardial infarction. Merck did nothing to further accurately publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials*, August 2000, p. 3.

17. Merck continued to deny the ill health effects associated with VIOXX™ while at the same time reaping the profits obtained through the non-disclosure. Merck engaged in a massive advertising and sampling program and gained continued increases in market share, which enhanced Merck's financial stability to the detriment of its consumers. The resultant effect to Merck in concealing and failing to reveal and warn of the risks was a more than $2 billion profit in 2000 alone to Merck and an approximately 23 percent share of the market.

18. The profits to Merck were realized as it continued to withhold relevant data from the Plaintiff and the health care industry generally. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with VIOXX™ consumption over naproxen consumption.

19. On or about August 29, 2001, the Journal of the American Medical Association published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al., showing what Merck had concealed -- that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among VIOXX™ users in Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. See Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors, J.A.M.A. 286:8,

954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for VIOXX™ users compared to placebo revealed a statistically significant increase among VIOXX™ users. *Id.*

20.   In the JAMA study the authors set forth the theory that "by decreasing PGI2 production [VIOXX] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events." Id. at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?, J.A.C.C., 39:3, Feb. 6, 2002.

21.   In responsive Merck-authored studies, Merck set forth the theory that naproxen had a cardioprotective effect and therefore accounted for the cardiovascular risks among VIOXX™ users. However, this theory was debunked in approximately January of 2002, by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in The Lancet concluding that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et al., Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease: an observational cohort study, The Lancet, 359:118-123, Jan. 12, 2002.

22.   In approximately September of 2001, Merck received a rare third Warning Letter from the FDA stating in part that Defendant's "promotional activities and

materials…are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." The FDA stated that Defendant's campaign minimized "potentially serious cardiovascular findings" from a VIOXX™ study and misrepresented VIOXX's "safety profile." The FDA concluded that Defendant's claim that "VIOXX™ has a 'favorable safety profile' is **simply incomprehensible** given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen." (emphasis added).

23.   On September 30, 2004, Defendant Merck removed VIOXX from the market citing data from its APPROVe study which showed an elevated risk for cardiovascular events.

24.   At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of VIOXX™'s efficacy, a very aggressive marketing program which involved financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive advertising and sampling program.

25.   As a result of such marketing, VIOXX™ gained a significant market share in competition with Celebrex that Merck would not have gained if Merck had not suppressed information about VIOXX™ and/or made false representations of VIOXX's superiority and efficacy.

26.   If Defendant had not engaged in this conduct, consumers, including the Plaintiff, would have switched from VIOXX™ to safer products or refrained wholly from its use.

27.   Plaintiff alleges that the suppression of this information constituted a common scheme by Defendant to conceal material information from the Plaintiff. Plaintiff alleges that the marketing strategies, including without limitation the detail and

sampling programs and direct-to-consumer advertising, of the Defendant targeted the Plaintiff to induce Plaintiff to purchase and/or otherwise obtain VIOXX™ for personal use. At the time the Defendant distributed, manufactured and marketed VIOXX™, Defendant intended that the Plaintiff would rely on the marketing, advertisements and product information propounded by Defendant.

## IV.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### (Negligence)

28.  Plaintiffs reallege the above paragraphs as if fully set forth herein.

29.  Merck was negligent in one or more of the following ways:

  a.  Failing to utilize and/or implement a reasonably safe design or formulation in the manufacture VIOXX™;

  b.  Failing to timely and adequately test VIOXX™  so as to ascertain whether they were safe and proper for the purposes for which it was designed, manufactured, marketed and/or sold;

  c.  Failing to timely and adequately warn health care providers and consumers, including the Plaintiffs, of the risks of complications and/or diseases associated with VIOXX™  when used in a foreseeable manner;

  d.  Failing to timely and adequately label VIOXX™ so as to warn health care providers and consumers, including the Plaintiffs, of the dangers of complications and/or diseases associated with VIOXX™  when used in a foreseeable manner;

  e.  Misrepresenting to the public that VIOXX™  was safe and without defect,

which statement and representation was false and involved a material fact concerning the character or quality of VIOXX™, upon which the Plaintiffs constructively relied as intended by;

f.   Manufacturing, marketing and selling VIOXX™, which constituted a serious hazard to health when used in a foreseeable manner; and

g.   Failing to timely recall VIOXX™ from the market.

30.   Merck knew, or in the exercise of reasonable care should have known, that one or more of the foregoing acts or omissions would create a foreseeable risk of harm to users of VIOXX™, including the Plaintiff.

31.   The described negligence of the Defendant in one or more of the foregoing ways was a substantial factor in causing the Plaintiff to suffer various coronary, arterial, vascular, pulmonary events with resulting physical injury. As a result of his injuries, Plaintiff suffered discomfort, pain and inconvenience, loss of enjoyment of life, diminished life expectancy, interference with his usual and regular activities, and anxiety, all to his non-economic damages in an amount to be determined by the jury at trial in accordance with the law.

32.   Because of the described injuries, Plaintiff has required medical transportation, hospitals, physicians, surgeons, nurses, technicians, therapists and medications and will continue to require similar medical care and services in the future, all to his economic damage, in amounts to be determined by a jury at trial in accordance with the law, together with prejudgment interest from the date of the economic damage incurred until entry of judgment herein. Plaintiff has also suffered lost income and past impaired earning capacity and will suffer an impairment of his future earning capacity, all to his economic damage, in amounts to be determined by a jury at trial

in accordance with the law, together with prejudgment interest from date the economic damage incurred until entry of judgment herein.

## SECOND CLAIM FOR RELIEF

### (Strict Product Liability – Defective Product)

33. Plaintiffs reallege the above paragraphs as if fully set forth herein.

34. Defendant is liable under the theory of Strict Product Liability as set forth in the RESTATEMENT (SECOND) OF TORTS § 402A. Defendant is, at all time relevant to this action, engaged in the business of manufacturing, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, warning about and otherwise distributing VIOXX™ in interstate commerce, a product Defendant sold and distributed throughout the United States.

35. VIOXX™ was expected to and did reach, and was ingested by, the Plaintiff without substantial change in its condition as manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, warned about and/or otherwise distributed.

36. Plaintiff used VIOXX™ in the manner for which the drug was intended to be used or in a reasonably foreseeable manner.

37. Defendant's VIOXX™ caused increased risks of personal injury and harm upon consumption, and therefore, constitutes a product unreasonably dangerous for normal use due to its defective design and manufacture, and due to the Defendant's misrepresentations and inadequate disclosure of facts to the Plaintiff.

38. The VIOXX™ manufactured and/or supplied by the Defendant was defective due to:

    a. Defective design or formulation in that when the drug left the hands of the manufacturer and/or supplier, the foreseeable risks exceeded the benefits associated with the drug's design or formulation;

    b. Defective marketing in that the Defendant made inappropriate, misleading,

inaccurate and incomplete representations about the product in
advertisements, news, commercials, and direct-to-consumer advertisements.
These deceptive marketing representations were made to the FDA,
healthcare providers, pharmacists and the public.    These deceptive
marketing representations were made in order to induce sales and increase
profits;

c.    Defective design or formulation, in that when the drug left the hands of the
manufacturer and/or supplier, it was unreasonably dangerous, more
dangerous than an ordinary consumer would expect and more dangerous
than other COX-2 medications;

d.    Inadequate warnings or instructions because Defendant knew or should have
known that the product created a risk of dangerous side effects and other
related conditions and diseases but failed to warn of these effects;

e.    Inadequate pre-marketing testing that, if conducted properly, would have
revealed the serious problems with this drugs prior to the first sale;

f.    Inadequate post-marketing surveillance to determine the safety of hormone
therapy that, if conducted properly, would have revealed serious problems
with the drug; and

g.    Inadequate post-marketing warning or instruction because, after Defendant
knew or should have known of the risk of dangerous side effects and other
related conditions and diseases, it failed to provide adequate warnings to
users or consumers of the product and continued to promote the product.

39.    The Defendant, therefore, is strictly liable to the Plaintiff.

40.    As a direct and proximate result of Defendant's manufacturing, creating, designing,

testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning and otherwise distributing VIOXX™ in interstate commerce, Plaintiff has suffered physical injury and is at an increased risk of developing future injuries and has suffered compensatory damages in an amount to be proved at trial.

41.   The Defendant's actions, as described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of the Plaintiff and the public. At a minimum, Defendant's acts and omissions, when viewed objectively from the standpoint of the Defendant at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendant had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including the Plaintiff. As such, the Plaintiff is entitled to punitive damages against the Defendant.

## THIRD CLAIM FOR RELIEF

### (Strict Product Liability – Defective Marketing & Inadequate Warnings)

42.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

43.   Defendant is a manufacturer and/or supplier of VIOXX™ using retail and/or sample distribution. The VIOXX™ manufactured and/or supplied by Defendant was not accompanied by proper warnings regarding dangerous and potentially lethal side effects of the drugs. Any warnings accompanying these products did not accurately and adequately warn of the symptoms, scope or severity of such potential injuries and health risks.

44.   Defendant failed to effectively warn consumers, pharmacists, physicians and healthcare providers that even under close medical monitoring, the potential for

serious health complications existed. There was and is no way to know which
patients would suffer such complications.

45.    Defendant failed to perform adequate testing that would have shown that VIOXX™
posed significant risks of serious health events, with respect to which full and proper
warnings accurately and fully reflecting symptoms, scope and severity should have
been made.

46.    Defendant knew, or should have known, that VIOXX™ was a dangerously defective
product which posed unacceptable risks unknown and unknowable to the
consuming public. VIOXX™ was defective due to inadequate warnings because
after Defendant knew or should have known of the risks of dangerous side effects
and potentially fatal health risks, they failed to provide adequate warnings to
consumers of the products and continued to aggressively promote and market the
dangerously defective drugs.

47.    As a direct and proximate result of Defendant's conduct, the Plaintiff has suffered
injury and is at an increased risk of developing further injuries and has suffered
compensatory damages in an amount to be proven at trial.

48.    Defendant's actions, described above, were performed wilifully, intentionally, with
malice and/or with reckless disregard for the rights of the Plaintiff and the public. At
a minimum, Defendant's acts and omissions, when viewed objectively from the
standpoint of the Defendant at the time of their occurrence, involved an extreme
degree of risk, considering the probability and magnitude of the potential harm to
others. Defendant had actual and subjective awareness of the risk involved but
nevertheless proceeded with conscious indifference to the rights, safety including

the Plaintiff. As such, the Plaintiff is entitled to punitive damages or welfare of
others, against the Defendant.

## FOURTH CLAIM FOR RELIEF

### (Breach of Implied Warranty)

49.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

50.    A warranty that a product is reasonably fit for its intended purpose is imposed by law
       on the seller of the product, including the Defendant in the sale of VIOXX™.

51.    Defendant breached its implied warranties, because VIOXX™ was not reasonably fit
       for its intended purpose for the reason alleged above in this complaint.

52.    Plaintiff reasonably relied on the belief that VIOXX™ was reasonably safe for his
       intended purposes in making the decision to take the drug.

53.    The defective and unreasonably dangerous condition of Defendant's prescription
       drug VIOXX™ in one or more of the foregoing ways was a substantial factor in
       causing Plaintiff to suffer various coronary, arterial, pulmonary, issues with resulting
       physical injury. As a result of his injuries, Plaintiff suffered discomfort, pain and
       inconvenience, loss of enjoyment of life, diminished life expectancy, interference
       with his usual and regular activities, and anxiety, all to his non-economic damages in
       an amount to be determined by the jury at trial in accordance with the law.

54.    Because of the described injuries, Plaintiff has required medical transportation,
       hospitals, physicians, surgeons, nurses, technicians, therapists and medications and
       will continue to require similar medical care and services in the future, all to his
       economic damage, in amounts to be determined by a jury at trial in accordance with
       the law, together with prejudgment interest from the date of the economic damage
       incurred until entry of judgment herein. Plaintiff has also suffered lost income and

past impaired earning capacity as well as impairment to his future earning capacity, all to his economic damage, in amounts to be determined by a jury at trial in accordance with the law, together with prejudgment interest from date the economic damage incurred until entry of judgment herein.

### FIFTH CLAIM FOR RELIEF

### (Breach of Express Warranty)

55.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

56.   Defendant created express warranties that VIOXX™ was reasonably safe for its intended purpose through the representations, described earlier in this complaint, made to health care professionals and to the public, including the Plaintiff.

57.   Defendant breached these express warranties, because VIOXX™ was not reasonably safe for its intended purpose.

58.   Plaintiff reasonably relied on Defendant's express warranty in making the decision to take the drug.

59.   The defective and unreasonably dangerous condition of Defendant's prescription drug VIOXX™ in one or more of the foregoing ways was a substantial factor in causing Plaintiff to suffer various coronary, arterial, vascular, pulmonary, cerebral, gastro-intestinal and/or renal conditions with resulting physical injury. As a result of his injuries, Plaintiff has suffered and will continue to suffer discomfort, pain and inconvenience, loss of enjoyment of life, diminished life expectancy, interference with his usual and regular activities, and anxiety, all to his non-economic damage in an amount to be determined by the jury at trial in accordance with the law.

60.   Because of the described injuries, Plaintiff has required medical transportation, hospitals, physicians, surgeons, nurses, technicians, therapists and medications and

will continue to require similar medical care and services in the future, all to his economic damage, in amounts to be determined by a jury at trial in accordance with the law, together with prejudgment interest from the date of the economic damage incurred until entry of judgment herein. Plaintiff has also suffered lost income and past impaired earning capacity as well as impairment to his future earning capacity, all to his economic damage, in amounts to be determined by a jury at trial in accordance with the law, together with prejudgment interest from date the economic damage incurred until entry of judgment herein.

## SIXTH CLAIM FOR RELIEF

### (Negligent Misrepresentation)

61.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

62.    At the time Defendant manufactured, designed, marketed, sold and distributed VIOXX™ for use by the Plaintiff, Defendant knew or should have known of the use for which VIOXX™ was intended and the serious risks and dangers associated with such use of this product.

63.    Defendant owed a duty to prescribing physician and ultimate end users of his products, including the Plaintiff, to accurately and truthfully represent the risks and benefits of VIOXX™. Defendant breached that duty by misrepresenting and/or failing to adequately warn of the risks of, and lack or exaggerated benefits of, VIOXX™ – effects which Defendant knew or in the exercise of diligence should have known – to the prescribing physicians and ultimate users, including Plaintiff.

64.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered injury and is at an increased risk of developing and/or suffering future injuries, and has suffered compensatory damages in an amount to be proven at trial. Defendant is

liable to the Plaintiff for al general, special and equitable relief to which Plaintiff is
entitled by law.

## SEVENTH CLAIM FOR RELIEF

### (Intentional Misrepresentation, Fraud & Deceit)

65.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

66.   Defendant, having undertaken to prepare, design, research, develop, manufacture,
       inspect, label, market, promote, sell and/or otherwise distribute VIOXX™, owed a
       duty to provide accurate and complete information regarding VIOXX™.

67.   Defendant's advertising program, by containing affirmative misrepresentations and
       omissions, falsely and deceptively sought to create the image and impression that
       VIOXX™ was safe for human use, had no unacceptable side effects and would not
       interfere with daily life.

68.   Defendant's product label, by containing affirmative misrepresentations and
       omissions, falsely and deceptively sought to create the image and impression that
       VIOXX™ was safe for human use, had no unacceptable side effects and would not
       interfere with daily life.

69.   Defendant intentionally encouraged prescribing physicians and consumers,
       including the Plaintiffs to remain on VIOXX™ for a longer duration than Defendant
       knew or should have known was safe and effective and at higher dosage levels than
       necessary.

70.   Defendant purposefully concealed, failed to disclose, misstated, downplayed and
       understated the health hazards and risks associated with the use of VIOXX™.
       Defendant, through promotional practices, the publication of medical literature, and

the dissemination of the product label, deceived potential users of VIOXX™ and the physicians who prescribed VIOXX™ by relaying only allegedly positive information, while concealing, misstating and downplaying the known adverse and serious health effects. Defendant falsely and deceptively kept relevant information from potential VIOXX™ users and minimized the concerns of prescribing physicians regarding the safety and efficacy of VIOXX™.

71.   Defendant expressly denied that VIOXX™ created an increased risk of coronary, arterial, vascular, pulmonary, cerebral, gastro-intestinal and/or renal conditions with resulting physical injury and took affirmative steps to prevent the discovery and dissemination of any evidence on the increased likelihood of injury from taking VIOXX™.

72.   Defendant did not properly study or accurately report the results of its human, animal and cell studies in terms of risks and benefits of VIOXX™. Defendant also fraudulently and intentionally polluted the scientific literature related to COX-2 Inhibitor drugs in general, VIOXX™ in particular. Defendant hired physicians and scientists to write inaccurate and misleading scientific articles for the purpose of contaminating scientific and medical knowledge pertaining to COX-2 Inhibitor drugs and VIOXX™ in particular. Defendant then used and relied on these inaccurate and fraudulently prepared scientific papers to defend and justify the marketing, promotion and labeling of VIOXX™. At all relevant times, Defendant knew these publications were inaccurate and would mislead those in the medical and scientific communities who were studying or prescribing COX-2 Inhibitor drugs and VIOXX™

in particular. As a result, Defendant effectively deceived and misled the scientific and medical communities regarding the risks and benefits of VIOXX™.

73.  The misconceptions as to the true risks and benefits of VIOXX™ were pervasive throughout the medical and scientific communities due to Defendant's marketing methods. These methods included, but were not limited, to the following:

   a.  Publishing papers in the scientific and medical literature that contained statements Defendant knew to be false;

   b.  Knowingly providing false and misleading information to doctors during sales and detailing calls at the doctors' offices or at medical or scientific conferences and meetings;

   c.  Funding third-party organizations to disseminate false and misleading scientific and medical information through their publications and members to physicians and patients;

   d.  Funding continuing medical education to disseminate false and misleading information to doctors;

   e.  Paying specialists in the cardiovascular and/or gastrointestinal fields to meet with prescribing doctors for the purpose of disseminating false and misleading information about the risks and benefits of COX-2 Inhibitor drugs and VIOXX™ in particular; and

   f.  Disseminating direct-to-consumer advertising that was false and misleading and/or concealed the true risks and benefits of COX-2 Inhibitor drugs and VIOXX™ in particular.

74. Through the materials they disseminated, Defendant falsely and deceptively misrepresented or omitted a number of material facts regarding VIOXX™, including, but not limited to, the following:

    a. The lack of and inadequacy of the testing of COX-2 Inhibitor drugs and VIOXX™ in particular both pre-and post-marketing;

    b. The severity and frequency of adverse health effects caused by COX-2 Inhibitor drugs and VIOXX™ in particular;

    c. The range of injuries caused by COX-2 Inhibitor drugs and VIOXX™ in particular; and

    d. The lack of any reliable science to support representations regarding the benefits of COX-2 Inhibitor drugs and VIOXX™ in particular.

75. These efforts resulted in a risk/benefit profile for COX-2 Inhibitor drugs and VIOXX™ in particular that was accepted by the medical and scientific communities even though it was later proven false by other independent studies and in the peer-reviewed medical literature.

76. Defendant possessed evidence demonstrating COX-2 Inhibitor drugs and VIOXX™ in particular cause serious adverse side effects. Nevertheless, Defendant continued to market and represent such products by providing false and misleading information with regard to their safety and efficacy to the Plaintiff and Plaintiff's prescribing physician(s).

77. Defendant engaged in all the acts and omissions described above with the intent that Plaintiff's physician(s) and the Plaintiff himself would rely on the misrepresentation, deception and concealment in deciding to prescribe and/or ingest

Defendant's products. Plaintiff's physician(s) and the Plaintiff himself relied on the

misrepresentation, deception and concealment, to Plaintiff's detriment.

## EIGHTH CLAIM FOR RELIEF

### (Violations of State Consumer Protection Act)

78. Plaintiff realleges the above paragraphs as if fully set forth herein.

79. Defendant's actions as described above constitute violations of Colorado's State
Consumer Protection Act, COLO. REV. STATE. § 6-1-101 *et seq.* and MINN. STAT. §
325D.44 (5), (7), (13).

80. Plaintiffs have the right of civil action for Defendant's breach of the State Consumer
Protection Act described above for actual damages, attorney fees and punitive
damages.

81. Defendant's actions as described above caused actual damage to Plaintiff when he
suffered various coronary, arterial, vascular, pulmonary, cerebral, gastro-intestinal
and renal conditions with resulting physical injury. As a result of his injuries, Plaintiff
suffered discomfort, pain and inconvenience, loss of enjoyment of life, diminished
life expectancy, interference with his usual regular activities, and anxiety, all to his
actual non-economic damage in an amount to be determined by jury at trial in
accordance with the law.

82. As a result of Defendant's violation of the Unfair Trade Practices Act as described
above, and because of the described injuries, Plaintiff has required medical
transportation, hospitals, physicians, surgeons, nurses, technicians, therapists and
medications and will continue to require similar medical care and services in the
future, all to his economic damage, in amounts to be determined by a jury at trial in
accordance with the law, together with prejudgment interest from the date of the

economic damage incurred until entry of judgment herein. Plaintiff has also suffered lost income and past impaired earning capacity all to his economic damage, in amounts to be determined by a jury at trial in accordance with the law, together with prejudgment interest from date the economic damage incurred until entry of judgment herein.

83.   The Court should award the Plaintiffs reasonable attorney fees.

## NINTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

84.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

85.   The acts, omissions and representations of Defendant regarding the manufacturing, distribution and marketing of VIOXX™ as described in this pleading was intentional and/or reckless. The conduct was also extreme and outrageous. As a proximate result of such conduct, Plaintiff suffered severe emotional distress.

86.   Defendant's actions, as described above, were performed willfully, intentionally, with malice and/or with reckless disregard of the rights of Plaintiffs and the pubic. At a minimum, Defendant's acts and omissions were (a) specifically intended to cause substantial injury to Plaintiff and/or (b) when viewed objectively from the standpoint of the Defendant at the time of their occurrence, involved an extreme degree of risk, considering the probably and magnitude of the potential harm to others. Defendant had actual knowledge and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including the Plaintiff. As such, the Plaintiff is entitled to punitive damages against the Defendant.

## TENTH CLAIM FOR RELIEF

### (Negligent Infliction of Emotional Distress)

87.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

88.   Defendant was negligent as described herein and proximately caused severe emotional distress to the Plaintiffs.

89.   Defendant's negligence was conducted with malice, as explained herein, and as such the Plaintiffs are entitled to punitive damages against the Defendant.

## ELEVENTH CLAIM FOR RELIEF

### (Gross Negligence & Malice)

90.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

91.   The Defendant's wrongs were aggravated by the kind of malice, fraud and reckless disregard for the rights of others, the public and the Plaintiff, for which the law allows the imposition of exemplary (punitive) damages, in that Defendant's conduct:

   a.   was specifically intended to cause substantial injury to the Plaintiff; or

   b.   when viewed objectively from the Defendant's standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendant was actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or

   c.   included a material misrepresentation that was false, with the Defendant knowing it was false or with reckless disregard as to its truth and a positive assertion, with the intent that the representation be acted on by the Plaintiff. Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

92.    Plaintiff therefore seeks exemplary (punitive) damages in an amount within the
       jurisdictional limits of the court.  Plaintiff also alleges that the acts and omissions of
       the Defendant, whether taken singularly or in combination with others, constitute
       gross negligence which proximately caused the injuries to the Plaintiff.  In that
       regard, Plaintiff seeks exemplary damages in an amount that would punish
       Defendant for its conduct and which would deter Defendant and other
       manufacturers from engaging in such misconduct in the future.

## V.

## DAMAGES

93.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

### General Damages

94.    As a result of Plaintiff's heart attack, Plaintiff required in the past, and will likely
       require in the future, medical transportation and continued monitoring and treatment
       from hospitals, physicians, surgeons, nurses, technicians, therapists and
       medications all to his economic damages.

95.    As a result of his injuries, Plaintiff suffered in the past, and will likely suffer in the
       future, discomfort, pain and inconvenience, loss of enjoyment of life, diminished life
       expectancy, diminished life expectancy, interference with his usual and regular
       activities, and anxiety, all to his non-economic damages.

96.    Plaintiff has also suffered lost income and past impaired earning capacity all to his
       economic damage, together with prejudgment interest from date the economic
       damages incurred until entry of judgment herein.

## Loss or Consortium Damages

97.   Plaintiff JULIA DIANNE DOOLEY was at all times relevant hereto the spouse of
      Plaintiff RONALD DOOLEY.

98.   For the reasons set forth herein, Plaintiff JULIA DIANNE DOOLEY has necessarily
      paid and have become liable to pay for medical aid, treatment and for medications,
      and will necessarily incur further expenses of a similar nature in the future as a
      proximate result of Defendant's misconduct.

99.   For the reasons set forth herein, Plaintiff JULIA DIANNE DOOLEY has suffered and
      will continue to suffer the loss of her loved one's support, companionship, services,
      society, love and affection.

100.  For the reasons set forth herein, Plaintiff JULIA DIANNE DOOLEY's marital
      relationship has been impaired and depreciated, and the marital association
      between husband and wife altered.

101.  For the reasons set forth herein, Plaintiff JULIA DIANNE DOOLEY has suffered
      great emotional pain and mental anguish.

## Punitive Damages

102.  Defendant knew or should have known of the defective nature of VIOXX™
      associated dangers of its use but continued to design, manufacture, sell, distribute,
      market, promote and/or supply VIOXX™ so as to maximize sales and profits at the
      expense of the public health and safety, in conscious disregard of the foreseeable
      harm caused by VIOXX™.

103.  Defendant before and/or after making VIOXX™ available for the public use,
      knowingly withheld from or misrepresented to the FDA or prescribing physician

information about the risks of using VIOXX™ that were known to be material and relevant to the described injuries suffered by the Plaintiffs.

104.  Defendant, in one or more of the acts or omissions previously alleged, acted with malice or with reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others, including the Plaintiff.

105.  As a result of Defendant's conduct and the injuries suffered by the Plaintiffs as described above, Defendant should be subject to the imposition of a punitive damages award in an amount determined by the jury, and reviewed by the court, that will adequately punish Defendant for its harmful conduct and will deter Defendant from engaging in such harmful conduct in the future.

**VI.**

**APPLICATION OF THE DISCOVERY RULE**

106.  Plaintiffs did not discover and should not have discovered, through the exercise of reasonable care and due diligence, the causal connection between the Plaintiff's injuries and the VIOXX™. Accordingly, the applicable discovery rule has tolled the commencement of the statute of limitations until Merck removed VIOXX™ from the marketplace, at the earliest. Plaintiffs' lawsuit is timely filed.

**VII.**

**FRAUDULENT CONCEALMENT**

107.  Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Defendant when it had a duty to disclose those facts. Defendant has kept Plaintiffs ignorant of information essential to pursuit of their claims, without any fault or lack of diligence on Plaintiffs' part, for

the purpose of obtaining delay on Plaintiffs' part in filing a complaint of their causes of action. Defendant's fraudulent concealment resulted in the intended delay. Plaintiffs could not reasonably have discovered their claims until shortly before filing this Complaint.

## VIII.

## FDA MISLED OR UNAWARE

108.   Plaintiffs reallege the above paragraphs as if fully set forth herein.

109.   Defendant, before and/or after pre-market approval and/or licensing of the products at issue withheld from and/or misrepresented to the United States Food and Drug Administration (FDA) required information that was material and relevant to the performance of the products. Plaintiffs do not make a claim for such fraud on the FDA but do allege that these misrepresentations and/or concealment are a contributing, producing and / or proximate cause of the Plaintiffs' injuries.

110.   The conduct outlined in the above paragraphs negate any defense based on FDA approval, including approval of products, labels or warnings, and overcome any presumption that might be argued was created by FDA approval.

## IX.

## DEMAND FOR JURY TRIAL

111.   Plaintiffs demand trial by jury of all issues set forth herein.

WHEREFORE, Plaintiffs pray for judgment against MERCK & COMPANY. INC., as follows:

a.   For non-economic damages as proven at trial;

b.   For economic damages as proven at trial, including prejudgment interest from the date incurred until the entry of judgment herein;

    c.      Reasonable attorney fees;

    d.      Punitive damages as proven appropriate at trial and upon judicial review;

    e.      For their costs and disbursements incurred herein; and

    f.      For other relief as the court deems just and equitable

**DATED: September 29, 2006.**      Respectfully submitted,

**HISSEY, KIENTZ & HERRON, P.L.L.C.**

/s/ Erik B. Walker

BY:_____

Erik B. Walker (345192)
16800 Imperial Valley Drive, Suite 130
Houston, Texas 77060
(713) 224-7670 (telephone)
(713) 224-7671 (facsimile)
Attorney for Plaintiffs