UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: VIOXX | : |
| | : MDL Docket NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : |
| | : SECTION L |
| | : |
| This document relates to All Actions | : JUDGE FALLON |
| | : MAG. JUDGE KNOWLES |
| | : |

**PLAINTIFF'S STEERING COMMITTEE'S RESPONSE TO MERCK & CO., INC'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THE APPLICATION OF PRIVILEGE TO THIRD-PARTY CONSULTANTS DDB AND OGILVY**

I.   **INTRODUCTION**

In its Supplemental Memorandum in Support of the Application of Privilege to Third-Party Consultants DDB and Ogilvy, Merck argues for the recognition of a privilege whose standard of proof it is unable to meet. The Special Master has already examined the relevant case law and determined that Merck failed to meet the standard established by those cases extending the attorney-client privilege to third-party consultants that are the "functional equivalent" of employees.[1]

Apart from the analysis by the Special Master, Merck had alternative means of communications available that would have allowed for it to convey legal instructions without

---

[1] *See* Second Special Master's Report and Recommendations - Merck Documents Circulated to Third Parties ("Second R&R") at 7 ("Employees of the marketing and advertising agency, DDB, and the public relations agency, Ogilvy, should *not* be treated as "functional" or "de facto employees" of Merck because Merck has not demonstrated that the relationship between Merck and these entities was significantly different than a relationship it would normally have had with entities retained to provide advertising and public relations services."). (Emphasis is original).

1

waiving the attorney-client privilege. Merck always had available to it the option of using its employees as intermediaries between the third-party consultants and its attorneys to preserve any privilege. Merck failed to take such measures. For Merck to now argue that efficiency and convenience are the basis for extending the attorney-client privilege to DDB and Ogilvy is unfounded.

## II. ARGUMENT

The attorney-client privilege as it applies to corporations is imperfect since at the time the privilege was developed, "corporate entities did not exist." *See* Second R&R at 2. The United States Supreme Court examined the applicability of an attorney client privilege to a corporation in its seminal case of *Upjohn Company v. United States*, 449 U.S. 383 (1981). Although *Upjohn* extended the attorney-client privilege to corporations, it is important to remember that the privilege is to be narrowly construed since it stands in derogation of the search for truth. *See U.S. v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976) (attorney-client privilege should be narrowly construed), *cert. denied*, 426 U.S. 952 (1976); *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000) (same); *see also* Second R&R at 4 ("The most fundamental principle of all privilege law is that privileges should not be created or expanded unless their protection is necessary to achieve a desired social end that otherwise would not be possible without the protection.").

The extension of the attorney-client privilege to third-party consultants that provide ordinary advertising and public relations services does not serve the public ends that justify the existence of the privilege. Such entities are not agents of the client or the attorney for purposes of seeking or giving legal advice. Furthermore, in this case there was no special relationship between Merck and its third-party consultants that would justify the extension of the privilege. Nor is the extension of

the attorney-client privilege to DDB and Ogilvy consistent with the requirement that confidentiality be strictly maintained. Merck could have easily conveyed the same information without divulging privileged communications to the third-party consultants by using knowledgeable Merck employees as intermediaries. Finally, if the privilege is extended in the manner advocated by Merck, the exception will swallow the rule, *i.e.*, since Merck's arguments for the application of the privilege could be applied in any number of inappropriate circumstances.

### A. The Extension of the Privilege to DDB and Ogilvy is Inconsistent with the Established Principle that the Attorney-Client Privilege Should be Narrowly Construed, and the Requirement that Confidentiality be Strictly Maintained

#### i. Merck could have facilitated communications in a manner that did not result in a waiver of the attorney-client privilege

Reduced to its essence, Merck contends that the attorney-client privilege extends to circumstances where it reveals privileged communications to third-party advertising and public relations firms. There is no legitimate purpose for extending the privilege in such circumstances. Although it may be burdensome for Merck employees to be responsible for communications to and from its attorneys, mere convenience and efficiency do not justify extending the privilege to DDB and Ogilvy. Merck could have and should have used its employees as intermediaries between its attorneys and the third-party consultants.[2]

Given Merck's vast experience operating in a regulated industry, numerous Merck employees are undoubtedly qualified to act as intermediaries between Merck attorneys and

---

[2] *See* Second R&R at 4 ("Clearly, both methods of communication with outside consultants by Merck were more efficient, and perhaps even more effective, because they were more direct ... [b]ut neither convenience nor efficiency has ever been a sufficient justification for creating or extending privilege protections.").

3

third–party consultants.[3] Indeed, in many instances Merck employees performed this type of function but inexplicably decided it was appropriate to relate information to the consultants in a manner that waived the attorney-client privilege.[4] These employees could have filtered communications from counsel and presented the same information to the consultants without revealing privileged communications. To the extent the consultants required legal advice from Merck's attorneys, a questionable proposition for the reasons discussed below, and/or Merck attorneys required information from the consultants to give Merck legal advise, there is no reason to suggest Merck employees were incapable of facilitating such communications.

Although Merck argues that important communications would be discouraged if the attorney-client privilege is not extended in this case,[5] the Special Master's review of this very issue refutes this assertion. In his Second Report and Recommendation, the Special Master observed that Merck behaved in a manner inconsistent with the preservation of privileged information:

> Here, it is questionable whether the existence of even the corporate privilege can be justified under this standard, but it seems without

---

[3] *See* Second R&R at 5 ("[because] pervasive regulation has permitted Merck employees to be so pervasively educated in previous communications about regulatory matters there is less need for Merck's in-house attorneys to be directly advising third parties working for Merck ... [o]ther corporate employees should have screened legal advice and related legal concerns to those third parties to the extent that they needed to be informed.").

[4] *See* Second R&R at 3 ("The first form of communications were e-mails between Merck employees and in-house lawyers, to which outside consultants had been added to the headers as either addressees or copyees ... [a] third form of communication was employees of Merck communicating with employees of the third parties and relating legal concerns previously communicated to Merck.").

[5] According to Merck, if the privilege were not recognized in such circumstances, "those individuals [meaning the third-party consultants] will be discouraged from consulting counsel regarding potential legal concerns ... [and] corporate counsel will be hesitant to provide consultants with legal advice for fear that those communications may one day be made public and harm the corporation's interests." *See* Merck's Suppl. Memo at 5.

4

>reasonable question that the substance of these communications with the outside public relations and advertising consultants would have been transmitted, albeit indirectly, regardless of the applicability of the attorney-client privilege. Consequently, it is inappropriate to expand the scope of the privilege to encompass communications with them.

*See* Second R&R at 4 (footnote omitted). Since these same communications could have been accomplished without any waiver of the privilege, there is no societal end that will be accomplished by extending the privilege to DDB and Ogilvy consistent with the understanding that the privilege is to be narrowly construed. *See* Second R&R at 7 (the consultants' "participation in Merck's confidential attorney-client communications was not necessary to either the client's obtaining legal advice or to the lawyers' ability to render legal advice.").[6]

Further refuting Merck's argument that attorney input from Merck attorneys was necessary to the third-party consultants is the fact that both Ogilvy and DDB are sophisticated entities that are capable of obtaining independent legal advice. For instance, on its website Ogilvy boasts of having over sixty offices scattered across the globe and list Berlex, Bristol-Myers Squibb, Dey Laboratories, GlaxoSmithKline, Ethicon, Ortho-Biotech, Medtronic, Merck, Novartis, NPS, Pfizer and Scherling-Plough amongst its clients in the health and medical field. *See* http://www.ogilvypr.com/ (accessed

---

[6] In actuality Merck has exaggerated the extent of direct communication between the consultants and its attorneys. For instance, as was pointed out in the PSC's response to Merck's objections to the Special Master's Report and Recommendation, DDB's Account Director, Molly Buchholz, has testified that she never directly interacted with Merck attorneys while working on the Vioxx account. *See* Buchholz Deposition March 14, 2006 at 73 ("Q: Would you from time to time interact while working on the Vioxx account with Merck attorneys? A: No. I never interacted directly."), Exhibit "A" to the Plaintiff's Steering Committee's Response to Merck & Co., Inc.'s Objection to the Special Master's Second Report and Recommendation ("PSC's Response to the Objection to Second R&R"). A copy of the PSC's Response to the Objection to Second R&R is attached hereto as Exhibit "1"; and is incorporated herein by reference.

on October 10, 2007). Likewise, DDB's website boasts of having worldwide talent with over 14,000 employees working in over 100 countries. *See* http://www.ddb.com/DDBWeb/ (accessed on October 10, 2007). Both Ogilvy and DDB surely have a team of attorneys capable of answering all questions relative to their retention and performance of services for Merck. Given Ogilvy's extensive experience working with clients in the health and medical field,[7] it cannot be seriously be argued that Ogilvy lacked the wherewithal or experience to properly advise Merck.

### ii. DDB and Ogilvy are not the "functional equivalents" of Merck employees

Merck's primary argument for the extension of the privilege to DDB and Ogilvy is that they are the functional equivalents of Merck employees. Notwithstanding this argument, the vast majority of courts addressing privilege in the context of third-party publicity firms have rejected the assertion of privilege.[8] Only under exceptional circumstances have courts been willing to extend

---

[7] DDB's website does not provide a list of clients but presumably it too has extensive experience in the health and medical field.

[8] *See NXIVM Corp. v. O'Hara*, 241 F.R.D. 109 (N.D.N.Y. 2007) (finding waiver of work-product protection where a privileged report was shared with a public relations firm); *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000) (rejecting extension of attorney-client privilege to public relations firm since the public relations firm did not serve as an agent for either the client or the attorney for purposes of seeking or giving legal advice and since the extension of the privilege to a public relations firm was inconsistent with the tenant that the privilege is to be narrowly construed); *Haugh v. Schroder Investment Management North American Inc.*, 2003 WL 21998674 (S.D.N.Y. 2003) (same); *Nance v. Thompson Medical Co.*, 173 F.R.D. 178 (E.D.Tex. 1997) (same); *In re Bristol-Myers Squibb Securities Litig., Inc.*, 2004 U.S.Dist. LEXIS 26985 (D.N.J. 2004) (rejecting assertion of attorney-client privilege as to communications shared with consultants that provided ordinary public relations and marketing advice). *See also Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, Ltd., 232 F.R.D. 103 (S.D.N.Y. 2005) (rejecting assertion of attorney-client privilege as to financial advisor intimately involved in the affairs of the client); *Freeport-McMoran Sulpher, LLC v. Mike Mullen Energy Equipment Resource, Inc.*, 2004 WL 1237450 (E.D.La. 2004) (rejecting assertion of attorney-client privilege as to consultant hired to work on a project); *SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties LLC*, 2002 WL 1334821 (S.D.N.Y. 2002) (refusing to

the attorney-client privilege to publicity firms under the "functional equivalent test." *See In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001); *Federal Trade Commission v. GlaxoSmithKline*, 294 F.3d 141 (D.C.Cir. 2002). Examination of those cases that have extended the privilege under the "functional equivalent test" demonstrates that Merck cannot meet this standard.

In his Second Report and Recommendation, the Special Master examined the relevant case law and determined that DDB and Ogilvy are not the functional equivalents of Merck employees. The Special Master reasoned that, "[e]mployees of the marketing and advertising agency, DDB, and the public relations agency, Ogilvy, should *not* be treated as "functional" or "de facto employees" of Merck because Merck has not demonstrated that the relationship between Merck and these entities was significantly different than a relationship it would normally have had with entities retained to provide advertising and public relations services." *See* Second R&R at 7 (emphasis is original). The Special Master examined each of the leading cases applying the "functional equivalent test", *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), and *Copper Market, supra*, and determined that the facts surrounding Merck's relationships with DDB and Ogilvy did not rise to the level as the consultants in *Bieter* and *Copper Market*.

In *Bieter*, unlike the present case, the third-party consultant retained by a real estate partnership, Dennis S. Klohs ("Klohs"), was effectively the equivalent of a principal of the plaintiff. *See Copper Market*, 200 F.R.D. at 219 (the consultant in *Bieter* "functioned as a principal with respect to the events underlying the litigation ..."). Klohs had a longstanding relationship with

---

extend attorney-client privilege to communications shared with an outside insurance broker that obtained insurance for the World Trade Center).

7

Bieter as a consultant. He shared office space with one of the principals of Bieter, which was the same office space used by a second company operated by Klohs and this same principal of Bieter. Also, Klohs was responsible for nearly all management of Bieter. *See Bieter*, 16 F.3d at 933-934. "In short, the case presents an individual who, while acting as an independent consultant to the client has been involved initially in the attempt to develop a parcel of property (the development of which appears to be the *sine qua non* of the client's existence) and subsequently in the litigation that resulted from the failure to develop said property." *Id.* at 934. Klohs also had extensive interactions with Bieter's attorneys and spoke with counsel regarding matters related to the venture as well as the litigation. *Id.*

Merck cannot seriously argue that its relationships with DDB and/or Ogilvy approaches the relationship between Bieter and Klohs.[9] Indeed, whereas Klohs was the equivalent of a principal of Bieter, neither DDB or Ogilvy "have primary responsibility for key corporate jobs, or possess information possessed by no one else at the company, as in *Bieter*." *See* Second R&R at 7. Additionally, unlike the scenario in *Bieter* where Kloh's interactions with counsel were invaluable to counsel and the client, the "participation [of DDB and Ogilvy] in Merck's confidential attorney-client communications was not necessary to either the client's obtaining legal advice or to the lawyers' ability to render legal advice." *See* Second R&R at 7. Since there was no special relationship between Merck and the third-party consultants, the reasoning of *Bieter* does not support

---

[9] Merck can hardly argue that its relationship with the third-party consultants approaches the standard of *Bieter* since provisions in its contracts with its consultants essentially state that DDB and Ogilvy personnel are not employees of Merck. *See* PSC's Response to the Objection to Second R&R at 3-7.

8

the extension of the privilege to DDB and Ogilvy.[10]

The case Merck will argue is most analogous, *Copper Market*, is distinguishable for several reasons that are enumerated by the Special Master in his Second Report and Recommendation. In *Copper Market* the outside consultant, RLM, a "crisis management" public relations firm, was retained by Sumitomo specifically for litigation purposes because Sumitomo lacked experience interacting with the Western Media and had few, if any, employees that could speak English. *See Copper Market*, 200 F.R.D. at 215. For purposes of coping with the public relations scandal that developed, RLM was responsible for all interactions with the Western media and for drafting, in conjunction with Sumitomo's counsel, public relations documents, press releases, talking points, and Question and Answers to be used as a framework for press inquires. *Id.* at 216. These responsibilities required that RLM have extensive interactions with Sumitomo's litigation counsel about litigation strategy.

More importantly, unlike the present scenario, "RLM had the authority to make decisions on behalf of Sumitomo concerning its public relations strategy." *Id.* Also telling was that while RLM was responsible for all interactions with the Western media, "Sumitomo's internal Corporate Communications Department dealt with the Japanese press." *Id.* at 216. Thus, had Sumitomo had the experience and the ability to do so, one can presume that Sumitomo's Corporate Communication Department would have handled interactions with the Western media. Because it lacked such

---

[10] *See Freeport-McMoran Sulphur*, 2004 WL 1237450, * 5 (refusing to extend attorney-client privilege under "functional-equivalent test" to consultant working on a project where, party asserting privilege failed to establish that consultant was held out as representative of client, that consultant was important link with development of project or that project was the *sine qua non* of client's existence); *see also Export-Import Bank of the United States*, 232 F.R.D. at 113-14 (financial advisor is not the functional-equivalent of an employee for purposes of extending the attorney-client privilege to financial advisor).

9

experience, however, it was necessary for Sumitomo to retain a third-party consultant that operated as its internal communications department. The Special Master recognized these unique circumstances in *Copper Market* to distinguish it from the present case, as follows:

> In this action Merck was facing no comparable fact pattern because it had not yet withdrawn Vioxx from the market and, since Merck claims it was not aware of the dangers in using Vioxx, it could not have been anticipating both civil actions by former users of the drug and an investigation by the Food and Drug Administration. All of the communications I examined *in camera* predate the withdrawal of Vioxx from the market. In addition, here, unlike in *Copper Market*, the outside consultants' duties did not appear to include preparing statements for public release that were closely tied to the legal issues being litigated and therefor had to be vetted with both in-house and outside legal counsel.
>
> * * * * * * * * * *
>
> Unlike Sumitomo, Merck had experience in dealing with issues relating to publicity arising from high profile cases, did not lack experience in dealing with the Western media, and had no language difficulties. Also different was the fact that RLM was given authority to make decision on behalf of Sumitomo concerning public relations strategy. By contrast, the public relations and advertising firms retained by Merck were closely supervised, given considerable direction, and, like all decisions within the Merck enterprise, everything they proposed doing was subject to review and approval.

*See* Second R&R at 5-6. Plainly, the circumstances in this case are not analogous to those in *Copper Market*. Unlike Sumitomo, Merck did not retain DDB or Ogilvy to assist in litigation involving Vioxx. Nor did either of these consultants posses decision-making authority or operate as internal departments of Merck.

Since there were no special relationships between Merck and its third-party consultants, the Special Master recommended that Judge Fallon follow *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000). In *Calvin Klein*, the court found a waiver of the attorney-client

10

privilege as to materials voluntarily provided to a third-party publicity firm. *See* Second R&R at 7. This recommendation is supported by the record and Merck's argument that the attorney-client privilege should be extended to DDB and Ogilvy should be rejected.

### iii. The Extension of the Privilege to DDB and Ogilvy is Inconsistent with the Requirement of Confidentiality

Extending the attorney-client privilege in the manner suggested by Merck would give rise to innumerable scenarios that would completely erode the confidentiality requirement of the privilege. As discussed above, there was no legitimate purpose for sharing privileged communications with DDB or Ogilvy. The mere existence of confidentiality agreements, as Merck suggests, is not enough to meet the requirements of the attorney-client privilege.

In order for the attorney-client privilege to operate effectively within our system of justice, there must be some logical limitations on disclosures to third-party consultants. Merck is advocating for an extension of the privilege that would impose few limits on disclosures to third-party consultants. Such a unprecedented extension of the attorney-client privilege should not be tolerated since it would wipe out the requirement that privileged communications remain limited to that closed coterie of persons necessary to preserve the legal confidences of the client. Expanding the privilege to any consultant willing to have its staff agree to maintain trade-secret information fails to conform to the intimate and private nature of the privilege. Such a distortion of the privilege would work a disservice to the legal profession and likely result in obstructive behavior in discovery, as evidenced by Merck's efforts in this case.

Moreover, as was pointed out by the Special Master in his Second Report and Recommendation, Merck has failed to come forward with any evidence that DDB and Ogilvy properly maintained the confidential communications after they were provided by Merck. *See*

Second R&R at 8 ("there has been no evidence offered by Merck that the secondary distribution policies within these companies was restricted, thereby preserving the confidentiality of each communication."). Indeed, "many of the documents do not identify any of the third party employees who received the communications ... [and] none of the employees of DDB or Ogilvy (whether listed in the hearers or not) have been identified and circulation to them justified because of their corporate responsibilities within each company." *Id.*[11] Nor has Merck remedied these problem with properly executed affidavits attesting to the specific procedures that the consultants used to preserve confidentiality. *See* Letter dated October 9, 2007 from Brent B. Barriere, Special Counsel to the Special Master, to Leonard A. Davis, Esquire and Phillip A. Wittmann, Esquire (affidavits submitted by Merck do not properly attest to and/or demonstrate that DDB and Ogilvy implemented effective secondary distribution procedures). This additional shortcoming further demonstrates that extending the attorney-client privilege to DDB and Ogilvy would be inconsistent with the strict confidentiality requirement of the privilege.

---

[11] Because Merck's privilege logs are vague it is impossible for the PSC to challenge individual assertions of privilege as either involving business advice or the mere transmission of technical information, *i.e.*, communications that do not involve either the seeking or the giving of legal advice. It is also impossible for the PSC to challenge individuals assertions of privilege as involving the transmission of publically available information. These are important concerns in this case since many of the communications at issue will likely involve the transmission of technical information and/or information that is publically available such as the contents of drug labeling. Communications of this nature could very well be outside the attorney-client privilege. *See generally U.S. v. Meyers*, 38 Fed.Appx. 99, *1 (3rd Cir. 2002) (testimony of attorney did not violate attorney-client privilege where testimony concerned defendant's prior business practices and history; attorneys testimony concerning defendant's prior lawsuits and filing of bankruptcy where matters of public record); *U.S. v. Martin*, 278 F.3d 988 (9th Cir. 2002) (no violation of attorney-client privilege where attorney disclosed defendant's prior convictions that were uncovered during background check, publically available information concerning structure of corporation managed by defendant, and report containing publicly available information); *Howes v. Medical Components, Inc.*, 1988 WL 15191, * 1 (E.D.Pa. 1998) (attorney-client privilege does not protect technical information related to patents).

12

### B. If the Attorney-Client Privilege is Extended to DDB and Ogilvy, the Exception Will Swallow the Rule

There is no logical end to the extension of the attorney-client privilege that Merck advocates. Merck would extend the attorney-client privilege to permit disclosures to third-party consultants providing ordinary advertising and public relations services. *See* Second R&R at 7 (the third party consultants are not functional or de facto employees of Merck and the relationship Merck had with the consultants was no different than it would have with any other entity providing advertising and public relations services). Such an extension of the privilege would swallow the rule since it would permit corporations to share privileged communications well beyond advertising and public relations firms provided standard confidentiality agreements are executed. The logic behind such an extension of the attorney-client privilege would also support the extension of the privilege in instances that defy logic.[12]

For instance, although Merck has failed to establish that the third-party consultants were responsible for key corporate jobs, as in *Bieter*, *see* Second R&R at 7, assuming Merck had been able to establish that DDB and/or Ogilvy was responsible for such a key corporate job, extension of the privilege under these circumstances would lead to innumerable instances where the privilege would be extended beyond its logical bounds. Accountants, financial advisors, bankers, advisory committee members and others would be free to review confidential attorney-client communications, without any waiver of the privilege, provided they executed standard confidentiality agreements. Courts have repeatedly found waivers of the attorney-client privilege when materials are voluntarily

---

[12] *See* Second R&R at 6 ("some "bright line" restrictions must be placed on the ability of corporation's to share privileged communications with outsiders without waiving the privilege because without limitations, sharing would become the rule, rather than the exception, and the concept of confidentiality that the client is supposed to be preserving will be meaningless.").

provided to such individuals even though they may aid the client in performing important corporate functions.[13] In short, even assuming the third-party consultants were responsible for key corporate jobs, extending the attorney-client privilege places the privilege on too slippery of a slope. Merck's proposal is too unfounded and would invariably lead to improper assertions of the privilege in a multitude of difference circumstances.

### III.   CONCLUSION

For the reasons stated above, Merck's attorney-client privilege should not be extended to DDB and Ogilvy.

Respectfully submitted,

**PLAINTIFFS' STEERING COMMITTEE**

Date: October 16, 2007

By:/s/ Leonard A. Davis
**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
**PLAINTIFFS' LIAISON COUNSEL**

---

[13] *See U.S. v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) (finding waiver of privilege as to attorney-client communications shared with accountant); *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, Ltd., 232 F.R.D. 103 (S.D.N.Y. 2005) (rejecting assertion of attorney-client privilege as to financial advisor intimately involved in the affairs of the client); *SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties LLC*, 2002 WL 1334821 (S.D.N.Y. 2002) (refusing to extend attorney-client privilege to insurance broker); *United States Postal Service v. Phelps Dodge Refining Corporation*, 852 F.Supp. 156, 161 (E.D.N.Y. 1994) (refusing to extend attorney-client privilege to outside scientific consultants hired to conduct an environmental audit and to oversee remedial work).

Andy D. Birchfield, Jr., Esquire
Leigh O'Dell, Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)
**Co-Lead Counsel**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)
**Co-Lead Counsel**

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID,
 MEUNIER & WARSHAUER, L.L.C.
Energy Centre
1100 Poydras Street, Ste. 2800
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (fax)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
 BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Thomas R. Kline, Esquire
Shanin Specter, Esquire
David J. Caputo, Esquire
Lisa S. Dagostino, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W., Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

Arnold Levin, Esquire **(on brief)**
Fred S. Longer, Esquire **(on brief)**
Matthew C. Gaughan, Esquire **(on brief)**
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Shelly A. Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 16th day of October, 2007.

/s/ Leonard A. Davis
Leonard A. Davis (Bar No. 14190)
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
PH:   (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhkc.com