UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
|     RAMON ALVARADO et al., Plaintiffs, | * | SECTION L |
| | * | |
|         Versus | * | JUDGE ELDON E. FALLON |
| | * | |
|     MERCK & CO., INC., Defendant, | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
|     Case No. 06-7150, | * | |
| | * | |
|         & | * | |
| | * | |
|     MATTHEW DEVITO et al., Plaintiffs, | * | |
| | * | |
|         versus | * | |
| | * | |
|     MERCK & CO., INC., Defendant, | * | |
| | * | |
|     Case No. 07-0562, | * | |
| | * | |
|         & | * | |
| | * | |
|     DIANE DURBIN, Plaintiff, | * | |
| | * | |
|         versus | * | |
| | * | |
|     MERCK & CO., INC., Defendant, | * | |
| | * | |
|     Case No. 06-11302, | * | |
| | * | |
|         & | * | |
| | * | |
|     BARBARA MCKEAL, Plaintiff, | * | |
| | * | |
|         versus | * | |
| | * | |
|     MERCK & CO., INC., Defendant, | * | |
| | * | |
|     Case No. 07-0380, | * | |
|         & | * | |

```
                                              *
        RONALD PALES, Plaintiff,              *
                                              *
             versus                           *
                                              *
        MERCK & CO., INC., Defendant,         *
                                              *
        Case No. 07-1389,                     *
                                              *
                              &               *
                                              *
        JACK RIDINGER, Plaintiff,             *
                                              *
             versus                           *
                                              *
        MERCK & CO., INC., Defendant,         *
                                              *
        Case No. 07-0381.                     *
                                              *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................. 1

    A.    The Withdrawal Of Vioxx From The Market And The Ensuing Media Blitz. ............................................................................................................. 1

        1.    Illinois ........................................................................................ 8

        2.    Pennsylvania ............................................................................ 10

        3.    Puerto Rico .............................................................................. 12

    B.    The Plaintiffs Addressed By This Motion ....................................... 13

        1.    Illinois ...................................................................................... 13

        2.    Pennsylvania ............................................................................ 14

        3.    Puerto Rico .............................................................................. 14

    C.    The Cain Class Action ................................................................... 14

STANDARD FOR SUMMARY JUDGMENT ................................................. 16

ARGUMENT ................................................................................................... 16

I.    THE CLAIMS OF THE PENNSYLVANIA AND PUERTO RICO PLAINTIFFS FAIL UNDER ALL POTENTIALLY APPLICABLE LAWS .................................... 17

    A.    Louisiana Choice-of-Law Rules Apply To the Pennsylvania and Puerto Rico Plaintiffs ..................................................................... 17

    B.    The Pennsylvania and Puerto Rico Plaintiffs' Claims Are Barred Under Louisiana Law ...................................................................... 19

        1.    Based On Indisputable Facts, Plaintiffs' Claims Accrued In Louisiana No Later Than September 30, 2004 As A Matter Of Law ...... 19

        2.    Based On Indisputable Facts And Plaintiffs' Own Allegations, Merck's Alleged Fraudulent Concealment Could Only Toll The Limitations Period To September 30, 2004 – At The Latest ................. 22

        3.    Plaintiffs' Claims Are Not Saved By American Pipe Tolling ................. 24

            a.    The Origin And Purpose Of The American Pipe Doctrine ......... 25

            b.    Applying American Pipe Tolling ................................................ 27

            c.    American Pipe In Diversity Cases ............................................. 29

            d.    Plaintiffs' Claims Are Stale Under Louisiana Law Notwithstanding American Pipe ................................................. 34

    C.    The Claims Of Plaintiffs Barrall, Ciabattoni, and Dusi Are Time-Barred Under Pennsylvania Law. .................................................... 38

## TABLE OF CONTENTS
(continued)

Page

1. Under Pennsylvania Law, The Discovery Rule Was Triggered – At The Latest – By The Media Coverage Following The Withdrawal Of Vioxx ................................................................................... 39

    a. Personal Injury Plaintiffs Barrall And Ciabattoni ..................... 39

    b. Wrongful Death Plaintiff Dusi .................................................. 41

2. Plaintiffs' Claims Are Not Saved By The Doctrine Of Fraudulent Concealment ................................................................................... 42

3. Plaintiffs' Claims Are Not Saved By American Pipe Tolling ................ 43

D. Puerto Rico Law Bars The Claims Of Plaintiff Medina-Alfanador .................. 45

1. Based On Indisputable Facts, Plaintiff's Claims Accrued In Puerto Rico No Later Than September 30, 2004 As A Matter Of Law ............. 46

2. Based On Indisputable Facts And Plaintiff's Own Allegations, Merck's Alleged Fraudulent Concealment Could Toll The Limitations Period To September 30, 2004 At The Latest .................... 48

3. Plaintiff's Claims Are Not Saved By American Pipe Tolling ................ 50

II. ILLINOIS LAW BARS THE CLAIMS OF PLAINTIFFS DURBIN, MCKEAL, PALES AND RIDINGER ...................................................................................... 54

A. The Illinois Plaintiffs' Claims Are Governed By Illinois Limitations Periods Because They Filed In Illinois State Court ........................................... 54

B. Illinois Limitations Rules Bar The Claims Of Plaintiffs Durbin, McKeal, Pales, And Ridinger ............................................................................................ 54

1. Under Illinois Law, The Discovery Rule Was Triggered – At The Latest – By The Avalanche Of News Coverage Following The Withdrawal Of Vioxx ........................................................................... 56

2. Fraudulent Concealment Tolling Is Not Available To Plaintiffs As A Matter Of Law .................................................................................... 58

3. Plaintiffs' Claims Are Not Saved By American Pipe Tolling ................ 61

CONCLUSION ........................................................................................................... 64

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Pipe & Constr. Co. v. Utah,*
  414 U.S. 538 (1974) ............................................................................................... passim

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................................................................... 16

*Anderson v. Wagner,*
  402 N.E.2d 560 (Ill. 1979) ........................................................................................... 59

*Andrews v. Orr,*
  851 F.2d 146 (6th Cir.1988)......................................................................................... 29

*Armstrong v. Martin Marietta Corp.,*
  138 F.3d 1374 (11th Cir. 1998)..................................................................................... 37

*Barela v. Showa Denko K.K.,*
  No. 93-1469 LH/RLP, 1996 U.S. Dist. LEXIS 7830 (D.N.M. Feb. 28, 1996)....................... 33

*Basch v. Ground Round, Inc.,*
  139 F.3d 6 (1st Cir.1998).............................................................................................. 29

*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.,*
  770 N.E.2d 177 (Ill. 2002) ........................................................................................... 54

*Boone v. Citigroup, Inc.,*
  416 F.3d 382 (5th Cir. 2005)......................................................................................... 30

*Bunge Corp. v. GATX Corp.,*
  557 So. 2d 1376 (La. 1990)...................................................................................... 22, 24

*Burnett v. N.Y. Cent. R. Co.,*
  380 U.S. 424 (1965) ....................................................................................................... 1

*Carey v. Kerr-McGee Chem. Corp.,*
  999 F. Supp. 1109 (N.D. Ill. 1998).................................................................... 57, 58, 64

*Cartwright v. Chrysler Corp.,*
  232 So. 2d 285 (1970) .................................................................................................. 19

*Catholic Soc. Servs., Inc. v. I.N.S.,*
  182 F.3d 1053 (9th Cir. 1999)....................................................................................... 29

*Chardon v. Fumero Soto,*
  462 U.S. 650 (1983) ..................................................................................................... 27

*Cochran v. GAF Corp.,*
  666 A.2d 245 (Pa. 1995)............................................................................................... 40

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,*
  758 F. Supp. 64 (D.P.R. 1991)...................................................................................... 46

## TABLE OF AUTHORITIES
(continued)

Page

*County Bd. of Sch. Trs. v. Ass'n of Franciscan Fathers*,
    364 N.E.2d 691 (Ill. App Ct. 1977) ........................................................................ 60

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983) ............................................................................... 25, 27, 36

*Curry v. A.H. Robins Co.*,
    775 F.2d 212 (7th Cir. 1985) .......................................................................... 59, 60

*Drumm v. Sizeler Realty Co.*,
    817 F.2d 1195 (5th Cir. 1987) ............................................................................... 28

*Espada v. Lugo*,
    312 F.3d 1 (1st Cir. 2002) ...................................................................................... 49

*Evans v. CanadianOxy Offshore Prod. Co.*,
    730 So. 2d 466 (La. App. 3d Cir. 1998) ............................................................... 19

*Fine v. Checcio*,
    870 A.2d 850 (Pa. 2005) ................................................................................. 39, 43

*Garber v. Ansell/Perry*,
    2003 Pa. Dist. & Cnty. Dec. LEXIS 129 (June 25, 2003) ................................ 38, 39

*Griffin v. Singletary*,
    17 F.3d 356 (11th Cir.1994) ................................................................................. 29

*Hess v. I.R.E. Real Estate Income Fund*,
    629 N.E.2d 520 (Ill. App. Ct. 1993) ................................................................ 62, 63

*Hoffman v. Orthopedic Sys., Inc.*,
    765 N.E.2d 116 (Ill. App. Ct. 2002) ..................................................................... 57

*Hunter v. Am. Gen. Life & Accident Ins. Co.*,
    384 F. Supp. 2d 888 (D.S.C. 2005) ....................................................................... 36

*IEJ Corp. v. Laserow*,
    No. 1128, 2005 Phila Ct. Com. Pl. LEXIS 467 (Phila. Com. P. Oct. 25, 2005) ..................... 38

*In re Am. Med Sys.*,
    75 F.3d 1069 (6th Cir. 1996) ................................................................................ 32

*In re Baycol Prods. Litig.*,
    218 F.R.D. 197 (D. Minn. 2003) ........................................................................... 37

*In re Ford Motor Co. Vehicle Paint Litig.*,
    MDL No. 1063, 1996 U.S. Dist. LEXIS 11063 (E.D. La. July 30, 2006) ................... 22, 43, 61

*In re Med. Review Panel of Howard*, 573 So. 2d 472, 474 (La. 1991) ....................... 19

*In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*,
    693 F.2d 847 (9th Cir. 1982) ................................................................................ 32

# TABLE OF AUTHORITIES
(continued)

Page

*In re Paxil Litig.,*
212 F.R.D. 539 (C.D. Cal. 2003) ............................................................................... 32

*In re Phenylpropanolamine Prods. Liab. Litig.,*
MDL 1407, 2006 U.S. Dist. LEXIS 82102 (W.D. Wash. Nov. 9, 2006) ..................... 20

*In re Propulsid Prods. Liab. Litig.,*
208 F.R.D. 133 (E.D. La. 2002) ................................................................................. 32

*In re Rezulin Prods. Liab. Litig.,*
MDL No. 1348, 2005 WL 26867 (S.D.N.Y. Jan. 5, 2005) ......................................... 32

*In re Vioxx Prods. Liab. Litig.,*
478 F. Supp. 2d 897 (E.D. La. 2007) ......................................................................... 17

*Ingenito v. AC & S, Inc.,*
633 A.2d 1172 (Pa. Super. Ct. 1993) .................................................................... 39, 40

*Johnson v. Ry. Express Agency, Inc.,*
421 U.S. 454 (1975) ................................................................................................... 27

*Jolly v. Eli Lilly & Co.,*
751 P.2d 923 (Cal. 1988) ...................................................................................... 32, 37

*Jones v. State,*
891 So. 2d 698 (La. App. 4th Cir. 2004) .................................................................... 20

*Jordan v. Employee Transfer Corp.,*
509 So. 2d 420 (La. 1987) .......................................................................................... 19

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
313 U.S. 487 (1941) ................................................................................................... 17

*Knox College v. Celotex Corp.,*
430 N.E.2d 976 (Ill. 1981) .......................................................................................... 56

*Korwek v. Hunt,*
827 F.2d 874 (2d Cir.1987) ......................................................................................... 29

*Lloyd's Leasing v. Bates,*
902 F.2d 368 (5th Cir. 1990) ...................................................................................... 27

*Lopez-Gonzalez v. Municipality of Comerio,*
404 F.3d 548 (1st Cir. 2005) .................................................................................. 51, 52

*Martin v. Dalkon Shield Claimants Trust,*
No. 93-2652, 1994 U.S. Dist. LEXIS 16395 (E.D. Pa. Nov. 20, 1994) .................. 40, 41

*Mertens v. Abbott Labs.,*
99 F.R.D. 38 (D.N.H. 1983) ........................................................................................ 32

*Molina-Acosta v. Martinez,*
392 F. Supp. 2d 210 (D.P.R. 2005) ............................................................................ 46

# TABLE OF AUTHORITIES
(continued)

Page

*Molineux v. Reed*,
532 A.2d 792 (Pa. 1987) ........................................................................................ 41

*Moreno's, Inc. v. Lake Charles Catholic High Sch., Inc.*,
315 So. 2d 660 (La. 1975) ...................................................................................... 19

*Muskat v. Sternberg*,
570 N.E.2d 696 (Ill. App. Ct. 1991) ...................................................................... 59

*Nobles v. Rexall Sundown*,
No. 2376, 2005 Phila. Ct. Com. Pl. LEXIS 161 (March 7, 2005) .......................... 42

*Ocaso, S.A., Compania de Seguros Y Reaseguros v. Puerto Rico Maritime Shipping Auth.*,
915 F. Supp. 1244, 1259 (D.P.R. 1996) ................................................................ 46

*Pennock v. Lenzi*,
882 A.2d 1057 (Pa. Commw. Ct. 2005) ................................................................ 42

*Philip Morris USA, Inc. v. Christensen*,
905 A.2d 340 (Md. 2006) ....................................................................................... 32

*Phillips Oil Co. v. OKC Corp.*,
812 F.2d 265 (5th Cir. 1987) ................................................................................. 16

*Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*,
468 A.2d 468 (Pa. 1983) ........................................................................................ 39

*Portwood v. Ford Motor Co.*,
701 N.E.2d 1102 (Ill. 1998) ............................................................................. 31, 62

*Quintana Lopez v. Liggett Group, Inc.*,
336 F. Supp. 2d 153 (D.P.R. 2004) ....................................................................... 47

*Ramos Santiago v. Wellcraft Marine Corp.*,
93 F. Supp. 2d 112 (D.P.R. 2000) ......................................................................... 46

*Ravitch v. Price-Waterhouse*,
793 A.2d 939 (Pa. Super. Ct. 2002) ................................................................ 43, 44

*Reed v. St. Charles Gen. Hosp.*,
815 So. 2d 319 (La. Ct. App. 4th Cir. 2002) ......................................................... 19

*Rhynes v. Branick Mfg. Corp.*,
629 F.2d 409 (5th Cir. 1980) ................................................................................. 31

*Rivera Castillo v. Municipio de San Juan*,
130 P.R. Dec. 683 (1992) ....................................................................................... 52

*Robbin v. Fluor Corp.*,
835 F.2d 213 (9th Cir.1987) ................................................................................... 29

*Rodriguez Narvaez v. Nazario*,
895 F.2d 38 (1st Cir. 1990) .................................................................................... 50

# TABLE OF AUTHORITIES
(continued)

**Page**

*Rodriguez Rosado v. SYNTEX (F.P.), Inc.*,
  160 P.R. Dec. 364 (2003)...................................................................................... 52, 53

*Rodriguez-Garcia v. Municipality of Caguas*,
  354 F.3d 91 (1st Cir. 2004) ...................................................................................... 46

*Ryan v. Eli Lilly & Co.*,
  84 F.R.D. 230 (D.S.C. 1979) .................................................................................... 32

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
  765 F.2d 1334 (5th Cir. 1985)................................................................................... 29

*Schach v. Ford Motor Co.*,
  210 F.R.D. 522 (M.D. Pa. 2002) .............................................................................. 39

*Sheppard v. Capital One Bank*,
  No. 06-7535, 2007 U.S. Dist. LEXIS 70061 (C.D. Cal. July 11, 2007) ................. 36

*Simonet v. SmithKline Beecham Corp.*,
  2007 U.S. Dist. LEXIS 60393 (D.P.R. 2007) .......................................................... 46

*Smith v. Cook County Hosp.*,
  518 N.E.2d 336 (Ill. App. Ct. 1987) ........................................................................ 59

*Smith v. Cutter Biological*,
  770 So. 2d 392 (La. Ct. App. 2000) ...............................................................35, 36, 37

*Steinberg v. Chicago Medical School*,
  371 N.E.2d 634 (Ill. 1977) ....................................................................................... 62

*Sundance Homes, Inc. v. County of Du Page*,
  746 N.E.2d 254 (Ill. 2001) ....................................................................................... 55

*Taylor v. Liberty Mut. Ins. Co.*,
  579 So. 2d 443 (La. 1991) ........................................................................................ 35

*Touchet v. Baker Hughes Inc.*,
  737 So. 2d 821 (La. App. 3d Cir. 1999) ................................................................... 20

*Vaccariello v. Smith & Nephew Richards, Inc.*,
  763 N.E.2d 160 (Ohio 2002)..................................................................................... 31

*Vaught v. Showa Denko K.K.*,
  107 F.3d 1137 (5th Cir. 1997)................................................................................... 30

*Wade v. Danek Med., Inc.*,
  182 F.3d 281 (4th Cir. 1999)................................................................................. 30, 32

*Wilson v. Devonshire Realty*,
  718 N.E.2d 700 (Ill. App. Ct. 1999)...................................................................... 57, 61

*Witherell v. Weimer*,
  421 N.E.2d 869 (Ill. 1981) ....................................................................................... 56

# TABLE OF AUTHORITIES
(continued)

**Page**

*Zehel-Miller v. AstraZenaca Pharms., LP,*
   223 F.R.D. 659 (M.D. Fla. 2004) ................................................................ 32

**Other Authorities**

13 Pa. Cons. Stat. Ann. § 2607 ....................................................................... 39

13 Pa. Cons. Stat. Ann. § 2607(c)(1) ............................................................... 39

42 Pa. Cons. Stat. Ann. § 5524(2) ............................................................. 39, 41

42 U.S.C. § 1981 ............................................................................................ 27

42 U.S.C. § 1983 ............................................................................................ 27

735 Ill. Comp. Stat. 5/13-202 ......................................................................... 54

735 Ill. Comp. Stat. 5/13-215 ......................................................................... 59

Article 1868(2) of the Civil Code, 31 L.P.R.A. § 5298(2) ................................ 46

La. Civ. Code Ann, art. 3549(B)(2) ................................................................ 18

La. Civ. Code Ann. art. 2315.2 ....................................................................... 19

La. Civ. Code Ann. art. 3462 ........................................................................... 35

La. Civ. Code Ann. art. 3492 ........................................................................... 19

La. Civ. Code Ann. art. 3549(B)(1) ................................................................ 18

La. Rev. Stat. Ann. § 51:1409(e) ..................................................................... 19

Laws of Hours and Days of Work, P.R. Laws Ann. tit. 29, § 282 ..................... 52

P.R. Laws Ann. tit. 29, § 282 ........................................................................... 53

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 16

Fed. R. Civ. P. F ............................................................................................. 28

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Despite an avalanche of national and local media coverage that put plaintiffs on notice of their claims against Merck – at the latest – on September 30, 2004, plaintiffs in these cases failed to sue Merck for their alleged Vioxx-related injuries until long after the applicable statutes of limitations ran on their claims.[1]  Although plaintiffs will argue that their claims accrued at a later date, those arguments fail as a matter of law.  Indeed, as Judge Higbee recently concluded, such arguments "are entirely unpersuasive," even on summary judgment.  (Mem., *Oldfield v. Merck & Co., Inc.*, No. ATL-L-2-07, at 5 (N.J. Super. Law Div. Oct. 15, 2007) (attached as Ex. 1).)

Statutes of limitations serve important policy interests.  As the Supreme Court has explained, "[s]uch statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. . . . [E]ven if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation.'"  *Burnett v. N.Y. Cent. R. Co.*, 380 U.S. 424, 428 (1965) (quoting *Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944)).  Enforcement of limitations periods serves institutional purposes as well.  "[T]he courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights."  *Id.*  These interests will be frustrated if plaintiffs are permitted to proceed.  Accordingly, the Court should grant this motion.

## BACKGROUND

### A.    The Withdrawal Of Vioxx From The Market And The Ensuing Media Blitz.

By mid-2000, the news media had already widely reported that the Vioxx

---

[1]    The *Alvarado* and *DeVito* complaints bring claims on behalf of several plaintiffs.  As described in Background § B, *infra*, this motion relates only to four plaintiffs total from those two complaints:  Milagros Medina-Alfanador from the *Alvarado* complaint, and James Barrall, Carol M. Ciabattoni and Alonzo Dusi from the *DeVito* complaint.

Gastrointestinal Outcome Research ("VIGOR") study – which was itself published in the *New England Journal of Medicine* – had identified a potential link between Vioxx use and MI risks. *See, e.g.*, Rita Rubin, *Vioxx Might Raise Heart Risk*, USA Today, Feb. 9, 2001, at 05B (attached as Ex. 2); Edward R. Silverman, *Merck Shares Fall On Vioxx Study, Painkiller Linked to Cardiovascular Problems*, Star-Ledger (Newark, N.J.), Apr. 29, 2000, at 17  (attached as Ex. 3); *see also National Briefing Science and Health:  U.S. Warns Merck About Marketing Arthritis Drug*, N.Y. Times, Sept. 26, 2001, at A14 (attached as Ex. 4).  During the course of the next three years, the news media repeatedly announced that the use of Vioxx might be linked to increased cardiovascular risks.  *See* Ed Silverman, *FDA Study Stresses Concerns About Merck's Vioxx*, Star-Ledger (Newark, N.J), Aug. 26, 2004, at 52 (attached as Ex. 5); Kawanaza L. Griffin, *Arthritis Drug Link To Heart Attack Risk*, Milwaukee Journal Sentinel, Apr. 22, 2002, at 2 (attached as Ex. 6); *Company News; Merck to Revise Label Information for Vioxx*, N.Y. Times, Apr. 12, 2002, at C2 (attached as Ex. 7) ("Merck & Co . . . would revise prescribing information for its Vioxx painkiller to show both cardiovascular risks and benefit in reducing side effects like ulcers in arthritis patients"); Gardiner, Harris, *Label Change For Merck's Vioxx Adds Ulcer Protection, Heart Risk*, Wall St. J., Apr. 12, 2002 , at A17 (attached as Ex. 8); Joe Graedon & Teresa Graedon, *Vioxx May Increase Risk Of Stroke*, Star-Ledger (Newark, N.J.), Nov. 6, 2001, at 43 (attached as Ex. 9).

On September 24, 2004, an external safety board monitoring the results of a long-term study – the APPROVe study – informed Merck that interim data from the study showed an increased rate of cardiovascular events in the Vioxx arm compared to the placebo arm.  (*See* MRK-AFJ0000067-69 (Sept. 24, 2004 facsimile from K. Horgan of Merck to P. Kim and B. Gertz of Merck forwarding APPROVe ESMB's meeting minutes and recommendations)

(attached as Ex. 10).)

Merck voluntarily withdrew Vioxx from the market six days later, on September 30, 2004.  In a written statement to patients, Merck Chairman, President, and CEO Raymond Gilmartin related that Merck's decision to withdraw Vioxx was "based on new data from a three-year clinical study" in which "there was an increased risk for cardiovascular (CV) events, such as heart attack and stroke, in patients taking VIOXX 25 mg compared to those taking placebo (sugar pill)."  *See* Letter From Raymond V. Gilmartin, Chairman, President & CEO of Merck & Co., Inc., to Patient (Sept. 30, 2004) (attached as Ex. 11).  Merck also sent a letter explaining the APPROVe findings and the reasons for withdrawal to doctors and pharmacies nationwide.  *See* Letter from William F. Keane, MD, Vice President of U.S. Medical and Scientific Affairs at Merck & Co., Inc., to Healthcare Professional (Sept. 30, 2004) (attached as Ex. 12).

Merck's withdrawal of Vioxx triggered an explosion of nationwide media attention.  ***In the first month after the withdrawal of Vioxx, there were at least 1,648 articles or reports in media outlets around the country about the Vioxx controversy***.[2]

The coverage began immediately.  On the morning of September 30, the story ran on major radio and television news shows.  The *Today Show*'s Ann Curry reported a "major announcement this morning from drugmaker Merck.  It's halting its sales worldwide of the popular arthritis drug Vioxx" due to risk of heart attack and stroke.  *The Today Show: Merck Pulls Vioxx Off the Market* (NBC television broadcast Sept. 30, 2004) (attached as Ex. 13).  *Good Morning America* on ABC began with "breaking news about a common arthritis drug.  Drug giant Merck is halting the sale of Vioxx worldwide.  The company says it is recalling the drug because it raises the risk of heart attack and stroke."  *Good Morning America: News*

---

[2]      This statistic is based on a search of U.S. news outlets on the Lexis/Nexis database for the period between September 30, 2004 and October 30, 2004.

*Headlines* (ABC television broadcast Sept. 30, 2004) (attached as Ex. 14).  On CNN's *American Morning*, host Heidi Collins kicked off a segment of *Paging Doctor Gupta* by announcing "a story that is breaking right at this time.  Dr. Gupta relayed the announcement that "there was an increased relative risk for confirmed cardiovascular events, such as heart attack and stoke" and noted that there had "been some speculation for some time that Vioxx may be related to heart attacks and strokes."  *American Morning: Merck Pulls Vioxx From the Market* (CNN television broadcast Sept. 30, 2004) (attached as Ex. 15).  Harry Smith, host of CBS's *Early Show*, reported simply that "Vioxx is being recalled worldwide.  Drugmaker Merck is halting sales after studies found that Vioxx raised the risk of stroke and heart attack for users."  *Early Show: Vioxx Recalls by Merck* (CBS television broadcast Sept. 30, 2004) (attached as Ex. 16).  And NPR's Renee Montagne reported during *Morning Edition* that "[o]ne of the world's largest drugmakers, Merck & Co., took its arthritis drug Vioxx off the market this morning."  *Morning Edition: Merck & Co. has taken its arthritis drug Vioxx off the market this morning due to health concerns* (NPR radio broadcast Sept. 30, 2004) (attached as Ex. 17).

The networks continued their coverage in the evening.  On the CBS *Evening News*, Dan Rather began the show by announcing "a medical bombshell about a prescription drug used by millions.  Vioxx, the arthritis drug, is being withdrawn from the market worldwide.  The manufacturer of this FDA-approved drug says it has found the strongest evidence yet that Vioxx can trigger heart attacks and strokes."  *CBS Evening News: Merck pulls its arthritis drug Vioxx off the shelves after a study showed it increases the risk of heart attack and stroke* (CBS television broadcast Sept. 30, 2004) (attached as Ex. 18).  NBC's Tom Brokaw covered the story on the *Nightly News*.  "Now to what could be the largest drug recall ever in this country.  Merck pharmaceutical company is pulling its arthritis drug called Vioxx off the market after a new

4

study disclosed that it could increase the risk of heart attacks and stroke." *NBC's Nightly News: Merck recalls Vioxx after study reveals increase in risk of heart attack and stroke* (NBC television broadcast Sept. 30, 2004) (attached as Ex. 19).  On *World News Tonight* on ABC, Peter Jennings and John McKenzie reported in a segment entitled *A Closer Look:  Vioxx Recalled* (ABC television broadcast Sept. 30, 2004) (attached as Ex. 20), that "Merck and Company made very big news today when it said that it was voluntarily taking its popular drug, Vioxx, off the market.  About two million people currently take Vioxx for pain, especially for pain of arthritis.  Merck said today that data from a clinical trial found an increased risk for heart attack and stroke."  On CNN, Lou Dobbs reported "stunning news for millions of Americans who use one of this country's most popular prescription drugs. *Lou Dobbs Tonight*, Merck recalls Vioxx because it's not safe" (CNN television broadcast Sept. 30, 2004) (attached as Ex. 21).  And on NPR's *All Things Considered*, Robert Siegel reported on the withdrawal, noting that "the decision also opens up a potential flood of lawsuits" *All Things Considered: Business ramifications of Merck's announcement about Vioxx* (NPR radio broadcast Sept. 30, 2004) (attached as Ex. 22).

The next day, television and radio coverage continued.  On the *Today Show*, Katie Couric asked Professor John Abramson of Harvard Medical School about the withdrawal of Vioxx. *Today Show: Dr. John Abramson discusses Vioxx recall and what Vioxx users can do* (NBC television broadcast Oct. 2, 2004) (attached as Ex. 23).  Couric reported that the "maker of the popular arthritis drug has pulled it off store shelves, saying it can actually double the risk of heart attack and stroke."  She later wrapped up the segment by explaining, "[s]o that's the bottom line. Stop taking Vioxx, and--and take Aleve."  *Id.*  On *Good Morning America*, Diane Sawyer and ABC News Medical Editor Dr. Tim Johnson reported that Vioxx had been withdrawn in a

segment entitled *Vioxx Recall Questions Answered*.  Sawyer reported that "we know if you're taking the drug, you should stop."  Dr. Johnson agreed, explaining the theory that plaintiffs have relied on since the beginning of the Vioxx litigation:  "Vioxx causes its problems by interfering with the blood clotting system, increasing the risk for blood clots, which leads to heart attacks and strokes."  *Good Morning America: Vioxx Recall Questions Answered* (ABC television broadcast Oct. 1, 2004) (attached as Ex. 24).  On *CBS Morning News*, Anchor Hannah Storm began a segment on "what everybody's talking about, the Vioxx recall."  *CBS Morning News: Vioxx Recall* (CBS television broadcast Oct. 1, 2004) (attached as Ex. 25).  Storm explained that "a new study links the medication to an increased risk of heart attacks and strokes" and asked CBS's Dr. Emily Senay to advise viewers what to do next.  On CNN's *American Morning*, anchor Heidi Collins interviewed Professor Abramson about the withdrawal.  *American Morning: Vioxx Recall* (CNN television broadcast Oct. 1, 2004) (attached as Ex. 26).  Collins introduced the segment by explaining that Merck was "pulling Vioxx from the store shelves worldwide after ongoing studies found it increased risk of heart attacks and strokes."  *Id.*  On National Public Radio's *Morning Edition*, host Renee Montagne reported that "Merck voluntarily pulled the arthritis medication yesterday after a new study found that it increased the risk of heart attack and stroke."  *Morning Edition: Issues of drug safety in connection with how long it takes to warn about risks found in studies* (NPR radio broadcast Oct. 1, 2004) (attached as Ex. 27).

Newspapers also carried the story that day, usually on the front page.  Headlines around the nation announced that "Risks Spur Merck to Pull Vioxx Off Market," "Merck Puts Nixx on 'Dangerous' Vioxx," and "Arthritis Drug Vioxx Pulled, Risk of Heart Attacks is Cited."  *See* Lewis Krauskopf and Lindy Washburn, *Risks Spur Merck To Pull Vioxx Off Market*, The Record

(Bergen County, N.J.), Oct. 1, 2004, at A01 (attached as Ex. 28); Leonard Greene & Perry

Chiaramonte, *Merck Puts Nixx On 'Dangerous' Vioxx*, N.Y. Post, Oct. 1, 2004, at 2 (attached as

Ex. 29) [hereinafter "Greene & Chiaramonte"]; Thomas H. Maugh II & Denise Gellene, *Arthritis*

*Drug Vioxx Pulled; Risk of Heart Attacks Is Cited*, L.A. Times, Oct. 1, 2004, at A1 (attached as

Ex. 30) [hereinafter "Maugh & Gellene"].  Many other news sources covering the withdrawal

identified a potential link between ingestion of Vioxx and increased cardiovascular risks.  *See*

Rita Rubin, *Merck Halts Vioxx Sales*, USA Today, Oct. 1, 2004, at A1 (attached as Ex. 31); Gina

Kolata, *A Widely Used Arthritis Drug Is Withdrawn*, N.Y. Times, Oct. 1, 2004, at A1 (attached

as Ex. 32); Barbara Martinez, *et al.*, *Expiration Date:  Merck Pulls Vioxx From Market After*

*Link to Heart Problems -- Stock Plunges Amid Questions About Drug Giant's Future*, Wall St.

J., Oct. 1, 2004, at A1 (attached as Ex. 33); Mark Kaufman, *Merck Withdraws Arthritis*

*Medication -- Vioxx Maker Cites Users' Health Risks*, Wash. Post, Oct. 1, 2004, at A01 (attached

as Ex. 34); Linda A. Johnson, *Merck Recalls Blockbuster Arthritis Drug, Stock Plunges*, AP

Alert, Sept. 30, 2004 (attached as Ex. 35) ("Merck & Co. is pulling its blockbuster Vioxx from

the market after new data found the arthritis drug doubled the risk of heart attacks and strokes.").

In the days following withdrawal, the media also reported a rush by plaintiffs' lawyers to

sign up claimants.  The *New York Post* explained that "[a]ttorneys across the country wasted no

time lining up litigation" because they viewed Merck's withdrawal as "wrapping up the evidence

they needed in a pretty bow."  *See* Greene & Chiaramonte, *supra*, at 2.  The *Post* related the

comments of one plaintiffs' lawyer who asserted that, even prior to withdrawal, "[i]t wasn't a

great secret that Vioxx might cause heart attacks and strokes."  *Id.* (quoting Barry Slotnick)

(internal quotation marks omitted).)  Another plaintiffs' lawyer stated:  "I'm pleased that Merck

has taken this very important step [of withdrawing Vioxx], but we firmly believe that this should

have happened years earlier." *Id.* (quoting Jerrold Parker) (internal quotations omitted).  In the *Los Angeles Times*, Law Professor Brietta Clark noted that plaintiffs' lawyers turned to the internet immediately following Vioxx's withdrawal, advertising their services to putative plaintiffs and seeking to sign up clients.  *See* Maugh & Gellene, *supra*, at 1.  As Professor Clark observed, "[c]learly, a lot of people think they have got a basis for a suit."  *Id.* (internal quotation marks omitted).

Finally, many plaintiffs' firms ran advertisements in the years after withdrawal urging potential claimants to file lawsuits before the limitations period expired.  (*See, e.g.*, sample advertisement (attached as Ex. 36).)

Similar coverage played out in plaintiffs' home media markets as well.

       1.    **Illinois**

The Vioxx controversy received substantial media attention throughout the state of Illinois.  Local news channels covered the story on September 30.  All of the major stations serving the St. Louis and Chicago areas – where plaintiffs reside – covered the story.  The local major network affiliates covered the withdrawal, as did WGN and CLTV.  (Summaries of local coverage provided by *Video Monitoring Services of America* are attached as Exs. 37, 38, 39, 40, 41, 42, and 43.)

Illinois's two largest newspapers carried stories about the Vioxx withdrawal the day after it happened.  The October 1, 2004 Chicago *Sun-Times* included a story (attached as Ex. 44) titled "*Arthritis drug pulled by maker; Study shows Vioxx could increase risk of heart attack, stroke*." And the Chicago *Tribune* ran a similar story – titled *Arthritis Drug Recalled* (attached as Ex. 45) – in its October 1 edition.  The *Tribune* noted that Vioxx "was pulled from the market by New Jersey-based Merck on Thursday after a study found it doubled the risk of heart attacks and strokes" and that "[e]xperts advised patients to immediately stop taking Vioxx and talk to their

doctors about alternatives." *Id.*  In addition, the *Tribune* published a substantial article on the withdrawal in its Business section titled *Merck Withdraws Arthritis Drug; Vioxx Increased Danger to Heart.*  Bruce Japsen, Chicago Tribune, Oct. 1, 2004 (attached as Ex. 46).  The article included a question-and-answer section on what to do if you were taking Vioxx and the drug's potential effects.  *Id.*

In addition, the *St. Louis Post-Dispatch* published several articles during the first week of October detailing the Vioxx withdrawal.  *See, e.g., Alternatives and Answers for Consumers*, St. Louis Post-Dispatch, Oct. 1, 2004 (attached as Ex. 47) (presenting questions and answers for Vioxx patients as to what to do in light of the withdrawal); Mary J. Feldstein and Kim Bell, *Vioxx Users Scramble for Replacement*, St. Louis Post-Dispatch, Oct. 1, 2004 (attached as Ex. 48); Linda A. Johnson, *Merck's Search for Income Sounds Alarms for Millions*, St. Louis Post-Dispatch, Oct. 1, 2004 (attached as Ex. 49); *Merck Will Pay UPS Costs to Return Vioxx*, St. Louis Post-Dispatch, Oct. 7, 2004 (attached as Ex. 50).  Other local papers throughout the state and region also reported on the withdrawal.  Edith Brady-Lunny, *Doctors Taking Calls on Vioxx*, The Pantagraph (Bloomington, IL), Oct. 1, 2004, at A1 (attached as Ex. 51); Linda Loyd, *Merck Withdraws Arthritis Medicine; Cites Increased Risk of Heart Attack, Stroke*, Belleville News Democrat (Belleville, IL), Oct. 1, 2004 (attached as Ex. 52); Kawanaza L. Griffin, *Vioxx Pulled From Shelves; Data Says Arthritis Drug Increases Heart Risks*, Milwaukee Journal Sentinel (WI), Oct. 1, 2004, at 1 (attached as Ex. 53); Linda Johnson, *Merck Recalls Vioxx for Heart Attack, Stroke Risks*, Northwest Herald (McHenry County, IL), Oct. 1, 2004 (attached as Ex. 54).  By October 5, 2004, the Illinois and nearby St. Louis papers were already reporting on post-withdrawal lawsuits.  An article in the *Sun-Times* entitled *Illinoisans Join Parade of Suits Against Merck over Vioxx,* Lori Rackl, Chicago Sun Times, Oct. 5, 2004 (attached as Ex. 55), for

9

example, reported that "[n]umerous Vioxx-related lawsuits, including two seeking class-action status, had been lodged against Merck before the drug was taken off the market.  Since then, more lawsuits have cropped up," including a recently-filed suit in Illinois.  *See also* Paul Hampel, *Vioxx Class-Action Suits Are Filed in Madison County*, St. Louis Post-Dispatch, Oct. 6, 2004 (attached as Ex. 56).[3]

And like the national media, Illinois papers had long been covering questions about the cardiovascular risks of Vioxx.  The *Sun-Times*, for example, had been covering the Vioxx story since at least 2001.  The paper's August 22, 2001 edition included a story (attached as Ex. 57) titled "*Pain pill linked to heart risk.*"  The story discussed an article in the *Journal of the American Medical Association* in which researchers warned that "[t]he hugely popular pain-killers Celebrex and Vioxx might increase the risk of heart attack."

2.  **Pennsylvania**

As in Illinois, Pennsylvania media covered the Vioxx withdrawal.  Local news shows across the state covered the story on September 30 and October 1, including major network affiliates in the Pittsburgh and Philadelphia markets.  (Summaries of local coverage provided by *Video Monitoring Services of America* are attached as Exs. 58, 59, 60, 61, 62, and 63.)

The largest newspapers in Pennsylvania also prominently covered Merck's September 2004 withdrawal of Vioxx.  For example, the *Philadelphia Inquirer*'s October 1, 2004 edition included a story (attached as Ex. 64) titled *Merck pulls Vioxx, citing health risks; Using the arthritis drug doubled the chances of heart attack and stroke.*  The paper noted that Merck was withdrawing Vioxx "in a sudden admission of problems with a blockbuster drug . . . because of an increased risk of heart attack and stroke."  Linda Lloyd, *Merck pulls Vioxx*, Philadelphia

---

[3]      Merck notes that the class actions discussed in this article were ***not*** personal injury actions, and therefore could not toll the statute of limitations governing these plaintiffs' claims even if *American Pipe* tolling were otherwise appropriate (which it is not, for the reasons set forth in Section I.B.3 below).

Inquirer, Oct. 1, 2004 at A1.  Similarly, the Pittsburgh *Post-Gazette*'s October 1, 2004 edition

included a story (attached as Ex. 65) titled simply *PAINKILLER VIOXX PULLED FROM*

*MARKET*.  The *Post-Gazette* story said Merck was "pulling Vioxx, its blockbuster arthritis and

pain drug, from the market after new data showed an increased risk of heart attacks and strokes

among patients taking it."  *Id.*

Local newspapers across the state also picked up the story.  The *Wilkes-Barre Times*

*Leader*, for example, which circulates in plaintiff Barrall's home county of Luzerne,

Pennsylvania, ran a front-page story on October 1, 2004 that noted the withdrawal of Vioxx and

specifically directed readers to "[s]top taking the drug and contact your doctor to inquire about

an alternative treatment" because "a clinical trial showed an increase risk of heart attack and

stroke."  Jerry Lynott, *Options Are Available, W-B Pharmacist Says*, Times-Leader, Oct. 1,

2004, at 1A (attached as Ex. 66).  The *Pittsburg Tribune-Review* ran an article  on October 1

entitled *Vioxx Yanked from Shelves*.  The article noted that "Pittsburgh doctors yesterday advised

patients to stop taking Vioxx" because "new data from a clinical trial show chronic users are at

increased risk of heart attack and stroke."  Jennifer Bails, *Vioxx Yanked from Shelves*, Pittsburgh

Tribune-Review, Oct. 2, 2004 (attached as Ex. 67).  The *Allentown Morning Call*, which

circulates in plaintiff Ciabattoni's hometown of Gilbertsville, ran a story in its October 1, 2004

edition under the headline *Stop Taking Vioxx and See Your Doctor, Local Specialists Say* in

which a local doctor urged patients to "stop taking [Vioxx] immediately" and reported that

"[m]any [patients] called his office after hearing of the recall" – *i.e.*, in the brief period (less than

one day) before the article was published.  Ann Wlazelek, *Stop Taking Vioxx and See your*

*Doctor, Local Specialists Say*, Allentown Morning Call, Oct. 1, 2004 at A9 (attached as Ex. 68).

The *Lancaster New Era* reported in a front-page article entitled *Arthritis Drug Yanked; Doctors*

*Urge Calm* that Vioxx had been withdrawn the day before, and it noted further that "there were

signs of the increased risk of cardiovascular disease among Vioxx users as early as 2000" –

referring to the VIGOR study – and that "doctors began steering away patients with a history of

heart disease or heart problems" after the label change.  Cindy Stauffer, *Arthritis Drug Yanked;

Doctors Urge Calm*, The Lancaster New Era, Oct. 1, 2004 at A1 (attached as Ex. 69).

By October 2, 2004, the *Philadelphia Inquirer* was already reporting the likely legal

fallout on its front page.  "Even before Merck's Vioxx withdrawal announcement, several

hundred suits had been filed against the company by users of the arthritis pain medicine," along

with one plaintiffs' lawyer's prediction that the "'number of cases will be growing

exponentially.'"  Josh Goldstein, *Merck Braces for Wave of Vioxx Lawsuits*, Phila. Inquirer, Oct.

2, 2004, at A1 (attached as Ex. 70).  And the *Intelligencer Journal* of Lancaster had already run a

story on October 1 reporting that, by the afternoon of September 30, "at least one plaintiffs'

attorney announced plans for a class-action lawsuit against Merck.  Another claimed to represent

58 patients around the country allegedly harmed by Vioxx, including people who suffered a heart

attack, stroke, internal bleeding or kidney failure."  Linda A. Johnson, *Merck Pulls Vioxx off

Drug Market*, Intelligencer Journal, Oct. 1, 2004, at B5 (attached as Ex. 71).

In addition, as in Illinois, individuals in Pennsylvania could have seen the news about the

alleged dangers of Vioxx as long ago as 2001.  For example, the *Post-Gazette* ran a story in

August 2001 (attached as Ex. 72) titled *PAINKILLER STUDY CITES HEART RISK;

CELEBREX, VIOXX RESULTS CONTESTED BY DRUG MAKERS*.  The paper pointed out that

"[t]he popular painkillers Celebrex and Vioxx may slightly increase a person's risk of having a

heart attack, according to a new analysis of clinical studies of the so-called 'super aspirin'

drugs."  *Id.*

### 3. Puerto Rico

Newspapers in Puerto Rico also heavily covered the Vioxx withdrawal.  For example, an October 1 story titled *Fabricante retira la popular "Vioxx"* ("Manufacturer Withdraws the Popular 'Vioxx'" (unofficial translation)) (attached as Ex. 73) appeared in the popular daily *El Vocero de Puerto Rico*.  On October 2, the largest newspaper in Puerto Rico, *El Nuevo Día*, reported the withdrawal as well, pointing to "los riesgos de ataques cardíacos y derrames" ("the risks of heart attacks and strokes") (unofficial translation).  OMaya Sosa Pascual, *The Risks of Heart Attacks and Strokes*, El Nuevo Dia, Oct. 2, 2004 (attached as Ex. 74).

### B.   The Plaintiffs Addressed By This Motion.

This motion addresses the claims of eight plaintiffs[4] – four from Illinois, three from Pennsylvania, and one from Puerto Rico.

### 1. Illinois

According to their complaints and plaintiff profile forms, plaintiffs Durbin, McKeal, Pales, and Ridinger reside in Illinois, were prescribed and took Vioxx in Illinois, and allegedly suffered their injuries there.  (*See* Durbin Compl. ¶ 1 (attached as Ex. 75); Durbin Pl. Profile Form at 2, 3 (attached as Ex. 76); McKeal Compl. ¶ 1 (attached as Ex. 77); McKeal Pl. Profile Form at 2, 3 (attached as Ex. 78); Pales Compl. ¶ 1, 7, 8 (attached as Ex. 79); Pales Pl. Profile Form at 2, 3 (attached as Ex. 80); Ridinger Compl. ¶ 1 (attached as Ex. 81); Ridinger Pl. Profile Form at 2, 3 (attached as Ex. 82).)  Plaintiff Diane Durbin allegedly suffered two heart attacks, one on October 1, 2003, and one on October 2, 2003.  (Durbin Pl. Profile Form at 2.)  Plaintiff Barbara J. McKeal allegedly suffered a heart attack on January 16, 2003.  (McKeal Pl. Profile Form at 2.)  Plaintiff Ronald E. Pales allegedly suffered an ischemic stroke on August 1, 2001.

---

[4]      Several plaintiffs' names are spelled differently in their complaints than their fact sheets; given that the fact sheets were completed by the plaintiffs themselves, however, this motion presumes the spelling of the name provided at question I.A of those documents to be the correct one.

(Pales Pl. Profile Form at 2.)  And Plaintiff Jack Ridinger allegedly suffered a heart attack on December 8, 2003.  (Ridinger Pl. Profile Form at 2.)

### 2.   **Pennsylvania**

According to their complaints and plaintiff profile forms, plaintiffs Barrall, Ciabattoni, and Dusi reside, were prescribed and took Vioxx, and suffered their alleged injuries in Pennsylvania.  (*See* DeVito Compl. ¶¶ 15, 17, 35 (attached as Ex. 83); Barrall Pl. Profile Form at 1, 2, 5 (attached as Ex. 84); Ciabattoni Pl. Profile Form at 1, 2, 5 (attached as Ex. 85); Dusi Pl. Profile Form at 1, 2-3, 5 (attached as Ex. 86).)  Plaintiff James Barrall allegedly suffered a stroke in May 2003.  (*See* Barrall Pl. Profile Form at 1.)  Plaintiff Carol M. Ciabattoni allegedly suffered a heart attack in October 2003.  (*See* Ciabattoni Pl. Profile Form at 1-2.)  And plaintiff Alonzo Dusi alleges that his wife, Catherine Dusi, suffered a heart attack and died on February 7, 2003.  (*See* Dusi Pl. Profile Form at 1-2.)

### 3.   **Puerto Rico**

Plaintiff Milagros Medina-Alfanador alleges that she resides in Puerto Rico, was prescribed and began taking Vioxx in 2000 in Puerto Rico, and experienced strong pain and throbbing in her heart in Puerto Rico in 2001.  (*See* Alvarado Compl. ¶ 10 (attached as Ex. 87); Medina-Alfanador Pl. Profile Form at 2, 3, 6 (attached as Ex. 88).)

### C.   The *Cain* Class Action

The first Vioxx-related personal injury class action was filed on May 29, 2001 by Dominick Lettieri and Mary Lombardozzi in the United States District Court for the Eastern District of New York seeking certification of a "nationwide class of persons who are taking . . . Vioxx . . . [or] Celebrex."  Comp. ¶ 1, *Lettieri v. Merck & Co., Inc.*, No. CV 01 3441 (E.D.N.Y. May 23, 2001) ( "Initial Cain Compl.") (attached as Ex. 89).  Plaintiffs sought relief under several theories, including compensatory damages for personal injury.  *Id.* ¶¶ 27-32 (failure to

warn), ¶¶ 33-38 (strict liability), ¶¶ 39-45 (negligence).  The complaint was amended August 1, 2001, substituting Alex Cain and William Watkins as new named plaintiffs and making other changes but retaining the personal injury claims.  Am. Class Action Compl., *Cain v. Merck & Co., Inc.*, No. CV 01 3441 (E.D.N.Y. Aug. 1, 2001) ("First Am. Cain Compl.") (attached as Ex. 90).

On September 21, 2001, Merck and its co-defendants moved to dismiss the claims for injunctive relief in the *Cain* class action on federal preemption and primary jurisdiction grounds, asking the court to refer the plaintiffs' injunctive claims to the Federal Food and Drug Administration ("FDA").  *See* Mem. in Supp. of Defs.' Mot. to Dismiss Claim for Injunctive Relief, *Cain v. Merck & Co., Inc.*, No. CV 01 3441 (E.D.N.Y. Sept. 21, 2001) (attached as Ex. 91.  Plaintiffs opposed, urging the district court that it was "eminently qualified to decide Plaintiffs' claims for injunctive relief, just as it will determine Plaintiffs' damages claims . . . . Given the needless delay and cost that would be incurred by bifurcating the Plaintiffs' claims and having them tried in two separate forums simultaneously, the Court should retain jurisdiction over Plaintiffs' equitable claims."  Mem. in Opp'n to Defs.' Mot. to Dismiss Claim for Injunctive Relief, *Cain v. Merck & Co., Inc.*, No. CV 01 3441 (E.D.N.Y. Nov. 2, 2001).  On August 21, 2002, the district court granted the motion to dismiss.

Plaintiffs then amended their complaint a second time on September 18, 2002, and dropped their personal injury claims prior to any disposition of the certification issue.  Second Am. Class Action Compl., *Cain v. Merck & Co., Inc.*, No. CV 01 3441. (E.D.N.Y. Sept. 18, 2002) ("Second Am. Cain Compl.") (attached as Ex. 92).  In light of the district court's ruling on primary jurisdiction, the parties stipulated that plaintiffs' claims – now solely for injunctive relief – would be stayed pending completion of FDA review of plaintiffs' claims.  *See* Stipulation and

Order, *Cain v. Merck & Co., Inc.*, No. CV 01 3441 (E.D.N.Y. Sept. 18, 2002) (attached as Ex. 93). On February 16, 2005, the *Cain* class was transferred to this Court as part of the MDL. *See* Transfer Order, No. 1657, at A5 (J.P.M.L. Feb. 16, 2005) (attached as Ex. 94).

Two of the plaintiffs here – Medina-Alfanador and Pales – were putative class members of the *Cain* class action while its claims for damages were pending because they allege injury dates prior to September 18, 2002. As explained in further detail below, these plaintiffs are barred from asserting *American Pipe* tolling because that doctrine does not permit tolling based on successive class actions. *See* Section I.B.3.b, *infra*. The remaining plaintiffs were not members of the putative *Cain* class.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . [Merck] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because "only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment," questions that are "unnecessary" to the resolution of a particular case "will not be counted." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

The Court should grant summary judgment on plaintiffs' claims because they are time-barred. There can be no material dispute that each plaintiff was on notice of his or her claim by September 30, 2004 at the latest, when the withdrawal of Vioxx from the market sparked a media frenzy, announcing the drug's alleged risks on the front pages of newspapers across the country. As a matter of law, such publicity is sufficient to trigger discovery and to start the limitations clock ticking. Thus, whether measured under their home-states' laws or under Louisiana law,

plaintiffs' claims should have been filed no later than September 30, 2006, two years after withdrawal. Each case addressed by this motion was filed after that date and is therefore time-barred.

Plaintiffs will likely insist that their claims are saved by various tolling rules, specifically the *American Pipe* and fraudulent concealment doctrines. Not so. *American Pipe* rules vary from state to state, but invariably they cannot save these plaintiffs' claims – because plaintiffs would need to "stack" or "piggyback" class actions; because the state doctrine does not permit tolling for class actions pending elsewhere; or because the state does not recognize *American Pipe* at all. And the fraudulent concealment doctrine, like ordinary discovery rules, ceases tolling claims when the media reports the facts necessary to make out a claim, as happened here. Plaintiffs' tolling arguments thus fail, and the Court should grant Merck summary judgment.

I.     **THE CLAIMS OF THE PENNSYLVANIA AND PUERTO RICO PLAINTIFFS FAIL UNDER ALL POTENTIALLY APPLICABLE LAWS.**

   A.     **Louisiana Choice-of-Law Rules Apply To the Pennsylvania and Puerto Rico Plaintiffs.**

Each Pennsylvania and Puerto Rico plaintiff addressed by this motion directly filed his or her case in this Court, pursuant to Pretrial Order No. 11. As this Court has previously recognized, Louisiana choice-of-law rules govern such claims. *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 904 (E.D. La. 2007). That holding was consistent with the rule set forth in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), that a federal court sitting in diversity applies the choice-of-law rules of the state in which the court is situated. This Court's holding was also the product of careful consideration of the potential for abuse – not realized here in light of how Louisiana's choice-of-law rules apply – in permitting plaintiffs to bypass unfavorable rules by filing directly in the MDL forum. *In re Vioxx*, 478 F. Supp. 2d at 904. No such potential for abuse arises here, and Louisiana choice-of-law rules therefore apply.

Under Louisiana choice-of-law rules, the Court must consider both Louisiana limitations rules and the rules of each plaintiff's home state. Because plaintiffs' claims are barred both under Louisiana law and the laws of their home states, the Court need not decide which of those laws to apply, however. Either way, the claims are time-barred and summary judgment is therefore appropriate.

Louisiana's choice-of-law rule for selecting the applicable limitations period (or "prescription" period) in a particular case requires the Court to conduct two separate choice-of-law determinations: *first*, the Court must determine which state's substantive laws govern the proceeding, and *second*, based on that determination, it must decide the applicable limitations law.

Regarding the first step, the plaintiffs' substantive claims are governed by the laws of their home states, as this Court has consistently held. *In re Vioxx*, 478 F. Supp. 2d at 905-06. That preliminary inquiry is thus easily answered, and no extended discussion is required here.

Under the second step, in a case like this one, where "the substantive law of another state would be applicable to the merits of an action brought in this state," Louisiana prescription law applies except in two circumstances:

(1) If the action would be barred under Louisiana prescription law but allowed under the other state's law, and "maintenance of the action in this state is warranted by compelling considerations of remedial justice," La. Civ. Code Ann. art. 3549(B)(1), the court will apply the limitations law of the state whose substantive law governs.

(2) If the action would not be barred under Louisiana prescription law but would be barred under the law of the state whose substantive law governs, then the action is allowed to proceed unless allowing the case to continue "is not warranted by the policies of this state and its relationship to the parties or the dispute nor by any compelling considerations of remedial justice." *Id.* art. 3549(B)(2).

As set forth below, the Court need not undertake this analysis because plaintiffs' claims

18

would be barred both under their own states' laws (which will govern the substance of their claims) and under Louisiana law. Accordingly, regardless of which state's limitations law applies, their claims are time-barred and must be dismissed.

**B.      The Pennsylvania and Puerto Rico Plaintiffs' Claims Are Barred Under Louisiana Law.**

Louisiana employs a one-year limitations period on personal injury claims.[5] La. Civ. Code Ann. art. 3492. Plaintiffs here each filed suit in 2007 or late 2006, but each alleges injury before the withdrawal of Vioxx from the market in 2004. Plaintiffs' claims are thus stale unless saved by some other doctrine.

**1.      Based On Indisputable Facts, Plaintiffs' Claims Accrued In Louisiana No Later Than September 30, 2004 As A Matter Of Law.**

Louisiana employs a discovery rule that postpones accrual of a cause of action while an injury or its cause is unknown. *E.g.*, *Reed v. St. Charles Gen. Hosp.*, 815 So. 2d 319, 322 (La. Ct. App. 4th Cir. 2002). Under the Louisiana discovery rule, accrual is held in abeyance only so long as ignorance of an injury and its cause is "not willful, negligent or unreasonable." *In re Med. Review Panel of Howard*, 573 So. 2d 472, 474 (La. 1991). The limitations period begins whenever, in light of actual or constructive notice, a reasonable plaintiff would be aware of his claim. *Cartwright v. Chrysler Corp.*, 232 So. 2d 285, 287 (1970) (recognizing constructive notice); *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) (sustaining

---

[5]      The same one-year period governs claims of wrongful death, which accrue on the date of death. La. Civ. Code Ann. art. 2315.2. The wrongful death period, like that applying to personal injury claims, is "prescriptive" rather than "peremptive" and thus susceptible to tolling by the discovery rule or by fraudulent concealment. *See Evans v. CanadianOxy Offshore Prod. Co.*, 730 So. 2d 466, 468-71 (La. App. 3d Cir. 1998) (wrongful death claims are susceptible to tolling by discovery rule or fraudulent concealment, while survival actions are "peremptive" and therefore only prone to tolling under fraudulent concealment). Thus, the analysis of the various tolling doctrines here applies in the same way to the personal injury and wrongful death claims.

Plaintiffs also bring claims under theories of fraud, misrepresentation, and breach of warranty. Louisiana's one-year limitations period would apply to these claims as well. Louisiana's Unfair Trade and Consumer Protection Law requires fraud claims to be brought within one year. La. Rev. Stat. Ann. § 51:1409(e). And redhibition claims – *i.e.*, warranty claims – must be brought within a year as well. *Moreno's, Inc. v. Lake Charles Catholic High Sch., Inc.*, 315 So. 2d 660, 663-64 (La. 1975).

*Cartwright*'s basic rule but refocusing inquiry on reasonableness).  Where a plaintiff's pleadings demonstrate that his case was filed beyond the limitations period, the plaintiff bears the burden of showing that his claims accrued at some time after his alleged injury dates.  *Jones v. State*, 891 So. 2d 698, 701 (La. App. 4th Cir. 2004) (dismissing case before trial because plaintiff failed to carry her burden to prove discovery rule should apply).

Media coverage of facts that would give rise to a claim trigger discovery under these rules as a matter of Louisiana law.[6]  In *Touchet v. Baker Hughes Inc.*, 737 So. 2d 821 (La. App. 3d Cir. 1999), for example, a Louisiana appeals court held that discovery was triggered for plaintiffs exposed to a toxic spill when the plaintiffs exhibited symptoms and the "story regarding the spill was reported three times on television in the local news and once in the local newspaper."  *Id.* at 825.  The court declined to postpone discovery because the facts of the case suggested that "it would have been reasonable for the plaintiffs, at least, to attempt to find out whether their ailments could be connected to the spill.  The plaintiffs are 'deemed to know' facts that they could have discovered through exercise of reasonable diligence."  *Id.* at 827.

Plaintiffs here will thus be unable to carry their burden because a reasonable plaintiff would have been on notice of a possible claim against Merck by the time the *Cain* litigation was underway.[7]  During that time, from May 2001 until September 2002, the possible link between Vioxx and cardio- and cerebrovascular injury was widely aired in the media,[8] and that kind of

---

[6]    It is plain that a court may, in light of media coverage, reject a plaintiff's claim that the discovery rule should apply on summary judgment.  *See, e.g., In re Phenylpropanolamine Prods. Liab. Litig.*, MDL 1407, 2006 U.S. Dist. LEXIS 82102, at *3-4 (W.D. Wash. Nov. 9, 2006) (rejecting discovery rule and granting summary judgment under Louisiana law where plaintiff read article linking her alleged injuries to PPA).

[7]    Even before the *Cain* litigation, there were numerous widely publicized articles in the national media regarding the alleged risks of Vioxx.  *See, e.g.,* Rita Rubin, *Data: Vioxx might raise heart risk*, USA Today, Feb. 9, 2001, at 05B (attached as Ex. 2); Ransdell Pierson, *Vioxx, Celebrex aim to profit from improved safety labels*, Reuters, May 21, 2000 (attached as Ex. 95).

[8]    *See, e.g.,* David Brown, *Heart Risk from Celebrex, Vioxx?  'Super Aspirin' Makers Contest Analysis*, Wash. Post, Aug. 22, 2001, at A04 (attached as Ex. 96); Melody Petersen, *Doubts are Raised on the Safety of 2*

media coverage continued right up until the date of withdrawal.[9]

Even at the very latest, however, a reasonable plaintiff would have been on notice of his or her claims on September 30, 2004, the date that Merck announced the results of APPROVe and its decision to withdraw Vioxx from the market. As set forth in Part A of the Background section above, the withdrawal of Vioxx and the APPROVe results – suggesting a link between Vioxx and heart attacks – were widely covered both by print and broadcast media. The story was carried in national newspapers and television broadcasts; it was carried in newspapers in plaintiffs' home states; and it was brought to the attention of hundreds of thousands of physicians and pharmacies nationwide. Under these circumstances, reasonable plaintiffs could not have – and in fact did not – sleep on their claims. That fact is evidenced by the fact that thousands of plaintiffs managed to file their lawsuits within six months of withdrawal.[10]

Judge Higbee recently reached precisely this conclusion under New Jersey law. Evaluating Merck's claim that the same media coverage triggered discovery as a matter of New Jersey law, Judge Higbee agreed that "[t]he onslaught of coverage regarding potential dangers of VIOXX® and heart attacks was sufficient to alert plaintiff that VIOXX® was a possible cause of her heart attack." *Oldfield* Mem. at 6. Accordingly, she concluded, "[e]xercising reasonable diligence and intelligence" – *i.e.*, the same standard exacted by Louisiana law – "plaintiff should have discovered VIOXX® as a potential cause of her injury no later than September 30, 2004

---

*Popular Arthritis Drugs*, N.Y. Times, May 22, 2001, at C1 (attached as Ex. 97); Lindsey Tanner, *New studies add to debate over arthritis drugs and suspected risk of heart attacks*, Associated Press, May 26, 2002 (attached as Ex. 98).

[9]     *See, e.g.*, Thomas M. Burton and Patricia Callahan, *Vioxx Study Sees Heart-Attack Risk -- Merck Funded Research After Concerns Were Raised About its Painkilling Drug*, Wall St. J., Oct. 30, 2003, at B2 (attached as Ex. 99).

[10]    Furthermore, any plaintiffs taking Vioxx up until the date of withdrawal would have had the additional cue of being unable to obtain refills on their prescriptions. At that point, plaintiffs would likely have been advised, consistent with the Dear Healthcare Professional letters sent to doctors and pharmacies, that the drug had been withdrawn due to concerns about cardiovascular risks. Even if they were not so advised, the sudden unavailability of the drug would have prompted any reasonable person to follow up to find out why the drug was no longer available.

21

after VIOXX® was withdrawn from the market." *Id.* This Court should reach the same

conclusion.

Thus, at the latest, each plaintiff's claim was stale under Louisiana's applicable limitation

doctrine on October 1, 2005.

>    2.    **Based On Indisputable Facts And Plaintiffs' Own Allegations, Merck's Alleged Fraudulent Concealment Could Only Toll The Limitations Period To September 30, 2004 – At The Latest.**

Many of the plaintiffs – apparently cognizant that their complaints are untimely – assert

in their complaints that they are entitled to tolling on fraudulent concealment grounds. (DeVito

Compl. ¶ 39;[11] Easley Compl. at 1 (title of complaint asserts tolling); *see also* Alvarado Compl. ¶

21 (alleging information was not "made available" to Puerto Rico plaintiffs until August 2006).)

Louisiana law tolls limitations periods if a plaintiff can prove that the defendant concealed

information critical to his claim. *See Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376 (La. 1990).

As Judge Sarah Vance has recognized, however, claims for tolling under fraudulent-concealment

auspices must be pled with particularity under Federal Rule 9(b). *In re Ford Motor Co. Vehicle

Paint Litig.*, MDL No. 1063, 1996 U.S. Dist. LEXIS 11063, at *23 (E.D. La. July 30, 2006).

Specifically, a plaintiff must plead both the precise date when his or her continuing diligence

revealed a cause of action notwithstanding the alleged concealment and the actions that

effectively concealed the cause of action. *Id.*

Any fraudulent concealment tolling argument fails in these cases for at least three

reasons:  1) plaintiffs have not pled fraud with particularity; 2) plaintiffs only plead fraud up until

September 30, 2004, the date of withdrawal, which would amount to no tolling at all assuming

an identical discovery date; and 3) media attention to the withdrawal of Vioxx was so

---

[11]    The DeVito complaint purports to advance a distinct "equitable estoppel" basis for tolling, but that is not elaborated in the complaint and apparently depends upon the same facts that support the fraudulent concealment allegation.  For purposes of this motion, they will be treated as the same argument.

overwhelming as to expose the basis of plaintiffs' claims to any reasonably diligent person.

*First,* no plaintiff has a viable fraudulent-concealment tolling argument because none has pled facts demonstrating ongoing diligence, nor has any plaintiff connected any alleged fraud by Merck with his or her inability to discover her claims.

*Second,* even assuming plaintiffs' complaints state cognizable claims of fraudulent concealment prior to the date of the withdrawal of Vioxx from the market, they fail to state such a claim beyond that date. Specifically, each complaint alleges fraudulent practices only up until September 30, 2004. (*See* Alvarado Compl. ¶ 55 (alleging "deceptive and fraudulent market efforts" "*up to* September 30, 2004" (emphasis added); DeVito Compl. ¶ 66 (alleging Merck "continued to represent to consumers Vioxx was safe . . . *until* Merck withdrew Vioxx from the market in September 2004" (emphasis added) Easley Compl. ¶ 44 (alleging concealment continued "*until* September 30, 2004, when MERCK voluntarily recalled VIOXX, and removed it from the market" (emphasis added).)

Some complaints go even further. The DeVito complaint, for example, alleges that Merck's withdrawal of Vioxx from the market on September 30, 2004 was tantamount to an acknowledgment by Merck that its alleged fraud was fully exposed and thus physicians "would not have prescribed and/or plaintiffs would not have taken Vioxx." (DeVito Compl. ¶ 120.) And the Easley complaint expressly alleges that on "September 30, 2004, . . . . [t]he FDA also issued a Public Health Advisory to inform patients of [withdrawal] and to advise them to consult with a physician about alternative medications." (Easley Compl. ¶ 59.) Under these allegations, any claim of fraudulent concealment beyond September 30, 2004 is unsustainable, and plaintiffs' claims are stale because they did not file within one year of that date.

*Third,* as a matter of law, the fraudulent concealment doctrine has no application where

broad media coverage exposes the facts necessary to plaintiffs' claims. The basic theory of the doctrine is that a plaintiff cannot make a diligent inquiry into the origins of his injury – as he is required to do under the discovery rule – when "he is not even aware that he has been injured" due to concealment of facts by the tortfeasor. *Bunge*, 557 So. 2d at 1386. But when other forces reveal those facts, tolling ceases. Thus, in *Bunge*, even though GATX never admitted that it failed to disclose knowledge of a hazardous situation, "Bunge received clear notice of injury when the tank exploded." *Id.*

The same is true here. The effect of any alleged concealment by Merck of facts critical to plaintiffs' claims was fully abated when the withdrawal of Vioxx from the market was announced on September 30, 2004. At that time, plaintiffs were fully capable of making the diligent inquiry into their alleged injuries that is required under Louisiana's discovery rule.[12] Because plaintiffs failed to file within a year of that date, their claims are stale.

### 3. Plaintiffs' Claims Are Not Saved By *American Pipe* Tolling.

While plaintiffs may try to argue that their claims were tolled under *American Pipe* principles, that argument fails because: (1) *American Pipe* tolling was available to plaintiffs, if at all, only once, during the pendency of the *Cain* personal injury action; and (2) *American Pipe* tolling is generally not available to plaintiffs awaiting certification of personal injury class actions, because reliance on the possibility of class treatment of such inherently individualized

---

[12]     Furthermore, the sheer volume of lawsuits filed after withdrawal is a testament to the fact that any alleged fraudulent concealment was not so concealed as to escape the attention of plaintiffs lawyers around the country. Indeed, the same lawyers who alleged fraudulent concealment on behalf of their plaintiffs in these cases had all filed cases at far earlier dates in this litigation. Attorney Rowland, who filed on behalf of three of the Illinois plaintiffs, filed *Ellis v. Merck & Co., Inc.*, No. 05-455, on October 29, 2004 (attached as Ex. 103) (*Ellis* transferred to this Court on March 11, 2005 (attached as Ex. 104)). Attorney Boundas, who filed on behalf of the other Illinois plaintiff, Mr. Pales, filed *Lewis v. Merck & Co., Inc.*, No. 06-1466, on December 30, 2005 (attached as Ex. 105) (*Lewis* transferred to this Court on April 17, 2006 (attached as Ex. 106)). Attorney Cantrell, who filed on behalf of plaintiff Medina-Alfanador, filed *Acevedo v. Merck & Co., Inc.*, No. 06-6997, on September 29, 2006 (attached as Ex. 107). And Attorney Lowe, who filed on behalf of the Pennsylvania plaintiffs, filed *Anderson v. Merck & Co., Inc.*, No. 05-2572, on December 11, 2004 (attached as Ex. 108) (*Anderson* transferred to this Court on July 7, 2005 (attached as Ex. 109).

cases is objectively unreasonable.

a.      **The Origin And Purpose Of The *American Pipe* Doctrine.**

In *American Pipe & Constr. Co. v. Utah*, the U.S. Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. 538, 554 (1974). Under the *American Pipe* rule, former members of a class can toll limitations periods to preserve their right to file suit in the event that their class is not certified.[13] The Court reached that conclusion after considering the purposes of statutes of limitations and of Rule 23, the federal class action rule.

***First,*** the Court noted that Rule 23 was adopted to improve the efficiency of the class action device. According to the Court, Rule 23 was adopted in part "to avoid, rather than encourage" – as the old class-action rule had done – "unnecessary filing of repetitious papers and motions." *Id.* at 550. But because class certification decisions could often linger beyond the end of limitations periods – as had happened in the *American Pipe* case itself – this efficiency purpose of Rule 23 would be undermined unless plaintiffs could count on the pendency of the action to toll their claims. Otherwise, "class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Id.* at 553.

***Second,*** the Court found it important that the class members had acted reasonably in relying upon the pendency of the class action. It explained that certification had been denied 1) "'not for failure of the complaint to state a claim on behalf of the members of the class (the court recognized the probability of common issues of law and fact respecting the underlying

---

[13]      Originally, *American Pipe*'s rule applied only to "purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status," *id.* at 553, but the rule was later extended. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ("[t]he filing of a class action tolls the statute of limitations 'as to all asserted members of the class,' not just as to intervenors" (quoting *American Pipe*, 414 U.S. at 554)).

conspiracy)'"; 2) "'not for lack of standing of the representative'"; and 3) not "'for reasons of bad faith or frivolity.'"  *Id.* (quoting *State v. Am. Pipe & Constr.*, 473 F.2d 580, 584 (1973)) (omitting footnote).  Rather, class certification had been denied by the district court "solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable.'"  *Id.* at n.9.  "[A]t least where class action status has been denied" on these grounds, the Court held, tolling is appropriate.  *Id.* at 552.  Otherwise, in cases "where the determination to disallow the class action [is] made upon considerations that may vary with such subtle factors as experience with prior similar litigation or the current status of a court's docket, a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions."  *Id.* at 553-54.

 *Third,* the Court noted that its tolling rule would not, as applied in *American Pipe*, disturb the purposes of the statutes of limitations.  "The policies of ensuring essential fairness to defendants and barring a plaintiff who 'has slept on his rights' . . . are satisfied when" the class action is such that it "notifies the defendants not only of the substantive claims being brought against them, but also the number and generic identities of the potential plaintiffs who may participate in the judgment."  *Id.* at 554-55 (quoting *Burnett v. N.Y. Cen. R.R. Co.*, 380 U.S. 424, 428 (1965)).  Thus, the Court was satisfied, such class actions provide defendants with "the essential information necessary to determine both the subject matter and size of the prospective litigation," the primary concerns addressed by limitations rules.  *Id.* at 555.

 *Finally,* Justice Blackmun, joining the opinion and concurring in the judgment, nonetheless issued a word of caution.  "Our decision . . . must not be regarded as an encouragement to lawyers in a case of this kind to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights."

26

*Id.* at 561 (Blackmun, J., concurring).  He also noted that tolling would be limited to cases like

the one before the Court, where the claims "invariably will concern the same evidence,

memories, and witnesses as the subject matter of the original class suit," *id.* at 562, a sentiment

that would later be echoed by other Justices on the Court.  *See Crown, Cork & Seal Co. v.

Parker*, 462 U.S. 345, 355 (1983) (Powell, J., concurring) ("[W]hen a plaintiff invokes *American

Pipe* in support of a separate lawsuit, the district court should take care to ensure that the suit

raises claims that 'concern the same evidence, memories, and witness as the subject matter of the

original class suit,' so that 'the defendant will not be prejudiced.'"  (quoting *American Pipe*, 414

U.S. at 562 (Blackmun, J., concurring))).

       b.      **Applying *American Pipe* Tolling.**

Particularly in light of these latter admonitions, courts have proceeded cautiously in

applying the *American Pipe* tolling doctrine.  The Supreme Court itself has returned to the

principles underpinning the rule before deciding whether and how to apply it in subsequent

cases.  *See Chardon v. Fumero Soto*, 462 U.S. 650, 658 (1983) ("We must examine the reasoning

of *American Pipe*" to determine how to apply the doctrine in an action brought under 42 U.S.C. §

1983, which borrows state limitations rules.); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454,

467 (1975) (rejecting argument based in part on *American Pipe* that filing of Title VII claim with

EEOC should toll the limitation period both as to the Title VII claim and a companion claim

under 42 U.S.C. § 1981 because the *American Pipe* rule "depended heavily on the fact that [the

class action] involved exactly the same cause of action subsequently asserted").

The Fifth Circuit has similarly demanded that the purposes underpinning the *American

Pipe* rule be satisfied, rather than applying it blindly.  In *Lloyd's Leasing v. Bates*, for example,

the Fifth Circuit rejected application of *American Pipe* because its purposes would not be served

by tolling the limitations period.  902 F.2d 368, 371-72 (5th Cir. 1990).  In that admiralty

proceeding, Lloyd's filed a complaint for a limitation of liability under Rule F after its vessel ran aground near Cameron, Louisiana, spilling two to three million tons of crude oil. *Id.* at 369-70; *see* Fed. R. Civ. P. F. The court issued a monition[14] requiring all claims to be filed by December 31, 1984. *Id.* at 369. Bates and five others filed a class action before that date, and class certification was denied on January 22, 1988, long after the end of the monition period. *Id.* Shortly thereafter, other parties sought to file claims, urging tolling under *American Pipe*. *Id.* at 369, 371. The Fifth Circuit rejected the argument. "The vice in the appellant's argument is that it ignores the grounds for the holding in *American Pipe*." Specifically, *American Pipe*'s concern with eliminating surplus filings was entirely misplaced in the proceeding before the court: "In the instant case, there is no danger of frustrating the purpose of the class action because no such action may be maintained in a limitation proceeding. The filing of numerous individual claims is not a danger to be avoided but an activity which the limitation proceeding invites by its notice provisions and its relaxed attitude towards the filing of claims after the monition period has expired." *Id.* at 372.

The Fifth Circuit similarly rejected tolling in *Drumm v. Sizeler Realty Co.*, 817 F.2d 1195 (5th Cir. 1987). In that case, plaintiffs filed an unsuccessful antitrust suit in state court and, upon its failure, an out-of-time antitrust suit in federal court. *Id.* at 1196. Plaintiffs sought equitable tolling, analogizing their case to *American Pipe* and another tolling case. But the Fifth Circuit rejected the argument, explaining that plaintiffs' cases "are distinguishable in fact and, even more critically, in their basic rationale." *Id.* Critical to the holding in *American Pipe* was the concern that the plaintiff "was unable to control the date of filing of his lawsuit, because of the pendency of a Rule 23 class action." *Id.* Without protection of tolling, "[u]nfairness results to

---

[14] The monition procedure is explained in greater detail in paragraph (4) of Supplemental Rule F in the Federal Rules of Civil Procedure.

the innocent plaintiff and, indirectly, to society." *Id.* at 1196-97. Not so in *Drumm*, where nothing prevented plaintiffs from filing lawsuits under state and federal antitrust laws simultaneously. *Id.* at 1197. Thus, tolling was not available. "The policies of ensuring essential fairness to defendants [includes] . . . barring a plaintiff who 'has slept on his rights.'" *Id.* (quoting *Burnett*, 380 U.S. at 428).

As a final example, the basic principles of *American Pipe* have guided federal courts to the uniform conclusion that its tolling rule operates only with respect to the first class action filed with regard to a specific controversy. If class certification has been denied, plaintiffs cannot receive the benefit of tolling in a second, subsequently-filed class action involving the same proposed class and claims. *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985). This doctrine is known colloquially as the prohibition on "stacking" or "piggybacking" class actions. Every federal circuit court to consider the question has adopted this rule,[15] and state courts that have considered the issue have generally adopted the same prohibition.

c.   ***American Pipe* In Diversity Cases.**

The federal *American Pipe* doctrine does not apply directly in a diversity case. Though

---

[15]   As the Ninth Circuit has noted:

> The Supreme Court has not yet considered whether the filing of a class action tolls the statute of limitations for a subsequently filed successor class action. However, every circuit to consider the question, including this one, has held that such tolling is not available. *See Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir.1998) ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely."); *Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir.1994) ("Plaintiffs may not piggyback one class action onto another and thus toll the statute of limitations indefinitely."); *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir.1988) ("The courts of appeals that have dealt with the issue appear to be in unanimous agreement that the pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class."); *Robbin v. Fluor Corp.*, 835 F.2d 213, 214 (9th Cir.1987) (holding that a class action tolls the statute of limitations only for subsequent individual actions, not for subsequent class actions); *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir.1987) (same).

*Catholic Soc. Servs., Inc. v. I.N.S.*, 182 F.3d 1053, 1059 (9th Cir. 1999).

the federal circuits are divided on the issue, the Fifth Circuit and others have held that, in the event of a conflict between the federal tolling rule and the tolling rules under the applicable state's statute of limitations, the *Erie* doctrine requires application of the state's tolling rule.  *See Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1147 (5th Cir. 1997) (noting that a state's interest in its own tolling rules has "quite considerable depth," and *Erie* requires application of the state rule that would undermine the policy rationale of *American Pipe* because neither "the federal constitution nor federal law would be displaced"); *see also, e.g.*, *Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999) (holding that "in any case in which a state statute of limitations applies – whether because it is 'borrowed' in a federal question action or because it applies under *Erie* in a diversity action – the state's accompanying rule regarding equitable tolling should also apply") (citing *Chardon*, 462 U.S. at 660-62, and *Board of Regents v. Tomanio*, 446 U.S. 478, 484-86 (1980)).

Thus, the Court must ask how each relevant state would interpret and apply *American Pipe* in deciding whether plaintiffs' claims are time-barred in this instance.  Three doctrinal developments are worthy of particular attention.

**First,** a number of states have not adopted *American Pipe*, and it would be inappropriate for a federal court to do so on their behalf.  In *Boone v. Citigroup, Inc.*, for example, the Fifth Circuit rejected a claim for *American Pipe* tolling in a case arising under Mississippi law.  416 F.3d 382 (5th Cir. 2005).  Critically, the court explained, *American Pipe* and *Crown, Cork* each involved "a federal class action for violation of a federal statute" and tolled the limitation period for parties who later brought "an action, within the scope of the putative class action, for violation of the same federal statute by a member of the putative class against a defendant in the class action."  *Id.* at 393.  But "Mississippi does not have class actions and we are cited to no

Mississippi court decision applying class action tolling to a Mississippi law cause of action allegedly barred by a Mississippi statute of limitations." *Id.* at 393-94.  Accordingly, the court rejected plaintiffs' tolling argument, declining to author such a doctrine on Mississippi's behalf.[16]  *Id.*  That holding was consistent with the Fifth Circuit's general policy against effecting a "substantive innovation" in state law in diversity cases.  *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. 1980) ("Whatever the merits or demerits of the proposed new rule, for us to adopt it for Texas would be presumptuous."); *see also, e.g.*, *Wade*, 182 F.3d at 286 (declining to adopt *American Pipe* tolling on behalf of Virginia for class actions filed out of state because Virginia had never expressly adopted *American Pipe* and because "of the general principle that, 'in trying to determine how the highest state court would interpret the law, we should not create or expand that State's public policy'" (quoting *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 260 (4th Cir. 1998))).

**Second,** some states afford "cross-jurisdictional" tolling, while others do not.  *Compare, e.g.*, *Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160, 162-63 (Ohio 2002) (cross-jurisdictional tolling), *with Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1103, 1105 (Ill. 1998) (no cross-jurisdictional tolling).  A state that does not recognize cross-jurisdictional tolling will not toll the statute of limitations pending certification of a related class action filed in the court of another state or in a federal court.  And even a state that observes some form of cross-jurisdictional tolling may not toll under all circumstances – for example, it may toll while a federal class action is pending within that state, but not while a class action is pending out-of-state.  Again, where states have declined to adopt such doctrines for themselves, a federal court

---

[16]     The court was further troubled by the fact that plaintiffs had pointed to a class action filed in another state, suggesting a narrower holding than an outright rejection of such a tolling doctrine.  But while it is possible to construe the holding as rejecting only a cross-jurisdictional tolling doctrine, the dicta unequivocally emphasizes the fact that Mississippi has never announced an *American Pipe* doctrine.

sitting in diversity should usually not reach out to author one on its own.  *Wade*, 182 F.3d at 286.

**Third,** several jurisdictions have held that *American Pipe* tolling is simply unavailable for mass-tort personal injury cases like this one.  These courts have looked to the purposes of *American Pipe* and found them to be ill-served by applying the doctrine to such cases, particularly because mass-tort personal injury cases are widely recognized as uncertifiable[17] (and thus plaintiffs relying on the pendency of such class actions act unreasonably) and because the varying nature of personal injury claims are such that the details of one plaintiff's case do not generally put a defendant on notice of the claims of nameless class members.  On the basis of these considerations, the more carefully reasoned opinions on the issue have uniformly rejected tolling.  *See, e.g., Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 937-38 (Cal. 1988) (admonishing that personal injury plaintiffs "would be ill advised to rely on the mere filing of a class action complaint to toll their individual statute of limitations.  *The presumption, rather, should be to the contrary* . . . ." (emphasis added)); *see also Philip Morris USA, Inc. v. Christensen*, 905 A.2d 340, 358-60 (Md. 2006) (expressing support for *Jolly*'s presumption against tolling in the mass tort context); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2005 WL 26867, at *3 (S.D.N.Y. Jan. 5, 2005) (noting that the "wisdom of adopting the *American Pipe* rule in mass tort cases is,

---

[17]     *See In re Am. Med Sys.*, 75 F.3d at 1089 (there is a "national trend to deny class certification in drug or medical product liability/personal injury cases"); *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 144-45 (E.D. La. 2002) (prescription drug) ("In the present case the monetary claims are dependent in a significant way on differences of each class member's circumstances.  They will require additional hearings to resolve the disparate merits of each individual's case." (quotation omitted)); *In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (contraceptive device) ("In products liability actions . . . individual issues may outnumber common issues.  No single happening or accident occurs to cause similar types of physical harm or property damage.  No one set of operative facts establishes liability."); *Zehel-Miller v. AstraZenaca Pharms., LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004) (antipsychotic drug) (certification of personal injury damages claims "would be indisputably inappropriate, since individual issues would overwhelm any common questions"); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003) (antidepressant) ("[I]ndividual questions of fact regarding causation . . . subvert any benefits to be gained through a class action proceeding."); *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 41 (D.N.H. 1983) (prescription drug DES) (resolving common issue of a drug's capacity to cause injury would do "substantially nothing" to advance the litigation "[i]n light of the varied degrees of use, exposure and harm in each Plaintiff's case"); *Ryan v. Eli Lilly & Co.*, 84 F.R.D. 230, 233 (D.S.C. 1979) (synthetic estrogen) ("A class situation is simply not efficient when so much in the way of individual proof by each of the class members will obviously be required.").

to say the least, highly debatable"); *Barela v. Showa Denko K.K.*, No. 93-1469 LH/RLP, 1996 U.S. Dist. LEXIS 7830, at *16 (D.N.M. Feb. 28, 1996) (expressing doubt whether a federal court should adopt *American Pipe* tolling for a state that had not adopted the doctrine in a mass-tort personal injury case in light of the fact that "most federal courts . . . refuse to permit the use of the class-action device in mass-tort cases" (citation and internal quotation marks omitted)).

That conclusion is the correct one, as a return to the principles of *American Pipe* confirms.  Because prescription drug personal injury cases are almost never certified, they are not the kinds of cases that present certification decisions that hinge on subtle distinctions.  The case in *American Pipe*, in contrast, was one of a genre of cases that entailed "considerations that may vary with . . . subtle factors" and thus made difficult "successful anticipation of the determination of the viability of the class," 414 U.S. at 553-54, making reliance on the possibility of certification reasonable.

Furthermore, the individualized nature of personal injury claims is such that a defendant is not fairly put on notice of all the claims against it by the filing of a class action.  As Merck noted in its opposition to class certification, these cases involve widely varying facts with respect to usage, dose, content of warnings, medical history, and a host of other factors unique to each plaintiff.  Not surprisingly, each trial requires extensive individualized discovery, involving "evidence, memories, and witnesses" that are unique to each case, including – by way of example – family members, treating physicians, and pharmacy records to which Merck cannot possibly have access without knowing the actual identity of the plaintiff.  And Merck could have no way of knowing the number of claims that would be encompassed by such an action, let alone the identities of the witnesses or their evidence.  The Vioxx suits are thus unlike the *American Pipe* case, in which the Court noted the "probability of common issues of law and fact," *id.* at

33

553, and in which there could be no doubt that individual claims "invariably will concern the same evidence, memories, and witnesses as the subject matter of the original class suit," *id.* at 562 (Blackmun, J., concurring).

In addition, extending the doctrine to mass-tort personal injury cases would encourage plaintiffs' lawyers to file class actions merely to achieve an illegitimate tolling benefit for unnamed members of the purported class (as happened in this case). They are thus precisely the kinds of cases Justices Blackmun and Powell warned about in their concurring opinions in *American Pipe* and *Crown, Cork*. As evidenced by the instant proceedings, tolling serves no efficiency purpose – the solitary virtue of *American Pipe* tolling – because the vast majority of plaintiffs file their complaints notwithstanding the hypothetical availability of class-action tolling. Indeed, *American Pipe* is all the more unnecessary in the instant litigation in light of the tolling agreement, which, at least for plaintiffs who have not slept on their claims, serves the purposes of *American Pipe* and would be redundant if *American Pipe* tolling actually applied in the mass-tort context.

Finally, class action tolling in the context of mass tort proceedings also leads to injustice. If plaintiffs are allowed to slumber and not assert their claims while others have pursued their claims in mass litigation of this kind, the parties – plaintiffs and defendants alike – cannot get a grasp of the size or scope of the litigation until years after the deadlines contemplated by the applicable statutes of limitations. Without a grasp on the size or scope of the litigation, the parties are shackled in searching for ways to resolve the litigation, leaving the claims of individual plaintiffs, some of whom may be ill or elderly, languishing until the doors are deemed closed.

d.    **Plaintiffs' Claims Are Stale Under Louisiana Law Notwithstanding *American Pipe*.**

Louisiana follows *American Pipe*.  Under the Civil Code, a limitation period "is interrupted when the owner commences action against the possessor, or when the obligee commences action against the obligor, in a court of competent jurisdiction and venue."  La. Civ. Code Ann. art. 3462.  Citing *American Pipe*, a Louisiana appeals court recently explained that this rule applies to class actions.  *Smith v. Cutter Biological*, 770 So. 2d 392, 408 (La. Ct. App. 2000).  In *Smith*, plaintiff sued producers of a clotting factor for hemophiliacs after he contracted HIV by use of the products.  The court determined that the plaintiff's claim was filed too late, *id.* at 400, and the plaintiff sought *American Pipe*-like tolling to save his claim.  *Id.* at 408.  To do so, however, he had to rely on several overlapping class action periods in order to make his claim timely.  *Id.* at 408-10.  The court rejected the effort, noting that article 3462 "was not intended to interrupt prescription where the stacking of class actions is concerned" and citing federal cases discussing the stacking prohibition.  *Id.* at 410 (citing *Basch*).

The court also embraced (in dicta) cross-jurisdictional tolling under the expansive language of article 3462, which requires tolling whenever an action is commenced in any "court of competent jurisdiction" and venue.  *Id.* at 408.  That observation was consistent with the Louisiana Supreme Court's earlier statement that "it has become well settled that prescription may be interrupted under article 3462 by the timely filing of a suit in a court of competent jurisdiction and venue, regardless of whether it is a federal, Louisiana or another state court." *Taylor v. Liberty Mut. Ins. Co.*, 579 So. 2d 443, 446 (La. 1991).

Louisiana's *American Pipe* doctrine cannot save plaintiffs' claims here.

***First,*** tolling is unavailable for Medina-Alfanador because of the rule against stacking. The *Cain* nationwide class action filed in New York in 2001 against Merck was the first Vioxx

personal injury class action to suspend plaintiffs' one-year limitation period, and the prohibition on stacking class actions prevented these plaintiffs from benefiting from any subsequently filed class action, whether in Louisiana or elsewhere. *See Smith*, 770 So. 2d at 410 ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely.").

The fact that the *Cain* plaintiffs voluntarily dismissed their personal injury claims prior to a certification ruling does not change this result. As other courts have recognized, the test cannot be how the class action ends; otherwise, plaintiffs could file an unending series of class actions that they voluntarily dismiss in each case prior to certification, thereby short-circuiting the stacking rule. *See Hunter v. Am. Gen. Life & Accident Ins. Co.*, 384 F. Supp. 2d 888, 893 (D.S.C. 2005) (holding that stacking prohibition applies to voluntarily dismissed claims because allowing tolling would encourage "spin-off litigation" in which "counsel could initially pursue a broad definition in one jurisdiction, voluntarily narrow it for settlement purposes, dismiss any remaining claims, and then revive the dismissed claims in multiple suits in other jurisdictions while gaining the benefit of tolling from the earlier litigation"); *Sheppard v. Capital One Bank*, No. 06-7535, 2007 U.S. Dist. LEXIS 70061, at *10-14 (C.D. Cal. July 11, 2007) (agreeing with *Hunter* that narrowing a class, whether voluntarily or involuntarily, implicates the stacking rule as to the severed claims); *see also Am. Pipe*, 414 U.S. at 561 (Blackmun, J., concurring) (urging that *American Pipe*'s rule "must not be regarded as encouragement to lawyers in a case of this kind to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights"); *Crown, Cork*, 462 U.S. at 354 (Powell, J., concurring) (warning that the "tolling rule of *American Pipe* is a generous one, inviting abuse").

**Second,** even if *Cain* did not disqualify plaintiffs from seeking additional subsequent

tolling, such tolling is inappropriate here because it is inconsistent with the purposes of *American Pipe*.

Louisiana law bars reliance on pending classes when such reliance is unreasonable. *Cf. Smith*, 770 So. 2d at 409 (agreeing that "continued tolling of the statute of limitations after the district court denies class certification is unnecessary to protect any ***reasonable*** . . . reliance by putative class members on their former class representatives" (emphasis added) (quoting *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1382 (11th Cir. 1998))). *Smith* held in part that reliance on the possibility that a district court would reverse its negative ruling on a certification question was "ordinarily not reasonable" and thus that tolling was inappropriate. *Id.* Reliance on the hope that a court would certify a statewide or nationwide class action for personal injury is similarly not reasonable. As the *Baycol* court noted, "[N]o [federal] Court of Appeals decision has approved class certification of an action involving prescription drugs." *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 204 (D. Minn. 2003) (cholesterol drug). There is thus no reason to believe that Louisiana courts would afford *American Pipe* tolling in Vioxx cases. Rather, Louisiana law appears to track the careful reasoning exhibited in opinions like the *Jolly* case, which held that reliance on the possibility of class certification is objectively and empirically unreasonable in mass-tort personal injury cases. *See Jolly*, 751 P.2d at 937-38.

Furthermore, as articulated above, the interests identified by the Supreme Court in *American Pipe* would not be furthered by tolling plaintiffs' claims. As the carefully reasoned opinion in *Smith* reveals, Louisiana courts do not automatically apply *American Pipe* tolling, but seek to apply it consistently with the purposes identified by the Supreme Court. Those purposes are absent here. As explained above, class actions cannot put Merck on notice of unnamed plaintiffs' claims because personal injury claims are so individualized. Thus, plaintiffs' claims

should not be tolled because they were never named parties prior to filing their individual suits. Their cases do not entail identical evidence, memories, or witnesses. Granting tolling here would simply award abuse of the class action process, which would serve neither federal nor Louisiana interests.

In sum, *American Pipe* tolling is unavailable, and plaintiffs were required to file their actions – at the latest – by September 30, 2005. Because they failed to do so, their claims are stale under Louisiana law.

**C.     The Claims Of Plaintiffs Barrall, Ciabattoni, and Dusi Are Time-Barred Under Pennsylvania Law.**

The claims of plaintiffs Barrall, Ciabattoni and Dusi are also untimely under their own home state's laws. Pennsylvania requires plaintiffs to file their claims within two years of injury or discovering their claims. Accordingly, these plaintiffs had to file their claims no later than September 30, 2006, two years after the withdrawal of Vioxx from the market. As explained in detail below, they failed to do so, and their claims are therefore stale.[18]

---

[18]     Pennsylvania's statute of limitations law expressly bars plaintiffs' claims for personal injury and wrongful death, including Strict Products Liability/Defective Design, Strict Products Liability/Failure to Warn, Negligent Design, and Negligence, Failure to Warn. (*See* DeVito Compl. ¶¶ 71-99.) Plaintiffs – whose claims are all raised by the DeVito complaint and are thus identical to one another – also allege negligent misrepresentation and fraudulent omission/concealment claims (*see id.* ¶¶ 100-21), as well as breach of implied and express warranty claims (*see id.* ¶¶ 122-32). These latter claims are also barred.

*First*, plaintiffs' negligent misrepresentation and fraudulent omission/concealment claims are barred under Pennsylvania's two-year statute of limitations as claims of "any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, ***including deceit or fraud*** . . ." 42 Pa.C.S. 5524(7) (emphasis added); *see also IEJ Corp. v. Laserow*, No. 1128, 2005 Phila Ct. Com. Pl. LEXIS 467 (Phila. Com. P. Oct. 25, 2005) ("[p]laintiffs' claims sound both in tort (negligence, negligent misrepresentation and breach of fiduciary duty) and in contract . . . the applicable statutes of limitations are two and four years, respectively").

*Second*, the claims of plaintiffs Barrall and Dusi for breach of warranty fail under Pennsylvania's four-year statute of limitations for warranty actions. 13 Pa.C.S. § 2725. The code expressly provides that a cause of action for breach of warranty accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* at 2725(b). The code also provides that except where an express warranty explicitly extends to future performance of the goods sold, a breach occurs, if at all, "when tender of delivery is made." As a result, "the discovery rule applicable to tort actions ***does not apply*** in warranty actions." *Garber v. Ansell/Perry*, No. GD 99-2338, 2003 Pa. Dist. & Cnty. Dec. LEXIS 129 (June 25, 2003) , at *10. Here, plaintiffs Barrall and Dusi initially purchased their Vioxx in November of 2002 (Barrall Pl. Profile Form at 5; Dusi Pl. Profile Form at 5), making their

1.    **Under Pennsylvania Law, The Discovery Rule Was Triggered – At The Latest – By The Media Coverage Following The Withdrawal Of Vioxx.**

a.    **Personal Injury Plaintiffs Barrall And Ciabattoni**

Pennsylvania, whose law governs the claims of plaintiffs Barrall and Ciabattoni, observes a two-year limitation period for personal injuries in a product liability case.  42 Pa. Cons. Stat. Ann. § 5524(2); *Schach v. Ford Motor Co.*, 210 F.R.D. 522, 523 (M.D. Pa. 2002) (applying Pennsylvania's two-year statute of limitations to motorist's personal injury product liability action against automobile and automobile tire manufacturers).  Generally, in Pennsylvania, the right to sue to recover damages for personal injuries arises – and the statute of limitations begins to run – "when the injury is inflicted."  *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005).  Like the other jurisdictions subject to this motion, however, Pennsylvania has adopted a "discovery rule" that tolls the running of the statute of limitations "until such time as the plaintiff discovers, or reasonably should have discovered" his or her injury.  *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).  *See id.* ("the 'discovery rule' exception arises from the inability, despite the exercise of diligence, to determine the injury or its cause").

In applying the discovery rule, Pennsylvania courts have explained that the rule "cannot be applied so loosely as to nullify the purpose for which a statute of limitations exists."  *Ingenito v. AC & S, Inc.*, 633 A.2d 1172, 1175 (Pa. Super. Ct. 1993).  Thus, in Pennsylvania, a claimant seeking to avail himself of the discovery rule "has the burden of establishing that he pursued the

---

last date to assert valid warranty claims November 2006.  *See Garber*, 2003 Pa. Dist. & Cnty. Dec. LEXIS 129, at *9-11 (finding statute of limitations for breach of warranty had run when plaintiff claimed latex gloves caused her an allergy from 1979 to 1997 and filed her complaint June 7, 1999).  Each of the plaintiffs' warranty claims also fail because they have not pled that they provided Merck with notice of its alleged breach of warranty.  Pennsylvania law requires that the buyer "must within a reasonable time after he discovers or should have discovered any breach [of warranty] notify the seller of that breach."  13 Pa. Cons. Stat. Ann. § 2607(c)(1).  Failure to comply with this fundamental requirement will "bar[] [the buyer] from any remedy."  *Id.*  Here, plaintiffs have not alleged that they provided Merck with notice of the alleged breach in compliance with the requirements of 13 Pa. Cons. Stat. Ann. § 2607.

cause of his injury with 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.'" *Cochran v. GAF Corp.*, 666 A.2d 245, 250 (Pa. 1995) (citation omitted). *See id.* ("Our cases firmly establish that the 'reasonable diligence' standard has some teeth."). As one Pennsylvania court has observed, "[t]he polestar of the Pennsylvania discovery rule is not a plaintiff's actual acquisition of knowledge but whether the information, through the exercise of due diligence, was knowable to the plaintiff." *Ingenito*, 633 A.2d at 1175 (citation omitted).

Events giving rise to extensive media coverage have thus been held to trigger discovery as a matter of law in a case like this where the coverage would put anyone exercising "due diligence" on notice of his or her claims. *See Martin v. Dalkon Shield Claimants Trust*, No. 93-2652, 1994 U.S. Dist. LEXIS 16395, at *11-12 (E.D. Pa. Nov. 20, 1994). In *Martin*, the plaintiff brought a product liability lawsuit over an allegedly defective contraceptive device and the defendant moved for summary judgment on the ground that the plaintiff's claim was time-barred. In granting the defendant's motion, the court observed that plaintiff failed to make any inquiry regarding the cause of her injury in the face of, *inter alia*, "published news accounts, articles in medical journals and reports by the Food and Drug Administration" confirming a link between IUDs and spontaneous abortions. *Id.* Accordingly, the court refused to apply the discovery rule, reasoning that where "a plaintiff fails to obtain information which is readily available, she has not acted with reasonable diligence." *Id.* at *11.

Summary judgment is likewise appropriate here. As set forth above, nationwide media coverage of the withdrawal of Vioxx from the market was substantial. In Pennsylvania, the media coverage was equally ubiquitous. (*See* Background § A.2, *supra* p.12.) Furthermore, vast numbers of plaintiffs in the instant litigation filed claims across the country shortly after the

withdrawal of Vioxx, triggering additional media coverage which itself should have put other users of Vioxx on notice of their potential claims.  In addition, the plaintiffs here offer no explanation in their complaints for their lack of knowledge of their claims prior to 2006.  Though plaintiffs assert in their complaint that the "applicable statute of limitations is tolled based on defendants' fraudulent concealment of the dangers and adverse side effects of Vioxx, respectively" and that "Merck is equitably estopped from raising the statute of limitations defense" (DeVito Compl. ¶ 39), there is no allegation in the complaint regarding Merck's conduct that post-dates the withdrawal of Vioxx.  To the contrary, plaintiffs aver that "[d]espite the foregoing, Defendant Merck continued to represent to consumers that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug, *until Merck withdrew Vioxx from the market in September 2004*."  (*Id.* ¶ 66; *see also id.* ¶ 120.)  Having made these allegations, it is each of the Pennsylvania plaintiffs' burden to "justify[] any delay" by demonstrating that "the failure timely to investigate the cause of [their injuries] was not unreasonable or that [they] could not have ascertained the pertinent information earlier through an exercise of due diligence."  *Martin*, 1994 U.S. Dist. LEXIS 16395, at *10.  Because they have not done so, their claims are time-barred under Pennsylvania law.

b.  **Wrongful Death Plaintiff Dusi**

Under Pennsylvania law, which governs plaintiff Dusi's claim for wrongful death, an action to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another must be commenced within two years.  *See* 42 Pa. Cons. Stat. Ann. § 5524(2).  The limitations period for a wrongful death action differs in at least one significant way from an action for personal injury:  the discovery rule does not apply to wrongful death and survival actions.  *E.g., Molineux v. Reed*, 532 A.2d 792, 795 (Pa. 1987).

This rule has recently been applied in a product liability drug case.  *Nobles v. Rexall*

*Sundown*, No. 2376, 2005 Phila. Ct. Com. Pl. LEXIS 161, at *2-4 (March 7, 2005).  *See also*

*Pennock v. Lenzi*, 882 A.2d 1057, 1065 (Pa. Commw. Ct. 2005), *appeal denied*, 897 A.2d 462

(Pa. 2006), *cert. denied*, 127 S. Ct. 227 (2006) ("Because of the clear notice that death provides,

combined with the ability to perform an autopsy to discover its cause, the two years prescribed

by the legislature afford a decedent's representatives a reasonable opportunity to bring [a

wrongful death or survival] suit.").  In *Nobles*, the administratrix of her late husband's estate

alleged that the diet drug Metabolite caused her husband's death.  Plaintiff brought claims for

strict product liability, negligence, wrongful death, survival action, loss of consortium and

fraudulent misrepresentation.  As the court observed, the decedent passed away on September

26, 2000; however, the plaintiff did not commence the lawsuit "until March 8, 2004, almost two

years after the statute of limitations had run and almost four years after death."  *Nobles*, 2005

Phila. Ct. Com. Pl. LEXIS 161, at *2.  Plaintiff argued the discovery rule applied and, thus, the

statute of limitations did not begin to run until the discovery of the injury, which occurred after

the date of death.  The court disagreed.  "The Pennsylvania Supreme Court has specifically held

that the discovery rule does not apply to wrongful death and survival actions."  *Id.* at *3.

Accordingly, the court concluded that "the statute of limitations for the wrongful death and

survival actions ran on September 26, 2002, two years after" the date of the decedent's death.  *Id.*

at *4.

Here, under Pennsylvania law, plaintiff Dusi must have filed his wrongful death claim –

***at the latest*** – by February 7, 2005, two years after the death of his decedent, February 7, 2003.

Because he did not do so, his wrongful death claim is time-barred under Pennsylvania law.

> 2.   **Plaintiffs' Claims Are Not Saved By The Doctrine Of Fraudulent Concealment.**

While plaintiffs Barrall, Ciabattoni, and Dusi may seek to argue that Merck fraudulently

concealed the facts necessary to make out their claims against Merck, such an argument cannot survive summary judgment.  In Pennsylvania, the doctrine of fraudulent concealment operates in much the same way as the discovery rule, *i.e.*, alleged concealment on the part of a defendant tolls the limitations period only so long as the plaintiff cannot, in the exercise of due diligence, discover the facts necessary to make out a claim.  As the court in *Fine v. Checcio*, 870 A.2d 850, 861 (Pa. 2005), stated, "the standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment."  Thus, for the very same reason that discovery was triggered no later than September 30, 2004, no concealment, even if proven, could toll the limitations period beyond that date.  Accordingly, the Pennsylvania plaintiffs' claims are not saved by fraudulent tolling here.  Just as reasonable diligence should have triggered discovery by September 30, 2004, so too would plaintiffs' reliance on any alleged fraudulent concealment have become unreasonable by that date.[19]

3. **Plaintiffs' Claims Are Not Saved By *American Pipe* Tolling.**

In addition, the Pennsylvania plaintiffs' claims are not saved by *American Pipe* tolling for two reasons:  1) Pennsylvania law will not toll the limitations periods for class actions filed in federal court, and no such suits have been filed in Pennsylvania state court; and 2) even if Pennsylvania recognized cross-jurisdictional tolling, it would not apply *American Pipe* tolling in a case like this one.

***First,*** Pennsylvania recognizes *American Pipe* but has expressly rejected cross-jurisdictional tolling.  *Ravitch v. Price-Waterhouse*, 793 A.2d 939, 945 (Pa. Super. Ct. 2002),

---

[19]      Furthermore, as noted in Section I.B.2 above, plaintiffs must plead fraudulent concealment with particularity in order to toll limitations periods, and they have not done so here.  *In re Ford Motor Co. Vehicle Paint Litig.*, MDL No. 1063, 1996 U.S. Dist. LEXIS 11063, at *23 (E.D. La. July 30, 1996).  Accordingly, tolling for fraudulent concealment is unavailable as a matter of law.

appeal denied, 818 A.2d 505 (Pa. 2003) ("In conclusion, we hold that the filing of a class action in another state does not toll the statute of limitations as to a subsequent action filed in Pennsylvania's state court system.").  In so holding, the *Ravitch* court observed that "tolling the statute of limitations for individual actions filed after the dismissal of a class action is sound policy when both actions are brought in the same court system."  *Ravitch*, 793 A.2d at 944 (quoting *Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1104 (Ill. 1998)).  However, permitting Pennsylvania plaintiffs to toll their claims based on a class action filed in a different court system may increase the burden on Pennsylvania's courts "because plaintiffs from across the country may elect to file a subsequent suit in that state solely to take advantage of the generous tolling rule" and, moreover, "any state which independently does so will invite into its court a disproportionate share of suits which the federal courts have refused to certify as class actions after the statute of limitations has run."  *Id.*  As the *Ravitch* decision makes clear, the *American Pipe* doctrine does not operate to toll a plaintiff's claim in Pennsylvania unless there has been a personal injury class action against a given defendant filed ***in Pennsylvania's court system.***  Here, no Vioxx personal injury class action has ever been pending in Pennsylvania state courts.  Thus, the Pennsylvania plaintiffs cannot rely on any past or pending Vioxx class actions for *American Pipe* tolling.

    ***Second,*** even if Pennsylvania courts recognized cross-jurisdictional tolling – and it is very clear that they do not – plaintiffs cannot rely on a pending class action under the present circumstances to toll the relevant limitations period.  Pennsylvania courts do not apply *American Pipe* tolling automatically.  In *Cunningham v. Insurance Company of North America*, for example, the plaintiff and putative class representative had sued thirty-one insurance companies but was insured by only one of them.  530 A.2d 407, 410 (Pa. 1987).  Class counsel urged

tolling, explaining that the purpose of filing the complaint against all companies was "a concern for plaintiffs who would not otherwise file suits." *Id.* The Pennsylvania Supreme Court rejected application of *American Pipe* tolling because the class representative's lack of standing was apparent on the face of the complaint. *Id.* at 409-10. In reaching its conclusion, the court looked to the purposes identified by the United States Supreme Court in *American Pipe*. Specifically, the court found that the case before it was an example of an abuse of the tolling procedure and thus would not "promote efficiency and economy of litigation," *id.* at 410, nor would it effectuate the purposes of the statutes of limitations, *id.* at 411. Accordingly, it concluded, "[w]e do not believe that the principle of tolling, as it has developed under applicable precedents and under Pa.R.C.P. 1701 [which implements the *American Pipe* rule] contemplates that tolling will occur in cases like the present one." *Id.*

The same is true here. Tolling the limitations periods in this case would not further the purposes identified in *American Pipe*. As explained above, mass-tort personal injury class actions are rarely certifiable, and almost never certifiable in the prescription drug context. Plaintiffs and lawyers nationwide realize this and file individual claims notwithstanding the hypothetical availability of *American Pipe* tolling. Thus, there is no efficiency benefit to be gained from tolling; rather, it simply encourages the filing of abusive class actions, the likes of which have been on display in every corner of the country since the withdrawal of Vioxx from the market. The ***only*** purpose of such filings is to thwart limitations rules, and it is in precisely this situation that neither the United States Supreme Court nor the Supreme Court of Pennsylvania would agree to toll limitations periods. Neither should this Court.

In sum, plaintiffs' claims are not saved by *American Pipe*, and they are untimely under Pennsylvania law. Accordingly, the Court should grant summary judgment on their claims.

**D.**     **Puerto Rico Law Bars The Claims Of Plaintiff Medina-Alfanador.**

Plaintiff Medina-Alfanador's personal injury claim is time-barred under Puerto Rico law. In her complaint, Medina-Alfanador asserts that the "applicable limitations period" is "two years," Alvarado Compl. ¶ 21, but this is incorrect.[20]  "Ever since the Spanish-American war it has been the law of Puerto Rico that the limitations period for tort actions, or obligations arising from fault or negligence, is the ***one year*** limitations period provided by Article 1868(2) of the Civil Code, 31 L.P.R.A. § 5298(2)."  *Molina-Acosta v. Martinez*, 392 F. Supp. 2d 210, 219 (D.P.R. 2005) (emphasis added).[21]  Plaintiff alleges an injury date of "2001"; thus, she was due to file her lawsuit by 2002.  But she did not file her claim until 2006, and it is therefore stale under Puerto Rico law unless saved by some other doctrine.[22]

---

[20]     Although it does not state so explicitly, the Alvarado complaint under which Medina-Alfador brings her claim might assume that New Jersey law – which does provide a two-year limitations period for personal-injury claims – governs.  *See* Alvarado Compl. ¶¶ 57, 59, 74-77.  But as explained in the choice-of-law section above, that is not the case.

[21]     A federal court sitting in diversity treats Puerto Rico like a state under the *Erie* doctrine.  *See Rodriguez-Garcia v. Municipality of Caguas*, 354 F.3d 91, 97 (1st Cir. 2004).

[22]     For the reasons set forth in this section, plaintiff Medina-Alfanador's personal injury-based claims – Count I (strict liability design defect and failure to warn) and Count II (negligence and/or wantonness) – are barred under Puerto Rico law.  (*See* Alvarado Compl. ¶¶ 58-73.)  In addition, all of plaintiff's other claims are similarly barred by the applicable statutes of limitation.  For example, plaintiff's claims for  breach of  express warranty (Count IV (Alvarado Compl ¶¶ 78-81)) and breach of implied warranty (Count V (Alvarado Compl ¶¶ 82-86)) are  subject to – and are barred  by – a one-year limitations period.  *See Ramos Santiago v. Wellcraft Marine Corp.*, 93 F. Supp. 2d 112, 115 (D.P.R. 2000) (noting that under Puerto Rico law breach of warranty claims based in contract are subject to a six-month statute of limitations and, where warranty claims are based on underlying tortious conduct, such claims are subject to a one-year limitations period).  Plaintiff's claims for fraudulent misrepresentation (Count VI) and fraudulent omission/suppression (Count VII) (*see* Alvarado Compl. ¶¶ 87-101) are also barred by a one-year statute of limitations.  *See Ocaso, S.A., Compania de Seguros Y Reaseguros v. Puerto Rico Maritime Shipping Auth.*, 915 F. Supp. 1244, 1259 (D.P.R. 1996) (holding that, in cases of fraud, the one-year statute of limitations runs "from the time when the fraud was discovered or when, with reasonable diligence might have been discovered"); *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 758 F. Supp. 64, 70 (D.P.R. 1991) (noting that the "[s]tatute of limitations for Puerto Rico Civil Code for fraud or deceit action [is] . . . one year").  Finally, plaintiff's claim for statutory consumer fraud under the New Jersey Consumer Fraud Act (Count III (Alvarado Compl. ¶¶ 71-77)) fails because plaintiff's claims are governed by Puerto Rico law, not New Jersey law, as discussed above.  (Puerto Rico, notably, does not have a consumer fraud statute.  *See Simonet v. SmithKline Beecham Corp.*, 2007 U.S. Dist. LEXIS 60393 (D.P.R. 2007) (recognizing that "Puerto Rico has no specific consumer protection statute that provides a private right of action for consumer fraud").

1.      **Based On Indisputable Facts, Plaintiff's Claims Accrued In Puerto Rico No Later Than September 30, 2004 As A Matter Of Law.**

Puerto Rico delays accrual of a claim until an injury and its cause are known.  *Quintana Lopez v. Liggett Group, Inc.*, 336 F. Supp. 2d 153, 156-57 (D.P.R. 2004).  An injured plaintiff who wishes to preserve her right to file a claim must pursue these facts with diligence.  "[U]nder Puerto Rico law, 'due diligence does not mean waiting for answers to fall from the sky, but rather requires reasonable, active efforts to seek answers and clarify doubts.'"  *Id.* at 157 (quoting *Estate of Ayala v. Phillip Morris, Inc.*, 263 F. Supp. 2d 311, 317 (D.P.R. 2003)).  Indeed, as to plaintiffs who do not demonstrate such diligence, the "plaintiff is then presumed to have knowledge of the injury at the time of the tortious act, and has the burden of proving that he learned of the act at a later date."  *Id.*

Discovery is triggered as a matter of law in a case like this one where media coverage of facts giving rise to a plaintiff's claim would put anyone exercising "due diligence" on notice of his or her claims.  In *Quintana Lopez*, for example, the District Court of Puerto Rico granted a motion to dismiss on statute-of-limitations grounds where plaintiffs claimed that they had no way of knowing prior to 2001 that cigarettes were addictive or linked to lung cancer.  The court explained that it was "common knowledge that in the 1990s several states including Puerto Rico filed suit against the tobacco companies claiming that the manufacturing companies have conspired to mislead and deceive the public as to the addictive nature of and the health related risks associated with smoking."  *Id.* at 158.  It also noted that, "by late 1990s, the suit against the tobacco companies yielded settlements which were covered on the news periodically."  *Id.*  The court thus concluded that "Plaintiffs have failed to meet their pleading burden of proving their timeliness to file the suit and/or their 'lack of knowledge to toll the statute of limitations.'"  *Id.* at 158-59 (quoting *Serrano v. E. I. Du Pont de Nemours & Co.*, 797 F. Supp. 98, 102 (D.P.R.

1992)).  It granted the defendants' motion to dismiss.  *See id.* at 159 (explaining further that "'lack of knowledge,' 'due diligence,' 'reasonable reliance' and 'common knowledge' standards can be made at motion to dismiss stage").

Summary judgment is appropriate here for the same reasons.  Media coverage of the withdrawal of Vioxx from the market was substantial both nationally and in Puerto Rico.  (*See* Background § A.3, *supra* p.14.)  Furthermore, as in *Quintana Lopez*, vast numbers of plaintiffs in the instant litigation filed claims across the country shortly after withdrawal, which itself should have put other users of Vioxx on notice of their potential claims.  Like the plaintiffs in *Quintana Lopez*, the plaintiff here offers no explanation in her complaint for her lack of knowledge of her claim prior to 2006.  She simply asserts generically that she "obtained knowledge of [her] right to sue only after the information was made available to [her] on or about August 2006," without explaining what this critical "information" was.  (Alvarado Compl. ¶ 21.)  Indeed, even while alleging that "the information" was not available until August 2006, plaintiff makes other allegations indicating knowledge of facts that should have put her on notice of her claim well before that time.  (*See id.* ¶¶ 47 (alleging existence of "voluminous evidence pointing to the cardiovascular dangers of Vioxx®" by August of 2004); 48 (noting withdrawal of Vioxx on September 30, 2004); 55 (alleging "deceptive and fraudulent market efforts" "***up to*** September 30, 2004" (emphasis added).)  Under these allegations, it is Medina-Alfanador's burden to show that she "took reasonable, active efforts to seek answers and clarify doubts" rather than "waiting for answers to fall from the sky."  *Estate of Ayala*, 263 F. Supp. 2d at 317.  She cannot do so, and the Court should grant summary judgment.

2.   **Based On Indisputable Facts And Plaintiff's Own Allegations, Merck's Alleged Fraudulent Concealment Could Toll The Limitations Period To September 30, 2004 At The Latest.**

Plaintiff may argue that Merck fraudulently concealed the facts necessary for her to

make out her claim, but that argument cannot survive summary judgment.  Like the discovery

rule, alleged concealment freezes the limitations clock only so long as the plaintiff cannot, in the

exercise of due diligence, discover the facts necessary to make out a claim.  Thus, for the same

reason that discovery was triggered no later than September 30, 2004, no concealment, even if

proven, could toll plaintiff's limitation period beyond that date.

Under the fraudulent concealment doctrine, the limitations period might be tolled where

"plaintiff's suspicions 'are assuaged by the person who caused the injury.'"  *Estate of Ayala*, 263

F. Supp. 2d at 317 (quoting *Espada v. Lugo*, 312 F.3d 1, 4 (1st Cir. 2002)).  But such tolling

"may be halted by further information that renders plaintiff's reliance on those assurances no

longer reasonable, so that plaintiff then has an obligation of diligent investigation."  *Espada*, 312

F.3d at 4.

As a matter of law, reliance on alleged concealment is no longer reasonable where, as in

this case, media coverage and the filing of other similar claims would put a diligent plaintiff on

notice of her claims.  In *Estate of Ayala*, for example, the District Court of Puerto Rico granted

defendants' motion to dismiss notwithstanding plaintiffs' claims of fraudulent concealment.

Plaintiffs claimed to rely on representations made by cigarette manufacturers that smoking was

not harmful even after "settlement between the nation's biggest tobacco companies and various

states received ample news coverage."  *Estate of Ayala*, 263 F. Supp. 2d at 318.  The court

declined to apply tolling under the fraudulent concealment doctrine.  The court explained that

even if plaintiffs "were 'confused' by the Defendants' fraudulent misrepresentations, due

diligence would have given them a 'reasonable basis for concern.'"  *Id.* at 320.  It rejected the

plaintiffs' contention that only certainty of a link could overcome fraudulent concealment.

"'Reasonable likelihood,' and not 'legal certainty,' is the applicable standard."  *Id.*  The court

further explained that "Plaintiffs do not cite a single, specific statement from the Defendants that 'nullified' the common knowledge about the hazards of smoking and prevented them from acknowledging the link between smoking and Mr. Alicano's illnesses." *Id.* at 319. Accordingly, the court granted defendants' motion to dismiss. *Id.* at 320-21.

Plaintiff thus cannot claim tolling based on fraudulent concealment here. Just as reasonable diligence should have triggered discovery by September 30, 2004, so too would plaintiff's reliance on any alleged fraudulent concealment have become unreasonable by the date. Thus, plaintiff's claim was stale – at the latest – on September 30, 2005, and the Court should enter summary judgment.

3. **Plaintiff's Claims Are Not Saved By *American Pipe* Tolling.**

Medina-Alfanador's claims are time barred – notwithstanding Puerto Rico's adoption of *American Pipe* – for three reasons: 1) Puerto Rico has not recognized cross-jurisdictional tolling, and no Puerto Rico class action could have tolled Medina-Alfanador's claims; 2) Medina-Alfanador would need to stack class actions to save her claims; and 3) Puerto Rico would not apply *American Pipe* tolling in a litigation like this one where other class actions would not put Merck on notice of Medina Alfanador's claims. *See Rodriguez Narvaez v. Nazario*, 895 F.2d 38, 43 (1st Cir. 1990) (citing *Diaz de Diana v. A.J.A.S. Ins. Co.*, 110 P.R. 602, 607-608, n. 1 (1980)) ("tolling provisions must be interpreted restrictively against the person invoking their protection"). Accordingly, Medina-Alfanador's claims are stale and the Court should grant summary judgment.

***First,*** Puerto Rico has not adopted cross-jurisdictional tolling, and for reasons already discussed, *see* Section I.B.3.c, *supra*, this Court sitting in diversity should decline to adopt such a doctrine on its behalf. Medina-Alfanador could thus only point to Puerto Rico state court class actions to toll her claim, and no such class action has ever been pending. Rather, the only Vioxx

class action in Puerto Rico was filed in federal court.

**Second,** even if *American Pipe* tolling were theoretically available based on a federal court case filed in Puerto Rico, Medina-Alfanador would still not be able to avail herself of stacking based on the federal case filed in Puerto Rico. For starters, the only Vioxx personal injury class action ever pending in federal court in Puerto Rico was dismissed for failure to prosecute and failure to comply with court orders. *See* Judgment, *Badillo-Morales v. Merck & Co., Inc.*, No. 05-2055, at 1 (D.P.R. Jan. 4, 2006) (attached as Ex. 100) (dismissing case "for lack of prosecution" because the attorney "failed to submit the electronic version of the complaint by the deadline"); Order, *Badillo Morales v. Merck & Co., Inc.*, No. 06-1983, at 1 (D.P.R. Oct. 16, 2006) (attached as Ex. 101) (dismissing re-filed class action because of "failure of attorney Jorge Carazo Quetglas to comply with the [electronic] filing requirements" despite being "notified several times" and being "given ample time to do so"). Under Puerto Rico law, the filing of an action does not toll the limitations period where it is dismissed for failure to comply with court orders. *Lopez-Gonzalez*, 404 F.3d at 554 (concluding that "abuse or bad faith conduct would be a basis for an exception" from the tolling rule and declining to toll the limitation period where plaintiffs "repeatedly failed to abide by the court's orders and so allow the case to move forward"). Accordingly, there is no valid class action to which Medina-Alfanador can point to toll her claim, and it became stale – at the latest – on September 30, 2005.

In addition, Medina-Alfanador, who alleges an injury date of "2001," was a member of the *Cain* class action while its personal injury claims were pending. Although Puerto Rico has never considered the stacking question, every jurisdiction to do so has disallowed stacking of class actions, often citing the abuses warned of by Justice Powell in *Crown, Cork*. Like these other courts, courts applying Puerto Rico law have declined to toll limitations periods where

doing so would encourage abuse of tolling rules.  *E.g.*, *Lopez-Gonzalez v. Municipality of Comerio*, 404 F.3d 548, 550 n.1 (1st Cir. 2005) (explaining that tolling is inappropriate where it would permit parties to "manipulate court proceedings for their own benefit" (quoting *Lopez-Gonzalez v. Santiago-Rivera*, 220 F.R.D. 386, 386-87 (D.P.R. 2004))).  There is thus no reason to doubt that Puerto Rico would decline to permit parties to stack class actions to toll their claims indefinitely.  Because Medina-Alfanador's one bite at the *American Pipe* apple was the *Cain* class action, her claims were stale no later than September 30, 2005.

**Third,** Puerto Rico would not apply *American Pipe* tolling to a case like this one, where plaintiff's claims are not amenable to class treatment.  The Puerto Rico Supreme Court adopted *American Pipe* tolling in *Rivera Castillo v. Municipio de San Juan*, 130 P.R. Dec. 683 (1992).  In that case, ten business owners sought class treatment in their law suit against San Juan after a fire broke out in the Plaza de Mercado de Rio Piedras.  *Id.* at 688-89.  The class was decertified, and a total of thirty-five plaintiffs sought to bring individual claims against the city.  *Id.* at 689.  San Juan moved to dismiss the twenty-five plaintiffs not named in the original class action on limitations grounds.  *Id.* at 690.  The court held that their claims were timely, adopting the reasoning of *American Pipe*.  *See id.* at 697-99.  Critically, the court noted the policy justifications of the rule – that it furthered the purpose of the class action device and that it was consistent with the purposes of limitations rules, specifically to put the defendant on notice of the claims against it.  *Id.* at 698-99.

Returning to these policy considerations, the Puerto Rico Supreme Court rejected the application of *Rivera Castillo* tolling in *Rodriguez Rosado v. SYNTEX (F.P.), Inc.*, 160 P.R. Dec. 364 (2003).  In that case, several plaintiffs sought relief against their employer under the Laws of Hours and Days of Work, P.R. Laws Ann. tit. 29, §§ 282 et seq.  160 P.R. Dec. at 387-88.  That

provision permits a representative action on behalf of other co-workers "who are in similar circumstances." P.R. Laws Ann. tit. 29, §§ 282. Following conclusion of the action, co-workers not listed in the claim sought to file their own claims. 160 P.R. Dec. at 387. Under the applicable limitations rules, those claims were stale, but the parties argued that the pendency of the prior proceeding should have tolled their limitations periods under the *Rivera Castillo* rule. *Id.* at 391. The court rejected the argument. First, it explained that the representative procedure under section 282 was not a "true" class action akin to what can be brought under Rule 20 (the Puerto Rico equivalent to Federal Rule 23). *Id.* at 390-91. More fundamentally, it explained that the reasoning of *Rivera Castillo* depended on the fact that the cause of action in that case was amenable to class treatment (even though the trial court had exercised its discretion not to certify a class). *Id.* at 391 & n.34. And unlike *Rivera Castillo*, the claims at issue in *Rodriguez Rosado* involved distinct and varying claims to salary and benefits. *Id.* at 392. As a result, the claims of one employee could not fairly put the employer on notice of the claims of others. *Id.*

The same is true in this case. As described above, each Vioxx case depends upon different memories, evidence, and witnesses. Unlike the single fire that affected multiple business in *Rivera Castillo*, Vioxx cases – and pharmaceutical mass-tort cases in general – do not involve a single incident amenable to class treatment. No previously-filed class action put Merck on notice of Medina-Alfanador's claims. Her particular case will likely involve, for example, memories of her alleged injury, evidence of dose and duration of Vioxx usage and of medical history, and testimony of family members and treating physicians, all of which are unique to her, and about which Merck had no prior knowledge (and no way to gain such knowledge). Thus, *American Pipe* tolling is simply inappropriate in this case. It would entirely frustrate the purposes of the statute of limitations, and as explained previously, it would do

nothing to further the purposes of the class action rule.

Accordingly, Medina-Alfanador's claims are stale, and the Court should enter summary judgment for Merck.

## II.  ILLINOIS LAW BARS THE CLAIMS OF PLAINTIFFS DURBIN, MCKEAL, PALES AND RIDINGER.

### A.  The Illinois Plaintiffs' Claims Are Governed By Illinois Limitations Periods Because They Filed In Illinois State Court.

Unlike the Pennsylvania and Puerto Rico plaintiffs, who filed their cases directly in this Court, the Illinois plaintiffs subject to this motion filed their actions in Illinois state court.  This Court must therefore apply Illinois choice-of-law rules to the Illinois plaintiffs' claims.  *In re Vioxx*, 478 F. Supp. 2d at 903 (explaining that, for cases transferred to the MDL, "the MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice-of-law rules" (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 524 (1990))).  Illinois law directs that no choice is to be made – *i.e.*, that Illinois limitations periods always govern claims filed in Illinois courts.  *E.g.*, *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002) (applying Illinois limitation period because, "[a]s to procedural matters, . . . the law of the forum controls" and "[s]tatutes of limitations are procedural").  As explained below, plaintiffs' claims are untimely under Illinois law.

### B.  Illinois Limitations Rules Bar The Claims Of Plaintiffs Durbin, McKeal, Pales, And Ridinger.

The personal injury claims of the Illinois plaintiffs are time-barred under Illinois law.  The relevant Illinois statute of limitations bars personal injury claims two years "after the cause of action accrued."  735 Ill. Comp. Stat. 5/13-202.  Generally, the limitations period begins to run when "facts exist that authorize one party to maintain an action against another."  *Sundance*

*Homes, Inc. v. County of Du Page*, 746 N.E.2d 254, 260 (Ill. 2001).  Calculating the two-year period from the date of plaintiffs' alleged injuries, each is out of time.  Plaintiff Durbin's last alleged injury occurred on October 2, 2003.  Her complaint was thus due by October 2, 2005, but she did not file until October 11, 2006.  Plaintiff McKeal's alleged injury occurred January 16, 2003.  Her complaint was thus due by January 16, 2005, but she did not file until October 11, 2006.  Plaintiff Pales's alleged injury occurred on August 1, 2001.  His complaint was thus due by August 1, 2003, but he did not file until January 10, 2007.  Finally, plaintiff Ridinger's alleged injury occurred December 8, 2003.  His complaint was thus due by December 8, 2005, but he did not file until October 11, 2006.

Because no combination of tolling doctrines can make plaintiffs' filing dates of October 11, 2006 and January 10, 2007 timely, Illinois law bars their claims, and the Court should therefore grant Merck summary judgment on those claims.[23]

---

[23]      This section addresses plaintiffs' personal injury claims grounded in negligence and strict liability.  (*See* Durbin Compl. ¶¶ 61-76; McKeal Compl. ¶¶ 61-76; Pales Compl. ¶¶ 54-66, 76-81; Ridinger Compl. ¶¶ 61-76.)  However, plaintiffs' remaining claims also fail under Illinois law for a variety of reasons.

*First*, plaintiffs' warranty claims (s*ee* Durbin Compl. ¶¶ 77-86; McKeal Compl. ¶¶ 77-86; Pales Compl. ¶¶ 82-92; Ridinger Compl. ¶¶ 77-86), fail under Illinois's four-year statute of limitations for warranty actions.  *See* 810 ILCS 5/2-725(1).  Illinois law expressly provides that a cause of action for breach of warranty accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  *Id.* at 5/2-725(2).  The statute also provides that, except where a warranty explicitly extends to future performance of the goods sold, a breach occurs, if at all, "when tender of delivery is made."  *Id.*  As a result, "the intent of the legislature is clear: the discovery rule does not apply to breach of warranty claims."  *Hagen v. Richardson-Merrell, Inc.*, 697 F. Supp. 334, 341 (N.D. Ill. 1988).  *See also Beckmire v. Ristokrat Clay Products Co.*, 343 N.E.2d 530, 532 (1976) ("The mere expectation, however reasonable, that due to the nature of a particular product the statute of limitations on the warranty begins to run upon discovery of the defect is not an adequate basis for ignoring the clear language of the statute . . . plaintiff's cause of action accrued and the statute of limitations began to run from the time the [product] was delivered.").  Furthermore, the clock begins ticking upon the first breach – *i.e.*, upon first tender of an allegedly defective product.  *See Schrott v. Bristol-Myers Squibb Co.*, No. 03 C 1522, 2003 U.S. Dist. LEXIS 18890, at *16 (N.D. Ill. Oct. 23, 2003) (concluding plaintiff's breach of implied warranty claim was untimely – and summary judgment was appropriate – where plaintiff failed "to offer evidence as to when the breast implant inserted on November 13, 1989 *was delivered to her doctor*") (emphasis added); *Meeker v. Hamilton Grain Elevator Co.*, 442 N.E.2d 921, 923-24 (Ill. Ct. App. 1982) (limitations period began upon first missed payment and subsequent additional mispayments did not restart the clock).  Here, plaintiff Durbin first began taking Vioxx on October 10, 2000; plaintiff McKeal first began taking Vioxx on January 4, 2001; plaintiff Pales first began taking Vioxx on August 25, 1999; and plaintiff Ridinger first began taking Vioxx in January 1999.  (*See* Durbin PFS at 5; McKeal PFS at 6; Pales PFS at 6; Ridinger PFS at 5.)  As a result, each of the warranty claims asserted by the Illinois plaintiffs is time-barred.  *See Dohra v. Alcon (Puerto Rico), Inc.*, No. 92 C 2624, 1994 WL 395000, at *6 (N.D. Ill.

1.      **Under Illinois Law, The Discovery Rule Was Triggered – At The Latest – By The Avalanche Of News Coverage Following The Withdrawal Of Vioxx.**

Illinois does recognize a discovery rule that provides that the limitations period starts to run when a plaintiff knows or reasonably should know of his injury, and also knows or reasonably should know that it was wrongfully caused.  *See Witherell v. Weimer*, 421 N.E.2d 869 (Ill. 1981), *rev'd on other grounds*, 515 N.E.2d 68 (Ill. 1987).  A plaintiff is deemed to know that his injury is wrongfully caused when he possesses "sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved" and "[a]t that point, under the discovery rule, the running of the limitations period commences." *Knox College v. Celotex Corp.*, 430 N.E.2d 976, 981 (Ill. 1981).  In addition, a plaintiff's "failure to pursue a more thorough inquiry to find the cause of her injuries does not

_____

July 26, 1994) (finding statute of limitations for breach of warranty in product liability personal injury case had run where "the drug which allegedly harmed the Plaintiff *was delivered in 1974*" and "Plaintiff filed her complaint in 1992") (emphasis added).

    *Second*, plaintiffs' statutory consumer fraud claims (*see* Durbin Compl. ¶¶ 101-06; McKeal Compl. ¶¶ 101-06; Ridinger Compl. ¶¶ 101-06) cannot sustain their personal injury claims because that statutory scheme provides only for recovery of economic damages.  *See* 815 ILCS 505/10a(a); *Price v. Philip Morris, Inc.*, 55 & n.1 (Karmeier, J., specially concurring) (observing that the scheme permits recovery of "actual economic *damages*" and that the "requirement of actual damages means that the plaintiff must have been harmed in a concrete, ascertainable way").  Thus, even if plaintiffs state valid causes of action under the statute, they cannot claim damages arising from personal injury under its auspices.  (In addition, plaintiff Pales cannot claim damages under the statute because he does not plead a cause of action under it.)

    *Third*, the Illinois plaintiffs' claims for negligent misrepresentation (*see* Durbin Compl. ¶¶ 93-100; McKeal Compl. ¶¶ 93-100; Ridinger Compl. ¶¶ 93-100), fail because, in Illinois, "to maintain an action for negligent representation, a plaintiff must allege . . . a false statement of material fact." *Weisblatt v. Chicago Bar Ass'n*, 684 N.E.2d 984, 991 (Ill. App. Ct. 1997).  Here, plaintiffs' claims are based on an alleged omission, or failure to warn, of the risks of Vioxx.  Such allegations are insufficient to support a claim for negligent misrepresentation.  *See id.*  As Judge Vowell concluded in the *Albright* case, "[w]ith regard to the summary judgment based on the claim of fraud I am going to grant it as to the fraudulent misrepresentation aspect because I can find no evidence of any affirmative misrepresentations to either Mr. Albright or to his treating physicians."  *See* Tr. 24:4-18, *Albright v. Merck*, No. CV 05-2316, Nov. 27, 2006 (Jefferson County, Ala.) (attached as Ex. 102).

    *Finally*, plaintiffs' common-law fraud claims fail for the same reason.  Plaintiffs' fraud claims collapse to a reassertion of their argument that Merck failed to warn – *i.e.*, that it omitted material information about risks of heart attack or stroke.  However, a claim for fraud cannot be sustained on an omission theory unless the defendant had a duty to disclose concealed facts to the plaintiffs.  *See, e.g.*, *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) (affirming dismissal of fraudulent concealment claim because duty to disclose only arises under specific circumstances of fiduciary duty or position of superiority and plaintiffs did not plead facts showing duty to disclose existed).

excuse her from failing to comply with the statute of limitations." *Hoffman v. Orthopedic Sys., Inc.*, 765 N.E.2d 116, 122 (Ill. App. Ct. 2002) (affirming trial court's grant of summary judgment of plaintiff's claims as time barred where plaintiff hired an attorney soon after her injury and "could have attempted to obtain the results of the hospital's investigation of this incident, with appropriate further investigation by her attorneys").  Finally, the "question of when a party knew or reasonably should have known of both an injury and its wrongful cause becomes a question of law for the trial court to determine when only one conclusion can be drawn from the undisputed facts." *Wilson v. Devonshire Realty*, 718 N.E.2d 700, 704 (Ill. App. Ct. 1999) (affirming summary judgment where plaintiff had sufficient knowledge to put her on notice her rights had been violated, giving her a reasonable opportunity to bring an action within the limitations period).

Extensive media coverage of facts necessary to make out a claim triggers discovery under Illinois law.  In *Carey v. Kerr-McGee Chem. Corp.*, for example, plaintiffs filed suit on nuisance, trespass, and other grounds after thorium tailings – low-level radioactive waste produced by certain milling operations by the defendant – were found on residential property in Chicago.  999 F. Supp. 1109, 1111 (N.D. Ill. 1998).  Plaintiffs' property-damage claims were filed out of time, but they sought to save them under various tolling doctrines, including the discovery rule.  *Id.* at 1114.  The court held the claims time-barred as a matter of law.  *Id.* at 1115.  In reaching its holding, the court pointed to extensive media coverage of the problem over several years, including television and newspaper articles in national and local media.  *Id.* at 1112-14.  On that basis, the court rejected plaintiffs' attempt to make a triable issue on the question of notice. According to the court, common knowledge of the issue in plaintiffs' community and the extensive media coverage "leads the court to the inescapable conclusion that a reasonable person

in their situation should have known of their claim." *Id.* at 1117.

The same is true here.  Whatever the exact date that plaintiffs first knew of their claims, *at a minimum*, plaintiffs were on notice to investigate their claims when Vioxx was withdrawn from the national market on September 30, 2004.  The withdrawal of Vioxx gave rise to extensive media coverage of the possible link between Vioxx and strokes, including numerous articles throughout Illinois.  (*See* Background § A.1, *supra* p.3.)  This media coverage should have given each plaintiff "sufficient information concerning the injury and its cause" to put him or her on inquiry to determine whether a cause of action against Merck existed.

Plaintiffs Durbin, McKeal, and Ridinger, who filed substantially similar complaints, seem to agree.  Each expressly alleges that the discovery rule only tolled their claims until the date of withdrawal:

> Plaintiff did not discover, and through the exercise of reasonable care and due diligence, could not have discovered, the true nature of his injuries earlier, nor could Plaintiff have discovered that his injuries were due to the negligent action of Defendants *until Merck pulled Vioxx off the market on September 30, 2004.*

(Durbin Compl. ¶ 4; McKeal Compl. ¶ 4; Ridinger Compl. ¶ 4 (emphasis added).)  Plaintiff Pales's allegations are less express, but he, too, recognizes September 30, 2004 as a watershed moment, alleging both that the APPROVe results "compelled Merck to finally acknowledge Vioxx's dangerous propensities" and that the Vioxx withdrawal "represents the largest prescription drug withdrawal in history."  (Pales Compl. ¶¶ 52, 53.)

Thus, plaintiffs were certainly on notice to investigate that there was a potential link between Vioxx and strokes *at the latest* on September 30, 2004, after which they had two full years to file a timely suit against Merck.  Because they each failed to file a claim within that two-year period, plaintiffs' claims are barred under Illinois law.

2.    **Fraudulent Concealment Tolling Is Not Available To Plaintiffs As A Matter Of Law.**

Plaintiffs' claims are not tolled under the Illinois doctrine of fraudulent concealment. While 735 Ill. Comp. Stat. 5/13-215 does, in certain circumstances, allow a five-year limitations period beginning when a person discovers that he or she has a cause of action if the defendant fraudulently concealed the cause of such action, that provision is not applicable to plaintiffs' claims here.  Illinois courts have held that, by its terms, Section 13-215 "applies only to fraudulent concealment cases where a party is unwittingly induced not to file his action until after expiration of the limitations period." *Muskat v. Sternberg*, 570 N.E.2d 696, 701 (Ill. App. Ct. 1991).  Further, "[i]f at the time the plaintiff discovers the fraudulent concealment a reasonable time remains within the applicable statute of limitations, section [13-215] of the Limitations Act does not toll the running of the limitation period." *Id.*, citing *Anderson v. Wagner*, 402 N.E.2d 560 (Ill. 1979).  Finally, "[w]hile reasonableness [of the amount of timing remaining on the statute of limitations after discovery, in spite of defendant's fraudulent concealment] is generally a fact question, it may be determined by a court, without a hearing on that issue, if no hearing on reasonableness is requested and if it is clear that a reasonable time did in fact remain within the statute of limitations." *Smith v. Cook County Hosp.*, 518 N.E.2d 336, 340 (Ill. App. Ct. 1987).

For example, in *Curry v. A.H. Robins Co.,* the plaintiff was implanted with a Dalkon Shield intrauterine device (IUD) in 1971 and had to have the IUD removed in 1974 because it was causing severe medical problems.  775 F.2d 212, 214 (7th Cir. 1985).  The plaintiff brought suit in 1983, alleging that she did not learn of the IUD maker's potential liability until a coworker casually told her so in 1981.  *Id.*  In response to the defendant's assertion that the plaintiff's claims were barred by Illinois's statute of limitations, the plaintiff argued that the

statute of limitations should be tolled because of the defendant's allegedly fraudulent concealment. *Id.* at 217. The district court dismissed the plaintiff's complaint, and the Seventh Circuit affirmed. The court held that even if the defendant's alleged misrepresentations at the time the IUD was implanted constituted fraudulent concealment, the fraudulent concealment doctrine was unavailing to the plaintiff because she did not exercise ordinary diligence to discover the potential cause of action. *Id.* at 218. In light of the FDA's public 1974 conclusion that the Dalkon Shield was medically dangerous, the court found it implausible that even "minimal diligence" on the part of the plaintiff would not have alerted her to the defendant's potential liability. *Id.* at 218 n.3; *see also County Bd. of Sch. Trs. v. Ass'n of Franciscan Fathers*, 364 N.E.2d 691, 700 (Ill. App Ct. 1977) (fraudulent concealment tolling unavailable where plaintiff could have determined requisite facts by following up on a newspaper article).

The same is true here. Plaintiffs each plead fraudulent concealment, but none pleads facts that suggest any concealment beyond the date of withdrawal. Plaintiffs Durbin, McKeal, and Ridinger each assert that Merck's alleged fraudulent concealment "tolls the statute of limitations for this action ***until VIOXX was pulled off the market on September 30, 2004.***" (Durbin Compl. ¶ 6; McKeal Compl. ¶ 6; Ridinger Compl. ¶ 6 (emphasis added).) Pales, who insists that Merck "fraudulently concealed its wrongful conduct" and as a result "[u]ntil very recently, [he] had no knowledge that Merck engaged in much of the wrongdoing alleged" (Pales Compl. ¶¶ 100, 103), nonetheless alleges elsewhere that the APPROVe study "compelled Merck to finally acknowledge Vioxx's dangerous propensities" on September 30, 2004 (Pales Compl. ¶ 52).[24] Even "minimal diligence" by plaintiffs would have revealed the intense media coverage

---

[24]     Pales alleges that he could not have, "as a practical matter, taken legally effective action given the unavailability, until very recently, of the internal memoranda and other documents (as generally described herein) as evidence in support of Plaintiff's claims." (Pales Compl. ¶ 103.) But plaintiff does not allege what in those documents was critical to putting him on notice of his claim, or why Merck's "fraud" was not sufficiently exposed

of the APPROVe results and the withdrawal of Vioxx from the market by September 30, 2004, during the applicable two-year statute of limitations for personal injury claims.  Further, Merck did nothing to "unwittingly induce" plaintiffs into not filing their claim prior to October 11, 2006, as required for application of § 13-215.  Indeed, thousands of plaintiffs filed their Vioxx-related claims in the first two years after withdrawal.

In addition, as noted above in Section I.B.2, plaintiffs must plead fraudulent concealment with particularity in order to toll limitations periods, and they have not done so here; none of the Illinois plaintiffs has identified the facts that revealed their causes of action to them.  Rather, they simply assert generically that their claims should be tolled.  That is not enough.  *In re Ford Motor Co. Vehicle Paint Litig.*, MDL No. 1063, 1996 U.S. Dist. LEXIS 11063, at *23 (E.D. La. July 30, 2006).  For all of these reasons, tolling for fraudulent concealment is unavailable as a matter of law.

### 3.    Plaintiffs' Claims Are Not Saved By *American Pipe* Tolling.

*American Pipe* tolling is also unavailable to plaintiffs for multiple reasons:  1) no class action exists upon which plaintiffs could base a claim for tolling; 2) Illinois would not apply tolling in a mass-tort personal injury class action involving prescription drugs; and 3) as to plaintiff Pales, whose alleged injury date of August 2001 makes him a member of the *Cain* class action, tolling is unavailable due to the rule against stacking class actions.  Accordingly, the Court should grant summary judgment.

**First,** although Illinois has adopted the *American Pipe* tolling doctrine for class actions filed in Illinois state court, it has expressly ***rejected*** cross-jurisdictional class action tolling.

---

when it was "compelled to acknowledge Vioxx's dangerous propensities."  It is not sufficient to argue that the documents are necessary for "legally effective action."  It is a basic principle of limitations law that a prospective plaintiff need not be able to prove his case before his claim accrues.  Knowledge of injury allegedly caused by another is enough.  *Wilson*, 718 N.E.2d at 705 ("[T]he limitations period commences when the plaintiff is injured, rather than when plaintiff realizes the consequences of the injury or the full extent of the injury.").

*Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1103, 1105 (Ill. 1998), citing *Steinberg v. Chicago Medical School*, 371 N.E.2d 634 (Ill. 1977).  In so holding, the Supreme Court of Illinois noted that allowing Illinois plaintiffs to toll their claims based on a class action filed in federal court would "encourage plaintiffs from across the country to bring suit here following dismissal of their class actions in federal court" and that it "refuse[d] to expose the Illinois court system to such forum shopping."  *Id.*  Given this powerful language, it is clear that unless there has been a personal injury class action against a given defendant filed ***in Illinois state court***, the *American Pipe* doctrine does not operate to toll a plaintiff's claim.  While there have been Vioxx class actions filed in Illinois state courts, none was a personal injury suit, and thus none can operate to toll plaintiffs' claims.  Accordingly, plaintiffs cannot toll the statute of limitations based on the *American Pipe* tolling doctrine, and their claims are untimely.

**Second,** even if plaintiffs could identify a relevant class action – and they cannot – there is no reason to believe Illinois would extend the *American Pipe* doctrine to cover cases like this one.  Illinois courts have exercised caution in applying *American Pipe* tolling, consistently pausing to consider whether the purposes of both the class action rule and the policy underlying statutes of limitations would be served by its application.  As the First District Appellate Court of Illinois has expressly cautioned, application of *American Pipe* "should be decided on a case-by-case basis.  In each case, the court should weigh the interests that will be served by the application of the tolling rule against the potential for abuse."  *Hess v. I.R.E. Real Estate Income Fund*, 629 N.E.2d 520, 532 (Ill. App. Ct. 1993).  Indeed, in *Hess*, the court declined to toll the limitations period for a class where the putative representative lacked standing to sue and where that defect was apparent on the face of the complaint.  *Id.* at 533.  "Under these circumstances, it was not reasonable for the absent plaintiffs to rely on the class action suit to protect their rights."

*Id.* The court specifically declined to apply *American Pipe* tolling out of a concern that doing so would not further the interests identified by the Supreme Court. "It is our view that the situation at bar is precisely the type of abuse that Justice Blackmun warned against in his concurring opinion to *American Pipe*. . . . [T]he plaintiffs here attempted to use the class action device to preserve the rights of potential plaintiffs who were sleeping on their rights." *Id.* at 533-34.

The same is true of the plaintiffs subject to this motion. As argued above, plaintiffs act unreasonably when they rely on an essentially uncertifiable class to toll the limitations periods for the claims. It is hard to imagine a less certifiable class than the personal injury class actions that were filed in this litigation, which involve different labels, different medical histories, different prescribing decisions, different dosages, and different duration of use, among other variables. Thousands of plaintiffs realized this and filed their claims within the first year that Vioxx was withdrawn from the market. Not only does that fact demonstrate that reasonably diligent plaintiffs knew it would be unwise to rely upon pending class actions, but it also demonstrates that the purpose identified by the Supreme Court in *American Pipe* – to improve the economy of class action litigation by cutting down on excess filings – has not been furthered in this litigation – notwithstanding the hypothetical availability of tolling. Furthermore, applying the *American Pipe* doctrine here would thwart the purposes of the statute of limitations by exposing Merck to claims of which it had no prior notice. These plaintiffs' cases would not involve the same memories, evidence, and witnesses that the class representatives in pending class actions would rely on to support their claims. It is plain that Illinois would not apply *American Pipe* in this context, and this Court should not do so on its behalf.

***Third,*** even if Illinois recognized cross-jurisdictional tolling and plaintiffs' claims did not otherwise fail to satisfy the requirements for applying *American Pipe*, plaintiff Pales's action

would still be ineligible for *American Pipe* tolling because of the stacking rule.  Although Illinois

state courts have not addressed the stacking rule, the Northern District of Illinois has predicted

that, in line with the vast majority of courts to consider the question, the Illinois Supreme Court

would adopt a rule against stacking.  *Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109,

1115n.1 (N.D. Ill. 1998).  Accordingly, because Pales already enjoyed tolling under the *Cain*

class action, he is not entitled to additional tolling from any subsequent class action.

For these reasons, the Court should grant summary judgment on the Illinois plaintiffs'

claims.

## <u>CONCLUSION</u>

Plaintiffs' claims are time-barred regardless of whether the Court applies Louisiana

limitations law or the laws of their respective home states.  For the foregoing reasons, Merck's

motion for summary judgment should be granted.

Dated:  October 22, 2007                                    Respectfully submitted,

                                                                                     */s/ Dorothy H Wimberly*___

                                                                                     Phillip A. Wittmann, 13625
                                                                                     Dorothy H. Wimberly, 18509
                                                                                     STONE PIGMAN WALTHER
                                                                                     WITTMANN L.L.C.
                                                                                     546 Carondelet Street
                                                                                     New Orleans, LA 70130

                                                                                     Defendants' Liaison Counsel

                                                                                     And

                                                                                     John H. Beisner
                                                                                     Jessica Davidson Miller
                                                                                     Geoffrey M. Wyatt
                                                                                     O'MELVENY & MYERS LLP
                                                                                     1625 Eye Street, NW

Washington, DC 20006

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion for Summary Judgment has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 22nd day of October, 2007.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel