# EXHIBIT  76



LEXISNEXIS' FILE & SERVE
16519297
E-SERVICE
Oct 2 2007
11:59AM

**IN RE; VIOXX® PRODUCTS
LIABILITY LITIGATION**

**MDL Docket No. 1657**

**THIS RELATES TO:**
**Durbin, Diane vs. Merck Co., et al**
**Civil Action No: 2:06-cv-11302**

Plaintiff: **Diane Durbin**

## FIRST SUPPLEMENT TO
## PLAINTIFF PROFILE FORM

Other than in Sections I, those questions using the term "You" should refer to the person who used VIOXX®. Please attach as many sheets of paper as necessary to fully answer these questions.

### I. CASE INFORMATION

A. Name of person completing this form:  **Diane Durbin**

B. If you are completing this questionnaire in a representative capacity (e.g., on behalf of the estate of a deceased person or a minor), please complete the following:  **N/A**

    1. Social Security Number:  **N/A**

    2. Maiden or Other Names Used or by which you have been known:  **N/A**

    3. Address:  **N/A**

    4. State which individual or estate you are representing, and in what capacity you are representing the individual or estate:  **N/A**

    5. If you were appointed as a representative by a court, please give the following information: **N/A**

        1. Court:  **N/A**
        2. Date of Appointment:  **N/A**

    6. What is your relationship to the deceased/represented person/person claimed to be injured:  **N/A**

    7. If you represent a decedent's estate, please give the following information:

        1. Date of Death:  **N/A**
        2. Address of where the decedent died:  **N/A**

M00FC23430

C. Claim Information

1. Are you claiming that you have or may develop bodily injury as a result of taking VIOXX®? YES ☒   NO☐ *If "yes,"* please complete the following:

    a. What is your understanding of the bodily injury you claim resulted from your use of VIOXX®? **Two heart attacks**

    b. When do you claim this injury occurred? **October 1, 2003 & October 2, 2003**

    c. Who diagnosed the condition? **Dr. Sam Yousuff**

    d. Did you ever suffer this type of injury prior to the date set forth in answer to the prior question? YES ☐ NO ☒ *If "yes,"* when and who diagnosed the condition at that time? **N/A**

    e. Do you claim that your use of VIOXX® worsened a condition that you already had or had in the past? YES ☐ NO ☒ *If "yes,"* set forth the injury or condition; whether or not you had already recovered form that injury or condition before you took VIOXX®; and the date of recovery, if any:

D. Are you claiming mental and/or emotional damages as a consequence of VIOXX? YES ☒ NO ☐ **Plaintiff suffered mental and/or emotional damage resulting from her injury from Vioxx; however, Plaintiff did not seek professional care for these damages.**

    *If "yes,"* for each provider (including but not limited to primary care physician, psychiatrist, psychologist, counselor) from whom you have sought treatment for psychological, psychiatric, or emotional problems during the last ten (10) years, please state the following:

    a. Name and address of each person who treated you: **N/A**

    b. To your understanding, the condition for which you were treated: **N/A**

    c. When treated: **N/A**

    d. Medications prescribed or recommended by provider: **N/A**

## II. PERSONAL INFORMATION OF THE PERSON WHO USED VIOXX®

A. Name: **Diane Durbin**

M00FC23431

B. Maiden or other names used or by which you have been known: **Robbins**

C. Social Security Number: **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**

D. Address: **2917 St. Anthony Road, Quincy, Il 62305**

E. Identify each address at which you have resided during the last ten (10) years, and list when you started and stopped living at each one:

| Address | Dates of Residence |
|---|---|
| 2917 St. Anthony Road, Quincy, IL 62305 | October 1968 to present |

F. Driver's License Number and State Issuing License: **IL D61517245763**

G. Date and Place of Birth: **6/8/45 – Quincy, Illinois**

H. Sex: Male ☐ Female ☒

I. Identify the highest level of education (high school, college, university or other educational institution) you have attended (even if not completed), the dates of attendance, courses of study pursued, and diplomas or degrees awarded:

| Institution | Dates Attended | Course of Study | Diplomas/Degrees |
|---|---|---|---|
| Unity High School | 1964 | General Studies | Diploma |
| John Wood Community College | May 1987 (6 weeks) | CNA – PRA | PRA |

J. Employment Information:

1. Current employer (if not currently employed, last employer):

| Name | Address | Dates of Employment | Occupation/ Job Duties |
|---|---|---|---|
| Good Samaritan Home | 2130 Harrison Quincy, IL | May 1987 to present | PRA |

2. List the following for each employer you have had in the last ten (10) years:

| Name | Address | Dates of Employment | Occupation/ Job Duties |
|---|---|---|---|
| Good Samaritan Home | 2130 Harrison Quincy, IL | May 1987 to present | PRA |

3. Are you making a wage loss claim for either your present or previous

M00FC23432

employment? YES ☐ NO ☒

*If "yes,"* state your annual income at the time of the injury alleged in Section I (part C): **N/A**

K. Military Service Information: Have you ever served in the military, including the military reserve or national guard? YES ☐ NO ☒

> *If "yes,"* were you ever rejected or discharged from military service for any reason relating to your physical, psychiatric, or emotional condition?
> YES ☐ NO ☐     **N/A**

L. Insurance/Claim Information:

1. Have you ever filed a worker's compensation and/or social security disability (SSI or SSD) claim? YES ☒ NO ☐ *If "yes,"* to the best of your knowledge please state:

   a. Year claim was filed: **2006**

   b. Nature of disability: **Workers' Compensation - injury to thumb and wrist**

   c. Approximate period of disability: **6 weeks**

2. Have you ever been out of work for more than thirty (30) days for reasons related to your health (other than pregnancy)? YES ☒ NO ☐ *If "yes,"* set forth when and the reason: **October 2003 heart attacks and March 2006 knee surgery**

3. Have you ever filed a lawsuit or made a claim, other than the present suit, relating to any bodily injury? YES ☐ NO ☒ *If "yes,"* please state to the best of your knowledge the court in which such action was filed, case name and/or names of adverse parties, and a brief description for the claims asserted. **N/A**

M. As an adult, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty? YES ☐ NO ☒ *If "yes,"* set forth where, when, and the felony and/or crime.

### III. FAMILY INFORMATION

A. List for each marriage the name of your spouse; spouse's date of birth (for your current spouse only); spouse's occupation; date of marriage; date the marriage ended (if applicable); and how the marriage ended (e.g. divorce, annulment, etc.): **Jerry Durbin, disabled**

M00FC23433

**DOB 12/15/43**
**Date of Marriage 9/7/66**

B. Has your spouse filed a loss of consortium claim in this action?   YES ☐ NO ☒

C. To the best of your knowledge did any child, parent, sibling, or grandparent of
yours suffer from any type of cardiovascular disease including but not limited to:
heart attack, abnormal rhythm, arteriosclerosis (hardening of the arteries),
murmur, coronary artery disease, congestive heart failure, enlarged heart, leaking
valves or prolapse, heart block, congenital heart abnormality, Scarlet Fever,
Rheumatic Fever, atrial fibrillation, or stroke?   YES ☒ NO ☐ Don't Know ☐
*If "yes,"* identify each such person below and provide the information requested.

1. Name:  **Timothy Durbin (son) and Christine Braeker**
   **(daughter)**
2. Current Age (or age at death):  **37 and 34**
3. Type of Problem:   **Open heart surgery at age 5 and**
   **prolapsed mitro valve**
4. If Applicable, cause of death:

D. If applicable, for each of your children, please provide the following information:

| Name | Age | Address |
|---|---|---|
| **Jerry Durbin, Jr.** | **38** | **1360 North 200th Avenue Payson, IL 62360** |
| **Tim Durbin** | **37** | **5921 Willoughby Dr., Portage, MI 49002** |
| **Christine Braeker** | **34** | **2502 Lind, Quincy, IL** |

E. If you are claiming the wrongful death of a family member, list any and all heirs
of the decedent:  **N/A**

## IV. VIOXX® PRESCRIPTION INFORMATION

A. Who prescribed VIOXX® to you?  **Dr. Daryl Miller**

B. On which dates did you begin to take, and stop taking VIOXX®?  **Approx.**
   **October 2000 – September 2004**

C. Did you take VIOXX® continuously during that period?
   YES ☒ NO ☐ DON'T RECALL ☐

D. To your understanding, for what condition were you prescribed VIOXX®?
   **Arthritis**

M00FC23434

E. Did you renew your prescription for VIOXX®?
YES ☒ NO ☐ DON'T RECALL ☐

F. If you received any samples of VIOXX®, please state who provided them, what dosage, how many samples, and when they were provided. **50 mg, for six days on October 5, 2001 from Dr. Daryl K. Miller.**

G. Which form of VIOXX® did you take? (check all that apply)
☐ 12.5 mg Tablet (round, cream, MRK 74)
☐ 12.5 mg Oral Suspension
☒ 25 mg Tablet (round, yellow, MRK 110)
☐ 25 mg Oral Suspension
☒ 50 mg Tablet (round, orange, MRK 114)

H. How many times per day did you take VIOXX®? **25 mg once daily from October 2000 – September 2004, except for the dates of October 5, 01 – October 11, 2001 took 50 mg daily.**

I. Did you request that any doctor or clinic provide you with VIOXX® or a prescription for VIOXX®? YES ☒ NO ☐ DON'T RECALL ☐

J. Instructions or Warnings:
1. Did you receive any written or oral information about VIOXX® before you took it? YES ☐ NO ☒ DON'T RECALL ☐

2. Did you receive any written or oral information about VIOXX® while you took it? YES ☐ NO ☒ DON'T RECALL ☐

3. *If "yes,"*
   a. When did you receive that information?

   b. From whom did you receive it?

   c. What information did you receive?

K. What over-the-counter pain relief medications, if any, were you taking at the same time you were taking VIOXX®? **None**

## V. MEDICAL BACKGROUND

A. Height: **5 ' 1 ½  inches tall**

B. Current Weight: **150 lbs**
Weight at the time of injury, illness, etc. described in Section I (C): **217**

M00FC23435

C. Smoking/Tobacco Use History: ***Check the answer and fill in the blanks if applicable to your history of smoking and/or tobacco use:***

    ☐ Never smoked cigarettes/cigars/pipe tobacco or used chewing tobacco/snuff
    ☒ Past smoker of cigarettes/cigars/pipe tobacco or chewing tobacco/snuff.
        a.  Date on which smoking/tobacco use ceased: **1968**
        b.  Amount smoked or used: on average **1 pack** per day for **2** years.
    ☐ Current smoker or cigarettes/cigars/pipes or use of chewing tobacco/snuff
        a.  Amount smoked or used: on average per day for years.
    ☐ Smoked different amounts at different time periods.

D. Drinking History: Do you now drink or have you in the past drank alcohol (beer, wine, whiskey, etc)?  YES ☐ NO ☒ ***If "yes," fill in the appropriate blanks*** with the number of drinks that represents your average alcohol consumption during the period you were taking VIOXX® up to the time that you sustained the injuries alleged in the complaint:
    _____drinks per week
    _____drinks per month
    _____drinks per year
    OTHER (please describe):

E. Illicit Drugs:  Have you ever used (even one time) any illicit drugs of any kind within one (1) year before, or any time after, you first experienced your alleged VIOXX® related injury?  YES ☐ NO ☒ DON'T RECALL ☐
**If "yes,"** identify each substance and when you first and last used: **N/A**

F. Please indicate to the best of your knowledge whether you have ever received any of the following treatments or diagnostic procedures:

    1.  Cardiovascular surgeries, including, but not limited to, the following specify for what condition the surgery was performed: Open Heart/Bypass Surgery, Pacemaker Implantation, Vascular Surgery, IVC Filter Placement, Carotid (Neck Artery) Surgery, Lung Resection, Intestinal Surgery:

| Surgery | Condition | Date | Physician | Hospital |
|---|---|---|---|---|
| Angioplasty Stent | Coronary artery disease | 10/2/03 | Dr. Nilesh Goswami | Memorial Hospital 701 N. 1st Street Springfield, IL 62781 |
| Cardiac Catheterization | Coronary artery disease | 10/2/03 | Dr. Nilesh Goswami | Memorial Hospital |

    2.  Treatments/interventions for heart attack, angina (chest pain), or lung ailments.

M00FC23436

| Treatment/Intervention | Date | Physician | Hospital |
|---|---|---|---|
| TNK | 10/1/03 | Dr. Richard Saalborn | Blessing Hospital |
| Lytic therapy | 10/1/03 | Dr. Richard Saalborn | Blessing Hospital |
| Nitroglycerin | 10/1/03 | Dr. Richard Saalborn | Blessing Hospital |
| PCI/Stent to LAD & Diagonal Ac | 10/2/03 | Dr. Nilesh Goswami | Memorial Medical Center |

3. To your knowledge, have you had any of the following tests performed:
   YES ☒ NO ☐ DON'T KNOW ☐  *If "yes,"* answer the following:

    i. Chest X-Ray
    ii. CT Scan
    iii. MRI
    iv. Angiogram
    v. EKG
    vi. Echocardiogram
    vii. TEE (trans-esophageal echo)
    viii. Bleeding scan
    ix. Lung bronchoscopy
    x. Carotid duplex/ultrasound
    xi. MRI/MRA of the head/neck
    xii. Angiogram of the head/neck
    xiii. CT scan of the head
    xiv. Bubble/Microbubble Study
    xv. Holter Monitor

| Diagnostic Test | Date | Treating Physician | Hospital | Reason |
|---|---|---|---|---|
| Electrocardiograph | 6/21/99 | Dr. Andre Edmonds | Quincy Medical Group | Diagnostic |
| Echocardiograph | 6/12/98 | Dr. David N. Wright | Quincy Medical Group | Diagnostic |
| Electrocardiograph | 4/20/94 | Dr. Louis E. DeGreeff | Quincy Physicians & Surgeons Clinic | Diagnostic |
| Chest X-Ray | 6/27/02 | Dr. Ahmad Mahmood | Quincy Medical Group | Diagnostic |
| Chest X-Ray | 5/29/02 | Dr. Timothy Jacobs | Quincy Medical Group | Diagnostic |
| Lower Extremety | 6/17/99 | Dr. George | Blessing | Poss Medial |

M00FC23437

| Joint MRI | | | Crickard | Hospital | Meniscus Tear |
|---|---|---|---|---|---|
| Chest X-Ray | 6/21/99 | | Dr. Andre Edmonds | Quincy Medical Group | Diagnostic |
| | 3/30/93 | | | Quincy Physicians & Surgeons Clinic | Paranasal Sinuses |
| MRI – left knee | 12/1/03 | | Dr. George Crickard | Quincy Medical Group | Knee pain |
| MRI – left knee | 12/1/03 | | Dr. George Crickard | Quincy Medical Group | Knee pain |
| Chest x-ray | 2/13/03 | | Dr. Ahmad Mahmood | Quincy Medical Group | Diagnostic |
| Chest x-ray | 1/29/03 | | Dr. Ahmad Mahmood | Blessing Hospital | Diagnostic |
| Chest x-ray | 1/27/03 | | Dr. Ahmad Mahmood | Quincy Medical Group | Diagnostic |
| Electrocardiograph | 1/24/06 | | Dr. Ahmad Mahmood | Quincy Medical Group | Diagnostic |
| Electrocardiograph | 3/20/03 | | Dr. Ahmad Mahmood | Quincy Medical Group | MI follow-up |
| Chest x-ray | 3/9/06 | | Dr. Crickard | Blessing Hospital | Pre-op for knee surgery |
| Chest x-rays | 1/4/07 | | Dr. Kurt Leimbach | Quincy Medical Center | Sinusitis |
| Chest x-rays | 12/26/06 | | Dr. Kurt Leimbach | Quincy Medical Center | Pneumonia |
| Chest x-rays | 12/12/06 | | Dr. Ernest Wallace | Quincy Medical Center | Diagnostic |
| MRI of right hand | 10/19/06 | | Dr. Jim Daniels | Quincy Medical Center | Crush injury |
| Electrocardiograph | 11/21/06 | | Dr. Tim Jacobs | Quincy Medical Center | Chest Pain |
| Chest X-ray | 10/1/03 | | Dr. Ahmad | Blessing | Chest Pain |

M00FC23438

| | | Mahmood | Medical Center | |
|---|---|---|---|---|
| EKG | 1/17/98 | Dr. Wade Gaeddeert | Blessing Medical Center | Pre-op |
| Echocardiograms (2) | 10/3/03 | Dr. Nilesh Goswami | Memoral Medical Center | Myocardial Infarction |
| Chest X-Ray | 5-29-02 | Dr. Tim Jacobs | Quincy Medical Center | Shortness of Breath |
| ECG | 11-24-06 | Dr. Tim Jacobs | Quincy Medical Center | Chest Pain |
| ECG | 1-24-06 | Dr. Tim Jacobs | Quincy Medical Center | Chest Pain |

## VI. DOCUMENTS

Please indicate if any of the following documents and things are currently in your possession, custody, or control, or in the possession, custody, or control of your lawyers by checking "*yes*" or "*no*." Where you have indicated "*yes*", please attach the documents and items to this profile form.

A. Records of physicians, hospitals, pharmacies, and other healthcare providers identified in response to this profile form.  YES ☒ NO ☐ **See attached**

B. Decedent's death certificate (if applicable)  YES ☐ NO ☐ ☒ **N/A**

C. Report of autopsy of decedent (if applicable)  YES ☐ NO ☒ **N/A**

## VII. LIST OF MEDICAL PROVIDERS AND OTHER SOURCES OF INFORMATION

*List the name and address of each of the following:*

A. Your current family physician and/or primary care physician:

| Name | Address |
|---|---|
| Dr. Kurt Leimbach | 1025 Maine, Quincy, IL 62301 |

B. To the best of your ability, identify each of your primary care physicians for the last ten (10) years.

| Name | Address | Approximate Dates |
|---|---|---|
| Dr. Ahmad Mahmood | 1025 Maine, Quincy, IL | 1997 to present |

M00FC23439

| | 62301 | |
|---|---|---|
| Dr. Daryl Miller | 1025 Maine, Quincy, IL 62301 | 1997 to present |

C. Each hospital, clinic, or healthcare facility where you have received inpatient treatment or been admitted as a patient during the last ten (10) years.

| Name | Address | Admission Date | Reason for Admission |
|---|---|---|---|
| Blessing Hospital | 11th Broadway, Quincy, IL 62301 | 6/25/99 | Knee surgery |
| | | 3/12/04 | Knee surgery |
| | | 1/29 – 2/1/03 | Pneumonia |
| | | 10/12/01 | Esophagogastroduo denoscopy with Biopsies |
| | | 10/1/03 - 10/2/03 | Pneumonia Myocardial Infarction |
| | | 3/15 – 3/18/06 | Left knee surgery |
| Memorial Hospital | 702 N. Rutledge Street, Springfield, IL 62702 | 10/2/03 – 10/4/03 | Myocardial Infarction |
| Prairie Cardiovascular | 747 N. Rutledge Street, Springfield, IL 62702 | October 2003 | Cardiovasular disease |

D. Each hospital, clinic, or healthcare facility where you have received outpatient treatment (including treatment in an emergency room) during the last ten (10) years.

| Name | Address | Admission Date | Reason for Admission |
|---|---|---|---|
| Blessing Hospital | 11th Broadway, Quincy, IL 62301 | 1/20/98 12/12/01 6/25/99 10/12/06 7/25/02 3/31/02 1/20/98 6/25/99 12/1/99 3/25/98 | Bilateral myringotomy with tubes Esophagogastroduodenoscopy with biopsies Right knee arthroscopy Upper GI Endoscopy Mammogram Chronic Otitis Media |

M00FC23440

| | | | Chronic Otitis Media<br><br>Arthroscopy<br><br>Mammogram<br><br>Mammogram |
|---|---|---|---|
| Memorial Hospital | 702 N. Rutledge Street, Springfield, IL 62702 | Will supplement when records are received | Will supplement when records are received |

E.   Each physician or healthcare provider from whom you have received treatment in the last ten years.

| Name | Address | Dates of Treatment |
|---|---|---|
| Dr. Louis E. Degreef | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 11-12-92 – 4-20-94 |
| Dr. Wade Gaeddert | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 12/18/07 to 6/4/98 |
| Dr. Ahmad Mahmood | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 1/1/97 to present |
| Dr. George Crichard | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 5/20/99 – 6/20/06 |
| Dr. Andre Edmonds | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 6/21/99 8/26/99 |
| Dr. Daryl Miller | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 4/12/00 – 5/30/02 |
| Dr. James Brokke | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | |
| Dr. Raman Khanna | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 9/14/01, 1/20/98 |
| Dr. Walter Stevens, III | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 1/6/07 – 2/8/99 |
| Dr. Louis J. Quintero | Quincy Medical Group 1025 Maine Street Quincy, IL 62301 | 12/27/99 – 6/7/04 |

M00FC23441

| | | |
|---|---|---|
| Dr. Richard Taylor | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 3/30/99 |
| Dr. David N. Wright | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 6/2/98 -6/30/98 |
| Dr. Steve Osborn | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 6/12/99 |
| Dr. Timothy Jacobs | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 5/29/02 – 11/21/06 |
| Dr. Raman Khanna | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 12/12/01 |
| Dr. Kurt Leimbach | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 1/29/03 – 1/2/07 |
| Dr. Christopher McDevitt | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 5/30/00 – 11/21/06 |
| Dr. James Murray | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 3/20/03 – 4/28/04 |
| Dr. Sam Youssef | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 10/30/03 – 1/20/04 |
| Dr. John Heilman | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 1/20/04 – 3/9/06 |
| Dr. Ernest Wallace | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 12/29/05 – 12/12/06 |
| Dr. Nilesh J. Goswami | Prairie Cardiovascular<br>Consultants, Ltd.<br>P.O. Box 19420<br>Springfield, IL 62794-9420 | 10/2/03 - 10/4/03 |
| Dr. Christian Zwick | Quincy Medical Group<br>1025 Maine Street<br>Quincy, IL  62301 | 5/16/05 |
| Dr. Richard A. Saalborn | Blessing Hospital<br>11th Broadway, Quincy, IL 62301 | 10/1/03 |
| Dr. Michael Crim | Blessing Hospital<br>11th Broadway, Quincy, IL | 1/29/03 -1/30/03 |

M00FC23442

| | 62301 | |
|---|---|---|

F. Each pharmacy that has dispensed medication to you in the last ten (10) years.

| Name | Address |
|---|---|
| Intergrated | Champva, MBM, P.O. Box 20330, Cheyanne, WY 82003-7008 |

G. If you have submitted a claim for social security disability benefits in the last ten (10) years, state the name and address of the office that is most likely to have records concerning your claim.

| Name | Address |
|---|---|
| N/A | N/A |

H. If you have submitted a claim for worker's compensation, state the name and address of the entity that is most likely to have records concerning your claim.

| Name | Address |
|---|---|
| Illinois Department of Workers' Compensation | Unknown |

M00FC23443

## CERTIFICATION

I declare under penalty of perjury subject to 28 U.S.C. § 1746 that all of the information provided in this Profile Form is true and correct to the best of my knowledge, that I have completed the List of Medical Providers and Other Sources of Information appended hereto, which is true and correct to the best of my knowledge, that I have supplied all the documents requested in part VI of this declaration, to the extent that such documents are in my possession, custody, or control, or in the possession, custody, or control of my lawyers, and that I have supplied the authorizations attached to this declaration.

_Deana Lou Durbin_          _Diana Durbin_          _10-1-07_
Signature                          Print Name                          Date

M00FC23444

# EXHIBIT  77



FILED

OCT 11 2006

CLERK OF CIRCUIT COURT #6
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

## IN THE CIRCUIT COURT
## THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

BARBARA J. MCKEAL              )

            Plaintiff,       )

            vs.           )

MERCK & CO., INC., also    )      Civil Action No. 06L922
d/b/a MERCK, SHARP AND DOHME )
and d/b/a MSD SHARP & DOHME GmbH, )

SERVE: CT CORPORATION     )
208 LASALLE STREET, SUITE 814 )
CHICAGO, IL 60604         )

          Defendants.  )

### PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, GOLDENBERG HELLER ANTOGNOLI ROWLAND SHORT & GORI, P.C., and on behalf of the above-named Plaintiff files this Complaint complaining of Product Defendants for cause of action would respectfully show this Honorable Court the following:

### THE PARTIES

1.    Barbara J. Mckeal, Plaintiff herein, is a resident of Edwardsville, Illinois. Plaintiff brings this action to recover for personal injuries Plaintiff sustained as a result of ingestion of and exposure to Defendant's drug product.

2.    Defendant Merck & Company, Inc. is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey, 08889-0100.

McKeal

Page 1 of 34

WCS&R

NOV 02 2006

RECEIVED

M00SE16516

Merck & Company, Inc. is a foreign corporation doing business in the State of Illinois and maintains an office and/or other facilities within this Judicial District. Merck & Company, Inc., conducts business in the United States and Canada as Merck & Company, Inc., outside of the United States and Canada Merck conducts business as Merck, Sharp and Dohme, LLC, with the exception of Germany where it conducts business as MSD Sharpe & Dohme, GmbH. Collectively Defendants will be referred to as "Merck." Merck manufactured, tested, distributed, marketed, and/or sold the drug rofecoxib under the brand name Vioxx for the treatment of pain associated with osteoarthritis, rheumatoid arthritis, acute pain and menstrual pain. Merck may be served with process through its registered agent, CT Corporation System, 208 La Salle Street, Suite 814, Chicago, Illinois 60604.

## DISCOVERY RULE AND FRAUDULENT CONCEALMENT

3.     The nature of Plaintiff's injuries and the relationship to VIOXX use were inherently undiscoverable; and, consequently, the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew or through the exercise of reasonable care and diligence should have known of the existence of potential claims against Defendants.

4.     Plaintiff did not discover, and through the exercise of reasonable care and due diligence, could not have discovered, the true nature of his injuries earlier, nor could Plaintiff have discovered that his injuries were due to the negligent action of Defendants until Merck pulled Vioxx off the market on September 30, 2004.

McKeal

M00SE16517

5.      Merck is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentation.  Merck was under a duty to disclose the risks of cardiac and cerebrovascular events associated with the use of Vioxx because this was nonpublic information over which Merck had exclusive control, because Merck knew that this information was not readily available to Plaintiff or his doctor and because this information was relevant to Plaintiff and his doctor in deciding whether to use Vioxx.

6.      Further, Plaintiff did not have knowledge of facts that would lead a reasonable, prudent person to make inquiry to discovery of Defendants' tortuous conduct. Under appropriate application of the "discovery rule", Plaintiffs suit is filed within the applicable statutory limitations period. Moreover, Defendants fraudulently concealed from Plaintiffs the nature of the injury and the connection between the injury and Defendants negligent acts in designing, manufacturing, and distributing VIOXX. This fraudulent concealment tolls the statute of limitations for this action until VIOXX was pulled off the market on September 30, 2004.

## JURISDICTION AND VENUE

7.      Defendants are subject to the *in personam* jurisdiction of this Court, and venue is proper herein, by virtue of the fact that Defendants did and continue to do business within the state of Illinois and committed torts in whole or in part in this state against Plaintiff, as more fully set forth herein.  Defendants advertised in Illinois and Madison County, made material omissions and representations in this county, and breached warranties in this county.

McKeal

Page 3 of 34

M005E16518

8.      There is no federal subject matter jurisdiction because no federal question is raised.

## **INTRODUCTION**

9.      This action arises from the sale and distribution of Vioxx (rofecoxib). Vioxx is the brand name used by Defendant Merck to market and distribute rofecoxib. Vioxx has been proven to cause adverse cardiovascular effects including, but not limited to, heart attack and stroke.

10.      Merck during all the times mentioned herein has been engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, inspecting, distributing, marketing, labeling, promoting, packaging and advertising of the prescription drug known as Vioxx for ingestion by consumers. Vioxx was manufactured, sold, designed, supplied, prescribed, distributed, marketed and processed by Defendant, who was at all times acting through their servants, employees, representatives and agents, who placed Vioxx in the market to be purchased and used by the public.

11.      Merck participated in, authorized and directed the production and promotion of Vioxx when they knew, or with the exercise of reasonable care, should have known, of the hazards and dangerous propensities of Vioxx and thereby actively participated in the tortious conduct which resulted in the injuries suffered by the Plaintiff.

12.      Vioxx is a member of a class of drugs known as "NSAIDs" (non-steroidal anti-inflammatory drug), but more specifically contains cyclooxygenase 2 ("COX-2") inhibitory properties. Generally, NSAIDs prevent the formation of fatty acid

M005E16519

cyclooxygenases, of which there are two known types ("COX-1 and "COX-2"). Vioxx is generally different than NSAIDs in that it is solely a COX-2 inhibitor. The rationale being that if the COX-1 enzyme is unaltered, the patient will experience fewer gastrointestinal complications commonly associated with NSAIDs. Merck marketed, sold, distributed, advertised, and promoted Vioxx for the relief of short term pain contending the drug is safer for the gastrointestinal system than typical anti-inflammatory drugs (NSAIDs) such as ibuprofen.

13.     Merck obtained FDA approval for Vioxx on May 20, 1999, for treatment of dysmenorrheal (painful menstrual cramps,) management of acute pain in adults, and relief for the symptoms of osteoarthritis. Merck obtained Vioxx's FDA approval for marketing, sale, and distribution based on inaccurate, false, and misleading information, contained in the New Drug Application, which was on a "fast-track," 6-month approval process to the FDA. Subsequent to this FDA approval, Defendant advertised and marketed Vioxx as safe and effective pain relief medication throughout the United States.

14.     Plaintiff, Barbara J. Mckeal , received a prescription for Vioxx. Plaintiff took the drug as prescribed by a medical professional for at least four years, and suffered a  heart attack and cardiovascular injuries due to clotting or thrombosis while taking Vioxx. Plaintiff brings this action recover for personal injuries Plaintiff sustained as a result of ingestion of and exposure to Defendant's drug product.  Plaintiff's use of Vioxx was the direct and proximate cause of the occurrence in question and the injuries at issue.

15.     At all relevant times, Plaintiff was ignorant of the dangerous nature of Vioxx, and the adverse cardiovascular effects that could occur due to consumption of and exposure to

McKeal

Page 5 of 34

M00SE16520

Vioxx.

16.     Merck knew (through its own studies) or should have known that Vioxx contributes to platelet aggregation or clotting, which can lead to catastrophic adverse effects such as myocardial infarctions, ischemic strokes, deep venous thrombosis as well as other medical conditions that result from abnormal clot formation.

17.     Through industry and medical studies, unknown to Plaintiff, Merck knew or should have known the adverse cardiovascular effects inherent in Vioxx.  Merck ignored or deliberately and fraudulently concealed the increased cardiovascular risk in order to sell Vioxx, avoid the costs of safety precautions, and avoid litigation by people injured by Vioxx. The actions or inactions constitute gross negligence and demonstrate a reckless disregard for the rights and safety of others.

## FACTS - VIOXX'S PRE-APPROVAL

18.     In the mid to late 1990's Defendant Merck faced the loss of patent protection of its top selling and most profitable drug. In 1996, Merck began plans for a proposed study to prove Vioxx was gentler on the stomach than older painkillers.

19.     In need of a new blockbuster drug, Merck pushed forward with plans for the study in spite of statements of the vice president for clinical research Dr. Elise Reicin, who wrote, "The possibility of increased cardiovascular risk (from Vioxx) is of great concern." To remedy this problem and conceal Vioxx's adverse cardiovascular effects, Merck's V.P. Dr. Reicin proposed people with risk of cardiovascular problems be kept out of the study so the adverse cardiovascular effects would not be evident.  Despite all internal knowledge and information relating to cardiovascular-related adverse health

McKeal

Page 6 of 34

M00SE16521

effects, Defendant Merck forged ahead aggressively promoting and marketing Vioxx as safe and effective for persons such as Plaintiff in efforts to obtain FDA approval.

20.     While it is not clear as to what became of this 1996-97 proposed study, it is clear that Merck concealed its knowledge of the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as financially critical for Merck to retain its current market share, and to sustain stock value. Vioxx's chief competing drug Celebrex (Celecoxib) was placed on the market by Merck competitors Pharmacia and Pfizer three months prior to the launch of Vioxx. Merck's disclosure of the safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market.

## FACTS - VIOXX'S POST-APPROVAL

21.     Merck knew, and had reason to know, of these serious adverse events occurring in patients who took Vioxx at a single dose of 25 mg or at a double dose of 50 mg each. Merck failed to advise the FDA, the medical community, and the patients about these dangerous side effects incident to Vioxx use.

22.     Merck intentionally and knowingly chose to market Vioxx, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data thereafter that use of Vioxx carried significant risk factors. These adverse effects were further realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

McKeal

M005E16522

23.     Merck also omitted the gastrointestinal warning about the possibility of serious gastrointestinal toxicity such as bleeding, ulceration or perforation in patients taking Vioxx.

24.     In early 1999, Merck started the 8,000 person VIGOR (Vioxx Gastrointestinal Outcomes Research) study to prove the drug's gastrointestinal safety benefits. The March 2000 VIGOR results revealed precisely what the above discussed internal Merck documents anticipated; a significant increase in the number of blood-clot related problems among Vioxx users. The heart attack rate in the Vioxx group was five times that of the other group taking naproxen.

25.     Merck research Chief Dr. Scolnick confessed that there was an inherent risk in Vioxx, and stated in an internal March 9, 2000 subject line "vigor," e-mail that cardiovascular events are "clearly there" and called it a "shame" that it is mechanism (Vioxx) based. Dr. Scolnick recognized that the cardiovascular effects could not have come from naproxen's protective effect. Merck's research chief wrote that like all Merck's big selling drugs, Vioxx too had side effects but assured Merck that they would "do well."

26.     However, in March of 2000 Merck issued a news release that the trial's cardiovascular findings were "consistent with" naproxen's favorable effects. To date, and not surprisingly, the only studies to report a protective cardiovascular effect with naproxen are ones funded and assisted by Merck. A number of independent studies have reported no reduction in risk with naproxen use. In fact, an FDA researcher recently published a report that blatantly contradicts Merck's position and holds naproxen is not protective against coronary heart disease, and if anything, actually confers an increase in

McKeal

M00SE16523

risk. Merck intentionally and knowingly made false assertions relating to the VIGOR trial with a blatant disregard for the public welfare all in an effort to conceal Vioxx's adverse cardiovascular effects in order to profit and maintain or gain market position.

27.    Merck repeatedly and purposefully downplayed, understated, and concealed the health hazards of Vioxx evident in the VIGOR study. In April of 2000, Merck issued response to the VIGOR results in a news release headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx." This and other similar Merck generated news releases were strategically designed and calculated to deceive and mislead the public about Vioxx's serious adverse effects.

28.    In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck did nothing to publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

29.    Merck continuously and systematically denied the ill health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure. Merck engaged in an aggressive and expansive advertising and sampling program and gained continued increases in market share. Merck spent over $160 million on direct-to-consumer television advertising on Vioxx in 2000. The resultant effect for this multi-million dollar advertising blitz combined with Merck's concealing and failing to

McKeal

Page 9 of 34

M00SE16524

reveal and warn of the risks was more than $2 billion in profits in the year 2000 alone to Merck and an approximately 23 percent market share.

30.      Merck's multi-million dollar advertising campaign created the image, impression, and belief that the use of Vioxx was safe for adults, had fewer side effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew these representations to be false. These advertisements, combined with their other promotional literature such as audio conferences, professional meetings, and press releases deceived potential consumers by relaying positive information, including testimonials from satisfied consumers, and manipulated the statistics to suggest widespread acceptability and safety of the product, while intentionally understating the known adverse and serious risks associated with the use of Vioxx. Merck's advertising and marketing campaign conveyed the false impression that Vioxx was a drug of first choice when it should not have been.

31.      The FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") reviewed the Vioxx promotional activities and materials and "concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug and Cosmetic Act (the Act) and applicable regulations."

32.      Most, if not all, of the noted misrepresentations were made in reference to the VIGOR study conducted by Merck.  According to DDMAC, Merck "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcome Research (VIGOR) study, and thus, misrepresents the safety profile of Vioxx.  Specifically, your promotional

M00SE16525

campaign discounts the fact that in the VIGOR study patients on Vioxx were observed to have a four to fivefold increase in myocardial infarctions (MIs) compared to patients on the comparator nonsteroidal anti-inflammatory drugs (NSAID), Naprosyn (naproxen)." The Warning Letter was released by the FDA on September 17, 2001, and posted by the FDA on September 21, 2001.

33.    The Warning Letter delineated the following misrepresentations made during six promotional audio conferences presented on behalf of Merck by Peter Hold, M.D., which were moderated by Merck employees, a press release, and oral representations made by Merck sales representatives to promote Vioxx.  According to the Warning Letter, Merck misrepresented that:

a.  The rate of myocardial infarction was minimized.  For example, in the June 21, 2000, audio conference, Merck began the discussion of the myocardial infarction rates observed in the VIGOR study by stating:  "when you looked at the myocardial infarction global rate, the rate was different for the two groups.  The MI rate for Vioxx was 0.4% and if you looked at the Naproxen arm it was 0.1%, so there was a reduction in the MI's in the Naproxen group."  Merck then presented an explanation when in fact the situation was not at all that clear.  The DDMAC wrote that as Merck knew, "the reason for the difference between Vioxx and Naproxen has not been determined; it is also possible that Vioxx has pro-thrombotic properties."

b.  Merck knew that the promotional statement was false because the reason for the difference between the myocardial infarction outcomes for the Vioxx users versus the Naproxen users had not yet been determined.

McKeal

Page 11 of 34

M005E16526

c.  Merck carefully excluded from the promotional literature that Vioxx may have pro-thrombotic properties, therefore providing an explanation for the increase in adverse cardiac events.

d.  Further, DDMAC said that Merck had claimed that the myocardial infarction rate for naproxen was 02% and for Vioxx it was 0.1%, which was completely inaccurate. DDMAC wrote: "Contrary to [Merck's] claim that there was a higher rate of MIs in the naproxen group compared to the Vioxx group, the MI rate for Vioxx in this subpoplation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs amount 3878 patients (0.1%) for naproxen." The Warning Letter, p. 4.

e.  Merck, its agents and/or its representatives falsely claimed that the myocardial infarction rate associated with the use of Vioxx was 0.4% in the VIGOR study, which Merck claimed was basically the same as or a little bit less than the crude myocardial infarction rate of Celebrex in a study involving Celebrex. DDMAC found these Merck claims to be false and misleading.

f.  Merck and its agents and representatives misrepresented claims regarding the efficacy of Vioxx as compared to its competitor, Pfizer's Celebrex. When publicly comparing the VIGOR study to a study done on Pfizer's Celebrex known as "CLASS." Merck failed to inform consumers that the patient populations in the two studies, the one performed of Pfizer's Celebrex versus the one performed on Merck's Vioxx, were extremely different. For instance, the VIGOR study excluded patients who had angina or congestive heart failure with symptoms that occurred at rest or with minimal activity as well as patients taking aspirin or other antiplatelet agents. The Celebrex CLASS study did not exclude these patients, therefore making it more likely

McKeal

Page 12 of 34

M005E16527

that the CLASS trial included patients with a higher risk for myocardial infarction prior to their ingestion of Celebrex. Nevertheless, Merck used the results from the comparison of the two studies VIGOR to CLASS to misrepresent that Vioxx was more effective, safer, and, therefore, a better drug than Celebrex, when indeed, Merck knew that this assertion was false.

        g. Merck and its agents and/or its representatives failed to point out that the more affordable alternative, Naproxen, had been statistically proven to produce half as many myocardial infarctions than Vioxx had. These misrepresentations and omissions were made not only at the promotional audio conferences in June of 2000, but also at the annual meeting of the American Society of Health-Systems Pharmacists ("ASHP") in Los Angeles, California, on June 3 through 6, 2001.

34. In the fall of 2000, Merck again sunk to new levels in their efforts to conceal information by employing a barrage of ruthless intimidation and even retaliation tactics against those who spoke out regarding Vioxx's adverse effects. In October of that year, Merck official Louis Sherwood contacted Dr. James Fries, a Stanford University Medical Professor, to inform him that if his "irresponsibly anti-Merck and specifically anti-Vioxx" lectures didn't stop, that he would "flame out." Dr. Fries responded in a letter to Merck chief executive Gilmartin stating, "that Merck had crossed (an ethical) line, that you can't go across." Dr. Fries also explained that several other top medical schools complained of "a consistent pattern of intimidation by Merck" on Vioxx.

35. Dr. Lee Simon, a rheumatologist at Beth Israel Deaconess Medical Center in Boston, reported being the victim of similar type Merck intimidation tactics when he publicly mentioned data that Vioxx may be associated with a risk of high blood pressure

McKeal

M00SE116528

and swelling. Dr. Simon was "shocked that a phone call was made" to his superior to complain that his lectures were slanted against Vioxx; Dr. Simon rightfully believed that Merck was "attempting to suppress discussion about this data."

36.    In November of 2000, Merck caused the publication of an incomplete study in the New England Journal of Medicine entitled, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption. The article simply failed to provide critical information about Vioxx related cardiovascular complications such as stroke or blood clots.

37.    The year 2001 proved to be more of the same; huge efforts by Merck to conceal and hide Vioxx's adverse effects from the public and, in turn, Merck reaping huge profits. In 2001 Merck spent $135 million to promote the drug in the United States alone; Merck was rewarded with $2.6 billion in revenue making Vioxx the world's tenth biggest selling medicine.

38.    In February of 2001, when the FDA revealed results of the VIGOR study, the FDA wanted to highlight the cardiovascular risk prominently on Vioxx's label. Merck resisted and fought hard to maintain its warning/caution free label and the label remained unchanged until April 2002 when Merck and the FDA eventually reached a compromise. Merck's relentless and aggressive efforts to keep the public in the dark enabled them to maintain market position and profits for yet another year, all at the expense of persons such as Plaintiff.

39.    The FDA wrote a "Warning Letter" to Merck on September 17, 2001 (hereinafter,

McKeal

M005E16529

the "Warning Letter"), which demanded that Merck correct the false and misleading messages contained in the promotional campaign for Vioxx, press releases and oral representations made by Merck sales representatives to promote Vioxx.

40.    On or about August 29, 2001, JAMA, the Journal of the American Medical Association, published a peer reviewed human epidemiologic study by the Cleveland Clinic Foundation showing that Merck had concealed the risk of a thrombotic cardiovascular event or myocardial infarctions among Vioxx users in Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin patients. See Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors, JAMA. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users. Id.

41.    In the JAMA study the authors set forth the theory that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic events." Id. at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular thrombotic events." Bing, R., & Lomnicka, M., Why Do Cylo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?, J.A.C.C., 39:3, Feb. 6, 2002. This biological plausibility is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et

McKeal

M00SE16530

al., Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2, Journal of Science, V. 296: 539-541, Apr. 19, 2002.

42.    The JAMA study's release was followed by a relentless series of publications and peer reviewed literature by Merck employees and consultants again setting forth the blatantly false theory that naproxen had antithrombotic effects which accounted for the appearance of cardiovascular risk among Vioxx users. Again, Merck funded and assisted studies are the only ones to ever make this assertion. This theory has been debunked by numerous respected medical journals and the FDA recently stated that this theory could not be further from the truth.

43.    In mid-September, 2001, Merck received a third Warning letter from the FDA stating in part that Defendant's promotional activities are "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." The FDA stated that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings" from a Vioxx study and "misrepresents the safety profile on Vioxx." As to a Merck May 22, 2001, press release, the FDA wrote "your claim in the press release that Vioxx has a 'favorable safety profile' is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx group... as in the naproxen treatment group..."

44.    Further, the FDA Warning letter reprimanded Merck for setting forth this false theory relating to the VIGOR study that Naproxen had anti-thrombotic effects, and went on to state that, "it is also possible that Vioxx has pro-thrombotic effects."

McKeal

M005E16531

45.     Nevertheless, Merck continued its course of action and continued to aggressively market its Vioxx primarily through direct-to-consumer advertising.

46.     In the midst of this adverse publicity, Merck took an offensive approach to marketing, providing all Vioxx field personnel with an "obstacle handling guide" to overcome doctors' objections to Vioxx relating to its cardiovascular problems. The training document was appropriately titled "Dodge Ball Vioxx." Merck's massive Vioxx sales force was instructed to avoid and "DODGE" serious, life threatening concerns of both health care professionals and the general public; Merck's corporate philosophy became one of "RUN" and "DODGE" as opposed to being that of "HONEST" and "TRUTHFUL."

47.     In April 2002, Merck was required to place information about cardiovascular implications on its Vioxx labeling based on the results of the VIGOR study. In addition, Merck was required to place new label information that Vioxx 50 mg per day is not recommended for chronic use. These warnings were based on information that had been in Merck's possession by approximately January of 2000 at the latest and, as such, Merck did not meet its obligation to provide adequate "direction or warnings" as to the use of Vioxx within the meaning of Section 402 of the Restatement (Second) of Torts or otherwise. Neither did Merck fulfill its alleged obligation to warn the prescribing health care provider of these risks.

48.     Internal Merck documents reveal that Merck was set to begin a major cardiovascular study of Vioxx in 2002, but company officials abruptly dropped the project just before it was set to start. This proposed study, which became known as the VALOR trial was set to begin in June of 2002. However, on March 13, 2002, Merck sent an e-mail

M005E16532

to Merck employees worldwide that simply stated the trial was being put on hold and did not cite any details leading to the decision. Although Merck officials have publicly denied it, it is far more than a coincidence that their decision to cancel the trial fell amidst their negotiations with the FDA over the April 2002 cardiovascular warnings mentioned above. Merck's decision to cancel the VALOR trial is in concert with their corporate strategy to conceal information relating to Vioxx's adverse cardiovascular effects.

49.     In the summer of 2002, Merck conducted its most inflammatory and aggressive measures via their intimidation and retaliation tactics to suppress and conceal speech and publicity relating to the adverse cardiovascular effects of Vioxx. Dr. Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain, had published his criticisms of Merck's handling of Vioxx. Merck then had the audacity to send him a "rectification" that they insisted Dr. Laporte publish, which Dr. Laporte refused. Merck then filed suit against the doctor in Spanish Court demanding a public correction. In early 2004 the judge ruled that the publication accurately reflected the cardiovascular safety (or lack thereof) of Vioxx and ordered Merck to pay all court costs.

50.     In October of 2002, the prestigious British medical journal *Lancet* published a study that analyzed the medical data of close to 300,000 people and determined that people who take Vioxx are almost twice at risk of developing heart disease, including heart attack. *Lancet* also concluded that there was no anti-thrombotic or protective effect of naproxen, effectively discounting Merck's theory. Merck again opted not to publicize or warn of these findings, and would stick to its same story for another two years. Merck would continue to spend more than $100 million annually in direct-to-consumer advertising, and expand its distribution to more than 80 countries.

McKeal

MOOSE16533

51.     On August 25, 2004, FDA researcher Dr. David Graham presented at a medical conference the results of a database analysis of 1.4 million patients that concludes Vioxx users are more likely to suffer a heart attack or sudden cardiac death than patients taking Celebrex. In fact, the report shows there is a 3.7-fold increase in risk compared with those taking Celebrex. With 92,791,000 prescriptions for Vioxx filled between 1999 and 2003, the FDA conservatively estimates an excess of 27,785 cases of AMI (Acute Myocardial Infarction) and SCD (Sudden Cardiac Death) for those years alone. Plaintiff is one of those 27,785 cases.

52.     Merck was still not ready to concede the truth. On August 26, 2004, true to form, Merck attempted to minimize and downplay the adverse findings and authorized a press release refuting Dr. Graham's study entitled, "Merck stands behind the efficacy and overall safety and cardiovascular safety of Vioxx."

53.     On September 23, 2004, Merck claims it had an epiphany. Merck had been sponsoring a small 2600 patient (APPROVe) study to in order to gain additional FDA approval for Vioxx to treat the recurrence colon polyps. The APPROVe study was stopped prematurely on the instruction of the data and safety monitoring board after the investigators found that after 18 months of treatment, patients taking Vioxx had twice the risk of a myocardial infarction compared with those receiving placebo. Merck alleges that this small study which was by no means intended to test for Vioxx's overall safety is what triggered the collapse of all their previous defenses. The results of the APPROVe study combined with mounting pressure from the FDA compelled Merck to finally acknowledge Vioxx's dangerous propensities. Merck then opted to back out rather than be forced out.

McKeal

Page 19 of 34

M00SE16534

54.  On September 30, 2004, Merck withdrew Vioxx from the U.S. and the more than 80 countries around the in world. This came only after an estimated 80 million patients had taken the drug and Merck's annual sales had topped $2.5 billion. This represents the largest prescription drug withdrawal in history.

## SUMMARY

55.  Critics have described the rise and fall of Vioxx as a cautionary tale of masterful public relations and aggressive marketing. At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which included financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program.

56.  As a result of such marketing, Vioxx gained a significant market share in competition with Celebrex that Merck would not have gained if Merck had not suppressed and concealed information about Vioxx and/or made false representations of Vioxx's superiority and efficacy.

57.  If Defendant had not engaged in this conduct, prescribers like Plaintiff's Physician would not have prescribed Vioxx and patients, like Plaintiff, would have switched from Vioxx to safer products or would have refrained wholly from any use of Vioxx.

58.  From approximately 1999 through September 30, 2004, Defendant continued to engage in a common scheme in marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as Plaintiff before, during and after Plaintiff experienced this confirmed adverse cardiovascular event.

59.  Plaintiff alleges that the marketing strategies, including without limitation the

McKeal

M00SE16535

detail and sampling programs and direct-to-consumer advertising, of the Defendant targeted Plaintiff to purchase Vioxx. At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Plaintiff and Plaintiff's health care professional would rely on the marketing, advertisements and product information propounded by Defendant.

60.    The actions of Defendant, in failing to warn of the clear and present danger posed to others by the use of its drug Vioxx, in suppressing evidence relating to this danger, and in making deliberate and misleading misrepresentations of fact to minimize the danger or to mislead prescribing physicians and patients as to the true risk, are the direct and proximate cause of Plaintiffs injuries. Plaintiff seeks compensation for the damages they have sustained relating to his past, present, and future physical pain and mental anguish, loss of earning capacity, disfigurement, physical impairment, and medical care expenses. Additionally, the actions of Defendant constitute gross negligence and a reckless disregard for the lives of others.

## COUNT 1-COMMON LAW STRICT LIABILITY-

## AGAINST MERCK

COMES NOW Plaintiff and for Count One of the Complaint against Defendant Merck alleges:

61.    The Plaintiff re-alleges and incorporates the foregoing allegations.

62.    In addition to pleading negligence, Plaintiff pleads the doctrine of strict liability. Defendant is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective design of the Vioxx. At the time Vioxx was designed, manufactured and sold by said Defendant, safer alternative designs existed, which

McKeal

M00SE16536

included designs other than those actually used, that had they been selected by said Defendant, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of said Defendant, and had they been used, would have not have impaired the utility of the product. Defendant's defectively designed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

63.     Defendant is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective marketing of Vioxx. Defendant failed to provide adequate warnings and instructions for safe use of Vioxx. Defendant's defectively marketed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

64.     Defendant Merck is also strictly liable to Plaintiff under Section 402B of the Restatement (Second) of Torts in misrepresenting to the public that its product was safe and without defect, which statement and representation was false and involved a material fact concerning the character of quality of the product in question, and upon which representations the consumer constructively relied, and which constituted a producing cause of the injury at issue.

65.     Further, each of the above and foregoing acts or omissions of Defendant were more than momentary thoughtlessness, inadvertence, or error of judgment. Such acts or omissions constituted such entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the rights, safety, or welfare of the person or persons affected. Plaintiff is entitled to recover judgment against Defendant for exemplary damages.

WHEREFORE, for Count One of the Complaint, Plaintiff prays for judgment

McKeal

Page 22 of 34

M00E16537

against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

## COUNT 2- NEGLIGENCE AND GROSS NEGLIGENCE-
## AGAINST MERCK

COMES NOW Plaintiff and for Count Two of the Complaint against Defendant Merck, alleges:

66.     The Plaintiff re-alleges and incorporates the foregoing allegations.

67.     The Plaintiff would further show that at all times material hereto, the manufacture, sale, design, supply, distribution, or prescription of Vioxx with which Plaintiff came in contact, was under the exclusive control of the Defendant, their agents, servants and employees, and that had the Defendant herein not been guilty of negligence, the Plaintiff would not have sustained his injuries. Accordingly, the Plaintiff is entitled to recover from the Defendant under the doctrine of res ipsa loquitur.

68.     The law imposed a duty on the Defendant, as a manufacturer and marketer of pharmaceutical drugs, to exercise reasonable care. The Defendant knew, or in the exercise of ordinary or reasonable care ought to have known, that Vioxx it manufactured, sold, designed, supplied, distributed, promoted, or marketed was dangerous, unsafe, and highly harmful to Plaintiff's health, notwithstanding which:

A.      Defendant negligently failed to design a reasonably safe product;

B.      Defendant negligently placed Vioxx into the market;

C.      Defendant negligently failed to remove Vioxx from the market;

D.      Defendant negligently failed to fund and conduct medical and scientific

McKeal

M00SE16538

studies to determine the risks of the overall safety of Vioxx, in the alternative, failed to heed the warnings and risks of Vioxx;

E.   Defendant negligently failed to conduct sufficient testing on Vioxx that would have shown Vioxx had serious side effects, including, but not limited to the cardiovascular events described above;

F.   Defendant negligently failed to conduct adequate post-marketing surveillance to determine the overall safety of Vioxx;

G.   Defendant negligently failed to accurately disclose the results of their post-marketing surveillance to advise the Plaintiff, consumers, and the medical community of the aforementioned risks to individuals when the drugs were ingested;

H.   Defendant negligently failed to investigate the adverse event reports relating to Vioxx;

I.   Defendant negligently marketed their products;

J.   Defendant negligently failed to provide Plaintiff with visible, understandable warnings that were adequate to convey and alert Plaintiff the severity of the risks and serious thrombotic cardiovascular side effects of Vioxx ingestion;

K.   Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

L.   Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiffs health care providers of the

McKeal

M00SE16539

potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

M.. Defendant negligently failed to take any reasonable precautions or exercise reasonable care to warn the health care industry of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

N. Defendant negligently failed to provide adequate post-marketing warnings or instructions after the Defendant knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

O. Defendant negligently failed to warn Plaintiff that Vioxx should not be used in conjunction with any risk factors for these adverse events such as a family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease; and,

P. Defendant negligently failed to warn Plaintiff that they undertook the risk of adverse events and death relating to Vioxx as described herein.

69. The Defendant's acts of negligence, as described above but not limited to these specific acts, proximately caused the Plaintiff's injuries and the occurrence in question.

WHEREFORE, for Count Two of the Complaint, Plaintiff prays for judgment against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

## COUNT 3- NEGLIGENCE- SALE OF PRODUCT-

McKeal

Page 25 of 34

M00SE16540

## AGAINST MERCK

COMES NOW Plaintiff and for Count Three of the Complaint against Defendant Merck, alleges:

70.     The Plaintiff re- alleges and incorporates the foregoing allegations.

71.     Defendant, during some or all relevant times, manufactured, sold, marketed, and/ or distributed Vioxx that was supplied to the Plaintiff for use.

72.     The Plaintiff had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiff.

73.     These duties included the responsibility for the following safety and health matters relating to Vioxx:

A. the investigation of the health risks;

B. writing and publishing adequate and timely precautionary product labels and other health and safety information;

C. writing and publishing adequate and timely specifications and standards about the true risks of injury associated with the products;

D. writing and publishing adequate and timely specifications and standards about the symptoms of such injuries

E. writing and publishing adequate and timely specifications and standards about the scope of such injuries

F. writing and publishing adequate and timely specifications and standards about the severity of the known risks associated with the products.

74.     The Defendant knew, or in the exercise of reasonable care should have known, that Vioxx would cause adverse cardiovascular effects to its consumers like the Plaintiff.

McKeal

Page 26 of 34

M00SE16541

75.     The Defendant breached its duty of reasonable care to the Plaintiff and was negligent, without regard to whether the acts were intentional, knowing, malicious, or reckless.

76.     Defendant's negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

WHEREFORE, for Count Three of the Complaint, Plaintiff prays for judgment against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

## COUNT 4 - BREACH OF WARRANTIES (EXPRESS and IMPLIED)
## AGAINST MERCK

COMES NOW Plaintiff and for Count Four of the Complaint against Defendant Merck, alleges:

77.     The Plaintiff re- alleges and incorporates the foregoing allegations.

78.     Merck through descriptions, affirmations of fact, and promises relating to their Vioxx drugs to the FDA, prescribing physicians, and the general public, including the Plaintiff, expressly warranted that Vioxx was both safe and efficacious for its intended use.

79.     These warranties came in the form of:

A.      Publicly made written and verbal assurances of the safety and efficacy of Vioxx by Merck;

B.      Press releases, interviews and dissemination via the media of promotional information, for the sole purpose of which was to create an increased demand for Vioxx, which failed to warn of the risks inherent to the ingestion of Vioxx;

McKeal

Page 27 of 34

M005E16542

C.     Verbal assurances made by Merck regarding Vioxx and the downplaying of any risk associated with the drug;

D.     False and misleading written information, supplied by Merck, and published in the Physician's Desk Reference on an annual basis, upon which physicians were forced to rely in prescribing Vioxx during the period of Plaintiff's ingestion of Vioxx including, but not limited to, information relating the recommended duration of the use of the drugs;

E.     Promotional pamphlets and brochures published and distributed by Merck and marketed directly to consumers, which contradicted the information that was set forth in the package insert and the Physician's Desk Reference; and

F. Advertisements, including but not limited to direct to consumer advertising.

80.    The documents referred to above were created by and at the direction of Defendant.

81.    At the time of these express warranties, Merck had knowledge of the purpose for which Vioxx was to be used and warranted it to be in all aspects safe, effective and proper for such purpose, when indeed it was not.

82.    Merck knew and had reason to know that Vioxx did not conform to these express representations in that Vioxx is neither safe nor as effective as represented, and that Vioxx produces serious adverse side effects.

83.    As such, Merck's products were neither in conformity to the promises, descriptions or affirmations of fact made about Vioxx nor adequately contained, packaged, labeled or fit for the ordinary purpose for which these goods were sold and used.

84.    Merck breached these express warranties to Plaintiff in violation of the applicable provisions of the Uniform Commercial Code by:

McKeal

Page 28 of 34

M00SE16543

A.    Manufacturing, marketing, packaging, labeling and selling Vioxx to Plaintiff in such a way that misstated the risks of injury, without warning or disclosure thereof by package or label of such risks to the Plaintiff or the prescribing physicians or pharmacist, and without modifying or excluding such express warranties;

B.    manufacturing, marketing, packaging, labeling, advertising and selling Vioxx to Plaintiff, which failed to counteract the negative health effects and increased risks in a safe and permanent manner; and

C.    manufacturing, marketing, packaging, labeling, advertising, promoting and selling Vioxx to Plaintiff, thereby causing the increased risk of serious physical injury and death, pain and suffering.

85.    Merck was or should have been in possession of evidence demonstrating that Vioxx causes serious side effects. Nevertheless, Merck continued to market Vioxx by providing false and misleading information without regard to the safety and efficacy of Vioxx.

86.    Merck's actions, as described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff and the public.

WHEREFORE, for Count Four of the Complaint, Plaintiff prays for judgment against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

## COUNT 5 COMMON LAW FRAUD- AGAINST MERCK

COMES NOW Plaintiff and for Count Five of the Complaint against Defendant Merck, alleges:

87.    Plaintiff re-alleges and incorporates the foregoing allegations.

88.    Merck, at all relevant times, made false representations and omissions to Plaintiffs

McKeal

Page 29 of  34

M00SE16544

and other members of the public, including but not limited to, that Vioxx was safe, had been adequately tested to determine safety, and did not present life-threatening dangers.

89.     These representations and omissions, as set forth in the above paragraphs, were false. The true facts were that Vioxx were not safe, had not been adequately tested, and had dangerous and life-threatening side effects.

90.     When Merck made the representations, it knew them to be false, and said representations were made by Merck with the intent to deceive Plaintiff and/or his prescribing physicians and with the intent to induce plaintiff to use the Vioxx manufactured by Merck.

91.     Plaintiff and/or his physicians reasonably relying upon the false representations and omissions, Plaintiff's physicians prescribed Vioxx, Plaintiff used Vioxx.  Plaintiff would not have done so if Plaintiff had known the true facts.  In using Vioxx, Plaintiff exercised ordinary care.

92.     As a direct and proximate result of the aforesaid fraudulent conduct, Merck caused Plaintiff to suffer the damages and injuries herein alleged.

WHEREFORE, for Count Five of the Complaint Plaintiff prays for judgment against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

## COUNT 6- NEGLIGENT MISREPRESENTATION – AGAINST MERCK

COMES NOW Plaintiff and for Count Six of the Complaint against Defendant Merck, alleges:

McKeal

Page 30 of 34

M005E16545

93.     The Plaintiff re-alleges and incorporates the foregoing allegations.

94.     Merck misrepresented to Plaintiff and/or Plaintiff's treating physicians the potential serious cardiovascular findings that were observed in the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted crucial risk information associated with Vioxx, misrepresented Vioxx safety profile and represented that Vioxx was safe, and that any cardiovascular and/or cardio thrombotic side effects were not associated with the drug.

95.     These representations were made with the actual knowledge of Merck.

96.     The representations set forth *supra* were material to Plaintiff and/or his treating physician to prescribe and maintain Plaintiff's prescription of Vioxx.

97.     The representations were made either without knowing of the truth or falsity of the representations or knew or should have known that the representations being made were false and, therefore, Defendant failed to exercise reasonable care in making the representations in the scope and course of their employment in marketing Vioxx to individual consumers, Plaintiff's treating physicians, hospitals, and other health care providers.

98.     Merck intended for Plaintiff and/or Plaintiff's treating physicians to rely upon the material misrepresentations to induce them to initially prescribe Vioxx and continue Plaintiff on Vioxx.

99.     Plaintiff justifiably relied on the representations which were made directly to Plaintiff or Plaintiff's treating physicians, with Merck knowing that Plaintiff was in a limited group who Merck knew would rely upon the information.

McKeal

M00SE16546

100.   As a direct result of Merck's negligent misrepresentation, personal injuries and actual damages in an amount to be proved at trial.  The negligent misrepresentations caused or substantially contributed to cause Plaintiffs' damages.

WHEREFORE, for Count Six of the Complaint, Plaintiff prays for judgment against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

### COUNT 7-DECEPTIVE TRADE PRACTICES ACT- AGAINST MERCK

COMES NOW Plaintiff and for Count Seven of the Complaint against Defendant Merck, alleges:

101.   The Plaintiff re-alleges and incorporates all the foregoing allegations.

102.   Plaintiff brings this action pursuant to 815 ILCS 505, et seq. (The Illinois Consumer Fraud and Deceptive Practices Act), in that Plaintiff purchased and used Vioxx for his personal use and thereby suffered ascertainable loss as a result of Merck's actions in violation of the Illinois consumer fraud statute.

103.   Unfair or deceptive acts or practices are defined and declared unlawful in Illinois. The unfair or deceptive acts or practices as defined in the statute include, "the use of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact . . . in the conduct of any trade or commerce."

104.   Merck violated the Act by its use of false and misleading misrepresentations or omissions of material fact in connection with the sale of Vioxx.  Merck communicated the

M00SE16547

purported benefits of Vioxx, while failing to disclose the serious and dangerous side effects related to the use of its product, and in fact actually concealing from health care providers the adverse cardiovascular effects of Vioxx.

105.    In this regard, Merck, including but not limited to, created a "dodgeball Vioxx" training package for its sales force, which instructed the individual Defendants named in this count to duck doctors and health care providers' questions about Vioxx's possible cardiovascular side effects.  Merck's sales representations followed its instructions and concealed, omitted, and suppressed these material facts when making sales calls to health care providers.

106.    As a result of violating the Illinois consumer fraud statute, Merck is liable to Plaintiff for actual damages, costs and reasonable attorneys' fees, and for such additional relief as the Court may deem appropriate.

WHEREFORE, for Count Seven of the Complaint, Plaintiff prays for judgment against Defendant Merck in a sum in excess of Fifty Thousand Dollars ($50,000.00), for such other relief as may be fair and reasonable under the circumstances and for his costs herein expended.

## PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, Plaintiff requests that this Court enter a judgment against the Defendant and in favor of the Plaintiff, and to award the following relief:

A. General damages in the sum in excess of the jurisdictional minimum of this Court;

B.  Compensatory damages, including past, present, and future physical pain and

McKeal

Page 33 of 34

M005E16548

suffering, loss of earning capacity, disfigurement, physical impairment, and medical care expenses;

C. Consequential Damages;

D. Costs including, but not limited to, discretionary Court costs of this cause, and those costs available under the law, as well as expert fees and attorney fees and expenses, and costs of this action; and,

E. Such other relief as the Court deems just and proper.

Respectfully submitted,

**GOLDENBERG HELLER ANTOGNOLI**
**ROWLAND SHORT & GORI, P.C.**

By _____
        **Robert D. Rowland #6198915**
        **Aaron K. Dickey #6281731**
        2227 S. State Route 157
        P.O. Box 959
        Edwardsville, IL 62025
        618/656-5150 Telephone
        618/656-6230 Facsimile

ATTORNEYS FOR PLAINTIFF

McKeal

Page 34 of 34

M00EI16549

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY
(618) 692-6240
WWW.CO.MADISON.IL.US

BARBARA J. MCKEAL
                    PLAINTIFF
        VS.

                                                    DATE: 10/12/2006

                                            CASE No. 2006 L  000922

MERCK & CO INC DBA MSD SHARP & DOHME
SERVE: CT CORPORATION
208 LASALLE ST STE 814
CHICAGO          IL 60604
                    DEFENDANT

DEFENDANT MERCK & CO INC DBA MSD SHARP & DOHME

    You are hereby summoned and required to file an answer in this case, or otherwise file your appearance, in the office of the Madison County Circuit Clerk, within 30 days after service of this summons, exclusive of the day of service.  If you fail to do so, a judgment or decree by default may be taken against you for the relief prayed in the complaint.

    This summons must be returned by the officer or other person to whom it was given for service, with endorsement thereon of service and fees, if any, immediately after service.  If service cannot be made, this summons shall be returned so endorsed.

    This summons may not be served later than 30 days after its date.

    Witness:  MATT MELUCCI the Clerk of said Circuit Court and the seal thereof, at Edwardsville, Illinois, this October        2006.



                        MATT MELUCCI
                        CLERK OF THE CIRCUIT COURT


                        BY:_____
                            Deputy Clerk


==================================================================================
(Plaintiff's attorney or plaintiff if he is not represented by an attorney)

AARON K. DICKEY
GOLDENBERG HELLER ANTOGNOLI ROWLAND
 2227 S STATE RT 157
EDWARDSVILLE     IL 62025

 Date of Service:_____, 20_____.
 (To be inserted by officer on the copy left with the defendant or other person)

M00SE16550

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

FILED

OCT 11 2006

CLERK OF CIRCUIT COURT #6
THIRD JUDICIAL CIRCUIT
MADISON COUNTY ILLINOIS

BARBARA J. MCKEAL,                          )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )
                                            )
MERCK & CO., INC., also                     )
d/b/a MERCK, SHARP AND DOHME                )    Civil Action No. 06L922
and d/b/a MSD SHARP & DOHME GmbH, )
                                            )
                                            )
                    Defendants.             )

## AFFIDAVIT OF DAMAGES

COMES NOW Plaintiff, BARBARA J. MCKEAL, by and through counsel,

GOLDENBERG HELLER ANTOGNOLI ROWLAND SHORT & GORI, P.C., and pursuant to

Supreme Court Rules, hereby states the total of money damages sought in the above-styled

matter exceeds FIFTY-THOUSAND DOLLARS, ($50,000.00).

        Further Affiant sayeth not.

                        Respectfully submitted,

                        **GOLDENBERG HELLER ANTOGNOLI,
                        ROWLAND SHORT & GORI, P.C.**

                        By _____
                            **Aaron K. Dickey #6281131**
                            2227 S. State Route 157
                            P.O. Box 959
                            Edwardsville, IL 62025
                            618/656-5150 Telephone
                            618/656-6230 Facsimile

McKeal _____

Page 1 of 2

M00SE16551

ATTORNEYS FOR PLAINTIFF

STATE OF ILLINOIS          )
                           ) SS
COUNTY OF MADISON          )

    SUBSCRIBED AND SWORN to before me this _22nd_ day of _September_
2006.

> "OFFICIAL SEAL"
> LORI FERNANDEZ
> Notary Public, State of Illinois
> My commission expires 1/23/2010

_Lori Fernandez_

McKeal _____

Page 2 of 2

M00SE16552

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

BARBARA MCKEAL,                    )
                                   )
                    Plaintiff,     )
                                   )
              vs.                  )
                                   )
MERCK & CO., INC., also            )
d/b/a MERCK, SHARP AND DOHME       )    Civil Action No. 2006 L 000922
and d/b/a MSD SHARP & DOHME GmbH, )
                                   )
                                   )
                    Defendants.    )

**FILED**
OCT 18 2006
CLERK OF CIRCUIT COURT # 82
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

## <u>MOTION TO APPOINT SPECIAL PROCESS SERVER</u>

COMES NOW the Plaintiff, above-mentioned, by GOLDENBERG, HELLER,

ANTOGNOLI, ROWLAND, SHORT AND GORI,  P.C., and move this Honorable Court to

enter an Order in this cause authorizing service of summons by JOHN REA, a private person,

over twenty-one years of age and not a party to the action, and as grounds for this Motion,

respectfully states:

1. A Complaint has been filed in this case and summons issued by the Clerk of the Court.

2. Plaintiffs believe that if JOHN REA, 1313 Drawbridge Lane, Lemont, Illinois, a

private person over twenty-one years of age and not a party to this action were authorized and

directed by this Court to serve summons herein, he would successfully carry out and accomplish

that mission.

Hayes _____
Page 1 of 2

M00E16553

WHEREFORE, the firm of GOLDENBERG, HELLER, ANTOGNOLI, ROWLAND, SHORT AND GORI,  P.C., prays that this court will enter an order appointing JOHN REA as Special Process Server to serve summons in this cause.

Respectfully submitted,

**GOLDENBERG HELLER ANTOGNOLI,
ROWLAND SHORT & GORI, P.C.**

By_____

**Aaron K. Dickey #6281731**
2227 S. State Route 157
P.O. Box 959
Edwardsville, IL 62025
618/656-5150 Telephone
618/656-6230 Facsimile

ATTORNEYS FOR PLAINTIFF

STATE OF ILLINOIS       )
                        ) SS
COUNTY OF MADISON       )

SUBSCRIBED AND SWORN to before me this ___18dh___ day of _Oclober_,
2006.

"OFFICIAL SEAL"
LORI FERNANDEZ
Notary Public, State of Illinois
My commission expires 1/23/2010

Hayes _____
Page 2 of 2

M00SE16554

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

BARBARA MCKEAL,                    )
                                   )
                    Plaintiff,     )
                                   )
            vs.                    )
                                   )
MERCK & CO., INC., also            )
d/b/a MERCK, SHARP AND DOHME       )   Civil Action No. 2006 L 000922
and d/b/a MSD SHARP & DOHME GmbH,  )
                                   )
                                   )
                    Defendants.    )

**F I L E D**

OCT 18 2006

CLERK OF CIRCUIT COURT # 82
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

## O R D E R

On Motion of the Plaintiffs, by GOLDENBERG, HELLER, ANTOGNOLI, ROWLAND,

SHORT AND GORI, P.C., it is **ORDERED** that **JOHN REA**, a private person over twenty-one

years of age and not a party to the action be and he is hereby authorized and directed to serve

summons in this cause.

_Clarence W. Harrison II_
                                                    JUDGE

DATE: _10|18|06_

Hayes _____
Page 1 of 1

M00SE16555

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
11/01/2006
Log Number 511613589 / 2

**TO:**       Ellen Gregg
              Womble Carlyle Sandridge & Rice, PLLC
              301 North Main Street, Suite 300
              Winston-Salem, NC, 27101

**RE:**    **Process Served in Illinois**

**FOR:**      Merck & Co., Inc. (Domestic State: NJ)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

| | |
|---|---|
| **TITLE OF ACTION:** | Barbara J. McKeal, Pltf. vs. Merck & Co., Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Original Complaint, Motion(s), Order(s), Affidavit(s) |
| **COURT/AGENCY:** | Madison County, IL - 3rd Judicial Circuit Court, IL<br>Case # 2006 L 000922 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Vioxx - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/01/2006 at 08:30 |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | Aaron K. Dickey<br>Goldenberg, Heller, Antognoli, Rowland, Short & Gori, P.C.<br>2227 South State<br>Route 157<br>PO Box 959<br>Edwardsville, IL, 62025<br>618-656-5150 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex Priority Overnight, 790107182497<br>Email Notification, Debra A Bollwage DEBRA_BOLLWAGE@MERCK.COM<br>Email Notification, Kristin L. Sunderman kristin_sunderman@merck.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Tawana Carter<br>208 South LaSalle Street<br>Suite 814<br>Chicago, IL, 60604<br>312-345-4336 |

WCS&R

NOV 0 2 2006

RECEIVED

Page 1 of  1 / TC

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of the package only, not of its contents.

M00SE16556