# EXHIBIT  78



16542565

Oct 3 2007
3:09PM

| IN RE; VIOXX® PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1657 |
|---|---|
| **THIS RELATES TO:**<br><br>Barbara J. McKeal v. Merck & Co., Inc.<br><br>Civil Action No: 2:07-cv-00380-EEF-DEK | Plaintiff: Barbara J. McKeal |

## FIRST SUPPLEMENT TO PLAINTIFF PROFILE FORM

Other than in Sections I, those questions using the term "You" should refer to the person who used VIOXX®. Please attach as many sheets of paper as necessary to fully answer these questions.

## I. CASE INFORMATION

A. Name of person completing this form:  Barbara J. McKeal

B. If you are completing this questionnaire in a representative capacity (e.g., on behalf of the estate of a deceased person or a minor), please complete the following:  N/A

    1.  Social Security Number: N/A

    2.  Maiden or Other Names Used or by which you have been known: N/A

    3.  Address:  N/A

    4.  State which individual or estate you are representing, and in what capacity you are representing the individual or estate:    N/A

    5.  If you were appointed as a representative by a court, please give the following information: N/A

        1.  Court:   N/A

        2.  Date of Appointment:  N/A

    6.  What is your relationship to the deceased/represented person/person claimed to be injured:   N/A

    7.  If you represent a decedent's estate, please give the following information:

M010A18541

1. Date of Death:  N/A

2. Address of where the decedent died:   N/A

C.  Claim Information

1.  Are you claiming that you have or may develop bodily injury as a result of taking VIOXX®?  YES ☒   NO☐  *If "yes,"* please complete the following:

   a.  What is your understanding of the bodily injury you claim resulted from your use of  VIOXX®?  Heart Attack

   b.  When do you claim this injury occurred?  January 16, 2003

   c.  Who diagnosed the condition?  Dr. Roque Ramos, Gateway Regional Medical Center.

   d.  Did you ever suffer this type of injury prior to the date set forth in answer to the prior question?  YES ☐  NO ☒ *If "yes,"* when and who diagnosed the condition at that time?

   e.  Do you claim that your use of VIOXX® worsened a condition that you already had or had in the past?  YES ☐ NO ☒  *If "yes,"* set forth the injury or condition; whether or not you had already recovered form that injury or condition before you took VIOXX®; and the date of recovery, if any:

D.  Are you claiming mental and/or emotional damages as a consequence of VIOXX? YES ☒ NO ☐
   *If "yes,"* for each provider (including but not limited to primary care physician, psychiatrist, psychologist, counselor) from whom you have sought treatment for psychological, psychiatric, or emotional problems during the last ten (10) years, please state the following:

Plaintiff suffered mental and/or emotional damages resulting from her injury from Vioxx; however, Plaintiff did not seek professional care for these damages.

   a.  Name and address of each person who treated you:    N/A

   b.  To your understanding, the condition for which you were treated:  N/A

   c.  When treated:    N/A

   d.  Medications prescribed or recommended by provider:  N/A

M010A18542

## II. PERSONAL INFORMATION OF THE PERSON WHO USED VIOXX®

A. Name:  Barbara J. McKeal

B. Maiden or other names used or by which you have been known:  Rushing, Garris, Gibson

C. Social Security Number:  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

D. Address:  2545 Stratford Lane, Granite City, IL 62040

E. Identify each address at which you have resided during the last ten (10) years, and list when you started and stopped living at each one:

| Address | Dates of Residence |
|---|---|
| 2545 Stratford Lane, Granite City, IL 62040 | 12/2005 – present |
| 83 Chouteau Trace, Granite City, IL 62040 | 10/2004 – 12/2005 |
| 2900 Sand Road, Edwardsville, IL 62025 | 3/2002 – 10/2004 |
| 4916 Redwood Lane, Granite City, IL 62040 | 25 Years |

F. Driver's License Number and State Issuing License:  M240-0705-0972, Ilinois

G. Date and Place of Birth: 12/31/50, East St. Louis, Illinois

H. Sex:  Male ☐  Female ☒

I. Identify the highest level of education (high school, college, university or other educational institution) you have attended (even if not completed), the dates of attendance, courses of study pursued, and diplomas or degrees awarded:

| Institution | Dates Attended | Course of Study | Diplomas/Degrees |
|---|---|---|---|
| Granite City High School | 1964 – 1968 | General/Business | H.S. Diploma |

J. Employment Information:

1. Current employer (if not currently employed, last employer):

| Name | Address | Dates of Employment | Occupation/ Job Duties |
|---|---|---|---|
| Smokey Joe's | 3998 Lake Street Granite City, IL 62040 | 3/2003 – 6/2005 | Barmaid |

M010A18543

2. List the following for each employer you have had in the last ten (10) years:

| Name | Address | Dates of Employment | Occupation/ Job Duties |
|---|---|---|---|
| Ramada Inn | 5105 State Route 111, Granite City, IL 62040 | 4/02 – 1/03 | Clerk |
| Home Interiors & Gifts | 4055 Valley View Lane, Dallas, TX 75244 | 1994 – 2003 | Independent Consultant |

3.  Are you making a wage loss claim for either your present or previous employment? YES ☐ NO ☒

*If "yes,"* state your annual income at the time of the injury alleged in Section I (part C): N/A

K.  Military Service Information:  Have you ever served in the military, including the military reserve or national guard? YES ☐ NO ☒

*If "yes,"* were you ever rejected or discharged from military service for any reason relating to your physical, psychiatric, or emotional condition?
YES ☐ NO ☐   N/A

L.  Insurance/Claim Information:

1.  Have you ever filed a worker's compensation and/or social security disability (SSI or SSD) claim? YES ☒ NO ☐ *If "yes,"* to the best of your knowledge please state:

a.  Year claim was filed: June 2005

b.  Nature of disability:  heart Attack, back problems, cancer, mental distress

c.  Approximate period of disability: Jan. 2003 – present

2.  Have you ever been out of work for more than thirty (30) days for reasons related to your health (other than pregnancy)?  YES ☒ NO ☐ *If "yes,"* set forth when and the reason:  Off work for three months for the heart attack.

3.  Have you ever filed a lawsuit or made a claim, other than the present suit,

M010A18544

relating to any bodily injury? YES ☐ NO ☒ *If "yes,"* please state to the best of your knowledge the court in which such action was filed, case name and/or names of adverse parties, and a brief description for the claims asserted. N/A

M. As an adult, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty? YES ☐ NO ☒ *If "yes,"* set forth where, when, and the felony and/or crime.

## III. FAMILY INFORMATION

A. List for each marriage the name of your spouse; spouse's date of birth (for your current spouse only); spouse's occupation; date of marriage; date the marriage ended (if applicable); and how the marriage ended (e.g. divorce, annulment, etc.):

**James Wesley Garris 1965-1966 Divorced**
**William Lee Gibson 1967 – 1969 Divorced**
**Clarence W. McKeal Jr. 1977 – 2003 Divorced**

B. Has your spouse filed a loss of consortium claim in this action? YES ☐ NO ☒

C. To the best of your knowledge did any child, parent, sibling, or grandparent of yours suffer from any type of cardiovascular disease including but not limited to: heart attack, abnormal rhythm, arteriosclerosis (hardening of the arteries), murmur, coronary artery disease, congestive heart failure, enlarged heart, leaking valves or prolapse, heart block, congenital heart abnormality, Scarlet Fever, Rheumatic Fever, atrial fibrillation, or stroke? YES ☒ NO ☐ Don't Know ☐ *If "yes,"* identify each such person below and provide the information requested.

    1. Name:  Daniel R. Rushing    (Father)
    2. Current Age (or age at death): deceased at 57
    3. Type of Problem:   Brain Aneurism (Stroke)
    4. If Applicable, cause of death:   Brain Aneurism (Stroke)

D. If applicable, for each of your children, please provide the following information:

| Name | Age | Address |
|---|---|---|
| William Lee Gibson, III. | 34 | No Address available, plaintiff will not be supplementing. |
| Shaun McKeal | 28 | 2803 Benton Street, Granite City, IL  62040 |
| Ann McKeal | 23 | 2900 Sand Road, Lot 9, Edwardsville, IL  62025 |

E. If you are claiming the wrongful death of a family member, list any and all heirs of the decedent: **N/A**

M010A18545

## IV. VIOXX® PRESCRIPTION INFORMATION

A. Who prescribed VIOXX® to you?  Dr. Kevin Konzen

B. On which dates did you begin to take, and stop taking VIOXX®?  January 4, 01 – September 23, 2004

C. Did you take VIOXX® continuously during that period?
    YES ☒ NO ☐ DON'T RECALL ☐

D. To your understanding, for what condition were you prescribed VIOXX®?
    Arthritis

E. Did you renew your prescription for VIOXX®?
    YES ☒ NO ☐ DON'T RECALL ☐

F. If you received any samples of VIOXX®, please state who provided them, what dosage, how many samples, and when they were provided.  None – N/A

G. Which form of VIOXX® did you take? (check all that apply)
    ☐ 12.5 mg Tablet (round, cream, MRK 74)
    ☐ 12.5 mg Oral Suspension
    ☒ 25 mg Tablet (round, yellow, MRK 110)
    ☐ 25 mg Oral Suspension
    ☐ 50 mg Tablet (round, orange, MRK 114)

H. How many times per day did you take VIOXX®?  Once daily.

I. Did you request that any doctor or clinic provide you with VIOXX® or a prescription for VIOXX®?  YES ☐ NO ☒ DON'T RECALL ☐

J. Instructions or Warnings:
    1. Did you receive any written or oral information about VIOXX® before you took it?  YES ☐ NO ☐ DON'T RECALL ☒

    2. Did you receive any written or oral information about VIOXX® while you took it?  YES ☒ NO ☐ DON'T RECALL ☐

    3. *If "yes,"*
        a. When did you receive that information?  At the time the prescription was filled

        b. From whom did you receive it?   The Pharmacist

M010A18546

    c. What information did you receive? That standard information
       pamphlet at the time the prescription was filled.

K. What over-the-counter pain relief medications, if any, were you taking at the same
time you were taking VIOXX®? Tylenol as needed, occasionally.

## V. MEDICAL BACKGROUND

A. Height: 5'6 ½"

B. Current Weight: 100
Weight at the time of injury, illness, etc. described in Section I (C): 118

C. Smoking/Tobacco Use History: ***Check the answer and fill in the blanks if
applicable to your history of smoking and/or tobacco use:***

☐ Never smoked cigarettes/cigars/pipe tobacco or used chewing tobacco/snuff
☐ Past smoker of cigarettes/cigars/pipe tobacco or chewing tobacco/snuff.
    a. Date on which smoking/tobacco use ceased: N/A
    b. Amount smoked or used: on average <u>N/A</u> per day for <u>N/A</u> years.
☒ Current smoker or cigarettes/cigars/pipes or use of chewing tobacco/snuff
    a. Amount smoked or used: on average 1 pack per day for 3 ½ years.
☐ Smoked different amounts at different time periods.

D. Drinking History: Do you now drink or have you in the past drank alcohol (beer,
wine, whiskey, etc)? YES ☒ NO ☐ ***If "yes," fill in the appropriate blanks***
with the number of drinks that represents your average alcohol consumption
during the period you were taking VIOXX® up to the time that you sustained the
injuries alleged in the complaint:
    _____ drinks per week
    __5__ drinks per month
    _____ drinks per year
    OTHER (please describe):

E. Illicit Drugs: Have you ever used (even one time) any illicit drugs of any
kind within one (1) year before, or any time after, you first experienced your
alleged VIOXX® related injury? YES ☐ NO ☒ DON'T RECALL ☐
***If "yes,"*** identify each substance and when you first and last used: N/A

F. Please indicate to the best of your knowledge whether you have ever received any
of the following treatments or diagnostic procedures:

    1. Cardiovascular surgeries, including, but not limited to, the following
      specify for what condition the surgery was performed: Open Heart/Bypass
      Surgery, Pacemaker Implantation, Vascular Surgery, IVC Filter

M01OA18547

Placement, Carotid (Neck Artery) Surgery, Lung Resection, Intestinal Surgery:

| Surgery | Condition | Date | Physician | Hospital |
|---------|-----------|------|-----------|----------|
| Stent Implant | Heart Attack | 1/17/03 | Dr. Deligonul Ubeydullah | Christian Northeast Hospital |
| Stent Implant | LAD in-stent restenosis | 4/7/04 | Dr. Jasvindar Singh | Barnes-Jewish Hospital |
| Pacemaker defibrillator/Cardiac Cath | Nonsustained ventricular tachycardia | 2/19/03 | Dr. Ali Mehdirad | St. John's Mercy Medical Center |
| Pacemaker upgrade to biventricular system | Cardiac resynchronization | 7/11/06 | Dr. Rafiq Ramadan | Gateway Regional Medical C enter |

2. Treatments/interventions for heart attack, angina (chest pain), or lung ailments.

| Treatment/Intervention | Date | Physician | Hospital |
|------------------------|------|-----------|----------|
| Cardiac Cath/Angiogram | 4-5-04 | Dr. Deligonul Ubeydullah | Christian Northeast Hospital |
| Cardiac Cath | 1-17-03 | Dr. Deligonul Ubeydullah | Christian Northeast Hospital |

3. To your knowledge, have you had any of the following tests performed:
YES ☒ NO ☐ DON'T KNOW ☐ *If "yes,"* answer the following:

　　i.　Chest X-Ray
　　ii.　CT Scan
　　iii.　MRI
　　iv.　Angiogram
　　v.　EKG
　　vi.　Echocardiogram
　　vii.　TEE (trans-esophageal echo)
　　viii.　Bleeding scan
　　ix.　Lung bronchoscopy
　　x.　Carotid duplex/ultrasound
　　xi.　MRI/MRA of the head/neck
　　xii.　Angiogram of the head/neck
　　xiii.　CT scan of the head
　　xiv.　Bubble/Microbubble Study
　　xv.　Holter Monitor

M010A18548

| Diagnostic Test | Date | Treating Physician | Hospital | Reason |
|---|---|---|---|---|
| Chest X-Ray | 2/19/03 | Dr. Ali Mehdirad | St. Johns Mercy Medical Center | Postop, pacemaker |
| ECG | 1/16/03 | Dr. Kevin Konzen | Gateway Regional | Chest Pain |
|  | 2/12/03 | Dr. Das Sundeep |  | Chest Pain |
|  | 4/7/04 |  | Christian Northeast | Stenting |
|  | 4/7/04 |  |  | Stenting |
|  | 4/8/04 |  | Barnes Jewish Medical Center | Diagnostic |
|  | 4/8/04 |  |  |  |
|  | 7/11/06 | Dr. Rafiq Ramadan | Gateway Regional Medical Center | Diagnostic |
|  | 7/12/06 |  |  |  |
|  | 4/18/06 | Dr. Ubeydullah Deligonul | St. Louis Heart & Vascular | Diagnostic |
|  | 2/25/05 | Dr. Ubeydullah Deligonul | St. Louis Heart & Vascular | Diagnostic |
| EKG | 2/11/03 | Dr. Das Sundeep | Christian Hospital Northeast | Chest Pain |
|  | 2/12/03 |  |  |  |
|  | 2/12/03 |  |  |  |
|  | 2/13/03 |  |  |  |
|  | 2/13/03 |  |  |  |
|  | 4/1/03 | Dr. Kevin Konzen |  | Cardiac Rehab |
|  | 4/7/03 |  |  |  |
|  | 4/11/03 |  |  |  |
|  | 4/14/03 |  |  |  |
|  | 4/16/03 |  |  |  |
|  | 4/21/03 |  |  |  |
|  | 4/28/03 |  |  |  |
|  | 4/30/03 |  |  |  |
|  | 5/5/03 |  |  |  |
|  | 4/4/04 |  |  | Loss of Consciousness |
|  | 4/5/04 | Dr. Ubeydullah Deligonul |  |  |
|  | 4/6/04 |  |  |  |
|  | 11/21/05 | Dr. Siva Konala |  |  |

M010A18549

| | 11/21/05 | | | |
|---|---|---|---|---|
| | 11/21/05 | | | |
| | 6/26/06 | Dr. Ubeydullah Deligonul | St. Louis Heart & Vascular | Diagnostic |
| | 8/23/05 | | St. Louis Heart & Vascular | Diagnostic |
| | 2/20/03 | Dr. Ali Mehdirad | St. Johns Mercy | Diagnostic |
| Chest X-Ray | 1/16/03 | Dr. Kevin Konzen | Gateway Regional Christian Northeast | Chest Pain |
| | 2/12/03 | Dr. Das Sundeep | | |
| | 2/12/03 | | | Preop/pacemaker upgrade |
| | 11/21/05 | Dr. Siva Konala | | Pacemaker upgrade |
| | 6/28/06 | Dr. Rafiq Ramadan | Gateway Regional Medical Center | |
| | 7/11/06 | | | |
| | 7/12/06 | | | |
| Stress Test | 2/12/03 | Dr. Das Sundeep | Christian Northeast | Chest Pain |
| | 4/1/03 | Dr. Kevin Konzen | Gateway Regional | Cardiac Rehab |
| | 9/05 | Will supplement | St. Louis Heart & Vascular | Diagnostic |
| | 4/07 | Dr. Rafiq Ramadan | Gateway Regional | Diagnostic |
| | 9/1/05 | Dr. Kevin Konzen/Dr. Ubeydullah Deligonul | St. Louis Heart & Vascular | Diagnostic |
| Arterial Doppler | 9/17/04 | Dr. Kevin Konzen | Gateway Regional Medical Center | Claudication |
| Carotid Arterial Duplex Study | 4/18/06 | Dr. Ubeydullah Deligonul | St. Louis Heart & Vascular | Diagnostic |

M01A18550

| Holter Monitor | 2/03 | Dr. Ubeydullah Deligonul | St. Louis Heart & Vascular | Diagnostic |

## VI. DOCUMENTS

Please indicate if any of the following documents and things are currently in your possession, custody, or control, or in the possession, custody, or control of your lawyers by checking **"yes"** or **"no."** Where you have indicated **"yes"**, please attach the documents and items to this profile form.

A. Records of physicians, hospitals, pharmacies, and other healthcare providers identified in response to this profile form.  YES ☒  NO ☐

B. Decedent's death certificate (if applicable)  YES ☐  NO ☒  N/A

C. Report of autopsy of decedent (if applicable)  YES ☐  NO ☒  N/A

## VII. LIST OF MEDICAL PROVIDERS AND OTHER SOURCES OF INFORMATION

*List the name and address of each of the following:*

A.  Your current family physician and/or primary care physician:

| Name | Address |
|------|---------|
| Dr. Kevin Konzen | 2044 Madison Ave., Suite 15 Granite City, IL 62040 |

B.  To the best of your ability, identify each of your primary care physicians for the last ten (10) years.

| Name | Address | Approximate Dates |
|------|---------|-------------------|
| Dr. Kevin Konzen | 2044 Madison Ave., Suite 15 Granite City, IL 62040 | **Last 20 years** |

C.  Each hospital, clinic, or healthcare facility where you have received inpatient treatment or been admitted as a patient during the last ten (10) years.

| Name | Address | Admission Date | Reason for Admission |
|------|---------|----------------|----------------------|
| Gateway Regional Medical Center | 2100 Madison Ave, Granite City, IL 62040 | 1/16/03  9/17/04  7/11/06 | Chest Pain & Syncope Claudication  Implant upgrade |
| Christian Northeast Hospital | 11133 Dunn Road, St. Louis, MO 63136 | 1/17/03 | Heart Attack, cardiac cath, 1st Stent |

M010A18551

| | | 2/12/03 | Chest Pain |
| | | 4/4/03 | Angina – Cardiac Cath |
| Barnes-Jewish Hospital | 1 Barnes Jewish Plaza, St. Louis, MO 63110 | 4/404 | Cardiac Cath - Stent |
| St. John's Mercy Medical Center | 615 S. New Ballas Road, St. Louis, MO 63141 | 2/19/03 | Pacemaker defibrillator/Cardiac Cath |

D.  Each hospital, clinic, or healthcare facility where you have received outpatient treatment (including treatment in an emergency room) during the last ten (10) years.

| Name | Address | Admission Date | Reason for Admission |
|---|---|---|---|
| Gateway Regional Medical Center | 2100 Madison Ave Granite City, IL 62040 | 4/1/03 | EKG Stress/Cardiac Rehab |
| Christian Northeast Hospital | 11133 Dunn Road, St. Louis, MO 63136 | 1/22/03<br>4/7/04<br>11/21/05 | Verify Ejection Fraction<br>Chest Pain<br>Loss of Consciousness |

E.  Each physician or healthcare provider from whom you have received treatment in the last ten years.

| Name | Address | Dates of Treatment |
|---|---|---|
| Dr. Kevin Konzen | 2044 Madison Granite City, IL | **Last 20 years** |
| Dr. Rafiq Ramadan | 2118 Washington Ave Granite City, Il | 2005 - present |
| Dr. Ubeydullah Deligonul | 11155 Dunn Road, Suite 340E, St. Louis, MO 63136 | 2003 - present |
| Dr. Ali Mehdirad | Midwest Heart Rhythm 777 S. New Ballas Rd, Suite 300 St. Louis, MO | 2003 - present |
| Dr. Jasvindar Singh | 11133 Dunn Road, St. Louis, MO 63136 | April 04 |
| Dr. Carey S. Fredman | 615 S. New Ballas Road, St. | February - March 03 |

M010A18552

|  | Louis, MO 63141 |  |
| --- | --- | --- |
| Dr. Gil Vardi | 11133 Dunn Road, St. Louis, MO 63136 | April 04 |
| Dr. Adrian Messerli | 11133 Dunn Road, St. Louis, MO 63136 | April 04 |
| Dr. Daniel | 1 Barnes Jewish Plaza, St. Louis, MO 63110 | April 04 |
| Dr. Andrew Dickler | 11133 Dunn Road, St. Louis, MO 63136 | January 2003 |
| Dr. Das Sundeep | 11133 Dunn Road, St. Louis, MO 63136 | February 2003 |
| Dr. Siva Konala | 11133 Dunn Road, St. Louis, MO 63136 | November 21, 2005 |
| Dr. Harvey Serota | 2100 Madison Ave Granite City, IL 62040 | July 2006 |
| Dr. Roque Ramos | 2100 Madison Ave. Granite City, IL 62040 | January 2003 |

F.    Each pharmacy that has dispensed medication to you in the last ten (10) years.

| Name | Address |
| --- | --- |
| Schnucks | 3100 Madison Ave Granite City, IL 62040 |

G.   If you have submitted a claim for social security disability benefits in the last ten (10) years, state the name and address of the office that is most likely to have records concerning your claim.

| Name | Address |
| --- | --- |
| Alton Social Security Office | 501 Belle Street Alton, IL 62202 |

H.   If you have submitted a claim for worker's compensation, state the name and address of the entity that is most likely to have records concerning your claim.

| Name | Address |
| --- | --- |
| None | None |

M01A18553

## CERTIFICATION

I declare under penalty of perjury subject to 28 U.S.C. § 1746 that all of the information provided in this Profile Form is true and correct to the best of my knowledge, that I have completed the List of Medical Providers and Other Sources of Information appended hereto, which is true and correct to the best of my knowledge, that I have supplied all the documents requested in part VI of this declaration, to the extent that such documents are in my possession, custody, or control, or in the possession, custody, or control of my lawyers, and that I have supplied the authorizations attached to this declaration.

Barbara J McKeal          BARBARA J MCKEAL     10.3.07
Signature                          Print Name                          Date

Page 14 of 14

M010A18554

# EXHIBIT  79

897029v.1

# IN THE CIRCUIT COURT OF
## COOK COUNTY, ILLINOIS

| | |
|---|---|
| **RONALD E. PALES** § | |
| § | |
| **PLAINTIFF,** § | |
| § | |
| **vs.** § | **CIVIL ACTION NO.:** |
| § | |
| **MERCK & CO., INC.** § | |
| § | |
| **SERVE:  CT CORPORATION** § | |
| **208 LASALLE STREET, SUITE 814** § | |
| **CHICAGO, ILLINOIS 60604** § | |
| § | |
| § | |
| **DEFENDANT.** § | |



## PLAINTIFF'S ORIGINAL PETITION

COMES NOW, Plaintiff, RONALD E. PALES, and files this Original Petition, alleging as follows:

## I. THE PARTIES

1.    Herein, RONALD E. PALES, Plaintiff, is a resident of Cook County, Illinois. Plaintiff brings this action to recover for personal injuries he sustained as a result of ingestion of and exposure to Defendant's drug product.

2.    Defendant MERCK & COMPANY, INC., ("Merck") is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey, 08889-0100. Merck is a foreign corporation doing business in the State of Illinois and maintains an office and/or other facilities within this Judicial District. Merck manufactured, tested,

M005E25167

distributed, marketed, and/or sold the drug rofecoxib under the brand name Vioxx for the treatment of pain associated with osteoarthritis, rheumatoid arthritis, acute pain and menstrual pain. This Defendant may be served with process through its registered agent, CT Corporation System, 208 La Salle Street, Suite 814, Chicago, Illinois, 60604.

### III. JURISDICTION AND VENUE

3.     Jurisdiction is proper in this Court, because Defendant conducts or has conducted a substantial amount of business activity in Illinois. Jurisdiction over Defendant is proper in Illinois because they had continuous and systematic contacts within the State of Illinois and have committed torts in whole or in part in Illinois against Plaintiff. Venue is proper in Cook County, Illinois because Plaintiff is a resident of Cook County, Illinois.

### IV. INTRODUCTION

4.     This action arises from the sale and distribution of Vioxx (rofecoxib). Vioxx is the brand name used by Defendant Merck to market and distribute rofecoxib. Vioxx has been proven to cause adverse cardiovascular effects including, but not limited to, heart attack and stroke.

5.     During all the times mentioned herein, Merck was engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, inspecting, distributing, marketing, labeling, promoting, packaging and advertising of the prescription drug known as Vioxx for ingestion by consumers. Vioxx was manufactured, sold, designed, supplied, distributed, marketed and processed by Defendant Merck, who was at all times acting through its servants, employees, representatives and agents, who placed Vioxx in the market to be purchased and used by the public.

M005E25168

6.      Defendant Merck participated in, authorized and directed the production and promotion of Vioxx when it knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of Vioxx and thereby actively participated in the tortious conduct which resulted in the injuries suffered by the Plaintiff.

7.      Plaintiff was prescribed Vioxx from approximately August 25, 1999 until approximately September 8, 2001.

8.      Plaintiff used the Vioxx as directed by his prescribing physician and suffered an ischemic stroke after ingesting Vioxx.  Plaintiff's use of Vioxx was the direct, producing and proximate cause of the occurrence in question and the injuries at issue.

9.      Defendant Merck marketed and distributed its product by misleading users about the product and by failing to adequately warn the users of the potential serious dangers, which Merck knew or should have known, that might result from consuming its product.  Merck intentionally and knowingly chose to market Vioxx, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data that the use of Vioxx carried significant risk factors.  Moreover, these adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.  Defendant widely and successfully marketed its products throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of its products in order to induce widespread use and consumption.  Merck's products were represented to aid the pain and discomfort of arthritis, osteoarthritis and related problems.  Additionally, or in the alternative,

Merck made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physician.

10.     As a result of claims made by the Defendant regarding the safety and effectiveness of Vioxx, Plaintiff suffered a severe ischemic stroke.

11.     Upon information and belief, as a result of the manufacturing and marketing of Defendant's product, Merck has reaped huge profits; while concealing from the public, knowledge of the potential hazard associated with the ingestion of Vioxx.

12.     Defendant Merck failed to perform adequate testing in that the adequate testing would have shown that Vioxx possessed serious side effects with respect to which Defendant should have taken appropriate measures to ensure that its defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

13.     Prior to the manufacturing, sale and distribution of Vioxx, Merck, through its officers, directors and managing agents, had notice and knowledge from several sources, prior to the date of the marketing and sale of Vioxx to Plaintiff, that the product presented substantial and unreasonable risks of harm to the consumer. As such, said consumers, including Plaintiff, were unreasonably subjected to risk of injury or death from the consumption of Merck's product.

14.     Despite such knowledge, Merck, through its officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of its products and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in its product.

M005E25170

15.     Merck, and its officers, agents and managers intentionally proceeded with the manufacturing, sale and marketing of its product, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests.

16.     Merck's conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Ronald E. Pales, entitling Plaintiff to exemplary damages.

17.     Merck acted with conscious and wanton disregard of the health and safety of Plaintiff, who requests an award of additional damages for the sake of example and for the purpose of punishing such entities for its conduct, in an amount sufficiently large to be an example to others, and to deter it and others from engaging in similar conduct in the future.  The above-described wrongful conduct was done with knowledge, authorization, and ratification of officers, directors, and managing agents of Merck.

18.     As a result of ingesting the products manufactured, supplied, and/or sold by Merck, Plaintiff suffered a severe, painful ischemic stroke.

19.     As a result of the dangerously defective nature of Merck's product at the time of manufacture and distribution, Plaintiff, by using Vioxx, sustained the injuries and damages as herein alleged.

20.     As a direct and proximate result of Defendant's negligence as described herein, Plaintiff sustained harm, including permanent and debilitating injuries resulting in serious injury.

21.     These injuries caused extensive pain and suffering and severe emotional distress.  As a result of the acts and omissions of Defendant, Plaintiff, Ronald E. Pales, suffered a severe, painful and permanent ischemic stroke.

M005E25171

## V.  FACTS – VIOXX'S PRE-APPROVAL

22.    In the mid to late 1990's Defendant, MERCK & CO., INC., faced the loss of patent protection of its top selling and most profitable drugs. In 1996, MERCK & CO., INC., began plans for a proposed study to prove Vioxx was gentler on the stomach than older painkillers.

23.    In need of a new blockbuster drug, MERCK & CO., INC., pushed forward with plans for the study and ignored a November 1996 memo from a top Merck official that stated, "there is a substantial chance that significantly higher rates" of cardiovascular problems would result from Vioxx. Further, Merck concealed or ignored a February 1997 e-mail regarding the study from another Merck official that revealed, "you will get more thrombotic events" or blood clots unless the Vioxx receiving patients in the study also got aspirin.

24.    In response to the February 1997 e-mail, Merck vice president for clinical research Dr. Elise Reicin wrote, "the possibility of increased cardiovascular risk (from Vioxx) is of great concern." To remedy this problem and conceal Vioxx's adverse cardiovascular effects, Merck's V.P. Dr. Reicin proposed people with risk of cardiovascular problems be kept out of the study so the adverse cardiovascular effects would not be evident. Despite its internal knowledge and information relating to cardiovascular-related adverse health effects, Defendant Merck forged ahead aggressively promoting and marketing Vioxx as safe and effective for persons such as Plaintiff in efforts to obtain FDA approval.

25.    While it is not clear as to whatever became of this 1996-97 proposed study, it is clear that Merck concealed its knowledge of the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as financially critical for Merck to retain its current market share, and to sustain stock value. Vioxx's chief competing drug Celebrex

(Celecoxib) was placed into the market by Merck competitors Pharmacia and Pfizer three months prior to the launch of Vioxx.   Merck's disclosure of the safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market.

## VI.  FACTS – VIOXX'S POST-APPROVAL

26.     Merck intentionally and knowingly chose to market this product, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data thereafter that use of Vioxx carried significant risk factors.  These adverse effects were further realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

27.     In early 1999, Merck started the 8,000 person VIGOR (Vioxx Gastrointestinal Outcomes Research study) to prove the drug's gastrointestinal safety benefits.  The March 2000 VIGOR results revealed precisely what the above discussed internal Merck documents anticipated; a significant increase in the number of blood-clot related problems among Vioxx users.  The heart attack rate in the Vioxx group was five times that of the other group taking naproxen.

28.     Merck research chief, Dr. Scolnick, confessed that there was an inherent risk in Vioxx, and stated in an internal March 9, 2000, e-mail that cardiovascular events are "clearly there" and called it a "shame" that it is mechanism (Vioxx) based.  Dr. Scolnick recognized that the cardiovascular effects could not have come from naproxen's protective effect. Merck's research chief wrote that like all Merck's big selling drugs, Vioxx too had side effects but assured Merck that they would "do well."

M005E25173

29.     However, in March of 2000 Merck issued a news release that the trial results cardiovascular findings were "consistent with" naproxen's favorable effects. To date, and not surprisingly, the only studies to report a protective cardiovascular effect with naproxen are ones funded and assisted by Merck. A number of independent studies have reported no reduction in risk with naproxen use. In fact, an FDA researcher recently published a report that blatantly contradicts Merck's position and holds naproxen is not protective against coronary heart disease, and if anything, actually confers an increase in risk. Merck intentionally and knowingly made false assertions relating to the VIGOR trial with a blatant disregard for the public welfare all in an effort to conceal Vioxx's adverse cardiovascular effects in order to profit and maintain or gain market position.

30.     Merck repeatedly and purposefully downplayed, understated, and concealed the health hazards of Vioxx evident in the VIGOR study. In April of 2000, Merck issued response to the VIGOR results in a news release headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx." This and other similar Merck generated news releases were strategically designed and calculated to deceive and mislead the public about Vioxx's serious adverse effects.

31.     In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck did nothing to publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

M005E25174

32.     Merck continuously and systematically denied the ill health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure. Merck engaged in an aggressive and expansive advertising and sampling program and gained continued increases in market share. Merck spent over $160 million on direct-to-consumer television advertising on Vioxx in 2000. The resultant effect for this multi-million dollar advertising blitz combined with Merck's concealing and failing to reveal and warn of the risks was more than $2 billion in profits in the year 2000 alone to Merck and an approximately 23 percent market share.

33.     Merck's multi-million dollar advertising campaign created the image and impression and belief that the use of Vioxx was safe for adults, had fewer side effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew these representations to be false. These advertisements, combined with their other promotional literature, audio conferences, professional meetings, and press releases deceived potential consumers by relaying positive information, including testimonials from satisfied consumers, and manipulated the statistics to suggest widespread acceptability and safety of the product, while intentionally understating the known adverse and serious risks associated with the use of Vioxx. Merck's advertising and marketing campaign conveyed the false impression that Vioxx was a drug of first choice when it should not have been.

34.     In the fall of 2000, Merck again sunk to new levels in their efforts to conceal information by employing a barrage of ruthless intimidation and even retaliation tactics against those who spoke out regarding Vioxx's adverse effects. In October of that year, Merck official Louis Sherwood contacted Dr. James Fries, a Stanford University Medical Professor, to inform him that if his "irresponsibly anti-Merck and specifically anti-Vioxx" lectures didn't stop, that he

would "flame out." Dr. Fries responded in a letter to Merck chief executive Gilmartin stating, "that Merck had crossed (an ethical) line, that you can't go across." Dr. Fries also explained that several other top medical schools complained of "a consistent pattern of intimidation by Merck" on Vioxx.

35.    Dr. Lee Simon, a rheumatologist at Beth Israel Deaconess Medical Center in Boston, reported being the victim of similar type Merck intimidation tactics when he publicly mentioned data that Vioxx might be associated with a risk of high blood pressure and swelling. Dr. Simon was "shocked that a phone call was made" to his superior to complain that his lectures were slanted against Vioxx; Dr. Simon rightfully believed that Merck was "attempting to suppress discussion about this data."

36.    In November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption. The article simply failed to provide critical information about Vioxx related cardiovascular complications such as stroke or blood clots.

37.    The year 2001 proved to be more of the same - huge efforts by Merck to conceal and hide Vioxx's adverse effects from the public and, in turn, Merck reaping huge profits. In 2001, Merck spent $135 million to promote the drug in the United States alone; Merck was rewarded with $2.6 billion in revenue making Vioxx the world's tenth biggest selling medicine.

38.    In February of 2001, when the FDA got results of the VIGOR study, the FDA wanted Merck to highlight the cardiovascular risk prominently on Vioxx's label. Merck resisted and fought hard to maintain its warning/caution free label and the label remained unchanged until

M005E25176

April 2002 when Merck and the FDA eventually reached a compromise. Merck's relentless and aggressive efforts to keep the public in the dark enabled them to maintain market position and profits for yet another year, all at the expense of persons such as Plaintiff.

39.     On or about August 29, 2001, JAMA, the Journal of the American Medical Association, published a peer reviewed human epidemiologic study by the Cleveland Clinic Foundation showing that Merck had concealed the risk of a thrombotic cardiovascular event or myocardial infarctions among Vioxx users in Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin patients. *See* Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors, JAMA. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users. *Id.*

40.     In the JAMA study the authors set forth the theory that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic events." Id. at 957. In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cylo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This biological plausibility is further supported by studies completed at the University of Pennsylvania. Cheng,

M005E25177

Y., et al., Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2, Journal of Science, V. 296: 539-541, Apr. 19, 2002.

41.    The JAMA study's release was followed by a relentless series of publications and peer reviewed literature by Merck employees and consultants again setting forth the blatantly false theory that naproxen had antithrombotic effects which accounted for the appearance of cardiovascular risk among Vioxx users.  Again, Merck funded and assisted studies are the only ones to ever make this assertion. This theory has been debunked by numerous respected medical journals and the FDA recently stated that this theory could not be further from the truth.

42.    In mid-September, 2001, Merck received a third warning letter from the FDA, stating in part that its promotional activities are "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." The FDA stated that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings" from a Vioxx study and "misrepresents the safety profile on Vioxx." As to a Merck May 22, 2001, press release, the FDA wrote "your claim in the press release that Vioxx has a 'favorable safety profile' is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen.    The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx group... as in the naproxen treatment group..."

43.    Further, the FDA letter reprimanded Merck for setting forth this false theory relating to the VIGOR study that Naproxen had anti-thrombotic effects, and went on to state that, "it is also possible that Vioxx has pro-thrombotic effects."

M005E25178

44.     Nevertheless, Merck continued its course of action and continued to aggressively market its Vioxx primarily through direct-to-consumer advertising.

45.     In the midst of this adverse publicity, Merck took an offensive approach to marketing, providing all Vioxx field personnel with an "obstacle handling guide" to overcome doctors' objections to Vioxx relating to its cardiovascular problems.   The training document was appropriately titled "Dodge Ball Vioxx."  Merck's massive Vioxx sales force was instructed to avoid and "DODGE" serious, life threatening concerns of both health care professionals and the general public; Merck's corporate philosophy became one of "RUN" and "DODGE" as opposed to being that of "HONEST" and "TRUTHFUL."

46.     In April 2002, Merck was required to place information about cardiovascular implications on its Vioxx labeling based on the results of the VIGOR study.  In addition, Merck was required to place new label information that Vioxx 50 mg per day is not recommended for chronic use.  These warnings were based on information that had been in Merck's possession by approximately January of 2000 at the latest and, as such, Merck did not meet its obligation to provide adequate "direction or warnings" as to the use of Vioxx within the meaning of Section 402 of the Restatement (Second) of Torts or otherwise.  Neither did Merck fulfill its alleged obligation to warn the prescribing health care provider of these risks.

47.     Internal Merck documents reveal that Merck was set to begin a major cardiovascular study of Vioxx in 2002, but company officials abruptly dropped the project just before it was set to start. This proposed study, which became known as the VALOR trial was set to begin in June of 2002. However, on March 13, 2002, Merck sent an e-mail to Merck employees worldwide that simply stated the trial was being put on hold and did not cite any details leading to the

M005E25179

decision. Although Merck officials have publicly denied it, it is far more than a coincidence that their decision to cancel the trial fell amidst their negotiations with the FDA over the April 2002 cardiovascular warnings mentioned above. Merck's decision to cancel the VALOR trial is in concert with their corporate strategy to conceal information relating to Vioxx's adverse cardiovascular effects.

48.     In the summer of 2002, Merck conducted its most inflammatory and aggressive measures via their intimidation and retaliation tactics to suppress and conceal speech and publicity relating to the adverse cardiovascular effects of Vioxx. Dr. Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain, had published his criticisms of Merck's handling of Vioxx. Merck then had the audacity to send him a "rectification" that they insisted Dr. Laporte publish, which Dr. Laporte refused. Merck then filed suit against the doctor in Spanish Court demanding a public correction. In early 2004 the judge ruled that the publication accurately reflected the cardiovascular safety (or lack thereof) of Vioxx and ordered Merck to pay all court costs.

49.     In October of 2002, the prestigious British medical journal Lancet published a study that analyzed the medical data of close to 300,000 people and determined that people who take Vioxx are almost twice at risk of developing heart disease, including heart attack. Lancet also concluded that there was no anti-thrombotic or protective effect of naproxen, effectively discounting Merck's theory. Merck again opted not to publicize or warn of these findings, and would stick to its same story for another two years. Merck would continue to spend more than $100 million annually in direct-to-consumer advertising, and expand its distribution to more than 80 countries.

50.     On August 25, 2004, FDA researcher Dr. David Graham presented at a medical conference the results of a database analysis of 1.4 million patients that concludes Vioxx users are more likely to suffer a heart attack or sudden cardiac death than patients taking Celebrex. In fact, the report shows there is a 3.7-fold increase in risk compared with those taking Celebrex. With 92,791,000 prescriptions for Vioxx filled between 1999 and 2003, the FDA conservatively estimates an excess of 27,785 cases of AMI (Acute Myocardial Infarction) and SCD (Sudden Cardiac Death) for those years alone.

51.     Merck was still not ready to concede the truth. On August 26, 2004, true to form, Merck attempted to minimize and downplay the adverse findings and authorized a press release refuting Dr. Graham's study entitled, "Merck stands behind the efficacy and overall safety and cardiovascular safety of Vioxx."

52.     On September 23, 2004, Merck claims it had an epiphany. Merck had been sponsoring a small 2600 patient (APPROVe) study to in order to gain additional FDA approval for Vioxx to treat the recurrence colon polyps. The APPROVe study was stopped prematurely on the instruction of the data and safety monitoring board after the investigators found that after 18 months of treatment, patients taking Vioxx had twice the risk of a myocardial infarction compared with those receiving placebo. Merck alleges that this small study, which was by no means intended to test for Vioxx's overall safety, is what triggered the collapse of all their previous defenses. The results of the APPROVe study, combined with mounting pressure from the FDA, compelled Merck to finally acknowledge Vioxx's dangerous propensities. Merck then opted to back out rather than be forced out.

M005E25181

53.     On September 30, 2004, Merck withdrew Vioxx from the U.S. and the more than 80 countries around the in world.  This came only after an estimated 80 million patients had taken the drug and Merck's annual sales had topped $2.5 billion.   This represents the largest prescription drug withdrawal in history.

## VII.  – NEGLIGENCE  AND GROSS NEGLIGENCE

54.     Plaintiff re-alleges and incorporates the foregoing allegations.

55.     Plaintiff would further show that at all times material hereto, the manufacture, sale, design, supply, distribution, or prescription of Vioxx with which Plaintiff came in contact, was under the exclusive control of Merck, its agents, servants and employees, and that had the Defendant herein not been guilty of negligence, Plaintiff would not have sustained his injuries. Accordingly, Plaintiff is entitled to recover from Merck under the doctrine of *res ipsa loquitur*.

56.     The law imposed a duty on the Defendant, as a manufacturer and/or marketer and/or prescriber of pharmaceutical drugs, to exercise reasonable care.

57.     Merck knew, or in the exercise of ordinary or reasonable care ought to have known, that Vioxx, as manufactured, sold, designed, supplied, distributed, promoted, or marketed was dangerous, unsafe, and highly harmful to Plaintiff's health, notwithstanding which:

      a.     Defendant Merck negligently failed to design a reasonably safe product;

      b.     Additionally, or in the alternative, Merck negligently placed Vioxx into the market;

      c.     Additionally, or in the alternative, Merck negligently failed to remove Vioxx from the market;

      d.     Additionally, or in the alternative, Merck negligently failed to fund and conduct medical and scientific studies to determine the risks of the overall

M005E25182

safety of Vioxx, in the alternative, failed to heed the warnings and risks of Vioxx;

e.  Additionally, or in the alternative, Merck negligently failed to conduct sufficient testing on Vioxx that would have shown Vioxx had serious side effects, including, but not limited to the cardiovascular events described above;

f.  Additionally, or in the alternative, Merck negligently failed to conduct adequate post-marketing surveillance to determine the overall safety of Vioxx;

g.  Additionally, or in the alternative, Merck negligently failed to accurately disclose the results of its post-marketing surveillance to advise the Plaintiff, consumers, and the medical community of the aforementioned risks to individuals when the drugs were ingested;

h.  Additionally, or in the alternative, Merck negligently failed to investigate the adverse event reports relating to Vioxx;

i.  Additionally, or in the alternative, Merck negligently marketed its products;

j.  Additionally, or in the alternative, Merck negligently failed to provide Plaintiff with visible, understandable warnings that were adequate to convey and alert Plaintiff of the severity of the risks and serious thrombotic cardiovascular side effects of Vioxx;

k.  Additionally, or in the alternative, Merck negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

l.  Additionally, or in the alternative, Merck negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff's health care providers of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ;

m.  Additionally, or in the alternative, Merck negligently failed to take any reasonable precautions or exercise reasonable care to warn the health care industry of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx;

M005E25183

n.     Additionally, or in the alternative, Merck negligently failed to provide adequate post-marketing warnings or instructions after it knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

o.     Additionally, or in the alternative, Merck negligently failed to warn Plaintiff that Vioxx should not be used in conjunction with any risk factors for these adverse events such as a family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease; and,

p.     Additionally, or in the alternative, Merck negligently failed to warn Plaintiff that he undertook the risk of adverse events and death relating to Vioxx as described herein.

58.    Merck's negligence was a proximate cause of the occurrence in question and Plaintiff's injuries and damages.

## VIII. – NEGLIGENCE-SALE OF PRODUCT

59.    Plaintiff re-alleges and incorporates the foregoing allegations.

60.    Additionally, or in the alternative, Merck, during some or all relevant times, manufactured, sold, marketed, and/or distributed Vioxx that was supplied to Plaintiff for use.

61.    Plaintiff was exposed to and ingested this hazardous product.

62.    Merck had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiff.

63.    These duties included the responsibility for the following safety and health matters relating to Vioxx :

a.     the investigation of the health risks;

b.     writing and publishing adequate and timely precautionary product labels and other health and safety information;

c.     writing and publishing adequate and timely specifications and standards about the true risks of injury associated with the products;

M005E25184

d.      writing and publishing adequate and timely specifications and standards about the symptoms of such injuries;

e.      writing and publishing adequate and timely specifications and standards about the scope of such injuries; or

f.      writing and publishing adequate and timely specifications and standards about the severity of the known risks associated with these products.

64.     Merck knew, or in the exercise of reasonable care should have known, that Vioxx would cause adverse cardiovascular effects to their consumers like Plaintiff.

65.     Merck breached its duty of reasonable care to the Plaintiff and was negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

66.     Merck's negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

### IX. – COMMON LAW FRAUD – FAILURE TO DISCLOSE

67.     Plaintiff re-alleges and incorporates the foregoing allegations.

68.     Additionally, or in the alternative, Defendant committed common law fraud against Plaintiff.

69.     Defendant had a duty to disclose the risks associated with the use of Vioxx.

70.     Defendant made numerous material misrepresentations about the safety and efficacy of Vioxx, with full knowledge of the falsity of these representations and/or made these misrepresentations with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred.

71.     Further, Defendant failed to disclose and concealed material facts within their knowledge.

M005E25185

72.    Defendant knew that Plaintiff was ignorant of the fact and did not have an equal opportunity to discovery the truth about the dangers presented by Defendant's products.

73.    Defendant intended to induce consumers such as Plaintiff to take some action, among other things, to buy and ingest Vioxx, by failing to disclose the fact.

74.    Plaintiff justifiably relied on Defendant's material misrepresentations to his detriment; but for Defendant's fraud, he would not have been exposed to Vioxx.

75.    Defendant's fraud was a proximate cause of the occurrence in question and Plaintiff's injuries and damages.

## X. – COMMON LAW STRICT LIABILITY

76.    Plaintiff re-alleges and incorporates the foregoing allegations.

77.    In addition to, or in the alternative, Plaintiff pleads the doctrine of strict liability. Merck is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective design of Vioxx.  At the time Vioxx was designed, manufactured and sold by Merck, safer alternative designs existed, which included designs other than that actually used, that had they been selected by Merck, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of Merck, and had they been used, would have not have impaired the utility of the product.  Defendant's defectively designed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

78.    Merck is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective marketing of Vioxx.  Defendant failed to provide adequate warnings and

M005E25186

instructions for safe use of Vioxx. Defendant's defectively marketed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

79.   Merck is also strictly liable to Plaintiff under Section 402B of the Restatement (Second) of Torts in misrepresenting to the public that its product was safe and without defect, which statement and representation was false and involved a material fact concerning the character of quality of the product in question, and upon which representations the consumer constructively relied, and which constituted a producing cause of the injury at issue.

80.   Further, each of the above and foregoing acts or omissions of Merck was more than momentary thoughtlessness, inadvertence, or error of judgment.   Such acts or omissions constituted such entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the rights, safety, or welfare of the person or persons affected. Plaintiff is entitled to recover judgment against Merck for exemplary damages.

81.   Merck's defective drug, Vioxx, was a producing cause of the occurrence in question and Plaintiff's injuries and damages.

### XI. – BREACH OF WARRANTIES (EXPRESS and IMPLIED)

82.   Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein

83.   Additionally, or in the alternative, Merck, through descriptions, affirmations of fact, and promises relating to Vioxx to the FDA, prescribing physicians, and the general public, including Plaintiff, expressly warranted that Vioxx was both safe and efficacious for its intended use.

84.   These warranties came in the form of:

M005E25187

a.   Publicly made written and verbal assurances of the safety and efficacy of Vioxx;

b.   Press releases, interviews and dissemination via the media of promotional information, for the sole purpose of which was to create an increased demand for Vioxx, which failed to warn of the risks inherent to the ingestion of Vioxx;

c.   Verbal assurances made by Merck regarding Vioxx and the downplaying of any risk associated with the drugs;

d.   False and misleading written information, supplied by Merck, and published in the Physician's Desk Reference on an annual basis, upon which physicians were forced to rely in prescribing Vioxx during the period of Plaintiff's ingestion of Vioxx including, but not limited to, information relating the recommended duration of the use of the drugs;

e.   Promotional pamphlets and brochures published and distributed by Merck and marketed directly to consumers, which contradicted the information that was set forth in the package insert and the Physician's Desk Reference; and

f.   Advertisements, including but not limited to direct to consumer advertising.

85.   The documents referred to above were created by and at the direction of Merck.

86.   At the time of these express warranties, Merck had knowledge of the purpose for which Vioxx was to be used and warranted it to be in all aspects safe, effective and proper for such purpose, when indeed they were not.

87.   Merck knew and had reason to know that Vioxx did not conform to these express representations in that Vioxx are neither safe nor as effective as represented, and that Vioxx produces serious adverse side effects.

M005E25188

88.   As such, Merck's products were neither in conformity to the promises, descriptions or affirmations of fact made about Vioxx nor adequately contained, packaged, labeled or fit for the ordinary purpose for which these goods were sold and used.

89.   Merck breached these express warranties to Plaintiff in violation of the applicable provisions of the Uniform Commercial Code by:

> g.   manufacturing, marketing, packaging, labeling and selling Vioxx to Plaintiff in such a way that misstated the risks of injury, without warning or disclosure thereof by package or label of such risks to the Plaintiff, or the prescribing physicians or pharmacist, and without modifying or excluding such express warranties;
>
> h.   manufacturing, marketing, packaging, labeling, advertising and selling Vioxx to Plaintiff, which failed to counteract the negative health effects and increased risks in a safe and permanent manner; and
>
> i.   manufacturing, marketing, packaging, labeling, advertising, promoting and selling Vioxx to Plaintiff, thereby causing the increased risk of serious physical injury and death, pain and suffering.

90.   Merck possessed or should have possesses evidence demonstrating that Vioxx and causes serious side effects.   Nevertheless, Merck continued to market Vioxx by providing false and misleading information without regard to the safety and efficacy of Vioxx.

91.   Merck's actions, as described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff and the public.

92.   Merck's breaches of warranties were proximate causes of the occurrence in question and Plaintiff's injuries and damages.

## XII. – ACTUAL DAMAGES

93.   Plaintiff seeks compensation for the damages he has sustained relating to his past, present, and future pecuniary loss, and mental anguish and pain and suffering.

## XIII. – PUNITIVE DAMAGES

94.    Plaintiff re-alleges and incorporates the foregoing allegations.

95.    Additionally, or in the alternative, Plaintiff is entitled to punitive damages against Merck because Merck's failure to warn was reckless and without regard for the public safety and welfare and constitutes malice under Illinois law.  Merck misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety of Vioxx.  Merck concealed, downplayed, understated and/or disregarded its knowledge of the serious and permanent side effects associated with the use of Vioxx, despite available information demonstrating that Vioxx was likely to cause fatal side effects to users.

96.    Merck, its agents, representatives and employees were or should have been in possession of evidence demonstrating that their products cause serious cardiovascular side effects. Nevertheless, Merck continued to aggressively market and advertise Vioxx by providing false and misleading information with regard to their safety and comparative efficacy.

97.    Merck failed to provide warnings that would have persuaded medical providers from prescribing Vioxx, and failed to provide adequate and accurate information in their advertising, promotions and marketing campaign, thus depriving medical providers and consumers from weighing the true risks against the benefit of prescribing and/or purchasing and consuming Vioxx.

98.    Merck's acts and omissions were grossly negligent, malicious, and constitute an egregious fraud.  Further, Merck acted in reckless disregard of the safety of Plaintiff and others, justifying the imposition of punitive damages.  Plaintiff is entitled to punitive damages because

M005E25190

of Merck's maliciousness and reckless disregard of Plaintiff's safety and the safety of others taking Vioxx.

99.   Merck's malicious conduct was a proximate cause of the occurrence in question and Plaintiff's injuries and damages.

## XIV. TOLLING OF APPLICABLE STATUTES OF LIMITATION, IF ANY

100.   Because Merck fraudulently concealed its wrongful conduct as alleged above and Plaintiff, using reasonable diligence, could not and did not discover his right of action until very recently, Merck is estopped from asserting any and all potentially applicable statutes of limitations, if any.

101.   Any and all potentially applicable statutes of limitations have been tolled by Merck's affirmative and intentional acts of fraudulent conduct, concealment, and misrepresentation, alleged above.  Such acts include but are not limited to intentionally covering up and refusing to disclose the material risks associated with the use of Vioxx.

102.   Merck is estopped from relying on any statutes of limitation because of their fraudulent concealment and misrepresentation alleged above.  Merck was under a duty to disclose the risks of adverse cardiovascular events associated with the use of Vioxx because this is nonpublic information over which they had exclusive control, because Merck knew this information was not readily available to Plaintiff, and because this information was relevant to Plaintiff in deciding whether to use Vioxx.

103.   Until very recently, Plaintiff had no knowledge that Merck engaged in much of the wrongdoing alleged herein.  Because of the fraudulent and active concealment of the wrongdoing by Merck, including but not limited to deliberate efforts to give Plaintiff the materially false

M005E25191

impression that Merck undertook all feasible safety precautions to reduce the risk of adverse

cardiac events, Plaintiff could not have reasonably discovered the wrongdoing any time prior to

this time, nor could Plaintiff have, as a practical matter, taken legally effective action given the

unavailability, until very recently, of the internal memoranda and other documents (as generally

described herein) as evidence in support of Plaintiff's claims.

## XV. JURISDICTIONAL LIMITS

104.    Plaintiff's damages are far in excess of this Court's minimum jurisdiction.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against the

Defendant and in favor of the Plaintiff, and to award the following relief:

      a.  General damages in the sum in excess of the jurisdictional minimum of this

           Court;

      b.  Compensatory damages;

      c.  Consequential Damages;

      d.  Punitive and exemplary damages;

      e.  Pre-judgment and post-judgment interest as provided by law;

      f.  Costs including, but not limited to, discretionary Court costs of this cause, and

           those costs available under the law, as well as expert fees and attorney fees

           and expenses, and costs of this action; and,

      g.  Such other relief as the Court deems just and proper.

## XVII. JURY DEMAND

Plaintiff demands a trial by jury.

Dated: __1/8_____, 2007.

Respectfully submitted,

JOHN BOUNDAS
Illinois State Bar No. 06236743
WILLIAMS BAILEY LAW FIRM
8441 Gulf Freeway, Suite 600
Houston, Texas  77017

GRANT KAISER
Texas State Bar No. 11078900
THE KAISER FIRM LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5001
(*pending pro hac admission*)

**ATTORNEYS FOR PLAINTIFF**

000511

M005E25193