# EXHIBIT 87

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 OCT -2 PM 3: 09

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RAMON ALVARADO; BARTOLOME BATISTA; JOSE BEATO; NANCY COLON-ORTIZ; DULCE DIONICIO; MIREYA FANITH; RHINA GONZALEZ-PATRICIO; MARIA DEL R ROSA; ANA MARIA-MINYETTI; MILAGROS MEDINA-AFANADO; JISELINA NUNEZ; CANDY PIMENTEL DE CABRERA; ROSA RIOS-OQUENDO; ESTEBANIA RODRIGUEZ-RODRIGUEZ; BELKIS ROSARIO-NUNEZ; MARIA ROSARIO-NUNEZ; ELBA SANTA-RODRIGUEZ, | IN RE: VIOXX PRODUCTS LIABILITY LITIGATION |
| | MDL DOCKET NO. 1657 |
| | SECTION L |
| | 06-7150 |
| **Plaintiffs,** | JUDGE FALLON |
| | MAGISTRATE JUDGE KNOWLES |
| **vs.** | SECT.L MAG3 |
| | CIVIL ACTION NO. _____ |
| **MERCK & CO., INC.** | |
| **Defendant.** | JURY TRIAL DEMANDED |

## COMPLAINT

COME NOW, the Plaintiffs, RAMON ALVARADO, BARTOLOME BATISTA, JOSE BEATO, NANCY COLON-ORTIZ, DULCE DIONICIO, MIREYA FANITH, RHINA GONZALEZ-PATRICIO, MARIA DEL R ROSA, ANA MARIA-MINYETTI, MILAGROS MEDINA-AFANADO, JISELINA NUNEZ, CANDY PIMENTEL DE CABRERA, ROSA RIOS-OQUENDO, ESTEBANIA RODRIGUEZ-RODRIGUEZ, BELKIS ROSARIO-NUNEZ, MARIA ROSARIO-NUNEZ, and ELBA SANTA-RODRIGUEZ, (hereinafter collectively referred to as "Plaintiffs"), by and through their

___ Fee $250°°
___ Process_____
_X_ Dktd _____
___ CtRmDep_____
___ Doc. No._____

M00A142784

undersigned counsel, and complaining of the Defendant, MERCK & CO., INC. (hereinafter referred to as "MERCK"), state as follows:

## I.    **PARTIES**

### A.    **PLAINTIFFS**

1.      Plaintiff, RAMON ALVARADO, is a citizen and resident of Allentown, Pennsylvania.  Plaintiff was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

2.      Plaintiff, BARTOLOME BATISTA, is a citizen and resident of Santiago, Dominican Republic.  Plaintiff was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

3.      Plaintiff, JOSE BEATO, is a citizen and resident of the Dominican Republic.  Plaintiff was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion

4.      Plaintiff, NANCY COLON ORTIZ, is a citizen and resident of Toa Baja, Puerto Rico.  Plaintiff was prescribed, purchased and ingested 25 mg of Vioxx® and took it on a continuous basis from February 2001 to 2004.  On or about July 2001, Plaintiff COLON-ORTIZ suffered arrhythmia and chest pain as a proximate result of her ingestion of Vioxx®.

5.      Plaintiff, DULCE DIONICIO, is a citizen and resident of Santo Domingo, Dominican Republic.  Plaintiff was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion

2

M00A142785

6.    Plaintiff, MIREYA FANITH, is a citizen and resident of Santo Domingo, Dominican Republic.  Plaintiff was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

7.    Plaintiff, RHINA GONZALEZ-PATRICIO, is a citizen and resident of Santiago, Dominican Republic.  Plaintiff was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

8.    Plaintiff, MARIA DEL R ROSA, is a citizen and resident of San Juan, Puerto Rico.  Plaintiff was prescribed, purchased and ingested Vioxx® on a continuous basis from January 2000 to September 2004.  Plaintiff DEL R ROSA suffered cardiovascular injuries as a proximate result of this ingestion, including atrial fibrillation.

9.    Plaintiff, ANA MARIA-MINYETTI, is a citizen and resident of Santo Domingo, Dominican Republic.  Plaintiff MARIA-MINYETTI was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion, including gastric bleeding.

10.   Plaintiff, MILAGROS MEDINA-AFANADO, is a citizen and resident of Utuado, Puerto Rico.  Plaintiff MEDINA-AFANADO was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

11.   Plaintiff, JISELINA NUNEZ, is a citizen and resident of Bronx, New York, New York.  Plaintiff NUNEZ was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

12.   Plaintiff, CANDY PIMENTEL DE CABRERA, is a citizen and resident of Santo Domingo, Dominican Republic.  Plaintiff PIMENTEL DE CABRERA was

3

M00A142786

prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

13.    Plaintiff, ROSA RIOS-OQUENDO, is a citizen and resident of Dorado, Puerto Rico.   Plaintiff RIOS-OQUENDO was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

14.    Plaintiff, ESTEBANIA RODRIGUEZ-RODRIGUEZ, is a citizen and resident of Sabana Hoyos , Puerto Rico.   Plaintiff RODRIGUEZ-RODRIGUEZ was prescribed, purchased and ingested Vioxx® and suffered cardiovascular injury as a proximate result of this ingestion.

15.    Plaintiff, BELKIS ROSARIO-NUNEZ, is a citizen and resident of Allentown, Pennsylvania.  Plaintiff ROSARIO-NUNEZ was prescribed, purchased and ingested Vioxx® and suffered cardiovascular injury as a proximate result of this ingestion.

16.    Plaintiff, MARIA ROSARIO-NUNEZ, is a citizen and resident of Bronx, New York, New York.   Plaintiff ROSARIO-NUNEZ was prescribed, purchased and ingested Vioxx® and suffered injury as a proximate result of this ingestion.

17.    Plaintiff, ELBA SANTA-RODRIGUEZ, is a citizen and resident of San Juan, Puerto Rico.   Plaintiff SANTA-RODRIGUEZ was prescribed, purchased and ingested Vioxx® and suffered cardiovascular injury as a proximate result of this ingestion.

**B.    DEFENDANT**

18.    Defendant, MERCK & CO., INC., is headquartered in Whitehouse Station, New Jersey.

M00A142787

19.    At all times relevant hereto, Defendant MERCK, was engaged in the business of testing, marketing, distributing, and promoting the pharmaceutical Vioxx® throughout the United States, Puerto Rico and the Dominican Republic.

20.    The injuries and damages of Plaintiffs herein were caused by the wrongful acts, omissions, and fraudulent misrepresentations of MERCK in researching, testing, developing, manufacturing, distributing, licensing, labeling and marketing the drug Vioxx®.

21.    Plaintiffs file this lawsuit within the applicable limitations period either because the injury complained of occurred within two years of the filing of this complaint; or within two years of first suspecting that Vioxx® was the cause of the injuries sustained by Plaintiffs.  Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of their injuries at an earlier time because the cause of the injuries were unknown to Plaintiffs.  Plaintiffs did not suspect, nor did they have any reason to suspect, that their ingestion of Vioxx® was the cause of their respective injuries until less than the applicable limitations period prior to the filing of this action. All Puerto Rico plaintiffs herein obtained knowledge of their right to sue only after the information was made available to them on or about August 2006. Additionally, Plaintiffs were prevented from discovering this information sooner because MERCK misrepresented and/or suppressed material information to the public and to the medical profession regarding the safety of Vioxx®.

M00A142788

## II.   JURISDICTION

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because this is an action by individuals and representative Plaintiffs who are citizens of a different state from the Defendant MERCK.

23.     The filing of this claim directly in this Multidistrict Litigation proceeding is proper pursuant to Pretrial Order number 11 issued by this Court on May 18, 2005.

24.     Defendant MERCK is a corporation headquartered and with its principal place of business in the State of New Jersey.  MERCK has, therefore, subjected itself to personal jurisdiction and venue is proper in this District pursuant to 28 U.S.C. § 1391.

25.     At all times relevant hereto, MERCK engaged in the business of researching, testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties, the pharmaceutical drug Vioxx® in the Dominican Republic, Puerto Rico and throughout the United States.

## III.   FACTUAL BACKGROUND OF VIOXX

26.     MERCK was incorporated more than 100 years ago and has its principal place of business and worldwide headquarters in Whitehouse Station, New Jersey.  The research and development of Vioxx® (including the manufacture of its active ingredient Rofecoxib), took place at MERCK's research laboratories, which are located in Rahway, also in New Jersey.

27.     MERCK made every decision related to the development, design, manufacture, testing, marketing, distribution, and commercialization of Vioxx® from its headquarters in the state of New Jersey.   All aspects of Vioxx®'s worldwide

M00A142789

commercialization and the ultimate decision to withdraw Vioxx® from the world market were orchestrated by MERCK from its headquarters in the state of New Jersey.

28.     Vioxx® is the brand name of rofecoxib and is classified as a nonsteroidal anti-inflammatory drug (NSAID) with anti-inflammatory, analgesic and antipyretic properties. As such, it is indicated for pain, dysmenorrheal, osteoarthritis and rheumatoid arthritis. The earlier marketed NSAID products (i.e., ibuprofen, naproxen, etc.) are approved for similar indications.

29.     Vioxx® is a Cyclooxygenase-2 (Cox-2) selective inhibitor and as such has a lower incidence of gastrointestinal upset and a lower ulcerogenic potential. However, inhibiting the Cox-2 enzyme selectively causes an imbalance between Prostacyclin (PGI) and Thromboxane A-2 (TX A2). Because "TX A2 is a major compound in the clotting process, and is a potent platelet aggregator and vasoconstrictor," the resulting imbalance between PGI and TX A2 places patients at an increased risk of thromboembolic events, primarily heart attacks and strokes. *The MERCK Manual (16th* ed. 1992).

30.     MERCK, the maker of Vioxx®, is also the publisher of *The MERCK Manual* (16th ed. 1992), which includes the following definition: "Thrombaxane A-2 is a major compound involved in the clotting process, and is a potent platelet aggregator and vasoconstrictor." This section of *The MERCK Manual* was not included in the 17th edition, published in 1999.

31.     MERCK-employed physicians, as well as industry leaders supported by MERCK, have published on the subject of Cox-2 inhibition induced prostaglandin synthesis and TXA2, creating a pro-thrombotic state that places patients at an increase

7

M00A142790

risk of heart attack and stroke. *See Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemo-dynamics, and Vasoactive Eiosanoids*, 289 (2) PHARMACOLOGY & EXPERIMENTAL THERAPEUTICS (May 1999).

32.     Vioxx® was approved by the U.S. Food and Drug Administration on May 20, 1999. The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contained a section "Gastrointestinal (GI) Effects – Risk of GI Ulceration, Bleeding and Perforation." At this time the warning did not mention any risk of potential adverse cardiovascular effects or cerebrovascular effects.

33.     At the conclusion of the VIGOR study, it was reported that serious cardiovascular events, including heart attacks and strokes, occurred in patients taking Vioxx® compared to patients taking naproxen. In the VIGOR study, analysis of the cardiovascular data by the Safety Monitoring Board focused on "the excess deaths and cardiovascular adverse experiences in [the Vioxx group] compared to [the Naproxen group]."

34.     On March 27, 2000, MERCK issued a press release stating that Vioxx® caused fewer digestive tract problems than Naproxen. More importantly, the press release further stated that the VIGOR results did not show that Vioxx® caused cardiovascular problems, but that Naproxen protected against them.

35.     In June 2000, studies presented at the European United League Against Rheumatism (EULAR), an organization which MERCK is a member and sponsor, revealed that Vioxx® use resulted in a statistically significant increase in hypertension, myocardial infarction and stroke. MERCK failed to accurately publish or inform

8

consumers about these studies and in fact denied some of the results in the industry magazine "Pharmacy Today."

36.     In November 2000, the New England Journal of Medicine published the results of the VIGOR study. MERCK responded to the studies damning results by downplaying and/or withholding information regarding the severity of the cardiovascular risks associated with Vioxx®. In a January 2001 public 8-K filing with the Securities and Exchange Commission, MERCK represented that the VIGOR study showed that Vioxx® reduced the risk of serious GI complications by ½ as compared to Naproxen, but failed to mention the dangerous adverse health effects.

37.     In February 2001, an FDA Advisory Panel recommended the FDA require the Vioxx® label carry a warning about the drug's cardiovascular risks. The Advisory Panel relied on the results of the VIGOR study in coming to this recommendation. In response, MERCK issued a press release stating, "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc., today reconfirmed the favorable cardiovascular safety profile of Vioxx®."

38.     On August 22, 2001 an article titled "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors" was published in the Journal of the American Medical Association (JAMA) which suggested that the use of Cox-2 inhibitors might lead to increased cardiovascular events. The study and accompanying article were conducted by Cleveland Clinic physicians Eric Topol and Steven Nessen.

39.     The day before the release of the JAMA article, a MERCK statement was reported in Bloomberg News noting that "we [MERCK] have additional data beyond what they [Drs. Topol and Nessen] cite, and the findings are very, very reassuring, Vioxx

9

does not result in any increase in cardiovascular events compared to placebo." On August 23, 2001, the day after the JAMA article, MERCK stated in a press release that "the Company stands behind the overall and cardiovascular safety profile ... of Vioxx®."

40.     MERCK's fraudulent advertising and marketing campaign resulted in a sharp rebuke by the FDA in a September 17, 2001 "Warning Letter." The letter, from the Division of Drug Marketing, Advertising, and Communications (DDMAC) issued the following warning to MERCK; "You (MERCK) have engaged in a promotional campaign for Vioxx® that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx® Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx®." The letter goes on to state:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx® were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

41.     The FDA's eight page "Warning Letter" set forth in detail MERCK's misrepresentations and misconduct with regard to the marketing of Vioxx® stating:

> The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx®/Coumadin drug interaction, omit crucial risk information associated with Vioxx® therapy, contain unsubstantiated comparative claims and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx® that misrepresented Vioxx®'s safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

> Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx® has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

M00A142793

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1.  Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx®.

2.  Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

3.  A written statement of your intent to comply with "1" and "2" above.

42.   In 2002 and 2003, despite repeated requests from the American Heart Association, the National Stroke Association and the Arthritis Foundation that it conduct additional safety studies on Vioxx®, MERCK refused to conduct any such study and continued to claim that Vioxx® was safe.

43.   An October 30, 2003, article in the <u>Wall Street Journal</u> reported that a study presented at the annual meeting of the American College of Rheumatology confirmed an increased risk of heart attacks in patients taking Vioxx®. The study, sponsored by MERCK, examined the medical records of 54,475 Medicare patients and found that within the first 30 days of taking Vioxx® the risk of heart attack was increased by 30% as compared to Celebrex.

44.   Also in 2003, Dr. Daniel Solomon and Dr. Jerry Avorn, a Divisional Director at Brigham and Women's Hospital in Boston, reported in a MERCK financed study based on a survey of patient records that Vioxx® use resulted in increased

M00A142794

cardiovascular risks, even at some moderate dosages.  MERCK disputed the findings of the Avorn-Solomon study and removed the name of the MERCK epidemiologist who had contributed to it before the study was published in a medical journal.

45.     In May 2004, the results of a Canadian study published in "The Lancet" found that elderly patients taking Vioxx® had an 80% increase in hospital admissions for congestive heart failure within one year of taking Vioxx® when compared to persons taking other NSAIDS.  The study reviewed data from 1.3 million elderly patients taking Vioxx®, Celebrex, NSAIDs, or no medication.

46.     On August 25, 2004, Dr. David Graham, Associate Director for Science in the FDA's Office of Drug Safety, revealed that a database analysis of 1.4 million patients showed Vioxx® users were more likely to suffer a heart attack or sudden cardiac death than those taking Celebrex or an older NSAID.

47.     Despite the voluminous evidence pointing to the cardiovascular dangers of Vioxx®, on August 26, 2004, MERCK continued to state that Vioxx® was safe and that any cardiovascular or cardiothrombotic side effects were not related to Vioxx® use.  In a press release MERCK stated that it "stands behind the efficacy, overall safety and cardiovascular safety of Vioxx®."

48.     On September 30, 2004, MERCK withdrew Vioxx® from all markets after its own internal study revealed Vioxx® almost tripled the risk of heart attack and stroke for those who take the product long term (more than 18 months).  The company's decision was based on three-year data from a prospective, randomized, placebo-controlled clinical trial, the APPROVe (Adenomatous Polyp Prevention on Vioxx®) trial.

M00A142796

49.     On April 7, 2005, the U.S. Food and Drug Administration (FDA) stated that MERCK, which withdrew Vioxx® from the market last September, had not presented sufficient evidence to lift the moratorium.  The FDA commissioner affirmed that the risks of Vioxx® outweighed the benefits, overruling the earlier recommendation of an advisory panel that believed the painkillers could be safely marketed.

50.     The FDA decision to continue the moratorium was based upon the substantial scientific evidence that Vioxx® and other Cox-2 inhibitors increase the risk of cardiovascular (CV) events such as heart attacks and strokes, gastrointestinal (GI) bleeding and ulcers, as well as adverse skin reactions such as Stevens-Johnson Syndrome, in which the patient suffers blisters and burn-like sensations.  These were recognized as class-wide risks associated with the entire family of NSAID's even over-the-counter medications like Advil, Aleve, and Motrin.  The FDA recommended that those NSAIDs which remain on the market should carry "black-box" labels, the strictest type of warning, in order to ensure that physicians and consumers are aware of the risks.

## IV.   GENERAL ALLEGATIONS

51.     MERCK's strategy was to aggressively market Vioxx® by falsely misleading potential users about the products and by failing to protect users from serious dangers that MERCK knew, or should have known would result from the use of Vioxx®.

52.     MERCK engaged in an advertising blitz to market Vioxx® in order to induce widespread use of Vioxx®.   This marketing campaign consisted of advertisements, promotional literature to be placed in the offices of doctors and other health care providers, and other promotional materials provided to potential Vioxx® users.

13

M00A142796

53.     This advertising program sought to create the image to consumers and physicians that the use of Vioxx® was safe for human use, had fewer side effects and adverse reactions than other pain relief medications despite the fact that MERCK knew these to be untrue and false, and there were no reasonable grounds to believe them to be true.

54.     MERCK's campaign to minimize, understate and/or hide the health hazards or risks associated with Vioxx® were carried out through the use of promotional materials, audio conferences, professional meetings, and press releases which deceived potential users of Vioxx® by relaying positive information such as testimonials, and manipulation of statistics, while downplaying the known adverse health effects.  The materials presented by MERCK to physicians and users misrepresented the severity, frequency and nature of the adverse health effects caused by Vioxx® and falsely represented that adequate testing had been conducted concerning Vioxx®.

55.     Despite overwhelming evidence to the contrary, up to September 30, 2004 MERCK continued to represent to consumers that Vioxx® was safe, and that any cardiovascular and/or cardiothrombotic side effects were not associated with Vioxx®. As a proximate result of MERCK's deceptive and fraudulent marketing efforts, which either omitted or misrepresented the serious health risks of Vioxx®, the Plaintiffs regularly purchased and ingested Vioxx® for various periods of time.  All of the injuries alleged by Plaintiffs herein were the proximate result of their use of Vioxx®.

56.     In addition to the link to cardiovascular events, Vioxx® has been linked to several severe and life threatening medical disorders including, but not limited to, edema,

M00A142797

changes in blood pressure, seizures, kidney and liver damage, and pregnancy complications.

57.     MERCK's tortuous conduct took place entirely at its headquarters and research laboratories in New Jersey.  MERCK obtained the results of its tests at its laboratories and decided to continue to commercialize Vioxx® after it knew from the resulting cardiovascular risks from its headquarters in New Jersey.  It was MERCK's headquarters in New Jersey where the ultimate decisions on research protocols and on interpretation and dissemination of the results of its internal studies were made.

## V.     CLAIMS FOR RELIEF

### COUNT I
### STRICT LIABILITY PURSUANT TO
### §402A OF THE RESTATEMENT (SECOND) OF TORTS
### (DEFECTIVE DESIGN AND FAILURE TO WARN)

58.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further alleges:

59.     Defendant MERCK, from its headquarters in New Jersey, made every and all decisions regarding the manufacturing, designing, testing, labeling, sterilizing, packaging, supplying, marketing, selling, advertising, warning, and otherwise distributing Vioxx® in the United States (including Puerto Rico) and the Dominican Republic, which it sold and distributed throughout the U.S. and Dominican Republic to the Plaintiffs herein.

60.     The Plaintiffs were using Vioxx® in a manner for which it was intended or in a reasonably foreseeable manner.

M00A142798

61.     Vioxx® was expected to and did reach the Plaintiffs without substantial change in its condition as manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, warned, and otherwise distributed.

62.     The Plaintiffs were not aware of, and reasonably could not have discovered, the dangerous nature of Vioxx®.

63.     At the time Vioxx® was manufactured and sold to Plaintiffs by MERCK, it was in a defective condition and unreasonably dangerous when put to its foreseeable use, and subjected its users to increased risks of heart attacks, strokes, and other illnesses which exceeded its benefits, and for which other safer products were available.

64.     Alternatively, when Vioxx® was manufactured and sold to Plaintiffs by MERCK, it was defective in design and formulation, making it more dangerous than other drugs for pain relief.  Despite its knowledge of the defective and dangerous nature of Vioxx®, MERCK failed to warn Plaintiffs and other users of the various adverse health effects of Vioxx®.

65.     The Vioxx® sold to Plaintiffs reached Plaintiffs without substantial change.  Plaintiffs were unaware of the dangerousness of the product, and ingested Vioxx® without making any changes or alterations and used it in a manner foreseeable and reasonably anticipated by MERCK.

66.     As a direct and proximate result of the defective and unreasonably dangerous design, and failure of MERCK to warn of these dangers, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injuries or death.

M00A142799

67.     MERCK, therefore, is strictly liable to the Plaintiffs. MERCK knew of the defective and/or dangerous condition of Vioxx®, yet continued to manufacture, distribute, advertise, market and sell Vioxx® to Plaintiffs and the general public in conscious disregard for their safety. The Plaintiffs, therefore, are entitled to punitive damages.

## COUNT II
## NEGLIGENCE AND/OR WANTONNESS

68.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

69.     Defendant MERCK designed, produced, manufactured and placed Vioxx into the stream of commerce in the regular course of its business, knowing it would be used by consumers such as the Plaintiffs.

70.     At all times herein, MERCK had a duty to properly manufacture, design, test, research, distribute, label and adequately warn of the risks and dangers of Vioxx®.

71.     Contrary to its duty, MERCK was guilty of one or more of the following negligent and/or wanton acts and/or omissions:

          (A).     Failed to adequately and properly test and inspect Vioxx® so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured and sold;

          (B).     Failed to utilize and/or implement a reasonably safe design in the manufacture of Vioxx®;

          (C).     Failed to manufacture Vioxx® in a reasonably safe condition for which it was intended;

17

M00A142800

(D).    Failed to adequately and properly warn Plaintiffs purchasing Vioxx® of the risks of complications when used in a manner for which it was intended;

(E).    Failed to adequately and properly warn Plaintiffs purchasing Vioxx® of the risks of diseases when used in a manner for which it was intended.

(F.)    Failed to adequately and properly label Vioxx® so as to warn the Plaintiffs of the risks of complications;

(G).    Failed to adequately and properly label Vioxx® so as to warn the Plaintiffs of the risks of retinal artery conclusion;

(H).    Manufactured Vioxx® which constituted a hazard to health;

(I).    Manufactured Vioxx® which caused adverse side effects;

(J)    Suppressed information about the dangers of Vioxx®;

(K)    Misrepresented information about the safety of Vioxx®; and

(J).    Was otherwise negligent and wanton.

72.    As a direct and proximate result of MERCK's negligent and/or wanton manufacture, design, test, research, distribute, label and/or failure to adequately warn of the risks and dangers of Vioxx®, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injuries or death.

73.    MERCK knew of the defective and/or dangerous condition of Vioxx®, yet ignored such warnings and continued to manufacture, distribute, advertise, market and sell Vioxx® to Plaintiffs and the general public in conscious disregard for their safety.

M00A142801

## COUNT III
## VIOLATIONS OF THE NEW JERSEY CONSUMER PROTECTION ACT

74. Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

75. MERCK engaged in unfair competition and/or unfair or deceptive acts and practices in violation of the New Jersey consumer protection statute when it represented, through advertising, warranties, and toher express representations that Vioxx® had benefits or characteristics that it did not actually possess. MERCK further violated the consumer protection statutes when it falsely represented that Vioxx® was of a particular standard or quality when it was not. Lastly, MERCK violated the consumer protection statutes when it advertised Vioxx® with the intent not to sell it as advertised, and in so doing, concealed and suppressed facts material to the true characteristics, standards and quality of Vioxx®.

76. MERCK's deceptive practices were specifically designed to induce, and indeed did induce, Plaintiffs to buy Vioxx®.

77. As a direct and proximate result of MERCK's unfair methods of competition and unfair or deceptive acts and practices, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injury.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

78. Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further allege:

M00A142802

79.     Defendant MERCK expressly warranted to Plaintiff, by and through statements made by MERCK or its authorized agents or sales representative, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Vioxx® was safe, effective, fit and proper for its intended use.

80.     In using Vioxx®, Plaintiff relied on the skill, judgment, representations and foregoing express warranties of the MERCK.  Said warranties and representations were false in that the aforementioned product was not safe and was unfit for the uses for which it was intended.

81.     As a direct and proximate result of MERCK's breach of warranty, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injuries or death.

## COUNT V
## BREACH OF IMPIED WARRANTY

82.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further alleges:

83.     Prior to the time that Vioxx® was used by Plaintiffs, Defendant MERCK impliedly warranted to Plaintiffs that Vioxx® was of merchantable quality and safe and fit for the use for which it was intended.

84.     Plaintiffs were and are unskilled in the research, design and manufacture of Vioxx® and reasonably relied entirely on the skill, judgment and implied warranty of the Defendant MERCK in using Vioxx®.

M00A142803

85.     Vioxx® was neither safe for its intended use nor of merchantable quality, as warranted by MERCK, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

86.     As a direct and proximate result of MERCK's breaches of warranty, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injuries or death.

## COUNT VI
## FRAUDULENT MISREPRESENTATION

87.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further alleges:

88.     Defendant MERCK misrepresented a number of material facts to the general public, including Plaintiffs and/or their treating physicians, regarding: the potential serious cardiovascular side effects of Vioxx use observed in the VIGOR study; the Vioxx®/Coumadin interaction; crucial risk information associated with Vioxx®; and the safety of Vioxx®, including the representation that any cardiovascular or cardiothrombotic side effects were not associated with the drug.

89.     These representations were false and made by MERCK with knowledge of their falsity, or with ignorance of their truth or falsity.

90.     These representations were material to Plaintiffs and/or their treating physicians' decision to prescribe Vioxx® to them.   MERCK intended for Plaintiffs and/or their treating physicians to rely upon these material misrepresentations in order to induce Plaintiffs to seek Vioxx® and/or for Plaintiffs' treating physicians to prescribe Vioxx®.

21

M00A142804

91.     Plaintiffs' treating physicians and other health care providers were unaware of the falsity of MERCK's representations as described above.     Plaintiffs' treating physicians and other health care providers were reasonable in, and relied on the truthfulness of MERCK's representations regarding Vioxx®.

92.     As a direct and proximate result of MERCK's fraudulent misrepresentations, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injuries or death.

## COUNT VII
## FRAUDLENT OMISSION/SUPPRESSION

93.     Plaintiffs repeat and reallege, as if fully set forth herein, each and every allegation contained in the above paragraphs and further alleges:

94.     Defendant MERCK had superior knowledge of the risks and dangers of Vioxx®, as described herein.   Such knowledge was not reasonably discoverable by Plaintiffs, Plaintiffs' treating physicians, other healthcare providers, or the general public.

95.     MERCK had actual knowledge of the cardiovascular and cardiothrombotic effects of Vioxx®, yet failed to disclose this information to Plaintiffs, Plaintiffs' treating physicians, other healthcare providers, or the general public.  MERCK also engaged in a pattern of actively suppressing and concealing this information when marketing and promoting Vioxx® to Plaintiffs, Plaintiffs' treating physicians, other healthcare providers, and the general public in direct to consumer advertisements.  Specifically, MERCK:

a.     Downplayed the results of various studies, including their own, showing the cardiovascular and cardiothrombotic effects of Vioxx®;

M00A142805

b.  Withheld adverse reports or gave incorrect information about the reports they received regarding the side effects of Vioxx®, such as heart attacks and strokes; and

c.  Instructed their sales force to dodge and mislead doctors when asked about the cardiovascular and cardiothrombotic effects of Vioxx®;

96.  MERCK's failure to disclose these material facts constitute fraudulent suppression/concealment.

97.  MERCK knew the suppressed/concealed facts were unavailable to Plaintiffs, Plaintiffs' treating physicians, other healthcare providers, or the general public, yet MERCK instructed its agents, servants and employees to not disclose this material information in order to promote the sale of Vioxx®.

98.  The suppressed/concealed material facts described above were material, and MERCK was aware, or should have been aware, that it was suppressing/concealing material facts.  MERCK suppressed/concealed these material facts with the intent that Plaintiffs and/or their treating physicians rely on said omissions.

99.  Plaintiffs and their treating physicians were unaware of the suppressed/concealed material facts and were reasonable in relying on said omissions.

100.  If Plaintiffs and/or their treating physicians had known of the suppressed/concealed material facts Plaintiffs would not have taken Vioxx®.

101.  As a direct and proximate result of MERCK's fraudulent suppressions/concealment of material facts, Plaintiffs suffered the injuries alleged hereinabove and other actual damages to be proven at trial and/or are threatened with irreparable harm by undue risk of physical injuries or death.

23

M00A142806

WHEREFORE, Plaintiffs, RAMON ALVARADO, BARTOLOME BATISTA, JOSE BEATO, NANCY COLON-ORTIZ, DULCE DIONICIO, MIREYA FANITH, RHINA GONZALEZ-PATRICIO, MARIA DEL R ROSA, ANA MARIA-MINYETTI, MILAGROS MEDINA-AFANADO, JISELINA NUNEZ, CANDY PIMENTEL DE CABRERA, ROSA RIOS-OQUENDO, ESTEBANIA RODRIGUEZ-RODRIGUEZ, BELKIS ROSARIO-NUNEZ, MARIA ROSARIO-NUNEZ, and ELBA SANTA-RODRIGUEZ, pray that the Court enter judgment against Defendant, MERCK CO., INC., and in favor of the Plaintiffs, for:

a.    A fair and just amount of actual damages sufficient to adequately and completely compensate Plaintiffs for the nature, extent and duration of the injuries and damages inflicted and the costs of this action;

b.    Costs of suit;

c.    Attorneys' fees;

d.    Pre-judgment and post-judgment interest;

e.    Punitive damages in a fair and reasonable amount sufficient to punish MERCK and deter others from engaging in similar conduct; and

f.    For such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

M00A142807

Respectfully submitted,

Chris W. Cantrell
Attorney for Plaintiff

**OF COUNSEL**:
Archie C. Lamb, Jr.
Dana Dachelet
*THE LAMB FIRM, LLC*
2017 Second Avenue North, Suite 200 (35203)
P.O. Box 2088
Birmingham, Alabama 35201
Phone: (205) 324-4644
Fax: (205) 324-4649

Eric Quetsglas
QUETSGLAS LAW OFFICES
PO Box 16606
San Juan, Puerto Rico 00908
Phone: (787) 722-0635
Fax: (787) 722-3970

E. Kirk Wood
WOOD LAW FIRM, LLC
P.O. Box 382434
Birmingham, AL 35238-2434

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon Liason Counsel, Russ Herman and Phillip Wittman by U.S. Mail and upon all parties by electronically uploading the same to LexisNexis File and Serve, and that said original is being filed with the Clerk of the United States District Court for the Eastern District of Louisiana on this the 29th day of September, 2006.

Chris W. Cantrell
Alabama State Bar # ASB-1500-R80C
***THE LAMB FIRM, LLC***
2017 Second Avenue North, Suite 200
(35203)
P.O. Box 2088
Birmingham, Alabama 35201
Phone: (205) 324-4644
Fax: (205) 324-4649

M00A142809