# EXHIBIT  108

Anderson et al v. Merck & Co., Inc. et al   Case:  4:05-cv-00089-CEJ      File Date: 01/20/2005      Doc #: 1.3      p: 1 of 39

 

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

**ARLINE ANDERSON, CLAUDIA BROWN, RONALD STRITTMATTER, ROBERT BUHROW, PATTY ROGERS, CAROL STUART, PATRICIA CARAKER, JOHN GILSON, JERRY DAVIS, GERALD HENDERSEN,**

                Plaintiffs,

    v.

**MERCK & CO. INC.,**

Serve:    Registered Agent
          The Corporation Company
          120 South Central Ave.
          Clayton, MO 63105

**AMY SEPKO,**

Serve:    Residence
          6622 Nottingham
          St. Louis, MO 63109

**SHERRY ALBERTS,**

Serve:    Residence
          5855 Nina
          St. Louis, MO 63112

**WALGREENS CO.,**

Serve:    Residence
          The Prentice-Hall
          Corporation System
          221 Bolivar Street
          Jefferson City, MO 65101

Cause No. 042-09317

Division No. 1

RECEIVED
IN THE CLERKS OFFICE
MARIANO V. FAVAZZO
2004 DEC 17 PM 4:37
CLERK
CASHIER

EXHIBIT
3

**WAL-MART STORES, INC.,**

Serve:       Registered Agent
CT Corporation
120 S. Central
Clayton, MO 63105

**THE MEDICINE SHOPPE
INTERNATIONAL, INC.,**

Serve:       Registered Agent
CSC-Lawyers Inc. Service
Company
221 Bolivar Street
Jefferson City, MO 65101

**CVS PHARMACY, INC.,**

Serve:       Registered Agent
CT Corporation
120 S. Central
Clayton, MO 63105

**WEST PINE PHARMACY,**

Serve:       Officer or agent
4401 West Pine
St. Louis, MO 63108

**JOHN AND/OR JANE DOES 1-100,**

Serve:       Hold Service

Defendants.

## PETITION

COME NOW plaintiffs, and for their petition against defendants Merck &

Co., Inc. ("Merck"), Amy Sepko ("Sepko"), Sherry Alberts ("Alberts"), Walgreens

2

Co. ("Walgreens"), Wal-Mart Stores, Inc. ("Wal-Mart"), CVS Pharmacy, Inc. ("CVS"), West Pine Pharmacy ("West Pine"), and The Medicine Shoppe International, Inc. ("Medicine Shoppe"), and John or Jane Doe 1-100, allege:

1.  This is a proceeding brought by plaintiffs seeking damages for personal injuries and economic damages suffered as a result of defective and dangerous pharmaceutical product Vioxx, which was manufactured, marketed, distributed and/or sold by Merck, Sepko, Alberts, John or Jane Doe 1-100, Walgreens, Wal-Mart, CVS, West Pine and Medicine Shoppe to the general public.

## THE PARTIES

2.  Arline Anderson is a citizen of the State of Missouri and resident of St. Louis City.  She was sold Vioxx by Walgreens in St. Louis City.  She suffered a blocked artery and a stroke.  The blocked artery and stroke were or contributed to be caused by Vioxx.

3.  Claudia Brown is an individual and citizen of the state of Missouri, residing in St. Louis City.  She was prescribed and took Vioxx that was sold by West Pine Pharmacy in St. Louis City.  At approximately 69 years old, she had coronary artery disease and angina that was caused or contributed to be caused by Vioxx.

4.  Ronald Strittmatter is a citizen of the State of Missouri and a resident of St. Louis City.  Ronald Strittmatter was sold the Vioxx by Walgreens including locations in St. Louis City and Medicine Shoppe on Gravois.  On January 29, 2001 and February 1, 2001, after taking Vioxx, he had blockage (blood clot) of his femoral

3

artery in his lower left leg, requiring two surgeries.  At the time he had the blockage, he was 54 years old.  Vioxx caused or contributed to cause his blood clot.

5.  Robert Buhrow is a citizen of the State of Illinois, living in Sterling, Illinois.  He took Vioxx that was sold by The Medicine Shoppe in Sterling, Illinois.  In 2001 when he was 64, he had a heart attack and legs amputated.  Vioxx caused or was a significant contributing cause to his heart attack and leg amputation.

6.  Patty Rogers is a citizen of the State of Illinois, residing in Trenton, Illinois.  She was given samples of Vioxx by her pharmacy.  After taking Vioxx, she had a heart attack on May 15, 2003 at age 51.  Vioxx caused or was a significant contributing cause to her heart attack.

7.  Carol Stuart is a citizen of the State of Missouri, residing in Kennett, Missouri.  She took Vioxx that was sold by Mitchell Drugs in Kennett, Missouri.  She had a TIA on November 21, 2002 and a stroke at June 9, 2003.  Vioxx caused or was a contributing cause to her stroke.

8.  Patricia Caraker is an individual who is a citizen of the State of Illinois, residing in Vienna, Illinois.  She was sold Vioxx by Dahncke Pharmacy in Vienna, Illinois.  She had a blockage in her artery to her heart and ischemic heart disease.  At the time of the blockage in her heart, she was approximately 51 years old.  Vioxx caused or was a significant contributing cause to her heart disease.

9.  John Gilson, Sr. is an individual who is a citizen of the State of Illinois, residing in Springfield, Illinois.  He was sold Vioxx by CVS Pharmacy in Springfield, Illinois.  In December 2001 he had a stent placed and open heart

surgery in March 2002, as well as blood clots.  At the time of these events, he was
approximately 57 years old.  Vioxx caused or was a significant contributing cause to
his heart condition and blood clots.

10.  Jerry Davis is an individual and citizen of the state of Missouri.  He
resides in Robertsville, Missouri.  He was prescribed Vioxx and was sold it by Wal-
Mart Pharmacy.  He had a heart attack in December 2002.  He was approximately
55 years old when he had the heart attack.  Vioxx caused or was a contributing
cause to his heart attack.

11.  Gerald Henderson is a citizen of the State of Missouri and residing in St.
Louis County, Missouri.  He was sold Vioxx by Walgreens.  He had chest pains,
blood clots, and heart surgery.  Vioxx caused or was a contributing cause to his
heart problems and blood clots.

12.  As more particularly pleaded below, Plaintiff maintains that Vioxx is
defectively designed, inadequately tested, dangerous to human health, and lacked
proper warnings as to the dangers associated with its use.

13.  The Defendant, Merck & Co., Inc. (hereinafter "Merck"), is a corporation
organized and existing under the laws of the State of New Jersey, with its principal
place of business at One Merck Drive, White House Station, New Jersey 08889.

14.  At all times relevant hereto, Defendant Merck was and continues to be
engaged in the business of testing, developing, manufacturing, distributing,
licensing, labeling and marketing, either directly or indirectly through third parties

or related entities, the pharmaceutical drug, Vioxx, in Missouri, Illinois and throughout the United States.

    15.  Defendant Amy Sepko is an employee sales representative of Merck in charge of selling Vioxx for Merck.  She is a citizen of the State of Missouri and resident of St. Louis City.  Defendant Sepko was involved in the distributing, marketing, and selling of Vioxx used to treat arthritis and as a pain reliever.

    16.  Defendant Sherry Alberts is an employee sales representative of Merck in charge of selling Vioxx for Merck.  She is a citizen of the State of Missouri and resident of St. Louis City.  Defendant Alberts was involved in the distributing, marketing, and selling of Vioxx used to treat arthritis and as a pain reliever.

    17.  Defendants John Doe and/or Jane Doe 1-100 are Merck sales representatives in Missouri and Illinois, in charge of selling Vioxx to doctors and hospitals in Missouri and Illinois.  Defendants John Doe and/or Jane Doe 1-100 were involved in the distributing, marketing, and selling of Vioxx used to treat arthritis and as a pain reliever.

    18.  Defendants Sepko, Alberts, and John Doe and/or Jane Doe 1-100, were hired by Merck to promote the use of Vioxx to individual doctors and hospitals in Missouri and Illinois.  In doing so, they engaged in tortious conduct by failing to disclose and/or affirmatively misrepresenting the safety of Vioxx with regard to heart attacks, strokes, and other cardiovascular events to promote the sale and distribution of Vioxx to individuals including the plaintiffs herein.  This included

6



providing samples, entering into formulary agreements, etc., as well as providing

misleading, false and omitting to disclose material facts as alleged below.

## FACTS COMMON TO ALL COUNTS

19.  Vioxx is the brand name of rofecoxib, one of a class of drugs called

"prostaglandins," which work to reduce inflammation and pain by providing

analgesic and anti-inflammatory benefits to persons with, among other conditions,

arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors;

COX enzymes metabolize arachidonic acid to produce prostaglandins.

20.  Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins

at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of

platelet aggregation.

21.  Defendant Merck submitted an Application to Market a New Drug for

Human Use ("NDA") for rofecoxib to the United States Food and Drug

Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and

25 mg, for relief of the signs and symptoms of osteoarthritis, the management of

acute pain, and the treatment of primary dysmenorrhea. This application was

denoted NDA 21-042 by the FDA.

22.  Defendant Merck also submitted an Application to Market a New Drug

for Human Use ("NDA") for rofecoxib to the United States Food and Drug

Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5

mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the



management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

23. On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

24. At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

25. The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

26. Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or



Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study

was performed from January 6, 1999 through March 17, 2000.

27.  The objectives of the VIGOR study were to (1) "determine the relative

risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966

50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and

(2) "study the safety and tolerability of MK-0966 in patients with rheumatoid

arthritis."

28.  In industry-sponsored studies presented at the European United League

Against Rheumatism (EULAR), an organization in which Merck is a member and

corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a

statistically significant increase in hypertension and stroke. Not only did Merck do

nothing to further accurately publish these studies, or warn consumers, but it

denied the results with respect to hypertension in the official publication of the

American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons

Emerge From COX-2 Trials*, in August 2000, page 3.

29.  Merck continued to deny the ill health effects associated with Vioxx while

at the same time reaping profits obtained through its non-disclosure and

concealment. Merck engaged in a massive advertising and sampling program and

gained continued increases in the market share, which enhanced Merck's financial

stability to the detriment of its consumers. As a result of Merck's scheme, it reaped

more than $2 billion in profit in the year 2000 alone, and appropriated

approximately 23 percent share of the market.

9

 

30.  Merck continued to profit from its scheme by withholding information from Plaintiff, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

31.  On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what Merck had concealed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

32.  In the JAMA study, the authors stated that by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic



thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in
thrombotic cardiovascular events.  In a follow-up peer-reviewed study reported in
the Journal of the American College of Cardiology on or about February 6, 2002,
Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2
inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane,
leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M.,
*Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3,
Feb. 6, 2002. This is further supported by studies completed at the University of
Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response
to Thromboxane A2*, Journal of Science, V. 296:539-541, Apr. 19, 2002.

33.  On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the
FDA Division of Drug Marketing, Advertising, and Communications, issued a
"Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant
Merck, relating to "promotional activities and materials for the marketing of Vioxx
(rofecoxib) tablets."

34.  The Warning Letter stated that Defendant Merck had "engaged in a
promotional campaign for Vioxx that minimizes the potentially serious
cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes
Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The
letter further states:

> Specifically, your promotional campaign discounts the
> fact that in the  VIGOR study, patients on Vioxx were
> observed to have a four to five fold increase in myocardial

infarctions (MIs) compared to patients on the comparator
non-steroidal anti-inflammatory drug (NSAID), Naprosyn
(naproxen).

35.  The eight (8) page Warning Letter outlines, in detail, the conduct of

Defendant Merck that supports the FDA's issuance of the Warning Letter, and

makes the following **"Conclusions and Requested Actions:"**

> The promotional activities and materials described above
> minimize the potentially serious Cardiovascular findings
> that were observed in the VIGOR study, minimize the
> Vioxx / Coumadin drug interaction, omit crucial risk
> information associated with Vioxx therapy, contain
> unsubstantiated comparative claims, and promote
> unapproved uses. On December 16, 1999, we also objected
> to your dissemination of promotional materials for Vioxx
> that misrepresented Vioxx's safety profile, contained
> unsubstantiated comparative claims, and lacked fair
> balance.

> Due to the seriousness of these violations, and the fact
> that your violative promotion of Vioxx has continued
> despite our prior written notification regarding similar
> violations, we request that you provide a detailed
> response to the issues raised in this Warning Letter on or
> before October 1,2001.

> This response should contain an action plan that includes
> a comprehensive plan to disseminate corrective messages
> about the issues discussed in this letter to the audiences
> that received these misleading messages. This corrective
> action plan should also include:

> 1.     Immediately ceasing all violative
>         promotional activities, and the dissemination
>         of violative promotional materials for Vioxx.

> 2.     Issuing a "Dear Healthcare provider"
>         letter to correct false or misleading
>         impressions and information. This
>         proposed letter should be submitted to

12



us for review prior to its release. After
agreement is reached on the content
and audience, the letter should be
disseminated by direct mail to all
healthcare providers who were, or
may have been exposed to the
violative promotion.

3.      A written statement of your intent to
comply with "1" and "2" above.

36.  On April 11, 2002, the FDA approved a supplemental application for the

use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the

previously approved indications for osteoarthritis and pain. The FDA also approved

new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling

and the "Dear Doctor" letter contained information concerning the results of the

VIGOR study.

37.  The revised labeling further states that the administration of Vioxx 50

mg, was associated with a higher incidence of gastrointestinal symptoms.

**Clinical Studies in OA and RA with VIOXX 50 mg (Twice the highest
dose recommended for chronic use)**
In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as
well as VIOXX 50 mg, VIOXX 50 mg QD was associated with a higher
incidence of gastrointestinal symptoms (abdominal pain, epigastric pain,
heartburn, nausea and vomiting), lower extremity edema, hypertension,
serious* adverse experiences and discontinuation due to clinical
adverse experiences compared to the recommended chronic doses of
12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

38.  Further, the "Dear Doctor" letter, approved in conjunction with the

revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.



39.  The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

40.  The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

41.  Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal side effects of Vioxx.

42.  Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious gastrointestinal side effects, Defendant Merck has concealed and/or downplayed the dangers associated with Vioxx, and continues to market the drug in the United States and abroad.  In its 2001 Annual Report, for example, Defendant Merck states:

> The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to *Vioxx.* . . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

43.  Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, **VIOXX**, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAIR, drove Merck's performance for the year and

14

created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

"Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. **VIOXX**, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, **VIOXX** has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, **VIOXX** now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. **VIOXX** achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which **VIOXX** reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that **VIOXX** significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

44.  Despite the foregoing, Defendant Merck has continued to represent to

consumers that Vioxx is safe, and that any cardiovascular and/or cardiothrombotic

side effects are not associated with the drug. The Defendant has also downplayed

any potential gastrointestinal side effects of the drug, promoting it as safer and

more efficacious than other medications approved for treatment of similar

conditions.

15

45.  Pursuant to prescriptions received from their treating physician, plaintiffs regularly purchased and ingested Vioxx for various periods of time. Plaintiffs now suffer from heart attacks, strokes, TIAs, coronary artery disease, althersclerosis, blood clots, and other diseases caused by the use of Vioxx.

46.  Vioxx is primarily prescribed to reduce pain from inflammation. However, the defendants failed to conduct sufficient research in manufacturing and marketing Vioxx to determine the severity of the drugs' potential side effects. Defendants also withheld adverse reports, or gave incorrect information about such reports, they had received about side effects such as heart attacks and strokes.  As a result of defendants' failure and the undisclosed defects of Vioxx, plaintiffs have sustained heart attacks, strokes, TIAs, and other ill-effects.

47.  Defendants Walgreens, West Pine Pharmacy, Wal-Mart, CVS Pharmacy, and/or the Medicine Shoppe sold the dangerous and defective drugs to plaintiffs Anderson, Brown, Strittmatter, Buhrow, Gilson, Davis, and/or Henderson and are therefore liable under Missouri and/or Illinois state law.

48.  Defendant Merck & Company, Inc. is a New Jersey corporation with its principal place of business located in New Jersey.  Merck is engaged in the business of producing, marketing and distributing pharmaceutical products for sale to the general public and is the manufacturer of Rofecoxib, distributed under the brand-name Vioxx.  Vioxx conducts business in the State of Missouri, and at all times relevant hereto, it developed, manufactured and sold the pharmaceutical drug Vioxx in the State of Missouri, including through sales representatives who had

16

offices in St. Louis City.  In fact, Merck had a formulary agreement with BJC for BJC to use Vioxx for patients at BJC hospitals over other Cox 2 inhibitors.

49.  Defendant Walgreens Co. is an Illinois corporation with its principal place of business located in Deerfield, Illinois.  Walgreens sold the Vioxx to plaintiffs Anderson, Strittmatter, and to thousands of other individuals in the regular course of its business.

50.  Defendant West Pine Pharmacy is a Missouri fictitious name registration with its principal place of business located on West Pine in St. Louis City.  West Pine Pharmacy sold the Vioxx to Plaintiff Claudia Brown and to other individuals in the regular course of its business.

51.  Defendant The Medicine Shoppe International, Inc. ("Medicine Shoppe") is a Delaware corporation with its principal place of business located in St. Louis, Missouri.  Medicine Shoppe sold the Vioxx to plaintiffs Ronald Strittmatter and Robert Buhrow and to thousands of other individuals in the regular course of its business.

52.  Defendant CVS Pharmacy is a Rhode Island corporation with locations in Missouri and Illinois.  CVS sold Vioxx to plaintiffs John Gilson, Sr. and to others in the regular course of its business.

53.  Defendant Wal-mart Stores, Inc. is a Delaware corporation with its principal place of business in Arkansas.  It sold Vioxx through its pharmacy to Jerry Davis and others in the regular course of its business.

 

## JURISDICTION AND VENUE

54.  Defendants are subject to the *in personam* jurisdiction of this Court, and venue is proper herein, by virtue of the fact that defendants did and/or does business within the state of Missouri and committed torts in whole or in part in this state against plaintiffs, as more fully set forth herein.  Defendants advertised in Missouri and the City of St. Louis, made material omissions and representations in this district, and breached warranties in St. Louis City.

55.  There is no federal subject matter jurisdiction because no federal question is raised and there is no jurisdiction based on diversity of citizenship because some plaintiffs and some defendants are citizens of the same state.

56.  Venue is proper in this Court pursuant to R.S.Mo. §508.010.2 in that defendants Sepko, Albert and West Pine Pharmacy reside in St. Louis City, in addition and in the alternative pursuant to R.S.Mo. §508.010.1 because plaintiffs Arline Anderson, Claudia Brown, and Ronald Strittmatter reside in St. Louis City and defendants Merck, Wal-Mart, Walgreens, Medicine Shoppe, and West Pine Pharmacy may be found in St. Louis City, in addition and in the alternative pursuant to 508.010.6 because certain of the causes of action accrued in the City of St. Louis, because the Vioxx was sold and/or ingested in St. Louis City.

18

## COUNT I

### Strict Products Liability/Defective Design -- Against Merck

Come now plaintiffs and for Count I of their petition against defendant Merck allege:

57. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

58. Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

59. At the time the Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

60. Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendants, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

61. The Vioxx sold to plaintiffs reached plaintiffs without substantial change. Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attack, strokes, transient ischemic accidents, blood clots, and other related illnesses. Plaintiffs ingested the Vioxx without making any changes or alterations.

19

 

62. As a direct and proximate result of the defective and dangerous design of the Vioxx, plaintiffs have been damaged.

63. Defendants' conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

WHEREFORE, plaintiffs demand judgment in their favor and against Merck for:

A. A fair and just amount of actual damages in an amount to be proved at trial;

B. Costs of suit;

C. Pre-judgment and post-judgment interest;

D. Punitive damages in a fair and reasonable amount to punish and deter Merck and others from engaging in the wrongful conduct; and

E. Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT II

### Strict Products Liability/Failure to Warn -- Against Merck

Come now plaintiffs and for Count II of their petition against defendant Merck allege:

64. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

65. The Vioxx manufactured and supplied by Merck was unaccompanied by proper and adequate warnings regarding all adverse side effects associated with the

use of Vioxx, and the comparative severity and duration of the adverse effects.  The

warnings given by Merck did not accurately reflect the symptoms, type, scope or

severity of the side effects.

66.  Merck failed to perform adequate testing and study Vioxx prior to

marketing it or properly analyze and warn based on its VIGOR study.  Such

adequate testing, study or analysis of the VIGOR would have shown that Vioxx

possessed serious life threatening side effects, with respect to which full and proper

warnings accurately and fully reflecting symptoms, type of illness, scope and

severity should have been given with respect to the use of Vioxx.

67.  Merck also failed to act properly on adverse reports it received about

Vioxx, and failed to properly study Vioxx pre-market as well as post market and

analyze and follow up on its VIGOR study as well as other studies.

68.  Merck also failed to effectively warn users and physicians that numerous

other methods of pain relievers, including Ibuprofen, Naproxen, and/or Mobic were

safer.

69.  Merck failed to give adequate post-marketing warnings or instructions

for the use of Vioxx because after Merck knew or should have known of the risk of

injury from Vioxx use, Merck failed to provide adequate warnings to users or

consumers and continued to aggressively promote the product to doctors, hospitals,

and directly to consumers.

 

70.  As a direct and proximate result of defendants' failure to warn of the potentially severe side effects of the Vioxx products, as well as the other conduct mentioned in this Count, plaintiffs have been damaged.

71.  Merck's conduct was done with conscious disregard for safety, justifying an award of punitive damages.

WHEREFORE, plaintiffs demand judgment in their favor and against Merck for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter Merck and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

### COUNT III

### Strict Products Liability/Sale of Defective Product -- Against Walgreens, Medicine Shoppe, Wal-Mart, CVS Pharmacy, and West Pine Pharmacy

Come now plaintiffs and for Count III of their petition against Walgreens, Medicine Shoppe, Wal-Mart, CVS Pharmacy, and West Pine Pharmacy ("the seller defendants") allege:

72. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

73. The Vioxx sold by the seller defendants was defective and unreasonably dangerous when sold, and unaccompanied by proper and adequate warnings regarding all possible adverse side effects associated with the use of Vioxx, and the comparative severity and duration of the adverse effects. The warnings accompanying the Vioxx did not accurately reflect the symptoms, type, scope or severity of the side effects. The seller defendants knew or should have known of these side effects due to the FDA sanctioning Merck for its misleading advertising and Dear Doctor letters Merck was required by the FDA to send.

74. The Vioxx sold to plaintiffs was unaccompanied by a warning to plaintiffs that numerous other methods of pain relievers, including Ibuprofen, Naproxen, Mobic, and/or potentially Celebrex were safer.

75. As a direct and proximate result of the seller defendants selling a defective product, they are strictly liable for the damages the Vioxx caused plaintiffs.

WHEREFORE, plaintiffs demand judgment in their favor and against the seller defendants for:

A. A fair and just amount of actual damages in an amount to be proved at trial;

B. Costs of suit;

C. Pre-judgment and post-judgment interest;

23

D.  Such other and further relief as the Court deems just and proper under

the circumstances.

## COUNT IV

### Negligent Design--Against Merck

Come now plaintiffs and for Count IV of their petition against defendant

Merck allege:

76.  Plaintiffs incorporate all allegations in the preceding paragraphs as if

fully set forth in this Count.

77.  Defendant Merck designed, produced, manufactured and injected into

the stream of commerce, in the regular course of its business, the pharmaceutical

drug Vioxx which it knew would be used by plaintiffs and others.

78.  At the time the Vioxx was manufactured and sold to plaintiffs by Merck,

it was defective in design and unreasonably dangerous, subjecting users to risks of

heart attacks, strokes, blood clots, and other illnesses which exceeded the benefits

of the products, and for which other safer products were available.

79.  Alternatively, when the Vioxx products were manufactured and sold to

plaintiffs by defendants, the products were defective in design and formulation,

making use of the products more dangerous than other drugs for pain relief.

80.  The Vioxx sold to plaintiffs reached plaintiffs without substantial change.

Plaintiffs were unaware of the dangerousness of the products until after their use

and the development of heart attack, strokes, and other related illnesses.  Plaintiffs

ingested the Vioxx without making any changes or alterations.

24

81.  In designing and testing Vioxx, Merck failed to exercise the ordinary care that a careful and prudent drug manufacturer would exercise in the same or similar circumstances.

82.  As a direct and proximate result of the negligent design of the Vioxx, plaintiffs have been damaged.

83.  Defendants' conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

WHEREFORE, plaintiffs demand judgment in their favor and against Merck for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  An award of punitive damages; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

<u>**COUNT V**</u>

<u>**Negligence, Failure to Warn--Against Defendants Merck, Sepko, Alberts and Does 1-100**</u>

Come now plaintiffs and for Count V of their petition against defendants Merck, Sepko, Alberts, and John or Jane Doe 1-100, allege:

84.  Plaintiffs incorporate all allegations in the preceding paragraphs as is fully set forth in this Count.

85.  Defendants owed a duty to warn of any dangerous defects or side effects; a duty to assure their products did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post market surveillence and warnings as it learned of Vioxx's substantial dangers.

86.  Defendants breached their duty of reasonable care to plaintiffs in that defendants failed to:

    a.  Conduct sufficient testing which, if properly performed, would have shown that Vioxx had serious side effects, including heart attacks, strokes, hypertension, althersclorosis, blood clots, and other serious side effects, and warn users of those risks; and/or

    b.  Include adequate warnings with the Vioxx products that would alert users to the potential risks and serious side effects of the drugs; and/or

    c.  Warn plaintiffs that use of Vioxx carried a risk of death or permanent disability from heart attack, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

    d.  Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Vioxx; and/or

    e.  Other appropriate warnings.

87.  Defendants should have know that Vioxx caused unreasonably dangerous risks and serious side effects of which the general public would not be

aware.  Defendants nevertheless advertised, marketed  and promoted their

products knowing there were safer methods and products for pain control.

88.  As a direct and proximate result of defendants' negligence and breaches

of their duty of reasonable care, plaintiffs have been damaged.

WHEREFORE, plaintiffs demand judgment in their favor and against

defendants Merck, Sepko, Alberts, and John or Jane Doe 1-100 for:

A.  A fair and just amount of actual damages in an amount to be proved at

trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter

Merck and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under

the circumstances.

## COUNT VI

### Negligence, Failure to Warn--Against Defendants Walgreens, Wal-Mart, CVS Pharmacy, Wal-Mart, Medicine Shoppe, and West Pine Pharmacy

Come now plaintiffs and for Count VI of their petition against defendants

Walgreens, Medicine Shoppe, Wal-Mart, CVS Pharmacy, and West Pine Pharmacy

("the seller defendants") allege:

89.  Plaintiffs incorporate all allegations in the preceding paragraphs as is

fully set forth in this Count.

90.  The seller defendants owed a duty to warn of any dangerous defects or side effects; a duty to assure the products they sold did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post sale warnings as it learned of Vioxx's substantial dangers.

91.  The seller defendants should have know that Vioxx caused unreasonably dangerous risks and serious side effects of which the general public would not be aware, including but not limited to the FDA sanctions of Merck, the Dear Doctor letters Merck sent to doctors and other health care providers, and the medical literature regarding Vioxx.  The seller defendants nevertheless sold Vioxx without adequate warnings of the dangerousness of Vioxx and knowing that there were safer methods and products for pain control.

92.  The seller defendants breached their duty of reasonable care to plaintiffs in that they failed to:

a.  Warn that Vioxx had serious side effects, including heart attacks, strokes, hypertension, althersclorosis, blood clots, and others, and warn users of those risks which defendants knew or should have known; and/or

b.  Include adequate warnings with the Vioxx products that would alert users to the potential risks and serious side effects of the drugs which defendants knew or should have known of; and/or

c.  Warn plaintiffs that use of Vioxx carried a risk of death or permanent disability from heart attack, strokes, blood clots, and other

28

cardiovascular disorders and other serious side effects which defendants

knew or should have known of; and/or

     d.  Other appropriate warnings.

    93.  As a direct and proximate result of defendants' negligence and breaches

of their duty of reasonable care, plaintiffs have been damaged.

    WHEREFORE, plaintiffs demand judgment in their favor and against the

seller defendants for:

    A.  A fair and just amount of actual damages in an amount to be proved at

trial;

    B.  Costs of suit;

    C.  Pre-judgment and post-judgment interest;

    D.  Such other and further relief as the Court deems just and proper under

the circumstances.

### COUNT VII

#### Deceptive Trade Practices Acts–
#### Against Merck, Sepko, Alberts, John or Jane Doe 1-100

    Come now plaintiffs and for Count VII of their petition against defendants

Merck, Sepko, Alberts, and John or Jane Doe 1-100 allege:

    94.  Plaintiffs incorporate all allegations in the preceding paragraphs as if

fully set forth in this Count.

    95.  Plaintiffs bring this action pursuant to R.S.Mo. §407.010 et seq. (The

Missouri Merchandising Practices Act) and 815 ILCS 505, et seq. (The Illinois

Consumer Fraud and Deceptive Practices Act), in that they purchased and used Vioxx for their personal use and thereby suffered ascertainable loss as a result of defendants' actions in violation of the Missouri and Illinois consumer protection statutes.

96.  Unfair or deceptive acts or practices are defined and declared unlawful in the Missouri and Illinois.  The unfair or deceptive acts or practices as defined in the statute include, "the use of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact . . . in the conduct of any trade or commerce."

97.  Defendants violated these subsections of the Acts by their use of false and misleading misrepresentations or omissions of material fact in connection with the sale of Vioxx.  Defendants communicated the purported benefits of Vioxx, while failing to disclose the serious and dangerous side effects related to the use of defendants' products, and in fact actually concealing questions from health care providers regarding the adverse cardiovascular effects of Vioxx.

98.  In this regard, Merck, including but not limited to, created a "dodgeball Vioxx" training package for its sales force, which instructed the individual defendants named in this count to duck doctors and health care providers' questions about Vioxx's possible side effects.  The individuals named in this court followed Merck's instructions and concealed, omitted, and suppressed these material facts when making sales calls to health care providers.

30

99.  As a result of violating the Missouri and Illinois consumer fraud statutes, defendants are liable to plaintiffs for actual damages, costs and reasonable attorneys' fees, and for such additional relief as the Court may deem appropriate.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Merck, Sepko, Alberts, and John or Jane Does 1-100 for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter Merck and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT VIII

### Negligent Misrepresentation–against defendants Merck, Sepko, Alberts, and John or Jane Doe 1-100

Come now plaintiffs and for Count VIII of their petition against defendants Merck, Sepko, Alberts, John or Jane Doe 1-100, allege:

100.  Plaintiffs reallege the allegations in the preceding paragraphs as if fully set out herein.

101.  Defendants misrepresented to plaintiffs and/or their treating physicians the potential serious cardiovascular findings that were observed in the VIGOR

31

study, minimized the Vioxx/Coumadin drug interaction, omitted crucial risk information associated with Vioxx, misrepresented Vioxx safety profile and represented that Vioxx was safe, and that any cardiovascular and/or cardio thrombotic side effects were not associated with the drug.

102.  These representations were made with the actual knowledge of Merck and the other individual defendants named in this count.

103.  The representations set forth *supra* were material to plaintiffs and/or their treating physicians to prescribe and maintain plaintiffs' prescription of Vioxx.

104.  The representations were made either without knowing of the truth or falsity of the representations or knew or should have known that the representations being made were false and, therefore, all defendants failed to exercise reasonable care in making the representations in the scope and course of their employment in marketing Vioxx to individual consumers, plaintiffs' treating physicians, hospitals, and other health care providers.

105.  The defendants intended for plaintiffs and/or their treating physicians to rely upon the material misrepresentations to induce them to initially prescribe Vioxx and continue plaintiffs on Vioxx.

106.  Plaintiffs justifiably relied on the representations which were made directly to them or made to their treating physicians, with defendants knowing that plaintiffs were in a limited group who defendants knew would rely upon the information.

107.  As a direct result of defendants' negligent misrepresentation, personal injuries and actual damages in an amount to be proved at trial.  The negligent misrepresentations caused or contributed to cause plaintiffs' damages.

WHEREFORE, plaintiffs pray for a judgment against defendants Merck, Sepko, Alberts, and John or Jane Doe 1-100 jointly and severally for:

A.  Actual and compensatory damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre and post judgment interest; and

D.  Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT IX

**Fraudulent Omission/Concealment–defendants Merck, Sepko, Alberts, and John or Jane Doe 1-100**

Come now plaintiffs and for Count IX of their petition against defendants Merck, Sepko, Alberts, and John or Jane Doe 1-100 allege:

108.  Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

109.  Defendants had actual knowledge of the cardiothrombotic effects of Vioxx.  Despite having knowledge of the cardiothrombotic effects of Vioxx, defendants jointly engaged in a pattern and conduct of actively concealing and omitting to disclose those effects when marketing Vioxx to doctors, health care providers, and to the general public for direct advertisements.

110.  At the time these omissions were made, defendants had knowledge of the substantial and significant cardiothrombotic effects of Vioxx.

111.  Defendants omitted to inform plaintiffs of the true cardiothrombotic and other adverse health effects of Vioxx.  They further downplayed the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set forth in the VIGOR study, they withheld adverse reports or gave incorrect information about the reports they received about the side effects of Vioxx such as heart attacks and strokes.  They further instructed and had a training manual for their sales force to dodge and mislead doctors when they asked questions about the cardiothrombotic effects of Vioxx.

112.  Defendants' failure to disclose material facts constituted fraudulent concealment.  Each of the defendants sanctioned approved and/or participated in the failure to disclose.

113.  Defendants had a duty to speak because they had superior knowledge regarding the adverse health effects of Vioxx as set forth herein.

114.  The information not disclosed by defendants was unavailable to plaintiffs and/or their treating health care professionals.  Defendants knew the information was unavailable yet approved and participated in instructing their agents, servants and employees to not disclose this information in order to promote the sales of Vioxx over other Cox 2 inhibitors as well as any non-steroidal anti-inflammatory such as Ibuprofen, Naproxin, and combined Cox 1 and Cox 2 inhibitors such as Mobic.

34

115.  Plaintiffs were diligent in attempting to seek the information by consulting with their physicians.

116.  The information not disclosed by defendants was not within the reasonable reach of plaintiffs and/or their treating physicians and was not discoverable by plaintiffs and/or their treating physicians in the exercise of reasonable care.

117.  The non-disclosed information was material, defendants knew they were not disclosing complete information and intended that plaintiffs and/or their treating physicians act upon the non-disclosed information in the manner reasonably contemplated.

118.  Plaintiffs and/or their treating physicians were ignorant as to the undisclosed information and had a right to rely on full disclosure.

119.  If plaintiffs and/or their treating physicians had known the complete information, they would not have prescribed and/or plaintiffs would not have taken Vioxx as evidenced by Merck withdrawing it from the market in September 2004.

120.  Defendants' non-disclosure of information was outrageous due to their evil motive or reckless indifference to the rights of plaintiffs, justifying an award of punitive damages.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Merck, Sepko, Alberts, and John or Jane Does 1-100 for:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter

Merck and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under

the circumstances.

## COUNT X

### Common Law Fraud--
### Against Merck, Sepko, Alberts, John or Jane Does 1-100

Come now plaintiffs and for Count X against Merck, Sepko, Alberts, and

John or Jane Doe 1-100 allege:

121.  Plaintiffs incorporate all allegations in the preceding paragraphs as if

fully set forth in this Count.

122.  Defendants, at all relevant times, made false representations and

omissions to plaintiffs and other members of the public, including but not limited

to, that Vioxx was safe, had been adequately tested to determine safety, and did not

present life-threatening dangers.

123.  These representations and omissions, as set forth in the above

paragraphs, were false. The true facts were that Vioxx were not safe, had not been

adequately tested, and had dangerous and life-threatening side effects.

When defendants made the representations, they knew them to be false, and said

representations were made by defendants with the intent to deceive plaintiffs

36

and/or their prescribing physicians and with the intent to induce plaintiffs to use the Vioxx manufactured by defendants.

124.  Plaintiffs and/or their physicians reasonably relying upon the false representations and omissions, plaintiffs' physicians prescribed Vioxx, plaintiffs used Vioxx.  Plaintiffs would not have done so if they had known the true facts.  In using Vioxx, plaintiffs exercised ordinary care.

125. As a direct and proximate result of the aforesaid fraudulent conduct, defendants caused plaintiffs to suffer the damages and injuries herein alleged.

126.  Defendants' conduct was outrageous due to their evil motive or reckless indifference to the rights of plaintiffs, justifying an award of punitive damages.

WHEREFORE, plaintiffs demand judgment in their favor and against defendants Merck, Sepko, Alberts, John or Jane Does 1-100:

A.  A fair and just amount of actual damages in an amount to be proved at trial;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter Merck and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

## COUNT XI

### Breach of Warranty--Against Walgreens, Medicine Shoppe, Wal-Mart, CVS Pharmacy, and West Pine Pharmacy

Come now plaintiffs and for Count XI of their petition against defendants Walgreens, Wal-Mart, Medicine Shoppe, CVS Pharmacy, and West Pine Pharmacy ("the seller defendants") allege:

127.  Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

128.  Plaintiffs purchased the defective and dangerous Vioxx drugs from the seller defendants pursuant to prescriptions from their physicians.

129.  In selling Vioxx to plaintiffs, the seller defendants expressly and impliedly warranted that Vioxx was safe for its intended use, was free from manufacturing or production defects, and would perform as indicated.  The seller defendants also expressly and impliedly warranted that Vioxx caused no side effects other than those listed in their package insert.

130.  The seller defendants breached these warranties by selling to plaintiffs Vioxx that was not of merchantable quality, was unsafe and whose potential side effects were substantially untested.

131.  As a direct and proximate result of the seller defendants' breaches of express and implied warranties, plaintiffs have been damaged.

WHEREFORE, plaintiffs demand judgment in their favor and against the seller defendants for:

38

Anderson et al v. Merck & Co., Inc. et al   Case:  4:05-cv-00089-CEJ      File Date: 01/20/2005      Doc #: 1.3      p: 39 of 39

A. Actual and compensatory damages in an amount to be proved at trial;

B. Costs of suit;

C. Pre and post judgment interest; and

D. Such other and further relief as the Court deems just and proper under

the circumstances.

JEFFREY J. LOWE, PC


By: _____

Jeffrey J. Lowe               #35114
Francis J. ("Casey") Flynn
Attorney for Plaintiff
8235 Forsyth, Suite 1100
St. Louis, Missouri 63105
(314) 678-3400
Fax: (314) 678-3401

Joseph P. Danis
CAREY & DANIS, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis MO 63105
Telephone: 314-725-7700
Facsimile: 314-721-0905

Evan Buxner
Walther Glenn Law Offices
1034 S. Brentwood Blvd., Suite 1300
St. Louis, MO 63117
314-725-9595
Fax: 314-725-9597