# EXHIBIT 3

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4

 5    IN RE: VIOXX PRODUCTS              *
      LIABILITY LITIGATION               *   MDL DOCKET NO. 1657
 6                                       *
                                         *
 7    THIS DOCUMENT RELATES TO           *   HOUSTON, TEXAS
      CASE NO. 05-4046:                  *
 8                                       *
      EVELYN IRVIN PLUNKETT, ET AL       *   DECEMBER 6, 2005
 9                                       *
      VERSUS                             *
10                                       *   8:30 A.M.
      MERCK & CO., INC.                  *
11    * * * * * * * * * * * * * * * *

12

13                           VOLUME VII
                       JURY TRIAL BEFORE THE
14                   HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
15

16
      APPEARANCES:
17

18    FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                    PORTIS & MILES
19                                BY:  JERE LOCKE BEASLEY, ESQ.
                                       ANDY D. BIRCHFELD, JR., ESQ.
20                                     LEIGH O'DELL, ESQ.
                                       J. PAUL SIZEMORE, ESQ.
21                                     FRANK WOODSON, ESQ.
                                  234 COMMERCE STREET
22                                POST OFFICE BOX 4160
                                  MONTGOMERY, ALABAMA 36103
23

24    FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                  BY:  MARK P. ROBINSON, JR., ESQ.
25                                620 NEWPORT CENTER DRIVE
                                  NEWPORT BEACH, CALIFORNIA 92660
```

Page 1656

1  E-MAIL EARLIER THIS AFTERNOON. WHAT DID YOU UNDERSTAND
2  DR. MORRISON'S POSITION TO BE ON THIS QUESTION OF WHETHER OR
3  NOT TO ALLOW LOW-DOSE ASPIRIN IN THE TRIAL?
4  A.  HE THOUGHT WE SHOULD ALLOW LOW-DOSE ASPIRIN IN THE STUDY.
5  Q.  DOES HE COMMUNICATE THAT IN HIS E-MAIL HERE?
6  A.  HE DOES, WITH A LITTLE BIT OF EXAGGERATION.
7  Q.  WHAT DID YOU UNDERSTAND DR. MORRISON TO BE COMMUNICATING
8  TO THE TEAM WHEN HE WRITES: "WOULD ALLOW LOW-DOSE ASPIRIN. I
9  KNOW THIS HAS BEEN DISCUSSED TO DEATH, BUT REAL WORLD IS
10 EVERYONE IS ON IT, SO WHY EXCLUDE, AND WITHOUT COX-1 INHIBITION
11 YOU WILL GET MORE THROMBOTIC EVENTS AND KILL DRUG." WHAT DID
12 YOU UNDERSTAND THAT TO MEAN WHEN YOU RECEIVED THIS E-MAIL?
13 A.  THAT HE ALSO WAS CONCERNED THAT YOU WOULD HAVE A DECREASED
14 NUMBER OF EVENTS ON THE NSAID, WHICH HAS COX-1 INHIBITION;
15 VIOXX WOULD BE NEUTRAL; AND THAT, WITHOUT A PLACEBO, PEOPLE
16 WOULD MISINTERPRET THE HIGHER RATE ON VIOXX AS BEING THAT VIOXX
17 INCREASED THE RATE, EVEN THOUGH THE REAL REASON WAS THAT THE
18 NSAIDS DECREASED THE RATE. BUT WITHOUT A PLACEBO, IT WOULD BE
19 DIFFICULT TO TELL.
20 Q.  WHERE DID YOU FALL ON THIS QUESTION? WE ARE NOW LOOKING
21 AT YOUR E-MAIL. WE KNOW DR. MORRISON'S VIEW WAS HE WOULD ALLOW
22 ASPIRIN. WHAT WAS YOUR VIEW WHEN YOU WERE CONSIDERING THIS
23 ISSUE IN FEBRUARY '97?
24 A.  I WAS REALLY ON THE FENCE. I WASN'T SURE WHAT THE RIGHT
25 THING TO DO WAS.

Page 1657

1  Q.  DO YOU COMMUNICATE THAT FENCE-SITTING VIEW IN YOUR E-MAIL
2  BACK TO THE TEAM?
3  A.  I DO WHEN I SAY, "I THINK THIS IS A NO-WIN SITUATION."
4  Q.  WHAT ABOUT THE SITUATION DID YOU THINK WAS A NO-WIN
5  PROPOSITION?
6  A.  WELL, I GO THROUGH EVERYTHING THAT I'VE LAID OUT. I SAY,
7  "THE RELATIVE RISK OF EVEN LOW-DOSE ASPIRIN MAY BE AS HIGH AS
8  TWO TO FOUR-FOLD." I'M TALKING ABOUT GI BLEEDING, THAT LOW
9  DOSE ASPIRIN ITSELF CAN CAUSE GI BLEEDING. "YET THE
10 POSSIBILITY OF INCREASED CV EVENTS IS OF GREAT CONCERN," AND
11 WHAT I'M TALKING ABOUT THERE IS THE DIFFERENCE THAT YOU WOULD
12 SEE IF THE NSAID ACTED AS A CARDIOPROTECTIVE AGENT.
13 Q.  THEN YOU GO ON TO SAY, "I JUST CAN'T WAIT TO BE THE ONE TO
14 PRESENT THOSE RESULTS TO SENIOR MANAGEMENT." WHAT WERE YOU
15 REFERRING TO THERE?
16 A.  WELL, WE WOULD DO THIS LARGE STUDY AND YOU WOULD SEE THIS
17 DIFFERENCE IN CARDIOVASCULAR EVENTS AND, WITHOUT A PLACEBO, HOW
18 COULD YOU BE SURE THAT THE TRADITIONAL OLDER DRUGS WERE
19 ACTUALLY BEING CARDIOPROTECTIVE VERSUS THIS NEWER DRUG ACTUALLY
20 CAUSING MORE EVENTS. EVEN THOUGH THERE WAS NO SCIENCE AT THAT
21 TIME TO SUPPORT THAT, I WAS CONCERNED THAT THE DATA WOULD BE
22 MISINTERPRETED.
23 Q.  DOCTOR, AT THIS TIME BACK IN FEBRUARY '97, WERE YOU AWARE
24 OF ANY MEDICAL LITERATURE THAT EVEN SUGGESTED A THEORETICAL
25 RISK TO THE CARDIOVASCULAR SYSTEM FROM COX-2 INHIBITION?

Page 1658

1  A.  NO.
2  Q.  HAVE YOU HEARD OF THE FITZGERALD HYPOTHESIS?
3  A.  I HAVE HEARD OF THE FITZGERALD HYPOTHESIS, DEFINITELY.
4  Q.  HAD THE FITZGERALD HYPOTHESIS EVEN BEEN ARTICULATED BY
5  FEBRUARY 1997?
6  A.  NO. WE DIDN'T FIND THAT OUT UNTIL MANY MONTHS LATER.
7  Q.  I THINK YOU TOLD THE JURY EARLIER THAT YOU PARTICIPATED IN
8  THE DESIGN OF THE VIGOR TRIAL?
9  A.  THAT'S CORRECT.
10 Q.  WHAT WAS THE PROTOCOL THAT YOU HELPED PUT TOGETHER FOR
11 VIGOR?
12 A.  YOU'LL HAVE TO EXPLAIN YOUR QUESTION TO ME.
13 Q.  DOSE, PATIENT POPULATION, DURATION OF USE, THAT KIND OF
14 THING.
15 A.  IT WAS A STUDY THAT WAS DONE IN PATIENTS WITH RHEUMATOID
16 ARTHRITIS, WHICH IS A SEVERE ARTHRITIS DISEASE. WE WERE
17 STUDYING PATIENTS ON 50 MILLIGRAMS OF VIOXX, 4,000 PATIENTS ON
18 50 MILLIGRAMS OF VIOXX. 50 MILLIGRAMS IS TWO TIMES THE DOSE
19 THAT WAS RECOMMENDED FOR CHRONIC USE. THAT WAS IN COMPARISON
20 TO 4,000 PATIENTS ON NAPROXEN AT A DOSE OF 500 MILLIGRAMS TWICE
21 A DAY. THAT'S THE MOST COMMONLY USED DOSE FOR THE TREATMENT OF
22 RHEUMATOID ARTHRITIS. PATIENTS WERE ON STUDY DRUG FOR UP TO 13
23 MONTHS IN THIS STUDY, THE AVERAGE ENDED UP BEING ABOUT NINE
24 MONTHS. WE DID NOT ALLOW PATIENTS WHO WERE ON ASPIRIN TO BE IN
25 THE STUDY.

Page 1659

1  Q.  WAS THE FDA INVOLVED AT ALL IN THE REVIEW OF THE PROTOCOL
2  FOR THE VIGOR STUDY?
3  A.  YES. WE SENT THE PROTOCOL DOWN TO THE FDA AND MET WITH
4  THEM TO DISCUSS IT, AND ONE OF THE STEERING COMMITTEE MEMBERS
5  ALSO CAME WITH US.
6  Q.  DID THE FDA HAVE ANY CRITICISMS ABOUT THE DESIGN OF THE
7  STUDY THAT WASN'T ULTIMATELY IMPLEMENTED IN THE PROTOCOL
8  ITSELF?
9  A.  I DON'T KNOW IF I CAN DESCRIBE THEM AS "CRITICISMS." WE
10 CERTAINLY HAD OPEN DISCUSSIONS ABOUT THE STUDY. I THINK THEY
11 WERE INTERESTED IN OUR SECONDARY ENDPOINT, WHICH WAS LOOKING AT
12 KIND OF THE MORE SEVERE LIFE-THREATENING GI SYMPTOMS. WE
13 TALKED ABOUT WHETHER ASPIRIN SHOULD OR SHOULD NOT BE ALLOWED IN
14 THE PROTOCOL. WE TALKED ABOUT THE DOSE OF VIOXX THAT WOULD BE
15 IN THE PROTOCOL.
16 Q.  AT SOME POINT MERCK RECEIVED THE RESULTS OF THAT STUDY; IS
17 THAT CORRECT?
18 A.  THAT IS CORRECT. IN MARCH OF 2000.
19 Q.  WERE YOU ONE OF THE FIRST AT MERCK TO RECEIVE THE
20 UNBLINDED RESULTS OF THE TRIAL?
21 A.  YES, THAT IS CORRECT.
22 Q.  I THINK A LOT OF FOLKS HAVE HEARD THIS TERM, "BLINDED
23 TRIAL." WHAT IS A BLINDED TRIAL?
24 A.  WELL, "BLINDED" MEANS YOU DON'T KNOW WHAT TREATMENT GROUP
25 YOU ARE ON. SO WHEN YOU DO A DOUBLE-BLIND TRIAL, THAT MEANS

53 (Pages 1656 to 1659)

ff147213-239a-4359-81c3-ecc5412a5939

Page 1660

1  THE PATIENT DOESN'T KNOW WHAT STUDY DRUG THEY ARE GETTING AND
2  THE PHYSICIAN WHO IS TREATING THEM DOESN'T KNOW WHAT STUDY DRUG
3  THEY ARE GETTING. THEN WE TALK ABOUT IN-HOUSE BLINDING, WHICH
4  MEANS THAT THOSE PEOPLE WHO ARE WORKING ON THE STUDY WITHIN THE
5  COMPANY SPONSORING THIS, IF THERE'S A SPONSOR, ALSO DON'T KNOW
6  WHAT TREATMENTS THE PATIENTS ARE GETTING.
7  Q. SO WERE YOU AWARE AT ANY TIME PRIOR TO MARCH OF 2000 WHAT
8  THE UNBLINDED RESULTS OF THE VIGOR TRIAL HAD SHOWN?
9  A. NO, I DID NOT KNOW THE UNBLINDED RESULTS.
10 Q. WAS THERE ANY --
11 A. "UNBLINDED" MEANING WHAT ARE THE RESULTS IN ONE TREATMENT
12 GROUP VERSUS THE OTHER TREATMENT GROUP. I WAS NOT AWARE OF
13 THOSE.
14 Q. WAS THERE A GROUP OF FOLKS WHO WERE LOOKING AT THE INTERIM
15 RESULTS OF THE TRIAL, MONITORING THE SAFETY OF THE PATIENTS WHO
16 WERE IN THE TRIAL?
17 A. WE HAD SET UP SEVERAL COMMITTEES FOR THIS STUDY, AND ONE
18 OF THOSE WAS WHAT WE CALLED THE DATA SAFETY MONITORING BOARD,
19 DSMB. IT WAS AN EXTERNAL GROUP OF EXPERTS -- PHYSICIANS,
20 STATISTICIANS, EPIDEMIOLOGISTS -- WHO WOULD FOLLOW THE
21 UNBLINDED SAFETY DATA AS THE STUDY WAS GOING ON.
22     THIS PARTICULAR DSMB ELECTED TO LOOK AT THOSE
23 UNBLINDED STUDY RESULTS AS TREATMENT A AND TREATMENT B. THEY
24 DIDN'T KNOW, BUT THEY COULD SURMISE WHAT TREATMENT A OR
25 TREATMENT B WAS.

Page 1661

1  Q. DOES THE DSMB HAVE THE POWER TO RECOMMEND THE TERMINATION
2  OF A CLINICAL TRIAL?
3  A. YES. THEY WOULD HAVE MADE THAT RECOMMENDATION TO THE
4  ADVISORY COMMITTEE OR THE STEERING COMMITTEE, WHO THEN WOULD
5  HAVE IMPLEMENTED THE RECOMMENDATION.
6  Q. DID ANYONE AT MERCK HAVE A RIGHT TO VOTE WITHIN THE DSMB
7  TO KEEP THE TRIAL GOING OR TO TERMINATE IT?
8  A. NO. THERE WAS ONE MEMBER FROM MERCK, WHAT WE CALLED THE
9  UNBLINDED STATISTICIAN, DEBORAH SHAPIRO. SHE WOULD DO THE
10 ANALYSES AND REPORT TO THEM, TO THE DATA SAFETY MONITORING
11 BOARD, BUT SHE WAS NOT ALLOWED TO VOTE. ONCE SHE BECAME
12 UNBLINDED TO THE RESULTS, SHE REALLY COULDN'T HAVE INTERACTIONS
13 WITH THE REST OF US ON THE TEAM.
14 Q. DID AT ANY TIME THE DATA SAFETY MONITORING BOARD FOR THE
15 VIGOR TRIAL RECOMMEND TERMINATION OF THE STUDY?
16 A. NO, THEY DID NOT.
17 Q. NOW, WE TALKED ABOUT THE FACT THAT THE RESULTS WERE
18 RECEIVED IN MARCH OF 2000; IS THAT CORRECT?
19 A. I BELIEVE IT WAS MARCH 9, 2000.
20 Q. WHAT DO YOU RECALL THE RESULTS WERE?
21 A. IT WAS A VERY CLEAR AND SIGNIFICANT DECREASE IN SERIOUS
22 GASTROINTESTINAL SIDE EFFECTS IN PATIENTS TAKING VIOXX COMPARED
23 WITH NAPROXEN. THAT WAS SEEN NOT ONLY FOR THE PRIMARY
24 ENDPOINT, BUT ALSO FOR THAT SECOND ENDPOINT THAT I TOLD YOU THE
25 FDA WAS INTERESTED IN FOR THE MORE LIFE-THREATENING SERIOUS GI

Page 1662

1  SIDE EFFECTS. IN ADDITION, THERE WAS AN IMBALANCE IN THE
2  NUMBER OF CARDIOVASCULAR EVENTS, SERIOUS CARDIOVASCULAR EVENTS,
3  ON VIOXX VERSUS NAPROXEN, WITH MORE HEART ATTACKS ON VIOXX
4  COMPARED WITH NAPROXEN.
5  Q. WHAT WAS YOUR REACTION TO THE DATA WHEN YOU RECEIVED IT?
6  A. WELL, I WAS VERY PLEASED WITH THE GI RESULTS. I DON'T
7  THINK I WAS SURPRISED BY THOSE. I REALLY DID BELIEVE THOSE
8  WERE THE RESULTS WE WOULD GET. I WAS QUITE CONCERNED ABOUT THE
9  CARDIOVASCULAR RESULTS.
10 Q. PRIOR TO THAT POINT WHEN THE VIGOR DATA WAS UNBLINDED IN
11 MARCH OF 2000, WERE YOU FAMILIAR WITH WHAT THE ONGOING CLINICAL
12 TRIALS FOR VIOXX HAD SHOWN WITH RESPECT TO CARDIOVASCULAR
13 SAFETY?
14 A. I KNEW OUR PHASE IIB/III DATA WAS A LARGE DATABASE AND WE
15 HAD SPECIFICALLY LOOKED AT CARDIOVASCULAR SAFETY IN THOSE
16 STUDIES, AND WE HAD SHOWN THERE WAS NO DIFFERENCE BETWEEN VIOXX
17 AND PLACEBO, THE SUGAR PILL -- ALTHOUGH THAT DATASET WAS PRETTY
18 LIMITED -- OR VIOXX AND THE COMPARATOR NONSELECTIVE NSAIDS,
19 WHICH WERE IN THAT CASE MAINLY IBUPROFEN AND DICLOFENAC AND
20 ADVIL AND VOLTAREN.
21 Q. HAD THERE BEEN ANY SIGNAL IN THE CLINICAL TRIALS UP UNTIL
22 THAT POINT?
23 A. NO, THERE HAD NOT.
24 Q. HAD BLOOD CLOT, THROMBOEMBOLIC CARDIOVASCULAR EVENTS BEEN
25 ANALYZED UP UNTIL THAT TIME?

Page 1663

1  A. WE HAD, PRIOR TO SENDING IN THE INITIAL NEW DRUG
2  APPLICATION, DONE A SPECIFIC ANALYSIS LOOKING AT THE
3  CARDIOVASCULAR SAFETY IN PATIENTS ON VIOXX COMPARED WITH THE
4  COMPARATOR NSAIDS AND THE RATES WERE SIMILAR.
5  Q. DID MERCK SHARE THE RESULTS OF THE UNBLINDED VIGOR DATA
6  WITH THE FDA?
7  A. YES, WE DID.
8  Q. DO YOU RECALL HOW SOON AFTER YOU FIRST LEARNED OF THE
9  RESULTS WAS THE FDA NOTIFIED?
10 A. FOURTEEN DAYS.
11 Q. I'M GOING TO ASK YOU TO LOOK AT EXHIBIT DX116. CAN YOU
12 IDENTIFY THAT?
13 A. I THINK THIS WAS THE DOCUMENT THAT WE SENT DOWN TO THE FDA
14 OUTLINING THE PRELIMINARY RESULTS FROM THE VIGOR STUDY. THIS
15 WAS NOT FINAL DATA, BUT THE PRELIMINARY DATA THAT WE HAD
16 REVIEWED ON MARCH 9.
17 Q. JUST SO WE ARE CLEAR ON THE CHRONOLOGY, THE DATA WAS FIRST
18 UNBLINDED TO MERCK ON MARCH 9, I BELIEVE; IS THAT CORRECT?
19 A. THAT'S CORRECT.
20 Q. THERE WAS STILL ANALYSES GOING ON OF THE DATA?
21 A. THAT IS CORRECT.
22 Q. YOU FOLKS SENT DOWN THE PRELIMINARY RESULTS TO THE FDA; IS
23 THAT CORRECT?
24 A. THAT IS CORRECT.
25     MR. ISMAIL: YOUR HONOR, WE MOVE THE ADMISSION OF

54 (Pages 1660 to 1663)

ff147213-239a-4359-81c3-ecc5412a5939

M009217704