UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX | * |
|     Products Liability Litigation | * |
| | * |
| This Document Relates to: | *  MDL No. 1657 |
| | * |
| | *  SECTION L |
|     PHILIP DAWSON, Plaintiff, | * |
| | *  JUDGE ELDON E. FALLON |
|    versus | * |
| | *  MAGISTRATE JUDGE |
|     MERCK & CO., INC., Defendant, | *  KNOWLES |
| | * |
|     Case No. 07-1259, | * |
| | * |
|           & | * |
| | * |
|     TIMOTHY R. WATSON, Plaintiff, | * |
| | * |
|    versus | * |
| | * |
|     MERCK & CO., INC., Defendant, | * |
| | * |
|     Case No. 05-5545. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
\*
\*
\*
\*

**MEMORANDUM IN SUPPORT OF RENEWED
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

BACKGROUND ............................................................................................................. 3

    A.    The Withdrawal Of Vioxx From The Market And The Ensuing Media
        Blitz. ............................................................................................................... 3

        1.    Kentucky ................................................................................................ 9

        2.    Tennessee ............................................................................................. 10

    B.    The Plaintiffs Addressed By This Motion ....................................................... 11

        1.    Kentucky .............................................................................................. 11

        2.    Tennessee ............................................................................................. 11

    C.    The *Cain* Class Action ................................................................................... 11

STANDARD FOR SUMMARY JUDGMENT .......................................................... 13

ARGUMENT ............................................................................................................... 13

I.      PLAINTIFF WATSON'S CLAIMS FAIL UNDER APPLICABLE LAW ................... 13

    A.    Louisiana Choice-of-Law Rules Apply To Plaintiff Watson's Claims. .............. 13

    B.    Plaintiff Watson's Claims Are Barred Under Louisiana Law ........................... 15

        1.    Based On Indisputable Facts, Plaintiff's Claims Accrued No Later
                Than September 30, 2004 As A Matter Of Law .................................... 15

        2.    Based On Indisputable Facts And Plaintiff's Own Allegations,
                Merck's Alleged Fraudulent Concealment Could Only Toll The
                Limitations Period To September 30, 2004 – At The Latest ................... 17

        3.    Plaintiff's Claims Are Not Saved By *American Pipe* Tolling ................ 19

            a.    The Origin And Purpose Of The *American Pipe* Doctrine ......... 19

            b.    Applying *American Pipe* Tolling ................................................ 22

            c.    *American Pipe* in Diversity Cases ............................................. 24

            d.    Plaintiff's Claims Are Stale Under Louisiana Law
                 Notwithstanding *American Pipe* ................................................ 29

        4.    Plaintiff's Other Claims Are Similarly Time-Barred Under
                Louisiana Law ..................................................................................... 33

    C.    Plaintiff Watson's Claims Are Also Time-Barred Under Kentucky Law. .......... 33

        1.    Under Kentucky's Discovery Rule, Plaintiff Watson's Claims
                Became Stale – At The Latest – One Year After The Date Vioxx
                Was Withdrawn From The Market ....................................................... 33

        2.    Plaintiff's Claims Are Not Subject To Tolling Under The
                Fraudulent Concealment Doctrine ....................................................... 36

        3.    *American Pipe* Tolling Does Not Extend The Life Of Plaintiff's
                Claims .................................................................................................. 36

**TABLE OF CONTENTS**
(continued)

   4. Plaintiff Watson's Other Claims Are Similarly Barred .......................... 38

II. PLAINTIFF DAWSON'S CLAIMS ARE BARRED UNDER TENNESSEE LAW.................................................................................................................. 41

 A. Tennessee Choice-of-Law Rules Govern Plaintiff Dawson's Claims. .............. 41

 B. Plaintiff Dawson's Claims Fail Under Tennessee Law...................................... 41

   1. Under Tennessee Law, The Discovery Rule Was Triggered – At The Latest – By The Media Coverage Following The Withdrawal Of Vioxx.................................................................................................... 42

   2. Plaintiff's Claims Were Not Tolled By Fraudulent Concealment........... 44

   3. Plaintiff's Claims Are Not Saved By *American Pipe* Tolling................ 45

   4. Plaintiff Dawson's Other Claims Are Also Barred ............................... 45

CONCLUSION ............................................................................................................... 46

# TABLE OF AUTHORITIES

Page

**Cases**

*American Pipe & Construction Co. v. Utah,*
    414 U.S. 538 (1974) ...................................................................................... 19, 20, 28, 31

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .............................................................................................. 12

*Andrews v. Orr,*
    851 F.2d 146 (6th Cir.1988)................................................................................... 24

*Armstrong v. Martin Marietta Corp.,*
    138 F.3d 1374 (11th Cir. 1998).............................................................................. 32

*Ball v. Union Carbide Corp.,*
    376 F.3d 554 (6th Cir. 2004)............................................................................. 43, 44

*Barela v. Showa Denko K.K.,*
    No. 93-1469 LH/RLP, 1996 U.S. Dist. LEXIS 7830 (D.N.M. Feb. 28, 1996)................ 27, 37

*Basch v. Ground Round, Inc.,*
    139 F.3d 6 (1st Cir.1998)....................................................................................... 24

*Bd. of Regents v. Tomanio,*
    446 U.S. 478 (1980) .............................................................................................. 25

*Bell v. Goforth,*
    No. M2004-00997-COA-R3-CV, 2006 WL 627189 (Tenn. Ct. App. Mar. 14, 2006) ........... 44

*Blanton v. Cooper Indus.,*
    99 F. Supp. 2d 797 (E.D. Ky. 2000)................................................................... 34, 35, 36

*Boone v. Citigroup, Inc.,*
    416 F.3d 382 (5th Cir. 2005)................................................................................... 25

*Bunge Corp. v. GATX Corp.,*
    557 So. 2d 1376 (La. 1990).............................................................................. 17, 19

*Burnett v. N.Y. Cent. R.R.,*
    380 U.S. 424 (1965) .............................................................................................. 21

*Cain v. Merck & Co.,*
    No. CV 01 3441 (E.D.N.Y. Nov. 2, 2001) ............................................................. 11, 12

*Cartwright v. Chrysler Corp.,*
    232 So. 2d 285 (1970) ........................................................................................... 15

*Catholic Soc. Servs., Inc. v. I.N.S.,*
    182 F.3d 1053 (9th Cir. 1999)................................................................................. 24

*Chardon v. Fumero Soto,*
    462 U.S. 650 (1983) .......................................................................................... 22, 25

*Compex Int'l Co. v. Taylor,*
    209 S.W.3d 462 (Ky. 2006) .................................................................................... 39

*Crown, Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983) ...................................................................................21, 29, 31, 37

*Dayco Corp. v. Goodyear Tire & Rubber Co.,*
    523 F.2d 389 (6th Cir. 1975)................................................................................... 44

*Drumm v. Sizeler Realty Co.,*
    817 F.2d 1195 (5th Cir. 1987)................................................................................. 23

i

## TABLE OF AUTHORITIES
(continued)

Page

*Foster v. Harris,*
   633 S.W.2d 304 (Tenn. 1982) ............................................................................ 42

*Griffin v. Singletary,*
   17 F.3d 356 (11th Cir.1994) ............................................................................. 24

*Hazel v. Gen. Motors Corp.,*
   863 F. Supp. 435 (W.D. Ky. 1994) .................................................................. 34

*Highland Park Ass'n of Bus. & Enters. v. Abramson,*
   No. 94-6424, 1996 U.S. App. LEXIS 19122 (6th Cir. July 3, 1996) ................ 37

*Hughes v. Vanderbilt Univ.,*
   215 F.3d 543 (6th Cir. 2000) ............................................................................ 44

*Hunter v. Am. Gen. Life & Accident Ins. Co.,*
   384 F. Supp. 2d 888 (D.S.C. 2005) .................................................................. 31

*In re Am. Med Sys.,*
   75 F.3d at 1089 ................................................................................................ 27

*In re Baycol Prods. Litig.,*
   218 F.R.D. 197 (D. Minn. 2003) ...................................................................... 32

*In re Ford Motor Co. Vehicle Paint Litig.,*
   MDL No. 1063, 1996 U.S. Dist. LEXIS 11063 (E.D. La. July 30, 2006) ............. 18

*In re Med. Review Panel of Howard,*
   573 So. 2d 472 (La. 1991) ................................................................................. 15

*In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.,*
   693 F.2d 847 (9th Cir. 1982) ............................................................................ 27

*In re Paxil Litig.,*
   212 F.R.D. 539 (C.D. Cal. 2003) ..................................................................... 27

*In re Propulsid Prods. Liab. Litig.,*
   208 F.R.D. 133 (E.D. La. 2002) ....................................................................... 27

*In re Rezulin Prods. Liab. Litig.,*
   MDL No. 1348, 2005 WL 26867 (S.D.N.Y. Jan. 5, 2005) ............................... 27

*In re Vioxx Prods. Liab. Litig.,*
   478 F. Supp. 2d 897 (E.D. La. 2007) ......................................................... 13, 14

*Johnson v. Ry. Express Agency, Inc.,*
   421 U.S. 454 (1975) ......................................................................................... 22

*Jolly v. Eli Lilly & Co.,*
   751 P.2d 923 (Cal. 1988) ............................................................................ 27, 32

*Jones v. State,*
   891 So. 2d 698 (La. App. 2004) ....................................................................... 15

*Jordan v. Employee Transfer Corp.,*
   509 So. 2d 420 (La. 1987) ................................................................................. 15

*Klaxon Co. v. Stentor Electric Mfg. Co.,*
   313 U.S. 487 (1941) ......................................................................................... 13

*Korwek v. Hunt,*
   827 F.2d 874 (2d Cir.1987) .............................................................................. 24

*Lavespere v. Niagara Mach. & Tool Works, Inc.,*
   910 F.2d 167 (5th Cir. 1990) .............................................................................. 1

## TABLE OF AUTHORITIES
(continued)

Page

*Lettieri v. Merck & Co.,*
  No. CV 01 3441 (E.D.N.Y. May 23, 2001) ........................................................ 11
*Little v. Liquid Air Corp.,*
  37 F.3d 1069 (5th Cir. 1994)........................................................................... 1
*Lloyd's Leasing, Ltd. v. Bates,*
  902 F.2d 368 (5th Cir. 1990)...................................................................... 22, 23
*Maestas v. Sofamor Danek Group, Inc.,*
  33 S.W.3d 805 (Tenn. 2000)............................................................................ 45
*Maestas v. Sofamor Danek Group, Inc.,*
  No. 02a01-9804-cv-00099, 1999 Tenn. App. LEXIS 97 (Tenn. Ct. App. Feb. 16, 1999) . 42, 43
*McLain v. Dana Corp.,*
  16 S.W.3d 320 (Ky. Ct. App. 1999) ................................................................. 36
*Mertens v. Abbott Labs.,*
  99 F.R.D. 38 (D.N.H. 1983)............................................................................ 27
*Moreno's, Inc. v. Lake Charles Catholic High Sch., Inc.,*
  315 So. 2d 660 (La. 1975).............................................................................. 33
*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983) ........................................................................................ 1
*Oldfield v. Merck & Co.,*
  No. ATL-L-2-07 (N.J. Super. Law Div. Oct. 15, 2007 ........................................ 17
*Orleans Parish Sch. Bd. v. U.S. Gypsum Co.,*
  892 F. Supp. 794 (E.D. La. 1995) .................................................................... 37
*Perkins v. Ne. Log Homes,*
  808 S.W.2d 809 (1991) .................................................................................. 33
*Philip Morris USA, Inc. v. Christensen,*
  905 A.2d 340 (Md. 2006) ............................................................................... 27
*Phillips Oil Co. v. OKC Corp.,*
  812 F.2d 265 (5th Cir. 1987)........................................................................... 12
*Portwood v. Ford Motor Co.,*
  701 N.E.2d 1102 (Ill. 1998) ............................................................................ 26
*Reed v. St. Charles Gen. Hosp.,*
  815 So. 2d 319 (La. Ct. App. 2002) .................................................................. 15
*Rhynes v. Branick Mfg. Corp.,*
  629 F.2d 409 (5th Cir. 1980)....................................................................... 26, 37
*Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.,*
  113 S.W.3d 636 (Ky. Ct. App. 2003) ................................................................ 40
*Robbin v. Fluor Corp.,*
  835 F.2d 213 (9th Cir.1987)............................................................................ 24
*Roberts v. Solideal Tire, Inc.,*
  No. 06-14-DLB, 2007 U.S. Dist. LEXIS 75512 (E.D. Ky. Oct. 10, 2007) .............. 38, 39
*Roman Catholic Diocese v. Secter,*
  966 S.W.2d 286 (Ky. Ct. App. 1998) ................................................................ 37
*Ryan v. Eli Lilly & Co.,*
  84 F.R.D. 230 (D.S.C. 1979)........................................................................... 27

## TABLE OF AUTHORITIES
(continued)

Page

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
    765 F.2d 1334 (5th Cir. 1985)...................................................................... 24

*Shadrick v. Coker*,
    963 S.W.2d 726 (Tenn. 1998) ...................................................................... 43

*Sheppard v. Capital One Bank*,
    No. 06-7535, 2007 U.S. Dist. LEXIS 70061 (C.D. Cal. July 11, 2007)................. 31

*Shorter v. McManus*,
    No. 03A01-9704-CV-00132, 1997 Tenn. App. LEXIS 789 (Tenn. Ct. App. Nov. 13, 1997) . 43

*Smith v. Cutter Biological*,
    770 So. 2d 392 (La. Ct. App. 2000) ........................................................30, 31, 40

*Snawder v. Cohen*,
    749 F. Supp. 1473 (W.D. Ky. 1990)............................................................... 38

*State v. Am. Pipe & Constr.*,
    473 F.2d 580 (1973) ........................................................................... passim

*Talkington v. Atria Reclamelucifers Fabrieken BV*,
    152 F.3d 254 (4th Cir. 1998)........................................................................ 26

*Taylor v. Liberty Mut. Ins. Co.*,
    579 So. 2d 443 (La. 1991)............................................................................ 30

*Touchet v. Baker Hughes Inc.*,
    737 So. 2d 821 (La. App. 1999)..................................................................... 16

*Vaccariello v. Smith & Nephew Richards, Inc.*,
    763 N.E.2d 160 (Ohio 2002)......................................................................... 26

*Vaught v. Showa Denko K.K.*,
    107 F.3d 1137 (5th Cir. 1997)....................................................................... 24

*Wade v. Danek Med., Inc.*,
    182 F.3d 281 (4th Cir. 1999)................................................................25, 26, 38

*Williams v. Fulmer*,
    695 S.W.2d 411 (Ky. 1985) .......................................................................... 39

*Wireman v. Fletcher*,
    CA No. 3:06-13-JMH, 2006 U.S. Dist. LEXIS 92059 (E.D. Ky. Dec. 20, 2006) .............. 35

*Zehel-Miller v. AstraZenaca Pharms., LP*,
    223 F.R.D. 659 (M.D. Fla. 2004) ................................................................... 27

**Statutes**

1 C.F.R. § 211.166 ...................................................................................... 46

21 C.F.R. § 211.137(a) ................................................................................. 46

21 C.F.R. § 211.137(b) ................................................................................. 46

42 U.S.C. § 1981 ........................................................................................ 22

42 U.S.C. § 1983 ........................................................................................ 22

Ky. Rev. Stat. Ann. § 355.2-313 ..................................................................... 38

Ky. Rev. Stat. Ann. § 355.2-314 ..................................................................... 38

Ky. Rev. Stat. Ann. § 355.2-315 ..................................................................... 39

Ky. Rev. Stat. Ann. § 413.140(1)(a).................................................................. 33

La. Civ. Code Ann. art. 3462 ......................................................................... 29

La. Civ. Code Ann. art. 3492 ......................................................................... 15

## TABLE OF AUTHORITIES
(continued)

Page

La. Civ. Code Ann. art. 3549(B)(1) .................................................................. 14
La. Civ. Code Ann. art. 3549(B)(2) .................................................................. 15
La. Rev. Stat. Ann. § 51:1409(e)...................................................................... 33
Tenn. Code Ann. § 28-3-104 ............................................................................ 41
Tenn. Code Ann. § 29-28-102(1) ...................................................................... 45
Tenn. Code Ann. § 29-28-103 .......................................................................... 45

**Other Authorities**
Fed. R. Civ. 23 ................................................................................................. 20
Fed. R. Civ. P. 56(c)........................................................................................ 12
Fed. R. Civ. P. F. ............................................................................................. 22

## MEMORANDUM IN SUPPORT OF RENEWED
## MOTION FOR SUMMARY JUDGMENT

Defendant Merck & Co., Inc. ("Merck") respectfully moves for summary judgment on plaintiffs' claims.  Although the Court previously denied a similar motion, defendants respectfully renew their motion based on substantial additional information demonstrating that plaintiffs were on notice of their claims – as a matter of law – no later than September 30, 2004, and their claims are therefore time-barred.[1]  Because neither plaintiff filed his claims within one year of that date – as required by law –  those claims are time-barred.

As set forth below, Merck's withdrawal of Vioxx triggered substantial attention in all aspects of the media – including newspapers, magazines, television and the Internet – as well as advertising campaigns by attorneys in all 50 states.  Immediately upon the drug's withdrawal, major newspapers across the country reported both that Merck had withdrawn Vioxx from the market and that the reason for withdrawal was a concern about the increased rate of cardiovascular events observed in the APPROVe study.  ***In the first month after the withdrawal of Vioxx, there were at least 1,648 articles or reports in media outlets around the country about the Vioxx controversy***.[2]  Moreover, thousands of lawsuits involving even more thousands

---

[1]	The Court previously denied Merck's motion for summary judgment on statute of limitations grounds as to plaintiff Timothy Watson and another Tennessee plaintiff, Donald Stinson.  Renewal of Merck's motion with respect to plaintiff Watson despite the prior denial is appropriate because "every order short of a final decree is subject to reopening at the discretion of the district judge."  *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 n.14 (1983).  "A ruling made early in the proceedings may rest on poorly developed facts that have been better developed by continuing proceedings.  In these circumstances, the forward progress of the case encourages reconsideration."  18B Charles Alan Wright et al., Federal Practice & Procedure § 4478.1, at 695 (2d ed. 2002).  Thus, "denial of summary judgment often is reconsidered and followed by an order granting summary judgment."  *Id.* at 699.  Indeed, the Fifth Circuit has recognized that trial courts may entertain and grant supplemental motions for summary judgment after the original motion was denied, even where the defendant has not presented new authority or evidence in support of its arguments.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), abrogated on other grounds by *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).

[2]	This statistic is based on a search of U.S. news outlets on the Lexis/Nexis database for the period between September 30, 2004 and October 30, 2004.

of plaintiffs were filed in the first six months after withdrawal – compelling circumstantial evidence that the message from those news reports had been received.  Even as scientists debated the significance of the results of APPROVe and other Vioxx and Cox-2 studies, headlines linking Vioxx to cardiovascular injuries and discussing the growing number of lawsuits faced by Merck continued to be printed and broadcast around the country.

Plaintiffs Philip Dawson and Timothy Watson claim personal injury as a result of their use of Vioxx.  In addition, both plaintiffs reside in states with a one-year statute of limitations period for personal injury claims.  Thus, plaintiffs Dawson and Watson were required to file their cases within one year of the date on which their claims accrued.  In light of the overwhelming media attention to the Vioxx withdrawal on September 30, 2004, that is the very latest date on which plaintiffs could have discovered their cause of action *as a matter of law*.  However, neither plaintiff filed his complaint against Merck in this Court until *after* September 30, 2005.

Accordingly, plaintiffs' claims are time-barred, and the Court should grant Merck's motion for summary judgment.

## BACKGROUND

### A.   The Withdrawal Of Vioxx From The Market And The Ensuing Media Blitz.

By early 2001, the news media had already widely reported that the Vioxx Gastrointestinal Outcome Research ("VIGOR") study – which was itself published in the *New England Journal of Medicine* – had identified a potential link between Vioxx use and MI risks. *See, e.g.*, Rita Rubin, *Vioxx Might Raise Heart Risk*, USA Today, Feb. 9, 2001, at 05B (attached as Ex. 1); Edward R. Silverman, *Merck Shares Fall On Vioxx Study, Painkiller Linked to Cardiovascular Problems*, Star-Ledger (Newark, N.J.), Apr. 29, 2000, at 17 (attached as Ex. 2); *see also National Briefing Science and Health:  U.S. Warns Merck About Marketing Arthritis Drug*, N.Y. Times, Sept. 26, 2001, at A14 (attached as Ex. 3).  During the course of the next

three years, the news media repeatedly announced that the use of Vioxx might be linked to increased cardiovascular risks.  *See* Ed Silverman, *FDA Study Stresses Concerns About Merck's Vioxx*, Star-Ledger (Newark, N.J.), Aug. 26, 2004, at 52 (attached as Ex. 4); Kawanza L. Griffin, *Arthritis Drug Link To Heart Attack Risk*, Milwaukee Journal Sentinel, Apr. 22, 2002, at 2 (attached as Ex. 5); *Company News; Merck to Revise Label Information for Vioxx*, N.Y. Times, Apr. 12, 2002, at C2 (attached as Ex. 6) ("Merck & Co . . . would revise prescribing information for its Vioxx painkiller to show both cardiovascular risks and benefit in reducing side effects like ulcers in arthritis patients"); Gardiner Harris, *Label Change For Merck's Vioxx Adds Ulcer Protection, Heart Risk*, Wall St. J., Apr. 12, 2002 , at A17 (attached as Ex. 7); Joe Graedon & Teresa Graedon, *Vioxx May Increase Risk Of Stroke*, Star-Ledger (Newark, N.J.), Nov. 6, 2001, at 43 (attached as Ex. 8).

On September 24, 2004, an external safety board monitoring the results of a long-term study – the APPROVe study – informed Merck that interim data from the study showed an increased rate of cardiovascular events in the Vioxx arm compared to the placebo arm.  (*See* MRK-AFJ0000067-69 (September 24, 2004 facsimile from K. Horgan of Merck to P. Kim and B. Gertz of Merck forwarding APPROVe ESMB's meeting minutes and recommendations) (attached as Ex. 9).)

Merck voluntarily withdrew Vioxx from the market six days later, on September 30, 2004.  *See* Merck press release, *Merck Announces Voluntary Worldwide Withdrawal of VIOXX®* (Sept. 30, 2004), (attached as Ex. 10.  In a written statement to patients, Merck Chairman, President, and CEO Raymond Gilmartin related that Merck's decision to withdraw Vioxx was "based on new data from a three-year clinical study" in which "there was an increased risk for cardiovascular (CV) events, such as heart attack and stroke, in patients taking VIOXX 25 mg

compared to those taking placebo (sugar pill)." *See* Letter From Raymond V. Gilmartin, Chairman, President & CEO of Merck & Co., Inc., to Patient (Sept. 30, 2004) (attached as Ex. 11). Merck also sent a letter explaining the APPROVe findings and the reasons for withdrawal to doctors and pharmacies nationwide. *See* Letter from William F. Keane, MD, Vice President of U.S. Medical and Scientific Affairs at Merck & Co., Inc., to Healthcare Professional (Sept. 30, 2004) (attached as Ex. 12).

Merck's withdrawal of Vioxx immediately triggered an explosive amount of nationwide media attention. On the morning of September 30, the story ran on major radio and television news shows. The *Today Show*'s Ann Curry reported a "major announcement this morning from drugmaker Merck. It's halting its sales worldwide of the popular arthritis drug Vioxx" due to risk of heart attack and stroke. *The Today Show: Merck Pulls Vioxx Off the Market* (NBC television broadcast Sept. 30, 2004) (attached as Ex. 13). *Good Morning America* on ABC began with "breaking news about a common arthritis drug. Drug giant Merck is halting the sale of Vioxx worldwide. The company says it is recalling the drug because it raises the risk of heart attack and stroke." *Good Morning America: News Headlines* (ABC television broadcast Sept. 30, 2004) (attached as Ex. 14). On CNN's *American Morning*, host Heidi Collins kicked off a segment of *Paging Doctor Gupta* by announcing "a story that is breaking right at this time. Dr. Gupta relayed the announcement that "there was an increased relative risk for confirmed cardiovascular events, such as heart attack and stroke" and noted that there had "been some speculation for some time that Vioxx may be related to heart attacks and strokes." *American Morning: Merck Pulls Vioxx From the Market* (CNN television broadcast Sept. 30, 2004) (attached as Ex. 15). Harry Smith, host of CBS's *Early Show*, reported simply that "Vioxx is being recalled worldwide. Drugmaker Merck is halting sales after studies found that Vioxx

raised the risk of stroke and heart attack for users." *Early Show: Vioxx Recalls by Merck* (CBS television broadcast Sept. 30, 2004) (attached as Ex. 16).  And NPR's Renee Montagne reported during *Morning Edition* that "[o]ne of the world's largest drugmakers, Merck & Co., took its arthritis drug Vioxx off the market this morning."  *Morning Edition: Merck & Co. has taken its arthritis drug Vioxx off the market this morning due to health concerns* (NPR radio broadcast Sept. 30, 2004) (attached as Ex. 17).

The networks continued their coverage in the evening.  On the CBS *Evening News*, Dan Rather began the show by announcing "a medical bombshell about a prescription drug used by millions.  Vioxx, the arthritis drug, is being withdrawn from the market worldwide.  The manufacturer of this FDA-approved drug says it has found the strongest evidence yet that Vioxx can trigger heart attacks and strokes." *CBS Evening News: Merck pulls its arthritis drug Vioxx off the shelves after a study showed it increases the risk of heart attack and stroke* (CBS television broadcast Sept. 30, 2004) (attached as Ex. 18).  NBC's Tom Brokaw covered the story on the *Nightly News*.  "Now to what could be the largest drug recall ever in this country.  Merck pharmaceutical company is pulling its arthritis drug called Vioxx off the market after a new study disclosed that it could increase the risk of heart attacks and stroke." *NBC's Nightly News: Merck recalls Vioxx after study reveals increase in risk of heart attack and stroke* (NBC television broadcast Sept. 30, 2004) (attached as Ex. 19).  On *World News Tonight* on ABC, Peter Jennings and John McKenzie reported in a segment entitled *A Closer Look:  Vioxx Recalled* (ABC television broadcast Sept. 30, 2004) (attached as Ex. 20), that "Merck and Company made very big news today when it said that it was voluntarily taking its popular drug, Vioxx, off the market.  About two million people currently take Vioxx for pain, especially for pain of arthritis.  Merck said today that data from a clinical trial found an increased risk for heart

attack and stroke." On CNN, Lou Dobbs reported "stunning news for millions of Americans who use one of this country's most popular prescription drugs. *Lou Dobbs Tonight*, Merck recalls Vioxx because it's not safe" (CNN television broadcast Sept. 30, 2004) (attached as Ex. 21). And on NPR's *All Things Considered*, Robert Siegel reported on the withdrawal, noting that "the decision also opens up a potential flood of lawsuits." *All Things Considered: Business ramifications of Merck's announcement about Vioxx* (NPR radio broadcast Sept. 30, 2004) (attached as Ex. 22).

The next day, television and radio coverage continued. On the *Today Show*, Katie Couric asked Professor John Abramson from Harvard Medical School about the withdrawal of Vioxx. *Today Show: Dr. John Abramson discusses Vioxx recall and what Vioxx users can do* (NBC television broadcast Oct. 2, 2004) (attached as Ex. 23). Couric reported that the "maker of the popular arthritis drug has pulled it off store shelves, saying it can actually double the risk of heart attack and stroke." She later wrapped up the segment by explaining, "So that's the bottom line. Stop taking Vioxx, and--and take Aleve." *Id.* On *Good Morning America*, Diane Sawyer and ABC News Medical Editor Dr. Tim Johnson reported that Vioxx had been withdrawn in a segment entitled *Vioxx Recall Questions Answered*. Sawyer reported that "we know if you're taking the drug, you should stop." *Good Morning America: Vioxx Recall Questions Answered* (ABC television broadcast Oct. 1, 2004) (attached as Ex. 24). Dr. Johnson agreed, explaining the theory that plaintiffs have relied on since the beginning of the Vioxx litigation: "Vioxx causes its problems by interfering with the blood clotting system, increasing the risk for blood clots, which leads to heart attacks and strokes." *Id.* On *CBS Morning News*, anchor Hannah Storm began a segment on "what everybody's talking about, the Vioxx recall." *CBS Morning News: Vioxx Recall* (CBS television broadcast Oct. 1, 2004) (attached as Ex. 25). Storm

explained that "a new study links the medication to an increased risk of heart attacks and strokes" and asked CBS's Dr. Emily Senay to advise viewers what to do next.  On CNN's *American Morning*, anchor Heidi Collins interviewed Professor Abramson about the withdrawal. *American Morning: Vioxx Recall* (CNN television broadcast Oct. 1, 2004) (attached as Ex. 26). Collins introduced the segment by explaining that Merck was "pulling Vioxx from the store shelves worldwide after ongoing studies found it increased risk of heart attacks and strokes."  *Id.* On National Public Radio's *Morning Edition*, host Renee Montagne reported that "Merck voluntarily pulled the arthritis medication yesterday after a new study found that it increased the risk of heart attack and stroke."  *Morning Edition: Issues of drug safety in connection with how long it takes to warn about risks found in studies* (NPR radio broadcast Oct. 1, 2004) (attached as Ex. 27).

Newspapers also carried the story that day, usually on the front page.  Headlines around the nation announced that "Risks Spur Merck to Pull Vioxx Off Market," "Merck Puts Nixx on 'Dangerous' Vioxx," and "Arthritis Drug Vioxx Pulled, Risk of Heart Attacks is Cited."  *See* Lewis Krauskopf & Lindy Washburn, *Risks Spur Merck To Pull Vioxx Off Market*, The Record (Bergen County, N.J.), Oct. 1, 2004, at A01 (attached as Ex. 28); Leonard Greene & Perry Chiaramonte, *Merck Puts Nixx On 'Dangerous' Vioxx*, N.Y. Post, Oct. 1, 2004, at 2 (attached as Ex. 29) [hereinafter "Greene & Chiaramonte"]; Thomas H. Maugh II & Denise Gellene, *Arthritis Drug Vioxx Pulled; Risk of Heart Attacks Is Cited*, L.A. Times, Oct. 1, 2004, at A1 (attached as Ex. 30) [hereinafter "Maugh & Gellene"].  Myriad other news sources covering the withdrawal identified a potential link between ingestion of Vioxx and increased cardiovascular risks.  *See* Rita Rubin, *Merck Halts Vioxx Sales*, USA Today, Oct. 1, 2004, at A1 (attached as Ex. 31); Gina Kolata, *A Widely Used Arthritis Drug Is Withdrawn*, N.Y. Times, Oct. 1, 2004, at A1 (attached

as Ex. 32); Barbara Martinez, *et al.*, *Expiration Date:  Merck Pulls Vioxx From Market After Link to Heart Problems -- Stock Plunges Amid Questions About Drug Giant's Future*, Wall St. J., Oct. 1, 2004, at A1 (attached as Ex. 33); Mark Kaufman, *Merck Withdraws Arthritis Medication -- Vioxx Maker Cites Users' Health Risks*, Wash. Post, Oct. 1, 2004, at A01 (attached as Ex. 34); Linda A. Johnson, *Merck Recalls Blockbuster Arthritis Drug, Stock Plunges*, AP Alert, Sept. 30, 2004 (attached as Ex. 35) ("Merck & Co. is pulling its blockbuster Vioxx from the market after new data found the arthritis drug doubled the risk of heart attacks and strokes.").

In the days following withdrawal, the media also reported a rush by plaintiffs' lawyers to sign up claimants.  The *New York Post* explained that "[a]ttorneys across the country wasted no time lining up litigation" because they viewed Merck's withdrawal as "wrapping up the evidence they needed in a pretty bow."  *See* Greene & Chiaramonte, *supra*, at 2.  The *Post* related the comments of one plaintiffs' lawyer who asserted that, even prior to withdrawal, "[i]t wasn't a great secret that Vioxx might cause heart attacks and strokes."  *Id.* (quoting Barry Slotnick) (internal quotation marks omitted).)  Another plaintiffs' lawyer stated:  "I'm pleased that Merck has taken this very important step [of withdrawing Vioxx], but we firmly believe that this should have happened years earlier."  *Id.* (quoting Jerrold Parker) (internal quotations omitted).  In the *Los Angeles Times*, Law Professor Brietta Clark noted that plaintiffs' lawyers turned to the internet immediately following withdrawal, advertising their services to putative plaintiffs and seeking to sign-up clients.  *See* Maugh & Gellene, *supra*, at 1.  As Professor Clark observed, "[c]learly, a lot of people think they have got a basis for a suit."  *Id.* (internal quotation marks omitted).

Finally, many plaintiffs' firms ran advertisements in the years after withdrawal urging potential claimants to file lawsuits before the limitations period expired.  (*See, e.g.*, sample

advertisement (attached as Ex. 36).)

Similar coverage played out in plaintiffs' home media markets as well.

### 1.  Kentucky

Newspapers around plaintiff Watson's home state of Kentucky immediately covered the Vioxx withdrawal, many on the front page.  For example, one of the largest papers in the state, the Lexington *Herald-Leader*, included a story in its October 1, 2004 edition titled *Vioxx News Stuns Area Doctors; Arthritis Drug Pulled on Heart, Stroke Risks*.  Barbara Isaacs, Lexington *Herald-Leader*, Oct. 1, 2004, at A1 (attached as Ex. 37).  This front-page story noted that "[s]pecialists recommend that patients immediately stop taking Vioxx and call their doctors for advice on which alternative medication to take in its place." *Id.*  Similarly, the suburban Owensboro *Messenger-Inquirer*'s October 1, 2004 edition carried a story titled *Merck Recalls Vioxx; Arthritis Drug Found in Study to Raise Heart Attack, Stroke Risks*.  Owensboro *Messenger-Inquirer*, Oct. 1, 2004, at A1 (attached as Ex. 38).  The story quoted a local pharmacist who noted that "[y]ou have recalls, but nothing so popular as Vioxx." *Id.*

### 2.  Tennessee

Newspapers in plaintiff Dawson's home state of Tennessee also had extensive and prominent coverage of the Vioxx withdrawal.  This coverage included front-page stories in many papers the day after the drug was withdrawn.  For example, the Memphis *Commercial Appeal* carried a front-page story on October 1, 2004 titled *Vioxx Shelved; Drug Used by Millions*.  Maria Burnam, Memphis Commercial Appeal, Oct. 1, 2004, at A1 (attached as Ex. 39).  The paper noted that "Vioxx users should stop taking the medicine and consult their physicians as soon as possible on an alternative prescription." *Id.*  Similarly, the Chattanooga *Times Free Press* carried a story in its October 1, 2004 edition titled simply *Arthritis Drug Vioxx Recalled*. Linda A. Johnson, Chattanooga Times Free Press, Oct. 1, 2004, at A1 (attached as Ex. 40).  The

article noted that "Vioxx, the blockbuster arthritis drug heavily promoted on TV and taken by tens of millions of people, was pulled from the market by its maker Thursday after a study found it doubled the risk of heart attacks and strokes." *Id.* The Nashville *Tennessean* also reported the withdrawal on October 1 in a story that noted that "[p]atients obviously should and will have to stop taking Vioxx." Bush Bernard, *Vanderbilt Study Helps Lead to Recall of Medicine*, The Tennessean, Oct. 1, 2004, at A2 (attached as Ex. 41).

     **B.**     **The Plaintiffs Addressed By This Motion**

This motion addresses the claims of two plaintiffs: Timothy Watson from Kentucky and Philip Dawson from Tennessee.

     **1.**     **Kentucky**

Plaintiff Watson resides in Kentucky, was prescribed and took Vioxx in that state, and alleges that he suffered a stroke in Kentucky on August 23, 2002. (*See* Watson Compl. ¶¶ 1, 4 (attached as Ex. 42); Watson Plaintiff Profile Form at 2, 9, 10, 12 (attached as Ex. 43).) Plaintiff Watson attributes his injury to his use of Vioxx while the drug was on the market. (*See* Watson Fact Sheet at 2, 6.) He alleges that Vioxx caused him to suffer "a stoke causing permanent and disabling injuries." (Watson Compl. ¶ 4.) Watson filed his suit on November 14, 2005.

     **2.**     **Tennessee**

Plaintiff Dawson resides in Tennessee, was prescribed and took Vioxx there, and suffered his alleged injury in Tennessee as well – a heart attack in December 2003. (*See* Dawson Compl. ¶¶ 1, 4, 5 (attached as Ex. 44); Dawson Pl. Profile Form at 2-3, 5, 8 (attached as Ex. 45).) Plaintiff Dawson attributes his injury to his use of Vioxx while the drug was on the market. (*See* Dawson Pl. Profile Form at 2.) He alleges that "Vioxx was the proximate cause of his heart attack." (Dawson Compl. ¶ 5.) Dawson filed his suit in December 2006.

C.     **The *Cain* Class Action**

The first Vioxx-related personal injury class action was filed on May 29, 2001 by Dominick Lettieri and Mary Lombardozzi in the United States District Court for the Eastern District of New York seeking certification of a "nationwide class of persons who are taking . . . Vioxx . . . [or] Celebrex." (Complaint ¶ 1, *Lettieri v. Merck & Co.,* No. CV 01 3441 (E.D.N.Y. May 23, 2001) ( "Initial Cain Compl.") (attached as Ex. 46).) Plaintiffs sought relief under several theories, including compensatory damages for personal injury. (*Id.* ¶¶ 27-32 (failure to warn), ¶¶ 33-38 (strict liability), ¶¶ 39-45 (negligence).) The complaint was amended August 1, 2001, substituting Alex Cain and William Watkins as new named plaintiffs and making other changes but retaining the personal injury claims. (Am. Class Action Compl., *Cain v. Merck & Co.,* No. CV 01 3441 (E.D.N.Y. Aug. 1, 2001) ("First Am. Cain Compl.") (attached as Ex. 47).)

On September 21, 2001, Merck and its co-defendants moved to dismiss the claims for injunctive relief in the *Cain* class action on federal preemption and primary jurisdiction grounds, asking the court to refer the plaintiffs' injunctive claims to the Federal Food and Drug Administration ("FDA"). (*See* Mem. in Supp. of Defs.' Mot. to Dismiss Claim for Injunctive Relief, *Cain v. Merck & Co.,* No. CV 01 3441 (E.D.N.Y. Sept. 21, 2001) (attached as Ex. 48).) Plaintiffs opposed, urging the district court that it was "eminently qualified to decide Plaintiffs' claims for injunctive relief, just as it will determine Plaintiffs' damages claims . . . . Given the needless delay and cost that would be incurred by bifurcating the Plaintiffs' claims and having them tried in two separate forums simultaneously, the Court should retain jurisdiction over Plaintiffs' equitable claims." (Mem. in Opp. to Defs.' Mot. to Dismiss Claim for Injunctive Relief, *Cain v. Merck & Co.,* No. CV 01 3441 (E.D.N.Y. Nov. 2, 2001).) On August 21, 2002, the district court granted the motion to dismiss.

Plaintiffs then amended their complaint a second time on September 18, 2002, and

11

dropped their personal injury claims prior to any disposition of the certification issue.  (Second Am. Class Action Compl., *Cain v. Merck & Co., Inc.*, CV 01 3441. (E.D.N.Y. Sept. 18, 2002) ("Second Am. Cain Compl.") (attached as Ex. 49).)  In light of the district court's ruling on primary jurisdiction, the parties stipulated that plaintiffs' claims – now solely for injunctive relief – would be stayed pending completion of FDA review of plaintiffs' claims.  (*See* Stipulation and Order, *Cain v. Merck & Co., Inc.*, CV 01 3441 (E.D.N.Y. Sept. 18, 2002) (attached as Ex. 50).)  On February 16, 2005, the *Cain* class action was transferred to this Court as part of the MDL.  (*See* Transfer Order, No. 1657, at A5 (J.P.M.L. Feb. 16, 2005) (attached as Ex. 51).)

Plaintiff Timothy Watson was a putative class member of the *Cain* class action while its claims for damages were pending because he alleges an injury before September 18, 2002.  As explained in further detail below, he is barred from asserting *American Pipe* tolling based on the post-withdrawal Vioxx class actions because, *inter alia*, that doctrine does not permit tolling based on successive class actions.  *See* Section I.B.3, *infra*.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . [Merck] is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Because "only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment," questions that are "unnecessary" to the resolution of a particular case "will not be counted."  *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

The Court should grant summary judgment on plaintiffs' claims because they are time-barred.  There can be no material dispute that both plaintiffs were on notice of their claims by

September 30, 2004 at the latest, when the withdrawal of Vioxx from the market sparked a media frenzy, announcing the drug's alleged risks on the front pages of newspapers across the country. As a matter of law, such publicity is sufficient to trigger discovery and to start the limitations clock ticking under all potentially applicable states' laws. Thus, plaintiffs' claims should have been filed no later than September 30, 2005, one year after withdrawal. Because both Dawson and Watson filed their complaints against Merck after that date, both plaintiffs' claims are time-barred.

Plaintiffs have argued in the past that their claims are saved by various tolling rules, specifically the *American Pipe* and fraudulent concealment doctrines. However, plaintiffs' claims cannot be saved by *American Pipe* because: (1) their states do not recognize cross-jurisdictional tolling; (2) they would need to "stack" or "piggyback" class actions; and/or (3) their states do not recognize *American Pipe* at all. In addition, the fraudulent concealment doctrine does not apply when, as in these cases, the media reports the facts necessary to make out a claim. As a result, plaintiffs' tolling arguments fail, and the Court should grant Merck summary judgment.

## I.   PLAINTIFF WATSON'S CLAIMS FAIL UNDER APPLICABLE LAW.

### A.   Louisiana Choice-of-Law Rules Apply To Plaintiff Watson's Claims.

Plaintiff Watson directly filed his case in this Court, pursuant to Pretrial Order No. 11. As this Court has previously recognized, Louisiana choice-of-law rules govern such claims. *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 904 (E.D. La. 2007). That holding is consistent with the rule set forth in *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941), that a federal court sitting in diversity applies the choice-of-law rules of the state in which the court is situated. In addition, the Court's choice-of-law analysis was the product of careful consideration of the potential for abuse in permitting plaintiffs to bypass unfavorable

rules by filing directly in the MDL forum.  *In re Vioxx*, 478 F. Supp. 2d at 904.  For the same reasons, Louisiana choice-of-law rules apply to plaintiff Watson's claims here.

Under Louisiana choice-of-law rules, the Court must consider both Louisiana limitations rules and the rules of the plaintiff's home state.  However, because plaintiff Watson's claims are barred both under Louisiana law and the laws of his own state, the Court need not decide which of those laws to apply.  Either way, the claims are time-barred, and summary judgment is therefore appropriate.

Louisiana's choice-of-law rule for selecting the applicable limitations period (or "prescription" period) in a particular case requires the Court to conduct two separate choice-of-law determinations:  ***first***, the Court must determine which state's substantive laws govern the proceeding, and ***second***, based on that determination, it must decide the applicable limitations law.

Regarding the first step, plaintiff Watson's substantive claims are governed by the laws of his home state, as this Court has consistently held.  *In re Vioxx*, 478 F. Supp. 2d at 905-06.  That preliminary inquiry is thus easily answered, and no extended discussion is required here.

Under the second step, in a case like these, where "the substantive law of another state would be applicable to the merits of an action brought in this state," Louisiana prescription law applies except in two circumstances:

> (1) If the action would be barred under Louisiana prescription law but allowed under the other state's law, and "maintenance of the action in this state is warranted by compelling considerations of remedial justice," La. Civ. Code Ann. art. 3549(B)(1), the court will apply the limitations law of the state whose substantive law governs.
>
> (2) If the action would not be barred under Louisiana prescription law but would be barred under the law of the state whose substantive law governs, then the action is allowed to proceed unless allowing the case to continue "is not warranted by the policies of this state and its relationship to the parties or the

dispute nor by any compelling considerations of remedial justice." *Id.* art. 3549(B)(2).

As set forth below, the Court need not undertake this analysis because Watson's claims would be barred both under his own state's laws and under Louisiana law.  Accordingly, regardless of which state's limitations law applies, plaintiff Watson's claims are time-barred and must be dismissed.

      **B.**      **Plaintiff Watson's Claims Are Barred Under Louisiana Law.**

Louisiana employs a one-year limitations period on personal injury claims.  La. Civ. Code Ann. art. 3492.  Plaintiff Watson filed suit on November 14, 2005, but he alleges injury before the withdrawal of Vioxx from the market on September 30, 2004.  Plaintiff's claims are thus stale unless saved by some other doctrine.

      **1.**      **Based On Indisputable Facts, Plaintiff's Claims Accrued No Later Than September 30, 2004 As A Matter Of Law.**

Louisiana employs a discovery rule that postpones accrual of a cause of action while an injury or its cause is unknown.  *E.g., Reed v. St. Charles Gen. Hosp.*, 815 So. 2d 319, 322 (La. Ct. App. 2002).  Under the Louisiana discovery rule, accrual is held in abeyance only so long as ignorance of an injury and its cause is "not willful, negligent or unreasonable."  *In re Med. Review Panel of Howard*, 573 So. 2d 472, 474 (La. 1991).  The limitations period begins whenever, in light of actual or constructive notice, a reasonable plaintiff would be aware of his claim.  *Cartwright v. Chrysler Corp.*, 232 So. 2d 285, 287 (1970) (recognizing constructive notice); *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) (sustaining Cartwright's basic rule but refocusing inquiry on reasonableness).  Where a plaintiff's pleadings demonstrate that his case was filed beyond the limitations period, the plaintiff bears the burden of showing that his claims accrued at some time after his alleged injury dates.  *Jones v. State*, 891 So. 2d 698, 701 (La. App. 2004) (dismissing case before trial because plaintiff failed to carry

her burden to prove discovery rule should apply).

Media coverage of facts that would give rise to a claim trigger discovery under these rules as a matter of Louisiana law.  In *Touchet v. Baker Hughes Inc.*, 737 So. 2d 821 (La. App. 1999), for example, a Louisiana appeals court held that discovery was triggered for plaintiffs exposed to a toxic spill when the plaintiffs exhibited symptoms and the "story regarding the spill was reported three times on television in the local news and once in the local newspaper." *Id*. at 825.  The court declined to postpone discovery because the facts of the case suggested that "it would have been reasonable for the plaintiffs, at least, to attempt to find out whether their ailments could be connected to the spill.  The plaintiffs are 'deemed to know' facts that they could have discovered through exercise of reasonable diligence." *Id*. at 827.

Here, a reasonable plaintiff would have been on notice of a possible claim against Merck by the time the *Cain* litigation was underway.  During that time, from May 2001 until September 2002, the possible link between Vioxx and cardio- and cerebrovascular injury was widely aired in the media, and that kind of media coverage continued right up until the date of withdrawal.

Even at the very latest, however, a reasonable plaintiff would have been on notice of his or her claims on September 30, 2004, the date that Merck announced the results of APPROVe and its decision to withdraw Vioxx from the market.  As set forth in Part A of the Background section above, the withdrawal of Vioxx and the APPROVe results – suggesting a link between Vioxx and heart attacks – were widely covered both by print and broadcast media.  The story was carried in national newspapers and television broadcasts; it was carried in newspapers in plaintiffs' home states; and it was brought to the attention of hundreds of thousands of physicians and pharmacies nationwide.[3]  Under these circumstances, reasonable plaintiffs could not have –

---

[3]     Furthermore, any plaintiffs taking Vioxx up until the date of withdrawal would have had the additional cue of being unable to obtain refills on their prescriptions.  At that point, plaintiffs would likely have been advised,

and in fact did not – sleep on their claims.  Indeed, thousands of plaintiffs managed to file their lawsuits within six months of withdrawal.

Judge Higbee recently reached precisely this conclusion under New Jersey law. Evaluating Merck's claim that the same media coverage triggered discovery as a matter of New Jersey law, Judge Higbee agreed that "[t]he onslaught of coverage regarding potential dangers of VIOXX® and heart attacks was sufficient to alert plaintiff that VIOXX® was a possible cause of her heart attack."  Mem. at 6, *Oldfield v. Merck & Co.*, No. ATL-L-2-07 (N.J. Super. Law Div. Oct. 15, 2007).  Accordingly, she concluded, "[e]xercising reasonable diligence and intelligence" – *i.e.*, the same standard exacted by Louisiana law – "plaintiff should have discovered VIOXX® as a potential cause of her injury no later than September 30, 2004 after VIOXX® was withdrawn from the market."  *Id.*  This Court should reach the same conclusion and find that, at the latest, plaintiff Watson's claims were stale under Louisiana's applicable limitation doctrine on October 1, 2005.

> ## 2. Based On Indisputable Facts And Plaintiff's Own Allegations, Merck's Alleged Fraudulent Concealment Could Only Toll The Limitations Period To September 30, 2004 – At The Latest.

Plaintiff Watson – apparently cognizant that his claims are untimely – asserts in his complaint that he is entitled to tolling on fraudulent concealment grounds.  (*See* Watson Compl. ¶¶ 63-64.)  Louisiana law tolls limitations periods where a plaintiff can prove that the defendant concealed information critical to his claim.  *See Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376 (La. 1990).  As Judge Sarah Vance has recognized, however, claims for tolling under fraudulent-concealment auspices must be pled with particularity under Federal Rule 9(b).  *In re Ford Motor*

---

consistent with the Dear Healthcare Professional letters sent to doctors and pharmacies, that the drug had been withdrawn due to concerns about cardiovascular risks.  Even if they were not so advised, the sudden unavailability of the drug would have prompted any reasonable person to follow up to find out why the drug was no longer available.

*Co. Vehicle Paint Litig.*, MDL No. 1063, 1996 U.S. Dist. LEXIS 11063, at \*23 (E.D. La. July 30, 2006).  Specifically, a plaintiff must plead both the precise date when his or her continuing diligence revealed a cause of action notwithstanding the alleged concealment, along with the actions that effectively concealed the cause of action.  *Id.*

Any fraudulent concealment tolling argument fails in these cases for at least three reasons:  (1) Watson has not pled fraud with particularity; (2) Watson only pleads fraud up until September 30, 2004, the date of withdrawal, which would amount to no tolling at all assuming an identical discovery date; and (3) media attention to the withdrawal of Vioxx was so overwhelming as to expose the basis of plaintiff's claims to any reasonably diligent person.

*First,* Watson does not have a viable fraudulent-concealment tolling argument because he has not pled facts demonstrating ongoing diligence, nor has he connected any alleged fraud by Merck with his inability to discover his claims.

*Second,* even assuming Watson's complaint states a cognizable claim of fraudulent concealment prior to the date of the withdrawal of Vioxx from the market, plaintiff fails to state such a claim beyond that date.  Specifically, Watson's complaint alleges fraudulent practices only up until September 30, 2004, when Merck stopped marketing and selling the drug.  (*See* Watson Compl. ¶ 40 (alleging that Merck improperly "continued to profit from the sale of Vioxx until September of 2004" and that "earlier removal of Vioxx would have prevented plaintiff's heart attack and continuing impairment").  Under these allegations, any claim of fraudulent concealment beyond September 30, 2004 is unsustainable, and plaintiff's claims are stale because he did not file within one year of that date.

*Third,* as a matter of law, the fraudulent concealment doctrine has no application where broad media coverage exposes the facts necessary to plaintiff's claims.  The basic theory of the

doctrine is that a plaintiff cannot make a diligent inquiry into the origins of his injury – as he is required to do under the discovery rule – when "he is not even aware that he has been injured" due to concealment of facts by the tortfeasor. *Bunge*, 557 So. 2d at 1386. But when other forces reveal those facts, tolling ceases. Thus, in *Bunge*, even though GATX never admitted that it failed to disclose knowledge of a hazardous situation, "Bunge received clear notice of injury when the tank exploded." *Id.*

The same is true here. The effect of any alleged concealment by Merck of facts critical to Watson's claims was fully abated when the withdrawal of Vioxx from the market was announced on September 30, 2004. At that time, Watson was fully capable of making the diligent inquiry into his alleged injuries that is required under Louisiana's discovery rule. Because he failed to file within a year of that date, his claims are stale.

### 3.   Plaintiff's Claims Are Not Saved By *American Pipe* Tolling.

While Watson may try to argue that his claims were tolled under *American Pipe* principles, that argument fails under Louisiana law because: (1) *American Pipe* tolling was available to plaintiff, if at all, only once, during the pendency of the *Cain* personal injury action; and (2) *American Pipe* tolling is generally not available to plaintiffs awaiting certification of personal injury class actions, because reliance on the possibility of class treatment of such inherently individualized cases is objectively unreasonable.

### a.   The Origin And Purpose Of The *American Pipe* Doctrine.

In *American Pipe & Construction Co. v. Utah*, the U.S. Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. 538, 554 (1974). Under the *American Pipe* rule, former members of a class can toll limitations periods to preserve their right to file suit in the event that their class is

not certified.[4]  The Court reached that conclusion after considering the purposes of statutes of

limitations and of Rule 23, the federal class action rule.

*First,* the Court noted that Rule 23 was adopted to improve the efficiency of the class

action device.  According to the Court, Rule 23 was adopted in part "to avoid, rather than

encourage" – as the old class-action rule had done – "unnecessary filing of repetitious papers and

motions." *Id.* at 550.  But because class action certification decisions could often linger beyond

the end of limitations periods – as had happened in the *American Pipe* case itself – this efficiency

purpose of Rule 23 would be undermined unless plaintiffs could count on the pendency of the

action to toll their claims.  Otherwise, "class members would be induced to file protective

motions to intervene or to join in the event that a class was later found unsuitable." *Id.* at 553.

*Second,* the Court found it important that the class members had acted reasonably in

relying upon the pendency of the class action.  It explained that certification had been denied (1)

"'not for failure of the complaint to state a claim on behalf of the members of the class (the court

recognized the probability of common issues of law and fact respecting the underlying

conspiracy)'"; (2) "'not for lack of standing of the representative'"; and (3) not "'for reasons of

bad faith or frivolity.'" *Id.* (quoting *Utah v. Am. Pipe & Constr.*, 473 F.2d 580, 584 (1973))

(omitting footnote).  Rather, class certification had been denied by the district court "solely

because of failure to demonstrate that 'the class is so numerous that joinder of all members is

impracticable.'" *Id.* at n.9.  "[A]t least where class action status has been denied" on these

grounds, the Court held, tolling is appropriate. *Id.* at 552.  Otherwise, in cases "where the

determination to disallow the class action [is] made upon considerations that may vary with such

---

[4]        Originally, *American Pipe*'s rule applied only to "purported members of the class who make timely
motions to intervene after the court has found the suit inappropriate for class action status," *id.* at 553, but the rule
was later extended.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ("[t]he filing of a class action
tolls the statute of limitations 'as to all asserted members of the class,' not just as to intervenors" (quoting *American
Pipe*, 414 U.S. at 554)).

subtle factors as experience with prior similar litigation or the current status of a court's docket, a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions."  *Id.* at 553-54.

**Third,** the Court noted that its tolling rule would not, as applied in *American Pipe*, disturb the purposes of the statutes of limitations.  "The policies of ensuring essential fairness to defendants and barring a plaintiff who 'has slept on his rights' . . . are satisfied when" the class action is such that it "notifies the defendants not only of the substantive claims being brought against them, but also the number and generic identities of the potential plaintiffs who may participate in the judgment."  *Id.* at 554-55 (quoting *Burnett v. N.Y. Cent. R.R.*, 380 U.S. 424, 428 (1965)).  Thus, the Court was satisfied, such class actions provide defendants with "the essential information necessary to determine both the subject matter and size of the prospective litigation," the primary concerns addressed by limitations rules.  *Id.* at 555.

**Finally,** Justice Blackmun, joining the opinion and concurring in the judgment, nonetheless issued a word of caution.  "Our decision . . . must not be regarded as an encouragement to lawyers in a case of this kind to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights." *Id.* at 561 (Blackmun, J., concurring).  He also noted that tolling would be limited to cases like the one before the Court, where the claims "invariably will concern the same evidence, memories, and witnesses as the subject matter of the original class suit," *id.* at 562, a sentiment that would later be echoed by other Justices on the Court.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 355 (1983) (Powell, J., concurring) ("[W]hen a plaintiff invokes *American Pipe* in support of a separate lawsuit, the district court should take care to ensure that the suit raises claims that 'concern the same evidence, memories, and witness as the subject matter of the

original class suit,' so that 'the defendant will not be prejudiced.'" (quoting *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring))).

b.   **Applying *American Pipe* Tolling.**

In light of these admonitions, courts have proceeded cautiously in applying the *American Pipe* tolling doctrine. The Supreme Court itself has returned to the principles underpinning the rule before deciding whether and how to apply it in subsequent cases. *See Chardon v. Fumero Soto*, 462 U.S. 650, 658 (1983) ("We must examine the reasoning of *American Pipe*" to determine how to apply the doctrine in an action brought under 42 U.S.C. § 1983, which borrows state limitations rules.); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 467 (1975) (rejecting argument based in part on *American Pipe* that filing of Title VII claim with EEOC should toll the limitation period both as to the Title VII claim and a companion claim under 42 U.S.C. § 1981 because the *American Pipe* rule "depended heavily on the fact that [the class action] involved exactly the same cause of action subsequently asserted").

The Fifth Circuit has similarly demanded that the purposes underpinning the *American Pipe* rule be satisfied, rather than applying it blindly. In *Lloyd's Leasing, Ltd. v. Bates*, for example, the Fifth Circuit rejected application of *American Pipe* because its purposes would not be served by tolling the limitations period. 902 F.2d 368, 371-72 (5th Cir. 1990). In that admiralty proceeding, Lloyd's filed a complaint for a limitation of liability under Rule F after its vessel ran aground near Cameron, Louisiana, spilling two to three million tons of crude oil. *Id.* at 369-70; *see* Fed. R. Civ. P. F. The court issued a monition[5] requiring all claims to be filed by December 31, 1984. *Lloyd's Leasing*, 902 F.2d at 369. Bates and five others filed a class action before that date, and class certification was denied on January 22, 1988, long after the end of the

---

[5]   The monition procedure is explained in greater detail in paragraph (4) of Supplemental Rule F in the Federal Rules of Civil Procedure.

monition period.  *Id.*  Shortly thereafter, other parties sought to file claims, urging tolling under *American Pipe.  Id.* at 369, 371.  The Fifth Circuit rejected the argument.  "The vice in the appellant's argument is that it ignores the grounds for the holding in *American Pipe*."  Specifically, *American Pipe*'s concern with eliminating surplus filings was entirely misplaced in the proceeding before the court:  "In the instant case, there is no danger of frustrating the purpose of the class action because no such action may be maintained in a limitation proceeding.  The filing of numerous individual claims is not a danger to be avoided but an activity which the limitation proceeding invites by its notice provisions and its relaxed attitude towards the filing of claims after the monition period has expired."  *Id.* at 371-72.

The Fifth Circuit similarly rejected tolling in *Drumm v. Sizeler Realty Co.*, 817 F.2d 1195 (5th Cir. 1987).  In that case, plaintiffs filed an unsuccessful antitrust suit in state court and, upon its failure, an out-of-time antitrust suit in federal court.  *Id.* at 1196.  Plaintiffs sought equitable tolling, analogizing their case to *American Pipe* and another tolling case.  But the Fifth Circuit rejected the argument, explaining that plaintiffs' cases "are distinguishable in fact and, even more critically, in their basic rationale."  *Id.*  Critical to the holding in *American Pipe* was the concern that the plaintiff "was unable to control the date of filing of his lawsuit, because of the pendency of a Rule 23 class action."  *Id.*  Without the protection of tolling, "[u]nfairness results to the innocent plaintiff and, indirectly, to society."  *Id.* at 1196-97.  Not so in *Drumm*, where nothing prevented plaintiffs from filing lawsuits under state and federal antitrust laws simultaneously.  *Id.* at 1197.  Thus, tolling was not available.  "The policies of ensuring essential fairness to defendants [include] . . . barring a plaintiff who 'has slept on his rights.'"  *Id.* (quoting *Burnett*, 380 U.S. at 428).

As a final example, the basic principles of *American Pipe* have guided federal courts to

the uniform conclusion that its tolling rule operates only with respect to the first class action filed with regard to a specific controversy.  If class certification has been denied, plaintiffs cannot receive the benefit of tolling in a second, subsequently filed class action involving the same proposed class and claims.  *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985).  This doctrine is known colloquially as the prohibition on "stacking" or "piggybacking" class actions.  Every federal circuit court to consider the question has adopted this rule,[6] and state courts that have considered the issue have generally adopted the same prohibition.

c.   ***American Pipe* In Diversity Cases.**

The federal *American Pipe* doctrine does not apply directly in a diversity case.  Though the federal circuits are divided on the issue, the Fifth Circuit and others have held that, in the event of a conflict between the federal tolling rule and the tolling rules under the applicable state's statute of limitations, the *Erie* doctrine requires application of the state's tolling rule.  *See Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1147 (5th Cir. 1997) (noting that a state's interest in its own tolling rules has "quite considerable depth," and *Erie* requires application of state rule that would undermine the policy rationale of *American Pipe* because neither "the federal

---

[6]     As the Ninth Circuit has noted:

> The Supreme Court has not yet considered whether the filing of a class action tolls the statute of limitations for a subsequently filed successor class action. However, every circuit to consider the question, including this one, has held that such tolling is not available.  *See Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir.1998) ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely."); *Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir.1994) ("Plaintiffs may not piggyback one class action onto another and thus toll the statute of limitations indefinitely."); *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir.1988) ("The courts of appeals that have dealt with the issue appear to be in unanimous agreement that the pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class."); *Robbin v. Fluor Corp.*, 835 F.2d 213, 214 (9th Cir.1987) (holding that a class action tolls the statute of limitations only for subsequent individual actions, not for subsequent class actions); *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir.1987) (same).

*Catholic Soc. Servs., Inc. v. I.N.S.*, 182 F.3d 1053, 1059 (9th Cir. 1999).

constitution nor federal law would be displaced"); *see also, e.g.*, *Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999) (holding that "in any case in which a state statute of limitations applies – whether because it is 'borrowed' in a federal question action or because it applies under *Erie* in a diversity action – the state's accompanying rule regarding equitable tolling should also apply") (citing *Chardon*, 462 U.S. at 660-62, and *Bd. of Regents v. Tomanio*, 446 U.S. 478, 484-86 (1980)).  Thus, the Court must ask how the relevant state would interpret and apply *American Pipe* in deciding whether plaintiff's claims are time-barred.

Three doctrinal developments among the various states are worthy of particular attention here.

**First,** a number of states, including Kentucky, have not adopted *American Pipe*, and it would be inappropriate for a federal court to do so on their behalf.  In *Boone v. Citigroup, Inc.*, for example, the Fifth Circuit rejected a claim for *American Pipe* tolling in a case arising under Mississippi law.  416 F.3d 382 (5th Cir. 2005).  Critically, the court explained, *American Pipe* and *Crown, Cork* each involved "a federal class action for violation of a federal statute" and tolled the limitation period for parties who later brought "an action, within the scope of the putative class action, for violation of the same federal statute by a member of the putative class against a defendant in the class action."  *Id.* at 393.  But "Mississippi does not have class actions and we are cited to no Mississippi court decision applying class action tolling to a Mississippi law cause of action allegedly barred by a Mississippi statute of limitations."  *Id.* at 393-94.  Accordingly, the court rejected plaintiffs' tolling argument, declining to author such a doctrine on Mississippi's behalf.[7]  *Id.*  That holding was consistent with the Fifth Circuit's general policy

---

[7]    The court was further troubled by the fact that plaintiffs had pointed to a class action filed in another state, suggesting a narrower holding than an outright rejection of such a tolling doctrine.  But while it is possible to construe the holding as rejecting only a cross-jurisdictional tolling doctrine, the dicta unequivocally emphasizes the fact that Mississippi has never announced an *American Pipe* doctrine.

against effecting a "substantive innovation" in state law in diversity cases.  *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. 1980) ("Whatever the merits or demerits of the proposed new rule, for us to adopt it for Texas would be presumptuous."); *see also, e.g.*, *Wade*, 182 F.3d at 286 (declining to adopt *American Pipe* tolling on behalf of Virginia for class actions filed out of state because Virginia had never expressly adopted *American Pipe* at all and because "of the general principle that, 'in trying to determine how the highest state court would interpret the law, we should not create or expand that State's public policy'" (quoting *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 260 (4th Cir. 1998))).

**Second,** some states afford "cross-jurisdictional" tolling, while others (such as Tennessee) do not.  *Compare*, *e.g.*, *Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160, 162-63 (Ohio 2002) (cross-jurisdictional tolling), *with Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1103, 1105 (Ill. 1998) (no cross-jurisdictional tolling).  A state that does not recognize cross-jurisdictional tolling will not toll the statute of limitations pending certification of a related class action filed in the court of another state or in a federal court.  And even a state that observes some form of cross-jurisdictional tolling may not toll under all circumstances – for example, it may toll while a federal class action is pending within that state, but not while a class action is pending out-of-state.  Again, where states have declined to adopt such doctrines for themselves, a federal court sitting in diversity should usually not reach out to author one on its own.  *Wade*, 182 F.3d at 286.

**Third,** several jurisdictions have held that *American Pipe* tolling is simply unavailable for mass-tort personal injury cases like this one.  These courts have looked to the purposes of *American Pipe* and found them to be ill-served by applying the doctrine to such cases, particularly because mass-tort personal injury cases are generally uncertifiable (and thus

plaintiffs relying on the pendency of such class actions act unreasonably)[8] and because the varying nature of personal injury claims are such that the details of one plaintiff's case do not generally put a defendant on notice of the claims of nameless class members.  On the basis of these considerations, the more carefully reasoned opinions on the issue have uniformly rejected tolling.  *See, e.g.*, *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 937-38 (Cal. 1988) (admonishing that personal injury plaintiffs "would be ill advised to rely on the mere filing of a class action complaint to toll their individual statute of limitations.  ***The presumption, rather, should be to the contrary*** . . . ." (emphasis added)); *see also Philip Morris USA, Inc. v. Christensen*, 905 A.2d 340, 358-60 (Md. 2006) (expressing support for *Jolly*'s presumption against tolling in the mass tort context); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2005 WL 26867, at *3 (S.D.N.Y. Jan. 5, 2005) (noting that the "wisdom of adopting the *American Pipe* rule in mass tort cases is, to say the least, highly debatable"); *Barela v. Showa Denko K.K.*, No. 93-1469 LH/RLP, 1996 U.S. Dist. LEXIS 7830, at *16 (D.N.M. Feb. 28, 1996) (expressing doubt whether a federal court should adopt *American Pipe* tolling for a state that had not adopted the doctrine in a mass-tort personal injury case in light of the fact that "most federal courts . . . refuse to permit the use of the class-action device in mass-tort cases" (citation and internal quotation marks omitted)).

---

[8]      *See In re Am. Med Sys.*, 75 F.3d 1069, 1089 (6th Cir. 1996) (there is a "national trend to deny class certification in drug or medical product liability/personal injury cases"); *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D. 133, 144-45 (E.D. La. 2002) (contraceptive drug) ("In the present case the monetary claims are dependent in a significant way on differences of each class member's circumstances.  They will require additional hearings to resolve the disparate merits of each individual's case." (quotation omitted)); *In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982) (contraceptive device) ("In products liability actions . . . individual issues may outnumber common issues.  No single happening or accident occurs to cause similar types of physical harm or property damage.  No one set of operative facts establishes liability."); *Zehel-Miller v. AstraZenaca Pharms., LP*, 223 F.R.D. 659, 663 (M.D. Fla. 2004) (antipsychotic drug) (certification of personal injury damages claims "would be indisputably inappropriate, since individual issues would overwhelm any common questions"); *In re Paxil Litig.*, 212 F.R.D. 539, 551 (C.D. Cal. 2003) (antidepressant) ("[I]ndividual questions of fact regarding causation . . . subvert any benefits to be gained through a class action proceeding."); *Mertens v. Abbott Labs.*, 99 F.R.D. 38, 41 (D.N.H. 1983) (prescription drug DES) (resolving common issue of a drug's capacity to cause injury would do "substantially nothing" to advance the litigation "[i]n light of the varied degrees of use, exposure and harm in each Plaintiff's case"); *Ryan v. Eli Lilly & Co.*, 84 F.R.D. 230, 233 (D.S.C. 1979) (synthetic estrogen) ("A class situation is simply not efficient when so much in the way of individual proof by each of the class members will obviously be required.").

That conclusion is the correct one, as a return to the principles of *American Pipe* confirms.  Because prescription drug personal injury cases are almost never certified, they are not the kinds of cases that present certification decisions that hinge on subtle distinctions.  The case in *American Pipe*, in contrast, was one of a genre of cases that entailed "considerations that may vary with . . . subtle factors" and thus made difficult "successful anticipation of the determination of the viability of the class," 414 U.S. at 553-54, making reliance on the possibility of certification reasonable.

Furthermore, the individualized nature of personal injury claims is such that a defendant is not fairly put on notice of all the claims against it by the filing of a class action.  As Merck noted in its opposition to class certification, these cases involve widely varying facts with respect to usage, dose, content of warnings, medical history, and a host of other factors unique to each plaintiff.  Not surprisingly, each trial requires extensive individualized discovery, involving "evidence, memories, and witnesses" that are unique to each case, including – by way of example – family members, treating physicians, and pharmacy records to which Merck cannot possibly have access without knowing the actual identity of the plaintiff.  And Merck could have no way of knowing the number of claims that would be encompassed by such an action, let alone the identities of the witnesses or their evidence.  The Vioxx suits are thus unlike the *American Pipe* case, in which the Court noted the "probability of common issues of law and fact," *id.* at 553, and in which there could be no doubt that individual claims "invariably will concern the same evidence, memories, and witnesses as the subject matter of the original class suit," *id.* at 562 (Blackmun, J., concurring).

In addition, extending the doctrine to mass-tort personal injury cases would encourage plaintiffs' lawyers to file class actions merely to achieve an illegitimate tolling benefit for

unnamed members of the purported class (as happened in this case).  They are thus precisely the kinds of cases Justices Blackmun and Powell warned about in their concurring opinions in *American Pipe* and *Crown, Cork*.  As evidenced by the instant proceedings, tolling also serves no efficiency purpose – the solitary virtue of *American Pipe* tolling – because the vast majority of plaintiffs file their complaints notwithstanding the hypothetical availability of class-action tolling.  Indeed, *American Pipe* is all the more unnecessary in the instant litigation in light of the tolling agreement, which, at least for plaintiffs who have not slept on their claims, serves the purposes of *American Pipe* and would be redundant if *American Pipe* tolling actually applied in the mass-tort context.

**Finally**, class action tolling in the context of mass tort proceedings also leads to injustice.  If plaintiffs are allowed to slumber and not assert their claims while others have pursued their claims in mass litigation of this kind, the parties – plaintiffs and defendants alike – cannot get a grasp of the size or scope of the litigation until years after the deadlines contemplated by the applicable statutes of limitations.  Without a grasp on the size or scope of the litigation, the parties are shackled in searching for ways to resolve the litigation, leaving the claims of individual plaintiffs, some of whom may be ill or elderly, languishing until the doors are deemed closed.

### d.     Plaintiff Watson's Claims Are Stale Under Louisiana Law Notwithstanding *American Pipe.*

Louisiana follows *American Pipe*.  Under the Civil Code, a limitation period "is interrupted when the owner commences action against the possessor, or when the obligee commences action against the obligor, in a court of competent jurisdiction and venue."  La. Civ. Code Ann. art. 3462.  Citing *American Pipe*, a Louisiana appeals court has explained that this rule applies to class actions.  *Smith v. Cutter Biological*, 770 So. 2d 392, 408 (La. Ct. App.

2000).  In *Smith*, plaintiff sued producers of a clotting factor for hemophiliacs after he contracted HIV by use of the products.  The court determined that the plaintiff's claim was filed too late, *id.* at 400, and the plaintiff sought *American Pipe*-like tolling to save his claim.  *Id.* at 408.  To do so, however, he had to rely on several overlapping class action periods in order to make his claim timely.  *Id.* at 408-10.  The court rejected the effort, noting that article 3462 "was not intended to interrupt prescription where the stacking of class actions is concerned" and citing federal cases discussing the stacking prohibition.  *Id.* at 410 (citing *Basch*).

The court also embraced (in dicta) cross-jurisdictional tolling under the expansive language of article 3462, which requires tolling whenever an action is commenced in any "court of competent jurisdiction" and venue.  *Id.* at 408.  That observation was consistent with the Louisiana Supreme Court's earlier statement that "it has become well settled that prescription may be interrupted under article 3462 by the timely filing of a suit in a court of competent jurisdiction and venue, regardless of whether it is a federal, Louisiana or another state court." *Taylor v. Liberty Mut. Ins. Co.*, 579 So. 2d 443, 446 (La. 1991).

Louisiana's *American Pipe* doctrine cannot save plaintiff's claims here for several reasons.

***First,*** tolling is unavailable with regard to plaintiff Watson because of the rule against stacking.  The *Cain* nationwide class action filed in New York in 2001 against Merck was the first Vioxx personal injury class action to suspend plaintiffs' one-year limitation period, and the prohibition on stacking class actions prevented these plaintiffs from benefiting from any subsequently filed class action, whether in Louisiana or elsewhere.  *See Smith*, 770 So. 2d at 410 ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely.").

The fact that the *Cain* plaintiffs voluntarily dismissed their personal injury claims prior to a certification ruling does not change this result.  As other courts have recognized, the test cannot be how the class action ends; otherwise, plaintiffs could file an unending series of class actions that they voluntarily dismiss in each case prior to certification, thereby short-circuiting the stacking rule.  *See Hunter v. Am. Gen. Life & Accident Ins. Co.*, 384 F. Supp. 2d 888, 893 (D.S.C. 2005) (holding that stacking prohibition applies to voluntarily dismissed claims because allowing tolling would encourage "spin-off litigation" in which "counsel could initially pursue a broad definition in one jurisdiction, voluntarily narrow it for settlement purposes, dismiss any remaining claims, and then revive the dismissed claims in multiple suits in other jurisdictions while gaining the benefit of tolling from the earlier litigation"); *Sheppard v. Capital One Bank*, No. 06-7535, 2007 U.S. Dist. LEXIS 70061, at *10-14 (C.D. Cal. July 11, 2007) (agreeing with *Hunter* that narrowing a class, whether voluntarily or involuntarily, implicates the stacking rule as to the severed claims); *see also Am. Pipe*, 414 U.S. at 561 (Blackmun, J., concurring) (urging that *American Pipe*'s rule "must not be regarded as encouragement to lawyers in a case of this kind to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights"); *Crown, Cork*, 462 U.S. at 354 (Powell, J., concurring) (warning that the "tolling rule of *American Pipe* is a generous one, inviting abuse").

***Second,*** even if *Cain* did not disqualify plaintiff from seeking additional subsequent tolling, such tolling is inappropriate here because it is inconsistent with the purposes of *American Pipe*.

Louisiana law bars reliance on pending classes when such reliance is unreasonable.  *Cf. Smith*, 770 So. 2d at 409 (agreeing that "continued tolling of the statute of limitations after the district court denies class certification is unnecessary to protect any ***reasonable*** . . . reliance by

putative class members on their former class representatives" (emphasis added) (quoting *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1382 (11th Cir. 1998))). *Smith* held in part that reliance on the possibility that a district court would reverse its negative ruling on a certification question was "ordinarily not reasonable" and thus that tolling was inappropriate. *Id.* Reliance on the hope that a court would certify a statewide or nationwide class action for personal injury is similarly not reasonable. As the *Baycol* court noted, "[N]o [federal] Court of Appeals decision has approved class certification of an action involving prescription drugs." *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 204 (D. Minn. 2003) (cholesterol drug). There is thus no reason to believe that Louisiana courts would afford *American Pipe* tolling in Vioxx cases. Rather, Louisiana law appears to track the careful reasoning exhibited in opinions like the *Jolly* case, which held that reliance on the possibility of class certification is objectively and empirically unreasonable in mass-tort personal injury cases. *See Jolly*, 751 P.2d at 937-38.

Furthermore, as articulated above, the interests identified by the Supreme Court in *American Pipe* would not be furthered by tolling plaintiff's claims. As the carefully reasoned opinion in *Smith* reveals, Louisiana courts do not automatically apply *American Pipe* tolling; rather, they seek to apply it consistently with the purposes identified by the Supreme Court. Those purposes are absent here. As explained above, class actions cannot put Merck on notice of unnamed plaintiffs' claims because personal injury claims are so individualized, plaintiffs were never named parties prior to filing their individual suits, and their cases do not entail identical evidence, memories, or witnesses. Granting tolling here would simply award abuse of the class action process, which would serve neither federal nor Louisiana interests.

In sum, *American Pipe* tolling is unavailable, and plaintiff Watson was required to file his action – at the latest – by September 30, 2005. Because he failed to do so, his claims are stale

under Louisiana law.

### 4.    Plaintiff's Other Claims Are Similarly Time-Barred Under Louisiana Law.

In addition to his personal injury-based claims, plaintiff Watson also alleges claims under theories of fraud, misrepresentation, and breach of warranty.  (*See* Watson Compl. ¶¶ 49-54, 55-59)  However, Louisiana's one-year limitation period applies to – and bars – these claims as well.  Louisiana's Unfair Trade and Consumer Protection Law requires fraud claims to be brought within one year.  La. Rev. Stat. Ann. § 51:1409(e).  A one-year statute of limitation also applies to redhibition, *i.e.*, warranty, claims.  *Moreno's, Inc. v. Lake Charles Catholic High Sch., Inc.*, 315 So. 2d 660, 663-64 (La. 1975).  As a result, all of plaintiff's claims are time-barred under Louisiana law.

### C.    Plaintiff Watson's Claims Are Also Barred Under Kentucky Law.

Kentucky requires plaintiffs to file personal injury claims within one year of injury or discovering their claims.   Ky. Rev. Stat. Ann. § 413.140(1)(a).  Accordingly, plaintiff Watson had to file his personal injury-based claims – including negligence (Watson Compl. ¶¶ 31-34), design defect (*id.* ¶¶ 35-41), and marketing defect (*id.* ¶¶ 42-48) – no later than September 30, 2005, one year after the withdrawal of Vioxx from the market.  As explained in detail below, plaintiff Watson failed to do so, and his claims are therefore stale under Kentucky law as well.

### 1.    Under Kentucky's Discovery Rule, Plaintiff Watson's Claims Became Stale – At The Latest – One Year After The Date Vioxx Was Withdrawn From The Market.

A personal injury cause of action does not accrue in Kentucky until discovery of the injury and its cause, including the identity of the tortfeasor.  *Perkins v. Ne. Log Homes*, 808 S.W.2d 809, 819 (1991) (explaining that "a cause of action will not accrue . . . until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has

been injured but also that his injury may have been caused by the defendant's conduct" (citations omitted) (quotation omitted)).

Under Kentucky's discovery rule, once substantial media coverage supplies the information necessary to state a claim, the clock starts ticking.  For example, in *Blanton v. Cooper Indus.*, 99 F. Supp. 2d 797, 802 (E.D. Ky. 2000), the district court held that local media coverage of water contamination caused by a power plant triggered discovery.  In *Blanton*, plaintiffs sued over a toxic spill that they alleged caused them cancer.  Plaintiffs argued that the news reports were insufficient to trigger discovery because they themselves did not have "subjective knowledge of their injuries and the cause" thereof.  *Id.* at 802.  Specifically, one plaintiff argued that his illiteracy prevented him from learning of the incident, and the other plaintiff argued that the reference in media reports to a particular community (not hers) prevented her from making the link between the contamination and her injury.  *Id.* at 802-03.  The court rejected these arguments and granted summary judgment.

According to the court, "widespread reports by local, regional, and national media" of the spill rendered plaintiffs' discovery-rule and fraudulent-concealment arguments insufficient as a matter of law to toll the limitations period.  *Id.* at 799, 802-03.  This is because "[t]he discovery rule focuses not on when a plaintiff has actual knowledge of a legal cause of action, but whether a plaintiff acquired knowledge of existing facts sufficient to put the party on inquiry."  *Id.* at 802.  Indeed, "'any fact that should excite his suspicion is the same as actual knowledge of his entire claim . . . [and] the means of knowledge are the same thing in effect as knowledge itself.'"  *Id.* (quoting *Hazel v. Gen. Motors Corp.*, 863 F. Supp. 435, 440 (W.D. Ky. 1994)).  The court also pointed to the hundreds of other plaintiffs who had filed suits in a timely manner, concluding that the plaintiffs in this case "failed to exhibit the qualities of attention, knowledge, intelligence and

judgment that society requires of its members for their own protection."  *Blanton*, 99 F. Supp. 2d at 803 (citation and quotation marks omitted).  *See also Wireman v. Fletcher*, CA No. 3:06-13-JMH, 2006 U.S. Dist. LEXIS 92059, at *23 (E.D. Ky. Dec. 20, 2006) (plaintiff "had reason to know of her injury" because, *inter alia*, the "defendants she named in her complaint . . . were the subjects of extensive media coverage throughout the summer and fall of 2005, coverage that specifically mentioned that position and their roles in suspect hiring practices").

The facts in this case are even more compelling than *Blanton*.  Unlike *Blanton*, plaintiff Watson does not offer any subjective reason, such as illiteracy, as to why he was not aware of the Vioxx controversy (which was, in any event, covered extensively in the broadcast media as well).  Indeed, plaintiff Watson has never alleged that he was unaware of the alleged risks of Vioxx as of September 30, 2004.  To the contrary, Watson previously submitted an affidavit to the Court merely stating that:  "***Prior*** to the ***withdrawal of Vioxx*** from the market on September 30, 2004, I had no knowledge that the drug was associated with causing cardiovascular injuries and/or that other plaintiffs had brought claims against Merck."  (Aff. of Timothy Watson, Dec. 22, 2006 (attached as Ex. 52) (emphasis added).)

Thus, ***at the very latest***, Watson was put on notice of his claims on September 30, 2004 – the date on which Merck announced the Vioxx withdrawal.  Indeed, Watson alleges in his complaint that it was the very results of the APPROVe study that "confirmed ***what researchers had been saying for years***, i.e., that Vioxx significantly increases the risk of thrombotic events." (Watson Compl. ¶ 27.)  However, Watson failed to file by September 30, 2005, waiting instead until November 14, 2005.  Thus, Watson's claims are stale under Kentucky law.

### 2.     Plaintiff's Claims Are Not Subject To Tolling Under The Fraudulent Concealment Doctrine.

Plaintiff Watson's allegation in his Complaint that his claims were tolled by alleged fraudulent concealment on Merck's part (*see* Watson Compl. ¶¶ 63-64) is also unavailing.

Under Kentucky law, the fraudulent concealment doctrine does not operate to toll a plaintiff's claims absent some real evidence that the defendant took actions to prevent the plaintiff from filing suit. *Blanton*, 99 F. Supp. 2d at 80.  In *Blanton*, the court rejected plaintiffs' argument that the statute of limitations applicable to their claims had been tolled by defendant's fraudulent concealment.  According to the court, tolling does not apply where plaintiffs "have not alleged that any of the defendants' actions actually caused the plaintiffs not to file suit," because the "statute [of limitations] cannot be tolled without at least some connection." *Id.*  The same is true in this case.  Mr. Watson has never made any allegation that any action by Merck after withdrawal caused him to delay filing his suit.  Moreover, the numerous reports in the media of a link between Vioxx and heart attacks were sufficient to apprise Mr. Watson of a possible cause of action.  Accrual of a claim is not held in abeyance until the plaintiff has learned every critical detail of his case.  *See McLain v. Dana Corp.*, 16 S.W.3d 320, 326 (Ky. Ct. App. 1999) ("A person who has knowledge of an injury is put on 'notice to investigate' and discover, within the statutory time constraints, the identity of the tortfeasor.").  Accordingly, plaintiff Watson could not prove any set of facts that could toll the limitations period under the fraudulent-concealment doctrine.  For this reason too, his claims fail as a matter of law.

### 3.     *American Pipe* Tolling Does Not Extend The Life Of Plaintiff's Claims.

Nor was plaintiff Watson's claim tolled by any class actions filed with respect to Vioxx.

For starters, Kentucky has never recognized *American Pipe* tolling.  *See Highland Park Ass'n of Bus. & Enters. v. Abramson*, No. 94-6424, 1996 U.S. App. LEXIS 19122, at *14 (6th

Cir. July 3, 1996) (noting that "Kentucky law does not specify the tolling effect of a class action when class certification has been denied").  Although Kentucky courts have never expressly rejected *American Pipe* tolling, they have generally held that tolling is inappropriate unless expressly authorized by the legislature.  *Cf. Roman Catholic Diocese v. Secter*, 966 S.W.2d 286, 288 (Ky. Ct. App. 1998) (noting that "Kentucky courts have generally refused to extend the discovery rule without statutory authority to do so" and declining to extend it in that case).

This Court should respect Kentucky's interest in the vitality of its limitations rules and not invent a tolling doctrine that Kentucky's courts have never adopted for themselves.  *See Orleans Parish Sch. Bd. v. U.S. Gypsum Co.*, 892 F. Supp. 794, 805 (E.D. La. 1995) ("The limitations periods of *American Pipe* and *Crown, Cork* were derived from federal statutes.  Here, we are dealing with Hawaii's limitation statutes.  Because none of them provide for tolling in a situation such as exists here, it is doubtful that either *American Pipe* or *Crown, Cork* can be treated as applicable precedent."); *see also Barela*, 1996 U.S. Dist. LEXIS 7830, at *16 (explaining that no "overriding federal interest in class actions mandates application of *American Pipe* in diversity cases in the absence of applicable state tolling law").[9]

Moreover, even if Kentucky adopted *American Pipe*, Watson's claims would still be barred.  No Vioxx personal injury class action is or ever has been pending in Kentucky.  Thus, unless Kentucky would not only adopt *American Pipe* tolling but also a doctrine of cross-jurisdictional tolling, Watson would have no pending class action to point to as a basis for tolling his limitation period.  As the U.S. Court of Appeals for the Fourth Circuit has explained, federal

---

[9]     When a state court has not spoken with respect to a particular question of law, federal courts sitting in diversity must make an "*Erie* guess" about what rule the state's highest court would adopt.  Federalism concerns counsel against making guesses that would work a dramatic change in state law.  For example, in *Rhynes*, the Fifth Circuit rejected a personal injury plaintiff's suggestion that Texas would adopt an innovative theory of product liability on the ground that it should tread lightly when asked to embrace a "substantive innovation" in state law.  629 F.2 at 410 (explaining that "[w]hatever the merits or demerits of the proposed new rule, for us to adopt it for Texas would be presumptuous").

courts should not invent a cross-jurisdictional tolling doctrine for a state that has not even

embraced *American Pipe* tolling for suits filed in the state itself. *See Wade*, 182 F.3d at 286-87.

In addition, even cross-jurisdictional tolling could not save Watson's claims unless

Kentucky rejected the rule against stacking, which would make it the first state or federal

jurisdiction to do so. This is so because Watson would already have received the benefit of

tolling from the *Cain* class action, making further tolling inappropriate.

Finally, even if Kentucky were to adopt some form of *American Pipe*, Watson would

independently be prevented from seeking tolling because, as discussed *supra*, his reliance on the

possible certification of a personal injury class action would be objectively unreasonable. Thus,

under every possible scenario and every potentially applicable state's laws, Watson's claims are

time-barred and should be dismissed.

### 4. Plaintiff Watson's Other Claims Are Similarly Barred.

In addition to his personal injury claims, which are time-barred for all of the reasons set

forth above, plaintiff alleges claims for breach of express warranties (Watson Compl. ¶¶ 49-54),

and misrepresentations and fraud (*id*. ¶¶ 55-59). However, these claims also fail under Kentucky

law.

***First***, plaintiff's claim for breach of warranty is barred for lack of privity. "Kentucky law

requires privity where liability is predicated on warranty, as opposed to ordinary negligence or

strict liability." *Roberts v. Solideal Tire, Inc*., No. 06-14-DLB, 2007 U.S. Dist. LEXIS 75512, at

*7 (E.D. Ky. Oct. 10, 2007) (granting summary judgment on product liability plaintiff's warranty

claims where plaintiff did not purchase allegedly defective product from manufacturer) (citing

*Snawder v. Cohen*, 749 F. Supp. 1473, 1481 (W.D. Ky. 1990)). Claims for breach of warranty

under Ky. Rev. Stat. Ann. § 355.2-313, breach of implied warranty under Ky. Rev. Stat. Ann. §

355.2-314, and breach for the implied warranty of fitness for a particular purpose under Ky. Rev.

Stat. Ann. § 355.2-315 "all require privity between a claimant and a defendant." *Roberts*, 2007 U.S. Dist. LEXIS 75512, at *8. Thus, summary judgment on breach of warranty claims is appropriate where, as here, the plaintiff did not purchase the allegedly defective product at issue directly from the manufacturer of that product.

For example, in *Williams v. Fulmer*, 695 S.W.2d 411 (Ky. 1985), the Kentucky Supreme Court affirmed summary judgment for defendants where plaintiff alleged breach of warranty claims stemming from the death of a motorcycle passenger allegedly killed as a result of a defective motorcycle helmet. In that case, the decedent purchased the helmet in question from a private seller, as opposed to the manufacturer of the helmet itself. *Id*. at 412-13. As a result, the court held that summary judgment was appropriate, noting that plaintiff had no basis for "asserting a cause of action based on breach of sale's warranties because there was no privity between the decedent and the appellees." *Id*.

The Supreme Court recently confirmed that holding in *Williams* in *Compex Int'l Co. v. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006). In *Compex Int'l*, the court affirmed dismissal of warranty claims brought by an individual allegedly injured by a defective chair. According to the court, plaintiff's claims were barred because neither plaintiff nor his family members purchased the chair directly from the manufacturer. *Id*. Because a "seller's warranty protections are only afforded to one with whom there is privity of contract, or, to use the terms of the statute, a 'seller's' warranty protections are only afforded to 'his buyer,'" the court held that plaintiff's warranty action failed as a matter of law. *Id*. The same is true in this case. Plaintiff Watson has not – and cannot – allege that he ever purchased Vioxx directly from Merck. As a result, there is no privity between the parties and, therefore, plaintiff's warranty claims must fail.

***Second***, plaintiff's misrepresentation/fraud claim is also barred because Kentucky does

not recognize a cause of action for fraud based on an omission absent evidence of a fiduciary relationship between the parties.  Kentucky courts have recognized that "[f]raud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.,* 113 S.W.3d 636, 641 (Ky. Ct. App. 2003).  In order to "prevail on a claim of fraud by omission, or fraud based on failure to disclose a material fact, a plaintiff must prove:  (a) that the defendants had a duty to disclose that fact; (b) that defendants failed to disclose that fact; (c) that the defendants' failure to disclose the material fact induced the plaintiff to act; and (d) that the plaintiff suffered actual damages.  *Id*. (citing *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127 (Ky. App. 1998) (it is "well established that mere silence is not fraudulent absent a duty to disclose)).  A "duty to disclose may arise from a fiduciary relationship, from a partial disclosure of information, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose same." *Smith*, 979 S.W.2d at 129.  In this case, no such duty exists.

Plaintiff Watson's fraud claims are based on allegations that Merck concealed information regarding the health risks of Vioxx.  (*See* Watson Compl. ¶ 58.)  Nowhere in plaintiff's complaint does he identify a specific, affirmative misrepresentation made by Merck. Instead, his claims turn on the assertion that Merck "actively concealed" information from the consuming public regarding the alleged side effects and risks of the drug.  As a result, his fraud claim cannot proceed absent some evidence that Merck had a duty to disclose information based on a fiduciary relationship or contract between the parties.  *Smith*, 979 S.W.2d at 129.  Because plaintiff has not – and cannot – present evidence that such a duty existed, his fraud claim must fail.

II.     **PLAINTIFF DAWSON'S CLAIMS ARE BARRED UNDER TENNESSEE LAW.**

A.      **Tennessee Choice-of-Law Rules Govern Plaintiff Dawson's Claims.**

Plaintiff Dawson filed his action in Tennessee state court.  This Court must therefore

apply Tennessee choice-of-law rules to his claims.  *In re Vioxx*, 478 F. Supp. 2d at 903

(explaining that for cases transferred to the MDL, "the MDL court must apply the law of the

transferor forum, that is, the law of the state in which the action was filed, including the

transferor forum's choice-of-law rules" (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 524

(1990)).  Tennessee law is clear, however, that courts "must apply the procedural law, including

statutes of limitations, of the forum state, Tennessee."  *Mackey v. Judy's Foods, Inc.*, 867 F.2d

325, 328 (6th Cir. 1989); *See also Elec. Power Bd. v. Monsanto Co.*, 879 F.2d 1368, 1375 (6th

Cir. 1989) ("the procedural law of the forum state applies, including its statutes of limitations");

*In re Sw. Equip. Rental*, No. CIV-1-90-62, 1992 U.S. Dist. LEXIS 21396, at *39 (E.D. Tenn.

July 9, 1992) ("Tennessee's choice of law rules follow the *lex fori* where the relevant statute is

procedural"); *Cronin v. Howe*, 906 S.W.2d 910, 913 (Tenn. 1995) ("statutes of limitation are

merely procedural").  As set forth in detail below, plaintiff Dawson's claims are untimely under

Tennessee law.

B.      **Plaintiff Dawson's Claims Fail Under Tennessee Law.**

Tennessee observes a one-year limitation period for personal injury product liability

cases.  Tenn. Code Ann. § 28-3-104.  Thus, at the very latest, plaintiff Dawson was required to

file his personal injury claim within one year of the withdrawal of Vioxx from the market.

Because he did not file his claim until December 2006, plaintiff Dawson's personal injury-based

claims – *i.e.*, his claims for and negligence (Dawson Compl. ¶¶ 7-9); strict liability (*see id*. ¶ 10);

41

loss of consortium (*id*. ¶ 13); and punitive damages (*id* ¶ 4)[10] – are time-barred under Tennessee law.

> 1.    **Under Tennessee Law, The Discovery Rule Was Triggered – At The Latest – By The Media Coverage Following The Withdrawal Of Vioxx.**

Tennessee's one-year limitations period begins either at the date of injury or, if the plaintiff did not know the basis of his injury at the time, the claim begins to accrue when he discovers that basis and the identity of the tortfeasor.  *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982) (explaining that the discovery rule is an equitable necessity because "no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty").

Tennessee courts have recognized that summary judgment is appropriate where a plaintiff filed his claims more than one year after the controversy at issue in the litigation became the subject of publicity.  For example, in *Maestas v. Sofamor Danek Group, Inc.*, No. 02a01-9804-cv-00099, 1999 Tenn. App. LEXIS 97, at *16-17 (Tenn. Ct. App. Feb. 16, 1999), a Tennessee appellate court affirmed summary judgment in favor of the defendant on limitations grounds, even though the publicity at issue there paled in comparison to the maelstrom of media coverage

---

[10]    Plaintiff's claims for loss of consortium and punitive damages are merely derivative of plaintiff Dawson's personal injury allegations.  Thus, if plaintiff's personal injury claims fail, so too do his punitive damages and consortium claims.  *See Wyatt v. TVA*, No. 3:05-0834, 2007 U.S. Dist. LEXIS 1763, at *11-12 (M.D. Tenn. Jan. 8, 2007) (noting that loss of consortium is considered a derivative claim in Tennessee and, as a result, once primary "claims have been dismissed . . [the] derivative loss of consortium claim is dismissed as well"); *Roy v. Diamond*, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999) (noting that "actual damages must be found as a predicate for the recovery of punitive damages") (citing *Allen v. Melton*, 99 S.W.2d 219, 225 (Tenn. Ct. App. 1936)).

following the withdrawal of Vioxx.  *See id.* (quoting *Shorter v. McManus*, No. 03A01-9704-CV-

00132, 1997 Tenn. App. LEXIS 789 (Tenn. Ct. App. Nov. 13, 1997)).

The *Maestas* case was part of a litigation over bone screws widely used as spinal fixation

devices, which were FDA-approved but not for use in spines.  *See Shadrick v. Coker*, 963

S.W.2d 726, 730 (Tenn. 1998).  There, the defendant manufacturer moved for summary

judgment, arguing that the plaintiffs' claims were barred by the one-year statute of limitations

under Tennessee law.  Like plaintiffs in this case, the plaintiffs in *Maestas* argued that the

discovery rule should have tolled the limitation period.  The defendant disagreed, pointing to a

**single** airing of a nationwide television program on December 16, 1993, as the last date that, as a

matter of law, could have started plaintiffs' limitation period.  The trial court granted summary

judgment, and the court of appeals affirmed:  "We do not see how the discovery rule could

continue to toll the statute of limitations after that date, since the nature of the allegedly wrongful

conduct was at minimum knowable, if not actually known, to plaintiffs from that day forward."

*Maestas*, 1999 Tenn. App. LEXIS 97, at *12.  Going further, the court noted that – again as in

the instant litigation – the "publicity generated a veritable host of lawsuits in U.S. District Courts

as to activate multi-district procedures."  *Id.* at *12 n.8.

The Sixth Circuit applied the same rule in *Ball v. Union Carbide Corp.*, 376 F.3d 554,

563-64 (6th Cir. 2004).  In *Ball*, the plaintiffs claimed they had been harmed by exposure to

radioactive and other toxic substances due to the proximity of a nuclear weapons manufacturing

plant.  The Sixth Circuit affirmed summary judgment on behalf of the defendants, holding that

plaintiffs' claims were barred by the Tennessee statute of limitations.  Although plaintiffs argued

the statute of limitations did not begin to run until the release of a report outlining the first

instance when a definite link between exposure and illness was established, the court disagreed.

43

Applying the one-year statute of limitations for personal injury actions that is applicable in Mr.
Dawson's case, the court concluded that "local and national news media repeatedly covered the
issue." *Id.* at 563. As a result, the court held that "[p]laintiffs should have raised their claims
sometime in the late 1990s when it became apparent that they may have had a viable claim." *Id.*
at 564; *see also Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (affirming
summary judgment on limitations grounds under Tennessee law and finding that "publicity was
sufficient to charge Hughes with constructive knowledge of the events underlying her cause of
action" because the "objective standard is the appropriate test for determining a date of
discovery" (internal quotation marks omitted)).

Thus, under Tennessee law, Dawson had to file his complaint – ***at the latest*** – by
September 30, 2005, one year after Merck announced its withdrawal of Vioxx. Because he did
not do so, his claims are time-barred.

### 2.     Plaintiff's Claims Were Not Tolled By Fraudulent Concealment.

Plaintiff Dawson has no argument in this case that his claims were tolled by any alleged
fraudulent concealment by Merck. Considerations relevant to the discovery rule and fraudulent
concealment merge at the requirement of diligence on the part of the plaintiff: both doctrines
cease to toll a limitations period under Tennessee law when a plaintiff has reason to know he has
a cause of action. *See, e.g., Bell v. Goforth*, No. M2004-00997-COA-R3-CV, 2006 WL 627189,
at *8 (Tenn. Ct. App. Mar. 14, 2006) (affirming trial court's dismissal of claims as untimely
notwithstanding plaintiff's arguments under both discovery rule and fraudulent concealment
doctrines for the same reason: "Ms. Bell failed to exercise due diligence"). *See also Dayco
Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) ("failure to investigate
further at [time of industry-wide publicity] was not the exercise of due diligence required in
order to employ the fraudulent concealment doctrine to avoid the bar of the statute of

limitations"). The same is true in this case. Even if Merck did fraudulently conceal the alleged risks of Vioxx prior to its withdrawal – which it did not – the publicity following withdrawal simply ends that concealment, causing plaintiff's claims to accrue. Thus, plaintiff Dawson does not have any basis for tolling under the fraudulent-concealment doctrine.

### 3. Plaintiff's Claims Are Not Saved By *American Pipe* Tolling.

Nor are Dawson's claims saved by *American Pipe* tolling. Tennessee recognizes *American Pipe* but has expressly rejected cross-jurisdictional tolling. *Maestas v. Sofamor Danek Group, Inc.*, 33 S.W.3d 805, 808 (Tenn. 2000) ("[W]e decline to adopt the doctrine of cross-jurisdictional tolling in Tennessee."). Thus, Tennessee will not toll a limitation period unless the plaintiff is a putative member of a class action *pending in Tennessee courts*. Neither a federal nor state Vioxx personal injury class action has ever been pending in Tennessee. As a result, Dawson cannot rely on any past or pending Vioxx class actions for *American Pipe* tolling. For this further reason, Merck is entitled to summary judgment on his claims.

### 4. Plaintiff Dawson's Other Claims Are Also Barred.

In addition to his personal injury-based claims, plaintiff Dawson also alleges claims for breach of express and implied warranty. (*See* Dawson Compl. ¶ 11.) However, these claims also fail.

Plaintiff's claims for breach of express and implied warranty – like his personal injury claims – are explicitly barred under the applicable statute of limitations. While warranty claims are ordinarily governed by a four-year limitations period, the statute establishing that period includes a repose provision indicating that a suit must, in any event, be filed "within one (1) year after the expiration of the anticipated life of the product." Tenn. Code Ann. § 29-28-103. Tennessee law defines the "anticipated life" of a product as determined by any expiration date "placed on the product by the manufacturer when required by law." *Id*. § 29-28-102(1). Under

this provision, Dawson's claims are not timely.

The FDA requires all drug products to bear an expiration date.  21 C.F.R. § 211.137(a).
That date is determined in advance by stability testing pursuant to standards described in 21
C.F.R. § 211.166.  See 21 C.F.R. § 211.137(b).  In according with these regulations, the shelf life
of Vioxx was determined to be 18 months.  *See* Merck, VIOXX in Colorectal Cancer Therapy:
Definition of Optimal Regime (VICTOR): Phase III, Randomised, Double Blind, Placebo
Controlled Study of Rofecoxib (VIOXX®) in Colorectal Cancer Patients Following Potentially
Curative Therapy § 5.1.2, at 6 (attached as Ex. 53).  Dawson's alleged injury date was December
23, 2003.  Assuming he purchased his Vioxx on the very date of his injury, his Vioxx would
have expired 18 months later – in June 2005 – and his claim would have been stale a year after
that – in June 2006.  But Dawson did not file until December 2006.  As a result, plaintiff's
warranty claims must fail.

## CONCLUSION

Plaintiffs' personal injury claims are time-barred under all potentially applicable states'
laws.  As a result, Merck's renewed motion for summary judgment should be granted, and their
claims should be dismissed.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Defendants' Liaison Counsel

And

John H. Beisner
Jessica Davidson Miller
Geoffrey M. Wyatt
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

Attorneys for Merck & Co., Inc.

47

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Merck & Co., Inc.'s Renewed Motion for Summary Judgment has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 25th day of October, 2007.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

48