03cv17000za-ord(cmo-amend).wpd

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE: WELDING FUME PRODUCTS LIABILITY LITIGATION : | |
| : | Case No. 1:03-CV-17000 |
| : | (MDL Docket No. 1535) |
| : | |
| : | JUDGE O'MALLEY |
| : | |
| : | **CASE ADMINISTRATION ORDER** |

Over the last few weeks, the Court has held several meetings with the parties to discuss ideas directed at streamlining the administration of this Multi-District Litigation. The Court and the parties all agree that it is appropriate to take some steps to prioritize the cases in this MDL, to ensure there are sufficient bases for the claims stated and defendants named in these cases, to resolve any ripe recurring legal issues, and generally to bring these cases to a trial-ready posture (or to determine they are not amenable to trial) as soon as reasonably possible.

Having considered the many good ideas suggested by the parties, the Court concludes there are certain procedural mechanisms that will aid the administration of this litigation. Specifically, the Court and the parties agree that imposition of the case management procedures set forth below will help the Court to most fairly and efficiently administer the great mass of cases that make up this MDL.

**I.   General Case Administration.**

There are now approximately 5,500 cases in this MDL. Of those, there are motions to

remand to state court pending in about 3,850, leaving about 1,650 cases where there is no jurisdictional issue.

Plaintiffs in these 1,650 cases, who are clearly a part of this MDL, were required by this court's Second Amended Case Management Order to submit to defendants a "fact sheet" which lists, among other things, the plaintiff's medical history and the welding products he used. *See* docket no. 405 at 4. The purpose of these fact sheets "is to provide basic factual information about each plaintiff's claims, so as to streamline the case-specific discovery process." *Id.*

The Court and the parties agree that it is appropriate to require each plaintiff to conform the claims he has asserted in his complaint to his fact sheet, and to clarify his medical diagnosis. In particular, the parties shall undertake the efforts described below in order to ensure that each plaintiff has named only the proper defendants, and that each plaintiff has a ripe medical diagnosis upon which to base his claims.

### A. Naming of "Peripheral Defendants."

As a rule, all of the plaintiffs in the many cases that are a part of this MDL used a generic complaint that named a great many defendants. By listing upwards of 70 defendants, this generic complaint was sure to name those particular defendants who manufactured and supplied a given plaintiff with the products he used; however, this generic complaint also named many defendants who did *not* manufacture or supply the welding products that a given plaintiff used. These latter defendants ("peripheral defendants") are not properly named by a particular plaintiff under, for example, a products liability theory, because that plaintiff did not actually use a product manufactured or supplied by that particular peripheral defendant.

Conceivably, some of these peripheral manufacturers and suppliers, who have no direct connection with a given plaintiff, are still properly named defendants pursuant to, for example, a conspiracy or aiding and abetting theory of liability.[1]  Experience has shown, however, that, as discovery proceeds and trial nears, plaintiffs usually dismiss the vast majority of these peripheral defendants, even under these other theories of law.  In the meantime, these peripheral defendants have real lawsuits pending against them, with all of the public reporting and attorney fee requirements that these lawsuits carry.

Of course, the fact sheet requires each plaintiff to identify those products he used, as best he can recall.[2]  Thus, in many (but not all) cases, it is relatively easy to determine those manufacturers, and even those suppliers, who do not have a direct nexus to a given plaintiff.  In other cases, even if the plaintiff is unable to identify the products he used, he may be willing to dismiss defendants against whom he now knows it is unlikely he would press his claims at trial.  In order to ensure that each plaintiff names only those defendants who have a direct nexus to that plaintiff, and/or defendants against whom the plaintiff has a real intention to pursue his claims at trial, the Court **ORDERS** as follows.

The parties shall meet and negotiate a "Dismissal Agreement," which shall have the following aims: (1) to provide the parties with a vehicle to identify the "peripheral defendants" in each case; (2) to allow plaintiffs to dismiss those peripheral defendants without prejudice, while (a)

---

[1] Although, as noted below, these legal theories are open to challenge, they provide bases for arguably viable claims that a given plaintiff could choose to pursue against even these peripheral defendants.

[2] Given the relatively fungible nature of the welding products used by plaintiffs, the task of identifying which products a plaintiff used over the course of his career is not always easy.

tolling any statutes of limitation, and (b) preserving all existing rights to consecutive dismissals under Fed. R. Civ. P. 41(a)(1) or similar state rule; (3) to allow plaintiffs to re-institute their claims against a previously-dismissed peripheral defendant, if discovery later provides a factual basis therefor;[3] and (4) to allow a peripheral defendant against whom a claim is re-instituted to re-open discovery only upon good cause shown and with the approval of the Court.  The "Dismissal Agreement" shall address cases already filed and made a part of this MDL, and also cases not yet filed or not yet made a part of this MDL.

The Dismissal Agreement shall provide that motions to dismiss peripheral defendants shall be: (1) "by stipulation, pursuant to the Dismissal Agreement," and are captioned similarly; and (2) filed on a case-by-case basis, as opposed to a defendant-by-defendant basis.  The parties shall tender this Dismissal Agreement for Court approval as soon as reasonably possible.

### B. Medical Diagnosis.

The fact sheet requires the plaintiff to set out whether he has obtained a diagnosis of a neurological disorder, and to name the doctor that provided that diagnosis.  Some of the fact sheets, however, do not set out this information clearly, and some fail to set it out at all.  Further, in some cases, the diagnosis alleged in the plaintiff's *complaint* is different from the diagnosis set out in the plaintiff's *fact sheet*, and/or different from the diagnosis documented by the diagnosing doctor (e.g., the medical conclusion noted in the *screening form* completed by the neurologist at a plaintiffs' counsel's medical screening event).

---

[3] Further, a plaintiff's re-institution of his claims shall simply require that a notice thereof be filed with the Court, without any additional filing fee obligation.

Earlier, defendants asked the Court to require all to obtain a new diagnosis by newly designated physicians. The Court concludes that this requirement, requested as broadly as defendants have stated it, is unwarranted.[4] However, to ensure that every plaintiff has a valid basis to assert a claim in this MDL, and with the agreement of the parties, the Court now **ORDERS** as follows.

Every plaintiff with a case pending in this MDL shall file in his specific case a "Notice of Diagnosis."[5] This requirement is hereby imposed both upon plaintiffs who have cases currently pending in this MDL, and also upon plaintiffs whose cases are later filed in or transferred to this MDL. The deadline for a plaintiff to file this Notice of Diagnosis shall be the later of the following two dates: (1) December 31, 2006; or (2) the date 120 days from the date that (a) the relevant certified transfer order is filed with this MDL court, or (b) the plaintiff's complaint is originally filed with this MDL court. If a plaintiff fails to timely file a Notice of Diagnosis, the Court will dismiss that plaintiff's case for failure to prosecute.[6]

In addition, the parties agree that a plaintiff may defer having to file a Notice of Diagnosis by instead: (1) filing a stipulated motion to voluntarily dismiss his case, pursuant to Fed. R. Civ. P. 41(a)(1); and/or (2) electing to participate in, and complying with the attendant requirements of, the

---

[4] *See* docket no. 1558 (motion for amendment of the case management order to impose a diagnosis requirement); docket no. 1567 (motion for an Order requiring dismissal of claims by plaintiffs who have not been diagnosed with neurological injury). In light of this Order and the agreement reached by the parties, these two motions are both **DENIED as moot**. In a separate Order to be issued shortly, the Court discusses in more detail defendants' request for requirement of a new diagnosis.

[5] The parties will continue to negotiate the contents of this Notice of Diagnosis.

[6] Any defendant is free to file a motion asking for the Court to enter a dismissal order at the appropriate time.

tolling agreement filed with this Court (*see* docket no. 235).[7]

Finally, the Court sets out the following guidelines regarding the nature of the required diagnosis. First, the Court will be satisfied if the medical conclusion of neurological disorder documented in a Notice of Diagnosis was obtained by a plaintiff from his treating physician in the normal course of medical treatment.

Second, some plaintiffs obtained a medical conclusion of neurological disorder from a non-treating physician at a medical screening sponsored by plaintiffs' counsel. This Court earlier found that a medical conclusion by Dr. Paul Nausieda (or any other qualified neurologist) of manganism or manganese-induced parkinsonism ("MIP") at a medical screening sponsored by plaintiffs' counsel *does* provide a plaintiff with a sufficient basis to prosecute his case. *See* hearing tr. at 545-51 (Feb. 15, 2006).[8] Thus, any plaintiff who obtains or has obtained such a conclusion need merely document it in a Notice of Diagnosis. Generally, the Court is satisfied so long as a plaintiff's Notice of Diagnosis documents a medical conclusion reached by a qualified neurologist using an evaluation no less rigorous than the two-level screening process described in detail to the Court during the hearings dated February 13-15, 2006.

In any case, however, where Dr. Nausieda earlier concluded at a medical screening that a plaintiff suffers from Idiopathic Parkinson's Disease ("IPD") or Drug-Induced Parkinsonism, that plaintiff must now obtain a second diagnosis of MIP (or manganism) from a doctor other than Dr.

---

[7] If a plaintiff elects to dismiss his case and participate in the tolling agreement, the "effective date" of the tolling agreement as to that plaintiff shall be the date of filing of that plaintiff's complaint, so long as the plaintiff: (1) previously submitted a fact sheet; or (2) within 10 days of dismissal, submits "the information requested in Exhibit A," *see* tolling agreement at 2, ¶2.

[8] In a separate Order to be issued shortly, the Court explains this conclusion at length.

Nausieda. With this requirement, the Court implies no criticism of Dr. Nausieda or his diagnoses; to the contrary, the need for these additional diagnoses arises from Dr. Nausieda's expertise. Because Dr. Nausieda is an expert at identifying MIP, and in *distinguishing* MIP from IPD or other forms of parkinsonism, his diagnosis of a plaintiff with IPD or drug-induced parkinsonism (while having knowledge of that plaintiff's manganese exposure history) suggests a conclusion that, based on his examination at that time, he could *not* then conclude that the plaintiff had a neurological injury attributable to manganese. Accordingly, any such plaintiff must now obtain, from a doctor other than Dr. Nausieda, a medical conclusion that he suffers a neurological disorder caused by exposure to manganese.

## II. Summary Judgment Briefing.

### A. Issue-Specific Briefs – Conspiracy Claims.

Earlier, in the case of *Ruth v. Lincoln Elec. Co.*, case no. 04-CV-18912, this Court granted the defendants' motion for summary judgment on Ruth's conspiracy claim. Specifically, the Court ruled that, under Mississippi law, a conspiracy claim cannot succeed when it is premised on a claim for an alleged failure to warn. This ruling depended largely on Mississippi law, and not on matters of undisputed fact.

Defendants have suggested that the same result will attach, as a matter of law, when the law of at least some other jurisdictions is applied. Defendants ask for leave to file summary judgment briefs addressing the viability of conspiracy claims made by plaintiffs in cases where the law of

states other than Mississippi will apply.[9]  The plaintiffs agree that this request is reasonable and that the suggested briefing process is likely to resolve efficiently certain legal issues likely to recur in many MDL cases.  Accordingly, the Court directs the parties to submit an agreed briefing schedule for the filing of a master summary judgment motion addressing the viability of the conspiracy claims asserted by the plaintiffs in this case.[10]

### B.     Defendant-Specific Briefs.

Defendants Caterpillar and MetLife have moved for leave to file summary judgment briefs in all cases and on all claims against them.  The Court earlier stated it would grant such leave after discovery against these parties was complete.  It appears that, in fact, discovery related to issues that might be raised in any summary judgment motions by Caterpillar and MetLife is, in fact, now

---

[9] In particular, defendants suggest that they address the viability of the plaintiffs' conspiracy claims in the dozen-or-fewer states whose law will apply to the great majority of the plaintiffs in this MDL (and not all 50 states).  Defendants also suggest the briefing should ignore, for now, any choice-of-law questions, such as whether the law of Mississippi or Alabama will apply to a given plaintiff's conspiracy claim; once the Court has ruled on the viability of conspiracy claims under a given state's law, the parties can address choice-of-law issues on a case-by-case basis, if necessary and appropriate.  The Court agrees that both of these suggestions make sense.

[10] Elsewhere in this Order, the Court directs the parties to submit a number of other agreed briefing schedules.  Given the workload that these schedules impose, along with the workload required to pursue the upcoming bellwether trials, the Court asks the parties to come to an agreement on these schedules, rather than set its own dates.  The Court asks the parties to: (1) fix schedules that work within the "greater scheme" of this MDL and will not require later requests for continuances; and (2) submit their proposed agreed schedules within two weeks of the date of this Order.

complete, and plaintiffs have dropped their opposition to the filing of such motions.[11] Accordingly, the Court directs the parties to submit an agreed briefing schedule for the filing of summary judgment briefs to be filed by Caterpillar and MetLife.

### III.     Assertion of Additional Claims.

Earlier, plaintiffs moved for leave to file a master amended complaint applicable to all cases pending in this MDL, in order to assert certain additional claims. The Court granted this motion in part, stating the plaintiffs had leave to file an amended complaint, but not the one plaintiffs' had tendered, because the proposed master amended complaint addressed insufficiently certain state-specific issues. *See* docket no. 1697 at 2.

With the agreement of defendants, plaintiffs have since determined that, in light of the other case administrative mechanisms agreed to in this Order, the better course is to file case-specific amended complaints, rather than a master amended complaint. The Court hereby **GRANTS**

---

[11] While there may remain open discovery issues related to Caterpillar and MetLife, these issues appear mostly unrelated to issues that might be raised in summary judgment motions. As an example, Caterpillar conducted an internal case-control study, known as the "Marsh Study," to determine whether its welder-employees suffered parkinsonism disorders at a higher-than-expected rate. Certain questions regarding discovery related to the Marsh Study may yet need to be resolved, but these open questions should not interfere with the parties' ability to file summary judgment briefs, nor the Court's ability to resolve summary judgment issues. Although the plaintiffs earlier opposed the requests by Caterpillar and MetLife to file summary judgment motions, plaintiffs now agree that discovery against these entities has progressed far enough that it is fair to allow briefing. Accordingly, by virtue of this Order, docket no. 1461 (MetLife's motion for leave to file an omnibus summary judgment motion) and docket no. 1694 (Caterpillar's second request for summary judgment briefing schedule) are both **GRANTED**.

**LEAVE** to each plaintiff in this MDL[12] to file an amended complaint in his case, for the purposes of: (1) withdrawing certain claims; and (2) asserting additional causes of action for (a) aiding and abetting, (b) negligent performance of an undertaking, and/or (c) negligent and/or conscious misrepresentation involving physical risk of harm.  Leave to assert new claims is granted only if those causes of action are recognized under the applicable state law.  Plaintiffs must file any such amended complaint on or before June 1, 2006, unless the Court grants additional time pursuant to Fed. R. Civ. P. 15.

### IV.    Briefing Schedule for *Simonds*.

The case known as *Simonds v. A.O. Smith*, case no. 06-CV-17057, which is a putative medical monitoring class action case, has been transferred to this MDL.  The Court and the parties agree that: (1) plaintiffs will file an amended complaint in that case no later than April 14, 2006 (leave for which is hereby granted); and (2) thereafter, the parties should undertake discovery and briefing of class certification issues as soon as reasonably possible.  Accordingly, the Court directs the parties to submit an agreed briefing and discovery schedule addressing these issues.

### V.    Scheduling of Next MDL Trials.

The statute pursuant to which many of the cases in this MDL have been transferred to this transferee Court, 28 U.S.C. § 1407(a), requires the Judicial Panel on Multidistrict Litigation to remand any such actions to the original transferor district "at or before the conclusion of . . . pretrial

---

[12] Plaintiff Solis, however, already has pending a motion to amend; the Court will rule on that motion separately, and this Order does not serve to grant Solis leave to file an amended complaint.

proceedings." This Court intends to suggest the remand of transferred cases as soon as it is reasonable to believe that only case-specific issues remain. As an example, given the Court' rulings in this MDL generally and in the *Ruth* case in particular, there are only a few general issues that might yet arise in a case where Mississippi law applies. One example is the admissibility generally of neuro-psychiatric evidence under *Daubert*. The Court anticipates that, after issuing rulings on the various summary judgment motions mentioned above, and on the *Daubert* issues that will arise in the next two or three scheduled MDL trials, this Court likely will conclude that a suggestion of remand of many cases has become fully appropriate.[13]

In order to increase the number and type of cases where remand to the transferor courts becomes appropriate, the Court concludes that the fifth MDL trial, currently scheduled to begin on October 30, 2005, should address the law of a state other than Mississippi, Texas, and Ohio.[14] Counsel for plaintiffs shall identify their choice of plaintiff for the Fifth MDL trial by April 14, 2006.[15]

**VI.   Case-Specific Discovery.**

In order to ensure that any cases this Court later suggests should be remanded to transferor courts are as close to trial-ready as possible, the Court concludes that certain case-specific discovery should commence. In particular, the Court intends to identify, in the near future, a batch of 100

---

[13] But see the Court's discussion of a common issues trial, below.

[14] The Court gives this direction in light of the law applicable in the first three bellwether cases: the *Ruth* case involved Mississippi law, the *Solis* case involves Texas law, and the *Peabody* case will probably involve Ohio law. The fifth MDL trial should involve a different state's law.

[15] Of course, counsel shall choose a plaintiff who has consented to and waived any objection to having his trial occur in this venue.

cases. Counsel for plaintiffs will promptly work to obtain medical authorizations from the plaintiffs in those cases, so that defendants may begin gathering the plaintiffs' medical records. The Court will also identify 15 cases within this batch of 100 cases. Counsel for the parties will then begin all case-specific discovery as to those 15 plaintiffs.[16] The Court will endeavor to choose cases with a broad variety of diagnoses, plaintiffs' attorneys, and applicable states' law. The Court will conduct a status conference approximately 90 days after this case-specific discovery begins, to assess progress and determine a date by which a next wave of cases shall be designated for and begin their case-specific discovery.[17]

### VII.   MDL Discovery Certification.

The Court and the parties agree that it is appropriate to require the MDL defendants to provide and file written certifications that their document productions in response to plaintiffs' discovery requests are complete. The Court and the parties will work on determining what is the appropriate mechanism for this certification to take place.

### VIII.  Common Issues Trial.

The Court discussed with the parties the concept of holding a "common issues trial,"

---

[16] The Court intends to notify the parties regarding the identity of these cases so that case-specific discovery can begin only after the *Solis* trial has concluded.

[17] If any of these 15 designated cases is voluntarily dismissed, a replacement case will be identified promptly.

pursuant to Fed. R. Civ. P. 23(c)(4)(A).[18] The use of a common issues trial has been very effective at achieving resolution in certain litigations. *See Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 44 (E.D.N.Y. 2001) ("[t]he very nature of injuries arising from mass production and mass marketing efforts makes trial judges' discretion to sever issues for trial one of the most necessary and natural in their arsenal of tools required for the shaping of these types of cases for efficient adjudication"); James A. Henderson Jr. *et al.*, *Optimal Issue Separation in Modern Products Liability Litigation*, 73 Tex. L. Rev. 1653, 1680 (1995) ("[i]n mass products liability litigation, when all of the individual cases share a number of discreet, potentially dispositive issues, the system-wide savings resulting from trying these common issues in consolidated trials can be compelling"). At this juncture, however, the parties were unable to agree on whether a common issues trial was a good idea, or on what the scope of any such trial would be. The parties did agree that briefing on these questions would be appropriate.

Accordingly, the Court directs the parties to submit an agreed briefing schedule for the filing of simultaneous briefs, followed by simultaneous response briefs, addressing all practical considerations relevant to the conduct of a common issues trial in this MDL.[19] The Court has not

---

[18] An example of a common issues trial is found at *In re: Richardson-Merrell, Inc. "Bendectin" Prods. Liab. Litig.*, 624 F. Supp. 1212 (S.D. Ohio 1985), *aff'd sub nom. In re: Bendectin Litig.*, 857 F.2d 290 (6th Cir. 1988), *cert. denied*, 488 U.S. 1006 (1989). A fairly recent critical discussion of the concept is found at Laura J. Hines, *Challenging the Issue Class Action End-Run*, 52 Emory L.J. 709 (2003).

[19] The Court seeks help from the parties in answering the following questions, as well as identifying any other questions that are relevant. Assuming the Court chooses to pursue the idea, what common issues should be addressed? Should it be a trial to a jury or the bench? What might jury instructions and interrogatories look like? What other practical, procedural, and substantive matters must be addressed? The parties need not address the question of whether the Court has the authority to conduct a common issues trial.

yet decided whether to conduct a common issues trial in this MDL and expresses no opinion at this juncture as to what issues should or reasonably can be addressed through any such trial. If the Court decides to proceed with a common issues trial, it likely will schedule that proceeding after the conclusion of the fifth bellwether trial, in the first half of 2007.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**:
March 31, 2006