# EXHIBIT  20

100434

**Time of Request:** Thursday, October 25, 2007  10:55:23 EST
**Client ID/Project Name:** 15612#574760-0090
**Number of Lines:** 70
**Job Number:**      1841:55671824

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Current Document: 49
**Source:** Combined Source Set 15
**Search Terms:** vioxx and date(geq (9/30/2004) and leq (12/31/2004))

**Send to:**  BAGGETTA, BRIAN
              O'MELVENY & MYERS - CSAMP
              1625 "I" ST. NW FL 10
              WASHINGTON, DC 20006

49 of 49 DOCUMENTS

Copyright 2004 The Austin American Statesman
Austin American-Statesman (Texas)

October 1, 2004 Friday

**SECTION:** NEWS; Pg. A1

**LENGTH:** 774 words

**HEADLINE:** Vioxx users take note: Popular pain relief drug deemed unsafe

**BYLINE:** FROM STAFF AND WIRE REPORTS

**BODY:**

Doctors in Austin and across the country were deluged by calls Thursday from concerned patients after Merck & Co. pulled its popular pain relief drug Vioxx off the market because of new data showing a sharply increased risk of heart attacks and stroke from long-term use.

"I'm telling patients to discontinue the medication. . . . Fortunately, it's not a medication where we have to worry about withdrawal," said Dr. Neal Blauzvern, a pain management specialist at the Central Texas Spine Institute, who said more than 100 patients called him Thursday.

About 2 million people worldwide take the drug commonly used for arthritis, making Merck's move one of the largest prescription drug withdrawals in history. Since the pain reliever was introduced in 1999, roughly 84 million prescriptions have been written for it.

"We are taking this action because we believe it best serves the interests of patients," said Raymond Gilmartin, chairman and chief executive of Merck. "Given the availability of alternative therapies and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take."

The U.S. Food and Drug Administration said patients should stop taking the drug and discuss possible alternatives with their doctors.

Blauzvern said the recall was a surprise.

"Just a couple of days ago, a rep from the company was here, and there was no indication from her that this was upcoming," he said.

Merck decided to pull the drug from pharmacy shelves after it conducted a study that it hoped would show that Vioxx prevented colon polyps, which can sometimes become cancerous. Instead, the study showed that the drug led to heart attacks and strokes. After getting the results late last week, Merck quickly ended the trial.

"What we found in this study is that beginning after 18 months, there was a discernible and unexpected increase in cardiovascular disease rates," Dr. Peter Kim, president of Merck Research Labs, said Thursday.

There had been hints before that the drug might increase the risk of heart attacks and strokes, but the studies were not definitive and the company said it had not been convinced that the risk was real, though it did revise the drug's label

Vioxx users take note: Popular pain relief drug deemed unsafe Austin American-Statesman (Texas) October 1, 2004
Friday

two years ago to include that possibility.

This time was different.

Kim said 7.5 of 1,000 patients taking the placebo in the study had a heart attack or stroke after 18 months, while 15 of 1,000 patients taking Vioxx had a heart attack or stroke during the same 18 months.

"What we saw was stunning," Kim said. "We certainly don't understand the cause of this effect, but it is statistically significant and it indicated that there is an issue."

The decision to pull the drug will be costly for Merck. Vioxx generated more than $2 billion a year, accounting for 11 percent of Merck's sales. On news of the product withdrawal, Merck shares plunged $12.07, or 27 percent, to $33 in heavy trading.

Vioxx had been part of a drug class of "super aspirin," known as cox-2 inhibitors, hailed for more long-term use because, unlike aspirin and ibuprofen, they don't harm the lining of the stomach. The drug was primarily used to treat people suffering osteoarthritis, a disease of the joints affecting an estimated 20 million Americans.

Even before the FDA approved Vioxx, a University of Pennsylvania study raised questions about whether it and similar drugs slightly raised the risk of heart attacks or strokes.

A 2000 study on the drug's effects on the stomach, which was published in the New England Journal of Medicine, clearly showed an increase in heart attacks, though none were fatal.

"Some of us in the medical profession have seen this coming and have been discussing this with patients," said Dr. Calvin Brown, an associate professor of rheumatology at Rush University Medical Center in Chicago. "I don't think Merck hid anything, but they saw the glass as half-full. But many of us in the medical profession saw it as half-empty."

One consumer group said patients also should stop using the two other most prescribed cox-2 inhibitors, Celebrex and Bextra, which are sold by Pfizer Inc.

"Today's announcement by Merck is the latest evidence that this family of drugs once referred to as 'super aspirins' are turning out to be super disasters," said Dr. Sidney Wolfe, director of Public Citizen's Health Research Group.

But Pfizer and some doctors defended Celebrex and Bextra, saying available data and clinical studies have not shown similar problems to Vioxx.

The FDA, however, says that studies of Celebrex and Bextra have lasted only a year, and the Vioxx study found risks only after people had taken it for 18 months.

**GRAPHIC:** Vioxx brought pain relief, and an increased risk of heart attack, to users.

**LOAD-DATE:** October 5, 2004

100434

```
********** Print Completed **********

Time of Request: Thursday, October 25, 2007  10:55:23 EST

Print Number:   1841:55671824
Number of Lines: 70
Number of Pages: 2
```

```
Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006
```

# EXHIBIT  21

100434

**Time of Request:** Monday, October 29, 2007  13:52:50 EST
**Client ID/Project Name:** 15612#574760-0090
**Number of Lines:** 75
**Job Number:**     1841:56343960

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Current Document: 6
**Source:** The Dallas Morning News
**Search Terms:** vioxx and date(geq (9/30/2004) and leq (10/30/2004))

**Send to:**  BAGGETTA, BRIAN
            O'MELVENY & MYERS - CSAMP
            1625 "I" ST. NW FL 10
            WASHINGTON, DC 20006

6 of 6 DOCUMENTS

Copyright 2004 THE DALLAS MORNING NEWS

# DallasNews.com

THE DALLAS MORNING NEWS

October 1, 2004 Friday
SECOND EDITION

**SECTION:** NEWS; Pg. 1A

**LENGTH:** 803 words

**HEADLINE:** Vioxx recall has millions wondering what to do Voluntary withdrawal has millions of patients wondering what to do

**BYLINE:** LAURA BEIL, Medical Writer

**BODY:**

Millions of patients were stunned Thursday when their favorite pain reliever was abruptly pulled off the market.

Drug maker Merck & Co. withdrew its hugely popular Vioxx voluntarily after reviewing a study testing whether the medicine prevented the recurrence of colon polyps.

During that research, almost twice as many people taking Vioxx suffered heart attacks, strokes or other serious cardiovascular side effects as did those who took a dummy pill.

"We think Merck is doing the right thing here by withdrawing Vioxx," Dr. Steven Galson of the federal Food and Drug Administration said during a hastily called morning news conference.

However, he also noted that studies had already pointed to cardiovascular dangers from long-term Vioxx use and that those risks had been listed on the product label since 2002. "This is not a total surprise," Dr. Galson said.

The move left patients wondering whether they were in imminent danger of a heart attack and where they should turn for pain relief. Almost 20 million prescriptions for Vioxx were filled in 2003 alone, according to the pharmaceutical information firm IMS Health.

"It's a mess," said rheumatologist Stanley Cohen of St. Paul University Hospital in Dallas. Callers to his office Thursday were greeted with recorded instructions for Vioxx patients.

"I don't think anyone is at immediate risk," Dr. Cohen said. Among those in the study taking Vioxx, fewer than four in 100 suffered the cardiovascular side effects. However, he is advising his patients to stop taking the drug, as the company recommends.

Alternative drugs

Patients do have several alternatives, he and other local physicians said. Two other drugs similar to Vioxx -

Vioxx recall has millions wondering what to do Voluntary withdrawal has millions of patients wondering what to do
THE DALLAS MORNING NEWS October 1, 2004 Friday

Celebrex and Bextra - remain on the market. These drugs, known as COX-2 inhibitors, don't work any better than other anti-inflammatory medicines for pain control, but they do have a lower risk of gastrointestinal side effects.

Another option is to combine more traditional alternatives such as naproxen or ibuprofen with drugs that combat stomach acid, said Dr. Byron Cryer, a gastroenterologist at the University of Texas Southwestern Medical Center at Dallas.

He said the Veterans Affairs medical system will shift its patients on Vioxx to another arthritis drug, Lodine. That medication is not a COX-2 inhibitor, but it is known for having less gastrointestinal risk than similar drugs.

Above all, Dr. Cryer said of Vioxx, "If you're taking it, you should have a conversation with your physician."

'Super-aspirins'

Vioxx came on the market in 1999 with great fanfare. The introduction of Celebrex, approved just before Vioxx, had been the most successful drug launch in history at the time. The drugs were dubbed "super-aspirins," a name that chafed consumer advocates because it implied the medicines offered superior pain relief. They worked neither better nor worse for pain, studies found, but they were much easier on the stomach.

That's because older painkillers - including ibuprofen, naproxen and even aspirin - are more blunt instruments. These drugs not only interfere with the enzyme known as COX-2, which is involved in pain, but also with its cousin COX-1, which helps protect the stomach from irritation.

Nevertheless, Vioxx appears to be harder on the heart. The beginning of the end for the drug came Monday, when representatives from Merck urgently contacted FDA officials, saying their colon polyp study had raised serious safety concerns. By the time Merck met with federal regulators the next day, the company had already decided to retract its product. The FDA posted the decision Thursday morning on its Web site.

The study in question had enrolled 2,600 volunteers, half of whom took 25 milligrams daily of Vioxx and half of whom took a placebo. After 18 months, 1.9 percent of those in the placebo group had suffered a heart attack, stroke or other serious cardiovascular event. Among those taking Vioxx, the number was 3.5 percent. Death rates in the two groups were similar.

Researchers still don't have an explanation for the finding. And while the warnings don't necessarily apply to the other COX-2 inhibitors, federal regulators will be watching those drugs closely, Dr. Galson said.

Refund procedure

Meanwhile, consumers who have unused Vioxx in their medicine cabinets can get a refund by sending the medicine in its pharmacy bottle - along with their sales receipt, name, address and phone number - to NNC Group, Merck Returns, 2670 Executive Drive, Indianapolis, Ind. 46241. More information on returning the drug is posted at www.vioxx .com.

In 2003, worldwide sales of Vioxx totaled $2.5 billion. By the close of business Thursday, though, Merck executives may have been looking for pain relief of their own: Merck stock had plunged 27 percent with the news, closing at $33 a share.

E-mail lbeil@dallasnews.com

**GRAPHIC:** PHOTO(S): (DANIEL HULSHIZER/Associated Press) Almost 20 million prescriptions for Vioxx were filled in 2003, when the drug had worldwide sales of $2.5 billion. CHART(S): VIOXX Q&A GRAPH(S): (LAYNE SMITH/Staff Artist) TARGETING PAIN

Vioxx recall has millions wondering what to do Voluntary withdrawal has millions of patients wondering what to do
THE DALLAS MORNING NEWS October 1, 2004 Friday

**LOAD-DATE:** October 1, 2004

100434

********** Print Completed **********

Time of Request: Monday, October 29, 2007  13:52:50 EST

Print Number:   1841:56343960
Number of Lines: 75
Number of Pages: 3

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT  22

9 of 10 DOCUMENTS

Copyright 2004 The Houston Chronicle Publishing Company
The Houston Chronicle

October 01, 2004, Friday 3 STAR EDITION

**SECTION:** A; Pg. 3

**LENGTH:** 305 words

**HEADLINE:** Merck pulls Vioxx, noting health risks;
Study shows pain medication could increase chances in strokes and heart attacks

**SOURCE:** New York Times

**BYLINE:** GINA KOLATA

**BODY:**

   The drug company Merck announced Thursday that it would stop selling its arthritis and pain medication Vioxx, currently taken by close to 2 million people worldwide, because a new study found that it doubled patients' risk of heart attack and strokes.

   Vioxx has been a blockbuster for Merck, with sales of $ 2.5 billion last year, and has been widely marketed as a safe alternative to drugs like aspirin that can cause ulcers and gastrointestinal bleeding.

   The decision to remove the drug from the market is the largest drug recall in history as measured by sales. Vioxx represented about 11 percent of the company's revenue last year. Merck stock plunged 27 percent Thursday on the news, reducing the company's stock market value by $ 25 billion and helping pull the Dow Jones industrial average down by 0.6 percent for the day.

   The company decided to pull the drug from pharmacy shelves after a study that it hoped would show Vioxx prevented colon polyps, which can sometimes become cancerous. Instead, the study showed that the drug led to heart attacks and strokes. After getting the results late last week, Merck quickly ended the trial.

   The risk was small - 15 cases of heart attacks, strokes or blood clots per thousand people over three years compared with 7.5 such events per thousand patients taking a placebo. But the data were so unambiguous that Merck told federal regulators this week that it had halted the trial and would take the drug off the market; it announced that decision Thursday.

   "What we found in this study is that beginning after 18 months, there was a discernible and unexpected increase in cardiovascular disease rates," Dr. Peter S. Kim, president of Merck Research Labs, said.

   The decision was the company's alone, and there was no pressure from the Food and Drug Administration.

**LOAD-DATE:** October 1, 2004

100434

********** Print Completed **********

Time of Request: Monday, October 29, 2007   09:35:08 EST

Print Number:    1861:56276160
Number of Lines: 43
Number of Pages: 1

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT  23

6 of 10 DOCUMENTS

Copyright 2004 The Houston Chronicle Publishing Company
The Houston Chronicle

October 03, 2004, Sunday 2 STAR EDITION

**SECTION:** BUSINESS; Pg. 4

**LENGTH:** 452 words

**HEADLINE:** Removal of Vioxx prompts questions about drug tests;
Approval process has not found all potential problems

**SOURCE:** Associated Press

**BYLINE:** LINDA A. JOHNSON

**BODY:**

TRENTON, N.J. - Vioxx was already a big success as an arthritis pain reliever, but Merck & Co. thought it could be an even bigger seller. The drug seemed to have some cancer-prevention qualities, so the drug maker began a long-term study to test it for that use.

The strategy backfired for the company, which Thursday pulled Vioxx off the market. The study showed that the drug doubled the risk of heart attack and stroke. At the same time, it sounded an alarm for the millions of people who took Vioxx.

"The only way these studies wind up getting done is if the companies see the gold at the end of the rainbow," said Dr. Sidney Wolfe, co-founder of Public Citizen's Health Research Group.

He said the Food and Drug Administration needs to push drug companies harder to do long-term safety studies of drugs on the market once concerns develop.

FDA spokeswoman Crystal Rice said the agency's authority is limited by law. The agency can only ask - not order - companies to do further safety studies on drugs already approved.

However, the FDA was able to require makers of antidepressants to study their safety in children under a law meant to increase testing of drugs for kids. Those studies led to findings this year that antidepressants slightly increase suicidal tendencies in children and adolescents.

As a result, FDA advisers now are urging that stringent warnings be added to package inserts for Celexa, Effexor, Luvox, Paxil, Prozac, Remeron, Serzone, Wellbutrin and Zoloft.

In some cases, experts say, such warnings on a drug's official labeling aren't sufficient.

Since 2002, Merck's Vioxx had a warning about increased cardiac risks based on results of its own post-approval study, but Merck disputed its own findings, and the drug remained on the market. Merck undertook the latest study because less rigorous experiments indicated Vioxx could prevent recurrence of potentially cancerous colon polyps, company spokesman Tony Plohoros said.

Removal of Vioxx prompts questions about drug tests;Approval process has not found all potential problems The Houston Chronicle October 03, 2004, Sunday

Dr. Alastair Wood, professor of pharmacology and associate dean at Vanderbilt University School of Medicine, said it should not have taken so long for the heart risks to be found.

"A hell of a lot of people got the drug between 2000 and 2004, and a very quick, very cheap study would have determined that risk" had the FDA taken a tougher stance after the first sign of trouble, Wood said.

Independent health care analyst Hemant Shah of HKS & Co. in Warren, N.J., said if Merck had not done the colon polyp study, Vioxx probably would have been on the market for another year or two. That's how long it would have taken for the results of a study focused on cardiovascular risk. Merck canceled that study after the cancer study findings.

**LOAD-DATE:** October 3, 2004

100434

```
********** Print Completed **********

Time of Request: Monday, October 29, 2007  09:32:59 EST

Print Number:    1862:56275828
Number of Lines: 52
Number of Pages: 2
```

```
Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006
```

# EXHIBIT  24

100434

**Time of Request:** Thursday, October 25, 2007  10:51:59 EST
**Client ID/Project Name:** 15612#574760-0090
**Number of Lines:** 47
**Job Number:**    1822:55670985

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Current Document: 33
**Source:** Combined Source Set 15
**Search Terms:** vioxx and date(geq (9/30/2004) and leq (12/31/2004))

**Send to:**  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

33 of 49 DOCUMENTS

Copyright 2004 The Austin American Statesman
Austin American-Statesman (Texas)

November 2, 2004 Tuesday

**SECTION:** BUSINESS; Pg. C1

**LENGTH:** 397 words

**HEADLINE:** Report: Merck knew of Vioxx problems;
Stock drops nearly 10% amid claims that drug maker covered up risks

**BYLINE:** STAFF AND WIRE REPORTS

**BODY:**

WHITEHOUSE STATION, N.J. -- Shares of Merck & Co. plunged nearly 10 percent Monday after a media report said that documents show the pharmaceutical giant hid or denied evidence for years that its blockbuster arthritis drug Vioxx caused heart problems.

Merck, one of the world's top five drug makers, pulled the arthritis and acute pain drug from the market worldwide on Sept. 30, saying it was acting in patients' best interest. Vioxx has been taken by about 20 million Americans and had produced 11 percent of Merck's total revenue.

Merck shares closed down $3.03, or 9.7 percent, to close at $28.28 on the New York Stock Exchange after The Wall Street Journal reported that internal e-mails and marketing materials show the company knew as far back as 2000 that Vioxx was linked to an increased risk of heart attack but tried to discredit such evidence.

Hundreds of lawsuits already have been filed against Merck over Vioxx, and one analyst thinks it could cost the company up to $12 billion.

The family of a Waco woman who died of a stroke in 2002 has sued Merck in U.S. District Court in Austin, claiming that the drug caused her death.

Elsie Geneva Bauman, 70, was taking Vioxx to treat arthritis when she suffered the stroke, according to the lawsuit filed Friday by her family's attorney, Tommy Jacks of Austin.

The lawsuit claims that Bauman had "no prior history of hypertension, stroke, or neurological or cardiovascular disorder" but "at the time of her death, Ms. Bauman's blood pressure was abnormally elevated . . ." The only medication that Bauman was using at the time, the lawsuit said, was Vioxx.

According to the Journal article, Merck continued to try to discredit academic researchers critical of the drug despite a March 9, 2000, e-mail from Merck research director Edward Scolnick to colleagues conceding an elevated risk of heart attack and stroke was "clearly there."

The Journal reported that one training document from Merck listed potentially difficult questions about the drug and stated in capital letters, "DODGE!"

Report: Merck knew of Vioxx problems; Stock drops nearly 10% amid claims that drug maker covered up risks Austin American-Statesman (Texas) November 2, 2004 Tuesday

Merck on Monday declined comment on the article. Last Friday, the company acknowledged some sealed trial documents had been made public, noting that in other similar court cases documents had been leaked to advance the plaintiffs' lawyers interests. It said that it "acted responsibly and appropriately as it developed and marketed Vioxx."

**LOAD-DATE:** November 10, 2004

100434

```
********** Print Completed **********

Time of Request: Thursday, October 25, 2007  10:51:59 EST

Print Number:   1822:55670985
Number of Lines: 47
Number of Pages: 2
```

```
Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006
```

# EXHIBIT  25

3 of 7 DOCUMENTS

Copyright 2001 The Houston Chronicle Publishing Company
The Houston Chronicle

August 22, 2001, Wednesday 3 STAR EDITION

**SECTION:** A; Pg. 15

**LENGTH:** 354 words

**HEADLINE:** Drugs linked to risk of heart attack ;
Researchers urge study of 2 arthritis medicines

**SOURCE:** Associated Press

**DATELINE:** CHICAGO

**BODY:**

CHICAGO - The popular and heavily promoted new arthritis drugs Vioxx and Celebrex have been linked by researchers to a small but troubling increase in the risk of heart attacks and strokes. Critics say the analysis is flawed and no cause for alarm.

Still, many agree the issue needs to be studied because millions of people take the drugs, known as cox-2 inhibitors.

The researchers analyzed four studies that were not designed to examine the drugs' effects on the heart.

Until such research is done, doctors should use caution in prescribing them to patients with heart disease, said Dr. Eric Topol, co-author of the analysis and chairman of cardiovascular medicine at the Cleveland Clinic.

Topol said he uses such medication himself for knee arthritis, "but if I had known heart disease, I would be concerned."

The analysis, published in the Journal of the American Medical Association, included a study that looked at the gastrointestinal side effects in 8,076 patients taking Vioxx or the pain reliever naproxen. Vioxx patients faced double the risk of serious cardiovascular problems, including strokes and heart attacks, though only 111 Vioxx patients had them. Two smaller Vioxx studies also suggested potential heart problems, Topol said.

Also, a study of 7,968 patients using Celebrex or two other pain relievers showed a slight but statistically insignificant increase in cardiovascular side effects with Celebrex, but the numbers were "trending in the wrong direction," Topol said.

An advisory panel warned the Food and Drug Administration in February of the Vioxx-naproxen study and said Vioxx should carry a warning label about potential cardiovascular risks. The FDA has not yet ruled on that recommendation.

Cox-2 drugs are touted for their ability to relieve pain without the gastrointestinal upsets of aspirin and other medications and are among the most popular medicines worldwide.

They are expected to generate $ 6 billion in sales and 200 million prescriptions in the United States alone this year,

Drugs linked to risk of heart attack ;Researchers urge study of 2 arthritis medicines The Houston Chronicle August 22, 2001, Wednesday

Topol said. Celebrex and Vioxx are widely advertised on television and in magazines.

**TYPE:** -LINKS-

**LOAD-DATE:** August 23, 2001

100434

********** Print Completed **********

Time of Request: Monday, October 29, 2007  09:39:53 EST

Print Number:   2842:56276988
Number of Lines: 48
Number of Pages: 2

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT  26

7 of 38 DOCUMENTS

Copyright 2001 San Antonio Express-News
San Antonio Express-News (Texas)

August 22, 2001, Wednesday , METRO

**SECTION:** A SECTION; Pg. 5A

**LENGTH:** 219 words

**HEADLINE:** Study finds heart risk with arthritis drugs ; But critics sayanalysis flawed

**BYLINE:** Lindsey Tanner

**BODY:** CHICAGO - The popular and heavily promoted new arthritis drugs Vioxx and Celebrex have been linked by researchers to a small but troubling increase in the risk of heart attacks and strokes.

Critics say the analysis is flawed and no cause for alarm.

Still, many agree the issue needs to be studied because millions of people take the drugs, known as cox-2 inhibitors.

The researchers analyzed four studies that weren't designed to examine the drugs' effects on the heart.

Until such research is done, doctors should use caution in prescribing them to patients with heart disease, said Dr. Eric Topol, co-author of the analysis and chairman of cardiovascular medicine at the Cleveland Clinic.

Topol said he uses such medication himself for knee arthritis, "but if I had known heart disease, I would be concerned."

The analysis, being published in today's Journal of the American Medical Association, included a study that looked at the gastrointestinal side effects in 8,076 patients taking Vioxx or the pain reliever naproxen.

Vioxx patients faced double the risk of serious cardiovascular problems, including strokes and heart attacks, though only 111 Vioxx patients had them.

Two smaller Vioxx studies also suggested potential heart problems, Topol said.

**LOAD-DATE:** August 22, 2001

100434

********** Print Completed **********

Time of Request: Thursday, October 25, 2007  10:05:15 EST

Print Number:   1861:55656960
Number of Lines: 38
Number of Pages: 1

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT  27

30 of 30 DOCUMENTS

Copyright 2004 Charleston Newspapers
Charleston Gazette (West Virginia)

October 1, 2004, Friday

**SECTION:** News; Pg. P1A

**LENGTH:** 1077 words

**HEADLINE:** Merck recalls Vioxx Arthritis drug linked to strokes, heart attacks

**BYLINE:** Linda A. Johnson The Associated Press

**BODY:**

TRENTON, N.J. - Merck & Co. is pulling its blockbuster Vioxx from the market after new data found the arthritis drug doubled the risk of heart attacks and strokes. Merck's stock plunged almost 27 percent as the pharmaceutical giant said the recall will hurt its earnings.

Merck said Thursday the clinical trial data showed an increased risk of heart attack and other cardiovascular complications 18 months after patients started taking Vioxx, which also is prescribed for acute pain and disorders such as carpal tunnel syndrome.

The three-year study - aimed at showing that Vioxx could prevent the recurrence of polyps, which can turn cancerous, in the colon and rectum - was stopped after Merck discovered participants had double the risk of a heart attack compared to those taking a placebo. During the study, 10 patients died, five who had been taking Vioxx and five who took dummy pills.

"It's a disaster for Merck, coming at the worst time," said independent health care analyst Hemant Shah of HKS & Co. in Warren, N.J.

At least one plaintiffs' attorney announced plans for a class-action lawsuit against Merck. Another claimed to represent 58 patients around the country allegedly harmed by Vioxx, including people who suffered a heart attack, stroke, internal bleeding or kidney failure.

Merck spokesman Tony Plohoros said the company anticipates additional personal injury lawsuits over Vioxx may be filed and will defend them vigorously.

About 2 million people worldwide use Vioxx, Merck said, and 84 million prescriptions have been filled since it came on the market with great fanfare in 1999. It is one of Merck's most important drugs, with $ 1.8 billion in U.S. sales in 2003 and global sales of $ 2.5 billion - 11 percent of the company's $ 22.49 billion in revenue that year.

But Vioxx sales dipped 18 percent in the second quarter of this year to $ 653 million, partly due to increasing concerns about an elevated risk of heart complications.

Medical experts advised patients Thursday to stop taking Vioxx and consult their doctor about alternatives.

Merck said the recall will slash about 50 cents to 60 cents a share from its earnings for the rest of this year. That

Merck recalls Vioxx Arthritis drug linked to strokes, heart attacks Charleston Gazette (West Virginia) October 1, 2004, Friday

includes foregone sales, writeoffs of inventory held by Merck, customer returns of product previously sold and other costs of the pullback. Merck expects foregone fourth quarter sales of Vioxx of $ 700 million to $ 750 million alone.

Merck, based in Whitehouse Station, N.J., had previously been expecting 2004 earnings per share of $ 3.11 to $ 3.17.

"We're taking this action because we believe it best serves the interest of patients," Ray V. Gilmartin, Merck's chairman, president and chief executive, said in a statement.

Plohoros said that because of the expected drop in revenues, Merck will shift people who worked on Vioxx to other areas that would increase revenues, but not all would find new jobs. He could not give an estimate on job cuts, but said those affected would include scientists who have been doing ongoing studies on Vioxx, sales and marketing staff and manufacturing employees.

"We will not react to this event with short-term actions such as decreased [research and development] spending, across-the-board job reductions or actions like salary freezes that would destroy employee morale," Plohoros said.

Shares in Merck, one of the world's biggest drug makers, plunged $ 12.07, nearly 27 percent, to close at $ 33 on the New York Stock Exchange. That wiped out $ 28 billion in market value. More than 140 million shares were traded, compared to a daily average below 10 million.

Shah said for Merck, the Vioxx withdrawal comes "at a time when they really need to get ready for expiration" of its patent for Zocor, the cholesterol treatment that is the company's top-selling drug.

Zocor loses patent protection early in 2006 and sales are expected to plunge against generic competition. In an effort to replace those revenues, Merck recently launched a drug with Schering-Plough Corp., Vytorin, that combines Zocor and Schering-Plough's Zetia to attack cholesterol levels in two complementary ways.

The Vioxx recall stands to benefit Pfizer Inc., the world's biggest drugmaker. Merck and Pfizer have been battling for market share, with Pfizer's Celebrex arthritis drug dominating the market with about $ 2.6 billion in U.S. sales alone last year. Pfizer shares were up 35 cents to $ 30.53 in afternoon trading on the NYSE.

Pfizer issued a statement Thursday citing the "outstanding long-term safety profile" of Celebrex and saying that in a recent FDA-sponsored study of 1.4 million patients, those who received Celebrex demonstrated no increased risk of cardiac trouble.

Vioxx was labeled with a warning about heart risks in 2002 after Merck's own study in 2000 uncovered the increased risk of heart attack and other complications. The Food and Drug Administration has been monitoring problems reported to it since then.

"This is not a total surprise," said Dr. Steven Galson, acting director of the FDA's Center for Drug Evaluation and Research.

Dr. Steven Abramson, director of rheumatology at New York University Hospital for Joint Diseases, said "there are very few patients for whom there won't be a good alternative drug."

Besides generic anti-inflammatory drugs such as ibuprofen, naproxen and aspirin, those include Celebrex, which Abramson said has not been linked to heart complications.

Celebrex and its successor drug, Bextra, as well as Vioxx and a successor drug called Arcoxia that is awaiting FDA approval, are part of a class of anti-inflammatory drugs touted by the pharmaceutical industry as being more effective and having less side effects, particularly on the gastrointestinal system, than older drugs.

Merck recalls Vioxx Arthritis drug linked to strokes, heart attacks Charleston Gazette (West Virginia) October 1, 2004, Friday

Vioxx's removal will be a blow to hopes that it and other drugs in the class known as COX-2 inhibitors could be used to prevent cancer in people at high risk of developing it. A landmark study in 2002 showed that small, daily doses of aspirin could prevent colon cancer, and studies hinted that COX-2 inhibitors might do the same - possibly without aspirin's side effects.

All COX-2 inhibitors can raise blood pressure, but Vioxx appears to be the only one that's been linked to higher risk of heart attacks and strokes, Galson said.

Merck is scheduled to release financial results for the third quarter, which ends today, on Oct. 21.

On the Net: www.merck.com

**LOAD-DATE:** October 1, 2004

100434

********** Print Completed **********

Time of Request: Thursday, October 25, 2007  11:20:12 EST

Print Number:    2822:55677995
Number of Lines: 83
Number of Pages: 3

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT  28

FOCUS - 7 of 8 DOCUMENTS

Copyright 2004 Charleston Newspapers
Charleston Gazette (West Virginia)

October 4, 2004, Monday

**SECTION:** News; Pg. P2C

**LENGTH:** 304 words

**HEADLINE:** Mother of Vioxx patient sues Merck, physician

**BYLINE:** The Associated Press

**BODY:**

KANSAS CITY, Mo. - A Missouri woman has sued the maker of arthritis drug Vioxx over the 2002 death of her daughter.

The suit filed Friday by Caroline Nevels of Lexington came a day after Merck & Co. pulled the medication from shelves over fears users faced increased risk of heart attack and stroke.

Nevels says her 34-year-old daughter, Shelly South, took Vioxx for 21/2 years before dying of a heart attack in November 2002. She claims Merck knew of the risks of Vioxx long before its announcement Thursday.

A spokeswoman for Merck said she had not seen the lawsuit and the company would not comment on litigation.

Also named in the suit is Dr. Waclaw Alex Dymek, the Carrollton physician who prescribed the drug to South.

Nevels claims Dymek failed to diagnose the severity of her daughter's heart condition and prescribed Vioxx despite her medical history.

Kenneth McClain, the plaintiff's attorney, said the suit was the first of its kind in Missouri, though similar lawsuits are in the works across the country.

One attorney claims to represent 58 patients around the U.S. who say they have been harmed by Vioxx, including people who suffered a heart attack, stroke, internal bleeding or kidney failure.

The lawsuit, filed as a class action although Nevels is the only named plaintiff, seeks unspecified compensatory and punitive damages and money for medical monitoring of Vioxx users.

Merck is one of the world's largest drug makers, and Vioxx is its popular medication for arthritis as well as acute pain and disorders such as carpal tunnel syndrome. The drug accounted for $ 2.5 billion in worldwide sales last year.

Some 84 million prescriptions have been filled since the drug's introduction.

The doctor said he had not seen the lawsuit and did not remember treating South.

**LOAD-DATE:** October 5, 2004

100434

********** Print Completed **********

Time of Request: Thursday, October 25, 2007  11:28:04 EST

Print Number:   1823:55680425
Number of Lines: 42
Number of Pages: 1

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT  29

FOCUS - 5 of 8 DOCUMENTS

Copyright 2004 Charleston Newspapers
Charleston Gazette (West Virginia)

November 2, 2004, Tuesday

**SECTION:** News; Pg. P3D

**LENGTH:** 516 words

**HEADLINE:** Merck shares plunge after report says company knew of Vioxx risks

**BYLINE:** The Associated Press

**BODY:**

WHITEHOUSE STATION, N.J. - Shares of Merck & Co. plunged more than 10 percent Monday after a media report said that documents show the pharmaceutical giant hid or denied evidence for years that its blockbuster arthritis drug Vioxx cause heart problems.

Merck, one of the world's top five drug makers, pulled the arthritis and acute pain drug from the market worldwide on Sept. 30, saying it was acting in patients' best interest. Vioxx has been taken by about 20 million Americans and had produced 11 percent of Merck's total revenues.

Also on Monday, Prudential Equity Group analyst Tim Anderson downgraded the stock's rating to neutral from overweight. Anderson wrote that he believes there is value in the company's drug pipeline but said it is likely to get lost in the negative Vioxx coverage.

Additionally, Standard & Poor's placed Merck on CreditWatch with negative implications, which sends a strong signal that the company's debt could be downgraded within the next three months.

When Merck withdrew Vioxx, S&P lowered its outlook to negative from stable.

The additional, more serious step taken Monday reflects the momentum in the Vioxx litigation and the delay in launching Arcoxia, Vioxx's successor drugs, said S&P analyst Arthur Wong.

Hundreds of lawsuits have been filed against Merck over Vioxx and one analyst believes it could cost the company up to $ 12 billion.

Last Friday, the FDA said it wouldn't approve Arcoxia without additional safety and efficacy information. Wong said it look like the drug will be delayed more than a year.

Merck shares were down $ 3.03, or 9.7 percent, to close at $ 28.28 on the New York Stock Exchange after The Wall Street Journal reported that internal e-mails and marketing materials show the company knew as far back as 2000 that Vioxx was linked to an increased risk of heart attack but tried to discredit such evidence.

The news led to Merck posting the largest percentage decline Monday among stocks in the S&P 500 index.

Despite a March 9, 2000 e-mail from Merck research director Edward Scolnick to colleagues conceding an elevated

Merck shares plunge after report says company knew of Vioxx risks Charleston Gazette (West Virginia) November 2, 2004, Tuesday

risk of heart attack and stroke was "clearly there," according to the newspaper, Merck continued to try to discredit academic researchers critical of the drug.

The Journal reported that one training document from Merck listed potentially difficult questions about the drug and stated in capital letters, "DODGE!"

Merck declined comment on the article.

Last Friday, Merck acknowledged some sealed trial documents had been made public, noting that in other similar court cases documents had been leaked to advance the plaintiffs' lawyers interests.

It said that it "acted responsibly and appropriately as it developed and marketed Vioxx."

Merck shares had been trading in the $ 45 range until the withdrawal announcement, plunged to the mid $ 30s that day and have hovered just above $ 30 since then.

The stock price was as high as $ 49 per share in February and was slightly above $ 90 at the end of 2000, before the recession.

On the Net: www.merck.com

**LOAD-DATE:** November 3, 2004

100434

********** Print Completed **********

Time of Request: Thursday, October 25, 2007  11:25:23 EST

Print Number:   1821:55679244
Number of Lines: 54
Number of Pages: 2

Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006

# EXHIBIT 30

FOCUS - 3 of 8 DOCUMENTS

Copyright 2004 Charleston Newspapers
Charleston Gazette (West Virginia)

November 9, 2004, Tuesday

**SECTION:** News; Pg. P2D

**LENGTH:** 830 words

**HEADLINE:** SUCCESSFUL INVESTING Analysts cautious about Merck

**BYLINE:** Andrew Leckey

**BODY:**

Q. I own many shares of Merck & Co., and I'm concerned about them. What's in store for this company? u P.H., via the Internet

A. Having to pull a drug from the shelves is always a problem. When it is a popular painkiller found to cause heart attacks and sudden deaths, it is a disaster on many fronts.

Vioxx accounted for $ 2.5 billion of Merck's annual sales, with 100 million prescriptions written since its introduction in 1999. About 2 million people were recently taking it, many for arthritis. One-third of them had done so more than 18 months.

The product was pulled by Merck on Sept. 30 after a Food and Drug Administration clinical trial found widespread use of Vioxx may have led to 27,000 heart attacks and sudden deaths that would not have occurred had Celebrex been used.

A patient taking a high dose of Vioxx was nearly four times more likely to have a serious cardiac event than one taking Celebrex. Not surprisingly, Celebrex, made by Pfizer Inc., is an early beneficiary of the consumer switch from Vioxx. So is Bextra, another Pfizer painkiller.

Countless lawsuits are being filed over whether Merck should have acted sooner. For example, a Sept. 17, 2001, FDA warning letter had been sent to Merck, urging more caution in advertising the drug.

Shares of Merck (MRK) are down 30 percent this year, following declines of 11 percent in 2003, 1 percent in 2002, and 36 percent in 2001.

Third-quarter net income fell 29 percent to $ 1.33 billion, primarily due to Vioxx. The recall required a $ 491.6 million reduction in revenues and marketing costs of $ 141.4 million.

Meanwhile, in 2006 Merck faces the U.S. patent expiration of the cholesterol drug Zocor, a $ 3 billion-a-year drug in the United States. A new study also showed the drug may be no better at reducing cardiovascular events than proper diet and exercise alone.

On the positive side, Merck is financially healthy with good cash flow and a strong credit rating. Merck's cholesterol absorption inhibitor Zetia, developed with Schering-Plough, looks promising. Emend, approved last year, is

SUCCESSFUL INVESTING Analysts cautious about Merck Charleston Gazette (West Virginia) November 9, 2004, Tuesday

a treatment for nausea induced by chemotherapy. The hypertension drug Cozaar has done well in a four-year trial.

There is caution about Merck on Wall Street. The consensus recommendation on its stock from analysts who track it is currently a "hold," according to the Boston-based First Call research firm. That consists of one "strong buy," three "buys," 25 "holds" and one "sell."

Merck earnings are projected to decline 13 percent this year, compared to the 8 percent increase forecast for the pharmaceutical industry. Next year's expected growth rate of 2 percent lags the industry-wide estimate of 10 percent. The five-year annualized growth rate for the company is estimated to be 3 percent vs. the 10 percent forecast for its peers.

Q. Vanguard Windsor is one of three funds in my individual retirement account. What's your opinion of it? u L.R., via the Internet

A. This famous $ 15 billion fund uses a disciplined deep-value, contrarian style that carries more risk than some other large value funds.

It buys many of its stocks after they've taken a really hard fall and are in the distressed category. This strategy also means that it can perform poorly in growth stock markets.

Vanguard Windsor (VWNDX) gained 14.69 percent in the past 12 months to rank just below the midpoint of all large value funds. Its three-year annualized return of 7.34 percent placed it in the top one-fourth of its peers.

"It's a streaky fund, so you'll have to put up with periods of relatively poor performance, and Charles Freeman, who had run it for nine years, retired on June 30," pointed out Christine Benz, associate director of fund analysis for Morningstar Inc. in Chicago. "David Fassnacht is now the lead manager, backed by an experienced team." Fassnacht has worked at lead adviser firm Wellington Management for 13 years. In addition, the value-oriented firm Sanford C. Bernstein manages one-third of assets.

As with all Vanguard funds, Windsor has a low annual expense ratio of 0.48 percent. This "no-load" (no sales charge) fund requires a $ 3,000 minimum.

Q. I have almost $ 20,000 in my 401(k) plan at work and just accepted a new job at another company. What should I do with my 401(k) when I leave my employer? u W.H., via the Internet

A. Employees with balances greater than $ 5,000 have the right to stay in their existing plan. If they have less, plans have the right to require that they move their money.

Check how good your former company's 401(k) plan is. Drawbacks of keeping it there are that you can't contribute to it anymore, you might lose track of it, and the company might fail, change names or merge.

Your new employer may permit you to roll your assets over to its plan. Just be sure its investment choices and fees are acceptable. You might have to wait until its enrollment period or until you're at the firm a full year.

**LOAD-DATE:** November 10, 2004

100434

```
********** Print Completed **********

Time of Request: Thursday, October 25, 2007  11:23:26 EST

Print Number:    1821:55678743
Number of Lines: 68
Number of Pages: 2
```

```
Send To:  BAGGETTA, BRIAN
          O'MELVENY & MYERS - CSAMP
          1625 "I" ST. NW FL 10
          WASHINGTON, DC 20006
```

# EXHIBIT 31

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2007 AUG 15   AM 10: 16
LORETTA G. WHYTE
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT LOUISIANA**

Pamela Tribby, Jacqueline Johnson, Joann
Freeman, Freda Mae Jobe, Rita James,
Margaret Doyle, Jettie Lee, James Smith,
Sarah Smith, Aileen Cover as the
Independent Administrator of the estate of
Woodland Cover, Julie Smugala as the
personal representative of the estate of
Edward Smugala and Susan Robello as
surviving spouse for Lawrence Robello

Plaintiffs,

v.

**MERCK & CO. INC.,**

Defendant.

Cause No.   **07-4118**

MDL No. 1657   **SECT. L MAG. 3**

## COMPLAINT

COME NOW Plaintiffs, and for their complaint against Merck & Co., Inc., allege as

follows:

1.      This action is brought by plaintiffs, seeking damages for personal injuries and

economic damages suffered as a result of a defective and dangerous pharmaceutical product,

Vioxx, which was manufactured, marketed, distributed and/or sold by Merck & Co. Inc.  This

action seeks monetary damages for personal injuries.

2.      Pamela Tribby is a citizen of the state of Michigan.  Because of her use of Vioxx,

she suffered a heart attack and related injuries.  Vioxx caused or was a contributing cause of her

health problems.

43425.1

Fee_____350.
✓ Process_____
X Dktd_____
___ CtRmDep_____
___ Doc. No._____

M00DE22273

3.      Jacqueline Johnson is a citizen of the state of Minnesota.  Because of her use of Vioxx, she suffered a heart attack and related injuries.  Vioxx caused or was a contributing cause of her health problems.

4.      Joann Freeman is a citizen of the state of Florida.  Because of her use of Vioxx, she suffered a heart attack and related injuries.  Vioxx caused or was a contributing cause of her health problems.

5.      Freda Mae Jobe is a citizen of the state of Arkansas.  Because of her use of Vioxx, she suffered a heart attack and related injuries.  Vioxx caused or was a contributing cause of her health problems.

6.      Rita James is a citizen of the state of Missouri.  Because of her use of Vioxx, she suffered a stroke and related injuries.  Vioxx caused or was a contributing cause of her health problems.

7.      Margaret Doyle is a citizen of the state of Missouri.  Because of her use of Vioxx, she suffered a stroke and related injuries.  Vioxx caused or was a contributing cause of her health problems.

8.      Jettie Lee is a citizen of the state of Georgia.  Because of her use of Vioxx, she suffered a stroke and related injuries.  Vioxx caused or was a contributing cause of her health problems.

9.      James Smith is a citizen of the state of New York.  Because of his use of Vioxx, he suffered heart attacks and related injuries.  Vioxx caused or was a contributing cause of his health problems.  Furthermore, as a result of James Smith's Vioxx-related injuries, Sarah Smith has lost the care, comfort, society, services, companionship, and support of her husband, and therefore has a consortium claim against defendant Merck.

43425.1

M00DE22274

10.    Aileen Cover is the surviving spouse of Woodland Cover ("decedent") and brings this action on his own behalf and on behalf of decedent's next of kin, having been appointed Independent Administrator of the estate of Woodland Cover by the Circuit Court of St. Clair County, Illinois.  Woodland Cover was a citizen of the State of Illinois.  Because of her use of Vioxx, he suffered a heart attack and stroke, which led to his wrongful death.  Vioxx caused or was a significantly contributing cause of his wrongful death.

11.    Julie Smugala is the personal representative of the estate of Edward Smugala. Julie Smugala is a citizen of the state of Illinois; Edward Smugala was a citizen of the state of Illinois.  Because of his use of Vioxx, he suffered blood clots and congestive heart failure, which caused or significantly contributed to cause his wrongful death.

12.    Susan Robello has standing and is the survivor in interest for Lawrence Robello and brings this action on his behalf pursuant to California law.  Susan Robello is a citizen of the State of California.  Decedent Lawrence Robello was a citizen of the State of California. Because of her use of Vioxx, she suffered a heart attack, which caused her wrongful death. Vioxx caused or was a contributing cause to his wrongful death.

### JURISDICTION AND VENUE

13.    There is federal subject matter jurisdiction based on diversity of citizenship because plaintiffs and defendant are citizens of different states and the amount-in-controversy requirement exceeds $75,000 for each plaintiffs' claim.

14.    Venue is proper in this District Court based on Pretrial Order No. 11 in re Vioxx Product Liability Litigation No. 1657.

15.    The applicable statute of limitations is tolled based on defendants' fraudulent concealment of the dangers and adverse side effects of Vioxx, respectively, from plaintiffs as

43425.1

M00DE22275

more fully stated herein.  In addition, the statute of limitations has been tolled because of the

discovery rule.  Additionally, for the reasons stated herein, defendant Merck is equitably

estopped from raising the statute of limitations defense.

## PARTIES-VIOXX

16.     The Defendant, Merck & Co., Inc. (hereinafter "Merck" or "defendant Merck," is

a corporation organized and existing under the laws of the State of New Jersey, with its principal

place of business at One Merck Drive, White House Station, New Jersey 08889.

17.     At all times relevant hereto, Defendant Merck was engaged in the business of

testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly

or indirectly through third parties or related entities, the pharmaceutical drug, Vioxx throughout

the United States.

18.     As more particularly pleaded below, plaintiffs maintain that Vioxx is defectively

designed, inadequately tested, dangerous to human health, and lacked proper warnings as to the

dangers associated with its use.

## FACTUAL BACKGROUND-VIOXX

19.     Vioxx is the brand name of rofecoxib, one of a class of drugs called

"prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-

inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.

Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid

to produce prostaglandins.

20.     Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at

inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet

aggregation.

43425.1

21.     Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

22.     On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

23.     At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

24.     The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

43425.1

M00DE22277

25.     Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

26.     The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

27.     In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

28.     Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment. Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers. As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

43425.1

MODDE22278

29.     Merck continued to profit from its scheme by withholding information from Plaintiffs, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

30.     On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what had been concealed by Merck.  The study revealed that the relative risk of developing a confirmed adjudicated thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. See Mukhisjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

31.     In the JAMA study, the authors stated that by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2

43425.1

MODDE22279

inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2, Journal of Science, V. 296:539-541, Apr. 19, 2002.

32.    On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional activities and materials for the marketing of Vioxx (rofecoxib) tablets."

33.    The Warning Letter stated that Defendant Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the  VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

34.    The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant Merck that supports the FDA's issuance of the Warning Letter, and makes the following **"Conclusions and Requested Actions:"**

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx / Coumadin drug interaction, omit crucial risk information associated with Vioxx therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

43425.1

M00DE22280

Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

1.    Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for Vioxx.

2.    Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion

3.    A written statement of your intent to comply with "1" and "2" above.

35.    On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

36.    Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the Vioxx labeling, outlines the changes to the Vioxx labeling.

37.    The revised "Patient Information" sheet does not add any information about the results of the VIGOR study."

38.    The "Patient Information" sheet is the only written document that is provided to a patient for whom Vioxx is prescribed.

43425.1

MODDE22281

39.     Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential cardiovascular and/or cardiothrombotic side effects of Vioxx.

40.     Despite knowledge of the ineffectiveness of the warnings, and despite knowledge that Vioxx may cause serious cardiovascular and/or cardiothrombotic side effects, defendant Merck has concealed and/or downplayed the dangers associated with Vioxx, and continued to market the drug in the United States and abroad.  In its 2001 Annual Report, for example, Defendant Merck states:

> The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx. . . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

41.     Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR*, FOSAMAX and SINGULAIR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter.

> "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter.

> A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the

43425.1

strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

42.     Despite the foregoing, Defendant Merck continued to represent to consumers that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug, until Merck withdrew Vioxx from the market in September 2004. Merck also downplayed any potential cardiovascular and/or cardiothrombotic side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

43.     Defendant Merck knew of the cardiothrombotic effects and increased risk of cardiovascular events caused by Vioxx use, yet failed to warn of these dangers to plaintiffs, its customers, healthcare providers or the public.

44.     Pursuant to prescriptions received from their treating physician, plaintiffs regularly purchased and ingested Vioxx for various periods of time.  Plaintiffs now suffer from heart attacks, strokes, transient ischemic attacks ("TIAs"), coronary artery disease, althersclerosis, blood clots, and other diseases caused by the use of Vioxx.

45.     Vioxx is primarily prescribed to reduce pain from inflammation. However, the defendants failed to conduct sufficient research in manufacturing and marketing Vioxx to determine the severity of the drugs' potential side effects.  Defendants also withheld adverse reports or gave incorrect information about such reports that they had received about side effects such as heart attacks and strokes.  As a result of defendants' failure and the undisclosed defects of Vioxx, plaintiffs have sustained heart attacks, strokes, TIAs, and other ill-effects.

43425.1

MODE22283

46.     Defendant Merck & Company, Inc. is a New Jersey corporation with its principal place of business located in New Jersey.  Merck is engaged in the business of producing, marketing and distributing pharmaceutical products for sale to the general public and is the manufacturer of Rofecoxib, distributed under the brand-name Vioxx.  Merck conducts business, and at all times relevant hereto, it developed, manufactured and sold the pharmaceutical drug Vioxx.

## COUNT I

### Strict Products Liability/Defective Design --

### Against Merck

Come now plaintiffs and for Count I of their complaint against defendant Merck allege:

47.     Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

48.     Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

49.     At the time Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

50.     Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendant Merck, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

43425.1

51.     The Vioxx sold to plaintiffs reached plaintiffs without substantial change. Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attack, strokes, transient ischemic accidents, blood clots, and other related illnesses.  Plaintiffs ingested the Vioxx without making any changes or alterations.

52.     As a direct and proximate result of the defective and dangerous design of Vioxx, plaintiffs have been damaged.

53.     Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

### COUNT II

### Strict Products Liability/Failure to Warn -- Against Merck

Come now plaintiffs and for Count II of their complaint against defendant Merck allege:

54.     Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

55.     The Vioxx manufactured and supplied by Merck was unaccompanied by proper and adequate warnings regarding all adverse side effects associated with the use of Vioxx, and the comparative severity and duration of the adverse effects.  The warnings given by Merck did not accurately reflect the symptoms, type, scope or severity of the side effects.

56.     Merck failed to perform adequate testing and study of Vioxx prior to marketing it or properly analyze and warn based on its VIGOR study.  Such adequate testing, study or analysis of the VIGOR study would have shown that Vioxx possessed serious life threatening side effects, with respect to which full and proper warnings accurately and fully reflecting symptoms, type of illness, scope and severity should have been given with respect to the use of Vioxx.

43425.1

MOODE22285

57.     Merck also failed to act properly on adverse reports it received about Vioxx, and failed to properly study Vioxx pre-market as well as post market and analyze and follow up on its VIGOR study as well as other studies.

58.     Merck also failed to effectively warn users and physicians that numerous other methods of pain relievers, including Ibuprofen, Naproxen, and/or aspirin were safer.

59.     Merck failed to give adequate post-marketing warnings or instructions for the use of Vioxx because after Merck knew or should have known of the risk of injury from Vioxx use, Merck failed to provide adequate warnings to users or consumers and continued to aggressively promote the product to doctors, hospitals, and directly to consumers.

60.     As a direct and proximate result of defendant Merck's failure to warn of the potentially severe side effects of the Vioxx products, as well as the other conduct mentioned in this Count, plaintiffs have been damaged.

61.     Merck's conduct was done with conscious disregard for the safety of the users of Vioxx, justifying an award of punitive damages.

**COUNT III**

**Negligent Design--Against Merck**

Come now plaintiffs and for Count III of their complaint against defendant Merck allege:

62.     Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

63.     Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

43425.1

MODDE22286

64.     At the time Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, blood clots, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

65.     Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendant Merck, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

66.     The Vioxx sold to plaintiffs reached plaintiffs without substantial change. Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attacks, strokes, and other related illnesses.  Plaintiffs ingested the Vioxx without making any changes or alterations.

67.     In designing and testing Vioxx, Merck failed to exercise the ordinary care that a careful and prudent drug manufacturer would exercise in the same or similar circumstances.

68.     As a direct and proximate result of the negligent design of Vioxx, plaintiffs have been damaged.

69.     Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT IV

### (Negligence, Failure to Warn--Against Defendant Merck)

Come now plaintiffs and for Count IV of their complaint against defendant Merck, allege:

70.     Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

43425.1

M00DE22287

71.     Defendant Merck owed a duty to warn of any dangerous defects or side effects; a duty to assure their products did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Vioxx's substantial dangers.

72.     Defendant Merck breached its duty of reasonable care to plaintiffs in that defendant Merck failed to:

a.  Conduct sufficient testing which, if properly performed, would have shown that Vioxx had serious side effects, including heart attacks, strokes, hypertension, althersclorosis, blood clots, and other serious side effects, and warn users of those risks; and/or

b.  Include adequate warnings with the Vioxx products that would alert users to the potential risks and serious side effects of the drugs; and/or

c.  Warn plaintiffs that use of Vioxx carried a risk of death or permanent disability from heart attack, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

d.  Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Vioxx; and/or

e.  Other appropriate warnings.

73.     Defendant Merck knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects of which the general public would not be aware. Defendant Merck nevertheless advertised, marketed  and promoted their products knowing there were safer methods and products for pain control.

74.     As a direct and proximate result of defendant Merck's negligence and breaches of their duty of reasonable care, plaintiffs have been damaged.

43425.1

M00DE22288

75.     Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT V

### Negligent Misrepresentation–against defendant Merck

Come now plaintiffs and for Count V of their complaint against defendant Merck, allege:

76.     Plaintiffs reallege the allegations in the preceding paragraphs as if fully set out herein.

77.     Defendant Merck misrepresented to plaintiffs and/or their treating physicians the potential serious cardiovascular findings that were observed in the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted crucial risk information associated with Vioxx, misrepresented Vioxx safety profile and represented that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects were not associated with the drug.

78.     These representations were made with the actual knowledge of Merck.

79.     The representations set forth supra were material to plaintiffs and/or their treating physicians to prescribe and maintain plaintiffs' prescription of Vioxx.

80.     The representations were made either without knowing of the truth or falsity of the representations or defendant Merck knew or should have known that the representations being made were false and, therefore, defendant Merck failed to exercise reasonable care in making the representations in the scope and course of their employment in marketing Vioxx to individual consumers, plaintiffs' treating physicians, hospitals, and other health care providers.

81.     The defendant Merck intended for plaintiffs and/or their treating physicians to rely upon the material misrepresentations to induce them to initially prescribe Vioxx and continue plaintiffs on Vioxx.

43425.1

MOODE22289

82.     Plaintiffs justifiably relied on the representations which were made directly to them or made to their treating physicians, with defendant Merck knowing that plaintiffs were in a limited group who defendant Merck knew would rely upon the information.

83.     As a direct result of defendant Merck's negligent misrepresentation, plaintiffs were injured.  The negligent misrepresentations caused or contributed to cause plaintiffs' damages.

84.     Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT VI

### Fraudulent Omission/Concealment–against defendant Merck

Come now plaintiffs and for Count VI of their complaint against defendant Merck allege:

85.     Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

86.     Defendant Merck had actual knowledge of the cardiothrombotic effects of Vioxx. Despite having knowledge of the cardiothrombotic effects of Vioxx, Defendant Merck engaged in a pattern and conduct of actively concealing and omitting to disclose those effects when marketing Vioxx to doctors, health care providers, and to the general public for direct advertisements.

87.     At the time these omissions were made, defendant Merck had knowledge of the substantial and significant cardiothrombotic effects of Vioxx.

88.     Defendant Merck omitted to inform plaintiffs of the true cardiothrombotic and other adverse health effects of Vioxx.  They further downplayed the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set

43425.1

MOODE22290

forth in the VIGOR study;  they withheld adverse reports or gave incorrect information about the reports they received about the side effects of Vioxx such as heart attacks and strokes.  They further instructed and had a training manual for their sales force to dodge and mislead doctors when they asked questions about the cardiothrombotic effects of Vioxx.

89.     Defendant Merck failure to disclose material facts constituted fraudulent concealment.

90.     Defendant Merck, itself and by and through its agents, had a duty to speak because they had superior knowledge regarding the adverse health effects of Vioxx as set forth herein.

91.     The information not disclosed by defendant Merck was unavailable to plaintiffs and/or their treating health care professionals.  Defendant Merck knew the information was unavailable yet approved and participated in instructing their agents, servants and employees not to disclose this information in order to promote the sales of Vioxx over other Cox 2 inhibitors as well as any non-steroidal anti-inflammatory such as Ibuprofen, Naproxin, and/or aspirin.

92.     Plaintiffs were diligent in attempting to seek the information by consulting with their physicians.

93.     The information not disclosed by defendant Merck was not within the reasonable reach of plaintiffs and/or their treating physicians and was not discoverable by plaintiffs and/or their treating physicians in the exercise of reasonable care.

94.     The non-disclosed information was material, defendant Merck knew they were not disclosing complete information and intended that plaintiffs and/or their treating physicians act upon the non-disclosed information in the manner reasonably contemplated.

43425.1

95.     Plaintiffs and/or their treating physicians were ignorant as to the undisclosed information and had a right to rely on full disclosure.

96.     If plaintiffs and/or their treating physicians had known the complete information, they would not have prescribed and/or plaintiffs would not have taken Vioxx as evidenced by Merck withdrawing it from the market in September 2004.

97.     Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT VII

## BREACH OF IMPLIED WARRANTY-VIOXX

Come now plaintiffs and for Count VII of their complaint against defendant Merck allege:

98.     Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if set forth at length herein.

99.     Plaintiffs relied upon Merck and its judgment when they purchased and utilized Vioxx.

100.    Vioxx was not of merchantable quality and was not safe or fit for its intended use because it was unreasonably dangerous as more fully set forth herein and incapable of satisfying the ordinary purpose for which it was intended, and because it caused serious injury to Plaintiffs.

101.    As a direct and proximate result of the dangerous and defective condition of Vioxx, plaintiffs were injured, including incurring economic damage in the form of medical expenses.

102.    Plaintiffs are entitled to recover from Merck for all damages caused by the defective product including, but not limited to, damages for pain, suffering, mental

43425.1

anguish, emotional distress, loss of the capacity to enjoy life, lost past and future income and incurred expense.

## COUNT VIII

## BREACH OF EXPRESS WARRANTY-VIOXX

Come now plaintiffs and for Count VIII of their complaint against defendant Merck allege:

103.    Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if set forth at length herein.

104.    At all relevant times, Merck expressly warranted to Plaintiffs by statements made by Merck or its authorized agents, orally or in written publications, package labels, and/or inserts, that the Vioxx was safe, effective, fit, and proper for its intended use. The express warranties include, but were not limited to:

Vioxx is used in adults for:

a. relief of the pain and inflammation (swelling and soreness) of osteoarthritis (arthritis from wear and tear on your bones and your joints);

b. relief of the pain and inflammation of rheumatoid arthritis in adults (arthritis caused by a condition where your immune system attacks your joints);

c. management of short-term pain;

d. treatment of menstrual pain (pain during women's monthly periods);

e. treatment of migraine headache attacks with or without aura

105.    In utilizing Vioxx, Plaintiffs relied upon the skill, judgment, representations,

43425.1

M00DE22293

and express warranties of Merck.

106.   The express warranties and representations made by Merck were false in that Vioxx was not safe and was not fit for the use for which it was intended.

107.   As a direct and proximate result of the dangerous and defective condition of Vioxx, plaintiffs were damaged, including incurring economic damages in the form of medical expenses.

108.   Plaintiffs are entitled to recover from Merck for all damages caused by the defective product including, but not limited to, damages for pain, suffering, mental anguish, emotional distress, loss of the capacity to enjoy life, lost past and future income and incurred expense.

WHEREFORE, each plaintiff demands judgments in their favor against defendant Merck for:

A.  A fair and just amount of actual damages in an amount to be proved at trial that exceeds the jurisdictional amount of this Court;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

43425.1

M00DE22294

JEFFREY J. LOWE, PC

By: _____

Jeffrey J. Lowe
Francis J. "Casey" Flynn
Attorney for Plaintiff
8235 Forsyth, Suite 1100
St. Louis, Missouri 63105
(314) 678-3400
Fax: (314) 678-3401

John Carey
Joseph P. Danis
David Bauman
Sarah Hale
CAREY & DANIS, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis MO 63105
Telephone: 314-725-7700
Facsimile: 314-721-0905

Charles Lampin
Kell Lampin LLC
4700 Mexican Rd.
St. Peters, Missouri 63376
636-498-4000

T. Evan Schaeffer
Andrea B. Lamere
SCHAEFFER & LAMERE, P.C.
5512 Godfrey Road
Highway 67, Suite B
Godfrey, IL 62035
618-467-8200

Evan Buxner
Walther Glenn Law Offices
10 S. Brentwood Blvd., Suite 102
St. Louis, MO 63105
314-725-9595
Fax: 314-725-9597

43425.1

# EXHIBIT  32

IN RE:  VIOXX® PRODUCTS )
LIABILITY LITIGATION )        MDL Docket No. 1657
)
)
)        Plaintiff:  **Susan Robello**
THIS RELATES TO: )                      (name)
**Tribby, et al v. Merck & Co., Inc., et al** )
**Civil Action No.:** )
)
**2:07-cv-4118** )

## PLAINTIFF PROFILE FORM

Other than in Sections I, those questions using the term "You" should refer to the person who used VIOXX®.  Please attach as many sheets of paper as necessary to fully answer these questions.

### I.     CASE INFORMATION

A.  Name of person completing this form:  **Susan Robello**

B.  If you are completing this questionnaire in a representative capacity (e.g., on behalf of the estate of a deceased person or a minor), please complete the following:

1.  Social Security Number:  **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**

2.  Maiden Or Other Names Used or By Which You Have Been Known:  **Androvich**

3.  Address:  **3137 Primrose Drive, Willits, CA 95490**

4.  State which individual or estate you are representing, and in what capacity you are representing the individual or estate?  **Lawrence Robello as his surviving spouse**

5.  If you were appointed as a representative by a court, state the:

Court:  **Mendocino County**          Date of Appointment:  **6/2006**

6.  What is your relationship to the deceased or represented person or person claimed to be injured?  **Spouse**

7.  If you represent a decedent's estate, state the date of death of the decedent and the address of the place where the decedent died:  **3/8/2005; 1 Madrone Street, Willits, CA 95490**

40445.1

M00AD57421

C.  Claim Information

1. Are you claiming that you have or may develop bodily injury as a result of taking VIOXX®?
   Yes  **X**  No ___  *If "yes,"*

   a.  What is your understanding of the bodily injury you claim resulted from your use of
       VIOXX®?  **Heart attack leading to wrongful death.**

   b.  When do you claim this injury occurred?  **On or about 3/8/2005**

   c.  Who diagnosed the condition?  **Dr. John Williams, DO**

   d.  Did you ever suffer this type of injury prior to the date set forth in answer to the prior
       question?   Yes _____  No  **X** *If  "yes,"* when and who diagnosed the condition at that time?

   e.  Do you claim that your use of VIOXX® worsened a condition that you already had or had in
       the past?   Yes _____  No  **X** *If "yes,"* set forth the injury or condition; whether or not you
       already recovered from that injury or condition before you took VIOXX®; and the date of
       recovery, if any.

D.  Are you claiming mental and/or emotional damages as a consequence of VIOXX®?
    Yes  **X**  No __
    *If "yes,"* for each provider (including but not limited to primary care physician, psychiatrist,
    psychologist, counselor) from whom you have sought treatment for psychological, psychiatric or
    emotional problems during the last ten (10) years, state:

    a.  Name and address of each person who treated you:  **Plaintiff will supplement**

    b.  To your understanding, condition for which treated:  **Plaintiff will supplement**

    c.  When treated:  **Plaintiff will supplement**

    d.  Medications prescribed or recommended by provider:  **Plaintiff will supplement**

## II.  PERSONAL INFORMATION OF THE PERSON WHO USED VIOXX®

A.  Name:  **Lawrence Robello**

B.  Maiden or other names by which you have been known:

C.  Social Security Number:  **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**

D.  Address:  **3137 Primrose Dr, Willits, CA 65490**

40445.1

E.  Identify each address at which you have resided during the last ten (10) years, and list when you started and stopped living at each one:

| Address | Dates of Residence |
|---|---|
| 4913 Sunshine Ave, Santa Rosa, CA | On or about 9/1/1986 until on or about 4/2001 |
| 4508 37th Ave, Sacto, CA | On or about 4/2001 until on or about 10/2001 |
| 3137 Primrose Dr, Willits, CA | On or about 10/2001 until on or about 3/2005 |

F.  Driver's License Number and State Issuing License: __California__

G.  Date and Place of Birth: __12/8/1946; Honolulu, HI__

H.  Sex: Male __X__ Female_____

I.  Identify the highest level of education (high school, college, university or other educational institution) you have attended (even if not completed), the dates of attendance, courses of study pursued, and diplomas or degrees awarded:

| Institution | Dates Attended | Course of Study | Diplomas or Degrees |
|---|---|---|---|
| Simi Valley High School | On or about 1964 | General Education | Diploma |
| Conumnes College | On or about 1973 until on or about 1974 | Business | AA |

J.  Employment Information.

1. Current employer (if not currently employed, last employer):

| Name | Address | Dates of Employment | Occupation/ Job Duties |
|---|---|---|---|
| Coyote Valley Tribal Police | Po Box 388, Calpella, CA 95418 | On or about 2003 until on or about 2005 | Patrolman |

2. List the following for each employer you have had in the last ten (10) years:

| Name | Address | Dates of Employment | Occupation/Job Duties |
|---|---|---|---|
| Shodakai Valley Casino | Redwood Valley | On or about 2002 until on or about 2003 | Security guard |
| Clubhouse | Sonoma, CA | On or about 1995 until on or about 2001 | Manager/bookkeeper |

3. Are you making a wage loss claim for either your present or previous employment?
   Yes ____ No __X__

   *If "yes,"* state your annual income at the time of the injury alleged in Section I(C):

40445.1

K.     Military Service Information:     Have you ever served in the military, including the military reserve or National Guard?     Yes **X** No ____

If "yes," were you ever rejected or discharged from military service for any reason relating to your physical, psychiatric or emotional condition?     Yes ____ No **X**

L.     Insurance / Claim Information:

1. Have you ever filed a worker's compensation and/or social security disability (SSI or SSD) claim?     Yes **X** No ___ If "yes," to the best of your knowledge please state:

   a.  Year claim was filed: **On or about 2003**

   b.  Nature of disability: **Hernia surgery**

   c.  Approximate period of disability: **Approximately 2 weeks**

2. Have you ever been out of work for more than thirty (30) days for reasons related to your health (other than pregnancy)?     Yes ___ No **X** If "yes," set forth when and the reason.

3. Have you ever filed a lawsuit or made a claim, other than in the present suit, relating to any bodily injury?     Yes **X** No ___ If "yes," state to the best of your knowledge the court in which such action was filed, case name and/or names of adverse parties, and a brief description for the claims asserted. **Mendocino Court; Wake vs. Robello; car accident**

M.     As an adult, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty?     Yes ___ No **X** If "yes," set forth where, when and the felony and/or crime. ___

## III.     FAMILY INFORMATION

A.  List for each marriage the name of your spouse; spouse's date of birth (for your current spouse only); spouse's occupation; date of marriage; date the marriage ended, if applicable; and how the marriage ended (e.g., divorce, annulment, death): **Sylvia Lewis; plaintiff will supplement; Susan Robello; 4/11/1950; retail; on or about 12/30/1972; 3/8/2005; death**

B.  Has your spouse filed a loss of consortium claim in this action?     Yes ___ No **X**

C.  To the best of your knowledge did any child, parent, sibling, or grandparent of yours suffer from any type of cardiovascular disease including but not limited to: heart attack, abnormal rhythm, arteriosclerosis, (hardening of the arteries), murmur, coronary artery disease, congestive heart failure, enlarged heart, leaking valves or prolapse, heart block, congenital heart abnormality, Scarlet Fever, Rheumatic Fever, atrial fibrillation, stroke? Yes ___ No ___ Don't Know **X** If "yes," identify each such person below and provide the information requested.

Name:_____

Current Age (or Age at Death):_____

Type of Problem:_____

If Applicable, Cause of Death:_____

D. If applicable, for each of your children, list his/her name, age and address: **Eva Marie Galten; 31; Willits, CA; Lawrence Matthew Yeisun; Sonoma, CA; 28**

E. If you are claiming the wrongful death of a family member, list any and all heirs of the decedent. **Eva Marie Galten;31; Willits, CA; Lawrence Matthew Yeisun; Sonoma, CA; 28**

## IV.    VIOXX® PRESCRIPTION INFORMATION

A. Who prescribed VIOXX® for you? **Dr. Paul Johnon-Kaiser**_____

B. On which dates did you begin to take, and stop taking, VIOXX®? **Plaintiff will supplement**
_____

C. Did you take VIOXX® continuously during that period?

Yes **X** No___ Don't Recall ___

D. To your understanding, for what condition were you prescribed VIOXX®? **Shoulder**_____
_____

E. Did you renew your prescription for VIOXX®?

Yes **X** No ___ Don't Recall ____

F. If you received any samples of VIOXX®, state who provided them, what dosage, how much and when they were provided: **Plaintiff will supplement**_____

G. Which form of VIOXX® did you take (check all that apply)? **Plaintiff will supplement**

___ 12.5 mg Tablet (round, cream, MRK 74)
___ 12.5 mg Oral Suspension
___ 25 mg Tablet (round, yellow, MRK 110)
___ 25 mg Oral Suspension
___ 50 mg Tablet (round, orange, MRK 114)

H. How many times per day did you take VIOXX®?
   **Plaintiff does not recall**_____

I. Did you request that any doctor or clinic provide you with VIOXX® or a prescription for VIOXX®     Yes ___ No __ Don't Recall **X**___

40445.1

M00AD57425

J.  Instructions or Warnings:

    1.  Did you receive any written or oral information about VIOXX® before you took it?
Yes __**X**__ No ___ Don't Recall __

    2.  Did you receive any written or oral information about VIOXX® while you took it?
Yes ___ No ___ Don't Recall __**X**__

    3.  *If "yes,"*

        a.  When did you receive that information? _____

        b.  From whom did you receive it? _____

        c.  What information did you receive? _____
_____

K.  What over-the-counter pain relief medications, if any, were you taking at the same time you were
taking VIOXX®?  __**None**__ _____
_____

## V.  <u>MEDICAL BACKGROUND</u>

A.  Height: **5'11"**

B.  Current Weight: **230**

    Weight at the time of the injury, illness, or disability described in Section I(C):___

C.  Smoking/Tobacco Use History: *Check the answer and fill in the blanks applicable to your
history of smoking and/or tobacco use.*

    ___Never smoked cigarettes/cigars/pipe tobacco or used chewing tobacco /snuff.

    ___ Past smoker of cigarettes/cigars/pipe tobacco or used chewing tobacco /snuff.
        a.  Date on which smoking/tobacco use ceased:_____
        b.  Amount smoked or used: on average _per day for _____ years.

    ___Current smoker of cigarettes/cigars/pipe tobacco or user of chewing tobacco /snuff.
        a.  Amount smoked or used: on average _____ per day for _____years.

    __**X**__Smoked different amounts at different times.

D.  Drinking History.  Do you now or have you in the past drunk alcohol (beer, wine, whiskey, et.)?
Yes __**X**__ No _ *If "yes," fill in the appropriate blank* with the number of drinks that
represents your average alcohol consumption during the period you were taking VIOXX® up to
the time that you sustained the injuries alleged in the complaint:

    _____ drinks per week,

M00AD57426

_____drinks per month,

___4___drinks per year, *or*

Other (describe): _____

E.  Illicit Drugs.  Have you ever used (even one time) any illicit drugs of any kind within one (1) year before, or any time after, you first experienced your alleged VIOXX® related injury?
Yes ___ No **X** Don't Recall ____

*If "yes,"* identify each substance and state when you first and last used it. _____

_____

F.  Please indicate to the best of your knowledge whether you have ever received any of the following treatments or diagnostic procedures:

1.  Cardiovascular surgeries, including, but not limited to, the following, and specify for what condition the surgery was performed: open heart/bypass surgery, pacemaker implantation, vascular surgery, IVC filter placement, carotid (neck artery) surgery, lung resection, intestinal surgery:

| Surgery | Condition | When | Treating Physician | Hospital |
|---------|-----------|------|--------------------|----------|
| None    |           |      |                    |          |
|         |           |      |                    |          |

2.  Treatments/Interventions for heart attack, angina (chest pain), or lung ailments:

| Treatment/Intervention | When | Treating Physician | Hospital |
|------------------------|------|--------------------|----------|
| None                   |      |                    |          |

3.  To your knowledge, have you had any of the following tests performed: chest X-ray, CT scan, MRI, angiogram, EKG, echocardiogram, TEE (trans-esophageal echo), bleeding scan, endoscopy, lung bronchoscopy, carotid duplex/ultrasound, MRI/MRA of the head/neck, angiogram of the head/neck, CT scan of the head, bubble/microbubble study, or Holter monitor?
Yes ____ No ____ Don't Recall **X** ____ *If "yes,"* answer the following:

| Diagnostic Test | When | Treating Physician | Hospital | Reason |
|-----------------|------|--------------------|----------|--------|
|                 |      |                    |          |        |
|                 |      |                    |          |        |
|                 |      |                    |          |        |

40445.1

## VI. DOCUMENTS

Please indicate if any of the following documents and things are currently in your possession, custody, or control, or in the possession, custody, or control of your lawyers by checking "yes" or "no." Where you have indicated "yes," please attach the documents and things to your responses to this profile form.

A.  Records of physicians, hospitals, pharmacies, and other healthcare providers identified in response to this profile form.          Yes ___ No **X**

B.  Decedent's death certificate (if applicable).          Yes **X** No ___

C.  Report of autopsy of decedent (if applicable).          Yes ___ No **X**

## VII. LIST OF MEDICAL PROVIDERS AND OTHER SOURCES OF INFORMATION

A.  Your current family and/or primary care physician:

| Name | Address |
|------|---------|
| N/A  |         |

B.  To the best of your ability, identify each of your primary care physicians for the last ten (10) years.

| Name | Address | Approximate Dates |
|------|---------|-------------------|
| Dr. John Williams | 1712 South Main Street, Ste C Willits, CA 95490 | On or about 2001 until on or about 2005 |
| VA Medical Center | 4150 Clement Street, San Francisco, CA, 94121 | On or about 2001-2005 |
| Dr. Paul Johnson | 5900 State Farm Dr Santa Rosa, CA 95401 | On or about 1990 until on or about 2001 |

C.  Each hospital, clinic, or healthcare facility where you have received inpatient treatment or been admitted as a patient during the last ten (10) years.

| Name | Address | Admission Dates | Reason for Admission |
|------|---------|-----------------|----------------------|
| Kaiser Santa Rosa | 5900 State Farm Dr Santa Rosa, CA 95401 | Plaintiff will supplement | Plaintiff will supplement |
| Howard Hospital | One Madrone Street, Willits, CA 95490 | On or about 8/2003 | Hernia surgery |

D.  Each hospital, clinic, or healthcare facility where you have received outpatient treatment (including treatment in an emergency room) during the last ten (10) years.

| Name | Address | Admission Dates | Reason for Admission |
|------|---------|-----------------|----------------------|
| Howard Hospital | One Madrone Street, Willits, CA 95490 | On or about 11/2003 | Car accident |

M00AD57428

E.   Each physician or healthcare provider from whom you have received treatment in the last ten (10) years.

| Name | Address | Dates of Treatment |
|---|---|---|
| Dr. John Williams | 1712 South Main Street, Ste C Willits, CA 95490 | On or about 2001 until on or about 2005 |
| VA Medical Center | 4150 Clement Street, San Francisco, CA, 94121 | On or about 2001-2005 |
| Dr. Paul Johnson | 5900 State Farm Dr Santa Rosa, CA 95401 | On or about 1990 until on or about 2001 |
| Kaiser Santa Rosa | 5900 State Farm Dr Santa Rosa, CA 95401 | Plaintiff will supplement |
| Howard Hospital | One Madrone Street, Willits, CA 95490 | On or about 8/2003 |

F.   Each pharmacy that has dispensed medication to you in the last ten (10) years.

| Name | Address |
|---|---|
| Kaiser Santa Rosa Pharmacy | 5900 State Farm Dr, Santa Rosa, CA 95401 |
| Safeway | 845 South Main St, Willits, CA 95490 |

G.   If you have submitted a claim for social security disability benefits in the last ten (10) years, state the name and address of the office that is most likely to have records concerning your claim.

| Name | Address |
|---|---|
| N/A | |

H.   If you have submitted a claim for worker's compensation, state the name and address of the entity that is most likely to have records concerning your claim.

| Name | Address |
|---|---|
| N/A | |

40445.1

## CERTIFICATION

I declare under penalty of perjury subject to 28 U.S.C. § 1746 that all of the information provided in this Profile Form is true and correct to the best of my knowledge, that I have completed the List of Medical Providers and Other Sources of Information appended hereto, which is true and correct to the best of my knowledge, that I have supplied all the documents requested in part VI of this declaration, to the extent that such documents are in my possession, custody, or control, or in the possession, custody, or control of my lawyers, and that I have supplied the authorizations attached to this declaration.

_Susan Robello_                    _Susan Robello_                    _6/25/07_
Signature                          Print Name                         Date

6721.1

M00AD57430

## STATE OF CALIFORNIA
### CERTIFICATION OF VITAL RECORD

# COUNTY OF MENDOCINO
### UKIAH, CALIFORNIA

**CERTIFICATE OF DEATH**   3200523000129

USE BLACK INK ONLY / NO CORRECTIONS / WHITEOUTS OR ALTERATIONS

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT — FIRST (Given) | LAWRENCE |
| 2. MIDDLE | WAYNE |
| 3. LAST (Family) | ROBELLO |
| 5. DATE OF BIRTH | 12/08/1946 |
| 6. AGE | 58 |
| 7. DATE OF DEATH | 03/08/2005 |
| 8. HOUR | 2040 |
| 11. BIRTH STATE/FOREIGN COUNTRY | HI |
| 12. SOCIAL SECURITY NUMBER | 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 |
| 13. EVER IN ARMED FORCES? | YES |
| 14. MARITAL STATUS | Married |
| 16. EDUCATION | Some College |
| 17. USUAL OCCUPATION | Salesman |
| 18. KIND OF BUSINESS OR INDUSTRY | Janitorial |

15. DECEDENT'S RACE — White

7137 Primrose
Willits   Mendocino   95490   CA

INFORMANT'S NAME: Susan Robello-wife   3137 Primrose, Willits CA 95490

NAME OF SURVIVING SPOUSE — FIRST: Susan   LAST: Androvich
NAME OF FATHER — FIRST: Lawrence   LAST: Robello   BIRTH STATE: HI
NAME OF MOTHER — FIRST: Evelyn   LAST: Inagawa   BIRTH STATE: HI

DATE OF FINAL DISPOSITION: 03/14/2005   PLACE: 3137 Primrose, Willits, CA 95490
TYPE OF DISPOSITION: CR/RES   Not Embalmed
NAME OF FUNERAL ESTABLISHMENT: Anker-Lucier Mortuary   FD 310   03/09/2005

NAME OF HOSPITAL: Howard Memorial Hospital
1 Madrone Street
COUNTY: Mendocino
CITY: Willits
COR 05-068

IMMEDIATE CAUSE OF DEATH: Acute Myocardial Infarction   Hours

OTHER SIGNIFICANT CONDITIONS: Tobacco Abuse

WAS OPERATION PERFORMED: No

04/03/2002   01/13/2005   John Williams, DO, 1712-C S Main Street   Willits, CA 95490

STATE REGISTRAR   FAX AUTH #: 30901

*232007159*

CERTIFIED COPY OF VITAL RECORDS

STATE OF CALIFORNIA
COUNTY OF MENDOCINO } SS   DATE ISSUED   MAR 1 6 2005

This is a true and exact reproduction of the document officially registered and placed on file in the VITAL STATISTICS OFFICE, MENDOCINO COUNTY DEPARTMENT OF PUBLIC HEALTH.

LOCAL REGISTRAR
MENDOCINO COUNTY, CALIFORNIA

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.



M00AD57431