UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID WYSER, ) | |
| ) | |
| Plaintiff, ) | **1:07-cv-0359-SEB-JMS** |
| ) | |
| vs. ) | CAUSE NO.: |
| ) | |
| MERCK & CO., INC., ) | **DEMAND FOR JURY TRIAL** |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR DAMAGES

Plaintiff, David Wyser, by counsel, brings this action against the Defendant, Merck & Co., Inc. ("Merck").

### PARTIES AND JURISDICTION

1. Plaintiff, David Wyser, is a citizen of the State of Indiana and a resident of Hamilton County.

2. Defendant, Merck, is incorporated under the laws of the State of New Jersey and maintains its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the Plaintiff and Merck and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

Exhibit C

4.    Venue is properly laid because Plaintiff is a resident of the Southern District of Indiana and Merck does business in that district.

## I.   GENERAL FACTS COMMON TO ALL CAUSES OF ACTION

5.    This action seeks damages on behalf of the Plaintiff for his personal injuries that were caused by the ingestion of Vioxx.

## II.   FACTS COMMON TO ALL CAUSES OF ACTION

6.    At all times relevant, Merck itself or through the use of agents, researched, developed, manufactured, designed, tested, distributed, marketed, promoted, advertised and otherwise sold the pharmaceutical product, Vioxx.

7.    Vioxx is a brand name used by Merck to market and distribute rofecoxib. Merck began its distribution and sale of Vioxx in or about May of 1999 throughout the United States, including the state of Indiana. In order too obtain FDA approval and insure successfully launching this product in competition with Celebrex (celecoxib), which was introduced to the market by Merck competitors Pharmacia and Pfizer, approximately three (3) months prior to the introduction of Vioxx, Merck failed to disclose the serious cardiovascular risks associated with Vioxx.

8.    Plaintiff took 25 mg per day of Vioxx before having a heart attack on July 28, 2003.

9.    The ingestion of Vioxx by the Plaintiff caused his injuries.

10.   Until Merck withdrew Vioxx from the market on or about September 30, 2004, the Plaintiff was not aware of the connection between Vioxx and the substantially increased likelihood of suffering a cardiovascular or cerebrovascular incident as a result of ingesting

Exhibit C

Vioxx. At no time did Plaintiff receive adequate warning that ingesting Vioxx could increase his chances of suffering cardiovascular incidents or cerebral events, such as a stroke. Merck continued to market Vioxx from 1999 through September 2004 via numerous television and print advertisements directed to the potential patient population and consuming public, as well as to the prescribing physicians, with no adequate warnings that Vioxx carried with it the cardiovascular risks which have now been disclosed.

11. Merck knew or should have known of this increased risk as a result of prior studies of the performance of the drug as early as the year 2000, shortly after introduction of Vioxx to the market.

12. In March 2000, Merck released the results of the Vioxx Gastrointestinal Outcomes Research Study (the "VIGOR Study"), which had begun in approximately January 1999. The VIGOR Study revealed, among other things, "significantly fewer heart attacks were observed in patients ingesting naproxen (0.1%) compared to the group ingesting Vioxx 50mg. (0.5%)."

13. The VIGOR Study did not demonstrate an improved safety profile for Vioxx. The VIGOR Study data revealed that:

    a.    Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on naproxen;

    b.    Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on naproxen; and

    c.    Patients on Vioxx actually suffered *more* cases of serious disease (either gastrointestinal or cardiovascular) than did naproxen users (61 and 57 cases respectively).

Exhibit C

14. In June 2000, in an effort to obtain approval for new gastrointestinal safety claims for Vioxx, Merck submitted to the FDA the VIGOR Study that disclosed a substantial increased risk of serious cardiovascular events, including heart attacks and strokes in patients ingesting Vioxx, compared to patients ingesting naproxen. According to the FDA, "[e]valuation of safety by routine parameters showed no advantage of [Vioxx] rofecoxib over naproxen."

15. Ignoring the evidence of a causal relationship between Vioxx and this significantly increased rate of cardiovascular events, Merck claimed that naproxen had "cardio-protective effects" thus resulting in the lower incidents of heart attacks in the group ingesting naproxen.

16. After the VIGOR Study, evidence of the increased danger of cardiovascular problems continued to mount. Industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, showed that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck denied the results of these studies as to the hypertension problems in the official publication of the American Pharmaceutical Association, *Pharmacy Today*.

17. Merck continued to deny the ill health effects associated with Vioxx, while at the same time, reaping the profits obtained through its false and misleading advertising to the patient public, including the Plaintiff, and to the physicians treating those individuals. Merck engaged in a massive advertising and sampling program and gained continued increases in market share and sales, resulting in billions of dollars in sales for Merck in 2000 and thereafter, and in Merck obtaining a significant market share.

18. In November 2000, Merck caused the publication of a study in the NEW ENGLAND JOURNAL OF MEDICINE, knowingly downplaying and/or withholding from publication the severity of

4

Exhibit C

cardiovascular risks associated with Vioxx consumption as compared to naproxen consumption found in the VIGOR Study.

19. Merck denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive. For example, on May 22, 2001, Merck issued a press release through the *PR Newswire* that stated, among other things: "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

20. On August 22, 2001, the *Journal of the American Medical Association* ("JAMA") published an article authored by cardiologists Eric J. Topol, M.D., Debarata Mukherjee, M.D., and Steven E. Nessen, M.D., of the Cleveland Clinic Foundation entitled "Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors," which reported the results of a study of Vioxx and its competitor Celebrex. The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of over 15,000 patients: "the annualized myocardial infarction rates for COX-2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group . . ."

21. The day before the JAMA article was published, *Bloomberg News* reported that Merck attempted to discredit the article and further deceive the public and prescribing physicians by claiming: "We have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo." Further, on August 23, 2001, the day after the article was published, Merck stated in a press release, "the Company stands behind the overall and cardiovascular safety profile...of Vioxx."

22. In July 2001, an article in Web MD quoted an FDA Study: "the study found that Vioxx cut the occurrence of ulcers and other gastrointestinal problems by half compared with the

5

Exhibit C

over-the-counter NSAID Aleve. But the study also showed that people ingesting Vioxx had four times the risk of a heart attack." Merck's spokeswoman, Christine Fanelle, contended the "risk was negligible" and that "it appeared to increase the risk of a heart attack because Aleve, like aspirin, actually reduces heart attack risks."

23. In September 2001, the FDA sent Merck a warning letter which warned Merck that its marketing of Vioxx was "false, lacking in fair balance, or otherwise misleading...." The warning letter went on to advise Merck that its marketing "minimize[s] the Vioxx/Coumadin drug interaction, omit[s] crucial risk information associated with Vioxx therapy, contain[s] unsubstantiated comparative claims, and promote[s] unapproved uses."

24. The Warning Letter also reprimanded Merck for:

> assert[ing] that Vioxx does not increase the risk of [heart attacks] and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

25. The theory asserted by Merck to explain the results of the Vigor Study, that naproxen had cardioprotective effect and therefore accounted for the higher cardiovascular risks among Vioxx users was refuted in approximately January 2002 by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study. The study was published in *The Lancet*, and concluded that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et al., "Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: an Observational Cohort Study," *The Lancet*, 359: 118-123, Jan. 12, 2002.

Exhibit C

26. In a follow-up study reported in the *Journal of the American College of Cardiology* on or about February 6, 2002, Dr. Richard J. Bing reported on having conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events.

27. During the time the results of these studies were being published, consumers and healthcare professionals were complaining about Vioxx to the FDA. The FDA's Adverse Events Reporting System ("AERS") database is a computerized system for collecting and maintaining information about adverse events reported by drug manufacturers, health professionals, and others. The system contains adverse events detected and reported after marketing of the drug.

28. According to AERS, through October 2003, almost 2,000 adverse cardiovascular events were experienced by individuals ingesting Vioxx, including myocardial infarctions, cardiac arrests, and cardiac failures. These cardiac events reported to the FDA, resulted in such outcomes as hospitalization, life threatening conditions, and even death. Moreover, this system under-reported the actual frequency of such events in the Vioxx-ingesting population.

29. On October 30, 2003, in an article entitled "Vioxx Study Sees Heart-Attack Risk," *The Wall Street Journal* reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients ingesting the pill [Vioxx]." According to *The Wall Street Journal* article, within the first thirty days of ingesting Vioxx, the risk of a heart attack was increased 39% as compared to Vioxx's competitor, Celebrex. However, Merck continued to insist that it stood behind the overall and cardiovascular safety profile of Vioxx.

7

Exhibit C

30. In August 2004, *Health Day News* quoted the FDA as finding "this and other studies cast serious doubt on the safety" of Vioxx and that Celebrex "may be safer." Again, even at this late date, Merck sprang to the defense of Vioxx. Peter S. Kim, President of Merck Research Laboratories, was quoted as saying Merck "strongly disagrees" with the findings of this new study. On August 26, 2004, The Street.com commented "Merck Thursday released a detailed critique questioning the studies significance."

31. Belatedly, on September 30, 2004, Merck finally revealed that this double blind FDA sponsored study had shown that Vioxx doubled the risk of heart attack and stroke for consumers who had taken the drug for a period of time in excess of 18 months, as compared to subjects ingesting a placebo for the same period of time. Because of the results of this study, Merck was finally forced to withdraw Vioxx from the market worldwide.

32. However, the withdrawal from the market came after the Plaintiff ingested the drug without adequate notice of the inherent risks to his health. As a result, Plaintiff suffered heart attacks, strokes and other cardiovascular events, including death.

33. If Merck had not engaged in this misleading conduct, consumers, including Plaintiff and his treating physicians, would have known the true risks of ingesting Vioxx and could have switched from Vioxx to safer products or refrained wholly from its use.

34. The marketing strategies of Merck through massive advertising in the consumer media targeted individuals to induce them to purchase Vioxx and to physicians to encourage them to prescribe Vioxx. At the time Merck distributed, manufactured and marketed Vioxx, Merck intended that individuals would rely on the advertisements which misleadingly omitted or minimized references to the cardiovascular risks known to Merck.

Exhibit C

35. Thus, despite knowledge from its clinical trials, post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Merck promoted and marketed Vioxx as safe and effective for persons such as Plaintiff.

## COUNT I
### Negligent Design, Failure to Reasonably Test and Failure to Warn

36. Plaintiff realleges each and every allegation of paragraphs 1 through 35 of this Complaint, as if set forth fully herein.

37. At least after the VIGOR Study in March 2000, Merck knew or in the exercise of reasonable care should have known that evidence existed associating Vioxx with a substantial increased risk of causing cardiovascular events dangerous to the health of those consumers ingesting Vioxx. This knowledge of Merck increased with each study between March 2000 and September 30, 2004.

38. Despite what Merck knew, should have known or was reckless in not knowing, as described herein, Merck negligently and in violation of 21 CFR § 201.57(e) failed to issue timely or adequate warnings of the danger of increased cardiovascular problems to the physicians prescribing or supplying Vioxx for use by Plaintiff herein.

39. Despite Merck's knowledge described herein, Merck negligently failed to advise Plaintiff, and the medical community of these dangers which would have alerted them to available safer treatments for arthritis and the other conditions for which the patients were ingesting Vioxx.

40. As a proximate result of Merck's active concealment of the cardiovascular risks of Vioxx and its failure to issue timely or adequate warnings as alleged above, Plaintiff was damaged as previously alleged above.

Exhibit C

WHEREFORE, Plaintiff demands judgment against Merck for medical costs, pain and suffering, emotional distress, lost wages, and all other available damages sufficient to fully and fairly compensate Plaintiff for the injuries which he suffered, taxable costs, and for all other proper relief.

## COUNT II
## Strict Liability

41. Plaintiff realleges each and every allegation of paragraphs 1 through 40 of this Complaint, as if set forth fully herein.

42. Merck was in the business of designing, manufacturing, supplying, marketing, selling and distributing Vioxx.

43. Vioxx was sold by Merck in a defective condition, unreasonably dangerous to potential users thereof.

44. Vioxx was expected to and did reach Plaintiff without substantial change in the condition in which it was sold.

45. Merck failed to adequately warn Plaintiff of the dangers and adverse health risks associated with the use of Vioxx.

46. Vioxx was acquired by the Plaintiff, and it was used by him for the purpose intended, and it caused them physical harm, in the form of blood clots, heart attacks, other cardiovascular events, and death.

47. Merck is strictly liable to the Plaintiff for the harm, damages, injuries and death complained of herein.

48. As a proximate result of Merck's actions as alleged above, the Plaintiff has been damaged thereby as previously alleged above.

Exhibit C

WHEREFORE, Plaintiff demands judgment against Merck for medical costs, pain and suffering, emotional distress, lost wages, and all other available damages sufficient to fully and fairly compensate Plaintiff for the injuries which he suffered, taxable costs, and for all other proper relief.

### COUNT III
### Fraud

49. Plaintiff realleges each and every allegation of paragraphs 1 through 48 of this Complaint, as if set forth fully herein.

50. Merck misrepresented to the treating physicians, the population of Vioxx consumers, and to the public at large, and thus to Plaintiff's doctors, and Plaintiff, that Vioxx was safe to prescribe and ingest by falsely minimizing the cardiovascular risks associated with Vioxx, which risks were known or should have been known to Merck.

51. At the time Merck made these misrepresentations, Merck knew or should have known that these statements were false.

52. These statements were made with the intent that those to whom they were directed would rely on them to their detriment; and Plaintiff and his physicians did so.

53. As a result of Merck's misrepresentations as above alleged, Plaintiff suffered the damages alleged above.

WHEREFORE, Plaintiff demands judgment against Merck for medical costs, pain and suffering, emotional distress, lost wages, and all other available damages sufficient to fully and fairly compensate Plaintiff for the injuries which he has suffered, taxable costs, and for all other proper relief.

Exhibit C

## COUNT IV
## Constructive Fraud

54. Plaintiff realleges each and every allegation of paragraphs 1 through 53 of this Complaint, as if set forth fully herein.

55. Merck was in a position of superior knowledge as to the information alleged above when compared with Plaintiff. Merck knew that Plaintiff and other members of the consuming public who were suffering from arthritis or other pain causing conditions, did not possess the knowledge and information necessary to enable them to appreciate the risks and dangers to which they were subjecting themselves by ingesting Vioxx to relieve the symptoms of these conditions rather than ingesting other available effective products. As a result of the relationship between Merck and the Plaintiff, and his treating physician, and Merck's position of superior knowledge, Merck had a duty to inform them of these risks and dangers.

56. Merck violated the duties owed to Plaintiff by remaining silent or issuing misleading statements when they had a duty to warn.

57. Plaintiff reasonably relied upon Merck's failure to warn and misleading statements as indicating that Vioxx continued to be safe to use. Merck thereby obtained an advantage at the expense of Plaintiff as they continued to sell Vioxx as a safe product when it in fact was not.

58. Merck's failure to advise Plaintiff as well as Merck's misrepresentations herein alleged constituted constructive fraud.

59. As a proximate result of the actions and omissions of Merck, the Plaintiff has been damaged thereby as alleged above.

Exhibit C

WHEREFORE, Plaintiff demands judgment against Merck for medical costs, pain and suffering, emotional distress, lost wages, and all other available damages sufficient to fully and fairly compensate Plaintiff for the injuries which they have suffered, taxable costs, and for all other proper relief.

## COUNT V
### Punitive Damages

60. Plaintiff realleges each and every allegation of paragraphs 1 through 59 of this Complaint, as if set forth fully herein.

61. Merck's actions were malicious, wanton, willful, grossly negligent, oppressive or in reckless disregard of the rights of the Plaintiff.

62. An award of punitive damages against Merck is necessary and appropriate to deter Merck and others similarly situated from engaging in similar conduct in the future.

WHEREFORE, in addition to the compensatory damages prayed for in Counts I through V above, Plaintiff prays that judgment be entered for punitive damages in an amount deemed by the jury to be sufficient to punish Merck for its conduct as alleged herein and to deter similar conduct in the future.

Exhibit C

## DEMAND FOR JURY TRIAL

Come now the Plaintiff, by counsel, Price Waicukauski & Riley, LLC, and demands that this Court schedule this matter for trial by jury.

PRICE WAICUKAUSKI & RILEY, LLC

*[signature]*

Henry J. Price, Bar No. 8522-49
William N. Riley, Bar No. 14941-49
Jamie R. Kendall, Bar No. 25124-49
Christopher A. Moeller, Bar No. 25710-49

The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-8787
FAX: (317) 633-8797

**COUNSEL FOR PLAINTIFFS**

Exhibit C