## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL GETZ and MARIBETH GETZ, on behalf of themselves and all other Pennsylvania residents similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>MERCK & CO., INC.<br><br>Defendant. | CIVIL ACTION NO .:<br><br>COMPLAINT - CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT FOR PERSONAL INJURY AND DEATH

AND COMES NOW Plaintiffs on behalf of themselves and all others similarly situated for their multiple causes of action against Merck & Co., Inc.  ("Merck" or "Defendant"), and allege and state the following:

## I.   INTRODUCTION

1.      This case involves the prescription drug VIOXX® ("Vioxx") generic name rofecoxib, which was researched, designed, developed, manufactured, marketed, promoted, advertised and distributed by defendant Merck & Co., Inc. ("Merck") for relief of pain and inflammation (swelling and soreness) in adults suffering from osteoarthritis, rheumatoid arthritis, short-term pain, menstrual pain, and migraine headaches; and in juveniles suffering from rheumatoid arthritis.

1

2.      At all times relevant to this litigation, Merck misrepresented the safety of Vioxx

and negligently manufactured, marketed, advertised, promoted, marketed, and sold Vioxx as a

safe prescription medication when in fact, it knew or should have known that Vioxx was not safe

for its intended purpose for patients for whom it was prescribed and to whom it was sold; and

that Vioxx caused serious medical problems, and in certain patients, catastrophic injuries and

deaths.

3.      In public statements to the press, Merck estimated that there were 105 million

U.S. prescriptions written for Vioxx between May, 1999 and August, 2004.  Based on this,

Merck has estimated that approximately 20 million patients have taken Vioxx in the U.S. since

the launch of the drug in May of 1999.

4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek

certification of a Pennsylvania class in this matter, consisting of:

> All persons residing in Pennsylvania who took Vioxx in any dose
> at any time between May 20, 1999, when Vioxx was first approved
> by the United States Food and Drug Administration ("FDA"), and
> September 30, 2004, when Vioxx was withdrawn from the market,
> and who claim personal injuries or assert wrongful death claims
> arising from ingestion of Vioxx.

5.      Included in the class are dependents and other entitled to recover under applicable

Wrongful Death and/or Survival Statutes.  This class seeks damages for personal injury and

wrongful death.

## II.   PARTIES

6.      Plaintiffs are residents residing at 82 Fox Road, Newmanstown, Pennsylvania,

17073.  Plaintiff Michael Getz was prescribed, purchased, or was given samples of, and ingested

Vioxx.  As a result of Mr. Getz's ingestion of Vioxx, he suffered injuries, including MI.

Additionally, Mrs. Getz suffered a loss of consortium of her husband's injuries.

7.      Plaintiffs bring this action on their behalf and for all other individuals who are

similarly situated.

8.      Defendant Merck was and is an American pharmaceutical company, incorporated

under and by the laws of the State of New Jersey.  Its headquarters are located at One Merck

Drive, Whitehouse Station, New Jersey.

9.      Merck does business in all of the United States, territories and possessions, and

worldwide, selling pharmaceutical products.

10.     At all times pertinent hereto, Merck developed, designed, researched,

manufactured, promoted, marketed, advertised, distributed, and sold Vioxx from its New Jersey

headquarters and New Jersey research and development facilities, for use in human individual

patients such as Plaintiffs identified herein, and those whom they seek to represent throughout

Pennsylvania.


## II.   STATEMENT OF JURISDICTION

11.     This Court has subject matter Federal jurisdiction pursuant to 28 U.S.C. §1332 as

amended by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711 et al. in that the

amount in controversy exceeds $150,000 and any one member of a class has diverse citizenship

3

with the Defendant.

12.     Venue is proper pursuant to 28 U.S.C. § 1391. The Defendant has sufficient minimum contacts with or otherwise intentionally avails itself of the consumer markets within Pennsylvania through the promotion, sale, marketing and/or distribution of its products in the State to render the exercise of jurisdiction by the courts permissible under traditional notions of fair play and substantial justice.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLASS MEMBERS

### A. Vioxx is a Non-Steroidal Anti-Inflammatory Drug ("NSAID") that Selectively Blocks Production of Cyclooxygenase-2 ("COX-2").

13.     Vioxx belongs to a class of drugs known as non-steroidal anti-inflammatory drugs or "NSAIDs" which are used to reduce pain. NSAIDs generally reduce pain by blocking the production of an enzyme called prostaglandin G/H synthase, which consists of two similar forms cyclooxygenase-1 ("Cox-1") and Cyclooxygenase-2 ("Cox-2"). Vioxx is a selective inhibitor of Cox-2. Vioxx reduces pain by selectively blocking the production of "Cox-2."

14.     Other, older NSAIDs, which inhibit production of Cox-1 as well as Cox-2 also provide effective relief from pain and inflammation. Because Cox-1 can adversely affect the gastro-intestinal ("GI") tract, traditional NSAIDs have been associated with potential GI toxicity.

15.     In the late 1980's and early 1990's, Merck was facing a business crisis, because patents on several of its best-selling drugs, including Vasotec, Prinivil, Mevacor, Pepcid, and Prilosec were expiring.

16.     No pharmaceutical company had ever faced the loss of so-many million dollar

4

patents at approximately the same time.  Merck management even feared that Merck might not survive as a company.

17.     In or about the summer of 1992, Merck began a Cox-2 research program at the Merck Frosst Centre for Therapeudic Research in Quebec, Canada.  Merck scientists explored the hypothesis that the therapeudic utilities of NSAIDs were due to inhibition of Cox-2, whereas much of the gastrointestinal toxicity of traditional NSAIDs were due to the inhibition of Cox-1.

18.     At the time, Merck management realized that the development of an NSAID that operated by selectively blocking Cox-2 could produce a much-needed "Blockbuster" for the company.  As the company has acknowledged, the race was on to find a selective inhibitor of Cox-2.

19.     During 1992, Merck became aware that both DuPont and Taisho, a Japanese pharmaceutical company, had selective Cox-2 inhibitors in development.  Almost every one of the more than three hundred scientists and support staff at the Merck-Frosst Centre for Therapeudic Research worked on the discovery and development of Vioxx.  After discarding one compound because it lacked sufficient selectivity for Cox-2, and another because metabolic studies raised questions of possible drug-drug interactions, Merck continued to research and develop the compound that eventually became known as Vioxx.

20.     On or about December 20, 1994, Merck filed its first investigational new drug (IND) application with the FDA to conduct clinical trials of Vioxx in humans.  The intended use of the drug identified in the IND was the treatment of osteoarthritis and acute pain.

21.     Following FDA approval of Vioxx in May of 1999, Merck marketed Vioxx as a selective Cox-2 inhibitor, which unlike traditional NSAIDs , did not inhibit the production of

Cox-1. Merck claimed that since Vioxx was the most selective inhibitor of Cox-2 on the market, it conferred the anti-inflammatory and analgesic benefits of traditional NSAIDs without the associated gastrointestinal toxicity. Accordingly, Merck asserted that Vioxx was the safest NSAID on the market.

22.     For the more than five years that Merck marketed Vioxx in the United States, it remained Merck's leading drug for control of acute pain and chronic pain associated with osteoarthritis, rheumatoid arthritis, migraine headaches, and dysmenorrheal pain.

23.     In 2003 alone, worldwide sales of Vioxx reached 2.5 billion dollars (U.S.), following the most impressive global sales growth of any drug in history. From a marketing standpoint, Vioxx was an unqualified, if not unprecedented, success. However, from a public safety standpoint, it was an unmitigated disaster. Vioxx's pre- and post-marketing history was plagued with safety concerns which Merck repeatedly ignored, concealed, and/or downplayed.

24.     The astonishing marketing success of Vioxx became so central to Merck's financial well-being, that Edward Scolnick, former President of Merck Research Laboratories in Rahway, New Jersey, stated that had the drug failed, Merck would have been a very different company.

25.     Despite the efforts of numerous healthcare professionals, Merck successfully downplayed, and in some instances, actively concealed, the fact that Vioxx significantly increased the risk of adverse thrombotic events, including devastating cardiovascular and cerebrovascular injuries such as myocardial infarctions (heart attacks) and strokes, until the drug was finally recalled in late September 2004.

26.     Because Vioxx inhibited Cox-2 without substantially inhibiting Cox-1, it, among

other things, created a homeostatic imbalance that could result in increased aggregation of blood platelets or blood clotting and thereby substantially increased the risk of adverse cardiovascular and cerebrovascular adverse events, including heart attacks – both clinically recognized and unrecognized – ischemic strokes, and other serious injuries.  Merck had reason to know and did know of these serious adverse events in patients who ingested Vioxx.

**B.    Merck Knew of Vioxx's Cardiotoxic and Pro-thrombotic Effects before it was Approved and Marketed.**

**1.    Merck's Knowledge of the Risks Associated with Vioxx Dates to at Least November 1996.**

27.    Merck sought to market Vioxx as an alternative to earlier NSAIDs such as aspirin, which had frequently been associated with adverse gastrointestinal side effects.  As early as November, 1996, years before FDA approval of Vioxx in May, 1999, Merck recognized that unless taken in conjunction with aspirin, Vioxx posed a "substantial risk" of "significantly higher rates" of cariovascular adverse events such as myocardial infarctions, strokes and transient ischemic attacks because, as a selective Cox-2 inhibitor, it lacked aspirin's "anti-platelet [i.e. anti-clotting] effect."

28.    In fact, early in the development program for Vioxx, to demonstrate that it selectively inhibited Cox-2 , Merck used a platelet aggregation assay to assess the drug's effect on Cox-1.  That research established that Vioxx did not affect thromboxane production or platelet aggregation because it did not inhibit Cox-1.  In addition, a Merck-sponsored study found that Vioxx, unlike several other NSAIDs against which it was tested, had no appreciable anti-platelet effect (Protocol 061).

7

29.     Two months later, in February 1997, Vioxx researcher Briggs Morrison conceded that "without Cox-1 inhibition you will get more thrombotic events and kill drug."

30.     Responding to this observation, Merck's Vice President of Clinical Research, Alise Reicin, complained:

> This is a no win situation.  The relative risk of [adverse GI events with] even low dose aspirin is 2-4 fold.  Yet the possibility of increased CV [cardiovascular] events of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA.?  This may decrease the CV event rate so that the difference between the two groups would not be evident.  The only problem would be – would we be able to recruit any patients?

31.     By early 1998, Merck's own clinical investigators, in fact, based on findings from a Merck-sponsored study (Protocol 023) advised the company that by inhibiting Cox-2, Vioxx, at the cellular level of blood vessel linings, may alter the homeostatic balance between prostacyclin- a Cox-2 platelet inhibitor that dilates blood vessels – and thromboxane – a Cox-1 platelet activator that constricts blood vessels – such that it could provoke the creation of blood clots.

32.     In or about May 1998, six months before Merck filed its New Drug Application ("NDA") with the FDA, Merck's Scientific Advisory Board for the drug recommended that researchers "systematically collect data on cardiovascular (CV) events in all clinical trials" for Vioxx. In issuing this recommendation, the Board noted that some of its consultants were concerned that "[b]ased on data on PGI [prostaglandin] metabolism obtained for Vioxx, it is conceivable that Vioxx could disturb the [endothelium-platelet] interaction to favor platelet aggregation."

33.     On or about November 23, 1998, Merck submitted a New Drug Application

8

("NDA") for Vioxx 12.5 mg and 25 mg tablets to treat the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

34.     On or about May 20, 1999, the FDA approved Vioxx for the relief of signs and symptoms of acute pain, dysmenorrhea, and osteoarthritis, a chronic swelling and painful joint disease of one or more joints.

35.     At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment  with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

36.     The "Warnings" section of the labeling for Rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects - Risk of GI Ulceration, Bleeding, and Perforation."

37.     Defendant Merck submitted sNDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for Rofecoxib.  In conjunction with the sNDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxrn in Patients With Rheumatoid Arthritis : U.S, Cohort."  The VIGOR study was performed from January 6, 1999 through March 17, 2000.

38.     The objectives of the VIGOR study were to (1) "determine the relative risk of

9

confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MD-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

        **2.**    **The Vigor Study showed significant increases in Cardiovascular events Occurring in Patients taking Vioxx as opposed to Naproxen.**

39.      Signs of Vioxx's risks of serious adverse events emerged soon after the FDA's approval of the drug.

40.      On or about January 6, 1999, a Merck-sponsored 8,000 patient clinical study known as the VIOXX Gastrointestinal Outcome Research Study (the "VIGOR study") was begun in rheumatoid arthritis patients comparing VIOXX with the over-the-counter NSAID Naproxen to obtain information regarding clinically meaningful gastrointestinal events, and purportedly, to develop a large controlled data-base for overall safety assessment.

41.      Merck excluded "high" cardiovascular risk patients from the VIGOR trial.

42.      On or about November 18, 1999, Merck's senior biostatistician, Deborah Shapiro, provided a tightly controlled, highly confidential interim safety report to the VIGOR study's Data Safety and Monitoring Board ("DSMB"), which showed that almost twice as many serious cardivascular events were occurring among patients taking Vioxx as among those taking Naproxen.

43.      In or about March of 2000, Merck released the results of the VIGOR study. The study data revealed, among other things, that Vioxx users suffered five times as many heart attacks than their Naproxen counterparts.  In addition, serious cardiovascular events (including

10

heart attacks, ischemic strokes, unstable angina, and sudden unexplained deaths) were reported for more than twice as many Vioxx as Naproxen patients.

44.     At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis," "Treatment  with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

45.     On March 9, 2000, shortly after completion of the VIGOR study, Edward M. Scolnick, former president of Merck Research Laboratories, concluded that "the CV [cardiovascular] events are clearly there" and stated that Merck should be prepared to "make clear to the world" that Vioxx's cardiovascular toxicity "is a class effect" (i.e. and effect of the class of selective Cox-2 inhibitors) that is "mechanism based as we worried it was" and as some of the company's consultants had maintained.

46.     Merck ignored the causal relationship between Vioxx and this significantly increased rate of cardiovascular events in the VIGOR study.  Instead, Merck seized upon and widely and continuously disseminated the *post hoc* rationalization that the VIGOR study showed that Naproxen reduced cardiovascular risk (i.e., it exerted a "cardioprotective effects"), not that Vioxx posed a serious cardiovascular hazard, an explanation with scant scientific support. Indeed, both the scientific literature and Merck consultants had concluded that Naproxen lacked any such cardioprotective effect.

11

47.     Merck continued to publish and describe that Naproxen had a cardioprotective effect, notwithstanding that Italian pharmacologist Carlo Patrono, one of Merck's own consultants and an expert in the platelet effects of cyclooxygenase-inhibiting drugs (whom Merck regarded as "the world's most respected and knowledgeable" scientist in his field), advised Merck in March 2000, that the dramatic cardiovascular effects observed in the VIGOR study could not be attributed plausibly to Naproxen for several reasons.

48.     Furthermore, on or about March 24, 2000, University of Pennsylvania pharmacologist Garrett Fitzgerald, then acting as a Merck consultant, advised Merck of a paper in press that included Naproxen among several NSAIDs which, in contrast to aspirin, had no significant effect on the incidence of first nonfatal myocardial infarctions in females in an epidemiological study.

49.     In or about January 2002, a study by Wayne A. Ray, et al. was published in The Lancet that disproved Merck's Naproxen theory, concluding that Naproxen and other NSAIDs had not been shown to protect against the risk of coronary heart disease.

50.     After the VIGOR study, evidence of the dangers of cardiovascular and cerebrovascular adverse events associated with Vioxx use continued to surface.

51.     In June of 2000, industry-sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which Merck is a member and a corporate sponsor, showed that Vioxx use resulted in statistically significant increases in hypertension and myocardial infarctions.

52.     Merck knowingly downplayed and, in certain instances, withheld from publication, the severity of cardiovascular and cerebrovascular risks associated with Vioxx. For

12

example, Merck downplayed this information in connection with the New England Journal of Medicine's November 2000 reporting regarding the VIGOR study, authored by Merck sponsored authors.

53.     On or about May 22, 2001, Merck issued a press release through PR Newswire touting and "reconfirm[ing] the favorable cardiovascular safety profile of Vioxx".

54.     In a warning letter it issued four months later, the FDA, severely rebuking Merck, advised that:

> your claim in the [May 22, 2001] press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to Naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the Naproxen treatment group (46 events, 1.1%) in the VIGOR study.

55.     On or about August 22, 2001, the Journal of the American Medical Association ("JAMA") published an article authored by cardiologists from the Cleveland Clinic Foundation entitled "Risk of Cardiovascular Events Associated with Selective Cox 2 Inhibitors."  The JAMA article reported the Cleveland Clinic's evaluation of two randomized trials of more than 15,000 patients, comparing Pfizer's Celebrex in a study called CLASS and the VIGOR study involving Vioxx to placebo.  The Cleveland Clinic reported that "the annualized myocardial infarction rates for COX 2 inhibitors in both VIGOR and CLASS were significantly higher than that in the placebo group"One day before, and in anticipation of publication of, the JAMA article, Merck issued a statement claiming:  "We have additional data beyond what they cite, and the findings are very, very reassuring.  VIOXX does not result in any increase in cardiovascular events

13

compared to placebo."

56.     On or about August 23, 2001, the day after the JAMA article was published, Merck stated in another press release: "The Company stands behind the overall and cardiovascular safety profile  of VIOXX."

57.     In October 2001, Merck learned of the publication of an article stating that there was a higher reporting rate for Vioxx compared to Celebrex, for adverse events relating to renal and cardiovascular effects.  Merck responded by conducting an internal analysis of reported adverse events for Vioxx and Celebrex.  Merck's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx in comparison to Celebrex.  Merck disregarded this signal of cardiovascular toxicity and failed to disclose it to the public.  Instead, Merck blamed the result on an alleged discrepancy in the number of events entered to the regulatory database for the two drugs.  As in the case of the Task Force analysis of 1997 and the VIGOR study of 2000, Merck once again searched for and found a reason to exonerate Vioxx and keep it on the market.

58.     In or about 2002, the FDA approved an additional indication for the use of Vioxx for the relief of the signs and symptoms of rheumatoid arthritis  in adults, which affects more than two million additional Americans.

C.     Merck Pursued an Aggressive and Misleading Marketing Campaign.

59.     Merck persistently failed to advise the medical community and patients of serious cardiovascular and cerebrovascular adverse events occasioned by the use of Vioxx.

60.     Merck's marketing strategy began in the 1990s.  Merck began to aggressively

market and sell Vioxx by falsely misleading potential users such as the consumer Plaintiffs and

members of the Class about the product and by failing to protect the consumers from serious

dangers which the Defendant knew or should have known would result from the drug's use.

61.     Merck wildly and successfully blitz-marketed Vioxx in the U.S. by undertaking an

advertising campaign extolling the virtues of Vioxx in order to induce widespread use of Vioxx.

This direct-to-consumer advertising campaign consisted of advertisements, promotional literature

to be placed in the offices of doctors and other health care providers and HMOs, and promotional

materials provided directly to potential Vioxx users themselves.

62.     The advertising campaign as a whole sought to create the image, impression and

belief that the use of Vioxx was safe, had fewer side-effects and adverse reactions than other pain

relief medications and would not interfere with daily life, even though Merck knew that these

representations were false.  Furthermore, Merck had no reasonable grounds to believe that any of

these representations were true.

63.     Merck engaged in a huge direct-to-consumer marketing scheme and failed to

address these serious side effects with consumers until after Vioxx was withdrawn from the

market.  According to reports in the public press, Merck spent an estimated $45 million

advertising Vioxx for a mere eight months in 2004.

64.     In the television advertising directed to consumers, Merck promoted Vioxx in the

following widely-disseminated advertisement featuring a testimonial from former Olympic skater

Dorothy Hammill:

> It seems like only yesterday.  When I started skating at 8 years old -
> I never thought I'd experience the thrill of winning a medal.

With all the great memories has come another thing I thought I'd
never experience - the pain of osteoarthritis.

Vioxx is here, a prescription medicine for osteoarthritis pain.

With one little pill a day Vioxx can provide powerful super 24
hour . . . relief.  Vioxx specifically targets only the COX 2
enzyme.

A key source of arthritis pain.  Super.  See our ad in Prevention.

People with allergic reactions such as asthma to aspirin - see our ad
in Prevention - or other arthritis medicines should not take Vioxx.

In rare cases, serious stomach problems such as bleeding can occur
without warning.
Tell your doctor, if you have liver or kidney problems.

For more information [superimpose] 1-888-36VIOXX talk to your
doctor about once daily Vioxx for the relief of osteoarthritis pain.

Perhaps my biggest victory is able to plan my day around my life
and not my pain[superimpose] Your results may vary.
Ask your doctor if Vioxx is right for you.

Vioxx for every day victories.

65.   Notably absent from this advertisement was any reference to the serious

cardiovascular side effects manifested in Merck's clinical trials of Vioxx.

66.   In print advertisements, Merck advertised Vioxx by picturing Dorothy Hammill

accompanying the statement:

Along with all the great memories has come something I thought
I'd never experienced - the pain of osteoarthritis.

The advertisements continued:

VIOXX is here.  24 hour relief of the most common type of
arthritis pain, osteoarthritis.

It isn't about going for a medal.  Or feeling like a kid again.  It's about controlling the pain that can keep you from doing everyday things.  And VIOXX may help.  VIOXX is a prescription medicine for osteoarthritis, the most common type of arthritis.

ONE PILL - ALL DAY AND ALL NIGHT RELIEF.

You take VIOXX only once a day.  Just one little pill can relieve your pain all day and all night for a full 24 hours. . . .

VIOXX EFFECTIVELY REDUCED PAIN AND STIFFNESS.

In clinical studies, one daily VIOXX effectively reduced pain and stiffness.  So VIOXX can help make it easier for you to do the things you want to do.  By going for a morning glide on the ice.

TAKE WITH OR WITHOUT FOOD.

VIOXX doesn't need to be taken with food.  So you don't have to worry about scheduling VIOXX around meals.

IMPORTANT INFORMATION ABOUT VIOXX.

People with allergic reactions, such as asthma, to aspirin or other arthritis medicines should not take VIOXX.  In rare cases, serious stomach problems, such as bleeding can occur without warning.  Tell your doctor if you have liver or kidney problems, or are pregnant.  Also, VIOXX should not be used by women in late pregnancy. VIOXX has been extensively studied in large clinical trials.  Commonly reported side effects include upper respiratory infection, diarrhea, nausea and high blood pressure.  Report any unusual symptoms to your doctor.  ASK YOUR DOCTOR OR HEALTHCARE PROFESSIONAL ABOUT VIOXX.  CALL 1 800 9MERCK8 FOR MORE INFORMATION, OR VISIT VIOXX.COM.  PLEASE SEE IMPORTANT ADDITIONAL INFORMATION BELOW.

67.     These direct-to-consumer advertisements make absolutely no mention of Vioxx's

association with cardiovascular or cerebrovascular disease, notwithstanding that Merck had

reason to know and, in fact, did know that Vioxx was causally related to serious cerebrovascular

17

and cardiovascular adverse side effects.

68.     At all times relevant, Vioxx had been promoted, marketed, and advertised by Merck directly to consumers and to medical care providers as a safe and effective pain reliever, similar to NSAIDs such as Advil (ibuprofen) and Aleve (Naproxen), but without any of the known side effects of other NSAIDs, most notably NSAID-induced GI toxicity.  Merck advertised, marketed and promoted Vioxx as a safe alternative that, unlike other NSAIDs, did not damage the mucus membrane of the gut.

69.     Medical care providers and consumers reasonably relied on Merck's misrepresentations to the effect that Vioxx was a safe alternative, easy to use, and perfect for long term use for "all day and all night relief" of pain.  As a result, Merck sold millions of prescriptions of Vioxx in the United States.

70.     Sales of Vioxx soared to $2.5 billion dollars in 2003 alone on the strength of the biggest direct-to-consumer marketing campaign ever undertaken by a pharmaceutical company for a prescription medication.

71.     Merck purposefully and knowingly misrepresented, understated and otherwise downplayed the serious health hazards and risks associated with protracted Vioxx use - precisely the use for which Vioxx was most often prescribed and, in fact, was intended.

72.     Merck, through the Vioxx promotional literature, audio conferences, professional meetings, press releases, and advertisements too numerous to catalogue herein, deceived Plaintiffs, the members of the Class, potential consumers and the medical community by relaying positive information, including testimonials from satisfied consumers; manipulating the statistics to suggest widespread acceptability and safety of the product; and intentionally understating the

known adverse and serious health risks associated with the use of Vioxx. All of these promotional materials shared one common thread, the intentional misrepresentation of cardiovascular and cerebrovascular side effects known to Merck.

73.     Merck concealed materially relevant information from potential Vioxx consumers and healthcare providers, and minimized user and prescriber concerns regarding the safety of Vioxx, while knowing that this materially relevant information was critical to the care of the consumers provided by health care providers.

74.     Merck falsely misrepresented, among other things:

    (a)     The severity, frequency and nature of adverse health effects caused by Vioxx;

    (b)     That adequate testing had been conducted concerning Vioxx; and

    (c)     That accurate information was reported about the adverse events.

**D.     The FDA Issued A Warning Letter on September 17, 2001, Indicating that Merck Had Engaged in "False or Misleading" Promotion of Vioxx.**

75.     On or about December 16, 1999, less than seven months after it approved Vioxx, the FDA informed Merck by letter that it had engaged in "false or misleading" promotion of Vioxx. Specifically, the FDA concluded that Merck misrepresented (1) the drug's "safety profile" by claiming that it was "safer than a placebo" and (2) the drug's efficacy through "unsubstantiated" comparisons to the COX-2 inhibitor Celebrex and other NSAIDs.

76.     Thereafter, Merck's conduct continued to be so egregious that the FDA issued a "Warning Letter" to Merck on or about September 17, 2001 (hereinafter the "Warning Letter"),

which demanded that Merck correct the false and misleading messages contained in the promotional campaign for Vioxx, the Vioxx press releases, and the oral representations made by Merck sales representatives to promote Vioxx.

77.    The FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") reviewed the Vioxx promotional activities and materials and warned Merck that its marketing of Vioxx was: "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations."

78.    Most, if not all, of the noted misrepresentations were made in reference to Merck's VIGOR study.  According to DDMAC, Merck:

> engaged in a promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings that were observed in the VIOXX Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of VIOXX.  Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

79.    The Warning Letter delineated the following misrepresentations made in six promotional audio conferences presented on behalf of Merck by Peter Holt, M.D., which were moderated by Merck employees; in Merck press releases; and in oral representations made by Merck sales representatives to promote Vioxx.  According to this warning letter:

(a)    Merck, its agents, employees and representatives minimized the rate of myocardial infarctions.  For example, in a June 21, 2000, audioconference, Merck began the discussion of the myocardial infarction rates observed in the VIGOR study by stating, "when you looked at the MI rate, the rate was different for the two groups.  The MI rate for VIOXX was 0.4

percent and if you looked at the Naproxen arm it was 0.1 percent, so there was a reduction in the MI's in the Naproxen group." Merck offered what purported to be a scientific explanation, when, in fact, it was purely hypothetical. DDMAC wrote that, as Merck knew, it was misleading to assert:

> that VIOXX does not increase the risk of [heart attacks] and that the Vigor finding is consistent with Naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you [Merck] fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that VIOXX may have pro-thrombotic properties.

    (b)    Merck knew that the promotional statement was false because the reason for the difference between the MI outcomes for the Vioxx users versus the Naproxen users had not yet been determined;

    (c)    Merck carefully excluded from the promotional literature materially relevant information that Vioxx may have pro-thrombotic properties;

    (d)    DDMAC reprimanded Merck for understating the rate of myocardial infarctions. Merck had claimed that the MI rate was 0.2 percent for Naproxen and 0.1 percent for Vioxx, which was completely inaccurate. DDMAC wrote:

> Contrary to [Merck's] claim that there was a higher rate of MIs in the Naproxen group compared to the VIOXX group, the MI rate for VIOXX in this subpopulation was 12 MIs among 3877 patients (0.3%) as compared to 4 MIs among 3878 patients (0.1%) for Naproxen.

    (e)    DDMAC reprimanded Merck for falsely claiming that the MI rate associated with the use of Vioxx was "basically the same as" the crude MI rate in the Celebrex

study known as CLASS (Celebrex Long-Term Arthritis Safety Study);

(f)     DDMAC reprimanded Merck for misrepresenting claims regarding the efficacy of Vioxx as compared to its competitor Celebrex.  When publicly comparing the VIGOR study to the CLASS study, Merck failed to inform consumers that the patient populations in the two studies were extremely different.  The VIGOR study excluded patients who had angina or congestive heart failure with symptoms that occurred at rest or with minimal activity as well as patients taking aspirin or other antiplatelet agents, all of which, if anything, should have made Vioxx appear to present less cardiovascular toxicity.  The CLASS study did not exclude these patients, therefore, making it more likely that the CLASS trial included patients with a higher risk for myocardial infarctions prior to their ingestion of Celebrex.  Nevertheless, Merck improperly compared two studies to misrepresent that Vioxx was more effective and safer than Celebrex;

(g)     Merck failed to point out that the more affordable alternative, Naproxen, had been statistically proven to produce half as many myocardial infarctions as Vioxx.  These misrepresentations and omissions were made not only at the promotional audio conferences in June of 2000, but also at the annual meeting of the American Society of Health-Systems Pharmacists ("ASHP") in Los Angeles, California, on June 3 through June 6, 2001;

(h)     DDMAC reprimanded Merck for making false statements about the risks of Vioxx therapy in patients who were taking warfarin.   For example, at an audio conference on June 16, 2000, Merck stated:

> . . . if you look at the thromboembolic agents, it's very clear that
> these selective COX 2 inhibitors [of which VIOXX is a member]
> have the benefit of not having platelet aggregation and bleeding

time, and therefore, can be used safely in terms of post-op and with
Coumadin.

This statement is directly contradicted by the precaution in the Product Insert, reprinted in

the Physicians Desk Reference ("PDR"), which states: " . . . in post-marketing experience,

bleeding events have been reported, predominantly in the elderly, in association with increases

with prothrombin time in patients receiving VIOXX concurrently with warfarin."

> (i)     DDMAC rebuked Merck for its false and misleading marketing:
>
> Merck's promotional audio conferences and sales representative
> presentations failed to present the serious and significant risks
> associated with Vioxx use. They failed to state that Vioxx is
> contraindicated in patients who have experienced asthma, urticaria,
> or allergic type reactions after taking aspirin or other NSAIDS.

80.     In those marketing promotional presentations, Merck omitted the  warning about

the possibility of serious gastrointestinal toxicity occurring with use of Vioxx, such as gastric

bleeding, ulceration or perforation; Merck failed to state that Vioxx's Product Insert clearly

defines certain precautions for use in patients with liver and kidney disease; failed to include

information about patient populations in which Vioxx use is not recommended such as women in

late pregnancy; and failed to include information about Vioxx's most common adverse events:

serious cardiovascular and cerebrovascular events such as myocardial infarctions and ischemic

strokes.


### E.     Adverse Events Continued to Occur Because of Vioxx Use, and Merck Continued to Deny Vioxx's Dangers.

81.     According to the FDA Adverse Event Reporting System (ERS), through October,

2003, almost 2,000 adverse cardiovascular events were experienced by Vioxx users, including

myocardial infarctions, cardiac arrest and cardiac failures.

82.    On October 30, 2002, the Wall Street Journal reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]." According to the Wall Street Journal article, within the first 30 days of taking Vioxx, the risk of heart attack was increased 30% as compared to patients taking Celebrex.

83.    In or about November 2003,  Merck received preliminary results of a study it had commissioned performed by Merck personnel and Alex Walker, an executive at the Ingenix unit of United Health Group.  The study revealed a statistically significantly greater incidence of myocardial infarction or unstable angina pectoris associated with use of Vioxx compared to the NSAIDs ibuprofen or diclofenac.  The risk did not vary significantly by duration, use, or dose. Merck never revealed the existence, much less the results of this study, prior to its withdrawal of Vioxx from the market in late September 2004.

84.    In August 2004, Health Day News quoted the FDA as finding "this [the study referenced in the Wall Street Journal, supra  75] and other studies cast serious doubt on the safety" of Vioxx and that Celebrex "may be safer."

85.    However, shortly after the August 24, 2004, FDA statement, Peter S. Kim, President of Merck Research Laboratories was quoted as saying that Merck "strongly disagrees" with the findings of this new study.

86.    On August 26, 2004, The Street.com reported: "Merck Thursday released a detailed critique questioning the studies" significance."

24

### E. Merck Finally Withdrew Vioxx from the Market in Response to Preliminary Results from its APPROVe Study.

87.     On or about November 8, 1999, Merck submitted an IND application to the FDA to conduct clinical trials of Vioxx to pursue a claim that Vioxx was effective in preventing colon polyps and ultimately colon cancer.

88.     Merck undertook another clinical study called the Adenomatous Polyp Prevention on Vioxx ("APPROVe") trial of Vioxx, 25 mg/day, to try to demonstrate the drug's effectiveness in preventing colon polyps.

89.     At its first meeting in or about January 2002, the External Safety Monitoring Board ("ESMB") for the APPROVe trial voiced concerns regarding "trends noted in serious adverse clinical events and in thromboembolic events."

90.     On or about September 17, 2004, the ESMB noted that "the trend for excess risk" for heart attacks and strokes "has continued to grow at each meeting over the last 1-2 years." Consequently, the ESMB recommended that participating patients in APPROVe be instructed to discontinue the study treatment.  Merck abruptly discontinued the APPROVe study in mid-September 2004.

91.     On or about September 27, 2004, Merck advised the FDA of the ESMB's recommendation.

92.     On or about September 28, 2004, Merck informed the FDA that it was withdrawing Vioxx from the market.

93.     On September 30, 2004, Merck disclosed the outcome of the APPROVe study and announced that it was withdrawing Vioxx from the market after the ESMB overseeing the study

recommended that it be halted prematurely because it had implicated the drug in a statistically significant increased risk of confirmed cardiovascular events-principally heart attacks and strokes-in patients taking Vioxx compared to those ingesting a placebo.

94.     Merck claims that the APPROVe study did not show a difference between the incidence of cardiovascular injuries until after 18 months of exposure.  However, Merck has concealed from the public its internal analysis showing that, in fact, there was a higher incidence of such injuries in the Vioxx group in BOTH the 0 to 18 months and 19-36 months exposure periods, when all events reported by the clinical trial investigators are considered.  Merck included this data in a January 2005 draft of the APPROVe study, but excluded it from the published version a month later.  Thus, contrary to the statements Merck has repeatedly made to the public and the FDA, the APPROVe data actually show that Vioxx is dangerous in both the shorter and longer term users.

95.     Merck's prior claims of Naproxen cardioprotectivity in the VIGOR study are irrelevant to the APPROVe results, and instead APPROVe reinforces the conclusion that the VIGOR results were due to Vioxx cardiovascular toxicity rather than supposed protection by Naproxen.

96.     In APPROVe, the relative risk for adverse cardiovascular events for Vioxx patients already at heightened cardiovascular risk was particularly high.  For example, Vioxx patients with a history of symptomatic atherosclerotic cardiovascular disease were approximately 9 ½ times more likely to suffer such events than their placebo counterparts, and those with a history of diabetes were approximately 6 times more likely to experience such events than patients in the placebo arm.

26

97.     More specifically, APPROVe showed a statistically significant Relative Risk of 2.80 for the cardiovascular events category including fatal and non-fatal MI, sudden death due to cardiac causes, and unstable angina; and an overall statistically significant relative risk of 1.92 for all events analyzed, including those referenced above, as well as stroke, trans-ischemic attack (TIA), and peripheral thrombotic events.

98.     Relative Risks of this magnitude are almost unheard of in the annals of epidemiology, and they are indicative of both a clear cause-and-effect relationship confirming that Vioxx is a highly hazardous and toxic chemical substance/drug/product.  Indeed, the Vioxx Relative Risk of 9.59 is comparable to the Relative Risk for  lung cancer among cigarette smokers versus nonsmokers. *See, e.g.*, Centers for Disease Control, *MMWR* August 27, 1993, indicating Relative Risk of 11.9 for smokers versus non-smokers as to cancers of the trachea, lung and bronchus.

99.     Even at super-therapeutic doses, no other pain reliever of any kind has ever been reported to have a Relative Risk anywhere close to those found for Vioxx and Cardiovascular disease among high risk patients in APPROVe, again distinguishing Vioxx as the most dangerous drug in its class.

100.     Because of the under-diagnosis of the high-risk conditions associated with the most severe risks of Vioxx, the drug inevitably results in its use by the very population most at risk.  Patients with prior heart attacks provide a prime example of those at greatest risk of Vioxx' harmful effects, yet who could not be protected from exposure due to under-diagnosis.  It is well established and generally accepted that 25 to 30% of all heart attacks are "silent" or "unrecognized" myocardial infarctions (MI's). "The Framingham Study was the first to show that

27

as many as half of all MIs may be clinically silent and unrecognized by the patient." Antman, et

al., ACC/AHA Guidelines for the Management of Patients with ST-Elevation Myocardial

Infarction-- *Executive Summary, J Am Coll Cardiol* 2004; 44: 671-719.

101.    Other under diagnosed conditions are also important. For example,  the\

prevalence of diabetes is of epidemic proportions in the U.S., and the condition often goes

undiagnosed for years. *See, e.g.,* Centers for Disease Control, *MMWR* September 5, 2003,

"Prevalence of Diabetes and Impaired Fasting Glucose in Adults-- 1999-2000," indicating that

29% of all diabetes cases are undiagnosed. Chronic atherosclerosis can  remain silent even when

the condition has reached a severe stage that would increase the danger of  a drug that promotes

cardiovascular disease. All of these undiagnosed, high-risk patients require the imposition of

extensive, diagnostic testing that could never be implemented in the real world of cost-conscious

medical practice.

102.    In February, 2005, Merck participated in the FDA Arthritis Drug Advisory

Committee  hearings.

103.    Significantly, the super-elevated Relative Risk described above were known to

Merck well before the February 2005 Advisory Panel hearings, yet these Relative Risks were

never mentioned during any presentations to the Panel, nor were they ever discussed by Panel

members in the published record.

## V.      CLASS ACTION ALLEGATIONS

104.    Pursuant to Federal Rule Civil Procedure 23(a) and (b)(3), class representative

Plaintiffs Michael and Maribeth Getz, on behalf of themselves and all others similarly situated,

seek a Pennsylvania class defined as follows:

28

All persons residing in Pennsylvania who were prescribed and ingested Vioxx, also known as Rofecoxib in any dose during the period from May 20, 1999 through September 30, 2004 (the "Class Period"), when Vioxx was withdrawn from the market, and who claim personal injuries or assert wrongful death claims arising from ingestion of Vioxx.  Excluded from the class is the defendant, including any parent, subsidiary, affiliate or controlled person of the defendant and their officers, directors, agents or employees, any judge or judicial officers assigned to this matter, and members of the immediate families of any excluded persons.

105.    Vioxx was widely prescribed and has been ingested by approximate 20 million persons. The members of the Class are so numerous that joinder is impracticable and would involve thousands of individual actions.

106.    Plaintiffs, Michael and Maribeth Getz are members of the Classes they seek to represent.

107.    There are questions of law and fact common to the Classes including, but not limited to:

a.    Whether Vioxx was and is unsafe for human ingestion;

b.    Whether defendant designed, manufactured and/or marketed Vioxx with knowledge that it was a dangerously defective product;

c.    Whether defendant acted negligently in marketing and selling Vioxx;

d.    Whether defendant conducted, either directly or indirectly, adequate testing of Vioxx;

e.    Whether defendant failed to adequately warn consumers of the adverse health hazards caused by using Vioxx;

f.    Whether defendant  falsely and fraudulently misrepresented in their

29

advertisements, promotional materials and other materials, among other things, the safety of using Vioxx;

g.    Whether defendant knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Vioxx from governmental regulators, the medical community and/or the consuming public;

h.    Whether defendant's post-marketing safety and surveillance system exists, and if so, was designed and implemented in a reasonable manner;

i.    Whether defendant designed and manufactured a drug that was dangerously defective because its use leads to or poses a substantial increased risk of the existence of potentially dangerous side effects, including, but not limited to, heart attack and stroke

j..    Whether defendant knew or should have known that the ingestion of Vioxx leads to or poses a substantial increased risk of side effects

k.    Whether defendant continued to manufacture, label, license, market, distribute, promote and/or sell the drug, Vioxx, notwithstanding its knowledge of the drug's dangerous nature and side effects;

l.    Whether the warnings and information defendant provided with Vioxx were adequate in warning of the potential hazards resulting from its use;

m.    Whether defendant engaged in unconscionable and/or deceptive business practices and conduct;

n.    Whether the Classes have been injured by virtue of defendant's negligence, recklessness, and/or unconscionable and/or deceptive business

practices and conduct;

o.      Whether ingestion of Vioxx causes an increased risk of side effects; and,

p.      Whether defendant earned substantial profits as a result of their sale of

Vioxx.

108.    These and other questions of law and/or fact are common to the Classes and predominate over any question affecting only individual class members.

109.    The claims of the class representatives are typical of the claims of the Class in that the named representatives and the members of the Class ingested Vioxx and were injured thereby.

110.    The plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex class actions and products liability litigation.  Plaintiffs have no known interests which are adverse to the interests of the other members of the Classes.   The interests of the plaintiffs and the Classes they seek to represent are aligned because of their ingestion of Vioxx and their consequential increased risk of the existence of the side effects caused by Vioxx.

111.    Class certification is also appropriate under Fed.R.Civ.P. Rule 23(b)(3) because common issues of law and fact relative to the design, manufacture and marketing of Vioxx predominate over individual issues.  A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all members of the Classes is impracticable.

Each class representative plaintiff is a member of the Class he/she seeks to represent.

31

112.   The plaintiffs and each member of the Classes have a strong interest in obtaining the requested relief.

113.   A class action is superior to any other available method for the fair and efficient adjudication of this dispute because common questions of law and fact overwhelming predominate any questions that may affect only individual Class members, and there would be enormous economies to the courts and the parties in litigating the common issues on a classwide instead of repetitive individual basis. A class action approach would serve to consolidate and create a scenario with far fewer management difficulties because it provides the benefits of unity adjudication, judicial economy, economies of scale and comprehensive supervision by a single court. Any person who has been seriously injured and wishes to pursue an individual action outside the remedy sought in this Complaint will have the opportunity to opt out.

114.   The plaintiffs, through counsel, have or will obtain adequate financial resources to assure that the interests of the Classes will not be harmed.

115.   Maintenance of this action as a class action for the classes alleged is a fair and efficient method for adjudication of this controversy. Given the large identity of common questions and proofs, it would be impracticable and undesirable for each member of each Class who has suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

116.   Notice may be provided to class members by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in

32

other drug-related products liability cases and complex class actions.

117.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action certified for the Class.

## VI.   CLAIMS FOR RELIEF

### COUNT I

### (NEGLIGENCE)

118.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

119.   With regard to the above averments, defendant was negligent in knowing same, having reason to know same, should have known same, and/or otherwise being in possession of facts which would have caused a reasonable person or company to inquire and, with due diligence, discover same, and has further:

    a.    failed to use reasonable care to design an arthritis drug (Vioxx) that was safe for its intended and foreseeable uses, not defective, and not unreasonably dangerous;

    b.    failed to use reasonable care in designing and manufacturing Vioxx so as to make it safe for its intended uses, not defective, and not unreasonably dangerous;

    c.    failed to use reasonable care to adequately warn foreseeable users such as plaintiff and the class of the dangers of using Vioxx, including, but not limited to adverse cardiac and stroke events;

    d.    failed to use reasonable care to make reasonable tests, inspections,  drug

trials, and/or evaluations necessary to discover such defects and
unreasonably dangerous conditions associated with defendant's Vioxx

e.    failed to comply with and/or to use reasonable care to comply with
      standards of care including accepted industry standards, FDA
      recommendations, government regulations, statutes, in the
      design,manufacture, affixing of warnings, and otherwise production and
      distribution of defendant's Vioxx;

f.    failed to use reasonable care to timely remove and/or recall from the
      market, retrofit, and/or otherwise prevent the continued contact of plaintiff
      and persons like plaintiff with such defects and unreasonably dangerous
      conditions of Vioxx;

g.    failed to use reasonable care to investigate and/or use known and/or
      knowable reasonable alternative designs, manufacturing processes, and/or
      materials for Vioxx;

h.    failed to use reasonable care to warn plaintiff and the class of dangers
      known and/or reasonably suspected by defendant to be associated with
      Vioxx;

i.    failed to use reasonable care to make Vioxx safe;

j.    failed to timely use reasonable care to discover the dangerous conditions
      or character of defendant's Vioxx; and,

k.    committed to a national advertising program of misrepresentations as
      described throughout this Complaint which was designed to and did

34

induce the public to pressure physicians to prescribe and over prescribe Vioxx.

120.    At all relevant times, defendants' actions were negligent .

121.    As a direct and proximate result of defendant's negligence, plaintiffs and the classes were harmed as aforesaid.

## COUNT II
### STRICT PRODUCTS LIABILITY

122.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

123.    At all relevant times, defendant was the researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of Vioxx, which, at all relevant times, was defective and unreasonably dangerous to consumers.

124.    At all relevant times, defendant's Vioxx was defective in its design and/or formulation in that it was not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.  Vioxx was defective in design and/or formulation in that it lacked efficacy and/or it posed a greater likelihood of injury than other nonsteroidal anti-inflammatory medicines and similar drugs on the market and was more dangerous than ordinary consumers can reasonably foresee.

125.    At all relevant times, the defective condition of Vioxx rendered it unreasonably dangerous, and Vioxx was in this defective condition at the time it left the hands of the defendant.  Vioxx was expected to and did reach consumers, including plaintiffs and the class,

35

without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

126.    At all relevant times, plaintiffs and the class was unaware of the significant hazards and defects in Vioxx. Vioxx was more dangerous than would be reasonably contemplated by the ordinary user. During the period that plaintiffs and the class were taking Vioxx, the medication was being utilized in a manner that was intended by Defendant. At the time plaintiffs and the class received and consumed Vioxx, it was represented to be safe and free from latent defects.

127.    At all relevant times, Merck knew or should have known of the dangers associated with the use of Vioxx, as well as the defective nature of Vioxx, but continued to design, manufacture, sell, distribute, market, promote and/or supply Vioxx so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by Vioxx.

128.    At all relevant times, defendant's Vioxx was in a defective and unreasonably dangerous condition which would not be recognized or contemplated by a reasonable person among the expected users and consumers at the time it left the control of the defendant.

129.    At all relevant times, defendant's Vioxx was defective and unreasonably dangerous when used in reasonably expectable ways of handling and/or consumption.

130.    At all relevant times, the aforesaid Vioxx was expected to reach, and did reach, the ultimate user or consumer without substantial change in the condition in which it was sold and/or distributed by defendant.

131.    At all relevant times, defendant's Vioxx was defective and unreasonably dangerous.

132.    Defendant Merck is strictly liable to plaintiffs and the class for designing, manufacturing, and placing into the stream of commerce a product which was defective and unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of defendant.

133.    As a direct and proximate result of defendant's defective and unreasonably dangerous products, plaintiffs and the class were harmed as aforesaid.

## COUNT III

### FAILURE TO WARN

134.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135.    At all relevant times, defendant Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Vioxx, and in the course of same, directly advertised or marketed the product to FDA, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Vioxx.

136.    At all relevant times, Vioxx was under the exclusive control of the defendant as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Vioxx, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury

37

with such use.

137.    At all relevant times, defendant Merck has failed to timely and reasonably warn of material facts regarding the safety and efficacy of Vioxx so that no medical care provider would have prescribed, or no consumer would have used, Vioxx had those facts been made known to such providers and consumers.

138.    At all relevant times, defendant Merck has failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Vioxx posed serious and potentially life-threatening side effects and complications with respect to which full and proper warnings would have accurately and fully reflected the symptoms, scope and severity to medical care providers, the FDA and the public, including the plaintiff, and the class.

139.    At all relevant times, Vioxx, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendant, was defective due to inadequate post-marketing warnings and/or instructions because, after Defendant knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of Vioxx, Defendant failed to provide adequate warnings to medical care providers, the FDA and the consuming public, including plaintiff and the class, and continued to promote Vioxx aggressively.

140.    As a direct and proximate result of defendant's defective and unreasonably dangerous product and its failure to warn plaintiffs and others like them of same, plaintiffs and the class were harmed as aforesaid.

38

## COUNT IV

### LOSS OF CONSORTIUM

141.    Plaintiffs restate and reallege all paragraphs above and in addition, states matters as set forth below.

142.    As a result of the wrongful conduct of Defendant and the injuries suffered by Plaintiffs and others like them,  Plaintiffs have suffered the loss of the care, services, consortium, aid, society, comfort, and companionship.

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, for themselves and all others similarly situated, request that this Court enter a judgment against the defendant and in favor of the plaintiff, on behalf of themselves and the members of the Classes, and to award the following relief:

1.    An Order requiring the immediate Notification of all individuals in the class of the potential harm from Vioxx either alone or in combination with other drugs;

2.    An Order declaring this action to be proper class action pursuant to Federal Rule of Civil Procedure 23, certifying and establishing  appropriate Classes, and finding that plaintiffs are proper representatives of the Class;

3.    An Order declaring the defendant financially responsible for notifying all class members that Vioxx is dangerous and for taking all other actions requested herein; · judgment in his favor and against defendant;

4.    compensatory damages in an amount in excess of the jurisdictional limit;

5.    exemplary and punitive damages in an amount in excess of the jurisdictional limit,

39

where appropriate;

    6.    all elements of interest, including but not limited to pre- and post-judgment

interest;

    7.    all Bill of Costs elements, including attorney fees and expert witness fees;

    8.    such other and further relief as the Court may deem just and proper;

    9.    trial by a jury on all issues of the case;

    10.    awarding reasonable attorney fees and costs to plaintiff and the class.

## JURY TRIAL DEMANDED

Plaintiffs demand on behalf of themselves and all others similarly situated, a trial

by jury on all issues so triable.

Dated: January 20, 2006         Respectfully submitted,

                BY:       DNG 4046

                        Dianne M. Nast
                        Pa. ID #24424
                        Daniel N. Gallucci
                        Pa. ID # 81995
                        RODA NAST, PC
                        801 Estelle Drive
                        Lancaster, PA 17601
                        Telephone: (717) 892-3000
                        Facsimile: (717) 892-1200

                        Attorneys for Plaintiff