# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to: | * | |
| *Pales v. Merck & Co., Inc.* | * | |
| No. 07-1389 | * | MAGISTRATE KNOWLES |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT OF JOHN ROBERT KNUDSEN

BEFORE ME, the undersigned authority, on this day personally appeared John Robert Knudsen, personally known by me to be the person whose name is subscribed below, and who, upon his oath, stated as follows:

1.      My name is John Robert Knudsen. I am over eighteen (18) years of age, of sound mind, and capable of making this sworn statement.

2.      I have power of attorney for the Plaintiff, Ronald Edward Pales, as evidenced by the attached Power of Attorney dated June 15, 1998.

3.      Ronald Edward Pales was first prescribed Vioxx on or about August 25, 1999. He took the Vioxx continuously, as directed by his physician, until on or after September 27, 2004.

4.      On or about August 1, 2001, Ronald Edward Pales suffered a stroke. At the time of the stroke, neither Mr. Pales nor myself knew that Vioxx caused cardiovascular injuries. I first learned that Vioxx caused cardiovascular injuries from the news media after the drug's withdrawal from the market.

I have personal knowledge of the facts stated in this Affidavit and they are true and correct.

SIGNED on this _5th_ day of November, 2007.


John Robert Knudsen

SUBSCRIBED AND SWORN TO BEFORE ME on this _5th_ day of November, 2007.

OFFICIAL SEAL
JUDY J GRECO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/09/08

Notary Public, State of Illinois

ILLINOIS STATUTORY SHORT FO...    ...WER OF ATTORNEY FOR HEALTH CARE

(NOTICE: THE PURPOSE OF THIS POWER OF ATTORNEY IS TO GIVE THE PERSON YOU DESIGNATE (YOUR "AGENT") BROAD POWERS TO MAKE HEALTH CARE DECISIONS FOR YOU, INCLUDING POWER TO REQUIRE, CONSENT TO OR WITHDRAW ANY TYPE OF PERSONAL CARE OR MEDICAL TREATMENT FOR ANY PHYSICAL OR MENTAL CONDITION AND TO ADMIT YOU TO OR DISCHARGE YOU FROM ANY HOSPITAL, HOME OR OTHER INSTITUTION. THIS FORM DOES NOT IMPOSE A DUTY ON YOUR AGENT TO EXERCISE GRANTED POWERS; BUT WHEN POWERS ARE EXERCISED, YOUR AGENT WILL HAVE TO USE DUE CARE TO ACT FOR YOUR BENEFIT AND IN ACCORDANCE WITH THIS FORM AND KEEP A RECORD OF RECEIPTS, DISBURSEMENTS AND SIGNIFICANT ACTIONS TAKEN AS AGENT. A COURT CAN TAKE AWAY THE POWERS OF YOUR AGENT IF IT FINDS THE AGENT IS NOT ACTING PROPERLY. YOU MAY NAME SUCCESSOR AGENTS UNDER THIS FORM BUT NOT CO-AGENTS, AND ADD WEALTH CARE PROVIDER MAY BE YOUR AGENT. UNLESS YOU EXPRESSLY LIMIT THE DURATION OF THIS POWER IN THE MANNER PROVIDED BELOW, UNTIL YOU REVOKE THIS POWER OR A COURT ACTING ON YOUR BEHALF TERMINATES IT, YOUR AGENT MAY EXERCISE THE POWERS GIVEN HERE THROUGHOUT YOUR LIFETIME, EVEN AFTER YOU BECOME DISABLED. THE POWERS YOU GIVE YOUR AGENT, YOUR RIGHT TO REVOKE THOSE POWERS AND THE PENALTIES FOR VIOLATING THE LAW ARE EXPLAINED MORE FULLY IN SECTIONS 4-5, 4-6, 4-9 AND 4-10(b) OF THE ILLINOIS "POWERS OF ATTORNEY FOR HEALTH CARE LAW" OF WHICH THIS FORM IS A PART (SEE THE BACK OF THIS FORM). THAT LAW EXPRESSLY PERMITS THE USE OF ANY DIFFERENT FORM OF POWER OF ATTORNEY YOU MAY DESIRE. IF THERE IS ANYTHING ABOUT THIS FORM THAT YOU DO NOT UNDERSTAND, YOU SHOULD ASK A LAWYER TO EXPLAIN IT TO YOU.)

POWER OF ATTORNEY made this __15th__ day of ___JUNE___ ____ 19__ .
                                              (month)              Year

1.   I, __Deborah Elizabeth Boles, 6460 N. Belle Plaine Ave., Unit 507, Chicago, IL 60638__ .
            (insert name and address of principal)

hereby appoint: __Jesse Robert Koerner, 6460 N. Belle Plaine Ave., Unit 507, Chicago, IL 60638__
            (insert name and address of agent)

as my attorney-in-fact (my "agent") to act for me and in my name (in any way I could act in person) to take any and all decisions for or concerning my personal care, medical treatment, hospitalization and health care and to require, withhold or withdraw any type of medical treatment or procedure, even though my death may ensue. My agent shall have the same access to my medical records that I have, including the right to disclose the contents to others. My agent shall also have full power to make a disposition of any part or all of my body for medical purposes, authorize an autopsy and direct the disposition of my remains.

(THE ABOVE GRANT OF POWER IS INTENDED TO BE AS BROAD AS POSSIBLE SO THAT YOUR AGENT WILL HAVE AUTHORITY TO MAKE ANY DECISION YOU COULD MAKE TO OBTAIN OR TERMINATE ANY TYPE OF HEALTH CARE, INCLUDING WITHDRAWAL OF FOOD AND WATER AND OTHER LIFE-SUSTAINING MEASURES, IF YOUR AGENT BELIEVES SUCH ACTION WOULD BE CONSISTENT WITH YOUR INTENT AND DESIRES. IF YOU WISH TO LIMIT THE SCOPE OF YOUR AGENT'S POWERS OR PRESCRIBE SPECIAL RULES OR LIMIT THE POWER TO MAKE AN ANATOMICAL GIFT, AUTHORIZE AUTOPSY OR DISPOSE OF REMAINS, YOU MAY DO SO IN THE FOLLOWING PARAGRAPHS.)

2. The powers granted above shall not include the following powers or shall be subject to the following rules or limitations (here you may include any specific limitations you deem appropriate, such as: your own definition of when life-sustaining measures should be withheld; a direction to continue food and fluids or life-sustaining treatment in all events; or instructions to refuse any specific types of treatment that are inconsistent with your religious beliefs or unacceptable to you for any other reason, such as blood transfusion, electro-convulsive therapy, amputation, psychosurgery, voluntary admission to a mental institution, etc.): _____

_____

(THE SUBJECT OF LIFE-SUSTAINING TREATMENT IS OF PARTICULAR IMPORTANCE. FOR YOUR CONVENIENCE IN DEALING WITH THAT SUBJECT, SOME GENERAL STATEMENTS CONCERNING THE WITHHOLDING OR REMOVAL OF LIFE-SUSTAINING TREATMENT ARE SET FORTH BELOW. IF YOU AGREE WITH ONE OF THESE STATEMENTS, YOU MAY INITIAL THAT STATEMENT; BUT DO NOT INITIAL MORE THAN ONE):

        (I do not want my life to be prolonged nor do I want life-sustaining treatment to be provided or
Initialed  continued if my agent believes the burden of the treatment outweigh the expected benefits. I want
          my agent to consider the relief of suffering, the expense involved and the quality as well as the
          possible extension of my life in making decisions concerning life-sustaining treatment.

__JRK__   (I want my life to be prolonged and I want life-sustaining treatment to be provided or continued unless
Initialed  I am in a coma which my attending physician believes to be irreversible, in accordance
          with reasonable medical standards at the time of reference. If and when I have suffered irreversible
          coma, I want life-sustaining treatment to be withheld or discontinued.

        (I want my life to be prolonged to the greatest extent possible without regard to my condition, the
Initialed  chances I have for recovery or the cost of the procedures.

(THIS POWER OF ATTORNEY MAY BE AMENDED OR REVOKED BY YOU IN THE MANNER PROVIDED IN SECTION 4-6 OF THE ILLINOIS "POWERS OF ATTORNEY FOR HEALTH CARE LAW" (SEE THE BACK OF THIS FORM). ABSENT AMENDMENT OR REVOCATION, THE AUTHORITY GRANTED IN THIS POWER OF ATTORNEY WILL BECOME EFFECTIVE AT THE TIME THIS POWER IS SIGNED AND WILL CONTINUE UNTIL YOUR DEATH, AND BEYOND IF ANATOMICAL GIFT, AUTOPSY OR DISPOSITION OF REMAINS IS AUTHORIZED, UNLESS A LIMITATION ON THE BEGINNING DATE OR DURATION IS MADE BY INITIALING AND COMPLETING EITHER OR BOTH OF THE FOLLOWING:
                      . . . . )

3. ( ) This power of attorney shall become effective on _when I am unable to make decisions on my own behalf and my attending physician certifies to this condition._
(Insert a future date or event during your lifetime, such as court determination of your disability, when you want this power of attorney to take effect.)

4. ( ) This power of attorney shall terminate on _MY DEATH_.
(Insert a future date or event, such as court determination of your disability, when you want this power to terminate prior to your death)
(IF YOU WISH TO NAME SUCCESSOR AGENTS, INSERT THE NAMES AND ADDRESSES OF SUCH SUCCESSORS IN THE FOLLOWING PARAGRAPH.)

5. If any agent named by me shall die, become incompetent, resign, refuse to accept the office of agent or be unavailable, I name the following (each to act alone and successively, in the order named) as successors to such agent:
__Janice Jane Niemanowski-Koerner, Gerald Ronald Niemanowski__

For purposes of this paragraph 5, a person shall be considered to be incompetent if and while the person is a minor or an adjudicated incompetent or disabled person or the person is unable to give prompt and intelligent consideration to health care matters, as certified by a licensed physician.

(IF YOU WISH TO NAME YOUR AGENT AS GUARDIAN OF YOUR PERSON, IN THE EVENT A COURT DECIDES THAT ONE SHOULD BE APPOINTED, YOU MAY, BUT ARE NOT REQUIRED TO DO SO BY RETAINING THE FOLLOWING PARAGRAPH. THE COURT WILL APPOINT YOUR AGENT IF THE COURT FINDS THAT SUCH APPOINTMENT WILL SERVE YOUR BEST INTERESTS AND WELFARE. STRIKE OUT PARAGRAPH 6 IF YOU DO NOT WANT YOUR AGENT TO ACT AS GUARDIAN.)

6. If a guardian of my person is to be appointed, I nominate the agent acting under this power of attorney as such guardian, to serve without bond or security.

7. I am fully informed as to all the contents of this form and understand the full import of this grant of powers to my agent.

Signed _Ronald Edmond Pales_
(principal)

The principal has had an opportunity to read the above form and has acknowledged and signed the form in his or her signature or mark on the form in my presence.

_____ (witness)  Residing at: _1784 Miner Des Plaines Il. 60016_

(YOU MAY, BUT ARE NOT REQUIRED TO, REQUEST YOUR AGENT AND SUCCESSOR AGENTS TO PROVIDE SPECIMEN SIGNATURES BELOW. IF YOU INCLUDE SPECIMEN SIGNATURES IN THIS POWER OF ATTORNEY, YOU MUST COMPLETE THE CERTIFICATION OPPOSITE THE SIGNATURES OF THE AGENTS.)

Specimen signatures of agent (and successors) (and successors).

JOHN ROBERT KNUDSEN   (Agent)

JANICE JANE WIEDA/KNUDSEN-WIEDA (Successor Agent)

GERALD RONALD NIEDZWIEDZKI   (Successor Agent)

I certify that the signatures of my agent (and successors) are correct.

_Ronald Edmond Pales_
RONALD EDMOND PALES   (Principal)

_Ronald Edmond Pales_
RONALD EDMOND PALES   (Principal)

_Ronald Edmond Pales_
RONALD EDMOND PALES   (Principal)

A photocopy of this (two (2) page) document hereof shall be deemed an original for all purposes whatsoever when initialed by RONALD EDMOND PALES and dated to indicate no change as of _____.

MAR 2 5 2005

R.E.P.

WITNESS AR/MM 3-25-05

R.E. Pales
J.R. Knudsen
6460 W. Belle Plaine Ave.
Unit #507
Chicago, IL 60634-8615

FOR PROPERTY

## ILLINOIS STATUTORY SHORT FORM POWER OF ATTORNEY
### AMENDED BY PUBLIC ACT 86-735 EFFECTIVE 9/1/89

[NOTICE: THE PURPOSE OF THIS POWER OF ATTORNEY IS TO GIVE THE PERSON YOU DESIGNATE (YOUR "AGENT") BROAD POWERS TO HANDLE YOUR PROPERTY, WHICH MAY INCLUDE POWERS TO PLEDGE, SELL OR OTHERWISE DISPOSE OF ANY REAL OR PERSONAL PROPERTY WITHOUT ADVANCE NOTICE TO YOU OR APPROVAL BY YOU. THIS FORM DOES NOT IMPOSE A DUTY ON YOUR AGENT TO EXERCISE GRANTED POWERS; BUT WHEN POWERS ARE EXERCISED, YOUR AGENT WILL HAVE TO USE DUE CARE TO ACT FOR YOUR BENEFIT AND IN ACCORDANCE WITH THIS FORM AND KEEP A RECORD OF RECEIPTS, DISBURSEMENTS AND SIGNIFICANT ACTIONS TAKEN AS AGENT. A COURT CAN TAKE AWAY THE POWERS OF YOUR AGENT IF IT FINDS THE AGENT IS NOT ACTING PROPERLY. YOU MAY NAME SUCCESSOR AGENTS UNDER THIS FORM BUT NOT CO-AGENTS. UNLESS YOU EXPRESSLY LIMIT THE DURATION OF THIS POWER IN THE MANNER PROVIDED BELOW, UNTIL YOU REVOKE THIS POWER OR A COURT ACTING ON YOUR BEHALF TERMINATES IT. YOUR AGENT MAY EXERCISE THE POWERS GIVEN HERE THROUGHOUT YOUR LIFETIME, EVEN AFTER YOU BECOME DISABLED. THE POWERS YOU GIVE YOUR AGENT ARE EXPLAINED MORE FULLY IN SECTION 3-4 OF THE ILLINOIS "STATUTORY SHORT FORM POWER OF ATTORNEY FOR PROPERTY LAW" OF WHICH THIS FORM IS A PART. THAT LAW EXPRESSLY PERMITS THE USE OF ANY DIFFERENT FORM OF POWER OF ATTORNEY YOU MAY DESIRE. IF THERE IS ANYTHING ABOUT THIS FORM THAT YOU DO NOT UNDERSTAND, YOU SHOULD ASK A LAWYER TO EXPLAIN IT TO YOU.]

POWER OF ATTORNEY MADE THIS __1st__ DAY OF __Deans__ 1998

1.    I, RONALD EDWARD PALES, HEREBY APPOINT: JOHN ROBERT KNUDSON AS MY ATTORNEY-IN-FACT (MY "AGENT") TO ACT FOR ME AND IN MY NAME (IN ANYWAY I COULD ACT IN PERSON) WITH RESPECT TO THE FOLLOWING POWERS, AS DEFINED IN SECTION 3-4 OF THE "STATUTORY SHORT FORM POWER OF ATTORNEY FOR PROPERTY LAW" (INCLUDING ALL AMENDMENTS), BUT SUBJECT TO ANY LIMITATION ON OR ADDITIONS TO THE SPECIFIED POWERS INSERTED IN PARAGRAPH 2 OR 3 BELOW: (You must strike out any one or more of the following categories of power you do not want your agent to have. Failure to strike the title of any category will cause the powers described in that category to be granted to the agent. To strike out a category you must draw a line through the title of that category.)

(A)    REAL ESTATE TRANSACTIONS.
(B)    FINANCIAL INSTITUTION TRANSACTIONS.
(C)    STOCK AND BOND TRANSACTIONS.
(D)    TANGIBLE PERSONAL PROPERTY TRANSACTIONS.
(E)    SAFE DEPOSIT BOX TRANSACTIONS.
(F)    INSURANCE AND ANNUITY TRANSACTIONS.
(G)    RETIREMENT PLAN TRANSACTIONS.
(H)    SOCIAL SECURITY, EMPLOYMENT AND MILITARY SERVICE BENEFITS.
(I)    TAX MATTERS.
(J)    CLAIMS AND LITIGATION.
(K)    COMMODITY AND OPTION TRANSACTIONS.
(L)    BUSINESS OPERATIONS.
(M)    BORROWING TRANSACTIONS.
(N)    ESTATE TRANSACTIONS.
(O)    ALL OTHER PROPERTY POWERS AND TRANSACTIONS.
(Limitations on and additions to the agent's powers may be included in this power of attorney if they are specifically described below.)

2.    THE POWERS GRANTED ABOVE SHALL NOT INCLUDE THE FOLLOWING POWERS OR SHALL BE MODIFIED OR LIMITED IN THE FOLLOWING PARTICULARS (Here you may include any specific limitations you deem appropriate, such as a prohibition or conditions on the sale of particular stock or real estate or special rules on borrowing by the agent):

_____

3.    IN ADDITION TO THE POWERS GRANTED ABOVE, I GRANT MY AGENT THE FOLLOWING POWER. (Here you may add any other delegable powers including, without limitation, power to make gifts, exercise powers of appointment, name or change beneficiaries or joint tenants or revoke or amend any trust specifically referred to below):

_____

4.    MY AGENT SHALL HAVE THE RIGHT BY WRITTEN INSTRUMENT TO DELEGATE ANY OR ALL OF THE FOREGOING POWERS INVOLVING DISCRETIONARY DECISION-MAKING TO ANY PERSON OR PERSONS WHOM MY AGENT MAY SELECT, BUT SUCH DELEGATION MAY BE AMENDED OR REVOKED BY ANY AGENT (INCLUDING ANY SUCCESSOR) NAMED BY ME WHO IS ACTING UNDER THIS POWER OF ATTORNEY AT THE TIME OF REFERENCE. (Your agent will have authority to employ other persons as necessary to enable the agent to properly exercise the powers granted in this form, but your agent will have to make all discretionary decisions. If you want to give your agent the right to delegate discretionary decision-making powers to others, you should keep the above sentence, otherwise it should be struck out.)

5.    MY AGENT SHALL BE ENTITLED TO REASONABLE COMPENSATION FOR SERVICES RENDERED AS AGENT UNDER THIS POWER OF ATTORNEY. (Your agent will be entitled to reimbursement for all reasonable expenses incurred in acting under this power of attorney. Strike out the above sentence if you do not want your agent to also be entitled to reasonable compensation for services as agent).

6.    (X )    THIS POWER OF ATTORNEY SHALL BECOME EFFECTIVE ON WHEN I AM UNABLE TO MAKE DECISIONS ON MY OWN

BEHALF AND MY PHYSICIAN AND MY AGENT SO CERTIFY TO THIS
(Insert a future date or event during your lifetime, such as court determination of your disability, when you want this power to first take effect.)

7.    (X )    THIS POWER OF ATTORNEY SHALL TERMINATE ON DATE OF MY DEATH

(Insert a future date or event, such as court determination of your disability, when you want this power to terminate prior to your death. This power of attorney may be amended or revoked by you at any time and in any manner. Absent amendment or revocation, the authority granted in this power of attorney will become effective at the time this power is signed and will continue until your death unless a limitation on the beginning date or duration is made by initialing and completing either (or both) of the above.)

8.    IF ANY AGENT NAMED BY ME SHALL DIE, BECOME INCOMPETENT, RESIGN OR REFUSE TO ACCEPT THE OFFICE OF AGENT, I NAME THE FOLLOWING (EACH TO ACT ALONE AND SUCCESSIVELY, IN THE ORDER NAMED) AS SUCCESSOR(S) TO SUCH AGENT: JANICE JUNE NIEMIADOWSKI-WIERA, GERALD RONALD NIEMIADOWSKI
For purposes of this paragraph 8, a person shall be considered to be incompetent if and while the person is a minor or an adjudicated incompetent or disabled person or the person is unable to give prompt and intelligent consideration to business matters, as certified by a licensed physician. (If you wish to name your agent as guardian of your estate, in the event a court decides that one should be appointed, you may, but are not required to, do so by retaining the following paragraph. The court will appoint your agent if the court finds that such appointment will serve your best interests and welfare. Strike out paragraph 9 if you do not want your agent to act as guardian.)

9.    IF A GUARDIAN OF MY ESTATE (MY PROPERTY) IS TO BE APPOINTED, I NOMINATE THE AGENT ACTING UNDER THIS POWER OF ATTORNEY AS SUCH GUARDIAN, TO SERVE WITHOUT BOND OR SECURITY.

10.    I AM FULLY INFORMED AS TO ALL THE CONTENTS OF THIS FORM AND UNDERSTAND THE FULL IMPORT OF THIS GRANT
OF POWERS TO MY AGENT.

SIGNED _Ronald Edward Pales_
RONALD EDWARD PALES

(You may, but are not required to, request your agent and successor agents to provide specimen signature below.
If you include specimen signatures in this power of attorney, you must complete the certification opposite the
signatures of the agents.)
SPECIMEN SIGNATURES OF                                    I CERTIFY THAT THE SIGNATURES OF MY AGENT
AGENT (AND SUCCESSORS).                                   (AND SUCCESSORS) ARE CORRECT.

_____                                _Ronald Edward Pales_
JOHN ROBERT KNUDSEN        (agent)                        RONALD EDWARD PALES        (principal)

_Janice June Niewiadowski-Hieda_                          _Ronald Edward Pales_
JANICE JUNE NIEWIADOWSKI-HIEDA (successor agent)          RONALD EDWARD PALES        (principal)

_____                                _Ronald Edward Pales_
GERALD RONALD NIEWIADOWSKI    (successor agent)           RONALD EDWARD PALES        (principal)

(This power of attorney will not be effective unless it is notarized, using the form below.)

STATE OF ___ILLINOIS___ )
                        )  SS.
COUNTY OF ___COOK___    )

        THE UNDERSIGNED, A NOTARY PUBLIC IN AND FOR THE ABOVE COUNTY AND STATE, CERTIFIES THAT RONALD EDWARD
PALES  SIGNED THIS INSTRUMENT AS THE FREE AND VOLUNTARY ACT OF THE PRINCIPAL, FOR THE USES AND PURPOSES THEREIN
SET FORTH, AND CERTIFIED TO THE CORRECTNESS OF THE SIGNATURE(S) OF THE AGENT(S).

DATED ____6-15-98____
            (SEAL)
                                                    NOTARY PUBLIC 7-18-98
                                                    MY COMMISSION EXPIRES

(The name and address of the person preparing this form should be inserted if the agent will have power to
convey any interest in real estate.) THIS DOCUMENT WAS PREPARED BY:

Louis Capozzoli, 1484 Miner St., Des Plaines, IL 60016

A photocopy of this (two (2) page) document hereof shall be deemed an original for all purposes whatsoever when
initialed by RONALD EDWARD PALES and dated to indicate no change as of _____.

10-05-05
R.E.P.

WITNESS AP/Aus  10-5-05

R.E. Pales
J.R. Knudsen
8480 W. Belle Plaine Ave.
Unit #507
Chicago, IL 60634-5615

# Exhibit B



**OUR LADY OF THE RESURRECTION MEDICAL CENTER**
CHICAGO, ILLINOIS  60634

**ADMITTED:**  08/01/2001          **DISCHARGED:**  08/05/2001

**ATTENDING PHYSICIAN:**  Isaac Reiser, M.D.

**FINAL DIAGNOSIS:**          1. STROKE WITH LEFT HEMIPARESIS.
                              2. DIABETES MELLITUS
                              3. HYPERTENSION.

CONSULTANT
R. Cabin, MD (neurologist).

HISTORY OF PRESENT ILLNESS
This is the case of a 65-year-old male who has history of type II
diabetes mellitus and hypertension who developed numbness in the left
arm for the past few days and since day before admission developed
weakness of the left arm and left lower extremity.

PAST MEDICAL HISTORY
Diabetes mellitus and hypertension.  Denies any history of smoking or
ethanol intake.

PHYSICAL EXAMINATION
The patient was alert and oriented.  BP 170/80.  Speech was normal with
no facial paralysis.  Weakness in the left arm and left lower extremity
was present.  No Babinski.  No bruit.  Lungs clear.  Heart regular
sinus rhythm, no murmurs.  S1 and S2 are normal.  Abdomen and
extremities negative.

HOSPITAL COURSE
The patient had CT scan of the brain on 8/1/01 that only showed
cerebral atrophy.  Carotid ultrasound showed soft atherosclerotic
plaque noted in the carotid bifurcation bilaterally and no flow was
detected in the distal portion of the left internal carotid artery and
this may be due to high grade occlusion disease or artifactual.  MRA
was done.  Report not present but probably normal.  Patient also had
repeat CT scan of the brain on 8/4/01 that showed right parietal
cerebral infarction.  Chest x-ray done on 8/1/01 showed calcified
granuloma.  The lungs were clear and there is some calcification of the
thoracic aorta.  The patient's electrocardiogram revealed sinus rhythm
and left axis deviation compared to left anterior hemiblock and
possible left ventricular hypertrophy.  The patient had blood count
showing hemoglobin 12.3, hematocrit 35.7 and WBC of 7.8.  The other
laboratory findings show glucose fluctuating between 123 and 160.  BUN
between 19-28.  Creatinine between 1.3 and 1.0.  Sodium and potassium
were normal and cardiac enzymes were also normal.  The patient as
stated above was seen in consultation by Dr. Cabin who agreed with
diagnosis.  As previously stated the MRA was done yesterday and the
report is not available yet but we will review it.  2D echo was also
performed but report is not available at this time.  The patient was
treated primarily with aspirin 325 mg q.d., ACTOS 50 mg q.d., Vioxx 25

PALES, RONALD
056437

DISCHARGE SUMMARY
Page 1




## DISCHARGE SUMMARY

CONTINUED...

mg q.d., Glucophage 500 mg two tablets in the morning and one in the evening, Toprol XL 50 mg q.d., Norvasc 10 mg q.d., Vasotec 20 mg b.i.d., Prilosec 20 mg q.d. and 1600 calorie diabetic low salt diet. The patient is now being transferred to the ECU where he will be placed on a subacute involvement for PT and given intensive PT and OT.


_____

Isaac Reiser, M.D.

10475   IR/ss DD: 08/05/2001   DT: 08/06/2001

PALES, RONALD
056437

## DISCHARGE SUMMARY
Page 2

# Exhibit C

# IN THE CIRCUIT COURT OF
# COOK COUNTY, ILLINOIS

RONALD E. PALES                         §
                                        §
  PLAINTIFF,                  §
                                        §
vs.                                     §  CIVIL ACTION NO.
                                        §
MERCK & CO., INC.                       §
                                        §
SERVE:  CT CORPORATION                  §
208 LASALLE STREET, SUITE 814           §
CHICAGO, ILLINOIS 60604                 §
                                        §
                                        §
  DEFENDANT.                  §



## PLAINTIFF'S ORIGINAL PETITION

  COMES NOW, Plaintiff, RONALD E. PALES, and files this Original Petition, alleging as follows:

## I. THE PARTIES

  1. Herein, RONALD E. PALES, Plaintiff, is a resident of Cook County, Illinois. Plaintiff brings this action to recover for personal injuries he sustained as a result of ingestion of and exposure to Defendant's drug product.

  2. Defendant MERCK & COMPANY, INC., ("Merck") is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey, 08889-0100. Merck is a foreign corporation doing business in the State of Illinois and maintains an office and/or other facilities within this Judicial District. Merck manufactured, tested,

distributed, marketed, and/or sold the drug rofecoxib under the brand name Vioxx for the treatment of pain associated with osteoarthritis, rheumatoid arthritis, acute pain and menstrual pain. This Defendant may be served with process through its registered agent, CT Corporation System, 208 La Salle Street, Suite 814, Chicago, Illinois, 60604.

### III. JURISDICTION AND VENUE

3.      Jurisdiction is proper in this Court, because Defendant conducts or has conducted a substantial amount of business activity in Illinois. Jurisdiction over Defendant is proper in Illinois because they had continuous and systematic contacts within the State of Illinois and have committed torts in whole or in part in Illinois against Plaintiff. Venue is proper in Cook County, Illinois because Plaintiff is a resident of Cook County, Illinois.

### IV. INTRODUCTION

4.      This action arises from the sale and distribution of Vioxx (rofecoxib). Vioxx is the brand name used by Defendant Merck to market and distribute rofecoxib. Vioxx has been proven to cause adverse cardiovascular effects including, but not limited to, heart attack and stroke.

5.      During all the times mentioned herein, Merck was engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, inspecting, distributing, marketing, labeling, promoting, packaging and advertising of the prescription drug known as Vioxx for ingestion by consumers. Vioxx was manufactured, sold, designed, supplied, distributed, marketed and processed by Defendant Merck, who was at all times acting through its servants, employees, representatives and agents, who placed Vioxx in the market to be purchased and used by the public.

M009B13189

6.      Defendant Merck participated in, authorized and directed the production and promotion of Vioxx when it knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of Vioxx and thereby actively participated in the tortious conduct which resulted in the injuries suffered by the Plaintiff.

7.      Plaintiff was prescribed Vioxx from approximately August 25, 1999 until approximately September 8, 2001.

8.      Plaintiff used the Vioxx as directed by his prescribing physician and suffered an ischemic stroke after ingesting Vioxx.  Plaintiff's use of Vioxx was the direct, producing and proximate cause of the occurrence in question and the injuries at issue.

9.      Defendant Merck marketed and distributed its product by misleading users about the product and by failing to adequately warn the users of the potential serious dangers, which Merck knew or should have known, that might result from consuming its product.  Merck intentionally and knowingly chose to market Vioxx, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data that the use of Vioxx carried significant risk factors.  Moreover, these adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.  Defendant widely and successfully marketed its products throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of its products in order to induce widespread use and consumption. Merck's products were represented to aid the pain and discomfort of arthritis, osteoarthritis and related problems. Additionally, or in the alternative,

MO00813190

Merck made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physician.

10.    As a result of claims made by the Defendant regarding the safety and effectiveness of Vioxx, Plaintiff suffered a severe ischemic stroke.

11.    Upon information and belief, as a result of the manufacturing and marketing of Defendant's product, Merck has reaped huge profits; while concealing from the public, knowledge of the potential hazard associated with the ingestion of Vioxx.

12.    Defendant Merck failed to perform adequate testing in that the adequate testing would have shown that Vioxx possessed serious side effects with respect to which Defendant should have taken appropriate measures to ensure that its defectively designed product would not be placed into the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

13.    Prior to the manufacturing, sale and distribution of Vioxx, Merck, through its officers, directors and managing agents, had notice and knowledge from several sources, prior to the date of the marketing and sale of Vioxx to Plaintiff, that the product presented substantial and unreasonable risks of harm to the consumer.  As such, said consumers, including Plaintiff, were unreasonably subjected to risk of injury or death from the consumption of Merck's product.

14.    Despite such knowledge, Merck, through its officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of its products and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in its product.

15.   Merck, and its officers, agents and managers intentionally proceeded with the manufacturing, sale and marketing of its product, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests.

16.   Merck's conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Ronald E. Pales, entitling Plaintiff to exemplary damages.

17.   Merck acted with conscious and wanton disregard of the health and safety of Plaintiff, who requests an award of additional damages for the sake of example and for the purpose of punishing such entities for its conduct, in an amount sufficiently large to be an example to others, and to deter it and others from engaging in similar conduct in the future.  The above-described wrongful conduct was done with knowledge, authorization, and ratification of officers, directors, and managing agents of Merck.

18.   As a result of ingesting the products manufactured, supplied, and/or sold by Merck, Plaintiff suffered a severe, painful ischemic stroke.

19.   As a result of the dangerously defective nature of Merck's product at the time of manufacture and distribution, Plaintiff, by using Vioxx, sustained the injuries and damages as herein alleged.

20.   As a direct and proximate result of Defendant's negligence as described herein, Plaintiff sustained harm, including permanent and debilitating injuries resulting in serious injury.

21.   These injuries caused extensive pain and suffering and severe emotional distress.  As a result of the acts and omissions of Defendant, Plaintiff, Ronald E. Pales, suffered a severe, painful and permanent ischemic stroke.

M009813192

## V.  FACTS – VIOXX'S PRE-APPROVAL

22.     In the mid to late 1990's Defendant, MERCK & CO., INC., faced the loss of patent protection of its top selling and most profitable drugs.  In 1996, MERCK & CO., INC., began plans for a proposed study to prove Vioxx was gentler on the stomach than older painkillers.

23.     In need of a new blockbuster drug, MERCK & CO., INC., pushed forward with plans for the study and ignored a November 1996 memo from a top Merck official that stated, "there is a substantial chance that significantly higher rates" of cardiovascular problems would result from Vioxx.  Further, Merck concealed or ignored a February 1997 e-mail regarding the study from another Merck official that revealed, "you will get more thrombotic events" or blood clots unless the Vioxx receiving patients in the study also got aspirin.

24.     In response to the February 1997 e-mail, Merck vice president for clinical research Dr. Elise Reicin wrote, "the possibility of increased cardiovascular risk (from Vioxx) is of great concern."  To remedy this problem and conceal Vioxx's adverse cardiovascular effects, Merck's V.P. Dr. Reicin proposed people with risk of cardiovascular problems be kept out of the study so the adverse cardiovascular effects would not be evident. Despite its internal knowledge and information relating to cardiovascular-related adverse health effects, Defendant Merck forged ahead aggressively promoting and marketing Vioxx as safe and effective for persons such as Plaintiff in efforts to obtain FDA approval.

25.     While it is not clear as to whatever became of this 1996-97 proposed study, it is clear that Merck concealed its knowledge of the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as financially critical for Merck to retain its current market share, and to sustain stock value.  Vioxx's chief competing drug Celebrex

M009813193

(Celecoxib) was placed into the market by Merck competitors Pharmacia and Pfizer three months prior to the launch of Vioxx. Merck's disclosure of the safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market.

## VI. FACTS – VIOXX'S POST-APPROVAL

26.     Merck intentionally and knowingly chose to market this product, despite its pre-FDA-approval knowledge, its knowledge at product launch, and its post-FDA-approval data thereafter that use of Vioxx carried significant risk factors. These adverse effects were further realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in numerous studies shortly after market launch which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

27.     In early 1999, Merck started the 8,000 person VIGOR (Vioxx Gastrointestinal Outcomes Research study) to prove the drug's gastrointestinal safety benefits. The March 2000 VIGOR results revealed precisely what the above discussed internal Merck documents anticipated; a significant increase in the number of blood-clot related problems among Vioxx users. The heart attack rate in the Vioxx group was five times that of the other group taking naproxen.

28.     Merck research chief, Dr. Scolnick, confessed that there was an inherent risk in Vioxx, and stated in an internal March 9, 2000, e-mail that cardiovascular events are "clearly there" and called it a "shame" that it is mechanism (Vioxx) based. Dr. Scolnick recognized that the cardiovascular effects could not have come from naproxen's protective effect. Merck's research chief wrote that like all Merck's big selling drugs, Vioxx too had side effects but assured Merck that they would "do well."

MOOSB13194

29.    However, in March of 2000 Merck issued a news release that the trial results cardiovascular findings were "consistent with" naproxen's favorable effects. To date, and not surprisingly, the only studies to report a protective cardiovascular effect with naproxen are ones funded and assisted by Merck. A number of independent studies have reported no reduction in risk with naproxen use. In fact, an FDA researcher recently published a report that blatantly contradicts Merck's position and holds naproxen is not protective against coronary heart disease, and if anything, actually confers an increase in risk. Merck intentionally and knowingly made false assertions relating to the VIGOR trial with a blatant disregard for the public welfare all in an effort to conceal Vioxx's adverse cardiovascular effects in order to profit and maintain or gain market position.

30.    Merck repeatedly and purposefully downplayed, understated, and concealed the health hazards of Vioxx evident in the VIGOR study. In April of 2000, Merck issued response to the VIGOR results in a news release headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx." This and other similar Merck generated news releases were strategically designed and calculated to deceive and mislead the public about Vioxx's serious adverse effects.

31.    In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck did nothing to publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

MOO9B13195

32.     Merck continuously and systematically denied the ill health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure. Merck engaged in an aggressive and expansive advertising and sampling program and gained continued increases in market share. Merck spent over $160 million on direct-to-consumer television advertising on Vioxx in 2000. The resultant effect for this multi-million dollar advertising blitz combined with Merck's concealing and failing to reveal and warn of the risks was more than $2 billion in profits in the year 2000 alone to Merck and an approximately 23 percent market share.

33.     Merck's multi-million dollar advertising campaign created the image and impression and belief that the use of Vioxx was safe for adults, had fewer side effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Merck knew these representations to be false. These advertisements, combined with their other promotional literature, audio conferences, professional meetings, and press releases deceived potential consumers by relaying positive information, including testimonials from satisfied consumers, and manipulated the statistics to suggest widespread acceptability and safety of the product, while intentionally understating the known adverse and serious risks associated with the use of Vioxx. Merck's advertising and marketing campaign conveyed the false impression that Vioxx was a drug of first choice when it should not have been.

34.     In the fall of 2000, Merck again sunk to new levels in their efforts to conceal information by employing a barrage of ruthless intimidation and even retaliation tactics against those who spoke out regarding Vioxx's adverse effects. In October of that year, Merck official Louis Sherwood contacted Dr. James Fries, a Stanford University Medical Professor, to inform him that if his "irresponsibly anti-Merck and specifically anti-Vioxx" lectures didn't stop, that he

M0098I3196

would "flame out." Dr. Fries responded in a letter to Merck chief executive Gilmartin stating, "that Merck had crossed (an ethical) line, that you can't go across." Dr. Fries also explained that several other top medical schools complained of "a consistent pattern of intimidation by Merck" on Vioxx.

35.     Dr. Lee Simon, a rheumatologist at Beth Israel Deaconess Medical Center in Boston, reported being the victim of similar type Merck intimidation tactics when he publicly mentioned data that Vioxx might be associated with a risk of high blood pressure and swelling. Dr. Simon was "shocked that a phone call was made" to his superior to complain that his lectures were slanted against Vioxx; Dr. Simon rightfully believed that Merck was "attempting to suppress discussion about this data."

36.     In November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption. The article simply failed to provide critical information about Vioxx related cardiovascular complications such as stroke or blood clots.

37.     The year 2001 proved to be more of the same - huge efforts by Merck to conceal and hide Vioxx's adverse effects from the public and, in turn, Merck reaping huge profits. In 2001, Merck spent $135 million to promote the drug in the United States alone; Merck was rewarded with $2.6 billion in revenue making Vioxx the world's tenth biggest selling medicine.

38.     In February of 2001, when the FDA got results of the VIGOR study, the FDA wanted Merck to highlight the cardiovascular risk prominently on Vioxx's label. Merck resisted and fought hard to maintain its warning/caution free label and the label remained unchanged until

M0D9B13197

April 2002 when Merck and the FDA eventually reached a compromise. Merck's relentless and aggressive efforts to keep the public in the dark enabled them to maintain market position and profits for yet another year, all at the expense of persons such as Plaintiff.

39.     On or about August 29, 2001, JAMA, the Journal of the American Medical Association, published a peer reviewed human epidemiologic study by the Cleveland Clinic Foundation showing that Merck had concealed the risk of a thrombotic cardiovascular event or myocardial infarctions among Vioxx users in Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin patients. *See* Mukherjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors, JAMA.  286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users. *Id.*

40.     In the JAMA study the authors set forth the theory that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic events." Id. at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cylo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002.   This biological plausibility is further supported by studies completed at the University of Pennsylvania.  Cheng,

M009B13198

Y., et al., Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2, Journal of Science, V. 296: 539-541, Apr. 19, 2002.

41.     The JAMA study's release was followed by a relentless series of publications and peer reviewed literature by Merck employees and consultants again setting forth the blatantly false theory that naproxen had antithrombotic effects which accounted for the appearance of cardiovascular risk among Vioxx users. Again, Merck funded and assisted studies are the only ones to ever make this assertion. This theory has been debunked by numerous respected medical journals and the FDA recently stated that this theory could not be further from the truth.

42.     In mid-September, 2001, Merck received a third warning letter from the FDA, stating in part that its promotional activities are "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations." The FDA stated that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings" from a Vioxx study and "misrepresents the safety profile on Vioxx." As to a Merck May 22, 2001, press release, the FDA wrote "your claim in the press release that Vioxx has a 'favorable safety profile' is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen.    The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx group... as in the naproxen treatment group..."

43.     Further, the FDA letter reprimanded Merck for setting forth this false theory relating to the VIGOR study that Naproxen had anti-thrombotic effects, and went on to state that, "it is also possible that Vioxx has pro-thrombotic effects."

M009B13199

44.    Nevertheless, Merck continued its course of action and continued to aggressively market its Vioxx primarily through direct-to-consumer advertising.

45.    In the midst of this adverse publicity, Merck took an offensive approach to marketing, providing all Vioxx field personnel with an "obstacle handling guide" to overcome doctors' objections to Vioxx relating to its cardiovascular problems.   The training document was appropriately titled "Dodge Ball Vioxx." Merck's massive Vioxx sales force was instructed to avoid and "DODGE" serious, life threatening concerns of both health care professionals and the general public; Merck's corporate philosophy became one of "RUN" and "DODGE" as opposed to being that of "HONEST" and "TRUTHFUL."

46.    In April 2002, Merck was required to place information about cardiovascular implications on its Vioxx labeling based on the results of the VIGOR study.  In addition, Merck was required to place new label information that Vioxx 50 mg per day is not recommended for chronic use.  These warnings were based on information that had been in Merck's possession by approximately January of 2000 at the latest and, as such, Merck did not meet its obligation to provide adequate "direction or warnings" as to the use of Vioxx within the meaning of Section 402 of the Restatement (Second) of Torts or otherwise.  Neither did Merck fulfill its alleged obligation to warn the prescribing health care provider of these risks.

47.    Internal Merck documents reveal that Merck was set to begin a major cardiovascular study of Vioxx in 2002, but company officials abruptly dropped the project just before it was set to start. This proposed study, which became known as the VALOR trial was set to begin in June of 2002.  However, on March 13, 2002, Merck sent an e-mail to Merck employees worldwide that simply stated the trial was being put on hold and did not cite any details leading to the

M0009B13200

decision. Although Merck officials have publicly denied it, it is far more than a coincidence that their decision to cancel the trial fell amidst their negotiations with the FDA over the April 2002 cardiovascular warnings mentioned above. Merck's decision to cancel the VALOR trial is in concert with their corporate strategy to conceal information relating to Vioxx's adverse cardiovascular effects.

48.     In the summer of 2002, Merck conducted its most inflammatory and aggressive measures via their intimidation and retaliation tactics to suppress and conceal speech and publicity relating to the adverse cardiovascular effects of Vioxx. Dr. Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain, had published his criticisms of Merck's handling of Vioxx. Merck then had the audacity to send him a "rectification" that they insisted Dr. Laporte publish, which Dr. Laporte refused. Merck then filed suit against the doctor in Spanish Court demanding a public correction. In early 2004 the judge ruled that the publication accurately reflected the cardiovascular safety (or lack thereof) of Vioxx and ordered Merck to pay all court costs.

49.     In October of 2002, the prestigious British medical journal Lancet published a study that analyzed the medical data of close to 300,000 people and determined that people who take Vioxx are almost twice at risk of developing heart disease, including heart attack. Lancet also concluded that there was no anti-thrombotic or protective effect of naproxen, effectively discounting Merck's theory. Merck again opted not to publicize or warn of these findings, and would stick to its same story for another two years. Merck would continue to spend more than $100 million annually in direct-to-consumer advertising, and expand its distribution to more than 80 countries.

50.    On August 25, 2004, FDA researcher Dr. David Graham presented at a medical conference the results of a database analysis of 1.4 million patients that concludes Vioxx users are more likely to suffer a heart attack or sudden cardiac death than patients taking Celebrex. In fact, the report shows there is a 3.7-fold increase in risk compared with those taking Celebrex. With 92,791,000 prescriptions for Vioxx filled between 1999 and 2003, the FDA conservatively estimates an excess of 27,785 cases of AMI (Acute Myocardial Infarction) and SCD (Sudden Cardiac Death) for those years alone.

51.    Merck was still not ready to concede the truth. On August 26, 2004, true to form, Merck attempted to minimize and downplay the adverse findings and authorized a press release refuting Dr. Graham's study entitled, "Merck stands behind the efficacy and overall safety and cardiovascular safety of Vioxx."

52.    On September 23, 2004, Merck claims it had an epiphany. Merck had been sponsoring a small 2600 patient (APPROVe) study to in order to gain additional FDA approval for Vioxx to treat the recurrence colon polyps. The APPROVe study was stopped prematurely on the instruction of the data and safety monitoring board after the investigators found that after 18 months of treatment, patients taking Vioxx had twice the risk of a myocardial infarction compared with those receiving placebo. Merck alleges that this small study, which was by no means intended to test for Vioxx's overall safety, is what triggered the collapse of all their previous defenses. The results of the APPROVe study, combined with mounting pressure from the FDA, compelled Merck to finally acknowledge Vioxx's dangerous propensities. Merck then opted to back out rather than be forced out.

M009B13202

53.   On September 30, 2004, Merck withdrew Vioxx from the U.S. and the more than 80 countries around the in world. This came only after an estimated 80 million patients had taken the drug and Merck's annual sales had topped $2.5 billion. This represents the largest prescription drug withdrawal in history.

## VII. – NEGLIGENCE AND GROSS NEGLIGENCE

54.   Plaintiff re-alleges and incorporates the foregoing allegations.

55.   Plaintiff would further show that at all times material hereto, the manufacture, sale, design, supply, distribution, or prescription of Vioxx with which Plaintiff came in contact, was under the exclusive control of Merck, its agents, servants and employees, and that had the Defendant herein not been guilty of negligence, Plaintiff would not have sustained his injuries. Accordingly, Plaintiff is entitled to recover from Merck under the doctrine of *res ipsa loquitur*.

56.   The law imposed a duty on the Defendant, as a manufacturer and/or marketer and/or prescriber of pharmaceutical drugs, to exercise reasonable care.

57.   Merck knew, or in the exercise of ordinary or reasonable care ought to have known, that Vioxx, as manufactured, sold, designed, supplied, distributed, promoted, or marketed was dangerous, unsafe, and highly harmful to Plaintiff's health, notwithstanding which:

    a.    Defendant Merck negligently failed to design a reasonably safe product;

    b.    Additionally, or in the alternative, Merck negligently placed Vioxx into the market;

    c.    Additionally, or in the alternative, Merck negligently failed to remove Vioxx from the market;

    d.    Additionally, or in the alternative, Merck negligently failed to fund and conduct medical and scientific studies to determine the risks of the overall

M009B13203

safety of Vioxx, in the alternative, failed to heed the warnings and risks of Vioxx;

e.  Additionally, or in the alternative, Merck negligently failed to conduct sufficient testing on Vioxx that would have shown Vioxx had serious side effects, including, but not limited to the cardiovascular events described above;

f.  Additionally, or in the alternative, Merck negligently failed to conduct adequate post-marketing surveillance to determine the overall safety of Vioxx;

g.  Additionally, or in the alternative, Merck negligently failed to accurately disclose the results of its post-marketing surveillance to advise the Plaintiff, consumers, and the medical community of the aforementioned risks to individuals when the drugs were ingested;

h.  Additionally, or in the alternative, Merck negligently failed to investigate the adverse event reports relating to Vioxx;

i.  Additionally, or in the alternative, Merck negligently marketed its products;

j.  Additionally, or in the alternative, Merck negligently failed to provide Plaintiff with visible, understandable warnings that were adequate to convey and alert Plaintiff of the severity of the risks and serious thrombotic cardiovascular side effects of Vioxx;

k.  Additionally, or in the alternative, Merck negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ingestion;

l.  Additionally, or in the alternative, Merck negligently failed to take any reasonable precautions or exercise reasonable care to warn Plaintiff's health care providers of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx ;

m.  Additionally, or in the alternative, Merck negligently failed to take any reasonable precautions or exercise reasonable care to warn the health care industry of the potential risks and serious thrombotic and cardiovascular side effects of Vioxx;

M009B13204

n.  Additionally, or in the alternative, Merck negligently failed to provide adequate post-marketing warnings or instructions after it knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

o.  Additionally, or in the alternative, Merck negligently failed to warn Plaintiff that Vioxx should not be used in conjunction with any risk factors for these adverse events such as a family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease; and,

p.  Additionally, or in the alternative, Merck negligently failed to warn Plaintiff that he undertook the risk of adverse events and death relating to Vioxx as described herein.

58.  Merck's negligence was a proximate cause of the occurrence in question and Plaintiff's injuries and damages.

## VIII. – NEGLIGENCE-SALE OF PRODUCT

59.  Plaintiff re-alleges and incorporates the foregoing allegations.

60.  Additionally, or in the alternative, Merck, during some or all relevant times, manufactured, sold, marketed, and/or distributed Vioxx that was supplied to Plaintiff for use.

61.  Plaintiff was exposed to and ingested this hazardous product.

62.  Merck had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiff.

63.  These duties included the responsibility for the following safety and health matters relating to Vioxx :

a.  the investigation of the health risks;

b.  writing and publishing adequate and timely precautionary product labels and other health and safety information;

c.  writing and publishing adequate and timely specifications and standards about the true risks of injury associated with the products;

M009813205

        d.      writing and publishing adequate and timely specifications and standards about the symptoms of such injuries;

        e.      writing and publishing adequate and timely specifications and standards about the scope of such injuries; or

        f.      writing and publishing adequate and timely specifications and standards about the severity of the known risks associated with these products.

64.    Merck knew, or in the exercise of reasonable care should have known, that Vioxx would cause adverse cardiovascular effects to their consumers like Plaintiff.

65.    Merck breached its duty of reasonable care to the Plaintiff and was negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

66.    Merck's negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

### IX. – COMMON LAW FRAUD – FAILURE TO DISCLOSE

67.    Plaintiff re-alleges and incorporates the foregoing allegations.

68.    Additionally, or in the alternative, Defendant committed common law fraud against Plaintiff.

69.    Defendant had a duty to disclose the risks associated with the use of Vioxx.

70.    Defendant made numerous material misrepresentations about the safety and efficacy of Vioxx, with full knowledge of the falsity of these representations and/or made these misrepresentations with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred.

71.    Further, Defendant failed to disclose and concealed material facts within their knowledge.

M009B13206

72.   Defendant knew that Plaintiff was ignorant of the fact and did not have an equal opportunity to discovery the truth about the dangers presented by Defendant's products.

73.   Defendant intended to induce consumers such as Plaintiff to take some action, among other things, to buy and ingest Vioxx, by failing to disclose the fact.

74.   Plaintiff justifiably relied on Defendant's material misrepresentations to his detriment; but for Defendant's fraud, he would not have been exposed to Vioxx.

75.   Defendant's fraud was a proximate cause of the occurrence in question and Plaintiff's injuries and damages.

### X. – COMMON LAW STRICT LIABILITY

76.   Plaintiff re-alleges and incorporates the foregoing allegations.

77.   In addition to, or in the alternative, Plaintiff pleads the doctrine of strict liability. Merck is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective design of Vioxx.  At the time Vioxx was designed, manufactured and sold by Merck, safer alternative designs existed, which included designs other than that actually used, that had they been selected by Merck, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of Merck, and had they been used, would have not have impaired the utility of the product.  Defendant's defectively designed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

78.   Merck is strictly liable to Plaintiff under Section 402A, Restatement (Second) of Torts, for the defective marketing of Vioxx.  Defendant failed to provide adequate warnings and

MO09813207

instructions for safe use of Vioxx. Defendant's defectively marketed drug was a producing cause of the occurrence in question and Plaintiff's injuries.

79.    Merck is also strictly liable to Plaintiff under Section 402B of the Restatement (Second) of Torts in misrepresenting to the public that its product was safe and without defect, which statement and representation was false and involved a material fact concerning the character of quality of the product in question, and upon which representations the consumer constructively relied, and which constituted a producing cause of the injury at issue.

80.    Further, each of the above and foregoing acts or omissions of Merck was more than momentary thoughtlessness, inadvertence, or error of judgment. Such acts or omissions constituted such entire want of care as to establish that the acts or omissions were the result of actual conscious indifference to the rights, safety, or welfare of the person or persons affected. Plaintiff is entitled to recover judgment against Merck for exemplary damages.

81.    Merck's defective drug, Vioxx, was a producing cause of the occurrence in question and Plaintiff's injuries and damages.

## XI. – BREACH OF WARRANTIES (EXPRESS and IMPLIED)

82.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein

83.    Additionally, or in the alternative, Merck, through descriptions, affirmations of fact, and promises relating to Vioxx to the FDA, prescribing physicians, and the general public, including Plaintiff, expressly warranted that Vioxx was both safe and efficacious for its intended use.

84.    These warranties came in the form of:

MDL9B13208

88.   As such, Merck's products were neither in conformity to the promises, descriptions or affirmations of fact made about Vioxx nor adequately contained, packaged, labeled or fit for the ordinary purpose for which these goods were sold and used.

89.   Merck breached these express warranties to Plaintiff in violation of the applicable provisions of the Uniform Commercial Code by:

g.   manufacturing, marketing, packaging, labeling and selling Vioxx to Plaintiff in such a way that misstated the risks of injury, without warning or disclosure thereof by package or label of such risks to the Plaintiff, or the prescribing physicians or pharmacist, and without modifying or excluding such express warranties;

h.   manufacturing, marketing, packaging, labeling, advertising and selling Vioxx to Plaintiff, which failed to counteract the negative health effects and increased risks in a safe and permanent manner; and

i.   manufacturing, marketing, packaging, labeling, advertising, promoting and selling Vioxx to Plaintiff, thereby causing the increased risk of serious physical injury and death, pain and suffering.

90.   Merck possessed or should have possesses evidence demonstrating that Vioxx and causes serious side effects. Nevertheless, Merck continued to market Vioxx by providing false and misleading information without regard to the safety and efficacy of Vioxx.

91.   Merck's actions, as described above, were performed wilifully, intentionally and with reckless disregard for the rights of Plaintiff and the public.

92.   Merck's breaches of warranties were proximate causes of the occurrence in question and Plaintiff's injuries and damages.

## XII. – ACTUAL DAMAGES

93.   Plaintiff seeks compensation for the damages he has sustained relating to his past, present, and future pecuniary loss, and mental anguish and pain and suffering.

M009B13210

## XIII. – PUNITIVE DAMAGES

94.    Plaintiff re-alleges and incorporates the foregoing allegations.

95.    Additionally, or in the alternative, Plaintiff is entitled to punitive damages against Merck because Merck's failure to warn was reckless and without regard for the public safety and welfare and constitutes malice under Illinois law.  Merck misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety of Vioxx.  Merck concealed, downplayed, understated and/or disregarded its knowledge of the serious and permanent side effects associated with the use of Vioxx, despite available information demonstrating that Vioxx was likely to cause fatal side effects to users.

96.    Merck, its agents, representatives and employees were or should have been in possession of evidence demonstrating that their products cause serious cardiovascular side effects. Nevertheless, Merck continued to aggressively market and advertise Vioxx by providing false and misleading information with regard to their safety and comparative efficacy.

97.    Merck failed to provide warnings that would have persuaded medical providers from prescribing Vioxx, and failed to provide adequate and accurate information in their advertising, promotions and marketing campaign, thus depriving medical providers and consumers from weighing the true risks against the benefit of prescribing and/or purchasing and consuming Vioxx.

98.    Merck's acts and omissions were grossly negligent, malicious, and constitute an egregious fraud.  Further, Merck acted in reckless disregard of the safety of Plaintiff and others, justifying the imposition of punitive damages.  Plaintiff is entitled to punitive damages because

M009813211

of Merck's maliciousness and reckless disregard of Plaintiff's safety and the safety of others taking Vioxx.

99.     Merck's malicious conduct was a proximate cause of the occurrence in question and Plaintiff's injuries and damages.

## XIV. TOLLING OF APPLICABLE STATUTES OF LIMITATION, IF ANY

100.    Because Merck fraudulently concealed its wrongful conduct as alleged above and Plaintiff, using reasonable diligence, could not and did not discover his right of action until very recently, Merck is estopped from asserting any and all potentially applicable statutes of limitations, if any.

101.    Any and all potentially applicable statutes of limitations have been tolled by Merck's affirmative and intentional acts of fraudulent conduct, concealment, and misrepresentation, alleged above. Such acts include but are not limited to intentionally covering up and refusing to disclose the material risks associated with the use of Vioxx.

102.    Merck is estopped from relying on any statutes of limitation because of their fraudulent concealment and misrepresentation alleged above. Merck was under a duty to disclose the risks of adverse cardiovascular events associated with the use of Vioxx because this is nonpublic information over which they had exclusive control, because Merck knew this information was not readily available to Plaintiff, and because this information was relevant to Plaintiff in deciding whether to use Vioxx.

103.    Until very recently, Plaintiff had no knowledge that Merck engaged in much of the wrongdoing alleged herein. Because of the fraudulent and active concealment of the wrongdoing by Merck, including but not limited to deliberate efforts to give Plaintiff the materially false

M009B13212

impression that Merck undertook all feasible safety precautions to reduce the risk of adverse cardiac events, Plaintiff could not have reasonably discovered the wrongdoing any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective action given the unavailability, until very recently, of the internal memoranda and other documents (as generally described herein) as evidence in support of Plaintiff's claims.

## XV. JURISDICTIONAL LIMITS

104.   Plaintiff's damages are far in excess of this Court's minimum jurisdiction.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against the Defendant and in favor of the Plaintiff, and to award the following relief:

a.  General damages in the sum in excess of the jurisdictional minimum of this Court;

b.  Compensatory damages;

c.  Consequential Damages;

d.  Punitive and exemplary damages;

e.  Pre-judgment and post-judgment interest as provided by law;

f.  Costs including, but not limited to, discretionary Court costs of this cause, and those costs available under the law, as well as expert fees and attorney fees and expenses, and costs of this action; and,

g.  Such other relief as the Court deems just and proper.

## XVII. JURY DEMAND

Plaintiff demands a trial by jury.

MOO9B13213

Dated: __1/8__, 2007.

Respectfully submitted,

_John Boundas_

JOHN BOUNDAS
Illinois State Bar No. 06236743
WILLIAMS BAILEY LAW FIRM
8441 Gulf Freeway, Suite 600
Houston, Texas 77017

GRANT KAISER
Texas State Bar No. 11078900
THE KAISER FIRM LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5001
(*pending pro hac admission*)

**ATTORNEYS FOR PLAINTIFF**

000511

M009B13214

# Exhibit D



**FILED**

AUG 0 7 2007

Carol E. Higbee, P.J.Cv.

Aug 8 2007
2:05PM

The Lanier Law Firm, PLLC
Tower 56
126 East 56th Street, 6th Floor
New York, New York 10022
212.421.2800
Attorneys for Plaintiffs

| | |
|---|---|
| THOMAS CONA and JOYCE CONA, husband and wife, | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION<br>: ATLANTIC COUNTY |
| Plaintiffs, | : Docket No.: ATL-L-3553-05MT |
| v. | : CIVIL ACTION |
| MERCK & CO., INC., | : |
| Defendant(s). | : **ORDER DENYING DEFENDANT'S<br>: MOTION FOR NEW TRIAL,<br>: JUDGMENT NOTWITHSTANDING THE<br>: VERDICT; GRANTING, IN PART,<br>: PLAINTIFFS' MOTION FOR FEES AND<br>: COSTS AND ENTERING JUDGMENT<br>: ON THE VERDICT** |

**THIS MATTER** having been tried to a jury before the Hon. Carol E. Higbee, P.J.Cv.,

beginning on March 6, 2006 and continuing on such dates as are reflected in the transcript; and

the jury having rendered its verdict on April 5, 2006, awarding to plaintiffs Thomas Cona and

Joyce Cona ascertainable economic loss pursuant to the Consumer Fraud Act ($45); and

defendant Merck & Co., Inc. having moved for a new trial and judgment notwithstanding the

verdict; and plaintiffs, Thomas Cona and Joyce Cona having moved for attorneys' fees and costs

pursuant to the Consumer Fraud Act (CFA);

**IT IS** on this _____7th_____ day of ___August___, 2007

**ORDERED** that defendant Merck & Co., Inc.'s motion for a new trial and judgment notwithstanding the verdict in this matter be and hereby is DENIED, for the reasons stated in the Court's Memorandum of Decision dated June 8, 2007; and it is further

**ORDERED** that plaintiffs Thomas Cona and Joyce Cona's motion for attorney's fees and costs in this matter be and hereby is GRANTED, in part, for the reasons stated in the Court's Memorandum of Decision dated June 15, 2007; and it is further

**ORDERED** that judgment be and hereby is entered in the Civil Docket in favor of plaintiffs and against defendant Merck & Co., Inc. in the amount of Two Million Two Hundred Sixty-eight Thousand Eight Hundred Two Dollars Eighty Cents ($2,268,802.80), together with post-judgment interest accruing at 6.0 percent per annum during calendar year 2007 after August ___, 2007, or $367.54 per day, and at the annual rate set pursuant to R. 4:42-11(a) for each calendar year, after 2007, that the judgment remains outstanding, as follows:

1. Treble damages pursuant to the CFA, awarded in the amount of One Hundred Thirty-five Dollars ($135.00), calculated as $45.00 (ascertainable loss) x 3; and

2. Attorney's fees pursuant to the CFA, awarded in the amount of Two Million Ninety Thousand Seven Hundred Ninety Seven Dollars and Twenty Cents ($2,090,797.20), calculated as $2,613,496.50 (total fees) x .80 (reduction rate); and

3. Costs of suit pursuant to the CFA, awarded in the amount One Hundred Seventy-seven Thousand Eight Hundred Seventy Dollars Sixty-eight Cents ($177,870.68), calculated as [$454,959.26 (original costs) - $154,970.90 (experts) - $209,101.00 (original lodging) + 131,451.00 (reduced lodging)($129 x 1,019 lodging nights)] x .80; and

4. Post-judgment interest pursuant to R. 4:42-11(a), accruing at an annual rate of 6.0 percent for each day during calendar year 2007 after August ___, 2007, or Three Hundred

–2–

Sixty-seven Dollars Fifty-four Cents  ($367.54) per day, calculated as follows:

$2,268,802.80 x 0.06 x 0.0027 (1/365); and

5. Post-judgment interest accruing at the annual rate set pursuant to <u>R.</u> 4:42-11(a) for each

calendar year after 2007 that the judgment remains outstanding.


BY THE COURT:

_____

CAROL E. HIGBEE, P.J.Cv

–3–