# AMERICAN BAR ASSOCIATION
STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY

**Formal Opinion 93-371**  April 16, 1993
**Restrictions on the Right to**
**Represent Clients in the Future**

*A restriction on the right of plaintiffs' counsel to represent present clients and future claimants against a defendant as part of a global settlement of some of counsel's existing clients' claims against that same defendant represents an impermissible restriction on the right to practice which may not be demanded or accepted without violating Model Rule 5.6(b).*

The pressure to find creative solutions to mass tort litigation has prompted an inquiry regarding the propriety of a lawyer entering into a settlement agreement with an opposing party pursuant to which the lawyer may be obligated to refuse to represent certain present clients as well as other similarly situated individuals against the same defendant in the future. The issues raised are important ones which the Committee has never addressed in this context.

The specific facts of the present inquiry involve a defendant in mass tort litigation approaching the plaintiffs' law firm and requesting that the firm enter into a global settlement agreement that would include not only all present cases handled by the firm against that defendant, but all future cases the firm would handle against the defendant as well. The global settlement agreement would contain predetermined settlement amounts to be offered to the firm's clients depending on the severity of each client's impairment. The defendant would be required to pay the predetermined amount if the client accepted it. If the client did not accept it, the case would either proceed to litigation, or be placed in a "deferred docket."[1] Deferred dockets are inactive dockets where cases would be filed for clients whose injuries were at a predetermined minimal level; the cases would not advance toward trial unless the client developed additional objective evidence of impairment as per the terms of the global settlement. The firm's future clients would also be subject to the

---

1. "Deferred docket" has been defined as follows:

[A]n inactive docket system for those plaintiffs diagnosed as having only slight evidence of asbestos related disease ... the registry would provide a method whereby plaintiffs, who showed only some small sign of asbestos-related injury but who were forced to file a claim in order to preserve their rights, could defer their cause of action to such time, if ever, that their condition progressed to disability. In Re Asbestos Cases, 586 N.E.2d 521, 522 (Ill.App.1991).

AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY, 541 N. Fairbanks Court, Chicago, Illinois 60611 Telephone (312)988-5300 CHAIR: David B. Isbell, Washington, DC ❑ Daniel Coquillette, Newton, MA ❑ Ralph G. Elliott, Hartford, CT ❑ Lawrence J. Fox, Philadelphia, PA ❑ Margaret Love, Washington, DC ❑ William C. McClearn, Denver, CO ❑ Richard McFarlain, Tallahassee, FL ❑ Truman Q. McNulty, Milwaukee, WI ❑ CENTER FOR PROFESSIONAL RESPONSIBILITY: George A. Kuhlman, Ethics Counsel; Joanne P. Pitulla, Assistant Ethics Counsel
© 1992 by the American Bar Association. All rights reserved.

Exhibit 1

conditions set forth in the global settlement regarding the deferred docket.

The global settlement agreement would have an "escape hatch" feature which would permit individual cases to be removed from the deferred docket and individually adjudicated. The number of such cases would be limited to a percentage of the total number of cases in the deferred docket. If the percentage of clients who refused to be placed on the deferred docket exceeded the percentage allowed under the global settlement agreement, the firm would be obligated to refuse to represent these opt-out clients whether they were clients of the firm at the time the settlement was reached or became clients of the firm thereafter.

The question presented for Committee consideration is whether, in the context of mass tort or other class action litigation, the lawyer can ethically agree, as a condition of settlement, to refrain from representing either present clients or potential future clients who would trigger the excess percentage figure.

This inquiry raises important issues regarding the intersection between a lawyer's duty to his or her present clients under Model Rule 1.2 and impermissible restrictions on the right of a lawyer to practice under Model Rule 5.6.

**Restriction on the Right to Represent Clients in the Future**

The question presented is whether the lawyer may accept as a condition of the global settlement a restriction on his right to represent some of his present clients who will wish to use his services for individual adjudication as well as individuals who in the future seek to become his clients against this defendant. For purposes of this discussion, we assume that a settlement offer of this sort is in the interest of some, and perhaps even most, of the lawyer's present clients.[2] Indeed, it may be that part of the reason these present clients are able to obtain particularly favorable terms is the fact that the defendant is willing to offer more consideration than it might otherwise offer in order to secure the covenant from the attorney not to represent other present clients as well as future claimants. Thus, if, as expected, most, if not all, of the present clients view the settlement offer with favor, following the injunction of Rule 1.2, the lawyer normally would be required to abide by the client's instructions to accept the settlement offer.[3]

However, Model Rule 1.2 is not dispositive of this issue. Model Rule 5.6 must also be considered. Model Rule 5.6(b) provides:

---

2. The fact that it may not be in the interest of all of the lawyer's present clients highlights another important issue embedded in this problem. See discussion at 8.

3. Rule 1.2(a) states in relevant part:

A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. The Comment to the Rule states in relevant part:

Both lawyer and client have authority and responsibility in the objectives and means of representation. The client has ultimate authority to determine the purposes to be served by legal representation, within the limit imposed by law and the lawyer's professional obligations.

3 Committee on Ethics and Professional Responsibility           93-371

> A lawyer shall not participate in offering or making:
>
> (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.

The Comment makes explicit how the rule is applicable to the present situation.

> Paragraph (b) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client.

Disciplinary Rule DR 2-108(b) of the Model Code of Professional Responsibility similarly states as follows:

> In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that restricts his right to practice law.

In comparing these provisions, it is instructive to note that when Model Rule 5.6 is read in conjunction with Model Rule 8.4(a) [FN4] the scope of the prohibition applies, not only to a lawyer agreeing to the restriction, but also to a lawyer offering or requiring the restriction.

The rationale of Model Rule 5.6 is clear. First, permitting such agreements restricts the access of the public to lawyers who, by virtue of their background and experience, might be the very best available talent to represent these individuals. Second, the use of such agreements may provide clients with rewards that bear less relationship to the merits of their claims than they do to the desire of the defendant to "buy off" plaintiff's counsel. Third, the offering of such restrictive agreements places the plaintiff's lawyer in a situation where there is conflict between the interests of present clients and those of potential future clients. While the Model Rules generally require that the client's interests be put first, forcing a lawyer to give up future representations may be asking too much, particularly in light of the strong countervailing policy favoring the public's unfettered choice of counsel.

Given the important public policies reflected in Rule 5.6, the Committee believes that the injunction of Rule 1.2 that the lawyer shall abide a client's decision regarding settlement must be read as limited by the provisions of Rule 5.6(b) and, as a result, a lawyer cannot agree to refrain from representing present or future clients against a defendant pursuant to a settlement agreement on behalf of current clients even in the mass tort, global settlement context.

The Committee previously considered a similar question in Informal Opinion 1039 (1968). That opinion included a discussion of the following two questions:

> 1) Can a lawyer ethically bind himself not to represent members of the public when his judgment is restricted by an agreement which may be

---

4. Rule 8.4 states in relevant part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another....

against public policy and which deprives him of his freedom of choice?
...
4) Is it ethical for a defense lawyer to communicate or implement his client's desire to require an opposing attorney to agree to refrain from representing any such client against such client?

The Committee concluded:

The covenant that you refer to (an agreement which settles the client's litigation when the settlement agreement contains a covenant that the lawyer will not represent other plaintiffs against the defendant ... imposes an undue restriction upon the plaintiffs' attorney and also affects the right of the client to obtain the benefit of the services to which he is entitled from his own lawyer. Because of the foregoing it is improper for the attorney representing the defendants to demand this kind of a covenant and by way of corollary it is improper for plaintiff's attorney to abandon the interests of other clients, who have depended upon his services through periods that may be invaluable and of long standing.

Informal Opinion 1039 involved a covenant that prohibited representation of any similarly situated claimants; the terms of the settlement here in question would operate only to prevent the representation of some similarly situated clients. But the principle is the same. Thus, this proposal, like the covenant in Informal Opinion 1039, would be violative of 5.6(b).

The view we reach here finds support in the legislative history of the predecessor Code provision of Model Rule 5.6. The Model Code of Professional Responsibility was adopted by the House of Delegates in August 1969. DR 2-108(B) of the Code read as follows:

In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that broadly restricts his right to practice law, but he may enter into an agreement not to accept any other representation arising out of a transaction or event embraced in the subject matter of the controversy or suit thus settled. (Emphasis supplied)

In February 1970, just six months later, the Standing Committee on Ethics and Professional Responsibility proposed an amendment to DR 2-108(B) to the House of Delegates, repealing the italicized language. That amendment was adopted by the House, yielding the current text of DR 2-108(B):

In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that restricts his right to practice law.

During the debate over the amendment, Walter P. Armstrong, Jr., chair of the Committee on Ethics and Professional Responsibility, explained the need for deleting the offending language:

[A] covenant of that type would, in effect, restrict ... a lawyer's ability to engage in the practice of law by agreeing in advance before he had considered any of the merits, that he would not represent certain types of clients. Secondly, we [the Committee] felt that a covenant of that type would inevitably involve a conflict of interests.

Armstrong also observed that the restrictive covenant would go "directly contrary to the letter and the meaning and the spirit of Canon 2," which urged lawyers to make legal counsel available. See Annotated Model Code of Professional Responsibility (1979) at 115.

We, therefore, conclude that a lawyer may not offer, nor may opposing counsel accept, a settlement agreement which would obligate the latter to limit the representation of future claimants. While we recognize that the suggested approach arose from a good faith attempt to settle enormously complicated litigation, those good intentions cannot overcome the ethical mandate of the Model Rules.

**Conflicts Among Present Clients**

Having addressed the issues raised by the proposed restrictions we should note that even if the restrictions on practice were permissible under the Model Rules, the hypothetical contains embedded in it a serious issue regarding conflicts of interest among present clients. Under Model Rule 1.7(b)[5] a lawyer may not represent multiple co-plaintiffs under certain circumstances. The Comment to 1.7(b) provides "[a]n impermissible conflict may exist by reason of ... the fact that there are substantially different possibilities of settlement of the claims or liabilities in question."

Certainly that situation is presented here where among the lawyer's present clients are (a) individuals who wish to accept the present settlement, (b) individuals who wish to go on the deferred docket and might be perfectly happy to accept the predetermined amount established in the proposed settlement at a later date, and (c) individuals who either now or, after being on the deferred docket a period of time, wish to have their claims individually adjudicated. There may also be a conflict simply among the lawyer's clients in category (c). There are those who, because they indicate their desire for individual adjudication early, before the trigger percentage is reached, will have an opportunity to have their claim individually adjudicated being represented by the lawyer negotiating the global settlement. There also may be a second group who, because of the trigger, will not have benefit of that lawyer's representation. Indeed, it is difficult to understand how the lawyer can resolve the dilemma into which he would place his present clients in category (c). Assuming they really want the settling lawyer to handle their individual adju-

---

5. Model Rule 1.7(b) states:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
  (1) the lawyer reasonably believes the representation will not be adversely affected; and
  (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

dications (a not surprising wish since he is, after all, their lawyer), then solely because of the arrangement counsel has struck, they will be torn between their wish to wait for individual adjudication until their cases are ripe and their need to get to adjudication early enough to avoid the trigger which would result in the loss of the lawyer's services.

Thus, we conclude that, for this independent reason, the lawyer may not proceed with the settlement on behalf of his present clients unless he resolves this conflict among them by seeking an appropriate waiver,[6] if that is possible, or securing, with the clients' consent, alternative counsel for those whose interests differ from those who wish to pursue that portion of the global settlement which provides predetermined settlement amounts.[7]

---

6. Such a waiver may only be sought after full disclosure of the risks involved, including the loss of the lawyer's services if the trigger is reached.

7. Mr. Isbell did not participate in the Committee's decision on this Opinion.