```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2
     ****************************************************************
 3   GERALD D. BARNETT

 4                                        Docket No. 06-CV-485
     v.                                   New Orleans, Louisiana
 5                                        Wednesday, March 28, 2007

 6   MERCK & CO., INC.
     ****************************************************************
 7

 8             TRANSCRIPT OF MOTION FOR NEW TRIAL PROCEEDINGS
                HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                    UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12   FOR THE PLAINTIFF:            ROBINSON, CALCAGNIE & ROBINSON
                                   BY:  MARK ROBINSON, ESQ.
13                                 620 Newport Center Dr., 7th Floor
                                   Newport Beach, CA 92660
14

15
     FOR THE PSC:                  LEVIN, FISHBEIN, SEDRAN & BERMAN
16                                 BY:  ARNOLD LEVIN, ESQ.
                                   510 Walnut Street, Suite 500
17                                 Philadelphia, PA 19106

18

19
     FOR THE DEFENDANT:            BARTLIT BECK HERMAN
20                                 PALENCHAR & SCOTT
                                   BY:  PHILIP S. BECK, ESQ.
21                                 54 West Hubbard St., Suite 300
                                   Chicago, IL 60610
22

23

24

25
```

```
1   ALSO PRESENT:                    HARRY T. LEMMON
                                     EDWARD F. SHERMAN
2

3

4   Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
                                     500 Poydras Street, Room HB-406
5                                    New Orleans, Louisiana 70130
                                     (504) 589-7776
6

7

8
         Proceedings recorded by mechanical stenography, transcript
9   produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

( WEDNESDAY, MARCH 28, 2007)

(MOTION PROCEEDINGS)


THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  Good to see you all.  Let's call the case, please.

THE DEPUTY CLERK:  MDL No. 1657, <u>in re:  Vioxx</u>.  <u>Gerald Barnett v. Merck and Company, Inc.</u>, Civil Action 06-485.

Counsel, make their appearance for the record, please.

MR. ROBINSON:  Mark Robinson for the plaintiff, your Honor.

MR. LEVIN:  Arnold Levin for the PSC, along with Mr. Lemmon and Mr. Sherman.

MR. BECK:  Good morning, your Honor, Phil Beck for Merck.

THE COURT:  Okay.  I know everybody else.  I'm sorry I have to impose time limits on you.  I have a jury that has been listening to some evidence for a long time and they are expecting to receive closing argument at ten o'clock.  So if we can get on with it and I'll hear from the movants.

I do have two motions before me, one is the renewed motion for judgment as a matter of law.  I do understand that motion and I've read the material and I can deal with it on the briefs.

I would appreciate some argument on the motion for new trial on all issues. Help me think this through first.  The options which your new trial motion brings, is it fair to say that the three

1    options that I have available to me are a new trial on all issues, a

2    stand pat, so to speak, and a remittitur?  Does that motion open

3    those three areas or not?

4              MR. BECK:  Your Honor, when you say the "stand pat"?

5              THE COURT:  I simply mean the trial on damages.

6              MR. BECK:  I think, your Honor, those are the three

7    options that are raised by our new trial motion -- well, I guess

8    they're all in play now.  They requested a remittitur and I don't

9    know procedurally whether it was done in the traditional way, but we

10   are not standing on ceremony on that.  So I do think those are the

11   three options that are in play.

12             THE COURT:  Okay.

13             MR. BECK:  And, your Honor, I know that you've read the

14   briefs on this issue as well, and so there is a couple of points

15   that have been briefed but I am not going to be discussing at any

16   length this morning given the time constraints.  First one is akin

17   to our JMOL motion, which is that a new trial is warranted because

18   there was not an adequate evidentiary basis.  So I am not going to

19   be dwelling on that.

20             And also, your Honor, while we feel strongly on this

21   point, I don't have a lot to add to what we've written on it.  And

22   that is whether the liability verdicts in Counts 2 and 3 were the

23   result of the same passion, prejudice and caprice that resulted in

24   the damages verdict.  And the reason I am going to kind of pass over

25   that, frankly, is because while we believe that that was the case

1    and warrants a new trial, the way I read your opinion from back in

2    August of 2006, I think you have at least tentatively come down on

3    the other side there.  And so I am going to proceed on the

4    assumption that your Honor has or will rule against us on those

5    points, even though we re-urge them this morning.

6           But for purposes of oral argument, I am going to assume

7    that those issues are off the table, that your Honor has determined

8    that a reasonable jury could find against us on Counts 2 and 3 and

9    that this particular jury was not swayed on liability by passion,

10   prejudice and caprice.  And so where does that leave us on the new

11   trial and the three options that your Honor indicated were on the

12   table?  And I think the answer is that we're entitled to a new trial

13   under both Supreme Court and Fifth Circuit precedent and the Seventh

14   Amendment.

15          And it's not because anybody did anything wrong.  I think

16   that there is some tenor in the briefs coming from the plaintiffs or

17   the PSC that it would somehow be a failure of the system if we had a

18   new trial on all issues, but that happens sometimes.  It happened in

19   the Irvin-Plunkett case, for example, we have a hung jury, you have

20   a new trial.  And here it's because of the nature of the case and

21   the nature of the verdict that means that we need a new trial on all

22   issues.  And that is for the reasons that I'll get into and we

23   briefed, that's the correct result; and it doesn't mean that the

24   system has failed, it doesn't mean that there was something wrong

25   with the trial.  It means that given the verdict that we got and

1    given the nature of the claims that they've made, there is no way

2    that we can have anything but a new trial on all issues.

3          Let me just briefly address the remittitur request that

4    they made.  Your Honor, the plaintiffs and the PSC seem to agree on

5    the legal point that a remittitur is not permitted when the damages

6    verdict is the result of passion and prejudice, rather than merely

7    excessive or a whacky calculation.  And the Brunnemann case that

8    your Honor cited in your order and the other side, at least the PSC

9    cites, clearly says that.

10         So then the question is, well, what was the situation with

11   this damages verdict?  And your Honor has already resolved this

12   issue.  In your order of August 30th, 2006, you noted that under

13   Erie the excessiveness question is governed by South Carolina law,

14   and South Carolina standard is as your Honor quoted, "passion,

15   caprice, prejudice or some other influence outside of the evidence."

16   That's the standard that you applied under South Carolina law.  And

17   your Honor also noted that the federal standard was passion or

18   prejudice, and your Honor said that the verdict was excessive under

19   any conceivable standard.

20         And of course the only one that governs is South Carolina,

21   which is passion, caprice, prejudice, some other influence outside

22   of the evidence.  So your Honor has already determined that the

23   damages portion of the verdict at least was the result of passion,

24   prejudice; and everybody agrees on the legal point that if that's

25   the case, then you cannot have a remittitur.

1           And there are practical as well as constitutional reasons

2    for that.  The practical reason is that your Honor would have no way

3    to say, okay.  This portion of the verdict makes sense, this portion

4    is excessive.  Instead you would have to build a verdict from the

5    ground up somehow.  You would have to just evaluate the evidence and

6    you would have to decide what you think is a sensible damages award.

7           But that brings us to the Seventh Amendment, we are

8    entitled to a jury trial on that, both sides are.  And it is not the

9    court's province in first instance.  You can correct a verdict where

10   there is an obvious mathematical miscalculation or where there is

11   mere excessiveness, but not one that is basically null and void

12   because it was the product of passion and prejudice.  So I think

13   that that option is not a permissible one.

14          So then we get to what should be the scope of the

15   re-trial.  And here I'd like to make a couple of general

16   observations.  One is we joked about this once when we were talking

17   about one of the issues that came up in Plunkett 2, and I can't

18   remember what it was, but we all sort of agreed that we should only

19   try a case twice, that we don't want to have a re-trial and then do

20   something that's going to cause the Fifth Circuit to bump it right

21   back down.  And the issues that we're talking about in terms of the

22   scope of the re-trial, these are not evidentiary issues where even

23   if the Fifth Circuit disagrees with your Honor, they're going to pay

24   a lot of deference to your Honor and to review it on a harmless

25   error type of an approach.

1          And it's not something like we always deal with on whether

2    Elise Grayson used Vioxx where it's a balancing 401 type issue where

3    the Fifth Circuit's going to defer to your Honor's judgment.  This

4    is a constitutional issue about the scope of the re-trial, and I

5    think the law is pretty clear that there has to be a re-trial on all

6    issues, unless it's clearly evident that there is no substantial

7    overlap in issues that would have to be decided by the jury.  So

8    it's a constitutional issue and the approach is that we're entitled

9    to a re-trial on all issues, unless it's clear that there is no

10   overlap on the issues that would have to be decided by the second

11   jury that were presented to the first jury.

12          So I feel like it would almost be a free shot if we got a

13   partial re-trial because whatever damage award grew out of that, I

14   think would be reversed quickly by the Fifth Circuit on the new

15   trial, on the scope of the new trial grounds.  It is a

16   constitutional issue and we think that far from it being clear that

17   there is no overlap, the opposite is the case, it's clear that there

18   is overlap on the issues that would have to be decided at the second

19   trial.

20          THE COURT:  Of course they take the position that it's

21   not, that there is no question, there is no contributory negligence,

22   there is liability under at least two of the theories, and that

23   you're only talking now about damages, meaning the amount of the

24   damages sustained by the plaintiff.

25          MR. BECK:  And, your Honor, they say that and we sort of

1    posed the question in our opening brief, that never got answered,

2    and that is what are you going to ask the jury to decide?  What are

3    you going to tell them was decided?  And just on a practical level,

4    this case is very unusual, it's unique among the cases that we've

5    tried in the MDL, and maybe unique among those that have been tried

6    more broadly, I don't know.

7            But in the usual case we have a heart attack and a theory,

8    so that's the injury, the heart attack; and then we have a causation

9    theory like the imbalance theory that he was in a proclotting state.

10   So if a jury reasonably found Merck liable but went haywire on

11   damages, you could charge that jury that -- I'm sorry, the new jury,

12   you could charge a new jury that it's already been determined that

13   the heart attack that Mr. So and so suffered was caused by Vioxx and

14   that Merck is legally responsible for that.  Now it's your job to

15   decide the amount of damages they suffered.  That would be

16   straightforward.

17           But here we don't have that.  We've got multiple claimed

18   injuries:  They say that Vioxx caused the heart attack that actually

19   took place; they say that Vioxx caused a second heart attack that

20   his own, Mr. Barnett's own doctors say did not take place, but

21   Dr. Zipes says did, even though he didn't include it in his expert

22   report; they say that Vioxx caused acceleration of atherosclerosis

23   and not just the heart attacks through this other mechanism; they

24   say that Vioxx caused athero to accelerate even after stopped taking

25   Vioxx; they say that then that acceleration of athero and occlusion

1    that occurred where the graphs took place, which mainly occurred

2    after he stopped taking Vioxx, was somehow caused by Vioxx and that

3    that led to the stint.

4           So that they have this string of injuries and they say

5    very simply this is not a simple heart attack case, they have all of

6    these other injuries.  And then they have multiple mechanisms that

7    they say accounted for these injuries.

8           So we have the imbalance theory, but that would only

9    relate to the heart attack, it wouldn't relate to acceleration of

10   athero.  Certainly it makes no sense in terms of the claimed

11   injuries that took place months or years after they stopped taking,

12   after Mr. Barnett stopped taking Vioxx.  So the imbalance theory

13   would apply only to the first heart attack, the only heart attack,

14   and none of the other injuries.

15          Dr. Zipes had a blood pressure spike theory, but that also

16   wouldn't apply to all of the injuries because he said that after the

17   first heart attack he took medication, had his blood pressure under

18   control.  And then there was this atherogenesis theory, but that

19   wouldn't even necessarily apply to the first heart attack because

20   the jury could determine that, well, he had plaque, preexisting

21   plaque that ruptured and Vioxx caused an imbalance which caused the

22   heart attack, but it wasn't at, you know, the plaque wasn't caused

23   by Vioxx because it was there already.

24          So what we've got is multiple injuries that they claim

25   here and multiple mechanisms or multiple theories of causation.

1      THE COURT:  But they would argue that the first jury

2    decided all of that and the issue is how much.

3      MR. BECK:  We don't have any idea what the first jury

4    decided.  We don't have any idea whether the first jury said, yes,

5    Vioxx caused that first heart attack and we're mad at Merck, let's

6    give them 50,000,000; or whether they said, no, Vioxx didn't cause

7    that first heart attack, I don't buy the imbalance theory, but I

8    kind of buy the accelerated athero theory so it contributed to the

9    second heart attack.  But no way did it contribute to this stent

10   thing because that's too long after they stopped taking Vioxx.

11      So, your Honor, there is no way to figure out which of the

12   various claimed injuries the jury said did happen.  This is all

13   assuming that they paid any attention to this question at all and

14   didn't just say we're mad at Merck and let's pick a number that'll

15   punish them.

16      But to the extent that they focused on this at all, there

17   is no way in the world for any of us to say what they decided as to

18   each of the claimed injuries and then also whether they decided to

19   take the second heart attack, for example.  There is a real question

20   whether that took place.  Did they decide that took place?  And then

21   if so, did they decide that the various injuries were caused by

22   Vioxx or caused by other things?  All we know is that there was, to

23   the extent they focused on it at all, some injury caused in some way

24   by Vioxx.  We don't know which one or which ones or how it was

25   caused, and we can't figure that out from the verdict form or from

1    the damages verdict.

2           So what's going to happen then is, on a practical level,

3    what would your Honor say to the second jury?  What would your Honor

4    say was decided in the first case?  Would your Honor say that the

5    first jury decided that Vioxx caused the first heart attack in this

6    way but there was, in fact, a second heart attack that's not in the

7    medical records that Vioxx also caused that, and Vioxx caused this

8    athero to accelerate and to the point where years after he stopped

9    using Vioxx the graphs occluded and that's Vioxx's fault and the

10   stent is Vioxx's fault?

11          There's nothing wrong with claiming lots of different

12   injuries, but when you have a case like that and when the damages

13   verdict gets overturned because it was the product of passion and

14   prejudice, then it's inescapable that you end up having to go back

15   and re-try the whole case because which injuries took place and

16   whether they were caused by Vioxx are liability issues, and this

17   jury, unless your Honor is going to decide every single one of them

18   took place and every single one of them was caused by Vioxx, which

19   we think would be clear error and no basis for that, then the jury's

20   going to be asked to decide which of these injuries took place and

21   which of these injuries was caused by Vioxx.

22          And those are liability issues, so they are -- from a

23   practical point of view I don't see what the jury could be asked to

24   do.  But more importantly from a constitutional point of view, I

25   think the case law is pretty clear that your Honor cannot tell the

1   jury those things, that because your Honor cannot, because the jury

2   is going to have to make those decisions, then we've got poor

3   liability issues that are interwoven, inextricably intertwined with

4   damages issues.  And when that happens the law is that we're

5   entitled to a new trial so that we have a single jury deciding these

6   issues and that that's the verdict that's going to stand, not that

7   we have two different juries whose verdicts stand on the same

8   issues.

9         Just before I leave the practicalities for a minute.

10  Another issue that they've raised is, well, let's not waste the

11  court's time and the parties' time and resources on a lengthy

12  re-trial.  Let's conserve resources by having it only on damages.

13  Your Honor, the trial is going to be the same length no matter what.

14  Again, unless your Honor is going to decide that every single one of

15  these injuries, that the other jury necessarily concluded that every

16  single one of the injuries was caused by Vioxx, which does not make

17  sense, then this jury is going to hear all of the causation

18  evidence -- and most of the evidence is causation evidence -- about

19  what mechanism and that sort of thing.  Even on what we knew and

20  when we knew it, they are going to hear all of that as part of the

21  punitive damages assessment.

22        They're probably going to hear more evidence than the last

23  jury heard because this time I'll call experts when I didn't last

24  time, and this time Dr. Zipes probably won't leave in the middle of

25  trial so they'll get to play the depositions of Dr. Graham and

 1   Dr. Topol when they didn't get to do that.  So we're going to have a

 2   longer trial.

 3                THE COURT:  Another $600,000 bill.

 4                MR. BECK:  Right.  Another 12 days in jail I think is how

 5   we put it.

 6                So anyway, your Honor, from a practical point of view, all

 7   the same evidence is going to come in and this jury's going to have

 8   to decide poor liability issues that were presented to the other

 9   jury, and that raises insurmountable Seventh Amendment questions.

10   There is no doubt that the fact of injury and causation are

11   liability issues that were presented to the first jury, and because

12   of the nature of this case of the claimed injuries, multiple

13   injuries, multiple mechanisms, it's not as simple as if we had a

14   liability determination in the Irvin-Plunkett case where he died of

15   a heart attack, a heart attack was caused by Vioxx, now assess

16   damages.  We wouldn't be having this argument because there was just

17   one injury and one theory.

18                So, your Honor, I think that that's the main reason, the

19   overpowering reason why there has to be a unitary re-trial.  We

20   think it's also required because of inconsistent verdicts.  I don't

21   know, your Honor, whether you want to hear from me on that subject

22   as well.  I guess I'd like to make one point on it or a couple of

23   points, but I'll be real brief.

24                It's important to keep in mind that what we've got here is

25   a prescription drug case governed by comment k, so that while there

1    are situations where somebody could be found negligent but not

2    strictly liable, those would be situations where it's strict

3    liability for defective design and the design was okay but there was

4    negligence in some other aspect, that sort of thing are the cases

5    that we've cited.  But with prescription drugs and comment k, the

6    jury is charged, as this one was, that the drug is inherently

7    dangerous but it is not defective unless the warning was inadequate

8    to convey the known or reasonably knowable risks.

9          And if that warning was inadequate, there is no

10   requirement that they prove intent or negligence or anything else,

11   misstatement, just prove that the warning was inadequate and they

12   win.

13         And then built on top of that is a negligence count where

14   they have to prove more than that and a fraud count where they have

15   to prove more than negligence, but it is inconsistent to conclude

16   that there is no strict liability because there was no failure to

17   warn and yet there was somehow a negligent failure to warn, or

18   somehow a deceitful failure to warn or misrepresentation of the

19   risks of the drug.

20         And, I think, your Honor, we all learned from this

21   experience and in the later trials all of the verdict forms reflect

22   that reality.  All of the verdict forms say if you answer no on the

23   question of strict liability, skip to the end and sign the verdict.

24   Because anything else would be an inconsistent verdict.  That was

25   the case here.  And, your Honor, you made one point in your order

1    and that was, well, the court could just as easily say that the

2    verdicts on Counts 2 and 3 make more sense than the verdict on Count

3    1, and therefore disregard the verdict on Count 1.

4              But, your Honor, I don't think that's the court's job.

5    The court's job -- and we are not asking in the new trial motion

6    that you say that the verdict on Count 1 is dispositive and we're

7    entitled to judgment in our favor.  What we're saying is we have

8    inconsistent verdicts and when you have inconsistent verdicts you

9    have a new trial.  So your Honor shouldn't be selecting the verdict

10   that was in favor of us or selecting a verdict that was in favor of

11   the plaintiffs and disregarding the other verdict.  What we've got

12   here is irreconcilably conflicting verdicts, and that's an

13   independent reason to add a new trial, independent of the fact that

14   the second jury's going to be asked to reconsider poor liability

15   rulings.

16             Thank you, your Honor, I think my time is about up.  Do

17   you have any questions I can answer?

18             THE COURT:  No.  Are you coming back for rebuttal?

19             MR. BECK:  Yes.

20             THE COURT:  Okay.  I may save it to then.

21             MR. ROBINSON:  I hope he isn't but I guess he is.

22             THE COURT:  All right.

23             MR. ROBINSON:  Your Honor, would you mind if I use a

24   PowerPoint?

25             THE COURT:  No, go ahead.

1           MR. ROBINSON:  I'll begin by responding here.  You know, I

2    disagree with some of these points that Mr. Beck made, and I'll go

3    into that with my PowerPoint.  But I want to -- Mr. Beck talked

4    about the word practical, i.e. real.  And let's really be real here

5    with what's going on, because I think that's important for this MDL

6    because there is a reality that's involved.  The purpose of doing

7    these bellwether cases was to get a fair valuation on whether

8    plaintiffs can win some cases, how much, whether they're going to

9    lose.  I think that's been accomplished.  I think that probably as

10   you go around the country, it was just a defense verdict yesterday,

11   I won't say there's going to be a defense verdict in California

12   coming up, but I am trying a case in California, a very difficult

13   one coming up, and I think they can, Merck can tell and we can all

14   tell that they won about three out of four of these cases, maybe

15   more, I don't know what the numbers are.  Maybe it's two out of

16   three, I don't know what it is.  I think we have a feel for what the

17   purpose that your Honor set out to accomplish with these bellwether

18   cases.

19           So now let's look at sort of a side effect of these

20   bellwether cases.  We don't try and hurt anybody, but frankly when a

21   plaintiff like Mr. Barnett goes through this trial, and I don't know

22   what the defense spent on these things but I've been reading about

23   millions and I know plaintiffs' very exorbitant, you mentioned

24   600,000, I don't know what the numbers are, but we had many experts

25   we didn't even call that were part of this thing.  So you can

1    imagine what our costs are.  If we are going to re-try this whole

2    thing like counsel wants, it's ridiculous.

3         I just think that there is good reason to sort of stop the

4    bleeding here financially.  Because even if there is a reduced

5    amount for Mr. Barnett, but if we take it all up in costs and

6    expenses, certainly, even if I waive my fee, he is not going to make

7    any money but he is really just being a good citizen by doing a

8    bellwether case for us.

9         THE COURT:  I've got that point.  Help me think this

10   through:  How would you, if you tried it just with damages, how

11   would you try a case like that if you had to try just damages?

12        MR. ROBINSON:  Well, I think that all of the stuff that

13   Mr. Beck talked about it goes to damages.  The court can give a

14   finding on causation, the court can give a finding on what the jury

15   found for punitive damages or the basis for punitives, and then the

16   court can say there's finding of liability, negligence and

17   concealment.  So the jury's told there's all these things and then

18   these issues are flushed out in damages.

19        That's sort of where, how I see it.  I mean, these issues

20   that he raises about possible second heart attack and all, I mean

21   it's clear that if he wants to fight that that's fine.  But the

22   bottom line is that those all go to damages.

23        THE COURT:  He says that the difficulty in this particular

24   case is not the question of amount, but the question of causation

25   and the causation will have to be in essence re-tried and that's

1    where the problem is, there's some overlap and you have to try it

2    all because the causation issue is part of the damages in this case.

3            MR. ROBINSON:  I don't think it is, your Honor.  Even

4    Mr. Beck just admitted that he called it the real heart attack.

5    Well, okay.  There's causation of that heart attack, they didn't

6    even call a cardiologist, so we have that.

7            Frankly, the only other area that I think is pretty clear

8    cut because they didn't call anybody to rebut it, other than

9    cross-examination of Dr. Zipes, was the accelerated plaque.  But it

10   was overwhelming that there was accelerated plaque from both

11   Dr. Popma and Dr. Zipes, so certainly that issue has been, that

12   causation issue has been found.  So I really think that causation

13   has already been found and it's just a matter of the issue of the

14   damages, were the damages excessive.

15           But I actually believe, your Honor, that if you look at

16   the case law -- so what I am saying is this.  All that Mr. Beck is

17   talking about really are issues of damages.

18           But I think that really more importantly, your Honor, if,

19   in fact, there is even a possibility of having to re-try this, I am

20   going to ask the court to really take a look at the Fifth Circuit

21   cases.  Okay.  First of all, granting a remittitur is a federal

22   procedure issue, that's important.  I agree with Mr. Beck that the

23   excessiveness issue is a South Carolina issue, but the court -- but

24   Fifth Circuit and federal law applies.  Now, go on.

25           Here is Judge Beer's decision in Willet, and I can give

```
 1   you these slides, your Honor.  And he cites the Gorsolitz (PHONETIC)
 2   and the Edwards cases to say that if it's sympathy -- that basically
 3   remittitur stands.
 4           Go to the next one.  Caldarera, another case that they
 5   cite.  Your Honor, when you look at the language that they use in
 6   that, "'shock the judicial conscience,' 'so gross or inordinately
 7   large as to be contrary to right reason,' so exaggerated as to
 8   indicate bias or prejudice clearly exceeding that amount that any
 9   reasonable man could feel the claimant is entitled to."
10   "Nonetheless, when a jury's award exceeds the bounds of any
11   reasonable recovery, we must suggest a remittitur ourselves."
12           So here is your language, "The court finds that 50 million
13   compensatory damage award is excessive under any conceivable
14   standard of excessiveness."  That's that language.  Eiland, this
15   case law provides for remittitur, contrary to right reason, entirely
16   disproportionate to injury sustained.  We are getting into verbiage,
17   your Honor; but frankly you didn't say, I looked at the actual, your
18   language and you do cite some law, you cite, quote from the
19   Gasperini and the O'Neal - Bowles South Carolina case and
20   Brunnemann, but you say, "The court finds that 50,000,000
21   compensatory damages award is excessive under any conceivable
22   substantive standard of excessiveness."  That's basically -- when
23   you look at a lot of these cases, your Honor, these are Fifth
24   Circuit cases, they basically say, yes, if it's unreasonably
25   excessive that you still could give a remittitur.
```

1          And frankly, your Honor, the cases that they're citing

2    like the Whitehead case and those other line of cases, if you take a

3    look at them, your Honor, there's always some error by counsel,

4    something that counsel argued in the final argument, something that

5    was extrinsic.  But there's always some error.  And Mr. Beck said no

6    one did anything wrong here.

7          So I really think when you weigh the equities here and you

8    look at the fact that this is a bellwether case, the costs involved

9    in this thing, that really the appropriate thing for this court to

10   do is to give a remittitur and give it to a number -- Mr. Beck's

11   talking about the Fifth Circuit, give it a low number if the

12   court -- whatever the court thinks is fair and reasonable.  And then

13   that's it.  You've already said 1,000,000 you feel is reasonable for

14   punitive, give the compensatory, move that down to a number you

15   think is fair and reasonable.  But don't --

16         We've accomplished the bellwether process here and there

17   is no need to put us through another ordeal with more witnesses and

18   even longer trial, as Mr. Beck wants, and fight all of these things

19   out.  I really think, your Honor, that frankly you didn't say it was

20   passion or prejudice in this order, and I think when you take a look

21   at the cases a lot of them talk about excessiveness, you know,

22   unreasonably excessive, things like that.  But really, your Honor,

23   what really, the cases say --

24         Go to the next one if you can.  When a jury's award

25   exceeds the bounds of any reasonable cover, we suggest a remittitur.

1    That's the Chemical Distributors case, your Honor.

2            Go to the next one.   Brunnemann, because there was no

3    evidence as a result of passion or prejudice, the court held that

4    the appropriate remedy was remittitur.

5            Go on to the next one.   The court did not make a finding

6    that the jury acted out of passion or prejudice when it found the

7    award was excessive, simply recited the South Carolina and Fifth

8    Circuit standards in its order.   The jury was reasonable.   The court

9    found the jury's findings for plaintiff on negligent failure to warn

10   and deceit by concealment were reasonable and that was not troubled

11   by the $1 million punitive damage award in this case.

12           And the cases say, the Fifth Circuit, that Curtis

13   Publishing case, just because the trial court believes the award is

14   excessive, does not mean the result of passion or prejudice

15   sufficient to require a new trial.   Size of award does not by itself

16   demonstrate that it resulted from passion or prejudice.   You know, I

17   just think this, your Honor, that frankly given the fact that it's a

18   bellwether case, the presentations in here, the jury hearing about

19   the money people are getting, et cetera, experts are getting, it was

20   a large verdict.   But the court can take care of that and that's

21   what the court is supposed to do is to remit.

22           And frankly, to be fair, the cases seem to say, look, if

23   the plaintiff doesn't want the remittitur then he has a right to

24   have a new trial on damages.   But the plaintiff's entitled to a

25   remittitur, especially in this situation with the bellwether cases

1    and the costs; because these costs are not realistic, you know, as

2    to what really is going to go on in a normal trial just because

3    these are bellwether cases and all of this money is spent.

4          THE COURT:  Let me ask you this.  What about the

5    defendant's position that there is inconsistent verdicts here and

6    that demands a new trial on everything?  He says that

7    notwithstanding the fact that there is strict liability, negligent

8    failure to warn, deceit by concealment, the causes of action in a

9    drug case, a failure to warn case, those sort of morph into one or

10   at least if the strict liability is out the rest are out also.

11         MR. ROBINSON:  Your Honor, No. 1:  Negligence was a

12   broader theory, it encompassed inadequate warning to treating

13   physicians and it often encompassed negligent testing and

14   inspection.  Strict liability did not encompass inadequate testing,

15   analysis of Merck's conduct or warnings to the medical community.

16          South Carolina law, a jury finding for the manufacturer on

17   strict liability does not exonerate the manufacturer for a claim

18   based on negligence.

19          In Talkington, the plaintiffs tried their case in South

20   Carolina while asserting causes of action for strict liability,

21   design defect and negligent design.  The jury found for the

22   manufacturer on the strict liability claim and against the

23   manufacturer on the negligence cause of action.  The court held:

24   "The jury expressly rejected one theory.  The jury did find,

25   however, that there was negligence."

1            Whether strict liability or negligence afford a plaintiff

2    the broader recovery will depend largely on the scope of evidence

3    admitted by the trial court and the jury instructions given under

4    each theory.  That's important, your Honor.  In their brief all they

5    talk about is the verdict form.  The cases say you've got to look at

6    the charge, and the charge on negligence is different and broader

7    than strict liability.  For one thing they cite this Carlin case

8    from California, California Carlin makes it clear that the failure

9    to warn strict liability is different than the failure to warn

10   negligence, they're two different -- and they say right in Carlin

11   that they're different.

12           Next point.  I just point out that in re:  Propulsid this

13   court found the same thing that they were separate forms.

14           Your Honor, I am just looking at -- I want to show you

15   something.  I don't think even on the verdict form the jury could

16   have found that the warning was adequate but nullified by fraudulent

17   over promotion.  Jury Interrogatory No. 1:  "Do you find that Merck

18   & Company failed to adequately warn Gerald Barnett's treating

19   physicians of a known or reasonably scientifically or medically

20   knowable risk associated with Vioxx?"  And they could have found for

21   defense there.

22           But then on the second point, inadequate warning to the

23   profession may be eroded or even nullified by over promotion of the

24   drug through vigorous sales program which may have the effect of

25   persuading the prescribing physicians to disregard the warnings

```
 1    given.  So manufacturer may prevent a product from being
 2    unreasonably dangerous because of a failure to warn if it places
 3    inadequate warning on the product regarding its use.
 4            I guess going back to that last point, what I'm saying is
 5    there can still be over promotion that negates the adequate warning.
 6            On this thing, comment K or no comment K doesn't -- there
 7    is no South Carolina law that says that -- it's a little hazy as to
 8    whether Brooks says that they even follow comment K, Mr. Levin can
 9    address the comment K issue as to really whether it is South
10    Carolina law.  But what's clear is this, there is no South Carolina
11    law that says that now that we've put comment K in, that eviscerates
12    any difference between strict liability and negligence, it doesn't
13    say that.  And that's the point.  In California, the case they cite,
14    even with -- we follow comment K and they still say there is a
15    difference between the strict liability failure to warn and the
16    negligence failure to warn.
17             Next point.
18            THE COURT:  Am I going to hear from Mr. Levin?
19            MR. LEVIN:  Briefly, sir.
20            THE COURT:  Okay.
21            MR. ROBINSON:  So basically, your Honor, that's sort of
22    it.  In summary I really feel that this is a situation that calls
23    for a combination of remittitur and trial, and/or trial on damages
24    only.
25            THE COURT:  Okay.  Thank you very much.
```

1        MR. LEVIN:  Good morning, your Honor.  My perspective may

2    be slightly different for the PSC than Mr. Robinson's perspective

3    because I didn't pay $600,000 for an expert here.  So I could look

4    at it maybe in a slightly different way because I didn't feel that

5    pain.

6        We support the plaintiff's position that there should be a

7    remittitur.  It's the easiest, cleanest way of resolving the

8    litigation, and we feel especially in an MDL with exemplar trials

9    that it would not be an abuse of discretion if your Honor, who has

10   sat through this trial and four other trials, looked at the picture

11   and saw what really happened here and could resolve the matter by

12   granting a remittitur.

13       The $50,000,000 was shocking to your Honor, may be

14   shocking to others, but it's in keeping, very much in keeping with

15   several verdicts, both in Vioxx where you find 20 million and 27

16   million for a heart attack in New Jersey or a cardiac case in South

17   Carolina where the verdict was 35,000,000.  I don't know the

18   difference between 35 and 50 any more than I would know the

19   difference between 350,000 for a broken leg and 500,000 for a broken

20   leg.

21       And you're the umpire and if you feel that the verdict is

22   excessive, and I know you feel that way and I am accepting that as a

23   given, then you can enter a remittitur.  And this verdict was not

24   the result of passion, may be excessive, but it wasn't the result of

25   passion.  Because what this jury saw in this courtroom was a Cecil

1   B. Demille production of a case with experts coming in from all

2   over, most of them are probably in New Orleans right now spending

3   the money that they earned in this courtroom with the cardiac

4   convention.  So experts coming from all over and this case being

5   tried in the grand fashion.

6        And they're not done.  They knew what it costs, they saw

7   Mr. Barnett and they figured out in their own heads, even though

8   they're not supposed to perhaps, but in their own psyche even though

9   they weren't conscious of what they did, it wasn't passion and

10   prejudice, they looked at what was going on in this courtroom and

11   came back with $50,000,000.  Your Honor can certainly reduce that

12   verdict and Mr. Barnett could have his judgment unimpaired by

13   excessiveness.

14        There is undisputed testimony that he lost ten years of

15   his life.  I don't know what a year's life is worth, it's worth

16   something different to everybody.  How do you give a yard stake for

17   that, is it a million, two million, three million?  Is it

18   10,000,000, 20,000,000 or 30,000,000 under that standard?  And

19   certainly Mr. Robinson, at page 2577 through 79 of his closing

20   address when he spoke to the jury on damages did not do anything to

21   inflame that jury.  He told them that 42 percent of the people that

22   have bypass surgery have ten year diminution in life expectancy.

23        He didn't quantify pain and suffering, I know that in some

24   jurisdictions you can quantify pain and suffering.  In Pennsylvania

25   they would put me in jail if I tried to quantify pain and suffering.

1    We can't give somebody a yardstick.  We can't tell them what we want

2    for pain and suffering.  We can't tell them what we want as a

3    verdict.  We nevertheless get across to the jury what Mr. Robinson

4    did here.  "There were damages for plaintiff's suffering.  The judge

5    will give you instruction on that.  And frankly, I don't ever -- I

6    don't like to tell the jury how much pain and suffering is worth.

7    You've heard jury during this case, you've heard what's going on.  I

8    am asking you to be fair and reasonable to him.  Just do the right

9    thing, you know, that's what you think, that's all I'm asking for."

10    That is not the type of closing address that leads to passion and

11    prejudice.

12    Now, the jury came in with $50,000,000, there can be a

13    remittitur, and I don't see anything that would impair your Honor in

14    granting the remittitur other than Mr. Beck's comment that in South

15    Carolina there can never be a remittitur, despite the fact that they

16    give remittiturs in South Carolina.

17    Now, turning to your Honor's opinion with regard to the

18    new trial.  Nobody wants a new trial because of the practicalities

19    of the expenses involved.  But if your Honor is inclined to go that

20    route and your opinion at least at that point in time indicated that

21    your Honor was inclined to go that route, then the 1931 Gasoline

22    case is no impairment.  It's often cited and never relied upon in

23    our jurisprudence.  The only time that it comes up with real

24    significance is in Rule 23 litigation where you try to have

25    individual issue trials and there's multiple issues.  And you say,

1   well, we'll discharge this jury and go on to another jury.

2          But if Gasoline was the case that the defendants make it

3   to be, there wouldn't be a Rule 42 where you could try separate

4   issues before separate juries.  There wouldn't be Rule 23 where

5   damage actions could be filed.  All certifications of a Rule 23 case

6   recognize the fact that damages may be individual.  Even in the most

7   perfect Rule 23 case, an antitrust case for price fixing or a

8   10(b)(5) case, damages might be individual and they can be tried

9   separately.

10          THE COURT:  How do you answer his argument that you can't,

11   that causation here is involved in the computation of damages and

12   that means that liability has to be re-tried?

13          MR. LEVIN:  By absolutely agreeing with him.  I have to go

14   back to when the world started for Arnold Levin 45 years ago in the

15   practice of law, whether it was blue car versus red car or a

16   longshoreman that slipped on grease on the vessel.  What if a new

17   trial was granted for damages only and it was a general verdict and

18   there was a shoulder injury and an ankle injury and you didn't know

19   whether the ankle injury was a sprain or a break or the shoulder

20   injury was a tear of the rotator cuff or just a sprain.

21   Nevertheless, you had a liability verdict and having a liability

22   verdict, that was it.  Now, you had to try damages.

23          Well, causation is part of the damage phase of every

24   trial.  It's not part of the liability, liability has already been

25   determined.  Will there be an overlap?  Yes.  And the courts say

```
 1   there can be somewhat of an overlap in a new trial, but those issues
 2   are presented to the jury.  And on punitive damages your Honor would
 3   charge the jury that the law of the case is that the defendant's
 4   conduct was willful, wanton, outrageous and that they have to
 5   quantify the punitive damages; and in order to quantify the punitive
 6   damages in the quantum phase of the trial, certainly the defendant's
 7   conduct comes in again.  But it's already been determined that the
 8   defendant's conduct warrants punitive damages.  It only comes in in
 9   the new trial to determine what the quantum is, how much is
10   involved.
11             Now, stepping back and looking where this case is right
12   now, Mr. Robinson took his turn in the barrel by agreeing to bring
13   this case in the Eastern District of Louisiana as a direct action so
14   that your Honor in managing an MDL would have sufficient cases to
15   have exemplar trials so that everybody can get their hands around
16   this situation, and maybe hope is eternal, have some sort of
17   resolution, global resolution.  And he did that.  And everybody
18   agreed to the venue in the Eastern District of Louisiana.  They
19   didn't -- for purposes of trying the case.
20             That stipulation does not avoid at the end of these
21   proceedings entertaining a 1404(a) motion to send the case to a more
22   proper venue, maybe it's South Carolina, maybe somebody will argue
23   South Carolina because that's where the injury occurred, maybe
24   somebody will then argue New Jersey because that's where the
25   defendant's conduct was involved.  But it's certainly those forums
```

```
 1   are more -- they're more applicable to the facts of the case than
 2   this forum other than the fact that the MDL was here and we know
 3   that Lexecon doesn't confer that type of authority on your honor.
 4        So I would suggest that if your Honor were to grant a new
 5   trial, and we support the remittitur, but if your Honor were to
 6   grant a new trial, the case should become part of the MDL and at the
 7   time of remands pursuant to 1407, it should be remanded pursuant to
 8   1404(a) to a jurisdiction where it doesn't take on the aura of the
 9   productions of exemplar trials in this case, which are being done
10   for a reason because everybody is fully committed to that, and we
11   can go back to the norm, the normal binary litigation and try the
12   case properly with an order from your court as to what it is to be
13   tried and a trial plan, have both sides to give you a trial plan.
14        And, your Honor, just like on remand you would file a
15   suggestion of remand to the MDL on a 1407 case and then you would
16   have a report to the transferor judge that's going resolve the case.
17   In this case the 1404(a) judge would get a report from your Honor.
18   Thank you.
19        THE COURT:  Let me hear from Merck.
20        MR. BECK:  On the remittitur point, your Honor,
21   Mr. Robinson said just do what you think is fair and reasonable.
22        THE COURT:  Told that to the jury, didn't he?
23        MR. BECK:  Yes.
24        THE COURT:  Talk to me a little bit more though on the
25   question of the three theories and the interlocking.  They take the
```

1  position both in their brief and somewhat in their argument, though

2  it's more sub silentio in the argument, the deceit by concealment

3  they say is in play in the case and that the jury found that there

4  was deceit by concealment and that focuses on more of the TV ads and

5  advertisement that advocated for Vioxx and that justifies an award.

6  　　　　MR. BECK:  Your Honor, the doctors said they didn't see

7  those.  And your Honor charged the jury that the deceit -- it had to

8  be deception of the doctors.  Your Honor said that, you know, did

9  Merck make material misrepresentations or concealments that mislead

10  the doctors, that the doctors reasonably relied on.  And so in their

11  effort to try to find some way in which the counts can be

12  distinguished, they seized on this over promotion or marketing.  But

13  the doctors said they didn't see those ads.

14  　　　　THE COURT:  But they would say that the reason they didn't

15  see them is because Merck concealed them.

16  　　　　MR. BECK:  The advertisements?

17  　　　　THE COURT:  No, not the advertisements but the

18  information.

19  　　　　MR. BECK:  But the information that they could say, well,

20  Merck concealed, that's information about what?  That's information

21  about the risks of Vioxx and the benefits of Vioxx, the safety of

22  Vioxx.  And that's the core question in the warnings case.  There is

23  no difference there.

24  　　　　If you had a case where you had a direct to consumer claim

25  where the consumer was saying I asked for Vioxx because I saw the

1    ads and I was tricked by the ads, then maybe we have something to

2    talk about.  Well, we don't have that here.

3           And also, your Honor, we still have the problem of the

4    multiple injuries and causation, so let's assume for a moment that

5    there was some kind of over promotion that nullified the warnings.

6    First of all, in the instructions concerning strict liability,

7    that's where your Honor talked about over promotion; so the over

8    promotion is part of a strict liability theory, that's how the jury

9    was charged and it was just another count for which, if they won,

10   they could also claim punitives.  But it was duplicative.

11          But, your Honor, let's assume that there is some kind of

12   over promotion, then we have all of these multiple injuries and

13   which one was caused by what over promotion?  You know, what is it

14   that Merck said or didn't say that caused one or more of these

15   injuries?  Because Merck said different things at different times

16   and Merck had different levels of knowledge at different times.  And

17   so maybe they say, well, it was the three MI's that you didn't

18   include in the VIGOR article.  Well, the first heart attack, the

19   real heart attack had taken place before the VIGOR article came out.

20   So it couldn't have caused that.

21          So in short, your Honor, even if there were some sort of

22   over promotion or concealment, it would have to be linked to a

23   specific injury; and we have here multiple claims of injury over a

24   long period of time, and there is no way, as I said before, to tell

25   which injury or injuries the jury found to have taken place,

1   assuming they cared about that at all.  And there certainly is no

2   way to say that, okay, well, I'm going to pretend that they all were

3   proven and found by the jury, but then they can't -- there's no way

4   to say that they are all linked to some kind of over promotion.  So

5   there are just insurmountable problems with that under the Seventh

6   Amendment, quite apart from the conflicting verdicts.

7          I take it you don't want to hear anymore on remittitur?

8          THE COURT:  No, I'm okay with it.  I understand the

9   argument.

10         MR. BECK:  Okay.  Just one point on Mr. Levin's

11  presentation.  And he said, well, you can always bifurcate, that's

12  done all the time.  But if you read their cases, I can't remember

13  now, but I think it's around page 20 or 21 of the PSC's amicus

14  brief, there is a long block quote and what it says is, yeah, you

15  can bifurcate, as long as you cleave off causation and present it

16  only to the second jury.  You can't have both juries deciding

17  causation.  You can't present causation to the first jury as part of

18  liability and then also present it to the second jury as part of

19  damages.

20          You can't bifurcate that way and the cases are very clear

21  that, okay.  If you're going to have an issue it can be whether

22  someone was negligent but causation won't be decided until the

23  second stage.

24          But here that issue wasn't presented to the first jury,

25  and we have Mr. Levin saying Mr. Beck is right, it would have to be

1   decided by the second jury and we have Mr. Robinson saying Mr. Beck

2   is wrong, the first jury already decided that.  In a sense they're

3   both right.  The first jury did decide it and the second jury would

4   have to decide it and that's why it's impermissible under the

5   Seventh Amendment.

6          THE COURT:  All right.  Thank you very much.  I've got the

7   material, I will look it over again, and you will be hearing from me

8   shortly.  Thank you very much.  The court will stand in recess.

9          THE DEPUTY CLERK:  Everyone rise.

10      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

11

12                          * * * * * *

13

14

15                    REPORTER'S CERTIFICATE

16

17      I, Karen A. Ibos, CCR, Official Court Reporter, United States

18  District Court, Eastern District of Louisiana, do hereby certify

19  that the foregoing is a true and correct transcript, to the best of

20  my ability and understanding, from the record of the proceedings in

21  the above-entitled and numbered matter.

22

23                              _____

24                              Karen A. Ibos, CCR, RPR, CRR

25                              Official Court Reporter