1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5

6  IN RE:  VIOXX PRODUCTS        *    Docket MDL 1657-L
       LIABILITY LITIGATION       *
                                  *    November 17, 2006, 8:30 a.m.
7  * * * * * * * * * * * * * * * *

8

9

10                    PROCEEDINGS BEFORE THE
                     HONORABLE ELDON E. FALLON
11               UNITED STATES DISTRICT JUDGE

12
   APPEARANCES:
13

14  For the Plaintiffs:          Levin Fishbein Sedran & Berman
                                 BY:  ARNOLD LEVIN, ESQ.
15                               510 Walnut Street, Suite 500
                                 Philadelphia, Pennsylvania 19106
16

17  For the Defendant:           O'Melveny & Myers
                                 BY:  JOHN H. BEISNER, ESQ.
18                               1625 Eye Street, NW
                                 Washington, DC 20006
19

20  Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room B-406
21                               New Orleans, Louisiana 70130
                                 (504) 589-7778
22

23

24
   Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

1                          <u>**PROCEEDINGS**</u>

2                        **(November 17, 2006)**

3            **THE DEPUTY CLERK:**  Everyone rise.

4            **THE COURT:**  Be seated, please.  Good morning, Ladies

5    and Gentlemen.

6            **THE DEPUTY CLERK:**  MDL 1657, In Re: Vioxx.

7            **THE COURT:**  Counsel make their appearances for the

8    record.

9            **MR. LEVIN:**  Arnold Levin for the plaintiff.

10   Fred Longer, Lisa Dagostino, Elizabeth Cabraser, Russ Herman,

11   Kathryn Snapka, Chris Seeger, and Matt Morland.  I have all the

12   troops with me.

13           **MR. BEISNER:**  Good morning, Your Honor.  For the

14   defense, John Beisner.  I have a shorter list.  With me is

15   Jessica Miller and Andrew Mendez.

16           **THE COURT:**  The matter is before the Court on a

17   motion.  On January 24, 2006, the FDA issued some new labeling

18   regulations that became effective June 30, 2006.  In the

19   preamble of the 2006 final ruling, the FDA in effect says that

20   the requirements of the FDA are both minimum and maximum, both

21   the floor and ceiling.  The issue that is posed is whether

22   their approval, in effect, preempts state tort law claims; that

23   is to say, when the FDA approves a drug, whether there's any

24   claim that can be made against the manufacturer who has the

25   FDA's approval for any claims for failure to warn or, for that

1   matter, any claims of tort law.  Here we are focused primarily
2   on the failure-to-warn claims.
3                    The Northern District of California in
4   <u>Bextra and Celebrex</u>, Judge Breyer -- although it's factually
5   pregnant -- seems to say there is some preemption available.
6   <u>Colacicco v. Apotex</u>, 432 F.Supp.2d 514, Judge Baylson's case,
7   is rather exhaustive in his approach to it.  He likewise finds
8   that it's preempted.  Another Eastern District of Pennsylvania
9   case, <u>Perry v. Norvatis</u>, Judge Dalzell also writes on this
10  issue.  He feels that it is not preempted.  There's a Vermont
11  Supreme Court case that I think was descriptive on the issue,
12  too, <u>Levine v. Wyeth</u>.  Judge Calabresi in the Second Circuit in
13  <u>Desiano v. Warner-Lambert</u> touched, also, on this issue.  As I
14  read the case, he feels that it is not preempted.
15                   So the cases do go in both directions.  I have
16  looked to the literature and I really haven't found any
17  Law Review articles that discuss this matter, but I'm
18  interested in hearing the parties' views.  I'll hear from the
19  plaintiff, if you want to present, or the defendant.
20          **MR. LEVIN:**  For once it's not my motion, Your Honor.
21  It's his motion.
22          **THE COURT:**  Let me hear from you, John.
23          **MR. BEISNER:**  Happy to proceed, Your Honor.
24          **THE COURT:**  Sure.
25          **MR. BEISNER:**  Well, Your Honor, as you noted, we are

1    talking this morning about two <u>Vioxx</u> cases.  I want to be very

2    clear that we are talking about two particular cases and the

3    facts of those particular cases, one brought by Lene Arnold and

4    the other by Joe Gomez.  Both plaintiffs allege suffering heart

5    attacks after taking Vioxx and both are suing for basically a

6    failure-to-warn theory, which is the only theory that's really

7    available to them under their respective state laws.  So we are

8    not talking about any other product liability theory in these

9    particular two cases.

10            **THE COURT:**  That's a similar theory of the entire

11   hundred thousand of them, isn't it?

12            **MR. BEISNER:**  Well, Your Honor, there would be some

13   cases -- fundamentally, that's right.  There would be some

14   states, though, there would be alternative theories that may be

15   available as a matter of law, but these are two states where

16   that's all we are talking about.

17            **THE COURT:**  Right.

18            **MR. BEISNER:**  I think what's most important about

19   these two claims, which do distinguish them from at least some

20   of the claims in the litigation, is that they started taking

21   Vioxx after Merck issued what has become known as the

22   *post-VIGOR label*.

23            **THE COURT:**  2002.

24            **MR. BEISNER:**  That's correct.  It's a warning label

25   incorporating information about cardiovascular risks based on

1   the VIGOR study.  As the Court knows from trial testimony in

2   the trials heard here, the VIGOR label was approved by the FDA

3   after review not only by its own scientists, but by an outside

4   advisory committee that was convened by the FDA to consider

5   this issue.  Thus, the two plaintiffs here are really directly

6   challenging a label that was approved by the FDA.  That's a

7   distinction in this case from some of the other precedents that

8   you cited where there are references to new information, to new

9   indications, to new theories.  They're going directly after a

10  label that the FDA approved and are fundamentally saying it was

11  insufficient, even as a matter of state law, even though the

12  FDA approved it.

13          The FDA has explicitly determined, we believe,

14  that such claims are preempted.  According to the recent brief

15  that the FDA filed in the Perry case, any claim premised on the

16  defendant's failure to provide additional warnings about a drug

17  as of the date of the drug's approval, premised on scientific

18  information known to and considered by the FDA as part of the

19  approval process, is preempted.  That's really what we are

20  talking about here, were the right disclosures made about the

21  VIGOR study even though the FDA reviewed it and approved the

22  label with its specific information included in the label about

23  the VIGOR study.

24          There's really no doubt I don't think -- I

25  didn't see in the briefing any debate about the FDA's intent to

1   preempt in this circumstance.  I think, as Your Honor was

2   suggesting earlier, the real question before the Court is the

3   following, and that is:  Does the FDA have the authority to do

4   this?  Put another way:  Can the FDA decide that its

5   regulations preempt state law?  We contend, Your Honor, that

6   the answer to that question is "Yes."  We believe the

7   Supreme Court has said so, that the Fifth Circuit has said so,

8   and it's really premised on four fundamental principles that I

9   want to review quickly, if I could, Your Honor.

10              **THE COURT:**  Okay.  Before you get there, let me just

11  talk with you first about the first part of the argument.  The

12  plaintiffs might argue that they are not questioning

13  necessarily the label.  What they are taking issue with is that

14  Merck advocated and pushed the FDA away from placing the

15  information in the warning part and convinced the FDA with

16  whatever means -- logic, information, or lack thereof -- to

17  place it in another portion of the label than the warnings

18  section; and if they did that and did it intentionally that

19  they then assumed the responsibility of the *Dear Doctor* letters

20  or visits to physicians to make them aware of what the current

21  situation was because they knew that it was in the precaution

22  label portion rather than the warning portion; and either at

23  that time or after that time they then, because of their

24  actions in getting it placed in the precaution section, had

25  some increased responsibility to alert the people.  They are

1    not questioning the label.  They are questioning Merck's

2    conduct, not the label itself.  That's what they would say.

3            MR. BEISNER:  Well, Your Honor, I think that still is

4    a challenge to the label.  They're saying that inadequate

5    warning was provided.  The FDA after the debate, everyone

6    providing input on the subject, said, "This is what you need to

7    tell the public."  That's its obligation under the statute it

8    operates under.  This is adequate.

9            It's still an argument, Your Honor, that more

10   should have been said, something different should have been

11   said.  It's a challenge to the adequacy of what the FDA said in

12   the circumstance.  So, to be sure, they would say, "Yes, you

13   should have done more," but that's the argument.  The FDA said

14   this disclosure is adequate, and they are challenging that.  I

15   think that frames the argument and I think that's fundamentally

16   what we are saying.

17           THE COURT:  Let's move to your argument.

18           MR. BEISNER:  Just briefly, Your Honor, I wanted to

19   go through four principles here that I think are really the key

20   of this.  The first is -- and there is some debate about this

21   in the briefing -- that federal agencies do have the authority

22   to preempt state law, that that authority is not limited to

23   Congress.  We think the key case on this, Your Honor, is

24   Hillsborough County, which is an FDA case from 1985.  I think

25   the Supreme Court there says it all: "We have held repeatedly

1   that state laws can be preempted by federal regulations as well

2   as by federal statutes."  Justice Breyer alludes to that

3   circumstance in the <u>Medtronic</u> case in his concurring opinion,

4   explaining why that's the case, saying that the FDA has a

5   special understanding of the likely impact of both state and

6   federal requirements, they can translate the understandings

7   into particularized preemptive intentions in its rules and

8   regulations.  I don't think there's a reasonable debate that an

9   agency is able to preempt.  I know we have some further steps

10  to take.

11          **THE COURT:**  Well, the cases that you cite generally

12  explain the regulations.  They interpret the regulations.  The

13  courts say, "Well, they passed the regulations, so they should

14  know what they meant," as opposed to going farther.

15          **MR. BEISNER:**  That's another set of cases I want to

16  get to, but the fundamental proposition that the FDA at least

17  theoretically has the authority to preempt is there.  One point

18  I want to make, Your Honor, that there's a little bit of

19  confusion about in the briefing, I think, is the kind of

20  preemption we are talking about here.  We are not talking about

21  occupation in the field.  We are not saying that the fact that

22  the FDA is there wipes out all tort litigation regarding

23  pharmaceutical products.  I don't think there's any argument

24  like that being made.  We are talking about conflict preemption

25  and the specific question about whether the labeling authority

1    of the agency is preemptive in some circumstances.

2              **THE COURT:**  Of course, they take issue with that,

3    don't they?  They say it's more than content.  They say it's

4    field preemption.

5              **MR. BEISNER:**  Right, but all we are arguing here for,

6    Your Honor, is conflict.  The second legal principle is whether

7    preemptive power exists without explicit congressional

8    authorization.  There's a suggestion in the briefing that since

9    there's not a line in the statute that says the FDA may

10   preempt, does that mean the agency doesn't have that authority.

11   Again, the power to preempt state laws is noted in the

12   De La Questa case that we have cited.  It doesn't depend on

13   expressed congressional authorization; it's inherent.  As the

14   Fifth Circuit noted in the Vernon Home Health case, it doesn't

15   depend on express congressional authorization to displace state

16   law.  There's an inherent authority to do that.  Judge Breyer

17   also notes that in the decision you were noting in the Bextra

18   and Celebrex litigation.

19              The third principle that I just wanted to note

20   is that an agency exercising preemptive authority can declare

21   preemption in numerous ways and can do so through the use of a

22   preamble.  Again, the Hillsborough County case, a Supreme Court

23   case listing the ways in which an agency may exercise and

24   announce its preemptive decision, specifically lists preambles,

25   draws a big circle around it, this is the way an agency can do

1    this.   Justice Breyer in the Medtronic case notes that again,

2    that there are various ways that the agency can declare the

3    preemptive effect of a regulatory regime.

4              The fourth point that I wanted to make and the

5    fourth legal premise that I think our argument is really based

6    on is -- and I think this is what you were alluding to,

7    Your Honor -- that an agency's interpretation of its own

8    regulations should receive substantial deference.  As the

9    Belt v. EmCare case a couple months ago out of the

10   Fifth Circuit says, "A court must give controlling deference to

11   an agency's construction of the meaning of its own regulations,

12   including when that construction is advanced in a regulatory

13   preamble," which was the situation in that case.  I should note

14   that we are talking here about Auer deference, that an agency's

15   interpretation of its regulations should be controlling unless

16   plainly erroneous or inconsistent with the regulation.

17              So I think what we have here are four

18   fundamental principles that combine to indicate preemption

19   should be available here.  These are Supreme Court and

20   Fifth Circuit cases announcing these general principles.  I

21   think it boils down to this.  Congress gave the FDA broad

22   authority to establish federal regulations regarding the

23   approval, labeling, and distribution of pharmaceutical products

24   and that includes, under these cases, the ability in the

25   appropriate circumstance to declare the regulations to have

11

1    preemptive effect.

2              The FDA did precisely that here in the preamble

3    to the labeling regulations that we are all focusing on.  I

4    think it's important to understand the rationale of the FDA

5    doing that.  I realize there are a number of people in this

6    courtroom who may disagree with that policy, but the FDA had

7    the authority to make it and it is not an irrational policy.

8              **THE COURT:**  How do you see it going back?  They

9    announce it in 2006 and they say that it's good for 1906.

10             **MR. BEISNER:**  I assume you're referring to the

11   retroactive arguments.  It's an interpretation of the

12   regulatory regime.  They are declaring it at that point, but

13   what they are declaring is the way they believe their

14   regulations ought to be interpreted.  No matter which way you

15   look at it, if you say, "Well, that was a change," the case law

16   is clear that an agency has the right, if there's a rational

17   basis for doing so, to make a change.  I think the better view

18   of what the agency did was to say that "This is how our

19   regulation ought to be interpreted.  This is not a change.

20   This is the way we view this."

21             I think the rationale for this is important in

22   the context of the sort of mass tort litigation that we are

23   seeing.  The FDA views itself as being charged with putting

24   with prescription medicines labeling that allows physicians to

25   make a rational determination about whether this product ought

 1   to be prescribed in a particular instance.  They want a

 2   communication that is meaningful to the physician and that is

 3   the intent.   Now, there can be debate about how successful the

 4   FDA is at doing that, whether they are making the right calls

 5   on this, but Congress has charged them with doing that until

 6   Congress changes the law.   They are the ones in charge of doing

 7   that.

 8              Now, the problem that the FDA identified in the

 9   explanation of its preamble is that you have another force at

10   work with respect to the warnings that manufacturers put on

11   products and those are jury trials in product liability cases.

12   If you go out and buy a ladder at the hardware store today, you

13   will have great visibility of what I'm talking about because

14   you can't see the ladder for all the warning labels on it.  The

15   concern I think that the FDA had -- not I think, it's the

16   concern they said they had -- is that you're going to end up

17   with product inserts, with warnings on these products that are

18   not going to be meaningful for physicians anymore.  If the

19   manufacturers are basically forced to say, "Okay.  What is it

20   we want to be able to put before a jury in the case," you're

21   going to drive everything to a label that basically lists every

22   possible indication you could ever get from any product.

23          **THE COURT:**  If you warn everything, you warn nothing

24   is what you're saying.

25          **MR. BEISNER:**  Yes.  You go before the jury at a

1    trial, they're not going to look at the overall label.  What

2    they are going to want to know is is *heart attack* in the list

3    or is some other ailment in the list that is an indication that

4    you wanted to warn about.  So the default mode is basically put

5    the same label on every product, think of every possible

6    consequence that could flow from taking a prescription drug and

7    you put it on there.  The FDA at that point has a label that is

8    written for juries and is not meaningful for physicians, who

9    are trying to go through a rational process of prescribing the

10   drug.

11              Now, again, we could have a policy debate for

12   days about whether that's the right approach, but this is what

13   Congress has determined.  They have charged the agency with

14   doing it.  That's the call the agency has made.  That's the

15   regime that we have got to live with in terms of making

16   decisions in this context.

17              **THE COURT:**  How do you deal with the argument that

18   states are charged with protecting the health and welfare of

19   their citizens and they pass laws and the courts give forth

20   opinions stating the law in that area, which protects the

21   health and welfare of the citizens, and if you take those laws

22   away from them what are they left with?  How do they get

23   recourse?

24              Let's suppose the label is improper either

25   through fraud or whatever.  I'm not saying it's in this case,

1   but in any case it's improper.  What does the litigant do to

2   seek a remedy?  They can't sue in their state.  They can't use

3   their state law.  They can't sue the FDA.  Fraud on the FDA is

4   preempted.  They don't have that forum.  What do they do?

5           **MR. BEISNER:**  I think the recourse is with the FDA,

6   going to the FDA.  If there is a product or a pattern that is

7   developing out there where different information needs to be

8   conveyed about the product, that is where they need to go.

9           **THE COURT:**  You need enough of them, if they are

10  injured, they go to their congressman and say they are not

11  going to vote for you?

12          **MR. BEISNER:**  Or to the agency itself.  The problem

13  you have, Your Honor, is that it's an area where somebody has

14  got to be in charge or you get the result I was just talking

15  about.  From the public standpoint, in terms of injured

16  parties, if you have a system of information about the product

17  that is wholly uninformative, you also have a public safety

18  issue because then people are being prescribed medicines that

19  shouldn't be prescribed for them because the doctor can't get

20  access to the information he or she needs in order to make a

21  rational determination.

22              There's no wholly satisfactory answer on this,

23  but that is the dilemma that we face in this very complicated

24  area where, more so than any other product, you have to have an

25  intermediary who is weighing these risks, who is helping a

1   patient make a determination about what products should be used

2   or shouldn't be used in their particular circumstances, and a

3   need for substantial information in order to do that.  It's an

4   instance where the determination has been made that the

5   Supremacy Clause should be exercised.  I think there's an

6   awareness that that is an exercise that should be used

7   sparingly, but this is a circumstance where the FDA, charged

8   with this authority, has made that determination.

9          THE COURT:  I think the argument would be stronger if

10  the concept was that they become federal cases rather than

11  state cases or that they must be filed in federal court.  The

12  difficulty is, when you push that preemption argument to the

13  extreme, you in effect take the remedy away, but nothing is

14  placed in its place.  That's the big issue that's difficult to

15  deal with because there's a remedy there, clearly, but for the

16  preemption.  It's preempted, but it's really squashed in its

17  preemption.  That's where the difficulty lies, I think, in the

18  situation.

19         MR. BEISNER:  Maybe I'm misunderstanding.  The mere

20  movement of those cases to federal court I don't think, from a

21  policy standpoint, would remedy that issue because you would

22  still be saying to juries, "You define what these labels should

23  say."

24         THE COURT:  I see that argument.

25         MR. BEISNER:  I think that's the concern of it.  You

1  might well argue that there's need for a federal statutory

2  regime that would lay out some approach to remedies, which has

3  been discussed, but that's a determination that Congress would

4  need to make on this issue.

5         THE COURT:  Or presumptive effect or something --

6         MR. BEISNER:  Yes.

7         THE COURT:  -- or whatever.

8         MR. BEISNER:  But it has not chosen to do so.  That

9  is something that is not within the FDA's authority.  They can

10  only make a determination about who is going to be boss about

11  the content of the label.  If, in light of that, Congress

12  wishes to create a federal regime or it creates a federal cause

13  of action with certain definitions that pay deference to the

14  FDA's process, that's Congress' prerogative, but they have not

15  done so.

16         THE COURT:  As you see it with your argument, there's

17  no tort remedy for pharmaceuticals or just --

18         MR. BEISNER:  Your Honor, that's not what I'm saying.

19  Ours is a narrow argument in this case.

20         THE COURT:  Why wouldn't it apply across the board?

21         MR. BEISNER:  Well, Your Honor, I think the FDA in

22  cases has indicated that it wouldn't apply in all cases.  We

23  have a case here where we have a label on the product that the

24  FDA approved with respect to the issues that plaintiffs are

25  saying there wasn't adequate disclosure about.

1    THE COURT:  Both the wording and the placing.

2    MR. BEISNER:  Yes.  If you had a case, Your Honor,

3  where there's a new indication regarding a product that the FDA

4  never looked at with respect to the label, the FDA hasn't ruled

5  upon, you may well have a different result in the case.  This

6  is not wholly preemptive.  That's why I'm stressing,

7  Your Honor, this is not a field preemption argument.  I think

8  the question before the Court and what distinguishes this case

9  from some of the others that are out there is this is sort of

10  the strongest preemption case because the FDA says this label

11  is okay.

12    THE COURT:  How do you feel about previous to 2002?

13    MR. BEISNER:  Well, we haven't debated that,

14  Your Honor, and I'm not going to speak to that.  We

15  intentionally, Your Honor -- no mystery about this -- picked

16  this category of case because it is, we believe, the strongest

17  argument.

18    THE COURT:  I see your argument.  I appreciate it.

19  Let me hear from the plaintiffs, and I'll give you an

20  opportunity to rebut.

21    The FDA takes a strong position on this.

22    MR. LEVIN:  So do the plaintiffs, Your Honor.

23    THE COURT:  They say FDA interprets the act to

24  establish both a floor and ceiling and they apparently were

25  satisfied, after they were educated by Merck, that the material

1   should be placed in the precautions section and not in the

2   warnings section.

3           **MR. LEVIN:**  Not exactly, Your Honor.  They weren't

4   satisfied.  They were dissatisfied.  Merck called them

5   "bastards."  It sounds like I'm back in high school with locker

6   room chatter, but Merck called them "bastards."  They didn't

7   tell Merck what to put on the label.  Merck told them what to

8   put on the label.  At that point the FDA had two options:  To

9   accede to Dr. Scolnick's pressure; or to invoke the nuclear

10  option and take the drug off the market.

11          Well, they weren't going to take the drug off

12  the market because at least at that point they thought the drug

13  was efficacious, but there was a reason why they acceded to

14  Merck's request, and that reason was that there were state law

15  remedies to cover the victims if, indeed, that product was

16  unsafe and improperly prescribed.  Over and over again, in our

17  system of jurisprudence, we see that there's a safety net and

18  the safety net is state remedies, which to me is rather

19  strange.

20          I once said this to Your Honor in <u>Propulsid</u>:  A

21  liberal kid from south Philadelphia in a working-class family,

22  union family, 50 years later finds himself in a federal court

23  in Louisiana arguing for states' rights, but in essence that's

24  what I'm arguing for now.  What Merck and the FDA recently

25  attempted to do is to do an end run on federalism.  Their

 1   conduct is violative of a presidential executive order in the
 2   year 2000.
 3                   They have tried for years to accomplish this
 4   result -- it's what they call tort reform, but to accomplish
 5   this result.  They have been rejected by the courts, they have
 6   been rejected by the legislature, and they found in the year
 7   2000 -- the latter part of the year because in the first part
 8   of the year the FDA had a different view.  They found in the
 9   latter part of 2000 a favorable administrative agency that
10   could accomplish for them what they failed to accomplish since
11   1906, when they started all of this.  Suddenly there was an
12   epiphany in the year 2000, the last part of 2000, that "Wait a
13   minute.  This is preempted."  Make no mistake, Your Honor.
14   This is field preemption.  It's not conflict preemption.  It's
15   not based on frustration of purpose.  It's field preemption.
16                   What they determined to do -- and Mr. Beisner
17   wouldn't answer the question -- is pick this little bit about
18   the label change -- which Ms. Dagostino will tell you what the
19   agency knew and what they didn't know about that after I
20   present my argument -- and pick this and get their foot in the
21   door so they can open it wide open and use their theory of
22   ladder warnings onto drugs.  It makes no sense.
23                   Your Honor indicated that they could have
24   brought the cases to federal court if they wanted to.  The
25   legislature has done that.  They did that in nuclear power with

1  the Price-Anderson Act.  They didn't like what was happening in
2  the states and they amended the Price-Anderson Act, invoked
3  federal jurisdiction, all existing cases were removed, and
4  there was a federal body of law which was defined as the state
5  law of the locus of the tort.  Congress knows how to accomplish
6  what it wants.

7          Now, we did not structure this summary judgment
8  motion.  This summary judgment motion was structured by Merck
9  and that's why we filed the 56(f) affidavit.  We thought that,
10  as a matter of law, they just can't do this, but they said,
11  "Well, Merck gave the FDA everything they needed.  The FDA
12  negotiated with Merck.  Merck negotiated with the FDA.  After
13  the rule was promulgated, we spoke to Governor Barbour and we
14  spoke to Governor Daniels and they said it was okay.  We looked
15  to the states."  They didn't tell anybody they were doing this.
16  They didn't tell anybody that Governor Barbour, besides being
17  the governor of Mississippi and a former chairman of a
18  political party, was also a lobbyist for the drug companies or
19  that Governor Daniels was the CEO for Eli Lily in Indiana.

20          What they have done is they have attempted to
21  stack the deck to accomplish what they wanted to accomplish.
22  They have never had a problem with preemption until the year
23  2000.  Merck has been defending suits since -- we found the
24  first one in 1968.  It's in the brief.  They're alive.  They're
25  doing well.  Wyeth, I don't know whether before -- since this

1   was the law as it always was and has nothing to do with the

2   preamble and the new rule, for the life of me I can't imagine

3   why Wyeth paid $22 billion in the <u>Diet Drug</u> litigation.  I

4   don't think their counsel committed malpractice.  I just think

5   they didn't have an FDA administration that was willing to

6   stand up and say what this FDA has done.  I think it's

7   disgraceful not only how they did it, but what they said.  For

8   70 years, Your Honor, this has never been part of our

9   jurisprudence.

10              **THE COURT:**  What's the situation with <u>Colacicco</u>?  Is

11  that on appeal now?

12              **MR. LEVIN:**  Yes.  <u>Colacicco</u> is in the Third Circuit,

13  Your Honor.  The plaintiffs have presented their brief.  Our

14  office filed an amicus brief on behalf of concerned scientists.

15  It's up there.

16              There is another case that went the other way by

17  Judge Simandle across the river in Camden.  That's up there.

18  It seems like an awful lot of this is going on in and about the

19  Philadelphia area and I have nothing to do with it, Your Honor.

20              There's another case, the <u>Perry</u> case with

21  Judge Dalzell.  That is not up there because Judge Dalzell went

22  the other way with a caveat that I'll get to.  Chief Judge

23  Bartle in the Eastern District of Pennsylvania had ruled in the

24  <u>Mingus</u> case, in a Fen-Phen case, that there wasn't preemption.

25  In fact, it was never raised by Wyeth at the time because the

1    epiphany had not occurred.  But when <u>Colacicco</u> came out,

2    Wyeth's counsel quickly went to the chief judge of the Eastern

3    District of Pennsylvania to vacate his opinion in <u>Mingus</u> and he

4    refused, confirming what he said the first time.  I think

5    <u>Colacicco</u> stands alone, really, and has created all this

6    excitement and encouragement in the pharmaceutical industry.

7            **THE COURT:**  How do you read Judge Breyer's opinion in

8    <u>Bextra</u>?

9            **MR. LEVIN:**  I read Judge Breyer as being flat out

10   wrong, Your Honor.  I'm told that there's still proceedings

11   going on in California involving that same issue, but that

12   opinion is just wrong.  Judge Breyer gave too much deference to

13   the FDA.  In fact, he gave all of the deference to the FDA.

14   <u>Auer</u> doesn't say that.  Unquoted up there is <u>Skidmore</u> and <u>Mead</u>,

15   which says you weigh the difference.  Breyer did not do that.

16   Judge Baylson in <u>Colacicco</u> did not do that.

17            Other judges have done that, especially in

18   circumstances where the agency changes their position or where

19   there's -- in this case the legislature did not give the agency

20   the ability to preempt state causes of action.  There are cases

21   where you can look through the legislative history, you can see

22   it.  There are cases where even an agency has a general grand

23   plan of what they are doing like the <u>Geier</u> case with the auto

24   safety issues.  This is not here.  In fact, in 1968, I believe

25   it was, with regard to the amendments to the FDCA, the

1    legislature said, "We're not going to create a federal cause of
2    action because there is in existence state causes of action."
3                     Justice O'Connor, Justice Scalia, and
4    Justice Thomas -- not the most liberal group on the
5    Supreme Court -- in Lohr v. Medtronic stated, "Preemption is
6    not for the agency.  It's for the courts.  This is our role,"
7    whether or not preemption, and they found comfort in citing the
8    Smiley case for that reason, a Supreme Court case.
9                     What Merck has done is they have put the rabbit
10   in the hat and dragged a red herring across and now attack it
11   because that's the law.  It isn't the law and it's never been
12   the law.  There's a host of cases.  Your Honor's comments in
13   this very litigation that the FDA regs, like other regs that we
14   have dealt with, is a floor, not a ceiling.  It's a beginning
15   point.  Courts have said that all along.
16                     Now, Merck doesn't know how to treat the new
17   rule or the preamble.  They cite it as authority and then when
18   you say, "Well, is it retroactive," they say, "Well, it's not
19   retroactive.  It's like the Supreme Court established in
20   Marbury v. Madison for agencies, 'What we are saying was always
21   the law,'" well, it wasn't always the law.  In the Buckman
22   case, which only ruled -- and I know because our office lost
23   that case -- that fraud on the FDA was not a cause of action,
24   the United States took the position at oral argument -- it's in
25   the opinion -- and filed an amicus brief when they said to the

1   court, "We are only saying that fraud on the FDA is not a cause

2   of action.  We are not saying that failure-to-warn cases are

3   preempted."

4           That very same year -- change in the

5   administration -- we now have the FDA saying what the FDA is

6   saying.  Well, you know, I'm not being pejorative.

7   Administrations change and they have different views and they

8   get elected for different views, but there is consistency in

9   the law.  At least in federal courts, where federal judges have

10  lifetime tenure, the rules of the game don't change every four

11  years, and that's what we have here.  The rules of the game

12  have changed because of a new FDA administration.

13          Most courts that have heard this case and dealt

14  with this issue have refused to preempt drug lawsuits.  On

15  page 30 of our brief, there's a host of cases.  Then Your Honor

16  mentioned all the recent cases from the Supreme Court of

17  Vermont, Second Circuit, _Desiano_, the hormone therapy cases in

18  the Common Pleas Court of Philadelphia, the _Perry_ case in the

19  Eastern District of Pennsylvania -- this is why you keep

20  getting all these supplemental submissions.  We can't keep up

21  with the courts that are rejecting what Merck wants to do here,

22  but we keep sending them to you.

23          **THE COURT:**  You said somebody else has another

24  portion of your argument?

25          **MR. LEVIN:**  Yes.  I think I got the message.

1          **THE COURT:**  I understand your position.

2          **MR. LEVIN:**  I just want to deal with the change, the

3    rule.

4          **THE COURT:**  Okay.

5          **MR. LEVIN:**  What they did here, Your Honor -- I don't

6    use the word *Outrageous* too many times, not at least with a

7    capital "O," but they published in the year 2000, I believe,

8    the new rule.  They said in that new rule that we are not

9    dealing with preemption, and then it comes out in 2006 and

10   there's a preamble.  The preamble has no legal significance.

11   It's only an expression of the agency.  It's like an amicus

12   brief, and it says there is preemption.

13          They never opened up the door for anybody to

14   comment on it other than a chosen few like Governor Haley

15   Barbour and Governor Daniels.  Never opened up the door.  In

16   fact, they promulgated the new rule, and after they promulgated

17   suddenly they said they talked to Governor Barbour and

18   Governor Daniels and put that in the record.  No statement

19   whatsoever.  That's a good reason why we have a 56(f) affidavit

20   here.

21          Judge Sentelle looked at a situation like that

22   in the Court of Appeals for the District of Columbia and he

23   said -- these are his words.  They could have been mine, but

24   they are his words.  "We are not going to tolerate a switchover

25   like that."  That's what's happened here, Your Honor.  Others

1  will speak.  Even Mr. Herman has something to say, and it's

2  very significant.

3          **THE COURT:**  Let me hear it.  Anybody else --

4          **MS. DAGOSTINO:**  Lisa Dagostino.  I had prepared a

5  little bit longer speech, but from your questions it's fairly

6  clear you understood where I would be going with respect to the

7  difference between the placement of the CV language in the

8  label as well as the content, so I'm just going to narrow it

9  down to one specific point.  While counsel has made the point

10 repeatedly that, "Well, the VIGOR results were in the label,"

11 it's not just a question of the placement; it's a question of

12 the content.  What they did say was extremely narrow and they

13 limited their caution to only those patients who had a history

14 of ischemic heart disease.  That does not apply to either of

15 the plaintiffs at issue.

16          -- neither of these plaintiffs -- to the best we

17 know with where discovery is at this point -- had a history of

18 ischemic heart disease.  That caution, that language, doesn't

19 even apply to them.  We are merely looking at language that is

20 very narrowly construed.  So when you say, "It is in the

21 label," "It is in the label," well, if the physician looks in

22 the label and is trying to see what that language says to him,

23 looks in there and says, "This has nothing to do with

24 Lene Arnold," "This has nothing to do with Mr. Gomez," "They

25 don't tell me I can't give it to these patients who have

1 hypertension" -- as it was the case with Mr. Gomez, or

2 Ms. Arnold, who had a history of peripheral vascular disease --

3 if the FDA had had the authority to put forth their original

4 label, the one that their medical officers had put forth after

5 reviewing all the data that they had from the FDA, from

6 Merck -- not including the analyses that we dispute they say

7 they did not receive -- if that language had gone forth, the

8 original FDA proposed language, that may have been, arguably,

9 covering these plaintiffs, but what is here is very, very

10 narrowly construed.

11    **THE COURT:**  He said that was approved by the FDA --

12 it may be narrow, but it's their approved language -- and that

13 since they approved it, they felt that that was all that was

14 necessary; and if they put in everything, he says warning about

15 every risk equals warning about no risk because it's going to

16 be meaningless.

17    **MS. DAGOSTINO:**  I understand, but there's also a

18 significant dispute as to whether the FDA has the authority to

19 put in language that they want versus language that Merck

20 wanted.  In this situation, it's fairly clear from the record

21 when you read both the FDA e-mails, the Merck e-mails, this was

22 language that Merck wanted.  This is Merck's language in

23 Merck's label.  This is not the language that the FDA wanted in

24 the medical officer's review after they spent over a year

25 reviewing the data.

1          When they reviewed the data, they wanted very

2    broad language in the label that had to do with a warning to

3    patients at risk for cardiovascular disease.  It's a very broad

4    category.  What ended up in the label, after negotiations with

5    Merck, was a caution to patients who had a history of ischemic

6    heart disease, a very small subset and a small subset that does

7    not include the two plaintiffs at issue.

8          **THE COURT:**  Okay.

9          **MS. SNAPKA:**  Your Honor, Kathryn Snapka.  I would

10   like to very briefly discuss the individuals at issue here.

11   Lene Arnold is represented by the law firm of Beasley, Allen,

12   Crow, Methvin, Portis & Miles.  She is a sweet little lady from

13   south Georgia who was a wife, a mother of three children, when

14   she received Vioxx for her arthritis.  She began taking 25

15   milligrams a day in July of 2003.  Three days after Christmas

16   2003, she suffered a heart attack.  Today she must live with

17   the effects of that heart attack even though at the time she

18   was prescribed they knew she had a history of deep veinous

19   thrombosis.  Thromboembolic events were placed in the warning

20   by the FDA and rejected by Merck.  She did not have a history

21   of ischemic heart disease as the final label showed.

22          I represent Alicia Gomez, the widow of

23   Joe Gomez.  He grew up in San Antonio, joined the Marines after

24   his graduation from high school, enjoyed a 30-year service to

25   our country, was awarded the Distinguished Service Award, and

1   at the end of his 30-year career he and his wife moved back to

2   San Antonio after their children had grown and he wanted to

3   join law enforcement.

4                   He had a history of hypertension.  In November

5   of 2002, he was prescribed 50 milligrams of Vioxx for a nagging

6   shoulder injury.  In January he kissed his wife good-bye, said

7   he was going to take the physical for the police department,

8   which he passed, and that afternoon was going to get a crown

9   replaced.  Joe Gomez died in the dentist's chair that

10  afternoon.  He was 50 years old.

11                  Your Honor asked about what recourse individuals

12  would have.  Make no mistake about it.  Their rights would be

13  extinguished if Merck's position were adopted.  Thank you.

14          **MR. HERMAN:**  May it please the Court.  Russ Herman

15  for plaintiffs.  Your Honor, I stand before you to make an

16  argument that doesn't appear in any case, doesn't appear in any

17  Supreme Court decision or brief.  I'm not a scholar of the law

18  or of legal history or of legal philosophy.  I'm a student.  As

19  a student, it is too difficult for me to weigh the complexities

20  of these arguments dealing with case law and at the same time

21  ignore the historic ground and the real contest at issue as it

22  appears to a simple advocate.

23                  If brevity is the soul of wit, Your Honor has

24  often observed that I may be witless.  Witless though I am, I

25  ask Your Honor to bear with me because I think -- at least on

 1   behalf of the thousands of claimants whom we represent not only

 2   in this litigation, but it impacts every pharmaceutical

 3   litigation in the country that has occurred or will occur.

 4           So I begin, Your Honor, with a very simple

 5   premise that the history of law in civilization is an attempt

 6   to elevate a human right of an individual to an equal plane

 7   with a property right of an oligarchy or landed aristocracy.

 8   Throughout the history of civilization, we have come to this

 9   point where a fiction called *preemption* seeks to reverse a

10   human's right to seek redress in favor of an oligarchy, which

11   computed that it would earn $500 million if it could move some

12   language from a warning to a precaution.

13           In Ancient Greece, Eupatridae knew that there

14   were three categories in an oligarchy.  There were Knights.

15   The Knights were based on ownership of a horse.  Zeugitae, the

16   second element, were based on other property rights, the owners

17   of oxen.  The Thetes, the laborers who owned nothing but their

18   own labor, had no rights.

19           In 620 B.C., Themistocles codified laws, but

20   those laws were to protect property rights, not the rights of

21   citizens to get equal treatment.  Out of that came Draco and

22   the Draconian laws that were so severe that there was a revolt

23   under Solon in 634 B.C.:  All debts were canceled, including

24   mortgages; amnesty was given; to rich and poor alike, equal

25   access to courts; a graduated tax rather than a tax on the

1   poor; government was by a council of 400 rather than 30

2   families.

3                 Democracy first had its seeds in about 500 B.C.

4   30,000 individuals were allowed to vote and juries were picked

5   by lot; out of these 30,000, 500 jurors a year.  They even had

6   alternates.  Of course, there was still a property problem

7   because only "free male citizens" were allowed to vote or serve

8   on juries.  Pericles then says, according to Thucydides, "We

9   discuss all matters of state carefully and in person, holding

10  not that words and deeds go ill together, but that an act is

11  far doomed to failure when undertaken undiscussed."  There has

12  been no legislative debate on this issue.  It is the farthest

13  departure from an imperfect Athenian democracy that one can

14  imagine.

15                During Pericles' time, he decreed that jurors

16  would be paid for the first time and 43,000 individuals were

17  elevated to equal rights.  Democracy grew.  A far cry from

18  Hammurabi.  A far cry from the Ten Commandments, which sought

19  to elevate individual rights to a higher level.  A far cry from

20  the *Old Testament* and the *New Testament*, and even then in which

21  the Prophet Amos says, "Plead for the young, the fatherless,

22  and the cause of the widow, but we still have a fight over

23  property rights and human rights."

24                I am not going to burden the Court with the

25  development through Roman Law except to say that our own law in

1  Louisiana, which comes from the Roman Law -- and when we read

2  Plainol and Pothier and Baudeloque and Kineray (ph.), we see

3  the emergence of a human right to equal property rights

4  codified for us in 1820 and recodified:

5          Whatever act of man which causes damage to

6  another, either through negligence or imprudence, obliges him

7  by whose act it happened to repair it;

8          The scales of justice should be equal;

9          Property rights of an oligarchy established on

10  some Aristoric (ph.) preying for profit has to be tempered with

11  the equal right of a citizen to seek redress in our courts.

12          What about this preamble:

13          We hold these truths to be self-evident, that

14  all men are created equal with unalienable rights to life,

15  liberty, and the pursuit of happiness.

16          Well, what would happen to the life and the

17  liberty and the pursuit of happiness to Ms. Snapka's marine?

18  Where is his justice?  Who paraded to the FDA, as counsel would

19  have?  Well, all these citizens who have been damaged by

20  Fen-Phen and faulty Shiley heart valves and faulty Medtronic

21  pacesetters and Zyprexa and Baycol, we need them all to march

22  on Washington and protest that the FDA -- because they weren't

23  given the voice the two Republican governors were through the

24  back door of the FDA.

25          It's true I am political.  I am a liberal.  I am

1    a human-rights liberal.  I'm a fiscal conservative, but a

2    human-rights liberal, and I'm proud of it.  So I am proud of

3    William Pitt who, in his understanding of the difference

4    between property rights and human rights, called for the

5    abolition of slavery; of Lord Byron, who called for the rights

6    of laboring people; of Martha Stewart for education of

7    African-Americans; of Elizabeth Stanton for woman's rights; of

8    Sojourner Truth for women's rights; of Chief Seattle for Native

9    American rights; of Susan B. Anthony for women's right to vote;

10   of John L. Lewis for the right of people that labored to be

11   equal; and even to Robert Taft, the conservative who said there

12   should be no ex post facto law, that it was constitutionally

13   inviolate.  Now we have an ex post facto administrative agency

14   ruling subverting the Constitution by individuals who cry "due

15   process," "due process."

16                Oh, the Mercks and the Pfizers and the J&J's and

17   the chemical companies, "We need due process.  You can't try

18   cases in this technological age together.  There are too many

19   due process problems."  The problem is that since the inception

20   of an attempt to balance property rights with human rights, our

21   technology has found a way to kill millions.  It was different

22   when there was an eye for an eye, and Judeo-Christian

23   philosophers and others have said really what that meant is

24   whatever harm you do has to be equaled by whatever the justice

25   is.  A simple concept.

1          But now, on the one hand, you can kill/maim

2   millions and then seek to interpose an agency's resolution that

3   you subverted while Your Honor's own questionnaire, agreed to

4   by Merck, has a question "Do you believe the FDA has been

5   corrupted?"  Well, if the issue wasn't the corruption of the

6   FDA, my goodness, why did it creep in to six jury trials?

7          I'm just a shirt-sleeve lawyer from New Orleans,

8   but I know this.  There is an answer.  The answer is jury

9   trials.  The answer is the jury.  Hamilton J. Madison in

10  *The Federalist Papers*, Adams, Patrick Henry, George Mason,

11  James Monroe, John Marshall, and Edmund Randolph --

12  conservatives, liberals, Federalists, Whigs all -- the right to

13  trial by jury is the refuge.

14         Case number 7, 1857, *Dred Scott* -- a colored

15  man -- *versus John F.A. Sandford*, that was the title of that

16  case.  The case was lost:  Negroes in bondage are property;

17  they have no rights or jurisdiction in a federal court.

18         Brown v. Board of Education, 1954, our great

19  Fifth Circuit, the beacon of liberty on human rights, more

20  cases establishing free men and women's rights to participate

21  in elections on juries, on transportation, this circuit, the

22  beacon.

23         Where are we today?  An ex post facto regulation

24  established June 30, 2006, when a watchdog agency becomes a

25  lapdog for the rich and the powerful.  When a watchdog becomes

1   toothless, where are we?

2            So I say, Your Honor, if there's going to be a

3   summary judgment on fact basis, give me Haley Barbour under

4   oath.  I want to go to Mississippi.  I want to take Haley

5   Barbour's testimony.  I want to know how he polled the citizens

6   of Mississippi.  I want to report back to the Mississippi

7   lawyers that have hundreds and hundreds of cases of maimed,

8   infirm folks in Mississippi that have been injured by drug

9   companies.  I want to know if they were polled.  I want to know

10  on what intellectual concrete basis -- I'm just a simple

11  lawyer.  I just want to ask him simple questions that call for

12  simple answers.

13            So, Your Honor, I don't think there's

14  preemption.  If there's preemption, it's outrageous, it's

15  undemocratic, and it seeks to restore a Greek oligarchy that we

16  fought against.  The Magna Carta is not the foundation of the

17  Bill of Rights.  The Magna Carta is aristocrats seeking more

18  power from a king.  Our Bill of Rights guarantees human rights,

19  the ability to speak, the ability to assemble, the ability to

20  seek justice.  So I say to Your Honor I've been waiting a long

21  time to make this argument --

22            **THE COURT:**  I can tell.

23            **MR. HERMAN:**  -- and I'm through.

24            **THE COURT:**  Okay.

25            **MR. HERMAN:**  Please let me take a deposition.

1          **THE COURT:**  Danny, you had something?  John, I'll
2     give you an opportunity to rebut.
3          **MR. BECNEL:**  Judge, I would like to point out a few
4     cases that are winding its way through the appellate courts and
5     the district courts and state courts dealing with these issues.
6     First is a case called <u>Mehl v. Canadian Pacific Railway</u>.  It
7     involved the largest anhydrous ammonia spill in the world.
8     Seven tank cars fell off of a railroad track because of the
9     negligence of the railroad company in the middle of the town of
10    Minot, North Dakota.  We had about 800 plaintiffs that were
11    injured.  One man died.  The federal judge in North Dakota
12    certified the class action.  We were proceeding to trial and
13    then they filed a preemption motion.
14             In the meantime, in the state courts in
15    Minnesota -- because that's where the railroad was located as
16    the principal place of business -- we tried five cases, got
17    verdicts, they paid the verdicts, they admitted liability, and
18    then preemption raises its head when we have 800 people with
19    permanent lung injuries.  The federal court said, "Look, I'm
20    obligated, because of preemption, to take away these people's
21    rights."  They were all asleep in their houses at 2:00 in the
22    morning, 15 degrees below zero.  Other than that, you would
23    have had 30,000 to 50,000 people killed.  In any event, he
24    said, "This is the most outrageous thing, as a federal judge, I
25    have ever had to do.  I think it's absurd, but I have to follow

1   this preemption," so he preempted, nullified the class action.

2   That's pending through the appellate courts.

3                The congressmen and the senators from both

4   states, Minnesota and North Dakota, went out and hired on their

5   own lawyers to represent them and file an amicus brief and

6   said, "We, as congressmen and senators, both Republican and

7   Democratic, had no intention of ceding this authority for

8   people to have states' rights to file against a company who in

9   the middle of the night allows a series of tank cars to go off

10  the tracks, admits liability, says they didn't do anything they

11  were supposed to do, and now they have nothing, no rights

12  whatsoever."  So that's pending right now.

13               Secondly, Judge Rosenbaum just a few months ago

14  had the argument in Medtronic, a company who made pacemakers

15  and defective batteries and for three years sold those

16  pacemakers which they knew were defective and did not report it

17  to the FDA.  Now hundreds and thousands of people have these

18  defective batteries.  He accepted the arguments.  I believe we

19  have been told that the decision will possibly come out today;

20  if not today, then in the next week.

21               We have the same thing with Guidant, another

22  pacemaker company, who sold from the shelf defective products

23  that they knew were defective, and that case is dealing with

24  the same issue.

25               So I think Mr. Herman is so correct.  This is

1    not just drugs we are dealing with.  This is everybody's rights

2    dealing with almost every product there is out there.  If

3    that's the way it works, then why would congressmen and

4    senators, who had no interest in the litigation whatsoever, go

5    out and hire lawyers on their own and say, "This is not what

6    Congress meant.  We didn't mean to take away the rights of

7    citizens for redress through the courts, whether they be state

8    courts or federal courts"?  So I thought I would point that's

9    out to you.

10             **MR. LEVIN:**  Just indulge me for a moment.

11   Mr. Becnel's argument should be viewed as an amicus.  He was

12   not part of the PSC presentation for the record because this

13   record may go up and certain statements may have certain

14   effects on an appeal.

15             Suffice it to say, this is not a Medical Device

16   Act case.  Congress in the Medical Device Act cases, as opposed

17   to the drug cases, knew what they were doing.  They had express

18   preemption.  Congress knows how to do it when they want to do

19   it.  They did it for medical devices to a certain extent.  They

20   didn't do it for drugs.

21             **THE COURT:**  I understand.

22             **MR. BEISNER:**  Your Honor, very briefly, I think I can

23   sum up the arguments that you have just heard from plaintiffs

24   in a few words, and those words would be "We don't like it."  I

25   don't think, Your Honor, that plaintiffs have provided a real

 1   rebuttal to the case law that is here that talks about
 2   preemption, recognizes its existence, and the arguments that we
 3   have laid out indicating that in this narrow circumstance that
 4   it was properly exercised by the FDA.
 5              I think Ms. Dagostino in her argument has made
 6   very clear, if there was any question about it, that what is
 7   being challenged here is the content of the label that the FDA
 8   approved.  She says, "I wish it were written differently," but
 9   the FDA approved it and has said that that approval has
10   preemptive effect.
11              We heard arguments about how that label came
12   into being, but the point is that the FDA has the authority
13   under the statute to prescribe what those labels should
14   contain.  They did so here in this instance.  There are going
15   to be complaints about the process of how they got there, but
16   there is a letter saying this is approved from the agency.
17   That's what the Court has to deal with.  "I don't like it"
18   isn't a basis for rejecting the arguments that have been made
19   here.
20              Let me note that I certainly appreciate
21   Mr. Herman's tour of history here this morning, but it doesn't
22   deal with another human rights issue that the FDA has been
23   struggling with.  You may debate about whether they came out
24   with the right answer, but they have come out with the right
25   answer and you can't deny that it is a real human rights

1    problem.  At this moment there are thousands of people who are

2    going into physician's offices for a remedy, and the FDA has

3    been struggling with how do we get the information to the

4    physicians that they need in order to give them a basis on

5    which to make prescriptions.

6                    The problem that exists out there is the

7    explosion in the number of lawsuits -- Baycol, 40,000 claims;

8    Norplant, 50,000 claims; Rezulin, 35,000 claims; Prempro, 8,000

9    claims; 122,000 claims in Diet Drug -- all of which create a

10   problem with respect to what information is provided to

11   physicians.

12                   One point I would note, in response to

13   Mr. Levin's question about where does this preemption come

14   from -- in 2000, when the FDA asked for comment on the labeling

15   regulations years before they were adopted, they pointed out

16   the problem.  The use of labeling in product liability, in

17   medical malpractice lawsuits, together with increasing

18   litigation costs, has caused manufacturers to become more

19   cautious and include virtually all known adverse event

20   information regardless of its importance or plausible

21   relationship to the drug.  They are saying this is destroying

22   the labeling system.  They said, "Comment.  Tell us how we can

23   deal with this."

24                   This was a major issue that the FDA was

25   addressing.  This didn't come out of the blue.  It was in

1    response to the number of lawsuits that were being filed and

2    the number of juries who were offering their opinions about

3    what should be in the label, which may not be consistent with

4    what a physician is looking for.

5              So I think that there's a need to address this

6    not on an "I don't like it" basis.  Maybe the FDA could have

7    done a better job, maybe there's a need for additional

8    legislation, whatever, but the law is what it is on preemption,

9    on the FDA's application of preemption here, and we

10   respectfully submit, Your Honor, that in the factual

11   circumstances of these two cases that summary judgment is in

12   order because the challenge here to the label on the product

13   used here has been preempted.

14             THE COURT:  Okay.  I do understand the issues and I'm

15   going to be looking at them.  I wanted to get your views and

16   oral argument first.  As I mentioned to you at the outset, the

17   cases really go both ways on it.  I'm going to try to deal with

18   this issue both generally and focusing on specifics.  I think

19   that's the way this matter has to be resolved.

20             MR. LEVIN:  May I, Your Honor, just read three

21   citations and not comment on the litigation explosion where

22   people have rights and are bringing lawsuits?

23             THE COURT:  Sure.

24             MR. LEVIN:  I think most of us here know who the

25   elephant in this courtroom is.  It's the Fifth Circuit.  This

1   case is appealable in whatever form.  Your Honor, I ask you to

2   look at the <u>Hurley</u> case, 863 F.2d 1173, 1988, no preemption,

3   Fifth Circuit, in a vaccine case, and the <u>Osborn</u> case, which is

4   cited in our brief.  I can't find the actual cite in my notes,

5   but that's 1987, no preemption.  August 22, 2006, <u>McNeil v.</u>

6   <u>Wyeth</u>, 462 F.3d 364, not a preemption case -- the Fifth Circuit

7   didn't even think of preemption -- a failure-to-warn case.

8   Under Texas law, in a drug case, you have a cause of action for

9   failure to warn. Mr. Longer has helped me with <u>Osborn</u>.

10  825 F.2d 908, Fifth Circuit, 1987.  Thank you, Your Honor.

11            **THE COURT:**  On both sides, if you think of anything

12  that you haven't put in the brief, send it on to me.  I'm also

13  interested in any of the literature.  I haven't found any, but

14  if there's any articles that I ought to be reading, I would

15  like to take a look at that, too.

16            **THE DEPUTY CLERK:**  Everyone rise.

17            (WHEREUPON, the Court was in recess.)

18                             * * *

19                        <u>**CERTIFICATE**</u>

20            I, Toni Doyle Tusa, CCR, FCRR, Official Court
    Reporter for the United States District Court, Eastern District
21  of Louisiana, do hereby certify that the foregoing is a true
    and correct transcript, to the best of my ability and
22  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

23

24

25                        _____
                          Toni Doyle Tusa, CCR, FCRR
                          Official Court Reporter