```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2

3   ****************************************************************

4   IN RE:  VIOXX PRODUCTS
        LIABILITY LITIGATION
5                               MDL DOCKET NO. 1657
                                NEW ORLEANS, LOUISIANA
6
        _____
7

8   GERALD D. BARNETT AND       CIVIL ACTION #06-485
    CORINNE BARNETT             SECTION "L"
9                               JULY 25, 2006, 2:00 P.M.
            VS
10
    MERCK & COMPANY, INC.
11

    ****************************************************************
12

13              TRANSCRIPT OF MOTION PROCEEDINGS
           HEARD BEFORE THE HONORABLE ELDON E. FALLON
14              UNITED STATES DISTRICT JUDGE

15

16  APPEARANCES:

17  FOR THE PLAINTIFF:
                            ROBINSON CALCAGNIE & ROBINSON
18                          BY:  MARK P. ROBINSON, JR., ESQUIRE
                                 KEVIN CALCAGNIE, ESQUIRE
19                               TED B. WACKER, ESQUIRE
                                 CARLOS A. PRIETTA, III, ESQUIRE
20                               LEXI MYER, ESQUIRE
                            620 NEWPORT CENTER DRIVE, 7TH FLOOR
21                          NEWPORT BEACH CA  92660

22
                            BEASLEY ALLEN CROW METHVIN
23                          PORTIS & MILES
                            BY:  ANDY D. BIRCHFELD, JR., ESQUIRE
24                               P. LEIGH O'DELL, ESQUIRE
                            234 COMMERCE STREET
25                          POST OFFICE BOX 4160
                            MONTGOMERY, ALABAMA 36103
```

```
 1                          THE KAISER FIRM
                            BY:  D. GRANT KAISER, ESQUIRE
 2                               BRANDON STEFFEY, ESQUIRE
                            8441 GULF FREEWAY, SUITE 600
 3                          HOUSTON TX 77017

 4

                            RANIER GAYLE & ELLIOT
 5                          BY:  DREW A. RANIER, ESQUIRE
                                 BRETT M. POWERS, ESQUIRE
 6                          1419 RYAN STREET
                            POST OFFICE BOX 1890
 7                          LAKE CHARLES LA  70602-1890

 8

 9   FOR THE DEFENDANT:
                            BARTLIT BECK HERMAN
10                          PALENCHAR & SCOTT
                            BY:  PHILIP S. BECK, ESQUIRE
11                               ANDREW GOLDMAN, ESQUIRE
                            54 W. HUBBARD STREET, SUITE 300
12                          CHICAGO, ILLINOIS 60601

13

14   ALSO PRESENT:
                            DREW RANIER, ESQUIRE
15                          BRETT POWERS, ESQUIRE
                            CHRIS TISI, ESQUIRE
16                          HOLLY WHEELER, ESQUIRE

17
                            JAMES L. DOYLE, ESQUIRE
18                          JOHN BOUNDAS, ESQUIRE
                            COLLYN PEDDIE, ESQUIRE
19

20

21   OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RPR, CRR
                                  500 POYDRAS STREET, ROOM B406
22                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7779
23

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
```

# I N D E X

Agenda Items                                                      Page

THE COURT............................................................   4
Jerry Avorn.........................................................   4
McCaffrey...........................................................   4
The State of South Carolina or any other area of the                 6
region known as the "stroke belt".....................
Issues of exhibits..................................................   6
Depositions.........................................................   6
MR. GOLDMAN.........................................................   6
Dr. McCaffrey.......................................................   7
Videotape playback..................................................   8
MR. ROBINSON........................................................  14
MR. GOLDMAN.........................................................  16
Dr. Mikola..........................................................  16
Videotape playback..................................................  16
Videotape playback..................................................  17
MR. ROBINSON........................................................  17
MR. GOLDMAN.........................................................  18
Dr. Karavan.........................................................  18
Dr. Karavan.........................................................  20
Videotape playback..................................................  20
Videotape playback..................................................  21
MR. ROBINSON........................................................  22
MR. GOLDMAN.........................................................  24
Videotape playback..................................................  26
Videotape playback..................................................  26
Videotape playback..................................................  27
Videotape playback..................................................  28
Videotape playback..................................................  29
MR. ROBINSON........................................................  30
MR. GOLDMAN.........................................................  37
Leading questions...................................................  37
Videotape playback..................................................  38
Adverse witness exception...........................................  40
MR. ROBINSON........................................................  43
Videotape playback..................................................  44
Videotape playback..................................................  45
Videotape playback..................................................  45
Videotape playback..................................................  46
Videotape playback..................................................  46
Videotape playback..................................................  49
Videotape playback..................................................  54
Videotape playback..................................................  55

1                        **P-R-O-C-E-E-D-I-N-G-S**

2                        MONDAY JULY 25, 2006

3                  A F T E R N O O N   S E S S I O N

4                      (COURT CALLED TO ORDER)

5           THE DEPUTY CLERK:  Everyone rise.

6           THE COURT:  Be seated, please.  Let's call the case.

7           THE DEPUTY CLERK:  Civil Action 05-1657 In re:  Vioxx.

8           THE COURT:  Counsel make their appearance for the

9    record, please.

10          MR. ROBINSON:  Mark Robinson for plaintiff Barnett.

11          MR. GOLDMAN:  Andy Goldman for Merck.  Phil Beck is with

12   me.

13          THE COURT:  I had several motions today, and I discussed

14   with the parties a number of them and resolved them, and I'll put

15   it out in a minute entry.  Basically Jerry Avorn, I will allow

16   him to testify.  The issue of some specificity, I asked the

17   parties to look at the deposition and then make the objections

18   that they have to the deposition, but basically, I think he could

19   and should be able to testify.

20          With respect to McCaffrey, the issue there is whether

21   or not he took Vioxx and then whether or not he can discuss his

22   view of the FDA.  Generally speaking, the way that I see

23   witnesses testifying about taking Vioxx is, I think it's really a

24   403 question.  It's relevant under 401.  The question is whether

25   it's confusing or problematic under 403.

1             Generally speaking, I find that it generally is

2    excludable because it's so fact specific.  The fact that one

3    person took Vioxx doesn't mean anything with regard to whether

4    another person should take Vioxx, because it's very fact

5    specific, and it's hard for the parties to get a hold of that

6    without the individual's medical records, without cross-examining

7    that individual witness on those specific aspects, and it

8    introduces concepts which create more problems than they solve.

9             So generally speaking, I exclude it, and I exclude it

10   under 403.  However, that having been said, with this witness,

11   McCaffrey, he's a treater, and the issue is why he prescribed

12   Vioxx.  And there is an issue of what he knew and when he knew it

13   and things of that sort.

14            And he's a treater, and his testimony, as I read it, is

15   that, Well, it worked on the patients, so therefore, I felt it

16   was a good medication for this individual.  Also, I took it

17   myself.  I had an arthritis condition and it worked.  So other

18   patients and myself, that's a reason that I use it.  Then I also

19   noted that it was approved by the FDA, and that, to me, is

20   significant, and for those reasons I approved Vioxx.

21            That, to me, is admissible.  When I weigh the 403,

22   since I know it's relevant under 401, I weigh the 403, and there

23   is some disadvantages to letting it in, some problem, potential

24   problems, but keeping it out is more problematic.  So it weighs

25   in favor of letting it in for somebody like McCaffrey.  So I let

1  that in with McCaffrey.

2       With regard to the issue of the State of South Carolina

3  or any other area of the region known as the "stroke belt," that,

4  to me, is excludable.  That's a 401 problem.  I don't think it

5  crosses that threshold.  If it does it certainly is out by 403.

6  So we cut through those motions and those were my rulings to

7  those motions.

8       Now, we also talked about some issues of exhibits which

9  the parties are looking at tonight, and I'll get more of their

10  feelings tomorrow and be able to rule on it.  Presently, the

11  issue that I do want to confront is the depositions, so that's

12  where we are this morning.

13       MR. GOLDMAN:  Good afternoon, Judge.  Andy Goldman for

14  Merck, and I want to start by talking about the treaters in this

15  case.  And there are four treaters that both sides intend to

16  introduce evidence of.  They are treaters who are outside of the

17  State of Louisiana, and none of them are going to be coming live

18  and their names are Dr. McCaffrey, as you know; Dr. Mikola,

19  M-I-K-O-L-A; Dr. Karavan; and Dr. Bryan.

20       And each one of these witnesses, Judge, the first area

21  I want to talk about are causation opinions that each one of

22  these witnesses gave in their depositions.  Plaintiff counsel

23  elicited the testimony from them.  Whether it was in the form of

24  you can't rule out Vioxx as a potential cause or asking their

25  views on whether or not Vioxx played a role in Mr. Barnett's

1    heart attack.

2            So the first area has to do with improper causation

3    opinions.  The second area has to do with improper use of

4    internal Merck documents that the witnesses have never seen in

5    their lives, and so they lack personal knowledge, and Number 3

6    has to do with leading questions of independent, third-party

7    witnesses who, just as if they were here testifying in court,

8    should not be led on direct examination by plaintiff's counsel.

9            So let me start with the causation opinions, Judge.

10   And we've made our objections more thoroughly in response to the

11   designations the plaintiffs made.  My goal here today is to give

12   you some examples, and I've printed them out as well so you can

13   follow along with some of the clips.

14           The first witness is Dr. McCaffrey.  And he -- Judge,

15   can I hand you this?

16           THE COURT:  Yes.

17           MR. GOLDMAN:  Dr. McCaffrey, Judge, is a Board-certified

18   neurologist.  He treated Mr. Barnett on a total of four

19   occasions.  The last time he treated Mr. Barnett was

20   December 30th, of 1999, which was two years, nine months before

21   he had his heart attack.  Mr. Barnett had his heart attack in

22   September of 2002.

23           So Dr. McCaffrey never once saw Mr. Barnett while

24   Mr. Barnett was taking Vioxx.  That never happened.  He just

25   prescribed it and never saw him again.  Never saw him again.

1        I'm going to show a few clips.  I think the most

2  important fact for Dr. McCaffrey is he said he never read the

3  VIGOR study.  He's never read APPROVe.  There was no foundation

4  laid for any work that he did to be able to assess whether Vioxx

5  causes heart attacks and whether or not Vioxx played any role in

6  Mr. Barnett's heart attack.

7        So I'm going to play a few clips, Judge, and they --

8  following along with what I just handed you beginning on page

9  175, line 25 of Dr. McCaffrey's deposition.

10                    (Videotape playback)

11  Q.    Now, if you had seen him, say, on around January 4th and his

12  blood pressure was elevated due to a cold -- or to medication for

13  the cold, would you have continued to allow him to take the

14  Vioxx?

15  A.    I think if he would have followed up with me, we wouldn't be

16  sitting here right now.

17  Q.    What do you mean by that?

18  A.    Because he would have been telling me that -- we would have

19  been looking at his blood pressure.  I didn't look and see what

20  his other blood pressures were, but that's why I follow-up very

21  soon after putting people on medication, because you can be doing

22  well and you won't feel your blood pressure go up.  And it would

23  have alleviated the problem that he had right now with his heart

24  problems.

25  Q.    So you do believe there is a connection between Vioxx and

1  heart problems?

2  A.    I think there is a connection between Vioxx and elevated

3  blood pressure, and I also get concerned about that because that

4  can lead on to heart disease and strokes in particular.  And you

5  know as a neurologist you're aware your blood pressure goes up,

6  you're going to have a stroke.

7  Q.    Explain what you did with Mr. Barnett.

8  A.    With Mr. Barnett, on the last visit, I gave him four sample

9  pills, which is documented in my note, and I was supposed to see

10 him three weeks later because we were going to do a nerve

11 conduction study, EMG on his arm.  He never came back for -- the

12 main reason -- the other reason I have people come back in three

13 or four weeks after starting a new medication, I want to see if

14 there are any side effects.  Especially with Vioxx.

15         One of the side effects of Vioxx is you have to watch

16 for about seven or eight percent of people develop high blood

17 pressure.  The high blood pressure they develop on Vioxx does not

18 improve when you put them on high blood pressure medication.  So

19 if I start somebody on Vioxx or Bextra, you can see the blood

20 pressure go up.  I want to see them three or four weeks later

21 because I knew this was a possible side effect of the medication.

22 Q.    Now, are you aware that -- that his blood pressure did go up

23 on January 4th and January 19, 2000?

24 A.    He never came back so I would never know because he would

25 have been immediately taken off the medicine.

1  Q.    If he'd come back?

2  A.    Yes, sir.

3  Q.    How can blood pressure work with genetics such as coronary

4  artery disease to -- to lead to heart attack?

5  A.    It accelerates atherosclerosis in the heart and in the brain

6  and in other blood vessels in the body.

7  Q.    How does it accelerate atherosclerosis?

8  A.    By the whole process.  I mean, you know -- you know, we're

9  stepping out, like we said, into a world where, you know, now

10  we're talking to academic people that talk about thrombogenesis

11  and everything else with the plaques and everything else in the

12  blood vessels.  So elevated blood pressure is a risk factor for

13  all of this.

14  Q.    You're saying with what you know about Vioxx, that had you

15  known that there was an increase in his blood pressure, you would

16  not have prescribed him Vioxx?

17  A.    If he would have followed up at three weeks and had an

18  elevated blood pressure, I would have taken him off the medicine.

19  Q.    Why?

20  A.    Because my concern is heart attack and stroke would -- I was

21  seeing people with blood pressure -- when you're on Vioxx, you

22  can be put on blood pressure medication and the blood pressure

23  doesn't come down, so the easiest way to solve the problem is to

24  take them off the medicine.

25  Q.    What is it about a drug like Vioxx that increases blood

1   pressure, from your experience, that can work with coronary

2   artery disease in a person to lead to a stroke or heart attack?

3   A.    Yeah, I have absolutely no idea.

4   Q.    Did you know there was some study that -- that showed

5   that -- that Vioxx, certainly in long-term use of Vioxx, had an

6   increased risk for MI's -- or heart attacks?

7   A.    I think I may have heard it on *CNN News* or something like

8   that, but I didn't read the study itself.

9   Q.    Did Mr. Robinson show you any of the blood pressure readings

10  for Mr. Barnett at all?

11  A.    No.

12  Q.    Do you have any idea whether, after his initial spike in

13  blood pressure, his blood pressure was fairly normal throughout

14  the time that he took Vioxx?

15  A.    No, sir.

16  Q.    When you said that you believe that increasing hypertension

17  can lead to a heart attack or heart disease --

18  A.    Yes, sir.

19  Q.    -- that was based on just your common knowledge about

20  hypertension?

21  A.    That's correct.

22  Q.    Not having any idea about what Mr. Barnett's high blood

23  pressure readings were during the time he took Vioxx, you're not

24  in a position to assess whether or not Vioxx contributed to

25  Mr. Barnett's heart attack, are you?

1   A.    That's correct.

2   Q.    When Mr. Robinson was asking you questions about

3   Mr. Barnett's hypertension and whether that played any role in

4   his heart attack, you didn't know what Mr. Barnett's family

5   history was for coronary artery disease, did you?

6   A.    That's correct.

7   Q.    You don't know whether Mr. Barnett's father had one heart

8   attack or two heart attacks, do you?

9   A.    I do not know.

10  Q.    You don't know whether Mr. Barnett's sister had a history of

11  TIA's or strokes, when you were answering those questions?

12  A.    When I read this earlier today, I saw that his sister did

13  have a history of TIA's, but I didn't at the time I was talking

14  to him because my computer was off.

15  Q.    You didn't know, when you were answering Mr. Robinson's

16  questions, whether Mr. Barnett had a long history of high

17  cholesterol, did you?

18  A.    No, sir.

19  Q.    When Mr. Barnett was asking you questions, you didn't know

20  about Mr. Barnett's triglyceride levels or HDL, the other type of

21  cholesterol, did you?

22  A.    No, sir.

23  Q.    Am I right, Dr. McCaffrey, that you can't say with any

24  degree of certainty, based on the limited information that

25  Mr. Robinson showed you, whether Vioxx played any role in

1  Mr. Barnett's heart attack?

2  A.   That's correct.

3                    (End of videotape playback)

4        MR. GOLDMAN:  Judge, the reason that that testimony

5  elicited by Mr. Robinson is inadmissible, first, the witness is

6  unqualified to testify about any cardiovascular risks potentially

7  associated with Vioxx.

8        Second, Mr. Robinson asked him an improper hypothetical

9  where he basically asked the witness to assume a false predicate;

10  and that is, Assuming that Mr. Barnett's blood pressure increased

11  right after you started to prescribe Vioxx to him, what would you

12  have done?  He said, I would have taken him off the medicine, and

13  we wouldn't be here today.

14        And the problem with that testimony is that it's going

15  to suggest to the jury that, according to this witness, if only

16  Mr. Barnett had not been taking Vioxx for all that time and if

17  only he had come back to have his blood pressure checked, he

18  would not be having any heart problems that he's experiencing

19  today, and that's a specific cause opinion rendered by an

20  unqualified neurologist, who has no -- there is no evidence that

21  he reviewed any of the studies and so forth.

22        So no foundation, there was a false predicate asked by

23  Mr. Robinson, and finally, Your Honor, with respect to

24  Dr. McCaffrey, Your Honor ruled with respect to Dr. Bryan -- you

25  might remember that plaintiffs moved to preclude Dr. Bryan, the

1  heart surgeon, from giving an opinion on the state of

2  Mr. Barnett's heart after Dr. Bryan stopped seeing him, and

3  Your Honor ruled, quote -- and this is on the July 7, 2006

4  transcript at page 12, line 9 -- "I don't see a doctor testifying

5  about somebody three or four years hence, when they haven't even

6  seen him for three or four years.  That I wouldn't allow in the

7  courtroom.  The person's prognosis is one thing that you can

8  give, but what's his condition when you haven't even seen him,

9  that's problematic."

10       And by that same logic, Your Honor, Dr. McCaffrey

11  should not be allowed to testify about what happened to

12  Mr. Barnett after Dr. McCaffrey stopped seeing him in

13  December 1999.

14       So I can stop with Dr. McCaffrey and then go on --

15       THE COURT:  Yes, let me hear from your opponent.

16       MR. ROBINSON:  First of all, Your Honor, I think you

17  need to see the context of Dr. McCaffrey.  Dr. McCaffrey is the

18  closest thing I've ever seen to a Merck agent and probably, in

19  this litigation, the closest thing you'll see to a Merck agent

20  than any other doctor.

21       THE COURT:  He's the person who was hired by Merck?

22       MR. ROBINSON:  Right.  And he contracted with them, and

23  he basically --

24       THE COURT:  Let me interrupt you, counsel.  I understand

25  the issue.  This is my view on Dr. McCaffrey:  I feel that both

1    sides have had an opportunity to attack and question

2    Dr. McCaffrey.  If he were called as an expert witness, I would

3    look at it a little differently, but he's called as a treater,

4    and all of this has come out.  I think both of you-all have put

5    it before the jury.  You put your portion; they put their

6    portion.  You are then going to attack him because of his link to

7    Merck.  My view is that Dr. McCaffrey ought to come in.  I'll let

8    the testimony in.

9              Who is next?

10             And the reason, just for the record:  He's a

11   treater.  He's asked questions.  It cuts both ways.  I can see an

12   argument being made from the standpoint of the defendants that

13   this person didn't come back.  Had he come back, maybe it would

14   have made a difference, but he didn't come back.  It's his fault

15   for not coming back.  I think the doctor, it's a fair thing for

16   him to say, if he had come back, I would have checked his blood

17   pressure.  I would have noted the blood pressure.  I would have

18   gone into a little more specifics.  I think that's fair for him

19   to be able to say that.

20             And I think it's also fair for you to cross-examine him

21   as you cross-examined him.  I just think the jury has got the

22   whole picture, and I think the playing field is level with

23   Dr. McCaffrey.  I don't have any problem with allowing his

24   testimony.

25             Who is next?

1          MR. GOLDMAN:  Dr. Mikola, Judge, is an internist.

2          THE COURT:  Do you have a piece of that one?

3          MR. GOLDMAN:  Yes.  Your Honor, does your's start on

4  page 356?

5          THE COURT:  361.

6          MR. GOLDMAN:  Okay.  Then take this one, Judge.

7          Dr. Mikola is an internist who prescribed Vioxx to

8  Mr. Barnett.  He gave the following two causation opinions.  They

9  are much shorter than Dr. McCaffrey's, but like Dr. McCaffrey,

10  this witness did not -- the foundation wasn't laid for his

11  ability to opine on causation, nor does he lack the expertise to

12  render it, so I'll play it quickly.

13                  (Videotape playback)

14  Q.   Assuming that Mr. Barnett had started Vioxx by Dr. McCaffrey

15  in December of '99 or January -- early January of 2000, would you

16  agree that you can't rule out that the Vioxx could have

17  potentially contributed to the ischemia that you observed in late

18  January of 2000?

19  A.   The question, I think, becomes whether or not Vioxx

20  contributes to instability of plaque and plaque rupture.  I can't

21  say that it does; I can't say that it doesn't.

22  Q.   In other words, you can't rule that out?

23  A.   That's correct.

24              (End of videotape playback)

25          MR. GOLDMAN:  Let me play one more, Judge, from

1  Dr. Mikola.

2                    (Videotape playback)

3  Q.   Let me ask you this:  Given that he was on Vioxx for some

4  two and a half years and then had a -- had a heart attack, can

5  you rule out Vioxx as one of the causes of the heart attack?

6  A.   I cannot say definitely that Vioxx didn't have a potentially

7  contributing role.

8  Q.   Why do you say that?

9  A.   Some of the data that was presented today, in addition to

10  some of the subsequent data published on the view of the VIGOR

11  trial stating that the protector effect of Naprosyn was not

12  likely to explain -- there was, I believe, an article in the

13  *Lancet* -- would not explain the difference entirely between the

14  thrombotic events attributed to the Vioxx, and the VIGOR trial

15  would suggest that Vioxx may have some -- however small or large

16  I don't really know -- increased risk of causing thromboses.

17                (End of videotape playback)

18            MR. GOLDMAN:  Your Honor, Dr. Mikola --

19            THE COURT:  I got it.  Let me hear from your opponent.

20  Why allow that in?

21            MR. ROBINSON:  Your Honor, because he's his treating

22  doctor.  There is the --

23            THE COURT:  I see it differently from Dr. McCaffrey.

24  Dr. McCaffrey is a person who is testifying what he did, why he

25  did it, what he would have done, and why he would have done it.

1    Dr. Mikola, in his testimony, is giving an opinion.  It's not a

2    question of a treater -- what I did for the person.  He's giving

3    an opinion.  And he's giving an opinion in the negative fashion.

4    He's not saying it caused it.  He's saying that he can't rule out

5    that it caused it because it might have or it might have not.

6          He's a treater but he's not testifying as to what he

7    did.  What he did, what he didn't do, why he did it, why he

8    didn't do it.  That's what the gravamen of Dr. McCaffrey's

9    testimony is.  He's a treater and he says this is what I did and

10   this is what I would have done, and this is why I would have done

11   it.

12         I think that's fair for a treater to testify to.  But

13   for a treater to say, In my opinion, I can't rule something out

14   because it may have done this or it may have done that or I don't

15   know whether it would have done this or I don't know whether it

16   would have done that is stepping over the bounds.  So I would

17   exclude Dr. Mikola.

18         MR. GOLDMAN:  Your Honor, Dr. Karavan is also a treater

19   and gave similar testimony.  I'll hand it to Your Honor.  And

20   again, these are just examples, so based on Your Honor's,

21   rulings, we can go back and make the adjustments to the

22   transcripts.

23         MR. ROBINSON:  Your Honor, could I go back to the last

24   question?

25         THE COURT:  Sure.

1          MR. ROBINSON:  Your Honor, here is my point, my concern

2     is this:  I don't want, in final argument the defense to come up

3     there and say, Well, you know, we have Dr. Mikola, who never gave

4     an opinion that Vioxx could even be on the differential

5     diagnosis, which is not true.  He said it's potentially on the

6     differential diagnosis.

7          I don't think that it would be fair to give the jury a

8     misimpression when we all know the truth that he said, Yeah, it

9     could be on the differential diagnosis.  So if they open this up

10     on rebuttal argument, I would like to be able to say that's not

11     true, or maybe we should just preclude them from making that

12     argument.  That's all I'm asking.

13          THE COURT:  I'm not precluding any one of you-all from

14     making any arguments, but the fairest statement is he wasn't

15     asked the question.  I mean, he didn't give an opinion, but he

16     wasn't asked what your opinion is.

17          I don't think that it's fair for the other side to say,

18     Well, had I asked him an opinion, he would have said such and

19     such.  You see that as an argument, because that's not what the

20     evidence is.  So I don't see that coming in for that reason.  I

21     don't think somebody can manufacture and say, If he would have

22     been asked an opinion, he would have said such and such.

23          So that I'm on the same page with you-all, I'm not going

24     to exclude anybody from making opening statements or closing

25     arguments.  I don't know what the facts are or what the evidence

1   is, but I just make those comments to give you some guidance.

2       Okay.

3       MR. GOLDMAN:  Dr. Karavan is Mr. Barnett's heart doctor,

4   and he gave similar testimony.  He testified he's only spent two

5   hours reviewing literature concerning COX-2 inhibitors, and he

6   gave the same type of testimony as Dr. Mikola.  I'll put it up

7   real quickly.

8                       (Videotape playback)

9   Q.   I want you to assume that Mr. Barnett took Vioxx for some

10  32 months daily before his heart attack.  Can you rule out Vioxx

11  as one of the causes of Mr. Barnett's heart attack along with his

12  coronary artery disease?

13  A.   The -- he had been on it for 32 months --

14  Q.   32 months.

15  A.   -- prior to the year 2002.

16  Q.   Before his -- September 6, 2002.

17  A.   The -- the way I clinically put Mr. Barnett together is like

18  this, okay?  He had some risk factors for coronary artery

19  disease, and he had one bad risk factor for the development of

20  plaque, hyperlipidemia, with an LDL that was said to be 190 at

21  the time of his first stress test in 2000, which is an extremely

22  high LDL, which will increase your risk of coronary

23  atherosclerosis right there.

24       And at the time of his presentation with his heart

25  attack, he had diffuse multi-vessel atherosclerotic disease which

1    I feel is probably most related to his risk factor of significant

2    hyperlipidemia with a significantly elevated LDL and a family

3    history, the genes.  He was on Vioxx for many months prior to

4    that, and what we know about the COX inhibitors and Vioxx is that

5    they have a pro -- possible prothrombotic effect and could they

6    be related to the fact that he had an occlusion of his PDA?  The

7    answer is it's possible that he could.

8                    (End of videotape playback)

9           MR. GOLDMAN:  One more clip from Dr. Karavan.

10                   (Videotape playback)

11   Q.   Now, if, in fact, a person such as Mr. Barnett has coronary

12   artery disease to begin with and a family history of coronary

13   artery disease and is a male over 55, is it reasonable that a

14   drug that's prothrombotic could contribute to his heart attack?

15   You can answer.

16   A.   I think the concern with anti-inflammatories is that in the

17   face of preexisting atherosclerosis, that thrombus formation

18   potentially can occur on a site of plaque rupture.

19   Q.   And by anti-inflammatories you mean like Vioxx?

20   A.   That would be correct.

21                   (End of videotape playback)

22          MR. GOLDMAN:  Judge, I can play the excerpt but

23   Dr. Karavan testified later that he spent a total of two hours

24   reviewing literature on COX-2 inhibitors, and then I asked him

25   questions in my examination, and he testified on page 172 to 173

1  that in his mind whether Vioxx causes a person to become in a

2  prothrombotic state is an open question.  So for the same reason

3  that Dr. Mikola shouldn't be able to testify, neither should

4  Dr. Karavan about this issue.

5       MR. ROBINSON:  I think that Dr. Karavan is totally

6  different than Dr. Mikola.

7       THE COURT:  I see this as a little closer.  I really

8  would like to see the deposition on it.  If I could take a look

9  at the deposition.  This is a little closer, as I see it.

10      The problem that I see from the standpoint of admitting

11  it, and I want to review it to make certain, is the issue of

12  whether this person would qualify as an expert under the *Daubert*

13  test comes in to play here.  It's a little fuzzy because there is

14  a question of treating treater, and I want to just look at that

15  deposition a little bit before I deal with this.

16      MR. ROBINSON:  Your Honor, could I show the Court

17  something here?

18      THE COURT:  Yes.  Are you calling it up?

19      MR. ROBINSON:  Yes.  We're getting it.  We had to switch

20  the -- they had it.

21      THE COURT:  All right.

22      MR. ROBINSON:  Your Honor -- pull that out.  Your Honor,

23  basically, the case law -- and I'll be clipping through the case

24  law -- the four *Daubert* doctors are not helpful in a case where

25  there is a treater involved.  He is a nonretained expert, and

1   basically they are saying that it's okay to ask a treater an

2   opinion type of question.

3        Go on to the next case.

4        "Recognizing this reality, even after *Daubert*,

5   treating physicians have routinely been permitted to testify to

6   determinations that they made in the course of providing

7   treatment regarding the cause."

8        He's a cardiologist, Your Honor.  He's the one that

9   just did the recent cath and stent.  "*Daubert* analysis held

10  inapplicable to factual testimony of plaintiff's treating

11  physician."

12       Go to the next one.  Can you hold up.

13       "The testimony of doctors has also been admitted

14  despite a failure to rule out alternative causes.  To the extent

15  that physicians do not fully consider and rule out possible

16  causes, such deficiency generally go to the weight of the

17  evidence, not admissibility, and weighing the evidence is a

18  function for the jury."

19       What I'm saying is this:  He's a cardiologist, he's

20  continued to treat him, he saw him at the time of the heart

21  attack, and he gave his opinion.  I think that's admissible.

22       THE COURT:  That's why I want to see the deposition.

23  I'm aware of it and that's why with Dr. McCaffrey, I felt it came

24  in.  And I'll look at it with that in mind, but I really do need

25  the deposition on this one.  It's a little closer than even

1   Dr. McCaffrey or Dr. Mikola.

2           MR. GOLDMAN:  Just to respond to what Mr. Robinson just

3   said, and I can put those quotes up very quickly, but unlike

4   those cases where I'm sure the treater actually made a diagnosis

5   at the time he treated the patient, here Dr. Karavan was not

6   being asked about his diagnosis about Mr. Barnett.  He was being

7   asked hypotheticals, Assuming Vioxx could be prothrombotic or, Is

8   it reasonable to conclude that Vioxx could be prothrombotic?

9           * He's not saying what was his opinion at the time he

10  was treating Dr. Bryan.  It's after the fact and then he's put in

11  the exact same shoes as the experts who you excluded in *Plunkett*,

12  who had far more experiences than this man does on COX-2

13  inhibition and studied way more than Dr. Karavan did, and yet

14  Your Honor excluded them.  And just because he's a treater

15  doesn't mean that the plaintiffs' lawyers can ask him anything

16  they want.

17          THE COURT:  Yes, I agree with that.  I think that the

18  likelihood is that he will be excluded, but I do want to see the

19  deposition and put it in because I think counsel makes a point.

20          What I'm really interested in the deposition for is to

21  see how much that played into his diagnosis, differential or

22  otherwise, and how much that that reflected the course of

23  treatment or the course of his diagnosing the condition.  And I

24  think that the closer you get to that, the more admissible it is.

25  The further you get from that, the less admissible it is.

1      MR. ROBINSON:  Your Honor, maybe when you look at this

2    also, I would look, make sure they are his words.  He's the one

3    saying that it's prothrombotic.  I'm not giving him a

4    hypothetical.  I may have after he said that, but the first time

5    he mentioned it, and in the previous -- in the deposition, he

6    said he had studied the APPROVe study before we even got to that.

7          So I would ask you to go and understand, don't forget

8    as a cardiologist, as a treater, the standard should be lessened.

9    It's not the *Daubert* standard like Dr. Baldwin in the last case.

10   He's a treater and he's the one that brought up the prothrombotic

11   part of Vioxx.

12        THE COURT:  You see, I wouldn't have any problem if the

13   person said, Look, when he came into the office, I gave this some

14   thought.  I analyzed this; I analyzed that.  I took this into

15   consideration; I took that into consideration.  Based on all of

16   these factors, I diagnosed his condition thus and so.  The

17   treater does that, then that's what he does.

18        But if the treater treats and then later on you take

19   his deposition and you say, I assume this, this, this, this and

20   this, what do you think about this, it may not have any

21   relationship to the treatment, and that's the area that I have to

22   be a little more careful of.  I've got to find out how close it

23   is to the diagnosis or how far it is from the diagnosis, and

24   that's the way I see these matters coming down.

25        MR. GOLDMAN:  The next one is very short.

1          THE COURT:  So I'll reserve ruling on this one.

2              Bob, let's make sure I've got a copy of this.

3          MR. GOLDMAN:  The next witness, Judge, is Dr. Bryan, who

4     is Mr. Barnett's heart surgeon in 2002, and there are two

5     questions that I just want to play real quickly at page 179.

6                    (Videotape playback)

7     Q.   All right.  Doctor, assuming that Mr. Barnett took Vioxx

8     daily for approximately 32 months before his heart attack, can

9     you rule out Vioxx as one of the causes of his heart attack?

10    A.    No.

11                (End of videotape playback)

12         MR. GOLDMAN:  One more.  At page 20, line 13.

13                    (Videotape playback)

14    Q.   Doctor, do you have any opinion as to whether or not Vioxx

15    is prothrombotic?

16    A.    No.

17                (End of videotape playback)

18         MR. ROBINSON:  Your Honor, we will agree with Dr. Bryan.

19    Dr. Karavan is the one --

20         THE COURT:  That's not even close.  That's excluded.

21         MR. GOLDMAN:  Your Honor, the next area has to do with

22    the improper use of internal Merck documents with these treating

23    physicians.  And in particular, there is one who stands out, and

24    that's Dr. Mikola, who is one of the two prescribers of Vioxx for

25    Mr. Barnett.

1          You might recall that back in May, we brought to your

2     attention the fact that I learned during Dr. Mikola's deposition

3     that Mr. Robinson's firm had sent him selected documents in

4     advance of THE deposition, highlighted documents in advance of

5     the deposition, and we had no opportunity under Your Honor's

6     current procedure to meet with Dr. Mikola.

7          And what ended up happening during the deposition is

8     that Mr. Robinson would ask questions, Have you seen that before,

9     and Dr. Mikola would say, No, I haven't.  And then he would read

10    from a document he's never seen before, such as -- I'll show you

11    some e-mails in a second -- and then either at that time that he

12    was being asked about a particular document, whether it's

13    Dr. Scolnick's views at a moment in time about the VIGOR trial or

14    whether it was at the very end of the deposition when

15    Mr. Robinson asked this sweeping question, Based on everything

16    you have seen today, would you have prescribed Vioxx?  And let me

17    just play some quick examples, and then I'll explain why I think

18    this is inappropriate.

19                         (Videotape playback)

20    Q.   The exhibit Number 7, will you read who it's to and from and

21    the date, please?

22    A.   It's to Barry Gertz from Alan Nies.  The date is March 28,

23    2000.

24    Q.   And what's the subject?

25    A.   Carlo Patrono on VIGOR, in capitals.

1  Q.    So going back to number 6, what was the -- the one we just

2  read in from Dr. Scolnick regarding the CV events are clearly

3  there, what was the subject of that study?

4  A.    The VIGOR trial, or VIGOR, I should say.

5  Q.    Would you read the -- the first sentence into the record,

6  please, of the next paragraph.

7  A.    He said that he does not think that the CV effect that we

8  observed can be attributed to Naproxen for a couple of good

9  reasons.

10 Q.    Then he gives the reasons.  Could you read those into the

11 record, please.

12 A.    Yes.  First, there is a weak pharmacological basis.

13                    (End of videotape playback)

14           MR. GOLDMAN:  Judge, I'm going to stop that there

15 because he reads forever about a document that he hasn't seen

16 before.  Let me put up another one.

17                      (Videotape playback)

18 Q.    And had you ever seen Exhibit 12 while you were prescribing

19 Vioxx for Mr. Barnett?

20 A.    No, sir.

21 Q.    Okay.  And why don't we read -- I think it appears that --

22 yeah, why don't you read from the bottom up because it looks like

23 the first e-mail was October 15, 2001 at 6:02 from --

24                    (End of videotape playback)

25           MR. GOLDMAN:  I don't need to play that either because

1   he just reads from that document.

2            And then the sweeping question is at page 114, line

3   11.

4                    (Videotape playback)

5   Q.   And given what you've read together, that combined with his

6   angina, would you say that that, from everything you've read

7   about Vioxx today, that you probably would not have prescribed

8   Vioxx for him if you'd known all this information -- in 2000?

9   A.   Having known today what I know about Vioxx, I would not have

10  prescribed it.

11  Q.   Thank you.

12                  (End of videotape playback)

13           MR. GOLDMAN:  Judge, I had another example where, when I

14  was asking questions of Dr. Mikola, he testified -- and I can

15  point you to the particular page -- that when he says I would not

16  have prescribed Vioxx to Mr. Barnett, what he's thinking about is

17  the fact that this drug has been withdrawn from the market -- had

18  he known that the drug had been withdrawn from the market, he

19  wouldn't have prescribed it for Mr. Barnett.  That is a separate

20  issue.

21           The issue here, Judge, is how, just like a witness who

22  would be testifying in your courtroom and would be shown a

23  document on direct examination, asked questions about that

24  document, if the proper foundation is not laid that that witness

25  has personal knowledge of the document, he wouldn't be allowed to

1    testify about it.

2            And just because Dr. Mikola is in South Carolina and

3    that's the way that Mr. Robinson chose to conduct his examination

4    of this witness doesn't mean that he should be allowed to testify

5    in that fashion.  And the ultimate question is also based, Your

6    Honor -- this is a real fundamental problem here -- when you have

7    a -- when you have the jury getting the impression that Merck

8    could have gone to Dr. Mikola and said, Here is Dr. Scolnick's

9    e-mail that you might want to be aware of, here is Dr. Scolnick

10   thought of and was aware of in March of 2000, here is this

11   document, here is that document, here Dr. Scolnick called the

12   FDA's bastards, the FDA would preclude Merck from doing that.

13           And the jury is going to get the misleading impression

14   under Rule 403 that just because a treating physician says, Yes,

15   I would have wanted to know that and if I only had known that I

16   wouldn't have prescribed, that Merck could have been able to do

17   that under the law and we couldn't have, Judge.

18           Those are all of the comments that I have on the issue

19   of misuse of internal documents.

20           THE COURT:  Okay.

21           MR. ROBINSON:  Under the law and under the facts in

22   these cases, we have the burden, the plaintiff Barnett has the

23   burden to show subjectively in the mind of treater, in this case

24   Dr. Mikola, who was his principal treater -- he is the treater --

25   he treated him from January -- actually he started in October of

1  '99, before Vioxx, and treated him all the way up to June of

2  2004, and he kept him on Vioxx during that whole period of time.

3           And then what he says is this -- incidentally, there is

4  more questions there when you read the deposition than the one

5  question.  There was multiple questions where he said, If I had

6  known what I know today about Vioxx, about the documents, the

7  proposed label that Merck put out to the FDA, you know, when they

8  actually said we should put this in a -- the subsequent label

9  that they were going to put out, and then the label that the FDA

10 wanted to put out in October of 2001, all that, he said, Had I

11 known that, I would have kept him on Feldene.  That's my burden.

12 My plaintiff has a burden.  I can't show that without showing the

13 doctor the truth about the drug.

14          Now, when you read the depo, Your Honor, you're going

15 to see that Mr. Goldman showed him multiple documents, including

16 another document by Dr. Scolnick the year later where he recanted

17 his position.  And they showed him the meta-analysis by Merck.

18          And don't forget, this man was married to a sales rep,

19 and she was rep-ing Vioxx for five years, all during this period

20 of time.  And for him to say, after reading all this, this

21 information, and learning what he learned about Naproxen, et al,

22 for him to say, I would have kept this man on Feldene is, it goes

23 to the very heart of this case.  I mean, that's our case.

24          So I really feel that the balance is here to allow this

25 examination.  They got to go into cross.  As Mr. Goldman said, he

32

1   got him to say, Well, you know, it was taken off the market.  The
2   jury can consider all of those things, but I think when you read
3   this deposition, both sides went on.  This deposition went on for
4   nine hours, Your Honor, and this poor man went back and forth,
5   and he was given all these documents, but he stuck to his
6   position that he would have kept him on Feldene, that he would
7   not have put him on Vioxx.  How else can we prove our case?  I
8   mean, this goes to the core of this case.

9          THE COURT:  I've got it.  Since I'm going to read it,
10  I'll read the whole deposition.

11          Let me is just make a comment or two about the question
12  of documents.  Generally speaking, the fact that a document is
13  admitted into evidence doesn't mean that it can be used with
14  every witness.  You've got 602 to be concerned about, with the
15  exception of experts.  Experts don't need to know certain things.
16  They can be asked to assume certain things.

17          But witnesses who are not experts, they need to know
18  something about what they are talking about.  The fact that
19  something is admissible with one witness doesn't mean that it can
20  be used with another witness.  That's generally speaking.

21          Now, there are exceptions to that.  If you're going to
22  impeach the witness, if you're going to refresh the witness'
23  recollection, or if you're going to do something that asks the
24  witness to respond to something that he didn't know or he says
25  something but he didn't know something else.

1        The point that I make is that there are certain

2   instances, certain exceptions, but as a general rule, you've got

3   602.  You can't show a witness something that he knows nothing

4   about, and then the witness says, I don't know anything about it,

5   I haven't seen the document before, and then you ask him to

6   comment on a document that he hadn't seen before.  As a generally

7   rule, I wouldn't allow that into evidence.

8        MR. BECK:  Your Honor, if I could interpose just one

9   comment I would ask you to keep in mind while you review the

10  deposition.  One of the things that Mr. Robinson just said is,

11  Well, the jury ought to know that, you know, the staff of the FDA

12  was recommending one kind of label language before the FDA itself

13  decided on a different kind of label language, and if he had

14  known that, what would he done differently?

15       It would be against the law for a pharmaceutical

16  company to go around to doctors and say, Here is what the

17  communications are at the preapproval stage in terms of what the

18  labeling language is going to be, and the staff has said this or

19  the staff has said that.  You can't do that.

20       I think that's the point that Andy made before that

21  here it's doubly prejudicial to show these documents because many

22  of the documents are documents that not only did he not see, but

23  that we would have been breaking the law if we showed them to

24  him.

25       MR. ROBINSON:  Your Honor, could I speak?  I'm being

34

1    double teamed here.  I feel like it.

2            THE COURT:  You can speak twice as often.

3            MR. ROBINSON:  I'll try, Your Honor.  Your Honor, I

4    really -- I mean, this is the reason, I guess, I'm getting double

5    teamed:  This is the core of the case.  I mean, when you think

6    about it.  If the treating doctor or the prescriber does not say

7    that he will not prescribe Vioxx, what are we doing here?

8            So the bottom line is:  These documents, we know, are

9    authenticated documents.  They are Merck documents.  They are not

10   like I created some documents out of magic and given them to

11   these witnesses.  These are documents that are otherwise

12   admissible.

13           And frankly, if he were in court, let's say that we

14   actually laid the foundation with Dr. Scolnick and laid the

15   foundation with the other witnesses and documents come in

16   evidence, which we believe they will here, and if they do come

17   into evidence in this case, and now we read Dr. Mikola's

18   deposition, that document is in evidence.  Now we can show

19   Dr. Mikola this document and he doesn't -- and we can ask him

20   to -- based on this understanding of what's in this document and

21   other documents, What would you have done?  Because that's all

22   we -- I mean, how else can you answer the question of the

23   subjective intent of the doctor but asking the doctor?  And

24   that's the dilemma that we have.

25           But the Court, really, in these cases has to allow us

35

1  to use the information that he never got.  The whole point is
2  that he didn't get this information.  And for them to say, Well,
3  these are documents he hadn't seen before.  That's the point.  He
4  hadn't seen the evidence regarding the problems in the case.
5        When you read his deposition, Mr. Goldman did an
6  excellent job of going back showing him other documents, but he
7  stuck to his guns on this thing.  And frankly, I think it --
8  really his testimony should come in.  That is the core part of
9  this case.
10       THE COURT:  I got it.  I understand it.  And there is
11  also a way of dealing with something like that from the
12  standpoint of the questioning.  Asking the doctor, Well, why did
13  you do this?  And the doctor says why he did it.  Did you know
14  such and such?  Did you know such and such?  Did you know such
15  and such?  Did you know such and such?  No.  No.  No.  No.  Did
16  you take that into consideration?
17       You get into it some way like that.  The point that I'm
18  making to you is that to show a witness a document and then read
19  it into evidence and the witness says, This is the first time
20  I've seen the document, and then to have the witness comment on
21  the document that he hadn't seen before is just a problem, as I
22  see it, but I'll look at the deposition.
23       MR. GOLDMAN:  Can I make one comment judge because
24  Mr. Robinson said something about me using documents.  I
25  scrambled at a break to try to find some documents to try to

1   respond to the use of Dr. Scolnick's e-mail from March of 2002.

2   So I called my office and had them fax one e-mail that I used in

3   my examination to try to somehow even the playing field here.

4           And the meta-analysis, I didn't use the meta-analysis,

5   that was a document they used.

6           And finally, Judge, there isn't an exception under the

7   federal is rules for 602 if a witness is married to a sales rep.

8   And there is also not -- just because it was a nine and a half

9   hour deposition, that just tells me there is plenty of other

10  testimony that legitimately was elicited that they could play.

11          You can't just say I really need this testimony, it's

12  important to my case, so therefore violate the federal rules.

13          So that's all on the misuse of internal documents.

14          The next area, Judge, is --

15          MR. ROBINSON:  Your Honor, may I --

16          THE COURT:  Yes.

17          MR. ROBINSON:  There is an exception to 602, and if you

18  go to our brief that I filed -- I guess I'm going to ask you to

19  read it -- and basically I said in chambers but basically there

20  is an exception to602.

21          It says, However, 602 is not at all applicable as to

22  documents which were shown by plaintiff's counsel to

23  Dr. McCaffrey and Dr. Mikola.  With respect to documents showing

24  the risk of Vioxx, the witnesses were not testifying about the

25  matter for which personal knowledge would be required.  As to

1   these documents they had no personal knowledge, which is

2   precisely the point.  The documents were introduced to

3   demonstrate the lack of personal knowledge and not to show they

4   knew anything about the matters stated therein.  The lack of

5   knowledge regarding the matters is a key issue to this action.

6          We're trying to say that had they been told the truth

7   that this is their response.  And this is the core in all these

8   cases.  Unless there is a state that says, Well, you have only an

9   objective standard, but in South Carolina, as I understand it,

10  it's a subjective state.

11         So I think that we have, I think that we don't have to

12  lay the 602 foundation.

13         MR. GOLDMAN:  Judge, the next area concerning these

14  witnesses and it's most significant in Dr. Mikola's deposition,

15  and, in particular, in his redirect examination, and that has to

16  do with leading objections of independent --

17         THE COURT:  Leading questions.

18         MR. GOLDMAN:  I'm sorry, leading questions.  Let me hand

19  you --

20         THE COURT:  May be the same.

21         MR. GOLDMAN:  I've handed the Court a list of all of the

22  leading objections that I felt were important to make, and then I

23  have some examples, Judge, to show you.

24         I want to respond to the brief that Mr. Robinson was

25  just referring to.  We didn't file a response to that 56-page

1  brief, but the gist of their argument about why leading questions

2  would be appropriate of independent third-party witness --

3          THE COURT:  611(c).  I got it.

4          MR. GOLDMAN:  Yes.  So that's one.  I'll address the

5  adverse witness issue.

6          The other is Mr. Robinson said that the leading

7  questions benefitted both parties, and somehow because the

8  witness could answer a question in one answer, as opposed to four

9  or five answers, that the parties benefitted from that.

10 Your Honor, I made very clear at the beginning of the deposition

11 of Dr. Mikola on page 10, I objected to the form of one of

12 Mr. Robinson's questions.  And the dialogue that we had was this:

13 I objected to the form, and Mr. Robinson said -- this is early;

14 Page 10 of the deposition -- For the record, your objection was

15 to leading, right?  And then I say, Yes.  And I've not objected

16 because I don't want to unnecessarily delay it, but when a

17 leading objection, I feel, is important, I'll make it; when it's

18 not, I won't.

19         And I made my position very clear at the beginning of

20 the deposition that I didn't think this was going to be

21 beneficial to lead a third-party witness along, so when I made a

22 form objection, it was the time to cure it.

23         So let me play a few examples here.

24                      (Videotape playback)

25 Q.   Dr. Mikola, this conclusion doesn't give you the other side

1    of the coin in terms of indicating that there is a potential

2    prothrombotic effect of Vioxx, does it?

3    A.    It does not indicate a prothrombotic effect.

4    Q.    And you as a prescribing physician rely upon a

5    pharmaceutical company providing you with a fair and balanced

6    presentation of the scientific evidence, correct?

7    A.    I rely on the presentation of evidence to be fair and

8    balanced, yes.

9    Q.    And that would include that if there is two possibilities,

10   that you would expect the company to give you both of those,

11   correct?

12   A.    The conclusion is there are is speculation in the instance.

13            THE COURT:  And you're objecting?

14            MR. GOLDMAN:  Every time.

15   A.    They speculated that the difference is due to a protective

16   effect of Naprosyn.  Would I expect them to also speculate that

17   it may be due to a prothrombotic effect of Vioxx, I don't know.

18   Q.    If they are they are going to provide you with one area of

19   speculation, would it be equally fair and reasonable to give you

20   the other side of that equation?

21   A.    Yes, sir.

22   Q.    And that's especially true in light of what you've seen

23   today where in Dr. Patrono specifically indicated in his e-mail

24   that you couldn't explain the difference because of Naproxen,

25   true?

1  A.    Yes.

2  Q.    And nowhere in this article does it indicate what

3  Dr. Patrono's e-mail indicated that we've already reviewed,

4  correct?

5  A.    That's correct.

6  Q.    And if they did have that evidence that there were those

7  potential prothrombotic effects of Vioxx and, as you indicated,

8  that they should have made it known, it would be wrong not to,

9  wouldn't it?

10  A.    It could potentially result in -- in problems, yes, sir.

11  Q.    It could result in misleading a prescriber that's

12  prescribing the drug, correct?

13  A.    I believe so, yes.

14                    (End of videotape playback)

15       MR. GOLDMAN:    Judge, I don't have to continue.    There

16  was leading question after leading question after leading

17  question.

18       Let me address the adverse witness exception.

19  Basically, the plaintiff's argument is that Dr. Mikola is an

20  adverse witness because his wife is a former Merck sales

21  representative.    Mr. Robinson never disclosed once during the

22  deposition that he felt Dr. Mikola was an adverse witness.    And

23  in fact, when we got into the dialogue about leading objections,

24  the response was that I view him as an adverse witness so I'm

25  going to lead.    And because Mr. Robinson never tried to establish

1   that he was an adverse witness, I didn't have the opportunity to

2   show that wasn't so that Your Honor could rule he is not an

3   adverse witness under Rule 611(c).

4        And we did research, although we haven't filed a brief

5   on it, but the law on what an adverse witness is, is a witness

6   who is identified with a party, and just because Dr. Mikola is

7   married to a former sales representative, it would be one thing

8   if a sales representative was the defendant, then there would

9   be -- then there would be some -- a relationship there, but this

10  would be a revolutionary ruling for a treating physician who

11  happens to have some relationship with somebody at a

12  pharmaceutical company to all of a sudden be an adverse witness

13  and can be led in direct examinations.

14       Your Honor, I objected.  I gave Mr. Robinson and

15  Mr. Wacker the opportunity to cure.  They didn't want to cure

16  because they wanted to lead the witness, and that was their

17  decision, and just because this witness is not available to

18  testify here at trial doesn't mean that they should somehow be

19  allowed to get away with that.

20       And I'll make one more point on this adverse witness

21  argument:  When we came here and told you, Judge, that this

22  happened when the plaintiffs' lawyers sent these highlighted

23  documents to Dr. Mikola, Mr. Robinson sent a letter to the Court

24  explaining why he views that as being appropriate.

25       And in the third paragraph of this letter dated

1   March 10, 2006, at this time -- this is now Mr. Robinson

2   describing who Dr. Mikola is and the circumstances of their

3   meeting.  And here it says, "Dr. Mikola is not a defendant, and

4   with the trial scheduled in July, he is not a potential

5   defendant.  He is a mere bystander."

6           A mere bystander is not an adverse witness under.

7   Rule 611(c), Judge, and that just doesn't make him an adverse

8   witness under 611(c) and doesn't make these questions

9   appropriate.

10          And one more point on Dr. McCaffrey where leading

11  questions also were asked.  Dr. McCaffrey is not an agent of

12  Merck nor is he an employee of Merck just because he has a

13  speaker agreement with Merck.  He entered into an agreement with

14  Merck to be a speaker.

15          And while the plaintiffs reference that in their brief,

16  they never provided Your Honor with the actual speaker agreement.

17  And if you're going to address the question of whether

18  Dr. McCaffrey is an adverse witness and they want you to rely on

19  a speaker agreement, I'm going to hand Your Honor a copy of it

20  and just point you to one section.

21          This is Exhibit 6 to Dr. McCaffrey's deposition.  This

22  is his speaker moderator agreement, and if you look, Judge, on

23  the second page -- I'll actually pull it up so I won't have to

24  direct you there.  Bear with me.  It's on the third page under

25  status.  "You, Dr. McCaffrey, are an independent contractor and

1  not an employee of Merck."

2  So there are independent contractors who can be

3  considered agents, but under those circumstances, the principal

4  has to have such control over the independent contractor that

5  he's basically acting as his agent.  Here the agreement makes

6  clear that Dr. McCaffrey has the right to say what he wants about

7  Merck's product consistent with the label.  It's not as though

8  Merck controls what Dr. McCaffrey has to say about Merck

9  products.

10  MR. ROBINSON:  Your Honor, first of all, let me

11  generally state, the law used to be adverse witness.  When I

12  started out practicing law, probably as Your Honor did, you had

13  to be an adverse witness, but 611(c) was amended to include a

14  person identified with a party.

15  And that's -- we're not saying that they are adverse

16  witnesses.  We're saying that these two doctors are closely

17  enough identified with the party.  And the cases that we show you

18  in that brief show there was a person whose girlfriend was

19  connected to the defendant and they said that was enough.  There

20  are cases where you don't have to be an employee.  You don't have

21  to be an agent but you identify.

22  And just quickly -- let's go to Number 1.  Leading

23  questions may be necessary to develop for a person identified

24  with an adverse party.  That the trial court has broad discretion

25  to permit leading questions on direct where it is the most

1   effective manner.

2         Go ahead.

3         However cooperative the witness has built-in incentive

4   to slide away from a question or slant the answer, hostility not

5   required.

6         An adverse party or witness identified with an adverse

7   party can be examined by leading questions without him showing

8   actual hostility.

9         To be identified with an adverse party, a witness must

10   have or had some relationship with that party.  Intent to enlarge

11   the category.

12         Whoever, you know, the group that modified 611 or

13   actually 43(b), they talked about expanding this rule.  And here

14   is the case where they say as a consequence, the courts have held

15   that a party's employee and girlfriend are sufficiently

16   identified with that party.

17         And I can give you -- I'll give you these -- these

18   cases are all in the brief I filed, Your Honor, that 56-page

19   thing that they talked about.

20         Now, let's go to Number 9.  This is Dr. McCaffrey.

21               (Videotape playback)

22   Q.   Have you ever felt during the time that Merck was paying you

23   to speak about some of their products that they were trying to

24   buy you off or to stop you from prescribing other medications?

25   A.   No, sir.

1  Q.   Your decision to prescribe Vioxx to your patients, was that

2  based on your judgment that that was the best medication for your

3  patients or was that because you were speaking on --

4                   (End of videotape playback)

5            MR. ROBINSON:  Your Honor, I want to say this right now:

6  This is Mr. Goldman and he went first so this is direct exam.  So

7  certainly he's leading him here on direct exam, and frankly, I

8  was cross-examining this witness.  So I don't think -- I think

9  he's definitely identified with the party but we'll go on.

10                   (Videotape playback)

11 Q.   -- speaking on behalf of Merck?

12 A.   I thought it was the best medication for my patients.

13                   (End of videotape playback)

14                   (Videotape playback)

15 Q.   Did your role as a speaker , sir, for Merck have anything to

16 do with your decision to prescribe Vioxx to Mr. Barnett on

17 December 30th of 1999?

18 A.   No, sir.

19 Q.   Why do you say that?

20 A.   Because I speak for multiple companies.  I have a -- when I

21 go into partnership with a company, and Merck has been the first

22 company to step out this year and say it, is I tell them I'll

23 speak -- I'll present the slides, but after the talk's over,

24 we're going to go free flow on what people want to ask about.  If

25 they don't want to talk about migraines, we'll talk about

1    something else.  I had to sign a contract with Merck this year

2    saying, We're not going to use slides any more.  We're not going

3    to talk about migraines.  We're going to walk in and --

4    roundtable and let people talk about what they want to talk about

5    neurology.  So there won't even be information that's given to

6    them any more.  If they want to talk about migraines, we'll talk

7    about migraines.  If they want to talk about low back pain, we'll

8    talk about low back pain.  But this -- you have to sign this

9    contract and show you're not going to talk about anything on

10   label with our -- our product unless asked to talk about it.

11                    (End of videotape playback)

12                       (Videotape playback)

13   Q.   Were you aware that -- that you were considered a Merck,

14   quote, top earner for Vioxx?

15   A.   I'm a top earner for many many pharmaceutical companies.

16   Merck is not special.

17   Q.   But were you aware that you were considered a Merck top

18   earner for the drug Vioxx?

19   A.   I knew that I [inaudible] a lot of medications, yes.

20   Q.   And you were a top earner for Vioxx, right?

21   A.   I mean, reps would say, you know, you know, You're doing

22   well with the medication.

23                    (End of videotape playback)

24                       (Videotape playback)

25   Q.   But does it appear from that chart that actually you're

1  getting paid more than the other people from Myrtle Beach; is

2  that correct?

3  A.   There isn't anybody else from Myrtle Beach.

4  Q.   You're the man?

5  A.   I'm the man.

6                    (End of videotape playback)

7           MR. ROBINSON:  Your Honor, I really think, first of all,

8  I had him on cross, so I can lead him.  And Number 2, he really

9  is identified with Merck.

10          THE COURT:  What about this under cross?  He's got him

11 under cross.  What's the --

12          MR. GOLDMAN:  Well, Your Honor, I wasn't taking a direct

13 examination of Dr. McCaffrey.  I was conducting a discovery

14 deposition.  He's not my witness who I'm sponsoring.  I noticed a

15 deposition of him and asked questions, and just because a lawyer

16 goes second a deposition doesn't mean that he can lead.  It has

17 to be true cross-examination.  This is the plaintiff's

18 prescriber.  It's not our witness.

19           And as far as -- that was the answer to your question

20 but I have other responses.

21          THE COURT:  You know, that's not totally accurate in the

22 sense of the law from the standpoint because if a plaintiff calls

23 a witness, a defense representative or something under

24 cross-examination, which he's allowed to do on 611(c), then you

25 take that person on after they are finished with it.  You have a

1    right to cross-examine the individual, even though he's your

2    witness.  That's the *Morvant* case, 570 F.2nd 626.  It's under the

3    federal law, at least in the Fifth Circuit here, nobody owns a

4    witness in that way.  Whoever goes second is questioning the

5    witness.

6         I don't know what type deposition and what type of

7    arrangements you-all made in this situation, but the fact that

8    you're taking a witness, a treater, you may take that witness

9    under 611(c), because that witness may be closely aligned to the

10   plaintiff.  I would expect them to be, if he's a treater.  So you

11   have a right to lead him under that.  But the fact that you lead

12   him or you take him under cross doesn't deprive the person who

13   follows you from taking him under cross-examination.

14        MR. ROBINSON:  Thank you, Your Honor.  You'll see in the

15   deposition, I mean, this witness, especially the first 50 pages,

16   Mr. Goldman, with all due respect, is just leading him, and he's

17   just repeatedly agreeing with everything Mr. Goldman is saying.

18   I clearly took this witness on cross.  This was what I felt was a

19   hostile witness, but he certainly was a person aligned with

20   Merck.

21        Now, with rep sect to Dr. Mikola, let's just show,

22   Mr. Goldman said that, you know, the fact that he was married to

23   a Merck sales rep had nothing to do with his prescribing Vioxx to

24   my client.  But I think a jury and you can look at the way he

25   answers the question on that issue and just take a look at the

1    body language.  Go right ahead.

2                    (Videotape playback)

3    Q.   Was your wife's job as a sales representative for Merck ever

4    a factor in your decision to prescribe Vioxx to your patients?

5    A.   Was it a factor?  I would say that if I had a patient who

6    would benefit from a COX-2 inhibitor and -- at that time and to

7    the day, I still probably don't believe that any of the three

8    that were available were more effective than the others I may be

9    inclined to use Vioxx first, but, if -- as I mentioned, if it

10   didn't work for the patient, I would not hesitate to switch them

11   or if a patient came in, for instance, and asked for Celebrex or

12   Bextra, I would not be opposed to putting them on it first.

13   Q.   Did your decision to recommend that Mr. Barnett use Vioxx

14   have anything to do with your wife being a sales representative

15   for Merck?

16   A.   No, sir.

17                   (End of videotape playback)

18   Q.   Your Honor, I would just --

19             MR. ROBINSON:  Your Honor, I would think that he can't

20   help if his wife is for five years selling Vioxx.  You could see

21   that he would have a tendency, he even said that to put these

22   people on Vioxx or keep them on Vioxx, like this is what happened

23   to Mr. Barnett.  I think this, Your Honor, that really 611(c)

24   should allow some level of leading.

25             We didn't lead throughout, but there were times,

1  especially when he became protective of the sales reps, and

2  you'll see in the deposition that he's protective of his own

3  wife.  I mean, so when he's asked questions about sales reps,

4  that is an area where he's really a little bit adverse or hostile

5  to the plaintiffs.  So I would ask that you read the deposition.

6          THE COURT:  Yes, I'll look it over.  There are two

7  issues, three issues, really.  The first issue is there may be

8  bias but the bias may not rise to the level of making him hostile

9  or associated with the party.  That's one area.

10         The other area is that the purpose of not leading a

11 witness is so that the witness is not taken advantage of.  And to

12 some extent, with experts, while there is no exception that says

13 you can lead an expert, the Courts generally allow more leading

14 of experts for efficiency purposes knowing that the expert knows

15 more than the lawyer, and so he's not going to be led or

16 intimidated by the lawyer.  So there is some leeway given to

17 that.

18         And so it's a little bit more of a gray area, and while

19 you can't lead a witness that you take on chief or under direct,

20 there is some areas that it might be okay with an expert.  So

21 it's going to be hard for me to just paint with a broad brush and

22 say no leading or okay leading.  It's easier for me to say if the

23 person is not hostile or the person is not related or the person

24 in 611(c) is not applicable for that basis.  But whether or not

25 in my discretion I allow it is going to be a little more in a

1   gray area because you take other things into consideration.

2          MR. GOLDMAN:  And, Judge, on that point, I just want to

3   remind you that on Dr. Mikola's examination, that was

4   Mr. Robinson going first and I questioned, and even when I

5   questioned -- and I could put an example up where Mr. Robinson

6   objected on form grounds -- if I thought it was a valid

7   objection, I cured it, and just because they didn't object if I

8   did lead doesn't mean that their leading objections are allowed

9   if I object at the time.

10          THE COURT:  That point is significant.

11          MR. GOLDMAN:  And then also, Judge, on the case that

12   they rely on for the party's girlfriend, they are just throwing

13   around the word *girlfriend.*  That's a case where the party's

14   girlfriend was a witness that was being led.  Dr. Mikola's wife

15   is not a party.  She is a former sales representative.  That's

16   not a party.

17          And then finally, Judge, if body language were the test

18   on whether or not a witness is adverse under Rule 611(c), which

19   it's not, I would encourage you to watch this man testify,

20   because Dr. Mikola, when I asked that first question, Is it a

21   factor when you prescribe Vioxx to your patient, that was

22   about -- I was going to play that for you -- that was about the

23   most deliberate, I think, thoughtful answer a witness could give.

24   It wasn't, No, I absolutely would never factor that in.  It was

25   a, Let me think about that, and you know what, if it's a close

1    call, then maybe I probably would prescribe it.  That's not --

2          THE COURT:  Six of one, half a dozen of the other is

3    what you're saying.

4          MR. GOLDMAN:  Yes.

5          All right.  The last deposition clip, Judge, that I

6    wanted to show you has to do with Dr. Epstein, and it's just two

7    areas for Dr. Epstein.  Let me hand this to you and I'll tell you

8    who he is.

9          Dr. Epstein is a nonretained expert for the plaintiffs.

10   He is very experienced in the field of atherosclerosis.  He

11   conducted a study that Merck funded with respect to animals and

12   testing to determine whether or not Vioxx played any role in

13   atherosclerosis.

14         His deposition was limited, as it says at the very

15   beginning, to the subject matter of that particular study.  And

16   admittedly, both sides went a little bit beyond that at times,

17   but that was the understanding that he was independently

18   represented.

19         So I asked some questions of Dr. Epstein, and he

20   answered some of these, and they had to do a plaque rupture.  And

21   they had to do with APPROVe.  And I'll show you the clip in a

22   minute, but what happened was he answered the question about

23   plaque rupture, and then it became clear to me that he didn't

24   read the APPROVe study, or he suggested that.

25         And we took a break and with Mr. Sizemore there as

1   well, we all talked about this issue, and then we got back on the

2   record, and you'll see that after he answers my questions about

3   plaque rupture and APPROVe, he acknowledges that he's never read

4   the APPROVe study, that he's only heard about the APPROVe study

5   secondhand.  And then with respect to the APPROVe extension data

6   or the follow-up data, he said that his only knowledge about that

7   comes from newspaper articles that he read.

8           So, while Dr. Epstein is extremely knowledgeable and

9   experienced about atherosclerosis, he admittedly is not when it

10  comes to whether Vioxx causes plaque rupture.  And let me just

11  play that.

12          THE COURT:  Before you do that, could we take a

13  five-minute break before 5:00.  Court will stand in recess.

14          THE DEPUTY CLERK:  Everyone rise.

15                      (Recess)

16          THE DEPUTY CLERK:  All rise.

17          THE COURT:  Be seated.

18          MR. GOLDMAN:  Judge, this is at page 237 to 239 and then

19  to 242 to Dr. Epstein's deposition.

20                  (Videotape playback)

21  Q.   Do you know whether any study has ever shown that Vioxx or

22  any other COX-2 inhibitor like Celebrex or Bextra or others had

23  shown that COX-2 inhibition can increase the likelihood of plaque

24  rupture in these atherosclerotic lesions?

25  A.   Yes.

1  Q.    Did I limit that to human studies?

2  A.    Yes.   I mean, you know, acute myocardial infarction is

3  95 percent of the time caused by plaque rupture.   So if there is

4  a study, a randomized study in which Vioxx was used, and there's

5  a threefold increase in myocardial infarction, you know, that's

6  very good evidence that it reduces the incidence of plaque

7  rupture.

8  Q.    Well, if there's the study -- are you speaking of the

9  APPROVe study?

10  A.    The APPROVe.

11  Q.    Were you through, Doctor?

12  A.    No.  Well, I'm talking, excuse me, about the VIGOR study,

13  where there was no placebo, and that's a whole different issue,

14  and then the APPROVe study, where it was against a placebo.

15  Q.    But I want to just be clear about the APPROVe study.   I'm

16  trying to talk about --

17  A.    May I just say, I've not read the APPROVe study.

18                    (End of videotape playback)

19                      (Videotape playback)

20  Q.    Dr. Epstein based on discussions we've just had off the

21  record, the previous testimony that you just gave about plaque

22  rupture and about the APPROVe study --

23  A.    Yes.

24  Q.    Was your previous testimony about plaque rupture and about

25  what occurred in APPROVe based on your review of the APPROVe

1  study?

2  A.    It was not, no.  I did not review the study.  It was based

3  on what I had heard secondhand about the results of the APPROVe

4  study.

5                    (End of videotape playback.)

6              MR. GOLDMAN:  And then just one more, Judge.  This is

7  about the APPROVe follow-up data.  I think Mr. Sizemore asked a

8  question about this, and then the witness made clear he doesn't

9  know anything about the follow-up data other than what he read in

10 the newspaper.

11                   (Videotape playback)

12 Q.    Are you aware of the APPROVe follow-up data, Doctor?

13 A.    Just insofar as I read Dr. FitzGerald's summary of it.

14 Q.    Is it your opinion, having reviewed Dr. FitzGerald's

15 information about the APPROVe follow-up data, that it

16 substantiates your study?

17 A.    Well, it showed -- it showed, you know, harmful effects of

18 Vioxx.  So certainly -- I mean, it showed harmful effects of

19 Vioxx.  I'd leave it at that.

20 Q.    Did it also show a harmful effect of Vioxx after treatment

21 had been stopped for a year?

22 A.    Right.  So those are studies that I just read in the

23 newspaper.

24                   (End of videotape playback)

25             MR. GOLDMAN:  So Your Honor, Dr. Epstein's methodology

1   is unsound, as he's relying on newspaper articles.

2           THE COURT:  Is he a treater?

3           MR. GOLDMAN:  No, he's not.  He's a nonretained expert

4   who deposition was to be limited to the one study that he

5   performed.

6           MR. ROBINSON:  Your Honor, with all due respect to Andy,

7   that was sort of what I call half of the truth.  Okay.  The truth

8   is this:  This man is one of the world-class cardiologists and

9   certainly in the United States.  And he was heading up cardiology

10  at the NIH.

11          And Merck hired him to do a study for Merck on

12  atherosclerosis, and what happened is he wanted to use Vioxx, but

13  Merck instead said, Well, we'll send him this tricyclic.  And

14  there is e-mails where they say, you know, This way, if he

15  publishes -- if he gets an adverse result on the tricyclic and it

16  shows atherosclerosis in the mice that he's going to do the study

17  on, then in the articles we won't see Merck; we won't see Vioxx.

18          In addition, the evidence is that they made him

19  actually, you know, submit some sort of an abstract or prediction

20  that actually -- that it was not going to -- Vioxx was not going

21  to cause accelerated atherosclerosis, which he did.  Now, he does

22  a study for Merck, and lo and behold, he sends an e-mail to Merck

23  saying in 2001 -- this is a year and two months before

24  Mr. Barnett had his heart attack -- in 2001, he says to Merck,

25  Gee, I've got a surprise for you.  My study results didn't come

1  out the way we predicted.  Vioxx, or this tricyclic, did cause

2  atherosclerosis.

3           So he definitely knows all about this.  He's doing the

4  same thing that FitzGerald is doing.  He's doing these studies.

5  He's not only a person doing a study like FitzGerald, he's a top

6  cardiologist.  He had been the head, like I said, at the NIH.

7           Now, I just saw that he later -- Mr. Sizemore took the

8  deposition, but he said he didn't read the APPROVe studies but he

9  read the VIGOR study, Number 1, and, Number 2, he read a study of

10  the APPROVe study, he said, from Dr. FitzGerald.

11           So you know, I think this, that that's a person aligned

12  with Merck, identified with Merck -- 611(c).  If you read my

13  brief, Your Honor, I think he really is.  He was retained by

14  Merck.  I think that we took his deposition because we found

15  these documents that he had done these studies.  So I wish you

16  would just read our brief and read the portions in there because,

17  you know, I could think --

18           THE COURT:  What about the deposition?  What's the

19  deposition going to be offered for?  For his study that he was

20  hired by Merck to do?

21           MR. ROBINSON:  Yes, Your Honor.

22           THE COURT:  His knowledge of the APPROVe --

23           MR. ROBINSON:  They are not objecting to that.  They

24  just don't want this line of questions to come in.

25           MR. GOLDMAN:  The former.  It's the former, Judge.  And

1    611(c), I'm not even arguing about leading.  And by the way, he's

2    a nonretained expert for plaintiffs, but we're not talking about

3    leading.  The VIGOR study, if you read that section carefully, he

4    said, Well, the VIGOR study, that has its own problems; that

5    wasn't a placebo-controlled study, so he's not relying on that

6    for his opinion.

7          And whether or not Dr. Epstein is a top cardiologist or

8    has done studies like Dr. FitzGerald doesn't qualify him to

9    testify or suggest that he's applied the appropriate scientific

10   methodology to reach an opinion about plaque rupture that he's

11   never made before and that's based on newspaper articles and the

12   APPROVe study he's never read.

13         THE COURT:  We're not talking about his whole

14   deposition.  We're talking about a portion.

15         MR. GOLDMAN:  Those questions.

16         THE COURT:  Give me the portion that we're focused on.

17         MR. ROBINSON:  Yes, Your Honor.  I think he gave it to

18   you.

19         THE COURT:  That's the only portion?

20         MR. GOLDMAN:  We made other objections to Dr. Epstein,

21   Judge, but those are the most important.

22         MR. ROBINSON:  Basically what he's saying, as I read

23   this, he was asked, Do you know of any studies in humans that

24   show that Vioxx or COX-2 inhibition can increase the likelihood

25   of plaque rupture in atherosclerotic lesions.  Now, this man is a

1   cardiologist who has done studies himself and he's saying, Look,

2   deductive reasoning as a cardiologist, I know that 95 percent of

3   heart attacks are due to plaque rupture so that if there is an

4   increased risk in VIGOR or in APPROVe or one of these studies

5   that -- for heart attacks with Vioxx, that ergo, if 95 percent of

6   heart attacks are plaque rupture, that that implies that the

7   studies show plaque rupture was the cause of it.

8           So I think what he's saying is what a cardiologist of

9   his repute would say, and I don't really see it as damaging as

10  counsel said.  I think that should come in.  That issue of plaque

11  rupture is important.

12          THE COURT:  You're asking the question, Are you speaking

13  about the APPROVe study?  He says, Well, I haven't read the

14  APPROVe study.  And then he says something, about you follow-up,

15  and he says, Well, the only thing I know about is what I read in

16  the newspaper.

17          A portion of this might be okay, but I mean, where

18  you're dealing with asking him about the APPROVe study which he

19  didn't even read and then asking him about the follow-up, and the

20  only thing he knows about it is in the newspaper.

21          MR. ROBINSON:  I wish I could say Mr. Beck did that.

22          THE COURT:  For some of this, I don't see that coming

23  in.

24          MR. ROBINSON:  Okay.

25          MR. GOLDMAN:  Judge, those are all the specific

1    objections we wanted to bring to your attention, but I wanted to

2    make clear what I handed you from Dr. Mikola, for example, about

3    leading objections, those are just examples of the leading

4    objections that we made in the redirect.  So I ask that you

5    consider all of the objections that we made for these witnesses

6    and consider some of the arguments that we made here today.

7         THE COURT:  I'll look over those.  But let me make sure

8    that I'm on the same page with you.  The ones that I'm looking at

9    are Dr. Mikola for the whole deposition, and what's the leading

10   one?

11        MR. GOLDMAN:  Dr. Mikola and Dr. McCaffrey, but

12   principally Dr. Mikola and primarily the redirect but elsewhere,

13   too.

14        THE COURT:  Okay.  Is that it for today?

15            The trial setup will be Friday, July 28th, in the

16   courtroom at 11 o'clock so that your staff and you can be

17   familiar with it.  They want you to bring your laptops to

18   configure the wireless system.

19            If you have any questions at all, talk to

20   Gaylyn Lambert.  She'll coordinate that with you and for you.

21            And you'll get in touch with me as to which time

22   you-all want to meet tomorrow, or the next day and Friday.

23        MR. ROBINSON:  Your Honor, I know Mr. Beck had a matter

24   at one o'clock, but we could do it in the morning or we could do

25   it about 3:00.  Would that be about right?  Whatever is good for

1    the Court's calendar.

2            THE COURT:  I'll check with my calendar and we'll work

3    it out.  Okay, folks, thank you very much.  The Court will stand

4    in recess.

5            THE DEPUTY CLERK:  Everyone rise.

6                         (END OF COURT)

7                         *    *    *

8

9

10                    REPORTER'S CERTIFICATE

11

12      I, Cathy Pepper, Certified Realtime Reporter, Registered

13   Professional Reporter, Certified Court Reporter, Official Court

14   Reporter, United States District Court, Eastern District of

15   Louisiana, do hereby certify that the foregoing is a true and

16   correct transcript, to the best of my ability and understanding,

17   from the record of the proceedings in the above-entitled and

18   numbered matter.

19

20

21                         _____

22                         Cathy Pepper, CCR, RPR, CRR

23                         Official Court Reporter

24                         United States District Court

25