1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE: VIOXX PRODUCTS        *    MDL DOCKET NO. 1657
     LIABILITY LITIGATION         *
6                                 *
                                  *
7    THIS DOCUMENT RELATES TO     *    AUGUST 1, 2006, 8:30 A.M.
                                  *
8                                 *
     GERALD BARNETT V. MERCK      *    CASE NO. 06-CV-485-L
9      & CO., INC.                *
     * * * * * * * * * * * * * * *

10

11
                               VOLUME II
12                      JURY TRIAL BEFORE THE
                        HONORABLE ELDON E. FALLON
13                   UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15

16   FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                 BY:  MARK P. ROBINSON JR., ESQ.
17                               620 NEWPORT CENTER DRIVE
                                 NEWPORT BEACH, CALIFORNIA 92660
18

19   FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                   PORTIS & MILES
20                               BY:  ANDY D. BIRCHFELD, JR., ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22

23   FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                   PALENCHAR & SCOTT
24                               BY:  PHILIP S. BECK, ESQ.
                                   ANDREW L. GOLDMAN, ESQ.
25                               54 W. HUBBARD STREET, SUITE 300
                                 CHICAGO, ILLINOIS 60601


                              DAILY COPY

1

2     OFFICIAL COURT REPORTERS:     CATHY PEPPER, CCR, RPR, CRR
                                    TONI DOYLE TUSA, CCR, FCRR
3                                   500 POYDRAS STREET, ROOM HB-406
                                    NEW ORLEANS, LOUISIANA 70130
4                                   (504) 589-7778

5

6

7     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
      PRODUCED BY COMPUTER.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  **I N D E X**

2                                                                    PAGE

3    DAVID ANSTICE
          DIRECT EXAMINATION                                       191
4         CROSS-EXAMINATION                                        231
          REDIRECT EXAMINATION                                     253
5

6    GERALD AVORN
          VOIR DIRE                                                265
7         TRAVERSE                                                 285
          DIRECT EXAMINATION                                       287
8         CROSS-EXAMINATION                                        403

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **MORNING SESSION**

2              **(AUGUST 1, 2006)**

3          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4   TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5   REPORTER.)

6          **THE DEPUTY CLERK:**  EVERYONE RISE.

7          **THE COURT:**  BE SEATED.  GOOD MORNING.

8          (WHEREUPON, **DAVID ANSTICE**, HAVING BEEN DULY SWORN,

9   TESTIFIED BY DEPOSITION AS FOLLOWS.)

10             **DIRECT EXAMINATION**

11  BY MR. ROBINSON:

12  **Q.**   YOUR NAME IS DAVID ANSTICE?

13  **A.**   THAT'S CORRECT.

14  **Q.**   DID I PRONOUNCE IT RIGHT?

15  **A.**   YOU DID.

16  **Q.**   ALL RIGHT.  I UNDERSTAND YOU'RE THE PRESIDENT OF SOME PART

17  OF MERCK.  WHAT PART ARE YOU THE PRESIDENT OF?

18  **A.**   HUMAN HEALTH FOR CANADA, LATIN AMERICA, JAPAN, AUSTRALIA,

19  AND NEW ZEALAND.

20  **Q.**   AT SOME POINT WERE YOU THE PRESIDENT OF MERCK AMERICA OR

21  SOMETHING LIKE THAT?

22  **A.**   YES, I WAS.

23  **Q.**   WHEN WAS THAT?

24  **A.**   FROM A PERIOD LATE '94 THROUGH TO THE END OF 2002.

25  **Q.**   DID YOU GET PROMOTED OUT OF THAT OR DEMOTED FROM THAT?

1    **A.**   I GOT A NEW ASSIGNMENT WITH JAPAN.

2    **Q.**   IS THAT A PROMOTION OR A DEMOTION?

3    **A.**   THAT IS AN IMPORTANT DIFFERENT RESPONSIBILITY.

4    **Q.**   OKAY.  I UNDERSTAND, BUT WAS IT A PROMOTION OR A DEMOTION?

5    **A.**   IT WAS NEITHER.  IT WAS --

6    **Q.**   A LATERAL?

7    **A.**   A LATERAL, CORRECT.

8    **Q.**   ALL RIGHT.  MERCK MADE SOME TRAGIC MISTAKES WITH VIOXX,

9    DIDN'T IT?

10   **A.**   I DON'T THINK SO.

11   **Q.**   ARE YOU SURE?

12   **A.**   YES.

13   **Q.**   WELL, SIR, ISN'T RULE NUMBER-- BY THE WAY, ARE YOU A

14   MEDICAL DOCTOR?

15   **A.**   NO, I AM NOT.

16   **Q.**   YOU'RE THE PRESIDENT OF WHAT PART OF MERCK NOW?  I'M

17   SORRY.  LET ME WRITE IT DOWN.  YOU'RE THE PRESIDENT OF HEALTH

18   AND WHAT?

19   **A.**   HUMAN HEALTH, WHICH IS OUR COMMERCIAL OPERATIONS.

20   **Q.**   YOU'RE THE PRESIDENT OF HUMAN HEALTH AND YOU DON'T HAVE A

21   MEDICAL DEGREE?

22   **A.**   I DO NOT.

23   **Q.**   WELL, DID YOU GO TO ANY MEDICAL SCHOOL AT ALL?

24   **A.**   NO, I DID NOT.

25   **Q.**   WELL, AS THE PRESIDENT OF HUMAN HEALTH, WHAT KIND OF HUMAN

DAILY COPY

1    HEALTH SCHOOLING DO YOU HAVE?

2    **A.**    I'M RESPONSIBLE FOR SALES AND MARKETING ACTIVITIES, AND I

3    HAVE THE TRAINING AND THE SKILLS DEVELOPED IN 31 YEARS AT

4    MERCK.

5    **Q.**    THAT WASN'T MY QUESTION, SIR.  WHAT KIND OF SCHOOLING DO

6    YOU HAVE IN HUMAN HEALTH IF YOU'RE GOING TO BE THE PRESIDENT OF

7    THE HUMAN HEALTH DIVISION?

8    **A.**    I HAVE SCHOOLING.  I HAVE TERTIARY EDUCATION IN ECONOMICS,

9    AND I JOINED MERCK.  AND AS TYPICAL WITH MANY PEOPLE ON THE

10   BUSINESS SIDE, I DO NOT HAVE A MEDICAL DEGREE OR A MEDICAL.

11   **Q.**    SO THE PRESIDENT OF HUMAN HEALTH FOR MERCK DOESN'T HAVE

12   ANY KIND OF HEALTH BACKGROUND AT ALL OTHER THAN THE FACT HE'S

13   BEEN IN SALES FOR MERCK FOR 30 SOME-ODD YEARS.  RIGHT?

14   **A.**    SALES AND MARKETING FOR MERCK FOR 30 YEARS.  THAT'S MY

15   EXPERIENCE AND BACKGROUND.

16   **Q.**    OKAY.  SO WHEN I SAY "MERCK MESSED UP WITH VIOXX" AND YOU

17   SAY, "NO, WE DIDN'T," I GUESS YOU'RE SPEAKING FROM THE SALES

18   AND MARKETING PERSPECTIVE?

19   **A.**    I'M SPEAKING AS A SENIOR EXECUTIVE AT MERCK.

20   **Q.**    WELL, Y'ALL PUT A DRUG ON THE MARKET THAT YOU HAD TO

21   WITHDRAW, DIDN'T YOU?

22   **A.**    WE PUT A DRUG ON THE MARKET.  WE HAVE NOW WITHDRAWN IT.

23   **Q.**    THE DRUG SHOULDN'T HAVE BEEN ON THE MARKET TO START WITH,

24   SHOULD IT?

25   **A.**    I BELIEVE IT SHOULD HAVE BEEN ON THE MARKET.

1   **Q.**   WERE YOU PART OF THE DECISION TO TAKE IT OFF THE MARKET?

2   **A.**   I WAS PART OF THAT DECISION, YES.

3   **Q.**   DID YOU VOTE FOR TAKING IT OFF OR FOR LEAVING IT ON?

4   **A.**   WE DID NOT HAVE A VOTE.  I SUPPORTED THE RECOMMENDATION

5   AND THE DECISION AFTER THE APPROVE STUDY THAT, IN THE INTEREST

6   OF PATIENT SAFETY, VIOXX SHOULD BE WITHDRAWN FROM THE MARKET.

7   **Q.**   WELL, Y'ALL SHOULD HAVE HAD THAT DATA FROM APPROVE BEFORE

8   YOU EVER PUT THE DRUG ON THE MARKET, SHOULDN'T YOU?

9   **A.**   THE DATA FROM APPROVE -- THE APPROVE WAS A STUDY IN COLON

10  POLYPS, AND THAT STUDY WAS STARTED SOME FOUR AND A HALF YEARS

11  EARLIER.

12  **Q.**   AND MY POINT IS:  Y'ALL OUGHT TO STUDY THESE THINGS AND

13  DECIDE IF THE DRUG IS SAFE OR NOT BEFORE YOU SELL IT, NOT AFTER

14  YOU'VE BEEN SELLING IT FOR YEARS.  DON'T YOU AGREE?

15  **A.**   MERCK DID STUDY THE PRODUCT, MERCK DID PROVIDE SAFETY

16  ANALYSIS, AND THE BASIS OF THE APPROVAL FOR THE PRODUCT IN 1999

17  WAS BASED ON THE SAFETY DATA.

18  **Q.**   BUT YOU DIDN'T STUDY THE PRODUCT ADEQUATELY TO DECIDE

19  WHETHER OR NOT YOU OUGHT TO KEEP IT ON THE MARKET BECAUSE THAT

20  STUDY DIDN'T HAPPEN UNTIL THE APPROVE STUDY, AND YOU PULLED IT.

21  RIGHT?

22  **A.**   THE DATA THAT WE HAD AT THE TIME OF THE NEW DRUG

23  APPLICATION WAS CONSISTENT WITH STUDIES DONE FOR ALL OTHER--

24  VERY SIMILAR TO ALL OTHER NONSTEROIDALS AND WAS APPROPRIATE FOR

25  THE MARKETING OF THE PRODUCT EFFICACY AND SAFETY.

1   **Q.**   TRUTH BE TOLD, YOU COULDN'T WAIT TO GET ALL THE STUDIES

2   DONE BECAUSE YOU HAD TO GET TO MARKET QUICKLY.   RIGHT?

3   **A.**   MERCK COMPLETED ALL OF THE STUDIES THAT WERE REQUIRED FOR

4   THE NEW DRUG APPLICATION.

5   **Q.**   OH, I'M NOT SAYING YOU DIDN'T SATISFY THE LAW.   I'M

6   TALKING ABOUT TAKING CARE OF THE PATIENTS.   MY POINT IS:   YOU

7   DIDN'T DO ALL OF THE STUDIES YOU SHOULD HAVE DONE BEFORE YOU

8   WENT TO MARKET BECAUSE YOU COULDN'T AFFORD TO TIME-WISE; ISN'T

9   THAT TRUE?

10  **A.**   I DO NOT ACCEPT THAT THAT'S CORRECT.

11  **Q.**   WELL, LET'S LOOK AT A COUPLE OF THINGS.   RULE NUMBER ONE

12  FOR A DOCTOR-- AND I KNOW YOU DON'T HAVE MEDICAL TRAINING, BUT

13  YOU HAVE PROBABLY HEARD, AT LEAST, THAT RULE NUMBER ONE IS DO

14  NO HARM.   RIGHT?

15  **A.**   THAT'S CORRECT.

16  **Q.**   AND YOU THINK, FOR A DRUG COMPANY, THAT OUGHT TO BE PRETTY

17  HIGH UP THE CHAIN OF RULES, ALSO, WOULDN'T YOU?

18  **A.**   PATIENT SAFETY IS PARAMOUNT IN OUR COMPANY.

19  **Q.**   SHOULD BE ANYWAY, SHOULDN'T IT?

20  **A.**   IT IS.

21  **Q.**   WELL, IF WAS, WHY DIDN'T YOU DO ALL OF YOUR STUDIES BEFORE

22  YOU MARKETED THE DRUG?

23  **A.**   WE BELIEVED THAT WE HAD THE APPROPRIATE STUDIES, BASED ON

24  THE KNOWLEDGE AT THAT TIME, TO SUPPORT THE BENEFIT AND RISKS OF

25  THE PRODUCT.

1    **Q.**   IF YOU HAD THE APPROPRIATE STUDIES, WHY WERE YOU STILL
2    DOING MORE?
3    **A.**   WELL, SOME OF THE STUDIES WERE FOR NEW INDICATIONS, AND SO
4    WE WERE CONTINUING TO DO STUDIES IN DIFFERENT DISEASES.
5    **Q.**   NO.  Y'ALL HAD TROUBLE WITH CARDIOVASCULAR EVENTS, CV
6    EVENTS, FROM THE VERY BEGINNING WITH THIS DRUG, AND YOU KNEW
7    THAT, DIDN'T YOU?
8    **A.**   I DID NOT KNOW THAT.
9    **Q.**   YOU DIDN'T SEE --
10   **A.**   MERCK DID NOT KNOW THAT.
11   **Q.**   YOU DIDN'T SEE ANY OF THE VIGOR RESULTS THAT SHOWED Y'ALL
12   HAD A FIVE-FOLD INCREASE OF HEART ATTACKS OVER NAPROSYN?
13   **A.**   YES, OF COURSE, I SAW THE VIGOR RESULTS.
14   **Q.**   LET'S BREAK IT DOWN THIS WAY.  CERTAIN THINGS YOU AND I
15   AGREE ON, I BELIEVE, AND I'D LIKE TO GET THOSE OUT OF THE WAY:
16   NUMBER ONE, IF WE GO TO THE MID '90S, YOUR COMPANY, MERCK, WAS
17   STUCK IN THE MIDDLE IN TERMS OF DRUG COMPANIES AND THE RANKINGS
18   OF THEM; FAIR TO SAY?
19   **A.**   MERCK'S BEEN A LARGE PHARMACEUTICAL COMPANY FOR MANY
20   YEARS.
21   **Q.**   SO YOU'RE THE DAVID W. ANSTICE.  AND IF YOU WILL LOOK ON
22   PAGE 2 OF THE TALKING POINTS, IT SAYS IN THE
23   SECOND-FROM-THE-BOTTOM:  "WHEN WE ESTABLISHED THIS GOAL IN
24   1994, WE WERE PERFORMING SOMEWHERE IN THE MIDDLE OF THE PACK."
25   DO YOU SEE THAT ONE?

1   A.   YES.

2   Q.   SO WHEN I USE THE LANGUAGE, "MIDDLE OF THE PACK," I'M

3   USING YOUR LANGUAGE I GOT FROM YOUR DOCUMENTS.  I DIDN'T MAKE

4   THAT UP.  DO YOU SEE THAT?

5   A.   FROM A MERCK DOCUMENT, YES.

6   Q.   YEAH.  A MERCK DOCUMENT THAT WENT TO YOU, RIGHT?

7   A.   YES.

8   Q.   AND SO I'M GOING TO ASK YOU AGAIN:  SIR, ISN'T IT TRUE

9   THAT IN 1994 Y'ALL WERE PERFORMING SOMEWHERE IN THE MIDDLE OF

10  THE PACK?

11  A.   IN TERMS OF GROWTH RATE, YES.

12  Q.   Y'ALL WANTED TO BE THE NUMBER ONE PHARMACEUTICAL COMPANY

13  IN THE WORLD, DIDN'T YOU?

14  A.   IN TERMS OF GROWTH RATES, YES.  NOT NECESSARILY SIZE.

15  Q.   ARE YOU FAMILIAR WITH THAT?

16  A.   I'M FAMILIAR WITH THIS PRODUCT, YES.

17  Q.   THAT'S CALLED PEPCID AC.  CAN YOU HOLD THAT UP TO THE

18  VIDEO SO THE JURY CAN SEE IT, PLEASE?  THANK YOU.  CAN WE GET A

19  CLOSE-UP WHERE WE CAN SEE WHAT THAT IS?  THAT'S GOOD ENOUGH.

20  THANK YOU, SIR.  Y'ALL HELD THE PATENT ON PEPCID, DIDN'T YOU?

21  A.   YES.

22  Q.   THAT PATENT WAS VERY VALUABLE TO YOUR COMPANY, WASN'T IT?

23  A.   YES, IT WAS.

24  Q.   MADE A LOT OF MONEY OFF PEPCID, DIDN'T YOU?

25  A.   YES, WE DID.

1   **Q.**   BUT YOU HAD A PROBLEM, BECAUSE YOUR PATENT WAS ABOUT TO

2   RUN OUT AND PEOPLE WERE GOING TO BE ABLE TO GO BUY THIS STUFF

3   AT THE GROCERY STORE; TRUE?

4   **A.**   ALL OF OUR RESEARCH-DISCOVERED PRODUCTS, EVENTUALLY THE

5   PATENT RUNS OUT, AND THE ANSWER IS TO FIND NEW DRUGS TO REPLACE

6   THEM.

7   **Q.**   I UNDERSTAND THAT, BUT THAT WASN'T MY QUESTION.  MY

8   QUESTION IS SPECIFIC:  SIR, THE END OF 1998, '99, EARLY 2004,

9   Y'ALL KNEW YOUR PATENT WAS RUNNING OUT ON PEPCID AND A BIG

10  MONEYMAKER FOR YOU WAS ABOUT TO BE COMMERCIALLY AVAILABLE TO

11  EVERYBODY, AND IT WAS GOING TO HURT YOUR BOTTOM LINE; TRUE?

12  **A.**   WE HAD KNOWN FOR MANY YEARS THAT THE PEPCID PATENT WOULD

13  EXPIRE, SO THIS WAS NOT AN UNKNOWN EVENT.

14  **Q.**   I KNOW.  THAT'S ONE OF THE REASONS Y'ALL HAD BEEN WORKING

15  TO TRY AND GET VIOXX UP AND GOING; YOU NEEDED THE MONEY.  TRUE?

16  **A.**   WE WERE WORKING IN OUR RESEARCH LABS TO FIND NEW PRODUCTS.

17  VIOXX WAS ONE OF THE IMPORTANT NEW PRODUCTS THAT WE HAD.

18  **Q.**   SIR, THAT WASN'T MY QUESTION.  I SAID YOU KNEW, YOUR

19  COMPANY KNEW, YOU HAD MAJOR DRUGS GOING OFF THE MARKET IN 2000

20  AND 2001 THAT WAS A SIGNIFICANT PERCENTAGE OF YOUR SALES; TRUE?

21  **A.**   IT WAS AN IMPORTANT PERCENTAGE OF OUR SALES, CORRECT.

22  **Q.**   A SIGNIFICANT PERCENTAGE; TRUE?

23  **A.**   I CANNOT DEFINE "SIGNIFICANT."

24  **Q.**   SIR, IF YOU'LL LOOK ON THE LAST PAGE OF THAT DOCUMENT

25  RIGHT THERE --

1   **A.**   I HAVE IT.

2   **Q.**   -- IT SAYS, FOUR POINTS UP FROM THE BOTTOM, "THE MAJOR

3   DRUGS GOING OFF PATENT IN 2000 AND 2001, INCLUDES PEPCID,

4   TOGETHER REPRESENT A SIGNIFICANT PERCENTAGE OF OUR SALES."

5   THAT'S WHAT IT SAYS, DOESN'T IT?

6   **A.**   THAT'S CORRECT, YES.

7   **Q.**   SO THAT'S JUST WHAT YOU'RE TELLING THE JURY TODAY WHEN I'M

8   ASKING QUESTIONS.  YOU KNEW WHAT IT MEANT WHEN YOU GOT THAT

9   MEMO, DIDN'T YOU?

10  **A.**   YES, I DID.

11  **Q.**   SO NOW WILL YOU GO BACK AND AGREE WITH ME THAT THE MAJOR

12  DRUGS GOING OFF PATENT REPRESENTED A SIGNIFICANT PERCENTAGE OF

13  YOUR SALES?

14  **A.**   YES, I WILL AGREE WITH YOU.

15  **Q.**   SO PRODUCING SOME REPLACEMENT REVENUE, SOME MONEY TO TAKE

16  THE PLACE THROUGH A LAUNCH OF PRODUCTS LIKE VIOXX WAS VERY

17  IMPORTANT FOR Y'ALL, WASN'T IT?

18  **A.**   YES, IT WAS IMPORTANT.

19  **Q.**   BECAUSE, BY THE END OF 1997, MERCK HAD PUT ITSELF AS THE

20  LARGEST PHARMACEUTICAL COMPANY OF THE WORLD, HADN'T IT?

21  **A.**   I'M SORRY.  THE QUESTION WAS HAD --

22  **Q.**   BY THE END OF 1997, MERCK HAD REGAINED ITS POSITION AS THE

23  LARGEST PHARMACEUTICAL COMPANY IN THE WORLD; TRUE?

24  **A.**   I DON'T KNOW IF IT WAS AT THAT TIME.  I DON'T REMEMBER.

25  **Q.**   WELL, GO BACK TO THE LAST PAGE OF THAT DOCUMENT AGAIN.

1    LOOK AT THE SECOND POINT FROM THE TOP:  "BY THE END OF 1997,

2    MERCK HAD REGAINED ITS POSITION AS THE LARGEST PHARMACEUTICAL

3    COMPANY IN THE WORLD."  DO YOU THINK HE WAS LYING WHEN HE SAID

4    THAT?

5    **A.**   NO, I DON'T.

6    **Q.**   ALL RIGHT.  SO WE CAN ASSUME THAT THAT'S TRUE, TOO, CAN'T

7    WE?

8    **A.**   YES, WE CAN.

9    **Q.**   SO Y'ALL WENT FROM THE MIDDLE OF THE PACK IN '94 TO THE

10   LARGEST PHARMACEUTICAL COMPANY IN THE WORLD IN '97, BUT YOU HAD

11   MAJOR DRUGS LIKE PEPCID GOING OFF PATENT IN 2000, 2001.  I'M

12   CORRECT SO FAR.  RIGHT?

13   **A.**   YES.

14   **Q.**   AND THOSE DRUGS GOING OFF PATENT REPRESENTED A SIGNIFICANT

15   PERCENTAGE OF YOUR SALES; TRUE?

16   **A.**   CORRECT.

17   **Q.**   SO IT WAS IMPORTANT Y'ALL GET SOME REPLACEMENT PRODUCTS

18   LIKE VIOXX TO MAKE THE MONEY.  RIGHT?

19   **A.**   NEW PRODUCTS ARE ALWAYS IMPORTANT TO OUR BUSINESS.

20   **Q.**   WELL, BUT THOSE PRODUCTS LIKE VIOXX, YOU SAW IT AS

21   SOMETHING THAT REPLACED THE REVENUE Y'ALL WERE GOING TO LOSE.

22   RIGHT?

23   **A.**   THAT'S THE NORMAL COURSE OF OUR BUSINESS, YES.

24   **Q.**   SO THE TIMING OF THIS -- AND BY "THIS" I MEAN SELLING THE

25   VIOXX -- IS VERY IMPORTANT TO YOUR COMPANY, WASN'T IT?

1    **A.**   YES, IT WAS IMPORTANT.

2    **Q.**   IF YOU REALIZE THAT IN A FEW MONTHS YOU ARE NOT GOING TO

3    BE HAVING ANY MONEY COMING IN, YOU NEED TO FIGURE OUT HOW TO

4    GET SOME MONEY IN THE DOOR IF YOU ARE GOING TO HAVE TO PAY

5    BILLS; TRUE?

6    **A.**   OR SPEND LESS MONEY.

7    **Q.**   DON'T GET THE BILLS, RIGHT?  BUT THE POINT IS IF MERCK--

8    MERCK HAS BILLS, DOESN'T IT?

9    **A.**   YES, IT DOES.

10   **Q.**   Y'ALL GOT EMPLOYEES.  Y'ALL GOT TO PAY EMPLOYEES, DON'T

11   YOU?

12   **A.**   THAT'S CORRECT.

13   **Q.**   YOU'VE GOT BUILDINGS AND COMMITMENTS TO FUND RESEARCH AND

14   ALL THESE OTHER THINGS GOING ON, TOO, DON'T YOU?

15   **A.**   YES.

16   **Q.**   YOU'VE GOT TO PAY MONEY TO DO ALL THAT, DON'T YOU?

17   **A.**   YES.

18   **Q.**   I BET Y'ALL EVEN HAVE ELECTRIC BILLS AND STUFF FOR YOUR

19   BUILDINGS, DON'T YOU?

20   **A.**   YES.

21   **Q.**   SO MERCK HAS GOT TO MAKE SURE THEY HAVE GOT MONEY COMING

22   IN THE DOOR TO PAY ALL THESE THINGS, DON'T THEY?

23   **A.**   YES.

24   **Q.**   NOT THE LEAST OF WHICH THEY HAVE GOT TO PAY YOU, DON'T

25   THEY?

1  **A.**   THEY HAVE TO PAY ALL 60,000 OF OUR PEOPLE.

2  **Q.**   YES.  BUT, I MEAN, YOU EXECUTIVES.  Y'ALL ARE SOME OF THE

3  HIGHEST-PAID EXECUTIVES IN THE INDUSTRY, AREN'T YOU?

4  **A.**   I THINK WE'RE COMPARATIVELY WELL PAID.

5  **Q.**   SO IT IS IMPORTANT TO KEEP THE MONEY IN, COMING IN TO

6  MERCK, SO THAT MERCK CAN KEEP PAYING YOU AND EVERYBODY ELSE.

7  RIGHT?

8  **A.**   IT'S IMPORTANT TO KEEP FINDING PRODUCTS TO BRING THEM TO

9  MARKET AND TO GENERATE REVENUES, YES.

10 **Q.**   AND MERCK HIT A POINT WHERE IT WASN'T GOING TO HAVE ANY

11 MORE MONEY COMING IN ON THE PEPCID AND SOME OF THESE OTHER

12 DRUGS THAT HAD BEEN KEEPING THE MACHINE GOING.  RIGHT?

13 **A.**   PATENT EXPIRATIONS WERE GOING TO REDUCE REVENUES FOR THOSE

14 PRODUCTS, CORRECT.

15 **Q.**   AND "REDUCE REVENUES FOR THOSE PRODUCTS" -- YOU ARE AN

16 ECONOMICS MAJOR -- IN EVERYDAY TALK, THAT MEANS Y'ALL AREN'T

17 GOING TO GET AS MUCH MONEY ANYMORE.  RIGHT?

18 **A.**   THOSE PRODUCTS WILL HAVE LESS SALES.

19 **Q.**   SO MERCK HAS REALLY INVESTED A LOT OF HOPES AND PLANS IN

20 VIOXX TO PICK UP THE SLACK FOR THE YEAR 2000-2001 --

21 **A.**   MERCK INVESTED A LOT OF HOPES AND PLANS IN VIOXX BECAUSE

22 IT WAS GOING TO BE A REALLY IMPORTANT PRODUCT FOR PATIENTS.

23 **Q.**   WELL, SIR, IF YOU'LL LOOK AT THE LAST PAGE OF THAT -- IT

24 SAYS, "VIOXX IS VERY IMPORTANT TO YOU," BUT IT SAYS, "PRODUCING

25 REPLACEMENT REVENUE THROUGH THE LAUNCH OF NEW PRODUCTS LIKE

1  VIOXX IS IMPORTANT."  THAT'S WHAT IT SAYS, DOESN'T IT?

2  **A.**   I'M SORRY, WHICH --

3  **Q.**   THAT'S THE FOURTH POINT UP FROM THE BOTTOM.

4  **A.**   YES, IT DOES.  YES.

5  **Q.**   NOW, THERE'S ALREADY, BEFORE Y'ALL GET ON THE MARKET WITH

6  YOUR DRUG, A RACE.  AND THERE'S ANOTHER COX-2 INHIBITOR THAT

7  WANTS TO GET ON THE MARKET, TOO.  RIGHT?

8  **A.**   THAT'S CORRECT.

9  **Q.**   AND THAT'S CELEBREX, RIGHT?

10 **A.**   CORRECT.

11 **Q.**   DO YOU REMEMBER WHICH DRUG COMPANY MAKES CELEBREX?

12 **A.**   AT THE TIME, SEARLE.

13 **Q.**   IT IS NOW PFIZER SEARLE, RIGHT?

14 **A.**   NOW IT'S PFIZER, YES.

15 **Q.**   IS IT FAIR TO SAY THAT Y'ALL WERE RACING EACH OTHER TO TRY

16 AND SEE WHO COULD GET TO THE MARKET FIRST?

17 **A.**   YES.  THAT'S A FAIR CHARACTERIZATION.

18 **Q.**   THEY BEAT Y'ALL, DIDN'T THEY?

19 **A.**   IN THE U.S., THEY BEAT US, YES.

20 **Q.**   IT WAS SIGNIFICANT ENOUGH TO WHERE Y'ALL WORKED HARD TO

21 OVERCOME A LATE START.  FAIR TO SAY?

22 **A.**   WE WERE SECOND.  IT WAS SOMETHING OF A DISADVANTAGE BUT

23 NOT OVERRIDING.

24 **Q.**   YOUR COMPANY REALLY PUSHED HARD TO MAKE VIOXX A WINNER

25 FROM A MARKETING PERSPECTIVE AND AN INCOME PERSPECTIVE; TRUE?

1   **A.**   WE BELIEVED IN VIOXX AS -- AS IT CAME TO MARKET.  WE

2   BELIEVED THAT IT WAS A VERY IMPORTANT PRODUCT FOR PATIENTS, WE

3   KNEW THAT THERE WERE A LARGE NUMBER OF PATIENTS THAT WOULD

4   BENEFIT, AND WE BELIEVED THAT VIOXX WOULD BE A WINNER IN THIS

5   MARKET, YES.  WE LAUNCHED THE PRODUCT WHEN IT WAS APPROVED BY

6   THE FDA.

7   **Q.**   BUT Y'ALL PUSHED FOR EARLY FDA APPROVAL?

8   **A.**   AND WE RECEIVED THAT EARLY APPROVAL FROM THE FDA.  WE CAN

9   REQUEST IT; THEY HAVE TO ACCEPT IT.

10   **Q.**   SIR, WHAT YOU'RE TELLING THIS JURY IS THAT Y'ALL PUSHED

11   FOR EARLY APPROVAL.  YOU WERE LOSING THE RACE AGAINST VIOXX

12   AGAINST CELEBREX, AND EVERY DAY YOU LOST THAT RACE, YOU FELL

13   FARTHER AND FARTHER BEHIND.  SO Y'ALL PUSHED FOR EARLY APPROVAL

14   BECAUSE IT WAS SO IMPORTANT TO REPLACE THAT INCOME STREAM FROM

15   THESE DRUGS GOING OFF PATENT, AND THE NET RESULT IS Y'ALL PUT

16   THIS ON THE MARKET NINE MONTHS BEFORE YOU EVEN GOT YOUR FIRST

17   VIGOR TEST RESULTS BACK; RIGHT?

18   **A.**   WE ASKED FOR AND RECEIVED SIX-MONTH APPROVAL FROM THE FDA

19   BASED ON THE MEDICAL IMPORTANCE OF THE PRODUCT.

20           THE REASON FOR DOING THE VIGOR STUDY, WHICH HAD BEEN

21   STARTED BEFORE THE APPROVAL, WAS TO GET GI OUTCOMES DATA FROM

22   THE VIGOR STUDY.  WE HAD GI DATA IN THE LABEL FROM THE

23   ENDOSCOPY STUDIES.  WE WERE HOPING THAT THOSE STUDIES WOULD

24   ENABLE A CHANGE IN THE GI SAFETY PART OF THE LABEL.  WE WERE

25   DISAPPOINTED IN THOSE EFFORTS.

1        THE VIGOR STUDY WAS STARTED AND THE VIGOR STUDY WAS

2   ALWAYS GOING TO-- THE RESULTS WERE ALWAYS GOING TO COME AFTER

3   THE PRODUCT APPROVAL EVEN IF IT HAD BEEN A REGULAR 12-MONTH

4   APPROVAL.

5   Q.   WELL, TRUTH BE TOLD, THERE WERE TWO MAIN REASONS Y'ALL

6   PUSHED FOR EARLY FDA APPROVAL; ISN'T THAT RIGHT?

7   A.   THE FIRST REASON WAS THAT THIS WAS AN IMPORTANT NEW

8   PRODUCT FOR PATIENTS.

9   Q.   WELL, NO.   THERE WAS ALREADY A COX-2 INHIBITOR ON THE

10  MARKET.   THAT WAS CELEBREX.   THE FIRST REASON WAS Y'ALL WERE

11  TRYING TO BEAT CELEBREX AND THEY BEAT YOU TO THE MARKET AND YOU

12  NEEDED TO HURRY YOUR PRODUCT OUT THERE, RIGHT?

13  A.   BUT AT A CERTAIN POINT WE KNEW WE WERE BEHIND THEM, AND SO

14  THAT DIDN'T CHANGE THE PATENT BEHAVIOR AT THAT TIME.

15  Q.   WELL, ONE REASON, THOUGH, WAS YOU NEEDED TO GET TO MARKET

16  AS QUICKLY AS POSSIBLE BECAUSE YOU WERE LOSING THE RACE; AND

17  THE SECOND REASON IS Y'ALL DIDN'T WANT THE FDA TO HAVE FOREVER

18  TO LOOK AT THIS DRUG, DID YOU?

19  A.   THAT'S NOT A FAIR CHARACTERIZATION.   WE SUBMITTED AN

20  APPLICATION.   WE ASKED FOR A SIX-MONTH REVIEW VERSUS A 12-MONTH

21  REVIEW.   THE FDA ACCEPTED THAT.

22  Q.   AND Y'ALL HAD AN EXTRAVAGANT INCENTIVE PROGRAM:   YOU'RE

23  GOING TO OWN THE MARKET AND YOU HAD SURPASSED YOUR GOAL OF MORE

24  THAN 560 ADVOCATES; IS THAT RIGHT?

25  A.   THAT'S -- IF THAT'S THE RIGHT NUMBER, YES.

1   **Q.**   WHY DON'T YOU TELL THIS JURY WHAT Y'ALL WERE DOING WHEN

2   YOU ARE TRYING TO SURPASS YOUR GOAL OF 560 ADVOCATES?

3   **A.**   WHAT WE WERE TRYING TO DO IS HAVE PEOPLE WHO WOULD SPEAK

4   IN SUPPORT OF VIOXX WHEN THE PRODUCT CAME TO THE MARKETPLACE.

5   AND BASED ON THE SIZE OF THE U.S. AND THE NUMBER OF SPEAKING

6   EVENTS THAT WE WANTED TO CONDUCT AROUND THE U.S., WE BELIEVED

7   WE NEEDED A LARGE NUMBER OF SPEAKERS AND ADVOCATES FOR THE

8   PRODUCT.

9   **Q.**   SO YOU'RE GOING TO OWN THE MARKET WITH AN EXTRAVAGANT

10  INCENTIVE PROGRAM.  YOU'VE GOT MORE THAN 560 ADVOCATES.  YOU'VE

11  ASSEMBLED THE LARGEST SALES FORCE IN HISTORY.  YOU ALSO DECIDED

12  THAT YOU WERE GOING TO GIVE OUT MORE FREE SAMPLES OF THIS DRUG

13  THAN YOU HAD EVER GIVEN OUT OF ANYTHING BEFORE.  TRUE?

14  **A.**   I THINK THAT WAS CORRECT, YES.

15  **Q.**   WHAT'S HEL STAND FOR?

16  **A.**   HEALTH EDUCATION LIAISON.

17  **Q.**   WELL, YOUR COMMITMENT OF HEALTH EDUCATION LIAISON DOLLARS,

18  HEL DOLLARS, WAS THE LARGEST OF ANYTHING Y'ALL HAD EVER DONE

19  WITH VIOXX, WASN'T IT?

20  **A.**   YES, IT WAS.

21  **Q.**   NOT ONLY THAT, Y'ALL HAD EXTRA FMC MONEY, DIDN'T YOU?

22  **A.**   YES.

23  **Q.**   SO THIS IS WHERE THEY GO OUT TO DOCTORS, AND THEY'VE GOT

24  MILLIONS AND MILLIONS OF DOLLARS TO TRY AND GIVE EXTRAS TO

25  DOCTORS SO THAT DOCTORS WILL START WRITING YOUR VIOXX

1  PRESCRIPTIONS.  IS THAT WHAT THAT BOILS DOWN TO?

2  **A.**   THIS IS TO CONDUCT SPEAKING EVENTS AND GET DOCTORS

3  INTERESTED IN OUR PRODUCT, YES, TO UNDERSTAND OUR PRODUCT.

4  **Q.**   YES.  THOSE ARE THE SPEAKING CONTRACTS THAT YOU'VE ALSO

5  GOT ON THERE.  YOU'RE PAYING DOCTORS TO STAND UP AND GIVE THESE

6  SPEECHES, AREN'T YOU?

7  **A.**   YES.  YES, WE DO THAT.

8  **Q.**   THESE ARE ADVOCATES.  YOU'VE MARKED OVER 560 OF THESE

9  PEOPLE.  YOU ARE GOING TO PAY THEM MONEY AND THEY ARE GOING TO

10  STAND UP AND SAY, "LOOK HOW WONDERFUL THIS PRODUCT IS HERE.

11  HAVE A FREE DINNER.  GO WRITE PRESCRIPTIONS."

12  **A.**   WE HAVE GIVEN MONEY TO SPEAKERS FOR SPEAKING AS A CONTRACT

13  SERVICE TO MERCK TO PRESENT THEIR INFORMATION ABOUT OUR PRODUCT

14  AND OTHER PRODUCTS BECAUSE THEY ARE TALKING AS PEOPLE THAT HAVE

15  EXPERTISE IN THE AREA, THAT HAVE KNOWLEDGE ABOUT THIS DISEASE,

16  AND THEY ARE PASSING ON THEIR EXPERIENCE AS AN OPINION LEADER

17  TO OTHER PHYSICIANS.

18  **Q.**   YOU DIDN'T DESIGN THE PRODUCT TO BE SAFE, YOU DIDN'T

19  DEVELOP THE PRODUCT TO BE SAFE, YOU DIDN'T DRIVE THE PRODUCT TO

20  BE SAFE.  YOU DESIGNED, DEVELOPED, AND DROVE THAT PRODUCT TO

21  WIN THE MARKET, DIDN'T YOU?

22  **A.**   THE DEVELOPMENT OF VIOXX WAS BASED ON ALL OF OUR STANDARDS

23  OF EFFICACY AND SAFETY.  WE DESIGNED THE PRODUCT WITH ALL OF

24  THAT IN MIND.  FROM THE MARKETING SIDE, YES, WE BELIEVED WE HAD

25  A WINNER; WE BELIEVED WE HAD A VERY EFFECTIVE PRODUCT; AND WE

1    BELIEVED THAT, WITH THE RIGHT PROMOTION SUPPORT -- WE'RE

2    RESPONSIBLE FOR PROMOTING THE PRODUCT TO PHYSICIANS -- WITH THE

3    RIGHT LEVEL OF SUPPORT, WE COULD MAKE THIS A LEADING -- THE

4    LEADING PRODUCT IN THE CATEGORY.

5    **Q.**   BUT YOU NEVER DID A CV STUDY.  YOU NEVER DID A STUDY TO

6    SEE IF IT CAUSED HEART ATTACKS, DID YOU?

7    **A.**   WE DID NOT DO THAT BECAUSE WE BELIEVED THAT THE

8    ALTERNATIVES, WHICH WE PUT IN PLACE, WOULD PROVIDE ANSWERS TO

9    THE QUESTIONS BEING POSED BY THE VIGOR DATA.

10   **Q.**   YOU NEVER STUDIED VIOXX TO SEE IF IT CAUSED HEART ATTACKS

11   OR STROKE OR CARDIOVASCULAR PROBLEMS; TRUE?

12   **A.**   WE DID NOT STUDY VIOXX SPECIFICALLY WITH CV OUTCOMES.

13   **Q.**   DO YOU WANT TO TELL US WHY?

14   **A.**   YES.  I WOULD LIKE TO ADD THAT BECAUSE WE CONSIDERED IT,

15   AS YOU KNOW, ON SEVERAL OCCASIONS; AND ULTIMATELY, WE CONCLUDED

16   THAT THE BEST WAY TO GET ANSWERS TO THE QUESTION, WAS THERE A

17   DIFFERENCE IN RISK, WAS THROUGH THE VARIOUS OTHER STUDIES THAT

18   WE HAD UNDERWAY.

19   **Q.**   THE BEST WAY TO GET THE ANSWER, DOES IT CAUSE HEART

20   ATTACKS, IS NOT BY STUDYING IT?

21   **A.**   THE BEST-- WE WERE-- NO.  THAT IS NOT WHAT I SAID.

22   **Q.**   SIR, BEFORE YOU HAVE EVER SOLD THE DRUG, YOU COULD HAVE

23   STUDIED IT TO SEE IF IT CAUSED HEART ATTACKS, COULDN'T YOU?

24   **A.**   BEFORE WE LAUNCHED THE DRUG, THERE WAS NO BASIS ON WHICH

25   WE THOUGHT IT WAS NECESSARY TO STUDY THE DRUG IN THE WAY YOU

1    JUST DESCRIBED.

2    **Q.**    YOU DON'T KNOW THAT.  YOU'RE NOT A DOCTOR; YOU'RE A

3    MARKETING GUY.  HOW WOULD YOU KNOW THAT?

4    **A.**    THE BASIS OF THE NDA WAS CONSISTENT WITH HOW YOU STUDY

5    AGENTS IN THIS CATEGORY.

6    **Q.**    SO YOUR COMPANY COULD HAVE TESTED TO SEE IF THE CONCERNS

7    ABOUT HEART ATTACKS AND STROKES WAS TRUE; YOUR COMPANY COULD

8    HAVE TESTED FOR THAT BEFORE YOU EVER WENT TO MARKET, COULDN'T

9    YOU?

10   **A.**    THE COMPANY COULD HAVE TESTED FOR THAT, BUT THE

11   SCIENTISTS, IN CONSIDERING THE DISCUSSIONS I JUST REFERENCED,

12   CONCLUDED THAT THAT WAS NOT NECESSARY.

13   **Q.**    WELL, WHAT WAS THE DOWNSIDE TO DOING A TEST LIKE THAT?

14   **A.**    IT WAS SEEMED TO BE NOT NECESSARY.

15   **Q.**    THAT WASN'T MY QUESTION.  I SAID WHAT WAS THE DOWN SIDE TO

16   IT?

17   **A.**    WELL, THAT WOULD TAKE-- I MEAN, TO DO STUDIES THAT ARE NOT

18   SCIENTIFICALLY NECESSARY OR RELEVANT WOULD DIVERT RESOURCES.

19   **Q.**    SO WHAT WOULD IT DO?  IT WOULD MEAN THAT YOU MIGHT NOT GET

20   TO MARKET AS EARLY AS YOU WANTED TO AND YOU WERE IN A RACE WITH

21   CELEBREX TO GET TO MARKET FIRST.  THAT'S WHAT IT REALLY BOILS

22   DOWN TO, DOESN'T IT?

23   **A.**    I DON'T ACCEPT THAT AT ALL.

24   **Q.**    WELL, YOU WERE IN A RACE WITH CELEBREX TO GET TO MARKET,

25   FIRST, WEREN'T YOU?  YOU ADMITTED THAT BEFORE.

DAILY COPY

1  **A.**   THERE WAS A COMPETITIVE DEVELOPMENT PROGRAM BETWEEN TWO

2  COMPANIES.

3  **Q.**   IF YOU TAKE THE TIME OUT FOR A YEAR TO DO A STUDY TO SEE

4  IF THIS DRUG IS GOING TO KILL PEOPLE WITH HEART ATTACKS, THAT'S

5  GOING TO DELAY YOU ANOTHER YEAR GETTING TO MARKET, ISN'T IT?

6  **A.**   THAT IS NOT THE REASON THAT MERCK DID NOT PROCEED WITH

7  THOSE STUDIES.

8  **Q.**   YOU UNDERSTAND BEFORE YOU SELL A DRUG YOU OUGHT TO CHECK

9  TO SEE IF IT'S SAFE; TRUE?

10  **A.**   YES.

11  **Q.**   AND IF YOU DELAY THE INTRODUCTION THAT DELAYS MAKING MONEY

12  ON IT, DOESN'T IT?

13  **A.**   YES.

14  **Q.**   YES.  I WANT TO TALK ABOUT THE EFFORTS AND MONEY Y'ALL PUT

15  INTO STUDYING THE CARDIOVASCULAR EFFECTS; IN OTHER WORDS, DOES

16  VIOXX CAUSE HEART ATTACKS?  I WANT TO COMPARE ON ONE SIDE WHAT

17  MONEY AND EFFORTS Y'ALL DID ON THAT TO THE OTHER SIDE, THE

18  EFFORTS Y'ALL DID TO MARKET AND SELL THE DRUG, TO SEE WHERE YOU

19  PUT YOUR RESOURCES AND EFFORT.  FAIR TO SAY?

20  **A.**   OKAY.

21  **Q.**   ALL RIGHT.  CARDIOVASCULAR EFFECTS, WHAT MONEY AND

22  RESOURCES DID Y'ALL PUT INTO STUDYING THAT?

23  **A.**   EVERY CLINICAL STUDY WE HAVE DONE HAS STUDIED THE

24  CARDIOVASCULAR EFFECTS OF VIOXX.

25  **Q.**   SIR, WE'RE TALKING ABOUT IT BEING THE RESULT OF STUDIES,

1   BUT NOT THE PURPOSE OF STUDIES.  Y'ALL DIDN'T DO A STUDY JUST

2   FOR CARDIOVASCULAR PURPOSES, DID YOU?

3   **A.**   WE DID NOT DO A STUDY WHERE THE PRIMARY ENDPOINT WAS CV

4   SAFETY.

5   **Q.**   RIGHT.  SO WHAT OTHER MONIES AND EFFORTS DID Y'ALL PUT

6   INTO TRYING TO FIGURE OUT IF CARDIOVASCULAR PROBLEMS WERE GOING

7   TO COME FROM THAT DRUG?

8   **A.**   BUT THAT'S ACROSS A LARGE NUMBER OF CLINICAL STUDIES, NOT

9   ONLY THE ORIGINAL STUDIES IN ARTHRITIS, RHEUMATOID ARTHRITIS,

10  VIGOR, BUT ALSO THE ALZHEIMER'S DISEASE STUDIES AND ALSO,

11  EVENTUALLY, FINALLY, THREE CANCER STUDIES.

12  **Q.**   ALL RIGHT.  SO --

13  **A.**   SO A LARGE NUMBER OF PHASE III AND SUBSEQUENT STUDIES.

14  **Q.**   I'LL LIST THEM:  VIGOR, ALZHEIMER'S, CANCER.  WHAT OTHERS?

15  **A.**   ALL THE PHASE III PROGRAMS.

16  **Q.**   PHASE III.  ANY OTHERS?

17  **A.**   EVERY STUDY THAT WE DID WITH VIOXX.

18  **Q.**   CAN YOU THINK OF ANY OTHERS?

19  **A.**   I'M SURE THERE WERE SOME OTHER STUDIES.

20  **Q.**   I'M GOING TO PUT "MAYBE OTHERS."  DID I WRITE IT RIGHT?

21  **A.**   YOU WROTE DOWN THE WORDS THAT YOU SAID YOU WERE WRITING

22  DOWN, YES.

23  **Q.**   OKAY.  NOW, LET'S JUST MAKE SURE WE'RE CLEAR ON THIS.

24  Y'ALL WERE NOT STUDYING VIOXX TO SEE IF IT CAUSED ALZHEIMER OR

25  TO SEE IF IT CAUSED CANCER, TO SEE IF IT WAS DANGEROUS IN THAT

1    WAY; Y'ALL WERE STUDYING IT TO SEE IF YOU COULD SELL IT AS A

2    CURE OR AS A HELP ALZHEIMER'S AND CANCER.  RIGHT?

3    **A.**   WE WERE STUDYING IT TO SEE IF THERE WAS A BENEFIT TO

4    PATIENTS, AND WE'RE ASSESSING THE RISKS AT THE SAME TIME SO

5    THAT WE COULD MAKE A BENEFIT/RISK ASSESSMENT.

6    **Q.**   IN OTHER WORDS, YOU WEREN'T STUDYING IT BECAUSE YOU WERE

7    WORRIED IT WAS GOING TO CAUSE CANCER AND YOU WANTED TO SEE; YOU

8    WERE STUDYING IT TO SEE IF YOU COULD HELP CANCER?

9    **A.**   YES, WE WERE.  AND ANOTHER BENEFIT OF THOSE STUDIES WAS

10   THAT WE COULD USE VIOXX IN THOSE STUDIES, ALONG WITH PLACEBO,

11   WHICH WE BELIEVED WOULD GIVE US THE BEST DATA IN TERMS OF

12   ANSWERING ALL QUESTIONS THAT MAY BE RAISED ABOUT SAFETY.

13   **Q.**   BUT TO BE FAIR, WE OUGHT TO PUT THE A NUMBER OF

14   RESEARCHERS BECAUSE THERE WERE A NUMBER OF RESEARCHERS OVER ON

15   THIS SIDE OF THE COLUMN THAT WERE WORKING ON SAFETY, AT LEAST,

16   EVEN IF IT WASN'T CARDIOVASCULAR.  RIGHT?

17   **A.**   CORRECT.

18   **Q.**   CAN YOU THINK OF ANYTHING ELSE Y'ALL WERE PUTTING IN OTHER

19   THAN RESEARCHERS AND STUDIES?  ANY OTHER EFFORTS TO DETERMINE

20   WHETHER OR NOT VIOXX CAUSED HEART ATTACKS?

21   **A.**   WELL, THERE ARE NUMEROUS SCIENTIFIC MEETINGS, REVIEWS AT

22   CONGRESSES, SO -- THERE WAS A LOT OF DIALOGUE AND THERE'S A LOT

23   OF EFFORT OVER AND ABOVE THE STUDIES BECAUSE THERE'S PEOPLE

24   DISCUSSING WHAT ALL THE OPTIONS WERE, THE ALTERNATIVES WERE,

25   EXTENSIVELY, RIGHT OF THROUGH THIS PERIOD.

1    Q.   SO THAT'S KIND OF RESEARCH, I GUESS.  BUT MORE THAN THAT,
2    IT'S JUST TALKING ABOUT RESEARCH?
3    A.   IT'S HAVING--
4    Q.   SO Y'ALL HAD-- I'M SORRY.  GO AHEAD.
5    A.   SO IT'S PEOPLE DISCUSSING WHAT ALL OF THE OPTIONS ARE.
6    Q.   SO I'VE PUT DOWN A THIRD THING:  PEOPLE TALKING ABOUT IT.
7    Y'ALL HAD THAT GOING IN TO TRY AND FIGURE IT OUT; TRUE?  IS
8    THAT FAIR TO SAY?
9    A.   WE HAD A LOT OF PEOPLE DOING MORE THAN TALKING ABOUT IT,
10   WORKING ON THIS ISSUE, REVIEWING DATABASES AND SO FORTH.
11   Q.   NOW, I WOULD LIKE TO THEN MOVE OVER TO THE OTHER SIDE OF
12   OUR CHART, THE MARKETING SIDE.  FIRST OF ALL, YOUR COMPANY
13   BROUGHT A LOT OF EXPERTISE INTO MARKETING; TRUE?
14   A.   WE HIRED SOME PEOPLE, YES.
15   Q.   WELL, YOU ARE WORLD-FAMOUS FOR IT.  YOU ARE WORLD-RENOWN
16   FOR MARKETING, AREN'T YOU?
17   A.   I HAVE A GOOD REPUTATION, YES.
18   Q.   I MEAN, YOU'RE NOT FUSSING THE "WORLD-RENOWN" LANGUAGE,
19   ARE YOU?
20   A.   NO.  NO, I'M NOT.
21   Q.   ANOTHER THING YOU DID ON MARKETING -- WE'LL LIST IT AS
22   NUMBER 5 -- YOU WOULD STUDY THE EFFECTS OF LABEL CHANGES.  YOU
23   ACTUALLY SPENT MONEY TO SEE IF CHANGING THE LABEL LANGUAGE WAS
24   GOING TO HURT YOUR SALES, WOULDN'T YOU?
25   A.   WE WOULD DO MARKET RESEARCH CONTINUALLY ON OUR PRODUCTS,

1  AND THAT INCLUDED TESTING DIFFERENT LANGUAGE AND LABELS, YES.

2  **Q.**   Y'ALL WOULD DO THAT WITH OUTSIDE COMPANIES, WOULDN'T YOU?

3  **A.**   MARKET RESEARCH WAS TYPICALLY DONE WITH OUTSIDE COMPANIES.

4  **Q.**   WHO'S YOUR EMPLOYER TODAY?  WHAT COMPANY GIVES YOU A

5  PAYCHECK?

6  **A.**   MERCK & CO., INC.

7  **Q.**   WHEN YOU MADE YOUR LATERAL MOVE, DID THAT CHANGE; OR IS IT

8  MERCK & CO., INC., THAT WAS GIVING YOUR SALARY PAYCHECK BEFORE?

9  **A.**   THE SAME COMPANY.

10  **Q.**   WELL, YOU DIDN'T WHEN YOU DECIDED TO PUT VIOXX ON THE

11  MARKET WITHOUT RUNNING A TEST TO SEE IF IT CAUSES HEART ATTACKS

12  THE WAY SOME OF YOUR SCIENTISTS THOUGHT IT MIGHT.

13  **A.**   WHEN VIOXX WAS BROUGHT TO THE MARKET, IT WAS A SAFE

14  PRODUCT.

15  **Q.**   SIR, THAT WASN'T MY QUESTION.  MY QUESTION IS THIS:  DID

16  THE DRUG CHANGE FROM THE TIME Y'ALL STARTED SELLING IT TO

17  EVERYBODY TO THE TIME YOU PULLED IT OFF THE MARKET?

18  **A.**   DID IT CHANGE IN WHAT REGARD?

19  **Q.**   WAS IT THE SAME DRUG?  DID IT HAVE THE SAME CHEMICAL

20  MAKEUP?

21  **A.**   YES, IT WAS THE SAME PRODUCT.

22  **Q.**   SIR, THE PRODUCT YOU PULLED FROM THE MARKET, ACCORDING TO

23  YOUR OWN APPROVE STUDY, CAUSES AN INCREASED NUMBER OF HEART

24  ATTACKS AND STROKES, DOESN'T IT?

25  **A.**   THE APPROVE STUDY SHOWED THAT THERE WAS A RELATIVE RISK

1   GREATER IN THE VIOXX GROUP VERSUS THE PLACEBO GROUP FOR THE

2   FIRST TIME IN ALL OF THE PLACEBO-CONTROLLED STUDIES, WHICH HAVE

3   BEEN EXTENSIVE.  BASED ON THAT RELATIVE RISK DIFFERENCE AND

4   BASED ON THE AVAILABILITY OF ALTERNATIVE THERAPIES, MERCK MADE

5   A DECISION TO WITHDRAW THE PRODUCT.

6   Q.    ALL RIGHT.  SO THIS STUDY IS GOING.  THIS SEMI-INDEPENDENT

7   GROUP'S MONITORING IT.  AND THIS GROUP SAYS TO MERCK:  TIME

8   OUT.  YOU'VE GOT TO STOP THIS STUDY BECAUSE THE PEOPLE WHO ARE

9   TAKING VIOXX HAVE A HIGHER RATE OF HEART ATTACKS AND STROKES

10  THAN THE PEOPLE WHO ARE JUST TAKING A SUGAR PILL."  IS THAT

11  RIGHT?

12  A.    THAT'S RIGHT.

13  Q.    ALL RIGHT.

14  A.    THEY TOLD MERCK TO STOP THE STUDY.  IT WAS THEIR

15  RECOMMENDATION.

16  Q.    NOW, THIS WAS NOT THE FIRST STUDY Y'ALL DID WHERE ONE

17  GROUP TAKING VIOXX HAD A HIGHER RATE OF HEART ATTACKS AND

18  STROKES THAN A GROUP THAT WAS TAKING A DIFFERENT KIND OF PILL;

19  TRUE?

20  A.    IT WAS NOT THE FIRST TIME, BUT IT WAS THE FIRST TIME IN A

21  PLACEBO-CONTROLLED STUDY THAT A DIFFERENCE HAD BEEN SHOWN.

22  Q.    BECAUSE THE FIRST TIME WAS THE VIGOR STUDY.  THAT WAS YOUR

23  VERY FIRST STUDY OUT OF THE BOX THAT Y'ALL WERE DOING WHILE YOU

24  WERE STUDYING THE DRUG ON THE FAST TRACK.  RIGHT?

25  A.    VIGOR WAS NOT THE FIRST STUDY THAT MERCK DID.  MERCK HAD

1  EXTENSIVE STUDIES BEFORE VIGOR.  VIGOR, WHICH DID NOT HAVE A

2  PLACEBO ARM, ALSO SHOWED A DIFFERENCE IN CV EVENTS BETWEEN

3  VIOXX AND, IN THAT CASE, NAPROXEN.  NOT A SUGAR PILL BUT

4  NAPROXEN.

5  Q.   AND SO Y'ALL'S REACTION TO THE VIGOR STUDY THAT SHOWED

6  PEOPLE TAKING VIOXX WERE GETTING MORE HEART ATTACKS AND STROKES

7  THAN THE PEOPLE TAKING THE OTHER PILL WAS JUST TO SAY THE OTHER

8  PILL MUST BE REALLY HELPFUL FOR YOUR HEART?  THAT WAS YOUR

9  RESPONSE THEN, WASN'T IT?

10  A.   OUR RESPONSE AT THAT TIME, AFTER LOOKING AT WHETHER OR NOT

11  VIOXX IN THE VIGOR STUDY -- THAT'S WHAT WE'RE TALKING ABOUT --

12  WHETHER VIOXX WAS PROTHROMBOTIC.  AND OUR CONCLUSION BASED ON

13  LOOKING AT THE THEN ACCUMULATED DATA WE HAD, WAS THAT VIOXX WAS

14  NOT DIFFERENT FROM PLACEBO AND NOT DIFFERENT FROM NON-NAPROXEN

15  NSAIDS.

16        WE THEN LOOKED AT THE NAPROXEN ARM TO SEE IF THERE

17  COULD BE EXPLANATIONS WHICH EXPLAINED WHY IT WOULD HAVE THE

18  STATISTICALLY SIGNIFICANT RATE.  AND OUR CONCLUSION IS THAT ON

19  THE WEIGHT-- THE BALANCE OF EVIDENCE, THAT THE MOST LIKELY, NOT

20  THE ONLY EXPLANATION BUT THE MOST LIKELY EXPLANATION, WAS THAT

21  NAPROXEN WAS CARDIOPROTECTIVE.

22  Q.   SIR, IN OTHER WORDS, IN COMMON EVERYDAY LANGUAGE, WHEN

23  YOUR VIGOR STUDY SHOWED PEOPLE TAKING VIOXX WERE MORE LIKELY TO

24  HAVE HEART ATTACKS AND STROKE THAN PEOPLE TAKING THE OTHER

25  PILL, THE EXPLANATION THAT YOUR COMPANY OFFERED WAS, WELL, THAT

1    OTHER PILL MUST HELP YOUR HEART; TRUE?

2    **A.**   AFTER CONSIDERING ALL OF THE DATA, WE BELIEVED THAT WAS

3    THE MOST LIKELY REASON FOR THAT DIFFERENCE, YES.

4    **Q.**   NOW, YOU COULDN'T VERY WELL PONY UP THAT REASON FOR THE

5    SUGAR PILL, THOUGH, BECAUSE EVERYBODY KNOWS THE SUGAR PILL IS

6    NOT GOING TO HELP YOUR HEART.  RIGHT?

7    **A.**   THE SUGAR PILL SHOULD NOT HAVE ANY EFFECT, POSITIVE OR

8    NEGATIVE.

9    **Q.**   LET'S GO BACK, THOUGH, TO THAT FIRST DRUG, NAPROXEN.

10   THAT'S SOMETHING YOU AND I CAN BUY IF WE GO DOWN TO THE

11   DRUGSTORE BECAUSE IT'S COME OFF PATENT AND BECAUSE IT'S NOW

12   OVER-THE-COUNTER; TRUE?

13   **A.**   THAT'S CORRECT.

14   **Q.**   SYNTEX WAS A DRUG COMPANY, WASN'T IT?

15   **A.**   YES, IT WAS.

16   **Q.**   TODAY SYNTEX IS OWNED BY WHO?

17   **A.**   ROCHE BOUGHT SYNTEX A NUMBER OF YEARS AGO.

18   **Q.**   DID IT EVER OCCUR TO YOU GUYS THAT IF SYNTEX'S DRUG WAS

19   GOOD FOR THE HEART, THAT SYNTEX WOULD HAVE BEEN SELLING IT FOR

20   THAT REASON AND TELLING EVERYBODY AND USING ALL OF THEIR

21   MARKETING PEOPLE LIKE YOU TO GET THAT DRUG OUT THERE AND SELL

22   MORE PRESCRIPTION BECAUSE IT'S GOOD FOR YOUR HEART; IT WILL

23   HELP STOP HEART ATTACKS?  DID IT OCCUR TO YOU THAT WOULD HAVE

24   BEEN DONE IF IT WAS TRUE?

25   **A.**   I DON'T KNOW THE REASONS THAT-- AT THE POINT IN TIME THAT

1   IT WAS SYNTEX WAS MANY YEARS AGO.  AND I DON'T RECALL WHEN THE

2   FACT OF ASPIRIN BEING KNOWN TO BE CARDIOPROTECTIVE WAS FIRST

3   ACKNOWLEDGED, AND I DON'T KNOW-- I HAVE NO IDEA WHETHER AT THAT

4   TIME SYNTEX, THE ORIGINATOR OF NAPROXEN, BELIEVED THAT THAT WAS

5   AN APPROPRIATE STUDY TO DO.  I HAVE NO INFORMATION.

6   **Q.**   YOU DIDN'T CALL THEM?

7   **A.**   THIS WAS MANY YEARS AGO.

8   **Q.**   YES.  BUT I'M JUST SAYING, BEFORE YOU-- WHEN YOUR STUDY

9   SHOWS THAT YOUR VIOXX IS CAUSING MORE OR, AS YOU LIKE TO SAY,

10  MORE HEART ATTACKS AND STROKES THAN NAPROXEN, BEFORE YOU HAVE

11  JUST TELL PEL MEDICAL GO AND TELL EVERYBODY, OH NAPROXEN, IS

12  GOOD FOR YOUR HEART, DID YOU BOTHER TO CALL THE PEOPLE WHO

13  STUDIED IT AND TESTED IT AND SOLD IT FOR YEARS AND YEARS AND

14  YEARS AND CALL THEM UP AND SAY, "DID YOU DO ANY TESTING TO SEE

15  IF THIS WAS GOOD FOR YOUR HEART?"

16  **A.**   I DON'T KNOW.

17  **Q.**   I MEAN, DON'T YOU THINK THAT WOULD BE A REASONABLE THING

18  TO DO BEFORE YOU START TELLING EVERYBODY NAPROXEN IS GOOD FOR

19  YOUR HEART:  YOU OUGHT TO CALL THE PEOPLE WHO INVENTED IT AND

20  SOLD IT FOR YEARS AND ASK IF THEY EVER DID ANY STUDIES AND IF

21  THEY KNEW.

22  **A.**   I THINK WHAT WOULD BE REASONABLE AND I KNOW WHAT MERCK DID

23  IS REVIEWED THE LITERATURE EXTENSIVELY IN ORDER TO DRAW THE

24  CONCLUSION.  WHETHER THAT REVIEW INCLUDED TALKING TO THE

25  ORIGINATOR, I DON'T KNOW.

1    **Q.**   YEAH.  BUT, IN THAT REVIEW, Y'ALL NEVER FOUND ONE STUDY

2    THAT SHOWED NAPROXEN WAS GOOD FOR YOUR HEART, DID YOU?

3    **A.**   THERE WERE NO STUDIES CONDUCTED WITH NAPROXEN TO SHOW OR

4    NOT SHOW THAT IT WAS CARDIOPROTECTIVE.

5    **Q.**   DID YOU EVER SEE THOSE MONKEYS WHERE ONE SET OF -- ONE

6    MONKEY HAS HIS EYES CLOSED AND THE OTHER MONKEY'S GOT HIS EARS

7    CLOSED, AND THE OTHER MONKEY'S GOT HIS MOUTH -- WITH HAS HANDS

8    OVER HIS MOUTH?

9    **A.**   YES.

10   **Q.**   YOU KNOW, HANDS OVER THE EYES.  HEAR -- SEE NO EVIL, HEAR

11   NO EVIL, SPEAK NO EVIL.  YOU'VE SEEN THOSE MONKEYS?

12   **A.**   YES, I HAVE.

13   **Q.**   THAT'S WHAT Y'ALL WERE DOING ON THIS, IS YOU WERE JUST

14   CLOSING YOUR EYES.  YOU DIDN'T WANT TO KNOW IF NAPROXEN WAS

15   GOOD OR BAD FOR YOUR HEART, AND YOU DIDN'T WANT TO KNOW IF YOUR

16   VIOXX WAS GOOD OR BAD FOR THE HEART.  AND YOU WERE CLOSING YOUR

17   EARS BECAUSE YOU DIDN'T WANT TO EAR ANYTHING TELL YOU THAT, AND

18   YOU WERE CLOSING YOUR MOUTH BECAUSE YOU WERE NOT GOING TO ASK

19   ANYBODY, WERE YOU?

20   **A.**   I DON'T BELIEVE THAT'S A FAIR CHARACTERIZATION OF MERCK'S

21   BEHAVIOR.

22   **Q.**   ALL RIGHT.  WHO DID YOU ASK IF -- OVER -- ANYWHERE?  WHO

23   DID YOU ASK ABOUT STUDIES TO SEE IF NAPROXEN IS GOOD FOR THE

24   HEART?

25   **A.**   I WAS INVOLVED IN MEETINGS WITH OUR RESEARCH PEOPLE WHO

1   PRESENTED THE ALTERNATIVE EXPLANATIONS AND PRESENTED THE

2   BALANCE OF EVIDENCE FOR VIOXX VERSUS PLACEBO, VIOXX VERSUS

3   NON-NAPROXEN NSAIDS, AND ALSO LOOK AT ALL OF THE DATA THAT

4   APPEARED TO SUPPORT THE "NAPROXEN HYPOTHESIS," AS IT'S CALLED.

5   Q.   THAT SAME PHYSICIAN WHO ENCOUNTERS A PATIENT WHO IS

6   SLIGHTLY OBESE, HAS HYPERTENSION, MAY HAVE SMOKED CIGARETTES,

7   WHAT INFORMATION DID MERCK TELL THAT PHYSICIAN IN 2000, AUGUST

8   OF 2000, THAT MERCK HAD DATA THAT SUGGESTED STRONGLY THAT THAT

9   PERSON WAS AT INCREASED RISK FOR HEART ATTACK OR STROKE IF HE

10  TOOK VIOXX?

11  A.   MERCK DID NOT HAVE DATA THAT THAT PARTICULAR PATIENT YOU

12  JUST DESCRIBED WAS AT INCREASED RISK OF HEART ATTACK.  IN THE

13  MIDDLE OF 2000, MERCK HAD DATA THAT, IN A STUDY WITH NAPROXEN,

14  THERE WAS A DIFFERENCE IN CV EVENTS BETWEEN THE NAPROXEN AND

15  THE VIOXX ARM.  WE HAD SUBSTANTIAL OTHER DATA IN NON-NAPROXEN

16  COMPARATORS AND WITH PLACEBO WHICH SAID CLEARLY THAT THERE WAS

17  NO DIFFERENCE BETWEEN VIOXX AND THESE OTHER PLACEBO OR OTHER

18  AGENTS IN TERMS OF UNWANTED CV SIDE EFFECTS.

19  Q.   LET ME UNDERSTAND THIS.  YOU'RE PRESIDENT OF THE HUMAN

20  HEALTH PART OF MERCK. RIGHT?

21  A.   CORRECT.

22  Q.   AND AS PRESIDENT OF THE HUMAN HEALTH PART OF MERCK, YOUR

23  RESPONSIBILITY IS TO SEE THAT THIS DRUG GETS SOLD, SOLD, SOLD,

24  SOLD.  YOU HAVE NO RESPONSIBILITY TO SEEING THAT IT'S SAFE,

25  SAFE, SAFE, SAFE.  THAT'S A WHOLE DIFFERENT DIVISION THAT

1  DOESN'T EVEN REPORT TO YOU; IS THAT RIGHT?

2  **A.**   NO, THAT IS NOT CORRECT.

3  **Q.**   AND I'M TRYING TO UNDERSTAND YOUR ANSWER.  I NEED HELP

4  WITH IT.  I'M SAYING YOU'RE THE PRESIDENT OF HUMAN HEALTH, AND

5  YOU'RE TELLING ME THAT, YES, YOU HAVE RESPONSIBILITY FOR

6  SAFETY.  SO YOU'RE OUT THERE PEDDLING A DRUG THAT YOU'RE SAYING

7  THE WHOLE REASON THAT THE DRUG IS -- IS CAUSING MORE HEART --

8  OR SEEMS TO BE ASSOCIATED WITH MORE HEART ATTACKS AND STROKES

9  IS BECAUSE THIS OTHER DRUG IS JUST REALLY GOOD FOR THE HEART.

10  AND IF YOU'RE OUT THERE PEDDLING THAT AS THE -- THE LINE FOR

11  THE COMPANY AND MAKING MORE SALES, I WANT TO KNOW WHO YOU WENT

12  TO TO TALK TO SEE IF, IN FACT, NAPROXEN WAS SAFER, WHO OUTSIDE

13  OF YOUR COMPANY.

14  **A.**   I DID NOT PERSONALLY TALK TO PEOPLE OUTSIDE OF MY COMPANY

15  BUT THE PEOPLE REPORTING TO ME WERE RESPONSIBLE FOR SELLING THE

16  PRODUCT CONSISTENT WITH THE BENEFITS AND RISKS SET OUT FOR

17  VIOXX.

18  **Q.**   SIR, YOU KNOW IT'S BILLIONS OF PILLS YOU MADE, DON'T YOU?

19  **A.**   IT PROBABLY IS.  I DON'T KNOW.

20  **Q.**   ALL RIGHT.  SO Y'ALL ARE MARKETING BILLIONS OF THESE PILLS

21  PROBABLY, AND YOU'RE TELLING ME, AS THE PRESIDENT OF HUMAN

22  HEALTH, YOU DIDN'T CHECK WITH ANYBODY OUTSIDE THE COMPANY TO

23  SEE IF YOUR -- YOUR LINE ABOUT "NAPROXEN IS JUST HEALTHY FOR

24  YOUR HEART" TO SEE WHETHER OR NOT THAT HAD ANY VALIDITY?  IS

25  THAT WHAT YOU'RE TELLING ME?

1  **A.**   I DID NOT DO THAT BECAUSE I KNEW THAT OTHERS WHO COULD
2  MAKE THOSE DETERMINATION MUCH BETTER THAN I WERE DOING THAT.
3  THAT'S A VERY LARGE MARKET.
4  **Q.**   IT'S SAFE FOR THE JURY TO ASSUME VIOXX WAS NOT A DRUG THAT
5  COULD SELL ITSELF; IS THAT RIGHT?
6  **A.**   THE RESPONSIBILITY OF MARKETING IS TO TAKE OUR PRODUCT TO
7  OUR CUSTOMERS AND TELL THEM OF THE BENEFITS, TELL THEM OF THE
8  RISKS, AND SEE IF IT'S AN APPROPRIATE CHOICE FOR THE MILLIONS
9  OF PATIENTS WE THOUGHT COULD AND DID BENEFIT FROM VIOXX.
10          **MR. BECK:**  YOUR HONOR, MAY WE STOP FOR A SECOND AND
11 APPROACH.  WILL YOU BRING THE TRANSCRIPT UP, PLEASE.
12          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT
13 THE BENCH.)
14          **MR. BECK:**  WE HAD THIS GUY FROM NOWHERE IN THE MIDDLE
15 OF THE THING.
16          **MR. ROBINSON:**  I THINK YOU INSERTED IT.  THAT WAS THE
17 PROBLEM.
18          **MR. BECK:**  IT WASN'T IN THE PLAY LIST.
19          **MR. ROBINSON:**  WHAT HAPPENED WAS -- WANTED TO PUT IT
20 IN, YOUR HONOR.  IT WAS ACTUALLY PUT IN AT THE VERY BEGINNING
21 OF THE DEPO.  SO WE SAID PUT IT SOMEWHERE ELSE, BUT DON'T PUT
22 IT --
23          **MR. BECK:**  I'M SORRY.  I WAS FOLLOWING THE PLAY LIST.
24          **MR. BIRCHFIELD:**  LET ME SAY THIS, JUDGE.  WE'RE DOING
25 THIS BY PLUG AND PLAY, AND THAT'S WAY THAT YOU INSISTED WE DO

1   IT.

2          **MR. BECK:**  I DON'T KNOW WHAT "PLUG AND PLAY" MEANS.

3          **MR. BIRCHFIELD:**  THAT MEANS THAT YOU HAVE A HARD

4   DRIVE AND IT PLAYS EXACTLY LIKE WE SHOWED YOU.

5          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

6   OPEN COURT.)

7   **BY MR. ROBINSON:**

8   **Q.**   YOU'VE HEARD OF A PRODUCT THAT'S SO GOOD IT SELLS ITSELF?

9   **A.**   I'VE HEARD THE EXPRESSION.  I DON'T KNOW THE PRODUCT.  I

10  CAN'T GIVE YOU AN EXAMPLE OF A PRODUCT.

11  **Q.**   YOU CAN'T THINK OF ONE PRODUCT THAT'S SO GOOD IT SELLS

12  ITSELF?

13  **A.**   I DON'T BELIEVE SO.

14  **Q.**   WOW.  WELL, AT LEAST IF WE WERE GOING TO START LISTING

15  PRODUCTS LIKE THAT, WE WOULDN'T PUT VIOXX ON THAT LIST, WOULD

16  WE?

17  **A.**   I DON'T THINK SUCH A LIST WILL BE PUT TOGETHER.

18  **Q.**   ALL RIGHT.  WELL, JUST ASSUME FOR ME THAT I'M GOING TO

19  COME UP WITH A LONG LIST OF PRODUCTS THAT ARE SO GOOD THAT THEY

20  BASICALLY SELL THEMSELVES.  THEY DON'T NEED HUNDREDS OF

21  MILLIONS OF DOLLARS BEHIND THEM.  WOULD YOU WANT TO PUT VIOXX

22  ON THAT LIST?

23  **A.**   I WOULD NOT PUT ANY OF OUR PRODUCTS ON THAT LIST BECAUSE I

24  THINK ALL OF THE PRODUCTS THAT WE SELL REQUIRE OUR MARKETING

25  AND SALES SUPPORT TO MAXIMIZE THE BENEFITS TO PATIENTS.

1   **Q.**   THE AMOUNT OF MONEY Y'ALL SPENT STUDYING THE DRUG ISN'T

2   ANYWHERE NEAR CLOSE TO THE AMOUNT OF MONEY Y'ALL SPENT TRYING

3   TO SELL THE DRUG AND MARKET IT; TRUE?

4   **A.**   THAT MAY BE TRUE.  BUT THE AMOUNT OF MONEY SPENT ON THE

5   STUDIES IS RELEVANT TO THE STUDIES; THE AMOUNT OF MONEY SPENT

6   ON MARKETING RELATES TO THE TOTAL EFFORT REQUIRED TO TAKE THE

7   PRODUCT TO OUR CUSTOMERS.

8   **Q.**   SIR, IF WE ARE TO CONTINUE DOWN THE LIST OF THINGS Y'ALL

9   DID IN MARKETING-- BY THE WAY, HAVE YOU EVER COMPARED THE

10  NUMBER OF PEOPLE AT MERCK WHO WERE IN CHARGE OF RESEARCH TO THE

11  NUMBER OF PEOPLE IN MERCK WHO ARE IN CHARGE OF SALES?

12  **A.**   NO, I HAVE NOT DONE THAT COMPARISON.

13  **Q.**   I BET YOU HAVE A TON MORE SALESPERSONS THAN YOU DO

14  RESEARCH SCIENTISTS ON VIOXX, DON'T YOU?

15  **A.**   YES.  BUT THE REASON FOR THAT IS WE HAVE THE SCIENTISTS

16  SUPPORTING VIOXX SUFFICIENT FOR THE NEEDS THERE, AND WE HAVE

17  THE SALES REPS SUFFICIENT TO SUPPORT THE MARKETING EFFORT

18  ACROSS THE AUDIENCE OF PHYSICIANS AND OTHERS THAT WE WERE

19  COVERING.

20  **Q.**   IN ADDITION TO THE EIGHT REASONS WE HAVE -- OR EIGHT ITEMS

21  WE HAVE LISTED HERE UNDER MARKETING, A THING Y'ALL DID IN

22  MARKETING, Y'ALL WOULD HAVE MARKETING CONSULTANT MEETINGS WHERE

23  Y'ALL WOULD MEET WITH CONSULTANTS AND DISCUSS THE MARKETING

24  PLANS; TRUE?

25  **A.**   THERE WERE MARKET RESEARCH CONSULTANT MEETINGS, YES.

1    **Q.**   IN ADDITION TO THAT, YOU SPENT A SURPLUS OR AN EXTRA
2    AMOUNT OF FMC MONEY, RIGHT?  BUT YOU DIDN'T REMEMBER WHAT FMC
3    MEANT, DID YOU?
4    **A.**   YES.  THE PEOPLE IN THE FIELD HAD A BUDGET WITH THEIR
5    CUSTOMERS, YES.
6    **Q.**   NOW, Y'ALL ALSO HIRED SPEECH GIVERS.  YOU PAID PEOPLE TO
7    GIVE SPEECHES?
8    **A.**   WE HAD A PROGRAM OF MEDICAL EDUCATION WITH PHYSICIANS WHO
9    WERE CONTRACTED WITH US TO SPEAK TO PHYSICIAN AUDIENCES, YES.
10   **Q.**   WHO WOULD I NEED TO TALK TO ABOUT THAT?
11   **A.**   I THINK THAT WOULD BE-- THAT WOULD BE DEE DEE SCOTT.
12   **Q.**   ALL RIGHT.  FOR NUMBER 12, I'M JUST GOING TO PUT "POSSIBLY
13   PAID CLINICAL PAPER WRITERS" BECAUSE YOU'RE NOT SURE?
14   **A.**   I'M NOT SURE.
15   **Q.**   ALL RIGHT.  NOW, THE MARKETING EFFORTS THAT YOU DID -- AND
16   BY "YOU" HERE, I MEAN MERCK.  THE MARKETING EFFORTS MERCK DID
17   GOT THEM IN SOME TROUBLE WITH THE FDA, DIDN'T IT.
18   **A.**   WE RECEIVED A WARNING LETTER FROM THE FDA, YES.
19   **Q.**   WELL, YOU GOT MORE THAN ONE, DIDN'T YOU?
20   **A.**   WITH REGARD TO VIOXX?
21   **Q.**   YES, SIR.
22   **A.**   I KNOW WE RECEIVED A WARNING LETTER.  AND I THINK THERE
23   HAD BEEN AN EARLIER COMPLAINT ABOUT HOMEMADE DETAIL PIECES.
24   **Q.**   YEAH.  LET'S LOOK AT THAT ONE FIRST.  THIS IS EXHIBIT 114.
25   YOU GOT IT IN FRONT OF YOU NOW?

1   **A.**   YES, I DO.

2   **Q.**   THIS IS FROM THE FDA, THE FOOD & DRUG ADMINISTRATION,

3   ISN'T IT?

4   **A.**   YES.  YES, IT IS.

5   **Q.**   IT WENT TO ELLEN WESTRICK, THE EXECUTIVE DIRECTOR OF

6   MEDICAL/LEGAL; IS THAT RIGHT?

7   **A.**   THAT'S CORRECT.

8   **Q.**   IS SHE A LAWYER?

9   **A.**   NO, SHE IS NOT A LAWYER.

10   **Q.**   SHE'S THE EXECUTIVE DIRECTOR IN THE MEDICAL/LEGAL OFFICE

11   OF MERCK?

12   **A.**   THAT'S CORRECT.

13   **Q.**   THIS WAS AN FDA LETTER YOU HAD SEEN BEFORE, HAVEN'T YOU?

14   **A.**   I MAY HAVE.  I DON'T RECALL.  IT'S QUITE POSSIBLE.

15   **Q.**   WELL, YOU SURE WOULD HOPE SOMEONE WOULD BRING IT TO YOUR

16   ATTENTION IF IT SLAMS THE MARKETING YOU'RE THE PRESIDENT OF?

17   **A.**   I'M SURE THE ISSUE WAS BROUGHT TO MY ATTENTION.

18   **Q.**   LOOK AT WHAT IT COMPLAINS ABOUT ON THE SECOND SENTENCE:

19   WELL, FIRST OF ALL, LOOK AT THE FIRST SENTENCE.  "REFERENCE IS

20   MADE TO MERCK'S LETTERS IN RESPONSE TO LETTERS FROM THE FDA

21   DATED NOVEMBER 12 AND DECEMBER 1."  SO THIS IS NOW OUR THIRD

22   LETTER FROM THE FDA ON THIS ISSUE, ISN'T IT?

23   **A.**   I DON'T KNOW THAT IT'S IN REGARD TO THIS ISSUE.

24   **Q.**   WELL, LOOK AT IT.  IT SAYS, "OUR LETTERS DATED

25   NOVEMBER 123.

1   **A.**   IN RESPONSE TO LETTERS.

2   **Q.**   YEAH.  "CONCERNED THE ALLEGED DISSEMINATION."

3   **A.**   YES.  YES, IT APPEARS TO BE.

4   **Q.**   ALL RIGHT.  SO WHAT YOU'VE GOT IN FRONT OF YOU NOW IS YOUR

5   THIRD LETTER FROM THE FDA CONCERNED ABOUT WHAT Y'ALL WERE

6   DOING.  RIGHT?

7   **A.**   THIS SEEMS TO BE A THIRD LETTER, RIGHT.

8   **Q.**   THE FDA SAYS, "OUR LETTERS CONCERNED THE ALLEGED

9   DISSEMINATION OF TWO "HOMEMADE" PROMOTIONAL PIECES ENTITLED

10  "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX."  DID I READ

11  THAT RIGHT?

12  **A.**   YES, YOU DID.

13  **Q.**   YOU DON'T THINK THAT'S THE SAME "TOP TEN REASON" TYPE

14  SPEECH-WRITER THAT HOMEMADE THAT ONE THAT MADE YOUR SPEECH OF

15  THE TOP TEN, DO YOU?

16  **A.**   I DON'T KNOW.  I WOULD BE SPECULATING.

17  **Q.**   WELL, DID YOU EVER INVESTIGATE TO SEE TO WHAT EXTENT THESE

18  HOME-MAILED PIECES WERE USED TO PROMOTE VIOXX?

19  **A.**   YES.  THAT WAS INVESTIGATED BY OUR PEOPLE AT MERCK.

20  **Q.**   WHO WAS DOING IT?

21  **A.**   IT WAS DONE BY THIS GROUP IN CONJUNCTION WITH OUR LEGAL

22  GROUP.

23  **Q.**   OKAY.  WHO WITHIN MERCK WAS HANDING OUT PROMOTIONAL PIECES

24  ENTITLED "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX"?

25  **A.**   I DON'T KNOW.

1    Q.   WELL, HOW DID YOU INVESTIGATE IT IF YOU DON'T KNOW WHO DID

2    IT?

3    A.   IT WAS INVESTIGATED AT A LEVEL BELOW ME.

4    Q.   WELL, WHO INVESTIGATED IT?  WHO DID YOU HAND THAT OFF TO?

5    A.   I DIDN'T HAND IT OFF.  THIS PERSON, ELLEN WESTRICK, IS

6    RESPONSIBLE FOR THE OFFICE OF MEDICAL/LEGAL.  SHE WOULD HAVE

7    IMMEDIATELY WORKED WITH OUR LEGAL GROUP TO INVESTIGATE IT AND

8    DETERMINE WHAT HAPPENED AND TAKE STEPS TO STOP IT.

9    Q.   LET ME SEE IF I UNDERSTAND THIS.  YOU'RE THE HEAD OF

10   MARKETING AND ADVERTISING, RIGHT?  YOU'RE THE PRESIDENT.

11   A.   CORRECT.

12   Q.   YOU'RE GETTING MULTIPLE-- MERCK IS GETTING MULTIPLE

13   LETTERS FROM THE FDA COMPLAINING ABOUT MARKETING, PROMOTIONAL

14   PIECES BEING HANDED OUT, ON YOUR BIGGEST SELLING DRUG.  RIGHT?

15   A.   YES.

16   Q.   WELL, IF I'M UNDERSTANDING MERCK'S POSITION, THOUGH, THIS

17   WAS A RENEGADE GROUP OF PIECES BEING HANDED OUT.  YOU'VE GOT

18   PEOPLE ALREADY VIOLATING YOUR PROCEDURES IN AN EFFORT TO TRY

19   AND SELL THIS DRUG.  DID YOU BOTHER TO CHECK TO SEE WHO?

20   A.   NO.  NOR WOULD I EXPECT TO CHECK AT THIS LEVEL.  IF THERE

21   WERE MORE THAN 2,000 SALES REPRESENTATIVES SUPPORTING VIOXX,

22   THEN I WOULD EXPECT THAT, CONSISTENT WITH OUR POLICIES AND

23   PROCEDURES IN THE SYSTEM, THAT SOMEBODY WOULD ADDRESS THIS

24   SITUATION AND TAKE THE APPROPRIATE ACTION.

25   Q.   SO YOUR COMPANY GETS WRITTEN UP THREE TIMES HERE BY THE

1    FDA FOR WRONG DISSEMINATION OF PROMOTIONAL PIECES THAT ARE OUT

2    OF LINE, AND YOUR POSITION ON THAT IS:  I'M SURE SOMEBODY IS

3    GOING TO HANDLE THAT.  I DON'T NEED TO?

4    **A.**   WELL, I BELIEVE THE THREE TIMES WOULD RELATE, IT SEEMS,

5    BASED ON A QUICK LOOK AT THIS LETTER, TO ONE INCIDENT.  AND,

6    YES, I BELIEVE OUR ORGANIZATION IS WELL EQUIPPED, HAS BEEN AND

7    IS, WELL EQUIPPED TO ADDRESS THESE ISSUES AND TAKE THE

8    APPROPRIATE ACTION.

9    **Q.**   WELL, SIR, BUT IT SAYS, "WE'VE REVIEWED THESE PROMOTIONAL

10   PIECES AND HAVE DETERMINED THEY ARE FALSE OR MISLEADING.  THEY

11   CONTAIN MISREPRESENTATIONS OF VIOXX'S SAFETY PROFILE.

12   UNSUBSTANTIATED COMPARATIVE CLAIMS.  THEY ARE LACKING IN FAIR

13   BALANCE.  AND IT ALSO SAYS THAT THESE PIECES WERE BEING HANDED

14   OUT, "IN THEIR RESPECTIVE GEOGRAPHIC REGIONS," PLURAL, QUOTE.

15          NOW, DID YOU BOTHER TO GO FIND OUT WHERE THEY WERE

16   HANDED OUT AND TRY TO FIX THE FALSE AND MISLEADING DATA THAT

17   THE FDA SAID Y'ALL WERE PASSING AROUND?

18   **A.**   I DID NOT DO THAT.  THE REASON I DID NOT DO THAT IS

19   HOMEMADE DETAIL PIECES, WHICH IS A PHRASE WHICH MEANS THAT THE

20   PIECES, JUST TO BE CLEAR ABOUT THAT, WERE NOT APPROVED THROUGH

21   OUR MEDICAL/LEGAL SYSTEM, WERE, IT SEEMS IN THIS CASE, PRODUCED

22   BY ONE SALES REPRESENTATIVE.  AND I AM SURE THAT THIS ISSUE WAS

23   SETTLED, THAT THESE ARE CLEARLY AGAINST MERCK'S POLICIES, TO

24   DO -- TO DO ANY MATERIAL THAT DOESN'T GO THROUGH OUR

25   MEDICAL/LEGAL APPROVAL.

1   **Q.**   YOU NEVER GAVE THIS TO THE FDA, DID YOU?

2   **A.**   BUT THIS IS NOT A DOCUMENT THAT WAS USED WITH CUSTOMERS.

3   **Q.**   YOU NEVER GAVE THIS TO THE FDA, DID YOU?

4   **A.**   THIS IS NOT A DOCUMENT THAT WE WOULD EVER NEED TO SEND TO

5   THE FDA.

6   **Q.**   YOU NEVER GAVE THIS DOCUMENT TO THE FDA, DID YOU?

7   **A.**   WE DID NOT GIVE THIS DOCUMENT TO THE FDA, NOR WOULD THERE

8   BE A REASON THAT WE WOULD NEED TO.

9   **Q.**   THERE'S A REASON NOT TO.  THEY'D PROBABLY GET YOU IN

10   TROUBLE AND SAY, "IT WASN'T A RENEGADE SALESMAN.  IT CAME FROM

11   THE PRESIDENT."  TRUE?

12   **A.**   NO.  I DON'T BELIEVE THEY WOULD REGARD THIS AS A RELEVANT

13   DOCUMENT FOR THEM TO RECEIVE AT ALL.

14   **Q.**   SO Y'ALL HAVE KNOWN FOR YEARS THAT VIOXX COULD CAUSE BLOOD

15   PRESSURE TO GO UP WHILE CELEBREX COULDN'T?

16   **A.**   NO, WE DID NOT KNOW THAT.  ALL OF THE NSAIDS, VIOXX AND

17   CELEBREX INCLUDED, ARE ASSOCIATED WITH TWO CLASS EFFECTS:  ONE

18   IS THAT THEY CAN CAUSE BLOOD PRESSURE TO GO UP; THE OTHER IS

19   THAT THEY CAN ACCUMULATE FLUID IN THE BODY, NEITHER OF WHICH

20   ARE GOOD THINGS.  VIOXX WAS ASSOCIATED WITH THESE TWO EFFECTS.

21   THIS WAS CAPTURED IN OUR EARLY CLINICAL STUDIES, DOCUMENTED IN

22   OUR LABEL.  CELEBREX IS ALSO ASSOCIATED, BUT WITH A LOWER

23   INCIDENCE, TO THESE EFFECTS.

24   **Q.**   BUT PRIOR TO MARKETING THE DRUG, YOU KNEW ABOUT THAT;

25   CORRECT?

1    **A.**   YES.  AND THAT WAS ANTICIPATED BECAUSE ALL NONSTEROIDALS

2    AND NOW THE NEWER COX-2 SELECTIVE ATHEROSCLEROSIS ALL SEEMED TO

3    HAVE A SIMILAR EFFECT IN SOME PATIENTS, SOME PERCENTAGE OF

4    PATIENTS, TO ELEVATE BLOOD PRESSURE AND TO CAUSE FLUID

5    RETENTION.  THAT WAS A KNOWN RISK WITH USING ANY OF THESE

6    AGENTS.

7                            **CROSS-EXAMINATION**

8    **BY MR. BECK:**

9    **Q.**   GOOD MORNING, MR. ANSTICE.  WOULD YOU PLEASE INTRODUCE

10   YOURSELF TO THE JURY.

11   **A.**   MY NAME IS DAVID WESTBROOK ANSTICE.

12   **Q.**   MR. ANSTICE, HOW ARE YOU CURRENTLY EMPLOYED?

13   **A.**   I'M EMPLOYED BY MERCK AS PRESIDENT FOR HUMAN HEALTH.

14   **Q.**   HOW LONG HAVE YOU HAD THAT POSITION?

15            **MR. BECK:**  YOUR HONOR, THIS THE EXAMINATION BY --

16            **THE COURT:**  LET ME STOP AND LET ME MENTION IT.

17            **MR. BECK:**  I'M SORRY.

18            **THE COURT:**  MEMBERS OF THE JURY, YOU KNOW ONE SIDE

19   GOES FIRST AND THEN THE OTHER SIDE.  NOW THIS IS THE DEFENSE

20   ASKING THE QUESTIONS.

21            **THE WITNESS:**  TWO YEARS AND THREE OR FOUR MONTHS.

22   **BY MR. BECK:**

23   **Q.**   MR. ANSTICE, DOES THE TITLE "PRESIDENT" MEAN THAT YOU'RE

24   THE HEAD OF THE ENTIRE COMPANY?

25   **A.**   NO, IT DOES NOT.

                              DAILY COPY

1   **Q.**   WHAT DOES THE TERM "HUMAN HEALTH" IN YOUR TITLE REFER TO?

2   **A.**   THIS REFERS TO MY RESPONSIBILITY TODAY IS FOR OUR SALES

3   AND MARKETING ACTIVITIES IN A NUMBER OF COUNTRIES AROUND THE

4   WORLD; SPECIFICALLY, THOSE COMPANIES ARE CANADA, LATIN AMERICA,

5   JAPAN, AUSTRALIA, AND NEW ZEALAND.

6   **Q.**   CAN YOU TELL US WHAT THE SIGNIFICANCE, IF ANY, IS OF THE

7   TERM "HUMAN HEALTH"?

8   **A.**   "HUMAN HEALTH" IS A TERM WE USE IN OUR COMPANY TO COVER

9   THE -- TO DESCRIBE THE BUSINESS OF OUR PRESCRIPTION MEDICINE

10   BUSINESS AS DISTINCT FROM VACCINES OR ANIMAL HEALTH PRODUCTS,

11   AND THEREFORE, I AM RESPONSIBLE FOR ALL OF THE PRESCRIPTION

12   MEDICINES SOLD BY MERCK AGAIN IN THE COMPANIES I JUST

13   DESCRIBED.

14   **Q.**   BEFORE YOU WERE THE PRESIDENT OF HUMAN HEALTH, WHAT WAS

15   YOUR POSITION AT MERCK?

16   **A.**   UP UNTIL DECEMBER 2002, I WAS PRESIDENT, HUMAN HEALTH, OF

17   AMERICAS.

18   **Q.**   HOW LONG DID YOU HOLD THAT POSITION?

19   **A.**   THAT POSITION WAS FROM APPROXIMATELY 1997 TO 2002.

20   **Q.**   WHAT WERE YOUR GENERAL DUTIES AND RESPONSIBILITIES AS

21   PRESIDENT OF HUMAN HEALTH FOR THE AMERICAS?

22   **A.**   MY RESPONSIBILITIES, AGAIN, WERE FOR -- RESPONSIBLE FOR

23   SALES AND MARKETING ACTIVITIES RELATED TO MERCK'S

24   PRESCRIPTION-MEDICINE BUSINESS, THIS TIME FOR THE U.S. MARKET,

25   FOR CANADA, AND FOR LATIN AMERICA.

1   **Q.**   DID YOUR RESPONSIBILITIES AS PRESIDENT OF HUMAN HEALTH IN

2   THE AMERICAS INCLUDE RESPONSIBILITY FOR VIOXX?

3   **A.**   YES, THEY DID.

4   **Q.**   MR. ANSTICE, ARE YOU A MEDICAL DOCTOR?

5   **A.**   NO, I AM NOT.

6   **Q.**   DOES THE HUMAN HEALTH DIVISION AT MERCK DEAL WITH ANYTHING

7   OTHER THAN SALES AND MARKETING SIDE OF MERCK?

8   **A.**   NO.  WE ARE THE COMMERCIAL ARM FOR MERCK.

9   **Q.**   IS THERE A DIVISION AT MERCK THAT'S RESPONSIBLE FOR THE

10  MEDICAL, SCIENTIFIC, AND RESEARCH PART OF MERCK'S BUSINESS?

11  **A.**   YES, THERE IS.

12  **Q.**   WHAT'S THE NAME OF THAT DIVISION?

13  **A.**   THAT DIVISION IS CALLED MERCK RESEARCH LABORATORIES.

14  **Q.**   ARE YOU A PART OF THAT DIVISION?

15  **A.**   NO, I AM NOT.

16  **Q.**   WHO IS THE PRESIDENT OF THAT DIVISION?

17  **A.**   TODAY THE PRESIDENT OF THAT DIVISION IS DR. PETER S. KIM.

18  **Q.**   WHO WAS PRESIDENT OF THAT DIVISION DURING THE DEVELOPMENT

19  OF VIOXX?

20  **A.**   DURING THE DEVELOPMENT OF VIOXX, DR. EDWARD SCOLNICK WAS

21  PRESIDENT OF THAT DIVISION.

22  **Q.**   WHAT KIND OF TRAINING DID DR. KIM AND DR. SCOLNICK HAVE?

23  **A.**   DR. KIM IS A PH.D. IN MEDICAL SCIENCE, AND DR. SCOLNICK IS

24  A MEDICAL PHYSICIAN BUT ALSO WITH EXTENSIVE SCIENTIFIC

25  TRAINING.

1  Q.   IN GENERAL TERMS, WHAT KINDS OF BACKGROUNDS DO THE PEOPLE

2  HAVE THAT WORK IN THE MERCK RESEARCH LABS DIVISION?

3  A.   CERTAINLY AT THE SENIOR LEVELS, THE PEOPLE, PHYSICIANS.

4  IN SOME CASES, PHYSICIANS WITH, FIRST OF ALL, DOCTORATES IN

5  MEDICAL SCIENCES; IN OTHER CASES, THEY HAVE PH.D.S OR OTHER

6  SENIOR DEGREES IN MEDICAL RESEARCH FIELDS QUITE BROADLY.

7  Q.   DO THOSE PEOPLE IN THE MERCK RESEARCH LABS DIVISION REPORT

8  TO YOU?

9  A.   NO, THEY DO NOT.

10  Q.   MR. ANSTICE, TO WHOM DID YOU REPORT WHEN YOU WERE

11  PRESIDENT OF HUMAN HEALTH FOR THE AMERICAS?

12  A.   I REPORTED THROUGHOUT THAT PERIOD TO MR. RAY GILMARTIN,

13  THE CEO OF MERCK.

14  Q.   TO WHOM DO YOU REPORT IN YOUR POSITION AS PRESIDENT OF

15  U.S -- I MEAN, STRIKE THAT.  TO WHOM DO YOU REPORT NOW IN YOUR

16  POSITION AS PRESIDENT OF HUMAN HEALTH?

17  A.   TO THE SAME PERSON, MR. RAY GILMARTIN.

18  Q.   MR. ANSTICE, WHERE ARE YOU ORIGINALLY FROM?

19  A.   FROM AUSTRALIA.

20  Q.   ARE YOU MARRIED?

21  A.   YES, I AM.

22  Q.   WHERE DO YOU AND YOUR WIFE CURRENTLY LIVE?

23  A.   IN WHITEMARK TOWNSHIP, PENNSYLVANIA.

24  Q.   LET'S TALK A LITTLE BIT MORE ABOUT YOUR BACKGROUND AND HOW

25  YOU CAME TO WORK FOR MERCK.  CAN YOU TELL US ABOUT YOUR FORMAL

1    EDUCATION?

2    **A.**    AFTER HIGH SCHOOL, MY FORMAL EDUCATION WAS TO DO A

3    BACHELOR OF ECONOMICS DEGREE AT THE UNIVERSITY OF SYDNEY IN

4    SYDNEY, AUSTRALIA.

5    **Q.**    IN WHAT SUBJECT WAS YOUR BACHELOR'S DEGREE?

6    **A.**    THE SUBJECT WAS ECONOMICS, WITH MAJORS IN POLITICAL

7    ECONOMY AND ECONOMICS.

8    **Q.**    WHAT DID YOU DO AFTER YOU GOT YOUR DEGREE FROM THE

9    UNIVERSITY OF SYDNEY?

10   **A.**    I JOINED THE PHARMACEUTICAL MANUFACTURERS TRADE

11   ASSOCIATION IN AUSTRALIA.

12   **Q.**    WHAT WERE YOUR GENERAL DUTIES IN THAT POSITION?

13   **A.**    I WAS AN ECONOMIST IN THAT ORGANIZATION, AND I GENERALLY

14   WORKED WITH THE 50, 60, MEMBER COMPANIES TO PROVIDE SERVICES TO

15   THEM, WHICH INCLUDED EXTENSIVE INVOLVEMENT WITH THE GOVERNMENT

16   ON A BROAD RANGE OF DIFFERENT ISSUES.

17   **Q.**    MR. ANSTICE, WHY DID YOU TAKE A JOB IN THE PHARMACEUTICAL

18   INDUSTRY AT THAT TIME?

19   **A.**    UPON LEAVING THE UNIVERSITY, I TOOK THAT POSITION BECAUSE

20   OF THE MIX -- BECAUSE I WANTED TO WORK IN THE COMMERCIAL WORLD,

21   BUT I WAS ALSO INTERESTED IN THE LINKAGE BETWEEN THE COMMERCIAL

22   WORLD AND THE WORLD OF GOVERNMENT, AND THIS JOB PROVIDED A VERY

23   INTERESTING PLATFORM TO DO THAT.

24   **Q.**    HOW LONG DID YOU STAY WITH THE PHARMACEUTICAL

25   MANUFACTURERS ASSOCIATION IN AUSTRALIA?

1    **A.**   I STAYED WITH THAT GROUP FOR APPROXIMATELY FIVE YEARS.

2    **Q.**   WHY DID YOU LEAVE THAT POSITION?

3    **A.**   I LEFT THAT POSITION BECAUSE I WAS OFFERED A POSITION IN A

4    NUMBER OF COMPANIES, BUT ONE OF THEM WAS MERCK.  AND I HAD

5    GROWN TO SEE THE IMPORTANCE OF THE INDUSTRY, THE BENEFIT THAT

6    IT PROVIDED TO PATIENTS.  AND MERCK IN AUSTRALIA AT THAT TIME

7    WAS A FINE COMPANY, WHICH HAD EXCELLENT PRODUCTS, AND I WAS

8    VERY PLEASED TO ACCEPT THEIR JOB OFFER AT THAT TIME.

9    **Q.**   WHAT YEAR DID YOU JOIN MERCK?

10   **A.**   1974.

11   **Q.**   CAN YOU DESCRIBE FOR US IN GENERAL TERMS THE POSITIONS

12   THAT YOU HAD AND THE NATURE OF YOUR RESPONSIBILITIES WHILE YOU

13   WERE WORKING FOR MERCK IN AUSTRALIA?

14   **A.**   I WORKED IN AUSTRALIA FOR THE NEXT SEVEN YEARS, AND I HAD

15   A VARIETY OF DIFFERENT JOBS IN MARKETING AND SUPPORTING

16   MARKETING AND SELLING ACTIVITIES IN OUR BUSINESS IN AUSTRALIA.

17   **Q.**   DID THERE COME A POINT IN TIME WHERE YOU MOVED TO THE

18   UNITED STATES?

19   **A.**   I CAME ON A TEMPORARY BASIS IN '81, '82.  I THEN WENT FOR

20   MERCK TO SOUTH AFRICA, WHERE I HAD RESPONSIBILITY FOR SALES AND

21   MARKETING, AND THEN RETURNED TO AUSTRALIA IN 1984.

22   **Q.**   DID YOU COME TO THE UNITED STATES ON A MORE PERMANENT

23   BASIS AT SOME POINT?

24   **A.**   YES, I DID.  IN 1988, I CAME TO THE U.S., APPARENTLY ON A

25   MORE PERMANENT BASIS, AND AT THAT TIME I CAME TO A POSITION,

1   WHICH WAS HEAD OF MARKET FOR OUR INTERNATIONAL -- THE
2   INTERNATIONAL PART OF OUR BUSINESS.
3   Q.   NOW, LET'S TALK ABOUT THE TIME WHEN YOU WERE THE PRESIDENT
4   OF HUMAN HEALTH FOR THE AMERICAS.  YOU'VE GOT THAT TIME FRAME
5   ALL SET?
6   A.   YES.
7   Q.   CAN YOU DESCRIBE FOR US GENERALLY WHAT YOUR JOB ENTAILED
8   AT THAT POINT?
9   A.   YES.  MY RESPONSIBILITY WAS TO OVERSEE -- I HAD ULTIMATE
10  RESPONSIBILITY AND ACCOUNTABILITY FOR ALL OF MERCK'S
11  PRESCRIPTION-MEDICINE BUSINESS IN THE UNITED STATES, AS WELL AS
12  IN THE OTHER AREAS THAT I MENTIONED.  AND AS PART OF THAT, I
13  WAS INVOLVED IN INTERACTIONS ALSO WITH OTHER DIVISIONS AT
14  MERCK.
15  Q.   ARE YOU FAMILIAR WITH DOCUMENTS AT MERCK THAT ARE REFERRED
16  TO AS BUSINESS PLANS AND PROFIT PLANS?
17  A.   YES, I AM.
18  Q.   WHAT ARE THOSE DOCUMENTS?
19  A.   WE USE THE TERM "BUSINESS PLAN" TO DESCRIBE A DOCUMENT
20  WHICH IS A PLANNING AND FINANCIAL DOCUMENT WHICH PROJECTS OUR
21  BUSINESS TYPICALLY FOR THE NEXT FIVE YEARS.  A PROFIT PLAN IS A
22  DOCUMENT WHICH IS, IN EFFECT, OUR ANNUAL PLANNING BUDGET, BOTH
23  SALES REVENUES AND EXPENSES FOR THE NEXT CALENDAR YEAR.  AND
24  THAT'S SOMETHING WE WORK ON EACH YEAR AS WE PUT TOGETHER OUR
25  PLANS.

1   **Q.**   DO THOSE BUSINESS PLANS AND PROFIT PLANS INVOLVE SALES

2   FORECASTS, FOR EXAMPLE?

3   **A.**   YES.   THEY ARE A VERY IMPORTANT COMPONENT OF THOSE PLANS.

4   **Q.**   WHAT KIND OF THINGS DOES MERCK CONSIDER WHEN IT DOES SALES

5   FORECASTS?

6   **A.**   WHEN WE CONSIDER SALES FORECASTS, THEY ARE WHAT WE

7   DESCRIBE AS ASSUMPTION-BASED; THAT IS, WE SURVEY ALL OF THE

8   EVENTS THAT ARE KNOWABLE LEAST AND CONSIDER WHAT THE IMPACT OF

9   THOSE EVENTS MIGHT BE ON OUR SALES FORECAST.   WE PROJECT TRENDS

10   FOR EXISTING PRODUCTS.   WE ANTICIPATE NEW PRODUCTS THAT WOULD

11   BE COMPETITIVE WITH THE PRODUCT.   WE ANTICIPATE OR ASSUME NEW

12   CLAIMS, NEW FORMULATIONS.   WE ALSO TRY AND ANTICIPATE CHANGES

13   GENERALLY IN THE MARKETPLACE THAT MIGHT AFFECT THE REVENUE OR

14   USAGE OF OUR PRODUCTS.

15   **Q.**   DOES MERCK EVER KEEP TRACK OF WHAT ITS COMPETITORS ARE

16   DOING?

17   **A.**   WE KEEP TRACK OF OUR COMPETITORS ON A CONSTANT BASIS

18   BECAUSE --

19   **Q.**   WHY DO YOU DO THAT?

20   **A.**   WELL, THAT'S A VERY IMPORTANT PART OF ASSESSING HOW OUR

21   PRODUCT IS BEING SEEN IN THE MARKETPLACE, HOW IT'S BEING USED.

22   AND WE'RE CONSTANTLY ASSESSING BOTH THE PERCEPTIONS RELATED TO

23   OUR PRODUCT AND COMPETITORS.   WE'RE CONSTANTLY ASSESSING THEIR

24   MARKET SHARE, THEIR SALES.   WE'RE ALSO MONITORING TO SEE WHAT

25   NEW STUDIES THEY MIGHT BE DOING AND SO FORTH.   IT'S A VERY

1    IMPORTANT PART OF OUR ACTIVITIES.

2    **Q.**   MR. ANSTICE, DID THE FORECASTS THAT YOU MENTIONED HAVE ANY

3    EFFECT ON HOW MERCK LABELS ITS DRUGS?

4    **A.**   NO.   THE FORECASTS DON'T AFFECT THE LABEL PER SE.   IF WE

5    MAKE ASSUMPTION WITH PARTICULAR CLAIMS, THEN WE MIGHT HAVE A

6    DIFFERENT AUDIENCE OF PATIENTS THAT MIGHT BE SUITABLE FOR A

7    PRODUCT THAT COULD AFFECT IT IN THAT WAY.   BUT THAT WOULD BE A

8    DIALOGUE WITH THE RESEARCH GROUP.

9    **Q.**   LET'S GO BACK TO MARKETING, MR. ANSTICE, AND I WOULD LIKE

10   TO TALK, IF WE CAN, ABOUT THE ROLE THAT MARKETING PLAYS AT

11   MERCK AND HOW IT RELATES TO SCIENTIFIC RESEARCH AT MERCK.

12   FIRST, HOW DOES MARKETING IN THE PHARMACEUTICAL BUSINESS DIFFER

13   FROM OTHER BUSINESSES?

14   **A.**   I THINK IT DIFFERS IN SOME IMPORTANT WAYS.   TO BEGIN WITH,

15   ONLY A PHYSICIAN CAN PRESCRIBE A PRESCRIPTION MEDICATION, AND

16   THAT MAKES IT, I THINK, VERY DIFFERENT FROM MANY BUSINESSES.   I

17   THINK THAT, ALSO, THE CONSUMER IS AN IMPORTANT PART ULTIMATELY,

18   BUT IT REALLY IS DIFFERENT IN THAT OUR PRIMARY AUDIENCE HAS TO

19   BE THE PHYSICIAN.

20   **Q.**   HOW DOES THE FACT THAT YOUR PRIMARY AUDIENCE IS THE

21   PHYSICIAN AFFECT THE WAY YOU MARKET AT MERCK?

22   **A.**   IT AFFECTS IT IN A NUMBER OF IMPORTANT WAYS.   FIRST OF

23   ALL, OUR -- THE PRODUCT THAT WE SELL IN THE MARKET, REGULATORS

24   AGREE WITH MERCK ON THE LABEL AND WHAT THE BENEFITS AND RISKS

25   OF THAT PRODUCT ARE, AND THAT SETS OUT WHAT THE BASIS OF THE

1   DISCUSSION CAN BE WITH A PHYSICIAN.

2          THAT'S A VERY IMPORTANT DIFFERENCE.  THAT, IN TURN,

3   LEADS MERCK TO PAY CLOSE ATTENTION TO THAT AS WE DIRECT OUR

4   MARKETING AND SELLING ACTIVITIES TO OUR PHYSICIAN AUDIENCES.

5   **Q.**   HOW DOES IT AFFECT THE TYPE OF INFORMATION THAT'S PROVIDED

6   TO DOCTORS AS PART OF THE MARKETING?

7   **A.**   IT AFFECTS THE TYPE OF MARKETING BECAUSE WE ARE CONSTANTLY

8   REVIEWING THE DATA OF THE PRODUCTS, AND IT AFFECTS IT IN THE

9   SENSE THAT WE HAVE TO MAKE SURE THAT WE'RE PROVIDING PHYSICIANS

10  WITH RELEVANT AND APPROPRIATE INFORMATION TO TREAT THE DISEASE

11  THAT THE PRODUCT IS DIRECTED TOWARDS.

12  **Q.**   IN YOUR EXPERIENCE, DO PHYSICIANS DEMAND THAT TYPE OF

13  INFORMATION?

14  **A.**   MY EXPERIENCE IS THAT -- AND I THINK BROADLY THE

15  EXPERIENCE OF PEOPLE IN THE COMMERCIAL SIDE OF MERCK -- IS THAT

16  PHYSICIANS TREATING DISEASES HAVE VERY SPECIFIC NEEDS.  THEY

17  HAVE CHOICES AVAILABLE TO THEM.  THOSE NEEDS ARE CONSTANTLY

18  BEING IDENTIFIED.  AND WE HEAR THAT ALL THE TIME ON THE SALES

19  AND MARKETING SIDE.

20  **Q.**   ARE THERE RULES AND REGULATIONS THAT CONTROL YOUR

21  MARKETING AND SALES OF DRUGS IN THE UNITED STATES?

22  **A.**   YES.  THERE ARE VERY IMPORTANT RULES AND REGULATIONS.

23  **Q.**   WHO OVERSEES THOSE RULES AND REGULATIONS IN THE

24  UNITED STATES?

25  **A.**   FOR PRESCRIPTION MEDICINES, THE FOOD & DRUG ADMINISTRATION

1   OVERSEES IT, BUT SPECIFICALLY THROUGH A GROUP THAT'S

2   RESPONSIBLE FOR DRUG ADVERTISING.

3   **Q.**   MR. ANSTICE, CAN YOU PLEASE DESCRIBE FOR US IN GENERAL

4   TERMS WHAT THE MARKETING GROUP DOES AT MERCK?

5   **A.**   IN GENERAL TERMS, THE MARKETING GROUP WORKS WITH ALL OF

6   OUR PRODUCTS COLLABORATIVELY WITH THE RESEARCH GROUP IN THE

7   FORMATIVE PERIOD OF DEVELOPMENT OF THE PRODUCT.  AND AS WE

8   APPROACH INTRODUCTION OF A PRODUCT, THEN WE BEGIN TO FORMALLY

9   DEVELOP THE PLANS FOR OUR MARKETING EFFORTS FOR OUR

10  SALESPEOPLE, AND WE ARE RESPONSIBLE FOR FORMING A BUDGET,

11  DIRECTING ACTIVITIES RELATED TO ALL THE ACTIVITIES THAT WE DEEM

12  APPROPRIATE TO SUPPORT THE MARKETING AND SELLING.  THAT IS THE

13  WORK, REALLY, OF OUR PEOPLE.

14         WE'RE ACTUALLY CHARGED WITH CREATING AWARENESS OF THE

15  PRODUCT THAT'S INSUFFICIENT.  WE ARE THEN CHARGED WITH CREATING

16  UNDERSTANDINGS; PHYSICIANS NEED TO UNDERSTAND THE BENEFITS AND

17  THE RISKS.  AND FINALLY, WE ARE CHARGED WITH ENCOURAGING

18  PHYSICIANS TO TRIAL AND USE THE PRODUCT IN APPROPRIATE

19  PATIENTS.

20  **Q.**   MR. ANSTICE, WHAT ROLE, IF ANY, DOES THE MARKETING GROUP

21  PLAY IN DECIDING WHAT TYPES OF STUDIES SHOULD BE DONE FOR A

22  DRUG AT MERCK?

23  **A.**   I THINK THE MARKETING GROUP PLAYS AN IMPORTANT ROLE IN

24  PROVIDING IDEAS FOR STUDIES.  AT THE END OF THE DAY, THE

25  RESEARCH GROUP HAS THE FINAL SAY, ALONG WITH THE REGULATORS.

1    BUT BECAUSE THE MARKETING GROUP IS TALKING TO PHYSICIANS AND TO

2    PAYERS, WE ARE CONSTANTLY AWARE, THEREFORE, OF GAPS OR

3    INFORMATION THAT WOULD BE VALUABLE TO PHYSICIANS AND PAYERS;

4    AND, THEREFORE, MARKETING CONSTANTLY IS PRESENTING IDEAS TO OUR

5    RESEARCH COLLEAGUES, MANY OF WHICH THEY MAY HAVE ALREADY HEARD

6    OF AND UNDERSTOOD.  BUT THE MARKETING PEOPLE ARE CONSTANTLY

7    ENGAGED IN THAT TYPE OF ACTIVITY.

8    Q.    IN GENERAL, WHAT IS THE MARKETING GROUP'S VIEW ABOUT

9    SCIENTIFIC STUDIES OF DRUGS?

10   A.    WE REGARD THEM AS EXTREMELY VALUABLE AND IMPORTANT.  AND

11   THE REASON FOR THAT IS THAT, IN OUR MARKETING, WE CAN DESCRIBE

12   THE BENEFITS AND RISKS OF OUR PRODUCT AS INCLUDED IN THE

13   PRODUCT CIRCULAR.

14          FROM A MARKETING AND SELLING POINT OF VIEW, THE MORE

15   DATA THERE IS TO SUPPORT THE USAGE OF OUR PRODUCT AND THE

16   APPROPRIATE USAGE, THE BETTER.  SO MARKETING IS VERY SUPPORTIVE

17   OF DOING AS MANY STUDIES AS POSSIBLE RELATED TO ALL OF OUR

18   PRODUCTS.

19   Q.    LET'S TALK, IF WE CAN, ABOUT THE DIFFERENT TYPES OF

20   MARKETING MATERIALS THAT MERCK USES, AND LET'S START AT THE

21   BEGINNING.  WHAT ARE THE VERY FIRST MARKETING MATERIALS THAT

22   MERCK USES WITH A NEW DRUG?

23   A.    THE FIRST MATERIALS ARE OFTEN CALLED "LAUNCH MATERIALS,"

24   AND PERHAPS THE TWO MOST IMPORTANT MATERIALS THERE ARE THE

25   DETAIL AID OR A PROMOTIONAL BROCHURE THAT WE MAKE AVAILABLE TO

1  OUR SALES REPRESENTATIVES, WHICH TYPICALLY BEGINS WITH THE

2  LABEL FOR THE PRODUCT AND THEN PROCEEDS TO A MORE COLORFUL

3  BROCHURE.

4         THE OTHER PRIMARY VEHICLE IS A JOURNAL AD, WHAT'S

5  CALLED A "JOURNAL AD," WHICH IS THEN PLACED IN APPROPRIATE

6  RELEVANT MEDICAL JOURNALS FOR THE PARTICULAR DISEASE THAT THE

7  PRODUCT -- OR DISEASES THAT THE PRODUCT TREATS.

8  Q.   ARE THESE LAUNCH MATERIALS SHARED WITH THE FDA BEFORE THEY

9  ARE MADE PUBLIC?

10 A.   THE FDA OFTEN REQUESTS IN ITS APPROVAL THE MATERIALS.

11 THESE LAUNCH MATERIALS ARE PRESENTED TO THEM.  EVEN IF THEY

12 DON'T, THE MERCK PRACTICE IS THAT WE SUBMIT FOR FDA REVIEW ALL

13 OF THE MATERIALS RELATED TO THE LAUNCH OF OUR PRODUCTS.  THAT'S

14 BEEN A LONG-STANDING PRACTICE AT MERCK.

15 Q.   WHAT IS THE PARTICULAR DIVISION WITHIN FDA TO WHOM THESE

16 MATERIALS ARE SUBMITTED?

17 A.   THE DIVISION THAT WE SUBMIT THE MATERIALS TO IS KNOWN BY

18 THE NAME DMAG, WHICH IS DRUG MARKETING ADVERTISING GROUP.

19 Q.   DO THE FDA RULES AND REGULATIONS REQUIRE THAT THESE LAUNCH

20 MATERIALS BE SUBMITTED TO THE FDA BEFORE THEY'RE PUBLICLY USED?

21 A.   THEY DON'T REQUIRE; ALTHOUGH, SOMETIMES THE APPROVAL

22 LETTERS FOR OUR PRODUCTS REQUEST THAT ALL LAUNCH MATERIALS BE

23 PROVIDED TO THE FDA BEFORE BEING USED IN THE MARKETPLACE.

24 Q.   WHY DOES MERCK MAKE IT A PRACTICE TO SUBMIT THESE

25 MATERIALS TO THE FDA AHEAD OF TIME?

1   **A.**   I THINK A COUPLE OF REASONS THAT WE DO THAT:  ONE IS THAT

2   THE DISCUSSION ON THE LABEL OCCURS BETWEEN THE SCIENTIFIC DRUG

3   DIVISION AND THE COMPANY'S REGULATORY PEOPLE, WHICH DESCRIBES

4   THE BENEFITS AND RISKS FOR THE PRODUCT.  BUT THERE NEEDS TO BE

5   AN UNDERSTANDING WITH THE DRUG ADVERTISING GROUP AS TO HOW THAT

6   LANGUAGE WAS DETERMINED BECAUSE ALL LANGUAGE CAN BE-- NEEDS TO

7   BE INTERPRETED.

8          AT THE LAUNCH OF A PRODUCT, WE THINK IT'S VERY

9   IMPORTANT AT MERCK THAT WE HAVE NOT ONLY FOLLOWED THE LETTER OF

10  THE LABEL BUT THAT WE ARE ALSO FULLY IN HARMONY WITH THE FDA IN

11  TERMS OF THE SPIRIT OF HOW THEY BELIEVE THAT THE PRODUCT SHOULD

12  BE PROMOTED.  THE ONLY WAY TO REALLY VALIDATE OR TO TEST THAT

13  IS BY PRESUBMITTING THE MATERIALS TO THE FDA SO THAT THEY CAN

14  ASSESS THEM AS BEING CONSISTENT WITH, OR IN SOME CASES THEY MAY

15  SUGGEST MODIFICATIONS TO HOW WE HAVE INCORPORATED THE SPECIFICS

16  OUT OF THE LABEL INTO OUR PROMOTIONAL MATERIALS.

17  **Q.**   LET'S TALK, IF WE CAN, ABOUT MARKETING TO PHYSICIANS, IF

18  WE CAN, FOR A MOMENT.  CAN YOU GENERALLY DESCRIBE FOR US THE

19  REVIEW PROCESS AT MERCK THAT OCCURS WITH MATERIALS THAT ARE

20  SENT TO PHYSICIANS?

21  **A.**   YES.  WE HAVE A LONG-STANDING PROCESS WHICH WE CALL

22  MEDICAL/LEGAL REVIEW, AND THAT PROCESS MANDATES WITHIN THE

23  COMPANY AS A POLICY THAT ALL MATERIALS WRITTEN AND BROADCAST

24  THAT ARE GOING TO BE REVIEWED WITH OUR CUSTOMERS, IN THIS CASE

25  PHYSICIANS, THAT THOSE MATERIALS GO THROUGH A GROUP WHICH HAS

1  AT LEAST TWO PHYSICIANS AND ONE LAWYER.  THEY REVIEW ALL OF THE

2  MATERIALS FOR CONSISTENCY AND BALANCE WITH RESPECT TO OUR

3  LABEL, MAKE ANY APPROPRIATE ADJUSTMENTS.  AND THEY ACTUALLY

4  APPROVE THE MATERIAL FOR USE.  AND ONLY UPON THE APPROVAL OF

5  THAT GROUP, WHATEVER THE FINAL FORM OF MATERIAL IS, CAN IT BE

6  USED WITH OUR CUSTOMERS.

7  **Q.**   DOES MERCK SHARE THESE PHYSICIAN MARKETING MATERIALS WITH

8  THE FDA?

9  **A.**   THE MERCK PRACTICE IS THAT, UPON OUR INTERNAL APPROVAL AND

10  UPON OUR SENDING MATERIAL TO WHOEVER WILL BE USING IT WITHIN

11  THE MERCK SYSTEM, WE THEN ROUTINELY AUTOMATICALLY SEND A COPY

12  OF THAT MATERIAL, WHATEVER IT IS, TO THE FDA SO THAT THEY HAVE

13  A RECORD OF ALL OF OUR PROMOTIONAL MATERIALS.

14  **Q.**   DID MERCK FOLLOW THAT PARTICULAR PROCESS THAT YOU'VE JUST

15  DESCRIBED WITH RESPECT TO VIOXX?

16  **A.**   YES.  MERCK ALWAYS FOLLOWS THAT PROCESS FOR ALL OF OUR

17  PRODUCTS.

18  **Q.**   LET'S TALK, IF WE CAN, ABOUT THE LAUNCH OF VIOXX.  CAN YOU

19  TELL US WHEN THE FDA APPROVED VIOXX FOR MARKETING IN THE

20  UNITED STATES?

21  **A.**   VIOXX WAS APPROVED FOR MARKETING IN THE UNITED STATES IN

22  MAY OR JUNE OF 1999.

23  **Q.**   WHAT WAS YOUR VIEW ABOUT VIOXX AS A NEW DRUG AT THAT TIME?

24  **A.**   WE BELIEVED AT THAT TIME -- AND I STILL BELIEVE -- THAT

25  VIOXX WAS A VERY EXCITING AND IMPORTANT NEW PRODUCT THAT COULD

1   PROVIDE BENEFIT TO MILLIONS OF PATIENTS SUFFERING FROM PAIN IN

2   MARKETS AROUND THE WORLD, AND CERTAINLY IN THE U.S.

3   Q.   AT THE TIME OF THE LAUNCH, WHAT HAD MERCK'S STUDIES SHOWED

4   ABOUT THE POTENTIAL FOR VIOXX AS A NEW DRUG?

5   A.   MERCK'S STUDIES-- WELL, LET ME DESCRIBE THAT IN TWO PARTS:

6   MERCK'S STUDIES THAT SUPPORTED THE DRUG APPROVAL HAD SHOWN

7   ACROSS A LARGE NUMBER OF PATIENTS THAT THE PRODUCT WAS

8   EXTREMELY HELPFUL IN RELIEVING PAIN.  ALSO, THERE WERE SOME

9   STUDIES -- THEY'RE CALLED ENDOSCOPY STUDIES -- INCLUDED IN THE

10  CIRCULAR WHICH HELPED PHYSICIANS TO UNDERSTAND THAT THE

11  ORIGINAL PROMISE, THE REASON IN FACT VIOXX WAS DEVELOPED AND

12  BROUGHT TO THE WORLD IN THE FIRST PLACE, THAT IT WOULD BE

13  GENTLER ON THE STOMACH.

14        THOSE STUDIES VERSUS MOTRIN, A COMMONLY USED AGENT,

15  SHOWED THAT VIOXX WAS, IN FACT, GENTLER ON THE STUDIES.  SO THE

16  PROMISE OF VIOXX WAS THAT HERE WAS ANOTHER EFFECTIVE DRUG FOR

17  RELIEVING PAIN, BUT A DRUG WHICH MAY IN FACT OFFER BENEFITS TO

18  PATIENTS IN TERMS OF BEING MORE FRIENDLY TO THE STOMACH.

19  Q.   WHAT WERE THE NATURE OF THE STOMACH PROBLEMS THAT EXISTED

20  WITH TRADITIONAL PAIN RELIEVERS AT THAT TIME?

21  A.   THERE WAS WIDESPREAD KNOWLEDGE THAT ALL OF THE SO-CALLED

22  TRADITIONAL AGENTS OR ALL OF THE PAIN-RELIEVERS USED AT THAT

23  TIME CREATED IN A PERCENTAGE OF PATIENTS STOMACH PROBLEMS;

24  WHICH WENT FROM MILD BUT THROUGH TO MORE SERIOUS, WHICH OFTEN

25  MEANT THE PATIENTS COULD NOT TAKE THE MEDICINE; THROUGH TO

1  ULCERS.

2          THERE WERE AT THE -- AT THE SERIOUS END OF THE

3  SPECTRUM, THERE WERE PERFORATIONS, ULCERS, BLEEDS, WHICH COULD

4  OCCUR WITH THE USE OF THESE AGENTS, AND THOSE COULD OCCUR IN

5  PATIENTS OF ANY AGE; THEY COULD OCCUR IN PATIENTS THAT TOOK THE

6  PRODUCT FOR A LONG TIME OR EVEN FOR A RELATIVELY SHORT

7  DURATION.  AND SO THE PROMISE OF VIOXX WAS THAT IT MIGHT LESSEN

8  THE INCIDENCE OF ALL OF THESE GI PROBLEMS AND THAT IT MIGHT

9  ALSO, THEREFORE, ADMIT MORE PATIENTS TO BE ABLE TO TAKE AN

10 EFFECTIVE PAIN-RELIEVER BECAUSE THESE PROBLEMS DID NOT OCCUR.

11 Q.   LET'S GO BACK, IF WE CAN, TO THE FORMAL LAUNCH OF VIOXX.

12 HOW DID MERCK LAUNCH THE PRODUCT AND WHEN?

13 A.   IN THE UNITED STATES, WE LAUNCHED IT AT A SALES-- TWO

14 LARGE SALES MEETINGS.  WE DID THAT IN JUNE OF 1999.  THAT WAS

15 SOMEWHAT TYPICAL OF THE WAY THAT WE INTRODUCED MANY OF OUR

16 LARGE AND IMPORTANT PRODUCTS.

17 Q.   WHERE DID THIS LAUNCH EVENT OCCUR?

18 A.   THIS PARTICULAR EVENT OCCURRED IN SAN FRANCISCO.

19 Q.   WHO ATTENDED THE LAUNCH EVENT?

20 A.   THE LAUNCH EVENT WAS ATTENDED BY ALL OF THE SALES

21 REPRESENTATIVES AND OTHERS IN THE ORGANIZATION WHO HAD PRIMARY

22 RESPONSIBILITY FOR VIOXX AT THAT TIME.

23 Q.   HOW LONG DID THIS LAUNCH EVENT GO ON?

24 A.   EACH OF THE MEETINGS LASTED APPROXIMATELY TWO AND A HALF

25 DAYS.  THEREFORE, THE MEETING-- THE TWO MEETINGS LASTED FOR A

1   WEEK.

2   **Q.**   WHAT KINDS OF SUBJECTS WERE DISCUSSED AND ADDRESSED AT THE

3   MEETINGS?

4   **A.**   THE MEETINGS WERE A MIX OF MOTIVATIONAL

5   EXCITEMENT-CREATING ACTIVITIES.  ALSO, THERE WAS EXTENSIVE

6   REVIEW OF THE PRODUCT INFORMATION OF THE DISEASES FOR WHICH

7   VIOXX WAS INDICATED AND ALSO TRAINING OF THE REPRESENTATIVES IN

8   TERMS OF THEIR KNOWLEDGE OF VIOXX AND THE LABEL IN ALL ASPECTS,

9   THE BENEFITS AND THE RISKS AND ALL OF THE DETAILS INCLUDED IN

10  THE LABEL.

11  **Q.**   MR. ANSTICE, DID THE SALES REPRESENTATIVES WHO ATTENDED

12  THIS EVENT GET ANY TRAINING BEYOND WHAT THEY LEARNED AT THE

13  LAUNCH EVENT?

14  **A.**   YES.  IT'S USUAL PRACTICE FOR US TO COMMENCE TRAINING FOR

15  NEW PRODUCTS SEVERAL MONTHS PRIOR TO THE PRODUCT BEING

16  APPROVED.  REPRESENTATIVES RECEIVED EXTENSIVE TRAINING AGAIN

17  AROUND THE DISEASES FOR WHICH THE PRODUCT WAS INDICATED, AROUND

18  THE COMPARATIVE AGENTS THAT PHYSICIANS COULD CHOOSE, AS WELL AS

19  OUR OWN PRODUCT.

20        AFTER A LAUNCH MEETING, OUR REPRESENTATIVES ARE

21  CONTINUALLY TRAINED AS CHANGES TO THE CIRCULAR OCCUR; BUT EVEN

22  INDEPENDENTLY OF THAT, WE CONSTANTLY UPDATE AND ENSURE-- UPDATE

23  OUR TRAINING AND ENSURE THAT OUR REPRESENTATIVES ARE VERY

24  FAMILIAR WITH ALL OF THE INFORMATION RELATED TO OUR PRODUCT,

25  AND THEY'RE ALSO GETTING UPDATES ON COMPARATIVE PRODUCTS AND

1  CHANGES IN MEDICINE WHICH THEY NEED TO BE AWARE OF IN TERMS OF
2  THE DISEASE CONDITIONS FOR WHICH THE PRODUCT IS INDICATED.
3  Q.   MR. ANSTICE, HAS THE WORD "OBSTACLE" EVER BEEN USED AT
4  MERCK IN TRAINING SALES REPRESENTATIVES?
5  A.   YES, IT HAS.  IN FACT, IN MY EXPERIENCE, IT'S A TERM THAT
6  HAS BEEN USED FOR DECADES IN THE MERCK ORGANIZATION.
7  Q.   WHAT DOES THE TERM "OBSTACLE" MEAN IN THAT CONTEXT?
8  A.   THE WORD "OBSTACLE" MEANS A QUESTION, OR MORE
9  SPECIFICALLY, A CONCERN WHICH, IN FACT, IS SOMETHING WHICH --
10  WHERE A PHYSICIAN OR A CUSTOMER, IN FACT, HAS A GENUINE EITHER
11  LACK OF KNOWLEDGE OR WANTS MORE KNOWLEDGE ABOUT A PARTICULAR
12  AREA OR MAY, IN FACT, HAVE A SET OF OPINIONS, WHICH MEANS THAT
13  THEY ARE NOT INCLINED TO USE YOUR PRODUCT.
14  Q.   WHY IS THE TERM "OBSTACLE" USED TO REFER TO THOSE KINDS OF
15  QUESTIONS OR CONCERNS THAT A DOCTOR MAY HAVE?
16  A.   I THINK THE REASON THAT WE USE THE WORD "OBSTACLE" AS
17  OPPOSED TO "QUESTION" IS THAT IT, IN FACT, DENOTES THAT THE
18  PHYSICIAN REQUIRES MORE INFORMATION IN ORDER TO PERHAPS USE THE
19  PRODUCT AT ALL OR MORE INFORMATION TO USE IT MORE BROADLY; OR,
20  IN FACT, IT'S SOMETHING WHICH IS A FUNDAMENTAL -- UNTIL THERE
21  IS AN ANSWER, A SATISFACTORY ANSWER PROVIDED TO A QUESTION,
22  THEN A PHYSICIAN IS NOT COMFORTABLE WITH A PARTICULAR MEDICINE.
23  Q.   ARE DOCTORS' QUESTIONS IMPORTANT TO SALES REPRESENTATIVES
24  AT MERCK?
25  A.   I THINK THAT DOCTORS' QUESTIONS ARE FUNDAMENTALLY

DAILY COPY

1    IMPORTANT.

2    **Q.**   WHY IS THAT?

3    **A.**   FOR THE SIMPLE REASON THAT IT'S VERY IMPORTANT THAT YOU

4    KNOW WHAT THE ISSUES, CONCERNS, QUESTIONS ARE THAT YOUR

5    CUSTOMERS HAVE, AND IT'S VERY IMPORTANT THAT YOU ENDEAVOR TO

6    YOUR BEST EXTENT TO ANSWER THOSE QUESTIONS AND TO RESPOND TO

7    THEM IN A HELPFUL WAY.

8    **Q.**   MR. ANSTICE, DID MERCK TRAIN ITS SALES REPRESENTATIVES TO

9    DODGE QUESTIONS OR AVOID ANSWERING THEM WHEN MEETING WITH

10   DOCTORS?

11   **A.**   NO.  IN MY EXPERIENCE, MERCK ENCOURAGED REPRESENTATIVES TO

12   LISTEN FOR QUESTIONS, IN FACT, EVEN PROBE, TO ASK THE DOCTOR

13   WHAT CONCERNS THEY MAY HAVE.  BECAUSE UNLESS THEY IDENTIFIED

14   WHAT THE PARTICULAR CONCERNS OR QUESTIONS WERE THAT THE DOCTOR

15   HAD, THEN THEY COULDN'T ADEQUATELY ADDRESS THE ISSUES THE

16   DOCTOR MAY HAVE.  SO, IN FACT, FOR A SALESPERSON, IT WAS VERY

17   IMPORTANT THAT THEY NOT ONLY RESPOND TO THE QUESTIONS BUT THAT

18   THEY, IN FACT, DRAW THEM OUT FROM THEIR CUSTOMERS.

19   **Q.**   MR. ANSTICE, WHEN VIOXX WAS LAUNCHED, THERE WAS ANOTHER

20   ONE OF THESE COX-2 PAIN RELIEVERS ON THE MARKET CALLED

21   CELEBREX; IS THAT RIGHT?

22   **A.**   THAT'S CORRECT, YES.

23   **Q.**   IF CELEBREX WAS ALREADY ON THE MARKET, WHY WAS VIOXX

24   NECESSARY?

25   **A.**   THE DEVELOPMENT FOR VIOXX WAS STARTED MANY YEARS AGO, AND

DAILY COPY

1    WE BELIEVED THAT THERE WAS CERTAINLY ROOM FOR MORE THAN ONE

2    COX-2 AGENT.

3            AT THE TIME WE WERE DEVELOPING VIOXX, WE COULD NOT BE

4    CERTAIN WHAT THE FINAL ULTIMATE PROFILE FOR CELEBREX WOULD BE,

5    BUT WE BELIEVED THAT VIOXX, FOR A VARIETY OF REASONS ASSOCIATED

6    WITH OUR DEVELOPMENT, WOULD BE AN EXTREMELY EFFECTIVE

7    PAIN-RELIEVER.  WE ALSO BELIEVED, BECAUSE OF THE COX-2

8    ACTIVITY, ITS PREFERENCE FOR COX-2 INHIBITION, THAT IT COULD

9    ALSO PROVIDE SUBSTANTIAL BENEFIT IN TERMS OF GI SAFETY.

10           AND I THINK OUR BELIEF HAS ALWAYS BEEN THAT PATIENT

11   NEEDS ARE BEST SERVED IF THERE'S AS BROAD A RANGE OF CHOICES AS

12   POSSIBLE AVAILABLE TO THEM FOR TREATMENT OF IMPORTANT DISEASES.

13   Q.   DID MERCK HAVE A POLICY OF INTIMIDATING DOCTORS OR

14   SCIENTISTS WHO WERE CRITICAL OF MERCK?

15   A.   NO.  MERCK HAS NEVER HAD A POLICY TO INTIMIDATE DOCTORS.

16   Q.   IF YOU WERE TO LEARN OF ALLEGATIONS THAT DOCTORS AND

17   SCIENTISTS WERE BEING INTIMIDATED BY PEOPLE AT MERCK, HOW WOULD

18   YOU RESPOND TO THAT?

19   A.   VERY PROMPTLY AND, I THINK, VERY STRONGLY TO FIND OUT IF

20   IT WAS HAPPENING AND TO STOP IT.

21   Q.   DID THE FDA REQUIRE MERCK TO TAKE VIOXX OFF THE MARKET?

22   A.   NO.  THAT WAS-- MERCK TOOK THE DECISION THAT WE SHOULD

23   VOLUNTARILY WITHDRAW VIOXX AFTER WE BECAME AWARE OF THE APPROVE

24   RESULTS FROM THEIR DATASET FROM THE DATA-MONITORING GROUP

25   RESPONSIBLE FOR THAT STUDY.  AND WE ADVISED THE FDA AND OTHER

1   REGULATORS THAT WE WERE TAKING THAT ACTION VOLUNTARILY.

2   **Q.**   WHY DID MERCK DECIDE TO WITHDRAW VIOXX FROM THE MARKET?

3   **A.**   WE DECIDED TO DO THAT FOR TWO REASONS:   ONE, THERE WAS, AS

4   SEEN IN APPROVE, THERE WAS A RELATIVELY GREATER RISK AFTER 18

5   MONTHS IN PEOPLE TAKING VIOXX VERSUS THE PLACEBO ARM.   AND

6   BASED ON THAT RELATIVELY GREATER RISK AND THE FACT THAT OTHER

7   AGENTS WERE AVAILABLE IN THIS CATEGORY, WHICH SEEMED, CERTAINLY

8   AT THAT TIME, HAD NOT SHOWN THIS RISK, WE THOUGHT THAT IT WAS

9   IN THE BEST INTEREST OF PATIENT SAFETY, GIVEN THE AVAILABILITY

10  OF ALTERNATIVES, THAT WE WITHDRAW VIOXX FROM THE MARKET.

11  **Q.**   MR. ANSTICE, I JUST HAVE A FEW MORE QUESTIONS BEFORE WE

12  BREAK.   THE ATTORNEYS FOR PLAINTIFF HAVE SAID, IN EFFECT, THAT

13  MERCK PUT PROFITS AHEAD OF PATIENT SAFETY.   WHAT DO YOU HAVE TO

14  SAY ABOUT THAT?

15  **A.**   I ABSOLUTELY DO NOT BELIEVE THAT THIS WAS TRUE.   MERCK PUT

16  PATIENT SAFETY FIRST.   I'VE WORKED AT MERCK FOR 30 MORE -- OR

17  MORE YEARS AND I HAVE SEEN MERCK CONSISTENTLY PUT PATIENT

18  SAFETY FIRST.   I'VE SEEN MERCK BRING TO MARKET WONDERFUL

19  PRODUCTS BUT ALWAYS TO BE VERY CONCERNED, NOT ONLY ABOUT THE

20  BENEFITS, BUT ABOUT REALLY UNDERSTANDING THE RISKS ASSOCIATED

21  WITH THAT, AND BEING VERY CLEAR TO IDENTIFY THEM AND TO

22  COMMUNICATE THEM TO THE PHYSICIANS WHO PRESCRIBE OUR PRODUCTS.

23  SO LET ME JUST BE CLEAR --

24          **MR. ROBINSON:**   AT THIS TIME, YOUR HONOR, WOULD BE THE

25  RECROSS OF THE PLAINTIFFS AND COMING TO END.

1           **THE COURT:**  ALL RIGHT.

2                    **REDIRECT EXAMINATION**

3    BY MR. ROBINSON:

4    **Q.**   SO LET ME JUST BE CLEAR ON WHAT YOUR TESTIMONY IS.  I'M

5    ASKING YOU ABOUT THE SALES REPS RIGHT NOW.

6    **A.**   YES.

7    **Q.**   SALES REPS WERE NOT ALLOWED TO ENGAGE THE DOCTORS ON

8    VIGOR; IS THAT CORRECT?

9    **A.**   WHAT I SAID WAS OUR REPRESENTATIVES WERE ASKED TO NOT

10   INITIATE DISCUSSIONS ON VIGOR.  THAT'S WHAT I SAID.

11   **Q.**   LOOK, MY QUESTION IS THIS:  YOU'RE AWARE THAT MERCK USED

12   IN CONNECTION WITH TRAINING ITS SALES REPRESENTATIVES SOMETHING

13   CALLED A CARDIOVASCULAR CARD.  CORRECT?

14   **A.**   YES.

15   **Q.**   OKAY.  NOW I WOULD LIKE TO ALSO MARK -- SHOW YOU WHAT I'VE

16   JUST MARKED AS 165.  FOR THE RECORD, IT IS BATES-STAMPED MRK

17   AAR 000-7383 THROUGH 388.  THIS IS ONE OF THOSE BULLETINS THAT

18   YOU'RE TALKING ABOUT; RIGHT?

19   **A.**   YES, THAT'S RIGHT.

20   **Q.**   AND THIS IS DATED APRIL 28, 2000; CORRECT?

21   **A.**   CORRECT.

22   **Q.**   NOW, IF YOU GO TO WHERE IT SAYS, "BACKGROUND" -- WELL,

23   FIRST OF ALL, THE "TO:  ALL FIELD PERSONNEL WITH RESPONSIBILITY

24   FOR VIOXX," THAT'S ALL THE SALES REPS SELLING THE DRUG; RIGHT?

25   **A.**   YES.  THAT'S ALL THE PEOPLE INVOLVED IN SELLING VIOXX,

1    THAT'S CORRECT.

2    **Q.**    OKAY.  BELOW THAT THERE A PARAGRAPH, AND IN THE MIDDLE OF

3    THE PARAGRAPH, THERE IS BOLD LANGUAGE.  AND I WOULD JUST LIKE

4    TO READ IT SO WE CAN MOVE THROUGH THIS LANGUAGE:  "THE

5    CARDIOVASCULAR CARD IS AN OBSTACLE-HANDLING PIECE AND SHOULD

6    ONLY BE USED WITH PHYSICIANS IN RESPONSE TO THEIR QUESTIONS

7    REGARDING THE CARDIOVASCULAR EFFECTS OF VIOXX; IS THAT CORRECT?

8    IS THAT CORRECT?

9    **A.**    THAT'S WHAT IT SAYS.

10    **Q.**    BUT IS IT CORRECT?

11    **A.**    IT'S READ, YOU READ IT CORRECTLY, YES.

12    **Q.**    BUT IS THAT CORRECT WHAT I READ?

13    **A.**    WELL, I THINK --

14    **Q.**    NOT THAT I READ IT CORRECTLY BUT NOW I'M ASKING IS THAT

15    CORRECT?

16    **A.**    I THINK THERE IS A BROADER CONTEXT OF INSTRUCTIONS TO

17    REPRESENTATIVES THAT NEEDS TO BE --

18    **Q.**    WHERE IS THAT IN HERE?

19    **A.**    IF YOU TO GO THE THIRD PAGE.

20    **Q.**    I'M THERE.

21    **A.**    THE CV -- I'M GOING TO READ THE FIRST TWO SENTENCES

22    UNDERNEATH THE BLACK DIAGRAM:  'THE CV CARD WILL ASSIST YOU

23    WITH ADDRESSING YOUR HI COXIB OR HI NSAID PHYSICIANS' QUESTIONS

24    ABOUT THE CARDIOVASCULAR EFFECTS OF VIOXX.  USE THIS RESOURCE

25    AS AN OBSTACLE-HANDLING TOOLING ONLY WHEN YOUR PHYSICIANS ASK,

1   YOU ABOUT THE CARDIOVASCULAR EFFECTS OF VIOXX OR EXPRESS

2   CONCERN REGARDING THE CARDIOVASCULAR EFFECTS OF VIOXX BASED ON

3   THE VIOXX GI OUTCOMES RESEARCH TRIAL."  AND THIS IS THE

4   BULLETIN THAT ACCOMPANIES THE CARDIOVASCULAR CARD THAT WE

5   TALKED ABOUT A MOMENT AGO.

6   **Q.**   GOTCHA.

7   **A.**   THERE IS ALSO A PRECEDING BULLETIN AFTER FEBRUARY 9,

8   BEFORE APRIL 28, WHICH WAS IN EXISTENCE, WHICH RELATED TO HOW

9   THE REPS WERE INSTRUCTED AROUND VIGOR.  SO THIS WAS

10  SPECIFICALLY DESIGNED FOR DISCUSSIONS BEYOND THE VIGOR RESULTS

11  TO DEAL WITH, AS THIS SAYS, "WHEN YOUR PHYSICIANS ASK YOU ABOUT

12  THE CARDIOVASCULAR EFFECTS OF VIOXX OR EXPRESS CONCERN

13  REGARDING THE CARDIOVASCULAR EFFECTS BASED ON," NOT ABOUT, BUT

14  "BASED ON THE VIGOR FINDINGS."

15  **Q.**   I UNDERSTAND.  MR. ANSTICE, WOULD YOU NOW TURN TO THE CV

16  CARD, PLEASE.

17  **A.**   YES.

18  **Q.**   NOW, YOU'RE AWARE AT THIS TIME THAT THE FDA HAD SERIOUS

19  CONCERNS ABOUT THIS DATA.  CORRECT?

20  **A.**   ABOUT WHICH DATA?

21  **Q.**   THE OA DATA THAT'S REFLECTED IN THE CV CARD?

22  **A.**   NO, I AM NOT AWARE OF THAT.

23  **Q.**   OKAY.  WELL, WHY DON'T WE GO AHEAD AND TAKE ANOTHER LOOK

24  BACK AT THAT FDA BRIEFING DOCUMENT WHICH I MARKED EARLIER.

25  WE'LL DO THIS AS QUICKLY AS WE CAN.  IT'S RIGHT THERE ON TOP.

1    **A.**    WHICH IS DATED FEBRUARY 8, 2001.

2    **Q.**    EXACTLY?

3    **A.**    BECAUSE WE'RE TALKING ABOUT A TIME PERIOD HERE, WHICH IS

4    APRIL/MAY 2000.

5    **Q.**    ARE YOU TESTIFYING NOW THAT THIS CARD WAS NOT IN EFFECT IN

6    FEBRUARY OF 2001?

7    **A.**    NO.  NO, I'M NOT.  I'M SIMPLY SAYING THAT THIS-- THE

8    DISCUSSION WE WERE HAVING ABOUT THE CARD RELATED TO ITS

9    INTRODUCTION.

10   **Q.**    NO.  PUT THE BULLETINS ASIDE.  NOW WE ARE TALKING ABOUT A

11   CARD THAT WAS IN USE FROM APRIL OF 2000 TO APRIL OF 2002.

12   OKAY.  IN FEBRUARY -- IN FEBRUARY OF 2001, THE FDA DID AN

13   ANALYSIS -- OR, I'M SORRY.  YOUR ATTORNEY DOESN'T LIKE THAT.

14   THE FDA MEDICAL REVIEWER TOOK A LOOK AT THE ORIGINAL DATA FROM

15   MERCK'S NDA, WHICH IS, YOU WOULD AGREE, IN THIS OA, THIS

16   OSTEOARTHRITIS TRIAL DATA.  CORRECT?

17   **A.**    YES.

18   **Q.**    I'LL FIND IT FOR YOU IN ONE SECOND.  IF YOU'D TURN TO

19   PAGE 19, DO YOU SEE WHERE IT TALKS ABOUT STUDY 058 AT THE TOP?

20   **A.**    YES.

21   **Q.**    AND THEN IN ITALICS IT SAYS, "BECAUSE OF THE SMALL SIZE

22   AND SHORT DURATION, THIS STUDY IS INADEQUATE TO DETECT

23   DIFFERENCES IN CLINICALLY RELEVANT ADVERSE EVENTS BETWEEN

24   ROFECOXIB," WHICH IS VIOXX, "AND NABUMENTONE."  DID I READ THAT

25   CORRECTLY?

1    **A.**   YES, YOU DID.

2    **Q.**   I HAVE JUST A COUPLE OF QUICK QUESTIONS.  THE MEDICAL

3    REVIEWER IN THIS DOCUMENT MADE THAT COMMENT ABOUT THAT TRIAL.

4    HAS THE FACT THAT THIS MEDICAL REVIEWER FOUND THAT THIS

5    PARTICULAR TRIAL, THE O58 TRIAL, WAS INADEQUATE TO DETECT

6    CLINICALLY RELEVANT ADVERSE EVENTS BETWEEN VIOXX AND THE DRUGS

7    IT WAS COMPARED TO?  DID THAT MAKE ITS WAY INTO ANY OF YOUR

8    SALES MATERIALS?

9    **A.**   I DON'T KNOW.  I JUST POINT OUT THAT A REFERENCE TO STUDY

10   O58 -- AND I DO NOT KNOW HOW MANY PATIENTS WERE IN STUDY O58 --

11   IS DIFFERENT FROM THE DATA PRESENTED HERE, WHICH IS IN ACROSS

12   NINE DOUBLE-BLIND STUDIES, 6,000 OA PATIENTS, AND SO IT IS A

13   VERY DIFFERENT DATASET.

14   **Q.**   HOW ABOUT STUDY 069?  DO YOU KNOW ANYTHING ABOUT THAT?

15   **A.**   NO.

16   **Q.**   WELL, YOU KNOW THAT WAS A POOLED ANALYSIS OF MANY

17   DIFFERENT TRIALS THAT WERE DONE AND PROVIDED TO THE FDA.  DOES

18   THAT REFRESH YOUR RECOLLECTION?

19   **A.**   I DON'T REMEMBER THE DETAILS OF IT.  I'VE HEARD THE NUMBER

20   CERTAINLY.

21   **Q.**   WERE YOU AWARE IN FEBRUARY OF 2001 OF THIS COMMENT MADE BY

22   THE MEDICAL REVIEWER WHERE IT SAYS, "THE DIVISION" -- AND IN

23   THIS INSTANCE SHE'S NOT TALKING ABOUT HER.  SHE SAYS, "THE

24   DIVISION HAS SERIOUS CONCERNS WITH THE COMBINED ANALYSIS OF

25   STUDIES OF DIFFERENT LENGTH AND DOSING REGIMENS."  AND IT SAYS,

```
1   "FURTHERMORE, COMBINING MULTIPLE DIFFERENT DRUGS WITH A SINGLE
2   COMPARATOR ARM MAY NOT BE REFLECTIVE OF THE RISK OF ANY ONE
3   DRUG."  DID THAT MATERIAL GET EXPOSED TO THE SALES
4   REPRESENTATIVES WHO WERE SELLING THE DRUG?
5   A.   I DON'T KNOW THE ANSWER TO THAT.  IT WOULD NOT BE USUAL
6   FOR US TO PRESENT COMMENTS FROM FDA REVIEWERS OR DIVISIONS IN
7   OUR MATERIAL TO REPRESENTATIVES.  WE WOULD GIVE OUR
8   REPRESENTATIVES MATERIAL THAT MERCK BELIEVED TO BE ACCURATE AND
9   BALANCED AND CONSISTENT WITH OUR TOTAL KNOWLEDGE OF THE
10  PRODUCT.
11  Q.   YOU DIDN'T PROVIDE THEM WITH CONCERNS OR DISCUSSION GIVEN
12  ON WITHIN THE FDA?
13  A.   WE'LL PROVIDED THEM WITH WHAT WE THOUGHT WERE APPROPRIATE
14  SETS OF INFORMATION RELATED TO THE DATA THAT WE GAVE THEM.
15  Q.   MR. ANSTICE, LET ME JUST ASK YOU TO TAKE A LOOK WHAT I'VE
16  MARKED AS 166.  FOR THE RECORD, IT'S BATES-STAMPED MRKACW
17  0008375.  DO YOU RECOGNIZE THIS CHART?  I'LL REPRESENT TO YOU
18  THAT IT IS A TABLE FROM-- REFLECTING THE MORTALITY DATA FROM
19  VIGOR.  IF YOU READ ABOVE, YOU'LL SEE --
20  A.   I SEE THAT IT IS REPRESENTED AS DATA FROM VIGOR.  I DON'T
21  KNOW THE SOURCE OF THE TABLE, THE BROADER CONTEXT.
22  Q.   NOW, YOU KNOW THIS DATA WAS AVAILABLE TO MERCK IN MARCH OF
23  2000.  WE'VE SAID THAT MANY TIMES TODAY.  CORRECT?
24  A.   YES.  AND QUICKLY MADE AVAILABLE TO THE REGULATORY
25  AUTHORITIES AS WELL.
```

1    **Q.**   ABSOLUTELY.  BUT IT NEVER MADE ITS WAY INTO THE CV CARD,

2    DID IT, THE DATA THAT WE'RE LOOKING AT?

3    **A.**   THE PURPOSE OF THE CV CARD WAS NOT TO DISCUSS THE VIGOR

4    STUDY BUT TO DISCUSS THE TOTAL RESULTS FROM THE OA STUDIES.

5    THAT WAS THE PURPOSE OF THE CV CARD.

6    **Q.**   BUT LET ME JUST BACK UP FOR A SECOND.  DID YOU EVER GO TO

7    THE FDA AT ANY POINT IN TIME AND SAY, "WE'D LIKE TO INCORPORATE

8    THE VIGOR MORTALITY DATA IN OUR TRAINING MATERIALS"?

9    **A.**   I DON'T KNOW.

10   **Q.**   WOULD THERE HAVE BEEN ANYTHING THAT WOULD HAVE PREVENTED

11   YOU FROM DOING THAT?

12   **A.**   I DON'T KNOW.

13   **Q.**   SO DOCTORS WHO WERE PRESCRIBING THE DRUG, LET'S SAY IN

14   SEPTEMBER 2001 WHILE THIS WAS IN USE, IF THE ONLY INFORMATION

15   THEY RECEIVED WAS FROM THE SALES REP. AND THEY DIDN'T ASK FOR A

16   PAMPHLET, WOULD NOT HAVE RECEIVED THE VIGOR DATA, THE MORTALITY

17   DATA FROM VIGOR FROM YOUR SALES REPRESENTATIVES.  RIGHT?

18   **A.**   WELL-- SORRY.  COULD YOU RESTATE THE --

19   **Q.**   DOCTORS PRESCRIBING-- EXCUSE ME ONE SECOND.  DOCTORS

20   PRESCRIBING THIS DRUG --

21   **A.**   RIGHT.

22   **Q.**   -- LET'S SAY IN SEPTEMBER OF 2001?

23   **A.**   SEPTEMBER OF 2001.

24   **Q.**   SEPTEMBER OF 2001.  WHERE THIS CARD WAS IN USE?

25   **A.**   RIGHT.

1   Q.   AND THEY DIDN'T RECEIVE ANY OTHER INFORMATION FROM THE

2   COMPANY.   THEY JUST HAD DISCUSSIONS WITH THE SALES REP. WOULD

3   NOT HAVE BEEN ADVISED ABOUT THE MORTALITY DATA FROM VIGOR.

4   CORRECT?

5   A.   IN THE HYPOTHETICAL SITUATION WHERE THAT PARTICULAR

6   PHYSICIAN HAD NO CONTACT WITH THE MANY OTHER DIVERSE WAYS IN

7   WHICH THE INFORMATION ABOUT VIGOR WAS BEING DISPERSED IN THE

8   MEDICAL COMMUNITY, THEY WOULD NOT HAVE HAD VIGOR DATA FROM A

9   MERCK REP. OTHER THAN THROUGH A PHYSICIAN INFORMATION REQUEST.

10  BUT IF THEY HAD WANTED IT, IT WOULD HAVE BEEN AVAILABLE THROUGH

11  THAT VEHICLE.

12  Q.   AND IS THERE ANYTHING THAT YOU'RE AWARE OF, ANY RULE OR

13  REGULATION, THAT WOULD HAVE PREVENTED YOU FROM GOING TO THE FDA

14  AND SAYING THAT WE WOULD LIKE TO EXCLUDE THE VIGOR DATA IN OUR

15  SALES TRAINING MATERIAL?

16  A.   I DON'T KNOW OF ANY SUCH RULE.

17  Q.   SO THE DOCTORS WOULD NOT HAVE GOTTEN THE VIGOR MATERIAL

18  FROM YOUR SALES REPRESENTATIVE; THEY WOULD HAVE HAD TO GET IT

19  FROM SOMEWHERE ELSE.   CORRECT?

20  A.   NO, THAT'S NOT WHAT I SAID.   A DOCTOR COULD ASK FOR THE

21  VIGOR DATA FROM OUR SALES REPRESENTATIVE AND GET IT THROUGH A

22  PIR.   SO THEY DID HAVE ACCESS THROUGH OUR REPRESENTATIVES.

23  THEY ALSO HAD ACCESS THROUGH OTHER FORMS.

24  Q.   THE ALZHEIMER'S DATA AS WELL, YOU KNOW THAT WAS UNBLINDED

25  IN APRIL OF 2001.   CORRECT?

1   **A.**   I DON'T RECALL THE MONTH.  I KNOW IT WAS UNBLINDED VERY
2   QUICKLY AFTER THE VIGOR RESULTS.
3   **Q.**   IN THE CHART I JUST SHOWED YOU FROM VIGOR, AT THE VERY
4   TOP, DO YOU SEE WHERE IT SAYS, "ALL DEATHS"?
5   **A.**   YES, I DO.
6   **Q.**   IT SHOWS 22 DEATHS FROM VIOXX.  CORRECT?
7   **A.**   YES.
8   **Q.**   AND 15 DEATHS FROM PEOPLE TAKING NAPROXEN IN THIS TRIAL.
9   CORRECT?
10  **A.**   RIGHT.
11  **Q.**   AND CARDIOVASCULAR DEATHS, IT SHOWS -- IF YOU LOOK DOWN A
12  COUPLE MORE, IT SHOWS 28 DEATHS OF PEOPLE ON VIOXX AND 16 ON
13  NAPROXEN.  CORRECT?
14  **A.**   RIGHT.  RIGHT.
15  **Q.**   YOU ARE ALSO AWARE FROM THE ALZHEIMER'S DATA, AREN'T YOU,
16  THAT THERE WERE MORE PEOPLE -- THAT MORTALITY WAS HIGHER IN
17  PEOPLE TAKING VIOXX VERSUS PEOPLE TAKING PLACEBO.  ARE YOU
18  AWARE OF THAT?
19  **A.**   I DON'T RECALL THE NUMBERS.
20  **Q.**   DO YOU RECALL AT ANY POINT IN TIME THE ALZHEIMER'S
21  MORTALITY DATA WAS INCLUDED IN THE CV CARD?
22  **A.**   I DON'T -- I DON'T KNOW IF IT WAS SUBSEQUENTLY ADDED.
23  **Q.**   WELL, YOU -- WE LOOKED AT THE CV CARD BEFORE, AND I THINK
24  WE BOTH AGREED, OR YOU AGREED, THAT IT DID NOT CONTAIN ANY
25  INFORMATION ABOUT THE VIGOR TRIAL AT LEAST PRIOR TO APRIL OF

DAILY COPY

1    2002.  CORRECT?

2    **A.**    YES.  AND I ALSO STATED THAT IT WAS FOR A REASON.  ITS

3    PURPOSE WAS TO PROVIDE INFORMATION ON THE EXISTING

4    CARDIOVASCULAR DATA AND IT DID NOT, THEREFORE, INCLUDE VIGOR AS

5    I BELIEVE IT DIDN'T INCLUDE THE ALZHEIMER'S DATA EITHER.

6    **Q.**    BUT THERE WAS NOTHING PREVENTING YOU FROM ADDING THE VIGOR

7    TRIALS TO YOUR TRAINING MATERIALS.  RIGHT?

8    **A.**    WELL, TRAINING MATERIALS IS A SEPARATE THING FROM A

9    BROCHURE GOING TO A DOCTOR.

10   **Q.**    I'M TALKING ABOUT THE MATERIALS USED TO TRAIN SALES REPS.

11   THERE WAS NOTHING THAT PREVENTED MERCK FROM TRAINING THEIR

12   SALES REPS TO ANSWER QUESTIONS ABOUT VIGOR?

13   **A.**    YES, THERE WAS.  BECAUSE WE HAD -- FIRST BECAUSE WE HAD--

14   FIRST OF ALL, WE HAD AN INSTRUCTION TO THEM TO NOT INITIATE

15   DISCUSSION.

16   **Q.**    I UNDERSTAND.

17   **A.**    WE ALSO HAVE A STANDARD PRACTICE STILL IN PLACE TODAY, I

18   BELIEVE, ALTHOUGH I'M NO LONGER RESPONSIBLE FOR U.S. BUSINESS,

19   OF LONG-STANDING, WHICH IS OUR REPRESENTATIVES ARE ASKED NOT TO

20   DISCUSS INFORMATION RELATING TO OUR DRUGS THAT'S OUTSIDE THE

21   LABEL OR INCONSISTENT WITH THE CURRENT LABEL.  THAT IS OUR

22   PRACTICE AT MERCK.

23   **Q.**    BASED UPON THIS NEW IMPORTANT DATA THAT CAME TO LIGHT IN

24   MARCH OF 2000, DID YOU GO TO THE FDA AND ASK THE FDA FOR

25   PERMISSION TO BEGIN TO TRAIN YOUR SALES REPS ON THAT DATA?

1   **A.**   NO, AND -- BUT THAT'S CONSISTENT WITH-- THAT'S NOT OUR

2   PRACTICE OR APPROACH.

3   **Q.**   BUT NOTHING WOULD HAVE PREVENTED YOU FROM GOING TO THE FDA

4   AND SEEKING THAT APPROVAL.  CORRECT?

5   **A.**   I DON'T KNOW.

6   **Q.**   THERE'S NOTHING IN THAT CARD THAT WE DISCUSSED, THE CV

7   CARD, IT DOESN'T CONTAIN ANY INFORMATION ABOUT THE ADVANTAGE

8   TRIAL, THE DATE OF WHICH ALSO BECAME AVAILABLE IN MARCH OF

9   2000.  CORRECT?

10  **A.**   I DON'T KNOW THE ANSWER.  IT DEALS WITH OA STUDIES.

11  ADVANTAGE WAS AN OA STUDY.

12  **Q.**   THE OA STUDIES THAT YOU DISCUSSED IN THE CV CARD

13  REPRESENTED STUDIES INVOLVING ABOUT 3500 CLINICAL TRIAL

14  PATIENTS.  CORRECT?

15  **A.**   FOR VIOXX, I THINK 6,000 PATIENTS IN ALL, BUT ABOUT 3500

16  ON VIOXX; THAT'S CORRECT.

17  **Q.**   YEAH, 3500 ON VIOXX.  FAIR OBJECTION.  I THINK WE CURED

18  IT.  THE VIGOR TRIAL HAD ABOUT 8,000 PATIENTS IN IT.  RIGHT?

19  **A.**   YES.

20  **Q.**   AND ADVANTAGE HAD ANOTHER FEW-THOUSAND PATIENTS IN IT.

21  CORRECT?

22  **A.**   YES, SEVERAL THOUSAND.

23  **Q.**   SO BETWEEN VIGOR AND ADVANTAGE, REALLY, THEY WERE MUCH,

24  MUCH LARGER WHEN YOU COMBINE THOSE TWO STUDIES THAN THE OA

25  STUDIES THAT YOU USED IN THE CV CARD.  CORRECT?

```
 1    A.   WELL, CERTAINLY VIGOR WAS MORE THAN THE OA PATIENTS IN THE
 2    CARD, YES.
 3              THE COURT:  IS THAT IT?
 4              MR. ROBINSON:  THAT'S IT, YOUR HONOR.
 5              THE COURT:  WE'LL TAKE A 15-MINUTE BREAK AT THIS
 6    TIME.  THE COURT WILL STAND IN RECESS.
 7              THE DEPUTY CLERK:  ALL RISE.
 8              (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
 9              THE DEPUTY CLERK:  EVERYONE RISE.
10              MR. ROBINSON:  YOUR HONOR, CAN WE TALK BEFORE THE
11    ACTUAL JURY COMES IN?  I DON'T KNOW IF THE CLERK NEEDS TO BE
12    HERE.
13              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT
14    THE BENCH.)
15              MR. ROBINSON:  YES.  ON THE ANSTICE DEPOSITION THAT
16    WAS JUST READ IN, YOUR HONOR, WE WOULD OFFER THE EXHIBITS IN
17    THAT THE COURT HAS RULED ON AS ADMISSIBLE.  THEY ARE
18    EXHIBIT 1008 -- YEAH, 1008, 10062, THE COURT REFERRED RULING ON
19    154.  WE'RE OFFERING 1.0155, 156, 157.  THE COURT RESERVES
20    RULING ON 166.  WE'RE OFFERING 1084 AND 1702.
21              WE'LL ALSO OFFER THE -- I DON'T KNOW IF THE
22    COURT RULED ON THE PEPCID LABEL, SO I'LL HOLD BACK ON THAT.  SO
23    WE'LL OFFER THOSE EXHIBITS, YOUR HONOR.
24              THE COURT:  I'LL COMMIT IN IT NOTICES EXHIBITS.
25              MR. GOLDMAN:  AND WE JUST STAND BY OUR ORIGINAL
```

1 | OBJECTIONS AND THE UNDERSTANDING THAT THE COURT IS RESERVED ON
2 | THAT.
3 |       **THE COURT:**  WITH REGARD TO THE RULE, I'LL RULE ON
4 | THOSE.
5 |       **MR. ROBINSON:**  THOSE WOULD BE 1.0154, AND IT IS
6 | EXHIBIT 166.  THANK YOU, YOUR HONOR.
7 |       (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
8 | OPEN COURT.)
9 |       **THE COURT:**  OKAY.  ALL RIGHT.  MEMBERS OF THE JURY,
10 | WE'RE NOT TRYING TO KEEP ANYTHING FROM YOU.  SO I DON'T WANT TO
11 | BURDEN YOU WITH THEM.  CALL YOUR NEXT WITNESS AND LET'S EXPLAIN
12 | WHO IT IS, PLEASE.
13 |       **MR. ROBINSON:**  YOUR HONOR, WE'RE GOING TO CALL
14 | PLAINTIFF'S FIRST EXPERT.
15 |       (WHEREUPON, **GERALD AVORN**, HAVING BEEN DULY SWORN,
16 | TESTIFIED BY DEPOSITION AS FOLLOWS.)
17 |                                        **VOIR DIRE**
18 | **BY MR. ROBINSON:**
19 | **Q.**   GOOD AFTERNOON, DOCTOR.
20 | **A.**   GOOD AFTERNOON.
21 | **Q.**   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE MEMBERS OF THE
22 | JURY.
23 | **A.**   YES.  MY NAME IS JERRY AVORN.
24 | **Q.**   AND WHERE DO YOU CURRENTLY LIVE, SIR?
25 | **A.**   IN BROOKLINE, JUST OUTSIDE OF BOSTON, MASSACHUSETTS.

1    **Q.**    AND DO YOU HOLD ANY ACADEMIC POSITIONS?

2    **A.**    YES.  I'M A PROFESSOR OF MEDICINE AT HARVARD MEDICAL

3    SCHOOL.

4    **Q.**    AND DO YOU HOLD ANY OTHER PROFESSIONAL POSITIONS AT

5    HARVARD MEDICAL SCHOOL?

6    **A.**    YES.  I AM THE CHIEF -- I AM THE CHIEF OF THE DIVISION OF

7    PHARMACOEPIDEMIOLOGY AND PHARMACOECONOMICS AT THE BRIGHAM

8    WOMEN'S HOSPITAL, WHICH IS ONE OF THE MAIN HARVARD TEACHING

9    HOSPITALS.

10   **Q.**    AND WOULD YOU TELL US A LITTLE BIT ABOUT THE DIVISION OF

11   PHARMACOEPIDEMIOLOGY AND PHARMACOECONOMICS.

12   **A.**    YES.  THAT'S A DIVISION THAT I WAS ASKED TO START IN 1997,

13   AND IT OPENED ITS DOORS IN 1998.  AND IT IS A COLLECTION OF 25

14   RESEARCHERS OF WHOM THERE'S 11 FACULTY, AND THE REST ARE

15   PROGRAMMERS AND RESEARCH ASSISTANTS AND ADMINISTRATORS.  AND

16   OUR MAIN AGENDA IS THE STUDY OF PATTERNS OF MEDICATION USE,

17   SIDE EFFECTS CAUSED BY DRUGS, GOOD EFFECTS CAUSED BY DRUGS, THE

18   COST-EFFECTIVENESS OF DRUGS, THE IMPACT OF POLICY, SUCH AS

19   REIMBURSEMENT AND OTHER SORTS OF POLICY ON HOW DOCTORS

20   PRESCRIBE DRUGS, HOW PATIENTS USE DRUGS, AND, FINALLY, THE WAY

21   THAT PHYSICIANS MAKE PRESCRIBING DECISIONS AND HOW THOSE

22   DECISIONS CAN BE MADE BETTER.

23   **Q.**    AND FORGIVE ME IF OCCASIONALLY I ASK YOU TO EXPLAIN SOME

24   TERMS.  YOU MENTIONED THE TERM "PHARMACOEPIDEMIOLOGY."  WOULD

25   YOU PLEASE DESCRIBE WHAT THAT IS.

1   **A.**   SURE.  THAT IS THE STUDY OF THE BENEFICIAL AND ADVERSE

2   EFFECTS OF DRUGS AS SEEN IN, QUOTE, THE REAL WORLD AS TYPICAL

3   DOCTORS AND TYPICAL PATIENTS USE THOSE MEDICATIONS, BOTH THE

4   GOOD EFFECTS AND THE BAD EFFECTS.

5   **Q.**   AND WHAT ABOUT THE TERM "PHARMACOECONOMICS"?

6   **A.**   PHARMACOECONOMICS IS THE STUDY OF THE RELATIONSHIP BETWEEN

7   WHAT A DRUG DOES AND WHAT ITS COST IS.  SO, WE TRY TO

8   UNDERSTAND WHETHER A GIVEN DRUG IS WORTH ITS PRICE AND WHETHER

9   IT'S COST-EFFECTIVE, WHETHER IT MIGHT EVEN SAVE MONEY FOR THE

10  HEALTHCARE SYSTEM, AND HOW THOSE BALANCE OUT.

11  **Q.**   HOW IS YOUR DIVISION FUNDED, DR. AVORN?

12  **A.**   PRIMARILY BY OUR PEER-REVIEWED RESEARCH GRANTS FROM THE

13  NATIONAL INSTITUTES OF HEALTH, WHICH IS, OF COURSE, THE FEDERAL

14  AGENCY THAT SUPPORTS SCIENTIFIC RESEARCH.  WE ALSO RECEIVE

15  MONEY FROM FOUNDATIONS THAT ARE DEVOTED TO, LET'S SAY,

16  ARTHRITIS AND OTHER AREAS THAT WE ARE CONCERNED IN.  AND WE

17  ALSO WILL ACCEPT RESEARCH GRANTS FROM PHARMACEUTICAL COMPANIES.

18  **Q.**   I'D LIKE TO GO THROUGH SOME OF YOUR EDUCATION AND

19  EXPERIENCE A LITTLE BIT.  OKAY?

20  **A.**   SURE.

21  **Q.**   ALL RIGHT.  WOULD YOU PLEASE TELL THE MEN AND WOMEN OF THE

22  JURY A LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND, HOW YOU

23  BECAME A PROFESSOR OF MEDICINE AT HARVARD?

24  **A.**   SURE.  IN BRIEF, I GREW UP IN NEW YORK CITY.  I WENT TO

25  COLUMBIA AS AN UNDERGRAD.  I THEN WENT TO HARVARD MEDICAL

1    SCHOOL, WHERE I WAS AWARDED THE M.D. DEGREE IN 1974.  I THEN

2    DID MY INTERNSHIP AND RESIDENCY IN VARIOUS OF THE HARVARD

3    TEACHING HOSPITALS AND BECAME CERTIFIED IN INTERNAL MEDICINE.

4    AND AROUND THE TIME THAT I WAS A RESIDENT, I ALSO BEGAN

5    TEACHING AT THE MEDICAL SCHOOL IN A VARIETY OF AREAS THAT

6    PRIMARILY RELATED TO MEDICATION USE.

7    **Q.**    DO YOU CURRENTLY TEACH MEDICAL STUDENTS AND RESIDENTS AT

8    HARVARD?

9    **A.**    YES.  THAT'S WHERE I JUST CAME FROM AN HOUR AGO.

10   **Q.**    OKAY.  AND DO YOU CONDUCT INDEPENDENT RESEARCH?

11   **A.**    YES, I DO.

12   **Q.**    IN WHAT MEDICAL AND SCIENTIFIC FIELDS DO YOU CONDUCT

13   MEDICAL RESEARCH?

14   **A.**    THE UTILIZATION OF DRUGS BY DOCTORS, THE SIDE EFFECTS OF

15   THOSE DRUGS, THE UTILIZATION OF DRUGS BY PATIENTS, THE

16   RELATIONSHIP BETWEEN THE HEALTHCARE SYSTEM AND MEDICATION USE,

17   AND IN GENERAL, THE OUTCOMES OF DRUG USE AND HOW IT CAN BE

18   IMPROVED.

19   **Q.**    NOW, YOU MENTIONED BRIGHAM AND WOMEN'S HOSPITAL.  DOES THE

20   DIVISION THAT YOU HEAD HAVE ANY RELATIONSHIP TO THE DAY-TO-DAY

21   FUNCTION OF THE BRIGHAM AND WOMEN'S HOSPITAL?

22   **A.**    YES.  ONE OF THE MISSIONS OF OUR DIVISION IS TO HELP

23   ADVISE THE HOSPITAL ABOUT WHAT MEDICATIONS SHOULD BE USED AT

24   THE HOSPITAL AND ALSO TO TEACH THE INTERNS AND RESIDENTS AND

25   MEDICAL STUDENTS AND PHYSICIANS WHO ARE PRACTICING AT THE

1  HOSPITAL ABOUT THE BEST WAY TO USE THE DRUGS THAT ARE ON OUR

2  LIST OF DRUGS OR THE FORMULARY.

3  Q.   OKAY.   NOW, YOU PREVIOUSLY DESCRIBED TO THE MEMBERS OF THE

4  JURY PHARMACOEPIDEMIOLOGY, PHARMACOECONOMICS.   YOU ALSO

5  MENTIONED THAT YOU DO RESEARCH IN THE FIELD OF LOOKING AT THE

6  FACTORS THAT AFFECT PRESCRIBING CHOICES OF PHYSICIANS?

7  A.   THAT'S RIGHT.

8  Q.   OKAY.   WOULD YOU DESCRIBE YOUR PARTICULAR INTEREST IN THAT

9  AREA?

10  A.   SURE.   THE FIRST PAPER I PUBLISHED IN THAT AREA WAS

11  ACTUALLY BACK IN 1982 IN WHICH I WAS INTERESTED IN HOW DOCTORS

12  MAKE DECISIONS ABOUT WHAT DRUGS TO USE.   AND I WAS INTERESTED

13  IN WHETHER -- THE BALANCE BETWEEN THE INFORMATION THAT WE AS

14  PRESCRIBERS GET FROM THE MEDICAL LITERATURE VERSUS FROM

15  COMMERCIAL SOURCES LIKE ADVERTISING OR SALES REPS.   AND SO WE

16  DID A STUDY OF PRIMARY CARE DOCS IN THE BOSTON AREA, AND WE

17  ASKED THEM WHERE THEY GOT THEIR INFORMATION FROM, AND THEN WE

18  GAVE THEM LITTLE QUIZZES ABOUT THE DRUGS THAT THEY COMMONLY

19  USED.   AND ALTHOUGH THEY THOUGHT THAT THEY GOT MOST OF THEIR

20  INFORMATION FROM JUST READING THE MEDICAL JOURNALS, IN FACT,

21  WHAT OUR QUIZ SHOWED WAS THAT A LOT OF WHAT THEY BELIEVED

22  ACTUALLY CAME FROM WHAT YOU COULD ONLY FIND IN ADS OR FROM

23  SALES REPS.

24  Q.   WHAT IS ACADEMIC DETAILING, DOCTOR?

25  A.   ACADEMIC DEALING IS AN APPROACH THAT I PRETTY MUCH

1  INVENTED IN THE LATE 1970S AND EARLY 1980S, AND IT WAS BASED ON

2  THE FOLLOWING IDEA:  THAT WE KNOW THAT THE DRUG MANUFACTURERS

3  ARE AWFULLY GOOD COMMUNICATORS.  THEY SEND PEOPLE INTO OUR

4  OFFICES.  THEY HAVE VERY WELL-PRESENTED SPIELS THAT THEY GIVE

5  US.  THEY INTERACT WITH US IN A VERY FRIENDLY WAY.  THEY'VE GOT

6  GREAT GRAPHICAL MATERIAL.  THEY WILL HAVE DINNER MEETINGS IN

7  GOOD RESTAURANTS AND SHOW US THEIR PRESENTATIONS.

8           AND THAT'S REALLY VERY EFFECTIVE COMMUNICATION, BUT

9  IT'S JUST TO SELL PRODUCT.  THAT'S THE ONLY REASON THAT THEY DO

10 THAT COMMUNICATION.

11          BY CONTRAST, FACULTY IN MEDICAL SCHOOLS TEND TO HAVE

12 A PRETTY GOOD HANDLE ON THE EVIDENCE AND DON'T USUALLY HAVE A

13 PARTICULAR AXE TO GRIND ABOUT SELLING A PRODUCT, BUT WE TEND TO

14 BE LOUSY COMMUNICATORS.  WE GIVE DULL LECTURES.  WE DON'T

15 REALLY HAVE VERY GOOD GRAPHICAL MATERIAL.  WE STAY IN OUR IVORY

16 TOWER AND WE DON'T GO OUT TO DOCTORS' OFFICES.

17          AND WHAT I BEGAN TO WONDER ABOUT IN THE LATE '70S AND

18 EARLY '80S IS WHETHER WE COULD KIND OF MARRY THAT VERY

19 EFFECTIVE COMMUNICATION APPROACH THAT THE PHARMACEUTICAL

20 INDUSTRY HAS WITH THE MORE BALANCED EVIDENCE-BASED APPROACH

21 THAT MEDICAL SCHOOL OR ACADEMIC FACULTY HAVE.

22          AND BECAUSE THE APPROACH OF THE SALES REPS IN THE

23 DRUG INDUSTRY IS CALLED DETAILING, I CALL THAT ACADEMIC

24 DETAILING.  AND OUR FIRST STUDY WAS FUNDED BY THE FEDERAL

25 GOVERNMENT IN 1979 AND ULTIMATELY WAS PUBLISHED IN THE *NEW*

1   *ENGLAND JOURNAL* IN 1983 IN WHICH WE SHOWED THAT BY SENDING

2   PHARMACISTS THAT WE TRAINED TO BE THE SO-CALLED SALES REPS OUT

3   TO DOCTORS' OFFICES TO TEACH THEM ABOUT HOW TO PRESCRIBE BETTER

4   IN THIS INTERACTIVE AND ENGAGING MANNER, WE COULD ACTUALLY

5   INFLUENCE THEIR PRESCRIBING FOR THE BETTER IN A WAY THAT WAS

6   BOTH EFFECTIVE AND ACTUALLY PAID FOR ITSELF.

7   **Q.**   DOCTOR, HAVE VARIOUS GOVERNMENTS AND DIFFERENT

8   ORGANIZATIONS ADOPTED THE CONCEPT OF ACADEMIC DETAILING?

9   **A.**   YES.  AS A MATTER OF FACT, JUST A FEW WEEKS AGO I CAME

10  BACK FROM AUSTRALIA WHERE THE ENTIRE COUNTRY HAS A VERY LARGE

11  PROGRAM OF ACADEMIC DETAILING WHICH WE ACTUALLY HELPED THEM SET

12  UP, BASED ON OUR EARLY RESEARCH, IN WHICH THEY HAVE PHARMACISTS

13  AND NURSES GOING OUT TO DOCTORS ALL OVER THE COUNTRY TO ADVISE

14  THEM ON HOW TO PRESCRIBE SO THAT THEY ARE NOT DEPENDENT ON ADS

15  OR SALES REPS FROM THE DRUG COMPANIES TO KNOW ABOUT THE DRUGS

16  THEY USE.

17  **Q.**   ANY STATES HAVE PROGRAMS AND --

18  **A.**   YES.  WE'RE ACTUALLY RUNNING A PROGRAM ON BEHALF OF THE

19  STATE OF PENNSYLVANIA WHICH HAS ASKED OUR GROUP TO PUT TOGETHER

20  EDUCATIONAL MATERIALS FOR DOCTORS ALL OVER PENNSYLVANIA.  AND

21  THE STATE OF PENNSYLVANIA FUNDS NURSES AND PHARMACISTS TO GO

22  OUT AND TEACH DOCTORS HOW TO PRESCRIBE SO THAT THEY ARE NOT

23  AGAIN, DEPENDENT ON JUST WHAT THEY HEAR FROM THE SALES REPS AND

24  SEE IN THE ADS.

25  **Q.**   HAVE YOU PUBLISHED IN EACH OF THE AREAS THAT YOU'VE

1   IDENTIFIED, PHARMACOEPIDEMIOLOGY, PHARMACOECONOMICS, AND

2   PHYSICIAN DRUG PRACTICES?

3   **A.**   YES, I HAVE.

4   **Q.**   IN THE COURSE OF YOUR CAREER, DR. AVORN, HAVE

5   PHARMACEUTICAL COMPANIES FUNDED SOME OF YOUR RESEARCH?

6   **A.**   YES.  AS I SAID, WE DO HAVE RESEARCH SUPPORT FROM A NUMBER

7   OF DRUG COMPANIES.

8   **Q.**   DO THESE INCLUDE SOME OF THE STUDIES THAT YOU HAVE

9   CONDUCTED WITH RESPECT -- WELL, FIRST OF ALL, LET ME BACK UP.

10           HAVE YOU STUDIED THE CLASS OF DRUGS THAT WE'LL TALK

11  ABOUT HERE TODAY CALLED NONSTEROIDAL ANTI-INFLAMMATORY DRUGS OR

12  NSAIDS?

13  **A.**   THAT'S RIGHT.

14  **Q.**   AND HAVE YOU STUDIED COX-2 DRUGS?

15  **A.**   THAT'S RIGHT.

16  **Q.**   OKAY.

17  **A.**   WE'VE BEEN LOOKING AT THAT CLASS OF DRUGS SINCE BEFORE

18  1990.

19  **Q.**   OKAY.  AND HAVE YOU RECEIVED GRANTS AND FUNDS FROM VARIOUS

20  PHARMACEUTICAL COMPANIES TO STUDY THAT CLASS OF DRUGS?

21  **A.**   YES.  BOTH DRUG COMPANIES AND ALSO THE NATIONAL INSTITUTES

22  OF HEALTH.

23  **Q.**   WOULD YOU TELL US SOME OF THE DRUG COMPANIES WHO HAVE

24  FUNDED YOUR RESEARCH.

25  **A.**   IN GENERAL, PFIZER, GLAXO, PHARMACIA, KABI, MERCK.

1    **Q.**    ARE YOU CURRENTLY BEING FUNDED BY MERCK?

2    **A.**    YES.  DR. SOLOMON, IN OUR GROUP, HAS A PROJECT IN WHICH

3    I'M PARTICIPATING IN WHICH MERCK HAS FUNDED US TO LOOK AT THE

4    UNDERUSE OF DRUGS FOR OSTEOPOROSIS OR BONE THINNING.

5    **Q.**    OKAY.  AND HAVE YOU BEEN FUNDED BY MERCK TO DO STUDIES IN

6    THE FIELD OF COX-2 DRUGS, INCLUDING VIOXX?

7    **A.**    YES, WE HAVE.

8    **Q.**    OTHER THAN YOUR EXPERIENCE WITH VIOXX, WHICH WE'LL TALK

9    ABOUT DURING THE COURSE OF THIS DEPOSITION, PUTTING THAT ASIDE

10   FOR A MOMENT, HOW WOULD YOU HAVE DESCRIBED YOUR EXPERIENCE WITH

11   MERCK?

12   **A.**    OTHER THAN WITH OUR VIOXX EXPERIENCE?

13   **Q.**    YES.

14   **A.**    I ALWAYS THOUGHT OF MERCK AS THE MOST RESPECTED,

15   UPSTANDING, CAREFUL PHARMACEUTICAL COMPANY IN THE COUNTRY, AS

16   MOST EVERYBODY ELSE DID BACK IN, LET'S SAY, THE 1980S AND EARLY

17   '90S.

18   **Q.**    WAS YOUR -- AND WE'LL TALK ABOUT THIS, BUT WAS YOUR

19   EXPERIENCE WITH MERCK DIFFERENT WITH RESPECT TO THE COX-2

20   DRUGS?

21   **A.**    YES, IT WAS.

22   **Q.**    DO YOU CURRENTLY HOLD ANY LEADERSHIP APPOINTMENTS WITHIN

23   YOUR FIELD?

24   **A.**    WELL, I HAVE SERVED IN THE PAST AS THE PRESIDENT OF THE

25   INTERNATIONAL SOCIETY FOR PHARMACOEPIDEMIOLOGY, WHICH IS THE

1    MAIN PROFESSIONAL BODY OF RESEARCHERS ALL AROUND THE WORLD WHO
2    STUDY DRUG SIDE EFFECTS AND DRUG UTILIZATION AND DRUG
3    COST-EFFECTIVENESS.
4    **Q.**    OKAY.  AND ARE YOU LICENSED TO PRACTICE MEDICINE?
5    **A.**    YES, I AM.  IN MASSACHUSETTS.
6    **Q.**    AND ARE YOU BOARD-CERTIFIED IN ANY SPECIALTY OF MEDICINE?
7    **A.**    INTERNAL MEDICINE.
8    **Q.**    DO YOU SUPERVISE THE TREATMENT OF PATIENTS AT HARVARD'S
9    BRIGHAM AND YOUNG -- BRIGHAM HOSPITAL?
10   **A.**    BRIGHAM AND WOMEN'S, YES, I DO.
11   **Q.**    HAS THERE EVER BEEN A TIME IN THE PAST 20 YEARS WHERE YOU
12   HAVE NOT TREATED OR SUPERVISED TREATMENT OF PATIENTS?
13   **A.**    NO.  I'VE TREATED OR SUPERVISED CONTINUOUSLY PRETTY MUCH
14   SINCE I GOT MY M.D.
15   **Q.**    OKAY.  DO YOU SPECIALIZE IN THE TREATMENT OF ANY
16   PARTICULAR PATIENT POPULATIONS, DR. AVORN?
17   **A.**    I'VE HAD A PARTICULAR EXPERTISE AND INTEREST IN MEDICATION
18   USE IN THE ELDERLY, PEOPLE OVER 65.
19   **Q.**    AS AN INTERNIST, DO YOU SUPERVISE THE TREATMENT OF
20   PATIENTS WITH CHRONIC PAIN CONDITIONS SUCH AS ARTHRITIS?
21   **A.**    SURE.
22   **Q.**    AS AN INTERNIST, YOU SUPERVISE PATIENTS WITH ACUTE PAIN
23   CONDITIONS?
24   **A.**    YES.
25   **Q.**    HOW ABOUT CARDIOVASCULAR DISEASE?

1  **A.**   CERTAINLY.

2  **Q.**   OKAY.  HAVE YOU HAD OCCASION TO PRESCRIBE OR SUPERVISE THE

3  PRESCRIPTION OF MEDICATIONS FOR PATIENTS AT THE BRIGHAM

4  HOSPITAL, INCLUDING NONSTEROIDAL ANTI-INFLAMMATORY DRUGS?

5  **A.**   YES.

6  **Q.**   IN ADDITION TO YOUR -- LET ME TALK FOR A MOMENT ABOUT YOUR

7  PUBLICATIONS, DOCTOR.  APPROXIMATELY HOW MANY ORIGINAL ARTICLES

8  HAVE YOU WRITTEN FOR THE PEER-REVIEWED MEDICAL LITERATURE?

9  **A.**   ABOUT 200.

10  **Q.**   WHAT ARE SOME OF THE MEDICAL -- THE PEER-REVIEW MEDICAL

11  JOURNALS IN WHICH YOU HAVE BEEN PUBLISHED?

12  **A.**   THE *NEW ENGLAND JOURNAL OF MEDICINE*, *THE JOURNAL OF THE*

13  *AMERICAN MEDICAL ASSOCIATION*, THE *BRITISH MEDICAL JOURNAL*,

14  *HEALTH AFFAIRS*, THE *ARCHIVES OF INTERNAL MEDICINE*, THE *ANNALS*

15  *OF INTERNAL MEDICINE*, AND A FEW DOZEN OTHERS.

16  **Q.**   OKAY.  HAVE YOU BEEN OR -- ARE YOU NOW OR HAVE YOU BEEN A

17  PEER-REVIEWER YOURSELF?

18  **A.**   YES.  I REGULARLY REVIEW ARTICLES FOR THE *NEW ENGLAND*

19  *JOURNAL OF MEDICINE* AND FOR *JAMA* IN PARTICULAR; *JAMA* BEING THE

20  *JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION*.

21  **Q.**   THANK YOU. HAS YOUR PUBLICATIONS -- HAS YOUR WORK AS AN

22  ACADEMICIAN IN PUBLISHING INFORMATION BEEN RECOGNIZED

23  GENERALLY?

24  **A.**   YES.

25  **Q.**   WOULD YOU TELL US A LITTLE BIT ABOUT THAT.

1   **A.**   THAT I WAS IDENTIFIED BY THE SCIENTIFIC BODY THAT KEEPS

2   TRACK OF ALL MEDICAL REFERENCES IN THE WORLD AS ONE OF THE MOST

3   HIGHLY CITED RESEARCHERS IN THE FIELD OF MEDICINE AND SOCIAL

4   SCIENCE BECAUSE OF THE NUMBER OF CITATIONS TO MY RESEARCH THAT

5   HAVE BEEN IN THE MEDICAL LITERATURE.

6   **Q.**   DOCTOR, HAVE YOU PUBLISHED SPECIFICALLY ABOUT THE SAFETY

7   OF VIOXX?

8   **A.**   YES, I HAVE.

9   **Q.**   HAVE YOU PUBLISHED SPECIFICALLY REGARDING THE SAFETY OF

10  COX-2 DRUGS INCLUDING BOTH VIOXX AND CELEBREX?

11  **A.**   YES.

12  **Q.**   HAVE YOU PUBLISHED SPECIFICALLY ABOUT THE SAFETY OF

13  NONSTEROIDAL ANTI-INFLAMMATORY DRUGS?

14  **A.**   THAT'S RIGHT.

15  **Q.**   OKAY.  HOW LONG HAVE YOU BEEN PUBLISHING IN THAT

16  PARTICULAR FIELD?

17  **A.**   I THINK THE FIRST PAPER ON NONSTEROIDALS WAS ONE THAT I

18  DID WITH DR. GURWITZ THAT I BELIEVE WAS IN THE *JOURNAL OF THE*

19  *AMERICAN MEDICAL ASSOCIATION* BACK IN 1990.

20  **Q.**   HAVE YOU PUBLISHED SPECIFICALLY ABOUT MERCK'S CONDUCT IN

21  THEIR COMMUNICATION OF RISK AND BENEFIT OF VIOXX TO PHYSICIANS?

22  **A.**   I'VE WRITTEN ABOUT THAT, YES.

23  **Q.**   DR. AVORN, FROM THE ALMOST 200 PEER-REVIEWED ARTICLES THAT

24  ARE IN YOUR CURRICULUM VITAE, I HAVE PULLED DOCUMENTS FROM YOUR

25  PEER-REVIEWED DOCUMENTS, THE ARTICLES WHICH I'M GOING TO HAND

1   TO YOU AS AN EXHIBIT, AND THEY WOULD BE EXHIBITS 2 THROUGH 15.

2   A.   RIGHT.

3   Q.   WOULD THESE BE SOME OF THE -- WOULD THESE BE THE ARTICLES

4   THAT YOU HAVE WRITTEN IN THE PEER-REVIEWED MEDICAL LITERATURE

5   PERTAINING TO NONSTEROIDAL ANTI-INFLAMMATORY DRUGS?

6   A.   YES, THAT'S SOME OF THEM.

7   Q.   OKAY.  WOULD THAT INCLUDE ARTICLES YOU'VE WRITTEN ON

8   VARIOUS COX-2 DRUGS, INCLUDING VIOXX?

9   A.   YES.

10  Q.   ARE ANY OF THESE STUDIES FUNDED BY MERCK?

11  A.   YES.  THE ONE FROM *CIRCULATION* THAT APPEARED IN 2004 WAS

12  SUPPORTED BY MERCK, AND SEVERAL OF THE OTHERS WERE BASED ON OUR

13  RESEARCH FUNDED BY MERCK AS WELL.

14  Q.   AND COULD YOU IDENTIFY THE ARTICLE THAT WAS SUPPORTED BY

15  MERCK?

16  A.   SURE.

17  Q.   AND IDENTIFY IT BY EXHIBIT NUMBER?

18  A.   SURE.  OKAY.  ONE OF THEM IS EXHIBIT NO. 7, WHICH IS THE

19  ONE THAT APPEARED IN THE JOURNAL CALLED *CIRCULATION* IN 2004.

20        THERE'S ANOTHER ONE THAT APPEARED IN THE JOURNAL

21  CALLED *EPIDEMIOLOGY* IN 2005 THAT WAS ALSO SUPPORTED BY MERCK.

22  Q.   AND THE TITLE OF THAT --

23  A.   I'M SORRY.

24  Q.   THOSE BOTH INVOLVE VIOXX?

25  A.   YES.  THOSE ARE BOTH ABOUT THE COX-2 DRUGS, WHICH WERE

DAILY COPY

1    BASICALLY VIOXX AND CELEBREX, PRIMARILY.

2             THERE'S ALSO A PAPER WE HAD IN THE *NEW ENGLAND*

3    *JOURNAL OF MEDICINE* IN 2004 CALLED "MEDICAID

4    PRIOR-AUTHORIZATION PROGRAMS AND THE USE OF COX-2 INHIBITORS,"

5    AND WE ACKNOWLEDGE THERE THAT WE ALSO WERE RECEIVING A GRANT

6    FROM MERCK, WHICH CONTRIBUTED TO THAT STUDY.

7             I'M CHECKING CAREFULLY BECAUSE WE USUALLY DON'T PAY

8    ATTENTION TO WHO'S PAYING FOR THE STUDY WHEN WE DO THE WORK.

9             WE ACKNOWLEDGED IN A PAPER THAT CAME OUT IN THE

10   *JOURNAL OF CLINICAL EPIDEMIOLOGY* IN 2005 ABOUT PHYSICIAN

11   PREFERENCES IN RELATION TO THE USE OF COX-2 DRUGS LIKE VIOXX

12   AND CELEBREX IN WHICH WE RECEIVED FUNDING FROM MERCK, BUT MERCK

13   DID NOT SPECIFICALLY FUND THAT STUDY.

14            THERE'S ANOTHER PAPER HERE, EXHIBIT NO. 13,

15   "CARDIOVASCULAR OUTCOMES IN NEW USERS OF COXIBS AND NSAIDS,"

16   THAT ALSO ACKNOWLEDGES THAT WE'VE RECEIVED SUPPORT FROM MERCK

17   TO DO THAT WORK.

18            NOT THAT ONE.

19            SO THAT'S PRETTY MUCH IT.

20   **Q.**   HAVE YOU WRITTEN ANY BOOKS WHICH PERTAIN TO ISSUES OF DRUG

21   SAFETY?

22   **A.**   YES, I HAVE.

23   **Q.**   DOCTOR, I'M GOING TO HAND YOU A BOOK.  I'M NOT GOING TO

24   MARK IT AS AN EXHIBIT UNLESS WE HAVE TO.  IS THAT THE BOOK THAT

25   YOU'VE WRITTEN?

1    **A.**   YES.   *POWERFUL MEDICINES:   THE BENEFITS, RISKS, AND COSTS*
2    *OF PRESCRIPTION DRUGS.*  IT CAME OUT IN 2004.
3    **Q.**   DOCTOR, HAVE YOU BEEN A CONSULTANT FOR THE UNITED STATES
4    FOOD & DRUG ADMINISTRATION AT ANY TIME IN THE PAST?
5    **A.**   YES, I HAVE.
6    **Q.**   WOULD YOU DESCRIBE FOR THE MEMBERS OF THE JURY WHAT THAT
7    IS ABOUT.
8    **A.**   SURE.   THERE WAS A MEDICATION ON THE MARKET CALLED
9    LOTRONEX, WHICH WAS A DRUG FOR IRRITABLE BOWEL SYNDROME.  AND
10   THERE WAS A CONCERN THAT IT WAS CAUSING SEVERE SIDE EFFECTS,
11   EVEN DEATH, IN PATIENTS WHO TOOK IT, AND THE FDA WAS TRYING TO
12   DETERMINE WHETHER ITS SAFETY WAS SUCH THAT IT SHOULD BE KEPT ON
13   THE MARKET OR PULLED FROM THE MARKET. AND THE FDA ASKED ME TO
14   CONSULT WITH IT AS PART OF ITS ADVISORY COMMITTEE THAT WOULD
15   LOOK AT THE SAFETY OF THAT DRUG.
16   **Q.**   HAVE YOU TESTIFIED BEFORE THE UNITED STATES CONGRESS ON
17   ISSUES RELATING TO DRUG SAFETY AND HEALTHCARE POLICY?
18   **A.**   YES.  ON A NUMBER OF OCCASIONS, I WAS INVITED TO TESTIFY
19   BY THE U.S. SENATE, SPECIAL COMMITTEE ON AGING, THE HOUSE
20   COMMITTEE ON AGING, AND OTHER COMMITTEES OF CONGRESS ABOUT
21   MEDICATION EFFECTS.
22   **Q.**   HAVE YOU ADVISED THE PRESIDENT OF THE UNITED STATES ON
23   DRUG SAFETY OR DRUG POLICY?
24   **A.**   I WAS INVITED BY A TRANSITION TEAM OF THE PRESIDENT-ELECT
25   TO ADVISE ABOUT DRUG POLICY.

```
1    Q.    AND HAVE YOU RECEIVED GRANTS FROM THE NATIONAL INSTITUTE
2    OF HEALTH TO CONDUCT YOUR RESEARCH?
3    A.    YES.
4    Q.    I'M GOING TO ASK YOU SOME QUESTIONS, DOCTOR, ABOUT YOUR
5    EXPERTISE DIRECTLY.
6    A.    OKAY.
7    Q.    DR. AVORN, ARE YOU AN EXPERT IN THE FIELD OF
8    PHARMACOEPIDEMIOLOGY?
9    A.    YES.
10   Q.    ARE YOU AN EXPERT IN THE FIELD OF PHARMACOECONOMICS?
11   A.    YES.
12   Q.    ARE YOU AN EXPERT IN THE FIELD OF PHARMACEUTICAL STUDY
13   DESIGN?
14   A.    YES.
15   Q.    AND ARE YOU AN EXPERT IN THE FIELD OF THE CONDUCT OF
16   PHARMACEUTICAL STUDIES?
17   A.    YES.
18   Q.    ARE YOU AN EXPERT IN THE FACTORS THAT DRIVE PRESCRIBING
19   PRACTICES AND HABITS OF PHYSICIANS GENERALLY?
20   A.    YES.
21   Q.    ARE YOU AN EXPERT IN THE FIELD OF INTERNAL MEDICINE?
22   A.    YES.
23   Q.    GERIATRIC MEDICINE?
24   A.    YES.
25   Q.    AN EXPERT IN THE COMMUNICATION OF RISKS AND BENEFITS TO
```

1    PHYSICIANS AND OTHER HEALTHCARE PROVIDERS?

2    **A.**    YES.

3    **Q.**    ARE YOU AN EXPERT IN THE RISKS AND BENEFITS OF A CLASS OF

4    DRUGS KNOWN AS NONSTEROIDAL ANTI-INFLAMMATORY DRUGS?

5    **A.**    YES.

6    **Q.**    COX-2 INHIBITORS?

7    **A.**    YES.

8    **Q.**    HOW ABOUT AN EXPERT IN THE FIELD IN THE RISKS AND BENEFITS

9    OF VIOXX?

10   **A.**    YES.

11   **Q.**    ARE ALL THE AREAS THAT I'VE JUST ASKED YOU YOUR EXPERTISE

12   ABOUT AREAS IN WHICH YOU HAVE ACTUALLY PUBLISHED IN THE

13   PEER-REVIEWED MEDICAL LITERATURE?

14   **A.**    THAT'S RIGHT.

15   **Q.**    DR. AVORN, ARE YOU PREPARED TO OFFER THE JURY IN THIS CASE

16   YOUR PROFESSIONAL OPINIONS REGARDING THE DRUG VIOXX

17   MANUFACTURED BY MERCK?

18   **A.**    YES.

19   **Q.**    DURING THE TIME THAT VIOXX WAS ON THE MARKET, DID YOU HAVE

20   OCCASION TO SPEAK WITH MERCK OFFICIALS CONCERNING VIOXX?

21   **A.**    YES.

22   **Q.**    DURING THE TIME THAT VIOXX WAS ON THE MARKET, DID YOU

23   FORMULATE OPINIONS REGARDING VIOXX'S SAFETY, EFFICACY, AND ITS

24   CARDIOVASCULAR RISK?

25   **A.**    YES.

1   **Q.**   DID YOU SHARE THOSE OPINIONS WITH MERCK?

2   **A.**   YES.

3   **Q.**   UNTIL 2004, WHEN VIOXX WAS NO LONGER AVAILABLE ON THE

4   MARKET, WERE YOU ASKED TO PRESENT YOUR SCIENTIFIC AND MEDICAL

5   OPINIONS ON VIOXX AND OTHER NSAIDS, INCLUDING NAPROXEN, WHICH

6   WE'LL TALK ABOUT, AT NATIONAL AND INTERNATIONAL SCIENTIFIC AND

7   PROFESSIONAL MEETINGS?

8   **A.**   YES.

9   **Q.**   DURING THE TIME VIOXX WAS ON THE MARKET AND SHORTLY

10  THEREAFTER, DID YOU PUBLISH ARTICLES AND EDITORIALS IN THE

11  PEER-REVIEWED LITERATURE CONCERNING THE FDA'S ROLE IN

12  EVALUATING VIOXX?

13  **A.**   I DID.

14  **Q.**   WHEN YOU WERE FORMULATING THESE OPINIONS AND PUBLISHING

15  THEM IN THE MEDICAL LITERATURE, WERE YOU CONSULTING WITH ANY

16  LAWYERS LIKE MYSELF WHO WERE REPRESENTING INDIVIDUALS WHO CLAIM

17  THAT THEY WERE INJURED AS A RESULT OF VIOXX?

18  **A.**   NO.  I TRY TO AVOID CONSULTING WITH LAWYERS WHENEVER I

19  CAN.

20  **Q.**   WHEN IS THE FIRST TIME YOU MET WITH ANY LAWYER

21  REPRESENTING PEOPLE WHO CLAIMED INJURIES AS A RESULT OF VIOXX?

22  **A.**   I WOULD SAY THE ONLY TIME I ACTUALLY -- WELL, THE FIRST

23  TIME I ACTUALLY MET WITH ANYBODY, AS OPPOSED TO CALLING THEM

24  BACK AND SAYING "NO THANK YOU," WOULD HAVE BEEN MAY OF '05.

25  **Q.**   SINCE MAY OF 2005, WHEN YOU FIRST HAD YOUR MEETING WITH

1    LAWYERS REPRESENTING PEOPLE WHO CLAIM INJURIES AS A RESULT OF

2    VIOXX, HAVE YOU BEEN PROVIDED WITH ADDITIONAL MATERIALS THAT

3    YOU HAD NOT HAD AN OPPORTUNITY TO SEE WHILE YOU WERE CONDUCTING

4    STUDIES INVOLVING VIOXX, NSAIDS, AND COX-2S?

5    **A.**   YES.  THERE WAS A LOT OF MATERIAL THAT CAME OUT AS A

6    RESULT OF THE DISCOVERY PROCESS THAT I HAD NOT HAD ACCESS TO

7    BEFORE.

8    **Q.**   HAVE YOU FORMED ADDITIONAL OPINIONS SINCE MAY OF 2005 AS A

9    RESULT OF REVIEWING THOSE ADDITIONAL DOCUMENTS THAT WERE

10   PROVIDED TO YOU?

11   **A.**   YES.

12   **Q.**   ARE YOU PREPARED TO OFFER THOSE ADDITIONAL OPINIONS TO THE

13   MEMBERS OF THE JURY TODAY?

14   **A.**   SURE.

15   **Q.**   DOCTOR, ARE ALL THE OPINIONS THAT YOU WILL TESTIFY ABOUT

16   TODAY, WHETHER THEY WERE FORMED BEFORE YOU WERE RETAINED AS AN

17   EXPERT IN THIS LITIGATION OR SINCE YOU WERE RETAINED AS AN

18   EXPERT IN THIS LITIGATION, OPINIONS THAT YOU HOLD TO A

19   REASONABLE DEGREE OF MEDICAL AND SCIENTIFIC CERTAINTY?

20   **A.**   DEFINITELY.

21   **Q.**   ARE YOU AWARE THAT YOUR TESTIMONY IS BEING VIDEOTAPED SO

22   IT COULD BE SHOWN TO THE MEMBERS OF THE JURY?

23   **A.**   YES.  THE CLUE WAS THAT BIG VIDEO CAMERA IN FRONT OF ME.

24   **Q.**   OKAY.  WHY IS IT THAT YOU ARE NOT APPEARING LIVE TO GIVE

25   YOUR OPINIONS TO THE MEMBERS OF THIS JURY?

1    **A.**   BECAUSE I HAVE A DAY JOB, AND I SPEND AN ENORMOUS AMOUNT

2    OF TIME JUST RUNNING MY DIVISION AT HARVARD AND AT THE BRIGHAM

3    AND TEACHING MEDICAL STUDENTS AND OCCASIONALLY SUPERVISING

4    PATIENT CARE, AND I WOULDN'T HAVE TIME TO DO THIS FOR MORE THAN

5    JUST ONCE.

6    **Q.**   ARE YOU BEING PAID PERSONALLY FOR THE TIME THAT YOU SPENT

7    CONSULTING WITH US AND APPEARING AT THIS VIDEOTAPE TESTIMONY?

8    **A.**   NO.  I RECEIVED NO PAYMENT FOR ANY OF MY WORK IN THIS

9    CASE.

10   **Q.**   WELL, DON'T DOCTORS LIKE YOURSELF USUALLY SUBMIT BILLS

11   WHEN THEY DO WORK LIKE THIS?

12   **A.**   THEY TRADITIONALLY DO, BUT I PREFER, SINCE I'VE

13   ESTABLISHED A POLICY IN MY DIVISION THAT NONE OF US ACCEPTS ANY

14   DIRECT PAYMENT FROM DRUG COMPANIES, IT SEEMED REASONABLE TO

15   ALSO NOT ACCEPT ANY PAYMENT PERSONALLY FROM PLAINTIFFS' LAWYERS

16   OR PLAINTIFFS EITHER, AND SO I DO THIS PRO BONO, AND IF THE

17   ATTORNEYS I'M WORKING WITH WANT TO MAKE A DONATION TO A

18   CHARITABLE CAUSE, THAT'S FINE WITH ME. BUT I DON'T TAKE ANY

19   PERSONAL REMUNERATION.

20   **Q.**   HAVE YOU SET UP A CHARITABLE FUND WHICH ANY MONEY THAT

21   WOULD BE BILLED WOULD GO INTO THAT FUND?

22   **A.**   SURE.  RIGHT.

23   **Q.**   AND WHAT IS THE PURPOSE OF THIS CHARITABLE FUND?

24   **A.**   IT IS BASICALLY TO HAVE AN ENDOWMENT TO SUPPORT

25   NONCOMMERCIAL RESEARCH ABOUT MEDICATION USE AND MEDICATION

1   EFFECTS, BECAUSE I THINK THERE'S A REAL NEED FOR THAT TO BE A

2   SOURCE OF FUNDING THAT IS INDEPENDENT OF ANY PARTICULAR

3   COMPANIES.

4   Q.   DO YOU DERIVE ANY PERSONAL MONETARY BENEFIT AS A RESULT OF

5   THE MONEY THAT WE MAY HOURLY -- ANY HOURLY RATE YOU MAY BILL US

6   WHICH WE PAY INTO THIS CHARITABLE FUND?

7   A.   NO, I DON'T.

8                            **TRAVERSE**

9   BY MR. BECK:

10  Q.   DOCTOR, MY NAME IS PHIL BECK.  I REPRESENT MERCK.  ON THIS

11  QUESTION OF WHETHER YOU ARE CHARGING FOR THE WORK THAT YOU DID

12  IN THIS CASE, DO YOU HAVE AN ESTABLISHED HOURLY RATE?

13  A.   YES.

14  Q.   AND FOR CONSULTING WITH LAWYERS?

15  A.   YES.

16  Q.   AND WHAT IS THE HOURLY RATE THAT YOU USE WHEN CONSULTING

17  WITH LAWYERS?

18  A.   $750 AN HOUR.

19  Q.   AND HOW MANY HOURS HAVE YOU WORKED ON THIS CASE?

20  A.   THUS FAR, I WOULD ESTIMATE ABOUT 200, I THINK.  I DON'T

21  KEEP REAL CLOSE TRACK.

22  Q.   SO 200 TIMES 750, I'M NOT GOOD AT MATH, BUT HOW MUCH DOES

23  THAT -- CAN YOU FIGURE OUT --

24  A.   I THINK YOU SHOULD DO THE MATH IF YOU ARE ASKING THE

25  QUESTION.

1  Q.   OKAY.  I'LL DO THAT, THEN.  WHEN I DO THE MATH, THAT COMES
2  TO $150,000.
3  A.   SOUNDS ABOUT RIGHT.
4  Q.   AND HOW MANY TIMES HAVE YOU CONSULTED WITH MR. TISI BEFORE
5  THE VIOXX LITIGATION?
6  A.   BEFORE THE VIOXX LITIGATION?  ONCE.
7  Q.   AND WHAT WAS THAT IN CONNECTION WITH?
8  A.   A DRUG CALLED REZULIN.
9  Q.   HAVE YOU ALSO OVERCOME YOUR RELUCTANCE TO CONSULT WITH
10  LAWYERS AND WORK WITH THEM, PLAINTIFFS' LAWYERS, ON THE DIET
11  DRUG LITIGATION?
12  A.   RIGHT.  I THINK THERE HAVE BEEN ABOUT FOUR CASES TOTAL
13  THAT I'VE BECOME INVOLVED WITH.
14  Q.   SO, REZULIN, WHICH YOU DID WITH MR. TISI, RIGHT?
15  A.   RIGHT.
16  Q.   AND JUST SO WE DON'T HAVE ANY LOOSE ENDS, DID HE PAY THE
17  BILL IN REZULIN?
18  A.   I DON'T EVEN KNOW WHO THE BILL WAS PAID BY BECAUSE THERE'S
19  THESE CONSORTIA OF LAWYERS, BUT SOMETHING GOT PAID INDEPENDENT
20  OF THE OUTCOME OF THE CASE.
21  Q.   AND DIET DRUGS, YOU CONSULTED WITH PLAINTIFFS' LAWYERS,
22  RIGHT?
23  A.   YES.
24  Q.   AM I CORRECT THAT YOU ALSO CONSULTED WITH PLAINTIFFS'
25  LAWYERS ON A DRUG CALLED BAYCOL?

1   A.   YES.

2   Q.   AND DID YOU SAY THERE WAS ANOTHER ONE OTHER THAN THOSE?

3   A.   PPA, PHENYLPROPANOLAMINE.

4   Q.   PPA?

5   A.   YES.

6   Q.   AND ALL OF THIS HAS BEEN, WHAT, WITHIN THE LAST FIVE, SIX

7   YEARS?

8   A.   PROBABLY.

9            **THE COURT:**  WHY DON'T YOU JUST STOP IT A MOMENT.

10                THIS WAS A LITTLE DIFFERENT THAN THE WAY IT WAS

11   PRESENTED TO YOU, MEMBERS OF THE JURY.  LET ME SAY A WORD ABOUT

12   THAT.

13                FIRST, WHEN AN EXPERT IS CALLED TO THE STAND OR

14   CALLED BEFORE YOU IN DEPOSITION, HE'S ASKED ABOUT HIS

15   QUALIFICATIONS.  WHEN THE PARTY WHO IS INTRODUCING THE EXPERT

16   IS FINISHED ON HIS QUALIFICATIONS, THEN THE OPPOSING COUNSEL

17   HAS A RIGHT TO ASK HIM QUESTIONS ON THOSE QUALIFICATIONS.

18                NOW, I'VE HEARD THE QUALIFICATIONS.  I'LL ACCEPT

19   THEM IN THE TENDERED FIELDS.  BUT AGAIN, THAT SIMPLY MEANS THAT

20   HE'S ABLE TO GIVE AN OPINION.  IT'S FOR YOU TO DETERMINE

21   CREDIBILITY.

22                SO NOW WE GO BACK TO THE PERSON WHO IS

23   PRESENTING HIM SO HE CAN PRESENT THE INFORMATION.  ALL RIGHT.

24

25

DAILY COPY

1                     **DIRECT EXAMINATION**

2    **BY MR. ROBINSON:**

3    **Q.**   FIRST OF ALL, WERE YOU PERSONALLY INVOLVED IN HOW MERCK

4    MANAGED THE RISKS OF VIOXX THROUGH YOUR WORK WITH THEM ON THE

5    OBSERVATIONAL STUDIES THAT YOU TESTIFIED TO EARLIER?

6    **A.**   YES.  WE PERFORMED RESEARCH FUNDED BY THEM WITH WHICH WE

7    WORKED VERY CLOSELY WITH MERCK EPIDEMIOLOGISTS ON THE

8    DEVELOPMENT OF THE STUDY AND ON THE CONDUCT OF THE STUDY AND ON

9    THE INTERPRETATION OF THE FINDINGS.  AND THAT WAS GERMANE TO

10   WHAT WAS KNOWN AT THE TIME AS IT WAS DEVELOPING ABOUT THE

11   CARDIAC RISKS OF VIOXX.

12   **Q.**   DOCTOR, ARE YOU AN EXPERT ON THE ISSUE OF VIOXX'S RISKS

13   THROUGHOUT THE DEVELOPMENT AND MARKETING OF THAT DRUG?

14   **A.**   YES.

15   **Q.**   THANK YOU.  WHY?

16   **A.**   IS THAT A QUESTION?

17   **Q.**   YES.  WHY?

18   **A.**   OKAY.  BECAUSE, AS I SAID BEFORE, PHARMACOEPIDEMIOLOGY AND

19   ALSO THE RESEARCH ABOUT MEDICATION RISKS AND BENEFITS BEYOND

20   THE EPIDEMIOLOGY IS ABOUT LOOKING AT ALL AS ASPECTS OF THE

21   DRUG'S PROPERTIES:  THE PHARMACOLOGY, THE CLINICAL EFFECTS IN

22   THE EARLY TRIALS, THE RANDOMIZED TRIALS THAT OCCUR ON A LARGER

23   SCALE, AND THE POSTMARKETING USE OF THAT DRUG.  ALL OF THAT IS

24   A PART OF WHAT I STUDY AND TEACH AT HARVARD AND WRITE PAPERS

25   ABOUT.

1   **Q.**    HAVE YOU CAREFULLY STUDIED VIOXX?

2   **A.**    YES, I HAVE.

3   **Q.**    AND HAVE YOU CAREFULLY STUDIED MERCK'S CONDUCT?

4   **A.**    YES, I HAVE.

5   **Q.**    DO YOU HAVE AN OPINION THAT YOU HOLD TO A REASONABLE

6   DEGREE OF MEDICAL CERTAINTY AS TO WHETHER OR NOT VIOXX IS A

7   DRUG FOR WHICH THE RISKS OUTWEIGH THE BENEFITS?

8   **A.**    YES, I HAVE THAT OPINION.

9   **Q.**    OKAY.  WHAT IS THAT OPINION?

10  **A.**    THAT VIOXX'S RISKS DO INDEED OUTWEIGH ITS BENEFITS, WHICH

11  IS THE VIEW THAT THE FDA AGREED WITH AS WELL.

12  **Q.**    DO YOU HAVE AN OPINION THAT YOU HOLD TO A REASONABLE

13  DEGREE OF MEDICAL CERTAINTY AS TO WHETHER OR NOT MERCK

14  ACCURATELY CONVEYED THROUGH ALL OF ITS ACTIVITIES --

15  PUBLICATIONS, DETAILING, DIRECT-TO-CONSUMER ADVERTISING,

16  LABELING, "DEAR DOCTOR" LETTERS, ET CETERA -- EFFECTIVELY

17  COMMUNICATED THE RISKS AND BENEFITS SO DOCTORS CAN MAKE

18  EVIDENCE-BASED PRESCRIBING DECISIONS?

19  **A.**    YES, I HAVE SUCH AN OPINION.

20  **Q.**    OKAY.  AND WHAT IS THAT OPINION?

21  **A.**    THAT MERCK'S CONDUCT OF ITS RESEARCH PROGRAM AND ANALYSIS

22  OF ITS DATA AND COMMUNICATION OF THOSE DATA TO PHYSICIANS, TO

23  PATIENTS, EVEN TO FDA, WAS INADEQUATE IN THAT IT FAILED TO

24  TRUTHFULLY REPRESENT WHAT WAS KNOWN TO MERCK AT THE TIME ABOUT

25  THE RISKS OF ITS DRUG IN RELATION TO THE CARDIOVASCULAR

1   SYMPTOMS.

2   **Q.**   DO YOU HAVE AN OPINION AS TO WHETHER OR NOT MERCK ACTED

3   REASONABLY AND PRUDENTLY IN COMMUNICATING THE RISKS OF VIOXX TO

4   PHYSICIANS?

5   **A.**   AS SOMEONE WHO HAS CONDUCTED YEARS OF RESEARCH ON HOW

6   PHYSICIANS MAKE PRESCRIBING DECISIONS IN RELATION TO WHAT

7   EVIDENCE IS AVAILABLE TO THEM, I HAVE CONDUCTED STUDIES AND

8   ACTUAL INTERVENTIONS TO IMPROVE PHYSICIANS' USE OF DRUGS, WHICH

9   HAVE BEEN PUBLISHED IN THE *NEW ENGLAND JOURNAL OF MEDICINE* AND

10  OTHER PEER-REVIEWED JOURNALS.  I THINK A LOT ABOUT HOW

11  PHYSICIANS USE INFORMATION THAT THEY HAVE AVAILABLE TO THEM IN

12  MAKING PRESCRIBING DECISIONS, AND MY CLEAR IMPRESSION IS THAT

13  DOCTORS DID NOT HAVE ADEQUATE INFORMATION PRESENTED TO THEM BY

14  MERCK TO MAKE A FAIR AND REASONABLE EVIDENCE-BASED DECISION

15  ABOUT VIOXX.

16  **Q.**   DOCTOR, LET ME MOVE INTO YOUR -- WHAT I WOULD CALL YOUR

17  FACTUAL TESTIMONY PORTION OF YOUR DEPOSITION HERE.  BUT BEFORE

18  I DO, LET ME ASK YOU SOME BASIC QUESTIONS ABOUT IT SO WE CAN

19  ORIENT THE JURY AS TO WHAT SOME OF THE TERMS WE'RE TALKING

20  ABOUT HERE.

21        OKAY.  FIRST I WOULD LIKE TO HELP THE JURY UNDERSTAND

22  A LITTLE ABOUT THE DRUGS WE'LL BE TALKING ABOUT TODAY.  WHAT

23  ARE NONSTEROIDAL ANTI-INFLAMMATORY DRUGS?

24  **A.**   THAT'S A CLASS OF DRUGS THAT ACTUALLY INCLUDES ASPIRIN,

25  BUT THE MORE MODERN NONSTEROIDS BEGAN TO APPEAR IN THE 1970S.

1  AND THEY ARE CALLED NONSTEROIDAL ANTI-INFLAMMATORY DRUGS

2  BECAUSE THEY REDUCE INFLAMMATION LIKE STEROIDS DO, BUT THEY ARE

3  NOT STEROIDS.  THEY HAVE A DIFFERENT MECHANISM OF ACTION THAT'S

4  A LITTLE BIT MORE LIKE ASPIRIN.

5  **Q.**   OKAY.  WOULD YOU GIVE US EXAMPLES OF COMMONLY KNOWN

6  NONSTEROIDAL ANTI-INFLAMMATORY DRUGS THAT THE JURY MIGHT BE

7  FAMILIAR WITH.

8  **A.**   SURE.  THE MOST COMMON AND OLDEST ONES ARE IBUPROFEN,

9  WHICH IS SOLD AS MOTRIN, AND IT'S ALSO AVAILABLE OVER THE

10  COUNTER AS ADVIL OR NUPRIN.

11        ANOTHER OLDER AND COMMONLY USED ONE IS NAPROXEN,

12  WHICH USED TO BE -- I GUESS IS STILL SOLD AS NAPROSYN AS A

13  PRESCRIPTION DRUG, AND THAT'S SOLD AS ALEVE OVER THE COUNTER.

14  **Q.**   OKAY.  LET'S TALK ABOUT ASPIRIN FOR A MOMENT.  PRIOR TO

15  2000, 1999/2000, WHEN VIOXX CAME ON THE MARKET, WAS THERE ANY

16  EVIDENCE THAT YOU'RE AWARE OF THAT ASPIRIN MIGHT BE GOOD FOR

17  THE HEART?

18  **A.**   YES.  THERE WERE STUDIES THAT WERE ACTUALLY DONE BY

19  COLLEAGUES OF MINE AT HARVARD AND THE BRIGHAM & WOMEN'S

20  HOSPITAL IN WHICH THOUSANDS OF DOCTORS WERE ACTUALLY RANDOMIZED

21  TO GET ASPIRIN OR A PLACEBO OR A DUMMY PILL, AND THEY WERE

22  FOLLOWED FOR YEARS.

23        AND THEN DR. HENNEKENS, WHO DID THE STUDY, AND HIS

24  COLLEAGUES, ATTEMPTED TO FIND OUT WHETHER THEY HAD HEART

25  ATTACKS OR NOT.

1   Q.   DOCTOR, IN 2000, WHEN VIOXX WAS BEING PROMOTED ON THE

2   MARKET, WAS THE USE OF ASPIRIN, LOW-DOSE ASPIRIN, A STANDARD OF

3   CARE FOR TREATMENT OF PATIENTS WITH CARDIOVASCULAR RISK

4   FACTORS?

5   A.   YES.

6   Q.   AND HAVE YOU EVER PERSONALLY PRESCRIBED ASPIRIN TO

7   PATIENTS AT RISK FOR HEART DISEASE?

8   A.   YES.

9   Q.   AND SWITCHING TO A DRUG CALLED NAPROXEN, I THINK WE TALKED

10  ABOUT BEFORE, ALEVE?

11  A.   YES.

12  Q.   HOW LONG HAS NAPROXEN OR ALEVE BEEN ON THE MARKET?

13  A.   I WOULD SAY SINCE THE 1970S.

14  Q.   AND WHAT, IF ANY, EVIDENCE EXISTED PRIOR TO 2000 THAT

15  NAPROXEN WAS GOOD FOR THE HEART IN THE SAME WAY THAT ASPIRIN

16  WAS?

17  A.   VIRTUALLY NO EVIDENCE.

18  Q.   DID THE MANUFACTURERS OF NAPROXEN EVER MAKE THE CLAIM THAT

19  THAT DRUG WAS WHAT WE CALL CARDIOPROTECTIVE?

20  A.   THEY COULDN'T BECAUSE THEY HAD NO GROUNDS TO CLAIM THAT.

21  Q.   DO YOU KNOW WHETHER THE MANUFACTURER OF NAPROXEN MAKES

22  THAT CLAIM EVEN TODAY?

23  A.   NO, THEY DON'T.

24  Q.   OKAY.  IS IT OR HAS IT EVER BEEN THE STANDARD OF CARE FOR

25  PHYSICIANS SUCH AS YOURSELF TO PRESCRIBE NAPROXEN TO PATIENTS

1    TO PROTECT THEIR HEARTS?

2    **A.**    NO.

3    **Q.**    HAVE YOU EVER PRESCRIBED NAPROXEN TO PATIENTS FOR THE

4    PURPOSE OF PROTECTING THEIR HEARTS?

5    **A.**    NO.  THERE'S NO EVIDENCE THAT IT PROTECTS YOUR HEART IN

6    ANY USEFUL WAY.

7    **Q.**    AND DO YOU KNOW ANYBODY WHO DOES THAT?

8    **A.**    NO.

9    **Q.**    OKAY.  SECOND QUESTION:  NSAIDS IN GENERAL, TRADITIONAL

10   NSAIDS, AS A CLASS --

11   **A.**    RIGHT.

12   **Q.**    -- ARE THERE SAFETY ISSUES THAT ARE UNDERSTOOD ABOUT

13   TRADITIONAL NSAIDS?

14   **A.**    SURE.

15   **Q.**    WOULD YOU DESCRIBE THE SIGNIFICANT SIDE EFFECTS OF NSAIDS

16   AS YOU KNEW THEM BACK IN 2000 -- 1999, 2000, 2001?

17   **A.**    SURE.  WE ACTUALLY DID SOME OF THOSE STUDIES IN WHICH WE

18   LOOKED AT THE CAPACITY OF THE OLDER NSAIDS, LIKE MOTRIN, TO

19   REDUCE KIDNEY FUNCTION IN OLDER PEOPLE.  WE DID STUDIES SHOWING

20   THAT THE OLDER NSAIDS, LIKE -- AGAIN, LIKE MOTRIN, WHICH IS

21   IBUPROFEN, CAN RAISE YOUR BLOOD PRESSURE.

22          OTHER PEOPLE HAVE DONE STUDIES SHOWING THE

23   ASSOCIATION BETWEEN THE OLDER NONSTEROIDALS OR NSAIDS AND

24   CONGESTIVE HEART FAILURE.  THAT WAS PRETTY WELL KNOWN BY THE --

25   BY 2000.

294

1  **Q.**    WHAT ABOUT GI, WHAT WE CALL GASTROINTESTINAL ISSUES?

2  **A.**    YEAH.  THAT'S THE BIGGEST PROBLEM FROM THE TRADITIONAL

3  NONSTEROIDALS.  THEY CAN CAUSE STOMACH PAIN, STOMACH UPSET, IN

4  A LOT OF PATIENTS.  AND THEY ALSO CAN CAUSE GASTROINTESTINAL

5  BLEEDING.

6  **Q.**    IS THAT A SERIOUS PROBLEM ASSOCIATED WITH TRADITIONAL

7  NONSTEROIDAL ANTI-INFLAMMATORIES?

8  **A.**    YES, IT CAN BE.

9  **Q.**    NOW, WITH THAT IN MIND, DID THERE COME A TIME WHEN YOU

10  BECAME FAMILIAR WITH THE FACT THAT CERTAIN DRUG MANUFACTURERS

11  WERE DEVELOPING A CLASS OF DRUGS CALLED COX-2 INHIBITORS?

12  **A.**    RIGHT.

13  **Q.**    OKAY.  WOULD YOU DESCRIBE FOR THE MEMBERS OF THE JURY WHAT

14  A COX-2 INHIBITOR IS AND YOUR UNDERSTANDING ABOUT WHY THEY WERE

15  BEING DEVELOPED?

16  **A.**    SURE.  THE COX-2 INHIBITORS, SOMETIMES CALLED COXIBS, ARE

17  A SUBSET OF THE BIGGER CLASS OF NONSTEROIDAL ANTI-INFLAMMATORY

18  DRUGS, OR NSAIDS.  AND THE HOPE WAS THAT -- WELL, I SHOULD BACK

19  UP.

20        IT TURNS OUT THAT THERE ARE -- THERE IS AN ENZYME

21  CALLS CYCLOOXYGENASE, WHICH IS ABBREVIATED AS "COX".  AND

22  PEOPLE DISCOVERED THAT THERE ARE TWO SUBSETS OF THAT:  COX-1

23  AND COX-2.  AND ONE KIND OF SIMPLE WAY OF THINKING ABOUT IT WAS

24  THAT COX-2 IS THE BAD SUBSET BECAUSE THAT'S THE ONE THAT CAUSED

25  PAIN AND INFLAMMATION; AND COX-1, IN A VERY SIMPLISTIC WAY, WAS

1    THOUGHT GOOD COX BECAUSE THAT PROTECTED THE LINING OF YOUR

2    STOMACH.

3              AND VIEWED IN THAT KIND OF SIMPLE BLACK-AND-WHITE

4    WAY, THE HOPE WAS THAT IF YOU COULD DEVELOP A DRUG -- SINCE

5    NONSTEROIDALS TEND TO BLOCK BOTH THE COX-1 AND THE COX-2

6    ENZYMES, IF YOU COULD DEVELOP A DRUG THAT WOULD ONLY BLOCK THE

7    BAD COX, OR COX-2, YOU WOULD BE ABLE TO GET RID OF PAIN AND

8    INFLAMMATION WITHOUT BLOCKING THE GOOD COX, OR COX-1, WHICH

9    PROTECTS THE STOMACH LINING.

10             AND THE HOPE WAS -- AND THIS WAS WHAT WENT INTO THE

11   DEVELOPMENT OF VIOXX AND CELEBREX -- THAT, BY DOING SO, YOU

12   WOULD BE ABLE TO HAVE A DRUG THAT WOULD TREAT PAIN AND

13   INFLAMMATION AND NOT CAUSE AS MUCH RISK OF STOMACH BLEEDING.

14   **Q.**   DO YOU HAVE ANY PROBLEM, DR. AVORN, WITH MERCK

15   INVESTIGATING COX-2S AS A POTENTIAL PAIN MEDICATION WITH THE

16   LACK OF A GI SIDE EFFECT?

17   **A.**   NO.   SEEMED LIKE A NEAT IDEA AT THE TIME.

18   **Q.**   OKAY.   I'M GOING TO HAND YOU WHAT I'D LIKE TO HAVE MARKED

19   AS THE NEXT EXHIBIT, EXHIBIT NO. 16.   DOCTOR, DO YOU RECOGNIZE

20   THAT?

21   **A.**   YES.   THAT'S THE VIGOR STUDY AS IT WAS PUBLISHED IN THE

22   *NEW ENGLAND JOURNAL OF MEDICINE* IN NOVEMBER OF 2000.

23   **Q.**   AND WHAT IS THE EXACT DATE OF THIS ARTICLE?

24   **A.**   NOVEMBER 23, 2000.

25   **Q.**   AND WHEN DID YOU FIRST LEARN OF THE VIGOR STUDY?

1    **A.**   WELL, ACTUALLY, INFORMATION ABOUT THE FINDINGS BEGAN TO

2    CIRCULATE IN THE SPRING OF 2000, I THINK IT WOULD HAVE BEEN,

3    MARCH, WHEN I GUESS IT WAS EITHER PRESENTED OR MERCK ISSUED A

4    STATEMENT ABOUT THE FINDINGS.

5    **Q.**   AND DO YOU KNOW -- WOULD YOU BRIEFLY DESCRIBE THE STUDY

6    AND WHAT IT WAS DESIGNED TO DO.

7    **A.**   SURE.  IT WAS FUNDED BY MERCK, AND A NUMBER OF THE

8    COAUTHORS WERE MERCK EMPLOYEES.  AND IT WAS DESIGNED TO ASK THE

9    QUESTION:  IS VIOXX SAFER ON YOUR STOMACH THAN OLDER

10   NONSTEROIDALS?

11          ABOUT 8,000 PATIENTS WERE RANDOMLY DIVIDED INTO TWO

12   GROUPS.  ONE GROUP WAS GIVEN VIOXX AND -- AT A DOSE OF

13   50 MILLIGRAMS A DAY, AND THE OTHER GROUP WAS GIVEN NAPROXEN,

14   THIS OLDER NONSTEROIDAL.  AND THEN THEY WERE FOLLOWED FOR A

15   MEDIAN PERIOD OF NINE MONTHS.

16          AND THERE WERE A NUMBER OF OUTCOMES THAT WERE

17   STUDIED:  ONE WAS WHETHER OR -- WHAT KIND OF PAIN RELIEF IT

18   GAVE, BECAUSE ITS PURPOSE WAS TO BE A PAIN RELIEVER; AND

19   ANOTHER OUTCOME, WHICH WAS THE ONE OF PARTICULAR INTEREST, WAS

20   WHETHER OR NOT THE PATIENTS WHO WERE RANDOMLY ASSIGNED TO THE

21   VIOXX GROUP WERE HAVING A LOWER RATE OF STOMACH BLEEDING AND

22   PERFORATION AND ULCER.

23          AND THE FINDINGS AS THEY EMERGED WERE THAT, AS A

24   PAIN-RELIEVER, VIOXX WORKED ABOUT AS WELL AS NAPROXEN, NO

25   BETTER, NO WORSE; BUT THERE WAS THE HOPE FOR REDUCTION IN

1  GASTROINTESTINAL EVENTS, LIKE ULCERS AND PERFORATIONS, IN THE
2  PATIENTS TAKING VIOXX COMPARED TO THE PATIENTS TAKING NAPROXEN.
3  AND A SURPRISE FINDING THAT EMERGED FROM THAT STUDY WAS THAT
4  THERE WAS AN APPROXIMATE FIVEFOLD INCREASE IN HEART ATTACKS IN
5  THE PEOPLE RANDOMLY ASSIGNED TO TAKE VIOXX AS COMPARED TO TAKE
6  NAPROXEN.
7  **Q.**   WHEN YOU SAY "SURPRISE FINDING," WAS IT A SURPRISE TO YOU,
8  DOCTOR?
9  **A.**   WELL, THERE HAD BEEN EVIDENCE OF A POTENTIAL THERE, BUT
10  THIS WAS THE -- THIS WAS A LARGE DEMONSTRATION OF THIS IN A BIG
11  RANDOMIZED TRIAL, EVEN THOUGH THERE HAD BEEN OTHER EVIDENCE OF
12  PATIENTS WHO HAD GIVEN VIOXX HAVING SIMILAR PROBLEMS.
13        BUT I THINK, TO THE MEDICAL PUBLIC AS A WHOLE, IT WAS
14  SOMETHING WHICH THEY DID NOT KNOW WAS GOING TO HAPPEN.
15  **Q.**   NOW, AS A PHARMACOEPIDEMIOLOGIST, WAS THE FINDING ABOUT
16  THE CARDIOVASCULAR RISK A CONCERN TO YOU PERSONALLY?
17  **A.**   IF YOU MEAN PERSONALLY, IN MY PROFESSIONAL ROLE?
18  **Q.**   YES?
19  **A.**   YES.
20  **Q.**   YEAH.
21  **A.**   YES.
22  **Q.**   AND WHY WAS THAT A SIGNIFICANT CONCERN TO YOU
23  PROFESSIONALLY?
24  **A.**   BECAUSE IF THERE WERE A DRUG THAT CAUSES A FIVEFOLD
25  INCREASE IN YOUR RISK OF HAVING A HEART ATTACK, THAT'S A REAL

1    PROBLEM.  IT'S NOT A DRUG THAT YOU WOULD BE HAPPY ABOUT GIVING

2    TO A PATIENT UNLESS IT HAD SOME OTHER INCREDIBLE BENEFIT TO

3    OUTWEIGH THAT.

4    Q.    AT THE TIME THAT VIGOR CAME OUT, HOW PREVALENT WAS THE USE

5    OF VIOXX?

6    A.    IT WAS ON THE UPSWING.  THE CURVE OF VIOXX USE WAS JUST

7    HEADING FOR THE MOON; AND BY NOVEMBER OF 2000, IT WAS WELL ON

8    THAT UPSWING.

9    Q.    GIVEN THE FINDINGS OF VIGOR AND THE NUMBER OF PATIENTS

10   THAT WERE ACTUALLY TAKING IT, DID YOU HAVE AN OPINION AT THE

11   TIME AS TO WHETHER OR NOT THERE WERE ANY POTENTIAL PUBLIC

12   HEALTH ISSUES CONCERNED WITH VIOXX?

13   A.    YES.  AT THE TIME, I CLEARLY REMEMBER SAYING AND

14   DISCUSSING WITH MY COLLEAGUES AND -- AND WITH DR. SHERWOOD AND

15   WITH A NUMBER OF PEOPLE, THAT IF IT WERE TRUE THAT THIS DRUG

16   CAUSES A FIVEFOLD OR FOURFOLD INCREASE IN THE RISK OF HEART

17   ATTACKS, THEN THAT COULD BE A REAL ISSUE THAT COULD WELL

18   OUTWEIGH WHATEVER BENEFIT IT MIGHT HAVE IN REDUCING STOMACH

19   PROBLEMS.

20   Q.    WHEN YOU REVIEWED THE ACTUAL TEXT OF THE VIGOR ARTICLE, AS

21   AN EPIDEMIOLOGIST, WAS YOUR -- IN THE WAY IN WHICH THE

22   STATISTICS WERE REPORTED, WERE THEY REPORTED IN A WAY THAT WAS

23   OF CONCERN TO YOU?

24   A.    YES.

25   Q.    WHAT WAS VERY UNUSUAL AND UNORTHODOX ABOUT THE WAY THE

1    FINDINGS WERE PRESENTED IN THE VIGOR PAPER WAS THAT, INSTEAD OF

2    SAYING PATIENTS RANDOMLY ASSIGNED TO TAKE VIOXX HAD FIVE TIMES

3    THE NUMBER OF HEART ATTACKS -- OR FOUR TIMES.  THERE'S

4    DIFFERENT NUMBERS IN DIFFERENT PARTS OF THE PAPER -- COMPARED

5    TO PEOPLE ASSIGNED TO TAKE NAPROXEN, INSTEAD, IT WAS FLIPPED

6    AROUND IN WAY THAT IS VIRTUALLY NEVER DONE IN REPORTING A

7    CLINICAL TRIAL; WHICH IS TO SAY, THE PATIENTS ASSIGNED TO TAKE

8    NAPROXEN HAD A REDUCTION IN THEIR HEART ATTACK RATE.

9            AND THAT WAS STRIKING -- I REMEMBER THE FIRST TIME I

10   READ THE PAPER.  THAT WAS A STRIKING DIFFERENCE, BECAUSE YOU

11   JUST NEVER SEE REPORTS WRITTEN LIKE THAT.

12           AS SOMEBODY WHO DOES EPIDEMIOLOGY, YOU WORK WITH

13   STATISTICS; WOULD THAT BE FAIR TO SAY?

14   **A.**   YES.

15   **Q.**   AND IN DOING SO, DOES THE MANNER IN WHICH YOU CONVEY

16   STATISTICS, YOU PRESENT STATISTICS, CAN THAT SOMETIMES CONVEY A

17   MESSAGE ABOUT WHAT THE STATISTICS MEAN?

18   **A.**   YES.  IN FACT, THERE'S A WHOLE SECTION IN MY BOOK ABOUT

19   WHAT'S CALLED FRAMING OF RISK INFORMATION.  AND IT'S BEEN WELL

20   KNOWN, AND THERE -- THERE ARE GROUPS AT STANFORD, AND, IN FACT,

21   THE NOBEL PRIZE WAS AWARDED IN ECONOMICS ON THIS TOPIC -- THAT

22   HOW YOU FRAME A QUESTION CAN OFTEN DRIVE THE KIND OF ANSWER

23   THAT YOU GET OR THE KIND OF BELIEF THAT SOMEBODY HAS.

24           SO IF YOU SAY THAT "HERE'S AN OPERATION THAT WORKS 95

25   PERCENT OF THE TIME.  DO YOU WANT TO HAVE THAT OPERATION?" YOU

1   GET A DIFFERENT ANSWER THAN IF YOU SAY "5 PERCENT WHO HAVE

2   THIS -- OF THE PEOPLE WHO HAVE THIS OPERATION WILL GET NO

3   BENEFIT FROM IT."

4           AND SIMILARLY -- AND WE THINK A LOT ABOUT FRAMING

5   WHEN WE DO OUR PROGRAMS TO PRESENT INFORMATION TO DOCTORS ABOUT

6   CHOICES, AND WHAT YOU WANT TO DO IS HAVE THE FRAMING BE AS

7   NEUTRAL AS POSSIBLE AND LET THE DATA SPEAK FOR THEMSELVES.

8           IF YOU FRAME THE VIGOR STUDY AS NAPROXEN REDUCES THE

9   RISK OF HEART ATTACK INSTEAD OF FRAMING IT AS THERE WERE FIVE

10  TIMES MORE PEOPLE WHO WERE GIVEN VIOXX WHO HAD HEART ATTACKS

11  THAN PEOPLE GIVEN NAPROXEN, IT CREATES A VERY DIFFERENT SENSE

12  OF THE RISKINESS OF THE DRUG TO THE DOCTOR.

13  **Q.**   DOCTOR, HAVING READ THE PAPER -- AND I WOULD TURN YOUR

14  ATTENTION TO THE LAST PAGE OF THE PAPER, AND ACTUALLY THE PAGE

15  BEFORE, THE LAST PARAGRAPH.

16  **A.**   YES.

17  **Q.**   -- DOES IT DISCUSS THE CARDIOVASCULAR FINDINGS IN VIGOR IN

18  THAT SECTION OF THE PAPER?

19  **A.**   YES.

20  **Q.**   OKAY.  WHAT, IF ANYTHING, DOES THE PAPER SAY ABOUT

21  NAPROXEN AND THE ROLE OF NAPROXEN IN HEART DISEASE?

22  **A.**   OKAY.  AT THE VERY BOTTOM OF PAGE 1526, THE LAST TWO

23  WORDS, "THUS OUR," AND THEN IT GOES ON TO 1527, "THUS OUR

24  RESULTS ARE CONSISTENT WITH THE THEORY THAT NAPROXEN HAS A

25  CORONARY PROTECTIVE EFFECT AND HIGHLIGHT THE FACT THAT

1   ROFECOXIB DOES NOT PROVIDE THIS KIND OF PROTECTION OWING TO ITS

2   SELECTIVE INHIBITION OF CYCLOOXYGENASE 2, OR COX-2, AT ITS

3   THERAPEUTIC DOSE AND AT HIGHER DOSES."

4   **Q.**   DOCTOR, HAVING REVIEWED THE ENTIRETY OF THE PAPER, BUT

5   LOOKING AT THIS PARTICULAR STATEMENT AS WELL, DID MERCK AND THE

6   MERCK AUTHORS ON THIS PAPER EVER COMMUNICATE THAT THERE WAS A

7   POTENTIAL FOR AN INCREASED RISK OF HEART ATTACKS RELATED TO

8   THIS USE OF VIOXX AS OPPOSED TO A DECREASED RISK ASSOCIATED

9   WITH THE CARDIOPROTECTIVENESS OF NAPROXEN?

10   **A.**   I DON'T THINK THERE IS ANYTHING IN THE PAPER THAT SUGGESTS

11   THAT VIOXX INCREASES THE RISK OF HEART ATTACK.

12   **Q.**   DID YOU HAVE ANY CONCERNS ABOUT THE WAY IN WHICH THIS

13   PARTICULAR ARTICLE WAS WRITTEN IN TERMS OF THE ACCURATE

14   PRESENTATION OF THE POTENTIAL BENEFITS AND THE POTENTIAL RISKS?

15   **A.**   YES.  AS SOMEONE WHO THINKS ABOUT DRUG BENEFITS AND RISKS

16   AND PATTERNS OF USE OF DRUGS AND HAS WRITTEN ABOUT THE

17   PRESENTATION OF RISK DATA TO PHYSICIANS, I WAS CONCERNED THAT

18   IT DID NOT SEEM TO BE AN ACCURATE WAY OF PRESENTING THE RISKS;

19   AND, IN FACT, IT WAS -- I THINK THE TERM THAT THE MERCK PEOPLE

20   MIGHT HAVE USED WAS "FLIPPED" FROM THE WAY THAT ONE WOULD

21   NORMALLY PRESENTED RISK INFORMATION.

22   **Q.**   LET ME ASK YOU THIS QUESTION, DOCTOR:  A REASONABLE AND

23   PRUDENT COMPANY PRESENTING THE RISKS AND THE BENEFITS --

24   POTENTIAL RISKS AND BENEFITS OF A DRUG, USING EVIDENCE-BASED

25   MEDICINE, DOES THIS COMPORT WITH WHAT IS EXPECTED OF

1  PHARMACEUTICAL COMPANIES IN DOING THAT?

2  **A.**   WELL, AS SOMEONE WHO REVIEWS PAPERS FOR THE *NEW ENGLAND*

3  *JOURNAL OF MEDICINE* AND *JAMA*, AND ALSO RUNS PROGRAMS ABOUT

4  COMMUNICATION OF RISKS AND BENEFITS TO PHYSICIANS AND HAS

5  WRITTEN A BOOK ABOUT THAT TOPIC, I DON'T FEEL THAT THIS WAS A

6  FAIR WAY OF PRESENTING THE DATA.

7          I THINK A FAIR WAY WOULD HAVE BEEN TO SAY, IN

8  ESSENCE, THE GOOD NEWS IS OUR DRUG SEEMS TO CAUSE LESS

9  GASTROINTESTINAL PROBLEMS; THE BAD NEWS IS IT DOESN'T WORK ANY

10  BETTER OR ANY WORSE THAN THE COMPARISON DRUG IN TERMS OF BEING

11  A PAIN-RELIEVER;" AND THE REALLY BAD NEWS IS THAT THE PEOPLE

12  GIVEN OUR DRUG HAD FIVE TIMES MORE HEART ATTACKS THAN THE

13  PEOPLE GIVEN THE COMPARISON DRUG."  I THINK THAT WOULD HAVE

14  BEEN A FAIR AND NEUTRAL PRESENTATION OF THE GOOD AND BAD NEWS

15  THAT CAME OUT OF THIS STUDY.

16  **Q.**   NOW, DOCTOR, DID THERE COME A TIME WHERE YOU HAD CONTACT

17  WITH MERCK OFFICIALS ABOUT THE RESULTS OF VIGOR?

18  **A.**   YES.

19  **Q.**   WHO IS LOU SHERWOOD?

20  **A.**   LOU SHERWOOD WAS ACTUALLY A PHYSICIAN AT THE BETH ISRAEL

21  HOSPITAL IN BOSTON, ANOTHER ONE OF THE HARVARD TEACHING

22  HOSPITALS, AT AROUND THE SAME TIME THAT I WAS THERE.  HE WAS IN

23  ACADEMICS BEFORE HE WENT TO WORK FOR MERCK.  AND I KIND OF KNEW

24  HIM A LITTLE BIT AROUND THOSE YEARS, AND WE HAD BEEN IN SOME

25  MEETINGS TOGETHER IN THE INTERVENING YEARS.

1          AND AROUND JANUARY OF 2000, I WAS ASKED BY THE

2    CHAIRMAN OF OUR DEPARTMENT OF MEDICINE TO SET UP A WEEKLY

3    LECTURE THAT WOULD BE ABOUT CONTROVERSIES IN PHARMACEUTICALS.

4    AND THEY ASKED ME TO MODERATE IT AND TO PICK THE PRESENTERS.

5    SO I THOUGHT IT WOULD BE FAIR TO PICK SOMEBODY FROM THE

6    PHARMACEUTICAL INDUSTRY AND SOMEBODY FROM AN HMO WHO WOULD BE

7    CRITICAL OF THE PHARMACEUTICAL INDUSTRY AND HAVE THEM DISCUSS

8    ISSUES ABOUT MEDICATIONS.

9          AND I IDENTIFIED DR. SHERWOOD AS SOMEBODY WHO HAD

10   BEEN AN EX-ACADEMIC, WHO WAS KNOWN TO ME, AND WHO WAS NOW IN A

11   SENIOR POSITION WITH A DRUG COMPANY.  AND I ASKED LOU TO COME

12   AND BE THE PHARMACEUTICAL COMPANY GUY, AND I ASKED SOMEBODY

13   FROM ONE OF THE HMOS IN BOSTON TO BE THE CRITICAL GUY.  AND IT

14   WAS A VERY STIMULATING DISCUSSION, WHICH I WAS JUST KIND OF THE

15   REFEREE FOR.

16         AND THEN AFTERWARDS WE ARRANGED TO HAVE DR. SHERWOOD

17   MEET WITH ME AND MEMBERS OF MY DIVISION TO TALK ABOUT MATTERS

18   OF MUTUAL INTEREST:  OUR WORK ON DRUGS; HIS WORK AT MERCK.  AND

19   SINCE THIS WAS WITHIN A BRIEF NUMBER OF WEEKS AFTER THE VIGOR

20   STUDY HAD COME OUT.

21         BECAUSE DR. SOLOMON, WHO IS MY COLLEAGUE, WHO IS A

22   RHEUMATOLOGIST AS WELL AS AN EPIDEMIOLOGIST, WAS THERE, THE

23   CONVERSATION TURNED TO VIGOR AND OF MY NOTING THAT IT WAS A

24   DISTURBING FINDING THAT THERE WAS THIS DRAMATIC INCREASE IN THE

25   NUMBER OF PEOPLE WHO HAD HEART ATTACKS IN THE VIGOR GROUP -- IN

1   THE VIOXX GROUP, I'M SORRY.

2           AND I WAS SOMEWHAT TAKEN ABACK BECAUSE DR. SHERWOOD

3   SAID, "OH, THAT'S JUST BECAUSE NAPROXEN PREVENTS HEART

4   ATTACKS."

5           AND I REMEMBER ASKING AT THE TIME, "WELL, HOW DO WE

6   KNOW THAT, AND IS THAT SOMETHING THAT SHOULD BE STUDIED OR

7   TESTED?"  AND HE KIND OF DISMISSED IT, WELL, YOU KNOW, IT'S

8   SORT OF AN OBVIOUS FINDING AND THAT'S WHAT WAS SAID IN THE

9   PAPER AND THERE WAS REALLY NOTHING MORE TO BE DISCUSSED.

10  **Q.**   DOCTOR, AT THE TIME YOU WERE HAVING THIS CONVERSATION WITH

11  DR. SHERWOOD, DID YOU -- WERE YOU IN THE PROCESS OF DOING ANY

12  RESEARCH ON THE ISSUE OF THE EFFECT OF NSAIDS ON THE HEART?

13  **A.**   YES.  AS A MATTER OF FACT, DR. SOLOMON AND MY DIVISION AND

14  I HAD ALREADY BECAME INTERESTED IN THIS QUESTION OF REGULAR

15  NONSTEROIDALS AND THE HEART, AND WE REALIZED THAT THERE WAS

16  ESSENTIALLY NO LITERATURE OUT THERE IN HUMANS THAT SUGGESTED

17  THAT THE OLDER NONSTEROIDALS LIKE NAPROXEN OR MOTRIN OR

18  IBUPROFEN CAN PROTECT THE HEART.  AND DR. SOLOMON AND I DECIDED

19  IT WOULD BE INTERESTING TO LOOK AT WHETHER THAT WAS SOMETHING

20  YOU COULD FIND.

21          IF THERE WAS SUCH A MASSIVE PROTECTIVE EFFECT OF

22  NAPROXEN AS WAS FOUND IN VIGOR, YOU'D THINK THAT YOU WOULD BE

23  ABLE TO FIND THAT IN A STUDY LOOKING AT TENS OF THOUSANDS OF

24  PEOPLE.  AND WE HAVE DATABASES IN OUR DIVISION IN WHICH WE HAVE

25  INFORMATION ABOUT MEDICATION USE AND HOSPITALIZATIONS AND

1   DOCTOR VISITS FOR HUNDREDS OF THOUSANDS OF PEOPLE, ALTHOUGH WE

2   HAVE THEIR NAMES AND IDENTIFIERS STRIPPED OFF.  BUT WE CAN LOOK

3   AT ALL OF THE PEOPLE WHO WERE PRESCRIBED ANY DRUG AND SEE IF

4   THEIR RATE OF HEART ATTACKS WAS HIGHER OR LOWER THAN THE RATE

5   OF HEART ATTACKS OF PEOPLE EITHER NOT TAKING THAT DRUG OR

6   TAKING ANOTHER DRUG.

7           AND SO I BELIEVE WE HAD BEEN TALKING ABOUT THAT

8   THROUGHOUT 2000.  OUR INTEREST IN IT WAS INCREASED IN THE

9   SPRING OF 2000 WHEN THE INITIAL VIGOR FINDINGS WERE RELEASED.

10  AND THEN, OF COURSE, WHEN THEY WERE PUBLISHED IN THE *NEW*

11  *ENGLAND JOURNAL* IN 2000, WE DECIDED THAT THIS WAS DEFINITELY

12  SOMETHING THAT WE WANTED TO PROCEED ON JUST BECAUSE IT SEEMED

13  LIKE AN IMPORTANT QUESTION.  IF NAPROXEN WAS THAT GREAT AND NO

14  ONE HAD EVER DISCOVERED IT BEFORE, MAYBE THAT WOULD BE

15  SOMETHING THAT WAS WORTH KNOWING.

16  **Q.**   AND DID YOU DO THAT STUDY?

17  **A.**   YES, WE DID.

18  **Q.**   DID YOU PERFORM WHAT WE CALL AN EPIDEMIOLOGIC STUDY, THAT

19  STUDIED THE QUESTIONS OF NAPROXEN'S EFFECT ON THE HEART?

20  **A.**   YES, WE DID.

21  **Q.**   AND, IN FACT, DID YOU PUBLISH A STUDY -- THE STUDY RESULTS

22  THAT CAME OUT OF THIS EPIDEMIOLOGIC STUDY THAT WE JUST TALKED

23  ABOUT?

24  **A.**   YES, WE DID.

25  **Q.**   AND IT'S ALL RIGHT, JUST FOR THE PURPOSES OF THIS

1    DEPOSITION -- I KNOW YOU STUDIED A LOT OF DRUGS IN THE CONTEXT

2    OF THAT PARTICULAR STUDY -- IF I CALL IT THE NAPROXEN STUDY?

3    **A.**    THAT'S FINE.

4    **Q.**    OKAY.  DID YOU -- YOU PUBLISHED IT.  DO YOU REMEMBER WHERE

5    IT WAS PUBLISHED, DOCTOR?

6    **A.**    IT WAS PUBLISHED IN THE *ARCHIVES OF INTERNAL MEDICINE* IN

7    2002, IN MAY OF 2002.

8    **Q.**    ARE YOU THE SENIOR AUTHOR ON THE PAPER?

9    **A.**    THAT'S RIGHT.

10   **Q.**    AND WHAT, IF ANY, CONCLUSIONS DID YOU AND DR. SOLOMON

11   REACH REGARDING NAPROXEN?

12   **A.**    WELL, OVERALL, WE FOUND THAT NONSTEROIDALS IN GENERAL,

13   LIKE MOTRIN AND SO FORTH, TAKEN AS A GROUP, DID NOT SEEM TO

14   HAVE ANY IMPORTANT PROTECTIVE EFFECT ON THE HEART.  BUT WHEN

15   YOU LOOKED AT NAPROXEN SEPARATELY, IT HAD A VERY MODEST

16   REDUCTION IN THE RISK OF HEART DISEASE IN PEOPLE WHO TOOK IT

17   COMPARED TO THE COMPARISON PATIENTS WHO WERE SIMILAR IN ALL

18   OTHER WAYS; THAT IS, THERE WAS ABOUT A 16 PERCENT REDUCTION IN

19   THE RISK OF HEART ATTACK, WHICH IS A PRETTY SMALL REDUCTION.

20   **Q.**    DID YOU ADDRESS THE FINDINGS OF VIGOR IN THE CONTEXT OF

21   THIS ARTICLE?

22   **A.**    YES, WE DID.

23   **Q.**    WOULD YOU PLEASE GO TO THE SECTION WHERE THAT IS

24   ADDRESSED.  AND IF YOU GO DOWN TO THE LAST PARAGRAPH, I THINK

25   THAT'S WHERE THAT IS.

1    A.   YES, RIGHT.  IN THE END OF THE DISCUSSION, "TO PLACE THE

2    EFFECT OF NAPROXEN IN PERSPECTIVE, IN A LARGE RANDOMIZED TRIAL

3    OF DAILY ASPIRIN USE IN PRIMARY PREVENTION, PATIENTS IN THE

4    INTERVENTION ARM EXPERIENCED A 44 PERCENT REDUCTION IN THE RISK

5    OF ACUTE MYOCARDIAL INFARCTION," OR HEART ATTACK.  "THEREFORE,

6    IT WOULD BE FALSE TO EQUATE THE MORE MODEST EFFECT OF

7    NAPROXEN" -- THAT IS, A 16 PERCENT REDUCTION, AS COMPARED TO A

8    44 PERCENT REDUCTION.  "IT WOULD BE FALSE TO EQUATE THE MORE

9    MODEST EFFECT OF NAPROXEN SUGGESTED IN THIS STUDY WITH THE

10   CARDIOPROTECTION AFFORDED BY ASPIRIN."

11   Q.   WOULD YOU TELL THE MEMBERS OF THE JURY IN A VERY SIMPLE

12   WAY WHAT YOU WERE SAYING THERE ABOUT THE VIGOR STUDY?

13   A.   YES.  WHAT WE SAID IN THAT PAPER THAT CAME OUT IN 2002 WAS

14   THAT THE VERY, I GUESS YOU COULD SAY, WIMPY EFFECT OF NAPROXEN

15   IN PROTECTING THE HEART OF JUST REDUCING THE RATE BY 16 PERCENT

16   WAS NO WAY BIG ENOUGH TO ACCOUNT FOR WHAT WOULD HAVE HAD TO

17   HAVE BEEN AN 80 PERCENT REDUCTION IN RISK TO GIVE YOU THAT

18   5-TO-1 DIFFERENCE THAT WAS SEEN BETWEEN VIOXX AND NAPROXEN IN

19   THE VIGOR STUDY.

20        NAPROXEN WOULD HAVE HAD TO HAVE BEEN THE MOST MAGICAL

21   DRUG TO PROTECT YOUR HEART THAT WAS EVER INVENTED, AND WE

22   DIDN'T FIND THAT.

23   Q.   AND YOU WROTE THIS IN 2002; CORRECT?

24   A.   RIGHT.

25   Q.   AND WAS THAT BEFORE YOU AND I HAD EVER MET ON THE ISSUE OF

DAILY COPY

1  VIOXX?

2  **A.**   RIGHT.  AND IN FACT, LET ME LOOK AT THE -- IN FACT, THE

3  PAPER, IT SAYS LOWER ON THAT PAGE, WAS ACCEPTED FOR PUBLICATION

4  IN JANUARY 31, 2002, WHICH MEANT THAT WE WOULD HAVE WRITTEN IT

5  IN 2001.

6  **Q.**   AND IS THIS CONSISTENT WITH YOUR REACTION TO

7  DR. SHERWOOD'S COMMENT ABOUT THE EFFECT OF NAPROXEN IN EARLY

8  2001?

9  **A.**   THAT'S RIGHT.

10  **Q.**   OKAY.  DOCTOR, WAS THE RESULTS OF THIS PAPER ACTUALLY

11  PRESENTED BEFORE IT WAS ACTUALLY PUBLISHED?

12  **A.**   YES, IT WAS.  DR. SOLOMON PRESENTED THEM AT THE

13  INTERNATIONAL SOCIETY FOR PHARMACOEPIDEMIOLOGY MEETINGS.

14  **Q.**   THE INTERNATIONAL SOCIETY FOR PHARMACOEPIDEMIOLOGY, IS

15  THAT -- IS THAT THE INTERNATIONAL SOCIETY THAT YOU HAD BEEN A

16  PRESIDENT OF?

17  **A.**   THAT'S RIGHT.

18  **Q.**   OKAY.  AND DO YOU REMEMBER, ACTUALLY, THAT PRESENTATION?

19  **A.**   YES.

20  **Q.**   AND WHO MADE THE PRESENTATION?

21  **A.**   DR. SOLOMON DID.

22  **Q.**   DO YOU REMEMBER WHEN IT WAS IN RELATIONSHIP TO THIS PAPER?

23  **A.**   YES.  THE MEETINGS OCCUR IN AUGUST.  SO GIVEN THAT WE

24  FINISHED THE PAPER IN -- IN LATE '01, THIS WOULD HAVE BEEN THE

25  AUGUST '01 PRESENTATION.

1   **Q.**   OKAY.  DO YOU RECALL -- DO YOU HAVE ANY SPECIFIC

2   RECOLLECTION WHETHER THERE WERE ANY PEOPLE FROM MERCK IN THE

3   AUDIENCE TO HEAR THE PRESENTATION ON YOUR NAPROXEN STUDY?

4   **A.**   YES, THERE WERE.

5   **Q.**   OKAY.  DO YOU REMEMBER WHO WAS IN THE AUDIENCE FROM MERCK

6   ON --TO HEAR YOUR PRESENTATION ABOUT THE EFFECT OF NAPROXEN?

7   **A.**   ONE PERSON I REMEMBER CLEARLY, BECAUSE WE TALKED ABOUT IT

8   RIGHT AT THE END OF THE PRESENTATION, WAS DR. HARRY GUESS, WHO

9   AT THAT TIME WAS THE HEAD OF EPIDEMIOLOGY AT MERCK.

10  **Q.**   WHAT, IF ANYTHING, WAS PRESENTED TO THE AUDIENCE,

11  INCLUDING DR. GUESS, ABOUT THE LIKELIHOOD OF VIOXX BEING

12  CARDIOTOXIC AS A RESULT OF YOUR STUDY WHICH YOU PRESENTED?

13  **A.**   IN THE PRESENTATION, I RECALL THAT DR. SOLOMON -- BECAUSE

14  CLEARLY WHAT WAS INTERESTING WAS WHAT DOES THIS MEAN ABOUT THE

15  VIGOR FINDINGS.  AND I RECALL THAT DR. SOLOMON SAID ESSENTIALLY

16  WHAT IS IN THE PAPER THAT WE LATER WROTE ON THAT TOPIC LATER

17  THAT YEAR, THAT WE HAD FOUND ONLY A VERY SMALL EFFECT, ABOUT

18  16 PERCENT, OF REDUCTION FROM NAPROXEN, AND THAT THAT MADE IT

19  UNLIKELY THAT NAPROXEN WAS THE REASON THAT -- A

20  CARDIOPROTECTIVE EFFECT OF NAPROXEN WAS THE REASON TO EXPLAIN

21  THIS FIVEFOLD INCREASE IN HEART ATTACKS IN THE VIOXX GROUP OF

22  PATIENTS IN THE VIGOR STUDY, COMPARED TO THE NAPROXEN GROUP OF

23  PATIENTS; AND THAT, THEREFORE, THE ONLY OTHER POSSIBLE

24  EXPLANATION WAS, IF IT WASN'T THAT NAPROXEN WAS PREVENTING

25  HEART ATTACKS, THE ONLY OTHER LOGICAL POSSIBILITY WAS THAT

1    VIOXX WAS CAUSING HEART ATTACKS.

2    **Q.**    AND THIS WAS IN MID-2001?

3    **A.**    THE PRESENTATION WAS IN AUGUST OF 2001, AND WE FINISHED

4    THE WORK -- ACTUALLY, WE FINISHED THE WORK THAT SUMMER.

5    **Q.**    OKAY.  AND YOU PERSONALLY SPOKE TO DR. GUESS ABOUT THIS --

6    ABOUT THESE RESULTS?

7    **A.**    YES.  THE REASON I SPOKE WITH DR. GUESS WAS THAT

8    DR. SOLOMON HAD BEEN IN TOUCH WITH DR. CANNUSCIO AT MERCK SINCE

9    ACTUALLY THE BEGINNING OF 2001, BECAUSE HE HAD INDICATED TO HER

10   THAT HE THOUGHT THIS WAS A -- THAT THERE WAS AN ISSUE WHICH WE

11   HAD BEEN DISCUSSING IN OUR DIVISION THAT THIS NEEDED TO BE

12   STUDIED SUBSEQUENT TO THE VIGOR PAPER, AND I INSTRUCTED

13   DR. SOLOMON TO SEE WHETHER THIS WAS SOMETHING WHICH A STUDY

14   COULD BE FUNDED BY ANYBODY.

15          AND ONE OF THE DIFFICULTIES ABOUT ADVERSE EFFECTS

16   RESEARCH IS THAT FDA DOESN'T HAVE HARDLY ANY MONEY TO SPEND ON

17   THEM, AND THE NATIONAL INSTITUTES OF HEALTH DOESN'T SPEND THAT

18   MUCH MONEY ON THEM.  AND OFTEN, IF YOU'RE A SCIENTIST STUDYING

19   DRUG SIDE EFFECTS, AS WE ARE, ONE NEEDS TO GO TO THE

20   MANUFACTURER OF THE DRUG AND SAY, "WE THINK THIS IS AN

21   IMPORTANT ISSUE IN RELATION TO THE DRUG THAT YOU'RE MAKING AND

22   WE WANT TO DO A STUDY."

23          AND AS I SAID EARLIER, WE'VE OFTEN HAD PERFECTLY FINE

24   RELATIONSHIPS WITH COMPANIES.  SOMETIMES A COMPANY WILL COME TO

25   US AND SAY, "WE THINK THERE MAY BE A PROBLEM WITH OUR DRUG.

1   WOULD YOU STUDY IT FOR US SO THAT WE CAN KNOW WHAT'S TRUE ABOUT

2   OUR DRUG?"  WE HAD A VERY GOOD EXPERIENCE WITH A PARKINSON'S

3   DRUG NOT LONG AGO IN THAT WAY.

4          AND SO I ASKED DR. SOLOMON TO TALK WITH PEOPLE AT

5   MERCK, AND AS IT TURNS OUT, DR. CANNUSCIO HAD RECENTLY

6   GRADUATED FROM THE HARVARD SCHOOL OF HEALTH ON -- IN

7   EPIDEMIOLOGY AND WENT TO WORK FOR MERCK.  SO SHE WAS KIND OF A

8   CONDUIT FOR OUR COMMUNICATIONS WITH MERCK.

9          AND NOTHING HAD COME OF THOSE DISCUSSIONS, EVEN

10  THOUGH HE WAS TRYING HARD.  AND SO I TOOK DR. GUESS ASIDE, AS

11  DR. CANNUSCIO'S BOSS AT THAT PHARMACOEPI MEETING IN AUGUST OF

12  2001, AND I -- SORT OF CHIEF TO CHIEF, AND I SAID, "HARRY, MY

13  GUY HAS BEEN TALKING TO YOUR PERSON, AND IT DOESN'T SEEM TO BE

14  GETTING ANYWHERE.  WE THINK THIS ISSUE IS IMPORTANT."

15         AND WE NOW CAN STUDY VIOXX AS WELL AS NAPROXEN,

16  BECAUSE WHEN WE FIRST DID THIS STUDY, VIOXX WAS NEW ENOUGH ON

17  THE MARKET THAT THERE WEREN'T ENOUGH PEOPLE ACTUALLY TAKING IT

18  FOR US TO ABLE TO DO A BIG POPULATION STUDY.  BUT BY THE TIME

19  IT WAS GETTING TO BE THE SUMMER OF 2001, IT WAS BEING VERY

20  HEAVILY PROMOTED, AND THE NUMBER OF PEOPLE TAKING IT WAS ON THE

21  RISE.

22         AND I TOLD DR. GUESS THAT I THOUGHT THAT THIS REALLY

23  WAS SOMETHING THAT OUGHT TO MOVE FORWARD BECAUSE WE COULD DO A

24  STUDY VERY MUCH LIKE THE STUDY THAT WE'RE LOOKING AT NOW,

25  INSTEAD OF LOOKING AT NAPROXEN AND THE OLDER NONSTEROIDALS, WE

1   WOULD BE ABLE TO HAVE THE SAME DESIGN AND LOOK AT VIOXX AND
2   CELEBREX AS WELL AND ANSWER THAT QUESTION IN A LARGE POPULATION
3   TO TRY TO GET TO THE BOTTOM OF THIS.
4   Q.   I'M GOING TO SHOW YOU WHAT I'D LIKE TO HAVE MARKED AS
5   EXHIBIT NO. 17.  I'M GOING TO REPRESENT THAT THIS DOCUMENT CAME
6   FROM THE MERCK FILES.  IT IS BATES NO. MRK-ACC 001-8681.  IT'S
7   A MEMO FROM A GENTLEMAN BY THE NAME OF DOUG WATSON TO VARIOUS
8   PEOPLE.  THESE ARE SOME OF THE PEOPLE YOU'VE MENTIONED HERE IN
9   YOUR TESTIMONY TODAY?
10  A.   RIGHT.
11  Q.   AND IT INCLUDES SOME OF THE PAPERS -- OR ACTUALLY SOME OF
12  THE PRESENTATIONS THAT WERE MADE AT THAT MEETING IN MID-2001?
13  A.   RIGHT.
14  Q.   IF YOU'D GO TO PAGE 1 -- THE DOCUMENT THAT ENDS WITH 686,
15  IS THAT THE PAPER THAT DR. SOLOMON PRESENTED?
16  A.   YES.
17  Q.   OKAY.  AND FOLLOWING THAT IS SOME NOTES THAT DR. GUESS
18  MADE OF THAT MEETING.  DO YOU SEE THAT?
19  A.   RIGHT.  HANDWRITTEN NOTES.
20  Q.   HAVE YOU HAD AN OPPORTUNITY TO READ THIS, DOCTOR?
21  A.   YES.
22  Q.   IS THIS SOMETHING -- JUST TO BE FAIR, IS THIS SOMETHING
23  THAT I PRESENTED TO YOU -- IS THIS A DOCUMENT YOU HAD EVER SEEN
24  AT THE TIME OF YOUR INVOLVEMENT WITH VIOXX IN MID-2001?
25  A.   NO.

313

1   **Q.**   OKAY.  AND DO YOU SEE AT THE BOTTOM OF THE SECOND PAGE

2   WHERE IT SAYS, "THE CONCLUSION"?

3   **A.**   YES.

4   **Q.**   OKAY.  WOULD YOU GO TO THE NEXT PAGE, TWO PAGES DOWN,

5   PLEASE.  KEEP GOING.

6   **A.**   ACTUALLY A COUPLE MORE.

7   **Q.**   ONE MORE.  NOW, HAVE YOU READ THIS, DOCTOR?

8   **A.**   YES.

9   **Q.**   DOES THIS APPEAR TO COMPORT WITH YOUR RECOLLECTION OF

10  DR. SOLOMON'S PRESENTATION AT THAT MEETING?

11  **A.**   CORRECT.

12  **Q.**   OKAY.  WOULD YOU PLEASE READ THE CONCLUSION AS RECORDED BY

13  DR. GUESS.

14  **A.**   YES.  "NSAIDS AS GROUP, NO EFFECT.  NAPROXEN,

15  16-20 PERCENT DECREASE IN RISK.  HYPOTHESIS THAT SELECTIVE" --

16  THAT IS SELECTIVE COX-2 INHIBITORS LIKE VIOXX -- "MAY INCREASE

17  RISK."

18  **Q.**   IS THIS SOMETHING -- DOES THIS COMPORT WITH YOUR

19  RECOLLECTION OF WHAT YOU AND DR. GUESS TALKED ABOUT?

20  **A.**   ABSOLUTELY.

21  **Q.**   DID YOU CONSIDER IT IMPORTANT IN MID-2001 TO SPECIFICALLY

22  STUDY THE RELATIONSHIP BETWEEN COX-2S AND HEART ATTACKS?

23  **A.**   YES.

24  **Q.**   WHY?

25  **A.**   BECAUSE THEIR -- A COUPLE OF REASONS, THE LARGEST OF WHICH

1   WAS THE VIGOR STUDY, WHICH, AS I SAID, HAD BEEN PUBLISHED IN

2   NOVEMBER OF 2000; HAD BEEN KIND OF ANNOUNCED, THE FINDINGS, IN

3   SPRING OF 2000; AND HERE IT WAS SITTING THERE, THIS FINDING,

4   THAT FIVE TIMES MORE PEOPLE IN THE VIOXX GROUP WERE HAVING

5   HEART ATTACKS THAN PEOPLE IN THE NAPROXEN GROUP.  AND THAT

6   SEEMED LIKE AN IMPORTANT PUBLIC HEALTH ISSUE THAT SOMEBODY

7   SHOULD LOOK AT.

8   **Q.**   HOW MUCH DOES A STUDY LIKE THAT YOU DISCUSSED WITH

9   DR. GUESS COST?

10   **A.**   OH, ABOUT 5- OR $600,000.

11   **Q.**   OKAY.  AND HOW LONG DOES SUCH A STUDY TYPICALLY TAKE?

12   **A.**   IF WE PULL OUT ALL THE STOPS AND CAN PROCEED REAL QUICKLY,

13   WE CAN DO IT IN ABOUT A YEAR OR LESS.

14   **Q.**   OKAY.  I'M GOING TO SHOW YOU WHAT I'D LIKE TO HAVE MARKED

15   AS EXHIBIT NO. 18.  FOLLOWING THE MEETING, THE ISPE MEETING, IN

16   AUGUST OF 2001, DID YOU HAVE FOLLOW-UP CONTACTS WITH MERCK

17   REGARDING THE PROPOSED STUDY TO STUDY VIOXX AND HEART ATTACKS?

18   **A.**   FREQUENTLY.

19   **Q.**   OKAY.  WHEN YOU SAY "FREQUENTLY," WHAT DO YOU MEAN?

20   **A.**   THAT THERE WAS ONGOING DISCUSSION FROM -- REALLY, FROM THE

21   BEGINNING OF 2001.  I BELIEVE THAT IT WAS FEBRUARY OF 2001,

22   WHEN I ASKED DR. SOLOMON TO BEGIN THOSE CONVERSATIONS, THROUGH

23   UNTIL ACTUALLY THE PUBLICATION OF THE PAPER IN 2004.

24   **Q.**   AND IS THIS A E-MAIL THAT YOU RECALL?

25   **A.**   YES.

1  **Q.**    OKAY.  DID YOU HAVE ANY ROLE IN THIS E-MAIL EXCHANGE?

2  **A.**    YES.  I URGED DR. SOLOMON, OR INSTRUCTED DR. SOLOMON, TO

3  PLEASE MOVE THINGS ALONG AS BEST HE COULD WITH MERCK; ONCE

4  THERE WAS AN EXPRESSION OF INTEREST IN SUCH A STUDY, TO PLEASE

5  GET IT FINALIZED SO THAT WE COULD ACTUALLY GET THE FUNDING WE

6  NEEDED TO DO THE WORK.

7  **Q.**    OKAY.  COULD YOU PLEASE GO DOWN TO THE E-MAIL FROM

8  DR. SOLOMON.  FIRST OF ALL, IS THAT AN E-MAIL THAT YOU RECEIVED

9  IN THE NORMAL COURSE OF BUSINESS?

10  **A.**    YES.  IT WAS CC'D TO ME.

11  **Q.**    OKAY.  IS THIS AN E-MAIL THAT YOU DIRECTED DR. SOLOMON TO

12  SEND TO MERCK?

13  **A.**    YES.

14  **Q.**    AND WOULD YOU PLEASE -- WHO WAS IT SENT TO?

15  **A.**    IT WAS SENT BY DR. SOLOMON TO DR. CANNUSCIO, WHO, AS I

16  MENTIONED, WAS THE EPIDEMIOLOGIST WHO HAD TRAINED IN OUR

17  NEIGHBORHOOD AND THEN WENT TO WORK AS A MERCK STAFFER.

18  **Q.**    OKAY.  AND WOULD YOU PLEASE READ FOR THE RECORD WHAT

19  DR. SOLOMON, AT YOUR DIRECTION, TOLD DR. CANNUSCIO?

20  **A.**    SURE.  SO THIS IS SEPTEMBER OF 2001, WHICH WOULD HAVE BEEN

21  ABOUT A MONTH AFTER THE PHARMACOEPI MEETING IN WHICH I SPOKE TO

22  DR. GUESS AND DR. SOLOMON PRESENTED OUR FINDINGS, AND ABOUT

23  EIGHT MONTHS OR -- SEVEN OR EIGHT MONTHS AFTER HE HAD INITIATED

24  HIS FIRST CONTACT WITH DR. CANNUSCIO.

25           IT SAYS, "DEAR CAROL, I WAS PLEASED TO HEAR LAST WEEK

1    THAT MERCK IS INDEED PREPARED TO MOVE FORWARD WITH SUPPORT OF

2    OUR STUDY ON NSAIDS, COX-2S," INCLUDING VIOXX, "AND MI," WHICH

3    IS HEART ATTACK.  "BUT AS I MENTIONED WHEN WE SPOKE, AFTER SO

4    MANY MONTHS, WE REALLY NEED AT LEAST AN E-MAIL NOTE FROM YOU

5    INDICATING THAT THE COMMITMENT IS TRULY THERE.  WE WILL NEED TO

6    FOREGO OTHER POSSIBLE SOURCES OF SUPPORT FOR THIS PROJECT TO

7    WORK WITH MERCK; AND GIVEN HOW LONG IT HAS TAKEN THUS FAR,

8    WE'RE NERVOUS ABOUT REJECTING OTHER POSSIBILITIES WITHOUT ANY

9    WRITTEN INDICATION OF COMMITMENT."

10   **Q.**   LET ME STOP YOU THERE, DOCTOR.  WHAT WAS YOUR -- WHAT WAS

11   YOUR PURPOSE OF WRITING THIS TO DR. CANNUSCIO?

12   **A.**   I TOLD DR. SOLOMON TO ESSENTIALLY, AFTER SO MANY MONTHS,

13   FROM FEBRUARY TO BE SEPTEMBER, PARTICULARLY ON THE HEELS OF THE

14   MEETING WITH DR. GUESS IN AUGUST, TO BASICALLY TELL THEM TO

15   FISH OR CUT BAIT; THAT I FELT THIS WAS AN IMPORTANT PROJECT TO

16   DO; THAT THERE WERE IMPORTANT CLINICAL AND PUBLIC HEALTH ISSUES

17   AT STAKE; AND THAT WE HAD BEEN WORKING ALONG WITH MERCK, OR

18   TRYING TO, BASED ON THEIR INDICATING TO US THAT THEY WERE KIND

19   OF INTERESTED IN SUPPORTING THE STUDY.

20           BUT SO MANY MONTHS LATER, I TOLD DR. SOLOMON TO WRITE

21   A NOTE SAYING, "LOOK, IF YOU-GUYS AREN'T GOING TO REALLY FUND

22   THIS STUDY, WE NEED TO KNOW THAT SO WE CAN LOOK FOR FUNDING

23   FROM SOMEWHERE ELSE."  SINCE WE DON'T LIKE TO PEDDLE THE SAME

24   STUDY TO A LOT OF DIFFERENT PEOPLE AND HOPE THAT SOMEBODY WILL

25   ACCEPT IT.  SO IT WAS BASICALLY A -- I ASKED HIM TO WRITE A

1   "FISH OR CUT BAIT" MEMO TO MERCK.

2   **Q.**   AND THAT'S WHAT THIS MEMO WAS?

3   **A.**   YES.

4             **THE COURT:**  MAY I SEE COUNSEL A MINUTE?

5             (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH,

6   OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

7   **BY MR. ROBINSON:**

8   **Q.**   WHAT WAS DR. CANNUSCIO'S RESPONSE TO YOUR "FISH OR CUT

9   BAIT" MEMO, AS YOU CALLED IT?

10  **A.**   THE NOTE THAT SHE SENT TO BOTH DR. SOLOMON AND TO ME ON

11  SEPTEMBER 17, ABOUT TWO HOURS AFTER DR. SOLOMON'S NOTE TO HER,

12  WAS THAT THEY -- SHE HAD -- WE -- CAN'T REMEMBER WHO "WE" WAS,

13  BUT SOMEBODY AT MERCK HAD PRESENTED THE IDEA OF THE STUDY THAT

14  WE HAD PROPOSED TO SEVERAL GROUPS WITHIN MERCK AND THAT SHE

15  SAID THAT THERE WAS INTEREST IN WORKING WITH US TO DEVELOP A

16  COMPLETE PROTOCOL, PRESENT THE DETAILED PROTOCOL TO MERCK'S

17  SCIENTIFIC REVIEW COMMITTEE, AND TO BASICALLY DISCUSS HAVING A

18  CONTRACT.

19            AND THEN SHE MENTIONED IN THAT LAST PARAGRAPH, "I

20  HAVE SPOKEN WITH HARRY GUESS, WHO HEADS THE EPIDEMIOLOGY

21  DEPARTMENT.  THOUGH HARRY AND I ARE NOT AUTHORIZED TO FINALIZE

22  A CONTRACT TO SUPPORT A RESEARCH PROJECT OF THIS SCALE, WE WISH

23  TO AFFIRM OUR INTEREST IN PURSUING WITH YOU THE STEPS OUTLINED

24  ABOVE."

25            AND SO, BASICALLY, IT WAS AN AGREEMENT TO HAVE

1    FURTHER DISCUSSIONS ABOUT HAVING AN AGREEMENT.

2    **Q.**    OKAY.  DOCTOR, AT ABOUT THE TIME THAT YOU WERE INVOLVED

3    WITH THE DISCUSSIONS WITH DR. CANNUSCIO, WERE YOU AWARE THAT

4    THE COMPANY WAS IN DISCUSSIONS WITH THE FOOD & DRUG

5    ADMINISTRATION ABOUT WHAT WOULD GO INTO THE LABEL ON THE

6    RESULTS OF VIGOR?

7    **A.**    NO.

8    **Q.**    DOCTOR, I DID PROVIDE YOU A -- MATERIAL THAT WAS SENT TO

9    THE FOOD & DRUG ADMINISTRATION.  HAVE I SHOWED YOU THIS BEFORE

10   TODAY'S DEPOSITION?

11   **A.**    YES.

12   **Q.**    HAVE YOU HAD AN OPPORTUNITY TO TAKE A LOOK AT IT?

13   **A.**    YES.

14   **Q.**    IS THIS A LETTER THAT WAS SENT TO THE FOOD & DRUG --

15   APPEAR TO BE A LETTER SENT TO THE FOOD & DRUG ADMINISTRATION,

16   IN PART REFERRING TO YOUR STUDY RESULTS ON THE NAPROXEN STUDY?

17   **A.**    YES.  IT WAS SENT BY MERCK BY DR. SILVERMAN, I BELIEVE.

18   **Q.**    OKAY.  CAN YOU TURN TO PAGE 3 OF THAT COVER LETTER THAT

19   WAS SENT TO THE FOOD & DRUG ADMINISTRATION.  OKAY.  AND THE TOP

20   PART OF IT REFERS TO THROMBOTIC CARDIOVASCULAR DATA AND HAS

21   SOME DISCUSSION ABOUT THE VIGOR STUDY.  DO YOU SEE THAT,

22   DOCTOR?

23   **A.**    YES.

24   **Q.**    OKAY.  IF YOU'D GO DOWN TO THE SECOND FULL PARAGRAPH --

25   **A.**    YES.

DAILY COPY

1   **Q.**    -- IS THERE A REFERENCE TO YOUR STUDY?

2   **A.**   YES, THERE IS.

3   **Q.**   OKAY.  WOULD YOU TELL US WHERE THAT IS, DOCTOR?

4   **A.**   YES.  THAT WOULD BE BEGINNING ON LINE 4, THE LAST WORD OF

5   THE LINE, "THE."

6   **Q.**   OKAY.

7   **A.**   SHALL I READ IT?

8   **Q.**   YES.  SURE.

9   **A.**   "THE CONCEPT THAT THERE ARE DIFFERENCES AMONG NSAIDS IS

10  SUPPORTED BY EXTERNAL EPIDEMIOLOGIC DATA FROM THREE DIFFERENT

11  STUDIES THAT UTILIZE DIFFERENT CLINICAL BASES, INCLUDING THAT

12  THE USE OF NAPROXEN, BUT NOT OTHER NSAIDS, IS

13  CARDIOPROTECTIVE."

14          AND THEN ITS REFERENCE IS TWO, THREE, AND FOUR; AND

15  OURS IS REFERENCE FOUR.

16          "AMONG THESE STUDIES IS A U.S. STUDY OF OVER 22,000

17  PATIENTS IN NEW JERSEY BY A BOSTON ACADEMIC GROUP UNAFFILIATED

18  WITH INDUSTRY."  AND THAT'S US.

19  **Q.**   DOCTOR, HAVING READ THIS DOCUMENT, DO YOU HAVE ANY

20  IMPRESSION ABOUT WHAT WAS BEING CONVEYED TO THE FDA ABOUT YOUR

21  STUDY?

22  **A.**   WELL, IT'S NOT AN IMPRESSION; IT'S WHAT THEY SAY.  WHAT

23  THEY SAY IS THAT OUR STUDY SHOWS THAT NAPROXEN PROTECTS THE

24  HEART.  AND IN THE CONTEXT OF WHAT IS ON THE REST OF THE PAGE,

25  IT IS JUSTIFICATION FOR THE MOTION THAT VIOXX DOES NOT CAUSE

1  HEART ATTACKS; NAPROXEN PREVENTS THEM.

2  **Q.**    AND DID THEY SPECIFICALLY SINGLE OUT YOUR STUDY AS BEING,

3  QUOTE, INDEPENDENT?

4  **A.**    YES.

5  **Q.**    DOCTOR, WERE YOU AWARE AT THE TIME THAT MERCK WAS USING

6  YOUR STUDY RESULTS THAT WERE PRESENTED TO DR. GUESS IN AUGUST

7  OF 2001 TO SUGGEST THAT THE RESULTS OF VIGOR WERE A RESULT OF

8  THE CARDIOPROTECTIVE EFFECT OF NAPROXEN?

9  **A.**    NO, I WAS NOT AWARE OF THAT AT THE TIME.

10  **Q.**    IF YOU HAD BEEN -- IF YOU HAD BEEN AWARE OF THAT, WHAT

11  WOULD YOUR REACTION HAVE BEEN?

12  **A.**    WELL, I CAN TELL YOU WHAT MY REACTION IS RIGHT NOW, WHICH

13  IS I'M INDIGNANT THAT THEY TOOK A FINDING OF OURS THAT WAS VERY

14  CLEARLY COMMUNICATED, THAT IS, THE VERY MODEST EFFECT OF

15  PROTECTION OF THE HEARTS THAT WE FOUND WITH NAPROXEN, WHICH WE

16  EXPLICITLY SAID WAS NOT ENOUGH TO EXPLAIN THE INCREASE IN HEART

17  ATTACKS IN THE NAPROXEN/VIOXX COMPARISON IN VIGOR, THAT

18  DR. GUESS WAS IN THE ROOM WHEN WE PRESENTED THAT AND, I NOW

19  UNDERSTAND, EVEN WROTE DOWN, THAT WE HYPOTHESIZED THAT WHAT

20  REALLY WAS PROBABLY GOING ON WAS AN INCREASED RISK IN THE

21  SELECTIVE COX-2, OR VIOXX, AS A EXPLANATION OF THE VIGOR STUDY.

22          I AM UPSET RIGHT NOW, AND I WAS THE FIRST TIME I SAW

23  THIS, TO KNOW THAT THEY WERE ESSENTIALLY DISTORTING OUR

24  SCIENTIFIC FINDINGS TO JUSTIFY EXACTLY THE OPPOSITE POSITION

25  FROM WHAT WE HAVE SAID BOTH IN WRITING AND IN PUBLIC.

1   **Q.**   DO YOU -- IN LOOKING AT THAT DOCUMENT, IS THAT A FAIR AND

2   ACCURATE REPRESENTATION OF THE SCIENCE THAT YOU PRESENTED TO

3   DR. GUESS AT THE ISPE MEETING IN AUGUST OF 2001?

4   **A.**   NO.   IT'S A DISTORTION OF WHAT WAS PRESENTED.

5   **Q.**   ALSO, YOU MENTIONED A STUDY THAT WE TALKED ABOUT BEFORE

6   WHERE YOU -- OF THE PUBLISHED VERSION OF THIS STUDY.   HAVE YOU

7   ON OTHER OCCASIONS SAID THAT THE RESULTS OF YOUR STUDY DOES NOT

8   EXPLAIN THE CARDIOPROTECTIVE -- DOES NOT EXPLAIN THE RESULTS

9   THAT WERE SEEN IN VIGOR?

10  **A.**   YES.   THERE ARE A NUMBER OF TIMES IN THE COURSE OF THE

11  EARLY 2000S WHERE I STATED THAT.

12  **Q.**   OKAY.   WOULD YOU GO TO ANOTHER ARTICLE THAT I HAVE IN YOUR

13  BOOK, EXHIBIT NO. 14.

14  **A.**   YES.

15  **Q.**   DO YOU RECOGNIZE THAT, DOCTOR?

16  **A.**   YES.   THAT IS A PAPER THAT WAS PUBLISHED IN A JOURNAL

17  CALLED *PHARMACOEPIDEMIOLOGY AND DRUG SAFETY*, DESCRIBING A PANEL

18  THAT I WAS INVITED TO BE ON AT ANOTHER MEETING OF THE

19  PHARMACOEPIDEMIOLOGY SOCIETY THAT WAS HELD IN EDINBOROUGH IN

20  SCOTLAND IN AUGUST OF 2002.

21  **Q.**   AND AMONG THE COAUTHORS IS A GENTLEMAN BY THE NAME OF

22  DR. WAYNE RAY?

23  **A.**   CORRECT.

24  **Q.**   WHO IS DR. RAY?

25  **A.**   DR. RAY IS A VERY RESPECTED PHARMACOEPIDEMIOLOGIST,

1   PROBABLY ONE OF THE BEST IN THE FIELD, WHO IS A PROFESSOR AT

2   VANDERBILT UNIVERSITY.

3   Q.   AND DAVID GRAHAM, DO YOU SEE HE'S REPRESENTED THERE AS

4   WELL?

5   A.   YES.  DR. GRAHAM IS A PHYSICIAN AND EPIDEMIOLOGIST AT THE

6   FOOD & DRUG ADMINISTRATION.

7   Q.   OKAY.  AND DR. SOLOMON IS THERE AS WELL?

8   A.   RIGHT.

9   Q.   DON'T WANT TO LEAVE DR. MCDONALD OUT.  WHO IS

10  DR. MCDONALD?

11  A.   TOM MCDONALD IS A PHARMACOEPIDEMIOLOGIST WHO WORKS IN

12  SCOTLAND.

13  Q.   OKAY.  AND, OF COURSE, YOU ARE LISTED THERE AS WELL.

14  A.   RIGHT.

15  Q.   DID YOU ANYWHERE INDICATE, AGAIN, YOUR FEELINGS ABOUT THE

16  NAPROXEN HYPOTHESIS AS AN EXPLANATION OF VIGOR?

17  A.   YES.  I DID.

18  Q.   WOULD YOU PLEASE GO TO THE LAST PAGE OF THE DOCUMENT,

19  PLEASE.

20  A.   YES.  THE LAST FULL PAGE?

21  Q.   ACTUALLY, THE LAST FULL PAGE.

22  A.   YES.

23  Q.   OKAY.  WOULD YOU TELL THE MEMBERS OF THE JURY WHAT YOU

24  WROTE IN 2000 -- AND I GUESS THIS IS 2003?

25  A.   RIGHT.  IN BRIEF, THE KEY SENTENCE THERE IS, "THESE

1   STUDIES," WHICH REVIEWS WHAT WAS KNOWN AT THE TIME, "SUGGESTS

2   THAT ANY POTENTIAL PROTECTIVE EFFECT OF NAPROXEN DOES NOT FULLY

3   ACCOUNT FOR THE FINDINGS IN THE VIGOR STUDY."

4   **Q.**   NOW, WHAT WERE YOU TRYING TO CONVEY THERE IN THIS ARTICLE

5   THAT WAS PUBLISHED IN 2002?

6   **A.**   THAT --

7   **Q.**   2003, EXCUSE ME.

8   **A.**   RIGHT.  BUT BASED ON STATEMENTS THAT WE MADE IN AUGUST OF

9   2002, THIS WAS PRETTY MUCH A TRANSCRIPT OF WHAT WE HAD SAID AT

10  THAT POINT?

11          THAT WE REVIEWED AS A GROUP THE EXISTING DATA ABOUT

12  EVIDENCE RELATING TO CARDIAC OUTCOMES FROM NONSTEROIDAL DRUGS,

13  AND WE DISCUSSED THE DRAMATIC INCREASE IN RATE OF HEART ATTACK

14  IN VIGOR IN PEOPLE TAKING NAPROXEN -- IN PEOPLE TAKING VIOXX,

15  COMPARED TO NAPROXEN, AND THE HYPOTHESIS THAT HAD BEEN OFFERED

16  BY MERCK THAT THAT WAS BECAUSE NAPROXEN PROTECTS YOUR HEART.

17          AND IN THAT AUGUST OF '02 SYMPOSIUM, ALL OF US, I

18  THINK, WERE -- WERE IN ACCORD, SINCE WE ALL SIGNED OFF ON THIS:

19  "THESE STUDIES SUGGEST THAT ANY POTENTIAL PROTECTIVE EFFECT OF

20  NAPROXEN DOES NOT FULLY ACCOUNT FOR THE FINDINGS IN THE VIGOR

21  STUDY."

22  **Q.**   WHAT WERE YOU TRYING TO COMMUNICATE THERE IN THIS -- IN

23  THIS SENTENCE?

24  **A.**   OKAY.  WHAT I SAID WAS THERE ARE ONLY -- AND THE CONTEXT

25  OF THE PRECEDING PARAGRAPH, THERE'S ONLY TWO WAYS THAT YOU CAN

1  EXPLAIN A FIVEFOLD DIFFERENCE IN HEART ATTACK BETWEEN GROUP A

2  AND GROUP B IN A RANDOMIZED TRIAL.  EITHER THE PEOPLE IN THE

3  GROUP THAT HAS THE HIGHER NUMBER OF HEART ATTACKS WERE GIVEN A

4  DRUG THAT CAUSES HEART ATTACKS OR THE PEOPLE IN THE GROUP GIVEN

5  THE COMPARISON DRUG GOT A DRUG THAT PREVENTS HEART ATTACKS, OR

6  PERHAPS SOME COMBINATION OF THE TWO.

7            AND WHAT THAT SENTENCE SAYS IS THAT YOU CAN'T EXPLAIN

8  THE FIVEFOLD INCREASE IN NUMBER OF HEART ATTACKS IN VIGOR, SEEN

9  IN PEOPLE GIVEN VIOXX, BY THE DATA THAT WERE AVAILABLE AT THE

10 TIME ABOUT NAPROXEN PREVENTING HEART ATTACKS BECAUSE IT JUST

11 WASN'T THERE.

12 Q.   AND DID YOU DRAW ANY CONCLUSIONS FROM THAT?

13 A.   THE ONLY LOGICAL -- THIS WAS DISCUSSED WIDELY FROM THE

14 PODIUM.  I RECALL IT VIVIDLY.  THE ONLY LOGICAL ALTERNATIVE IS

15 THAT IF IT IS NOT BECAUSE NAPROXEN IS PREVENTING HEART ATTACKS

16 OR IF ONLY A TEENY FRACTION OF THE DIFFERENCE CAN POSSIBLY BE

17 EXPECTED -- BE EXPLAINED BY THAT, THEN THE ONLY OTHER LOGICAL

18 POSSIBILITY IS THAT VIOXX CAUSED HEART ATTACKS.

19 Q.   IS THAT THE SAME THING YOU TOLD DR. GUESS IN MID-2001?

20 A.   IN MID-2001, I TOLD DR. GUESS THAT I THOUGHT THAT WAS AN

21 IMPORTANT QUESTION THAT NEEDED TO BE ADDRESSED.

22 Q.   ALL RIGHT.  MOVING FORWARD, LET'S GO BACK TO YOUR

23 NEGOTIATIONS WITH MERCK ON TO DO YOUR STUDY.

24            FOLLOWING THE SEPTEMBER "FISH OR CUT BAIT" E-MAIL

25 WITH DR. CANNUSCIO, SEPTEMBER 2001 "FISH OR CUT BAIT" MEMO WITH

1  DR. CANNUSCIO, DID THEY EXECUTE A CONTRACT?

2  **A.**   NOT FOR MANY, MANY MONTHS, UNTIL LATER, DID THEY FINALLY

3  ACTUALLY SIGN THE CONTRACT.

4  **Q.**   DOCTOR, DID THERE COME A TIME THAT THE CONTRACT WAS

5  ACTUALLY SIGNED?

6  **A.**   YES.  MY RECOLLECTION IS THAT IT WAS IN APRIL OF 2002,

7  ABOUT 15 MONTHS AFTER THE INITIAL CONVERSATION THAT DR. SOLOMON

8  HAD WITH DR. CANNUSCIO THAT THE CONTRACT WAS EVENTUALLY SIGNED.

9  **Q.**   ARE YOU AWARE THAT AT THE TIME THAT MERCK EXECUTED THE

10  CONTRACT FOR YOUR STUDY ON APRIL 24, 2002, THAT MERCK HAD JUST

11  RECEIVED TWO WEEKS PRIOR THE APPROVAL FOR THE NEW LABEL THAT

12  DID NOT CONTAIN A CARDIOVASCULAR WARNING?

13  **A.**   I WAS NOT AWARE OF THAT.

14  **Q.**   DOCTOR, ARE YOU FAMILIAR WITH THE TERM "FIRST DO NO HARM"?

15  **A.**   YES.

16          **MR. BIRCHFIELD:**

17             YOUR HONOR, WE COULD GO ANOTHER 10 OR 15 MINUTES

18  OR BREAK NOW.

19          **THE COURT:**  LET'S GO ANOTHER 10 OR 15 MINUTES, AND

20  THEN WE'LL STOP FOR LUNCH.

21  **Q.**   BEFORE WE BROKE, I SHOWED YOU A PUBLIC AFFAIRS PLAN FOR

22  THE GI LABEL CHANGE FOR VIOXX DATED MARCH 23, 2001?

23  **A.**   RIGHT.

24  **Q.**   HAVE YOU SEEN THAT BEFORE?  I'VE SHOWN YOU THAT IN CONTEXT

25  OF SHOWING YOU DOCUMENTS FOR LITIGATION HERE?

1    A.    THAT'S RIGHT.

2    Q.    OKAY.  WOULD YOU PLEASE TURN TO THE PAGE CONTAINING THE

3    BATES, RANGE 20167.  DO YOU SEE THAT?

4    A.    YES.

5    Q.    YOU SEE "OVERALL COMMUNICATION OBJECTIVES"?  DO YOU SEE

6    THAT?

7    A.    YES.

8    Q.    DO YOU SEE THE FIRST BULLET POINT?

9    A.    YES.

10   Q.    WOULD YOU PLEASE TELL THE MEMBERS OF THE JURY WHAT IT

11   SAYS.

12   A.    IT SAYS, "DO NO HARM."

13   Q.    IS THAT -- CAN YOU READ THE REST?

14   A.    YES.  "REFRAIN FROM PROACTIVELY GENERATING COVERAGE THAT

15   JEOPARDIZES LABEL NEGOTIATIONS AND/OR THAT LINKS VIOXX TO

16   CARDIOVASCULAR ADVERSE EVENTS.

17   Q.    DOCTOR, DO YOU -- WAS IT -- WERE YOU CONCERNED IN 2001 AND

18   2002 ABOUT THE DELAY IN ACTUALLY GETTING YOUR STUDY OFF THE

19   GROUND?

20   A.    VERY CONCERNED.

21   Q.    DO YOU HAVE ANY EXPLANATION FOR MERCK'S INABILITY TO

22   EXECUTE A CONTRACT UNTIL AFTER THE LABEL WAS APPROVED FOR

23   VIOXX?

24   A.    AT THE TIME I HAD NO UNDERSTANDING OF THE LABEL

25   DISCUSSIONS THAT WERE GOING ON.  I JUST WAS CONCERNED THAT

1   EITHER THIS WAS A VERY BIG COMPANY THAT COULDN'T GET OUT OF ITS

2   OWN WAY AND MAKE A DECISION IN LESS THAN A YEAR ON AN IMPORTANT

3   STUDY OR PERHAPS -- AND I VIVIDLY RECALL RAISING THIS

4   POSSIBILITY WITH DR. SOLOMON -- PERHAPS THE FOOT-DRAGGING WAS

5   INTENTIONAL BECAUSE THEY DIDN'T REALLY WANT THE STUDY TO GET

6   DONE.

7   **Q.**   FIRST OF ALL, WAS THAT -- WAS THAT WHAT WAS ON YOUR MIND

8   AT THE TIME, THAT THERE WAS CONCERN THAT THERE WAS

9   FOOT-DRAGGING ON THE PART OF THE COMPANY?

10  **A.**   WE HAD CONVERSATIONS ON ALMOST A BIWEEKLY BASIS ABOUT WHY

11  IS IT TAKING SO LONG.

12  **Q.**   OKAY.  NOW, DOCTOR, I ASSUME THAT ONCE THE CONTRACT WAS

13  SIGNED, YOU GOT RIGHT TO WORK ON ACTUALLY DOING THE STUDY.  IS

14  THAT CORRECT?

15  **A.**   WE -- THAT WAS OUR PLAN, BUT --

16  **Q.**   WHAT HAPPENED?

17  **A.**   THERE WAS -- I LEARNED A LESSON, WHICH IS THAT -- I HAD

18  LEARNED WITH DISCUSSIONS WITH OTHER PHARMACEUTICAL COMPANIES TO

19  NEVER ALLOW THE FUNDING TO BE CONTINGENT UPON THEIR ACCEPTANCE

20  OF THE WORK PRODUCT BECAUSE THAT, IN EFFECT, WOULD GIVE A

21  COMPANY CENSORSHIP OVER WHAT WE WERE ABLE TO PUBLISH.

22          AND WE MANAGED EVERY STEP OF THE WAY, EXCEPT FOR ONE,

23  TO NOT HAVE AS ANY OF THE BENCHMARKS IN THE CONTRACT ANY WORDS

24  LIKE "PRODUCE A MANUSCRIPT THAT IS ACCEPTABLE TO MERCK" OR

25  "PRODUCE DATA THAT ARE SATISFACTORY TO MERCK," BECAUSE I

1    LEARNED NOT TO DO THAT.

2            THE THING I HADN'T LEARNED YET BUT LEARNED FROM THIS

3    WAS THAT, AS ONE OF THE -- AS THE ONLY BENCHMARK THAT WAS THERE

4    IN THE BEGINNING WAS LANGUAGE, AND ITS IN THE CONTRACT.  AND

5    PERHAPS I SHOULD ACTUALLY REFER TO THE CONTRACT.  THE FIRST

6    MILESTONE OR BENCHMARK WAS PAYMENT TO OUR HOSPITAL TO FUND THE

7    RESEARCH "WILL BE MADE UPON ACCEPTANCE OF A DETAILED PROTOCOL."

8            AND IT TURNS OUT THAT -- THAT'S NOT A MISTAKE I'LL

9    MAKE AGAIN.  IT TURNS OUT THAT MERCK'S ACCEPTANCE OF THE

10   PROTOCOL, EVEN AFTER MORE THAN A YEAR OF DISCUSSION ABOUT

11   GETTING THE CONTRACT SIGNED, TOOK ANOTHER NINE MONTHS BEFORE

12   THEY ACTUALLY ACCEPTED THE PROTOCOL.

13   Q.   DOCTOR, I'M GOING TO HAND YOU A GROUP OF DOCUMENTS THAT

14   I'M GOING TO COLLECTIVELY REFER TO AS EXHIBITS 23A THROUGH -- I

15   THINK IT'S K.

16           DOCTOR, IS THIS -- WHAT ARE THOSE, DOCTOR?

17   A.   THIS IS A SUCCESSION OF STUDY PROTOCOLS THAT WE SUBMITTED

18   TO MERCK AND WHICH MERCK THEN WAS NOT SATISFIED WITH AND THEN

19   RESUBMIT -- ASKED US TO MAKE THIS CHANGE OR THAT CHANGE.  OFTEN

20   MATTERS THAT SEEMED TO US TO BE RELATIVELY MODEST TO TRIVIAL,

21   BUT EACH STEP OF THE WAY WE WERE TOLD, "NO, YOU NEED TO FIX

22   THAT.  YOU NEED TO CHANGE THAT."  AND THIS IS WHAT OCCUPIED THE

23   BETTER PART OF 2002 BEFORE WE COULD ACTUALLY GET THEIR OKAY TO

24   START DOING THE WORK.

25   Q.   HOW LONG DID IT TAKE YOUR -- HARVARD AND MERCK TO AGREE ON

1    THE PROTOCOL OF THE STUDY?

2    **A.**   WELL, THE FIRST ONE IN YOUR PILE IS DATED JUNE 7, 2002,

3    WHICH WAS RELATIVELY SOON AFTER THE CONTRACT WAS SIGNED IN THE

4    END OF APRIL.  AND THEN THERE'S ANOTHER ONE DATED SEPTEMBER 4,

5    2002, AND THEN ANOTHER REVISION DATED -- LET'S SEE.  THERE'S

6    SEVERAL REVISIONS.  OH, COMMENTS FROM DAN FROM 10-1.  ANOTHER

7    REVISION OCTOBER 4, OCTOBER 22, OCTOBER 24.  ANOTHER REVISION

8    DATED OCTOBER 31 AND THEN CHANGED NOVEMBER 6.  ANOTHER ONE FROM

9    NOVEMBER 12, ANOTHER ONE FROM DECEMBER 17, AND ANOTHER ONE FROM

10   FEBRUARY 2003.

11           AND THIS -- THIS WAS UNPRECEDENTED IN MY MANY YEARS

12   OF RESEARCH, THAT THERE WOULD BE THIS LONG A PERIOD BEFORE A

13   COMPANY SIGNS OFF ON A RESEARCH PROTOCOL.

14   **Q.**   DOCTOR, DID THE PROTOCOLS THAT I LAID IN FRONT OF YOU,

15   AFTER THOSE PROTOCOLS IN EARLY 2003, DID YOU ACTUALLY GET TO

16   START THE STUDY?

17   **A.**   WELL, NO.  PART OF WHAT MERCK ASKED US TO DO DURING THIS

18   MANY, MANY MONTHS OF NEGOTIATION WAS THEY ASKED US TO GO BACK

19   AND REVIEW THE INDIVIDUAL PATIENT RECORDS FOR A SAMPLE OF THE

20   SUBJECTS IN OUR STUDY TO SEE IF THE PEOPLE THAT WE WERE

21   STUDYING AS HAVING HEART ATTACKS ACTUALLY HAD HEART ATTACKS.

22           AND WE POINTED OUT TO MERCK THAT THAT WAS A QUESTION

23   THAT HAD BEEN STUDIED BY OTHER GROUPS PREVIOUSLY AND THAT THERE

24   WAS PRETTY GOOD EVIDENCE IN THE MEDICAL LITERATURE THAT A

25   COMBINATION OF DIAGNOSIS CODES AND HOSPITAL CODES VIRTUALLY

1    ALWAYS MEANT THAT THE PERSON HAD HAD A HEART ATTACK.

2              AND MERCK'S RESPONSE WAS, "NO, WE REALLY WANT TO BE

3    SURE, AND SO GO OUT AND VALIDATE.  HAVE PEOPLE GO DOWN TO

4    PENNSYLVANIA.  GET IN CONTACT WITH THE HOSPITALS, HAVE THEM

5    PULL THE PATIENT'S ACTUAL MEDICAL RECORDS, AND CHECK TO SEE IF

6    THEY REALLY HAD HEART ATTACKS."

7    Q.   DOCTOR, YOU'VE DONE -- HOW MANY STUDIES HAVE YOU DONE WITH

8    THIS PARTICULAR DATABASE THAT YOU'RE TALKING ABOUT HERE?

9    A.   DOZENS.

10   Q.   HAVE YOU EVER HAD ANY COMPANY ASK YOU TO DO THE KIND OF

11   VALIDATION THAT MERCK ASKED YOU TO DO?

12   A.   NO.

13   Q.   DID YOU ACTUALLY DO WHAT MERCK ASKED YOU TO DO?

14   A.   WE HAD TO.

15   Q.   WHAT DID YOU DO?  WHAT HAPPENED?

16   A.   WE HIRED A PROFESSIONAL REVIEW ORGANIZATION TO GO DOWN TO

17   PENNSYLVANIA.  WE ESTABLISHED A PROTOCOL FOR HOW THEY WOULD

18   REVIEW THE CHARTS, THE CRITERIA FROM THE WORLD HEALTH

19   ORGANIZATION ABOUT HOW YOU DEFINE HEART ATTACK.  AND WE GAVE

20   THEM THE LIST OF A SAMPLE OF PATIENTS, AND THEY WENT AND PULLED

21   EACH ONE OF THEIR MEDICAL RECORDS, WHICH WAS BOTH AN EXPENSIVE

22   AND A TIME-CONSUMING PROCESS.

23             AND THEY THEN CONFIRMED THAT, INDEED, IN ABOUT 93 OR

24   94 PERCENT OF THE CASES, THEY HAD HEART ATTACKS, WHICH IS ABOUT

25   AS GOOD AS ANY VALIDATION STUDY GETS.

1    **Q.**   DOCTOR, DID -- WHO CONDUCTED THE INDEPENDENT VALIDATION?

2    **A.**   IT WAS A COMPANY THAT WAS A PROFESSIONAL REVIEW

3    ORGANIZATION.  I THINK THEY WERE CALLED KEYPRO, WHICH IS A

4    GROUP SANCTIONED BY THE GOVERNMENT TO GO IN AND INSPECT

5    HOSPITAL RECORDS.

6    **Q.**   AND DID THEY FIND ANY PROBLEM WITH WHAT YOU DID?

7    **A.**   NO.  THEY FOUND THAT WE HAD A REMARKABLY HIGH RATE OF

8    VALIDATION.

9    **Q.**   AND WHEN YOU FINALLY GOT THE APPROVAL AND THE CONTRACT WAS

10   SIGNED AND ALL OF THE PROTOCOLS WERE DONE AND THE INDEPENDENT

11   EVALUATION WERE DONE AND ALL OF THOSE THINGS, DID YOU FINALLY

12   GET TO DO YOUR STUDY?

13   **A.**   NO.

14   **Q.**   WHAT HAPPENED?

15   **A.**   MERCK TOLD US THAT WE COULD NOT PROCEED UNTIL WE HAD AN

16   INDEPENDENT EPIDEMIOLOGIST COME IN AND REVIEW THE PROTOCOL AS

17   AN OUTSIDER AND ALSO REVIEW ALL THE PROGRAMMING CODE THAT OUR

18   PROGRAMMERS HAD WRITTEN TO DO THE ANALYSES.

19   **Q.**   AND WHO WAS THAT?  WHO DID THAT?

20   **A.**   THAT WAS DR. RHONDA BOHN.

21   **Q.**   DID SHE FIND ANY PROBLEMS WITH YOUR -- WITH YOU CODES AND

22   THE THINGS SHE WAS ASKED TO DO?

23   **A.**   NO.

24   **Q.**   OKAY.  NOW, DOCTOR, DID THERE FINALLY COME A TIME WHEN YOU

25   ACTUALLY HAD AN OPPORTUNITY TO DO THE STUDY?

1  A.   YES.  BY SPRING OF 2003, WE -- THERE WAS FINALLY NO OTHER

2  CONCERNS THAT MERCK HAD, AND WE WERE GIVEN A GREEN LIGHT TO

3  PROCEED.

4  Q.   AND DID YOU ACTUALLY DO THE DATA ANALYSIS AT THAT TIME?

5  A.   YES.

6  Q.   AND WHAT DID YOU FIND?

7  A.   WE FOUND THAT THERE WAS A SIGNIFICANT INCREASE IN THE RISK

8  OF HEART ATTACK IN PATIENTS TAKING VIOXX COMPARED TO COMPARATOR

9  DRUGS.

10 Q.   LET ME ASK YOU THESE QUESTIONS.  DID MERCK HAVE INPUT INTO

11 THE DESIGN OF THE STUDY?

12 A.   YES.  IN THAT THEY WOULD NOT LET US PROCEED UNTIL THEY

13 WERE PERFECTLY SATISFIED WITH THE PROTOCOL.

14 Q.   AND DID THEY -- DID THEY INDICATE THAT THEY WERE SATISFIED

15 WITH THE PROTOCOL AT THE END OF THE DAY?

16 A.   YES.  THEY SIGNED OFF ON THE PROTOCOL.

17 Q.   OKAY.  DID THEY HAVE ONE OF THEIR -- DID THEY HAVE ANY

18 EMPLOYEES WHO THEY EMPLOYED WORKING ON THE STUDY?

19 A.   YES.  DR. CANNUSCIO WAS A KEY MEMBER OF THE PROJECT TEAM,

20 AND SHE WAS A MERCK EMPLOYEE.

21 Q.   ALL RIGHT.  NOW, I PUT IN FRONT OF YOU A DOCUMENT

22 ENTITLED, "THE RELATIONSHIP BETWEEN COX-2 INHIBITORS AND ACUTE

23 MYOCARDIAL INFARCTION" DATED MAY 5, 2003.  WOULD YOU TELL ME

24 WHAT THIS IS.

25 A.   YES, THIS IS JUST THE TABLES, BASICALLY THE DATA, AS WE

1    HAD IT IN MAY OF 2003 FROM THE STUDY.

2    **Q.**   OKAY.  IN AN OVERVIEW, WHAT DID IT TELL THE PEOPLE AT

3    MERCK ABOUT THE RESULTS OF YOUR STUDY OF THE -- THE

4    EPIDEMIOLOGIC STUDY?

5    **A.**   THAT WE FOUND AN INCREASED RATE OF HEART ATTACKS IN PEOPLE

6    TAKING VIOXX COMPARED TO TAKING COMPARISON DRUGS.

7              **THE COURT:**  WE'LL STOP HERE.

8              **MR. BIRCHFIELD:**  YES.

9              **THE COURT:**  OKAY.  LET'S STOP HERE AND COME BACK AT

10   1:45.  COURT WILL STAND IN RECESS UNTIL 1:45.

11             **THE DEPUTY CLERK:**  EVERYONE RISE.

12                       **(LUNCHEON RECESS)**

13                      * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1              **AFTERNOON SESSION**

2              **(AUGUST 1, 2006)**

3         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4  TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

5  REPORTER.)

6         **THE DEPUTY CLERK:**  EVERYONE RISE.

7         **THE COURT:**  BE SEATED, PLEASE.

8         (WHEREUPON, **GERALD AVORN**, HAVING BEEN DULY SWORN,

9  TESTIFIED BY DEPOSITION AS FOLLOWS.)

10              **DIRECT EXAMINATION**

11  BY MR. ROBINSON:

12  **Q.**  NOW, THE RESULTS THAT YOU SAW HERE, FROM A PUBLIC HEALTH

13  STANDPOINT, DID YOU CONSIDER THEM TO BE IMPORTANT FINDINGS?

14  **A.**  YES.

15  **Q.**  WHY?

16  **A.**  BECAUSE IN THERE-- LET ME JUST TURN TO THE PAGE WITH THE

17  DATA ON IT AS IT WAS EVENTUALLY PUBLISHED.  WE FOUND THAT, IN

18  THE FINAL TABLES, THERE WAS A SIGNIFICANT INCREASE IN THE RISK

19  OF HEART ATTACK THAT WE FOUND WITH VIOXX COMPARED TO WITH

20  CELEBREX.

21         WE ALSO FOUND THAT IT WAS PARTICULARLY HIGH IN PEOPLE

22  WHO WERE TAKING HIGHER DOSES OF VIOXX, AND THAT SEEMED LIKE AN

23  IMPORTANT FINDING.  THE DATA FOR THE HIGH-DOSE VIOXX VERSUS

24  HIGH-DOSE CELEBREX WAS A 70 PERCENT INCREASE OR ALMOST A

25  DOUBLING OF THE RISK OF HEART ATTACK IN OUR PATIENT POPULATION.

1    **Q.**   DID YOU FIND AN INCREASED RISK WITH LOW DOSE?

2    **A.**   YES.

3    **Q.**   DID YOU FIND AN INCREASED RISK AT LESS THAN 30 DAYS?

4    **A.**   YES.

5    **Q.**   DID YOU FIND AN INCREASED RISK AT 30 TO 90 DAYS?

6    **A.**   YES.

7    **Q.**   WAS THAT INCREASED RISK SEEN WHETHER YOU WERE COMPARING IT

8    TO CELEBREX OR OTHER NSAIDS?

9    **A.**   WE FOUND IT WITH A WIDE VARIETY OF COMPARISON DRUGS OR

10   NONEXPOSURES.

11   **Q.**   DOCTOR, DID THERE COME A TIME WHEN YOU SOUGHT TO WRITE

12   THESE RESULTS UP IN AN ABSTRACT?

13   **A.**   YES.

14   **Q.**   DID YOU SPEAK TO DR. CANNUSCIO ABOUT DOING THAT?

15   **A.**   YES.  THE TERMS OF OUR CONTRACT WERE THAT WE WOULD ALLOW

16   THEM TO SEE WHAT WE WERE PUBLISHING, ALTHOUGH THEY DID NOT HAVE

17   THE RIGHT TO CENSOR IT OR TO HOLD IT BACK; BUT AS A COURTESY,

18   WE AGREED TO LET THEM SEE WHAT WE WERE GOING TO SUBMIT AND GIVE

19   THEM A PERIOD OF TIME TO COMMENT.

20   **Q.**   DOCTOR, DID THERE COME A TIME WHEN THERE WAS DISCUSSION

21   ABOUT WHETHER OR NOT DR. CANNUSCIO WOULD ACTUALLY BE ON THE

22   PAPER?

23   **A.**   YES.

24   **Q.**   DOCTOR, I'VE HANDED YOU WHAT I HAVE HAD MARKED AS

25   EXHIBIT 27.  DOES THIS INCLUDE THE ABSTRACT THAT WAS WRITTEN BY

1   YOUR DIVISION?

2   **A.**   CORRECT.

3   **Q.**   THERE'S AN E-MAIL THERE, AS WELL; CORRECT?

4   **A.**   RIGHT.

5   **Q.**   WHAT DOES THE E-MAIL SAY ABOUT THE TABLES?  IT SAYS,

6   "THESE TABLES ALL SUGGEST THAT THE HIGHER ADJUSTED ODDS RATIOS

7   SEEN IN SHORTER DURATION USE IS NOT CONFINED TO HIGH-RISK

8   USERS."  WHAT DOES THAT MEAN?

9   **A.**   "HIGH-DOSAGE USERS."

10  **Q.**   "HIGH-DOSAGE USERS."  WHAT DOES THAT MEAN?

11  **A.**   THAT'S A NOTE FROM DR. SOLOMON TO DR. CANNUSCIO POINTING

12  OUT SOMETHING ABOUT OUR FINDINGS, WHICH IS THAT THIS WAS NOT

13  JUST ABOUT PEOPLE TAKING HIGH-DOSE VIOXX; THIS WAS ABOUT PEOPLE

14  TAKING REGULAR-DOSE VIOXX, AS WELL.

15  **Q.**   OKAY.  WAS THERE A FURTHER DISCUSSION ABOUT THE

16  CO-AUTHORSHIP OF THE PAPER?

17  **A.**   YES.

18  **Q.**   WOULD YOU PLEASE READ THAT.

19  **A.**   YES.  IN PARAGRAPH 2 DR. SOLOMON WRITES, "I WOULD LIKE TO

20  DISCUSS YOUR CO-AUTHORSHIP ON THE PAPER.  YOU HAVE CONTRIBUTED

21  SUBSTANTIALLY TO THE PROJECT, AND I AM VERY COMFORTABLE WITH

22  YOU BEING A CO-AUTHOR, ASSUMING THAT YOU ARE COMFORTABLE WITH

23  ITS CONTENT.  IN LIGHT OF OUR FINDINGS, THERE MAY BE ASPECTS OF

24  THE PAPER THAT WILL BE PROBLEMATIC FROM MERCK'S PERSPECTIVE.

25  YOU MAY BE IN A DIFFICULT POSITION AS A MERCK EMPLOYEE AND A

1   CO-AUTHOR."

2   **Q.**   LET'S STOP RIGHT HERE, DOCTOR.  WHAT WAS YOUR CONCERN AS

3   REFLECTED IN THIS PARAGRAPH?

4   **A.**   WELL, THIS, AGAIN, WAS A NOTE THAT HE SENT TO

5   DR. CANNUSCIO AT MY SUGGESTION TO CONVEY TO HER THAT WE DID

6   FEEL THAT SHE WAS A MEMBER OF THE PROJECT TEAM, BUT THAT WE

7   WERE BOTH WORRIED, NOW THAT THE STUDY HAD SHOWN THAT VIOXX DID

8   INCREASE THE RISK OF HEART ATTACK, WOULD THAT BE A PROBLEM FOR

9   MERCK AND WOULD THAT BE PROBLEMATIC FOR HER TO HAVE HER NAME ON

10  THE PAPER.

11  **Q.**   DID YOU ACTUALLY PRESENT THIS AT A PROFESSIONAL MEETING?

12  **A.**   DR. SOLOMON PRESENTED IT IN THE FALL OF 2003 AT THE

13  AMERICAN COLLEGE OF RHEUMATOLOGY.

14  **Q.**   I'M HANDING YOU WHAT'S MARKED EXHIBIT 23.

15  **A.**   YES.

16  **Q.**   DOCTOR, IS THIS THE ABSTRACT THAT WAS PRESENTED AT THE

17  AMERICAN COLLEGE OF RHEUMATOLOGY IN 2003?

18  **A.**   CORRECT.

19  **Q.**   IS THIS THE RESULTS OF YOUR STUDY, YOUR MERCK-FUNDED

20  STUDY?

21  **A.**   CORRECT.

22  **Q.**   DOES IT HAVE CAROLYN CANNUSCIO'S NAME ON THE TOP?

23  **A.**   YES, IT DOES.

24  **Q.**   DOES IT HAVE YOUR NAME ON THE TOP?

25  **A.**   YES.

1   **Q.**   DOCTOR, DID THERE COME A TIME WHEN YOU SOUGHT TO CONVERT

2   THIS ABSTRACT INTO AN ACTUAL PUBLISHED ARTICLE?

3   **A.**   YES.

4   **Q.**   DID YOU DO THAT?

5   **A.**   YES.

6   **Q.**   DID YOU SUBMIT THAT MANUSCRIPT TO MERCK FOR ITS COMMENT?

7   **A.**   YES, WE DID.

8   **Q.**   DID THEY HAVE AN OPPORTUNITY TO MAKE COMMENTS?

9   **A.**   YES.

10  **Q.**   DID YOU ACCEPT SOME COMMENTS?

11  **A.**   WE ACCEPTED SOME AND WE DIDN'T ACCEPT OTHERS.

12  **Q.**   OKAY.  WOULD YOU DESCRIBE FOR US THE COMMENTS THAT MERCK

13  DID NOT ACCEPT.

14  **A.**   YOU MEAN THAT WE DID NOT ACCEPT.

15  **Q.**   YOU DID NOT ACCEPT THAT MERCK--

16  **A.**   SURE.  THERE WERE SOME HELPFUL COMMENTS THAT MERCK MADE

17  ABOUT MAKING THINGS CLEARER.  WE ACCEPTED THOSE.  THEN THERE

18  WERE OTHERS THAT WE FELT WOULD HAVE DEEMPHASIZED THE IMPORTANCE

19  OR THE EXTENT OF OUR FINDINGS, AND WE TENDED TO NOT ACCEPT

20  THOSE.

21  **Q.**   WOULD YOU PLEASE TELL US WHAT WAS REJECTED BY YOU THAT

22  MERCK HAD SUGGESTED.

23  **A.**   SURE.  AS BEST I CAN RECALL, THERE WERE -- FOR EXAMPLE, IN

24  THE ABSTRACT OF THE PAPER AS IT WAS EVENTUALLY PRESENTED, THERE

25  WAS ONE FINDING THAT DEMONSTRATED AN INCREASED RISK OF VIOXX,

1    AND THE STATISTICAL SIGNIFICANCE OF THAT WAS A P-VALUE OF .054.

2    NOW, LET ME EXPLAIN WHAT THAT MEANS.

3            A P-VALUE OF .054, OR 5 PERCENT, MEANS THAT THERE'S A

4    95 PERCENT CERTAINTY THAT THE FINDING YOU ARE REPORTING WAS NOT

5    THE RESULT OF CHANCE.  THAT IS A BENCHMARK THAT IS OFTEN USED.

6    IT'S NOT ENGRAVED IN STONE, BUT IT'S A CONVENIENT BENCHMARK

7    THAT PEOPLE OFTEN USE TO UNDERSTAND HOW LIKELY IT IS THAT THIS

8    WAS NOT JUST THE RESULT OF HAPPENSTANCE.

9            ONE OF OUR FINDINGS HAD A P-VALUE OF 0.54, WHICH

10   MEANS THAT, INSTEAD OF A 95 PERCENT CERTAINTY OR LIKELIHOOD

11   THAT THIS WAS NOT THE RESULT OF CHANCE, THERE WAS, INSTEAD OF

12   95 PERCENT, A 94.6 PERCENT LIKELIHOOD THAT THIS WAS NOT THE

13   RESULT OF CHANCE.  WE FELT THAT, GIVEN PARTICULARLY THE PUBLIC

14   HEALTH RESPONSE OF HEART ATTACK AND THE WIDESPREAD USE OF THIS

15   DRUG, THAT THAT NEEDED TO BE IN THE ABSTRACT.

16           MERCK OBJECTED THAT THIS WAS, QUOTE, NOT A

17   SIGNIFICANT FINDING BECAUSE IT WAS 94.6 PERCENT PROBABILITY

18   THAT IT WAS NOT CHANCE INSTEAD OF A 95 PERCENT AND SAID WE

19   SHOULD TAKE IT OUT OF THE ABSTRACT.  THEY ALSO TOLD US THAT WE

20   SHOULD CHANGE THE WAY WE DESCRIBED THAT FINDING AS A NUMERICAL

21   DIFFERENCE THAT WAS NOT SIGNIFICANT OR SOMETHING TO THAT

22   EFFECT.  WE DISAGREED ON BOTH POINTS.

23   Q.   DID YOU HAVE DISCUSSIONS WITH MERCK ABOUT THAT?

24   A.   YES.

25   Q.   DID THERE COME A TIME WHEN YOU HAD TO MAKE A DECISION

```
 1  ABOUT WHAT REMAINED IN THE PAPER AND WHAT DID NOT REMAIN IN THE
 2  PAPER?
 3  A.   YES.  DR. SOLOMON AND I DISCUSSED THIS ON AN ALMOST DAILY
 4  BASIS AT THAT POINT.
 5  Q.   DID YOU ACTUALLY SUBMIT THE PAPER AS YOU WISHED IT TO BE?
 6  A.   YES.
 7  Q.   WAS IT ACCEPTED FOR PUBLICATION?
 8  A.   YES.  IT WAS INITIALLY SENT TO THE NEW ENGLAND JOURNAL OF
 9  MEDICINE AND JAMA AND THEY PASSED ON IT, AND IT WAS EVENTUALLY
10  ACCEPTED IN CARDIOLOGY-- I'M SORRY, IN CIRCULATION, WHICH IS
11  THE NUMBER ONE CARDIOLOGY JOURNAL IN THE WORLD.
12  Q.   DID ANYTHING UNUSUAL HAPPEN AT ABOUT THE TIME OF THE
13  PUBLICATION OF THE ARTICLE THAT WE HAVE BEEN TALKING ABOUT?
14  A.   YES.  AS THE ARTICLE WAS IN GALLEY ON PAGE PROOF, WHICH IS
15  THE PRINTED VERSION OF THE ARTICLE THAT IS SENT BACK TO THE
16  AUTHORS TO MAKE SURE THERE'S NO TYPOS, WE RECEIVED A PHONE CALL
17  FROM DR. SANTANELLO INSTRUCTING US TO REMOVE DR. CANNUSCIO'S
18  NAME FROM THE PAPER.
19  Q.   I'M ASKING WHAT HAPPENED.  DID HER NAME COME OFF THE
20  PAPER?
21  A.   HER NAME CAME OFF THE PAPER, AND I RELUCTANTLY AGREED TO
22  LET THAT HAPPEN.
23  Q.   DID YOU ACKNOWLEDGE DR. CANNUSCIO IN ANY OTHER WAY IN THE
24  PAPER?
25  A.   YES.  I WROTE AN ACKNOWLEDGMENT THAT I ASKED DR. SOLOMON
```

1    TO INCLUDE IN THE PAPER.

2    **Q.**    YOU DID THAT?

3    **A.**    YES.  THAT WAS MY-- THOSE ARE MY WORDS.  BECAUSE I FELT

4    THAT, LEAVING ASIDE THE ETHICS OF IT, HERE WAS A YOUNG WOMAN

5    STARTING OUT HER CAREER WHO WAS ABOUT TO HAVE A PAPER IN THE

6    BEST CARDIOLOGY JOURNAL IN THE WORLD AND THAT SHE DESERVED TO

7    BE A CO-AUTHOR OF, AND I WAS CONCERNED ALMOST IN MY FACULTY

8    ROLE THAT HERE SOMEBODY'S HARD WORK WAS BEING SNATCHED AWAY

9    FROM HER.  SO I WROTE THAT LANGUAGE THAT INDICATED THAT THERE

10   WAS AN UNNAMED EPIDEMIOLOGIST WHO HAD WORKED WITH US, AS IT

11   SAYS, "ACTIVELY IN THE STUDY DESIGN, STATISTICAL ANALYSIS, AND

12   INTERPRETATION OF THE DATA AND PREPARATION OF THE MANUSCRIPT",

13   WHICH ARE IN FACT THE CRITERIA FOR AUTHORSHIP.

14          WHILE WE ARE FORBIDDEN FROM USING DR. CANNUSCIO'S

15   NAME, I WANTED HER TO BE ABLE TO REFER TO THAT, AS SHE WENT ON

16   IN HER CAREER, AND SAY, "THAT WAS REALLY ME."  SO WE DID PUT

17   THE ACKNOWLEDGMENT THAT I WROTE AT THE END OF THE PAPER, BUT

18   STILL RESPECTED HER WISHES TO BE NOT LISTED AS A CO-AUTHOR.

19   **Q.**    DOCTOR, THIS ARTICLE WAS THEN PUBLISHED IN *CIRCULATION*?

20   **A.**    THAT'S RIGHT.

21   **Q.**    I'M GOING TO SHOW YOU WHAT I WOULD LIKE TO HAVE MARKED AS

22   EXHIBIT 30.  YOU TESTIFIED BEFORE-- AND I JUST WANT TO REFER

23   YOU TO THAT TESTIMONY-- THAT YOU FELT THIS WAS AN IMPORTANT

24   PUBLIC HEALTH ISSUE THAT YOUR STUDY WAS ADDRESSING.

25   **A.**    I'VE SAID THAT, AND I FELT THAT, AND I FEEL THAT.

1  Q.  NOW, LET ME SHOW YOU WHAT I HAVE HAD MARKED AS EXHIBIT 29.

2  A.  30.

3  Q.  I WILL REPRESENT TO YOU THAT IT IS A BULLETIN BEING USED

4  FOR DETAILERS DETAILING VIOXX.

5  A.  YOU MEAN THE SALES REPRESENTATIVES?

6  Q.  THE SALES REPRESENTATIVES.

7  A.  FOR MERCK.

8  Q.  YES.  IT'S DATED APRIL 21, 2004.

9  A.  CORRECT.

10 Q.  DO YOU SEE THAT, DOCTOR?  DOES IT REFER TO YOUR PARTICULAR

11 STUDY?

12 A.  YES.

13 Q.  IT'S CALLED AN OBSTACLE RESPONSE.  DO YOU SEE THAT?

14 A.  YES.

15 Q.  DID YOU CONSIDER YOUR PAPER AN OBSTACLE?

16 A.  NO.

17 Q.  YOU'RE SMILING.  WHY DO YOU SMILE?

18 A.  IT WAS AN IMPORTANT FINDING ABOUT THE RISKS OF A VERY,

19 VERY WIDELY USED DRUG IN RELATION TO A VERY COMMON AND

20 IMPORTANT AND DANGEROUS SIDE EFFECT THAT WAS ONLY AN OBSTACLE,

21 I SUPPOSE, FROM THE PERSPECTIVE OF VIOXX SALES, BUT IT WAS NOT

22 AN OBSTACLE IN TERMS OF SCIENCE.

23 Q.  WHEN IT SAYS "ACTION REQUIRED," IT SAYS, "DO NOT INITIATE

24 DISCUSSIONS ON THE ARTICLE WITH PHYSICIANS."  DO YOU SEE THAT?

25 A.  I SEE THAT.

343

1    **Q.**   DOCTOR, AS SOMEBODY WHO HAS BEEN INVOLVED IN ACADEMIC

2    DETAILING, WHICH WE SPOKE ABOUT BEFORE, CAN YOU THINK OF ANY

3    MEDICAL OR SCIENTIFIC REASON WHY A RESPONSIBLE DRUG COMPANY

4    WOULD NOT WANT TO HAVE ALL OF THE EVIDENCE DISCUSSED WITH

5    PHYSICIANS?  I'M NOT ASKING YOU TO SPECULATE, DOCTOR.  I'M

6    ASKING YOU, AS SOMEBODY WHO HAS DONE RESEARCH IN THIS AREA, IS

7    THERE ANY MEDICAL OR SCIENTIFIC REASON WHY THIS ARTICLE AND

8    THIS RESEARCH SHOULD NOT BE SHARED WITH DOCTORS?

9    **A.**   NO.

10   **Q.**   WHY NOT?

11   **A.**   AS SOMEONE WHO HAS SPENT HIS LIFE STUDYING HOW DOCTORS

12   MAKE PRESCRIBING DECISIONS AND WRITTEN PAPERS ABOUT AND

13   CONDUCTED PROGRAMS IN THE FAIR AND EVIDENCE-BASED PRESENTATION

14   OF BOTH BENEFIT AND RISK DATA TO PHYSICIANS SO THAT THEY CAN BE

15   HELPED TO MAKE MORE APPROPRIATE DECISIONS TO BENEFIT THEIR

16   PATIENTS, I CAN THINK OF NO REASON THAT ANYBODY WOULD-- NO

17   LEGITIMATE REASON WHY IT WOULD BE EVER APPROPRIATE TO SUPPRESS

18   NEGATIVE FINDINGS ABOUT A DRUG RISK.

19   **Q.**   IS THERE ANYTHING IN THIS OBSTACLE RESPONSE THAT INDICATES

20   THAT MERCK FUNDED THIS STUDY, APPROVED THE PROTOCOL, APPROVED

21   THE STATISTICAL ANALYSIS, AND WORKED ON THE MANUSCRIPT?

22   **A.**   NO.

23   **Q.**   DOCTOR, I WOULD LIKE FOR YOU TO TURN -- AND I'M GOING TO

24   SWITCH TOPICS FOR MOMENT.  LET'S GO TO AVORN EXHIBIT 9, WHICH

25   IS IN YOUR BINDER THERE.  IT'S AN ARTICLE ENTITLED, "ADJUSTING

1    FOR UNMEASURED CONFOUNDERS."

2    **A.**    YES.

3    **Q.**    DO YOU REMEMBER THAT STUDY?

4    **A.**    YES.

5    **Q.**    WAS THAT MERCK-FUNDED?

6    **A.**    YES.

7    **Q.**    WHAT WAS THE PURPOSE OF THAT STUDY?

8    **A.**    WE WANTED TO BE CERTAIN, WHEN WE FOUND THAT THERE WAS A

9    HIGHER RISK OF HEART ATTACK IN PATIENTS TAKING VIOXX -- AS I

10   SAID BEFORE, WE WANTED TO MAKE SURE THAT, TO BE FAIR TO THE

11   DRUG, THAT WAS NOT BECAUSE PEOPLE WHO HAPPENED TO BE ON VIOXX

12   WERE SICKER OR MORE LIKELY TO BE SMOKERS, WHICH WE KNOW CAUSES

13   HEART ATTACK, OR MIGHT HAVE BEEN MORE OVERWEIGHT OR PERHAPS

14   WERE LESS LIKELY TO BE TAKING ASPIRIN.

15            THESE ARE ALL POTENTIAL RISK FACTORS FOR HEART

16   ATTACK, BUT WE DID NOT HAVE INFORMATION ABOUT THEM IN OUR DATA,

17   ABOUT THEIR DRUG PRESCRIPTIONS AND THEIR MEDICAL HISTORY.  WE

18   WANTED TO HAVE SOME INDEPENDENT ASSESSMENT OF MAYBE PEOPLE WHO

19   WERE TAKING VIOXX WERE SICKER THAN PEOPLE TAKING CELEBREX.  IF

20   THAT WAS THE CASE, IT WOULD CAST OUR FINDINGS INTO DOUBT, AND

21   WE WANTED TO GET IT RIGHT.

22   **Q.**    WHEN YOU DID THE STUDY, WHAT DID YOU FIND?

23   **A.**    THAT THERE WAS NO MEANINGFUL DIFFERENCE BETWEEN VIOXX

24   USERS AND CELEBREX USERS; AND, IN FACT, TO THE VERY SMALL

25   EXTENT THAT THERE WAS A LITTLE BIT OF A DIFFERENCE, IT

1   INDICATED THAT OUR FINDINGS WOULD HAVE UNDERESTIMATED THE RISK

2   OF VIOXX.

3   **Q.**   GOING TO THE NEXT DOCUMENT, EXHIBIT 6, IT'S ANOTHER

4   ARTICLE, "DETERMINANTS OF SELECTIVE COX-2 PRESCRIBING."

5   **A.**   YES.

6   **Q.**   DO YOU SEE THAT?

7   **A.**   YES.

8   **Q.**   "ARE PATIENT OR PHYSICIAN CHARACTERISTICS MORE IMPORTANT?"

9   **A.**   RIGHT.

10  **Q.**   DO YOU SEE THAT?

11  **A.**   YES.

12  **Q.**   OKAY.  IS THAT AN ARTICLE YOU WROTE?

13  **A.**   YES, WITH MY TEAM.

14  **Q.**   IT WAS PUBLISHED IN 2003?

15  **A.**   YES.

16  **Q.**   WHAT, IF ANYTHING, BRIEFLY, DID YOU CONCLUDE?

17  **A.**   WELL, WE WERE AT THAT POINT TRYING TO UNDERSTAND HOW IT

18  COULD BE THAT THE USE OF COX-2 DRUGS, BOTH VIOXX AND CELEBREX,

19  WERE GOING THROUGH THE ROOF, DESPITE THE FACT THAT THEY HAD

20  NEVER BEEN SHOWN TO BE BETTER PAIN-RELIEVERS OR

21  ANTI-INFLAMMATORY DRUGS.  WITH THE EVIDENCE THAT WAS ALREADY

22  OUT THERE ABOUT THEIR RISKS, THE BENEFIT THAT THEY HAD IN

23  RELATION TO LESS STOMACH SYMPTOMS DID NOT SEEM, TO US, TO BE

24  ENOUGH REASON TO EXPLAIN THAT ASTRONOMICAL RISE.  SO WE LOOKED

25  IN OUR DATABASE AT THE PATTERNS OF USE AND WE THOUGHT, WELL,

1    MAYBE THERE ARE MORE PEOPLE OUT THERE WHO ARE GETTING THIS DRUG

2    BECAUSE THEY HAVE A HISTORY OF ULCER OR A BLEEDING PROBLEM OR

3    ARE ON ANTICOAGULANTS, ALL OF WHICH WOULD BE REASONS TO USE

4    THEM.

5    **Q.**   WHAT DID YOU FIND?

6    **A.**   WE FOUND THAT THAT REALLY DIDN'T PREDICT WHO WAS GETTING

7    THESE DRUGS.

8    **Q.**   IN THE CONCLUSION, IF YOU GO TO PAGE 720, IT SAYS,

9    "IMPORTANT QUESTIONS HAVE EMERGED AS TO WHETHER OR NOT POSSIBLE

10   INCREASES IN CARDIOVASCULAR RISK ASSOCIATED WITH THESE AGENTS

11   SHOULD LIMIT THEIR USE TO PATIENTS WHO ARE MOST LIKELY TO

12   BENEFIT FROM APPROVED GASTROINTESTINAL SAFETY."

13   **A.**   CORRECT.

14   **Q.**   WHAT, IF ANYTHING, ARE YOU SAYING HERE ABOUT THE

15   RISK/BENEFIT OF VIOXX?

16   **A.**   THAT BY 2003 WE WERE WRITING THAT THERE WAS ALREADY, AS WE

17   SAY, IMPORTANT QUESTIONS ABOUT WHETHER THEY INCREASE

18   CARDIOVASCULAR RISK AND THAT, THEREFORE, THESE SHOULD BE DRUGS

19   USED IN PATIENTS IN WHOM IT'S WORTH TAKING THAT RISK IF YOU

20   REALLY NEEDED TO HAVE A DRUG THAT WAS GENTLER ON THE STOMACH,

21   BUT NOT IN OTHER PEOPLE WHO DIDN'T NEED THAT EXTRA DEGREE OF

22   STOMACH PROTECTION.

23   **Q.**   COULD YOU TURN TO PAGE 719.

24   **A.**   YES.

25   **Q.**   IT SAYS "OTHER FACTORS" IN THE MIDDLE OF THE PAGE.  "OTHER

1   FACTORS MAY ALSO BE IMPORTANT CORRELATES TO PRESCRIBING SUCH AS

2   PATIENT EDUCATION LEVEL AND SOCIAL" WORK, AS WELL AS --

3   A.    "SOCIAL NETWORK."

4   Q.    "SOCIAL NETWORK" AND "PATIENT EXPOSURE TO ADVERTISING."

5   DO YOU SEE THAT?

6   A.    "PATIENT AND PHYSICIAN EXPOSURE TO ADVERTISING."

7   Q.    WHAT DID YOU MEAN BY THAT?

8   A.    THAT SINCE WE COULDN'T EXPLAIN THE VERY, VERY WIDESPREAD

9   USE OF THESE DRUGS BASED ON THEIR BEING PRESCRIBED TO PATIENTS

10  IN WHOM IT WOULD BE WORTH THE TRADEOFF OF HIGHER HEART ATTACK

11  RISK IN EXCHANGE FOR PERHAPS MORE ULCER PROTECTION, THAT THERE

12  MUST BE SOMETHING ELSE GOING ON.  ONE OF THE FACTORS THAT WAS

13  AN OBVIOUS POTENTIAL CAUSE WAS THE EXTENSIVE ADVERTISING TO

14  PATIENTS AND TO DOCTORS.

15  Q.    HAVE YOU WRITTEN ABOUT THE EFFECT OF DIRECT-TO-CONSUMER

16  ADVERTISING IN COMMERCIAL DETAILING ON PRESCRIBING PRACTICES?

17  A.    YES, I HAVE.

18  Q.    WHAT, IF ANY, EFFECT DOES DIRECT-TO-CONSUMER ADVERTISING

19  HAVE ON PHYSICIAN PRESCRIBING BEHAVIOR?

20  A.    AS I HAVE WRITTEN AND AS MANY PEOPLE HAVE FOUND, IT DRIVES

21  PHYSICIAN PRESCRIBING, WHICH IS WHY IT GETS DONE SO MUCH.  THE

22  PATIENTS WILL OFTEN TELL A DOCTOR, "I SAW THIS AD" OR "I HEARD

23  THIS COMMERCIAL.  DO YOU THINK I OUGHT TO BE ON THIS DRUG?

24  GIVE ME THIS DRUG."

25  Q.    NOW, YOU HAVE TESTIFIED TO A LOT OF ISSUES THAT YOU

1  DEVELOPED DURING THE COURSE OF YOUR WORK WITH MERCK AND DURING

2  THE COURSE OF THE TIME THE DRUG WAS ON THE MARKET.  DO YOU HOLD

3  THOSE OPINIONS AND THINGS THAT YOU HAVE TESTIFIED TO TO A

4  REASONABLE DEGREE OF MEDICAL CERTAINTY, DOCTOR?

5  **A.**   YES, I DO.

6  **Q.**   YOU STILL HOLD THOSE OPINIONS TO A REASONABLE DEGREE OF

7  MEDICAL CERTAINTY TODAY?

8  **A.**   ABSOLUTELY.

9  **Q.**   DO YOU FEEL IT IMPORTANT TO THE ISSUES THAT WE ASKED YOU

10  TO ADDRESS TO REVIEW THE DEPOSITION TESTIMONY OR THE TRIAL

11  TESTIMONY OF EVERY MERCK WITNESS WHO HAS TESTIFIED IN THIS

12  LITIGATION?

13  **A.**   THAT WOULD NOT EVEN BE POSSIBLE, EVEN IF I WANTED TO, BUT

14  MY CONCERN HAS BEEN ON WHAT WAS DONE AND SAID AND ACTED UPON AT

15  THE TIME, NOT A RECONSTRUCTION OF THAT YEARS LATER IN THE MIDST

16  OF LITIGATION.

17  **Q.**   NOW, LET ME ASK YOU SOME OF YOUR OPINIONS, GENERALLY, AND

18  WE CAN HOPEFULLY MOVE THROUGH THESE FAIRLY QUICKLY.  DOCTOR, WE

19  ADDRESSED THIS PREVIOUSLY ABOUT WHAT YOUR OPINIONS WERE AT THE

20  TIME THAT YOU WERE STUDYING VIOXX.  LET'S MOVE FORWARD IN TIME.

21  AS OF TODAY, DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF

22  MEDICAL CERTAINTY AS TO WHETHER OR NOT VIOXX WAS ANY MORE

23  EFFECTIVE AS A PAIN-RELIEVER THAN OTHER NONSTEROIDAL

24  ANTI-INFLAMMATORIES, WHETHER IT BE ASPIRIN, MOTRIN, NAPROXEN,

25  ALL THE OTHERS WE HAVE TALKED ABOUT?

1    **A.**   YES, I HAVE SUCH AN OPINION.

2    **Q.**   WHAT IS YOUR OPINION?

3    **A.**   MY OPINION -- I THINK IT'S PRETTY UNIVERSAL -- IS THAT

4    THERE'S REALLY NO EVIDENCE THAT VIOXX WAS OR IS ANY MORE

5    EFFECTIVE AS AN ANALGESIC OR A PAIN-RELIEVER THAN ANY OF THE

6    OLDER NONSTEROIDS ON THE MARKET.

7    **Q.**   DO YOU KNOW WHETHER OR NOT MERCK EVER CLAIMED THAT VIOXX

8    WAS BETTER AT PAIN RELIEF THAN ANY OTHER DRUG THAT WAS ON THE

9    MARKET?

10   **A.**   IT DID NOT.

11   **Q.**   IS THAT IMPORTANT IN APPLYING THE RISK/BENEFIT ANALYSIS

12   THAT WE TALKED ABOUT BEFORE?

13   **A.**   YES.  BECAUSE IF THERE WERE A DRUG THAT WAS-- WHEN VIOXX

14   FIRST CAME OUT, THERE WERE A LOT OF ARTICLES IN THE PAPERS

15   CALLING IT THE SUPER ASPIRIN AND KIND OF IMPLYING THAT IT

16   WORKED MUCH BETTER THAN ASPIRIN OR MOTRIN.  IF THAT WERE TRUE,

17   THEN MAYBE FOR SOMEBODY WITH REALLY BAD ARTHRITIS YOU MIGHT

18   EVEN BE WILLING TO CONSIDER A SLIGHT INCREASE IN SOME OTHER

19   RISKS IF THIS WAS REALLY THE MOST FANTASTIC PAIN-RELIEVER EVER,

20   BUT IT'S ABOUT AS GOOD AS ALL THE OTHERS WE HAVE.

21   **Q.**   LET ME GO ON.  DO YOU KNOW WHETHER OR NOT-- DO YOU HAVE AN

22   OPINION AS TO WHETHER OR NOT VIOXX HAD ANY EFFECT ON THE GI

23   SYSTEM?

24   **A.**   YES.

25   **Q.**   WHAT IS THAT OPINION?

1   A.   WELL, LIKE ALL DRUGS IN THE NONSTEROIDAL CLASS, IT'S MORE

2   IRRITATING THAN NOT TAKING ANYTHING.  BUT IT ALSO, IN THE VIGOR

3   STUDY, WAS FOUND TO ACTUALLY BE LESS IRRITATING TO THE STOMACH

4   AND LESS PRODUCING OF IMPORTANT GASTRIC PROBLEMS THAN OTHER

5   DRUGS LIKE NAPROXEN, IN PARTICULAR.

6   Q.   IN ASSESSING THE BENEFITS AND THE RISKS OF VIOXX, HAVE YOU

7   CONSIDERED THE FACT THAT, AT LEAST COMPARED TO NAPROXEN, IT HAD

8   A BETTER GI BENEFIT?

9   A.   YES.  THAT WAS ACTUALLY THE SUBSTANCE OF THE DISCUSSIONS

10  THAT I HAD WITH MY COLLEAGUES AROUND THE TIME THAT THE VIGOR

11  DATA WAS COMING OUT; THAT, WELL, IF IT'S WORSE FOR YOUR HEART

12  BUT BETTER FOR YOUR STOMACH, IS THAT A TRADEOFF THAT WAS WORTH

13  MAKING.  BECAUSE OFTEN, IN EITHER PRACTICE OR RESEARCH OR

14  TEACHING MEDICAL STUDENTS OR RESIDENTS, I HAVE TO CONFRONT THE

15  ISSUE OF THIS DRUG IS WORSE IN THIS RESPECT, BUT BETTER IN THIS

16  RESPECT, AND HOW DO YOU BALANCE THOSE TWO.  THERE'S A COUPLE OF

17  SECTIONS IN MY BOOK ABOUT THAT, BECAUSE A LOT OF DRUGS WILL

18  HAVE SOME PLUSES AND SOME MINUSES, AND YOU HAVE TO BE ABLE TO

19  MEASURE THEM AND THEN WEIGH THEM.

20  Q.   DO YOU KNOW WHETHER OR NOT MERCK, IN CONNECTION WITH

21  VIOXX, AS TIME WENT ON, SUGGESTED THAT PATIENTS WHO ARE AT RISK

22  FOR HEART PROBLEMS SHOULD TAKE ASPIRIN?

23  A.   YES.

24  Q.   THAT VIOXX WAS NO SUBSTITUTE FOR ASPIRIN?

25  A.   CORRECT.  THEY STATED THAT.

1   Q.   IN PATIENTS IN WHICH ASPIRIN AND VIOXX WERE TAKEN, HOW DID

2   THAT AFFECT THE GI BENEFIT?  DO YOU HAVE AN OPINION AS TO THAT?

3   A.   I HAVE AN OPINION.

4   Q.   WHAT IS THAT OPINION?

5   A.   WELL, BASED ON MERCK'S OWN STUDY -- THEY DID A STUDY,

6   WHICH I THINK WAS CALLED THE ASPIRIN ENDOSCOPY STUDY, IN WHICH

7   THEY ACTUALLY LOOKED AT WHETHER OR NOT THE

8   GENTLER-ON-YOUR-STOMACH ADVANTAGE OF VIOXX WOULD STILL BE THERE

9   IN PATIENTS WHO NEEDED TO TAKE A BABY ASPIRIN A DAY TO PROTECT

10  THEIR HEART.  BECAUSE AFTER THE VIGOR STUDY CAME OUT, MERCK

11  THEMSELVES WERE SAYING, IF YOU NEED TO BE ON ASPIRIN WHILE

12  YOU'RE TAKING VIOXX, YOU SHOULD TAKE ASPIRIN TO PROTECT YOUR

13  HEART.  IN THE STUDY WHICH THEY CONDUCTED OF PATIENTS WHO WERE

14  GIVEN BOTH ASPIRIN AND VIOXX, WHAT THEY FOUND WAS THAT THE

15  PROTECTIVE EFFECT ON THE STOMACH OF VIOXX WAS ACTUALLY LOST IF

16  A PATIENT WAS TAKING ASPIRIN IN ADDITION; THAT IS, YOU COULDN'T

17  DEMONSTRATE THE GASTROPROTECTIVE EFFECT OF VIOXX IF A PATIENT

18  WAS TAKING A BABY ASPIRIN ALONGSIDE IT.

19  Q.   DO YOU HAVE AN OPINION THAT YOU HOLD TO A REASONABLE

20  DEGREE OF MEDICAL AND SCIENTIFIC CERTAINTY AS TO WHETHER OR NOT

21  VIOXX IS CAPABLE OF CAUSING HEART ATTACKS IN HUMAN BEINGS?

22  A.   I HAVE AN OPINION.

23  Q.   WHAT IS THAT OPINION?

24  A.   THAT VIOXX DOES CAUSE HEART DISEASE, SPECIFICALLY HEART

25  ATTACKS, IN HUMAN BEINGS.

1    **Q.**   WOULD YOU BRIEFLY GIVE US THE BASIS OF THAT OPINION.

2    **A.**   YES.  I THINK THAT THERE'S A NUMBER OF DIFFERENT REASONS

3    FOR COMING TO THAT OPINION; ALL OF WHICH, IN MY VIEW, POINT IN

4    THE SAME DIRECTION.

5    **Q.**   WHAT ARE THE BASES OF YOUR OPINION, AS AN EPIDEMIOLOGIST,

6    THAT VIOXX IS CAPABLE OF CAUSING HEART ATTACKS IN HUMAN BEINGS?

7    **A.**   THE CLINICAL TRIAL EVIDENCE I THINK IS THE NUMBER ONE

8    STRONGEST INDICATION OR EVIDENCE FOR THIS.  RANDOMIZED

9    CONTROLLED CLINICAL TRIALS, DOUBLE-BLIND, IN WHICH PATIENTS WHO

10   WERE GIVEN VIOXX COMPARED TO OTHER DRUGS, THE CONSISTENCY OF

11   THE EVIDENCE THAT VIOXX CAUSES A HIGHER NUMBER OF HEART ATTACKS

12   OR OTHER CARDIOVASCULAR ADVERSE EVENTS, FROM A NUMBER OF

13   STUDIES WHICH WE COULD GO THROUGH, THAT IS ONE KEY FOUNDATION

14   OF THIS ASSOCIATION.  THAT WAS FOUND IN VIGOR, IN 090, IN

15   ADVANTAGE, IN A NUMBER OF STUDIES, MOST OF WHICH ACTUALLY WERE

16   CONDUCTED BY MERCK, WHICH SHOWED A HIGHER --

17   **Q.**   APPROVE?

18   **A.**   I'M SORRY?

19   **Q.**   APPROVE?  DOES APPROVE FIT IN THERE?

20   **A.**   APPROVE.  I'M SORRY.  THAT WAS THE ONE THAT GOT IT OFF THE

21   MARKET.  ALL THOSE ARE STUDIES WHICH SHOWED A HIGHER RATE OF

22   HEART ATTACKS AND OTHER CARDIOVASCULAR OUTCOMES IN PATIENTS

23   GIVEN VIOXX.  THAT IS ONE LINE OF EVIDENCE.

24           THE OTHER LINE OF EVIDENCE, WHICH IS TOTALLY SEPARATE

25   BUT ALSO POINTS IN THE SAME DIRECTION, IS STUDIES OF THE KIND

1    THAT WE HAVE DONE WHERE YOU LOOK AT PEOPLE TAKING VIOXX

2    COMPARED TO PEOPLE TAKING CELEBREX COMPARED TO OTHER

3    MEDICATIONS AND, AGAIN, FINDING THAT THE PEOPLE TAKING VIOXX

4    OUT THERE IN THE NORMAL WORLD, NOT IN THE CLINICAL TRIAL, ARE

5    HAVING MORE HEART ATTACKS THAN PEOPLE NOT TAKING IT.  THEN, IN

6    A WAY, THE ICING ON THE CAKE IS IF THERE IS SOME REASON FOR

7    BEING ABLE TO SAY WE THINK WE MAY KNOW WHY THIS HAPPENS, THAT

8    IS ADDITIONAL HELPFUL INFORMATION.

9    **Q.**   DID YOU HAVE ALL THREE OF THOSE IN CONNECTION WITH-- TO

10   SUPPORT VIOXX?

11   **A.**   YES.  I THINK ALL THREE LINES OF ARGUMENT WERE PRESENT AND

12   REASONABLY CLEAR IN THE CASE OF VIOXX.

13   **Q.**   MOVING FORWARD, DOCTOR, DO YOU HAVE AN OPINION AS TO

14   WHETHER OR NOT IT IS GENERALLY ACCEPTED IN THE MEDICAL AND

15   SCIENTIFIC COMMUNITY TODAY THAT VIOXX IS CAPABLE OF CAUSING

16   HEART ATTACKS IN HUMAN BEINGS?

17   **A.**   YES.  THAT WAS THE UNANIMOUS VIEW OF THE FDA ADVISORY

18   COMMITTEE THAT MET IN 2005.

19   **Q.**   WHEN YOU SAY "THE UNANIMOUS VIEW," WHAT DO YOU MEAN?

20   **A.**   I THINK THERE WERE 32 PEOPLE VOTING AND I BELIEVE THAT

21   32 -- IN ANSWER TO THE QUESTION DOES VIOXX CAUSE CARDIOVASCULAR

22   DISEASE IN HUMANS, I THINK 32 OUT OF THE 32 SAID YES, AND I

23   DON'T THINK ANYONE SAID NO.

24   **Q.**   DR. AVORN, DO YOU HAVE AN OPINION THAT YOU HOLD TO A

25   REASONABLE DEGREE OF MEDICAL CERTAINTY AS TO WHETHER OR NOT A

1   PERSON WHO HAS TO BE TAKING VIOXX FOR ANY PARTICULAR PERIOD OF

2   TIME BEFORE THEY ARE ACTUALLY AT RISK FOR A VIOXX-INDUCED HEART

3   ATTACK?

4   **A.**   WELL, IN OUR STUDY WE FOUND AN INCREASE IN RISK IN 1 TO 30

5   DAYS AS WELL AS 30 TO 90 DAYS.  WE HAVE RECENTLY, JUST IN THE

6   LAST WEEK OR TWO, SEEN THAT THE CONTENTION--

7   **Q.**   LET ME ASK YOU A QUESTION.

8   **A.**   OKAY.

9   **Q.**   HAS THERE BEEN ANY EVIDENCE THAT HAS COME OUT IN THE PAST

10  TWO DAYS THAT SUPPORTS YOUR OPINION THAT THERE IS NOT A PERIOD

11  OF TIME IN WHICH IT IS NECESSARY FOR A PERSON TO BE ON VIOXX

12  BEFORE THEY DEVELOP A VIOXX-INDUCED HEART ATTACK?

13  **A.**   LET'S CALL IT THE LAST WEEK BECAUSE IT WAS PUT UP ON THE

14  WEBSITE OF THE *NEW ENGLAND JOURNAL OF MEDICINE* IN THE LAST

15  SEVERAL DAYS, BUT I DON'T REMEMBER IF IT WAS TWO OR THREE.

16  **Q.**   GO AHEAD.

17  **A.**   BUT IT HAS JUST BECOME KNOWN TO THE WORLD-AT-LARGE THAT

18  THE ANALYSIS WHICH WAS PERFORMED ON THE DATA FROM THE APPROVE

19  STUDY, WHICH WAS THE STUDY THAT WAS RELEASED IN SEPTEMBER OF

20  2004, WHICH WAS THE OCCASION FOR WITHDRAWING THE DRUG FROM THE

21  MARKET, THAT THE ANALYSIS WHICH WAS INITIALLY DONE AND REPORTED

22  IN THE *NEW ENGLAND JOURNAL OF MEDICINE*, TO THEIR EMBARRASSMENT,

23  WAS INCORRECT AND THAT IT WAS-- IT LOOKED AT THIS ISSUE OF

24  BEFORE 18 MONTHS VERSUS AFTER 18 MONTHS IN A WAY THAT WAS

25  ERRONEOUS IN A STATISTICAL SENSE, AND THAT IF ONE LOOKS AT IT

1   IN THE CORRECT WAY THAT THERE IS NOT THIS PHENOMENON OF NO

2   EFFECT BEFORE 18 MONTHS, AND THEN THE EFFECT STARTS.  IF I

3   COULD JUST COMPLETE THE THOUGHT, THE *NEW ENGLAND JOURNAL*

4   REQUIRED THE AUTHORS OF THAT PAPER TO PUBLISH A CORRECTION TO

5   THEIR ORIGINAL REPORT, WHICH IS THE NEW ELEMENT THAT HAS COME

6   OUT IN JUST THE LAST FEW DAYS.

7   **Q.**   DOCTOR, ARE THERE ANY OTHER CLINICAL TRIALS THAT YOU ARE

8   AWARE OF, IN REVIEWING THE MATERIALS WE ASKED YOU TO REVIEW,

9   WHICH WERE SHORTER-TERM STUDIES WHERE RISKS WERE SEEN?

10  **A.**   YES.  THE VIGOR STUDY ITSELF ONLY LASTED NINE MONTHS, AND

11  THAT WAS THE STUDY IN WHICH THE FOUR OR FIVEFOLD INCREASE IN

12  HEART ATTACKS WAS SEEN.  SO IF THERE WAS NO EFFECT BEFORE 18

13  MONTHS, IT WOULD HAVE NOT BEEN SEEN IN VIGOR, BUT IT WAS.  IN

14  ADDITION, STUDIES LIKE ADVANTAGE AND STUDY 090 WERE MUCH

15  BRIEFER THAN THAT, AND THEY ALSO FOUND AN EFFECT THAT WAS

16  DIFFERENT IN VIOXX USERS VERSUS THE COMPARISON GROUP IN WELL

17  UNDER SIX MONTHS.

18  **Q.**   LOOKING AT ALL OF THOSE TOGETHER, IN YOUR OPINION DID A

19  PATTERN EMERGE THAT IN ANY WAY SUGGESTED, GOOD OR BAD, THAT

20  THERE WAS NOT A CUTOFF PERIOD OF TIME WHERE THE RISK BEGINS?

21  **A.**   I THINK, LOOKING AT ALL THE DATA TOGETHER FROM THE

22  CLINICAL TRIALS AND, IN ADDITION, SEPARATELY LOOKING AT THE

23  DATA FROM THE OBSERVATIONAL OR THE EPIDEMIOLOGIC STUDIES, THE

24  TOTALITY OF THE EVIDENCE DOES NOT SUGGEST THAT THERE IS A,

25  QUOTE, SAFE PERIOD EARLY ON WHEN YOU DON'T GET INTO TROUBLE

1   WITH THE DRUG.

2   **Q.**   DOCTOR, WE TALKED ABOUT THE VIGOR STUDY IN THE EARLIER

3   PART OF YOUR DEPOSITION.  HAVE YOU SINCE COME TO LEARN THAT THE

4   DATA FROM THE VIGOR STUDY IS DIFFERENT THAN YOU INITIALLY

5   THOUGHT IT WAS AT THE TIME IT WAS PUBLISHED?

6   **A.**   YES.

7   **Q.**   WHAT DID YOU UNDERSTAND IS NOW DIFFERENT THAN WHAT WAS

8   ORIGINALLY REPORTED BY MERCK IN NOVEMBER OF 2000?

9   **A.**   WELL, APPARENTLY-- NOT APPARENTLY.  IT IS NOW AGREED, I

10  THINK, BY ALL PARTIES THAT THERE WERE THREE CASES OF HEART

11  ATTACK IN PATIENTS WHO WERE IN THE VIGOR STUDY, WHO ACTUALLY

12  WERE IN THE VIOXX ARM OF THE VIGOR STUDY, WHOSE HEART ATTACKS

13  WERE NOT INCLUDED IN THE ORIGINAL REPORT AS IT WAS PUBLISHED IN

14  THE *NEW ENGLAND JOURNAL OF MEDICINE*.

15  **Q.**   WERE THOSE IN ANY PARTICULAR SUBGROUP IN THE VIGOR STUDY

16  THAT IS OF CLINICAL IMPORTANCE?

17  **A.**   ALL OF THEM WERE IN WHAT WAS CALLED THE

18  ASPIRIN-NOT-INDICATED GROUP, WHICH WAS THE SUPPOSEDLY LOWER

19  RISK FOR CARDIAC DISEASE SUBGROUP OF THE STUDY.

20  **Q.**   IN TERMS OF WHAT WE CALL THE "NAPROXEN ISSUE," WHAT

21  SIGNIFICANCE -- IN AS SIMPLE A WAY AS YOU CAN EXPLAIN IT, WHAT

22  SIGNIFICANCE IS IT THAT THE THREE DEATHS --

23  **A.**   HEART ATTACKS.

24  **Q.**   -- HEART ATTACKS WERE NOT IN THE ASPIRIN-INDICATED GROUP?

25  **A.**   OKAY.  THE FACT THAT THE THREE HEART ATTACKS THAT WERE NOT

1   ORIGINALLY REPORTED IN THE PUBLICATION OF THE VIGOR STUDY, THE

2   IMPORTANCE OF THEIR HAVING ALL OCCURRED IN THE, QUOTE,

3   ASPIRIN-NOT-INDICATED GROUP IS THE FOLLOWING:

4           THE ARGUMENT THAT WAS BEING MADE IN THE VIGOR STUDY

5   AS IT WAS PUBLISHED WAS THAT THE REASON THAT THERE WERE MORE

6   HEART ATTACKS SEEN IN PEOPLE TAKING VIOXX COMPARED TO PEOPLE

7   TAKING NAPROXEN WAS THAT NAPROXEN HAD THIS VERY POWERFUL

8   ASPIRIN-LIKE EFFECT ON YOUR PLATELETS, WHICH MADE THEM NOT

9   CLOT, AND THAT VIOXX DIDN'T HAVE THAT EFFECT, AND THAT'S HOW

10  NAPROXEN WAS SUPPOSEDLY PREVENTING HEART ATTACKS RATHER THAN

11  HAVING VIOXX CAUSE HEART ATTACKS.

12          THE IMPORTANCE OF THOSE THREE CASES OCCURRING IN THE

13  PATIENTS WHO DIDN'T NEED ASPIRIN GROUP IS THAT THAT DOESN'T

14  FIT; THAT IF THE ISSUE WAS THAT VIOXX LACKED THE ASPIRIN-LIKE

15  EFFECT THAT NAPROXEN SUPPOSEDLY HAD, THEN YOU WOULD NOT EXPECT

16  PEOPLE WHO DIDN'T NEED ASPIRIN TO DO ANY WORSE.  BUT, IN FACT,

17  THE PEOPLE WHO DIDN'T NEED ASPIRIN ALSO DID WORSE ON VIOXX,

18  WHICH IS CONSISTENT WITH THE IDEA THAT IT WASN'T JUST ABOUT

19  SOME IMAGINED NAPROXEN PROTECTIVE EFFECT BUT, RATHER, ABOUT THE

20  LIKELIHOOD-- WHICH I THINK IS NOW QUITE PLAUSIBLE-- THAT VIOXX

21  WAS ACTUALLY PRECIPITATING THE HEART ATTACKS.

22  Q.   LET'S GO TO THE NEXT QUESTION THAT WE ASKED YOU TO

23  ADDRESS, WHICH IS MERCK'S INVESTIGATION AND MANAGEMENT OF--

24  INVESTIGATION OF THE POTENTIAL OF VIOXX TO CAUSE HEART ATTACKS

25  AND THEIR MANAGEMENT OF THAT ISSUE, THE STUDIES, THE

1   COMMUNICATIONS, ET CETERA.  FIRST OF ALL, HAVE YOU REVIEWED
2   DOCUMENTS THAT WERE BEFORE THE NEW DRUG APPLICATION WAS FILED
3   FOR VIOXX?
4   **A.**   YES.  THERE WERE SOME INITIAL REPORTS OF CLINICAL TRIALS
5   THAT HAD BEEN CONDUCTED.
6   **Q.**   WHAT IS THE TERM "SIGNAL," DOCTOR?  FIRST OF ALL, IS THE
7   TERM "SIGNAL" SOMETHING THAT IS COMMONLY USED IN YOUR FIELD OF
8   PHARMACOEPIDEMIOLOGY?
9   **A.**   YES.
10  **Q.**   WOULD YOU PLEASE EXPLAIN TO THE JURY WHAT A "SIGNAL" IS.
11  **A.**   YES.  I THINK A GOOD REGULAR LANGUAGE WORD WOULD BE
12  "CLUE," THAT IF THERE MAY BE SOME EVIDENCE THAT COMES UP THAT
13  IS NOT IN ITSELF A SLAM-DUNK PROOF THAT THERE'S A PROBLEM, BUT
14  SOMETHING THAT MIGHT BE CALLED A SMOKING GUN, SOMETHING THAT
15  SURE LOOKS SUSPICIOUS AND WARRANTS FOLLOW-UP EVEN THOUGH, IN
16  ITSELF, IT DOES NOT ABSOLUTELY WRAP UP THE CERTAINTY THAT
17  THERE'S A PROBLEM.
18  **Q.**   DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER OR NOT MERCK
19  SHOULD HAVE RECOGNIZED-- A REASONABLE AND PRUDENT COMPANY, WITH
20  THE KNOWLEDGE THAT MERCK HAD BEFORE THE DRUG WAS ON THE MARKET,
21  SHOULD HAVE RECOGNIZED THAT THERE WAS A POTENTIAL FOR
22  CARDIOVASCULAR DISEASE IN PATIENTS WHO TOOK VIOXX?
23  **A.**   YES.  IF ONE LOOKS AT THE TOTALITY OF THE INFORMATION THAT
24  WAS AVAILABLE AS OF THE TIME THAT THE NEW DRUG APPLICATION WAS
25  SUBMITTED, THERE WERE A NUMBER OF PIECES OF INFORMATION FROM

DAILY COPY

1   CLINICAL TRIAL DATA, AS WELL AS FROM OTHER SOURCES, THAT

2   CERTAINLY RAISED A QUESTION AS TO WHETHER OR NOT THIS WAS A

3   PROBLEM.  I'M NOT SAYING THAT THEY WERE SLAM-DUNK -- TO USE A

4   PHRASE FROM THE CURRENT ADMINISTRATION, "SLAM-DUNK EVIDENCE"

5   THAT THERE WAS A PROBLEM, BUT THAT CERTAINLY WERE VERY

6   SUSPICIOUS WORRIES.

7   Q.   I'M GOING TO HAND YOU WHAT I HAVE MARKED AS EXHIBIT 31.

8   FOR THE RECORD, THIS IS A RESEARCH MANAGEMENT COMMITTEE

9   DOCUMENT DATED OCTOBER 10, 1996, MRK-ABC0048699.  HAVE YOU SEEN

10  THIS DOCUMENT BEFORE?

11  A.   YES, I HAVE.

12  Q.   IS THIS A DOCUMENT YOU RELIED ON IN SUPPORTING YOUR

13  OPINION THAT THERE WAS A, QUOTE, SIGNAL OF POTENTIAL

14  CARDIOTOXICITY FOR VIOXX PRIOR TO THE FILING OF THE NEW DRUG

15  APPLICATION?

16  A.   IN PART.

17  Q.   WOULD YOU PLEASE GO TO PAGE 8.

18  A.   YES.

19  Q.   FIRST OF ALL, WHAT IS MK-966?

20  A.   THAT WAS THE WORKING NAME FOR VIOXX BEFORE IT WAS CALLED

21  VIOXX.

22  Q.   IS THIS A DOCUMENT THAT IS A MERCK DOCUMENT?

23  A.   YES.

24  Q.   IN SECTION 3 IT INDICATES A SECTION THAT SAYS "ADVERSE

25  EVENTS."  DO SEE THAT?

1    **A.**   YES.

2    **Q.**   WOULD YOU TELL US WHAT, IF ANYTHING, WAS SIGNIFICANT IN

3    YOUR REVIEW OF THIS DOCUMENT WHICH SUPPORTS YOUR OPINIONS.

4    **A.**   SURE.   IN FAIRNESS, I SHOULD POINT OUT THAT THESE WERE

5    VERY, VERY BIG DOSES OF VIOXX.   THIS WAS BEFORE THEY REALLY

6    KNEW WHAT THE RIGHT DOSE WOULD BE.   SO THESE DOSES WERE 125 TO

7    175 MILLIGRAMS.   I THINK THAT'S PART OF THE PICTURE HERE.

8    **Q.**   SURE.

9    **A.**   HAVING SAID THAT, THE SECOND PARAGRAPH-- AND THE OTHER

10   IMPORTANT POINT WAS THAT THIS STUDY LASTED ONLY SIX WEEKS.   SO

11   IT WAS A REALLY REMARKABLY SHORT PERIOD OF TIME IN WHICH YOU

12   REALLY WOULD NOT EXPECT TO SEE A CARDIOVASCULAR RISK BECAUSE IT

13   WAS ONLY A MONTH AND A HALF LONG.

14          THE SECOND PARAGRAPH READS, "ADVERSE EVENTS OF MOST

15   CONCERN WERE IN THE CARDIOVASCULAR SYSTEM, E.G., MI" -- OR

16   HEART ATTACK -- "UNSTABLE ANGINA" -- WHICH IS INCREASING CHEST

17   PAIN FROM HEART DISEASE-- "RAPID FALL IN HEMOGLOBIN AND

18   HEMATOCRIT IN SOME SUBJECTS, AND A SMALL INCREASE IN BLOOD

19   PRESSURE."

20   **Q.**   THIS WAS OCTOBER 1996?

21   **A.**   CORRECT.   THE NEXT SENTENCE, WHICH I THINK IS ALSO

22   RELEVANT, "WE PLAN TO EVALUATE MK-966" OR VIOXX "IN A STUDY

23   WHERE SUBJECTS ARE ALSO GIVEN LOW-DOSE ASPIRIN."

24   **Q.**   WAS THAT STUDY EVER DONE?

25   **A.**   IT WAS NOT UNTIL THE VIGOR DATA CAME OUT IN 2000 THAT

1   MERCK BEGAN TO ADVOCATE USING ASPIRIN IN PEOPLE TAKING VIOXX,

2   AND SO THAT WOULD HAVE BEEN, OH, FOUR YEARS LATER.

3   Q.   NOW, DOCTOR, DID YOU ALSO REVIEW IN THE MEDICAL OFFICER

4   REVIEWS FOR VIOXX -- THE FDA MEDICAL OFFICER REVIEW FOR VIOXX

5   WHEN THE DRUG WAS APPROVED?

6   A.   YES.

7   Q.   DID YOU CONSIDER THE VIEWS OF THE MEDICAL OFFICER WHEN

8   FORMING YOUR OPINIONS?

9   A.   YES, BECAUSE THAT WAS WHAT WAS KNOWN AT THE TIME.

10  Q.   WHAT, IF ANY, SIGNIFICANCE -- AND I'M GOING TO TRY TO GO

11  THROUGH THESE FAIRLY QUICKLY.  WHAT, IF ANY, SIGNIFICANCE WAS

12  THERE IN THE CARDIOVASCULAR SECTION OF THE MEDICAL OFFICER

13  REVIEW FOR THE VIOXX CLINICAL TRIAL PROGRAM THAT ASSISTED YOU

14  IN FORMULATING YOUR OPINIONS?

15  A.   WELL, A NUMBER OF THE FDA STAFF THAT WERE EVALUATING

16  VIOXX-- I'M THINKING OF DR. PULAYO, DR. VILLALBA, AND

17  DR. TARGUM-- WERE STRUCK WITH AND NOTICED AND WROTE ABOUT THE

18  FACT THAT THERE APPEARED TO BE AN EXCESS OF CARDIOVASCULAR

19  DISEASE IN PATIENTS WHO WERE GIVEN VIOXX IN THE CLINICAL TRIALS

20  THAT WERE SUBMITTED BY MERCK TO FDA IN THE LATE '90S.

21  Q.   MOVING ON, I WOULD LIKE TO SHOW YOU A DOCUMENT-- I'M GOING

22  TO SHOW YOU A DOCUMENT-- FIRST OF ALL, IS THIS A DOCUMENT THAT

23  YOU REVIEWED IN THE CONTEXT OF YOUR OPINIONS THAT YOU HAVE

24  PREPARED TO RENDER IN THIS CASE?

25  A.   YES.

1   **Q.**    WHAT IS THIS DOCUMENT, DOCTOR?

2   **A.**    THIS IS LABELED "SCIENTIFIC ADVISORS MEETING, MAY 3-MAY 6,

3   1998."

4   **Q.**    WHAT IS THIS DOCUMENT?

5   **A.**    THIS IS A SUMMARY OF THE REPORT OF A GROUP OF SCIENTIFIC

6   ADVISORS THAT MERCK PULLED TOGETHER TO ADVISE IT ON THE

7   DEVELOPMENT OF VIOXX AS IT WAS IN ITS PREAPPROVAL STATE, THAT

8   IS, BEFORE THE FDA APPROVED IT.

9   **Q.**    WOULD YOU TURN TO PAGE 11 OF THIS DOCUMENT --

10  **A.**    YES.

11  **Q.**    -- UNDER THE SECTION ENTITLED "CARDIOVASCULAR."

12  **A.**    YES.

13  **Q.**    DO YOU SEE THAT?

14  **A.**    YES.

15  **Q.**    WOULD YOU PLEASE TELL THE MEMBERS OF THE JURY WHAT MERCK

16  WAS BEING TOLD BY ITS BOARD OF SCIENTIFIC ADVISORS ABOUT THE

17  POTENTIAL PROBLEMS FOR VIOXX PRIOR TO THE DRUG BEING ON THE

18  MARKET.

19  **A.**    THE BOARD OF SCIENTIFIC ADVISORS DREW THE COMPANY'S

20  ATTENTION TO THREE SPECIFIC ISSUES THAT ARE NUMBERED HERE.  ONE

21  WAS THE POSSIBILITY OF -- WE TALK ABOUT THIS BALANCE OF COX-1

22  AND COX-2; THAT IF YOU BLOCK COX-2 AND DON'T BLOCK COX-1, THE

23  COMMITTEE -- WHICH WAS OUTSIDE PHARMACOLOGISTS OF SOME

24  RENOWN -- SAID HERE'S SOMETHING THAT COULD HAPPEN, THAT ONE

25  MIGHT EXPECT OR WORRY ABOUT IF YOU BLOCK COX-2 AND DON'T BLOCK

1   COX-1 AS MUCH.

2          ONE IS "THE DEVELOPMENT OF LIPID-RICH CORONARY

3   PLAQUES."  THAT'S BASICALLY GUNK DEVELOPED, BUILDING UP IN THE

4   ARTERY OF THE HEART, WHICH CAN THEN ERUPT AND FORM A CLOT AND

5   CAUSE HEART DISEASE.

6          TWO, "THE DESTABILIZATION OF THE CAP OF THESE PLAQUES

7   BY INFLAMMATORY CELLS MAKING THEM RUPTURE-PRONE," AND THAT IS

8   WHAT WE NOW BELIEVE IS THE MECHANISM OF HEART ATTACKS; THAT YOU

9   HAVE THIS FATTY GUNK SITTING IN YOUR ARTERIES AND THEN, FOR

10  SOME REASON, IT RUPTURES, AND THE FAT IS KIND OF SPILLED INTO

11  THE ARTERY, AND THAT CAUSES THE CLOT TO FORM AND THAT CAUSES

12  THE HEART ATTACK.

13         THREE, "THE THROMBOTIC OCCLUSION OF THE VESSEL AT THE

14  SITE OF PLAQUE RUPTURE WITH ENSUING CONSEQUENCES OF ISCHEMIA,"

15  THAT BASICALLY MEANS HAVING A HEART ATTACK.

16  Q.   DOCTOR, PUTTING ALL THE KIND OF EVIDENCE WE HAVE BEEN

17  TALKING ABOUT TOGETHER, DO YOU HAVE AN OPINION AS TO WHETHER OR

18  NOT THERE WAS EVIDENCE PRIOR TO VIOXX BEING ON THE MARKET THAT

19  A REASONABLE AND PRUDENT COMPANY, REVIEWING THE SAFETY PROFILE

20  OF THIS DRUG, WOULD HAVE CONSIDERED IN TERMS OF DESIGNING THEIR

21  CLINICAL TRIAL PROGRAM AND INVESTIGATING THIS SIGNAL?

22  A.   YES.

23  Q.   WHAT IS THAT OPINION?

24  A.   IN DEVELOPING A DRUG OR LOOKING AT DRUG RISKS AND

25  BENEFITS, IT IS NECESSARY TO LOOK NOT JUST AT WHAT IS FOUND IN

1  A PARTICULAR STUDY, BUT ALSO WHAT IS ALL THE EVIDENCE ABOUT

2  WHAT MIGHT WORK AND WHAT MIGHT NOT WORK.  IN FACT, WHAT MIGHT

3  WORK CAN BE VERY USEFUL IN PLANNING THE DEVELOPMENT OF THE

4  DRUG.

5          WHEN I TEACH IN A COURSE AT TUFTS MEDICAL SCHOOL FOR

6  DRUG COMPANY EXECUTIVES ABOUT THINKING ABOUT RISKS AND BENEFITS

7  IN DRUG DEVELOPMENT, ONE OF THE POINTS I MENTION IS THAT IT'S

8  KEY TO PULL TOGETHER EVERYTHING THAT'S KNOWN SO THAT YOU CAN

9  PLAN YOUR CLINICAL DEVELOPMENT PROGRAM, WHETHER IT'S ANIMAL

10  STUDIES OR HUMAN STUDIES OR FOLLOW-UP EPIDEMIOLOGIC STUDIES, SO

11  AS TO FOLLOW UP ON SIGNALS.  SOME SIGNALS MAY BE GOOD SIGNALS

12  LIKE HERE IS A POTENTIAL REALLY GOOD EFFECT OF THIS DRUG THAT

13  WE WANT TO FIND OUT MORE ABOUT, AS WELL AS THE BAD SIGNALS.

14          LOOKING AT IT ALL TOGETHER, THERE IS THE EVIDENCE

15  FROM MERCK'S OWN PHARMACOLOGY ADVISORS SAYING HERE'S SOME

16  PROBLEMS THAT YOU GUYS NEED TO KEEP AN EYE OUT FOR BECAUSE

17  SPECIFICALLY, 1, 2, 3, HERE ARE WAYS IN WHICH THIS DRUG MIGHT

18  CAUSE HEART ATTACKS.  NOBODY KNEW SPECIFICALLY AT THE TIME THAT

19  IT WOULD, BUT THEY WERE TOLD WATCH OUT FOR THIS.  I THINK THERE

20  WAS SOME PHRASE IN HERE THAT THEY SHOULD BE ACTIVELY PURSUED,

21  OR SOMETHING TO THAT EFFECT.

22          THERE WERE THE EARLIER CLINICAL TRIALS THAT MERCK HAD

23  PERFORMED IN WHICH, WHATEVER THE DOSE, IF YOU HAVE A DRUG THAT

24  INCREASES HEART ATTACKS IN A SIX-WEEK STUDY, THAT'S AN

25  IMPORTANT SIGNAL TO WORRY ABOUT.

1          THERE WERE THE ANIMAL STUDIES AND OTHER PHARMACOLOGIC

2     STUDIES THAT SAY, GEE, YOU KNOW, MAYBE BLOCKING COX-2

3     SELECTIVELY IS NOT A TOTALLY GOOD IDEA, MAYBE THERE'S SOME

4     IMPORTANT GOOD THINGS THAT COX-2 DOES THAT YOU DON'T WANT TO

5     BLOCK TOTALLY, AND THAT WAS IN THE LITERATURE BEFORE THE DRUG

6     WAS ON THE MARKET.

7          SO COMBINING THE ADVICE FROM THEIR SCIENTIFIC

8     ADVISORS, THE EVIDENCE FROM THE ANIMAL STUDIES, FROM THE

9     PHARMACOLOGIC LITERATURE, AND THE EVIDENCE FROM THEIR OWN

10    CLINICAL TRIALS SUGGESTING AN INCREASE IN EVENTS -- I'M NOT

11    SAYING THEY SHOULD NOT HAVE MARKETED THE DRUG.  I'M NOT SAYING

12    THEY SHOULD HAVE PULLED IT OFF THE MARKET THE DAY IT WAS

13    APPROVED, BUT I AM SAYING THESE WERE SOME SMOKING GUNS THAT A

14    REASONABLE COMPANY WOULD HAVE SAID, AS WE MARKET THIS DRUG,

15    LET'S MAKE SURE THAT WE'RE ALSO KEEPING AN EYE ON THIS

16    POTENTIAL PROBLEM THAT WE HAVE BEEN WARNED ABOUT FROM MULTIPLE

17    SOURCES.

18  **Q.**   DR. AVORN, DO YOU HAVE AN OPINION THAT YOU HOLD TO A

19    REASONABLE DEGREE OF MEDICAL CERTAINTY AS TO WHEN THERE WAS

20    REASONABLE EVIDENCE OF AN ASSOCIATION BETWEEN VIOXX AND HEART

21    ATTACKS?

22  **A.**   YES.

23  **Q.**   WHAT IS THAT OPINION?

24  **A.**   THAT SAID, I HAVE SUCH AN OPINION, AND IT IS THAT BY THE

25    TIME THE DATA FROM THE VIGOR STUDY WERE AVAILABLE TO MERCK,

1   WHICH WOULD HAVE BEEN THE SPRING OF 2000, COMBINING THE VIGOR

2   DATA WITH THE EVIDENCE FROM THE OTHER CLINICAL TRIALS, ALL OF

3   WHICH MERCK HAD CONDUCTED ITSELF, COUPLED WITH THE GUIDANCE

4   THAT MERCK HAD SOUGHT AND RECEIVED FROM ITS OWN BOARD OF

5   SCIENTIFIC ADVISORS, COUPLED WITH THE PHARMACOLOGIC EVIDENCE

6   THAT WAS OUT THERE IN THE LITERATURE PRIOR TO THAT POINT, BY

7   THE SPRING OF 2000 THE BURDEN OF EVIDENCE WAS ENOUGH TO SUGGEST

8   THAT THERE WAS, INDEED, A REASON FOR CONCERN THAT VIOXX WAS

9   ASSOCIATED WITH HEART ATTACK AND OTHER CARDIOVASCULAR DISEASE

10  IN HUMANS.

11  Q.   LET'S TALK ABOUT A COUPLE OF THOSE TRIALS.  YOU MENTIONED

12  THE ADVANTAGE TRIAL BEFORE.  COULD YOU TELL ME, FIRST OF ALL,

13  WHEN DID THE ADVANTAGE TRIAL DATA BECOME AVAILABLE TO MERCK AS

14  BEST AS YOU COULD TELL FROM YOUR REVIEW OF THE EVIDENCE?

15  A.   AS I UNDERSTAND IT, ADVANTAGE WAS CONDUCTED AROUND THE

16  SAME TIME FRAME AS VIGOR, SO THAT THE EVIDENCE FROM ADVANTAGE

17  WAS BECOMING AVAILABLE IN 2000 JUST AS THE EVIDENCE FROM VIGOR

18  WAS BECOMING AVAILABLE.

19  Q.   LET'S TALK ABOUT ADVANTAGE FOR A LITTLE BIT.  WOULD YOU

20  PLEASE DESCRIBE FOR THE MEMBERS OF THE JURY WHAT, IF ANY,

21  SIGNIFICANCE YOU WOULD ATTACH TO THE ADVANTAGE STUDY.

22  A.   YES.  THAT WAS A STUDY THAT, AS I RECALL, ENROLLED A

23  SMALLER NUMBER THAN VIGOR.  MY RECOLLECTION WOULD BE SOMETHING

24  LIKE 4,000 OR 5,000 PATIENTS WHO WERE RANDOMLY ALLOCATED.  THEY

25  WERE PATIENTS WITH OSTEOARTHRITIS, AND THAT'S IMPORTANT BECAUSE

1  ONE OF THE CONCERNS THAT WAS RAISED BY MERCK WAS, WELL, THE

2  VIGOR STUDY WAS IN PATIENTS WITH RHEUMATOID ARTHRITIS, AND THEY

3  ARE NOT LIKE TYPICAL PATIENTS, AND THEY HAVE MORE HEART

4  DISEASE, SO THAT MUST BE PART OF WHY THERE WERE MORE HEART

5  ATTACKS.  BUT ADVANTAGE WAS NOT ABOUT RHEUMATOID ARTHRITIS; IT

6  WAS ABOUT PATIENTS WHO HAD OSTEOARTHRITIS, WHICH IS THE

7  GARDEN-VARIETY ARTHRITIS PEOPLE GET IN THEIR HIPS AND HANDS AND

8  KNEES AND SO FORTH.

9        SECONDLY, ADVANTAGE WAS NOT IN COMPARISON-- WELL, IT

10 WAS IN COMPARISON WITH NAPROXEN, BUT THERE WERE PATIENTS IN IT

11 WHO WERE TAKING ASPIRIN, AS I RECALL.  AS A RESULT, THE ISSUE

12 OF, WELL, THIS IS ONLY SEEN IF YOU DON'T HAVE PEOPLE TAKING

13 ASPIRIN, I DON'T BELIEVE WAS THE CASE IN ADVANTAGE.

14        IT WAS ALSO A RELATIVELY BRIEF STUDY.  IT DID NOT

15 LAST FOR THE FULL NINE MONTHS ON AVERAGE THAT VIGOR LASTED.  IT

16 WAS MUCH BRIEFER THAN THAT, AND YET THERE WAS STILL A

17 DISPROPORTIONATE NUMBER OF HEART ATTACKS IN THE VIOXX GROUP

18 COMPARED TO THE COMPARISON GROUP.  THAT WAS ANOTHER KIND OF

19 BRICK IN THE WALL INDICATING THAT THERE WAS A HIGHER RATE OF

20 CARDIOVASCULAR DISEASE IN PEOPLE GIVEN VIOXX.

21 **Q.**  LET'S TALK ABOUT THE O90 TRIAL THAT YOU MENTIONED BEFORE.

22 **A.**  RIGHT.

23 **Q.**  WHAT IS THE O90 TRIAL?

24 **A.**  THAT WAS ANOTHER STUDY DONE IN PATIENTS WHO HAD ARTHRITIS,

25 AND IT WAS REVIEWED ON THE FDA MATERIALS, ALONG WITH STUDY O85,

1   I BELIEVE.

2          090 WAS IMPORTANT IN THIS WHOLE STORY BECAUSE IT WAS

3   NOT TESTING VIOXX AGAINST NAPROXEN.  SO THE IDEA THAT THIS WAS

4   ALL BECAUSE NAPROXEN PREVENTS HEART ATTACKS AND THAT EXPLAINS

5   THE VIGOR FINDINGS DID NOT APPLY BECAUSE THE COMPARISON GROUPS

6   IN 090 WERE ANOTHER NONSTEROIDAL CALLED NABUMETONE AND PLACEBO.

7   THERE AGAIN, THERE WAS AN INCREASE IN STUDY 090 IN THE NUMBER

8   OF CARDIOVASCULAR EVENTS THAT WERE IN PEOPLE RANDOMLY ASSIGNED

9   TO VIOXX COMPARED TO PEOPLE ON PLACEBO OR NABUMETONE.

10  Q.   LET ME JUST ASK YOU THIS.  DO YOU KNOW WHETHER OR NOT

11  THE-- I THINK YOU USED THE WORD "DISPROPORTIONATE" DISTRIBUTION

12  OF HEART ATTACKS IN THAT STUDY.  WAS THAT REPORTED IN THE

13  ADVANTAGE STUDY IN THE PUBLISHED LITERATURE?

14  A.   MY UNDERSTANDING IS THAT THE VERSION THAT EVENTUALLY FOUND

15  ITS WAY INTO THE PRESS REPORTED THE SO-CALLED APTC COMPOSITE

16  BUT DID NOT, AS I UNDERSTAND IT, REPORT THE ACTUAL NUMBER OF

17  HEART ATTACKS.  THE DIFFERENCE IN THE NUMBER OF HEART ATTACKS

18  ON VIOXX COMPARED TO NABUMETONE OR PLACEBO WAS MUCH MORE

19  STRIKING THAN THE DIFFERENCE IN THE SO-CALLED APTC COMPOSITE

20  OUTCOME, BUT THAT WAS NOT THE WAY IT WAS REPORTED.

21  Q.   LET'S TALK ABOUT 090 FOR A MOMENT.  DO YOU KNOW WHETHER

22  THAT STUDY WAS EVER PUBLISHED BY MERCK?

23  A.   I CAN'T RECALL THAT IT WAS.

24  Q.   090, WHEN DID THAT BECOME AVAILABLE TO MERCK?

25  A.   MY UNDERSTANDING IS THAT WAS ALSO AROUND THE SAME TIME OF

1   2000.

2   **Q.**   NOW, IN FAIRNESS, THERE'S ALSO ANOTHER STUDY CALLED 085.

3   ARE YOU FAMILIAR WITH THAT STUDY?

4   **A.**   YES.   THIS WAS VERY MUCH LIKE 090.   WHEN THE FDA REVIEWED

5   THE DATA, THEY REVIEWED THEM BOTH TOGETHER AND DID FIND THIS

6   IMBALANCE WITH MORE EVENTS IN THE VIOXX GROUP THAN IN THE TWO

7   OTHER COMPARISON GROUPS, BUT FOR REASONS THAT ARE UNCLEAR MOST

8   OF THE ACTION SEEMED TO BE IN THE 090 AND NOT IN THE 085 PIECE

9   OF THE STUDY.

10  **Q.**   IN SMALL STUDIES LIKE THIS, IN OTHER WORDS, I THINK YOU

11  MENTIONED IT WAS A SMALL STUDY.   IF YOU SEE SOMETHING IN ONE

12  SMALL STUDY AND YOU DON'T SEE IT IN ANOTHER STUDY, DO YOU

13  IGNORE WHAT YOU SEE OR HOW DOES THAT WORK IN YOUR PROFESSION?

14  **A.**   THE ABSENCE OF A FINDING DOES NOT CANCEL OUT THE PRESENCE

15  OF A FINDING, ESPECIALLY IF THE FINDING IS AN EXCESS RISK OF

16  HEART ATTACKS.

17  **Q.**   WHY IS THAT?

18  **A.**   BECAUSE SOMETIMES YOU DON'T FIND A BAD THING; SOMETIMES

19  YOU DON'T FIND A GOOD THING.   SO, FOR EXAMPLE, COMPANIES WILL

20  OFTEN DO MULTIPLE CLINICAL TRIALS, AND IF SOME SHOW GOOD EFFECT

21  AND THE OTHERS DON'T, VERY OFTEN THEY WILL BRING THE ONES THAT

22  SHOW GOOD EFFECT TO FDA AND SAY, "APPROVE OUR DRUG ON THAT

23  BASIS," BECAUSE A LOT OF THINGS CAN CAUSE A STUDY TO YIELD A

24  NULL FINDING, EITHER A GOOD EFFECT OR A BAD EFFECT, AND WE KNOW

25  THAT.   STUDIES ARE GOOD THINGS TO DO, AND OFTEN THINGS DON'T GO

1    AS EXPECTED.

2    **Q.**   OKAY.

3    **A.**   BUT I THINK WHEN ONE LOOKS AT A 12-WEEK STUDY AND YOU'RE

4    SEEING HEART ATTACKS, THAT'S ENORMOUSLY IMPORTANT BECAUSE YOU

5    SHOULDN'T BE ON ANYTHING THAT WILL CAUSE A HIGHER RISK OF HEART

6    ATTACKS IN 12 WEEKS.

7    **Q.**   USING VIGOR, 090, ADVANTAGE, AND ALL THE OTHER EVIDENCE

8    YOU TALKED ABOUT BEFORE, DO YOU HAVE AN OPINION TO A REASONABLE

9    DEGREE OF MEDICAL CERTAINTY AS TO WHAT A REASONABLE AND PRUDENT

10   COMPANY, LOOKING AT THE TOTALITY OF THAT EVIDENCE, SHOULD HAVE

11   CONCLUDED ABOUT THE CARDIOVASCULAR SAFETY OF VIOXX IN THE

12   SPRING OF 2000?  DOCTOR, WHAT IS YOUR OPINION?

13   **A.**   MY OPINION IS THAT THE BURDEN OF EVIDENCE IN THE SPRING OF

14   2000 WAS SUCH THAT THERE WAS EVIDENCE OF A LIKELY ASSOCIATION

15   BETWEEN VIOXX AND HEART DISEASE IN HUMANS.

16   **Q.**   DOCTOR, I'M GOING TO SHOW YOU TWO DOCUMENTS I'M GOING TO

17   HAND YOU SIDE-BY-SIDE.  ONE IS EXHIBIT 33, WHICH IS THE FDA

18   ADVISORY COMMITTEE BRIEFING DOCUMENT; SPECIFICALLY, THE REPORT

19   OF DR. VILLALBA, AND THAT IS FEBRUARY 8, 2001.  I'M ALSO GOING

20   TO HAND YOU A SECOND DOCUMENT, WHICH IS THE FDA'S

21   CARDIOVASCULAR REPORT CONSULTATION OF A SHARI TARGUM.  HAVE YOU

22   SEEN BOTH OF THESE DOCUMENTS IN CONNECTION WITH YOUR OPINION?

23   **A.**   I'VE REVIEWED BOTH OF THESE.

24   **Q.**   ARE THESE THE KINDS OF THINGS THAT EXPERTS LIKE YOURSELF

25   WOULD REVIEW IN CONSIDERING ISSUES LIKE THE ONES WE HAVE ASKED

1   YOU TO ADDRESS?

2   **A.**   YES.  THIS IS EXACTLY THE KIND OF INFORMATION THE FDA

3   ASKED ME TO EVALUATE IN RELATION TO LOTRONEX AROUND THE

4   QUESTION OF WHETHER IT SHOULD BE TAKEN OFF THE MARKET AROUND

5   2000 OR SO.

6   **Q.**   DOCTOR, LET ME ASK YOU THIS:  YOU REVIEWED BOTH OF THESE

7   REPORTS OF THESE FDA MEDICAL OFFICERS.  DO YOU KNOW THAT OR DO

8   YOU HAVE AN UNDERSTANDING AS TO WHETHER THEY LOOKED AT THESE

9   THREE STUDIES TOGETHER, ADVANTAGE, 090, 085 -- ACTUALLY, WE'LL

10  ADD 085 IN THIS, AS WELL, AND VIGOR, AND REACHED THE SAME

11  CONCLUSIONS YOU'VE REACHED?

12  **A.**   THAT IS MY IMPRESSION.

13  **Q.**   DOCTOR, LET'S GO TO DR. VILLALBA'S REPORT FOR A MOMENT, IF

14  YOU CAN LOOK AT PAGE 11 AND 12.

15  **A.**   YES.

16  **Q.**   DO YOU SEE, AT THE BOTTOM THERE, THERE IS A PARAGRAPH THAT

17  STARTS, "THE SPONSOR'S EXPLANATION FOR THE EXCESS OF

18  CARDIOVASCULAR EVENTS IN THE VIGOR STUDY"?  DO YOU SEE THAT?

19  **A.**   RIGHT.  YES.

20  **Q.**   OF COURSE, THIS IS DR. VILLALBA'S REPORT.  WOULD YOU

21  DESCRIBE THE FACTS THAT-- WHAT DOES DR. VILLALBA CONCLUDE HERE?

22  **A.**   DR. VILLALBA, WHO IS AN FDA OFFICIAL WHO WAS REVIEWING ALL

23  THE DATA SUBMITTED WHILE THE DRUG WAS STILL ON THE MARKET,

24  CONCLUDED THAT IT WAS IMPLAUSIBLE THAT THE DIFFERENCE

25  BETWEEN -- IN THE VIGOR STUDY, THAT THE DIFFERENCE IN HEART

1   ATTACK RATES -- AND ONE CAN SEE THAT GRAPH GO UP QUITE HIGH FOR

2   INCIDENCE OF HEART ATTACKS THROMBOTIC CARDIOVASCULAR SERIOUS

3   ADVERSE EXPERIENCES.  THE EVIDENCE THAT THIS COULD BE EXPLAINED

4   BY THE FACT THAT NAPROXEN WAS PREVENTING HEART ATTACKS WAS

5   IMPLAUSIBLE.

6   **Q.**   WHAT ARE THE FACTORS THAT DR. VILLALBA INDICATES?

7   **A.**   DR. VILLALBA WAS SPEAKING SPECIFICALLY TO THE RAPID RISE

8   IN THE INCIDENCE OF HEART ATTACKS IN PEOPLE TAKING VIOXX AS

9   COMPARED WITH NAPROXEN, AND SHE NOTES THAT THERE ARE NO

10  PLACEBO-CONTROLLED TRIALS OF NAPROXEN THAT EVER HAVE SHOWN THAT

11  IT REDUCES HEART ATTACKS.

12  **Q.**   STOP RIGHT THERE.  IS THAT SOMETHING THAT YOU AGREE WITH?

13  **A.**   SURE.

14  **Q.**   IS THAT SOMETHING YOU AGREED WITH AT THE TIME?

15  **A.**   I AGREE WITH IT NOW, TOO.

16  **Q.**   IS IT SOMETHING THAT YOU ACTUALLY INVESTIGATED?

17  **A.**   YES.

18  **Q.**   YOU CONCLUDED THAT THERE WAS NO EVIDENCE-- DID YOU

19  CONCLUDE-- WHAT DID YOU CONCLUDE ABOUT THE EVIDENCE OF

20  NAPROXEN?

21  **A.**   AT THE TIME THAT THIS WAS BEING DISCUSSED AT FDA, WE WERE

22  CONCURRENTLY DOING RESEARCH IN MY DIVISION ON WHETHER NAPROXEN

23  CAUSES A REDUCTION IN THE RISK OF HEART ATTACKS.

24  **Q.**   GO TO THE NEXT FACT HERE NOTED BY DR. VILLALBA.

25  **A.**   THIS IS ALSO IN PARALLEL WITH OUR OWN RESEARCH IN THAT SHE

1  POINTS OUT THAT THE EFFECT OF NAPROXEN-- AND THIS IS ALMOST THE

2  EXACT LANGUAGE THAT WE USED IN OUR PAPER EVEN THOUGH I HAD NOT

3  SEEN HER REPORT AT THE TIME-- THAT THE EFFECT SIZE THAT YOU

4  WOULD NEED TO HAVE, THAT IS, THE PROTECTIVE EFFECT OF NAPROXEN

5  WOULD NEED TO BE SO HUGE THAT IT WOULD MAKE IT HUGER THAN HAD

6  EVER BEEN SEEN WITH ASPIRIN OR WITH, FRANKLY, ANY OTHER DRUG,

7  FOR THAT MATTER, AND THAT THAT ALSO MADE THE NAPROXEN IDEA

8  IMPLAUSIBLE.

9  **Q.**   NEXT THING.  GO TO SECTION D.

10  **A.**   OKAY.  SHE CITES THE OTHER STUDIES WHICH WE HAVE TALKED

11  ABOUT JUST NOW, 085, 090, AND 102.  THIS IS HER EXACT WORDS:

12  "SUGGEST TRENDS TOWARDS HIGHER RATES OF MYOCARDIAL INFARCTION,"

13  OR HEART ATTACK, "IN THE ROFECOXIB," THAT IS, VIOXX, "GROUP

14  COMPARED TO ACTIVE CONTROL GROUPS."

15  **Q.**   DOCTOR, LET'S TURN --

16  **A.**   I'M SORRY, JUST ONE OTHER POINT.

17  **Q.**   GO AHEAD.

18  **A.**   THE NEXT SENTENCE, WHICH I THINK IS RELEVANT HERE, IS THAT

19  SHE ALSO POINTS OUT -- BECAUSE ONE OF THE THINGS WE STUDY IN

20  PHARMACOEPIDEMIOLOGY IS DOSES AND DURATION AND WHETHER OR NOT

21  THERE'S A RELATIONSHIP TO THE EFFECT.  SHE POINTS OUT IN 2001

22  THAT 085, 090, AND 102 INVOLVE LOWER DOSES OF VIOXX AND SHORTER

23  DURATIONS OF EXPOSURE THAN WERE SEEN IN VIGOR AND ALSO ALLOW

24  THE USE OF ASPIRIN.

25          SO THE REASONS THAT HAD BEEN PUT FORWARD BY MERCK

1    ABOUT WHY THE VIGOR FINDINGS COULD BE EXPLAINED AWAY -- THAT

2    IS, NO ASPIRIN, PATIENTS HAD RHEUMATOID ARTHRITIS, THERE WAS A

3    BIG DOSE OF VIOXX USED, AND SO THIS WOULDN'T APPLY TO LOWER

4    DOSES, AND IT WAS A LONG STUDY -- NONE OF THOSE WERE PRESENT IN

5    THESE STUDIES AND YET THE SAME INCREASE IN HEART ATTACK WAS

6    SEEN.

7    Q.    ASSUMING IT IS FEBRUARY 8, 2001, IS THAT ABOUT THE TIME

8    YOU HAD YOUR CONVERSATION WITH DR. SHERWOOD?

9    A.    YES.

10   Q.    NOW, LET'S GO TO DR. TARGUM'S REPORT.

11   A.    OKAY.

12   Q.    FIRST OF ALL, CAN WE BRING THAT UP?  THIS IS A REPORT OF

13   DR. TARGUM AT THE CARDIORENAL DIVISION; CORRECT?

14   A.    YES.

15   Q.    FEBRUARY 1, 2004 (SIC)?

16   A.    2001.

17   Q.    2001.  EXCUSE ME.  IF YOU WOULD, GO TO PAGE 34.

18   A.    GOT IT.

19   Q.    DO YOU SEE THE SECTION 4 AT THE BOTTOM OF THE PAGE THERE

20   WHICH TALKS ABOUT ASSESSMENT OF A SPONSOR'S CLAIM OF CV RISK?

21   A.    YES.

22   Q.    FIRST OF ALL, THE SPONSOR'S CLAIM THERE THAT THE "SPONSOR

23   CLAIMS THAT THE DIFFERENCE IN MYOCARDIAL INFARCTIONS BETWEEN

24   THE TWO GROUPS IS PRIMARILY DUE TO THE ANTIPLATELET EFFECTS OF

25   NAPROXEN" --

1   A.   YES, I REVIEWED THAT SECTION.

2   Q.   -- IS THAT WHAT THEY SAID IN THE VIGOR PAPER THAT WE

3   REVIEWED EARLIER TODAY?

4   A.   YES.

5   Q.   IS THAT WHAT THEY WERE TELLING YOU AND YOUR PEOPLE AT

6   HARVARD?

7   A.   THAT'S WHAT DR. SHERWOOD TOLD ME.

8   Q.   IS THAT WHAT WAS BEING SAID BY MERCK PUBLICLY, IN YOUR

9   EXPERIENCE, IN 2000 AND 2001?

10  A.   CORRECT.

11  Q.   WHAT DOES DR. TARGUM SAY ABOUT THE, QUOTE, NAPROXEN

12  HYPOTHESIS?

13  A.   I'LL JUST READ HER WORDS:  "THE SPONSOR CLAIMS THAT THE

14  DIFFERENCE IN MYOCARDIAL INFARCTIONS BETWEEN THE TWO GROUPS IS

15  PRIMARILY DUE TO THE ANTI-PLATELET EFFECTS OR THE PROTECTIVE

16  EFFECTS OF NAPROXEN.  THIS HYPOTHESIS IS NOT SUPPORTED BY ANY

17  PROSPECTIVE PLACEBO-CONTROLLED TRIALS WITH NAPROXEN.  ONE CAN

18  FURTHER ARGUE THAT, NO MATTER WHAT THE ATTRIBUTION, THE RESULTS

19  (FROM THE CARDIOVASCULAR STANDPOINT) ARE FAVORABLE FOR

20  NAPROXEN."

21  Q.   DO YOU AGREE WITH THAT?

22  A.   YES.

23  Q.   IS THAT WHAT YOU TESTIFIED TO EARLIER?

24  A.   YES.

25  Q.   NEXT ONE, NEXT BULLET POINT ON THE NEXT PAGE:  "THE

1   SPONSOR CLAIMS THAT THE MAJORITY OF THE CARDIOVASCULAR EVENTS

2   IN THE VIGOR STUDY OCCURRED IN THOSE PATIENTS WHO SHOULD HAVE

3   BEEN TAKING ASPIRIN FOR CARDIOPROTECTION."

4   A.   YES.

5   Q.   IS THAT THE ISSUE THAT WE TALKED ABOUT BEFORE THAT HAD TO

6   BE CORRECTED IN THE *NEW ENGLAND JOURNAL OF MEDICINE*?

7   A.   THAT'S RIGHT.

8   Q.   THAT WAS CORRECTED IN 2005?

9   A.   THAT'S CORRECT.

10  Q.   DO YOU AGREE WITH DR. TARGUM AS TO THE SIGNIFICANCE OF

11  THAT FACT?

12  A.   YES.  AS SHE STATES IT IN HER OWN WORDS, "THIS CLAIM HAS

13  NOT CONVINCED THIS MEDICAL REVIEWER," AND SHE GOES ON TO SAY

14  THAT THERE ARE INCREASED EVENTS, HEART ATTACKS, IN THE VIOXX

15  GROUP EVEN IN PATIENTS WHO DID NOT FALL INTO THE

16  ASPIRIN-INDICATED SUBGROUP."

17  Q.   COULD YOU TURN TO PAGE 36, PLEASE --

18  A.   YES.

19  Q.   -- AT THE BOTTOM OF THE PAGE THERE.

20  A.   YES.

21  Q.   THE VERY BOTTOM, IT SAYS "SUGGESTED LABELING."

22  A.   YES.

23  Q.   DO YOU SEE THERE?

24  A.   YES.

25  Q.   WOULD YOU READ WHAT SHE SAYS ABOUT THAT.

1   **A.**   YES.

2   **Q.**   WELL, ACTUALLY, GO TO THE SECOND SENTENCE, IF YOU DON'T

3   MIND.

4   **A.**   IN BOLD IT SUGGESTS LABELING THAT WOULD PROPERLY ADDRESS

5   CV RISKS.

6   **Q.**   AND THEN THE LAST SENTENCE THERE.

7   **A.**   "IT WOULD BE DIFFICULT TO IMAGINE INCLUSION OF VIGOR

8   RESULTS IN THE ROFECOXIB OR VIOXX LABELING WITHOUT MENTIONING

9   CARDIOVASCULAR SAFETY RESULTS IN THE STUDY DESCRIPTION, AS WELL

10  AS THE WARNINGS SECTION."

11  **Q.**   DO YOU AGREE WITH DR. TARGUM?

12  **A.**   YES.

13  **Q.**   SO, IN FAIRNESS, DOCTOR -- I JUST WANT TO BE CLEAR -- THE

14  OPINIONS THAT YOU GAVE EARLIER, ARE THEY CONSISTENT WITH WHAT

15  THE MEDICAL OFFICERS WERE SAYING AT THE TIME WHEN THEY REVIEWED

16  THE SAME DATA THAT YOU REVIEWED IN CONNECTION WITH THIS

17  LITIGATION?

18  **A.**   YES.

19  **Q.**   DOES YOUR OPINIONS ABOUT THE CONFLUENCE OF 090, 085,

20  ADVANTAGE, APPROVE, AND ALL THE OTHER --

21  **A.**   NOT APPROVE.  YOU MEAN VIGOR.

22  **Q.**   VIGOR, AND ALL THE EVIDENCE SURROUNDING, THAT WE HAVE BEEN

23  TALKING ABOUT, DO YOU COME TO THE SAME CONCLUSIONS ABOUT THE

24  VALIDITY OF THE NAPROXEN HYPOTHESIS THAT BOTH THESE MEDICAL

25  OFFICERS LOOKING AT THE SAME INFORMATION CAME TO?

1   **A.**   YES, I DO.  I THINK, EQUALLY IMPORTANTLY, THOSE ARE

2   OPINIONS WHICH I WROTE MYSELF IN OUR PUBLICATIONS AROUND THIS

3   PERIOD.

4   **Q.**   OKAY.  WE HAVEN'T TALKED ABOUT THE ALZHEIMER'S STUDIES.

5   **A.**   RIGHT.

6   **Q.**   DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF MEDICAL

7   CERTAINTY AS TO WHETHER OR NOT THERE WAS REASONABLE EVIDENCE OF

8   INCREASED MORTALITY ASSOCIATED WITH VIOXX?

9   **A.**   YES.

10  **Q.**   WHAT IS THAT OPINION?

11  **A.**   THAT OPINION IS THAT THERE WAS AN INCREASE IN MORTALITY,

12  PARTICULARLY AS REFLECTED IN THE ALZHEIMER'S STUDIES CONDUCTED

13  BY MERCK WITH VIOXX.

14  **Q.**   DOCTOR, WHEN YOU LOOKED AT CARDIAC DEATH IN THE

15  ALZHEIMER'S TRIALS, WAS THERE AN IMBALANCE?

16  **A.**   NO.

17  **Q.**   CARDIAC DEATH?

18  **A.**   I'M SORRY.  I THOUGHT YOU MEANT CARDIAC OUTCOMES.  I DON'T

19  REMEMBER THE CARDIAC DEATH BY HEART.  LET ME LOOK AT THAT.  I

20  THINK THAT ONE WAS -- THAT WAS THE 8-TO-2 OR 8-TO-3 RATIO OF

21  DEATHS, AS I RECALL.  I CAN DIG THROUGH IT HERE, BUT IF WE

22  AGREE THAT IT WAS 8-TO-2 OR 8-TO-3 -- THE 2 AND 3 VARIED, BUT

23  THERE WAS A FOUR-FOLDISH INCREASE.

24  **Q.**   IS THAT SIGNIFICANT, DOCTOR?

25  **A.**   WELL, IT DEPENDS ON WHAT YOU MEAN BY "SIGNIFICANT."  IT'S

1   STRIKING.  WITH SMALL NUMBERS, I HONESTLY DON'T RECALL WHETHER

2   IT WAS SIGNIFICANT IN THE STATISTICAL SENSE.  BUT, AGAIN, I

3   THINK IF YOU TELL ME THERE ARE FOUR TIMES AS MANY PEOPLE HAVING

4   CARDIAC DEATHS IN GROUP A VERSUS GROUP B, THAT WOULD CATCH MY

5   ATTENTION.

6   **Q.**   ALL RIGHT.  DOCTOR, LET'S MOVE ON.

7   **A.**   WELL, THERE'S ONE POINT, IN ANSWER TO YOUR QUESTION THAT I

8   DIDN'T GET TO SAY, AND THAT IS:  IF ONE LOOKS AT THE MEANS OF

9   ASCERTAINING EVENTS IN THESE STUDIES, I WAS STRUCK WITH THE

10  FACT THAT THE STUDIES DID NOT SEEM TO ME, AS A GERIATRICIAN AND

11  AS SOMEBODY WHO HAS WRITTEN ABOUT GERIATRIC PHARMACOLOGY, TO BE

12  SET UP IN A WAY THAT WOULD ASCERTAIN CARDIAC EVENTS IN A

13  SYSTEMATIC WAY SO THAT YOU COULD REALLY BE CONFIDENT OF THE

14  RESULTS THAT WOULD COME FROM ANY PART OF THE STUDY DESIGN THAT

15  WOULD IDENTIFY WHO HAD A HEART ATTACK OR WHO DIDN'T, OR WHO HAD

16  ANGINA AND WHO DIDN'T, WHO HAD STROKE AND WHO DIDN'T.

17          I WAS UNDERWHELMED WITH THE CARE WITH WHICH THOSE

18  OUTCOMES WERE BEING LOOKED AT.  PERHAPS THEIR FOCUS WAS JUST ON

19  TRACKING PEOPLE'S MENTAL STATUS.  BUT ANOTHER REASON THAT I

20  SUSPECT THERE WAS NOT A CLEAR DIFFERENCE SEEN IN CARDIOVASCULAR

21  EVENTS WAS THAT THEY WERE NOT BEING LOOKED FOR VERY CAREFULLY.

22  **Q.**   WELL, DOCTOR, DID YOU REVIEW THE DATA ANALYSIS PLAN AND

23  THE STANDARD OPERATING PROCEDURE HERE FOR ASCERTAINING

24  CARDIOVASCULAR EVENTS?

25  **A.**   YES, I DID.

1    **Q.**    OKAY.  DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THIS

2    WAS SET UP APPROPRIATELY TO ASCERTAIN AND ANALYZE EVENTS IN THE

3    VIOXX CLINICAL TRIALS?

4    **A.**    YES, I DO.

5    **Q.**    WHAT IS THAT OPINION?

6    **A.**    BASED ON REVIEWING THE CARDIAC STANDARD OPERATING

7    PROCEDURE THAT MERCK PUT TOGETHER, WHICH THEY ARGUED WAS THEIR

8    RESPONSE TO THE VIGOR DATA TO LOOK FOR CARDIAC EVENTS IN ALL

9    THEIR OTHER STUDIES, I WAS STRUCK WITH THE FACT THAT A NUMBER

10   OF KEY PRESENTATIONS OF HEART ATTACK, THAT IS, KEY

11   MANIFESTATIONS OF HAVING A HEART ATTACK, SEEMED TO HAVE BEEN

12   DELETED IN THE COURSE OF THAT STANDARD OPERATING PROCEDURE

13   BEING IMPLEMENTED.

14         SO, FOR EXAMPLE, PULMONARY EDEMA, WHICH IS WELL KNOWN

15   TO BE A PRESENTING OR A MANIFESTING SIGN OF A HEART ATTACK,

16   CONGESTIVE HEART FAILURE, ARRHYTHMIAS -- WHICH IS RHYTHM

17   DISTURBANCES -- ALL WERE EXCISED FROM HAVING BEEN THERE BEFORE,

18   WERE STRUCK OUT IN THE VERSION OF THE STANDARD OPERATING

19   PROCEDURE AT MERCK THAT I SAW, WHICH WOULD CLEARLY RESULT IN

20   UNDERASCERTAINMENT OR MISSING A LOT OF CASES OF HEART ATTACK,

21   WHICH PARTICULARLY IN THE ELDERLY ARE GOING TO PRESENT

22   THEMSELVES IN PRECISELY THAT WAY.

23   **Q.**    DOCTOR, DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF

24   MEDICAL CERTAINTY, AS SOMEBODY WHO HAS TAUGHT PHARMACEUTICAL

25   COMPANY EXECUTIVES ABOUT LOOKING AT SIGNALS AND DESIGNING

1   CLINICAL TRIALS AND THIS AND THAT, AS TO WHETHER OR NOT IT WAS

2   FEASIBLE TO DO A CARDIOVASCULAR OUTCOMES STUDY THAT WOULD HAVE

3   DEFINITIVELY ANSWERED THIS QUESTION WHILE VIOXX WAS ON THE

4   MARKET?

5   **A.**   YES, I DO.

6   **Q.**   WHAT IS THAT OPINION?

7   **A.**   MY OPINION IS THAT IT WOULD HAVE BEEN FEASIBLE AND ETHICAL

8   AND QUITE DOABLE TO HAVE SUCH A STUDY DONE IN RESPONSE TO THE

9   SIGNALS THAT EMERGED AND THAT THE -- MORE THAN SIGNALS, THE

10  DATA THAT EMERGED FROM THE STUDIES WE HAVE BEEN DISCUSSING.

11  **Q.**   I'M GOING TO SHOW YOU WHAT I HAVE HAD MARKED AS

12  EXHIBIT 36.  IS THIS THE DOCUMENT TO WHICH YOU REFER?

13  **A.**   I THINK SO.

14  **Q.**   WHEN YOU LOOK AT THE E-MAIL FROM DR. SCOLNICK DATED

15  APRIL 12, 2000-- AND THIS WOULD HAVE BEEN RIGHT AFTER THE VIGOR

16  STUDY, THE VIGOR ON OUR TIME LINE--

17  **A.**   RIGHT.

18  **Q.**   -- RIGHT AFTER VIGOR WAS UNBLINDED AND THE DATA BECAME

19  AVAILABLE?

20  **A.**   CORRECT.

21  **Q.**   WOULD YOU READ WHAT DR. SCOLNICK HAS TO SAY.

22  **A.**   YES.  THIS IS TO DR. REICIN.  "HI, ALISE.  I HAVE BEEN

23  TRADING E-MAILS WITH DOUG GREEN IN REALTIME.  WE ARE ALL ONLINE

24  TOO LATE.  I WILL TELL YOU MY WORRY QUOTIENT IS HIGH.  I

25  ACTUALLY AM IN MINOR AGONY.  WHAT I REALLY WANT TO DO IS A

1   10,000-VERSUS-10,000 PATIENT STUDY IN MILD TO MODERATE

2   OSTEOARTHRITIS, TYLENOL VERSUS VIOXX WITH PRN," WHICH MEANS AS

3   NEEDED, "LOW-DOSE ASA," WHICH IS ASPIRIN, "FOR THOSE JUDGED TO

4   NEED IT.  "SAFETY," I GUESS HE MEANS "WOULD BE THE "FIRST

5   PRIMARY ENDPOINT AND EFFICACY SECONDARY OR CO-PRIMARY.  WE WILL

6   NOT"-- NOW, THIS IS IN CAPITAL LETTERS.  "WE WILL NOT KNOW FOR

7   SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.  PLEASE THINK

8   HARD ABOUT THE DESIGN BEFORE THE PAC MEETING.  THANKS, ED."

9   **Q.**   AS SOMEBODY WHO CONDUCTS CLINICAL TRIALS AND CONDUCTS

10  EPIDEMIOLOGIC STUDIES AND LOOKS AT THESE KINDS OF ISSUES, WOULD

11  THIS HAVE BEEN AN ETHICAL STUDY TO DO?

12  **A.**   YEAH.  I THINK HE GOT IT EXACTLY RIGHT.

13  **Q.**   WAS ANY SUCH STUDY EVER DONE?

14  **A.**   NOT TO MY KNOWLEDGE.

15  **Q.**   MOVING ON, DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER OR

16  NOT, TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, HAVING

17  REVIEWED ALL THE DOCUMENTS YOU REVIEWED IN CONNECTION WITH YOUR

18  PRIOR EXPERIENCE, AS TO WHETHER OR NOT THE BENEFITS OF VIOXX

19  WERE OUTWEIGHED BY ITS RISKS?

20  **A.**   YES.

21  **Q.**   WHAT IS THAT OPINION?

22  **A.**   THAT ITS BENEFITS WERE NOT OUTWEIGHED BY ITS RISKS.  IF

23  ONE COUNTS UP THE NUMBER OF SERIOUS GASTROINTESTINAL

24  COMPLICATIONS THAT IT PREVENTED -- AND IT DID, AT LEAST IN

25  PEOPLE NOT TAKING ASPIRIN -- AND YOU COMPARE THOSE WITH THE

1   NUMBER OF SERIOUS CARDIOVASCULAR EVENTS THAT IT CAUSED, THE

2   NUMBERS ARE ACTUALLY QUITE CLOSE.  CLINICALLY, IT IS WORSE TO

3   HAVE A HEART ATTACK OR A STROKE THAN TO HAVE A GI BLEED BECAUSE

4   YOU CAN FIX THE GI BLEED BY STOPPING THE OFFENDING DRUG, MAYBE

5   THE PATIENT MAY NEED A BLOOD TRANSFUSION, AND THEN THEY ARE

6   GOOD AS THEY WERE BEFORE.  BUT IF YOU HAVE HAD A HEART ATTACK

7   OR A STROKE, THERE'S OFTEN PERMANENT DAMAGE TO YOUR HEART OR

8   BRAIN, AND YOU'RE USUALLY NOT AS GOOD AS YOU WERE BEFORE.

9   **Q.**   DOCTOR, THAT BRINGS ME TO ANOTHER QUESTION.  DO YOU HAVE

10  AN OPINION AS TO WHETHER OR NOT ALL NSAIDS HAVE THE SAME

11  CARDIOVASCULAR RISK AS VIOXX?

12  **A.**   I HAVE SUCH AN OPINION.

13  **Q.**   OKAY.  IS THAT SOMETHING YOU HAVE WRITTEN ABOUT?

14  **A.**   YES.

15  **Q.**   IN FACT, IS THAT SOMETHING THAT YOU LOOKED AT SPECIFICALLY

16  IN THE CONTEXT OF YOUR VIOXX STUDIES COMPARED TO CELEBREX?

17  **A.**   CORRECT.

18  **Q.**   IN FACT, THAT'S SOMETHING THAT YOU LOOKED AT IN YOUR NSAID

19  STUDY COMPARING NAPROXEN TO OTHER DRUGS?

20  **A.**   CORRECT.

21  **Q.**   IN LOOKING AT THE TOTALITY OF EVIDENCE, DO YOU HAVE AN

22  OPINION AS TO WHETHER OR NOT THERE IS A, QUOTE, CLASS EFFECT, A

23  CARDIOVASCULAR CLASS EFFECT BETWEEN ALL NONSTEROIDAL

24  ANTI-INFLAMMATORY DRUGS?

25  **A.**   I DO HAVE SUCH AN OPINION.

1  **Q.**   WHAT IS THAT OPINION?

2  **A.**   MY OPINION IS THAT THERE IS NOT A UNITARY CLASS EFFECT,

3  THAT IS, IT IS NOT THE SAME FOR ALL DRUGS; AND THAT, IN FACT,

4  THERE IS A GRADIENT OF EFFECTS WHERE WITH SOME DRUGS, WHICH

5  HAPPEN TO BE THE ONES THAT WERE TAKEN OFF THE MARKET, NAMELY,

6  VIOXX AND BEXTRA, HAVING THE WORST RISK OF HEART ATTACK AND

7  STROKE AND THEN LOWER RISK FOR CELEBREX, BUT CERTAINLY CELEBREX

8  AT HIGH DOSES, AND I THINK WE KNOW THAT FROM SOME CLINICAL

9  TRIAL DATA, AND THEN PROBABLY LOWER RISK FOR THE OLDER

10  NONSTEROIDALS.  THEN, OF COURSE, ASPIRIN, ON THE OTHER END OF

11  THE SPECTRUM, NOT ONLY HAS NO CARDIAC RISK, BUT IT PREVENTS

12  HEART ATTACKS.

13  **Q.**   HAVE YOU COMMUNICATED THIS OPINION TO THE FOOD & DRUG

14  ADMINISTRATION?

15  **A.**   YES, I HAVE.

16  **Q.**   IS CELEBREX STILL ON THE MARKET, BY THE WAY?

17  **A.**   YES, IT IS.

18  **Q.**   IS NAPROXEN STILL ON THE MARKET?

19  **A.**   YES, IT IS.

20  **Q.**   IS DICLOFENAC STILL ON THE MARKET?

21  **A.**   YES.

22  **Q.**   ASPIRIN?

23  **A.**   YES.

24  **Q.**   NAPROXEN?

25  **A.**   YES.

1   **Q.**   DOCTOR, YOU TESTIFIED THAT YOU'RE AN EXPERT IN THE FACTORS

2   THAT GO INTO PHYSICIAN PRESCRIBING PRACTICES.  WHAT ARE THOSE

3   FACTORS?

4   **A.**   WE HAVE DONE A NUMBER OF STUDIES ABOUT WHAT SHAPES

5   PHYSICIAN PRESCRIBING DECISIONS, AND I MENTIONED THE FIRST ONE

6   I PUBLISHED IN 1982.  IN DOING THAT WORK, WE HAVE TRIED TO

7   DEFINE WHAT PREDICTS OR DRIVES WHAT A DOCTOR PRESCRIBES.  A

8   GREAT DEAL OF IT IS THE DOCTOR'S PERCEPTION OF BENEFIT VERSUS

9   RISK, WHICH HE OR SHE LEARNS FROM A VARIETY OF SOURCES.

10  **Q.**   WHAT ARE THE SOURCES IN WHICH A PHARMACEUTICAL COMPANY

11  COMMUNICATES WITH DOCTORS ABOUT THEIR PRODUCTS?

12  **A.**   WELL, THE LEGAL GOVERNING DOCUMENT THAT IS PROBABLY

13  CENTRAL BECAUSE IT DETERMINES WHAT THE COMPANY IS ALLOWED TO

14  SAY IN ALL OF ITS PROMOTIONAL MATERIAL AND ALL OF ITS SALES

15  PRESENTATIONS IS WHAT FDA CALLS THE LABELING, OR SOMETIMES IT'S

16  CALLED THE PACKAGE INSERT.  BUT IT'S A LENGTHY DOCUMENT,

17  USUALLY IN SMALL PRINT, THAT DESCRIBES EVERYTHING ABOUT A DRUG,

18  WHAT IT'S USED FOR, WHAT ITS BENEFITS ARE, WHAT ITS RISKS ARE,

19  WHAT ITS DOSE IS AND SO FORTH.

20  **Q.**   ANY OTHER METHODS BY WHICH A PHARMACEUTICAL COMPANY

21  COMMUNICATES WITH DOCTORS THAT YOU'RE FAMILIAR WITH?

22  **A.**   SURE.  THEY WILL ALSO, OF COURSE, SEND OUT SALES REPS TO

23  DOCTORS' OFFICES TO TALK TO US ABOUT THE ATTRIBUTES OF THEIR

24  DRUG; AND, OF COURSE, THEY WILL TAKE OUT ADS IN MEDICAL

25  JOURNALS; THEY WILL ALSO TAKE OUT ADS OR PUT COMMERCIALS ON TV

1    FOR PATIENTS; AND THEY WILL SPONSOR CONTINUING-EDUCATION
2    PROGRAMS FOR PHYSICIANS.
3    **Q.**   WHAT ABOUT PUBLICATION OF MEDICAL ARTICLES?
4    **A.**   VERY OFTEN COMPANIES ARE HEAVILY INVOLVED, AS WE HAVE
5    LEARNED, IN THE PUBLICATION OF ARTICLES IN THE MEDICAL
6    LITERATURE.
7    **Q.**   LET ME TALK ABOUT SOME OF THOSE THINGS FOR A MOMENT.
8    LET'S TALK ABOUT THE LABEL FOR A MOMENT.  FIRST OF ALL, WHAT IS
9    A BLACK-BOX WARNING?
10   **A.**   A BLACK-BOX WARNING IS THE STRONGEST KIND OF WARNING THAT
11   APPEARS ON A LABEL, WHICH IS LITERALLY IN A BLACK BOX.  IF THE
12   FDA FEELS THAT THERE IS A PARTICULARLY IMPORTANT RISK FOR A
13   GIVEN DRUG, IT INSISTS THAT THE MANUFACTURER -- BECAUSE THE
14   MANUFACTURER KIND OF OWNS THE WORDS IN THE LABEL AND NEGOTIATES
15   WITH THE FDA, BUT ULTIMATELY IT IS THE MANUFACTURER'S WORDS --
16   THE FDA WILL INSIST THAT A BLACK BOX APPEAR AT THE VERY
17   BEGINNING OF THE DESCRIPTION OF THE DRUG IN THE LABELING
18   INFORMATION WARNING ABOUT A PARTICULAR PROBLEM.
19   **Q.**   WHAT IS A WARNING?
20   **A.**   A WARNING IS THE NEXT HIGHEST LEVEL OF ALERT, AND IT IS A
21   SECTION IN THE LABELING IN WHICH THE MOST IMPORTANT RISKS OF A
22   DRUG ARE PRESENTED.
23   **Q.**   WHAT ABOUT A PRECAUTION?
24   **A.**   THAT'S A MUCH MILDER PART OF THE LABELING IN WHICH IT'S
25   KIND OF A "WATCH OUT FOR THIS," BUT IT'S KNOWN TO BE A LOWER

1    STANDARD OF RISK.

2    **Q.**   HAVE YOU REVIEWED THE LABEL THAT WAS IN EFFECT FROM 1999

3    TO 2002?

4    **A.**   YES, I HAVE.

5    **Q.**   STARTING FROM THE DATE OF THE VIGOR RESULTS -- LET ME HAND

6    THAT TO YOU.  DOCTOR, WAS THERE ANY BLACK-BOX WARNING FOR

7    CARDIOVASCULAR DISEASE IN THIS LABEL?

8    **A.**   THERE WAS NO BLACK-BOX WARNING OF ANY KIND.

9    **Q.**   WAS THERE A WARNING?

10   **A.**   NO.

11   **Q.**   WAS THERE EVEN A PRECAUTION IN THE ORIGINAL LABEL THAT

12   DEALT WITH CARDIOVASCULAR DISEASE?

13   **A.**   LET ME JUST TURN TO THE "PRECAUTIONS" SECTION BECAUSE I

14   WANT TO BE SURE I'M BEING FAIR TO THE COMPANY.  NO.  I'VE JUST

15   REVIEWED THE PRECAUTIONS SECTION AGAIN AND I DON'T SEE ANYTHING

16   ABOUT HEART ATTACK.

17   **Q.**   THAT WAS IN EFFECT UNTIL APRIL OF 2002?

18   **A.**   THAT'S CORRECT.

19   **Q.**   VIGOR CAME OUT-- VIGOR RESULTS BECAME AVAILABLE IN 2000,

20   EARLY 2000?

21   **A.**   IN THE SPRING OF 2000.

22   **Q.**   DOCTOR, GIVEN WHAT WAS KNOWN ABOUT VIOXX FROM 2000 TO

23   2002, DOES THIS LABEL CONTAIN INFORMATION ABOUT CARDIOVASCULAR

24   RISKS THAT WOULD HAVE ALLOWED PHYSICIANS TO WEIGH THOSE RISKS

25   AGAINST THE BENEFITS?  DOES THIS LABEL CONTAIN ACCURATE MEDICAL

1    AND SCIENTIFIC INFORMATION ABOUT THE INCREASED MORTALITY SEEN

2    IN THE ALZHEIMER'S TRIALS?

3    A.    THERE'S NOTHING IN THE LABEL ABOUT THE DOUBLING OF THE

4    DEATH RATE IN THE ALZHEIMER'S STUDY IN THIS LABEL.

5    Q.    IS THAT, IN YOUR OPINION, IMPORTANT INFORMATION FOR

6    DOCTORS TO CONSIDER IN MAKING A FAIR RISK/BENEFIT ANALYSIS FOR

7    THEIR PATIENTS?

8    A.    AS SOMEONE WHO HAS PUBLISHED PAPERS ON DOCTORS' ASSESSMENT

9    OF RISK VERSUS BENEFIT AND HOW THAT DRIVES THEIR PRESCRIBING,

10   AS SOMEONE WHO HAS CONDUCTED AND STUDIED PROGRAMS TO PRESENT

11   INFORMATION TO DOCTORS IN AN UNBIASED MANNER, I CAN ASSERT WITH

12   COMPLETE CONFIDENCE THAT FAILING TO INDICATE THAT A GIVEN DRUG

13   HAS BEEN ASSOCIATED WITH A DOUBLING OF DEATH RATE IN A STUDY

14   THAT WAS STATISTICALLY SIGNIFICANT, FAILING TO HAVE THAT ON THE

15   LABEL DOES NOT GIVE DOCTORS THE INFORMATION THEY NEED TO USE

16   THAT DRUG APPROPRIATELY.

17   Q.    DOCTOR, HAVE YOU LOOKED AT THE 2002 LABEL WHICH I'M

18   HANDING TO YOU NOW?

19   A.    YES, I HAVE.

20   Q.    IS IT YOUR UNDERSTANDING THAT IN APRIL 2002 THE VIOXX

21   LABEL WAS CHANGED TO INCLUDE SOME INFORMATION ABOUT THE CARDIAC

22   FINDINGS IN THE VIGOR STUDY?

23   A.    YES.

24   Q.    HAVE YOU REVIEWED THAT, DOCTOR?

25   A.    YES.

1   **Q.**   FIRST OF ALL, LET ME ASK YOU:  IS THERE A BLACK-BOX

2   WARNING FOR DOCTORS IN THE 2002 LABEL?  IS THERE A WARNING ON

3   CARDIOVASCULAR RISK IN THE LABEL?

4   **A.**   NO.

5   **Q.**   WHERE DOES THE INFORMATION ABOUT VIGOR APPEAR IN THIS

6   LABEL?

7   **A.**   IT IS OVER HERE IN THE SECTION THAT IS CALLED "CLINICAL

8   STUDIES."

9   **Q.**   IS IT ALSO IN THE PRECAUTIONS SECTION?

10   **A.**   I BELIEVE THERE IS A PRECAUTION ABOUT CARDIOVASCULAR

11   EFFECTS.

12   **Q.**   DO YOU KNOW WHETHER OR NOT -- WE TALKED ABOUT BEFORE -- WE

13   LOOKED AT THE MEDICAL OFFICER REPORT OF DR. TARGUM --

14   **A.**   YES.

15   **Q.**   -- WHICH TALKS ABOUT THE -- I THINK HER WORDS WERE, "IT IS

16   HARD TO CONCEIVE THAT THIS INFORMATION FROM VIGOR WOULD NOT BE

17   CONTAINED IN THE WARNINGS SECTION."  DO YOU REMEMBER THAT?

18   **A.**   CORRECT.

19   **Q.**   DO YOU KNOW WHETHER OR NOT THE FDA, IN FACT, DID RECOMMEND

20   THAT THE COMPANY INCLUDE A WARNING ABOUT THE CARDIOVASCULAR

21   RISK SEEN IN VIGOR?

22   **A.**   YES, I KNOW THAT.

23   **Q.**   DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THERE WAS A

24   REASONABLE EVIDENCE OF AN ASSOCIATION BETWEEN VIOXX AND

25   CARDIOVASCULAR DISEASE AT THE TIME THAT VIGOR BECAME AVAILABLE?

1    IF THAT IS THE STANDARD FOR PLACING A WARNING --

2    **A.**    YES.

3    **Q.**    -- WOULD THAT INFORMATION ALONE HAVE BEEN ENOUGH TO

4    INCLUDE THE CV RISK IN THE WARNINGS SECTION OF THE VIOXX LABEL?

5    **A.**    YES.

6    **Q.**    DO YOU HAVE AN OPINION, AGAIN, TO A REASONABLE DEGREE OF

7    MEDICAL CERTAINTY, AS TO WHETHER OR NOT THE INFORMATION IN THE

8    WARNING LABEL IN 2002 CONTAINED INFORMATION ABOUT INCREASED

9    MORTALITY?

10   **A.**    DO I HAVE AN -- I'M SORRY.  DO I HAVE AN OPINION?

11   **Q.**    DO YOU KNOW WHETHER IT WAS THERE ARE NOT?

12   **A.**    I KNOW IT WAS NOT THERE.

13   **Q.**    DO YOU HAVE AN OPINION, TO A REASONABLE DEGREE OF MEDICAL

14   CERTAINTY, AS TO WHETHER OR NOT THE EVIDENCE OF AN ASSOCIATION

15   BETWEEN VIOXX AND INCREASED MORTALITY SHOULD HAVE BEEN

16   CONTAINED IN THE WARNINGS SECTION OF THE VIOXX LABEL?

17   **A.**    I HAVE SUCH AN OPINION, AND MY OPINION IS THAT IF A

18   COMPANY IS IN POSSESSION OF DATA THAT INDICATES A STATISTICALLY

19   SIGNIFICANT DOUBLING OF THE DEATH RATE IN A PLACEBO-CONTROLLED

20   RANDOMIZED CONTROL TRIAL THAT IT CONDUCTED, THEN THAT

21   INFORMATION NEEDS TO BE IN THE LABEL TO BE ABLE TO GUIDE

22   PHYSICIANS TO MAKE APPROPRIATE DECISIONS ABOUT THE USE OF THAT

23   DRUG.

24   **Q.**    HAVE YOU SEEN ANY EVIDENCE THAT THE FDA WANTED TO INCLUDE

25   INFORMATION ABOUT VIGOR AND ADVANTAGE IN THE WARNINGS SECTION?

DAILY COPY

1   **A.**   I HAVE SEEN CORRESPONDENCE BETWEEN MERCK AND FDA IN BOTH

2   DIRECTIONS ABOUT THE MODIFICATIONS TO THE LABEL THAT WERE

3   PROPOSED.

4   **Q.**   DO YOU KNOW WHETHER OR NOT THE FDA PROPOSED THAT

5   INFORMATION ABOUT VIGOR AND ADVANTAGE ON CARDIOVASCULAR EVENTS

6   AND CARDIOVASCULAR RISKS BE PLACED IN THE WARNINGS SECTION?

7   **A.**   YES.

8   **Q.**   HAVING SEEN IT, AND AS SOMEBODY WHO IS AN EXPERT IN THE

9   FACTORS THAT DRIVE DOCTORS' PRESCRIBING PRACTICES, DO YOU HAVE

10  AN OPINION AS TO WHETHER OR NOT THAT KIND OF INFORMATION IN THE

11  WARNINGS SECTION WOULD HAVE ASSISTED DOCTORS IN MAKING A

12  RISK/BENEFIT ANALYSIS FOR THEIR PATIENTS?

13  **A.**   I HAVE SUCH AN OPINION THAT THAT WOULD HAVE BEEN AN

14  IMPORTANT PIECE OF INFORMATION FOR DOCTORS TO HAVE.

15  **Q.**   DO YOU THINK THAT THE LACK OF THAT INFORMATION DEPRIVED

16  DOCTORS OF AN IMPORTANT PIECE OF INFORMATION FROM WHICH THEY

17  COULD MAKE REASONABLE PRESCRIBING CHOICES?

18  **A.**   AS SOMEONE WHO HAS DONE RESEARCH AND PUBLISHED IN

19  PEER-REVIEWED JOURNALS ABOUT PHYSICIANS' ASSESSMENTS OF RISKS

20  AND BENEFITS, AND AS SOMEONE WHO TEACHES PHYSICIANS ABOUT

21  WEIGHING RISKS AND BENEFITS AND HAS WRITTEN A BOOK ABOUT RISKS

22  AND BENEFITS AS DRIVERS OF DRUG USE, AND AS SOMEBODY WHO HAS

23  WRITTEN A PAPER RECENTLY IN THE *NEW ENGLAND JOURNAL* ABOUT THE

24  EFFECT OF LABELING, ON WARNINGS, AND ON PRESCRIBING, I CAN SAY

25  WITH A GREAT DEAL OF CERTAINTY THAT A PHYSICIAN NOT HAVING

1   INFORMATION ABOUT DOUBLING OF MORTALITY RISK AND OF INCREASED

2   RISK OF HEART ATTACK CAUSED BY A DRUG WOULD DEPRIVE THAT

3   PHYSICIAN FROM THE ABILITY TO BE ABLE TO MAKE A WISE

4   PRESCRIBING DECISION.

5   **Q.**   DOCTOR, LET ME ASK YOU THIS:  DO YOU HAVE ANY EVIDENCE YOU

6   HAVE SEEN IN THIS CASE THAT THE ADDITION OF SUCH A WARNING, AS

7   OPPOSED TO PRECAUTION, WOULD HAVE MADE A DIFFERENCE WITH

8   RESPECT TO PRESCRIBING PRACTICES WITH RESPECT TO VIOXX?

9   **A.**   YES.

10  **Q.**   LET ME SHOW YOU WHAT I WOULD LIKE TO HAVE MARKED AS

11  EXHIBIT 39.  DOCTOR, HAVE YOU SEEN THIS BEFORE IN PREPARATION

12  FOR YOUR TESTIMONY TODAY?

13  **A.**   YES.

14          **THE COURT:**  LET'S GET TO A BREAKING POINT.  LET ME

15  KNOW WHEN WE CAN TAKE A BREAK.  IS THIS IT?

16          **MR. ROBINSON:**  WE CAN TAKE ONE NOW IF YOU WANT,

17  YOUR HONOR.

18          **THE COURT:**  LET'S TAKE A BREAK AT THIS POINT.  WE'LL

19  STAND IN RECESS 15 MINUTES.

20          **THE DEPUTY CLERK:**  EVERYONE RISE.

21          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

22          **THE DEPUTY CLERK:**  EVERYONE RISE.

23          **THE COURT:**  BE SEATED.

24  BY MR. ROBINSON:

25  **Q.**   THIS IS BEFORE THE LABEL CHANGE?

DAILY COPY

1    **A.**    RIGHT.

2    **Q.**    WHAT DOES THIS DOCUMENT INDICATE AS TO DOCTORS'

3    WILLINGNESS TO PRESCRIBE VIOXX IF THERE IS A WARNING VERSUS A

4    PRECAUTION?  GO AHEAD.

5    **A.**    THIS DOCUMENT INDICATES THAT THE INDIVIDUALS AT MERCK WHO

6    PREPARED IT HAD EXACTLY THE SAME IMPRESSION AS I DID ABOUT THE

7    EFFECT OF A CLEAR WARNING VERSUS WHAT THEY CALL A MILD WARNING

8    ON UTILIZATION OF THE DRUG, AND WHAT THEIR GRAPH INDICATES IS

9    THEIR PROJECTION THAT UTILIZATION OF THE DRUG WOULD BE MUCH

10   LOWER IF THERE WAS A STRONG WARNING VERSUS A MILD WARNING.

11   **Q.**    IS THIS CONSISTENT WITH YOUR OWN RESEARCH THAT THE VARIOUS

12   LEVELS OF WARNING MAKE A DIFFERENCE WITH DOCTORS?

13   **A.**    YES.

14   **Q.**    DOCTOR, YOU MENTIONED ANOTHER METHOD BY WHICH DOCTORS

15   COMMUNICATE -- COMPANIES COMMUNICATE WITH DOCTORS IS THEIR

16   STATEMENTS TO THE PRESS.  I THINK YOU MENTIONED THAT BEFORE.

17   **A.**    RIGHT.

18   **Q.**    HAVE YOU SEEN STATEMENTS THAT MERCK HAS MADE TO THE PRESS

19   ABOUT THE CARDIOVASCULAR SAFETY OF VIOXX?

20   **A.**    YES.

21   **Q.**    I'M GOING TO HAND YOU WHAT I WOULD LIKE TO HAVE MARKED AS

22   EXHIBIT 40.

23   **A.**    SOUNDS RIGHT.

24   **Q.**    DOCTOR, HAVE YOU SEEN THIS BEFORE AS AN EXAMPLE OF THE

25   KIND OF COMMUNICATION THAT MERCK MADE TO THE PRESS?

1   **A.**   YES.

2   **Q.**   WHAT IS THIS?

3   **A.**   THIS IS LABELED AS A NEWS RELEASE ON MERCK'S STATIONERY

4   FOR IMMEDIATE RELEASE AND THE TITLE OF IT IS -- IT'S DATED

5   MAY 22, 2001, AND THE TITLE IS, "MERCK CONFIRMS FAVORABLE

6   CARDIOVASCULAR SAFETY PROFILE OF VIOXX."

7   **Q.**   THIS TALKS ABOUT THE VIGOR STUDY?

8   **A.**   RIGHT.

9   **Q.**   KNOWING WHAT YOU KNOW ABOUT VIGOR, AND LOOKING AT THE

10  MEDICINE AND THE SCIENCE SURROUNDING VIGOR, IS THIS MEDICALLY

11  AND SCIENTIFICALLY ACCURATE INFORMATION TO DISSEMINATE TO THE

12  PUBLIC?

13  **A.**   A GREAT DEAL OF MY WORK INVOLVES LOOKING AT WAYS OF

14  PRESENTING COMPLICATED INFORMATION ABOUT DRUG RISKS AND DRUG

15  BENEFITS BOTH TO PHYSICIANS AND TO PATIENTS.  WE DID SOME OF

16  THE FIRST STUDIES OF HOW TO PRESENT INFORMATION TO PATIENTS

17  BACK IN THE EARLY 1980S RELATING TO ANTIBIOTIC RISKS AND

18  BENEFITS.  WE HAVE SINCE PRODUCED COPIOUS MATERIALS FOR

19  PATIENTS IN OUR PROGRAM IN THE STATE OF PENNSYLVANIA EXPLAINING

20  TO THEM THE RISKS AND BENEFITS OF VARIOUS DRUGS, IN ADDITION TO

21  INFORMATION FOR DOCTORS, TO TEACH THEM HOW TO BALANCE RISK AND

22  BENEFITS OF DRUGS IN A PROGRAM SUPPORTED BY THE STATE OF

23  PENNSYLVANIA.

24          OUR OTHER STUDIES ON PRESENTING INFORMATION ABOUT

25  RISKS AND BENEFITS TO PATIENTS AND TO PHYSICIANS HAVE BEEN

1   SUPPORTED BY THE NATIONAL INSTITUTES OF HEALTH AND THE JOHN A.

2   HARTFORD FOUNDATION AND A VARIETY OF OTHER SOURCES, INCLUDING

3   THE ARTHRITIS FOUNDATION AND MERCK ITSELF IN A CURRENT STUDY

4   THAT I'M DOING WITH DR. SOLOMON ABOUT EXPLAINING TO PATIENTS

5   HOW TO BALANCE THE RISKS AND BENEFITS OF OSTEOPOROSIS DRUGS, OF

6   WHICH THE MOST PROMINENT ONE IS MADE MY MERCK.

7            I HAVE SPENT 25 YEARS OF STUDYING THE QUESTION OF HOW

8   ONE CAN CONDENSE COMPLICATED DATA -- EPIDEMIOLOGIC DATA,

9   CLINICAL DATA, BIOLOGICAL DATA -- TO DOCTORS AND PATIENTS SO AS

10  TO INFORM THEIR PRESCRIBING IN A WAY THAT IS DRIVEN BY AND

11  SCIENCE AND BY PATIENT BENEFIT RATHER THAN DRIVEN BY THE NEED

12  TO PUSH OR DUMP ON A GIVEN PRODUCT.  THAT IS WHAT MY CAREER HAS

13  BEEN ABOUT.

14           I SPEND MOST DAYS THINKING ABOUT HOW TO PRESENT SUCH

15  INFORMATION FAIRLY.  BASED ON THAT 25 AND 20 YEARS OF

16  EXPERIENCE, PUBLISHED IN PEER-REVIEWED JOURNALS, FUNDED BY

17  FEDERAL AGENCIES AND PEER-REVIEWED GRANT PROPOSALS, I CAN TELL

18  YOU THAT THIS IS AN INADEQUATE AND A DECEPTIVE WAY OF

19  PRESENTING THIS INFORMATION TO THE PRESS, TO DOCTORS, TO

20  PATIENTS, OR TO ANYONE.

21  **Q.**   DOCTOR, WE HAVE TALKED ABOUT ANOTHER METHOD OF

22  COMMUNICATING RISKS AND BENEFITS TO PATIENTS AND DOCTORS AS

23  BEING THE PEER-REVIEWED PUBLISHED LITERATURE.  WE HAVE TALKED

24  ABOUT SEVERAL ARTICLES TODAY THAT DID THAT.  LET'S TALK ABOUT

25  THE TWO ARTICLES THAT APPEARED IN THE *NEW ENGLAND JOURNAL OF*

1   *MEDICINE*, THE APPROVE STUDY AND THE VIGOR STUDY.  HAVE YOU

2   REVIEWED INFORMATION ABOUT BOTH OF THOSE STUDIES?

3   **A.**   YES.

4   **Q.**   LET'S TAKE VIGOR.  WAS VIGOR ACCURATE, COMPLETE, AND A

5   SCIENTIFICALLY APPROPRIATE WAY TO PRESENT A FAIR AND BALANCED

6   PICTURE OF THE DATA COLLECTED IN THAT STUDY?

7   **A.**   NO, IT WAS NOT.

8   **Q.**   OKAY.  WHY WAS IT NOT, DOCTOR?  MEDICALLY AND

9   SCIENTIFICALLY, HAVING REVIEWED THE VIGOR DATA AND KNOWING WHAT

10  YOU KNOW AS AN EPIDEMIOLOGIST, WAS THE INFORMATION PORTRAYED TO

11  DOCTORS IN A WAY THAT IS MEDICALLY AND SCIENTIFICALLY ACCURATE?

12  **A.**   NO.

13  **Q.**   WHY IS THAT?

14  **A.**   SEVERAL REASONS.  ONE IS THAT IT IS INAPPROPRIATE FOR

15  AUTHORS, WHETHER THEY WORK FOR A CORPORATION OR A UNIVERSITY,

16  TO KNOW ABOUT IMPORTANT SIDE EFFECTS, LIKE A HEART ATTACK, IN

17  PATIENTS IN A STUDY THAT THEY ARE REPORTING AND TO FAIL TO

18  INCLUDE THAT INFORMATION IN THE PUBLISHED VERSION OF THAT

19  PAPER.  THAT'S REASON NUMBER ONE.

20          REASON NUMBER TWO IS THE SO-CALLED FLIPPING OF THE

21  DATA -- AND, AGAIN, THAT'S A MERCK TERM, NOT MINE -- TO PRESENT

22  THE DIFFERENCE IN THE HEART ATTACK RATE BETWEEN NAPROXEN AND

23  VIOXX AS BEING EXPLAINED BY THE FACT THAT NAPROXEN WAS

24  PROTECTING PATIENTS' HEARTS WHEN AT LEAST AN EQUALLY PLAUSIBLE

25  CONCLUSION AND, FRANKLY, A FAR MORE PLAUSIBLE CONCLUSION, WAS

1  THAT VIOXX WAS CAUSING THE HEART ATTACKS.  THAT INVERSION IS

2  SOMETHING WHICH WAS NOT A FAIR PRESENTATION OF THE DATA.

3  **Q.**  LET'S MOVE FORWARD TO THE APPROVE STUDY.  HAVING REVIEWED

4  THE APPROVE STUDY AND NOW KNOWING WHAT YOU KNOW AND SEEING WHAT

5  YOU'VE SEEN, WAS THE EVIDENCE PRESENTED AND THE INFORMATION

6  PRESENTED IN THE APPROVE STUDY A MEDICALLY AND SCIENTIFICALLY

7  ACCURATE PRESENTATION OF THE DATA COLLECTED IN THAT STUDY SO

8  THAT DOCTORS IN THE SCIENTIFIC COMMUNITY WOULD UNDERSTAND THE

9  RISKS AND BENEFITS ASSOCIATED WITH VIOXX?

10  **A.**  APPROVE WAS NOT A FAIR AND ACCURATE DEPICTION OF THE DATA,

11  WE NOW KNOW, FOR A COUPLE OF REASONS.  ONE IS THAT IT

12  ELIMINATED PATIENTS WHO HAD THEIR CARDIAC EVENTS GREATER THAN

13  TWO WEEKS AFTER STOPPING THE DRUG.  WE NOW UNDERSTAND THAT

14  THERE ARE ASPECTS OF THE WAY THAT VIOXX MIGHT CAUSE DAMAGE THAT

15  COULD EASILY OCCUR GREATER THAN TWO WEEKS AFTER STOPPING THE

16  DRUG.  AND, IN FACT, THE STROKE DATA FROM THE APPROVE FOLLOW-UP

17  DOES INDICATE THE PATIENTS WHO HAD BEEN ON VIOXX CONTINUED TO

18  HAVE A STATISTICALLY SIGNIFICANT HIGHER RATE OF STROKE AFTER

19  THE STUDY WAS COMPLETED OR THE ACTIVE PHASE WAS COMPLETED

20  COMPARED TO THE PATIENTS WHO WERE ON PLACEBO.  THAT'S REASON

21  NUMBER ONE.

22       REASON NUMBER TWO IS THAT IT IS NOW FAIRLY WELL

23  RECOGNIZED THAT THE STUDY USED AN INCORRECT STATISTICAL

24  APPROACH, WHICH CREATED THE MISIMPRESSION THAT THE RISK FROM

25  VIOXX IN THAT STUDY ONLY BEGAN AT MONTH 18 AND THAT ANYONE

1   TAKING THE DRUG FOR LESS THAN 18 MONTHS, ACCORDING TO THE WAY

2   THAT STUDY WAS ORIGINALLY PRESENTED, HAD NO RISK.  AS OF THE

3   LAST FEW DAYS, THAT HAS BEEN CORRECTED IN THE *NEW ENGLAND*

4   *JOURNAL*; AND THE STATEMENT THAT THIS IS NOT A PROBLEM BEFORE 18

5   MONTHS HAS BEEN MODIFIED, AS I UNDERSTAND IT, IN RESPONSE TO

6   THIS BECOMING KNOWN BY THE EDITORS OF THE *NEW ENGLAND JOURNAL*,

7   WHO, AS I KNOW IT, REQUESTED THAT CHANGE.

8          I THINK THOSE ARE THE TWO MOST IMPORTANT WAYS THAT --

9   AND VERY IMPORTANT WAYS -- THAT APPROVE DID NOT PRESENT THE

10  DATA IN AN ACCURATE AND BALANCED MANNER.

11  **Q.**   DOCTOR, WE TALKED ABOUT THE ADVANTAGE STUDY AND THE

12  PUBLICATION OF THE ADVANTAGE STUDY.  DID THE PUBLICATION OF THE

13  ADVANTAGE STUDY CONTAIN INFORMATION ABOUT MYOCARDIAL

14  INFARCTION, HEART ATTACKS, AS OPPOSED TO APTC EVENTS?

15  **A.**   NO.  ALTHOUGH THAT DATA WAS COLLECTED, THE ENDPOINT THAT

16  WAS CHOSEN FOR PUBLICATION WAS THE SO-CALLED APTC OR

17  ANTI-PLATELET TRIALISTS COLLABORATIVE DEFINITION, WHICH WAS

18  MUCH BROADER.  THAT DEFINITION DID NOT REVEAL A STRIKING

19  DIFFERENCE IN OUTCOMES, BUT HAD HEART ATTACKS, WHICH IS EXACTLY

20  THE ISSUE AT HAND, BEEN THE OUTCOME THAT WAS PRESENTED, THAT

21  WOULD HAVE REVEALED A DIFFERENCE.

22  **Q.**   DID ANY OF THE PUBLISHED ALZHEIMER'S STUDIES PUBLISH THE

23  INTENTION TO TREAT ANALYSIS THAT DR. CHEN REPORTED ABOUT THE

24  INCREASED MORTALITY IN BOTH OF THOSE STUDIES?

25  **A.**   NO.  EVEN THOUGH THAT ANALYSIS WAS DONE BY MERCK AND

DAILY COPY

1  AVAILABLE TO MERCK, IT WAS NOT PRESENTED IN PUBLISHED FORM TO

2  DOCTORS.

3  **Q.**   LOOKING AT ALL THE MAJOR PUBLICATIONS THAT WERE SUBMITTED

4  TO THE MEDICAL AND SCIENTIFIC COMMUNITY, DO YOU HAVE AN OPINION

5  AS TO WHETHER OR NOT THE MEDICAL AND SCIENTIFIC INFORMATION

6  THAT CAME TO THEM IN THEIR TOTALITY WAS A REASONABLE EXPOSITION

7  OF THE MEDICAL AND SCIENTIFIC INFORMATION KNOWN TO MERCK?

8  **A.**   AS SOMEONE WHO REVIEWS ARTICLES FOR THE *NEW ENGLAND*

9  *JOURNAL OF MEDICINE,* REVIEWS ARTICLES FOR *JAMA*, A NUMBER OF

10  OTHER PUBLICATIONS IN WHICH THE EDITORS SEEK MY PEER REVIEW AS

11  TO THE APPROPRIATENESS OF PRESENTATION OF THE DATA, AS SOMEONE

12  WHO HAS PUBLISHED OVER 200 ARTICLES IN WHICH I, MYSELF, HAVE

13  BEEN SUBJECTED TO PEER REVIEW ABOUT THE FAIRNESS OF THE

14  PRESENTATION OF OUR OWN DATA, AS SOMEONE WHO HAS WRITTEN WIDELY

15  ABOUT PHYSICIANS' AND PATIENTS' PERCEPTION OF RISK AND HOW THAT

16  PERCEPTION DRIVES THEIR PRESCRIBING, I CAN SAY THAT I HAVE

17  NEVER KNOWN A COLLECTION OF PAPERS ON ANY ONE TOPIC IN WHICH

18  THERE HAS BEEN SUCH A CONSTELLATION OF SKEWED AND DISTORTED

19  PRESENTATION OF DATA IN ANY DRUG STUDIES THAT I'VE EVER LOOKED

20  AT.

21  **Q.**   DOCTOR, WE TALKED ABOUT ANOTHER METHOD OF MERCK

22  COMMUNICATING THE RISKS, ACCURATE INFORMATION ABOUT THE RISKS.

23  YOU DO UNDERSTAND THAT THERE WAS DIRECT-TO-CONSUMER ADVERTISING

24  DIRECTLY TO PATIENTS AND YOU'VE WRITTEN ABOUT THAT; CORRECT?

25  **A.**   YES.

1   Q.   DO YOU HAVE AN OPINION, TO A REASONABLE DEGREE OF MEDICAL

2   CERTAINTY, AS TO WHETHER OR NOT THE DIRECT-TO-CONSUMER

3   ADVERTISING CONDUCTED BY MERCK PLAYED A ROLE IN WHAT'S A FAIR

4   AND ACCURATE DEPICTION OF THE RISKS AND BENEFITS ASSOCIATED

5   WITH VIOXX?

6   A.   YES.  AS I SAID IN MY *HEALTH AFFAIRS* ARTICLE ABOUT

7   DIRECT-TO-CONSUMER ADVERTISING A COUPLE OF YEARS AGO, IT'S

8   VITAL THAT PATIENTS BE ABLE TO GET A REASONABLE DEPICTION OF

9   BOTH THE GOOD NEWS AND THE BAD NEWS ABOUT A DRUG.  GIVEN WHAT

10  WE NOW UNDERSTAND WAS AVAILABLE TO MERCK AT THE TIME THAT

11  ALL -- THAT THOSE $100 MILLION A YEAR COMMERCIALS AND ADS WERE

12  BEING RUN, I THINK IT IS ABSOLUTELY CORRECT TO SAY THAT THEY

13  PROVIDED ALL THE GOOD NEWS ABOUT THE DRUG AND DID AN INADEQUATE

14  JOB OF PRESENTING THE BAD NEWS ABOUT THE DRUG TO PATIENTS.

15  Q.   NOW, DOCTOR, LET ME TURN TO THE ONE LAST TOPIC I WOULD ASK

16  YOU ABOUT HERE, AND THAT IS THE DETAILING OF THE DOCTORS, WHICH

17  IS ANOTHER METHOD IN WHICH COMPANIES WILL COMMUNICATE WITH

18  DOCTORS.  HAVE YOU REVIEWED ANY OF THE DETAILING INFORMATION

19  THAT WAS PROVIDED TO DOCTORS?

20  A.   YES, AS WELL AS THE TRAINING OF THE SALES REPS, WHICH IS

21  PART OF THAT.

22  Q.   DID YOU SEE ANY INFORMATION ABOUT HOW TO RESPOND TO

23  DOCTORS' INQUIRIES ABOUT CARDIOVASCULAR EVENTS IN YOUR REVIEW

24  OF THE DOCUMENTS?

25  A.   YES.

1    **Q.**    WHAT DID YOU SEE?

2    **A.**    WELL, THE MOST MEMORABLE WAS THE DODGE BALL GAME THAT WAS

3    APPARENTLY DEVELOPED AS A TRAINING TOOL FOR THEIR SALES REPS TO

4    BE ABLE TO RESPOND TO DOCTORS' QUESTIONS ABOUT THE

5    CARDIOVASCULAR RISKS OF VIOXX, PARTICULARLY AFTER THE APPROVE

6    STUDY FINDINGS HAD COME OUT, AND I WAS STRUCK --

7    **Q.**    YOU MEANT VIGOR; RIGHT?

8    **A.**    I'M SORRY.  THAT'S WHAT I MEANT TO SAY.

9    **Q.**    ALL RIGHT.  OKAY.

10   **A.**    I WAS STRUCK BY THE FACT THAT THE PURPOSE IS PRETTY MUCH

11   SUMMED UP IN THE NAME, THAT IT WAS TO DODGE QUESTIONS ABOUT

12   THIS VERY IMPORTANT RISK OF THE COMPANY'S DRUG.  MERCK'S

13   TRAINING MATERIALS TO THEIR SALES REPS EXPLICITLY TELL THEM,

14   "DO NOT RAISE OR DO NOT INITIATE ANY DISCUSSION OF OUR PAPER OR

15   OTHER PAPERS RELATED TO CARDIOVASCULAR RISK."  THERE WERE A

16   NUMBER OF COMPLETELY EVASIVE ANSWERS THAT WERE BEING FED TO THE

17   SALES REPS FOR THEM TO GIVE AS RESPONSES TO DOCTORS WHO ASKED

18   ABOUT WHETHER OR NOT THIS DRUG COULD CAUSE HEART ATTACKS.  THAT

19   DID NOT SEEM TO ME TO BE A REASONABLE OR SCIENTIFICALLY

20   ACCURATE PRESENTATION OF THE DATA.

21   **Q.**    WE TALKED ABOUT ACADEMIC DETAILING EARLIER IN YOUR

22   DEPOSITION AND THE PROGRAMS THAT YOU'VE DEVELOPED AND STUDIED

23   AND PUBLISHED IN THE *NEW ENGLAND JOURNAL OF MEDICINE*.

24   **A.**    YES.

25   **Q.**    NOW, LET ME ASK YOU:  GIVEN ALL THAT EXPERIENCE, DOCTOR,

1   GIVEN YOUR EXPERIENCE IN 20-SOME-ODD, 30-SOME-ODD YEARS IN
2   TEACHING HOW TO COMMUNICATE THE RISKS AND THE BENEFITS, LOOKING
3   AT ALL THE WAYS IN WHICH VIOXX WAS COMMUNICATED, THE RISKS AND
4   THE BENEFITS, THE GOOD NEWS AND THE BAD NEWS, TO DOCTORS, PRESS
5   RELEASE, MEDICAL JOURNALS, LABELS, DETAILERS, ALL OF THOSE
6   THINGS PUT TOGETHER, DO YOU HAVE AN OPINION, TO A REASONABLE
7   DEGREE OF MEDICAL AND SCIENTIFIC CERTAINTY, AS TO WHETHER OR
8   NOT AN ACCURATE PICTURE OF THE RISKS AND BENEFITS OF THE DRUGS
9   WAS COMMUNICATED TO DOCTORS SO THAT THEY CAN MAKE ACCURATE
10  PRESCRIBING DECISIONS FOR THEIR PATIENTS?
11  A.   THAT THERE WAS A PATTERN OF GROSS DISTORTION OF THE RISKS
12  OF VIOXX, AND THAT NO MATTER WHICH WAY PHYSICIANS TURNED --
13  WHETHER IT WAS LOOKING AT THE LABEL, HEARING WHAT THEY WERE
14  HEARING FROM THE MERCK TRAINING SALES REPRESENTATIVES, TRYING
15  TO READ THE LITERATURE IN THE MEDICAL JOURNALS, AND TRYING TO
16  GET SOME ACCURATE COMPLETE DEPICTION OF WHAT WAS HAPPENING IN
17  THE CLINICAL TRIALS, EVEN THE INFORMATION THAT PATIENTS WERE
18  BRINGING TO THEM FROM THE COMMERCIALS AND ADS THAT THEY HAD
19  SEEN, ACROSS THE BOARD THERE WAS A PATTERN OF WHAT I WOULD
20  CHARACTERIZE AS SYSTEMATIC DISTORTION THAT ROSE ALMOST TO THE
21  LEVEL OF GROTESQUE AND, FRANKLY, IT WAS AN EMBARRASSMENT TO ME,
22  AS A MEMBER OF THE MEDICAL PROFESSION, THAT THIS WAS GOING ON
23  IN PRESENTING INFORMATION TO DOCTORS IN SUCH A ONE-SIDED AND
24  LOPSIDED WAY.
25  Q.   IS THAT OPINION YOU JUST GAVE AN OPINION THAT YOU ARE

1   BASING ON THE SCIENTIFIC AND MEDICAL INFORMATION THAT YOU KNOW

2   WAS AVAILABLE AT THE TIME?

3   **A.**   IT IS THE OPINION OF ME, AS AN EXPERT WHO HAS SPENT 25

4   YEARS STUDYING THE RISKS AND BENEFIT OF DRUGS AND HOW THOSE

5   RISKS AND BENEFITS SHOULD BE COMMUNICATED TO DOCTORS AND TO

6   PATIENTS.

7            **MR. BECK:**   YOUR HONOR, NOW WE HAVE CROSS-EXAMINATION

8   THAT WILL GET UNDER WAY TODAY, BUT I'M AFRAID IT'S NOT GOING TO

9   FINISH TODAY.

10                        **CROSS-EXAMINATION**

11  **BY MR. BECK:**

12  **Q.**   DOCTOR, ONCE AGAIN MY NAME IS PHIL BECK, AND I REPRESENT

13  MERCK.  AS I UNDERSTAND IT, SIR, YOU WERE RETAINED AS AN EXPERT

14  BY THE PLAINTIFF'S LAWYERS IN AROUND MAY OF 2005; IS THAT

15  CORRECT?

16  **A.**   THAT'S RIGHT.

17  **Q.**   I THINK MR. TISI MENTIONED THIS, BUT THEY PROVIDED YOU

18  WITH A LARGE NUMBER OF DOCUMENTS TO REVIEW; IS THAT RIGHT?

19  **A.**   THOUSANDS OF PAGES, YES.

20  **Q.**   WERE THESE DOCUMENTS CONTAINED IN BINDERS THAT MR. TISI

21  SHOWED TO US DURING YOUR FIRST DEPOSITION?

22  **A.**   YES.

23  **Q.**   I THINK YOU'VE GOT THOSE BINDERS WITH YOU TODAY?

24  **A.**   RIGHT.

25  **Q.**   WHAT ARE THERE, TEN OR SOME BINDERS OF DOCUMENTS THAT THEY

1   GAVE YOU?

2   **A.**   SOUNDS ABOUT RIGHT, YES.

3   **Q.**   WHEN YOU WROTE YOUR REPORT, DID THE LAWYERS THAT YOU

4   WORKED WITH TURN AROUND AND MARK IT UP AND PROVIDE YOU WITH

5   SUGGESTIONS AND CHANGES FOR YOUR REPORT?

6   **A.**   THEY DID NOT DO ANY MARKING UP, BUT THEY DID COMMENT ON

7   ASPECTS OF IT:  "THIS IS UNCLEAR."  "THIS IS UNFAIR TO MERCK."

8   "YOU FORGOT ABOUT THIS THING THAT WE HAD TALKED ABOUT."  BUT

9   THEY DIDN'T MAKE ANY MARKS OR CHANGES.

10  **Q.**   YOUR TESTIMONY IS THAT THE LAWYERS DID NOT PROVIDE YOU

11  WITH ANY MARKUPS; IS THAT RIGHT?

12  **A.**   BY "MARKUPS" YOU MEAN DID THEY MAKE NOTES ON MY REPORT AND

13  MAKE SUGGESTIONS ABOUT CHANGING IT?  THAT'S RIGHT, THEY DID

14  NOT.

15  **Q.**   I'M HANDING YOU WHAT WE HAVE MARKED AS EXHIBIT 43.  DO YOU

16  SEE THAT EXHIBIT 43 IS AN E-MAIL TO YOU FROM JEFF GRAND?

17  **A.**   YES.

18  **Q.**   JEFF GRAND IS ONE OF THE LAWYERS THAT YOU WORKED WITH?

19  **A.**   THAT'S RIGHT.

20  **Q.**   YOU WILL SEE AT THE BOTTOM -- EXCUSE ME.  I'LL GO BACK UP

21  TO THE TOP.  THIS IS DATED MARCH 12, 2006.  DO YOU SEE THAT?

22  **A.**   YES.

23  **Q.**   THAT WAS BEFORE THE DATE OF YOUR EXPERT REPORT IN THIS

24  CASE; RIGHT?

25  **A.**   IT WAS BEFORE IT WAS FINALIZED, YES.

405

1    **Q.**   BEFORE IT WAS FINALIZED.  THEN DO YOU SEE THE VERY LAST

2    THING THAT MR. GRAND SAID IN HIS E-MAIL TO YOU WAS, "ALSO,

3    TOMORROW I WILL SEND YOU A MARKUP OF YOUR REPORT AS WE

4    DISCUSSED"?

5    **A.**   YES, I SEE THAT.

6    **Q.**   DO YOU AGREE THAT THERE WERE GOOD PUBLIC HEALTH REASONS

7    FOR MERCK TO DEVELOP VIOXX?

8    **A.**   YES, I DO.

9    **Q.**   DO YOU AGREE THAT ONE OF THE GOOD PUBLIC HEALTH REASONS

10   FOR DEVELOPING VIOXX WAS THAT THERE WERE SERIOUS

11   GASTROINTESTINAL PROBLEMS, PARTICULARLY GASTROINTESTINAL

12   BLEEDING, THAT RESULTED FROM THE USE OF TRADITIONAL NSAIDS?

13   **A.**   THAT'S RIGHT.

14   **Q.**   WERE THE GASTROINTESTINAL BLEEDS AN IMPORTANT CLINICAL

15   PROBLEM?

16   **A.**   THAT'S RIGHT.

17   **Q.**   THERE HAVE BEEN STUDIES THAT SHOWED THE NUMBER OF

18   HOSPITALIZATIONS EACH YEAR THAT CAME FROM GASTROINTESTINAL

19   COMPLICATIONS FROM TRADITIONAL NSAIDS?

20   **A.**   YES, THERE WERE.

21   **Q.**   DOES IT SQUARE WITH YOUR RECOLLECTION THAT THESE STUDIES

22   SHOWED THAT THERE WOULD BE OVER 100,000 HOSPITALIZATIONS EACH

23   YEAR DUE TO GASTROINTESTINAL COMPLICATIONS FROM TRADITIONAL

24   NSAIDS?

25   **A.**   THAT'S CORRECT.

1   **Q.**   NOW, YOU TALKED ABOUT SOME FDA ADVISORY COMMITTEES

2   YESTERDAY.  DO YOU REMEMBER THAT?

3   **A.**   YES.

4   **Q.**   I THINK YOU TALKED ABOUT THE 2005 ADVISORY COMMITTEE

5   MEETING; RIGHT?

6   **A.**   THAT'S RIGHT.

7   **Q.**   I THINK YOU MAY HAVE TALKED ABOUT THE 2001 ADVISORY

8   COMMITTEE?

9   **A.**   THAT'S RIGHT.

10  **Q.**   WAS THERE ALSO AN ADVISORY COMMITTEE THAT WAS CONVENED IN

11  1999 TO CONSIDER WHETHER VIOXX SHOULD BE APPROVED BY THE FDA?

12  **A.**   THAT'S RIGHT.

13  **Q.**   IS IT THE CASE THAT BEFORE PRESCRIPTION MEDICINES GET

14  APPROVED, THE FDA OFTEN SEEKS THE ADVICE OF ADVISORY COMMITTEES

15  MADE UP OF OUTSIDE DOCTORS AND PROFESSIONALS?

16  **A.**   THAT'S RIGHT.

17  **Q.**   THERE WAS SUCH AN ADVISORY COMMITTEE CONVENED CONCERNING

18  WHETHER TO APPROVE VIOXX; RIGHT?

19  **A.**   THAT'S RIGHT.

20  **Q.**   WERE YOU ASKED TO BE ON THAT COMMITTEE?

21  **A.**   NO.

22  **Q.**   DID THAT COMMITTEE INVOLVE OR INCLUDE MEDICAL DOCTORS?

23  **A.**   YES.

24  **Q.**   DID IT INCLUDE PHARMACOLOGISTS?

25  **A.**   YES.

1   **Q.**   OTHER PH.D'S?

2   **A.**   USUALLY SUCH PEOPLE ARE ON THOSE COMMITTEES.

3   **Q.**   ARE YOU FAMILIAR WITH THE MATERIALS THAT WERE EXAMINED BY

4   THAT COMMITTEE AND THE CONCLUSIONS THAT IT CAME TO?

5   **A.**   YES.

6   **Q.**   DID THE ADVISORY COMMITTEE IN 1999 VOTE UNANIMOUSLY THAT

7   VIOXX SHOULD BE APPROVED FOR THE TREATMENT OF OSTEOARTHRITIS?

8   **A.**   THEY VOTED TO APPROVE.  I DON'T REMEMBER THE VOTE NUMBERS,

9   BUT THEY CLEARLY VOTED TO APPROVE.

10  **Q.**   YOU DO NOT DISAGREE WITH THE RECOMMENDATION OF THE

11  ADVISORY COMMITTEE BASED ON THE INFORMATION THAT WAS AVAILABLE

12  AT THE TIME, DO YOU?

13  **A.**   RIGHT.

14  **Q.**   AS YOU'VE TESTIFIED, VIOXX WAS APPROVED BY THE FOOD & DRUG

15  ADMINISTRATION FOR USE IN THE UNITED STATES IN MAY OF 1999;

16  RIGHT?

17  **A.**   THAT'S RIGHT.

18  **Q.**   YOU DO NOT DISAGREE WITH THAT DECISION EITHER, DO YOU?

19  **A.**   I DO NOT.

20  **Q.**   YESTERDAY YOU TESTIFIED ABOUT SOMETHING THAT'S BEEN

21  REFERRED TO AS THE IMBALANCE THEORY AS A POSSIBLE EXPLANATION

22  FOR WHAT YOU SAY ARE HIGHER CARDIOVASCULAR RISKS WITH VIOXX.

23  DO YOU REMEMBER THAT?

24  **A.**   YES.  THAT WAS ONE OF THE ISSUES WE DISCUSSED, YES.

25  **Q.**   AT THE TIME THAT THE FDA APPROVED VIOXX IN MAY OF 1999,

1    THEY WERE AWARE OF THIS IMBALANCE THEORY THAT YOU TALKED ABOUT

2    YESTERDAY, WERE THEY NOT?

3    **A.**   I CAN'T SPEAK TO WHAT FDA WAS OR WASN'T AWARE OF.

4    **Q.**   DR. AVORN, I HAVE HANDED YOU WHAT I HAVE MARKED AS

5    EXHIBIT 44.  DO YOU RECOGNIZE THIS AS ONE OF THE DOCUMENTS THAT

6    WAS PROVIDED TO YOU FOR YOUR REVIEW AND ANALYSIS BY THE LAWYERS

7    THAT YOU HAVE BEEN WORKING WITH ON THIS CASE?

8    **A.**   YES.

9    **Q.**   YOU UNDERSTOOD IT TO BE A COPY OR EXCERPTS OF A REPORT BY

10   ONE OF THE MEDICAL REVIEW OFFICERS FROM THE FDA; CORRECT?

11   **A.**   RIGHT.

12   **Q.**   IN YOUR ANALYSIS IN THIS CASE, YOU HAVE RELIED ON THIS

13   DOCUMENT AND OTHER REVIEWS BY MEDICAL OFFICERS OF THE FDA; IS

14   THAT RIGHT?

15   **A.**   RIGHT.

16   **Q.**   LET'S TURN OVER TO -- IT'S THE 20th PAGE IN HERE, AND

17   I'LL SEE HOW IT'S NUMBERED.  SO THAT YOU HAVE GOT THE PAGE THAT

18   I HAVE PUT UP ON THE SCREEN THAT SAYS "IN SUMMARY" AT THE TOP?

19   **A.**   YES.

20   **Q.**   DO YOU SEE HERE UNDER "THROMBOEMBOLIC AND VASCULAR SAFETY"

21   THAT -- YOU SEE THAT HEADING THERE?

22   **A.**   YES.

23   **Q.**   FOR THE BENEFIT OF THE JURY, WHAT DOES "THROMBOEMBOLIC"

24   MEAN?

25   **A.**   THAT REFERS TO PROBLEMS THAT OCCUR WHEN THERE IS A BLOOD

1    CLOT IN THE ARTERY.

2    **Q.**    "VASCULAR" REFERS TO?

3    **A.**    RELATING TO BLOOD VESSELS.

4    **Q.**    SO IT WAS REVIEWED IN ADVANCE OF THE APPROVAL OF VIOXX IN

5    MAY OF 1999; RIGHT?

6    **A.**    CORRECT.

7    **Q.**    SO BEFORE THE FDA APPROVED VIOXX IN MAY OF 1999, THE FDA

8    MEDICAL OFFICER UNDERSTOOD WHAT THE INFORMATION I HAVE BLOWN UP

9    ON THE SCREEN THAT "THERE IS A THEORETICAL CONCERN THAT

10   PATIENTS CHRONICALLY TREATED WITH A COX-2 SELECTIVE INHIBITOR

11   MAY BE AT HIGHER RISK FOR THROMBOEMBOLIC CARDIOVASCULAR ADVERSE

12   EXPERIENCES THAN PATIENTS TREATED WITH COX-1/COX-2 INHIBITORS

13   (CONVENTIONAL NSAIDS) DUE TO THE LACK OF EFFECT OF COX-1

14   INHIBITION ON PLATELET FUNCTIONS."  NOW, THAT'S A MOUTHFUL, BUT

15   WOULD YOU AGREE WITH ME, SIR, THAT WHAT'S REFERRED TO THERE IS

16   THE SAME IMBALANCE THEORY THAT YOU WERE TALKING ABOUT?

17   **A.**    I THINK IT'S INCORRECT IN THAT THE SO-CALLED IMBALANCE

18   THEORY HAS A LOT MORE TO IT THAN JUST PLATELET FUNCTION.

19   THERE'S A LOT OF DIFFERENCES IN PROSTACYCLIN VERSUS THROMBOXANE

20   BALANCE THAT ARE NOT JUST ABOUT PLATELET INHIBITION.

21   **Q.**    DOES THE IMBALANCE THEORY THAT YOU TALKED ABOUT YESTERDAY

22   INCLUDE THE NOTION OF PLATELET FUNCTIONING AS DESCRIBED HERE IN

23   THIS EXCERPT THAT WE PUT UP?

24   **A.**    THAT'S ONE PIECE OF IT.

25   **Q.**    SO CERTAINLY THAT PIECE OF THE IMBALANCE THEORY, AT THE

1   VERY LEAST, WAS UNDERSTOOD BY THE FDA WHEN THEY APPROVED VIOXX

2   IN MAY 1999; WOULD YOU AGREE WITH THAT?

3   A.   YES.

4   Q.   DO YOU ALSO AGREE, SIR, THAT VIOXX WORKED TO REDUCE PAIN

5   AND INFLAMMATION FOR THE VAST MAJORITY OF PATIENTS WHO USED IT

6   WITHOUT CAUSING THEM ANY SIDE EFFECTS WHATSOEVER?

7   A.   THAT'S PROBABLY TRUE.

8   Q.   YESTERDAY YOU TESTIFIED ABOUT SOME THINGS THAT YOU SAID

9   WERE SIGNALS OF POTENTIAL CARDIOVASCULAR RISKS THAT YOU SAID

10  WERE AROUND IN ADVANCE OF THE ACTUAL APPROVAL OF VIOXX IN MAY

11  OF 1999.  DO YOU REMEMBER THAT?

12  A.   YES.

13  Q.   IN THAT CONNECTION, DID YOU TESTIFY ABOUT SOMETHING CALLED

14  PROTOCOL 017?

15  A.   THAT'S RIGHT.

16  Q.   WAS IT YOUR POSITION THAT YOU THOUGHT PROTOCOL 017 WAS

17  SOME SORT OF A SIGNAL TO MERCK BEFORE VIOXX WAS APPROVED THAT

18  VIOXX COULD POTENTIALLY BE HARMFUL TO THE HEART?

19  A.   RIGHT.

20  Q.   HOW LONG A STUDY WAS PROTOCOL 017?

21  A.   IT WAS VERY BRIEF.  IT MAY HAVE BEEN ONLY SIX WEEKS, AS I

22  RECALL.

23  Q.   WHAT KIND OF PATIENTS WERE INVOLVED IN THAT STUDY?

24  A.   I'D NEED TO GO BACK TO THE NOTES.  IT WAS PATIENTS WITH

25  ARTHRITIS.  I DON'T REMEMBER THE EXACT KIND OF ARTHRITIS.

DAILY COPY

1  **Q.**   WOULD YOU ACCEPT THAT IT WAS RHEUMATOID ARTHRITIS?  DOES

2  THAT REFRESH YOUR RECOLLECTION?

3  **A.**   THAT SOUNDS REASONABLE.

4  **Q.**   WHAT DOSES OF VIOXX WERE THESE PATIENTS RECEIVING?

5  **A.**   125 MILLIGRAMS TO 175 MILLIGRAMS.

6  **Q.**   THAT IS FIVE TO SEVEN TIMES THE 25-MILLIGRAM DOSE THAT IS

7  RECOMMENDED ON THE LABEL WHEN VIOXX WAS APPROVED; RIGHT?

8  **A.**   RIGHT.  I THINK I MENTIONED YESTERDAY THAT IT WAS GIVEN IN

9  VERY HIGH DOSES.

10  **Q.**   IN FACT, IT'S SO HIGH THAT IT WOULD BE FIVE TO SEVEN TIMES

11  AS HIGH AS THE DOSE THAT WAS ACTUALLY RECOMMENDED ON THE LABEL;

12  CORRECT?

13  **A.**   RIGHT.

14  **Q.**   HOW MANY PEOPLE ACTUALLY HAD A HEART ATTACK IN THIS STUDY

15  OF PROTOCOL 017 THAT YOU SAID WAS A SIGNAL?

16  **A.**   THERE WAS A VERY SMALL NUMBER.  IT WAS A HANDFUL.  I CAN'T

17  TELL YOU THE NUMBER SITTING HERE, BUT IT WAS A VERY SMALL

18  NUMBER.

19  **Q.**   IS THERE SOMETHING IN YOUR REPORT THAT YOU COULD LOOK TO

20  AND TELL US HOW SMALL A HANDFUL IT WAS?

21  **A.**   NO.  I JUST KNOW THAT IT WAS A VERY SMALL, BRIEF STUDY.

22  BUT THE REASON IT SEEMED IMPORTANT WAS THAT IT ONLY LASTED SIX

23  WEEKS, AND MERCK'S REVIEW OF IT INDICATED THERE WAS A WORRISOME

24  INCREASE IN HEART ATTACKS AND UNSTABLE ANGINA.

25  **Q.**   WELL, DO YOU KNOW THAT, IN FACT, THERE WAS ONLY ONE PERSON

1   IN THE WHOLE STUDY WHO EXPERIENCED A HEART ATTACK?

2   A.    THE REVIEW WITHIN MERCK SPOKE OF A NUMBER OF

3   CARDIOVASCULAR OUTCOMES, INCLUDING UNSTABLE ANGINA, AND AT THIS

4   POINT I DO WANT TO REFER TO MY NOTES RATHER THAN TRYING TO DO

5   ALL OF THIS FROM MEMORY.

6   Q.    SURE.  I INVITED YOU TO.

7   A.    OKAY.

8   Q.    I ASKED YOU IF THERE WAS ANYTHING IN THERE THAT WOULD HELP

9   YOU TO FIGURE OUT HOW MANY PEOPLE IN THIS STUDY THAT YOU CALLED

10  A SIGNAL ACTUALLY HAD A HEART ATTACK.

11  A.    AGAIN, THE SIGNAL ASPECT OF IT WOULD NOT ONLY BE HEART

12  ATTACKS, IT WOULD ALSO BE IF SOMEBODY DEVELOPS ANGINA, WHICH IS

13  THE EXACT SAME KIND OF ILLNESS AS A HEART ATTACK, BUT IN SIX

14  WEEKS YOU WOULD BE VERY SURPRISED THAT ANYBODY WOULD PROGRESS

15  TO ACTUALLY HAVING A HEART ATTACK.  BUT IF YOU WANT, I CAN --

16  Q.    HOW MANY PEOPLE HAD A HEART ATTACK IN THIS STUDY?

17  A.    IF YOU CONFINE IT TO HEART ATTACKS AS OPPOSED TO HEART

18  ATTACKS, UNSTABLE ANGINA, AND OTHER KINDS OF CARDIOVASCULAR

19  DISEASE, I WOULDN'T BE SURPRISED THAT IT WAS A VERY SMALL

20  NUMBER.  IT COULD EVEN HAVE BEEN ONE.  BUT THAT WAS NOT THE

21  TOTAL NUMBER OF CARDIOVASCULAR ADVERSE EVENTS THAT WERE

22  OBSERVED.

23  Q.    DR. AVORN, BEFORE WE BROKE, WE WERE TALKING ABOUT

24  PROTOCOL 017, WHICH YOU SAID WAS A SIX-WEEK STUDY INVOLVING

25  HIGH DOSES OF VIOXX.  MY QUESTION FOR YOU, SIR, WAS:  DO YOU

1   KNOW HOW MANY PEOPLE ACTUALLY HAD A HEART ATTACK IN THIS STUDY?

2   **A.**   YES.

3   **Q.**   HOW MANY PEOPLE ACTUALLY HAD A HEART ATTACK IN THIS STUDY?

4   **A.**   ONE HAD A HEART ATTACK AND ABOUT SIX OTHERS HAD WHAT THE

5   FDA CHARACTERIZED AS "CARDIOVASCULAR ADVERSE EXPERIENCES."

6   **Q.**   SO FOR THE ONE PERSON WHO ACTUALLY HAD A HEART ATTACK, DO

7   YOU KNOW WHAT THAT PERSON'S RISK FACTORS WERE?

8   **A.**   IT WAS A 73-YEAR-OLD PERSON, WHO I BELIEVE WAS A MALE, AND

9   THOSE ARE RISK FACTORS IN THEMSELVES.  HAVING RHEUMATOID

10  ARTHRITIS IS ANOTHER RISK FACTOR FOR HEART DISEASE, AND I DON'T

11  KNOW ABOUT OTHER CHARACTERISTICS OF THAT ONE PERSON.

12  **Q.**   DO YOU KNOW WHAT THE INVESTIGATOR SAID ABOUT WHETHER HE

13  BELIEVED VIOXX CAUSED THE PERSON'S HEART ATTACK?

14  **A.**   I TEND TO NOT PAY ATTENTION TO INVESTIGATOR ATTRIBUTIONS,

15  ESPECIALLY IN COMPANY-FUNDED STUDIES.  I THINK A HEART ATTACK

16  IS A HEART ATTACK.

17  **Q.**   WELL, DO YOU KNOW ONE WAY OR ANOTHER WHAT THE INVESTIGATOR

18  SAYS?

19  **A.**   NO.

20  **Q.**   YOU'RE NOT TAKING THE POSITION IN THIS LITIGATION THAT

21  VIOXX CAUSED THE PATIENT'S HEART ATTACK IN PROTOCOL 017, ARE

22  YOU?

23  **A.**   I HAVE NO WAY OF KNOWING IN THAT PARTICULAR INSTANCE.

24  **Q.**   WE'RE DONE WITH THAT.  ACTUALLY, WE MAY -- YOU WERE

25  LOOKING AT -- WHEN YOU WERE ANSWERING THOSE QUESTIONS, YOU WERE

```
 1   LOOKING AT EXHIBIT 44 --
 2   A.   EXHIBIT 44.
 3   Q.   -- WHICH WAS DR. VILLALBA'S MEDICAL REVIEW; IS THAT WHAT
 4   IT'S CALLED?
 5   A.   RIGHT.  PRIMARY REVIEW OF THE NEW DRUG APPLICATION.
 6   Q.   IS THAT WHAT YOU CALLED YESTERDAY THE MEDICAL REVIEWS?
 7   A.   "MEDICAL OFFICER REVIEW" I THINK IS WHAT I CALLED IT.
 8   Q.   OKAY.  YESTERDAY YOU TALKED ABOUT SOME OF THE MEDICAL
 9   OFFICER REVIEWS; RIGHT?
10   A.   RIGHT.
11   Q.   LET'S LOOK AT THE 13$^{th}$ PAGE OF THIS DOCUMENT,
12   EXHIBIT 44.  LET ME PUT IT UP ON THE SCREEN.  IT'S GOT TABLE 39
13   ON IT.
14   A.   GOT IT.
15   Q.   AND IT MUST BE A PART OF TABLE 38.  DO YOU SEE THAT?
16   A.   RIGHT.
17   Q.   CAN YOU TELL FROM THIS PAGE, AT THE VERY BOTTOM, THAT
18   DR. VILLALBA IS BEGINNING A DISCUSSION THERE OF STUDY 017?
19   THAT'S THE SAME THING THAT YOU'VE BEEN REFERRING TO AS PROTOCOL
20   017?
21   A.   RIGHT.
22   Q.   IS THAT RIGHT?
23   A.   RIGHT.
24   Q.   THEN WHEN WE GO OVER TO THE NEXT PAGE -- AND LET ME ASK
25   YOU:  THIS DOCUMENT THAT WAS PROVIDED TO YOU FOR YOUR REVIEW
```

1    HAS SOME UNDERLININGS AND MARKINGS.  ARE THOSE YOUR

2    UNDERLININGS AND MARKINGS?

3    **A.**    THAT'S RIGHT.

4    **Q.**    DO YOU SEE ABOUT HALFWAY DOWN ON THE PAGE THERE WAS A

5    PARAGRAPH THAT HAS A LITTLE HANDWRITTEN BRACKET ON THE SIDE?

6    IS THAT YOUR HANDWRITTEN BRACKET?

7    **A.**    THAT'S RIGHT.

8    **Q.**    WOULD YOU READ, PLEASE, WHAT THIS SAYS, THIS PARAGRAPH

9    THAT YOU BRACKETED.

10   **A.**    SURE.  "THERE WERE MORE PATIENTS WITH CARDIOVASCULAR

11   ADVERSE EVENTS IN THE ROFECOXIB OR VIOXX 175 MILLIGRAM GROUP

12   THAN IN THE PLACEBO GROUP."

13   **Q.**    WOULD YOU READ THE NEXT SENTENCE.

14   **A.**    TABLE 9 IS WHERE THEY ARE LISTED.  "THE NUMBER OF PATIENTS

15   ENROLLED IN THIS STUDY WAS SMALL AND NO CONCLUSIONS CAN BE

16   DRAWN FROM THESE DATA."  THAT'S WHY IT'S A SIGNAL.

17   **Q.**    DO YOU AGREE WITH THE MEDICAL OFFICER FROM THE FDA THAT

18   BECAUSE OF THE SMALL NUMBER OF PATIENTS ENROLLED IN THE STUDY

19   THAT NO CONCLUSIONS CAN BE DRAWN FROM THESE DATA?

20   **A.**    I WOULD NOT HAVE PHRASED IT AS "NO CONCLUSIONS."  I WOULD

21   SAY THAT THERE'S NO STATISTICALLY SIGNIFICANT DIFFERENCE,

22   THERE'S NO PROOF, THERE'S NO HARD-AND-FAST EVIDENCE FROM THIS

23   ONE STUDY, BUT I THINK A CONCLUSION THAT I WOULD DRAW WAS THAT

24   THIS WARRANTS FURTHER SCRUTINY.

25   **Q.**    DO YOU AGREE, SIR, BASED ON THE INFORMATION THAT WAS IN

416

1    THIS DOCUMENT THAT YOU REVIEWED, THAT THE INCIDENCE OF

2    THROMBOEMBOLIC EVENTS WITH VIOXX APPEAR TO BE SIMILAR TO THAT

3    OF COMPARATOR NSAIDS?

4    **A.**    SO, NOW, WE'RE NOT TALKING ABOUT STUDY 017 ANYMORE, BUT

5    THE TOTALITY OF THE DOCUMENT?

6    **Q.**    YES.

7    **A.**    IF YOU CAN REFER ME TO WHERE IT SAYS THAT, THAT WILL SPEED

8    THINGS UP.

9    **Q.**    OKAY.  IF WE GO TO THE -- I THINK IT'S THE NEXT PAGE.  NO,

10   IT'S NOT THE NEXT PAGE.  IT IS ABOUT SEVEN PAGES FORWARD.  LET

11   ME PUT IT UP ON THE SCREEN AND I'LL HELP YOU FIND IT.  IT'S THE

12   PAGE AT THE BOTTOM THAT HAS TABLE 52.

13   **A.**    RIGHT.

14   **Q.**    DO YOU SEE WHERE, AT THE BOTTOM OF THE SECOND PARAGRAPH,

15   DR. VILLALBA SAYS, "THE INCIDENCE OF THROMBOEMBOLIC EVENTS WITH

16   ROFECOXIB APPEARS TO BE SIMILAR TO COMPARATOR NSAIDS"?  DO YOU

17   SEE THAT, SIR?

18   **A.**    YES.  BUT IT'S IMPORTANT TO POINT OUT THAT A FEW LINES

19   LATER, TO BE FAIR, IN SUMMARY, WHICH IS WHERE DR. VILLALBA PUTS

20   ALL OF IT TOGETHER IN HER SUMMARY STATEMENT -- PERHAPS IF YOU

21   MIGHT HIGHLIGHT THAT A FEW LINES DOWN -- "WITH THE AVAILABLE

22   DATA, IT IS IMPOSSIBLE TO ANSWER WITH COMPLETE CERTAINTY

23   WHETHER THE RISK OF CARDIOVASCULAR AND THROMBOEMBOLIC EVENTS IS

24   INCREASED IN PATIENTS ON ROFECOXIB.  A LARGER DATABASE WILL BE

25   NEEDED TO ANSWER THIS AND OTHER SAFETY COMPARISON QUESTIONS."

1          SO I THINK THE MOST IMPORTANT PIECE ON THAT PAGE IS

2   HER SUMMARY IN WHICH SHE SAYS WE CAN'T TELL WHETHER VIOXX

3   INCREASES THE RISK OF HEART DISEASE.  MORE INFORMATION IS

4   NEEDED TO ANSWER THAT QUESTION.  I THINK THAT'S THE CULMINATION

5   OF DR. VILLALBA'S ANALYSIS.

6   Q.   SHE SAID MORE INFORMATION IS NEEDED AND, OF COURSE, OTHER

7   STUDIES WERE DONE; CORRECT?

8   A.   I CAN'T IDENTIFY A SINGLE STUDY THAT WAS DONE TO

9   SPECIFICALLY ADDRESS THE QUESTION OF CARDIOVASCULAR SAFETY.

10  Q.   WELL, LET'S MOVE TO ANOTHER DOCUMENT THAT YOU SPENT SOME

11  TIME ON YESTERDAY, THE COMMENTS OF THE BOARD OF SCIENTIFIC

12  ADVISORS WITHIN MERCK.  DO YOU REMEMBER THAT DOCUMENT?

13  A.   YES.

14  Q.   YOU HAVE IT IN YOUR STACK.  IT WAS EXHIBIT 32.  DO YOU

15  WANT TO TAKE A MOMENT AND PULL IT OUT?

16  A.   OKAY.  I HAVE IT.

17  Q.   UP ON THE SCREEN, IS THIS THE SAME DOCUMENT THAT YOU HAVE

18  GOT IN FRONT OF YOU, EXHIBIT 32?

19  A.   RIGHT.

20  Q.   JUST TO KIND OF RESET THE SCENE, THIS WAS A BOARD OF

21  SCIENTIFIC ADVISORS WHO WERE, IN MAY OF 1998, GIVING ADVICE TO

22  MERCK ON THE QUESTION OF THE DEVELOPMENT OF VIOXX; RIGHT?

23  A.   CORRECT.

24  Q.   MR. TISI AND YOU FOCUSED ON PAGE 11 OF THIS DOCUMENT --

25  I'M SORRY -- YES, IT IS PAGE 11.  DO YOU HAVE THAT IN FRONT OF

1  YOU?

2  **A.**   YES, I DO.

3  **Q.**   THIS IS THE DISCUSSION THAT'S HEADED "CARDIOVASCULAR

4  PATHOPHYSIOLOGY"; RIGHT?

5  **A.**   RIGHT.

6  **Q.**   I WANT TO GO OVER SOME OF THIS LANGUAGE WITH YOU IN SOME

7  DETAIL.  THE FIRST SENTENCE YOU MAY HAVE DISCUSSED, IT SAYS

8  "THE BOARD" -- THAT WOULD BE THE BOARD OF SCIENTIFIC ADVISORS;

9  RIGHT?

10  **A.**   RIGHT.

11  **Q.**   "THE BOARD ADDRESSED THE POTENTIAL FOR EITHER BENEFITS OR

12  ADVERSE CONSEQUENCES OF SELECTIVE INHIBITION OF COX-2 ON

13  CORONARY HEART DISEASE."  RIGHT?

14  **A.**   RIGHT.

15  **Q.**   WHEN YOU READ "SELECTIVE INHIBITION OF COX-2," THAT'S

16  BASICALLY A COX-2 INHIBITOR SUCH AS VIOXX; RIGHT?

17  **A.**   RIGHT.

18  **Q.**   SO THE BOARD WAS LOOKING FOR THE POTENTIAL OF EITHER GOOD

19  THINGS OR BAD THINGS, IN TERMS OF CORONARY HEART DISEASE, THAT

20  COULD COME FROM A DRUG SUCH AS VIOXX; IS THAT FAIR?

21  **A.**   THAT'S FAIR.

22  **Q.**   THEN THE REPORT GOES ON TO SAY, "THE POSSIBLE EFFECTS OF

23  COX-2 INHIBITION ON THREE SEPARATE COMPONENTS OF THE PROCESS

24  LEADING TO CORONARY ISCHEMIC EVENTS WERE CONSIDERED."  AGAIN,

25  DO YOU READ THIS TO MEAN THAT THE POSSIBLE EITHER BENEFITS OR

419

1   ADVERSE CONSEQUENCES OF A DRUG SUCH AS VIOXX, A COX-2

2   INHIBITOR, WERE LOOKED AT IN CONNECTION WITH THESE THREE ITEMS

3   THAT ARE LISTED BELOW?

4   A.   CORRECT.

5   Q.   IN YOUR TESTIMONY YESTERDAY, ISN'T IT TRUE THAT THE WAY

6   YOU CHARACTERIZED THIS DOCUMENT WAS THAT THE BOARD OF

7   SCIENTIFIC ADVISORS WAS ALERTING MERCK TO THE POTENTIAL ADVERSE

8   CONSEQUENCES OF VIOXX WHEN IT CAME TO ITEM 1, "THE DEVELOPMENT

9   OF LIPID-RICH CORONARY PLAQUES"?

10  A.   THAT WAS ONE OF THE POINTS THAT THEY MAKE, YES.

11  Q.   I'M TALKING ABOUT YOUR TESTIMONY YESTERDAY.

12  A.   RIGHT.

13  Q.   YOU CHARACTERIZED THIS DOCUMENT, DID YOU NOT, AS ALERTING

14  MERCK TO THE POTENTIAL ADVERSE CONSEQUENCES OF VIOXX WHEN IT

15  CAME TO THE DEVELOPMENT OF LIPID-RICH CORONARY PLAQUE?

16  A.   CORRECT.

17  Q.   YOU ALSO CHARACTERIZED THIS DOCUMENT AS ALERTING MERCK TO

18  THE ADVERSE CONSEQUENCES OF VIOXX WITH THE SECOND ITEM LISTED,

19  WHICH IS "DESTABILIZATION OF PLAQUE"; RIGHT?

20  A.   RIGHT.

21  Q.   LET'S LOOK AT THIS DOCUMENT IN A LITTLE BIT MORE DETAIL.

22  MAYBE WE CAN SHORTEN IT.  DO YOU AGREE WITH ME THAT, IN FACT,

23  THE POINT FROM THE SCIENTIFIC ADVISORS WAS THAT VIOXX COULD

24  HAVE BENEFITS CONCERNING THE DEVELOPMENT OF LIPID-RICH CORONARY

25  PLAQUE AND COULD HAVE BENEFITS ON THE QUESTION OF

DAILY COPY

1    DESTABILIZATION OF PLAQUE?

2    A.   IN THE FIRST CASE, THE DEVELOPMENT OF LIPID-RICH CORONARY

3    PLAQUES, THEY SAY THIS COULD MAKE THINGS WORSE OR THIS COULD

4    MAKE THINGS BETTER, WE DON'T KNOW.  IN THE CASE OF THE SECOND

5    POINT, THE RELEVANT PIECES ON THE NEXT PAGE, WHERE THEY

6    DESCRIBE THAT MORE FULLY, AND THIS IS THE DESTABILIZATION OF

7    THE JUNK IN THE ARTERY THAT WHEN IT BURSTS CAN CAUSE A HEART

8    ATTACK.

9          LET ME JUST READ THIS PARAGRAPH BRIEFLY BECAUSE IT'S

10   WHAT YOU'RE TALKING ABOUT.  OKAY.  WHAT THEY ARE SAYING IS

11   THAT, IN THE SECOND SENTENCE OF THE PARAGRAPH ON THE NEXT PAGE,

12   "AS THE CRITICAL CELLS IN THIS PROCESS ARE INFLAMMATORY CELLS,

13   THE POSSIBILITY EXISTS THAT THE PRODUCTS OF COX-2 COULD

14   REGULATE THINNING THE CAP OF PLAQUES AND RENDER THEM

15   RUPTURE-PRONE."

16   Q.   WHAT THAT MEANS, DOCTOR, IS THAT THE COX-2 ENZYME COULD

17   CAUSE PLAQUE RUPTURE AND, THEREFORE, SOMETHING THAT INHIBITS

18   THE COX-2 ENZYMES, SUCH AS VIOXX, WOULD HELP PROTECT AGAINST

19   PLAQUE RUPTURE.  THAT WAS THE REAL POINT OF THE SCIENTIFIC

20   ADVISORS; ISN'T THAT TRUE?

21   A.   I CAN'T TELL FROM THIS WHAT THEIR MAIN POINT WAS IN THAT

22   REGARD.

23   Q.   YESTERDAY YOU CLAIMED THAT THEIR MAIN POINT WAS THE

24   OPPOSITE, DIDN'T YOU?

25   A.   I CLAIMED THAT THEY WERE CONCERNED THAT HERE WAS A

1   BRAND-NEW CLASS OF DRUGS THAT HAD AN EFFECT ON MANY IMPORTANT

2   ASPECTS OF THE CARDIOVASCULAR SYSTEM AND THAT IT WAS DIFFICULT,

3   BECAUSE THERE HAD NEVER BEEN DRUGS LIKE THIS BEFORE, TO KNOW

4   WHETHER THEY WOULD MAKE THINGS BETTER OR MAKE THINGS WORSE.

5   Q.   WELL, LET'S TAKE A LOOK IN MORE DETAIL ABOUT WHAT THEY

6   SAID ON BOTH OF THESE SUBJECTS.  WE ARE GOING TO LOOK FIRST AT

7   THE DEVELOPMENT OF THE LIPID-RICH PLAQUES.  THAT WAS ITEM 1;

8   RIGHT?

9   A.   RIGHT.

10  Q.   BEFORE WE GET INTO THAT DISCUSSION, JUST TO BACK UP FOR A

11  MINUTE SO THE JURY UNDERSTANDS THE SIGNIFICANCE, PEOPLE DEVELOP

12  PLAQUE IN THEIR CORONARY ARTERIES OVER TIME; RIGHT?

13  A.   RIGHT.

14  Q.   THAT CAN TAKE MANY, MANY YEARS; DECADES, IN FACT.  RIGHT?

15  A.   IT CAN.

16  Q.   SOME PLAQUE IS MORE DANGEROUS THAN OTHERS WHEN IT COMES TO

17  HEART ATTACKS; IS THAT RIGHT?

18  A.   I'M NOT SURE WHAT YOU MEAN.

19  Q.   SURE.  THERE ARE SOME PLAQUES THAT ARE LIPID-RICH AND MORE

20  PRONE TO RUPTURE THAN OTHER PLAQUES.  ARE YOU AWARE OF THAT?

21  A.   WELL, BUT ALL PLAQUES HAVE LIPID IN THEM.

22  Q.   YES.  I SEE THAT HERE THEY'RE TALKING ABOUT LIPID-RICH

23  CORONARY PLAQUES.  ARE YOU AWARE, DOCTOR, THAT CARDIOLOGISTS

24  DRAW A DISTINCTION BETWEEN DIFFERENT KINDS OF PLAQUES AND SAY

25  THAT SOME ARE MORE DANGEROUS THAN OTHERS WHEN IT COMES TO HEART

1   ATTACKS?

2   **A.**   YES, BUT THEY ALL CONTAIN LIPIDS.

3   **Q.**   ARE YOU AWARE, SIR, THAT CARDIOLOGISTS, THE PEOPLE WHO

4   ACTUALLY SPECIALIZE IN HEART DISEASE, SAY THAT THE PLAQUES THAT

5   HAVE MORE LIPIDS, THAT ARE LIPID-RICH, ARE MORE DANGEROUS THAN

6   THE PLAQUES THAT HAVE LESS LIPID?

7   **A.**   RIGHT.

8   **Q.**   ARE YOU AWARE OF THAT FACT?

9   **A.**   YES.

10  **Q.**   OKAY.  SO HERE THE BOARD OF SCIENTIFIC ADVISORS IS TALKING

11  ABOUT THE ESPECIALLY DANGEROUS LIPID-RICH CORONARY PLAQUES; IS

12  THAT WHAT YOU UNDERSTAND?

13  **A.**   RIGHT.

14  **Q.**   DOWN HERE IN THE MIDDLE OF THE PAGE, DO YOU SEE WHERE THE

15  BOARD OF SCIENTIFIC ADVISORS SAYS THAT "THERE IS A GROWING BODY

16  OF EVIDENCE INDICATING THAT INFLAMMATORY DISEASE IS A RISK

17  FACTOR FOR MYOCARDIAL INFARCTION, AND SUCH INFLAMMATORY

18  PROCESSES ALMOST CERTAINLY ARE ACCOMPANIED BY THE RELEASE

19  OF" -- HOW DO YOU PRONOUNCE THAT NEXT WORD?

20  **A.**   CYTOKINES.

21  **Q.**   -- "CYTOKINES THAT AFFECT CELLS IN THE" --

22  **A.**   MONOCYTIC.

23  **Q.**   -- "MONOCYTIC SERIES IN GENERAL, AND COX-2 EXPRESSION IN

24  PARTICULAR."

25  **A.**   RIGHT.

1   **Q.**   NOW, WHEN IT SAYS THAT INFLAMMATORY DISEASE IS A RISK
2   FACTOR FOR MYOCARDIAL INFARCTION, WHAT YOU UNDERSTAND THAT TO
3   MEAN IS THAT INFLAMMATION MIGHT BE A CAUSE OF HEART ATTACKS;
4   RIGHT?
5   **A.**   CORRECT.
6   **Q.**   INFLAMMATION COMES FROM THE COX-2 ENZYME, I THINK YOU
7   TESTIFIED YESTERDAY; RIGHT?
8   **A.**   RIGHT.
9   **Q.**   SO THE POINT HERE IS THAT THE COX-2 ENZYME, IF IT'S
10  CAUSING INFLAMMATION, COULD CAUSE THIS KIND OF -- COULD BE A
11  RISK FACTOR FOR THE HEART ATTACKS AND CONTRIBUTE TO THE
12  LIPID-RICH CORE; RIGHT?
13  **A.**   ACTUALLY, WHAT THEY'RE SAYING IN JUST THE NEXT SENTENCE IS
14  IT COULD GO EITHER WAY, IF YOU JUST GO TO THAT VERY NEXT
15  SENTENCE.
16  **Q.**   THE "ACCORDINGLY"?
17  **A.**   YES.
18  **Q.**   "ACCORDINGLY, IT IS APPROPRIATE TO ASK WHETHER COX-2
19  EXPRESSION IN MONOCYTE-MACROPHAGE" --
20  **A.**   I THINK WE CAN SPEED THIS UP AND I'LL JUST, IF YOU WILL
21  ALLOW ME, SKIP A LOT OF THE WORDS BECAUSE THEY ARE NOT GERMANE
22  TO THIS ARGUMENT:  ACCORDINGLY, IT IS APPROPRIATE TO ASK
23  WHETHER THE COX-2 ENZYME REGULATES THE PROGRESSION OF
24  ATHEROSCLEROSIS, EITHER POSITIVELY OR NEGATIVELY.  WHAT THEY
25  ARE SIMPLY SAYING IS IT SEEMS TO BE INVOLVED IN THIS PROCESS

1   AND IT'S APPROPRIATE TO STUDY WHETHER IT MAKES THINGS BETTER OR

2   IT MAKES THINGS WORSE, AND THAT'S PRETTY CLEAR BY WHAT THE NEXT

3   SENTENCE SAYS.

4   **Q.**   IT'S PRETTY DIFFERENT, ACTUALLY, FROM HOW YOU

5   CHARACTERIZED IT YESTERDAY; ISN'T THAT TRUE?

6   **A.**   NO.   I CHARACTERIZED IT AS THEY'RE INDICATING THIS COULD

7   BE A PROBLEM, WHICH IS EXACTLY WHAT THEY SAID IN THE SENTENCE I

8   JUST READ.

9   **Q.**   ACTUALLY, WHAT THEY SAID IN THE SENTENCE THAT YOU JUST

10  READ WAS THAT IT COULD BE A PROBLEM OR IT COULD BE A BENEFIT.

11  **A.**   CORRECT.

12  **Q.**   YOU LEFT THAT OUT YESTERDAY.  YOU DIDN'T MENTION THAT IT

13  COULD BE A BENEFIT YESTERDAY, DID YOU?

14  **A.**   THE ISSUE AT HAND IS WHETHER THERE IS EVIDENCE PRESENTED

15  TO MERCK THAT THERE COULD BE A PROBLEM WITH THEIR DRUG CAUSING

16  HEART ATTACKS IN 1998, AND I STILL CONTEND THAT IS STATED HERE.

17  **Q.**   HOW ABOUT ON THE NEXT QUESTION, WHICH IS DESTABILIZATION?

18  HAVING READ THIS DOCUMENT A FEW MINUTES AGO AND THIS PARAGRAPH,

19  IS IT STILL YOUR CONTENTION THAT THIS WAS SOMEHOW A RED FLAG

20  THAT INDICATED THAT THERE MIGHT BE A PROBLEM WITH COX-2

21  INHIBITORS?

22  **A.**   WHAT IT STATES HERE IS, IN THAT SECOND SENTENCE, "THE

23  POSSIBILITY EXISTS THAT THE PRODUCTS OF COX-2 COULD REGULATE

24  THINNING THE CAP OF PLAQUES AND RENDERING THEM RUPTURE-PRONE."

25  COX-2 HAS NUMEROUS DIFFERENT PRODUCTS, AND IT IS HARD TO TELL

1  TO WHAT EXTENT THEY WERE REFERRING, AS THEY DO THROUGHOUT, TO

2  THE POSSIBLE GOOD OR THE POSSIBLE BAD ISSUES.  BUT WHAT WAS KEY

3  TO ME WAS THAT THEY WERE SAYING, LOOK, THIS IS A DRUG THAT IS

4  INTIMATELY INVOLVED IN INHIBITING AN ENZYME THAT HAS NEVER BEEN

5  INHIBITED BEFORE, AND IT COULD HAVE AN IMPORTANT EFFECT ON THE

6  DEVELOPMENT OF HEART DISEASE.

7  Q.   WELL, THIS LANGUAGE THAT YOU REFERRED TO, THE PRODUCTS OF

8  COX-2, THAT MEANS THE COX-2 ENZYME; RIGHT?

9  A.   RIGHT.

10 Q.   THE POSSIBILITY EXISTS THAT THE COX-2 ENZYME COULD

11 REGULATE THE THINNING OF THE CAP OF THE PLAQUES AND RENDER THEM

12 RUPTURE-PRONE.  IT MEANS THAT THE COX-2 ENZYME COULD CAUSE

13 PLAQUE RUPTURE; RIGHT?  IS THAT CORRECT?

14 A.   THE PRODUCTS OF THE COX-2 ENZYME.

15 Q.   RIGHT.  COULD CAUSE PLAQUE RUPTURE?

16 A.   RIGHT.

17 Q.   ISN'T THE POINT HERE THAT SOMETHING THAT WOULD INHIBIT

18 COX-2, THAT WOULD HOLD DOWN THAT ENZYME, WOULD BE POTENTIALLY

19 HELPFUL IN GUARDING AGAINST PLAQUE RUPTURE?

20 A.   I THINK THAT'S A FAIR INTERPRETATION.

21 Q.   THAT'S NOT THE INTERPRETATION YOU PUT ON IT YESTERDAY, IS

22 IT?

23 A.   NO.

24 Q.   BEFORE YOU TESTIFIED YESTERDAY ABOUT THIS DOCUMENT, HAD

25 YOU READ THE TESTIMONY OF ANY OTHER WITNESS, WHETHER FROM MERCK

1    OR INDEPENDENT EXPERTS, OR EXPERTS TESTIFYING ON BEHALF OF THE

2    PLAINTIFFS, ABOUT THE MEANING OF THIS DOCUMENT?

3    **A.**    NO.  BUT FOR THE SAKE OF COMPLETENESS, MR. BECK, I THINK

4    WE SHOULDN'T JUST CHERRY-PICK WHICH OF THE POINTS OF THIS WE

5    WANT TO DISCUSS UNLESS YOU ARE ABOUT TO GET TO EVENTS FOLLOWING

6    PLAQUE RUPTURE, WHICH IS THE MOST COMPELLING PLACE WHERE THE

7    BOARD OF EXPERT ADVISORS TALKS ABOUT THIS, AND I THINK IT WOULD

8    BE FAIR TO THE JURY TO NOT ONLY TALK ABOUT THE FIRST TWO AND

9    IGNORE THE THIRD.

10   **Q.**    OBVIOUSLY, IF YOU DIDN'T READ ANY TESTIMONY ON THIS, THAT

11   INCLUDES DR. REICIN'S TESTIMONY; CORRECT?

12   **A.**    CORRECT.

13   **Q.**    SO YOU DIDN'T READ OR LEARN ABOUT FROM ANY OTHER SOURCE

14   WHAT DR. REICIN SAID ABOUT THIS OR WHAT DR. MORRISON SAID ABOUT

15   THIS; IS THAT RIGHT?

16   **A.**    THAT'S CORRECT.

17   **Q.**    HAVE YOU EVER HEARD OF DR. STEPHEN EPSTEIN?

18   **A.**    THE NAME DOES NOT RING A BELL.

19   **Q.**    HE IS A NONRETAINED EXPERT FOR THE SAME LAWYERS THAT

20   YOU'RE WORKING WITH.  HE IS AN EXPERT IN ATHEROSCLEROSIS.  DOES

21   THAT HELP YOU AT ALL?  DOES THAT RING A BELL NOW?

22   **A.**    THERE'S A LOT OF DR. EPSTEINS.  NO, IT DOESN'T RING A

23   BELL.  HE MAY WELL BE A FANTASTIC EXPERT.  THE NAME JUST

24   DOESN'T RING A BELL.

25   **Q.**    HE, FROM HIS DEPOSITION, SAID HE TOOK OVER FOR DR. EUGENE

1  BRAUNWALD AS CHIEF OF CARDIOLOGY AT THE NATIONAL INSTITUES OF

2  HEALTH.  DOES THAT RING A BELL YET?

3  **A.**  NO.

4  **Q.**  BEFORE YOU TESTIFIED ABOUT WHETHER THE BOARD OF SCIENTIFIC

5  ADVISORS WAS A RED FLAG OR NOT, DID YOU LEARN WHAT DR. EPSTEIN

6  HAD TO SAY ABOUT THE MEANING OF THE POINTS WE JUST WENT OVER?

7  **A.**  NO.

8  **Q.**  DO YOU KNOW WHAT DR. EPSTEIN HAS SAID ABOUT WHETHER VIOXX

9  COULD HAVE A BENEFICIAL EFFECT ON ATHEROSCLEROSIS?

10 **A.**  I KNOW THERE WAS THE HOPE WHEN VIOXX WAS BEING DEVELOPED

11 THAT, AS AN ANTI-INFLAMMATORY DRUG, IT MIGHT HAVE THE POTENTIAL

12 FOR HELPING WITH INFLAMMATION IN THE CARDIOVASCULAR SYSTEM.

13 THAT WAS A HOPED-FOR EFFECT.  THAT ACTUALLY NEVER PANNED OUT,

14 BUT IT WAS A PLAUSIBLE HOPE IN THE MID '90S, LATE '90S.

15 **Q.**  PART OF THAT WAS THAT IT WAS HOPED THAT IT COULD HELP

16 REDUCE BOTH THE FORMATION OF PLAQUE AND THE POSSIBILITY OF

17 PLAQUE RUPTURE; RIGHT?

18 **A.**  I THINK THE FAIREST WAY OF PRESENTING IT IS THAT THERE WAS

19 THE UNDERSTANDING THAT THIS RECENTLY DESCRIBED ENZYME CALLED

20 COX-2 HAD A VERY IMPORTANT EFFECT ON THE HEALTH OF THE ARTERIES

21 AND THAT INHIBITING IT COULD DO BAD THINGS OR COULD DO GOOD

22 THINGS.  I THINK IN 1998 THOSE POSSIBILITIES WERE BOTH ON THE

23 TABLE.

24 **Q.**  WELL, DO YOU REMEMBER YESTERDAY, WHEN YOU WENT OVER THIS

25 DOCUMENT, YOU HAD NO TROUBLE AT ALL HOLDING YOURSELF TO TALKING

1    ABOUT POTENTIAL BAD CONSEQUENCES OF COX-2 INHIBITORS?  DO YOU

2    REMEMBER THAT ALL YOU TALKED ABOUT IN CONNECTION WITH THIS WAS

3    THE POTENTIAL ADVERSE CONSEQUENCES?  DO YOU REMEMBER THAT?

4    **A.**   THAT WAS WHAT WE WERE TALKING ABOUT.

5    **Q.**   OKAY.  SO YESTERDAY YOU CONFINED YOURSELF TO THE POTENTIAL

6    ADVERSE CONSEQUENCES, AND NOW I'M JUST GOING TO ASK YOU WHETHER

7    YOU CAN GIVE ME ANSWERS THAT FOCUS ON THE POTENTIAL POSITIVE

8    CONSEQUENCES RATHER THAN THIS, WELL, IT MAY BE GOOD OR IT MAY

9    BE BAD.  OKAY?

10   **A.**   YES.

11   **Q.**   NOW, DO YOU AGREE WITH ME, SIR, THAT BACK IN 1998 AND 1999

12   RESPECTED SCIENTISTS SAID THAT AMONG THE POTENTIAL GOOD THINGS

13   THAT MIGHT COME FROM VIOXX WERE THAT IT WOULD PROTECT -- IT

14   COULD POSSIBLY PROTECT AGAINST HEART DISEASE, NUMBER ONE, BY

15   HELPING TO GUARD AGAINST THE FORMATION OF PLAQUE?  DO YOU AGREE

16   WITH THAT?

17   **A.**   THEY SAID THAT THERE WERE BOTH GOOD AND BAD POTENTIALS.

18   **Q.**   NOW, WHY IS IT TODAY THAT YOU CAN'T CONFINE YOURSELF TO

19   THE GOOD SIDE THAT SCIENTISTS TALK ABOUT WHEN YESTERDAY YOU

20   ALREADY ADMITTED YOU WERE PERFECTLY CAPABLE OF CONFINING

21   YOURSELF TO THE BAD SIDE?

22   **A.**   BECAUSE TODAY, MR. BECK, WE'RE HERE TO TALK ABOUT THE FACT

23   THAT IT IS NOW UNIVERSALLY AGREED THAT VIOXX CAUSES HEART

24   ATTACKS, AND WE'RE NOW TRYING TO LOOK BACK AND FIND OUT WHAT

25   INFORMATION WAS AVAILABLE TO MERCK.  WE ARE NOT HERE DISCUSSING

1    THE FACT THAT VIOXX PREVENTS HEART ATTACK, IN WHICH CASE, MAYBE

2    THAT WOULD BE APPROPRIATE.

3    **Q.**   WERE YOU AWARE BACK IN 1998 AND 1999 WHAT WAS BEING

4    DISCUSSED IN THE SCIENTIFIC AND MEDICAL COMMUNITY ABOUT THE

5    POTENTIAL GOOD THINGS OR BAD THINGS OF COX-2 INHIBITORS?

6    **A.**   AROUND THIS PERIOD -- I DON'T KNOW IF IT WAS 1999 OR 2000,

7    BUT WHEN WE WERE DOING OUR OWN WORK ON THIS, WE DID REVIEW WHAT

8    WAS KNOWN IN THE LITERATURE ABOUT THE POTENTIAL FOR GOOD AND

9    FOR BAD.

10   **Q.**   AROUND THE TIME THAT VIOXX CAME ON THE MARKET, DO YOU

11   AGREE, SIR, THAT ONE OF THE POTENTIAL GOOD THINGS THAT

12   SCIENTISTS AND DOCTORS WERE TALKING ABOUT WAS THAT VIOXX

13   POTENTIALLY COULD BE PROTECTIVE OF THE HEART BY GUARDING

14   AGAINST PLAQUE FORMATION?

15   **A.**   YES.

16   **Q.**   DO YOU AGREE, SIR, THAT ANOTHER POTENTIAL GOOD THING THAT

17   SCIENTISTS AND DOCTORS WERE TALKING ABOUT AROUND THE TIME THAT

18   VIOXX CAME ON THE MARKET WAS THAT VIOXX COULD GUARD AGAINST --

19   COULD POSSIBLY GUARD AGAINST HEART DISEASE BY HELPING TO

20   PREVENT PLAQUE RUPTURE?

21   **A.**   THAT POSSIBILITY WAS RAISED.

22   **Q.**   DOCTOR, WOULD YOU PLEASE TURN TO WHAT WAS MARKED YESTERDAY

23   AS EXHIBIT 7.  IT'S IN THE FOLDER OF MEDICAL ARTICLES THAT

24   MR. TISI GAVE YOU.

25   **A.**   RIGHT.  GOT IT.

1  Q.   IS EXHIBIT 7 AN ARTICLE WHERE YOU WERE ONE OF THE AUTHORS?

2  A.   YES.  I WAS A SENIOR AUTHOR.

3  Q.   IT'S TITLED "THE RELATIONSHIP BETWEEN SELECTIVE" HOW DO

4  YOU PRONOUNCE THAT NEXT WORD?

5  A.   "CYCLOOXYGENASE."

6  Q.   IS THAT THE SAME THING AS COX-2?

7  A.   COX-2, YES.  YOU CAN CALL IT COX.

8  Q.   SO "THE RELATIONSHIP BETWEEN SELECTIVE COX-2 INHIBITORS

9  AND ACUTE MYOCARDIAL INFARCTION IN OLDER ADULTS."  RIGHT?

10  A.   CORRECT.

11  Q.   WHAT'S THE DATE OF THIS ARTICLE?

12  A.   IT WAS PUBLISHED IN MAY OF 2004 AND I CAN LOOK -- MAY 4,

13  '04.

14  Q.   SO SOME FIVE YEARS AFTER VIOXX WAS FIRST APPROVED BY THE

15  FDA?

16  A.   RIGHT.

17  Q.   TURN OVER TO PAGE 2072, WHICH I THINK IS THE FIFTH PAGE

18  IN.

19  A.   GOT IT.

20  Q.   I WANT TO CALL YOUR ATTENTION IN THE SECOND COLUMN IN THE

21  FIRST FULL PARAGRAPH TO ONE STATEMENT HERE ABOUT EMERGING DATA.

22  ARE YOU WITH ME ON THAT --

23  A.   YES.

24  Q.   -- IN YOUR COPY?

25  A.   YES.

1  Q.    "EMERGING DATA SUPPORT A VARIED ROLE FOR COX-2."  THERE

2  WE'RE TALKING -- AGAIN, JUST SO THE JURY IS CLEAR, WE'RE

3  TALKING ABOUT THE ENZYME, NOT VIOXX OR ANY OTHER COX-2

4  INHIBITORS; RIGHT?

5  A.    CORRECT.

6  Q.    "EMERGING DATA SUPPORT A VARIED ROLE FOR THE COX-2

7  ENZYME," AND THEN YOU LIST VARIOUS THINGS, CONCLUDING WITH

8  "ATHEROGENESIS."  DO YOU SEE THAT?

9  A.    YES.

10  Q.    THEN YOU HAVE THESE CITES TO THESE TWO ITEMS, 27 AND 28.

11  A.    RIGHT.

12  Q.    WHAT IS ATHEROGENESIS?

13  A.    IT'S ATHEROGENESIS.

14  Q.    I'M SORRY, ATHEROGENESIS.

15  A.    IT'S THE DEVELOPMENT OF PLAQUE IN THE ARTERY WALL.

16  Q.    THE SAME THING AS ATHEROSCLEROSIS?

17  A.    WELL, ATHEROSCLEROSIS IS KIND OF THE END PRODUCT OF

18  ATHEROGENESIS.

19  Q.    OKAY.  THE DEVELOPMENT OF PLAQUE.  YOUR STATEMENT HERE, AT

20  LEAST THE PORTIONS I HAVE HIGHLIGHTED, IS THAT THERE IS NEW

21  INFORMATION THAT WOULD BE EMERGING DATA; RIGHT?

22  A.    YES.  ONGOING WORK, YES.

23  Q.    ONGOING WORK, NEW INFORMATION INDICATING THAT THE COX-2

24  ENZYME HAS SOME SORT OF POSSIBLE ROLE IN THE FORMATION OF

25  PLAQUE; RIGHT?

432

1    A.    CORRECT.

2    Q.    THEN YOU CITE THESE TWO SOURCES, AND IF YOU GO TO THE END

3    OF YOUR ARTICLE -- THOSE ARE SOURCES IN 27 AND 28.  IF YOU GO

4    TO THE END OF YOUR ARTICLE, YOU'VE GOT THE ACTUAL SOURCES THAT

5    YOU WERE REFERRING TO; CORRECT?

6    A.    RIGHT.

7    Q.    ONE OF THOSE IS AN ARTICLE BY BURLEIGH; RIGHT?

8    A.    RIGHT.

9    Q.    THE OTHER ONE IS BY -- HOW IS HIS NAME PRONOUNCED?  DO YOU

10   KNOW?

11   A.    AFTER BURLEIGH, I THINK IT'S CIPOLLONE.

12   Q.    CIPOLLONE.  OKAY.  I WILL HAND YOU WHAT I'M MARKING AS

13   EXHIBIT 45.  DO YOU RECOGNIZE EXHIBIT 45 AS THE FIRST OF YOUR

14   CITED REFERENCES, THE BURLEIGH ARTICLE?

15   A.    YES.  CORRECT.

16   Q.    LET ME PUT THAT UP ON THE SCREEN.  SO THIS IS THE ARTICLE

17   BY BURLEIGH THAT YOU CITED WHEN YOU SAID THAT THERE'S EMERGING

18   DATA CONCERNING THE ROLE OF THE COX-2 ENZYME ON THE DEVELOPMENT

19   OF PLAQUE; RIGHT?

20   A.    RIGHT.

21   Q.    IF YOU WOULD PLEASE TURN TO PAGE 1822.  WE ARE ON THE

22   BURLEIGH ARTICLE, WHICH WAS CITED IN YOUR ARTICLE, AND WE'RE ON

23   THE LAST PAGE OF THE TEXT OF THE BURLEIGH ARTICLE, PAGE 1822.

24   ARE YOU WITH ME, DOCTOR?

25   A.    YES.

1   **Q.**   I'M BLOWING UP HERE ON THE SCREEN THE LAST CONCLUDING

2   PARAGRAPH OF THE ARTICLE YOU CITED.  WOULD YOU PLEASE READ THAT

3   TO THE JURY.

4   **A.**   WHERE WOULD YOU LIKE ME TO START?

5   **Q.**   "MOUNTING EVIDENCE."

6   **A.**   "MOUNTING EVIDENCE SUPPORTS AN IMPORTANT ROLE FOR

7   INFLAMMATION IN ATHEROSCLEROSIS AND PLAQUE RUPTURE.  WE PRESENT

8   EVIDENCE THAT PHARMACOLOGIC INHIBITION OF COX-2 REDUCES

9   ATHEROSCLEROSIS IN THE LDLR-DEFICIENT MOUSE MODEL OF

10  ATHEROSCLEROSIS, AND WE PROVIDE GENETIC EVIDENCE INDICATING

11  THAT MACROPHAGE COX-2 PROMOTES EARLY ATHEROGENESIS.  THESE

12  RESULTS DEMONSTRATE THE POTENTIAL OF COX-2 INHIBITORS IN THE

13  TREATMENT OF ATHEROSCLEROSIS AND SUPPORT THE POTENTIAL OF

14  ANTI-INFLAMMATORY APPROACHES TO THE PREVENTION OF CORONARY

15  HEART DISEASE."

16  **Q.**   THIS ARTICLE, I THINK WE CAN TELL FROM THE VERY TOP, WAS

17  WRITTEN OR AT LEAST PUBLISHED IN APRIL 2002; RIGHT?

18  **A.**   CORRECT.

19  **Q.**   DO YOU AGREE WITH THE STATEMENTS THAT ARE IN THIS

20  PARAGRAPH?

21  **A.**   YES.

22  **Q.**   DO YOU AGREE THAT WHAT THIS PARAGRAPH INDICATES IS THAT

23  THERE IS INCREASING SUPPORT FOR THE NOTION THAT THE COX-2

24  ENZYME, THROUGH INFLAMMATION, CAN CONTRIBUTE TO PLAQUE

25  FORMATION?  DO YOU AGREE WITH THAT?

1  **A.**   I'M NOT SURE ABOUT THE INCREASING SUPPORT, WHERE THAT

2  COMES FROM.

3  **Q.**   "MOUNTING EVIDENCE SUPPORTS," THE VERY FIRST SENTENCE.

4  **A.**   THAT REFERS JUST TO INFLAMMATION.

5  **Q.**   OKAY.  WELL, IT SAYS, ACTUALLY, "MOUNTING EVIDENCE

6  SUPPORTS AN IMPORTANT ROLE FOR INFLAMMATION IN ATHEROSCLEROSIS

7  AND PLAQUE RUPTURE."  RIGHT?

8  **A.**   RIGHT.

9  **Q.**   DO YOU AGREE, SIR, THAT IN 2002 THERE WAS EVIDENCE, NUMBER

10  ONE, THAT INFLAMMATION CONTRIBUTED TO ATHEROSCLEROSIS AND

11  PLAQUE RUPTURE?  DO YOU AGREE WITH THAT?

12  **A.**   YES.

13  **Q.**   DO YOU AGREE, NUMBER TWO, THAT THERE WAS EVIDENCE THAT THE

14  COX-2 ENZYME COULD CONTRIBUTE TO INFLAMMATION, WHICH IN TURN

15  COULD CAUSE ATHEROSCLEROSIS AND PLAQUE RUPTURE?

16  **A.**   WELL, THE PRODUCTS OF THE COX-2 ENZYME, BUT YES.

17  **Q.**   ALSO, DO YOU AGREE THAT IN 2002 THAT SCIENTISTS WHOM YOU

18  CITED IN YOUR OWN ARTICLE WERE SAYING THAT THERE WAS A

19  POTENTIAL THAT COX-2 INHIBITORS -- AND THAT WOULD INCLUDE VIOXX

20  AND CELEBREX; RIGHT?

21  **A.**   RIGHT.

22  **Q.**   THAT COX-2 INHIBITORS COULD BE USEFUL IN THE TREATMENT OF

23  ATHEROSCLEROSIS?

24  **A.**   THAT THEY HAD POTENTIAL USE.

25  **Q.**   DO YOU AGREE WITH THIS FINAL SENTENCE OF THE ARTICLE THAT

1    YOU CITED, THAT "THE RESULTS DEMONSTRATE THE POTENTIAL OF COX-2

2    INHIBITORS IN THE TREATMENT OF ATHEROSCLEROSIS AND SUPPORT THE

3    POTENTIAL OF ANTI-INFLAMMATORY APPROACHES TO THE PREVENTION OF

4    CORONARY HEART DISEASE"?

5    A.   RIGHT.   THIS IS PART OF THE SAME GOOD NEWS/BAD NEWS ISSUE

6    WE HAVE BEEN TALKING ABOUT, THAT THERE'S POTENTIAL FOR GOOD AND

7    THERE'S POTENTIAL FOR HARM.

8    Q.   AND HERE YOU'RE TALKING ABOUT THE POTENTIAL FOR GOOD;

9    RIGHT?

10   A.   THAT'S RIGHT.

11   Q.   WHAT PUBLICATION DID THIS ARTICLE APPEAR IN?

12   A.   *CIRCULATION*.

13   Q.   IS THAT THE SAME ONE THAT AT LEAST SOME OF YOUR ARTICLES

14   APPEARED IN?

15   A.   RIGHT.

16   Q.   AND I THINK YOU SAID YESTERDAY THAT IT'S THE TOP

17   CARDIOLOGY JOURNAL IN THE WORLD; RIGHT?

18   A.   THAT'S RIGHT.   FOR COMPLETENESS, WE ALSO CITE THE OTHER

19   SIDE OF THE STORY IN -- IN OUR PAPER.   YOU'VE SELECTED ONE OR

20   TWO REFERENCES WHERE WE TALK ABOUT THE POTENTIAL GOOD EFFECTS,

21   BUT THE ENTIRE PART OF THE PARAGRAPH BEFORE THE PIECE YOU

22   PULLED OUT ALSO DISCUSSES THE POTENTIAL BAD.

23   Q.   NOW I WANT TO MOVE TO THE SECOND OF THE CITED REFERENCES

24   THAT WE LOOKED AT IN YOUR ARTICLE.

25   A.   OKAY.

1    **Q.**   NOW, I WANT TO LOOK AT THE NEXT ONE, WHICH WAS THE -- WAS

2    IT CIPOLLONE?

3    **A.**   RIGHT.

4    **Q.**   IS THE DOCUMENT I NOW HAVE ON THE SCREEN THE SAME THING AS

5    THE ONE YOU HAVE IN FRONT OF YOU, WHICH IS THE CIPOLLONE

6    ARTICLE?

7    **A.**   CORRECT.

8    **Q.**   AND WHAT JOURNAL WAS THE CIPOLLONE ARTICLE PUBLISHED IN?

9    **A.**   *CIRCULATION*.

10   **Q.**   AND WHAT IS THE DATE OF THE CIPOLLONE ARTICLE?

11   **A.**   2001.

12   **Q.**   WOULD YOU PLEASE TURN TO PAGE 926.  ARE YOU WITH ME THERE?

13   **A.**   YES.

14   **Q.**   FOCUSING ON THE LAST SENTENCE IN THIS ARTICLE, WOULD YOU

15   PLEASE READ THAT FOR THE JURY.

16   **A.**   YES.  "FROM PRACTICAL PRACTICE STANDPOINT, THESE FINDINGS

17   RAISE THE POSSIBILITY THAT THE SELECTIVE COX-2 INHIBITORS NOW

18   CURRENTLY AVAILABLE FOR CLINICAL USE OR FUTURE PGES INHIBITORS

19   MIGHT PROVIDE A NOVEL FORM OF THERAPY FOR PLAQUE STABILIZATION

20   OF PATIENTS WITH ATHEROSCLEROTIC DISEASE AND PREVENTION OF

21   ACUTE ISCHEMIC SYNDROMES."

22   **Q.**   AND IN 2001, DID YOU AGREE WITH DR. CIPOLLONE AND HIS

23   COLLEAGUES THAT THE FINDINGS IN THEIR STUDY RAISED THE

24   POSSIBILITY THAT COX-2 INHIBITORS SUCH AS VIOXX MIGHT PROVIDE A

25   NOVEL FORM OF THERAPY FOR PLAQUE STABILIZATION FOR PATIENTS

1    WITH ATHEROSCLEROTIC DISEASE?

2    **A.**    NO, I DID NOT.

3    **Q.**    YOU DISAGREED WITH THAT?

4    **A.**    CORRECT.  BECAUSE BY THEN THERE WAS EVIDENCE THAT THE

5    BAD-NEWS PIECES, WHICH WE HAD PREVIOUSLY CITED, WERE MORE

6    LIKELY TO BE REAL THAN A THEORETICAL STUDY FROM ANIMALS.

7    **Q.**    AND YET YOU CITED THIS ARTICLE IN YOUR OWN 2002 ARTICLE;

8    CORRECT?

9    **A.**    THAT'S RIGHT.

10   **Q.**    I'M SORRY.  YOUR 2004 ARTICLE?

11   **A.**    2004, RIGHT.

12   **Q.**    DO YOU AGREE, SIR, THAT DURING THE ENTIRE TIME VIOXX WAS

13   ON THE MARKET, SCIENTISTS WHOM YOU CONSIDERED TO BE REPUTABLE

14   WERE SUGGESTING THAT VIOXX'S ANTI-INFLAMMATORY PROPERTIES MIGHT

15   SLOW DOWN THE PROGRESSION OF ATHEROSCLEROSIS AND HELP STABILIZE

16   PLAQUE?

17   **A.**    I DO NOT AGREE WITH THAT.  BY THE TIME IT GOT TO BE 2003

18   AND 2004, I DON'T THINK PEOPLE WERE ANY MORE SUGGESTING, WITH

19   THE EVIDENCE AT HAND, THAT VIOXX WOULD BE USED TO TREAT HEART

20   DISEASE.

21   **Q.**    YOUR DEPOSITION OF A FEW WEEKS AGO BEGINNING ON PAGE 389,

22   LINE 23:

23            "Q.  WERE YOU AWARE OF ANY ARTICLES PUBLISHED BY

24        REPUTABLE SCIENTISTS WHILE VIOXX WAS ON THE MARKET WHICH

25        SAID THAT VIOXX'S ANTI-INFLAMMATORY PROPERTIES MIGHT

1    ACTUALLY SLOW DOWN THE PROGRESSION OF ATHEROSCLEROSIS AND

2    HELP STABILIZE PLAQUE?"

3         "A.  YES."

4         "Q.  THAT WAS A THEORY THAT ACTUALLY SCIENTISTS WERE

5    SUGGESTING DURING THE ENTIRE TIME VIOXX WAS ON THE MARKET

6    CREW; TRUE?"

7         "A.  RIGHT."

8         IS THAT YOUR SWORN TESTIMONY?

9    **A.**   THAT'S MY TESTIMONY, WHICH I THINK DIFFERS FROM THE

10   QUESTION YOU JUST ASKED ME.

11   **Q.**   SO WE CAN SET THE STAGE, AGAIN, THE VIGOR TRIAL INVOLVED

12   VIOXX AT 50 MILLIGRAMS PER DAY; CORRECT?

13   **A.**   CORRECT.

14   **Q.**   WHICH WAS TWICE THE MAXIMUM DOSE THAT HAD BEEN APPROVED BY

15   THE FDA AT THE TIME OF THE VIGOR TRIAL; RIGHT?

16   **A.**   I'D WANT TO GO BACK AND LOOK AT THE LABEL, BUT THAT SOUNDS

17   REASONABLE.  IT WAS THE DOSE THAT WAS BEING USED IN PATIENTS

18   WITH ARTHRITIS COMMONLY, ALTHOUGH IT WAS NOT THE DOSE ON THE

19   LABEL.

20   **Q.**   THE LABEL, AS YOU RECALL, SPECIFIED 25 MILLIGRAMS; RIGHT?

21   **A.**   THAT'S RIGHT.

22   **Q.**   AND THAT WAS THE STANDARD DOSE; RIGHT?

23   **A.**   FOR OSTEOARTHRITIS, BUT NOT FOR RHEUMATOID ARTHRITIS.

24   **Q.**   AND THE AVERAGE USE OF THE PEOPLE WHO WERE INVOLVED IN THE

25   VIGOR TRIAL TAKING THIS 50-MILLIGRAM DOSE WAS HOW LONG?

1    **A.**    MEDIAN DURATION WAS ABOUT NINE MONTHS.

2    **Q.**    NOW, DO YOU KNOW WHETHER THE LABEL SAID ANYTHING ABOUT HOW

3    LONG -- IF SOMEBODY WAS TAKING 50 MILLIGRAMS A DAY INSTEAD OF

4    25 MILLIGRAMS A DAY, THAT HOW LONG THEY SHOULD TAKE THAT FOR?

5    **A.**    WELL, I THOUGHT YOU JUST STIPULATED THAT THE LABEL DIDN'T

6    INDICATE USE FOR 50 MILLIGRAMS.

7    **Q.**    WELL, DO YOU REMEMBER WHETHER THERE WAS ANYTHING IN THE

8    LABEL ABOUT, IF YOU'RE GOING TO USE 50 MILLIGRAMS, ONLY DO IT

9    FOR, YOU KNOW, FIVE DAYS OR LESS?

10            THE QUESTION IS:  DO YOU REMEMBER ONE WAY OR THE

11   OTHER?

12   **A.**    YES, YES.  TYPICALLY, DOSES ARE RECOMMENDED FOR A DEFINED

13   PERIOD OF TIME, BUT IT'S WELL KNOWN THAT DOCTORS TEND TO IGNORE

14   THAT DURATION ISSUE.

15   **Q.**    BY QUESTION REALLY IS:  DO YOU REMEMBER -- YOU TALKED

16   ABOUT THE TWO LABELS YESTERDAY --

17   **A.**    CORRECT.

18   **Q.**    -- YESTERDAY WITH MR. TISI.  AND IF YOU DON'T REMEMBER,

19   YOU DON'T REMEMBER, BUT MY QUESTION IS:  DO YOU REMEMBER WHAT

20   THE LABEL, THE FIRST LABEL, SAID ABOUT HOW LONG SOMEBODY SHOULD

21   USE 50 MILLIGRAMS IF, IN FACT, THEY'RE GOING TO GO UP TO THAT

22   DOSE?

23   **A.**    I THINK THERE WAS A TIME LIMIT SUGGESTED IN THE LABEL FOR

24   50 MILLIGRAMS.

25   **Q.**    DO YOU REMEMBER WHAT THAT TIME LIMIT WAS?

440

1   **A.**   OFF THE TOP OF MY HEAD, I WOULD SAY TEN DAYS, BUT WE COULD

2   CHECK IT OUT.

3   **Q.**   OKAY.  IT CERTAINLY WASN'T NINE MONTHS, THOUGH; RIGHT?

4   **A.**   RIGHT.

5   **Q.**   AND ON THE -- AND YOU SAID THAT THE VIGOR TRIAL INVOLVED

6   PATIENTS WHO HAD WHAT CONDITION?

7   **A.**   RHEUMATOID ARTHRITIS.

8   **Q.**   ARE PEOPLE WHO HAVE RHEUMATOID ARTHRITIS, BY NATURE, AT

9   INCREASED RISK OF HEART ATTACKS?

10  **A.**   YES.  YES.

11  **Q.**   AND THE OTHER SIDE, ON THE OTHER ARM OF THE TRIAL, SO TO

12  SPEAK, THERE WERE PEOPLE WHO WERE TAKING NAPROXEN; RIGHT?

13  **A.**   CORRECT.

14  **Q.**   NOW THAT YOU HAVE THE VIGOR PUBLICATION IN FRONT OF YOU --

15  **A.**   YES.

16  **Q.**   -- CAN YOU TELL ME WHAT THE DOSE OF NAPROXEN WAS FOR THE

17  PARTICIPANTS WHO TOOK NAPROXEN RATHER THAN VIOXX?

18  **A.**   500 MILLIGRAMS TWICE A DAY.

19  **Q.**   IN TERMS OF THE GASTROINTESTINAL RESULTS, DID VIOXX

20  SIGNIFICANTLY REDUCE THE INCIDENCE OF PERFORATIONS, ULCERS, AND

21  BLEEDS?

22  **A.**   YES, YES.

23  **Q.**   DID VIOXX SIGNIFICANTLY REDUCE SERIOUS COMPLICATED

24  GASTROINTESTINAL PROBLEMS?

25  **A.**   YES.

1   **Q.**   FOR THE PEOPLE WHO USED TWICE THE NORMAL DOSE OF VIOXX FOR

2   SEVERAL MONTHS INSTEAD OF DAYS, WAS THERE ANY DOUBT THAT VIOXX

3   WAS SUPERIOR TO NAPROXEN FROM A GASTROINTESTINAL PERSPECTIVE?

4   **A.**   YES, THERE WAS A DOUBT.

5   **Q.**   ON THE CARDIOVASCULAR RESULTS, I THINK YOU TESTIFIED

6   YESTERDAY THAT THE DIFFERENCE IN THE CV EVENTS WAS THAT THERE

7   WERE FIVE TIMES AS MANY HEART ATTACKS IN THE VIOXX GROUP AS IN

8   THE NAPROXEN GROUP; IS THAT RIGHT?

9   **A.**   AS I SAID YESTERDAY, THE NUMBERS ARE VARIABLY PRESENTED,

10  WHETHER IT'S FOUR TIMES OR FIVE TIMES.

11  **Q.**   YOU SAID THEY ARE VARIOUSLY PRESENTED.  AND ONE OF YOUR

12  CRITICISMS YESTERDAY OF MERCK, AS I RECALL, WAS THE WAY THAT

13  THIS DATA WAS RECORDED IN THE *NEW ENGLAND JOURNAL* ARTICLE.  DO

14  YOU REMEMBER THAT?

15  **A.**   THAT'S RIGHT.

16  **Q.**   NOW, YOU KNOW THAT WHEN YOU READ THE VIGOR ARTICLE AND YOU

17  SAW THAT THE RISK OF NAPROXEN WAS REPRESENTED AS .2 OF THE RISK

18  OF VIOXX, YOU KNEW .2 WAS ONE-FIFTH; RIGHT?

19  **A.**   YES.

20  **Q.**   YOU UNDERSTOOD THAT WHAT THAT MEANT WAS THAT THERE WERE

21  FIVE TIMES AS MANY HEART ATTACKS IN THE GROUP THAT TOOK VIOXX

22  AS IN THE GROUP THAT TOOK NAPROXEN; CORRECT?

23  **A.**   WELL, I DO THIS FOR A LIVING, BUT WHAT IT SAID WAS THAT

24  THERE WERE ONE-FIFTH AS MANY HEART ATTACKS IN THE NAPROXEN

25  GROUP.

1  **Q.**   MY QUESTION IS:  WHEN YOU READ THAT, YOU UNDERSTOOD FROM

2  READING THE VIGOR ARTICLE THAT THERE WERE FIVE TIMES AS MANY

3  HEART ATTACKS IN THE VIOXX GROUP AS IN THE NAPROXEN GROUP,

4  DIDN'T YOU?

5  **A.**   IF I STOPPED AND THOUGHT ABOUT IT AND FLIPPED AROUND THE

6  NUMBERS AND DID THE MATH, I COULD DERIVE THAT NUMBER.

7  **Q.**   YOUR DEPOSITION, PAGE 360, LINE 10:

8       "Q.  YOU UNDERSTOOD FROM READING THE RESULTS HERE IN

9       THE ABSTRACT THAT THERE WERE FIVE TIMES THE NUMBER OF

10      HEART ATTACKS IN THE VIOXX ARM THAN IN THE NAPROXEN ARM;

11      RIGHT?"

12      "A.  RIGHT."

13      WAS THAT YOUR TESTIMONY?

14 **A.**   CORRECT.

15 **Q.**   DOCTOR, THE QUESTION IS WHETHER -- AT THE TIME YOU FIRST

16 READ THE VIGOR ARTICLE, MY QUESTION IS, DID YOU UNDERSTAND THAT

17 THERE WAS FIVE TIMES AS MANY HEART ATTACKS IN THE VIOXX GROUP

18 AS IN THE NAPROXEN GROUP?

19 **A.**   I THINK WHAT'S FAIR TO SAY IS, THE FIRST TIME I READ IT, I

20 READ WHAT IT SAID, WHICH IS THAT THERE WERE ONE-FIFTH AS MANY

21 HEART ATTACKS IN THE NAPROXEN GROUP.

22 **Q.**   DID YOU UNDERSTAND FROM THAT THAT THAT'S THE SAME THING AS

23 FIVE TIMES AS MANY HEART ATTACKS IN THE VIOXX GROUP?

24 **A.**   TO TELL YOU THE TRUTH, THE FIRST TIME I READ IT, THAT DID

25 NOT STRIKE ME.

1  Q.   AND BEFORE YOU EVEN READ THE VIGOR ARTICLE, YOU KNEW THAT

2  IT HAD BEEN PUBLICLY REPORTED THAT THERE WERE FIVE TIMES AS

3  MANY HEART ATTACKS IN THE VIOXX GROUP AS IN THE NAPROXEN GROUP;

4  ISN'T THAT RIGHT?

5  A.   NO.  THAT'S NOT HOW IT WAS PUBLICLY REPORTED.

6  Q.   WELL, DID YOU UNDERSTAND ALREADY BY THE TIME YOU READ THE

7  ARTICLE THAT THERE WERE MORE HEART ATTACKS IN THE VIOXX GROUP

8  THAN IN THE NAPROXEN GROUP?

9  A.   YES.

10 Q.   YOU UNDERSTOOD THERE WERE FIVE TIMES AS MANY; RIGHT?

11 A.   TO MOVE THINGS ALONG, YES.

12 Q.   YESTERDAY YOU SPENT SOME TIME TALKING ABOUT THE

13 *NEW ENGLAND JOURNAL* ARTICLE AND THE FACT THAT --

14 A.   MAY I ASK WHICH *NEW ENGLAND JOURNAL* ARTICLE?

15 Q.   THE SAME ONE WE WERE JUST LOOKING AT, EXHIBIT 16.

16 A.   OKAY.

17 Q.   -- THAT THERE WERE THREE HEART ATTACKS THAT WERE NOT

18 INCLUDED IN THE DATA IN THE *NEW ENGLAND JOURNAL* ARTICLE.  DO

19 YOU REMEMBER THAT SUBJECT?

20 A.   YES.

21 Q.   DO YOU KNOW FROM YOUR REVIEW OF MATERIALS IN THIS CASE

22 WHETHER MERCK INFORMED THE FDA ABOUT THESE THREE OTHER HEART

23 ATTACKS IN OCTOBER OF 2000?

24 A.   I KNOW FROM MY CONVERSATIONS WITH EDITORS OF THE

25 *NEW ENGLAND JOURNAL* THAT THEY DID.

DAILY COPY

1  **Q.**   THAT MERCK DID INFORM THE FDA OF THESE THREE HEART

2  ATTACKS?

3  **A.**   YES.

4  **Q.**   YOU TESTIFIED YESTERDAY ABOUT A REPORT WRITTEN BY

5  DR. TARGUM.  DO YOU REMEMBER THAT?

6  **A.**   YES.

7  **Q.**   DO YOU REMEMBER WHETHER DR. TARGUM'S ANALYSIS INCLUDED

8  THOSE THREE ADDITIONAL HEART ATTACKS?

9  **A.**   I BELIEVE THEY DID.

10  **Q.**   YOU TESTIFIED YESTERDAY ABOUT THE ADVISORY COMMITTEE THAT

11  MET IN FEBRUARY OF 2001 TO DISCUSS THE VIGOR RESULTS.  DO YOU

12  REMEMBER THAT?

13  **A.**   YES.

14  **Q.**   DO YOU KNOW WHETHER THIS ADVISORY COMMITTEE WAS COMPRISED

15  OF DOCTORS AND SCIENTISTS WHO YOU WOULD RESPECT IN THEIR

16  FIELDS?

17  **A.**   EXPECT THAT IT WOULD HAVE BEEN, YES.

18  **Q.**   WERE YOU INVITED TO PARTICIPATE?

19  **A.**   NO.  WE HAVE ALREADY ESTABLISHED THAT.

20  **Q.**   HAVE YOU READ THE TRANSCRIPT OF THAT MEETING?

21  **A.**   YES.

22  **Q.**   AND DID THE MEMBERS OF THE ADVISORY COMMITTEE ALSO HAVE

23  INFORMATION CONCERNING THE THREE ADDITIONAL HEART ATTACKS?

24  **A.**   I BELIEVE THEY DID.

25  **Q.**   YESTERDAY YOU TALKED ABOUT SOMETHING BECOMING CLEAR IN

1    EITHER THE 2000 OR 2001 TIME FRAME.  DO YOU REMEMBER THAT?

2    **A.**   YES.

3    **Q.**   WHAT WERE YOU TALKING ABOUT YESTERDAY WHEN YOU SAID THAT

4    SOMETHING BECAME CLEAR IN THAT TIME FRAME?

5    **A.**   THAT BY THE SPRING OF 2001, WHEN THE ORIGINAL FINDINGS

6    FROM THE VIGOR STUDY WERE RELEASED BY MERCK, IN COMBINATION

7    WITH THE EXISTING INFORMATION FROM A VARIETY OF OTHER STUDIES

8    THAT WE HAVE TALKED ABOUT THAT WERE DONE AT AROUND THE SAME

9    TIME, THAT -- AS WELL AS THE INFORMATION FROM THE PREAPPROVAL

10   STUDIES AND THE EVIDENCE FROM THE PHARMACOLOGY STUDIES THAT

11   WERE ALSO AVAILABLE BY THE SPRING OF 2000, THAT AT THAT POINT

12   THERE WAS EVIDENCE OF A LIKELY ASSOCIATION OR EVEN OF A

13   POSSIBLE ASSOCIATION BETWEEN VIOXX AND CARDIOVASCULAR OUTCOMES.

14   **Q.**   YOU SAID SPRING OF 2001?

15   **A.**   I'M SORRY.  I MISSPOKE.  I MEANT SPRING OF 2000.

16   **Q.**   SO, BY THE SPRING OF SEVERAL MONTHS BEFORE THE PUBLICATION

17   IN THE *NEW ENGLAND JOURNAL* -- RIGHT?

18   **A.**   RIGHT.

19   **Q.**   -- YOU WERE SAYING THERE WAS EVIDENCE OF A LIKELY OR

20   POSSIBLE ASSOCIATION BETWEEN THE USE OF VIOXX AND --

21   **A.**   AND ADVERSE CARDIOVASCULAR OUTCOMES.

22   **Q.**   AND YESTERDAY DID YOU SAY THAT YOU YOURSELF HAD CONCLUDED

23   THAT THERE WAS THIS POSSIBLE ASSOCIATION BACK IN THE 2000 TIME

24   FRAME?

25   **A.**   YES.

1    Q.   IN ANY EVENT, YOU YOURSELF, BACK IN 2000, BASED ON

2    INFORMATION THAT WAS AVAILABLE TO YOU IN THE SPRING OF 2000,

3    HAVE CONCLUDED IN YOUR OWN MIND THAT THERE WAS A LIKELY OR

4    POSSIBLE ASSOCIATION BETWEEN VIOXX AND ADVERSE CARDIOVASCULAR

5    OUTCOMES.  IS THAT YOUR TESTIMONY?

6    A.   CERTAINLY POSSIBLE ASSOCIATION, YES.  SO...

7    Q.   SO A POSSIBLE ASSOCIATION?

8    A.   YES.

9    Q.   RATHER THAN ASKING YOU WHAT WAS YOUR TESTIMONY YESTERDAY,

10   LET ME TRY TO SHORT-CIRCUIT IT.  IS IT YOUR POSITION THAT AT

11   THE TIME OF THE VIGOR PUBLICATION LATE 2000, THAT THERE WAS NO

12   RELIABLE EVIDENCE TO SUPPORT THE NAPROXEN HYPOTHESIS?

13   A.   "NO" IS AN EXTREME TERM, BUT I WOULD SAY VIRTUALLY NO.

14        THERE WAS THE OCCASIONAL NAPROXEN PLATELET STUDY.

15   THERE WAS OUR OWN RESEARCH THAT INDICATED A 16 PERCENT

16   REDUCTION.  SO I THINK THE FAIREST WAY TO CATEGORIZE IT WOULD

17   BE THAT THERE WAS NO CONVINCING EVIDENCE THAT THE SO-CALLED

18   NAPROXEN HYPOTHESIS EXPLAINED THE INCREASED RATE OF

19   CARDIOVASCULAR DISEASE SEEN IN VIGOR.

20        BUT, CLEARLY, ALL THE ANSWERS WERE NOT YET IN, IN

21   PART BECAUSE THE DEFINITIVE CLINICAL TRIAL NEVER GOT DONE; AND

22   THERE WERE UNRESOLVED QUESTIONS.  BUT THAT'S MY POSITION.

23   Q.   WELL, IN FACT, HAVE YOU STATED BEFORE THAT AT THE TIME OF

24   THE VIGOR STUDY ALONE, THAT YOU THOUGHT IT WAS FAIRLY OBVIOUS

25   FROM THE ABSENCE OF ANY CORROBORATING EVIDENCE OF ANY KIND ON

1   THE PLANET THAT NAPROXEN WAS A MAJOR-LEAGUE CARDIOPROTECTIVE
2   DRUG?
3   A.   YES.
4   Q.   SO I WANT TO TALK ABOUT WHAT YOU AND OTHERS ON THE PLANET
5   WERE ACTUALLY SAYING AT THE TIME ABOUT THE POTENTIAL
6   CARDIOPROTECTIVE EFFECT OF NAPROXEN.
7           DURING THE TIME THAT VIOXX WAS ON THE MARKET, WERE
8   SCIENTISTS WHOM YOU CONSIDERED TO BE REPUTABLE WRITING ARTICLES
9   SAYING THAT THE DIFFERENCE IN HEART ATTACKS IN THE VIGOR
10  RESULTS COULD BE EXPLAINED BY NAPROXEN?
11  A.   YOU'D HAVE TO CHARACTERIZE WHEN YOU MEAN ABOUT WHILE IT
12  WAS ON THE MARKET, BECAUSE CERTAINLY THAT WAS BEING SAID
13  CREDIBLY IN 1999.  IT IS MUCH LESS LIKELY THAT IT WAS BEING
14  SAID CREDIBLY IN 2004.
15  Q.   WELL, IT WOULDN'T HAVE BEEN SAID IN 1999 SINCE VIGOR
16  HADN'T COME OUT IN 1999; RIGHT?
17  A.   I'M SORRY.  YOUR QUESTION WAS ABOUT SCIENTISTS SPEAKING
18  ABOUT WHAT?
19  Q.   ABOUT THE DIFFERENCE IN HEART ATTACKS IN VIGOR RESULTS
20  COULD BE EXPLAINED BY NAPROXEN.
21  A.   I'M SORRY.  YES, 2000.  WHAT WAS SAID IN 2000 WOULD HAVE
22  BEEN MORE CREDIBLE THAN WHAT WAS SAID IN 2004.
23  Q.   DO YOU KNOW WHO DR. STEVEN NISSEN IS?
24  A.   YES, I DO.
25  Q.   WAS HE A MEMBER OF THE ADVISORY COMMITTEE THAT MET IN

1    FEBRUARY OF 2001 TO DISCUSS THE RESULTS OF VIGOR?

2    **A.**    I BELIEVE HE WAS.

3    **Q.**    IS HE A CARDIOLOGIST WHOM YOU RESPECT?

4    **A.**    YES.

5    **Q.**    AT THE TIME BACK IN 2001, DO YOU KNOW WHERE DR. NISSEN WAS

6    WORKING?

7    **A.**    I THINK HE WAS AT THE CLEVELAND CLINIC THEN.

8    **Q.**    WAS HE A COLLEAGUE OF DR. TOPOL'S BACK THEN?

9    **A.**    THAT'S RIGHT.

10   **Q.**    IS DR. NISSEN STILL AT THE CLEVELAND CLINIC?

11   **A.**    YES, HE IS.

12   **Q.**    IS DR. TOPOL STILL AT THE CLEVELAND CLINIC?

13   **A.**    NO.

14   **Q.**    YOU SAID YOU REVIEWED THE TRANSCRIPT OF THE ADVISORY

15   COMMITTEE, RIGHT, THE 2001 MEETING?

16   **A.**    RIGHT.

17   **Q.**    DO YOU REMEMBER WHETHER DR. NISSEN MADE A PRESENTATION AT

18   THAT MEETING?

19   **A.**    YES, HE DID.

20   **Q.**    DO YOU REMEMBER WHAT DR. NISSEN CONCLUDED ABOUT WHAT COULD

21   BE GLEANED FROM THE VIGOR RESULTS?

22   **A.**    WELL, RATHER THAN GOING ON MY MEMORY OF WHAT DR. NISSEN

23   SAID, IT MIGHT BE MORE HELPFUL IF I COULD JUST LOOK AT THE

24   TRANSCRIPT YOU'RE REFERRING TO.

25   **Q.**    FIRST, LET'S JUST ESTABLISH, IS EXHIBIT 47 THE TRANSCRIPT

1    OF THE ADVISORY COMMITTEE MEETING THAT YOU REVIEWED?

2    **A.**   YES.

3    **Q.**   AND IF YOU WOULD, PLEASE TURN TO PAGE 206.  SO JUST

4    REFERRING TO PAGE 206.  AND DR. NISSEN IS QUOTED ON PAGE 206.

5    DID YOU REVIEW THIS QUOTATION FROM DR. NISSEN WHEN CONSIDERING

6    MATERIALS IN REACHING YOUR OPINION?

7    **A.**   YES.

8    **Q.**   AND HE IS QUOTED HERE AS SAYING:  "BRIEFLY, I THINK WHAT I

9    WOULD SAY IN THE LABEL THAT THERE WAS AN EXCESS OF

10   CARDIOVASCULAR EVENTS IN COMPARISON TO NAPROXEN, THAT IT

11   REMAINS UNCERTAIN WHETHER THIS WAS DUE TO BENEFICIAL

12   CARDIOPROTECTIVE EFFECTS OF NAPROXEN OR PROTHROMBOTIC EFFECTS

13   OF THE AGENT, AND LEAVE IT AT THAT; THAT, BASICALLY, WE DON'T

14   KNOW THE REASON.  WE DO KNOW THERE WAS A DIFFERENCE.  THAT

15   AWARENESS SHOULD BE MADE AVAILABLE TO THE PRESCRIBER AND TO THE

16   CONSUMER, BUT WITHOUT NECESSARILY A FINAL JUDGMENT AS TO THE

17   REASONS FOR THAT DIFFERENCE."

18           DID I READ THAT QUOTATION CORRECTLY?

19   **A.**   YES, YOU DID.

20   **Q.**   AFTER DR. NISSEN MADE THIS STATEMENT, DO YOU KNOW WHETHER

21   THE ADVISORY COMMITTEE VOTED ON WHETHER THAT'S HOW THEY

22   RECOMMENDED THE SUBJECT BE TREATED IN THE LABEL?

23   **A.**   YES.  I WOULD WANT TO LOOK AT THE ACTUAL VOTE.  I KNOW

24   THERE WAS A VOTE, BUT I WOULD WANT TO SEE JUST HOW IT WAS

25   CHARACTERIZED.

1   **Q.**   IF YOU'D LOOK AT THE NEXT PAGE, AND DURING OUR PAUSE,

2   DURING THE MUSICAL INTERLUDE, DOCTOR, DID YOU HAVE A CHANCE TO

3   REVIEW THE TRANSCRIPT PAGES AROUND DR. NISSEN'S COMMENTS?

4   **A.**   YES.  BUT I DON'T THINK IT'S FAIR TO CHARACTERIZE IT AS A

5   VOTE ON DR. NISSEN'S COMMENTS.

6   **Q.**   OKAY.  HOW WOULD YOU CHARACTERIZE THE VOTE?

7   **A.**   I WOULD CHARACTERIZE IT AS -- I WILL READ THE ACTUAL

8   QUESTION THAT WAS POSED.

9   **Q.**   WHAT PAGE ARE YOU ON?

10  **A.**   207.

11  **Q.**   AND WHAT LINE?

12  **A.**   5.

13          "SO LET ME ASK FOR THOSE FEELING YES, THAT THERE

14  NEEDS TO BE SOMETHING, SOME ADDITIONAL LANGUAGE" -- AND I'M NOT

15  SURE THAT COMMA IS PLACED APPROPRIATELY.  I READ IT AS, SINCE

16  IT DOESN'T MAKE SENSE WHERE THE COMMA IS, "SOME ADDITIONAL

17  LANGUAGE, PERHAPS ALONG THE LINES OF DR. NISSEN, IN TERMS OF

18  THE LABEL."

19          AND SO WHAT IT SEEMS TO ME A FAIR READING OF THIS

20  QUESTION IS SHOULD THERE BE SOMETHING MORE ON THE LABEL THAT

21  DESCRIBES THE VIGOR FINDINGS, PERHAPS ALONG THE LINES THAT

22  DR. NISSEN SUGGESTED.

23  **Q.**   OKAY.  SO --

24  **A.**   AND THE VOTE WAS MOSTLY ON SHOULD THERE BE MORE LANGUAGE

25  IN THE LABEL ABOUT THE VIGOR FINDINGS.

451

1   **Q.**   WELL, NOBODY SAID THAT.

2   **A.**   "THAT THERE NEEDS TO BE SOMETHING, SOME ADDITIONAL

3   LANGUAGE" -- AND THE TOPIC WAS THE VIGOR FINDINGS -- "PERHAPS

4   ALONG THE LINES OF DR. NISSEN IN TERMS OF THE LABEL."

5   **Q.**   IN ANY EVENT, THE ACTUAL LANGUAGE THAT WAS VOTED ON WAS:

6   "SO, LET ME ASK FOR THOSE FEELING YES, THAT THERE NEEDS TO BE

7   SOMETHING, SOME ADDITIONAL LANGUAGE PERHAPS, ALONG THE LINES OF

8   DR. NISSEN IN TERMS OF THE LABEL."  IS THAT THE QUESTION THAT

9   WAS POSED?

10  **A.**   YES.

11  **Q.**   HOW DID THE VOTE COME OUT?

12  **A.**   THE VOTE WAS -- WELL, WE CAN'T GET A COUNT, BUT IT LOOKS

13  LIKE EVERYBODY BUT ONE VOTED FOR ADDITIONAL LANGUAGE.

14  **Q.**   WELL, VOTED FOR THE QUESTION THAT WAS "SOME ADDITIONAL

15  LANGUAGE PERHAPS ALONG THE LINES OF DR. NISSEN."  RIGHT?

16  **A.**   AGAIN, HAVING READ MANY OF THESE TRANSCRIPTS AND SAT --

17  AND THROUGH SOME OF THESE MEETINGS, I -- I SEE THE QUESTION AND

18  I THINK IT'S RIGHT THERE IN THE LANGUAGE THAT "SHOULD THERE BE

19  SOMETHING, SOME ADDITIONAL LANGUAGE," ABOUT THE VIGOR FINDINGS,

20  "PERHAPS ALONG THE LINES OF DR. NISSEN."

21  **Q.**   SO WE AGREE THAT THAT WAS THE QUESTION, AND IT WAS

22  EVERYBODY BUT ONE PERSON SAID YES TO THAT?

23  **A.**   RIGHT.  AND MY READING TO THAT IS THEY SAID, YES, THERE

24  SHOULD BE SOME ADDITIONAL LANGUAGE IN THE LABEL.

25  **Q.**   YOU DON'T HAVE ANY REASON TO BELIEVE THAT THE ADVISORY

DAILY COPY

1   COMMITTEE MEMBERS IN 2001 WERE BIASED IN FAVOR OF MERCK, DO

2   YOU.

3   **A.**   THE REASON I'M HAVING A HARD TIME ANSWERING THAT IS THAT

4   WE KNOW THAT THE ADVISORY COMMITTEE'S VOTE LATER ON -- AND I

5   SIMPLY DON'T KNOW IF IT WAS THE SAME MEMBERS OR HOW MANY WERE

6   THE SAME -- DEFINITELY DID SPLIT IN THEIR STATEMENTS ABOUT

7   VIOXX, ABOUT THE OTHER COX-2S, IN RELATION TO THEIR

8   AFFILIATIONS WITH INDUSTRY.  AND THIS HAS BEEN WIDELY

9   DOCUMENTED.

10        AND THE QUESTION HAS BEEN RAISED, I THINK

11  UNDERSTANDABLY, THAT IF THE VOTES IN A SUBSEQUENT MEETING, THE

12  ONE OF 2005, I BELIEVE, OF THE ADVISORY COMMITTEE CORRELATED

13  VERY CLOSELY WITH THE TIES OF ADVISORY COMMITTEE MEMBERS TO

14  INDUSTRY, THAT THAT RAISED THE QUESTION AS TO WHETHER THERE

15  WAS, PERHAPS UNCONSCIOUS, PERHAPS UNINTENTIONAL, BIAS.

16        SO I DON'T THINK I RULE OUT THAT POSSIBILITY IN

17  RELATION TO THIS ADVISORY COMMITTEE EITHER.

18  **Q.**   YOUR SWORN TESTIMONY FROM A FEW WEEKS AGO, PAGE 379, LINE

19  20:

20        "Q.  THERE'S NO REASON TO THINK THAT THE ADVISORY

21        COMMITTEE IN FEBRUARY OF 2001 WAS BIASED IN FAVOR OF

22        MERCK, WAS THERE, SIR?"

23        "A.  NOT TO MY KNOWLEDGE."

24        IS THAT YOUR SWORN TESTIMONY A COUPLE WEEKS AGO.

25  **A.**   YES.

1         **MR. BECK:**  YOUR HONOR, WE ARE ABOUT TO MOVE ON TO

2    STUDY 090, AND I THINK EVERYBODY WOULD WANT TO BE FRESH FOR

3    THAT.

4         **THE COURT:**  MEMBERS OF THE JURY, WE ARE GOING TO STOP

5    HERE AND LET YOU GO HOME, RELAX, AND WATCH SOME TELEVISION

6    TONIGHT.  LEAVE YOUR BOOKS IN THE ROOM AGAIN, AND I'LL SEE YOU

7    TOMORROW AT 8:30.  ALL RISE AS THE JURY LEAVES, PLEASE.

8         (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25