```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   IN RE: VIOXX PRODUCTS        *    MDL DOCKET NO. 1657
     LIABILITY LITIGATION         *
 6                                *
                                  *
 7   THIS DOCUMENT RELATES TO     *    AUGUST 3, 2006, 8:30 A.M.
                                  *
 8                                *
     GERALD BARNETT V. MERCK      *    CASE NO. 06-CV-485-L
 9     & CO., INC.                *
     * * * * * * * * * * * * * * * *

10

11

12                        VOLUME IV
                   JURY TRIAL BEFORE THE
13                HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                 BY:  MARK P. ROBINSON JR., ESQ.
17                               620 NEWPORT CENTER DRIVE
                                 NEWPORT BEACH, CALIFORNIA 92660
18

19   FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                   PORTIS & MILES
20                               BY:  ANDY D. BIRCHFELD, JR., ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22

23   FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                   PALENCHAR & SCOTT
24                               BY:  PHILIP S. BECK, ESQ.
                                   ANDREW L. GOLDMAN, ESQ.
25                               54 W. HUBBARD STREET, SUITE 300
                                 CHICAGO, ILLINOIS 60601
```

DAILY COPY

```
OFFICIAL COURT REPORTERS:     CATHY PEPPER, CCR, RPR, CRR
                              TONI DOYLE TUSA, CCR, FCRR
                              500 POYDRAS STREET, ROOM HB-406
                              NEW ORLEANS, LOUISIANA 70130
                              (504) 589-7778


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.
```

DAILY COPY

1                          <u>I N D E X</u>

2                                                        <u>PAGE</u>

3   EDWARD SCOLNICK (BY DEPOSITION)
         CROSS-EXAMINATION                           691
4        REDIRECT EXAMINATION                         727

5
    LEMUEL MOYE
6        VOIR DIRE                                    740
         TRAVERSE                                     762
7        DIRECT EXAMINATION                           768
         CROSS-EXAMINATION                            841
8        REDIRECT EXAMINATION                         871

9
    LAURA DEMOPOULOS (BY DEPOSITION)
10       DIRECT EXAMINATION                           881

11
    MICHAEL MIKOLA (BY DEPOSITION)
12       DIRECT EXAMINATION                           887

13

14

15

16

17

18

19

20

21

22

23

24

25

                          DAILY COPY

1    **MORNING SESSION**

2    **(AUGUST3, 2006)**

3        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4    TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5    REPORTER.)

6        (WHEREUPON, **EDWARD SCOLNICK**, HAVING BEEN DULY SWORN,

7    TESTIFIED AS FOLLOWS.)

8    **CROSS-EXAMINATION**

9    **BY MR. BECK:**

10   **Q.**   GOOD MORNING, DR. SCOLNICK.  WOULD YOU PLEASE TELL US YOUR

11   FULL NAME.

12   **A.**   EDWARD M. SCOLNICK.

13   **Q.**   DR. SCOLNICK, ARE YOU CURRENTLY EMPLOYED BY MERCK?

14   **A.**   NO, I AM NOT.

15   **Q.**   WHY ARE YOU NO LONGER EMPLOYED BY MERCK?

16   **A.**   I RETIRED FROM MERCK SEPTEMBER 1, 2004.

17   **Q.**   CAN YOU TELL US THE REASONS THAT YOU RETIRED FROM MERCK IN

18   SEPTEMBER OF 2004?

19   **A.**   YES.  I RETIRED TO PURSUE OTHER INTERESTS THAT I'VE

20   DEVELOPED IN THE FIELD OF SEVERE MENTAL ILLNESS; SPECIFICALLY,

21   SCHIZOPHRENIA AND BIPOLAR DISORDER.

22   **Q.**   WHERE ARE YOU PURSUING THOSE INTERESTS RIGHT NOW?

23   **A.**   I'M PURSUING INTERESTS AT A NEWLY FORMED GENOME INSTITUTE

24   CALLED THE BROAD INSTITUTE AT MIT AND HARVARD, IN THE HARVARD

25   MEDICAL HOSPITALS.

1   **Q.**   WHAT PROMPTED YOUR INTEREST IN THIS FIELD?

2   **A.**   MY INTERESTS HAVE BEEN PROMPTED BY UNFORTUNATE ILLNESSES

3   IN MY -- IN SOME FAMILY MEMBERS, AND, BECAUSE OF THAT,

4   INTERACTIONS THAT I'VE HAD IN SERVICE ORGANIZATIONS THAT HELP

5   FAMILIES WITH FAMILY MEMBERS BESET BY EITHER OF THOSE TWO

6   ILLNESSES.

7   **Q.**   DR. SCOLNICK, CAN YOU JUST DESCRIBE FOR US GENERALLY THE

8   TYPE OF WORK YOU'RE CURRENTLY DOING IN THIS PROJECT?

9   **A.**   YES.  WE'VE ORGANIZED A NEW INITIATIVE IN THIS FIELD TO

10  TRY TO FIND THE GENETIC BASIS FOR THESE ILLNESSES.  IT IS WELL

11  KNOWN, FOR MANY YEARS, THAT THERE'S A HEAVY GENETIC BASIS FOR

12  BOTH SCHIZOPHRENIA AND BIPOLAR DISORDER.  THE GENES HAVE NOT

13  BEEN FOUND; AND THIS INSTITUTE, WHICH IS WORLD-CLASS IN

14  GENETICS, IS INTERESTED IN THE PROBLEM, AND I THOUGHT IT WAS A

15  WONDERFUL OPPORTUNITY TO TRY TO REALLY MAKE A DIFFERENCE IN

16  THIS FIELD.

17  **Q.**   DR. SCOLNICK, ARE YOU MARRIED?

18  **A.**   YES, I AM.

19  **Q.**   HOW LONG HAVE YOU BEEN MARRIED?

20  **A.**   SINCE 1965.  FORTY-ONE YEARS.

21  **Q.**   DO YOU HAVE CHILDREN?

22  **A.**   YES.  THREE.

23  **Q.**   ANY GRANDCHILDREN?

24  **A.**   ONE.

25  **Q.**   A GRANDDAUGHTER OR GRANDSON?

1   **A.**   GRANDDAUGHTER.  OF RECENT VINTAGE.  ABOUT SIX MONTHS OLD.

2   **Q.**   WHERE DO YOU CURRENTLY LIVE?

3   **A.**   WE LIVE IN WAYLAND, MASSACHUSETTS.

4   **Q.**   DR. SCOLNICK, WOULD YOU PLEASE TELL US OVER WHAT TIME

5   PERIOD YOU WERE EMPLOYED BY MERCK.

6   **A.**   YES.  I STARTED WORKING AT MERCK IN JULY 1982 AND RETIRED

7   SEPTEMBER 1, 2004.

8   **Q.**   WHAT WAS YOUR ROLE IN THE DEVELOPMENT OF THE DRUG VIOXX?

9   **A.**   DURING THE DEVELOPMENT OF VIOXX, I WAS PRESIDENT OF THE

10  RESEARCH LABORATORIES AND HAD THE BASIC RESEARCH GROUP AND

11  CLINICAL GROUPS, THEREFORE, REPORTING TO ME WHO INITIATED AND

12  CARRIED OUT THE PROJECT.

13  **Q.**   WHAT WERE YOUR GENERAL DUTIES AND RESPONSIBILITIES AS THE

14  PRESIDENT OF MERCK RESEARCH LABS?

15  **A.**   MY GENERAL RESPONSIBILITIES WERE TO OVERSEE THE QUALITY OF

16  THE SCIENCE AND CLINICAL SCIENCE AND BASIC SCIENCE THAT WAS

17  CONDUCTED BY THE MEMBERS OF THE LABORATORIES.

18  **Q.**   AND DURING WHAT PERIOD OF TIME WERE YOU THE PRESIDENT OF

19  HE MERCK RESEARCH LABS?

20  **A.**   I WAS PRESIDENT OF THE LABORATORIES FROM -- IT'S EITHER

21  FROM LATE APRIL OR EARLY MAY, 1985, THROUGH JANUARY 1, 2003.

22  **Q.**   CAN YOU TELL US GENERALLY THE BACKGROUNDS OF THE PEOPLE

23  WHO WORKED AT MRL, MERCK RESEARCH LABS, WHILE YOU WERE

24  PRESIDENT?

25  **A.**   WE HAD -- WE HAD PEOPLE OF VARYING SCIENTIFIC BACKGROUNDS,

DAILY COPY

1  MANY PEOPLE WITH MEDICAL DEGREES, TRAINING IN VARIOUS ASPECTS

2  OF CELLULAR AND BIOCHEMICAL SCIENCE, PHYSIOLOGY, TOXICOLOGY,

3  DRUG METABOLISM, CLINICAL RESEARCH, STATISTICS.  A WHOLE

4  VARIETY OF DISCIPLINES.

5  **Q.**   ABOUT HOW MANY DOCTORS AND SCIENTISTS WORKED WITHIN THE

6  MERCK RESEARCH LABS DIVISION?

7  **A.**   AT THE TIME I RETIRED, THE TOTAL NUMBER OF PERSONS IN THE

8  LABORATORY AND SCIENCE WERE CLOSE TO 10,000.  I THINK IT WAS

9  AROUND 3,000 WHEN I STARTED.

10  **Q.**   WHAT TYPE OF RESEARCH IS DONE AT MERCK RESEARCH LABS AND

11  WAS DONE WHILE YOU WERE PRESIDENT OF THE DIVISION?

12  **A.**   MOST OF THE RESEARCH WAS FOCUSED ON FINDING NEW TREATMENTS

13  OR NEW PREVENTIONS FOR SERIOUS MEDICAL ILLNESSES THAT REALLY

14  HAD POOR TREATMENTS OR NO TREATMENTS.  THAT WAS THE CLEAR

15  MANTRA OF THE LABORATORY.

16  **Q.**   ARE THERE DIFFERENT TYPES OF RESEARCH THAT ARE DONE IN A

17  RESEARCH LAB LIKE MRL?

18  **A.**   YES.  THERE'S VERY BASIC RESEARCH, WHICH IS SOMETIMES

19  DESCRIBED AS DISCOVERY RESEARCH.  THERE'S CHEMISTRY THAT GOES

20  ON ASSOCIATED WITH THAT.

21         THERE'S ALSO SO-CALLED "DEVELOPMENT RESEARCH," WHICH

22  IS THE TESTING FOR SAFETY AND THEN CLINICAL SAFETY AND EFFICACY

23  OF THE COMPOUNDS OR VACCINES THAT ARE BROUGHT INTO DEVELOPMENT

24  AS POTENTIALLY NEW TREATMENTS OR PREVENTIONS.

25  **Q.**   WHEN YOU MENTIONED CLINICAL EFFICACY, IS THAT ANOTHER WAY

1   TO SAY THAT A DRUG WORKS THE WAY IT'S SUPPOSED TO WORK OR

2   INTENDED TO WORK?

3   **A.**   CLINICAL EFFICACY IS -- IT MEANS THE TESTING IN PEOPLE TO

4   SEE WHETHER THE DRUG WORKS OR DOES NOT WORK AS YOU THINK IT'S

5   GOING TO, OR SOMETIMES IT WORKS EVEN BETTER THAN YOU THINK IT'S

6   GOING TO OR NOT QUITE AS WELL AS YOU THINK IT'S GOING TO.  IT

7   IS TRYING TO GATHER THE CLINICAL DATA TO SEE WHAT A DRUG DOES

8   IN PATIENTS.

9   **Q.**   DURING YOUR TIME AS THE PRESIDENT OF MERCK RESEARCH LABS,

10  WAS THERE EVER A TIME WHERE YOU DID NOT HAVE ENOUGH MONEY OR

11  RESOURCES TO DO DEVELOPMENT RESEARCH FOR SAFETY AND EFFICACY?

12  **A.**   NO.  WE -- WE ALWAYS HAD SUFFICIENT RESOURCES TO DO

13  ANYTHING CLINICAL IN DEVELOPMENT WITH A DRUG TO PROVE ITS

14  EFFICACY AND SAFETY.

15  **Q.**   ABOUT HOW MANY NEW DRUGS WERE DEVELOPED DURING THE TIME

16  THAT YOU WERE THE PRESIDENT OF MERCK RESEARCH LABS?

17  **A.**   THE NUMBERS RANGE FROM -- SOMEWHERE IN THE RANGE OF 25 TO

18  29, ADDING VACCINES, DRUGS, AND NEW COMBINATION TREATMENTS.

19  **Q.**   I WANT TO CHANGE THE SUBJECT VERY BRIEFLY HERE.

20  DR. SCOLNICK, IS THERE A DIVISION AT MERCK THAT IS RESPONSIBLE

21  FOR THE SALES AND MARKETING OF MERCK'S DRUGS?

22  **A.**   YES.  THERE ARE MARKETING DIVISIONS AT MERCK RESPONSIBLE

23  FOR THE SALES OF MERCK'S DRUGS.

24  **Q.**   AS PRESIDENT OF THE MERCK RESEARCH LABS, WERE YOU A PART

25  OF THAT DIVISION?

1   **A.**   NO, I WAS NOT A PART OF THAT DIVISION.

2   **Q.**   IN WHAT AREA IS YOUR FIELD OF MEDICAL EXPERTISE?

3   **A.**   WELL, MY ORIGINAL TRAINING WAS IN INTERNAL MEDICINE.  I

4   SUBSEQUENTLY WAS TRAINED IN BIOCHEMISTRY AND GENETICS AND THEN

5   EXTENSIVE TRAINING IN CANCER RESEARCH AND VIRUS RESEARCH; AND

6   AFTER COMING TO MERCK, LEARNED MANY NEW FIELDS:  PHARMACOLOGY,

7   SOME ASPECTS OF CLINICAL RESEARCH, AND THE VARIETY OF

8   DISCIPLINES THAT IT TAKES TO DEVELOP -- DISCOVER AND DEVELOP A

9   DRUG.

10   **Q.**   WHERE DID YOU GO TO COLLEGE AND WHERE DID YOU GO TO

11   MEDICAL SCHOOL?

12   **A.**   I WENT TO HARVARD COLLEGE AND HARVARD MEDICAL SCHOOL

13   BETWEEN 1957 AND 1965.

14   **Q.**   WHY DID YOU DECIDE THAT YOU WANTED TO GO TO MEDICAL

15   SCHOOL?

16   **A.**   I DECIDED IN MY COLLEGE LIFE THAT I WANTED TO DO SOMETHING

17   THAT WAS IMPORTANT, THAT WOULD HELP PEOPLE.  I WAS INTERESTED

18   IN SCIENCE, AND I THOUGHT I COULD BETTER SATISFY MIGHT HAVE

19   DESIRES BY GOING TO MEDICAL SCHOOL THAN IN GOING INTO PURE

20   BASIC RESEARCH.

21   **Q.**   LET'S TALK A LITTLE BIT ABOUT WHAT YOU DID AFTER YOU

22   GRADUATED FROM MEDICAL SCHOOL AT HARVARD.  WHAT DID YOU DO

23   NEXT?

24   **A.**   AFTER I GRADUATED FROM MEDICAL SCHOOL AT HARVARD, I WAS

25   TWO YEARS OF INTERNAL MEDICINE TRAINING AT MASS GENERAL, AN

1   INTERNSHIP AND A FIRST-YEAR RESIDENCY AT MASS GENERAL HOSPITAL.

2   Q.   TELL US WHAT YOU DID, IN GENERAL, DURING THE TIME YOU WERE

3   AN INTERN AND A RESIDENT.

4   A.   MY RESPONSIBILITIES WERE TO TAKE CARE OF ANY SICK PATIENT

5   WHO CAME IN THE DOORS OF MASS GENERAL HOSPITAL.  THE HOSPITAL

6   WAS OPEN TO ANY PATIENT, INDIGENT OR ABILITY TO PAY.  THE

7   HOSPITAL STAFF AND THE TRAINEES, AS I WAS, WERE PROUD OF THE

8   FACT THAT WE COULD TAKE CARE OF ABSOLUTELY ANYBODY WHO WALKED

9   IN THE DOOR WITHOUT ASKING ANY QUESTIONS.

10          AND IT WAS A -- JUST A WONDERFUL PLACE TO TRAIN AND

11  LEARN MEDICINE AND HOW TO TAKE CARE OF REALLY SICK PATIENTS.

12  Q.   WHEN YOU FINISHED YOUR INTERNSHIP AND RESIDENCY AT

13  MASSACHUSETTS GENERAL, WHAT DID YOU DO NEXT?

14  A.   I WENT -- WE MOVED TO MARYLAND, AND I JOINED THE NATIONAL

15  INSTITUTES OF HEALTH; IN SPECIFIC, THE NATIONAL HEART, LUNG,

16  AND BLOOD INSTITUTE, WHERE I DID BASIC GENETICS RESEARCH FOR

17  TWO OR THREE YEARS.

18  Q.   WHAT IS THE NATIONAL INSTITUTE OF HEALTH?

19  A.   THE NATIONAL INSTITUTE OF HEALTH IS A GOVERNMENT

20  ORGANIZATION.  IT IS PART, I THINK, OF THE DEPARTMENT OF HEALTH

21  AND HUMAN SERVICES; AND IT BOTH CONDUCTS INTERNAL RESEARCH IN

22  MEDICAL AREAS TO TRY TO IMPROVE THE BENEFIT OF MEDICINE FOR

23  PEOPLE.

24          IT ALSO SPONSORS, WITH GRANTS AND CONTRACTS, A GREAT

25  DEAL OF EXTRAMURAL, SO-CALLED OUTSIDE OF THE NIH AND

1  UNIVERSITY-BASED RESEARCH -- TO TRY TO FIND THE CAUSES AND

2  INSIGHTS INTO DISEASES THAT AFFECT PEOPLE.

3  **Q.**   YOU MENTIONED NIH.  DO PEOPLE SOMETIMES REFER TO THE

4  NATIONAL INSTITUTE OF HEALTH AS NIH?

5  **A.**   YES.

6  **Q.**   WHY DID YOU PURSUE THIS AREA OF GENETICS AT NIH?

7  **A.**   GENETICS HAS BEEN A -- REALLY A DRIVING FORCE FOR MEDICINE

8  SINCE THE DISCOVERY OF THE STRUCTURE OF DNA IN 1953.  IT HAS

9  ALWAYS CAPTIVATED ME AS BEING THE VERY ESSENCE OF LIFE AND, BY

10  STUDYING IT, YOU COULD LEARN ABOUT HOW LIFE OCCURS AND HOW

11  PEOPLE DEVELOP.

12          THE LABORATORY I WAS FORTUNATE ENOUGH TO GO TO WAS A

13  PIONEER IN DECIPHERING SO-CALLED GENETIC CODE WITH MARSHALL

14  NIREMBERG, AND I WAS FORTUNATE TO BE ACCEPTED TO THE LAB.  HE

15  WAS A TERRIFIC TEACHER AND MENTOR, AND IT REALLY STIMULATED MY

16  RESEARCH SCIENTIFIC CAREER.

17  **Q.**   HOW LONG DID YOU SPEND WORKING IN THAT LAB AT NIH?

18  **A.**   I WORKED FOR DR. NIREMBURG FOR NOT QUITE THREE YEARS AND

19  FINISHED MY WORK THERE AND WENT ON TO THE NATIONAL CANCER

20  INSTITUTE IN EITHER LATE '69 OR '70.  I DON'T RECALL.

21  **Q.**   IS THE NATIONAL CANCER INSTITUTE AFFILIATED IN ANY WAY

22  WITH NIH?

23  **A.**   YES.  IT'S A -- IT'S ONE OF THE INSTITUTES WITHIN THE

24  NATIONAL INSTITUTES OF HEALTH, WITHIN NIH.

25  **Q.**   WHY DID YOU DECIDE TO GO WORK AT THE NATIONAL CANCER

1   INSTITUTE?

2   **A.**   WELL, AT THE TIME, THE UNDERLYING MOLECULAR CAUSES OF

3   CANCER WERE REALLY COMPLETELY UNKNOWN.  THIS GOES BACK TO THE

4   LATE '60S AND EARLY.  70S.  PEOPLE WHO WERE MORE SENIOR THAN I

5   IN SCIENCE FELT STRONGLY THAT THE WAY TO FIGURE OUT WHAT CANCER

6   WAS ABOUT WAS TO TRY TO USE A GENETIC APPROACH TO IT.  AND

7   THERE WERE APPROACHES USING GENETICS AVAILABLE, AND THERE WERE

8   ONE OR TWO LABORATORIES IN THE NATIONAL CANCER INSTITUTE TAKING

9   THESE APPROACHES; AND SINCE I WAS INTERESTED IN THE GENERAL

10  FIELD, AND AGAIN, WANTED TO DO SOMETHING IMPORTANT, CHOSE THAT

11  FIELD TO GO INTO AT THAT POINT.

12  **Q.**   HOW LONG DID YOU SPEND WORKING AT THE NATIONAL CANCER

13  INSTITUTE FOR NIH?

14  **A.**   I WORKED AT THE NATIONAL CANCER INSTITUTE FOR ABOUT A

15  DOZEN YEARS, STUDYING GENES AND VIRUSES THAT CAUSE CANCER

16  DURING THAT -- DURING THAT DOZEN YEARS.

17  **Q.**   CAN YOU TELL US ABOUT ANY OF THE RESEARCH ACHIEVEMENTS

18  THAT YOUR GROUP -- OF YOUR GROUP AT NIH?

19  **A.**   YES.  I THINK THE HALLMARK ACHIEVEMENT WAS THE DISCOVERY

20  OF A GENE CALLED A ONCOGENE, THAT IS A GENE THAT CAUSES CANCER

21  THAT WE DISCOVERED IN BASIC RESEARCH WE DID, AND UNCOVERED THE

22  GENETICS, THE BIOCHEMISTRY, THE BIOCHEMICAL PATHWAYS IN WHICH

23  IT WORKED.

24          AND THEN THE REAL PIECE DE RESISTANCE DISCOVERY WAS

25  MADE LATE IN MY TIME AT NIH, IN 1982, WHEN, IN COLLABORATION

1   WITH A LABORATORY AT MIT, WE DISCOVERED THAT THIS GENE WAS

2   ALTERED IN HUMAN BLADDER CANCER.  AND IT WAS THE FIRST EXAMPLE

3   EVER OF A ONCOGENE, A MUTATED HUMAN ONCOGENE, BEING IDENTIFIED

4   AS A CAUSE OF HUMAN CANCER.

5            AND IT TOTALLY TRANSFORMED THE CANCER FIELD.

6   THOUSANDS OF PEOPLE CAME INTO THE INTO THE FIELD AFTER THAT AND

7   MANY, MANY IMPORTANT DISCOVERIES AND TREATMENTS HAVE BEEN

8   EMANATED AS A RESULT OF THIS VERY IMPORTANT DISCOVERY.

9   Q.   WHEN DID YOU END YOUR TIME WORKING AT THE NATIONAL CANCER

10  INSTITUTE?

11  A.   IT WAS IN LATE JUNE OF 1982.

12  Q.   WHAT DID YOU DO THEN?

13  A.   I MOVED TO MERCK.  I HAD BEEN RECRUITED THERE BY

14  DR. VAGELOS AND DR. HILLERMAN, WHO HAS JUST PASSED AWAY, TO

15  BUILD A MOLECULAR GROUP IN THE VACCINE DEPARTMENT THAT

16  DR. HILLERMAN WAS SO COMPETENTLY OVERSEEING AT THAT POINT.

17  Q.   WHAT POSITION DID YOU TAKE WHEN YOU JOINED MERCK IN 1982?

18  A.   I WAS RECRUITED AS AN EXECUTIVE DIRECTOR IN THE VACCINE

19  DEPARTMENT.

20  Q.   WHY DID YOU DECIDE TO JOIN MERCK IN 1982?

21  A.   I KNEW THE REPUTATION OF THE COMPANY AND WHAT IT HAD DONE

22  IN THE PAST IN DISCOVERING MEDICINES.  I SAW THE OPPORTUNITY

23  THAT HAD BEEN DISCUSSED WITH ME BY DR. VAGELOS AND

24  DR. HILLERMAN THAT I COULD APPLY MY BASIC SCIENCE BACKGROUND

25  AND INTEREST IN APPLYING THAT TO MEDICINE BY GOING THERE IN

1  WAYS THAT I COULD NEVER HAVE DONE STAYING AT NIH, AND SO I TOOK

2  THAT OPPORTUNITY.

3  **Q.**   WHAT WAS NEW OR DIFFERENT TO THE APPROACH YOU HAD ABOUT

4  DEALING WITH VIRUSES?

5  **A.**   WELL, WE WERE USED TO STUDYING VIRUSES FROM A VERY

6  MOLECULAR PERSPECTIVE AS HOW THEY GREW, HOW THEY REPRODUCED

7  THEMSELVES, HOW THEY CAUSED DISEASE.

8          UP UNTIL THAT POINT IN THE VACCINE DEPARTMENT, THE

9  MAJOR APPROACH, WHICH, IN FACT, HAD BEEN VERY SUCCESSFUL, WAS

10 TO MAKE SO-CALLED LIVE VIRUS VACCINES; AND THAT IS, EXAMPLES OF

11 THAT, ARE THE MUMPS VACCINE, THE MEASLES VACCINE, THE RUBELLA

12 VACCINE, CALLED MMR, THAT SO MANY CHILDREN GET.

13         THEIR APPROACH WAS CONSISTENT OVER A NUMBER OF YEARS

14 IN THAT THEY WOULD GROW THESE VIRUSES OUTSIDE HUMANS IN

15 CULTURED CELLS SO THAT THEY NO LONGER CAUSED DISEASE, BUT THEY

16 COULD STILL REPLICATE WHEN PUT BACK INTO PEOPLE AND CAUSE

17 ENOUGH OF AN ANTIBODY RESPONSE TO PROTECT THE PEOPLE FROM THE

18 REAL DISEASE.

19         THAT WAS A TECHNOLOGY THEY DEVELOPED AND PERFECTED.

20 IT WAS NOW CLEAR IN THE WORLD OF SCIENCE THAT YOU COULD MAKE

21 VACCINES IN MORE MOLECULAR WAYS WITHOUT USING LIVE ATTENUATED

22 VIRUSES.  AND THAT WAS THE DIFFERENCE IN WHAT APPROACHES WE

23 TOOK WHEN I CAME TO MERCK.

24 **Q.**   OKAY.  AND YOU THEN WERE PROMOTED TO THE PRESIDENT OF MRL

25 IN 1985; IS THAT CORRECT?

1   **A.**   YES.  I WAS -- I WAS PROMOTED IN ORDER -- TO HEAD OF THE

2   DEPARTMENT OF VACCINE RESEARCH A YEAR AFTER I CAME TO MERCK;

3   SIX MONTHS AFTER THAT TO BE HEAD OF BASIC DISCOVERY RESEARCH;

4   AND THEN A YEAR AND A HALF OR SO, ROUGHLY, AFTER THAT, I BECAME

5   PRESIDENT OF MRL.

6   **Q.**   DR. SCOLNICK, WOULD IT BE FAIR TO SAY THAT VIOXX WAS AN

7   IMPORTANT NEW DRUG FOR MERCK AT THAT TIME?

8   **A.**   YES.  YES, IT DEFINITELY WAS AN IMPORTANT NEW DRUG FOR;

9   MERCK.

10   **Q.**   WOULD YOU CALL IT A POTENTIAL BLOCKBUSTER FOR MERCK?

11   **A.**   YES, I WOULD.  WE KNEW IT WOULD BE MEDICALLY VERY

12   IMPORTANT, AND DRUGS THAT ARE MEDICALLY IMPORTANT USUALLY TURN

13   OUT TO BE BLOCKBUSTERS.

14   **Q.**   WAS IT IMPORTANT FOR MERCK TO HAVE A BLOCKBUSTER DRUG AT

15   THAT TIME?

16   **A.**   YES, IT WAS.

17   **Q.**   WHY IS THAT?

18   **A.**   MERCK FACED THE EXPIRATION OF PATENTS, LIKE MEVACOR AND

19   ZOCOR, AROUND THE TURN OF THE CENTURY -- I'M SORRY, MEVACOR AND

20   VASOTEC, NOT ZOCOR BUT MEVACOR AND VASOTEC, AROUND THE TURN OF

21   THE CENTURY.  AND VIOXX WAS AN IMPORTANT DRUG BECAUSE OF THAT.

22   **Q.**   DR. SCOLNICK, DID THERE COME A POINT WHERE YOU LEARNED

23   THAT THERE WAS A COMPETING PRODUCT OUT THERE; IN OTHER WORDS,

24   ANOTHER COX-2 INHIBITOR THAT WAS BEING DEVELOPED?

25   **A.**   YES.  SOMEWHERE IN THE MID-'90S -- I DON'T RECALL THE

1  EXACT TIME -- WE LEARNED THAT A COMPETING -- ANOTHER COMPANY
2  HAD A COMPETING PRODUCT.
3  **Q.**   WHAT WAS THE NAME OF THAT COMPANY?
4  **A.**   I THINK IT WAS SEARLE.  I'M NOT SURE IF IT WAS MONSANTO OR
5  SEARLE AT THAT POINT, AND THE COMPETING PRODUCT TURNED OUT TO
6  BE CELEBREX.
7  **Q.**   DID MERCK WANT TO BE THE FIRST ONE TO COME TO MARKET?
8  **A.**   YES, WE DID.  WE CLEARLY WANTED TO BE THE FIRST TO COME TO
9  MARKET.
10 **Q.**   WHY IS THAT?
11 **A.**   BECAUSE THE FIRST TO COME TO MARKET USUALLY HAS THE
12 GREATEST CHANCE OF HAVING THEIR DRUG BE THE MOST SUCCESSFUL AND
13 THE MOST WIDELY USED.
14 **Q.**   DR. SCOLNICK, WHAT ROLE DID YOUR DESIRE TO HAVE VIOXX BE
15 THE FIRST DRUG TO MARKET PLAY IN YOUR DECISIONS ABOUT SAFETY?
16 **A.**   DESPITE THE FACT WE WANTED TO BE FIRST, WE WANTED TO BE
17 SURE WHAT THE DOSING WAS BECAUSE OF THE ISSUES OF HYPERTENSION
18 AND EDEMA, AND WE WANTED NOT -- AND WE WANTED TO PROVE
19 UNAMBIGUOUSLY THE IMPROVED SAFETY PROFILE BY ENDOSCOPY BEFORE
20 WE WENT TO MARKET.  ALTHOUGH, IT WAS WIDELY KNOWN AND, IN A
21 SENSE, ACCEPTED AHEAD OF TIME THAT COX-2 INHIBITORS WOULD BE
22 SAFER FOR THE STOMACH, WE WANTED THE PROOF THAT WE COULD GET BY
23 THE ENDOSCOPY STUDIES, AND SO WE TOOK THE TIME TO VERY, VERY
24 CAREFULLY DO THAT SO THAT WE COULD DOCUMENT THAT AS PART OF THE
25 INITIAL SUBMISSION FOR THE DRUG.

1  **Q.**   WHICH DRUG CAME TO MARKET FIRST, CELEBREX OR VIOXX?

2  **A.**   CELEBREX CAME TO MARKET FIRST.

3  **Q.**   WHY IS THAT?

4  **A.**   I DON'T KNOW THE DETAILS OF WHY IT CAME TO MARKET FIRST.

5  I ALWAYS FELT THAT IT WAS BECAUSE WE HAD SPENT THE TIME ON

6  THESE EXTENSIVE GI SAFETY STUDIES AND OTHER STUDIES THAT I'VE

7  DESCRIBED TO YOU IN ORDER TO HAVE REALLY METICULOUS CLINICAL

8  DATA.

9  **Q.**   CAN YOU PLEASE TELL US WHAT WAS YOUR VIEW ABOUT PATIENT

10  SAFETY AS PRESIDENT OF MERCK RESEARCH LABS?

11  **A.**   MY VIEW ON PATIENT SAFETY WAS WELL-KNOWN TO EVERY

12  SCIENTIST IN THE LABORATORY, REPEATEDLY TOLD PEOPLE THAT

13  PATIENT SAFETY CAME FIRST; THAT IF WE HAD A DRUG THAT WAS READY

14  TO GO INTO THE CLINIC AND UNDERGOING ANIMAL SAFETY TESTING OR

15  WAS IN THE CLINIC ALREADY AND HAD GONE THROUGH STAGES OF ANIMAL

16  SAFETY TESTING, THAT IF ANY SERIOUS EVENT OCCURRED IN ANIMALS

17  OR IN PEOPLE IN SUCH A PROGRAM THAT I WANTED TO BE THE FIRST OR

18  AMONG THE VERY FIRST WHO WOULD KNOW ABOUT THAT SO THAT I COULD

19  PARTICIPATE IN THE DECISION OF POTENTIALLY STOPPING SUCH A

20  PROGRAM.

21  **Q.**   HOW DID YOUR VIEW ABOUT PATIENT SAFETY INFLUENCE YOUR

22  MANAGEMENT STYLE?

23  **A.**   I WAS VERY DEMANDING ON THAT POINT TO PEOPLE.  I WAS A

24  PERFECTIONIST IN THAT REGARD, AND I OFTEN REITERATED THAT.  I

25  WANTED PEOPLE TO PRESENT ALL OF THE DATA THAT THEY HAD,

1   WHENEVER A SAFETY ISSUE CAME UP, ANALYZE IT IN EVERY WHICH WAY,

2   AND I CONSTANTLY WOULD GO BACK OVER IT, EVEN AFTER FIRST

3   PRESENTATIONS, TO MAKE SURE THAT WHATEVER HAD BEEN SAID AND

4   WHATEVER HAD BEEN PRESENTED WAS ACCURATE AND WAS THERE MORE WE

5   COULD DO TO REASSURE OURSELVES.

6   **Q.**   AS THE PRESIDENT OF MERCK RESEARCH LABS, HOW DID YOU

7   ATTEMPT TO ENSURE THE INTEGRITY OF THE DATA FROM MERCK STUDIES?

8   **A.**   I TRIED TO ENSURE THE INTEGRITY BY, A, EMPHASIZING THAT WE

9   WOULD NOT TOLERATE ANYTHING BUT AUTHENTIC DATA; AND SECONDLY,

10  BY THE APPOINTMENTS I MADE TO CRITICAL POSITIONS IN CLINICAL

11  DEVELOPMENT.

12         THE PEOPLE THAT HEADED CLINICAL RESEARCH, REGULATORY

13  AFFAIRS, AND BIOSTATISTICS, WHO WERE PRESENT DURING MOST OF MY

14  TIME AS PRESIDENT, WERE HONEST, HARD-WORKING, METICULOUS PEOPLE

15  WHO I FELT THAT I COULD TRUST COMPLETELY TO TELL ME IF THERE

16  WAS A SAFETY PROBLEM ABOUT SOMETHING IN THE AREAS THAT THEY

17  WERE DEALING WITH.

18         AND THE SAME TRUE OF THE HEAD OF SAFETY ASSESSMENT AT

19  MERCK WHO REPORTED TO ME FOR A NUMBER OF YEARS WHILE I WAS

20  PRESIDENT OF MRL.

21  **Q.**   DID YOU ENCOURAGE SCIENTIFIC DEBATE WITHIN MERCK?

22  **A.**   I DEMANDED IT.  I HAD NO TOLERANCE FOR PEOPLE WHO DIDN'T

23  UNDERSTAND THEIR DATA, HADN'T ANALYZED THEIR DATA, AND COULDN'T

24  DISCUSS THE PROS AND CONS OF PROJECTS THAT THEY WERE IN CHARGE

25  OF:  THE GOOD THINGS, THE BAD THINGS, WHAT THE ISSUES WERE.  I

1    ACTUALLY DEMANDED THAT FROM EVERYBODY.

2    **Q.**    DR. SCOLNICK, DID YOU EVER MAKE ANY DECISIONS AS PRESIDENT

3    OF MERCK RESEARCH LABS TO STOP THE DEVELOPMENT OF A DRUG?

4    **A.**    YES, OF COURSE.

5    **Q.**    WHAT KINDS OF CONSIDERATIONS WERE IN PLAY IN THOSE

6    DECISIONS?

7    **A.**    SOMETIMES PROGRAMS WERE STOPPED DUE TO LACK OF EFFICACY OF

8    THE COMPOUND AT THE CLINIC THAT DIDN'T WORK, AND OFTEN THEY

9    WERE STOPPED BECAUSE OF SAFETY PROBLEMS THAT AROSE, EITHER IN

10   ANIMALS, ON A PROMISING DRUG, OR OCCASIONALLY IN TRIALS IN

11   HUMANS.

12   **Q.**    CAN YOU GIVE US ANY EXAMPLES OF A SITUATION WHERE YOU

13   TERMINATED THE DEVELOPMENT OF A DRUG OVER SAFETY CONCERNS?

14   **A.**    YES.  I CAN GIVE YOU SEVERAL EXAMPLES OF THAT.  ONE OF THE

15   MOST PAINFUL ONES WAS A PRECURSOR TO SINGULAIR, A COMPOUND FOR

16   THE TREATMENT OF ASTHMA, THAT GOT AS FAR AS -- ALMOST GOT AS

17   FAR AS A PHASE III STUDY IN HUMANS.

18           THE DRUG WAS WORKING WELL, AND A VERY SMALL NUMBER OF

19   PERCENTAGE OF PATIENTS DEVELOPED ABNORMALITIES OF LIVER

20   FUNCTION, AND WE TERMINATED THE PROGRAM BECAUSE WE RECOGNIZED

21   THERE WAS A SIGNAL IN PEOPLE AND THAT WE DIDN'T WANT THAT RISK.

22           WE STOPPED THE DEVELOPMENT OF A SPECIAL DOSAGE FORM

23   OF ZOCOR, WHICH WAS OUR CHOLESTEROL-LOWERING DRUG IN

24   COMPETITION WITH ATORVASTATIN, AND WE WERE TRYING TO DEVELOP A

25   SPECIAL FORMULATION FOR A HIGHER DOSE OF ZOCOR FOUND IN HUMANS.

1   DESPITE THE EXCITEMENT ABOUT THIS DOSAGE FORM, THAT IT CAUSED

2   SIDE EFFECTS IN PEOPLE, AND WE IMMEDIATELY STOPPED THE PROGRAM.

3            PEOPLE, IN FACT, WHO WERE IN CHARGE OF THE PROGRAM,

4   KNOWING THAT I WOULD WANT TO KNOW, ACTUALLY CALLED ME IN

5   ENGLAND TO TELL ME ABOUT THIS AND TO TELL ME THEY WERE STOPPING

6   THE PROGRAM.  THEY THOUGHT IT WAS SO IMPORTANT AND THEY KNEW I

7   WOULD WANT TO KNOW ABOUT IT.

8            WE STOPPED DEVELOPMENT IN THE LATE '90S OF A VERY,

9   VERY PROMISING COMPOUND IN THE PSYCHIATRIC AREA THAT WOULD HAVE

10  BEEN A DRAMATIC IMPROVEMENT OVER A CLASS OF DRUGS KNOWN AS

11  BENZODIAZEPINES, WHICH ARE USED TO TREAT ANXIETY PROBLEMS AND

12  PSYCHOSIS IN HUMANS.  THIS DRUG WAS MUCH MORE SELECTIVE FOR

13  RECEPTORS IN THAT PHARMACOLOGY FIELD.  IT PRODUCED ALL THE

14  BENEFITS AND LACKED MOST OF THE SIGNIFICANT DEFICITS AND

15  PROBLEMS ASSOCIATED WITH THOSE DRUGS, AND IT WAS VERY PAINFUL

16  IN THAT IT WAS JUST A WHISPER OF POTENTIAL FOR THIS DRUG TO

17  ALTER THE STRUCTURE OF DNA, TO BE A MUTAGEN, AND I DECIDED THAT

18  IT WAS NOT WORTH THAT RISK BECAUSE THE DATA WAS -- WAS REAL,

19  ALTHOUGH THE EVIDENCE WAS SLIGHT, AND WE STOPPED THE

20  DEVELOPMENT OF THAT DRUG.  AND THERE ARE TWO OR THREE OTHER

21  EXAMPLES.

22  **Q.**   WHY DID YOU STOP THOSE -- THE DEVELOPMENT OF THOSE DRUGS

23  WHEN THE SAFETY WAS CALLED INTO QUESTION?

24  **A.**   BECAUSE I LOOKED AT MYSELF FIRST AS A PHYSICIAN, IN MY

25  POSITION, AND I ALWAYS WANTED TO LOOK OUT FOR PATIENT SAFETY AS

1   WELL AS THE WAY OUR DRUGS WORK AND BENEFITTED PATIENTS.

2   Q.   DR. SCOLNICK, ARE YOU FAMILIAR WITH SOMETHING CALLED AN

3   "FDA ADVISORY COMMITTEE"?

4   A.   YES.

5   Q.   WHAT IS AN FDA ADVISORY COMMITTEE?

6   A.   AN FDA ADVISORY COMMITTEE IS A GROUP OF OUTSIDE SCIENTISTS

7   WITH VARIOUS DISCIPLINES CONVENED SOLELY BY THE FDA,

8   COMPOSITION DETERMINED SOLELY BY THE FDA, THAT THEY CALL UPON

9   TO REVIEW MANY NEW DRUG APPLICATIONS THAT COME TO THEM,

10  ESPECIALLY ON ANY NEW DRUG THAT WOULD HAVE A NEW MECHANISM OF

11  ACTION, AND IT'S A PROVINCE OF THE FDA.  IT'S BEEN THERE FOR A

12  VERY, VERY LONG PERIOD OF TIME.

13  Q.   WAS THERE AN FDA ADVISORY COMMITTEE MEETING THAT OCCURRED

14  RELATING TO THE APPROVAL OF VIOXX?

15  A.   YES, DEFINITELY.

16  Q.   WAS THAT MEETING OPEN TO THE PUBLIC?

17  A.   OH, YES.

18  Q.   CAN YOU TELL US GENERALLY WHAT OCCURRED AT THAT MEETING?

19  A.   YES.  WHAT OCCURS AT THAT MEETING IS THE SAME THAT OCCURS

20  AT ALL MEETINGS OF THE ADVISORY COMMITTEE.  THE SPONSOR SUBMITS

21  A BACKGROUND PACKAGE TO THE FDA THAT THEY GIVE TO THE ADVISORY

22  COMMITTEE.

23          THE FDA PREPARES ITS OWN REVIEW OF THE APPLICATION,

24  WHICH IT GIVES TO THE COMMITTEE AHEAD OF TIME.  THE SPONSOR

25  THEN COMES AND MAKES A PRESENTATION ON THE DATA, QUIZZED FOR AS

```
 1   LONG AND AS EXTENSIVELY AS THE ADVISORY COMMITTEE WANTS ON ANY

 2   QUESTION ABOUT THE DATA, HAS TO ANSWER IT.

 3            THE FDA PRESENTS THEIR INTERPRETATION OF THE DATA,

 4   THEIR ANALYSIS OF THE DATA.  AGAIN, THE COMMITTEE GETS A CHANCE

 5   TO ASK QUESTIONS, GET THEM ANSWERED.  THIS GOES ON FOR SEVERAL

 6   HOURS, AND THEN EVENTUALLY THE COMMITTEE IS ASKED TO VOTE ON

 7   QUESTIONS THAT THE FDA GIVES THEM THAT RELATE TO THE SAFETY,

 8   EFFICACY, AND APPROVABILITY OF THE DRUG.

 9   Q.   THE PROCESS THAT YOU'VE DESCRIBED, DID THAT OCCUR WITH

10   RESPECT TO VIOXX BEFORE VIOXX WAS APPROVED?

11   A.   OH, YES.

12   Q.   I WOULD LIKE TO SHOW YOU A DOCUMENT THAT WE'LL MARK AS

13   EXHIBIT 102.  DR. SCOLNICK, CAN YOU IDENTIFY EXHIBIT 102,

14   PLEASE?

15   A.   YES.  IT'S A LETTER TO DR. ROBERT SILVERMAN, WHO WAS A

16   SENIOR DIRECTOR IN THE MERCK RESEARCH LAB REGULATORY AFFAIRS

17   DEPARTMENT, AND IT'S -- IT'S A LETTER THAT COMES TO HIM FROM

18   DR. ROBERT DELAP, M.D., PH.D, WHO'S DIRECTOR OF DRUG EVALUATION

19   AT THE FDA, AND IT RELATES TO THE NEW DRUG APPLICATION OF

20   VIOXX.

21   Q.   DR. SCOLNICK, WHAT IS THE DATE OF THIS LETTER FROM THE

22   FDA?

23   A.   I BELIEVE IT'S MAY 20, 1999.

24   Q.   SIR, I'D LIKE YOU TO TAKE A LOOK, IF YOU WOULD, AT THE

25   FIRST PAGE OF EXHIBIT 102, AND I'M GOING TO ASK YOU, IF YOU
```

1  WOULD, PLEASE, TO READ OUT LOUD THE FOURTH PARAGRAPH OF THIS

2  LETTER.

3  **A.**   THE ONE THAT BEGINS, "WE HAVE"?

4  **Q.**   YES.

5  **A.**   THE PARAGRAPH SAYS, "WE HAVE COMPLETED THE REVIEW OF THIS

6  APPLICATION AS AMENDED AND HAVE CONCLUDED THAT ADEQUATE

7  INFORMATION HAS BEEN PRESENTED TO DEMONSTRATE THAT THE DRUG

8  PRODUCT IS SAFE AND EFFECTIVE FOR USE AS RECOMMENDED IN THE

9  ENCLOSED LABELING TEXT.  ACCORDINGLY, THE APPLICATION IS

10 APPROVED EFFECTIVE ON THE DATE OF THIS LETTER."

11 **Q.**   IS THIS LETTER WHAT IS KNOWN AS THE APPROVAL LETTER FOR

12 VIOXX?

13 **A.**   YES, I BELIEVE SO.

14 **Q.**   DID THERE COME A POINT IN TIME WHEN YOU SAW THE RESULTS

15 FROM THE VIGOR STUDY?

16 **A.**   YES.

17 **Q.**   WHEN DID THAT OCCUR?

18 **A.**   MARCH 9, 2000.

19 **Q.**   WERE YOU AMONG THE FIRST PEOPLE AT MERCK TO SEE THOSE

20 RESULTS?

21 **A.**   I THINK I WAS SHOWN THE DATA OR SENT THE DATA AFTER THE

22 PROJECT TEAM INITIALLY SAW IT AND ANALYZED IT.  SO, IN THAT

23 SENSE, I WAS AMONG THE FIRST, BUT I WAS NOT IN THE VERY FIRST

24 GROUP.

25 **Q.**   WHAT WAS YOUR INITIAL REACTION TO THE VIGOR RESULTS?

1  **A.**   I WAS EXTREMELY PLEASED AT THE GI OUTCOMES, WHICH WERE

2  MUCH BETTER FOR VIOXX THAN NAPROXEN, EVEN AT 50 MILLIGRAMS OF

3  VIOXX, AND I WAS STUNNED AND SURPRISED AT THE CARDIOVASCULAR

4  DIFFERENCE SEEN IN THE TRIAL BETWEEN NAPROXEN AND VIOXX.  I DID

5  NOT EXPECT TO SEE SUCH A RESULT.

6  **Q.**   DID YOU EVER PUT DOWN THAT INITIAL REACTION IN WRITING?

7  **A.**   YES, I DID.  I SENT AN E-MAIL TO THE -- SOME MEMBERS OF

8  THE PROJECT TEAM STATING -- STATING THAT.

9  **Q.**   DR. SCOLNICK, IS EXHIBIT 14 IN FRONT OF YOU THE E-MAIL

10  THAT YOU JUST REFERRED TO?

11  **A.**   YES, IT IS.

12  **Q.**   IN YOUR E-MAIL, YOU WRITE, "TO ALL:  I JUST RECEIVED AND

13  WENT THROUGH THE DATA.  THANK YOU FOR SENDING IT TO ME.  THERE

14  IS NO DOUBT ABOUT THE PUB DATA.  VERY, VERY STRONG, AS

15  EXPECTED."  DO YOU SEE THAT?

16  **A.**   YES, I DO.

17  **Q.**   WHAT IS THE PUB DATA?

18  **A.**   "PUB" WAS A SHORTHAND FOR PERFORATIONS, ULCERS, AND

19  BLEEDS.  THOSE WERE THE SERIOUS SIDE EFFECTS OF PRIOR

20  NONSTEROIDALS THAT EVERYONE WANTED TO KNOW ABOUT.

21  **Q.**   WHEN YOU SAY "VERY, VERY STRONG, AS EXPECTED," WHAT WERE

22  YOU REFERRING TO?

23  **A.**   I WAS REFERRING TO THE FACT THAT THEIR FIRST LOOK AT THE

24  DATA THERE SEEMED TO BE A DRAMATIC DECREASE IN THE NUMBER OF

25  THOSE WHEN COMPARED TO NAPROXEN IN THE STUDY.

1  **Q.**   YOU GO ON TO SAY, "GENERAL SAFETY IS BETTER THAN COULD

2  HOPE FOR IN THIS PATIENT POPULATION.   INCIDENCES OF

3  HYPERTENSION, RENAL ANYTHING, EDEMA, LIVER, ALL GREAT.   VERY

4  SAFE.   VERY, VERY SAFE."   DO YOU SEE THAT?

5  **A.**   YES, I DO.

6  **Q.**   WHEN YOU ARE TALKING ABOUT "BETTER THAN COULD HOPE FOR IN

7  THIS PATIENT POPULATION," WHAT DOES THAT REFER TO?

8  **A.**   THESE PATIENTS WERE PATIENTS WHO HAD RHEUMATOID ARTHRITIS,

9  A VERY SERIOUS ILLNESS.   MANY OF THEM WOULD BE ON STEROIDS IN

10  ADDITION TO WHATEVER NONSTEROIDAL ANTI-INFLAMMATORY DRUGS, SOME

11  OTHER MEDICATIONS ALSO, AND A SOMEWHAT FRAGILE PATIENT

12  POPULATION IN THAT REGARD.   THEREFORE, WHENEVER ONE TESTS ANY

13  KIND OF DRUG IN A PATIENT POPULATION THAT'S SICK TO BEGIN WITH,

14  AS THESE PATIENTS WERE, ONE WORRIES THAT ONE MIGHT SEE SIDE

15  EFFECTS THAT WOULD SHOW UP IN AN UNEXPECTED WAY.

16          THOSE WERE NOT SEEN AND NOT DETECTED IN THE TRIAL,

17  AND I WAS VERY PLEASED ABOUT THAT.

18  **Q.**   DR. SCOLNICK, YOU THEN GO ON TO SAY, "THE CV EVENTS ARE

19  CLEARLY THERE."   DO YOU SEE THAT?

20  **A.**   YES, I DO.

21  **Q.**   WHAT DOES THAT REFER TO?

22  **A.**   WHAT I WAS REFERRING TO WAS THE REPORTS OF THE

23  CARDIOVASCULAR EVENTS IN THE TWO ARMS OF THE TRIAL AND THAT THE

24  TWO CURVES WERE DIFFERENT.   THE INCIDENCE OF CURVES WERE

25  CLEARLY DISTINGUISHABLE.

1  Q.   THERE WAS A DIFFERENCE IN THE NUMBER OF CV EVENTS BETWEEN

2  THE VIOXX GROUP AND THE NAPROXEN GROUP; IS THAT WHAT YOU'RE

3  SAYING?

4  A.   YES, THAT'S EXACTLY WHAT I'M SAYING.

5  Q.   FURTHER ON DOWN, YOU SAY, "IT IS MECHANISM-BASED AS WE

6  WORRIED IT WAS."  DO YOU SEE THAT?

7  A.   YEAH -- YES, I DO.

8  Q.   WHAT DOES IT MEAN WHEN YOU SAY, "IT'S MECHANISM-BASED"?

9  WHAT WERE YOU REFERRING TO?

10  A.   WELL, AS PART OF MY INITIAL REACTION -- AS I'VE DESCRIBED

11  MANY TIMES, I HADN'T EXPECTED THESE RESULTS, AND MY VERY FIRST

12  REACTION WAS THAT VIOXX HAD ELEVATED THE RATE AS OPPOSED TO

13  NAPROXEN LOWERING THE RATE.

14         AND MY CONNECTION WAS TO THE PROSTACYCLIN HYPOTHESIS,

15  WHICH WAS MY SET OF FIRST THOUGHTS WHEN I SAW THE DATA.  AND

16  THAT'S WHAT I WAS TALKING ABOUT SINCE COX-2 INHIBITORS HAD BEEN

17  SHOWN TO LOWER PROSTACYCLIN IN THE URINE.

18  Q.   YOU GO ON TO SAY AT THE END OF THIS E-MAIL, "WE HAVE A

19  GREAT DRUG," AND YOU SAY, "THE CLASS WILL DO WELL."  DO YOU SEE

20  THOSE REFERENCES?

21  A.   YES, I DO.

22  Q.   WHAT DID YOU MEAN BY THAT?

23  A.   WELL, THAT EVEN IF THESE RESULTS WERE CAUSED BY VIOXX, AS

24  OPPOSED TO NOT BEING CAUSED BY VIOXX, THE INCIDENCE WAS LOW.

25  WE COULD CHANGE THE LABEL TO REFLECT THE RESULTS.  THE DRUG

1   STILL HAS SIGNIFICANT BENEFIT TO PATIENTS AND PEOPLE, AND WE

2   WOULD LEARN HOW TO USE IT SAFELY IN PEOPLE AND STILL PRODUCE

3   THE BENEFIT WITH AN ARTICULATION OF WHAT COULD HAVE BEEN A

4   KNOWN RISK AT THAT POINT -- WHAT I THOUGHT WAS A KNOWN RISK AT

5   THAT POINT.

6   Q.   DR. SCOLNICK, DID THERE COME A TIME WHEN MEMBERS OF THE

7   VIOXX TEAM INFORMED YOU THAT THERE MIGHT BE ANOTHER EXPLANATION

8   FOR THE DIFFERENCE IN THE CV EVENTS BETWEEN VIOXX AND NAPROXEN?

9   A.   YES.  SUBSEQUENTLY TO THIS -- AND I DON'T RECALL WHETHER

10  IT WAS THIS EVENING OR THE NEXT DAY -- MEMBERS OF THE TEAM TOLD

11  ME THEY, IN FACT, THOUGHT THERE WAS A VERY PLAUSIBLE AND MORE

12  LIKELY EXPLANATION FOR THE DIFFERENCES IN THE EVENT RATES IN

13  THE TWO ARMS OF THE TRIAL.

14  Q.   WHAT DID YOU INSTRUCT THE VIOXX TEAM MEMBERS TO DO AT THAT

15  POINT?

16  A.   WELL, THEY TOLD ME THAT BECAUSE NAPROXEN WAS AT THIS DOSE

17  TWICE A DAY, 500 MILLIGRAMS TWICE A DAY, HAD A POTENT

18  ANTIPLATELET ACTIVITY, THAT THE MORE PLAUSIBLE EXPLANATION WAS

19  THAT NAPROXEN HAD ACTUALLY LOWERED THE CV EVENT RATE IN THE

20  TRIAL.

21          SO I SAID TO THEM, WELL, THAT SOUNDS GOOD, BUT WHAT

22  OTHER EVIDENCE IS THERE TO SUPPORT THAT?  SO LET'S LOOK BACK AT

23  ALL OUR CLINICAL TRIAL DATA AND SEE IF THERE'S ANY OTHER

24  EVIDENCE FOR THAT, AND WHAT OTHER EVIDENCE CAN YOU FIND THAT

25  NAPROXEN OR DRUGS LIKE NAPROXEN COULDN'T BE CARDIOPROTECTIVE.

1  **Q.**   DID THE VIOXX TEAM PRESENT YOU WITH ANY EVIDENCE OF
2  NAPROXEN'S ABILITY TO INHIBIT PLATELETS THE WAY THAT THEY HAD
3  DESCRIBED?
4  **A.**   YES.  THEY TOLD ME ABOUT IT AND, I BELIEVE, SHOWED ME A
5  GRAPH WHICH SHOWED THAT NAPROXEN, 500 MILLIGRAMS TWICE A DAY,
6  WAS POTENT, HAD A POTENT ANTIPLATELET EFFECT THROUGHOUT THE
7  DAY, AND COMPARED THAT TO IBUPROFEN AND DICLOFENAC, TWO OTHER
8  MESHES OF THE CLASS WHICH DID NOT, IN THEIR USUAL DOSAGE
9  REGIMENS HAVE THAT KIND OF EFFECT AND, THEREFORE, NAPROXEN WAS
10 UNIQUE AS A PROTOTYPICAL ANTI-INFLAMMATORY DRUG.
11 **Q.**   THAT DATA ABOUT NAPROXEN THAT YOU WERE SHOWN, WAS THAT
12 DATA THAT HAD BEEN OBTAINED IN A MERCK-RELATED STUDY?
13 **A.**   THE BIOCHEMISTRY DATA I'M TALKING ABOUT IN PEOPLE I THINK
14 WAS IN A MERCK -- IN A MERCK STUDY, YES, CLINICAL PHARMACOLOGY
15 STUDY.
16 **Q.**   THAT DATA, WERE YOU AWARE OF THAT DATA WHEN YOU WROTE YOUR
17 E-MAIL ON MARCH 9, 2000?
18 **A.**   NO, I HAD NOT BEEN AWARE OF IT.  I WAS VERY SURPRISED AT
19 THIS DATA AND HAD NOT HEARD ABOUT THE NAPROXEN EFFECT BEFORE
20 THEY TOLD ME ABOUT IT.
21 **Q.**   WHAT -- IN YOUR WORDS, WHAT DID THAT DATA ABOUT NAPROXEN
22 SUGGEST TO YOU AT THAT POINT?
23 **A.**   WELL, AT THAT POINT, MY THINKING, I THOUGHT, WELL, THEY
24 HAVE A PLAUSIBLE HYPOTHESIS HERE.  THIS IS CERTAINLY, BASED ON
25 THE ANTIPLATELET ACTIVITY, THEY COULD BE SEEING A NAPROXEN

1   PROTECTIVE EFFECT, I WANTED THEM TO LOOK AT ALL OUR OTHER

2   CLINICAL TRIAL DATA AGAIN AND WAS REALLY STRUGGLING WITH TRYING

3   TO FIND A WAY TO GET MORE PLACEBO-CONTROLLED DATA.

4              BECAUSE IN THIS TRIAL, WHAT WE HAD FROM OUR DATABASE

5   AT THAT POINT WAS, ON THE ONE HAND, WE HAD VIOXX VERSUS ALL OF

6   THE NONSTEROIDALS, WHICH HAVE BEEN TESTED IN OUR TRIALS --

7   PHASE IIB, III TRIALS AND EXTENSIONS -- WHERE WE HAD SEEN NO

8   DIFFERENCE IN CARDIOVASCULAR EVENT RATES.  THEN NOW WE HAD A

9   TRIAL WHERE, AT 50 MILLIGRAMS OF VIOXX VERSUS NAPROXEN, WE HAD

10  A DIFFERENCE, AND THOSE WERE TWO DIFFERENT DATABASES AND

11  NEITHER OF WHICH HAD A PLACEBO AGAINST IT.

12             SO THEIR INTERPRETATION BASED ON THE ANTIPLATELET

13  ACTIVITY WAS NAPROXEN HAD LOWERED THE HEART ATTACK RATE,

14  CONSISTENT WITH THE FACT THAT IT WAS DIFFERENT BIOCHEMICALLY

15  FROM OTHER NONSTEROIDALS, AND VIOXX WAS NOT DIFFERENT FROM THEM

16  IN CV EVENTS.

17             I SAID THE TIEBREAKER HERE HAS TO BE PLACEBO DATA,

18  AND HOW MUCH PLACEBO DATA DO WE HAVE TO SEE IF VIOXX IS

19  DIFFERENT FROM PLACEBO.

20  Q.   BEFORE WE GET TO PLACEBO DATA, DID THE VIOXX PROJECT TEAM

21  PROVIDE YOU WITH ANY OTHER BIOCHEMICAL OR PHARMACOLOGICAL

22  INFORMATION THAT SUGGESTED A DRUG LIKE NAPROXEN COULD INHIBIT

23  PLATELETS LIKE ASPIRIN?

24  A.   YES.  THEY -- THEY ACTUALLY, YOU KNOW, TOLD ME ABOUT AND

25  THEN SUBSEQUENTLY SENT ME A PAPER ON A DRUG CALLED

1  FLURBIPROFEN, WHICH IS A VERY POTENT NONSTEROIDAL.  AND THE

2  DOSES GIVEN IN THE TRIAL, THEY CITED TO ME, BLOCKED PLATELETS

3  LIKE NAPROXEN.

4        IT HAD BEEN TESTED IN A VERY HIGH-RISK PATIENT

5  POPULATION IN WHICH PATIENTS HAD THEIR ARTERIES OPEN --

6  SOMETHING CALLED ANGIOPLASTY TODAY -- AND THEN FOLLOWED FOR SIX

7  MONTHS WITH AND WITHOUT FLURBIPROFEN TREATMENT TO SEE IF

8  FLURBIPROFEN LOWERED THE RESTENOSIS, RECLOTTING RATE, OF THESE

9  OPEN ARTERIES.  AND LO' AND BEHOLD, FLURBIPROFEN HAD A DRAMATIC

10 BENEFIT TO THOSE PATIENTS.  IT DROPPED THE RESTENOSIS RATE, THE

11 RETHROMBOSIS RATE DRAMATICALLY IN THOSE PATIENTS.

12       AND SUBSEQUENTLY, THEY TOLD ME ABOUT A DRUG CALLED

13 INDOBUFEN, WHICH HAD EVEN MORE DATA ASSOCIATED WITH IT.  IT HAD

14 TWO OR CLINICAL SITUATIONS.  IT HAD ACTUAL HEART BYPASS GRAFT

15 WHERE IT BLOCKED THE STENOSIS, SUBSEQUENT CLOTTING OF THAT; AND

16 YET ANOTHER SITUATION, PATIENTS WHO HAVE A RHYTHM DISTURBANCE

17 IN THEIR ATRIUM, WHICH SETS THEM UP TO HAVE CLOTS CALLED ATRIAL

18 FIBRILLATION.  AND GIVING THOSE PATIENTS INDOBUFEN REDUCED THE

19 INCIDENCE OF THEIR THROMBOTIC EVENTS.

20       SO WE HAD THREE PIECES OF INFORMATION WITH DRUGS LIKE

21 NAPROXEN, WHICH WAS VERY STRONG CLINICAL EVIDENCE TO SUPPORT

22 THE BIOCHEMICAL EVIDENCE THAT WE HAD WITH NAPROXEN AT THAT

23 POINT.

24 **Q.**   I WOULD LIKE TO SHOW YOU A DOCUMENT THAT WE'LL MARK AS

25 EXHIBIT 103.  DR. SCOLNICK, CAN YOU IDENTIFY EXHIBIT 103,

1    PLEASE?

2    **A.**    YES.  EXHIBIT 103 IS A PAPER FROM THE *EUROPEAN HEART*

3    *JOURNAL* PUBLISHED IN 1993.  THE TITLE OF THE PAPER IS

4    "EVALUATION OF FLURBIPROFEN FOR PREVENTION OF A REINFARCTION

5    AND REOCCLUSION AFTER SUCCESSFUL THROMBOLYSIS OR ANGIOPLASTY IN

6    ACUTE MYOCARDIAL INFARCTION."

7    **Q.**    IS THIS EXHIBIT 103, THE FLURBIPROFEN DATA, OR PAPER, THAT

8    YOU REFERRED TO EARLIER IN YOUR TESTIMONY?

9    **A.**    YES, IT IS.

10   **Q.**    WERE YOU AWARE OF THE DATA CONTAINED IN THIS PAPER ON

11   FLURBIPROFEN WHEN YOU WROTE YOUR E-MAIL ON MARCH 9, 2000?

12   **A.**    NO, I WAS NOT.

13   **Q.**    SIMILARLY, WERE YOU AWARE OF THE DATA REGARDING THE DRUG

14   INDOBUFEN WHEN YOU WROTE YOUR E-MAIL ON MARCH 9, 2000?

15   **A.**    NO, I WAS NOT.

16   **Q.**    YOU MENTIONED A FEW MINUTES AGO SOMETHING ABOUT PLACEBO

17   DATA.  CAN YOU TELL US WHAT ELSE YOU AND YOUR TEAM LOOKED AT TO

18   ANSWER THE QUESTION OF WHETHER THE DIFFERENCE IN THE CV RATES

19   BETWEEN NAPROXEN AND VIOXX WAS DUE TO NAPROXEN?

20   **A.**    DURING THE DISCUSSION OF TRYING TO FIGURE OUT A WAY TO

21   HAVE -- LOOK AT PLACEBO DATA, SOMEONE -- I DON'T RECALL WHO --

22   REMINDED US THAT WE HAD AN ONGOING TRIAL IN PATIENTS WITH

23   ALZHEIMER'S DISEASE.

24          THIS TRIAL COMPARED PLACEBO TO 25 MILLIGRAMS OF

25   VIOXX, AND I DON'T RECALL WHETHER IT WAS A TREATMENT TRIAL OR A

1   PREVENTION TRIAL, BUT IT WAS ATTEMPTING TO IMPROVE THE LOT, THE

2   CLINICAL BENEFIT TO PATIENTS WITH ALZHEIMER'S.

3           THE REASON THAT THIS TRIAL WAS ONGOING WAS THERE WAS

4   A THEORY -- AGAIN, A HYPOTHESIS -- THAT SUCH AN

5   ANTI-INFLAMMATORY WOULD IMPROVE THE CLINICAL CONDITION OR

6   PREVENT THE PROGRESSION OF ALZHEIMER'S DISEASE BASED ON

7   LITERATURE POST HOC EPIDEMIOLOGY DATA, BUT IT WAS ONLY A

8   HYPOTHESIS, AND IT WAS NOW REGARDED THAT VIOXX WAS SAFE ENOUGH

9   ON THE STOMACH TO TEST THIS THEORY IN PATIENTS WITH ALZHEIMER'S

10  COMPARED TO PLACEBO.

11          NO DRUG HAD EVER BEEN SHOWN TO RETARD THE PROGRESSION

12  OF ALZHEIMER'S, SO IT WAS PERFECTLY ETHICAL TO DO THE STUDY

13  VERSUS PLACEBO.  IT WAS A FAIRLY LARGE STUDY.

14          THE GROUP THOUGHT -- VERY SHARPLY, THEY FIGURED OUT

15  THAT THERE WERE ONLY TWO ARMS IN THE TRIAL:  TREATMENT ARM A

16  AND TREATMENT ARM B.  THEY WERE BLINDED, SO -- BUT DURING ANY

17  TRIAL, INCLUDING THIS ONE, WE ALWAYS RECORD IMMEDIATELY IN OUR

18  DATABASE ADVERSE EXPERIENCE REPORTS THAT COME IN DURING THE

19  COURSE OF THE TRIAL; AND THEREFORE, THIS DATABASE HAD

20  POTENTIALLY IN IT CARDIOVASCULAR ADVERSE EXPERIENCE REPORTS

21  FROM THE ALZHEIMER'S TRIAL, AN OLD POPULATION, PRESUMABLY WITH

22  SOME UNDERLYING HEART DISEASE.

23          SO WE SAID, "TERRIFIC.  IS THERE A WAY, WITHOUT

24  UNBLINDING THE WHOLE TRIAL, THAT WE CAN LOOK AT THIS SAFETY

25  DATA:  COLUMN A AND COLUMN B?"  IT WAS MADE CLEAR BY THE

1   STATISTICS GROUP TO ME THAT WE COULD DO THAT WITHOUT

2   COMPROMISING THE TRIAL BY JUST AGGREGATING THE DATA UNDER

3   TREATMENT A AND TREATMENT B, AND THEY WOULD ENUMERATE THE

4   CARDIOVASCULAR SIDE EFFECTS.

5          AND I SAID, "THAT'S JUST TERRIFIC.  GO DO IT RIGHT

6   AWAY.  I WANT TO KNOW THE MINUTE YOU KNOW THE ANSWER TO THIS."

7          SO THEY DID ALL THE THINGS NECESSARY TO DO THIS

8   LEGALLY, AND THEY ENUMERATED ALL THE DATA.  THEY CALLED ME 48

9   HOURS LATER IN THE EVENING SUNDAY NIGHT AND TOLD ME THAT THERE

10  WAS NO DIFFERENCE IN THE EVENT RATES IN THE TREATMENT A AND

11  TREATMENT B ARM.  THAT WAS GREATLY REASSURING.

12  **Q.**   WHY WAS THAT SIGNIFICANT TO YOU?

13  **A.**   THAT WAS SIGNIFICANT TO ME BECAUSE IT WAS, IN MY MIND, THE

14  CRITICAL PIECE OF INFORMATION TO ACCEPT THE NAPROXEN HYPOTHESIS

15  THAT THE GROUP HAD PUT FORWARD.  WE KNEW NAPROXEN COULD BE

16  POTENTIALLY CARDIOPROTECTIVE, BASED ON ALL THE DATA I'VE TALKED

17  TO YOU ABOUT, BUT I WANTED TO SEE DATA VERSUS VIOXX.  BECAUSE

18  IF THEY WERE RIGHT, VIOXX VERSUS PLACEBO SHOULD NOT HAVE BEEN

19  DIFFERENT.

20         WHEN I WAS TOLD THIS DATA, I WAS REASSURED, BUT I

21  THEN ASKED THE STATISTICIAN WHO CALLED ME, "I WANT TO KNOW NOT

22  JUST THE GROUPED DATA THAT YOU'VE GIVEN ME ON IT, I WANT TO

23  KNOW ALL THE CATEGORIES OF CARDIOVASCULAR EVENTS IN BOTH

24  TREATMENT ARMS, A AND B."  HE READ ME THOSE ON THE PHONE AND,

25  AGAIN, THEY WERE NO DIFFERENT.

1        SO I WAS REALLY RELIEVED AND REASSURED AND THOUGHT,

2   WELL, THEY ARE RIGHT; I WAS WRONG, AND THE NAPROXEN HYPOTHESIS

3   IS THE EXPLANATION FOR THIS."

4   **Q.**   DID MERCK DO ANYTHING TO LOOK AT THE OSTEOARTHRITIS DATA

5   THAT IT WAS CONTINUING TO COLLECT AT THAT POINT?

6   **A.**   YES.  WE CONTINUALLY LOOKED AT THAT DATA AS MORE AND MORE

7   PATIENTS ACCRUED FROM DIFFERENT TRIALS, UPDATED IT, DID LARGE

8   META-ANALYSES OF THE TRIALS COMPARING VIOXX TO THE OTHER

9   COMPARATORS, CONTINUALLY LOOKING TO SEE IF THERE WAS A SIGNAL,

10  AND THERE WAS NO SIGNAL.

11  **Q.**   ALL RIGHT.  DR. SCOLNICK, THEN AFTER YOU CONSIDERED THE

12  DATA ABOUT NAPROXEN, AFTER YOU CONSIDERED THE DATA ABOUT

13  FLURBIPROFEN AND THE DATA ABOUT INDOBUFEN AND THE DATA FROM THE

14  ALZHEIMER'S TRIALS COMPARING VIOXX WITH PLACEBO, WHAT DID YOU

15  CONCLUDE WAS THE BEST EXPLANATION FOR THE DIFFERENCES IN CV

16  EVENTS THAT OCCURRED IN THE VIGOR STUDY?

17  **A.**   I CONCLUDED THAT THE TEAM HAD BEEN RIGHT AND I HAD BEEN

18  WRONG:  THAT THE NAPROXEN ARM WAS LOWER THAN THE VIOXX ARM

19  BECAUSE NAPROXEN HAD BEEN CARDIOPROTECTIVE.

20  **Q.**   CAN YOU IDENTIFY THE E-MAIL THAT APPEARS TOWARDS THE

21  BOTTOM OF THIS EXHIBIT?

22  **A.**   YES, I CAN.  IT'S AN E-MAIL FROM MYSELF ON FEBRUARY 8 TO

23  DOUGLAS GREEN, ALISE REICIN, ALAN NIES, HARRY GUESS,

24  DEBORAH SHAPIRO, AND THOMAS SIMON, AND THE SUBJECT IS "TODAY."

25  **Q.**   DR. SCOLNICK, YOUR E-MAIL READS, "TO ALL" -- WELL, LET ME

1  BACK UP.  WHAT WAS THE CONTEXT OF YOUR SENDING THIS E-MAIL TO

2  THOSE INDIVIDUALS ON THIS DAY?

3  **A.**   THE CONTEXT WAS TO CONGRATULATE THEM FOR THE WONDERFUL JOB

4  THEY HAD DONE IN PRESENTING THE DATA TO THE COMMITTEE,

5  ANSWERING ALL THE QUESTIONS IN GREAT DETAIL, BEING PREPARED FOR

6  THE DETAILS THAT THE ADVISORY COMMITTEE WANTED ON ADDITIONAL

7  QUESTIONS, AND I THOUGHT THEY HAD JUST DONE A FANTASTIC JOB AND

8  I WANTED TO ENCOURAGE THEM AND TELL THEM WHAT A GREAT JOB IT

9  WAS.

10  **Q.**   YOUR E-MAIL READS:  "TO ALL.  I BIT MY NAILS ALL DAY.  YOU

11  ALL WERE FANTASTIC.  YOU MADE THEM LOOK LIKE GRADE D HIGH

12  SCHOOL STUDENTS AND YOU WON BIG, HUGE, AND COMPLETELY.  YOU

13  SHOULD BE PROUD, HAPPY, AND EXHAUSTED.  ENJOY AND BASK IN THE

14  WARMTH OF HAVING DONE AN IMPOSSIBLE JOB SUPERBLY.  ED."  DO YOU

15  SEE THAT?

16  **A.**   YES, I DO.

17  **Q.**   CAN YOU EXPLAIN TO US YOUR REFERENCE THERE TO MAKING

18  SOMEONE "LOOK LIKE GRADE D HIGH SCHOOL STUDENTS"?

19  **A.**   YES.  I WAS TRYING TO PRAISE THE TEAM IN A WAY THAT WAS

20  SIMPLY AN ANALOGY TO SOMETHING THAT HAD HAPPENED SEVERAL YEARS

21  AGO DURING OUR CRIXIVAN NDA REVIEW.

22  **Q.**   WHAT HAD HAPPENED THERE?

23  **A.**   WHEN WE PRESENTED CRIXIVAN AT A COMPARABLE FDA ADVISORY

24  COMMITTEE MEETING -- AND I DON'T RECALL THE EXACT YEAR THIS

25  WAS.  IT WAS IN THE EARLIER '90S.  IT WAS A TWO-DAY MEETING ON

1  PROTEASE INHIBITORS.  ANOTHER SPONSOR HAD PRESENTED THEIRS ON

2  THE FIRST DAY AND WE WERE PRESENTING ON THE SECOND DAY.

3              OUR PRESENTATION WAS FINISHED BY THE PHYSICIAN WHO

4  MADE IT UP, AND WHEN HE FINISHED THE FIRST HAND UP FROM THE

5  ADVISORY COMMITTEE WAS FROM SOMEONE ON THE COMMITTEE WHO SAID

6  TO OUR PRESENTER, "THAT WAS FANTASTIC.  YOU MADE THEM LOOK LIKE

7  GRADE D HIGH SCHOOL STUDENTS."

8              AND THAT WAS ALL I WAS REFERRING TO HERE.  IT WAS A

9  LAUDATORY COMMENT BY A MEMBER OF THIS PAST ADVISORY COMMITTEE,

10  AND I WAS SORT OF REMINDING THEM OF THAT COMMENT IN A KIND OF

11  JOVIAL WAY WHEN I WAS SO PROUD OF THEM FOR WHAT THEY HAD DONE.

12  **Q.**   YOU REFER LATER ON IN THIS E-MAIL TO YOUR TEAM HAVING DONE

13  "AN IMPOSSIBLE JOB SUPERBLY."  DO YOU SEE THAT?

14  **A.**   YES, I DO.

15  **Q.**   WHAT'S THE "IMPOSSIBLE JOB" THAT YOU WERE REFERRING TO?

16  **A.**   WELL, I THOUGHT THAT HAVING A PUBLIC DISCUSSION ABOUT

17  CARDIOVASCULAR EVENTS WAS A VERY DIFFICULT SUBJECT TO HANDLE

18  AND THAT THEY DID IT IN AN UNEMOTIONAL WAY WHERE IT WAS CARRIED

19  OUT IN A COMPLETELY RATIONAL DISCUSSION, WITH FULL DISCLOSURE

20  OF ALL THE DATA, WITHOUT ANYONE BECOMING EMOTIONAL ABOUT IT,

21  EITHER ON OUR SIDE OR THE COMMITTEE SIDE, SO THAT ALL THE DATA

22  COULD BE CONSIDERED RATIONALLY AND A MOST RATIONAL DECISION

23  COULD BE MADE.

24  **Q.**   DID YOU EVER SHARE YOUR -- AFTER YOU HAD SEEN ALL THE DATA

25  RELATING TO NAPROXEN AND VIOXX AND PLACEBO, DID YOU EVER SHARE

1    YOUR FEELING THAT YOU BELIEVED THERE WAS NO SAFETY PROBLEM WITH

2    VIOXX?

3    **A.**   YES.  I TOLD PEOPLE THAT ALL OF THE EVIDENCE WE HAD WAS

4    COMPLETELY CONSISTENT WITH THE FACT THAT NAPROXEN WAS

5    CARDIOPROTECTIVE, THAT ONE COULD NOT EXCLUDE ANY EFFECT OF

6    VIOXX BECAUSE THAT WAS TRYING TO PROVE THE NEGATIVE AND THAT

7    WAS VERY DIFFICULT TO DO IN SCIENCE.  THOSE WERE THE KINDS OF

8    STATEMENTS I WOULD MAKE TO PEOPLE.

9    **Q.**   DR. SCOLNICK, I WANT TO SHOW YOU A DOCUMENT THAT WE'LL

10   MARK AS EXHIBIT 105.  IT HAS THE NUMBERS MRK-ACT-0009918.  CAN

11   YOU IDENTIFY FOR US THE E-MAIL THAT APPEARS IN THE MIDDLE OF

12   THE PAGE ON EXHIBIT 105?

13   **A.**   YES.  IT'S AN E-MAIL FROM MYSELF TO ALAN NIES,

14   ALISE REICIN, AND HARRY GUESS.  THE SUBJECT IS "A WORD OF

15   PRAISE."

16   **Q.**   WHAT IS THE DATE OF THIS E-MAIL?

17   **A.**   FEBRUARY 4, 2001.

18   **Q.**   WHAT WAS THE CONTEXT FOR SENDING THIS E-MAIL TO THAT GROUP

19   ON FEBRUARY 4, 2001?

20   **A.**   I BELIEVE THEY WERE GETTING CLOSE TO THE FDA ADVISORY

21   COMMITTEE ON THE VIGOR RESULTS AND I WANTED TO TELL THEM THAT

22   THEY HAD DONE A TERRIFIC JOB AND I WAS NO LONGER WORRIED ABOUT

23   THE SAFETY OF THE DRUG AND ALL THE ISSUES THAT WE HAVE COVERED

24   AND AGAIN THANK THEM FOR THE ENORMOUS AMOUNT OF WORK THEY HAD

25   DONE SO WELL.  THEY WERE EXTREMELY THOROUGH.

725

1   Q.   YOUR E-MAIL SAYS TOWARDS THE MIDDLE, "WE ALL WORRIED TO

2   DEATH ABOUT THE CV EVENTS LAST SPRING."  THEN IT SAYS, "BUT I

3   WAS SICK AT THE THOUGHT WE MIGHT BE DOING HARM TO PATIENTS."

4   DO YOU SEE THAT?

5   A.   YES, I DO.

6   Q.   WHAT IS THAT REFERRING TO?

7   A.   IT IS REFERRING TO MY MAJOR CONCERN WHICH WAS, AS I HAVE

8   TOLD YOU EARLIER, I ALWAYS REGARDED MYSELF AS A PHYSICIAN FIRST

9   AND AS PRESIDENT OF MRL SECOND.  AND THE THOUGHT THAT I HAD

10  INITIALLY THAT VIOXX MIGHT BE HARMING PATIENTS WAS REALLY QUITE

11  UPSETTING TO ME, AND WE WORRIED ABOUT IT.  WE LOOKED FOR

12  WHETHER IT WAS THE CASE OR NOT.

13          AND AS I'VE STATED HERE, I TOLD THEM THAT.  I KNEW

14  THAT THEY ALL THOUGHT THE SAME WAY AND TOLD THEM THAT I WAS NO

15  LONGER WORRIED; THAT WE HAD DONE SO MUCH ANALYSIS AND HAD SO

16  MUCH OTHER DATA, THAT I HAD BEEN REASSURED THAT THE DRUG WAS

17  SAFE.

18  Q.   YOUR E-MAIL GOES ON TO SAY, "I KNOW EACH OF YOU WELL

19  ENOUGH TO KNOW YOU FELT THE SAME WAY.  WITH ALL THE DATA NOW

20  AVAILABLE, I AM NO LONGER WORRIED."  DO YOU SEE THAT?

21  A.   YES, I DO.

22  Q.   DID THAT REFLECT YOUR STATE OF MIND ABOUT THE SAFETY OF

23  VIOXX AS OF FEBRUARY 4, 2001?

24  A.   YES.  THAT'S WHAT I SAID IN THE E-MAIL.

25  Q.   DID MERCK CONTINUE TO STUDY AND ANALYZE DATA RELATING TO

1   VIOXX?

2   **A.**   YES.  AGAIN, OTHER ONGOING TRIALS WERE DONE, AND THEY WERE

3   ALL ANALYZED IN THE SAME WAY WITH THE SAME STANDARD OPERATING

4   PROCEDURE.

5   **Q.**   DR. SCOLNICK, CAN YOU PLEASE IDENTIFY EXHIBIT 111?

6   **A.**   YES.  IT'S AN E-MAIL FROM MYSELF TO DR. ALISE REICIN.

7   IT'S ON NOVEMBER 7, 2001.  THE SUBJECT IS "COMFORT."

8   **Q.**   DR. SCOLNICK, IN LOOKING AT THIS E-MAIL, DOES THIS REFRESH

9   YOUR MEMORY AS TO WHETHER YOU TOLD ANY OF YOUR COLLEAGUES AT

10  MERCK NEAR THE END OF 2001 THAT YOU WERE COMFORTABLE WITH THE

11  DATA AND FELT YOU DIDN'T HAVE ANY PROBLEMS WITH VIOXX?

12  **A.**   I DON'T RECALL THIS MEMO, BUT IT'S CLEAR I WROTE IT.

13  **Q.**   OKAY.  CAN YOU READ TO US WHAT IT SAYS, PLEASE.

14  **A.**   "ALISE, THANKS FOR THE UPDATE TODAY.  THE RATES IN THE

15  ALZHEIMER'S STUDY AND THE LARGE NUMBERS OF PATIENTS INCLUDED

16  MAKE WE VERY COMFORTABLE WITH THE DATA AND THAT WE DO NOT HAVE

17  ANY PROBLEMS.  MANY THANKS AGAIN.  ED."

18  **Q.**   DOES THIS E-MAIL THAT YOU WROTE ON NOVEMBER 7, 2001,

19  ACCURATELY REFLECT YOUR STATE OF MIND ABOUT THE SAFETY OF VIOXX

20  AT THAT TIME?

21  **A.**   YES, IT DOES.

22         **MR. ROBINSON:**  YOUR HONOR, I THINK NOW WE'RE GOING TO

23  PLAY THE -- JUST A VERY SHORT -- ABOUT EIGHT MINUTES OF

24  RECROSS.

25         **THE COURT:**  OKAY.  SO THIS IS THE --

1          **MR. ROBINSON:**  THIS IS THE PLAINTIFF.

2          **THE COURT:**  THIS IS THE PLAINTIFFS NOW.

3          **MR. ROBINSON:**  YES.

4          **THE COURT:**  ALL RIGHT.

5                    **REDIRECT EXAMINATION**

6    BY MR. ROBINSON:

7    **Q.**   YOU SAID IN WRITING, SIR, IN AN E-MAIL THAT, FOR VIOXX,

8    ONLY -- THE CV OUTCOMES STUDY IS THE ONLY ESSENTIAL STUDY.  AND

9    YOU WERE SAYING THAT AS OF SEPTEMBER 17, 2001, LONG AFTER THE

10   VIGOR RESULTS WERE KNOWN; CORRECT?

11   **A.**   THAT IS CORRECT.

12   **Q.**   DID MERCK RESEARCH LABS OR MERCK EVER DO A STUDY TO

13   EVALUATE ADVERSE EVENTS OF MOST CONCERN -- HEART ATTACKS AND

14   UNSTABLE ANGINA -- PRIOR TO APPROVE WHERE THEY GAVE PEOPLE

15   ASPIRIN?

16   **A.**   I'M NOT AWARE THAT THAT STUDY WAS DONE.

17   **Q.**   WHY DIDN'T YOU DO IT?

18   **A.**   I'M UNAWARE OF THIS DATA.  I DON'T KNOW WHY.  AND SO THE

19   SUGGESTION NEVER CAME UP, AND SO I CAN'T ANSWER YOUR QUESTION.

20   **Q.**   DID YOU EVER DO IT?

21   **A.**   DID WE EVALUATE VIOXX IN THE PRESENCE OF ASPIRIN?

22   **Q.**   YES.

23   **A.**   YES.  WE DID ENDOSCOPY STUDIES WITH THAT.

24   **Q.**   WHEN?

25   **A.**   AFTER THE VIGOR TRIAL.

1  **Q.**   YOU DID IT AFTER APPROVAL; RIGHT?

2  **A.**   YES.

3  **Q.**   PRIOR TO APPROVAL, YOU DIDN'T LET PEOPLE TAKE ASPIRIN IN

4  YOUR ENDOSCOPY STUDIES, DID YOU?

5  **A.**   NO.  BECAUSE WE THOUGHT ASPIRIN WOULD CLOUD THE RESULTS OF

6  THE ENDOSCOPY STUDY BECAUSE ASPIRIN IS GASTRIC IRRITATIVE.

7  **Q.**   YOU DIDN'T WANT TO GIVE PEOPLE ASPIRIN BECAUSE YOU KNEW IT

8  WOULD ELIMINATE THE GI BENEFIT OF THE DRUG?

9  **A.**   WE DID NOT THINK -- CERTAINLY, I DIDN'T THINK THAT IT

10  WOULD ELIMINATE THE COMPLETE GI BENEFIT OF THE DRUG.  IT WOULD

11  SIMPLY MAKE THE STUDIES VERY COMPLICATED TO INTERPRET.

12  **Q.**   WELL, LET'S GO THROUGH THIS, THEN, SIR.  IT CONTINUES:

13  "YET THE POSSIBILITY OF INCREASED CV EVENTS IS OF GREAT

14  CONCERN."  DO YOU SEE THAT?

15  **A.**   YES, I SEE HER COMMENTS, YES.

16  **Q.**   THEN IT STATES:  "I JUST CAN'T WAIT TO BE THE ONE TO

17  PRESENT THOSE RESULTS TO SENIOR MANAGEMENT."  SHE GAVE US

18  ANOTHER EXCLAMATION POINT, DIDN'T SHE?

19  **A.**   YES, SHE DID.

20  **Q.**   THAT'S YOU?

21  **A.**   I AM A MEMBER OF SENIOR MANAGEMENT, YES.  I'M ONE OF THE

22  SENIOR MANAGEMENT.

23  **Q.**   IT WOULDN'T HAVE MADE YOU HAPPY TO HAVE AN OUTCOMES TRIAL

24  THAT SHOWED THAT VIOXX INCREASED THE CV RATES, DID IT?

25  **A.**   OBVIOUSLY NOT.  IF I HAD KNOWN, OBVIOUSLY NOT.  NO ONE

1    WANTED TO SEE A RESULT WHERE -- A QUESTION WHETHER VIOXX
2    ELEVATED OR NAPROXEN LOWER THE RATE OF EVENTS.
3    Q.   "IT HAVE THE SOLUTION, THOUGH"; RIGHT?  IN THE NEXT
4    SENTENCE.  SHE SAYS HOW WE SOLVE THIS DILEMMA.  DOESN'T SHE?
5    DO YOU SEE THE NEXT SENTENCE, SIR?
6    A.   I SEE THE NEXT SENTENCE.
7    Q.   WHAT'S SHE SAY?
8    A.   "WHAT ABOUT THE IDEA OF EXCLUDING HIGH-RISK CV PATIENTS,
9    THOSE THAT HAVE ALREADY HAD MI, CABG, OR PTCA?  THIS MAY
10   DECREASE THE CV EVENT RATES SO THAT A DIFFERENCE BETWEEN THE
11   TWO GROUPS WOULD NOT BE EVIDENCE.  THE ONLY PROBLEM WOULD BE
12   WOULD WE BE ABLE TO RECRUIT ANY PATIENTS.  THAT'S THE REST OF
13   THE PARAGRAPH.
14   Q.   HER SOLUTION IS TO EXCLUDE HIGH-RISK CV PATIENTS, ISN'T
15   IT.
16   A.   THAT'S CORRECT.  SO THEY WOULDN'T REQUIRE LOW-DOSE
17   ASPIRIN.
18   Q.   SO YOU WOULDN'T SEE A CV EFFECT?
19   A.   SO THERE WOULDN'T BE CARDIOPROTECTIVE EFFECT OF THE NSAID
20   THAT WAS GOING TO BE COMPARED TO.  BECAUSE IT BLOCKED COX-1 AND
21   VIOXX DID NOT.  BECAUSE ASPIRIN BLOCKS COX-1.  THAT'S WHAT
22   SHE'S TALKING ABOUT.
23   Q.   WHY DON'T WE LOOK AT THE DOCUMENT, SIR.
24   A.   THAT'S WHAT SHE'S TALKING ABOUT.
25   Q.   "THIS MAY DECREASE THE CV EVENT RATE SO THAT A DIFFERENCE

1   BETWEEN THE TWO GROUPS WOULD NOT BE EVIDENT."  DO YOU SEE THAT?

2   **A.**   YES, I DO.  AND I UNDERSTAND WHAT SHE MEANT BY THAT.

3   **Q.**   SO WHAT YOU'RE DOING HERE IS YOU'RE EXCLUDING ASPIRIN SO

4   THAT YOU CAN SEE A GI BENEFIT FROM YOUR OUTCOMES TRIAL; TRUE?

5   **A.**   THAT IS CORRECT.

6   **Q.**   I'M ASKING YOU, SIR, THAT IN ASPIRIN-USING PATIENTS, THE

7   RESULTS FROM THE VIGOR TRIAL DON'T PRESENT A GI BENEFIT THAT

8   EXTENDS TO THEM; IS THAT RIGHT?

9   **A.**   YOU CANNOT EXTRAPOLATE THE MAGNITUDE OF THE BENEFIT FROM

10  THE NONLOW-DOSE ASPIRIN USING POPULATION TO A LOW-DOSE ASPIRIN

11  POPULATION.  THAT IS CORRECT.

12  **Q.**   IN FACT, YOU ACTUALLY DID DO A TEST -- VIOXX PLUS ASPIRIN,

13  COMPARED TO THE TRADITIONAL NSAIDS -- AFTER THE VIGOR TRIAL,

14  DIDN'T YOU?

15  **A.**   WE DID.  WE DID AN ENDOSCOPY STUDY.

16  **Q.**   IT DIDN'T SHOW ANY BENEFIT, DID IT?

17  **A.**   THE STUDY SHOWED THAT USING ASPIRIN IN THE PRESENCE OF

18  VIOXX ELEVATED THE RATE OVER ASPIRIN ALONE; THAT SUBSEQUENT

19  STUDIES SHOWED THAT THAT RATE WAS STILL LOWER THAN STANDARD

20  NSAID USED WITH LOW-DOSE ASPIRIN.

21  **Q.**   SIR?

22  **A.**   IT STILL SHOWED A BENEFIT, ALTHOUGH NOT AS GREAT A BENEFIT

23  AS IN THE ABSENCE OF ASPIRIN.

24  **Q.**   SIR, I'M PASSING OVER WHAT WE'VE JUST MARKED AS

25  EXHIBIT 66.  I WOULD -- I WOULD LIKE YOU TO LOOK AT THE

1  EARLIEST-IN-TIME E-MAIL.  THIS IS NOVEMBER 19, 2001, THE BOTTOM

2  OF THE FIRST PAGE?

3  **A.**  YES.

4  **Q.**  IT'S FROM YOU TO -- WHO IS THAT TO?

5  **A.**  RAYMOND GILMARTIN AND DAVID ANSTICE.

6  **Q.**  MR. GILMARTIN IS YOUR BOSS; RIGHT?

7  **A.**  YES, HE WAS.

8  **Q.**  YOU SENT IT WITH HIGH IMPORTANCE?  YOU WILL SEE IT ON THE

9  NEXT PAGE?

10  **A.**  OKAY.  YES.

11  **Q.**  IT SAYS, "RAY," AND IT SAYS DN."  YOU MEANT "AND"?

12  **A.**  YES.  I DON'T TYPE WELL.

13  **Q.**  "RAY AND DAVID, NOT A GOOD RESULT.  LOW-DOSE ASPIRIN AND

14  VIOXX EQUAL ALMOST IBUPROFEN."  THAT'S ADVIL; RIGHT?

15  **A.**  YES.

16  **Q.**  HIGHER THAN ASA ALONE?

17  **A.**  YES.

18  **Q.**  "IT IS CLEAR WHY THEIR CLASS STUDY FAILED NOW."  THAT'S

19  WITH THE CELEBREX STUDY; RIGHT?

20  **A.**  YES.

21  **Q.**  WHAT YOU'RE SAYING HERE IS, IN THE CELEBREX STUDY, THE

22  MANUFACTURERS OF CELEBREX ALLOWED ASPIRIN USERS IN THEIR STUDY;

23  RIGHT?

24  **A.**  YES, I BELIEVE THAT'S TRUE.

25  **Q.**  AND THEY SHOWED NO GI BENEFIT IN TERMS OF PUBS IN THAT

1   OUTCOMES STUDY; RIGHT?

2   **A.**   I THINK THEY SHOWED A QUANTITATIVE BENEFIT, BUT THEY DID

3   NOT GET STATISTICALLY SIGNIFICANT.

4   **Q.**   AND IF THEY DON'T HAVE STATISTICALLY SIGNIFICANCE, THAT'S

5   NOT GOOD ENOUGH FOR THE FDA, IS IT?

6   **A.**   IT WILL NOT ALLOW THEM TO MAKE A CONCLUSION THAT THE PUBS

7   ARE REDUCED; THAT IS CORRECT.

8   **Q.**   SO WHAT YOU'RE SAYING HERE IS THE REASON WHY THEY DIDN'T

9   SHOW STATISTICALLY SIGNIFICANT BENEFIT ON PUBS IS BECAUSE THEY

10  ALLOWED ASPIRIN USERS IN; RIGHT?

11  **A.**   THAT WAS HOW I INTERPRETED THEIR RESULTS, SEEING OUR

12  RESULT IN THE ENDOSCOPY STUDY.

13  **Q.**   THEN YOU CONTINUE, SAYING, "I DO NOT THINK WE SHOULD

14  ANNOUNCE THE CV OUTCOMES STUDY NOW SINCE NOW I AM NOT AT ALL

15  SURE WHAT THE DESIGN SHOULD BE."  DO YOU SEE THAT?

16  **A.**   I DO.

17  **Q.**   HOW DO THEY TIE TOGETHER, SIR?

18  **A.**   I'M NOT SURE WHAT I WAS THINKING BECAUSE -- I DON'T KNOW

19  WHAT THE DESIGN WAS AT THIS TIME, SO I REALLY CAN'T REMEMBER

20  WHAT I WAS THINKING AT THIS POINT.  BECAUSE WE WENT THROUGH

21  MANY, MANY DISCUSSIONS ABOUT DIFFERENT TRIAL DESIGNS.

22  **Q.**   WHAT YOU WERE CONCERNED ABOUT, SIR, IS IF YOU DID WHAT YOU

23  WANTED TO DO IN YOUR CV OUTCOMES TRIAL AND ALLOWED ASPIRIN IN

24  THAT TRIAL, THERE WOULD BE A MERCK-SPONSORED CLINICAL TRIAL

25  THAT WOULD SHOW THAT VIOXX IN FACT DOES NOT PREVENT PUBS IN A

1   POPULATION OF HIGH-RISK CV USERS USING ASPIRIN?  THAT'S WHAT

2   YOU WERE CONCERNED ABOUT, ISN'T IT?

3   **A.**   I AM NOT SURE WHAT I WAS THINKING BECAUSE I DON'T KNOW

4   WHAT TRIAL DESIGNS WERE BEING CONSIDERED.

5   **Q.**   WELL, YOU'D AGREE, SIR, THAT IF YOU WERE CONSIDERING A CV

6   OUTCOME TRIAL THAT WAS GOING TO ALLOW ASPIRIN USERS, THAT WOULD

7   ALSO HAVE A POTENTIAL NEGATIVE EFFECT OF REVEALING THAT VIOXX

8   DID NOT PREVENT THE INCIDENCE OF PUBS?

9   **A.**   NO.  I THINK THAT THE DATA WITHOUT ASPIRIN WOULD SHOW WHAT

10  THE MAXIMUM POTENTIAL BENEFITS OF VIOXX WOULD BE AND THAT, IN

11  THE PRESENCE OF ASPIRIN, WHAT THE DIMINUTION OF THOSE BENEFITS

12  WOULD BE.  AND IN THE SUBSEQUENT ENDOSCOPY STUDIES WE DID, THE

13  MAGNITUDE OF THE ULCER INCIDENCE WAS LESS THAN IF YOU USED THE

14  ASPIRIN WAS STILL LESS THAN WITH ANOTHER DRUG, ANOTHER

15  NONSTEROIDAL, THAT WAS NOT SELECTED.

16          **THE COURT:**  IS THAT IT?

17          **MR. ROBINSON:**  THAT'S IT.

18          **THE COURT:**   THAT COMPLETES HIS TESTIMONY.  I

19  UNDERSTAND YOU WANT TO TAKE A BREAK SO WE COULD SET UP FOR THE

20  NEXT PERSON?

21          **MR. ROBINSON:**  ALSO, BEFORE WE PUT ON THE NEXT

22  PERSON, WE'RE GOING TO OFFER THE EXHIBITS FROM HIS DEPOSITION.

23          **THE COURT:**  WE'LL DO THAT NOW, OR DO YOU WANT TO TALK

24  WITH THE DEFENDANT?  OKAY.  LET'S TAKE A BREAK AT THIS TIME.

25  WE'LL TAKE A BREAK FOR 15 MINUTES.

1          **MR. ROBINSON:**  YES, YOUR HONOR.

2          **THE DEPUTY CLERK:**  EVERYONE RISE.

3          (WHEREUPON, THE JURY EXITED THE COURTROOM.)

4          **THE COURT:**  I HAVE BEFORE ME A MOTION, A <u>DAUBERT</u>

5    QUESTIONING THE METHODOLOGY OF DR. MOYE.  I'VE HAD AN

6    OPPORTUNITY TO REVIEW THE DOCUMENTS PRESENTED TO ME AS WELL AS

7    HEAR ORAL ARGUMENT ON THIS.  I'VE CONSIDERED THE MATTER

8    CLOSELY.

9          I THINK THAT DR. MOYE IS QUALIFIED BY EDUCATION

10   AND EXPERIENCE TO RENDER OPINIONS IN THIS PARTICULAR CASE.  I

11   FEEL THE DEFENDANT'S COMPLAINTS ARE MAINLY WITH HIS CONCLUSIONS

12   AS WELL AS HIS SUPPORT FOR HIS CONCLUSIONS.  THEY ALSO DEAL

13   MORE WITH TRIAL-MANAGEMENT ISSUES.  I CAN DEAL WITH THE

14   TRIAL-MANAGEMENT ISSUES AND HAVE DEALT WITH THOSE EITHER BEFORE

15   OR DURING THE COURSE OF THE PRESENTATION.  THE OTHER AREAS THAT

16   ARE RAISED, I THINK, CAN BE PROPERLY DEALT WITH IN

17   CROSS-EXAMINATION.  SO I'LL DENY THE OBJECTION TO DR. MOYE ON

18   THE <u>DAUBERT</u> BASIS.

19         I ALSO HAVE BEFORE ME AN ISSUE REGARDING THE

20   QUESTIONING OF THE WITNESSES, AT LEAST SEVERAL WITNESSES OR ONE

21   WITNESS, ON THE BASIS OF CANCER.  I'VE PRESENTED THE TESTIMONY,

22   AND I HEARD THE TESTIMONY GIVEN BY DR. DAVID ANSTICE QUESTIONED

23   BY PLAINTIFF COUNSEL, AND I DO FEEL THAT THE PLAINTIFF COUNSEL,

24   BOTH IN COMMENTS AS WELL AS TONE, QUESTIONS THE VALIDITY OF THE

25   USE OF VIOXX OR THE DECISION TO ATTEMPT TO USE VIOXX ON CANCER

1    PATIENTS.

2                    THERE IS SOME TONE, AS WELL AS COMMENTS, THAT

3    INJECT AN AIR OR AN AURA OF DISBELIEF THAT SOMEONE WOULD

4    CONSIDER THE USE OF CANCER.  SO I THINK IT'S APPROPRIATE THAT

5    THIS BE PURSUED TO SOME EXTENT BY THE DEFENDANTS.  I DON'T WANT

6    THIS TO BE TAKING OVER THE CASE, BUT THERE ARE SOME AREAS THERE

7    THAT HAVE BEEN OPENED AND SHOULD BE, IN ALL FAIRNESS, DEALT

8    WITH ON CROSS-EXAMINATION ON THIS ISSUE.

9                    LET ME ASK COUNSEL ON THESE TWO ISSUES.  MAYBE

10   YOU COULD APPROACH THE BENCH.  I DON'T NEED THIS ON THE RECORD.

11                   (WHEREUPON, THERE WAS A BENCH CONFERENCE OUTSIDE THE

12   PRESENCE OF THE COURT REPORTER.)

13            **THE COURT:**  I ALSO HAVE A MOTION IN LIMINE BEFORE ME

14   REGARDING DR. DEMOPOLOUS.  THE PLAINTIFFS INTEND TO PUT A

15   PORTION OF HER TESTIMONY ON AND ALSO TO SHOW VIDEO NEWS RELEASE

16   AND QUESTION HER ON THAT.  THE DEFENDANTS SEEK TO INTRODUCE

17   ANOTHER PORTION, WHICH GOES INTO THE -- IT TALKS ABOUT THE

18   PARTY'S USE OF VIOXX AND HER MOTHER'S USE OF VIOXX.  IS THAT

19   BASICALLY IT?

20                   AND MY FEELING ON THE PERSONAL USE OF VIOXX IS

21   THAT IT'S SO FACT-SPECIFIC, IT DOES HAVE SOME RELEVANCE UNDER A

22   401 ANALYSIS, BUT THE 403 REALLY IS -- IS PROBLEMATIC.  TO

23   ALLOW PEOPLE TO SAY THAT THEY'VE USED VIOXX OR MEMBERS OF THEIR

24   FAMILY USED VIOXX IS PROBLEMATIC UNDER 403 BECAUSE IT'S SO

25   FACT-SPECIFIC.  WE DON'T KNOW WHAT THEIR HEALTH CONDITION WAS,

1   WHAT THEIR MONITORING CONDITION WAS, WHAT DOSAGE THEY TOOK, HOW

2   LONG THEY TOOK IT, AND THINGS OF THAT NATURE.  AND ALL OF THAT

3   IS SIGNIFICANT IN THE USE OF VIOXX.  TO ALLOW THAT IN, I WOULD

4   HAVE TO ALLOW OPPOSING COUNSEL TO TRAVERSE THAT TESTIMONY BY

5   GOING INTO THE MEDICAL BACKGROUND OF THAT INDIVIDUAL, AND WE

6   WOULD HAVE A PLAY WITHIN A PLAY, AND ONLY SHAKESPEARE DOES THAT

7   WELL.  I'M AFRAID THAT THE COURTS ARE NOT ABLE TO HANDLE ALL OF

8   THOSE THINGS.  SO I UNDERSTAND THE ISSUE, BUT I'LL DENY THAT.

9   THANK YOU VERY MUCH.

10          **MR. GOLDMAN:**  YOUR HONOR, I JUST WANTED TO MAKE ONE

11  THING CLEAR ON THIS RULING.  THE POST-IT NOTE HERE, THIS

12  DOESN'T MEAN THAT WE'VE REACHED AN AGREEMENT.  WHAT THIS MEANS

13  IS, IF YOUR HONOR ALLOWS THIS QUESTION, WHICH WE THINK SHOULD

14  BE EXCLUDED BECAUSE YOUR HONOR SUSTAINED AN OBJECTION THAT WE

15  RAISED EARLIER, THEN WE WOULD ADD THIS.  SO THIS IS ONLY IF

16  YOUR HONOR SUSTAINS THIS.

17          **MR. ROBINSON:**  AND YOU HAVE NO PROBLEM WITH CALLING

18  UP THAT -- IF YOU RULE, WE CAN PUT IT IN.  I HAVE NO PROBLEM

19  WITH HIM FOLLOWING IT UP WITH THE NEXT QUESTION.

20          **THE COURT:**  YOU WANTED TO PUT 19 AND 20.

21          **MR. GOLDMAN:**  YEAH.  BUT, JUDGE, I'M SORRY, THIS

22  SHOULDN'T HAVE BEEN ON.  WE NEED A RULING ON THIS.  AND WE

23  BELIEVE THAT IT SHOULD BE EXCLUDED FOR THE SAME REASONS

24  YOUR HONOR EXCLUDED.

25          **MR. ROBINSON:**  THE COURT ALREADY RULED THAT IT WOULD

```
 1    COME IN, BUT I WOULD HAVE NO PROBLEM WITH PLAYING THE NEXT
 2    QUESTION.
 3              THE COURT:  YOU SEE, I'M MISSING YOU.
 4              MR. GOLDMAN:  LET ME EXPLAIN.
 5              THE COURT:  YOU WANT THIS IN, AND YOU DON'T HAVE ANY
 6    PROBLEM WITH PUTTING THIS.
 7              MR. ROBINSON:  YOU CAN PUT THAT IN, YOUR HONOR.  IF
 8    YOU RULE IN MY FAVOR, YOU'RE CONSISTENT WITH YOUR PREVIOUS
 9    RULING THAT THIS SHOULD COME IN, I DON'T HAVE A PROBLEM WITH
10    HIM ADDING THAT QUESTION.
11              MR. GOLDMAN:  CAN I MAKE IT CLEAR, JUDGE?  THIS
12    QUESTION THAT'S IN RED IS A QUESTION THAT I ASKED DURING MY
13    EXAMINATION OF DR. MIKOLA.  THE ONLY REASON I ASKED THAT
14    QUESTION IS TO FOLLOW UP ON QUESTIONS THAT MR. ROBINSON ASKED
15    OF DR. MIKOLA.  YOUR HONOR SUSTAINED OUR OBJECTION TO THOSE
16    QUESTIONS THAT MR. ROBINSON ASKED AND, THEREFORE, THIS
17    DESIGNATION IS IRRELEVANT BECAUSE IT FOLLOWS UP ON
18    MR. ROBINSON'S QUESTION.
19                   THIS FOLLOW-UP IS NOT EVEN RELEVANT TO THE ISSUE
20    BEFORE YOUR HONOR.  IT'S WHETHER OR NOT THIS PARTICULAR
21    DESIGNATION SHOULD BE PERMITTED IN LIGHT OF THE FACT THAT
22    YOUR HONOR SUSTAINED AN OBJECTION THAT WE MADE TO
23    MR. ROBINSON'S QUESTIONS.
24              MR. ROBINSON:  YOU ACTUALLY OVERRULED THE OBJECTION
25    TO CERTAIN QUESTIONS ABOUT FELDENE, AND THAT'S A CONSISTENT
```

1   FOLLOW-UP WITH THAT.  AND FRANKLY, I WOULD -- WE WOULD OFFER --

2   I KNOW THEY DON'T WANT TO PUT IT IN, BUT WE WANT TO OFFER IT

3   IN, YOUR HONOR.  YOU SAID IT WAS ADMISSIBLE.

4           **THE COURT:**  YOU SEE, IN ALL CANDOR, THIS IS REALLY A

5   TWEEDLE-DUM AND TWEEDLE-DEE.  THIS IS THE SAME THING AS THIS

6   QUESTION, WHICH I ALLOWED IN.

7           **MR. ROBINSON:**  YES.

8           **THE COURT:**  I DON'T SEE WHY WE'RE HAVING THIS

9   SKIRMISH ON THIS.  I DON'T THINK THAT THIS IS EVEN -- I DON'T

10  EVEN UNDERSTAND THE ISSUE.  THIS QUESTION IS REALLY THE SAME AS

11  THIS, AND I ALLOWED THIS IN.  I OVERRULED THIS OBJECTION.

12          **MR. ROBINSON:**  YES, YOU DID.

13          **MR. GOLDMAN:**  THIS IS ACTUALLY -- THIS IS ACTUALLY A

14  DIFFERENT ISSUE.  IT'S NOT RELATING TO THAT SAME DOCUMENT,

15  JUDGE.  THIS RELATES TO A PARTICULAR DOCUMENT.

16          **MR. ROBINSON:**  BECAUSE THE CONCEPT THAT HE WOULD HAVE

17  GIVEN FELDENE --

18          **THE COURT:**  QUESTION:  "IF YOU HAD SEEN THAT BACK

19  WHEN YOU WERE PRESCRIBING MEDICINE TO MR. BARNETT --

20              "ANSWER:  YEAH.

21              "QUESTION:  -- WOULD THAT HAVE CAUSED YOU NOT TO

22  PRESCRIBE VIOXX AND INSTEAD TO PRESCRIBE" --

23              "ANSWER:  AND THE WITNESS SAYS, "IT'S QUITE

24  POSSIBLE."

25              "QUESTION:  YES, BUT IF YOU HAD KNOWN BEFORE

 1   MR. BARNETT'S HEART ATTACK THAT YOU SHOULD USE CAUTION IN

 2   PRESCRIBING VIOXX IN PATIENTS WHO HAD A MEDICAL HISTORY OF

 3   ISCHEMIC HEART DISEASE IN LIGHT OF MR. BARNETT'S JANUARY 2000

 4   ISCHEMIC EVENTS, WOULD YOU HAVE PRESCRIBED VIOXX?

 5                "ANSWER:  I DON'T BELIEVE SO."

 6          **MR. ROBINSON:**  I THINK IT'S FINE.  THE WHOLE THING,

 7   HE HAS ALREADY SAID IT.

 8          **THE COURT:**  I'LL ALLOW.

 9          **MR. ROBINSON:**  THANK YOU, YOUR HONOR.

10          **MR. BIRCHFIELD:**  WHAT TIME ARE WE COMING BACK, JUDGE?

11          **THE COURT:**  15 MINUTES.  BUT LET ME KNOW WHEN YOU'RE

12   READY.

13          **THE CLERK:**  EVERYONE RISE.

14          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

15          **THE DEPUTY CLERK:**  EVERYONE RISE.

16          **THE COURT:**  BE SEATED, PLEASE.

17          **MR. ROBINSON:**  YOUR HONOR, PLAINTIFF, WITH REGARD TO

18   THE DEPOSITION OF DR. SCOLNICK, WOULD OFFER THE FOLLOWING

19   EXHIBITS INTO EVIDENCE.  THERE HAS BEEN TWO THAT WE'VE AGREED,

20   THAT AREN'T COMING IN.  THE ONES I'M GOING TO READ HAVE BEEN

21   AGREED TO:  1.0001; 1.0002; 1.0004; 1.0010; 1.0011; 1.017;

22   1.0021; 1.0042; 1.0061; 1.0062; 1.0079; 1.0095; 1.0124; 1.0131;

23   1.0132; 1.0133; 1.0145; 1.0158; 1.0192; 1.0234; 1.0298; 1.0300;

24   1.0304; 1.0305; 1.0309; 1.0339; 1.0413; 1.0498; 1.0531; 1.0542;

25   1.1091; 1.1097; 1.1098; 1.1100; 1.1103; 1.1106; AND 1.1143.

1    THANK YOU, YOUR HONOR.

2         **MR. GOLDMAN:**  YES, YOUR HONOR.  WE HAVE ONLY THREE

3    EXHIBITS FOR DR. SCOLNICK'S DEPOSITION:  DX-186; DX-244; AND

4    DX-962.

5         **THE COURT:**  ALL RIGHT.  LET'S LET THOSE BE ADMITTED.

6         **MR. BIRCHFIELD:**  YOUR HONOR, AT THIS TIME THE

7    PLAINTIFFS CALL DR. LEM MOYE.

8         **THE COURT:**  DR. MOYE.

9         (WHEREUPON, **LEMUEL MOYE**, HAVING BEEN DULY SWORN,

10   TESTIFIED AS FOLLOWS.)

11        **THE CLERK:**  PLEASE BE SEATED AND IF YOU WOULD USE THE

12   MICROPHONE THERE IN FRONT OF YOU.  IT'S ADJUSTABLE.  WOULD YOU

13   STATE YOUR FULL NAME FOR THE RECORD.

14        **THE WITNESS:**  MY NAME IS LEMUEL, L-E-M-U-E-L, MOYE,

15   M-O-Y-E.

16        **THE DEPUTY CLERK:**  THANK YOU.

17                            **VOIR DIRE**

18   BY MR. BIRCHFIELD:

19   **Q.**   GOOD MORNING, DR. MOYE.  WOULD YOU TAKE JUST A MINUTE AND

20   INTRODUCE YOURSELF TO THE JURY, PLEASE.

21   **A.**   SURE.  I GO BY LEM.  MY NAME IS LEM MOYE.  I'M 53 YEARS

22   OLD -- I THINK -- AND I AM LIVING IN HOUSTON, TEXAS.  I'VE BEEN

23   LIVING IN HOUSTON SINCE 1984.

24   **Q.**   DR. MOYE, ARE YOU A MEDICAL DOCTOR?

25   **A.**   I AM, YES.

1   Q.   YOU HAVE A MEDICAL DEGREE?

2   A.   I DO.

3   Q.   DO YOU HAVE ANY OTHER DEGREES?

4   A.   YES.  I HAVE A MASTER'S DEGREE AND A PH.D. IN STATISTICS.

5   Q.   AND WHERE DID YOU GET YOUR PH.D.?

6   A.   I GOT MY PH.D. AT THE UNIVERSITY OF TEXAS, SCHOOL OF

7   PUBLIC HEALTH, IN 1987.

8   Q.   OKAY.  AND WHAT WAS THAT DEGREE IN?

9   A.   THAT WAS IN BIOSTATISTICS.

10  Q.   OKAY.  AND THEN YOU SAID AN MS DEGREE; IS THAT RIGHT?

11  A.   I HAVE A MASTER'S DEGREE IN STATISTICS THAT I GAINED

12  EARLIER AT PURDUE UNIVERSITY IN INDIANA IN, I THINK, 1981.

13  Q.   COULD YOU TELL THE JURY YOUR EDUCATION BACKGROUND, WHAT

14  YOU HAD TO DO TO GET THOSE DEGREES?

15  A.   SURE.  I WENT TO -- I GREW UP IN NEW YORK CITY, IN QUEENS.

16  I WENT TO PUBLIC HIGH SCHOOL.  I ATTENDED COLLEGE AT JOHNS

17  HOPKINS UNIVERSITY.  THAT'S IN BALTIMORE.  I GRADUATED IN FOUR

18  YEARS WITH A DEGREE IN MATHEMATICAL SCIENCES, A BACHELOR'S.  I

19  THEN WENT TO MEDICAL SCHOOL.  I SPENT TWO YEARS AT CORNELL,

20  THEN WENT TO INDIANA WHERE I GRADUATED IN 1978, WHERE I GOT AN

21  M.D. DEGREE.  I ENTERED A ONE-YEAR INTERNSHIP, AND AN

22  INTERNSHIP IS REQUIRED FOR PHYSICIANS TO BE LICENSED IN MOST

23  STATES, AND SO I COMPLETED MY INTERNSHIP ONE YEAR LATER THEN

24  ENTERED THE MASTER'S PROGRAM AT PURDUE UNIVERSITY AT WEST

25  LAFAYETTE IN INDIANA AND, AFTER THAT, MOVED TO HOUSTON IN 1984,

1   WHERE I ENROLLED AS A PH.D. STUDENT AT THE UNIVERSITY OF TEXAS

2   SCHOOL OF PUBLIC HEALTH AND EARNED A DEGREE, A PH.D., THREE

3   YEARS LATER, IN 1987.  AND I'VE BEEN ON THE FACULTY OF THAT

4   SCHOOL EVER SINCE.

5   **Q.**   IN WHAT DEPARTMENT?

6   **A.**   I'M IN THE DEPARTMENT OF BIOSTATISTICS.

7   **Q.**   AND, DR. MOYE, DID YOU EVER PRACTICE MEDICINE?

8   **A.**   YES, I DID.

9   **Q.**   DESCRIBE THE NATURE OF YOUR PRACTICE.

10  **A.**   YES.  I PRACTICED MEDICINE RIGHT AFTER I COMPLETED MY

11  INTERNSHIP IN INDIANA, AND THAT WAS IN 1979.  I PRACTICED

12  GENERAL MEDICINE -- FAMILY PRACTICE, GENERAL MEDICINE, UNTIL

13  1984, WHEN I MOVED TO HOUSTON.  I GAINED A LICENCE TO PRACTICE

14  MEDICINE IN TEXAS AND WAS IN GENERAL PRACTICE IN TEXAS UP UNTIL

15  MARCH 1992.

16  **Q.**   AND WHAT DID YOU DO IN MARCH OF 1992?

17  **A.**   I HAD TO MAKE A DECISION IN '92 BECAUSE I WAS INVOLVED IN

18  SO MANY DIFFERENT THINGS.  I WAS INVOLVED IN TEACHING AND

19  RESEARCH AND COMMUNITY SERVICE AT THE UNIVERSITY, AND IT REALLY

20  BECAME UNREASONABLE FOR ME TO DO ALL OF THAT ACTIVITY AND

21  ATTEMPT TO PRACTICE MEDICINE OUTSIDE THE UNIVERSITY.  AND SO I

22  DECIDED TO STOP PRACTICING MEDICINE THAT YEAR AND TO DEVOTE ALL

23  OF MY ENERGIES TO MY ACADEMIC ACTIVITY.

24  **Q.**   SO YOU SHIFTED THE FOCUS OF YOUR CAREER FROM PRACTICING

25  MEDICINE TO TEACHING AND RESEARCH?

1    **A.**   WELL, I HAD BEEN FULL-TIME AT THE UNIVERSITY SINCE 1987

2    AND HAD REALLY CUT DOWN MY MEDICAL PRACTICE WHEN I JOINED THE

3    SCHOOL AS A FACULTY MEMBER IN 1987.   WHILE I WAS A STUDENT, IT

4    WAS EASIER FOR ME TO SPEND MORE HOURS WORKING AS A PRACTICING

5    PHYSICIAN.   ONCE I BECAME A FACULTY MEMBER, IT BECAME A LITTLE

6    MORE COMPLICATED.   I WAS ABLE TO KEEP IT UP, NEVERTHELESS,

7    UNTIL 1992, WHEN I THINK I JUST REALIZED I WOULD NOT BE ABLE TO

8    CONTINUE TO DO BOTH AT AN APPROPRIATE LEVEL SATISFACTORILY, AND

9    I THEN DECIDED I HAD BETTER STOP THE PRACTICE OF MEDICINE.

10   **Q.**   SO DO YOU CURRENTLY TREAT PATIENTS ON A REGULAR BASIS?

11   **A.**   NO, I DON'T.

12   **Q.**   AND, DOCTOR, I WANT TO TALK FOR A FEW MINUTES ABOUT YOUR

13   TEACHING.   ARE YOU A FULL PROFESSOR NOW?

14   **A.**   I AM, SIR.

15   **Q.**   AND WHAT DO YOU TEACH?

16   **A.**   I TEACH EPIDEMIOLOGY AND BIOSTATISTICS.

17   **Q.**   TELL US JUST VERY BRIEFLY WHAT EPIDEMIOLOGY IS.

18   **A.**   SURE.   EPIDEMIOLOGY AND BIOSTATISTICS ARE REALLY ABOUT THE

19   SAME THING.   THEY USE DIFFERENT TOOLS.   THEY ARE ABOUT

20   IDENTIFYING THE TRUE NATURE OF THE EXPOSURE-DISEASE

21   RELATIONSHIP.   SOMETIMES EXPOSURES ARE MERELY ASSOCIATED WITH

22   DISEASES.   THEY HAPPEN TO OCCUR AT THE SAME TIME, BUT THAT'S

23   THE EXTENT OF THE RELATIONSHIP.   OTHER TIMES, THERE IS THE

24   EXPOSURE ACTUALLY CAUSES THE DISEASE.

25          EPIDEMIOLOGY AND BIOSTATISTICS HELP TO -- USING

1   DIFFERENT TOOLS, HELP TO DISTINGUISH THESE TWO RELATIONSHIPS.

2   THEIR COINCIDENTAL RELATIONSHIP REALLY ISN'T OF GREAT PUBLIC

3   HEALTH IMPORTANCE.  HOWEVER, THE CAUSAL RELATIONSHIP -- AND BY

4   "CAUSAL," I MEAN THE EXPOSURE EXCITES THE PRODUCTION OF THE

5   DISEASE.  IN THAT CIRCUMSTANCE, WE HAVE A CRITICAL PUBLIC

6   HEALTH SITUATION, AND THERE IT'S IMPORTANT FOR PUBLIC HEALTH TO

7   TAKE AIM AND ACTION.

8   Q.   DR. MOYE, WE'LL COME BACK AND GET A FULLER EXPLANATION OF

9   WHAT YOU DO AS AN EPIDEMIOLOGIST, BUT I WANT TO CONTINUE WITH

10  YOUR BACKGROUND FOR A MINUTE.  SO YOU TEACH BOTH EPIDEMIOLOGY

11  AND BIOSTATISTICS?

12  A.   YES.

13  Q.   AT WHAT SCHOOL?

14  A.   AT UNIVERSITY OF TEXAS, SCHOOL OF PUBLIC HEALTH, IN

15  HOUSTON.

16  Q.   WHAT TYPE OF STUDENTS DO YOU HAVE IN YOUR CLASSROOM?

17  A.   I HAVE STUDENTS WITH A VARIETY OF BACKGROUNDS:  I TEACH

18  PHYSICIANS WHO ARE INTERESTED IN GOING INTO RESEARCH.  I TEACH

19  GRADUATE STUDENTS WHO WANT TO GO INTO RESEARCH.  I TEACH PEOPLE

20  WHO ARE IN THE COMMUNITY, SUCH AS HEALTH AGENCY WORKERS, WHO

21  ARE INTERESTED IN UNDERSTANDING MORE ABOUT HOW TO DRAW THE

22  CORRECT CONCLUSIONS FROM STUDIES THAT THEY READ.  I ALSO TEACH

23  CLINICAL INVESTIGATORS WHO ARE INTERESTED IN TIGHTENING AND

24  AMPLIFYING THEIR RESEARCH EXPERIENCES AND THEIR RESEARCH

25  TRAINING.

1    **Q.**   IN ADDITION TO TEACHING AT THE TEXAS SCHOOL OF PUBLIC

2    HEALTH, HAVE YOU BEEN INVITED TO TEACH AT OTHER INSTITUTIONS?

3    **A.**   YES, I HAVE.

4    **Q.**   AND DESCRIBE THAT FOR US.

5    **A.**   YES.  I'VE BEEN INVITED TO GIVE LECTURES AT SCHOOLS SUCH

6    AS HARVARD.  I'VE GIVEN -- HARVARD HAS A LECTURE CALLED GRAND

7    ROUNDS WHERE THEY WILL INVITE A SPEAKER IN TO SPEAK TO THEM

8    ABOUT A PARTICULAR TOPIC THAT IS OF INTEREST TO PHYSICIANS AND

9    TO RESEARCHERS.  I WAS INVITED AND GAVE GRAND ROUNDS AT

10   HARVARD.  I'VE ALSO GIVEN A LECTURE AT THE UNIVERSITY OF

11   FLORIDA.  I'VE GIVEN A LECTURE AT THE UNIVERSITY OF NEW YORK,

12   AMONG OTHERS.

13   **Q.**   HAVE YOU RECEIVED ANY AWARDS OR HONORS FOR YOUR TEACHING?

14   **A.**   YES, I HAVE.

15   **Q.**   TELL US ABOUT THAT, PLEASE.

16   **A.**   YES.  EVERY SUMMER WE HAVE WHAT'S CALLED A "JOINT

17   STATISTICAL MEETING," WHICH IS A HUGE MEETING OF ALL THE

18   STATISTICIANS, ESSENTIALLY, AROUND THE WORLD.  AND I WAS GIVEN

19   AN AWARD FOR -- A BEST TEACHING AWARD IN 2004, TWO SUMMERS AGO.

20   **Q.**   IN ADDITION TO YOUR WORK AS A TEACHER, DO YOU ALSO DO

21   RESEARCH YOURSELF?  ARE YOU PERSONALLY INVOLVED IN DOING

22   RESEARCH?

23   **A.**   YES.

24   **Q.**   TELL US ABOUT THAT.

25   **A.**   YES.  MY RESEARCH IS ALONG TWO AVENUES:  THE FIRST AVENUE

1   IS WORKING WITH OTHER INVESTIGATORS, OTHER CARDIOLOGISTS, OTHER

2   NEUROLOGISTS, WHO ARE INTERESTED IN DESIGNING, EXECUTING, AND

3   ANALYZING A GOOD EXPERIMENT THAT WILL BE REVEALING TO THE

4   COMMUNITY ABOUT THE EFFECT OF THE EXPOSURE OR THE EFFECT OF A

5   NEW TREATMENT.  THESE ARE LARGE EFFORTS THAT INVOLVE MANY, MANY

6   INVESTIGATORS AND SEVERAL BIOSTATISTICIANS AND EPIDEMIOLOGISTS,

7   AND I AM ONE OF THE BIOSTATISTICIANS AND EPIDEMIOLOGISTS WHO

8   WORK WITH INVESTIGATORS.  I'VE DONE THIS SINCE I JOINED THE

9   FACULTY BACK IN 1987.

10           SO WORKING WITH OTHER DOCTORS IN DESIGNING AND

11   EXECUTING RESEARCH IS ONE AVENUE OF MY WORK.  THE SECOND AVENUE

12   OF MY WORK IS MY OWN PARTICULAR RESEARCH IN BIOSTATISTICS AND

13   IN MATHEMATICS.  WE'RE UNDER A GREAT DEAL OF PRESSURE NOW TO

14   USE DIMINISHING RESOURCES AS EFFICIENTLY AS POSSIBLE, THAT IS

15   TO SAY, DIMINISHING RESOURCES IN TERMS OF PATIENTS AND ALSO IN

16   TERMS OF MONEY.  AND SO WE HAVE TO HAVE THE BEST MATHEMATICAL

17   TOOLS THAT ARE AVAILABLE TO BE ABLE TO DRAW RELIABLE

18   CONCLUSIONS AS QUICKLY AS POSSIBLE, AND THAT REQUIRES RESEARCH.

19   AND THAT'S ONE AVENUE OF RESEARCH I'M INVOLVED IN.

20   **Q.**   HOW LONG HAVE YOU BEEN INVOLVED IN ACTUALLY CONDUCTING

21   CLINICAL RESEARCH?

22   **A.**   SINCE I JOINED THE FACULTY.  THE FIRST DAY I JOINED THE

23   FACULTY, I GOT INVOLVED IN CLINICAL RESEARCH.  SO THAT WAS BACK

24   IN 1987.

25   **Q.**   SO ABOUT 19 YEARS?

1    **A.**   YES, SIR.

2    **Q.**   QUICK MATH.  NOW I WANT TO TALK ABOUT YOUR INVOLVEMENT IN

3    ACTUALLY DESIGNING AND IMPLEMENTING CLINICAL TRIALS YOURSELF.

4    HAVE YOU SERVED AS A PRINCIPAL INVESTIGATOR IN CLINICAL TRIALS?

5    **A.**   YES.

6    **Q.**   WILL YOU TELL US WHAT THAT MEANS, WHAT IT MEANS TO BE A

7    PRINCIPAL INVESTIGATOR?

8    **A.**   ACTUALLY, IT'S A GOOD ONE-WORD ANSWER, AND THAT IS

9    "RESPONSIBLE."  I AM RESPONSIBLE FOR THE PROTOCOL.  I MEAN, THE

10   PROTOCOL IS THE RULE BOOK OF THE STUDY THAT DETERMINES HOW THE

11   STUDY SHOULD BE CARRIED OUT.  I'M RESPONSIBLE FOR THE CONDUCT

12   OF PEOPLE IN MY GROUP.

13           NOW, MY GROUP IS PRIMARILY -- CONSISTS PRIMARILY OF

14   OTHER BIOSTATISTICIANS AND EPIDEMIOLOGISTS AND SOME PHYSICIANS

15   AS WE COLLECT DATA, AS WE CHECK DATA, AS WE ANALYZE DATA, AND

16   AS WE HELP TO PUBLISH DATA.  I MEET REGULARLY WITH CLINICAL

17   INVESTIGATORS WHOSE RESPONSIBILITY IN THE STUDY MAY BE

18   DIFFERENT THAN MINE.  THEIR RESPONSIBILITY MAY BE SEEING THE

19   PATIENTS, ACTUALLY COLLECTING THE INFORMATION WHICH IS THEN

20   SENT TO US FOR US TO ANALYZE.  AND I MEET WITH THEM REGULARLY

21   TO TELL THEM HOW THE STUDY IS THE PROGRESSING AND, MORE

22   IMPORTANTLY, TO TELL THEM WHAT PROBLEMS ARE APPEARING AND WHAT

23   STEPS THAT WE MIGHT NEED TO TAKE TO HELP CORRECT THOSE.

24   **Q.**   HOW MANY TIMES HAVE YOU SERVED AS THE PRINCIPAL

25   INVESTIGATOR?

1  **A.**   I THINK, JUST SITTING HERE TRYING TO COUNT, MAYBE SIX

2  TIMES, FIVE OR SIX TIMES, OVER THE COURSE OF MY CAREER.

3  **Q.**   AND WHO HAS HIRED YOU TO SERVE AS A PRINCIPAL

4  INVESTIGATOR?

5  **A.**   THE GOVERNMENT.  THE FEDERAL GOVERNMENT HAS HIRED ME

6  THROUGH THE NATIONAL INSTITUTES OF HEALTH, WHICH USES TAX

7  DOLLARS TO SPONSOR GOOD RESEARCH.  ALSO, PRIVATE PHARMACEUTICAL

8  COMPANIES HAVE HIRED ME.  BRISTOL-MEYERS SQUIBB HAS HIRED ME,

9  SCHERING-PLOUGH HAS HIRED ME, SPECIFICALLY TO BE PRINCIPAL

10 INVESTIGATORS IN SOME OF THEIR STUDIES.

11 **Q.**   DR. MOYE, ARE YOU CURRENTLY SERVING AS A PRINCIPAL

12 INVESTIGATOR?

13 **A.**   I AM, SIR.

14 **Q.**   TELL US ABOUT THAT.

15 **A.**   YES.  I AM INVOLVED IN A PROGRAM WITH OTHER NEUROLOGISTS

16 TO HELP IDENTIFY NEW THERAPIES TO REDUCE THE BAD OUTCOMES, THE

17 BAD SIDE EFFECTS, OF STROKES.  THERE ARE 600,000 STROKES THAT

18 OCCUR IN THIS COUNTRY EVERY YEAR.  YOU HAVE A LOT OF WORK TO DO

19 IN STROKE THERAPY:  HELPING TO PREVENT STROKES AND WHEN THEY

20 OCCUR, HELPING TO REDUCE THEIR SIZE.  AND I AM INVOLVED WITH

21 INVESTIGATORS WHO ARE LOOKING FOR NEW THERAPIES TO WHICH OFFER

22 PROMISE AS PROCEDURES TO REDUCE THE OCCURRENCES OF STROKE OR TO

23 REDUCE THE SIZE OF THE STROKES.

24 **Q.**   DR. MOYE, ARE YOU EXPERT IN THE AREA OF CLINICAL TRIALS?

25 **A.**   I AM, SIR.

1   **Q.**   I WANT TO MOVE TO PUBLICATIONS, SIR.   HAVE YOU WRITTEN ANY

2   BOOKS?   BOOK CHAPTERS?

3   **A.**   YES, I HAVE.

4   **Q.**   TELL US, IN THE AREA OF BIOSTATISTICS AND SCIENCE, WHAT

5   BOOKS HAVE YOU WRITTEN.

6   **A.**   I STARTED WRITING BOOKS IN THE YEAR 2000.   I WROTE A BOOK

7   THAT WAS -- THE MAJORITY OF MY BOOKS ARE INTENDED FOR

8   PHYSICIANS WHO ARE INTERESTED IN DOING GOOD RESEARCH.   THE

9   FIRST BOOK I WROTE WAS CALLED STATISTICAL REASONING IN

10  MEDICINE, THE INTUITIVE P-VALUE PRIMER.

11  **Q.**   IS THAT THIS ONE, MR. MOYE?

12  **A.**   IT IS, YES.   THE NEXT BOOK I WROTE GOES BY THE ENGAGING

13  TITLE OF DIFFERENCE EQUATIONS WITH PUBLIC HEALTH APPLICATIONS.

14  IT'S AN AREA OF PUBLIC HEALTH.   IT'S A TOOL THAT IS REALLY

15  UNDERUSED IN PUBLIC HEALTH.   SO WHAT I DID WAS WRITE ABOUT THE

16  THEORY OF THESE EQUATIONS AND PROVIDE CONCRETE EXAMPLES OF HOW

17  THESE EQUATIONS MIGHT BE USED IN REAL PUBLIC-HEALTH PROBLEMS.

18  **Q.**   THAT'S THIS BOOK?

19  **A.**   THAT'S THAT ONE.   WE'LL HAVE TO WAIT UNTIL THE MOVIE COMES

20  OUT TO SEE THAT.

21  **Q.**   DID YOU WRITE ANY OTHER BOOKS?

22  **A.**   THE NEXT BOOK I WROTE IS A BOOK ON THE VERY COMPLICATED

23  PROBLEM IN CLINICAL TRIALS -- I WON'T TAKE TOO MUCH TIME TO

24  TALK ABOUT IT.   IT HAS TO DO WITH THE NUMBER OF TIMES YOU

25  ACTUALLY USE THE SAME SAMPLE TO INTERROGATE TO GET A QUESTION

1  FROM.  WE KNOW THAT SAMPLES CAN SOMETIMES MISLEAD, AND THE MORE
2  YOU INTERROGATE A SAMPLE TO GET AN ANSWER, THE MORE LIKELY YOU
3  ARE TO -- EVENTUALLY TO GET A MISLEADING ANSWER.  THIS IS A
4  HUGE PROBLEM IN CLINICAL TRIALS, WHICH ARE VERY EXPENSIVE AND,
5  OF COURSE, WANT TO GET AS MUCH AS POSSIBLE FROM THE SAMPLE.
6          IT'S CALLED THE MULTIPLE ANALYSIS ISSUE, AND I WROTE
7  AN ENTIRE TEXTBOOK ABOUT THIS WITH SOME WAYS TO ADDRESS THIS.
8  Q.   IS THAT THIS BOOK, DR. MOYE?
9  A.   YES, SIR.
10  Q.   WHAT ABOUT ANY OTHER BOOKS?
11  A.   YES.  I WROTE A -- WITH TWO OTHER INVESTIGATORS, I WROTE A
12  TEXTBOOK IN MATHEMATICAL STATISTICS.  THIS IS CERTAINLY NOT FOR
13  PHYSICIANS.  THIS IS A TEXTBOOK FOR STUDENTS WHO ARE INTERESTED
14  IN LEARNING THE DEEPER THEORY IN STATISTICS SO THAT THEY CAN
15  DEVELOP THEIR OWN NEW INNOVATIVE APPROACHES IN STATISTICS.  AND
16  THAT WAS CALLED STATISTICAL THEORY WITH MATHEMATICAL
17  APPLICATIONS.
18  Q.   THAT'S THIS ONE?
19  A.   YES.
20  Q.   DID YOU WRITE ANOTHER BOOK?
21  A.   YES.  I THEN WROTE A BOOK ABOUT THE -- A BOOK THAT SPEAKS
22  ABOUT THE PRESSURES WE HAVE IN SCIENCE AND HOW GOOD CHARACTER
23  IS BEING SQUEEZED OUT OF SCIENTISTS.  AND SO I SPENT A YEAR
24  WRITING A BOOK ABOUT HOW ONE -- TAILORED FOR JUNIOR
25  INVESTIGATORS, WHO ARE JUST TRYING TO GET ORIENTED TO THEIR

1   SCIENCE, THE SCIENCE AND THEIR CAREERS, AND THEY RECOGNIZE THAT

2   SCIENCE ISN'T WHAT THEY THOUGHT IT WOULD BE, AT LEAST ITS

3   DAY-TO-DAY OPERATION.  SO I WROTE A BOOK THAT'S CALLED FINDING

4   YOUR WAY IN SCIENCE:  HOW TO COMBINE COMPASSION, CHARACTER, AND

5   PRODUCTIVITY IN YOUR RESEARCH CAREER.

6   **Q.**   DR. MOYE, IN ADDITION TO WRITING BOOKS, HAVE YOU ALSO

7   PUBLISHED ARTICLES IN PEER-REVIEW JOURNALS?

8   **A.**   I HAVE, YES.

9   **Q.**   AND WE'VE ALREADY HEARD A LITTLE BIT OF REFERENCES IN SOME

10  VIDEO DEPOSITIONS ABOUT PEER REVIEW.  CAN YOU TELL US WHAT THE

11  PEER-REVIEW PROCESS IS?

12  **A.**   YES, I CAN.  I, LIKE EVERY OTHER SCIENTIST, BELIEVE THAT

13  MY WORK IS WORTHY OF PUBLICATION.  I MEAN, I WORK HARD AT IT.

14  I BELIEVE OTHER PEOPLE SHOULD KNOW ABOUT IT.  BUT MY WORK IS

15  NOT GOOD ENOUGH.  BECAUSE EVERY SCIENTIST BELIEVES THAT ABOUT

16  THEIR WORK.  AND SO WHAT THE SYSTEM IN PLACE SET UP WAS A

17  PROCESS BY WHICH MY WORK IS REVIEWED.

18          SO I SUBMIT A 25-PAGE MANUSCRIPT OR PAPER TO A

19  JOURNAL, AND THE JOURNAL THEN SENDS THAT PAPER OUT FOR OTHER

20  EXPERTS IN THE FIELD -- SOME OF WHICH I MAY KNOW; SOME I MAY

21  NOT KNOW -- TO ACTUALLY REVIEW IT.  AND THEY SPEND SEVERAL DAYS

22  OR WEEKS STUDYING MY WORK, STUDYING THE METHODOLOGY I USED,

23  STUDYING THE DATA I COLLECTED, TRYING TO SEE WHETHER THE

24  RESULTS I DREW WERE APPROPRIATE FOR THE DATA AND THE ANALYSIS

25  PLAN I HAD, AND THEN THEY COMMUNICATE BACK TO ME THROUGH THE

1  EDITOR WHAT THEY THINK OF MY WORK.

2       SINCE THEY ARE MY PEERS, IT'S CALLED THE PEER-REVIEW

3  PROCESS, AND THEY TELL ME EITHER MY WORK IS GREAT, IT SHOULD BE

4  PUBLISHED; IT'S NOT GREAT, IT SHOULD NOT BE PUBLISHED OR IT'S

5  DEFICIENT IN THESE MATTERS.  AND THEY SPECIFY THE MATTERS, AND

6  I HAVE THE OPTION OF EITHER WITHDRAWING THE PAPER OR CHOOSING

7  TO MAKE THE PAPER BETTER BY RESPONDING DIRECTLY TO THEIR

8  CRITIQUE.  AND IN THAT WAY, THE QUALITY OF THE RESEARCH IS

9  ELEVATED SOME.  IT'S NOT AS HIGH AS IT SHOULD BE, BUT IT IS AN

10  IMPORTANT ELEVATION IN THE QUALITY OF RESEARCH THAT'S

11  PUBLISHED.

12  Q.   DR. MOYE, HOW MANY TIMES HAVE YOU HAD AN ARTICLE THAT YOU

13  HAVE WRITTEN ACTUALLY GO THROUGH THAT PEER-REVIEW PROCESS AND

14  BE PUBLISHED IN A MEDICAL OR SCIENTIFIC JOURNAL?

15  A.   APPROXIMATELY 120 TIMES.

16  Q.   AND IN ADDITION TO HAVING ARTICLES PUBLISHED, HAVE YOU

17  SERVED AS A REVIEWER FOR OTHER ARTICLES?

18  A.   YES, IT HAVE.

19  Q.   AND CAN YOU TELL US WHAT SOME OF THE MORE SIGNIFICANT

20  JOURNALS THAT YOU HAVE SERVED AS A PEER-REVIEWER?

21  A.   I'VE SERVED AS A PEER-REVIEWER FOR THE NEW ENGLAND JOURNAL

22  OF MEDICINE; FOR LANCET, WHICH IS A MAJOR EUROPEAN JOURNAL.

23  I'VE JUST FINISHED SERVING AS AN EDITOR -- I'M SORRY, AS A

24  REVIEWER FOR THE CIRCULATION, WHICH IS THE JOURNAL OF THE

25  AMERICAN HEART ASSOCIATION.  I'VE ALSO SERVED AS A PEER

1    REVIEWER FOR ATHEROSCLEROSIS, WHICH IS ANOTHER IMPORTANT

2    JOURNAL IN CARDIOVASCULAR MEDICINE.

3    **Q.**    AND I WANT TO SHIFT NOW TO YOUR -- TO THE AREA OF

4    GOVERNMENT SERVICE.  HAVE YOU -- IN ADDITION TO TEACHING AND

5    CONDUCTING RESEARCH, HAVE YOU SERVED IN SOME CAPACITY WITH THE

6    NATIONAL INSTITUTES OF HEALTH?

7    **A.**    YES, SIR, I HAVE.

8    **Q.**    AND TELL US ABOUT THAT, PLEASE, DOCTOR.

9    **A.**    IN ADDITION TO BEING ACTUALLY FUNDED BY THE NATIONAL

10   INSTITUTES OF HEALTH TO DO RESEARCH, I HAVE WORKED WITH THEM TO

11   REVIEW THE RESEARCH OF OTHERS.  JUST AS EVERY SCIENTIST

12   BELIEVES THEIR WORK IS WORTHY, EVERY SCIENTIST BELIEVES THEIR

13   WORK IS WORTHY TO RECEIVE MONEY TO GET DONE.  AND THERE IS NOT

14   ENOUGH MONEY TO GO AROUND, AND SO THE NATIONAL INSTITUTES OF

15   HEALTH HAS A SYSTEM WHERE GRANTS OR REQUESTS FOR FUNDING FOR

16   RESEARCH HAVE TO BE REVIEWED.  AND I HAVE SERVED AS A REVIEWER

17   FOR NIH FOR MANY, MANY YEARS, AND I'VE SPENT MANY, MANY

18   MEETINGS IN WASHINGTON AND ELSEWHERE REVIEWING GRANTS WITH

19   OTHERS, TRYING TO PROVIDE THE BEST ADVICE TO NIH AS TO HOW TO

20   SPEND OUR TAX DOLLARS AND RESEARCH.

21   **Q.**    AND I THINK YOU MENTIONED EARLIER THAT YOU SERVED AS AN

22   INVESTIGATOR FOR NIH?

23   **A.**    YES, SIR.

24   **Q.**    WOULD YOU TELL US WHAT IS INVOLVED IN THAT, JUST BRIEFLY.

25   **A.**    THAT INVOLVES BEING FUNDED TO WORK WITH OTHER

1   INVESTIGATORS TO CARRY OUT CLINICAL RESEARCH PROGRAM.

2   **Q.**   OKAY.  AND WHAT WAS THE NATURE OF THE STUDIES WHERE YOU

3   SERVED AS AN INVESTIGATOR?

4   **A.**   FOR NIH, THE NATURE WERE -- EXCUSE ME, HIGH BLOOD

5   PRESSURE.  HIGH BLOOD PRESSURE, WE KNOW, IS A PUBLIC HEALTH

6   THREAT.  WE DON'T ALWAYS KNOW THE BEST WAY TO REDUCE BLOOD

7   PRESSURE.  THERE ARE LOTS OF MEDICATIONS AND PROCEDURES THAT

8   COULD BE USED -- SOME MORE EXPENSIVE THAN OTHERS; SOME MORE

9   COMPLICATED THAN OTHERS -- AND WE DON'T KNOW THE BEST WAY TO

10  REDUCE BLOOD PRESSURE.  SO THE BEST WAY TO LEARN IT IS TO STUDY

11  IT.  AND SO I WAS ASKED, WITH OTHER INVESTIGATORS, TO STUDY THE

12  BEST WAYS TO REDUCE BLOOD PRESSURE IN ONE PARTICULAR

13  POPULATION.  THIS WAS THE POPULATION WHICH WAS CONSIDERED

14  ELDERLY AT THE TIME.

15  **Q.**   AND IN ADDITION TO NIH, HAVE YOU WORKED WITH ANY OTHER

16  GOVERNMENTAL AGENCIES?

17  **A.**   YES, I HAVE.  I'VE WORKED WITH THE FOOD & DRUG

18  ADMINISTRATION.

19  **Q.**   THE FDA?

20  **A.**   YES, SIR.

21  **Q.**   WOULD YOU TELL US ABOUT YOUR INVOLVEMENT WITH THE FDA.

22  **A.**   YES.  SPECIFICALLY, I HAD BEEN ASKED TO PROVIDE ADVICE TO

23  THE FDA WITH OTHERS AS THE FDA REVIEWS NEW DRUGS OR DRUGS THAT

24  ARE ALREADY ON THE MARKET.

25  **Q.**   WE'VE HEARD A LITTLE BIT ABOUT FDA ADVISORY COMMITTEE SO

1   FAR IN THIS TRIAL.  CAN YOU TELL US WHAT AN ADVISORY COMMITTEE

2   FOR THE FDA IS?

3   **A.**   YES.  FORTUNATELY, IT'S AS EASY AS IT SOUNDS.  WE

4   PROVIDE -- WE ARE OUTSIDE EXPERTS WHO PROVIDE ADVICE TO THE

5   FDA.  THE FDA IS CHARGED UNDER LAW TO USE MODERN SCIENTIFIC

6   METHODS TO DETERMINE WHETHER DRUGS AND OTHER AGENTS ARE SAFE

7   AND EFFECTIVE.  MOST TIMES, THE FDA DOES NOT NEED ANY OUTSIDE

8   HELP TO DO THIS.  OCCASIONALLY, THOUGH, THEY DO SEEK THE

9   COUNSEL OF OTHERS, AND SO THEY HAVE CREATED THIS COLLECTION OF

10  ADVISORY COMMITTEES.

11          AND THE ADVISORY COMMITTEES MEET SEVERAL TIMES A YEAR

12  TO DISCUSS THE ISSUE THAT THE FDA IS CONCERNED ABOUT.  THESE

13  MEETINGS ARE -- ACTUALLY, THEY ARE OPEN TO THE PUBLIC, SO

14  ANYBODY CAN COME IN AND WATCH THE DISCUSSION.  IT IS A PROCESS

15  BY WHICH THE FDA SCIENTISTS HAVE A SAY IN WHAT THEY THINK

16  SHOULD HAPPEN; THE SPONSOR, THE MAKER OF THE PRODUCT, HAS THE

17  OPPORTUNITY TO MAKE A LONG, CLEAR PRESENTATION ABOUT WHAT THEY

18  THINK SHOULD HAPPEN; AND THEN THE BALANCE OF THE TIME IS SPENT

19  WITH THE ADVISORY COMMITTEE MEMBERS SPEAKING AMONG OURSELVES ON

20  A STAGE, INTO MICS IN THE OPEN, IN PUBLIC, SO THAT THE PUBLIC

21  CAN SEE SCIENTIFIC POLICY BEING CREATED AND SCIENTIFIC --

22  SCIENTIFIC MATTERS THAT SUPPORT THE POLICY BEING DISCUSSED.

23  **Q.**   HOW ARE THE MEMBERS OF THE ADVISORY COMMITTEE SELECTED?

24  **A.**   IT'S GETTING INCREASINGLY COMPLICATED.  WE ARE SELECTED

25  BASED ON OUR BACKGROUND, NUMBER ONE.  BASED ON OUR -- AND BY

1    BACKGROUND, I MEAN BASED ON OUR KNOWLEDGE AND BASED ON OUR

2    TRAINING AND BASED ON OUR EXPERIENCE IN CLINICAL TRIALS, BASED

3    ON OUR INTERACTIONS, OUR UNDERSTANDING OF THE TYPES OF DRUGS

4    THAT WILL COME UP BEFORE THE COMMITTEE.  SINCE MY -- MOST OF MY

5    EXPERIENCE WAS IN CARDIOVASCULAR, I SERVED ON THE CARDIORENAL

6    ADVISORY COMMITTEE.  CARDIORENAL JUST MEANS CARDIOVASCULAR

7    DRUGS AND DRUGS THAT INVOLVE THE KIDNEY.

8            THEN IT GOES THROUGH A RIGOROUS INTERNAL REVIEW

9    PROCESS AT THE FDA, AND SOMETIMES THE DECISION ACTUALLY GOES TO

10   THE HEAD ADMINISTRATOR OF THE FDA FOR THEM TO MAKE THE FINAL

11   DETERMINATION AS TO WHO SERVES AND WHO DOES NOT SERVE.

12   **Q.**   YOU MENTIONED THAT YOU SERVED ON THE CARDIORENAL ADVISORY

13   COMMITTEE?

14   **A.**   FOR FOUR YEARS.

15   **Q.**   WHEN WAS THAT, DR. MOYE?

16   **A.**   FROM 1995 TO 1999.

17   **Q.**   AND HAVE YOU SERVED ON ANY OTHER -- BEEN INVITED TO SERVE

18   ON ANY OTHER ADVISORY COMMITTEES FOR THE FDA?

19   **A.**   YES, I HAVE.

20   **Q.**   WHAT OTHER?

21   **A.**   I SERVED ON THE COMMITTEE THAT WAS CALLED THE PHARMACY

22   SCIENCES COMMITTEE.  I SERVED FOR TWO YEARS, AND THIS IS THE

23   COMMITTEE THAT DEALS WITH THE IMPORTANT ISSUE OF GENERIC DRUGS,

24   THE QUALITY OF GENERIC DRUGS, HOW DO WE ASSURE OURSELVES THAT

25   GENERIC DRUGS ARE AS GOOD AND AS EFFECTIVE AND AS SAFE AS THE

1  ORIGINAL PRODUCT THAT WAS ON THE MARKET.  AND SO THIS COMMITTEE

2  FOCUSED ON ISSUES INVOLVING THOSE TYPES OF -- THOSE TYPES OF

3  DRUGS.

4  **Q.**   IN SERVING ON THE ADVISORY COMMITTEES, ARE YOU INVOLVED IN

5  ASSESSING THE SAFETY AND THE EFFICACY OF DRUGS?

6  **A.**   YES.  OUR CONVERSATIONS, THE PRESENTATIONS, MADE TO THE

7  ADVISORY COMMITTEE DEAL WITH SAFETY AND EFFICACY.  THE FORMAL

8  QUESTIONS THAT WE ARE ASKED DEAL WITH SAFETY AND EFFICACY, AND

9  SO OUR DISCUSSIONS ARE ABOUT SAFETY AND EFFICACY.

10  **Q.**   ARE YOU FAMILIAR WITH THE REGULATIONS AND THE STANDARDS OF

11  THE FDA?

12  **A.**   YES, SIR, I AM.

13  **Q.**   AND IN ADDITION TO SERVING ON THE ADVISORY COMMITTEES,

14  HAVE YOU ALSO MADE PRESENTATIONS TO THE FDA?

15  **A.**   YES, I HAVE.  I MADE PRESENTATIONS ON BEHALF OF PRIVATE

16  INDUSTRY, ON BEHALF OF DRUG COMPANIES.

17  **Q.**   AND HAVE YOU BEEN CALLED ON TO SERVE AS A CONSULTANT IN

18  THE AREA OF BIOSTATISTICS TO THE FDA?

19  **A.**   YES, I HAVE.

20  **Q.**   AND, DR. MOYE, ARE YOU PAID FOR YOUR SERVICES AT THE FDA?

21  **A.**   I AM PAID, YES.  I'M PAID $150 A DAY JUST FOR MY MEETING.

22  I'M NOT PAID FOR ANY REVIEW TIME I SPEND AWAY FROM WASHINGTON

23  REVIEWING THE RECORDS THEY SEND ME.

24  **Q.**   AND DR. MOYE, ARE YOU AN EXPERT ON MATTERS RELATING TO

25  INTERACTION WITH THE FDA AND DRUG COMPANIES?

1    **A.**    YES, I AM.

2    **Q.**    ARE YOU AN EXPERT IN MATTERS DEALING WITH PRODUCT OR

3    PRODUCT LABELS?

4    **A.**    YES.  THERE ARE PARTS OF DRUGS -- THE ISSUE OF DRUG LABELS

5    COMES UP COMMONLY IN OUR DISCUSSIONS AT THE ADVISORY COMMITTEE.

6    AND IN FACT, THE FDA WILL ASK THE ADVISORY COMMITTEE MEMBERS

7    SPECIFICALLY ABOUT WHAT SHOULD GO INTO A LABEL, WHAT SHOULD THE

8    LABEL SAY ABOUT A MATTER SUCH AS CONTRAINDICATIONS, OR WHO

9    SHOULD NOT USE THE DRUG.  IT SPEAKS -- THEY ASK US VERY

10   SPECIFIC, DIRECT QUESTIONS.  AND THEY USE THE WORD "LABELING,"

11   THEY USE THE PHRASEOLOGY, THE KIND OF PHRASE THAT GO INTO A

12   LABEL, AND WE ARE ASKED TO HELP THEM CRAFT AT LEAST INITIAL

13   LABELING STATEMENTS THAT GO BACK TO THE SPONSOR.

14   **Q.**    DR. MOYE, I'M GOING TO MOVE NOW TO YOUR CONSULTING WORK.

15   YOU'VE MENTIONED THAT YOU CONSULT THE FDA.  DO YOU ALSO CONSULT

16   WITH DRUG COMPANIES?

17   **A.**    I DO.

18   **Q.**    WOULD YOU TELL US JUST VERY BRIEFLY WHAT SOME OF THE DRUG

19   COMPANIES THAT YOU'VE BEEN CALLED TO CONSULT?

20   **A.**    PROCTOR & GAMBLE, 3M, PFIZER, BRISTOL-MEYERS SQUIBB,

21   MARION MERRELL DOW, WHICH HAS BECOME EVENTUS (PH.).  THOSE ARE

22   JUST A FEW.  CURRENTLY I'M WORKING WITH A GROUP CALLED POWER 3

23   MEDICAL IN HOUSTON, AND ACTUALLY MADE A PRESENTATION ON THEIR

24   BEHALF TO THE FDA IN MAY, 2005.

25   **Q.**    AND DO YOU CONSULT WITH THESE DRUG COMPANIES IN REGARDS TO

1  CLINICAL TRIALS?

2  **A.**   YES, SIR.

3  **Q.**   AND DO YOU CHARGE THEM FOR YOUR TIME AND YOUR WORK?

4  **A.**   I DO.

5  **Q.**   AT WHAT RATE?

6  **A.**   $400 AN HOUR.

7  **Q.**   IN ADDITION TO CONSULTING WORK FOR DRUG COMPANIES, DO YOU

8  ALSO DO CONSULTING WORK AND PROVIDE EXPERTISE FOR LAWYERS LIKE

9  ME AND MARK THAT REPRESENT INDIVIDUALS?

10  **A.**   YES, I DO.

11  **Q.**   AND DO YOU CHARGE US A RATE, TOO; RIGHT?

12  **A.**   I CHARGE EVERYBODY THE SAME RATE.

13  **Q.**   $400 AN HOUR?

14  **A.**   THAT'S RIGHT.

15  **Q.**   AND ARE YOU AFFILIATED WITH AN ORGANIZATION KNOWN AS

16  SCIENTIFIC EVIDENCE?

17  **A.**   YES.

18  **Q.**   WOULD YOU TELL US WHAT SCIENTIFIC EVIDENCE IS AND DESCRIBE

19  YOUR RELATIONSHIP THERE, PLEASE.

20  **A.**   SURE.  SCIENTIFIC EVIDENCE IS A PRIVATE GROUP IN TEXAS WHO

21  PROVIDE SCIENTIFIC CONSULTATIVE SERVICES TO ATTORNEYS.  I AM A

22  CONSULTANT THROUGH THEM INSOFAR AS THAT, IN SOME LITIGATION, I

23  AGREE TO BE AN EXPERT WITNESS.  AND WHEN I AGREE TO BE AN

24  EXPERT WITNESS, SCIENTIFIC EVIDENCE HANDLES MY INTERACTIONS

25  WITH ATTORNEYS.  BY THAT I MEAN THEY GET MY WRITTEN STATEMENTS

1    TO ATTORNEYS, MY WRITTEN OPINIONS TO ATTORNEYS.  THEY -- AND

2    ALSO HANDLE ALL OF THE LOGISTICS FOR ME, ALL OF THE SCHEDULING

3    ARRANGEMENTS, THE TRAVELING ARRANGEMENTS.  THAT'S THE NATURE OF

4    MY RELATIONSHIP WITH THEM.

5    **Q.**   DID YOU FIRST BECOME INVOLVED IN THAT ASPECT SURROUNDING

6    THE FEN-PHEN LITIGATION, WHEN I SAY THAT ASPECT, IN CONSULTING

7    AND PROVIDING EXPERT TESTIMONY FOR INDIVIDUALS THAT HAD BEEN

8    IMPACTED BY THE PHARMACEUTICALS?

9    **A.**   YES.  THAT WAS IN 1998, I THINK.

10   **Q.**   AND HOW DID YOU COME TO GET INVOLVED IN THAT LITIGATION,

11   DR. MOYE?

12   **A.**   I WAS ASKED -- WELL, THE PRESIDENT OF SCIENTIFIC EVIDENCE

13   WAS A STUDENT OF MINE WHO GRADUATED -- AN EPIDEMIOLOGIST WHO

14   GRADUATED, AND SHE ASKED ME IF I WOULDN'T MIND HELPING THEM

15   TO -- I MEAN, THAT IS TO SAY, HELPING SCIENTIFIC EVIDENCE TO

16   DESIGN A STUDY THAT WOULD DETERMINE HOW STRONG THE RELATIONSHIP

17   WAS BETWEEN THE USE OF THIS DRUG AND HEART DEFECTS.

18          **MR. BECK:**  EXCUSE ME, YOUR HONOR.  I THINK WE HAVE

19   GONE WELL BEYOND THE RELEVANT QUALIFICATIONS.

20          **THE COURT:**  I SUSTAIN THAT.  LET'S GET TO AN END ON

21   THE QUALIFICATIONS, PLEASE.

22          **MR. BIRCHFIELD:**  YOUR HONOR, MAY WE APPROACH FOR JUST

23   A SECOND?

24          **THE COURT:**  YES.

25          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

DAILY COPY

1    THE BENCH.)

2         **MR. BIRCHFIELD:**  MY ONLY CONCERN HERE, YOUR HONOR, IS

3    IF WE'RE NOT -- WHEN PHIL TAKES HIM ON VOIR DIRE AND GOES INTO

4    THE WHOLE OTHER DEAL ABOUT MONEY, I NEED TO BE THE ONE THAT

5    EXPOSES THAT AND NOT HIM.

6         **MR. BECK:**  I'M NOT GOING TO DO THAT ON VOIR DIRE.

7         **MR. BIRCHFIELD:**  OKAY.  THEN THAT'S FINE.

8         **MR. BECK:**  THIS IS QUALIFICATIONS RIGHT NOW.  I DON'T

9    CARE IF YOU TALK ABOUT IT LATER.

10        **THE COURT:**  ON DIRECT, MAYBE.

11        **MR. BIRCHFIELD:**  BUT IN THE PAST, YOU'VE DONE IT ON

12   VOIR DIRE.  THAT'S THE REASON I WAS DOING THAT.

13        **Mr. Beck:**  BUT I'M A NEW MAN.

14        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

15   OPEN COURT.)

16   **BY MR. BIRCHFIELD:**

17   **Q.**  DR. MOYE, WOULD YOU DESCRIBE FOR US VERY BRIEFLY YOUR

18   QUALIFICATIONS IN THE AREA OF EPIDEMIOLOGY AND BIOSTATISTICS.

19        **MR. BECK:**  YOUR HONOR, THIS HAS BEEN ASKED AND

20   ANSWERED AT LENGTH.

21        **MR. BIRCHFIELD:**  JUST A BRIEF STATEMENT, YOUR HONOR.

22        **THE COURT:**  I'LL ALLOW A BRIEF STATEMENT.

23        **THE WITNESS:**  JUST VERY BRIEFLY, I HAVE A PH.D. IN

24   BIOSTATISTICS.  I HAVE TAKEN COURSES IN EPIDEMIOLOGY, I'VE

25   TAKEN EXAMS IN EPIDEMIOLOGY, I HAVE WORKED WITH PH.D.

1    EPIDEMIOLOGISTS, I'VE WORKED IN EPIDEMIOLOGY JOURNALS, AND I DO

2    RESEARCH WITH WELL-QUALIFIED OTHER EPIDEMIOLOGISTS AS WELL AS

3    ADVISE EPIDEMIOLOGY STUDENTS.

4    **BY MR. BIRCHFIELD:**

5    **Q.**   DR. MOYE, YOU HAVE A NOTEBOOK THERE AT THE PODIUM.  I ASK

6    YOU TO TAKE A LOOK AT EXHIBIT P50007.  YOU HAVE A COPY THERE.

7    DR. MOYE, IS THAT YOUR CURRICULUM VITAE?

8    **A.**   ACTUALLY, I'M AFRAID IT'S NOTHING.  IT'S BLANK.  THERE IS

9    NOTHING HERE.

10   **Q.**   ALL RIGHT.  LET ME GIVE YOU THIS ONE.  IS THIS A COPY OF

11   YOUR CURRICULUM VITAE?

12   **A.**   YES, IT IS.  DATED FEBRUARY 4, YES.

13         **MR. BIRCHFIELD:**  YOUR HONOR, WE OFFER PLAINTIFF'S

14   EXHIBIT 50007 INTO EVIDENCE.  IT'S DR. MOYE'S CV.

15         **MR. BECK:**  NO OBJECTION.

16         **THE COURT:**  I'LL ADMIT IT.

17         **MR. BIRCHFIELD:**  WE ALSO TENDER DR. MOYE AS AN EXPERT

18   IN THE AREA OF CLINICAL TRIALS, FDA INTERACTION WITH DRUG

19   COMPANIES, LABELING, EPIDEMIOLOGY, AND BIOSTATISTICS.

20         **THE COURT:**  ANY QUESTIONS?

21                          **TRAVERSE**

22   **BY MR. BECK:**

23   **Q.**   GOOD MORNING, DR. MOYE.

24   **A.**   GOOD MORNING, SIR.

25   **Q.**   MY NAME IS PHIL BECK.  I REPRESENT MERCK.

1   **A.**   GOOD DAY, MR. BECK.

2   **Q.**   WHEN YOU WERE PRACTICING MEDICINE BEFORE 1992, WERE YOU A

3   CARDIOLOGIST AT ANY TIME?

4   **A.**   I WAS NOT, SIR.

5   **Q.**   AND THAT IS A HEART DOCTOR; RIGHT?

6   **A.**   THAT'S RIGHT.  YES.

7   **Q.**   AND SIMILARLY, A RHEUMATOLOGIST, THAT'S SOMEONE WHO DEALS

8   WITH PEOPLE WHO HAVE ARTHRITIS AND CHRONIC PAIN; CORRECT?

9   **A.**   AND IMMUNE DISORDERS, YES.

10  **Q.**   WERE YOU A RHEUMATOLOGIST?

11  **A.**   NO, SIR.

12  **Q.**   AND PHARMACOLOGY IS THE STUDY OF HOW DRUGS INTERACT WITH

13  HUMAN BODIES.  IS THAT A FAIR SUMMARY?

14  **A.**   YES.

15  **Q.**   YOU'RE NOT A PHARMACOLOGIST, ARE YOU, SIR?

16  **A.**   I'M NOT A FORMALLY TRAINED PHARMACOLOGIST, THAT'S CORRECT.

17  **Q.**   YOU SAID THAT YOU CONSIDER YOURSELF AN EXPERT IN DRUG

18  LABELING.  HOW LONG HAVE YOU CONSIDERED YOURSELF SUCH AN

19  EXPERT?

20  **A.**   I DON'T REALLY KNOW.  I MEAN, I CERTAINLY FUNCTION THAT

21  WAY AS A -- ON THE ADVISORY COMMITTEE, BUT I MUST SAY I DON'T

22  KNOW THE DATE THAT I STARTED THINKING I WAS AN EXPERT.

23  **Q.**   YOU TALKED ABOUT HOW YOU'RE AFFILIATED WITH THIS GROUP,

24  SCIENTIFIC EVIDENCE; RIGHT?

25  **A.**   YES, YES.

1    **Q.**   AND THROUGH THEM YOU PROVIDE YOUR SERVICES AS AN EXPERT

2    WITNESS IN PHARMACEUTICAL CASES; CORRECT?

3    **A.**   YES, SIR.

4    **Q.**   AND DID YOU START WORKING WITH THEM AROUND 1999 OR SO?

5    **A.**   YES, SIR.

6    **Q.**   AND IN 1999, BEFORE YOU STARTED GIVING TESTIMONY IN

7    COURTROOMS, YOU ADMITTED THAT YOU WERE NOT AN EXPERT IN DRUG

8    LABELING; ISN'T THAT SO?

9    **A.**   WELL, I REMEMBER THIS -- AND IT'S BEEN A LONG TIME, BUT IF

10   I REMEMBER, I THINK I WAS BEING OFFERED AS -- IN A CASE THAT

11   DID NOT INVOLVE MY EXPERTISE IN LABELING.  AND SO MY ANSWER,

12   AGAIN, IF I REMEMBER CORRECTLY, WAS THAT IT WASN'T INTENDED --

13   I WASN'T GOING TO TESTIFY ABOUT LABELING MATTERS.

14   **Q.**   WELL, SINCE YOU REFER TO YOUR ANSWER, LET ME FLIP BACK

15   OVER HERE.  WHEN YOU REFERRED TO YOUR ANSWER, IT MAY BE

16   DIFFICULT TO READ, BUT WERE YOU REFERRING TO A DEPOSITION THAT

17   YOU GAVE IN 1999?

18   **A.**   YES, SIR.

19   **Q.**   AND YOU REMEMBER THAT TODAY, SITTING UP THERE?

20   **A.**   YES, I DO.

21   **Q.**   AND ON PAGE 32 OF THAT DEPOSITION, WERE YOU ASKED, "ARE

22   YOU AN EXPERT IN DRUG LABELING?" AND DID YOU ANSWER UNDER OATH,

23   "NO, SIR, I AM NOT"?

24   **A.**   THAT'S WHAT I SAID, YES, SIR.

25   **Q.**   DO YOU HAVE ANY PERSONAL CLINICAL EXPERIENCE WITH VIOXX?

1    **A.**   I DO NOT.

2    **Q.**   HAVE YOU EVER PRESCRIBED VIOXX?

3    **A.**   NO, I DID NOT.

4    **Q.**   HAVE YOU EVER PRESCRIBED ANY COX-2 INHIBITOR OTHER THAN

5    VIOXX?

6    **A.**   NO, SIR.

7    **Q.**   HAVE YOU EVER DISCUSSED WITH ANY PATIENTS OR PHYSICIANS

8    THEIR EXPERIENCES WITH VIOXX?

9    **A.**   NO, SIR.

10   **Q.**   YOU TALKED ABOUT THE KIND OF RESEARCH THAT YOU DO.  HAVE

11   YOU EVER CONDUCTED ANY RESEARCH ON VIOXX?

12   **A.**   NO.  NOT IN THE CONTEXT OF THE RESEARCH THAT I DO AT THE

13   UNIVERSITY, NO, SIR.

14   **Q.**   AND YOU MENTIONED THAT YOU HAVE BEEN INVOLVED IN CLINICAL

15   TRIALS, I BELIEVE?

16   **A.**   YES.

17   **Q.**   HAVE YOU EVER BEEN INVOLVED IN A CLINICAL TRIAL ON VIOXX?

18   **A.**   I'VE NEVER BEEN INVOLVED IN A CLINICAL TRIAL WHOSE

19   INTENTION WAS TO STUDY THE EFFECTS OF VIOXX, NO.

20   **Q.**   AND YOU TALKED ABOUT EPIDEMIOLOGICAL STUDIES.  YOU'VE DONE

21   THOSE; CORRECT?

22   **A.**   YES, SIR, I HAVE.

23   **Q.**   HAVE YOU EVER DONE AN EPIDEMIOLOGICAL STUDY ON VIOXX?

24   **A.**   NO, SIR, I HAVE NOT.

25   **Q.**   AND HAVE YOU EVER DONE ANY KIND OF BASIC SCIENCE RESEARCH

1    ON VIOXX?

2    **A.**    NO, SIR.

3    **Q.**    YOU TALKED ABOUT HOW COMPANIES SOMETIMES ASK YOU TO

4    CONSULT, NOT PLAINTIFFS LAWYERS BUT PHARMACEUTICAL COMPANIES?

5    **A.**    YES, SIR.

6    **Q.**    HAS A PHARMACEUTICAL COMPANY EVER ASKED YOU TO CONSULT ON

7    ANY COX-2 INHIBITORS?

8    **A.**    THEY HAVE NOT, NO.

9    **Q.**    YOU ALSO MENTIONED THAT YOU'VE DONE WORK FOR VARIOUS

10   GOVERNMENTAL AGENCIES; CORRECT?

11   **A.**    YES, SIR.

12   **Q.**    THE FDA WAS ONE?

13   **A.**    YES.

14   **Q.**    HAVE YOU EVER DONE ANY WORK WITH THE FDA IN CONNECTION

15   WITH VIOXX OR ANY OTHER COX-2 INHIBITOR?

16   **A.**    NO, I HAVE NOT.

17   **Q.**    AND THE NIH, THAT'S THE NATIONAL INSTITUTES OF HEALTH;

18   CORRECT?

19   **A.**    IT IS, SIR.

20   **Q.**    HAVE YOU EVER DONE ANY WORK WITH THE NATIONAL INSTITUTES

21   OF HEALTH CONCERNING VIOXX OR ANY OTHER COX-2 INHIBITOR?

22   **A.**    NO, I HAVE NOT.

23   **Q.**    AND THE ADVISORY COMMITTEE WORK THAT YOU TALKED ABOUT --

24   AND WE'VE HEARD ABOUT ADVISORY COMMITTEES FROM SOME OTHER

25   WITNESSES BEFORE YOU ARRIVED -- HAS YOUR WORK ON ADVISORY

1    COMMITTEES HAD ANYTHING WHATSOEVER TO DO WITH VIOXX OR ANY

2    OTHER COX-2 INHIBITOR?

3    **A.**   NO.   THE CARDIORENAL ADVISORY COMMITTEE DID NOT CONSIDER

4    VIOXX, AND NONE OF OUR CONVERSATIONS INVOLVED VIOXX.

5    **Q.**   YOU TALKED ABOUT WHAT YOU SAY IS YOUR EXPERTISE IN

6    LABELING.   BEFORE YOU WERE HIRED BY THE PLAINTIFFS' LAWYERS TO

7    TESTIFY ON THEIR BEHALF IN VIOXX LAWSUITS, HAVE YOU EVER

8    ACTUALLY READ THE VIOXX LABEL?

9    **A.**   I'M NOT REALLY SURE.

10   **Q.**   DO YOU REMEMBER THAT YOU TESTIFIED, OH, ABOUT THREE WEEKS

11   AGO IN ANOTHER VIOXX TRIAL IN LOS ANGELES?

12   **A.**   YES, I DO -- I'M SORRY.   YES, I DO.

13   **Q.**   DO YOU REMEMBER THEN THAT YOU SAID THAT YOU HAD NEVER READ

14   THE VIOXX LABEL BEFORE YOU WERE HIRED BY THE PLAINTIFFS'

15   LAWYERS?

16   **A.**   THEN I ACCEPT THAT ANSWER.

17   **Q.**   YOU DISCUSSED THE PEER-REVIEW PROCESS THAT IS UNDERTAKEN

18   WHEN YOU WRITE AN ARTICLE FOR A SCHOLARLY JOURNAL.   DO YOU

19   REMEMBER THAT?

20   **A.**   I DO, SIR.

21   **Q.**   AND THAT'S A PROCESS WHERE A SCIENTIST'S METHODS AND

22   CONCLUSIONS ARE REVIEWED BY OTHER SCIENTISTS, BASICALLY, AS A

23   CHECK TO SEE THAT THEY MEET THE STANDARDS OF GOOD SCIENCE;

24   RIGHT?

25   **A.**   YES.

1   Q.   NOW, THE OPINIONS THAT YOU'VE BEEN HIRED TO GIVE IN THIS

2   LITIGATION, HAVE THEY EVER BEEN PUT THROUGH THE PEER-REVIEW

3   PROCESS, WHERE OTHER SCIENTISTS WHO DON'T HAVE A FINANCIAL

4   INTEREST IN THE LITIGATION WOULD LOOK TO SEE WHETHER YOU

5   FOLLOWED THE RIGHT METHODOLOGY?

6   A.   I'M NOT SURE I UNDERSTAND YOUR QUESTION.

7   Q.   I'LL WITHDRAW IT.

8           MR. BECK:  THAT'S ALL I HAVE, YOUR HONOR.

9           THE COURT:  I'LL ALLOW HIM TO TESTIFY IN THE GENERAL

10  AREA OF CLINICAL TRIALS, BIOSTATISTICS, EPIDEMIOLOGY, AND DRUG

11  LABELING.  I'LL ACCEPT HIM AS A GENERAL EXPERT IN THOSE AREAS.

12          MR. BIRCHFIELD:  THANK YOU, YOUR HONOR.

13                     DIRECT EXAMINATION

14  BY MR. BIRCHFIELD:

15  Q.   DR. MOYE, MR. BECK SHOWED YOU A PORTION OF A DEPOSITION

16  THAT YOU GAVE IN SOME FEN-PHEN LITIGATION; IS THAT RIGHT?

17  A.   YES, SIR.

18  Q.   AND, DR. MOYE, YOU'VE BEEN CALLED TO TESTIFY AS AN EXPERT

19  IN A NUMBER OF DRUG-LITIGATION CASES; IS THAT RIGHT?

20  A.   YES, SIR.

21  Q.   AND YOU QUALIFIED AS AN EXPERT; IS THAT RIGHT?

22  A.   YES, SIR.

23  Q.   AND IN YOUR EXPERIENCE THERE, DR. MOYE, ARE THERE

24  CERTAIN -- IN SOME CASES, ARE YOU CALLED TO GIVE EXPERT

25  OPINIONS IN ONE AREA AND NOT GIVE OPINIONS IN THE OTHER AREAS?

1    **A.**   THAT'S CORRECT.  YEAH.

2    **Q.**   AND YOU WERE DESCRIBING THAT FOR US EARLIER, IS THAT

3    RIGHT, INVOLVING THE FEN-PHEN LITIGATION?

4    **A.**   YES.

5    **Q.**   WHAT DO YOU MEAN BY THAT?

6    **A.**   WELL, I SIMPLY MEAN THAT I HAVE TRAINING IN MANY DIFFERENT

7    AREAS.  THE LAWYERS THAT I WORK WITH COMMONLY DON'T NEED TO

8    DRAW ON ALL OF THOSE AREAS, AND IN THIS MAY 25, 1999 -- IN THE

9    CASE FOR WHICH THE MAY 25, 1999, DEPOSITION WAS TAKEN, I

10   BELIEVED THAT I WASN'T -- MY EXPERTISE IN LABELING WASN'T

11   NECESSARY.  AND SO I BELIEVE THEY WERE ASKING WAS I GOING TO BE

12   AN EXPERT IN THIS CASE ABOUT LABELING, AND MY ANSWER WAS NO.

13   THAT WAS THE INTENT OF MY ANSWER.

14   **Q.**   OKAY.  DR. MOYE, I WOULD LIKE FOR YOU TO DESCRIBE FOR US

15   THE CLINICAL DEVELOPMENT PROCESS OF A DRUG OR A COMPOUND ONCE A

16   COMPOUND IS CREATED.  WILL YOU TAKE US THROUGH THE CLINICAL

17   DEVELOPMENT PROCESS THAT WOULD LEAD UP TO THE SUBMISSION TO THE

18   FDA OF THAT DRUG, AND ARE YOU PREPARED TO DO THAT, DR. MOYE?

19   **A.**   I AM, SIR.

20            **MR. BIRCHFIELD:**  YOUR HONOR, MAY I USE THE EASEL?

21            **THE COURT:**  YES.

22            **MR. BIRCHFIELD:**  YOUR HONOR, MAY I ASK DR. MOYE TO

23   STEP DOWN?

24            **THE COURT:**  YES, YOU MAY STEP DOWN.  SEE IF YOU CAN

25   USE ONE OF THOSE MICROPHONES, THOUGH.  THE HANDHELD ONES.

1      **MR. BECK:**  YOUR HONOR, MAY I STEP AROUND SO I CAN

2  SEE?

3      **THE COURT:**  YES.

4      **MR. BIRCHFIELD:**  YOUR HONOR, IS THIS OKAY?

5      **THE COURT:**  THAT'S FINE.

6  BY MR. BIRCHFIELD:

7  **Q.**  DR. MOYE, WE HAVE VARIOUS STEPS OF THE CLINICAL

8  DEVELOPMENT PROCESS OF A NEW DRUG HERE; IS THAT CORRECT?

9  **A.**  YES, SIR.

10  **Q.**  AND I'M GOING TO ASK YOU, IF YOU WOULD, TO DESCRIBE THE

11  PROCESS EACH STEP OF THE WAY AND THE SIGNIFICANCE AND THE

12  PURPOSE, AND IF YOU CAN JUST FILL IN KIND OF A SHORTHAND OF THE

13  PURPOSE THERE.  WILL YOU START WITH THE PRECLINICAL TESTING?

14  **A.**  YES.  AND I WILL BE AS BRIEF AS I CAN BECAUSE, OBVIOUSLY,

15  ONE CAN TALK A LONG TIME ABOUT THIS.  THE PURPOSE IS TO

16  IDENTIFY A MOLECULE THAT CAN BE USED SAFELY AND EFFECTIVELY IN

17  HUMANS.  THAT TAKES A LOT OF TIME AND A LOT OF ENERGY BECAUSE

18  MANY MOLECULES THAT ARE INITIALLY DISCOVERED CAN'T BE USED IN

19  HUMANS.

20      SO THESE PROCESSES REALLY SERVE AS FILTERS TO FILTER

21  OUT THOSE MOLECULES THAT AREN'T GOING TO BE EFFECTIVE AND GET

22  DOWN TO THE RELATIVELY SMALL NUMBER OF MOLECULES THAT WILL BE

23  EFFECTIVE.  SO THE FIRST THING YOU HAVE TO UNDERSTAND ABOUT A

24  MOLECULE IS WHAT IT LOOKS LIKE AND IS IT STABLE?  IS IT GOING

25  TO HOLD UP IN THE LIVING BODY, OR IS IT GOING TO BE TAKEN APART

 1   INTO SOMETHING THAT'S HARMLESS OR PERHAPS INTO SOMETHING THAT'S

 2   DANGEROUS?

 3            AND SO THIS FIRST PHASE OF PRECLINICAL TESTING IS

 4   CHEMICAL AND ALSO ANIMAL TESTING.  ANIMAL TESTING IS A VERY

 5   IMPORTANT PART OF TESTING BECAUSE, EVEN THOUGH WE ARE DIFFERENT

 6   THAN ANIMALS, WE HAVE MANY SIMILARITIES.  COMPOUNDS THAT ARE

 7   FOUND TO BE VERY DANGEROUS IN ANIMALS, WE CAN'T JUSTIFY TESTING

 8   IN HUMANS, AND SO WE USE THE ANIMAL TESTING TO HELP US IDENTIFY

 9   COMPOUNDS THAT JUST ARE NOT GOING TO BE POSSIBLE TO BE STUDIED

10   IN HUMANS.

11            HOWEVER, THERE ARE A NUMBER OF COMPOUNDS THAT GET

12   THROUGH THIS PHASE.  AND ACTUALLY, IN ANIMAL TESTING, THERE ARE

13   SOME SUGGESTIONS THAT THE MEDICATION MAY BE EFFECTIVE -- MAYBE

14   THE MEDICATION HAS BEEN FOUND TO AFFECT THE BLOOD-SUGAR LEVEL

15   IN ANIMALS OR PERHAPS IT AFFECTS THE BRAIN FUNCTIONING IN

16   ANIMALS -- AND THAT LEADS SCIENTISTS TO BELIEVE THAT PERHAPS,

17   IF THE MEDICINE IS SAFE, THAT IT COULD BE STUDIED IN HUMANS.

18   Q.   DR. MOYE, THE FIRST PHASE, THE PRECLINICAL TESTING, YOU'RE

19   LOOKING AT A CHEMICAL.  YOU TEST THAT IN ANIMALS.  IS THAT

20   RIGHT?

21   A.   YES.  THAT'S RIGHT.

22   Q.   AND YOU'RE LOOKING TO SEE IF IT CAN BE SAFELY TAKEN; IS

23   THAT RIGHT?

24   A.   THAT'S RIGHT.

25   Q.   NOW, DO YOU -- ARE THESE STEPS, ARE THEY DONE IN PHASES?

1  YOU COMPLETE PRECLINICAL TESTING, TYPICALLY, BEFORE YOU MOVE TO

2  PHASE I TESTING; IS THAT RIGHT?

3  **A.**   YES, THAT'S THE TRADITIONAL APPROACH.   THIS IS A

4  SEQUENTIAL PROCESS BECAUSE WE HAVE TO LEARN FROM THE CLINICAL

5  TESTING IN ORDER TO BEGIN TESTING ON HUMANS, AND SO,

6  TRADITIONALLY, EACH PHASE OR STAGE IS COMPLETED AND ITS

7  KNOWLEDGE DIGESTED BEFORE THEY MOVE -- BEFORE THE SCIENTISTS

8  MOVE TO THE NEXT PHASE.   THAT WAY WE LEARN APPROPRIATELY FROM

9  THE PREVIOUS STAGE AND BRING THAT KNOWLEDGE INTO THE NEXT

10  STAGE.

11  **Q.**   SO, AS A COMPOUND IS TESTED IN THE PRECLINICAL TESTING,

12  YOU TAKE WHAT YOU LEARN THERE, AND THE ONES THAT YOU SEE CAN BE

13  SAFELY TAKEN, YOU WOULD MOVE TO PHASE I; IS THAT RIGHT?

14  **A.**   YES, THAT'S RIGHT.

15  **Q.**   WILL YOU TELL US ABOUT PHASE I.

16  **A.**   YES.   PHASE I IS THE FIRST LEVEL OF TESTING IN HUMANS.

17  THE SUBJECTS ARE NORMALLY VOLUNTEERS.   THESE ARE PATIENTS

18  WITHOUT DISEASE.   THESE ARE TYPICALLY YOUNG ADULTS WHO AGREE TO

19  HAVE THE COMPOUND STUDIED IN THEM.   THIS IS THE FIRST TIME THE

20  DRUG IS BEING USED IN HUMANS, AND THE TESTING IS VERY RIGOROUS,

21  BECAUSE EVEN THOUGH WE'VE LEARNED SOME THINGS IN ANIMALS SUCH

22  AS PERHAPS HOW MUCH MEDICINE SHOULD BE GIVEN, WE DON'T KNOW

23  WHAT THE EFFECTS ARE GOING TO BE IN HUMANS.   AND COMMONLY,

24  COMPOUNDS THAT LOOK LIKE THEY ARE GOING TO BE EFFECTIVE IN

25  ANIMALS CAN'T BE TOLERATED BY HUMANS.   AND SO THESE -- AND SO

1   THESE ARE -- THESE COMPOUNDS ARE GIVEN TO NORMAL VOLUNTEERS WHO

2   ARE HEALTHY AND FROM WHICH ALL MEASUREMENTS ARE OBTAINED:

3   MEASUREMENTS OF BRAIN FUNCTION, MEASUREMENTS OF THE HEART,

4   MEASUREMENTS OF THE LUNG, MEASUREMENTS OF THE ENDOCRINE, THE

5   GLAND SYSTEM, MEASUREMENTS OF THE MUSCLES AND SKELETONS AND

6   BLOOD.  EVERYTHING THAT CAN BE LEARNED ABOUT THE INTERACTION

7   BETWEEN THE COMPOUND IN HUMANS THAT'S LEARNABLE IS OBTAINED

8   FROM PHASE I STUDIES.

9   **Q.**   AND THEN COMPOUNDS THAT ARE SUCCESSFUL IN PHASE I HAVE

10  BEEN SHOWN TO BE CAPABLE OF BEING TAKEN BY HEALTHY HUMANS

11  SAFELY, THEY WOULD MOVE TO PHASE II; IS THAT RIGHT?

12  **A.**   RIGHT.  NOW, THE NEW INFORMATION THAT WE HAVE THAT WE TAKE

13  TO PHASE II IS, NUMBER ONE, HOW SAFE IS THE COMPOUND, BECAUSE

14  IF THE COMPOUND IS NOT SAFE, YOU DON'T GO TO PHASE II; AND

15  SECONDLY, WHAT DO WE THINK THIS COMPOUND IS GOING TO DO THAT'S

16  BENEFICIAL?  IF THE COMPOUND CAN BE TAKEN SAFELY BUT IT HAS NO

17  BENEFICIAL EFFECT, THEN THERE IS NO JUSTIFICATION FOR PROVIDING

18  ANY OTHER -- FOR EXPOSING ANY OTHER SUBJECTS TO IT.  AND SO AT

19  THIS -- AT THE END OF PHASE I, THERE NEEDS TO BE AN IDEA OF,

20  NUMBER ONE, THE SAFETY; AND, NUMBER TWO, WHAT'S IT GOING TO DO?

21  IS IT GOING TO BE A MEDICINE THAT PERHAPS WOULD BE A USEFUL

22  ANTIDEPRESSANT?  IS IT GOING TO BE A MEDICINE THAT WOULD BE A

23  USEFUL ANTIDIABETIC MEDICATION?

24          THAT'S IMPORTANT TO KNOW BECAUSE THE PHASE II

25  PATIENTS ARE PATIENTS WHO HAVE THE DISEASE THAT THEY THINK THE

```
 1   MEDICATION MAY HELP.  SO LET'S SAY THIS -- THESE ARE -- I'M
 2   SORRY, I'VE DRAWN OUTSIDE THE LINE.
 3   Q.   YOU'RE OKAY.
 4   A.   THESE ARE TREATABLE PATIENTS, PATIENTS -- A RELATIVELY
 5   SMALL NUMBER OF PATIENTS WHO HAVE THE CONDITION THAT THE
 6   SCIENTISTS BELIEVE THE DRUG WILL BE EFFECTIVE FOR.  AND NOW
 7   WE'RE LOOKING FOR INFORMATION ABOUT HOW MUCH MEDICATION DO WE
 8   NEED TO GIVE IN ORDER TO SEE THE EFFECT VERSUS -- THE
 9   BENEFICIAL EFFECT VERSUS HOW MUCH MEDICINE CAN THE PATIENT
10   TOLERATE BEFORE THEY HAVE TROUBLE?
11        IF THE PATIENT CAN ONLY TOLERATE A SMALL AMOUNT OF
12   THE MEDICINE, MUCH TOO LOW OF AN AMOUNT TO HAVE AN EFFECT, THEN
13   THE MEDICINE IS NOT GOING TO ABLE TO ADVANCE BEYOND THIS.  IF
14   THE MEDICINE IS RELATIVELY SAFE BUT DOESN'T REALLY HELP
15   PATIENTS WHO THEY THOUGHT -- THE SCIENTISTS THOUGHT WOULD BE
16   TREATABLE, THEN THE MEDICATION IS NOT GOING TO ADVANCE BEYOND
17   THAT.
18        SO AT THE END OF PHASE II, WE KNOW WHAT MEDICATION,
19   THE DOSES OF MEDICINE TO USE, BEGIN TO HAVE A SENSE FOR WHAT
20   SIDE EFFECTS TO LOOK FOR, AND ALSO TO KNOW WHAT BENEFICIAL
21   EFFECTS TO LOOK FOR.
22   Q.   SO PHASE I INVOLVES NORMAL VOLUNTEERS AND A VERY SMALL
23   NUMBER OF VOLUNTEERS?
24   A.   THAT'S RIGHT.
25   Q.   AND WHEN THEY ARE GIVEN THE MEDICATION, ARE THEY IN A
```

1    HOSPITAL OR IN A CLINICAL SETTING?

2    **A.**   WELL, ACTUALLY, TALKING ABOUT PHASE I PATIENTS, THESE

3    PATIENTS, THESE NORMAL VOLUNTEERS, ARE IN A VERY HYPERTECHNICAL

4    CLINIC SITUATION.  THEY ARE CALLED RESEARCH UNITS.  THESE UNITS

5    ALLOW FOR 24-HOUR AROUND-THE-CLOCK MONITORING AND CARE.  THAT'S

6    ESSENTIAL BECAUSE, AT PHASE I, WE DON'T KNOW WHAT THE EFFECTS

7    ARE GOING TO BE IN HUMANS OR HOW LONG IT'S GOING TO TAKE BEFORE

8    THEY ARE SEEN, AND SO PATIENTS ARE MEASURED REGULARLY,

9    CONTINUOUSLY, FOR 12 OR 24 OR 48 HOURS TO MAKE SURE THAT ALL

10   THAT'S LEARNABLE ABOUT THE EFFECTS OF THE MEDICINE IS LEARNED.

11   **Q.**   IN PHASE II, WHAT'S THE OBSERVATIONAL SITUATION THERE?

12   **A.**   WELL, HERE WE HAVE A LITTLE BIT MORE FUNCTION ABOUT THE

13   EFFECTS OF THE MEDICINE.  SO THESE PATIENTS DON'T HAVE TO BE

14   TAKEN FROM THEIR LIFESTYLES AND BE HOSPITALIZED AND PUT THROUGH

15   THIS PROCEDURE.  THAT OCCURS IN A CLINICAL RESEARCH UNIT.

16   THESE PATIENTS, TYPICALLY, ARE LEADING THEIR NORMAL LIVES AND

17   NOW SOME OF THEM, THOUGH, ARE GETTING THE THERAPY.  NOW, ARE

18   THEY GOING TO RECEIVE CALLS FROM PHYSICIANS AND NURSES?  THEY

19   WILL BE ENCOURAGED, OF COURSE, TO CALL, IF THEY HAVE ANYTHING

20   OCCUR THAT THEY THINK IS UNUSUAL OR WORRISOME, BUT THEY ARE

21   ALLOWED TO WORK IN THEIR ENVIRONMENT.

22   **Q.**   AND, DR. MOYE, IS THE IDEA TO TAKE THE INFORMATION THAT'S

23   LEARNED IN PHASE II BY OBSERVING THE PATIENTS BEING GIVEN THE

24   COMPOUND AND THEN FASHION YOUR PHASE III TRIALS BASED ON IT?

25   **A.**   THAT'S RIGHT.  THE IDEA IS LEARN WHAT YOU'VE LEARNED FROM

1   PHASE I AND HELP DESIGN THE BEST PHASE II STUDY, AND THEN, ONCE

2   YOU'VE COMPLETED YOUR PHASE II STUDY, TO NOW BEGIN YOUR

3   PHASE III STUDY.

4   **Q.**   AND THEN, NOW, ARE THESE -- ARE THESE PHASES, THESE ARE

5   PHASES THAT THE FDA RECOGNIZES AND CALLS FOR DRUG COMPANIES

6   SUBMITTING NEW THE DRUG APPLICATIONS?

7   **A.**   YES.  THIS IS PART OF THE COMMON LANGUAGE USED, NOT JUST

8   AT THE FDA BUT NIH, AND ALSO FOR PRIVATE PHARMACEUTICAL

9   COMPANIES.

10   **Q.**   AND THEY ARE SET UP IN THESE PHASES TO CAREFULLY EVALUATE

11   THE SAFETY AND EFFICACY OF THE DRUG; IS THAT RIGHT?

12   **A.**   AT EVERY STEP.  AT PHASE I, YOU HAVE SOME INTEREST IN

13   EFFICACY BUT YOUR FIRST AND FOREMOST CONCERN IS SAFETY.  PHASE

14   II, AFTER YOU'VE ESTABLISHED TO SOME DEGREE SOME SAFETY, YOU

15   CAN BEGIN TO FOCUS NOW A LITTLE BIT ON EFFICACY.

16   **Q.**   NOW, DR. MOYE, WHEN WE'RE IN PHASE I AND PHASE II, WHEN

17   WE'RE DEALING WITH A SMALL NUMBER OF PATIENTS, WHAT DOES THAT

18   TELL US ABOUT THE LARGER POPULATION?

19   **A.**   WELL, WHEN -- TO ANSWER YOUR QUESTION DIRECTLY, WHEN THE

20   SAMPLE IS COLLECTED APPROPRIATELY, IT CAN TELL US A GREAT DEAL.

21   WHEN THE SAMPLES ARE COLLECTED INAPPROPRIATELY, THEN THE

22   RESULTS ARE RELATIVELY MEANINGLESS.  AND SO THERE ARE

23   PRINCIPLES THAT ARE USED IN COLLECTING THE SAMPLES OF PHASE II

24   PATIENTS THAT SUGGEST THAT THE FINDINGS DON'T APPLY ONLY TO

25   THEIR RELATIVELY SMALL NUMBER OF PATIENTS THAT WERE SELECTED

1   FOR THE PHASE II STUDY BUT FROM A LARGER POPULATION OF PATIENTS

2   FROM WHICH THE PHASE II PATIENTS WERE SELECTED.

3   **Q.**    OKAY.  AND SO THEN WE MOVE TO PHASE III?  IS THAT RIGHT?

4   **A.**    YES.  AND PHASE III IS STILL BEFORE DRUG APPROVAL, BUT NOW

5   WE WANT TO PROVIDE PERSUASIVE EVIDENCE THAT THE PHASE II

6   FINDINGS COULD BE CONFIRMED.  SO HERE THE POINT IS

7   CONFIRMATION, AND I PUT AN EXCLAMATION POINT THERE BECAUSE THIS

8   IS PIVOTAL.

9           AT THE END OF PHASE II, THE SCIENTISTS UNDERSTAND,

10  THEY BELIEVE, THE EFFECTS OF THE DRUG, THE SIDE EFFECTS, AND

11  THE BENEFITS.  BUT THERE ARE A RELATIVELY SMALL NUMBER OF

12  PATIENTS THAT WERE STUDIED.  AND WE KNOW IN SCIENCE THAT

13  DIFFERENT SAMPLES WHICH HAVE DIFFERENT INDIVIDUALS AND

14  DIFFERENT EXPERIENCES CAN PRODUCE DIFFERENT RESULTS.  AND SO

15  THE POINT IS NOW TO CARRY OUT A SECOND INDEPENDENT ASSESSMENT.

16  NOW, AT THIS POINT, A LOT OF INFORMATION IS ALREADY LEARNED

17  ABOUT THE DRUG.  WE ALREADY KNOW WHAT THE BEST DOSE TO USE IS.

18  THEY ALREADY KNOW WHAT ADVERSE EVENTS THE PATIENTS SHOULD WATCH

19  OUT FOR.  THEY ALREADY KNOW WHAT THEY THINK THIS DRUG WILL BE

20  BENEFICIAL FOR AND HOW TO MEASURE THAT.  PERHAPS THAT EFFECT

21  CAN BE MEASURED IN A RELATIVELY SHORT TIME.  SOMETIMES IT MAY

22  TAKE FOUR OR FIVE YEARS TO MEASURE THE EFFECT.

23          ALL OF THIS INFORMATION THAT COMES FROM PHASE II THEN

24  GOES INTO THE DESIGN OF PHASE III.  PHASE II ESSENTIALLY SETS

25  UP THE SITUATION BY PRESENTING THE QUESTION.  PHASE III SHOULD

1  BE DESIGNED SO THAT IT CAN ANSWER THAT QUESTION FURTHER.

2  PHASE II KIND OF TEES UP THE BALL.  A GOOD, WELL-DESIGNED

3  PHASE III HITS IT TO THE HOLE.

4  **Q.**   DR. MOYE, WE'VE TALKED ABOUT PHASE I AND PHASE II, NOW

5  PHASE III.  IS THERE JUST, LIKE, ONE PHASE I TEST AND ONE PHASE

6  II TEST?

7  **A.**   FOR PHASE II STUDIES, THERE ARE TYPICALLY MULTIPLE

8  PHASE II STUDIES BECAUSE YOU DON'T KNOW WHAT DOSES TO USE, YOU

9  DON'T KNOW WHAT PATIENTS -- WHAT PATIENTS WOULD DO BEST TO USE.

10  NONE OF THAT IS REALLY KNOWN AT THE END OF PHASE I.  WE REALLY

11  JUST KNOW THAT THE DRUG IS APPARENTLY SAFE AT SOME DOSES.  AND

12  SO YOU DO MULTIPLE PHASE II STUDIES, WHICH ARE ALL FAIRLY

13  SMALL, WHICH GIVE SOME IDEA ABOUT WHAT'S HAPPENING WITH ADVERSE

14  EVENTS AND ALSO SOME IDEA ABOUT WHAT THE DRUG'S EFFECTIVENESS

15  IS.

16       SO THERE WILL BE MULTIPLE PHASE II STUDIES.  THE

17  NUMBER OF PHASE III STUDIES, THAT REALLY DEPENDS ON WHAT THE

18  CONVERSATIONS BETWEEN THE SPONSOR AND THE FDA HAVE BEEN.

19  SOMETIMES THE FDA WILL REQUIRE MULTIPLE CONFIRMATION STUDIES.

20  THEY JUST DON'T WANT ONE STUDY; THEY WANT TWO STUDIES.  MORE

21  RECENTLY, THE FDA HAS DECIDED THAT IF THEY HAVE ONE GOOD, LARGE

22  AND WELL-DESIGNED, WELL-EXECUTED, WELL-ANALYZED CONFIRMATION

23  STUDY, THAT WILL BE ENOUGH.

24  **Q.**   AND YOU MENTIONED WELL-DESIGNED AND WELL-CARRIED OUT

25  STUDIES.  DOES JUST THE SHEER NUMBER OF STUDIES THAT'S

1    CONDUCTED, DOES THAT GIVE YOU ANY ASSURANCE OF SAFETY, JUST THE
2    SHEER NUMBERS OF THE STUDY?
3    **A.**   NO, SIR.   NO.   BECAUSE THE STUDIES COULD ALL BE FLAWED,
4    AND IF THE STUDIES ARE ALL FLAWED, THEN YOU CAN'T RELY ON ANY
5    OF THE RESULTS.
6              A LITTLE BIT LIKE HAVING A COLLECTION OF BAD RADIOS
7    AND SAYING THAT YOU CAN'T PICK UP A SIGNAL AND LOOK AT ALL OF
8    THE RADIOS YOU'VE GOT.   WELL, IF THE RADIOS ARE ALL BAD, IT
9    DOESN'T MATTER IF YOU HAVE ONE OR 51.   YOU HAVE TO HAVE A GOOD,
10   SOLID RADIO TO PICK THE SIGNAL UP.
11             YOU HAVE TO HAVE A GOOD, WELL-DESIGNED, WELL-EXECUTED
12   STUDY TO REALLY PICK UP THE ADVERSE EVENTS THAT ARE PRODUCED BY
13   THESE DRUGS, BECAUSE ALL DRUGS HAVE UNDESIRABLE SIDE EFFECTS.
14   YOU HAVE TO BE ABLE TO KNOW WHAT THEY ARE SO DOCTORS CAN BE
15   INFORMED AS TO WHETHER PATIENTS SHOULD GET IT AND WHAT PATIENTS
16   SHOULD LOOK FOR.
17             ALSO, DRUGS CAN HAVE MULTIPLE BENEFICIAL EFFECTS.
18   ONCE IDENTIFIED, THE STUDIES HAVE TO BE IDENTIFIED VERY WELL.
19   **Q.**   DR. MOYE, IS IT IMPORTANT THAT THE MOVEMENT THROUGH EACH
20   OF THESE STUDIES BE GUIDED -- BE GUIDED BY SOLID SCIENTIFIC
21   PURPOSES?
22   **A.**   IN CLINICAL TRIALS, SOMETIMES WE ARE THE WORLD'S GREATEST
23   AND SADDEST AUTHORITIES.   WHEN MISTAKES ARE MADE IN EARLY PHASE
24   STUDIES, WHAT HAPPENS IS THAT MAYBE GOOD DRUGS DON'T GET TO
25   MARKET BECAUSE THE INITIAL EARLY STUDIES WERE FLAWED OR THAT,

1    UNFORTUNATELY, BAD DRUGS DO GET TO MARKET.

2           SO WE -- AGAIN AND AGAIN, IT COMES BACK TO BEING

3    PATIENT, BEING THOROUGH, MAKING SURE THAT YOU ARE TRUE TO

4    SCIENTIFIC PRINCIPLES, AND BEING WILLING TO WAIT TO ANALYZE

5    CAREFULLY THE RESULTS OF EACH OF THESE PHASES BEFORE THE

6    INFORMATION AT THE END OF THE DAY IS FINALLY SHARED WITH THE

7    SCIENTIFIC WORLD FOR THE WORLD TO REVIEW AND MAKE ITS OWN

8    DETERMINATION WHETHER IT AGREES WITH YOU ABOUT THE DRUG BEING

9    SAFE AND EFFECTIVE OR NOT.

10   **Q.**   AND WHAT ARE PHASE IV STUDIES, DOCTOR?

11   **A.**   PHASE IV STUDIES ARE CARRIED OUT AFTER THE DRUG IS ALREADY

12   ON THE MARKET.  AFTER PRECLINICAL TESTING, PHASE I, PHASE II,

13   PHASE III ARE COMPLETED, TRADITIONALLY ALL OF THIS INFORMATION

14   NOW GOES TO THE FOOD & DRUG ADMINISTRATION IN A HUGE VOLUME OF

15   DOCUMENTS CALLED THE "NEW DRUG APPLICATION," OR THE "NDA."  IT

16   CONTAINS HUNDREDS OF NOTEBOOKS, TENS OF THOUSANDS, MAYBE

17   HUNDREDS OF THOUSANDS, OF PAGES.

18           IF THE DRUG, AFTER REVIEW, GOES -- IS APPROVED, THE

19   DRUG COMPANY STILL IS RESPONSIBLE FOR MONITORING THE USE OF THE

20   DRUG.  AND BY MONITORING THE USE OF THE DRUG, THEY ARE LOOKING

21   FOR THE OCCURRENCE OF SURPRISES, EITHER GOOD SURPRISES OR BAD

22   SURPRISES.  AND PHASE IV STUDIES ARE STUDIES DESIGNED TO HELP

23   IDENTIFY THOSE SURPRISES.

24   **Q.**   SO THE PHASE IV STUDIES WOULD BE, WHAT, POST-MARKETING

25   STUDIES; IS THAT RIGHT?

1   **A.**   YES.  AFTER THE DRUG IS ALREADY APPROVED AND IT'S LEGAL TO

2   MARKET THE DRUG, THEN YOU CAN DO A PHASE IV STUDY OR

3   POST-MARKETING STUDY.

4   **Q.**   WILL YOU FILL THAT OUT FOR US, DR. MOYE.

5   **A.**   (WITNESS COMPLIES).

6   **Q.**   SO THE PRECLINICAL TESTING -- PHASE I, PHASE II, PHASE

7   III -- THOSE ARE ALL STUDIES THAT ARE CONDUCTED BEFORE THE DRUG

8   IS APPROVED FOR THE MARKET?

9   **A.**   THAT'S RIGHT.

10  **Q.**   AND DR. MOYE, THE TYPICAL SITUATION, WOULD THE TOTAL

11  NUMBER OF PATIENTS INVOLVED IN THOSE TRIALS BE SMALL OR LARGE

12  COMPARED TO WHO ULTIMATELY GETS THE DRUG?

13  **A.**   IT'S HARD TO GIVE ONE NUMBER.  IT DEPENDS ON THE

14  CLINICAL -- ON THE CLINICAL -- IT DEPENDS ON HOW NEW THE

15  COMPOUND IS.  IF THE COMPOUND IS A COMPOUND THAT HAS BEEN SEEN

16  BY THE FDA IN THE COMMUNITY BEFORE, THERE IS A SENSE OF

17  FAMILIARITY ABOUT IT AND THERE IS NO NEED TO STUDY A LOT OF

18  PATIENTS IN ORDER TO LEARN ABOUT THE DRUG BECAUSE WE THINK WE

19  KNOW ABOUT IT.

20       ON THE OTHER HAND, IF THE COMPOUND IS A COMPLETELY

21  NEW MOLECULE THAT NOBODY IN REGULATORY, IN THE FDA OR IN THE

22  SCIENTIFIC COMMUNITY OR IN THE MEDICAL COMMUNITY HAS ANY

23  EXPERIENCE WITH, THEN WE HAVE TO GET EXPERIENCE, AND WE GET

24  EXPERIENCE WITH SEEING WHAT HAPPENS IN LOTS OF PATIENTS.  SO

25  THOSE KINDS OF INVESTIGATIONS LEAD DO MANY MORE PATIENTS BEING

1    IN THESE PHASE II AND PHASE III STUDIES.

2    **Q.**   IN TERMS OF A SAFETY SIGNAL THAT IS RECOGNIZED IN PHASE I,

3    PHASE II, AND PHASE III, WHAT'S THE SIGNIFICANCE OF THAT GIVEN

4    THE FACT THAT YOU'RE DEALING WITH A SMALL NUMBER OF PATIENTS,

5    RELATIVELY SPEAKING?

6    **A.**   THE SIGNIFICANCE IS THAT THE KINDS OF -- THE INFORMATION

7    YOU GET INVOLVING A SIGNAL AT PHASE II OR PHASE III HAS

8    IMPORTANT IMPLICATIONS DOWN THE LINE.  BECAUSE IF YOU SEE IN A

9    STUDY THAT INVOLVES -- SAY A HYPOTHET THAT INVOLVES 50 PEOPLE,

10   AND YOU SEE ONE PATIENT HAD A BAD ADVERSE EVENT, YOU MAY THINK:

11   ONE PATIENT OUT OF 50.  HOW BAD IS THAT?  BUT IF THE DRUG IS

12   EVENTUALLY GOING TO BE USED IN HUNDREDS OF MILLIONS OF PEOPLE,

13   THEN THAT 1 IN 50 MULTIPLIES TO A LARGE NUMBER OF PEOPLE BEING

14   AFFECTED.

15           AND IT SEEMS TO BE A LITTLE BIT OF A PARADOX.  WE GET

16   A CALL, THE PRESENCE OF A SERIOUS ADVERSE EVENT IN A SMALL

17   NUMBER OF THE PATIENTS, IT'S EASY TO IGNORE THAT BECAUSE, AFTER

18   ALL, IT'S A SMALL NUMBER OF PATIENTS.

19           HOWEVER, WE HAVE TO KEEP IN MIND THAT THERE IS AN

20   EFFECT MULTIPLIER THAT WHEN THAT DRUG IS USED IN THOUSANDS OR

21   HUNDREDS OF THOUSANDS OR MILLIONS OF PATIENTS, YOU CAN HAVE A

22   PUBLIC HEALTH HAZARD.  AND SO THEREFORE, THE SCIENTISTS HAVE TO

23   BE ESPECIALLY VIGILANT FOR THE OCCURRENCE OF ADVERSE EVENTS,

24   SERIOUS ADVERSE EVENTS, THAT OCCUR IN THE STUDY.  BECAUSE THAT

25   MAY BE THE FIRST SIGNAL OF A PUBLIC HEALTH HAZARD THAT IS BEST

1   RESPONDED TO AT THIS POINT RATHER THAN AFTER THE DRUG HAS BEEN

2   RELEASED.

3   **Q.**   THANK YOU, DR. MOYE.  YOU CAN TAKE THE STAND FOR JUST A

4   MOMENT.  LET ME MOVE THIS OUT OF THE WAY.

5   DR. MOYE, AT THIS TIME I WANT TO SHOW YOU WHAT'S MARKED AS

6   PLAINTIFF'S EXHIBIT 732.  WILL YOU CHECK AND SEE IF THAT'S IN

7   YOUR BINDER.

8             **MR. BECK:**  I'M SORRY, ANDY.  WHAT DID YOU SAY?

9             **MR. BIRCHFIELD:**  PLAINTIFF'S EXHIBIT 732.

10            **THE WITNESS:**  YES, I HAVE IT.

11  BY MR. BIRCHFIELD:

12  **Q.**   DR. MOYE, HAVE YOU SEEN THIS DOCUMENT BEFORE?

13  **A.**   I HAVE.

14            **MR. BECK:**  YOUR HONOR, MAY WE APPROACH?

15            **THE COURT:**  SURE.

16            **MR. BECK:**   YOUR HONOR, 732 IS THE STAGE O REVIEW.

17  THIS WAS A DOCUMENT, BUT THEN IT HAS TO DO WITH ACCELERATED

18  APPROVAL OF VIOXX.  IN THE 100-PAGE REPORT FILED BY DR. MOYE,

19  THERE IS NO REFERENCE WHATSOEVER TO EXPEDITED REVIEW AND HOW

20  THAT AFFECTED THE PROCESS AND THE RACE TO MARKET WITH CELEBREX.

21  THAT WAS THE SUBJECT OF LENGTHY REPORT EXCEPTIONS AND TESTIMONY

22  BY DR. KAPIT, BUT THEY DROPPED DR. KAPIT, AND THERE IS NOTHING

23  IN THIS MAN'S REPORT ABOUT THIS DOCUMENT.

24            THE ONLY TIME THIS DOCUMENT IS CITED ANYWHERE IN

25  HIS REPORT IS IN THE PARAGRAPH THAT SAID THAT WHERE THERE WAS

1  17 HOSPITALIZATIONS IN SOME FACTUAL STATEMENT, BUT THERE IS NO
2  DISCLOSURE IN THE REPORT WHATSOEVER THAT THERE WILL BE ANYTHING
3  ABOUT RUSH TO JUDGMENT.

4             THERE IS A LOT OF CRITICISMS OF MERCK WHICH HE,
5  APPARENTLY, IS NOT GOING TO MAKE, BUT THIS TOPIC IS NOT
6  DISCLOSED ANYWHERE, AND I WOULD ASK MR. BIRCHFIELD TO POINT OUT
7  WHERE BECAUSE I SPENT ALL NIGHT READING THE REPORT TO SEE IF IT
8  WAS THERE.

9             **MR. BIRCHFIELD:**  HE DOES REFERENCE IT IN HIS REPORT.
10  THIS DOCUMENT HAS BEEN DEEMED PREADMISSIBLE.  THE EXECUTIVE
11  SUMMARY OF THIS DOCUMENT, WE HAVE JUST GONE THROUGH THE BASIS
12  THERE OF THE IMPORTANCE OF MOVING PHASE BY PHASE THROUGH THIS
13  PROCESS.  IT TALKS ABOUT THE MARKET PRESSURES TO GET THIS DRUG
14  TO MARKET FIRST, IT TALKS ABOUT A COMPRESSED AND ACCELERATED
15  CLINICAL DEVELOPMENT PROGRAM, IT TALKS ABOUT THE RISKS INVOLVED
16  WITH THE COMPRESSED AND ACCELERATED PROGRAM.  THE COMPRESSED
17  DEVELOPMENT STRATEGY HERE.  AND IT PROVIDES -- IT PROVIDES WHY.

18             IF YOU LOOK AT PAGE 64, THEY HAVE ANALYZED THE
19  DIFFERENCE BETWEEN BEING FIRST TO MARKET VERSUS SECOND TO
20  MARKET, AND AT $611 MILLION, AND THAT'S WHAT IS SHOWN RIGHT
21  HERE.  WE NEED TO SHOW THAT THROUGH THEIR CLINICAL DEVELOPMENT
22  PROGRAM.

23             AND I'M NOT ASKING HIM TO GIVE ANYTHING OTHER
24  THAN I WANT HIM TO READ, YOU KNOW, THIS PORTION HERE, AND THE
25  FACT THAT THEY COMPRESSED AND ACCELERATED -- OR THE DOCUMENTS

1   SHOWS THAT THEY COMPRESSED AND ACCELERATED THE CLINICAL

2   DEVELOPMENT PROGRAM IN WHAT HAZARDS THAT WOULD POSE.

3           **THE COURT:**  HIS POINT IS THAT WASN'T INCLUDED IN THE

4   REPORT.

5           **MR. BECK:**  IT'S IN KAPIT'S REPORT.  IT'S NOT IN HIS

6   REPORT, AND WE NEVER DEPOSED HIM ON IT BECAUSE HE WASN'T

7   DESIGNATED ON THAT ISSUE.  WE DEPOSED KAPIT.  WE HAVE GOOD

8   STUFF ON KAPIT.  THEY SENT HIM TO THE MOVIES.

9           **MR. BIRCHFIELD:**  HE DID REFERENCE IT IN HIS REPORT.

10  YESTERDAY, YESTERDAY MORNING, FIRST THING YESTERDAY MORNING I

11  TOLD PHIL EXACTLY THE DOCUMENTS THAT I INTENDED TO USE WITH

12  DR. MOYE, FOUR DOCUMENTS -- THIS DOCUMENT, THE LONG-RANGE

13  OPERATING PLAN, AND THE TWO LABELS.

14          **MR. BECK:**  AND I TOLD HIM THIS MORNING --

15          **MR. BIRCHFIELD:**  BEFORE I COULD PUT ON --

16          **MR. BECK:**  SURE.  BECAUSE I READ THE REPORT LAST

17  NIGHT, AND HE DOESN'T TALK ABOUT THIS ISSUE.

18          YOUR HONOR, I WOULD ASK MR. BIRCHFIELD TO SHOW

19  US IN THE REPORT WHERE HE TALKS ABOUT THIS TOPIC, BECAUSE HE

20  DOESN'T DO IT.

21          **MR. BIRCHFIELD:**  YOUR HONOR, I HAVE STREAMLINED HIS

22  TESTIMONY AND THIS IS ONE AREA THAT I'M GETTING INTO AS WELL AS

23  TO THE WARNING.  IT'S NOT SURPRISE BECAUSE HE'S REFERENCED THE

24  DOCUMENT IN HIS REPORT.  IT'S LISTED IN HIS DOCUMENTS THAT HE

25  REVIEWED.

1          **MR. BECK:**  YOUR HONOR, THERE WERE 5,000 DOCUMENTS

2    LISTED ON 9 CDS THAT HE CLAIMS TO HAVE REVIEWED.  IF HE SPENT

3    250 HOURS, AS HE SAID HE DID, THAT WOULD BE SOMETHING LIKE 35

4    SECONDS PER DOCUMENT AND WOULDN'T EVEN GET TO THIS PAGE.

5    YOUR HONOR, THIS SUBJECT IS NOT DISCLOSED.

6          **THE COURT:**  THAT'S THE PROBLEM THAT I'M HAVING.  YOU

7    KNOW THE RULES AS WELL AS I.  IT'S REQUIRED THAT YOU DISCLOSE

8    THE AMOUNT, AND WE'RE NOT TALKING ABOUT -- HE DOESN'T HAVE TO

9    WRITE A BOOK ON EACH ASPECT OF HIS REPORT, BUT AT LEAST HE HAS

10   TO TELEGRAPH THE OPPOSING COUNSEL SO HE CAN BE DEPOSED ON THAT

11   AREA.  IF HE WASN'T DEPOSED IN THE AREA AND IT'S NOT INCLUDED

12   IN HIS REPORT, IT'S NOT FAIR IF YOU DECIDE TO GO INTO IT.  SO

13   YOU'RE GOING TO HAVE TO DEAL WITH THIS IN ANOTHER WAY.  SO I

14   SUSTAIN THE OBJECTION.

15         **MR. BECK:**  THANK YOU, YOUR HONOR.

16   **BY MR. BIRCHFIELD:**

17   **Q.**   DR. MOYE, IN GOING THROUGH THE CLINICAL PROCESS, YOU

18   DESCRIBED FOR US THE IMPORTANCE THAT THAT BE GUIDED BY SOLID

19   SCIENTIFIC PRINCIPLES; IS THAT RIGHT?

20   **A.**   YES.

21   **Q.**   AND WOULD IT PRESENT DANGERS TO BE GUIDED, INSTEAD OF BY

22   SCIENTIFIC PRINCIPLES, BY MARKET PRESSURES?

23   **A.**   CERTAINLY.

24   **Q.**   NOW, I WANT TO MOVE TO THE FDA.  WILL YOU TELL US WHAT THE

25   ROLE OF THE FDA IS IN THE DRUG-APPROVAL PROCESS.

1   **A.**   YES.  THE FDA'S RESPONSIBILITY, THEIR CHARGE UNDER LAW, IS
2   TO USE STATE-OF-THE-ART SCIENCE TO IDENTIFY WHETHER COMPOUNDS
3   CAN BE USED SAFELY AND EFFECTIVELY.  THAT'S BEEN THEIR CHARGE
4   NOW SINCE THE EARLY 1960'S.
5   **Q.**   AND HOW DO DRUG COMPANIES INTERACT WITH THE FDA?
6   **A.**   WELL, DRUG COMPANIES ARE AN ESSENTIAL COMPONENT OF THE
7   REVIEW PROCESS, BECAUSE THE FDA DOESN'T HAVE THE RESOURCES TO
8   CARRY OUT THEIR OWN STUDIES.  THIS LITANY OF SCIENCE THAT I
9   PRESENTED TO YOU ABOUT PRECLINICAL DOWN TO PHASE IV, THE FDA
10  CAN'T DO THAT.  THE FDA HAS TO OVERVIEW TENS OF THOUSANDS OF
11  COMPOUNDS.  THEY CAN'T -- THEY DON'T HAVE THE TIME OR THE
12  RESOURCES TO BE ABLE TO DO THAT FOR EVERY COMPOUND, SO THEY,
13  THEREFORE, RELY ON THE DRUG COMPANY TO CARRY OUT THIS RESEARCH
14  AND TO REPORT ALL OF THE RESULTS FROM THAT RESEARCH TO THE FDA.
15  SO THE INTERACTION BETWEEN THE FDA AND THE SPONSOR IS A TIGHT
16  ONE THAT ACTUALLY STARTS DURING PRECLINICAL.

17          NOW, I DON'T WANT TO LEAVE YOU WITH THE IMPRESSION
18  THAT THE SPONSOR DOES ALL THIS IN ISOLATION AND THEN DROPS A
19  HUGE NUMBER OF BOXES ON THE FDA'S DOORSTOP (SIC) ONE MORNING.
20  THEY ARE WORKING TIGHTLY WITH THE FDA, FROM PRECLINICAL DOWN
21  INTO PHASE I, AND REPORT -- THEY REPORT THE RESULTS OF PHASE I.
22  THEY TALK ABOUT THE DESIGN OF THE PHASE II STUDY WITH THE FDA.
23  THE FDA HAS THE OPPORTUNITY TO PROVIDE ITS INPUT, SAYS WHAT IT
24  WOULD LIKE TO SEE FROM PHASE II.  THE DRUG COMPANY GOES BACK,
25  ACCEPTS THE ADVICE OR NOT, GOES THROUGH PHASE III, AND THEN

1    COMES BACK WITH EVERYTHING FOR THE FDA TO REVIEW.

2          SO THE INTERACTION REALLY SHOULD BE A TIGHT ONE, AND

3    THERE MUST BE AN OPEN AND AN HONEST ONE.  BECAUSE ANY

4    DISHONESTY THAT OCCURS AT PHASE -- PRECLINICAL OR PHASE I, OF

5    COURSE, IS GOING TO CONTAMINATE THE REST OF THE DISCUSSIONS.

6    **Q.**  SO ALL OF THESE STUDIES, ALL OF THESE TESTS THAT ARE DONE

7    THROUGH THE END OF PHASE III, THEY ARE CONDUCTED BY THE DRUG

8    COMPANY THAT'S SUBMITTING THE APPLICATION; IS THAT RIGHT?

9    **A.**  THAT'S RIGHT.  IT'S THE DRUG COMPANY'S DRUG.  THEY USE

10    THEIR OWN RESOURCES TO IDENTIFY THE DRUG, IDENTIFY THE

11    PATIENTS, WORKUP THE COMPOUND, COLLECT THE RESULTS, THEY

12    ANALYZE THE RESULTS ON THEIR OWN AND IT IS THEIR CLINICAL

13    PROGRAM.  IT'S NOT THE FDA'S CLINICAL PROGRAM.  IT'S THEIR

14    CLINICAL PROGRAM, BUT THE FDA RELIES ON THAT CLINICAL PROGRAM.

15    **Q.**  AND DOES THE FDA, DOES IT HAVE BIG SCIENCE LABORATORIES

16    WHERE IT CONDUCTS ITS OWN TESTING TO SEE WHAT THE DRUG COMPANY

17    IS SUBMITTING IS CORRECT?

18    **A.**  THE FDA CANNOT VALIDATE THE DATA.  THE FDA CAN'T SELECT

19    THEIR OWN SUBJECTS AND DO THEIR OWN WORK AND THEN COMPARE WHAT

20    THEY GET WITH WHAT THE DRUG COMPANY HAS.  THE FDA ONLY GETS THE

21    DATA FROM THE DRUG COMPANY.  NOW, IN ALL FAIRNESS, SOMETIMES IF

22    THE COMPOUND IS NOT NEW AND THE FDA HAS SEEN THIS KIND OF DATA

23    BEFORE, THEY HAVE DATA FROM OTHER NDA'S THAT THEY CAN USE TO

24    TRY TO COMPARE, BUT IT'S A PRETTY ARTIFICIAL PROPERTY.  THE FDA

25    DOESN'T HAVE THE RESOURCES TO IDENTIFY, TO CARRY OUT THEIR OWN

1    INDEPENDENT STUDIES ON PATIENTS.

2    **Q.**    NOW, JUST LIKE WE HAVE DIFFERENT PHASES OF CLINICAL

3    TRIALS, ARE THERE ALSO STEPS INVOLVED WITH THE FDA FOR DRUG

4    APPROVAL?

5    **A.**    YES, THERE ARE.

6    **Q.**    I'M GOING TO ASK YOU TO STEP DOWN ONCE AGAIN, DR. MOYE.

7            **THE COURT:**  YOU MAY DO SO.

8            **THE WITNESS:**  THANK YOU.

9    BY MR. BIRCHFIELD:

10   **Q.**    DR. MOYE, WILL YOU WALK US THROUGH THE FDA APPROVAL

11   PROCESS?  I TELL YOU WHAT, SO WE CAN REFERENCE THE PHASES, I'M

12   GOING TO...

13   **A.**    A SPONSOR DOESN'T NEED THE PERMISSION OF THE FDA TO CARRY

14   OUT ANY OF THIS.  BUT SINCE, IN THE END, THEY WILL NEED THE

15   FDA'S APPROVAL DOWN HERE, THE INTELLIGENT SPONSORS WILL INVOLVE

16   THE FDA THROUGHOUT THIS PROCESS.  HOWEVER, I DO HAVE TO ADD A

17   LEGAL CAVEAT.  THE FDA IS CONCERNED ABOUT THE CIRCUMSTANCES

18   WHERE PATIENTS ARE EXPOSED TO DRUGS THAT ARE UNAPPROVED, AND

19   THAT'S TO PROTECT THE POPULATION.  ON THE OTHER HAND, IF YOU

20   DON'T EXPOSE PATIENTS TO UNAPPROVED COMPOUNDS, YOU NEVER GET

21   THE EXPERIENCE THAT LEADS TO APPROVAL.  SO, RECOGNIZING THIS,

22   THE FDA PERMITS WHAT'S CALLED AN INVESTIGATIONAL NEW DRUG

23   APPLICATION.  THIS OCCURS BEFORE PHASE I, AND THEY ARE LOOKING

24   FOR PERMISSION.

25            NOW, THEY ARE LOOKING FOR PERMISSION TO STUDY IN

1   HUMANS, PERMISSION FOR HUMAN STUDY.

2   **Q.**   DR. MOYE, IS THAT SOMETIMES REFERRED TO AS AN IND.  YOU

3   SEE THAT IN FDA DOCUMENTS, IN DRUG COMPANY DOCUMENTS?

4   **A.**   THIS IS THE IND.  AND THE IND IS COMPOSED OF ALL OF THE

5   ALL OF THE INFORMATION DOWN THROUGH PRECLINICAL.  SO ALL OF THE

6   CHEMISTRY, BIOCHEMISTRY, ANIMAL STUDIES ARE SUBMITTED TO THE

7   FDA WITH THE VIEW THAT THE FDA WILL PROVIDE AN IND APPROVAL.

8   THE IND APPROVAL THEN ALLOWS THE INVESTIGATOR TO BEGIN STUDIES

9   AT PHASE I AND PHASE II BECAUSE NOW THE DRUG IS NOT YET

10   APPROVED BUT THEY WANT ASSURANCES THAT THE DRUG WILL BE USED IN

11   A CONTROLLED FASHION IN A RELATIVELY SMALL NUMBER OF SUBJECTS.

12   **Q.**   SO YOU GET IND APPROVAL, AND THEN YOU CAN BEGIN TESTING IN

13   HUMANS; IS THAT RIGHT?

14   **A.**   YES.

15   **Q.**   AND THEN DESCRIBE FOR US WHAT'S INCLUDED IN THE NEW DRUG

16   APPLICATION.

17   **A.**   NEW DRUG APPLICATION IS TYPICALLY AFTER PHASE III, A NEW

18   DRUG APPLICATION COMES DOWN HERE.  AND A NEW DRUG APPLICATION

19   IS PERMISSION AND MARKETS.  THEY ARE LOOKING FOR THE FDA'S

20   DECISION THAT THE NEW DRUG APPLICATION IN ITS ENTIRETY

21   DEMONSTRATES THAT THIS COMPOUND CAN BE USED SAFELY AND

22   EFFECTIVELY.

23          THE NEW DRUG APPLICATION IS A HUGE DOCUMENT.  IT

24   INCLUDES EVERYTHING THAT WAS IN THE IND, PLUS ALL THE

25   INFORMATION THAT CAME FROM THE PHASE I, PHASE II AND PHASE III

1   HUMAN STUDIES.  SO IT'S THE SND INFORMATION WHICH IS

2   VOLUMINOUS, AND THEN ALL OF THE INFORMATION THAT COMES FROM

3   THIS HUMAN TESTING.  AND AT THE END OF THIS PROCESS, CERTAINLY

4   THE SPONSOR KNOWS WHAT THEY WANT TO USE THE DRUG FOR.  AND THEY

5   THEREFORE HAVE TO DEFEND THAT ASSERTION WITH THE SCIENTIFIC

6   DATA.  AND IT'S THE JOB OF THE FDA TO REVIEW THIS HUGE QUANTITY

7   OF DATA AND TO EITHER AGREE OR DISAGREE WITH THE SPONSOR.

8   **Q.**   AND THEN WE HAVE WHAT'S CALLED A SUPPLEMENTAL NEW DRUG

9   APPLICATION?

10  **A.**   YES.

11  **Q.**   WILL YOU TELL US WHAT THAT IS.  DR. MOYE.

12  **A.**   YES.  AT THE END OF PHASE III, AS I SAID, THE DRUG COMPANY

13  KNOWS WHAT THEY WANT TO USE THE DRUG FOR.  THAT'S CALLED AN

14  INDICATION.  WE THINK THIS DRUG WILL HAVE EFFECT A IN THESE CAN

15  KIND OF PATIENTS.  THE DRUG IS INDICATED FOR THESE KINDS OF

16  PATIENTS.  BUT IT'S POSSIBLE THAT THE DRUG HAS ANOTHER BENEFIT

17  THAT WASN'T REALLY CONFIRMED HERE.

18         SINCE IT'S THE SAME DRUG, IT'S UNFAIR TO MAKE THE

19  COMPANY GO BACK TO THE VERY BEGINNING AND GO THROUGH ALL OF

20  THIS AGAIN.  BUT IF IT'S A NEW INDICATION, THEY DO HAVE TO

21  PROVIDE SOME ADDITIONAL SUPPLEMENTAL INFORMATION THAT SUPPORTS

22  THIS NEW IDEA FOR THERAPY.  SO THAT'S CALLED THE SUPPLEMENTAL

23  NEW DRUG APPLICATION.  THIS IS AFTER THE NDA, PERMISSION FOR A

24  NEW USE.

25  **Q.**   OKAY.  ALL RIGHT.  WHEN YOU SAY FOR A NEW USE, WHAT DO YOU

1    MEAN BY THAT, DR. MOYE?

2    **A.**   I MEAN A USE THAT WAS NOT PROVED BY -- AT THE END OF PHASE

3    III.  SO THEY HAVE TO CARRY OUT SOME ADDITIONAL RESEARCH, FOR

4    EXAMPLE.  IT MAY BE WHAT WHEN YOU COME DOWN THROUGH PHASE III,

5    THE SPONSOR BELIEVES THEY HAVE AN VERY GOOD DRUG TO REDUCE

6    ELEVATIONS IN BLOOD PRESSURE.  THEY ALSO LEARN DURING PHASE III

7    THAT MEN WERE HAVING NEW HAIR GROWTH.  THIS IS REALLY A TRUE

8    STORY.  SO NOW, THEY WANT TO THINK ABOUT USING THE DRUG FOR NEW

9    HAIR GROWTH.

10           WELL, IT'S UNFAIR TO GO BACK TO THE BASIC

11   BIOCHEMISTRY, BUT WHAT THEY DO IS THEY CARRY OUT A STUDY WITH

12   THIS APPROVED DRUG NOW TO DEMONSTRATE THAT THERE IS NEW HAIR

13   GROWTH.  AND THEN THEY COME BACK WITH A SUPPLEMENTAL NEW DRUG

14   APPLICATION SUPPORTING THE IDEA THAT THIS DRUG IS ASSOCIATED

15   WITH HAIR GROWTH.

16   **Q.**   AND SO IT WOULD GO THROUGH THE APPROVAL PROCESS AT THE FDA

17   JUST LIKE THE NEW DRUG APPLICATION?

18   **A.**   THAT'S RIGHT.  YOU WOULDN'T HAVE A MUCH, YOU WOULD HAVE

19   NEW INFORMATION, BUT THE VOLUMES OF OLD INFORMATION WOULD NOT

20   HAVE TO BE COMPLETED.  THE FDA LOOKS AT THIS AS REALLY THE SAME

21   DOCUMENT THAT'S GROWING OVER TIME.  A DRUG MIGHT HAVE TWO OR

22   THREE SNDA'S, AND SO THOSE GET TACKED ON AT THE BOTTOM AS THE

23   DRUG HOPEFULLY INCREASES IN POPULARITY AND IN USE.

24   **Q.**   ALL RIGHT.  THANK YOU, DR. MOYE.  YOU MAY TAKE THE STAND.

25   **A.**   THANK YOU.

1   **Q.**   DR. MOYE, TYPICALLY HOW LONG DOES IT TAKE FOR A DRUG TO

2   MOVE THROUGH THE -- THROUGH THE APPROVAL PROCESS FROM THE NDA?

3   LET'S GO TO THE NDA.  ONCE THE PHASE I, II AND III STUDIES HAVE

4   BEEN SUBMITTED AND THE DRUG COMPANY SUBMITS A NEW DRUG

5   APPLICATION, WHAT'S THE TYPICAL PERIOD OF REVIEW BEFORE GETTING

6   A VOTE ON AN APPROVAL OR NOT?

7   **A.**   IT CAN TAKE A YEAR OR LONGER TO GET AN ASSESSMENT BY THE

8   FDA OF WHETHER ALL THE INFORMATION IN THE NDA LINES UP BEHIND

9   AND SUPPORTS THE INDICATION FOR THE DRUG.

10  **Q.**   NOW, DOES THE FDA HAVE WHAT'S CALLED A "PRIORITY REVIEW"?

11  **A.**   THEY DO.

12  **Q.**   WOULD YOU TELL US WHAT A PRIORITY REVIEW IS, DOCTOR.

13  **A.**   YES, A PRIORITY REVIEW IS A MORE RAPID REVIEW.  RATHER

14  THAN TAKE A YEAR OR LONGER, THE FDA COMMITTEES TO A SIX-MONTH

15  REVIEW.  THEY COMMIT TO THE SIX-MONTH REVIEW BECAUSE THEY'VE

16  BEEN CONVINCED THAT RAPID APPROVAL OF THIS DRUG IS NECESSARY TO

17  MEET AN UNMET MEDICAL NEED.

18  **Q.**   WHEN A COMPANY -- DOES A COMPANY ASK THE FDA FOR PRIORITY

19  REVIEW?

20  **A.**   YES.

21  **Q.**   AND DO THEY SUBMIT AN APPLICATION FOR PRIORITY REVIEW?

22  **A.**   THEY SUBMIT AN APPLICATION, AND COMMONLY THEY HAVE SEVERAL

23  MEETINGS WITH THE FDA TO HOPEFULLY PERSUADE THE FDA REGULATORS

24  THAT AN EXPEDITED REVIEW OR A PRIORITY REVIEW IS NECESSARY.

25  **Q.**   AND DOES A DRUG COMPANY PAY A SUBSTANTIAL AMOUNT OF MONEY

1  TO THE FDA FOR PRIORITY REVIEW?

2  **A.**   YES.  AS PART OF THE PHYSICIAN DRUG USER FEE ACT, OF, I

3  THINK IT WAS 1992, THE DRUG COMPANIES, WHEN THEY SUBMIT THEIR

4  NDA FOR REVIEW, THEY ALSO PAY THE FDA.  THEY PROVIDE A LOT OF

5  MONEY TO THE FDA.

6         THE IDEA IS THAT THE FDA, WHICH HAS FOR GENERATIONS

7  BEEN CRITICALLY STARVED OF RESOURCES, FROM ANYTHING FROM VIDEO

8  MONITORS TO BOXES OF DISKETTES.  THEY HAVE TO BE ABLE TO MEET

9  THEIR OWN SOURCE NEEDS IN ORDER TO PROVIDE RAPID REVIEW.  AND

10  SO THE MONEY IS PROVIDED TO THE FDA TO HELP BUILD THEIR

11  INFRASTRUCTURE, TO HELP MAINTAIN AN ADEQUATE NUMBER OF

12  REVIEWERS.

13        AND WHEN THE FDA RECEIVES THIS MONEY, THEY COMMIT TO

14  THE SPONSOR TO GIVE AN ON-TIME REVIEW.  NOW, THE ON-TIME REVIEW

15  MAY NOT BE A SIX-MONTH REVIEW.  WHATEVER THE REVIEW TIME IS

16  AGREED TO UP FRONT, THE FDA COMMIT TO THAT.  SO THE SPONSOR

17  COMES AWAY WITH A SENSE OF CLOSURE THAT THEY KNOW WHEN THEY ARE

18  GOING TO HEAR FROM THE FDA ONE WAY OR THE OTHER ABOUT THE DRUG,

19  AND THE FDA COMES AWAY FROM THE PROCESS WITH MORE FINANCIAL --

20  WITH MORE FINANCIAL RESOURCES TO HELP KEEP ITS INFRASTRUCTURE

21  ROBUST THAT IT CAN MEET ITS REQUIREMENT TO HAVE AN ON-TIME

22  REVIEW.

23  **Q.**   DR. MOYE, I WANT TO SHIFT THE FOCUS FROM WHAT THE DRUG

24  COMPANY GIVES TO THE FDA TO WHAT GOES ON FROM THE FDA'S

25  PERSPECTIVE WHEN A NEW DRUG APPLICATION IS SUBMITTED.

1    **A.**   YES.

2    **Q.**   WHAT OFFICE IS RESPONSIBLE FOR REVIEWING THAT NEW DRUG

3    APPLICATION?

4    **A.**   IT DEPENDS ON WHAT THE COMPOUND IS.  THERE ARE SEVERAL

5    DIFFERENT CENTERS IN THE FDA.  THERE IS A CENTER FOR DRUG

6    EVALUATION AND RESEARCH, THERE IS A CENTER FOR DEVICES, THERE

7    IS A CENTER FOR WHAT'S CALLED BIOLOGICS.  THAT'S ALL WORKED OUT

8    WELL BEFORE, OF COURSE, BECAUSE THE FDA KNOWS WHAT'S COMING.

9    **Q.**   IS THERE A MEDICAL OFFICER THAT IS ASSIGNED TO A NEW DRUG

10   APPLICATION?

11   **A.**   YES, THERE IS.

12   **Q.**   AND WHAT'S THE RESPONSIBILITY OF THE MEDICAL OFFICER OF

13   THE FDA?

14   **A.**   THE ULTIMATE RESPONSIBILITY IS TO COLLECT AND ASSESS,

15   ASSIMILATE AND FINALLY PROVIDE AN ASSESSMENT OF THE STRENGTHS

16   AND WEAKNESSES OF THE DRUG, DETERMINING WHETHER THE DRUG CAN BE

17   USED SAFELY AND EFFECTIVELY AS THE SPONSOR SUGGESTS.

18   **Q.**   YOU TOLD US EARLIER THAT THE FDA RELIES ON THE INFORMATION

19   THAT THE DRUG COMPANY PROVIDES; IS THAT RIGHT?

20   **A.**   THAT'S RIGHT.

21   **Q.**   IS IT LIKE AN HONOR SYSTEM?

22   **A.**   WELL, YES.  THAT'S EXACTLY WHAT IT IS.  I MEAN, OBVIOUSLY,

23   IF THE REVIEWER IS RELYING ON INFORMATION THAT COMES FROM THE

24   SPONSOR AND THE SPONSOR IS PROVIDING INCOMPLETE OR MISLEADING

25   INFORMATION, THAT'S GOING TO PERTURB THE REVIEW PROCESS,

```
 1   BECAUSE THE REVIEWER DOESN'T KNOW THAT.  AND THEY LOOK AT THE
 2   INFORMATION AS BEING COMPLETE AND THOROUGH AND THEY MAKE A
 3   DETERMINATION BASED ON THAT.  BUT IF THE PREMISE IS FALSE, THEN
 4   THE ENTIRE STRUCTURE ON WHICH IT'S BUILT ITSELF WINDS UP BEING
 5   MISLEADING AND UNFORTUNATELY, IN THE END, DAMAGING.
 6   Q.   DR. MOYE, COULDN'T A DRUG COMPANY JUST -- WOULDN'T THEY
 7   WANT TO JUST SUBMIT THE DATA THAT SUPPORTS THE GOOD SIDE OF
 8   THEIR DRUG?  CAN THEY DO THAT?
 9   A.   WELL, THERE IS ALWAYS THAT PART OF HUMAN NATURE.  IT
10   ALWAYS WANTS TO PRESENT THE VERY BEST SIDE OF WHAT YOU'RE
11   DOING.  BUT IN SCIENCE WE'VE LEARNED THAT THE WORST SIDE ALWAYS
12   COMES OUT.  NOW, IT'S BEST TO HAVE IT COME OUT EARLY WHEN
13   YOU'VE DONE THE LEAST DAMAGE.  MOST TIMES PEOPLE UNDERSTAND
14   THAT.
15   Q.   IS IT THE OBLIGATION OF THE DRUG COMPANY, THE
16   RESPONSIBILITY OF THE DRUG COMPANY TO SUBMIT BOTH THE GOOD AND
17   THE BAD TO THE FDA?
18   A.   YES.  IT MOST CERTAINLY IS.
19   Q.   AND WHAT ABOUT IF A DRUG COMPANY HAS, LIKE, AN ANALYSIS OR
20   A META-ANALYSIS OF ITS DATA THAT SUGGESTS A HARM?  ARE THEY
21   OBLIGATED TO INFORM THE FDA OF THAT AS WELL?
22   A.   WE HAVE ALL TAKEN AN OATH TO FIRST DO NO HARM, SO AT THE
23   FIRST SIGN OF HARM WE HAVE TO GET WORKED UP.  WE HAVE TO GET
24   ENERGIZED, AND THAT MEANS THAT WE CAN'T ALWAYS WAIT UNTIL ALL
25   OF THE I'S ARE DOTTED AND THE T'S ARE CROSSED, BECAUSE IF WE
```

1  WAIT THAT LONG, THAT JUST MEANS THAT MORE PEOPLE ARE GOING TO

2  BE INJURED.

3         AND SO WE TEND TO BE MORE PROACTIVE WHEN IT COMES TO

4  THE POSSIBILITY OF HARM.  THAT MEANS AN ANALYSIS THAT IS

5  PROVIDED, EVEN THOUGH IT MAY BE THE BEST THAT CAN BE CARRIED

6  OUT AT THE TIME, IT MUST BE PROVIDED TO THE FDA EVEN THOUGH THE

7  INVESTIGATORS BELIEVE THAT LATER ON DOWN THE ROAD, THEY'LL HAVE

8  A CLEANER ANALYSIS.

9         IF YOUR FIRST ANALYSIS, WHICH YOU THOUGHT WAS GOOD

10 ENOUGH FOR YOU TO DO SUGGESTED THERE IS A POSSIBILITY OF HARM,

11 THEN CLEARLY THE SMART THING TO DO IS TO ANNOUNCE THAT TO THE

12 REGULATORS SO THAT THE BEST MINDS CAN COME TOGETHER AND DECIDE,

13 IS THIS A REAL PROBLEM, IS IT A PROBLEM ONLY IN SOME PATIENTS,

14 OR IS IT A GENERAL PROBLEM THAT IS GOING TO EFFECT THE USE OF

15 THE DRUG OVERALL?

16 **Q.**   HOW IMPORTANT IS IT FOR PUBLIC HEALTH THAT THE FDA BE

17 GIVEN BOTH THE GOOD AND THE BAD?

18 **A.**   PUBLIC HEALTH, VERY BRIEFLY, IS ABOUT PROTECTING

19 VULNERABLE POPULATIONS.  AND WHEN WE ARE EXPOSED TO COMPOUNDS,

20 BE THEY IN THE ENVIRONMENT OR BE THEY FROM A DRUG COMPANY AND

21 WE DON'T KNOW ALL OF THE RISKS AND BENEFITS, HOW CAN WE ASSESS

22 WHETHER THE EXPOSURE IS GOOD ENOUGH?  AND SO WE HAVE TO HAVE AN

23 UNDERSTANDING OF ALL OF THE RISKS AND ALL OF THE BENEFITS SO

24 THAT WE CAN MAKE AN INDEPENDENT ASSESSMENT OF WHETHER THE RISK

25 IS WORTH THE BENEFIT.  WITHOUT HAVING ALL THAT INFORMATION, ANY

1   DECISION THAT PHYSICIANS MAKE ON BEHALF OF THEIR PATIENTS IS

2   FLAWED, ANY DECISION THAT PATIENTS MAKE IS GOING TO BE FLAWED.

3   Q.   DR. MOYE, I WANT TO SHIFT OUR FOCUS FOR JUST A FEW MINUTES

4   TO THE AREA OF EPIDEMIOLOGY AND BIOSTATISTICS.

5   A.   YES.

6   Q.   WE HAVE -- WE'VE HEARD SOME TESTIMONY ALREADY AND WE'LL

7   HEAR MORE ABOUT STUDIES AND EVALUATING THOSE STUDIES, AND I'M

8   NOT GOING TO ASK YOU TO GET INTO THE SPECIFICS, BUT I WANT YOU

9   TO GIVE US SOME TOOLS TO HELP US EVALUATE THOSE STUDIES, OKAY?

10  A.   YES.

11  Q.   FIRST OF ALL, WILL YOU HAVE GIVE US A MORE COMPLETE

12  DESCRIPTION OF WHAT EPIDEMIOLOGY IS.

13  A.   YES.  EPIDEMIOLOGY IS THE USE OF CAREFUL OBSERVATION AND

14  DEDUCTIVE REASONING TO DECIDE WHETHER AN EXPOSURE IS CAUSING A

15  DISEASE.  EPIDEMIOLOGY IS DETECTIVE WORK.  EPIDEMIOLOGISTS ARE

16  CALLED TO THE SCENE OF THE CRIME, WHEN WE HAVE THE EXPOSURE AND

17  WE HAVE THE DISEASE.  I DON'T USE CRIME LITERALLY HERE BUT JUST

18  FIGURATIVELY.  THERE ARE POSSIBLE CAUSES.

19          IT'S UP TO THE EPIDEMIOLOGIST TO LOOK TO EACH

20  DIFFERENT EXPOSURE, RULE OUT, TO PUSH ASIDE THE NUMBER OF THE

21  EXPOSURES THAT DIDN'T CAUSE IT, AND NARROW THEIR WAY DOWN TO

22  THE EXPOSURE THAT CAUSED THE DISEASE.

23          I JUST READ RECENTLY THIS IS THE 30TH ANNIVERSARY OF

24  THE LEGIONNAIRES' DISEASE OUTBREAK IN PHILADELPHIA, WHEN

25  VETERANS WERE GETTING SICK AT A CONVENTION AND NOBODY KNEW WHAT

1   WAS THE CAUSE.  IT COULD BE ANYTHING.  IT COULD HAVE BEEN FOOD
2   POISONING.  IT COULD HAVE BEEN SOMETHING IN THE AIR.  IT COULD
3   HAVE BEEN SOMETHING IN THE WATER, AND NOBODY KNEW.  IT WAS THE
4   EPIDEMIOLOGIST TO LOOK AT ALL OF THE DIFFERENT POSSIBLE CAUSES
5   AND FINALLY NARROW IT DOWN TO THIS ONE BACTERIA.
6   **Q.**   WHAT'S THE DIFFERENCE -- WE'VE HEARD REFERENCE TO
7   ASSOCIATION AND CAUSATION.  IN TERMS OF AN EXPOSURE TO TRUE
8   NATURE RELATIONSHIP, WHAT'S THE DIFFERENCE BETWEEN AN
9   ASSOCIATION AND CAUSATION?
10  **A.**   THE DIFFERENCE IS IN ASSOCIATION, THERE IS JUST A HARMLESS
11  SIMULTANEOUS OCCURRENCE.  FOR EXAMPLE, I'M ASHAMED OF THIS, BUT
12  I CONFESS, I HAVE A NEW LOVE FOR THESE LITTLE TOOTSIE ROLLS.
13  LET'S SAY I HAD ONE, I TOOK ONE AND I INSTANTLY HAD A STROKE.
14  OKAY.  THEY BOTH OCCUR AT THE SAME TIME.  BUT DOES THAT MEAN
15  THAT THAT TOOTSIE ROLL CAUSED THE STROKE?
16          THERE ARE SEVERAL THINGS THAT COULD CAUSE A STROKE.
17  I MAY HAVE HAD THE STROKE REGARDLESS OF WHETHER I HAD THE
18  TOOTSIE ROLL THAT DAY OR NOT.  THAT'S AN EXAMPLE OF A MERE
19  ASSOCIATION.  THE TWO ARE RELATED JUST IN TIMING.
20          BUT DID THE TOOTSIE ROLL EXCITE THE PRODUCTION OF THE
21  STROKE?  IF IT EXCITED PRODUCTION OF THE STROKE, THEN WE SAY,
22  IT CAUSED IT.  AND CAUSAL IS VERY CRITICAL IN PUBLIC HEALTH
23  BECAUSE IF YOU HAVE AN EXPOSURE EXCITING THE PRODUCTION OF A
24  DISEASE, AND PUBLIC HEALTH WORKERS CAN REMOVE THE EXPOSURE,
25  THEN YOU REDUCE THE DISEASE.  SO THAT'S THE IMPORTANT LINK

1    BETWEEN THE IDENTIFICATION OF THE EXPOSURE/DISEASE RELATIONSHIP

2    AND THE ACTION.  IF IT'S MERELY A HARMLESS, SIMULTANEOUS

3    ASSOCIATION, THEN THERE IS NO PROBLEM.

4           THERE WAS A BIG SCARE LATE 1970'S, ABOUT COFFEE

5    INGESTION BEING ASSOCIATED WITH PANCREATIC CANCER.  WELL,

6    PANCREATIC CANCER IS VERY SERIOUS DISEASE.  THERE IS REALLY NO

7    GOOD TREATMENT FOR IT.  AND MANY ADULTS, MOST ADULTS DRINK

8    COFFEE AND SO PERHAPS WE HAVE A PUBLIC HEALTH EMERGENCY ON OUR

9    HANDS, BUT IT DEPENDS ON WHETHER COFFEE ACTUALLY EXCITES THE

10   PRODUCTION OF PANCREATIC CANCER.  IF IT DOES, THEN WE HAVE AN

11   ISSUE THAT PUBLIC HEALTH MUST ADDRESS FORTHRIGHTLY AT ONCE.

12          FORTUNATELY, THE ASSOCIATION BETWEEN THE TWO, THE

13   RELATIONSHIP BETWEEN THE TWO, THE COFFEE AND THE PANCREATIC

14   CANCER WAS JUST ASSOCIATION.  IT WAS NOT CAUSATION.  SO THERE

15   WAS NOT A NEW PUBLIC HEALTH EMERGENCY, SO IT'S IMPORTANT TO

16   UNDERSTAND WHETHER THE RELATIONSHIP IS MERELY ASSOCIATION OR IS

17   IT CAUSATION?

18   **Q.**   DR. MOYE, ARE EPIDEMIOLOGICAL STUDIES, CLINICAL TRIALS, DO

19   THOSE PROVIDE EVIDENCE TO SHOW WHETHER THERE IS AN ASSOCIATION

20   OR CAUSATION?

21   **A.**   THOSE ARE THE KINDS OF TOOLS THAT WE HAVE TO HELP

22   DISTINGUISH ASSOCIATION VERSUS CAUSATION.  FORTUNATELY, MOST OF

23   THE TOOLS THAT WE USE ARE REALLY COMMONSENSE TOOLS.  THEY ARE

24   THINGS LIKE, IF I BELIEVE AN EXPOSURE CAUSED THE DISEASE, THEN

25   DON'T I EXPECT TO SEE MORE DISEASE IN THE EXPOSED THAN THE

1    UNEXPOSED?  THAT'S CALLED STRENGTH OF ASSOCIATION.  THAT'S

2    IMPORTANT.

3            IS THE RELATIONSHIP BELIEVABLE?  SOMETIMES WE FIND,

4    IN SOME CLINICAL STUDIES THAT AREN'T ANALYZED WITH DISCIPLINE,

5    WE FIND SOME FANTASTIC THINGS WE CAN'T BELIEVE.  FOR EXAMPLE, A

6    PATIENT WHO IS EXPOSED TO ASPIRIN BUT WAS BORN UNDER THE LIBRA

7    AND GEMINI SIGN DOES NOT RECEIVE ASPIRIN PROTECTION FOR HEART

8    ATTACK.  THAT WAS ACTUALLY SHOWN IN THIS STUDY.  DID ANYBODY

9    REALLY BELIEVE THAT THIS?

10           SO THERE IS A SENSE OF PLAUSIBILITY.  THERE HAS TO BE

11   CONSISTENCY.  DO WE SEE IT AGAIN AND AGAIN AND AGAIN?  IT'S

12   THESE KINDS OF TOOLS, WHICH ARE REALLY JUST COMMONSENSE TOOLS,

13   THAT HELP US TO BUILD A CASE FOR OR AGAINST A RELATIONSHIP

14   BEING CAUSATIVE OR ASSOCIATIVE.

15   **Q.**   IN LOOKING AT CLINICAL STUDIES OR OBSERVATIONAL STUDIES

16   THAT YOU MENTIONED, DO YOU USE WHAT'S CALLED "RELATIVE RISK"?

17   **A.**   YES.  A RELATIVE RISK IS JUST A MEASURE OF STRENGTH OF

18   ASSOCIATION.  THAT'S ALL IT IS.  THE LARGER -- THE LARGER THE

19   RELATIVE RISK -- THE FURTHER THE RELATIVE RISK IS AWAY FROM

20   ONE, THE STRONGER THE ASSOCIATION.

21           THE RELATIVE RISK OF ONE MEANS THAT THE DISEASE IN

22   THE EXPOSED GROUP OCCURS AT THE SAME LEVEL AS THE UNEXPOSED

23   GROUP.  NO STRENGTH IN THIS ASSOCIATION THERE.  IF THE DISEASE

24   IS TWICE AS COMMON IN THE EXPOSED GROUP AS THE UNEXPOSED GROUP,

25   WE HAVE A RELATIVE RISK OF TWO.  IF IT'S THREE TIMES AS COMMON,

802

1   WE HAVE A RELATIVE RISK OF THREE.  SO THE LARGER THE RELATIVE

2   RISK, THE LARGER THE STRENGTH OF THE ASSOCIATION.

3   **Q.**   IN DOING EPIDEMIOLOGICAL STUDIES OR CLINICAL TRIALS, DON'T

4   YOU HAVE WHAT'S CALLED A "COMPARATOR GROUP"?

5   **A.**   YES.

6   **Q.**   AND WHAT IS THAT?  WHAT'S A COMPARATOR GROUP?

7   **A.**   A COMPARATOR GROUP IS PROBABLY WHAT WE ALL LEARNED IN HIGH

8   SCHOOL AS A CONTROL GROUP.  IT SIMPLY MEANS THAT IF WE ARE TO

9   SAY AN EXPOSURE CAUSES A DISEASE, THEN WE HAVE TO -- IT WOULD

10  BE GOOD TO BE ABLE TO DECIDE JUST HOW MUCH OF THE DISEASE IS

11  DUE TO THE EXPOSURE.

12        PATIENTS GET DISEASE WITHOUT THE EXPOSURE.  SO HOW DO

13  WE KNOW IF A PATIENT WOULDN'T HAVE ALREADY GOTTEN -- WOULDN'T

14  HAVE GOTTEN THE DISEASE WITHOUT THE EXPOSURE?  THE ONLY WAY TO

15  KNOW IS TO LOOK AT ANOTHER GROUP OF SIMILAR PATIENTS WHO WERE

16  UNEXPOSED.

17        SO IN THE END YOU HAVE TWO GROUPS OF PATIENTS WHO

18  HAVE DIFFERENT EXPERIENCES, AND HOPEFULLY THE ONLY DIFFERENCE

19  BETWEEN THE TWO GROUPS IS ONE RECEIVED THE EXPOSURE, THE OTHER

20  WAS UNEXPOSED.  SO THE DIFFERENCE YOU SEE IN THE END IS DUE TO

21  THE EXPOSURE.

22  **Q.**   LET ME SEE IF I CAN REDUCE THIS INTO REAL SIMPLE TERMS.

23  IF YOU HAD ONE CLINICAL TRIAL THAT INVOLVES 10 PEOPLE, AND THEN

24  YOU HAVE A CONTROL GROUP THAT INVOLVES 10 PEOPLE, AND IN THE

25  CONTROL GROUP YOU HAVE ONE BAD EVENT AND IN THE OTHER GROUP YOU

1   HAVE TWO BAD EVENTS, HOW WOULD YOU CALCULATE THE RELATIVE RISK?

2   **A.**   THERE THE RELATIVE RISK IS JUST HOW LIKELY IS IT THAT

3   SOMEBODY WOULD HAVE AN EVENT IN THE EXPOSED GROUP IS TWO OVER

4   TEN AND HOW LIKELY IS IT THAT SOMEONE HAS AN EVENT IN THE

5   CONTROL THE GROUP IS ONE OVER TEN, SO IT'S .2 OVER .1, OR TWO.

6   **Q.**   SO THAT'S OUR RELATIVE RISK?

7   **A.**   RIGHT.

8   **Q.**   NOW, WE'VE ALSO HEARD A DISCUSSION ABOUT CONFIDENCE

9   INTERVALS.  WHAT'S MEANT BY CONFIDENCE INTERVALS?

10  **A.**   YES, THE WHOLE NOTION OF CONFIDENCE INTERVALS RELATES TO

11  THE ACKNOWLEDGMENT THAT IN SCIENCE AND IN MEDICAL RESEARCH, WE

12  COMPROMISE.  WHAT WE WOULD LIKE TO DO IS STUDY THE ENTIRE

13  POPULATION.  THAT'S WHAT WE WOULD LIKE TO DO.  THAT'S

14  IMPOSSIBLE.  SO WHAT WE DO IS WE COMPROMISE.  WE TAKE A SAMPLE.

15         NOW, WHAT DO WE GAIN IN THE COMPROMISE?  WELL, WE CAN

16  ACTUALLY STUDY THE SAMPLE.  I CAN'T STUDY A POPULATION OF,

17  300,000,000 PEOPLE AROUND THE WORLD WITH HEART FAILURE.  I CAN

18  STUDY 300 PEOPLE.  SO THAT'S WHAT I GET.  I GET EXECUTABILITY

19  OUT OF IT.  BUT WHAT DO I LOSE?

20         SOMEBODY ELSE COULD TAKE A DIFFERENT SAMPLE FROM THIS

21  LARGE POPULATION OF 300 PEOPLE, AND THIS PERSON IS EQUALLY

22  DILIGENT, THEY ARE EQUALLY INQUISITIVE, EQUALLY HONEST, THEIR

23  SAMPLE HAS DIFFERENT PATIENTS WITH DIFFERENT EXPERIENCES WITH

24  MINE.  WE COME UP WITH DIFFERENT ANSWERS.  WHO IS RIGHT?

25         IF YOU FIGURE THAT OUT, YOU WOULD PUT ME OUT OF A

1    JOB.  BECAUSE THAT'S WHAT WE DO IN STATISTICS.  WE TRY TO DEAL

2    WITH THE FACT THAT THERE IS THIS SAMPLE-TO-SAMPLE VARIABILITY.

3    AND THIS INTRODUCES, THIS IS CALLED SAMPLING ERROR,

4    SAMPLE-TO-SAMPLE VARIABILITY.  WHAT THIS DOES IS IT INTRODUCES

5    ERRORS.  FOR EXAMPLE, IT'S POSSIBLE THAT IN A LARGE

6    POPULATION -- IN A HUGE POPULATION THAT THERAPY HAS NO

7    BENEFICIAL EFFECT WHATSOEVER.  BUT I, AS AN INVESTIGATOR,

8    HAPPENED TO BE UNLUCKY AND CHOOSE A SMALL SAMPLE FROM THAT

9    POPULATION WHICH DOES SHOW AN EFFECT.

10            NOW, ALL I KNOW IS MY SAMPLE AND OF COURSE, I'M VERY

11   EXCITED ABOUT THIS POSITIVE EFFECT, BUT IF, IN FACT, THE

12   POPULATION HAS MISLED ME, THEN MY CONCLUSION IS FLAWED.  THAT'S

13   A STATISTICAL ERROR THAT'S DUE TO SAMPLING.  WHAT CONFIDENCE

14   INTERVALS DO ARE THEY GIVE US AN ASSESSMENT OF HOW MUCH OF OUR

15   RESULT WOULD VARY FROM SAMPLE TO SAMPLE.  A NARROW CONFIDENCE

16   INTERVAL TELLS US THAT THE RESULTS ARE PRETTY PRECISE, AND IN

17   FACT, IF I TOOK ANOTHER SAMPLE OF PATIENTS, I WOULD BE UNLIKELY

18   TO GET RESULTS MUCH DIFFERENT.  ON THE OTHER HAND, IF I HAD A

19   HUGE CONFIDENCE INTERVAL, THEN THIS TELLS ME THAT MY RESULTS

20   AREN'T PRECISE AT ALL.  AND OTHER SAMPLES WOULD GIVE ME RESULTS

21   THAT WOULD BE CLOSER TO ONE END OR CLOSER TO THE OTHER END.

22            SO THE NARROWER THE CONFIDENCE INTERVAL, THE MORE

23   PRECISE MY ANSWER -- THE MORE PRECISE MY EFFECT SIZE IS FROM MY

24   SAMPLE, AND PERHAPS, EVERYTHING ELSE BEING EQUAL, THE MORE

25   CONFIDENCE, THE MORE CONFIDENT I CAN BE THAT MY RESULTS IN MY

1  SAMPLE MIGHT REALLY GENERALIZE A IF LARGE POPULATION.

2  **Q.**  THANK YOU, DR. MOYE.  YOUR HONOR, IT'S JUST AFTER NOON.

3  WOULD THIS BE A GOOD TIME FOR A BREAK?

4       **THE COURT:**  LET ME SEE COUNSEL AND TALK ABOUT IT.

5       (WHEREUPON, PROCEEDINGS WERE HELD AT THE BENCH

6  OUTSIDE OF THE PRESENCE OF THE COURT REPORTER.)

7       **THE COURT:**  OKAY.  MEMBERS OF THE JURY, WE'LL STOP AT

8  THIS POINT AND WE'LL COME BACK AT 1:45.  THE COURT WILL STAND

9  IN RECESS UNTIL 1:45.

10      **THE MARSHAL:**  ALL RISE.

11                   **(LUNCH RECESS)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2            **(AUGUST 3, 2006)**

3          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4    TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

5    REPORTER.)

6          **THE DEPUTY CLERK:**  EVERYONE RISE.

7          **THE COURT:**  BE SEATED, PLEASE.

8          **MR. BECK:**  I WOULD ASK IF DR. MOYE COULD BE EXCUSED

9    FROM THE COURTROOM DURING THIS DISCUSSION.

10         **THE COURT:**  YES.  PLEASE, DOCTOR.  WE'LL BE RIGHT

11   WITH YOU.

12         **MR. ROBINSON:**  I THINK IT'S APPROPRIATE TO APPROACH

13   THE BENCH.  I DON'T WANT TO DRAG OUT LAUNDRY.

14         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

15   THE BENCH.)

16         **MR. BECK:**  WHEN I CAME BACK FROM LUNCH, ANDY WAS

17   WRITING THAT ON THE FLIP CHART.  THE NUMBERS ARE:  2.30 (95

18   PERCENT CONFIDENCE INTERVAL), 1.22 TO 4.33, WITH A P-VALUE OF

19   0.01.  I TOLD ANDY THAT, BEFORE HE ASKED ANY QUESTIONS ABOUT

20   THAT, I WANTED AN OPPORTUNITY TO RAISE IT WITH THE COURT

21   BECAUSE I SUSPECTED THAT THOSE NUMBERS COME STRAIGHT OUT OF THE

22   CLINICAL TRIAL AND EPIDEMIOLOGICAL STUDY AND THIS WAS AN END

23   RUN AROUND THE LIMITATION ON THIS WITNESS' TESTIMONY; AND THAT

24   HE WAS GOING TO ASK HIM IN THE GUISE OF A HYPOTHETICAL ABOUT

25   WHAT WOULD THESE NUMBERS SHOW AND THEN, OF COURSE, THEY WOULD

1   PUT IT IN LATER, AND SO THEY WOULD GET HIS EXPERT OPINION IN

2   THROUGH THE BACK DOOR.  SO I TOLD ANDY I WANTED AN OPPORTUNITY

3   TO TALK WITH YOUR HONOR BEFORE HE USED THAT WITH THE WITNESS.

4           **THE COURT:**  OKAY.

5           **MR. BECK:**  HE THEN COVERED IT UP AND WALKED OVER AND

6   STARTED CONFERRING PRIVATELY WITH DR. MOYE.  WHEN I NOTICED

7   THAT, I SAID, "ANDY DON'T YOU REMEMBER THE JUDGE'S RULE ABOUT

8   NOT CONFERRING WITH WITNESSES WHILE THEY'RE SUBJECT TO

9   EXAMINATION," AT WHICH TIME HE STOPPED.

10          NOW, YOUR HONOR, ANDY TOLD ME THAT THIS IS JUST

11  AN ILLUSTRATION.  I'M TOLD THAT IT COMES OUT OF THE JÜNI

12  META-ANALYSIS OF 16, OR WHATEVER IT IS, DIFFERENT

13  EPIDEMIOLOGICAL STUDIES.  SO I THINK THAT, NUMBER 1, HE HAS

14  COVERED THIS SUBJECT ALREADY.  NUMBER 2, THIS IS AN EFFORT TO

15  DO AN END RUN AND TO TURN A GENERAL STATS 101 EXPERT INTO A

16  GENERAL CAUSATION EXPERT, AND I HAVE A REALLY GOOD

17  CROSS-EXAMINATION ON JÜNI.  I'VE DONE IT TWICE WITH RAY.

18          HERE'S THE JÜNI ANALYSIS, WHICH IS MARKED AS

19  PLAINTIFF'S EXHIBIT 2.0126, AND IT HAS THE EXACT SAME NUMBERS

20  IN IT.  SO, YOUR HONOR, THIS IS NOW ALSO -- QUITE APART FROM

21  THE FACT THAT IT GOES BEYOND THE SCOPE OF STATS 101, WE NOW

22  HAVE A SET PIECE THAT'S BEEN WORKED OUT OVER THE LUNCH HOUR,

23  WHERE ANDY ASKED TO BREAK EARLY.  WE HAVE A SET PIECE THAT'S

24  BEEN WORKED OUT, AND I WOULD ASK THAT THE COURT INSTRUCT

25  MR. BIRCHFIELD NOT TO INQUIRE INTO THIS AND MOVE ON TO A

1  DIFFERENT SUBJECT AND NOT TO HAVE THIS WITNESS VOLUNTEER AN

2  EXAMPLE ON THIS SCORE.

3                    HE HAS ALREADY TALKED ABOUT RELATIVE RISK.  HE

4  HAS ALREADY TALKED ABOUT CONFIDENCE INTERVALS.  HE HAS GIVEN

5  EXAMPLES ALREADY OF TWO MEANS TWO TIMES, THREE MEANS THREE

6  TIMES, AND NOW THIS GETS INTO GENERAL CAUSATION.  IF HE DOES

7  THAT -- I CAN'T LET HIM TESTIFY ABOUT THE NUMBERS IN THE JÜNI

8  ANALYSIS AND THEN HAVE THEM WAVE THEM AROUND LATER WITHOUT ME

9  GETTING A CHANCE TO CROSS-EXAMINE THE ONLY GUY THAT CAN TESTIFY

10  ABOUT THIS.

11            THE COURT:  LET'S SEE WHAT ANDY SAYS.

12            MR. BECK:  I FEEL A LITTLE STRONGLY ABOUT THIS.

13            THE COURT:  I GATHER.

14            MR. BIRCHFIELD:  I'M REALLY LIVID BECAUSE IT WASN'T A

15  MATTER LIKE PHIL JUST DESCRIBED.  INSTEAD, HE CALLED ME OVER

16  AND ACCUSED ME OF COACHING THE WITNESS.  I WANTED TO USE THIS

17  AS AN ILLUSTRATION.  HE RAISES A CONCERN ABOUT THAT, SO I COVER

18  IT UP.  I JUST WANT TO USE A PLAIN VANILLA -- THIS IS NOT

19  SOMETHING THAT WE COOKED UP OVER LUNCH.  I NEEDED REAL NUMBERS.

20  I ASKED HIM CAN HE DO IT JUST A PLAIN SAMPLE.  I HAVE BEEN

21  FORTHRIGHT.  YOU HAVE ASKED US, YOUR HONOR, TO COMMUNICATE.  I

22  TRIED TO TELL PHIL THAT.  INSTEAD, HE WON'T DISCUSS IT, AND

23  INSTEAD HE JUST ACCUSES ME OF IMPROPER CONDUCT, AND IT'S JUST

24  FLAT WRONG.

25            THE COURT:  I DON'T FEEL ANYBODY HAS DONE ANYTHING

1    IMPROPER.  I KNOW WE ARE GETTING INTO THE CASE NOW, SO YOU ALL

2    BOTH HAVE TO KIND OF TAKE A DEEP BREATH AND DEAL WITH IT.  SO

3    WHERE ARE WE WITH THIS?  YOU'RE NOT GOING TO USE THIS?

4            **MR. BIRCHFIELD:**  I WON'T USE THAT.  I'LL JUST USE A

5    GENERIC SAMPLE.

6            **THE COURT:**  OKAY.

7            **MR. BECK:**  HE HAS USED A GENERIC SAMPLE ALREADY,

8    YOUR HONOR.  THE WITNESS SAID A RELATIVE RISK OF TWO EQUALS TWO

9    TIMES A RELATIVE RISK OF THREE EQUALS THREE TIMES; CONFIDENCE

10   INTERVALS, WHERE THEY ARE BOTH ABOVE A ONE, MEANS A

11   STATISTICALLY SIGNIFICANT --

12           **MR. ROBINSON:**  WHY DON'T YOU LET HIM EXPLAIN.

13           **MR. BIRCHFIELD:**  THEY ARE GOING TO SEE ARTICLES, AND

14   ALL HE IS GOING TO DO IS BE ABLE TO SHOW THEM WHAT THEY ARE

15   ACTUALLY SEEING.

16           **MR. BECK:**  UNFORTUNATELY, YOUR HONOR, I'M AFRAID THAT

17   THIS -- MAYBE WE COULD HAVE DR. MOYE COME BACK AND FIND OUT

18   WHETHER HE HAS DISCUSSED WHAT KIND OF EXAMPLE TO USE, BECAUSE

19   IF HE HAS DISCUSSED WHAT HE IS GOING TO BE DOING AFTER LUNCH

20   ABOUT USING AN EXAMPLE TO ILLUSTRATE THIS, I THINK THAT'S

21   INAPPROPRIATE.

22           **THE COURT:**  I TAKE BOTH OF YOU AT YOUR WORD.

23   ANDY BIRCHFIELD SAID HE DIDN'T DO IT.  HE IS A REPUTABLE

24   LAWYER.  YOU ALL HAVE BEEN TRYING CASES -- THIS IS THE THIRD

25   TIME YOU ALL HAVE BEEN TO THE WELL HERE, AND I ASSUME IF YOU

1  TELL ME YOU DIDN'T TALK TO HIM --

2        **MR. BIRCHFIELD:**  I DIDN'T COACH HIM ON THIS.

3        **MR. BECK:**  DID YOU DISCUSS WITH HIM USING AN EXAMPLE?

4        **MR. BIRCHFIELD:**  I TOLD YOU WHAT I DID.  YOU FUSSED

5  AT ME USING THAT.  I ASKED HIM, "CAN YOU GIVE A GENERIC

6  SAMPLE," THAT'S IT, SO I COULD REMEDY HIS PROBLEM, NO DETAILS

7  OR ANYTHING ABOUT THAT.

8        **MR. BECK:**  YOUR HONOR, DISCUSSING WITH THE WITNESS

9  WHAT HE CAN DO BY WAY OF AN EXAMPLE -- I BELIEVE ANDY 100

10 PERCENT ON THIS, SO I'M NOT SAYING HE DID ANYTHING OTHER THAN

11 THAT, BUT WHAT I'M SAYING IS WHAT HE DID VIOLATES YOUR HONOR'S

12 INSTRUCTIONS THAT YOU'VE GIVEN US TWO TRIALS IN A ROW.

13       **MR. BIRCHFIELD:**  I DID IT TO ACCOMMODATE YOUR

14 OBJECTION.

15       **THE COURT:**  LET ME MAKE THE POINT TO BOTH OF YOU ALL

16 I DON'T LIKE THE WITNESSES TO BE TALKED TO IN BETWEEN.  THE

17 ONLY EXCEPTION TO THAT IS A CLIENT.  I CAN'T TELL SOMEBODY NOT

18 TO TALK TO THEIR CLIENT, WHETHER IT'S YOUR CLIENT OR YOUR

19 CLIENT, BUT WITH THE WITNESSES I CAN TELL YOU TO DO THAT.  WITH

20 THIS GUY, LET'S BACK INTO IT FROM THE STANDPOINT OF TWO, THREE

21 TIMES HE SAID THAT IT'S TWO TIMES AND THAT SORT OF THING.  IF

22 YOU WANT TO ILLUSTRATE WHAT HE SAID, I'LL LET YOU DO THAT.

23       **MR. BIRCHFIELD:**  YES, SIR.

24       **THE COURT:**  MARK, LET'S TAKE THAT OTHER THING DOWN.

25       **MR. ROBINSON:**  IT'S DOWN, YOUR HONOR.

1          **THE COURT:**  JUST BACK INTO IT BY SAYING, "YOU

2    TESTIFIED EARLIER THAT IT WAS TWO TIMES.  WOULD YOU ILLUSTRATE

3    THAT TO THE JURY," SO THAT THEY CAN FOLLOW IT.

4          **MR. BECK:**  SO WE ARE GOING TO HAVE TWO TIMES, NOT

5    SOME OTHER NUMBERS THAT ARE GOING TO APPEAR LATER?

6          **THE COURT:**  YES, HE ALREADY SAID.

7          **MR. BECK:**  FINE.

8          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

9    OPEN COURT.)

10          **THE COURT:**  BRING THE JURY IN, PLEASE.

11          (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

12          (WHEREUPON, **LEMUEL MOYE**, HAVING BEEN DULY SWORN,

13    TESTIFIED AS FOLLOWS.)

14                    **DIRECT EXAMINATION**

15    **BY MR. BIRCHFIELD:**

16    **Q.**  DR. MOYE, RIGHT BEFORE THE LUNCH BREAK YOU HAD DESCRIBED

17    FOR US CONFIDENCE INTERVALS; IS THAT RIGHT?

18    **A.**  YES.

19    **Q.**  I WOULD LIKE FOR YOU TO MOVE TO STATISTICAL SIGNIFICANCE.

20    WILL YOU DESCRIBE FOR US WHAT STATISTICAL SIGNIFICANCE IS AND

21    WHAT'S ITS RELEVANCE IN EVALUATING CLINICAL TRIALS.

22    **A.**  YES.  THIS MORNING WE TALKED ABOUT THE COMPROMISE THAT

23    SCIENTISTS TAKE BY DRAWING SAMPLES, AND WHAT WE WANT TO DO IS

24    INFER THAT TO THE POPULATION, BELIEVE WHAT WE FIND IN THE

25    SAMPLE AND BELIEVE THAT IT APPLIES TO THE POPULATION, BUT OF

1  COURSE THE POPULATION CAN FOOL US.  I GAVE AN EXAMPLE THIS

2  MORNING OF HOW A POPULATION IN WHICH THERE IS NO ASSOCIATION

3  BETWEEN AN EXPOSURE AND A DISEASE CAN PRODUCE A SAMPLE THAT HAS

4  ONE.  THAT'S A FALSE SIGNAL.

5         STATISTICAL SIGNIFICANCE IS A MEASURE OF FALSE

6  SIGNALS.  STATISTICAL SIGNIFICANCE DISTILLS DOWN TO SOMETHING

7  CALLED A P-VALUE.  A P-VALUE ESSENTIALLY IS THIS.  IT'S THE

8  PROBABILITY THAT A POPULATION IN WHICH THERE IS NO ASSOCIATION

9  BETWEEN EXPOSURE AND DISEASE PRODUCES A SAMPLE THAT HAS AN

10 ASSOCIATION.  THAT'S A MISTAKE.  IF THE PROBABILITY OF THAT

11 OCCURRING IS HIGH, THEN YOU CAN'T REALLY BELIEVE WHAT'S IN THE

12 SAMPLE.

13        SO LOW P-VALUES OR HIGH STAT SIGNIFICANCE IS

14 ASSOCIATED WITH EFFECTS IN THE SAMPLE THAT WE BELIEVE CAN BE

15 TRANSLATED BACK TO THE POPULATION.  SO IT ALL HAS TO DO WITH

16 HOW WE MEASURE SAMPLING ERROR AND HOW SAMPLING FROM LARGE

17 POPULATIONS CAN FOOL US.  THE MESSAGE THAT MANY USERS COMMONLY

18 TAKE FROM THIS IS THAT IF YOU WANT TO DEMONSTRATE THAT YOUR

19 EFFECT IS IMPORTANT, YOU BETTER HAVE A P-VALUE OF LESS THAN O5.

20 THAT'S WHAT IT COMES DOWN TO.  THERE ARE MANY CRITICISMS OF

21 THAT, BUT I THINK IN THIS CONTEXT THAT'S WHAT WE ARE TALKING

22 ABOUT.

23 **Q.**  THAT'S IF YOU ARE DESIGNING A STUDY TO LOOK FOR A

24 PARTICULAR RESULT YOU WOULD EXPECT?

25 **A.**  YES.  OF COURSE, THERE ARE OTHER ERRORS, AS WELL.  THERE

1   ARE ERRORS WHERE, IN FACT, YOU -- THERE IS A RELATIONSHIP

2   BETWEEN THE EXPOSURE AND THE DISEASE IN THE POPULATION, THERE

3   IS A RELATIONSHIP, BUT WE DON'T SEE ONE IN THE SAMPLE.  THAT'S

4   ANOTHER ERROR.  IN ORDER TO AVOID THAT, WE NEED TO HAVE HIGH

5   POWER.  LOTS OF STATISTICAL POWER ALLOWS US TO LOOK AT NULL OR

6   NEGATIVE CONCLUSIONS IN THE SAMPLE AND INFER THEM BACK TO THE

7   POPULATION.  IN THE END, IT COMES DOWN TO WHAT OUR CRITICS ARE

8   GOING TO SAY.  IF WE FIND A POSITIVE RESULT IN THE SAMPLE, THEN

9   THE CRITICS ARE GOING TO WANT A LOW P-VALUE.  IF WE FIND NULL

10  RESULT IN THE SAMPLE, THEN OUR CRITICS WANT TO BE SURE THAT THE

11  POWER IS HIGH.

12          CLINICAL TRIALS ARE DESIGNED TO LOOK FOR A SPECIFIC

13  FINDING, AS OFTEN AS THE TRIALS ARE.  SPECIFIC FINDINGS ARE

14  DESIGNED SO THAT THERE IS A GOOD CHANCE FOR STAT SIGNIFICANCE

15  AND ALSO HIGH POWER.  WHEN STUDIES AREN'T DESIGNED THAT WAY,

16  THEN WE CAN'T RELY ON THINGS LIKE STATISTICAL SIGNIFICANCE IF

17  THE STUDY REALLY WASN'T DESIGNED TO PRODUCE A STATISTICALLY

18  SIGNIFICANT EFFECT.

19  **Q.**   DR. MOYE, WE SEE ARTICLES WHERE WE HAVE A SERIES OF

20  NUMBERS WRITTEN OUT AND THERE'S REFERENCES TO RELATIVE RISK AND

21  THE CONFIDENCE INTERVALS AND THE P-VALUES.

22  **A.**   YES.

23  **Q.**   BEFORE WE BROKE, YOU GAVE US JUST AN ILLUSTRATION USING A

24  RELATIVE RISK OF 2.0.

25  **A.**   YES.

1    **Q.**   WOULD YOU GO TO THE BOARD HERE.  WHAT I WOULD ASK YOU TO

2    DO IS A HYPOTHETICAL SITUATION WITH A 2.0 RELATIVE RISK, AND

3    WRITE OUT HOW WE WOULD SEE THE CONFIDENCE INTERVALS AND THE

4    P-VALUES EXPRESSED IN A MEDICAL JOURNAL.

5    **A.**   YES.  WELL, WE ARE STARTING WITH A RELATIVE RISK EQUALS

6    2.0.  NOW, REMEMBER THIS MORNING WE SAID THAT THAT MEANS THAT

7    THE EVENT IS TWICE AS LIKELY IN THE EXPOSED GROUP AS IN THE

8    UNEXPOSED GROUP.  THAT'S AN IMPORTANT MESSAGE, BUT THERE ARE

9    OTHER ASPECTS OF THIS WE HAVE TO CONSIDER AND ONE IS THAT WE

10   DIDN'T STUDY THE ENTIRE POPULATION.  IF WE STUDIED THE ENTIRE

11   POPULATION, WE HAVE OUR ANSWER.  IF WE ONLY STUDY A SAMPLE,

12   THEN WE HAVE TO WORRY ABOUT THINGS LIKE PRECISION.

13         SO WHEN WE TALK ABOUT PRECISION, ONE USEFUL TOOL TO

14   REFLECT THAT IS THE CONFIDENCE INTERVAL.  THE CONFIDENCE

15   INTERVAL IS A RANGE OF VALUES AROUND 2.0.  IF THAT RANGE IS

16   LARGE -- FOR EXAMPLE, IT MIGHT GO FROM -- IF IT'S A CONFIDENCE

17   INTERVAL THAT GOES FROM 0.1 TO 99, THAT SAYS THAT THERE'S NOT

18   MUCH PRECISION IN THIS ESTIMATE OF 2.0 AT ALL, BECAUSE OTHER

19   SAMPLES MIGHT PRODUCE RELATIVE RISK AS LARGE AS 99, WHICH IS A

20   HUGE EFFECT.  OTHER SAMPLES MIGHT PRODUCE RELATIVE RISK AS LOW

21   AS .1.  SO THIS TELLS US THAT WE CAN'T HAVE VERY MUCH

22   CONFIDENCE AT ALL IN THAT 2.0.

23         HOWEVER, IF THE CONFIDENCE INTERVAL WAS -- I JUST SAY

24   THIS IS A Y CONFIDENCE INTERVAL AND IT EQUALS IMPRECISION.  A

25   NARROW CONFIDENCE INTERVAL THAT GOES FROM, SAY, 1.6 TO 3.2,

1  WELL, THAT CONVEYS A DIFFERENT MESSAGE.  THAT SAYS THAT, OKAY,

2  WE RECOGNIZE THAT EVERY SAMPLE WON'T PRODUCE A RELATIVE RISK OF

3  2.0, BUT THAT THE RANGE OF EXPECTED RELATIVE RISK ARE

4  RELATIVELY NARROW.  THEY ARE ALL PRETTY CLOSE TO EACH OTHER.

5  SO WHETHER IT'S 1.6 OR 1.7 OR 3.2, IT STILL TRANSMITS THE SAME

6  MESSAGE THAT THIS IS A FAIRLY PRECISE ESTIMATE OF RELATIVE RISK

7  AND, EVERYTHING ELSE BEING EQUAL, IS MORE BELIEVABLE THAN THE

8  RELATIVE RISK THAT PRODUCED THIS Y CONFIDENCE INTERVAL.

9  **Q.**   WE ALSO SEE A P-VALUE; IS THAT RIGHT?

10  **A.**   YES.  NOW, STATISTICAL SIGNIFICANCE CAN BE RELATED TO EACH

11  OF THESE.  REMEMBER, WE SAID THE SMALLER THE P-VALUE, THE LESS

12  LIKELY WE ARE GOING MISLED BY THE POPULATION.  BY "MISLED" I

13  SIMPLY MEAN THAT THE POPULATION DEALT US A BAD HAND, DEALT US A

14  MISLEADING SAMPLE.  THE SMALLER THE P-VALUE, THE LESS LIKELY

15  THAT'S GOING TO HAPPEN.

16  **Q.**   A FORMULA LIKE WE WOULD SEE IN A MEDICAL JOURNAL, WE WOULD

17  SEE LIKE 2.0, IS THAT RIGHT, REPRESENTING THE RELATIVE RISK?

18  **A.**   YES, SIR.

19  **Q.**   AND THEN A CONFIDENCE INTERVAL, CI; IS THAT RIGHT?

20  **A.**   YES.

21  **Q.**   AND LIKE 95 PERCENT; IS THAT STANDARD?

22  **A.**   YES.  STANDARD CONFIDENCE INTERVALS ARE 95 PERCENT

23  CONFIDENCE.

24  **Q.**   THEN WE WOULD HAVE A SERIES OF NUMBERS LIKE HERE

25  REPRESENTING THE RANGE .1 TO 99; IS THAT CORRECT?

1  **A.**   YES.  THAT WOULD REFLECT THE 95 PERCENT CONFIDENCE

2  INTERVAL ASSOCIATED WITH THE RELATIVE RISK OF 2.0.

3  **Q.**   THEN WE WOULD HAVE A P-VALUE; IS THAT RIGHT?

4  **A.**   YES.

5  **Q.**   P EQUALS .05, WOULDN'T IT?

6  **A.**   WHATEVER IT HAPPENED TO BE.

7  **Q.**   SO WHEN WE ARE LOOKING AT A MEDICAL JOURNAL AND WE SEE A

8  SERIES OF NUMBERS LIKE THIS --

9  **A.**   YES.

10  **Q.**   -- THE 2.0 WOULD REPRESENT THE RELATIVE RISK?

11  **A.**   RIGHT.

12  **Q.**   THE CI, 95 PERCENT, WOULD TELL US IT'S A 95 PERCENT

13  CONFIDENCE INTERVAL?

14  **A.**   YES.

15  **Q.**   .1 TO 99 WOULD GIVE US THE RANGE?

16  **A.**   THE ACTUAL POSITION OF THE CONFIDENCE INTERVAL.

17  **Q.**   THE P-VALUE WOULD TELL US WHAT, DOCTOR?

18  **A.**   THE P-VALUE TELLS US HOW LIKELY IT IS THAT A POPULATION IN

19  WHICH THE TRUE RELATIVE RISK WAS 1 WOULD PRODUCE A VALUE OF

20  2.0.

21  **Q.**   SO IF WE HAVE A P-VALUE OF .05, THAT TELLS US HOW LIKELY

22  THE RESULT IS?

23  **A.**   WELL, WHAT THAT TELLS US IS THAT IT'S UNLIKELY THAT A

24  RELATIVE RISK AS LARGE AS 2.0 IS DUE TO CHANCE.

25  **Q.**   HOW UNLIKELY?

1   **A.**   I DON'T WANT TO BE TOO TECHNICAL.  I WOULD JUST SAY IT IS

2   VERY UNLIKELY.  VERY UNLIKELY.  OF COURSE, THE LOWER THE

3   P-VALUE, THE LESS LIKELY IT BECOMES.

4   **Q.**   THANK YOU, DOCTOR.  YOU MENTIONED THE CONCEPT OF POWER,

5   DR. MOYE.

6   **A.**   YES.

7   **Q.**   IN DESIGNING A CLINICAL TRIAL, CAN YOU TELL US HOW THE

8   CONCEPT OF POWER COMES INTO PLAY?

9   **A.**   YES.  IN THIS SAMPLING PRACTICE, WE COULD BE MISLEAD TWO

10  WAYS.  ONE WAY, AS I MENTIONED, WE JUST TALKED ABOUT, IS THAT

11  THE SAMPLE, THE POPULATION HAD A RELATIVE RISK OF 1 AND IT

12  PRODUCED A SAMPLE WITH A RELATIVE RISK OF 2.0.  WELL, THAT'S

13  MISLEADING.  THAT SUGGESTS THAT THERE'S SOMETHING GOING ON IN

14  THE POPULATION WHEN THERE REALLY ISN'T.  SO THE P-VALUE ALLOWS

15  US TO ASSESS THAT.

16       BUT THE REVERSE PARADIGM, THE REVERSE PROBLEM, IS

17  THERE REALLY IS A RELATIONSHIP IN THE POPULATION, THERE REALLY

18  IS SOMETHING THERE, BUT AGAIN WE ARE -- THE INVESTIGATOR IS

19  DEALT A BAD HAND AND IS UNLUCKY ENOUGH TO GET A SAMPLE IN WHICH

20  THERE IS NO RELATIONSHIP.  SO WE WANT TO BE ABLE TO DRAW

21  CONCLUSIONS ACCURATELY FROM NEGATIVE RESULTS OR NULL RESULTS AS

22  WE DO FROM POSITIVE RESULTS.  SO WE NEED TO HAVE ASSURANCES

23  THAT THERE WAS ENOUGH POWER TO FIND THE DIFFERENCE.

24       TO ME POWER IS LIKE A SPOTLIGHT.  IT WOULD BE LIKE IF

25  I WAS TOLD THAT THERE IS SOMETHING OF GREAT VALUE IN THE

1    BASEMENT OF THIS BUILDING AND I GO DOWN AND LOOK FOR IT AND I

2    COME BACK AND I SAY I DIDN'T FIND IT, BUT I NEVER TURNED THE

3    LIGHT ON.  WELL, YOU CAN'T ACCEPT MY CONCLUSION ONCE YOU KNOW

4    THE LIGHT WASN'T ON.  THAT'S WHAT POWER IS.  POWER IS LIKE A

5    SPOTLIGHT.  THE MORE POWER I HAVE, THE BRIGHTER THE LIGHT IS,

6    THE MORE PERSUASIVE MY CONCLUSION THAT THERE REALLY ISN'T

7    ANYTHING DOWN THERE.  IF THE LIGHT WAS REALLY ON AND I LOOKED

8    AND I COULDN'T FIND IT, THEN YOU CAN BELIEVE THERE WAS NOTHING

9    DOWN THERE.  BUT IF THE LIGHT WASN'T ON AND THE POWER IS LOW,

10   THEN YOU CAN'T BELIEVE A NEGATIVE FINDING.

11           THAT'S WHAT IS CONVEYED IN THE PHRASE THAT'S USED

12   COMMONLY BY THE FDA.  "ABSENCE OF EVIDENCE IS NOT EVIDENCE OF

13   ABSENCE."  ABSENCE OF EVIDENCE OF AN EXPOSURE/DISEASE

14   RELATIONSHIP IN AN UNDERPOWERED ENVIRONMENT IS NOT EVIDENCE

15   THAT THERE'S NO RELATIONSHIP THERE.  SO WHEN PEOPLE DESIGN

16   STUDIES, THEY WANT TO DESIGN STUDIES THAT IF THEY FIND

17   SOMETHING IMPORTANT, THEY WANT TO BELIEVE THAT REALLY APPLIES

18   TO THE POPULATION.  SO YOU WANT TO MAKE SURE YOU'VE GOT STAT

19   SIGNIFICANCE, BUT ALSO THE STUDY HAS TO BE INTERPRETABLE IF YOU

20   DON'T FIND ANYTHING EITHER.  SO YOU ALSO HAVE TO HAVE ADEQUATE

21   POWER.

22           ASSUMPTIONS ABOUT POWER AND ASSUMPTIONS ABOUT STAT

23   SIGNIFICANCE ARE BUILT INTO THE DESIGN OF THE STUDY, AND

24   TYPICALLY WHAT IT DOES IS IT INCREASES THE NUMBER OF SUBJECTS

25   YOU HAVE TO HAVE IN THE STUDY SO THAT YOU CAN DRAW REASONABLE

1    CONCLUSIONS AND GENERALIZABLE CONCLUSIONS WHEN EITHER THE STUDY

2    IS POSITIVE OR IT'S NULL.

3    **Q.**    SO, DR. MOYE, IN ORDER TO LEARN ANYTHING FROM A STUDY

4    ABOUT A PARTICULAR OUTCOME, YOU HAVE TO HAVE A LARGE ENOUGH

5    STUDY, A STUDY THAT HAS ENOUGH POWER TO DETECT THAT RISK?

6    **A.**    THAT'S RIGHT.  THAT'S ONE OF THE REASONS YOU HAVE TO KNOW

7    WHAT YOU ARE LOOKING FOR.  WHEN YOU DESIGN A STUDY, YOU HAVE TO

8    KNOW WHAT EFFECT YOU ARE LOOKING FOR SO THAT YOU CAN BE SURE

9    THAT YOU HAVE ENOUGH SUBJECTS IN THE STUDY, SO THAT YOU HAVE

10   ADEQUATE POWER AND ADEQUATE STATISTICAL SIGNIFICANCE.  WITHOUT

11   THOSE, YOU CAN'T REALLY INTERPRET THE CONCLUSIONS OF THE STUDY.

12   **Q.**    SO IF YOU HAVE A SMALL STUDY AND IT DOESN'T SHOW ANY RISK

13   BECAUSE IT'S NOT POWERED TO DETECT THAT RISK, YOU DON'T REALLY

14   LEARN ANYTHING FROM IT; IS THAT WHAT YOU'RE SAYING?

15   **A.**    RIGHT.  THE WORD WE USE FOR STUDY RESULTS LIKE THAT --

16   WHICH ARE NULL, THEY DON'T FIND ANY RELATIONSHIP, THERE'S NO

17   STAT SIGNIFICANCE, BUT THEY ARE ALSO UNDERPOWERED -- WE SAY

18   THOSE STUDIES ARE UNINFORMATIVE.  THEY DON'T REALLY INFORM US.

19   THEY DON'T EDUCATE US ABOUT THE PRESENCE OF AN EXPOSURE/DISEASE

20   RELATIONSHIP IN THE POPULATION.

21   **Q.**    WHEN YOU'RE TALKING ABOUT STAT SIGNIFICANCE OR STATISTICAL

22   SIGNIFICANCE, DO YOU VIEW STATISTICAL SIGNIFICANCE DIFFERENTLY

23   IF YOU'RE LOOKING FOR A BENEFIT VERSUS A RISK?

24   **A.**    WELL, YES, I DO, BUT NOT JUST ME.  I MEAN, THE MEDICAL

25   COMMUNITY AND THE REGULATORY COMMUNITY ALL AGREE THAT THE

1  THRESHOLD FOR LOOKING FOR A BENEFICIAL EFFECT IS DIFFERENT THAN

2  THE THRESHOLD FOR LOOKING FOR RISK, BECAUSE WHEN WE'RE LOOKING

3  FOR RISK -- AND WE ARE OATH BOUND TO FIRST DO NO HARM.  SO WE

4  WANT TO BE VERY SENSITIVE TO THE OCCURRENCE OF RISK, AND THAT

5  MEANS THAT WE DON'T REQUIRE NEARLY AS MUCH EVIDENCE TO FIND

6  RISK.  BECAUSE IF WE DID, WE WOULD HAVE TO DO A LOT MORE WORK,

7  AND IN THE MEANTIME MORE PEOPLE ARE GETTING ILL.  SO THAT'S THE

8  MOTIVATION FOR HAVING A LOWER THRESHOLD FOR RISK.

9          HOWEVER, WHEN IT COMES TO EFFECTIVENESS WE HAVE A

10  HIGHER THRESHOLD, AND IT IS BECAUSE WE KNOW THAT -- ASSUME WE

11  ARE TALKING ABOUT MEDICATIONS HERE, IN GENERAL.  EVERY

12  MEDICATION HAS RISK INVOLVED.  WE KNOW THAT.  WE WANT TO BE,

13  THEREFORE, SURE THAT THE BENEFIT IS WORTH THE RISK.  WE WANT TO

14  BE VERY SURE THAT BENEFIT IS THERE.  SO WE HAVE A HIGH STANDARD

15  FOR BENEFIT.  SO THE THRESHOLDS FOR BENEFIT ARE VERY, VERY

16  TOUGH TO MEET, FRANKLY.  THE THRESHOLDS FOR RISK, BECAUSE WE

17  ARE SO SENSITIVE TO REOCCURRENCE OF RISK, ARE MUCH EASIER TO

18  MEET AND IT CAN APPEAR MUCH EASIER IN SMALL SAMPLES.

19  **Q.**   WOULD IT BE THE PROPER COURSE OR AN IMPROPER COURSE IF A

20  CLINICAL STUDY SHOWS AN ADVERSE EVENT, A BAD EFFECT OF THE

21  DRUG, BUT IT'S NOT QUITE STATISTICALLY SIGNIFICANT, IT'S JUST

22  BORDERLINE, IS IT OKAY JUST TO DISMISS THAT AS A SIGNAL?

23  **A.**   IF THE STUDY WAS NOT DESIGNED TO LOOK FOR THIS EFFECT, IT

24  POPPED UP, THEN CLEARLY THE STUDY WASN'T DESIGNED TO SHOW IT,

25  AND SO I DON'T EXPECT ANYTHING TO BE STATISTICALLY SIGNIFICANT.

1   IF IT'S A HAZARD, THEN I HAVE TO REACT TO THAT.  IT DOESN'T
2   MEAN I HAVE TO SOUND THE ALARMS AND STOP WORKING ON THE DRUG.
3   IT DOES MEAN THAT I HAVE TO TAKE THIS SIGNAL SERIOUSLY AND ACT
4   ON IT.
5   **Q.**   WHEN YOU SAY IF IT'S NOT DESIGNED SPECIFICALLY FOR THAT,
6   TELL US WHAT A PRIMARY ENDPOINT IS IN A STUDY.
7   **A.**   YES.  EARLIER WE SAID THAT STUDIES, YOU HAVE TO KNOW WHAT
8   IT IS YOU'RE LOOKING FOR, THAT IS TO SAY, THAT YOU HAVE TO BE
9   ABLE TO COLLECT ENOUGH PEOPLE WHO HAVE THE EVENTS OF INTEREST.
10  LET'S SAY WE WERE DOING A STUDY THAT WAS TRYING TO REDUCE THE
11  NUMBER OF LUNG INFECTIONS, THE NUMBER OF PNEUMONIA CASES.
12  WELL, I CAN'T DRAW ANY CONCLUSIONS ABOUT THE EFFECT OF THERAPY
13  IN THIS STUDY IF NOBODY HAS LUNG INFECTIONS.  I HAVE TO HAVE
14  ENOUGH PEOPLE WITH LUNG INFECTIONS SO THAT I CAN DRAW A
15  REASONABLE CONCLUSION ABOUT THE EFFECT OF THERAPY IN REDUCING
16  IT.
17          SO THAT MEANS I HAVE TO THINK ABOUT HOW I'M GOING TO
18  SELECT PEOPLE FOR THE STUDY.  I WANT TO SELECT PEOPLE WHO ARE
19  LIKELY TO GET LUNG INFECTIONS, AND SO THAT WAY I GET ENOUGH
20  PEOPLE WITH LUNG INFECTIONS IN THE STUDY AND I CAN COME TO A
21  REASONABLE CONCLUSION ABOUT THE EFFECT OF THERAPY.  IF I DON'T
22  DESIGN THE STUDY -- SO, THEREFORE, LUNG INFECTIONS IS GOING TO
23  MY PRIMARY ENDPOINT, THAT IS TO SAY, IT IS THE ANALYSIS THAT'S
24  GOING TO DETERMINE WHETHER THE STUDY IS POSITIVE OR NULL.  SO
25  THAT MEANS I'M GOING TO HAVE ENOUGH SUBJECTS SO I HAVE A GOOD

822

1  CHANCE FOR STATISTICAL SIGNIFICANCE PROTECTING AGAINST ONE

2  ERROR; AND, ALSO, I HAVE HIGH POWER PROTECTING AGAINST THE

3  OTHER ERROR.  SO I HAVE TO KNOW WHAT THE PRIMARY ENDPOINT IS

4  AND THAT WAY I CAN FIND ENOUGH PATIENTS WHO WILL GET THAT

5  ENDPOINT THAT WILL ALLOW ME TO DETERMINE WITH A REASONABLE

6  STATISTICAL CERTAINTY WHETHER THE THERAPY IS EFFECTIVE OR NOT.

7  Q.   SO IN THE ILLUSTRATION YOU JUST USED, THAT WOULD BE LIKE A

8  LUNG INFECTION OUTCOME STUDY BECAUSE YOU'RE LOOKING FOR THAT

9  PARTICULAR OUTCOME?

10 A.   YES.

11 Q.   IF YOU WERE LOOKING FOR CARDIOVASCULAR RISKS, THAT WOULD

12 BE LIKE A CV OUTCOME STUDY; RIGHT?

13 A.   YES, SIR.

14 Q.   THAT'S WHERE YOU DESIGN THE STUDY TO LOOK FOR THAT

15 PARTICULAR EFFECT OR BAD EFFECT; IS THAT RIGHT?

16 A.   EXACTLY RIGHT.

17 Q.   DR. MOYE, I WANT TO ASK YOU ABOUT THE DIFFERENCES IN TYPES

18 OF STUDIES THAT ARE DONE.  WE HAVE RANDOMIZED CLINICAL TRIALS;

19 RIGHT?

20 A.   YES, SIR.

21 Q.   IS THAT WHAT YOU WERE TALKING ABOUT WITH LIKE THE

22 PHASE III TRIALS?

23 A.   YES, SIR.  THOSE ARE PRIMARILY WHAT ARE CALLED PROSPECTIVE

24 RANDOMIZED CLINICAL TRIALS.

25 Q.   THAT'S WHERE YOU HAVE THE CONTROL GROUP OR THE COMPARATIVE

1  GROUP; RIGHT?

2  **A.**   THAT'S WHERE THE INVESTIGATOR CHOOSES THE EXPOSURE.  THE

3  INVESTIGATOR DECIDES THIS PERSON GETS THE EXPOSURE, THIS PERSON

4  DOES NOT GET THE EXPOSURE, AND IT'S ESSENTIALLY CARRIED OUT

5  VERY ELEGANTLY; SO THAT THE ONLY DIFFERENCE BETWEEN THESE TWO

6  GROUPS IN THE END IS THAT ONE GOT THE EXPOSURE AND THE OTHER

7  DIDN'T.  DEMOGRAPHICS ARE THE SAME, HISTORY OF DISEASE IS THE

8  SAME, SO THE ONLY DIFFERENCE BETWEEN THE TWO IS THE EXPOSURE;

9  THEREFORE, ANY DIFFERENCE I FIND IN THE END I CAN ATTRIBUTE TO

10  THE PRESENCE OF THE EXPOSURE.

11  **Q.**   WOULD YOU DESCRIBE FOR US WHAT OBSERVATIONAL STUDIES ARE.

12  **A.**   RIGHT.  AN OBSERVATIONAL STUDY IS A STUDY WHERE THE

13  INVESTIGATOR DOESN'T CHOOSE THE EXPOSURE, PEOPLE CHOOSE THE

14  EXPOSURE.  NOW, THESE STUDIES ARE MUCH MORE DIFFICULT TO DRAW

15  CONCLUSIONS FROM BECAUSE PEOPLE CHOOSE EXPOSURES FOR LOTS OF

16  DIFFERENT REASONS, AND THOSE REASONS MAY BE BOUND UP IN THE

17  EFFECT.

18         AS A SIMPLE HYPOTHETICAL EXAMPLE, IF SOMEBODY REALLY

19  WANTED TO DO A STUDY THAT LOOKED AT THE RELATIONSHIPS BETWEEN

20  CELLPHONE USE AND THE OCCURRENCE OF BRAIN CANCER, THEN HOW CAN

21  YOU DECIDE WHO IS GOING TO USE A CELLPHONE AND WHO ISN'T?  YOU

22  CAN'T CONTROL THAT.  YOU CAN THINK YOU'RE DECIDING, BUT PEOPLE

23  ARE GOING TO DO WHAT THEY WANT TO DO.  SO THAT IS AN

24  OBSERVATIONAL STUDY WHERE THE INVESTIGATOR DOESN'T DETERMINE

25  THE EXPOSURE, THE INVESTIGATOR SITS BACK AND WATCHES THE

1  EXPOSURE/DISEASE RELATIONSHIP THAT'S ALREADY EMBEDDED IN THE

2  POPULATION.  BECAUSE PEOPLE ARE EXPOSED FOR DIFFERENT REASONS

3  THAT THE INVESTIGATOR CAN'T CONTROL, IN THE END THE EFFECT YOU

4  GET MAY NOT BE REALLY ATTRIBUTABLE TO THE EXPOSURE BECAUSE

5  THERE ARE OTHER DIFFERENCES BETWEEN EXPOSED AND UNEXPOSED.  SO

6  THESE OBSERVATIONAL STUDIES, SOMETIMES THEY'RE THE ONLY THING

7  WE CAN DO, BUT WE RECOGNIZE THAT THERE ARE LIMITATIONS IN THE

8  RESULTS THAT WE DRAW FROM THEM.

9  **Q.**   THERE ARE LIMITATIONS --

10  **A.**   YES.

11  **Q.**   -- WITH OBSERVATIONAL STUDIES?

12  **A.**   YES, SIR.

13  **Q.**   BUT THEY CAN STILL PROVIDE A USEFUL TOOL IN DISCOVERING

14  BAD EFFECTS?

15  **A.**   ESSENTIALLY, IF THE OBSERVATIONAL STUDY PRODUCES A HUGE

16  SIGNAL, A VERY LARGE SIGNAL, THEN THAT OBSERVATIONAL STUDY,

17  EVERYTHING ELSE BEING EQUAL, IS GOING TO BE MORE BELIEVABLE

18  THAN AN OBSERVATIONAL STUDY THAT PRODUCES A MODEST SIGNAL.

19  IT'S LIKE A SIGNAL-TO-NOISE RATIO.  THERE'S A LOT OF NOISE IN

20  OBSERVATIONAL STUDIES, SO THE SIGNAL HAS TO BE MUCH HIGHER IN

21  ORDER TO SEPARATE OUT THE SIGNAL FROM THE NOISE.  IF THE SIGNAL

22  IS VERY LOW IN THE OBSERVATIONAL STUDY, THEN IT MAY JUST BE

23  PART OF THE BACKGROUND.

24  **Q.**   I WANT TO GO BACK TO YOUR DISCUSSION ABOUT YOUR EXPERT

25  TESTIMONY IN OTHER DRUG COMPANY LITIGATION, IF I COULD DO THAT

1    FOR A FEW MINUTES.

2    **A.**   YES.

3    **Q.**   YOU TOLD US YOU TESTIFIED IN <u>FEN-PHEN</u> LITIGATION; IS THAT

4    CORRECT?

5    **A.**   THAT'S RIGHT, YES.

6    **Q.**   OVER WHAT PERIOD OF TIME?  HOW MANY YEARS WERE YOU

7    INVOLVED IN THE <u>FEN-PHEN</u> LITIGATION?

8    **A.**   I THINK JUST OVER EIGHT YEARS.  I THINK THAT'S RIGHT.

9    **Q.**   DURING THAT PERIOD OF TIME, DID YOU GIVE DEPOSITIONS AND

10   TESTIFY AT TRIAL?

11   **A.**   THAT'S RIGHT, I DID.

12   **Q.**   DID YOU REVIEW DOCUMENTS AND CONSULT WITH ATTORNEYS?

13   **A.**   YES, THAT'S RIGHT.  I MET WITH ATTORNEYS; SOMETIMES

14   INDIVIDUALLY, SOMETIMES AS GROUPS.

15   **Q.**   OVER THAT PERIOD OF TIME, WHAT DID YOU AVERAGE PER YEAR IN

16   PAYMENT FROM THE LAWYERS INVOLVED IN THOSE CASES?

17   **A.**   I THINK IT AVERAGES TO ABOUT $170,000 A YEAR.  I THINK

18   THAT'S APPROXIMATELY RIGHT.

19   **Q.**   SO, OVER THAT SEVEN OTHER EIGHT-YEAR PERIOD, WHAT'S THE

20   TOTAL YOU MADE?

21   **A.**   ABOUT $1.35 MILLION, $1.4 MILLION.

22   **Q.**   YOUR PAYMENT IN THOSE CASES, WAS IT ALL BASED ON THE

23   HOURLY WORK THAT YOU DID?

24   **A.**   YES.

25   **Q.**   $400 AN HOUR, ROUGHLY?

1    **A.**   YES.

2    **Q.**   HAVE YOU TESTIFIED OR BEEN INVOLVED IN OTHER DRUG COMPANY

3    LITIGATION INVOLVING DRUGS THAT HAVE BEEN PULLED OFF THE

4    MARKET?

5    **A.**   YES, I HAVE.  THAT'S RIGHT.

6    **Q.**   DID THAT INCLUDE REZULIN?

7    **A.**   YES.

8    **Q.**   LOTRONEX?

9    **A.**   FOR A SHORT TIME WITH LOTRONEX, YES.

10   **Q.**   OVER WHAT PERIOD OF TIME DID YOU WORK IN THE REZULIN

11   LITIGATION?

12   **A.**   GEE, I THINK THAT STARTED IN MAYBE 2000.  I'M TRYING TO

13   REMEMBER OFF THE TOP OF MY HEAD HERE.  I THINK IT STARTED IN

14   2000, APPROXIMATELY.

15   **Q.**   HOW MUCH MONEY DID YOU MAKE INVOLVED IN THAT LITIGATION?

16   HOW MUCH WERE YOU PAID?

17   **A.**   ACTUALLY, I DON'T REMEMBER.  I MAY HAVE SAID IT SOMEWHERE,

18   BUT SITTING HERE NOW I DON'T REMEMBER.

19   **Q.**   WERE YOU PAID BASED ON YOUR HOURLY RATE?

20   **A.**   YES.

21   **Q.**   YOU'RE ONLY PAID FOR THE HOURS THAT YOU WORK IN A CASE?

22   **A.**   THAT'S RIGHT, YES.

23   **Q.**   WHAT ABOUT LOTRONEX?

24   **A.**   LOTRONEX, I DIDN'T WORK VERY LONG EVEN AT ALL.  I THINK I

25   ONLY GAVE -- I THINK I WROTE A REPORT AND GAVE A SINGLE

DAILY COPY

1   DEPOSITION, SO I DIDN'T MAKE VERY MUCH MONEY THERE.

2   **Q.**   DR. MOYE, YOU DESCRIBED FOR US YOUR RELATIONSHIP WITH

3   SCIENTIFIC EVIDENCE; IS THAT RIGHT?

4   **A.**   YES.

5   **Q.**   YOU MENTIONED THE FACT THAT THEY WOULD ASK YOU TO GET

6   INVOLVED IN CERTAIN LITIGATION AND YOU WOULD MAKE A DECISION ON

7   WHETHER TO GET INVOLVED OR NOT.

8   **A.**   THAT'S RIGHT.

9   **Q.**   DESCRIBE FOR US WHAT YOU GO THROUGH IN THAT DECISION

10   MAKING PROCESS.

11   **A.**   SURE.  I FIRST TRY TO ASSESS WHAT I UNDERSTAND ABOUT THE

12   ISSUES, WHAT'S MY UNDERSTANDING OF THE ISSUE.  SOMETIMES MY

13   UNDERSTANDING IS INCOMPLETE BECAUSE I HAVEN'T DONE ANY WORK

14   YET, SO I DON'T REALLY KNOW ALL OF THE RELEVANT PARTS OF IT.

15   SO I MAKE AN INITIAL DETERMINATION ABOUT THAT.  I ALSO TRY TO

16   MAKE A DETERMINATION OF HOW MUCH TIME IT IS GOING TO TAKE.

17   SOMETIMES I'M JUST TOO BUSY AND THERE'S NO MORE ROOM ON MY

18   PLATE TO DO ANYTHING ELSE.  THOSE ARE ESSENTIALLY THE TWO MAIN

19   THINGS.

20   **Q.**   HAVE THERE BEEN OPPORTUNITIES FOR YOU TO GET INVOLVED IN

21   LITIGATION THAT YOU HAVE DECLINED?

22   **A.**   OH, SURE.  YES.

23   **Q.**   BASED ON THOSE FACTORS YOU JUST DESCRIBED?

24   **A.**   YES.

25   **Q.**   DR. MOYE, I WANT TO GO BACK TO VIOXX AND ACTUALLY THE

1   LABEL.  HAVE YOU REVIEWED THE VIOXX LABEL FOR 1999?

2          **MR. BECK:**  YOUR HONOR, MAY WE APPROACH?

3          **THE COURT:**  YES.

4          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

5   THE BENCH.)

6          **MR. BECK:**  YOUR HONOR, HERE'S THE PROBLEM, WHERE I

7   SEE THIS GOING.  I DON'T KNOW WHAT HE IS GOING TO SAY TODAY ON

8   THE STAND, BUT IN HIS REPORT THAT HE FILED IN THIS CASE THE

9   OPINION THAT HE HAD CONCERNING THE 1999 LABEL WAS NO LABEL

10  WOULD EVER BE ADDED BECAUSE THE DRUG IS UNSAFE AT ANY DOSE FOR

11  ANY DURATION.  IF THAT'S WHAT HE TESTIFIES TO, THEN WE ARE

12  STRAYING INTO GENERAL CAUSE.  IF HE TESTIFIES TO SOMETHING

13  OTHER THAN -- LIKE IF HE JUST GIVES A VANILLA OPINION THAT

14  SAYS, "I DON'T THINK THE CV WARNING IS ADEQUATE," I HAVE TO

15  EXAMINE AND POINT OUT THAT'S NOT WHAT HE SAID IN HIS OPINION

16  AND THEN WE ARE STRAYING INTO GENERAL CAUSE.

17          AS LONG AS I'M UP HERE, I WILL TALK ABOUT THE

18  2002 LABEL SO I DON'T HAVE TO INTERRUPT AGAIN.  HE DOES NOT

19  HAVE ANY OPINION IN HIS REPORT ON THE 2002 LABEL.  IT DOESN'T

20  MENTION THE 2002 LABEL.  IN FAIRNESS, HE WAS ASKED AT HIS

21  DEPOSITION ABOUT THE 2002 LABEL AND, ONCE AGAIN, HE SAYS -- I

22  COULD QUOTE IT, BUT TAKE MY WORD FOR IT.  HE SAYS, "WELL, IT'S

23  MY OPINION, LIKE ALL THESE LABELS, THE DRUG IS UNSAFE AT ANY

24  DOSE, SO THERE CAN'T BE A LABEL THAT'S ADEQUATE."  HE WAS

25  ASKED, "WELL, DOES IT ACCURATELY SET FORTH VIGOR?"  HE SAYS

1    YES.

2              IF HE IS GOING TO GIVE THESE OPINIONS, THE LABEL

3    OPINIONS HE HAS ACTUALLY GIVEN BEFORE -- THE DRUG IS UNSAFE AT

4    ANY DOSE AND, THEREFORE, THERE CAN'T BE A GOOD LABEL -- IT'S

5    NOT AN OPINION THAT SAYS THAT THERE'S A KNOWN CARDIOVASCULAR

6    RISK AND THE LABELS DO NOT ACCURATELY SET THAT RISK FORWARD.

7    SO THAT'S THE PROBLEM I SEE US GOING TOWARD.

8              **MR. BIRCHFIELD:**  WE CAN AVOID THAT, YOUR HONOR.  I

9    THINK THAT I CAN ASK HIM HAS HE REVIEWED THIS LABEL, POSING AS

10   A HYPOTHETICAL, SO I DO NOT GET INTO ANY GENERAL CAUSATION.  I

11   HAVE THE TESTIMONY THROUGH JERRY AVORN THAT THERE WERE CONCERNS

12   ABOUT CARDIOVASCULAR RISKS PRIOR TO APPROVAL.  I CAN ASK HIM TO

13   ASSUME IF THERE WERE CONCERNS PREAPPROVAL OF CARDIOVASCULAR

14   RISKS, GIVEN THAT ASSUMPTION, DOES THIS LABEL ADEQUATELY WARN

15   DOCTORS OF CARDIOVASCULAR RISKS, AND HE CAN TELL ME THERE'S NOT

16   ANYTHING IN THE LABEL, NOT EVEN IN THE PRECAUTIONS.

17             **MR. BECK:**  OF COURSE, THAT'S NOT THE OPINION THAT HE

18   PUT IN THE REPORT HE GAVE US.

19             **MR. BIRCHFIELD:**  HE DID TESTIFY THAT THE 1999 WARNING

20   WAS INADEQUATE.

21             **MR. BECK:**  WHAT HE SAID IN HIS DEPOSITION WAS NOT

22   THAT THERE WERE SIGNALS AND THERE SHOULD HAVE BEEN SOME

23   LANGUAGE IN THERE ABOUT THE SIGNALS, HE WENT FULL --

24             **THE COURT:**  HE DIDN'T LIKE IT AT ALL.

25             **MR. BECK:**  HE SAID THEY COULDN'T HAVE A LABEL NO

DAILY COPY

1    MATTER WHAT.

2          **THE COURT:**  I UNDERSTAND THE POINT, BUT IF YOU DO IT

3    THAT WAY I WILL ALLOW IT.

4          **MR. BECK:**  I AM GOING TO CROSS HIM ON WHAT HE

5    ACTUALLY SAID IN HIS REPORT.  WHAT ABOUT 2002, BECAUSE WE DON'T

6    DIDN'T HAVE AN OPINION?

7          **THE COURT:**  ARE YOU GOING INTO 2002?

8          **MR. BIRCHFIELD:**  YES, SIR.  I WILL ALSO DO IT IN A

9    HYPOTHETICAL.  WE HAVE THE VIGOR RESULTS.  ASK HIM, BASED ON

10   THAT ASSUMPTION, "ASSUME THAT THE VIGOR STUDY SHOWED AN

11   INCREASED RISK," AND THEN -- THE ONLY OPINIONS THAT HE IS

12   OFFERING IS, GIVEN THAT ASSUMPTION, IS IT ADEQUATE OR NOT.

13   THAT'S IT.  WE ARE NOT GETTING INTO -- I'M NOT REHASHING VIGOR.

14   I'M NOT.

15         **THE COURT:**  YOU'RE WALKING ON THE EDGE, BUT WE WILL

16   TAKE IT A STEP AT A TIME AND SEE HOW IT COMES OUT.

17         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

18   OPEN COURT.)

19   **BY MR. BIRCHFIELD:**

20   **Q.**   DR. MOYE, DO YOU HAVE 1.0463 IN YOUR BINDER?

21   **A.**   I DO, YES.

22   **Q.**   DO YOU RECOGNIZE THIS AS THE 1999 LABEL FOR VIOXX?

23   **A.**   I WILL IN A MOMENT.  YES, I DO.

24         **MR. BIRCHFIELD:**  YOUR HONOR, AT THIS TIME WE OFFER

25   THE EXHIBIT.

1          **THE COURT:**  I WILL ALLOW IT.

2     **BY MR. BIRCHFIELD:**

3     **Q.**   DR. MOYE, I WANT TO LOOK AT THE DIFFERENT SECTIONS OF THAT

4     LABEL AND ASK YOU IF YOU WOULD JUST DESCRIBE FOR US THE PURPOSE

5     OF EACH SECTION WITHIN THE LABEL AND THE SIGNIFICANCE IT HAS

6     FOR DOCTORS.  WOULD YOU DO THAT FOR US?

7     **A.**   SURE.

8          **THE COURT:**  WHY DON'T YOU ASK HIM FIRST WHAT IS A

9     LABEL.

10    **BY MR. BIRCHFIELD:**

11    **Q.**   DR. MOYE, WHAT IS A LABEL?

12    **A.**   A LABEL IS A STATEMENT BY THE SPONSOR OF ALL THE

13    INFORMATION THEY BELIEVE IS NECESSARY FOR A DOCTOR TO USE THE

14    DRUG SAFELY AND EFFECTIVELY.  IF THE DOCTOR READS THE LABEL,

15    THEN THEY WILL GET ALL THE INFORMATION THAT THEY NEED TO BE

16    ABLE TO USE THIS DRUG SAFELY AND EFFECTIVELY IN PATIENTS.

17    **Q.**   THE CONTENTS WE HAVE IN A PRODUCT LABEL, IS THAT INCLUDED

18    IN A *PHYSICIANS DESK REFERENCE*?

19    **A.**   YES.  THE *PHYSICIANS DESK REFERENCE*, OR *PDR*, IS NOTHING

20    BUT A COLLECTION OF LABELS AS WELL AS PHOTOGRAPHS OF THE DRUG.

21    **Q.**   IS THE LABEL DIVIDED INTO DIFFERENT SECTION, DR. MOYE?

22    **A.**   YES, IT IS.

23    **Q.**   IF YOU WILL LOOK ON THE FIRST PAGE OF THAT LEFT-HAND

24    COLUMN, DO YOU SEE THE CLINICAL PHARMACOLOGY?

25    **A.**   YES, SIR.

1  **Q.**   DOES THAT JUST DESCRIBE HOW THE DRUG WORKS?

2  **A.**   YES.  THE FIRST PART OF THE LABEL PROVIDES SOME SCIENTIFIC

3  INFORMATION ABOUT WHAT THE DRUG IS, HOW THEY BELIEVE IT WORKS,

4  AND SOME BACKGROUND CHEMISTRY.

5  **Q.**   I'M NOT GOING TO ASK YOU SPECIFICALLY ABOUT VIOXX, BUT

6  RIGHT UNDERNEATH THE CLINICAL PHARMACOLOGY IS A TERM "MECHANISM

7  OF ACTION."  WOULD YOU JUST TELL US, IN GENERAL TERMS, WHAT IS

8  MECHANISM OF ACTION?

9  **A.**   SURE.  IT'S THE METHOD BY WHICH SCIENTISTS BELIEVE THE

10  DRUG WORKS.  THAT INFORMATION COMES FROM MUCH OF THE

11  PRECLINICAL WORK AND THE ANIMAL STUDIES AND SOME OF THE

12  INFORMATION FROM PHASE I AND PHASE II STUDY.

13  **Q.**   DR. MOYE, UP ON THE RIGHT-HAND COLUMN WE SEE AT THE TOP A

14  SECTION CALLED "CLINICAL STUDIES."

15  **A.**   YES, SIR.

16  **Q.**   WHAT GOES INTO THE CLINICAL STUDIES PORTION OF THE PRODUCT

17  LABEL?

18  **A.**   A SUMMARY OF THE FINDINGS FROM THE CLINICAL STUDIES IN THE

19  NEW DRUG APPLICATION, SPECIFICALLY THE FINDINGS FROM THE SOME

20  OF THE PHASE II AND PHASE III STUDIES.

21  **Q.**   THEN ON THE SECOND PAGE WE HAVE A SECTION LABELED

22  "INDICATIONS AND USAGE."  WOULD YOU DESCRIBE FOR US THE PURPOSE

23  OF THE INDICATIONS SECTION.

24  **A.**   YES.  THE INDICATIONS SECTION TELLS THE DOCTOR WHAT

25  PATIENTS THIS SHOULD BE USED IN AND WHAT TREATMENTS IT SHOULD

1   BE USED FOR.

2   **Q.**   THEN WE HAVE A CONTRAINDICATIONS SECTION AT THE TOP OF THE

3   RIGHT-HAND COLUMN?

4   **A.**   YES.

5   **Q.**   WHAT DID WE LEARN IN THE CONTRAINDICATIONS SECTION?

6   **A.**   CONTRAINDICATIONS IS SIMPLY WHAT PATIENTS YOU SHOULD NOT

7   USE THE DRUG IN, WHAT PATIENTS ARE KNOWN TO HAVE DIFFICULTY IN

8   THIS DRUG AND THE DRUG SHOULD BE AVOIDED.

9   **Q.**   RIGHT BELOW THAT WE HAVE A WARNINGS SECTION?

10  **A.**   YES.

11  **Q.**   DOES A WARNINGS SECTION HAVE A SPECIFIC MEANING TO

12  DOCTORS?

13  **A.**   YES, IT DOES, MOST DEFINITELY.  WARNINGS SECTIONS TALK

14  ABOUT A PARTICULAR KIND OF ADVERSE EVENT.  IF I CAN, I JUST SAY

15  BRIEFLY THAT AN ADVERSE EVENT IS AN UNDESIRABLE SIDE EFFECT

16  THAT'S REASONABLY BELIEVED TO BE ASSOCIATED WITH THE DRUG.  NOT

17  EVERY ADVERSE EVENT IS A SERIOUS ADVERSE EVENT.  SO TO THE FDA

18  THERE ARE SERIOUS ADVERSE EVENTS AND NONSERIOUS ADVERSE EVENTS.

19  SERIOUS ADVERSE EVENTS ARE ADVERSE EVENTS THAT CAN PRODUCE

20  DEATH, PRODUCE DISABILITY, PRODUCE HOSPITALIZATION OR PROLONGED

21  HOSPITALIZATION, CAUSE BIRTH DEFECTS OR CAUSE CANCER, CLEARLY

22  SERIOUS ADVERSE EVENTS.  THAT'S A SPECIFIC DEFINITION.  THE

23  WARNINGS STATEMENT IN THE WARNINGS SECTION OF THE LABEL TALKS

24  ABOUT THE SERIOUS ADVERSE EVENTS THAT HAVE BEEN ASSOCIATED WITH

25  THE DRUG.

1  **Q.**   HEART ATTACK AND STROKES, WOULD THAT BE CONSIDERED SERIOUS
2  ADVERSE EVENTS, DR. MOYE?
3  **A.**   DEFINITELY.
4  **Q.**   UNDERNEATH THE WARNINGS SECTION, WE HAVE PRECAUTIONS?
5  **A.**   YES.
6  **Q.**   DOES THE PRECAUTIONS SECTION HAVE PARTICULAR MEANING TO
7  DOCTORS?
8  **A.**   YES.  THE PRECAUTIONS SECTION IS LESS ALARMING.  THE
9  PRECAUTIONS SECTION TALKS ABOUT HOW TO USE THE DRUG IN SPECIAL
10 CIRCUMSTANCES.  FOR EXAMPLE, CAN THE DRUG BE USED IN PREGNANT
11 WOMEN?  CAN IT BE USED IN CHILDREN?  CAN IT BE USED IN THE
12 ELDERLY?  CAN IT BE USED WHILE DRIVING?  THESE ARE JUST SPECIAL
13 CIRCUMSTANCES THAT COME UP THAT PATIENTS COMMONLY HAVE FROM
14 DAY-TO-DAY.  IF THERE ARE PARTICULAR CONCERNS ABOUT THE DRUG IN
15 THOSE CIRCUMSTANCES, THEY ARE EXPRESSED HERE IN THE PRECAUTIONS
16 SECTION.
17 **Q.**   ON THE LAST PAGE, DR. MOYE, WE HAVE A SECTION ENTITLED
18 "ADVERSE REACTIONS."
19 **A.**   YES.
20 **Q.**   TELL US WHAT THAT SECTION IS FOR.
21 **A.**   WELL, THE ADVERSE REACTIONS ARE THE REST OF THE ADVERSE
22 EVENTS.  WE ALREADY TALKED ABOUT THE SERIOUS ADVERSE EVENTS,
23 BUT DRUGS HAVE A WHOLE COLLECTION OF ADVERSE EVENTS.  THEY MAY
24 BE TEMPORARY DIZZINESS.  THERE MAY BE NUMBNESS.  THERE MAY BE
25 ITCHING.  THERE MAY BE A CHANGE IN PERCEPTION OF VISION WHEN AN

1    INDIVIDUAL IS LOOKING AT SOMETHING.  THESE ARE NOT

2    LIFE-THREATENING, BUT THEY CERTAINLY ARE NUISANCES, AND DOCTORS

3    AND PATIENTS NEED TO BE AWARE OF THEM.

4    **Q.**   DR. MOYE, I WANT YOU TO ASK YOU TO ASSUME THAT DURING THE

5    FIRST THREE PHASES OF THE DEVELOPMENT OF VIOXX A CONCERN AROSE

6    ABOUT SERIOUS CARDIOVASCULAR RISKS.  ARE YOU WITH ME?

7    **A.**   I UNDERSTAND THE ASSUMPTION.

8    **Q.**   CONSIDERING THAT A SERIOUS CARDIOVASCULAR RISK AROSE

9    PREAPPROVAL OF VIOXX, CAN YOU TELL US WHETHER OR NOT MERCK

10   ADEQUATELY CONVEYED THAT RISK TO DOCTORS IN THE 1999 PRODUCT

11   LABEL?

12   **A.**   NO, THEY DID NOT.

13   **Q.**   WHY DO YOU SAY THAT, DR. MOYE?

14   **A.**   BECAUSE CARDIOVASCULAR RISKS, BY DEFINITION, ARE SERIOUS

15   ADVERSE EVENTS WHICH MEANS THAT PHYSICIANS AND PATIENTS NEED TO

16   KNOW ABOUT THEM.  THEY NEED TO BE PLACED IN THE APPROPRIATE

17   PART OF THE LABEL SO THAT PHYSICIANS AND PATIENTS WILL KNOW

18   ABOUT THEM.  SO THERE NEEDS TO BE A STATEMENT IN THE WARNINGS

19   SECTION OF THE LABEL THAT DESCRIBES CLEARLY WHAT THE

20   CARDIOVASCULAR RISKS ARE, AND THERE IS NO SUCH STATEMENT IN THE

21   WARNINGS SECTION.

22   **Q.**   WELL, DR. MOYE, WOULD A COMPANY HAVE TO HAVE ABSOLUTE

23   PROOF THAT THEIR DRUG IS CAUSING HEART ATTACK RISKS BEFORE THEY

24   PUT IT IN THEIR PRODUCT LABEL?

25   **A.**   NO.  THIS MORNING WE DISCUSSED THE DIFFERENCE BETWEEN

1   ASSOCIATION AND CAUSATION, BUT WHEN IT COMES TO ASSESSING RISKS

2   THE FDA DOES NOT REQUIRE THE SPONSOR TO WAIT UNTIL THEY HAVE

3   FLESHED OUT WHETHER THE RELATIONSHIP IS A MERE ASSOCIATION OR

4   IS CAUSATIVE.  THE VERY IDENTITY OF THE ASSOCIATION IS

5   SUFFICIENT FOR IT TO GO IN THE LABEL.  IN FACT, THE SPECIFIC

6   FDA DEFINITION OF AN ADVERSE EVENT IS AN ASSOCIATION REASONABLY

7   BELIEVED TO BE DUE TO THE DRUG.

8   Q.   DR. MOYE, WHOSE LABEL IS IT?  IS IT MERCK'S LABEL OR THE

9   FDA'S LABEL?

10  A.   IT'S THE SPONSOR'S LABEL.  IN THIS CASE, IT WOULD BE OWNED

11  BY MERCK.

12  Q.   I WANT YOU TO TAKE A LOOK AT PLAINTIFF'S EXHIBIT P1.0466.

13  DO YOU HAVE THAT IN YOUR BINDER?

14  A.   YES, I DO.

15  Q.   DO YOU RECOGNIZE THIS AS THE 2002 PRODUCT LABEL?

16  A.   I DO, YES.

17       MR. BIRCHFIELD:  YOUR HONOR, AT THIS TIME I OFFER

18  PLAINTIFF'S EXHIBIT 1.0466.

19       MR. BECK:  NO OBJECTION.

20       THE COURT:  LET IT BE ADMITTED.

21  BY MR. BIRCHFIELD:

22  Q.   I WOULD ASK YOU TO TURN TO THE SECOND PAGE IN THE WARNINGS

23  SECTION OF THIS DOCUMENT --

24  A.   YES, SIR.

25  Q.   -- AND ASK YOU TO REVIEW THE WARNINGS SECTION OF THIS

1  LABEL AND TELL US WHETHER OR NOT THERE IS A CARDIOVASCULAR OR

2  HEART ATTACK WARNING IN THIS SECTION.

3  **A.**   THERE'S NO HEART ATTACK -- THERE IS NO STATEMENT ABOUT

4  HEART ATTACKS IN THE WARNINGS SECTION OF THE 2002 VIOXX LABEL.

5  **Q.**   DR. MOYE, IF YOU WILL TURN TO THE LAST PAGE OF THIS

6  DOCUMENT, IN THE BOTTOM RIGHT-HAND CORNER, WE SEE THAT THIS IS

7  ISSUED APRIL 2002; IS THAT CORRECT?

8  **A.**   YES, IT IS.

9  **Q.**   SO THIS IS THE VIOXX LABEL FOR APRIL 2002; CORRECT?

10  **A.**   YES.  THAT'S RIGHT.

11  **Q.**   DR. MOYE, LET ME ASK YOU ABOUT A BLACK-BOX WARNING.  WE

12  DON'T SEE A BLACK BOX WARNING ON THAT LABEL, DO WE?

13  **A.**   NO, WE DON'T.

14  **Q.**   THERE WASN'T ONE ON THE '99 LABEL EITHER; IS THAT CORRECT?

15  **A.**   THAT'S RIGHT.

16  **Q.**   WHAT IS A BLACK-BOX WARNING?

17  **A.**   A BLACK-BOX WARNING IS AN EMERGENCY STATEMENT TO

18  PHYSICIANS THAT THE DRUG HAS BEEN ASSOCIATED WITH A

19  PARTICULARLY UNUSUAL ADVERSE EVENT.  THERE ARE SEVERAL

20  CIRCUMSTANCES FOR ITS USE.  ONE OF ITS USES IS IF THE RISK

21  EXCEEDS THE BENEFIT OF THE DRUG, THEN DOCTORS NEED TO KNOW

22  ABOUT THAT AND THAT WOULD APPEAR IN THE BLACK BOX.  IF THERE

23  ARE A PARTICULAR GROUP OF INDIVIDUALS WHO, THROUGH THEIR

24  LIFESTYLE OR THEIR HEREDITY, WOULD BE PARTICULARLY AT RISK -- A

25  GOOD EXAMPLE OF THIS IS BIRTH CONTROL PILLS AND SMOKING.

1    THERE'S A VERY HIGH RISK OF STROKE ASSOCIATED WITH A

2    COMBINATION OF THOSE TWO, SO THAT APPEARS IN THE BLACK BOX.

3    ALSO, IF THERE IS AN EFFECT THAT CAN BE REMOVED, AN ADVERSE

4    EVENT, SERIOUS ADVERSE EVENT THAT CAN BE INSTANTLY REMOVED BY

5    DISCONTINUING THE DRUG, STOPPING IT AT ONCE, THOSE ARE THE

6    KINDS OF EXAMPLES OF WHAT YOU SEE IN BLACK BOXES.

7    **Q.**   DOES A BLACK BOX HAVE A HIGH LEVEL OF SIGNIFICANCE TO

8    DOCTORS?

9    **A.**   YES.  A BLACK BOX IS ALMOST LIKE FLASHING LIGHTS TO A

10   PHYSICIAN.  WHEN YOU SEE A BLACK BOX ON THE LABEL, OUR

11   REFLEXIVE RESPONSE IS TO THINK TWICE BEFORE WE USE THE DRUG.

12   **Q.**   DR. MOYE, IF YOU WILL GO DOWN TO THE PRECAUTIONS SECTION

13   OF THE LABEL ON THE SECOND PAGE.

14   **A.**   YES, SIR.  THIS IS STILL THE 2002 LABEL.

15   **Q.**   THE 2002 LABEL.

16   **A.**   YES.

17   **Q.**   IN THAT PRECAUTIONS SECTION, DO WE SEE DATA FROM THE VIGOR

18   STUDY?

19   **A.**   YES, THAT'S RIGHT.

20   **Q.**   DO YOU SEE DATA FROM THE VIGOR STUDY IN THE WARNINGS

21   SECTION OF THAT LABEL?

22   **A.**   NO, I DON'T.

23   **Q.**   IN OPENING STATEMENT, MR. BECK REFERRED TO THE DIFFERENCE

24   BETWEEN THE WARNINGS SECTION AND THE PRECAUTIONS SECTION, OR

25   THE DISAGREEMENT THERE, AS A QUIBBLE.  WOULD YOU DESCRIBE --

1   **A.**   I'M SORRY?

2   **Q.**   AS QUIBBLING.

3   **A.**   QUIBBLE?

4   **Q.**   QUIBBLING.  I'M SORRY.

5   **A.**   OKAY.  I UNDERSTAND.

6   **Q.**   THE DIFFERENCE BETWEEN WHAT GOES IN A WARNINGS SECTION AND

7   A PRECAUTIONS SECTION; IS THAT SIGNIFICANT OR NOT?

8   **A.**   WELL, IT'S OF GREAT IMPORTANCE TO DOCTORS.  I MEAN, THE

9   DIFFERENCE BETWEEN THE INFORMATION YOU HAVE IN THE TWO, A

10  PRECAUTION WOULD BE LIKE WATCHING THE 10:00 NEWS AT NIGHT AND

11  BEING TOLD THAT THERE'S A LITTLE MORE CRIME IN YOUR

12  NEIGHBORHOOD, SO BE VIGILANT.  THAT'S A PRECAUTION.  A WARNING

13  WOULD BE YOUR FRONT DOOR GETTING KICKED IN.  THEY ARE VERY

14  DIFFERENT.  YOU HAVE TO RESPOND TO THEM VERY DIFFERENTLY.  A

15  WARNING IS URGENT.  THE PRECAUTION IS BE MORE VIGILANT.

16          **MR. BIRCHFIELD:**  YOUR HONOR, MAY WE APPROACH JUST

17  BRIEFLY?

18          **THE COURT:**  YES.

19          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

20  THE BENCH.)

21          **MR. BIRCHFIELD:**  BEFORE LUNCH PHIL RAISED THE ISSUE

22  OF THE STAGE ZERO DOCUMENT.  HE SAID I COULD NOT USE THAT

23  DOCUMENT.  THEN THERE'S A LONG RANGE OPERATING PLAN, AS WELL.

24  THE LONG RANGE OPERATING PLAN IS IN EVIDENCE.  WHAT I WOULD

25  LIKE TO DO WITH DR. MOYE IS PRESENT THAT DOCUMENT TO HIM AND

1  HAVE HIM COMMENT ON HOW THAT REFLECTS THE SIGNIFICANCE BETWEEN

2  THE WARNING AND THE PRECAUTION AND AFFECTS DOCTORS' PRESCRIBING

3  HABITS AND CUTS THEIR SALES IN HALF.

4          **MR. BECK:**  YOUR HONOR, THE LONG RANGE PLANNING

5  DOCUMENT IS NOT IDENTIFIED IN HIS REPORT THAT HE RELIES ON.

6  IT'S NOT CITED FOR ANY PURPOSE WHATSOEVER.  THERE IS NOTHING IN

7  HIS REPORT ANYWHERE THIS SAYS THE DIFFERENCE BETWEEN WARNING

8  AND PRECAUTION.  THIS IS NOT IN HIS REPORT.  IT'S CERTAINLY NO

9  RELIANCE ON THE LONG RANGE PLANNING DOCUMENT.  THIS WAS A

10  SPECIFIC SUBJECT THAT DR. KAPIT HAD IN HIS REPORT, AND WE ARE

11  PREPARED TO CROSS HIM ON IT AND HE IS NOT HERE.

12          **THE COURT:**  IN ANY EVENT, THAT'S ARGUMENT.  YOU CAN

13  ARGUE THAT TO THE JURY.  IT'S IN EVIDENCE.  YOU CAN ARGUE ABOUT

14  IT.  I'M AFRAID, IF I START OPENING THE DOOR TO AREAS THAT WERE

15  NOT COVERED IN A REPORT, BOTH OF YOU LOSE OUT ON THAT.  THAT'S

16  NOT A BIG DEAL.

17          **MR. BECK:**  YOUR HONOR, WHEN ANDY ENDS, AS I ASSUME HE

18  IS ABOUT TO DO, COULD YOU JUST CALL FOR A BREAK SO I CAN GET MY

19  STUFF?

20          **THE COURT:**  SURE.  THEN WE'LL STOP AT ABOUT 3:30.  I

21  HAVE ANOTHER MATTER AT 3:30, BUT WE'LL TAKE A 10-MINUTE BREAK

22  HERE.

23          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

24  OPEN COURT.)

25

1  BY MR. BIRCHFIELD:

2  Q.   DR. MOYE, I'M GOING TO ASK YOU TO ASSUME THAT IN MARCH OF

3  2000 MERCK GOT THE RESULTS FROM THE VIGOR STUDY IN.

4  MARCH 2000, RESULTS FROM THE VIGOR STUDY COME IN, AND THEY SHOW

5  A FIVEFOLD INCREASE IN RISK OF HEART ATTACKS VERSUS NAPROXEN.

6  ARE YOU WITH ME?

7  A.   YES.

8  Q.   MARCH 2000, VIGOR RESULTS IN, FIVEFOLD INCREASE, VIOXX

9  VERSUS NAPROXEN.

10  A.   YES.

11  Q.   GIVEN THAT ASSUMPTION, DID MERCK ADEQUATELY WARN DOCTORS

12  OF THE CARDIOVASCULAR RISK IN THE 2002 PRODUCT LABEL?

13  A.   NO, SIR.

14          MR. BIRCHFIELD:  THANK YOU, DR. MOYE.

15          THE COURT:  WE'LL TAKE A 10-MINUTE BREAK HERE AND

16  COME BACK.  COURT WILL STAND IN RECESS.

17          THE DEPUTY CLERK:  EVERYONE RISE.

18          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

19          THE DEPUTY CLERK:  EVERYONE RISE.

20          THE COURT:  BE SEATED, PLEASE.

21                      CROSS-EXAMINATION

22  BY MR. BECK:

23  Q.   DOCTOR, YOU TESTIFIED ABOUT THIS COMPANY CALLED SCIENTIFIC

24  EVIDENCE THAT YOU HAVE A RELATIONSHIP WITH?

25  A.   YES, SIR, I DID.

1    **Q.**   DOES SCIENTIFIC EVIDENCE ACTUALLY PERFORM ANY SCIENTIFIC

2    STUDIES OR DO ANY KIND OF LAB WORK OR KIND OF CLINICAL TRIALS

3    OR EPIDEMIOLOGICAL STUDIES THAT YOU DESCRIBED?

4    **A.**   THEY DO NO PRIMARY RESEARCH.

5    **Q.**   IN FACT, THEY ACT AS BROKERS FOR PEOPLE WHO SERVE AS

6    EXPERT WITNESSES IN LITIGATION; RIGHT?

7    **A.**   I'M NOT SURE WHAT YOU MEAN BY "BROKER."  THEY CERTAINLY

8    HELP IDENTIFY EXPERT WITNESSES FOR SOME ATTORNEYS, IN ADDITION

9    TO PROVIDING SCIENTIFIC EDUCATION FOR ATTORNEYS.

10   **Q.**   WELL, WHAT I MEAN BY "BROKER" IS THAT WHEN A PLAINTIFF'S

11   LAWYER, FOR EXAMPLE, WANTS AN EXPERT ON A PARTICULAR SUBJECT,

12   THEY CAN CALL SCIENTIFIC ADVISORS (SIC), WHO ADVERTISES FOR

13   THIS, AND THEN SCIENTIFIC ADVISORS (SIC) LINES THEM UP WITH A

14   PERSON WHO CAN ACT AS AN EXPERT; RIGHT?

15   **A.**   JUST SO WE ARE CLEAR, YOU MEAN SCIENTIFIC EVIDENCE?

16   **Q.**   YES.  I'M SORRY.  SCIENTIFIC EVIDENCE.

17   **A.**   I BELIEVE THEY DO THAT FOR SOME LAWYERS.  I DON'T THINK

18   THEY DO IT FOR ALL LAWYERS, BUT YES, THEY DO IT FOR SOME.

19   **Q.**   IN FACT, THEY DO IT MAINLY FOR PLAINTIFFS' LAWYERS; RIGHT?

20   **A.**   I THINK THAT'S TRUE, IT'S MAINLY FOR PLAINTIFF LAWYERS.  I

21   THINK THAT'S CORRECT.

22   **Q.**   IN FACT, ALL THE TIME THAT YOU'VE WORKED THROUGH

23   SCIENTIFIC ADVISORS (SIC) -- AND THAT'S BEEN WHAT, SEVEN OR

24   EIGHT YEARS?

25   **A.**   SCIENTIFIC EVIDENCE.

1   Q.   ALL THE TIME YOU WORKED THROUGH SCIENTIFIC EVIDENCE -- AND

2   THAT'S BEEN SEVEN OR EIGHT YEARS?

3   A.   YES, SIR.

4   Q.   EVERY SINGLE TIME THEY HAVE PLACED YOU IN LITIGATION IT'S

5   BEEN ON BEHALF OF THE PLAINTIFFS; RIGHT?

6   A.   RIGHT, AND EVERY TIME I AGREED TO -- LET ME SAY THIS.

7   THEY HAVE SUGGESTED SOMETIMES THAT I WORK WITH DEFENSE, THEY

8   HAVE DONE THAT, BUT --

9   Q.   YOU HAVE SAID NO?

10  A.   I HAVE SAID NO YES, THAT'S RIGHT.

11  Q.   SO EVERY TIME YOU HAVE BEEN ON BEHALF OF PLAINTIFFS'

12  LAWYERS?

13  A.   YES, THAT'S RIGHT.

14  Q.   WITH REGARD TO TESTIFYING, AM I RIGHT THAT SINCE YOU

15  FORMED THIS RELATIONSHIP WITH SCIENTIFIC ADVISORS (SIC) YOU

16  HAVE TESTIFIED AT LEAST 60 TIMES IN CASES?

17  A.   SCIENTIFIC EVIDENCE.  IF YOU WOULD ADD UP ALL MY

18  DEPOSITION APPEARANCES, MY HEARING APPEARANCES, AND MY TRIAL

19  TESTIMONY, I DON'T KNOW WHAT IT ADDS UP TO.  PERHAPS IT ADDS UP

20  TO 60.  I'VE NEVER DONE IT BEFORE, BUT THAT SOUNDS ABOUT RIGHT.

21  Q.   ON BEHALF OF PLAINTIFFS' LAWYERS WHO COME TO YOU THROUGH

22  SCIENTIFIC EVIDENCE, THIS YEAR ALONE YOU'VE TESTIFIED 12 OR 13

23  TIMES FOR PLAINTIFFS' LAWYERS; RIGHT?

24  A.   THAT SOUNDS LIKE -- I DON'T THINK I HAVE APPEARED IN 12 OR

25  13 TRIALS THIS YEAR.

844

1    **Q.**   WELL YOU APPEARED IN A TRIAL A COUPLE WEEKS AGO; RIGHT?

2    **A.**   YES, THAT'S RIGHT.

3    **Q.**   THEN YOU APPEARED IN DEPOSITIONS FOR LOTS OF DIFFERENT

4    CASES?

5    **A.**   AGREED.

6    **Q.**   12 OR 13 TIMES YOU HAVE GIVEN SWORN TESTIMONY, WHETHER IN

7    COURT OR IN DEPOSITIONS LIKE THE JURY HAS SEEN ON THE SCREEN;

8    RIGHT?

9    **A.**   THAT SOUNDS, RIGHT, YES.

10   **Q.**   THAT'S JUST THIS YEAR ALONE; RIGHT?

11   **A.**   YES.

12   **Q.**   I THINK YOU SAID EACH TIME WAS FOR PLAINTIFFS' LAWYERS;

13   RIGHT?

14   **A.**   YES.

15   **Q.**   EVERY SINGLE TIME THIS YEAR WAS AGAINST ONE PHARMACEUTICAL

16   COMPANY OR ANOTHER; RIGHT?

17   **A.**   THAT'S TRUE, YES.

18   **Q.**   IN FACT, OUT OF ALL THE TIMES YOU HAVE TESTIFIED SINCE YOU

19   FORMED THIS RELATIONSHIP WITH SCIENTIFIC EVIDENCE, YOU HAVE

20   TESTIFIED 100 PERCENT OF THE TIME FOR PLAINTIFFS' LAWYERS

21   AGAINST PHARMACEUTICAL COMPANIES; IS THAT RIGHT?

22   **A.**   YES, THAT'S RIGHT, YES.

23   **Q.**   YOU TALKED ABOUT THE WORK THAT YOU DID AT THE UNIVERSITY,

24   BUT AM I CORRECT, SIR, THAT IN SOME OF THE YEARS SINCE YOU

25   FORMED THE RELATIONSHIP WITH SCIENTIFIC EVIDENCE AS MUCH AS 75

DAILY COPY

1  PERCENT OF YOUR TOTAL INCOME HAS COME FROM TESTIFYING FOR

2  PLAINTIFFS' LAWYERS AGAINST PHARMACEUTICAL COMPANIES?

3  A.    THAT'S TRUE, YES.

4  Q.    YOU MENTIONED THAT FEN-PHEN WAS ONE OF THE CASES -- I

5  GUESS THAT MUST BE ONE OF THE EARLY CASES THAT YOU WORKED ON;

6  IS THAT RIGHT?

7  A.    FEN-PHEN WAS THE DRUG THAT I, IF YOU WILL, TESTIFIED

8  AGAINST FOR MOST OF THE TIME IN THE 1999 THROUGH -- ACTUALLY

9  THROUGH LAST YEAR.

10 Q.    THAT WAS AN ASSIGNMENT THAT YOU GOT THROUGH THE SCIENTIFIC

11 EVIDENCE FOLKS; RIGHT?

12 A.    WELL, IT'S NOT SO MUCH AN ASSIGNMENT.  AN ASSIGNMENT TO ME

13 MEANS I'M TOLD TO DO SOMETHING AND I DO IT.  IT WAS AN

14 OPPORTUNITY THAT I CHOSE TO TAKE ADVANTAGE OF.  I CHOSE TO

15 PARTICIPATE.

16 Q.    THAT OPPORTUNITY WAS PRESENTED TO YOU BY SCIENTIFIC

17 EVIDENCE?

18 A.    THAT'S TRUE, YES.

19 Q.    IN FACT, YOU HAVE A CONTRACT WITH SCIENTIFIC EVIDENCE, DO

20 YOU NOT?

21 A.    YES.

22 Q.    BASICALLY, WHAT THE CONTRACT SAYS IS THAT YOU WILL WORK

23 EXCLUSIVELY THROUGH THEM, SO NO MOONLIGHTING ON YOUR OWN, AND

24 IN EXCHANGE THEY WILL DO THEIR BEST TO FIND CASES FOR YOU TO

25 TESTIFY IN?  THAT'S THE BASIC DEAL IN THE CONTRACT; RIGHT?

1   **A.**   I THINK THAT'S FAIR, YES.

2   **Q.**   NOW, IN THE <u>FEN-PHEN</u> LITIGATION, DID THIS INVOLVE -- IS

3   "FEN-PHEN" ANOTHER WORD FOR "DIET DRUGS"?

4   **A.**   CERTAINLY.  FEN-PHEN IS A COMBINATION OF DRUGS USED AS A

5   DIET PILL.

6   **Q.**   DO YOU REMEMBER WHEN YOU FIRST GOT INVOLVED IN 1999 THERE

7   WERE PEOPLE IN THE SCIENTIFIC COMMUNITY WHO WERE WRITING

8   LETTERS TO THE EDITOR, TO SCHOLARLY JOURNALS, CRITICIZING THE

9   THEORIES BEING PURSUED BY THE PLAINTIFFS' LAWYERS FOR WHOM YOU

10  WERE WORKING?

11  **A.**   YES, THAT'S CORRECT.

12  **Q.**   DO YOU RECALL THAT THE FOLKS YOU HAD THE RELATIONSHIP WITH

13  AT SCIENTIFIC EVIDENCE SAID, "GEE, WE NEED SOME HELP DEFENDING

14  OUR PLAINTIFFS' LAWYERS AGAINST THESE CHALLENGES TO THE

15  THEORIES THAT THEY ARE PURSUING"?

16  **A.**   IT DOESN'T RING A BELL AS YOU PHRASED IT.

17  **Q.**   LET ME HAND YOU WHAT I HAVE MARKED AS DEFENSE EXHIBIT

18  3014.

19  **A.**   THANK YOU.

20  **Q.**   DO YOU RECOGNIZE DEFENSE EXHIBIT 3014?

21  **A.**   YES, I DO.

22  **Q.**   WAS THIS AN E-MAIL TO YOU DATED FEBRUARY 10, 1999, FROM

23  THE BOSS AT SCIENTIFIC EVIDENCE?

24  **A.**   DR. HOEPFEL, YES.

25         **THE COURT:**  ARE YOU GOING TO INTRODUCE THIS INTO

DAILY COPY

1   EVIDENCE I'LL ADMIT IT?

2   **MR. BECK:**  YES, YOUR HONOR.

3   **BY MR. BECK:**

4   **Q.**   WHO IS THIS PERSON HERE?

5   **A.**   DR. HOEPFEL.

6   **Q.**   IT'S TO?

7   **A.**   FRED ANNEGARS.

8   **Q.**   TO YOU, AS WELL?

9   **A.**   YES.

10  **Q.**   WHO IS FRED ANNEGERS?

11  **A.**   FRED ANNEGERS WAS AN EPIDEMIOLOGIST WITH WHOM I WAS

12  WORKING, WHO WAS ALSO AN EXPERT IN THE <u>FEN-PHEN</u> LITIGATION.

13  **Q.**   THEN IT SAYS "A RESPONSE TO *NEJM* NEEDED"; RIGHT?

14  **A.**   YES, SIR.

15  **Q.**   *NEJM*, DOES THAT STAND FOR THE *NEW ENGLAND JOURNAL OF*

16  *MEDICINE*?

17  **A.**   IT DOES, SIR.

18  **Q.**   TELL ME IF I HAVE THIS RIGHT, SIR.  "WELL, I AM

19  ANTICIPATING A REQUEST FROM THE ATTORNEYS" -- IS THAT WHAT YOU

20  READ THAT AS?

21  **A.**   YES, SIR.

22  **Q.**   "FOR A REBUTTAL TO THE COMMENTS MADE IN THESE LETTERS TO

23  THE ED" -- BEING LETTERS TO THE EDITOR?

24  **A.**   YES, SIR.

25  **Q.**   "AS WELL AS WEISSMAN'S COMMENTS," DO YOU SEE THAT?

1  **A.**   YES, SIR.

2  **Q.**   DO YOU KNOW WEISSMAN IS?

3  **A.**   YES.  NEIL WEISSMAN WAS THE AUTHOR OF ONE OF THREE

4  MANUSCRIPTS THAT APPEARED IN THE *NEW ENGLAND JOURNAL* IN

5  SEPTEMBER 1999, I BELIEVE.

6  **Q.**   THEN IT SAYS, "PLEASE PREPARE COMMENTS ON EACH LETTER TO

7  THE ED WHERE APPROPRIATE, AS WELL AS FOR THE PPH LETTER THAT

8  FOLLOWED."  WHAT DOES "PPH" STAND FOR?

9  **A.**   PRIMARY PULMONARY HYPERTENSION.

10  **Q.**   THEN IT SAYS "COMMENTS ON WEISSMAN'S REBUTTAL" AND THEN

11  BELOW THAT SAYS "DEVEREUX."

12  **A.**   DEVEREUX, YES.

13  **Q.**   "DEVEREUX'S COMMENTS ARE SOMEWHAT CONFUSING, BUT LESS SO

14  THAN WILLIAMSON.  CAN YOU REEXPLAIN THIS IS (SIC) VERY SIMPLE

15  TERMS FOR THE ATTORNEYS?  ALSO" -- IS THAT INCLUDE?  IS THAT

16  HOW YOU UNDERSTOOD THAT?

17  **A.**   I THINK WHAT SHE MEANS IS "CAN YOU REEXPLAIN THIS IN VERY

18  SIMPLE TERMS FOR THE ATTORNEYS?"

19  **Q.**   "IN VERY SIMPLE TERMS FOR THE ATTORNEYS.  ALSO, INCLUDE

20  THE MATH HE USED TO CALCULATE ATTRIBUTABLE RISKS."  THEN SHE

21  SAYS, "YES, I CAN DO IT, BUT I AM REALLY SWAMPED AND SINKING

22  FAST AND NEED Y'ALL TO CLARIFY THESE COMMENTS FOR THE

23  ATTORNEYS."  SHE'S FROM TEXAS; RIGHT?

24  **A.**   NO, BUT I'M NOT GOING TO TELL YOU WHERE SHE IS FROM.  SHE

25  IS NOT FROM TEXAS.

1   **Q.**   OKAY.  ALL RIGHT.  I DON'T WANT TO KNOW.  THEN, WHEREVER

2   SHE'S FROM, SHE SAYS, "BESIDES, IT MEANS DOLLARS TO Y'ALL, DATA

3   FOR DOLLARS," AND THEN SHE HAS DOWN HERE A LITTLE SMILEY FACE;

4   RIGHT?

5   **A.**   YES.

6   **Q.**   DID YOU DO THE WORK THAT SHE ASKED YOU TO DO?

7   **A.**   ACTUALLY, I DON'T REMEMBER.  AT THIS POINT -- THIS IS

8   FEBRUARY '99 -- I WAS IN THE MIDDLE OF PREPARING MY FIRST

9   AFFIDAVIT, AND SO I DON'T RECALL WHETHER I WAS ABLE TO DO THIS

10  PARTICULAR WORK FOR HER OR NOT.  I WAS BUSY MYSELF.  I DON'T

11  REMEMBER IF I DID IT FOR HER.

12  **Q.**   I THINK YOU SAID, ON THE <u>FEN-PHEN</u> LITIGATION THAT THIS

13  REFERS TO, OVER THE SEVERAL YEARS YOU ESTIMATED THE TOTAL FEES

14  THAT YOU RECEIVED AT SOMEWHERE BETWEEN $1.35 MILLION AND

15  $1.4 MILLION?

16  **A.**   YES, SIR.

17  **Q.**   REZULIN, I THINK YOU INDICATED THAT TODAY YOU DIDN'T

18  REMEMBER, ALTHOUGH YOU MAY HAVE SAID SOMEWHERE HOW MUCH YOU

19  RECEIVED IN FEES FOR REZULIN.  THAT'S ANOTHER DRUG THAT YOU

20  TESTIFIED AGAINST, SO TO SPEAK, ON BEHALF OF PLAINTIFFS'

21  LAWYERS?

22  **A.**   THAT'S RIGHT.

23  **Q.**   IF I TOLD YOU $227,000 OR SO, WOULD THAT SQUARE WITH YOUR

24  RECOLLECTION, OR WOULD YOU LIKE ME TO GO THROUGH THE PIECES ONE

25  BY ONE?

1   **A.**   NO.  IF YOU REPRESENT TO ME THAT, IN FACT, IN A PREVIOUS

2   TRIAL I TESTIFIED THAT I MADE $225,000, THEN I ACCEPT THAT

3   REPRESENTATION.

4   **Q.**   I REPRESENT THAT YOU TESTIFIED TO THAT ON JULY 5 OF THIS

5   YEAR, JUST LESS THAN A MONTH AGO.

6   **A.**   OKAY.  I ACCEPT THAT.

7   **Q.**   THEN LOTRONEX, I THINK YOU SAID YOU DIDN'T KNOW HOW MUCH

8   YOU GOT PAID FOR THAT?

9   **A.**   LOTRONEX, YES, THAT'S RIGHT, I DON'T RECALL HOW MUCH I GOT

10  FOR THAT.  IT WASN'T VERY MUCH WORK.

11  **Q.**   THEN WERE THERE OTHER DRUGS OTHER THAN VIOXX, OF COURSE,

12  WHERE YOU HAVE WORKED THROUGH SCIENTIFIC EVIDENCE ON BEHALF OF

13  PLAINTIFFS' LAWYERS AND RECEIVED PAYMENT FOR?

14  **A.**   I WOULD ANSWER THIS WAY.  WHEN I HAVE BEEN ASKED TO LOOK

15  INTO GETTING INVOLVED IN LITIGATION, I DO SOME INITIAL WORK AND

16  I CHARGE FOR THAT WORK, BUT I MAY NOT GET INTO THE LITIGATION.

17  SO THERE ARE, SAY, THREE OR FOUR DRUGS THAT I LOOKED AT FOR A

18  FEW DAYS AND THEN DECIDED I WASN'T GOING TO GET INVOLVED, BUT I

19  STILL CHARGED FOR THE SMALL AMOUNT OF WORK I DID.

20  **Q.**   I'M ASKING YOU WHETHER THERE ARE ANY OTHER DRUGS OTHER

21  THAN LOTRONEX, REZULIN, FEN-PHEN, AND VIOXX THAT YOU CAN

22  REMEMBER NOW THAT YOU HAVE TESTIFIED ON BEHALF OF PLAINTIFFS

23  LAWYERS SINCE YOU FORMED THIS RELATIONSHIP WITH SCIENTIFIC

24  EVIDENCE?

25  **A.**   LET'S SEE -- I DON'T THINK SO.  THERE WAS ONE DEPOSITION I

1  GAVE, BUT IT WASN'T ABOUT A DRUG.  IT WAS ABOUT A COMMENT -- I

2  WAS ASKED TO PROVIDE A REPORT THAT COMMENTS ON A STUDY DONE BY

3  AN INSURANCE COMPANY, BUT THAT WASN'T A DRUG.  I GUESS I WOULD

4  HAVE TO TELL YOU I CAN'T THINK OF ANY OTHERS AS I SIT HERE NOW.

5  **Q.**   WHEN DID YOU BEGIN WORKING WITH THE PLAINTIFFS' LAWYERS ON

6  THE VIOXX LITIGATION?

7  **A.**   I THINK ABOUT A YEAR AND A HALF AGO.  BEGINNING OF '95, I

8  THINK.

9  **Q.**   HOW MUCH HAVE YOU BEEN PAID FOR THE WORK THAT YOU'VE DONE

10  ON THE VIOXX LITIGATION?

11  **A.**   I DON'T REMEMBER.  I MAY HAVE -- AGAIN, I MAY HAVE

12  MENTIONED IT EARLIER, BUT TODAY I DON'T REMEMBER.

13  **Q.**   WILL YOU ACCEPT IT IF I TELL YOU THAT IN YOUR MAY 2006

14  DEPOSITION YOU INDICATED THAT IT WAS THEN ABOUT $100,000?

15  **A.**   YES, SIR.

16  **Q.**   WILL YOU ACCEPT THAT SINCE THEN YOU OR SCIENTIFIC EVIDENCE

17  HAVE GIVEN US ANOTHER COUPLE OF INVOICES THAT WOULD ADD UP TO

18  ANOTHER $45,000 OR SO?

19  **A.**   SINCE THE BEGINNING OF MAY, I THINK THAT'S ABOUT RIGHT.

20  **Q.**   SO APPROXIMATELY $150,000 ON THE VIOXX LITIGATION SO FAR?

21  **A.**   YES, SIR.  BASED ON THESE JOINT CALCULATIONS, YES.

22  **Q.**   YOU HAVE OTHER VIOXX TRIALS LINED UP THAT YOU'RE GOING TO

23  TESTIFY IN AS WELL; RIGHT?

24  **A.**   I DON'T KNOW.  THE FUTURE IS ALWAYS UNCERTAIN.  I WOULD

25  SAY THIS.  I CERTAINLY HOPE TO BE AVAILABLE TO BE CONTINUED

1   PART OF THE VIOXX LITIGATION, BUT I DON'T KNOW WHAT THE FUTURE

2   HOLDS.

3   **Q.**   DO YOU KNOW HOW MANY CASES THE PLAINTIFFS' LAWYERS HAVE

4   DESIGNATED YOU AS AN EXPERT IN?

5   **A.**   I DON'T KNOW THAT.

6   **Q.**   ONE OF THE OPINIONS YOU GAVE TODAY CONCERNED THE 1999

7   VIOXX LABEL.  DO YOU RECALL THAT?

8   **A.**   YES, SIR.

9   **Q.**   DO YOU ALSO RECALL, SIR, THAT AS PART OF YOUR WORK FOR THE

10  PLAINTIFFS' LAWYERS YOU WROTE A LENGTHY REPORT THAT SUMMARIZED

11  THE OPINIONS THAT YOU SAID YOU WOULD BE RENDERING IN COURT IN

12  VIOXX LITIGATION?

13  **A.**   YES, THAT'S RIGHT.

14  **Q.**   I'LL HAND YOU WHAT WE HAVE MARKED FOR IDENTIFICATION

15  PURPOSES ONLY AS DEFENSE EXHIBIT 3534.  IS THAT A COPY OF THE

16  REPORT THAT BEARS YOUR NAME?

17  **A.**   YES, IT IS.

18  **Q.**   IS THIS THE FIRST PAGE THAT I PUT UP ON THE SCREEN?

19  **A.**   IT IS.

20  **Q.**   I'M GOING TO TURN TO A PARAGRAPH THAT RELATES TO THE

21  OPINION THAT YOU GAVE TODAY ON THE WARNING IN 1999.  IF YOU

22  TURN OVER TO PARAGRAPH 179, WHICH I BELIEVE IS ON PAGE 65, IF

23  THAT HELPS YOU TO GET THERE.

24  **A.**   YES, SIR.

25  **Q.**   IN THIS OPINION THAT BEARS YOUR NAME IN THE VIOXX

1    LITIGATION, YOUR BASIC LABELING OPINION, DOES IT SAY, "BOTH

2    PHYSICIANS AND PATIENTS HAVE THE RIGHT TO DRAW INDEPENDENT

3    CONCLUSIONS CONCERNING THE RISKS AND BENEFITS OF A THERAPY?"

4    **A.**   YES.

5    **Q.**   "THEIR BEST AND CLEAREST RECOMMENDATIONS COME FROM THESE

6    CONSIDERATIONS?"

7    **A.**   YES.

8    **Q.**   "REVIEW OF THE ROFECOXIB" -- WE KNOW THAT MEANS VIOXX;

9    RIGHT?

10   **A.**   YES, THAT'S RIGHT.

11   **Q.**   "REVIEW OF THE VIOXX LABELS REVEALS SEVERAL

12   UNDERSTATEMENTS ABOUT THE LABEL.  THE FEDERAL REGULATIONS

13   REQUIRE THAT THE LABELING SHALL CONTAIN A SUMMARY OF THE

14   ESSENTIAL SCIENTIFIC INFORMATION NEEDED FOR THE SAFE AND

15   EFFECTIVE USE OF THE DRUG."

16   **A.**   YES.

17   **Q.**   "THE ESSENTIAL INFORMATION WAS LACKING IN THE WARNING

18   LABELS FOR THE FENFLURAMINES."

19   **A.**   FENFLURAMINES, YES.

20   **Q.**   IS "FENFLURAMINES" ANOTHER SCIENTIFIC WORD FOR VIOXX?

21   **A.**   NO.  NO, THAT'S A MISTAKE.

22   **Q.**   WHAT?

23   **A.**   THAT IS A MISTAKE.

24   **Q.**   FENFLURAMINES, DOES THAT HAVE ANYTHING TO DO WITH VIOXX?

25   **A.**   IT DOES NOT, SIR.

1  **Q.**   IS THAT FEN-PHEN?

2  **A.**   YES.

3  **Q.**   DID YOU JUST CUT AND PASTE THE OPINION THAT YOU HAD IN A

4  REPORT FOR PLAINTIFFS' LAWYERS IN <u>FEN-PHEN</u> AND STICK IT IN THE

5  VIOXX REPORT?

6  **A.**   ACTUALLY, IT'S WORSE THAN THAT.  IF I HAD DONE THAT, THEN

7  YOU WOULD SEE IN THE THIRD LINE "REVIEW OF THE FEN-PHEN LABEL,"

8  SO I DIDN'T DO THAT.

9  **Q.**   YOU DID NOT DO THAT?

10  **A.**   NO, IT WASN'T CUT AND PASTE.  I ACTUALLY JUST LOST MY

11  TRAIN OF THOUGHT.

12  **Q.**   WHEN YOU WERE TYPING, YOU JUST LOST YOUR TRAIN OF THOUGHT?

13  **A.**   YES.

14  **Q.**   LET'S LOOK AT THE REPORT THAT BEARS YOUR NAME IN THE

15  <u>FEN-PHEN</u> LITIGATION, WHICH WE HAVE MARKED AS DEFENSE EXHIBIT

16  3527 FOR IDENTIFICATION PURPOSES ONLY.  UP ON THE RIGHT SIDE OF

17  THE SCREEN, IS THAT THE FRONT PAGE OF THE REPORT THAT BEARS

18  YOUR NAME IN THE <u>FEN-PHEN</u> LITIGATION?

19  **A.**   YES, SIR.

20  **Q.**   YOU CAN LOOK AT THE BACK IF YOU WANT, BUT IT'S DATED

21  AUGUST 30, 2004.  GO OVER TO PAGE 99, PLEASE.

22  **A.**   SURE.

23  **Q.**   ARE YOU WITH ME?

24  **A.**   I AM.

25  **Q.**   SO BACK ON THE VIOXX ONE, WE HAD THIS PARAGRAPH BLOWN UP

1    AND THEN -- WHICH YOU SAID YOU DID NOT CUT AND PASTE FROM

2    FEN-PHEN; RIGHT?

3    **A.**   THAT'S RIGHT, YES.

4    **Q.**   NOW WE HAVE FEN-PHEN UNDERNEATH IT, AND LET'S JUST READ

5    ALONG.  IN FEN-PHEN DOES THE FIRST LINE SAY, "BOTH PHYSICIANS

6    AND PATIENTS HAVE THE RIGHT TO DRAW INDEPENDENT CONCLUSIONS

7    CONCERNING THE RISKS AND BENEFITS OF A THERAPY"?

8    **A.**   I'M SORRY.  WERE YOU ASKING ME?

9    **Q.**   YES.

10   **A.**   YES, THAT'S WHAT IT SAYS.

11   **Q.**   WORD-FOR-WORD WHAT'S IN THE VIOXX ONE?

12   **A.**   YES, YES.

13   **Q.**   THEN THE NEXT SENTENCE, "THEIR BEST AND CLEAREST

14   RECOMMENDATIONS COME FROM THESE CONSIDERATIONS."  THAT'S

15   WORD-FOR-WORD WHAT A YEAR OR SO LATER YOU PUT IN THE VIOXX ONE?

16   **A.**   YES.

17   **Q.**   THEN YOU TALK ABOUT THE FEDERAL REGULATIONS.  THAT'S

18   WORD-FOR-WORD -- I'M SORRY "REVIEW OF THE" -- HERE'S A CHANGE.

19   IN VIOXX YOU PUT THE WORD "ROFECOXIB" IN WHEREAS IN FEN-PHEN

20   YOU PUT THE NAME OF THESE TWO OTHER DRUGS IN; RIGHT?

21   **A.**   YES.

22   **Q.**   IN FACT, IF YOU CONTINUE ON WITH THE LABELING OPINION IN

23   THE REPORT BEARING YOUR NAME IN FEN-PHEN, IT IS WORD-FOR-WORD

24   EXACTLY WHAT YOU WROTE IN VIOXX JUST WITH THE EXCEPTION OF

25   SWITCHING THE DRUG NAMES; RIGHT?

856

```
 1   A.   YES, THAT'S RIGHT.
 2            MR. BECK:  DID YOU SAY AT 3:30 YOU HAVE TO BREAK?
 3            THE COURT:  YES.
 4            MR. BECK:  MY NEXT THING IS GOING TO TAKE ME A LITTLE
 5   MORE THAN FIVE MINUTES.
 6            THE COURT:  LET'S TAKE A 15-MINUTE BREAK.  THE COURT
 7   WILL STAND IN RECESS.
 8            THE DEPUTY CLERK:  EVERYONE RISE.
 9            (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
10            THE DEPUTY CLERK:  EVERYONE RISE.
11            THE COURT:  BE SEATED, PLEASE.  YOU MAY PROCEED,
12   COUNSEL.
13   BY MR. BECK:
14   Q.   SO TO FINISH THIS UP, WE GOT TO ABOUT THE FOURTH LINE DOWN
15   WHERE -- DO YOU SEE WHERE IT'S THE FEDERAL REGULATIONS AND SO
16   FAR IT'S WORD-FOR-WORD; RIGHT?
17   A.   NO, IT'S NOT.
18   Q.   EXCEPT FOR WHERE "ROFECOXIB" AND THE TWO OTHER NAMES OF
19   THE DRUGS ARE SUBSTITUTED?
20   A.   EXCEPT WHERE I USED THE APPROPRIATE DRUG IN THE VIOXX
21   LABEL, YES.
22   Q.   THEN IF WE GO OVER TO THE NEXT PAGE IN THE FEN-PHEN
23   OPINION, DOES THAT GO ON AND USE THE SAME LANGUAGE WE LOOKED AT
24   BEFORE?
25   A.   DOES WHAT GO ON?
```

857

1    **Q.**   I'M SORRY.  I'VE GOT THIS MESSED UP.  HERE WE HAVE ON THE

2    LEFT THE OPINION THAT ENDS WITH <u>FEN-PHEN</u>, BUT IT'S THE

3    <u>ROFECOXIB</u> OPINION; RIGHT?

4    **A.**   YES.

5    **Q.**   THEN WE WENT THROUGH THE FIRST HALF AND I'M TRYING TO GO

6    THROUGH THE SECOND HALF NOW.  IF WE GO OVER TO THE <u>FEN-PHEN</u>

7    OPINION, JUST TO MAKE SURE WE GET IT ALL BECAUSE IT WAS ON A

8    DIFFERENT PAGE, IN THE <u>VIOXX</u> OPINION WE CONCLUDE BY SAYING,

9    "THE FEDERAL REGULATIONS REQUIRE THAT THE LABELING SHALL

10   CONTAIN A SUMMARY OF THE ESSENTIAL SCIENTIFIC INFORMATION

11   NEEDED FOR THE SAFE AND EFFECTIVE USE OF THE DRUG.  THE

12   ESSENTIAL INFORMATION WAS LACKING IN THE WARNING LABELS FOR THE

13   FENFLURAMINES."  RIGHT?

14   **A.**   RIGHT.

15   **Q.**   THAT EXACT LANGUAGE INCLUDES IN THE <u>FEN-PHEN</u>, INCLUDING

16   FENFLURAMINES; RIGHT?

17   **A.**   YES.

18   **Q.**   NOW, TODAY THE OPINION THAT YOU GAVE IN COURT CONCERNING

19   THE 1999 LABEL, AS I HEARD IT, WAS THAT IF YOU ASSUME ALONG

20   WITH MR. BIRCHFIELD THAT THERE WAS EVIDENCE OF SOME RISK OF

21   CARDIOVASCULAR PROBLEMS PRIOR TO 1999, DID THE LABEL CONTAIN AN

22   ADEQUATE WARNING?

23   **A.**   THAT'S MY UNDERSTANDING OF THE QUESTION HE ASKED.

24   **Q.**   YOU SAID, "NO.  BASED ON YOUR ASSUMPTION, MR. BIRCHFIELD,

25   IT DID NOT CONTAIN AN ADEQUATE WARNING"?

1   **A.**   THAT'S RIGHT.

2   **Q.**   YOUR REPORT TAKES A MUCH MORE EXTREME POSITION THAN THAT?

3   **A.**   WELL, I WOULD HAVE TO SEE IT.

4   **Q.**   DO YOU REMEMBER WHAT YOU SAID IN YOUR REPORT?

5   **A.**   IT'S 100 PAGES LONG.  I DID NOT COMMIT IT TO MEMORY, SIR.

6   IT'S BEST THAT I SEE IT.

7   **Q.**   I'M TALKING ABOUT THE ONLY OPINION THAT YOU GAVE TODAY,

8   WHICH IS ON THE ADEQUACY OF THE LABEL, AND YOU DON'T

9   REMEMBER -- I'M NOT ASKING YOU WORD-FOR-WORD, BUT YOU DON'T

10  REMEMBER THE SUBSTANCE OF THE OPINION THAT YOU WROTE IN YOUR

11  100-PAGE REPORT ON THE LABEL FOR VIOXX?

12  **A.**   MY ANSWER IS THIS.  I STAND BY MY LABEL (SIC) I GAVE TODAY

13  UNDER OATH.  I DON'T REMEMBER EXACTLY WHAT I SAID IN MY REPORT,

14  AND IT'S REALLY BEST IF I LOOK AT WHAT I SAID IN MY REPORT

15  BEFORE I COMMENT.

16  **Q.**   OKAY.  LET'S LOOK, THEN.  JUST MOVING DOWN TO THE NEXT

17  PARAGRAPH, WE WERE LOOKING AT 179 SAYING LABELING, BUT THE NEXT

18  PARAGRAPH, 180, SAYS, "DRUG LABELS ARE TO BE DESIGNED FOR THE

19  SAFE AND EFFECTIVE USE OF THE DRUG.  THERE IS NO WAY TO WRITE

20  AN ADEQUATE LABEL ABOUT A DRUG THAT HAS MINIMAL EFFICACY AND

21  CAUSES SERIOUS LIFE-THREATENING SIDE EFFECTS BECAUSE SUCH A

22  COMPOUND CANNOT BE USED SAFELY AND EFFECTIVELY.  BY DEFINITION,

23  AN ADEQUATE LABEL CANNOT BE WRITTEN FOR ROFECOXIB SINCE THE

24  DRUG CANNOT BE USED SAFELY AND EFFECTIVELY."  THEN YOU SAY,

25  "THE PARTICULAR DEFECTS ARE AS FOLLOWS."  SO NOW DO YOU

859

1   REMEMBER, NOTWITHSTANDING YOUR TESTIMONY TODAY, THE OPINION IN

2   THE REPORT THAT BEARS YOUR NAME TOOK THE EXTREME POSITION THAT

3   NO LABEL WOULD EVER BE ADEQUATE FOR VIOXX?

4   A.   YES, I DO.

5   Q.   DO YOU RECALL WHAT YOUR OPINION WAS IN FEN-PHEN ABOUT THE

6   LABEL THERE?

7   A.   I WOULD THINK IT WOULD BE -- AGAIN, I HAVEN'T READ THE

8   FEN-PHEN AFFIDAVIT FOR A WHILE, BUT I WOULD THINK IT WOULD BE

9   PRETTY MUCH THE SAME.

10  Q.   IN FACT, IT'S WORD-FOR-WORD THE SAME, ISN'T IT, SIR?

11  A.   WELL, IF IT IS, GOOD BECAUSE IT APPLIES.

12  Q.   "DRUG LABELS ARE DESIGNED TO BE SAFE AND EFFECTIVE USE OF

13  THE DRUG.  THERE'S NO WAY TO WRITE AN ADEQUATE LABEL ABOUT A

14  DRUG THAT HAS MINIMAL EFFICACY AND CAUSES SERIOUS

15  LIFE-THREATENING" -- HERE WE ARE CATCHING UP -- "SIDE EFFECTS

16  BECAUSE SUCH A COMPOUND CANNOT BE USED SAFELY AND EFFECTIVELY.

17  BY DEFINITION, AN ADEQUATE LABEL CANNOT BE WRITTEN FOR

18  REDUX" -- INSTEAD OF "ROFECOXIB" -- "SINCE THE DRUG CANNOT BE

19  USED SAFELY AND EFFECTIVELY.  THE PARTICULAR DEFECTS IN THE

20  REDUX LABEL ARE AS FOLLOWS."  THIS WAS A CUT AND PASTE JOB,

21  WASN'T IT?

22  A.   WELL, I DON'T KNOW IF IT WAS CUT AND PASTE, BUT I'M

23  CERTAINLY GLAD THEY ARE IDENTICAL BECAUSE THE WORDS APPLY TO

24  EACH CIRCUMSTANCE.

25  Q.   ON THE SUBJECT OF THE LABELING, GENERALLY, YOU TALKED

1   ABOUT HOW IT'S MERCK'S LABEL, AND I THINK THE WORD YOU USED WAS

2   MERCK OWNS THE LABEL; RIGHT?

3   A.   YES, THAT'S RIGHT, I DID SAY THAT.

4   Q.   DOES FDA HAVE AUTHORITY OVER DRUG LABELS, BOTH WHEN

5   DECIDING WHETHER TO APPROVE A DRUG AND WHEN A DRUG'S LABEL IS

6   CHANGED?

7   A.   I DON'T KNOW WHAT YOU MEAN WHEN YOU SAY "HAD AUTHORITY"

8   OVER IT.

9   Q.   WELL, IN ORDER TO APPROVE A DRUG, MUST THE FDA HAVE PROOF

10  THAT THE DRUG IS BOTH SAFE AND EFFECTIVE?

11  A.   THAT'S TRUE, YES.

12  Q.   WHEN THE FDA DOES APPROVE A DRUG, IT IS FOR USE AS

13  SPECIFIED IN THE LABEL; CORRECT?

14  A.   THAT'S CORRECT, YES.

15  Q.   IS IT TRUE, SIR, THAT THE FDA'S GOAL WITH RESPECT TO

16  LABELING IS TO INCLUDE PERTINENT SCIENTIFIC EVIDENCE THAT

17  COMMUNICATES TO DOCTORS THE FDA'S AUTHORITATIVE CONCLUSIONS

18  WITH RESPECT TO THE CONDITIONS UNDER WHICH A DRUG CAN BE USED

19  SAFELY AND EFFECTIVELY?

20  A.   WELL, I'M NOT SURE WHERE YOU'RE GETTING THAT LANGUAGE, BUT

21  CERTAINLY -- YES, BUT IT DOES NOT DETRACT FROM THE FACT THE

22  SPONSOR IS THE ONE WHO IS ULTIMATELY RESPONSIBLE FOR THE WORDS

23  IN ITS OWN LABEL.  SO THE FDA DOES, OF COURSE, HAVE AN

24  IMPORTANT ROLE TO PLAY IN DISCUSSIONS WHERE THE SPONSOR AS THEY

25  WHAT'S CALLED "NEGOTIATE" THE LABEL, BUT THE IMPORTANCE OF THE

1  FDA'S INPUT DOES FOR THE REDUCE THE FACT THAT THE SPONSOR OWNS
2  THE LABEL.
3  Q.   WELL, THE PLACE THAT I WAS GETTING THE LANGUAGE FROM WAS
4  ANSWERS THAT YOU GAVE UNDER OATH ON JUNE 16 IN THIS CASE.  DID
5  YOU SAY AT PAGE 618 OF YOUR SWORN DEPOSITION:
6          "Q.  YOU AGREE WITH ME THAT THE FDA'S GOAL, WITH
7          RESPECT TO LABELING, IS TO INCLUDE PERTINENT SCIENTIFIC
8          EVIDENCE THAT COMMUNICATES TO HEALTH CARE PRACTITIONERS
9          THE FDA'S FORMAL, AUTHORITATIVE CONCLUSIONS REGARDING THE
10         CONDITIONS UNDER WHICH THE PRODUCT CAN BE USED SAFELY AND
11         EFFECTIVELY?"
12         "A.  RIGHT, THAT'S THEIR GOAL."
13         WAS THAT YOUR SWORN TESTIMONY?
14 A.   JUST TO BE CLEAR, THOSE WERE NOT MY WORDS.  I DIDN'T SPEAK
15 THOSE WORDS.
16 Q.   YOU AGREED WITH THOSE WORDS UNDER OATH, DID YOU NOT SIR?
17 A.   IF I CAN FINISH?
18 Q.   DID YOU AGREE WITH THOSE GOALS UNDER OATH?
19         THE COURT:  THAT'S THE QUESTION.  YOU CAN ANSWER IT
20 AND THEN EXPLAIN IT.
21         THE WITNESS:  THANK YOU, SIR.  I SAID, "RIGHT, THAT'S
22 THEIR GOAL," BUT THOSE WERE NOT MY WORDS, "FDA'S FORMAL
23 AUTHORITATIVE CONCLUSIONS."  THAT'S ALL I'M SAYING.
24 BY MR. BECK:
25 Q.   YOU AGREED WITH THOSE WORDS UNDER OATH, DIDN'T YOU, SIR?

862

1    **A.**   I AGREED THAT THEIR GOAL IS TO PROVIDE PERTINENT

2    SCIENTIFIC EVIDENCE THAT COMMUNICATES, ET CETERA.  I AGREED

3    WITH THAT, YES.  I STILL DO.

4    **Q.**   DO YOU ALSO AGREE THAT WHEN THE FDA APPROVES A DRUG, IT

5    LOOKS VERY CAREFULLY AT THE PROPOSED LABELING?

6    **A.**   I WOULD AGREE WITH THAT, YES.

7    **Q.**   DO YOU AGREE, SIR, THAT THE FDA LOOKS AT EVERY WORD, EVERY

8    COMMA, EVERY SEMICOLON, AND EVERY PERIOD IN THE PROPOSED LABEL?

9    **A.**   THEY READ IT VERY CAREFULLY.

10   **Q.**   WOULD YOU AGREE THEY LOOK AT EVERY WORD, EVERY COMMA,

11   EVERY SEMICOLON, AND EVERY PERIOD IN THE PROPOSED LABEL?

12   **A.**   AGAIN, I WOULD JUST SAY THEY READ IT VERY CAREFULLY.

13   **Q.**   YOUR SWORN TESTIMONY:

14          "Q.  THEY LITERALLY LOOK AT EVERY WORD IN THE

15       LABELING?"

16          "A.  YES."

17          "Q.  LOOK AT EVERY -- AS IT IS SAID, EVERY COMMA,

18       EVERY PERIOD, EVERY SEMICOLON; FAIR?"

19          "A.  YES, UH-HUH."

20          WAS THAT YOUR SWORN TESTIMONY, SIR?

21   **A.**   IT IS.

22   **Q.**   DO YOU AGREE THAT IT IS THE FDA THAT ULTIMATELY HAS THE

23   AUTHORITY TO DECIDE WHETHER REVISIONS TO THE LABEL ARE

24   NECESSARY?

25   **A.**   THAT'S TRUE.

1    **Q.**   NOW, WE TALKED ABOUT THE 1999 LABEL.  NOW I'M MOVING TO

2    THE 2002 LABEL.  THERE DID YOU TESTIFY ON DIRECT EXAMINATION

3    THAT THERE WAS NOTHING ON HEART ATTACKS IN THE WARNINGS

4    SECTION, BUT THERE WAS INFORMATION IN THE PRECAUTIONS SECTION?

5    **A.**   YES, SIR, I DID.

6    **Q.**   WE WILL COME BACK TO THE DISTINCTION BETWEEN WARNINGS AND

7    PRECAUTIONS IN A MINUTE, BUT DID YOU ALSO SAY THAT, BASED ON

8    MR. BIRCHFIELD'S DESCRIPTION TO YOU OF WHAT WAS IN THE VIGOR

9    STUDY, THAT EVEN THE LANGUAGE THAT WAS IN THE PRECAUTIONS

10   SECTION WAS NOT AN ADEQUATE STATEMENT OF THE VIGOR RESULTS?

11   **A.**   I DON'T KNOW IF I SAID THAT THIS MORNING.

12   **Q.**   DO YOU REMEMBER ONE WAY OR ANOTHER WHETHER YOU SAID THAT?

13   **A.**   I DON'T THINK I SAID THAT.  JUST SITTING HEAR NOW,

14   REMEMBERING WHAT WE TALKED ABOUT THIS MORNING, I THINK I WAS --

15   I CRITICIZED THE PLACEMENT.  I DON'T KNOW THAT I CRITICIZED THE

16   ACTUAL WORDS THAT WERE USED IN THE PRECAUTIONS SECTION.

17   **Q.**   WELL, LET'S HONE IN ON THAT FOR A MINUTE.  SETTING ASIDE

18   WHERE IT'S PLACED FOR A MINUTE, WARNINGS VERSUS PRECAUTIONS, DO

19   YOU AGREE THAT THE 2002 LABEL ACCURATELY SETS FORTH THE RESULTS

20   OF THE VIGOR STUDY WITH REGARD TO CARDIOVASCULAR RISKS?

21   **A.**   I BELIEVE SO, YES.

22   **Q.**   SO THE BONE OF CONTENTION, THEN, AS I UNDERSTAND IT FROM

23   YOUR DIRECT TESTIMONY AND THEN YOUR ANSWER TO THAT QUESTION, IS

24   YOU AGREE THAT THE INFORMATION ON VIGOR AND THE CV RISKS IS

25   ACCURATELY SET FORTH IN THE LABEL, BUT YOU SAY IT'S IN THE

1    PRECAUTIONS SECTION RATHER THAN THE WARNINGS SECTION?

2    **A.**    YES, SIR.

3    **Q.**    THAT'S YOUR ONLY CRITICISM?

4    **A.**    YES, SIR.

5    **Q.**    ON THAT POINT ABOUT PRECAUTIONS VERSUS WARNINGS, I THINK

6    THE ANALOGY YOU USED IS A PRECAUTION IS LIKE HEARING THAT CRIME

7    IS UP ON THE 10:00 NEWS AND A WARNING IS WHEN SOMEBODY KICKS

8    YOUR DOOR DOWN; RIGHT?

9    **A.**    I THINK I SAID A PRECAUTION IS LIKE HEARING THAT CRIME IS

10   UP ON THE 10:00 NEWS AND THAT YOU SHOULD BE ESPECIALLY VIGILANT

11   FOR IT AND THEN A WARNING IS WHEN SOMEBODY ACTUALLY KICKS YOUR

12   DOOR DOWN.

13   **Q.**    YOU KNOW, DON'T YOU, SIR, THAT THE FDA ITSELF THINKS THAT

14   THE OPINION YOU RENDERED HERE IN THIS LITIGATION ON THAT SCORE

15   IS 100 PERCENT WRONG?

16   **A.**    I'M NOT SURE -- I ASSUME WE ARE NOT TALKING ABOUT THE NEWS

17   AND THE DOOR ANALOGY BECAUSE I HAVEN'T HEARD THAT, SO I'M NOT

18   SURE WHAT EXACTLY IT IS YOU'RE SAYING I'M 100 PERCENT WRONG ON.

19   **Q.**    WHAT I'M SAYING YOU'RE 100 PERCENT WRONG ON IS THAT THERE

20   IS A DIFFERENCE IN SIGNIFICANCE TO DOCTORS BETWEEN READING

21   SOMETHING IN A SECTION CALLED "PRECAUTIONS" AND READING

22   SOMETHING IN A SECTION CALLED "WARNINGS."  ARE YOU AWARE, SIR,

23   THAT THE FDA, THE AGENCY THAT YOU WORK WITH, HAS CONCLUDED THAT

24   THERE'S NO DIFFERENCE, FROM A DOCTOR'S POINT OF VIEW, ON THOSE

25   TWO?

865

1   **A.**   I HAVEN'T SEEN THAT AND SO I CAN'T COMMENT ON IT ONE WAY

2   OR ANOTHER.

3   **Q.**   YOU SAID EARLIER TODAY THAT NOW, AT LEAST, YOU CONSIDER

4   YOURSELF AN EXPERT ON FDA WARNINGS; CORRECT?

5   **A.**   WELL, I TALKED ABOUT BEING AN EXPERT ON FDA -- I DON'T

6   THINK WE SAID WARNINGS.  I FORGET EXACTLY WHAT THE LANGUAGE WAS

7   WE MENTIONED THIS MORNING.

8   **Q.**   YOU SAID TODAY YOU CONSIDER YOURSELF AN EXPERT ON LABELS;

9   RIGHT?

10  **A.**   YES, THAT'S WHAT WE TALKED ABOUT.

11  **Q.**   WELL, AS AN EXPERT ON LABELS, HAVE YOU KEPT UP WITH THE

12  NEW REGULATIONS THAT HAVE BEEN ISSUED BY THE FDA CONCERNING

13  WHAT SHOULD AND SHOULD NOT BE IN THE LABEL FOR PRESCRIPTION

14  DRUGS?

15  **A.**   I WOULD SAY THIS.  I HAVE MADE AN EFFORT TO STAY CURRENT

16  WITH IT.  I DON'T KNOW IF I'M CURRENT WITH THE MOST RECENT

17  VERSION BECAUSE I DON'T KNOW WHEN THE MOST RECENT VERSION WAS.

18  IF THERE WAS A RECENT VERSION IN 2006 --

19  **Q.**   DO YOU KNOW, SIR, THAT THE FDA HAS DECIDED EIGHT MONTHS

20  AGO THAT THEY'RE DOING AWAY WITH THE DISTINCTION BETWEEN

21  WARNINGS AND PRECAUTIONS BECAUSE THAT DIFFERENCE DOESN'T MAKE

22  ANY DIFFERENCE AT ALL TO DOCTORS IN REAL LIFE?

23          **MR. ROBINSON:**  YOUR HONOR, COULD WE APPROACH THE

24  BENCH?

25          **THE COURT:**  SURE.

1          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

2    THE BENCH.)

3          **MR. ROBINSON:**  YOUR HONOR, I HAVE AN OBJECTION TO HIM

4    GETTING INTO -- THE HISTORY OF THIS IS THAT THE -- WHEN VIOXX

5    WAS ON THE MARKET, THE LAW WAS -- AND THE FDA HAS ACTUAL

6    PRINTED PUBLICATIONS THAT DEFINES A PRECAUTION, IT DEFINES A

7    WARNING, AND DEFINES A CONTRAINDICATION.  WHAT HE IS TALKING

8    ABOUT IS THAT THE COMPANIES BASICALLY GOT TO THE BUSH

9    ADMINISTRATION -- HOLD ON.  I'M JUST PUTTING IT ON THE RECORD.

10          SO WHAT HAPPENED IS THIS.  THIS YEAR, AS SOON

11   AS -- THEY GOT THEM, BASICALLY, TO PUT SOME NEW LANGUAGE IN

12   THAT CAME OUT THIS YEAR, YOUR HONOR, AND THEY PUT SOME NEW FDA

13   LANGUAGE IN.  THAT WASN'T IN EFFECT AT THE TIME VIOXX WAS ON

14   THE MARKET.  I KNOW THEY HAVE LANGUAGE IN THERE THAT THIS IS

15   THE INTENT AND THINGS LIKE THAT, BUT FRANKLY THIS IS

16   PREJUDICIAL BECAUSE IT WASN'T THE LAW.  THERE WAS NOTHING CITED

17   AS TO THE DEFINITION REGARDING THE FDA.  I THINK, BEFORE WE GET

18   INTO ANY OF THIS KIND OF QUESTIONING, REALLY, WE NEED TO HEAR A

19   DETAILED MOTION IN LIMINE WE NEED TO PREPARE BRIEFS ON THIS --

20          **MR. BIRCHFIELD:**  YOUR HONOR, IF I CAN?

21          **THE COURT:**  DO YOU WANT TO RESPOND TO BUSH?

22          **MR. BECK:**  I HAD NOTHING TO DO WITH IT.

23          **MR. BIRCHFIELD:**  YOUR HONOR, I DO THINK IT CLEARLY

24   HAS HAPPENED THE DOOR FOR ME TO ESTABLISH THAT, WHETHER THE FDA

25   RECOGNIZES IT OR NOT, MERCK DID TO THE TUNE OF A BILLION

1   DOLLARS --

2           **MR. BECK:**  I DIDN'T ASK ABOUT MERCK.  HIS DIRECT

3   EXAMINATION IS WHAT DO DOCTORS THINK.

4           **THE COURT:**  HOW FAR ARE YOU GOING TO DO?

5           **MR. BECK:**  I HAVE ABOUT FOUR MORE QUESTIONS AND I'M

6   DONE.

7           **THE COURT:**  I MEAN ON THIS.

8           **MR. BECK:**  I'M GOING TO SHOW HIM THE REGS THAT DO

9   AWAY WITH IT AND I'M GOING TO SHOW HIM THE REGS THAT SAY THE

10  REASON WE ARE DOING AWAY WITH IT IS BECAUSE IT DOESN'T MAKE ANY

11  DIFFERENCE TO DOCTORS.  HE HOLDS HIMSELF OUT AS AN EXPERT ON

12  LABELS AND HE OPINED ABOUT WHAT IS IMPORTANT TO DOCTORS.  I'M

13  ENTITLED TO SHOW THAT THE FDA THINKS HE IS WRONG.

14          **MR. BIRCHFIELD:**  I'M ENTITLED TO SHOW THAT MERCK

15  KNOWS HE IS RIGHT.

16          **THE COURT:**  LET'S DO THEM BOTH.  YOU DO IT AND TAKE

17  HIM FROM THE STANDPOINT THAT THIS IS WHEN IT WAS, AFTER, AND SO

18  FORTH.

19          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

20  OPEN COURT.)

21  **BY MR. BECK:**

22  **Q.**  DO YOU KNOW, SIR, THAT THE FDA HAS DECIDED EIGHT MONTHS

23  AGO THAT THEY'RE DOING AWAY WITH THE DISTINCTION BETWEEN

24  WARNINGS AND PRECAUTIONS BECAUSE THAT DIFFERENCE DOESN'T MAKE

25  ANY DIFFERENCE AT ALL TO DOCTORS IN REAL LIFE?

DAILY COPY

1  **A.**   I CAN ANSWER THAT?

2  **Q.**   YES.

3           **THE COURT:**  YES.

4           **THE WITNESS:**  I KNEW THAT THEY WERE INVOLVED IN

5  INTENSE STUDY AND HAD ISSUED GUIDANCES AND SOLICITED OPINIONS

6  ABOUT WHAT TO DO WITH THE LABEL.  I DID NOT KNOW THEY HAD

7  DECIDED ULTIMATELY TO REORGANIZE THE LABEL ALONG THE LINES OF

8  MERGING THE PRECAUTIONS AND THE WARNINGS.

9  **BY MR. BECK:**

10 **Q.**   I'M HANDING YOU, SIR, WHAT WE HAVE MARKED AS DX-3557,

11 WHICH IS A COPY OF THE FEDERAL REGISTER FROM TUESDAY,

12 JANUARY 24, 2006.  IN YOUR WORK OVER THE YEARS, SIR, HAVE YOU

13 EVERY DEALT WITH PUBLICATIONS LIKE THIS, WHERE THE DIFFERENT

14 AGENCIES OF THE GOVERNMENT SET FORTH THEIR NEW RULES AND THEIR

15 EXPLANATIONS FOR THEIR RULES?

16 **A.**   I HAVE SIR, YES.

17 **Q.**   BUT IN ALL THOSE HOURS THAT YOU WORKED ON THIS CASE, YOU

18 NEVER CAME ACROSS THESE NEW REGULATIONS CONCERNING LABELS?

19 **A.**   I DID NOT READ THE LABEL -- THE SUGGESTIONS FOR LABEL

20 CHANGES, AS YOU HAVE DESCRIBED TO ME, JANUARY 24, 2006, NO.

21 **Q.**   YOU SEE ON THE SCREEN, THE FIRST PAGE, THE DEPARTMENT OF

22 HEALTH AND HUMAN SERVICES -- DOES THAT INCLUDE THE FOOD & DRUG

23 ADMINISTRATION?

24 **A.**   YES.

25 **Q.**   IN FACT, WE SEE OVER ON THE NEXT PAGE IT'S SUMMARIZING

1  WHAT'S GOING ON WITH THE NEW REGULATIONS FOR THE FOOD & DRUG

2  ADMINISTRATION; CORRECT?

3  **A.**   YES, THAT'S RIGHT.

4  **Q.**   IF YOU WILL TURN OVER TO THE FOURTH PAGE IN, WHICH HAS A

5  TABLE IN IT.  ARE YOU WITH ME?

6  **A.**   I AM, SIR.

7  **Q.**   PRESCRIPTION DRUG LABELING SECTIONS, DO YOU SEE THAT?

8  **A.**   I DO.

9  **Q.**   THEN ON THE LEFT SIDE IS SECTIONS REQUIRED FOR ALL

10  PRODUCTS BEFORE THE EFFECTIVE DATE OF THE FINAL RULE AND FOR

11  OLDER PRODUCTS ON AND AFTER THE EFFECTIVE DATE OF THE FINAL

12  RULE.  DO YOU SEE THAT?

13  **A.**   RIGHT.

14  **Q.**   THAT HAS SEPARATE SECTIONS FOR WARNINGS AND A SEPARATE ONE

15  FOR PRECAUTIONS?

16  **A.**   RIGHT.

17  **Q.**   THEN YOU SEE WHERE THEY'RE CHANGING THE RULE AND THERE

18  THEY ARE JUST COMBINING WARNINGS AND PRECAUTIONS INTO ONE

19  SECTION?  DO YOU SEE THAT?

20  **A.**   WAIT ONE SECOND, PLEASE.  I'M GOING TO DISAGREE WITH YOU A

21  LITTLE BIT HERE.  CERTAINLY, THERE'S NO DOUBT THAT IN THE

22  SECOND COLUMN THEY TALK ABOUT WARNINGS AND PRECAUTIONS WITH A

23  SLASH, THAT SUGGESTS THEY ARE GOING TO BE FUSED, COMBINED, BUT

24  THEY HAVE BROKEN SOME THINGS OUT.  DRUG INTERACTIONS USED TO BE

25  IN THE PRECAUTIONS SECTION.  THAT'S BROKEN OUT.  SO I'M NOT

870

1   REALLY SURE IT'S AS EASY AS TAKING ALL THE INFORMATION IN

2   PRECAUTIONS AND PUTTING IT TOGETHER WITH ALL THE INFORMATION IN

3   THE WARNINGS.  I THINK WHAT THEY ARE SUGGESTING IS A LITTLE

4   MORE COMPLICATED THAN THAT.

5   **Q.**   TURN OVER TO PAGE 3946, PLEASE.

6   **A.**   3946?

7   **Q.**   YES. TELL ME WHEN YOU'RE THERE.

8   **A.**   I AM THERE.

9   **Q.**   THEN ON THE LEFT-HAND COLUMN DO YOU SEE THE LANGUAGE

10  WHERE -- WARNINGS AND PRECAUTIONS, WHERE IT SAYS "FDA PROPOSED

11  TO REVISE THE CONTENT OF THE WARNINGS AND PRECAUTIONS

12  SECTIONS"?  DO YOU SEE THAT?

13  **A.**   I DO.  IT'S ABOUT TWO-THIRDS OF THE WAY DOWN THE FIRST

14  COLUMN.

15  **Q.**   SORT OF CUTTING TO THE CHASE HERE, DO YOU SEE HERE WHERE

16  IT'S STATED THAT, "SEVERAL COMMENTS SUPPORTED REORGANIZING THE

17  WARNINGS AND PRECAUTIONS SECTION.  THE COMMENTS AGREED WITH THE

18  FDA'S FINDINGS, BASED ON PHYSICIAN SURVEYS AND FOCUS TESTING,

19  THAT THE DISTINCTION BETWEEN WARNINGS AND PRECAUTIONS IS NOT

20  MEANINGFUL TO PRACTITIONERS WHO USE LABELING."  DO YOU SEE

21  THAT?

22  **A.**   YES, I DO SEE THAT.

23          **MR. BECK:**  THAT'S ALL I HAVE, YOUR HONOR.

24          **THE COURT:**  ANY REDIRECT.

25          **MR. BIRCHFIELD:**  YES, YOUR HONOR.

DAILY COPY

1                    **REDIRECT EXAMINATION**

2  BY MR. BIRCHFIELD:

3  **Q.**   DR. MOYE, MR. BECK ASKED YOU ABOUT YOUR TESTIMONY THIS

4  MORNING WHERE YOU SAID THAT IT MAKES A DIFFERENCE TO PHYSICIANS

5  BETWEEN THE WARNINGS SECTION AND THE PRECAUTIONS SECTION; IS

6  THAT RIGHT?

7  **A.**   THAT'S RIGHT.

8  **Q.**   THEN HE SHOWED YOU A DOCUMENT JUST NOW THAT WAS CREATED

9  WHEN?

10  **A.**   THIS WAS CREATED IN JANUARY 2006.

11  **Q.**   SO THAT'S AFTER VIOXX IS OFF THE MARKET; IS THAT RIGHT?

12  **A.**   THAT'S RIGHT.

13  **Q.**   SO YOU SAY IT MAKES A DIFFERENCE IN DOCTORS' PRESCRIBING

14  HABITS WHETHER IT'S IN THE PRECAUTIONS SECTION VERSUS THE

15  WARNINGS SECTION?

16  **A.**   I DO, YES.

17  **Q.**   THE FDA IN JANUARY SAID THAT IT DOESN'T MAKE A DIFFERENCE?

18  **A.**   ACTUALLY, I'M NOT SURE IT SAYS THAT.  CERTAINLY, THOSE

19  WORDS ARE HERE, BUT WHAT THEY DESCRIBE IS VERY DIFFERENT.

20  **Q.**   DO YOU KNOW HOW THIS DOCUMENT CAME ABOUT?  HOW ARE THESE

21  THINGS DONE?  IS THERE A LOBBYING EFFORTS THAT COME INTO PLAY

22  HERE?  ARE THERE PUBLIC HEARINGS?  DO YOU KNOW, DR. MOYE?

23  **A.**   WELL, I KNOW THAT THE FDA BY DESIGN IS INFLUENCED BY THE

24  DRUG MANUFACTURERS AND THEY PUT -- AND THERE ARE REQUESTS AND

25  CONCERNS THAT COME FROM DRUG MANUFACTURERS THAT THE FDA IS

1   OBLIGATED TO INVESTIGATE.  THEY INVESTIGATE BY HAVING THEIR OWN

2   INTERNAL DISCUSSIONS AND OPENING THE ISSUE FOR COMMENT.  THEY

3   ALWAYS WANT TO BE RESPONSIVE TO THEIR PARTNERS, THE DRUG

4   INDUSTRY, BUT ALSO TRY TO BE RECEPTIVE TO THE PUBLIC HEALTH

5   CONCERNS, AS WELL.

6   **Q.**   DR. MOYE LET ME MAKE SURE.  ALL DRUG SALES, ALL

7   PRESCRIPTION DRUG SALES, THEY COME FROM DOCTORS ACTUALLY

8   WRITING PRESCRIPTIONS; RIGHT?

9   **A.**   YES, THAT'S RIGHT.

10  **Q.**   SO LET'S TAKE A LOOK AT WHAT MERCK UNDERSTOOD --

11         **MR. BECK:**  YOUR HONOR, MAY WE APPROACH?

12         **THE COURT:**  YES.

13         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

14  THE BENCH.)

15         **MR. BECK:**  YOUR HONOR, HE ELICITED ON DIRECT

16  EXAMINATION WHAT IT IS, THAT DOCTORS/PRESCRIBERS ARE IMPORTANT

17  TO THEM.  I WAS ENTITLED TO CROSS-EXAMINE ON THAT.  THAT

18  DOESN'T OPEN THE DOOR THAT NOW HE CAN GO IN AND SAY, "HERE'S

19  WHAT MERCK'S PLAN SAYS."

20         **MR. BIRCHFIELD:**  IT ABSOLUTELY DOES.

21         **THE COURT:**  I OVERRULE THE OBJECTION.

22         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

23  OPEN COURT.)

24  **BY MR. BIRCHFIELD:**

25  **Q.**   I WANT TO SHOW YOU P1.1135.  THIS IS A DOCUMENT ALREADY IN

DAILY COPY

1   EVIDENCE?

2   **A.**   IS IT IN MY NOTEBOOK?  YES.  1135.

3   **Q.**   YES.

4   **A.**   YES.

5   **Q.**   IF WILL LOOK AT THE FRONT PAGE, YOU WILL SEE THIS IS A

6   U.S. LONG-RANGE OPERATING PLAN, FRANCHISE ANALGESIC AND

7   ANTI-INFLAMMATORY PRODUCTS AND SPECIFICALLY NAMES VIOXX; IS

8   THAT RIGHT?

9   **A.**   YES, THAT'S RIGHT.

10  **Q.**   THIS IS A DOCUMENT THAT SAYS IT'S GENERATED JULY 2001; IS

11  THAT CORRECT?

12  **A.**   YES.

13  **Q.**   IF YOU WOULD TURN WITH ME TO PAGE 17 OF THIS DOCUMENT.

14  COULD YOU SEE THE FORECAST THAT IS OUTLINED HERE BY BAR GRAPH?

15  **A.**   NOT A BAR GRAPH.  A LINE GRAPH.

16  **Q.**   I'M SORRY.  A LINE GRAPH.

17  **A.**   YOU'RE TALKING TO A STATISTICIAN HERE.

18  **Q.**   SORRY.  DO YOU SEE THE BOX ON THE RIGHT-HAND SIDE?

19  **A.**   I DO, YES.

20  **Q.**   WHERE IT REFERS TO THE DOWN SIDE EFFECT OF HAVING A CV

21  LABEL IS WARNING AS OPPOSED TO THE PRECAUTIONS SECTION?

22  **A.**   YES.

23  **Q.**   WHAT DOES IT SAY THERE, DOCTOR?

24  **A.**   IT SAYS, JUST READING THIS, "DOWN SIDE MINUS 50 PERCENT

25  IN," PRESUMABLY, "2006.  CV LABEL IS WARNING/NOT PRECAUTION

1   MINUS 50 PERCENT."

2   **Q.**   SO A CV LABEL IN THE WARNINGS SECTION VERSUS THE

3   PRECAUTIONS WOULD AFFECT SALES BY NEGATIVE 50 PERCENT; CORRECT?

4   **A.**   YES, SIR.

5   **Q.**   LOOK ON THE LEFT-HAND SIDE THERE, DR. MOYE.  WE SEE IN THE

6   VERTICAL COLUMN WHERE IT HAS 500, 1,000?

7   **A.**   YES.

8   **Q.**   1,500.  UP AT THE TOP IT SAYS "CONSTANT MILLIONS'; IS THAT

9   CORRECT?

10  **A.**   YES, SIR.

11  **Q.**   SO THESE FIGURES HERE, IF WE LOOK AT THE DOWN SIDE, THAT

12  WOULD REDUCE THE SALES IN 2006 TO $1.5 BILLION; IS THAT

13  CORRECT?

14  **A.**   THAT'S APPROXIMATELY RIGHT, YES.

15  **Q.**   SO WE'RE LOOKING AT A DIFFERENCE HERE, PORTRAYED BY

16  MERCK'S FORECASTS, THAT HAVING A CV LABEL IN THE WARNINGS

17  SESSION AS OPPOSED TO THE PRECAUTIONS SECTION WOULD IMPACT

18  SALES BY APPROXIMATELY $1 BILLION; IS THAT CORRECT, DR. MOYE?

19  **A.**   YES, JUST TRYING TO DO THE SUBTRACTION FROM THE ORDINANT

20  VALUES HERE, YES, ABOUT A BILLON.

21  **Q.**   DOES THAT SUGGEST MERCK UNDERSTOOD, LIKE YOU DO, THERE IS

22  A DIFFERENCE BETWEEN A WARNINGS SECTION AND A PRECAUTIONS

23  SECTION?

24          **MR. BECK:**  OBJECT, LEADING.

25          **THE COURT:**  IT IS A LEADING QUESTION.

1    **BY MR. BECK:**

2    **Q.**   DR. MOYE, TELL US WHAT THIS DOCUMENT SAYS TO YOU ABOUT

3    MERCK'S UNDERSTANDING IN 2001 ABOUT THE IMPACT OF SALES ON

4    HAVING A CV WARNING IN THE WARNINGS SECTION AS OPPOSED TO THE

5    PRECAUTIONS SECTION.

6             **MR. BECK:**   I OBJECT, YOUR HONOR, BOTH ON GROUNDS OF

7    SPECULATION AND THAT MR. BIRCHFIELD HAS ALREADY GIVEN HIM THE

8    ANSWER HE WANTS TO HEAR IN HIS LEADING QUESTION.

9             **THE COURT:**   I'LL OVERRULE THE OBJECTION AND ALLOW IT.

10            **THE WITNESS:**   WELL, MY SENSE ABOUT THIS IS THAT

11   DOCTORS PAY ATTENTION TO LABELS AND, AS WE SAID EARLIER, THAT

12   THEY TAKE WARNINGS MUCH MORE SERIOUSLY THAN THEY TAKE

13   PRECAUTIONS AND THAT THIS SAME CONCERN IS REFLECTED BY MERCK.

14   **BY MR. BIRCHFIELD:**

15   **Q.**   MR. BECK ASKED YOU QUESTIONS ABOUT YOUR REPORT AND

16   SPECIFICALLY ABOUT YOUR REPORT DEALING WITH THE LABELS OF

17   VIOXX; IS THAT CORRECT?

18   **A.**   YES.

19   **Q.**   THE PARAGRAPHS HE SHOWED YOU AND THE JURY SUGGESTED THAT

20   IT WAS A CUT AND PASTE JOB WITH FEN-PHEN; IS THAT FAIR?

21   **A.**   I THINK THAT WAS HIS SUGGESTION.

22   **Q.**   YOUR LABELING SECTION, WAS IT JUST A CUT AND PASTE JOB

23   FROM FEN-PHEN?

24   **A.**   NO.

25   **Q.**   DID YOU GO INTO DETAILS ABOUT THE VIOXX LABEL?

1    A.    YES.

2    Q.    I WANT TO SHOW YOU THE PORTION OF YOUR REPORT DEALING WITH

3    THE LABELING SECTION.  PARAGRAPH 179, THAT'S THE PARAGRAPH

4    MR. BECK READ TO YOU; IS THAT CORRECT?

5    A.    THAT'S RIGHT.

6    Q.    ALSO, PARAGRAPH 180, DID YOU LOOK AT THAT WITH MR. BECK,

7    AS WELL?

8    A.    YES, SIR.

9    Q.    IT CONTINUES.  PARAGRAPH 180 SAYS, "THE PARTICULAR DEFECTS

10   IN THE VIOXX LABEL ARE AS FOLLOWS"; IS THAT CORRECT?

11   A.    YES, SIR.

12   Q.    THEN YOU CONTINUE FOR FOUR MORE PAGES DESCRIBING SPECIFICS

13   ABOUT DEFECTS IN THE VIOXX LABEL; IS THAT RIGHT?

14   A.    I DO, YES.

15   Q.    TO PUT THIS IN FAIR CONTEXT, LET'S GO THROUGH IT?

16   A.    YES.

17   Q.    AN ADEQUATE LABEL MUST CONTAIN COMPLETE STATEMENTS ABOUT

18   THE EFFECTIVENESS OF THE COMPOUND; IS THAT CORRECT?

19   A.    YES.

20   Q.    THE DATA FOR THE ANALGESIC EFFECT OF VIOXX -- IS THAT LIKE

21   A PAIN-RELIEVER.

22   A.    THAT WAS THE ANTI-PAIN EFFECT.

23   Q.    DID NOT STATE THAT WAS OF THE SAME EFFECTIVENESS AS

24   NSAIDS?

25   A.    THAT'S RIGHT.

1  **Q.**   THE NEXT PARAGRAPH YOU TALK ABOUT THE C.F.R. PARTS.  WHAT

2  IS THAT?

3  **A.**   C.F.R. IS THE CODE OF FEDERAL REGULATIONS.  IT'S THE

4  FORMAL REGULATIONS THAT THE FDA AND THE SPONSOR MUST ABIDE BY

5  IN WARNING ABOUT ADVERSE EVENTS AND WRITING LABELS AND SO ON.

6  IT'S THE OFFICIAL RULES.

7  **Q.**   SO THOSE OFFICIAL RULES THEY WOULD APPLY TO WHETHER YOU'RE

8  DEALING WITH A VIOXX LABEL OR A FEN-PHEN LABEL; IS THAT

9  CORRECT?

10  **A.**   YES.

11  **Q.**   LET'S GO TO PARAGRAPH 183.  THAT'S SPECIFICALLY ABOUT

12  VIOXX; RIGHT?

13  **A.**   YES, THAT'S RIGHT.

14  **Q.**   DID NOT PROVIDE ADEQUATE WARNINGS; IS THAT RIGHT?

15  **A.**   YES, SIR.

16  **Q.**   THEN YOU SET OUT SPECIFIC DETAILS SUPPORTING THIS?

17  **A.**   I DO, SIR.

18  **Q.**   WOULD YOU READ THAT FOR US.

19  **A.**   THE ENTIRE PARAGRAPH.

20  **Q.**   YES.

21  **A.**   "HOWEVER, MERCK DID NOT PROVIDE ADEQUATE WARNINGS.  ON

22  FEBRUARY 25, 1996, IN AN E-MAIL FROM BRYAN F. DANIELS TO THOMAS

23  SIMON, ET AL REGARDING GI OUTCOMES TRIAL PROTOCOL HE STATES,

24  'WOULD ALLOW LOW-DOSE ASA.  REAL WORD, EVERYONE IS ON IT, SO

25  WHY EXCLUDE, AND WITHOUT COX-1 INHIBITION YOU WILL GET MORE

1    THROMBOTIC EVENTS AND KILL DRUG."

2    **Q.**   IS THAT REFERENCING A MERCK DOCUMENT PARTICULARLY ABOUT

3    VIOXX?

4    **A.**   IT IS, SIR.

5    **Q.**   THERE'S NOT A SIMILAR DOCUMENT IN FEN-PHEN, IS THERE?

6    **A.**   THERE IS NO, SIR.  CONTINUE READING?

7    **Q.**   PLEASE.

8    **A.**   "WITH THIS COMMENT, NOT ONLY DOES MERCK RECOGNIZE THAT

9    WITHOUT COX-1 INHIBITION ROFECOXIB WILL INCREASE CARDIOVASCULAR

10   THROMBOTIC EVENTS, BUT ALSO THAT PATIENTS SHOULD TAKE LOW-DOSE

11   ASPIRIN WHILE ON ROFECOXIB.  YET THIS WARNING NEVER APPEARED IN

12   THE ROFECOXIB LABEL."

13   **Q.**   ALL THAT'S DEALING SPECIFICALLY WITH VIOXX; RIGHT?

14   **A.**   IT IS SIR.

15   **Q.**   PARAGRAPH 184.

16          **MR. BECK:**  YOUR HONOR, I OBJECT HERE AND I NEED TO

17   APPROACH.

18          **THE COURT:**  OKAY.

19          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

20   THE BENCH.)

21          **MR. BECK:**  YOUR HONOR, I DIDN'T OBJECT BECAUSE I

22   FIGURED IT'S FAIR FOR HIM TO GIVE A COUPLE EXAMPLES, BUT WHAT

23   HE IS MOVING ONTO NOW, FIRST OF ALL, WE ARE VEERING INTO

24   GENERAL CAUSE, AND MY POINT WAS CREDIBILITY ON THE CUT AND

25   PASTE JOB.  HE HAS MADE HIS POINT.  NOW HE IS GETTING INTO THE

1  ATTITUDE TOWARD THE FDA, WHOSE ONLY MISSION IS TO ENSURE -- WAS

2  ANTAGONISTIC.  THIS IS NOT ON THE LABEL ANYMORE.  THIS IS

3  MOVING OUT OF THE LABEL.  ANDY HAS MADE HIS POINT.

4         **THE COURT:**  I THINK HE IS RIGHT, ANDY.  I THINK

5  YOU'VE GOT ENOUGH MATERIAL DEALING WITH THE FDA.  I THINK

6  YOU'RE REBUTTING HIS SITUATION AND I THINK YOU'VE REBUTTED IT.

7         **MR. BIRCHFIELD:**  YOUR HONOR, CAN I DO THIS?  NOT

8  READING THE SPECIFIC SECTIONS HERE, BUT I'M GOING TO JUST GO

9  THROUGH LIKE "LOOK AT THE NEXT PARAGRAPH" FOR ALL THESE FOUR

10  PAGES, THE REMAINING FOUR PAGES, NOT ONE BY ONE, BUT SAY THESE

11  FOUR PAGES THEY CONTAIN SPECIFIC INFORMATION PERTAINING TO THE

12  VIOXX LABEL, BUT NOT READING.

13         **THE COURT:**  OKAY, AND IT'S DIFFERENT AND SO FORTH AND

14  LET'S MAKE THAT POINT.

15         **MR. BECK:**  BUT WITHOUT READING IT.

16         **THE COURT:**  RIGHT.

17         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

18  OPEN COURT.)

19         **THE COURT:**  I'VE ASKED COUNSEL TO SPEED IT UP A

20  LITTLE BIT.  WE CAN'T HAVE A HUNDRED PAGES READ.

21  **BY MR. BIRCHFIELD:**

22  **Q.**   DR. MOYE, YOUR SECTION DEALING WITH LABELING, IT CONTINUES

23  ON PARAGRAPH 185; IS THAT RIGHT?

24  **A.**   YES, SIR.

25  **Q.**   SPECIFICALLY REFERENCING MERCK DOCUMENTS; IS THAT RIGHT?

DAILY COPY

1    **A.**   THAT'S CORRECT.

2    **Q.**   SAME FOR 186?

3    **A.**   YES.

4    **Q.**   187?

5    **A.**   YES, SIR.

6    **Q.**   188 THAT'S SPECIFIC INFORMATION PERTAINING TO VIOXX;

7    RIGHT?

8    **A.**   YES, SIR.

9    **Q.**   STILL IN THE LABELING SECTION OF YOUR REPORT, PARAGRAPH

10   189?

11   **A.**   YES, SIR.

12   **Q.**   IS THAT DEALING SPECIFICALLY WITH FDA DOCUMENTS AND

13   REGARDING THE VIGOR STUDY PERTAINING SPECIFICALLY TO VIOXX?

14          **MR. BECK:**  YOUR HONOR, I OBJECT.

15          **THE COURT:**  YOU DON'T NEED TO SHOW IT, ANDY.  JUST

16   ASK THE QUESTION.

17   **BY MR. BIRCHFIELD:**

18   **Q.**   DOES THAT CONTINUE THROUGH 190, 191, 192, 193, 194 ALL THE

19   WAY TO PARAGRAPH 198?

20   **A.**   YES, SIR.

21   **Q.**   ALL OF THOSE PARAGRAPHS ARE DEALING SPECIFICALLY WITH

22   DEFECTS IN THE VIOXX LABEL; IS THAT RIGHT?

23          **MR. BECK:**  I OBJECT, ASKED AND ANSWERED AND LEADING.

24          **THE COURT:**  MARSHAL LET'S HANDLE THAT, PLEASE.

25          **MR. BIRCHFIELD:**  IF I CAN GET AN ANSWER?  I WAS

1   TRYING TO SHORTCUT IT.

2          **THE WITNESS:**  YES.

3   **BY MR. BIRCHFIELD:**

4   **Q.**   ALL THAT DEALT SPECIFICALLY WITH VIOXX?

5   **A.**   YES.

6          **THE COURT:**  YOU'RE EXCUSED, DOCTOR.  THANK YOU VERY

7   MUCH.  LET ME TALK WITH COUNSEL ABOUT LOGISTICS.

8          (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH

9   OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

10          **THE COURT:**  WE'LL GO TO ABOUT 5:15, 5:30, SOMETHING

11   LIKE THAT.  CALL YOUR NEXT WITNESS.

12          **MR. ROBINSON:**  YOUR HONOR, WE HAVE A VERY SHORT VIDEO

13   DEPO FROM DR. LAURA DEMOPOULOS.  SHE IS A MERCK DOCTOR.  SHE IS

14   AN EMPLOYEE OF MERCK.

15          (WHEREUPON, **LAURA DEMOPOULOS**, HAVING BEEN DULY SWORN,

16   TESTIFIED BY DEPOSITION AS FOLLOWS.)

17                      **DIRECT EXAMINATION**

18   **BY MR. BIRCHFIELD:**

19   **Q.**   NOW, MA'AM, THEN LET'S LOOK AT VIOXX AS A DRUG.  YOU DO

20   KNOW WHAT THE WORD "PROTHROMBOTIC" MEANS, DON'T YOU?

21   **A.**   YES.

22   **Q.**   "PROTHROMBOTIC" MEANS SOMETHING MIGHT CAUSE A CLOT IN THE

23   BODY; RIGHT?

24   **A.**   CORRECT.

25   **Q.**   YOU KNEW AT MERCK THAT ONE OF THE REASONS AT LEAST THE

DAILY COPY

1  VIGOR STUDY SHOWED AN INCREASE IN HEART ATTACK RISKS WITH

2  VIOXX, YOU KNEW ONE OF THE POSSIBLE EXPLANATIONS WAS VIOXX WAS

3  CAUSING CLOTS; RIGHT?

4  **A.**   THAT WAS ONE OF SEVERAL POSSIBLE EXPLANATIONS.

5  **Q.**   IT WAS A POSSIBLE EXPLANATION THAT YOU KNEW ABOUT

6  CONSCIOUSLY IN YOUR MIND AS A POSSIBILITY BACK WHEN YOU WERE

7  THE SENIOR DIRECTOR OF HEART RESEARCH AT MERCK; RIGHT?

8  **A.**   I AND OTHERS WITHIN MERCK STATED THAT AS A POSSIBILITY.

9  **Q.**   RIGHT.  BECAUSE IT WASN'T JUST YOU; EVERYBODY AT MERCK

10  KNEW THAT ONE OF THE POSSIBILITIES FOR WHY THE VIGOR STUDY

11  SHOWED WHAT IT SHOWED IS YOUR VIOXX WAS CAUSING THE CLOTTING;

12  RIGHT?

13  **A.**   WE ENUMERATED THAT AMONG THE POSSIBILITIES.

14  **Q.**   BUT YOU DEALT WITH THE PUBLIC AFFAIRS PEOPLE, DIDN'T YOU?

15  **A.**   I DID.

16  **Q.**   YOU PUT OUT A VIDEO NEWS RELEASE OR YOU WERE A PART OF IT

17  AT LEAST; RIGHT?

18  **A.**   YES.

19  **Q.**   WHEN YOU DID YOUR TAPING, WHAT WAS INVOLVED IN THE TAPING?

20  **A.**   I RESPONDED TO SOME QUESTIONS THAT RELATED TO AN ARTICLE

21  WHICH HAD BEEN PUBLISHED BY ERIC TOPOL AND THE QUESTIONS AND MY

22  ANSWERS WERE MADE IN RESPONSE TO THAT ARTICLE.

23  **Q.**   TO PUT THIS INTO A YEAR FRAME, DO YOU REMEMBER WHEN THAT

24  ARTICLE WAS?

25  **A.**   IT WAS AUGUST OF 2002, I BELIEVE.

 1   **Q.**   TWO YEARS BEFORE MERCK PULLED THE DRUG; RIGHT?

 2   **A.**   YES.

 3   **Q.**   IN AUGUST OF 2002, THE ARTICLE CAME OUT.  HOW SOON AFTER

 4   THAT DID YOU DO YOUR VIDEO TAPING FOR THE COMPANY?

 5   **A.**   I DON'T RECALL EXACTLY, BUT I SUSPECT IT WAS WITHIN

 6   SEVERAL WEEKS.

 7   **Q.**   DO YOU RECALL WHEN THEY CAME IN WHETHER OR NOT THEY WOULD

 8   GET YOU TO, IN ESSENCE, PRACTICE, PRACTICE, PRACTICE, SAY THE

 9   SAME THING OVER AND OVER AND OVER, GET IT JUST RIGHT?

10   **A.**   MY RECOLLECTION IS THAT WE DID SEVERAL TAKES, IF YOU'D

11   CALL IT THAT, IF THAT'S THE RIGHT TERM, OF SIMILAR QUESTIONS.

12   **Q.**   WE HAVE GOT THIS, ALL THE OUTTAKES FROM THIS, AND I WANT

13   TO PLAY SOME OF THEM WITH YOU AND SEE IF THIS REFRESHES YOUR

14   MEMORY A LITTLE BIT ABOUT WHAT WENT ON.

15   **A.**   OKAY.

16           (WHEREUPON, THE FOLLOWING WAS PLAYED DURING THE VIDEO

17   DEPOSITION.)

18           **FEMALE SPEAKER:**  NOW, IDEALLY WHAT WE NEED FROM YOU,

19   AS KIND OF A COMPANY PERSON OUT THERE IS, YOU KNOW, MERCK

20   STANDS BEHIND THE SAFETY PROFILE, WHATEVER YOU FEEL COMFORTABLE

21   SAYING, AND THEN GIVE YOUR REASONS FOR IT -- MILLIONS OF PEOPLE

22   STUDIED IT, ROUTINELY WE CONTINUED MONITORING IT, YOU KNOW, WE

23   HAVE REPORTED -- WE HAVE REPORTED THINGS AND LOOKED AT REPORTS

24   COMING FROM PHYSICIANS.  SO WHATEVER MAKES YOU COMFORTABLE IN

25   SAYING THAT MERCK STANDS BEHIND THE SAFETY.

884

1        **THE WITNESS:**  DO YOU THINK IT'S USEFUL TO -- I MEAN

2   I THINK, YOU KNOW, IN FAIRNESS AND IN OUR OWN STAND-BY

3   STATEMENT AND, YOU KNOW, THE PIRS AND OUR OWN PUBLICATIONS, WE

4   SAY THAT ONE POSSIBLE EXPLANATION FOR THE VIGOR RESULT IS THE

5   PROTHROMBOTIC EFFECT OF VIOXX.  WE SAY IT OURSELVES.  WE HAVE

6   SAID IT IN LOTS OF DIFFERENT PLACES.  IT'S IN THERE AND THEY

7   RAISED THAT.  THERE ISN'T A SINGLE PERSON IN THE COMPANY WHO'S

8   GOING TO SAY THAT'S NOT A POSSIBLE EXPLANATION.  SO, YOU KNOW,

9   TO SAY THAT -- TO MAKE THE ANSWER AN ABSOLUTE AND SAY WE STAND

10  BEHIND THE SAFETY, IT'S UNASSAILABLE IS, YOU KNOW, PROBABLY TOO

11  MUCH OF A GENERALIZATION AT LEAST.

12  BY MR. ROBINSON:

13  Q.   MA'AM, WHAT YOU TOLD THAT PERSON IS "DO YOU THINK IT'S

14  USEFUL" -- I MEAN, YOU STARTED OUT ASKING THEM IF THEY THOUGHT

15  IT WOULD BE USEFUL; RIGHT?

16  A.   I DID, YES.

17  Q.   THEN YOU CHANGED IT AND YOU SAID, "I MEAN, TO THINK, YOU

18  KNOW, IN FAIRNESS" -- THAT WAS YOUR WORD, "IN FAIRNESS," WASN'T

19  IT?

20  A.   CORRECT.

21  Q.   "IN OUR OWN STAND-BY STATEMENT, YOU KNOW, THE PIRS AND OUR

22  OWN PUBLICATIONS, WE SAY THAT ONE POSSIBLE EXPLANATION FOR THE

23  VIGOR RESULTS IS A PROTHROMBOTIC EFFECT OF VIOXX."  YOU SAID

24  THAT, DIDN'T YOU?

25  A.   CORRECT.

1  **Q.**   YOU SAY, "WE SAY IT OURSELVES.  I MEAN, WE HAVE SAID IT IN

2  LOTS OF DIFFERENT PLACES.  IT'S IN THERE AND THEY RAISED THAT."

3  YOU SAID THAT, DIDN'T YOU?

4  **A.**   I DID.

5  **Q.**   YOU SAID, "THERE ISN'T A SINGLE PERSON IN THE COMPANY

6  WHO'S GOING TO SAY THAT'S NOT A POSSIBLE EXPLANATION."  THAT'S

7  WHAT YOU SAID.

8  **A.**   YES.  MERCK SAID THAT MANY TIMES.

9  **Q.**   NOW, MA'AM, IF YOU'LL LOOK AT THE WAY YOU'VE ENDED THIS,

10  BECAUSE IT KIND OF FRAMES HER FIRST REQUEST OF DOES THE COMPANY

11  STAND BY, YOU SAID "SO, YOU KNOW, TO SAY THAT, YOU KNOW, TO

12  MAKE THE ANSWER AN ABSOLUTE AND SAY WE STAND BEHIND THE SAFETY,

13  IT'S UNASSAILABLE, IS, YOU KNOW, PROBABLY TOO MUCH OF A

14  GENERALIZATION, AT LEAST."  THAT'S WHAT YOU SAID, ISN'T IT?

15  **A.**   YES.

16  **Q.**   BECAUSE IT IS TOO MUCH OF A GENERALIZATION TO SAY MERCK

17  STOOD BEHIND THE SAFETY OF VIOXX WHEN IT CAME TO HEART ATTACKS;

18  RIGHT?

19  **A.**   NO.

20  **Q.**   SO WHEN YOU SAY THAT IT -- TO MAKE AN ANSWER AND SAY WE

21  STAND BEHIND THE SAFETY IS POSSIBLY TOO MUCH OF A

22  GENERALIZATION, WERE YOU TELLING THE TRUTH?

23  **A.**   YES.

24  **Q.**   ALL RIGHT.  TO MAKE SURE -- I DON'T UNDERSTAND HOW I'M

25  MISSING THIS.  I JUST WANT TO MAKE SURE I'VE GOT THIS RIGHT.

1   YOU DO AGREE THAT EVERY -- THAT ONE POSSIBLE EXPLANATION FOR

2   THE VIGOR RESULT IS A PROTHROMBOTIC EFFECT OF VIOXX; RIGHT?

3   **A.**   YES, THAT'S A POSSIBLE EXPLANATION.

4   **Q.**   YOU DO AGREE, "THERE ISN'T A SINGLE PERSON IN THE COMPANY

5   WHO'S GOING TO SAY THAT'S NOT A POSSIBLE EXPLANATION"; RIGHT?

6   **A.**   A POSSIBLE EXPLANATION.

7   **Q.**   YOU DO AGREE THAT MERCK OUGHT TO TELL CUSTOMERS THE TRUTH

8   ABOUT ITS DRUGS; RIGHT?

9   **A.**   THE TRUTH, YES.

10  **Q.**   YOU DO AGREE THAT IF MERCK THINKS VIOXX POSSIBLY CAUSES

11  HEART ATTACKS, THAT MERCK OUGHT TO AT LEAST SAY WE THINK THAT'S

12  POSSIBLE, TRUE?

13  **A.**   NO, NOT NECESSARILY.  I THINK THERE ARE MANY INSTANCES

14  WHERE IT MAY OR MAY NOT BE APPROPRIATE OR PRUDENT TO RAISE

15  QUESTIONS THAT ONE MIGHT HAVE.

16              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

17  THE BENCH.)

18              **MR. GOLDMAN:**  YOUR HONOR, I WANT TO REVISIT THE ISSUE

19  ABOUT OUR SIX MINUTES OF DESIGNATIONS WITH DR. DEMOPOULOS.  AS

20  YOU COULD HEAR, MR. LANIER ASKED WHETHER SHE CONSCIOUSLY IN HER

21  MIND THOUGHT THAT VIOXX WAS POSSIBLY PROTHROMBOTIC, ONLY HE

22  SAID, "WERE YOU TELLING THE TRUTH," ATTACKING HER CREDIBILITY,

23  AND SHE HAS A RIGHT TO EXPLAIN THAT AT THAT TIME -- THIS IS NOT

24  US PUTTING ON A WITNESS IN 2006 TO TESTIFY ABOUT PERMANENT USE.

25  THIS IS HER AT THE TIME SAYING THE TRUTH ABOUT HOW SHE FELT

1    ABOUT THE SAFETY OF VIOXX.

2                  YOU TALKED ABOUT PREJUDICE TO THE OTHER SIDE BY

3    NOT BEING ABLE TO ACCESS MEDICAL RECORDS AND SO FORTH.  WE'RE

4    THE ONES WHO WILL BE PREJUDICED BY THE JURY HAVING THE

5    MISIMPRESSION THAT THIS WOMAN FELT THAT THE DRUG WAS UNSAFE,

6    BUT MERCK WAS SAYING IT WAS SAFE.

7            **THE COURT:**  I'M NOT GOING TO ALLOW IT.  THANK YOU

8    VERY MUCH.

9            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

10   OPEN COURT.)

11           **MR. ROBINSON:**  NOW WE ARE GOING TO PLAY MR. BARNETT'S

12   TREATING DOCTOR.

13           **THE COURT:**  WE'LL JUST START HIM.

14           (WHEREUPON, **MICHAEL MIKOLA**, HAVING BEEN DULY SWORN,

15   TESTIFIED AS FOLLOWS.)

16                     **DIRECT EXAMINATION**

17   **BY MR. ROBINSON:**

18   **Q.**   HI, DOCTOR.  I'M MARK ROBINSON.  I REPRESENT

19   GERALD BARNETT, YOUR PATIENT.  DO YOU WANT TO TELL THE JURY

20   WHAT KIND OF DOCTOR YOU ARE.

21   **A.**   I'M AN INTERNIST.  I PRACTICE INTERNAL MEDICINE.

22   **Q.**   WHERE DO YOU PRACTICE RIGHT NOW?

23   **A.**   WHERE?

24   **Q.**   YES.

25   **A.**   IN MT. PLEASANT, SOUTH CAROLINA.

888

1    Q.    WHERE WERE YOU PRACTICING AT THAT TIME?

2    A.    MYRTLE BEACH, SOUTH CAROLINA.

3    Q.    DO YOU REMEMBER JERRY BARNETT?

4    A.    YES, SIR.

5    Q.    YOU ACTUALLY TOOK CARE OF HIM ALMOST FOUR AND A HALF

6    YEARS; IS THAT RIGHT?

7    A.    I BELIEVE THAT'S CORRECT, YES.

8    Q.    WHAT WERE YOU TAKING CARE OF JERRY BARNETT FOR?

9    A.    AT THE TIME HIGH CHOLESTEROL.  HE HAD A HISTORY OF

10   GASTROESOPHAGEAL REFLUX DISEASE AND ALLERGIES AS WELL AS

11   ROUTINE HEALTH MAINTENANCE ISSUES.

12   Q.    WERE YOU HELPING HIM WITH PAIN MEDICATION FOR HIS BACK?

13   A.    YES.

14   Q.    OKAY.

15   A.    HE ALSO HAD -- I THINK HE HAD NECK PROBLEMS.

16   Q.    WAS ONE OF THE DRUGS THAT JERRY BARNETT WAS TAKING FROM,

17   SAY, SOMETIME IN 2000 UP TO 2004 VIOXX?

18   A.    THAT'S CORRECT.

19   Q.    INITIALLY, IS IT YOUR UNDERSTANDING THAT DR. MCCAFFREY, A

20   NEUROLOGIST FROM MYRTLE BEACH, PRESCRIBED VIOXX FOR

21   MR. BARNETT?

22   A.    I BELIEVE THAT'S CORRECT, YES.

23   Q.    THEN YOU CONTINUED WITH THAT PRESCRIPTION; IS THAT RIGHT?

24   A.    CORRECT.

25   Q.    IS IT YOUR UNDERSTANDING THAT MR. BARNETT SAW

DAILY COPY

1   DR. MCCAFFREY UP THROUGH, I THINK, SOMETHING LIKE DECEMBER 30
2   OF 1999 --
3   A.   I BELIEVE THAT'S CORRECT.
4   Q.   IS THAT CORRECT?  IS IT ALSO TRUE THAT JERRY BARNETT
5   STARTED WITH YOU AS A PATIENT IN OCTOBER OF 1999?
6   A.   YES, SIR, THAT'S CORRECT.
7   Q.   IN FACT, LET ME GIVE YOU WHAT WILL BE EXHIBIT 1.  IT'S A
8   RECORD FROM OCTOBER 22, 1999.  IS THIS THE RECORD OF YOUR FIRST
9   SEEING MR. BARNETT?
10  A.   THAT'S CORRECT.
11  Q.   AT PAGE 2 IT TALKS ABOUT THE ASSESSMENT AND PLAN; IS THAT
12  RIGHT?
13  A.   CORRECT.
14  Q.   WHY DON'T YOU READ THE FIVE CATEGORIES, WITHOUT GOING INTO
15  THE DETAIL, BUT WHAT ARE THE FIVE CATEGORIES UNDER THE
16  ASSESSMENT AND PLAN?
17  A.   THE FIVE DIAGNOSES ARE HYPERLIPIDEMIA, OSTEOARTHRITIS,
18  REFLUX WITH DILATATION AND ESOPHAGITIS, CANCER SCREENING, AND
19  SINUSITIS.
20  Q.   WHAT IS HYPERLIPIDEMIA?
21  A.   THAT'S ELEVATED SUGAR AND BLOOD LIPIDS, MORE COMMONLY
22  REFERRED TO AS CHOLESTEROL LEVELS.
23  Q.   AT SOME POINT YOU PUT HIM ON A DRUG CALLED LIPITOR; IS
24  THAT RIGHT?
25  A.   I'LL REFER TO THE RECORDS, BUT I BELIEVE HE WAS STARTED

DAILY COPY

1   ON -- LET ME CHECK.  I KNOW HE WAS ON LIPITOR.  I BELIEVE I

2   STARTED THAT.  YES, THAT'S CORRECT.  I WASN'T CLEAR IF I

3   STARTED THAT MEDICINE OR NOT, BUT ACCORDING TO MY NOTES IN

4   AUGUST HE WAS ON IT.

5   **Q.**  AUGUST OF 2000?

6   **A.**  YES.

7   **Q.**  OKAY.

8   **A.**  I BELIEVE I PRESCRIBED THAT FOR HIM.

9   **Q.**  OKAY.  THEN IF YOU GO BACK TO EXHIBIT ONE --

10  **A.**  YES, I DID START HIM ON LIPITOR.  OKAY.

11  **Q.**  THAT WAS FOR HIS HYPERLIPIDEMIA; IS THAT RIGHT?

12  **A.**  CORRECT.

13  **Q.**  WHAT TYPE OF DRUG IS LIPITOR?

14  **A.**  IT'S A DRUG CLASS CALLED A STATIN.  IT'S A DRUG DESIGNED

15  TO LOWER CHOLESTEROL.

16  **Q.**  GOING BACK TO EXHIBIT 1 UNDER THE ASSESSMENT AND PLAN ON

17  PAGE 2 OF EXHIBIT 1 --

18  **A.**  YES, SIR.

19  **Q.**  -- DO YOU SEE NUMBER 2, IT SAYS "OSTEOARTHRITIS, CONTINUE

20  FELDENE"?

21  **A.**  YES, SIR.

22  **Q.**  NOW, SO WHEN HE FIRST CAME TO YOU HE WAS ON FELDENE;

23  RIGHT?

24  **A.**  CORRECT.

25  **Q.**  AND THE NOTE SAYS HE TAKES IT FAIRLY REGULARLY AND IT

DAILY COPY

1  SEEMS TO BE EFFECTIVE FOR HIM?

2  **A.**   CORRECT.

3  **Q.**   I'M GOING TO NOW SHOW YOU A RECORD DATED JANUARY 19 AND

4  JANUARY 20.  HERE YOU GO.

5  **A.**   I CAN PROBABLY CLARIFY A LITTLE, IF YOU'D LIKE.  THE TYPED

6  NOTES THAT SAY "CAROLINA HEALTH SPECIALISTS" AT THE TOP WERE MY

7  OFFICE NOTES.  THE TYPED NOTES THAT SAY "GRANDSTAND REGIONAL

8  MEDICAL CENTER" WOULD BE THE HOSPITAL NOTES, AND THE

9  HANDWRITTEN NOTE IS A PROGRESS NOTE FROM THE HOSPITAL.

10 **Q.**   JUST TO GET THE ORDER HERE, IF WE GO TO THE TYPEWRITTEN

11 NOTES DATED 1-19-2000, IT APPEARS THAT MR. BARNETT HAD A

12 STANDARD TYPE PRESENTATION OF CHEST DISCOMFORT; IS THAT RIGHT?

13 **A.**   YES, SIR.

14 **Q.**   APPARENTLY IT PROGRESSED THROUGHOUT THAT DAY OF

15 JANUARY 19, 2000?

16 **A.**   I BELIEVE THAT'S CORRECT, YES.  THERE IS A TYPO ON THIS

17 PAGE, AS WELL.  WHERE IT SAYS, "AN EKG WAS OBTAINED.  IT DID

18 SHOW ANY SIGNIFICANT ISCHEMIC CHANGES," IT SHOULD SAY, "IT DID

19 NOT SHOW ANY SIGNIFICANT ISCHEMIC CHANGES."

20 **Q.**   OKAY.  SO THERE WAS AN EKG THAT DID NOT SHOW ANY

21 SIGNIFICANT ISCHEMIC CHANGES; IS THAT RIGHT?

22 **A.**   THAT'S CORRECT.

23 **Q.**   SO WHEN HE PRESENTED WITH HIS CHEST PAIN, WHAT DID YOU DO

24 FOR HIM?

25 **A.**   I DID THE EKG.  IT DID NOT SHOW ANY ACUTE CARDIAC

1    PROBLEMS.  I WAS CONCERNED, GIVEN HIS RISK FACTORS, THAT IT MAY

2    BE INDICATIVE OF CORONARY ARTERY DISEASE, SO I GAVE HIM A

3    PRESCRIPTION FOR SUBLINGUAL NITROGLYCERINE TO TAKE IN THE EVENT

4    THAT HIS SYMPTOMS RECURRED, AND THEN IT APPEARS THAT HE PAGED

5    ME THAT EVENING STATING HIS CHEST DISCOMFORT RECURRED, HE TOOK

6    A NITROGLYCERIN, AND IT RESOLVED.

7    Q.   OKAY.  WAS ONE OF THE CONCERNS YOU HAD WAS THAT THE CHEST

8    PAIN MIGHT HAVE BEEN ANGINA?

9    A.   CORRECT.

10   Q.   WHAT IS ANGINA?

11   A.   ANGINA IS CHEST -- TYPICALLY CHEST PAIN, BUT IT'S --

12   REFERS TO SYMPTOMS CAUSED BY AN INADEQUATE BLOOD SUPPLY TO THE

13   HEART MUSCLE.

14   Q.   DO YOU SEE UNDER ASSESSMENT PLAN -- WOULD YOU READ INTO

15   THE RECORD NUMBER ONE, PLEASE.

16   A.   YES, SIR.  RECURRENT CHEST DISCOMFORT.  DIAGNOSTIC

17   POSSIBILITIES WOULD INCLUDE ESOPHAGEAL SPASM OR ESOPHAGITIS.

18   GIVEN THE FACT THAT HE TAKES HIS PRILOSEC REGULARLY, I THINK IT

19   WOULD BE A LITTLE LESS LIKELY AND I'M ALSO CONCERNED, GIVEN THE

20   FAMILY HISTORY OF CORONARY DISEASE AND A PERSONAL HISTORY OF

21   HYPERLIPIDEMIA, THAT IT COULD REPRESENT AN UNSTABLE ANGINA

22   PATTERN.

23   Q.   YOU CAN STOP AT THAT POINT.  WHAT DOES AN "UNSTABLE ANGINA

24   PATTERN" REFER TO?

25   A.   UNSTABLE ANGINA GENERALLY REFERS TO AN UNSTABLE PLAQUE IN

1   THE CORONARY ARTERIES.  INADEQUATE BLOOD SUPPLY TO THE HEART

2   MUSCLE THAT WE REFER TO AS ANGINA GENERALLY OCCURS IN TWO

3   PATTERNS COMMONLY.  ONE IS STABLE ANGINA, WHICH IS THOUGHT TO

4   REPRESENT A GRADUAL PROGRESSION OF PLAQUE BUILDUP IN THE

5   ARTERY, AND THAT TYPICALLY OCCURS WHEN THE HEART MUSCLE DEMAND

6   FOR BLOOD AND OXYGEN IS IMPEDED BY PLAQUE BUILDUP IN THE

7   ARTERIES.  UNSTABLE ANGINA IS FELT TO REPRESENT A PLAQUE THAT

8   IS IN THE PROCESS OF RUPTURING, AND THAT PUTS PATIENTS AT A

9   HIGHER RISK OF A HEART ATTACK OR AN IMPENDING EVENT.

10  **Q.**   OKAY.  GOING TO NUMBER 2, WILL YOU READ THAT INTO THE

11  RECORD, PLEASE.

12  **A.**   "HYPERLIPIDEMIA.  CERTAINLY, IF HE HAS SIGNIFICANT

13  CORONARY DISEASE, HE WILL NEED HIS LDL BELOW 100.  GIVEN THE

14  FAMILY HISTORY OF CORONARY DISEASE AND THE ABSENCE OF

15  DOCUMENTED DISEASE, I THINK HIS LDL GOAL WOULD BE CLOSER TO

16  130.  HE DID LOWER HIS LDL FROM 190 TO 152 WITH DIETARY

17  CHANGES, AND FURTHER DECISIONS REGARDING HIS THERAPY WILL BE

18  MADE AFTER THE RESULTS OF HIS CARDIAC WORK-UP."

19  **Q.**   AND THEN WILL YOU READ NUMBER 3, PLEASE.

20  **A.**   NUMBER 3 SAYS, "GASTRIC ESOPHAGEAL REFLUX.  WE WILL

21  CONTINUE THE PRILOSEC.  CERTAINLY IF HIS CARDIO WORKUP IS

22  NEGATIVE, WILL CONSIDER UPPER GI SERIES FOR FURTHER EVALUATION

23  TO EVALUATE HIS ESOPHAGUS.  HE WILL ALSO HAVE A PA AND LATERAL

24  CHEST X-RAYS UPON ADMISSION.

25  **Q.**   COULD WE GO TO PAGE 3 OF THE EXHIBIT 2, PLEASE, DOCTOR?

1    **A.**   IS THAT THE PAGE WITH HANDWRITING?  IT'S NOT NUMBERED.

2    **Q.**   YES.

3    **A.**   OKAY.

4    **Q.**   IT SAYS IN THE SECOND LINE PATIENT -- CAN YOU READ THAT

5    INTO THE RECORD, PLEASE.

6    **A.**   YES, SIR.  IT SAYS, "PATIENT HAD ACUTE ONSET SEVERE

7    PRECORDIAL CHEST PAIN IN THE EMERGENCY ROOM PROMPTLY RELIEVED

8    BY ONE SUBINGUAL NITROGLYCERIN.  EKG OBTAINED.  HOWEVER, CHEST

9    PAIN RESOLVED" -- I CAN'T MAKE OUT THE NEXT WORD -- "WITHIN 30

10   SECONDS OF SUBLINGUAL NITROGLYCERIN."

11   **Q.**   WHAT IS PRECORDIAL CHEST PAIN?

12   **A.**   THAT REFERS TO THE AREA LOCATED OVER THE HEART ON THE LEFT

13   SIDE OF THE CHEST.

14   **Q.**   OKAY.  BUT IS PRECORDIAL PAIN SOMETHING THAT WOULD BE

15   ASSOCIATED OR COULD BE ASSOCIATED WITH ANGINA?

16   **A.**   CORRECT.

17   **Q.**   OKAY.  COULD WE GO TO THE FOURTH PAGE OF EXHIBIT 2,

18   DOCTOR.  THIS IS A NOTE THAT WAS, I GUESS, DICTATED BY YOU?

19   **A.**   CORRECT.  DO YOU WANT ME TO READ IT?

20   **Q.**   YES.

21   **A.**   "THE HISTORY OF PRESENT ILLNESS ON GERALD BARNETT.  HE IS

22   A 55-YEAR-OLD GENTLEMAN SEEN FOR EVALUATION OF CHEST PAIN.  HE

23   RECENTLY RECOVERED FROM AN UPPER RESPIRATORY INFECTION.  HE HAD

24   ABOUT ONE DAY OF FEVER AND MYALGIAS FOLLOWED BY A PRODUCTIVE

25   COUGH.  HE WAS TREATED WITH TWO WEEKS OF ANTIBIOTICS AND THEN

1   DISCONTINUED THEM."

2   **Q.**   OKAY.  CAN I STOP AT THIS POINT?  AT THAT POINT YOU'RE

3   TALKING REALLY ABOUT AN UPPER RESPIRATORY INFECTION HE HAD HAD

4   PREVIOUSLY; IS THAT CORRECT?

5   **A.**   CORRECT.

6   **Q.**   NOW YOU'RE GOING TO GO TO THE EVENT THAT OCCURRED THAT

7   DAY?

8   **A.**   CORRECT.

9   **Q.**   COULD YOU READ ON.

10   **A.**   "HE DEVELOPED LEFT-SIDED PRECORDIAL CHEST DISCOMFORT THAT

11   OCCURRED INTERMITTENTLY THROUGHOUT THE DAY.  IT BECAME

12   PROGRESSIVELY WORSE.  APPROXIMATELY ONE HOUR AGO IT RESOLVED.

13   IT DID NOT RADIATE.  NO PALPITATIONS, NAUSEA, VOMITING,

14   DIAPHORESIS.  IT WAS NOT ASSOCIATED WITH PHYSICAL ACTIVITY.  HE

15   EXERCISED LAST NIGHT PER HIS ROUTINE OF LIFTING WEIGHTS,

16   ET CETERA."

17   **Q.**   COULD YOU GO DOWN TO ASSESSMENT AND PLAN AND READ INTO THE

18   RECORD NUMBER 1, PLEASE?

19   **A.**   YES, SIR.  IT SAYS "CHEST PAIN.  HE HAS A HISTORY OF

20   HYPERLIPIDEMIA, BUT HIS RATIO HAS BEEN FAIRLY ACCEPTABLE."

21   **Q.**   WHAT DOES THAT REFER TO, "HIS RATIO"?

22   **A.**   THAT REFERS TO THE RATIO OF WHAT WE CALL THE GOOD

23   CHOLESTEROL TO THE BAD CHOLESTEROL.  A PATIENT'S RISK OF

24   DEVELOPING VASCULAR DISEASE IN PART IS RELATED TO THE DIFFERENT

25   FRACTIONS OF CHOLESTEROL IN THE BLOODSTREAM.

1   **Q.**   OKAY.  COULD YOU READ ON. THEN.

2   **A.**   "I'M GIVING HIM SUBLINGUAL NITROGLYCERIN TO TAKE ON AN

3   AS-NEEDED BASIS.  I'M GOING TO SCHEDULE HIM FOR A STRESS

4   THALLIUM TOMORROW.  IF HIS STRESS THALLIUM IS ABNORMAL, WE WILL

5   ADMIT HIM FOR CATHETERIZATION.  IF IT IS NORMAL, I WILL

6   PROBABLY ATTRIBUTE IT TO ESOPHAGEAL SPASM OR POSSIBLY MUSCLE

7   SPASM AND WILL NOT PURSUE FURTHER WORKUP."

8   **Q.**   IF A PERSON HAS ANGINA, HOW DOES SUBLINGUAL NITROGLYCERIN

9   WORK TO RESOLVE PAIN FROM ANGINA?

10  **A.**   GENERALLY, IT'S BELIEVED TO CAUSE DILATATION OF THE

11  CORONARY ARTERIES.  IT OPENS UP THE ARTERIES TO THE HEART, SO

12  TO SPEAK.

13  **Q.**   "DILATATION" MEANS OPENING IT UP?

14  **A.**   YES.  TO IMPROVE THE BLOOD FLOW.

15  **Q.**   IF A PERSON HAS ESOPHAGEAL PAIN AND ARE GIVEN PRILOSEC,

16  HOW DOES PRILOSEC HELP THE ESOPHAGEAL PAIN?

17  **A.**   IT GENERALLY DOESN'T RIGHT AWAY.  PRILOSEC WORKS BY

18  BLOCKING ACID PRODUCTION IN THE STOMACH.  ESOPHAGEAL PAIN

19  CAUSED BY REFLUX DISEASE OFTEN RESULTS FROM ONE OF TWO THINGS,

20  A CHEMICAL IRRITATION OF THE ESOPHAGUS THAT WE CALL ESOPHAGITIS

21  OR MUSCLE SPASM IN THE ESOPHAGUS GENERALLY RELATED TO THE

22  CHEMICAL IRRITATION.

23          WHAT PRILOSEC DOES IS IT CHANGES THE ACIDITY OF ANY

24  MATERIAL THAT COMES FROM THE STOMACH INTO THE ESOPHAGUS, SO

25  THAT PEOPLE WITH REFLUX DISEASE, THE REFLUXANT OR THE MATERIAL

1   THAT COMES IN THE ESOPHAGUS IS NOT ACIDIC AND IT DOESN'T

2   CHEMICALLY IRRITATE THE LINING OF THE ESOPHAGUS.  IT GENERALLY

3   TAKES SEVERAL HOURS TO START WORKING.

4   **Q.**   IF A PERSON HAS CHEST PAIN AND HE'S GIVEN NITROGLYCERIN

5   AND THE NITROGLYCERIN RESOLVED THE CHEST PAIN, COULD THAT BE

6   SOME EVIDENCE THAT HIS CHEST PAIN WAS DUE TO ANGINA?

7   **A.**   IT COULD BE, YES.

8   **Q.**   OKAY.  COULD WE GO TO THE NEXT PAGE, DOCTOR.  NOW, DO YOU

9   KNOW WHEN THIS NEXT PAGE WOULD HAVE BEEN DICTATED?

10  **A.**   SOMETIME THE FOLLOWING DAY.  I'M NOT SURE.  GENERALLY --

11  VICKY ALLEN WAS THE PHYSICIAN'S ASSISTANT WORKING FOR THE

12  CARDIOLOGY GROUP IN MYRTLE BEACH, AND GENERALLY THEY WERE

13  PRETTY EFFICIENT AT SEEING PATIENTS IN A TIMELY MANNER.  I

14  WOULD ASSUME IT WOULD HAVE BEEN RELATIVELY EARLY IN THE DAY,

15  BUT I DON'T KNOW THAT TO BE A FACT.

16  **Q.**   THE DATE OF HIS REPORT IS 1-20-2000; IS THAT RIGHT?

17  **A.**   CORRECT.

18  **Q.**   WHAT KIND OF DOCTOR IS VICKY ALLEN?

19  **A.**   SHE IS A PHYSICIAN'S ASSISTANT WHO WORKS FOR THE

20  CARDIOLOGIST.

21  **Q.**   SHE IS NOT A DOCTOR?

22  **A.**   THAT'S CORRECT.

23  **Q.**   UNDER THE PROBLEM LIST UP AT THE TOP, CAN YOU READ THAT

24  INTO THE RECORD, PLEASE.

25  **A.**   YES, SIR.  "CHEST PAIN.  RULE OUT ISCHEMIA.

1    HYPERCHOLESTEROLEMIA.  HISTORY OF CERVICAL DISK HERNIATION

2    SECONDARY TO MOTOR VEHICLE ACCIDENT IN 1979.  FOLLOWED BY

3    DR. MCCAFFREY.  HISTORY OF MULTIPLE NORMAL STRESS EKG'S, AS THE

4    PATIENT WAS IN THE FBI AND THEY WERE REQUIRED EVERY OTHER YEAR.

5    GERD," WHICH IS GASTROESOPHAGEAL REFLUX DISEASE, "EGD ONE YEAR

6    AGO.  NORMAL.  FOLLOWED BY DR. CORNNELL."

7    Q.    FOR THE RECORD, WHAT IS ISCHEMIA?

8    A.    ISCHEMIA GENERALLY REFERS TO AN INADEQUATE BLOOD SUPPLY TO

9    A MUSCLE OR TISSUE TO AN ORGAN.

10   Q.    NOW, AT SOME POINT HE WAS SEEN BY A CARDIOLOGIST; IS THAT

11   RIGHT?

12   A.    YES.  GENERALLY THE ROUTINE IS THAT THE PHYSICIAN'S

13   ASSISTANT WOULD SEE THE PATIENT.  WHEN THEY ROUNDED WITH THE

14   CARDIOLOGIST THAT DAY, THEY WOULD GIVE THE CARDIOLOGIST A

15   REPORT.  HE OR SHE WOULD THEN GO SEE THE PATIENT, REVIEW THE

16   INFORMATION WITH THE PATIENT, AND THEN MAKE THE MEDICAL

17   DECISIONS.

18   Q.    WELL, THE REASON I BROUGHT THAT UP IS THAT IF YOU LOOK AT

19   THE -- PAGE 3 OF 3, IT WAS SIGNED BY DR. SWAMI.

20   A.    YES.

21   Q.    I'M WONDERING, DOES THAT APPEAR TO SHOW THAT DR. SWAMI

22   ACTUALLY DICTATED THIS REPORT?

23   A.    NO, SIR.

24   Q.    OH, OKAY.

25   A.    VICKY ALLEN MOST LIKELY DICTATED IT.  DR. SWAMI OVERREAD

1    IT AND SIGNED IT IS HOW -- THE NORMAL ROUTINE.

2    **Q.**   COULD YOU READ THE ASSESSMENT PLAN INTO THE RECORD OF

3    PAGE 3 OF 3, PLEASE.

4    **A.**   YES, SIR.  "THIS IS A 55-YEAR-OLD WHITE MALE WHO PRESENTS

5    WITH ATYPICAL CHEST PAIN.  THE PATIENT WAS RULED OUT FOR A

6    MYOCARDIAL INFARCTION AS CARDIAC ENZYMES HAVE BEEN NEGATIVE

7    TIMES TWO.  GIVEN THAT THE PATIENT DOES HAVE RISK FACTORS FOR

8    CORONARY ARTERY DISEASE, AN EXERCISE STRESS TEST IS

9    RECOMMENDED.  PATIENT STATES THAT HE PREFERS THIS CONSERVATIVE

10   MANAGEMENT.  THE PATIENT IS FAIRLY STABLE AT THIS TIME, AND WE

11   FEEL THAT THIS STRESS TEST CAN BE PERFORMED ON AN OUTPATIENT

12   BASIS AT OUR OFFICE.  THIS WAS DISCUSSED WITH THE PATIENT AND

13   THIS WILL BE SET UP THROUGH OUR OFFICE."

14   **Q.**   HE WAS ADMINISTERED A CARDIOLITE EXAM.

15   **A.**   YES.

16   **Q.**   DO YOU HAPPEN TO HAVE THAT RECORD IN FRONT OF YOU?

17   **A.**   I DO NOT BELIEVE SO.  I HAVE A NOTE FROM MY OFFICE VISIT

18   OF JANUARY 27 THAT REFERS TO THE TEST, BUT I DON'T HAVE A COPY

19   OF THE TEST RESULTS.

20   **Q.**   OKAY.  OKAY.  DO YOU KNOW WHAT THE TEST RESULTS WERE?

21   **A.**   ACCORDING TO MY RECORDS, THEY SHOWED A SMALL ABNORMAL AREA

22   IN THE LATERAL WALL OF THE HEART.

23   **Q.**   SO THERE WAS -- WAS THERE LATERAL -- SOME MILD LATERAL

24   ISCHEMIA FOUND?

25   **A.**   THAT'S WHAT THIS STRESS TEST SUGGESTED, YES, SIR.

1  **Q.**    WHAT DOES THAT MEAN?

2  **A.**    GENERALLY MEANS ONE OF TWO THINGS:  EITHER SOME PLAQUE

3  DEVELOPMENT IN THE CORONARY ARTERY THAT LIMITS FLOW TO THAT

4  PORTION OF THE HEART, OR IT COULD BE WHAT'S CALLED A "FALSE

5  POSITIVE" WHICH IS WHERE YOU GET AN ABNORMAL IMAGE WITHOUT

6  ACTUAL CORONARY DISEASE.

7  **Q.**    LOOKING BACK ON THIS EVENT, IS ONE OF THE POSSIBLE

8  EXPLANATIONS FOR THIS EVENT OF JANUARY 19 AND 20, 2000, FOR

9  MR. BARNETT IS THAT HE HAD A MILD BOUT OF ANGINA?

10  **A.**    YES, THAT'S POSSIBLE.

11  **Q.**    WHY DON'T YOU TELL THE JURY ABOUT YOUR EDUCATION, BOTH

12  UNDERGRADUATE AND MED SCHOOL.

13  **A.**    I WENT TO THE COLLEGE OF CHARLESTON FOR MY UNDERGRADUATE

14  EDUCATION.  I ATTENDED THE MEDICAL UNIVERSITY OF SOUTH CAROLINA

15  IN CHARLESTON FOR MEDICAL SCHOOL FOR FOUR YEARS, FROM 1987 TO

16  1991, AND THEN I COMPLETED THREE YEARS OF INTERNSHIP AND

17  RESIDENCY AT THE MEDICAL UNIVERSITY OF SOUTH CAROLINA, 1991

18  THROUGH 1994, AND RECEIVED BOARD CERTIFICATION TO PRACTICE

19  INTERNAL MEDICINE IN 1994.

20  **Q.**    THEN FROM 1994 THROUGH 1999 WHERE DID YOU PRACTICE?

21  **A.**    IN MYRTLE BEACH, SOUTH CAROLINA, PRIVATE PRACTICE.

22  **Q.**    YOU CONTINUED ON PRACTICING IN MYRTLE BEACH UNTIL 2004?

23  **A.**    THAT'S CORRECT.

24  **Q.**    WHAT MONTH IN 2004 DID YOU MOVE TO CHARLESTON?

25  **A.**    JUNE OF 2004.

901

1 **Q.** SO YOU WOULD HAVE TREATED MR. BARNETT FROM OCTOBER 22,

2 1999, UNTIL SOMETIME IN JUNE OF 2004; IS THAT RIGHT?

3 **A.** PROBABLY SOMETIME IN MAY. I THINK -- I BELIEVE I MOVED

4 AROUND THE BEGINNING OF JUNE.

5 **Q.** SO EXHIBIT 3 IS A GROUP OF MERCK-MEDCO PRESCRIPTION

6 RECORDS FOR VIOXX THAT WENT TO GERALD BARNETT; IS THAT RIGHT,

7 DOCTOR?

8 **A.** IT'S A FORM FROM MERCK-MEDCO, YES, STATING THE MEDICINES

9 THAT HE HAD ORDERED.

10 **Q.** WHEN MR. BARNETT CAME TO SEE YOU IN 2000, WAS HE ON VIOXX

11 AS IT WAS PRESCRIBED BY SOME OTHER DOCTOR?

12 **A.** MARCH 21, 2000, HE WAS TAKING VIOXX, CORRECT.

13 **Q.** IS IT YOUR UNDERSTANDING THAT IT WAS PRESCRIBED ORIGINALLY

14 BY DR. MCCAFFREY?

15 **A.** I BELIEVE THAT'S CORRECT.

16 **Q.** DO YOU KNOW DR. MCCAFFREY?

17 **A.** YES, SIR.

18 **Q.** WHAT TYPE OF DOCTOR IS DR. MCCAFFREY?

19 **A.** HE IS A NEUROLOGIST.

20 **Q.** OKAY. SO INITIALLY DR. MCCAFFREY GAVE VIOXX TO

21 MR. BARNETT?

22 **A.** I BELIEVE THAT'S CORRECT.

23 **Q.** AT SOME POINT DID YOU THEN PRESCRIBE VIOXX FOR

24 MR. BARNETT?

25 **A.** CORRECT.

1   **Q.**    BUT WHAT DID YOU PRESCRIBE VIOXX FOR?

2   **A.**    FOR OSTEOARTHRITIS, THE PAIN ASSOCIATED WITH

3   OSTEOARTHRITIS.

4   **Q.**    NOW, EXHIBIT 4 IS A SERIES OF RECORDS. WHY DON'T WE DO

5   THIS DOCTOR. WHY DON'T WE PUT THE SECOND PAGE -- LET'S PUT

6   THAT IN THE SEQUENCE WHERE IT BELONGS IN EXHIBIT 4. SO THAT

7   WOULD GO BEHIND THE ONE FOR 8-2.

8   **A.**    OKAY.

9   **Q.**    DOCTOR, WHAT I TRIED TO DO WITH EXHIBIT 4 IS PUT TOGETHER

10   A GROUP OF YOUR RECORDS THAT PRECEDED THE HEART ATTACK, BUT I

11   ALSO ATTACHED THE FIRST PAGE, WHICH APPEARS TO BE RECORDINGS OF

12   BLOOD PRESSURE AND OTHER VITAL SIGNS FOR MR. BARNETT; IS THAT

13   CORRECT?

14   **A.**    THAT'S CORRECT.

15   **Q.**    SO THIS WOULD HAVE BEEN SOMETHING DONE BY YOUR OFFICE; IS

16   THAT RIGHT?

17   **A.**    MY NURSE WOULD DO IT.

18   **Q.**    COULD WE GO TO THE SECOND PAGE, WHICH WOULD BE DATED

19   3-21-00.

20   **A.**    OKAY.

21   **Q.**    UNDER THE ASSESSMENT, WILL YOU READ THAT INTO THE RECORD,

22   NUMBER ONE, PLEASE.

23   **A.**    YES. "HYPERLIPIDEMIA. I WILL CHECK THE LIPID PROFILE.

24   HE INQUIRES ABOUT LIPITOR. SOME OF HIS FRIENDS HAVE TOLD HIM

25   THERE ARE VERY" -- AND IT SHOULD READ "FEW," WHICH I'LL WRITE

1    IN, "SIDE EFFECTS.  IF HIS LDL IS SIGNIFICANTLY ABOVE 130, WE

2    WILL CONSIDER A TRIAL OF LIPITOR ON FOLLOW-UP IN EIGHT WEEKS.

3    HE HAS A FAMILY HISTORY OF CORONARY DISEASE.  NUMBER 2,

4    OSTEOARTHRITIS.  STABLE ON VIOXX.  NUMBER 3, GASTROESOPHAGEAL

5    REFLUX DISEASE.  WE WILL CONTINUE PRILOSEC LIFELONG,

6    20 MILLIGRAMS A DAY.  I WILL SEE HIM IN SIX MONTHS FOR

7    FOLLOW-UP WITH LIPIDS, OR SOONER IF WE START HIM ON LIPITOR."

8    Q.   OKAY.  LET'S GO TO THE NEXT RECORD, WHICH IS AUGUST 2,

9    2000.

10   A.   OKAY.

11   Q.   WILL YOU READ THE FIRST TWO SENTENCES INTO THE RECORD,

12   PLEASE.

13   A.   "A 55-YEAR-OLD GENTLEMAN WITH A HISTORY OF HYPERLIPIDEMIA

14   SEEN FOR FOLLOW-UP VISIT.  WE STARTED HIM ON LIPITOR.  HIS

15   LIPID PROFILE IS UNDER EXCELLENT CONTROL."

16   Q.   OKAY.  GOING DOWN IN THAT SAME PARAGRAPH, COULD YOU READ

17   INTO THE RECORD THE SENTENCE THAT BEGINS "HE HAS NOT HAD ANY".

18   A.   "HE HAS NOT HAD ANY ANGINA, SHORTNESS OF BREATH, PND,

19   ORTHOPNEA."

20   Q.   OKAY.  NOW, SINCE HE HAD THAT EPISODE WE TALKED ABOUT

21   PREVIOUSLY ON JANUARY 19, 2000, YOU WERE MONITORING HIM TO MAKE

22   SURE HE DIDN'T HAVE ANY ANGINA; IS THAT RIGHT?

23   A.   CORRECT.

24   Q.   WHY WAS SHORTNESS OF BREATH IMPORTANT?

25   A.   ANGINA -- IT CAN BE WHAT WE CALL "AN ANGINAL EQUIVALENT."

1    SOME PEOPLE DON'T GET THE TYPICAL CHEST PAIN WHEN THEY HAVE

2    ISCHEMIA OF THE HEART MUSCLE.  ONE OF THE SYMPTOMS THAT CAN

3    INDICATE ANGINA IS SHORTNESS OF BREATH WITH PHYSICAL ACTIVITY.

4    **Q.**   OKAY.  LET'S GO TO THE NEXT DATE, WHICH IS 10-24-2000.

5    **A.**   ALL RIGHT.

6    **Q.**   DO YOU SEE THERE'S A SENTENCE IN THERE BEGINNING "NO

7    ANGINA"?  WOULD YOU READ THAT IN THE RECORD, PLEASE.

8    **A.**   "NO ANGINA OR RESPIRATORY COMPLAINTS.  NO CHANGE IN HIS

9    BOWEL OR BLADDER HABITS."

10   **Q.**   ONCE AGAIN, YOU'RE DOCUMENTING THAT HE HAS NO ANGINA FOR

11   THE REASONS YOU HAVE PREVIOUSLY TOLD US ABOUT; RIGHT?

12   **A.**   RIGHT.

13   **Q.**   GOING DOWN TO NUMBER -- COULD YOU READ -- UNDER ASSESSMENT

14   PLAN, READ NUMBER 2 INTO THE RECORD, PLEASE.

15   **A.**   YES, SIR.  "HYPERLIPIDEMIA.  HE IS DOING QUITE WELL ON

16   LIPITOR, 10 MILLIGRAMS.  WE WILL CONTINUE THE SAME.  HIS DIET

17   AND EXERCISE HAVE BEEN STABLE.  HE'S TRYING TO KEEP HIS WEIGHT

18   UNDER CONTROL."

19   **Q.**   OKAY.  GO TO THE NEXT PAGE, WHICH IS 12-28-2000.

20   **A.**   YES, SIR.

21   **Q.**   COULD YOU READ THE SECOND SENTENCE INTO THE RECORD,

22   PLEASE.

23   **A.**   YES, SIR.  "HE HAD A COUPLE EPISODES OF CHEST PAIN, BUT

24   THEY DO NOT SOUND CARDIAC."

25   **Q.**   GO AHEAD.  READ ON.

1   **A.**   "THEY SEEM TO BE REFLUX RELATED.  THEY ARE QUITE MILD

2   COMPARED TO HIS PREVIOUS EPISODE.  HE IS CONCERNED ABOUT

3   ELEVATION IN HIS LIPIDS.  HE IS COMPLIANT WITH HIS DIET AND

4   EXERCISE AND EATING A LOW-FAT, LOW-CARBOHYDRATE DIET.  HE HAS

5   NOT HAD ANY CHANGE IN HIS BOWEL HABITS, SYMPTOMS OF PROGRESSIVE

6   BLADDER OUTLET OBSTRUCTION, PARESTHESIAS, TINGLING, NUMBNESS,

7   FOCAL NEUROLOGIC DEFICITS."

8   **Q.**   OKAY.  IF WE CAN GO TO THE ASSESSMENT PLAN, CAN YOU READ

9   THAT FIRST NOTE --

10  **A.**   HYPERTENSION?

11  **Q.**   -- NOTE UNDER "HYPERTENSION."  YES.

12  **A.**   "HYPERTENSION.  HIS BLOOD PRESSURE IS ACCEPTABLE, ALTHOUGH

13  A LITTLE ELEVATED TODAY AT 138.  HE STATES IN THE COMMUNITY IT

14  IS UNDER BETTER CONTROL.  HE IS ANXIOUS BECAUSE HE IS ON

15  OVER-THE-COUNTER SINUS MEDICINES."

16  **Q.**   LET'S GO TO THE NEXT DOCUMENT, WHICH IS JULY 12, 2001.

17          **MR. ROBINSON:**  YOUR HONOR, WE'LL START WITH THAT

18  TOMORROW.

19          **THE COURT:**  WE'LL STOP HERE, MEMBERS OF THE JURY, AND

20  WE'LL SEE YOU TOMORROW AT 8:30.  PLEASE, AGAIN, DON'T TALK TO

21  ANYONE.  DON'T READ ANYTHING ABOUT THE CASE.

22          **THE DEPUTY CLERK:**  ALL RISE.

23          (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

24                              * * *

25