<pre>
 1                   UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   IN RE: VIOXX PRODUCTS        *   MDL DOCKET NO. 1657
     LIABILITY LITIGATION        *
 6                               *
                                 *
 7   THIS DOCUMENT RELATES TO    *   AUGUST 5, 2006, 8:30 A.M.
                                 *
 8                               *
     GERALD BARNETT V. MERCK     *   CASE NO. 06-CV-485-L
 9     & CO., INC.               *
     * * * * * * * * * * * * * * *
10

11
                             VOLUME VI
12                   JURY TRIAL BEFORE THE
                  HONORABLE ELDON E. FALLON
13               UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15

16   FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                 BY:  MARK P. ROBINSON JR., ESQ.
17                               620 NEWPORT CENTER DRIVE
                                 NEWPORT BEACH, CALIFORNIA 92660
18

19   FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                   PORTIS & MILES
20                               BY:  ANDY D. BIRCHFELD, JR., ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22

23   FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                   PALENCHAR & SCOTT
24                               BY:  PHILIP S. BECK, ESQ.
                                   ANDREW L. GOLDMAN, ESQ.
25                               54 W. HUBBARD STREET, SUITE 300
                                 CHICAGO, ILLINOIS 60601


                             DAILY COPY
</pre>

1150

1
2       OFFICIAL COURT REPORTERS:    CATHY PEPPER, CCR, RPR, CRR
                                     TONI DOYLE TUSA, CCR, FCRR
3                                    500 POYDRAS STREET, ROOM HB-406
                                     NEW ORLEANS, LOUISIANA 70130
4                                    (504) 589-7778
5
6
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
7       PRODUCED BY COMPUTER.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


                            DAILY COPY

1                          **I N D E X**

2                                                       PAGE

3

MARK KARAVAN (DEPO 2)
4        REDIRECT EXAMINATION                      1153
         RECROSS-EXAMINATION                       1163
5

6    STEPHEN EPSTEIN (BY DEPOSITION)
         DIRECT EXAMINATION                        1167
7        CROSS-EXAMINATION                         1205
         REDIRECT EXAMINATION                      1242
8        REDIRECT EXAMINATION                      1245

9

TOM CANNELL
10       DIRECT EXAMINATION                        1252

11

MARY BLAKE
12       DIRECT EXAMINATION                        1261

13

JAN WEINER                                         1278
14       DIRECT EXAMINATION                        1278
         CROSS-EXAMINATION                         1300
15

16

17

18

19

20

21

22

23

24

25

                        DAILY COPY

1       **MORNING SESSION**

2       **(AUGUST 5, 2006)**

3               (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4       TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5       REPORTER.)

6               **THE DEPUTY CLERK:**  EVERYONE RISE.

7               **THE COURT:**  GOOD MORNING, GENTLEMEN OF THE JURY.

8               **MR. BECK:**  YOUR HONOR, WE'RE GOING TO CONTINUE ON

9       WITH THE BRIEF SEGMENTS OF DR. KARAVAN'S DEPOSITION.  IF I MAY,

10      THERE WAS ONE QUESTION AND ANSWER THAT MARK HAD ASKED TO BE

11      PLAYED AND IT GOT LEFT OUT.  THIS IS FROM EARLIER IN THE

12      DEPOSITION.  WE WON'T TRY TO EXPLAIN ALL THE DETAILS OF WHERE.

13      SO THERE IS ONE QUESTION THAT MARK HAD WANTED PLAYED YESTERDAY

14      AND IT GOT OMITTED, SO WE SAID WE WOULD PLAY IT NOW.

15              **THE COURT:**  THAT'S FINE.  IT'S NOTHING UNUSUAL,

16      MEMBERS OF THE JURY.  THIS HAPPENS SOMETIME.  I'M PUSHING ON

17      THEM TO TRY TO GET THE CASE TO YOU QUICKLY, SO SOMETIMES THESE

18      MATTERS HAPPEN AND IT'S MY FAULT.

19              (WHEREUPON, **MARK KARAVAN (DEPO 2)**, HAVING BEEN DULY

20      SWORN, TESTIFIED BY DEPOSITION AS FOLLOWS.)

21                              **EXAMINATION**

22      **BY MR. ROBINSON:**

23      **Q.**   LET ME SHOW YOU DECEMBER 20, 2005.  THIS IS A NOTE FROM

24      EXHIBIT 36.  THIS SAYS, "ON DECEMBER 20, 2005, MR. BARNETT HAS

25      NOT BEEN AS AGGRESSIVE WITH HIS EXERCISE AS HE USED TO."  DO

DAILY COPY

1    YOU SEE THAT?

2    **A.**   YES, I DO.

3    **Q.**   THERE ARE OTHER MEDICAL RECORDS WHICH INDICATE THAT HE

4    WASN'T WORKING AS HARD ON HIS RISK FACTORS AS HE USED TO.  DO

5    YOU REMEMBER THAT?

6    **A.**   NO.  HE'S ALWAYS -- IF HE WASN'T EXERCISING, IT WAS

7    USUALLY AN EXPLANATION FOR IT.  HE ALWAYS WAS A VERY

8    CONSCIENTIOUS PATIENT.  HE DID MORE THAN 99 PERCENT OF THE

9    PATIENTS I KNOW AS FAR AS TRYING TO MODIFY ANY RISK FACTORS HE

10   HAD.  HE'S BEEN A GOOD PATIENT AS FAR AS THAT GOES.

11            **MR. BECK:**  NOW WE GO BACK INTO THE TENNIS MATCH AND

12   BACK-AND-FORTH.

13                    **REDIRECT EXAMINATION**

14   **BY MR. ROBINSON:**

15   **Q.**   GIVEN THE AMOUNT OF PLAQUES THAT HE'S GOT, CAD, WOULD YOU

16   BE ABLE TO COMPARE HIS PROGNOSIS VERSUS A PERSON WHO DOES NOT

17   HAVE THIS LEVEL OF PLAQUE?

18   **A.**   I THINK HE -- CLINICALLY, THE THING THAT WOULD BE THE MOST

19   WORRISOME IS THAT HE HAS SOMEWHAT OF A DIFFUSE PROCESS AND

20   PROGRESSION OF THAT PROCESS WOULD BE -- MORE PROGRESSION OF IT

21   IS THE MAIN CONCERN TO ME.

22            AGAIN, GIVEN THE FACT THAT HIS HEART PUMPS NORMALLY

23   AND THE OVERALL BLOOD FLOW IS PROBABLY NORMAL NOW -- IT WAS

24   ONLY MILDLY DIMINISHED -- THAT STILL WOULD, OVERALL, GIVE HIM A

25   GOOD PROGNOSIS, BUT I AM CONCERNED ABOUT HIS TOTAL PLAQUE

1  BURDEN AND THAT PROGRESSION.

2  **Q.**   DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THAT TOTAL

3  PLAQUE BURDEN COULD SHORTEN HIS LIFE EXPECTANCY?

4  **A.**   WELL, ONE OF THE HARDEST THINGS, IN MY MIND, IS TO TELL

5  SOMEONE HOW LONG THEY'RE GOING TO LIVE OR HAVE TO LIVE AND

6  THE -- BUT THE AMOUNT OF PLAQUE BURDEN WOULD BE ONE OF THE

7  THINGS I'D BE CONCERNED ABOUT.  HE CERTAINLY, FROM A CARDIAC

8  STANDPOINT, WOULD NOT HAVE THE SAME PROGNOSIS OF SOMEONE THAT

9  HAD MORE SIMPLE, YOU KNOW, LESS DIFFUSE DISEASE.  I THINK HE

10  HAS A DIFFERENT PROGNOSIS THAN SOMEONE LIKE THAT.  I WOULD NOT

11  PUT A NUMBER ON IT.

12  **Q.**   WOULD IT BE A SHORTER LIFE, WITHOUT PUTTING A NUMBER ON

13  IT?

14  **A.**   I THINK THAT, AGAIN, PEOPLE THAT HAVE MORE DISCRETE

15  LESIONS, LESS DIFFUSE DISEASE, HAVE A BETTER PROGNOSIS THAN

16  SOMEONE THAT HAS THE AMOUNT OF DIFFUSE PLAQUING THAT HE HAS.

17  **Q.**   COUNSEL ASKED YOU SOME QUESTIONS REGARDING STRESS.  I

18  MEAN, WHEN WE WERE TALKING ABOUT CHEST PAIN BEFORE YOU DID THE

19  STENT, DO YOU HAVE AN OPINION AS TO THE MOST LIKELY SOURCE OF

20  HIS CHEST PAIN BEFORE YOU DID THE STENT?

21  **A.**   I THINK, LOOKING BACK -- AND I THINK HE WAS HAVING SOME

22  DEGREE OF ANGINA DISCOMFORT.  OKAY.

23  **Q.**   WHAT WAS THAT DUE TO?

24  **A.**   I THINK THE CULPRIT LESION IS GOING TO BE THIS CIRCUMFLEX

25  RAMUS INTERMEDIUS THAT WAS STENTED.  HE HAS SOME SMALL BRANCH

1    DISEASE THAT WE TALKED ABOUT THAT POTENTIALLY COULD GIVE

2    SOMEONE ANGINA.  IN MY OPINION, THOSE VESSELS, CLINICALLY ARE

3    INSIGNIFICANT AND CLINICALLY SILENT.  I'M NOT GOING TO SIT HERE

4    AND SAY IT'S IMPOSSIBLE THAT HE WILL NOT HAVE SOME ANGINA FROM

5    THESE SMALL VESSELS, BUT UNLIKELY.  WITH EXERTION, THERE'S

6    POTENTIAL THAT HE COULD OUTSTRIP THE COLLATERAL FILLING OF HIS

7    PDA AND HAVE POTENTIAL -- SOME ANGINA FROM THE REGION OF THE

8    PDA.  SO THOSE WOULD BE THE POTENTIAL SOURCES.

9    **Q.**   THE CHEST PAIN THAT HE HAD THIS SPRING AND THAT HE HAD IN

10   JUNE BEFORE YOU DID THE CATH, LOOKING BACK, BASED ON YOUR

11   RESULTS OF THE CATH, CAN YOU GIVE AN OPINION NOW, LOOKING BACK,

12   AS TO WHAT THE MOST LIKELY CAUSE OF THAT PAIN THAT HE WAS

13   EXPERIENCING IN HIS CHEST WAS?

14   **A.**   I THINK SOME OF THE DISCOMFORT THAT HE WAS HAVING PROBABLY

15   SINCE THE SPRING AND MAY AND JUNE WAS A FORM OF ANGINA.

16   **Q.**   THAT'S FROM WHAT AREA OF HIS HEART?

17   **A.**   AGAIN, I WOULD SAY THE MOST LIKELY AREA WOULD BE THIS

18   RAMUS INTERMEDIUS.

19   **Q.**   THAT'S THE AREA YOU STENTED?

20   **A.**   CORRECT.

21   **Q.**   WOULD YOU AGREE THAT THE RCA IS THE MAIN PART OF THAT

22   BRANCH?

23   **A.**   RIGHT.  THE MAIN BRANCH, THE MAIN TRUNK, IS THE RIGHT

24   CORONARY ARTERY AND THE BRANCHES ARE THE RIGHT POSTEROLATERAL

25   BRANCH AND THE PDA.

1156

1   **Q.**   WAS THE RCA, BACK IN SEPTEMBER OF '02, SUBSTANTIALLY
2   BLOCKED OR OCCLUDED?
3   **A.**   ONLY DISTALLY AT THE BIFURCATION AREA INTO THE TWO
4   BRANCHES.
5   **Q.**   SO TODAY IS THE RCA OCCLUDED?
6   **A.**   ESPECIALLY THE MIDDLE PORTION IS CLOSED AT THE MIDPORTION
7   DOWN.
8   **Q.**   IS THERE A PORTION OF THE RCA THAT IS THE CLOSED OFF TO
9   POTENTIALLY FEEDING THE HEART?
10  **A.**   WELL, WHEN THAT CLOSES, THE PDA -- WELL, THERE'S NO LONGER
11  GOOD FLOW.  THE SEGMENT BETWEEN THE MID RIGHT AND THE
12  POSTEROLATERAL BRANCH NO LONGER GETS FLOW.  THE GRAFT TO THAT
13  POSTEROLATERAL BRANCH IS OPEN AND FILLS THAT, AND THE PDA
14  BASICALLY GETS FLOW THROUGH THE COLLATERALS.
15  **Q.**   NOW, COUNSEL ASKED YOU A QUESTION ABOUT WHETHER OR NOT YOU
16  THINK HE HAD A SECOND HEART ATTACK, BUT EARLIER WHEN I ASKED
17  YOU A QUESTION YOU CONCEDED THAT IT WAS POSSIBLE THAT THE RAMUS
18  OCCLUSION BEFORE YOUR STENT MAY HAVE BEEN A SITE OF A POTENTIAL
19  SILENT HEART ATTACK?  IS THAT WHAT YOU SAID?
20  **A.**   HIS ECHOGRAM SHOWS A LITTLE MIDLATERAL BASAL HYPERKINESIS
21  AND I FEEL, CLINICALLY, THAT REPRESENTS AN ISCHEMIC AREA FROM
22  THE RAMUS INTERMEDIUS.  BECAUSE IF A PORTION OF THE HEART IS
23  NOT GETTING THE PROPER BLOOD FLOW, IT -- THERE'S A POTENTIAL
24  FOR IT NOT TO PERFORM PROPERLY.  THAT DOESN'T NECESSARILY MEAN
25  IT'S DAMAGED OR SCARRED OR HEART ATTACK.  OKAY.

1157

1        I FEEL, LIKE I SAID, THAT THAT WAS AN ISCHEMIC AREA
2   GIVING YOU AN AREA OF HYPOKINESIS.  COULD IT BE -- CAN I SIT
3   HERE AND SAY 100 PERCENT THAT HE NEVER HAD ANY DAMAGE TO THIS
4   SMALL AREA?  NO, I CAN'T.  CLINICALLY, I FELT IT WAS AN AREA OF
5   ISCHEMIA FROM THAT STENOSIS.
6   Q.   OKAY.  BUT IS IT POSSIBLE THAT IT WAS ALSO A SMALL AREA OF
7   DAMAGE TO THAT PORTION OF HIS HEART?
8   A.   NOW, WHEN YOU TALK ABOUT DAMAGE, YOU'RE TALKING ABOUT --
9   DAMAGE MEANS SCAR TISSUE.  OKAY.  I HAVE NOT YET SEEN ANY ONE
10  STUDY SHOW SCAR.  WHEN YOU DO A NUCLEAR SCAN, YOU LOOK FOR
11  ISCHEMIA.  YOU LOOK FOR SCAR.  YOU LOOK FOR NORMAL PERFUSION.
12  ALL OF THE SCANS HAVE SHOWN EITHER NORMAL PERFUSION, APICAL
13  THINNING, WHICH IS AN IMAGING ARTIFACT, OR ISCHEMIA, AND
14  ISCHEMIA IS NOT SCAR TISSUE.
15  Q.   WELL, EXPLAIN HOW DOCTORS ACTUALLY DETERMINE THAT THERE
16  MIGHT BE AN AREA OF SCAR IN THE HEART.
17  A.   OKAY.  YOU HAVE A COUPLE THINGS.  ONE IS YOU MEASURE BLOOD
18  FLOW TO THE AREA.  SCAR TISSUE GENERALLY IS DEAD TISSUE.
19  GENERALLY.  IT'S NOT ALIVE.  IT DOESN'T TAKE UP THESE
20  CARDIOLITE IMAGINGS AND THALLIUM OR WHATEVER, AND SO HE -- NONE
21  OF HIS -- AND THIS IS WHAT WE CALL VIABLE, ALIVE.  OKAY.  SO
22  THE SCANS HAVE SHOWN VIABILITY TO ALL OF HIS HEART.  OKAY.
23  THEN YOU LOOK AT WALL MOTION, OKAY, AND HE HAS HAD SOME AREAS
24  OF HYPOKINESIS.  COULD THERE HAVE BEEN SOME SMALL EVENT,
25  POTENTIALLY SOME SMALL HEART ATTACK THAT CAUSES HIM TO BE

1    HYPOKINETIC WITHOUT CAUSING A SCAR FORMATION, THAT SORT OF

2    THING?  IT'S POSSIBLE ON A SMALL, VERY SMALL, LEVEL.

3    Q.    THANK YOU.  CAN YOU TELL ME THIS:  IS IT TRUE THAT THE

4    VAST MAJORITY OF HEART ATTACKS ARE DUE TO PLAQUE RUPTURE?  IS

5    THAT TRUE?

6    A.    I WOULD AGREE WITH THAT.

7    Q.    OKAY.  WHY DON'T YOU EXPLAIN TO THE JURY HOW THAT HAPPENS

8    WITH PLAQUE RUPTURE AND HEART ATTACK.

9    A.    WELL, IT HAS TO DO WITH THIS -- ALONG WITH THESE

10   DOCUMENTS, YOU HAVE A FIBROUS CAP THAT THINS, AND IT CRACKS FOR

11   WHATEVER REASON.  WHEN THAT FIBROUS PLAQUE CRACKS, IT EXPOSES

12   THE ATHEROMA, THE LIPID-LADEN ATHEROMA, TO THE BLOODSTREAM.

13   WHEN THIS FISSURE OR CRACK OCCURS, THEN ALL OF THESE PRODUCTS

14   ARE EXPOSED TO THE BLOODSTREAM.  WHEN THAT HAPPENS, THE

15   CLOTTING CASCADE AND PLATELET AGGREGATION AND ALL OF THIS IS

16   PRECIPITATED AND YOU GET ACUTE THROMBOTIC HEART ATTACK.

17   Q.    BY THE WAY, I DON'T KNOW IF YOU KNOW THIS, BUT DO YOU KNOW

18   ANYTHING ABOUT DR. ZIPES' REPUTATION AS A CARDIOLOGIST?

19   A.    OF COURSE, BEING A CARDIOLOGIST, I'VE HEARD OF HIM, AND I

20   KNOW OF HIS REPUTATION.  HE'S A WELL-RESPECTED CARDIOLOGIST.

21   Q.    IN YOUR COMMUNITY; RIGHT?  BY "YOUR COMMUNITY," I'M

22   TALKING ABOUT THE CARDIOLOGIST COMMUNITY.  RIGHT?

23   A.    YES, SIR.

24   Q.    ARE YOU A NUCLEAR CARDIOLOGIST?

25   A.    I WAS TRAINED IN NUCLEAR CARDIOLOGY.

1  **Q.**   I MEAN, THE CARDIOLITE EXAM, DO YOU DEFER TO OTHERS

2  REGARDING THE READING OF THOSE EXAMS?

3  **A.**   I READ CARDIOLITE EXAMS PRESENTLY.

4  **Q.**   IF YOU LOOK AT THE -- THIS IS A EXHIBIT THAT WE PREVIOUSLY

5  MARKED IN THE PRIOR DEPOSITION.  WILL YOU READ INTO THE

6  RECORD -- I THINK THIS IS THE OPERATIVE REPORT FROM DR. BRYAN

7  REGARDING THE VEIN GRAFT.  WOULD YOU READ INTO THE RECORD THE

8  YELLOW PORTION OF IT, AND PLEASE SHOW COUNSEL WHAT YOU'RE

9  READING.  IT'S FROM THE --

10 **A.**   IT'S THE REPORT FROM DR. BRYAN, 9/02, I GUESS?

11 **Q.**   9/10.

12 **A.**   9/10.  OKAY.  WOULD YOU LIKE ME TO READ THIS PARAGRAPH?

13 **Q.**   COULD YOU READ IT INTO THE RECORD.

14 **A.**   "THE HEART WAS ELEVATED AND A SAPHENOUS VEIN GRAFT AND

15 ANASTOMOSIS WAS PERFORMED TO THE -- SAPHENOUS VEIN GRAFT

16 ANASTOMOSIS WAS PERFORMED TO THE 1.8-MILLIMETER SECOND DIAGONAL

17 BRANCH OF THE LAD.  THE FIRST DIAGONAL WAS EXAMINED AND FOUND

18 TO BE TOO SMALL FOR GRAFTING.  THE SECOND VEIN GRAFT

19 ANASTOMOSIS CONSTRUCTED WAS TO A 1.8-MILLIMETER RAMUS

20 INTERMEDIUS.  BOTH VEIN GRAFT ANASTOMOSES WERE PROBED AND

21 PATENT AT THEIR COMPLETION."

22        "CARDIOPLEGIA WAS INJECTED DOWN THESE TWO VEIN GRAFTS

23 TO ENSURE GOOD RUNOFF, AS WELL AS TO ENSURE AGAINST LEAKS.  THE

24 POSTERIOR DESCENDING AND LEFT VENTRICULAR BRANCHES OF THE RIGHT

25 CORONARY ARTERY WERE THEN GRAFTED, EMPLOYING A NATURAL WIDE

1    PORTION OF THE SAPHENOUS VEIN GRAFT.  THE PROXIMAL PORTION WAS

2    PLACED TO THE PDA, THE DISTAL TO THE LEFT VENTRICULAR BRANCH.

3    BOTH ANASTOMOSES WERE PROBED AND PATENT AT THEIR COMPLETION.

4    ADDITIONAL CARDIOPLEGIA WAS INFUSED DOWN EACH LIMB OF THE GRAFT

5    TO ENSURE GOOD RUNOFF AS WELL AS TO ENSURE AGAINST LEAKS."

6    Q.    OKAY.  NOW, IN TERMS OF THE CAUSE OF THE OCCLUSION OR

7    FAILURE OF THE GRAFT, FROM THAT REPORT CAN WE RULE OUT THE

8    TECHNICAL ASPECT THAT YOU TALKED ABOUT AND THE OUTFLOW ASPECTS?

9    A.    YOU KNOW, WE SEE ACUTE GRAFT CLOSURE SOMETIMES AND ALL THE

10   REPORTS ALWAYS SAY THEY DO THESE THINGS.  IN ACUTE GRAFT -- I

11   MEAN, IF YOU HAVE ACUTE GRAFT CLOSURE -- WHICH COULD BE A

12   RUNOFF PROBLEM OR A STITCH PROBLEM OR A THROMBOSIS PROBLEM.  SO

13   HE FELT THAT THERE WAS A PRETTY GOOD FLOW.  ALSO, THE SURGEON,

14   AT LEAST, THOUGHT HE HAD DONE A GOOD JOB.

15   Q.    OKAY.  SO THAT WOULD LEAVE, IF YOU TAKE HIM AT HIS WORD

16   AND THAT HE THINKS THAT HE DID A PRETTY GOOD JOB, WOULD THE

17   MOST LIKELY CAUSE OF THESE OCCLUSIONS NOT BE DETECT THE OUTFLOW

18   PART --

19   A.    THAT'S A DIFFICULT QUESTION, I THINK, TO ANSWER.  I THINK

20   IT'S HARD TO SPECULATE WHY IT CLOSED.

21   Q.    FROM WHAT YOU'VE READ, DID VIOXX HAVE A PROTHROMBOTIC

22   NATURE TO IT?

23   A.    FROM WHAT I READ, THERE IS THE GENERAL CONCERN THAT THERE

24   MAY BE A PROTHROMBOTIC EFFECT OF VIOXX.

25   Q.    CAN YOU TELL ME IF IT IS POSSIBLE THAT VIOXX COULD BE A

1   POSSIBLE CAUSE OF THE CLOSING OF THE VEIN GRAFT?

2   **A.**   OKAY.  YOU KNOW, AS I UNDERSTAND IT, THE GENERAL CONCERN

3   IS INCREASED CARDIOVASCULAR EVENTS WITH VIOXX.  OKAY.  THE

4   ETIOLOGY OF IT, AS I UNDERSTAND, IS NOT TOTALLY KNOWN AND,

5   THEREFORE, ANYONE ON VIOXX HAD THE POTENTIAL FOR INCREASED

6   CARDIOVASCULAR EVENT, INCLUDING MI.

7   **Q.**   "MI" IS A HEART ATTACK, FOR THE JURY?

8   **A.**   MYOCARDIAL INFARCTION.

9   **Q.**   WOULD THAT INCLUDE MR. BARNETT?

10  **A.**   MR. BARNETT WAS ON VIOXX AND THAT WOULD BE THE CONCERN IF

11  THAT DRUG IS ASSOCIATED WITH ANY PROBLEM LIKE THAT.

12  **Q.**   DID LAWSUIT STRESS CAUSE THE OCCLUSION OF HIS VESSELS?

13  **A.**   IN ALL HONESTY, I THINK IT WOULD BE UNLIKELY THAT THE

14  STRESS OF THIS LAWSUIT WOULD CAUSE HIM TO HAVE AN OCCLUSION.

15  **Q.**   NOW, LET ME ASK YOU THIS.  SHE WANTS ME TO SHOW YOU THIS

16  TOTALLY OCCLUDED VEIN GRAFT AND ASK YOU IF HE'S GETTING ANY

17  FLOW FROM IT.  GO AHEAD.

18  **A.**   THIS IS THE CLOSED VEIN GRAFT TO THE RAMUS INTERMEDIUS.

19  NO FLOW WHATSOEVER.

20  **Q.**   WOULD YOU POINT TO THAT SO THE JURY CAN SEE IT.

21  **A.**   IT'S JUST A LITTLE BIT OF NUB.  YOU CAN BARELY SEE IT,

22  THAT LITTLE CIRCULAR THING WHERE THE DYE IS HANGING UP JUST A

23  LITTLE BIT, THAT'S WHAT A CLOSED VEIN GRAFT LOOKS -- THAT'S

24  WHERE THE SURGEON SEWED IT TO THE WALL OF THE AORTA.  IT'S

25  SUPPOSED TO COME DOWN AND FEED BLOOD TO THE HEART.  IT'S NOT

1    DOING IT.  IT'S 100 PERCENT CLOSED.  NO BLOOD.

2    **Q.**   IS HE GETTING ANY BLOOD TO THAT PART OF THE HEART?

3    **A.**   THROUGH THE NATIVE BLOOD VESSEL THAT HAS AN 80 PERCENT OR

4    SO BLOCKAGE IN IT.  SO HE'S GETTING BLOOD FLOW THROUGH A

5    STENOTIC OR NARROWED VESSEL, AND IN MY OPINION THAT'S WHY HE

6    WAS HAVING ANGINA.

7    **Q.**   THIS WILL HELP THE JURY SEE THAT THIS WAS THE CAUSE OF THE

8    PAIN HE WAS HAVING IN HIS CHEST?

9    **A.**   I THINK THAT IS THE SOURCE OF HIS ANGINA, THE FACT THAT

10   THIS GRAFT WAS CLOSED AND THERE WAS STILL A TIGHT BLOCKAGE IN

11   THE RAMUS INTERMEDIUS VESSEL.

12   **Q.**   THE LAST THING THAT -- I'M GOING TO GET THE LAST WORD

13   HERE.  FIRST OF ALL, YOU SAID SOMETHING ABOUT SURGEONS HOLD IT

14   IN THEIR HANDS.  SO SOMETIMES THEY DO PICK UP THE HEART AND

15   HOLD IT IN THEIR HANDS?

16   **A.**   THEY EVALUATE IT WHEN THEY'RE IN THE OPERATING ROOM.

17   **Q.**   SO THEY ACTUALLY HAVE THEIR HANDS ON THE HEART?

18   **A.**   YES, SIR.

19   **Q.**   YOU'D EXPECT THAT WOULD BE TYPICAL OF, SAY, DR. BRYAN OR

20   ANY SURGEON?

21   **A.**   THEY WOULDN'T HOLD IT -- THAT'S CORRECT.  THEY TOUCH THE

22   HEART WHEN THEY'RE OPERATING.

23   **Q.**   IN TERMS OF THE CORONARY ARTERY DISEASE IN MR. BARNETT,

24   CAN YOU SAY -- FOR EXAMPLE, JUST TAKE EACH AREA.  WE'LL TAKE

25   THE LEFT MAIN.  IS THERE MORE CORONARY ARTERY DISEASE IN JULY

1    OF 2006 VERSUS SEPTEMBER OF 2002?

2    **A.**   IN GENERAL, AS FAR AS THE AMOUNT OF ATHEROSCLEROSIS,

3    PLAQUE BURDEN, THAT SORT OF THING?

4    **Q.**   YES.

5    **A.**   I THINK, IN GENERAL, HE PROBABLY HAS A GREATER BURDEN NOW

6    THAN HE DID FOUR YEARS AGO.

7    **Q.**   WOULD THAT BE TRUE -- I'M JUST GOING TO TAKE YOU THROUGH

8    QUICKLY -- OF THE LAD?

9    **A.**   I WOULD AGREE IT'S PROBABLY WORSE.

10   **Q.**   WOULD IT BE TRUE FOR THE DIAGONALS OFF THE LAD?

11   **A.**   CORRECT.

12   **Q.**   WOULD IT BE TRUE FOR THE RAMUS INTERMEDIUS?

13   **A.**   WE WENT THROUGH THIS BEFORE.  I'M GOING TO GO THROUGH MY

14   EVALUATION BEFORE AND -- YEAH, I THINK FOR THE RAMUS, TOO,

15   MORE -- A LITTLE BIT LONGER DISEASE.

16   **Q.**   WOULD IT BE TRUE FOR THE RIGHT CORONARY ARTERY?

17   **A.**   YES.

18   **Q.**   WOULD IT BE TRUE FOR THE POSTEROLATERAL BRANCH?

19   **A.**   THAT WOULD BE CORRECT.

20         **MR. GOLDMAN:**  JUDGE, WE HAVE THREE AND A HALF MINUTES

21   LEFT OF DR. KARAVAN.

22                    **RECROSS-EXAMINATION**

23   **BY MR. GOLDMAN:**

24   **Q.**   YOU WERE ASKED ABOUT MR. BARNETT'S LIFE EXPECTANCY, AND

25   YOU SAID YOU WOULD NOT PUT A NUMBER OF YEARS ON THE LOSS OF

1164

1    LIFE.  WHY NOT?

2    **A.**    BECAUSE IT'S DIFFICULT.  I THINK IT'S ONE OF THE MOST

3    DIFFICULT THINGS TO DO.  HE HAS A GOOD PUMP.  AGAIN, I GO BACK

4    TO THE FACT HE HAS A GOOD PUMP AND HE HAS GOOD BLOOD FLOW.  HE

5    IS ON MEDICINE.  MORE MEDICINE IS BEING DEVELOPED IN A YEAR OR

6    TWO.  ANTI-LIPID OR DIFFERENT LIPID DRUGS AND OTHER DRUGS ARE

7    BEING DEVELOPED, AND LIFE EXPECTANCY CHANGES.  SO I CAN'T SIT

8    HERE AND PUT A NUMBER ON IT.

9    **Q.**    ANOTHER GOOD THING THAT HAPPENED TO MR. BARNETT WAS THAT

10   YOU WERE ABLE TO GO IN AND STENT THE RAMUS INTERMEDIUS, THE

11   AREA THAT YOU'VE JUST SHOWN TO THE JURY ON THE SCREEN; RIGHT?

12   **A.**    CORRECT.

13   **Q.**    NOW THAT YOU HAVE PUT A STENT, WHICH HAS ELIMINATED THE

14   PLAQUE IN THE RAMUS, THERE IS SUFFICIENT BLOOD FLOW GOING TO

15   THE HEART; CORRECT?

16   **A.**    CORRECT.

17   **Q.**    THAT PARTICULAR CLOSURE THAT YOU WERE JUST TESTIFYING

18   ABOUT IS NOT HARMING MR. BARNETT RIGHT NOW, IS IT?

19   **A.**    NOW THAT WE'VE OPENED UP THE NATIVE BLOOD VESSEL THAT IT

20   WENT TO, CORRECT.

21   **Q.**    AS LONG AS THE NATIVE VESSEL IS CLEAR AND ADEQUATE, BLOOD

22   FLOW IS FLOWING THROUGH IT, THEN THE CONDITION OF MR. BARNETT'S

23   BYPASS GRAFT THAT WAS FEEDING THAT PARTICULAR AREA OF THE HEART

24   DOESN'T MATTER MUCH; RIGHT?

25   **A.**    THAT'S RIGHT.

1  **Q.**   YOU WERE ASKED QUESTIONS ABOUT SCAR TISSUE.  DO YOU

2  REMEMBER THAT?

3  **A.**   I THINK I BROUGHT THAT UP.  I DON'T KNOW.

4  **Q.**   YOU HAVE NEVER, IN ANY OF YOUR MEDICAL RECORDS, INDICATED

5  THAT YOU SAW ANY SCAR IN MR. BARNETT'S HEART; RIGHT?

6  **A.**   AS EVIDENCED THROUGH SCANS, MAINLY.  IN OTHER WORDS, HE

7  HAD AT LEAST VIABLE, ALIVE HEART TISSUE BECAUSE THERE WAS NEVER

8  A SCAN THAT SAID HE HAD SCAR.  HE HAD ISCHEMIA, JUST ISCHEMIA.

9  **Q.**   SO TO THE EXTENT THAT THERE'S ANY SMALL AREA OF SCARRING,

10  THAT'S NOT AFFECTING HIS HEART'S ABILITY TO FUNCTION; RIGHT?

11  **A.**   I FEEL THE PUMPING ACTION IS NORMAL AND NOT AFFECTED BY

12  ANY SMALL SCARS.

13  **Q.**   MR. BARNETT'S EJECTION FRACTION IS NORMAL EVEN FOR A

14  62-YEAR-OLD; AND WHATEVER LITTLE SCAR THERE MIGHT BE IN THAT

15  AREA OF THE HEART, THAT'S NOT AFFECTING HIS HEART'S ABILITY TO

16  PUMP BLOOD.  TRUE?

17  **A.**   I FEEL HIS HEART PUMPS BLOOD NORMALLY.

18  **Q.**   DR. BRYAN, IN THE RECORD THAT MR. ROBINSON SHOWED YOU OR

19  IN ANY OF THE OTHER RECORDS THAT DR. BRYAN HAS SENT YOU, HE

20  NEVER INDICATED THAT THERE WAS ANY SCARRING THAT HE SAW IN

21  MR. BARNETT'S HEART, DID HE?

22  **A.**   WE CAN LOOK AT HIS OP REPORT, AND SOMETIMES THEY'LL MAKE A

23  GROSS VISUALIZATION OF THE HEART AS THEY HOLD IT IN THEIR

24  HANDS.

25  **Q.**   I ASKED DR. BRYAN THIS IN DEPOSITION AND HE SAID HE DIDN'T

1    SEE ANY SCARRING, SO IF THAT --

2    **A.**    OKAY.  IF THAT'S WHAT HE SAID AND I HAVE TO -- IT'S BEEN A

3    LITTLE WHILE SINCE I'VE SEEN THIS.  IF HE MAKES NO MENTION OF

4    IT AND HE NEVER SAID IT, THEN THAT'S THE WAY IT IS.

5    **Q.**    SO YOU WOULDN'T DISAGREE WITH DR. BRYAN IF DR. BRYAN WERE

6    TO TESTIFY THAT, WHEN HE ACTUALLY LOOKED AT MR. BARNETT'S HEART

7    WHEN HE WAS DOING THE BYPASS SURGERY, THERE WAS NO SCAR?

8    **A.**    I WOULDN'T DISAGREE.

9    **Q.**    WHEN YOU WERE ANSWERING QUESTIONS ABOUT WHETHER VIOXX WAS

10   PROTHROMBOTIC -- DO YOU REMEMBER QUESTIONS ABOUT THAT?

11   **A.**    THIS TIME OR LAST TIME?

12   **Q.**    THIS TIME.

13   **A.**    I REMEMBER WHAT WE DISCUSSED.

14   **Q.**    DO YOU RECALL TESTIFYING, SIR, THAT EVEN TO THIS DAY YOU

15   THINK IT'S AN OPEN QUESTION ABOUT WHETHER VIOXX OR THE OTHER

16   NSAID'S ARE PROTHROMBOTIC?

17   **A.**    THE QUESTION HAS BEEN RAISED WHETHER THAT'S -- AGAIN, THE

18   ASSOCIATION BETWEEN CARDIAC EVENTS, THROMBOTIC EVENTS, HAS BEEN

19   RAISED.  IN WHAT I'VE SEEN, THE EXACT ANSWER TO THAT HASN'T

20   BEEN WORKED OUT.

21   **Q.**    SO, IN TERMS OF COX-2 INHIBITORS, INCLUDING CELEBREX AND

22   VIOXX AND BEXTRA, YOU'RE NOT TAKING THE POSITION THAT ONE IS

23   MORE PROTHROMBOTIC, IF THEY ARE AT ALL?

24   **A.**    OF ALL THE COXIBS?

25   **Q.**    YES.

1   **A.**   TO MY KNOWLEDGE, I WOULDN'T THINK ONE WAS MORE

2   PROTHROMBOTIC.

3               **THE COURT:**  ALL RIGHT.  IS THAT IT?  ALL RIGHT.

4               **MR. GOLDMAN:**  THAT'S IT.

5               **THE COURT:**  LET'S CALL THE NEXT WITNESS.

6               **MR. ROBINSON:**  WE'RE GOING TO CALL DR. EPSTEIN.

7   DR. EPSTEIN WAS A CARDIOLOGIST FROM WASHINGTON, D.C., WHO GOT A

8   GRANT FROM MERCK TO DO A STUDY ON ATHEROSCLEROSIS, AND HE'S

9   GOING TO TESTIFY BY DEPOSITION.

10              **THE COURT:**  DO YOU WANT TO JUST CLARIFY THAT?

11              **MR. GOLDMAN:**  I THINK THAT'S A FAIR DESCRIPTION.

12  DR. EPSTEIN PERFORMED A STUDY FOR MERCK.

13              **THE COURT:**  ARE WE CALLING HIM BY DEPOSITION?

14              **MR. ROBINSON:**  WE'RE CALLING HIM BY DEPOSITION.

15  WE'RE SORRY.  MOST OF THESE PEOPLE WERE DEPOSED.  THEY CAN'T

16  COME HERE.

17              **MR. BIRCHFIELD:**  YOUR HONOR, MAY WE APPROACH FOR JUST

18  ONE SECOND?

19              (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH

20  OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

21              (WHEREUPON, **STEPHEN EPSTEIN**, HAVING BEEN DULY SWORN,

22  TESTIFIED BY DEPOSITION AS FOLLOWS.)

23                        **DIRECT EXAMINATION**

24  BY MR. ROBINSON:

25  **Q.**   CAN YOU TELL THE JURY YOUR NAME, PLEASE, DOCTOR.

DAILY COPY

1   A.   STEPHEN EPSTEIN.

2   Q.   ARE YOU A MEDICAL DOCTOR?

3   A.   YES.

4   Q.   WHAT TYPE OF MEDICINE DO YOU PRACTICE, DOCTOR?

5           MR. ROBINSON:  HOLD ON.  CAN WE BACK IT UP, MIKE?

6   BY MR. ROBINSON:

7   Q.   CAN YOU TELL THE JURY YOUR NAME, PLEASE, DOCTOR.

8   A.   STEPHEN EPSTEIN.

9   Q.   ARE YOU A MEDICAL DOCTOR?

10  A.   YES.

11  Q.   WHAT TYPE OF MEDICINE DO YOU PRACTICE, DOCTOR?

12  A.   I HAD PRACTICED CARDIOLOGY.  AT THE PRESENT TIME, I'M HEAD

13  OF THE CARDIOVASCULAR RESEARCH INSTITUTE, AND I'M RESPONSIBLE

14  FOR ALL OF THE RESEARCH THAT'S DONE IN THE CARDIOVASCULAR

15  RESEARCH INSTITUTE.

16  Q.   FOR WHAT PERIOD OF YEARS DID YOU PRACTICE CARDIOLOGY,

17  DOCTOR?

18  A.   FROM 1966 OR 1967 THROUGH 2000, 2001.  I STILL CONSULT AND

19  I AM LICENSED TO PRACTICE, BUT CONFLICTS IN MY TIME HAVE

20  LIMITED THAT ENORMOUSLY.

21  Q.   WHAT STATES ARE YOU LICENSED TO PRACTICE MEDICINE IN,

22  DOCTOR?

23  A.   NEW YORK AND WASHINGTON, D.C.

24  Q.   DURING THE TIME PERIOD FROM 1966 TO 2001, DID YOU ACTIVELY

25  TREAT PATIENTS?

DAILY COPY

1   **A.**   YES.

2   **Q.**   DID YOU HAVE A CLINIC THAT YOU PARTICIPATED IN, DOCTOR?

3   **A.**   YES.

4   **Q.**   CAN YOU PLEASE DESCRIBE THAT FOR ME.

5   **A.**   I WAS CHIEF OF CARDIOLOGY AT THE NATIONAL HEART, LUNG AND

6   BLOOD INSTITUTE AND WAS HEAD, IN THAT CAPACITY, OF ALL CLINICAL

7   WORK AND RESEARCH WORK THAT WAS BEING DONE IN CARDIOVASCULAR

8   DISEASE.  WE HAD A VERY ACTIVE CLINICAL PROGRAM, BOTH

9   INPATIENTS AND OUTPATIENTS, AND I WAS IN CHARGE OF BOTH OF

10  THOSE EFFORTS.

11  **Q.**   DOCTOR, WHAT IS THE NATIONAL HEART, LUNG, AND BLOOD

12  INSTITUTE?

13  **A.**   IT'S PART OF THE NATIONAL INSTITUTES OF HEALTH.  I WAS IN

14  CHARGE OF THE INTRAMURAL PROGRAM, THAT IS, ALL OF THE

15  ACTIVITIES THAT WERE CONDUCTED IN HEART DISEASE ON CAMPUS.

16  THAT CAMPUS IS IN BETHESDA, MARYLAND.

17  **Q.**   CAN YOU DESCRIBE FOR THE JURY, DOCTOR, WHAT THE NATIONAL

18  INSTITUTES OF HEALTH ARE.

19  **A.**   THE NATIONAL INSTITUTES OF HEALTH IS A FEDERAL

20  ORGANIZATION THAT SPANS VIRTUALLY ALL OF MEDICINE, AND ITS

21  PRIMARY RESPONSIBILITY IS TO IDENTIFY AND FUND RESEARCH, BOTH

22  BASIC AND CLINICAL, TO ADVANCE THE APPLICATION OF MEDICINE TO

23  THE HEALTH OF PATIENTS.

24  **Q.**   WOULD IT BE FAIR TO SAY, DOCTOR, THAT THE NATIONAL

25  INSTITUTES OF HEALTH IS A WELL-RESPECTED INSTITUTE IN THE U.S.?

1    **A.**    I THINK SO.

2    **Q.**    DOCTOR, COULD YOU PLEASE, IN A SUMMARY FASHION, EXPLAIN

3    FOR THE JURY YOUR EDUCATIONAL BACKGROUND.

4    **A.**    I RECEIVED MY BACHELOR'S DEGREE FROM COLUMBIA UNIVERSITY,

5    WENT ON TO CORNELL MEDICAL SCHOOL AND RECEIVED MY M.D. FROM

6    CORNELL.   I DID MY HOUSE STAFF TRAINING AT THE NEW YORK

7    HOSPITAL, WHICH IS PART OF THE CORNELL MEDICAL SCHOOL SYSTEM,

8    AND THEN WENT TO THE NATIONAL INSTITUTES OF HEALTH TO WORK

9    UNDER DR. EUGENE BRAUNWALD, WHO AT THE TIME WAS ONE OF THE

10   WORLD'S OUTSTANDING CARDIOLOGY INVESTIGATORS.   WHEN HE LEFT THE

11   NIH, I TOOK OVER FOR HIM AS CHIEF OF CARDIOLOGY, AND THAT

12   OCCURRED IN 1967 OR 1969.   SORRY.

13   **Q.**    DOCTOR, IN YOUR PROFESSIONAL ACTIVITIES, HAVE YOU ALSO HAD

14   AN OCCASION TO TEACH MEDICINE?

15   **A.**    YES.

16   **Q.**    CAN YOU EXPLAIN THAT TO ME, PLEASE, DOCTOR.

17   **A.**    I WAS A VISITING PROFESSOR OF MEDICINE AT GEORGETOWN AND,

18   IN THAT CAPACITY, TAUGHT GEORGETOWN STUDENTS AS WELL AS HOUSE

19   STAFF.   THESE INDIVIDUALS CAME TO THE NIH, WHICH IS JUST A

20   20-MINUTE DRIVE FROM GEORGETOWN, AND THEY PARTICIPATED IN

21   RESEARCH, AS WELL AS CLINIC ACTIVITIES.   ONE OF MY

22   RESPONSIBILITIES WAS TO TEACH THOSE STUDENTS.   WE ALSO HAD MANY

23   STUDENTS COMING FROM ALL OVER THE WORLD TO SPEND TIME WITH US,

24   AND PART OF MY RESPONSIBILITIES WAS TO ENSURE THEIR MEDICAL

25   EDUCATION.

1  Q.   DOCTOR, BEFORE THE DEPOSITION BEGAN, I GAVE YOU A COPY OF

2  WHAT I'VE MARKED AS EXHIBIT 1 TO YOUR DEPOSITION.  DO YOU HAVE

3  THAT IN FRONT OF YOU?

4  A.   YES.

5  Q.   IS THAT AN UP-TO-DATE COPY OF YOUR CV, DOCTOR?

6  A.   IT WOULD TAKE ME AWHILE TO GO THROUGH THIS.  IT MAY BE A

7  MONTH OR TWO OUT-OF-DATE.

8  Q.   IT APPEARS TO BE ABOUT A 48-PAGE DOCUMENT, IF THAT HELPS.

9  A.   UH-HUH.

10  Q.   OKAY.  THANK YOU.  I NOTE ON HERE, WITHOUT GOING THROUGH

11  ALL OF YOUR SPECIFIC HONORS AND SPECIAL SCIENTIFIC RECOGNITION,

12  THAT YOU HAVE A GREAT DEAL OF THEM.  ARE THERE ANY THAT STICK

13  OUT IN YOUR MIND AS BEING THE MOST IMPORTANT TO YOU OR THE MORE

14  IMPORTANT OF THOSE ACADEMIC ACHIEVEMENTS OR HONORS?  I PUT YOU

15  ON THE SPOT.

16  A.   WELL, A LOT OF THEM, TO ME, ARE IMPORTANT.  ONE OF MY MOST

17  IMPORTANT ONES, AS A YOUNG PERSON, WAS TO BE ELECTED TO THE

18  AMERICAN SOCIETY OF CLINICAL RESEARCH -- CLINICAL

19  INVESTIGATION, WHICH WAS, TO ME, SOMETHING TO BE EXTREMELY

20  PROUD OF.  THAT OCCURRED IN MY VERY EARLY YEARS.  SINCE THEN, I

21  THINK THE GREATEST HONORS I HAD WERE TO BE INVITED TO GIVE

22  DISTINGUISHED LECTURESHIPS AT EITHER THE AMERICAN COLLEGE OF

23  CARDIOLOGY OR THE AMERICAN HEART ASSOCIATION'S ANNUAL MEETING.

24  Q.   I ALSO NOTE THAT YOU HOLD SEVERAL PATENTS, DOCTOR.  HOW

25  MANY IN TOTAL DO YOU HOLD?

1172

1  **A.**   PROBABLY FOUR, BUT I DON'T WANT TO BE HELD TO THAT PRECISE

2  NUMBER.

3  **Q.**   I ALSO NOTE THAT YOU'RE A MEMBER OF SEVERAL EDITORIAL

4  BOARDS, DOCTOR.  CAN YOU DESCRIBE WHICH EDITORIAL BOARDS YOU

5  SIT UPON.

6  **A.**   UNTIL RECENTLY, I SAT FOR -- THE MOST DISTINGUISHED

7  EDITORIAL BOARD I SAT ON WAS *CIRCULATION*, BUT TWO YEARS AGO,

8  BECAUSE OF TOO MANY COMPETING RESPONSIBILITIES, I GAVE THAT UP.

9  I ALSO, IN THE PAST, HAVE SAT ON A NUMBER OF EDITORIAL BOARDS,

10  WHICH I HAVE SINCE GIVEN UP.  SO AT THE PRESENT TIME I DO NOT

11  ACTIVELY PARTICIPATE ON THE EDITORIAL BOARDS, ALTHOUGH I DO

12  RECEIVE AN ENORMOUS NUMBER OF MANUSCRIPTS TO REVIEW FOR THESE

13  DIFFERENT JOURNALS.

14  **Q.**   DO YOU SERVE AS AN AD HOC REVIEWER --

15  **A.**   YES.

16  **Q.**   -- FOR SEVERAL DIFFERENT JOURNALS?

17  **A.**   YES.

18  **Q.**   DOCTOR, YOU MENTIONED DR. EUGENE BRAUNWALD.  IS HE THE

19  EDITOR OF A SCIENTIFIC TEXT OR TREATISE IN REFERENCE TO

20  CARDIOLOGY?

21  **A.**   YES, HE IS.

22  **Q.**   IS IT FAIR TO SAY THAT THAT'S A VERY DISTINGUISHED AND

23  WELL-RESPECTED TREATISE?

24  **A.**   YES, PROBABLY THE MOST DISTINGUISHED TREATISE ON

25  CARDIOVASCULAR DIAGNOSIS AND TREATMENT.

1  **Q.**   DID I UNDERSTAND YOU CORRECTLY TO SAY THAT YOU HAD THE

2  HONOR OF ACTUALLY LEARNING UNDER AND TRAINING WITH

3  DR. BRAUNWALD?

4  **A.**   THAT'S CORRECT.

5  **Q.**   HAVE YOU EVER HAD THE PLEASURE OF ACTUALLY WRITING ANY

6  SCIENTIFIC ARTICLES WITH DR. BRAUNWALD?

7  **A.**   MANY, YES.

8  **Q.**   HAVE THESE ARTICLES BEEN PEER REVIEWED AND PUBLISHED?

9  **A.**   YES.

10 **Q.**   I NOTE IN YOUR BIBLIOGRAPHY, DOCTOR, THAT YOU HAVE

11 PUBLISHED APPROXIMATELY 515 DIFFERENT ARTICLES.  IS THAT--

12 **A.**   THAT'S CORRECT.

13 **Q.**   -- ACCURATE TO THE BEST OF YOUR RECOLLECTION?

14 **A.**   YES.

15 **Q.**   HAVE THE MAJORITY OF THOSE ARTICLES BEEN PUBLISHED IN

16 PEER-REVIEWED JOURNALS?

17 **A.**   ALL OF THEM.

18 **Q.**   DOCTOR, WHAT IS THE CARDIOVASCULAR RESEARCH INSTITUTE?

19 **A.**   THIS IS AN COMPONENT OF THE MEDSTAR RESEARCH INSTITUTE.

20 MEDSTAR HEALTH IS A HOLDING CORPORATION WHICH HAS UNDER ITS --

21 UNDER ITS CONTROL I THINK APPROXIMATELY SEVEN HOSPITALS, THE

22 TWO PREMIER HOSPITALS BEING GEORGETOWN AND THE WASHINGTON

23 HOSPITAL CENTER.  AS A COEQUAL OF THESE SEVEN HOSPITALS, THERE

24 IS A MEDSTAR RESEARCH INSTITUTE, WHICH HAS THE RESPONSIBILITY

25 FOR CONDUCTING AND ADMINISTERING ALL RESEARCH DONE WITHIN ALL

1    OF THE HOSPITALS THAT ARE PART OF MEDSTAR HEALTH.  WITHIN THE

2    MEDSTAR RESEARCH INSTITUTE, ONE OF THE LARGEST DIVISIONS IS THE

3    CARDIOVASCULAR RESEARCH INSTITUTE, WHICH I'M DIRECTOR OF, AND

4    THAT'S RESPONSIBLE FOR ALL OF THE CARDIOVASCULAR RESEARCH

5    THAT'S DONE AT THESE HOSPITALS.

6    Q.   WOULD IT BE FAIR TO SAY, THEN, DOCTOR, THAT YOU ARE IN

7    CHARGE OF OR THE EXECUTIVE DIRECTOR OF ALL CARDIOVASCULAR

8    RESEARCH THAT GOES ON AT THESE VARIOUS HOSPITALS?

9    A.   THAT'S CORRECT.  MY DOMINANT ROLE, THOUGH, IS AT THE

10   WASHINGTON HOSPITAL CENTER AND GEORGETOWN.

11   Q.   ARE YOU ACTUALLY AFFILIATED WITH THESE HOSPITALS, AS WELL?

12   A.   YES, SIR.

13   Q.   DOCTOR, DOES YOUR PRESENT -- PARDON ME.  DOES YOUR PRESENT

14   FIELD OF PRACTICE PRIMARILY INVOLVE CARDIOVASCULAR RESEARCH?

15   A.   YES.

16   Q.   WOULD YOU CONSIDER YOURSELF AN EXPERT IN THE AREA OF

17   ATHEROSCLEROSIS?

18   A.   YES.

19   Q.   WOULD YOU CONSIDER YOURSELF AN EXPERT IN THE AREA OF

20   CARDIOVASCULAR DISEASE?

21   A.   YES.

22   Q.   WOULD YOU CONSIDER YOURSELF AN EXPERT IN THE AREA OF

23   CARDIOVASCULAR FUNCTION?

24   A.   YES.

25   Q.   WOULD YOU ALSO CONSIDER YOURSELF AN EXPERT IN THE AREA OF

1    ATHEROGENESIS?

2    **A.**    YES.

3    **Q.**    IS IT FAIR TO SAY THAT ALL OF THOSE AREAS OF EXPERTISE

4    WERE UTILIZED IN DEVELOPING THE OPINIONS THAT ARE GENERATED IN

5    THE STUDY THAT WE'RE HERE ABOUT TODAY THAT YOU CONDUCTED WITH

6    DR. ROTT, I BELIEVE?

7    **A.**    UH-HUH.  I WOULD SAY THAT'S TRUE.

8    **Q.**    DOCTOR, IN YOUR CURRENT PRACTICE, DO YOU CONDUCT ANY TYPE

9    OF CLINICAL RESEARCH?

10   **A.**    YES.

11   **Q.**    DOES THAT CLINICAL RESEARCH INVOLVE BOTH HUMAN PATIENTS OR

12   SUBJECTS AND BOTH ANIMAL SUBJECTS?

13   **A.**    YES.

14   **Q.**    WHAT ARE THE VARIOUS TYPES OF ANIMALS THAT YOU'VE UTILIZED

15   IN CONDUCTING VARIOUS STUDIES?

16   **A.**    OTHER THE YEARS?

17   **Q.**    YES, SIR.

18   **A.**    YES.  WELL, THERE WERE DOGS, THERE WERE PIGS, RATS, MICE.

19   THAT ABOUT DOES IT.

20   **Q.**    IS THERE SOMETHING ABOUT THE CONSTITUTION OR PHYSICAL

21   MAKEUP OF A MOUSE THAT MAKES IT DESIRABLE FOR CONDUCTING ANIMAL

22   STUDIES?

23   **A.**    YES.  THERE ARE SEVERAL ATTRIBUTES THAT, IN CERTAIN

24   CIRCUMSTANCES, MAKE IT MORE DESIRABLE.  NOT IN ALL, BUT IN

25   CERTAIN CIRCUMSTANCES.

1  **Q.**   FROM A CARDIOVASCULAR CONTEXT, ARE THERE CERTAIN

2  ATTRIBUTES OF THE MOUSE PHYSICALITY THAT ARE EASILY

3  TRANSFERABLE TO HUMANS?

4  **A.**   I WOULD HAVE TO SAY NOT EASILY TRANSFERABLE.

5  **Q.**   IN A BROADER SENSE, CAN WE GENERALLY TRANSFER THE FINDINGS

6  THAT WE DEVELOP IN MOUSE STUDIES TO HUMANS?

7  **A.**   THE ANSWER TO THAT IS MORE COMPLICATED THAN THE QUESTION,

8  AND THE ANSWER IS THAT THESE STUDIES PROVIDE US WITH VERY, VERY

9  IMPORTANT MECHANISTIC INFORMATION WHICH PROBABLY IS

10  TRANSFERABLE TO PATIENTS.  THE RESULTS THAT WE OBTAIN FROM SUCH

11  STUDIES ARE VERY IMPORTANT LEADS TO QUESTIONS THAT COULD BE

12  ASKED IN A CLINICAL CONTEXT.  NOT ALL RESULTS IN ANY ANIMAL

13  MODEL CAN BE ASSUMED TO BE DIRECTLY APPLICABLE, BUT ENORMOUS

14  PROGRESS HAS BEEN MADE BECAUSE THE MAJORITY OF RESULTS OBTAINED

15  IN ANIMAL STUDIES ARE, INDEED, TRANSFERABLE TO THE HUMAN

16  SITUATION.

17  **Q.**   OKAY.  YOU SAID SOMETHING ABOUT MECHANISTIC APPROACHES OR

18  MECHANISTIC STUDIES.  DOCTOR, WHAT DO YOU MEAN WHEN YOU SAY

19  "MECHANISTIC APPROACH" OR "MECHANISTIC STUDY"?

20  **A.**   WELL, IF A DRUG, FOR EXAMPLE, HAS AN EFFECT ON HEART

21  FUNCTION, WE WOULD LIKE TO KNOW, WELL, WHAT ARE THE MOLECULAR

22  PATHWAYS THAT LEAD FROM THE ADMINISTRATION OF THE DRUG TO THE

23  EFFECT OBSERVED.  USING, IN PARTICULAR, A MOUSE MODEL WHERE

24  YOU'RE ABLE TO USE GENETICALLY ALTERED MICE WHERE THE

25  PARTICULAR MOLECULES YOU'RE INTERESTED IN ARE EITHER PRESENT IN

1    OVERABUNDANCE OR ARE ELIMINATED, YOU COULD THEN SEE HOW THAT

2    OVERABUNDANCE OR THAT ELIMINATION WILL ALTER THE EFFECT, SO

3    THAT YOU THEN CAN DETERMINE THAT A GIVEN DRUG WORKS THROUGH A

4    SPECIFIC MOLECULAR PATHWAY.

5    **Q.**    DOCTOR, IS IT TRUE THAT ANIMAL STUDIES ARE IMPORTANT

6    ENOUGH THAT MOST MEDICATIONS THAT ARE ULTIMATELY APPROVED BY

7    THE FDA BEGIN LIFE OR INITIALLY STUDIED IN ANIMAL MODELS?

8    **A.**    YES.  ALL DRUG STUDIES -- ALL DRUGS ULTIMATELY APPLIED TO

9    PATIENTS GO THROUGH ANIMAL TESTING.

10   **Q.**    DOCTOR, I WOULD LIKE TO ASK YOU SOME GENERAL QUESTIONS

11   BEFORE WE GO STRAIGHT TO YOUR STUDY.  ARE YOU FAMILIAR WITH

12   PROSTACYCLIN AND THROMBOXANE?

13   **A.**    YES.

14   **Q.**    DOCTOR, TO YOUR KNOWLEDGE AND BASED ON YOUR RESEARCH, IS

15   PROSTACYCLIN A POTENT VASODILATOR AND ANTI-AGGREGATORY?  I'M

16   SORRY.  DID YOU SAY YES?

17   **A.**    I GUESS I SHOULD ANSWER THAT.  YES.

18   **Q.**    DOCTOR, BASED ON YOUR PERSONAL EXPERIENCE IN RESEARCH, IS

19   THROMBOXANE A POTENT VASOCONSTRICTOR AND PRO-AGGREGATORY AGENT?

20   **A.**    YES.

21   **Q.**    DOCTOR, ALSO, BASED UPON YOUR EXPERIENCE AND RESEARCH IN

22   THIS AREA, IS IT TRUE THAT THE BODY OF A HUMAN NORMALLY KEEPS A

23   HOMEOSTATIC BALANCE BETWEEN PROSTACYCLIN AND THROMBOXANE?

24   **A.**    YES.

25   **Q.**    OKAY.  THANK YOU.  DOCTOR, IS IT ALSO TRUE, BASED UPON

DAILY COPY

1178

1    YOUR PERSONAL EXPERIENCE AND RESEARCH, THAT PROSTACYCLIN PLAYS

2    AN IMPORTANT ROLE IN PREVENTING ATHEROSCLEROSIS FORMATION?

3    A.   YES, I WOULD ANSWER.  NOT NECESSARILY FROM MY OWN

4    RESEARCH, BUT FROM OTHER RESEARCH THAT HAS BEEN PUBLISHED IN

5    THE LITERATURE.

6    Q.   IS IT ALSO TRUE, THEN, BASED UPON YOUR REVIEW OF THIS

7    OTHER RESEARCH AND YOUR PERSONAL EXPERIENCE, THAT PROSTACYCLIN

8    PLAYS AN IMPORTANT ROLE IN PREVENTING THE PROGRESSION OF

9    ATHEROSCLEROSIS?

10   A.   I'M NOT PERSONALLY AWARE OF STUDIES THAT HAVE SHOWN THAT

11   PROSTACYCLIN INTERFERES WITH THE PROGRESSION OF

12   ATHEROSCLEROSIS, ALTHOUGH SUCH STUDIES MAY VERY WELL EXIST.

13   Q.   BASED UPON YOUR EXPERIENCE IN THIS AREA AND YOUR REVIEW OF

14   MEDICAL STUDIES, DOES PROSTACYCLIN HELP PREVENT ATHEROGENESIS?

15   A.   YES.

16   Q.   CAN YOU EXPLAIN FOR THE JURY WHAT ATHEROGENESIS IS,

17   PLEASE, DOCTOR.

18   A.   WELL, IT'S THE DEVELOPMENT WITHIN ARTERIAL WALLS, THE

19   BLOOD VESSELS THAT SUPPLY SUCH TISSUES AS THE HEART AND THE

20   BRAIN, THE LEGS, THE DEVELOPMENT IN THOSE TISSUES OF FIRST

21   USUALLY INFLAMMATION AND THEN FOLLOWING INFLAMMATION A BUILDUP

22   OF CHOLESTEROL DEPOSITS AND BUILDUP OF SCAR TISSUE AND THE

23   GRADUAL NARROWING OF THOSE VESSELS, WHICH THEREBY COMPROMISES

24   FLOW TO THE TISSUES THAT THESE VESSELS SUPPLY.

25   Q.   IS THAT PROCESS COMMONLY KNOWN AS CORONARY ARTERY DISEASE?

1   **A.**   THAT'S ONE OF THE COMPONENTS OF ATHEROSCLEROSIS OR

2   ATHEROGENESIS, YES.

3   **Q.**   FROM A LAY STANDPOINT, THEN, ARE WE TALKING ABOUT PLAQUE

4   BUILDUP IN YOUR CORONARY ARTERIES?

5   **A.**   IT COULD BE THE CORONARY ARTERIES, OR IT COULD BE THE

6   CAROTID ARTERY THAT SUPPLIES THE BRAIN, OR IT COULD BE THE

7   FEMORAL ARTERIES THAT SUPPLY THE LEGS.

8   **Q.**   DOCTOR, BASED ON YOUR PERSONAL EXPERIENCE IN THIS AREA AND

9   YOUR REVIEW OF THE MEDICAL LITERATURE, ARE YOU AWARE THAT

10   PROSTACYCLIN ALSO HELPS MAINTAIN PLAQUE INTEGRITY?

11   **A.**   I'M NOT SURE I HAVE THE INFORMATION TO BE ABLE TO SAY YES

12   ON THAT.  ONCE AGAIN, IT MAY VERY WELL EXIST, BUT I WOULD NOT

13   BE ABLE TO CITE A PARTICULAR STUDY SHOWING THAT.

14   **Q.**   YES, SIR.  LET ME ASK A BROADER QUESTION, THEN.  BASED ON

15   YOUR PERSONAL EXPERIENCE AND YOUR REVIEW OF THE MEDICAL

16   LITERATURE, DOES COX-2 PLAY A ROLE IN MAINTAINING PLAQUE

17   INTEGRITY?

18   **A.**   IT'S HIGHLY CONTROVERSIAL.  IF YOU LOOK AT ALL OF THE DATA

19   THAT'S ACCUMULATED OVER THE LAST SEVERAL YEARS AS TO WHETHER OR

20   NOT COX-2 PLAYS A BENEFICIAL OR DELETERIOUS EFFECT ON PLAQUE

21   STABILITY, ONE COULD MAKE -- BASED ON THE MOLECULAR MECHANISMS

22   THAT WE'VE BECAME AWARE OF, YOU CAN MAKE AN ARGUMENT THAT

23   INHIBITING COX-2 IS DANGEROUS OR THE CONVERSE, AND THAT'S WHAT

24   RESEARCH IS ALL ABOUT.

25   **Q.**   THAT WAS THE EXACT TYPE OF RESEARCH THAT YOU UNDERTOOK

1  WITH FUNDING FROM MERCK AND IT WAS A RESULT OF THE ROTT

2  ARTICLE?

3  **A.**   YES.

4  **Q.**   IS THAT CORRECT?  CAN WE AGREE THAT THE ULTIMATE

5  CONCLUSION OF YOUR ARTICLE WAS THAT COX-2 INHIBITION IS

6  DELETERIOUS FROM AN ATHEROSCLEROTIC STANDPOINT?

7  **A.**   NO.  I'M SORRY.  I THINK WE WERE VERY CLEAR IN THE ARTICLE

8  THAT WHAT WE SAID WAS THESE STUDIES, IN A PARTICULAR MOUSE

9  MODEL OF ATHEROSCLEROSIS, INDICATES THAT INHIBITION OF COX-2

10  WITH MF-TRICYCLIC LEADS TO DELETERIOUS EFFECTS IN TERMS OF

11  ACCUMULATION OF ATHEROSCLEROSIS.  WE DID POINT OUT THAT WHETHER

12  OR NOT THIS RELATES TO ATHEROGENESIS IN PATIENTS HAS TO BE

13  DEMONSTRATED BY HUMAN STUDIES.

14  **Q.**   LET ME ASK YOU A COUPLE OF QUESTIONS ABOUT THAT.  WHEN YOU

15  SAY "ACCUMULATION," DOCTOR, ARE YOU TALKING ABOUT PROGRESSION

16  OF ATHEROSCLEROTIC PLAQUE?

17  **A.**   CORRECT.

18  **Q.**   AS FAR AS ATHEROGENESIS, ARE YOU SAYING THAT YOUR ARTICLE

19  OR YOUR STUDY WOULD SEEM TO INDICATE THAT COX-2 INHIBITION IS

20  ATHEROGENETIC, BUT THAT YOUR STUDY NEEDS TO BE FOLLOWED UP WITH

21  ACTUAL HUMAN CLINICAL TRIALS?

22  **A.**   CORRECT.

23  **Q.**   DOCTOR, WHEN DID YOU CONDUCT YOUR STUDY WITH DR. ROTT OR

24  MERCK?

25  **A.**   WE GOT APPROVAL FROM MERCK FOR FUNDING, AND THE MOST

1    CRITICAL COMPONENT WAS RECEIVING THE DRUG IN CHOW THAT WAS FED

2    TO MICE.  I BELIEVE WE STARTED THE STUDY SOMETIME IN JUNE OF

3    2000.

4    Q.   WHO WAS YOUR PRIMARY CONTACT AT MERCK IN REFERENCE TO YOUR

5    STUDY, DOCTOR?

6    A.   DR. RODGER, R-O-D-G-E-R.

7    Q.   IS HE IN CHARGE OF THE CONDUCTION OF STUDIES AT MERCK?

8    A.   HIS TITLE IS MEDICAL DIRECTOR AT MERCK.

9    Q.   DID DR. RODGER INDICATE TO YOU THAT THERE WAS A HYPOTHESIS

10   THAT HAD BEEN PROVIDED TO MERCK BY THEIR SCIENTIFIC ADVISORS

11   THAT PROSTACYCLIN BIOSYNTHESIS IN THE VASCULATURE IS INHIBITED

12   BY VIOXX AND THAT, BY REMOVING THIS POTENT INHIBITOR OF

13   PLATELET AGGREGATION, THE PROBABILITY THAT A CORONARY PLAQUE

14   RUPTURE WOULD LEAD TO MYOCARDIAL INFARCTION OR ISCHEMIC

15   VENTRICULAR FIBRILLATION IS ENHANCED?

16   A.   ONCE AGAIN, ANYONE KNOWLEDGEABLE IN THE FIELD WOULD KNOW

17   THAT.  SO I DID KNOW THAT THAT WAS ONE POSSIBILITY.

18   Q.   WAS THAT WELL KNOWN IN THE MEDICAL COMMUNITY EVEN BEFORE

19   YOU CONDUCTED YOUR STUDY, DOCTOR, THAT IF YOU DECREASED

20   PROSTACYCLIN IN THE BODY THAT YOU INCREASED THE PROBABILITY OF

21   A CORONARY PLAQUE RUPTURE?

22   A.   NO, I DON'T THINK THAT THAT WAS WELL KNOWN IN THE

23   COMMUNITY.  THAT WAS STILL, AT THAT TIME, A POSSIBLE OUTCOME OF

24   SUCH A DRUG.  THERE WAS NO EVIDENCE AT THAT TIME THAT THAT

25   ACTUALLY WAS SOMETHING THAT WOULD OCCUR.

1    **Q.**   LET ME SHOW YOU WHAT I'M GOING TO MARK AS EXHIBIT 3 TO

2    YOUR DEPOSITION, AND I HAVE A COPY FOR YOUR ATTORNEY THERE.

3    DOCTOR, TO MOVE THIS ALONG AND INSTEAD OF READING THROUGH ALL

4    OF THIS E-MAIL, I'LL POINT YOU TO WHERE I'M GOING TO ASK

5    QUESTIONS ABOUT.  IT WILL BE TOWARDS THE BOTTOM OF THE E-MAIL

6    STRING.

7             IT'S THE SECOND PARAGRAPH BEGINNING "I'M SURE" AND

8    I'LL READ IT TO YOU.  "I'M SURE STEVE IS AN UNKNOWN IN THE A&A

9    ARENA, BUT HE IS AN INTERNATIONALLY RECOGNIZED THOUGHT LEADER

10   IN THE CARDIOVASCULAR ARENA."  DOCTOR, I'LL REPRESENT TO YOU

11   THAT THIS IS AN INTERNAL MERCK E-MAIL THAT'S BEEN PRODUCED TO

12   US IN DISCOVERY.  I WOULD LIKE TO POINT OUT TO YOU THE

13   PARAGRAPH I WAS JUST REFERENCING, THE SECOND FROM THE BOTTOM,

14   BEGINNING "I'M SURE."  DO YOU NEED ME TO READ THAT AGAIN,

15   DOCTOR?

16   **A.**   NO, THAT'S OKAY.

17   **Q.**   WITH ALL DUE HUMILITY, DO YOU AGREE THAT YOU ARE AN

18   INTERNATIONALLY RECOGNIZED THOUGHT LEADER IN THE CARDIOVASCULAR

19   ARENA?

20   **A.**   IT'S VERY HARD TO OBJECT TO THAT.

21   **Q.**   WOULD YOU ALSO AGREE, DOCTOR, THAT YOUR CURRENT INTEREST

22   IS IN THE AREA OF INFECTION AND INFLAMMATION IN

23   ATHEROSCLEROSIS, AT LEAST AT THE TIME OF 2000?

24   **A.**   YES.

25   **Q.**   I'M MOVING ON TO YOUR STUDY WITH DR. ROTT, DOCTOR.  YES,

1    THIS WOULD BE EXHIBIT 4 FOR THE RECORD.  DOCTOR, I PROBABLY

2    HAVE MISSPOKEN AND I SAID THAT IS "YOUR STUDY" THROUGHOUT THIS

3    DEPOSITION, BUT THERE ARE OTHER DOCTORS THAT WERE INVOLVED WITH

4    YOU IN THE CONDUCTION OF THIS STUDY; IS THAT CORRECT?

5    **A.**   CORRECT.

6    **Q.**   IS IT FAIR TO SAY, DOCTOR, THAT THESE DOCTORS OR

7    PARTICIPANTS IN THE OVERALL STUDY ARE WELL-RESPECTED IN THEIR

8    VARIOUS FIELDS?

9    **A.**   I MEAN, THERE ARE SEVERAL VERY JUNIOR PHYSICIANS, SO I

10   DON'T THINK THAT WOULD APPLY TO THEM.  BUT IN TERMS OF DR. ZHU

11   AND DR. MARY SUSAN BURNETT, THAT CERTAINLY APPLIES TO THEM.

12   **Q.**   WOULD IT ALSO BE FAIR TO SAY, DOCTOR, THAT THE RESULTS OF

13   THIS STUDY WERE A JOINT EFFORT AND IT WAS NOT JUST

14   DR. EPSTEIN'S STUDY?

15   **A.**   THAT'S CORRECT.

16   **Q.**   DOCTOR, WERE MERCK DOCTORS OR SCIENTISTS ACTUALLY INVOLVED

17   IN THE DESIGN OF THIS STUDY?

18   **A.**   NO.

19   **Q.**   I NOTE DOWN AT THE BOTTOM LEFT-HAND CORNER, DOCTOR, IT

20   SAYS THAT, "THIS WORK WAS SUPPORTED IN PART BY A GRANT FROM

21   MERCK PHARMACEUTICALS"; IS THAT CORRECT?

22   **A.**   CORRECT.

23   **Q.**   IN LAYMEN'S TERMS, IS IT TRUE, THEN, THAT MERCK PROVIDED

24   FUNDING SO THAT THIS STUDY COULD BE CONDUCTED?

25   **A.**   CORRECT.

1    **Q.**   IS IT ALSO TRUE THAT MERCK ACTUALLY PROVIDED THE COX-2

2    INHIBITOR THAT WAS USED IN THIS STUDY?

3    **A.**   CORRECT.

4    **Q.**   IS THAT MF-TRICYCLIC?

5    **A.**   RIGHT.

6    **Q.**   IS MF-TRICYCLIC AN ANALOG OF VIOXX?

7    **A.**   YES.

8    **Q.**   WHEN YOU USE THE WORD "ANALOG," WHAT DOES THAT MEAN?

9    **A.**   IT MEANS THAT IT HAS -- IT SHARES MOST OR MANY OF THE

10   MOLECULAR STRUCTURE OF THE PARENT COMPOUND.  USUALLY THE

11   IMPLICATION IS THAT, BECAUSE IT SHARES SO MUCH OF THE

12   STRUCTURE, IT HAS SIMILAR BIOLOGIC ACTIVITY.

13   **Q.**   LET ME SHOW YOU WHAT I'VE MARKED AS EXHIBIT 5 TO YOUR

14   DEPOSITION.  I REPRESENT TO YOU THIS IS AN INTERNAL E-MAIL.  IF

15   YOU'LL GO TO THE THIRD PAGE, IT BEGINS, "IRWIN, THERE'S NO REAL

16   SYNOPSIS OF DATA ON MF-TRICYCLIC.  ITS PROPERTIES ARE VERY

17   SIMILAR TO VIOXX.  THE DOSING, POTENCY, AND BIOAVAILABILITY AND

18   HALF-LIVES ARE ALL VERY CLOSE TO THOSE OF VIOXX."  IS ALL OF

19   THAT TRUE, TO YOUR UNDERSTANDING, IN REFERENCE TO MF-TRICYCLIC,

20   DOCTOR?

21   **A.**   MY ONLY UNDERSTANDING OF MF-TRICYCLIC IS WHAT DR. RODGER

22   TOLD ME.  ESSENTIALLY, HE TOLD ME WHAT WAS CONTAINED IN THAT

23   PARAGRAPH YOU READ.

24   **Q.**   I SHOW YOU WHAT I HAVE MARKED AS EXHIBIT 6 TO YOUR

25   DEPOSITION.  ARE YOU FAMILIAR WITH THIS DOCUMENT --

1  A.   YES.

2  Q.   -- DOCTOR?  DOES THIS APPEAR TO BE THE E-MAIL THAT YOU

3  JUST MADE REFERENCE TO?

4  A.   YES.

5  Q.   DR. RODGER NOTES, "THE COMMITTEE ALSO DECIDED THAT WE

6  WOULD SUPPLY YOU WITH MF-TRICYCLIC, A VERY CLOSE ANALOG TO

7  ROFECOXIB, WITH AN ALMOST IDENTICAL PHARMACOLOGICAL PROFILE

8  INSTEAD OF ROFECOXIB."  ROFECOXIB, IS THAT VIOXX, DOCTOR?

9  A.   YES.

10  Q.   WHERE IT SAYS IT'S "A VERY CLOSE ANALOG OF VIOXX...WITH AN

11  ALMOST IDENTICAL PHARMACOLOGICAL PROFILE," WHAT DOES THAT MEAN

12  IN LAYMEN'S TERMS?

13  A.   WHAT THAT MEANT TO ME AND I'M SURE WHAT THAT MEANT TO

14  DR. RODGER, THAT IT IS A HIGHLY SPECIFIC INHIBITOR OF COX-2.

15  Q.   DOES IT ALSO MEAN THAT MF-TRICYCLIC IS A SIMILAR COMPOUND

16  TO VIOXX?

17  A.   IT HAS SIMILAR BIOLOGIC ACTIONS, YES.

18  Q.   AGAIN, IN LAYMEN'S TERMS, DOES "SIMILAR BIOLOGIC ACTIONS"

19  MEAN THAT VIOXX AND MF-TRICYCLIC ACT THE SAME IN THE HUMAN BODY

20  OR SIMILAR?

21  A.   WELL, YOU KNOW, MF-TRICYCLIC, TO MY KNOWLEDGE HAS NEVER

22  BEEN GIVEN TO HUMANS, SO I DON'T THINK YOU COULD ASSUME THAT.

23  BUT IN TESTS THAT MERCK HAS DONE IN A TEST TUBE AND IN ANIMALS,

24  THEY SEEM TO HAVE IDENTICAL ACTIONS.

25  Q.   DOCTOR, CAN YOU, IN LAYMEN'S TERMS, EXPLAIN TO THE JURY

1    THE METHODOLOGY THAT YOU UTILIZED IN CONDUCTING YOUR STUDY WITH

2    DR. ROTT AND THE ULTIMATE CONCLUSIONS THAT YOU AND YOUR FELLOW

3    AUTHORS REACHED.

4    **A.**    THERE WERE TWO MAJOR COMPONENTS TO THE STUDY.  WE HAD DONE

5    WORK OVER THE PAST 10 YEARS SUGGESTING THAT CERTAIN VIRUSES AND

6    BACTERIA, WHEN THEY PRODUCE AN INFECTION IN PATIENTS, CAN

7    CONTRIBUTE TO THE DEVELOPMENT OF ATHEROSCLEROSIS.  JUST THE

8    BACKGROUND ON THAT IS THAT MANY OF THESE INFECTIOUS AGENTS --

9    AND I'LL JUST MENTION CYTOMEGALOVIRUS, OR CMV, IN ORDER TO

10   INFECT CELLS AND TO REPLICATE, THEY RELY ON THE COX-2 SYSTEM.

11            ONE OF THE COMPONENTS OF THE COX-2 SYSTEM, THAT IS,

12   WHEN THE ENZYMES ARE ACTIVE, ONE OF THE PRODUCTS OF COX-2

13   ACTIVATION IS THE PRODUCTION OF WHAT'S CALLED REACTIVE OXYGEN

14   SPECIES.  SO THESE ARE OXYGEN MOLECULES THAT ARE ACTIVATED.

15   NOT ONLY DOES THE CELL THAT'S BEEN INFECTED USE THESE MOLECULES

16   TO TURN ON A PROTECTIVE RESPONSE AGAINST THE VIRUS, BUT THE

17   VIRUS USES CELLS' PROTECTIVE MACHINERY TO ENHANCE ITS OWN

18   REPLICATION.

19            WE HAD DONE STUDIES IN THE PAST SIX OR SEVEN YEARS

20   DEMONSTRATING THAT IF YOU INHIBIT COX-2, YOU INHIBIT VIRAL

21   REPLICATION.  AND WE WERE ABLE TO DO THAT WITH AGENTS THAT

22   INHIBITED BOTH THE COX-1 AND COX-2, LIKE ASPIRIN AND

23   INDOMETHACIN.  WE ALSO, INTERESTINGLY, USED A SPECIFIC COX-2

24   INHIBITOR, NS-398 THAT ALSO INHIBITED THE FORMATION OF REACTIVE

25   OXYGEN SPECIES AND VIRAL ACTIVITY AT A MUCH LOWER CONCENTRATION

1    THAN THE ASPIRIN AND INDOMETHACIN.

2             SO WE FORMULATED THE HYPOTHESIS THAT IF YOU

3    ADMINISTERED TO PATIENTS A DRUG THAT INHIBITED THE COX-2

4    SYSTEM, IT MAY COMPROMISE THE ABILITY OF THE VIRUS TO REPLICATE

5    AND INFECT THE AGENT.  SO THAT WAS THE FIRST BASIS FOR APPLYING

6    TO MERCK FOR USE OF VIOXX TO TEST WHETHER VIOXX HAD HERETOFORE

7    UNKNOWN ACTION; AND, THAT IS, MAYBE IT'S A VERY POTENT

8    ANTIVIRAL DRUG, WHICH WAS VERY EXCITING TO US.  THE SECOND

9    COMPONENT OF THAT RESEARCH --

10   **Q.**   DOCTOR, MAY I STOP YOU RIGHT THERE --

11   **A.**   SURE.  SORRY.

12   **Q.**   -- JUST TO SEE IF I CAN NUTSHELL THAT?  IS IT ACCURATE TO

13   SAY THAT YOUR STUDY ESSENTIALLY HAD TWO COMPONENTS AND THE

14   FIRST ONE, WHICH WE JUST DISCUSSED, WAS TO DETERMINE WHETHER OR

15   NOT COX-2 INHIBITION COULD HAVE ANTIVIRAL EFFECTS THAT COULD

16   LEAD TO THE EITHER ELIMINATION OR DIMINUTION OF THE PROGRESSION

17   OF ATHEROSCLEROSIS?

18   **A.**   BY DECREASING THE ABILITY OF THE VIRUS TO INFECT THE

19   MOUSE, THAT IT WOULD COMPROMISE -- THAT IT WOULD INHIBIT THE

20   CONTRIBUTION OF THE VIRUS TO THE DEVELOPMENT OF

21   ATHEROSCLEROSIS, YES.

22   **Q.**   THANK YOU.  IS THERE A SECOND COMPONENT OF YOUR STUDY, AS

23   WELL?

24   **A.**   YES.  BECAUSE ATHEROSCLEROSIS IS AN INFLAMMATORY DISEASE,

25   WHICH IS ONE OF THE MECHANISMS THAT THE VIRUS MAKES

1    ATHEROSCLEROSIS WORSE, WE THOUGHT THAT A COX-2 INHIBITOR, WHICH

2    WOULD IMPAIR IMPORTANT INFLAMMATORY PATHWAYS, THAT THE COX-2

3    INHIBITOR WOULD DECREASE THE DEVELOPMENT OF ATHEROSCLEROSIS.

4    Q.   IF WE COULD, DOCTOR, COULD I TAKE THE ULTIMATE FINDINGS OF

5    YOUR STUDY IN REVERSE ORDER IN WHICH WE JUST DISCUSSED THEM.

6    LET ME MAKE SURE THAT I UNDERSTAND THE SECOND ASPECT OF THE

7    STUDY.  IS IT TRUE THAT YOU WERE LOOKING TO SEE THAT BECAUSE

8    ATHEROSCLEROSIS HAS AN INFLAMMATORY MECHANISM THAT IF YOU WERE

9    TO UTILIZE A COX-2 INHIBITOR TO DECREASE THAT INFLAMMATION,

10   PERHAPS YOU COULD DO AWAY WITH ATHEROSCLEROSIS FORMATION OR

11   PROGRESSION?

12   A.   CORRECT.

13   Q.   WHAT DID YOUR STUDY ULTIMATELY REVEAL IN REFERENCE TO THAT

14   HYPOTHESIS?

15   A.   WELL, WE WERE SURPRISED TO FIND THAT IT HAD THE OPPOSITE

16   EFFECT.  IT MADE ATHEROSCLEROSIS WORSE.

17   Q.   LET ME MAKE SURE I UNDERSTAND, DOCTOR.  ARE YOU SAYING,

18   THEN, THAT THE USE OF A COX-2 INHIBITOR WILL ACTUALLY INCREASE

19   ATHEROSCLEROTIC DEVELOPMENT OR PROGRESSION?

20   A.   IN THIS PARTICULAR MODEL, USING THE CONDITIONS THAT WE

21   USED, IT CLEARLY MADE ATHEROSCLEROSIS WORSE.

22   Q.   THE WAY I'VE BROKEN IT DOWN, DOCTOR, AT LEAST IN MY

23   HEAD -- AND I THINK THAT YOU'RE BREAKING IT DOWN THE SAME WAY

24   IN TALKING TO ME NOW -- IS THAT YOU HAD TWO ESSENTIAL FINDINGS:

25   THAT COX-2 INHIBITION COULD INCREASE PROGRESSION OF

1    ATHEROSCLEROSIS IN THIS PARTICULAR STUDY; AND, ALSO, THAT COX-2

2    INHIBITION COULD BE ATHEROGENIC IN THIS PARTICULAR STUDY.  IS

3    THAT FAIR?

4    **A.**   I THINK THEY'RE ONE AND THE SAME.

5    **Q.**   OKAY.  DOCTOR, IF YOU HAVE YOUR STUDY IN FRONT OF YOU -- I

6    BELIEVE IT'S EXHIBIT 4 TO YOUR DEPOSITION -- AND IF YOU WOULD

7    TURN TO WHAT IS MARKED PAGE 1815 AT THE TOP RIGHT-HAND CORNER.

8    IT'S THE PAGE BEFORE THE PHOTOMICROGRAPH.  ARE YOU WITH ME,

9    DOCTOR?

10   **A.**   YES.

11   **Q.**   DOWN AT THE BOTTOM, IT REFERENCES FIGURE 3.  DO YOU SEE

12   THAT, AS WELL?

13   **A.**   YES.

14   **Q.**   IT MENTIONS "ATHEROSCLEROTIC LESION AREA."  WHAT DOES THAT

15   TERMINOLOGY INDICATE?

16   **A.**   SO IN ORDER TO DO THE ANALYSIS OF THIS MODEL, WHAT WE DO

17   IS WE CUT THE AORTA INTO STRIPS.  SO IF YOU'RE THINKING OF A

18   TUBE, WE USE A KNIFE TO CUT THROUGH CROSS-SECTIONS OF THE TUBE.

19   SO WE HAVE LIKE LITTLE TIRES, ESSENTIALLY, AND WE LOOK AT THOSE

20   UNDERNEATH THE MICROSCOPE.  AS IS EVIDENT ON FIGURE 4 OF OUR

21   PAPER, WE'RE LOOKING AT A CROSS-SECTION OF THAT VESSEL AND WE

22   ARE ABLE TO SEE THE ATHEROSCLEROSIS.  USING APPROPRIATE STAINS,

23   WE COULD SEE THE ATHEROSCLEROSIS.  WE MEASURED THE AREA OF

24   ATHEROSCLEROSIS IN ANIMALS THAT WERE TREATED WITH A COX-2

25   INHIBITOR AND IN ANIMALS THAT WERE NOT.

1  **Q.**   DOCTOR, WHILE YOU'RE HOLDING THAT UP, PERHAPS YOU COULD

2  EXPLAIN ON THE PREVIOUS PAGE -- AND IF YOU'LL HOLD THOSE

3  PHOTOMICROGRAPHS UP -- YOU INDICATE IN YOUR STUDY THAT

4  SELECTIVE CYCLOOXYGENASE-2 INHIBITION CONSISTENTLY INCREASED

5  LESION SIZE BY 84 PERCENT IN THE NONINFECTED GROUP AND BY 70

6  AND BY 80 PERCENT IN THE CMV-INFECTED LOW-DOSE AND HIGH-DOSE

7  GROUPS, RESPECTIVELY.

8  **A.**   CORRECT.

9  **Q.**   USING THOSE TWO PICTURES THERE, CAN YOU DESCRIBE IN

10  LAYMEN'S TERMS WHAT YOU'RE DISCUSSING.

11  **A.**   WELL, THIS BLACK AREA THAT YOU SEE HERE IS

12  ATHEROSCLEROSIS.  JUST AS BACKGROUND, WE SACRIFICED THESE

13  ANIMALS THREE WEEKS AFTER WE STARTED EITHER INFECTION,

14  TREATMENT, OR BOTH.  SO THIS IS VERY, VERY EARLY

15  ATHEROSCLEROSIS.  WE INTENTIONALLY SELECTED THAT EARLY TIME

16  POINT BECAUSE WE WERE INTERESTED IN THE EARLY DEVELOPMENT OF

17  ATHEROSCLEROSIS.

18         YOU CAN SEE THERE'S JUST A TINY LITTLE BIT OF

19  ATHEROSCLEROSIS IN THE UNTREATED ANIMAL; WHEREAS, IN THE ANIMAL

20  TREATED WITH A SELECTIVE COX-2 INHIBITOR, MF-TRICYCLIC, THERE

21  IS MORE.  WE STUDIED 11 TO 12 ANIMALS IN EACH GROUP AND CAME UP

22  WITH THE GRAPH THAT YOU PREVIOUSLY REFERRED TO.

23  **Q.**   DOCTOR, IF YOU WILL, COULD YOU GO TO PAGE 1817 OF YOUR

24  STUDY.  DOWN AT THE BOTTOM RIGHT-HAND COLUMN YOU'LL SEE IN THAT

25  LAST PARAGRAPH IT BEGINS "THE MECHANISMS RESPONSIBLE."

1    **A.**    UH-HUH.

2    **Q.**    THANK YOU, DOCTOR.  I WANTED YOU TO READ THOSE SO I

3    WOULDN'T HAVE TO SAY SOME OF THOSE WORDS, AT LEAST HEAR YOU

4    READ THEM.  I WOULD LIKE TO BREAK IT DOWN, THOUGH, DOCTOR, IF

5    WE COULD.  IN THE FIRST ONE IT SAYS, "THE DELETERIOUS EFFECTS

6    OF SELECTIVE COX-2 INHIBITORS ON THE COURSE OF ATHEROSCLEROSIS

7    COULD INVOLVE THREE SEPARATE PROCESSES:  ONE, A PROPER

8    INFLAMMATORY EFFECT THAT ACCELERATES THE INITIATION AND CHRONIC

9    PROGRESSION OF THE ATHEROGENESIS PROCESS AND THAT MAY INDUCE

10   PLAQUE INSTABILITY AND RUPTURE." IN LAYMEN'S TERMS, WHAT DOES

11   THAT MEAN, DOCTOR?

12   **A.**    IT'S VERY HARD TO GIVE YOU THAT IN LAYMEN'S TERMS, BUT LET

13   ME TRY.  SO THIS PRO-INFLAMMATORY -- THE UNDERSTANDING OF MOST

14   OF THE MEDICAL COMMUNITY IS THAT COX-2 INHIBITORS -- THAT COX-2

15   EXERTS PRO-INFLAMMATORY EFFECTS, AND THAT IF YOU INHIBIT IT

16   IT'S ANTI-INFLAMMATORY.  IF YOU'RE THINKING OF A PROCESS LIKE

17   ATHEROSCLEROSIS, WHICH IS AN INFLAMMATORY DISEASE, BY

18   INHIBITING INFLAMMATION A COX-2 INHIBITOR WOULD PRODUCE A

19   BENEFICIAL EFFECT ON ATHEROSCLEROSIS.

20          HOWEVER, THERE IS A BODY OF LITERATURE IN RODENTS --

21   AND THIS HAS NEVER BEEN SHOWN IN PATIENTS.  BUT AS I INDICATED

22   EARLIER, ONE CAN DEVELOP MECHANISTIC INSIGHTS IN ANIMALS THAT

23   MAY VERY WELL APPLY TO PATIENTS, BUT WE DON'T KNOW FOR SURE

24   WHETHER THEY ALWAYS DO.  THESE STUDIES HAVE DEMONSTRATED THAT

25   THE PRO-INFLAMMATORY EFFECT OF THE PRODUCTS OF COX-2 IS TIME

1  AND CONTENT DEPENDENT.

2          SO THAT IN THE CONTEXT IF YOU HAVE A TISSUE THAT HAS

3  BEEN RECENTLY INJURED AND NOW THERE'S AN INFLAMMATORY EFFECT IN

4  THESE SPECIFIC ANIMAL MODELS WHICH HAVE NOT BEEN SHOWN TO EXIST

5  IN PATIENTS, COX-2 EXERTS PRO-INFLAMMATORY EFFECTS.  THIS IS

6  THE WAY, NATURE'S WAY, OF TRYING TO HEAL AN INJURY BY PRODUCING

7  INFLAMMATORY CELLS.

8          LATER ON, WITHIN A WEEK OR 10 DAYS AFTER THIS ACTIVE

9  PROCESS IN RESPONSE TO THE ACUTE INJURY, THE CONTEXT OF THAT

10  LESION OF THE INJURED TISSUE CHANGES, AND NOW COX-2 IS

11  EXPRESSED IN A SECOND PEAK.  INSTEAD OF BEING PRO-INFLAMMATORY,

12  IT BECOMES ANTI-INFLAMMATORY.  SO NOW THE PROSTANOIDS THAT ARE

13  PRODUCED BY COX-2 -- INITIALLY, THE MAJOR PROSTANOID PRODUCED

14  BY COX-2 WAS PGE2, AND PGE2 INDUCES AN INFLAMMATORY PROCESS.

15  LATER ON DURING THE PROCESS, PGE2 IS SHUT OFF AND THE SAME

16  ACTIVATION OF COX-2 NOW PRODUCES OTHER PROSTANOIDS, PGD2, PGJ2,

17  WHICH ARE ANTI-INFLAMMATORY.

18          SO ACCORDING TO MECHANISMS THAT HAVE BEEN DEVELOPED

19  IN THESE RODENT MODELS OF TISSUE INJURY, COX-2 IS A HIGHLY

20  COMPLEX MOLECULE.  THE EFFECTS OF ITS ACTIVATION WILL DIFFER

21  DEPENDING ON TIME AND CONTENT.  SO WE RAISED THE POSSIBILITY,

22  SINCE THE RESULTS THAT WE FOUND WERE AT TOTAL VARIANCE FROM

23  WHAT OUR ORIGINAL HYPOTHESIS WAS, WE TRIED TO EXPLAIN WHAT THE

24  POSSIBLE MECHANISMS MIGHT BE TO SEE JUST THE OPPOSITE OF WHAT

25  WE HAD HYPOTHESIZED.

1    **Q.**   LET'S MOVE ON TO THE SECOND PORTION.  NUMBER 2 ON

2    PAGE 1818, "A PROPER COAGULANT EFFECT INDUCED BY INHIBITION OF

3    COX-2 MEDIATED EXPRESSION OF THE HIGHLY ANTITHROMBOTIC

4    PROSTACYCLIN WITHOUT CONCOMITANT REDUCTION OF THE COX-1

5    MEDIATED EXPRESSION OF THE HIGHLY THROMBOTIC THROMBOXANE A2."

6    AGAIN, IN CONCISE LAYMEN'S TERMS, WHAT EXACTLY DOES THAT REFER

7    TO?

8    **A.**   SO THERE'S COX-1 AND COX-2.  COX-1 PRODUCES THROMBOXANE,

9    WHICH CAUSES PLATELETS TO CLUMP AND WHICH CAN THEN PRODUCE A

10   THROMBUS, WHICH CAN OCCLUDE, WHICH CAN JUST OBSTRUCT THE BLOOD

11   VESSELS SO BLOOD CAN'T GET THROUGH.  PROSTACYCLIN, WHICH IS

12   PRODUCED BY COX-1 COUNTERACTS THAT.  SO INSOFAR AS YOU'VE

13   CHANGED THE BALANCE OF COX-1 AND COX-2, YOU'VE CHANGED THE

14   BALANCE BETWEEN PRO-CLOTTING AND ANTI-CLOTTING IN FAVOR OF

15   PRO-CLOTTING.  THAT WOULD BE ONE ASPECT, THAT IS, PRO-CLOTTING,

16   BUT ALSO -- WELL THAT'S NUMBER THREE.

17   **Q.**   YOU CAN GO AHEAD AND EXPLAIN THAT ONE, YES, SIR.

18   **A.**   SO THE SAME THING FOR PROLIFERATIVE.  PROLIFERATIVE MEANS

19   THAT CELLS START DIVIDING AND MANY MORE CELLS ARE PRESENT AFTER

20   THIS PROLIFERATIVE PROCESS.  THROMBOXANE A2 STIMULATES SMOOTH

21   MUSCLES CELLS, AND SMOOTH MUSCLE CELLS COMPRISE A LARGE

22   COMPONENT OF THE ATHEROSCLEROTIC PLAQUE.  THROMBOXANE A2 LEADS

23   TO SMOOTH MUSCLE CELL PROLIFERATION, WHEREAS, PROSTACYCLIN

24   INHIBITS SMOOTH MUSCLE CELL PROLIFERATION.  SO THAT COULD ALSO

25   BE A MECHANISM BY WHICH INHIBITING COX-2, WHERE YOU'RE

1    INHIBITING PROSTACYCLIN, WHICH INHIBITS SMOOTH MUSCLE CELL
2    PROLIFERATION, THAT COULD BE A MECHANISM WHEREBY WE SAW THE
3    INCREASE IN ATHEROSCLEROSIS.
4    **Q.**   OKAY.  AGAIN, IN A NUTSHELL, ARE YOU AND YOUR COAUTHORS
5    HERE SAYING THAT THERE ARE THREE POSSIBLE MECHANISMS OF ACTION
6    BY WHICH COX-2 INHIBITORS COULD INCREASE THE EXISTENCE OF
7    ATHEROSCLEROSIS?
8    **A.**   YES.  AT LEAST THOSE THREE AND PROBABLY OTHERS THAT WE'RE
9    JUST NOT AWARE OF, RIGHT.
10   **Q.**   HOW DID YOU FIRST EXPRESS TO MERCK OR ANY OF MERCK'S
11   SCIENTISTS OR DOCTORS THE FINDINGS OF YOU AND YOUR COAUTHORS IN
12   YOUR STUDY?
13   **A.**   I SENT AN E-MAIL TO DR. RODGER REPORTING -- THE WAY THE
14   STUDY WAS SET UP WAS THE FIRST ANALYSIS THAT WE DID WAS RELATED
15   TO VIRAL INFECTIVITY, AND THE FIRST ANALYSIS WAS COMPLETED --
16   OH, I GUESS, IT WAS TOWARDS MAY OF 2001.  WE FOUND, MUCH TO OUR
17   SURPRISE, THAT TREATMENT WITH COX-2 LED TO AN INCREASE IN THE
18   AMOUNT OF VIRUSES PRESENT IN THE USUAL PLACE THAT CMV RESIDES
19   AFTER INFECTION, IN THE SALIVARY GLANDS OR IN THE SPLEEN.  SO I
20   SENT AN E-MAIL TO DR. RODGER TELLING HIM ABOUT THAT FINDING.
21   **Q.**   DID DR. RODGER OR ANY OF THE OTHER MERCK SCIENTISTS OFFER
22   ANY INPUT OR CRITIQUES OR CRITICISM OF YOUR STUDY?
23   **A.**   THAT DID NOT OCCUR UNTIL WE SENT HIM AN ABSTRACT.  SO WE
24   DECIDED LATER ON, AS WE CONTINUED OUR ANALYSIS -- AND MAYBE
25   THIS IS JUMPING A LITTLE BIT AHEAD OF YOUR STORY, BUT THE

1   ANALYSIS AND THE SUGGESTIONS OCCURRED AFTER WE SENT DR. RODGER

2   AND HIS COLLEAGUES AN ABSTRACT THAT WE WANTED TO SUBMIT TO THE

3   AMERICAN COLLEGE OF CARDIOLOGY.

4   **Q.**   DID YOU ACTUALLY RECEIVE EDITS OR CRITIQUES OR INPUT FROM

5   MERCK AT THE TIME OR AFTER YOU SUBMITTED THIS ABSTRACT?

6   **A.**   YES, I DID.

7   **Q.**   CAN YOU PROVIDE OR TELL US ABOUT THOSE IN A NUTSHELL

8   FASHION?

9   **A.**   RIGHT.  I MEAN, THE GIST OF IT WAS THAT DR. RODGER WANTED

10  TO MAKE IT -- WANTED US TO MAKE IT CLEAR THAT THIS WAS A MOUSE

11  STUDY AND IT WAS QUESTIONABLE WHETHER THE DATA WERE APPLICABLE

12  TO PATIENTS.  HE DID OBJECT TO OUR HAVING "COX-2 INHIBITOR" IN

13  THE TITLE.

14  **Q.**   DID HE WANT YOU TO INCLUDE THE VERBIAGE "MF-TRICYCLIC" IN

15  THE TITLE?

16  **A.**   WELL, HE WANTED TO HAVE THE SPECIFIC DRUG THAT WE USED IN

17  THE TITLE, WHICH WAS NOT UNREASONABLE.

18  **Q.**   HAD YOUR INITIAL PROPOSAL INDICATED THE TITLE WOULD

19  INCLUDE THE VERBIAGE "A SELECTIVE COX-2 INHIBITOR"?

20  **A.**   YES, YES.

21  **Q.**   WAS THAT VERBIAGE EVENTUALLY SUBSTITUTED WITH THE WORDS

22  "MF-TRICYCLIC"?

23  **A.**   YOU KNOW, I DON'T KNOW WHAT THE ABSTRACT SAID NOW, BUT

24  WHAT I DID IN THE PAPER WAS TO HAVE BOTH.

25  **Q.**   FAIR ENOUGH.

1    A.   SO THE PAPER HAS BOTH "MF-TRICYCLIC," "A SELECTIVE COX-2

2    INHIBITOR."

3    Q.   DOCTOR, BASED ON YOUR EXPERIENCE AND RESEARCH IN THIS

4    AREA, DO YOU FEEL THAT YOUR STUDY AND YOUR COAUTHORS' STUDY WAS

5    SCIENTIFICALLY RELIABLE?

6    A.   YES, I DO.

7    Q.   YOU STAND BEHIND TODAY THE RESULTS OF THAT STUDY; IS THAT

8    ACCURATE?

9    A.   THAT'S ACCURATE.

10   Q.   DID ANYBODY AT MERCK EVER CONVEY TO YOU THAT THEY FELT

11   THAT YOUR STUDY WAS HARMFUL TO VIOXX OR MERCK, IN GENERAL?

12   A.   NO.   THEY, AGAIN, WANTED ME TO MAKE ABSOLUTELY CLEAR IN

13   THE MANUSCRIPT THAT THIS WAS A STUDY DONE IN MICE AND WAS ONLY

14   QUESTIONABLY RELEVANT TO PATIENTS.

15   Q.   DOCTOR, YOU'VE REITERATED THAT SEVERAL TIMES.

16   A.   YES.

17   Q.   WAS THAT SOMETHING THAT WAS --

18   A.   WELL, THAT'S THE ONLY CRITICISM, SCIENTIFIC CRITICISM THAT

19   I RECEIVED FROM DR. RODGER.  I MEAN, DR. RODGER DID MAKE SOME

20   SUGGESTIONS FOR CHANGING THE MANUSCRIPT, MUCH OF WHICH WERE

21   VERY HELPFUL AND LED TO MY, INDEED, CHANGING THEM.  BUT THE

22   ONLY REAL CRITICISM THAT I HAD WAS THAT STATEMENT THAT I'VE

23   REPEATED NOW, AS I HAVE NOTHING ELSE TO SAY.

24   Q.   MOVE ON TO THE NEXT EXHIBIT, DOCTOR, EXHIBIT 9 TO YOUR

25   DEPOSITION.  DOCTOR, I'LL POINT YOU TO THE BOTTOM E-MAIL FROM

```
 1   DR. RODGER DATED JULY 27, 2001, TO THE COXIB MSGP COMMITTEE,
 2   AGAIN REFERENCING EPSTEIN NUMBER 213 ABSTRACT.
 3   A.   UH-HUH.
 4   Q.   DO YOU SEE THAT, DOCTOR?
 5   A.   YES.
 6   Q.   OKAY.  READING FROM THAT, IT SAYS, "I CANNOT SAY THAT I
 7   LIKE THE CONCLUSIONS COX-2 INHIBITORS ARE IMMUNOSUPPRESSIVE AND
 8   ATHEROGENETIC?"  DO YOU SEE THAT, DOCTOR?
 9   A.   YES, I DO SEE THAT.  DID DR. RODGER CONVEY TO YOU THAT HE
10   DID NOT LIKE THE CONCLUSIONS OF YOUR STUDY?  NO, HE DID NOT.  I
11   MEAN, THE IMPLICATION WAS THERE, BUT HE NEVER EXPRESSED THAT.
12   Q.   DOCTOR, WERE YOU INFORMED BY MERCK THAT THEY HAD CONDUCTED
13   OTHER STUDIES IN APOE KNOCKOUT MICE TO DETERMINE THE EFFECT OF
14   COX-2 INHIBITION ON ATHEROGENETICS?
15   A.   YES.
16   Q.   WHO TOLD YOU ABOUT THAT?
17   A.   I BELIEVE -- THAT WAS FROM AN E-MAIL -- THAT WAS IN AN
18   E-MAIL SENT TO ME FROM MERCK.  I DON'T KNOW IF IT WAS
19   DR. RODGER OR DR. CHANG, BUT THEY INDICATED THAT THERE WAS
20   ANOTHER STUDY THAT THEY WERE SUPPORTING.
21   Q.   DID THEY EVER INDICATE TO YOU THAT THAT WAS A STUDY
22   CONDUCTED BY DR. FITZGERALD?
23   A.   THEY DID NOT.
24   Q.   HAVE YOU SEEN A STUDY CONDUCTED BY DR. FITZGERALD WHERE HE
25   EXAMINED THAT ISSUE IN APOE KNOCKOUT MICE?
```

1    A.    YES, SIR.  HE'S PUBLISHED A NUMBER OF STUDIES.  WHICH ONE

2    ARE YOU REFERRING TO?  GO.

3    Q.    JUST THAT GENERAL ISSUE.  I'M SORRY?

4    A.    WELL, HE'S PUBLISHED, TO MY KNOWLEDGE, AT LEAST THREE

5    PAPERS, ONE USING LDL KNOCKOUT MICE AND TWO USING APOE KNOCKOUT

6    MICE.  I'M FAMILIAR WITH THOSE THREE PAPERS.

7    Q.    ARE THEY GENERALLY SUPPORTIVE OF YOUR CONCLUSIONS AND YOUR

8    COAUTHORS' CONCLUSIONS?

9    A.    THE FIRST TWO PAPERS -- ONE WAS PUBLISHED, SAY, IN 2001,

10   2002 -- WERE NOT SUPPORTIVE.  HIS RESULTS, NOT USING MF -- I

11   DON'T BELIEVE HE USED MF-TRICYCLIC, NOR DID HE USE VIOXX, BUT

12   HE USED OTHER COX-2 INHIBITORS -- SHOWED NO EFFECT ON

13   ATHEROSCLEROSIS.  HIS MOST RECENT STUDY, WHICH WAS PUBLISHED IN

14   2005, I'M NOT SURE WHAT -- IT MIGHT HAVE BEEN -- I'M NOT SURE

15   WHAT COX-2 INHIBITOR HE USED, BUT THAT DEMONSTRATED WHAT HE

16   INTERPRETED WAS A DESTABILIZATION OF THESE LESIONS WHEN THE

17   COX-2 INHIBITOR WAS ADMINISTERED CONCOMITANTLY WITH AN

18   INHIBITOR OF THROMBOXANE A2.

19   Q.    ARE YOU AWARE OF OWES STUDIES, TOO, BESIDES THOSE

20   CONDUCTED BY DR. FITZGERALD THAT ARE ENTIRELY SUPPORTIVE OF THE

21   FINDINGS OF YOU AND YOUR COAUTHORS' STUDY?

22   A.    OUR STUDY WAS THE ONLY STUDY IN WHICH AN ISOLATED

23   ADMINISTRATION OF THE COX-2 INHIBITOR SHOWED WORSENING.  I WAS

24   VERY MUCH INTERESTED IN FINDING STUDIES THAT AGREED WITH US,

25   AND I FAILED TO FIND ANY OTHER THAN THIS RECENT FITZGERALD

1   PAPER.

2   **Q.**   THE RECENT FITZGERALD PAPER THAT YOU'RE DISCUSSING IS --

3   DR. EGAN IS THE FIRST LISTED AUTHOR?

4   **A.**   YES.

5   **Q.**   LET ME SHOW YOU WHAT I'VE MARKED AS EXHIBIT 10 TO YOUR

6   DEPOSITION.  FOR THE RECORD, THIS IS A MEMO FROM DR. IAN RODGER

7   DATED JUNE 16, 2000, TO THE MSGP REVIEW COMMITTEE FOR VIOXX.

8   DOCTOR, DO YOU KNOW WHAT THE MSGP REVIEW COMMITTEE IS?

9   **A.**   MEDICAL SCHOOL GRANT PROGRAM, I GUESS.

10  **Q.**   IS THAT THE ACTUAL PROGRAM OR REVIEW COMMITTEE THAT HAD

11  DECISION-MAKING AUTHORITY AS TO WHETHER OR NOT TO FUND YOUR

12  PARTICULAR STUDY?

13  **A.**   I BELIEVE SO, YES.

14  **Q.**   I BELIEVE YOU STATED EARLIER THAT DR. RODGER IS THE

15  EXECUTIVE DIRECTOR OR HEAD OF THAT GROUP; IS THAT CORRECT?

16  **A.**   YES.  HIS TITLE I THINK IS MEDICAL DIRECTOR, SO I DON'T

17  KNOW IF HE SITS AS CHAIRMAN ON THAT.

18  **Q.**   THE SECOND PROPOSAL ON THAT PAGE, "PROPOSAL 270,

19  FITZGERALD/USA"?

20  **A.**   RIGHT.  I SEE IT.

21  **Q.**   IT SAYS, "A BIOCHEMICALLY SELECTIVE DOSE OF ROFECOXIB

22  RETARDS ATHEROGENESIS IN THE DKO MOUSE."

23  **A.**   YES.

24  **Q.**   LET ME JUST ASK YOU A QUICK QUESTION ON THIS.  UNDER

25  ISSUES B, LET ME READ IT.  IT SAYS, "THERE IS A COMMERCIAL

1  MARKETING ANXIETY ABOUT A POSSIBLE DOWNSIDE RISK THAT ENHANCED

2  MORTALITY MAY OCCUR IN THE ROFECOXIB-TREATED ANIMALS FROM

3  CARDIOVASCULAR COMPLICATIONS THAT IS MECHANISM-BASED.  THIS MAY

4  ATTACH TO THE CARDIOVASCULAR EVENTS FROM VIGOR."  DID I READ

5  THAT CORRECTLY?

6  A.   YES.

7  Q.   DID DR. RODGER OR ANY OF THE OTHER MEMBERS OF THE MSGP

8  EVER CONFER TO YOU THAT THEY WERE CONCERNED ABOUT A MECHANISTIC

9  APPROACH FOR CARDIOVASCULAR COMPLICATIONS BEING ASSOCIATED WITH

10 YOUR STUDY?

11 A.   NO.

12 Q.   AGAIN, THIS IS AN INTERNAL MERCK DOCUMENT TO DR.IAN RODGER

13 FROM DR. STEPHEN EPSTEIN IT APPEARS.  DOES THIS DOCUMENT COME

14 FROM YOU, DOCTOR, OR THIS E-MAIL?  EXCUSE ME.

15 A.   LET ME JUST LOOK AT THIS.

16 Q.   SURE.  TAKE YOUR TIME.

17 A.   YES.  THIS CAME FROM ME.

18 Q.   OKAY.  YOU'RE SENDING THIS E-MAIL ON OR ABOUT OCTOBER 12,

19 2001, TO DR. IAN RODGER; IS THAT CORRECT?

20 A.   CORRECT.

21 Q.   SURE.  WHY DON'T YOU READ IT, DOCTOR.  I THINK IT WILL

22 SOUND BETTER.

23 A.   OKAY.  "ATTACHED IS THE PAPER ON THE EFFECTS OF SELECTIVE

24 COX-2 INHIBITION ON SUSCEPTIBILITY TO CMV INFECTION AND TO

25 ATHEROGENESIS.  WE PLAN TO SEND IT TO *CIRCULATION* IN 30 DAYS.

1   I WOULD BE MOST INTERESTED IN YOUR COMMENTS AND SUGGESTIONS.

2   I'M SORRY THAT WE DIDN'T GET THE RESULTS WE THOUGHT WE WOULD,

3   BUT IT'S BETTER TO KNOW ABOUT THIS NOW THAN TO BE BLIND-SIDED

4   IN ONE OR TWO YEARS BY COMPLICATIONS THAT WERE TOTALLY

5   UNEXPECTED.  ON THE OTHER HAND, AS WE TRIED TO EMPHASIZE IN OUR

6   PAPER, OUR RESULTS IN MICE, USING OUR PARTICULAR EXPERIMENTAL

7   CONDITIONS, MAY NOT BE AT ALL RELEVANT TO WHAT HAPPENS

8   CLINICALLY.  I'M, THEREFORE, VERY PLEASED TO HAVE LEARNED THAT

9   MERCK IS PLANNING TO MEET THIS HEAD ON AND IS PLANNING TO

10  CONSIDER SOME DEFINITIVE CLINICAL STUDY.  I WOULD BE HAPPY TO

11  WORK WITH YOU IN ANY WAY THAT WOULD BE HELPFUL TO SUCH A

12  PROJECT.  THANKS FOR YOUR HELP.  STEVE."

13  Q.   THANK YOU, DOCTOR.  NOW, IF I MAY BREAK THIS DOWN, THE

14  FIRST SENTENCE OF THE SECOND PARAGRAPH SAYS, "I'M SORRY THAT WE

15  DIDN'T GET THE RESULTS WE THOUGHT WE WOULD, BUT IT'S BETTER TO

16  KNOW ABOUT THIS NOW THAN TO BE BLIND-SIDED IN ONE OR TWO YEARS

17  BY COMPLICATIONS THAT WERE TOTALLY UNEXPECTED."  WHAT DID YOU

18  MEAN BY THAT, DOCTOR?

19  A.   WELL, OUR INITIAL PROPOSAL TO MERCK HAD THE HYPOTHESES

20  THAT VIOXX WOULD BE PROTECTIVE AGAINST VIRAL INFECTION AND

21  PROTECTIVE AGAINST THE DEVELOPMENT OF ATHEROSCLEROSIS, AND WE

22  FOUND JUST THE OPPOSITE.  YOU KNOW, I WAS -- I'M NOT SURE WHAT

23  I MEANT BY BEING SORRY, BUT, YOU KNOW, THOSE WERE THE RESULTS.

24  MY FEELING WAS THAT THIS, ALTHOUGH AN ANIMAL STUDY IN MICE IN A

25  PARTICULAR MODEL, SHOULD SERVE AS A YELLOW FLAG.  SO THAT BEING

1   AWARE OF THE POTENTIAL FOR SUCH AN ADVERSE EFFECT, ALBEIT IN

2   MICE -- WE DON'T KNOW IF IT APPLIES TO HUMANS.  BUT BEING AWARE

3   OF THAT POTENTIAL, IT WOULD BE IMPORTANT FOR MERCK TO HELP FUND

4   ADDITIONAL STUDIES TO DEFINE THIS IN A MORE DEFINITIVE WAY.

5   **Q.**   IS IT FAIR TO SAY, THEN, DOCTOR, THAT YOU WERE PLEASED

6   THAT THIS POTENTIAL ADVERSE EFFECT OF VIOXX WAS DISCOVERED AT

7   THIS POINT IN TIME AND NOT A YEAR OR TWO DOWN THE ROAD?

8   **A.**   YES.  THAT'S EXACTLY MY THOUGHT.

9   **Q.**   NOW, YOU MENTIONED -- I'M SORRY, LET ME JUST READ INSTEAD

10  OF PARAPHRASING.  THE LAST TWO SENTENCES OF YOUR E-MAIL HERE,

11  IT SAYS, "I'M, THEREFORE, VERY PLEASED TO HAVE LEARNED THAT

12  MERCK IS PLANNING TO MEET THIS HEAD ON AND IS PLANNING TO

13  CONSIDER SOME DEFINITIVE CLINICAL STUDY.  I WOULD BE HAPPY TO

14  WORK WITH YOU IN ANY WAY THAT WOULD BE HELPFUL TO SUCH A

15  PROJECT."  WHAT KIND OF DEFINITIVE CLINICAL STUDY WERE YOU

16  REFERRING TO THERE, DOCTOR?

17  **A.**   WELL, I'VE READ THROUGH THIS MEMO ANY NUMBER OF TIMES IN

18  PREPARATION FOR THIS DEPOSITION AND I TRIED TO RECALL WHAT THAT

19  STATEMENT WAS BASED ON.  I'M QUITE CERTAIN IT WAS BASED ON A

20  TELEPHONE CALL.  I HAD MANY TELEPHONE CALLS WITH DR. RODGER

21  DURING THE COURSE OF THIS, BUT I HAVE NO E-MAIL FROM HIM

22  INDICATING WHAT THIS HEAD-ON STRATEGY WAS.  SO I CAN'T GIVE YOU

23  MORE INFORMATION THAN IS IN THIS MEMO, ONLY TO SAY THAT THERE

24  MUST HAVE BEEN SOME COMMUNICATION WITH DR. RODGER PROBABLY THAT

25  INDICATED THAT MERCK WAS TAKING THIS SERIOUSLY AND THAT THEY

1203

1   WOULD PLAN TO DO SOME DEFINITIVE CLINICAL STUDY.

2   **Q.**   BEFORE WE MOVE ON TO THIS CLINICAL STUDY AND AWAY FROM

3   THIS E-MAIL, DOCTOR, BASED ON YOUR EXPERIENCE IN THIS AREA AND

4   YOUR STUDY AND YOUR YEARS OF RESEARCH IN THIS AREA, WAS MERCK

5   GIVEN A YELLOW FLAG OR A WARNING BACK IN 2001 ABOUT THE

6   POTENTIAL HARMFUL EFFECTS OF VIOXX IN HUMANS?

7   **A.**   YES.

8   **Q.**   DOES THAT HELP REFRESH YOUR RECOLLECTION IN ANY WAY ABOUT

9   WHAT THIS POTENTIAL CLINICAL STUDY IS?

10  **A.**   NO.  I REALLY DON'T RECALL.  THAT WAS -- I DON'T RECALL.

11  **Q.**   DOCTOR, SEE IF THIS DOCUMENT THAT I'VE MARKED

12  EXHIBIT 13 -- I'LL REPRESENT TO YOU THAT THIS IS AN INTERNAL

13  MERCK DOCUMENT.  THE FRONT PAGE IS ENTITLED "CARDIOVASCULAR

14  OUTCOMES STUDY CONSULTANTS MEETING" AND THE DATE IS MONDAY,

15  OCTOBER 29, 2001, AT FOUR SEASONS HOTEL IN PHILADELPHIA.

16  **A.**   MAY I CLARIFY MY PREVIOUS REMARK?

17  **Q.**   YES, SIR.

18  **A.**   WHAT I WAS RESPONDING TO WAS DO I RECALL -- WHICH I

19  THOUGHT YOU WERE ASKING DO I RECALL A SPECIFIC CLINICAL STUDY

20  THAT WAS DISCUSSED AND PROPOSED.  THE ANSWER TO THAT IS NO, I

21  DO NOT.  DO I RECALL THIS MEETING?  THE ANSWER TO THAT IS YES,

22  I DO.

23  **Q.**   WAS THE PURPOSE OF THIS PARTICULAR MEETING, DOCTOR, TO

24  DISCUSS THE DEVELOPMENT AND EXECUTION OF A CARDIOVASCULAR

25  OUTCOMES STUDY INVOLVING VIOXX?

1    **A.**   AS I RECALL -- AND, AGAIN, THIS IS FIVE YEARS AGO -- THE

2    PURPOSE OF THIS MEETING WAS TO DISCUSS THE EVIDENCE THAT

3    EXISTED AT THE TIME AS TO THE POTENTIAL CARDIOVASCULAR SIDE

4    EFFECTS OF VIOXX AND HOW TO DEVELOP MORE INFORMATION AS TO

5    WHETHER THIS WAS, IN FACT, OF IMPORTANCE CLINICALLY.

6    **Q.**   DID YOU ACTUALLY ATTEND THIS MEETING--

7    **A.**   YES.  YES, I DID.

8    **Q.**   -- DOCTOR?  I THINK IF WE LOOK ON PAGE 4 WITH THE BATES

9    NUMBER NJ0267306 AT THE BOTTOM, YOU'LL SEE YOUR NAME LISTED,

10   "STEPHEN E. EPSTEIN, M.D.," AS ONE OF THE CONSULTANTS.

11   **A.**   THAT'S CORRECT.

12   **Q.**   NOW, DOCTOR, DURING THIS MEETING, IS IT ACCURATE TO SAY

13   THAT THERE WAS A CONCERN AMONG MERCK SCIENTISTS, AS WELL AS THE

14   MERCK CONSULTANTS, THAT VIOXX COULD CAUSE ADVERSE

15   CARDIOVASCULAR OUTCOMES?

16   **A.**   THERE WAS CERTAINLY CONCERN.

17   **Q.**   YES, SIR.  IS IT FAIR TO SAY THAT VIOXX'S ASSOCIATION WITH

18   CAUSING HEART ATTACKS AND STROKES AND OTHER ADVERSE

19   CARDIOVASCULAR OUTCOMES WAS AT LEAST A HYPOTHESIS AT THIS TIME?

20   **A.**   YES.

21   **Q.**   DOCTOR, AT THIS MEETING OF THE CONSULTANTS, WAS THE DESIGN

22   OF A CARDIOVASCULAR OUTCOMES STUDY ACTUALLY DISCUSSED?

23   **A.**   I WISH I COULD ANSWER, BUT I REALLY DON'T RECALL.

24   **Q.**   DID YOU EVER PARTICIPATE IN THE DESIGN OR WERE YOU EVER

25   DISCUSSED -- EXCUSE ME, INVOLVED IN DISCUSSIONS AROUND THE

1    VALOR STUDY?

2    **A.**   NO.

3    **Q.**   DID YOU INDICATE TO MERCK THAT YOU THOUGHT A

4    CARDIOVASCULAR OUTCOMES STUDY COULD BE CONDUCTED IN REFERENCE

5    TO VIOXX?

6    **A.**   YES.

7    **Q.**   WERE YOU AN ACTUAL ADVOCATE FOR CONDUCTING A

8    CARDIOVASCULAR OUTCOMES TRIAL IN REFERENCE TO VIOXX?

9    **A.**   YES.

10           **THE COURT:**  WE'LL TAKE A BREAK AT THIS TIME.  LET'S

11    TAKE A 15-MINUTE BREAK.

12           **THE DEPUTY CLERK:**  ALL RISE.

13           (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

14           **THE DEPUTY CLERK:**  EVERYONE RISE.

15           **THE COURT:**  BE SEATED.

16                          **CROSS-EXAMINATION**

17    **BY MR. GOLDMAN:**

18    **Q.**   GOOD MORNING, DOCTOR.  GOOD MORNING.  MY NAME IS ANDY

19    GOLDMAN.  I REPRESENT MERCK.  HAVE WE MET BEFORE TODAY?

20    **A.**   NOT TO MY RECALL.

21    **Q.**   DR. EPSTEIN, DO YOU KNOW ANYBODY BY THE NAME OF

22    GERALD BARNETT, A PLAINTIFF IN THE <u>VIOXX</u> LITIGATION?

23    **A.**   I DO NOT.

24    **Q.**   HAVE THE PLAINTIFF'S LAWYERS ASKED YOU TO REVIEW

25    MR. BARNETT'S MEDICAL RECORDS?

1   **A.**   THEY HAVE NOT.

2   **Q.**   BY YOUR TESTIMONY HERE TODAY, ARE YOU EXPRESSING AN

3   OPINION ON WHETHER OR NOT MR. BARNETT'S' SEVERE MULTIVESSEL

4   CORONARY ARTERY DISEASE WAS CAUSED BY VIOXX?

5   **A.**   NO.

6   **Q.**   BEFORE THIS DEPOSITION, DR. EPSTEIN, DID YOU DO ANYTHING

7   TO TRY TO DETERMINE WHETHER OR NOT THE RESULTS THAT YOU FOUND

8   IN THE STUDY YOU CONDUCTED WITH ROTT HAD BEEN REPLICATED BY ANY

9   OTHER STUDY?

10  **A.**   RIGHT.  I DID JUST AS I DO WHEN WE'RE WRITING ANY PAPER.

11  WE DO AS COMPLETE A REVIEW OF THE LITERATURE AS POSSIBLE TO SEE

12  WHAT OTHER STUDIES WERE PUBLISHED.

13  **Q.**   WHAT DID YOU FIND?

14  **A.**   WELL, I FOUND THAT THERE WERE A NUMBER OF STUDIES THAT HAD

15  BEEN PUBLISHED FROM 2001 TO 2005 THAT WERE ASKING THE SAME

16  QUESTION THAT WE ASKED AND I FOUND -- WOULD YOU LIKE ME TO GO

17  OVER WHAT THE FINDINGS WERE OF EACH OF THOSE STUDIES?

18  **Q.**   NO, NOT OF EACH OF THE STUDIES, BUT GENERALLY, ID YOU FIND

19  ANY STUDY THAT HAPPENED TO COME UP WITH THE SAME RESULTS THAT

20  YOU DID?

21  **A.**   THERE WAS NO STUDY USING A COX-2 INHIBITOR ALONE THAT CAME

22  UP WITH THE SAME RESULTS THAT WE DID.

23  **Q.**   LET'S TALK BRIEFLY AGAIN ABOUT YOUR EXPERIENCE, DOCTOR.

24  ARE YOU THE CURRENT DIRECTOR OF THE VASCULAR BIOLOGY RESEARCH

25  CENTER AT WASHINGTON HOSPITAL CENTER?

1207

1   **A.**   I'M THE EXECUTIVE DIRECTOR OF THE CARDIOVASCULAR RESEARCH

2   INSTITUTE, WHICH SITS ASTRIDE ALL OF OUR RESEARCH, AND THEN I'M

3   PARTICULARLY THE HEAD OF THE VASCULAR BIOLOGY LABORATORY IN

4   WHICH THIS PARTICULAR STUDY TOOK PLACE.

5   **Q.**   WERE YOU PREVIOUSLY THE CHIEF OF CARDIOLOGY AT THE

6   NATIONAL HEART, BLOOD, AND LUNG INSTITUTE WITH THE NIH?

7   **A.**   YES.

8   **Q.**   HAVE YOU DEVOTED MUCH OF YOUR LIFE, SIR, TO RESEARCHING

9   ISSUES RELATING TO CORONARY HEART DISEASE?

10  **A.**   YES.

11  **Q.**   IS ONE OF THE AREAS YOU'VE RESEARCHED EXTENSIVELY

12  ATHEROSCLEROSIS?

13  **A.**   YES.

14  **Q.**   YOU CONSIDER YOURSELF AN EXPERT IN THE AREA OF

15  ATHEROSCLEROSIS; RIGHT?

16  **A.**   YES.

17  **Q.**   CAN YOU TELL US WHAT ATHEROSCLEROSIS IS, SIR.

18  **A.**   ATHEROSCLEROSIS IS A DISEASE INVOLVING ARTERIES, WHETHER

19  THEY BE SERVING THE CORONARY ARTERIES, THE BRAIN, THE

20  PERIPHERAL -- THE LEGS, WHICH IS CHARACTERIZED BY AN

21  INFLAMMATORY RESPONSE, AN ACCUMULATION OF CHOLESTEROL AND

22  CHOLESTEROL PRODUCTS, AS WELL AS SCAR TISSUE, WHICH OVER THE

23  COURSE OF TIME ENLARGES AND, THEREBY, NARROWS THE BLOOD VESSEL

24  SO THAT BLOOD FLOW ULTIMATELY IS COMPROMISED AND ISCHEMIA

25  OCCURS IN WHATEVER TISSUE IS BEING SUPPLIED BY THAT ARTERY.

1    THESE ATHEROSCLEROTIC LESIONS CAN ALSO RUPTURE, WHICH COULD

2    LEAD TO THE DEVELOPMENT OF AN ACUTE CLOT, WHICH WOULD ACUTELY

3    LEAD TO THE CESSATION OF FLOW, WHICH THEN COULD LEAD TO A HEART

4    ATTACK OR A STROKE.

5    **Q.**   WHEN DOES ATHEROSCLEROSIS START DEVELOPING IN PEOPLE,

6    DR. EPSTEIN?

7    **A.**   WELL, THERE ARE STUDIES SHOWING THAT IT STARTS VERY EARLY,

8    TEENAGE YEARS.  IT CAN.  IT DOESN'T ALWAYS.

9    **Q.**   WHEN HUMAN BEINGS HAVE ATHEROSCLEROSIS, IS IT TRUE THAT

10   PLAQUE WITHIN THE ARTERIES BUILDS UP OVER TIME?

11   **A.**   YES.

12   **Q.**   WHEN THAT HAPPENS, DOES THAT TEND TO NARROW THE BLOOD

13   VESSEL?

14   **A.**   YES.

15   **Q.**   IS IT COMMON IN PEOPLE WHO HAVE HEART ATTACKS FOR THEIR

16   PLAQUE TO RUPTURE?

17   **A.**   YES.  SORRY.

18   **Q.**   IS IT ALSO COMMON WHEN PLAQUE RUPTURES FOR THERE TO BE A

19   CLOT THAT DEVELOPS?

20   **A.**   YES.

21   **Q.**   WHEN THE BODY CLOTS IN RESPONSE TO A PLAQUE RUPTURE, DO

22   YOU CONSIDER THAT TO BE A NATURAL PROGRESSION OR NATURAL PART

23   OF ATHEROSCLEROSIS?

24   **A.**   YES.

25   **Q.**   HAVE YOU SEEN THIS PROCESS THAT WE DESCRIBED JUST NOW AS

1   ATHEROSCLEROSIS EXIST BEFORE VIOXX EVER CAME ON THE MARKET?

2   A.   YES.

3   Q.   HAS IT EXISTED SINCE VIOXX WAS WITHDRAWN FROM THE MARKET?

4   A.   YES.

5   Q.   YOU MENTIONED THAT YOU'VE DONE MUCH RESEARCH SUGGESTING

6   THAT INFECTION MAY PLAY A ROLE IN THE DEVELOPMENT OF

7   ATHEROSCLEROSIS; IS THAT RIGHT?

8   A.   THAT'S RIGHT.

9   Q.   BECAUSE YOU HAD SEEN THAT PHENOMENON, YOU APPROACHED MERCK

10  IN MARCH OR SO OF 2000 TO SEE IF THEY WOULD ASSIST IN FUNDING A

11  STUDY THAT THEN BECAME THE STUDY YOU DID WITH DR. ROTT?

12  A.   WELL, THE BRIDGE IS THAT WE FOUND THAT COX-2 ENHANCED THE

13  ABILITY OF THE VIRUS TO REPLICATE, AND THAT IF WE BLOCKED COX-2

14  IT REDUCED THE ABILITY OF THE VIRUS TO REPLICATE.  THEREFORE,

15  WE FELT THAT VIOXX MIGHT BE AN ANTIVIRAL AGENT, AND THAT'S WHAT

16  LED TO MY APPROACHING MERCK.

17  Q.   SO YOUR THOUGHT WAS THAT IF YOU DID THIS STUDY AND MERCK

18  PROVIDED FUNDING FOR IT THAT YOUR HYPOTHESIS WAS THAT

19  MF-TRICYCLIC, THE DRUG THAT WAS USED, WOULD ACTUALLY REDUCE THE

20  AMOUNT OF VIRUS IN THE BODY?

21  A.   CORRECT.

22  Q.   WHICH COULD HAVE A HELPFUL EFFECT ON ATHEROSCLEROSIS?

23  A.   CORRECT.

24  Q.   DID YOU ALSO HAVE ANOTHER HYPOTHESIS BACK IN 2000 THAT

25  MF-TRICYCLIC COULD ACTUALLY HAVE A DIRECT HELPFUL EFFECT ON

1   ATHEROSCLEROSIS?

2   **A.**    YES.

3   **Q.**    CAN YOU EXPLAIN WHY YOU BELIEVED IN 2000 AND 2001 THAT

4   VIOXX OR MF-TRICYCLIC COULD HAVE A HELPFUL EFFECT ON

5   ATHEROSCLEROSIS?

6   **A.**    COX-2, THE ENZYME, IS AN IMPORTANT MEDIATOR OF

7   INFLAMMATORY MOLECULES, PROSTANOIDS, THAT WHEN ACTIVATED IN

8   BLOOD VESSELS COULD LEAD TO FURTHER INFLAMMATION AND ALSO THE

9   ELABORATION OF MOLECULES THAT COULD LEAD TO PLAQUE INSTABILITY.

10  SO THAT BY INHIBITING COX-2 OUR HYPOTHESIS AND MY THOUGHT AT

11  THE TIME WAS THAT WE WOULD INHIBIT THOSE PRO-ATHEROSCLEROTIC

12  PROCESSES THAT ARE MEDIATED BY INFLAMMATORY MECHANISMS.

13  **Q.**    SO WAS YOUR THOUGHT, DR. EPSTEIN, THAT BECAUSE VIOXX AND

14  OTHER COX-2 INHIBITORS HELPED REDUCE INFLAMMATION IN GENERAL

15  THAT THEY WOULD ALSO HELP TO REDUCE INFLAMMATION AND THEREBY

16  SLOW DOWN THE PROGRESSION OF ATHEROSCLEROSIS?

17  **A.**    THAT'S CORRECT.

18  **Q.**    WOULD YOU TURN WITH ME, SIR, TO EXHIBIT 15 AT PAGE 25.

19  THIS IS A DOCUMENT DATED MARCH 1 OF 2000.  IT'S CALLED

20  "RESEARCH PROPOSAL FROM THE CARDIOVASCULAR RESEARCH INSTITUTE:

21  EFFECTS OF A SPECIFIC COX-2 INHIBITOR ON CYTOMEGALOVIRUS

22  REPLICATION AND ATHEROSCLEROSIS PROGRESSION IN APOE KNOCKOUT

23  MICE."  IS THIS THE PROPOSAL THAT YOU GAVE TO MERCK INITIALLY

24  WHEN YOU WANTED TO DO YOUR STUDY WITH DR. ROTT?

25  **A.**    I THINK THERE WERE SEVERAL ITERATIONS OF THIS.  I BELIEVE

1    THIS IS THE ONE THAT I SENT TO MERCK.

2    **Q.**    THEN IF YOU TURN TO THE SECOND PAGE OF THIS DOCUMENT, CAN

3    YOU READ UNDER "BACKGROUND" WHAT YOU WROTE IN THE FIRST

4    SENTENCE.

5    **A.**    "AS MANY AS 50 PERCENT OF PATIENTS WITH ATHEROSCLEROSIS

6    LACK CURRENTLY IDENTIFIED RISK FACTORS (SUCH AS HYPERTENSION,

7    SMOKING, HYPERCHOLESTEROLEMIA, AND DIABETES), AN OBSERVATION

8    INDICATING THAT ADDITIONAL FACTORS PREDISPOSING TO

9    ATHEROSCLEROSIS ARE AS YET UNDETECTED.  A PARALLEL OBSERVATION

10   IS THAT WHILE INFLAMMATION IS AN ESSENTIAL COMPONENT OF

11   ATHEROGENESIS, THE TRIGGERS THAT INITIATE AND SUSTAIN THE

12   INFLAMMATORY PROCESS HAVE NOT BEEN DEFINITIVELY IDENTIFIED.

13   ONE CANDIDATE TRIGGER OF THE INFLAMMATORY RESPONSE INVOLVED IN

14   ATHEROGENESIS AND, THEREFORE, A CANDIDATE FACTOR THAT

15   CONTRIBUTES TO ATHEROSCLEROSIS IS INFECTION."

16   **Q.**    FOCUSING ON THE FIRST SENTENCE, DR. EPSTEIN, IS IT TRUE

17   THAT ONE OF THE REASONS YOU WERE INTERESTED IN PURSUING

18   RESEARCH ALONG THIS LINE WAS THAT YOU RECOGNIZED THAT THERE ARE

19   ABOUT 50 PERCENT OF PEOPLE WHO HAVE ATHEROSCLEROSIS, BUT WHO DO

20   NOT HAVE ANY OF THE TRADITIONAL RISK FACTORS?

21   **A.**    THAT'S CORRECT.

22   **Q.**    WHAT DO YOU MEAN WHEN YOU SAY "RISK FACTORS"?

23   **A.**    WELL, IT'S LISTED IN THIS.  THE TRADITIONAL RISK FACTORS

24   ARE HYPERTENSION, SMOKING, HIGH CHOLESTEROL, AND DIABETES.

25   **Q.**    HAS IT BEEN KNOWN FOR SOME TIME, SIR, THAT HYPERTENSION,

1    SMOKING, HYPERCHOLESTEROLEMIA, OR HIGH CHOLESTEROL, AND

2    DIABETES ARE RISK FACTORS FOR ATHEROSCLEROSIS AND HEART

3    ATTACKS?

4    **A.**    YES.

5    **Q.**    BUT FOR THOSE PEOPLE WHO DON'T HAVE THOSE PARTICULAR RISK

6    FACTORS, IT WAS YOUR EXPERIENCE THAT THEY OFTEN DEVELOP

7    ATHEROSCLEROSIS, AS WELL, AND UNFORTUNATELY HAVE HEART ATTACKS?

8    **A.**    THAT'S CORRECT.

9    **Q.**    IN OTHER WORDS, YOU DON'T HAVE TO HAVE HIGH CHOLESTEROL,

10   HYPERTENSION, DIABETES, AND SMOKING IN ORDER TO DEVELOP

11   ATHEROSCLEROSIS AND THEN HAVE A HEART ATTACK OR STROKE?

12   **A.**    NO.  BUT THESE RISK FACTORS JUST INCREASE THE LIKELIHOOD

13   THAT YOU WILL, BUT IT DOESN'T -- IF YOU DON'T HAVE THEM, IT

14   DOESN'T MEAN YOU WON'T HAVE THE HEART ATTACK AND STROKE.

15   **Q.**    YOU WERE SEARCHING, AS A SCIENTIST, TO TRY TO DETERMINE

16   MAYBE THERE IS SOMETHING ELSE OUT THERE THAT WE DON'T KNOW

17   ABOUT YET WHERE MAYBE IT'S A VIRUS THAT'S CAUSING

18   ATHEROSCLEROSIS; AND IF COX-2 INHIBITION CAN REDUCE THE AMOUNT

19   OF VIRUS IN THE BODY, WELL, MAYBE THAT MIGHT HELP PREVENT THE

20   PROGRESSION OF ATHEROSCLEROSIS IN THOSE PEOPLE WHO DON'T HAVE

21   RISK FACTORS?

22   **A.**    THAT'S EXACTLY WHAT I THOUGHT.

23   **Q.**    THEN WHAT YOUR ANTICIPATED RESULTS OR YOUR PREDICTION WAS

24   WAS ON PAGE 10, OR 34 AT THE BOTTOM, AND YOU WRITE, UNDER

25   "ANTICIPATED RESULTS," "WE ANTICIPATE A LOWER VIRAL LOAD IN THE

1   VIOXX-TREATED GROUP."

2   **A.**    THAT'S CORRECT.

3   **Q.**    SO IT WAS YOUR HYPOTHESIS THAT GOING INTO THIS STUDY,

4   MF-TRICYCLIC WAS GOING TO REDUCE THE AMOUNT OF VIRUS IN THE

5   MOUSE AND THEN HOPEFULLY REDUCE THE AMOUNT OF ATHEROSCLEROSIS?

6   **A.**    CORRECT.

7   **Q.**    THEN YOU ALSO HAD A THEORY ABOUT MF-TRICYCLIC'S DIRECT

8   EFFECT ON ATHEROSCLEROSIS APART FROM THIS ANTIVIRUS ASPECT;

9   RIGHT?

10  **A.**    YES.

11  **Q.**    IF YOU LOOK ON PAGE 35, UNDER B3, YOU SAY, "TO DETERMINE

12  WHETHER TREATMENT WITH VIOXX WILL INHIBIT INFLAMMATION-INDUCED

13  ATHEROSCLEROSIS PROGRESSION IN ATHEROGENIC MICE IN THE ABSENCE

14  OF INFECTION."  IS THAT ANOTHER WAY OF SAYING THIS IS THE TEST

15  YOU WANTED TO DO TO SEE IF VIOXX, OR IT TURNED OUT TO BE

16  MF-TRICYCLIC, WOULD REDUCE INFLAMMATION IN THE MICE AND,

17  THEREFORE, RETARD OR SLOW DOWN THE PROGRESSION OF

18  ATHEROSCLEROSIS?

19  **A.**    THAT'S CORRECT.

20  **Q.**    YOUR ANTICIPATION IN 35, UNDER "ANTICIPATED RESULTS," WAS

21  WHAT?  CAN YOU READ THAT, PLEASE.

22  **A.**    "WE ANTICIPATE THAT VIOXX TREATMENT WILL REDUCE THE

23  PROGRESSION OF ATHEROSCLEROTIC LESIONS."

24  **Q.**    DO YOU BELIEVE THAT INFLAMMATION PLAYED A CRITICAL ROLE IN

25  ATHEROGENESIS, SIR?

1  **A.**    YES.

2  **Q.**    SO YOUR HOPE WAS THAT, WITH VIOXX OR MF-TRICYCLIC OR COX-2

3  INHIBITION, YOU WOULD BE ABLE TO SHOW IN ANIMALS THAT THE COX-2

4  INHIBITION ACTUALLY SLOWED DOWN THE PROGRESSION OF

5  ATHEROSCLEROSIS?

6  **A.**    CORRECT.

7  **Q.**    THAT WAS YOUR EXPECTATION?

8  **A.**    THAT WAS OUR HYPOTHESIS; RIGHT.

9  **Q.**    WAS IT TRUE BACK IN THE TIME THAT VIOXX WAS ON THE MARKET,

10 LET'S SAY IN THE 2000-2001 TIME FRAME, THAT YOU WERE NOT ALONE

11 IN THINKING THAT COX-2 INHIBITION COULD HELP SLOW DOWN THE

12 PROGRESSION OF ATHEROSCLEROSIS?

13 **A.**    THAT'S CORRECT.

14 **Q.**    CAN YOU TELL ME A LITTLE BIT MORE ABOUT THAT.

15 **A.**    WELL, ANYONE WHO IS KNOWLEDGEABLE ABOUT TWO FACTS:  ONE IS

16 THAT INFLAMMATION IS A CRITICAL COMPONENT OF ATHEROSCLEROSIS,

17 WHICH BY THAT TIME MOST PHYSICIANS INTERESTED IN

18 ATHEROSCLEROSIS; AND, TWO, THAT COX-2 INHIBITORS OR COX-2 WAS

19 AN IMPORTANT MODULATOR OF INFLAMMATION AND, THEREFORE, IF YOU

20 INHIBIT INFLAMMATION, THEN THE TWO WOULD NATURALLY SEEM TO GO

21 TOGETHER.  IF YOU INHIBITED INFLAMMATION BY INHIBITING COX-2,

22 THERE WAS A REASONABLY GOOD CHANCE THAT YOU MIGHT INHIBIT THE

23 ATHEROSCLEROTIC PROCESS.

24 **Q.**    BASED ON YOUR RESEARCH, ALSO, DR. EPSTEIN, ARE YOU AWARE

25 THAT THERE WERE SEVERAL ARTICLES ALL THE WAY THROUGH 2004 WHERE

1    DOCTORS AND SCIENTISTS WERE PREDICTING THAT VIOXX AND OTHER

2    COX-2 INHIBITORS WOULD BE BENEFICIAL FOR THE HEART BY REDUCING

3    ATHEROSCLEROSIS?

4    **A.**   YES.

5    **Q.**   SCIENTISTS LIKE YOURSELF HAD THAT THEORY THAT VIOXX COULD

6    BE BENEFICIAL FOR THE HEART EVEN AFTER DR. FITZGERALD, GARRETT

7    FITZGERALD, PUBLISHED HIS STUDY SHOWING THAT VIOXX REDUCED THE

8    AMOUNT OF PROSTACYCLIN METABOLITE IN THE URINE?

9    **A.**   THAT'S CORRECT.

10   **Q.**   WAS IT ALSO GENERAL KNOWLEDGE, DR. EPSTEIN, THAT JUST

11   BECAUSE YOU HAVE A REDUCTION IN PROSTACYCLIN METABOLITE IN THE

12   URINE DOESN'T MEAN THAT THE REDUCTION OF PROSTACYCLIN IS COMING

13   FROM THE BLOOD VESSEL?

14   **A.**   TRUE.

15   **Q.**   IS IT TRUE, DR. EPSTEIN, THAT A 60 PERCENT REDUCTION IN

16   THE PROSTACYCLIN URINARY METABOLITE DOES NOT NECESSARILY MEAN

17   THAT THERE'S GOING TO BE ANYTHING CLINICALLY SIGNIFICANT ABOUT

18   THAT REDUCTION?

19   **A.**   THE WAY YOU PHRASED THAT, I WOULD AGREE.

20   **Q.**   ARE YOU AWARE OF ANY STUDY, DR. EPSTEIN, SHOWING THAT A

21   60 PERCENT REDUCTION IN PROSTACYCLIN -- LET'S JUST SAY

22   PROSTACYCLIN -- IN THE BLOOD VESSEL ACTUALLY HAS ANY CLINICAL

23   EFFECT ON HUMAN BEINGS?

24   **A.**   I DON'T KNOW OF ANY STUDY THAT HAVE MEASURED SPECIFICALLY

25   THE 60 PERCENT REDUCTION IN PROSTACYCLIN IN A BLOOD VESSEL

1  WALL.

2  **Q.**   CAN YOU TURN WITH ME, PLEASE, SIR, TO PAGE 36 OF YOUR

3  STUDY AND READ WHAT YOU WROTE UNDER "IMPORTANCE OF THE

4  SUGGESTED RESEARCH."  I'M GOING TO ASK YOU TO READ THE WHOLE --

5  **A.**   "IMPORTANCE OF THE SUGGESTED RESEARCH:  CORONARY ARTERY

6  DISEASE RESULTS IN 500,000 DEATHS, 1.25 MILLION MYOCARDIAL

7  INFARCTIONS, AND AN ECONOMIC BURDEN OF $46 BILLION EACH YEAR.

8  CURRENTLY, MORE THAN 10 MILLION AMERICANS HAVE SYMPTOMATIC

9  CORONARY ARTERY DISEASE, AND ASYMPTOMATIC DISEASE IS EVEN MORE

10  COMMON."

11  **Q.**   LET ME STOP YOU THERE.  WHAT DID YOU MEAN WHEN YOU WROTE

12  THAT THERE ARE CURRENTLY -- AND THIS WAS BACK IN 2000 -- MORE

13  THAN 10 MILLION AMERICANS WITH SYMPTOMATIC CORONARY ARTERY

14  DISEASE AND THEN YOU SAY THAT THERE ARE EVEN MORE AMERICANS

15  THAT HAVE ASYMPTOMATIC DISEASE?  CAN YOU TRANSLATE THAT TO A

16  NONCARDIOLOGIST LIKE MYSELF?

17  **A.**   WELL, IF YOU TAKE PATIENTS WHO HAVE HAD A HEART ATTACK OR

18  WHO HAVE ONE OF THE MOST COMMON SYMPTOMS OF CORONARY ARTERY

19  DISEASE, AND THAT IS THE ANGINA PECTORIS, THEY REPRESENT ABOUT

20  10 MILLION PEOPLE IN THE UNITED STATES.  HOWEVER, THERE ARE

21  MANY MORE INDIVIDUALS -- AND THE EXACT NUMBER IS VERY DIFFICULT

22  TO GET AT, BUT THERE IS CERTAINLY AN ENORMOUS NUMBER OF

23  INDIVIDUALS WHO HAVE VERY EARLY-STAGE ATHEROSCLEROSIS, WHICH IS

24  NOT SEVERE ENOUGH TO BECOME MANIFEST SYMPTOMATICALLY.  SO IT'S

25  A SORT OF SILENT DISEASE, BUT IT'S THERE AND COULD LEAD TO A

1217

```
1   SUDDEN RUPTURE AND HEART ATTACK EVEN WITHOUT PRECEDING
2   SYMPTOMS.
3   Q.   ARE THERE MANY AMERICANS, SIR, WHO DON'T HAVE CORONARY
4   ARTERY DISEASE AND DON'T HAVE SYMPTOMS?
5   A.   IT'S HARD TO KNOW WHAT YOU MEAN BY "SEVERE," BUT A GENERAL
6   RESPONSE IS THAT THERE ARE INDIVIDUALS WHO HAVE SURPRISINGLY
7   SEVERE DISEASE AND YET MANIFEST NO SYMPTOMS.
8   Q.   IS IT ALSO TRUE THAT MANY AMERICANS HAVE SEVERE CORONARY
9   ARTERY DISEASE AND DON'T EVEN KNOW IT UNTIL THEY HAVE A HEART
10  ATTACK?
11  A.   THAT'S CORRECT.
12  Q.   IS IT ALSO TRUE THAT MANY AMERICANS, UNFORTUNATELY, DIE
13  WITHOUT EVER KNOWING THAT THEY HAD SEVERE CORONARY ARTERY
14  DISEASE?
15  A.   THAT'S CORRECT.
16  Q.   SKIPPING DOWN TO TWO SENTENCES, YOU WROTE:  "HOWEVER,
17  50 PERCENT OF CORONARY ARTERY DISEASE PATIENTS LACK TRADITIONAL
18  CORONARY ARTERY DISEASE RISK FACTORS," AND THEN YOU LIST THEM.
19  "EVIDENCE NOW IMPLICATES INFLAMMATION AS A MAJOR CONTRIBUTING
20  FACTOR IN THE ATHEROGENESIS, AND EVIDENCE IS BECOMING
21  COMPELLING THAT INFECTION CONSTITUTES AN ADDITIONAL RISK FACTOR
22  FOR CORONARY ARTERY DISEASE."  THAT'S CONSISTENT WITH WHAT YOU
23  SAID EARLIER --
24  A.   THAT'S CORRECT.
25  Q.   -- ABOUT THE THINKING IN THE SCIENTIFIC COMMUNITY THAT,
```

1   PUTTING ASIDE SMOKING, DIABETES, HIGH CHOLESTEROL, ALL THE

2   TRADITIONAL RISK FACTORS, NOW WE THINK THAT INFLAMMATION MAY

3   PLAY A ROLE IN THE ATHEROSCLEROSIS?

4   A.   UH-HUH.

5   Q.   RIGHT?

6   A.   THAT'S CORRECT.

7   Q.   SO THE THINKING WAS, IF THAT'S TRUE, THEN COX-2

8   INHIBITION, WHICH WOULD REDUCE THE AMOUNT OF INFLAMMATION,

9   WOULD SLOW DOWN THE DEVELOPMENT OF ATHEROSCLEROSIS; RIGHT?

10  A.   THAT'S TRUE.

11  Q.   THEN AT THE LAST SENTENCE, "IF IT, IN ADDITION,

12  DEMONSTRATES" -- AND BY "IT" WE'RE TALKING ABOUT VIOXX --

13  "DEMONSTRATES THE CAPACITY TO REDUCE ATHEROSCLEROSIS

14  PROGRESSION, EITHER PATHOGEN-RELATED OR

15  PATHOGEN-INDEPENDENT" -- I'M GOING TO ASK YOU TO EXPLAIN

16  THAT -- "A STRONG CASE CAN BE MADE OF THE ROUTINE DAILY

17  ADMINISTRATION OF VIOXX TO ALL INDIVIDUALS WHO DO HAVE SOME

18  SPECIFIC CONTRAINDICATION."

19  A.   WHO DO NOT HAVE.  THAT'S A TYPO.

20  Q.   -- "WHO DO NOT HAVE SOME SPECIFIC CONTRAINDICATION."

21  A.   THAT MEANS THAT DO THEY HAVE SOMETHING THAT YOU WOULD SAY

22  THEY SHOULD NOT TAKE VIOXX FOR.  SO THAT IS AN UNFORTUNATE

23  TYPO.

24  Q.   CAN YOU EXPLAIN WHAT YOU MEANT BY THAT LAST SENTENCE, SIR.

25  A.   YES.  SO SINCE INFECTION -- IT HAS BEEN MY BELIEF THAT

1   INFECTION CONTRIBUTES TO ATHEROSCLEROSIS, AND ONE OF THE

2   MECHANISMS WHEREBY IT CONTRIBUTES TO ATHEROSCLEROSIS IS THROUGH

3   INDUCING AN INFLAMMATORY RESPONSE.  EVEN IN THE ABSENCE OF

4   VIRAL INFECTION, ATHEROSCLEROSIS INVOLVES INFLAMMATION.  SO MY

5   STATEMENT HERE MEANS THAT A DRUG THAT BLOCKS COX-2, LIKE VIOXX,

6   MIGHT REDUCE ATHEROSCLEROSIS, WHETHER IT'S RELATED TO INFECTION

7   OR WHETHER THERE IS NO INFECTION PRESENT, THROUGH ITS EFFECTS

8   ON INFLAMMATION.

9   Q.   DIRECTING YOUR ATTENTION TO THE STUDY THAT YOU WERE THE

10  PRIMARY AUTHOR OF AND THAT YOU DID WITH DR. ROTT, LET'S GO BACK

11  IN A LITTLE BIT MORE DETAIL CONCERNING THE METHODS THAT YOU

12  USED.  CAN YOU TELL US WHAT AN APOE-KO MOUSE IS IN AS SIMPLE

13  TERMS AS YOU CAN.

14  A.   IT'S USUALLY REFERRED TO AS AN APOE KNOCKOUT MOUSE.  AND

15  THAT -- THE GENE THAT IS RESPONSIBLE FOR MAKING A PROTEIN

16  CALLED APOE IS THROUGH MOLECULAR TECHNIQUES.  KNOCKOUT, IT'S

17  TAKEN OUT OF THE GENOME OF THE MOUSE.  SO IT'S NOT THERE AND,

18  THEREFORE, APOE IS NOT THERE, WHICH IS THE PROTEIN THAT THE

19  GENE ENCODES.  APOE IS INVOLVED IN THE TRANSPORTATION OF

20  CHOLESTEROL TO THE LIVER, WHERE IT'S METABOLIZED.  IN THE

21  ABSENCE OF APOE, THAT PROCESS IS IMPAIRED, LEADING TO AN

22  INCREASE IN CHOLESTEROL IN SUCH RABBIT, AND ULTIMATELY, THIS

23  LEADS TO THE DEVELOPMENT OF ATHEROSCLEROSIS.

24  Q.   ARE THESE MICE CONSIDERED GENETICALLY ALTERED MICE?

25  A.   CORRECT.

1   **Q.**   IS IT A TYPICAL TYPE OF A MOUSE MODEL TO STUDY IN THIS

2   AREA OF ATHEROSCLEROSIS BECAUSE THAT TYPE OF A MOUSE CAN GROW

3   ATHEROSCLEROTIC LESIONS?

4   **A.**   CORRECT.

5   **Q.**   BY GROWING ATHEROSCLEROTIC LESIONS, SCIENTISTS LIKE YOU

6   CAN STUDY THE LESIONS AND DETERMINE WHETHER OR NOT THEY'RE

7   GROWING OR NOT AS A RESULT OF A PARTICULAR MEDICINE?

8   **A.**   CORRECT.

9   **Q.**   WHEN WE TALK ABOUT ATHEROSCLEROTIC LESIONS, WHAT ARE WE

10  REFERRING TO?  IS THAT PLAQUE?

11  **A.**   YES.

12  **Q.**   HOW LONG DID YOU ACTUALLY CONDUCT THE APOE KNOCKOUT MICE

13  STUDY WITH DR. ROTT?  WAS THAT THREE WEEKS?

14  **A.**   SO YOU MEAN -- THE STUDY TOOK A LONG TIME.

15  **Q.**   YES.  HOW LONG WERE THE MICE ACTUALLY ANALYZED?

16  **A.**   THREE WEEKS.  FROM THE TIME OF INITIATION OF MF-TRICYCLIC

17  ADMINISTRATION TO THE TERMINATION OF THE STUDY WAS THREE WEEKS.

18  **Q.**   AFTER YOU ANALYZED THE PLAQUE OF THESE 11-WEEK-OLD MICE,

19  YOU NOTICED, TO YOUR SURPRISE, THAT THERE WAS AN INCREASE IN

20  EARLY LESION DEVELOPMENT?

21  **A.**   CORRECT.

22  **Q.**   SO HOW LONG WOULD YOU ESTIMATE THREE WEEKS OF TREATMENT IN

23  A MOUSE TRANSLATES INTO TREATMENT IN HUMANS?

24  **A.**   I WOULDN'T -- I WOULDN'T -- THERE'S NO WAY I COULD MAKE

25  THAT ESTIMATION.

1    **Q.**   WOULD IT BE IMPROPER TO SAY THAT JUST BECAUSE YOU SEE AN

2    EFFECT ON LESION SIZE WITH MF-TRICYCLIC AFTER THREE WEEKS OF

3    TREATMENT THAT THAT REFLECTS THAT EVEN IN HUMANS YOU WOULD

4    EXPECT TO SEE AN INCREASE IN ATHEROSCLEROSIS IN A SHORT PERIOD

5    OF TIME IF YOU USE A COX-2 INHIBITOR?

6    **A.**   I DON'T THINK THAT THE RESULTS IN THIS MODEL CAN BE SO

7    EQUIVALENTLY TRANSFERRED TO PATIENTS.  IT RAISES THAT AS A

8    QUESTION, BUT CERTAINLY OUR STUDY DOESN'T DEFINITIVELY ANSWER

9    THAT.

10   **Q.**   HOW HIGH OF A DOSE OF MF-TRICYCLIC WAS USED IN YOUR STUDY

11   RELATIVE TO, LET'S SAY, A 25-MILLIGRAM DAILY DOSE OF VIOXX?

12   **A.**   IT WAS SEVERAL TIMES HIGHER THAN THE USUAL CONCENTRATIONS

13   OF VIOXX THAT WERE ADMINISTERED CLINICALLY.

14   **Q.**   WHAT IS THE SIGNIFICANCE OF HAVING A DOSE THAT'S SEVERAL

15   TIMES HIGHER USED IN A MOUSE MODEL WHEN YOU'RE TRYING TO

16   PREDICT WHETHER THE EFFECT THAT'S SEEN IN THAT MODEL WILL BE

17   SEEN IN HUMANS?

18   **A.**   WELL, WHENEVER YOU UNDERTAKE A STUDY IN A MOUSE, YOU FIRST

19   WANT TO DEMONSTRATE PROOF OF CONCEPT, AND YOU NEVER KNOW WHAT

20   THE EQUIVALENT DOSE IS IN A MOUSE AND A PATIENT.  SO TO SAY --

21   BECAUSE YOU DON'T KNOW WHETHER DISEASE PROCESSES ARE AS

22   RESPONSIVE TO A DRUG IN A MOUSE AS IN A PATIENT.  SO AS A FIRST

23   STEP IN ANY DRUG-RELATED STUDY, USUALLY YOU GIVE MORE THAN THE

24   EQUIVALENT DOSE IN PATIENTS.  BECAUSE IF YOU SEE A BENEFICIAL

25   EFFECT OR IF YOU DON'T SEE A BAD EFFECT WITH A VERY HIGH DOSE,

1   THEN YOU COULD FEEL QUITE COMFORTABLE.  SO USUALLY THESE

2   STUDIES, INITIALLY AT LEAST, ARE DESIGNED SO THAT THERE IS A

3   GREATER AMOUNT OF DRUG ADMINISTERED TO A MOUSE THAN YOU WOULD

4   TO A HUMAN.

5   Q.   IF YOU WOULD TURN TO PAGE 1817 OF YOUR STUDY, SIR, DO YOU

6   REMEMBER MR. SIZEMORE WAS ASKING YOU TO READ THE VERY LAST

7   SENTENCE ON PAGE 1817 WHERE YOU WRITE, "THUS, ANY DELETERIOUS

8   EFFECT OF SELECTIVE COX-2 INHIBITORS ON THE COURSE OF

9   ATHEROSCLEROSIS COULD INVOLVE THESE SEPARATE PROCESSES," AND

10  THEN YOU DESCRIBE THOSE?  DO YOU REMEMBER HIM ASKING YOU ABOUT

11  THAT?

12  A.   YES, I DO.

13  Q.   WHY DID YOU USE THE WORD "COULD"?

14  A.   BECAUSE WE DIDN'T KNOW WHETHER IT WAS.

15  Q.   I'M GOING TO ASK YOU A FEW QUESTIONS, DR. EPSTEIN, ABOUT

16  OTHER SECTIONS OF THIS ARTICLE THAT MR. SIZEMORE DIDN'T ASK YOU

17  ABOUT.  ON PAGE 1818 DO YOU SEE THAT YOU WROTE, "THESE

18  CONCEPTS, HOWEVER, MUST STILL BE CONSIDERED HYPOTHESES TO BE

19  VALIDATED" -- LET'S STOP THERE.  WHAT DO YOU MEAN WHEN YOU

20  WROTE:  "THESE CONCEPTS, HOWEVER, MUST STILL BE CONSIDERED

21  HYPOTHESES TO BE VALIDATED"?

22  A.   THIS WAS, TO MY KNOWLEDGE, THE FIRST STUDY DEMONSTRATING

23  THAT A COX-2 INHIBITOR HAD DELETERIOUS EFFECTS.  SO WHENEVER

24  YOU HAVE A FIRST OBSERVATION, ESPECIALLY OF SOMETHING THAT HAS

25  SUCH IMPORTANT POTENTIAL IMPLICATIONS, IT ALWAYS HAS TO BE

1  VALIDATED BY ANOTHER STUDY.

2  **Q.**   WHY?

3  **A.**   BECAUSE YOU COULD GET DIFFERENT RESULTS, AND THE RESULTS

4  FROM ANY ONE STUDY COULD BE FORTUITOUSLY POSITIVE OR NEGATIVE.

5  SO, IN SCIENCE, THAT'S THE WHOLE REASON THAT STUDIES HAVE TO BE

6  DUPLICATED.

7  **Q.**   AS OF THE DATE THAT YOU PUBLISHED YOUR ARTICLE, DR.

8  EPSTEIN, TO YOUR KNOWLEDGE, THIS WAS THE FIRST STUDY IN ANIMALS

9  SHOWING ANY POTENTIAL HARMFUL EFFECT OF A COX-2 INHIBITOR ON

10  ATHEROSCLEROSIS?

11  **A.**   CORRECT.

12  **Q.**   EVEN IN THE FACE OF THIS NEW OBSERVATION, WHAT YOU'RE

13  SAYING IN THIS STUDY IS THAT THIS OBSERVATION NEEDS TO BE

14  VALIDATED AND CAN'T JUST BE ACCEPTED AS TRUE?

15  **A.**   CORRECT.

16  **Q.**   WE JUST TALKED ABOUT THE FIRST PART OF THAT SENTENCE,

17  ABOUT HOW THE CONCEPTS NEED TO BE VALIDATED, AND THEN YOU

18  CONTINUE AND YOU WRITE "AS OTHER DATA RELATING TO SELECTIVE

19  COX-2 INHIBITION SUGGEST POSSIBLE ANTI-ATHEROGENESIS EFFECTS

20  (THROUGH INHIBITION OF INFLAMMATION) AND A PLAQUE STABILIZATION

21  EFFECT" -- AND I'M NOT GOING TO TRY TO READ THE REST BECAUSE I

22  DON'T UNDERSTAND THE WORDS.  THEN YOU CITE AN ARTICLE, 35.

23  RIGHT?

24  **A.**   UH-HUH.  YES.

25  **Q.**   WHEN YOU SAID "A PLAQUE STABILIZATION EFFECT," WERE YOU

1224

1    SAYING THAT THERE ARE DATA OUT THERE SUGGESTING THAT COX-2

2    INHIBITORS MIGHT ACTUALLY STABILIZE PLAQUE AND REDUCE THE

3    LIKELIHOOD OF A PLAQUE RUPTURE?

4    **A.**   THE SIMPLE ANSWER IS YES.

5    **Q.**   IF YOU LOOK BACK AT YOUR STUDY NOW, DR. EPSTEIN, ON

6    PAGE 1818, AFTER YOU CITE THE CIPOLLONE ARTICLE -- IN THE LEFT

7    COLUMN, 1818.

8    **A.**   I GOT IT.

9    **Q.**   YOU SAY, "MOREOVER, OUR RESULTS MAY BE MODEL, THERAPY

10   DURATION, AND DRUG-SPECIFIC."  LET'S STOP THERE.  WHAT DO YOU

11   MEAN WHEN YOU SAY THE RESULTS IN YOUR STUDY MIGHT BE

12   MODEL-SPECIFIC?

13   **A.**   WELL, AS WE'VE TALKED ALL ALONG, A MOUSE PROVIDES

14   IMPORTANT CLUES AND IMPORTANT EVIDENCE OF CONCEPTS, BUT IT

15   DOESN'T PROVIDE PROOF, IT'S CONCEIVABLE THAT WHAT WE FIND IN A

16   GIVEN MOUSE MODEL MAY NOT BE APPLICABLE TO PATIENTS.

17   **Q.**   IS IT ALSO TRUE THAT WHAT YOU FIND IN ONE PARTICULAR MOUSE

18   MODEL MAY NOT BE FOUND IN ANOTHER TYPE OF MOUSE MODEL?

19   **A.**   THAT'S CORRECT.

20   **Q.**   OR A DIFFERENT TYPE OF ANIMAL MODEL?

21   **A.**   THAT'S CORRECT.

22   **Q.**   WHAT DO YOU MEAN BY, "OUR RESULTS MAY BE THERAPY

23   DURATION-SPECIFIC"?

24   **A.**   WELL, IF YOU GIVE THE DRUG FOR A DAY OR IF YOU GIVE IT FOR

25   A YEAR, THE EFFECTS MAY BE VERY DIFFERENT AND EVERYTHING IN

1   BETWEEN.  I MEAN, IT'S SPECULATION, AND ANYTHING MIGHT BE

2   POSSIBLE.

3   **Q.**   ARE YOU AWARE OF OTHER MICE STUDIES THAT DID STUDY THE

4   EFFECT OF MF-TRICYCLIC AND VIOXX AND OTHER COX-2 INHIBITORS FOR

5   A LONGER PERIOD OF TIME THAN YOUR STUDY AND FOUND EITHER THAT

6   THERE WAS NO EFFECT ON THE SIZE OF THE ATHEROSCLEROTIC PLAQUE

7   OR THAT THE COX-2 INHIBITOR ACTUALLY REDUCED THE SIZE OF THE

8   PLAQUE?

9   **A.**   YES.

10  **Q.**   I THINK YOUR STATEMENT ABOUT "OUR RESULTS MAY BE

11  DRUG-SPECIFIC" IS SELF-EXPLANATORY.  I ASSUME THAT MEANS THAT

12  WHAT YOU SEE WITH MF-TRICYCLIC MAY NOT BE SEEN WITH CELEBREX OR

13  VIOXX OR ANOTHER MOLECULE?

14  **A.**   RIGHT.

15  **Q.**   THEN YOU TALK ABOUT THE PRATICO ARTICLE.  "FOR EXAMPLE,

16  PRATICO, WHICH IS CITED AS 33, USED A LOW-DENSITY LIPOPROTEIN

17  RECEPTOR KNOCKOUT MOUSE."  IS THAT A DIFFERENT TYPE OF A MOUSE

18  THAN THE --

19  **A.**   IT RESULTS IN HIGH CHOLESTEROL, BUT IT'S A DIFFERENT WAY

20  OF GETTING THERE.

21  **Q.**   IN THAT STUDY "THE SELECTIVE COX-2 INHIBITOR" -- IS IT

22  NIMESULIDE?

23  **A.**   I THINK THAT'S HOW YOU PRONOUNCE IT.

24  **Q.**   "THE COX-2 INHIBITOR WAS NIMESULIDE AND SACRIFICED MICE AT

25  26 WEEKS OF AGE COMPARED WITH OUR 11 WEEKS OF AGE."  SO IN THE

1226

1    PRATICO STUDY ARE YOU POINTING OUT HERE THAT THE STUDY LASTED
2    LONGER THAN YOUR STUDY DID?
3    **A.**    AND A DIFFERENT DRUG THAT WAS USED.
4    **Q.**    AND IT'S A DIFFERENT MOUSE MODEL?
5    **A.**    AND IT'S A DIFFERENT MOUSE MODEL.
6    **Q.**    IN PRATICO, YOU WROTE, "THEY FOUND THE COX-2 INHIBITOR
7    EXERTED NO EFFECT ON THE RATE OF ATHEROGENESIS."
8    **A.**    I DID?
9    **Q.**    LET ME HAND YOU WHAT I'LL MARK AS EXHIBIT 17.  IS THIS THE
10   ARTICLE, DR. EPSTEIN, THAT YOU CITE IN YOUR STUDY WITH
11   DR. ROTT?
12   **A.**    IT IS.
13   **Q.**    AND IN THE AUTHORS' SECTION, IT SAYS, DOMENICO PRATICO.
14   AND THEN ALL THE WAY AT THE END, WHOSE NAME IS LISTED?
15   **A.**    DR. FITZGERALD.
16   **Q.**    AND THAT'S THE SAME DR. FITZGERALD WHO IDENTIFIED IN HIS
17   STUDY THE REDUCTION OF PROSTACYCLIN METABOLITE IN THE URINE;
18   RIGHT?
19   **A.**    I HAVEN'T READ THAT, BUT I'M ASSUMING THAT'S CORRECT.
20   **Q.**    LET ME START BY ASKING YOU TO TURN TO FIGURE 5, WHICH IS
21   ON PAGE 361.  ARE YOU THERE?
22   **A.**    YES.  I'M SORRY.  I AM.
23   **Q.**    CAN YOU JUST HOLD THAT UP FOR THE JURY, JUST TO POINT OUT
24   WHAT WE'RE LOOKING AT?  WE'RE GOING TO GET IT ON THE SCREEN,
25   HOPEFULLY.

1    **A.**    (WITNESS COMPLIES).

2    **Q.**    THANK YOU.  CAN YOU DESCRIBE WHAT THIS GRAPH SHOWS.  THERE

3    IS THREE DIFFERENT BARS:  "PLACEBO"; "INDOMETHACIN", WHICH IS A

4    TRADITIONAL NONSELECTIVE NSAIDS; AND "NIMESULIDE", WHICH IS A

5    COX-2 INHIBITOR.  AND THEN ON THE Y AXIS, "AORTIC LESION AREA."

6    CAN YOU DESCRIBE, PLEASE, WHAT THIS GRAPH SHOWS?

7    **A.**    IT SHOWS THAT THE NONSPECIFIC COX-2 INHIBITOR,

8    INDOMETHACIN, WHICH BLOCKS BOTH COX-1 AND COX-2, RESULTS OVER

9    THE COURSE OF THE 18 WEEKS OF THERAPY, I THINK -- RESULTS IN A

10   DECREASE IN AORTIC ATHEROSCLEROTIC LESION AREA; WHEREAS,

11   NIMESULIDE HAD NO SIGNIFICANT EFFECT.

12   **Q.**    IF YOU JUST LOOK AT THE BARS ALONE, PUTTING ASIDE

13   STATISTICAL SIGNIFICANCE --

14   **A.**    I DON'T DO THAT.

15   **Q.**    WE'LL TALK ABOUT THAT -- WHY WON'T YOU PUT ASIDE

16   STATISTICALLY SIGNIFICANCE?

17   **A.**    BECAUSE THE ONLY WAY TO KNOW WHETHER THEY'RE TWO DIFFERENT

18   EVENTS IS TO APPLY STATISTICS TO THEM.

19   **Q.**    WOULD YOU THINK IT WOULD BE IMPROPER FOR A SCIENTIST TO

20   TAKE RESULTS OF A STUDY AND SAY THAT THERE WAS A DIFFERENCE

21   BETWEEN TWO DRUGS IF THE RESULT WAS NOT STATISTICALLY

22   SIGNIFICANT?

23   **A.**    IT WOULD BE IMPROPER.

24   **Q.**    IF YOU LOOK AT THE GRAPH HERE, THE PLACEBO BAR RAISES UP

25   TO A LITTLE BIT OVER 8 PERCENT.  RIGHT?

1228

1    A.    RIGHT.

2    Q.    AND THEN INDOMETHACIN, WHICH IS A NONSELECTIVE INHIBITOR,

3    THAT SHOWS A REDUCTION IN LESION SIZE TO UNDER 4 PERCENT;

4    CORRECT?

5    A.    THAT'S CORRECT.

6    Q.    AND IF YOU LOOK AT THE COX-2 INHIBITOR NIMESULIDE, THERE

7    IS A REDUCTION, COMPARED TO PLACEBO, TO THE POINT WHERE

8    NIMESULIDE IS ABOUT 6 PERCENT.  DO YOU SEE THAT?

9    A.    I DO.

10   Q.    WOULD IT BE FAIR TO SAY, BECAUSE THERE IS A REDUCTION

11   THERE SEEN IN A GRAPH LIKE THAT, THAT THERE IS ACTUALLY A

12   DIFFERENCE AND A BENEFIT THAT YOU GET FROM THE COX-2 INHIBITOR

13   IN TERMS OF EFFECT ON LESION SIZE?

14   A.    NO.

15   Q.    WHY NOT?

16   A.    IT'S NOT STATISTICALLY SIGNIFICANT AND, THEREFORE, COULD

17   BE DUE TO CHANCE ALONE, AND THIS IS WHAT DOCTOR FITZGERALD

18   CORRECTLY POINTS OUT.

19   Q.    NOW, THIS PARTICULAR STUDY WAS WRITTEN MARCH 13 OF 2001 --

20   AND I'LL REPRESENT TO YOU THAT THAT WAS AFTER THE VIGOR STUDY

21   CAME OUT.  OKAY?

22   A.    UH-HUH.

23   Q.    AND LET'S TAKE A LOOK AT -- LET'S TAKE A LOOK AT WHAT

24   DR. FITZGERALD SAID BACK AT THE TIME ABOUT THIS STUDY ON

25   ATHEROSCLEROSIS.

1   A.   THE VIGOR STUDY OR --

2   Q.   NO.  HIS STUDY HERE.

3   A.   OKAY.

4   Q.   IN THE ABSTRACT -- START THERE -- CAN YOU READ THE

5   SECOND-TO-LAST SENTENCE?

6   A.   "ACCELERATED PROGRESSION OF ATHEROSCLEROSIS IS UNLIKELY

7   DURING CHRONIC INTAKE OF SPECIFIC COX-2 INHIBITORS."

8   Q.   IS DR. FITZGERALD SAYING THERE THAT, BASED ON THIS

9   PARTICULAR STUDY, HE BELIEVES THAT IF YOU TAKE COX-2 INHIBITORS

10  CHRONICALLY, THAT IT IS UNLIKELY THAT THEY WILL AFFECT THE

11  PROGRESSION OF ATHEROSCLEROSIS?

12  A.   THAT'S CORRECT.

13  Q.   SO WHY DID YOU DECIDE TO INCLUDE THIS PARTICULAR CITATION

14  IN YOUR ARTICLE?

15  A.   I WANTED TO QUOTE AS MANY OF THE ARTICLES THAT I KNEW OF

16  THAT EITHER SUPPORTED OR DID NOT SUPPORT OUR STUDY.

17  Q.   WHEN YOU'RE DOING A SCIENTIFIC ANALYSIS, DR. EPSTEIN, IS

18  IT IMPORTANT TO CONSIDER ALL OF THE RELEVANT SCIENTIFIC

19  LITERATURE ON A PARTICULAR TOPIC?

20  A.   YES.

21  Q.   WOULD IT BE IMPROPER TO SIMPLY IDENTIFY ONE STUDY, LIKE

22  THE ONE THAT YOU DID WITH DR. ROTT, OR ONE PARTICULAR CLINICAL

23  STUDY, AND SAY, BASED ON THAT STUDY, THERE IS A

24  CAUSE-AND-EFFECT RELATIONSHIP BETWEEN A DRUG AND A SIDE EFFECT?

25  A.   IT WOULD BE IMPROPER.

1  **Q.**   WHY?

2  **A.**   BECAUSE SCIENCE IS -- IS A DIFFICULT -- IT'S DIFFICULT,

3  AND THE RESULTS DEPEND ON MULTIPLE VARIABLES, AND IT MAY VERY

4  WELL BE THAT A SPECIFIC OUTCOME USING ONE APPROACH MAY BE VERY

5  DIFFERENT FROM A SPECIFIC OUTCOME USING A DIFFERENT APPROACH,

6  WHETHER THAT RELATES TO ANIMAL STUDIES OR HUMAN TRIALS.

7  **Q.**   FOCUSING BACK, DR. EPSTEIN, TO YOUR STUDY WITH DR. ROTT,

8  ON PAGE 1818, I WANT TO NOW ASK YOU ABOUT THE FIRST SENTENCE IN

9  THE SECOND-TO-LAST PARAGRAPH.

10          IT SAYS, "IN CONCLUSION, THE RESULTS OF THIS

11  INVESTIGATION RAISE DISTURBING QUESTIONS ABOUT POSSIBLE ADVERSE

12  EFFECTS DERIVING FROM CHRONIC USE OF SELECTIVE COX-2 INHIBITORS

13  ON SUSCEPTIBILITY TO VIRAL INFECTION AND ON EARLY

14  ATHEROSCLEROSIS LESION DEVELOPMENT."

15          CAN YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE

16  JURY WHAT YOU MEAN BY "EARLY ATHEROSCLEROSIS LESION

17  DEVELOPMENT"?

18  **A.**   ATHEROSCLEROSIS IS AN EXTREMELY COMPLEX PROCESS THAT

19  PROGRESSES IN FITS AND STARTS THAT CAN OCCUR OVER MANY YEARS

20  BUT ALSO CAN OCCUR RATHER RAPIDLY.  IF ONE IS INVESTIGATING THE

21  DEVELOPMENT OF ATHEROSCLEROSIS AND THE POTENTIAL EFFECTS OF ANY

22  INTERVENTION, LIKE DRUGS ON ATHEROSCLEROSIS, IT'S REALLY NOT

23  SUFFICIENT TO LOOK AT AN INTERVENTION THAT'S GIVEN OVER FIVE

24  YEARS OR OVER TEN YEARS OR OVER ONE MONTH AND TO SAY THAT THE

25  TRUE RESULTS ARE ONLY THOSE RESULTS SEEN AT FIVE YEARS OR TEN

1    YEARS.

2              SO DURING THE EARLY PHASES OF DRUG ADMINISTRATION, IF

3    THERE IS AN INCREASE IN ATHEROSCLEROSIS, THAT IN ITSELF IS VERY

4    IMPORTANT, EVEN IF, OVER THE COURSE OF THE LONG-TERM THERAPY,

5    SOMETHING ELSE MAY DEVELOP; THAT IS, THERE MAY BE NO EFFECT OR

6    PROTECTIVE.

7              SO IT'S IMPORTANT AS YOU'RE CONSIDERING SOMETHING TO

8    THINK OF THE EARLIER EFFECTS, THE MIDTERM EFFECTS, AND THE LATE

9    EFFECTS.  OUR STUDY WOULD SUGGEST THE POSSIBILITY THAT THERE IS

10   AN ADVERSE EFFECT OF COX-2 INHIBITORS AFTER RELATIVELY EARLY

11   EXPOSURE OF THE MOUSE TO MF TRICYCLIC.

12   Q.   IF YOU TURN, DR. EPSTEIN, BACK TO PAGE 1816 AND FOCUS YOUR

13   ATTENTION ON THE RIGHT COLUMN, THE MIDDLE OF THE FIRST FULL

14   PARAGRAPH, DO YOU SEE WHERE YOU WROTE:  "IT SHOULD BE NOTED

15   THAT LESIONS IN THIS PARTICULAR MODEL IN WHICH APOE KNOCKOUT

16   MICE WERE SACRIFICED AT ONLY 11 WEEKS OF AGE, AND AFTER ONLY

17   THREE WEEKS ON THE SELECTIVE COX-2 INHIBITOR, WERE VERY EARLY

18   LESIONS.  THEREFORE, OUR RESULTS ARE PROBABLY MORE RELEVANT TO

19   LESION INITIATION."

20   A.   YES.

21   Q.   CAN YOU EXPLAIN THAT, SIR?

22   A.   WELL, WHAT WE STUDIED WAS VERY EARLY DEVELOPMENT OF

23   ATHEROSCLEROSIS LESIONS.  SO GIVEN THAT THAT'S WHAT WE

24   INVESTIGATED, WE CAN'T SAY FROM OUR STUDY WHAT WOULD HAPPEN

25   OVER THE LONGER TERM.

1          WHAT WE SAY IS, OVER THE RELATIVELY SHORT-TERM, THE

2     RESULTS SEEN IN OUR PARTICULAR MODEL RAISE SOME CONCERN ABOUT

3     WHETHER THESE DRUGS CAN INFLUENCE THE EARLY DEVELOPMENT OF

4     ATHEROSCLEROSIS.

5     Q.    IS IT FAIR TO SAY, DR. EPSTEIN, THAT THE FINDINGS OF YOUR

6     STUDY, WHILE THEY MAY BE RELEVANT TO MICE IN THE EARLY STAGES

7     OF ATHEROSCLEROSIS, MAY NOT BE RELEVANT WHEN YOU'RE TALKING

8     ABOUT ADVANCED ATHEROSCLEROSIS?

9     A.    THAT'S ABSOLUTELY TRUE.

10    Q.    JUST BECAUSE, IN YOUR STUDY, THERE WAS A FINDING OF MICE

11    AFTER THREE WEEKS OF DOSING THAT MF-TRICYCLIC INCREASED THE

12    SIZE OF THE ATHEROSCLEROTIC PLAQUE DOESN'T MEAN THAT

13    MF-TRICYCLIC, OR ANY OTHER COX-2 INHIBITOR, FOR THAT MATTER,

14    NECESSARILY ACCELERATES THE PROGRESSION OF EXISTING

15    ATHEROSCLEROSIS?

16    A.    THAT'S CORRECT.

17    Q.    NOR DO THE FINDINGS IN YOUR STUDY MEAN THAT MF-TRICYCLIC,

18    OR ANY OTHER COX-2 INHIBITOR, FOR THAT MATTER, INCREASED THE

19    LIKELIHOOD OF PLAQUE RUPTURE AT THAT STAGE OF ATHEROSCLEROSIS;

20    TRUE?

21    A.    THIS STUDY DOES NOT INVESTIGATE THAT PARTICULAR POINT.

22    Q.    YOU DIDN'T SUGGEST IN THIS PAPER AT ALL THAT, BECAUSE OF

23    YOUR RESULTS, VIOXX SHOULD BE REMOVED FROM THE MARKET, DID YOU?

24    A.    CORRECT.

25    Q.    DID YOU AND YOUR COAUTHORS, DR. EPSTEIN, MAKE THE DECISION

1233

1    ON YOUR OWN THAT YOU FELT IT WAS IMPORTANT TO PROVIDE A
2    BALANCED PREPARATION OF THE RESULTS OF YOUR STUDY, OR IS THAT
3    SOMETHING THAT MERCK INSISTED YOU DO?
4    **A.**   THIS IS WHAT WE -- WE HAD DECIDED -- WE DIDN'T DECIDE --
5    THIS IS WHAT I ALWAYS DO.  I MEAN, I TRY TO PRESENT AS BALANCED
6    A PICTURE AS POSSIBLE.  MERCK WANTED US TO DO THAT, OBVIOUSLY,
7    AND THIS WAS SOMETHING THAT I COMPLETELY AGREED WITH.
8    **Q.**   MR. SIZEMORE ASKED YOU ABOUT A SUGGESTION THAT DR. RODGER
9    OF MERCK HAD MADE ABOUT POINTING OUT IN THE ABSTRACT, I
10   BELIEVE, THAT YOUR STUDY INVOLVED MICE AND NOT HUMANS.  DO YOU
11   REMEMBER MR. SIZEMORE ASKING YOU THAT?
12   **A.**   I DO.
13   **Q.**   DID YOU FEEL THAT WAS A REASONABLE REQUEST BY MERCK?
14   **A.**   OH, YES.
15   **Q.**   AND IF YOU HADN'T AGREED WITH DR. RODGER, YOU COULD HAVE
16   DECIDED NOT TO INCLUDE THAT LANGUAGE AND TALK ABOUT HUMANS ALL
17   YOU WANT; RIGHT?
18   **A.**   WELL, IT WOULD BE VERY DIFFICULT DOING A MOUSE STUDY TO
19   SAY THESE RESULTS UNEQUIVOCALLY APPLY TO HUMANS.  SO, YOU KNOW,
20   THE QUESTION IS NAIVE.
21   **Q.**   YOU ALSO MENTIONED THAT DR. RODGER REQUESTED THAT YOU
22   REFER TO MF-TRICYCLIC IN THE TITLE OF YOUR PAPER.
23   **A.**   RIGHT.
24   **Q.**   DID YOU FEEL THAT WAS A REASONABLE REQUEST?
25   **A.**   YES.  I THINK, AS I RECALL, AND I MAY BE MISTAKEN ABOUT

DAILY COPY

1234

1   THAT.  I THINK THE REQUEST WAS TO SUBSTITUTE MF-TRICYCLIC FOR

2   COX-2 INHIBITOR IN THE ABSTRACT, AND I DIDN'T RECALL THAT

3   THAT -- IF MY RECALL IS ACCURATE, MY RECALL OF MY RECALL IS

4   THAT I DIDN'T THINK THAT WAS REASONABLE.

5          I THOUGHT IT WAS IMPORTANT TO PUT IN BOTH --

6   MF-TRICYCLIC BECAUSE IT'S A SPECIFIC DRUG, AND THE RESULTS OF

7   ONE DRUG MAY BE DIFFERENT FROM ANOTHER; BUT I ALSO WANTED TO

8   CALL EVERYONE'S ATTENTION TO THE FACT THAT THIS WAS A COX-2

9   INHIBITOR.

10  Q.   IS THIS AN EXAMPLE OF AN INSTANCE WHERE MERCK MADE A

11  SUGGESTION TO YOU ABOUT REFERRING HERE TO JUST MF-TRICYCLIC BUT

12  YOU DECIDED THAT YOU THINK THE PROPER WAY TO WRITE THE PAPER

13  AND DESCRIBE IT IS TO INCLUDE MF-TRICYCLIC AND A REFERENCE TO

14  COX-2 INHIBITOR?

15  A.   THAT'S RIGHT.

16  Q.   ULTIMATELY, IT WAS YOUR DECISION AND THE DECISION OF YOUR

17  COAUTHORS ABOUT EXACTLY HOW YOU WERE GOING TO WRITE THIS PAPER;

18  TRUE?

19  A.   TRUE.

20  Q.   WHEN YOU REFERENCED THAT THE DOSES GIVEN THE MICE RESULTED

21  IN BLOOD LEVELS THAT WERE AT LEAST FOUR TIMES HIGHER THAN THOSE

22  SEEN IN PATIENTS RECEIVING THE USUAL CLINICAL DOSE OF VIOXX,

23  WHY DID YOU DECIDE TO INCLUDE THAT LANGUAGE IN?

24  A.   BECAUSE, ONCE AGAIN, WE WANTED TO MAKE SURE THAT EVERYONE

25  WAS AWARE THAT THE DOSES WE WERE USING RESULTED IN

1    HIGHER-THAN-USUAL DOSES AS ACHIEVED IN PATIENTS.

2    **Q.**    WHY IS IT IMPORTANT FOR PATIENTS OR THE MEDICAL COMMUNITY

3    TO HAVE THAT UNDERSTANDING?

4    **A.**    BECAUSE IT MAY VERY WELL BE THAT, IN THE DOSES THAT ARE

5    USED CLINICALLY, WHICH ARE -- RESULT IN LOWER CONCENTRATIONS OF

6    VIOXX, THAT IT MIGHT NOT HAVE THE SAME EFFECTS AS HIGHER DOSES.

7    **Q.**    THE LAST PARAGRAPH, SIR, OF YOUR ARTICLE, YOU WROTE:

8    "BECAUSE OF THE IMPORTANCE OF THE IMPLICATIONS OF THE

9    CONCLUSIONS DERIVING FROM OUR INVESTIGATION, AND BECAUSE OF THE

10   INTRINSIC LIMITATIONS OF AN ANIMAL MODEL OUTLINED ABOVE, THE

11   CONCLUSIONS MUST BE REGARDED AS TENTATIVE AND

12   HYPOTHESIS-GENERATING."

13            CAN YOU DESCRIBE WHAT YOU MEAN BY "TENTATIVE AND

14   HYPOTHESIS-GENERATING"?

15   **A.**    THE CONCLUSIONS ARE DEFINITIVE FOR THE PARTICULAR MODEL

16   AND THE PARTICULAR EXPERIMENTAL CONDITIONS THAT WE USED.

17   HOWEVER, THE MORE GENERIC CONCLUSIONS, THAT IS, THAT THIS MIGHT

18   APPLY TO ALL COX-2 INHIBITORS, HAS TO BE CONSIDERED STILL A

19   HYPOTHESIS TO BE TESTED.

20            SO OUR RESULTS ESSENTIALLY GENERATED A NEW

21   HYPOTHESIS, THAT HYPOTHESIS BEING THAT COX-2 INHIBITORS CAN

22   RESULT IN A WORSENING OF ATHEROSCLEROSIS.  SO IT DEVELOPED A

23   NEW -- OUR FINDINGS CREATED A NEW HYPOTHESIS.

24   **Q.**    WOULD IT BE IMPROPER, DR. EPSTEIN, TO ONLY TAKE THE

25   RESULTS OF YOUR STUDY AND SAY THIS STUDY PROVES THAT VIOXX

1  CAUSES AN ACCELERATION OF ATHEROSCLEROSIS IN HUMAN BEINGS?

2  **A.**   IT WOULD BE IMPROPER.

3  **Q.**   WOULD IT ALSO BE IMPROPER TO HOLD UP YOUR STUDY AND SAY

4  THIS PROVES THAT VIOXX AND OTHER COX-2 INHIBITORS INCREASE THE

5  LIKELIHOOD OF PLAQUE RUPTURE?

6  **A.**   IT WOULD BE IMPROPER.

7  **Q.**   BASED ON YOUR RESEARCH, DR. EPSTEIN, HAVE YOU FOUND ANY

8  ANIMAL STUDIES SHOWING THAT VIOXX WORSENED ATHEROSCLEROSIS?

9  **A.**   NO.

10  **Q.**   HAVE YOU FOUND IN YOUR INVESTIGATION, DR. EPSTEIN, THAT AT

11  LEAST ONE STUDY IN MICE SHOWED THAT VIOXX ACTUALLY REDUCED THE

12  SIZE OF ATHEROSCLEROTIC LESIONS?

13  **A.**   I JUST WANT TO CONFIRM:  WAS THAT THE OATES, JOHN OATES',

14  STUDY?

15  **Q.**   I REFER TO IT AS BURLEY.

16  **A.**   BURLEY, RIGHT.  OKAY.  JOHN WAS JUST A MENTOR OF MINE WAY

17  BACK.  SO I REMEMBER HIS NAME?

18          YES.  THE ANSWER TO THAT IS YES.

19  **Q.**   BASED ON YOUR RESEARCH, DR. EPSTEIN, IS IT TRUE THAT EVERY

20  MOUSE STUDY THAT HAS BEEN DONE WITH MF-TRICYCLIC, OTHER THAN

21  YOURS, HAS SHOWN NO EFFECT ON THE ATHEROSCLEROTIC PROCESS?

22  **A.**   CORRECT.

23  **Q.**   IS IT TRUE, DR. EPSTEIN, THAT EVERY MOUSE STUDY USING

24  COX-2 INHIBITORS LIKE CELEBREX, NIMESULIDE, NS-398, SC-236,

25  EITHER SHOW NO EFFECT ON ATHEROSCLEROSIS OR A DECREASE IN

DAILY COPY

1    LESION SIZE?

2    **A.**    UNDER THE CONDITIONS STUDIED, THE ANSWER IS YES.

3    **Q.**    DO YOU REMEMBER, IN RESPONSE TO MR. SIZEMORE'S QUESTIONS,

4    YOU MENTIONED THAT YOU FELT THAT, GIVEN THAT YOUR STUDY WAS THE

5    FIRST TO IDENTIFY A POTENTIAL RISK CONCERNING ATHEROSCLEROSIS,

6    YOU FELT THAT THIS STUDY AMOUNTED TO A YELLOW FLAG?

7    **A.**    RIGHT.  THE FIRST MOUSE STUDY.  I MEAN, AS YOU KNOW, THE

8    VIGOR STUDY SORT OF RAISED THAT YELLOW FLAG BEFORE.

9    **Q.**    IN TERMS OF THE FOCUS ON ATHEROSCLEROSIS SPECIFICALLY,

10   THOUGH?

11   **A.**    RIGHT.

12   **Q.**    IF WE'RE FOCUSING ON THE POTENTIAL EFFECT OF COX-2

13   INHIBITORS ON ATHEROSCLEROSIS, YOU BELIEVE THAT YOUR STUDY

14   RAISED A YELLOW FLAG IN THAT REGARD?

15   **A.**    CORRECT.

16   **Q.**    DO YOU ALSO AGREE, DR. EPSTEIN, THAT THE OTHER STUDIES,

17   LIKE THE ONE THAT YOU REFERENCED CONCERNING VIOXX SHOWING A

18   DECREASE IN ATHEROSCLEROSIS, DID NOT RAISE A YELLOW FLAG?

19   **A.**    THAT'S CORRECT.

20   **Q.**    THE OTHER MOUSE STUDIES THAT WERE DONE WITH MF-TRICYCLIC,

21   OTHER THAN YOURS, WHERE THERE WAS NO EFFECT SHOWN ON

22   ATHEROSCLEROSIS OR A DECREASE IN ATHEROSCLEROSIS, THOSE WEREN'T

23   YELLOW FLAGS EITHER; TRUE?

24   **A.**    RIGHT.  TRUE.

25   **Q.**    DO YOU AGREE, DR. EPSTEIN, THAT THE OTHER MOUSE STUDIES

1238

1    USING COX-2 INHIBITORS LIKE CELEBREX, NIMESULIDE, NS-398,

2    SC-236, THAT SHOWED NO EFFECT ON ATHEROSCLEROSIS, THAT THOSE

3    WOULDN'T BE A YELLOW FLAG?

4    **A.**    CORRECT.

5    **Q.**    CORRECT?

6    **A.**    I WILL AGREE, YES.  CORRECT.

7    **Q.**    AND WOULD YOU ALSO AGREE, DR. EPSTEIN, THAT IT'S

8    APPROPRIATE FOR MERCK TO CONSIDER ALL THE STUDIES AS A WHOLE,

9    NOT JUST ONE?

10   **A.**    I DON'T AGREE WITH THAT.

11   **Q.**    OKAY.

12   **A.**    I'D LIKE -- I COULD ELABORATE ON THAT IF YOU'D LIKE.

13   **Q.**    SURE.

14   **A.**    BECAUSE EACH ONE OF THESE STUDIES WAS DONE EITHER WITH A

15   DIFFERENT DRUG OR A DIFFERENT DURATION OF STUDY OR WITH A

16   DIFFERENT MOUSE MODEL, ONE CAN'T BE DEMOCRATIC ABOUT HOW ONE

17   EVALUATES THESE RESULTS.  SO IF FOUR OR FIVE SHOW A BENEFICIAL

18   EFFECT, A BENEFICIAL EFFECT IS NOT THE CONCLUSION.

19   **Q.**    FAIR ENOUGH?

20   **A.**    OKAY.

21   **Q.**    THAT'S FAIR.  SO, IN OTHER WORDS, IT WOULD BE

22   INAPPROPRIATE FOR MERCK TO TAKE ONLY THE STUDIES THAT SHOWED A

23   BENEFICIAL EFFECT OR NO EFFECT AND CONCLUDE DEFINITELY THAT

24   THERE IS A BENEFICIAL EFFECT OF VIOXX ON ATHEROSCLEROSIS?

25   **A.**    THAT'S TRUE.

1   Q.   YOU TALKED WITH MR. SIZEMORE BRIEFLY ABOUT THE EGAN STUDY.

2   DO YOU REMEMBER THAT?

3   A.   YES.

4   Q.   THIS IS A STUDY IS ALSO PUBLISHED IN *CIRCULATION*, AND IT

5   IS TITLED "CYCLOOXYGENASE, THROMBOXANE, AND ATHEROSCLEROSIS."

6   AND THIS IS THE STUDY THAT INCLUDES DR. FITZGERALD AS AN

7   AUTHOR; RIGHT?

8   A.   THAT'S CORRECT.

9   Q.   DID THIS STUDY TEST MF-TRICYCLIC AS ONE OF THE DRUGS?

10  A.   THAT'S CORRECT.

11  Q.   IF YOU LOOK AT THE CONCLUSION ON THE FIRST PAGE, THE

12  SECOND SENTENCE SAYS, "DESPITE EARLY INHIBITION OF COX-2, ALONE

13  OR IN COMBINATION WITH A TP ANTAGONIST" -- AND REMIND US WHAT

14  THAT IS AGAIN?

15  A.   THROMBOXANE A2, LIKE ANY PROTEIN, ACTS BY COMBINING WITH A

16  RECEPTOR ON A CELL SURFACE.  TP IS THE THROMBOXANE A2 RECEPTOR.

17  SO BY GIVING IT AN ANTAGONIST, IT BLOCKS THE EFFECTS OF

18  THROMBOXANE A2.

19  Q.   ARE TP ANTAGONISTS ACTUALLY APPROVED?

20  A.   I DON'T KNOW THE ANSWER TO THAT.

21  Q.   SO THE STATEMENT SAYS, "SELECTIVE INHIBITION OF COX-2,

22  ALONE OR IN COMBINATION WITH A TP ANTAGONIST, FAILED TO MODIFY

23  DISEASE PROGRESSION BUT MAY UNDERMINE PLAQUE STABILITY WHEN

24  DEFINED WITH THE ANTAGONIST."  DO YOU SEE THAT?

25  A.   YES.

1    **Q.**   IS THAT SAYING THAT REQUEST COX-2 INHIBITION WITH

2    MF-TRICYCLIC ALONE MAY UNDERMINED PLAQUE STABILITY?

3    **A.**   NO.

4    **Q.**   WHAT IS IT SAYING?

5    **A.**   IT'S SAYING -- IT'S SAYING THAT IN THE PRESENCE OF THIS

6    INHIBITOR OF THROMBOXANE A2, IN COMBINATION WITH THAT, THEN

7    PLAQUE STABILITY MAY BE COMPROMISED, BUT ONLY IN THIS

8    PARTICULAR STUDY WHEN COMBINED WITH THE TP ANTAGONIST.

9    **Q.**   IN OTHER WORDS, IF YOU GIVE A MOUSE MF-TRICYCLIC AND A TP

10   ANTAGONIST, YOU MIGHT SEE AN INCREASE IN ATHEROSCLEROSIS OR --

11   I'M SORRY, IN PLAQUE INSTABILITY.

12   **A.**   CORRECT.

13   **Q.**   BUT IF YOU GIVE THE MOUSE JUST THE COX-2 INHIBITOR,

14   MF-TRICYCLIC, THIS STUDY FOUND THAT YOU DIDN'T AFFECT THE

15   STABILITY OF PLAQUE?

16   **A.**   THAT'S CORRECT.

17   **Q.**   ARE YOU AWARE, DR. EPSTEIN, OF ANY STUDIES THAT HAVE SHOWN

18   THAT VIOXX HAS INCREASED THE DEVELOPMENT OF ATHEROSCLEROTIC

19   LESIONS IN HUMAN BEINGS?

20   **A.**   NO.

21   **Q.**   DR. EPSTEIN, WHEN YOU CAME TO MERCK PRESENTING YOUR

22   RESULTS OF YOUR STUDY WITH DR. ROTT, DID ANYBODY FROM MERCK

23   EVER TELL YOU NOT TO PUBLISH YOUR RESULTS?

24   **A.**   OH, NO.

25   **Q.**   DID ANYBODY FROM MERCK EVER TELL YOU NOT TO DO YOUR STUDY?

1241

1    A.    NO.

2    Q.    DID ANYBODY FROM MERCK EVER TRY TO TELL YOU TO CHANGE THE

3    SUBSTANCE OF YOUR FINDINGS?

4    A.    NO.

5    Q.    DID ANYBODY FROM MERCK EVER TRY TO DOWNPLAY THE

6    SIGNIFICANCE OF YOUR FINDINGS WITH SOME PRESS RELEASE OR SOME

7    OTHER ACTION?

8    A.    NO.

9    Q.    DO YOU FEEL THAT MERCK EVER TRIED TO RETALIATE AGAINST YOU

10   OR BE AGGRESSIVE TOWARD YOU OR DO ANYTHING INAPPROPRIATE TOWARD

11   YOU OR YOUR COLLEAGUES BECAUSE OF THE STUDY THAT YOU DID AND

12   PUBLISHED?

13   A.    NO.

14   Q.    IN FACT, A MONTH AFTER YOU SUBMITTED YOUR FIRST DRAFT OF

15   THE STUDY TO MERCK, YOU WERE INVITED TO BE ONE OF THE

16   CONSULTANTS IN PHILADELPHIA TO DISCUSS THE CARDIOVASCULAR

17   OUTCOMES STUDY?

18   A.    THAT'S CORRECT.

19   Q.    THAT'S A MEETING THAT YOU ATTENDED?

20   A.    YES.

21   Q.    MERCK OBVIOUSLY THOUGHT HIGHLY OF YOU AND SAID SO IN

22   INTERNAL DOCUMENTS AND INVITED YOU TO PHILADELPHIA TO ENGAGE IN

23   DISCUSSION ABOUT THE OUTCOMES STUDY?

24   A.    THAT'S CORRECT.

25   Q.    WERE THERE OTHER RESPECTED SCIENTISTS THERE AS WELL?

DAILY COPY

1    **A.**   YES.

2    **Q.**   AND THE PURPOSE OF THE MEETING THAT YOU ATTENDED WAS TO

3    SORT OF BRAINSTORM WITH MERCK ON THE BEST WAY TO TRY TO DESIGN

4    A STUDY TO FOCUS ON A POSSIBLE CV OUTCOMES STUDY?

5    **A.**   I THINK IT WAS TWOFOLD.  IT WAS, ONE, TO EVALUATE THE DATA

6    THAT WERE CURRENTLY AVAILABLE RELATING TO THE POTENTIAL

7    CARDIOVASCULAR RISKS; AND THEN, TWO, TO DESIGN A STUDY TO

8    EXAMINE THAT POSSIBILITY.

9    **Q.**   AND MERCK WELCOMED THE INPUT OF YOU AND OTHER SCIENTISTS

10   IN THAT REGARD?

11   **A.**   YES.

12         **MR. GOLDMAN:**  THAT'S THE END OF OUR

13   CROSS-EXAMINATION.

14         **THE COURT:**  IS THERE ANY REDIRECT?

15         **MR. ROBINSON:**  YES, YOUR HONOR.

16                    **REDIRECT EXAMINATION**

17   BY MR. ROBINSON:

18   **Q.**   DOCTOR, IS IT YOUR UNDERSTANDING FROM REVIEWING THIS

19   DOCUMENT AND HAVING VARIOUS QUESTIONS ASKED TO YOU TODAY THAT

20   THE SCIENTIFIC ADVISORY BOARD IS ESSENTIALLY SAYING THAT

21   COXIBS, LIKE VIOXX, COULD HELP OR HARM ATHEROMATOUS PLAQUES?

22   **A.**   THAT'S MY UNDERSTANDING, YES.

23   **Q.**   AND YOUR STUDY SHOWED HARMFUL EFFECTS OF COX-2 INHIBITORS

24   LIKE VIOXX ON THE FORMATION AND PROGRESSION OF ATHEROMATOUS

25   PLAQUES; CORRECT?

1    **A.**   THE STUDY SHOWED THE DEVELOPMENT OF -- I AGREE WITH THAT

2    STATEMENT, YES.

3    **Q.**   NOW, DIDN'T MERCK -- MERCK DIDN'T TELL YOU NOT TO DO YOUR

4    STUDY, BUT DIDN'T THEY TURN YOU DOWN THE FIRST TIME YOU

5    APPROACHED MERCK ABOUT DOING THE STUDY?

6    **A.**   THEY DID.

7    **Q.**   AND YOU TOLD THEM ESSENTIALLY THAT YOU WOULD GO FORWARD

8    EVEN IF YOU HAD TO FUND THE STUDY YOURSELF; ISN'T THAT RIGHT?

9    **A.**   I DID, BUT THE ONLY CAVEAT THERE WAS THAT I COULDN'T

10   OBTAIN THE DRUG WITHOUT THEIR COOPERATION.

11   **Q.**   AND YOU ASKED FOR VIOXX SPECIFICALLY FROM MERCK TO DO THE

12   STUDY; CORRECT?

13   **A.**   CORRECT.

14   **Q.**   AND DID THEY PROVIDE YOU WITH VIOXX?

15   **A.**   THEY DID NOT.

16   **Q.**   WHAT DRUG DID THEY GIVE YOU INSTEAD?

17   **A.**   MF-TRICYCLIC.

18   **Q.**   NOW, I'LL POINT YOU TO THE SECOND PAGE OF THIS CUMULATIVE

19   EXHIBIT, AND IF YOU LOOK DOWN AT THE BOTTOM, IT APPEARS TO BE

20   MRK-ABS0343457.

21   **A.**   I'M SORRY.  I DON'T SEE WHERE YOU'RE READING.

22   **Q.**   BATES NUMBER -- THAT DOESN'T REALLY MATTER, DOCTOR.  I'LL

23   POINT YOU OUT TO AN E-MAIL FROM LESLIE KOCH, TO GREG

24   WIEDERRECHT, APPEARS TO BE OBENCHAIN.

25   **A.**   YES.

1    **Q.**   AND IT SAYS, "GREG, YES, WE DO SEND OUT MARKETED

2    COMPOUNDS -- ACTUALLY, THAT IS ABOUT 80 PERCENT OF THE TOTAL

3    REQUESTS.  DECISIONS ABOUT THE APPROPRIATENESS OF THE

4    EXPERIMENTS INVOLVING VIOXX AND IF MERCK WANTS TO SUPPORT GO TO

5    DR. ROBERT YOUNG (MFC) AND DR. IAN RODGERS, (CHAIRMAN, VIOXX

6    MEDICAL SCHOOL GRANT COMMITTEE).  OCCASIONALLY, THEY WILL OFFER

7    SUBSTITUTE COMPOUNDS LIKE MF-TRICYCLIC OR DFU IF THEY ARE

8    INTERESTED IN THE STUDY, BUT" CONCERNED "ABOUT POTENTIAL BAD

9    IMPLICATIONS ON MARKETED PRODUCTS."

10           DID MERCK EVER INFORM YOU OR ANYBODY AT MERCK,

11   DR. RODGER, TELL YOU THAT THEY WERE CONCERNED ABOUT YOUR STUDY

12   SHOWING BAD IMPLICATIONS FOR A MARKETED PRODUCT AND THAT'S WHY

13   THEY DIDN'T YOU GIVE YOU VIOXX, DOCTOR?

14   **A.**   THEY NEVER INFORMED ME ABOUT THAT.

15   **Q.**   AND MERCK HAS BEEN VERY SPECIFIC IN THE QUESTIONS THEY'VE

16   ASKED YOU, DOCTOR.  IF YOU'LL RECALL, THEY'VE ASKED YOU, "ARE

17   THERE ANY VIOXX STUDIES IN KNOCKOUT MICE THAT REPLICATED YOUR

18   FINDING?

19   **A.**   YES.

20   **Q.**   ARE YOU AWARE OF OTHER STUDIES, WHETHER IT BE IN ANIMALS

21   OR HUMANS, INVOLVING OTHER COX-2 INHIBITORS OR INVOLVING

22   KNOCKOUT MICE, PERIOD, THAT WOULD TEND TO SUBSTANTIATE OR

23   REPLICATE YOUR FINDINGS?

24   **A.**   NO.

25   **Q.**   DOES YOUR STUDY RAISE QUESTIONS, OR AT LEAST GENERATE

1   HYPOTHESIS -- HYPOTHESES, EXCUSE ME, ABOUT POTENTIAL ADVERSE

2   EFFECTS OF VIOXX AND OTHER COX-2 INHIBITORS IN HUMANS?

3   **A.**   IT DOES.

4   **Q.**   DOES YOUR STUDY ALSO RAISE QUESTIONS OR GENERATE

5   HYPOTHESES IN HUMANS THAT VIOXX AND OTHER COX-2 INHIBITORS

6   COULD PROMOTE ATHEROSCLEROSIS FORMATION AND PROGRESSION?

7   **A.**   IT DOES.

8   **Q.**   WOULD IT BE PROPER TO SAY THAT YOUR STUDY, AT LEAST,

9   GENERATES THIS HYPOTHESIS OR -- THAT COX-2 INHIBITION,

10  INCLUDING THE USE OF VIOXX, IN HUMANS COULD INCREASE

11  ATHEROGENESIS?

12  **A.**   IT RAISES THAT POSSIBILITY, YES.

13  **Q.**   IS THAT THE YELLOW FLAG THAT YOU REFERRED TO EARLIER?

14  **A.**   YES.

15                      **REDIRECT EXAMINATION**

16  **BY MR. GOLDMAN:**

17  **Q.**   DR. EPSTEIN, I JUST HAVE A FEW FOLLOW-UP QUESTIONS.  YES.

18  MR. SIZEMORE ASKED YOU WHETHER MERCK TURNED DOWN YOUR INITIAL

19  REQUEST FOR FUNDING FOR YOUR STUDY.  DO YOU REMEMBER THAT?

20  **A.**   YES.

21  **Q.**   AND IT IS TRUE THAT INITIALLY DR. RODGER SAID THAT MERCK

22  WASN'T INTERESTED IN PURSUING THE STUDY; RIGHT?

23  **A.**   CORRECT.

24  **Q.**   WAS THE -- DID DR. RODGER EXPLAIN TO YOU THAT, BASED ON

25  HIS UNDERSTANDING OF THE STUDY, THE GOAL WAS TO DETERMINE

1   WHETHER VIOXX HAD ANY BENEFICIAL EFFECT ON ATHEROSCLEROSIS, AND

2   MERCK HAD ALREADY FUNDED RESEARCH ALONG THAT LINE?

3   **A.**   THAT WAS THE EXPLANATION THAT I RECEIVED FROM HIM.

4   **Q.**   AND WHEN YOU EXPLAINED TO DR. RODGER THAT YOUR PRIMARY

5   HYPOTHESIS WAS TO TEST SOMETHING THAT REALLY NOBODY HAD THOUGHT

6   OF, AND THAT WAS COULD COX-2 INHIBITION DECREASE THE AMOUNT OF

7   VIRUS IN THE BODY, DID DR. RODGER AND MERCK THEN DECIDE TO FUND

8   THAT PART OF THE STUDY?

9   **A.**   YES.

10          **THE COURT:**  IS THAT IT?

11          **MR. ROBINSON:**  YES, YOUR HONOR.

12          **THE COURT:**  LET'S TALK ABOUT THE REST OF THE LINE-UP

13   FOR TODAY.

14          (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH

15   OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

16          **THE COURT:**  OKAY.  LET'S TAKE A BREAK, A 10-MINUTE

17   BREAK.

18          **THE DEPUTY CLERK:**  EVERYONE RISE.

19          (WHEREUPON, THE COURT TOOK A BRIEF RECESS, AFTER

20   WHICH THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE THE PRESENCE

21   OF THE JURY.)

22          **THE DEPUTY CLERK:**  EVERYONE RISE.

23          **THE COURT:**  BE SEATED.

24          **MR. ROBINSON:**  YOUR HONOR, THERE IS A DOCUMENT THAT

25   THE COURT RULED AS ADMISSIBLE.  IT'S HARD WITH ALL THESE

1    WITNESSES TO TRY AND GO FIND A DEPO TO PUT THESE IN.  SO THIS

2    IS THE PROPOSED LABEL BY THE FDA IN OCTOBER 1, 2001, THAT GOT

3    SENT TO MERCK.  SO MERCK HAD NOTICE OF IT.  THEY KNEW ABOUT IT.

4    IT WAS THE PROPOSED LABEL THAT WAS MENTIONED IN SCOLNICK'S

5    DEPOSITION, BUT THE EXHIBIT WASN'T MARKED OR PUT IN.  HE

6    REFERRED TO IT.  IT WAS MENTIONED THAT HE KNEW ABOUT IT AND HE

7    DIDN'T WANT THAT LABEL.  HE WANTED HIS OWN LABEL, A PRECAUTION

8    LABEL.

9                 SO WHAT HAPPENED IS THIS.  WE THEN TOOK THAT

10   LABEL AND SHOWED THAT TO DR. MIKOLA, AND YOU ALLOWED IN THE

11   TESTIMONY THAT HE LOOKED AT THAT LABEL.  WE LOOKED AT THE

12   LABEL, AND THAT BECAME PART OF HIS TESTIMONY.  NOW, THAT'S

13   EXHIBIT 11 TO DR. MIKOLA'S TESTIMONY, AND WE OFFER THAT IN.

14   IT'S AN ADMISSIBLE DOCUMENT.  MERCK GOT IT.  THERE IS NOTICE OF

15   IT.  THEY AGREE.  IT'S SOMETHING THAT THEY GOT COPIES OF.  IT

16   WAS MENTIONED IN DR. SCOLNICK'S DEPO.  SO THAT'S PART OF THE

17   FOUNDATION, AND THEY ARE OBJECTING TO IT BECAUSE THEY ARE

18   SAYING THAT --

19                 **THE COURT:**  WELL, LET ME HEAR THEIR OBJECTION.

20                 **MR. BECK:**  YOUR HONOR, FIRST OF ALL, WITH DR. MIKOLA,

21   YOUR HONOR SUSTAINED THE OBJECTION TO THE USE OF THAT DOCUMENT

22   WITH DR. MIKOLA.  THIS IS AN EXAMPLE OF A DOCUMENT, I THINK,

23   THAT SHOULD NOT BE ADMITTED UNLESS THERE IS TESTIMONY ABOUT THE

24   PARTICULAR DOCUMENT.  BECAUSE THIS CAN CHARACTERIZE IT AS "THE

25   FDA PROPOSAL"; AND, IN FACT, SOMEBODY WITH KNOWLEDGE WOULD SAY

1    THIS IS COMING FROM STAFF PEOPLE, AND THERE IS BACK-AND-FORTH.

2              SO WITHOUT A FOUNDATION ON WHAT THE DOCUMENT

3    REALLY IS, I THINK THAT IT SHOULD NOT BE RECEIVED IN EVIDENCE.

4    IT CERTAINLY IS A PIECE OF PAPER THAT WE RECEIVED, BUT THERE

5    HASN'T BEEN FOUNDATIONAL TESTIMONY ABOUT WHAT IT MEANS, WHO

6    FROM THE FDA IT COMES FROM, WHAT LEVEL OF PEOPLE THOSE ARE, AND

7    IT GETS MISCHARACTERIZED AS THE FDA ASKING FOR THIS.

8              **THE COURT:**  ALL RIGHT.  I UNDERSTAND THE ISSUE.  THIS

9    IS WHAT I NEED FROM YOU.  GIVE ME SOME SECTIONS OF SCOLNICK'S

10   TESTIMONY AND ALSO THE TESTIMONY OF THE OTHER DOCTOR AND LET ME

11   TAKE A LOOK AT THAT.  ALSO, GIVE ME THE DOCUMENT.  I'LL RULE ON

12   IT.  BUT I DON'T WANT TO JUST SHOOT FROM THE HIP ON IT.

13             **MR. BIRCHFIELD:**  WE'LL DO THAT, YOUR HONOR.  THIS IS

14   THE LABEL THAT PROMPTED DR. SCOLNICK'S RESPONSE ABOUT "WE WILL

15   NOT ACCEPT THIS LABEL.  IT'S UGLY.  IT'S UGLY CUBED."

16             **THE COURT:**  I THINK I REMEMBER, BUT I WOULD LIKE TO

17   PUT IT IN CONTEXT SO THAT I UNDERSTAND IT.

18             **MR. ROBINSON:**  YOUR HONOR, WITH THAT ONE EXCEPTION,

19   WE WOULD OFFER THE FOLLOWING DOCUMENTS INTO EVIDENCE.  I DON'T

20   THINK THERE IS ANY OBJECTION.  MIKOLA EXHIBITS 1, 2, 3, 4, 5,

21   9, 15, AND 21.

22             **THE COURT:**  NO OBJECTION.

23             **MR. GOLDMAN:**  NO OBJECTION TO THOSE OTHER THAN THE

24   ONES WE MADE BEFORE THAT THE COURT RULED ON OUR OBJECTIONS.

25   THIS IS FOR DR. MIKOLA.  MERCK OFFERS EXHIBITS DX2009, DX2054,

1    DX2055, DX2067, DX2068, PX1.2000, DX2062, DX2074.  THAT'S FOR

2    DR. MIKOLA.

3            **THE COURT:**  OKAY.  LET THEM BE ADMITTED.

4            **MR. ROBINSON:**  YOUR HONOR, I WANT TO MAKE SURE THAT

5    ONE OF THE -- DID THAT INCLUDE THE -- WAS IT THE MOBIC LABEL,

6    THE FELDENE LABEL?

7            **MR. GOLDMAN:**  NO.  I TOOK OUT THE MOBIC LABEL BECAUSE

8    THE JUDGE SUSTAINED THAT OBJECTION.

9            **MR. ROBINSON:**  OKAY.  YOU DIDN'T PUT THAT IN?

10           **MR. GOLDMAN:**  I DID NOT PUT THE MOBIC LABEL IN.

11           **MR. ROBINSON:**  I JUST WANTED TO MAKE SURE.

12           **THE COURT:**  ANDY, GET THAT MATERIAL TO ME EITHER

13   TODAY, SO I COULD LOOK AT IT TOMORROW, OR MONDAY I'LL LOOK AT

14   IT.

15           **MR. GOLDMAN:**  DR. KARAVAN.  DO YOU WANT ME TO START?

16           **MR. ROBINSON:**  GO AHEAD.

17           **MR. GOLDMAN:**  THIS IS FOR DR. KARAVAN.  MERCK OFFERS

18   DX0027, 2045, 2046, 2047, 2048, 2049, 2050, 2051, 2052, 2053,

19   2054, 2055, 2078, 2088.

20           **THE COURT:**  HEARING NO OBJECTION, I'LL ADMIT.

21           **MR. ROBINSON:**  NO OBJECTION.  YOUR HONOR, WE'RE

22   OFFERING DR. KARAVAN EXHIBITS 3, 4, 5, 6, 7, 8, 10, 11, 12, 13,

23   14, 15, 16, 17, 18, 21, 22, 29, 31, 37, 38, 39, AND 40.

24           **MR. GOLDMAN:**  JUDGE, WE STAND BY OUR ORIGINAL

25   OBJECTIONS.  THE ONLY ONE THAT I'LL REITERATE AS AN OBJECTION

1  IS EXHIBIT 39, WHICH IS AN ARTICLE BY GERALD -- IT'S JUST A

2  LEARNED TREATISE.  IT SHOULDN'T BE COMING IN.

3         **MR. ROBINSON:**  YOUR HONOR, IT WAS SOMETHING THAT WAS

4  READ INTO THE DEPOSITION AND, BASICALLY, IT SHOULD COME IN AS

5  NOTICE TO MERCK.  IT WAS A 2004 PUBLICATION, AND IT SHOULD COME

6  IN FOR ALL PURPOSES.

7         **MR. GOLDMAN:**  IT WAS WRITTEN AFTER THE WITHDRAWAL AND

8  IT'S STILL A LEARNED TREATISE.

9         **THE COURT:**  THE PROBLEM, OF COURSE, IS THAT 803(18)

10 IN THE RULES OF EVIDENCE TALKS ABOUT THE FACT THAT A LEARNED

11 TREATISE CAN BE READ TO THE JURY BUT NOT INTRODUCED AND BECOME

12 A PART OF THE EVIDENCE, SO I'LL EXCLUDE THAT.  IF YOU WANT TO

13 SUBSTITUTE FOR THAT A PAGE WITH WHATEVER IT IS, I DON'T HAVE A

14 PROBLEM.

15        **MR. ROBINSON:**  I WOULD LIKE HAVE THE PART THAT I READ

16 IN.

17        **MR. GOLDMAN:**  NO.

18        **THE COURT:**  THAT'S NOT ADMISSIBLE.  WHAT I'M SAYING

19 IS THAT YOU CAN PUT IN THE NAME OF THE ARTICLE AND WHATEVER IT

20 IS, BUT NOT THE PART.  THAT'S WHAT'S NOT INTRODUCIBLE, NOT

21 ADMISSIBLE.  YOU CAN READ IT, BUT YOU CAN'T ADMIT IT.

22        **MR. ROBINSON:**  OKAY.  YOUR HONOR, ALSO ON

23 DR. CANNUSCIO, WE'VE NOW WORKED OUT AN AGREEMENT WITH COUNSEL.

24 REMEMBER WE HAD THE TWO LENGTHY ARTICLES?  MS. ODELL PUT

25 TOGETHER THE TITLE AND THEN THE REFERENCE TO HER, AN

1   ACKNOWLEDGMENT TO HER, AND THEN THE ACTUAL PUBLISHED VERSION

2   THAT DIDN'T HAVE THE ACKNOWLEDGMENT TO HER, SO WE WOULD OFFER

3   BOTH OF THOSE IN AT THIS TIME.

4           MR. GOLDMAN:  THOSE ARE FINE.  I JUST WANT TO MAKE

5   SURE I SEE THE RIGHT ONES THAT ARE BEING INTRODUCED.

6           THE COURT:  IN THAT REGARD, LET'S MAKE SURE THAT

7   EITHER YOU OR YOUR PEOPLE LOOK AT THE EXHIBITS.  IT'S VERY

8   HELPFUL TO US IF YOU DO IT DAILY OR EVERY COUPLE OF DAYS SO

9   THAT WE MAKE SURE THAT WE HAVE THE EXHIBITS OR WE HAVE THEM IN

10  THE FORM AND FASHION THAT YOU WISH THEM IN.

11          MR. ROBINSON:  YOUR HONOR, FOR THE RECORD, I WANT TO,

12  IF YOU COULD, IDENTIFY THE TWO EXHIBITS.  THE TWO EXHIBITS ARE

13  P2.0017A AND --

14          MR. BIRCHFIELD:  THE OTHER ONE IS P1.1729A.

15          THE DEPUTY CLERK:  WHAT'S THE SECOND ONE?

16          MR. BIRCHFIELD:  P1.1729A.

17          THE COURT:  LET THEM BE ADMITTED.  WE WANTED TO GIVE

18  THE JURY ENOUGH TIME TO EAT.  I BROUGHT THEM SOME FRUIT AND

19  DOUGHNUTS FOR TODAY, SO I'M SURE THEY ARE FINISHED NOW.

20          THE DEPUTY CLERK:  EVERYONE RISE.

21          (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

22          THE COURT:  BE SEATED, PLEASE.  MEMBERS OF THE JURY,

23  WE'RE GOING TO GET YOU OUT OF HERE ON TIME, IF NOT BEFORE.

24          MR. ROBINSON:  WHAT WE'RE GOING TO DO IS PLAY A

25  SERIES OF TAPES.  IS THAT A SURPRISE?

1          **THE COURT:**  I MIGHT SAY, MEMBERS OF THE JURY, THAT

2    IT'S INTERESTING.  YOU KNOW, I PRACTICED IN THE OLD DAYS WHEN

3    WE USED TO HAVE SOMEBODY TAKE THE STAND AND READ IT.  VERY

4    DIFFICULT.  WE'VE TRIED TO DO ALL SORTS OF THINGS, PUTTING THE

5    NAMES IN FRONT OF THE WITNESS BOX AND SO FORTH.  IT'S A LITTLE

6    EASIER NOW.  OFTENTIMES, IN CASES OF THIS SORT, WHERE YOU HAVE

7    EXPERTS, BUSY INDIVIDUALS FROM ALL OVER THE WORLD, IT'S HARD TO

8    HARNESS THEM AND GET THEM INTO COURT.  SO MORE AND MORE I'M

9    SEEING THIS IN LITIGATION.  I APPRECIATE YOUR ATTENTION THAT

10   YOU'VE GIVEN TO IT.

11          **MR. ROBINSON:**  YOUR HONOR, THE NEXT PERSON IS A MERCK

12   EMPLOYEE.  HE IS EXECUTIVE MARKETING DIRECTOR FOR VIOXX FOR

13   MERCK.  HIS NAME IS TOM CANNELL.

14          (WHEREUPON, **TOM CANNELL**, HAVING BEEN DULY SWORN,

15   TESTIFIED BY DEPOSITION AS FOLLOWS.)

16                    **DIRECT EXAMINATION**

17   BY MR. ROBINSON:

18   **Q.**   DO YOU WANT TO STATE YOUR NAME FOR THE RECORD, PLEASE.

19   **A.**   MY NAME IS TOM CANNELL.

20   **Q.**   AT ONE TIME YOU WERE THE EXECUTIVE MARKETING DIRECTOR FOR

21   VIOXX FOR MERCK?

22   **A.**   THAT'S RIGHT.

23   **Q.**   AT WHAT TIME PERIOD WERE YOU THE EXECUTIVE MARKETING

24   DIRECTOR FOR MERCK ON VIOXX?

25   **A.**   FROM APPROXIMATELY MID-FEBRUARY OF 2001 TO DECEMBER OF

1  2002.

2  **Q.**   WHAT WERE YOUR DUTIES AS THE EXECUTIVE MARKETING DIRECTOR

3  FOR VIOXX ON BEHALF OF MERCK?

4  **A.**   I WAS RESPONSIBLE FOR OUR DIRECT-TO-CONSUMER PROMOTION AND

5  FOR OUR PHYSICIAN PROMOTION.

6  **Q.**   NOW, EXHIBIT 1 IS MERCK'S CODE OF CONDUCT, WHICH IS A

7  BOOKLET CREATED BY MERCK REGARDING THEIR VALUES AND STANDARDS;

8  CORRECT?

9  **A.**   THAT'S CORRECT.  CAN I JUST TAKE ONE MOMENT --

10  **Q.**   YEAH.

11  **A.**   -- AND READ IT?

12  **Q.**   HAVE YOU READ IT?

13  **A.**   I GLANCED THROUGH IT, YES.

14  **Q.**   YOU'RE FAMILIAR WITH THE MERCK CODE OF CONDUCT; CORRECT?

15  **A.**   I AM FAMILIAR WITH THIS.

16  **Q.**   YES.  DO YOU SEE THERE A SECTION ENTITLED "HONEST

17  COMMUNICATION"?

18  **A.**   (NODS HEAD)

19  **Q.**   FIRST OF ALL, LET ME ASK YOU THIS:  AS THE EXECUTIVE

20  MARKETING DIRECTOR FOR VIOXX AND AS A VICE-PRESIDENT, RELATED

21  TO SALES DUTIES AND MARKETING DUTIES FOR VIOXX, DID YOU FOLLOW

22  THIS PRACTICE OF HONEST COMMUNICATION?

23  **A.**   YES.  WE DID AND I DID.

24  **Q.**   LOOKING AT THE FIRST SENTENCE UNDER "HONEST

25  COMMUNICATION," DOES IT SAY, "LIVES DEPEND NOT ONLY ON THE

1254

1   QUALITY OF OUR PRODUCTS AND SERVICES, BUT ALSO ON THE QUALITY

2   OF THE INFORMATION WE PROVIDE TO THE COMMUNITY AND GENERAL

3   PUBLIC"?  DID I READ THAT RIGHT?

4   **A.**   YES, YOU DID.

5   **Q.**   THEN DOES IT SAY, "INFORMATION FURNISHED TO OUR CUSTOMERS

6   ABOUT OUR PRODUCTS AND SERVICES, INCLUDING AVAILABILITY AND

7   DELIVERY, MUST BE USEFUL, ACCURATE, SUPPORTED BY SCIENTIFIC

8   EVIDENCE WHERE RELEVANT, AND PRESENTED HONESTLY, FAIRLY, AND BY

9   PROPER MEANS"?  DID I READ THAT RIGHT?

10  **A.**   YES, YOU DID.

11  **Q.**   IS THERE A TERM USED IN SALES AND MARKETING IN YOUR

12  BUSINESS CALLED "A FAIR COMMENT" OR "A FAIRNESS IN

13  COMMUNICATION"?

14  **A.**   "FOR BALANCE" IS --

15  **Q.**   "FAIR BALANCE"?

16  **A.**   YES, THERE IS.

17  **Q.**   WHAT DOES THAT REFER TO, FOR THE JURY'S SAKE?

18  **A.**   WHEN WE DISCUSS A PRODUCT WITH A CUSTOMER, THE BASIS FOR

19  THAT DISCUSSION IS THE PACKAGE INSERT OR PACKAGE CIRCULAR.  THE

20  EXPECTATION OF THE FDA AND THE EXPECTATION OF MERCK IS THAT

21  THERE BE A BALANCED DISCUSSION WHERE WE NOT ONLY TALK ABOUT THE

22  BENEFITS OF THE PRODUCT, BUT ALSO SAFETY AND TOLERABILITY

23  INFORMATION.

24  **Q.**   NOW, WHEN YOU COMMUNICATED TO DOCTORS AND TO CONSUMERS

25  ABOUT VIOXX, DID YOU ALSO HAVE A DUTY TO TELL THE CONSUMERS

DAILY COPY

1    ABOUT THE CARDIOVASCULAR RISKS, WHICH INCLUDED HEART ATTACKS
2    AND STROKES?
3    **A.**   WHEN WE, THROUGH PROMOTION, TALKED TO CONSUMERS OR TALKED
4    TO PHYSICIANS, TALKED TO DOCTORS ABOUT VIOXX, WE WERE OBLIGATED
5    TO GIVE A BALANCED PRESENTATION OF VIOXX BASED ON THE PACKAGE
6    CIRCULAR OF THE BRAND.
7    **Q.**   IS THERE ANY LETTER THAT YOU EVER RECEIVED FROM THE FDA
8    THAT SAID YOU CANNOT DISCUSS THE VIGOR RESULTS WITH TREATING
9    DOCTORS AND PRESCRIBING DOCTORS PENDING A NEW LABEL?
10   **A.**   I DON'T RECALL THAT LETTER.
11   **Q.**   THERE WAS NO LETTER; CORRECT?
12   **A.**   NOT THAT I AM AWARE OF.
13   **Q.**   SO THIS IS EXHIBIT 6.  FOR THE RECORD, IT BEGINS AT BATES
14   NUMBER MRK-ADG0057776; CORRECT?  THAT'S THE BATES NUMBER.
15   **A.**   ARE YOU ASKING ME?
16   **Q.**   7776?
17   **A.**   YES, THAT'S CORRECT.
18   **Q.**   JUST FOR THE RECORD, THIS IS A TOM CANNELL POWERPOINT;
19   RIGHT?
20   **A.**   THIS IS A PRESENTATION WITH MY NAME.  I'M NOT SURE IF THIS
21   IS POWERPOINT OR NOT.
22   **Q.**   IT'S A PRESENTATION?
23   **A.**   YEAH.
24   **Q.**   LET'S BACK UP TO 7793.  SO YOUR CORE MESSAGES ARE TIED TO
25   MARKETING STRATEGY; CORRECT?

1256

1    **A.**   THAT'S CORRECT.  THAT'S WHAT IT SAYS HERE.

2    **Q.**   "ATTRIBUTES KNOWN TO IMPACT PRESCRIBING:  ENSURES

3    CONSISTENCY OF PROMOTIONAL CAMPAIGN.  ALLOWS FOR REFRESHED

4    REASONS TO BELIEVE."  CONTINUING ON, "POWERFUL PAIN RELIEF,

5    CHRONIC EFFICACY OR OA AND RA, PROVEN GI RISK REDUCTION,

6    ELDERLY SAFETY DATA."  DOES THAT COMPLETE YOUR CORE MESSAGES?

7    **A.**   I DON'T RECALL THEM.  THAT IS WHAT'S ON THIS DOCUMENT.

8    **Q.**   NOWHERE IN YOUR CORE MESSAGES IS THERE MENTION OF THE

9    POTENTIAL FOR CARDIOVASCULAR RISKS; CORRECT?

10   **A.**   THAT'S CORRECT.

11   **Q.**   ISN'T IT TRUE THAT YOU ACTUALLY LOOKED AT THE

12   CARDIOVASCULAR RISKS AS AN OBSTACLE TO SALES?

13   **A.**   I DON'T RECALL CHARACTERIZING THAT -- PHYSICIANS HAD

14   QUESTIONS ABOUT CARDIOVASCULAR DATA FOR VIOXX AND WE WOULD

15   ANSWER THOSE QUESTIONS.  THIS IS AFTER THE LABEL CHANGE.  SO

16   NOW WE'RE ANSWERING THEM COMPLETELY USING THE VIGOR DATA THAT'S

17   IN THE PACKAGE CIRCULAR.

18   **Q.**   BUT MERCK AND YOU, AS EXECUTIVE DIRECTOR OF MARKETING,

19   LOOKED AT THE CARDIOVASCULAR RISK ISSUES AND QUESTIONS FROM

20   PRESCRIBERS AS "OBSTACLES"; CORRECT?

21   **A.**   I DON'T RECALL USING THAT TERM, BUT THE FACT IS THERE WERE

22   QUESTIONS BEING RAISED BY DOCTORS.

23   **Q.**   HERE, LET'S TAKE A LOOK HERE.  WE'LL STAY ON EXHIBIT 6,

24   BUT I WANT YOU TO LOOK AT EXHIBIT 7.  EXHIBIT 7 IS AN E-MAIL

25   FROM YOU TO ANTONIA SISTI.

1    **A.**    THAT'S CORRECT.

2    **Q.**    AND COPIES GOING TO MAUREEN CHRISTIANO AND TYRUS BARKER;

3    RIGHT?

4    **A.**    THAT'S CORRECT.

5    **Q.**    LET'S READ WHAT YOUR E-MAIL SAYS, WHICH IS EXHIBIT 7.  YOU

6    SAY, "I THINK THREE, TWO, ONE, GO WOULD WORK."  DID I READ THAT

7    RIGHT?

8    **A.**    YES, YOU DID.

9    **Q.**    THEN YOU SAY, "THREE ARE THE STRENGTHS WE HAVE:  ONE,

10   EFFICACY; TWO, PROVEN GI OUTCOMES; AND THREE, COST."  DID I

11   READ THAT RIGHT?

12   **A.**    YES, YOU DID.

13   **Q.**    THEN YOU SAY, "TWO ARE THE OBSTACLES WE NEED TO BE ABLE TO

14   HANDLE CONFIDENTLY:  ONE, CV; AND TWO, HYPERTENSION."  DID I

15   READ THAT RIGHT?

16   **A.**    YES, YOU DID.

17   **Q.**    BY "CV," THAT'S CARDIOVASCULAR RISK; CORRECT?

18   **A.**    "CV" STANDS FOR CARDIOVASCULAR QUESTIONS.

19   **Q.**    YOU LOOKED AT THAT AS AN OBSTACLE; CORRECT?

20   **A.**    RIGHT.  WE USE THE TERM "OBSTACLE" AND "QUESTION"

21   INTERCHANGEABLY.

22   **Q.**    HAS SOMEBODY DISCUSSED WITH YOU THE IDEA THAT MAYBE YOU

23   SHOULD CHANGE THE WORD "OBSTACLE" TO "QUESTION" BEFORE WE SAT

24   HERE FOR THIS DEPOSITION?

25   **A.**    I HAVE NEVER HEARD ANYONE SAY THAT.  I CAN TELL YOU THAT,

1   SINCE I STARTED WITH MERCK IN 1987, "QUESTION" AND "OBSTACLE"

2   WERE ALWAYS USED INTERCHANGEABLY.

3   **Q.**   WELL, I MEAN, THERE WERE QUESTIONS REGARDING EFFICACY,

4   CORRECT, OF THE DRUG?

5   **A.**   THERE WAS A LOT OF DISCUSSION ABOUT EFFICACY.

6   **Q.**   BUT YOU DON'T CALL THAT AN OBSTACLE, DO YOU?

7   **A.**   WELL, AS YOU SAW, EFFICACY IS ACTUALLY REFERRED TO AS A

8   CORE MESSAGE IN THE DOCUMENT.

9   **Q.**   IT'S NOT AN OBSTACLE?

10  **A.**   IT'S A CORE MESSAGE.

11  **Q.**   I WANT TO GO BACK TO THIS PRESENTATION.  YES.  IN YOUR

12  CORE MESSAGES REGARDING VIOXX, YOU TALK ABOUT MARKETING

13  STRATEGY.  YOU TALK ABOUT POWERFUL PAIN RELIEF, CHRONIC

14  EFFICACY, PROVEN GI RISK, ELDERLY SAFETY DATA, BUT YOU DO NOT

15  TALK ABOUT THE CARDIOVASCULAR ISSUE; CORRECT?

16  **A.**   THE CORE MESSAGES DO NOT REFERENCE CARDIOVASCULAR.

17  HOWEVER, THE EXPECTATION IS THAT REPRESENTATIVES WOULD DELIVER

18  A BALANCED DISCUSSION CONSISTENT WITH THE PI.

19  **Q.**   BUT ONE OF YOUR MESSAGES WAS ELDERLY SAFETY DATA; RIGHT?

20  **A.**   YEAH.

21  **Q.**   ARE YOU AWARE FROM YOUR WORK AT MERCK OR FROM YOUR READING

22  OF ANY LITERATURE ON MI'S THAT STROKES -- THAT OLDER PEOPLE ARE

23  AT A HIGHER RISK FOR HEART ATTACK AND STROKE THAN YOUNGER

24  PEOPLE?

25  **A.**   YES.  I BELIEVE -- IT'S MY UNDERSTANDING THAT OLDER PEOPLE

DAILY COPY

1    ARE SOMETIMES AT AN INCREASED RISK OF CERTAIN CARDIOVASCULAR

2    EVENTS THAN YOUNGER PEOPLE.

3    **Q.**    NOW LET'S GO TO BATES NUMBER MRK-ADG57804.  LET'S GO BACK

4    TO 802.  SO THIS IS GOING TO BE FOR SALES REPS; RIGHT?

5    **A.**    THIS IS A DRAFT OF A DECK THAT I USED IN PRESENTATIONS TO

6    EITHER SALES REPRESENTATIVES OR MANAGERS.  I DON'T RECALL WHAT

7    LEVEL.

8    **Q.**    BUT YOU'RE TELLING THEM AT PAGE 802, YOU'RE SAYING

9    "PRODUCT KNOWLEDGE."  KNOW THE PI'S," WHICH IS THE PACKAGE

10   INSERT; RIGHT?

11   **A.**    THAT'S CORRECT.

12   **Q.**    THEN WHAT YOU'RE DOING IS YOU'RE TELLING THEM TO DISCERN

13   BETWEEN THE DIFFERENT PARTS OF THE FDA LABELING GUIDELINES;

14   RIGHT?

15   **A.**    WHAT WE DID HERE IS WE ACTUALLY TOOK EXCERPTS FROM THE FDA

16   WEBSITE THAT DESCRIBED THE DIFFERENT SECTIONS OF THE LABEL.

17   **Q.**    SO WHAT'S GOING ON HERE IS THIS, IS YOU HAVE -- FOR

18   EXAMPLE, 57803 IS SORT OF A PORTION OF THE DEFINITION OF

19   CONTRAINDICATIONS; IS THAT RIGHT?

20   **A.**    FROM THE FDA WEBSITE, THAT'S CORRECT.

21   **Q.**    WELL, FOR EXAMPLE, I'M READING YOUR OWN PRESENTATION UNDER

22   "CONTRAINDICATIONS."  YOU SAY, "CONTRAINDICATIONS.  DESCRIPTION

23   OF SITUATIONS IN WHICH THE DRUG SHOULD NOT BE USED BECAUSE THE

24   RISK OF USE OUTWEIGHS ANY POSSIBLE BENEFIT."  DID I READ THAT

25   RIGHT?

1260

1    **A.**   YES, YOU DID.

2    **Q.**   THEN, FOR "WARNINGS" YOU SAY TO THE SALES REPS AND

3    MARKETING MANAGERS, "DESCRIPTION OF SERIOUS ADVERSE REACTIONS

4    AND POTENTIAL SAFETY HAZARDS, SUBSEQUENT LIMITATION IN USE AND

5    STEPS THAT SHOULD BE TAKEN IF THEY OCCUR."  DID I READ THAT

6    RIGHT?

7    **A.**   YES, YOU DID.

8    **Q.**   THEN UNDER "PRECAUTIONS" YOU SAY, "INFORMATION REGARDING

9    ANY SPECIAL CARE TO BE EXERCISED FOR THE SAFE AND EFFECTIVE USE

10   OF THE DRUG INCLUDES GENERAL PRECAUTIONS AND INFORMATION FOR

11   PATIENTS ON DRUG INTERACTIONS, CARCINOGENESIS, MULTIGENESIS,

12   PREGNANCY RATING, LABOR AND DELIVERY, NURSING MOTHERS, AND

13   PEDIATRIC USE."  DID I READ THAT RIGHT?

14   **A.**   YES.

15   **Q.**   IN OTHER WORDS, WHAT YOU'RE TELLING YOUR SALESPEOPLE IS

16   THAT THEY SHOULD KNOW THE DIFFERENCE BETWEEN PRECAUTIONS,

17   WARNINGS, AND CONTRAINDICATIONS SECTIONS OF THE LABEL TO POINT

18   OUT TO THE DOCTORS THAT THE FDA ONLY REQUIRED SOME LANGUAGE

19   ABOUT VIGOR IN THE PRECAUTIONS SECTION AND NOT THE WARNINGS OR

20   THE CONTRAINDICATIONS SECTION; CORRECT?

21   **A.**   NO, THAT'S NOT CORRECT.  I MEAN, WE'RE TEACHING OUR

22   REPRESENTATIVES TO USE THE LABEL, THE PACKAGE CIRCULAR, AS THE

23   BASIS FOR THEIR DISCUSSIONS REGARDING VIOXX, WHICH IS WHAT WE

24   HAVE BEEN TALKING ABOUT THIS MORNING.

25   **Q.**   I WANT TO MAKE IT CLEAR, NOW.  YOU ARE SAYING THAT YOU

1  AGREE THAT THE CARDIOVASCULAR RISK VIGOR LANGUAGE WAS NOT IN

2  THE CONTRAINDICATION OR WARNING SECTION OF THE APRIL 2002

3  LABEL?

4  **A.**   I'M SAYING VIOXX DID NOT INCREASE THE RISK, THE

5  CARDIOVASCULAR RISK.  I'M SAYING THERE WAS CARDIOVASCULAR DATA

6  FROM VIGOR IN AT LEAST THE CLINICAL STUDIES SECTION, AS WELL AS

7  THE PRECAUTION SECTION.

8  **Q.**   BUT IT WASN'T IN THE CONTRAINDICATION OR WARNINGS SECTION;

9  RIGHT?

10  **A.**   NOT THAT I RECALL.

11          **MR. ROBINSON:**  OKAY.  YOUR HONOR, THE NEXT DEPOSITION

12  IS, I BELIEVE, MARY BLAKE, AND SHE'S THE SENIOR DIRECTOR FOR

13  MERCK PUBLIC AFFAIRS.

14          **THE COURT:**  WHAT'S HER NAME?

15          **MR. ROBINSON:**  BLAKE, B-L-A-K-E, YOUR HONOR.

16          **THE COURT:**  ALL RIGHT.

17          (WHEREUPON, **MARY BLAKE**, HAVING BEEN DULY SWORN,

18  TESTIFIED BY DEPOSITION AS FOLLOWS.)

19                    **DIRECT EXAMINATION**

20  BY MR. ROBINSON:

21  **Q.**   OKAY.  GOOD MORNING, MRS. BLAKE.

22  **A.**   GOOD MORNING.  HOW ARE YOU?

23  **Q.**   YOU ARE CURRENTLY WORKING FOR MERCK; CORRECT?

24  **A.**   YES, I AM.

25  **Q.**   WHAT IS YOUR CURRENT TITLE?

1    **A.**   I AM SENIOR DIRECTOR FOR MERCK VACCINES, PUBLIC AFFAIRS.

2    **Q.**   AND WHEN YOU WERE HIRED AS A FULL-TIME MERCK EMPLOYEE,

3    WHAT WERE YOU HIRED AS?

4    **A.**   I WAS HIRED AS A PUBLIC AFFAIRS ASSOCIATE.

5    **Q.**   AND THAT WAS SPECIFICALLY WHAT DATE?

6    **A.**   DECEMBER 1993, I THINK IT MIGHT HAVE BEEN.

7    **Q.**   SO FROM, SAY, '9 -- WHAT WAS YOUR JOB TITLE FROM 1997

8    THROUGH 2001?

9    **A.**   IT VARIED; BUT FOR MOST OF THE TIME, I WAS A MANAGER OF

10   PUBLIC AFFAIRS.

11   **Q.**   MANAGER.  OKAY.  AND WHO DID YOU WORK FOR?

12   **A.**   THERE I WORKED FOR A NUMBER OF PEOPLE.  PRIMARILY

13   JAN WEINER, WHO WAS THE HEAD OF THAT GROUP.  SOMETIMES I WORKED

14   DIRECTLY FOR HER; OTHER TIMES I WORKED FOR OTHER PEOPLE IN

15   BETWEEN.

16   **Q.**   WHEN IS THE FIRST TIME YOU BECAME INVOLVED WITH THE DRUG

17   VIOXX OR ITS PREDECESSOR WHILE WORKING FOR MERCK?

18   **A.**   I STARTED WORK ON VIOXX -- I DID SOME HELP WHEN I WASN'T

19   DIRECTLY RESPONSIBLE FOR IT -- IN THE MIDDLE OF 1999.

20   **Q.**   OKAY.

21   **A.**   SOMETIME IN THE SPRING, EARLY SUMMER, OF 1999.  AND I WAS

22   ASSIGNED VIOXX IN THE FALL OF 1999.

23   **Q.**   SO, IN THE FALL OF 1999, YOU SAY YOU WERE "ASSIGNED

24   VIOXX."  WHAT DOES THAT MEAN?

25   **A.**   UH-HUH.  I BECAME THE MANAGER WITH RESPONSIBILITY FOR

DAILY COPY

1  VIOXX.

2  **Q.**   IN THE UNITED STATES ONLY OR --

3  **A.**   IN THE UNITED STATES ONLY.

4  **Q.**   AS IT RELATED TO VIOXX, WHAT WAS YOUR EXACT TITLE?

5  **A.**   MANAGER.

6  **Q.**   MANAGER?

7  **A.**   U.S.H.H. PUBLIC AFFAIRS.

8  **Q.**   ALL RIGHT.  EPIDEMIOLOGY.  DID YOU MANAGE EPIDEMIOLOGIC

9  ISSUES RELATED TO VIOXX?

10  **A.**   I WORKED WITH MERCK RESEARCH LABS AS WELL AS OTHERS ON

11  EPIDEMIOLOGICAL STUDIES AS I -- IN TERMS OF DRAFTING PUBLIC

12  AFFAIRS MATERIALS.  YES, I DID THAT.

13  **Q.**   OKAY.  AND WHAT PEOPLE WITHIN MERCK RESEARCH LABORATORIES

14  DID YOU DEAL WITH CONCERNING THOSE ISSUES?

15  **A.**   IT COULD RANGE BASED ON THE INDIVIDUAL STUDY.  IF IT WAS

16  AN EPIDEMIOLOGICAL STUDY, IT WOULD -- I WOULD GENERALLY SPEAK

17  WITH NANCY SANTANELLO AND ALISE REICIN, AS WELL AS PERHAPS

18  OTHERS IN THEIR DEPARTMENT.  BUT IT DEPENDED ON THE SITUATION.

19  **Q.**   BEFORE I GET TO THAT, DESCRIBE FOR ME GENERALLY WHAT YOUR

20  JOB RESPONSIBILITIES WERE AS MANAGER, U.S.H.H., OF PUBLIC

21  AFFAIRS FOR VIOXX?

22  **A.**   ESSENTIALLY, IN THAT POSITION I HAD RESPONSIBILITY FOR

23  INTERACTIONS WITH THE NEWS MEDIA RELATED TO VIOXX AND ALSO FOR

24  PUBLIC AFFAIRS PROGRAMS RELATED TO DISEASE AWARENESS.

25  **Q.**   WHAT DOES THAT MEAN, THE LAST PART?

1  **A.**   THE "DISEASE AWARENESS" PART?  WE WORK WITH THIRD-PARTY

2  GROUPS TO IMPLEMENT PROGRAMS THAT ENCOURAGED CONSUMERS TO TALK

3  TO THEIR DOCTOR ABOUT OSTEOARTHRITIS, IF THEY HAD IT.

4  **Q.**   WHEN YOU WORKED FOR PUBLIC AFFAIRS, THERE WOULD BE VARIOUS

5  TOOLS THAT YOU WOULD USE TO GET THE WORD OUT, WHEN YOU NEEDED

6  TO, CONCERNING VIOXX; CORRECT?

7  **A.**   YES.

8  **Q.**   WHO WAS IN CHARGE OF PRESS RELEASES FOR VIOXX?

9  **A.**   WELL, ULTIMATELY, THE PUBLIC AFFAIRS DEPARTMENT IS

10 RESPONSIBLE FOR DEVELOPING AND GETTING THE APPROPRIATE

11 APPROVALS AND ISSUING NEWS RELEASES IN CONSULTATION WITH THE

12 VARIOUS REVIEWERS INCLUDING MEDICAL/LEGAL BOARD.

13 **Q.**   BUT WHO WAS IN CHARGE?  WHERE DID THE BUCK STOP?

14 **A.**   IN TERMS OF WHERE THE BUCK STOPPED, ULTIMATELY, MERCK

15 RESEARCH LABS AND LEGAL HAVE THE FINAL SAY IN TERMS OF WHETHER

16 OR NOT A NEWS RELEASE IS ISSUED.

17 **Q.**   WHO IS RESPONSIBLE FOR DRAFTING THE PRESS RELEASES AND

18 PUTTING THEM IN FINAL FORM?

19 **A.**   PUBLIC AFFAIRS.

20 **Q.**   COULD THE PRESS RELEASE GO OUT WITHOUT YOUR APPROVAL?

21 **A.**   WITHOUT MY APPROVAL?

22 **Q.**   UH-HUH.

23 **A.**   ULTIMATELY, THE FINAL SIGN-OFF OF PRESS RELEASES IS REALLY

24 MERCK RESEARCH LABS AND LEGAL.

25 **Q.**   WHAT IS A STAND-BY STATEMENT?

1265

1   **A.**   STAND-BY STATEMENTS ARE DOCUMENTS THAT WE CREATE IF WE
2   ANTICIPATE GETTING QUESTIONS ABOUT SOMETHING THAT WE WOULD NEED
3   TO RESPOND TO WITHIN PUBLIC AFFAIRS.
4   **Q.**   AND WHO WAS IT INTENDED THAT THE STAND-BY STATEMENTS WOULD
5   BE USED BY?
6   **A.**   STAND-BY STATEMENTS ARE INTENDED TO BE USED BY PUBLIC
7   AFFAIRS PEOPLE IN THEIR INTERACTIONS WITH THE NEWS MEDIA, AS
8   WELL AS INVESTOR RELATIONS, FOR THEIR INTERACTIONS WITH
9   ANALYSTS.
10  **Q.**   WERE THEY EVER GIVEN TO PEOPLE WITHIN MERCK FOR RESPONDING
11  TO INTERVIEWS?
12  **A.**   WITH THE NEWS MEDIA?
13  **Q.**   CORRECT.
14  **A.**   YES.
15  **Q.**   WHAT ABOUT VIDEO NEWS RELEASES, WERE THEY A TOOL USED FOR
16  GETTING THE WORD OUT?
17  **A.**   YES.  WE USED VIDEO NEWS RELEASES AS WELL.
18  **Q.**   AND THE VIDEO NEWS RELEASES, WHO WAS THE PERSON PRIMARILY
19  RESPONSIBLE WITHIN PUBLIC AFFAIRS FOR THE VIDEO NEWS RELEASES
20  RELATED TO VIOXX?
21  **A.**   WELL, THAT, TOO, COULD VARY BASED ON WHO HAD
22  RESPONSIBILITY FOR A GIVEN PROJECT.  OFTEN, I HAD
23  RESPONSIBILITY, AND IT WOULD ALSO GO THROUGH MEDICAL/LEGAL
24  BOARD.  THEY HAD THE FINAL SAY.
25  **Q.**   IN FACT, YOU WERE INVOLVED WITH MEDIA TRAINING FOR THE

```
 1    VIDEO NEWS RELEASES AND INTERVIEWS AT VARIOUS POINTS IN TIME
 2    RELATED TO VIOXX; TRUE?
 3    A.   YES.  I DID MEDIA TRAINING.
 4    Q.   AND INTERVIEWS WITH SPOKESPERSONS FOR MERCK, WAS THAT A
 5    TOOL THAT WAS USED FOR GETTING THE WORD OUT RELATED TO VIOXX?
 6    A.   MERCK PEOPLE PARTICIPATED IN INTERVIEWS ABOUT VIOXX, YES.
 7    Q.   WHAT ABOUT SPOKESPERSONS VERSUS -- DID YOU HAVE
 8    SPOKESPERSONS THAT YOU HIRED THAT WERE NON-MERCK EMPLOYEES TO
 9    GET THE WORD OUT THAT RELATED TO VIOXX?
10    A.   YES.
11    Q.   DID YOU USE WEB SITES AS A VEHICLE FOR GETTING THE WORD
12    OUT RELATED TO VIOXX?
13    A.   WITHIN PUBLIC AFFAIRS?
14    Q.   UH-HUH?
15    A.   YES, WE DID.
16    Q.   AND WHAT WEB SITES DID YOU USE?
17    A.   SOME -- IF I'M REMEMBERING CORRECTLY -- AND I APOLOGIZE.
18    IT WAS A GO LONG TIME AGO -- WE HAD A DISEASE AWARENESS WEBSITE
19    IN CONJUNCTION WITH THE ARTHRITIS FOUNDATION ABOUT THE
20    "SPEAKING OF PAIN" PROGRAM, AND I CAN'T REMEMBER THE URL FOR
21    THAT.  THE CONTENT WAS ALSO ON THE ARTHRITIS FOUNDATION'S
22    WEBSITE.  IT MIGHT EVEN STILL BE THERE.
23           AND THEN IN ADDITION TO THAT, SOME OF THE PUBLIC
24    AFFAIRS MATERIALS, I BELIEVE, WERE ON VIOXX.COM.
25    Q.   DID MARKETING HAVE -- DID MARKETING ALSO HAVE TO APPROVE
```

1  YOUR PRESS RELEASES BEFORE THEY WERE SENT OUT?

2  **A.**   THEY WERE REVIEWED, AGAIN.

3  **Q.**   AND WHO WAS THAT?  WHO APPROVED YOUR PRESS RELEASES IN

4  MARKETING?

5  **A.**   THAT WOULD ALSO VARY BY THE NEWS RELEASE.  MY PRIMARY

6  POINT OF CONTACT FOR MANY THINGS WAS CAREY BOURDOW ON THE

7  MARKETING TEAM, BUT SOME THINGS WOULD ALSO BE REVIEWED BY HER

8  BOSSES AS WELL AS THE VICE-PRESIDENT OF THE MARKETING TEAM.

9  **Q.**   DID THAT INCLUDE WENDY DIXON?

10  **A.**   YES.  WENDY WAS THE VICE-PRESIDENT AT THE TIME, IF I

11  REMEMBER CORRECTLY.

12  **Q.**   PUBLIC AFFAIRS WAS REALLY RESPONSIBLE FOR COMMUNICATIONS

13  CONCERNING VIOXX TO THE GENERAL PUBLIC; CORRECT?

14  **A.**   NO, TO THE NEWS MEDIA.

15  **Q.**   ONLY TO THE NEWS MEDIA?

16  **A.**   THE NEWS MEDIA IS THE PRIMARY AUDIENCE.  THE PROGRAMS THAT

17  WE WORK ON AND THE MATERIALS WE CREATE ARE INTENDED FOR USE BY

18  THE NEWS MEDIA.

19        NOW, WE TALKED BEFORE ABOUT THE DISEASE-EDUCATION

20  PROGRAM.  THAT INVOLVES WORKING WITH CONSUMER GROUPS AND ALSO

21  HAD A MEDIA COMPONENT TO IT AS WELL.

22  **Q.**   WELL, YOU CALL IT PUBLIC AFFAIRS; CORRECT?

23  **A.**   THAT IS THE NAME OF OUR DEPARTMENT, YES.

24  **Q.**   MEANING THAT YOU UNDERSTOOD THAT THE MESSAGES THAT YOU

25  WERE ISSUING WOULD ULTIMATELY -- WERE ULTIMATELY INTENDED TO

1    REACH THE PUBLIC; CORRECT?

2    **A.**   OUR NEWS RELEASES GO TO THE NEWS MEDIA, WHO THEN

3    COMMUNICATE TO THE PUBLIC.

4    **Q.**   THE PURPOSE OF YOUR REACHING THE NEWS MEDIA WASN'T SO THEY

5    TOOK THE PRESS RELEASES AND VIDEO MATERIALS HOME AND PUT THEM

6    ON -- IN A SHELF; RIGHT?

7    **A.**   THAT IS CORRECT.

8    **Q.**   YOU UNDERSTOOD THAT THE MESSAGES THAT YOU WERE DELIVERING

9    WERE ULTIMATELY INTENDED FOR THE PUBLIC TO SEE; CORRECT?

10   **A.**   WELL -- I APOLOGIZE.  IT'S HARD TO ANSWER THE QUESTION

11   THAT WAY JUST BECAUSE, I MEAN, THE MATERIALS THAT WE CREATE GO

12   TO THE NEWS MEDIA, WHO THEN ARE RESPONSIBLE FOR THE STORIES

13   THAT THEY WRITE; AND THEY HAVE OTHER SOURCES BESIDES MERCK.

14          SO IT WOULD BE EXCEEDINGLY RARE FOR A NEWS RELEASE

15   JUST TO GO -- TO BE SEEN BY THE GENERAL PUBLIC.  IT GOES TO THE

16   NEWS MEDIA, WHO THEN WRITES THEIR STORIES, SO -- BUT YES,

17   ULTIMATELY, THEY TO GO THE PUBLIC --

18   **Q.**   ALL RIGHT.  I'LL --

19   **A.**   THE STORY IS SEEN BY THE PUBLIC, BUT THE NEWS RELEASE IS

20   NOT NECESSARILY.

21   **Q.**   BUT THE PURPOSE OF THE NEWS TOOLS THAT WE'VE DISCUSSED IS

22   TO COMMUNICATE MERCK'S MESSAGE TO THE PUBLIC, ULTIMATELY; TRUE?

23   **A.**   YES.

24   **Q.**   OKAY.  AND, IN FACT, YOU ISSUED YOUR PRESS RELEASES ONLINE

25   AS WELL, DIDN'T YOU?

1    **A.**   WE DISTRIBUTE OUR NEWS RELEASES THROUGH VARIOUS NEWS WIRE

2    SERVICES.  WE CHANGE THEM DURING THE COURSE OF TIME, AND THEY

3    ALSO APPEARED ON MERCK.COM.

4    **Q.**   RIGHT.

5    **A.**   SO --

6    **Q.**   SO IF SOMEBODY WAS SEARCHING FOR VIOXX, LET'S SAY, THEY

7    COULD VERY WELL SEE YOUR PRESS RELEASES ON MERCK.COM;

8    CORRECT?

9    **A.**   THEY COULD, YES.

10   **Q.**   OKAY.  AND AS SOMEBODY WHO WORKED IN THE OFFICE OF

11   MEDICAL/LEGAL, YOU RECOGNIZED, DID YOU NOT, THAT ALL OF THE

12   TOOLS THAT WE'VE DISCUSSED WERE GOVERNED BY THE FDA LABELING

13   LAW; TRUE?

14   **A.**   YES.  I'M FAMILIAR WITH THAT.

15   **Q.**   OKAY.  IN OTHER WORDS -- AND LABELING INCLUDES NOT JUST A

16   PACKAGE INSERT; IT INCLUDES YOUR PRESS RELEASES, YOUR VIDEO

17   NEWS RELEASES, ANYTHING YOU'D GIVE OUT TO THE PUBLIC.  RIGHT?

18   **A.**   WELL, WHEN I SAID "LABELING" BEFORE, I WAS REFERRING

19   SPECIFICALLY TO THE PRODUCT INFORMATION.

20   **Q.**   YOU'RE AWARE THAT YOUR PRESS RELEASES AND OTHER TOOLS WERE

21   GOVERNED BY THE FDA LABELING LAW; TRUE?

22   **A.**   YES.  I'M AWARE THAT PUBLIC AFFAIRS MATERIALS ARE GOVERNED

23   BY FDA REGULATIONS.

24   **Q.**   OKAY.  AND THAT LAW REQUIRED THAT ALL OF YOUR MATERIALS BE

25   FAIRLY BALANCED; CORRECT?

1   **A.**   WITHIN FDA REGULATIONS, YES, THERE'S AN EXPECTATION FOR

2   FAIR AND BALANCED.

3   **Q.**   OKAY.

4   **A.**   BUT, ULTIMATELY -- I JUST DO WANT TO CLARIFY THAT, YOU

5   KNOW, AS PART OF THE MEDICAL/LEGAL BOARD REVIEW PROCESS, I

6   MEAN, THAT'S WHERE THOSE DECISIONS GET MADE.

7   **Q.**   WELL, YOU WERE PART OF THE MEDICAL/LEGAL REVIEW, SO YOU

8   HAD SOME KNOWLEDGE ABOUT THE REGULATIONS THAT PERTAIN TO WHAT

9   WAS NECESSARY TO COMPLY WITH THE FDA'S LAWS; CORRECT?

10  **A.**   WITH -- YES.   WITHIN -- WHAT MY JOB WAS WITHIN THE OFFICE

11  OF MEDICAL/LEGAL, I WAS THE LIAISON TO THE FDA IN TERMS OF

12  SENDING THEM PROMOTIONAL MATERIALS FOR THEIR PRE-REVIEW, FOR

13  EXAMPLE, FOR THE PRODUCTS THAT I WORKED ON.   I REVIEWED THOSE

14  MATERIALS AS THEY CAME THROUGH.   BUT THAT WAS ONCE THEY HAD

15  ALREADY GONE THROUGH MEDICAL/LEGAL BOARD.

16  **Q.**   OKAY.

17  **A.**   I WAS NOT A SIGN-OFF ON ANY MATERIALS.

18  **Q.**   YOU WERE GENERALLY AWARE OF WHAT THE FDA RULES WERE

19  CONCERNING LABELING AND PUBLIC AFFAIRS MATERIALS; CORRECT?

20  **A.**   GENERALLY.   BUT AGAIN, I'M NOT A LAWYER OR DOCTOR.

21  **Q.**   BUT THAT WAS PART OF YOUR JOB TO KNOW; CORRECT?

22  **A.**   IT WAS PART OF MY JOB TO BE FAMILIAR WITH, BUT I WOULD NOT

23  CALL MYSELF AN EXPERT IN ANY WAY.

24  **Q.**   IT WAS PART OF YOUR JOB TO KNOW AND UNDERSTAND WHAT THE

25  RULES WERE CONCERNING WHAT YOU COULD SAY AND NOT SAY IN PUBLIC

1   AFFAIRS MATERIALS; TRUE?

2   **A.**   TO UNDERSTAND, YES.

3   **Q.**   WELL, YOU UNDERSTAND, AS THE DIRECTOR OR MANAGER OF PUBLIC

4   AFFAIRS, THAT IT'S YOUR RESPONSIBILITY TO MAKE SURE, FROM YOUR

5   PERSPECTIVE, THAT THE INFORMATION THAT'S CONTAINED IN YOUR

6   MATERIALS THAT'S SENT OUT TO THE PUBLIC, THAT IT CONTAINS THE

7   TRUTH AND THE WHOLE TRUTH, NOT HALF THE TRUTH; CORRECT?

8   **A.**   YES.  OUR MATERIALS ARE TRUTHFUL.  I RECOGNIZE THAT AS OUR

9   RESPONSIBILITY.

10  **Q.**   LET ME HAVE THIS MARKED AS P-1.  THIS IS THE ONLY ONE I

11  DON'T HAVE MULTIPLE COPIES OF, SO I APOLOGIZE.

12          I'M GOING TO SHOW YOU WHAT'S BEEN MARKED P-1 FOR

13  IDENTIFICATION AND ASK YOU IF YOU HAVE EVER SEEN THIS BEFORE.

14  **A.**   OKAY.  I BELIEVE THAT THIS IS A FIELD COMMUNICATION

15  DOCUMENT, BUT I MAY BE WRONG.

16  **Q.**   HAVE YOU EVER SEEN IT BEFORE?

17  **A.**   I BELIEVE SO.

18  **Q.**   OKAY.  CAN YOU TURN TO PAGE 44.

19  **A.**   UM-HUM.  YES.

20  **Q.**   YOU SEE WHERE IT SAYS "GENERAL PRINCIPLES OF PROMOTION"?

21  **A.**   UH-HUH.

22  **Q.**   THIS IS A MERCK DOCUMENT, BY THE WAY; CORRECT?

23  **A.**   YES.

24  **Q.**   OKAY.  AND HERE IT SAYS, "GENERAL PRINCIPLES OF PROMOTION.

25  FDA REGULATIONS IMPOSE FIVE MAIN PRINCIPLES ON PROMOTION."  DO

1  YOU SEE THAT?

2  **A.**   YES, I DO.

3  **Q.**   IT SAYS, "A PROMOTIONAL CLAIM MAY NOT BE INTERPRETED IN A

4  FALSE OR MISLEADING MANNER BY A SIGNIFICANT MINORITY OF

5  PRESCRIBERS."  DID I READ THAT CORRECTLY?

6  **A.**   YES.

7  **Q.**   OKAY.  THEN IT SAYS, "INCLUSION OF PROPER BALANCE.  THERE

8  MUST BE APPROPRIATE WEIGHT GIVEN TO ALL CLINICALLY RELEVANT

9  INFORMATION; THAT IS, THE RISKS AND BENEFITS THAT CAN AFFECT A

10  PHYSICIAN'S PRESCRIBING PRACTICES."  DID YOU UNDERSTAND THAT TO

11  BE THE CASE?

12  **A.**   THAT'S WHAT IT SAYS, YES.

13  **Q.**   OKAY.  THEN IT SAYS, "ABSENCE OF OMISSIONS OF RELEVANT

14  INFORMATION.  PROMOTIONAL MATERIAL, WHEN TAKEN AS A WHOLE, IS

15  INADEQUATE IF IT DOES NOT TELL THE WHOLE TRUTH, I.E.,

16  UNFAVORABLE INFORMATION MAY NOT BE OMITTED."  CORRECT?

17  **A.**   YES.

18  **Q.**   "SUPPORT BY ADEQUATE CLINICAL STUDIES.  PROMOTION MAY NOT

19  PROMOTE THE PRODUCT IN A LIGHT MORE FAVORABLE THAN SHOWN BY

20  DATA OBTAINED FROM CLINICAL EXPERIENCE."  DID I READ THAT

21  CORRECTLY?

22  **A.**   YES.

23  **Q.**   DID YOU UNDERSTAND THAT THESE WERE THE GENERAL PRINCIPLES

24  THAT GUIDED YOU IN CONSTRUCTING PROMOTIONAL MATERIALS FOR THE

25  PRODUCT VIOXX?

1   A.   YES.  I'M FAMILIAR WITH THOSE.

2   Q.   SO, IN TERMS OF YOUR UNDERSTANDING, IF A COMPANY INDICATES

3   THAT A DRUG DOES NOT HAVE SIDE EFFECTS, WHEN THERE'S CREDIBLE

4   SCIENTIFIC EVIDENCE TO CONTRARY, THAT WOULD BE FALSE AND

5   MISLEADING, FROM YOUR UNDERSTANDING?

6   A.   FROM MY UNDERSTANDING?

7   Q.   YES.

8   A.   YES.

9   Q.   ONE OF YOUR MISSIONS AS IT RELATED TO THE DRUG VIOXX WAS

10  TO MINIMIZE THE ATTENTION GIVEN TO HEART ATTACK ISSUES;

11  CORRECT?

12  A.   ONE OF MY RESPONSIBILITIES AS THE -- ONE OF THE PUBLIC

13  AFFAIRS PEOPLE RESPONSIBLE FOR VIOXX WAS -- ONCE THE VIGOR

14  RESULTS CAME OUT AND THE MEDIA REPORTED AGAIN AND AGAIN ON THE

15  CARDIOVASCULAR FINDINGS OF VIGOR, WAS TO -- THERE WAS SO MUCH

16  COVERAGE ON THE CARDIOVASCULAR FINDING -- TO BRING THAT

17  ESSENTIALLY BACK INTO BALANCE BECAUSE THAT'S WHAT THEY REPORTED

18  ON ALL THE TIME, AND MRL, BASED ON THEIR ANALYSIS, DIDN'T

19  BELIEVE THAT TO BE THE CASE.  IT WAS MY JOB TO TALK ABOUT THAT

20  TO THE NEWS MEDIA.

21  Q.   YOUR MISSION, YES OR NO, THAT YOU WERE TO ACCOMPLISH WAS

22  TO MINIMIZE THE ATTENTION GIVEN TO HEART ATTACK ISSUES AS IT

23  RELATED TO VIOXX?

24  A.   I APOLOGIZE.  I WOULDN'T CHARACTERIZE THAT AS MY MISSION.

25  Q.   ONE OF YOUR JOBS WAS TO CONVINCE THE WORLD THAT THERE WAS

1  NO REASON TO BELIEVE THAT VIOXX CAUSED HEART ATTACKS; TRUE?

2  **A.**   BASED ON MERCK RESEARCH LABS' ASSESSMENT, BECAUSE, YOU

3  KNOW, THEY'RE THE ONES WHO KNOW THE DATA AND UNDERSTAND THE

4  DATA.  THAT WAS MY JOB TO COMMUNICATE THAT TO THE NEWS MEDIA.

5  MY INTERACTIONS, BUT IT WAS BASED ON THEIR ASSESSMENT.

6  **Q.**   TO CONVINCE -- IT WAS YOUR JOB TO TELL THE NEWS MEDIA THAT

7  THERE WAS NO REASON TO BELIEVE THAT VIOXX CAUSED HEART ATTACKS.

8  CAN WE AGREE ON THAT?

9  **A.**   IT WAS -- WELL, I MEAN, IT'S IMPORTANT TO KEEP IN MIND

10  THAT THE NEWS MEDIA ARE A HIGHLY INDEPENDENT BODY, AND IT WAS

11  MY JOB TO CONVEY TO THEM MERCK'S PERSPECTIVE.  SOMETIMES I DID

12  THAT DIRECTLY; SOMETIMES WE HAD PEOPLE FROM MERCK RESEARCH LABS

13  WHO DID THAT.  AND ULTIMATELY, REPORTERS PUT TOGETHER A

14  COMPLETE STORY BASED ON OUR PERSPECTIVE AS WELL AS OTHERS, AND

15  THAT INCLUDED --

16  **Q.**   CAN YOU ANSWER THAT QUESTION?

17  **A.**   YES.  WITH MERCK RESEARCH LABS.

18  **Q.**   CAN WE HAVE THIS MARKED P-2 OR P-BLAKE-2, HOWEVER YOU WANT

19  IT.

20  **A.**   MY RESPONSIBILITY WAS TO INTERACT WITH THE NEWS MEDIA,

21  WHICH, THROUGHOUT MOST OF 2000, WAS A LOT OF DISCUSSION ABOUT

22  THE CARDIOVASCULAR FINDINGS IN THE VIGOR TRIAL.

23  **Q.**   YOU KEEP SAYING THE NEWS MEDIA, BUT YOUR WHOLE POINT WAS

24  TO GET THE INFORMATION THAT YOU WANTED OUT TO THE PUBLIC.  YOU

25  DIDN'T DO IT JUST SO THE NEWS MEDIA WAS GOING TO TAKE IT HOME

1    AND PUT ON IT A SHELF; RIGHT?

2    **A.**   AS A PUBLIC AFFAIRS PERSON, I MEAN, THE NEWS MEDIA IS WHO

3    I INTERACT WITH.  I DON'T INTERACT WITH THE GENERAL PUBLIC.

4              SO, I MEAN, THAT'S -- THAT'S WHERE INTERACTIONS WERE,

5    YES.  THEY COMMUNICATE TO THE BROADER PUBLIC, BUT THEY ARE THE

6    ONES WHO HAVE COMPLETE CONTROL OVER WHAT IT IS THAT THEY

7    REPORT.  IT'S MY JOB TO CONVEY TO THEM MERCK'S PERSPECTIVE.

8    **Q.**   RIGHT.  AND THAT'S MY POINT.  BUT YOUR HOPE WAS THAT, IN

9    COMMUNICATING TO THE NEWS MEDIA, THEY WOULD COMMUNICATE YOUR

10   MESSAGE, IN TURN, TO THE PUBLIC; TRUE?

11   **A.**   YES.

12   **Q.**   NOW, I WANT TO SHOW YOU P-2.  THAT IS YOUR PERFORMANCE

13   REVIEW FORM?

14   **A.**   UH-HUH.

15   **Q.**   DO YOU RECOGNIZE THIS?

16   **A.**   YES.

17   **Q.**   HERE IT SAYS THAT, FOR THE YEAR 2000, YOUR ACCOMPLISHMENTS

18   CONCERNING THE VIGOR STUDY WERE -- INCLUDED MINIMIZING THE

19   ATTENTION OF HEART ATTACK ISSUES; CORRECT?

20             YOU SEE WHERE IT SAYS "ACCOMPLISHMENTS INCLUDE," AND

21   THEN UNDERNEATH IT, IT SAYS "VIGOR"?  DO YOU SEE WHERE IT SAYS

22   "VIGOR"?

23   **A.**   YES.  I'M SORRY.  THAT WAS THE PARAGRAPH I WAS READING.

24   **Q.**   OKAY.  AND PART OF YOUR ACCOMPLISHMENT, WHICH MEANT YOUR

25   MISSION, RIGHT, WAS TO MINIMIZE THE ATTENTION TO HEART ATTACK

1    ISSUES.  CORRECT?

2    **A.**   WELL, IT DOES INCLUDE THAT LANGUAGE, YES.

3           BUT THIS IS DONE AT THE END OF THE YEAR, NOT THE

4    BEGINNING OF THE YEAR, SO WHEN -- WELL, WHEN YOU TALK ABOUT

5    MISSION, THAT IMPLIES THAT IT STARTED AT THE BEGINNING OF THE

6    YEAR.  AND THIS WAS WRITTEN AT THE END OF 2000, AFTER ALMOST

7    ALL OF THE MEDIA COVERAGE WAS AROUND THE CARDIOVASCULAR

8    FINDINGS FROM THE VIGOR TRIAL.

9           SO IT WAS MY JOB TO INCLUDE MERCK'S PERSPECTIVE IN

10   THOSE STORIES BASED ON WHAT MERCK RESEARCH LABS SAID, BRINGING

11   IT FROM THE POINT OF OVEREMPHASIS.  SO I THINK WHERE IT TALKS

12   ABOUT BALANCED COVERAGE, I MEAN, THAT WAS REALLY THE GOAL.

13   **Q.**   ALL RIGHT.  LET ME ASK THE QUESTION AGAIN THIS WAY:  THE

14   ULTIMATE SUCCESS IN YOUR JOB AS IT RELATED TO HEART ATTACK

15   ISSUES AND VIOXX WAS TO KEEP IT OUT OF THE NEWS ALTOGETHER;

16   CORRECT?

17   **A.**   NO, I WOULDN'T CHARACTERIZE IT IN THAT WAY, NO.

18   **Q.**   OKAY.  SO ONE OF YOUR ACCOMPLISHMENTS --

19   **A.**   I'M SORRY.  CAN I FINISH?

20   **Q.**   GO AHEAD.

21   **A.**   BECAUSE ALMOST ALL OF THE MEDIA COVERAGE ABOUT VIOXX IN

22   THE YEAR 2000 WAS AROUND THE CARDIOVASCULAR FINDINGS FROM

23   VIGOR.  I OFTEN TRIED TO TALK TO REPORTERS ABOUT THE GI

24   FINDINGS FROM VIGOR, BUT REALLY THEIR ATTENTION WAS ALL ON THE

25   CARDIOVASCULAR FINDINGS.  SO IT WAS GETTING IT BALANCED.

1    Q.    AND EVERY TIME THEY ASKED YOU A QUESTION, YOUR JOB WAS TO

2    TELL THEM, "NO, VIOXX DOES NOT CAUSE HEART ATTACKS, AND WE HAVE

3    THE PROOF"; RIGHT?

4    A.    BASED ON MERCK RESEARCH LABS' ASSESSMENT.

5    Q.    CORRECT?

6    A.    THAT WAS MERCK RESEARCH LABS' ASSESSMENT, YES.

7    Q.    SO -- AND DO YOU TRACK, BY THE WAY, FOR THE FIRST YEAR,

8    THE NUMBER OF MEDIA IMPRESSIONS WHERE THE MERCK MESSAGE GOT

9    OUT?

10   A.    IT'S HARD TO TRACK.  WE DO SOMETIMES TRY AND TRACK THAT

11   TYPE.  CERTAINLY FOR THE YEAR 2000, FOR VIOXX, THAT WOULD HAVE

12   BEEN VERY HARD BECAUSE THERE WAS SO MUCH COVERAGE OF THE VIGOR

13   STUDY.

14   Q.    YOU HAD NEVER HEARD THAT THERE WERE AT LEAST A MILLION --

15   A BILLION MEDIA IMPRESSIONS RELATED TO VIOXX WITH MERCK'S

16   MESSAGE IN THE YEAR 2000?

17   A.    WELL, ACTUALLY, IT WOULDN'T -- MOST OF THE MEDIA COVERAGE

18   IN 2000 WAS AROUND CARDIOVASCULAR FINDINGS FROM VIGOR, IF I

19   REMEMBER CORRECTLY.  THAT'S CERTAINLY WHAT I FELT LIKE.

20   Q.    "A BILLION IMPRESSIONS," HAVE YOU EVER HEARD THAT?

21   A.    I'VE HEARD THAT BEFORE, YEAH.

22   Q.    IN FACT, IT WAS THE MERCK MESSAGE FOR THE BILLION MEDIA

23   IMPRESSIONS, WHENEVER ASKED, THAT VIOXX DOES NOT CAUSE HEART

24   ATTACKS; CORRECT?

25   A.    THAT WAS MERCK RESEARCH LABS, YES.

1

2          **MR. ROBINSON:**  OKAY.  YOUR HONOR, THE NEXT DEPOSITION

3   IS ANOTHER MERCK EMPLOYEE.  HER NAME IS JAN WEINER.  SHE HEADED

4   UP THE DIRECTOR OF -- SHE WAS THE DIRECTOR OF INFORMATION

5   SERVICES FOR MERCK.

6          (WHEREUPON, **JAN WEINER**, HAVING BEEN DULY SWORN,

7   TESTIFIED BY DEPOSITION AS FOLLOWS.)

8                    **DIRECT EXAMINATION**

9   BY MR. ROBINSON:

10  **Q.**   YOU'RE CURRENTLY EMPLOYED BY MERCK?

11  **A.**   YES.

12  **Q.**   OKAY.  WHEN DID YOU START WITH MERCK?

13  **A.**   OCTOBER OF 1989.

14  **Q.**   TELL ME, WHEN YOU STARTED WITH MERCK IN 1989, WHAT WAS

15  YOUR FIRST JOB?

16  **A.**   MY TITLE WAS DIRECTOR OF INFORMATION SERVICES, AND I

17  WORKED IN THE PUBLIC AFFAIRS DEPARTMENT FOR THE U.S. BUSINESS.

18  MY JOB GENERALLY WAS TO WORK ON COMMUNICATIONS RELATED TO

19  MERCK'S PRODUCTS.

20  **Q.**   HOW LONG DID YOU HAVE THAT DIRECT -- WHAT WAS YOUR TITLE?

21  **A.**   MY TITLE WAS DIRECTOR OF INFORMATION SERVICES.

22  **Q.**   OKAY.  HOW LONG DID YOU HAVE THAT TITLE?

23  **A.**   A COUPLE OF YEARS.

24  **Q.**   UNTIL ABOUT '91 OR SO?

25  **A.**   '91, '92.

                    DAILY COPY

1  **Q.**   DID YOUR JOB CHANGE AFTER THAT?

2  **A.**   MY TITLE CHANGED TO SENIOR DIRECTOR AND SOME OF THE

3  RESPONSIBILITIES -- THE RESPONSIBILITIES WERE GENERALLY THE

4  SAME.

5  **Q.**   WAS IT CONSIDERED A PROMOTION?

6  **A.**   YES, IT WAS.

7  **Q.**   OKAY.  HOW LONG DID YOU HAVE THAT JOB?

8  **A.**   I HAD THAT JOB FOR, I GUESS, ABOUT FIVE YEARS.

9  **Q.**   UNTIL LIKE '97, '98, SOMETHING LIKE THAT?

10 **A.**   YEAH.

11 **Q.**   IN 1998, WHAT JOB DID YOU TAKE?

12 **A.**   AT THAT POINT THE TITLE WAS EXECUTIVE DIRECTOR, PUBLIC

13 AFFAIRS, FOR THE U.S. BUSINESS AND IT WAS THE -- IT WAS A

14 HIGHER TITLE, MORE RESPONSIBILITY.  I HAD RESPONSIBILITY FOR

15 ALL OF THE PRODUCTS AND SOME OF THE ISSUES THAT WERE CURRENT IN

16 THE MEDIA AT THE TIME.

17 **Q.**   OKAY.  FOR JUST DOMESTIC RESPONSIBILITIES?

18 **A.**   YES, JUST DOMESTIC RESPONSIBILITIES.

19 **Q.**   HOW LONG DID YOU HOLD THAT TITLE OR THAT JOB?

20 **A.**   THAT JOB, WHERE IT WAS FOCUSED STRICTLY ON DOMESTIC, WAS

21 UNTIL SOMEWHERE 2000; 2000, 2001.  I'M HAVING SOME TROUBLE WITH

22 THE DATES, BUT --

23 **Q.**   YOUR BEST ESTIMATE.

24 **A.**   YES.  THE JOB AND HOW WE ORGANIZED THAT WORK CHANGED FOR

25 ONE YEAR ABOUT THAT TIME.

1280

1  **Q.**  SO AROUND 2000, 2001 DID YOUR JOB TITLE CHANGE?

2  **A.**  EXECUTIVE DIRECTOR, GLOBAL PRODUCT COMMUNICATIONS.

3  **Q.**  OKAY.  HOW LONG DID YOU HOLD THAT JOB?

4  **A.**  UNTIL APRIL OF 2003.

5  **Q.**  THEN WHAT JOB DID YOU HAVE?

6  **A.**  EXECUTIVE DIRECTOR OF PUBLIC AFFAIRS FOR ASIA, JAPAN,

7  AUSTRALIA, AND NEW ZEALAND.

8  **Q.**  SO YOU HAD NO MORE DOMESTIC RESPONSIBILITIES AT THAT

9  POINT?

10  **A.**  THAT IS CORRECT.

11  **Q.**  APPROXIMATELY WHEN WERE YOUR FIRST RESPONSIBILITIES FOR

12  VIOXX?  WHEN DID YOU FIRST TAKE ON THOSE RESPONSIBILITIES?

13  **A.**  '97, '98.  THAT'S THE BEST I CAN DO ON TIMING.

14  **Q.**  DURING THE '97, 1998 TIMEFRAME, WHAT WERE YOUR

15  RESPONSIBILITIES AS IT RELATED TO THE DRUG VIOXX?

16  **A.**  THE RESPONSIBILITIES WERE PRIMARILY TO DEVELOP

17  COMMUNICATIONS PLANS FOR THE DRUG AND THEN ALSO TO DEVELOP NEWS

18  RELEASES AND OTHER MATERIALS RELATED TO SCIENTIFIC

19  PRESENTATIONS AND PUBLICATIONS ABOUT THE DRUG.

20  **Q.**  DID THOSE RESPONSIBILITIES CHANGE AT ALL OVER TIME AS IT

21  RELATES TO THE DRUG VIOXX?

22  **A.**  THOSE REMAINED THE PRIMARY RESPONSIBILITIES.

23  **Q.**  REGARDLESS OF JOB TITLE?

24  **A.**  YES.

25  **Q.**  WERE YOUR RESPONSIBILITIES, AS RELATED TO THE DRUG VIOXX

DAILY COPY

1    ALWAYS, FOCUSED ON THE U.S. MARKET?

2    **A.**   THEY WERE UNTIL I HELD THE TITLE OF GLOBAL PRODUCT

3    COMMUNICATIONS.

4    **Q.**   THAT WAS LIKE 2000, EXECUTIVE DIRECTOR OF GLOBAL PRODUCT

5    COMMUNICATIONS?

6    **A.**   IF YOU GIVE ME A MINUTE, I CAN RECONSTRUCT IN MY HEAD THE

7    TIMING ON THAT.

8    **Q.**   GO AHEAD.  TAKE YOUR TIME.

9    **A.**   THE GLOBAL PRODUCT COMMUNICATIONS JOB WAS DURING THE

10   CALENDAR YEAR OF 2002.

11   **Q.**   SO, UP TO 2002 YOUR RESPONSIBILITIES, AS IT RELATED TO THE

12   DRUG VIOXX, WERE LIMITED TO THE UNITED STATES?

13   **A.**   THAT IS CORRECT.

14   **Q.**   OKAY.  THE PRESS RELEASES THAT WERE ISSUED TO THE NEWS

15   MEDIA, WHAT AUDIENCE WAS IT THAT YOU ULTIMATELY INTENDED TO

16   REACH OUT TO?

17   **A.**   THE NEWS RELEASES WERE DESIGNED TO BE REVIEWED BY NEWS

18   REPORTERS WHO WOULD MAKE JUDGMENT AS TO WHETHER THE INFORMATION

19   WAS WORTHY OF NEWS COVERAGE, AND THEN IT WOULD BE A MATTER OF

20   WHO THE AUDIENCE IS OF ANY PARTICULAR MEDIA ORGANIZATION.

21   **Q.**   OKAY.  YOU UNDERSTOOD WHEN THOSE PRESS RELEASES WERE

22   ISSUED THAT THE INFORMATION YOU SUPPLIED COULD EVENTUALLY BE

23   READ OR SEEN BY PEOPLE TAKING VIOXX, CORRECT?

24   **A.**   YES, WE UNDERSTOOD THAT.

25   **Q.**   AS WELL AS DOCTORS?

1282

1    A.   YES.

2    Q.   AS WELL AS PEOPLE WHO WERE NOT CURRENTLY TAKING VIOXX, BUT

3    WHO MIGHT BE CANDIDATES FOR TAKING VIOXX?

4    A.   YOU'RE REALLY TALKING ABOUT THE AUDIENCE FOR THE GENERAL

5    MEDIA IN THE COUNTRY?

6    Q.   CORRECT.

7    A.   THAT'S THE GENERAL POPULATION WHO WAS CONSUMERS OF NEWS

8    MEDIA.

9    Q.   HOW DID PUBLIC AFFAIRS INTEGRATE WITH MARKETING?

10   A.   WE WORKED WITH MARKETING AS ONE OF THE SOURCES OF

11   INFORMATION THAT WE HAD AT OUR DISPOSAL AND WE WORKED WITH

12   THEM.  THEY HAD THE OPPORTUNITY, LIKE OUR SCIENTISTS, LIKE

13   INVESTOR RELATIONS, TO REVIEW THE NEWS RELEASE AND THE Q & A,

14   AND WE WORKED WITH THEM SIDE BY SIDE, AS DEPARTMENTS DO WITHIN

15   A COMPANY.

16   Q.   WHAT WAS ALICE REICIN'S PRIMARY FUNCTION AS IT RELATED TO

17   VIOXX AND PUBLIC RELATIONS?

18   A.   SHE OFTEN WAS THE PERSON THAT WE WOULD GO TO EITHER TO

19   OBTAIN INFORMATION OR DATA ON WHICH WE BASED OUR NEWS RELEASES

20   AND MATERIALS, AND THEN SHE WOULD OFTEN BE THE POINT PERSON

21   WITHIN MRL CLINICAL TO WHOM WE WOULD SUBMIT OUR MATERIALS FOR

22   REVIEW AND CLEARANCE.

23   Q.   THE MATERIAL THAT YOU USED AS TOOLS FOR PUBLIC RELATIONS,

24   THEY INCLUDE PRESS RELEASES, CORRECT?

25   A.   YES.

1    **Q.**    WOULD THEY INCLUDE STANDBY STATEMENTS?

2    **A.**    YES.

3    **Q.**    WHAT IS A STANDBY STATEMENT?

4    **A.**    A STANDBY STATEMENT IS THE COMPANY'S POSITION ON AN ISSUE

5    THAT IS USED BY PEOPLE IN PUBLIC AFFAIRS, TYPICALLY, TO RESPOND

6    TO QUESTIONS IN CASES WHERE WE ARE NOT GOING TO BE ISSUING A

7    NEWS RELEASE.

8    **Q.**    OKAY.  WHAT IS THE REASON WHY SOME PRESS RELEASES WERE

9    SUBMITTED TO THE FDA AND OTHERS WERE NOT?

10   **A.**    MERCK'S PRACTICE HAD BEEN TO SEND TO THE FDA NEWS RELEASES

11   RELATED TO REGULATORY ACTIONS AS PART OF A LAUNCH CAMPAIGN.

12   THE FDA TYPICALLY LIKES TO SEE LAUNCH CAMPAIGNS, AND SO A NEWS

13   RELEASE AS PART OF A LAUNCH CAMPAIGN WAS SENT TO THE FDA.

14   **Q.**    I DON'T WANT TO GET ANYBODY IN TROUBLE HERE, SO YOU CAN

15   JUST TELL ME WHAT YOUR UNDERSTANDING WAS FOR THE REASON WHY

16   SOME PRESS RELEASES WERE SENT TO THE FDA AND OTHERS WERE NOT,

17   YOUR UNDERSTANDING.

18   **A.**    THAT THE FDA LIKED TO SEE LAUNCH MATERIALS.  THE NEWS

19   RELEASE WAS PART OF THE LAUNCH AND, ON THE BASIS OF THAT, IT

20   WAS SUBMITTED TO THE FDA.

21   **Q.**    SO OTHER THAN THAT, GENERALLY SPEAKING, THE NEWS RELEASES

22   WERE NOT SUBMITTED TO THE FDA?

23   **A.**    GENERALLY SPEAKING.  THERE WERE EXCEPTIONS.

24   **Q.**    SO EVERY PRESS RELEASE OR VIDEO NEWS RELEASE WAS SUBMITTED

25   TO THE FDA AFTER IT WAS ISSUED?

1   **A.**   THOSE RELEASES RELATED TO PRODUCTS, YES.

2   **Q.**   WHEN YOU SAYS "RELATED TO PRODUCTS," WHAT DO YOU MEAN BY

3   THAT?

4   **A.**   WELL, NEWS RELEASES THAT THE COMPANY WOULD ISSUE ABOUT

5   SALES AND EARNINGS, FOR INSTANCE, WOULD NOT BE SUBMITTED TO THE

6   FDA.

7   **Q.**   OKAY.  WERE YOU AWARE, AS EXECUTIVE DIRECTOR OF PUBLIC

8   AFFAIRS, THAT THE PRESS RELEASES WERE GOVERNED BY THE FDA

9   LABELING REQUIREMENTS?

10  **A.**   YES.

11  **Q.**   WERE STANDBY STATEMENTS EVER REVIEWED BY THE FDA?

12  **A.**   I DON'T RECALL THAT.

13  **Q.**   OKAY.  I THINK I LEFT OFF WITH Q & A'S, QUESTIONS AND

14  ANSWERS.  DID PUBLIC AFFAIRS PREPARE Q & A'S AS THEY RELATED TO

15  VIOXX?

16  **A.**   YES.

17  **Q.**   CAN YOU TELL US WHAT A Q & A IS AND WHAT ITS FUNCTION WAS

18  RELATED TO VIOXX?

19  **A.**   A Q & A IS PREPARED TO ANSWER QUESTIONS THAT WE MAY

20  RECEIVE FROM THE REPORTERS THAT WOULD NOT BE COVERED IN A NEWS

21  RELEASE.  SOMETIMES YOU CAN'T PUT ABSOLUTELY EVERYTHING IN A

22  NEWS RELEASE AND YOU KNOW THERE ARE GOING TO BE ADDITIONAL

23  QUESTIONS, AND SO THAT'S WHERE YOU PUT THE QUESTIONS THAT YOU

24  EXPECT TO RECEIVE AND WHAT THE ANSWERS WOULD BE.

25  **Q.**   OKAY.  WERE Q & A'S REVIEWED BY THE FDA AT ANY POINT IN

1285

1    TIME CONCERNING VIOXX?

2    **A.**    TO THE BEST OF MY KNOWLEDGE, NO.

3    **Q.**    OKAY.  BEFORE YOU MENTIONED VIDEO NEWS RELEASES.  CAN YOU

4    TELL US WHAT A VIDEO NEWS RELEASE IS?

5    **A.**    A VIDEO NEWS RELEASE IS PREPARED FOR TELEVISION STATIONS,

6    AND IT BASICALLY TAKES THE STORY IN A PRINT PRESS RELEASE AND

7    PUTS IT IN A FORMAT AND FORM THAT TELEVISION STATIONS CAN

8    CHOOSE TO USE IF THEY WANT TO, AND THERE ARE SEVERAL DIFFERENT

9    WAYS OF PREPARING THEM.  THE WAY THAT I THOUGHT ABOUT IT WAS

10   YOU GIVE A TELEVISION STATION THE INGREDIENTS TO DO A STORY IF

11   THEY CHOOSE TO DO IT.  YOU GIVE THEM ADDITIONAL BACKGROUND

12   FOOTAGE.  YOU GIVE THEM ADDITIONAL QUOTES SO THEY CAN TAILOR IT

13   IF THEY CHOOSE TO DO A STORY ON THAT PARTICULAR SUBJECT.

14   **Q.**    DID MERCK DISTRIBUTE VIDEO NEWS RELEASES CONCERNING VIOXX

15   TO THE MEDIA WITHOUT GOING TO THE FDA FIRST?

16   **A.**    I DON'T REMEMBER ALL OF THE VIDEO NEWS RELEASES THAT WE

17   DID ON VIOXX, SO I REALLY CAN'T ANSWER YOUR QUESTION.

18   **Q.**    DID YOU EVER USE THE PR NEWSWIRE?

19   **A.**    WE USED PR NEWSWIRE AND BUSINESSWIRE FOR DISTRIBUTION OF

20   PRESS RELEASES.

21   **Q.**    WOULD YOU DISTRIBUTE THOSE NEWS RELEASES EVER

22   ELECTRONICALLY OVER THE PR NEWSWIRE ON THE INTERNET?

23   **A.**    OH, NOW I SEE.  OKAY.  YES.

24   **Q.**    OKAY.  DID YOU UNDERSTAND THAT WHEN YOU DISTRIBUTED PRESS

25   RELEASES ON THE PR NEWSWIRE OR BUSINESSWIRE OVER THE INTERNET

1   THAT THOSE PRESS RELEASES WERE LIKELY TO APPEAR ON VARIOUS WEB

2   SITES THROUGHOUT THE INTERNET?

3   A.   YES.

4   Q.   CAN YOU TELL ME THE PHYSICIANS THAT YOU RECALL THAT WERE

5   CHARGED WITH THE RESPONSIBILITY OF REVIEWING VIOXX PRESS

6   RELEASES?

7   A.   I CAN REMEMBER DR. REICIN REVIEWING RELEASES.  I KNOW THAT

8   ED SCOLNICK IN ONE CASE REVIEWED A NEWS RELEASE.  I KNOW THAT

9   THERE WERE OTHER PEOPLE ON DR. REICIN'S STAFF WHO REVIEWED NEWS

10  RELEASES RELATED TO THEIR PRESENTATIONS AND PUBLICATIONS, BUT

11  THOSE WOULD BE THE NAMES THAT I DON'T RECALL AT THIS POINT.

12  Q.   SURE.  WHEN IS THE FIRST TIME YOU LEARNED THAT THERE WERE

13  RESPECTED SCIENTISTS THAT WERE CONCERNED THAT VIOXX MIGHT HAVE

14  A ROLE IN CAUSING HEART ATTACKS?

15  A.   I REMEMBER THAT THERE WAS A PUBLICATION FROM GARRETT

16  FITZGERALD THAT RAISED QUESTIONS ABOUT COX-2 INHIBITORS.

17  THAT'S WHAT I REMEMBER.

18  Q.   WHEN WAS THAT PUBLICATION, BEFORE OR AFTER VIGOR?

19  A.   I BELIEVE IT WAS BEFORE.

20  Q.   BEFORE.  OKAY.  WHAT WERE THE CIRCUMSTANCES THAT -- WELL,

21  STRIKE THAT.  GARRETT FITZGERALD WAS AN OCCASIONAL PAID ADVISOR

22  TO -- MEDICAL ADVISOR TO MERCK.  WERE YOU AWARE OF THAT?

23  A.   NO, I WAS NOT.

24  Q.   OKAY.  WHAT WERE THE CIRCUMSTANCES UNDER WHICH YOU LEARNED

25  ABOUT THE GARRETT FITZGERALD PUBLICATION RELATED TO HEART

DAILY COPY

1   ATTACKS AND COX-2S?

2   **A.**   WE RECEIVED A QUESTION FROM A REPORTER BASED UPON THAT

3   PUBLICATION, AND THROUGH THE QUESTION WE LEARNED ABOUT THE

4   PUBLICATION AND PREPARED A STANDBY STATEMENT AND A Q & A.

5   **Q.**   OKAY.  SO THE QUESTION THAT WAS ASKED BY THE REPORTER

6   CONCERNING THE PUBLICATION OF GARRETT FITZGERALD WAS WHAT?

7   **A.**   I DON'T REMEMBER.

8   **Q.**   WHO DECIDED THAT A STANDBY STATEMENT AND Q & A WAS

9   NECESSARY IN RELATION TO THE GARRETT FITZGERALD PUBLICATION?

10  **A.**   I DON'T KNOW WHO SPECIFICALLY MADE THAT DECISION, BUT IF

11  YOU HAVE A QUESTION FROM A REPORTER AND YOU NEED TO DEVELOP AN

12  ANSWER, THE USUAL MECHANISM IS TO DEVELOP A QUICK STANDBY

13  STATEMENT AND Q & A.

14  **Q.**   FOR THE RECORD, YOU WERE CONCERNED ABOUT THE QUESTION AS

15  IT RELATED TO COX-2 BECAUSE VIOXX WAS A COX-2, CORRECT?

16  **A.**   THAT IS CORRECT.

17  **Q.**   NOW, DO YOU RECALL WHAT MERCK WAS PREPARED TO TELL THE

18  PRESS IN RESPONSE TO THE FITZGERALD ARTICLE THAT WAS

19  INCORPORATED INTO THE STANDBY STATEMENT AND Q & A AT THAT POINT

20  IN TIME?

21  **A.**   I DON'T RECALL.

22  **Q.**   I THINK I HAD IT MARKED.  HER PERSONNEL FILE, DECEMBER 31,

23  1997, IS THE COVER PAGE.  I'M GOING TO SHOW YOU WHAT HAS BEEN

24  MARKED WEINER EXHIBIT 2.  I'LL MAKE SURE THAT WE'RE ON THE SAME

25  PAGE, SO I'M GOING TO GIVE YOU PAGE 3.  TAKE A LOOK.  SEE WHERE

1  IT SAYS UNDER VIOXX AND THE THIRD OR FOURTH SENTENCE DOWN IT
2  SAYS, "STRONG MEDIA OUTREACH CONTRIBUTED TO THE MOST SUCCESSFUL
3  LAUNCH IN MERCK HISTORY."  DO YOU SEE THAT?
4  A.   YES, I SEE THAT.
5  Q.   OKAY.  "VIOXX WAS HIGHLIGHTED IN ARTICLES REACHING A TOTAL
6  OF MORE THAN 2 BILLION, ALMOST 10 TIMES PER PERSON."  DID I
7  READ THAT CORRECTLY?
8  A.   YES, YOU DID.
9  Q.   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHAT THE
10  REACH WAS OF YOUR MEDIA CAMPAIGN IN THE YEAR 1999?
11  A.   SOMEWHAT.
12  Q.   OKAY.  "OF THIS TOTAL, THERE WERE 1.4 BILLION IMPRESSIONS
13  FOR VIOXX ALONE AND AN ADDITIONAL 700 MILLION HIGHLIGHTING BOTH
14  AGENTS."  THAT IS CELEBREX, CORRECT?
15  A.   YES.
16  Q.   WOULD YOU AGREE WITH ME GENERATING ENOUGH STORIES TO REACH
17  10 TIMES PER PERSON, ALL THE PEOPLE IN THE UNITED STATES, IS AN
18  EXTRAORDINARY MEDIA OUTREACH?
19  A.   I WOULD SAY IT WAS VERY SUCCESSFUL.
20  Q.   SO THE 2 BILLION IMPRESSIONS MEANS THAT, BASED ON MERCK'S
21  CALCULATIONS, THEIR MESSAGE WOULD HAVE REACHED PEOPLE IN THE
22  UNITED STATES 2 BILLION TIMES?
23  A.   IT WOULD HAVE MEANT THAT 2 BILLION PEOPLE OVER THE COURSE
24  OF THE YEAR POTENTIALLY WOULD HAVE SEEN THE MESSAGE.
25  Q.   OKAY.  BUT WE DON'T HAVE 2 BILLION PEOPLE IN THE

1    UNITED STATES.

2    **A.**    THAT IS CORRECT.

3    **Q.**    SO TO BREAK DOWN THE MATH, IT WOULD MEAN THAT EVERY PERSON

4    IN THE UNITED STATES WOULD HAVE SEEN YOUR MESSAGE AT LEAST 10

5    TIMES, CORRECT?

6    **A.**    THAT IS THE WAY THE MATH WOULD WORK.

7    **Q.**    SO IF EVERY PERSON IN THE UNITED STATES WOULD HAVE SEEN

8    YOUR MESSAGE 10 TIMES IN A GIVEN YEAR, IT WOULD BE EXTREMELY

9    IMPORTANT TO BE SURE THAT THE INFORMATION CONTAINED IN THE

10   MESSAGE WAS ACCURATE AND TRUTHFUL IN EVERY RESPECT?

11   **A.**    I WOULD AGREE WITH THAT.

12   **Q.**    THIS PRESS RELEASE SAYS IN ITS HEADLINE, "MERCK CONFIRMS

13   FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF VIOXX."  DID I READ

14   THAT CORRECTLY?

15   **A.**    YES, YOU DID.

16   **Q.**    WOULD THE READER READING THAT HEADLINE BELIEVE THAT VIOXX

17   HAD THE POTENTIAL TO HURT YOUR HEART?

18   **A.**    I DON'T KNOW WHAT THE AVERAGE PERSON READING IT WOULD

19   NECESSARILY TAKE AWAY FROM THAT HEADLINE.

20   **Q.**    OKAY.  IT SAYS IN THE FIRST SENTENCE, "IN RESPONSE TO

21   SPECULATIVE NEWS REPORTS, MERCK AND COMPANY, INC., TODAY

22   CONFIRMED THE FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF VIOXX,

23   ITS MEDICINE THAT SELECTIVELY INHIBITS COX-2."  DID I READ THAT

24   CORRECTLY?

25   **A.**    YES, YOU DID.

1  **Q.**   WHAT DID MERCK DO ON APRIL 28, 2000, TO CONFIRM THAT VIOXX

2  WAS SAFE FROM A CARDIOVASCULAR STANDPOINT?

3  **A.**   THE WORD "CONFIRM" THERE IS USED IN A NEWS RELEASE

4  CONTEXT.  YOU COULD HAVE SAID "TODAY COMMENTED ON," "TODAY

5  ANNOUNCED," "TODAY SAID."  IT'S USED IN TERMS OF -- IT'S A NEWS

6  RELEASE TYPE TERM AS OPPOSED TO SOME OTHER TYPE MEANING.

7  **Q.**   WELL, DOESN'T THE AVERAGE PERSON, WHEN THEY HEAR

8  "CONFIRM," THINK THAT THAT MEANS THAT SOMEBODY CHECKED

9  SOMETHING AND NOW STANDS BEHIND IT?  ISN'T THAT WHAT "CONFIRMS"

10  MEANS?

11  **A.**   THAT IS ANOTHER WAY IN WHICH THE WORD IS USED.  BUT,

12  AGAIN, YOU LOOK AT THE TOTAL OF THE NEWS RELEASE, NOT JUST THE

13  ONE SENTENCE.

14  **Q.**   OKAY.  IS THERE ANY MENTION IN THIS PRESS RELEASE

15  CONCERNING AN ALTERNATE EXPLANATION FOR THE HEART ATTACK

16  FINDING IN VIGOR, I.E., THAT VIOXX COULD BE THE CAUSE OF THE

17  HEART ATTACK IMBALANCE IN THE VIGOR STUDY?

18  **A.**   THE SPECIFIC LANGUAGE THAT YOU SUGGESTED IS NOT IN THIS

19  PARTICULAR NEWS RELEASE.

20  **Q.**   IS THERE ANY INDICATION WHATSOEVER ANYWHERE IN THIS PRESS

21  RELEASE BY MERCK THAT ONE OF THE EXPLANATIONS FOR THE VIGOR

22  RESULTS IS THAT VIOXX WAS CAUSING THE HEART ATTACKS?

23  **A.**   THAT SPECIFIC LANGUAGE IS NOT IN THE NEWS RELEASE.

24  **Q.**   NOW, IN THE NEXT MONTH, NOVEMBER 2000, THE VIGOR STUDY WAS

25  PUBLISHED IN THE *JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION*.

1  DO YOU RECALL THAT?

2  **A.**   I BELIEVE IT WAS PUBLISHED IN *THE NEW ENGLAND JOURNAL OF*

3  *MEDICINE*.

4  **Q.**   YOU'RE RIGHT.  YOU'RE CORRECT.  DID YOU HAVE PRESS

5  ACTIVITIES AROUND THAT PUBLICATION?

6  **A.**   WE ISSUED A NEWS RELEASE AROUND THAT PUBLICATION.

7  **Q.**   OKAY.  YOU ALSO ISSUED A VIDEO NEWS RELEASE, CORRECT?

8  **A.**   I DON'T RECALL WHETHER WE DID OR NOT.

9  **Q.**   I'M GOING TO SHOW YOU A VIDEO NEWS RELEASE AND THEN WE'LL

10  TALK ABOUT IT.

11  **A.**   OKAY.

12                        **(VIDEO CLIP SHOWN)**

13  **BY MR. ROBINSON:**

14  **Q.**   NOW, I'VE STOPPED THE VIDEO NEWS RELEASE IN THE BEGINNING.

15  IT SAYS, "IN A STUDY OF VIOXX PUBLISHED IN THE *NEW ENGLAND*

16  *JOURNAL OF MEDICINE*, VIOXX SIGNIFICANTLY REDUCED THE RISK OF

17  SERIOUS GASTROINTESTINAL SIDE EFFECTS BY HALF COMPARED TO

18  NAPROXEN.  TV NEEDS FEED:  DWJ TELEVISION."  HAVE YOU EVER SEEN

19  THIS VIDEO NEWS RELEASE BEFORE?

20  **A.**   I'M CERTAIN THAT I SAW IT AT THE TIME.

21                        **(VIDEO CLIP SHOWN)**

22  **BY MR. ROBINSON:**

23  **Q.**   DO YOU RECOGNIZE THE INDIVIDUAL ON THIS NEWS RELEASE, THE

24  DOCTOR?

25  **A.**   I RECOGNIZE THE NAME.  I HAVE NEVER MET THE MAN, SO SEEING

1    HIM I ASSUME THAT THAT'S WHO IT IS.

2    **Q.**   WHO IS THAT?

3    **A.**   HIS NAME IS DR. LOREN LAINE.

4    **Q.**   WHAT WAS HIS RELATIONSHIP WITH MERCK?

5    **A.**   HE WAS INVOLVED IN THE VIGOR STUDY.  I DO NOT KNOW HIS

6    SPECIFIC ROLE IN THAT STUDY.

7    **Q.**   OKAY.  WAS HE PAID BY MERCK?

8    **A.**   IF HE WAS AN INVESTIGATOR IN THE STUDY, THERE WOULD HAVE

9    BEEN A CONTRACT.

10   **Q.**   NOW, IN THAT VIDEO NEWS RELEASE, IS THERE ANY MENTION OF

11   THE HEART ATTACK FINDINGS OF VIGOR?

12   **A.**    IN THE CUT PIECE THAT WE JUST SAW, THERE WAS NO MENTION OF

13   CARDIOVASCULAR.

14   **Q.**   NOW, WHEN YOU SAY "CUT PIECE," WHAT DO YOU MEAN BY THAT?

15   **A.**    THE VIDEO PACKAGE, AS WE TYPICALLY PUT THEM TOGETHER, HAD

16   SEVERAL DIFFERENT ELEMENTS.  AT THE BEGINNING YOU HAD THE FULL

17   NEWS RELEASE, THEN YOU HAVE WHAT WE CALL -- AND THE TERM IN

18   TELEVISION IS "CUT PIECE," AND THAT IS THE PART THAT'S PUT

19   TOGETHER THAT WE JUST SAW.  THEN YOU HAVE THE ADDITIONAL

20   BACKGROUND FOOTAGE AND OTHER CHOICES THAT THE TELEVISION

21   EDITORS CAN USE IN PUTTING TOGETHER THEIR OWN PIECES, AND THEN

22   WE HAD FULL LABELING AT THE END.

23   **Q.**   OKAY.  ANY OF THE VIDEO CONNECTED TO THIS VIDEO NEWS

24   RELEASE, INCLUDING THE B-ROLL PORTIONS, WAS THERE EVER ANY

25   MENTION OF THE HEART ATTACK FINDINGS IN VIGOR?

1293

1   A.   WE HAVE NOT REVIEWED THE FULL PACKAGE.  WE HAVEN'T LOOKED

2   AT THE BACKGROUND FOOTAGE.

3   Q.   OKAY.

4   A.   SO I DON'T -- I CAN'T ANSWER YOUR QUESTION.

5                    **(VIDEO CLIP SHOWN)**

6   BY MR. ROBINSON:

7   Q.   THIS IS A SECTION WITHOUT AMBIENT SOUND, MEANING IT'S JUST

8   PHOTOS, CORRECT?

9   A.   IT'S JUST VISUALS.

10  Q.   OKAY.  YOU USE THIS IN CASE SOMEBODY WANTS TO DO A LEAD-IN

11  OR A FADE-OUT OR SOMETHING LIKE THAT WHEN THEY'RE DOING THE

12  STORY.  SO FAR, HAVE YOU SEEN ANYTHING FROM DR. LAINE TO

13  INDICATE THAT HE WAS TELLING THE VIEWERS THAT ONE OF THE

14  FINDINGS IN VIGOR WAS THAT PEOPLE ON VIOXX HAD MORE HEART

15  ATTACKS?

16  A.   THERE'S NO INFORMATION THAT I HAVE HEARD RELATED TO

17  CARDIOVASCULAR.

18  Q.   DO YOU SEE ANY LANGUAGE ON THIS PART OF THE VIDEO NEWS

19  RELEASE TELLING PEOPLE THAT ONE OF THE FINDINGS IN VIGOR WAS

20  THAT THE PEOPLE ON VIOXX HAD MORE HEART ATTACKS?

21  A.   I HAVE NOT SEEN THE INFORMATION RELATED TO CARDIOVASCULAR.

22  Q.   OKAY.  NOW, WHAT WE'RE WATCHING NOW IS A B-ROLL, AND A

23  B-ROLL IS TYPICALLY SILENT, CORRECT?

24  A.   IT CAN BE EITHER WAY, WITH AMBIENT SOUND OR WITHOUT.

25  Q.   BUT IT'S REALLY THERE JUST AS BACKGROUND, IF I RECALL, FOR

1    PEOPLE RUNNING THE STORY, RIGHT?

2    **A.**   THEY HAVE A VISUAL TO ACCOMPANY WHATEVER SOUND THEY WISH

3    TO ADD TO IT.

4    **Q.**   OKAY.  WHILE WE'RE WATCHING THIS SILENT PART, CAN YOU TELL

5    US WHETHER THIS VIDEO NEWS RELEASE WAS SUBMITTED TO THE FDA

6    BEFORE IT WAS ISSUED?  DO YOU KNOW WHETHER THIS WAS EVER

7    SUBMITTED TO THE FDA BEFORE NOVEMBER 23, 2000?

8    **A.**   IT IS UNLIKELY THAT IT WOULD HAVE BEEN SUBMITTED BECAUSE

9    OUR PRACTICE WAS TO SUBMIT FOR PRECLEARANCE THOSE ITEMS

10   GENERALLY THAT RELATED TO REGULATORY ACTIONS.  THIS IS A

11   STUDY -- THIS IS A STUDY PUBLICATION.  AGAIN, I DON'T KNOW IF

12   THIS WAS EVER ISSUED.

13                        **(VIDEO CLIP SHOWN)**

14   **BY MR. ROBINSON:**

15   **Q.**   ANYWHERE ON THIS VIDEO NEWS RELEASE DID YOU HEAR MENTIONED

16   THAT ONE OF THE FINDINGS IN VIGOR WAS THAT THE PEOPLE ON VIOXX

17   HAD MORE HEART ATTACKS THAN THE PEOPLE ON NAPROXEN?

18   **A.**   I DID NOT HEAR THAT IN THE VIDEO NEWS RELEASE.

19   **Q.**   ANY OF THE SPOKESPEOPLE IN THIS VIDEO NEWS RELEASE TELL

20   THE AUDIENCE THAT ONE OF THE SIGNIFICANT FINDINGS IN VIGOR WAS

21   THAT PEOPLE ON VIOXX HAD MORE HEART ATTACKS THAN PEOPLE ON

22   NAPROXEN?

23   **A.**   THERE WAS NO VERBAL STATEMENT GIVEN RELATED TO THE

24   CARDIOVASCULAR FINDINGS IN VIGOR.

25   **Q.**   WHY NOT?

1    **A.**    I DON'T KNOW.

2    **Q.**    DID MEDICAL/LEGAL CLEAR THIS VIDEO NEWS RELEASE?

3    **A.**    IF THIS VIDEO NEWS RELEASE WERE ISSUED, IT WOULD HAVE GONE

4    THROUGH THE MERCK REVIEW PROCESS, AND IT WOULD HAVE BEEN SEEN

5    AND REVIEWED BY A NUMBER OF PEOPLE.

6    **Q.**    WHEN IS IT PROPER TO ISSUE PRESS MATERIALS, INCLUDING A

7    VIDEO NEWS RELEASE, THAT INCLUDES SOME SIGNIFICANT FINDINGS OF

8    A STUDY BUT NOT OTHERS?

9    **A.**    WHEN A VIDEO NEWS RELEASE IS PREPARED, THERE WILL BE

10   DECISIONS ABOUT WHAT IS INCLUDED AND NOT INCLUDED.  I DO NOT

11   KNOW THE DISCUSSIONS OR THE DECISIONS THAT WERE MADE IN THIS

12   CASE.  I DON'T RECALL.

13   **Q.**    DO YOU RECALL YOU OR ANY OF YOUR STUFF RAISING OBJECTION

14   TO THIS NEWS RELEASE ON NOT INCLUDING ALL OF THE SIGNIFICANT

15   FINDINGS OF VIGOR?

16   **A.**    I DON'T RECALL.

17   **Q.**    OKAY.  THIS VIDEO NEWS RELEASE DID NOT INCLUDE ANY

18   INFORMATION FROM THE HEART ATTACK META–ANALYSIS DONE BY MERCK A

19   MONTH BEFORE, CORRECT?

20   **A.**    IT DID NOT INCLUDE CARDIOVASCULAR INFORMATION.  IT DID NOT

21   INCLUDE CARDIOVASCULAR INFORMATION IN THE SPOKEN PART OF THE

22   VIDEO NEWS RELEASE.

23   **Q.**    NOW, IN CONJUNCTION WITH THE PRESS RELEASE THAT YOU ISSUED

24   CONCERNING THE TOPOL ARTICLE, YOU ALSO CONSTRUCTED AND ISSUED A

25   VIDEO NEWS RELEASE, CORRECT?

1   **A.**   MY RECOLLECTION IS THAT WE PUT TOGETHER A VIDEO PACKAGE,

2   BUT NOT A VIDEO NEWS RELEASE PER SE.

3   **Q.**   WHAT'S THE DIFFERENCE?

4   **A.**   THE DIFFERENCE IS A VIDEO PACKAGE JUST GIVES JUST THE

5   ELEMENTS; AND THAT IS IT WILL BE SOUND BITES, IF YOU WILL, AND

6   THAT IS ALL.  IT DOES NOT PRESENT WHAT IS CALLED A CUT PIECE OR

7   A PREPARED TOTAL STORY --

8   **Q.**   OKAY.

9   **A.**   -- WHICH MEANS THAT, IF A TELEVISION STATION WANTS TO USE

10  IT, THEY'RE GOING TO HAVE TO GO IN, CONSTRUCT THEIR OWN STORY,

11  AND PULL ELEMENTS OR INGREDIENTS FROM THE PACKAGE THAT WE HAVE

12  PREPARED FOR THEM.

13

14

15

16  **Q.**   OKAY.  THEY COULD CUT AND PASTE WHATEVER THEY WANTED AND

17  STICK IT IN THEIR NEWS STORY, CORRECT?

18  **A.**   ESSENTIALLY, YES.

19  **Q.**   WAS THE VIDEO PACKAGE PRESENTED TO THE FDA BEFORE IT WAS

20  AIRED?

21  **A.**   I DON'T BELIEVE SO.  THAT WOULD NOT HAVE BEEN NORMAL

22  PRACTICE.

23  **Q.**   NOW, I'M GOING TO SHOW YOU WHAT'S BEEN PRODUCED TO US BY

24  MERCK'S COUNSEL CONCERNING THE TOPOL ARTICLE IN AUGUST 2001.

25  **A.**   OKAY.

```
 1                    (VIDEO CLIP SHOWN)
 2   BY MR. ROBINSON:
 3   Q.   ALL RIGHT.  BEFORE WE MOVE FORWARD, DID YOU SEE THAT WAS
 4   FROM AUGUST 21, 2001?
 5   A.   I GLANCED AT IT.
 6   Q.   ALL RIGHT.  LET ME GO BACK.
 7   A.   I SEE AUGUST 21.
 8   Q.   THIS MATERIAL, ACCORDING TO THIS, INCLUDES SOURCE
 9   DISCLOSURE, NEWS RELEASE, SUPER INFORMATION.  WHAT'S "SUPER
10   INFORMATION"?
11   A.   IT'S THE NAME AND TITLE OF THE PEOPLE WHO ARE ON THE
12   SCREEN.
13   Q.   OKAY.  SOUND BITES, B-ROLL, AND PRESCRIBING INFORMATION;
14   CORRECT?
15   A.   THAT IS CORRECT.
16                    (TAPE PLAYED BACK)
17   BY MR. ROBINSON:
18   Q.   WHAT IS IT THAT LAURA DEMOPOULOS JUST TOLD THE WORLD ABOUT
19   VIOXX AND CARDIOVASCULAR EVENTS?
20   A.   THAT THERE IS AN EXTENSIVE BODY OF EVIDENCE THAT WOULD
21   TEND TO SUGGEST THAT PATIENTS RECEIVING VIOXX ARE NOT AT AN
22   INCREASED RISK OF CARDIOVASCULAR EVENTS.
23   Q.   OKAY.  TO BE FAIR IN THE FULLEST SENSE, WHAT I'M GOING TO
24   DO IS PLAY THE ENTIRE THING THROUGH, AND THEN WE'LL GO BACK AND
25   TAKE PIECES RATHER THAN HAVE YOU GUESS WHAT'S COMING.  OKAY?
```

1   BECAUSE THAT MAY NOT BE A FAIR WAY TO APPROACH THIS.

2            DOES DR. DEMOPOULOS TELL PEOPLE WHO ARE WATCHING THIS

3   VIDEO THAT MERCK RAN A STUDY, VIGOR, THAT ONE OF THE THEORIES

4   WAS THAT THERE WAS AT LEAST FOUR TIMES AS MANY HEART ATTACKS

5   FOR PEOPLE ON VIOXX VERSUS NAPROXEN?

6   A.   THAT PARTICULAR SOUND BITE DOES NOT MAKE REFERENCE TO THAT

7   STATEMENT.

8   Q.   IN FACT, HER STATEMENT IS THAT VIOXX DOES NOT CAUSE HEART

9   ATTACKS, CORRECT?

10  A.   I THINK -- I THINK HER STATEMENT -- HER STATEMENT IS QUITE

11  CLEAR.

12  Q.   WHAT SHE TELLS THE WORLD IS THAT IT'S MERCK'S POSITION,

13  EVEN AS OF AUGUST 2001, DESPITE WHATEVER MERCK KNEW INTERNALLY,

14  THAT VIOXX CAN'T CAUSE HEART ATTACKS; TRUE?

15  A.   AGAIN, I THINK WHAT DR. DEMOPOLOUS SAID ON THE VIDEOTAPE

16  IS -- WAS QUITE CLEAR THAT -- AND, YOU KNOW, WE'VE TALKED ABOUT

17  IT PREVIOUSLY, THAT THE DATA TENDED TO SUGGEST THAT PATIENTS

18  TAKING VIOXX DID NOT HAVE AN INCREASED RISK.

19  Q.   BUT MERCK KNEW THERE WAS A LOT OF DATA TO THE CONTRARY,

20  TRUE?

21  A.   AGAIN, HER STATEMENTS WENT THROUGH THE MERCK REVIEW

22  PROCESS.

23  Q.   ONE, MERCK HAD THE INFORMATION FROM THE VIGOR STUDY AT

24  THIS POINT, TRUE?

25  A.   YES, MERCK HAD THE VIGOR RESULTS OF THAT TIME.

1   **Q.**   MERCK HAD THE RESULTS OF THE ADVANTAGE TRIAL AS OF THIS

2   POINT, TRUE?

3   **A.**   I BELIEVE THAT'S THE CASE.

4   **Q.**   MERCK HAD THE RESULTS OF THE LOW-BACK PAIN STUDY, TRUE?

5   **A.**   I DON'T KNOW THAT TO BE A FACT.

6   **Q.**   MERCK HAD IN ITS POSSESSION THE STUDY -- THE ANALYSIS THAT

7   DR. SHAPIRO DID IN OCTOBER OF 2000 CONCERNING HEART ATTACKS AND

8   VIOXX, TRUE?

9   **A.**   WE CERTAINLY HAD DR. SHAPIRO'S ANALYSIS.

10  **Q.**   LAURA DEMOPOULOS MENTIONED NONE OF THAT ON NATIONAL

11  TELEVISION IN RESPONSE TO DR. TOPOL'S ARTICLE, TRUE?

12  **A.**   HER COMMENTS DO NOT INCLUDE SPECIFIC REFERENCES TO THOSE

13  THINGS.

14  **BY MR. ROBINSON:**

15  **Q.**   I'M GOING TO SHOW YOU A DOCUMENT THAT WE'LL MARK AS

16  WEINER-78 AND ASK IF YOU CAN IDENTIFY IT?

17  **A.**   THIS IS THE NEWS RELEASE THAT WAS ISSUED TO ANNOUNCE THE

18  PRELIMINARY RESULTS OF THE VIGOR STUDY.

19  **Q.**   WAS THERE MEDIA COVERAGE IN RESPONSE TO THIS NEWS RELEASE?

20  **A.**   THERE WAS A SMALL AMOUNT OF MEDIA COVERAGE ON THE DAY THAT

21  THIS PARTICULAR NEWS RELEASE WAS ISSUED.  BUT OVER THE COMING

22  MONTHS, THERE WAS A GREAT DEAL OF MEDIA COVERAGE ABOUT THIS

23  TOPIC.

24  **Q.**   DID THIS NEWS RELEASE SAY ANYTHING ABOUT THE

25  CARDIOVASCULAR RESULTS OF THE VIGOR STUDY, IN PARTICULAR, THE

1   DIFFERENCE IN EVENT RATES BETWEEN VIOXX AND NAPROXEN?

2   **A.**   YES, IT DOES.

3   **Q.**   WHAT DOES IT SAY ABOUT THAT?

4           **MR. BECK:**  YOUR HONOR, THESE ARE OUR QUESTIONS NOW.

5           **THE COURT:**  OKAY.

6                          **CROSS-EXAMINATION**

7   BY MR. BECK:

8   **Q.**   WHAT DOES IT SAY ABOUT THAT?

9   **A.**   READING FROM THE RELEASE AT THE BEGINNING OF THE SECOND

10  PARAGRAPH:  "IN ADDITION, SIGNIFICANTLY FEWER THROMBOEMBOLIC

11  EVENTS WERE OBSERVED IN PATIENTS TAKING NAPROXEN IN THIS GI

12  OUTCOMES STUDY, WHICH IS CONSISTENT WITH NAPROXEN'S ABILITY TO

13  BLOCK PLATELET AGGREGATION.  THIS EFFECT ON THESE EVENTS HAS

14  NOT BEEN OBSERVED PREVIOUSLY IN ANY CLINICAL STUDIES FOR

15  NAPROXEN."

16  **Q.**   MS. WEINER, WHAT IS AN IMPRESSION?  FROM A PUBLIC AFFAIRS

17  POINT OF VIEW, WHAT DOES THAT WORD MEAN?

18  **A.**   AN IMPRESSION IS A CALCULATION OF THE POTENTIAL REACH OF A

19  NEWS MEDIA STORY.  IN THE CASE OF A NEWSPAPER, IT'S NOT JUST

20  THE CIRCULATION, RECOGNIZING THAT A NEWSPAPER CAN GO INTO AN

21  OFFICE OR A HOME AND BE SEEN BY OTHER PEOPLE.  SO IN THE CASE

22  OF A NEWSPAPER, WE WILL OBTAIN FROM THAT ORGANIZATION THEIR

23  BEST ESTIMATE OF THE NUMBER OF PEOPLE, ON AVERAGE, WHO SEE EACH

24  ISSUE.  SO AN IMPRESSION WOULD BE THE CIRCULATION TIMES

25  WHATEVER THE PASS-ALONG FACTOR IS.  THAT COVERS PRINT.  THEN AN

1    IMPRESSION AS IT RELATES TO BROADCAST WILL BE THEIR BEST

2    ESTIMATE OF THE NUMBER OF PEOPLE WHO ARE VIEWING A PROGRAM.

3    THE DATA IS MUCH BETTER FOR BROADCAST THAN IT IS FOR PRINT.

4    **Q.**   DOES THE CALCULATION OF IMPRESSION, FOR PURPOSES OF

5    NEWSPAPERS, MEAN A PERSON ACTUALLY SAW OR READ A PARTICULAR

6    ITEM?

7    **A.**   NO.

8              **THE COURT:**  IS THAT IT?

9              **MR. ROBINSON:**  CAN WE APPROACH THE BENCH, YOUR HONOR?

10             **THE COURT:**  YES.

11             (WHEREUPON, THERE WAS A CONFERENCE AT THE BENCH

12   OUTSIDE THE PRESENCE OF THE COURT REPORTER.)

13             **THE COURT:**  WE'LL END HERE AND YOU CAN GO HOME.

14   THANK YOU VERY MUCH FOR WORKING ON SATURDAY.  I REALLY

15   APPRECIATE THAT.  HAVE A GOOD REST TOMORROW AND I'LL SEE YOU AT

16   8:30 ON MONDAY.  ALL RISE AS THE JURY LEAVES, PLEASE.

17             (WHEREUPON, THE JURY EXITED THE COURTROOM.)

18             **MR. BIRCHFIELD:**  WE'RE OFFERING MIKOLA EXHIBIT 11.

19   IT IS THE PROPOSED LABEL FROM THE FDA IN OCTOBER OF 2001.

20             **THE COURT:**  THERE IS AN OBJECTION.  I OVERRULE THE

21   OBJECTION AND I'LL ALLOW IT INTO EVIDENCE.

22             (WHEREUPON, THE COURT WAS IN RECESS.)

23                          * * *

24

25