2221

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE: VIOXX PRODUCTS        *   MDL DOCKET NO. 1657
     LIABILITY LITIGATION         *
6                                 *
                                  *
7    THIS DOCUMENT RELATES TO     *   AUGUST 14, 2006, 8:30 A.M.
                                  *
8                                 *
     GERALD BARNETT V. MERCK      *   CASE NO. 06-CV-485-L
9      & CO., INC.                *
     * * * * * * * * * * * * * * * *
10

11                           VOLUME XI
12                      JURY TRIAL BEFORE THE
                       HONORABLE ELDON E. FALLON
13                   UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15

16   FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                 BY:  MARK P. ROBINSON JR., ESQ.
17                               620 NEWPORT CENTER DRIVE
                                 NEWPORT BEACH, CALIFORNIA 92660
18

19   FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                    PORTIS & MILES
20                               BY:  ANDY D. BIRCHFELD JR., ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22

23   FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                    PALENCHAR & SCOTT
24                               BY:  PHILIP S. BECK, ESQ.
                                    ANDREW L. GOLDMAN, ESQ.
25                               54 W. HUBBARD STREET, SUITE 300
                                 CHICAGO, ILLINOIS 60601


                            DAILY COPY

2222

1

2       OFFICIAL COURT REPORTERS:      CATHY PEPPER, CCR, RPR, CRR
                                       TONI DOYLE TUSA, CCR, FCRR
3                                      500 POYDRAS STREET, ROOM HB-406
                                       NEW ORLEANS, LOUISIANA 70130
4                                      (504) 589-7778

5

6
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
7       PRODUCED BY COMPUTER.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              DAILY COPY

2223

1                                   **I N D E X**

2                                                              PAGE

3   ALISE REICIN
        DIRECT EXAMINATION                              2224
4       CROSS-EXAMINATION                               2345
        REDIRECT EXAMINATION                            2432
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                DAILY COPY

2224

1              **MORNING SESSION**

2              **(AUGUST 14, 2006)**

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4    TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5    REPORTER.)

6              **THE DEPUTY CLERK:**  EVERYONE RISE.

7              **THE COURT:**  BE SEATED, PLEASE.  GOOD MORNING,

8    GENTLEMEN OF THE JURY.

9              CALL YOUR NEXT WITNESS, PLEASE.

10             **MR. GOLDMAN:**  MERCK CALLS DR. ALISE REICIN.

11             (WHEREUPON, **ALISE REICIN**, HAVING BEEN DULY SWORN,

12   TESTIFIED AS FOLLOWS.)

13             **THE DEPUTY CLERK:**  PLEASE BE SEATED, AND IF YOU WOULD

14   USE THAT MICROPHONE HERE.  IT'S ADJUSTABLE AND YOU CAN PULL IT

15   TOWARD YOU, IF YOU WOULD LIKE.  WOULD YOU STATE YOUR FULL NAME

16   FOR THE RECORD.

17             **THE WITNESS:**  DR. ALISE SUSAN REICIN.

18             **THE DEPUTY CLERK:**  WOULD YOU SPELL THE LAST NAME.

19             **THE WITNESS:**  R-E-I-C-I-N.

20                  **DIRECT EXAMINATION**

21   BY MR. GOLDMAN:

22   **Q.**   GOOD MORNING, DR. REICIN.

23   **A.**   GOOD MORNING.

24   **Q.**   COULD YOU PLEASE TELL THE JURY WHERE YOU LIVE.

25   **A.**   I LIVE IN ENGLEWOOD, NEW JERSEY.

1   **Q.**   ARE YOU MARRIED, DR. REICIN?

2   **A.**   I AM MARRIED.

3   **Q.**   DO YOU HAVE CHILDREN?

4   **A.**   I HAVE THREE BOYS, AGES 16, 14, AND 12.

5   **Q.**   AND WHERE DO YOU WORK, DR. REICIN?

6   **A.**   I WORK AT MERCK RESEARCH LABORATORIES.

7   **Q.**   WHAT IS YOUR CURRENT POSITION?

8   **A.**   I'M A VICE-PRESIDENT OF CLINICAL RESEARCH.

9   **Q.**   AND WHEN DID YOU FIRST JOIN MERCK, DOCTOR?

10   **A.**   I JOINED MERCK A LITTLE BIT OVER TEN YEARS AGO, IN

11   FEBRUARY OF 1996.

12   **Q.**   ARE YOU A MEDICAL DOCTOR?

13   **A.**   I AM A MEDICAL DOCTOR.

14   **Q.**   CAN YOU TELL THE JURY WHERE YOU WENT TO COLLEGE AND A

15   LITTLE BIT ABOUT YOUR MEDICAL TRAINING BEFORE YOU JOINED MERCK,

16   PLEASE.

17   **A.**   I WENT TO COLLEGE AT BARNARD COLLEGE, WHICH IS THE WOMEN'S

18   COLLEGE OF COLUMBIA UNIVERSITY IN NEW YORK CITY, AND I MAJORED

19   IN BIOCHEMISTRY.  AFTER THAT I WENT TO MEDICAL SCHOOL AT

20   HARVARD MEDICAL SCHOOL IN BOSTON.  I WAS IN A SPECIAL JOINT

21   PROGRAM THERE BETWEEN HARVARD AND MIT, MASSACHUSETTS OF

22   TECHNOLOGY.  THE PROGRAM WAS CALLED THE HEALTH SCIENCE AND

23   TECHNOLOGY PROGRAM.  IT WAS FOR PEOPLE WHO WERE GOING FOR THEIR

24   MEDICAL DEGREE BUT WHO HAD A SPECIAL INTEREST IN DOING MEDICAL

25   RESEARCH.

1        DURING MEDICAL SCHOOL, I TOOK A YEAR OFF.

2   **Q.**   TO DO WHAT?

3   **A.**   TO DO MEDICAL RESEARCH, BASIC SCIENCE, CANCER RESEARCH, AT

4   SLOAN-KETTERING CANCER INSTITUTE IN NEW YORK CITY.

5        AS A PART OF THE HST PROGRAM, YOU HAVE TO WRITE A

6   THESIS.

7   **Q.**   WHAT'S THE HST PROGRAM?

8   **A.**   THAT WAS THE HEALTH SCIENCE AND TECHNOLOGY PROGRAM THAT I

9   WAS IN AT HARVARD.  YOU HAVE TO WRITE A THESIS ON INDEPENDENT

10  RESEARCH THAT YOU DO WHILE YOU ARE IN MEDICAL SCHOOL, AND SO I

11  TOOK A YEAR OFF TO DO CANCER RESEARCH.

12       AND WHEN I GRADUATED FROM HARVARD IN 1987, I WENT

13  BACK TO NEW YORK, TO COLUMBIA PRESBYTERIAN HOSPITAL, WHICH IS

14  THE MAJOR HOSPITAL OF COLUMBIA MEDICAL SCHOOL, WHERE I DID AN

15  INTERNSHIP AND RESIDENCY IN INTERNAL MEDICINE FOLLOWED BY A

16  RESEARCH FELLOWSHIP IN INFECTIOUS DISEASES.

17  **Q.**   DID YOU TREAT PATIENTS AT ALL, DOCTOR, WHILE YOU WERE AT

18  COLUMBIA PRESBYTERIAN HOSPITAL DOING YOUR INTERNSHIP AND

19  RESIDENCY?

20  **A.**   ABSOLUTELY.  DURING YOUR INTERNSHIP AND RESIDENCY, YOU'RE

21  ALMOST FULL-TIME TAKING CARE OF PATIENTS, BOTH IN THE HOSPITAL,

22  EITHER IN THE EMERGENCY ROOM OR ON THE WARDS OF THE HOSPITAL,

23  AS WELL AS I HAD IN OUTPATIENT GENERAL MEDICINE CLINIC.

24  **Q.**   CAN YOU EXPLAIN WHAT A FELLOWSHIP IS?  YOU MENTIONED THAT.

25  WHAT IS A FELLOWSHIP?

1    **A.**    A FELLOWSHIP IS WHERE YOU DO A SUBSPECIALIZATION.  SO WHEN

2    I FINISHED MY INTERNSHIP AND RESIDENCY, I COULD HAVE GONE OUT

3    AND PRACTICED INTERNAL MEDICINE; BUT INSTEAD, I DID A

4    THREE-YEAR SUBSPECIALTY WHERE I SPECIALIZED IN INFECTIOUS

5    DISEASES.

6             THE FIRST YEAR, I DID ALMOST FULL-TIME PATIENT CARE

7    DOING INFECTIOUS DISEASE CONSULTATIONS IN THE HOSPITAL, ALL

8    OVER THE HOSPITAL.  AND PLUS I HAD AN INFECTIOUS DISEASE

9    OUTPATIENT CLINIC.  AND THEN THE SECOND TWO YEARS OF THE

10   FELLOWSHIP, I DID BASIC SCIENCE AIDS RESEARCH.

11   **Q.**    DID YOU SPEND MOST OF YOUR TIME IN YOUR FELLOWSHIP

12   RESEARCHING AIDS OR WORKING WITH PATIENTS WHO HAD HIV OR AIDS?

13   **A.**    BASICALLY, THE MAJORITY OF TIME IN MY FELLOWSHIP WAS SPENT

14   DOING BASIC SCIENCE AIDS RESEARCH, AND MY OUTPATIENT CLINIC WAS

15   ABOUT 90 PERCENT PATIENTS WHO WERE INFECTED WITH THE HIV VIRUS,

16   WHICH IS WHAT CAUSED AIDS, OR HAD AIDS ALREADY.

17   **Q.**    WHY, DR. REICIN, WERE YOU INTERESTED IN RESEARCHING HIV

18   AND AIDS?

19   **A.**    WHEN I STARTED MEDICAL SCHOOL, THAT WAS RIGHT WHEN THEY

20   DISCOVERED THE HIV VIRUS, AND WHEN I WAS AT HARVARD AT THE BETH

21   ISRAEL DOING MY INTERNAL MEDICINE RESIDENCE ON JUST ROTATION, I

22   TOOK CARE OF ONE OF THE FIRST AIDS PATIENTS THAT THEY HAD AT

23   THE BETH ISRAEL WITH AN INFECTION CALLED CRYPTOCOCCAL

24   MENINGITIS.  I GOT VERY CLOSE TO THAT PATIENT.  AND TO ME, IN

25   ESSENCE, AIDS WAS -- THAT WAS THE DISEASE OF MY GENERATION.

1        AND THE RESEARCH THAT I HAD DONE AT SLOAN-KETTERING,

2    EVEN THOUGH IT WAS CANCER RESEARCH, IT WAS USING A VIRUS THAT

3    TURNED OUT TO BE VERY SIMILAR TO THE AIDS VIRUS.  AND SO I

4    THINK IT WAS ALL OF THAT THAT CAME TOGETHER FOR ME.  I MEAN,

5    THERE WAS A DISEASE THAT I REALLY THOUGHT, POTENTIALLY, WE

6    COULD IMPACT.

7    **Q.**    AND DID YOU HAVE ANY FINDINGS, DID YOU REACH ANY

8    CONCLUSIONS, BASED ON YOUR RESEARCH, THAT'S ACTUALLY BEING

9    IMPLEMENTED TODAY IN ANY WAY IN THE AIDS AREA?

10   **A.**    WELL, I DON'T WANT TO OVERSTATE THAT.  I THINK --

11   **Q.**    I KNOW YOU HAVEN'T CURED IT, BUT DID YOU DO ANYTHING IN

12   YOUR RESEARCH THAT PEOPLE ARE USING NOW MAYBE AS A POTENTIAL

13   RESPONSE TO IT?

14   **A.**    WELL, I THINK THERE WAS A LITTLE BIT OF RELATIONSHIP.  I

15   DON'T THINK MY RESEARCH -- I DON'T THINK THERE IS A DIRECT

16   CORRELATION.  I WAS STUDYING TWO PARTICULAR PARTS OF THE HIV

17   VIRUS, TWO GENES:  ONE WAS CALLED THE GAG GENE AND ONE WAS

18   CALLED THE INTERGRASE GENE.  THAT'S WHAT I WROTE MY RESEARCH

19   GRANTS ON.

20        AND IT TURNS OUT THAT, ACTUALLY, MERCK IS NOW

21   DEVELOPING A DRUG THAT INTERACTS WITH THE INTERGRASE GENE.  IT

22   HAS NOTHING TO DO WITH THE RESEARCH I ACTUALLY DID.  I WANT TO

23   BE CLEAR, BUT I DO FEEL GOOD THAT SOMETHING THAT I WAS WORKING

24   ON MERCK IS NOW DEVELOPING A DRUG FOR.

25   **Q.**    AFTER YOUR FELLOWSHIP, DID YOU DO ANYTHING ELSE IN THE

1   AREA OF MEDICINE BEFORE YOU JOINED MERCK IN 1996?

2   **A.**   I CONTINUED TO DO -- I JOINED THE FACULTY AT COLUMBIA

3   WHERE I CONTINUED TO DO AIDS BASIC RESEARCH.  I TAUGHT MEDICAL

4   STUDENTS AND DID INFECTIOUS DISEASE ROUNDS WITH THE INFECTIOUS

5   DISEASE FELLOWS, AND I ALSO CONTINUED TO HAVE MY OUTPATIENT

6   CLINIC.

7   **Q.**   WHAT DO YOU MEAN WHEN YOU SAY "ROUNDS"?  WHAT IS THAT?

8   **A.**   ALL OVER THE HOSPITAL, THERE WOULD BE CONSULTATIONS THAT

9   WOULD BE REQUESTED FROM INFECTIOUS DISEASE SPECIALISTS.  IF YOU

10  HAD SOMEONE WHO HAD SURGERY AND GOT AN INFECTION AFTER THAT,

11  THE FELLOWS WOULD BE CALLED TO SEE THE PATIENTS.  AND THEN I

12  WOULD GO AND SEE THE PATIENTS WITH THE FELLOWS AS WELL.

13  **Q.**   YOU SAID YOU JOINED MERCK IN FEBRUARY OF 1996.  DID THERE

14  COME A TIME, DOCTOR, WHEN YOU JOINED THE VIOXX PROJECT TEAM?

15  **A.**   I FIRST STARTED WORKING ON SINGULAIR, WHICH WAS A DRUG FOR

16  ASTHMA.  THAT WAS IN 1996.  AND THEN IN 1997, I JOINED THE

17  VIOXX PROJECT TEAM.

18  **Q.**   CAN YOU DESCRIBE, DOCTOR, YOUR INITIAL ROLE, YOUR FIRST

19  MAJOR PROJECT THAT YOU DID, WHILE YOU JOINED THE -- WHEN YOU

20  JOINED THE PROJECT TEAM IN 1997?

21  **A.**   THE FIRST THING THAT I WAS ASKED TO DO WAS TO DESIGN A

22  STUDY THAT WOULD BE WHAT WE CALL A "GI OUTCOMES STUDY."  AND

23  THAT WAS THE PRIMARY REASON TO DO THE STUDY WAS TO EVALUATE

24  WHETHER PATIENTS WHO TOOK VIOXX, WHICH IS A COX-2 SELECTIVE

25  INHIBITOR, WOULD HAVE A LOWER INCIDENCE OF SERIOUS GI EVENTS,

1  SUCH AS ULCERS IN THEIR STOMACH, BLEEDING FROM THEIR STOMACH,

2  COMPARED WITH PATIENTS WHO TOOK TRADITIONAL NONSTEROIDAL

3  ANTI-INFLAMMATORIES SUCH AS ADVIL.

4  Q.   DID YOU WORK WITH DR. BRIGGS MORRISON AT ALL, AMONG

5  OTHERS, ON THIS POSSIBLE GI OUTCOMES STUDY?

6  A.   AT MERCK, WHEN THEY ASK YOU TO DESIGN A STUDY, THEY DON'T

7  JUST SEND YOU IN A ROOM AND SAY "DESIGN A STUDY AND LET US KNOW

8  IF IT WORKS."  IT'S REALLY DONE -- THERE IS A WHOLE PEER-REVIEW

9  PROCESS WHERE YOU SHARE YOUR STUDY DESIGN WITH OTHER SCIENTISTS

10 AT MERCK.

11       SO BRIGGS WAS A COLLEAGUE OF MINE, DR. MORRISON WAS A

12 COLLEAGUE OF MINE, AND I DID SHARE WITH HIM, AS WELL AS WITH

13 OTHERS, THE STUDY DESIGN.

14 Q.   I'M GOING TO SHOW YOU, DR. REICIN, A SLIDE THAT

15 MR. ROBINSON USED IN OPENING STATEMENT, AND IT HAS YOUR NAME ON

16 IT AND IT HAS BRIGGS MORRISON ON IT.  AND IT SAYS, "1997,

17 PROPOSED VIOXX STUDY DESIGN.  "BRIGGS MORRISON."  "USED

18 LOW-DOSE ASPIRIN."  AND "ALISE REICIN EXCLUDING HIGH-RISK CV

19 PATIENTS AND MAY NOT BE EVIDENT."  DO YOU SEE THAT?

20 A.   I DO.

21 Q.   ARE YOU GENERALLY FAMILIAR WITH WHAT MR. ROBINSON IS

22 TALKING ABOUT THERE IN THAT SLIDE?

23 A.   YES, I AM.

24 Q.   WE TALKED A LITTLE BIT ABOUT THIS WITH DR. MORRISON, BUT

25 SINCE YOU AND HE WERE CORRESPONDING ON THIS ISSUE, I HAVE

1   QUESTIONS FOR YOU AS WELL ABOUT IT.

2            LET ME START -- AND YOU CAN LOOK IN YOUR BINDER,

3   DR. REICIN, ON VOLUME I.  THERE SHOULD BE AN EXHIBIT THAT'S

4   DX13.  THIS IS IN EVIDENCE, AND IT IS A MEMO FROM DR. TOM

5   MUSLINER.  YOU SEE IT THERE?

6   A.   YES, I DO.

7   Q.   HERE, THIS IS DR. MUSLINER WROTE THE MEMO, AND IT'S DATED

8   NOVEMBER 21, 1996.  YOUR NAME IS NOT LISTED AS SOMEBODY WHO

9   RECEIVED IT, BUT DID YOU REVIEW THIS MEMO AROUND THE TIME THAT

10  YOU JOINED THE VIOXX PROJECT TEAM?

11  A.   YES, I DID.

12  Q.   AND THE SUBJECT OF IT SAYS, "ANTICIPATED CONSEQUENCES OF

13  NSAID ANTI-PLATELET EFFECTS ON CARDIOVASCULAR EVENTS AND

14  EFFECTS OF EXCLUDING LOW-DOSE ASPIRIN USE IN THE COX-2 GI

15  OUTCOMES MEGA TRIAL."

16           CAN YOU EXPLAIN TO THE JURY, DR. REICIN, WHAT

17  DR. MORRISON IS DESCRIBING IN THIS MEMO?  IT'S A LONG MEMO, BUT

18  WHAT IS THE GIST OF WHAT HE'S TRYING TO EXPLAIN?

19  A.   I THINK YOU SAID "DR. MORRISON."  IT'S DR. MUSLINER.

20  Q.   I'M SORRY.  DR. MUSLINER.  THANK YOU.

21  A.   BEFORE I ACTUALLY STARTED WORKING ON THE DESIGN OF THE GI

22  OUTCOMES STUDY, DR. MUSLINER HAD BEEN ASKED TO START TO DESIGN

23  THIS, AND HE WAS LOOKING AT WHETHER OR NOT ASPIRIN SHOULD BE

24  INCLUDED IN A GI OUTCOMES STUDY.  AND WE CAN GET INTO THE GI

25  PARTS MAYBE IN A FEW MINUTES --

1    **Q.**    SURE.

2    **A.**    -- OF WHY OR WHY NOT, BECAUSE THAT'S THE MOST IMPORTANT

3    QUESTION OF WHETHER YOU SHOULD ALLOW LOW-DOSE ASPIRIN.

4              BUT HE WAS LOOKING AT IT FROM A CARDIOVASCULAR POINT

5    OF VIEW IN THIS MEMO.  THE QUESTION THAT HE WAS RAISING WAS

6    ACTUALLY A QUESTION THAT HAD BEEN RAISED IN THE LITERATURE,

7    WHICH WAS:  COULD NSAIDS ACT AS A CARDIOPROTECTIVE AGENT AND

8    HOW WOULD THAT BE?

9              WELL, ASPIRIN IS THE GOLD STANDARD THAT WE USE IN

10   PATIENTS TO PROTECT THEM FROM HAVING HEART ATTACKS AND STROKES,

11   AND IT'S COMMONLY BELIEVED THAT THE WAY ASPIRIN WORKS IS BY

12   INHIBITING COX-1; AND IF YOU INHIBIT COX-1, YOU INHIBIT

13   PLATELET CLUMPING, WHICH WE CALL "PLATELET AGGREGATION."  AND

14   BY INHIBITING PLATELETS FROM CLUMPING, YOU CAN ACTUALLY PREVENT

15   BLOOD FROM CLOTTING.  THAT'S WHAT MAKES PATIENTS WHO TAKE

16   ASPIRIN A LITTLE -- HAVE A GREATER TENDENCY TO BLEED.

17             NOW, NSAIDS, TRADITIONAL NSAIDS SUCH AS ADVIL, ALSO

18   INHIBIT COX-1 AND, THEREFORE, THEY ALSO CAN INHIBIT PLATELET

19   CLUMPING OR PLATELET AGGREGATION.  AND SO WHAT HE WAS SAYING IS

20   IS IT POSSIBLE THAT NSAIDS COULD ACT AS A CARDIOPROTECTIVE

21   AGENT AND DECREASE THE RATE OF PATIENTS HAVING HEART ATTACKS OR

22   STROKES.

23             AND HE WAS SAYING WHAT WOULD HAPPEN IF YOU DID A

24   LARGE STUDY AND, YOU KNOW, PUT HALF THE PATIENTS ON VIOXX OR,

25   COX-2 INHIBITOR; AND YOU PUT HALF THE PATIENTS ON A TRADITIONAL

1   NSAID, WHICH INHIBITS BOTH COX-1 AND COX-2.  THE ASSUMPTION

2   WOULD BE THAT THE COX-2 INHIBITOR WOULD HAVE NO EFFECT, IT

3   WOULD BE NEUTRAL; BUT THAT THE NSAID WOULD ACTUALLY INHIBIT

4   PLATELET CLUMPING AND, THEREFORE, COULD PREVENT PATIENTS FROM

5   HAVING HEART ATTACKS OR STROKE AND WOULD ACTUALLY DECREASE THE

6   RATE.

7               AND IF YOU DID A STUDY, YOU MIGHT ACTUALLY SEE A

8   HIGHER RATE OF EVENTS OF HEART ATTACKS AND STROKES IN THE

9   PATIENTS WHO TOOK THE COX-2 INHIBITOR THAN YOU WOULD IN THE

10  PATIENTS WHO TOOK THE NSAID.  NOT BECAUSE THE COX-2 INHIBITOR

11  WAS CAUSING EVENTS BUT BECAUSE THE NSAID WAS PREVENTING EVENTS.

12  **Q.**   YOU MENTIONED THAT THE MOST IMPORTANT QUESTION OR ONE OF

13  THE IMPORTANT QUESTIONS WAS WHETHER TO USE ASPIRIN IN THE STUDY

14  AND HOW THAT MIGHT AFFECT THE GI SIDE OR THE STOMACH SIDE.  CAN

15  YOU EXPLAIN THAT, PLEASE?

16  **A.**   WELL, ASPIRIN ITSELF CAN CAUSE PATIENTS TO HAVE GI BLEEDS

17  AND ULCERS.  EVEN LOW DOSES OF ASPIRIN CAN INCREASE THE RISK.

18  **Q.**   HOW DOES IT DO THAT?  IS THAT BY INHIBITING A PARTICULAR

19  ENZYME?

20  **A.**   WELL, IT CERTAINLY MAY BE DUE TO ITS INHIBITION OF COX-1

21  WOULD BE ONE OF THE WAYS THAT IT WOULD DO THAT.  IT CAN

22  POTENTIALLY HAVE SOME LOCAL EFFECTS ON THE STOMACH.  AND SO IF

23  YOU ADDED -- IF YOU ALLOWED PATIENTS WHO WERE IN THIS GI

24  OUTCOMES STUDY TO BE TAKING ASPIRIN, IT WOULD KIND OF CONFOUND

25  THE GI RESULTS THAT YOU WOULD BE LOOKING AT.

DAILY COPY

2234

```
1              THE QUESTION WE WERE TRYING TO ASK FROM A GI POINT OF
2     VIEW IS:  WOULD A COX-2 SELECTIVE INHIBITOR BE SAFER ON THE
3     STOMACH THAN A NONSELECTIVE INHIBITOR THAT INHIBITED BOTH COX-1
4     AND COX-2.  IF YOU ALLOWED PATIENTS ON ASPIRIN, THOSE WHO WERE
5     TAKING THE COX-2 INHIBITOR WOULD ALSO HAVE COX-1 INHIBITED
6     BECAUSE ASPIRIN INHIBITS COX-1, AND YOU WOULDN'T REALLY BE
7     ASKING THE QUESTION OF WHETHER A COX-2 INHIBITOR WAS SAFER THAN
8     A NONSELECTIVE INHIBITOR BECAUSE THOSE PATIENTS WHO WERE ON
9     ASPIRIN WHO TOOK THE COX-2 INHIBITOR WOULD ALSO HAVE COX-1
10    INHIBITED.
11    Q.   SO IS IT THAT YOU WOULDN'T KNOW WHETHER A COX-2 INHIBITOR
12    LIKE VIOXX WAS ACTUALLY REDUCING THE AMOUNT OF STOMACH BLEEDS,
13    IF YOU INCLUDED ASPIRIN BECAUSE PEOPLE WHO TOOK ASPIRIN MIGHT
14    GET THOSE BLEEDS?
15    A.   EXACTLY.  IT WOULD CONFOUND THE RESULTS OF THE STUDY.
16    Q.   IF YOU COULD TURN, DR. REICIN, TO PAGE 5 -- AND IF IT'S
17    EASIER, I CAN USE THE MONITOR FOR YOU.
18              THIS IS UNDER ONE OF DR. MUSLINER'S CONCLUSIONS.  HE
19    SAYS IN THE FIRST SENTENCE, "IF ASPIRIN PROPHYLAXIS IS NOT
20    PERMITTED, THERE IS A SUBSTANTIAL CHANCE THAT SIGNIFICANTLY
21    HIGHER RATES OF CV, CARDIOVASCULAR ADVERSE EVENTS, MI'S,
22    ANGINA, STROKES, TIA'S, ET CETERA, WILL BE OBSERVED IN THE
23    COX-2 INHIBITOR GROUP COMPARED TO STANDARD NSAID GROUP."  DO
24    YOU SEE THAT?
25    A.   I DO.
```

1   **Q.**   WHAT IS DR. MUSLINER SAYING THERE?  WHAT IS ASPIRIN

2   PROPHYLAXIS, AND THEN WHAT IS HE SAYING IN THAT SENTENCE?

3   **A.**   HE'S SAYING IF YOU DON'T ALLOW PATIENTS TO -- IN THE STUDY

4   TO BE ON LOW-DOSE ASPIRIN TO PREVENT THEM FROM HAVING HEART

5   ATTACKS, THEN YOU MIGHT SEE A HIGHER RATE OF EVENTS IN THE

6   PATIENTS TAKING THE COX-2 SELECTIVE INHIBITOR THAN THOSE TAKING

7   THE TRADITIONAL NSAID.

8           AND HE DOESN'T SAY IT HERE, BUT HE SAYS IT ELSEWHERE:

9   BECAUSE THE COX-2 INHIBITOR WOULD BE NEUTRAL, AND THE NSAID

10  WOULD REDUCE THE RATE AS IF THOSE PATIENTS WERE ON ASPIRIN.

11  **Q.**   LET'S LOOK AT THAT PART OF THE MEMO.  YOU ACTUALLY

12  MENTIONED AN ASSUMPTION EARLIER THAT DR. MUSLINER REFERENCED.

13  AND THIS IS ON PAGE 4, AND HERE HE'S SAYING IN THE FIRST

14  SENTENCE, IS HE ESTIMATING THE AMOUNT OF CARDIOVASCULAR EVENTS

15  THAT MIGHT OCCUR IN THE DIFFERENT GROUPS IN THIS TRIAL?

16  **A.**   THAT'S CORRECT.

17  **Q.**   AND THEN HE SAYS, "ASSUMPTIONS UNDERLYING THESE NUMBERS

18  INCLUDE THE FOLLOWING."  CAN YOU EXPLAIN WHAT A IS:  "PATIENTS

19  TREATED WITH STANDARD NSAIDS WILL EXPERIENCE ANTI-PLATELET

20  EFFECTS AND RESULTANT CV PROTECTION SIMILAR TO THAT PRODUCED BY

21  ASPIRIN"?

22  **A.**   SO HIS FIRST ASSUMPTION WAS WHAT I WAS JUST EXPLAINING,

23  WHICH WAS THAT THOSE PATIENTS WHO TAKE THE TRADITIONAL NSAID

24  WILL GET AN EFFECT OF -- THERE WILL BE AN ANTI-PLATELET EFFECT.

25  THE NSAIDS WILL PREVENT THEIR PLATELETS FROM CLUMPING IN A

1  MANNER SIMILAR TO ASPIRIN, AND THEY WILL THEREFORE BE PROTECTED

2  FROM HAVING HEART ATTACKS AS IF THEY WERE ON ASPIRIN.

3  Q.    NOW, LET'S SKIP TOWN TO C, BECAUSE B IS SIMILAR TO A.

4  C SAYS, "PATIENTS TREATED WITH THE SELECTIVE COX-2

5  INHIBITOR" -- SO THAT WOULD BE VIOXX?

6  A.    THAT'S CORRECT.

7  Q.    -- "WILL EXPERIENCE NEITHER A REDUCTION NOR AN INCREASE IN

8  CV EVENTS ASSOCIATED WITH THIS THERAPY."  CAN YOU EXPLAIN WHAT

9  THAT IS, AND IS THAT THE ASSUMPTION YOU WERE REFERRING TO

10  BEFORE?

11  A.    YES.  THIS IS SAYING THAT BECAUSE VIOXX DOESN'T INHIBIT

12  COX-1, VIOXX WILL NOT PREVENT PLATELETS FROM CLUMPING; AND

13  THEREFORE, VIOXX WILL HAVE NEITHER A BENEFICIAL EFFECT NOR A

14  HARMFUL EFFECT.

15          THERE WAS NOTHING IN THE LITERATURE OR IN THE STUDIES

16  THAT WE HAD DONE UP TO THIS POINT IN TIME THAT SUGGESTED THAT

17  VIOXX OR ANY OTHER COX-2 INHIBITOR WOULD EITHER BE BENEFICIAL

18  OR HARMFUL IN TERMS OF CARDIOVASCULAR EFFECTS.

19  Q.    NOW, DID YOU AND DR. MORRISON AND OTHERS ON THE PROJECT

20  TEAM THEN HAVE AN E-MAIL DISCUSSION, AND ALSO JUST DISCUSSIONS

21  IN GENERAL, ABOUT WHETHER TO USE ASPIRIN IN THE PROPOSED CV

22  OUTCOMES STUDY?

23  A.    YES, WE DID.

24  Q.    DID YOU ACTUALLY DRAFT A PROTOCOL OR A DESIGN FOR THAT GI

25  OUTCOMES STUDY?

1   **A.**   YES, I DID.

2   **Q.**   IF YOU TURN, DOCTOR -- AND THIS MAY BE IN THE SECOND

3   BINDER, TO WHAT'S BEEN ADMITTED AS P1.0538.

4           **MR. GOLDMAN:**  IF IT HADN'T BEEN ADMITTED, I OFFER IT.

5   I CAN'T REMEMBER IF IT WAS OR NOT.

6           **MR. ROBINSON:**  I HAVE NO OBJECTION.

7           **THE COURT:**  OKAY.  LET IT BE ADMITTED.

8   BY MR. GOLDMAN:

9   **Q.**   I HAVE PUT ON THE SCREEN, DR. REICIN, THE FIRST PAGE OF

10  THIS DOCUMENT.  IS THIS -- WHAT IS THIS?

11  **A.**   THIS IS A DRAFT OF THE PROTOCOL THAT I WAS WORKING ON THAT

12  I SENT OUT TO MY COLLEAGUES, WHICH HAD SOME COMMENTS FROM ME

13  EMBEDDED.  AND I THINK THIS WAS A DRAFT THAT CAME BACK WITH

14  MAYBE SOME COMMENTS BACK ALSO FROM ONE OF MY COLLEAGUES.

15  **Q.**   AND IF YOU TURN TO PAGE IS 11, YOU SEE THERE IS A SECTION

16  CALLED "EXCLUSION CRITERIA."

17  **A.**   YES, I SEE THAT.

18  **Q.**   WHAT DOES IT MEAN WHEN YOU SAY "EXCLUSION CRITERIA"?

19  **A.**   IT'S STANDARD IN EVERY CLINICAL STUDY TO HAVE BOTH

20  INCLUSION CRITERIA AND EXCLUSION CRITERIA.  WHAT TYPE OF

21  PATIENTS ARE YOU LOOKING TO STUDY? -- AND THAT VERY MUCH

22  DEPENDS ON THE QUESTION YOU'RE ASKING -- AND WHAT TYPE OF

23  PATIENTS SHOULDN'T BE IN THE STUDY.

24  **Q.**   AND THEN ON THE NEXT PAGE, DOCTOR, UNDER ONE OF THE

25  PARAGRAPHS UNDER "EXCLUSION CRITERIA," F, AS IN "FRANK," THAT'S

1    WHAT I WANT TO DIRECT YOUR ATTENTION TO.  ARE YOU THERE?

2    **A.**   I AM.

3    **Q.**   I WANT TO ASK YOU ABOUT THIS STATEMENT:  "I AM STILL

4    CONCERNED THAT THE NSAID GROUP WILL BE GETTING CARDIOPROTECTION

5    THAT THE 966 GROUP WILL NOT."  AND THE 966 GROUP, THAT'S VIOXX.

6    **A.**   THAT'S CORRECT.

7    **Q.**   SO EXPLAIN WHAT YOU MEAN HERE WHEN YOU'RE SAYING YOU'RE

8    CONCERNED THAT THE NSAID GROUP MAY BE GETTING CARDIOPROTECTION?

9    **A.**   I WAS REFERRING BACK TO WHAT DR. MUSLINER'S MEMO WAS

10   TALKING ABOUT, THAT IF WE DIDN'T ALLOW IN PATIENTS ON ASPIRIN,

11   WHICH WOULD MEAN ALSO THAT THE MAJORITY OF HIGH-RISK PATIENTS,

12   PATIENTS AT HIGH RISK FOR CARDIOVASCULAR EVENTS WERE NOT

13   ALLOWED IN, WOULD WE THEN SEE PATIENTS -- WOULD WE SEE A LOWER

14   RATE OF CARDIOVASCULAR EVENTS ON THE NSAID GROUP THAN ON THE

15   COX-2 INHIBITOR GROUP BECAUSE THE NSAID GROUP WAS GETTING

16   CARDIOPROTECTION AND THE VIOXX GROUP WAS NOT?

17   **Q.**   AND IF YOU WILL TURN, DR. REICIN, TO WHAT'S IN THE SECOND

18   BINDER, I BELIEVE, P1.0004.  THIS HAS BEEN ADMITTED.  THIS

19   IS -- THIS IS AN E-MAIL EXCHANGE RELATING TO THIS ISSUE.  AND I

20   WANT TO FIRST CULL OUT AN E-MAIL FROM DR. MORRISON TO YOU AND

21   OTHERS ON FEBRUARY 25, 1997.  AND I WANT TO FOCUS YOUR

22   ATTENTION ON POINT 5.  AND FIRST HE'S SAYING, "QUICK COMMENTS.

23   READ IT LATE LAST NIGHT."  IS HE REFERRING THERE TO THE GI

24   OUTCOMES PROTOCOL YOU SENT AROUND?

25   **A.**   I HAD ATTACHED THE PROTOCOL THAT WE JUST REVIEWED TO AN

1    E-MAIL AND SENT IT OUT TO MY COLLEAGUES.  SO THAT' RIGHT, HE

2    HAD JUST FINISHED READING THAT PROTOCOL AND WAS COMMENTING ON

3    IT.

4    Q.    AND DR. MORRISON SAYS IN POINT 5 "WOULD ALLOW LOW-DOSE

5    ASPIRIN.  I KNOW THIS HAS BEEN DISCUSSED TO DEATH, BUT REAL

6    WORLD IS EVERYONE IS ON IT, SO WHY EXCLUDE.  AND WITHOUT COX-1

7    INHIBITION, YOU WILL GET MORE THROMBOTIC EVENTS AND KILL DRUG."

8            DID DR. MORRISON EXPLAIN WHAT HE MEANT?  WHAT WAS

9    YOUR UNDERSTANDING WHEN YOU SAW THIS E-MAIL BACK IN FEBRUARY

10   ABOUT WHAT HE MEANT BY THAT?

11   A.    WELL, FIRST OF ALL, I THINK HE DID A LITTLE BIT OF

12   OVEREXAGGERATING HERE.  NOT EVERYBODY IN THE WORLD IS ON

13   LOW-DOSE ASPIRIN.  I'M NOT.  BUT WHAT HE WAS SAYING WAS A LOT

14   OF PEOPLE TAKE LOW-DOSE ASPIRIN, SO LET'S OPEN UP THE NUMBER OF

15   PATIENTS THAT YOU ALLOW THE STUDY AND INCLUDE IT.  AND IF YOU

16   DON'T, IT'S LIKELY TOM MUSLINER IS CORRECT:  YOU'LL SEE A LOWER

17   RATE OF EVENTS ON THE NSAID GROUP THAN YOU WILL ON VIOXX.

18   Q.    THE CARDIOVASCULAR EVENTS?

19   A.    EXACTLY.  THERE WILL BE NO PLACEBO GROUP IN THE STUDY, AND

20   SO YOU'LL HAVE THIS NEW DRUG VIOXX, AND HOW DO YOU KNOW

21   EVERYONE WON'T ASSUME THAT VIOXX ISN'T CAUSING THE

22   CARDIOVASCULAR EVENTS.  AND THAT WOULD OBVIOUSLY BE VERY

23   PROBLEMATIC BECAUSE YOU WON'T HAVE HAD A PLACEBO GROUP TO SHOW

24   THAT, IN FACT, IT WAS THE NSAID DECREASING THE RATE OF EVENTS.

25   Q.    CAN YOU EXPLAIN JUST A LITTLE BIT ABOUT WHY -- WHY IT

DAILY COPY

1    WOULD MATTER IF THERE WAS A PLACEBO INVOLVED IN THIS STUDY?

2    HOW WOULD THAT ANSWER ANY QUESTION ABOUT WHETHER VIOXX WAS

3    CAUSING CARDIOVASCULAR EVENTS?

4    **A.**   WELL, IF YOU HAD -- IF THERE IS NO PLACEBO, AND YOU SEE A

5    HIGHER RATE ON VIOXX AND A LOWER RATE ON THE NSAID GROUP, THERE

6    IS TWO POTENTIAL HYPOTHESES:  ONE IS THAT VIOXX IS INCREASING

7    THE RATE AND THE OTHER IS THAT THE NSAID IS LOWERING THE RATE.

8    AND IF YOU LOOKED AT JUST THAT STUDY, THERE IS NO WAY YOU COULD

9    TELL BETWEEN THOSE TWO POTENTIAL HYPOTHESES.

10           IF, HOWEVER, YOU HAD A PLACEBO GROUP IN THERE AND

11   THERE WOULD BE TWO POTENTIAL THINGS THAT COULD HAPPEN.  IF THE

12   PLACEBO GROUP LOOKED LIKE THE NSAID AND THE VIOXX GROUP WAS

13   HIGHER, YOUR CONCLUSION WOULD THEN BE THAT VIOXX INCREASED THE

14   RISK.  IF, HOWEVER, THE PLACEBO GROUP LOOKED LIKE VIOXX AND THE

15   NSAID GROUP WAS LOWER, YOU WOULD COME TO THE CONCLUSION THAT

16   THE NSAID GROUP LOWERED THE RISK.  SO THE PLACEBO WOULD HELP

17   YOU INTERPRET THE DATA.

18   **Q.**   NOW, IF WE GO TO THE PREVIOUS PAGE IN THIS E-MAIL

19   EXCHANGE, DR. REICIN, YOU RESPOND ON FEBRUARY 25 TO

20   DR. MORRISON AND OTHERS.  AND IN POINT 5, YOU SAY, "LOW-DOSE

21   ASPIRIN, I HEAR YOU.  THIS IS A NO-WIN SITUATION.  THE RELATIVE

22   RISK OF EVEN LOW-DOSE ASPIRIN MAY BE AS HIGH AS TWO- TO

23   FOURFOLD, YET THE POSSIBILITY OF INCREASED CV EVENTS IS OF

24   GREAT CONCERN.  (I JUST CAN'T WAIT TO BE THE ONE TO PRESENT

25   THOSE RESULTS TO SENIOR MANAGEMENT.)"

1      LET ME STOP THERE AND ASK YOU TO EXPLAIN THAT AND ASK

2   YOU TO EXPLAIN THE REST OF THE PARAGRAPH.

3   **A.**   SO I SAID, "THIS IS A NO-WIN SITUATION BECAUSE, IF WE

4   ALLOW PATIENTS IN THE STUDY TO RUN ASPIRIN, THEN I WAS

5   CONCERNED WE WOULDN'T BE ALLOWED TO ANSWER THE GI QUESTION,

6   WHICH WAS THE WHOLE REASON WE WERE DOING THE STUDY.

7      AND THE NEXT SENTENCE WHICH SAYS, "THE RELATIVE RISKS

8   OF EVEN LOW-DOSE ASPIRIN MAY BE AS HIGH AS TWO- TO FOURFOLD."

9   I'M TALKING ABOUT THE RISK OF HAVING A GI EVENT ON LOW-DOSE

10  ASPIRIN.  SO IF WE ALLOW IT, WE POTENTIALLY CAN'T ASK THE GI

11  QUESTION.  IF WE DON'T ALLOW IT, THEN WE POTENTIALLY WILL GET A

12  IMBALANCE IN THE CARDIOVASCULAR EVENTS BECAUSE THE NSAIDS ARE

13  PROVIDING CARDIOPROTECTION AND VIOXX IS NEUTRAL, YOU WOULD HAVE

14  A HIGHER RATE ON VIOXX, NO PLACEBO.

15     AND YOU CAN'T HAVE PLACEBO IN THESE STUDIES BECAUSE

16  WE WERE GOING INTO ARTHRITIS PATIENTS WHO NEEDED TO TAKE NSAIDS

17  FOR PAIN RELIEF, AND YOU CAN'T EXPECT THEM TO STAY ON PLACEBO,

18  A SUGAR PILL, FOR A YEAR.  THEY NEED SOMETHING TO TREAT THEIR

19  PAIN.

20  **Q.**   IS THAT WHY PATIENTS IN THOSE OA TRIALS NEEDED TO BE ON

21  TRADITIONAL NSAID VERSUS VIOXX AND COULDN'T JUST BE ON PLACEBO

22  FOR A LONG TIME?

23  **A.**   CORRECT.  WE CAN KEEP THEM ON PLACEBO FOR ABOUT SIX TO 12

24  WEEKS.  THAT'S THE MOST, AND YOU END UP GETTING A VERY HIGH

25  NUMBER OF PATIENTS ON THE PLACEBO GROUP THAT DROP OUT OF THE

1    STUDY EARLY.

2    **Q.**    SO WHY WAS IT, THEN, THAT YOU WERE RELUCTANT OR YOU DIDN'T

3    LOOK FORWARD TO PRESENTING THE RESULTS TO SENIOR MANAGEMENT?

4    **A.**    WELL, HERE WE WOULD HAVE DONE THIS LARGE STUDY, WHICH MY

5    ASSUMPTION WOULD HAVE SHOWN THE GI BENEFIT OF VIOXX, AND YOU

6    GET A DIFFERENCE IN CARDIOVASCULAR RATES THAT, WITHOUT A

7    PLACEBO, YOU CAN'T -- YOU CAN'T INTERPRET.  AND YOUR

8    ASSUMPTION, YOU'VE GOT THIS NEW DRUG, MANY WOULD ASSUME THAT

9    VIOXX WAS INCREASING THE RATE.

10   **Q.**    AND THEN YOU CONTINUE, DOCTOR, AND YOU SAY, "WHAT ABOUT

11   THE IDEA OF EXCLUDING HIGH-RISK CV PATIENTS, IN OTHER WORDS,

12   THOSE THAT HAVE ALREADY HAD AN MI, CABG" -- WHAT DOES THAT

13   STAND FOR?

14   **A.**    CORONARY ARTERY BYPASS GRAFTING.

15   **Q.**    THAT'S BYPASS SURGERY?

16   **A.**    THAT'S CORRECT.

17   **Q.**    "OR PTCA"?  IS THAT LIKE A STENT?

18   **A.**    IT'S ANGIOPLASTY.  NOWADAYS THEY OFTEN USE A STENT, BUT

19   OFTENTIMES THEY'LL OPEN UP THE ARTERY WITHOUT A STENT.

20   **Q.**    "THIS MAY DECREASE THE CV EVENT RATE SO THAT A DIFFERENCE

21   BETWEEN THE TWO GROUPS WOULD NOT BE EVIDENCE EVIDENT.  THE ONLY

22   PROBLEM WOULD BE WOULD WE BE ABLE TO RECRUIT ANY PATIENTS."

23            SO THERE IS THOSE WORDS, "WOULD NOT BE EVIDENT,"

24   WHICH MR. ROBINSON HAD ON THE SLIDE.  WHAT DO YOU MEAN THERE IN

25   THE REST OF THAT PARAGRAPH, DR. REICIN?

1   **A.**   WELL, I'M TALKING ABOUT THE FACT THAT IF YOU DON'T ALLOW

2   PATIENTS INTO THE STUDY ON LOW-DOSE ASPIRIN, IN ESSENCE, YOU'RE

3   GOING TO BE EXCLUDING THE MAJORITY OF YOUR HIGH-RISK PATIENTS.

4   THE CARDIOVASCULAR EVENTS WOULD BE LOWER, ON AVERAGE, AND YOU

5   MIGHT NOT BE ABLE TO SEE A DIFFERENCE BETWEEN THE TWO GROUPS.

6   BUT THE MINUTE YOU DON'T ALLOW LOW-DOSE ASPIRIN, IT'S HARD TO

7   THEN SAY YOU'RE GOING TO ALLOW A LOT OF HIGH-RISK PATIENTS WHO

8   NEED ASPIRIN INTO THE STUDY.

9   **Q.**   DOCTOR, DID MERCK END UP DOING THE GI OUTCOME TRIAL BACK

10  IN 1997?

11  **A.**   NO.  WE DID NOT DO THAT PARTICULAR GI OUTCOMES STUDY.

12  **Q.**   DID YOU DO AN OUTCOME STUDY LATER?

13  **A.**   YES, WE DID.

14  **Q.**   WHAT WAS THAT CALLED?

15  **A.**   THAT WAS CALLED THE VIGOR STUDY.

16  **Q.**   CAN YOU DESCRIBE TO THE JURY, DR. REICIN, WHAT THE VIGOR

17  STUDY WAS ABOUT, WHAT THE FORMAT OF IT WAS, AND HOW IT WAS

18  DESIGNED?

19  **A.**   THE VIGOR STUDY WAS A LARGE GI OUTCOMES STUDY WHERE WE

20  WERE EVALUATING WHETHER THE INCIDENCE OF SERIOUS GI EVENTS

21  WOULD BE HIGHER IN PATIENTS WHO WERE ON A TRADITIONAL NSAID --

22  IN THIS PARTICULAR CASE, NAPROXEN, WHICH, WHEN IT'S SOLD AT

23  LOWER DOSES OVER THE COUNTER, IS KNOWN AS ALEVE -- COMPARED TO

24  VIOXX, AT A DOSE OF 50 MILLIGRAMS, WHICH IS ACTUALLY TWO TIMES

25  THE HIGHEST DOSE THAT'S RECOMMENDED FOR CHRONIC USE.

1   Q.   I'M SORRY.  GO AHEAD.

2   A.   WE WERE DOING THE STUDY IN PATIENTS WITH RHEUMATOID

3   ARTHRITIS, WHICH IS A SPECIAL TYPE OF AUTOIMMUNE TYPE OF

4   ARTHRITIS.  IT'S DIFFERENT THAN OSTEOARTHRITIS, WHICH IS THE

5   MOST COMMON TYPE OF ARTHRITIS THAT PEOPLE GET AS THEY AGE.  AND

6   THE REASON WE WERE LOOKING AT RHEUMATOID ARTHRITIS IS THAT WHEN

7   WE STARTED TO DESIGN THIS STUDY, WE ALREADY HAD SOME GI

8   OUTCOMES DATA FROM ALL OF OUR OSTEOARTHRITIS PHASE IIB, III,

9   STUDIES THAT SUGGESTED THAT VIOXX DECREASED THE RATE OF SERIOUS

10  GI EVENTS, AND SO WE THOUGHT IT BETTER TO GO INTO A DIFFERENT

11  PATIENT POPULATION.

12          AND WE WERE EVALUATING PATIENTS OVER A PERIOD OF

13  APPROXIMATELY ONE YEAR.

14  Q.   DO YOU KNOW WHETHER PATIENTS WHO HAVE RHEUMATOID ARTHRITIS

15  BY NATURE ARE AT HIGHER RISK OF HAVING HEART ATTACKS?

16  A.   THERE HAS BEEN A SERIES OF LITERATURE THAT HAS COME OUT

17  OVER THE LAST SEVERAL YEARS THAT SUGGESTS THAT THOSE PATIENTS

18  ARE, IN FACT, AT INCREASED RISK FOR HAVING HEART ATTACKS.

19  Q.   WHEN DID THE VIGOR STUDY START?  WHEN DID PATIENTS START

20  ENROLLING?

21  A.   WE STARTED ENROLLING PATIENTS IN VIGOR IN JANUARY OF 1999.

22  Q.   I APOLOGIZE IF YOU ALREADY SAID THIS, DOCTOR, BUT ABOUT

23  HOW MANY PATIENTS WERE IN THIS STUDY TOTAL?

24  A.   OVER 8,000.  I THINK IT WAS 8,047.

25  Q.   WHY WAS IT THAT MERCK DECIDED TO USE NAPROXEN AS THE DRUG

1   TO COMPARE VIOXX TO IN THE VIGOR STUDY?

2   **A.**    SEVERAL REASONS.  FIRST OF ALL, NAPROXEN IS THE MOST

3   COMMONLY USED TREATMENT OF AN NSAID FOR THE TREATMENT OF

4   RHEUMATOID ARTHRITIS IN THE UNITED STATES.  SO THAT'S THE NSAID

5   THAT'S MOST COMMONLY USED.

6          ONE OF THE REASONS THAT IT'S THE NSAID THAT WAS MOST

7   COMMONLY USED IS IT'S VERY EFFICACIOUS --

8   **Q.**    WHICH MEANS WHAT?

9   **A.**    IT'S POTENT.  IT REALLY ACTS -- IT TAKES PATIENTS' PAIN

10  AWAY, TAKES THEIR SWELLING AWAY.  AND IN ADDITION, IT'S GIVEN

11  TWICE A DAY; WHEREAS, SOME OF THE OTHER NSAIDS, SUCH AS

12  IBUPROFEN, OR DICLOFENAC, AT LEAST AT THAT POINT IN TIME, WERE

13  GIVEN THREE TIMES A DAY.  PATIENTS WITH RHEUMATOID ARTHRITIS

14  WERE OFTEN ON VERY COMPLICATED MEDICAL REGIMENS, AND WHAT THE

15  RHEUMATOLOGISTS TOLD US YOU GOT -- TWO TIMES A DAY IS ABOUT THE

16  MAXIMUM NUMBER OF TIMES THEY CAN TAKE THE MEDICINE, RATHER THAN

17  THREE TIMES A DAY.

18          IN ADDITION, THE MAJORITY OF OUR STUDIES IN OUR

19  OSTEOARTHRITIS STUDIES WERE DONE AGAINST IBUPROFEN AND

20  DICLOFENAC, AND THIS PROVIDED US AN OPPORTUNITY TO TEST VIOXX

21  VERSUS ANOTHER NSAID, NAPROXEN.

22  **Q.**    WHY DID YOU DECIDE THAT YOU WOULD USE THE 50-MILLIGRAM

23  DOSE OF VIOXX -- AND I BELIEVE YOU SAID THAT THE STUDY WENT ON

24  FOR AN AVERAGE OF A YEAR.  WHY DID YOU DECIDE TO HAVE PATIENTS

25  TAKE THE 50-MILLIGRAM DOSE FOR THAT LONG A PERIOD OF TIME?

1  **A.**   WELL, FIRST OF ALL, THE AVERAGE WASN'T A YEAR.  IT TURNED

2  OUT, DURING THE STUDY, THE AVERAGE TIME ON TREATMENT WAS EIGHT

3  TO NINE MONTHS.  BUT THE LARGEST TIME ON TREATMENT WAS 13

4  MONTHS.

5          WE STUDIED THE HIGHER DOSE OF VIOXX AT THE REQUEST OF

6  THE FOOD & DRUG ADMINISTRATION, THE FDA.  THEY WANTED US TO

7  PUSH THE DOSE OF VIOXX TO PROVE THAT EVEN AT DOSES HIGHER THAN

8  WHAT WERE RECOMMENDED FOR CHRONIC USE, THAT WE WOULD STILL BE

9  ABLE TO BE SAFER FROM A GI POINT OF VIEW THAN A TRADITIONAL

10  NSAID.

11  **Q.**   AND DO YOU KNOW, DR. REICIN, HOW LONG PATIENTS ARE ADVISED

12  OR RECOMMENDED TO USE THE 50-MILLIGRAM DOSE OF VIOXX ONCE VIOXX

13  WAS APPROVED FOR USE IN THE UNITED STATES?

14  **A.**   IT WAS APPROVED FOR SHORT-TERM USE, ONLY FOR THE TREATMENT

15  OF ACUTE PAIN.  AND WE MENTIONED THAT WE HAD ONLY STUDIED IT IN

16  ACUTE PAIN STUDIES FOR UP TO FIVE DAYS.

17  **Q.**   YOU MENTIONED THAT THE FDA WAS INVOLVED IN SUGGESTING THAT

18  MERCK USE THE 50-MILLIGRAM DOSE OF VIOXX.  WAS THE FDA AWARE OF

19  THE DESIGN, THEN, OF THE VIGOR TRIAL BEFORE YOU ACTUALLY

20  STARTED IT?

21  **A.**   WE SENT THE PROTOCOL DOWN TO THEM BEFORE WE STARTED IT,

22  AND ALSO HAD A MEETING WITH THEM.  WE WERE THERE, AS MEMBERS OF

23  THE FDA WERE THERE.  AND WE HAD A COMMITTEE FOR THE VIGOR

24  STUDY, OR THE STEERING COMMITTEE, WHICH WAS COMPOSED OF A GROUP

25  OF OUTSIDE EXPERTS -- RHEUMATOLOGISTS AND

1    GASTROENTEROLOGISTS -- WHO OVERSAW THE CONDUCT OF THE STUDY

2    WHILE THE STUDY WAS ONGOING.  AND MEMBERS OF THE STEERING

3    COMMITTEE CAME WITH US AS WELL.

4    Q.   WHAT ARE RHEUMATOLOGISTS AND GASTROENTEROLOGISTS?

5    A.   RHEUMATOLOGISTS ARE PHYSICIANS WHO TAKE CARE OF PATIENTS

6    WITH AUTOIMMUNE-TYPE DISEASES, SUCH AS RHEUMATOID ARTHRITIS.

7    THEY ALSO TAKE CARE OF PATIENTS WITH OSTEOARTHRITIS ON

8    OCCASION, OTHER AUTOIMMUNE DISEASES, LIKE LUPUS, THINGS LIKE

9    THAT.

10   Q.   AND GASTROENTEROLOGISTS, THEY TAKE CARE OF THE STOMACH

11   PROBLEMS?

12   A.   EXACTLY.  THE STOMACH AND THE INTESTINES AND THE COLON.

13   Q.   SO IF THE FDA WANTED MERCK TO DO THE VIGOR STUDY

14   DIFFERENTLY OR WANTED DIFFERENT ENDPOINTS IN THE VIGOR STUDY,

15   COULD THE FDA HAVE INSISTED THAT MERCK DO THAT STUDY

16   DIFFERENTLY?

17   A.   WELL, CERTAINLY, THEY COULD PUT A STUDY ON HOLD IF THEY

18   REALLY FEEL STRONGLY ABOUT SOMETHING.  BUT, VERY OFTEN, IT'S A

19   DIALOGUE WITH THEM.  WE WANT TO UNDERSTAND, IF THEY HAVE

20   CHANGES, WHY THEY HAVE CHANGES.  AND THEY DID.  THERE WERE

21   THINGS THAT WE DID CHANGE IN THE STUDY AS WE WENT ALONG.

22   Q.   WAS IT IMPORTANT TO YOU TO KNOW THAT THE FDA WAS SATISFIED

23   WITH THE DESIGN OF THE VIGOR TRIAL, BEFORE STARTING THAT, SO

24   THAT, IF YOU HAD A FAVORABLE RESULT, THE FDA WOULD AGREE THAT

25   MAYBE THE DRUG COULD BE USED FOR RHEUMATOID ARTHRITIS?

1    **A.**   WELL, THIS STUDY WAS NOT SPECIFICALLY GEARED TO GET AN

2    INDICATION FOR RHEUMATOID ARTHRITIS.  BUT YOU ARE CORRECT:  YOU

3    WANT TO DESIGN A STUDY THAT THE FDA IS COMFORTABLE WITH SO THAT

4    YOU CAN GET IT INTO YOUR LABEL; AND IF THEY ARE NOT GOING TO

5    ALLOW YOU TO PUT IT IN THE LABEL, YOU'RE GOING TO CHANGE THE

6    DESIGN IN ORDER TO SATISFY WHAT THEIR NEEDS ARE.

7    **Q.**   THE RESULTS OF THE VIGOR STUDY CAME OUT.  I'M GOING TO ASK

8    YOU EXACTLY WHEN YOU LEARNED THOSE, BUT WHAT WERE THE RESULTS

9    OF THE GI PERSPECTIVE, THE STOMACH PERSPECTIVE, OF THE VIGOR

10   TRIAL?

11   **A.**   VERY, VERY CLEAR.  ABSOLUTELY THERE WAS A SIGNIFICANT

12   REDUCTION IN GI EVENTS ON VIOXX COMPARED WITH NAPROXEN.

13        AND WE LOOKED AT IT MULTIPLE WAYS.  THERE WAS A

14   SIGNIFICANT REDUCTION IN, YOU KNOW, ULCERS, PERFORATIONS, WHICH

15   ARE HOLES IN THE STOMACH, AND BLEEDS; A SIGNIFICANT REDUCTION

16   IN A SUBGROUP OF THOSE, WHICH WERE MORE SERIOUS OR

17   LIFE-THREATENING; HOSPITALIZATIONS FOR GI EVENTS.  VERY, VERY

18   CLEAR BENEFIT FOR VIOXX.

19   **Q.**   WHAT WAS YOUR REACTION, DR. REICIN, WHEN YOU LEARNED ABOUT

20   THE STOMACH RESULTS, THE GI RESULTS?

21   **A.**   VERY, VERY PLEASED.

22   **Q.**   DID YOU ALSO LEARN ABOUT THE RESULTS FROM THE

23   CARDIOVASCULAR SIDE IN THE VIGOR TRIAL?

24   **A.**   YES, WE DID.

25   **Q.**   WHEN DID YOU LEARN THOSE RESULTS?

1   A.   THE SAME TIME WE LEARNED THE GI RESULTS.

2   Q.   WHICH WAS WHEN?

3   A.   I BELIEVE IT WAS MARCH 9 OF 2000.

4   Q.   CAN YOU TELL THE JURY -- I'M GOING TO PUT A MAGNET UP ON

5   THE BOARD, "MARCH 9 OF 2000, MERCK LEARNS OF VIGOR RESULTS."

6   CAN YOU TELL THE JURY WHAT YOU LEARNED ABOUT THE CARDIOVASCULAR

7   RESULTS OF THE VIGOR TRIAL AND HOW YOU LEARNED THAT?

8   A.   THE INCIDENCE OF SERIOUS THROMBOTIC EVENTS, SUCH AS HEART

9   ATTACKS, WERE SIGNIFICANTLY HIGHER ON VIOXX THAN THEY WERE ON

10  NAPROXEN.

11  Q.   AND HOW DID YOU LEARN THAT?

12  A.   THERE WAS A MEETING WITH A SMALL GROUP OF US AND

13  DEBORAH SHAPIRO, WHO WAS THE STATISTICIAN WHO PRESENTED THE

14  RESULTS TO US.

15  Q.   WHAT WAS YOUR REACTION, DOCTOR, WHEN YOU LEARNED THAT?

16  A.   MY FIRST REACTION TO THE DATA WAS A CONCERN.  I WAS

17  CONCERNED AND WONDERED WHETHER WE HAD SOMEHOW INADVERTENTLY

18  DONE HARM TO PATIENTS.

19  Q.   I'M GOING TO ASK YOU HOW YOU FOLLOWED UP ON THAT CONCERN

20  IN A MINUTE, BUT I FIRST WANT TO ASK WHETHER MERCK INFORMED THE

21  FDA AFTER YOU LEARNED ABOUT THE VIGOR RESULTS?

22  A.   WE DID A SERIES OF THINGS OVER THE NEXT FEW DAYS TO MAKE

23  SURE THE RESULTS WERE ACCURATE.  THESE WERE INTERIM RESULTS.

24  THERE WERE STILL OTHER THINGS THAT WERE HAPPENING, BUT WE DID

25  INFORM THE FDA WITHIN APPROXIMATELY TWO WEEKS OF GETTING THE

1    DATA.

2    **Q.**   IF YOU TURN -- THIS MIGHT BE IN THE FIRST BINDER -- TO

3    DEFENSE EXHIBIT 116?

4    **A.**   IS THAT DX116?

5    **Q.**   YES, DX116.

6              **MR. GOLDMAN:**  WHICH WE OFFER.

7              **MR. ROBINSON:**  NO OBJECTION.

8              **THE COURT:**  LET IT BE ADMITTED.

9    BY MR. GOLDMAN:

10   **Q.**   THIS IS A LETTER FROM MERCK TO ROBERT DELAP -- DELAP?

11   **A.**   I THINK IT'S DELAP.

12   **Q.**   -- OF THE FDA, AND IT'S REFERRING TO A TELEPHONE

13   CONVERSATION BETWEEN DR. DELAP AND MERCK ABOUT THE VIGOR TRIAL.

14   DO YOU SEE THAT?

15   **A.**   I DO.

16   **Q.**   AND THEN IT REFERS IN THE NEXT PARAGRAPH TO "WE REQUEST

17   THAT YOU PROVIDE THIS FAX TO THE APPROPRIATE MEMBERS OF THIS

18   DIVISION OF THE FDA."  DO YOU SEE THAT?

19   **A.**   I DO.

20   **Q.**   SO LET ME PUT ON THE BOARD THAT MERCK FAXED THE VIGOR

21   TRIAL RESULTS TO THE FDA ON MARCH 23 OF 2000.

22   **A.**   THE PRELIMINARY RESULTS.

23   **Q.**   DID THERE COME A TIME, ALSO, DR. REICIN, WHEN MERCK

24   REQUESTED A LABEL CHANGE BASED ON THE VIGOR RESULTS?

25   **A.**   YES.  WE -- WHEN WE HAD THE PRIMARY RESULTS OF THE DATA

1  AVAILABLE, WE PUT TOGETHER WHAT WE CALL A SUPPLEMENTAL NDA,

2  WHICH IS A STANDARD FORMAT THAT YOU HAVE TO PUT THINGS TOGETHER

3  FOR THE FDA.  WE SUBMITTED THAT IN JUNE OF 2000 AND, ALONG WITH

4  IT, REQUESTED A LABEL CHANGE WHERE BOTH THE GI AND THE

5  CARDIOVASCULAR RESULTS WOULD BE INCLUDED IN THE LABEL.

6  **Q.**   THAT WAS IN JUNE OF 2000.  I PUT A MAGNET ON THE BOARD,

7  "SUBMIT LABEL TO FDA JUNE OF 2000."

8  **A.**   THAT'S CORRECT.

9  **Q.**   NOW, I WOULD LIKE YOU TO TALK, DR. REICIN, ABOUT WHAT YOU

10  DID, WHAT DID MERCK DO, AFTER LEARNING ABOUT THE CARDIOVASCULAR

11  RISKS SEEN IN THE VIGOR TRIAL.  WHAT WAS ONE OF THE FIRST THING

12  YOU DID TO INVESTIGATE THOSE RESULTS?

13  **A.**   WELL, ONE OF THE FIRST THINGS WE DO IS LOOK AT THE TRIAL

14  ITSELF, MAKE SURE THE DATA IS CORRECT, MAKE SURE THERE WAS

15  NOTHING, NO PARTICULAR PATIENT GROUP THAT WAS DRIVING THE

16  RESULTS.

17          THE OTHER THING THAT THAT WE DID IS WE HAD DATA FROM

18  OUR OSTEOARTHRITIS PROGRAM.  THAT WAS THE DATA BASED UPON WHICH

19  THE FDA HAD APPROVED THE DRUG, AND WE HAD LOOKED AT

20  CARDIOVASCULAR EVENTS SPECIFICALLY IN THAT TRIAL BECAUSE OF THE

21  QUESTION RAISED BY GARRETT FITZGERALD RIGHT BEFORE WE SUBMITTED

22  THAT NDA.

23  **Q.**   JUST TO REMIND THE JURY, WHEN YOU SAY THE QUESTION RAISED

24  BY GARRETT FITZGERALD, WAS THAT YEAR-END STUDY THAT

25  DR. FITZGERALD DID WITH DR. MORRISON?

1    A.    THAT'S CORRECT.

2    Q.    CONTINUE.

3    A.    SO WE SAID, "MAYBE WE MISSED SOMETHING.  LET'S GO BACK TO

4    OUR OSTEOARTHRITIS STUDIES AND REANALYZE THE CARDIOVASCULAR

5    DATA AND SEE IF THERE IS A SIGNAL THERE THAT WE SOMEHOW

6    MISSED."  WE WENT BACK, WE REANALYZED THE DATA, AND, IN FACT,

7    THERE WAS NO EVIDENCE OF A SIGNAL.

8          THE CARDIOVASCULAR EVENT RATE, IN TERMS OF THE

9    POTENTIAL THROMBOTIC EVENTS, WAS SIMILAR ON VIOXX AND THE NSAID

10   COMPARATORS, IBUPROFEN AND DICLOFENAC, AND IT WAS ALSO SIMILAR

11   TO PLACEBO; ALTHOUGH, WE HAD, REALLY, VERY LITTLE PLACEBO DATA,

12   AS I SAID BEFORE, BECAUSE SOME OF OUR PATIENTS -- SOME OF OUR

13   STUDIES DIDN'T HAVE PLACEBO AT ALL, AND THE OTHER ONES THAT HAD

14   IT HAD IT ONLY FOR SHORT-TERM.

15   Q.    AND WHEN SAY THERE WAS A SIMILAR INCIDENCE OF THROMBOTIC

16   EVENTS, ARE YOU REFERRING THERE TO HEART ATTACKS AND STROKES,

17   THOSE TYPE OF THINGS?

18   A.    THAT'S CORRECT.

19   Q.    DID YOU ALSO -- LET ME LET ME BACK UP FOR A MINUTE.  WHEN

20   THE OSTEOARTHRITIS TRIALS WERE DONE, DID THE INVESTIGATORS LOOK

21   FOR AND DOCUMENT INCIDENTS OF CARDIOVASCULAR EVENTS?  DID THEY

22   TRACK THAT?

23   A.    WELL, THEY -- WHEN WE DO CLINICAL TRIALS LIKE THAT,

24   INVESTIGATORS HAVE TO REPORT ALL ADVERSE EVENTS, EVEN THINGS

25   AS -- YOU KNOW, AS SMALL AS COMING IN AND SAYING, "YOU KNOW, I

 1   HAD A NOSEBLEED TODAY."  THAT GETS REPORTED AS WELL.

 2            IN ADDITION, SERIOUS EVENTS, WHERE PATIENTS HAVE TO

 3   BE HOSPITALIZED -- AND THERE ARE OTHER CRITERIA FOR SERIOUS --

 4   THEY HAVE TO REPORT TO US IN AN EXPEDITED MANNER.  ALL OF THOSE

 5   THINGS ARE COLLECTED AND ARE IN THE DATABASE.  SO CARDIAC

 6   EVENTS ABSOLUTELY WERE COLLECTED DURING THE OSTEOARTHRITIS

 7   STUDIES AND WERE IN OUR DATABASE.

 8   **Q.**   DID YOU LATER PUBLISH AN ARTICLE WITH OTHER SCIENTISTS,

 9   DR. REICIN, THAT REFLECTS HOW THE CARDIOVASCULAR EVENTS

10   COMPARED IN THE OA TRIALS?

11   **A.**   YES, WE DID.

12   **Q.**   IF YOU LOOK IN YOUR BINDER, DOCTOR, TO -- IT'S PROBABLY IN

13   THE SECOND ONE, B -- OH, I'M SORRY, P2.0104, WHICH I MARK FOR

14   IDENTIFICATION PURPOSES ONLY.

15            IS THIS THE ARTICLE THAT YOU WERE JUST REFERRING TO

16   CALLED "COMPARISON OF CARDIOVASCULAR THROMBOTIC EVENTS IN

17   PATIENTS WITH OSTEOARTHRITIS TREATED WITH VIOXX VERSUS

18   NONSELECTIVE NSAIDS, IBUPROFEN, DICLOFENAC, AND NABUMETONE"?

19   **A.**   YES, SIR, IT IS.

20   **Q.**   AND YOU'RE LISTED HERE AS ONE OF THE AUTHORS?

21   **A.**   THAT'S CORRECT.

22   **Q.**   IF YOU TURN TO -- LET ME FIRST BACK UP.  THIS WAS

23   PUBLISHED IN WHAT JOURNAL?

24   **A.**   I BELIEVE IT WAS THE *AMERICAN JOURNAL OF CARDIOLOGY*.

25   **Q.**   AND IS THAT A JOURNAL THAT HAS A PEER-REVIEW PROCESS?

1    **A.**   YES, IT DOES.

2    **Q.**   WAS YOUR ARTICLE PEER-REVIEWED?

3    **A.**   YES, IT WAS.

4    **Q.**   WHAT DOES IT MEAN TO HAVE AN ARTICLE PEER-REVIEWED?

5    **A.**   THE EDITORS SEND IT OUT TO THE EXPERTS IN THE FIELD TO

6    REVIEW AND COMMENT.  AT THAT POINT IN TIME EITHER -- SOMETIMES

7    THEY CAN SAY "WE'LL ACCEPT THE PAPER"; "WE WON'T ACCEPT THE

8    PAPER"; OR "HERE ARE THE COMMENTS OF OUR REVIEWERS.  PLEASE

9    ADDRESS THESE COMMENTS, AND THEN WE'LL RECONSIDER THE PAPER."

10   **Q.**   IF YOU TURN, DOCTOR, AND YOU CAN LOOK AT THE SCREEN AGAIN,

11   IF IT'S EASIER -- TO TABLE 2 OF YOUR ARTICLE, CAN YOU TELL THE

12   JURY WHAT THE SUBJECT OF THIS TABLE IS?  WHAT ARE YOU TRYING TO

13   SHOW IN TABLE 2?

14   **A.**   WE'RE LOOKING AT THE NUMBER ON THE INCIDENTS OF

15   CARDIOVASCULAR EVENTS OR POTENTIAL THROMBOTIC EVENTS IN

16   PATIENTS ON VIOXX COMPARED WITH THE NONSELECTIVE NSAIDS IN OUR

17   OSTEOARTHRITIS STUDIES.

18   **Q.**   AND DOES THE TABLE LIST THE NUMBER OF PATIENTS WHO HAD

19   TAKEN VIOXX IN THE OA TRIALS, AT LEAST AS TO THAT POINT?

20   **A.**   THAT'S CORRECT.

21   **Q.**   AND THAT'S 3,357?

22   **A.**   CORRECT.  THESE WERE THE INITIAL PHASE IIB, III, STUDIES.

23   **Q.**   I DON'T THINK THE JURY HAS HEARD ABOUT PHASE IIB, III.

24   WE'VE TALKED ABOUT PHASE II AND PHASE III.  WHAT'S A PHASE IIB,

25   III?

1  **A.**   PHASE IIB IS WHERE YOU DETERMINE WHAT THE APPROPRIATE DOSE

2  IS, AND THEN PHASE III ARE YOUR CONFIRMATORY EFFICACY STUDIES.

3  THOSE ARE THE STUDIES BASED UPON WHICH THE FDA USUALLY GIVES

4  YOU YOUR INDICATION.

5          PHASE IIA ARE YOUR FIRST STUDIES THAT INDICATE THAT A

6  DRUG ACTUALLY DOES WHAT YOU WANT IT TO DO,SO THAT IT WORKS, BUT

7  OFTEN YOU DON'T REALLY KNOW THE DOSE.

8  **Q.**   NOW, BACK TO YOUR TABLE HERE.  YOU HAVE VARIOUS ENDPOINTS,

9  AND WHAT DID YOU REPORT HERE ABOUT THE NUMBER OR A PERCENTAGE

10  OF CARDIAC EVENTS IN THE OA TRIALS?

11  **A.**   GENERALLY SIMILAR.  IT WAS .54 PERCENT ON VIOXX AND

12  .7 PERCENT, .77 PERCENT ON THE NONSELECTIVE NSAIDS.

13  **Q.**   SO IT ACTUALLY LOOKS LIKE THERE ARE MORE CARDIAC EVENTS ON

14  THE NONSELECTIVE NSAIDS THAN VIOXX.  IS THAT A CONCLUSION THAT

15  YOU COULD REACH FROM THIS, DR. REICIN?

16  **A.**   NO, I WOULD SAY THEY WERE SIMILAR.  YES, NUMERICALLY, IT

17  WAS HIGHER ON THE NONSELECTIVE NSAID GROUP; BUT, STATISTICALLY,

18  THERE WAS NO DIFFERENCE BETWEEN THEM.  SO I WOULD SAY THEY WERE

19  SIMILAR.

20  **Q.**   AND IF YOU LOOKED AT HEART ATTACKS OR MYOCARDIAL

21  INFARCTION, WHAT DO YOU REPORT ABOUT THOSE IN THE OA TRIALS?

22  **A.**   AGAIN, SIMILAR:  .27, .26 PERCENT.

23  **Q.**   ON THE LAST PAGE OF YOUR ARTICLE, DOCTOR, YOU WROTE:  "IN

24  SUMMARY, AN ANALYSIS FROM THE VIOXX OSTEOARTHRITIS DEVELOPMENT

25  PROGRAM FOUND NO DIFFERENCE BETWEEN VIOXX COMPARATOR

1    NONSELECTIVE NSAIDS AND PLACEBO IN THE RISKS OF CARDIOVASCULAR
2    THROMBOTIC EVENTS."  WHAT SIGNIFICANCE, IF ANY, DR. REICIN, DID
3    YOU FIND WHEN YOU REACHED THIS CONCLUSION BACK WHEN YOU WERE
4    ANALYZING THE OA TRIALS?
5    A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION FOR ME.
6    Q.   SURE.  YOU SAID BEFORE THAT ONE OF THE THINGS YOU DID TO
7    TRY TO INTERPRET THE VIGOR RESULTS WAS TO GO LOOK AT THE OA
8    TRIALS TO SEE IF THERE WAS ANY SIGNAL OF A CARDIOVASCULAR
9    PROBLEM IN THOSE; RIGHT?
10   A.   CORRECT.
11   Q.   MY QUESTION TO YOU IS:  WHAT, IF ANY, SIGNIFICANCE DID YOU
12   PLACE ON THE FACT THAT YOU SAW NO SIGNAL IN THE OSTEOARTHRITIS
13   TRIALS?
14   A.   WELL, IF VIOXX WAS INCREASING THE RATE IN THE VIGOR STUDY,
15   THEN YOU MIGHT EXPECT YOU WOULD SEE AN INCREASED RATE VERSUS
16   THE NSAIDS IN THE OA STUDY.  WE DID NOT SEE THAT.  NOW, THEN
17   YOU WOULD BE LEFT WITH, YOU KNOW, WHY?  IT DIDN'T QUITE HOLD
18   TOGETHER.  IS THERE SOMETHING UNUSUAL ABOUT THE RHEUMATOID
19   ARTHRITIS PATIENTS?  IS THERE SOMETHING ABOUT THE DOSE?  THOSE
20   WERE ALL THINGS WE WERE THINKING ABOUT AS WELL.
21   Q.   BUT YOU MENTIONED THAT THERE WEREN'T THAT MANY PATIENTS ON
22   PLACEBO FOR A LONG PERIOD OF TIME IN THE OSTEOARTHRITIS TRIALS.
23   A.   CORRECT.
24   Q.   DID YOU DO ANYTHING TO TRY TO FIND OUT WHETHER THERE WAS
25   PLACEBO DATA WITH RESPECT TO VIOXX THAT WOULD HELP ANSWER THE

1    QUESTION ABOUT WHETHER VIOXX WAS CAUSING THE HEART ATTACKS IN

2    THE VIGOR STUDY OR WHETHER NAPROXEN WAS PREVENTING THEM?

3    **A.**   WE WERE UNFORTUNATE IN THAT WE HAD AT THE TIME TWO LARGE

4    ONGOING STUDIES IN PATIENTS WITH ALZHEIMER'S DISEASE OR EARLY

5    ALZHEIMER'S DISEASE.  IT'S CALLED MILD COGNITIVE IMPAIRMENT,

6    WHERE WE WERE STUDYING VIOXX COMPARED WITH PLACEBO IN THESE

7    PATIENT POPULATIONS.  IT WAS ABOUT 2,000 PATIENTS.  AND SO THE

8    STUDIES WERE STILL ONGOING, BUT A DECISION WAS MADE TO

9    PARTIALLY UNBLIND THE DATA, TO UNBLIND SPECIFICALLY THE

10   CARDIOVASCULAR DATA.

11   **Q.**   BY "UNBLINDING," YOU MEAN --

12   **A.**   TO LOOK AT WHAT THE CARDIOVASCULAR DATA WERE.  AND THAT

13   DATA WAS VERY, VERY COMFORTING IN THAT IT SHOWED THERE WAS NO

14   DIFFERENCE BETWEEN VIOXX AND PLACEBO IN THE INCIDENTS OF

15   CARDIOVASCULAR EVENTS.  IN AN ELDERLY POPULATION, THE MEAN AGE

16   IN THE STUDY WAS 75.

17   **Q.**   WERE THE ALZHEIMER'S TRIALS THE MOST COMPREHENSIVE SET OF

18   DATA THAT YOU HAD ON HOW VIOXX DID WITH RESPECT TO

19   CARDIOVASCULAR EVENTS IN A PLACEBO GROUP --

20   **A.**   YES.

21   **Q.**   -- COMPARED WITH A PLACEBO GROUP?

22   **A.**   THAT'S CORRECT.

23   **Q.**   SO ONE OF THE THINGS THAT YOU DID -- I'LL PUT THIS MAGNET

24   ON.  TELL ME IF THIS IS RIGHT.  YOU REVIEWED CLINICAL TRIAL

25   DATA FROM THE OA AND ALZHEIMER'S TRIALS?

DAILY COPY

1    **A.**    THAT'S CORRECT.

2    **Q.**    SO NOW THAT YOU'VE REVIEWED THE RESULTS OF THE OA TRIALS

3    AND THE ALZHEIMER'S TRIALS, AND YOU DON'T SEE ANY SIGNAL OF A

4    CARDIOVASCULAR RISK, WHAT IS YOUR THOUGHT PROCESS THEN?

5    **A.**    SO NOW WE'VE GOT THREE DATABASES.  AND YOU'VE GOT VIGOR,

6    WHERE YOU SEE A HIGHER RATE ON VIOXX COMPARED WITH THE NSAID

7    NAPROXEN; YOU'VE GOT OA, WHERE THE RATE ON VIOXX IS SIMILAR TO

8    THE NSAIDS; YOU'VE GOT PLACEBO, WHERE THE RATE ON VIOXX IS THE

9    SAME, SIMILAR TO THE PLACEBO GROUP.  SO IF VIOXX IS INCREASING

10   THE RATE OF EVENTS IN VIGOR, WE WOULD EXPECT TO SEE AN

11   INCREASED RATE OF EVENTS ON VIOXX VERSUS PLACEBO.  AND WE DID

12   NOT, WHICH, AS I SAID, WAS VERY, VERY COMFORTING DATA.

13            SO NOW YOU'RE LEFT WITH TWO DATABASES WHERE YOU'RE

14   COMPARING VIOXX TO AN NSAID.  AND IF IN VIGOR THE NSAID IS

15   REDUCING THE RATE OF EVENTS, THEN YOU'RE LEFT WITH ASKING THE

16   QUESTION WHY YOU DIDN'T SEE THE SAME THING IN THE OA DATABASE.

17   WHY DIDN'T WE SEE A DIFFERENCE BASED ON THE NSAID REDUCING THE

18   RATE DUE TO THE CARDIOPROTECTIVE EVENTS?

19   **Q.**    IN OTHER WORDS -- LET ME INTERRUPT YOU A MINUTE -- IN THE

20   OA DATABASE, YOU HAD OTHER NSAIDS; RIGHT?  WHAT WERE THOSE?

21   **A.**    IBUPROFEN AND DICLOFENAC.

22   **Q.**    SO YOU'RE ASKING IF NAPROXEN WAS REDUCING THE INCIDENTS OF

23   HEART ATTACKS IN VIGOR, WHY DIDN'T WE SEE DICLOFENAC AND

24   IBUPROFEN REDUCING HEART ATTACKS IN THE OA TRIALS?

25   **A.**    CORRECT.

2259

1    **Q.**   SO THEN WHAT DID YOU DO?

2    **A.**   WELL, AROUND THIS TIME, I JUST -- I WAS IN DR. BARRY

3    GERTZ'S OFFICE.  HE WAS AT THE TIME THE HEAD OF CLINICAL

4    PHARMACOLOGY, AND I WAS REVIEWING THE DATA WITH HIM AND, YOU

5    KNOW, TOLD HIM WHAT THE QUESTIONS THAT WERE STILL IN MY MIND.

6             AND HE -- WE BOTH KIND OF -- HE KIND OF HAD A AHA

7    MOMENT WHERE HE SAID, "ALISE, THIS DATA ACTUALLY PERFECT FITS

8    THE CLINICAL PHARMACOLOGY DATA THAT WE ALREADY HAVE ON THE

9    DRUG.  WE'VE ALREADY SUBMITTED THIS DATA TO THE FDA."  HE SAID,

10   "BECAUSE IN TERMS OF ITS EFFECTS ON PLATELET CLUMPING, ON

11   PLATELET AGGREGATION, NAPROXEN, WHEN TAKEN AT THE TYPE OF DOSE

12   YOU USED IN VIGOR, 500 MILLIGRAMS TWICE DAY, ACTUALLY INHIBITS

13   PLATELET CLUMPING TO THE SAME DEGREE ASPIRIN, WHEREAS IBUPROFEN

14   AND DICLOFENAC DO NOT."

15            IT'S ACCEPTED THAT, IN ORDER FOR AN AGENT TO ACT AS A

16   CARDIOPROTECTIVE AGENT, YOU HAVE TO INHIBIT COX-1.

17   **Q.**   THE PLATELETS?

18   **A.**   WELL, AND THEN IT INHIBITS PLATELET AGGREGATION BY AT

19   LEAST 95 PERCENT, AND THAT HAS TO BE MAINTAINED THROUGHOUT THE

20   HIGHER DOSING INTERVAL.  SO YOU CAN'T HAVE IT GO UP AND DOWN

21   THROUGHOUT THE DAY.  IT HAS GOT TO BE MAINTAINED.  AND, IN

22   FACT, ASPIRIN DOES THAT --

23   **Q.**   SO I WANT TO --

24   **A.**   -- AND SO DOES NAPROXEN.

25   **Q.**   WHEN YOU SAY "PHARMACOLOGY DATA," WHAT ARE YOU REFERRING

1   TO THERE?  WHAT IS PHARMACOLOGY, FIRST OF ALL?

2   **A.**   THESE ARE STUDIES THAT ARE DONE TO LOOK AT WHAT A DRUG

3   DOES IN THE BODY, HOW IS IT ABSORBED INTO THE BODY, HOW IS IT

4   ELIMINATED FROM THE BODY, AND WHAT ARE THE ACTIONS THAT THE

5   DRUG HAS WHILE IT'S IN SOMEONE'S BODY?

6           SO THESE WERE STUDIES WHICH WERE DONE IN HUMANS,

7   WHERE PATIENTS WERE GIVEN THE DRUG, AND THEN WE LOOKED AT THE

8   EFFECTS OF THOSE DRUGS ON CERTAIN THINGS IN PATIENTS.

9   **Q.**   WOULD YOU MIND STEPPING DOWN, DOCTOR?

10          **MR. GOLDMAN:**  IS THAT OKAY, JUDGE?

11          **THE COURT:**  YES.

12  **BY MR. GOLDMAN:**

13  **Q.**   I'VE PUT UP A BOARD THAT COMES FROM AN ARTICLE, AND IT'S

14  ALSO CONTAINED IN ONE OF THE MINUTES TO YOUR PROJECT TEAM

15  MINUTES, AND IT'S CALLED "PLATELET INHIBITION OF NAPROXEN

16  VERSUS OTHER NSAIDS."  CAN YOU EXPLAIN TO THE JURY WHAT THIS IS

17  AND WHY IT WAS SIGNIFICANT, IF AT ALL, TO YOU, BACK AT THE TIME

18  YOU WERE INTERPRETING THE VIGOR RESULTS?

19  **A.**   THIS WAS A STUDY WHERE PATIENTS WERE -- THESE WERE

20  ACTUALLY SUBJECTS.  THEY DIDN'T -- THEY WEREN'T SICK PATIENTS.

21  THEY CAME INTO THE STUDY AND THEY WERE DOSED WITH ONE OF THESE

22  THERAPIES FOR FIVE DAYS.  AND THEN THEY CAME IN ON DAY SIX AT

23  THE TIME THAT THEY WOULD TAKE THEIR NEXT DOSE.

24          SO FOR VIOXX, IT WAS 24 HOURS AFTER THEY HAD TAKEN

25  THEIR LAST DOSE; FOR PATIENTS ON DICLOFENAC OR IBUPROFEN, IT

1   WOULD HAVE BEEN EIGHT HOURS AFTER THEY HAD TAKEN THEIR LAST

2   DOSE; AND FOR PATIENTS ON NAPROXEN, IT WOULD HAVE BEEN 12 HOURS

3   AFTER THEY HAD TAKEN THEIR LAST DOSE.

4           SO -- AND WHAT WE ARE MEASURING HERE IS INHIBITION OF

5   CYCLOOXYGENASE-1.

6   **Q.**   THAT'S COX-1?

7   **A.**   THAT'S ON THIS AXIS.  AND THEN ON THE HORIZONTAL AXIS,

8   IT'S SEVERAL TIME POINTS.  SO AT BASELINE, THAT'S BEFORE

9   PATIENTS GET ANY STUDY DRUG.  AND YOU CAN SEE EVERYBODY IS AT

10  ABOUT ZERO PERCENT INHIBITION OF COX-1.  AND THEN THEY CAN'T

11  COME IN ON DAY SIX.  THAT'S AFTER FIVE DAYS OF DOSING AND AT

12  ZERO HOURS.  THAT'S RIGHT BEFORE THEY ARE SUPPOSED TAKE THEIR

13  NEXT DOSE.  SO THEY STILL HAVE DRUG ON BOARD.

14          THEY DO A MEASUREMENT THERE FOR COX-1 INHIBITION, AND

15  THEN THEY DRAW -- THEY DOSE THEM, AND THEN THEY DRAW THEIR

16  BLOOD AGAIN AT TWO HOURS AFTER DOSING, FOUR HOURS AFTER DOSING,

17  AND EIGHT HOURS AFTER DOSING.  AND YOU CAN, IN THE BLOOD,

18  MEASURE THE INHIBITION OF COX-1.  AND WHAT YOU CAN SEE DOWN

19  HERE IS PLACEBO HAS A HEART, AND YOU SEE, OVER TIME, NO

20  INHIBITION OF COX-1.  YOU CAN SEE VIOXX HERE IN THE TRIANGLES,

21  AND YOU CAN SEE THAT VIOXX ALSO HAS NO INHIBITION OF COX-1.  IT

22  GOES ALONG WITH THE FACT THAT IT SELECTIVELY INHIBITS COX-2.

23  MELOXICAM --

24  **Q.**   IS THAT MOBIC?

25  **A.**   THAT'S MOBIC -- ALSO DOES NOT INHIBIT COX-1 IN THIS ASSAY.

1   DICLOFENAC, WHICH IS RIGHT OVER HERE, YOU CAN SEE AT ZERO HOURS

2   YOU GET ABOUT -- THIS IS ABOUT EIGHT HOURS AFTER THEY TOOK

3   DOSE, ABOUT 20 PERCENT INHIBITION OF COX-1 -- GETS UP TO ABOUT

4   40 OR 50 PERCENT, NEVER GETS UP TO 95 PERCENT INHIBITION, AND

5   THEN IT STARTS TO COME BACK DOWN.

6           AND IBUPROFEN -- THAT'S KNOWN AS ADVIL WHEN IT'S SOLD

7   OVER THE COUNTER -- YOU CAN SEE THAT A TROUGH -- THAT'S BEFORE

8   THEY TAKE THEIR NEXT DOSE, YOU ONLY GET ABOUT 50 PERCENT OF

9   INHIBITION OF COX-1.  YOU DO GET UP TO 90 PERCENT BUT ONLY FOR

10  ABOUT TWO TO FOUR HOURS, BETWEEN TWO OR FOUR HOURS, AND THEN

11  YOU COME BACK DOWN.  SO ALTHOUGH IBUPROFEN GETS UP TO 95

12  PERCENT INHIBITION, IT'S NOT MAINTAINED OVER THE WHOLE DOSING

13  INTERVAL.

14          ON THE OTHER HAND, HERE IS NAPROXEN, AND THE PATIENTS

15  HERE, REMEMBER, HAVEN'T TAKEN A NAPROXEN IN 12 HOURS; AND YET

16  WHEN THEY COME IN, THEY ARE STILL UP AT 95 PERCENT INHIBITION

17  OF COX-1, AND THAT'S MAINTAINED THROUGHOUT THE WHOLE DOSING

18  INTERVAL.  AND SO IF YOU ACTUALLY TESTED THEM FOR THE WHOLE 24

19  HOURS, YOU WOULD ACTUALLY SEE IN THE NAPROXEN PATIENTS 95

20  INHIBITION OF CYCLOOXYGENASE-1.

21  Q.   THANK YOU, DOCTOR.  AGAIN, HOW DID NAPROXEN'S INHIBITION

22  OF COX-1 IN THE NEIGHBORHOOD OF 95 PERCENT COMPARE TO ASPIRIN?

23  A.   THIS IS WHAT YOU WOULD SEE WITH ASPIRIN.  THE DIFFERENCE

24  IS THAT, WITH ASPIRIN, YOU CAN ACTUALLY TAKE A DOSE AND EVEN

25  TWO OR THREE DAYS LATER SEE -- YOU CAN SEE 95 PERCENT

1    INHIBITION OF COX-1.

2            WITH NAPROXEN, YOU HAVE TO TAKE 500 MILLIGRAMS TWICE

3    A DAY AND TAKE THAT CONTINUOUSLY IN ORDER TO SEE THE

4    INHIBITION.

5    Q.   IS THAT THE DOSE THAT WAS IN THE VIGOR STUDY?

6    A.   YES, IT WAS.

7    Q.   SO I'M GOING TO PUT ANOTHER MAGNET UP CALLED "REVIEW

8    PHARMACOLOGY DATA ON NAPROXEN."  I PUT "SPRING OF 2000."  IS

9    THAT A FAIR TIME FRAME?

10   A.   YES.  IT WAS ALL WITHIN THE SAME COUPLE OF -- YOU KNOW,

11   COUPLE-OF-WEEK PERIOD.

12   Q.   DID YOU ALSO, DR. REICIN, LOOK AT THE MEDICAL LITERATURE

13   TO SEE IF THERE IS ANY EVIDENCE THAT NAPROXEN OR ANY OTHER

14   NSAIDS COULD PROVIDE CARDIOPROTECTION OR BE BENEFICIAL TO THE

15   HEART?

16   A.   YES, WE DID.  SOME OF THAT LITERATURE I HAD HAD PREVIOUSLY

17   AND, AGAIN, DID OTHER SEARCHES THIS TIME AS WELL.

18   Q.   CAN YOU TURN, DOCTOR, TO DEFENSE EXHIBIT 548, AND I'LL

19   JUST MARK THIS FOR IDENTIFICATION PURPOSES ONLY.  SO I PUT UP

20   ON THE SCREEN AN ARTICLE CALLED "EVALUATION OF FLURBIPROFEN" --

21   WHAT IS THAT?

22   A.   FLURBIPROFEN IS ANOTHER NONSELECTIVE NSAID.

23   Q.   -- "FOR PREVENTION OF REINFARCTION AND REOCCLUSION."  WHAT

24   DO THOSE TERMS MEAN?

25   A.   REINFARCTION MEANS ANOTHER HEART ATTACK.  SO THESE WERE

1    PATIENTS WHO WERE COMING IN WITH A HEART ATTACK.  SO

2    REINFARCTION, ANOTHER HEART ATTACK.

3    **Q.**    "AFTER SUCCESSFUL" --

4    **A.**    AND REOCCLUSION MEANS THEIR ARTERY CLOGGED UP, RECLOGGED

5    UP.

6    **Q.**    "AFTER SUCCESSFUL THROMBOLYSIS"?

7    **A.**    THROMBOLYSIS.  THAT MEANS LYSING THE CLOT OR BREAKING THE

8    CLOT APART WITH DRUGS.

9    **Q.**    "OR ANGIOPLASTY IN ACUTE MYOCARDIAL INFARCTION."  WAS THIS

10   AN ARTICLE THAT YOU HAD SEEN BEFORE AND YOU HAD READ AGAIN

11   AFTER THE VIGOR RESULTS?

12   **A.**    YES.

13   **Q.**    CAN YOU EXPLAIN TO THE JURY WHAT THIS STUDY SHOWED AND WHY

14   IT WAS SIGNIFICANT TO YOU?

15   **A.**    PATIENTS WHO CAME INTO THE HOSPITAL AND WERE HAVING A

16   HEART ATTACK, OR ABOUT TO HAVE A HEART ATTACK, AND WERE GOING

17   TO REQUIRE THAT THEY TRIED TO ABORT THE HEART ATTACK BY OPENING

18   UP THE ARTERY WERE RANDOMIZED TO EITHER PLACEBO OR TO

19   FLURBIPROFEN, THIS NSAID.  NOW, I HAVE TO -- AND THEY WERE NOT

20   GIVEN ASPIRIN.  THIS STUDY COULD NEVER BE DONE AGAIN, BECAUSE

21   IT IS STANDARD OF CARE TO TREAT THESE PATIENTS WITH ASPIRIN.

22          BUT AT THAT POINT IN TIME, IT WAS NOT.  THEY TOOK

23   THESE PATIENTS.  THEY GAVE THEM EITHER A PLACEBO OR AN NSAID,

24   FLURBIPROFEN, AND THEN THEY FOLLOWED THEM FOR SIX MONTHS.  AND

25   WHAT THEY FOUND WAS THAT THOSE PATIENTS ON FLURBIPROFEN, AN

1   NSAID, YOU KNOW, VERY POTENT NSAID, HAD SIGNIFICANT REDUCTION

2   IN HEART ATTACKS OVER THAT SIX-MONTH PERIOD COMPARED WITH

3   PLACEBO.  SO THE FLURBIPROFEN APPEARED TO BE PREVENTING HEART

4   ATTACKS.

5   **Q.**   IF YOU TURN, IF YOU WOULD JUST LOOK ON THE SCREEN TO TABLE

6   3 OF THIS ARTICLE, THE TABLE IS CALLED "TOTAL NUMBER OF EVENTS

7   AT SIX MONTHS," AND "PATIENTS FREE OF SYMPTOMS AT SIX MONTHS."

8   AND THEN THE FIRST ENTRY IS "REINFARCTION."  IS THAT LIKE A

9   SECOND HEART ATTACK?

10  **A.**   CORRECT.

11  **Q.**   AND HOW MANY PATIENTS HAD A SECOND HEART ATTACK IN THIS

12  STUDY?

13  **A.**   ON FLURBIPROFEN, THERE WERE SEVEN PATIENTS WHO HAD A

14  SECOND HEART ATTACK; VERSUS PLACEBO, THERE WERE 24.

15  **Q.**   SO LET ME JUST MOVE THIS FOR A MINUTE.  SO IF WE LOOK AT

16  THE RESULTS OF THE FLURBIPROFEN, F-L-U-R --

17  **A.**   F-L-U-R-B-I-P-R-O-F-E-N.  I THINK THAT'S SOLD AS SOMETHING

18  CALLED ANSAID.

19  **Q.**   SO I THINK IN THIS STUDY, THERE WERE HOW MANY EVENTS OF

20  REINFARCTION IN FLURBIPROFEN, DID YOU SAY?

21  **A.**   SEVEN.

22  **Q.**   AND HOW MANY ON PLACEBO?

23  **A.**   24.

24  **Q.**   AND DOES THAT MEAN THAT THE PLACEBO WAS CAUSING MORE HEART

25  ATTACKS?

1   **A.**   YOU ASSUME, PLACEBO IS A SUGAR PILL, YOU ASSUME THAT THAT
2   IS NEUTRAL AND THAT THE FLURBIPROFEN IS REDUCING THE NUMBER OF
3   HEART ATTACKS.
4   **Q.**   AND THEN IN THE VIGOR STUDY, HOW MANY HEART ATTACKS
5   OCCURRED IN THE NAPROXEN ARM?
6   **A.**   IN THE FINAL ANALYSIS, THERE WERE FOUR.
7   **Q.**   AND HOW MANY HEART ATTACKS OCCURRED IN THE VIOXX ARM?
8   **A.**   IN THE FINAL ANALYSIS, THERE WERE 20.
9   **Q.**   SO DOES THAT MEAN, JUST LOOKING AT VIOXX VERSUS NAPROXEN,
10  THAT VIOXX WAS CAUSING HEART ATTACKS?
11  **A.**   WELL, AGAIN, JUST LOOKING AT VIGOR, WE COULDN'T SAY ONE
12  WAY OR THE OTHER.  BUT WHEN WE LOOKED AT THE TOTALITY OF DATA,
13  LOOKED AT THE FACT THAT VIOXX DID NOT INCREASE THE RATE
14  COMPARED TO PLACEBO IN ALZHEIMER'S, DIDN'T INCREASE THE RATE
15  COMPARED TO THE NSAIDS IBUPROFEN AND DICLOFENAC, IT DIDN'T
16  MAXIMALLY INHIBIT PLATELET AGGREGATION, THE TOTALITY OF THE
17  DATA WAS MOST CONSISTENT WITH NAPROXEN DECREASING THE RATE IN A
18  MANNER SIMILAR TO WHAT FLURBIPROFEN HAD DONE IN THE STUDY THAT
19  WAS DONE WITH THE PATIENTS WHO WERE HAVING HEART ATTACKS.
20  **Q.**   DID YOU ALSO REVIEW A STUDY ABOUT AN NSAID CALLED
21  INDOBUFEN?
22  **A.**   THERE WERE ACTUALLY SEVERAL STUDIES THAT WE REVIEWED ON
23  INDOBUFEN.  IT'S A BIT OF AN UNUSUAL NSAID.  IT INHIBITS COX-1
24  VERY POTENTLY AND IS ACTUALLY SOLD IN A FEW COUNTRIES IN EUROPE
25  AS AN ANTI-PLATELET AGENT, AS A CARDIOPROTECTIVE AGENT.

1    **Q.**   AND I'LL MARK FOR IDENTIFICATION PURPOSES ONLY DEFENSE

2    EXHIBIT 549, WHICH I WILL PUT UP, AND THIS IS AN ARTICLE CALLED

3    "INDOBUFEN IN THE PREVENTION OF THROMBOEMBOLIC COMPLICATIONS IN

4    PATIENTS WITH HEART DISEASE."

5              CAN YOU TELL THE JURY WHAT THIS STUDY SHOWED?  DO YOU

6    REMEMBER THIS STUDY, DR. REICIN?

7    **A.**   I DO REMEMBER THIS STUDY.  I PROBABLY JUST HAVE TO REVIEW

8    IT QUICKLY.

9              THIS WAS ACTUALLY A STUDY THAT WAS LOOKING AT

10   PATIENTS WHO WERE AT RISK OF HAVING WHAT WE CALL "EMBOLIC

11   EVENTS."  THEY HAD A DISEASE OF THE HEART CALLED ATRIAL

12   FIBRILLATION.  YOU CAN ACTUALLY GET BLOOD CLOTS IN THE HEART,

13   AND THEN THOSE BLOOD CLOTS CAN BREAK OFF AND CAUSE HEART

14   ATTACKS.

15             OFTEN YOU WOULD PUT THOSE PATIENTS ON ASPIRIN OR

16   ACTUALLY OTHER EVEN STRONGER ANTI-PLATELET AGENTS, SUCH AS

17   WARFARIN, TO PREVENT THEIR BLOOD FROM CLOTTING.  AND INSTEAD,

18   THEY PUT THESE PATIENTS ON INDOBUFEN, OR PLACEBO.  THEY FOUND

19   THAT THOSE PATIENTS WHO WERE ON INDOBUFEN HAD A SIGNIFICANT

20   REDUCTION IN EMBOLIC EVENTS COMPARED WITH THOSE PATIENTS ON

21   PLACEBO.

22   **Q.**   AND HERE IN THE ABSTRACT UNDER "RESULTS," IT REFERS TO A

23   REDUCTION OF 65 PERCENT IN THE RISK OF A PRIMARY EVENT.  IS

24   THAT THE REDUCTION?

25   **A.**   THAT'S CORRECT.

1    **Q.**   YOU MENTIONED, DOCTOR, THAT ONE OF THE THINGS YOU DID

2    AFTER VIGOR CAME OUT WAS TO LOOK AT THE VIGOR STUDY ITSELF TO

3    SEE IF THERE WAS ANYTHING UNUSUAL ABOUT IT.  DID YOU ALSO

4    ANALYZE INFORMATION ABOUT BLEEDING, WHETHER NAPROXEN CAUSED

5    MORE BLEEDING THAN VIOXX IN TERMS OF NOT GI BLEEDS BUT MINOR

6    BLEEDS.

7    **A.**   YES, WE DID.  ONE OF THE SIDE EFFECTS OF ASPIRIN IS YOU

8    CAN GET -- REMEMBER I SAID ASPIRIN PREVENTS PLATELETS FROM

9    CLUMPING.  AND THERE IS A REASON THAT WE WANT OUR PLATELETS TO

10   CLUMP.  IF YOU'RE SHAVING AND YOU NICK YOURSELF, YOU WANT THE

11   BLOOD TO STOP.  AND PLATELETS ARE WHAT ARE INVOLVED WITH THAT.

12   SO PATIENTS WHO ARE ON ASPIRIN CAN HAVE AN INCREASE IN MINOR

13   BLEEDING EVENTS, SUCH AS NOSEBLEEDS, OR THEY BRUISE MORE

14   EASILY.  SO WE LOOKED FOR NON-GI BLEEDING EVENTS IN THE VIGOR

15   STUDY AS WELL.

16   **Q.**   WHAT DID YOU FIND?

17   **A.**   WE FOUND THAT THE RATE OF THESE SMALLER BLEEDING EVENTS

18   WAS HIGHER ON THE NAPROXEN GROUP THAN IT WAS ON THE VIOXX

19   GROUP, WHICH WAS -- WOULD HAVE BEEN CONSISTENT WITH NAPROXEN

20   HAVING ANTI-PLATELET EFFECTS SIMILAR TO ASPIRIN.

21   **Q.**   WE'RE GOING TO TALK ABOUT THE FDA ADVISORY COMMITTEE IN A

22   LITTLE WHILE, BUT DID YOU PREPARE OR PARTICIPATE IN A PROCESS

23   OF PREPARING MATERIALS FOR THE ADVISORY COMMITTEE TO REVIEW IN

24   FEBRUARY OF 2001?

25   **A.**   YES.  THE FDA CALLED A PUBLIC ADVISORY COMMITTEE TO REVIEW

1   THE VIGOR RESULTS, AND I PARTICIPATED IN THAT MEETING AND
2   PARTICIPATED IN PUTTING TOGETHER A BACKGROUND PACKAGE FOR THE
3   ADVISORS.
4   Q.   IF YOU COULD TURN, DOCTOR, TO DEFENSE EXHIBIT 353, WHICH
5   IS THE BACKGROUND PACKAGE THAT MERCK SUBMITTED TO THE FDA.
6           MR. GOLDMAN:  WHICH WE OFFER INTO EVIDENCE.
7           MR. ROBINSON:  NO OBJECTION.
8           THE DEPUTY CLERK:  WHAT WAS THAT NUMBER?
9           THE COURT:  LET IT BE ADMITTED.
10          MR. GOLDMAN:  353.
11  BY MR. GOLDMAN:
12  Q.   I WANT TO JUST DIRECT YOUR ATTENTION TO ONE PAGE IN THIS
13  SUBMISSION, DOCTOR, AND IT'S ON PAGE 811.  I CULLED IT OUT ON
14  THE SCREEN, IF THAT'S EASIER.  AND HERE YOU'RE TALKING ABOUT
15  ADDITIONAL EVIDENCE FOR ANTI-PLATELET EFFECTS OF NAPROXEN IN
16  VIGOR.
17          SO TO BACK UP, ARE YOU EXPLAINING THE VIGOR STUDY
18  HERE TO THE ADVISORY COMMITTEE?
19  A.   WE HAD -- WE HAD PRESENTED THE DATA FROM THE VIGOR STUDY,
20  THE GI DATA, THE CARDIOVASCULAR DATA, AND HERE WE WERE
21  PRESENTING SOME OF THE ADDITIONAL ANALYSES, INCLUDING THOSE
22  ANALYSES OF THE NON-GI MINOR BLEEDING EVENTS.
23  Q.   AND HERE IT SAYS, "IN VIGOR, NAPROXEN WAS ASSOCIATED WITH
24  A HIGHER INCIDENCE OF MINOR BLEEDING EVENTS RELATIVE TO VIOXX
25  2.7 VERSUS 1.9 PERCENT."  AND THEN IT CONTINUES AND SAYS, "THE

1    LARGEST DIFFERENCES BETWEEN NAPROXEN AND VIOXX OCCURRED IN

2    THOSE EVENTS TYPICALLY ASSOCIATED WITH ANTI-PLATELET EFFECTS,

3    SUCH AS" -- HELP ME OUT.

4    A.    ECCHYMOSIS.  IT'S JUST A FANCY TERM FOR BRUISING.

5    Q.    -- "AND" --

6    A.    EPISTAXIS, WHICH IS A MEDICAL TERM FOR NOSEBLEEDS.

7    Q.    SO WHAT SIGNIFICANCE TO YOU, IF ANY, DR. REICIN, WAS IT

8    THAT WHEN YOU SAW IN THE VIGOR TRIAL THAT WERE MORE MINOR

9    NOSEBLEEDS AND BRUISING IN THE NAPROXEN GROUP OF PEOPLE VERSUS

10   THE VIOXX GROUP OF PEOPLE?

11   A.    IT WAS ANOTHER -- IT WAS AN INDICATION IN THIS PATIENT

12   POPULATION THAT NAPROXEN WAS ACTING SIMILAR TO ASPIRIN.  AND IN

13   FACT, IF YOU -- WE WENT BACK AND LOOKED AT THE NAPROXEN LABEL,

14   AND IN THE NAPROXEN LABEL, IT SAYS THAT NAPROXEN CAN INCREASE

15   BLEEDING TIME, WHICH IS SOMETHING THAT YOU SEE IN THE ASPIRIN

16   LABEL.

17   Q.    DID MERCK ALSO TURN TO ITS CONSULTANTS, OUTSIDE

18   CONSULTANTS, TO DISCUSS THE VIGOR TRIAL AND SEE WHAT THEIR

19   INTERPRETATION OF THE RESULTS WAS?

20   A.    YES, EXTENSIVELY.

21   Q.    CAN YOU TELL THE JURY A LITTLE BIT ABOUT WHEN THOSE

22   MEETINGS WERE AND GENERALLY WHAT TYPE OF MEETINGS MERCK HELD IN

23   THE YEAR 2000 TO DISCUSS THE VIGOR TRIAL?

24   A.    WELL, WITHIN THE FIRST TWO WEEKS, OBVIOUSLY WE SHARED THE

25   RESULTS WITH THE STEERING COMMITTEE.  THAT'S THE OUTSIDE GROUP

1   OF EXPERTS WHO WERE THE AUTHORS ON THE PAPER, HAD HELPED DESIGN

2   THE STUDY, HAD OVERSEEN THE CONDUCT OF THE STUDY.  SO WE SHOWED

3   ALL OF THEM THE RESULTS.

4           WE ALSO, IN THOSE FIRST FEW WEEKS, MET WITH SEVERAL

5   CONSULTANTS, WHO WERE KIND OF EXPERTS IN THE FIELD OF

6   PROSTAGLANDIN BIOLOGY, PEOPLE SUCH AS DR. FITZGERALD AND

7   DR. CARLO PATRONO, DR. JOHN OATES.

8           AND THEN OVER THE SUMMER AND EARLY FALL -- MAYBE IT

9   WAS EARLY FALL -- WE HAD A SERIES OF CONSULTANT MEETINGS.  WE

10  HAD ONE CONSULTANT MEETING WHERE WE BROUGHT IN A GROUP OF

11  WELL-KNOWN CARDIOLOGISTS; ANOTHER ONE WHERE WE BROUGHT IN SOME

12  OF THE SAME PROSTAGLANDIN EXPERTS AND SOME ADDITIONAL -- AN

13  ADDITIONAL ONE AS WELL; AND THEN A THIRD MEETING THAT HAD

14  RHEUMATOLOGISTS AND EPIDEMIOLOGISTS.

15  **Q.**   AND AT THESE MEETINGS -- DID YOU ATTEND THESE MEETINGS,

16  DOCTOR?

17  **A.**   I ATTENDED ALL OF THEM.

18  **Q.**   AT ANY OF THESE --

19  **A.**   ACTUALLY, THERE WAS ONE OTHER ONE.  MERCK HAS A BOARD OF

20  SCIENTIFIC ADVISORS.  THEY LOOK AT ALL OF OUR SCIENCE, I WAS

21  NOT AT THAT MEETING.  ALAN NIES PRESENTED AT THAT MEETING.

22  **Q.**   DR. REICIN, IN ANY OF THE MEETINGS THAT YOU HAD WITH THESE

23  OUTSIDE CONSULTANTS THROUGHOUT 2000, DID ANY OUTSIDE CONSULTANT

24  EVER SUGGEST TO YOU THAT, BASED ON THE VIGOR RESULTS, MERCK

25  OUGHT TO WITHDRAW VIOXX FROM THE MARKET?

1    **A.**   OH, ABSOLUTELY NOT.

2    **Q.**   DID ANY OF YOUR CONSULTANTS SAY TO YOU THAT MERCK SHOULD

3    HAVE A BLACK-BOX WARNING IN THE LABEL ABOUT CARDIOVASCULAR

4    EVENTS?

5    **A.**   NO, ABSOLUTELY NOT.

6    **Q.**   WHAT WAS YOUR SENSE ABOUT THE MAJORITY VIEW OR THE -- I'M

7    SURE THERE WASN'T A CONSENSUS AND EVERYBODY AGREED ACROSS THE

8    BOARD, BUT WHAT WAS THE MAJORITY VIEW ABOUT WHAT THE REASON WAS

9    FOR THE DIFFERENCE IN HEART ATTACKS IN THE VIGOR TRIAL?

10   **A.**   I THINK THE MAJORITY VIEW WAS THAT THE TOTALITY OF DATA --

11   BECAUSE IT REALLY IS A WHOLE SERIES OF DATA POINTS, NOT JUST

12   ONE -- THAT THE TOTALITY OF DATA WAS MOST CONSISTENT WITH

13   NAPROXEN ACTING AS A CARDIOPROTECTIVE AGENT IN THE VIGOR STUDY.

14   THERE WERE OTHER HYPOTHESES THAT WERE RAISED, HOWEVER, AS WELL.

15   **Q.**   DO YOU REMEMBER -- LET ME ASK YOU YOUR VIEW.  WHAT DID

16   YOU, DR. REICIN, FEEL AFTER YOU REVIEWED ALL THE DATA, THE

17   TOTALITY OF THE DATA THAT WE JUST TALKED ABOUT, THE OA TRIAL,

18   THE ALZHEIMER'S TRIALS, THE STUDIES THAT YOU LOOKED AT, THE

19   PLATELET INHIBITION FOR NAPROXEN, THE BLEEDING RESULTS THAT WE

20   SAW IN VIGOR, WHAT DID YOU THINK BACK THEN, BASED ON THE DATA

21   THAT YOU HAD REVIEWED, ABOUT WHAT WAS CAUSING THE DIFFERENCE IN

22   HEART ATTACKS IN THE VIGOR TRIAL?

23   **A.**   I THOUGHT IT WAS MOST CONSISTENT WITH NAPROXEN HAVING A

24   CARDIOPROTECTIVE EFFECT.  IF VIOXX WAS CAUSING HEART ATTACKS, I

25   THOUGHT YOU WOULD HAVE SEEN AN INCREASED RISK IN THE

2273

1   ALZHEIMER'S STUDIES AND YOU WOULD HAVE SEEN AN INCREASED RISK

2   IN THE OSTEOARTHRITIS STUDIES.  AND WE DIDN'T SEE THAT.

3   Q.   THE JURY MAY RECALL SEEING AN E-MAIL -- AND MR. ROBINSON

4   REFERRED TO IT IN HIS OPENING STATEMENT -- FROM DR. SCOLNICK,

5   MARCH 9 OF 2000.  AND I'LL PULL IT UP.  IT'S ADMITTED ALREADY

6   AS P1.132.

7            THE COURT:  AFTER THIS, COUNSEL, LET'S TAKE A BREAK

8   WHEN WE GET TO A POINT.

9            MR. GOLDMAN:  DO YOU WANT TO DO IT NOW, JUDGE?

10           THE COURT:  WHENEVER YOU WANT.

11           MR. GOLDMAN:  LET'S FINISH THIS E-MAIL AND WE'LL TAKE

12   A BREAK.

13   BY MR. GOLDMAN:

14   Q.   THIS IS AN E-MAIL FROM DR. SCOLNICK TO YOU AND OTHERS,

15   MARCH 9, 2000, AND THE SUBJECT IS VIGOR.  AND HE SAYS A NUMBER

16   OF THINGS IN THE E-MAIL.  I THINK THE THINGS THAT MR. ROBINSON

17   POINTED OUT IN OPENING STATEMENT HAD TO DO WITH THE CV EVENTS

18   ARE CLEARLY THERE.  DO YOU SEE THAT HERE?

19   A.   YES, I DO.

20   Q.   AND THEN FURTHER DOWN:  "IT IS A SHAME, BUT IT IS A LOW

21   INCIDENCE AND IT IS MECHANISM-BASED, AS WE WORRIED IT WAS."

22   AND THERE IS MORE TO THE E-MAIL.  BUT I WANT TO ASK YOU ABOUT

23   THOSE PARTICULAR SECTIONS FOR NOW.

24           DID YOU UNDERSTAND THAT, ON MARCH 9 OF 2000,

25   DR. SCOLNICK WAS CONCERNED THAT WHAT HE WAS SEEING IN THE VIGOR

1  TRIAL WAS THAT VIOXX MIGHT BE CAUSING THE HEART ATTACKS, NOT

2  NAPROXEN PREVENTING THEM?

3  **A.**   THAT'S CORRECT.   THAT WAS WHAT HIS FIRST REACTION WAS AND,

4  AS I SAID -- THAT WAS WHAT MY FIRST REACTION WAS.

5  **Q.**   AND AFTER WE TAKE A BREAK, DR. REICIN, I'M GOING TO ASK

6  YOU ABOUT WHETHER, BASED ON ALL OF THE DATA THAT YOU REVIEWED,

7  WHETHER DR. SCOLNICK CONTINUED TO HOLD THAT VIEW AFTER YOU

8  PRESENTED THE DATA TO HIM.   OKAY?

9          **THE COURT:**   WE'LL TAKE A 15-MINUTE BREAK AT THIS

10  TIME.   THE COURT WILL STAND IN RECESS.

11          (WHEREUPON, THE JURY EXITED THE COURTROOM.)

12          **THE COURT:**   LET ME SEE COUNSEL AT THE BENCH.

13          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

14  THE BENCH.)

15          **THE COURT:**   I WANT TO VISIT WITH YOU AGAIN ON THE

16  QUESTION OF PERSONAL USE, AND LET ME GIVE YOU MY VIEW ON THIS

17  SO EVERYBODY IS CLEAR ON IT.   WE TALKED ABOUT IT BRIEFLY THIS

18  MORNING ABOUT PERSONAL USE WITH REGARD TO DR. REICIN, AND I

19  TOLD YOU AT THAT TIME THAT MY INITIAL FEELING AND MY FEELING

20  WAS THAT I WOULD ALLOW THAT TO COME OUT.

21          I'M REALLY CONCERNED ABOUT PERSONAL USE BECAUSE,

22  AS I MENTIONED TO YOU BEFORE, THE WAY I SEE IT, I THINK IT'S

23  RELEVANT.   I THINK IT'S A 401 RELEVANCY.   I THINK THE FACT THAT

24  SOMEBODY TOOK VIOXX IS RELEVANT TO WHETHER OR NOT THEY FEEL

25  IT'S SAFE.

1          THE PROBLEM WITH IT, WITH PERSONAL USE, AS I SEE

2     IT, IS REALLY A 403 QUESTION.  AND IN 403 PROVIDES THAT,

3     ALTHOUGH RELEVANT, EVIDENCE MAY BE EXCLUDED IF ITS PROBATIVE IS

4     SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE,

5     CONFUSION OF THE ISSUES, OR MISLEADING TO THE JURY.  IT'S THE

6     AREA OF MISLEADING TO THE JURY MORE THAN CONFUSION; ALTHOUGH,

7     THERE ARE SOME SEEPAGE IN CONFUSION.

8          SO I ALLOWED IT IN THE CASE WITH TREATERS

9     BECAUSE, AS I SAW IT, THE QUESTION WAS, WHY DID YOU GIVE VIOXX?

10    AND THIS WAS PART OF THE REASON THAT THEY GAVE VIOXX.  AND IT

11    WAS FOR FULL DISCLOSURE AND IT ALSO HAD SOME RELEVANCE.  AND I

12    WEIGHED THE 403 AND I FELT IT WAS APPROPRIATE FOR TREATERS WHO

13    HAD VIOXX TO AT LEAST SAY, "WELL, I TOOK VIOXX, AND I GAVE IT

14    TO OTHER PATIENTS, AND BECAUSE I GAVE IT TO OTHER PATIENTS, AND

15    BECAUSE EVEN I TOOK IT, I THOUGHT IT WAS GOOD FOR THIS

16    INDIVIDUAL."  SO I ALLOWED IT.

17          I'M HAVING PROBLEMS WITH OTHER PEOPLE TESTIFYING

18    AS TO THEIR PERSONAL USE OF VIOXX AND USING THAT TO BOLSTER.

19    AND I'M RETHINKING IN THE LAST TWO HOURS OR THEREABOUTS, I'VE

20    RETHOUGHT THE POSITION WITH DR. REICIN.  THIS IS THE WAY I SEE

21    IT.  ALTHOUGH IT'S RELEVANT TO HER, I THINK THAT 403

22    PREDOMINATES IN FAVOR OF NOT ALLOWING HER TO DO IT.  HER AGE IS

23    DIFFERENT.  HER SEX IS DIFFERENT.  HER STRESS LEVEL IS

24    DIFFERENT.  HER CHOLESTEROL IS DIFFERENT.  THE AMOUNT OF HEART

25    DISEASE IS DIFFERENT FOR HER.  THEREFORE, I THINK IT'S

1   CONFUSING AND ALSO I THINK IT'S MISLEADING TO THE JURY TO SAY,

2   "WELL, I USED IT; THEREFORE, IT'S GOOD."

3              BUT IN ADDITION TO THAT, THIS PARTICULAR CASE IS

4   A WARNING CASE.  THIS PARTICULAR CASE, THE PLAINTIFF SAYS, "I

5   DIDN'T KNOW IT.  MY DOCTOR DIDN'T KNOW IT OR MY DOCTOR DIDN'T

6   TELL ME.  HAD I KNOWN IT, I WOULDN'T HAVE DONE IT."  NOW,

7   DR. REICIN IS PROBABLY MORE KNOWLEDGEABLE ON VIOXX, ITS

8   EFFECTS, ITS POTENTIAL, ITS GOOD BALANCE, ITS BAD VALUE, ITS

9   RISKS OR WHATEVER.  SO WARNING TO HER IS OF NO RELEVANCE.  I

10  MEAN, THE FACT THAT SHE USED IT KNOWING WHAT SHE KNEW ABOUT THE

11  DRUG, KNOWING WHAT SHE KNOWS ABOUT HER OWN CONDITIONS, IT HAS

12  NO BENEFIT TO HER FROM THE WARNING ASPECT, AND I THINK FROM THE

13  STANDPOINT OF HER SITUATION, HER AGE, HER SEX, HER STRESS

14  LEVEL, ALL OTHER FACTORS WHICH SHE CAN EVALUATE ARE DIFFERENT

15  THAN THE FACTORS THAT THE PLAINTIFF IS FACING.

16             SO I'M SORRY IF I AM CAUSING ANY PROBLEM WITH

17  YOU ALL, BUT I REEVALUATED IT AND I ASK THAT WE NOT GO INTO

18  THAT.  AND I ASK THAT YOU TELL THE DOCTOR.

19        MR. BECK:  I WAS JUST GOING TO ASK IF ANDY COULD HAVE

20  PERMISSION TO MAKE SURE THAT SHE DOESN'T JUST SAY IT.  SO ANDY

21  WILL GO AHEAD AND TAKE CARE OF THAT.

22             I WOULD LIKE SIMPLY FOR THE RECORD TO MAKE AN

23  OFFER OF PROOF, AND I HOPE THIS WILL BE ADEQUATE AS FAR AS THE

24  PLAINTIFFS ARE CONCERNED, THAT IF ASKED, DR. REICIN WOULD

25  TESTIFY THAT SHE HERSELF TOOK VIOXX BECAUSE SHE CONSIDERED IT

1  SAFE AND EFFECTIVE, AND ALSO MAKE THE SAME OFFER OF PROOF FOR

2  DR. SCOLNICK, THAT IF WE WERE TO PLAY THE PORTION OF HIS

3  DEPOSITION THAT YOUR HONOR EXCLUDED, THAT WE WOULD SAY THAT HE

4  TOOK VIOXX.  AND SO I WOULD MAKE THOSE OFFERS OF PROOF.

5         **THE COURT:**  I'LL ACCEPT THAT.  AND ALSO, AS I RECALL,

6  THE REASON THAT DR. REICIN TOOK IT WAS SHE HAD SOME

7  MUSCULOSKELETAL PAIN THAT WAS GIVING HER DIFFICULTY, AND SHE

8  FELT VIOXX WAS HELPFUL, SHE TOOK IT, AND INDEED IT WAS HELPFUL

9  AND INDEED IT DIDN'T CAUSE HER ANY PROBLEM AT ALL.

10         **MR. BECK:**  YES.

11         **MR. BICHFIELD:**  AND SHE TOOK IT INTERMITTENTLY.

12         **MR. ROBINSON:**  COUNSEL IS GOING TO INSTRUCT HER NOT

13  TO BLURT IT OUT OR SOMETHING.

14         **MR. BECK:**  THAT'S WHAT ANDY IS GOING TO DO.  THAT'S

15  WHY I WANTED TO HAVE PERMISSION.

16         (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

17

18         **THE DEPUTY CLERK:**  ALL RISE.

19         **THE COURT:**  BE SEATED, PLEASE.

20  **BY MR. GOLDMAN:**

21  **Q.**   DR. REICIN, WOULD YOU PLEASE TURN TO DEFENSE EXHIBIT 186,

22  WHICH IS IN EVIDENCE.  THIS IS AN E-MAIL, THE BOTTOM ONE, IS AN

23  E-MAIL FROM DR. SCOLNICK TO YOU AND OTHERS, AND THE SUBJECT IS

24  "A WORD OF PRAISE."  "ALAN AND ALISE AND HARRY (NOT A NEW TITLE

25  FOR A WOODY ALLEN MOVIE)."  AND THEN IT GOES ON.  AND HE TALKS

1  ABOUT HERE THE EFFORT:  "I WANT TO THANK YOU FOR THE FANTASTIC

2  EFFORT YOU HAVE ALL MADE PREPARING FOR THE MEETING THIS WEEK.

3  I HAVE NEVER SEEN BETTER PREPARATION FOR AN ADVISORY MEETING."

4  WOULD YOU DESCRIBE WHAT THAT'S ABOUT?

5  **A.**   HE HAD JUST FINISHED COMING TO ONE OF OUR REHEARSALS FOR

6  THE UPCOMING FDA ADVISORY COMMITTEE MEETING.

7  **Q.**   AND THEN FURTHER DOWN IN THE E-MAIL, DR. SCOLNICK WRITES:

8  "WE ALL WORRIED TO DEATH ABOUT THE CV EVENTS LAST SPRING."  AND

9  THEN HE CONTINUES:  "MERCK IS, OF COURSE, ALWAYS AN ISSUE, BUT

10  I WAS SICK AT THE THOUGHT WE MIGHT BE DOING HARM TO PATIENTS.

11  I KNOW EACH OF YOU WELL ENOUGH TO KNOW YOU FELT THE SAME WAY.

12  WITH ALL THE DATA NOW AVAILABLE, I AM NO LONGER WORRIED."

13        IS THAT CONSISTENT WITH WHAT DR. SCOLNICK

14  COMMUNICATED TO YOU AROUND THIS TIME FRAME AND EVEN BEFORE?

15  **A.**   AROUND THIS TIME, YES, AND EVEN BEFORE THAT TIME.

16  **Q.**   AND THEN I'M GOING TO SHOW YOU ONE MORE E-MAIL.  THIS IS

17  IN EVIDENCE AS DEFENSE 244.

18        THIS IS AN E-MAIL FROM DR. SCOLNICK TO YOU,

19  NOVEMBER 7, 2001.  THE SUBJECT LINE IS "COMFORT."  "ALISE,

20  THANKS FOR THE UPDATE TODAY.  THE RATES IN THE ALZHEIMER'S

21  STUDY AND THE LARGE NUMBERS OF PATIENTS INCLUDED MAKES ME VERY

22  COMFORTABLE WITH THE DATA AND THAT WE DO NOT HAVE ANY

23  PROBLEMS."

24        WHAT DID YOU UNDERSTAND THAT TO MEAN WHEN YOU

25  RECEIVED IT?

1    **A.**   WELL, YOU KNOW, ALZHEIMER'S WAS CONTINUING -- THAT STUDY

2    WAS CONTINUING, AND SO WE WERE CONTINUING, NOT EVERY DAY, BUT

3    AT CERTAIN TIME INTERVALS WE WOULD UPDATE THE DATA WITH NEW

4    CARDIOVASCULAR DATA.  WE HAD JUST PRESENTED THAT DATA TO HIM, I

5    BELIEVE, AS WELL AS OTHER DATA RELATED TO THE ALZHEIMER'S STUDY

6    AND OTHER STUDIES, AND HE WAS SAYING:  I CONTINUE TO BE

7    COMFORTABLE THAT THERE'S NOT AN ISSUE.

8    **Q.**   DID YOU AND OTHER AUTHORS, DR. REICIN, PUBLISH THE RESULTS

9    OF THE VIGOR STUDY?

10   **A.**   YES, WE DID.

11   **Q.**   WHEN WAS THAT?

12   **A.**   WE SUBMITTED THOSE RESULTS IN, I BELIEVE, MAY OF 2000,

13   SOON AFTER GETTING THEM.  AND THOSE WERE PUBLISHED BY THE *NEW*

14   *ENGLAND JOURNAL* IN NOVEMBER OF 2000.

15   **Q.**   I'M GOING TO PUT UP A MAGNET "PUBLISHED VIGOR IN *NEW*

16   *ENGLAND JOURNAL OF MEDICINE* NOVEMBER OF 2000."

17         DID MERCK EARLIER SEND OUT A PRESS RELEASE AND ALSO

18   INFORM CLINICAL INVESTIGATORS, WHO WERE CONDUCTING VIOXX

19   TRIALS, OF THE RESULTS OF THE VIGOR TRIAL?

20   **A.**   YES.  IN MARCH OF 2000, AROUND THE SAME TIME THAT WE SENT

21   THE PRELIMINARY RESULTS TO THE FDA.

22   **Q.**   WE'VE HEARD TESTIMONY, DR. REICIN, ABOUT HOW THERE WAS A

23   SCIENTIFIC DEBATE IN THE MEDICAL COMMUNITY ABOUT HOW TO

24   INTERPRET THE RESULTS OF THE VIGOR STUDY.

25         **MR. ROBINSON:**  OBJECTION:  LEADING.

1          **THE COURT:**  RESTATE IT, PLEASE.

2    BY MR. GOLDMAN:

3    **Q.**   DR. REICIN, DO YOU REMEMBER WHAT THE MEDICAL COMMUNITY WAS

4    SAYING IN GENERAL ABOUT THE VIGOR RESULTS BACK IN THE 2000-2001

5    TIME FRAME?

6    **A.**   THERE WAS, IN FACT, A DEBATE IN THE MEDICAL COMMUNITY.  IT

7    WAS EXTENSIVELY DEBATED.  THERE WERE NUMEROUS ARTICLES.  THERE

8    WERE SYMPOSIA AT MEDICAL MEETINGS DISCUSSING THE VIGOR RESULTS.

9    AND THAT DIDN'T REALLY STOP UNTIL 2001.  THAT CONTINUED FOR

10   SEVERAL YEARS.

11          AND THE DEBATE WAS -- THE QUESTION WAS WHAT WE -- THE

12   DATA THAT WE SAW IN VIGOR, WAS THAT, IN FACT, CONSISTENT WITH

13   NAPROXEN BEING A CARDIOPROTECTIVE AGENT, OR WAS IT SHOWING THAT

14   VIOXX WAS -- COULD BE ASSOCIATED WITH AN INCREASED RISK OF

15   CARDIOVASCULAR EVENTS.

16   **Q.**   HOW DID THE FDA DECIDE TO ADDRESS THAT QUESTION BACK IN

17   THE, LET'S SAY, LATE 2000-EARLY 2001 TIME FRAME?

18   **A.**   WELL, THAT WAS THE FDA ADVISORY COMMITTEE MEETING THAT

19   THEY HELD THAT -- IN FEBRUARY 2001.  THAT WAS THE E-MAIL FROM

20   DR. SCOLNICK THAT CAME RIGHT BEFORE THAT ADVISORY COMMITTEE

21   MEETING.

22   **Q.**   I'M PUTTING UP "FDA ADVISORY COMMITTEE MEETING

23   FEBRUARY 2001."  WHAT IS AN ADVISORY COMMITTEE MEETING?

24   **A.**   IT'S WHEN THE FDA ASKS FOR OUTSIDE EXPERTS TO COME IN AND

25   REVIEW THE DATA -- REVIEW DATA -- IN THIS CASE, THE DATA FROM

1    THE VIGOR STUDY AS WELL AS SOME OF OUR OTHER DATA -- AND THEY

2    OFTEN ASK THE COMMITTEE SPECIFIC QUESTIONS, ASK THEM ABOUT

3    LABELING SOMETIMES OR THEIR INTERPRETATION OF THE DATA.

4    Q.   ARE AD COM MEETINGS AND WAS THE ONE THAT WAS HELD IN

5    FEBRUARY OF 2001 OPEN TO THE PUBLIC?

6    A.   THE OVERWHELMING MAJORITY OF THEM ARE, AND THIS ONE WAS

7    OPEN TO THE PUBLIC.

8    Q.   ARE THE MATERIALS THAT ARE PRESENTED AT THAT MEETING

9    ALSO -- AND THE TRANSCRIPT OF WHAT OCCURS AT THE MEETING, ALSO

10   AVAILABLE FOR THE PUBLIC TO SEE?

11   A.   THEY ARE PUT ON THE FDA WEBSITE, WHICH IS AVAILABLE TO

12   EVERYBODY.

13   Q.   YOU MAY HAVE SAID THIS.  DID YOU ATTEND THE MEETING IN

14   FEBRUARY OF 2001?

15   A.   I ATTENDED THE MEETING AND I GAVE A PRESENTATION.

16   Q.   CAN YOU DESCRIBE FOR US WHAT THE FORMAT WAS?  WAS IT A

17   ONE-DAY MEETING?  A TWO-DAY MEETING?  AND, GENERALLY, HOW WAS

18   THE MEETING RUN?

19   A.   THIS PARTICULAR MEETING WAS A TWO-DAY MEETING.  THE FIRST

20   DAY, THE RESULTS FROM A SIMILAR STUDY WERE PRESENTED.  THAT'S

21   CALLED THE CLASS STUDY.  THAT WAS A STUDY LOOKING AT CELEBREX

22   GI OUTCOMES COMPARED TO SOME NSAIDS.

23        ON THE SECOND DAY, WE PRESENTED THE RESULTS FROM THE

24   VIGOR STUDY.  THERE WERE A COUPLE OF PRESENTATIONS BY PEOPLE

25   FROM MERCK, INCLUDING MYSELF.  THERE WERE SEVERAL PRESENTATIONS

1   BY MEMBERS OF THE FDA.  AND THEN THERE WAS AN OPPORTUNITY FOR

2   THE ADVISORY COMMITTEE MEMBERS TO ASK US QUESTIONS AND HAVE

3   DISCUSSIONS AMONG THEMSELVES.

4   Q.   I WANT TO SHOW YOU DEFENSE EXHIBIT 187, DR. REICIN, WHICH

5   WE'LL OFFER.  THIS IS A TRANSCRIPT OF, I BELIEVE, THE SECOND

6   DAY, FEBRUARY 8, 2001.

7             MR. ROBINSON:  WHICH EXHIBIT NUMBER?

8             MR. GOLDMAN:  187.  I AM OFFERING IT.

9             MR. ROBINSON:  YOUR HONOR, IT'S THIS THICK

10  (INDICATING).  MAYBE I COULD ASK QUESTIONS ABOUT IT AND THEN

11  I'LL --

12            THE COURT:  WHAT IS IT?

13            MR. GOLDMAN:  I'M JUST GOING TO SHOW A FEW PAGES FROM

14  IT, AND WE CAN DISCUSS WHETHER YOU WANT TO ADMIT IT.

15            THE COURT:  WHAT IS IT?

16            MR. GOLDMAN:  IT'S THE TRANSCRIPT FROM THE

17  FEBRUARY 8, 2001, ADVISORY COMMITTEE MEETING.

18  BY MR. GOLDMAN:

19  Q.   SO HERE IS THE TRANSCRIPT OF THE FIRST PAGE.  "DEPARTMENT

20  OF HEALTH AND HUMAN SERVICES, FOOD & DRUG ADMINISTRATION,

21  ARTHRITIS ADVISORY COMMITTEE."  AND THEN AT THE BOTTOM,

22  "FEBRUARY 8, 2001."

23            AND IF YOU LOOK AT THE THIRD PAGE, IS THERE AN

24  INDICATION HERE OF WHO PRESENTED INFORMATION FROM MERCK?

25  A.   YES.  UNDER "MERCK RESEARCH LABORATORIES PRESENTATION,"

1   BONNIE GOLDMANN GAVE A VERY BRIEF INTRODUCTION; ALAN NIES

2   PRESENTED DATA ON THE COX-2 SELECTIVITY OF VIOXX, AS WELL AS

3   SOME OF THE OTHER PHARMACOLOGY DATA; AND THEN I PRESENTED THE

4   RESULTS OF THE VIGOR STUDY AS WELL AS THE RESULTS OF THE OA

5   STUDIES AND THE ALZHEIMER'S STUDIES.

6   Q.   AND THEN WERE THERE PRESENTATIONS GIVEN BY MEMBERS OF THE

7   FDA?

8   A.   SEVERAL PRESENTATIONS GIVEN BY MEMBERS OF THE FDA AS WELL.

9   Q.   AND DID THOSE INCLUDE DR. VILLALBA, DR. GOLDKIND,

10  DR. TARGUM, DR. QIAN LI?

11  A.   I BELIEVE THAT'S HOW IT'S PRONOUNCED.

12  Q.   AND THEN ANOTHER SUMMARY BY DR. VILLALBA.  WHO IS

13  DR. VILLALBA, BY THE WAY?

14  A.   SHE WAS ONE OF THE REVIEWING OFFICERS OF THE FDA.

15  Q.   AND THEN SIDNEY WOLFE, HE MADE A PRESENTATION TOO?

16  A.   HE ALSO MADE A SHORT PRESENTATION AS PART OF THE OPEN

17  PUBLIC HEARING.

18  Q.   AND THEN DOWN HERE, "DISCUSSIONS AND QUESTIONS," WHO WAS

19  THE DISCUSSIONS AND THE QUESTIONS WITH?  WAS THAT JUST THE

20  ADVISORY COMMITTEE ALONE, OR WERE THEY ASKING QUESTIONS OF

21  PEOPLE LIKE YOU WHO MADE PRESENTATIONS?

22  A.   SOMETIMES THEY WOULD ASK US QUESTIONS AND ASK US TO GET UP

23  AND SHOW MORE DATA.  THE MAJORITY OF THIS WAS A DISCUSSION

24  AMONG THE CONSULTANTS THEMSELVES, HOWEVER.

25  Q.   NOW, I WANT TO TURN TO THE PRESENTATIONS THAT MERCK GAVE.

1        **MR. GOLDMAN:**  AND THAT'S AT DEFENSE EXHIBIT 188,

2   WHICH WE OFFER.

3   **BY MR. GOLDMAN:**

4   **Q.**   THESE ARE THE SERIES OF PRESENTATIONS:  ONE IS BY

5   DR. GOLDMANN, ONE IS BY DR. NIES, AND ONE IS BY YOU.

6        **MR. GOLDMAN:**  IT'S ONE EXHIBIT, YOUR HONOR.  IT'S

7   DEFENDANT'S EXHIBIT 188.

8        **MR. ROBINSON:**  MAYBE WE COULD SELECTIVELY PICK THINGS

9   WE'RE GOING TO COVER, AND THEN I CAN LOOK AT THIS LATER.  IT'S

10  PRETTY THICK, ABOUT TWO INCHES THICK.

11  **BY MR. GOLDMAN:**

12  **Q.**   OKAY.  LET ME PULL UP THE FIRST PAGE.  WHAT IS THIS FIRST

13  PAGE, DR. REICIN?

14  **A.**   IT'S AN INTRODUCTION PAGE FOR BONNIE GOLDMANN'S TALK.

15  **Q.**   AND THEN IF WE TURN TO THE 43RD PAGE OF THE EXHIBIT, WHAT

16  IS THIS?

17  **A.**   AN INTRODUCTION PAGE FOR MINE, MY TALK.

18  **Q.**   AND WITHIN YOUR TALK, THIS IS SLIDE, AT THE BOTTOM, 116.

19  CAN YOU DESCRIBE JUST WHAT THIS PARTICULAR SLIDE IS SHOWING?

20  **A.**   I THINK THIS WAS -- I HAD JUST PRESENTED THE VIGOR

21  CARDIOVASCULAR DATA, AND THIS WAS THE QUESTION, OBVIOUSLY, THAT

22  CAME OUT OF THAT.

23        THE FIRST BULLET THERE JUST SUMMARIZES THE DATA:

24  THERE WAS A LOWER INCIDENCE OF CARDIOVASCULAR EVENTS ON

25  NAPROXEN COMPARED WITH VIOXX.  BUT IF YOU LOOKED AT VIGOR

1    ALONE, YOU DIDN'T KNOW IF THE IMBALANCE IN CARDIOVASCULAR

2    EVENTS WAS DUE TO A DECREASE IN EVENTS ON PLATELET-INHIBITING

3    NSAID, I.E., NAPROXEN ACTING AS A CARDIOPROTECTIVE AGENT; OR AN

4    INCREASE IN EVENTS ON A COX-2 SELECTIVE INHIBITOR.

5    **Q.**   AND SO WAS THIS THE QUESTION THAT YOU ARE RAISING HERE AND

6    THE ADVISORY COMMITTEE IS DISCUSSING:  IS IT NAPROXEN THAT

7    EXPLAINS THE DIFFERENCE IN THE HEART ATTACKS IN VIGOR OR IS IT

8    VIOXX?

9    **A.**   THAT'S CORRECT.

10   **Q.**   DID YOU ALSO PRESENT DATA ABOUT THE VIOXX CLINICAL TRIALS

11   THAT YOU HAD OBTAINED TO DATE?

12   **A.**   I PRESENTED THE OA DATA.  I PRESENTED THE ALZHEIMER'S

13   DATA.  I PRESENTED A POOLED ANALYSIS THAT WE HAD DONE.  I

14   PRESENTED SOME OF THAT BLEEDING DATA, I BELIEVE.  THERE WERE

15   OTHER ADVERSE EXPERIENCE DATA I PRESENTED ON HYPERTENSION AND

16   EDEMA.

17   **Q.**   AND THEN THERE WAS A PRE -- WAS THERE A PRESENTATION BY

18   DR. TARGUM?

19   **A.**   YES.  DR. TARGUM GAVE A PRESENTATION ON THE CARDIOVASCULAR

20   DATA.

21   **Q.**   IF YOU TURN TO EXHIBIT 364, DR. REICIN, WHICH IS ALREADY

22   ADMITTED, DO YOU RECOGNIZE THIS MEMORANDUM?  IT'S DATED

23   FEBRUARY 1, 2001.  IT'S WRITTEN BY DR. TARGUM OF THE FDA, AND

24   THE SUBJECT LINE IS "REVIEW OF CARDIOVASCULAR SAFETY DATABASE."

25   **A.**   THIS WAS DR. TARGUM'S REVIEW OF THE VIGOR SNDA.

1   **Q.**   WHICH IS WHAT, SNDA?

2   **A.**   SUPPLEMENTAL NEW DRUG APPLICATION.  SO THAT WAS ALL THE

3   DATA THAT WE SENT IN IN JUNE AS WELL AS THE SAFETY UPDATE

4   REPORT THAT WE HAD SENT IN A COUPLE MONTHS LATER.  THIS WAS HER

5   REVIEW OF THAT, AND THIS WAS HER BACKGROUND PACKAGE FOR THE FDA

6   ADVISORY COMMITTEE MEETING.

7            ALL OF THE ADVISORS WERE GIVEN THAT, AND THIS WAS

8   ALSO POSTED ON THE FDA WEBSITE.

9   **Q.**   IF WE TURN TO THE 14th PAGE, THERE IS A TABLE THAT

10  DR. TARGUM INCLUDES IN HER ANALYSIS, AND IT'S CALLED "ANALYSIS

11  OF CARDIOVASCULAR EVENTS IN THE VIGOR STUDY USING ENDPOINT

12  DEFINITIONS STANDARD IN LARGE ANTI-PLATELET TRIALS."

13           AND THEN IF YOU JUST LOOK AT "MI" HERE, WHAT IS THE

14  NUMBER OF HEART ATTACKS THAT SHE IS REPORTING TO THE ADVISORY

15  COMMITTEE OCCURRED IN THE VIOXX ARM?

16  **A.**   SO THIS DATA CAME FROM OUR SAFETY UPDATE REPORT, AND --

17  **Q.**   THAT'S UP HERE, THE UPDATED SAFETY?

18  **A.**   UH-HUH.

19  **Q.**   OKAY.

20  **A.**   THIS IS DATA THAT CAME IN AFTER -- THIS IS THE UPDATED

21  DATA.  WE DIDN'T HAVE ALL OF THIS DATA IN JUNE DURING THE

22  INITIAL REPORT THAT WE SENT TO THE FDA.  IT'S NOT UNUSUAL TO

23  GET DATA THAT COMES IN AFTER YOUR INITIAL CUTOFF DATE.  THIS

24  INCLUDES THAT.  AND THERE WERE 20 HEART ATTACKS ON VIOXX AND 4

25  ON NAPROXEN.

1  **Q.**   NOW, AT THE END OF THE MEETING, OR TOWARD THE END OF THE

2  ADVISORY COMMITTEE MEETING, DID THE ADVISORY COMMITTEE MEMBERS

3  DISCUSS WHAT MERCK SHOULD DO AND WHAT THE FDA SHOULD DO WITH

4  RESPECT TO THE LABEL AND HOW IT SHOULD DISCUSS THE VIGOR TRIAL?

5  **A.**   THERE WAS A DISCUSSION RELATED TO THAT, YES.

6  **Q.**   DID ANYBODY AT THE ADVISORY COMMITTEE, DR. REICIN, SUGGEST

7  THAT MERCK WITHDRAW VIOXX FROM THE MARKET BASED ON THE RESULTS

8  OF THE VIGOR TRIAL?

9  **A.**   ABSOLUTELY NOT.

10 **Q.**   DID ANYBODY FROM THE ADVISORY COMMITTEE EVER SUGGEST THAT

11 THE VIOXX LABEL SHOULD HAVE A BLACK-BOX WARNING FOR

12 CARDIOVASCULAR RISKS?

13 **A.**   NO.

14 **Q.**   LET'S JUST TAKE A LOOK AT WHAT THE ADVISORY COMMITTEE DID

15 SAY ABOUT THE LABEL.  THIS IS THE SAME TRANSCRIPT NOW AT

16 PAGE 206, AND IT STARTS BY DR. NISSEN.  WHO IS DR. NISSEN?

17 **A.**   DR. STEVE NISSEN IS A CARDIOLOGIST WHO ACTUALLY SITS ON

18 THE CARDIOLOGY FDA ADVISORY BOARD, AND HE WAS BROUGHT IN AS A

19 CONSULTANT TO THE RHEUMATOID -- THE INFORMATION ADVISORY BOARD.

20 **Q.**   SO DR. NISSEN SAYS, "BRIEFLY, I THINK WHAT I WOULD SAY IN

21 THE LABEL IS THAT THERE WAS AN EXCESS OF CARDIOVASCULAR EVENTS

22 IN COMPARISON TO NAPROXEN, THAT IT REMAINS UNCERTAIN WHETHER

23 THIS WAS DUE TO BENEFICIAL CARDIOPROTECTIVE EFFECTS OF NAPROXEN

24 OR PROTHROMBOTIC EFFECTS OF THE AGENT" -- WHICH WOULD BE VIOXX;

25 RIGHT?

1    A.    THAT'S CORRECT.

2    Q.    -- "AND LEAVE IT AT THAT, THAT BASICALLY WE DON'T KNOW THE

3    REASON.  WE DO KNOW THERE WAS A DIFFERENCE.  THAT AWARENESS

4    SHOULD BE MADE AVAILABLE TO THE PRESCRIBER AND TO THE CONSUMER

5    BUT WITHOUT NECESSARILY A FINAL JUDGMENT AS TO THE REASONS FOR

6    THAT DIFFERENCE."

7            AND THEN ON THE NEXT PAGE, DOCTOR, DID THE ADVISORY

8    COMMITTEE THEN VOTE IN RESPONSE TO THE FOLLOWING QUESTIONS:

9    "SO LET ME ASK FOR THOSE FEELING YES, THAT THERE NEEDS TO BE

10   SOMETHING, SOME ADDITIONAL LANGUAGE, PERHAPS, ALONG THE LINES

11   OF DR. NISSEN, IN TERMS OF THE LABEL?  I WILL ASK FOR A SHOW OF

12   HANDS."  AND HOW MANY MEMBERS OF THE ADVISORY COMMITTEE VOTED

13   AGAINST DR. NISSEN'S PROPOSAL?

14   A.    ONE PERSON.

15   Q.    DID EVERYBODY ELSE VOTE IN FAVOR OF IT?

16   A.    THAT'S MY UNDERSTANDING, YES.  THAT'S MY RECOLLECTION.

17   Q.    DID MERCK TAKE INTO CONSIDERATION WHAT THE ADVISORY

18   COMMITTEE SAID WHEN DECIDING WHAT TO DO WITH THE LABEL FOR

19   VIOXX?

20   A.    IN ORDER TO HELP EXPEDITE DISCUSSIONS WITH THE FDA ABOUT

21   THE LABEL CHANGE, WE ACTUALLY SUBMITTED WITHIN A COUPLE OF

22   WEEKS AFTER THE ADVISORY COMMITTEE AN UPDATED LABEL TO REFLECT

23   WHAT WE HAD HEARD AT THE ADVISORY COMMITTEE MEETING.

24   Q.    IF YOU TURN TO EXHIBIT 196, DOCTOR, WHICH IS THE

25   MARCH 2001 SUBMISSION TO THE FDA, PROPOSING THAT LABEL.

1          **MR. GOLDMAN:**  WHICH WE OFFER.

2          **MR. ROBINSON:**  NO OBJECTION.

3          **THE COURT:**  LET IT BE ADMITTED.

4   BY MR. GOLDMAN:

5   **Q.**   UP HERE AT THE TOP, THERE IS AN E-MAIL FROM ROBERT

6   SILVERMAN, WHO WORKS AT -- DR. SILVERMAN?

7   **A.**   HE WORKS AT MERCK.  HE'S ONE OF OUR REGULATORY AFFAIRS

8   EXPERTS.

9   **Q.**   AND HE'S SENDING AN E-MAIL TO SOMEBODY WITHIN THE FDA,

10  CDER.FDA.GOV?

11  **A.**   CORRECT.  IT LOOKS LIKE HE WAS SENDING IT TO SANDY COOK,

12  WHO WAS ONE OF THEIR PROJECT MANAGERS WITHIN THE FDA.

13  **Q.**   WITHIN THIS DOCUMENT IS THIS WHERE MERCK IS SUGGESTING THE

14  LABEL BE REVISED?

15  **A.**   THAT'S CORRECT.

16  **Q.**   DID THE FDA APPROVE A REVISED LABEL WHICH INCLUDED THE

17  VIGOR DATA IN APRIL OF 2002?

18  **A.**   YES, THEY DID.

19  **Q.**   IF YOU LOOK, DR. REICIN, AT DEFENDANT'S EXHIBIT 2074,

20  WHICH IS THE APRIL 2002 LABEL THAT WE OFFERED --

21          **MR. ROBINSON:**  NO OBJECTION.

22          **THE COURT:**  LET IT BE ADMITTED.

23  BY MR. GOLDMAN:

24  **Q.**   -- I JUST WANT TO SHOW YOU THE TOP PORTION.  WE'RE GOING

25  TO LOOK AT THIS CLOSELY.  BUT IS THIS THE PACKAGE INSERT OF THE

1   LABEL THAT THE FDA APPROVED IN APRIL OF 2002?  IF YOU LOOK AT

2   THE END THERE?

3   **A.**   YES.  IF YOU SHOW ME -- YES, THAT'S IT.  I CAN TELL YOU

4   BECAUSE IT SAYS, "ISSUED APRIL 2002."

5   **Q.**   DID MERCK ALSO SEND OUT THE REVISED LABEL TO DOCTORS WHO

6   PRESCRIBE VIOXX?

7   **A.**   YES, WE DID.

8   **Q.**   CAN YOU EXPLAIN TO THE JURY HOW THAT WAS DONE?

9   **A.**   I PROBABLY -- MAYBE NOT IN DETAIL, OTHER THAN THE FACT

10  THAT WE HAVE A LARGE DATABASE OF PHYSICIANS WHO HAVE PRESCRIBED

11  VIOXX, AND A LETTER WAS SENT OUT TO THEM INFORMING THEM THAT

12  THERE WERE IMPORTANT LABEL CHANGES THAT WE THOUGHT THEY SHOULD

13  BE AWARE.  THOSE LABEL CHANGES WERE SUMMARIZED IN A LETTER, AND

14  THEN WE ALSO HAD WITH THAT A COPY OF THE UPDATED LABEL WITH ALL

15  OF THE CHANGES HIGHLIGHTED.

16  **Q.**   LET ME SHOW YOU, DOCTOR -- OR FIRST ASK YOU TO LOOK AT

17  DEFENSE EXHIBIT 945, WHICH IS A HIGHLIGHTED VERSION OF THE

18  LABEL THAT WAS SENT TO DOCTORS.

19          **MR. GOLDMAN:**  WE OFFER THAT INTO EVIDENCE.

20          **MR. ROBINSON:**  NO OBJECTION.

21          **THE COURT:**  LET IT BE ADMITTED.

22          **MR. ROBINSON:**  FOR THE RECORD, A HIGHLIGHTED ONE WAS

23  SENT TO DOCTORS; RIGHT?  IT WASN'T ACTUALLY HIGHLIGHTED FOR

24  THIS COURT?

25          **MR. GOLDMAN:**  NO.

1    **THE WITNESS:**  NO.  THIS WAS -- A HIGHLIGHTED VERSION

2  WAS SENT OUT FOR DOCTORS SO THAT THEY COULD EASILY SEE WHAT THE

3  CHANGES WERE IN THE DOCUMENT.

4    **MR. ROBINSON:**  THERE IS NO EVIDENCE THAT THAT --

5    **MR. GOLDMAN:**  YOUR HONOR --

6    **THE COURT:**  WELL, SHE JUST TESTIFIED.

7    **MR. ROBINSON:**  -- THAT IT WENT TO DOCTORS.

8    **MR. GOLDMAN:**  YOUR HONOR.

9    **THE COURT:**  THANK YOU.

10  BY MR. GOLDMAN:

11  **Q.**   IF WE LOOK AT THE BOTTOM OF THE VERY FIRST PAGE OF THE

12  LABEL, I'M GOING TO CULL OUT TABLE 2 ON THE FIRST PAGE OF THE

13  APRIL 2002 LABEL.  CAN YOU TELL THE JURY WHAT THIS TABLE IS

14  TELLING DOCTORS?

15  **A.**   THIS IS A SUMMARY OF THE NUMBER AND THE INCIDENCE OF

16  CARDIOVASCULAR -- SERIOUS CARDIOVASCULAR AND THROMBOTIC EVENTS

17  THAT OCCURRED IN THE VIGOR STUDY IN PATIENTS TAKING VIOXX

18  VERSUS PATIENTS TAKING NAPROXEN.  IT SHOWS THE RATES OVER TIME.

19    IF YOU GO OUT TO THE LAST TIME POINT OVER ON THE

20  RIGHT, YOU CAN SEE THAT THERE WERE 45 EVENTS ON VIOXX, 19 ON

21  NAPROXEN.  AND YOU CAN SEE THERE'S A LITTLE STAR BY THE 1.81

22  PERCENT.  THAT'S THE CUMULATIVE INCIDENCE RATE.  AND THAT

23  LITTLE STAR MEANS THAT IT WAS STATISTICALLY SIGNIFICANTLY

24  DIFFERENT.

25  **Q.**   THEN IF YOU TURN TO THE NEXT PAGE AND THE TOP LEFT COLUMN.

1  NOW, FIRST OF ALL, YOU SEE IN THE MIDDLE OF THE PAGE THERE A

2  SECTION CALLED "WARNINGS"?

3  **A.**   THAT'S CORRECT.

4  **Q.**   SO JUST TO THE LEFT OF THAT SECTION, THERE'S A TABLE

5  THAT'S TABLE 3.  IT'S CALLED "VIGOR SERIOUS CARDIOVASCULAR

6  THROMBOTIC ADVERSE EVENTS."  WHAT IS THIS TELLING DOCTORS?

7  **A.**   THIS IS ANOTHER WAY OF PRESENTING THE CARDIOVASCULAR DATA

8  FROM VIGOR.  HERE WE'VE BROKEN THE DATA DOWN BY THE TYPES OF

9  EVENTS THAT WERE INCLUDED IN THE THROMBOTIC ENDPOINT.  AND WE

10  SHOW THE INCIDENCE OF OR THE NUMBERS OF EVENTS THAT OCCURRED IN

11  EACH OF THE TWO TREATMENT GROUPS, AND WE HIGHLIGHT WITH

12  ASTERISKS WHICH PARTICULAR TYPES OF EVENTS WERE STATISTICALLY

13  SIGNIFICANTLY DIFFERENT BETWEEN THE TWO GROUPS.

14  **Q.**   AND THEN TO THE RIGHT OF THAT SECTION, THERE IS A SECTION

15  CALLED "PRECAUTIONS," AND BECAUSE IT'S A LITTLE HARDER TO SEE

16  BECAUSE OF ALL OF THE TEXT, I HAVE A BLOWUP OF THIS SECTION.

17         THIS IS NOW IN THE "PRECAUTIONS" SECTION; RIGHT?

18  **A.**   THAT'S CORRECT.

19  **Q.**   AND UNDER "CARDIOVASCULAR EFFECTS," RIGHT HERE, WHAT IS

20  MERCK SAYING THERE?  "THE INFORMATION BELOW SHOULD BE" -- WHAT?

21  **A.**   "THE INFORMATION BELOW SHOULD BE TAKEN INTO ACCOUNT, AND

22  CAUTION SHOULD BE EXERCISED WHEN VIOXX IS USED IN PATIENTS WITH

23  A MEDICAL HISTORY OF ISCHEMIC HEART DISEASE."

24  **Q.**   AND WE'VE HEARD A LITTLE BIT ABOUT ISCHEMIA.  THAT WAS

25  WHAT MR. BARNETT HAD IN JANUARY OF 2000.  AND THEN FOR PATIENTS

1    WHO HAVE ISCHEMIC HEART DISEASE, WHAT IS MERCK HERE IN THE FDA

2    TELLING DOCTORS ABOUT THE VIGOR STUDY?  AND I'LL READ IT IF

3    IT'S HARD FOR YOU.

4    **A.**   DO YOU WANT ME TO READ IT?

5    **Q.**   SURE.  GO AHEAD.

6    **A.**   "IN VIGOR, A STUDY OF 8,076 PATIENTS WITH A MEAN AGE" --

7    THAT MEANS AN AVERAGE AGE -- "OF 58, VIOXX (N=4,047)"-- THAT

8    MEANS THERE WERE 4,047 PATIENTS ON VIOXX AND 4,029 PATIENTS ON

9    NAPROXEN" -- WHICH MEANS WHEN I TOLD YOU EARLIER THAT THERE

10   WERE 8,047 PATIENTS IN VIGOR, I WAS WRONG -- "WITH A MEDIAN

11   DURATION OF EXPOSURE OF NINE MONTHS" -- SO THE AVERAGE EXPOSURE

12   WAS NINE MONTHS -- "THE RISK OF DEVELOPING A SERIOUS

13   CARDIOVASCULAR THROMBOTIC EVENT WAS SIGNIFICANTLY HIGHER IN

14   PATIENTS TREATED WITH VIOXX 50 MILLIGRAMS ONCE DAILY (N=45)" --

15   THERE WERE 45 EVENTS ON VIOXX -- "AS COMPARED TO PATIENTS

16   TREATED WITH NAPROXEN 500 MILLIGRAMS TWICE DAILY (N=19)."

17   **Q.**   LET ME STOP YOU THERE, AND THEN WE'LL GO TO THE NEXT

18   SECTION IN A MINUTE.  IS THERE ANYWHERE IN THIS LABEL THAT --

19   WHERE MERCK IS SAYING THAT THE DIFFERENCE IN THE VIGOR STUDY IS

20   DUE TO NAPROXEN?

21   **A.**   NO.

22   **Q.**   SO IT SAYS THAT THE RISK OF DEVELOPING A SERIOUS

23   CARDIOVASCULAR THROMBOTIC EVENT WAS SIGNIFICANTLY HIGHER IN

24   PATIENTS IN THE VIOXX GROUP?

25   **A.**   THAT'S CORRECT.

1    Q.   AND THEN YOU CAN CONTINUE ON IN THE NEXT SENTENCE.  "IN

2    VIGOR MORTALITY"...

3    A.   "IN VIGOR MORTALITY DUE TO CARDIOVASCULAR THROMBOTIC

4    EVENTS, 7 ON VIOXX VERSUS 6 ON NAPROXEN."

5    Q.   AND THAT'S THE NUMBER OF DEATHS?

6    A.   CORRECT.  WAS SIMILAR BETWEEN THE TREATMENT GROUPS.

7    Q.   AND THEN THERE'S A --

8    A.   AND THEN WE SEND THEM BACK TO THE CLINICAL STUDIES SECTION

9    WHERE WE POINTED OUT HOW MANY HEART ATTACKS AND STROKES AND

10   OTHER THINGS LIKE THAT.

11   Q.   AND THEN THERE IS A SECTION THAT STARTS:  "IN A

12   PLACEBO-CONTROLLED DATABASE DERIVED FROM TWO STUDIES WITH A

13   TOTAL OF 2,142 ELDERLY PATIENTS, MEAN AGE 75, WITH A MEAN

14   DURATION OF EXPOSURE OF APPROXIMATELY 14 MONTHS, THE NUMBER OF

15   CARDIOVASCULAR THROMBOTIC EVENTS WAS 21 VERSUS 35 FOR PATIENTS

16   TREATED WITH VIOXX 25 MILLIGRAMS ONCE DAILY VERSUS PLACEBO."

17   WHAT IS THAT REFERRING TO?

18   A.   THAT'S REFERRING TO THE ALZHEIMER'S STUDIES.  AND SO IN

19   THOSE, THERE WERE 21 SERIOUS THROMBOTIC EVENTS ON VIOXX VERSUS

20   35 EVENTS ON PLACEBO.

21   Q.   AND THEN IT --

22   A.   ACTUALLY NUMERICALLY HIGHER ON PLACEBO; ALTHOUGH, WE

23   CONSIDER THOSE SIMILAR.

24   Q.   AND THEN THE LABEL CONTINUES TO SAY, "IN THESE SAME TWO

25   PLACEBO-CONTROLLED STUDIES, MORTALITY DUE TO CARDIOVASCULAR

1    THROMBOTIC EVENTS WAS 8 VERSUS 3 FOR VIOXX VERSUS PLACEBO."

2            WAS THAT IN THE ALZHEIMER'S TRIALS?

3    **A.**   IN THE ALZHEIMER'S TRIALS, CARDIOVASCULAR MORTALITY WAS 8

4    ON VIOXX VERSUS 3 ON PLACEBO.

5    **Q.**   AND WE'LL TALK MORE ABOUT MORTALITY IN ALZHEIMER'S IN A

6    LITTLE WHILE.

7            AND THEN IT SAYS, "THE SIGNIFICANCE OF THE

8    CARDIOVASCULAR FINDINGS FROM THESE THREE STUDIES IS UNKNOWN."

9    IS THAT CONSISTENT WITH WHAT THE ADVISORY COMMITTEE WAS TELLING

10   YOU AND THE FDA IN FEBRUARY OF 2001?

11   **A.**   YES, IT WAS.

12   **Q.**   NOW, THERE IS ANOTHER SECTION IN THE LABEL RIGHT

13   UNDERNEATH THIS IN THIS SECTION THAT IS CALLED "FLUID

14   RETENTION, EDEMA, AND HYPERTENSION."

15           IS EDEMA BASICALLY SWELLING?

16   **A.**   THAT'S CORRECT.

17   **Q.**   AND HERE MERCK IS TELLING DOCTORS, "FLUID RETENTION,

18   EDEMA, AND HYPERTENSION HAVE BEEN REPORTED IN SOME PATIENTS

19   TAKING VIOXX.  IN CLINICAL TRIALS OF VIOXX OF 25 MILLIGRAMS IN

20   PATIENTS WITH RHEUMATOID ARTHRITIS, THE INCIDENCE OF

21   HYPERTENSION WAS TWICE AS HIGH IN PATIENTS IN THE VIOXX GROUP

22   COMPARED TO THE NAPROXEN GROUP."

23   **A.**   THAT'S CORRECT.

24   **Q.**   AND THEN IT SAYS, "CLINICAL TRIALS WITH VIOXX AT DAILY

25   DOSES OF 12.5 AND 25 MILLIGRAMS IN PATIENTS WITH OSTEOARTHRITIS

1  HAVE SHOWN EFFECTS ON HYPERTENSION AND EDEMA SIMILAR TO THOSE

2  OBSERVED WITH COMPARATOR NSAIDS."  IS THAT ALSO --

3  A.   THAT'S CORRECT.  AND IT'S BELIEVED ALL NSAIDS AND COX-2

4  INHIBITORS CAN CAUSE HYPERTENSION, EDEMA, AND FLUID RETENTION.

5  IT'S IN ALL LABELS FOR NSAIDS AND COX-2 INHIBITORS AND WAS IN

6  OUR ORIGINAL LABEL AS WELL.

7          THIS IS HIGHLIGHTED BECAUSE WE WERE ADDING SOME DATA

8  FROM THE RHEUMATOID ARTHRITIS STUDIES, AND SOME OF THE LANGUAGE

9  HAD CHANGED.

10 Q.   WHAT DID MERCK SAY IN THE LAST SENTENCE OF THIS SECTION

11 ABOUT VIOXX BEING USED WITH CAUTION?

12 A.   "VIOXX SHOULD BE USED WITH CAUTION AND SHOULD BE

13 INTRODUCED AT THE LOWEST RECOMMENDED DOSE IN PATIENTS WITH

14 FLUID RETENTION, HYPERTENSION, OR HEART FAILURE."

15 Q.   THERE HAS BEEN SOME TESTIMONY ABOUT THE PRECAUTION SECTION

16 OF THE LABEL AND THE WARNING SECTION IN THE LABEL.  AND LET ME

17 ASK YOU, DOCTOR:  WHY DID YOU AND MERCK FEEL THAT IT WAS MORE

18 APPROPRIATE TO PUT THE VIGOR DATA IN THE PRECAUTION SECTION

19 THAN IN THE WARNING SECTION OF THE LABEL?

20 A.   OUR UNDERSTANDING OF WHAT IS APPROPRIATE IN THE WARNING

21 SECTION ARE WHAT THE FDA CONSIDERS KNOWN RISKS THAT ARE

22 ASSOCIATED WITH THE DRUG.

23          I'LL GIVE YOU SOME EXAMPLES.  IF YOU GIVE PENICILLIN,

24 OCCASIONALLY, RARELY, PATIENTS WILL HAVE ALLERGIC REACTIONS,

25 LIKE ALLERGIC REACTIONS TO PENICILLIN.  IT'S A KNOWN RISK

1    THAT'S ASSOCIATED WITH THAT DRUG.  WHEREAS THE PRECAUTION

2    SECTION ARE FOR THINGS THAT PHYSICIANS SHOULD TAKE INTO ACCOUNT

3    AND CONSIDER WHEN THEY ARE DECIDING WHETHER OR NOT TO USE A

4    PARTICULAR DRUG.

5              AND BECAUSE THE DATA THAT WE HAD ON VIOXX CERTAINLY

6    DIDN'T SHOW A KNOWN RISK -- IN FACT, THERE WAS NO EVIDENCE THAT

7    THERE WAS AN INCREASE VERSUS PLACEBO -- AND WHAT WE HEARD FROM

8    THE FDA ADVISORY COMMITTEE WAS THAT THE CLINICAL SIGNIFICANCE

9    WAS UNKNOWN, THE PRECAUTION SECTION WAS THE APPROPRIATE PLACE.

10   Q.   THERE WAS SOME EVIDENCE EARLIER IN THE TRIAL ABOUT

11   FORECASTS THAT SOME OF THE MARKETING PEOPLE DID ABOUT WHAT

12   WOULD HAPPEN IF THE CARDIOVASCULAR DATA WAS IN THE PRECAUTION

13   SECTION VERSUS THE WARNING SECTION.  HAVE YOU SEEN THAT IN

14   OTHER TRIALS?

15   A.   I'VE SEEN THAT IN OTHER TRIALS, YES.

16   Q.   DID MERCK'S DECISION OR RECOMMENDATION TO THE FDA TO

17   INCLUDE THE CARDIOVASCULAR EFFECTS OF VIOXX IN THE PRECAUTION

18   SECTION HAVE ANYTHING TO DO WITH SALES FORECASTS THAT WERE DONE

19   BY MARKETING PEOPLE?

20   A.   ABSOLUTELY NOT.  IT'S THE SCIENTISTS AT MERCK THAT MAKE

21   THE DECISION ABOUT WHAT GOES IN THE LABEL.  AND WE MAKE OUR

22   DECISION BASED ON SCIENTIFIC DATA THAT WE HAVE AND WHAT'S IN

23   THE BEST INTEREST OF PATIENTS, NOT ON WHAT THE SALE FORECASTS

24   OF A DRUG ARE GOING TO BE.

25   Q.   WERE YOU AWARE WHEN VIOXX WAS ON THE MARKET, DR. REICIN,

1   THAT IN ADDITION TO THE CLINICAL TRIALS THAT WERE DONE ON

2   VIOXX, DID YOU KNOW ABOUT ANY EPIDEMIOLOGIC OR OBSERVATIONAL

3   STUDIES THAT WERE BEING PUBLISHED IN THE LITERATURE?

4   **A.**   WE WERE CERTAINLY FOLLOWING THE LITERATURE.  WE WERE AWARE

5   OF OBSERVATIONAL STUDIES.  WE WERE ACTUALLY GIVING PEOPLE

6   GRANTS TO DO SOME OF THOSE STUDIES.

7   **Q.**   WERE YOU FAMILIAR WITH A STUDY BY DR. WAYNE RAY, WHO IS

8   ACTUALLY AN EXPERT IN THE CASE DESIGNATED BY THE PLAINTIFFS?

9   **A.**   YES, I AM.

10          **THE COURT:**  JUST A MOMENT.

11          **MR. ROBINSON:**  HE'S NOT AN EXPERT IN THE CASE.

12          **MR. BECK:**  WE CAN APPROACH.

13          **THE COURT:**  YES, LET ME SEE.

14          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

15   THE BENCH.)

16          **MR. BECK:**  YOUR HONOR, HE WAS DESIGNATED IN ALL OF

17   THE MDL CASES AS AN EXPERT AND PUT ON A WITNESS LIST FOR THIS

18   CASE.

19          **THE COURT:**  WHAT'S THE SIGNIFICANCE OF ASKING -- I

20   MEAN, JUST ASK ABOUT RAY, BUT DON'T GO INTO THE EXPERT.

21          **MR. ROBINSON:**  I THANK YOU.  THANK YOU, YOUR HONOR.

22          **THE COURT:**  LET'S REPHRASE THAT QUESTION.

23          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

24   OPEN COURT.)

25   **BY MR. GOLDMAN:**

1    **Q.**    DID YOU READ A STUDY BY DR. WAYNE RAY AT THE TIME THAT

2    VIOXX STUDY CAME OUT?

3    **A.**    YES, I DID.

4    **Q.**    I'LL MARK FOR IDENTIFICATION DEFENSE EXHIBIT 628.  IS THIS

5    THE STUDY BY DR. RAY CALLED "COX-2 SELECTIVE NONSTEROIDAL

6    ANTI-INFLAMMATORY DRUGS AND RISK OF SERIOUS CORONARY HEART

7    DISEASE"?

8    **A.**    YES.  THIS WAS AN ARTICLE THAT WAS PUBLISHED IN OCTOBER OF

9    2002.

10   **Q.**    DOWN HERE IN THE *LANCET* -- IS THAT A REPUTABLE MEDICAL

11   JOURNAL?

12   **A.**    IT'S A VERY WELL-KNOWN PEER-REVIEWED JOURNAL.

13   **Q.**    AND THEN IN THE ABSTRACT HERE -- WELL, WHY DON'T YOU JUST

14   DESCRIBE IN GENERAL WHAT DR. RAY DID IN THIS STUDY?  WHAT WAS

15   THE POINT OF IT AND WHAT DID HE DO?

16   **A.**    THIS WAS AN EPIDEMIOLOGIC STUDY, WHICH IS DIFFERENT THAN A

17   CLINICAL TRIAL WHERE YOU ACTUALLY RANDOMIZED PATIENTS TO

18   TREATMENT A OR TREATMENT B, AND YOU DO IT IN A BLINDED MANNER.

19   AND YOU DO ALL OF THAT BECAUSE YOU'RE MORE LIKELY, IF YOU DO

20   THAT, TO GET BALANCED GROUPS.

21           IN EPIDEMIOLOGIC STUDIES, THERE ARE SEVERAL DIFFERENT

22   WAYS OF DOING IT, BUT THOSE ARE DONE USING DATABASES, KIND OF

23   RETROSPECTIVE LOOKS AT DATA.  AND YOU SOMETIMES CAN HAVE

24   CONFOUNDING THAT YOU CAN'T REALLY FIND WHEN YOU'RE DOING THE

25   ANALYSES.

1          WE CONSIDER CLINICAL TRIALS TO BE THE GOLD STANDARD.

2    EPIDEMIOLOGIC STUDIES CAN BE USED, I THINK, TO RAISE QUESTIONS

3    THAT ARE HYPOTHESIS-GENERATING THAT OFTEN RAISE QUESTIONS THAT

4    OFTEN GO INTO CLINICAL TRIALS TO ANSWER MORE DEFINITIVELY.

5    Q.   AND IN THE ABSTRACT HERE, DR. RAY WRITES THE FOLLOWING:

6    "USERS OF HIGH-DOSE VIOXX" -- AND WHAT IS HIGH-DOSE?

7    A.   I THINK IN THIS PARTICULAR INCIDENCE HE DEFINED THAT AS

8    GREATER THAN 25 MILLIGRAMS.

9    Q.   -- "WERE 1.70."  AND THEN HE HAS THIS CONFIDENCE INTERVAL

10   THAT'S LESS THAN 1.  DO YOU SEE THAT?

11   A.   IT SPANS WHERE IT GOES FROM .98 TO 2.95.

12   Q.   SO THE USERS OF HIGH-DOSE VIOXX WERE 1.7 TIMES MORE LIKELY

13   THAN NONUSERS TO HAVE CHD."  WHAT IS CHD, CORONARY HEART

14   DISEASE, AND HOW IS THAT DEFINED IN THE STUDY?

15   A.   IN THIS PARTICULAR CASE, I THINK THESE WERE PATIENTS WHO

16   EITHER DIED FROM HEART DISEASE OR HAD A HEART ATTACK.

17   Q.   AND THEN IT SAYS, "AMONG NEW USERS, THIS RATE INCREASED TO

18   1.93."  AND THAT'S WITH THE NEW USERS OF THE HIGH-DOSE?

19   A.   THAT'S CORRECT.

20   Q.   AND THEN WHAT DOES DR. RAY SAY IN THE LAST SENTENCE OF HIS

21   STUDY?

22   A.   "BY CONTRAST, THERE WAS NO EVIDENCE OF RELATED RISK OF

23   CORONARY HEART DISEASE AMONG USERS OF ROFECOXIB AT DOSES OF

24   25 MILLIGRAMS OR LESS OR AMONG USERS OF OTHER NSAIDS."

25   Q.   SO HOW DID YOU INTERPRET THIS STUDY BACK AT THE TIME THAT

1  VIOXX WAS ON THE MARKET WITH RESPECT TO THE 25-MILLIGRAM DOSE?

2  **A.**   WELL, HE SHOWED SOME EVIDENCE OF AN INCREASED RISK AT THE

3  50-MILLIGRAM DOSE FOR DOSES ABOVE 25, WHICH WOULD USUALLY MEAN

4  IT WAS 50.  NO EVIDENCE OF A RISK AT THE 25-MILLIGRAM DOSE.

5          WHEN WE SAW THESE, WE ACTUALLY WENT BACK TO THE

6  DATABASE AGAIN AND DID ADDITIONAL ANALYSES, LOOKING AT

7  50 MILLIGRAMS VERSUS 25 MILLIGRAMS IN OUR CLINICAL STUDIES, WAS

8  THERE EVIDENCE OF AN INCREASED RISK.  WE DID NOT FIND THAT IN

9  OUR CLINICAL STUDIES; ALBEIT, WE -- IT WAS A LITTLE BIT OF A

10 LIMITED DATABASE TO HAVE THE SAME PATIENTS IN THE SAME STUDIES

11 ON EITHER 25 OR 50, BUT NO EVIDENCE IN THE CLINICAL TRIALS THAT

12 MI'S WERE INCREASED ON 50 COMPARED TO 25.

13 **Q.**   DID MERCK CAUTION DOCTORS IN THE LABEL ITSELF ABOUT HOW

14 LONG TO USE THE 50-MILLIGRAM DOSE FOR?

15 **A.**   YES, WE DID.  WE CAUTIONED THEM NOT TO USE 50 MILLIGRAMS

16 CHRONICALLY; THAT IT WAS ONLY INDICATED FOR SHORT-TERM USE.

17 **Q.**   DO YOU REMEMBER REVIEWING A STUDY BY DR. MANDANI THAT CAME

18 OUT WHILE VIOXX WAS ON THE MARKET?

19 **A.**   YES, I DO.

20 **Q.**   I MARK FOR IDENTIFICATION DEFENSE EXHIBIT 642.  IS THIS

21 ANOTHER EPIDEMIOLOGIC STUDY CALLED "EFFECTIVE SELECTIVE COX-2

22 INHIBITORS AND NAPROXEN ON SHORT-TERM RISK OF ACUTE MYOCARDIAL

23 INFARCTION IN THE ELDERLY"?

24 **A.**   YES, IT IS.

25 **Q.**   AND DOWN HERE IT SAYS, "THE *ARCHIVES OF INTERNAL*

1   *MEDICINE*."  IS THAT A PEER-REVIEWED JOURNAL?

2   **A.**   YES, IT IS.

3   **Q.**   AND IT COMES OUT IN 2003.  IF WE TURN TO TABLE 3 HERE,

4   TABLE 3 IS SHOWING -- WHAT IS THIS, "PRIMARY ANALYSIS AMI

5   OUTCOMES"?  WHAT DOES THAT MEAN?

6   **A.**   THIS IS LOOKING AT ACUTE MYOCARDIAL INFARCTION.  SO ACUTE

7   HEART ATTACK OUTCOMES.

8   **Q.**   AND IF WE LOOK DOWN HERE AT "ADJUSTED RATE RATIO," AND

9   THEN IN EACH OF THESE COLUMNS, THERE'S -- WHAT DOES "COMMUNITY

10  CONTROL GROUP" MEAN?

11  **A.**   I THINK THERE IS NOT A COMPLETE COPY OF THE PAPER HERE.

12  **Q.**   OKAY.  CAN YOU SEE IT ON THE SCREEN?

13  **A.**   YES, I CAN.

14  **Q.**   "COMMUNITY CONTROL GROUP," WHAT DOES THAT MEAN?

15  **A.**   I THINK THEY WERE LOOKING AT PATIENTS WHO WERE EITHER ON

16  CELECOXIB, ROFECOXIB, NAPROXEN, OR NON-NAPROXEN NSAIDS,

17  COMPARING THAT TO PATIENTS WHO WERE NOT ON ANY NSAIDS OR COX-2

18  INHIBITOR.

19  **Q.**   AND WHAT IS THE --

20  **A.**   AND THAT'S THE COMMUNITY CONTROL GROUP.

21  **Q.**   AND WHAT IS THE RELATIVE RISK FOR VIOXX IN THIS STUDY?

22  **A.**   BASICALLY 1.  SO PATIENTS ON VIOXX HAD THE SAME RISK OF

23  HAVING AN ACUTE HEART ATTACK AS PATIENTS WHO WEREN'T TAKING ANY

24  NSAIDS OR COX-2 INHIBITORS.

25  **Q.**   WERE YOU ALSO FAMILIAR, DR. REICIN, WITH THE STUDY -- AND

1    THIS IS THE LAST ONE I'LL TALK ABOUT.  I KNOW THERE WERE

2    OTHERS.  BUT BY DR. SOLOMON.  AND DR. AVORN WAS ACTUALLY ALSO

3    ON THE STUDY.  IT CAME OUT IN 2004.

4    **A.**   YES, I WAS.  I READ THAT STUDY.

5    **Q.**   WE'RE GOING TO MARK FIRST FOR IDENTIFICATION PURPOSES ONLY

6    EXHIBIT 3064, AND THIS IS AN ABSTRACT OF THAT STUDY.

7            DO YOU SEE, DOCTOR, WHERE, IN THE "RESULTS" SECTION,

8    DR. SOLOMON IS REPORTING WHAT RISK HE SAW IN THIS STUDY, IN

9    THIS EPIDEMIOLOGIC STUDY, FOR THE 25-MILLIGRAM DOSE OF VIOXX?

10   **A.**   MY RECOLLECTION HERE IS THAT HE FOUND AN INCREASED RISK IN

11   PATIENTS WHO WERE ON 25 MILLIGRAMS OR LESS COMPARED TO PATIENTS

12   WHO WERE ON 200 MILLIGRAMS OR LESS OF CELEBREX.

13   **Q.**   YES.

14   **A.**   THERE WAS NO SIGNIFICANTLY INCREASED RISK COMPARED WITH

15   PATIENTS WHO WEREN'T TAKING ANY NSAIDS.

16   **Q.**   SO HERE WHERE IT SAYS -- AND WE'RE TALKING ABOUT THE

17   ADJUSTED RELATIVE RISK OF HEART ATTACKS.

18   **A.**   THAT'S CORRECT.

19   **Q.**   AND WHEN YOU'RE TALKING ABOUT VIOXX, "LESS THAN OR EQUAL

20   TO 25 MILLIGRAMS VERSUS CELEBREX LESS THAN 200 MILLIGRAMS."

21   AND DO YOU KNOW --

22   **A.**   I THINK THAT'S A TYPO.  I THINK IT'S LESS THAN OR EQUAL TO

23   200 MILLIGRAMS.

24   **Q.**   AND THAT RELATIVE RISK WAS -- FOR ODDS RATIO WAS 1.21?

25   **A.**   CORRECT.

1    **Q.**   AND THEN IT CONTINUES.  WHEN YOU LOOK AT VIOXX COMPARED

2    WITH NO NSAID USE, DOWN HERE IT SAYS, OR 1.11, AND A CONFIDENCE

3    INTERVAL IS LESS THAN 1.  SO WHAT DOES THAT MEAN?

4    **A.**   WELL, YOU SEE A NUMERIC INCREASE 1.11.  SO IT WAS A LITTLE

5    INCREASED, BUT IT WASN'T STATISTICALLY SIGNIFICANT AS EVIDENCED

6    BY THE FACT THAT THE CONFIDENCE INTERVAL GOES BOTH BELOW 1 AND

7    OVER 1.

8    **Q.**   AND THEN DID DR. SOLOMON ALSO PUBLISH THIS STUDY IN

9    *CIRCULATION* IN 2004?

10   **A.**   YES, HE DID.

11   **Q.**   AND *CIRCULATION* IS A MEDICAL JOURNAL?

12   **A.**   YES, IT IS.  CARDIOLOGY JOURNAL.

13   **Q.**   IF WE JUST LOOK HERE.  THIS IS FOR IDENTIFICATION

14   PURPOSES.  3077.  UNDER "CONCLUSIONS" -- AND THIS IS DR. AVORN,

15   AND DR. SOLOMON IN 2004 -- CAN YOU TELL THE JURY WHAT HE IS

16   SAYING AND HIS STUDIES SHOW -- WHAT DR. SOLOMON SAYS HIS STUDY

17   SHOWS FOR VIOXX GREATER THAN 25 MILLIGRAMS, LESS THAN

18   25 MILLIGRAMS, AND A TIME PERIOD?

19   **A.**   HE SAYS THAT DOSAGES OF VIOXX MORE THAN 25 MILLIGRAMS WERE

20   ASSOCIATED WITH A HIGHER RISK THAN DOSAGES OF LESS THAN OR

21   EQUAL TO 25 MILLIGRAMS AND THAT THE RISK WAS ELEVATED ONLY IN

22   THE FIRST 90 DAYS AND THEN NOT -- NOT -- IF YOU CONTINUE TO

23   TAKE THE DRUG FOR MORE THAN 90 DAYS, YOU DIDN'T HAVE AN

24   ELEVATED RISK.

25   **Q.**   NOW, WERE THERE ALSO EPIDEMIOLOGIC STUDIES THAT CAME OUT

1    AFTER VIOXX WAS WITHDRAWN THAT SHOWED SOMETIMES THERE WAS AN

2    INCREASED RISK; SOMETIME THERE WASN'T?

3    **A.**    THAT'S CORRECT.  BOTH BEFORE AND AFTER.

4    **Q.**    DID YOU, DR. REICIN, WHEN VIOXX WAS ON THE MARKET, FOLLOW

5    THE MEDICAL LITERATURE TO SEE WHAT SCIENTISTS WERE SAYING ABOUT

6    WHETHER NAPROXEN COULD EXPLAIN THE DIFFERENCE IN HEART ATTACKS

7    IN THE VIGOR STUDY?

8    **A.**    I WAS FOLLOWING THE LITERATURE ON VIOXX IN GENERAL.  THAT

9    DOESN'T MEAN I SAW EVERY SINGLE ARTICLE THAT WAS PUBLISHED,

10   BUT -- AND I WAS LOOKING AT BOTH THE VIEWS ON VIOXX AS WELL AS

11   THE VIEWS ON NAPROXEN.

12   **Q.**    LET ME JUST SHOW YOU TWO ARTICLES, AND IF YOU SAW THEM AT

13   THE TIME, GREAT, WE'LL COVER IT; IF YOU DIDN'T, THEN WE WON'T.

14   I'LL MARK THIS AS DEFENSE EXHIBIT 635.

15          DO YOU RECOGNIZE THIS ARTICLE, DR. REICIN, CALLED

16   "PLATELET ACTIVE DRUGS:  THE RELATIONSHIPS AMONG DOSE,

17   EFFECTIVENESS, AND SIDE EFFECTS," BY DR. PATRONO AND

18   DR. FITZGERALD?

19   **A.**    YES, I DO REMEMBER THIS ARTICLE.  THERE WERE OTHER AUTHORS

20   AS WELL.

21   **Q.**    AND THEN JUST SO WE CAN GET THE DATE, THIS CAME OUT IN A

22   JOURNAL CALLED *CHEST*.  THAT'S AN ABBREVIATION FOR THE NAME OF

23   THE JOURNAL OR --

24   **A.**    NO, NO, THAT'S THE NAME OF THE JOURNAL.  IT'S CALLED

25   *CHEST*.

1    **Q.**    IS THAT ALSO PEER-REVIEWED?

2    **A.**    YES.

3    **Q.**    AND WHEN DID THIS ARTICLE COME OUT?

4    **A.**    IN SEPTEMBER 2004.  I'M NOT SURE IF -- THIS IS PART OF

5    SUPPLEMENTS, THOUGH, SO I'M NOT SURE IF THE SUPPLEMENTS ARE

6    PEER-REVIEWED.

7              AND IT LOOKS LIKE THIS IS A SUMMARY OF A CONFERENCE

8    THAT HAD OCCURRED.  IT'S THE SEVENTH ACC CONFERENCE ON

9    ANTI-THROMBOTIC AND THROMBOLYTIC THERAPY.

10   **Q.**    WHEN DID MERCK WITHDRAW VIOXX FROM THE MARKET, WHAT MONTH?

11   **A.**    WE WITHDREW IT IN SEPTEMBER OF 2004.

12   **Q.**    NOW, IN THIS ARTICLE, WE LOOK AT PAGE 246S.  DO YOU SEE,

13   DR. REICIN -- I HAVE IT UP ON THE SCREEN, IF IT'S EASIER FOR

14   YOU.  THIS IS IN THE LEFT COLUMN.  DO YOU SEE THAT THE AUTHORS

15   ARE DISCUSSING THE VIGOR TRIAL?  "WHILE THE CAUSE OF THE

16   APPARENT EXCESS RISK OF HEART ATTACKS IN THE VIOXX GI OUTCOMES

17   RESEARCH TRIAL CANNOT BE CONCLUSIVELY ESTABLISHED."  WHAT DO

18   THE AUTHORS SAY THEY THINK THE EXPLANATION IS?

19   **A.**    "A COMBINATION OF SOME CARDIOPROTECTIVE EFFECT OF NAPROXEN

20   AND THE PLAY OF CHANCE DOES SEEM TO OFFER A PLAUSIBLE

21   EXPLANATION FOR THESE UNEXPECTED FINDINGS."

22             AND I THINK WHAT THEY ARE TALKING ABOUT THERE IS THAT

23   THE DIFFERENT SEEN WAS LARGER THAN THE 25 PERCENT DIFFERENCE

24   YOU USUALLY EXPECT ASPIRIN TO CONFER.  WE'RE SAYING THAT IF

25   NAPROXEN IS ACTING LIKE ASPIRIN, YOU WOULD HAVE EXPECTED TO SEE

1   A 25 TO 30 PERCENT REDUCTION.  WE SAW A LARGER REDUCTION.  AND

2   WHAT THEY WERE SAYING IS, WELL, IT'S PLAUSIBLE TO SAY IT WAS

3   NAPROXEN ACTING AS A CARDIOPROTECTIVE AGENT, AND THEN, BECAUSE

4   YOU HAD SO FEW EVENTS, THE MAGNITUDE IS A LITTLE BIT GREATER

5   THAN YOU WOULD EXPECT OR IS GREATER THAN YOU WOULD EXPECT

6   BECAUSE OF CHANCE.

7   **Q.**   AND SO DR. FITZGERALD SAID THAT.  AND WHAT DID HE SAY HERE

8   IN THIS ARTICLE IN THE LAST SENTENCE?  "WHILE OTHER

9   MECHANISMS..."?

10  **A.**   THE AUTHORS WROTE:  "WHILE OTHER MECHANISMS CANNOT BE

11  DISCOUNTED, THERE IS CURRENTLY LITTLE EVIDENCE IN HUMANS TO

12  SUPPORT A PROTHROMBOTIC EFFECT FOR COXIBS."

13  **Q.**   WHAT WAS YOUR INTERPRETATION OF THAT, DR. REICIN, WHEN YOU

14  READ IT?

15  **A.**   I THINK THEY WERE TALKING ABOUT THE TOTALITY OF DATA THAT

16  WAS AVAILABLE AT THAT POINT IN TIME, WHICH WAS -- THIS WAS

17  LIKELY WRITTEN BEFORE SEPTEMBER 2004.

18  **Q.**   AND THEN LET ME SHOW YOU ANOTHER ARTICLE AND ASK YOU IF

19  YOU READ THIS AT THE TIME, DOCTOR.  IT'S AN ARTICLE CALLED

20  "CLINICAL" -- AND I MARKED IT FOR IDENTIFICATION AS DEFENSE

21  EXHIBIT 671.  "CLINICAL PHARMACOLOGY OF PLATELET, MONOCYTE AND

22  VASCULAR CYCLOOXYGENASE" --

23  **A.**   OR COX.

24  **Q.**   -- "INHIBITION BY NAPROXEN AND LOW-DOSE ASPIRIN IN HEALTHY

25  SUBJECTS."  AND ONE OF THE AUTHORS IS MARTA CAPONE.  AND THEN

1    CARLO PATRONO IS ALSO AN AUTHOR.  DID YOU READ THIS BACK AT THE
2    TIME VIOXX WAS ON THE MARKET?
3    A.    I DID, AND I WAS AWARE OF THESE RESULTS BEFORE THEY WERE
4    PUBLISHED AS WELL.
5    Q.    DO YOU SEE DOWN HERE, "CIRCULATION"?  AND WHAT'S THE YEAR
6    THAT THIS WAS PUBLISHED?
7    A.    IN 2004.
8    Q.    AND IF YOU LOOK IN THE CONCLUSIONS, DR. REICIN, THE
9    AUTHORS WRITE:  "THE REGULAR ADMINISTRATION OF NAPROXEN
10   500 MILLIGRAMS" -- WHAT DOES B.I.D. MEAN?
11   A.    B.I.D. IS TWICE DAILY.
12   Q.    -- "CAN MIMIC THE ANTI-PLATELET COX-1 EFFECT OF LOW-DOSE
13   ASPIRIN."  WHAT DID YOU UNDERSTAND THAT TO MEAN?  WHAT WERE
14   THEY SAYING HERE IN THIS STUDY ABOUT NAPROXEN?
15   A.    THEY HAD ACTUALLY DONE A STUDY THAT WAS SIMILAR TO THAT
16   STUDY THAT I SHOWED YOU BEFORE, THAT I WALKED DOWN TO TALK TO
17   THE CHART, WHERE THEY LOOKED AT NAPROXEN'S ABILITY TO AFFECT
18   PLATELETS AND COMPARE THAT TO LOW-DOSE ASPIRIN.  THEY FOUND
19   THAT, WHEN YOU TOOK NAPROXEN AT A DOSE OF 500 MILLIGRAMS TWICE
20   DAILY, IN FACT, ITS EFFECTS ON THE PLATELETS WERE SIMILAR TO
21   WHAT WE SAW WITH LOW-DOSE ASPIRIN.
22   Q.    CAN YOU EXPLAIN TO THE JURY -- I CAN'T REMEMBER IF THIS
23   HAS COME UP IN ANY OF THE VIDEOS OR NOT -- WHAT A DSMB, OR DATA
24   SAFETY MONITORING BOARD, IS?
25   A.    THAT'S AN EXTERNAL GROUP OF EXPERTS.  WE PUT THOSE

1   TOGETHER FOR SOME OF OUR TRIALS, AND THEY BASICALLY MONITOR THE

2   SAFETY DATA AS IT'S COMING THROUGH DURING CLINICAL TRIALS TO

3   ENSURE PATIENT SAFETY.  SO THEY HAVE ACCESS TO THE DATA IN AN

4   ONGOING BASIS.

5           IN THE PARTICULAR CASE OF THE VIGOR DSMB -- THERE WAS

6   AN DSMB -- THEY MONITORED THE DATA AS TREATMENT GROUP A VERSUS

7   TREATMENT GROUP B.  THEY LOOKED AT THE GI DATA; THEY LOOKED AT

8   OTHER SAFETY DATA, INCLUDING THE CARDIOVASCULAR DATA, ON AN

9   ONGOING BASIS.  THEY WERE PEOPLE EXTERNAL TO MERCK:

10  RHEUMATOLOGISTS, CLINICAL TRIALISTS -- EXPERTS IN CLINICAL

11  TRIALIST, STATISTICIANS.  AND ALL THEM EXTERNAL TO MERCK.

12          THERE WAS A MERCK STATISTICIAN WHO DID THE ANALYSES

13  AND -- BUT SHE, ONCE SHE DID THOSE, COULDN'T DISCUSS ANY OF THE

14  DATA THAT SHE WAS SEEING WITH ANYBODY ELSE IN MERCK.

15  **Q.**   AND WHAT WAS HER NAME?

16  **A.**   THAT WOULD BE DR. DEBORAH SHAPIRO.

17  **Q.**   DID SHE HAVE ANY VOTING RIGHT OR ANY SAY ON THE DSMB IN

18  TERMS OF HOW THEY WOULD INTERPRET THE DATA?

19  **A.**   SHE HAD NO VOTING RIGHT.  HER JOB WAS TO PRESENT THEM THE

20  DATA.  THEY ASKED FOR ADDITIONAL ANALYSES.  SHE WOULD DO THOSE

21  ANALYSES FOR THEM AND PRESENT THAT DATA TO THEM.

22  **Q.**   DID THERE COME A TIME, DR. REICIN, WHEN YOU REVIEWED

23  MINUTES OF ONE OF THE BOARD MEETINGS THAT OCCURRED WHERE THE

24  DSMB MET THAT ADDRESSED THE QUESTION ABOUT TREATMENT A AND

25  TREATMENT B IN THE VIGOR TRIAL?

1    **A.**   IN THE SPRING OF 2000, WE MET WITH THE FDA TO REVIEW THE

2    DATA, THE VIGOR CARDIOVASCULAR DATA WITH THEM, GI DATA.  THIS

3    WAS RIGHT BEFORE WE PUT IN OUR FILING IN JUNE OF 2000.  AND AT

4    THAT MEETING, THEY SAID THEY WANTED TO SEE ALL THE MINUTES OF

5    THE DATA SAFETY MONITORING BOARD MEETINGS.

6            THAT WAS THE FIRST TIME I SAW THEM, RIGHT BEFORE THEY

7    WENT DOWN TO THE FDA.

8    **Q.**   IF YOU WOULD TURN TO -- THIS IS PROBABLY IN THE SECOND

9    BINDER -- EXHIBIT P1-430.

10           **MR. GOLDMAN:**  THIS IS A PLAINTIFF'S EXHIBIT WHICH

11   WE'LL OFFER.

12           **MR. ROBINSON:**  WE HAVE NO OBJECTION.

13           **THE COURT:**  LET IT BE ADMITTED.

14   BY MR. GOLDMAN:

15   **Q.**   ON THE SCREEN HERE IS A MEMO FROM DR. MICHAEL WEINBLATT TO

16   A NUMBER OF PEOPLE.  WHO IS DR. MICHAEL WEINBLATT?

17   **A.**   HE IS A WELL-KNOWN, WELL-RESPECTED RHEUMATOLOGIST FROM

18   HARVARD MEDICAL SCHOOL.

19   **Q.**   IS HE WRITING TO OTHER MEMBERS ON THE DSMB?

20   **A.**   YES, HE IS.  AND, YES, THAT'S CORRECT.

21   **Q.**   SO HERE WE ARE NOW, THIS IS DECEMBER 1999, AND SO IT'S

22   AFTER VIOXX WAS APPROVED?

23   **A.**   CORRECT.

24   **Q.**   BUT BEFORE YOU LEARNED ABOUT THE RESULTS OF THE VIGOR

25   TRIAL?

DAILY COPY

1  **A.**   CORRECT.  I LEARNED ABOUT THE RESULTS OF THE VIGOR TRIAL

2  IN MARCH OF 2000.

3  **Q.**   IF YOU TURN TO THE FIRST PARAGRAPH -- ACTUALLY THE THIRD

4  PARAGRAPH, DO YOU SEE THAT DR. WEINBLATT WRITES AT THE

5  BEGINNING:  "NONE OF THE MEMBERS BELIEVE THAT THE TRIAL SHOULD

6  BE STOPPED" -- WHAT TRIAL ARE YOU TALKING ABOUT THERE?

7  **A.**   THE VIGOR TRIAL.

8  **Q.**   -- "BASED ON THESE RESULTS, AND MEMBERS EXPRESS THE BELIEF

9  THAT THE DIFFERENCES MAY BE DUE TO A CARDIOPROTECTIVE EFFECT OF

10  TREATMENT B."  DID THE DSMB NOT KNOW WHAT DRUG WAS IN

11  TREATMENT B VERSUS TREATMENT A?

12  **A.**   WELL, THEY DIDN'T KNOW, BUT THEY DID KNOW.  THEY DIDN'T

13  KNOW BECAUSE IT WAS TREATMENT A VERSUS TREATMENT B; HOWEVER,

14  THEY WERE LOOKING AT THE GI DATA, AND THEY SAW THAT TREATMENT B

15  HAD A LOWER INCIDENCE OF GI EVENTS COMPARED TO TREATMENT A.

16  AND SINCE THE HYPOTHESIS WAS THAT NAPROXEN WOULD HAVE A LOWER

17  INCIDENCE COMPARED TO VIOXX, I'M SURE THEY MADE SOME

18  ASSUMPTIONS.

19  **Q.**   WHERE VIOXX WOULD HAVE A LOWER INCIDENCE --

20  **A.**   YES, I'M SORRY, WHERE VIOXX WOULD HAVE -- I THINK I MESSED

21  THAT UP.  TREATMENT B HAD A HIGHER INCIDENCE OF GI EVENTS

22  COMPARED TO TREATMENT A, AND SINCE OUR HYPOTHESIS WAS THAT

23  TREATMENT A WOULD HAVE A LOWER INCIDENCE, I THINK -- VIOXX

24  WOULD HAVE A LOWER INCIDENCE, I THINK THEY PROBABLY ASSUMED

25  THAT TREATMENT B WAS NAPROXEN.

1   **Q.**   SO HERE IS THE DSMB SAYING THEIR VIEW IN DECEMBER OF 1999

2   THAT THE DIFFERENCES IN THE CARDIOVASCULAR RESULTS MIGHT BE DUE

3   TO WHAT?

4   **A.**   THE CARDIOPROTECTIVE EFFECT OF TREATMENT B.

5   **Q.**   AND THEN FURTHER DOWN, DR. WEINBLATT SUGGESTS THAT AN

6   ANALYSIS PLAN -- DO YOU SEE THAT THE DSMB AGREED THAT IT IS

7   IMPORTANT THAT THIS ANALYSIS PLAN BE DEVELOPED?  DO YOU SEE

8   THAT, DR. REICIN?

9   **A.**   THAT'S CORRECT.

10  **Q.**   CAN YOU JUST BRIEFLY DESCRIBE WHAT THIS ANALYSIS PLAN WAS

11  THAT THE DSMB WAS RECOMMENDING MERCK IMPLEMENT?

12  **A.**   THEY ASKED THAT WE HAVE AN ANALYSIS PLAN FOR LOOKING AT

13  THE CARDIOVASCULAR EVENTS SPECIFICALLY IN THE VIGOR TRIAL.  YOU

14  WOULD PUT IN THAT PLAN HOW YOU PLANNED TO ANALYZE THE DATA,

15  WHAT THE CUTOFF DATE WOULD BE FOR THE EVENTS IN THE ANALYSIS,

16  AND OTHER DETAILS LIKE THAT.

17  **Q.**   AND DID MERCK DO THAT?

18  **A.**   YES, WE DID.

19  **Q.**   IF YOU TURN, DR. REICIN, TO DEFENSE EXHIBIT 1114, WHICH IS

20  A SERIES OF E-MAILS.  LET ME MAKE SURE I'M ON THE RIGHT ONE

21  HERE.  YES, I AM.

22          **MR. GOLDMAN:**  MARK, IT'S DEFENSE EXHIBIT 114, WHICH

23  WE OFFER.

24          **MR. ROBINSON:**  I HAVE NO OBJECTION.

25          **THE COURT:**  LET IT BE ADMITTED.

1  BY MR. GOLDMAN:

2  Q.   DOWN AT THE BOTTOM OF THIS E-MAIL CHAIN, DR. REICIN, IS AN

3  E-MAIL FROM SOMEBODY NAMED DAVID -- HOW DO YOU PRONOUNCE HIS

4  LAST NAME?

5  A.   BJORKMAN.

6  Q.   AND HIS E-MAIL ADDRESS REFERS TO UTAH.EDU.  SO WHAT IS

7  HE --

8  A.   HE'S A PROFESSOR AT THE UNIVERSITY OF UTAH.

9  Q.   AND WHAT WAS HIS ROLE, IF ANY, WITH REGARD TO VIOXX?

10 A.   HE'S A GASTROENTEROLOGIST WHO SERVED ON THE DATA SAFETY

11 MONITORING BOARD FOR THE VIGOR STUDY.

12 Q.   NOW, HE'S WRITING TO DEBORAH SHAPIRO YOU REFERRED TO

13 BEFORE; RIGHT?

14 A.   THAT'S CORRECT.

15 Q.   A STATISTICIAN?

16 A.   THAT'S CORRECT.

17 Q.   AND HE'S REFERRING TO A CONFERENCE CALL.  AND HE SAYS

18 HERE, "I THINK THAT THE VIGOR STUDY UNMASKED THE ANTITHROMBOTIC

19 EFFECTS OF NAPROXEN."  DO YOU SEE THAT?

20 A.   YES, I DO.

21 Q.   AND THEN HE CONTINUES AND SAYS, "THE TRUTH IS THAT THIS IS

22 A CLASS EFFECT THAT RESULTS FROM ALTERATIONS IN THROMBOXANE AND

23 PROSTACYCLIN LEVELS THAT ARE DIFFERENT BETWEEN NAPROXEN AND

24 ROFECOXIB."  IS HE TALKING ABOUT THE IMBALANCE THEORY THERE OR

25 SOMETHING ELSE?

1   **A.**   HE'S TALKING ABOUT THE FACT THAT IT WOULD BOTH DECREASE

2   FROM PROSTACYCLIN, BUT ONLY NAPROXEN WOULD DECREASE THROMBOXANE

3   TO THE SAME DEGREE AS ASPIRIN AND, THEREFORE, ACT AS A

4   CARDIOPROTECTIVE AGENT.

5   **Q.**   THEN IN THE NEXT PARAGRAPH, DR. -- BJORKMAN?

6   **A.**   BJORKMAN.

7   **Q.**   -- BJORKMAN SAYS, "I WAS VERY IMPRESSED WITH THE WAY THAT

8   YOU DEALT WITH THIS ISSUE FROM THE ETHICAL AND SAFETY

9   STANDPOINT.  I THINK THAT YOU AND MIKE" -- DO YOU KNOW WHO MIKE

10  IS?

11  **A.**   THAT WOULD BE MIKE WEINBLATT.

12  **Q.**   -- "DID A GREAT JOB IN POINTING THIS ISSUE OUT TO THE

13  COMPANY, AND I THINK THAT MERCK IS TAKING THE HIGH ROAD THAT

14  WILL, AT LEAST IN THE LONG RUN, BE MOST PROFITABLE."

15          LET'S SWITCH NOW TO THE ALZHEIMER'S STUDIES, WHICH WE

16  TALKED A LITTLE BIT ABOUT BEFORE.  THERE HAS BEEN TESTIMONY IN

17  THE CASE ABOUT ALL-CAUSE MORTALITY.  AND DR. SCOLNICK WAS ASKED

18  QUESTIONS ABOUT IT.  WHAT IS ALL-CAUSE MORTALITY, DR. REICIN?

19  **A.**   THAT MEANS DEATH FROM ANY CAUSE.

20  **Q.**   IS THAT SOMETHING THAT MERCK TYPICALLY LOOKS AT WHEN IT

21  CONDUCTS -- OR WHEN INDEPENDENT INVESTIGATORS CONDUCT CLINICAL

22  TRIALS?

23  **A.**   WE ALWAYS COLLECT MORTALITY DATA.

24  **Q.**   WHEN YOU COLLECTED MORTALITY DATA IN THE VIOXX TRIALS --

25  LET'S SAY THE ALZHEIMER'S TRIALS, LET'S SAY THAT ONE OF THE

1   PATIENTS IN THE VIOXX ARM GOT HIT BY LIGHTNING AND DIED --

2   WOULD THAT DEATH BE COUNTED AGAINST VIOXX?

3   **A.**   YES, IT WOULD.   IT DOESN'T MEAN THAT VIOXX CAUSED IT, BUT

4   IF YOU COUNTED UP THE NUMBER OF DEATHS ON VIOXX, THAT WOULD BE

5   ONE OF THEM.

6   **Q.**   I WANT TO SHOW YOU JUST SOME EXCERPTS.

7          **MR. GOLDMAN:**   MARK, THIS IS DEFENSE EXHIBIT 314.   AND

8   IT'S FROM MERCK'S DECEMBER 17, 2003, SUBMISSION TO THE FDA,

9   WHICH IS 1400 PAGES.   SO I'M JUST GOING TO MARK A FEW PAGES,

10   AND WE CAN GO THROUGH IT AT THE BREAK.

11          **MR. ROBINSON:**   WHAT WAS THE NUMBER AGAIN?

12          **MR. GOLDMAN:**   314.

13          **MR. ROBINSON:**   HE CAN PLAY PARTS OF IT, YOUR HONOR.

14   IT'S THICK.

15   **BY MR. GOLDMAN:**

16   **Q.**   LET ME JUST SHOW YOU THE FIRST PAGE SO WE CAN DISCUSS WHAT

17   THIS IS.   WHAT DOES THE FIRST PAGE OF THIS DOCUMENT SHOW?   IT'S

18   DATED DECEMBER 17, 2003.

19   **A.**   THIS SAYS THAT IT'S A RESPONSE TO FDA REQUEST FOR

20   INFORMATION.

21   **Q.**   AND IF WE TURN TO THE 42nd PAGE OF THIS, THERE IS A

22   SECTION CALLED "ALL-CAUSE MORTALITY."   DO YOU SEE THAT?   ARE

23   YOU WITH ME?

24   **A.**   YES.

25   **Q.**   SO IT'S ALL-CAUSE MORTALITY.   AND JUST SO WE'RE CLEAR, UP

1  AT THE TOP MERCK IS PROVIDING THE FDA WITH INFORMATION FROM THE

2  ALZHEIMER'S TRIALS?

3  **A.**   CORRECT.  WE HAD BEEN PROVIDING THEM INFORMATION ON AN

4  ONGOING BASIS FROM THOSE STUDIES.  THIS WAS THE FINAL REPORT, A

5  COMBINED SAFETY ANALYSIS FROM ALL OF THE STUDIES.  ALL OF THE

6  STUDIES HAD BEEN EITHER COMPLETED AND WERE NO LONGER ONGOING AT

7  THIS POINT IN TIME.

8  **Q.**   WHAT DOES MERCK SAY HERE?  I CULLED OUT A PORTION OF THE

9  THIRD PARAGRAPH.  WHAT DO THEY SAY HERE -- WHAT DO YOU SAY TO

10  THE FDA ABOUT THE NUMBER OF DEATHS FROM ALL CAUSES?

11  **A.**   THIS IS -- IT SAYS THERE WERE 41 ON VIOXX AND 23 ON

12  PLACEBO.

13  **Q.**   AND DO YOU INDICATE TO THE FDA WHETHER THE DIFFERENCE SEEN

14  IN ALL-CAUSE MORTALITY WAS STATISTICALLY SIGNIFICANT?

15  **A.**   YES, WE DO.

16  **Q.**   WAS IT?

17  **A.**   YES, IT WAS.  IT WAS HIGHER ON VIOXX THAN IT WAS ON

18  PLACEBO.

19  **Q.**   AND THEN IF WE TURN TO PAGE 43, WHICH I THINK IS THE NEXT

20  PAGE, THERE IS A TABLE, TABLE 11.  WHAT IS THIS TABLE MEANT TO

21  SHOW?

22  **A.**   THIS SHOWS THE SPECIFIC CAUSES OF DEATH FOR PATIENTS THAT

23  OCCURRED IN -- WHILE PATIENTS WERE ON DRUG OR WITHIN 14 DAYS OR

24  LESS DOSES OF STUDY DRUG, AND IT GIVES THE CAUSES.

25  **Q.**   SO THIS GIVES THE NUMBER OF DEATHS THAT OCCURRED WHILE

1    PATIENTS WERE TAKING VIOXX AND PLACEBO IN THE ALZHEIMER'S

2    TRIALS?

3    A.    IT'S VIOXX VERSUS PLACEBO.

4    Q.    AND SO IF WE JUST LOOK AT THE VERY FIRST LINE HERE OF THE

5    TABLE -- WE'LL LOOK THROUGH SOME OF THE OTHERS IN A MINUTE --

6    IT SAYS, "PATIENTS WITH ONE OR MORE ADVERSE EXPERIENCE:  36,

7    22."  36 ON VIOXX, 22 ON PLACEBO; RIGHT?

8    A.    THAT'S CORRECT.

9    Q.    THEN THERE WAS A REFERENCE TO 41 IN THE TEXT.  WHY IS

10   THAT?

11   A.    RIGHT.  SO THERE WERE A COUPLE OF ADDITIONAL EVENTS WITH

12   PATIENTS DIED, YOU KNOW, MANY DAYS, SOME EVEN UP TO -- I DON'T

13   KNOW -- CLOSE TO A YEAR AFTER THEY HAD TAKEN THEIR LAST DOSE OF

14   VIOXX BUT MAY HAVE HAD AN AE, AN ADVERSE EXPERIENCE, THAT

15   SOMEHOW WAS RELATED TO THE REASON THAT THEY DIED.  AND SO IN A

16   BLINDED MANNER, WITHOUT KNOWING WHETHER PATIENTS WERE ON VIOXX

17   OR PLACEBO, WE ADDED THOSE PATIENTS TO THE ANALYSES AS WELL.

18   WE CHOSE THE PATIENTS WHICH NEEDED TO BE ADDED BEFORE WE KNEW

19   WHAT THEY WERE ON, AND THEN WE UPDATED THE ANALYSES.

20   Q.    OKAY.

21   A.    AND THOSE ARE ON A SUBSEQUENT TABLE.

22   Q.    AND WE'LL GO TO THAT.  I THINK THAT'S ON THE NEXT PAGE.

23        SO I'M JUST GOING TO WRITE ON HERE, "ALL-CAUSE

24   MORTALITY IN THE ALZHEIMER'S STUDIES."  AND THE NUMBER THAT'S

25   LISTED FOR VIOXX ON THAT FIRST LINE OF THE TABLE IS WHAT?

1  A.   36.

2  Q.   AND THE NUMBER ON PLACEBO?

3  A.   22.

4  Q.   NOW, IF WE LOOK FURTHER DOWN IN THE TABLE, DR. REICIN,

5  LET'S LOOK AT A FEW OF THE EXAMPLES OF WHAT MAKES UP THAT 36.

6  OKAY?  DO YOU SEE HERE -- WELL, FIRST OF ALL, WHAT IS THE

7  TABLE -- HOW IS IT FORMATTED?  WHY IS THERE SOME THAT'S BOLD

8  AND SOME THAT ARE --

9  A.   THE BOLDS ARE KIND OF SPECIFIC GROUPINGS OF TERMS THAT

10  OCCUR BY OUR DICTIONARY AND BY BODY SYSTEM.  SO YOU HAVE

11  CARDIAC DISORDERS THAT GET GROUPED TOGETHER, GASTROINTESTINAL

12  DISORDERS, INFECTIONS, INJURY.  AND THAT BOLDED LINE WOULD BE

13  THE TOTAL NUMBER OF EVENTS IN THAT GROUPING ON VIOXX VERSUS

14  PLACEBO.

15  Q.   SO LET'S --

16  A.   AND THEN YOU HAVE THE SPECIFIC EVENTS LISTED BENEATH THEM.

17  Q.   LET'S LOOK AT "INFECTIONS AND INFESTATIONS."  WHAT IS THE

18  NUMBER OF DEATHS THAT OCCURRED IN PEOPLE WHO HAD INFECTIONS IN

19  THE VIOXX GROUP?

20  A.   6.

21  Q.   AND HOW MANY IN THE PLACEBO GROUP?

22  A.   ZERO.

23  Q.   AND THE TYPE OF INFECTIONS THAT ARE LISTED HERE ARE WHAT?

24  A.   PNEUMONIA.  EMPYEMA IS ACTUALLY -- IT'S RELATED TO

25  PNEUMONIA.  IT'S AN INFECTIOUS COMPLICATION OF PNEUMONIA.

1    ENDOCARDITIS IS ACTUALLY AN INFECTION OF ONE OF THE HEART

2    VALVES THAT CAN HAPPEN IF YOU GET BACTERIA IN YOUR BLOOD.

3    Q.   IS THERE ANY EVIDENCE, DR. REICIN, THAT YOU KNOW OF THAT

4    VIOXX CAUSES INFECTIONS AND THESE SORTS OF THINGS THAT ARE

5    LISTED IN THESE TABLE?

6    A.   NO.  IF YOU LOOK AT THE OVERALL INFECTIONS OR SERIOUS

7    INFECTIONS, THEY WERE SIMILAR BETWEEN THE TWO TREATMENT GROUPS.

8    IT WAS JUST THE MORTALITY THAT YOU SAW THAT WAS DIFFERENT.

9    Q.   AND THEN THE NEXT CATEGORY IS "INJURY, POISONING, AND

10   PROCEDURAL COMPLICATIONS," WHICH LISTS HOW MANY IN THE VIOXX

11   GROUP?

12   A.   5.

13   Q.   AND HOW MANY IN PLACEBO?

14   A.   ZERO.

15   Q.   AND IN THIS GROUP, THIS IS AN EXAMPLE OF SOMEBODY WHO DIED

16   AFTER AN ELECTRIC SHOCK; RIGHT?

17   A.   SOMEONE WHO WAS DOWN WORKING -- DOING SOME WOODWORKING

18   STUFF AND ACTUALLY GOT ELECTROCUTED.

19   Q.   AND THEN THERE'S SOMEBODY WHO HAD A HEAD INJURY; RIGHT?

20   A.   RIGHT.

21   Q.   AND PASSED AWAY FROM THAT?  AND OTHER TRAUMATIC TYPE

22   EVENTS?

23   A.   RIGHT.

24   Q.   IS THERE ANY SCIENTIFIC EVIDENCE, DR. REICIN, THAT VIOXX

25   HAS ANYTHING TO DO WITH ANY OF THE CONDITIONS LISTED HERE UNDER

1    "INJURIES AND POISONING"?

2    **A.**    NO.

3    **Q.**    SO IF WE JUST TAKE THOSE TWO CATEGORIES AND YOU LOOK AT

4    THE NUMBER OF DEATHS IN THE VIOXX ARM VERSUS THE PLACEBO ARM,

5    HOW MANY WERE IN VIOXX TOTAL?

6    **A.**    11.

7    **Q.**    SO IF YOU SUBTRACT 11 FROM 36 -- HOW MANY WERE IN PLACEBO?

8    **A.**    ZERO.

9    **Q.**    AND SO, THEN, WHAT WOULD THE TOTAL BE FOR ALL-CAUSE

10   MORTALITY IN THAT TABLE?

11   **A.**    25.

12   **Q.**    IS THERE ANY STATISTICAL SIGNIFICANCE OR CLINICAL

13   SIGNIFICANCE TO THOSE NUMBERS?

14   **A.**    NO.  THOSE WOULD NOT BE STATISTICALLY SIGNIFICANT.

15   **Q.**    YOU REFERRED BEFORE TO ANOTHER TABLE.  THE NEXT TABLE

16   IS -- BEAR WITH ME -- TABLE 12.  DO YOU REMEMBER YOU REFERRED

17   TO THE 5 OTHER CASES.  IF YOU ADD THE 36 PLUS 5, IT'S 41?

18   **A.**    THAT'S CORRECT.

19   **Q.**    IS THIS WHAT YOU'RE REFERRING TO?

20   **A.**    THAT'S CORRECT.

21   **Q.**    AND WHAT IS THIS TABLE SHOWING?  "PATIENTS WITH FATAL

22   OFF-DRUG ADVERSE EXPERIENCES POSSIBLY RELATED TO PREVIOUS

23   ON-DRUG ADVERSE EXPERIENCES"?

24   **A.**    WE WERE BEING EXTREMELY CONSERVATIVE.  I MUST SAY I GOT

25   SOME GRIEF FROM SOME OF MY COLLEAGUES WHO THOUGHT WE WERE

1    OVERLY CONSERVATIVE HERE.

2            WHAT WE SAID WAS -- IF YOU JUST TAKE THE FIRST ONE AS

3    AN EXAMPLE.  HERE IS SOMEONE WHO DIED FROM LUNG NEOPLASM,

4    MALIGNANT -- LUNG CANCER, BASICALLY.  THE LUNG CANCER -- THEN

5    HE DIED AND GOT DIAGNOSED WITH THE LUNG CANCER OFF DRUG.  BUT

6    WHILE THEY WERE ON DRUG WITHIN 14 DAYS, THEY HAD COUGH AND

7    BLOODY SPUTUM.  AND WE SAID, YOU KNOW, COUGH AND BLOODY SPUTUM

8    IS PROBABLY THE FIRST SIGN OF LUNG CANCER, AND SO --

9    Q.   OKAY.  AND THERE'S OTHERS:  OVARIAN CANCER, LEUKEMIA,

10   FUNGEMIA.  WHAT IS THAT?

11   A.   THAT MEANS FUNGUS IN YOUR BLOODSTREAM.  IT'S A VERY, VERY

12   SERIOUS INFECTION.

13   Q.   DO YOU KNOW FOR THIS PATIENT, PATIENT NUMBER 376, THE

14   CIRCUMSTANCES AROUND HIS DEATH OR HER DEATH?

15   A.   MY RECOLLECTION, THIS WAS A VERY TRAGIC CASE OF A PATIENT

16   WITH ALZHEIMER'S DISEASE WHO WAS LEFT BY A SPA, AND THERE WERE

17   BROMINE TABLETS THAT WERE USED TO CLEAN THE SPA.  HE ATE ONE OF

18   THE BROMINE TABLETS.  IT BURNED HIS ESOPHAGUS.  AND ONE OF THE

19   THINGS THAT HAPPENS WHEN YOU GET THAT TYPE OF SEVERE ESOPHAGEAL

20   BURN IS YOU'RE AT RISK OF GETTING SEVERE INFECTIONS, AND HE

21   DIED OF THE INFECTION.

22   Q.   AND SO WAS HIS DEATH COUNTED AGAINST VIOXX?

23   A.   YES, IT WAS.

24   Q.   LET ME SHOW YOU, DR. REICIN, EXHIBIT 268, WHICH WE'LL

25   OFFER.  DR. REICIN, I'VE PUT UP DEFENSE EXHIBIT 268.  DO YOU

1  RECOGNIZE THIS DOCUMENT AND WHO THE INDIVIDUALS ARE IN THIS

2  MEMO?

3  **A.**   THIS IS A MEMO FROM DR. VILLALBA.  THIS WAS THE SAME

4  DR. VILLALBA WHO WAS THE MEDICAL REVIEWER FOR THE VIGOR STUDY

5  AND PRESENTING IT TO THE ADVISORY COMMITTEE, SENDING IT TO

6  OTHER MEMBERS OF THE FDA.  IT'S HER REVIEW OF THE

7  CARDIOVASCULAR DATA FROM THE ALZHEIMER'S STUDIES.  I THINK IT'S

8  CARDIOVASCULAR MORTALITY DATA.

9  **Q.**   WHAT'S THE DATE OF THIS MEMO?

10  **A.**   THIS MEMO IS MARCH OF '02 BEFORE THE VIGOR LABEL CHANGE

11  WAS APPROVED IN APRIL OF '02.

12  **Q.**   SO BEFORE THE FDA APPROVED THE APRIL 2002 LABEL WITH THE

13  VIGOR INFORMATION, THEY PREPARED THIS MEMO ABOUT THE

14  ALZHEIMER'S STUDIES?

15  **A.**   THAT'S CORRECT.

16  **Q.**   AND IF WE LOOK TO SEE WHAT DR. VILLALBA HAD TO SAY ABOUT

17  THE ALL-CAUSE MORTALITY, THE FIRST SENTENCE, THE FIRST

18  PARAGRAPH, SHE WRITES:  "IN VIEW OF THE CARDIOVASCULAR FINDINGS

19  IN VIGOR, THE FDA HAS BEEN CONDUCTING A DETAILED REVIEW OF ALL

20  AVAILABLE DATA ON CARDIOVASCULAR THROMBOTIC EVENTS IN A

21  PLACEBO-CONTROLLED DATABASE OF APPROXIMATELY 3,000 PATIENTS

22  ENROLLED IN THREE STUDIES FOR THE PREVENTION OF ALZHEIMER'S

23  DISEASE."

24       AND THEN, IF WE TURN TO PAGE 2, DOCTOR, DO YOU SEE

25  HOW DR. VILLALBA IS WRITING A MEMO ABOUT TOTAL-CAUSE MORTALITY

DAILY COPY

1   AND ABOUT CARDIOVASCULAR DEATHS?  DO YOU SEE THAT?

2   **A.**   CORRECT.  THIS IS THE DATA THAT WAS AVAILABLE IN 2002.

3   **Q.**   AND WE CAN READ THROUGH THE ENTIRE SECTION, BUT DO YOU

4   KNOW BASICALLY WHAT SHE WAS SAYING ABOUT THE SIGNIFICANCE OF

5   TOTAL-CAUSE MORTALITY AND CARDIOVASCULAR DEATHS?

6   **A.**   WELL, SHE CAME TO THE SAME CONCLUSION THAT WE HAD COME TO,

7   WHICH WAS THERE WAS AN INCREASED INCIDENCE ON VIOXX VERSUS

8   PLACEBO, BUT THERE WASN'T A SPECIFIC PATTERN TO THE CAUSE OF

9   EVENTS.  SHE WAS INTERESTED -- SHE DID KNOW, HOWEVER, THE

10  NUMERIC INCREASE OF CARDIOVASCULAR EVENTS, AND WE DID PUT THE

11  CARDIOVASCULAR MORTALITY DATA, BOTH FROM VIGOR AND FROM

12  ALZHEIMER'S, IN THE LABEL.

13  **Q.**   SO HERE DR. VILLALBA SAYS, "REVIEW OF THE CAUSES OF DEATH

14  DID NOT SUGGEST A PARTICULAR PATTERN, WITH THE POSSIBLE

15  EXCEPTION OF CARDIOVASCULAR DEATHS."  AND THEN DOWN HERE, DOES

16  SHE INDICATE, OF THE CARDIOVASCULAR DEATHS, 8 TO 4 WERE

17  THROMBOTIC DEATHS?

18  **A.**   CORRECT.  I THINK THE NUMBER WAS 8 TO 3.

19  **Q.**   AND IS THAT INFORMATION IN THE LABEL THAT WE LOOKED AT

20  BEFORE?

21  **A.**   8 VERSUS 3 IS IN THE LABEL; CORRECT.

22  **Q.**   IF THE FDA WANTED MERCK TO INCLUDE THESE ALL-CAUSE

23  MORTALITY NUMBERS, COULD THEY HAVE INSISTED THAT MERCK DO THAT?

24  **A.**   YES.

25  **Q.**   LET ME TURN TO PLAINTIFF'S EXHIBIT 1-1916, WHICH IS

1  ALREADY ADMITTED.  DO YOU RECOGNIZE THIS, DR. REICIN, AS AN

2  INTERIM REVIEW BY THE FDA, DECEMBER 18, 2004, UPDATING

3  CARDIOVASCULAR THROMBOTIC EVENTS IN THE ALZHEIMER'S TRIALS?

4  **A.**   RIGHT.  THESE STUDIES HAD BEEN COMPLETED, AND I THINK WE

5  LOOKED AT THE 2003 MEMO WITH THE UPDATED INFORMATION THAT WE

6  HAD PROVIDED TO THE FDA.  THIS WAS DR. VILLALBA'S REVIEW OF

7  THAT DATA.

8  **Q.**   AND THEN IF YOU TURN TO THE SEVENTH PAGE OF THIS, IN THE

9  SECOND PARAGRAPH, DO YOU SEE THAT THE FDA, OR DR. VILLALBA, IS

10 SAYING, "ALTHOUGH THE NUMBERS ARE SMALL, THERE IS GREATER

11 NUMBER OF CARDIOVASCULAR THROMBOTIC DEATHS IN THE VIOXX

12 25-MILLIGRAM GROUP AS COMPARED TO PLACEBO.  OF NOTE, THERE WERE

13 8 VERSUS 4 CASES OF SUDDEN CARDIAC DEATH."

14          AND THEN SHE SAYS, "THE FINDING OF MORE

15 CARDIOVASCULAR DEATHS IN THE ALZHEIMER'S STUDIES IS NOT

16 CONSISTENT WITH OTHER STUDIES, SUCH AS VIGOR AND APPROVE, IN

17 WHICH THE NUMBER OF CARDIOVASCULAR DEATHS WAS THE SAME IN VIOXX

18 AS COMPARED TO NAPROXEN AND VIOXX AS COMPARED TO PLACEBO."

19          IS IT YOUR UNDERSTANDING, DR. REICIN -- LET ME ASK IT

20 THIS WAY:  ARE YOU AWARE OF ANY OTHER CLINICAL TRIAL FOR VIOXX

21 WHERE THERE WAS A STATISTICALLY SIGNIFICANT INCREASE IN

22 ALL-CAUSE MORTALITY IN THE VIOXX GROUP VERSUS THE COMPARATOR

23 GROUP?

24 **A.**   I'M NOT AWARE OF ANY OTHER TRIAL WITH A SIGNIFICANT

25 INCREASE FOR A DATABASE.  WE LOOKED AT OUR RA DATABASE.  WE

1   LOOKED AT OUR OA DATABASE.  IN FACT, THE ONLY OTHER DATABASE

2   WHERE THERE WAS A SIGNIFICANT DIFFERENCE WAS IN OA WHERE THE

3   RATES WERE LOWER ON VIOXX THAN THE COMPARATOR NSAID.  THAT WAS

4   FOR OVERALL MORTALITY.

5   **Q.**   FINALLY, THE LAST THING I WANT TO ASK YOU ABOUT THIS

6   DOCUMENT, DOCTOR, IS IN THE CONCLUSIONS, WHERE DR. VILLALBA

7   WRITES:  "BASED ON THIS INTERIM REVIEW OF AVAILABLE DATA FROM

8   PLACEBO-CONTROLLED STUDIES IN PATIENTS WITH EITHER ESTABLISHED

9   ALZHEIMER'S DISEASE OR MILD COGNITIVE IMPAIRMENT, AS SUBMITTED

10  BY MERCK ON MARCH 30, 2000, IT APPEARS THAT UP TO THE TIME OF

11  THE APPROVE STUDY, THE CARDIOVASCULAR SAFETY SIGNAL WITH VIOXX

12  DID NOT WARRANT A REGULATORY ACTION BY FDA."

13  **A.**   CAN YOU REPEAT THE QUESTION THAT YOU ASKED ME ABOUT THIS.

14  **Q.**   I WAS JUST GOING TO ASK YOU WHETHER YOU WERE AWARE OF THIS

15  CONCLUSION IN DECEMBER OF 2004.

16  **A.**   I CAN'T REMEMBER EXACTLY WHEN I READ IT.  SOMEWHERE AROUND

17  THAT TIME, I DID READ THIS.

18  **Q.**   DID THE FDA, AFTER THE VIGOR TRIAL CAME OUT, APPROVE VIOXX

19  AS A SAFE AND EFFECTIVE MEDICINE ON A FEW OCCASIONS?

20  **A.**   YES, THEY DID.

21  **Q.**   CAN YOU TAKE A LOOK AT DEFENSE EXHIBIT 277.

22          **MR. GOLDMAN:**  WHICH IS THE APPROVAL LETTER, MARK,

23  WHICH WE OFFER.

24          **MR. ROBINSON:**  NO OBJECTION.

25          **THE COURT:**  LET IT BE ADMITTED.

1   BY MR. GOLDMAN:

2   Q.   DO YOU SEE THAT -- I'M GOING TO CULL IT OUT.  ON THIS FAX

3   COVER SHEET, THERE IS AN E-MAIL -- FAX COVER SHEET FROM BARBARA

4   GOULD TO DR. BRAUNSTEIN, AND IT REFERENCES THE APPROVAL LETTER

5   HERE?

6   A.   YES, I DO SEE THAT.

7   Q.   AND IT'S APRIL 11, 2002?

8   A.   THAT'S CORRECT.

9   Q.   AND IS THIS THE APPROVAL LETTER THAT IS NOW ON THE SCREEN,

10  THE SECOND PAGE OF THE DOCUMENT?

11  A.   YES, IT IS.

12  Q.   AND DO YOU SEE HERE THE FDA SAYS, "WE HAVE COMPLETED THE

13  REVIEW OF THESE SUPPLEMENTAL APPLICATIONS."  WHAT WAS THAT FOR

14  AT THIS TIME?

15  A.   WELL, THIS WAS FOR THE VIGOR STUDY.  IT WAS ALSO WE HAD

16  SUBMITTED OUR PHASE II AND PHASE III TRIALS FOR RHEUMATOID

17  ARTHRITIS, AND THERE MAY HAVE BEEN SOME OTHER CLINICAL

18  PHARMACOLOGY STUDIES THAT WE SUBMITTED AT THE SAME TIME.  I

19  JUST CAN'T RECALL.  AND THEY WERE BASICALLY CONCLUDING THAT THE

20  DRUG WAS SAFE AND EFFECTIVE FOR USE IN RHEUMATOID ARTHRITIS,

21  AND THEY WERE PUTTING THE VIGOR GI AND CARDIOVASCULAR

22  INFORMATION INTO THE LABEL.

23  Q.   LET ME DIRECT YOUR ATTENTION TO DEFENSE EXHIBIT 321, WHICH

24  IS AN APPROVAL LETTER -- APPROVABLE LETTER FROM MARCH OF 2004.

25          MR. GOLDMAN:  WHICH WE OFFER.

1          MR. ROBINSON:  NO OBJECTION.

2          THE COURT:  LET IT BE ADMITTED.

3    BY MR. GOLDMAN:

4    Q.   IS THIS, DR. REICIN, AN APPROVAL LETTER FROM THE FDA

5    APPROVING VIOXX FOR ANOTHER USE IN MARCH OF 2004?

6    A.   YOU HAVE TO GO FURTHER DOWN FOR ME TO SEE THE -- I CAN'T

7    TELL FROM WHAT YOU'VE PUT UP ON THE SCREEN.

8          OH, YES.  THAT IS WHAT IT IS.  THIS IS APPROVAL FOR

9    THE USE OF VIOXX FOR THE TREATMENT OF ACUTE MIGRAINE ATTACKS.

10   Q.   AND THEN IN AUGUST OF 2004, A MONTH BEFORE MERCK WITHDREW

11   THE MEDICINE, DID THE FDA APPROVE VIOXX AGAIN FOR A DIFFERENT

12   USE?

13   A.   THEY APPROVED VIOXX FOR THE USE AND THE TREATMENT OF

14   JUVENILE RHEUMATOID ARTHRITIS, WHICH IS A TYPE OF AUTOIMMUNE

15   ARTHRITIS IN CHILDREN.

16   Q.   DIRECTING YOUR ATTENTION TO DEFENSE EXHIBIT 324 --

17         MR. GOLDMAN:  WHICH WE OFFER.

18         MR. ROBINSON:  NO OBJECTION.

19         THE COURT:  LET IT BE ADMITTED.

20   BY MR. GOLDMAN:

21   Q.   -- IS EXHIBIT 324, DR. REICIN, AN APPROVAL LETTER BY THE

22   FDA FOR THE TREATMENT OF JUVENILE RHEUMATOID ARTHRITIS?

23   A.   YES, THIS IS AN APPROVAL LETTER FOR JUVENILE -- OR

24   TREATMENT OF JUVENILE RHEUMATOID ARTHRITIS.

25   Q.   LET ME JUST PUT UP THE MAGNET ON THE BOARD THE DIFFERENT

DAILY COPY

2328

1   APPROVAL LETTERS THAT YOU JUST REFERRED TO.  ONE WAS IN APRIL

2   OF 2002.  AND ONE WAS IN MARCH OF 2004?

3   A.   THAT'S CORRECT.

4   Q.   AND THE FOURTH APPROVAL BY THE FDA WAS IN AUGUST OF 2004?

5   A.   CORRECT.

6   Q.   LET ME ASK YOU A FEW QUESTIONS, DR. REICIN, ABOUT A CV

7   OUTCOMES STUDY.  OKAY?  THERE HAS BEEN SOME TESTIMONY ABOUT CV

8   OUTCOMES TRIALS.  WHAT IS A CV OUTCOME TRIAL?

9   A.   "CV" STANDS FOR CARDIOVASCULAR, SO A CARDIOVASCULAR

10  OUTCOMES STUDY WOULD BE A STUDY WHERE YOU -- WOULD BE A TRIAL

11  WHERE YOU PRE-SPECIFY THAT YOU WERE GOING TO EVALUATE

12  CARDIOVASCULAR OUTCOMES AS YOUR PRIMARY ENDPOINT.

13  Q.   WERE YOU AWARE OF PEOPLE IN THE MEDICAL COMMUNITY WHO

14  THOUGHT THAT IT MIGHT BE A GOOD IDEA FOR MERCK TO DO A

15  CARDIOVASCULAR OUTCOME STUDY?

16  A.   YES, I AM AWARE OF PEOPLE WHO ARE -- WHO THOUGHT WE SHOULD

17  DO A CARDIOVASCULAR OUTCOMES STUDY.  THERE WERE PEOPLE IN THE

18  COMPANY WHO ALSO THOUGHT WE SHOULD DO A CARDIOVASCULAR OUTCOME

19  STUDY.

20  Q.   AND DID THE COMPANY DO A CARDIOVASCULAR OUTCOME STUDY,

21  DR. REICIN?

22  A.   WE DID WHAT I BELIEVE WAS OUR CARDIOVASCULAR OUTCOME

23  STUDY.  IT WAS CALLED PROTOCOL 203.

24  Q.   WHAT WAS PROTOCOL 203?

25  A.   PROTOCOL 203 WAS A PROTOCOL THAT HAD AS ITS PRIMARY

1    HYPOTHESIS AND ITS PRIMARILY ENDPOINT CARDIOVASCULAR OUTCOMES,

2    AND THE PRE-SPECIFIED HYPOTHESIS WAS THAT THE CARDIOVASCULAR

3    OUTCOMES IN -- ON VIOXX WOULD BE SIMILAR TO THOSE ON PLACEBO.

4            SO WE PRE-SPECIFIED IN THIS PROTOCOL WHAT THE

5    ENDPOINT WOULD BE, HOW WOULD WE -- AND HOW WOULD WE ANALYZE IT.

6    NOW, THIS WASN'T JUST ONE TRIAL.  THIS WAS THREE TRIALS, AND WE

7    WERE GOING TO POOL THE RESULTS OF THOSE THREE TRIALS.

8    Q.   WHY?

9    A.   WELL, BASICALLY, SO THAT WE WOULD GET THE RESULTS SOONER.

10           YOU NEED A CERTAIN NUMBER OF EVENTS IN ORDER FOR YOU

11   TO BE SURE THAT YOU WERE POWERED ENOUGH TO ACTUALLY SAY THERE

12   WAS NO DIFFERENCE BETWEEN TWO GROUPS.  YOU NEED MANY MORE

13   EVENTS TO SAY THAT YOU'RE THE SAME AS SOMETHING THAN TO SHOW

14   THAT YOU ARE DIFFERENT THAN SOMETHING.

15           AND WE INITIALLY THOUGHT ABOUT JUST DOING IT IN ONE

16   TRIAL, WHICH WAS A TRIAL FOR PROSTATE CANCER WITH 15,000

17   PATIENTS.  THAT WAS -- THAT TRIAL WAS DESIGNED TO LOOK AT

18   WHETHER VIOXX COULD PREVENT PROSTATE CANCER.  WE COULD HAVE HAD

19   A SECONDARY HYPOTHESIS IN THAT TRIAL OR SECOND CO-PRIMARY

20   HYPOTHESIS LOOKING AT CARDIOVASCULAR OUTCOMES, BUT IT WOULD

21   HAVE TAKEN US LONGER TO GET THE RESULTS.

22           WE HAD, AT THE SAME TIME, APPROVE THAT WAS ALREADY

23   ONGOING AND HAD BEEN STARTED IN 2000, WHICH WAS ALSO A

24   CHEMO-PREVENTION STUDY.  IN THIS CASE WE WERE LOOKING AT

25   WHETHER VIOXX COULD PREVENT PATIENTS WHO HAD COLON POLYPS,

2330

 1  WHICH ARE PRECURSORS TO CANCER, FROM GETTING CURRENT COLON

 2  POLYPS.

 3          THERE WAS AN ADDITIONAL STUDY CALLED VICTOR WHICH WAS

 4  GOING TO BE RUN BY OXFORD LOOKING AT PATIENTS -- IT WAS ANOTHER

 5  CHEMO-PREVENTION STUDY.

 6          IF WE ADDED -- AND WE ALREADY HAD -- WE HAD

 7  CARDIOVASCULAR EVENTS FROM APPROVE.  AND SO IF WE ADDED THE

 8  EVENTS FROM APPROVE AND THE EVENTS WE THOUGHT WE GOT FROM

 9  VICTOR, YOU'D MEET YOUR NUMBER OF PRE-SPECIFIED ENDPOINTS

10  EARLIER AND YOU WOULD GET THE RESULTS FROM THE STUDY EARLIER.

11  **Q.**   YOU MENTIONED THAT THE APPROVE STUDY BEGAN WHEN?

12  **A.**   THE APPROVE STUDY BEGAN IN JANUARY, I BELIEVE, OF 2000.

13  **Q.**   THAT WAS EVEN BEFORE THE VIGOR RESULTS CAME OUT?

14  **A.**   THAT IS CORRECT.  THAT'S MY RECOLLECTION, AT LEAST.

15  **Q.**   WAS THE FDA INVOLVED, DR. REICIN, AND DID YOU NEED TO

16  INFORM THEM ABOUT PROTOCOL 203?

17  **A.**   WE DID DISCUSS PROTOCOL 203 WITH THEM.

18  **Q.**   WERE THEY IN FAVOR OF PROCEEDING DOWN THAT PATH TO ASSESS

19  CARDIOVASCULAR RISKS?

20  **A.**   THEY BELIEVED THAT THIS WAS AN APPROPRIATE -- THE

21  APPROPRIATE SIZE AND TYPE OF DATABASE THAT WE WOULD WANT TO

22  ASSESS THE CARDIOVASCULAR RISKS, YES.

23  **Q.**   LET'S JUST TALK NOW ABOUT THE APPROVE STUDY.  THE JURY HAS

24  HEARD ABOUT THAT.  WHAT WAS THE RESULT -- AT LEAST, AS OF THE

25  TIME THAT VIOXX WAS WITHDRAWN, WHAT WAS THE RESULT IN THE

1    APPROVE STUDY CONCERNING THE BENEFITS IN TERMS OF CANCER, COLON

2    POLYPS?

3    **A.**    IT DID PREVENT COLON POLYPS COMPARED WITH PLACEBO.

4    **Q.**    AND WHAT ABOUT THE CARDIOVASCULAR RESULTS?  WHEN DID YOU

5    LEARN ABOUT THE CARDIOVASCULAR RESULTS OF APPROVE AND WHAT DID

6    THEY SHOW?

7    **A.**    I LEARNED OF THE CARDIOVASCULAR RESULTS OF APPROVE IN

8    SEPTEMBER OF 2004, AND THEY SHOWED THAT THERE WAS A

9    SIGNIFICANT -- SIGNIFICANTLY HIGHER RATE OF SERIOUS THROMBOTIC

10   CARDIOVASCULAR EVENTS ON VIOXX COMPARED WITH PLACEBO.

11   **Q.**    HOW DID YOU LEARN THAT RESULT, DR. REICIN, AND WHAT WAS

12   YOUR REACTION?

13   **A.**    I WAS DRIVING IN TO WORK AND I WAS CHECKING MY

14   VOICE-MAILS, AND THERE WAS A VOICE-MAIL MESSAGE FROM MY BOSS,

15   WHO WAS SENDING ME A VOICE-MAIL THAT HE HAD RECEIVED FROM THE

16   CLINICAL MONITOR FROM THE APPROVE STUDY.  HE HAD RECEIVED A

17   CALL FROM THE HEAD OF THE ADMINISTRATIVE COMMITTEE, AN EXTERNAL

18   OVERSIGHT COMMITTEE OF THE APPROVE STUDY, RECOMMENDING THAT WE

19   STOP THE STUDY EARLY BECAUSE THERE WAS AN INCREASED INCIDENCE

20   OF CARDIOVASCULAR EVENTS SEEN ON VIOXX COMPARED WITH PLACEBO.

21   **Q.**    WHAT WAS THE NEXT THING THAT HAPPENED AFTER YOU LEARNED

22   AND MERCK LEARNED ABOUT THE CARDIOVASCULAR RESULTS OF THE

23   APPROVE STUDY?

24   **A.**    A WHOLE SERIES OF MEETINGS OCCURRED OVER THE NEXT COUPLE

25   OF DAYS.  THAT DAY SEVERAL OF US WERE IN A MEETING LOOKING IN

1    DETAIL AT THE DATA, ASKING FOR MORE ANALYSES.  OVER THE

2    FOLLOWING FEW DAYS, WE MET WITH -- BY PHONE, WITH MEMBERS OF

3    THE STEERING COMMITTEE AND I THINK SOME OF THE MEMBERS OF THE

4    DATA SAFETY MONITORING BOARD TO ASK THEM WHAT THEY WERE

5    THINKING AND WHAT THEIR THOUGHTS WERE OF THE DATA.  AND THEN WE

6    ALSO MET WITH SOME CARDIOLOGISTS AND RHEUMATOLOGISTS, PRESENTED

7    THE DATA TO THEM, AND ASKED THEM THEIR THOUGHTS ABOUT THE DATA

8    AS WELL.

9    **Q.**  WAS THERE A CONSENSUS BY THESE OUTSIDE CONSULTANTS,

10   DR. REICIN, ABOUT WHAT MERCK SHOULD DO CONCERNING THE APPROVE

11   RESULTS, GIVEN THE INCREASE IN CARDIOVASCULAR EVENTS VERSUS

12   PLACEBO?

13   **A.**  I THINK THE MAJORITY OF THEM ACTUALLY THOUGHT THAT WE

14   COULD HAVE LEFT VIOXX ON THE MARKET; THAT WE OBVIOUSLY HAD TO

15   CHANGE THE LABEL AND WE WOULD HAVE TO PUT THESE DATA IN -- IN

16   THE LABEL.

17   **Q.**  WHAT DID MERCK DECIDE TO DO, DR. REICIN, IN THE FACE OF

18   THE APPROVE RESULTS?

19   **A.**  WE DECIDED TO VOLUNTARILY TAKE THE DRUG OFF THE MARKET.

20   **Q.**  DID MERCK LEARN THE RESULTS OF APPROVE ON SEPTEMBER 24 OF

21   2004?

22   **A.**  I CAN'T REMEMBER THE EXACT DATE, BUT IT WAS IN SEPTEMBER.

23   **Q.**  DID MERCK WITHDRAW THE MEDICINE SIX DAYS LATER?

24   **A.**  YES, WE DID.

25   **Q.**  AFTER THE WITHDRAWAL OF VIOXX, DR. REICIN, DID YOU

1    LEARN -- WELL, LET ME ACTUALLY BACK UP.

2          BEFORE VIOXX WAS WITHDRAWN BY MERCK, HAD YOU READ A

3    STUDY, AN ASPIRIN STUDY, BY A DOCTOR NAMED DR. BARON, IN THE

4    SAME POPULATION OF PEOPLE AS APPROVE, THAT IS, THIS COLON POLYP

5    GROUP OF PEOPLE?  DID YOU READ A STUDY LIKE THAT?

6    A.    I DO RECALL READING THAT STUDY.

7    Q.    I'M MARKING FOR IDENTIFICATION PURPOSES EXHIBIT 3545, AND

8    THIS IS IN THE *NEW ENGLAND JOURNAL OF MEDICINE*.  YOU CAN'T READ

9    ANY OF THE AUTHORS, BUT I'LL TELL YOU I CAN REPRESENT TO YOU

10   THAT THE FIRST AUTHOR IS DR. BARON AND THE TITLE IS "A

11   RANDOMIZED TRIAL OF ASPIRIN TO PREVENT COLORECTAL ADENOMAS."

12   WHAT IS COLORECTAL ADENOMA?

13   A.    THAT'S ONE OF THESE COLON POLYPS.

14   Q.    IF YOU LOOK AT PAGE 7 -- AND I CULLED OUT THIS TABLE -- DO

15   YOU SEE A TABLE CALLED "INCIDENCE OF SERIOUS ADVERSE EVENTS

16   AFTER RANDOMIZATION"?

17   A.    YES, I DO.

18   Q.    NOW, THIS IS ASPIRIN.  AND WE'RE LOOKING HERE -- LET'S

19   JUST LOOK AT MYOCARDIAL INFARCTION.  THAT'S AN ADVERSE EVENT IN

20   THIS STUDY; RIGHT?

21   A.    THAT'S CORRECT.

22   Q.    HOW MANY ADVERSE EVENTS -- HOW MANY HEART ATTACKS OCCURRED

23   IN THE PLACEBO ARM IN THIS STUDY?

24   A.    ONE.

25   Q.    HOW MANY HEART ATTACKS OCCURRED IN THE ASPIRIN ARMS, IF

2334

1    YOU LOOK AT THE 81 MILLIGRAMS OF ASPIRIN AND 325 MILLIGRAMS OF

2    ASPIRIN?

3    A.    THERE WERE 2 IN THE 81-MILLIGRAM GROUP AND 325 -- I'M

4    SORRY, 2 IN THE 81-MILLIGRAM GROUP AND 5 IN THE 325-MILLIGRAM

5    GROUP.

6    Q.    AND THEN DO YOU SEE UNDER "STROKE," HOW MANY STROKES

7    OCCURRED IN THE PLACEBO GROUP?

8    A.    NONE.

9    Q.    HOW MANY STROKES OCCURRED IF YOU ADD UP THE 81 MILLIGRAMS

10   OF ASPIRIN AND THE 325 MILLIGRAMS OF ASPIRIN?

11   A.    2 IN THE 81 GROUP AND 5 IN THE 325-MILLIGRAM GROUP.

12   Q.    SO IF YOU COMBINE THE HEART ATTACKS AND THE STROKES IN

13   THIS ASPIRIN STUDY, IS IT TRUE THAT YOU HAVE 14 EVENTS ON

14   ASPIRIN AND 1 ON PLACEBO?

15   A.    THAT'S TRUE, 4 IN THE 81-MILLIGRAM GROUP AND 10 IN THE

16   325-MILLIGRAM GROUP.

17   Q.    DESPITE THIS STUDY, DR. REICIN, SHOWING THAT, IN THE

18   ASPIRIN GROUP, THERE WERE MORE HEART ATTACKS IN THIS COLON

19   POLYP POPULATION, DID MERCK DECIDE TO WITHDRAW VIOXX

20   NONETHELESS?

21   A.    YES, WE DID.  AT THAT POINT IN TIME, THERE WAS NO OTHER

22   NSAID OR COX-2 INHIBITOR THAT HAD THE AMOUNT OF PLACEBO DATA

23   THAT WE HAD FROM THE APPROVE STUDY.  NO ONE HAD AS LARGE A

24   DATABASE WHERE THEY HAD FOLLOWED PATIENTS FOR AS LONG AS IN THE

25   APPROVE STUDY.  THEREFORE, BASED ON THAT, WE DIDN'T KNOW --

1    OTHER THAN THAT ASPIRIN STUDY, WHICH CERTAINLY THERE WAS A

2    SUGGESTION OF SOMETHING; ALTHOUGH, YOU KNOW, I CAN'T MAKE ANY

3    CONCLUSIONS ABOUT THAT -- AND WE DIDN'T KNOW IF WHAT WE SAW IN

4    APPROVE WAS SOMETHING RELATED TO VIOXX, SOMETHING RELATED TO

5    ALL COX-2 INHIBITORS, SOMETHING RELATED TO ALL NSAIDS,

6    SOMETHING JUST IN THIS PATIENT POPULATION.  AND SINCE THERE

7    WERE ALTERNATIVE THERAPIES AVAILABLE THROUGH OTHER COX-2

8    INHIBITORS ON THE MARKET, CERTAINLY OTHER NSAIDS, WE THOUGHT

9    THAT THE MOST CONSERVATIVE THING TO DO WAS TO TAKE VIOXX OFF

10   THE MARKET.

11            **MR. ROBINSON:**  CAN WE APPROACH THE BENCH?

12            **THE COURT:**  SURE.

13            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

14   THE BENCH.)

15            **MR. ROBINSON:**  YOUR HONOR, I THINK THAT I READ THE

16   TRANSCRIPTS FROM THE TRIALS AND DEPOSITIONS.  SHE NEVER GOT

17   INTO THIS COLON POLYP STUDY.  THIS IS GETTING INTO EXPERT

18   TESTIMONY BEYOND HER DESCRIPTION, AND IF THEY ARE GOING TO GO

19   ANY FURTHER --

20            **MR. GOLDMAN:**  I'M NOT.

21            **MR. ROBINSON:**  YOU'RE NOT.  YOU'RE GOING INTO A

22   DIFFERENT SUBJECT?

23            **MR. GOLDMAN:**  YES, TOTALLY DIFFERENT SUBJECT.

24            **MR. ROBINSON:**  I JUST WANTED TO MAKE SURE.  WHAT TIME

25   DO YOU THINK YOU'LL BREAK FOR LUNCH?

1      **THE COURT:**  HE TOLD ME HE'S GOING TO BE FINISHED BY

2    12:30 OR SO, WHATEVER.

3      **MR. BECK:**  I'LL BE DONE BY LUNCH, JUDGE.

4      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

5    OPEN COURT.)

6    BY MR. GOLDMAN:

7    **Q.**   DR. REICIN, DID YOU COME TO LEARN AFTER VIOXX WITHDREW --

8    DID YOU COME TO LEARN AFTER MERCK WITHDREW VIOXX FROM THE

9    MARKET ABOUT A STUDY THAT PFIZER DID WITH CELEBREX?

10   **A.**   RIGHT.  YES, WE DID.  I DID AND THE COMPANY DID.

11   **Q.**   AND DID THAT STUDY --

12     **MR. ROBINSON:**  YOUR HONOR, I'M GOING TO OBJECT.  CAN

13   WE GO BACK INTO --

14     **MR. GOLDMAN:**  I'M NOT TALKING ABOUT THAT ISSUE.

15     **MR. ROBINSON:**  YOU'RE NOT?

16     **MR. GOLDMAN:**  NO.

17   BY MR. GOLDMAN:

18   **Q.**   DID THE CELEBREX STUDY AND THE VIOXX APPROVE STUDY CAUSE

19   THE FDA TO CONVENE AN ADVISORY COMMITTEE MEETING?

20   **A.**   YES, THEY DID.

21   **Q.**   WHEN WAS THE ADVISORY COMMITTEE MEETING THAT THE FDA HELD

22   AFTER VIOXX WAS WITHDRAWN?

23   **A.**   IT WAS IN FEBRUARY OF 2005?

24   **Q.**   DID YOU ATTEND THAT MEETING?

25   **A.**   YES, I DID.

1   **Q.**   DID YOU ANSWER QUESTIONS THAT WERE ASKED OF YOU?

2   **A.**   I DIDN'T DO A PRESENTATION, BUT I DID HELP ANSWER

3   QUESTIONS THAT ONE OF THE OTHER MERCK PEOPLE COULDN'T ANSWER.

4   **Q.**   I MAY HAVE MENTIONED THIS.  WAS THAT FEBRUARY OF 2005?

5   **A.**   FEBRUARY OF 2005.

6   **Q.**   DID THE FDA RELEASE TO THE PUBLIC A MEMO SETTING FORTH ITS

7   CONCLUSIONS ABOUT THE CARDIOVASCULAR SAFETY OF NSAIDS AND COX-2

8   INHIBITORS FOLLOWING THAT MEETING WITH THE AD COM?

9   **A.**   YES, THEY DID.

10  **Q.**   IF YOU COULD TURN TO DEFENSE EXHIBIT 338 --

11           **MR. GOLDMAN:**  WHICH IS THE FDA MEMO WHICH WE OFFER.

12           **MR. ROBINSON:**  WHAT'S THE NUMBER?

13           **MR. GOLDMAN:**  IT'S EXHIBIT 338.

14           **MR. ROBINSON:**  THIS IS NOT FEBRUARY.  THIS IS APRIL.

15           **MR. GOLDMAN:**  YES, APRIL.

16           **MR. ROBINSON:**  WE'VE ALREADY DISCUSSED IT.

17           **THE COURT:**  ANY OBJECTION?

18           **MR. ROBINSON:**  WELL, I HAVE NO OBJECTION.

19           **THE COURT:**  LET IT BE ADMITTED.

20  BY MR. GOLDMAN:

21  **Q.**   DR. REICIN, THIS IS A MEMO FROM JOHN JENKINS.  WHO IS HE?

22  **A.**   HE IS DIRECTOR OF THE OFFICE OF NEW DRUGS.

23  **Q.**   AT THE FDA?

24  **A.**   AT THE FDA.

25  **Q.**   THIS IS APRIL 6, 2005.  AND HE WRITES IT WITH

 1   DR. SELIGMAN?

 2   **A.**   SELIGMAN.

 3   **Q.**   SELIGMAN.  AND WHAT IS THE SUBJECT OF THIS MEMO?

 4   **A.**   THIS WAS ANALYSIS AND RECOMMENDATIONS FOR AGENCY ACTION

 5   REGARDING NONSTEROIDAL ANTI-INFLAMMATORY DRUGS.  THOSE ARE

 6   NSAIDS AND CARDIOVASCULAR RISKS.

 7   **Q.**   DID YOU REVIEW THIS MEMO, DR. REICIN, IN YOUR CAPACITY AS

 8   A MERCK SCIENTIST INVOLVED IN VIOXX-RELATED MATTERS?

 9   **A.**   YES, I DID.

10   **Q.**   IF WE GO TO THE FIRST PARAGRAPH -- ACTUALLY, LET'S TURN TO

11   THE THIRD PAGE FIRST.  UNDER "BACKGROUND," DO YOU SEE THAT THE

12   FDA IS WRITING "VIOXX WAS VOLUNTARILY WITHDRAWN FROM THE MARKET

13   BY MERCK IN SEPTEMBER 2004 FOLLOWING THE OBSERVATION OF AN

14   INCREASED RISK OF SERIOUS ADVERSE CARDIOVASCULAR EVENTS

15   COMPARED TO PLACEBO.  SUBSEQUENT TO THAT ACTION, REPORTS OF

16   ADDITIONAL DATA FROM CONTROLLED CLINICAL TRIALS BECAME

17   AVAILABLE FOR OTHER COX-2 SELECTIVE NSAIDS THAT ALSO

18   DEMONSTRATED AN INCREASED RISK OF SERIOUS ADVERSE

19   CARDIOVASCULAR EVENTS COMPARED TO PLACEBO.  THESE NEW DATA

20   PROMPTED THE AGENCY TO CONDUCT A COMPREHENSIVE REVIEW OF THE

21   AVAILABLE DATA AND TO PRESENT THE ISSUE FOR REVIEW AT THE

22   AD COM MEETING."  DO YOU SEE THAT, DOCTOR?

23   **A.**   YES, I DO.

24   **Q.**   AND THEN DO YOU SEE WHERE THEY WRITE:  "FOLLOWING THE

25   JOINT MEETING, CDER" -- THAT'S THAT DIVISION AT THE FDA?

1    **A.**   THAT'S CORRECT, THAT REVIEWS DRUGS.

2    **Q.**   -- "CONDUCTED A THOROUGH INTERNAL REVIEW OF THE AVAILABLE

3    DATA REGARDING CARDIOVASCULAR SAFETY ISSUES FOR COX-2 SELECTIVE

4    AND NONSELECTIVE NSAIDS," AND THAT THIS MEMO SUMMARIZES THE

5    CONCLUSIONS?  IS THAT RIGHT?

6    **A.**   THAT'S CORRECT.

7    **Q.**   DO YOU ALSO SEE THAT THOSE PARTICIPANTS IN THIS DISCUSSION

8    FROM THE DIVISION AT THE FDA INCLUDE STAFF FROM THE DIVISION OF

9    ANTI-INFLAMMATORY, ANALGESIC, AND OPHTHALMOLOGIC?

10   **A.**   THINGS RELATED TO THE EYE.

11   **Q.**   AND THE DIVISION OF OVER-THE-COUNTER DRUGS, A DIVISION OF

12   DRUG EVALUATION, THE OFFICE OF DRUG SAFETY, THE OFFICE OF

13   BIOSTATISTICS, THE OFFICE OF PHARMACOEPIDEMIOLOGY AND SO FORTH.

14   SO A LOT OF PEOPLE WERE INVOLVED IN THIS.

15   **A.**   THIS WAS A VERY EXTENSIVE REVIEW.

16   **Q.**   IF WE TURN TO THE FIRST PAGE NOW, UNDER "EXECUTIVE

17   SUMMARY," DOES THE FDA WRITE:  "FOLLOWING A THOROUGH REVIEW OF

18   THE AVAILABLE DATA, WE HAVE REACHED THE FOLLOWING CONCLUSIONS

19   REGARDING CURRENTLY APPROVED COX-2 SELECTIVE AND NONSELECTIVE

20   NSAIDS AND THE RISK OF CARDIOVASCULAR EVENTS"?  WHAT DOES THIS

21   FIRST BULLET POINT SAY, DR. REICIN?

22   **A.**   THE FIRST BULLET SAYS THAT "THE THREE APPROVED COX-2

23   SELECTIVE NSAIDS -- CELECOXIB, ROFECOXIB, AND VALDECOXIB" --

24   THAT'S CELEBREX, VIOXX, AND BEXTRA -- "ARE ASSOCIATED WITH AN

25   INCREASED RISK OF SERIOUS CARDIOVASCULAR EVENTS COMPARED TO

1   PLACEBO.  THE AVAILABLE DATA DO NOT PERMIT A RANK ORDERING OF

2   THESE DRUGS WITH REGARD TO CV RISKS."

3   **Q.**    LET ME ASK YOU ABOUT THE LAST SENTENCE FIRST:  "THE

4   AVAILABLE DATA DO NOT PERMIT A RANK ORDER."  HOW DO YOU

5   INTERPRET THAT?

6   **A.**    IT MEANS THEY CAN'T TELL -- THEY CAN'T SAY THAT VIOXX IS

7   WORSE THAN CELEBREX OR CELEBREX IS WORSE THAN VIOXX.  ALL THEY

8   CAN SAY IS THAT ALL THREE OF THEM HAVE BEEN ASSOCIATED WITH AN

9   INCREASED RISK.

10  **Q.**    NOW, "ASSOCIATED," I WANT TO FOCUS ON THAT WORD.  DR. MOYE

11  TESTIFIED A LITTLE BIT ABOUT THAT.  WHAT'S THE DIFFERENCE

12  BETWEEN SOMETHING BEING ASSOCIATED WITH SOMETHING ELSE AND

13  SOMETHING CAUSING SOMETHING ELSE?

14  **A.**    WELL, "ASSOCIATED" IN THIS CLINICAL TRIALS, THE -- THERE

15  WAS AN INCREASED RISK SEEN, OBSERVED, IN THOSE CLINICAL TRIALS.

16  THERE WAS ONE FOR CELEBREX, THERE WAS ONE FOR VIOXX, AND THERE

17  WERE ONE OR TWO FOR BEXTRA.  THAT'S DIFFERENT THAN CAUSATION

18  WHERE IT'S BEEN -- YOU'VE SEEN REPLICATE RESULTS IN MORE THAN

19  ONE STUDY, PROBABLY FOR EACH DRUG; YOU HAVE BETTER

20  UNDERSTANDING OF THE MECHANISM; AND YOU MIGHT BE ABLE TO TALK

21  ABOUT A CAUSE AND EFFECT.

22  **Q.**    WHAT DOES THE SECOND BULLET SAY, DR. REICIN?

23  **A.**    "DATA FROM LARGE, LONG-TERM, CONTROLLED CLINICAL TRIALS

24  THAT HAVE INCLUDED A COMPARISON OF COX-2 SELECTIVE AND

25  NONSELECTIVE NSAIDS DO NOT CLEARLY DEMONSTRATE THAT THE COX-2

DAILY COPY

1   SELECTIVE AGENTS CONFER A GREATER RISK OF SERIOUS ADVERSE

2   EVENTS THAN NONSELECTIVE NSAIDS."

3   **Q.**   WHAT DOES THAT MEAN?

4   **A.**   WELL, WHEN THEY LOOKED AT THE TOTALITY OF CLINICAL DATA

5   FROM ALL OF THE COX-2 INHIBITORS, THE CARDIOVASCULAR RISK

6   WAS -- COMPARED BETWEEN COX-2 SELECTIVE INHIBITORS AND THE

7   NONSELECTIVE INHIBITORS, THEY DIDN'T DEMONSTRATE THAT THERE WAS

8   A CLEAR INCREASED RISK WITH THE COX-2 SELECTIVE INHIBITORS

9   COMPARED WITH THE NONSELECTIVE INHIBITORS.

10  **Q.**   IF WE TURN NOW TO PAGE 5, DID -- DOES THIS MEMO ADDRESS

11  EACH OF THE DIFFERENT COX-2 INHIBITORS?  AND IN THIS CASE, ON

12  THIS PAGE, DO THEY DISCUSS VIOXX?

13  **A.**   YES, THEY DO.  RIGHT HERE YOU'VE GOT THE ROFECOXIB, THE

14  VIOXX DISCUSSION.

15  **Q.**   AND I'M JUST GOING TO READ THE FIRST PARAGRAPH, AND THEN

16  WE'LL MOVE ON.  ALMOST DONE, DOCTOR.  YOU SEE THAT THE FDA

17  WRITES:  "THE STRONGEST DATA FROM A LONG-TERM

18  PLACEBO-CONTROLLED TRIAL FOR AN INCREASED RISK OF SERIOUS

19  ADVERSE CARDIOVASCULAR EVENTS WITH VIOXX CAME FROM THE APPROVE

20  TRIAL IN WHICH VIOXX 25 MILLIGRAMS ONCE DAILY WAS COMPARED TO

21  PLACEBO FOR UP TO THREE YEARS.  THE RELATIVE RISK OF

22  APPROXIMATELY 2 WAS SEEN FOR VIOXX COMPARED TO PLACEBO FOR

23  SERIOUS ADVERSE CARDIOVASCULAR EVENTS."  AND THEN THEY TALK

24  ABOUT THIS KAPLAN-MEIER CURVE.  AND THEN THE NEXT SENTENCE --

25         **MR. ROBINSON:**  WOULD YOU READ --

1          MR. GOLDMAN:  SURE.

2   BY MR. GOLDMAN:

3   Q.   "IT IS NOTEWORTHY THAT THE VIOXX AND PLACEBO CV EVENTS

4   OCCURS IN A KAPLAN-MEIER PLOT DID NOT APPEAR TO BEGIN TO

5   SEPARATE UNTIL AFTER APPROXIMATELY 18 MONTHS OF TREATMENT."

6   CAN YOU EXPLAIN WHAT THAT MEANS?

7   A.   THE KAPLAN-MEIER FIGURES WERE LOOKING AT THE INCIDENCE OF

8   EVENTS OVER TIME.  AND WHAT THEY ARE SAYING IS THAT OVER THE

9   FIRST 18 MONTHS, YOU REALLY -- YOU DIDN'T SEE ANY DIFFERENCE

10  BETWEEN VIOXX AND PLACEBO.  IT WAS ONLY BEGINNING AFTER 18

11  MONTHS THAT YOU SAW THE CURVE SEPARATE.  THE VIOXX CURVE WENT

12  UP, AND ACTUALLY IN THE APPROVE STUDY, THE PLACEBO CURVE, THE

13  RATE OF THE PLACEBO WENT DOWN.

14  Q.   AND THAT'S WHAT THE FDA IS SAYING HERE?

15  A.   THAT'S CORRECT.

16  Q.   "IN CONTRAST TO THE RESULTS SEEN IN APPROVE, TWO LONG-TERM

17  PLACEBO-CONTROLLED TRIALS IN PATIENTS WITH EARLY ALZHEIMER'S

18  DISEASE, INCLUDING UP TO FOUR YEARS OF TREATMENT IN A SMALL

19  NUMBER OF PATIENTS, DID NOT SHOW A SIGNIFICANT DIFFERENCE IN

20  CARDIOVASCULAR EVENTS BETWEEN VIOXX 25 MILLIGRAMS DAILY AND

21  PLACEBO."

22          SO ARE THEY TALKING THERE ABOUT THE ALZHEIMER'S

23  TRIALS AND THE FACT THAT THERE WERE NO RISK SEEN IN THOSE?

24  A.   THERE WAS NO DIFFERENCE.  THE RELATIVE RISK WAS 1 IN THOSE

25  STUDIES.

2343

1   **Q.**   DID THE FDA MAKE ANY RECOMMENDATIONS, DR. REICIN, BASED ON

2   THEIR ANALYSIS OF ALL OF THE DATA, INCLUDING VIGOR, IN APRIL OF

3   2005 IN THIS MEMO?

4   **A.**   THEY RECOMMENDED THAT ALL OF COX-2 INHIBITORS AND NSAIDS

5   THAT WERE ON THE MARKET, THAT THE PRESCRIPTION LABELING INCLUDE

6   A BLACK-BOX WARNING FOR CARDIOVASCULAR EVENTS.

7   **Q.**   SO --

8   **A.**   AND FOR GI.  I THINK GI EVENTS AS WELL.

9   **Q.**   SO HERE IT SAYS, "THE PROFESSIONAL LABELING FOR ALL

10  PRESCRIPTION NSAIDS SHOULD BE REVISED TO INCLUDE A BOXED

11  WARNING HIGHLIGHTING THE POTENTIAL INCREASED RISK OF SERIOUS

12  ADVERSE CARDIOVASCULAR EVENTS."  IS THAT WHAT YOU'RE REFERRING

13  TO?

14  **A.**   THAT'S CORRECT.

15  **Q.**   AND THEN, FINALLY, DR. REICIN, YESTERDAY DR. MORRISON WAS

16  ASKED SOME QUESTIONS ABOUT THE IMBALANCE THEORY AND WHAT

17  DR. FITZGERALD THINKS ABOUT HIS IMBALANCE THEORY.  DID THE FDA

18  COMMENT ABOUT -- THEIR VIEWS ABOUT THE IMBALANCE THEORY IN THIS

19  MEMO OR THEIR CONCLUSIONS ABOUT IT?

20  **A.**   WELL, RIGHT HERE THEY SAY THAT THERE IS "SERIOUS QUESTIONS

21  ABOUT THE SO-CALLED COX-2 HYPOTHESIS."  I THINK THEY WERE

22  REFERRING TO THE IMBALANCE THEORY.

23  **Q.**   "SO TAKEN TOGETHER, THESE OBSERVATIONS RAISE SERIOUS

24  QUESTIONS ABOUT THE SO-CALLED COX-2 HYPOTHESIS."  IS THAT THE

25  IMBALANCE THEORY YOU JUST SAID?

1    **A.**   THAT'S CORRECT.

2    **Q.**   WHICH SUGGESTS THAT THE COX-2 SELECTIVELY CONTRIBUTES TO

3    INCREASED CARDIOVASCULAR RISK.

4          **MR. GOLDMAN:**  DR. REICIN, I MAY HAVE SOME QUESTIONS

5    AFTER MR. ROBINSON IS FINISHED.  THANK YOU.

6          **THE COURT:**  OKAY.  WE'LL TAKE A BREAK HERE AND RETURN

7    FOR LUNCH AT 1:45.  THE COURT WILL STAND IN RECESS.

8          **THE DEPUTY CLERK:**  EVERYONE RISE.

9                    **(LUNCHEON RECESS)**

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY

```
 1                      AFTERNOON SESSION

 2                     (AUGUST 14, 2006)

 3           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

 4   TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

 5   REPORTER.)

 6           THE DEPUTY CLERK:  EVERYONE RISE.

 7           THE COURT:  BE SEATED, PLEASE.

 8           (WHEREUPON, ALISE REICIN, HAVING BEEN DULY SWORN,

 9   TESTIFIED AS FOLLOWS.)

10                     CROSS-EXAMINATION

11   BY MR. ROBINSON:

12   Q.   GOOD AFTERNOON, DR. REICIN.

13   A.   GOOD AFTERNOON.

14   Q.   JUST TO GIVE THE JURY A PERSPECTIVE, THIS IS WHAT, THE

15   EIGHTH TIME YOU HAVE TESTIFIED DEFENDING VIOXX IN A COURTROOM

16   IN THIS COUNTRY?

17   A.   I DON'T KNOW IF I WOULD QUITE USE THOSE TERMS, BUT THIS

18   IS, I THINK, THE EIGHTH TIME THAT I HAVE -- WE HAVE TO GO BACK

19   AND COUNT.  ABOUT THE EIGHTH TIME.

20   Q.   LET ME GO QUICKLY THROUGH THEM.  SO YOUR FIRST TIME WAS

21   THE ERNST CASE DOWN IN TEXAS; RIGHT?

22   A.   THAT'S CORRECT.

23   Q.   THEN YOU TESTIFIED IN THE HUMESTON CASE; CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   YOU TESTIFIED IN IRVIN 1?
```

1  **A.**   THAT'S CORRECT.

2  **Q.**   YOU TESTIFIED IN <u>IRVIN 2</u>?

3  **A.**   THAT'S CORRECT.

4  **Q.**   DID YOU TESTIFY IN <u>MCDARBY</u>?

5  **A.**   I DID.

6  **Q.**   DID YOU TESTIFY IN THE <u>DOHERTY</u> CASE IN NEW JERSEY?

7  **A.**   YES, I DID.

8  **Q.**   DID YOU TESTIFY JUST LAST WEEK, OR 10 DAYS AGO, IN L.A. IN

9  THE <u>GROSSBERG</u> CASE?

10  **A.**   YES, I DID.

11  **Q.**   SO THIS WOULD BE THE EIGHTH CASE; CORRECT?

12  **A.**   I BELIEVE THAT'S CORRECT.

13  **Q.**   IS IT TRUE THAT, BEFORE YOU STARTED DOING THIS TESTIFYING,

14  YOU RECEIVED TRAINING ON HOW TO ANSWER QUESTIONS?  IS THAT

15  RIGHT?

16  **A.**   NO, THAT'S NOT TRUE.

17  **Q.**   WELL, IS IT TRUE THAT YOU RECEIVED MEDIA TRAINING?

18  **A.**   NOT IN RELATION TO ANY OF THE TRIALS.  I HAVEN'T RECEIVED

19  MEDIA TRAINING IN MANY YEARS.

20  **Q.**   WELL, WHY DON'T YOU -- DID YOU GET TRAINING OR NOT?

21  **A.**   PROBABLY AROUND 2001 TO 2002, AS IT RELATED TO TIMES WHEN

22  I WAS GOING TO SPEAK TO THE PRESS, YES.

23  **Q.**   IN THE MEDIA TRAINING, WAS ONE OF THE THINGS THEY TAUGHT

24  YOU WHEN YOU'RE SPEAKING TO THE PRESS TO STAY ON MESSAGE?

25  **A.**   THAT WOULD BE CERTAINLY ONE OF THE THINGS THEY WOULD SAY,

1   YES.

2   Q.   SO, IN OTHER WORDS, IF THE PRESS ASKED YOU A QUESTION THAT

3   MAY BE A TOUGHER QUESTION, YOU MIGHT STAY ON THE MESSAGE THAT

4   YOU WANTED TO MAKE --

5   A.   WELL, THEY MAY HAVE TOLD THAT TO ME.  I ALWAYS TOLD THEM

6   THAT I WAS GOING TO ANSWER THE QUESTIONS THAT I WAS ASKED TO

7   THE BEST OF MY ABILITY.

8   Q.   IN THESE EIGHT TRIALS THAT YOU HAVE TESTIFIED IN, HAVE YOU

9   FELT YOU HAVE DONE THAT?

10  A.   I HAVE CERTAINLY DONE IT TO THE BEST OF MY ABILITY.

11  Q.   AS FAR AS A "YES" OR "NO" ANSWER, YOU HAVE NO PROBLEM

12  GIVING A QUESTION OR NO ANSWER?

13  A.   VERY OFTEN I'M ASKED QUESTIONS THAT I DON'T THINK CAN BE

14  ANSWERED ADEQUATELY BY "YES" OR "NO."

15  Q.   FRANKLY, THESE EIGHT TRIALS YOU HAVE TESTIFIED IN ARE,

16  WHAT, IN THE LAST YEAR; RIGHT?

17  A.   THAT'S CORRECT.

18  Q.   BEFORE THAT DID MERCK PUT YOU UP AS A CORPORATE

19  REPRESENTATIVE IN DEPOSITIONS AS EARLY AS 2003?  IS THAT RIGHT?

20  A.   I CAN'T TELL YOU WHETHER I WAS A CORPORATE REPRESENTATIVE

21  OR NOT, BUT I DID HAVE DEPOSITIONS PRIOR TO -- PROBABLY 2003

22  SOUNDS ABOUT -- 2003 OR 2004.

23  Q.   YOU'VE BEEN OVER AT THE HOTEL THERE AT THE WINDSOR COURT

24  WITH THE MERCK TEAM?

25  A.   THAT IS WHERE I'M STAYING; THAT'S CORRECT.

2348

1  **Q.**   HAVE YOU BEEN MEETING WITH THE PEOPLE --

2           **MR. GOLDMAN:**  YOUR HONOR, MAY WE APPROACH?

3           **THE COURT:**  OKAY.

4           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

5  THE BENCH.)

6           **MR. BECK:**  JUDGE, WE ACTUALLY HAD AN UNDERSTANDING

7  WHEN WE WERE TALKING ABOUT WHAT HOTELS PEOPLE ARE STAYING AT,

8  WHETHER THEY ARE RICH LAWYERS FROM MALIBU, THE WINDSOR COURT

9  HOTEL, THIS IS BULLSHIT.  EXCUSE ME.  THIS IS INAPPROPRIATE.

10          **MR. GOLDMAN:**  IT'S ALSO ABOUT TO INVADE THE

11 ATTORNEY-CLIENT PRIVILEGE.

12          **THE COURT:**  YES.  IT DOESN'T MATTER --

13          **MR. ROBINSON:**  I THINK THIS, YOUR HONOR, BASICALLY --

14 YOU KNOW, WHEN THEY WENT INTO THAT KIND OF THING WITH

15 DR. ZIPES, I FEEL A LITTLE BIT OF THIS IS APPROPRIATE, BUT --

16          **THE COURT:**  WELL, IT DOESN'T MATTER WHAT HOTEL --

17          **MR. ROBINSON:**  I WON'T MENTION THE HOTEL.

18          **MR. BECK:**  MARK, BUT YOU ALREADY DID AND WHEN YOU

19 SAID YOU WOULDN'T.

20          **MR. GOLDMAN:**  DON'T INVADE THE ATTORNEY-CLIENT

21 PRIVILEGE.

22          **MR. ROBINSON:**  I WON'T INVADE THE ATTORNEY-CLIENT

23 PRIVILEGE.

24          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

25 OPEN COURT.)

DAILY COPY

1    **BY MR. ROBINSON:**

2    **Q.**   WITHOUT INVADING THE ATTORNEY-CLIENT PRIVILEGE, DID YOU

3    ACTUALLY TALK TO THESE LAWYERS WITHOUT SAYING WHAT THEY SPOKE

4    WITH?

5    **A.**   YES.

6    **Q.**   DID YOU TALK TO A GUY BY THE NAME OF -- A CONSULTANT THAT

7    THEY HAVE NAMED DAN JACKS?

8    **A.**   NO.  I DON'T EVEN KNOW WHO DAN JACKSON IS.

9    **Q.**   JACKS, J-A-C-K-S.

10   **A.**   I DON'T KNOW WHO THAT IS.

11   **Q.**   NOW, IS IT TRUE THAT, IN PRIOR TESTIMONY HERE, YOU'VE SAID

12   THAT YOU, OVER THE YEARS, HAVE BECOME ATTACHED TO THE VIGOR

13   STUDY?  IS THAT RIGHT?

14   **A.**   I THINK I MAY HAVE USED THAT WORD.  IT WAS A STUDY I WAS

15   VERY MUCH INVOLVED IN DESIGNING AND OVERSEEING, AND I WAS -- I

16   MAY HAVE USED THE WORD "ATTACHED" TO IT.  I TOOK IT VERY

17   SERIOUSLY, MY RESPONSIBILITIES.

18   **Q.**   IN OTHER WORDS, YOU BECAME PROTECTIVE OF IT?

19   **A.**   NO, I DON'T THINK I WOULD USE THOSE WORDS.

20   **Q.**   WELL, DIDN'T YOU GET PROMOTED BASED ON PERFORMANCE REVIEWS

21   THAT SAID THAT YOU WERE THE DEFENDER OF THE VIGOR STUDY AND THE

22   FRANCHISE?

23   **A.**   NO.  I THINK THAT'S A MISCHARACTERIZATION.  I THINK I WAS

24   PROMOTED BASED ON MY ABILITIES, MY ABILITY TO MANAGE PEOPLE, I

25   BELIEVE AS A MANAGER AND WHAT I DID AS A SCIENTIST.  BUT THE

1   WORDS "DEFENDER" WERE USED IN ONE OF MY EVALUATIONS.

2   **Q.**   IT WAS USED IN ONE OF YOUR EVALUATIONS?

3   **A.**   YES.  IT MAY HAVE BEEN USED IN MORE THAN ONE, BUT IT WAS

4   USED.  BUT THAT HAD NOTHING -- I WASN'T PROMOTED BECAUSE I WAS

5   THE DEFENDER.

6   **Q.**   WELL, LET'S TAKE A LOOK AND SEE WHAT THE DOCUMENT SAYS.

7          **MR. ROBINSON:**  YOUR HONOR, I'M GOING TO MARK IT, I

8   GUESS, AS 1227A.  PUT THAT ON --

9          **THE COURT:**  GIVE A COPY TO THE DOCTOR FIRST, PLEASE.

10         **MR. ROBINSON:**  YES, YOUR HONOR.

11  BY MR. ROBINSON:

12  **Q.**   DOES THAT APPEAR TO BE A COPY OF YOUR EMPLOYMENT

13  PERFORMANCE REVIEWS?

14  **A.**   THERE APPEAR TO BE SOME PERFORMANCE REVIEWS IN HERE.

15  **Q.**   OKAY.  THEN THERE ARE BATES NUMBERS AT THE BOTTOM.  DO YOU

16  SEE THOSE?

17  **A.**   THE ONES THAT ARE KIND OF GOING OFF ALONG THE SIDE?

18  **Q.**   WELL, THEY SAY MERCK, MRKAAD, AND THE FIRST PAGE STARTS

19  WITH 08.  DO YOU SEE THAT?

20  **A.**   I SEE THAT.

21  **Q.**   LET ME TAKE YOU THROUGH TO 80032.

22         **MR. ROBINSON:**  YOUR HONOR, I WOULD OFFER HER

23  PERFORMANCE REVIEW CHART INTO EVIDENCE BEFORE WE SHOW IT TO THE

24  JURY.

25         **MR. GOLDMAN:**  NO OBJECTION, JUDGE.

DAILY COPY

1          **THE COURT:**  LET IT BE ADMITTED.

2    **BY MR. ROBINSON:**

3    **Q.**   SO THIS IS YOUR PERFORMANCE REVIEW FOR YOUR WORK THAT YOU

4    DID FROM JANUARY 1, '01 TO DECEMBER 31, '01; IS THAT RIGHT?

5    **A.**   THAT'S CORRECT.

6    **Q.**   SO THE FIRST SENTENCE -- WELL, THEY HAVE A TITLE "OVERALL

7    CONTRIBUTION SUMMARY."  RIGHT?

8    **A.**   THAT'S CORRECT.

9    **Q.**   THEN THE FIRST SENTENCE THAT'S BEEN YELLOW-LINED UP THERE

10   ON THE BOARD -- AND YOU CAN SEE IT ON YOUR SCREEN -- SAYS,

11   "DR. REICIN'S MAJOR EFFORTS THIS YEAR WERE FOCUSED ON DEFENDING

12   THE VIOXX FRANCHISE AND BUILDING THE SCIENTIFIC BASE FOR THE

13   2-COXIB BUSINESS."  DID I READ THAT RIGHT?

14   **A.**   THAT'S CORRECT.

15   **Q.**   SO THIS WAS SIGNED BY YOUR BOSS, ALAN NIES; IS THAT RIGHT?

16   **A.**   I THINK MY BOSS AT THE TIME WAS BARRY GERTZ.  IT APPEARS

17   TO ME BOTH DR. GERTZ AND DR. NIES SIGNED THIS.

18   **Q.**   OKAY.  SO, BASICALLY, THIS DOCUMENT SAYS THAT YOUR MAJOR

19   EFFORTS WERE DEFENDING THE VIOXX FRANCHISE; RIGHT?

20   **A.**   THAT IS CORRECT.

21   **Q.**   AS I UNDERSTAND THE VIOXX FRANCHISE --

22   **A.**   WELL, AND BUILDING THE SCIENTIFIC BASE.

23   **Q.**   OKAY.

24   **A.**   IF YOU SEE, IT GOES ON TO EXPLAIN HOW I DID THAT BY

25   PRESENTING AN FDA ADVISORY COMMITTEE, OTHER REGULATORY

1    MEETINGS, AS WELL.

2    **Q.**    RIGHT.  BUT JUST TALKING ABOUT THE TERM "FRANCHISE," THE

3    "VIOXX FRANCHISE" --

4    **A.**    THAT'S CORRECT.

5    **Q.**    -- THAT'S THE RIGHT THAT MERCK HAS TO SELL VIOXX; CORRECT?

6    THE BUSINESS RIGHT, THE BUSINESS LICENSE, TO SELL VIOXX;

7    CORRECT?

8    **A.**    I THINK THAT MAY BE AN APPROPRIATE WAY TO DESCRIBE IT.

9    **Q.**    "DEFEND" MEANS TO WHAT, TO PROTECT?

10   **A.**    NO, I WOULDN'T DESCRIBE IT THAT WAY.  I PERSONALLY

11   WOULDN'T HAVE USED THE WORD "DEFEND," BUT MY BOSS DID.

12   **Q.**    WELL, LET'S -- BUT YOUR BOSS WAS THE ONE WHO WAS

13   EVALUATING YOUR WORK, AND IT WAS HIS IMPRESSION THAT YOU WERE

14   DEFENDING VIOXX; RIGHT?

15   **A.**    THAT IS THE WORD THAT HE USED.  I THINK IF YOU ASKED HIM,

16   HE WOULD TELL YOU THAT I WAS PRESENTING SCIENTIFIC DATA.  I WAS

17   GIVING MY VIEW OF THE SCIENTIFIC DATA.

18   **Q.**    IF WE WENT TO *WEBSTER'S DICTIONARY*, DO YOU AGREE THAT

19   THAT'S AUTHORITATIVE?

20   **A.**    I THINK IT WOULD BE AUTHORITATIVE.

21            **MR. GOLDMAN:**  OBJECTION, YOUR HONOR, ARGUMENTATIVE.

22            **THE COURT:**  THAT IS ARGUMENTATIVE.  LET'S MOVE ON.

23   **BY MR. ROBINSON:**

24   **Q.**    IN ANY EVENT, DO YOU AGREE THAT THE WORD "DEFEND" MEANS TO

25   PROTECT?

1    A.    MAYBE THAT'S WHAT IT SAYS IN *WEBSTER'S*.  I DON'T KNOW.

2    Q.    LET'S GO ON TO THE NEXT ONE I WOULD LIKE YOU TO LOOK AT

3    AND THAT IS 800052.  FIRST OF ALL, YOU GOT PRETTY GOOD GRADES

4    THERE.  THEY CHECKED YOUR BOXES "SIGNIFICANTLY ABOVE

5    OBJECTIVE"; RIGHT?  PRETTY CONSISTENT.

6    A.    THAT'S CORRECT.

7    Q.    VERY GOOD.  IT SAYS, "EFFECTIVELY REPRESENTS FRANCHISE AT

8    DOMESTIC AND INTERNATIONAL MEETINGS"; CORRECT?

9    A.    THAT'S CORRECT.

10   Q.    THEN IT SAYS, "TIRELESSLY DEFENDS USING SCIENTIFICALLY

11   SOUND METHODS.  NUMEROUS CHALLENGES TO THE FRANCHISE."

12   A.    THAT'S CORRECT.

13   Q.    THAT YEAR WOULD HAVE BEEN, IF WE GO BACK A PAGE, WOULD

14   HAVE BEEN --

15   A.    2002.

16   Q.    -- 2002.  SO NOW IF WE GO TO THE NEXT PAGE, WHICH I THINK

17   IS NEAR THE END, IT'S 800078.  WHAT YEAR WAS THAT FOR?

18   A.    WHAT YOU READ WAS JUST ONE SMALL PART OF THAT EVALUATION.

19   Q.    I UNDERSTAND, BUT I'M TALKING ABOUT THE DEFENDER ISSUE.

20   SO IF YOU'D GO TO 800078.  ONCE AGAIN, YOUR PERFORMANCE IS

21   BASED ON YOU HAVE BEEN "A TENACIOUS DEFENDER OF THE COXIB

22   FRANCHISE AND ARE CONSIDERED INVALUABLE ON THE WDST."  DID I

23   READ THAT RIGHT?

24   A.    YOU DID.

25   Q.    OKAY.

1  **BY MR. ROBINSON:**

2  **Q.**   P1.004.  I'LL GIVE YOU A COPY OF IT.  IF WE LOOK AT

3  P1.0004, THAT'S AN E-MAIL CHAIN BETWEEN YOU AND DR. MORRISON;

4  RIGHT?

5  **A.**   THAT IS CORRECT.  I THINK THERE MAY HAVE BEEN OTHERS THAT

6  MAY HAVE BEEN ON THE E-MAIL CHAIN.  I MEAN, I WAS SENDING IT TO

7  OTHERS, AS WELL.  BUT BETWEEN DR. MORRISON AND I FOR RIGHT

8  HERE, YES.

9  **Q.**   REMEMBER, DR. MORRISON HAD SAID TO YOU -- WELL, LET'S GO

10  ON THE SECOND PAGE.  QUICKLY, DR. MORRISON SAID, "I WOULD ALLOW

11  LOW-DOSE ASPIRIN.  I KNOW THIS HAS BEEN DISCUSSED TO DEATH, BUT

12  REAL WORLD IS EVERYONE IS ON IT, SO WHY EXCLUDE, AND WITHOUT

13  COX-1 INHIBITION YOU WILL GET MORE THROMBOTIC EVENTS AND KILL

14  DRUG."

15  **A.**   CORRECT.

16  **Q.**   BY KILL THE DRUG, IN OTHER WORDS, IF THERE'S A PUBLICATION

17  OF MORE THROMBOTIC EVENTS, IT'S GOING TO HURT THE DRUG; RIGHT?

18  **A.**   I THINK WHAT HE IS SAYING IS, IF YOU HAVE THIS STUDY AND

19  THERE'S NO PLACEBO, AND YOU CAN'T TELL WHETHER NAPROXEN

20  DECREASED THE EVENTS OR VIOXX INCREASED THE EVENTS, THEN THE

21  DATA CAN BE MISINTERPRETED AND, YES, IT COULD HURT THE DRUG.

22  **Q.**   ULTIMATELY, THE APPROVE STUDY, THE FINDING IN THE APPROVE

23  STUDY, WAS THAT THERE WAS AN EXCESS IN THROMBOTIC EVENTS OF

24  VIOXX OVER PLACEBO, NOT NAPROXEN; RIGHT?

25  **A.**   THAT IS CORRECT.  IN THAT STUDY, BEGINNING AFTER 18

1    MONTHS.

2    **Q.**   SO IF, IN FACT, WE WERE DEBATING THE RESULTS OF THE

3    APPROVE STUDY, YOU WOULDN'T BE SAYING THAT THE PLACEBO WAS

4    CARDIOPROTECTIVE; RIGHT?

5    **A.**   NO, I WOULD NOT, BUT THAT'S NOT WHAT WE WERE DISCUSSING

6    HERE.

7    **Q.**   BUT, FRANKLY, DOESN'T THE APPROVE STUDY PROVE THAT THE

8    NAPROXEN HYPOTHESIS, IN OTHER WORDS, THAT NAPROXEN WAS

9    CARDIOPROTECTIVE, ONLY REDUCES THE DIFFERENCE FROM AN 80

10   PERCENT REDUCTION TO SAY, ABOUT, A 50 OR 60 PERCENT REDUCTION?

11   **A.**   I'M SORRY.  I DIDN'T UNDERSTAND THE QUESTION.

12   **Q.**   WELL, LET ME GO TO THIS DOCUMENT.  I'LL COME TO THE

13   APPROVE STUDY LATER.  YOU RESPOND HERE.  YOU SAY -- I WANT TO

14   GO TO YOUR SUGGESTION.  ARE YOU SUGGESTING SOMETHING BESIDES

15   USING LOW-DOSE ASPIRIN IN THIS PROPOSED STUDY?

16   **A.**   EITHER TO USE LOW-DOSE ASPIRIN OR TO NOT ALLOW PATIENTS

17   INTO THE STUDY WHO ARE ON LOW-DOSE ASPIRIN.

18   **Q.**   SO WHAT YOU SAY IS THIS:  "WHAT ABOUT THE IDEA OF

19   EXCLUDING HIGH-RISK CV PATIENTS?"  CORRECT?

20   **A.**   THAT'S CORRECT, BECAUSE THEY WOULD HAVE BEEN ON ASPIRIN.

21   **Q.**   THEN YOU SAY -- AND YOU GIVE EXAMPLES OF PEOPLE THAT HAVE

22   MI'S, CABG, AND PTCA?

23   **A.**   THAT'S CORRECT.

24   **Q.**   THEN YOU SAY, "THIS MAY DECREASE THE CV EVENT RATE SO THAT

25   A DIFFERENCE BETWEEN THE TWO GROUPS WOULD NOT BE EVIDENT?

1  A.   THAT'S CORRECT.

2  Q.   SO, I MEAN, YOU'RE GOING TO RUN A STUDY AT THIS POINT TO

3  BE READ BY DOCTORS IN THE COMMUNITY; CORRECT?

4  A.   WE WOULD CERTAINLY HOPE THAT WE WOULD BE ABLE TO PUBLISH

5  OUR DATA.

6  Q.   SO WHAT YOU WERE SUGGESTING WAS THAT BY NOT INCLUDING THE

7  HIGH-CV RISK PATIENTS, THAT THE DIFFERENCE BETWEEN THE VIOXX

8  GROUP AND THE COMPARATOR GROUP WOULD NOT BE EVIDENT; CORRECT?

9  A.   WELL, FIRST OF ALL, HIGH-RISK CV PATIENTS WOULD HAVE BEEN

10  ON ASPIRIN, SO REALLY WHAT WE WERE DISCUSSING WAS NOT INCLUDING

11  PATIENTS ON ASPIRIN.  YOU WOULD ALSO -- I SAID THIS EARLIER

12  TODAY -- HAVE A LOWER EVENT RATE, AND YOU MIGHT NOT BE ABLE TO

13  DISCERN THE DIFFERENCE BETWEEN THE TWO GROUPS.

14  Q.   BUT YOU WERE SAYING THAT THE DIFFERENCE BETWEEN THE TWO

15  GROUPS WOULD NOT BE EVIDENT; RIGHT?

16  A.   THAT'S CORRECT.

17  Q.   SO IS A FAIR INTERPRETATION OF THAT IS THAT YOU WOULD HAVE

18  A LOWER NUMBER OF HEART ATTACKS AND STROKES IF YOU DESIGNED THE

19  STUDY YOUR WAY?

20  A.   NO.  I DID SAY THAT -- REMEMBER, WE WERE TALKING ABOUT

21  WHETHER OR NOT TO ALLOW PATIENTS IN ON ASPIRIN.  ONCE YOU DON'T

22  ALLOW PATIENTS IN ON ASPIRIN, AUTOMATICALLY YOU ARE EXCLUDING

23  SOME PATIENTS WHO ARE AT HIGH RISK.  BUT THE NUMBERS THAT

24  DR. MUSLINER HAD ALSO ASSUMED THAT PATIENTS WHO WERE ON ASPIRIN

25  WOULD NOT BE IN THE STUDY, AS WELL.

1  **Q.**   BUT DR. MUSLINER DIDN'T USE THE WORDS "WOULD NOT BE

2  EVIDENT"; CORRECT?  YOU USED THOSE WORDS.

3  **A.**   THAT'S CORRECT.

4  **Q.**   BY "NOT BE EVIDENT," WHAT YOU ARE REALLY SAYING IS THAT WE

5  WOULD BE MASKING OR HIDING THE EVIDENCE OF POTENTIAL HEART

6  ATTACK PROBLEMS?

7  **A.**   NO, THAT IS NOT WHAT I WAS SAYING.  TO HAVE THE RESULT OF

8  A STUDY THAT YOU DIDN'T KNOW HOW TO INTERPRET IS NOT HELPFUL TO

9  ANYBODY.  IT WAS A THEORETICAL ISSUE THAT WE WERE DISCUSSING AT

10  THIS POINT IN TIME.  AND, IN FACT, WHEN WE WENT AND DID THE

11  VIGOR STUDY, WE DIDN'T HAVE AN EXCLUSION FOR HIGH-RISK

12  PATIENTS, ONLY THOSE ON ASPIRIN, AND SOME HIGH-RISK PATIENTS,

13  IN FACT, CAME INTO THE STUDY.

14  **Q.**   HERE, ORIGINALLY, DR. MORRISON SAYS, "WITHOUT COX-1

15  INHIBITION, YOU'LL GET MORE THROMBOTIC EVENTS, AND IT WOULD

16  KILL THE DRUG"; CORRECT?

17  **A.**   AGAIN, WHAT HE WAS REFERRING TO -- AND WE KNOW THAT FROM

18  THE LITERATURE THAT WE WERE LOOKING AT AS WELL AS MY E-MAIL --

19  IS THE POTENTIAL FOR NSAIDS, BECAUSE THEY'RE INHIBITING COX-1,

20  TO DECREASE THE RATE.  THE RATE WOULD, THEREFORE, BE HIGHER ON

21  A COX-2 INHIBITOR THAT DID NOT INCREASE IT.  WITHOUT A PLACEBO

22  IN THE STUDY, PEOPLE WOULD NOT KNOW HOW TO INTERPRET THE

23  RESULTS AND MIGHT INTERPRET THEM AS VIOXX CAUSING THE EVENTS,

24  EVEN THOUGH, AT THIS POINT IN TIME, THERE'S NO SCIENTIFIC DATA

25  WHATSOEVER TO SUGGEST THAT THAT WOULD BE THE CASE.

1   **Q.**   THAT WASN'T THE QUESTION.  MY QUESTION WAS, "YES" OR "NO":

2   DID DR. MORRISON SAY, "WITHOUT COX-1 INHIBITION, YOU WILL GET

3   MORE THROMBOTIC EVENTS AND KILL DRUG"?

4   **A.**   THAT IS WHAT HE WROTE.

5   **Q.**   OKAY.  SO YOU'RE FACED WITH THAT.  YOU ARE FACED WITH THE

6   THOUGHT THAT EITHER YOU USE ASPIRIN OR YOU DON'T USE ASPIRIN

7   AND THAT, IF YOU DON'T USE ASPIRIN, YOU'RE GOING TO GET MORE

8   THROMBOTIC EVENTS AND KILL DRUG; CORRECT?

9   **A.**   I WOULDN'T HAVE PUT IT QUITE LIKE THAT.  WE WERE AN ISSUE

10  OF DO WE USE ASPIRIN THAT MIGHT CONFOUND THE GI RESULTS, DO WE

11  NOT USE ASPIRIN THAT MIGHT CONFOUND THE CARDIOVASCULAR RESULTS,

12  AND REALLY WEIGHING WHAT THE MOST APPROPRIATE PATH FORWARD WAS.

13  **Q.**   SO WHAT YOU SAY, THEN, YOUR IDEA WAS LET'S NOT USE

14  LOW-DOSE ASPIRIN.  LET'S TAKE OUT THE HIGH-RISK PATIENTS AND

15  THEN WE'LL HAVE A LOWER HEART ATTACK AND STROKE RATE.  THEN, TO

16  THE DOCTORS READING THE RESULTS OF THE STUDY, THE DIFFERENCE

17  BETWEEN THE TWO DRUGS YOU'RE COMPARING HEART ATTACK RATES FOR

18  WOULD NOT BE EVIDENT.  CORRECT?

19          **MR. GOLDMAN:**  OBJECTION, ASKED AND ANSWERED.

20          **THE COURT:**  I'LL OVERRULE IT.

21          **THE WITNESS:**  AGAIN, I WOULDN'T PUT -- YOU PUT

22  SEVERAL THINGS IN THERE THAT WEREN'T QUITE RIGHT.  BY NOT

23  HAVING ASPIRIN IN, THAT MEANT MANY PATIENTS WHO WOULD BE AT

24  HIGH RISK WOULD BE EXCLUDED AND, YES, THE EVENT RATE MIGHT BE

25  LOWER AND YOU MIGHT NOT BE ABLE TO SEE A DIFFERENCE BETWEEN THE

DAILY COPY

1   TWO GROUPS.

2   **BY MR. ROBINSON:**

3   **Q.**   LET ME ASK YOU THIS:  WAS THIS, LIKE, THE FIRST STUDY THAT

4   YOU WERE GOING TO DESIGN FOR MERCK?

5   **A.**   NO.

6   **Q.**   WAS THIS ONE OF THE FIRST STUDIES YOU WERE GOING TO DESIGN

7   FOR MERCK?

8   **A.**   I THINK IT WAS THE SECOND OR THIRD.

9   **Q.**   NOW, YOU ARE NOT ONLY A MERCK SCIENTIST WORKING AT MERCK,

10  BUT YOU'RE A DOCTOR AT THIS TIME; RIGHT?  YOU HAVE TAKEN THE

11  HIPPOCRATIC OATH, RIGHT, TO DO NO HARM?

12  **A.**   SIR, I ALWAYS KEEP THAT WITH ME.

13  **Q.**   BUT YOU SAY THAT PART OF YOUR DUTIES ARE TO LET THE CHIPS

14  FALL WHERE THEY MAY AND LET THE RESULTS COME OUT THE WAY

15  THEY'RE GOING TO COME OUT; RIGHT?

16  **A.**   NO.  ACTUALLY, WHAT YOU WOULD LIKE TO DO IS DESIGN THE

17  STUDY THAT ARE GOING TO SHOW RESULTS THAT TELL PEOPLE SOMETHING

18  MEANINGFUL AND THAT ARE INTERPRETABLE.  THE ISSUES THAT WE WERE

19  DEALING WITH HERE WERE COMPLEX; THEY WERE NOT OBVIOUS.  WE WANT

20  TO PRESENT DATA THAT IS CLEAR TO PEOPLE, THAT THEY KNOW WHEN TO

21  DO WITH.  IN FACT, WHEN WE GOT THE VIGOR DATA, THERE WAS A

22  CONUNDRUM, AND THE SCIENTIFIC COMMUNITY DIDN'T KNOW WHAT TO DO

23  WITH THAT DATA.

24  **Q.**   WELL, I'M ACTUALLY TALKING ABOUT YOUR WORDS "WOULD NOT BE

25  EVIDENT."  WERE YOU SAYING THAT REALLY WE WOULD BE HIDING THE

1    EVIDENCE?  IS THAT WHAT I'M GETTING FROM THIS?

2    **A.**    NO, THAT IS NOT WHAT I WAS SAYING.

3    **Q.**    LET'S MOVE ON TO THE NEXT DOCUMENT.  THAT IS P1.0132.

4    NOW, MR. GOLDMAN QUICKLY WENT OVER THIS, BUT I WANT TO GO OVER

5    IT A LITTLE MORE THAN HE DID.  THIS IS DR. SCOLNICK'S MEMO;

6    RIGHT?

7    **A.**    THIS IS AN E-MAIL.

8    **Q.**    THIS IS DATED MARCH 9, 2000; RIGHT?

9    **A.**    THAT IS CORRECT.

10   **Q.**    THE PART MR. GOLDMAN READ SAID, "THE CV EVENTS ARE CLEARLY

11   THERE."

12   **A.**    THAT'S CORRECT.

13   **Q.**    BY "CV EVENTS" THAT MEANS HEART ATTACK, STROKES, BUT

14   CLEARLY HEART ATTACKS; RIGHT?

15   **A.**    CORRECT.

16   **Q.**    IN FACT, THE HEART ATTACKS TURNED OUT TO BE, WHAT,

17   FIVEFOLD INCREASED IN THE VIOXX GROUP OVER THE NAPROXEN GROUP?

18   **A.**    20 ON VIOXX AND 4 ON NAPROXEN.

19   **Q.**    SO THEY WERE CLEARLY THERE?

20   **A.**    THAT'S CORRECT.  THAT WASN'T THE DATA AT THAT POINT IN

21   TIME, BUT THERE WAS AN INCREASE, THAT'S TRUE.

22   **Q.**    GOING DOWN, IT SAYS -- LET'S GO DOWN TO -- THIS IS THE

23   PART MR. GOLDMAN READ:  "IT IS A SHAME, BUT IT IS A LOW

24   INCIDENCE AND IT IS MECHANISM-BASED, AS WE WORRIED IT WAS."

25   DID I READ THAT RIGHT?

 1   A.   YES, YOU DID.

 2   Q.   BY "MECHANISM-BASED," THE MECHANISM THAT THEY WERE TALKING

 3   ABOUT WAS AT THAT TIME THE DROP IN PROSTACYCLIN CAUSING AN

 4   INCREASE IN HEART ATTACKS, STROKES, WHATEVER?

 5   A.   I THINK THAT WAS THE THEORY THAT HE WAS REFERRING TO.  I

 6   CAN'T TELL YOU FOR SURE, BUT I THINK.

 7   Q.   DR. SCOLNICK, HE WENT TO HARVARD, TOO; RIGHT?

 8   A.   YES, HE DID.

 9   Q.   HE WENT TO HARVARD MEDICAL SCHOOL; RIGHT?

10   A.   A FEW YEARS BEFORE ME, THOUGH.

11   Q.   OKAY.  BUT HE HAD BEEN AROUND THE COMPANY LONGER THAN YOU

12   HAD; RIGHT?

13   A.   YES, HE HAD.

14   Q.   YOU HAD BEEN THERE, WHAT, FIVE YEARS, FOUR OR FIVE YEARS,

15   AT THAT TIME?

16   A.   THAT'S CORRECT.

17   Q.   NOW, HE'S PRESIDENT OF MERCK RESEARCH LABS; RIGHT?

18   A.   THAT'S CORRECT.

19   Q.   SO WHAT HE IS SAYING IS, "IT IS MECHANISM-BASED, AS WE

20   WORRIED ABOUT.  OATES AND ALAN AND BARRY WERE RIGHT ABOUT THE

21   METABOLITE MEANINGS, I.E. URINE PROSTACYCLIN DATA"?  IS THAT

22   WHAT HE'S TALKING ABOUT --

23   A.   I THINK THAT'S WHAT HE MEANS BY "PG."

24   Q.   OATES IS JOHN OATES FROM VANDERBILT?

25   A.   I THINK SO.

1  **Q.**   ALAN IS ALAN NIES, WHO SIGNED OFF AT THE BOTTOM OF YOUR
2  PERFORMANCE REVIEW; RIGHT?
3  **A.**   THAT'S RIGHT.
4  **Q.**   BARRY IS BARRY GERTZ, WHO ALSO SIGNED OFF -- HE IS YOUR
5  BOSS; RIGHT?
6  **A.**   HE WAS MY BOSS AT THE TIME -- NOT AT THIS POINT IN TIME,
7  BUT WHEN HE SIGNED THE FORM.
8  **Q.**   SO, BASICALLY, YOU'VE GOT DR. SCOLNICK, YOU'VE GOT
9  DR. NIES, AND YOU'VE GOT BARRY GERTZ, ALL THE PEOPLE AHEAD OF
10  YOU, SAYING THAT THEY BELIEVED THAT THERE WAS A MECHANISM WHERE
11  PROSTACYCLIN WOULD DROP WITH A COX-2 INHIBITOR; CORRECT?
12  **A.**   I WASN'T PART OF THOSE CONVERSATIONS WITH OATES AND ALAN
13  AND BARRY AT THAT POINT IN TIME, SO I CAN'T TELL YOU EXACTLY
14  WHAT THE DISCUSSIONS WERE.
15  **Q.**   NOW I WANT TO TAKE YOU TO THE NEXT DOCUMENT, WHICH IS --
16  ACTUALLY, IT'S GOING TO BE REICIN 1.
17          **MR. ROBINSON:**  I'LL GIVE A COPY TO COUNSEL.
18  **BY MR. ROBINSON:**
19  **Q.**   YOU RECEIVED A COPY OF THIS.  IT WAS AN E-MAIL CHAIN
20  BETWEEN YOU AND ELIAV BARR AND DEBORAH SHAPIRO AND OTHERS;
21  CORRECT?
22  **A.**   THAT'S WHAT IT APPEARS.  I DON'T RECALL SEEING THIS SINCE
23  2000, BUT --
24  **Q.**   WHY DON'T YOU TAKE A MOMENT TO REVIEW IT.  GO AHEAD.  ARE
25  YOU READY?

1   **A.**   YES.

2   **Q.**   I GUESS THIS IS ELIAV BARR TELLING YOU AND DEBORAH

3   SHAPIRO -- DEBORAH WAS THE ONE THAT WAS ACTUALLY UNBLINDED TO

4   THE RESULTS IN THE VIGOR STUDY; RIGHT?

5   **A.**   WHILE THE STUDY WAS ONGOING, SHE WAS THE UNBLINDED

6   STATISTICIAN WORKING WITH THE DSMB MONITORING BOARD.  LYNN

7   OPPENHEIMER, ALSO ON THIS LIST, WAS ONE OF THE HEADS OF THE

8   STATISTICAL GROUP.  NOT THE HEAD.  HE WAS DEBORAH'S BOSS, I

9   BELIEVE.

10  **Q.**   BY THE WAY, COUNSEL ASKED YOU SOME QUESTIONS ABOUT THAT

11  DATA SAFETY MONITORING BOARD.  DO YOU REMEMBER THAT?

12  **A.**   YES.

13  **Q.**   DR. MICHAEL WEINBLATT?

14  **A.**   THAT'S CORRECT.

15  **Q.**   YOU TESTIFIED ABOUT HIM IN THE JERSEY CASE; RIGHT?

16  **A.**   I'VE BEEN ASKED ABOUT HIM.

17  **Q.**   BASICALLY, JUST TO TELL THE JURY THIS, HE HAD BEEN A

18  CONSULTANT WITH MERCK SINCE 1995.  HE WAS THE HEAD OF THIS

19  BOARD; RIGHT?

20  **A.**   HE WAS THE HEAD OF THE DATA SAFETY MONITORING BOARD,

21  THAT'S CORRECT.

22  **Q.**   WAS HE A CONSULTANT WITH MERCK GOING BACK TO 1995?

23  **A.**   THAT'S TRUE.  HE GAVE US ADVICE AS WE WERE DEVELOPING

24  VIOXX.  HE KNEW VIOXX VERY WELL; THAT'S CORRECT.

25  **Q.**   HE AND HIS WIFE WERE STOCKHOLDERS IN MERCK; RIGHT?

DAILY COPY

1    **A.**   THEY MAY HAVE BEEN.

2    **Q.**   I THINK YOU STATED THAT.  DO YOU REMEMBER STATING THAT AT

3    ALL?  I DON'T WANT TO PUT IT OUT THERE --

4    **A.**   I DON'T RECALL.

5    **Q.**   OKAY.  WELL, DO YOU REMEMBER THAT IN FEBRUARY, MERCK --

6    AFTER YOU TURNED OVER THE RESULTS OF THE STUDY TO YOU, MERCK

7    PROMISED TO GIVE HIM $30,000 ADDITIONAL --

8    **A.**   I THINK YOU KIND OF MISCHARACTERIZED IT.  AT A PERIOD OF

9    TIME WHEN PEOPLE -- THAT WAS DONE BY THE MARKETING GROUP.  THE

10   MARKETING GROUP WAS ASKING HIM TO BE A CONSULTANT.  THE PEOPLE

11   WHO ARRANGED THE CONSULTANT AGREEMENT WITH HIM HAD NO IDEA WHAT

12   THE VIGOR RESULTS WERE AT THAT POINT IN TIME, NEITHER DID WE.

13   SO NONE OF US AT MERCK DID.  THAT WAS A CONSULTING AGREEMENT.

14   I DON'T KNOW HOW MUCH IT WAS FOR, BUT IT WAS BASICALLY

15   REIMBURSING HIM FOR TIME THAT HE WOULD BE GIVING OVER THE NEXT

16   THREE YEARS.

17   **Q.**   SO HE GOT 30 GRAND UP FRONT FOR THE NEXT THREE YEARS;

18   RIGHT?  AFTER HE SUPERVISED THIS VIGOR RESEARCH; RIGHT?

19   **A.**   I COULDN'T TELL YOU HOW MUCH HE GOT.  I WOULD NEVER HAVE

20   SEEN THE AGREEMENT.

21   **Q.**   OKAY.  LET ME GO BACK HERE.

22   **A.**   EXCEPT I MAY HAVE SEEN IT IN THE NEW JERSEY CASE, BUT NOT

23   AS A COURSE OF BUSINESS.

24   **Q.**   I'M GOING TO TRY TO MOVE ON.  WE ARE NOT GOING TO TAKE A

25   DAY LIKE THEY DID THERE.  I'M GOING TO TRY TO GET YOU OFF HERE.

1    NOW, IS IT TRUE THAT ELIAV -- HOW DO YOU PRONOUNCE THAT?

2    **A.**    ELIAV.

3    **Q.**    SO ELIAV, HE SAYS, NO. 1, "ARE THE VIGOR RESULTS REAL?"

4    HE ASKED THAT QUESTION?

5    **A.**    THAT'S CORRECT.

6    **Q.**    ACTUALLY, BEFORE THAT, HE SAID, THE SECOND PARAGRAPH, "THE

7    ADJUDICATION AND PRE-ADJUDICATION CVSAE ANALYSIS DEMONSTRATES

8    THAT THERE IS A GREATER INCIDENCE OF CVSAES IN PATIENTS TAKING

9    ROFECOXIB" -- THAT'S VIOXX -- "VERSUS NAPROXEN IN THE VIGOR

10   STUDY."  DID I READ THAT RIGHT?

11   **A.**    OH, YES, I HAVE GOT THAT.  THAT'S CORRECT.

12   **Q.**    THEN, IF YOU SEE THE PARAGRAPH THERE THAT'S HIGHLIGHTED ON

13   THE SCREEN TOO, IT SAYS, "THE CV ADJUDICATION CONFIRMS THAT

14   THERE IS A REAL PROBLEM IN VIGOR."  DID I READ THAT RIGHT?

15   **A.**    THAT'S CORRECT.

16   **Q.**    SO NOT ONLY DO WE HAVE DR. SCOLNICK, BUT WE HAVE ELIAV

17   MAKING A COMMENT ABOUT THE VIGOR STUDY; RIGHT?

18   **A.**    HE IS REFERRING TO THE VIGOR STUDY.  I'M NOT SURE THE

19   RELATION TO DR. SCOLNICK.

20   **Q.**    OKAY.

21   **A.**    BUT HE IS SAYING IN THE VIGOR STUDY THAT HE IS REFERRING

22   TO THE FACT THERE'S A DIFFERENCE IN THE CARDIOVASCULAR RATES

23   BETWEEN THE TWO GROUPS.

24   **Q.**    THEN IT SAYS, "THE RESULTS ARE NOT A CONSEQUENCE OF

25   MISCLASSIFICATION AND POTENTIAL BIASES THAT MAY HAVE OCCURRED

1   DUE TO NONTHROMBOTIC ISSUES RELATED TO ROFECOXIB, SUCH AS

2   INCREASED EDEMA AND HYPERTENSION, CAUSING AN INCREASED SCRUTINY

3   OF THE CARDIOVASCULAR STATUS OF THE ROFECOXIB PATIENTS,

4   RELATIVE TO THE NAPROXEN PATIENTS, THAT LED TO MORE PROCEDURES

5   AND MORE MI'S.  THAT'S WHAT HAPPENED IN FIT."  DID I READ THAT

6   RIGHT?

7   A.   YES, YOU DID.

8   Q.   THEN HE SAYS, "THE QUESTION OF BASELINE IMBALANCES IS

9   CERTAINLY MORE PROBLEMATIC STATISTICALLY."  DID I READ THAT

10  RIGHT?

11  A.   YES.

12  Q.   "IF YOU LOOK ENOUGH, YOU'LL FIND SOMETHING, SO YOU MAY BE

13  FOOLED.  SO WE ALL HAVE TO TAKE EVERYTHING WITH A GRAIN OF

14  SALT."  DID I READ THAT RIGHT?

15  A.   CORRECT.

16  Q.   THEN GOING DOWN TWO PARAGRAPHS, DOES HE SAY:  "DEBORAH HAS

17  ALREADY DONE AN ANALYSIS OF CV RISK FACTORS VERSUS EVENTS AND

18  FOUND THAT THERE DOES NOT APPEAR TO BE SEGREGATION OF EFFECT IN

19  THE HIGH-RISK PATIENTS.  I BELIEVE THE DATA BECAUSE IT IS

20  INTERNALLY CONSISTENT.  EVENT RATES GO UP WITH NUMBERS OF RISK

21  FACTORS, AND THE INCIDENCES ARE CONSISTENT WITH THE CV

22  LITERATURE IN HIGHER-RISK PATIENTS"?  DID I READ THAT RIGHT?

23  A.   YES, YOU DID.

24  Q.   WHAT I WANT TO GET TO ON THE SECOND PAGE, THERE IS A VERY

25  SHORT COMMENT BY YOU.  DO YOU SEE THAT?  IN AN E-MAIL TO,

1   ACTUALLY, DEBORAH SHAPIRO.  RIGHT IN THE MIDDLE OF THE PAGE.

2   **A.**   CORRECT.

3   **Q.**   WHY DON'T YOU READ INTO THE RECORD WHAT YOU SAY THERE.

4   **A.**   "BOTH SMOKING AND HRT SEEMED TO EXAGGERATE THE IMBALANCE.

5   KINDA SUPPORTS THE HYPOTHESIS THAT PATIENTS WITH A

6   PROTHROMBOTIC STATE ARE EITHER MORE SENSITIVE TO THE

7   CARDIOPROTECTIVE EFFECTS OF ASPIRIN/NAPROXEN OR THE NEGATIVE

8   EFFECTS OF VIOXX."

9   **Q.**   OKAY.  NOW, WHAT YOU'RE SAYING THERE IS THAT CERTAIN

10  PATIENTS WITH A MAYBE ATHEROSCLEROSIS ARE EITHER MORE SENSITIVE

11  TO CARDIOPROTECTIVE EFFECTS OF ASPIRIN, NAPROXEN, OR THE

12  NEGATIVE EFFECTS OF VIOXX?  DID I READ THAT RIGHT?

13  **A.**   THIS HAD NOTHING TO DO WITH ATHEROSCLEROSIS.  THIS WAS

14  PARTICULARLY LOOKING AT SMOKERS AND PATIENTS ON HORMONE

15  REPLACEMENT THERAPY, BOTH OF THEM, AND THERE WERE -- I THINK

16  WAS A GREATER NUMERIC IMBALANCE, WHICH MAYBE WAS CONSISTENT

17  WITH ASPIRIN OR NAPROXEN IN THIS STUDY HAVING A GREATER EFFECT

18  OR IF YOU THOUGHT IT WAS VIOXX HAVING A BIGGER EFFECT.  THE

19  HEAD OF STATISTICS THEN POINTED OUT TO ME THAT I WAS

20  OVERREADING THE DATA.

21  **Q.**   YOU SAID "OR THE NEGATIVE EFFECTS OF VIOXX."  YOU MEANT

22  THAT VIOXX COULD BE CAUSING THESE HEART ATTACKS; RIGHT?

23  **A.**   THAT'S CORRECT.  THIS WAS IN THE INITIAL DAYS WHEN WE WERE

24  CONSIDERING EVERYTHING.

25  **Q.**   WELL, YOU WROTE THIS ON MARCH 16, 2000; RIGHT?

1    **A.**   THAT'S CORRECT.  APPROXIMATELY A WEEK AFTER WE GOT

2    UNBLINDED.

3    **Q.**   DIDN'T YOU TESTIFY IN NEW JERSEY THAT YOU HAD THE ANSWERS

4    IN FOUR DAYS?

5              **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.  SHE HAS

6    TESTIFIED A NUMBER OF TIMES.  SHE CAN'T REMEMBER EVERYTHING SHE

7    SAID.

8              **MR. ROBINSON:**  WELL, I'M JUST GOING TO --

9              **THE COURT:**  OKAY.  LET HIM ASK HER.  IF SHE DOESN'T

10   KNOW, SHE --

11   **BY MR. ROBINSON:**

12   **Q.**   I'LL JUST ASK YOU.  DIDN'T YOU SAY THAT YOU HAD EVERYTHING

13   ALL FIGURED OUT WITH THIS NAPROXEN THEORY AS OF MARCH 13,

14   APPROXIMATELY FOUR DAYS AFTERWARDS?

15   **A.**   I DON'T THINK I SAID THAT.

16   **Q.**   IN ANY EVENT, HERE YOU ARE ON MARCH 16 -- BASICALLY, ON

17   MARCH 16, YOU'RE CONCEDING THAT ONE POSSIBILITY HERE MIGHT BE

18   THE NEGATIVE EFFECTS OF VIOXX; CORRECT?

19   **A.**   I WAS SAYING IT COULD BE NAPROXEN OR IT COULD BE VIOXX IN

20   THE VIGOR STUDY.  AS I SAID BEFORE, IF YOU LOOKED AT VIGOR

21   ALONE, YOU COULDN'T TELL ONE WAY OR THE OTHER.

22   **Q.**   NOW, LET ME MOVE ON TO ANOTHER DOCUMENT.  YOU WEREN'T

23   SAYING IT WAS EXCLUSIVELY THE CARDIOPROTECTIVE EFFECT OF VIOXX,

24   WERE YOU?

25   **A.**   NO, I WAS NOT SAYING THAT I THOUGHT THAT VIOXX WAS

1   CARDIOPROTECTIVE.

2   Q.   OKAY.

3   A.   WE HAD NO DATA THAT VIOXX WAS CARDIOPROTECTIVE FROM THE

4   VIGOR STUDY.

5   Q.   EVEN THOUGH YOU THOUGHT IT MIGHT BE VIOXX, WITHIN ABOUT 11

6   DAYS YOU AUTHORIZED A PRESS RELEASE TO GO OUT THAT BASICALLY

7   BLAMED EVERYTHING ON THE CARDIOPROTECTION OF VIOXX; RIGHT?

8   A.   AT THE TIME OF THE PRESS RELEASE, WE HAD -- FIRST OF ALL,

9   I WOULDN'T USE THOSE WORDS, BUT WE DID PUT OUT A PRESS RELEASE

10  THAT WAS AT THE TIME THAT WE SENT LETTERS TO INVESTIGATORS

11  TELLING THEM OF THE DATA AND WE SENT THE DATA TO THE FDA.  WE

12  HAD A CHANCE AT THIS POINT TO SEE ALL THE ALZHEIMER'S DATA, THE

13  OA DATA, THE CLINICAL PHARMACOLOGY DATA.

14        WE DID SAY IN THE PRESS RELEASE WE THOUGHT THE MOST

15  LIKELY EXPLANATION WAS NAPROXEN WAS ACTING AS A

16  CARDIOPROTECTIVE AGENT, BUT WE DID POINT OUT THAT THAT HAD

17  NEVER BEEN PROVEN IN OTHER CLINICAL TRIALS.  AND I'M

18  PARAPHRASING.  I'M SURE I DIDN'T USE THE EXACT TERMINOLOGY.

19  Q.   BUT YOU HAD IT ALL FIGURED OUT IN JUST 11 DAYS; RIGHT?

20  A.   I DON'T THINK -- FIRST OF ALL, I WOULDN'T USE THE WORD WE

21  "HAD IT ALL FIGURED OUT," BUT I DON'T THINK IT WAS 11 DAYS; I

22  THINK IT WAS APPROXIMATELY 2 WEEKS.

23  Q.   LET ME GIVE YOU P1.0581 AND ASK YOU IF THAT IS THE PRESS

24  RELEASE THAT YOU AUTHORIZED TO BE SENT OUT ON MARCH 27, 2000.

25  A.   I HAVE NO AUTHORIZATION FOR PRESS RELEASES.

DAILY COPY

1    Q.   WELL, CAN WE GO BACK TO YOUR -- I GUESS IT'S EXHIBIT

2    1227A, YOUR PERFORMANCE REVIEW DOCUMENT THERE.  IT'S THIS ONE

3    HERE.  SO IF YOU TURN, PLEASE, TO 800043, IN YOUR PERFORMANCE

4    REVIEW ON THIS PAGE 800043, ONE OF THE RESULTS YOU ACHIEVED IT

5    SAYS WAS "ONGOING SUPPORT TO PUBLIC AFFAIRS WITH REVIEWS OF

6    PRESS RELEASES; Q AND A; INTERVIEWS AND MEETING WITH ANALYSIS

7    POST-VIGOR LABEL APPROVAL."  DID I READ THAT RIGHT?

8    A.   THAT'S CORRECT.  I WOULD REVIEW THEM FOR SCIENTIFIC

9    ACCURACY, BUT I WAS NOT THE AUTHORIZATION FOR SENDING OUT PRESS

10   RELEASES.  I WAS ONE OF THE SCIENTIFIC REVIEWERS.

11   Q.   YOU WOULD REVIEW THE PRESS RELEASES FOR SCIENCE OR

12   SCIENTIFIC ACCURACY; RIGHT?

13   A.   THAT IS CORRECT.  NOT ALL PRESS RELEASES, BUT SOME, YES.

14   Q.   I MEAN, ARE YOU AWARE THAT -- DO YOU KNOW WHO JAN WIENER

15   IS?

16   A.   I KNOW JAN WIENER.

17   Q.   DO YOU KNOW MARY BLAKE?

18   A.   I KNOW MARY ELIZABETH BLAKE.

19   Q.   DO YOU UNDERSTAND THAT THEY BOTH SAID THAT THEY RELIED ON

20   YOU --

21            MR. GOLDMAN:  OBJECTION, YOUR HONOR.

22            THE COURT:  SUSTAINED.

23   BY MR. ROBINSON:

24   Q.   LET ME ASK YOU THIS.  WHILE YOU WORKED AT MERCK, DID MARY

25   AND JAN RELY ON YOU TO GIVE THEM THE SCIENTIFIC INFORMATION

DAILY COPY

1   BEFORE IT WENT OUT IN THE PRESS RELEASE, ABOUT THE VIGOR STUDY?

2   **A.**   WITH VIGOR, THEY WOULD PROBABLY RELY ON ME AND OTHERS TO

3   PROVIDE THEM WITH SCIENTIFIC INFORMATION.

4   **Q.**   DID YOU GIVE THEM INFORMATION, BOTH OF THEM, ABOUT THE

5   VIGOR STUDY?

6   **A.**   SURE.  ON OCCASION, I WOULD GIVE THEM INFORMATION, YES.

7   **Q.**   SO, BASICALLY, IN THE FIRST PRESS RELEASE THAT YOU PUT OUT

8   ON MARCH 27, 2000, WHAT DO YOU SAY ABOUT THE CARDIOPROTECTIVE

9   EFFECT OF NAPROXEN?

10  **A.**   WE SAID THAT "FEWER THROMBOTIC EVENTS WERE OBSERVED IN

11  PATIENTS TAKING NAPROXEN IN THIS GI OUTCOMES STUDY, WHICH IS

12  CONSISTENT WITH NAPROXEN'S ABILITY TO BLOCK PLATELET

13  AGGREGATION.  THIS EFFECT ON THESE EVENTS HAS NOT BEEN OBSERVED

14  PREVIOUSLY IN ANY CLINICAL STUDIES FOR NAPROXEN."

15           **MR. ROBINSON:**  YOUR HONOR, I WOULD OFFER P1.0581,

16  PLEASE.

17           **MR. GOLDMAN:**  NO OBJECTION.

18           **THE COURT:**  LET IT BE ADMITTED.

19           **MR. ROBINSON:**  COULD WE SHOW IT, YOUR HONOR?

20           **THE COURT:**  YES.

21  BY MR. ROBINSON:

22  **Q.**   YOU SAY, "IN ADDITION, SIGNIFICANTLY FEWER THROMBOEMBOLIC

23  EVENTS WERE OBSERVED IN PATIENTS TAKING NAPROXEN IN THIS GI

24  OUTCOMES STUDY, WHICH IS CONSISTENT WITH NAPROXEN'S ABILITY TO

25  BLOCK PLATELET AGGREGATION."  IS THAT RIGHT?

1    **A.**   THAT'S CORRECT.  THEN WE GO ON TO SAY, "THIS HAS NOT BEEN

2    PREVIOUSLY OBSERVED IN OTHER CLINICAL STUDIES WITH NAPROXEN."

3    **Q.**   IN FACT, AT THAT TIME THERE WERE NO RANDOMIZED CLINICAL

4    STUDIES ON NAPROXEN WHEN YOU PUBLISHED THIS PRESS RELEASE?

5    **A.**   CERTAINLY, THERE HAD BEEN RANDOMIZED CLINICAL STUDIES DONE

6    WITH NAPROXEN.  IT WOULDN'T HAVE BEEN APPROVED AS A DRUG IF

7    THEY HADN'T BEEN --

8    **Q.**   NO.  THERE'S BEEN NO RANDOMIZED CLINICAL STUDIES THAT

9    SHOWED A CARDIOPROTECTIVE EFFECT OF NAPROXEN AT THAT TIME?

10   **A.**   THAT'S CORRECT.  THAT'S WHAT WE SAID IN THE PRESS RELEASE.

11   **Q.**   FRANKLY, YOU SHOWED THE JURY A STUDY OF FLURBIPROFEN;

12   RIGHT?

13   **A.**   THAT'S CORRECT.

14   **Q.**   WELL, AFTER THE FDA ISSUED THAT WARNING LETTER YOU SHOWED

15   THE JURY, IN APRIL OF 2005, RIGHT, FLURBIPROFEN NOW HAS A

16   BLACK-BOX WARNING LABEL ON IT; ARE YOU AWARE OF THAT?

17   **A.**   WELL, AS WE SHOWED, IN 2005, ALL NSAIDS, INCLUDING

18   NAPROXEN AND FLURBIPROFEN, HAVE A WARNING LABEL.  ALTHOUGH, IN

19   THAT 2005 MEMO, THE FDA SAID THAT NAPROXEN ACTUALLY MAY BE THE

20   EXCEPTION, BUT THEY DID PUT A WARNING LABEL ON IT.

21   **Q.**   SO LET'S SEE IF WE CAN REVIEW, BECAUSE YOU SAID YOU WERE

22   INVOLVED IN THIS EVERY TIME THERE WAS SOME ISSUE CAME UP ABOUT

23   THE SAFETY OF VIOXX; RIGHT?  YOU REALLY MONITORED THIS; RIGHT?

24   **A.**   WE CERTAINLY MONITORED THE SAFETY OF VIOXX, YES.

25   **Q.**   YOU ATTENDED THE DIFFERENT CONFERENCES REGARDING VIOXX,

1  RIGHT, BY THE GOVERNMENT?

2  **A.**   CERTAINLY.  I WAS AT FDA ADVISORY COMMITTEES.  I WASN'T AT

3  THE FIRST ONE.

4  **Q.**   SO, BASICALLY, DRUGS LIKE MOBIC, FELDENE, NAPROXEN,

5  FLURBIPROFEN NOW ALL HAVE BLACK-BOX WARNINGS; RIGHT?

6  **A.**   THAT'S CORRECT.

7  **Q.**   BUT YOU SAY THAT NAPROXEN IS CARDIOPROTECTIVE; RIGHT?

8  **A.**   I THINK IN A DOSE OF 500 MILLIGRAMS TWICE DAILY, IT CAN

9  BE.  THE FDA SAID THAT IN THAT 2005 MEMO AS WELL.

10  **Q.**   ARE YOU AWARE THAT, IN THE RECENT STUDY BY KEARNEY, THEY

11  FOUND THAT IT WAS A .92 CARDIOPROTECTION?

12  **A.**   WAS THAT A RANDOMIZED, LARGE CLINICAL TRIAL?

13  **Q.**   WAS IT A RANDOMIZED CLINICAL TRIAL?

14  **A.**   I DON'T KNOW WHAT STUDY YOU'RE REFERRING TO.

15  **Q.**   YOU'RE NOT AWARE OF THE KEARNEY STUDY IN 2006?

16  **A.**   YOU'D HAVE TO SHOW ME THE STUDY.  IT MAY HAVE BEEN AN

17  OBSERVATIONAL STUDY.

18  **Q.**   IN ANY EVENT, YOU PUBLISHED THIS IN 11 DAYS WITHOUT ANY

19  STUDY, RANDOMIZED CLINICAL STUDY, ON NAPROXEN; RIGHT?

20  **A.**   AGAIN, I DON'T THINK -- WAS IT 11 DAYS?

21  **Q.**   ON THE DATE THAT YOU SAID IT COULD BE A PROBLEM WITH

22  VIOXX --

23  **A.**   I THINK IT'S 16 OR 17 DAYS?

24  **Q.**   OH, I'M SORRY.  I MEANT 11 DAYS AFTER YOU WROTE THAT

25  E-MAIL ON MARCH 16.

1   **A.**   WHICH E-MAIL?  THE ONE WITH DR. BARR?

2   **Q.**   RIGHT.

3   **A.**   THAT'S CORRECT.  THIS WAS 11 DAYS AFTER THAT E-MAIL.

4   **Q.**   ALL RIGHT.  I THINK THIS IS ALREADY IN EVIDENCE, BUT I'LL

5   GIVE YOU A COPY OF IT.  IT'S P1.0118.  SO THIS IS AN E-MAIL

6   CHAIN ACTUALLY ORIGINALLY, I GUESS, FROM ED SCOLNICK TO YOU,

7   AND THEN YOU RESPOND TO HIM; RIGHT?

8   **A.**   THAT'S CORRECT.

9   **Q.**   LET ME BLOW UP THE MIDDLE OF THE DOCUMENT.  SO THIS IS

10  AFTER YOU HAVE GOT IT ALL FIGURED OUT; RIGHT?  WOULD YOU AGREE,

11  THEN, AFTER THE PRESS RELEASE?

12  **A.**   I WOULD NEVER REFER TO IT IN THAT WAY, BUT AT THAT PERIOD

13  OF TIME WE THOUGHT THAT THE TOTALITY OF DATA WAS CONSISTENT

14  WITH NAPROXEN HAVING A CARDIOPROTECTIVE EFFECT, THAT IS

15  CORRECT.

16  **Q.**   YOU DON'T THINK YOU WERE WEARING YOUR DEFENDER HAT AT THIS

17  TIME A LITTLE BIT?

18  **A.**   NO, I DO NOT THINK I WAS WEARING MY DEFENDER HAT.

19  **Q.**   OKAY.  SO DR. SCOLNICK SAYS -- AND HE PUTS UNDER SUBJECT,

20  HE SAYS, "RA AND CV MORTALITY."  DID I READ THAT RIGHT?

21  **A.**   THAT'S CORRECT.

22  **Q.**   UNDER "IMPORTANCE" HE PUTS "HIGH."  HIGH IMPORTANCE;

23  RIGHT?

24  **A.**   RIGHT.

25  **Q.**   HE SAYS, "HI, ALISE.  I HAVE BEEN TRADING E-MAILS WITH

1  DOUG GREENE IN REALTIME.  WE ARE ALL ONLINE TOO LATE."  IT MUST

2  HAVE BEEN 10:42 AT NIGHT; RIGHT?

3  **A.**   THAT'S CORRECT.

4  **Q.**   SORT OF LIKE THIS TRIAL FOR SOME OF US HERE.  "I WILL TELL

5  YOU, MY WORRY QUOTIENT IS HIGH."  DID HE SAY THAT?

6  **A.**   HE DID.

7  **Q.**   SO HE IS WORRYING ABOUT THESE VIGOR RESULTS; RIGHT?

8  **A.**   THAT'S CORRECT.

9  **Q.**   THIS IS 16 DAYS AFTER YOU PUT OUT THE PRESS RELEASE?

10 **A.**   THAT'S CORRECT.

11 **Q.**   THEN HE SAYS, "I ACTUALLY AM IN MINOR AGONY."  THEN HE

12 SAYS, "WHAT I REALLY WANT TO DO IS A 10,000-VERSUS-10,000

13 PATIENT STUDY IN MILD MODERATE OA TYLENOL VERSUS VIOXX WITH

14 P.R.N. LOW-DOSE ASPIRIN FOR THOSE JUDGED TO NEED IT."  DID I

15 READ THAT --

16 **A.**   YOU DID.

17 **Q.**   -- RIGHT?  OKAY.  THEN IT SAYS, "SAFETY FIRST PRIMARY

18 ENDPOINT AND EFFICACY SECONDARY OR CO-PRIMARY."  DID I READ

19 THAT RIGHT?

20 **A.**   YES, YOU DID.

21 **Q.**   THEN HE SAYS, "WE WILL" -- AND HE PUTS THIS IN BIG --

22          **MR. ROBINSON:**  JIM, CAN WE PUT DOWN THE PART WHERE HE

23 PUTS IT IN BIG BOLD -- THIS PART RIGHT HERE.

24          **THE COURT:**  JUST UNDERLINE IT.

25          **MR. ROBINSON:**  YES, JUST UNDERLINE.

1  BY MR. ROBINSON:

2  Q.   HE SAYS, "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL

3  WE DO THIS STUDY."  IS THAT RIGHT?

4  A.   THAT IS WHAT HE WROTE.

5  Q.   THEN IS IT TRUE THAT YOU AUTHORIZED ANOTHER PRESS RELEASE

6  THAT WENT OUT 16 DAYS AFTER THAT E-MAIL?

7  A.   I'M NOT SURE WHICH PRESS RELEASE.  AGAIN, I'LL TELL YOU

8  I'M NOT THE PERSON WHO AUTHORIZES PRESS RELEASES.  I MAY OR MAY

9  NOT HAVE REVIEWED IT.

10  Q.   I THINK YOUR ROLE WAS TO VERIFY IT'S SCIENTIFICALLY VALID;

11  RIGHT?

12  A.   I WAS NOT ASKED TO REVIEW ALL PRESS RELEASES.

13  Q.   BUT WOULD YOU AGREE THAT SINCE YOU WERE INTIMATELY

14  INVOLVED WITH VIGOR AND YOU WERE THE ONE DEALING WITH JAN

15  WIENER AND MARY BLAKE, THAT THIS IS ONE OF THE ONES YOU WOULD

16  HAVE LOOKED AT BEFORE IT WENT OUT?

17  A.   I MAY OR MAY NOT HAVE.  IF I WAS NOT IN THE OFFICE, OTHER

18  PEOPLE WOULD HAVE LOOKED AT IT.  SO I WOULD HAVE TO READ IT AND

19  SEE IF I CAN REMEMBER WHETHER I LOOKED AT IT.

20  Q.   GO AHEAD.  READ IT.

21       MR. ROBINSON:  YOUR HONOR, I WOULD OFFER THIS PRESS

22  RELEASE.  I THINK IT'S IN EVIDENCE, BUT IT'S 1.0583.

23       MR. GOLDMAN:  NO OBJECTION.

24       THE COURT:  LET IT BE ADMITTED IF IT'S NOT.

25

1  BY MR. ROBINSON:

2  **Q.**    SO THE DATE OF THAT, DR. REICIN, IS APRIL 28, 2000?

3  **A.**    THAT'S CORRECT.

4  **Q.**    THE HEADLINE IS, "MERCK CONFIRMS FAVORABLE CARDIOVASCULAR

5  SAFETY PROFILE OF VIOXX"?

6  **A.**    THAT'S CORRECT.

7  **Q.**    THAT'S 16 DAYS AFTER THE PRESIDENT OF MERCK RESEARCH

8  LABORATORIES SAYS HE IS IN MINOR AGONY AND HE WANTS TO DO A CV

9  OUTCOMES STUDY; RIGHT?

10  **A.**    THAT'S CORRECT.  YOU HAVE TO UNDERSTAND DR. SCOLNICK.  HE

11  TOOK HIS JOB AS HEAD OF MERCK RESEARCH LABS AND THE SCIENTIFIC

12  AND SAFETY OFFICER FOR THE COMPANY EXTREMELY, EXTREMELY

13  SERIOUSLY.  HE ALWAYS WORRIED, AND IT WAS COMFORTING FOR THOSE

14  OF US WHO WORKED FOR HIM THAT HE DID.  HE WAS ALWAYS PUSHING

15  AND PUSHING US THAT WE SHOULD CONTINUE TO LOOK AT THE DATA, WE

16  SHOULD CONTINUE TO THINK ABOUT IT, AND THAT IS WHAT THAT E-MAIL

17  REFLECTS.

18  **Q.**    IN ANY EVENT, MERCK RECONFIRMED THE CARDIOVASCULAR SAFETY

19  PROFILE, RIGHT, OF VIOXX?

20  **A.**    THAT IS CORRECT.  THIS IS WHAT WE BELIEVED WE WERE SEEING

21  IN VIGOR.  AND, IN FACT, IT'S STILL WHAT I BELIEVE WE SAW IN

22  VIGOR.

23  **Q.**    ACTUALLY, THAT WAS AT A TIME WHERE DR. SCOLNICK IS SAYING

24  WE HAVE GOT TO DO A CV OUTCOMES STUDY; RIGHT?

25  **A.**    HE ASKED US TO LOOK INTO WHETHER WE COULD TO DO A TYLENOL

1    CV OUTCOMES STUDY.

2    **Q.**   IN FACT, ARE YOU AWARE THAT, UNDER OATH, IN THE DEPOSITION

3    IN THIS COURTROOM --

4              **THE COURT:**   SUSTAINED.

5    **BY MR. ROBINSON:**

6    **Q.**   ARE YOU AWARE THAT -- LET ME ASK IT THIS WAY.   YOU SAID

7    THAT -- IS IT TRUE THAT THERE WAS GOING TO BE A STUDY CALLED

8    VALOR?

9    **A.**   WE WERE CONSIDERING SEVERAL DIFFERENT DESIGNS FOR CV

10   OUTCOME STUDIES, AND I CAN EXPLAIN TO YOU WHAT THOSE DESIGNS

11   WERE AND WHY WE CONSIDERED THEM.   VALOR WAS ONE OF THOSE

12   STUDIES; THAT IS TRUE.

13   **Q.**   VALOR WAS SUPPOSED TO BE A CV OUTCOMES STUDY; RIGHT?

14   **A.**   VALOR WAS ONE OF THE STUDIES THAT WE WERE CONSIDERING AS A

15   CV OUTCOMES STUDY; THAT IS CORRECT.

16   **Q.**   THESE THREE STUDIES THAT YOU CALLED 203 -- RIGHT?

17   REMEMBER ON DIRECT --

18   **A.**   THAT WAS PROTOCOL 203, WHICH WE CONSIDERED TO BE THE CV

19   OUTCOMES STUDY WITH VIOXX; THAT'S CORRECT.

20   **Q.**   WELL, WASN'T THAT SORT OF THE RESIDUE OF YOU CANCELING THE

21   VALOR STUDY AND NOW WE'LL LOOK AT CV RISKS IN THE 203 STUDY?

22   **A.**   NO.   THAT'S A COMPLETE MISCHARACTERIZATION.

23   **Q.**   ISN'T IT TRUE THAT THE WAY THE 203 STUDY WAS DESIGNED, YOU

24   WEREN'T GOING TO GET RESULTS FROM THOSE STUDIES UNTIL THE YEAR

25   2006; RIGHT?

2379

1   **A.**   I CAN'T REMEMBER THE EXACT DATE.  2005, 2006.  YEAH, THAT

2   MAY HAVE BEEN CORRECT.

3   **Q.**   WELL, THAT'S NOT GOING TO DO YOU A LOT OF GOOD IN 2000;

4   RIGHT?

5   **A.**   THAT IS CORRECT.

6   **Q.**   YOU SAID THAT THE APPROVE STUDY STARTED IN JANUARY OF

7   2000; RIGHT?

8   **A.**   THAT'S CORRECT.

9   **Q.**   SO HERE YOU ARE IN 2000 AND WE'VE GOT QUESTIONS ABOUT

10  WHETHER VIOXX IS CAUSING HEART ATTACKS, AND YOU'RE GOING TO

11  WAIT UNTIL 2006 TO KEEP THE DRUG ON THE MARKET?

12  **A.**   I DON'T EVEN KNOW HOW TO ANSWER THAT QUESTION BECAUSE THE

13  TWO AREN'T REALLY RELATED.  AT THAT POINT IN TIME, WE HAD

14  EXTENSIVE DATA IN ALZHEIMER'S, AND THOSE STUDIES WERE STILL

15  ONGOING.  WE HAD APPROVE THAT WAS ONGOING.  WE SAID WE ARE

16  GOING TO CONTINUE TO COLLECT DATA FROM THESE STUDIES.  IN THE

17  ALZHEIMER'S STUDIES, AS YOU SAW, THE RATES WERE ACTUALLY LOWER

18  ON VIOXX THAN THEY WERE ON PLACEBO.  THE CHANCE OF VIOXX HAVING

19  AN INCREASED RATE WHEN WE SAW LOWER EVENT RATES THAN PLACEBO

20  WERE QUITE SMALL.

21  **Q.**   I'M NOT ASKING YOU ABOUT -- I'LL COME TO THE ALZHEIMER'S

22  AND I'LL COME TO THE OA.  BUT, IN ANY EVENT, LET ME SHOW YOU

23  THE NEXT DOCUMENT, WHICH IS P1.0541.  THIS IS AN E-MAIL THAT

24  YOU RECEIVED ON MAY 25 WITHIN ABOUT THREE WEEKS OF THAT PRESS

25  RELEASE WE JUST SAW; RIGHT?  2000.

1   **A.**   THAT'S CORRECT.  THIS WAS SOON AFTER THE PRIMARY RESULTS

2   OF THE GI AND CARDIOVASCULAR RESULTS WERE PRESENTED BY ONE OF

3   THE STEERING COMMITTEE MEMBERS AT A SCIENTIFIC MEETING.

4           **MR. ROBINSON:**  YOUR HONOR, I WOULD OFFER P1.0541 INTO

5   EVIDENCE, PLEASE.

6           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

7   THE BENCH.)

8           **MR. GOLDMAN:**  YOUR HONOR RESERVED RULING ON THIS

9   DOCUMENT, AND THIS DOCUMENT CONTAINS RANK HEARSAY.  IT'S AN

10  ANALYST REPORT THAT I SUSPECT MR. ROBINSON NOW WANTS TO --

11          **MR. ROBINSON:**  I'M GOING TO GET INTO THE FIRST

12  PARAGRAPH ONLY.

13          **THE COURT:**  JUST GO INTO IT.  JUST ASK HER ABOUT IT.

14          **MR. ROBINSON:**  YOUR HONOR, ACTUALLY, SHE DID GET THIS

15  REPORT.

16          **MR. GOLDMAN:**  IT'S NOT A MATTER OF HER GETTING IT.

17          **MR. ROBINSON:**  IT GOES TO NOTICE.

18          **MR. GOLDMAN:**  NO.  IT'S AN ANALYST REPORT.  IT'S

19  HEARSAY, JUDGE.

20          **MR. ROBINSON:**  I DON'T THINK.  IT GOES TO WHAT SHE

21  KNEW AT THE TIME.  IT GOES TO HER STATE OF MIND.

22          **THE COURT:**  WAIT JUST A MINUTE.  ONE AT A TIME.

23          **MR. GOLDMAN:**  WHAT AN ANALYST HAS TO SAY ABOUT VIOXX

24  DOES NOT WHAT DR. REICIN ON NOTICE OF ANY RISK ASSOCIATED WITH

25  THE MEDICINE.  THIS IS AN OPINION BY AN ANALYST BASED ON HIS

 1    REVIEW OF THE DATA.  THAT DOESN'T GO TO NOTICE AT ALL.

 2            **THE COURT:**  LET'S ASK HER ABOUT IT AND LET'S SEE WHAT

 3    SHE KNOWS ABOUT IT.

 4            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

 5    OPEN COURT.)

 6    **BY MR. ROBINSON:**

 7    **Q.**   OKAY.  SO YOU RECEIVED THIS E-MAIL ON MAY 25, 2000, FROM

 8    MARGIE MCGLYNN.  WHO IS MARGIE MCGLYNN?

 9    **A.**   SHE WAS IN THE MARKETING GROUP, ONE OF THE MARKETING

10    GROUPS.

11    **Q.**   IT WAS DATED MAY 25, 2000; RIGHT?

12    **A.**   THAT'S CORRECT.

13    **Q.**   THAT'S ABOUT 28 DAYS AFTER THE LAST PRESS RELEASE -- 27

14    DAYS AFTER THE PREVIOUS PRESS RELEASE OF APRIL 28?

15    **A.**   THAT'S CORRECT.

16    **Q.**   SO WHAT MARGIE SAYS TO YOU IS THAT:  "ALISE" -- SHE

17    MISSPELLS YOUR NAME; RIGHT?

18            **MR. GOLDMAN:**  OBJECTION.  THIS IS READING FROM A

19    HEARSAY DOCUMENT, JUDGE.

20            **THE COURT:**  WELL, YOU'RE OFFERING THE DOCUMENT?

21            **MR. ROBINSON:**  YES, YOUR HONOR.

22            **THE COURT:**  I'LL ADMIT THE DOCUMENT.  IT'S BEEN

23    RECEIVED BY HER, TO HER, AND I'LL ALLOW IT.

24    **BY MR. ROBINSON:**

25    **Q.**   SO, IT SAYS, "ALISE, ATTACHED ARE TWO ANALYST REPORTS

1   WHICH MOST CLEARLY DEMONSTRATE THE SUCCESS OF OUR EFFORTS TO

2   DIFFUSE THE CV RISK FOR VIOXX."  DID I READ THAT RIGHT?

3   **A.**   NO.  YOU LEFT OUT A WORD.

4   **Q.**   OKAY.  WELL, WHY DON'T YOU READ THAT SENTENCE INTO THE

5   RECORD, PLEASE.

6   **A.**   "ALICE" -- I THINK SHE MEANT ALISE -- "ATTACHED ARE TWO

7   ANALYST REPORTS WHICH MOST CLEARLY DEMONSTRATE THE SUCCESS OF

8   OUR EFFORTS TO DIFFUSE THE CV RISK ISSUE FOR VIOXX."

9   **Q.**   OKAY.  THEN SHE SAYS, "YOU PLAYED A MAJOR ROLE IN MAKING

10  THIS HAPPEN"; CORRECT?

11  **A.**   THAT IS WHAT THAT SAYS, YEAH.

12  **Q.**   "ALONG WITH BRIAN."  WHO IS BRIAN?

13  **A.**   THAT WOULD BE, I BELIEVE, BRIAN DANIELS, WHO WAS ANOTHER

14  PHYSICIAN WHO WORKED WITH ME.

15  **Q.**   "AND I KNOW MANY OTHERS SUPPORTING YOU IN MRL."  THAT'S

16  MERCK RESEARCH LABORATORIES?

17  **A.**   THAT'S CORRECT.

18  **Q.**   THEN SHE SAYS, "I WANTED TO PERSONALLY THANK YOU FOR ALL

19  OF YOUR EFFORTS AND THE TREMENDOUS SUPPORT YOU PROVIDED FOR THE

20  MARKETING ORGANIZATION."  DID I READ THAT RIGHT?

21  **A.**   YES, YOU DID.

22  **Q.**   SO IT'S TWO MONTHS AFTER THE VIGOR RESULTS COME OUT AND

23  YOU'RE BEING CONGRATULATED FOR DIFFUSING THE CV RISK.  IS THAT

24  A FAIR SUMMARY OF THIS?

25  **A.**   IT WAS RIGHT AFTER WE PRESENTED THE DATA.  THOSE ARE THE

1   WORDS SHE USED.  THAT WAS CERTAINLY NOT THE INTENTION OF MERCK

2   RESEARCH LABS TO DIFFUSE AN ISSUE, BUT THOSE ARE THE WORDS SHE

3   USED.

4   Q.  DID YOU SEND HER AN E-MAIL BACK SAYING, "MARGIE, DON'T SAY

5   I DIFFUSED THESE CV RISKS BECAUSE I WOULD NEVER DO THAT"?

6   A.  I DON'T THINK I SENT HER AN E-MAIL THEN.

7   Q.  AT SOME POINT WERE YOU INVOLVED IN THE PUBLICATION OF THE

8   VIGOR ARTICLE?

9   A.  I WAS ONE OF THE AUTHORS.

10  Q.  ALONG WITH DEBORAH SHAPIRO AT MERCK.

11  A.  DEBORAH SHAPIRO WAS ALSO AN AUTHOR.  WE WERE THE ONLY TWO

12  MERCK AUTHORS.  THE REMAINDER OF THE AUTHORS WERE MEMBERS OF

13  THE STEERING COMMITTEE WHO DID NOT WORK FOR MERCK.

14  Q.  ONE OF THEM WAS THIS CLAIRE BOMBARDIER; IS THAT RIGHT?

15  A.  THAT'S CORRECT.  SHE'S A PROFESSOR AT UNIVERSITY OF

16  TORONTO.

17  Q.  ANOTHER ONE WAS LOREN LAINE?

18  A.  THAT'S CORRECT.  HE'S A PROFESSOR AT U.S.C., I THINK.

19  Q.  LET ME GIVE YOU A COPY OF THE ARTICLE YOU PUBLISHED WITH

20  THAT GROUP.

21        MR. ROBINSON:  FOR THE RECORD, THAT'S P2.0183.

22  BY MR. ROBINSON:

23  Q.  NOW, YOU HAD SOME INVOLVEMENT IN HELPING TO WRITE THAT

24  ARTICLE?

25  A.  YES.  LOREN LAINE WAS THE ONE WHO DID THE FIRST DRAFT, AND

1  THEN HE AND I AND CLAIRE MET, AND THEN SEVERAL OTHER -- WE MET

2  WITH THE ENTIRE STEERING COMMITTEE, AND SEVERAL OTHER PEOPLE

3  WORKED ON THE DRAFT AS WELL.

4  **Q.**   HAVE YOU EVER USED THE TERM "FLIPPING THE DATA" BEFORE?

5  **A.**   I HAVE.

6  **Q.**   WHAT DOES THAT MEAN FOR THE JURY?

7  **A.**   WELL, DO YOU WANT --

8  **Q.**   JUST THAT TERM, WHAT DOES IT MEAN, "FLIPPING THE DATA"?

9  **A.**   WELL, I THINK WHAT WE WERE TALKING ABOUT WAS DO YOU TALK

10  ABOUT THE RELATIVE RISK OF A VERSUS B OR B VERSUS A.

11  **Q.**   SO WOULD YOU AGREE THAT IF, FOR EXAMPLE, I SAID, "THE

12  VIGOR STUDY SHOWED A FIVEFOLD INCREASE IN HEART ATTACK RISKS IN

13  VIOXX OVER NAPROXEN," THAT WOULD BE THE NORMAL WAY THE DATA

14  WOULD BE PRESENTED; RIGHT?

15  **A.**   NO, I DON'T THINK THERE'S A NORM.  IT DEPENDS -- IT REALLY

16  DEPENDS.  OR YOU COULD SAY, "THERE WAS AN 80 PERCENT REDUCTION

17  OF EVENTS ON NAPROXEN COMPARED WITH VIOXX," DEPENDING ON WHAT

18  YOU THOUGHT THE MOST LIKELY EXPLANATION WAS.

19  **Q.**   LATER ON, WHEN WE TALK ABOUT DR. TOPOL, WE WILL SEE WHAT

20  "FLIPPING THE DATA" MEANT TO YOU, BUT RIGHT NOW WHAT I'D LIKE

21  TO DO IS ASK YOU THIS.

22  **A.**   WE HAVE PRESENTED THE DATA --

23          **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.

24  **BY MR. ROBINSON:**

25  **Q.**   LET ME ASK YOU, NOW, IN THIS ARTICLE THAT WAS PUBLISHED,

1    WHEN WAS IT PUBLISHED?

2    **A.**    THIS ARTICLE WAS PUBLISHED IN NOVEMBER.  WE SUBMITTED THE

3    DATA IN MAY OF 2000, AND WE SUBMITTED THE PRIMARY ANALYSES FOR

4    THE STUDY.

5    **Q.**    IN THE ARTICLE ITSELF THAT YOU PUBLISHED IN NOVEMBER OF

6    2000, WHAT WERE THE NUMBER OF HEART ATTACK EVENTS YOU SAID WERE

7    IN THE VIOXX GROUP?

8    **A.**    WE SAID IT WAS 17 VERSUS 4, 17 ON VIOXX VERSUS 4 ON

9    NAPROXEN, WHICH WAS STATISTICALLY SIGNIFICANT.  AND THE NUMBERS

10   IN HERE WERE BASED ON THE PRE-SPECIFIED CUTOFF DATE.  I

11   MENTIONED THAT THE DATA SAFETY MONITORING BOARD ASKED US TO PUT

12   TOGETHER A PLAN, AND WE HAD A PRE-SPECIFIED CUTOFF FOR DATA.

13   **Q.**    SO THAT DOCUMENT WAS PUBLISHED, WHAT, THE MIDDLE OF

14   NOVEMBER 2000; RIGHT?

15   **A.**    THAT'S CORRECT.

16   **Q.**    NOW, IN OCTOBER, DID YOU KNOW THAT NUMBER 17 HEART ATTACKS

17   WAS WRONG; THAT IT WAS REALLY 20 HEART ATTACKS?

18   **A.**    I WOULDN'T SAY THAT IT WAS WRONG.  IT WAS CORRECT FOR THE

19   PRE-SPECIFIED ANALYSIS.  BUT ADDITIONAL HEART ATTACKS GOT

20   REPORTED ON VIOXX AND ACTUALLY SOME ADDITIONAL STROKES GOT

21   REPORTED ON NAPROXEN, SOME ADDITIONAL GI EVENTS FOR THE

22   REPORTED ON NAPROXEN.  THOSE WERE ALL SUBMITTED TO THE FDA, AND

23   I SHOWED THOSE UPDATED DATA AT THE FDA ADVISORY COMMITTEE.  BUT

24   THE PRIMARY ANALYSIS IS WHAT WE HAD INCLUDED IN THE PAPER.

25   **Q.**    BUT THIS PAPER THAT YOU PUBLISHED, YOU KNEW IT WAS GOING

1 TO GO OUT IN THE *NEW ENGLAND JOURNAL OF MEDICINE* TO EVERY

2 DOCTOR IN THE COUNTRY; RIGHT?

3 **A.**   THAT'S CORRECT.

4 **Q.**   IN FACT, MERCK BOUGHT ANOTHER 500 COPIES --

5 **A.**   WELL, I DON'T THINK EVERY DOCTOR IN THE COUNTRY, BUT IT

6 CERTAINLY WOULD BE WIDELY READ.

7 **Q.**   WOULDN'T YOU AGREE THAT IT'S PROBABLY THE MOST PRESTIGIOUS

8 JOURNAL IN THE COUNTRY, MEDICAL JOURNAL?

9 **A.**   IT'S CERTAINLY ONE OF THE MORE WIDELY READ JOURNALS.

10 **Q.**   THEN WHAT HAPPENED IS MERCK, THEN, WENT OUT AND BOUGHT

11 ANOTHER 500,000 REPRINTS AND DISTRIBUTED THOSE TO DOCTORS ON

12 TOP OF THE ONES THAT THEY WOULD HAVE GOT WITH THEIR NORMAL

13 SUBSCRIPTIONS TO THE *NEW ENGLAND JOURNAL OF MEDICINE*; CORRECT?

14 **A.**   I CAN'T TELL YOU ONE WAY OR THE OTHER.  IT'S POSSIBLE WE

15 DID.  IT WOULD BE OUT OF THE MARKETING GROUP.

16 **Q.**   SO WAS IT IMPORTANT TO YOU TO MAKE SURE THAT IF THERE WERE

17 REALLY 20 HEART ATTACKS, THAT YOU WERE GOING TO MAKE SURE THAT

18 YOU WERE GOING TO PUBLISH 20 HEART ATTACKS AND NOT 17 HEART

19 ATTACKS?

20 **A.**   IT WAS IMPORTANT TO ME, NO. 1, THAT WE MADE SURE THAT THE

21 DIFFERENCE, THE SIGNIFICANT DIFFERENCE, WAS IN THE PAPER, AND

22 IT WAS; AND THAT I FOLLOW NORMAL PROCEDURES, WHICH IS TO FOLLOW

23 THE PRE-SPECIFIED PRIMARY ANALYSIS, AND THAT WAS WHAT WE DID.

24 **Q.**   YOU PUBLISHED --

25 **A.**   HAD THE UPDATED ANALYSIS SHOWN SOMETHING DIFFERENT, LIKE

1    HEART ATTACKS WAS NOT SIGNIFICANT, AND THE UPDATED ANALYSIS WAS

2    SIGNIFICANT, I THINK THAT MAY HAVE BEEN AN EXCEPTION.  BUT THE

3    FACT THAT THE DATA WAS SIMILAR -- IN FACT, THE RELATIVE RISK

4    HERE WE USE IS .2, WHICH IS THE SAME RELATIVE RISK WHEN YOU

5    HAVE 20 VERSUS 4.

6    **Q.**   WELL, I MEAN, ISN'T IT TRUE THAT FOUR AND A HALF MONTHS

7    BEFORE YOU PUBLISHED THIS DATA, YOU RECEIVED AN E-MAIL THAT

8    TOLD YOU THAT THERE WERE 20 HEART ATTACKS, NOT 17?

9    **A.**   I CAN'T TELL YOU EXACTLY WHEN I FOUND BUT, BUT CERTAINLY

10   BEFORE THIS PAPER WAS PUBLISHED, YES.

11   **Q.**   LET ME SHOW YOU ON THIS EXHIBIT 1.1231.  DID YOU RECEIVE

12   THIS MEMO P1.1231 ON OR ABOUT JULY 5, 2000?

13   **A.**   YES, I DID.

14          **MR. ROBINSON:**  YOUR HONOR, WE WOULD OFFER THIS

15   EXHIBIT INTO EVIDENCE.

16          **MR. GOLDMAN:**  NO OBJECTION.

17          **THE COURT:**  LET IT BE ADMITTED.

18   **BY MR. ROBINSON:**

19   **Q.**   SO THIS IS AN E-MAIL -- OR NOT.  THIS IS A MEMO FROM

20   DEBORAH SHAPIRO TO YOU AND ELIAV BARR AND DENNIS ERB; RIGHT?

21   **A.**   THAT'S CORRECT.

22   **Q.**   IT'S DATED JULY 5, 2000; RIGHT?

23   **A.**   THAT'S CORRECT.

24   **Q.**   NOW, THAT LAST ARTICLE THAT I SHOWED YOU, THE LAST

25   EXHIBIT, THE ACTUAL VIGOR ARTICLE WAS PUBLISHED IN NOVEMBER,

2388

1   FOUR AND A HALF MONTHS LATER; RIGHT?

2   **A.**   THAT'S CORRECT.  WE HAD ALREADY SUBMITTED THE PAPER,

3   HOWEVER, IN MAY.

4   **Q.**   SO HERE YOU GET INFORMATION THAT AFTER THE FEBRUARY 10

5   CUTOFF, YOU FOUND THREE MORE HEART ATTACKS ON VIOXX, ONE MORE

6   THROMBOSIS ON VIOXX, AND ONE STROKE ON NAPROXEN; RIGHT?

7   **A.**   THAT'S CORRECT.

8   **Q.**   SO YOU'VE GOT FOUR NEW EVENTS ON VIOXX AND ONE ON

9   NAPROXEN; RIGHT?

10  **A.**   THAT'S CORRECT.

11  **Q.**   DID YOU CALL THE *NEW ENGLAND JOURNAL* UP AND SAY, "HOLD THE

12  PRESSES.  YOU HAVE FOUR AND A HALF MONTHS HERE.  WE ARE GOING

13  TO MAKE SURE THIS IS ACCURATE.  WE WANT TO GIVE YOU THESE FOUR

14  NEW EVENTS"?

15  **A.**   AGAIN, WHAT WE DID WAS ACCURATE.  THIS IS NORMAL COURSE OF

16  PROCEDURE.  YOU HAVE PRE-SPECIFIED CUTOFFS.  WHAT IF THE DATA

17  EVENTS THAT HAD COME IN AND GONE THE OTHER DIRECTION AND THINGS

18  LOOKED BETTER?  SHOULD I HAVE CALLED THE *NEW ENGLAND JOURNAL*

19  THEN?  THAT'S WHY YOU DO A PRESPECIFIED CUTOFF.  DATA CONTINUES

20  TO COME IN EVEN AFTER A STUDY HAS BEEN CLOSED.  THIS DATA DID

21  NOT SIGNIFICANTLY CHANGE THE EVENT RATES.  WHAT WITH SAID IN

22  OUR PRE-SPECIFIED DATA ANALYSIS PLAN IS THE PRIMARY ANALYSIS

23  WILL BE BASED ON THIS CUTOFF DATE.  ANY EVENTS THAT COME AFTER

24  THAT WILL BE SUBMITTED TO REGULATORY AGENCIES.  WE DID SUBMIT

25  IT TO REGULATORY AGENCIES AND, IN FACT, LATER WE ALSO SUBMITTED

1    AN UPDATED PUBLICATION WHERE WE PUT THE UPDATED RESULTS.

2    **Q.**   WELL, ARE YOU AWARE THAT THE *NEW ENGLAND JOURNAL* PUBLISHED

3    A DOCUMENT --

4             **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.  CAN WE APPROACH

5    ABOUT THIS?

6             **THE COURT:**  YES.

7             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

8    THE BENCH.)

9             **MR. GOLDMAN:**  YOUR HONOR, HE IS ABOUT TO GET INTO THE

10   "EXPRESSION OF CONCERN" WHICH YOUR HONOR EXCLUDED FROM THE

11   PLUNKETT TRIAL.

12            **MR. ROBINSON:**  HE DIDN'T EXCLUDE IT HERE.  IT'S

13   CROSS-EXAMINATION, YOUR HONOR.  I MEAN, I THINK SHE KNEW.  SHE

14   SAW THIS.  IT GOES TO --

15            **THE COURT:**  NOT SO LOUD.  I CAN HEAR YOU.

16            **MR. ROBINSON:**  YOUR HONOR, IT SHOWS THAT, BASICALLY,

17   WHAT SHE IS SAYING IS -- SHE JUST SAID, "IT'S OKAY.  IT'S OKAY

18   IF I PUBLISHED THIS BECAUSE OF THE PRE-SPECIFIED POINT."  THEY

19   GO IN THERE AND THEY GO, "NO, THAT'S HER EXCUSE, BUT WE DON'T

20   THINK THAT'S RIGHT.  WE WOULD HAVE ACCEPTED" --

21            **MR. GOLDMAN:**  JUDGE, THIS IS A HEARSAY DOCUMENT

22   THAT'S PUBLISHED BY THE *NEW ENGLAND JOURNAL OF MEDICINE*.  IT IS

23   NOT A PEER-REVIEWED ARTICLE.  IT CANNOT BE USED TO IMPEACH HER.

24   IT'S AN OPINION OF DR. CURFMAN AND DR. DRAZEN.  IT IS NOTHING

25   MORE THAN HEARSAY, AND IT DOESN'T GO TO IMPEACH HER AT ALL.

1          **THE COURT:**  THAT'S A CLOSE ONE, IT HONESTLY IS.  I'LL

2    OVERRULE THE OBJECTION AND ALLOW IT.  IT'S A CLOSE ONE.  I DO

3    IT BECAUSE SHE KNOWS ABOUT IT.  THIS IS SOMETHING THAT SHE HAS

4    GOT TO BE ABLE TO RESPOND TO.

5          **MR. BECK:**  YOUR HONOR, ARE YOU SAYING HE CAN ASK HER

6    QUESTIONS ABOUT IT?  HE CERTAINLY CANNOT PUT THE DOCUMENT IN.

7          **THE COURT:**  NO, YOU CAN'T PUT THE DOCUMENT IN.  JUST

8    ASK IF SHE KNOWS --

9          **MR. ROBINSON:**  CAN I HAVE HER READ THE DOCUMENT?

10          **MR. BECK:**  ASK HER IF SHE KNOWS IT AND SHE CAN

11    EXPLAIN.

12          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

13    OPEN COURT.)

14    **BY MR. ROBINSON:**

15    **Q.**  ARE YOU AWARE THAT LAST DECEMBER, DECEMBER 2005, THE

16    *NEW ENGLAND JOURNAL OF MEDICINE* PUBLISHED AN ARTICLE CALLED

17    "EXPRESSION OF CONCERN" SAYING THAT THERE WERE THREE MYOCARDIAL

18    INFARCTIONS ALL IN THE ROFECOXIB GROUP WERE NOT INCLUDED IN THE

19    DATA SUBMITTED TO THE JOURNAL?

20    **A.**  I AM AWARE OF THAT.

21    **Q.**  ARE YOU AWARE THEY SAID THAT, UNTIL THE END OF

22    NOVEMBER 2005, JUST LAST YEAR, THEY BELIEVED THAT THESE WERE

23    LATE EVENTS THAT WERE NOT --

24          **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.  HE IS READING

25    FROM THE DOCUMENT.

DAILY COPY

1          **MR. ROBINSON:**  I'LL ASK IT A DIFFERENT WAY.

2          **THE COURT:**  YES.  RESTATE THE QUESTION.

3    BY MR. ROBINSON:

4    Q.   ARE YOU AWARE THAT THEY ASSUMED THAT YOU AND DEBORAH

5    SHAPIRO DIDN'T KNOW THAT --

6          **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.

7          **THE COURT:**  YES.  JUST ASK ABOUT WHETHER THEY

8    COMPLAINED, WHETHER THEY REGISTERED A COMPLAINT.

9    BY MR. ROBINSON:

10   Q.   DID THEY REGISTER A COMPLAINT IN THE *NEW ENGLAND JOURNAL*

11   *OF MEDICINE* ABOUT YOU AND DEBORAH SHAPIRO?

12   A.   I DON'T RECALL THAT ME AND DEBORAH SHAPIRO WERE REFERRED

13   TO EXACTLY.  THEY DID PUT IN A COMPLAINT THAT WE HAD NOT GIVEN

14   THEM THE UPDATED DATA.  THEY DID THAT IN DECEMBER OF 2005 AFTER

15   SOMETHING RELATED TO THE TRIALS.  IT'S MY UNDERSTANDING THEY

16   KNEW ABOUT THESE DATA MANY YEARS BEFORE, THOUGH.  AND WE HAD

17   PUBLISHED THE UPDATED DATA MANY YEARS BEFORE.

18   Q.   DID THEY SAY YOU HAD AMPLE TIME TO INCLUDE THE DATA --

19         **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.

20         **THE COURT:**  YES, I SUSTAIN THE OBJECTION.  SHE HAS

21   TESTIFIED WHAT SHE TESTIFIED TO.  LET'S MOVE ON.

22   BY MR. ROBINSON:

23   Q.   WERE YOU WEARING YOUR DEFENDER HAT WHEN YOU DEALT WITH THE

24   *NEW ENGLAND JOURNAL*?

25         **MR. GOLDMAN:**  OBJECTION, YOUR HONOR, ARGUMENTATIVE.

DAILY COPY

1      **THE COURT:**  WELL, I'LL ALLOW THAT.  SHE'S UNDER

2    CROSS.

3    **BY MR. ROBINSON:**

4    **Q.**   WERE YOU WEARING YOUR DEFENDER HAT?  IS THAT WHAT YOU WERE

5    DOING HERE?

6    **A.**   I'M NOT SURE WHAT YOU ARE REFERRING TO.  I WAS NOT WEARING

7    MY DEFENDER HAT; I WAS WEARING MY SCIENCE HAT.  WE HAD A

8    PRE-SPECIFIED PLAN.  WE KEPT TO THAT PLAN.  AS I SAID, HAD THE

9    NUMBERS GONE IN THE OTHER DIRECTION, WE WOULD HAVE BEEN

10   SEVERELY CRITICIZED FOR PUTTING THE UPDATED NUMBERS IN THE

11   *NEW ENGLAND JOURNAL*.  WE SAID THERE WAS A SIGNIFICANT

12   DIFFERENCE IN THE RATES OF HEART ATTACKS.  THE UPDATED NUMBERS

13   DID NOT CHANGE THAT, AND WE PUBLISHED THAT DATA AFTERWARDS.

14   **Q.**   LET'S MOVE ON TO ANOTHER SUBJECT.  IS IT TRUE THAT, IN

15   AUGUST OF 2001, DR. NISSEN -- I THINK EARLIER I HEARD YOU

16   MENTION DR. NISSEN ON DIRECT EXAM.  WHO'S DR. NISSEN?

17   **A.**   HE IS A CARDIOLOGIST AT THE CLEVELAND CLINIC.

18   **Q.**   ISN'T HE THE CURRENT PRESIDENT OF THE AMERICAN COLLEGE OF

19   CARDIOLOGY?

20   **A.**   HE MIGHT BE.

21   **Q.**   IN FACT, YOU READ SOMETHING FROM HIM WHEN YOU WERE READING

22   FROM THE FDA ADVISORY COMMITTEE REPORT WITH MR. GOLDMAN.

23   REMEMBER THAT?

24   **A.**   THAT'S CORRECT.

25   **Q.**   HE IS THE CURRENT PRESIDENT; RIGHT?

1   **A.**   HE IS THE PRESIDENT OF ONE OF THE CARDIOLOGY SOCIETIES.

2   I'M NOT SURE IF IT'S THAT ONE.

3   **Q.**   OKAY.  AND THEN HIS PARTNER AT THE CLEVELAND CLINIC AT THE

4   TIME -- OR HIS PARTNERS WERE DR. TOPOL AND DR. MUKHERJEE?  IS

5   THAT RIGHT?

6   **A.**   DR. TOPOL WAS ALSO AN ATTENDING.  I BELIEVE DR. MUKHERJEE

7   WAS A FELLOW AT THAT TIME AT THE CLEVELAND CLINIC.

8   **Q.**   THEY PUBLISHED AN ARTICLE IN *JAMA*, IN THE *JOURNAL OF THE*

9   *AMERICAN MEDICAL ASSOCIATION*, IN AUGUST OF 2001; IS THAT RIGHT?

10  **A.**   THAT IS CORRECT.

11  **Q.**   BASICALLY, THAT ARTICLE SAID SOME THINGS THAT WERE

12  CRITICAL TO VIOXX; RIGHT?

13  **A.**   THEY RAISED THE QUESTION OF WHETHER COX-2 INHIBITORS COULD

14  BE PRO-THROMBOTIC.  THEY ALSO MENTIONED THAT NAPROXEN COULD BE

15  CARDIOPROTECTIVE, BUT RAISED THE QUESTIONS.

16  **Q.**   LET ME SHOW YOU EXHIBIT P1.05899.  I'M SORRY.  I GAVE YOU

17  THE WRONG ONE.  SORRY.  FOR THE RECORD, I'M GOING TO GIVE

18  P.20032, WHICH IS THE ARTICLE BY MUKHERJEE, NISSEN, AND TOPOL.

19  TELL ME IF THIS IS THE ARTICLE THAT DRS. MUKHERJEE, NISSEN, AND

20  TOPOL PUBLISHED ABOUT VIOXX?

21  **A.**   YES, THIS IS -- WELL, IT WASN'T ONLY ABOUT VIOXX.  IT WAS

22  ALSO ABOUT CELEBREX.

23  **Q.**   COX-2.  BY THE WAY, THERE WAS ONE PART OF THAT DOCUMENT

24  THAT MR. GOLDMAN READ TO YOU, THAT APRIL 2005 DOCUMENT FROM THE

25  FDA.  THEY ACTUALLY ORDERED BEXTRA OFF THE MARKET, RIGHT, IN

1  THAT DOCUMENT.  RIGHT?

2  **A.**    MY UNDERSTANDING IS THEY ORDERED BEXTRA OFF THE MARKET

3  BECAUSE OF SERIOUS SKIN REACTIONS THAT WERE ASSOCIATED WITH

4  BEXTRA.  IT WAS NOT RELATED TO THE CARDIOVASCULAR.  THAT'S MY

5  UNDERSTANDING.

6  **Q.**    THAT WASN'T READ IN, WAS IT.

7  **A.**    OH, IT MAY OR MAY NOT HAVE BEEN ON THERE.

8  **Q.**    SO YOU ACTUALLY HEARD THAT DRS. NISSEN AND TOPOL AND

9  MUKHERJEE WERE GOING TO PUBLISH THIS ARTICLE; RIGHT?

10  **A.**    DR. TOPOL SAW A COUPLE OF PEOPLE WHO WORKED FOR MERCK,

11  TOLD THEM THAT HE WAS IN THE MIDDLE OF WRITING AN ARTICLE.  AND

12  DR. LAURA DEMOPOULOS, WHO WAS IN OUR CARDIOVASCULAR GROUP AND

13  KNEW DR. TOPOL, HEARD ABOUT IT AND GAVE DR. TOPOL A CALL.

14  **Q.**    SO WHAT HAPPENS IS, DR. DEMOPOULOS, SHE THEN GETS A COPY

15  OF HIS DRAFT MANUSCRIPT; RIGHT?

16  **A.**    NO, THAT'S NOT HOW IT WORKED.  SHE CALLED DR. TOPOL, SAID

17  "WE HEARD THAT YOU WERE WRITING A PAPER ON CARDIOVASCULAR

18  SAFETY OF VIOXX.  IS THERE ANY DATA THAT YOU NEED THAT WE CAN

19  PROVIDE TO YOU?  WOULD YOU LIKE US TO COME DOWN AND MEET WITH

20  YOU AND REVIEW ALL OF THE DATA THAT WE RECENTLY REVIEWED AT THE

21  FDA ADVISORY COMMITTEE MEETING?"  HE SAID YES.

22        SO WE WENT DOWN TO MEET WITH HIM.  WE REVIEWED ALL OF

23  THAT.  AND AT THE END OF THAT MEETING, HE ASKED IF WE WANTED TO

24  REVIEW A COPY OF THE PAPER.  HE HAD ALREADY SUBMITTED IT, HE

25  TOLD US AT THAT POINT IN TIME, TO *JAMA*.

1    **Q.**   ISN'T IT TRUE THAT, BASICALLY, YOU WENT DOWN THERE TO TRY

2    AND GET HIM NOT TO PUBLISH THE ARTICLE?

3    **A.**   THAT'S COMPLETELY INACCURATE.  I WOULD NEVER GO DOWN TO AN

4    EXTERNAL SCIENTIST AND TRY AND CONVINCE THEM NOT TO PUBLISH THE

5    DATA.  FIRST OF ALL, I HADN'T EVEN SEEN THE PAPER AT THAT POINT

6    IN TIME.  I WENT DOWN TO GO OVER WITH HIM THE DATA WE HAD

7    SHOWED AT THE FDA ADVISORY COMMITTEE, AND THAT IS WHAT I DID.

8    WE DIDN'T EVEN DISCUSS HIS PAPER OTHER THAN, AT THE END, HE

9    ASKED US IF WE WANTED TO REVIEW AND COMMENT ON IT EVEN THOUGH

10   HE HAD ALREADY SUBMITTED IT.

11   **Q.**   SO, FOR THE JURY, YOU FLEW ALL THE WAY FROM NEW YORK TO

12   CLEVELAND, RIGHT, TO GO TRY AND TALK HIM OUT OF PUBLISHING THIS

13   PAPER; RIGHT?

14   **A.**   NO.  I WILL AGAIN SAY THAT IS NOT AT ALL WHAT HAPPENED.

15   **Q.**   IS IT TRUE THAT YOU SORT OF, REALLY IN A VERY STRONG

16   APPROACH TO HIM, ACTUALLY TOLD HIM HE'S GOT IT WRONG, AND IF HE

17   PUBLISHES IT, HE IS GOING TO BE EMBARRASSED?

18   **A.**   I WOULD NEVER SAY SOMETHING LIKE THAT, NO.

19            **MR. ROBINSON:**  YOUR HONOR, WE'D LIKE TO PLAY THE

20   TRANSCRIPT.

21            **MR. GOLDMAN:**  I'D LIKE TO APPROACH.

22            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

23   THE BENCH.)

24            **MR. GOLDMAN:**  MARK IS ABOUT TO PLAY A CLIP FROM

25   DR. TOPOL'S DEPOSITION.  NO. 1, HE HAS AGREED NOT TO PLAY

1   DR. TOPOL AT ALL; NO. 2, IT'S AN IMPROPER WAY TO IMPEACH THIS
2   WITNESS.  IT'S THE OPINION OF DR. TOPOL.  IF MR. ROBINSON WERE
3   ALLOWED TO GET INTO IT, I WOULD HAVE TO PLAY MY
4   CROSS-EXAMINATION OF DR. TOPOL, AND I WOULD HAVE TO PLAY
5   MIXON'S DEPOSITION TO SHOW THE JURY EXACTLY WHAT DR. TOPOL IS
6   ABOUT.
7           **THE COURT:**  DON'T YOU HAVE IN EVIDENCE SOMETHING THAT
8   IS AN E-MAIL BACK AND FORTH?
9           **MR. GOLDMAN:**  YES.
10          **MR. ROBINSON:**  NO, YOUR HONOR.  UNFORTUNATELY, THE
11  ONE THING WE HAVE --
12          **MR. BECK:**  THE E-MAILS SAY, "THANKS FOR COMING."  IT
13  WAS A REAL PLEASANT CONVERSATION.
14          **MR. ROBINSON:**  NO, NO.  WHAT WE HAVE IS HIS TESTIMONY
15  YOUR HONOR, WHERE HE REMEMBERS WHAT SHE SAID, THAT SHE SAID,
16  "YOU'VE GOT IT WRONG, AND IF YOU PUBLISH THIS YOU'RE GOING TO
17  BE EMBARRASSED."  THAT'S ALL I'M GOING TO PLAY.  IT IMPEACHES
18  HER WORDS.
19          **MR. BECK:**  HE CANNOT IMPEACH WITH THE TESTIMONY OF
20  ANOTHER FACT WITNESS.  YOUR HONOR, THIS IS ALL A BACK-DOOR
21  EFFORT TO BREAK A DEAL THAT THEY MADE THAT WE WOULD NOT HAVE
22  THE ONLY WITNESS THAT THEY HAD ON SPECIFIC CAUSE, HAVE HIS
23  TESTIMONY STRICKEN.  THEY SAID, WELL, IF WE'LL AGREE TO A
24  HIATUS, WE WON'T PLAY TOPOL AND WE WON'T PLAY GRAHAM AND
25  CURFMAN.  WE AGREED TO THAT, AND NOW THEY ARE TRYING TO BREAK

1  THE DEAL BY IMPROPER USE OF THIS FOR IMPEACHMENT.  IT'S BOTH

2  IMPROPER IMPEACHMENT AND BARRED BY THE AGREEMENT THAT WE

3  REACHED.

4          **MR. ROBINSON:**  IT'S NOT IMPROPER IMPEACHMENT,

5  YOUR HONOR.  THE SUPREME COURT HAS SAID THAT -- THERE'S AT

6  LEAST TWO CASES I KNOW OF THAT SAID THAT BIAS -- WHICH SHE HAS

7  HERE AND NOW SHE'S DENYING THAT SHE SAID.  IT SHOWS HER BIAS,

8  YOUR HONOR.

9          **THE COURT:**  I DON'T KNOW ABOUT THE AGREEMENT BACK AND

10  FORTH.  THAT'S THE THING THAT CONCERNS ME, TOO.

11          **MR. ROBINSON:**  BUT THE AGREEMENT IS NOT THAT WE CAN'T

12  IMPEACH A WITNESS WITH IT.  THAT'S ONE THING TO --

13          **MR. BECK:**  YOUR HONOR, I MOVE TO STRIKE THE TESTIMONY

14  OF DR. ZIPES IN ITS ENTIRETY.

15          **THE COURT:**  WE ARE MIXING APPLES AND ORANGES NOW.

16  I'M GOING TO DENY THAT MOTION.  HIS TESTIMONY IS IN.  LET'S GO

17  ABOUT IT IN A DIFFERENT WAY.  I DON'T WANT TO OPEN UP ANOTHER

18  AREA, BUT THIS MAY PRESENT ITSELF UNDER REBUTTAL.  I DON'T

19  KNOW.  I JUST DON'T KNOW.

20          **MR. BECK:**  YOUR HONOR, WE DIDN'T ASK A SINGLE

21  QUESTION ABOUT TOPOL.  THERE'S NO OPENING OF THE DOOR.  YOU

22  CAN'T, ON CROSS-EXAMINATION, KICK OPEN A DOOR THAT YOU AGREED

23  WOULD BE CLOSED AND THEN SAY, "I'M GOING TO DO IT ON REBUTTAL."

24          **THE COURT:**  I THINK THAT THAT'S ACCURATE, AT LEAST

25  FROM THE STANDPOINT OF CROSS-EXAMINATION.  I'M GOING TO HAVE TO

1  DEAL WITH THAT ON ANOTHER LEVEL.  LET'S GET OFF OF THIS AT THIS

2  POINT.  THANK YOU.

3          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

4  OPEN COURT.)

5  **BY MR. ROBINSON:**

6  **Q.**  SO WHEN YOU FLEW TO CLEVELAND TO TALK TO DR. TOPOL BEFORE

7  HE WROTE HIS ARTICLE --

8  **A.**  NO.  HE HAD ALREADY WRITTEN THE ARTICLE AND SUBMITTED IT

9  TO *JAMA*.

10 **Q.**  WELL, DID YOU AT SOME POINT TRY AND EDIT HIS ARTICLE?

11 **A.**  NO, I DID NOT.  I REVIEWED A VERSION OF IT.  I MADE

12 SEVERAL COMMENTS ON IT, SENT THEM TO OTHER PEOPLE, TO LAURA

13 DEMOPOULOS.  IT WAS AN INTERNAL VERSION.  IT WAS NOT TO BE SENT

14 OUT TO DR. TOPOL.  IT WAS NOT SENT OUT TO DR. TOPAL.  LAURA

15 DEMOPOULOS AND PETER DIBATTISTE GAVE DR. TOPOL SOME OF OUR

16 COMMENTS.

17 **Q.**  WHAT DID YOU SAY IN YOUR DRAFT WHEN YOU ATTEMPTED TO

18 REWRITE HIS ARTICLE?

19 **A.**  AGAIN, I DIDN'T ATTEMPT TO REWRITE HIS ARTICLE.  THIS WAS

20 AN INTERNAL DOCUMENT.  I THOUGHT THAT THERE WERE PARTS OF IT

21 THAT -- I CAN'T REMEMBER EVERYTHING.  I THOUGHT THERE WERE

22 PARTS THAT WERE POORLY WRITTEN.  THE ANALYSIS THAT HE DID WAS

23 AN UNUSUAL ANALYSIS WHERE HE COMPARED THE RATE OF EVENTS IN

24 VIOXX AND CELEBREX IN ONE GROUP OF STUDIES TO THE RATE OF

25 EVENTS IN A COMPLETELY DIFFERENT GROUP OF STUDIES AND

1  COMPLETELY DIFFERENT PATIENT POPULATION ON PLACEBO.  AND THE

2  PATIENTS WERE DIFFERENT TYPES OF PATIENTS.  I MAY HAVE SAID IN

3  THAT DRAFT -- I DON'T REMEMBER, BUT I KNOW I THOUGHT AT THE

4  TIME I WONDERED WHETHER THAT WAS A VALID TYPE OF ANALYSIS TO

5  DO.

6  Q.   LET ME SHOW YOU EXHIBIT P1.1445 AND SEE IF THIS IS YOUR

7  EDIT OF DR. TOPOL'S DRAFT.

8  A.   AGAIN, I DON'T THINK I USED THE WORD "EDIT."  I WAS MAKING

9  COMMENTS ON IT.  THIS WAS FOR INTERNAL USE, AND THAT IS WHAT

10 THIS APPEARS TO BE.

11           MR. ROBINSON:  YOUR HONOR, I WOULD OFFER P1.1445 INTO

12 EVIDENCE.

13           MR. GOLDMAN:  NO OBJECTION.

14           THE COURT:  LET IT BE ADMITTED.  DO YOU WANT TO SHOW

15 IT TO THE JURY?

16 BY MR. ROBINSON:

17 Q.   THAT'S YOUR E-MAIL FROM YOU TO LAURA DEMOPOULOS; RIGHT?

18 A.   THAT'S CORRECT.

19 Q.   YOU SAY THAT YOU ACTUALLY DID THIS -- WHAT DO YOU CALL

20 THIS, RED LINING OF HIS ARTICLE?

21 A.   I WAS MAKING COMMENTS ON IT.

22 Q.   YOU DID THIS IN THE MIDDLE OF THE NIGHT; RIGHT?

23 A.   CORRECT.

24 Q.   IF YOU GO TO THE NEXT PAGE.  ACTUALLY, THAT'S THE FRONT

25 PAGE OF THE DRAFT; RIGHT?  THE SECOND PAGE.  THE ONE THAT'S UP

1  ON THE SCREEN.  THEN IF WE GO TO THE ABSTRACT, THOSE LINES ON

2  THE SIDE ARE CHANGES THAT YOU'RE PROPOSING TO MAKE TO HIS

3  ARTICLE?

4  **A.**   AGAIN, THESE WERE NOT CHANGES I WAS PROPOSING TO MAKE.  I

5  WAS POINTING OUT ISSUES WITH THE ARTICLE.  SOME COMMENTS WERE

6  SENT TO HIM.  YOU CAN SEE ON THE FIRST PAGE HE SAID THAT, IN

7  OUR STUDIES, NO PATIENTS HAD CORONARY ARTERY DISEASE, AND THAT

8  WASN'T FACTUALLY CORRECT.

9  **Q.**   IN ANY EVENT, THE NEXT PAGE OF THE ABSTRACT, YOU MAKE SOME

10  CHANGES ON THE PAGE WHERE THOSE LINES ARE; RIGHT?  ON THE RIGHT

11  SIDE, YOU'VE GOT THE LINES.

12  **A.**   THAT'S CORRECT.  I'M MAKING SOME COMMENTS.

13  **Q.**   GO TO THE NEXT PAGE, "INTRODUCTION."  FOR EXAMPLE, HE SAID

14  BACK HERE, "HOWEVER" -- HE SAID, "SELECTIVE COX-2 INHIBITORS,"

15  AND YOU PUT IN "AND NONSELECTIVE NSAIDS, AS WELL, DECREASE"?

16  **A.**   THAT'S CORRECT, BECAUSE IT'S NOT CORRECT THAT ONLY COX-2

17  INHIBITORS DO IT.  NSAIDS AND COX-2 INHIBITORS -- BECAUSE

18  NONSELECTIVE NSAIDS INHIBIT COX-2, SO THEY ALSO DECREASE

19  PROSTACYCLIN.

20  **Q.**   OH, BUT NONSELECTIVE NSAIDS DECREASE BOTH -- HAVE AN

21  EFFECT BOTH ON THROMBOXANE AND PROSTACYCLIN; RIGHT?

22  **A.**   THAT IS CORRECT.

23  **Q.**   BUT HE WAS SAYING, "HOWEVER, SELECTIVE COX-2 INHIBITORS

24  DECREASE VASCULAR PROSTACYCLIN PRODUCTION AND MAY AFFECT THE

25  BALANCE BETWEEN PROTHROMBOTIC AND ANTITHROMBOTIC EICOSANOIDS."

1    A.   CORRECT.  MY COMMENT THERE WAS HE MADE IT SOUND LIKE ONLY

2    COX-2 INHIBITORS DECREASE PROSTACYCLIN.  I WAS POINTING OUT TO

3    MY COLLEAGUES, WHO WEREN'T AS FAMILIAR WITH THE FIELD YET, THAT

4    NSAIDS ALSO DECREASE PROSTACYCLIN.

5    Q.   SO WHAT YOU'RE DOING THERE, HE IS TALKING ABOUT STUDY 090

6    AND YOU'RE CROSSING ALL THAT OUT; RIGHT?  THOSE ARE LINES

7    THROUGH IT; RIGHT?

8    A.   WHAT PAGE ARE YOU ON?

9    Q.   PAGE 6 OF THE TRANSCRIPT, UNDER THE "METHODS" SECTION --

10   SEE?  IT'S GOT A "6" ON THE BOTTOM.

11   A.   THAT'S CORRECT.  I THINK WHAT I SUGGESTED HERE -- HE WAS

12   TALKING ABOUT OUR OSTEOARTHRITIS STUDIES, BUT WE HAD

13   OSTEOARTHRITIS STUDIES IN CLOSE TO 6,000 PATIENTS, BUT YET HE

14   WAS ONLY PRESENTING DATA FROM TWO SMALL STUDIES, AND I

15   SUGGESTED THEY MIGHT BE INTERESTED IN PRESENTING DATA FROM THE

16   ENTIRE OSTEOARTHRITIS PROGRAM.

17   Q.   GO ON TO PAGE 8.  ALL RIGHT.  WHERE HE'S TALKING ABOUT THE

18   VIGOR STUDY HE SAYS, "THE RESULTS OF THE EVENT-FREE SURVIVAL

19   ANALYSIS ON THE 66 CASES SHOWED THAT THE RELATIVE RISK OF

20   DEVELOPING A CARDIOVASCULAR EVENT IN ROFECOXIB TREATMENT ARM

21   WAS 2.37 (1.39-4.06, WITH A P-VALUE OF 0.0016)."  THEN YOU SAY,

22   "WE PREFER TO FLIP THE DATA AND SAY IT WAS REDUCED ON

23   NAPROXEN."  RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   YOU'RE TELLING HIM YOU WANT -- HE'S PUBLISHING IT THE WAY

1  HE WANTS TO PUBLISH IT, AND YOU WANTED TO FLIP THE DATA AROUND;

2  RIGHT?

3  **A.**   WE NEVER SENT THAT COMMENT TO HIM.  EVEN I, AT THE FDA

4  ADVISORY COMMITTEE, PRESENTED THE DATA JUST LIKE THIS.

5  **Q.**   YOU GO THROUGH THE WHOLE PAPER LIKE THAT, AND THEN AT THE

6  VERY END, PAGE 18, YOU SAY, "CONCLUSION NEEDS TO BE TONED

7  DOWN."  RIGHT?

8  **A.**   THAT'S CORRECT, AND THAT COMMENT WAS ALSO NOT SENT TO HIM.

9  **Q.**   THEN, AFTER YOU MET WITH HIM, YOU MET WITH ONE OF THE

10  OTHER AUTHORS, DR. NISSEN.

11  **A.**   WE MET WITH DR. NISSEN, AS WELL, THAT'S CORRECT.

12  **Q.**   IN NEW YORK CITY; RIGHT?

13  **A.**   THAT'S CORRECT.

14  **Q.**   YOU TRIED TO TALK HIM OUT OF PUBLISHING THE DATA.

15  **A.**   I DID NOT TRY AND TALK DR. NISSEN OUT OF PUBLISHING THE

16  DATA.  THAT'S JUST NOT CORRECT.

17  **Q.**   SO HIS ARTICLE WAS PUBLISHED ON AUGUST 21, '01; RIGHT?

18  **A.**   THAT'S CORRECT.

19  **Q.**   MERCK PUTS OUT ANOTHER PRESS RELEASE ON THAT DAY; RIGHT?

20  **A.**   I CAN'T COMMENT ONE WAY OR ANOTHER.  I WAS NOT IN THE

21  COUNTRY AT THE TIME.  I WAS ON LEAVE OF ABSENCE.

22  **Q.**   YOU DIDN'T HAVE ANYTHING TO DO WITH THIS PRESS RELEASE

23  THAT WENT OUT REGARDING DR. MUKHERJEE AT ALL AND THEIR ARTICLE?

24  **A.**   NO, I DID NOT.  I WAS ON LEAVE OF ABSENCE AT THAT POINT IN

25  TIME.  I WAS NOT IN THE COUNTRY.

 1   **Q.**   DID YOU READ THE PRESS RELEASE WHEN YOU GOT BACK?

 2   **A.**   I CAN'T RECALL, SITTING HERE TODAY, WHETHER I DID OR DID

 3   NOT.

 4   **Q.**   OKAY.  WELL, THEN I GUESS I CAN'T ASK YOU ABOUT IT.

 5          **THE COURT:**  ARE WE INTO A NEW AREA NOW?

 6          **MR. ROBINSON:**  MAYBE WE CAN STOP AND TAKE A QUICK

 7   BREAK.

 8          **THE COURT:**  LET'S TAKE A 15-MINUTE BREAK AT THIS

 9   TIME.

10          **THE DEPUTY CLERK:**  EVERYONE RISE.

11          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

12          **THE DEPUTY CLERK:**  EVERYONE RISE.

13          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

14   THE BENCH.)

15          **MR. ROBINSON:**  YOUR HONOR, I LET PHIL KNOW THAT I

16   WANTED TO GO INTO AN AREA, AND I THOUGHT WE WOULD GO TO THE

17   BENCH BEFORE I WENT INTO IT.  WHAT THEY DID, YOUR HONOR, THEY

18   WENT THROUGH LIKE SEVEN OR EIGHT STUDIES.

19          **MR. BECK:**  THREE.

20          **MR. ROBINSON:**  HOLD ON.

21          **MR. BECK:**  THREE.

22          **MR. ROBINSON:**  I THINK IT WAS FOUR OR FIVE.

23          **MR. BECK:**  THREE.

24          **MR. ROBINSON:**  THE BOTTOM LINE WAS HE WENT THROUGH

25   SOLOMON, HE WENT THROUGH SOME OTHER --

1          **THE COURT:**  WHAT'S THE --

2          **MR. ROBINSON:**  -- RAY, ET CETERA.  THEY WENT THROUGH

3    STUDIES INTO 2004, OBSERVATIONAL STUDIES.  SO, FRANKLY, ALL I

4    WANT TO DO IS TAKE HER THROUGH A STUDY SHE DIDN'T MENTION THAT

5    SHE LOOKED AT AND THAT WAS THE RAY, GRAHAM STUDY.  NOW, THE

6    REASON I BROUGHT THAT UP WAS BECAUSE THEY THINK BECAUSE I SAID

7    I WON'T PLAY GRAHAM'S TESTIMONY THAT THAT PRECLUDES ME FROM

8    LOOKING AT HIS STUDY.  I DON'T THINK IT DOES, BUT I JUST WANTED

9    TO BE FAIR.

10          **THE COURT:**  SURE.

11          **MR. BECK:**  YES, YOUR HONOR.  WHAT HAPPENED IS THAT

12   THEY, WITH DR. AVORN, SHOWED THE SOLOMON STUDY.  DR. AVORN IS A

13   CO-AUTHOR OF SOLOMON.  THIS IS A 2004 STUDY.  DURING

14   DR. AVORN'S TESTIMONY WAY BACK IN THE FIRST COUPLE DAYS OF

15   TRIAL, THE PLAINTIFFS PUT IN CONCLUSIONS FROM HIS

16   EPIDEMIOLOGICAL STUDY.  IT'S RELEVANT BECAUSE, AS MARK SAID

17   THIS MORNING, THIS HAS BOILED DOWN TO A DUTY TO WARN CASE.  IT

18   WAS PUBLISHED WHILE VIOXX WAS ON THE MARKET, SO IT HAS

19   RELEVANCE TO NOTICE TO US.  WE THEN, THROUGH ANDY AND

20   DR. REICIN, BROUGHT OUT THE SAME SOLOMON STUDY THAT HAD ALREADY

21   BEEN TESTIFIED TO BY DR. AVORN, SHOWED THE MANDANI STUDY FROM

22   2003, ALSO WHILE VIOXX IS ON THE MARKET.

23          **MR. ROBINSON:**  BUT AFTER THE HEART ATTACK.

24          **MR. BECK:**  AFTER THE HEART ATTACK, BUT THEIR DAMAGES

25   CLAIM IS FOR A FUTURE HEART ATTACK THAT'S GOING TO TAKE PLACE

1    BECAUSE PLAQUE BUILT UP AFTER 2002 AND BEFORE 2004, UNLESS THEY

2    ARE DROPPING THAT CLAIM.  SO THEIR CLAIM DOESN'T STOP WITH THE

3    HEART ATTACK.  THEIR CLAIM IS THAT HE HAS LOST --

4                **THE COURT:**  LIFE EXPECTANCY.

5                **MR. BECK:**  SO WE TALKED ABOUT THREE STUDIES, EACH ONE

6    OF WHICH WAS DURING THE PERIOD WHILE VIOXX IS ON THE MARKET

7    AND, THEREFORE, RELEVANT TO OUR STATE OF MIND ON THE DUTY TO

8    WARN.  NOW, WHAT THEY WANT TO DO IS BRING IN A 2005 --

9                **MR. ROBINSON:**  2004.

10               **MR. BECK:**  NO, IT'S 2005.  IT WAS PUBLISHED IN

11   JANUARY OF 2005.  THAT WAS THE INTERNET VERSION OF HIS ARTICLE.

12   IT WAS PUBLISHED LATER IN 2005.  HE WAS BITTERLY DISAPPOINTED

13   IT DIDN'T GET PUBLISHED BEFORE WITHDRAWAL BECAUSE HE WANTED TO

14   TAKE CREDIT FOR WITHDRAWAL, BUT IT'S POST WITHDRAWAL AND HAS

15   NOTHING TO DO WITH OUR STATE OF MIND AND SO THE STUDY IS

16   IRRELEVANT.

17               ALSO, YOUR HONOR, WHAT THEY WANT TO SHOW IS NOT

18   THE EPIDEMIOLOGICAL PART OF THE STUDY; THEY WANT TO SHOW HIS

19   NONEPIDEMIOLOGICAL CONCLUSION HE THREW IN AT THE END ABOUT

20   NUMBERS OF DEATHS.  YOUR HONOR HAS PREVIOUSLY RULED THAT STAYS

21   OUT UNLESS A FOUNDATION IS LAID UNDER DAUBERT AND IT HASN'T

22   BEEN LAID IN THIS CASE.  THE REASON IT HASN'T BEEN LAID IS

23   BECAUSE THEY MADE AN AGREEMENT THEY WERE NOT GOING TO CALL

24   GRAHAM.  NOW, TO TRY TO GET THIS IN, THIS POST-WITHDRAWAL

25   ESTIMATE BY A WITNESS THEY SAID THEY WEREN'T GOING TO CALL,

1  WOULD BE THE ONLY ONE WHO COULD LAY THE FOUNDATION, REALLY DOES

2  BREAK THAT AGREEMENT.

3              THEY WERE FACING THE POSSIBILITY OF STRIKING THE

4  TESTIMONY OF THE ONLY SPECIFIC-CAUSE WITNESS THAT THEY HAD, AND

5  THEY OFFERED A PROPOSAL WHERE THEY SAID IF WE AGREE TO A HIATUS

6  IN THE TRIAL THAT HURTS US THAT THEY WOULD AGREE TO DO

7  SOMETHING ELSE IN EXCHANGE, AND ONE OF THEM WAS NOT TO CALL

8  GRAHAM.  NOW THEY ARE TRYING TO DO IT THROUGH THE BACK DOOR.

9          **MR. ROBINSON:**  YOUR HONOR, FIRST OF ALL, I HAVE

10  E-MAILS WHERE SHE RECEIVED AN ADVANCED COPY OF THE GRAHAM STUDY

11  IN AUGUST OF 2004, SO SHE KNEW ABOUT IT BEFORE THE DRUG --

12          **MR. BECK:**  IT DOESN'T HAVE THOSE NUMBERS IN IT.

13  THOSE GOT THROWN IN WAY LATER.

14          **MR. ROBINSON:**  ALL I'M SAYING IS THAT -- WELL, THE

15  NUMBERS ARE THE NUMBERS.  HOLD ON.  SHE KNEW ABOUT THEM.  THE

16  NUMBERS ARE THERE.  LOOK, PHIL, IT'S ONE THING FOR ME TO SAY

17  I'M NOT GOING TO READ -- BECAUSE IT'S GOING TO TAKE A DAY OF

18  TIME -- TOPOL'S TRANSCRIPT AND GRAHAM'S TRANSCRIPT.  IT'S

19  ANOTHER THING PRECLUDING MYSELF FROM TALKING ABOUT GRAHAM OR

20  TALKING ABOUT TOPOL IN CROSS OF A WITNESS.  I'M BEING FAIR.  I

21  BROUGHT IT TO THE JUDGE'S ATTENTION.

22          **MR. BECK:**  THANK YOU FOR THAT.  WE DIDN'T SAY YOU

23  COULDN'T TALK ABOUT TOPOL.

24          **MR. ROBINSON:**  YOU KNOW WHAT?  I'LL WITHDRAW IT.

25          **THE COURT:**  IT'S JUST NOT A BIG DEAL.

1           **MR. ROBINSON:**  I WITHDRAW IT.

2           **MR. BECK:**  I APPRECIATE THAT, MARK.

3           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

4     OPEN COURT.)

5           **THE COURT:**  BRING THE JURY IN, MARSHAL.

6           **THE DEPUTY CLERK:**  EVERYONE RISE.

7           (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

8           **THE COURT:**  BE SEATED, PLEASE.

9     BY MR. ROBINSON:

10    **Q.**   DR. REICIN, I'M GOING THE TRY AND MOVE QUICKLY HERE, IF I

11    CAN.  I WANT TO GO INTO THE SUBJECT OF LABELING.  REMEMBER ON

12    DIRECT MR. GOLDMAN ASKED YOU ABOUT WHETHER OR NOT THE VIGOR

13    INFORMATION SHOULD HAVE BEEN IN THE WARNINGS SECTION VERSUS THE

14    PRECAUTIONS SECTION?  DO YOU REMEMBER THAT LINE OF QUESTIONING?

15    **A.**   I DO.

16    **Q.**   IS IT TRUE THAT MERCK PUBLISHES A GUIDELINE FOR THE

17    COMPANY REGARDING DRUG REGULATIONS AND ESSENTIALS?

18    **A.**   I'M NOT SURE WHAT YOU'RE REFERRING TO.

19    **Q.**   LET ME SHOW YOU EXHIBIT P1.1734.  DOES THIS APPEAR TO BE A

20    MERCK DOCUMENT?

21    **A.**   IT DOES APPEAR IT HAS THE MERCK LOGO.  I'VE NEVER SEEN

22    THIS DOCUMENT BEFORE.

23           **MR. GOLDMAN:**  THEN, YOUR HONOR, I OBJECT ON

24    FOUNDATION GROUNDS.

25           **THE COURT:**  ASK HER SOME QUESTIONS AS TO WHETHER OR

DAILY COPY

1   NOT SHE KNOWS ANYTHING ABOUT IT, BUT IF SHE DOESN'T I DON'T

2   WANT HER TO SPECULATE ABOUT A DOCUMENT SHE HASN'T SEEN BEFORE.

3   **BY MR. ROBINSON:**

4   **Q.**   YOU TESTIFIED THAT THE REASON YOU DIDN'T PUT VIGOR IN THE

5   WARNINGS SECTION WAS BECAUSE THERE WAS NO CAUSATION, SOMETHING

6   LIKE THAT; RIGHT?  NO PROOF OF CAUSATION; RIGHT?

7   **A.**   NO, I DON'T THINK THOSE WERE THE WORDS THAT I USED.  MY

8   UNDERSTANDING FROM MY REGULATORY COLLEAGUES IS THAT WARNINGS

9   ARE APPROPRIATE WHEN THERE'S A KNOWN ASSOCIATION.  IT HAD

10  NOTHING TO DO WITH CAUSATION.  THAT IS NOT WHAT WE FOUND IN THE

11  VIGOR STUDY.

12  **Q.**   ARE YOU AWARE THAT SERIOUS ADVERSE REACTIONS AND POTENTIAL

13  SAFETY HAZARDS AND ANY LIMITATIONS IN USE IMPOSED BY THEM AND

14  STEPS THAT SHOULD BE TAKEN, IF THEY OCCUR, ARE TO BE DISCUSSED

15  IN THE WARNINGS SECTION ACCORDING TO MERCK'S OWN GUIDELINES?

16  **A.**   THE WAY YOU READ THAT, IT HAS TO BE OUT OF CONTEXT,

17  BECAUSE THERE ARE ALL SORTS OF ADVERSE EXPERIENCES THAT GET

18  REPORTED ON DRUGS AND THEY ARE NOT ALL IN THE WARNINGS SECTION,

19  SO I'M SURE EXACTLY WHAT YOU'RE READING FROM.  I WOULD HAVE TO

20  SEE THE WHOLE CONTEXT OF IT.  WE CERTAINLY FOLLOWED MERCK'S OWN

21  GUIDELINES, THAT I CAN ASSURE YOU.

22  **Q.**   WOULD YOU STUDY THIS EXHIBIT 1.1734, PARTICULARLY PAGE 37,

23  AND SEE IF THAT REFRESHES YOUR MEMORY AS TO WHAT MERCK'S

24  GUIDELINES WERE FOR WHEN YOU PUT SOMETHING IN THE WARNINGS

25  SECTION AS OPPOSED TO THE PRECAUTIONS SECTION.  THE PRECAUTION

1  LANGUAGE IS ON PAGE 38.

2  **A.**  I SEE THIS AND IT'S VERY CONSISTENT WITH WHAT I SAID

3  BEFORE.

4  **Q.**  CAN WE READ IT INTO THE RECORD, THEN?

5     **MR. GOLDMAN:**  NO, YOUR HONOR.  AGAIN, IT LACKS

6  FOUNDATION.  IT WAS USED TO REFRESH HER RECOLLECTION, WHICH SHE

7  DIDN'T EVEN SAY IT DID.

8     **THE COURT:**  THIS IS MERCK'S POLICY.  DO YOU RECOGNIZE

9  THAT AS MERCK'S POLICY OR NOT?

10     **THE WITNESS:**  I HAVEN'T SEEN THIS PARTICULAR ONE, BUT

11  IT DOES SAY HERE THAT YOU WOULD PUT SOMETHING IN THE WARNING AS

12  SOON AS THERE IS REASONABLE EVIDENCE OF AN ASSOCIATION.  WE

13  DIDN'T BELIEVE AND NEITHER DID THE FDA, NEITHER DID THE FDA

14  ADVISORY COMMITTEE, THAT THERE WAS REASONABLE ASSOCIATION.  THE

15  MEDICAL SIGNIFICANCE AND FINDINGS WERE CONSIDERED UNKNOWN.

16  **BY MR. ROBINSON:**

17  **Q.**  DOES IT ALSO SAY A CAUSAL RELATIONSHIP NEED NOT BE

18  ESTABLISHED?  DOES IT SAY THAT?

19     **MR. GOLDMAN:**  OBJECTION, YOUR HONOR.

20     **THE WITNESS:**  THAT'S CORRECT, IT DOES SAY THAT.

21     **THE COURT:**  JUST A MOMENT.  WE ARE TALKING ABOUT

22  SOMETHING SHE HASN'T SEEN BEFORE.  I SUSTAIN THAT OBJECTION.

23  **BY MR. ROBINSON:**

24  **Q.**  YOUR MEMORY OF MERCK'S PRACTICE IS THAT YOU CAN PUT

25  SOMETHING IN THE WARNINGS LABEL OR THE WARNINGS SECTION OF THE

1    LABEL EVEN IF A CAUSAL RELATIONSHIP HAS NOT BEEN ESTABLISHED?

2    **A.**   THAT'S ACTUALLY THE FDA'S -- THAT'S WHAT THEY SAY.  IN

3    FACT, THEY MADE THAT COMMENT.  WHAT THEY SAID IN 2005 WASN'T

4    THAT THERE WAS A CAUSAL ASSOCIATION, IT WAS -- CAUSAL EFFECT.

5    IT WAS AN ASSOCIATION.

6    **Q.**   SO, IN OTHER WORDS, IT GOES INTO THE WARNINGS SECTION OF

7    THE LABEL EVEN IF YOU DON'T BELIEVE THERE'S A CAUSAL CONNECTION

8    THAT'S BEEN FOUND?

9    **A.**   AS I SAID BEFORE, IT'S A KNOWN ASSOCIATION, NOT CLINICAL

10   SIGNIFICANCE UNKNOWN.

11   **Q.**   NOW, THE ORIGINAL LABEL THE ONE THAT CAME OUT IN 1999,

12   2000, 2001, BEGINNING OF 2002, IS IT TRUE THAT THERE'S NO

13   STATEMENT IN THE CONTRAINDICATIONS SECTION, THE WARNINGS

14   SECTION, OR THE PRECAUTIONS SECTION ABOUT THE RISK OF HEART

15   ATTACKS?

16   **A.**   THAT IS CORRECT.  WE HAD SUBMITTED THE DATA TO THE FDA

17   FROM VIGOR IN 2000.  THEY DIDN'T APPROVE THE LABEL CHANGE UNTIL

18   2002.  HEART ATTACKS WERE MENTIONED, HOWEVER, IN THE ADVERSE

19   EXPERIENCE SECTION, THAT THEY HAD BEEN SEEN IN PATIENTS DURING

20   OUR CLINICAL TRIALS.

21   **Q.**   NOTHING IN THE CONTRAINDICATIONS, WARNINGS, OR PRECAUTIONS

22   SECTION FROM MAY OF '99 THROUGH APRIL OF 2002; CORRECT?

23   **A.**   THAT'S CORRECT.

24   **Q.**   THEN, IN APRIL OF 2002 UP UNTIL THEY TOOK IT OFF THE

25   MARKET, THERE WAS NOTHING IN THE CONTRAINDICATIONS SECTION OR

1    THE WARNINGS SECTION ABOUT HEART ATTACKS; RIGHT?

2    **A.**    THAT'S CORRECT.  IT WAS IN THE PRECAUTIONS SECTION.

3    **Q.**    THE ONLY LANGUAGE THAT BASICALLY HAS A PRECAUTION ABOUT

4    THE HEART ATTACK, CARDIOVASCULAR EVENTS OR ISSUES, WAS WHAT YOU

5    SHOWED THAT MORNING IN THE PRECAUTIONS SECTION; RIGHT?

6    **A.**    ALL OF THE DATA IS IN THE CLINICAL TRIALS SECTION OF THE

7    LABEL AND THEN THERE WERE STATEMENTS -- THERE'S A PARAGRAPH IN

8    THE PRECAUTIONS SECTION.

9    **Q.**    THIS MORNING YOU SAID THAT IN ABOUT JUNE OF 2000 YOU

10   SUBMITTED TO THE FDA WITHIN ABOUT THREE MONTHS OF THE VIGOR

11   STUDY A PROPOSED NEW LABEL, RIGHT, THE FIRST VIGOR LABEL?

12   **A.**    THAT'S CORRECT, AND THEN WE REVISED THAT BASED ON WHAT WE

13   HEARD AT THE FDA ADVISORY COMMITTEE.

14   **Q.**    LET ME SHOW YOU P1.1132.  I'M GOING TO ASK YOU IF THIS IS

15   THE MERCK LETTER AND PROPOSED VIGOR LABEL THAT MERCK PROPOSED

16   IN JUNE OF 2000 WITHIN THREE MONTHS OF GETTING THE RESULTS ON

17   VIGOR?

18   **A.**    THIS WAS THE FIRST PROPOSAL.  AS I SAID, WE UPDATED IT

19   AFTER THE ADVISORY COMMITTEE.

20   **Q.**    IS IT TRUE THAT YOUR FIRST PROPOSAL IN 2000 HAD NOTHING IN

21   THE PRECAUTIONS SECTION, WARNINGS SECTION, OR CONTRAINDICATIONS

22   SECTION THAT MADE A STATEMENT ABOUT HEART ATTACK RISKS?

23   **A.**    I CAN'T --

24   **Q.**    DO YOU WANT TO LOOK AT THAT?

25   **A.**    I CAN'T REMEMBER EXACTLY WHERE IT IS.  IT WAS IN, I THINK,

1    THE USE WITH ASPIRIN SECTION.

2    **Q.**   I WOULD LIKE TO ASK YOU TO TELL ME IF IT'S IN THE

3    CONTRAINDICATIONS, WARNINGS, OR PRECAUTIONS SECTION IN THE

4    PROPOSAL YOU SENT TO THE FDA AFTER THE VIGOR TRIAL.

5    **A.**   I BELIEVE IT'S IN THE USE WITH ASPIRIN SECTION.  WHAT I

6    CAN'T REMEMBER IS WHETHER THAT SECTION IS IN THE PRECAUTIONS

7    SECTION OR NOT.  I WOULD HAVE TO LOOK.

8    **Q.**   LET ME SEE IF I CAN HELP YOU FIND THE PRECAUTIONS SECTION.

9    IF YOU GO TO 8028, THE BATES NUMBER 8028, THE LAST FOUR

10   NUMBERS -- DO YOU SEE ON THE BOTTOM THERE ON THE RIGHT?

11   **A.**   8028?

12   **Q.**   MRK00420008028.  DO YOU SEE IT?

13   **A.**   OKAY.

14   **Q.**   THERE'S NO VIGOR RESULTS, FIVEFOLD INCREASE, ANYTHING LIKE

15   THAT IN THE PROPOSED PRECAUTIONS SECTION; RIGHT?

16   **A.**   AS I SAID, I THINK WE PUT IT IN THE USE WITH ASPIRIN

17   SECTION.

18   **Q.**   THERE'S NOTHING IN THE WARNINGS SECTION ABOVE THAT; RIGHT?

19   **A.**   THAT IS CORRECT, BUT THEN WE UPDATED THIS AND SENT A

20   REVISED LABEL TO THE FDA.

21   **Q.**   THEN WHAT YOU DID IS THAT YOU PROPOSED A -- THEN YOU

22   ACTUALLY PROPOSED, "WELL, LET'S PUT IT IN THE PRECAUTIONS

23   SECTION."  RIGHT?

24   **A.**   WE FELT, AFTER THE FDA ADVISORY COMMITTEE, THAT WAS THE

25   MOST APPROPRIATE PLACE FOR IT, AND I REALLY DO THINK THAT WAS

1    THE MOST APPROPRIATE PLACE.

2    **Q.**   SO WHAT HAPPENED IS YOU THEN GOT A LETTER BACK FROM THE

3    FDA SAYING, "NO.  WE WANT IT IN THE WARNINGS SECTION."  RIGHT?

4    **A.**   THEIR FIRST PROPOSAL BACK FROM THE FDA WAS IN OCTOBER, I

5    BELIEVE, OF 2001.  IN THEIR FIRST PROPOSAL TO US, THEY

6    SUGGESTED IT BE IN THE WARNINGS SECTION.  THERE WERE A LOT OF

7    OTHER THINGS THAT THEY HAD IN THERE.  WE SENT BACK A REVISED

8    LABEL.  WE SUGGESTED THAT IT BE IN THE PRECAUTIONS SECTION,

9    THEN THEY SENT US SOMETHING BACK AND IT WAS IN THE PRECAUTIONS

10   SECTION.

11   **Q.**   LET ME SHOW YOU P1.1309.  I ASK:  IS THIS THE LETTER AS TO

12   WHEN MERCK RECEIVED THE PROPOSAL FROM THE FDA WHERE THEY WANTED

13   TO PUT THE HEART ATTACK RISK IN THE WARNINGS SECTION?

14   **A.**   YES.  THIS WAS THE FIRST DRAFT WE GOT FROM THEM IN

15   OCTOBER 2001.  THE NEXT DRAFT WE GOT FROM THEM WAS IN THE

16   PRECAUTIONS SECTION.

17             **MR. ROBINSON:**  I WOULD OFFER P1.1309 AS AN EXHIBIT,

18   IF IT'S NOT ALREADY, YOUR HONOR.

19             **MR. GOLDMAN:**  NO OBJECTION.

20             **THE COURT:**  LET IT BE ADMITTED.

21   BY MR. ROBINSON:

22   **Q.**   CAN WE GO TO THE WARNINGS SECTION UNDER CARDIOVASCULAR

23   DISEASE.  DO YOU SEE IT'S BATES NUMBER 8572, DR. REICIN?  I

24   THINK WE HAVE TO PUT THIS ON THE ELMO.  SO THIS IS WHAT THE FDA

25   TELLS YOU SHOULD BE SAID; RIGHT?

1   A.   THIS WAS THEIR FIRST RECOMMENDATION.  AS I SAID, IT'S NOT

2   UNUSUAL FOR THERE TO BE A BACK AND FORTH WITH THE FDA

3   DISCUSSING WHAT THE BEST WAY TO LABEL A DRUG IS.

4   Q.   SO WHAT THE FDA PROPOSED WARNING -- THIS IS IN THE

5   WARNINGS SECTION; RIGHT?

6   A.   THAT'S CORRECT.

7   Q.   IT SAYS, "VIOXX SHOULD BE USED WITH CAUTION IN PATIENTS AT

8   RISK OF DEVELOPING CARDIOVASCULAR THROMBOTIC EVENTS SUCH AS

9   THOSE WITH A HISTORY OF MYOCARDIAL INFARCTION AND ANGINA AND IN

10  PATIENTS WITH PREEXISTENT HYPERTENSION AND CONGESTIVE HEART

11  FAILURE."  DID I READ THAT RIGHT?

12  A.   YES, YOU DID.

13  Q.   THEN IT SAYS, "THE RISK OF DEVELOPING A MYOCARDIAL

14  INFARCTION IN THE VIGOR STUDY WAS FIVEFOLD HIGHER IN PATIENTS

15  TREATED WITH VIOXX 50 MILLIGRAMS (0.5 PERCENT) AS COMPARED TO

16  PATIENTS TREATED WITH NAPROXEN (0.1 PERCENT) (SEE SPECIAL

17  STUDIES, VIGOR).  DID I READ THAT RIGHT?

18  A.   YES, YOU DID.

19  Q.   THEN IT SAYS, "THE FINDING WAS CONSISTENT IN A SMALLER AND

20  SHORTER STUDY USING VIOXX 25 MILLIGRAMS THAT ALLOWED THE USE OF

21  LOW-DOSE ASPIRIN (SEE SPECIAL STUDIES, ADVANTAGE)."  DID I READ

22  THAT RIGHT?

23  A.   YES, YOU DID.

24  Q.   "PROSPECTIVE WELL-POWERED, LONG-TERM STUDIES REQUIRED TO

25  COMPARE THE INCIDENCE OF SERIOUS CV EVENTS IN PATIENTS TAKING

1    VIOXX VERSUS NSAID COMPARATORS OTHER THAN NAPROXEN HAVE NOT

2    BEEN PERFORMED."  DID I READ THAT RIGHT?

3    A.   YES, YOU DID.

4    Q.   SO THE FDA NOT ONLY MENTIONED THE FIVEFOLD INCREASE IN THE

5    VIGOR STUDY OF HEART ATTACKS OVER NAPROXEN, FOR VIOXX OVER

6    NAPROXEN, BUT IT ALSO SAYS THAT THAT FINDING WAS CONSISTENT

7    WITH THE SMALLER STUDY, WHICH WAS THE ADVANTAGE STUDY; RIGHT?

8    A.   THAT IS WHAT IT SAYS HERE.

9    Q.   DID YOU KNOW THAT, THAT THE ADVANTAGE STUDY RESULTS WERE

10   CONSISTENT WITH THE VIGOR STUDY RESULTS?

11   A.   WELL, THEY WERE CONSISTENT AND THEY WEREN'T CONSISTENT.

12   THERE WERE, I THINK, FIVE MYOCARDIAL INFARCTIONS/HEART ATTACKS

13   ON VIOXX.

14   Q.   THERE WAS ZERO ON THE COMPARATOR; RIGHT?

15   A.   IT WAS ZERO -- NO.  THERE WAS ONE ON THE COMPARATOR.

16   STROKES WENT IN THE OTHER DIRECTION.  IT WAS SIX EVENTS ON THE

17   COMPARATOR, NAPROXEN, THE SAME COMPARATOR, AND NONE ON VIOXX,

18   WHICH WAS AN UNUSUAL FINDING.

19   Q.   THE JURY HAS ALREADY SEEN THE E-MAIL, BUT THIS IS WHERE

20   DR. SCOLNICK THEN RESPONDS, "THIS LABEL IS UGLY CUBED.  I'M NOT

21   GOING TO ACCEPT IT," SOMETHING LIKE THAT?

22   A.   I DON'T BELIEVE THAT I WAS ON THAT E-MAIL.

23   Q.   YOU SAID THIS MORNING THAT YOU WERE FAMILIAR WITH WHAT WAS

24   GOING ON WITH THE FDA IN 2005.  DO YOU REMEMBER THAT?

25   A.   CERTAINLY NOT EVERYTHING GOING ON WITH THE FDA IN 2005.  I

2416

1   SAID THAT I WAS AT THE FDA ADVISORY COMMITTEE MEETING AND THAT

2   I READ THE 2005 LABEL.  WE HAD OTHER CONVERSATIONS WITH THEM

3   ABOUT COX-2 INHIBITORS DURING THAT TIME.

4   **Q.**   YOU TALKED ABOUT THE FACT THERE WAS AN ADVISORY COMMITTEE

5   MEETING IN FEBRUARY 2005; RIGHT?

6   **A.**   THAT IS CORRECT.

7   **Q.**   THEN YOU SHOWED THAT DOCUMENT IN APRIL OF 2005 FROM THE

8   FDA WHERE THEY PUT BLACK BOXES ON NAPROXEN, FLURBIPROFEN,

9   MOBIC, FELDENE, EVERYBODY; RIGHT?

10  **A.**   THAT IS MY UNDERSTANDING.

11  **Q.**   IBUPROFEN?

12  **A.**   YES.

13  **Q.**   BEFORE THAT TIME NONE OF THOSE DRUGS HAD TO HAVE BLACK

14  BOXES ON THEM?

15  **A.**   THAT'S CORRECT.

16  **Q.**   IS IT TRUE ABOUT A MONTH BEFORE THAT LETTER FROM THE FDA

17  THAT MR. GOLDMAN SHOWED YOU THAT MERCK SENT A LETTER TO THE FDA

18  PROPOSING TO PUT VIOXX BACK ON THE MARKET WITH THEIR OWN BLACK

19  BOX?

20  **A.**   I THINK YOU'VE MISCHARACTERIZED THAT WE MET WITH THE FDA.

21  **Q.**   I'M JUST ASKING:  DID YOU SEND THIS LETTER?

22  **A.**   YOU ASKED A VERY SPECIFIC QUESTION.  YOU ASKED IF WE ASKED

23  THEM TO PUT VIOXX BACK ON THE MARKET.

24  **Q.**   LET ME WITHDRAW THAT QUESTION.  WAS THERE A LETTER SENT TO

25  MERCK ON MARCH 15, 2005?

1   **A.**   SENT TO MERCK?

2   **Q.**   I'M SORRY, SENT FROM MERCK TO THE FDA.  EXCUSE ME.

3   **A.**   I CAN'T REMEMBER THE EXACT DATE, BUT WE DID MEET WITH THEM

4   AND WE SENT THEM A BACKGROUND PACKAGE BEFORE WE MET WITH THEM.

5   **Q.**   LET ME SHOW YOU P1.1220 AND SEE IF THIS IS THE BACKGROUND

6   PACKAGE THAT YOU SENT TO THE FDA ON OR ABOUT MARCH 15, 2000.

7   **A.**   YES, THIS IS IT.

8          **MR. ROBINSON:**  YOUR HONOR, WE WOULD OFFER P1.1220

9   INTO EVIDENCE.

10         **MR. GOLDMAN:**  NO OBJECTION.

11         **THE COURT:**  LET IT BE ADMITTED.

12  **BY MR. ROBINSON:**

13  **Q.**   DOES THE APPEAR TO BE THE PROPOSED BLACK-BOX WARNING THAT

14  MERCK SUBMITTED IN MARCH OF 2005?

15  **A.**   AGAIN, THIS WAS PART OF THE BACKGROUND PACKAGE WHERE WE

16  WERE SUBMITTING POTENTIAL LANGUAGE THAT WE MIGHT INCLUDE IN A

17  LABEL FOR VIOXX BASED ON WHAT WE THOUGHT WE HEARD AT THE FDA

18  ADVISORY COMMITTEE MEETING THAT WE WANTED TO DISCUSS WITH THEM

19  AND DISCUSS WITH THEM WHAT THE PATH FORWARD WOULD BE FOR VIOXX

20  BASED ON WHAT WE HEARD AT THE ADVISORY COMMITTEE MEETING.

21  **Q.**   IF WE GO TO THE HEADING, DOES IT SAY "CARDIOVASCULAR

22  EFFECTS"?

23  **A.**   CORRECT.

24  **Q.**   THEN IT SAYS, "USE OF SELECTIVE COX-2 INHIBITORS HAS BEEN

25  ASSOCIATED WITH AN INCREASED RISK OF SERIOUS CARDIOVASCULAR

1    THROMBOTIC EVENTS."  DID I READ THAT RIGHT?

2    **A.**   YOU DID.

3    **Q.**   THEN IT SAYS, "IN A LARGE CLINICAL STUDY WITH VIOXX 25

4    MILLIGRAMS, AN INCREASED RISK OF SERIOUS CARDIOVASCULAR

5    THROMBOTIC EVENTS VERSUS PLACEBO WAS OBSERVED WITH LONG-TERM

6    USE."  DID I READ THAT RIGHT?

7    **A.**   YES, YOU DID.

8    **Q.**   BY "LONG TERM USE" I THINK WE SAID EARLIER IT WAS OVER 18

9    MONTHS; IS THAT RIGHT?

10   **A.**   WHAT I SAID BEFORE IS YOU DIDN'T SEE ANY INCREASED RISK

11   UNTIL BEGINNING AFTER 18 MONTHS.  THE STUDY WENT ON FOR THREE

12   YEARS.

13   **Q.**   THEY STARTED SHOWING AN INCREASED RISK AFTER 18 MONTHS;

14   RIGHT?

15   **A.**   THAT'S CORRECT.

16   **Q.**   ARE YOU AWARE THAT MR. BARNETT WAS ON IT FOR LIKE 31

17   MONTHS AND 26 DAYS?

18   **A.**   I'M NOT AWARE OF THE DETAILS.

19   **Q.**   OKAY.  THEN IT SAYS, "VIOXX SHOULD BE USED AT THE LOWEST

20   DOSE FOR THE SHORTEST DURATION POSSIBLE TO MINIMIZE THE

21   POTENTIAL RISK FOR AN ADVERSE EVENT."  IS THAT WHAT IT SAYS?

22   **A.**   YES, IT DOES.

23   **Q.**   THEN YOU SAY, "USE OF SELECTIVE COX-2 INHIBITORS,

24   INCLUDING VIOXX, IS RESERVED FOR PATIENTS WHO HAVE BEEN

25   UNRESPONSIVE TO OR CANNOT TOLERATE NONSELECTIVE NSAIDS."  DID I

1    READ THAT RIGHT?

2    **A.**   YES, YOU DID.

3    **Q.**   SO THAT WOULD BE SOMEONE WHO COULDN'T MAYBE TAKE FELDENE,

4    FOR EXAMPLE?

5    **A.**   POTENTIALLY SOMEONE WHO COULDN'T TAKE FELDENE, THAT'S

6    CORRECT.

7    **Q.**   "FURTHER, PATIENTS WITH A HISTORY OF ATHEROSCLEROTIC

8    CARDIOVASCULAR DISEASE OR CEREBROVASCULAR DISEASE ARE AT

9    INCREASED RISK FOR HAVING A SERIOUS CARDIOVASCULAR THROMBOTIC

10   EVENT."  DID I READ THAT RIGHT?

11   **A.**   YES, YOU DID.

12   **Q.**   WHEN THEY SAY "INCREASED RISK FOR HAVING A SERIOUS

13   CARDIOVASCULAR THROMBOTIC EVENT," BY THAT YOU MEAN HEART

14   ATTACK?

15   **A.**   THAT'S CORRECT.  IT'S JUST A STATEMENT THAT THE PATIENTS,

16   THESE TYPE OF PATIENTS, ARE AT AN INCREASED RISK FOR HAVING

17   EVENTS.

18   **Q.**   SOMETIMES YOU USE BIG WORDS, BUT WHAT IT REALLY MEANS IS

19   HEART ATTACK; RIGHT?  THROMBOTIC EVENT?

20   **A.**   WELL, HEART ATTACK IS ONE TYPE OF THROMBOTIC EVENT.

21   **Q.**   THEN YOU SAY, "USE OF SELECTIVE COX-2 INHIBITORS,

22   INCLUDING VIOXX, SHOULD BE CONSIDERED IN THESE PATIENTS ONLY IF

23   THE BENEFITS OUTWEIGH THE RISKS."  DID I READ THAT RIGHT?

24   **A.**   YES, YOU DID.

25   **Q.**   THEN IT SAYS, "VIOXX IS CONTRAINDICATED IN PATIENTS WITH

2420

1    ACUTE CORONARY SYNDROME AND IN PATIENTS IMMEDIATELY FOLLOWING
2    CORONARY ARTERY BYPASS GRAFT SURGERY OR OTHER REVASCULARIZATION
3    PROCEDURES."  DID I READ THAT RIGHT?
4    A.    YES.
5    Q.    YOU DON'T KNOW OF THE SPECIFIC FACTS, IF MR. BARNETT HAD A
6    BYPASS SURGERY IN THIS CASE?
7    A.    NO, I DON'T.  YOU WILL SEE THAT IT SAYS "IMMEDIATELY
8    FOLLOWING."  IT'S IN THE FIRST COUPLE DAYS FOLLOWING.
9    Q.    WITHIN ABOUT FOUR DAYS, IS THAT --
10   A.    I DON'T KNOW THE SPECIFICS OF THE CASE.
11   Q.    NOW, IS IT TRUE THAT IN THAT APPROVE STUDY WE JUST TALKED
12   ABOUT THAT THE RELATIVE RISKS FOR CARDIAC EVENTS WAS 2.8 AND IT
13   WAS STATISTICALLY SIGNIFICANT?
14   A.    YOU SAID FOR CARDIAC EVENTS?
15   Q.    CARDIAC EVENTS.
16   A.    IT MAY HAVE BEEN.  THAT'S KIND OF A SUBGROUP OF THE
17   PRIMARY ENDPOINT, WHICH WAS THROMBOTIC.  IT MAY HAVE BEEN 2.8.
18   IF YOU COULD SHOW ME THE DOCUMENT --
19   Q.    LET ME SHOW YOU -- IS IT THE BRESALIER ARTICLE THAT WAS
20   PUBLISHED ON THE APPROVE STUDY?
21   A.    THAT WOULD BE FINE.  YES, YOU ARE CORRECT.  THE RELATIVE
22   RISK OF CARDIAC EVENTS WAS 2.8.
23   Q.    THE KAPLAN-MEIER CURVE SEPARATES AFTER ABOUT 18 MONTHS IN
24   THIS ORIGINAL PUBLICATION; RIGHT?
25   A.    THAT IS CORRECT.

DAILY COPY

1   Q.   LATER ON -- WELL, I DON'T WANT TO GET INTO THAT.  NOW, AT

2   SOME TIME ACTUALLY IN SEPTEMBER OF 2001 MERCK GOT A WARNING

3   LETTER FROM THE FDA; RIGHT?

4   A.   THAT IS CORRECT.

5   Q.   YOU WERE AWARE BECAUSE IT WAS RELATING TO VIOXX; RIGHT?

6   A.   I BECAME AWARE OF IT WHEN I GOT BACK FROM MY LEAVE OF

7   ABSENCE IN EARLY OCTOBER.

8   Q.   SO THE WARNING LETTER HAD TO DO WITH THREE DIFFERENT

9   THINGS THAT MERCK DID:  (1) AN AUDIO CONFERENCE; (2) A PRESS

10  RELEASE OF MAY 22, 2001; AND THEN (3) SOME REPRESENTATIONS MADE

11  BY MERCK SALES REPS TO PROMOTE VIOXX.  CORRECT?

12  A.   I THINK THREE SEPARATE PARTICULAR INCIDENTS, THAT'S

13  CORRECT.

14       MR. ROBINSON:  YOUR HONOR, I WOULD OFFER P1.0006 INTO

15  EVIDENCE.

16       MR. GOLDMAN:  WE STAND BY OUR PRETRIAL OBJECTIONS.

17       THE COURT:  I'LL ADMIT IT.

18  BY MR. ROBINSON:

19  Q.   THIS LETTER WENT TO MR. GILMARTIN.  HE WAS YOUR CEO;

20  RIGHT?

21  A.   THAT IS CORRECT.

22  Q.   BASICALLY, IF YOU LOOK AT THE FIRST SENTENCE, IT TALKS

23  ABOUT AUDIO CONFERENCES, THEN A PRESS RELEASE, AND ORAL

24  REPRESENTATIONS.  BASICALLY, IF YOU CAN READ THE SECOND

25  PARAGRAPH IT SAYS, "YOU HAVE ENGAGED IN A PROMOTIONAL CAMPAIGN

1  FOR VIOXX THAT MINIMIZES THE POTENTIALLY SERIOUS CARDIOVASCULAR

2  FINDINGS THAT WERE OBSERVED IN THE VIOXX GASTROINTESTINAL

3  OUTCOMES RESEARCH (VIGOR) STUDY AND THUS MISREPRESENTS THE

4  SAFETY PROFILE FOR VIOXX."  DID I READ THAT RIGHT?

5  **A.**   YES, YOU DID.

6  **Q.**   "SPECIFICALLY, YOUR PROMOTIONAL CAMPAIGN DISCOUNTS THE

7  FACT THAT IN THE VIGOR STUDY PATIENTS ON VIOXX WERE OBSERVED TO

8  HAVE A FOUR TO FIVEFOLD INCREASE IN MYOCARDIAL INFARCTIONS

9  COMPARED TO PATIENTS ON THE COMPARATOR NONSTEROIDAL

10  ANTI-INFLAMMATORY DRUG (NSAID) NAPROSYN (NAPROXEN)."  THOSE ARE

11  THE SAME THING; RIGHT?

12  **A.**   YES.  ONE IS THE GENERIC NAME; THE OTHER IS THE BRANDED

13  NAME.

14  **Q.**   "ALTHOUGH THE EXACT REASON FOR THE INCREASED RATE OF MI'S

15  OBSERVED IN THE VIOXX TREATMENT GROUP IS UNKNOWN, YOUR

16  PROMOTIONAL CAMPAIGN SELECTIVELY PRESENTS THE FOLLOWING

17  HYPOTHETICAL EXPLANATION FOR THE OBSERVED INCREASE IN MI'S."

18  DID I READ THAT RIGHT?

19  **A.**   YES, YOU DID.

20  **Q.**   "YOU ASSERT THAT VIOXX DOES NOT INCREASE THE RISK OF MI'S

21  AND THAT THE VIGOR FINDING IS CONSISTENT WITH NAPROXEN'S

22  ABILITY TO BLOCK PLATELET AGGREGATION LIKE ASPIRIN."  DID I

23  READ THAT RIGHT?

24  **A.**   YES.

25  **Q.**   DOES THAT SOUND FAMILIAR TO YOU, THAT STATEMENT?

2423

1  **A.**   YES, THE STATEMENT DOES.

2  **Q.**   ISN'T THAT WHAT YOU'RE SAYING HERE IN COURT TODAY?

3  **A.**   I STILL BELIEVE IT TODAY.

4  **Q.**   SO NOW, THEN, THEY SAY THAT IS --

5  **A.**   AS DO OTHER SCIENTISTS, BY THE WAY.

6  **Q.**   AT MERCK; RIGHT?

7  **A.**   NO, OUTSIDE OF MERCK, INCLUDING AT THE FDA.

8  **Q.**   THEY'RE NOT DEFENDERS; RIGHT?

9          **THE COURT:**  LET'S CONTINUE, PLEASE.

10 **BY MR. ROBINSON:**

11 **Q.**   THEN THEY SAY, "THAT IS A POSSIBLE EXPLANATION, BUT YOU

12 FAIL TO DISCLOSE THAT YOUR EXPLANATION IS HYPOTHETICAL AND HAS

13 NOT BEEN DEMONSTRATED BY SUBSTANTIAL EVIDENCE AND THAT THERE IS

14 ANOTHER REASONABLE EXPLANATION, THAT VIOXX MAY HAVE

15 PROTHROMBOTIC PROPERTIES."  DID I READ THAT RIGHT?

16 **A.**   THAT'S CORRECT.

17 **Q.**   "YOUR MINIMIZING THESE POTENTIAL RISKS AND MISREPRESENTING

18 THE SAFETY PROFILE FOR VIOXX RAISES SIGNIFICANT PUBLIC HEALTH

19 AND SAFETY CONCERNS."  DID I DID READ THAT RIGHT?

20 **A.**   YES, YOU DID.

21 **Q.**   "YOUR MISREPRESENTATION OF THE SAFETY PROFILE FOR VIOXX IS

22 PARTICULARLY TROUBLESOME BECAUSE WE HAVE PREVIOUSLY, IN AN

23 UNTITLED LETTER, OBJECTED TO PROMOTIONAL MATERIALS FOR VIOXX

24 THAT ALSO MISREPRESENTED VIOXX'S SAFETY PROFILE."  DID I READ

25 THAT RIGHT?

2424

1   A.   YES.

2   Q.   YOU DIDN'T LEAVE ON YOUR VACATION UNTIL SOMETIME IN THE

3   SUMMER OF 2001; RIGHT?

4   A.   IT WASN'T A VACATION; IT WAS A LEAVE OF ABSENCE.

5   Q.   I'M SORRY.

6   A.   WHEN DID YOU SAY?  NO.  I WAS GONE BEFORE SEPTEMBER.

7   Q.   SOMETHING LIKE AUGUST OF 2001?

8   A.   I THINK IT WAS SOMETIME IN JULY.

9   Q.   SO THERE'S A PRESS RELEASE THAT YOU LOOKED AT AND

10  APPROVED -- NOT APPROVED, BUT YOU APPROVED THE SCIENTIFIC PART

11  OF IT THAT WAS MAY 22, 2001?

12  A.   NO.  AS I SAID, I DON'T RECALL REVIEWING THAT PRESS

13  RELEASE.

14  Q.   THE MAY 22, 2001?

15  A.   I DON'T RECALL REVIEWING THAT PRESS RELEASE.

16  Q.   SOMEONE FROM MERCK RESEARCH LABORATORIES HAD TO APPROVE

17  IT; RIGHT?

18  A.   WELL, THEY WERE PROVIDING DATA THAT HAD PREVIOUSLY

19  PROVIDED, SO IT'S POSSIBLE SOMEONE FROM MERCK RESEARCH

20  LABORATORIES REVIEWED THAT.  IT MAY HAVE BEEN ME.  I JUST DON'T

21  RECALL SITTING HERE TODAY.

22  Q.   IT MIGHT HAVE BEEN YOU?

23  A.   IT MAY HAVE BEEN, BUT I DON'T RECALL SITTING HERE TODAY.

24  Q.   I'M JUST TRYING TO GET THROUGH THIS QUICKLY.  IF YOU GO TO

25  THIS PAGE THAT SAYS "PRESS RELEASE," PAGE 6 --

1          **MR. BECK:**  IT'S NOT WORKING.

2   **BY MR. ROBINSON:**

3   **Q.**   "WE HAVE IDENTIFIED A MERCK PRESS RELEASE ENTITLED 'MERCK

4   CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF VIOXX'

5   DATED MAY 22, 2001, THAT IS ALSO FALSE OR MISLEADING FOR

6   SIMILAR REASONS STATED ABOVE."  DID I READ THAT RIGHT?

7   **A.**   YOU DID.

8   **Q.**   "ADDITIONALLY, YOUR CLAIM IN THE PRESS RELEASE THAT VIOXX

9   HAS A FAVORABLE CARDIOVASCULAR SAFETY PROFILE IS SIMPLY

10  INCOMPREHENSIBLE GIVEN THE RATE OF MI AND SERIOUS

11  CARDIOVASCULAR EVENTS COMPARED TO NAPROXEN."

12  **A.**   THAT'S CORRECT.  THEY ACTUALLY THOUGHT WE WERE TRYING TO

13  CLAIM THAT WE WERE PROTECTIVE IN SOME WAY, EXCEPT THE PRESS

14  RELEASE WAS PUT OUT IN RESPONSE TO THINGS THAT WERE HAPPENING

15  IN THE MEDIA AT THAT TIME, SO WE WERE JUST RESPONDING TO THEM.

16  **Q.**   I KNOW THERE'S SOME LETTER YOU SENT BACK AND THEN THEY

17  SENT A LETTER SAYING, OKAY, YOU'RE NOT GOING TO DO THIS

18  ANYMORE.  BASICALLY IS THAT WHAT HAPPENED?

19  **A.**   WHAT HAPPENED IS WE MET WITH THEM; AND ONCE WE EXPLAINED

20  THE CONTEXT OF THIS PRESS RELEASE, THEY DID NOT ASK US TO DO

21  ANYTHING ADDITIONAL, WHICH THEY WOULD HAVE.

22  **Q.**   THE POINT IS THEY ARE TELLING YOU TO THAT TO ATTRIBUTE THE

23  HEART ATTACKS IN THE VIGOR STUDY SOLELY TO NAPROXEN IS WRONG?

24  **A.**   THEY ARE SAYING THAT THERE ARE OTHER POTENTIAL

25  EXPLANATIONS.

1    **Q.**    WHICH IS THAT VIOXX CAUSES HEART ATTACKS?

2    **A.**    THEY SAID THAT AND THAT WAS ONE POTENTIAL EXPLANATION,

3    THAT IS CORRECT.

4    **Q.**    COUNSEL SHOWED YOU A WHOLE GROUP OF DOCUMENTS THIS MORNING

5    ABOUT THE ALZHEIMER'S STUDIES AND THE OA STUDIES; RIGHT?

6    **A.**    THAT'S CORRECT.  WE DISCUSSED THOSE TODAY.

7    **Q.**    LET'S TALK ABOUT THE ALZHEIMER'S STUDIES.  WERE YOU TOLD

8    BY BRIGGS MORRISON IN AN E-MAIL IN ABOUT AUGUST OF 2001 THAT

9    AFTER HE LOOKED AT THE OA STUDY NUMBERS AND THE RA STUDY

10   NUMBERS IT --

11              **MR. GOLDMAN:**  YOUR HONOR, IF HE WANTS TO SHOW --

12              **MR. ROBINSON:**  I'M JUST ASKING IF SHE REMEMBERS.

13              **THE WITNESS:**  WELL, I WAS ON LEAVE IN AUGUST OF 2001.

14   BY MR. ROBINSON:

15   **Q.**    LET ME SEE IF YOU WOULD HAVE GOTTEN THIS E-MAIL.  IT WAS

16   ADDRESSED TO YOU.  I'LL APPROACH THE WITNESS.  SO THIS IS AN

17   E-MAIL YOU WOULD HAVE RECEIVED FROM BRIGGS MORRISON WHEN YOU

18   GOT BACK FROM YOUR VACATION; RIGHT?

19   **A.**    IT PROBABLY WOULD HAVE BEEN IN MY E-MAIL.  AGAIN, I WASN'T

20   ON VACATION; IT WAS A LEAVE OF ABSENCE.  IT MAY OR MAY NOT HAVE

21   BEEN IN MY E-MAIL BOX.

22   **Q.**    DO YOU SEE NO. 1, A FEW THINGS, WHERE HE SAYS, "THE ROFE

23   VERSUS PLACEBO IN THE OA AND RA, ALBEIT WAS SMALL NUMBERS,

24   LOOKS A LOT LIKE THE ETORI FIGURES VERSUS PLACEBO.  IS ALZ THE

25   OUTLIER?"

1   A.   CORRECT.

2         MR. ROBINSON:  YOUR HONOR, COULD I OFFER P1.1866 INTO

3   EVIDENCE?

4         MR. GOLDMAN:  NO OBJECTION.

5         THE COURT:  LET IT BE RECEIVED.

6   BY MR. ROBINSON:

7   Q.   HE SAYS HE HAS LOOKED AT THE OA STUDY NUMBERS AND THE RA

8   STUDY NUMBERS AND BASICALLY IT LOOKS LIKE ALZHEIMER'S IS THE

9   OUTLIER?

10  A.   HE IS ASKING THE QUESTION, ALTHOUGH HE IS SAYING YOU HAVE

11  GOT VERY SMALL NUMBERS OF EVENTS HERE, JUST A HANDFUL.  WE HAD

12  MANY MORE IN THE ALZHEIMER'S.  WHAT BRIGGS WAS DOING HERE IS HE

13  HAD REVIEWED A MANUSCRIPT AND WAS TRYING TO ACT AS A HARD

14  REVIEWER, ASKING ALL THE TYPES OF QUESTIONS THAT WE WOULD GET

15  FROM OUTSIDE REVIEWERS.

16  Q.   THIS IS PART OF HIS E-MAIL; RIGHT?

17  A.   UH-HUH.

18  Q.   HE SAYS RA IS A RELATIVE RISK OF 1.78, THE OA IS A

19  RELATIVE RISK OF 1.53, AND THESE ALZHEIMER'S ARE BELOW 1;

20  RIGHT?

21  A.   THAT'S CORRECT.  WHAT YOU DON'T HAVE THERE ARE THE

22  CONFIDENCE INTERVALS OF THE NUMBER OF EVENTS.  IF YOU DID, YOU

23  WOULD SEE THAT THE ALZHEIMER'S AND CHRONIC LOW BACK PAIN HAD

24  FAR MORE EVENTS THAN RA OR OA.

25  Q.   COUNSEL SHOWED YOU SEVERAL EXHIBITS THIS MORNING FROM

1    DR. VILLALBA.  DO YOU REMEMBER THE ONE IN 2004?

2    **A.**   YES.

3    **Q.**   YOU SAID YOU MONITORED THOSE DOCUMENTS FROM THE FDA AND

4    YOU WOULD LOOK AT THEM, ET CETERA?

5    **A.**   CERTAINLY, YES.

6    **Q.**   LET ME SHOW YOU ANOTHER ONE FROM DR. VILLALBA.

7              **THE COURT:**  I HOPE WE'RE COMING TO AN END, COUNSEL.

8              **MR. ROBINSON:**  I AM, YOUR HONOR.

9    BY MR. ROBINSON:

10   **Q.**   YOU WOULD HAVE REVIEWED THIS DOCUMENT ALONG WITH THE OTHER

11   FDA DOCUMENTS THAT YOU SAID YOU REVIEWED ON OR ABOUT

12   JANUARY 28, 2004, RIGHT?

13   **A.**   NO.  THAT'S THE DATE THAT SHE WROTE THE DOCUMENT.  THAT'S

14   NOT NECESSARILY THE DATE THAT I WOULD HAVE RECEIVED THE

15   DOCUMENT.  I DON'T RECALL RECEIVING THIS IN EARLY 2004.

16   **Q.**   DID YOU RECEIVE IT SOMETIME WITHIN THREE MONTHS OF THAT

17   DATE?

18   **A.**   I DON'T THINK SO.  I DON'T THINK I GOT A COPY OF THIS

19   UNTIL AFTER SEPTEMBER 2004, WHEN WE REMOVED VIOXX FROM THE

20   MARKET, AT LEAST THAT'S MY RECOLLECTION.

21   **Q.**   IS THERE ANYTHING IN THERE, WHEN YOU LOOKED AT IT, THAT

22   YOU FOUND THAT IT WASN'T SOMETHING THAT SHE WROTE?

23   **A.**   I COULDN'T COMMENT ONE WAY OR ANOTHER ON WHETHER SHE WROTE

24   IT.

25              **MR. ROBINSON:**  IN ANY EVENT, WE OFFER THIS INTO

1   EVIDENCE.

2            **MR. GOLDMAN:**  OBJECTION.

3            **THE COURT:**  IS IT SENT TO HER?

4            **MR. ROBINSON:**  YOUR HONOR, IT'S A DOCUMENT THAT WAS

5   SENT TO MERCK ON VIOXX AND SHE WOULD HAVE REVIEWED IT IN THEIR

6   NORMAL COURSE LIKE ALL THE OTHER DOCUMENTS WE PUT IN THIS

7   MORNING.

8            **THE COURT:**  I SUSTAIN THE OBJECTION.

9   BY MR. ROBINSON:

10  **Q.**   IN ANY EVENT, DO YOU REMEMBER THAT THE FDA ASKED YOU TO

11  PUT THE ALZHEIMER'S DEATH INFORMATION ON THE VIOXX LABEL?

12  **A.**   THE CARDIOVASCULAR MORTALITY DATA, AND THAT WAS PUT IN THE

13  LABEL, THAT'S TRUE.

14  **Q.**   TO GO QUICKLY HERE, ONE OF THE DOCUMENTS THAT MR. GOLDMAN

15  SHOWED YOU THIS MORNING -- HE TALKED ABOUT ALL-CAUSE MORTALITY.

16  DO YOU REMEMBER THAT?

17  **A.**   I DO.

18  **Q.**   DO YOU REMEMBER UP IN THAT DOCUMENT THEY HAD A CATEGORY

19  CALLED CARDIAC EVENTS?

20  **A.**   THAT'S CORRECT.

21  **Q.**   IS IT TRUE THAT ON THAT DOCUMENT THERE WERE 12 VIOXX

22  CARDIAC EVENTS AND SIX IN THE PLACEBO GROUP?

23  **A.**   I THINK THAT'S CORRECT, BUT THEY WEREN'T THROMBOTIC

24  EVENTS.

25  **Q.**   THEY WERE CARDIAC EVENTS.  I'M SORRY.

                    DAILY COPY

1   **A.**   THAT'S CORRECT, SO IT INCLUDED OTHER THINGS OTHER THAN

2   THINGS LIKE MI.  THEY WERE DIFFERENT TYPES OF CARDIAC EVENTS.

3   **Q.**   ANYWAY, DR. REICIN, IS IT TRUE THAT IN FEBRUARY OF 2005

4   THAT THE FDA ADVISORY COMMITTEE VOTED 32 TO NOTHING AND SAID

5   THAT, "THE AVAILABLE DATA SUPPORTS THE CONCLUSION THAT

6   ROFECOXIB SIGNIFICANTLY INCREASES THE RISK OF CARDIOVASCULAR

7   EVENTS"?

8   **A.**   THAT IS CORRECT, THEY DID VOTE THAT IN FEBRUARY OF 2005.

9   **Q.**   YOU WERE THERE AT THAT MEETING?

10  **A.**   YES, I WAS.

11  **Q.**   DID YOU SEE ALL THE 32 PEOPLE RAISE THEIR HAND OR WHATEVER

12  AND SAID YES?

13  **A.**   I CAN'T REMEMBER IF THEY RAISED THEIR HAND, BUT THEY SAID

14  YES.

15  **Q.**   TO BE FAIR, THEY SAID THE SAME THING ABOUT CELEBREX;

16  CORRECT?

17  **A.**   YES, THEY DID.

18  **Q.**   WE'LL TAKE A 10-MINUTE BREAK AND COME BACK AND FINISH.

19           **THE DEPUTY CLERK:**  EVERYONE RISE.

20           (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

21           **THE DEPUTY CLERK:**  EVERYONE RISE.

22           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

23  THE BENCH.)

24           **MR. GOLDMAN:**  WE WANTED TO RAISE THE ISSUE OF

25  PERSONAL USE WITH DR. REICIN IN LIGHT OF MR. ROBINSON'S

DAILY COPY

1    CROSS-EXAMINATION.  ON SEVERAL OCCASIONS HE ATTACKED HER

2    CREDIBILITY.  HE ATTACKED HER CREDIBILITY WHEN HE SAID "DO NO

3    HARM TO PATIENTS" AND RAISED THE HIPPOCRATIC OATH.  HE

4    SUGGESTED DIRECTLY THAT MERCK WAS TRYING TO MASK OR HIDE

5    EVIDENCE OF A POTENTIAL HEART ATTACK PROBLEM.  HE REFERRED

6    REPEATEDLY TO HER AS THE "VIOXX DEFENDER," SUGGESTING THAT SHE

7    WAS MISLEADING THE MEDICAL COMMUNITY.  YOUR HONOR RECOGNIZED

8    THAT THIS EVIDENCE IS RELEVANT.  YOU ALLOWED IT WITH DR. REICIN

9    IN PLUNKETT 2.  IF YOU BALANCE ON A 403 SCALE THE PROBATIVE

10   VALUE VERSUS PREJUDICIAL EFFECT, WE ARE THE ONES PREJUDICED

11   MORE BY NOT BEING ALLOWED TO INTRODUCE THIS EVIDENCE THAT SHE

12   WAS ACTING IN GOOD FAITH, THAT SHE TOOK THE MEDICINE THEY ARE

13   ACCUSING HER OF BELIEVING WAS UNSAFE.

14          THE COURT:  I UNDERSTAND YOUR POSITION.  MY SITUATION

15   IS STILL THE SAME.  I THINK IT'S IRRELEVANT.  I THINK IT'S 403.

16   IN BALANCING IT, THE REASON I FEEL THIS WAY IS THAT ALL OF THE

17   RISK FACTORS THAT THE PLAINTIFF HAS DON'T EXIST WITH HER.

18   ALSO, THE KNOWLEDGE THAT SHE HAS ABOUT THIS DRUG, AS WELL AS

19   THE KNOWLEDGE THAT SHE, AS A DOCTOR, HAS ABOUT HERSELF, SHE IS

20   IN A POSITION THAT'S TOTALLY DIFFERENT THAN THE PLAINTIFF'S

21   POSITION.  SO I UNDERSTAND YOUR POSITION AND I APPRECIATE YOU

22   MAKING IT AGAIN.  MY RULING IS STILL THE SAME.  DO YOU HAVE A

23   LOT?

24          MR. GOLDMAN:  TWENTY MINUTES.

25          THE COURT:  GIVE ME SOME INPUT.

 1          **MR. BECK:**  WE HAVE ABOUT AN HOUR OF THE BRYAN VIDEO

 2  AND THEN I HAVE TO MAKE DECISIONS ON WHAT ELSE I DO.

 3          **THE COURT:**  WHAT'S YOUR VIEW ABOUT TONIGHT?  DO WE GO

 4  WITH THE VIDEO OR DO WE CUT THEM LOOSE?

 5          **MR. BECK:**  I WOULD RATHER CUT THEM LOOSE AND GO

 6  TOMORROW.

 7          **MR. ROBINSON:**  IF THAT'S WHAT YOU WANT TO DO.

 8          **THE COURT:**  WE'LL DO IT THAT WAY.

 9          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

10  OPEN COURT.)

11          **THE COURT:**  MEMBERS OF THE JURY, WE ARE GOING TO

12  FINISH WITH THE REDIRECT EXAMINATION, WHICH I UNDERSTAND IS

13  ABOUT 20 MINUTES, AND THEN WE WILL CALL IT A DAY AND COME BACK

14  TOMORROW.  WE ARE STILL AIMING AT FINISHING THE TESTIMONY

15  TOMORROW.

16                    **REDIRECT EXAMINATION**

17  BY MR. GOLDMAN:

18  **Q.**  DR. REICIN, MR. ROBINSON ENDED BY ASKING YOU ABOUT THE

19  FEBRUARY 2005 ADVISORY COMMITTEE MEETING.  DO YOU REMEMBER

20  THAT?

21  **A.**  YES, I DO.

22  **Q.**  AND WHAT THE VOTE WAS, 32 TO NOTHING; DO YOU REMEMBER

23  THAT?

24  **A.**  YES.

25  **Q.**  DO YOU REMEMBER WHAT THE VOTE WAS, DR. REICIN, FOR WHETHER

1    THE BENEFITS OF VIOXX OUTWEIGH THE RISKS, EVEN THOUGH VIOXX HAD

2    BEEN OFF THE MARKET?

3    **A.**   THEY THOUGHT THAT THE BENEFITS OUTWEIGHED THE RISKS AND

4    THAT WE SHOULD BE ABLE TO PUT VIOXX BACK ON THE MARKET, THE

5    MAJORITY.  IT WASN'T ALL 32 THAT VOTED FOR THAT, BUT THE

6    MAJORITY VOTED IT COULD BE PUT BACK ON THE MARKET.

7    **Q.**   YOU WERE ASKED QUESTIONS ABOUT THE VIGOR ARTICLE AND THESE

8    THREE HEART ATTACKS THAT YOU LEARNED ABOUT IN JUNE OF 2000.  DO

9    YOU REMEMBER THAT?

10   **A.**   YES, I DO.

11   **Q.**   DID YOU SEND INFORMATION DR. REICIN AND DID MERCK SEND

12   INFORMATION ABOUT THOSE THREE ADDITIONAL HEART ATTACKS TO THE

13   FDA?

14   **A.**   YES.  ACCORDING TO OUR PRESPECIFIED PLAN, WHICH MEANT THAT

15   WE PUT THAT PLAN TOGETHER BEFORE WE SAW ANY DATA, WE SAID THAT

16   WE WOULD SUBMIT ANY ADDITIONAL DATA THAT CAME IN AFTER THE

17   CUTOFF DATE TO REGULATORY AGENCIES AND WE DID.  WE SENT THAT TO

18   THE FDA.

19   **Q.**   LET ME SHOW YOU DEFENSE EXHIBIT 364, WHICH IS IN EVIDENCE.

20   DO YOU RECOGNIZE THIS DOCUMENT AGAIN, DR. REICIN, FEBRUARY 1,

21   2001?

22   **A.**   THIS IS THE DOCUMENT WE LOOKED AT EARLIER.  IT WAS A

23   REVIEW OF THE VIGOR DATA BY SHARI TARGUM FROM THE FDA.

24   **Q.**   ON PAGE 3 OF THE DOCUMENT, DO YOU SEE IN THE LAST

25   PARAGRAPH DR. TARGUM WRITES, "ON OCTOBER 13, 2000, THE

1   SPONSOR" -- WHO IS THAT?

2   **A.**   THAT WOULD BE MERCK.

3   **Q.**   "-- SUBMITTED A SAFETY UPDATE WHICH INCLUDED 11 ADDITIONAL

4   PATIENTS REFERRED FOR ADJUDICATION OF CARDIOVASCULAR SERIOUS

5   ADVERSE EXPERIENCES AFTER FEBRUARY 10, 2000, THE PRESPECIFIED

6   CUTOFF DATE IN THE ORIGINAL SAFETY REPORT."  CAN YOU JUST

7   EXPLAIN WHAT THAT MEANS.  IS THAT THE PRESPECIFIED CUTOFF DATE

8   YOU HAVE BEEN REFERRING TO?

9   **A.**   SO THE FEBRUARY 10 DATE IS THE PRESPECIFIED CUTOFF DATE

10  WHERE WE SAID ANY EVENTS REPORTED TO US BY THAT DATE WILL BE

11  INCLUDED IN THE ORIGINAL ANALYSIS.  11 EVENTS CAME IN AFTER

12  THAT DATE.  WE SENT THOSE TO OUR OUTSIDE ADJUDICATORS.  I DON'T

13  THINK WE TALKED ABOUT THAT TODAY.

14  **Q.**   YOU CAN DESCRIBE IT, SURE.

15  **A.**   WE HAD AN OUTSIDE SET OF EXPERTS IN THE FIELDS OF

16  CARDIOLOGY, NEUROLOGY, AND CEREBROVASCULAR DISEASE, WHO IN A

17  BLINDED MANNER WOULD REVIEW REPORTS OF POTENTIAL THROMBOTIC

18  EVENTS AND DETERMINE:  YES, THIS IS A THROMBOTIC EVENT; OR, NO,

19  THIS IS NOT A THROMBOTIC EVENT.  THEY WERE SENT THOSE 11.  FIVE

20  WERE, IN FACT, CONFIRMED, FOUR ON VIOXX AND ONE ON NAPROXEN.

21  **Q.**   IF WE TURN FURTHER IN THE DOCUMENT, DR. REICIN, THIS IS A

22  TABLE WE LOOKED AT BEFORE ABOUT THE EVENTS IN THE VIGOR STUDY.

23  DO YOU SEE THAT THERE'S A REFERENCE HERE TO "SAFETY UPDATE,

24  OCTOBER 13, 2000"?

25  **A.**   YES, I DO.

1  **Q.**   HOW MANY HEART ATTACKS DOES --

2          **MR. ROBINSON:**  THIS WAS SHOWN IN DIRECT EXAMINATION.

3          **THE COURT:**  I UNDERSTAND.  I'LL OVERRULE THE

4  OBJECTION.

5  **BY MR. GOLDMAN:**

6  **Q.**   DR. REICIN, HOW MANY HEART ATTACKS DOES DR. TARGUM REPORT

7  FOR VIOXX VERSUS NAPROXEN IN THIS FEBRUARY 2001 DOCUMENT?

8  **A.**   20 ON VIOXX, FOUR ON NAPROXEN.

9  **Q.**   WAS THIS INFORMATION PRESENTED TO THE ADVISORY COMMITTEE

10 IN FEBRUARY OF 2001?

11 **A.**   THIS WAS CERTAINLY THE INFORMATION UPON WHICH WE BASED OUR

12 PRESENTATION TO THE ADVISORY COMMITTEE, THAT'S CORRECT.

13 **Q.**   WAS DR. TARGUM'S MEMO ITSELF MADE AVAILABLE TO THE

14 ADVISORY COMMITTEE?

15 **A.**   YES, IT WAS.

16 **Q.**   YOU WERE ASKED ABOUT AN ARTICLE BY DOCTORS TOPOL,

17 MUKHERJEE, AND NISSEN IN THE *JAMA* PUBLICATION.  DO YOU REMEMBER

18 THAT?

19 **A.**   YES, I DO.

20 **Q.**   THIS IS THE ARTICLE THAT MR. ROBINSON REFERRED TO, "RISK

21 OF CARDIOVASCULAR EVENTS ASSOCIATED WITH SELECTIVE COX-2

22 INHIBITORS."  DO YOU RECOGNIZE THAT, DR. REICIN?

23 **A.**   YES, I DO.

24 **Q.**   LET'S LOOK AT THE ARTICLE THAT WAS PUBLISHED.  *JAMA*, BY

25 THE WAY, THIS MEDICAL JOURNAL WHERE THIS WAS PUBLISHED, IS THAT

1   A REPUTABLE JOURNAL?

2   **A.**   YES, IT IS.  IT'S A PEER-REVIEWED JOURNAL.

3   **Q.**   IF WE LOOK AT PAGE 957 OF THE DOCUMENT, DO YOU SEE THAT

4   THE AUTHORS ARE SAYING, "THE RESULTS OF THE VIGOR STUDY CAN BE

5   EXPLAINED BY EITHER A SIGNIFICANT PROTHROMBOTIC EFFECT FROM

6   VIOXX (ROFECOXIB) OR AN ANTITHROMBOTIC EFFECT FROM NAPROXEN OR

7   CONCEIVABLY BOTH"?  THEN THEY CONTINUE TO TALK ABOUT PLATELET

8   AGGREGATION.  DO YOU SEE THAT?

9   **A.**   YES.

10  **Q.**   THEN IT CONTINUED "NAPROXEN HAS" IN THE MIDDLE COLUMN.

11  I'M GOING TO ASK YOU IF YOU REMEMBER READING THIS.  "NAPROXEN

12  HAS SIGNIFICANT ANTIPLATELET EFFECTS WITH MEAN PLATELET

13  AGGREGATION INHIBITION OF 93 PERCENT COMPARED WITH PLATELET

14  AGGREGATION OF 92 PERCENT FOR THOSE TAKING ASPIRIN."  WAS THAT

15  THE SORT OF THING YOU WERE DESCRIBING EARLIER ABOUT THE AMOUNT

16  OF PLATELET INHIBITION THAT NAPROXEN CAN ACHIEVE?

17  **A.**   YES.  I THINK WHEN WE WERE SHOWING THE CHART WE WERE

18  ACTUALLY LOOKING AT INHIBITION OF COX-1.  THE OTHER THING YOU

19  LOOK AT IS PLATELET AGGREGATION, ACTUAL CLUMPING OF PLATELETS.

20  IT'S A SLIGHTLY DIFFERENT ASPECT.

21  **Q.**   THE AUTHORS CONTINUE, "THUS NAPROXEN, BUT NOT IBUPROFEN

22  (PLATELET AGGREGATION OF APPROXIMATELY 80 PERCENT) OR

23  DICLOFENAC (PLATELET AGGREGATION OF APPROXIMATELY 40 PERCENT)

24  RESULTED IN A HIGH LEVEL OF PLATELET AGGREGATION INHIBITION

25  SIMILAR TO THAT ACHIEVED WITH ASPIRIN.  THERE IS CLINICAL

1  EVIDENCE THAT FLURBIPROFEN" -- IS THAT THE SAME MEDICINE YOU

2  WERE TALKING ABOUT EARLIER?

3  **A.**   THAT'S CORRECT.

4  **Q.**   "FLURBIPROFEN, 50 MILLIGRAMS TWICE DAILY FOR SIX MONTHS,

5  REDUCED THE INCIDENCE OF MI BY 70 PERCENT COMPARED WITH

6  PLACEBO."  THEN WHAT DRUG DO THE AUTHORS HERE TALK ABOUT AFTER

7  FLURBIPROFEN?

8  **A.**   INDOBUFEN.  THAT WAS THE OTHER DRUG WE TALKED ABOUT THIS

9  MORNING.

10  **Q.**   FINALLY, DO THE AUTHORS INDICATE HERE, "BECAUSE OF THE

11  EVIDENCE FOR AN ANTIPLATELET EFFECT OF NAPROXEN, IT IS

12  DIFFICULT TO ASSESS WHETHER THE DIFFERENCE IN CARDIOVASCULAR

13  EVENT RATES IN VIGOR WAS DUE TO A BENEFIT FROM NAPROXEN OR TO A

14  PROTHROMBOTIC EFFECT FROM VIOXX"?  IS THAT WHAT THE AUTHORS

15  WROTE?

16  **A.**   THAT'S CORRECT.

17  **Q.**   YOU WERE ASKED ABOUT THE WARNING LETTER THAT THE DDMAC --

18  WELL, I WILL ASK YOU ABOUT THAT IN A MINUTE.  DO YOU REMEMBER

19  THE WARNING LETTER THAT MERCK RECEIVED IN SEPTEMBER OF 2001?

20  **A.**   YES, I DO.

21  **Q.**   LET ME SHOW THAT TO YOU.  THIS WAS THE LETTER THAT

22  MR. ROBINSON WAS GOING THROUGH WITH YOU; RIGHT?

23  **A.**   THAT'S CORRECT.

24  **Q.**   LET ME FIRST ASK YOU ABOUT THE DIVISION THAT WRITES THESE

25  LETTERS.  IS THERE A DIVISION AT THE FDA CALLED DDMAC?

1    **A.**   YES, THERE IS.

2    **Q.**   WHAT IS THE DDMAC DIVISION OF THE FDA?

3    **A.**   I'M NOT SURE I REMEMBER WHAT "DDMAC" STANDS FOR.

4    **Q.**   HERE, I CAN HELP YOU OUT IN THE FIRST PARAGRAPH.  IT SAYS

5    THE DIVISION OF DRUG MARKETING ADVERTISING AND COMMUNICATIONS,

6    DDMAC.

7    **A.**   THAT'S CORRECT.

8    **Q.**   WHAT IS THAT DIVISION?

9    **A.**   THAT IS A DIVISION THAT REVIEWS MARKETING MATERIALS AND

10   ADVERTISING MATERIALS THAT DRUG COMPANIES USE FOR THEIR DRUGS

11   AND ENSURE THAT THEY ARE FOLLOWING FDA REGULATIONS.

12   **Q.**   IS THE DDMAC DIVISION OF THE FDA INVOLVED AT ALL IN

13   ASSESSING THE SAFETY OF MEDICATIONS THAT ARE ON THE MARKET?

14   **A.**   NO.  THAT'S DONE BY A DIFFERENT REVIEW DIVISION.

15   **Q.**   LET ME ASK YOU A LITTLE BIT MORE ABOUT THE DETAILS OF THIS

16   LETTER.  WELL, LET ME ASK YOU, JUST TO SUMMARIZE, YOU'RE

17   FAMILIAR WITH THE LETTER; RIGHT?

18   **A.**   I AM.

19   **Q.**   WHAT WERE THE CIRCUMSTANCES THAT THE DDMAC DIVISION WAS

20   CONCERNED ABOUT?  WHY DID THEY SEND MERCK THIS LETTER?  WHAT

21   WERE THE PROBLEMS THAT THE DDMAC DIVISION SAW?

22   **A.**   MY RECOLLECTION IS THERE WERE THREE SPECIFIC

23   CIRCUMSTANCES.  ONE WAS A CONFERENCE THAT WAS GIVEN BY

24   DR. PETER HOLT, AND HE HAD GONE BEYOND WHAT OUR LABEL SAYS FOR

25   WHAT WE WOULD, IN FACT, INSTRUCT PHYSICIANS WHO ARE SPEAKING ON

1    OUR BEHALF TO SAY.  WE TELL THEM THEY HAVE TO STAY WITH THE

2    LABEL.  THE OTHER WAS THE PRESS RELEASE THAT WE HAD TALKED

3    ABOUT.  THEN THE THIRD WAS AT A SPECIFIC MEDICAL CONFERENCE

4    WHERE THEY THOUGHT SOME SALES REPRESENTATIVES REPRESENTED

5    SOMETHING INAPPROPRIATELY, AND I CAN'T REMEMBER ALL THE DETAIL

6    AROUND IT.

7    Q.   DO YOU KNOW WHETHER MERCK TOOK THESE STATEMENTS BY DDMAC

8    SERIOUSLY?

9    A.   VERY SERIOUSLY.  GETTING A WARNING LETTER IS TAKEN

10   EXTREMELY SERIOUSLY BY MERCK.

11   Q.   DO YOU KNOW WHAT MERCK DID WITH DR. HOLT?

12   A.   WE STOPPED USING DR. HOLT AS A SPEAKER.

13   Q.   DO YOU KNOW WHAT MERCK DID WITH RESPECT TO THE PRESS

14   RELEASE THE FDA WAS CONCERNED ABOUT?

15   A.   THE AGENCY DID NOT ASK US -- AT LEAST THAT'S MY

16   RECOLLECTION -- TO DO ANYTHING WITH REGARD TO THE PRESS RELEASE

17   ONCE THEY UNDERSTOOD THE CIRCUMSTANCES SURROUNDING THE PRESS

18   RELEASE.

19   Q.   HOW ABOUT THE REPRESENTATIONS MADE BY SALES

20   REPRESENTATIVES?  WAS THAT AT THESE PHARMACY CONFERENCES?

21   A.   I THINK THAT'S CORRECT.

22   Q.   WHAT DID MERCK DO WITH RESPECT TO THE REPRESENTATIONS THAT

23   CERTAIN SALES REPRESENTATIVES MADE TO PHARMACISTS?

24   A.   I DON'T THINK I COULD TELL YOU IN DETAIL WHAT WAS DONE

25   OTHER THAN I THINK THERE WAS RETRAINING THAT WENT ON WITH OUR

 1  SALES REPS, BUT I COULDN'T GO INTO ANY MORE DETAIL WITH THAT.

 2  Q.   LET ME ASK YOU, DR. REICIN, IF YOU RECOGNIZE THIS DOCUMENT

 3  THAT'S MARKED DEFENSE EXHIBIT 236, WHICH IS A LETTER THAT MERCK

 4  WROTE BACK TO THE DDMAC DIVISION ON OCTOBER 1, 2001.

 5            **MR. GOLDMAN:**  WE OFFER EXHIBIT 236.

 6            **THE COURT:**  LET IT BE ADMITTED.

 7  **BY MR. GOLDMAN:**

 8  **Q.**   DO YOU RECOGNIZE THIS, DR. REICIN, AS THE RESPONSE MERCK

 9  GAVE TO THE DDMAC DIVISION AFTER RECEIVING THE WARNING LETTER?

10  **A.**   YES, THIS IS WHAT THIS APPEARS TO BE.

11  **Q.**   IF WE TURN TO THE NINTH9 PAGE, DOES MERCK DESCRIBE AN

12  ACTION PLAN THEY INTEND TO FOLLOW BASED ON WHAT THEY LEARNED

13  FROM THE DDMAC DIVISION?  PAGE 9, I THINK, OF THE DOCUMENT.

14  **A.**   THIS IS WHAT THIS IS, YES.

15  **Q.**   DOES IT INDICATE THAT THERE'S GOING TO BE NOTIFICATION TO

16  FIELD SALES ORGANIZATION REGARDING EDUCATION PROGRAMS AND

17  VIGOR?

18  **A.**   YES.

19  **Q.**   THE TARGET DATE WAS OCTOBER 1, 2001?

20  **A.**   THAT'S CORRECT.

21  **Q.**   DO YOU SEE MERCK SAID THEY WERE GOING TO TRAIN TO

22  REINFORCE THE STANDARDS ON EDUCATIONAL PROGRAMS AND NEED TO

23  CONDUCT PRODUCT DISCUSSION IN STRICT CONFORMANCE WITH THE

24  LABEL?  DO YOU SEE THAT?

25  **A.**   YES, I DO.

1   **Q.**   THE THIRD POINT, CERTIFICATION OF FIELD SALES COMPLIANCE,

2   AND THE FOURTH POINT, REVIEW ALL PROMOTIONAL MATERIALS AND

3   DISCONTINUE USE OF ANY THAT CONTAIN SIMILAR PRESENTATIONS, WERE

4   YOU AWARE THAT MERCK DID THAT?

5   **A.**   WELL, MY UNDERSTANDING -- WE ALWAYS REVIEW OUR PROMOTIONAL

6   MATERIALS, BUT ANOTHER REVIEW WAS DONE TO ENSURE EVERYTHING WE

7   HAD WAS IN COMPLIANCE.

8   **Q.**   FINALLY, DO YOU SEE AS PART OF THE ACTION PLAN THAT MERCK

9   SAID THEY WOULD PREPARE AND DISSEMINATE "DEAR HEALTH CARE

10  PROVIDER" LETTERS -- ARE THOSE LETTERS THAT GO TO DOCTORS?

11  **A.**   THAT'S CORRECT.

12  **Q.**   TO PARTICIPANTS IN THE AUDIO CONFERENCES.  WERE THOSE THE

13  AUDIO CONFERENCES THAT DR. HOLT WAS RUNNING?

14  **A.**   THAT'S CORRECT.

15  **Q.**   MEETING ATTENDEES AS APPROPRIATE; DO YOU SEE THAT?

16  **A.**   THAT'S CORRECT.

17  **Q.**   DID MERCK HEAR BACK FROM THE FDA AFTER MERCK SENT THEIR

18  RESPONSE TO THE WARNING LETTER?

19  **A.**   YES, WE DID.

20  **Q.**   THIS IS DEFENSE EXHIBIT 359.

21          **MR. ROBINSON:**  NO OBJECTION.

22          **THE COURT:**  LET IT BE ADMITTED.

23  **BY MR. GOLDMAN:**

24  **Q.**   IS THIS THE LETTER THAT THE FDA'S DDMAC DIVISION WROTE

25  BACK TO MERCK?

1    **A.**   YES, IT IS.

2    **Q.**   DO YOU SEE IT SAYS, "THIS LETTER RESPONDS TO YOUR LETTER

3    DATED NOVEMBER 19," AND IT REGARDS THE DISSEMINATION OF

4    CORRECTIVE LETTERS THAT MERCK SENT TO HEALTH CARE PROVIDERS WHO

5    ATTENDED THESE PHARMACIST SESSIONS.  DO YOU SEE THE SECOND

6    PARAGRAPH, AND CAN YOU READ THAT TO THE JURY, PLEASE.

7    **A.**   "DDMAC HAS REVIEWED YOUR CORRECTIVE ACTIONS BASED ON THE

8    INFORMATION PROVIDED AND CONCLUDES THAT THIS MATTER HAS BEEN

9    SATISFACTORILY RESOLVED AND IS CONSIDERED CLOSED."

10   **Q.**   DID MERCK EVER RECEIVE ANOTHER WARNING LETTER FROM THE

11   DDMAC DIVISION OF THE FDA CONCERNING VIOXX AFTER SEPTEMBER OF

12   2001?

13   **A.**   NO, WE DID NOT.

14   **Q.**   YOU ALSO REFERRED -- DR. REICIN, WHEN YOU WERE BEING ASKED

15   ABOUT THE LABEL, DO YOU REMEMBER THE DISCUSSION ABOUT THE

16   PRECAUTIONS AND THE WARNINGS?

17   **A.**   YES.

18   **Q.**   YOU REFERRED TO A LETTER THE FDA SENT TO MERCK REFERRING

19   TO THE VIGOR DATA IN THE PRECAUTIONS SECTION.  LET ME SHOW YOU

20   THAT LETTER AND ASK YOU IF THAT'S WHAT YOU HAD IN MIND.

21             **MR. ROBINSON:**  YOUR HONOR, MAY WE APPROACH THE BENCH?

22             **THE COURT:**  SURE.

23             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

24   THE BENCH.)

25             **MR. ROBINSON:**  YOUR HONOR, SHE NEVER REFERRED TO THIS

DAILY COPY

1    LETTER.

2           **MR. GOLDMAN:**  YES, SHE DID.

3           **MR. ROBINSON:**  NO, SHE DIDN'T.  LOOK AT THE

4    TRANSCRIPT.  SHE BASICALLY LOOKED AT THIS OTHER DOCUMENT.  I

5    SHOWED HER THE DOCUMENT TO TRY TO REFRESH HER MEMORY, SHE

6    COULDN'T REMEMBER IT, BUT SHE SAID THAT WAS THE GENERAL --

7           **MR. GOLDMAN:**  MARK WAS DESCRIBING IT BACK AND FORTH

8    BETWEEN THE FDA AND MERCK ABOUT THIS LABEL.

9           **MR. ROBINSON:**  I'M SORRY.  I APOLOGIZE.

10          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

11   OPEN COURT.)

12          **MR. GOLDMAN:**  DEFENSE EXHIBIT 253, WHICH WE OFFER.

13          **MR. ROBINSON:**  NO OBJECTION.

14          **THE COURT:**  LET IT BE ADMITTED.

15   BY MR. GOLDMAN:

16   Q.   DO YOU SEE THIS IS A FAX FROM THE FDA TO MERCK ON

17   DECEMBER 20, 2001, AND IT CONCERNS A DRAFT LABEL PROPOSAL?

18   A.   YES, I DO.

19   Q.   IF WE TURN TO PAGE 15, DO YOU SEE THAT WITHIN THIS LETTER

20   FROM THE FDA THERE'S A REFERENCE TO CARDIOVASCULAR EFFECTS IN

21   THE PRECAUTIONS SECTION OF THE LABEL?

22   A.   YES, THAT'S CORRECT.

23   Q.   DR. REICIN, YOU WERE ASKED A QUESTION ABOUT THE

24   HIPPOCRATIC OATH AND DO NO HARM TO PATIENTS.  DO YOU REMEMBER

25   THAT?

DAILY COPY

1    **A.**   YES, I DO.

2    **Q.**   AT ANY POINT WHILE VIOXX WAS ON THE MARKET, DR. REICIN,

3    DID YOU EVER THINK YOU WERE PUTTING PATIENTS IN HARM'S WAY BY

4    KEEPING VIOXX ON THE MARKET?

5    **A.**   ABSOLUTELY NOT.  IF I HAD, I WOULD HAVE SAID SOMETHING TO

6    SOMEONE AT MERCK AND WE WOULD HAVE DONE SOMETHING ABOUT IT.

7            **MR. GOLDMAN:**  THANK YOU, DR. REICIN.

8            **THE COURT:**  THANK YOU VERY MUCH.  YOU ARE EXCUSED.

9    THANK YOU.  MEMBERS OF THE JURY, WE ARE GOING TO END HERE.

10   I'LL SEE YOU TOMORROW AT 8:30.  COURT WILL STAND IN RECESS

11   UNTIL 8:30 TOMORROW.

12           **THE DEPUTY CLERK:**  EVERYONE RISE.

13           (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

14                              * * *

15

16

17

18

19

20

21

22

23

24

25