1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE: VIOXX PRODUCTS        *    MDL DOCKET NO. 1657
     LIABILITY LITIGATION         *
6                                 *
                                  *
7    THIS DOCUMENT RELATES TO     *    AUGUST 15, 2006, 8:30 A.M.
                                  *
8                                 *
     GERALD BARNETT V. MERCK      *    CASE NO. 06-CV-485-L
9      & CO., INC.                *
     * * * * * * * * * * * * * * * *
10

11
                              VOLUME XII
12                      JURY TRIAL BEFORE THE
                       HONORABLE ELDON E. FALLON
13                   UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15

16   FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                 BY:  MARK P. ROBINSON JR., ESQ.
17                               620 NEWPORT CENTER DRIVE
                                 NEWPORT BEACH, CALIFORNIA 92660
18

19   FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                   PORTIS & MILES
20                               BY:  ANDY D. BIRCHFELD JR., ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22

23   FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                   PALENCHAR & SCOTT
24                               BY:  PHILIP S. BECK, ESQ.
                                     ANDREW L. GOLDMAN, ESQ.
25                               54 W. HUBBARD STREET, SUITE 300
                                 CHICAGO, ILLINOIS 60601


                              DAILY COPY

OFFICIAL COURT REPORTERS:     CATHY PEPPER, CCR, RPR, CRR
                              TONI DOYLE TUSA, CCR, FCRR
                              500 POYDRAS STREET, ROOM HB-406
                              NEW ORLEANS, LOUISIANA 70130
                              (504) 589-7778


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

1                            <u>I N D E X</u>

2                                                          <u>PAGE</u>

3
FOSTER BRYAN II (BY DEPOSITION)
4         CROSS-EXAMINATION                               2450
          REDIRECT EXAMINATION                            2496
5         RECROSS-EXAMINATION                             2501

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **MORNING SESSION**

2                          **(APRIL 16, 2006)**

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4    TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5    REPORTER.)

6              **THE DEPUTY CLERK:**  EVERYONE RISE.

7              **THE COURT:**  BE SEATED, PLEASE.  GOOD MORNING, MEMBERS

8    OF THE JURY.  LET ME DISCUSS WITH YOU A LITTLE BIT OF THE

9    LOGISTICS TO GIVE YOU SOME IDEA AS TO WHERE WE ARE AND WHERE

10   WE'RE GOING WITH IT.

11              WE HAVE ONE MORE DEPOSITION OR ONE SEGMENT OF A

12   DEPOSITION, AND THEN THE DEFENDANT IS GOING TO REST.  I THEN

13   NEED TO MEET WITH THE ATTORNEYS.

14              WHAT HAPPENS IN THESE CASES IS THAT, DURING THE

15   PROCESS, I GET PROPOSED JURY CHARGES FROM THEM.  I DO RESEARCH

16   ON THEM, I LOOK THEM OVER, I DEAL WITH THEM AT NIGHTTIME, AND I

17   DRAFT CHARGES AND I GIVE IT TO THEM.  I HAVE HAD AN OPPORTUNITY

18   TO LOOK AT SOME OF THEM TO GIVE ME SOME INPUT.  I WILL BE

19   MEETING WITH THEM TODAY TO DRAFT A FINAL JURY CHARGE.

20              BUT WE'LL FINISH UP IN ABOUT AN HOUR OR SO AND

21   THEN WE'LL BE FINISHED FOR THE DAY.  TOMORROW, THEY ARE GOING

22   TO PRESENT ORAL ARGUMENT TO YOU, AND I'LL HAVE THE JURY CHARGE,

23   AND WE SHOULD GET IT TO YOU BEFORE NOON.

24              I'LL PROVIDE LUNCH TOMORROW.  WE'LL GIVE YOU

25   MENUS.  WE'RE NOT GOING TO BE ABLE TO GET ANTOINE'S, BUT WE

1   MIGHT GET MOTHER'S, AND THEN YOU CAN HAVE A LEISURELY LUNCH AND

2   THEN BEGIN YOUR DELIBERATIONS.  THAT'S OUR SCHEDULE.

3                TOMORROW YOU NEED TO MAKE ARRANGEMENTS FOR

4   LATE -- IN CASE WE NEED TO --

5           **THE DEPUTY CLERK:**  YES, JUST MAKE SURE THEY HAVE

6   THEIR CAR KEYS.

7           **THE COURT:**  YES, JUST MAKE SURE YOU HAVE YOUR CAR

8   KEYS, SO THAT OUR MARSHALS CAN TAKE CARE OF THAT IF WE DO NEED

9   TO WORK LATE OR YOU DO WORK LATE.

10               OKAY.  LET'S PROCEED.

11          **MR. BECK:**  YOUR HONOR, ON FRIDAY, WE PLAYED THE

12  PLAINTIFF'S EXAMINATION OF DR. BRYAN, THE HEART SURGEON, WHO

13  DID THE BYPASS, AND NOW WE'RE GOING TO PLAY OUR EXAMINATION OF

14  DR. BRYAN, THE HEART SURGEON.

15          **THE COURT:**  OKAY.  YOU REMEMBER THAT, MEMBERS OF THE

16  JURY.  THIS WAS THE HEART SURGEON WHO DID THE OPERATION ON THE

17  PLAINTIFF.

18          **MR. ROBINSON:**  I THINK THERE IS ABOUT MAYBE SEVEN

19  MINUTES OF OUR REDIRECT.

20          **THE COURT:**  OKAY.

21          **MR. BECK:**  YES.

22          **THE COURT:**  ALL RIGHT.  LET'S START IT.

23               (WHEREUPON, **FOSTER BRYAN II**, HAVING BEEN DULY SWORN,

24  TESTIFIED BY DEPOSITION AS FOLLOWS.)

25

1     CROSS-EXAMINATION

2   BY MR. GOLDMAN:

3   Q.   GOOD AFTERNOON, DR. BRYAN. MY NAME IS ANDY GOLDMAN.   HAVE

4   WE MET BEFORE TODAY?

5   A.   NO.

6   Q.   FOR HOW MANY YEARS, SIR, HAVE YOU TREATED PATIENTS WITH

7   HEART PROBLEMS?

8   A.   LET'S SEE.   IT'S NOW BEEN 13 YEARS.

9   Q.   HOW MANY HEART SURGERIES HAVE YOU DONE IN THAT TIME?

10  A.   IF YOU INCLUDE RESIDENCY, IT'S PROBABLY -- PROBABLY WELL

11  OVER 2,000.

12  Q.   ABOUT HOW MANY SURGERIES OR BYPASS SURGERIES HAVE YOU DONE

13  THIS YEAR?

14  A.   THIS YEAR, PROBABLY -- SEE, WE'RE IN JUNE.   PROBABLY

15  AROUND 100 OR -- YOU KNOW, PROBABLY BETWEEN 80 AND 100,

16  PROBABLY, RIGHT NOW.   SOMEWHERE IN THAT VICINITY.

17  Q.   HAVE YOU NOTICED AT ALL, DR. BRYAN, THAT YOU'RE DOING

18  FEWER BYPASS SURGERIES NOW THAT VIOXX WAS WITHDRAWN FROM THE

19  MARKET?

20  A.   NO DIFFERENCE FROM -- DUE TO VIOXX BEING WITHDRAWN.

21  Q.   DID YOU NOTICE THAT THERE WAS ANY INCREASE IN BYPASS

22  SURGERIES THAT YOU WERE DOING WHEN VIOXX WAS ON THE MARKET?

23  A.   I DID NOT NOTICE ANY INCREASE, NO.

24  Q.   HOW MANY PATIENTS, SIR, WOULD YOU SAY YOU HAVE SEEN WITH

25  SEVERE MULTI-VESSEL DISEASE LIKE MR. BARNETT?

1    **A.**   WELL, PROBABLY THOUSANDS.  I MEAN, PROBABLY, YOU KNOW,

2    2000 -- AT LEAST A COUPLE THOUSAND WHERE WE'VE OPERATED ON THEM

3    AND EVEN SOME WE DON'T EVEN OPERATE ON.  SO, YOU KNOW, AT LEAST

4    2,000, PROBABLY.  MAYBE MORE.

5    **Q.**   HAVE YOU SEEN PATIENTS, SIR, WHO ACTUALLY HAVE DIED FROM

6    HEART ATTACKS WITHOUT KNOWING THAT THEY HAD HEART DISEASE?

7    **A.**   YES.

8    **Q.**   IS THAT COMMON?

9    **A.**   I WOULD SAY IT'S NOT UNCOMMON FOR PEOPLE TO HAVE THAT

10   HAPPEN.

11   **Q.**   HAVE YOU HEARD THAT APPROXIMATELY 50 PERCENT OF ALL HEART

12   ATTACKS OCCUR IN PEOPLE WHO DON'T HAVE SYMPTOMS?

13   **A.**   YES.

14   **Q.**   IS IT ALSO YOUR EXPERIENCE, DR. BRYAN, THAT EVEN PEOPLE

15   WHO ARE IN GREAT SHAPE AND TAKE CARE OF THEMSELVES AND TRY TO

16   WATCH THEIR CHOLESTEROL ALSO HAVE HEART ATTACKS?

17   **A.**   YES.

18   **Q.**   HAVE YOU SEEN PATIENTS ALSO, DR. BRYAN, WHO HAD SERIOUS,

19   SEVERE CORONARY ARTERY DISEASE AND DIDN'T REALIZE IT UNTIL THEY

20   HAD A MINOR HEART ATTACK AND A CATHETERIZATION?

21   **A.**   YES.

22   **Q.**   DO YOU BELIEVE THAT MR. BARNETT HAD A MILD HEART ATTACK?

23   **A.**   IT WAS A MILD HEART ATTACK BY ENZYMES, YES.

24   **Q.**   DID MR. BARNETT HAVE SEVERE CORONARY ARTERY DISEASE?

25   **A.**   YES.

1   **Q.**   GIVEN THE SEVERITY OF MR. BARNETT'S CORONARY ARTERY

2   DISEASE AND MULTI-VESSEL DISEASE, IF HE HAD NOT HAD BYPASS

3   SURGERY, WHAT DO YOU THINK MIGHT HAVE HAPPENED TO HIM?

4   **A.**   AT SOME POINT, IN ALL LIKELIHOOD, HE WOULD HAVE EITHER

5   DEVELOPED CHEST PAIN OR HAD A HEART ATTACK WITH THE DEGREE OF

6   DISEASE THAT HE HAD.

7   **Q.**   WHETHER OR NOT MR. BARNETT ACTUALLY HAD A MILD HEART

8   ATTACK IN SEPTEMBER OF 2002, IF YOU HAD SEEN THE EXTENT OF HIS

9   CORONARY ARTERY DISEASE, WOULD YOU HAVE RECOMMENDED BYPASS

10  SURGERY?

11  **A.**   GIVEN THE DEGREE OF THREE-VESSEL DISEASE, WITH OR WITHOUT

12  A HEART ATTACK, WE WOULD RECOMMENDED CORONARY BYPASS GRAFTING.

13  IF HE'S -- IF HE'S SYMPTOMATIC IN SOME WAY -- CHEST PAIN,

14  POSITIVE STRESS TEST -- YOU KNOW, WITH THAT DEGREE OF DISEASE,

15  HE WOULD HAVE BEEN REFERRED FOR BYPASS.

16  **Q.**   SO IF MR. BARNETT HAD HAD CHEST PAIN OR A POSITIVE

17  STRESS-TEST RESULT, AND HE'D COME TO SEE YOU A FEW MONTHS

18  BEFORE YOU OPERATED ON HIM, AND HE HAD NOT HAD A HEART ATTACK,

19  BASED ON THE CONDITION OF HIS ARTERIES, WOULD YOU HAVE

20  RECOMMENDED BYPASS SURGERY?

21  **A.**   YES.

22  **Q.**   WHEN DID YOU FIRST MEET MR. BARNETT, SIR?

23  **A.**   I FIRST MET MR. BARNETT IN SEPTEMBER OF 2002, THE DAY OF

24  HIS CONSULTATION ON THE -- OH, HERE IT IS -- THE 9TH --

25  SEPTEMBER 9TH, 2002.

2453

1  **Q.**   HAD DR. KARAVAN, BY SEPTEMBER 9TH, ALREADY PERFORMED A

2  CATHETERIZATION ON MR. BARNETT?

3  **A.**   YES.

4  **Q.**   IS A CARDIAC CATHETERIZATION A PROCEDURE THAT

5  CARDIOLOGISTS OR HEART DOCTORS USE TO DETERMINE THE EXTENT OF

6  ATHEROSCLEROSIS OR CORONARY ARTERY DISEASE IN PATIENTS'

7  ARTERIES?

8  **A.**   YES.

9  **Q.**   IS A CARDIAC CATHETERIZATION OR ANGIOGRAM CONSIDERED THE

10  GOLD STANDARD TO DETERMINE THE AMOUNT OF CORONARY DISEASE,

11  ARTERY DISEASE, IN PEOPLE?

12  **A.**   YES.

13  **Q.**   I'M GOING TO HAND YOU, DR. BRYAN, WHAT I'LL MARK AS

14  EXHIBIT 11, AND WE'RE GOING TO WORK PRIMARILY FROM THIS

15  EXHIBIT.  I BELIEVE, SIR, THAT EXHIBIT 11, WHICH IS

16  BATES-STAMPED BARNETT G-BRYAN FMD 1 THROUGH 35, IS A COMPLETE

17  CHART FROM YOUR RECORDS.

18       IF YOU WANT TO TAKE A MINUTE, I'M GOING TO ASK YOU

19  WHETHER THIS LOOKS TO BE MR. BARNETT'S CHART.

20  **A.**   YES.

21  **Q.**   IF YOU TURN WITH ME, SIR, TO THE PAGE THAT HAS IN THE

22  BOTTOM RIGHT CORNER 20, THIS IS ALSO AN EXHIBIT THAT WAS MARKED

23  EARLIER AS EXHIBIT 1.  IS THIS THE CONSULT THAT YOU DICTATED,

24  SIR?

25  **A.**   YES, IT IS.

1   **Q.**   DOES THIS REFLECT YOUR INITIAL DISCUSSIONS WITH
2   MR. BARNETT AND YOUR EVALUATION OF HIS HEART CONDITION?
3   **A.**   YES.
4   **Q.**   IN THE FIRST LINE WHERE IT SAYS "RFC," WHAT DOES THAT
5   MEAN?
6   **A.**   "REASON FOR CONSULTATION."
7   **Q.**   WHAT DID YOU WRITE THERE?
8   **A.**   "CORONARY ARTERY DISEASE."
9   **Q.**   IS "CORONARY ARTERY DISEASE" ANOTHER TERM FOR
10  ATHEROSCLEROSIS?
11  **A.**   YES.
12  **Q.**   IS THAT THE MOST COMMON CAUSE OF HEART ATTACKS IN THE
13  UNITED STATES?
14  **A.**   YES.
15  **Q.**   IS CORONARY ARTERY DISEASE SOMETHING THAT BEGINS EARLY IN
16  LIFE IN PEOPLE?
17  **A.**   IT IS BEING BROUGHT TO LIGHT THIS MAY BE STARTING EVEN AS
18  YOUNG AS PRETEEN YEARS.
19  **Q.**   IS IT YOUR UNDERSTANDING, SIR, THAT CORONARY ARTERY
20  DISEASE, OR ATHEROSCLEROSIS, IS SOMETHING THAT IS A GRADUAL AND
21  CHRONIC PROCESS?
22  **A.**   TYPICALLY, YES.
23  **Q.**   IS IT TRUE THAT PEOPLE WITH CORONARY ARTERY DISEASE AND
24  ATHEROSCLEROSIS GENERALLY HAVE PLAQUE BUILDUP OVER YEARS OF
25  THEIR LIFE?

1  A.   YES.

2  Q.   IF THE PLAQUE INSIDE OUR ARTERIES GETS TO BE BIG ENOUGH,

3  IS IT TRUE THAT THE PLAQUE CAN ACTUALLY SLOW DOWN OR STOP THE

4  FLOW OF BLOOD TO THE HEART?

5  A.   YES.  YES, IT CAN.

6  Q.   IS IT ALSO A NATURAL PART OF THE ATHEROSCLEROSIS PROCESS

7  FOR SOME PLAQUE TO RUPTURE?

8  A.   YES.

9  Q.   WHEN PLAQUE RUPTURES, DR. BRYAN, DOES THE BODY HAVE A

10 NATURAL RESPONSE TO THAT?

11 A.   IT DOES.  WHAT HAPPENS IS THE -- THE PLAQUE RUPTURES,

12 EXPOSING BASICALLY RAW -- RAW MATERIAL IN THE LUMEN, ALL THE

13 PLAQUE AND ALL THE -- IT SENSES INJURY, LIKE A CUT.  AND ONE OF

14 THE THINGS THAT HAPPENS IS THE BODY SENDS AN IMMUNE RESPONSE,

15 WHICH STARTS A CASCADE OF CLOTTING.  AND TYPICALLY, IT -- THE

16 ARTERY -- IF YOU RUPTURE A PLAQUE, YOU'LL DEVELOP THROMBUS IN

17 THE PLAQUE, IN THE AREA OF THE RUPTURE.

18 Q.   IS IT YOUR UNDERSTANDING, SIR, THAT THE BODY'S NATURAL

19 REACTION TO A PLAQUE RUPTURE IS TO CLOT?

20 A.   YES.

21 Q.   IS THAT SOMETHING THAT'S OCCURRED IN HUMAN BEINGS LONG

22 BEFORE VIOXX CAME TO THE MARKET?

23 A.   YES.

24 Q.   IS THAT SOMETHING THAT CONTINUES TO HAPPEN TO PEOPLE WITH

25 SEVERE CORONARY ARTERY DISEASE TODAY?

1    A.    YES.

2    Q.    YOU MENTIONED IN RESPONSE TO QUESTIONS EARLIER THAT YOU

3    SEEM TO REMEMBER SOME DYE THAT WAS HANGING IN A CATHETERIZATION

4    THAT WAS DONE ON MR. BARNETT.  YOU REMEMBER THAT?

5    A.    YES.

6    Q.    AND I THINK THERE'S BEEN A SUGGESTION THAT MR. BARNETT HAD

7    A CLOT IN HIS -- ONE OF HIS ARTERIES AND THAT THAT'S EVIDENCE

8    OF THE CLOT.  DO YOU REMEMBER THAT?

9    A.    YES.

10   Q.    AM I RIGHT, DR. BRYAN, THAT THERE'S NO SUCH THING AS A

11   VIOXX CLOT OR A CLOT THAT HAS A SIGNATURE ON IT SHOWING THIS

12   WAS CAUSED BY VIOXX?

13   A.    THAT IS CORRECT.

14   Q.    WHEN YOU SAID THAT YOU NOTICED THE CLOT IN THE

15   CATHETERIZATION FILM, IS THAT TO BE EXPECTED WHEN SOMEBODY HAS

16   SEVERE CORONARY ARTERY DISEASE AND HAS A PLAQUE RUPTURE?

17   A.    YES.

18   Q.    IS A CLOT SOMETHING THAT'S EXPECTED WHEN PLAQUE RUPTURES

19   OCCUR REGARDLESS OF WHETHER THEY'RE TAKING ANY MEDICATION?

20   A.    YES.

21   Q.    LET ME GO TO THE HISTORY.  IS THAT "HPI" ON THE CONSULT?

22   A.    CORRECT.

23   Q.    YOU WERE ASKED SOME QUESTIONS ABOUT LANGUAGE LATER IN THE

24   PARAGRAPH.  I WANT TO START WITH THE FIRST SENTENCE WHERE YOU

25   WROTE:  "THE PATIENT IS A 58-YEAR-OLD GENTLEMAN ADMITTED ON

1    SEPTEMBER 6TH, 2002, WITH A NON-Q-WAVE MYOCARDIAL INFARCTION."

2    DO YOU SEE THAT?

3    A.   CORRECT.

4    Q.   WHAT IS A NON-Q-WAVE MYOCARDIAL INFARCTION, AS BRIEFLY AS

5    YOU CAN TELL US?

6    A.   NON-Q-WAVE MYOCARDIAL INFARCTION IMPLIES THAT THERE HAS

7    NOT BEEN A FULL-THICKNESS MUSCLE DAMAGE.

8         MOST OF THESE MYOCARDIAL INFARCTIONS ARE ON THE INNER

9    LAYER OF THE HEART, NOT WHAT WE CALL "TRANSMURAL," OR ALL THE

10   WAY THROUGH THE MUSCLE OF THE HEART, WHICH WILL TYPICALLY, WHEN

11   IT'S A FULL-THICKNESS HEART ATTACK, MEANING THE WHOLE MUSCLE

12   WALL THICKNESS, YOU WILL DEVELOP AN EKG ABNORMALITY THAT'S A

13   SIGNATURE CALLED A Q-WAVE.  AND THAT'S PRETTY MUCH SIGNATURE

14   FOR A TRANSMURAL OR A FULL-THICKNESS HEART ATTACK.

15   Q.   SO IF AN EKG TEST SHOWS A Q-WAVE -- AND WE'LL SHOW THE

16   JURY WHAT THAT IS IN A MINUTE -- THAT COULD BE AN INDICATION

17   THAT THE PATIENT HAD A TRANSMURAL HEART ATTACK?

18   A.   YES.

19   Q.   NOW, YOU DIAGNOSED MR. BARNETT WITH A NON-Q-WAVE

20   MYOCARDIAL INFARCTION; RIGHT?

21   A.   WELL, I JUST REPEATED WHAT HAD BEEN DIAGNOSED BY

22   DR. KARAVAN WITH THE POSITIVE ENZYME.

23   Q.   AND THROUGHOUT THE RECORDS, INCLUDING THE DISCHARGE

24   SUMMARY AND ALL OF THE OTHER RECORDS THAT WERE CREATED DURING

25   MR. BARNETT'S HOSPITAL STAY, HE WAS ALWAYS DIAGNOSED AS HAVING

1    A NON-Q-WAVE HEART ATTACK; TRUE?

2    **A.**   CORRECT.

3    **Q.**   DO YOU STAND BY THE DIAGNOSIS, SIR, THAT MR. BARNETT HAD A

4    NON-Q-WAVE HEART ATTACK?

5    **A.**   YES.

6    **Q.**   FROM YOUR EXPERIENCE ACTUALLY LOOKING AT MR. BARNETT'S

7    HEART WHEN YOU OPERATED ON HIM AND REVIEWING THE LABS THAT WERE

8    TAKEN DURING SEPTEMBER OF 2002, WHAT IS YOUR VIEW ABOUT WHETHER

9    HE HAD A NON-Q-WAVE HEART ATTACK OR A Q-WAVE HEART ATTACK?

10   **A.**   HE DID NOT HAVE ANY EVIDENCE AT SURGERY IN MY OP NOTE OF

11   A -- A TRANSMURAL HEART ATTACK; AT LEAST, EXAMINING HIS HEART

12   AND LOOKING AT HIS ENZYMES AND -- AND WHATNOT.

13          HE DID NOT HAVE -- USUALLY -- TYPICALLY, IF I SEE

14   WHAT I CONSIDER A TRANSMURAL INFARCT, WHICH WOULD USUALLY BE

15   EDEMA OF THE WALL OR -- OR TRANSMURALITY DEMONSTRATED BY

16   HEMORRHAGE, I'LL MENTION THAT IN MY OPERATIVE NOTE.

17   **Q.**   WHAT IS EDEMA OF THE WALL AND -- WHAT WAS THE OTHER TERM

18   YOU SAID?

19   **A.**   HEMORRHAGE.

20   **Q.**   HEMORRHAGE.  COULD YOU JUST EXPLAIN WHAT THAT IS?

21   **A.**   HEMORRHAGE OF THE -- IF YOU HAVE A BIG Q-WAVE MI, A BIG

22   Q-WAVE HEART ATTACK, TYPICALLY, YOU HAVE EITHER EDEMA -- THE --

23   THAT WALL OF THE HEART WILL LOOK SWOLLEN.  YOU WILL SEE

24   SWELLING IN THAT -- IN THAT AREA.

25   **Q.**   THAT'S WHAT EDEMA IS:  SWELLING?

1   **A.**   THAT'S WHAT EDEMA IS:  SWELLING.  OR YOU'LL SEE

2   HEMORRHAGES. IT LOOKS LIKE A BIG BRUISE ON THE HEART ON -- ON

3   SOME OF THESE FOLKS.

4          SO, TYPICALLY, A BIG Q-WAVE MYOCARDIAL INFARCTION,

5   YOU WILL SEE SOME KIND OF A FINDING AT SURGERY.

6   **Q.**   WHEN YOU WERE ACTUALLY THE PERSON LOOKING AT MR. BARNETT'S

7   HEART AND EXAMINING IT, DID YOU SEE ANY EVIDENCE OF EDEMA OF

8   THE WALL?

9   **A.**   NO.

10  **Q.**   DID YOU DOCUMENT ANYWHERE THAT HE HAD ANY HEMORRHAGING OR

11  ANY BRUISING IN THE HEART?

12  **A.**   NO.

13  **Q.**   IF YOU HAD SEEN A Q-WAVE INFARCTION, SIR, AND YOU HAD SEEN

14  SWELLING OF THE WALL OR SERIOUS DAMAGE TO THE HEART, IS THAT

15  SOMETHING YOU WOULD HAVE WRITTEN DOWN?

16  **A.**   OH, I -- YES.

17  **Q.**   AND YOU DIDN'T SEE THOSE THINGS WHEN YOU ACTUALLY LOOKED

18  AT MR. BARNETT'S HEART ON SEPTEMBER 10, 2002?

19  **A.**   NO.  I USUALLY WILL DOCUMENT THAT IN THE NOTE.

20  **Q.**   YOU WERE ASKED QUESTIONS, SIR, ABOUT A DIAGNOSIS, AND

21  LET'S GO BACK TO YOUR CONSULT.  YOU REMEMBER THAT MR. BARNETT

22  WAS DIAGNOSED WITH ISCHEMIA BACK IN JANUARY OF 2000?

23  **A.**   YES.

24  **Q.**   AND IF YOU LOOK BACK AT YOUR CONSULT, THE THIRD SENTENCE.

25  YOU WROTE: "THE PATIENT HAS A HISTORY OF CHEST PAIN DATING BACK

1    TO JANUARY OF 2000, WHEN HE UNDERWENT A CARDIOLITE STRESS TEST

2    FOR SHARP CHEST PAIN.  THE PATIENT RULED OUT FOR MYOCARDIAL

3    INFARCTION."

4            THAT MEANS THAT THE DOCTORS DETERMINED THAT HE DIDN'T

5    HAVE A HEART ATTACK; RIGHT?

6    A.   RIGHT.  THAT -- THAT'S CORRECT.

7    Q.   AND ONLY A SMALL AREA OF LATERAL ISCHEMIA WAS IDENTIFIED.

8    I'M NOT SURE IF, BY THE TIME YOUR VIDEO IS PLAYED, SIR, THE

9    JURY WILL HAVE BEEN TOLD WHAT ISCHEMIA IS.  BUT IS "ISCHEMIA"

10   ANOTHER WORD FOR REDUCED BLOOD FLOW?

11   A.   YES.

12   Q.   SO WHEN A PATIENT HAS ENOUGH BLOCKAGE OR PLAQUE IN THEIR

13   ARTERIES TO REDUCE THE BLOOD FLOW, THAT'S CONSIDERED ISCHEMIA?

14   A.   YES.

15   Q.   I TAKE IT YOU'RE FAMILIAR WITH CARDIOLITE STRESS TESTS,

16   DR. BRYAN?

17   A.   YES.

18   Q.   AND DR. KARAVAN IS ALSO FAMILIAR WITH CARDIOLITE STRESS

19   TESTS, ISN'T HE?

20   A.   VERY FAMILIAR.  HE DOES THEM.

21   Q.   ARE YOU AWARE, SIR, THAT ONE OF THE KNOWN LIMITATIONS OF A

22   CARDIOLITE STRESS TEST IS THAT IF A PATIENT HAS BALANCED

23   BLOCKAGE OF HIS MAJOR CORONARY ARTERIES, IN OTHER WORDS, A

24   SIMILAR AMOUNT OF PLAQUE IN HIS CORONARY ARTERIES, THAT A

25   CARDIOLITE STRESS TEST MAY COME BACK SHOWING THAT THE PATIENT

1  HAS MILD ISCHEMIA?

2  **A.**   YEAH, THAT'S CORRECT.

3  **Q.**   IS IT ALSO A KNOWN LIMITATION OF CARDIOLITE STRESS TESTS,

4  SIR, THAT IF THE PATIENT HAS AN EQUAL AMOUNT OF BLOCKAGE IN HIS

5  CORONARY ARTERIES, IT'S QUITE POSSIBLE THAT THAT CARDIOLITE

6  STRESS TEST WILL SHOW NO ISCHEMIA?

7  **A.**   THAT'S CORRECT.

8  **Q.**   IS THAT BECAUSE THESE CARDIOLITE STRESS TESTS MEASURE THE

9  RELATIVE AMOUNT OF BLOOD FLOW AMONG THE CORONARY ARTERIES?

10  **A.**   THAT IS CORRECT.  YOU HAVE TO HAVE A DIFFERENCE BETWEEN

11  RESTING STATE AND STRESS STATE TO HAVE A POSITIVE STUDY -- HAVE

12  A POSITIVE STUDY.

13  **Q.**   SO IF ALL OF THE ARTERIES CONTAIN A SIMILAR OR NEAR

14  SIMILAR AMOUNT OF PLAQUE BUILDUP, THEN THE CARDIOLITE STRESS

15  TEST MAY COME BACK AND SAY THERE'S EITHER NO DIFFERENCE AMONG

16  THE CORONARY ARTERIES IN TERMS OF PLAQUE BUILDUP OR THERE'S

17  MILD ISCHEMIA OR A MILD DIFFERENCE?

18  **A.**   THAT'S CORRECT.

19  **Q.**   THE ONLY WAY TO KNOW HOW MUCH CORONARY ARTERY DISEASE OR

20  BLOCKAGE THAT MR. BARNETT HAD FOR SURE IN JANUARY OF 2000 WOULD

21  BE TO HAVE THE RESULTS OF AN ANGIOGRAM OR A CARDIAC

22  CATHETERIZATION; IS THAT TRUE?

23  **A.**   TRUE.

24  **Q.**   DID YOU SEE THE EXTENT OF CORONARY ARTERY DISEASE IN

25  MR. BARNETT'S ARTERIES IN SEPTEMBER OF 2002?

1    **A.**    YES.

2    **Q.**    WAS THERE CONSISTENT BLOCKAGE, BALANCED BLOCKAGE, OF

3    PLAQUE IN HIS ARTERIES?

4    **A.**    YES.

5    **Q.**    I'M GOING TO SHOW YOU, SIR, WHAT I'LL MARK AS EXHIBIT 13.

6    THIS IS ACTUALLY A DOCUMENT THAT WE USED WITH DR. KARAVAN, AND

7    HE DREW ON THIS DOCUMENT THE AMOUNT OF BLOCKAGE OR PLAQUE

8    BUILDUP THAT HE SAW ON THE CARDIAC CATHETERIZATION WHEN HE

9    PERFORMED IT ON MR. BARNETT ON SEPTEMBER 9TH, 2002.  OKAY?

10   **A.**    YES.

11   **Q.**    SO DO YOU SEE -- WE WON'T GO THROUGH ALL OF THESE, BUT THE

12   LEFT MAIN -- UP TOWARD THE TOP, THE LEFT MAIN CORONARY ARTERY

13   HAS 50 PERCENT BLOCKAGE?

14   **A.**    YES.

15   **Q.**    AND THEN THE LAD, AS YOU DESCRIBED EARLIER, THE ANTERIOR

16   DESCENDING ARTERY, HAS 80 PERCENT.  DO YOU SEE THAT?

17   **A.**    YES.

18   **Q.**    THE CIRCUMFLEX HAS 80 PERCENT; RIGHT?

19   **A.**    YES.  UH-HUH.

20   **Q.**    AND THEN THE RIGHT CORONARY ARTERY, WHICH IS ACTUALLY TO

21   THE LEFT SIDE OF THE PAGE, SHOWS 80 PERCENT BLOCKAGE; RIGHT?

22   **A.**    THAT'S THE -- YEAH.  THAT'S THE -- WHAT WE CALL THE LD

23   BRANCH OR ONE OF THE BRANCHES OF THE RIGHT CORONARY ARTERY.

24   **Q.**    AND THEN THERE'S 100 PERCENT BLOCKAGE IN SEPTEMBER OF 2002

25   IN THE PDA.  DO YOU SEE THAT?

1   A.   YES.

2   Q.   THAT'S SORT OF THE BRANCH AT THE BOTTOM LEFT OR WHERE IT

3   SAYS "100 PERCENT"?

4   A.   YES.  UH-HUH.

5   Q.   AND THEN IN THE MIDDLE OF THE HEART THERE, DO YOU SEE "70

6   PERCENT"?

7   A.   YES.

8   Q.   ARE THESE PERCENTAGES, SIR, CONSISTENT WITH WHAT YOUR

9   UNDERSTANDING WAS OF MR. BARNETT'S ARTERIES IN SEPTEMBER OF

10  2002?

11  A.   YES.

12  Q.   DOES THIS REFLECT, AS YOU TESTIFIED A MINUTE AGO, THAT

13  MR. BARNETT HAD BALANCED ISCHEMIA THROUGHOUT HIS ARTERIES?

14  A.   HE DOES -- HE DOES HAVE A FAIRLY BALANCED DEGREE OF

15  STENOSES.

16  Q.   OKAY.  LET ME ASK IT THIS WAY:  DO YOU KNOW, SIR, WHETHER

17  CORONARY ARTERY DISEASE TAKES A WHILE TO BUILD UP?

18  A.   IT TYPICALLY DOES.

19  Q.   SO, TYPICALLY, WOULD A PATIENT LIKE MR. BARNETT WHO HAS

20  THIS MUCH OCCLUSION OR BLOCKAGE TAKE YEARS AND YEARS TO DEVELOP

21  IT?

22  A.   I WOULD SAY, THE MAJORITY OF PEOPLE, IT TAKES YEARS TO

23  DEVELOP THIS -- THIS MUCH, YOU KNOW, THIS DEGREE OF STENOSES.

24  Q.   AND BY YEARS, DO YOU MEAN DECADES?

25  A.   I'VE SEEN IT IN TWO, THREE, FOUR YEARS; SEEN IT IN

DAILY COPY

1   DECADES.  IT VARIES FROM PATIENT TO PATIENT.  THERE ARE PEOPLE

2   WHO HAVE -- THAT I'VE OPERATED ON WHO'VE HAD WHAT WAS

3   CONSIDERED MODERATE DISEASE AT ONE TIME, AND THREE YEARS LATER

4   WE'RE SEEING SEVERE STENOSES IN AN ARTERY THAT WAS CALLED 50

5   PERCENT.  IT'S, YOU KNOW, 80 OR 90 LATER.  SO, YOU KNOW, THREE

6   OR FOUR YEARS LATER.

7           IT'S -- IT'S HARD TO SAY.  ALL I CAN SAY ABOUT HIM IS

8   I DON'T KNOW WHAT HIS -- WHAT HE HAD IN 2000.  I MEAN, I

9   JUST -- THERE'S NO CATH.  THERE'S NO WAY TO KNOW.

10  Q.   HAS IT BEEN YOUR EXPERIENCE, DR. BRYAN, THAT YOU'VE SEEN

11  PATIENTS WHO HAVE BOTH DEVELOPED CORONARY ARTERY DISEASE, LOTS

12  OF CORONARY ARTERY DISEASE OVER A LONG PERIOD OF TIME, AND

13  THERE'S SOME PATIENTS WHO ACTUALLY DEVELOP IT RAPIDLY?

14  A.   IN MY PRACTICE, I HAVE SEEN BOTH SUBSETS OF PATIENTS.

15  Q.   LET'S SWITCH TOPICS NOW, DR. BRYAN.  HAVE YOU SEEN

16  PATIENTS, SIR, WHO HAVE HAD MILD ISCHEMIA AT ONE POINT IN THEIR

17  LIFE AND THEN RAPIDLY PROGRESS TO SEVERE MULTI-VESSEL DISEASE,

18  EVEN IF THEY TRY TO CONTROL THEIR RISK FACTORS?

19  A.   YES.

20  Q.   CAN YOU EXPLAIN THAT, SIR?  HOW IS IT POSSIBLE FOR

21  SOMEBODY TO TRY HARD AND EVEN CONTROL THEIR CHOLESTEROL

22  PERFECTLY, WHY IS IT THAT THAT PERSON MIGHT GO FROM A MILD

23  AMOUNT OF ISCHEMIA TO A SEVERE AMOUNT?

24  A.   IT'S -- IT'S HARD TO KNOW WHY.  IN SOME -- IN SOME PEOPLE,

25  IT'S GENETIC.  WE DON'T KNOW EXACTLY WHY CORONARY DISEASE

1   PROGRESSES MORE RAPIDLY IN SOME PEOPLE THAN OTHERS.  YOU CAN

2   HAVE TWO PATIENTS WITH IDENTICAL CHOLESTEROL PROFILES THAT ONE

3   IS -- DOES WELL FOR TEN YEARS; ONE DOES WELL FOR, YOU KNOW, A

4   YEAR OR TWO AND IS ON THE OPERATING TABLE OR GETTING A STENT.

5          I'VE HAD PATIENTS WHO ARE IN THEIR 20S, WHO ARE

6   NONSMOKERS WITH NORMAL CHOLESTEROLS, GET CORONARY BYPASS

7   GRAFTING.  THERE'S NO WAY TO KNOW WHY THEY'RE HAVING THESE

8   RAPIDLY PROGRESSIVE PROBLEMS.

9          I -- I WOULD SAY THAT IT'S AN INFLAMMATORY PROCESS,

10  WE KNOW, AND WHETHER -- AND WHY IT'S WORSE IN OTHER PEOPLE THAN

11  SOME, THERE'S PROBABLY A MULTITUDE OF FACTORS THAT GO INTO IT

12  THAT WE'RE -- THAT THEY'RE NOT ALL -- THEY'RE NOT ALL

13  DELINEATED RIGHT NOW.

14  Q.   SO EVEN TODAY, WITH ALL OF THE STUDY THAT'S BEEN DONE ON

15  ATHEROSCLEROSIS, IS IT FAIR TO SAY THAT NOBODY KNOWS ALL OF THE

16  REASONS WHY PEOPLE PROGRESS FROM A SMALL AMOUNT OF ISCHEMIA OR

17  CORONARY ARTERY DISEASE TO A HEART ATTACK?

18  A.   WE KNOW THAT THE MAJORITY OF THOSE ARE RUPTURE.  BUT WHY

19  DOES THE PLAQUE SUDDENLY RUPTURE, I THINK IT'S ALL -- WE HAVE

20  IDEAS, BUT WHAT WE CAN TELL YOU -- YOU KNOW, EVEN JUST TO GIVE

21  YOU AN EXAMPLE, LOOKING AT CHOLESTEROL LEVELS, YOU CAN TELL

22  WHAT A RELATIVE RISK IS.  WE CAN'T TELL YOU THAT BECAUSE YOU

23  HAVE A HIGH CHOLESTEROL YOU'RE GOING TO HAVE A -- YOU KNOW,

24  HEART DISEASE.

25          WE CAN -- WE CAN TELL YOU THAT -- WE CAN TELL YOU

1    THAT IF YOU KEEP IT LOW, YOUR RELATIVE RISK OF A PROBLEM IS

2    THIS, BUT WE CAN'T TELL YOU YOU'RE GOING TO BE THAT GUY WHO

3    GETS IT.

4            SO I THINK THERE'S -- STILL A LOT IS NOT KNOWN

5    EXACTLY ABOUT WHY PEOPLE PROGRESS, WHY PLAQUES RUPTURE.

6    THERE'S POSTULATION THAT THEY BECOME UNSTABLE PLAQUES.  YOU

7    KNOW, THEY GET A LOT OF CHOLESTEROL AND THE BURDEN BECOMES TOO

8    MUCH AND IT RUPTURES; CLOT.  YOU KNOW, WE DON'T KNOW ALL THE --

9    ALL THE ISSUES RELATED TO THIS.

10   Q.   IF A PATIENT, SIR, IN YOUR EXPERIENCE, HAS A HISTORY OF

11   HIGH CHOLESTEROL AND THEN GETS ON A STATIN LIKE LIPITOR AND

12   THEN CONTROLS THEIR CHOLESTEROL, DOES THAT MEAN THAT THE PLAQUE

13   THAT'S BUILT UP IN THEIR ARTERIES GOES AWAY?

14   A.   NO.

15   Q.   DOES IT MEAN, IF YOU CONTROL YOUR CHOLESTEROL EVEN

16   PERFECTLY AFTER YOU'VE HAD A HISTORY OF HIGH CHOLESTEROL, THAT

17   THE PLAQUE WILL NOT ACCELERATE AND PROGRESS?

18   A.   NO.

19   Q.   HAS IT BEEN YOUR EXPERIENCE THAT YOU'VE SEEN IN PATIENTS

20   WHO ACTUALLY CONTROL THEIR CHOLESTEROL LEVELS, THAT BECAUSE

21   THEY HAD HIGH CHOLESTEROL IN THE PAST, THEIR PLAQUE PROGRESSES

22   OVER TIME?

23   A.   YES.

24   Q.   DR. BRYAN, IF YOU TURN BACK TO YOUR CONSULT -- THE BOTTOM

25   HAS A "20" ON IT -- DO YOU SEE IN THE FOURTH OR FIFTH SENTENCE,

DAILY COPY

1   AFTER DISCUSSING THAT MR. BARNETT WAS RULED OUT FOR A HEART

2   ATTACK IN JANUARY OF 2000, IT SAYS, "THE PATIENT WAS TREATED

3   MEDICALLY"?  DO YOU WHERE SEE THAT, SIR?

4   **A.**   YES.

5   **Q.**   NOW, BACK IN JANUARY OF 2000, MR. BARNETT WAS 56 YEARS

6   OLD, AND YOU KNOW THAT HE HAD A HISTORY OF HIGH CHOLESTEROL;

7   RIGHT?

8   **A.**   YES.

9   **Q.**   DID MR. BARNETT ALSO HAVE A SIGNIFICANT FAMILY HISTORY OF

10  HEART DISEASE?

11  **A.**   HE DID.  HIS FATHER HAD UNDERGONE -- HAD-- HAD TWO

12  MYOCARDIAL INFARCTIONS:  ONE AT AGE 62; ONE AT AGE 68.

13          ALSO, THE FAMILY HISTORY DID HAVE ATHEROSCLEROTIC

14  RISK FACTORS:  A SISTER WHO'S HAD -- WHO IS 50 YEARS OLD AND

15  HAD MULTIPLE TIAS.  ALL OF THESE THINGS WERE --

16  **Q.**   WHAT'S A TIA?

17  **A.**   COMMONLY KNOWN AS A MINI STROKE.  TEMPORARY SYMPTOMS,

18  USUALLY LESS -- LESS THAN 24 HOURS THAT RESOLVE.

19          BUT HIS FATHER HAD A STROKE.  I MEAN, THERE WAS A --

20  HE HAD A FAMILY HISTORY THAT CONSIDER -- YOU KNOW, YOU'D PUT

21  HIM AT RISK FOR ATHEROSCLEROSIS.

22  **Q.**   AND HEART ATTACKS?

23  **A.**   AND HEART ATTACKS.

24  **Q.**   SO, IN JANUARY OF 2000, MR. BARNETT WAS 56 YEARS OLD.  HE

25  HAD A HISTORY OF HIGH CHOLESTEROL.  HE HAD A FAMILY HISTORY OF

1   HEART DISEASE.  HE HAD AN ABNORMAL CARDIOLITE STRESS TEST

2   SHOWING ISCHEMIA.  BASED ON THOSE FACTORS, SIR, DO YOU THINK

3   THAT MR. BARNETT SHOULD HAVE BEEN TAKING ASPIRIN ON A DAILY

4   BASIS?

5   **A.**  YES.

6   **Q.**  WHEN YOU TALKED ABOUT ASPIRIN EARLIER, IS IT YOUR

7   UNDERSTANDING -- WHY IS IT IMPORTANT TO RECOMMEND ASPIRIN TO

8   PATIENTS AND THAT PATIENTS TAKE DAILY ASPIRIN IF THEY HAVE A

9   HISTORY LIKE MR. BARNETT OF HEART DISEASE?

10  **A.**   THE MAIN BENEFIT TO ASPIRIN IS IT -- IT INHIBITS THE

11  CLOTTING CELLS KNOWN AS PLATELETS FROM FORMING A CLOT.  AND SO,

12  IN PATIENTS WHO HAVE CORONARY DISEASE OR BLOCKAGES THAT WE'VE

13  TALKED ABOUT AND WHO ARE WHO AT RISK FOR PLAQUE RUPTURE AT ANY

14  TIME IN THEIR LIFE, A BABY ASPIRIN OR A FULL ASPIRIN A DAY IS

15  USUALLY PART OF THE TREATMENT FOR A PATIENT WITH CORONARY

16  DISEASE.

17  **Q.**  IS IT PART OF THE STANDARD OF CARE OR NORMAL COURSE FOR A

18  PATIENT WHO HAS A HISTORY OF HEART DISEASE TO TAKE ASPIRIN SO

19  THAT THEY MIGHT PREVENT A HEART ATTACK IN THE FUTURE?

20  **A.**   YES.

21  **Q.**  IS IT ALSO COMMON FOR DOCTORS TO PRESCRIBE ASPIRIN SO THAT

22  PATIENTS WHO HAVE A HISTORY OF HEART DISEASE MIGHT NOT HAVE A

23  CLOT IN RESPONSE TO A PLAQUE RUPTURE BECAUSE OF THE PROPERTIES

24  OF ASPIRIN, THE ANTI-CLOTTING PROPERTIES?

25  **A.**  CORRECT.

1   **Q.**   LOOKING NOW DOWN IN THE MIDDLE OF THE PAGE OF YOUR

2   CONSULT, DO YOU SEE WHERE YOU THEN DESCRIBE THE CARDIAC

3   CATHETERIZATION THAT WAS PERFORMED BY DR. KARAVAN?

4   **A.**   YES.

5   **Q.**   AND I'M NOT GOING TO REPEAT ALL OF THESE, BUT YOU TALK

6   ABOUT 50 PERCENT BLOCKAGE IN THE LEFT MAIN, 80 PERCENT IN

7   ANOTHER, 80 PERCENT IN ANOTHER ARTERY AND SO FORTH.  AND THEN

8   DO YOU SEE NUMBER 8 WHERE YOU WROTE:  "EJECTION FRACTION

9   APPROXIMATELY 50 PERCENT"?

10          AND LET'S STOP THERE.  WHAT IS AN EJECTION FRACTION?

11  **A.**   WHAT AN EJECTION FRACTION MEASURES IS, WITH EACH

12  HEARTBEAT, THERE'S A CERTAIN AMOUNT OF BLOOD EJECTED.  WE DON'T

13  EMPTY OUR HEART TOTALLY WITH EACH HEARTBEAT.  SO THE EJECTION

14  FRACTION IS THE AMOUNT OF THAT BLOOD IN THE CHAMBER WHEN THE

15  HEART IS FULL, THAT WHEN IT SQUEEZES, THAT'S THE PERCENTAGE OF

16  BLOOD THAT GOES OUT TO THE BODY.

17          SO A NORMAL EJECTION FRACTION WOULD BE BETWEEN 50 AND

18  60 PERCENT.

19  **Q.**   SO WHEN SOMEBODY TALKS ABOUT AN EJECTION FRACTION, OR EF,

20  AS A SHORTHAND VERSION, WHAT THAT ATTEMPTS TO MEASURE IS HOW

21  WELL THE HEART MUSCLE IS CONTRACTING AND PUMPING OUT BLOOD TO

22  THE REST OF THE BODY?

23  **A.**   CORRECT.

24  **Q.**   IS THAT AN IMPORTANT MEASUREMENT?

25  **A.**   YES.

1    **Q.**   IS IT THE MOST IMPORTANT MEASUREMENT FOR HEART FUNCTION?

2    **A.**   YES.

3    **Q.**   IS AN EJECTION FRACTION ACTUALLY CONSIDERED THE GOLD

4    STANDARD FOR MEASURING HEART FUNCTION IN HEART DAMAGE?

5    **A.**   WELL, THE EJECTION FRACTION IS –– THERE ARE MULTIPLE WAYS

6    OF MEASURING AN EJECTION FRACTION, BUT FINDING OUT WHAT A

7    PATIENT'S EJECTION FRACTION IS IS THE –– IS –– DETERMINES

8    THE –– THE CONTRACTILE PERFORMANCE OF THE HEART.  IT GIVES YOU

9    THE PERFORMANCE OF THE HEART, WHETHER IT'S –– WHETHER YOU'RE

10   PUMPING NORMALLY OR NOT.  THAT WOULD BE THE GOLD STANDARD

11   DESCRIPTION OF HOW WELL YOU'RE PUMPING BLOOD.

12   **Q.**   AND WHEN YOU SAW THAT MR. BARNETT HAD A NORMAL EJECTION

13   FRACTION OF 50 PERCENT AT THE SAME TIME HE WAS HAVING HIS HEART

14   ATTACK, DID THAT STRIKE YOU AS A GOOD SIGN FOR MR. BARNETT?

15   **A.**   YES.

16   **Q.**   DR. KARAVAN REFERS IN HIS CARDIAC CATHETERIZATION REPORT

17   TO SOMETHING CALLED "PRESERVED LEFT VENTRICULAR SYSTOLIC

18   FUNCTION."

19   **A.**   YES.

20   **Q.**   WHAT DOES IT MEAN TO HAVE PRESERVED LEFT VENTRICULAR

21   SYSTOLIC FUNCTION?

22   **A.**   THAT MEANS TO HAVE A NORMAL EJECTION FRACTION.

23   **Q.**   DO YOU AGREE WITH DR. KARAVAN THAT, ON SEPTEMBER 9TH,

24   2002, MR. BARNETT HAD A NORMAL VENTRICULAR FUNCTION AND

25   EJECTION FRACTION?

1   A.   YES.

2   Q.   YOU ALSO WROTE IN NUMBER 8:  "WITH AN LVEDP OF 16."  DO

3   YOU SEE THAT?

4   A.   CORRECT.

5   Q.   WHAT IS AN LVEDP?

6   A.   "LVEDP" STANDS FOR LEFT VENTRICULAR END DIASTOLIC

7   PRESSURE.  AND WE MEASURE IT -- DR. KARAVAN OFTEN MEASURES IT

8   WHEN HE PUTS THE CATHETER IN THE CHAMBER TO DO THE EJECTION

9   FRACTION.  HOW THEY DO THAT IS THEY SLIP THE CATHETER INTO THE

10  HEART CHAMBER ITSELF AND INJECT DYE SO THEY CAN SEE HOW THE

11  HEART IS PUMPING.

12          WELL, THE LVEDP IS JUST THAT PRESSURE MEASUREMENT

13  BEFORE -- THEY DO ONE BEFORE AND AFTER THEY PUT THE DYE IN.  AN

14  LVEDP OF 16 IS UPPER NORMAL FOR A PATIENT.

15  Q.   IF YOU LOOK ON PAGE 23, SIR, OF EXHIBIT 11, THIS IS

16  DR. KARAVAN'S CARDIAC CATHETERIZATION REPORT.  DO YOU SEE THAT?

17  A.   YES.

18  Q.   AND IN THE THIRD SENTENCE, OR PHRASE, IT SAYS:

19  "MID-INFERIOR DIAPHRAGMATIC HYPOKINESIS."  AND THEN IT TALKS

20  ABOUT THE EJECTION FRACTION.  DO YOU SEE THAT, SIR?

21  A.   YES, I SEE THAT.

22  Q.   CAN YOU TELL ME JUST BRIEFLY WHAT A MID-INFERIOR

23  DIAPHRAGMATIC HYPOKINESIS MEANS?

24  A.   WHAT THAT MEANS, HE -- HE'S STATING THAT THE BOTTOM WALL

25  OF THE HEART SITS ON THE DIAPHRAGM, THE INFERIOR WALL OF THE

1   HEART SITS ON THE DIAPHRAGM.  AND THEN THAT AREA OF THE HEART
2   WAS NOT MOVING QUITE NORMALLY.  IT WAS MILDLY HYPOKINETIC OR
3   DECREASED FUNCTION OF THE HEART.
4   **Q.**   NOW, IF A PATIENT HAS A EJECTION FRACTION THAT'S NORMAL
5   AND THIS MILD HYPOKINESIS AT THE SAME TIME, IS THERE ANY
6   CLINICAL SIGNIFICANCE TO HAVING HYPOKINESIS?
7   **A.**   NO.  I MEAN, IF HIS OVERALL EJECTION FRACTION IS NORMAL,
8   THEN IT'S -- IT'S NOT A -- ESPECIALLY FROM THE STANDPOINT OF
9   OPERATING ON HIM FOR US, THAT'S NOT A SIGNIFICANT ISSUE.
10  **Q.**   AND HAVING MILD HYPOKINESIS WHEN YOU HAVE A NORMAL
11  EJECTION FRACTION ISN'T CLINICALLY SIGNIFICANT FOR A PATIENT AT
12  ALL; TRUE?
13  **A.**   AS LONG AS THE PATIENT'S NOT HAVING ANY EVIDENCE OF HEART
14  FAILURE, IT'S NOT GOING TO GIVE HIM ANY LONG-TERM PROBLEM, IN
15  ALL LIKELIHOOD.
16  **Q.**   LET'S GO BACK TO YOUR CONSULT NOW, PLEASE, WHICH IS
17  PAGE 20.  YOU WERE ASKED SOME QUESTIONS ABOUT -- DO YOU SEE
18  "PMH" ON THE BOTTOM?  IS THAT PRIOR MEDICAL HISTORY?
19  **A.**   PAST MEDICAL HISTORY, UH-HUH.
20  **Q.**   "SIGNIFICANT FOR THE FOLLOWING."  AND THEN YOU WERE ASKED
21  ABOUT HYPERLIPIDEMIA.  THAT'S ABNORMAL CHOLESTEROL LEVELS?
22  **A.**   CORRECT.
23  **Q.**   AND THAT'S A RISK FACTOR FOR HEART DISEASE AND HEART
24  ATTACK?
25  **A.**   YES.

1  **Q.**   DO YOU SEE ANY REFERENCE, SIR, TO HYPERTENSION IN YOUR

2  CONSULT WHEN YOU WERE TALKING TO MR. BARNETT?

3  **A.**   NO.

4  **Q.**   DID MR. BARNETT TELL YOU IN SEPTEMBER OF 2002 THAT HE HAD

5  A HISTORY OF HYPERTENSION?

6  **A.**   NO.

7  **Q.**   WOULD THAT BE SOMETHING YOU WOULD HAVE WRITTEN DOWN HERE

8  IF HE HAD?

9  **A.**   YES.

10 **Q.**   AND TO DETERMINE WHETHER SOMEBODY HAS HYPERTENSION, IS IT

11 IMPORTANT TO LOOK AT AS MANY READINGS AS YOU HAVE FOR THAT

12 PARTICULAR PATIENT AS OPPOSED TO SOME INDIVIDUAL SPIKES IN

13 BLOOD PRESSURE?

14 **A.**   MULTIPLE BLOOD PRESSURES ARE BETTER.

15 **Q.**   IS IT YOUR UNDERSTANDING, DR. BRYAN, THAT TO DETERMINE

16 WHETHER SOMEBODY HAS HYPERTENSION, YOU WOULD WANT TO TAKE AN

17 AVERAGE OF THE BLOOD PRESSURE READINGS WITHIN A CERTAIN PERIOD

18 OF TIME?

19 **A.**   TYPICALLY, WHAT I -- WHAT WE DO IS HAVE THEM TAKE MULTIPLE

20 TIMES, DIFFERENT TIMES OF THE DAY, TO SEE IF THEY ARE HAVING

21 ANY SPIKES.

22 **Q.**   WHAT ARE THE DIFFERENT CAUSES OF HYPERTENSION, SIR?

23 **A.**   WELL, SOME PEOPLE ARE SALT-RETAINERS.  THEY RETAIN SALT.

24 THAT CAUSES HYPERTENSION.  THERE IS ALSO SOME PEOPLE, THE

25 REASON FOR THEIR HYPERTENSION IS THEY ARE VASOCONSTRICTED.

DAILY COPY

1    THAT'S ONE ETIOLOGY FOR HYPERTENSION.

2    **Q.**   WHAT IS VASOCONSTRICTED?

3    **A.**   THEIR BLOOD VESSELS ARE CHRONICALLY CONSTRICTED.  THEIR --

4    I GUESS YOU COULD SAY THEIR SYSTEM IS KIND OF REVVED UP WHERE

5    THEY -- THEIR BLOOD VESSELS ARE -- ARE TIGHTENED DOWN, CAUSING

6    THEIR HYPERTENSION ON -- ON A -- ON A CHRONIC BASIS.

7            THERE'S ALSO ANXIETY THAT CAN CAUSE HYPERTENSION.

8            CHEST PAIN.  IF A PATIENT HAS CHEST PAIN, THEY CAN

9    HAVE HYPERTENSION.  ANY KIND OF PAIN SYNDROME CAN CAUSE

10   HYPERTENSION.

11           BUT IF YOU'RE TALKING ABOUT YOUR GARDEN VARIETY,

12   EVERYDAY JUST BASIC HYPERTENSION, MOST OF THOSE ARE EITHER

13   GOING TO BE RELATED TO A VASOCONSTRICTOR OR A SYMPATHETIC

14   SYSTEM, A NERVOUS SYSTEM, YOU KNOW, KIND OF OVERLOAD ON THE

15   VESSELS -- TO MAKE IT SIMPLE -- OR SALT RETENTION-TYPE THING.

16   **Q.**   IF A PATIENT DOESN'T HAVE SYSTEMIC CONSTANT ELEVATED BLOOD

17   PRESSURE, THEN THAT COULD BE CAUSED BY ANY ONE OF A NUMBER OF

18   FACTORS SUCH AS THOSE YOU IDENTIFIED?

19   **A.**   RIGHT.  ANXIETY.

20   **Q.**   STRESS?

21   **A.**   STRESS.  YOU KNOW, ANYTHING THAT CAN DO THAT.

22   **Q.**   YOU MENTIONED BEFORE THAT IT'S NOT UNCOMMON -- I THINK YOU

23   SAID IT'S NOT UNUSUAL FOR PATIENTS TO HAVE INCREASED BLOOD

24   PRESSURE WHEN THEY COME INTO THE OFFICE.  DO YOU REMEMBER

25   TESTIFYING TO THAT?

2475

1  **A.**    YES.

2  **Q.**    HAVE YOU HEARD OF THE TERM "WHITE-COAT HYPERTENSION"?

3  **A.**    YES.

4  **Q.**    WHAT IS WHITE-COAT HYPERTENSION?

5  **A.**    ESPECIALLY WHEN THEY SEE THEIR HEART SURGEON.  THEY --

6  THEY GET NERVOUS AND THEY HAVE HIGH BLOOD PRESSURE.

7  **Q.**    IS IT COMMON FOR PATIENTS TO BE NERVOUS AND ANXIOUS WHEN

8  THEY SEE A CARDIOLOGIST LIKE DR. KARAVAN, OR EVEN AN INTERNIST,

9  IF THEY'RE WORRIED ABOUT A PARTICULAR MEDICAL CONDITION, TO

10  HAVE A SPIKE IN BLOOD PRESSURE?

11  **A.**    YES.

12  **Q.**    HAVE YOU SEEN PATIENTS, SIR, WHO HAVE HAD SPIKES IN BLOOD

13  PRESSURE WHEN THEY COME INTO THE OFFICE, BUT WHEN THEY TAKE

14  THEIR BLOOD PRESSURE AT HOME, IT'S NORMAL?

15  **A.**    YES.

16  **Q.**    ARE YOU AWARE THAT THERE'S CERTAIN MEDICATIONS THAT CAN

17  CAUSE HYPERTENSION?

18  **A.**    YES.

19  **Q.**    IS CLARITIN OR A DECONGESTANT OVER-THE-COUNTER MEDICATION

20  THE TYPE OF MEDICINE THAT CAN CAUSE HYPERTENSION?

21  **A.**    CLARITIN ITSELF IS NOT, ITSELF.  BUT WITH CLARITIN-D WITH

22  THE DECONGESTANT SUDAFED IN IT IS MORE LIKELY TO CAUSE -- CAN

23  CAUSE HYPERTENSION.

24  **Q.**    DO YOU KNOW THAT ALL NON-STEROIDAL ANTI-INFLAMMATORIES CAN

25  CAUSE HYPERTENSION?

1    A.    I DO KNOW THAT'S A RISK FACTOR FOR HYPERTENSION.

2    Q.    CAN YOU TURN WITH ME, SIR, TO PAGE 1 -- OOPS.  YES, PAGE 1

3    OF EXHIBIT 11.  WHAT IS THIS DOCUMENT?

4    A.    THIS IS A -- ONE OF OUR SCREENING SHEETS THAT WE -- WE DO

5    IN THE PATIENTS.

6              OUR NURSE, KIRSTEN, WHILE WE'RE OPERATING, IF A

7    CONSULT COMES IN, SHE'LL GO BY AND DO A QUICK SHEET TO GIVE US

8    AN IDEA OF WHAT'S GOING ON WITH THE PATIENT BEFORE WE GO OFF TO

9    SEE THEM.

10   Q.    AND DO YOU SEE IN THE RIGHT COLUMN UNDER PMH -- WHAT DOES

11   "PMH" STAND FOR?

12   A.    PAST MEDICAL HISTORY.

13   Q.    AND IS KIRSTEN OR THE NURSE SUPPOSED TO FILL IN ONE OF

14   THESE COLUMNS:  "HTN," "DN," OR "TOBACCO," IF THE PATIENT

15   INDICATES THAT THEY HAVE THAT CONDITION?

16   A.    YES.

17   Q.    WHAT IS HTM?

18   A.    HYPERTENSION.

19   Q.    DOES THIS INDICATE THAT MR. BARNETT DID NOT REPORT THAT HE

20   HAD HYPERTENSION ON SEPTEMBER 6 OF 2002?

21   A.    THAT'S CORRECT.

22   Q.    DOES MR. BARNETT REPORT HERE THAT HIS BLOOD PRESSURE HAS

23   GOTTEN ANY WORSE WHILE HE'S BEEN ON VIOXX?

24   A.    NO.

25   Q.    YEAH.  DID MR. BARNETT REPORT IN THE ER THAT HE HAD A

1    HISTORY OF HYPERTENSION?

2    **A.**   NO.

3    **Q.**   IF YOU TURN TO PAGE 14 AND 15 -- LET'S START WITH 14.  AND

4    THIS IS ALSO AN ER REPORT PREPARED BY SOMEBODY ELSE.  MARK

5    WAGGENER; RIGHT?

6    **A.**   THIS IS PROBABLY THE ER PHYSICIAN HIMSELF WHO DICTATED.

7    PAMELA PYLE WAS PROBABLY THE HOSPITALIST WHO ADMITTED HIM.  AND

8    THAT'S PROBABLY -- THE "H&P", FOR ADMISSION FOR PAMELA PYLE.

9    **Q.**   AND DO YOU SEE ON THIS PARTICULAR RECORD, "PMH," PAST

10   MEDICAL HISTORY, THERE'S NO INDICATION THAT MR. BARNETT HAD

11   HYPERTENSION; RIGHT?

12   **A.**   CORRECT.

13   **Q.**   LET ME REPRESENT TO YOU, DR. BRYAN, THAT MR. BARNETT,

14   BEFORE HE CAME INTO THE HOSPITAL ON SEPTEMBER OF 2002, TOOK HIS

15   BLOOD PRESSURE TWICE, AND IT WAS 190/111 AND 194/104.  OKAY?

16   **A.**   YES.

17   **Q.**   AND THEN HERE YOU CAN SEE, IN THE ER, IT'S DROPPED DOWN TO

18   166/92?  DO YOU SEE THAT?

19   **A.**   LET ME -- IS THAT PAGE 14?

20   **Q.**   14.

21   **A.**   HOLD ON A SECOND.

22   **Q.**   UNDER "PHYSICAL EXAM."

23   **A.**   YES, I SEE THAT.

24   **Q.**   IS IT COMMON, SIR, FOR PATIENTS WHO ARE EXPERIENCING CHEST

25   PAIN OR HAVING A HEART ATTACK TO HAVE ELEVATED BLOOD PRESSURE?

1  **A.**   YES.

2  **Q.**   YOU SAID THAT BEFORE, THAT EVEN SLIGHT CHEST PAIN CAN

3  INCREASE A PATIENT'S BLOOD PRESSURE; TRUE?

4  **A.**   YES.

5  **Q.**   IF YOU TURN TO PAGE 17, SIR, THIS IS A CONSULTATION REPORT

6  SEPTEMBER 6, 2002, DICTATED BY -- IS IT NURSE GONZALES?

7  **A.**   ROBERTA GONZALES.  THAT IS A PHYSICIAN ASSISTANT THAT

8  WORKED FOR DR. KARAVAN.

9  **Q.**   DO YOU SEE THAT SHE REPORTS IN THE MIDDLE OF THE HISTORY,

10  IN THE MIDDLE OF THE PARAGRAPH:  "HE DENIES ASSOCIATED" -- IS

11  IT "DIAPHORESIS OR NAUSEA, BUT DID START TO BECOME SHORT OF

12  BREATH, PART OF WHICH HE THINKS MAY HAVE BEEN DUE TO ANXIETY."

13  DO YOU SEE THAT, SIR?

14  **A.**   YES.

15  **Q.**   IS ANXIETY, AS I THINK YOU MENTIONED BEFORE, SOMETHING

16  THAT CAN CAUSE SHORTNESS OF BREATH OR AN INCREASE IN BLOOD

17  PRESSURE?

18  **A.**   YES.

19  **Q.**   DR. PYLE, IN THE LAST PARAGRAPH, IS SAYING WHY SHE THINKS

20  MR. BARNETT SHOULD BE ADMITTED TO THE HOSPITAL:  "AT THIS TIME

21  I THINK THE PATIENT REQUIRES ADMISSION TO THE HOSPITAL TO RULE

22  OUT MI PROTOCOL GIVEN HIS MULTIPLE CARDIAC RISK FACTORS,

23  INCLUDING HIS AGE OF 58, HYPERCHOLESTEROLEMIA, FAMILY HISTORY

24  OF CORONARY ARTERY DISEASE."  DO YOU SEE THAT?

25  **A.**   YES.

2479

1   **Q.**   IS THERE ANY REFERENCE TO HYPERTENSION AS A RISK FACTOR

2   FOR MR. BARNETT?

3   **A.**   NO.

4   **Q.**   IS THE PURPOSE OF A BYPASS SURGERY, DR. BRYAN, TO ACTUALLY

5   FIX WHATEVER SMALL DAMAGE MIGHT OCCUR AS A RESULT OF A SMALL

6   HEART ATTACK?

7   **A.**   WELL, THAT IS ONE OF THE GOALS OF BYPASS, IS TO RESTORE

8   BLOOD FLOW TO THE AREA OF MUSCLE THAT IS NOT GETTING ENOUGH AND

9   ANY, HOPEFULLY, THAT -- AND TO -- TO PRESERVE OR HEAL ANY

10  VIABLE CELLS THAT ARE -- THAT ARE STILL VIABLE, STILL LIVING.

11  **Q.**   IS THE PURPOSE HERE FOR MR. BARNETT TO HAVE A BYPASS SO

12  THAT YOU, HOPEFULLY, WILL AVOID A FATAL OR DEADLY HEART ATTACK

13  IN THE FUTURE?

14  **A.**   THAT WOULD BE ONE OF THE GOALS.

15  **Q.**   IF THE BYPASS IS SUCCESSFUL, THEN THE HOPE IS THAT THE

16  PATIENT WOULD BE ABLE TO LIVE A FULL LIFE EXPECTANCY AND NOT

17  HAVE ANOTHER HEART ATTACK OR DIE OF A HEART ATTACK; RIGHT?

18  **A.**   WELL --

19  **Q.**   THAT'S THE HOPE?

20  **A.**   THAT'S THE HOPE, YES.

21  **Q.**   BUT, CERTAINLY, YOU, IN YOUR EXPERIENCE, HAVE PERFORMED

22  SUCCESSFUL BYPASS SURGERIES ON PATIENTS AND THEY HAVE GONE ON

23  TO LIVE FULL, COMPLETE LIVES?

24  **A.**   YES.

25  **Q.**   WHEN YOU SAID BEFORE THAT YOU RECOMMENDED BYPASS SURGERY

DAILY COPY

1  FOR MR. BARNETT BASED ON HIS SEVERE CORONARY ARTERY DISEASE,

2  WERE YOU AWARE THAT HE HAD 50 PERCENT BLOCKAGE IN HIS LEFT MAIN

3  ARTERY?

4  **A.**   YES.

5  **Q.**   IS THE LEFT MAIN ARTERY A PARTICULARLY IMPORTANT ONE?

6  **A.**   IT IS.

7  **Q.**   WHY?

8  **A.**   THE AMOUNT OF CIRCULATION IN THE LEFT MAIN IS TREMENDOUS.

9  THE REASON IS THE LEFT-SIDE CIRCULATION IN MOST PATIENTS IS

10  FAIRLY EXTENSIVE, SO IF YOU LOSE THAT ARTERY, YOU LOSE A LARGE

11  AMOUNT OF MUSCLE.

12        AND OFTEN -- NOW, IF A LEFT MAIN SHUTS DOWN OR

13  OCCLUDES, THEN THAT ARTERY -- THAT'S OFTEN A SUDDEN-DEATH

14  EPISODE.

15  **Q.**   I ASSUME YOU MEAN THAT THERE, UNFORTUNATELY, ARE A NUMBER

16  OF PEOPLE WHO HAVE SIGNIFICANT BLOCKAGE IN THEIR LEFT MAIN

17  ARTERY AND THEN THEY DIE?

18  **A.**   THAT SHUTS DOWN AND THEY HAVE A SUDDEN EPISODE.

19  **Q.**   IS IT TRUE, SIR, THAT EVEN IF YOU DON'T HAVE ANY BLOCKAGE

20  AT ALL IN ANY OTHER ARTERY, BUT YOU HAVE 50 PERCENT OR MORE

21  BLOCKAGE IN YOUR LEFT MAIN ARTERY, THAT THAT MAKES YOU A

22  CANDIDATE FOR BYPASS SURGERY?

23  **A.**   I WOULD TELL YOU, BASED ON THE -- IT DEPENDS ON THE

24  CARDIOLOGIST ON A 50 PERCENT LEFT MAIN.  I WOULD TELL YOU, YOU

25  KNOW, YOU SEE SOME WHO WANT IT DONE AND SOME WHO TREAT THEM

1    MEDICALLY.

2              BUT I WOULD SAY THAT WHEN YOU START GETTING INTO THAT

3    50 AND 60 -- CERTAINLY, AT 60 PERCENT, THEY'RE SENDING THEM TO

4    SURGERY.  AT 50, MOST OF US ARE GOING TO OPERATE ON THEM IF

5    THEY'RE SYMPTOMATIC.  I MEAN, IF THEY'RE HAVING CHEST PAIN OR

6    HAVE HAD AN MI AND THEY HAVE A 50 PERCENT LEFT MAIN, WE'RE

7    GOING TO TAKE CARE OF IT.

8    **Q.**   SO EVEN IF A PATIENT HAS NO OCCLUSION OR BLOCKAGE IN ANY

9    OTHER ARTERY, AND HE HAS CHEST PAIN AND 50 PERCENT BLOCKAGE IN

10   HIS LEFT MAIN ARTERY, YOUR RECOMMENDED COURSE OF ACTION IS TO

11   HAVE SURGERY?

12   **A.**   THE MAJORITY OF THE TIME, IT WOULD BE, YES.

13   **Q.**   THE HEART ATTACK THAT MR. BARNETT HAD WAS A HEART ATTACK

14   THAT EXPOSED THE SEVERITY OF HIS CORONARY ARTERIES; RIGHT?

15   **A.**   IT -- IT DID, YES.  IT LED TO A CARDIAC CATHETERIZATION,

16   WHICH OUTLINED THE SEVERITY OF HIS DISEASE.

17   **Q.**   AND THEN THE CARDIAC CATHETERIZATION LED TO A BYPASS WHICH

18   HELPED PROLONG HIS LIFE; IS THAT RIGHT?

19   **A.**   WELL, YES.  IN HIS CASE, IT WOULD PROLONG HIS LIFE BECAUSE

20   OF THE LEFT MAIN, YES.

21   **Q.**   HOW LONG DID YOUR BYPASS SURGERY TAKE FOR MR. BARNETT,

22   ABOUT?

23   **A.**   I DON'T HAVE THAT.  I WOULD -- I WOULD GUESS THREE AND A

24   HALF, FOUR HOURS OF ACTUAL -- OF SURGICAL TIME FOR ME, NOT ROOM

25   TIME.  BUT PROBABLY THREE AND A HALF, FOUR HOURS, SOMEWHERE

1    AROUND THERE, I GUESS.

2    **Q.**    WERE THERE ANY COMPLICATIONS DURING THE SURGERY?

3    **A.**    NO.

4    **Q.**    WHEN YOU DO A BYPASS SURGERY, SIR, DO YOU ACTUALLY ATTEMPT

5    TO CLEAR OUT THE BLOCKAGE IN THE ARTERIES?

6    **A.**    NO.  THE ONLY TIME THAT IS ATTEMPTED IS IF THE ARTERY IS

7    AN IMPORTANT ARTERY, LIKE THE ANTERIOR DESCENDING, AND IT'S SO

8    FULL OF PLAQUE THAT YOU CAN'T BYPASS IT.  WE'LL SHELL OUT THE

9    PLAQUE, LIKE A COROTID ARTERY, AND THEN BYPASS IT.

10           I'D SAY THAT -- IN MY PRACTICE, THAT IS PROBABLY

11   MAYBE -- OH, I DON'T KNOW -- 1 TO 2 PERCENT OF MY CASES, I HAVE

12   TO DO THAT.

13   **Q.**    IF WE DID A CATHETERIZATION OR ANGIOGRAM OF MR. BARNETT'S

14   ARTERIES TODAY, WOULD YOU EXPECT TO SEE AT LEAST AS MUCH

15   BLOCKAGE IN HIS CORONARY ARTERIES AS YOU SAW IN SEPTEMBER OF

16   2002?

17   **A.**    I WOULD EXPECT TO SEE AS MUCH OR MORE.

18   **Q.**    WHY WOULD YOU EXPECT TO SEE MORE?

19   **A.**    ONE THING IS, WE DO KNOW THAT PUTTING VEIN GRAFTS ON A --

20   ON AN ARTERY PROBABLY ACCELERATES THE PLAQUE FOR -- PLAQUE

21   FORMATION PROXIMAL TO THE VEIN GRAFT AND ALSO THE NATURAL

22   COURSE OF THE DISEASE IN -- IN CORONARY DISEASE.  THERE'S A

23   COUPLE OF REASONS WHY.

24   **Q.**    WAS YOUR BYPASS SURGERY OF MR. BARNETT SUCCESSFUL?

25   **A.**    YES.

1   **Q.**   DID YOU INSPECT HIS HEART DURING THE SURGERY, SIR?

2   **A.**   YES.

3   **Q.**   AND THIS INSPECTION WAS FOUR DAYS AFTER HIS HEART ATTACK;

4   RIGHT?

5   **A.**   YES.

6   **Q.**   DID YOU LOOK TO SEE IF THERE WAS ANY EVIDENCE OF

7   HEART-MUSCLE DAMAGE WHEN YOU WERE LOOKING AT HIS HEART?

8   **A.**   YES.

9   **Q.**   IF THE HEART MUSCLE IS DAMAGED, DO YOU SEE SCARRING AND

10  BRUISING?

11  **A.**   THERE ARE -- THERE ARE SEVERAL THINGS YOU CAN SEE FOR

12  HEART DAMAGE:  ONE, AS I MENTIONED BEFORE, WAS -- WAS SWELLING

13  OF THE MUSCLE.  YOU'LL SEE IT ACTUALLY LOOKS KIND OF EDEMATOUS

14  OR SWOLLEN.  THE SECOND IS A HEMORRHAGE, WHICH IS A -- WHICH IS

15  USUALLY ANOTHER SIGN OF A BIG HEART ATTACK.

16          NOW, ALSO, IF THERE IS SOME -- YOU CAN SEE SOME

17  SCARRING IN A HEART IF THEY'VE HAD A PRIOR HEART ATTACK IN THE

18  PAST.  IF THEY HAD A BIG HEART ATTACK THAT RESULTED IN A BIG

19  GIANT SCAR IN THEIR HEART, YOU'LL SEE THAT, OR JUST MAYBE SOME

20  SCARRING MIXED IN WITH THE MUSCLE.

21  **Q.**   DID YOU REPORT AFTER EXAMINING MR. BARNETT'S HEART THAT

22  THERE WAS ANY SWELLING OF THE MUSCLE HEART, HEMORRHAGE, OR

23  BRUISING OR SCARRING, SIR?

24  **A.**   NO.

25  **Q.**   IS IT FAIR TO SAY THAT YOU SAW A NORMAL-LOOKING HEART WHEN

1    YOU LOOKED AT MR. BARNETT'S?

2    A.   YES.

3    Q.   I HAVE HANDED YOU A SERIES OF EKG TESTS THAT WERE TAKEN OF

4    MR. BARNETT BETWEEN SEPTEMBER 6 OF 2002 AND SEPTEMBER 11TH OF

5    2002.  DO YOU SEE THAT, SIR?

6    A.   UH-HUH.

7    Q.   WERE YOU TREATING MR. BARNETT DURING THAT PERIOD?

8    A.   YES.  OH, IT'S FROM THE 9TH ON.  YES.

9    Q.   AND DO YOU SEE THAT, ON THE LAST PAGE, THE SEPTEMBER 11TH

10   EKG, IT REFERS TO YOUR NAME THERE, CURTIS BRYAN --

11   A.   YES.

12   Q.   -- ON THE LEFT SIDE?  I WANT YOU TO -- IF YOU WOULDN'T

13   MIND, COULD YOU JUST TAKE EXHIBIT 15 AND TURN IT OVER TO WHERE

14   YOU SEE A BLANK WHITE PAGE AND JUST DRAW AND SHOW THE CAMERA

15   AND THE JURY WHAT A Q-WAVE WOULD LOOK LIKE ON AN EKG.

16   A.   YEAH.

17   Q.   AND PLEASE MAKE IT BIG ENOUGH SO THAT THEY CAN SEE.

18   A.   IS THAT BIG ENOUGH?

19   Q.   CAN YOU POINT TO THE JURY WHAT YOU JUST DREW AND WHAT

20   ABOUT THAT DRAWING INDICATES THAT THERE'S A Q-WAVE?

21   A.   IT'S A DOWN-GOING -- DOWN-GOING WAVE OF -- THE FIRST --

22   WELL, THE FIRST PART OF THE QRS, WHICH IS THE BIG SPIKE IN YOUR

23   EKG.  IT'S A DEEP, DOWNWARD SLOPE.

24   Q.   SO IF YOU HAVE A Q-WAVE, THEN YOU WOULD EXPECT TO SEE --

25   THE FIRST MOVE WOULD BE DOWN --

DAILY COPY

1    **A.**   YES.

2    **Q.**   -- BEFORE IT RISES UP?

3    **A.**   CORRECT.

4    **Q.**   IS A Q-WAVE MEASURED IN PART BY THE DEPTH AND THE WIDTH OF

5    THE READING?

6    **A.**   OH, YES.  YES, IT IS.

7    **Q.**   SO THE DEEPER THE SPIKE DOWNWARD AND THE WIDER IT IS, THE

8    MORE LIKELY IT IS TO BE AN ACTUAL Q-WAVE; RIGHT?

9    **A.**   THAT'S CORRECT.

10   **Q.**   ARE THERE CERTAIN Q-WAVES THAT ARE NONDIAGNOSTIC Q-WAVES?

11   **A.**   SOMETIMES IN THE INFERIOR LEADS, II, III, AND AVF, SMALL

12   Q-WAVES THERE, MAY OR MAY NOT MEAN ANYTHING.

13   **Q.**   SO, AND WHEN YOU SAY "II, III, AND AVF," JUST LOOKING ON

14   THE FIRST PAGE OF EXHIBIT 15 -- HOPEFULLY, WE CAN BLOW THIS UP

15   FOR THE JURY.  BUT WHEN YOU SAY "II," THAT'S THE SECOND LINE

16   GOING ACROSS THE PAGE FROM THE TOP; RIGHT?

17   **A.**   ROMAN NUMERAL II HERE, YES.  IT'S THIS LITTLE SEGMENT

18   RIGHT HERE, ROMAN NUMERAL II AND THEN ROMAN NUMERAL III.  AND

19   NEXT TO III IS THE AVF.

20   **Q.**   IS IT YOUR UNDERSTANDING, SIR, THAT IF YOU HAVE A REAL

21   TRUE Q-WAVE, THAT'S SOMETHING YOU WOULD SEE ON REPEAT EKGS?

22   **A.**   YES.

23   **Q.**   A REAL TRUE Q-WAVE IS NOT SOMETHING THAT YOU EXPECT TO GO

24   AWAY; TRUE?

25   **A.**   TRUE.

DAILY COPY

1    **Q.**   LET'S LOOK, IF YOU COULD, SIR, ON THE VERY FIRST EKG,

2    SEPTEMBER 6 OF 2002.  WHICH YOU REVIEWED BACK AT THE TIME;

3    RIGHT?

4    **A.**   YES.

5    **Q.**   DO YOU SEE ANY EVIDENCE, SIR, OF A Q-WAVE IN THIS EKG?

6    **A.**   BASED ON WHAT I CAN SEE HERE, I REALLY DON'T SEE ANYTHING

7    THAT LOOKS LIKE A SIGNIFICANT Q-WAVE ON THIS EKG.

8    **Q.**   IF YOU LOOK ON -- LET'S GO TWO IN TO SEPTEMBER 7, 2002,

9    AND THIS IS A LOT EASIER TO READ.  IF WE LOOK AT THE THIRD

10   LEAD, BOTTOM LEFT PART, DO YOU SEE THAT THERE IS A SMALL

11   DECREASE DOWN?

12   **A.**   YES.

13   **Q.**   AND THEN AN INCREASE UP?

14   **A.**   YES.

15   **Q.**   WOULD YOU CONSIDER THAT TO BE A Q-WAVE, SIR, OR A

16   NONDIAGNOSTIC Q-WAVE?

17   **A.**   YEAH, I WOULD SAY A NONDIAGNOSTIC Q-WAVE.  IT'S A SMALL --

18   IT LOOKS LIKE A SMALL NONDIAGNOSTIC Q-WAVE THERE.

19   **Q.**   THIS IS SEPTEMBER 7, 2002.  AND THEN IF YOU TURN TO THE

20   LAST PAGE, SEPTEMBER 11, 2002, DO YOU SEE ANY EVIDENCE OF A

21   DIAGNOSTIC Q-WAVE?

22   **A.**   NO.

23   **Q.**   NOW, THREE AND A HALF YEARS AFTER YOU EXAMINED

24   MR. BARNETT, SIR, THE PLAINTIFFS IN THIS CASE HAVE HIRED AN

25   EXPERT WITNESS TO SAY THAT THERE WAS A Q-WAVE ON SEPTEMBER 11TH

1   OF 2002 AND THAT THAT IS INDICATIVE OF AN ACUTE INFERIOR WALL

2   TRANSMURAL MI.  OKAY?

3   A.   YEAH.

4   Q.   WHAT'S YOUR REACTION TO THAT?

5   A.   THAT'S NOT TRUE.

6   Q.   WHAT IS A TRANSMURAL MI?

7   A.   A FULL-THICKNESS HEART ATTACK, MEANING THE ENTIRE -- FROM

8   THE INNER LAYER OF THE HEART TO THE OUTER LAYER OF THE HEART.

9   Q.   DID MR. BARNETT SUFFER A TRANSMURAL MI AT ANY POINT WHILE

10  YOU DIAGNOSED HIM AND WORKED WITH HIM IN SEPTEMBER OF 2002?

11  A.   NO.

12  Q.   HOW LONG AFTER YOU OPERATED ON MR. BARNETT DID YOU

13  DISCHARGE HIM HOME?

14  A.   FOUR DAYS POSTOP.

15  Q.   IS THAT AN INDICATION THAT MR. BARNETT REALLY DIDN'T HAVE

16  ANY COMPLICATIONS WITH THE SURGERY AND HE WAS DOING WELL?

17  A.   YES.

18  Q.   LET ME MARK EXHIBIT 16, DR. BRYAN.  THIS IS A DISCHARGE

19  SUMMARY THAT IS ACTUALLY SIGNED ON THE SECOND PAGE.  IS THAT

20  YOUR SIGNATURE OR A STAMP OF YOUR SIGNATURE?

21  A.   YES.

22  Q.   DO YOU SEE ON THE FIRST PAGE THAT -- UNDER "DG DX," DO YOU

23  SEE THAT?

24  A.   YES.

25  Q.   THERE IS A REFERENCE -- DOES THAT MEAN DISCHARGE

1    DIAGNOSIS?

2    **A.**    CORRECT.

3    **Q.**    AND THEN NUMBER 1 SAYS, "NON-Q-WAVE MYOCARDIAL

4    INFARCTION"; RIGHT?

5    **A.**    YES.

6    **Q.**    AND YOU STAND BY THAT DIAGNOSIS?

7    **A.**    YES.

8    **Q.**    NUMBER 2 SAYS, "CORONARY ARTERY DISEASE"?

9    **A.**    YES.

10   **Q.**    NUMBER 3, "HYPERLIPIDEMIA, HIGH CHOLESTEROL"?

11   **A.**    YES.

12   **Q.**    NUMBER 4, "SYSTEMIC HYPERTENSION."

13   **A.**    YES.

14   **Q.**    DO YOU SEE THAT, SIR?  AND WE LOOKED BEFORE AT THE FACT

15   THAT THERE WAS NO REFERENCE TO HYPERTENSION IN ANY REPORT

16   DURING MR. BARNETT'S HOSPITALIZATION, AND HERE IS A REFERENCE

17   TO SYSTEMIC HYPERTENSION.

18           IS IT TRUE OR NOT THAT WHAT WAS MEANT HERE BY

19   "SYSTEMIC HYPERTENSION" WAS THE BLOOD PRESSURE THAT YOU SAW

20   MR. BARNETT HAD WHILE HE WAS IN THE HOSPITAL?

21   **A.**    THAT'S CORRECT.  DURING HIS POSTOPERATIVE STAY, HE

22   REQUIRED INTERVENTION FOR HIGH BLOOD PRESSURE.

23   **Q.**    WHAT DOES THAT MEAN --

24   **A.**    POSTOP STAY, HIS BLOOD PRESSURE -- IN FACT, WE HAD TO PUT

25   HIM ON -- WE PUT ON LOPRESSOR 50 P.O. TWICE A DAY.  AND HIS

1   POSTOP DAY TWO OR THREE --

2   **Q.**   IS LOPRESSOR A BLOOD PRESSURE MEDICINE?

3   **A.**   IT CONTROLS BLOOD PRESSURE AND HEART RATE.  WE USE IT

4   POSTOP FOR THAT REASON.  PATIENTS WHO HAVE ANY DIAGNOSIS OF MI

5   GO ON IT.  WE USE IT TO PREVENT IRREGULAR HEART RATES AFTER

6   HEART SURGERY, BUT IT ALSO HAS THE BENEFIT OF BEING

7   ANTI-HYPERTENSIVE.

8            AND 50 TWICE A DAY IS HIGHER THAN MY STARTING DOSE.

9   I THINK WE USUALLY START AT 25 MILLIGRAMS TWICE A DAY.  AND I

10  SAW IN HIS POSTOP NOTES SOMEWHERE EARLIER THAT HIS BLOOD

11  PRESSURE HAD GOTTEN TO 150, 160 SYSTOLIC, SOMEWHERE IN THAT

12  VICINITY.

13  **Q.**   WHILE HE WAS IN THE HOSPITAL?

14  **A.**   WHILE HE WAS IN THE HOSPITAL POSTOP.

15  **Q.**   SO THE REFERENCE TO SYSTEMIC HYPERTENSION HERE IN THIS

16  DISCHARGE SUMMARY DOES NOT MEAN THAT YOU'RE CONCLUDING THAT HE

17  HAD HYPERTENSION BEFORE SEPTEMBER OF 2002; RIGHT?

18  **A.**   NO.  I'M CONCLUDING THAT DURING MY -- MY OBSERVATION OF

19  HIM AFTER A -- WHEN I WAS TAKING CARE OF HIM FOR THOSE FOUR

20  DAYS, HE DEMONSTRATED ELEVATED BLOOD PRESSURES THAT NEEDED --

21  NEEDED INTERVENTION.

22  **Q.**   AND THOSE ELEVATED BLOOD PRESSURES COULD BE DUE TO THE

23  FACT THAT HE WAS HAVING CHEST PAIN AND A HEART ATTACK?

24  **A.**   WELL, THE ONE -- THE ONES THAT HE GOT TREATED FOR BY ME

25  WERE FOR FOR HIS POSTOPS -- POSTOP COURSE.

1   **Q.**   WHEN YOU RELEASED MR. BARNETT FROM THE HOSPITAL, DID YOU

2   ADVISE THAT IT WOULD BE A GOOD IDEA TO EXERCISE REGULARLY?

3   **A.**   YES.

4   **Q.**   WHEN YOU RELEASED MR. BARNETT FROM THE HOSPITAL, DID YOU

5   ADVISE HIM THAT IT WOULD BE A GOOD IDEA TO EXERCISE REGULARLY?

6   **A.**   YES.

7   **Q.**   DID YOU ADVISE MR. BARNETT TO CONTINUE TO TAKE LIPITOR TO

8   CONTROL HIS CHOLESTEROL?

9   **A.**   YES.

10   **Q.**   DID YOU ADVISE MR. BARNETT TO CONTINUE TO TAKE ASPIRIN TO

11   PREVENT FUTURE CLOTTING?

12   **A.**   YES.  I -- WHAT WE STATE IS FOR GRAFT PATENCY, IS HOW WE

13   PUT IT TO THE PATIENT.  FOR KEEPING HIS GRAFTS OPEN.

14   **Q.**   AND THEN YOU PUT MR. BARNETT ON BLOOD PRESSURE MEDICATION

15   TO TRY TO CONTROL HIS BLOOD PRESSURE; RIGHT?

16   **A.**   FOR THAT AND FOR THE RHYTHM -- RHYTHM CONTROL REASONS,

17   TOO.  FOR BOTH.

18   **Q.**   AND WERE YOU OPTIMISTIC, SIR, BASED ON YOUR OBSERVATION OF

19   MR. BARNETT'S HEART, HIS 50 PERCENT EJECTION FRACTION, HOW HE

20   RESPONDED TO THE SURGERY, THAT IF HE WERE TO DO THE THINGS YOU

21   SUGGESTED, THAT HE WOULD DO WELL IN THE FUTURE?

22   **A.**   YES.

23   **Q.**   IF YOU THOUGHT THAT ONE OF MR. BARNETT'S MEDICATIONS

24   CONTRIBUTED TO HIS HEART ATTACK, WOULD YOU HAVE ALLOWED HIM TO

25   CONTINUE TO TAKE THAT MEDICATION?

1  **A.**   NO.

2  **Q.**   IF YOU THOUGHT VIOXX, FOR EXAMPLE, CAUSED IN ANY WAY

3  MR. BARNETT'S HEART ATTACK, YOU WOULD NOT HAVE CONTINUED HIM ON

4  VIOXX; RIGHT?

5  **A.**   CORRECT.

6  **Q.**   YOU DECIDED TO KEEP MR. BARNETT ON VIOXX BECAUSE IT WAS

7  HELPING HIS ARTHRITIS; IS THAT RIGHT?

8  **A.**   THAT WAS THE REASON FOR THAT, YES.

9  **Q.**   WERE YOU EVER A PAID SPEAKER FOR MERCK CONCERNING VIOXX

10  WHEN YOU DECIDED IT WOULD BE A GOOD IDEA FOR MR. BARNETT TO

11  CONTINUE ON VIOXX?

12  **A.**   NO.

13  **Q.**   DID ANYBODY FROM MERCK, REPRESENTATIVES OR OTHERWISE, TRY

14  TO ENTICE YOU WITH LUNCHES OR ANY FINANCIAL INCENTIVES TO TRY

15  TO GET YOU TO PRESCRIBE VIOXX TO YOUR PATIENTS?

16  **A.**   NO.

17  **Q.**   DID YOU SUGGEST THAT MR. BARNETT TAKE VIOXX AFTER HIS

18  HEART ATTACK BECAUSE OF ANY ADVERTISEMENTS YOU SAW ON TV ABOUT

19  VIOXX?

20  **A.**   NO.

21  **Q.**   DR. BRYAN, BASED ON THE FACT THAT MR. BARNETT HAS A STRONG

22  FAMILY HISTORY OF HEART DISEASE AND A PREVIOUS HISTORY OF HIGH

23  CHOLESTEROL AND HIS AGE AND HIS GENDER, DO YOU BELIEVE THAT

24  MR. BARNETT'S SEVERE CORONARY ARTERY DISEASE AND HEART ATTACK

25  CAN BE EXPLAINED BY CONVENTIONAL RISK FACTORS?

1    A.   YES.

2    Q.   WHAT DO YOU MEAN BY "CONVENTIONAL RISK FACTORS" AS A

3    EXPLANATION FOR MR. BARNETT'S HEART ATTACK?

4    A.   ONE WOULD BE THE DIAGNOSIS OF THE HYPERLIPIDEMIA OR HIGH

5    CHOLESTEROL; THE SECOND WOULD BE A MALE OVER 50 YEARS OF AGE

6    WHEN THE RISK OF CORONARY DISEASE GOES UP; THIRD WOULD BE HIS

7    FAMILY HISTORY.

8    Q.   WHAT MEDICAL JOURNALS DO YOU TYPICALLY READ?

9    A.   I WOULD TYPICALLY READ THE *ANNALS OF THORACIC SURGERY*, THE

10   *JOURNAL OF THORACIC AND CARDIOVASCULAR SURGERY*.  I READ THE --

11   THE *HEART JOURNAL*, READ -- WHAT ELSE WOULD BE -- SEMINARS IN --

12   IN CARDIAC AND THORACIC SURGERY.  PROBABLY A COUPLE OTHER ONES.

13   *CHEST*, I READ *CHEST* AS WELL.  AND EVERY -- EVERY NOW AND THEN

14   I'LL PICK UP *CIRCULATION* OR THE *NEW ENGLAND JOURNAL OF*

15   *MEDICINE*.  I BROWSE THROUGH TO SEE IF THERE'S ANYTHING OF

16   INTEREST IN WHAT I DO.

17   Q.   GIVEN YOUR REVIEW OF THE VARIOUS MEDICAL JOURNALS, SIR,

18   HAVE YOU EVER READ ANY ARTICLE IN HUMANS OR IN ANIMALS

19   SUGGESTING THAT COX-2 INHIBITORS LIKE VIOXX CONTRIBUTE TO

20   PLAQUE FORMATION, THE PROGRESSION OF PLAQUE, OR PLAQUE RUPTURE?

21   A.   NO, I HAVE NOT READ THAT.

22   Q.   WAS THERE ANYTHING UNIQUE OR DIFFERENT ABOUT MR. BARNETT'S

23   HEART ATTACK AS YOU EXAMINED HIS HEART THAT WAS DIFFERENT FROM

24   HEART ATTACKS YOU'VE SEEN OVER THE YEARS?

25   A.   NO.

1   **Q.**   DID YOU WRITE A LETTER ON OCTOBER 10TH, 2002 TO

2   DR. KARAVAN SUMMARIZING YOUR FOLLOW-UP VISIT WITH MR. BARNETT?

3   **A.**   YES.

4   **Q.**   DID YOU WRITE IN THE SECOND SENTENCE THAT HE WAS ADMITTED

5   WITH A NON Q-WAVE MYOCARDIAL INFARCTION?

6   **A.**   YES.

7   **Q.**   IN THE LAST -- SECOND-TO-LAST SENTENCE, DO YOU SEE THAT IT

8   SAYS:  "POSTOPERATIVELY HE DID QUITE WELL.  SINCE DISCHARGE, HE

9   IS WALKING EVERY DAY"?

10  **A.**   YES.

11  **Q.**   DID MR. BARNETT TELL YOU THAT HE HAD ANY HEART TROUBLE,

12  ANGINA, OR SHORTNESS OF BREATH WHEN HE SAW YOU ON OCTOBER 10TH,

13  2002?

14  **A.**   NO.  HE DIDN'T REPORT ANY TO ME.

15  **Q.**   THE FIRST SENTENCE THERE SAYS:  "MY IMPRESSION IS THAT

16  MR. BARNETT IS PROGRESSING ON A SATISFACTORY POSTOPERATIVE

17  COURSE.  I HAVE INSTRUCTED HIM THAT HE MAY RETURN TO DRIVING.

18  HE MAY RETURN TO FULL ACTIVITY IN ANOTHER MONTH."  DO YOU SEE

19  THAT, SIR?

20  **A.**   YES.

21  **Q.**   IS THAT A SIGN THAT MR. BARNETT WAS RECOVERING WELL FROM

22  HIS BYPASS SURGERY?

23  **A.**   YES.

24  **Q.**   DO YOU REMEMBER I SHOWED YOU A FEW MINUTES OR LONGER THAN

25  THAT AGO THE CARDIOLITE STRESS TEST FROM JULY OF 2003?

1    **A.**    RIGHT.

2    **Q.**    DID YOU SEE THEN, IN JULY OF 2003, THAT MR. BARNETT LASTED

3    FOR 15 MINUTES ON A TREADMILL?

4    **A.**    YES, I DID.

5    **Q.**    WHAT'S YOUR VIEW OF -- OF THE EXERCISE TOLERANCE OF A MAN

6    OF MR. BARNETT'S AGE WHO CAN EXERCISE FOR 15 MINUTES ON A

7    TREADMILL?

8    **A.**    IN GENERAL, IF HE'S -- IF HE'S EXERCISING 15 MINUTES,

9    GETTING TO STAGE 5, HE DID QUITE WELL.  HE -- HE HAD 17.2 METS,

10    WHICH IS A PRETTY GOOD ENERGY -- ENERGY EXPENDITURE ON A

11    TREADMILL.

12    **Q.**    17.2 METS, LET'S TALK ABOUT THAT, BECAUSE THAT'S

13    IMPORTANT.  "METS" MEAN WHAT IN --

14    **A.**    IT'S AN -- IT'S AN AMOUNT OF ENERGY EXPENDITURE A PATIENT

15    EXPENDS DURING EXERCISE.  IT'S HOW VIGOROUS A WORKOUT THEY'RE

16    GETTING, I GUESS, IS AN EASY WAY TO PUT IT.

17    **Q.**    DO YOU KNOW, SIR, THAT A 17.2 METS SCORE IS A SCORE THAT

18    SOME ATHLETES DON'T EVEN REACH?

19    **A.**    I -- I DON'T KNOW ABOUT THE WELL-TRAINED ATHLETE, BUT THIS

20    IS A -- A GOOD ONE FOR A PATIENT WHO IS 58 YEARS AGE AND HAD

21    HEART SURGERY.

22    **Q.**    DO YOU KNOW WHAT THE AVERAGE METS SCORE IS FOR A MAN WHO

23    IS 58, 59 YEARS AGO?

24    **A.**    I'M GOING TO GUESS IT'S PROBABLY 7 TO 10.

25    **Q.**    DO KNOW WHAT THE AVERAGE METS SCORE IS FOR A MAN AGE 20 TO

29?

**A.** PROBABLY MORE AROUND 10 OR 12.

**Q.** WHAT DOES A 17.2 METS SCORE AND LASTING 15 MINUTES ON A TREADMILL INDICATE TO YOU ABOUT MR. BARNETT'S HEART CONDITION IN JULY OF 2003?

**A.** IT -- IT WOULD JUST TELL ME THAT HE HAS A FAIRLY -- HE HAS GOOD STAMINA AND -- AND THAT HE'S -- FROM A CARDIAC STANDPOINT THAT HE'S DOING -- I MEAN, ASSUMING EVERYTHING ELSE TURNED OUT OKAY ON THE STRESS TEST, HE'S DOING WELL.

**Q.** DO YOU SEE THE REFERENCE TO "LV EF WAS 58 PERCENT"?

**A.** YES.

**Q.** IS THAT LEFT VENTRICULAR EJECTION FRACTION WAS 58 PERCENT?

**A.** CORRECT.

**Q.** IS, AT THIS POINT IN JULY OF 2003, MR. BARNETT'S EJECTION FRACTION HIGHER THAN IT WAS WHEN HE HAD HIS HEART ATTACK WHEN IT WAS 50 PERCENT?

**A.** YES.

**Q.** BASED ON YOUR REVIEW OF THE JULY 2003 CARDIOLITE STRESS TEST, WOULD YOU AGREE THAT MR. BARNETT'S HEART CONDITION AND HEART FUNCTION IS DOING QUITE WELL?

**A.** IF THIS WERE TO COME ACROSS MY DESK, I WOULD SAY IT SEEMS HE'S DOING WELL, I MEAN, WITHOUT ANY OTHER INFORMATION.

**MR. BECK:** THAT'S ALL FOR OUR DESIGNATIONS, YOUR HONOR.

**MR. ROBINSON:** WE HAVE JUST A VERY SHORT -- ABOUT

1   SEVEN MINUTES.

2           **MR. BECK:**  OH.  I GUESS, THEN, AFTER THEIR SEVEN, WE

3   HAVE ANOTHER FIVE.  SO WE GET THE LAST WORD AFTER ALL.

4           **MR. ROBINSON:**  THIS IS ANITA SHERBANEE FROM MY

5   OFFICE.

6                       **REDIRECT EXAMINATION**

7   BY MR. ROBINSON:

8   **Q.**   OKAY.  NOW, DOCTOR, YOU'RE NOT AN ELECTROPHYSIOLOGIST;

9   CORRECT?

10  **A.**   NO.

11  **Q.**   WE'VE GONE THROUGH THE DEPOSITION TODAY AND YOU HAVE

12  REVIEWED SOME OF THE EKGS; CORRECT?

13  **A.**   CORRECT.

14  **Q.**   IS THERE ANY REASON WHY WE SHOULD DISCOUNT YOUR TESTIMONY

15  IN THIS REGARD BECAUSE YOU'RE NOT AN ELECTROPHYSIOLOGIST?

16  **A.**   THERE WAS REALLY NO ARRHYTHMIA ISSUE WITH THIS PATIENT,

17  SO...

18  **Q.**   THERE IS AN OVERLAP IN SPECIALTIES, THOUGH.  YOU'RE

19  COMPETENT TO REVIEW EKGS?

20  **A.**   RIGHT.  RIGHT.  RIGHT.  ELECTROPHYSIOLOGISTS GIVE YOU --

21  YOU KNOW, I MEAN, THEIR SPECIALITY, COMPARED TO WHAT WE DO,

22  WOULD BE -- YOU KNOW, CERTAIN RHYTHMS THAT ARE VERY DIFFICULT

23  TO DIAGNOSE SOMETIMES.  IS IT A LOWER-CHAMBER RHYTHM OR AN

24  UPPER-CHAMBER RHYTHM?  YOU KNOW, SOME OF THOSE THINGS.

25  MANAGEMENT OF CERTAIN OF THESE RHYTHMS.  IF THEY WANT TO PUT A

1   DEVICE IN TO SHOCK.  YOU KNOW, THOSE KINDS OF THINGS.

2            BUT THERE IS A LITTLE OVERLAP, YEAH, WITH -- BUT IN

3   MR. BARNETT'S CASE, WE DIDN'T HAVE ANY, YOU KNOW,

4   ELECTROPHYSIOLOGIC -- YOU KNOW, ISSUES.

5   Q.   CORRECT.  BUT DO YOU FEEL THAT YOU'RE COMPETENT TO REVIEW

6   EKGS AND LOOK AT ANGIOGRAMS AS --

7   A.   YES.

8   Q.   -- AS WELL AS DR. KARAVAN?

9   A.   YES.  UH-HUH.

10  Q.   OKAY.  AND, DOCTOR, LET'S GO BACK A MINUTE TO THE JANUARY

11  2000 EXERCISE STRESS TEST.  NOW, YOU DID SAY THAT YOU DID NOT

12  REVIEW THE FILMS; IS THAT CORRECT?

13  A.   RIGHT.  THAT'S CORRECT.

14  Q.   DOCTOR, JUST TO REFRESH YOUR RECOLLECTION, THERE IS THE

15  ACTUAL REPORT.

16  A.   YES.

17  Q.   ALL RIGHT.  NOW, DOCTOR, WOULD YOU AGREE, ACCORDING TO

18  THIS REPORT AND THE INFORMATION THAT YOU RECEIVED FROM

19  DR. KARAVAN, THAT DURING THE PERFORMANCE OF THIS TEST, THAT

20  MR. BARNETT HAD NO EXERTIONAL ANGINA AT THE TIME OF THE TEST?

21  A.   LET'S JUST LOOK HERE.  NO, THERE'S NO REPORT OF ANGINAL

22  SYMPTOMS DURING THIS TEST.

23  Q.   AND THAT WOULD BE SOMETHING THAT A CARDIOLOGIST SUCH AS

24  DR. SWAMI WOULD REPORT IF THERE HAD BEEN ANY EXERTIONAL ANGINA;

25  CORRECT?  THAT WOULD BE IMPORTANT?

1   **A.**   YEAH.  TYPICALLY, DURING -- I WAS -- TYPICALLY, BEFORE OR

2   TYPICALLY DURING A STRESS TEST, IF THE PATIENT HAS CHEST PAIN,

3   IT IS MENTIONED IN THE REPORT.

4   **Q.**   OKAY.  AND PRIOR TO YOUR FIRST INTERVENTION WITH

5   MR. BARNETT, DID YOU EVER RECEIVE ANY HISTORY THAT HE HAD BEEN

6   SUFFERING FROM ANY TYPE OF EXERTIONAL ANGINA?

7   **A.**   THE ONLY HISTORY I HAVE WAS -- BEFORE THE ADMISSION, WAS

8   THE CHEST PAIN WITH THE BLOATING OF THE ABDOMEN.  THAT'S THE

9   ONLY CHEST-PAIN HISTORY HE GAVE ME.

10  **Q.**   ACCORDING TO THIS REPORT, CAN YOU DETERMINE WHETHER OR NOT

11  HE HAD ANY LEFT MAIN DISEASE?

12  **A.**   NO.  YOU CANNOT DETERMINE THAT FROM A STRESS TEST.

13  **Q.**   ALL RIGHT.  DOCTOR, BACK IN 2000, WAS THERE A SCHOOL OF

14  THOUGHT THAT PATIENTS WITH MILD ISCHEMIA CAN BE MANAGED

15  CONSERVATIVELY WITHOUT REFERRAL FOR CORONARY ANGIOGRAPHY?

16  **A.**   YES.

17  **Q.**   ALL RIGHT.  SO IT WOULD HAVE BEEN APPROPRIATE TO DO THE

18  CARDIOLITE AND NOT NECESSARILY DO AN ANGIOGRAM; CORRECT?

19  **A.**   CORRECT.

20  **Q.**   ALL RIGHT.  SO YOU WOULDN'T FAULT ANY OF MR. BARNETT'S

21  DOCTORS FOR NOT PERFORMING THE CORONARY ANGIOGRAM; CORRECT?

22  **A.**   NO.

23  **Q.**   OKAY.  AND, DOCTOR, THEN WOULD YOU AGREE THAT IN JANUARY

24  OF 2000, THAT HE PROBABLY, ACCORDING TO THIS TEST, HE HAD A

25  CLASS 1 GRADE OF ANGINA ACCORDING TO THE CURRENT ACC GUIDELINES

1  FOR PCI?

2  **A.**   I DON'T -- YOU KNOW, SHE DOESN'T DESCRIBE WHAT LEVEL OF

3  EXERTION IT REQUIRES TO BRING THE CHEST PAIN, BUT GIVEN THAT HE

4  WAS GOING 15 MINUTES ON A TREADMILL, I WOULD SAY PROBABLY IS A

5  CLASS 1.

6  **Q.**   AND, DOCTOR, WOULD IT BE IMPORTANT FOR YOU, AS A CARDIAC

7  SURGEON, TO KNOW WHETHER A DRUG LIKE VIOXX COULD CONTRIBUTE TO

8  THE DEVELOPMENT OF PLAQUE?

9  **A.**   YES.

10  **Q.**   AND WHY IS THAT?

11  **A.**   PARTICULARLY IN THE PATIENTS WHO HAVE BEEN -- HAD BYPASS

12  SURGERY.  NUMBER ONE, CORONARY ARTERIES CAN DEVELOP DISEASE

13  DOWNSTREAM FROM THEIR GRAFTS.  YOU WOULDN'T WANT TO ACCELERATE

14  THAT.  BUT PROBABLY AS IMPORTANT, IF NOT MORE IMPORTANT, YOU

15  DON'T WANT TO ACCELERATE PLAQUE FORMATION IN THE VEIN GRAFTS OR

16  OTHER GRAFTS THAT ARE -- THAT ARE PLACED.

17         SO IF YOU KNOW SOMETHING IS GOING TO -- IF YOU KNEW

18  SOMETHING WAS GOING TO ACCELERATE PLAQUE, YOU WOULD NOT WANT TO

19  GIVE IT TO THAT PATIENT, PARTICULARLY BECAUSE THE VEIN GRAFTS

20  ARE MORE VULNERABLE TO PLAQUE FORMATION THAN, SAY, YOU KNOW,

21  EVEN THE NATIVE ARTERIES ARE.

22  **Q.**   DOCTOR, YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE EKG

23  ANALYSES.

24  **A.**   UH-HUH.

25  **Q.**   AND YOU HAD SAID THAT YOU DISAGREED THAT THERE WAS ANY

1   Q-WAVES.  DO YOU REMEMBER THAT TESTIMONY?

2   **A.**   SIGNIFICANT Q-WAVES, SUGGESTING A -- YOU KNOW, AN INFERIOR

3   MI.

4   **Q.**   OKAY.  SO YOU DID SEE Q-WAVES?

5   **A.**   SMALL WHAT I DON'T CONSIDER WOULD BE CLINICALLY

6   SIGNIFICANT Q-WAVES, YOU KNOW, IN THE INFERIOR LEADS.

7   **Q.**   BUT THERE WERE Q-WAVES?

8   **A.**   YES.

9   **Q.**   OKAY.  I JUST WANT TO --

10  **A.**   SMALL.

11  **Q.**   DOCTOR, GOING TO YOUR DISCHARGE SUMMARY, WE KNOW THAT

12  MR. BARNETT WAS DISCHARGED ON VIOXX; CORRECT?

13  **A.**   THAT'S CORRECT.

14  **Q.**   AT THAT PARTICULAR TIME, WHAT INFORMATION WAS AVAILABLE TO

15  YOU IN REGARDS TO THE CARDIOVASCULAR RISKS OF VIOXX?

16  **A.**   THE ONLY THING I -- AND I DIDN'T KNOW OF ANY

17  CARDIOVASCULAR RISKS OTHER THAN -- PEOPLE KNEW THAT

18  HYPERTENSION WAS A SIDE EFFECT OR RENAL SUFFICIENCY WITH

19  SOME -- WITH THESE DRUGS, OR ULCERS.  BUT SO FAR AS SPECIFIC,

20  YOU KNOW, MI OR STROKE, THERE'S NOTHING THAT I KNEW OF AT THAT

21  TIME.

22  **Q.**   ALL RIGHT.  DOCTOR, ASSUMING THAT MR. BARNETT TOOK VIOXX

23  DAILY FOR APPROXIMATELY 32 MONTHS BEFORE HIS HEART ATTACK, CAN

24  YOU RULE OUT VIOXX AS ONE OF THE CAUSES OF HIS HEART ATTACK?

25  **A.**   NO.

1          **THE COURT:**  ANYTHING FURTHER?

2                      **RECROSS-EXAMINATION**

3    BY MR. GOLDMAN:

4    **Q.**   YOU WERE ASKED QUESTIONS ABOUT EXERTIONAL ANGINA.  DO YOU

5    REMEMBER THAT?

6    **A.**   YES.

7    **Q.**   AND I THINK YOU WERE ASKED WHETHER OR NOT, IN JANUARY OF

8    2000, MR. BARNETT SHOWED ANY EVIDENCE OF EXERTIONAL ANGINA.

9    REMEMBER THAT?

10   **A.**   CORRECT.

11   **Q.**   NOW, EXERTIONAL ANGINA MEANS THAT WHEN THE PATIENT IS

12   EXERCISING, THE PATIENT ACTUALLY FEELS HEART PAIN.

13   **A.**   CORRECT.

14   **Q.**   WHEN YOU SAW MR. BARNETT IN SEPTEMBER OF 2002, DID HE HAVE

15   SIGNIFICANT ADVANCED CORONARY ARTERY DISEASE?

16   **A.**   YES.

17   **Q.**   DID MR. BARNETT HAVE MULTI-VESSEL AND MULTI-BRANCH

18   OCCLUSIONS IN HIS ARTERIES?

19   **A.**   YES.

20   **Q.**   DID MR. BARNETT INDICATE AT ALL TO YOU THAT HE WAS

21   EXPERIENCING EXERTIONAL ANGINA PRIOR TO THE TIME THAT HE WAS

22   ADMITTED FOR HIS HEART ATTACK?

23   **A.**   NO.

24   **Q.**   SO THIS COULD BE A SITUATION WHERE A PATIENT, HERE

25   MR. BARNETT, HAS SEVERE CORONARY ARTERY DISEASE BUT IS IN

DAILY COPY

1   GOOD-ENOUGH SHAPE THAT HE DOESN'T HAVE ANGINA WHEN HE

2   EXERCISES; TRUE?

3   **A.**   IT'S -- THE PROBLEM WITH THIS IS WHEN DOES A PATIENT

4   BECOME SYMPTOMATIC.  THEY CAN GO FOR YEARS OR WEEKS OR -- YOU

5   KNOW, WE DON'T KNOW WHY ONE DAY THE PLAQUE RUPTURES, WE DON'T,

6   WHY ONE DAY A GUY LIKE THIS, WHO'S HAD DISEASE, STARTS BECOMING

7   SYMPTOMATIC, WHEN HE'S -- YOU KNOW, HE'LL TELL YOU THAT "I'VE

8   BEEN FINE FOR" -- I HAVE PATIENTS WHO HAVE BEEN EXERCISING

9   THREE MILES A DAY FOR YEARS AND THEN, ALL OF A SUDDEN, IN A

10  WEEK, THEY CAN'T WALK A MILE, THEY CAN'T WALK TWO BLOCKS,

11  WITHOUT GETTING CHEST PAINS.  WHY?  I DON'T KNOW.

12          WITH HIM, IT'S HARD TO KNOW.  WAS HE A PRETTY FIT

13  GUY?  MAYBE THAT'S WHY HE DID FAIRLY WELL WITH HIS CORONARY

14  DISEASE.  I CAN'T TELL YOU THAT BEING MORE FIT KEEPS YOU FROM

15  HAVING CHEST PAIN.  I CAN TELL YOU THAT IT HELPS YOU WHEN YOU

16  GET OPERATED ON TO SURVIVE IT.  AND IT MAY INDUCE THEM TO HAVE

17  CHEST PAIN, BUT --

18  **Q.**   SO, IN SEPTEMBER OF 2002, WHEN MR. BARNETT PRESENTED WITH

19  THIS HEART ATTACK, HE HAD SEVERE CORONARY ARTERY DISEASE IN

20  MULTI VESSELS AND DID NOT COMPLAIN ABOUT EXERTIONAL HEART PAIN?

21  **A.**   NOT PRIOR TO -- NOT PRIOR TO HIS ADMISSION.  AND IN FACT,

22  IF I -- I'VE GOT TO REVIEW HIS ADMISSION AGAIN, BUT I DON'T

23  KNOW IF HE WAS EXERTING HIMSELF AGAIN OR NOT WHEN HE CAME IN

24  THAT TIME.  I'D HAVE TO REVIEW THAT.  I CAN'T REMEMBER WHAT THE

25  SCENARIO WAS.

1   **Q.**   HE WAS ACTUALLY WORKING AT HIS COMPUTER WHEN HE --

2   **A.**   THAT'S RIGHT.  HE WAS -- THAT'S RIGHT.  HE WAS AT

3   LOW-LEVEL ACTIVITY WHEN IT HAPPENED.

4   **Q.**   YOU WERE ASKED QUESTIONS ABOUT WHETHER YOU KNEW ABOUT

5   CARDIOVASCULAR RISKS THAT ARE POTENTIALLY ASSOCIATED WITH VIOXX

6   AND COX-2 INHIBITORS.  DO YOU REMEMBER THAT?

7   **A.**   YES.

8   **Q.**   YOU WEREN'T THE PERSON RESPONSIBLE FOR PRESCRIBING VIOXX

9   TO MR. BARNETT, WERE YOU, SIR?

10  **A.**   NO.

11  **Q.**   YOU DIDN'T READ THE PACKAGE INSERT THAT WAS IN EXISTENCE

12  IN APRIL OF 2002, DID YOU, SIR, FOR VIOXX?

13  **A.**   NOT THAT I'M AWARE -- NOT THAT I CAN RECALL, NO.

14  **Q.**   YOU DON'T KNOW WHETHER THE APRIL 2002 PACKAGE INSERT FOR

15  VIOXX IDENTIFIES A SPECIFIC STUDY THAT SHOWED A FIVE TIMES'

16  DIFFERENCE IN HEART ATTACKS BETWEEN VIOXX AND 500 MILLIGRAMS OF

17  NAPROSYN TWICE A DAY?

18  **A.**   I DON'T RECALL THAT.

19  **Q.**   YOU RELIED ON MR. BARNETT'S INTERNIST, DR. MIKOLAJCZYK, TO

20  DECIDE WHETHER VIOXX WAS THE APPROPRIATE MEDICATION TO TREAT

21  MR. BARNETT'S OSTEOARTHRITIS; CORRECT?

22  **A.**   OH, CORRECT.

23  **Q.**   DID YOU RELY ON DR. MIKE TO DETERMINE WHETHER VIOXX WAS

24  THE APPROPRIATE MEDICATION TO TREAT MR. BARNETT'S

25  OSTEOARTHRITIS?

1   **A.**   YES.

2   **Q.**   DO YOU KNOW DR. MIKE PERSONALLY?

3   **A.**   I KNOW HIM PERSONALLY.  I DON'T -- I NEVER SOCIALIZED WITH

4   HIM REALLY MUCH OF ANYTHING, BUT I KNOW HIM PERSONALLY.

5   **Q.**   DO YOU ALSO KNOW HIM PROFESSIONALLY?

6   **A.**   YES.

7   **Q.**   IS HE A FINE INTERNIST?

8   **A.**   HE WAS CONSIDERED ONE OF THE BETTER INTERNISTS, YES.

9   **Q.**   DO YOU THINK THAT DR. MIKE, BASED ON YOUR EXPERIENCE WITH

10  HIM, PUTS HIS PATIENTS FIRST?

11  **A.**   YES.

12  **Q.**   LAST QUESTION, SIR:  BASED ON YOUR EXPERIENCE WITH

13  DR. MIKE AND YOUR REVIEW OF THE MEDICAL RECORDS THAT EXISTED IN

14  SEPTEMBER OF 2002, DO YOU HAVE ANY REASON TO THINK THAT

15  DR. MIKOLA TREATED MR. BARNETT IN SOME INAPPROPRIATE WAY?

16  **A.**   NO.

17         **MR. BECK:**  THAT'S IT, YOUR HONOR.  WITH THAT, SUBJECT

18  TO GETTING SOME DOCUMENT MATTERS CLEANED UP, MERCK RESTS.

19         **THE COURT:**  ALL RIGHT.

20         **MR. ROBINSON:**  WE HAVE NO REBUTTAL.

21         **THE COURT:**  ALL RIGHT.  SO THE PLAINTIFF RESTS?

22         **MR. ROBINSON:**  WE REST.

23         **THE COURT:**  OKAY.  WE'LL TAKE CARE OF SOME

24  HOUSEKEEPING, MEMBERS OF THE JURY, AND THEN I HAVE SOME

25  MEETINGS WITH COUNSEL ON THE JURY CHARGES, AS I MENTIONED, AND

 1   WE'LL GET THE CASE TO YOU TOMORROW BEFORE NOON, HOPEFULLY.  ALL

 2   RIGHT.  ALL RISE AS THE JURY LEAVES, PLEASE.  SEE YOU TOMORROW

 3   AT 8:30.

 4            (WHEREUPON, THE JURY WAS EXCUSED FOR THE REMAINDER OF

 5   THE DAY.)

 6            **THE COURT:**  BE SEATED, PLEASE.  DO WE HAVE ANY

 7   HOUSEKEEPING MATTERS TO DEAL WITH?

 8            **MR. ROBINSON:**  YES, YOUR HONOR.  YOUR HONOR, WE HAVE

 9   ONE GROUP OF DOCUMENTS THAT I WOULD LABEL THE DOCUMENTS THAT

10   WERE PART OF THE STIPULATIONS BETWEEN MR. GOLDMAN AND MYSELF

11   REGARDING THE MIKOLA AND MCCAFFERY -- WE'LL SAY SALES AND

12   MARKETING AND COMMUNICATIONS WITH MERCK DOCUMENTS.  I THINK WE

13   HAVE AN AGREEMENT AS TO WHAT DOCUMENTS THEY ARE.

14            **THE COURT:**  LET ME JUST GET GAYLYN SO SHE CAN KEEP

15   ALL OF THIS RECORD STRAIGHT.

16            **MR. ROBINSON:**  YOUR HONOR, DID YOU KEEP YOUR COPY OF

17   THIS?

18            **THE COURT:**  YES, I HAVE IT, BUT I DON'T HAVE IT WITH

19   ME ON THE BENCH.

20            **MR. ROBINSON:**  MAY I GIVE IT TO YOU?

21            **THE COURT:**  YES.  GREAT.  OKAY.

22            **MR. GOLDMAN:**  YOUR HONOR, DO YOU WANT TO READ IT AND

23   THEN I CAN EXPLAIN?

24            **THE COURT:**  YES.  SURE.  GO AHEAD.  YOU CAN DO IT.

25   I'VE READ IT AND I SEE, "PLAINTIFFS WILL NOT READ OR SHOW" --

1          **MR. GOLDMAN:**  YES.  WE DON'T HAVE AN OBJECTION TO THE

2   DOCUMENTS COMING INTO EVIDENCE AS THEY ARE REDACTED, AND WE

3   WORKED WITH THE PLAINTIFF'S LAWYERS TO DO THAT.  WHAT WE DO

4   HAVE AN OBJECTION TO IS THE USE OF THESE DOCUMENTS -- THAT THE

5   JURY HAS NEVER SEEN BEFORE THROUGH ANY WITNESS -- IN CLOSING

6   ARGUMENT BY MR. ROBINSON.  WE HAVE A STATEMENT IN HERE IN THE

7   MIDDLE OF THE FIRST PARAGRAPH THAT SAYS, "PLAINTIFFS WILL NOT

8   READ OR SHOW THESE DOCUMENTS TO THE JURY, OTHER THAN THROUGH

9   ONE OF THE WITNESSES IDENTIFIED BELOW, UNLESS THE COURT PERMITS

10  THEIR USE IN OPENING STATEMENT AND CLOSING ARGUMENT."  I HAVE A

11  FEELING THAT MR. ROBINSON WANTS TO STAND UP NOW AND SHOW THESE

12  SALES DOCUMENTS TO THE JURY IN CLOSING ARGUMENT WHEN THEY

13  HAVEN'T SEEN THEM AT ALL THROUGH ANY WITNESS, AND THAT'S WHAT

14  WE THINK IS INAPPROPRIATE.

15          **MR. BECK:**  YOUR HONOR, IF I COULD ADD JUST ONE POINT

16  ON THAT, IT SAYS UNLESS YOU PERMIT THEM TO DO IT IN OPENING AND

17  CLOSING.  IF HE HAD DONE IT IN OPENING, IF HE HAD ASKED TO DO

18  IT IN OPENING, THEN WE COULD HAVE ADDRESSED IT.  IF HE HAD PUT

19  THEM IN THROUGH ONE OF THE WITNESSES, WE COULD HAVE ADDRESSED

20  IT.  BUT HE CHOSE NOT TO ASK TO DO IT IN OPENING AND HE CHOSE

21  NOT TO DO IT THROUGH THE WITNESSES, SO WE NEVER DID ADDRESS IT.

22  THAT'S THE CONUNDRUM OF THE STEALTH DOCUMENTS.

23          **MR. ROBINSON:**  WELL, YOUR HONOR, THIS IS NOT A

24  STEALTH SITUATION.  THIS IS A SITUATION WHERE THEY BARGAINED

25  WITH ME THAT I WOULD NOT TAKE THE DEPOSITIONS OF THEIR SALES

1   REPS, IN EXCHANGE FOR ME BEING ABLE TO PUT THESE DOCUMENTS THAT

2   THEY PROVIDED ME AS BEING MERCK DOCUMENTS THAT WERE SENT TO

3   DR. MIKOLA AND SENT TO DR. MCCAFFREY AS PART OF THIS VIOXX

4   CASE.  WHEN I BARGAINED FOR THIS, I AT ALL TIMES THOUGHT I WAS

5   GOING TO PUT IT IN FINAL ARGUMENT.

6               I BASICALLY PUT IN THERE THAT I COULD PUT IT IN

7   THROUGH CERTAIN WITNESSES, WHICH I DIDN'T, BUT I CERTAINLY

8   WANTED THEM TO GO INTO FINAL ARGUMENT.  THEY WANTED TO HAVE THE

9   RIGHT, YOUR HONOR, TO HAVE US FIGHT ON THIS ISSUE WITH YOU.  I

10  SAID FINE BECAUSE THE JUDGE ALWAYS HAS THE RIGHT TO EXCLUDE

11  SOMETHING FROM FINAL ARGUMENT.  BUT I FEEL THAT, GIVEN THE

12  NATURE OF THESE DOCUMENTS, THAT THESE ARE ACTUALLY MERCK

13  DOCUMENTS THAT WENT TO MIKOLA AND MCCAFFERY THAT RELATE TO

14  THEIR STATE OF MINDS AT THE TIME, THAT THEY SHOULD COME INTO

15  EVIDENCE, THAT THEY SHOULD BE SHOWN TO THE JURY UNDER THIS

16  STIPULATION.  OTHERWISE, WHAT IS THE VALUE OF PUTTING THEM INTO

17  EVIDENCE?

18               **THE COURT:**  I'VE GOT TO LOOK AT THE DOCUMENTS.

19               **MR. GOLDMAN:**  JUDGE, LET ME JUST MAKE ONE MORE

20  COMMENT ON THIS.  WHAT WE BARGAINED FOR WAS FOR MR. ROBINSON TO

21  NOT HAVE TO LAY THE FOUNDATION FOR THESE DOCUMENTS THROUGH

22  THESE SALES REP DEPOSITIONS.  OKAY.  SO WE SAID WE WOULD AGREE

23  THEY ARE ADMISSIBLE; YOU DON'T HAVE TO PUT THEM IN THROUGH THE

24  SALES REPS.  WHAT WE SAID WAS THAT THEY COULD BE SHOWN OR READ

25  THROUGH THE DEPOSITION TESTIMONY OF DR. MIKOLA OR DR. MCCAFFREY

1   OR MR. ANSTICE AND EVEN PLAINTIFF'S EXPERT, DR. PECHMANN, WHO

2   THEY DIDN'T CALL, HE WANTED THE RIGHT TO BE ABLE TO USE THEM

3   WITH.

4               SO WE NEVER AGREED THAT THEY COULD JUST BE

5   DUMPED INTO EVIDENCE WITHOUT BEING USED WITH A WITNESS.  IF HE

6   WANTED TO PLAY DR. MCCAFFREY'S DEPOSITION, WHERE HE DID USE ONE

7   OR TWO OF THESE DOCUMENTS, THAT WOULD HAVE BEEN FINE.  WE

8   AGREED HE COULD DO THAT WITHOUT LAYING THE FOUNDATION FOR THESE

9   DOCUMENTS.  THAT WAS THE WHOLE REASON FOR AVOIDING THE SALES

10  REP DEPS.

11          **MR. ROBINSON:**  HERE IS WHAT MERCK AGREED TO.  THIS IS

12  FROM THEIR STIPULATION:

13              "THAT THE FOLLOWING EXHIBITS, COPIES OF WHICH

14  ARE ATTACHED HERETO" -- AND BEFORE THE JUDGE RIGHT NOW --

15  "SHALL BE ADMITTED INTO EVIDENCE IN THEIR ENTIRETY AND WITHOUT

16  OBJECTION BY DEFENDANT MERCK AND WITHOUT THE NECESSITY OF

17  ADDITIONAL LIVE OR RECORDED TESTIMONY WHEN ANY SUCH EXHIBIT IS

18  OFFERED BY PLAINTIFFS AT ANY TIME DURING THE TRIAL OF THE

19  ACTION."

20              I OFFERED IT DURING THE TRIAL.  THEY SAID,

21  "WELL, WE WANT TO WAIT AND CUT OUT THE PARTS THAT WE DON'T

22  WANT."  I TOOK OUT SOME OF THE DOCUMENTS, YOUR HONOR, BUT NOW

23  WE HAVE GOT AN AGREEMENT AS TO WHAT THEY ARE AND THEY SHOULD

24  COME INTO EVIDENCE.  THERE IS NO REQUIREMENT FOR A WITNESS.

25  THERE IS NO REQUIREMENT HERE.  IT JUST TELLS ME YOU LIMIT ME,

 1   THAT IF I'M GOING TO READ IT WITH A WITNESS THAT I WILL READ IT

 2   THROUGH THESE FOLLOWING WITNESSES, BUT THEY COME INTO EVIDENCE

 3   IN THEIR ENTIRETY.  I MEAN, OTHERWISE --

 4          THE COURT:  OKAY.  I UNDERSTAND BOTH SIDES.  I JUST

 5   NEED TO LOOK AT THE MATERIAL.  I'LL GET BACK TO YOU ON THAT.

 6   ANYTHING ELSE THAT WE NEED TO DISCUSS?

 7          MR. GOLDMAN:  JUST TO DEAL WITH THE EXHIBITS.

 8          THE COURT:  YOU CAN DO THAT WITH STAFF.

 9          THE DEPUTY CLERK:  JUDGE, I THINK THERE ARE SOME THAT

10   NEED TO BE OFFERED.

11          MR. GOLDMAN:  OKAY.  YES.  MARK.

12          THE COURT:  MARK, DO YOU WANT TO GET WITH HIM ON

13   THAT?

14          MR. GOLDMAN:  FIRST, WE OFFER DEFENSE EXHIBIT 2031,

15   WHICH ARE MEDICAL RECORDS.

16          MR. ROBINSON:  WE HAVE NO OBJECTION, YOUR HONOR.

17          THE COURT:  LET IT BE ADMITTED.

18          MR. GOLDMAN:  WE ALSO OFFER DEFENSE EXHIBIT 2033,

19   WHICH ARE OTHER MEDICAL RECORDS FROM DR. MCCAFFREY.

20          MR. ROBINSON:  WE HAVE NO OBJECTION, YOUR HONOR.

21          THE COURT:  LET IT BE ADMITTED.

22          MR. GOLDMAN:  WE OFFER DEFENSE EXHIBIT 155, WHICH IS

23   THE OCTOBER 13, 2000 SAFETY UPDATE REPORT, WHICH WE MENTIONED

24   WITH DR. REICIN.

25          MR. ROBINSON:  IT'S A MERCK DOCUMENT.  NO OBJECTION,

1    YOUR HONOR.

2             **THE COURT:**  LET IT BE ADMITTED.

3             **MR. GOLDMAN:**  THAT IS IT; RIGHT?  THOSE ARE ALL RIGHT

4    NOW.  LET ME GO LOOK.

5             **THE COURT:**  SURE.

6             **THE DEPUTY CLERK:**  JUDGE, ON AUGUST 10 YOU RESERVED

7    RULING ON EPSTEIN.

8             **THE COURT:**  I UNDERSTAND AUGUST 10 I RESERVED RULING

9    ON EPSTEIN.  WHAT IS THAT?

10            **THE DEPUTY CLERK:**  THE EPSTEIN EXHIBITS THAT

11   PLAINTIFF OFFERED, THE JUDGE HAD RESERVED RULING.

12            **MR. ROBINSON:**  YES.

13            **THE COURT:**  WHAT IS THAT?  LET'S FINISH WITH THE

14   DEFENDANT FIRST.

15            **MR. GOLDMAN:**  THESE ARE DEPOSITION EXHIBITS,

16   DEPOSITION EXHIBIT 1, DR. BRYAN.

17            **MR. ROBINSON:**  NO OBJECTION.

18            **THE COURT:**  LET IT BE ADMITTED.

19            **MR. GOLDMAN:**  DEPOSITION EXHIBIT 3.

20            **MR. ROBINSON:**  NO OBJECTION.

21            **THE COURT:**  LET IT BE ADMITTED.

22            **MR. GOLDMAN:**  DEPOSITION EXHIBIT 4.

23            **MR. ROBINSON:**  NO OBJECTION.

24            **THE COURT:**  LET IT BE ADMITTED.

25            **MR. GOLDMAN:**  DEPOSITION EXHIBIT 5.

1          MR. ROBINSON:  NO OBJECTION.

2          THE COURT:  LET IT BE ADMITTED.

3          MR. GOLDMAN:  DEPOSITION EXHIBIT 6.

4          MR. ROBINSON:  NO OBJECTION.

5          THE COURT:  ADMITTED.

6          MR. GOLDMAN:  DEPOSITION EXHIBIT 7.

7          MR. ROBINSON:  NO OBJECTION.

8          THE COURT:  ADMITTED.

9          MR. GOLDMAN:  DEPOSITION EXHIBIT 8.

10         MR. ROBINSON:  NO OBJECTION.

11         THE COURT:  ADMITTED.

12         MR. GOLDMAN:  DEPOSITION EXHIBIT 9.

13         MR. ROBINSON:  NO OBJECTION.

14         THE COURT:  ADMITTED.

15         MR. GOLDMAN:  DEFENSE EXHIBIT 2076.

16         MR. ROBINSON:  NO OBJECTION.

17         THE COURT:  ADMITTED.

18         MR. GOLDMAN:  DEFENSE 2077.

19         THE COURT:  ADMITTED.

20         MR. GOLDMAN:  DEFENSE EXHIBIT 2079.

21         MR. ROBINSON:  NO OBJECTION.

22         THE COURT:  ADMITTED.

23         MR. GOLDMAN:  DEFENSE EXHIBIT 2080.

24         MR. ROBINSON:  NO OBJECTION.

25         THE COURT:  ADMITTED.

DAILY COPY

2512

1          **MR. ROBINSON:**  YOUR HONOR, IN ADDITION --

2          **THE COURT:**  IS THAT IT?

3          **MR. GOLDMAN:**  YES.  I BELIEVE NOW WE HAVE -- FOR

4   DR. REICIN I HAVE, GAYLYN, HERE THE BINDERS OF DOCUMENTS THAT

5   HAVE ALREADY BEEN ADMITTED.

6          **THE DEPUTY CLERK:**  JUDGE, YESTERDAY TWO OF

7   DR. REICIN'S, THE PLAINTIFF HAD TO LOOK AT THEM BECAUSE THEY

8   WERE VOLUMINOUS.

9          **THE COURT:**  I HAVE TWO THAT THE PLAINTIFF HAD TO LOOK

10  AT, I UNDERSTAND.

11         **THE DEPUTY CLERK:**  187 AND 188, MR. GOLDMAN?

12         **THE COURT:**  187 AND 188.

13         **MR. GOLDMAN:**  I'M LOOKING RIGHT NOW.

14         **THE DEPUTY CLERK:**  MR. ROBINSON NEEDED TO LOOK AT

15  THOSE.

16         **MR. GOLDMAN:**  YES.  187, WE'RE NOT GOING TO OFFER.

17  188 IS IN.  188 WE'RE OFFERING AND HE DOESN'T OBJECT.

18         **THE COURT:**  LET IT BE ADMITTED.

19         **MR. GOLDMAN:**  SO THAT'S ALL FOR THE DEFENSE.

20         **MR. ROBINSON:**  YOUR HONOR, ON EPSTEIN --

21         **THE COURT:**  YES.

22         **MR. ROBINSON:**  ANDY, TAKE A LOOK AT THIS.  WE HAD --

23         **THE DEPUTY CLERK:**  THIS IS THE ONES YOU OFFERED AND

24  YOU WITHDREW TWO.  THESE ARE THE ONES YOU HAD OFFERED.

25         **MR. ROBINSON:**  ANDY, THE ONE WITH THE SCIENTIFIC

1    ADVISOR --

2              **MR. GOLDMAN:**  YES.

3              **MR. ROBINSON:**  SO WHAT WE'RE GOING TO DO, YOUR HONOR,

4    I'M WITHDRAWING EXHIBIT 2, WHICH IS THE SCIENTIFIC ADVISORS,

5    BUT EVERYTHING ELSE IN EPSTEIN COMES IN.  THOSE ARE EXHIBIT 1,

6    EXHIBIT 3, EXHIBIT 5, EXHIBIT 6, EXHIBIT 9, EXHIBIT 10,

7    EXHIBIT 11, EXHIBIT 13, AND EXHIBIT 19, YOUR HONOR.

8              **MR. GOLDMAN:**  NO OBJECTION.

9              **THE COURT:**  LET IT BE ADMITTED WITH THE EXCEPTION OF

10   EXHIBIT 2.  THAT'S OUT.

11             **MR. ROBINSON:**  WE ARE OFFERING REICIN DOCUMENTS FROM

12   YESTERDAY.  THESE ARE REICIN EXHIBITS.  NO. 1 IS THE DRUG

13   REGULATIONS, MERCK DRUG REGULATIONS.

14             **MR. GOLDMAN:**  THAT ONE WE OBJECTED TO BECAUSE THE

15   WITNESS HAD NO KNOWLEDGE OF IT.  THESE ARE THE DRUG REGULATIONS

16   SHE DIDN'T KNOW ANYTHING ABOUT.  YOU SAID SHE COULD TESTIFY IN

17   GENERAL, BUT SHE DIDN'T USE THIS DOCUMENT.

18             **MR. ROBINSON:**  WELL, I THINK SHE SAID THAT IT DID

19   APPEAR TO BE A MERCK DOCUMENT, AND I HAD ASKED THE COURT TO

20   LOOK AT IT.  EVEN THOUGH SHE SAID SHE DIDN'T SEE THIS SPECIFIC

21   DOCUMENT, THE CONTENTS OF THE PORTION WE WANTED TO PUT IN

22   REGARDING WARNING APPEARED TO BE CONSISTENT WITH HER

23   UNDERSTANDING OF WHAT THE RULES WERE AT MERCK REGARDING

24   WARNING.

25             **THE COURT:**  THERE IS ONE SECTION THAT SHE TESTIFIED

1   TO.  THE REST OF IT I EXCLUDE.  PUT THAT SECTION IN, AND I'LL

2   ADMIT IT.

3           **THE DEPUTY CLERK:**  HOW WAS IT MARKED?

4           **MR. ROBINSON:**  IT WAS MARKED AS P1.1734.  I'LL MAKE

5   THAT 1.734A, THAT ONE SECTION.  THEN THERE WAS REICIN

6   EXHIBIT 1, WHICH THE JUDGE ADMITTED, WHICH WAS HER MEMO, HER

7   E-MAIL FROM 3/17/2000.

8           **THE DEPUTY CLERK:**  IS THERE A ONE, JUST ONE?

9           **MR. ROBINSON:**  WE CALLED IT "REICIN 1" BECAUSE WE

10  DIDN'T HAVE ANY OTHER --

11          **THE DEPUTY CLERK:**  JUDGE, YOU DIDN'T RULE ON THAT

12  YESTERDAY.

13          **THE COURT:**  I'LL ADMIT IT.

14          **MR. ROBINSON:**  HERE IS REICIN 1.  UNFORTUNATELY, WE

15  DIDN'T HAVE A "P" NUMBER FOR IT.

16          **THE DEPUTY CLERK:**  THAT'S FINE.

17          **MR. ROBINSON:**  NOW, THIS WAS ANOTHER REICIN THAT WAS

18  QUESTIONED ON YESTERDAY, ANDY, AND I THINK HE ADMITTED IT,

19  P1.1132.

20          **MR. GOLDMAN:**  NO OBJECTION.

21          **MR. ROBINSON:**  IT'S THE JUNE 2000.

22          **THE COURT:**  LET IT BE ADMITTED.

23          **MR. ROBINSON:**  THEN THIS IS ANOTHER E-MAIL THAT WE

24  WENT INTO WITH DR. REICIN.  IT'S HER E-MAIL TO DR. DEMOPOLOUS.

25  IT'S P1.1445.

1        MR. GOLDMAN:  NO OBJECTION.

2        THE DEPUTY CLERK:  THAT CAME IN YESTERDAY.

3        MR. ROBINSON:  I THOUGHT IT DID.

4        THE DEPUTY CLERK:  I HAVE IT ALREADY.

5        MR. ROBINSON:  I'M OFFERING BRYAN EXHIBIT 1.

6        MR. GOLDMAN:  NO OBJECTION.

7        THE COURT:  LET IT BE ADMITTED.

8        MR. ROBINSON:  I'M OFFERING BRYAN EXHIBIT 2.

9        MR. GOLDMAN:  NO OBJECTION.

10       THE COURT:  ADMITTED.

11       MR. ROBINSON:  I'VE OFFERING BRYAN EXHIBIT 3.

12       MR. GOLDMAN:  NO OBJECTION.

13       THE COURT:  ADMITTED.

14       MR. ROBINSON:  I'M OFFERING BRYAN EXHIBIT 4.

15       MR. GOLDMAN:  NO OBJECTION.

16       THE COURT:  ADMITTED.

17       MR. ROBINSON:  I'M OFFERING BRYAN EXHIBIT 5.

18       MR. GOLDMAN:  NO OBJECTION.

19       THE COURT:  ADMITTED.

20       MR. ROBINSON:  I'M OFFERING BRYAN EXHIBIT 6.

21       MR. GOLDMAN:  NO OBJECTION.

22       THE COURT:  ADMITTED.

23       MR. ROBINSON:  I'M OFFERING BRYAN EXHIBIT 7.

24       MR. GOLDMAN:  NO OBJECTION.

25       THE COURT:  ADMITTED.

1          **MR. ROBINSON:**  I'M OFFERING BRYAN EXHIBIT 8.

2          **MR. GOLDMAN:**  NO OBJECTION.  WAIT.  LET ME SEE THIS.

3   OKAY.  NO OBJECTION.

4          **THE COURT:**  ADMITTED.

5          **MR. ROBINSON:**  I'M OFFERING BRYAN EXHIBIT 9.

6          **MR. GOLDMAN:**  NO OBJECTION.

7          **THE COURT:**  ADMITTED.

8          **MR. ROBINSON:**  I'M OFFERING BRYAN EXHIBIT 17.

9          **MR. GOLDMAN:**  NO OBJECTION.

10         **THE COURT:**  ADMITTED.

11         **MR. ROBINSON:**  ONE LAST THING.  HAMILTON AND I AND

12  LEXI WORKED OUT THE AGREEMENT OF THE FOUR SERIES OF MEDICAL

13  RECORDS WITH GAYLYN.  WE HAVE A STIPULATION.

14         **MR. GOLDMAN:**  WHY DON'T YOU GIVE HER AN EXHIBIT

15  NUMBER.

16         **MR. ROBINSON:**  WHAT THEY ARE IS MEDICAL RECORDS.

17  WE'VE TABBED THEM BY -- SHOULD I READ THEM ALL INTO THE RECORD?

18  CAN WE JUST CALL IT THE FOUR SERIES SINCE THEY ARE IN BOXES,

19  THE MEDICAL RECORDS?

20         **THE COURT:**  WHAT'S EASIEST, GAY?

21         **THE DEPUTY CLERK:**  WELL, ARE THEY SEPARATE RECORDS?

22         **MR. ROBINSON:**  EACH ONE IS A SEPARATE FILE.  DO YOU

23  WANT TO READ THEM ALL OR JUST CALL IT THE FOUR SERIES?  LET ME

24  SHOW IT TO YOU.

25         **THE DEPUTY CLERK:**  IF YOU WANT TO MARK IT ONE

1    EXHIBIT, BUT SAY WHAT IT STARTS WITH AND ENDS WITH.

2              **MR. ROBINSON:**  YES.  THANK YOU.  WE WILL OFFER THE

3    FOUR SERIES.

4              **THE DEPUTY CLERK:**  THE WHAT SERIES?

5              **MR. ROBINSON:**  4.0001, AND IT GOES ALL THE WAY

6    THROUGH 4.0050.

7              **THE DEPUTY CLERK:**  DO I HAVE A LIST OF THOSE?  DO I

8    HAVE A LIST OF WHAT THEY ARE?

9              **MS. O'DELL:**  YES, MA'AM.  THEY ARE ON YOUR EXHIBIT

10   LIST.

11             **THE COURT:**  LET IT BE ADMITTED.

12             **MR. GOLDMAN:**  MY TRUSTY LEGAL ASSISTANT POINTED ME TO

13   THE ONE DOCUMENT I FORGOT TO OFFER.  THEY DON'T HAVE AN

14   OBJECTION.  IT'S DEFENSE EXHIBIT 314.  IT WAS USED WITH

15   DR. REICIN.

16             **THE COURT:**  EXHIBIT 314, LET IT BE ADMITTED.  IS THAT

17   IT?

18             **MR. BIRCHFIELD:**  ONE OTHER, YOUR HONOR.  WE HAVE

19   PLAINTIFF'S EXHIBIT 1.0353.  IT'S AN FDA MEDICAL OFFICER REVIEW

20   WE USED WITH DR. MORRISON.

21             **MR. GOLDMAN:**  NO OBJECTION.

22             **THE COURT:**  LET IT BE ADMITTED.  ALL RIGHT.  SOMETIME

23   BEFORE WE GO TO THE JURY, LET'S MAKE SURE WE CHECK ONE LAST

24   TIME AND MAKE SURE WE HAVE ALL OF THE EXHIBITS IN THE FORM THAT

25   YOU WANT.

2518

1          **MR. BIRCHFIELD:**  AND THE INDEX.

2          **THE DEPUTY CLERK:**  THAT'S ANOTHER THING.  I THOUGHT

3  COUNSEL WERE GOING TO GET TOGETHER AND PREPARE AN INDEX FOR THE

4  JURY.  NOW, THEY CAN DECIDE, BUT WE JUST WANT A NUMBER AND A

5  DESCRIPTION; RIGHT?

6          **THE COURT:**  YES.  IT'S REALLY IMPORTANT.  WE'RE

7  GETTING A LOT OF INPUT FROM THE JURORS.

8          **THE DEPUTY CLERK:**  NUMBER AND DESCRIPTION.  JUDGE,

9  THEY CAN DO IT BY WITNESS; RIGHT?  THEY COULD PUT MIKOLA --

10          **THE COURT:**  ANY WAY YOU THINK IT WOULD BE BENEFICIAL.

11          **MR. ROBINSON:**  YOU WANT A JOINT LIST?

12          **THE DEPUTY CLERK:**  YOU ALL DECIDE, BUT NOTHING MORE

13  THAN A NUMBER AND A DESCRIPTION.  IF YOU WANT TO GO BY WITNESS,

14  THAT WILL BE FINE.

15          **MR. GOLDMAN:**  WE'LL HAVE THAT BY THE END OF THE DAY.

16          **THE COURT:**  YES.  I'LL GET WITH YOU FOLKS ON THE JURY

17  CHARGE, SAY, ABOUT 11:00, BUT LET ME MEET WITH THE OTHER

18  PARTIES FIRST, JUST A COUPLE OF MINUTES.

19          **MR. BECK:**  JUDGE, BEFORE WE DO THAT, WE'RE FILING

20  ELECTRONICALLY OUR MOTION FOR JUDGMENT.  COULD WE HAVE JUST A

21  FEW MINUTES TO ARGUE IT?  I REALIZE WHAT THE UNLIKELY OUTCOME

22  IS, BUT IF WE COULD HAVE A FEW MINUTES TO ARGUE IT BEFORE WE DO

23  THE OTHER STUFF?

24          **THE COURT:**  SOMETIME THIS AFTERNOON -- WHAT TIME,

25  GAY?

1          THE DEPUTY CLERK:  IS 2:00 ALL RIGHT FOR A

2    REPRESENTATIVE FROM EACH SIDE TO MEET WITH ME AND GO OVER THE

3    EXHIBITS AND SIGN OFF ON THE CERTIFICATION?  TO WAIT UNTIL

4    TOMORROW MORNING I THINK WOULD BE --

5          MR. GOLDMAN:  SURE.  THAT'S FINE.  WHATEVER YOU WANT.

6          THE DEPUTY CLERK:  IS 2:00 OKAY, SOMEBODY MEET ME IN

7    HERE?

8          MR. ROBINSON:  YES.

9          THE COURT:  WITH REGARD TO THE MOTIONS, IT'S

10   APPROPRIATE, NOW THAT THE JURY IS OUT OF THE ROOM, TO HEAR

11   MOTIONS.  I WILL ASSUME THAT THEY ARE MADE AT THE APPROPRIATE

12   TIME AND I'LL HEAR THEM NOW.  THEY CAN BE SUPPLEMENTED BY

13   WRITTEN MATERIAL.

14          MR. CURREY:  BRIAN CURREY, C-U-R-R-E-Y, FOR MERCK.

15          THE COURT:  OKAY.  MR. CURREY.

16          MR. CURREY:  THANK YOU, YOUR HONOR.  I WAS, OF

17   COURSE, HERE IN THE COURTROOM WHEN YOU HEARD OUR ORIGINAL

18   MOTION FOR JUDGMENT AS A MATTER OF LAW, AND WE ARE RENEWING

19   THAT AT THIS TIME NOW THAT BOTH SIDES HAVE RESTED.  I'M, OF

20   COURSE, COGNIZANT THAT WHAT YOU SAID AT THE TIME WAS THAT YOU

21   BELIEVED THIS WAS A CASE ABOUT WHAT MERCK KNEW AND WHEN IT KNEW

22   IT AND THAT THAT RAISED QUESTIONS OF FACT.

23          SINCE THAT TIME, I THINK IT'S BECAME MORE AND

24   MORE CLEAR, BOTH TO THE COURT AND TO THE PARTIES, THAT THIS

25   CASE HAS COME IN AS A FAILURE-TO-WARN CASE AND THAT, BECAUSE OF

1   THAT, IT WOULD BE FAIR TO TURN THAT QUESTION ON ITS HEAD AND

2   ASK:  WHAT WAS IT THAT MR. BARNETT'S PHYSICIANS KNEW, AND WHEN

3   DID THEY KNOW IT, AND WHAT DID THEY DO ABOUT IT?

4                    THE EVIDENCE HAS BEEN CLEAR ON THAT POINT.

5   DR. MIKOLA TESTIFIED THAT HE READ THE VIGOR ARTICLE WHEN IT

6   CAME OUT, THAT HE WAS FULLY AWARE OF THE RISKS DISCLOSED IN THE

7   VIGOR STUDY, THAT HE WAS AWARE OF THE DISCUSSION IN THE MEDICAL

8   COMMUNITY ABOUT EXACTLY WHAT THAT MEANT AND THE CONTROVERSY ON

9   BOTH SIDES AS TO WHAT WAS THE MEANING OF THAT DATA.

10  DR. KARAVAN TESTIFIED THAT HE'S BEEN AWARE SINCE MEDICAL SCHOOL

11  THAT NSAID'S MAY POSE A CARDIOVASCULAR RISK, THAT HE WAS FULLY

12  VERSED ON THE VIGOR STUDY AND WAS FULLY AWARE OF THE RISKS.

13  BOTH OF THEM INDICATED THAT THEY BALANCED THE RISKS AND THE

14  BENEFITS FOR THIS PARTICULAR PATIENT, AS THEY ARE SUPPOSED TO

15  DO UNDER THE LEARNED INTERMEDIARY RULE, AND CONCLUDED THAT IN

16  ORDER TO MANAGE MR. BARNETT'S PAIN IT MADE SENSE FOR HIM TO GO

17  AHEAD AND TAKE VIOXX.

18                    NOW, I'VE HANDED UP TO YOU, YOUR HONOR, A VERY

19  ELOQUENT LITTLE CASE DECIDED BY JUDGE WILKINSON OUT OF THE

20  FOURTH CIRCUIT APPLYING SOUTH CAROLINA LAW.  IT'S ONLY THREE

21  PAGES LONG.  I CONTEND THAT IN THOSE THREE PAGES ARE EVERYTHING

22  THAT YOU NEED TO KNOW TO UNDERSTAND THAT YOU NEED TO DIRECT A

23  VERDICT IN MERCK'S FAVOR IN THIS CASE.

24                    IN THE ODOM CASE, UNDER SOUTH CAROLINA LAW

25  AGAIN, WHAT HAPPENED WAS:  IT'S A CASE ABOUT AN I.U.D.  THE

1   PLAINTIFF ALLEGED THAT THE MANUFACTURER OF THE I.U.D. FAILED TO

2   WARN OF RISKS ASSOCIATED WITH IT.  THE COURT SAID, WELL,

3   SOUTH CAROLINA USES THE LEARNED INTERMEDIARY RULE.  IT'S A

4   FAILURE-TO-WARN CASE.  THE DOCTOR WHO PRESCRIBED THE I.U.D.

5   KNEW EVERYTHING THERE WAS TO KNOW ABOUT THE RISKS ASSOCIATED

6   WITH THAT PRODUCT AND HE DECIDED, AGAIN APPLYING HIS SKILLS AS

7   A LEARNED INTERMEDIARY, THAT THE BEST COURSE WAS TO PRESCRIBE

8   THE I.U.D. FOR THIS PARTICULAR PATIENT.  HE DID IT THEN AND HE

9   SAID HE'D DO IT AGAIN.

10              IN THIS CASE, DR. MIKOLA KNEW ALL THE RISKS.  HE

11  WAS ASKED, "KNOWING NOW, WOULD YOU DO THE SAME THING," AND HE

12  SAID, "OH, IF I KNEW THEN WHAT I KNEW NOW, NO," BUT ON

13  CROSS-EXAMINATION HE REVEALED THAT THE THING THAT HE DIDN'T

14  KNOW THEN WAS THAT THE DRUG WOULD BE WITHDRAWN FROM THE MARKET.

15  SO HE WAS FULLY AWARE OF ALL OF THE RISKS AND ALL OF THE

16  BENEFITS THAT THE PLAINTIFFS CLAIM HAVE NOT BEEN DISCLOSED.

17              NOW, AS YOU KNOW, THERE IS NO DUTY TO WARN OF

18  KNOWN RISKS.  THAT'S WHAT ODOM SAYS.  SO IN ODOM THE COURT

19  AFFIRMED THE GRANT OF SUMMARY JUDGMENT IN THAT CASE BECAUSE

20  THERE WAS NO DUTY TO WARN OF A KNOWN RISK AND, MORE

21  IMPORTANTLY, THERE WAS NO CAUSATION SHOWN BECAUSE, AGAIN, IT'S

22  A FAILURE-TO-WARN CASE.  THEY'VE GOT TO SHOW, WELL, IF THERE

23  HAD BEEN SOME BETTER WARNING OF THESE RISKS, THE DOCTOR WOULD

24  HAVE REACHED A DIFFERENT CONCLUSION.  HERE, JUST AS IN ODOM,

25  IT'S CLEAR THAT THE DOCTORS KNEW THE RISKS.  THEY WOULD HAVE

1  PRESCRIBED THE DRUG.  IN FACT, HERE THEY CONTINUED TO PRESCRIBE

2  IT AFTER THE 2002 LABEL CAME OUT, AFTER MR. BARNETT HAD HIS

3  HEART ATTACK.  WITH THAT, YOUR HONOR, WE SUBMIT.

4          **THE COURT:**  OKAY.  THANK YOU VERY MUCH.  I THINK IT'S

5  A QUESTION OF WHAT WAS KNOWN AND WHEN IT WAS KNOWN.  WITH

6  REGARD TO THE WAY THE VIGOR ARTICLE WAS PACKAGED BY THE

7  DEFENDANT, THAT IS ALSO A QUESTION OF FACT.  THE NATURE AND

8  EXTENT OF THE RISKS ARE, I THINK, HOTLY DISPUTED AS TO WHAT WAS

9  KNOWN BY THE DOCTORS.  I THINK THAT'S A QUESTION FOR THE JURY,

10  SO I'LL DENY THE MOTION.  THANK YOU VERY MUCH.

11          **MR. CURREY:**  THANK YOU, YOUR HONOR.

12          **THE COURT:**  I'LL SEE THE PARTIES IN THE <u>SMITH</u> CASE.

13  THE COURT WILL STAND IN RECESS.

14          **THE DEPUTY CLERK:**  EVERYONE RISE.

15          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

16          **THE DEPUTY CLERK:**  EVERYONE RISE.

17          **THE COURT:**  WE CAN DO THIS AT THE BENCH.  IT'S

18  EASIER.

19          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

20  THE BENCH.)

21          **THE COURT:**  THIS IS THE MATTER THAT WE DISCUSSED IN

22  CHAMBERS, AND I KNOW I TOLD THE PARTIES THAT WE RESERVED THE

23  OPPORTUNITY FOR THEM TO MAKE APPROPRIATE COMMENTS TO PRESERVE

24  THE RECORD.  IT HAS TO DO WITH REBUTTAL EVIDENCE, AND I'LL LET

25  THE PLAINTIFF FRAME THIS ISSUE.

1          **MR. BIRCHFIELD:**  YOUR HONOR, THE PLAINTIFF CONTENDS

2    THAT WE WERE ENTITLED TO PUT ON A REBUTTAL CASE.  ALISE REICIN,

3    WHEN SHE WAS ON THE STAND, OFFERED THAT NAPROXEN -- THE

4    NAPROXEN HYPOTHESIS WAS SUPPORTED BY SCIENTISTS OUTSIDE OF

5    MERCK AND AT THE FDA.  THIS WAS NOT IN DIRECT RESPONSE TO ANY

6    QUESTION FROM THE PLAINTIFF.  SHE VOLUNTEERED THIS, AND WE

7    THINK THAT WE'RE ENTITLED TO OFFER REBUTTAL TESTIMONY TO SHOW

8    THAT THE NAPROXEN HYPOTHESIS IS NOT ACCEPTED GENERALLY IN THE

9    SCIENTIFIC COMMUNITY.

10          ALSO, DR. REICIN SAID THAT WHEN SHE VISITED WITH

11   DR. TOPOL THAT SHE DID NOT -- SHE DID NOT TRY TO DISSUADE HIM

12   FROM PUBLISHING HIS PAPER; AND WE HAVE THE TESTIMONY OF

13   DR. ERIC TOPOL THAT, WHEN SHE VISITED, THAT SHE SAID THAT HE

14   WOULD BE EMBARRASSED IF HE PUBLISHED HIS PAPER; AND WE THINK

15   WE'RE ENTITLED TO PUT THAT ON THE REBUTTAL.

16          **MR. BECK:**  YOUR HONOR, THE BUSINESS ABOUT THE

17   NAPROXEN HYPOTHESIS BEING ACCEPTED OR NOT ACCEPTED WAS MERELY

18   THE MAIN SUBJECT OF THEIR CASE IN CHIEF WHERE THEY SAID THAT

19   THAT WAS THE MISINFORMATION THAT MERCK PUT OUT AND THAT THAT

20   WAS THE DECEIT.  THAT SUBJECT WAS COVERED IN THEIR CASE IN

21   CHIEF BY DR. AVORN AND BY DR. ZIPES, AND THE PLAINTIFFS CHOSE

22   NOT TO CALL DR. TOPOL IN THEIR CASE IN CHIEF TO SUPPORT THAT.

23   DR. TOPOL'S VIEWS ON THIS DOES NOT REBUT ANY TESTIMONY FROM

24   DR. REICIN THAT THEY ELICITED ON CROSS-EXAMINATION.  WHAT SHE

25   SAID WAS THAT THERE IS A DEBATE IN THE SCIENTIFIC COMMUNITY,

1   AND SOME PEOPLE IN THE FDA AGREE WITH OUR POSITION.  DR. TOPOL

2   DOES NOT SAY THAT THERE IS NOT A DEBATE IN THE SCIENTIFIC

3   COMMUNITY OR THAT PEOPLE AT THE FDA ALL DISAGREE WITH US.  HE

4   SIMPLY SAYS THAT HE DISAGREES WITH US.

5                 AS TO THE QUESTION ABOUT WHETHER DR. REICIN

6   SOMEHOW INTIMIDATED DR. TOPOL, URGED HIM NOT TO PUBLISH THE

7   MANUSCRIPT, THE PLAINTIFFS ELICITED THAT ON CROSS-EXAMINATION.

8   THAT WAS NOT VOLUNTEERED INFORMATION BY HER AT ALL.  WE NEVER

9   ASKED HER ANYTHING ABOUT DR. TOPOL OR ABOUT HIS MANUSCRIPT.

10  THE REBUTTAL CASE, IF THERE IS ONE, IS SUPPOSED TO BE OF OUR

11  CASE, NOT OF A SIDESHOW THAT THE PLAINTIFFS LAWYERS CREATE ON

12  CROSS-EXAMINATION.

13                ALSO, YOUR HONOR, THE WHOLE BUSINESS ABOUT WHAT

14  SHE SAID TO DR. TOPOL AND WHAT DR. TOPOL SAID TO HER IS A

15  COLLATERAL MATTER, AND THEY CANNOT IMPEACH HER ON A COLLATERAL

16  MATTER WITH EXTRINSIC EVIDENCE.  THEY TAKE THE ANSWER AS THEY

17  GET IT.  HAD THEY BEEN ALLOWED TO PUT IN A REBUTTAL, WE WOULD

18  HAVE HAD TO HAVE ANOTHER DAY OR SO WHILE WE WENT THROUGH AND

19  PULLED OUT THE CLIPS FROM TOPOL SHOWING THAT THE TESTIMONY THAT

20  THEY WANTED TO SHOW WAS CONTRADICTED BY DOCUMENTS THAT HE WROTE

21  AT THE TIME; AND IT WOULD HAVE BEEN CONFUSING AND DISTRACTING

22  FOR THE JURY.

23                AND THIS INTIMIDATION STORY, ACTUALLY, WAS PART

24  OF THEIR CASE IN CHIEF AS WELL.  THEY OPENED AND SAID THAT THE

25  DOCTORS WERE INTIMIDATED AND COERCED; BUT THEY DECIDED, FOR

1    REASONS THAT WE ALL UNDERSTAND, THAT THEY WOULD VOLUNTARILY NOT

2    PUT THAT EVIDENCE IN THROUGH DR. TOPOL.  AND THEY CAN'T, IN OUR

3    VIEW, SANDBAG BY CHOOSING NOT TO PUT IT IN THROUGH DR. TOPOL,

4    THEN ASKING ALISE REICIN WHETHER DR. TOPOL'S STORY IS TRUE; AND

5    IF SHE SAYS NO, THEN ALL OF A SUDDEN PUTTING IT IN IN REBUTTAL.

6            MR. BIRCHFIELD:  BEAR WITH ME, YOUR HONOR.  IN

7    REGARDS TO DR. TOPOL, IT'S NOT A MATTER OF DR. TOPOL SAYING,

8    "THIS IS MY OPINION AND MY OPINION ALONE THAT THE NAPROXEN

9    HYPOTHESIS IS UNFOUNDED."  DR. TOPOL IS, FROM HIS VANTAGE

10   POINT, AS THE NUMBER 8 CITED MEDICAL -- HE IS NUMBER 8 ON THE

11   LIST OF MOST CITED MEDICAL AUTHORS; AND HE HAS A UNIQUE VANTAGE

12   POINT TO SAY WHAT IS THE UNDERSTANDING AND WHAT IS GENERALLY

13   ACCEPTED IN THE SCIENTIFIC COMMUNITY.  SO IT'S NOT A MATTER OF

14   JUST HIS TESTIMONY ALONE; AND THIS WAS IN DIRECT RESPONSE TO

15   WHAT SHE VOLUNTEERED, NOT SOMETHING THAT WAS ELICITED AT TRIAL.

16           THE COURT:  I HEARD THE TESTIMONY OF ALL OF THE

17   WITNESSES AND WATCHED AS THEY TESTIFIED; AND I DO FEEL THAT THE

18   MATERIAL THAT COUNSEL WISHES TO PLACE IN REBUTTAL EITHER WAS

19   PUT IN CHIEF BY OTHER WITNESSES OR COVERED APPROPRIATELY BY

20   THEM ON, OR IT COULD HAVE BEEN, SHOULD HAVE BEEN COVERED BY

21   THEM.  I DO FEEL THAT THIS IS NOT REBUTTAL.  IT'S JUST

22   RESTATING, REAFFIRMING SOME THINGS; AND FRANKLY, I THINK THEY

23   COVERED IT QUITE EXTENSIVELY IN THEIR CASE IN CHIEF; AND THIS

24   IS JUST A REHASHING.  IT'S NOT WHAT THIS IS ABOUT, SO I'LL DENY

25   THAT WITH THE UNDERSTANDING THAT COUNSEL HAS TIMELY MADE IT.

1          **MR. BIRCHFIELD:**  THANK YOU, YOUR HONOR.  MAY WE

2    MAKE -- JUST SUBMIT A PROFFER OF THEIR TESTIMONY?

3              **THE COURT:**  SURE.

4              (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)

5                           *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25