1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE: VIOXX PRODUCTS        *   MDL DOCKET NO. 1657
     LIABILITY LITIGATION         *
6                                 *
                                  *
7    THIS DOCUMENT RELATES TO     *   AUGUST 16, 2006, 8:30 A.M.
                                  *
8                                 *
     GERALD BARNETT V. MERCK      *   CASE NO. 06-CV-485-L
9      & CO., INC.                *
     * * * * * * * * * * * * * * * *

10

11                          VOLUME XIII
12                    JURY TRIAL BEFORE THE
                     HONORABLE ELDON E. FALLON
13                  UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15

16   FOR THE PLAINTIFF:          ROBINSON, CALCAGNIE & ROBINSON
                                 BY:  MARK P. ROBINSON JR., ESQ.
17                               620 NEWPORT CENTER DRIVE
                                 NEWPORT BEACH, CALIFORNIA 92660
18

19   FOR THE PLAINTIFF:          BEASLEY ALLEN CROW METHVIN
                                    PORTIS & MILES
20                               BY:  ANDY D. BIRCHFELD JR., ESQ.
                                 234 COMMERCE STREET
21                               POST OFFICE BOX 4160
                                 MONTGOMERY, ALABAMA 36103
22

23   FOR THE DEFENDANT:          BARTLIT BECK HERMAN
                                    PALENCHAR & SCOTT
24                               BY:  PHILIP S. BECK, ESQ.
                                    ANDREW L. GOLDMAN, ESQ.
25                               54 W. HUBBARD STREET, SUITE 300
                                 CHICAGO, ILLINOIS 60601


                        DAILY COPY

1

2    OFFICIAL COURT REPORTERS:     CATHY PEPPER, CCR, RPR, CRR
                                   TONI DOYLE TUSA, CCR, FCRR
3                                  500 POYDRAS STREET, ROOM HB-406
                                   NEW ORLEANS, LOUISIANA 70130
4                                  (504) 589-7778

5

6
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
7    PRODUCED BY COMPUTER.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                DAILY COPY

2529

1                          <u>I N D E X</u>

2                                                    <u>PAGE</u>

3

CLOSING ARGUMENTS

4
        MARK P. ROBINSON JR., ESQ.            2543
5       PHILIP S. BECK, ESQ.                  2579
        MARK P. ROBINSON JR., ESQ.            2633
6

7   JURY INSTRUCTIONS                         2646

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        DAILY COPY

1                          **MORNING SESSION**

2                          **(AUGUST 16, 2006)**

3                  (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4    TRANSCRIBED BY CATHY PEPPER, CCR, RPR, CRR, OFFICIAL COURT

5    REPORTER.)

6                  **THE DEPUTY CLERK:**  EVERYONE RISE.

7                  **THE COURT:**  BE SEATED, PLEASE.

8                          THE JURY IS OUT OF THE ROOM.  THE COURT HAS THE

9    MET SEVERAL TIMES WITH COUNSEL AND RECEIVED FROM COUNSEL

10   SUGGESTED JURY CHARGES.  THE INFORMATION GOTTEN FROM COUNSEL IS

11   VERY HELPFUL TO THE COURT IN PREPARING THE FINAL JURY CHARGES.

12   I THANK THEM FOR THEIR EFFORTS.

13                         I LOOKED IT OVER.  I GAVE THEM SEVERAL DRAFTS

14   AND HAVE NOW FINALIZED THE JURY CHARGE.  I'VE GIVEN IT TO THEM,

15   AND I ASK THEM WHETHER THEY HAVE ANY OBJECTIONS TO IT AT THIS

16   TIME FROM THE PLAINTIFF'S STANDPOINT.

17                  **MR. BIRCHFIELD:**  NO, YOUR HONOR.

18                  **THE COURT:**  FROM THE DEFENDANT?

19                  **MR. CURREY:**  GOOD MORNING, YOUR HONOR.  BRYAN CURRIE

20   FROM MERCK.  MERCK OBJECTS TO THE FOLLOWING PORTION OF THE

21   STRICT LIABILITY, FAILURE-TO-WARN INSTRUCTION, WHICH IS FOUND

22   ON PAGE 10 AT THE END OF THE FIRST FULL PARAGRAPH OF THE

23   WRITTEN JURY CHARGE.  THERE IS A SENTENCE THAT SAYS, "AN

24   ADEQUATE WARNING TO THE PROFESSION MAY BE ERODED OR EVEN

25   NULLIFIED BY OVERPROMOTION OF THE DRUG THROUGH A VIGOROUS SALES

1    PROGRAM WHICH MAY HAVE THE EFFECT OF PERSUADING THE PRESCRIBING

2    PHYSICIANS TO DISREGARD THE WARNINGS GIVEN.

3              THIS ONE, ACTUALLY, JUDGE, YOU MAY WANT TO

4    CONSIDER MAKING A CHANGE TO.  CHANGING THE "MAY HAVE THAT

5    EFFECT" TO "HAD THAT EFFECT," BECAUSE AS STATED IT'S BOTH

6    LEGALLY INCORRECT AND UNSUPPORTED BY THE EVIDENCE.

7              HERE IT'S SUGGESTING THAT OVERPROMOTION CAN

8    ERODE THE WARNING, EVEN IF IT DID NOT HAVE THE EFFECT OF

9    PERSUADING THE PRESCRIBING PHYSICIANS TO DISREGARD THE WARNINGS

10   GIVEN.  ARE YOU FOLLOWING THAT?

11             **THE COURT:**  WELL, THE --

12             **MR. CURREY:**  IN OTHER WORDS, IF YOU JUST CHANGE THE

13   WORDS "MAY HAVE" TO "HAD," "HAD THE EFFECT OF PERSUADING THE

14   PRESCRIBING PHYSICIANS."

15             **THE COURT:**  WELL, THE REASON THAT I LEFT IT WITH

16   "MAY" IS BECAUSE I DON'T KNOW WHETHER IT DID.  "THE VIGOROUS

17   SALES PROGRAM" IS WHAT I WANTED TO FOCUS ON.  WHETHER "THE

18   VIGOROUS SALES PROGRAM WHICH MAY HAVE THE EFFECT OF PERSUADING

19   THE PHYSICIANS TO DISREGARD THE WARNINGS GIVEN."  YOUR

20   SUGGESTION IS THAT WE PUT "WHICH HAD THE EFFECT"?

21             **MR. CURREY:**  YES.

22             **THE COURT:**  I DON'T KNOW WHETHER HE'S PROVEN THAT.

23             **MR. BIRCHFIELD:**  I THINK THAT'S A QUESTION OF FACT.

24   I MEAN, IF YOU WERE TO SAY "HAD," THAT'S THE COURT INSTRUCTING

25   THE JURY AS TO WHAT THE EVIDENCE HAS SHOWN.

DAILY COPY

1          **MR. CURREY:**  MY POINT IS THAT YOU WOULD HAVE TO PROVE

2    THAT IT HAD AN EFFECT.  IN ANY EVENT, SOUTH CAROLINA HAS NOT

3    ADOPTED THE OVERPROMOTION DOCTRINE; AND, AGAIN, THERE IS NO

4    EVIDENCE THAT THERE WAS OVERPROMOTION OR THAT IT HAD THAT

5    EFFECT.

6          **THE COURT:**  I LISTENED TO THE EVIDENCE, AND THERE IS

7    SOME EVIDENCE THAT THERE WAS SOME ONE BILLION HITS ON THE

8    TELEVISION OR IN THE NEWS MEDIA; AND THE EVIDENCE WAS THAT AT

9    LEAST EVERYONE IN THE UNITED STATES WOULD HAVE HEARD IT AT

10   LEAST FOUR TIMES.  THERE IS SOME EVIDENCE TO JUSTIFY THAT

11   POSITION, SO THAT'S WHY I INCLUDED IT, AND SO I DENY THE

12   SUGGESTION.

13          WHAT'S THE NEXT ONE?

14          **MR. CURREY:**  THE NEXT ONE HAS TO DO WITH THE DUTY TO

15   TEST, YOUR HONOR.  MERCK OBJECTS TO -- IT'S AT THE TOP OF PAGE

16   12 IN THE WRITTEN JURY CHARGE.  THE SENTENCES SAY, "A

17   MANUFACTURER OWES A DUTY TO CONDUCT ADEQUATE TESTS AND

18   INSPECTIONS OF ITS PRODUCTS SUCH AS WILL REVEAL LATENT DEFECTS

19   OR DEFECTS THAT ARE NOT APPARENT UPON A REASONABLE INSPECTION

20   SO THAT IT CAN GIVE ADEQUATE WARNING.  THE FAILURE TO EXERCISE

21   REASONABLE CARE IN FULFILLING ANY OF THESE DUTIES CONSTITUTES

22   NEGLIGENCE."

23          WE'RE OBJECTING TO THAT ON THE BASIS THAT IT'S

24   AN INCORRECT STATEMENT OF THE LAW BECAUSE THE FDA IS CHARGED

25   WITH APPROVING DRUGS AS SAFE AND EFFECTIVE, AND TELLS

1   MANUFACTURERS WHAT TESTS ARE NECESSARY.  AND ANY STATE
2   LAW-BASED TESTING REQUIREMENT WOULD BE PREEMPTED BY FEDERAL
3   LAW.
4              MOREOVER, STATE LAW IN SOUTH CAROLINA DOES NOT
5   IMPOSE A DUTY ON PRESCRIPTION DRUG MANUFACTURER TO CONDUCT ANY
6   TESTS IN ADDITION TO OR DIFFERENT FROM THOSE REQUIRED BY THE
7   FDA; AND AS A MATTER OF PUBLIC POLICY, IT WOULD BE UNWISE FOR
8   THIS COURT TO ALLOW TRIAL JURORS TO IMPOSE TORT LIABILITY ON A
9   PHARMACEUTICAL COMPANY FOR FAILURE TO ADEQUATELY TEST A PRODUCT
10  THAT THE FDA HAS APPROVED AS SAFE AS EFFECTIVE, BECAUSE THAT
11  WOULD, IN THE LONG-TERM, DISCOURAGE OR SLOW THE DEVELOPMENT OF
12  NEWER DRUGS, MAKE VALUABLE MEDICATIONS UNAVAILABLE, OR DELAY
13  THEIR INTRODUCTION.
14             SOUTH CAROLINA, AS A LEARNED INTERMEDIARY STATE,
15  WANTS DOCTORS, NOT JURORS, TO MAKE THE DECISION ABOUT WHETHER
16  THE POTENTIAL BENEFITS OF MEDICINES OUTWEIGH ANY OF THE RISKS,
17  INCLUDING THE RISKS THAT THE DRUG HAS NOT BEEN SUFFICIENTLY
18  STUDIED.
19             IT'S NOT A FARFETCHED CONCERN, YOUR HONOR, THE
20  LINE OF QUESTIONING OF MR. MORRISON, FOR EXAMPLE, THAT THERE
21  WEREN'T ANY PATIENTS WHO WERE TESTED FOR THREE YEARS OR MORE,
22  MAY LEAD TO AN ARGUMENT IN CLOSING THAT THE DRUG SHOULD NOT
23  HAVE BEEN BROUGHT TO MARKET BECAUSE IT WASN'T TESTED FOR THREE
24  YEARS OR MORE, EVEN THOUGH THE FDA DECIDED THAT SUCH TESTING
25  WAS NOT NECESSARY.

1             **THE COURT:**  I UNDERSTAND YOUR OBJECTION.  THE LAW

2    APPLICABLE TO THIS IS A STATE LAW, AND I DON'T EVEN KNOW

3    WHETHER CONGRESS CAN INTERFERE WITH THAT OR THE TENTH

4    AMENDMENT, BUT I FEEL CONFIDENT THAT A REGULATORY AGENCY OUGHT

5    NOT TO BE ABLE TO MODIFY OR CHANGE STATE LAW OR ABOLISH

6    REMEDIES THAT ARE GIVEN BY STATE LAW.

7             WITH REGARD TO THE TEST, THEY HAVE A DUTY TO

8    GIVE ADEQUATE WARNINGS.  IT'S IMPOSSIBLE, IN MY VIEW, TO GIVE

9    ADEQUATE WARNINGS IF THEY DON'T KNOW WHAT THE RISKS ARE.  THE

10   ONLY WAY TO GET THE RISKS IS TO ADEQUATELY TEST IT, SO IT MEANS

11   TO ME THAT IT'S PART OF THE WARNING CASE TO HAVE KNOWN RISKS

12   AND THE WAY YOU KNOW RISKS IS TO ADEQUATELY TEST IT -- BECAUSE

13   IF THEY FAILED TO ADEQUATELY TEST THAT, THIS MAY HAVE SOMETHING

14   TO DO WITH THEIR WARNINGS.

15           **MR. CURREY:**  JUST FOR MY RECORD, YOUR HONOR,

16   SOUTH CAROLINA, BY STATUTE, HAS ADOPTED COMMENTS J AND K TO

17   SECTION 4(2)(A) OF THE RESTATEMENT SECOND TORTS, BOTH OF WHICH

18   REFER TO PRESENT STATE OF THE HUMAN KNOWLEDGE AND DON'T

19   CONTEMPLATE ADDITIONAL TESTING.

20             THE OTHER OBJECTION TO THAT, JUST FOR THE RECORD

21   AGAIN, IS THAT IT'S UNSUPPORTED BY THE EVIDENCE BECAUSE THE

22   EVIDENCE IS THAT MERCK DID CONDUCT ADEQUATE TESTS.

23   MR. ROBINSON, IN HIS OPENING, EVEN ALLUDED TO THE FACT THAT

24   IT'S THE MOST TESTED DRUG EVER.  MR. MORRISON AND MS. REICIN

25   CONFIRMED THAT.

1          WE ALSO WOULD REQUEST AN ALTERNATIVE CHARGE,

2   EITHER THE CHARGE THAT SAYS, "THE FDA REQUIRES COMPREHENSIVE

3   TESTING OF A PRESCRIPTION DRUG BEFORE IT APPROVES THE DRUG IS

4   SAFE AND EFFECTIVE.  A PRESCRIPTION DRUG MANUFACTURER HAS NO

5   DUTY TO CONDUCT TESTS NOT REQUIRED BY THE FDA OR ANY IN THE

6   ALTERNATIVE."  A CHARGE THAT SAYS, INSTEAD OF THE EXISTING ONE,

7   "THE FDA REQUIRES COMPREHENSIVE TESTING OF A PRESCRIPTION DRUG

8   BEFORE IT APPROVES THE DRUG IS SAFE AND EFFECTIVE.  A

9   MANUFACTURER WHOSE DRUG HAS BEEN APPROVED AS SAFE AND EFFECTIVE

10  IS PRESUMED TO HAVE CONDUCTED ADEQUATE TESTING."  AND WE WOULD

11  CONTEND THAT IT'S ERROR NOT TO INCLUDE ONE OF THOSE CHARGES.

12          **THE COURT:**  I UNDERSTAND.  I THINK THAT THE JURY HAS

13  TO FOLLOW THE CHARGE AS A WHOLE.  I THINK THE WHOLE CHARGE

14  ACCURATELY STATES THE LAW IN THE CASE, AND I THINK THE EVIDENCE

15  DOES SUPPORT THE VIEW THAT THERE WAS SOME INDICATION THAT

16  ADDITIONAL TESTING WAS CALLED FOR AND SHOULD HAVE BEEN DONE,

17  AND MERCK MAY OR MAY NOT HAVE DONE THAT.  I THINK IT IS

18  SUPPORTED BY THE EVIDENCE.  I DENY THE SUGGESTION.

19          MR. CURREY:  THE NEXT OBJECTION, YOUR HONOR, IS

20  TO THE DECEIT BY CONCEALMENT.

21          **MR. BIRCHFIELD:**  PAGE 12.

22          **MR. CURREY:**  THE INSTRUCTION AS A WHOLE.  GOT IT?

23          **THE COURT:**  YES.

24          **MR. CURREY:**  WE OBJECT TO THE INSTRUCTION ON THE

25  GROUND THAT IT'S AN INCORRECT STATEMENT OF THE LAW BECAUSE A

1   CLAIM OF DECEIT BY CONCEALMENT RELATES ONLY TO FRAUDULENT

2   OMISSIONS, OR NONDISCLOSURES, NOT AFFIRMATIVE

3   MISREPRESENTATIONS; YET, THE INSTRUCTION REFERS TO CLAIMS BASED

4   ON AFFIRMATIVE MISREPRESENTATIONS.

5              THE PLAINTIFFS NEVER PLED AN AFFIRMATIVE

6   MISREPRESENTATION FRAUD CLAIM.  IT'S NOT IN HIS COMPLAINT.  AND

7   BEFORE TRIAL, THE PLAINTIFF DROPPED ALL CLAIMS OTHER THAN

8   STRICT LIABILITY OF FAILURE TO WARN, NEGLIGENT FAILURE TO WARN,

9   AND DECEIT BY CONCEALMENT.  THE CASE WAS TRIED ON THAT BASIS.

10  THAT'S ALSO UNSUPPORTED BY THE EVIDENCE BECAUSE THERE IS NO

11  EVIDENCE THAT THE PHYSICIANS OF MR. BARNETT RELIED ON ANY

12  INTENTIONAL MISSTATEMENTS OF FACT BY MERCK.

13             **THE COURT:**  ANYTHING?

14             **MR. BIRCHFIELD:**  YOUR HONOR, FIRST OF ALL, THERE IS

15  EVIDENCE TO SUPPORT THE FACT THAT MERCK ENGAGED IN A CAMPAIGN,

16  THEY ISSUED PRESS RELEASES, EXPLAINING AWAY THE VIGOR RESULTS.

17  THEY USED MEDICAL LITERATURE AND THE PUBLICATIONS OF THE

18  MEDICAL LITERATURE TO CONCEAL THE TRUTH, THROUGH THE

19  AFFIRMATIVE REPRESENTATIONS THAT THE EXPLANATION FOR THE VIGOR

20  RESULT IS THAT NAPROXEN IS CARDIOPROTECTIVE AND NOT THAT VIOXX

21  IS CAUSING OR IS CARDIOTOXIC, SO THE EVIDENCE DOES SUPPORT.

22             **MR. CURREY:**  THERE IS NEVER ANY EVIDENCE LINKING THE

23  PRESS RELEASE TO ANY OF THESE DOCTORS THAT THEY SOUGHT.

24  DR. MIKOLA TESTIFIED THAT HE READ THE NEW ENGLAND JOURNAL

25  ARTICLE AND THAT HE WOULD NOT HAVE BEEN INFLUENCED TO CHANGE

1  HIS MIND IF HE HAD KNOWN OF THE ADDITIONAL HEART ATTACKS THAT

2  WERE THE SUBJECT OF THE EXPRESSION OF CONCERN IN THE NEW

3  ENGLAND JOURNAL.

4          **MR. BIRCHFIELD:**  THERE IS EVIDENCE BY DR. AVORN ABOUT

5  A STUDY THAT WAS DONE ABOUT THE PRESCRIBING HABITS OF DOCTORS

6  AND HOW THEY ARE INFLUENCED BY THINGS OUTSIDE THE PRODUCT

7  LABEL.  THEY MAY NOT RECOGNIZE THAT THEY ARE INFLUENCED BY

8  THAT, BUT THE STUDIES HAVE SHOWN THAT THEY ARE.

9          **THE COURT:**  OKAY.  I UNDERSTAND BOTH SIDES.  I'LL

10  DENY THE MOTION.  I THINK THE EVIDENCE SUPPORTS THE CHARGE.

11          GO AHEAD.

12          **MR. CURREY:**  THE LAST OBJECTION HAS TO DO WITH THE

13  FDA CERTIFICATION INSTRUCTION AS A WHOLE, WHICH IS AT THE

14  BOTTOM OF PAGE 15 OF THE WRITTEN JURY CHARGE.

15          **THE COURT:**  16.

16          **MR. CURREY:**  I'M SORRY.  NOW IT'S 16.  THANK YOU,

17  YOUR HONOR.

18          THE INSTRUCTION IS AN INCORRECT STATEMENT OF LAW

19  BECAUSE FEDERAL LAW PREEMPTS STATE LAW BASED TORT CLAIMS THAT

20  CONFLICT OR ADD TO FDA REQUIREMENTS.  ADDITIONALLY, SOUTH

21  CAROLINE THAT HAS NOT ADDRESSED THIS ISSUE, BUT IT'S OUR

22  CONTENTION IF IT WERE TO DO SO, IT WOULD PRECLUDE A CLAIM BASED

23  ON AGENCY APPROVED ACTION OR ESTABLISH A PRESUMPTION IN FAVOR

24  OF AN AGENCY APPROVED LABEL THAT COULD ONLY BE OVERCOME BY

25  CLEAR AND CONVINCING EVIDENCE THAT THE DEFENDANT KNEW OR SHOULD

1    HAVE KNOWN TO ADD A WARNING.

2              WE'VE PREVIOUSLY REQUESTED, AS YOU KNOW,

3    YOUR HONOR, THE FOLLOWING INSTRUCTION AND CONTEND THAT IT'S

4    ERROR TO OMIT IT.  THE INSTRUCTION THAT WE'VE REQUESTED AND

5    THAT HAS BEEN REFUSED IS ENTITLED "FDA APPROVAL."  IT READS AS

6    FOLLOWS:  "THE FDA IS THE EXPERT FEDERAL PUBLIC HEALTH AGENCY

7    CHARGED BY CONGRESS WITH ENSURING THAT DRUGS ARE SAFE AND

8    EFFECTIVE AND THAT THEIR LABELING ADEQUATELY INFORMS PHYSICIANS

9    OF RISKS AND BENEFITS OF THE PRODUCT AND IS TRUTHFUL AND NOT

10   MISLEADING.  THE FDA CAREFULLY CONTROLS THE CONTENT OF LABELING

11   FOR A PRESCRIPTION DRUG BECAUSE LABELING IS THE FDA'S PRINCIPAL

12   TOOL FOR EDUCATING HEALTHCARE PROFESSIONALS ABOUT THE RISKS AND

13   BENEFITS OF THE APPROVED PRODUCT TO HELP ENSURE SAFE AND

14   EFFECTIVE USE.  IF YOU FIND THAT MERCK'S LABELS FOR VIOXX WERE

15   APPROVED BY THE FDA, YOU MUST PRESUME THAT MERCK'S WARNINGS

16   WERE ADEQUATE."

17             **MR. BIRCHFIELD:**  YOUR HONOR, IN ESSENCE, THE

18   DEFENDANTS ARE ARGUING FDA PREEMPTION.  THERE IS NO AUTHORITY

19   TO ESTABLISH THAT THE FDA PREEMPTS THE STATE LAW HERE.  THERE

20   IS AUTHORITY ESTABLISHING THE REGULATORY BODY AS ESTABLISHING A

21   MINIMUM STANDARD OF CARE AS OPPOSED TO PREEMPTION.

22             **THE COURT:**  THAT'S THE WAY I SEE IT.  I AM CONSCIOUS

23   OF THE PROVISION RECENTLY ANNOUNCED BY THE FDA AND A PREAMBLE

24   TO THEIR REGULATIONS EVEN MAKING IT RETROACTIVE.  WE'RE DEALING

25   WITH STATE LAW AND THE APPLICATION OF STATE LAW.  AS I SAID,

1    THE TENTH AMENDMENT EVEN QUESTIONS WHETHER OR NOT CONGRESS CAN

2    INTERFERE WITH STATE LAW OR WITH REMEDIES.

3                    I DON'T FEEL THAT THE FDA, AN AGENCY, CAN JUST

4    ALTER OR ERADICATE OR SUPERSEDE STATE REMEDIES PARTICULARLY

5    EVEN IN A PREAMBLE.  THAT WOULD BE DISTORTION OF OUR SYSTEM IF

6    THAT WERE ALLOWED, SO I'LL DENY THE MOTION.

7                    MR. CURREY:  I HOPE YOU'LL BE OPEN TO

8    RECONSIDERING THAT VIEW, YOUR HONOR.  THANK YOU.

9                    **MR. BIRCHFIELD:**  THANK YOU, YOUR HONOR.

10                   **The court:**  ANYTHING FURTHER?  WHAT ABOUT THE JURY

11   CHARGES -- I'M SORRY, THE QUESTIONNAIRE?  ANYTHING IN THE

12   QUESTIONNAIRE.

13                   **MR. CURREY:**  I BELIEVE WE'RE NOW AGREED ON THE

14   CONTENT OF THE JURY INTERROGATORIES.

15                   **The court:**  THERE IS NO OBJECTION TO --

16                   **MR. BIRCHFIELD:**  NO, YOUR HONOR.

17                   **THE COURT:**  THANK YOU VERY MUCH.  WE'LL BE OUT AT

18   8:30.

19                   **MR. BIRCHFIELD:**  YOUR HONOR, WE'VE GOT JUST A COUPLE

20   OF EXHIBITS THAT WE NEED TO CLEAN UP.

21                   **THE COURT:**  GAY, WE HAVE SOME EXHIBITS.

22                   **MS. O'DELL:**  GOOD MORNING, YOUR HONOR.  PLAINTIFF

23   WOULD LIKE TO WITHDRAW BRYAN 1, BRYAN 3, BRYAN 4, BRYAN 5,

24   BRYAN 6, BRYAN 7, BRYAN 8, AND BRYAN 9.

25                   **THE COURT:**  ANY OBJECTION?

```
 1              MR. GOLDMAN:  NO.

 2              THE COURT:  LET IT BE DONE.

 3              MS. O'DELL:  PLAINTIFF WOULD LIKE TO WITHDRAW 4.0050

 4    AND 4.0040.

 5              THE COURT:  ANY OBJECTION?

 6              MR. GOLDMAN:  NO.

 7              MS. O'DELL:  AND THEN OFFER INTO EVIDENCE,

 8    YOUR HONOR, 4.0051.

 9              THE COURT:  ANY OBJECTION?

10              MR. GOLDMAN:  WHICH ONE IS THAT?

11              MS. O'DELL:  THAT'S THE MEDICAL RECORD.

12              MR. GOLDMAN:  NO OBJECTION.

13              THE COURT:  LET IT BE RECEIVED.

14              MS. O'DELL:  AND THEN 1.1087.

15              MR. GOLDMAN:  WHAT IS THAT, AGAIN?

16              MS. O'DELL:  THAT'S THE MERCK MANUAL.

17              MR. GOLDMAN:  NO OBJECTION, OTHER THAN OUR ORIGINAL

18    PRETRIAL OBJECTION.

19              MS. O'DELL:  LAST BUT NOT LEAST, PLAINTIFF'S PROFFER

20    NUMBER 1, WHICH IS THE TOPOL TESTIMONY.

21              THE COURT:  LET IT BE ADMITTED AS A PROFFER, PROFFER

22    NUMBER 1 FOR THE PLAINTIFFS.

23              The deputy clerk:  AND THEN I THINK THE DEFENSE

24    HAS -- THEY HAVE THE OUTTAKES, ANDY.

25              MR. GOLDMAN:  RIGHT.  PLAINTIFFS WANTED TO OFFER A CD
```

1    WITH TWO HOURS OR SO WORTH OF VIDEO OUTTAKES, AND ONLY A

2    PORTION OF THOSE VIDEO OUTTAKES WERE PLAYED DURING A

3    DEPOSITION, SO WE OBJECT TO THE ADMISSION OF THE CD THAT HAS

4    EVIDENCE THAT WAS NOT ADMITTED IN THE CASE.

5            THE DEPUTY CLERK:  IT'S ALREADY IN.  THEY ARE ALREADY

6    IN, SO I DON'T KNOW THAT WE HAVE A CD WITH JUST THE OUTTAKES

7    THAT WERE SHOWN TO THE JURY.

8            MS. O'DELL:  WE DO NOT.  IF WE COULD PROVIDE THE

9    COURT WITH A CD THAT'S JUST THE OUTTAKE, DO YOU HAVE AN

10   OBJECTION TO THAT?

11           MR. BIRCHFIELD:  NO.  JUST SHOW IT TO ME IN ADVANCE,

12   THAT'S FINE.

13           MS. O'DELL:  AND IF NOT, WE'LL --

14           THE COURT:  TO CLEAN UP THE RECORD, WE'RE NOT GOING

15   TO USE IT FOR THE JURY.  THEY ARE NOT GOING TO SEE IT.

16           THE DEPUTY CLERK:  SO ARE WE GOING TO --

17           MR. BIRCHFIELD:  WE'LL SUBSTITUTE.

18           THE COURT:  THEY CAN SUBSTITUTE.

19           THE DEPUTY CLERK:  BUT, THEN, I'M NOT GOING TO SEND

20   IN EVEN A FOLDER, JUDGE, THAT WOULD ALLUDE TO THIS NUMBER; IS

21   THAT RIGHT?

22           THE COURT:  YES.  RIGHT.

23           MR. BIRCHFIELD:  YES.

24           MS. O'DELL:  AND, YOUR HONOR, LASTLY, I'M SORRY, I

25   LEFT OFF THIS GROUP OF MEDICAL RECORDS, PLAINTIFF OFFERS

1    DR. MIKOLA EXHIBIT 25A.

2         **The deputy clerk:**  TELL THE JUDGE WHICH ONES THOSE

3    ARE.

4         **MS. O'DELL:**  THESE WERE THE RECORDS THAT THE

5    STIPULATION PERTAINED TO THAT HAD BEEN REDACTED, AND WE

6    RECOGNIZE THEY WON'T GO TO THE JURY, BUT -- GO BACK TO THE JURY

7    BUT THAT THEY WILL BE IN THE RECORD.

8         **THE COURT:**  RIGHT.  IS THAT YOUR --

9         **MR. BIRCHFIELD:**  THAT'S RIGHT.  THEY COULD BE IN THE

10   RECORD, BUT THEY CAN'T GO JURY BECAUSE THEY HAVEN'T BEEN SHOWN

11   TO THE JURY.

12        **The deputy clerk:**  SO WHAT ARE THEY?

13        **MS. O'DELL:**  MIKOLA EXHIBIT 25A, MIKOLA EXHIBIT 26A,

14   MIKOLA EXHIBIT 22A, MCCAFFREY EXHIBIT 11A, MCCAFFREY

15   EXHIBIT 12A, MCCAFFREY EXHIBIT 13A, MCCAFFREY EXHIBIT 14A,

16   MCCAFFREY EXHIBIT 15A, MCCAFFREY EXHIBIT 16A, MCCAFFREY

17   EXHIBIT 17A, AND MCCAFFREY EXHIBIT 18A.

18             THANK YOU, YOUR HONOR.

19        **MR. BIRCHFIELD:**  THANKS, JUDGE.

20        **The court:**  OKAY, FOLKS, THANK YOU VERY MUCH.

21        (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)

22        **THE DEPUTY CLERK:**  EVERYONE RISE.

23        **THE COURT:**  GOOD MORNING, GENTLEMEN.  WELL, WE'RE AT

24   THE STAGE NOW WHERE THE EVIDENCE IS IN AND WE'RE ABOUT TO HEAR

25   CLOSING ARGUMENTS.

1          LET ME BEGIN BY AGAIN THANKING YOU FOR YOUR

2   SERVICE DURING THIS TIME.  ALL OF US KNOW THAT WE'VE TAKEN YOUR

3   PRIVATE TIME.  WE'VE TAKEN YOU AWAY FROM YOUR JOBS, YOUR OTHER

4   ACTIVITIES.  IT'S BEEN A BURDEN UPON YOU, BUT YOU'VE BORNE THAT

5   BURDEN WELL.  THE ATTORNEYS IN THE COURT KNOW THAT YOU HAVE

6   BEEN ATTENDANT, PROMPT, AND DOING A GOOD JOB.  WE'RE ALL PROUD

7   OF YOU, AND THE COURT IS PROUD OF YOUR SERVICE.

8          WE'RE AT THE POINT NOW WHERE THE PARTIES GIVE

9   CLOSING ARGUMENTS.  I'VE IMPOSED CERTAIN TIME ON THEM.  IT'S MY

10  TIME, NOT THEIRS, LIMITATIONS.  YOU KNOW THAT THEY CAN SPEAK

11  FOR DAYS ON THESE ISSUES.  I'M NOT GOING TO LET THEM.  WE'VE

12  GOT TO FINISH UP TODAY AND GET THE CASE TO YOU.

13          THE PLAINTIFF WILL BEGIN, FOLLOWED BY THE

14  DEFENDANT, AND THEN THE PLAINTIFF WILL HAVE AN OPPORTUNITY TO

15  REBUT.  WE'LL BEGIN WITH THE PLAINTIFF.

16          **MR. ROBINSON:**  THANK YOU, YOUR HONOR.  YOUR HONOR,

17  GENTLEMEN OF THE JURY, FRIENDS OF THE COURT, COUNSEL, THIS IS

18  THE END, BUT MAYBE IT'S THE BEGINNING FOR JERRY BARNETT.  YOU

19  KNOW, THIS IS A CASE, REALLY, ABOUT RESPONSIBILITY.  I THINK

20  THAT WHAT YOU'VE HEARD HERE -- YOU KNOW, THERE IS A LOT OF

21  PEOPLE IN LIFE WHO LIKE TO BLAME EVERYBODY ELSE, WHO TAKE --

22  WHO DON'T WANT TO TAKE PERSONAL RESPONSIBILITY THEMSELVES.

23          I DON'T THINK THE BARNETT FAMILY WAS THAT TYPE

24  OF FAMILY.  I THINK, WHATEVER THOSE PARENTS GREW, THEY GREW

25  PEOPLE THAT CARED ABOUT BEING RESPONSIBLE, BEING GOOD PEOPLE,

1   TAKING RESPONSIBILITY FOR THEIR OWN HEALTH, BEING DISCIPLINED

2   ABOUT WHAT YOU DID, INVESTIGATING THINGS.

3               THAT WAS JERRY BARNETT, AND I'M PROUD TO REALLY

4   REPRESENT HIM.  BECAUSE WHEN YOU COULD GO ALL THROUGH

5   NEW ORLEANS RIGHT NOW, AND YOU'RE NOT GOING TO FIND VERY MANY

6   PEOPLE WHO TOOK AS MUCH PERSONAL RESPONSIBILITY AS JERRY

7   BARNETT DID.  AND SO HE'S TAKEN RESPONSIBILITY FOR HIS ACTS.

8               AND WHAT WE'VE HEARD HERE IS REALLY THE FLIP

9   SIDE, THE OPPOSITE, BY A COMPANY THAT SORT OF LOST ITS COURSE,

10  A GREAT COMPANY, A COMPANY THAT WE'VE ALL RESPECTED OVER THE

11  YEARS, BUT, FOR WHATEVER REASON, LOST ITS PATH, ITS VISION, THE

12  WAY IT'S OPERATING.

13              HOW IT ALL CAME TOGETHER, UNFORTUNATELY, THE

14  DRIVING FORCE WAS MONEY.  THAT'S WHAT THIS STORY IS ABOUT,

15  UNFORTUNATELY.  IT DOESN'T MEAN THAT THEIR PEOPLE ARE

16  INTENTIONALLY TRYING TO HURT PEOPLE OR WHATEVER.  NO, WE DON'T

17  THINK THAT.  I DON'T THINK THAT.

18              BUT WHAT HAPPENS IS THIS:  WHEN YOU PUT TOGETHER

19  A NEW CEO, HE COMES IN AND HE -- HE SAYS, LOOK, WE'RE GOING TO

20  MAKE MONEY.  WE'RE IN THE MIDDLE OF THE PACK IN '94.  AND NOW

21  HE COMES IN.  HE GETS THEM UP TO THE TOP OF THE PACK, THE TOP

22  OF THE HEAP IN '97.  BUT NOW THEY ARE LOOKING AT THEIR -- AT

23  THE DRUGS GOING OFF PATENT AND HOW ARE WE GOING TO STAY THERE.

24  AND THAT'S WHAT'S HAPPENED.

25              AND THEN THEY HAVE BRILLIANT PEOPLE, THEY HAVE

1   VERY BRIGHT PEOPLE THERE, UNFORTUNATELY, WHO COULD DO A LOT OF
2   GOOD THINGS.  AND I'M SURE, YOU KNOW, IN MEDICAL SCHOOL AND THE
3   LIKE, THEY WERE.  BUT WHEN THEY ARE DIRECTED THAT PROFITS ARE
4   IMPORTANT, THAT WE'VE GOT TO RELOAD HERE, AND WE'RE CONCERNED
5   BUSINESS-WISE ACTION, AND LET'S JUST LET BUSINESS DIRECT THE
6   SCIENCE, YOU SAW WHAT HAPPENED.  THAT'S WHAT HAPPENED HERE.
7            IT'S REALLY WHAT -- WHAT'S GOING ON IS THIS:
8   YOU KNOW, THIS COMPANY IS NOT TAKING RESPONSIBILITY IN THIS
9   COURTROOM.  THEY HAVE NOT TAKEN RESPONSIBILITY IN THE LAST TWO
10  WEEKS.  THEY'VE TRIED TO BLAME EVERYBODY.  WHEN THEY CAN, THEY
11  TRY AND HIDE BEHIND THE FDA, WHICH YOU'VE HEARD ABOUT THE FDA.
12  IT'S NOT OUR GRANDFATHERS' FDA.
13           YOU'VE HEARD THAT THEY -- THEY TRY AND BLAME
14  JERRY BARNETT.  THEY TRY AND BLAME HIS DOCTORS, BUT THEN THEY
15  DON'T BLAME HIS DOCTORS.  WHEN THEY WANT, YOU KNOW, MIKOLA --
16  TO RELY ON MIKOLA, THEY RELY ON MIKOLA; BUT WHEN THEY DON'T
17  WANT TO RELY ON HIM, THEY BLAME HIM.  AND WHEN THEY WANT TO
18  RELY ON KARAVAN, THEY RELY ON HIM; BUT WHEN THEY DON'T LIKE --
19  YOU KNOW, THEY SAY, "WELL, HE SHOULD HAVE KNOWN."
20           THE REALITY IS THEY NEVER WARNED.  THEY NEVER --
21  THEY NEVER TOOK RESPONSIBILITY TO DO THE RIGHT THINGS WITH THAT
22  MEDICINE.  AND THERE IS NO WAY THAT JERRY BARNETT, THE GUY THAT
23  TOOK THIS DRUG FOR, YOU KNOW, 31 MONTHS AND THEN ANOTHER 24
24  MONTHS -- BUT HE ALSO TOOK LIPITOR RELIGIOUSLY.  HE DID
25  WHATEVER THE DOCTORS TOLD HIM TO DO.  HE -- BEFORE THAT, HE

1    TOOK PRILOSEC.

2                    HE HAD NO PROBLEMS ON FELDENE.  FOR 13 YEARS HE

3    TAKES FELDENE.  HE HAD SOME STOMACH PROBLEMS.  HE TOOK PRILOSEC

4    WITH IT, BUT HE HAD NO HEART PROBLEMS.  AND YOU HEARD THAT

5    FELDENE -- THE ONE STUDY THAT'S IN EVIDENCE ON FELDENE SHOWS

6    THAT IT'S -- IT'S THE SAME AS NAPROXEN.  SO FELDENE IS LIKE

7    ANOTHER NAPROXEN.  THAT'S THE STATE OF THIS EVIDENCE RIGHT NOW.

8                    BECAUSE OF VIOXX, AND BECAUSE OF THIS

9    INVESTIGATION WITH VIOXX WITH THE FDA, NOW ALL OF THEM HAVE

10   BLACK BOXES ON THEM, AND THERE IS NO SCIENCE.  IF YOU READ THE

11   DOCUMENT ITSELF, THE GOVERNMENT DOCUMENT IN APRIL OF 2006, IT

12   SAYS:  "LOOK, WE DON'T HAVE ANY STUDIES, WE DON'T HAVE ANY

13   STUDIES ON NSAIDS, BUT WE'RE STILL GOING TO PUT A BLACK BOX

14   JUST TO BE SAFE.  THE FDA WAS COVERING THEMSELVES.  THAT WAS

15   WHAT WAS GOING ON.

16                    BUT THE REALITY IS THE ONE DRUG WE DO HAVE

17   STUDIES ON, VIOXX, WAS THE CULPRIT.  AND THAT STARTED THIS

18   WHOLE PROBLEM.  BUT THE PROBLEM IS THAT WE KNOW THAT THERE'S

19   A -- THERE'S A TRACK OF HEART ATTACKS ON VIOXX.  WE DON'T KNOW

20   THAT ABOUT THESE OTHER NSAIDS.

21                    SO THIS IS A CASE ABOUT NOT WARNING.  IN 1999,

22   THEY PUT OUT A WARNING LABEL.  I'M GOING TO GO THROUGH.  WHAT

23   I'M GOING TO DO IS THIS:  YOU'RE GOING TO HAVE TO SEE -- YOU'RE

24   GOING TO BE THE JUDGES OF THE EVIDENCE.

25                    AND INCIDENTALLY, SOME OF THOSE CHARTS THAT

1   MR. GOLDMAN WROTE DOWN, I JUST SAT THERE, BUT HE DIDN'T WRITE

2   THE WHOLE THING THAT THE WITNESS SAID.  HE WROTE -- HE WROTE

3   HIS POINT, AND THEN YOU'RE GOING TO -- IF THEY USE THOSE

4   CHARTS, I'LL BE BACK UP ON REBUTTAL TO REBUT SOME OF THOSE.

5                    BUT THE REALITY IS THIS:  WHAT I'M GOING TO DO

6   IS TAKE YOU THROUGH A TIME LINE HERE BECAUSE I THINK IT'S

7   IMPORTANT THAT YOU SEE THE THING FROM THE BEGINNING DOWN TO THE

8   END.  AND ABOVE THE LINE, I'M GOING TO TALK TO YOU ABOUT JERRY

9   BARNETT UP HERE.  AND THEN DOWN HERE, I'M GOING TO TALK TO YOU

10  ABOUT VIOXX AND MERCK.

11                   THIS IS A CASE THAT, BUT FOR A SIMPLE WARNING,

12  VIOXX -- "WE BELIEVE VIOXX POTENTIALLY COULD CAUSE HEART

13  ATTACKS, DR. MIKOLA."  YOU KNOW, REMEMBER THE FDA WARNING LABEL

14  THAT CAME OUT IN 2000 -- I'M SORRY, IN 2001, THE ONE THAT HE

15  SAID THAT THEY -- THEY SAID -- DR. SCOLNICK SAID, "NO WAY WILL

16  I" -- I'M GOING TO ALLOW THIS.  THIS IS UGLY, UGLY CUBED."

17                   VIOXX SHOULD BE USED WITH CAUTION IN PATIENTS AT

18  RISK DEVELOPING CARDIOVASCULAR THROMBOTIC EVENTS SUCH AS THOSE

19  WITH A HISTORY OF MYOCARDIAL INFARCTION AND ANGINA AND IN

20  PATIENTS WITH PREEXISTING HYPERTENSIVE CONGESTIVE HEART

21  FAILURE.  THE RISK OF DEVELOPING MYOCARDIAL INFARCTION, THE

22  VIGOR STUDY, WAS FIVEFOLD HIGHER IN PATIENTS TREATED WITH

23  VIOXX, 50 MILLIGRAMS, AS COMPARED TO PATIENTS WITH NAPROXEN.

24  AND THEN THIS FINDING'S CONSISTENT WITH SMALLER AND SHORTER

25  STUDIES AT 25 MILLIGRAMS.  THE ADVANTAGE STUDY.

1          THAT'S THE WARNING THEY SHOULD HAVE GIVEN.  THEY

2   DIDN'T GIVE IT.  THEY FOUGHT THE FDA ON THAT.

3          I SHOWED DR. MIKOLA THAT AT HIS DEPO.  I SHOWED

4   HIM THAT WARNING.  AND HE GOES, "IF I HAD SEEN THAT, AND IF I

5   HAD SEEN THAT -- DR. SCOLNICK'S LETTER THAT THE EVENTS ARE

6   HERE, HE WOULD HAVE" -- THE BOTTOM LINE IS HE SAYS, "I WOULD

7   HAVE PUT HIM BACK ON FELDENE."  THAT'S IT.  JERRY WOULD GO BACK

8   TO FELDENE.  HE WAS FINE ON FELDENE.

9          MIKOLA'S WIFE WORKED FOR MERCK.  HE DIDN'T KNOW

10  THERE WAS A PROBLEM WITH VIOXX.  HE DID NOT KNOW.

11          AND INCIDENTALLY, REMEMBER SOMETHING,

12  DR. KARAVAN DIDN'T EVEN START TREATING UNTIL AFTER HIS HEART

13  ATTACK.  FIRST TIME KARAVAN EVER SAW HIM WAS SEPTEMBER 6, AFTER

14  HIS HEART ATTACK, OF 2002.

15          SO -- AND THEN DR. MCCAFFREY, THE FIRST DOCTOR,

16  GAVE HIS VIOXX IN 1999, HE NEVER SAW HIM AGAIN.

17          SO REALLY, MIKOLA IS THE DOCTOR -- MIKOLA IS THE

18  TREATING DOCTOR.  HE WOULD HAVE PUT HIM BACK ON FELDENE IF HE

19  HAD SEEN THAT LABEL.

20          THAT'S WHAT THIS CASE REALLY, IN A NUTSHELL, IS

21  ABOUT.  IT'S A FAILURE TO WARN.  THEY FOUGHT OFF THE FDA.

22  YOU -- I MEAN, IT'S AMAZING.  I DON'T THINK ANYBODY KNEW BEFORE

23  THIS TRIAL, AT LEAST HERE, THAT -- WHAT THE FDA'S ALL ABOUT.

24          AND THEN WE HAVE THIS FIGHT OVER A CARDIOLITE

25  EXAM.  HERE HE'S GOT A CARDIOLITE EXAM IN 2000 THAT SHOWS HE'S

1   GOT MILD ISCHEMIA IN ONE VESSEL.  AND I'LL SHOW YOU THAT.  I'M

2   GOING TO TAKE YOU THROUGH THIS.  AND THEN WE FIND, WELL,

3   MAYBE -- LET'S SPECULATE THAT MAYBE IT'S GOT MORE THAN WHAT IT

4   SHOWS.  DR. SWAMI, WHO IS A CARDIOLOGIST, SAID HE COULD GO

5   SKIING AFTER THAT.  DR. MIKOLA, YOU'RE GOING TO SEE, SAYS RIGHT

6   IN HIS OWN DOCUMENT THAT THIS WAS A NEGATIVE STRESS TEST EXCEPT

7   FOR A SMALL AREA OF MILD ISCHEMIA ON THE LATERAL WALL.

8               AND HE HAS THIS RAPID BUILDUP OF PLAQUE.  AND WE

9   KNOW WHY, WHAT VIOXX DOES.  AND, REALLY, HAVE YOU HEARD

10  EVIDENCE FROM THEM REBUTTING THAT IN THIS CASE?  DID THEY PUT

11  ON -- I MENTIONED DR. ROACH IN OPENING.  WHERE IS DR. ROACH?

12  DID THEY PUT HIM ON?  NO.  THEY PUT ON A COUPLE COMPANY

13  EMPLOYEES.  REMEMBER, I'M GOING TO SHOW YOU THE LAW IN A BIT,

14  BUT YOU'VE GOT TO BALANCE THE EVIDENCE HERE.  THEY DON'T PUT ON

15  COUNTER EVIDENCE, THAT'S THE EVIDENCE.

16               31 MONTHS.  31 MONTHS.  THIS ISN'T A MATTER OF

17  THREE WEEKS.  THIS IS 31 MONTHS ON THE DRUG BEFORE HIS HEART

18  ATTACK.  EVEN MERCK, WHEN THEY WITHDREW THE DRUG, SAID AFTER --

19  WELL, WE FOUND PROBLEMS AFTER 18 MONTHS.  THIS IS 31 MONTHS.

20  BUT THAT'S WHAT THIS CASE IS ABOUT.

21               NOW, WHAT I WANT TO DO IS THIS, IS I WANTED

22  TO -- THERE IS A LOT OF EVIDENCE HERE.  I'M NOT GOING TO BE

23  ABLE TO COVER IT ALL.  IT'S GOING TO BE IN YOUR PROVINCE.  IT'S

24  A LOT OF EXHIBITS.  BUT WHAT I WANT TO DO IS TAKE YOU THROUGH

25  IT, JUST BRIEFLY.

1            LET ME SEE WHAT WE HAVE HERE.

2            YOU KNOW, AS I SAID, THESE ARE GOOD PEOPLE.

3     THESE AREN'T PEOPLE THAT -- JERRY IS NOT A GIANT RISK-TAKER.

4     HE'S QUESTIONING HIS DOCTORS.  HE'S DOING WHAT HE COULD DO.  I

5     MEAN, COME ON.  HE WORKED 27 YEARS WITH THE FBI.  YOU DEVELOP

6     GOOD HABITS THERE.  IF THERE WAS ANY POSSIBILITY THAT THIS DRUG

7     WAS GOING TO CAUSE HIM A PROBLEM, HE WOULD HAVE GOT OFF OF IT.

8     HE GOT OFF METABOLIFE WHEN HE -- AFTER TWO WEEKS WHEN HE

9     THOUGHT THERE WAS A PROBLEM.

10            HIS WIFE SAID, "LOOK, HE REALLY IS A -- YOU

11     KNOW, HE'S RELIGIOUS ABOUT CHECKING THINGS OUT."

12            AND DR. MIKOLA, THE SAME WAY, WAS A GOOD DOCTOR.

13     THAT'S WHY JERRY LIKED HIM.

14            OKAY.  FIRST THING I WANT TO DO IS THIS.  YOU'RE

15     GOING TO GET THE JURY INTERROGATORIES HERE.  THESE ARE GOING TO

16     BE THE QUESTIONS THAT YOU'RE GOING TO ANSWER WHEN THE CASE --

17     AFTER MR. BECK AND I FINISH.  THEN YOU'RE GOING TO GO THROUGH

18     THE EVIDENCE AND THEN YOU GET TO ANSWER THESE QUESTIONS.

19            AND THE FIRST QUESTION IS:  "DO YOU FIND THAT

20     MERCK & COMPANY FAILED TO ADEQUATELY WARN GERALD BARNETT, HIS

21     TREATING PHYSICIANS" -- DR. MIKOLA -- OF A KNOWN OR REASONABLY

22     SCIENTIFICALLY OR MEDICALLY KNOWABLE RISK ASSOCIATED WITH

23     VIOXX..."  HEART ATTACKS.  MIKOLA, YOU KNOW, GIVEN THAT WARNING

24     LABEL, HE WOULD HAVE TAKEN HIM OFF IT.  HE WOULD HAVE PUT HIM

25     ON FELDENE.

1      "...AND THAT SUCH FAILURE TO ADEQUATELY WARN WAS

2   A LEGAL CAUSE OF INJURY TO GERALD BARNETT?"

3      GO TO NUMBER 2.  "DO YOU FIND THAT MERCK &

4   COMPANY WAS NEGLIGENT?"  OKAY.  SO NUMBER 1 IS WHAT THEY CALL

5   STRICT LIABILITY, AND THE KEY WORDS ON "STRICT LIABILITY" ARE

6   WHAT WAS KNOWN OR KNOWABLE.  I'LL SHOW YOU.  IN OTHER WORDS,

7   IT'S NOT JUST WHAT'S -- UNDER "STRICT LIABILITY" IN THIS

8   COUNTRY, THERE -- YOU CAN ACTUALLY PROVE IT EVEN IF THEY ARE

9   NOT NEGLIGENT.  IF THERE IS SOMETHING THAT THEY KNEW THAT WAS

10  KNOWN OR KNOWABLE.  "KNOWABLE" IS THE KEY WORD.  IF IT'S

11  KNOWABLE.

12      IT WAS KNOWABLE.  THEY COULD HAVE RUN A TEST.

13  THEY DIDN'T FERRET IT OUT.  THEY DIDN'T FERRET IT OUT, THE CV

14  TEST.  THEY DIDN'T WANT TO KNOW.  BUT IT WAS CERTAINLY

15  KNOWABLE.  DO YOU KNOW WHY?  THE APPROVE STUDY CLEARLY SHOWED

16  IT.  BUT WHY DIDN'T THEY RUN THAT EARLIER?  IT WAS KNOWABLE.

17      PLUS, THEY DIDN'T WARN HIM:  "HEY, WE HAVEN'T

18  REALLY FERRETED THIS OUT.  WE HAVE SOME EVIDENCE HERE THAT THIS

19  CAUSES HEART ATTACKS SO WE'RE GOING TO PUT THIS ON THE FIRST

20  LABEL AND TELL YOU, LOOK, DOCTORS, BE CAREFUL."  COULDN'T DO

21  THAT.

22      THEN THE NEXT STANDARD IS NEGLIGENCE FAILURE TO

23  WARN, WHICH IS WHAT THEY SHOULD HAVE KNOWN.

24      AND THEN THE THIRD STANDARD IS DECEIT.  THIRD

25  QUESTION IS:  "DO YOU FIND THAT THEY KNOWINGLY MISREPRESENTED

1    OR FAILED TO DISCLOSE A MATERIAL FACT TO GERALD BARNETT'S

2    DOCTORS, PHYSICIANS, IN A CIRCUMSTANCE WHERE IT WAS" -- LET ME

3    SEE IF I CAN READ -- "REQUIRED TO DO SO AND THAT

4    GERALD BARNETT'S TREATING PHYSICIANS WERE ENTITLED TO RELY ON

5    THAT MISREPRESENTATION OR NONDISCLOSURE AND THAT THE

6    MISREPRESENTATIONS OR NONDISCLOSURE OF A LEGAL CAUSE OF INJURY

7    TO GERALD BARNETT."

8                    SO YES, THEY -- THEY MISLED DR. MIKOLA.  AND

9    THEY DID IT INTENTIONALLY.  I DON'T CARE.  YOU MAY SAY, "GEE,

10   WHY WOULD THEY DO THAT?"  MONEY.  DID THEY -- DID THEY HAVE THE

11   INFORMATION THEY SHOULD HAVE GIVEN HIM?  YES.  HE SHOULD HAVE

12   HAD ALL THAT INFORMATION THAT THEY HAD.  THAT'S THEIR DUTY, TO

13   WARN.

14                   AND THEN IF YOU ANSWER YES TO ANY ONE OF THOSE

15   THREE, THEN YOU GO ON TO 4, 5, 6, AND 7.  "DO YOU FIND" --

16   BECAUSE THEN THEY -- YOU GET TO COMPARE IN THE NEGLIGENCE OF

17   THESE -- OF THE DOCTORS AND GERALD BARNETT.

18                   SO NUMBER 4 IS:  "DO YOU FIND THERE WAS

19   NEGLIGENCE ON THE PART OF GERALD BARNETT THAT WAS A LEGAL CAUSE

20   OF HIS INJURY?"  I DON'T THINK SO.  I THINK HE DID EVERYTHING

21   IN HIS POWER.  I MEAN, THEY TRIED TO SPECULATE THAT, WELL, HE

22   WAS ON ASPIRIN IN THE HOSPITAL BACK IN 2000.  BUT I WENT

23   THROUGH HIS RECORDS.  HE WAS NEVER PRESCRIBED ASPIRIN AFTER

24   THAT.  THERE WAS SOME QUESTIONS FROM LAWYERS ABOUT THE HOSPITAL

25   AND TRYING -- "WELL, WOULD YOU HAVE PUT HIM ON THAT?"  YES.

1  AFTER THE FACT.

2              JERRY WAS NEVER ON THAT.  IF JERRY WAS ON A

3  MEDICINE, HE TOOK IT EVERY DAY.  IF HE WAS ON ASPIRIN, HE TOOK

4  IT EVERY DAY.  HE TOOK PRILOSEC EVERY DAY.  HE TOOK -- HE TOOK

5  VIOXX EVERY DAY, RELIGIOUSLY.  HE TOOK LIPITOR WHEN HE WAS ON

6  THAT.  IF HE WAS ON ASPIRIN, HE WOULD HAVE TAKEN IT.  HE WAS

7  NOT PRESCRIBED ASPIRIN.  THAT'S CLEAR.  THAT'S THE WEIGHT OF

8  THE EVIDENCE HERE.

9              NUMBER 5, "DO YOU FIND THAT DR. MCCAFFREY WAS

10  NEGLIGENT?"  YOU'RE GOING TO SEE THAT THE FIRST WARNING LABEL

11  IN '99 HAD NO WARNING ABOUT HEART ATTACKS AT ALL.  HOW WOULD

12  MCCAFFREY KNOW TO WARN?

13              NEXT THING, NUMBER 6:  "DO YOU FIND DR. MIKOLA

14  WAS NEGLIGENT?"  I DON'T THINK -- I REALLY DON'T THINK SO.  I

15  THINK HE DID WHAT HE THOUGHT WAS RIGHT.  I THINK --

16         **MR. BECK:**  YOUR HONOR, I THINK IT'S IMPROPER ARGUMENT

17  FOR MR. ROBINSON TO BE TALKING ABOUT WHAT HE THINKS.

18         **THE COURT:**  YES.  LET'S GO WITH THE EVIDENCE.

19         **MR. ROBINSON:**  THAT'S FINE.

20              DR. MIKOLA, YOU SAW HIM, YOU SAW THE VIDEO.

21  REMEMBER HIM?  HE WAS A CARING PERSON.  EVERYBODY ELSE -- EVEN

22  DR. KARAVAN AND DR. BRYAN SAID, "I DON'T THINK HE'S NEGLIGENT.

23  I DON'T THINK HE DID ANYTHING WRONG."  THAT'S THE STATE OF THE

24  EVIDENCE.  HE DIDN'T.

25              SO -- AND THEN DR. KARAVAN?  NUMBER 7?  DID HE

2554

1    DO SOMETHING WRONG?  I DON'T THINK SO.  I THINK HE DID THE BEST
2    HE COULD DO.
3              **MR. BECK:**  YOUR HONOR, IT'S THE SAME PROBLEM.
4              **MR. ROBINSON:**  WELL, I'LL -- OKAY.  THE EVIDENCE
5    SHOWED THAT DR. KARAVAN DID THE BEST HE COULD DO UNDER THE
6    CIRCUMSTANCES.  NOBODY SAID THAT DR. KARAVAN MALPRACTICED,
7    THAT -- FIRST OF ALL, KARAVAN DIDN'T EVEN KNOW JERRY BARNETT
8    UNTIL AFTER HIS HEART ATTACK.  RIGHT THERE, THAT'S ENOUGH.  HE
9    DIDN'T -- HE COULDN'T HAVE CONTRIBUTED TO HIS HEART ATTACK.  HE
10   DIDN'T EVEN SEE HIM UNTIL AFTER SEPTEMBER 6, 2002.
11             NEXT POINT, SO IT SAYS, "IF YOU ANSWER NO TO 4,
12   5, 6, AND 7, THEN YOU CAN SKIP NUMBER 8.  LET'S GO TO NUMBER 9.
13   WELL, NUMBER 8 IS -- IF YOU FIND FOR SOME PERCENTAGE ON THESE
14   OTHER PEOPLE, YOU PUT THE PERCENTAGE FOR MERCK AND THE
15   PERCENTAGES FOR EVERYBODY ELSE.
16             BUT IF YOU DON'T FIND PERCENTAGES ON THESE
17   PEOPLE, THEN YOU GO TO NUMBER 9, AND THEN THAT IS DAMAGES.
18   NOW, I'LL GO OVER THAT LATER.  SO THAT REALLY IS WHAT YOU'RE
19   GOING TO GET IN THE JURY ROOM.
20             OKAY.  NOW, LET ME GO TO THE -- NOW I'M JUST
21   GOING TO QUICKLY GO OVER THE JURY CHARGE.  THE JURY CHARGE IS
22   LONG.  I CAN'T -- IT'S PRETTY THICK.  BUT BASICALLY I'M GOING
23   TO PICK JUST SOME HIGHLIGHT POINTS.  I'M SURE MR. BECK WILL
24   PICK SOME POINTS TOO.  I'LL COME BACK AND GO OVER THEM AGAIN.
25   I CAN'T GO OVER EVERYTHING.  BUT THERE ARE SOME IMPORTANT

1    POINTS THAT YOU MIGHT NOT KNOW.

2                        CAN YOU PUT IT UP THERE?

3                        THE LAW IN THIS CASE IS NOT A CRIMINAL CASE,

4    IT'S PREPONDERANCE.  IT'S MORE LIKELY THAN NOT THAT THE

5    EVIDENCE -- FOR EACH OF THESE ISSUES, IS IT MORE LIKELY THAN

6    NOT.  FOR EXAMPLE, IS IT MORE LIKELY -- WELL, FOR EXAMPLE,

7    KARAVAN NEVER TREATED HIM BEFORE HIS HEART ATTACK, SO THAT'S

8    NOT EVEN -- THAT'S BEYOND A REASONABLE DOUBT TO A MORAL

9    CERTAINTY.

10                       BUT SOME OF THE ISSUES -- YOU COULD WEIGH

11   EVIDENCE, BUT -- AND THAT'S WHAT WE'LL DO TODAY:  WE'LL WEIGH

12   EVIDENCE.  BUT BASICALLY, IT'S WHAT'S MORE LIKELY THAN NOT.

13   AND THAT'S WHAT YOUR OBLIGATION IS, TO WEIGH THE EVIDENCE.

14                       OKAY.  GO TO THE NEXT -- CAN WE GO TO THE JURY

15   CHARGE.

16                       OKAY.  THIS IS YOUR JURY CHARGE, AND I'VE

17   HIGHLIGHTED -- THE FIRST ISSUE IS "STRICT LABILITY FAILURE TO

18   WARN."  AND THEN IT SAYS, "TO PROVIDE AN ADEQUATE WARNING, THE

19   MANUFACTURER MUST DISCLOSE THE KNOWN" -- REMEMBER I SAID

20   REASON -- THE KNOWN OR REASONABLY SCIENTIFICALLY OR MEDICALLY

21   KNOWABLE RISK.  SO THAT A REASONABLY PRUDENT PHYSICIAN CAN ACT

22   IN LINE WITH THE POTENTIAL DANGER.

23                       AND THEN I THINK THERE'S A VERY IMPORTANT PART

24   OF THIS.  NOW, HOW DO YOU MEASURE WHAT THE DUTY TO WARN IS?

25   AND THE COURT HAS ALREADY GIVEN US THESE INSTRUCTIONS.  IT

                          DAILY COPY

1    SAYS, "THE DUTY TO WARN INCLUDES THE DUTY TO WARN WITH A DEGREE

2    OF INTENSITY THAT WOULD CAUSE A REASONABLE PRESCRIBING

3    PHYSICIAN TO EXERCISE THE CAUTION COMMENSURATE WITH THE

4    POTENTIAL DANGER."

5                    SO YOUR DUTY TO WARN IS YOU'VE GOT TO WARN WITH

6    AN INTENSITY COMMENSURATE WITH A HEART ATTACK RISK.  YOU CAN'T

7    TRY AND -- YOU CAN'T HIDE IT IN THE FIRST LABEL.  FOR 27

8    MONTHS, THERE IS NO WARNING OF HEART ATTACKS.  FROM -- FROM

9    JANUARY OF 2000 TO APRIL 2002, THERE IS NO -- NOTHING IN THE

10   LABEL ON HEART ATTACKS, WARNING ABOUT HEART ATTACKS.

11                   THEY MENTION AT THE BOTTOM END -- IN THE SORT OF

12   THE -- THE CATCH-ALL SECTION OF THE LABEL, AT THE VERY END,

13   THEY LIST ALL THE THINGS THAT HAVE BEEN ASSOCIATED WITH VIOXX,

14   AND ONE OF THEM IS HEART ATTACKS.  BUT THEY DON'T WARN DOCTORS.

15   THERE IS NOTHING IN THE PRECAUTION SECTION, THE WARNING

16   SECTION, ANY OF THE SECTIONS, OTHER THAN THIS CATCH-ALL AT THE

17   END WHICH INCLUDES EVERYTHING:  RASHES.

18                   OKAY.  AND THEN IT WILL GO ON.  I'M NOT --

19   BASICALLY, I WANT TO JUMP TO "NEGLIGENT FAILURE TO WARN."  IT

20   GIVES YOU THE THREE CRITERIA, THE THREE ELEMENTS.  THE "DECEIT

21   BY CONCEALMENT."  IT TELLS YOU WHAT THE ELEMENTS ARE.  YOU'LL

22   READ THAT.

23                   NOW, I THINK I JUST WANT TO COVER CAUSATION JUST

24   BRIEFLY.  AND BASICALLY, VIOXX -- WE HAVE TO SHOW VIOXX WAS A

25   PROXIMATE CAUSE OF HIS ALLEGED INJURY.  "THE LAW DEFINES

1  PROXIMATE CAUSE AS SOMETHING THAT PRODUCES A NATURAL CHAIN OF

2  EVENTS, WHICH, IN THE END, BRING ABOUT THE INJURY.  IN OTHER

3  WORDS, PROXIMATE CAUSE IS THE CAUSE WITHOUT WHICH," I THINK,

4  "THE INJURY WOULD NOT HAVE OCCURRED."

5              "IN ORDER TO BE REGARDED AS A PROXIMATE CAUSE OF

6  INJURY, HOWEVER, THE DEFECT NEED NOT BE THE ONLY CAUSE."  THIS

7  IS REALLY IMPORTANT.  THIS IS THE MOST IMPORTANT INSTRUCTION IN

8  THE CAUSATION INSTRUCTION.

9              IN OTHER WORDS, IF JERRY BARNETT HAS

10  ATHEROSCLEROSIS THAT YOU BELIEVE CONTRIBUTED TO HIS HEART

11  ATTACK, THAT SET HIM UP FOR IT.  BUT IF VIOXX, ON TOP OF HIS

12  ATHEROSCLEROSIS, COMES IN, THERE CAN BE MORE THAN ONE CAUSE OF

13  HIS HEART ATTACK.  AND THAT'S WHAT HAPPENED HERE.  THAT'S WHAT

14  THE EVIDENCE SHOWED.

15              SO "A DEFECT MAY BE A LEGAL CAUSE OF AN INJURY

16  EVEN THOUGH IT OPERATES IN COMBINATION WITH THE ACT OF ANOTHER,

17  SOME NATURAL CAUSE" -- LIKE ATHEROSCLEROSIS -- "OR SOME OTHER

18  CAUSE IF SUCH OTHER CAUSE OCCURS AT THE SAME TIME THE DEFECT

19  HAS ITS EFFECT AND IF THE DEFECT CONTRIBUTES SUBSTANTIALLY TO

20  PRODUCING THE ALLEGED INJURY."

21              SO YOU HAVE YOUR ATHEROSCLEROSIS, BUT YOU GO 31

22  MONTHS ON VIOXX, AND IT TRIGGERS ALL SORTS OF THINGS.  AND

23  THAT'S WHAT HAPPENED HERE.

24              AND THEN IT SAYS, "FURTHERMORE, A DEFENDANT MAY

25  STILL BE HELD LIABLE WHEN THE DEFENDANT'S FAULT OPERATES UPON A

1    CONCEALED PHYSICAL CONDITION, SUCH AS A LATENT DISEASE" --

2    ATHEROSCLEROSIS INSIDE -- "TO PRODUCE CONSEQUENCES WHICH THE

3    DEFENDANT COULD NOT REASONABLY ANTICIPATE."

4                    IN OTHER WORDS, EVEN IF THE DEFENDANTS DIDN'T

5    KNOW THAT, IF THEY -- IF JERRY BARNETT HAD ATHEROSCLEROSIS THAT

6    WAS INSIDE OF HIM, AND YOU PUT VIOXX ON TOP OF THAT, EVEN IF

7    THEY DON'T KNOW JERRY BARNETT OR CAN ANTICIPATE THE

8    CONSEQUENCES, THEY ARE STILL LIABLE.  THEY STILL CAUSED IT

9    UNDER THE LAW.

10                   IT'S AN IMPORTANT INSTRUCTION.  I ASK YOU TO

11   REALLY STUDY THAT WHEN YOU -- IF YOU ARE ALLOWED TO TAKE -- I

12   DON'T KNOW IF YOU'RE GETTING THOSE INSTRUCTIONS IN THE JURY

13   ROOM, BUT WHEN THE JUDGE INSTRUCTS YOU, I'D ASK YOU TO LISTEN

14   TO THEM.

15                   AND THEN ONE OTHER THING:  FDA.  THIS IS ANOTHER

16   IMPORTANT INSTRUCTION.  BASICALLY WHAT IT SAYS IS THIS:

17   "COMPLIANCE WITH THE FDA REGS MAY ESTABLISH THAT A MANUFACTURER

18   MET THE APPROPRIATE MINIMUM STANDARDS OF DUE CARE.  BUT

19   COMPLIANCE DOES NOT NECESSARILY ABSOLVE A MANUFACTURER OF ALL

20   LIABILITY, NOR DOES IT ESTABLISH THAT THE WARNINGS AT ISSUE

21   WERE ADEQUATE.  IF YOU FIND THAT THE DEFENDANT MERCK MET ALL

22   GOVERNMENT REGS AND REQUIREMENTS, SUCH COMPLIANCE IS NOT A

23   DEFENSE IF A REASONABLY PRUDENT MANUFACTURER WOULD HAVE TAKEN

24   ADDED PRECAUTIONS."

25                   SO, FIRST OF ALL, THE FDA WAS TELLING THEM TO DO

```
 1    THIS.  THAT'S WHAT THEY SHOULD HAVE DONE.  THEY SHOULD HAVE PUT
 2    THE PROPER WARNING ON.  BUT THE BOTTOM LINE IS:  IT DOESN'T
 3    MATTER IF THEY COMPLIED WITH THE FDA.  IF THEY FAILED TO
 4    WARN -- WHICH THEY DID.  THE EVIDENCE SHOWED THAT THEY DID FAIL
 5    TO WARN -- THEN THEY ARE LIABLE.  THEY CAN'T GET OUT OF THIS
 6    BECAUSE THE FDA KEPT RUBBER-STAMPING IT AND PUTTING ALL THOSE
 7    APPROVALS ON THEM.  AND YOU HEARD A LOT ABOUT THE FDA.
 8              OKAY.  SO LET'S MOVE ON.  WHEN I STARTED THIS
 9    CASE, I TOLD YOU ABOUT GEORGE MERCK.  IN ONE OF THE DOCUMENTS
10    HERE, GEORGE MERCK SAID, "WE TRY NEVER TO FORGET THAT MEDICINE
11    IS FOR THE PEOPLE.  IT IS NOT FOR THE PROFITS.  THE PROFITS
12    FOLLOW, AND IF WE HAVE REMEMBERED THAT, THEY HAVE NEVER FAILED
13    TO APPEAR."
14              UNFORTUNATELY, THAT'S WHAT THIS CASE IS ABOUT.
15    THEY PUT THE PROFITS BEFORE THE PEOPLE HERE.  AND YOU KNOW
16    WHAT?  IT WAS REALLY THE ATTITUDE OF RAY GILMARTIN.  YOU'RE NOT
17    MAKING WIDGETS HERE THAT GO OUT AND, YOU KNOW, CAN'T HURT
18    PEOPLE; YOU'RE MAKING DRUGS THAT ARE GOING OUT TO ALL THE
19    AMERICANS.  SO, BASICALLY, WE WANT -- RAY GILMARTIN SAYS, "WE
20    WANT MERCK TO BE ONE OF THE FASTEST-GROWING PHARMACEUTICAL
21    COMPANIES IN THE WORLD."  HE WAS A HARVARD MBA.  THAT WAS HIS
22    ATTITUDE.
23              YOU SAW -- REMEMBER I TOLD YOU WHO THE KEY
24    DECISION-MAKERS WERE.  I THINK THEY ALL PROVED OUT TO BE TRUE.
25    THEY LOST SIX DRUGS TO PATENT EXPIRATION.  THAT'S THEIR MOTIVE.
```

1  THE CONCERN ABOUT THE DRUGS THAT ARE GOING TO PATENT, THAT'S

2  WHAT SCOLNICK SAID.

3            GILMARTIN SAID THE SAME THING:  "WE'RE LOSING

4  THE DRUGS TO PATENT.  VIOXX IS SORT OF RELOADING FOR US."

5            WHY VIOXX?  IT'S A LONG-TERM-USE DRUG.

6            JERRY IS LIKE THE PERFECT -- HE'S THE PERFECT

7  CUSTOMER.  REMEMBER, JERRY'S THEIR CUSTOMER.  AND DO YOU KNOW

8  WHO THE CUSTOMERS ARE?  THEY ARE PEOPLE IN THEIR 50S, 60S, 70S,

9  MAYBE LATE 40S.  PEOPLE WHO -- PEOPLE WHO HAVE OSTEOARTHRITIS

10  AND RHEUMATOID ARTHRITIS AND NEED THIS DRUG PRIMARILY ARE OLDER

11  PEOPLE WITH ACCELERATED PLAQUE -- I'M SORRY -- WITH

12  ATHEROSCLEROSIS.

13            EVEN SCOLNICK SAID, "I KNEW THAT A CV OUTCOMES

14  STUDY WOULD HAVE -- WOULD HAVE DELAYED MERCK'S ENTRANCE ONTO

15  THE MARKET.  HE WAS ASKED THAT QUESTION.  IN THIS EXHIBIT HERE,

16  YOU KNOW, HE SAYS THAT, YOU KNOW, THEY -- WE'VE GOT TO GET TO

17  MARKET QUICKLY.  HE SAYS -- AT THE BOTTOM THERE, IT SAYS, "IT'S

18  TO PRESERVE MERCK AND MRL, PERIOD, FOR OTHERS AND YOURSELVES."

19  HE'S A DOCTOR, BUT HE'S TRYING TO PUSH THEM TO BEAT CELEBREX

20  FOR THE GOOD OF THE COMPANY.  IT'S GOING TO GO UNDER.

21            OKAY.  WHAT DID MERCK KNOW AND WHEN DID THEY

22  KNOW IT.  THAT'S WHY I'M GOING TO GO TO THIS TIME LINE HERE.

23  SO, BASICALLY, WHAT WE HAVE IS, WE HAVE -- I'LL GO OVER HERE.

24  MERCK KNEW THAT IF PROSTACYCLIN WAS REDUCED -- I'LL TAKE THIS

25  HERE SO THAT CATHY CAN HEAR ME.

1          SO MERCK KNEW THAT IF PROSTACYCLIN IS REDUCED,

2   THAT YOU'RE GOING TO -- IF YOU KEEP THE THROMBOXANE UP, THAT

3   YOU GOT AN IMBALANCE AND THAT YOU'RE IN TROUBLE BECAUSE YOU'RE

4   AT A RISK OF HEART ATTACKS.  THEY SAY THAT RIGHT IN THE *MERCK*

5   *MANUAL*.  SO THAT'S RIGHT HERE AT 1992.

6          REMEMBER THE QUESTIONS THAT -- IN THE '99 *MERCK*

7   *MANUAL*, DIDN'T HAVE THE SAME LANGUAGE ABOUT PROSTACYCLIN AND

8   THROMBOXANE.  I THINK YOU CAN TAKE THAT AS SOME EVIDENCE OF

9   KNOWLEDGE HERE, THAT THEY WOULD MAYBE CONCEAL IT.  I THINK

10  THAT'S SOME EVIDENCE OF CONCEALMENT.

11          AND REMEMBER, DR. JERRY AVORN SAID, "A SIGNAL IS

12  NOT A SLAM DUNK THAT THERE'S A PROBLEM WITH A DRUG.  IT'S MORE

13  OF A SMOKING GUN."  IF SOMETHING" -- THESE ARE FROM MY NOTES,

14  NOW.  BUT YOUR NOTES, YOU CAN REMEMBER.  WE'RE NOT ALLOWED TO

15  PUT QUOTES UP THERE, SO I'M JUST TELLING YOU FROM OUR NOTES.

16  AND IT WILL BE THE SAME FOR MR. BECK.  "IF SOMETHING LOOKS

17  SUSPICIOUS" --

18          **MR. BECK:**  YOUR HONOR, AT THIS POINT COULD YOU

19  INSTRUCT THE JURY ON THIS?

20          **MR. ROBINSON:**  YEAH.  THAT'S FINE.

21          **THE COURT:**  MEMBERS OF THE JURY, AS I MENTIONED

22  EARLIER ON, THE OPENING STATEMENTS ARE NOT EVIDENCE AND

23  SUMMATION OR CLOSING ARGUMENT IS NOT EVIDENCE.  OPENING

24  STATEMENTS ARE WHAT THE ATTORNEYS FEEL THE EVIDENCE IS GOING TO

25  SHOW, AND THE OPENING STATEMENTS ARE WHAT THEY FEEL THE

1    EVIDENCE HAS SHOWN OR THE INFERENCES THAT THEY FEEL THAT YOU

2    CAN REASONABLY DRAW FROM THAT.  WHAT COUNSEL PUTS ON THE BOARD

3    OR DRAWS IS NOT EVIDENCE.  IT'S WHAT HIS ARGUMENT IS.  HE'S

4    ADVANCING HIS ARGUMENT.  ON EACH SIDE.

5              **MR. ROBINSON:**  OKAY.  SO THE FIRST -- SO IN '96,

6    EXHIBIT P-10122 SAID THAT THE "ADVERSE EVENTS, INCLUDING HEART

7    ATTACKS, WERE OF MOST CONCERN."  SO THEY HAD EVIDENCE OF HEART

8    ATTACKS.  JUST PUT HEART ATTACKS HERE IN '96.

9                   THEN, AGAIN, YOU HEARD THE DEFENSE TALK ABOUT

10   THIS MUSLINER MEMO WHERE HE WAS TALKING ABOUT, GEE, IF WE -- IF

11   WE'RE GOING TO HAVE A HIGHER RISK -- HIGHER NUMBER OF HEART

12   ATTACKS, THEN, IF WE COMPARE IT TO OTHER DRUGS -- WELL, FIRST

13   OF ALL, YOU'RE PUTTING OUT A PAIN MEDICATION THAT YOU DON'T

14   KNOW THE ANSWERS TO WITH THE OTHER NSAIDS ALL HAVE BEEN PROVEN

15   TO WORK ONE WAY.  THEY ALL -- THEY KEEP COX-1 AND COX-2 IN

16   BALANCE, BUT YOU'RE PUTTING OUT, ONE, A BRAND-NEW DRUG, AND

17   YOU'RE PUTTING IT OUT -- YOU'RE TAKING THE -- LEAVING COX-1,

18   BUT YOU'RE -- YOU'RE TAKING AWAY THE COX-2.  YOU'RE

19   EXPERIMENTING.

20                   SO EVERYTHING YOU LEARN IN YOUR STUDIES, HEART

21   ATTACKS, OR HERE, THAT THERE MIGHT BE AN INCREASED RISK IN

22   HEART ATTACKS FROM THE MUSLINER MEMO, IS IMPORTANT.  SO

23   INCREASE IN HEART ATTACKS THEY KNEW FROM THE MUSLINER MEMO.

24   THEY WERE CONCERNED ABOUT THAT.

25                   THEN FROM EXHIBIT P1.1004, AND I'M SUMMARIZING

1    HERE, BUT I THINK THIS IS WHAT YOU HEARD BETWEEN BRIGGS

2    MORRISON -- DR. MORRISON AND DR. REICIN, BASICALLY; THAT

3    MORRISON SAYS, "WITHOUT COX-1 INHIBITION, THERE WILL BE A DROP

4    IN THROMBOXANE AND YOU WILL GET MORE THROMBOTIC EVENTS AND

5    KILL" -- HE DIDN'T SAY HEART ATTACKS, BUT THAT'S WHAT THAT

6    MEANT -- "AND KILL THE DRUG."  HE SAYS -- HIS SUGGESTION WAS TO

7    USE LOW-DOSE ASPIRIN.  THAT WILL REDUCE THE EVENTS.

8              WELL, DR. REICIN SAYS, "LOW-DOSE ASPIRIN IS A

9    NO-WIN SITUATION BECAUSE OF STOMACH PROBLEMS."  THAT'S WHAT SHE

10   SAID ON THE STAND.  "AND THAT POSSIBLY OF HEART ATTACKS IS OF

11   GREAT CONCERN."  THAT'S HER LANGUAGE.

12             AND THEN SHE SAID, "EXCLUDING HIGH-RISK CV HEART

13   ATTACK PATIENTS" -- MAYBE EVEN EXCLUDING JERRY BARNETTS OF THE

14   WORLD.  LET'S EXCLUDE THEM -- "MAY DECREASE THE CV EVENT RATE

15   SO THAT A DIFFERENCE WOULD NOT BE EVIDENT."

16             I ASKED HER THAT.  YOU CAN'T GET AROUND THAT.

17   THAT'S CONCEALMENT.  THAT'S OUT-AND-OUT CONCEALMENT.  YOU'RE

18   TRYING TO -- COME ON, YOU'RE TRYING TO PUT OUT A STUDY HERE SO

19   THE EVENTS WON'T BE EVIDENT?  SO, YOU KNOW, CV EVENTS NOT

20   EVIDENT.

21             THEN THEY DO THE -- REMEMBER THE STUDY THAT

22   DR. FITZGERALD DID, AND DR. MORRISON WAS PART OF IT.  REMEMBER

23   HE HAD JUST COME ON BOARD AND HE GOT TO WORK WITH FITZGERALD?

24   BASICALLY, THE RESULT WAS THAT VIOXX DROPS PROSTACYCLIN, AND

25   THERE IS -- THE CONCERN WAS THE CV PROBLEM.

1          SO THIS IS THE "PROSTACYCLIN DROP" DOCUMENT.
2     AND IF YOU REMEMBER, WHEN IT WAS FINALLY PUBLISHED HERE,
3     REMEMBER IN '99, MORRISON SAID, LET'S TAKE OUT -- TAKE OUT THE
4     CAUTION LANGUAGE -- TAKE OUT THE CAUTION LANGUAGE THAT
5     FITZGERALD WANTED TO PUT IN.  LET'S TAKE OUT CAUTION.  MORE
6     CONCEALMENT.  RIGHT THERE.
7          WHY IS THAT?  THAT SHOULD BE IN THE LABEL.
8     FIRST OF ALL, IF THE DRUG IS GOING TO GO ON THE MARKET -- WHICH
9     I QUESTION WHY IT DID, BUT -- THEN YOU PUT THIS CAUTION IN
10    THERE, IN THE LABEL.  IT WAS NOT IN THE LABEL IN '99.
11         AND THEN ON TOP OF THAT -- YEAH, THERE IS THE
12    CAUTION THING.
13         AND THEN THE BOARD OF SCIENTIFIC ADVISORS, YOU
14    KNOW, YES, THEY DISCUSSED THAT VIOXX COULD ACCELERATE PLAQUE
15    BUILDUP, WHICH IT DID END UP DOING.  THEY -- FROM THEIR OWN
16    STUDY WITH EPSTEIN.  THEN THEY DISCUSSED THAT MAYBE IT MIGHT BE
17    PROTECTIVE ON THESE PLAQUES.
18         BUT THE ONE THING THAT MR. BECK DIDN'T FOCUS ON
19    HERE IS NUMBER 3, "THROMBOTIC OCCLUSIONS."  THEY WERE CONCERNED
20    THAT VIOXX COULD CAUSE THROMBOTIC -- THAT'S HEART ATTACKS.  SO
21    THEY KNEW FROM THE BOARD OF SCIENTIFIC ADVISORS THEY HAD A
22    HEART ATTACK RISK.
23         AND YEAH, THEY DID SAY YOU CAN GO ON WITH -- PUT
24    THE DRUG ON THE MARKET, BUT THEY SAY IN PARALLEL -- THEY SAY IN
25    PARALLEL STUDY, THIS RISK OF HEART ATTACKS.  STUDY CV RISKS.

1   AND THAT'S THE STUDY THAT WASN'T DONE.  THEY NEVER DID THE CV

2   ENDPOINT STUDY.  REMEMBER DR. AVORN TALKED ABOUT THAT DOCUMENT

3   AS WELL.

4             NOW, FROM 1999 TO 2004, UNTIL -- WHEN THEY TOOK

5   THE DRUG OFF THE MARKET, THERE WAS NEVER A WARNING OR

6   CONTRAINDICATION FOR DOCTORS ABOUT HEART ATTACKS.  SO RIGHT

7   HERE, HERE IS THE WARNING LABEL.  SO I CALL THIS, THIS WAS A

8   NON -- IN '99 IS WHAT -- A NONHEART ATTACK.  THERE WAS NO -- NO

9   CONTRAINDICATIONS, NO WARNINGS, AND NO PRECAUTION.

10            WHAT'S IMPORTANT IS THIS, IS JERRY BARNETT

11  STARTS ON THE DRUG LATER -- ACTUALLY IN EARLY 2000, AND HE GOES

12  27 MONTHS ON THAT LABEL, 27 MONTHS ON VIOXX, WHERE THERE WAS NO

13  WARNING TO DOCTORS ABOUT HEART ATTACKS.  27 MONTHS.  MIKOLA,

14  NOBODY -- NOTHING IN THE LABEL, OTHER THAN A WHOLE LIST OF

15  THINGS, WHERE THEY SAY HEART ATTACKS AT THE BOTTOM, AT THE BACK

16  END, THE JUNK PILE.

17            SO THAT'S IMPORTANT HERE IN THIS CASE.  THE

18  DAMAGE IS BEING DONE FOR 27 MONTHS.  NO LABEL.

19            NOW, ACCORDING TO DR. AVORN, HE SAID MERCK DID

20  NOT ADEQUATELY REPRESENT THE KNOWN RISK OF VIOXX TO DOCTORS.

21  "THE INFORMATION MERCK GAVE DOCTORS ABOUT VIOXX DID NOT ALLOW

22  DOCTORS TO MAKE AN INFORMED DECISION ABOUT WHETHER OR NOT TO

23  PRESCRIBE VIOXX."

24            AND DR. MOYE SAID, "MERCK'S 1999 VIOXX WARNING

25  LABEL DID NOT ADEQUATELY WARN OF THE DANGERS OF THE DRUG.

1    HEART ATTACKS ARE SERIOUS SIDE EFFECTS THAT BELONGED IN THE
2    WARNING SECTION OF THE VIOXX LABEL."  THEY ARE LIABLE FOR THAT.
3    THAT'S QUESTIONS 1 AND 2.
4                 AND FRANKLY, I THINK WHAT YOU'VE HEARD HERE IS 3
5    IS DECEIT.  IT'S THERE TOO.
6                 AND REMEMBER, POOR DR. MIKOLA, HE -- HE'S TRYING
7    TO DO THE RIGHT THING, BUT HE SAYS, "IT'S IMPORTANT FOR DOCTORS
8    TO KNOW THE RISKS OF A DRUG IN ORDER TO PRESCRIBE IT
9    APPROPRIATELY."
10                NOW, YOU KNOW, IN THE -- IN THE ACTUAL -- BEFORE
11   THE VIGOR STUDY CAME OUT, YOU HAVE THE -- CAN WE -- OKAY.  NO.
12   OKAY.  IN THIS DOCUMENT -- YOU'LL LOOK AT IT.  IT'S EXHIBIT
13   P1.00430 -- THEY WERE HAVING PROBLEMS -- LOOK AT THAT DOCUMENT.
14   THEY WERE HAVING PROBLEMS IN THE VIGOR STUDY, IT TELLING THEM:
15   HEY, WE'VE GOT AN EXCESS IN HEART ATTACKS.  SO THEY KNEW ABOUT
16   IT BEFORE IT CAME OUT.
17                SO WHAT WAS THE RESULTS OF THE VIGOR STUDY?
18   FIVEFOLD INCREASE.  FIVEFOLD.  5 TO 1, VIOXX VERSUS NAPROXEN.
19   8,000 PATIENTS.  THE BIGGEST STUDY EVER DONE BY MERCK.  YOU'RE
20   GOING TO SEE ALL THESE OA STUDIES AND ALZHEIMER'S STUDIES, ALL
21   THESE OTHER STUDIES, THAT ALL HAVE -- THEY'RE SHORT-TERM, SHORT
22   DURATION, BASICALLY, BUT THEY -- NONE OF THEM HAD 8,000
23   PATIENTS:  4,000 ON VIOXX; 4,000 ON NAPROXEN.  FIVEFOLD
24   INCREASE.  SO FIVEFOLD INCREASE VIGOR.
25                AND THEN DR. SCOLNICK SAYS, "THE EVENTS ARE

1   CLEARLY THERE."  "THE EVENTS ARE CLEARLY THERE."  "IT IS
2   MECHANISM-BASED AS WE WORRIED ABOUT."  IN OTHER WORDS, THEY
3   KNEW.  THEY NEVER WARNED ANYBODY, BUT THEY KNEW.  HE SAYS, "AS
4   WE WORRIED IT WAS."  HE AGREED.  HIM, JOHN OATES, ALAN NIES,
5   BARRY GERTZ.  THEY ALL KNEW.  THEY WERE RIGHT ABOUT THE
6   PROSTACYCLIN MECHANISM.  AND THEY PUT OUT A PRESS RELEASE
7   SAYING THAT IT'S SAFE.  SAFE IN A PRESS RELEASE.
8                      BASICALLY, YOU HEARD DR. AVORN SAY THAT
9   NAPROXEN, EVEN IF IT HAS SOME CARDIOPROTECTIVE EFFECT, CAN'T
10  EXPLAIN THE 5-TO-1 DIFFERENCE.  THERE HAS BEEN NO STUDIES ON
11  NAPROXEN, NO STUDIES.  THERE IS ONE STUDY ON FLURBIPROFEN THAT
12  NOW HAS A BLACK-BOX LABEL ON IT TOO.
13                      IN ANY EVENT, THE BOTTOM LINE IS:  THEY
14  SHOULDN'T HAVE DONE THIS.  BUT THEY WENT RIGHT OUT WITH A PRESS
15  RELEASE BLAMING IT ON NAPROXEN.
16                      AND DR. AVORN DID HIS OWN STUDY THAT SHOWED
17  THERE WAS A 16 PERCENT REDUCTION DUE TO NAPROXEN, NOT AN 80
18  PERCENT REDUCTION AS IN THE VIGOR STUDY.  SO THERE IS
19  64 PERCENT UNEXPLAINED.
20                      HE SAYS THAT THAT WARNING LABEL, EVEN THE ONE
21  THAT THEY PUT OUT AFTER 2002, WAS NOT APPROPRIATE.  THEY DIDN'T
22  PUT THE FIVE TIMES MORE HEART ATTACKS IN THE LABEL.  THEY
23  DIDN'T SAY FIVEFOLD INCREASE LIKE THE FDA ASKED THEM TO.
24  FIVEFOLD INCREASE.
25                      THE FDA NOTES THAT "THE VIGOR FINDINGS CANNOT BE

1    EXPLAINED AWAY BY POINTING TO NAPROXEN BECAUSE THERE ARE

2    SUBJECTS IN THE 090, 085, AND 102 STUDIES WHERE NAPROXEN WAS

3    NOT THE ONLY COMPARATOR.  THE ADVANTAGE STUDY SHOWS GREATER

4    HEART ATTACKS IN VIOXX THAN THE NAPROXEN GROUP AT

5    25 MILLIGRAMS."

6               SCOLNICK ACKNOWLEDGED "THERE WAS NO SCIENTIFIC

7    EVIDENCE THAT NAPROXEN WAS CARDIOPROTECTIVE."  HE DID THAT A

8    YEAR LATER.  REMEMBER, THEY PUT A DOCUMENT IN IN 2001 WHERE IT

9    WAS A PEP TALK:  YOU-GUYS ARE GOING TO GO INTO THE FDA ADVISORY

10   COMMITTEE IN FEBRUARY OF 2001.  THEY SAID, "WE THOUGHT IT WAS A

11   PROBLEM, BUT NOW WE THINK THAT IT'S NOT A PROBLEM.  GO GET

12   THEM.  GO IN THERE."  A PEP TALK.

13              WELL, FOUR DAYS BEFORE, HE PUBLISHES THIS

14   DOCUMENT HERE WHERE HE SAYS, "IT'S IMPOSSIBLE TO PROVE," THAT

15   IT WAS NAPROXEN.  AND REMEMBER HERE HE WAS IN MINOR AGONY OVER

16   THE INABILITY TO OF MERCK TO EXPLAIN THE POSSIBLE CV RISKS?

17   SCOLNICK?  HE WAS THE GUY IN POSITION TO ORDER THE STUDY.

18              SO HERE HE WANTS -- HE SAID, "A CV STUDY IS

19   ESSENTIAL."  THEY NEVER DID IT.

20              THIS IS STILL IN 2000.  JERRY IS GOING ALONG.

21              SCOLNICK, HE SAID, "IT SHOULD BE ESSENTIAL."

22   THEN THEY PUT OUT ANOTHER PRESS RELEASE SAYING THAT IT'S SAFE.

23   AND THEY NEVER DID THE CV ENDPOINT STUDY.  IT WAS DOABLE.

24              AND THEN REICIN, DR. REICIN, GETS A

25   CONGRATULATIONS HERE:  "YOU DIFFUSED THE CV RISKS."  IN THE

2569

1   MEANTIME, THEY PROPOSE ANOTHER NONWARNING LABEL TO THE FDA.

2   MERCK NONWARNING PROPOSAL.  NO -- NO CONTRAINDICATION WARNING

3   OR PRECAUTION THERE.  SAME THING.  THEY PROPOSED NO PRECAUTION,

4   WARNING, OR CONTRAINDICATION AT THAT TIME.

5           FDA TELLS MERCK IT WANTED A HEART ATTACK WARNING

6   IN THE PACKAGE INSERT.  MERCK RESPONDS:  "WE WANT IT IN THE

7   PRECAUTIONS SECTION."  SO THE FDA THEN SENDS THEM THIS -- THIS

8   LABEL RIGHT HERE.  THEY SAY, "NO, WE DON'T WANT THIS.  THIS IS

9   UGLY CUBED."

10          SO HERE -- HERE'S THE FDA PROPOSAL, A REAL

11  WARNING, A REAL WARNING LABEL.

12          **THE DEPUTY CLERK:**  EXCUSE ME, MR. ROBINSON.  YOU'VE

13  USED 45 MINUTES.

14          **MR. ROBINSON:**  THANK YOU.

15          IN ANY EVENT, THEY -- THIS IS DR. TARGUM.  "IT

16  WOULD BE DIFFICULT" -- THIS IS FROM THE FDA -- "TO IMAGINE THE

17  INCLUSION OF A VIGOR RESULTS IN THE VIOXX LABELING IN 2002

18  WITHOUT MENTIONING CARDIOVASCULAR SAFETY RESULTS IN THE STUDY

19  DESCRIPTION AS WELL AS THE WARNING SECTION."

20          "WARNINGS."  "MERCK DID NOT ADEQUATELY WARN" --

21  DR. MOYE -- "IN THE 2002 LABEL.  INFORMATION APPEARING IN THE

22  WARNING SECTION OF THE LABEL VERSUS THE PRECAUTION SECTION IS

23  IMPORTANT."

24          DR. MIKOLA SAID, "I WOULD PUT HIM BACK ON

25  FELDENE."

1        "WILL NOT" -- DR. SCOLNICK SAID HE WILL NOT SIGN

2   OFF ON ANY LABEL THAT HAD A CARDIAC WARNING.

3        NOW, THE DOCUMENT HERE, 1135, SAID THAT -- THAT

4   THE DIFFERENCE IN A PRECAUTION LABEL VERSUS A WARNING LABEL WAS

5   $1 BILLION A YEAR, $1 BILLION.  WHY?  THERE'S LESS

6   PRESCRIPTIONS.  IF YOU'RE -- THAT'S 500 MILLION LESS

7   PRESCRIPTIONS AT TWO BUCKS A PILL.  THAT'S THE DOCUMENT THERE.

8        SEE THE DIFFERENCE THERE?  THEY HAVE 2.5 BILLION

9   REVENUES THERE, AND THEY SAID IT WOULD BE DOWN TO 1.5 BILLION

10  IF THEY -- IF THEY HAD A PRECAUTION.  IF THEY HAD A WARNING

11  LABEL, IT WOULD BE DOWN TO 1.5 BILLION.  THAT'S A BILLION A

12  YEAR.  THAT WAS A BIG DIFFERENCE IN LABELING PRESCRIPTIONS.

13        IF YOU GET THIS NEW LABEL AND YOU KEEP THAT

14  PRECAUTION -- YOU GET THE PRECAUTION LABEL.  "DO YOU BELIEVE IN

15  MIRACLES?"  REMEMBER, THE FDA DOESN'T TEST.  IT'S UNDERSTAFFED,

16  PROVIDES MONIES TO THE FDA -- MERCK PROVIDES MONIES.  MERCK

17  MADE THEM LOOK LIKE GRADE D HIGH-SCHOOLERS.  DR. MOYE SAYS,

18  "THE FDA HAS TO RELY ON THE HONESTY OF THE DRUG COMPANY."

19        OKAY.  I'M GOING TO MOVE ON HERE TO MR. BARNETT.

20  FIRST OF ALL, THERE IS A LOT OF EVIDENCE IN THIS CASE OF

21  CONCEALMENT.  THE WHOLE DR. AVORN SITUATION, THEY PULLED

22  DR. CANNUSCIO OUT OF THE -- YOU KNOW, OUT OF THE ARTICLE.

23        IN ANY EVENT, THE -- MERCK'S -- ALL THEIR PRESS

24  RELEASES, ET CETERA, THEY CONSIDERED DOCTORS' QUESTIONS ARE

25  OBSTACLES.  IN ANY EVENT, YOU'LL SEE A LOT OF EVIDENCE OF

1    CONCEALMENT.  BUT I'M GOING TO GO QUICKLY HERE TO CAUSATION.

2              NOW, MR. BARNETT'S HEART ATTACK, ACCORDING TO

3    DR. ZIPES, WAS CAUSED BY VIOXX.

4              AND INCIDENTALLY -- YOU KNOW, MR. BECK ATTACKED

5    DR. ZIPES, BUT FRANKLY, I THINK THAT -- WELL, THE EVIDENCE

6    SHOWED THAT HE PRESENTED HIMSELF VERY WELL.  AND FRANKLY, THE

7    EVIDENCE THAT HE PUT ON WAS EVIDENCE THAT'S IN THE PUBLISHED

8    LITERATURE.  THE ANIMAL STUDIES WERE IN THE PUBLISHED

9    LITERATURE.  THE EPIDEMIOLOGICAL DATA WAS MERCK'S OWN STUDIES.

10   MR. BARNETT'S MEDICAL RECORDS WERE IN THE -- HE BASED IT ON THE

11   MEDICAL RECORDS.  AND BASICALLY, DR. POPMA DID THE SAME.

12             AND THE 2005 FDA ADVISORY COMMITTEE VOTE, 32 TO

13   NOTHING, HE DIDN'T -- YOU KNOW, HE RELIED ON IT, BUT THAT'S THE

14   VOTE.

15             AND THEN THE PRINCIPLES OF PROSTACYCLIN WERE PROVED

16   IN THIS CASE; THAT PROSTACYCLIN HURTS THE BODY'S ABILITY TO

17   LOWER BLOOD PRESSURE.  IT DISCOURAGES PLATELET CLUMPING.

18   THROMBOXANE ENCOURAGES PLATELET CLUMPING.  COX-2 INHIBITS

19   PROSTACYCLIN AND THROWS THE BODY OFF BALANCE.  VIOXX

20   ACCELERATES PLAQUE BUILDUP BY INHIBITING PROSTACYCLIN IN PEOPLE

21   WITH ATHEROSCLEROSIS ALREADY.

22             YOU HAVE THE ATHEROSCLEROSIS, YOU HAVE THE TRIGGER

23   FOR COX-2 AND -- BECAUSE YOU HAVE THE INFLAMMATION THERE

24   ALREADY.  DR. EPSTEIN FOUND THAT IN HIS STUDY.  HE CALLED IT A

25   YELLOW FLAG TO MERCK.  THEY NEVER REALLY FOLLOWED UP ON IT.

1            BASICALLY -- DR. FITZGERALD IN 2006:  ONE MECHANISM.

2   ACCELERATES PLAQUE, INCREASES BLOOD PRESSURE.  LEADS TO PLAQUE

3   RUPTURE, CLOT, AND HEART ATTACK.

4            MERCK'S OWN STUDIES:  VIGOR, FIVEFOLD INCREASE.  THE

5   APPROVE STUDY, 2.8-FOLD INCREASE OF HEART ATTACKS.  JUST A

6   WEALTH OF EVIDENCE.

7            IN THE APPROVE STUDY, DR. ZIPES SAID, "IT WAS SHOWN

8   THAT THE CV RISKS INCREASED OVER TIME AND OCCURRED WELL BEFORE

9   18 MONTHS."

10           DR. AVORN SAID, "THE STRONGEST EVIDENCE THAT VIOXX

11  CAUSES HEART ATTACKS IS THE CLINICAL STUDIES SUCH AS VIGOR,

12  ADVANTAGE, 090, AND APPROVE."

13           DR. ZIPES SAID THAT WHEN YOU HAVE -- IN THE APPROVE

14  STUDY, THERE WAS A GROUP OF PEOPLE THAT HAD BLOOD PRESSURE

15  SPIKES OVER 160.  AND WHEN THEY HAD THAT AND YOU LOOK BACK TO

16  SEE WHAT THE RESULT WAS, YOU FOUND THAT THOSE PEOPLE HAD 3.8

17  TIMES THE INCREASED RISK OF HEART ATTACKS OVER THE NORMAL GROUP

18  IN THE STUDY, THE 2.8.  SO IT WENT UP AN ENTIRE -- IT WENT UP

19  100 PERCENT, FROM 2.8 TO 3.8.

20           AND WE SAW THAT MR. BARNETT, IN THE BIG THREE SPIKES

21  UP THERE AT THE TOP, DIDN'T HAVE UPPER RESPIRATORY INFECTIONS

22  AS COUNSEL TRIED TO INFER.  THERE'S THE BLOOD PRESSURES RIGHT

23  THERE.  YOU HAVE THAT IN EVIDENCE.  THAT'S MIKOLA NUMBER 4,

24  DR. MIKOLA NUMBER 4.

25           THE DAMAGE -- ACCORDING TO ZIPES, "THE DAMAGE CAUSED

1    BY VIOXX DOES NOT JUST GO AWAY WHEN A PERSON STOPS TAKING THE
2    DRUG.  PLAQUE DOES NOT JUST DISAPPEAR."  "31 MONTHS WAS A LONG
3    TIME TO BE ON VIOXX," HE SAID.  "32-TO-NOTHING VOTE."  "IT DOES
4    INCREASE RISKS."  "IT WAS SOLID EVIDENCE."
5                AND IN TERMS OF JERRY BARNETT, HE UNDERWENT A
6    CARDIOLITE EXAM AND THEN, 31 MONTHS LATER, HE HAS A PROBLEM.
7                DR. POPMA SAID, "CARDIOLITE STRESS TESTS ARE VERY
8    ACCURATE AND RELIABLE AT ASSESSING THE STATE OF A PERSON'S
9    BLOOD VESSELS, THAT IT TESTS -- IT IDENTIFIES BLOOD VESSELS
10   WITH BLOCKAGES OF 50 PERCENT OR MORE."  THAT'S UNCONTESTED.
11   THAT'S WHAT THIS DOES.
12               WHEN YOU LOOK AT THE CARDIOLITE RESULT HERE, WHAT
13   HAPPENED IS THIS:  HERE IS THE ISCHEMIA RIGHT HERE.  THERE IS
14   MILD, MILD -- AND BASICALLY, IT IS RIGHT IN HERE TO THE LATERAL
15   SIDE.  BUT THERE IS NO PROBLEMS WITH THE INTERIOR WALL OF THE
16   HEART, SEPTAL OR THE INFERIOR WALL, ON THAT CARDIOLITE EXAM.
17   MILD AREA.
18               THAT'S THE PROOF.  THEY ARE TRYING TO SPECULATE AND
19   SAY IT MEANS SOMETHING ELSE THAN IT SHOWED.  I MEAN, WHAT'S
20   IMPORTANT IS HE WENT 15 MINUTES, 17 AND A HALF METS.  TID .800.
21   THAT MEANS THAT IT'S NOT BALANCED ISCHEMIA.  IT'S INDICATIVE
22   THAT IT'S NOT BALANCED ISCHEMIA.  HIS NO LUNG PULMONARY UPTAKE
23   PROBLEMS.  SO THAT'S EVIDENCE THAT IT WASN'T BALANCED ISCHEMIA.
24               NOW, THIS IS FROM DR. MIKOLA.  THIS IS JANUARY 27,
25   2000, RIGHT AFTER THE STRESS TEST.  MIKOLA SAID HE HAD A

1   NEGATIVE STRESS THALLIUM EXCEPT FOR SOME MILD LATERAL WALL

2   ISCHEMIA, WITH NO SYMPTOMS OF PAIN.  WE WILL TREAT HIM

3   CONSERVATIVELY AND TREAT HIS MODIFIABLE RISK FACTORS.

4           THAT'S THE EVIDENCE.

5           WE'LL PUT HIM ON LIPIDS, LIPITOR.  THERE WAS NO NEED

6   FOR A CAP.  VERY GOOD TEST RESULTS.  LESS THAN 2 PERCENT RISK

7   OF HEART ATTACK WITHOUT VIOXX.  THE FIRST CARDIOLITE STRESS

8   TEST SHOWED THAT HE HAD ONLY ONE AREA OF REDUCED BLOOD FLOW.

9   HE DID NOT HAVE BALANCED ISCHEMIA.  HE WOULDN'T HAVE BEEN ABLE

10  TO EXERCISE LIKE HE DID.  DR. ZIPES SAYS THAT IF HE HAD -- IF

11  HE HAD BALANCED ISCHEMIA, IT WOULD HAVE SHOWED UP ON THE EXAM.

12          HIS BROTHERS -- YOU KNOW, WE'RE NOW GOING TO GO TO

13  HIS RISK FACTORS.  NONE OF HIS BROTHERS HAVE HEART PROBLEMS

14  RIGHT NOW.  ONE BROTHER IS ON CHOLESTEROL DRUGS.  THE OTHER

15  THREE ARE FINE.  YOU SAW JOHN IN COURT.

16          FATHER DID EAT BAD.  HE WAS OVERWEIGHT, DIDN'T

17  EXERCISE.  HIS WEIGHT WAS 220.  BUT THAT'S NOT JERRY.

18          HIS PARENTS DIDN'T SMOKE.  HIS MOTHER IS STILL ALIVE

19  AT 91.

20          ACCORDING TO HIS BROTHER, HE WAS SLOWING DOWN JUST

21  BEFORE THAT HEART ATTACK, A COUPLE OF MONTHS BEFORE.

22          "JERRY DOES NOT LIKE CIGARETTE SMOKE," CORINNE SAID.

23  "I USUALLY GO OUTSIDE TO SMOKE."

24          THERE ARE MANY RISK FACTORS THAT YOU CAN CONTROL,

25  LIKE CHOLESTEROL, WEIGHT, AND BLOOD PRESSURE.  HE WAS DOING

1    EVERYTHING HE COULD TO MODIFY HIS RISK FACTORS.  HE REGULATED

2    HIS LDL.  HE BROUGHT THAT DOWN.  REMEMBER, IT WAS UP AS HIGH AS

3    174.  HE BROUGHT THE LDL DOWN TO 101.  I MEAN, YOU CAN SEE IT

4    THERE.  174.

5              NOW IT'S RIGHT AROUND THE TIME OF HIS HEART ATTACK

6    HERE IN 2002.  IN FACT, IN 2000, HE'S GOT IT AT -- AT -- IN

7    THE -- UNDER 100, THEN HE'S GOT IT TO 124.  BUT THEN HE'S 104

8    IN 2001 AND 103 IN 2002 AND 102 IN 2002.  AND THEN IT STARTS

9    GOING DOWN EVEN MORE.

10             DR. MIKOLA SAID HIS CHOLESTEROL WAS UNDER CONTROL AT

11   THAT POINT.  HIS DIET WAS HEALTHY AND HE STUCK TO IT.

12             DR. POPMA:  WHEN CHOLESTEROL LEVELS ARE REDUCED TO

13   LEVELS BARNETT REACHED, PLAQUE IS SLOWED DOWN.  YOU CAN

14   ACTUALLY REGRESS THE PLAQUE.  AND HE GOT TO 70.  HE WAS

15   REGRESSING.  GOT TO 60.  IT'S EVEN BETTER.

16             JERRY WAS THE TYPE OF PERSON WHO WAS SERIOUS ABOUT

17   WHAT HE DID.  VERY RELIGIOUS ABOUT WALKING DAILY.  FELT,

18   REALLY, THERE WAS A LOW RISK FOR A HEART ATTACK.

19             THE CARDIOLITE EXAM TOOK INTO CONSIDERATION ALL OF

20   HIS 30 OR 40 YEARS OF RISK FACTORS.  SO IN 2000, IT TOOK IN THE

21   FACT THAT HE HAD CHOLESTEROL BEFORE THAT, AND IT TOOK IN THE

22   FACT OF HIS PARENTS GENETICS AND ALL HE -- THE LITTLE BIT OF

23   SMOKE HE GOT EXPOSED TO FROM HIS WIFE.  ALL THAT WAS PART OF

24   HIS RISK FACTORS TAKEN INTO CONSIDERATION IN THAT CARDIOLITE

25   EXAM.

1          LOOK AT THE BEFORE AND THE AFTER.  HE'S GOT A MILD

2     AREA OF SINGLE-VESSEL ISCHEMIA.  SO HE HAS MILD TO MODERATE

3     SINGLE-VESSEL CORONARY ARTERY DISEASE.  AND YET HERE, WITHIN 31

4     MONTHS, HE'S GOT ALL THIS PLAQUE BUILDUP.  80, 90 PERCENT

5     ACROSS THE BOARD.  IN THE MEANTIME, HE'S ON VIOXX FOR 31

6     MONTHS.  LITTLE DID HE KNOW, AS HE WAS TAKING ALL OF THAT

7     LIPITOR TRYING TO CONTROL THINGS, THAT THE VIOXX WAS THE

8     HIDDEN -- WAS HIDDEN INSIDE.

9          ANYWAY, THE BOTTOM LINE IS THAT THE PLAQUE BUILT UP

10    AND WE BELIEVE IT CAUSED HIS HEART ATTACK AND IT LEFT HIM WHERE

11    HE IS TODAY.

12         NOW, ONE THING THAT'S IMPORTANT IS THIS, IS DR. ZIPES

13    WAS THE ONE WHO FOUND THE OCCLUDED VESSEL IN 2006.  AND THEN

14    THAT'S WHY YOU SAW A DIFFERENCE IN DR. KARAVAN'S SECOND

15    DEPOSITION FROM HIS FIRST DEPOSITION.  HIS FIRST DEPOSITION, HE

16    THOUGHT HE WAS OKAY.  IF YOU LOOK AT JERRY BARNETT, HE LOOKS --

17    YOU LOOK AT A PERSON LIKE THAT, HE LOOKED HEALTHY.  HE LOOKED

18    HEALTHY PROBABLY AT -- WHEN KARAVAN LAST SAW HIM IN 2005.

19         BUT IN MAY OF 2006, DR. ZIPES DID THESE TESTS AND

20    FOUND THAT HE HAD TWO OCCLUDED VEIN GRAFTS.  THAT'S WHY HE WAS

21    HAVING PROBLEMS.  THAT'S WHY HIS -- HE WENT DOWN TO NINE

22    MINUTES ON THE TEST RATHER THAN 15 MINUTES.

23         AND THE ONLY EXPLANATION OF THOSE OCCLUDED VEIN

24    GRAFTS IN HIS RECORDS IS WHEN HE WENT INTO THE HOSPITAL IN JULY

25    OF '04.  THERE'S NOTHING ELSE IN THERE WHERE HE HAD THIS

1    SERIOUS CHEST PAIN LIKE HE HAD AT THE TIME OF HIS HEART ATTACK
2    AND -- OTHER THAN JULY '04.  THE CARDIOLITE STRESS TEST IN
3    JULY 2003 SHOWED HE WAS OKAY.  SO EVERYTHING WAS PUMPING WELL
4    IN 2003 AFTER HIS HEART ATTACK.  AND YET THE ECHOCARDIOGRAM
5    SHOW HE'S GOT PERMANENT SCARRING NOW.  HE'S GOT PERMANENT
6    MUSCLE WEAKNESS.
7              AND THE -- IF YOU LOOK AT THE JULY 10 ANGIOGRAM THAT
8    DR. KARAVAN DID, YOU SEE A GIANT BUILDUP BETWEEN 2002 AND 2006,
9    BUT HE'S KEEPING ALL HIS CHOLESTEROL UNDER CONTROL.  BUT DON'T
10   FORGET, THE FIRST TWO YEARS OF THAT, HE WAS ON VIOXX.
11             SO I THINK THE WEIGHT OF THE EVIDENCE IS THAT THIS
12   BUILDUP OCCURRED WHILE -- DURING THE FIRST TWO YEARS, FROM 2002
13   TO 2004.  BECAUSE, REMEMBER, HE UPPED HIS LIPITOR IN NOVEMBER
14   OF 2004, AND THAT'S WHEN HIS CHOLESTEROL WENT DOWN INTO THE 70S
15   AND 60S AND 50S.
16             AND HIS THIRD CARDIOLITE STRESS TEST SHOWED HEART
17   MUSCLE DAMAGE THAT OCCURRED DUE TO A SECOND HEART ATTACK.
18             **THE DEPUTY CLERK:**  MR. ROBINSON, YOU'VE USED ONE
19   HOUR.
20             **MR. ROBINSON:**  OKAY.  THANK YOU.
21             **THE COURT:**  IF YOU'RE GOING TO DISCUSS DAMAGES,
22   YOU'RE GOING TO HAVE TO DO IT.
23             **MR. ROBINSON:**  SO NOW, BASICALLY.  DR. KARAVAN TODAY
24   SAYS TODAY THERE IS PLAQUE BURDEN.  HE TESTIFIED THAT HE MAY
25   HAVE HAD A SMALL HEART ATTACK CAUSED BY THE HYPOKINESIS BUT DID

1   NOT LEAVE PERMANENT SCAR.  DR. KARAVAN TESTIFIED THAT THE

2   ANGIOGRAM MIGHT NOT VISUALIZE ALL SEGMENTS OF THE HEART LIKE

3   THE ECHOCARDIOGRAM DID.

4            IN ANY EVENT, THE BOTTOM LINE IS HE DOESN'T HAVE

5   THE SAME ENERGY LEVEL.  HE'S GOT THIS PLAQUE BUILDUP.  HE CAN

6   WALK AROUND, BUT HE'S GOT IT ALL INSIDE OF HIS BODY.

7            AND HIS LIFE EXPECTANCY HAS BEEN REDUCED.  THERE

8   ARE STUDIES THAT SHOW 42 PERCENT OF PEOPLE WHO HAD BYPASS

9   SURGERY DIE WITHIN TEN YEARS.

10           IN ANY EVENT, I'M GOING TO TELL YOU THIS ON

11  DAMAGES.  I THINK HE DESERVES YOUR VERDICT.  I THINK HE

12  DESERVES DAMAGES --

13           **MR. BECK:**  YOUR HONOR, THIS IS --

14           **MR. ROBINSON:**  I THINK THE EVIDENCE SHOWS THAT HE

15  DESERVES YOUR VERDICT.  THE EVIDENCE SHOWS HE DESERVES DAMAGES

16  IN THIS CASE.

17           YOU KNOW, THE MEDICAL BILLS ARE IN EVIDENCE.

18  YOU CAN LOOK AT THOSE, BUT I DON'T THINK THAT'S THE BIG PART OF

19  IT HERE.  I THINK THAT, REALLY, HIS LIFE HAS BEEN CHANGED.

20  YES, HE'S TRIED TO LIVE HIS LIFE PROPERLY.  HE TRIED TO CHANGE

21  HIS RISK FACTORS, MODIFY HIS RISK FACTORS.  HE'S TRIED TO DO

22  EVERYTHING HE CAN DO.  HE TRIED TO STAY ALIVE TO BE WITH HIS

23  WIFE AND BROTHER AND PEOPLE LIKE THAT.  BUT THE PROBLEM IS THAT

24  VIOXX THREW HIM OFF COURSE, AND I THINK THAT HIS LIFE HAS BEEN

25  CHANGED FOREVER.

```
 1              AND FRANKLY, I THINK THAT HE'S ENTITLED TO A
 2   SERIOUS LEVEL OF DAMAGES, BUT I BELIEVE IT'S -- YOU KNOW, AND
 3   PRIMARILY, THEY ARE DAMAGES FOR PAIN AND SUFFERING.  THE JUDGE
 4   WILL GIVE YOU AN INSTRUCTION ON THAT.
 5              AND FRANKLY, I DON'T -- I DON'T EVER -- I DON'T
 6   LIKE TO TELL THE JURY HOW MUCH PAIN AND SUFFERING IS WORTH.
 7   YOU'VE HEARD JERRY DURING THIS CASE, YOU'VE HEARD WHAT'S GOING
 8   ON.  I'M ASKING YOU TO BE FAIR AND REASONABLE TO HIM, TO JUST
 9   DO THE RIGHT THING FOR HIM, YOU KNOW, WHAT YOU THINK IS FAIR.
10              THAT'S ALL I'M ASKING FOR.  AND THAT'S ALL HE
11   REALLY WANTS.  THIS CASE IS ABOUT PRINCIPLE FOR HIM.  SO YOU DO
12   WHAT'S FAIR FOR HIM.  THAT'S ALL WE ASK.
13              SO WITH THAT, I THANK YOU FOR YOUR ATTENTION,
14   AND I WILL BE BACK UP HERE AFTER MR. BECK GETS TO GIVE HIS
15   CLOSING.
16         THE COURT:  WE'LL TAKE A BREAK AT THIS POINT.  WE'LL
17   TAKE A 15-MINUTE BREAK.
18         THE DEPUTY CLERK:  ALL RISE.
19         (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
20         THE DEPUTY CLERK:  EVERYONE RISE.
21         THE COURT:  BE SEATED, PLEASE.  WE WILL NOW HEAR FROM
22   THE DEFENSE.  YOU MAY PROCEED, COUNSEL.
23         MR. BECK:  THANK YOU, YOUR HONOR.
24              THE PLAINTIFF'S LAWYERS HAVE BIG PROBLEMS WITH
25   MR. BARNETT'S SMALL HEART ATTACK.  THE FIRST PROBLEM WAS THAT
```

1   VIOXX DID NOT CAUSE THE SEPTEMBER 2002 HEART ATTACK.

2   MR. BARNETT HAD BEEN EXPERIENCING PLAQUE BUILDUP FOR YEARS, FOR

3   DECADES; AND IT WAS DUE TO NORMAL RISK FACTORS THAT YOU HEARD

4   SO MUCH ABOUT:  HIS AGE, HIS SEX, HIS FAMILY HISTORY, HIS

5   CHOLESTEROL, THE STRESSFUL NATURE OF HIS LIFE, AND PERHAPS EVEN

6   SECONDHAND SMOKE.

7               AT SOME POINT, HE HAD PLAQUE THAT RUPTURED, AS

8   PLAQUE OFTEN DOES, AND A SMALL CLOT FORMED IN A SMALL ARTERY,

9   BUT NO ONE IN THIS CASE SAID THAT THAT -- THAT VIOXX CAUSED

10  THAT SMALL CLOT TO FORM, AND NO ONE SAID THAT, IF IT WERE NOT

11  FOR VIOXX, THE SMALL CLOT IN THE SMALL ARTERY WOULD HAVE BEEN

12  EVEN SMALLER.  IN FACT, NO ONE FROM THEIR SIDE OF THE CASE EVEN

13  TALKED ABOUT HOW VIOXX PLAYED ANY ROLE WHATSOEVER IN THAT SMALL

14  CLOT IN THE SMALL ARTERY IN SEPTEMBER OF 2002.

15              THE SECOND PROBLEM THAT THE PLAINTIFF'S HAVE

16  WITH THE SMALL HEART ATTACK IS THAT IT DID NOT CAUSE ANY

17  LASTING HARM.  YOU HEARD THE TESTIMONY FROM ALL OF THE DOCTORS,

18  INCLUDING EVEN DR. ZIPES, THAT THE HEART QUICKLY COMPENSATED,

19  AND THAT THE HEART FUNCTION RETURNED TO 100 PERCENT NORMAL.

20              DR. KARAVAN, THE CARDIOLOGIST, TESTIFIED THAT,

21  USING TODAY'S DEFINITION OF A HEART ATTACK, WHAT HAPPENED BACK

22  IN SEPTEMBER 2002 WOULD NOT EVEN COUNT AS A HEART ATTACK, BUT

23  HE SAID WHAT IT'S NOW CALLED IS UNSTABLE ANGINA, WITHOUT DAMAGE

24  TO THE HEART.

25              THE MOST SIGNIFICANT EFFECT OF THE LITTLE HEART

1    ATTACK FROM SEPTEMBER OF '02 IS THAT IT LED DOCTORS TO DISCOVER

2    SOMETHING DIFFERENT THAT PROBABLY SAVED MR. BARNETT'S LIFE.

3    THE DOCTORS DID A CATHETERIZATION.  YOU HEARD ABOUT THOSE.

4    THIS IS -- FINALLY DID ONE IN SEPTEMBER OF '02.  AND THEY

5    DISCOVERED A DIFFERENT PROBLEM FROM THE LITTLE HEART ATTACK.

6    THEY DISCOVERED THAT MR. BARNETT HAD SEVERE ATHEROSCLEROSIS IN

7    SEVERAL OF HIS CORONARY ARTERY DISEASE -- OF HIS CORONARY

8    ARTERIES, AND THEY CALLED THAT A MULTIVESSEL CORONARY ARTERY

9    DISEASE.

10            AND THIS WAS NOT CAUSED IN ANY WAY BY THE LITTLE

11   HEART ATTACK.  THIS SEVERE PLAQUE BUILDUP, ATHEROSCLEROSIS, HAD

12   COME FROM DECADES AND DECADES OF ADVANCING ATHERO.

13            AND SO THE DOCTORS DID A BYPASS OPERATION IN

14   SEPTEMBER OF '02.  AND, AGAIN, THEY TESTIFIED THEY DID NOT DO

15   THAT BECAUSE OF THE LITTLE HEART ATTACK IN THE LITTLE ARTERY;

16   THEY DID THAT BECAUSE OF THE PLAQUE BUILDUP IN THE BIG ARTERIES

17   THAT WERE MUCH MORE IMPORTANT.  AND THE BYPASS WAS A SUCCESS,

18   AND MR. BARNETT HAS AVOIDED HAVING A BIGGER HEART ATTACK THAT

19   COULD HAVE DONE HIM REAL HARM.

20            I HAVE A FRIEND WHOSE WIFE WAS PLAYING GOLF ONE

21   DAY, AND SHE WAS HIT ON THE BACK OF THE HEAD WITH A GOLF BALL

22   ON THE LEFT SIDE.  THIS IS A TRUE STORY.  THEY TOOK HER TO THE

23   HOSPITAL AND THEY DID AN MRI.  THE DOCTORS CAME OUT AND THEY

24   SAID, "THE GOLF BALL DIDN'T HURT YOU, BUT WE FOUND THAT YOU

25   HAVE A TUMOR ON THE OTHER SIDE AND WE NEED TO OPERATE RIGHT

1   AWAY."  AND THEY WENT IN AND THEY OPERATED, AND THE OPERATION

2   WAS A SUCCESS, JUST LIKE MR. BARNETT'S BYPASS WAS A SUCCESS.

3                  NOW, THE MORAL OF THIS STORY IS THAT WHENEVER

4   I'M ON THE GOLF COURSE AND I HEAR SOMEBODY YELL "FOUR," I DUCK,

5   BECAUSE I DO NOT WANT TO GET HIT ON THE HEAD WITH A GOLF BALL,

6   JUST LIKE THERE IS NO SUCH THING AS A GOOD HEART ATTACK.  BUT

7   SOMETIMES, SOMETHING SMALL AND BAD THAT HAPPENS TO YOU ENDS UP

8   HELPING YOU AVOID SOMETHING MUCH BIGGER AND SOMETHING MUCH

9   WORSE.  AND THAT IS WHAT HAPPENED IN THIS CASE.  THE MAIN

10  EFFECT OF THE SMALL HEART ATTACK IN SEPTEMBER OF '02 WAS THAT

11  IT LED TO A CATHETERIZATION, WHICH LED TO A BYPASS, WHICH SAVED

12  MR. BARNETT FROM A MUCH WORSE PROBLEM.

13                  NOW, HOW DID THE PLAINTIFF'S LAWYERS TRY TO GET

14  AROUND THESE PROBLEMS THAT THEY HAVE WITH THE SMALL HEART

15  ATTACK IN SEPTEMBER OF '02?  WHAT THEY REALLY DO IN TERMS OF

16  THE DAMAGES CLAIM IS THEY'VE SHIFTED THEIR FOCUS TO A BIG HEART

17  ATTACK THAT THEY SAY MIGHT HAPPEN SOMETIME IN THE FUTURE.

18  THAT'S REALLY WHAT MR. ROBINSON IS TALKING ABOUT WHEN HE

19  FLASHES UP FOR A SECOND THAT THING ON THE SCREEN WITH THE LIFE

20  EXPECTANCY AND THAT DR. ZIPES TALKED ABOUT.  WHAT THEY ARE

21  SAYING, WHAT THEIR REAL CLAIM FOR DAMAGES IS, IS THAT THEY'VE

22  GOT A FEAR THAT A BIG HEART ATTACK MIGHT HAPPEN IN THE FUTURE,

23  AND THAT'S WHAT THEIR CLAIM IS FOR.

24                  BUT THE PLAINTIFF'S LAWYERS HAVE EVEN BIGGER

25  PROBLEMS WITH THIS FUTURE HEART ATTACK.  THE FIRST PROBLEM, OF

DAILY COPY

1    COURSE, IS THAT IT HAS NOT HAPPENED, AND IT MAY NEVER HAPPEN.

2    AND THE JUDGE WILL INSTRUCT YOU -- AND INCIDENTALLY, YOU WILL

3    GET THE JUDGE'S INSTRUCTIONS IN THE JURY ROOM SO YOU DON'T HAVE

4    TO TRY TO REMEMBER EVERYTHING WHEN HE'S READING HIS

5    INSTRUCTIONS TO YOU.  YOU'LL GET COPIES TO TAKE BACK.  THE

6    JUDGE WILL INSTRUCT YOU THAT A CLAIM CANNOT BE BASED ON

7    SPECULATION, BUT THAT'S WHAT THEIR WHOLE CLAIM ABOUT MAYBE

8    WE'LL HAVE PROBLEMS IN THE FUTURE IS BASED ON:  SPECULATION.

9               THE SECOND PROBLEM WITH THIS CLAIM ABOUT THE

10   FUTURE IS THAT THERE IS NO SCIENTIFIC BASIS FOR THEM TO BLAME

11   PAST VIOXX USE FOR THE CURRENT SITUATION IN TERMS OF

12   MR. BARNETT'S PLAQUE AND THE POSSIBILITY THAT HE MIGHT HAVE A

13   HEART ATTACK IN THE FUTURE.

14              WE'VE ALL LEARNED SOMETHING ABOUT HEART ATTACKS

15   IN THE COURSE OF THE LITIGATION.  WE KNOW THAT THEY ARE USUALLY

16   CAUSED BY PLAQUE THAT RUPTURES, AND THEN A CLOT FORMS, AND THE

17   CLOT CUTS OFF THE BLOOD SUPPLY TO THE HEART.  BUT IF SOMEDAY IN

18   THE FUTURE MR. BARNETT HAS PLAQUE THAT RUPTURES AND THEN A CLOT

19   FORMS, THE RUPTURE AND THE CLOT ARE NOT GOING TO BE DUE TO

20   VIOXX.  HE STOPPED TAKING VIOXX ALMOST TWO YEARS AGO.

21              AND YOU HEARD FROM DR. REICIN THE OTHER DAY

22   ABOUT HOW QUICKLY MEDICINES BREAK DOWN.  AND VIOXX, IN

23   PARTICULAR.  THEY BREAK DOWN INTO THE BODY, THEY ARE TURNED

24   INTO OTHER CHEMICALS, AND THEN THEY ARE EXCRETED OUT IN THE

25   URINE.  SO THE MEDICINE ONLY HANGS AROUND FOR A DAY OR SO.  SO

1   IF, IN FACT, SOMEDAY IN THE FUTURE, THERE IS PLAQUE RUPTURE AND

2   CLOT, IT'S NOT GOING TO BE BECAUSE VIOXX IS IN THE BLOOD SYSTEM

3   DOING IT.

4           BUT WHAT THE PLAINTIFFS HAVE CLAIMED, THEIR

5   LAWYERS AND THEIR EXPERTS, IS THAT THEY CLAIM, WELL, IT'S THE

6   PLAQUE ITSELF IN MR. BARNETT THAT'S VIOXX'S FAULT.  NOW, SO THE

7   QUESTION IS:  DID PAST VIOXX USE CAUSE THE CURRENT PLAQUE THAT

8   WE KNOW MR. BARNETT HAS FROM THAT TEST THAT HE WAS GIVEN IN

9   JULY OF 2006?  I'M GOING TO COME BACK TO THIS IN MORE DETAIL

10  LATER ON.  THE SHORT ANSWER IS NO, IT DID NOT.  MR. BARNETT HAS

11  PLAQUE TODAY FOR THE SAME REASONS THAT HUNDREDS OF MILLIONS OF

12  AMERICANS HAVE DEVELOPED ATHEROSCLEROSIS OVER THE YEARS WITHOUT

13  EVER TAKING VIOXX.

14          HE HAS PLAQUE TODAY FOR THE SAME REASON THAT HIS

15  FATHER BEFORE HIM DEVELOPED ATHEROSCLEROSIS WITHOUT EVER TAKING

16  VIOXX, AND HE HAS PLAQUE TODAY FOR THE SAME REASON THAT HE

17  HIMSELF, PRIOR TO JANUARY OF 2000, DEVELOPED ATHEROSCLEROSIS

18  WITHOUT EVER TAKING VIOXX.  AND WHAT ARE THE REASONS?  IT'S

19  THOSE RISK FACTORS THAT I MENTIONED ALREADY AND THAT YOU HEARD

20  SO MUCH ABOUT DURING THE TRIAL.

21          NOW, I'D LIKE TO SAY A WORD ABOUT THE DOCTORS

22  WHO TOOK CARE OF MR. BARNETT AND THEIR IMPORTANCE IN THIS

23  LITIGATION.  NOW, THE PLAINTIFF'S LAWYERS IN THE CASE HAVE

24  RELIED MAINLY ON PAID LITIGATION EXPERTS.  WHEN IT COMES TO

25  ACTUALLY BLAMING VIOXX FOR MR. BARNETT'S CONDITION, IT ALL

1    COMES DOWN TO ONE PAID LITIGATION EXPERT, AND THAT IS
2    DR. ZIPES.
3              NOW, WE ALSO RELY ON EXPERTS TO DEFEND
4    OURSELVES; BUT HAPPILY FOR US, WE DON'T HAVE TO PAY THEM $1,000
5    AN HOUR.  OUR TWO VIOXX EXPERTS WERE TWO OF OUR TYPE SCIENTISTS
6    IN THE COMPANY.  THAT WOULD BE DR. BRIGGS MORRISON, WHO IS HERE
7    TODAY AND HAS BEEN WITH US THROUGHOUT MUCH OF THE TRIAL; AND
8    DR. ALISE REICIN.  THEY HELPED DEVELOP THE MEDICINE.  THEY
9    PROBABLY KNOW MORE ABOUT VIOXX THAN ANYBODY ELSE IN THE WORLD.
10             MEANWHILE, OUR CARDIOLOGY AND MEDICAL EXPERTS
11   WERE THE DOCTORS WHO ACTUALLY TOOK CARE OF MR. BARNETT.  WE
12   DON'T ATTACK THEM.  WE RELY ON THEM.  WE RELY ON DR. MIKOLA,
13   WHO WAS THE INTERNIST WHO TOOK CARE OF MR. BARNETT; WE RELY ON
14   DR. KARAVAN, WHO IS A CARDIOLOGIST; AND WE RELY ON DR. BRYAN,
15   THE HEART SURGEON THAT YOU SAW JUST THE OTHER DAY.  THEY ARE
16   THE EXPERTS WHO PROVED THAT DR. ZIPES IS WRONG.
17             THESE DOCTORS, THE REAL DOCTORS FOR MR. BARNETT,
18   ARE THE ONES WHO TESTIFIED THAT MR. BARNETT HAD SEVERE PLAQUE
19   IN SEVERAL CORONARY ARTERIES BEFORE HE STARTED TAKING VIOXX IN
20   JANUARY OF 2000.  THEY TESTIFIED THAT MR. BARNETT'S PLAQUE HAD
21   BUILT UP OVER THE YEARS DUE TO THE NORMAL RISK FACTORS THAT I
22   ALREADY MENTIONED, JUST LIKE HAPPENED FOR THOUSANDS AND
23   THOUSANDS OF THEIR PATIENTS THAT THEY SEE EVERY YEAR.  THESE
24   DOCTORS TESTIFIED THAT THEY PRESCRIBED VIOXX BECAUSE, IN THEIR
25   MEDICAL JUDGMENT, THE BENEFITS OUTWEIGH THE RISKS.

1              AND THEY SAID THAT MR. BARNETT'S SEPTEMBER 2

2    HEART ATTACK, THEY CALLED IT A MILD, SMALL HEART ATTACK.  THEY

3    SAID IT WAS NOT THE KIND OF BIG Q-WAVE HEART ATTACK THAT

4    DR. ZIPES PRETENDED IT WAS.

5              NOW, THESE DOCTORS WHO REALLY TOOK CARE OF

6    MR. BARNETT ALSO SAID THERE WAS NO SECOND HEART ATTACK IN JULY

7    OF 2004.  THEY SAID IT WAS NOT TRUE.  NOTWITHSTANDING DR. ZIPES

8    SAID.  THESE DOCTORS ALSO SAID THAT THE BYPASS AND THE STENT

9    OPERATIONS WERE SUCCESSFUL AND THAT MR. BARNETT'S OUTLOOK IS

10   GOOD.

11             NOW, I WANT TO SPEND JUST A FEW MINUTES ON ONE

12   ASPECT OF THE VERDICT FORM THAT YOU'RE GOING TO BE WORKING

13   WITH.  HERE IS HOW THE VERDICT FORM IS ORGANIZED.  THE FIRST

14   THREE QUESTIONS RELATE TO THE CLAIMS OR THE THEORIES THAT THE

15   PLAINTIFF IS PURSUING IN THIS CASE.  AND THEY ALL BASICALLY

16   HAVE TO DO WITH WHETHER WE GAVE ADEQUATE WARNINGS OR NOT, BUT

17   THEY ARE STATED A LITTLE BIT DIFFERENTLY BECAUSE THERE IS THREE

18   DIFFERENT LEGAL STANDINGS THAT THEY ARE -- PROCEEDING

19   UNDERNEATH.

20             AND THEN IF YOU FIND -- IF YOU CHECK "YES" ON

21   ANY ONE OF THOSE BOXES, THEN YOU MOVE ON TO THE OTHER QUESTIONS

22   ABOUT DIVIDING UP RESPONSIBILITY AND DAMAGES.  IF YOU CHECK

23   "NO" ON THOSE BOXES, THEN THE CASE IS OVER, AND YOU SIGN THE

24   VERDICT AND COME BACK IN.

25             EACH IS A LITTLE BIT DIFFERENT, BUT THE

1   QUESTIONS FOLLOW A FORMAT THAT I THINK IS IMPORTANT FOR YOU TO

2   UNDERSTAND.  AND SO I'M GOING TO USE QUESTION 1 AS AN EXAMPLE.

3   IT'S REALLY -- WHILE IT'S ONE QUESTION, IT'S DIVIDED INTO TWO

4   PARTS, AND I'VE HIGHLIGHTED ONE OF THE PARTS IN YELLOW; AND

5   THAT IS:  "DO YOU FIND THAT MERCK & COMPANY FAILED TO

6   ADEQUATELY WARN GERALD BARNETT'S TREATING PHYSICIANS OF A KNOWN

7   OR A REASONABLY SCIENTIFICALLY OR MEDICALLY KNOWABLE RISK

8   ASSOCIATED WITH VIOXX?"  SO DID WE FAIL TO WARN THEM.

9             AND THEN THE SECOND PART OF THE QUESTION GOES

10  ON.  IT'S WHAT WE CALL "CAUSATION," AND IT SAYS, "AND THAT SUCH

11  FAILURE TO ADEQUATELY WARN WAS A LEGAL CAUSE OF AN INJURY TO

12  GERALD BARNETT?"

13            SO WHAT THE PLAINTIFFS NEED FOR YOU TO CHECK

14  "YES" ON ANY ONE OF THESE FIRST THREE QUESTIONS IS FOR YOU TO

15  AGREE WITH THEM ON BOTH HALVES OF THE QUESTION.  YOU HAVE TO

16  SAY, YES, MERCK FAILED TO WARN AND, YES, THIS WAS A CAUSE OF

17  HIS INJURY.  IF YOU AGREE WITH THEM ON BOTH THINGS, THEN YOU

18  SAY "YES."  IF YOU DISAGREE WITH THEM ON EITHER ONE OF THOSE

19  THINGS, THEN THE ANSWER IS "NO."  BECAUSE THEY HAVE TO SHOW

20  BOTH IN ORDER TO GET A "YES" ANSWER.

21            NOW, WHY IS THAT IMPORTANT?  THE REASON IT'S

22  IMPORTANT IS BECAUSE, WHEN YOU GO BACK AND YOU DELIBERATE ABOUT

23  THIS CASE, IF YOU-ALL AGREE THAT VIOXX DID NOT CAUSE THE HEART

24  ATTACK, THEN THE ANSWER TO THIS QUESTION IS NO EVEN IF SOME OF

25  YOU MIGHT SAY, YOU KNOW WHAT, I THINK THAT THE WARNINGS COULD

```
 1   HAVE BEEN BETTER.  BECAUSE IF THEY DON'T PROVE BOTH HALVES,
 2   THEY DON'T GET A "YES" ANSWER TO THE QUESTION.
 3                  AND AS I SAID, THAT'S TRUE FOR QUESTION
 4   NUMBER 1.  WHEN YOU GET A CHANCE AND YOU LOOK AT QUESTION
 5   NUMBER 2, IT'S THE SAME WAY.  AND QUESTION NUMBER 3 IS THE SAME
 6   WAY.  AND IF YOU ANSWER "NO" TO EACH ONE, AS I SAID, THEN THE
 7   QUESTION OR THE -- YOUR JOB IS DONE.  YOU SIGN THE VERDICT FORM
 8   AND COME BACK IN.
 9                  NOW, WHILE WE'RE TALKING ABOUT THE CAUSATION
10   PART, THE GREEN PART THERE, LET ME SAY A WORD ABOUT
11   MR. BARNETT'S OTHER MEDICINES.  WE BELIEVE THAT THE EVIDENCE
12   SHOWS THAT MR. BARNETT'S SMALL HEART ATTACK WAS DUE TO NATURAL
13   CAUSES, THE USUAL CAUSES OF ATHEROSCLEROSIS.  BUT IF YOU DECIDE
14   THAT THEY ARE SOMEHOW DRUG RELATED, THERE IS NO BASIS TO SAY
15   THAT THEY ARE DUE TO VIOXX RATHER THAN THE 15 YEARS OF FELDENE
16   USE THAT HE HAD BEFORE HE EVER WENT ON VIOXX; OR IF YOU'RE
17   TALKING ABOUT HIS CURRENT PLAQUE CONDITION, THE TWO YEARS OF
18   MOBIC USE AFTER HE WENT OFF VIOXX.
19                  THE FDA HAS CONCLUDED THAT FELDENE AND MOBIC AND
20   VIOXX AND CELEBREX ALL POSE THE SAME CARDIOVASCULAR RISK.  THEY
21   ALL HAVE THESE BIG BLACK-BOX WARNINGS NOW WARNING ABOUT
22   CARDIOVASCULAR RISKS.
23                  THE FDA MEMO IS DEFENDANT'S EXHIBIT 338, AND
24   THAT'S GOING TO BE ONE OF THE DOCUMENTS THAT YOU CAN LOOK AT
25   WHEN YOU'RE BACK IN THE ROOM.  IT'S APRIL 6, 2005, "DECISION
```

1    MEMORANDA."  AND I REALLY WOULD ASK YOU TO TAKE A LOOK AT THAT

2    MEMORANDUM.  MR. ROBINSON HAS SAID THERE IS NO SCIENCE IN IT.

3    THEY SAY THERE IS NO DATA AT ALL.  LOOK AT THAT MEMORANDA.

4    IT'S ABOUT 20 PAGES LONG.  IT IS CHOCKED FULL OF SCIENCE

5    SUPPORTING THE FDA'S CONCLUSIONS.

6                   MR. ROBINSON SAID IN HIS OPENING REMARKS AT THE

7    BEGINNING OF THIS CASE THAT MR. BARNETT WANTED TO BE PUT ON

8    CELEBREX, BUT THEN HE GOT -- SOMEHOW GOT PUT ON VIOXX BY

9    MISTAKE.  SO, ACCORDING TO THE PLAINTIFFS, IF MERCK HAD HAD

10   SOME SORT OF WARNING THAT WOULD HAVE SCARED OFF THE DOCTORS,

11   THEN, ACCORDING TO THEIR THEORY, MR. BARNETT WOULD HAVE BEEN

12   TAKING CELEBREX INSTEAD OF VIOXX BECAUSE THAT'S WHAT THEY SAY

13   HE ASKED FOR.

14                   LET ME JUST SHOW YOU IN THIS FDA MEMO.  THIS IS

15   WHAT THE FIRST PAGE LOOKS LIKE.  THEN IF YOU GO OVER TO PAGE 4,

16   THERE IS A PARAGRAPH -- THERE IS MORE THAN A PARAGRAPH, BUT

17   THERE IS ONE PARAGRAPH I'LL SHOW YOU ON CELEBREX.  THIS IS THE

18   ONE THAT MR. ROBINSON SAYS THERE IS NO SCIENCE.  THEY GO ON TO

19   SAY, "THE STRONGEST DATA IN SUPPORT OF AN INCREASED RISK OF

20   SERIOUS ADVERSE CARDIOVASCULAR EVENTS FOR CELEBREX COMES FROM

21   THE NATIONAL CANCER INSTITUTE'S ADENOMA PREVENTION WITH

22   CELEBREX TRIAL IN PATIENTS AT RISK," ET CETERA.

23                   SO THEY TALK ABOUT THE CLINICAL TRIALS -- AND

24   I'M NOT GOING TO GO THROUGH THOSE WITH YOU THIS MORNING, BUT

25   THE FDA TALKS ABOUT THE SPECIFIC EVIDENCE THAT SHOWS THAT

1  THERE -- THAT CELEBREX POSES THE RISK WHATEVER THE RISK THAT

2  VIOXX POSES.  AND THEIR THEORY HERE IS THAT, IF WE HAD STRONGER

3  WARNINGS, DIFFERENT WARNINGS, DIFFERENT HEADING, THAT HE WOULD

4  NOT HAVE TAKEN VIOXX; HE WOULD HAVE TAKEN CELEBREX INSTEAD.  HE

5  WOULD HAVE TAKEN A MEDICINE THAT, ACCORDING TO THE FDA, POSES

6  EXACTLY THE SAME CARDIOVASCULAR RISKS AS VIOXX.  AND THERE IS

7  NO REASON TO THINK THAT IF HE HAD BEEN TAKING CELEBREX INSTEAD

8  OF VIOXX, THAT HIS HEALTH CONDITION WOULD HAVE BEEN ANY

9  DIFFERENT.

10            ANOTHER IMPORTANT FACT ABOUT THE OTHER MEDICINE

11  THAT HE TOOK IS THAT HE TOOK MOBIC EVEN AFTER IT CAME OUT WITH

12  THIS BLACK-BOX WARNING.  MR. ROBINSON SAID SOMETHING TO THE

13  EFFECT THAT IF JERRY HAD ONLY KNOW THAT THERE WAS ANY

14  POSSIBILITY, ANY POSSIBILITY OF ANY RISKS, HOWEVER SLIGHT, HE

15  NEVER WOULD HAVE TAKEN VIOXX.  WELL, HE TOOK MOBIC WHEN IT HAD

16  A BLACK-BOX WARNING THAT SAID THAT IT POSES A SIGNIFICANT

17  CARDIOVASCULAR RISK.  AND HE TOOK IT FOR A COUPLE OF YEARS WITH

18  THAT WARNING UNTIL A MONTH OR SO BEFORE TRIAL.  HE IS WILLING

19  TO TAKE MEDICINE THAT HE THINKS WILL DO HIM GOOD EVEN THOUGH IT

20  HAS A BIG CARDIOVASCULAR RISK WARNING.

21            IT'S NOT JUST MOBIC.  HE ALSO TOOK A MEDICINE

22  CALLED SPORANOX.  SPORANOX HAS A GREAT BIG BLACK-BOX WARNING

23  THAT TALKS ABOUT CARDIOVASCULAR RISKS.  AND DO YOU KNOW WHAT

24  THAT'S USED FOR?  TO CLEAR UP TOENAIL FUNGUS.  SO WHEN HE

25  WANTED TO CLEAR UP HIS TOENAIL FUNGUS, HE TOOK A MEDICINE EVEN

1  THOUGH IT HAS THE KIND OF WARNING THAT HE SAYS, "OH, I NEVER

2  WOULD HAVE TAKEN VIOXX."  VIOXX HAD THAT KIND OF WARNING.

3                 NOW, WE HAD A QUESTION UP THERE WITH THE YELLOW

4  PART AND THE GREEN PART, JUST BASICALLY WHAT DID MERCK DO, AND

5  THEN DID VIOXX CAUSE A HEART ATTACK.  SO LET ME TURN TO THE

6  FIRST HALF OF THOSE QUESTIONS; AND THAT IS, WHAT DID MERCK DO.

7  AND I WANT TO SPEND SOME TIME TALKING ABOUT THAT.

8                 MR. ROBINSON SAID IN HIS OPENING STATEMENT AND

9  AGAIN TODAY THAT THERE WAS A CHANGE IN CULTURE AT MERCK IN THE

10  MID 1990S.  HE SAID THAT THE WHOLE COMPANY CHANGED FROM ONE

11  THAT WAS SCIENCE-DRIVEN TO ONE THAT WAS JUST A BIG MONEY

12  MACHINE.  AND HE SHOWED YOU THIS SLIDE WITH RAY GILMARTIN'S

13  NAME ON IT.  THEY NEVER PUT ANY EVIDENCE IN TO BACK UP THAT

14  CHARGE.

15                 MERCK WAS AND IS A SCIENCE-DRIVEN COMPANY.

16  BRIGGS MORRISON TESTIFIED THAT THAT'S WHY HE CAME TO WORK FOR

17  MERCK, BECAUSE HE THOUGHT, OF ALL OF THE PHARMACEUTICAL

18  COMPANIES, IT WAS THE ONE THAT CARED MOST ABOUT SCIENCE AND DID

19  THE BEST SCIENCE.

20                 AND WHAT WAS THE EVIDENCE ABOUT THE EVIL

21  MR. GILMARTIN?  WELL, THE EVIDENCE -- YOU'VE HEARD IT FROM

22  MR. ROBINSON TODAY -- HE HAD AN ADVANCED BUSINESS DEGREE FROM

23  HARVARD.  AND WHAT EXACTLY IS WRONG WITH A GUY WITH AN ADVANCED

24  BUSINESS DEGREE RUNNING A BUSINESS?

25                 AND MR. MORRISON -- OR DR. MORRISON, RATHER,

1    SAID THAT ONE OF THE THINGS THAT MR. GILMARTIN DID WHEN HE CAME

2    TO MERCK WAS HE CREATED THE BOARD OF SCIENTIFIC ADVISORS TO

3    MAKE SURE THAT MERCK WOULD CONTINUE TO BE A SCIENCE-DRIVEN

4    COMPANY.  THIS WAS AN OUTSIDE BOARD OF EXPERTS, SCIENTIFIC

5    EXPERTS, WHO BASICALLY LOOKED OVER THE SHOULDERS AT WHAT THE

6    MERCK SCIENTISTS WERE DOING TO MAKE SURE THAT THEY WERE DOING

7    IT RIGHT.

8              MR. ROBINSON SAID HE WAS PROUD TO REPRESENT THE

9    BARNETTS.  AND HE SHOULD BE PROUD.  THEY ARE A FINE COUPLE.

10   AND I AM PROUD TO REPRESENT THE MEN AND WOMEN OF MERCK.  LET'S

11   LOOK AT THE TYPE OF PEOPLE THAT MERCK ATTRACTS.

12             WE HAD DR. ED SCOLNICK.  YOU SAW HIS PICTURE ON

13   A LOT OF MR. ROBINSON'S SLIDES.  HE CAME TO MERCK FROM THE

14   NATIONAL CANCER INSTITUTE.  HE RETIRED A FEW YEARS BACK, AND HE

15   HAS DEVOTED HIMSELF TO RESEARCHING MEDICINES TO HELP PEOPLE

16   WITH SCHIZOPHRENIA AND WITH BIPOLAR DISORDER.

17             YOU ALSO MET ALISE REICIN.  SHE WAS AN AIDS

18   RESEARCHER AND MEDICAL SCHOOL PROFESSOR BEFORE SHE CAME TO

19   MERCK IN ORDER TO DEVELOP MEDICINE TO HELP PEOPLE.

20             AND BRIGGS MORRISON.  HE WAS A CANCER RESEARCHER

21   WHO CAME TO MERCK HOPING THAT HE COULD HELP PEOPLE FIGHTING

22   CANCER.

23             THE PLAINTIFF'S LAWYERS ASKED YOU TO BELIEVE

24   THAT THOSE PEOPLE FROM MERCK ARE MONSTERS, THAT THEY ARE PEOPLE

25   WHO DON'T CARE IF PATIENTS GET KILLED AS LONG AS MERCK CAN MAKE

1   MORE MONEY.  THAT'S WHAT THEIR THEORY IS.  THAT'S WHAT THEIR

2   CLAIM IS.  YOU GOT TO MEET TWO OF THEM AND LOOK THEM IN THE

3   EYE, AND YOU CAN DECIDE WHETHER YOU BELIEVE THAT.

4                    OR DO YOU BELIEVE THAT DR. REICIN AND

5   DR. MORRISON ARE DEDICATED DOCTORS WHO DID THEIR BEST TO HELP

6   THEIR PATIENTS WHEN THEY WERE PRACTICING MEDICINE AND WHO,

7   SINCE THEY CAME TO MERCK, HAVE DONE THEIR BEST TO DEVELOP GOOD

8   MEDICINES THAT ARE SAFE AND EFFECTIVE AND THAT CAN HELP PEOPLE?

9                    HERE IS WHAT DR. REICIN AND DR. MORRISON AND

10  THEIR COLLEAGUES AT MERCK DID OVER THE TIME PERIOD THAT WE'RE

11  CONCERNED WITH IN THIS CASE.  THEY DEVELOPED A MEDICINE TO HELP

12  RELIEVE PAIN FOR MILLIONS AND MILLIONS OF AMERICANS AND, TO DO

13  SO, WHILE SAVING TENS OF THOUSANDS FROM DEADLY STOMACH BLEEDS

14  AND ULCERS.  THEY PERFORMED OVER 100 CLINICAL TRIALS BOTH

15  BEFORE AND AFTER THE APPROVAL OF VIOXX, AND THEY SHARED THE

16  RESULTS OF EVERY SINGLE ONE OF THOSE WITH THE FOOD & DRUG

17  ADMINISTRATION.

18                    THEY ALSO SHARED THEIR RESEARCH WITH THE

19  SCIENTIFIC COMMUNITY.  AND THE PLAINTIFFS TALK -- AND

20  MR. ROBINSON DID TODAY -- ABOUT THEIR THEORY THAT PROSTACYCLIN,

21  WHICH WE KNOW CAN HELP PREVENT CLOTS, THEIR THEORY IS, WELL,

22  THAT'S PRODUCED BY THE COX-2 ENZYME AND VIOXX INHIBITS THAT AND

23  SO, THEREFORE, IT CAN BE PROTHROMBOTIC, OR PROMOTE CLOTS.

24                    WELL, THE FIRST HINT OF THE THEORETICAL

25  POSSIBILITY THAT PROSTACYCLIN MIGHT BE COMING FROM COX-2

1    INSTEAD OF COX-1 WAS IN THE FITZGERALD PAPER.  MERCK FUNDED THE

2    FITZGERALD PAPER, DR. MORRISON WAS AN AUTHOR ON THE FITZGERALD

3    PAPER, AND MERCK HAD THIS PAPER PUBLISHED CONTAINING THIS

4    HYPOTHESIS WHILE VIOXX WAS STILL BEING DEVELOPED.

5             SO FAR FROM HIDING POTENTIAL PROBLEMS IN ORDER

6    TO MAKE A DOLLAR, WHAT MERCK DID WAS IT PUBLISHED THE PAPER

7    THAT LAID OUT THE FITZGERALD HYPOTHESIS WHILE WE WERE STILL IN

8    THE DEVELOPMENT PROCESS.  AND THEY DID SO BECAUSE THE MERCK

9    SCIENTISTS CARE ABOUT THE TRUTH.

10            DR. MORRISON EXPLAINED THAT MERCK TESTED THIS

11   HYPOTHESIS ABOUT WHERE THE PROSTACYCLIN IS COMING FROM.  HE

12   SAID, "WE TESTED THE HYPOTHESIS IN SEVERAL DIFFERENT WAYS.  HE

13   EXPLAINED THE RABBIT STUDY, WHERE THEY HAD SOME RABBITS WHO HAD

14   HIGH CHOLESTEROL AND SOME THAT DIDN'T, AND THEY GAVE THEM

15   VIOXX, AND THEN THEY SAW WHETHER THE ATHERO CAME OR NOT.

16            WHAT THEY FOUND WAS THAT THE PROSTACYCLIN DOES

17   NOT COME FROM COX-2, LIKE DR. FITZGERALD HAD THEORIZED.

18   INSTEAD, IT COMES FROM COX-1.  BECAUSE WHEN THEY GAVE THE

19   RABBITS, THE VIOXX, THEY DIDN'T GET ANY ATHEROSCLEROSIS WHEN

20   THEIR COX-2 WAS HELD DOWN.

21            HE TALKED ABOUT OTHER STUDIES THAT MERCK DID, AN

22   EARLIER BLEEDING-TIME STUDY WHERE PEOPLE WERE GIVEN VIOXX AND

23   THEN THE ARMS ARE CUT TO SEE HOW LONG IT TAKES TO CLOT.  THE

24   CLOTTING TIME DIDN'T CHANGE, WHICH ALSO COMES TO SHOW THAT THE

25   FITZGERALD HYPOTHESIS WAS WRONG.  AND THAT'S WHAT SCIENCE IS

 1   ALL ABOUT, IS TESTING HYPOTHESES TO SEE WHETHER THEY ARE RIGHT

 2   OR WRONG.

 3                  AND DR. MORRISON AND MERCK WERE NOT THE ONLY

 4   PEOPLE WHO CONCLUDED THAT THE FITZGERALD HYPOTHESIS IS

 5   INCORRECT; THE FDA HAS AS WELL.  IN THAT MEMO THAT MR. ROBINSON

 6   SAID HAS NO SCIENCE IN IT, IN FACT, AT PAGE 8 OF THE MEMO,

 7   THERE IS -- THIS IS A PARAGRAPH THAT ANDY GOLDMAN WENT OVER

 8   WITH DR. REICIN THE OTHER DAY, THIS WHOLE PARAGRAPH -- AND I'M

 9   NOT GOING TO TAKE TIME TO READ THE WHOLE THING -- TALKS ABOUT

10   ALL OF THE PROBLEMS WITH THE FITZGERALD HYPOTHESIS.  AND THEY

11   SAID THAT IT JUST DOESN'T BEAR OUT IN REAL LIFE, AND THEY TALK

12   ABOUT THE HARD SCIENCE THAT SHOWS THAT.

13                  AND THEN THE PORTION THAT I PUT IN YELLOW, THEY

14   SAY, "TAKEN TOGETHER, THESE OBSERVATIONS RAISE SERIOUS

15   QUESTIONS ABOUT THE SO-CALLED COX-2 HYPOTHESIS" -- AND THAT'S

16   THE SAME THING AS THE FITZGERALD HYPOTHESIS -- "WHICH SUGGESTS

17   THAT COX-2 SELECTIVITY CONTRIBUTES TO INCREASED CV RISK."  SO

18   THE FDA ITSELF LOOKED AT THE SCIENCE AND SAID REAL SERIOUS

19   DOUBTS ABOUT THE FITZGERALD HYPOTHESIS.

20                  NOW, AFTER -- THIS IS ALL BEFORE VIOXX COMES ON

21   THE MARKET.  WE'RE PUBLISHING THE FITZGERALD MEMO AND DOING

22   THIS -- SCIENTIFIC STUDIES TO SEE WHETHER THE HYPOTHESIS STANDS

23   UP.  AFTER VIOXX CAME ON THE MARKET, MERCK HAD THE SAME

24   APPROACH TO OPEN SCIENCE.

25                  THE VIGOR RESULTS CAME OUT IN THE YEAR 2000.

1    YOU'VE HEARD A LOT ABOUT THAT.  YOU'LL RECALL THAT VIGOR --
2    THAT WAS THE CLINICAL TRIAL WHERE THEY USED A 50-MILLIGRAM DOSE
3    OF VIOXX, TWICE THE NORMAL DOSE, TWICE THE DOSE THAT
4    MR. BARNETT GOT, AND THEY COMPARED THAT TO A HIGH DOSE OF
5    NAPROXEN.  I THINK IT WAS A THOUSAND MILLIGRAMS A DAY.  AND
6    THEY FOUND THAT THERE WAS A STATISTICALLY SIGNIFICANT
7    DIFFERENCE IN THE CARDIOVASCULAR EVENTS.
8                    AND THE MERCK SCIENTISTS TOOK THIS INFORMATION
9    VERY SERIOUSLY.  MR. ROBINSON SAID THAT WE SOMEHOW TRIED TO
10   BURY IT OR COVER IT UP.  DR. REICIN DESCRIBED THE STEPS THAT WE
11   TOOK TO LOOK INTO THIS AND SEE WHETHER IT WAS NAPROXEN CAUSING
12   THIS OR WHETHER IT WAS SOMETHING FROM VIOXX THAT WAS CAUSING
13   IT.
14                   MR. ROBINSON SAID, WELL, WE NEVER DID WHAT HE
15   CALLED A CV OUTCOMES STUDY, CARDIOVASCULAR OUTCOMES STUDY.
16   DR. REICIN EXPLAINED THAT THAT REALLY IS NOT CORRECT.  SHE
17   DESCRIBED THE OTHER DAY THAT WE PUT TOGETHER SOMETHING CALLED
18   PROTOCOL 203.  AND WHAT THAT WAS, IT WAS A SPECIFIC PROGRAM
19   THAT GATHERED IN A VERY SYSTEMATIC WAY ALL OF THE
20   CARDIOVASCULAR EVENTS THAT WERE TAKING PLACE OR THAT WOULD TAKE
21   PLACE, WHETHER ON VIOXX OR ON PLACEBO, IN THREE LARGE
22   CANCER-RELATED STUDIES.  SO WE -- SHE PUT IN PLACE A CV
23   OUTCOMES STUDY IN THE FORM OF THIS PROTOCOL THAT WENT ACROSS
24   THREE LARGE CANCER STUDIES:  ONE THAT WAS UNDERWAY ALREADY AND
25   A COUPLE OF OTHERS THAT WERE ABOUT TO BE UNDERWAY.

1          AND WHAT WE ALSO DID WHEN VIGOR CAME OUT IS WE
2   INVITED OUTSIDE SCIENTISTS TO LOOK AT THE DATA AND GIVE US
3   THEIR VIEWS.  SHE TALKED ABOUT CONFERENCES THAT WE HELD.  SOME
4   OF THESE OUTSIDE SCIENTISTS DID EPIDEMIOLOGICAL STUDIES OF
5   VIOXX.  DR. REICIN DESCRIBED THESE.  THREE OF THESE STUDIES
6   THAT SHE TALKED ABOUT SHOWED THAT THE PEOPLE WHO HAD TAKEN
7   VIOXX, THERE WAS NO DIFFERENCE WHATSOEVER BETWEEN HOW OFTEN
8   THEY HAD CARDIOVASCULAR PROBLEMS COMPARED TO THE PEOPLE WHO HAD
9   NEVER TAKEN ANY PAIN MEDICATION AT ALL.
10          AND THOSE WERE ALL STUDIES THAT DONE IN THE
11  MONTHS AND YEARS FOLLOWING THE VIGOR STUDY, AND THEY TENDED TO
12  CONFIRM MERCK'S VIEW THAT WHAT VIGOR SHOWED WAS THAT THE
13  DIFFERENCE WAS DUE TO A CARDIOPROTECTIVE EFFECT OF NAPROXEN,
14  LIKE TAKING THE BABY ASPIRIN, INSTEAD OF SOMETHING IN VIOXX
15  THAT WAS INCREASING THE RISK.
16          **THE DEPUTY CLERK:**  MR. BECK, YOU'VE USED 30 MINUTES.
17          **MR. BECK:**  THANK YOU.
18          MERCK ALSO DID THE RIGHT THING WHEN THE APPROVE
19  STUDY CAME OUT IN 2004.  APPROVE WAS THE FIRST PLACEBO TRIAL,
20  WHERE WE'RE COMPARING MERCK TO SOMEBODY TAKING A SUGAR PILL,
21  INDICATING THAT THERE WAS EVEN A POSSIBILITY OF AN INCREASED
22  RISK WITH VIOXX.
23          MEANWHILE, WHAT MERCK HAD WERE THE ALZHEIMER'S
24  STUDIES THAT SHOWED THE OPPOSITE.  REMEMBER, THE ALZHEIMER'S
25  STUDY, WHICH WERE ALSO ON PLACEBO, SHOWED THAT THERE WAS NO

1   INCREASED RISK, CARDIOVASCULAR RISK, USING VIOXX.  IT WAS JUST

2   LIKE MR. ROBINSON SAID IN HIS OPENING STATEMENT BUT DR. ZIPES

3   DENIED ON THE STAND:  THE ALZHEIMER'S STUDIES WERE GOOD FOR

4   VIOXX.

5                   WE HEARD FROM DR. MOYE, THE BIOSTATISTICIAN THAT

6   THEY CALLED, AND HE SAID SOME INTERESTING THINGS ABOUT STUDIES

7   GENERALLY.  THEY NEVER DID ASK HIM ABOUT ANY OF THE VIOXX

8   STUDIES, WHICH WAS INTERESTING.  BUT HE TALKED ABOUT CLINICAL

9   TRIALS GENERALLY.  HE SAID THAT SCIENTISTS CANNOT DRAW

10  CONCLUSIONS FROM ONE STUDY SHOWING AN INCREASED RISK.  HE SAID

11  THAT YOU NEED TO BE ABLE TO REPLICATE STUDIES IN ORDER TO DRAW

12  CONCLUSIONS.  AND BY "REPLICATE," HE SAID THAT MEANS THAT YOU

13  HAVE TO REPEAT IT AND GET THE SAME RESULTS.

14                  AND HE WAS VERY EMPHATIC ABOUT IT.  HE SAID YOU

15  HAVE TO GET THOSE SAME RESULTS AGAIN AND AGAIN AND AGAIN.  AND

16  PERHAPS THAT'S WHY THEY NEVER ASKED HIM ABOUT ANY OF THE VIOXX

17  CLINICAL TRIALS, BECAUSE THOSE RESULTS FROM APPROVE NEVER WERE

18  REPLICATED.

19                  SO HERE IS MERCK IN 2004 AND IT'S FACED WITH

20  CONFLICTING STUDIES:  WITH THE ALZHEIMER'S STUDIES THAT HAD

21  SHOWED NO INCREASED RISK; AND THEN WITH THE APPROVE STUDY,

22  WHICH, FOR THE FIRST TIME, INDICATED A POSSIBILITY OF AN

23  INCREASED RISK.

24                  NOW, WHAT MERCK DID THEN WAS CALLED ON ITS

25  OUTSIDE SCIENTIFIC ADVISORS.  THE COMPANY THAT MR. ROBINSON

1    SAID ABANDONED SCIENCE, WE WENT TO THE OUTSIDE SCIENTIFIC

2    ADVISORS.  WE LAID ALL THIS BEFORE THEM AND SAID, "WHAT SHOULD

3    WE DO?"  AND THE MAJORITY OF THEM SAID YOU SHOULD KEEP VIOXX ON

4    THE MARKET BUT ASK THE FDA TO CHANGE THE WARNING TO REFLECT

5    THIS NEW INFORMATION FROM APPROVE.

6                 BUT WE DIDN'T FOLLOW THAT ADVICE.  WE TOOK A

7    MORE CONSERVATIVE ROUTE AND WE TOOK VIOXX OFF THE MARKET, AND

8    WE DID SO WITHIN SIX DAYS OF GETTING THE APPROVE RESULTS.  AND

9    WE TOOK IT OFF IN THE INTEREST OF PATIENT SAFETY, BECAUSE OUR

10   UNDERSTANDING AT THE TIME WAS THAT, WHILE THE APPROVE STUDY MAY

11   OR MAY NOT BE VALID WHEN IT SHOWS THESE HIGHER RISKS, THERE IS

12   A POSSIBILITY OF HIGHER RISKS.

13                 AND MEANWHILE, THERE IS OTHER MEDICINE OUT THERE

14   LIKE CELEBREX THAT ALSO PROVIDES PAIN RELIEF AND PROTECTS

15   AGAINST THE STOMACH, AND WE DON'T KNOW WHETHER OUR RISKS ARE

16   HIGHER THAN CELEBREX, SO WE'RE GOING TO DO THE SAFE THING AND

17   TAKE IT OFF THE MARKET.

18                 MR. ROBINSON HAS REFERRED TO A 2005 ADVISORY

19   COMMITTEE VOTE THAT WAS 32 TO NOTHING THAT SAID VIOXX INCREASED

20   THE RISK OF CARDIOVASCULAR PROBLEMS.  WELL, THEY VOTED THE SAME

21   WAY FOR CELEBREX.  AND ALSO, THAT ADVISORY COMMITTEE VOTED

22   THAT, EVEN WITH THAT, FOR BOTH VIOXX AND CELEBREX, THE BENEFITS

23   OF THE MEDICINE OUTWEIGHED THE RISKS.  AND THIS IS THREE OR

24   FOUR MONTHS AFTER WE'VE ALREADY TAKEN VIOXX OFF THE MARKET.

25                 BUT WE DID NOT WAIT FOR A VOTE FROM THE ADVISORY

1    COMMITTEE IN THE SPRING OF 2005.  WE ACTED ON OUR OWN IN THE

2    FALL OF 2004:  WE WITHDREW VIOXX WITHIN JUST A FEW DAYS OF

3    GETTING THE RESULTS OF THE APPROVE TEST.  AND THE REASON WE DID

4    SO IS BECAUSE WE CARE ABOUT PATIENT SAFETY TODAY EVERY BIT AS

5    MUCH AS WE DID BACK WHEN DR. MERCK WAS THE HEAD OF THE COMPANY.

6              THE JUDGE IS GOING TO ADVISE YOU THAT OUR

7    DECISION TO VOLUNTARILY WITHDRAW VIOXX FROM THE MARKET CANNOT

8    BE CONSIDERED BY YOU AS EVIDENCE THAT WE DID SOMETHING WRONG OR

9    THAT THE WARNINGS WERE INADEQUATE OR THAT THERE WAS ANYTHING

10   WRONG WITH THE PRODUCT, AND THAT'S BECAUSE WE DON'T WANT THE

11   LAW TO PENALIZE SOMEBODY FOR BEING EXTRA CAUTIOUS OR

12   SAFETY-CONSCIOUS BY LETTING THE OTHER SIDE SAY, "WELL, IF THEY

13   WITHDREW THE MEDICINE, THAT MUST SHOW THAT THERE WAS SOMETHING

14   WRONG WITH IT."

15             WHAT OUR VOLUNTARY WITHDRAWAL SHOWS IS THAT WE

16   DID THE RIGHT THING WHEN WE WERE NOT SURE WHETHER VIOXX POSED

17   HIGHER RISKS THAN ANY OTHER MEDICINE THAT WAS AVAILABLE AT THE

18   SAME TIME.

19             NOW WE KNOW THAT VIOXX DOES NOT POSE HIGHER

20   RISKS.  THE FDA TOLD US THAT AFTER THE ADVISORY COMMITTEE IN

21   APRIL OF 2005.  AND THEY SAID, BASED ON SCIENCE, THAT THE RISKS

22   ARE THE SAME FOR VIOXX; FOR CELEBREX; AND FOR FELDENE, WHICH HE

23   TOOK FOR 15 YEARS; AND FOR MOBIC, WHICH HE TOOK FOR TWO YEARS

24   AFTER THAT.  BUT WE DIDN'T KNOW THAT IN 2004, AND SO WHAT WE

25   DID, WHAT I THINK ALL OF US WOULD HOPE A RESPONSIBLE COMPANY

1   WOULD DO, WE TOOK THE CAUTIOUS ROUTE AND TOOK OUR PRODUCT OFF
2   THE MARKET.
3                   NOW, MOST OF THE EVIDENCE THAT I'VE BEEN TALKING
4   ABOUT CONCERNING MERCK'S CONDUCT CAME FROM DR. MORRISON AND
5   DR. REICIN.  AND YOU'RE GOING TO BE THE JUDGES OF THEIR
6   CREDIBILITY AS WELL AS CREDIBILITY OF ALL OF THE OTHER
7   WITNESSES IN THE CASE.
8                   NOW, WHEN YOU'RE EVALUATING THE CREDIBILITY OF
9   THE WITNESSES, I WOULD ASK YOU TO CONSIDER THE JUDGE'S
10  INSTRUCTIONS CONCERNING THE IMPORTANCE OF WHETHER A WITNESS IS
11  SHOWN TO HAVE GIVEN FALSE TESTIMONY.  LET ME PUT THIS ON THE
12  SCREEN.  THIS IS FROM THE JUDGE'S INSTRUCTIONS.  AND HE WILL
13  SAY, "IF A WITNESS IS SHOWN TO HAVE TESTIFIED FALSELY
14  CONCERNING ANY MATERIAL MATTER, YOU HAVE A RIGHT TO DISTRUST
15  SUCH WITNESS' TESTIMONY ON OTHER MATTERS AND YOU MAY DISTRUST
16  ALL OF THE TESTIMONY OF THAT WITNESS."
17                  NOW, ONE WAY THAT YOU SHOW THAT A WITNESS HAS
18  TESTIFIED FALSELY ON AN IMPORTANT MATTER IS IF YOU SHOW THAT,
19  WHEN HE WAS UNDER OATH ON A PRIOR OCCASION, HE GAVE A DIFFERENT
20  INCONSISTENT ANSWER.
21                  THAT NEVER HAPPENED WITH DR. MORRISON.  IT NEVER
22  HAPPENED WITH DR. REICIN, EVEN THOUGH, AS THE PLAINTIFF'S
23  LAWYERS POINTED OUT, THEY'VE BEEN CALLED UPON TO GIVE TESTIMONY
24  IN MANY VIOXX TRIALS AND IN MANY DEPOSITIONS.  AND YET NEVER
25  ONCE, WITH THIS STACK OF TRANSCRIPTS, DID THEY EVER CONFRONT

1    EITHER ONE WITH ANY STATEMENT THEY HAD EVER MADE THAT WAS
2    INCONSISTENT WITH WHAT THEY SAID TO YOU.  AND THE ONLY WAY THAT
3    SOMEBODY CAN BE THAT CONSISTENT TIME AFTER TIME, HUNDREDS OR
4    THOUSANDS OF TRANSCRIPT PAGES, IS IF YOU TELL THE TRUTH.
5              NOW, CONTRAST THAT WITH SOME OF THE PLAINTIFF'S
6    WITNESSES.  DR. ZIPES WAS PROBABLY THE KING OF INCONSISTENT
7    SWORN TESTIMONY.  HE CHANGED HIS TESTIMONY FROM MONTH TO MONTH,
8    SOMETIMES EVEN HOUR TO HOUR, DEPENDING ON WHAT HE NEEDED TO SAY
9    TO SUPPORT WHAT HE CALLED HIS CASE.
10             AND EVEN WITH DR. AVORN, WHOM WE SAW ON THE
11   VIDEO, THERE WERE 10 OR 11 TIMES WHERE I HAD TO SHOW HIM
12   STATEMENTS THAT HE MADE UNDER OATH THAT WERE DIFFERENT FROM THE
13   ONES HE WAS MAKING DURING THE VIDEOTAPED DEPOSITION.
14             AND THESE WERE IMPORTANT QUESTIONS.  ONE OF THEM
15   WAS:  "DURING THE ENTIRE PERIOD, WHEN VIOXX WAS ON THE MARKET,
16   DID GOOD SCIENTISTS BELIEVE THAT NAPROXEN WAS CARDIOPROTECTIVE,
17   THE THING THAT THEY NOW SAY IS A SMOKESCREEN?"  I ASKED HIM
18   THAT QUESTION ON THE VIDEO, AND HE SAID, "NO, SCIENTISTS DID
19   NOT BELIEVE THAT."  AND THEN I SHOWED HIM A TRANSCRIPT FROM A
20   DEPOSITION THAT ANDY HAD TAKEN JUST TWO WEEKS EARLIER, AND THE
21   ANSWER WAS DIRECTLY THE OPPOSITE.  THE ANSWER WAS:  "YES, GOOD
22   SCIENTISTS DID BELIEVE THAT."
23             LET ME JUST SPEND A MOMENT ON DR. AVORN.  HE WAS
24   THE ONE WHO DID NOT LIKE THE FACT THAT IT TOOK US A LONG TIME
25   TO GIVE HIM THE $700,000 THAT HE WANTED TO DO HIS

1  EPIDEMIOLOGICAL STUDY.  REMEMBER, HE WANTED FUNDING FROM US.

2  AND EVENTUALLY WE DID GIVE HIM THE MONEY, BUT IT TOOK HIM

3  AWHILE.

4          AND HE WAS MAD BECAUSE WE HAD ONE OF OUR

5  SCIENTISTS NAMES REMOVED FROM THE LIST OF AUTHORS.  AND YOU SAW

6  THE REASON THAT WE DID WAS THAT HE REFUSED TO DO WHAT THE

7  *JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION* SAID HE SHOULD DO,

8  AND THAT IS NOTE RIGHT UP FRONT THAT HIS FINDINGS WERE NOT

9  STATISTICALLY SIGNIFICANT.  HE DIDN'T WANT TO DO THAT.  WE

10 DIDN'T WANT OUR PERSON'S NAME ON THE LIST OF AUTHORS.

11         BUT A LOT MORE IMPORTANT THAN THAT IS THE

12 DETAILS OF WHAT HE SAID.  WHEN YOU LOOK AT THE DETAILS, HE

13 ADMITTED SOME VERY IMPORTANT THINGS IN MERCK'S FAVOR, AND A LOT

14 OF HIS CRITICISMS STARTED TO FALL APART.

15         WHAT DID HE SAY IMPORTANT IN THIS CASE?  HE SAID

16 THAT DEVELOPING COX-2 INHIBITORS WAS A GOOD IDEA BECAUSE OF THE

17 STOMACH BLEEDS FROM TRADITIONAL NSAIDS AND HOW THEY WERE

18 KILLING TENS OF THOUSANDS OF PEOPLE A YEAR.  AND HE SAID THAT

19 THE FDA ACTED PROPERLY WHEN APPROVING VIOXX BACK IN 1998 -- OR

20 1999.

21         MR. ROBINSON SAID TODAY -- AND I WROTE DOWN THE

22 QUOTE -- THIS IS MR. ROBINSON TALKING, "I QUESTIONED WHETHER IT

23 SHOULD HAVE BEEN APPROVED AT ALL."  THAT'S MR. ROBINSON

24 CAUTIONING.

25         HIS EXPERT WITNESS DIDN'T QUESTION THAT.  HE

Case 2:05-md-01657-EEF-DEK   Document 13128   Filed 12/18/07   Page 78 of 149
2604

```
 1    SAID THE FDA DID THE RIGHT THING WHEN THEY APPROVED VIOXX.  HE
 2    SAID THAT VIOXX WAS EFFECTIVE IN TREATING PAIN AND INFLAMMATION
 3    AND IN REDUCING STOMACH BLEEDS.  HE SAID THAT THE VAST, VAST
 4    MAJORITY OF VIOXX USERS GOT PAIN RELIEF AND STOMACH PROTECTION
 5    WITHOUT EXPERIENCING ANY SIDE EFFECTS WHATSOEVER.
 6                    AND HE SAID THAT HIS OWN STUDY -- THE ONE THAT
 7    HE COMPLAINED TOOK SO LONG TO GET UNDERWAY, HE SAID HIS OWN
 8    STUDY SHOWED THAT THERE WAS NO RISK, NO ADDITIONAL RISK, WITH
 9    VIOXX WHEN IT WAS USED AT THE 25-MILLIGRAM DOSE, WHICH IS WHAT
10    MR. BARNETT USED THROUGHOUT THE PERIOD HE WAS USING IT.
11                    AND HE ALSO SAID THAT, EVEN AT THE HIGHER DOSES,
12    WHERE HE FOUND THERE WAS AN INCREASED RISK, IT WENT AWAY AFTER
13    90 DAYS.  IF SOMEBODY TOOK THE MEDICINE, EVEN AT THE HIGH DOSE,
14    FOR MORE THAN 90 DAYS, THERE WAS NO DIFFERENCE BETWEEN VIOXX
15    AND SOMEONE WHO TOOK NO MEDICINE AT ALL.
16                    AND THAT SAME ARTICLE THAT HE WROTE -- AND IT
17    WAS PUBLISHED, I THINK, IN 2004 -- SAID THAT THE JURY WAS STILL
18    OUT CONCERNING WHETHER THE VIGOR STUDY AS EXPLAINED BY THE
19    NAPROXEN THEORY OR THE IMBALANCE THEORY.  IT'S THE SAME SORT OF
20    THING CONCERNING MARKETING MATERIALS.
21                    I GUESS DR. AVORN DOES NOT LIKE THE FACT THAT
22    PHARMACEUTICAL COMPANIES HAVE SALESMEN AND MARKETING
23    DEPARTMENTS, BUT HE'S NOT THE ONLY DOCTOR IN AMERICA SMART
24    ENOUGH TO REALIZE THAT HE SHOULD LOOK AT SCIENTIFIC ARTICLES
25    INSTEAD OF SALES MATERIALS.
```

1        I MENTIONED IN THE OPENING STATEMENT THAT YOU

2   WOULD PROBABLY HEAR TWO OR THREE DAYS OF DEPOSITIONS ON

3   MARKETING ISSUES, AND YOU DID.  AND I ALSO SAID THAT THE

4   PLAINTIFF'S LAWYERS WOULD NEVER CONNECT ANY OF THIS TO

5   MR. BARNETT OR TO HIS DOCTORS, AND THEY DID NOT.  WE NEVER

6   HEARD ANY EVIDENCE AT ALL THAT MR. BARNETT RELIED ON TELEVISION

7   ADS WHEN DECIDING THAT HE WOULD GO ON VIOXX.

8        NOW, WE HEARD REFERENCES TO DOROTHY HAMILL

9   SKATING AROUND IN THE VIOXX ADD.  MR. BARNETT WAS A

10  COUNTERINTELLIGENCE AGENT FOR THE FBI.  HE'S NOT THE KIND OF

11  GUY WHO IS GOING TO BE SWAYED BY DOROTHY HAMILL SKATING AROUND

12  IN A TELEVISION AD.

13        THEN THERE WAS NO EVIDENCE AT ALL THAT THIS

14  MARKETING EFFORT HAD ANY INFLUENCE ON HIS DOCTORS EITHER.  TAKE

15  DR. MIKOLA AS AN EXAMPLE.  THIS WAS A SLIDE THAT THEY PUT UP

16  CONCERNING DR. MIKOLA.  YOU KNOW, THEY MENTIONED THAT HIS WIFE

17  WAS A SALES REP FOR MERCK.

18        YOU KNOW, MERCK IS NOT BREACHING A DUTY TO

19  INFORM DOCTORS SIMPLY BECAUSE ONE OF THE DOCTORS FALLS IN LOVE

20  WITH ONE OF THEIR SALES REPRESENTATIVES AND THEY GET MARRIED.

21  THERE IS NOTHING ILLEGAL ABOUT THAT.  AND, IN FACT, I WAS

22  THINKING AS I LISTENED TO MR. ROBINSON:  WHAT DOCTOR IN AMERICA

23  IS GOING TO KNOW MORE ABOUT VIOXX THAN ONE WHO IS MARRIED TO A

24  MERCK SALES REPRESENTATIVE?  HE'S GOT TO LISTEN TO HER EVERY

25  NIGHT TALK ABOUT HOW THE CELEBREX SALES REPS ARE OUT THERE

1 SAYING ALL THESE MEAN THINGS ABOUT VIOXX.  HE'S GOING TO KNOW
2 EVERYTHING IN THE WORLD YOU CAN KNOW BEING MARRIED TO A SALES
3 REP.
4             YOU KNOW, THE ATTACK ON DR. MIKOLA CAME FROM THE
5 PLAINTIFFS, NOT FROM US, AND WE THINK IT WAS UNCALLED FOR.
6             MR. BARNETT TESTIFIED THAT DR. MIKOLA TOOK GOOD
7 CARE OF HIM, BUT THAT DID NOT STOP HIS LAWYERS.  YOU KNOW, IT'S
8 INTERESTING BECAUSE, DR. MIKOLA, HE WAS NOT EVEN THE DOCTOR WHO
9 STARTED MR. BARNETT ON VIOXX.
10             DR. MIKOLA FIRST SAW MR. BARNETT BACK IN OCTOBER
11 OF 1999.  YOU DIDN'T HEAR THAT MUCH ABOUT THIS, BUT THIS IS A
12 MEDICAL RECORD THAT'S IN EVIDENCE.  YOU CAN SEE THAT
13 MR. BARNETT -- IT'S OCTOBER '99, AND DR. MIKOLA ENDED UP
14 SHORTENING HIS NAME FROM THAT LONG NAME THAT I CANNOT
15 PRONOUNCE.  BUT THAT'S THE SAME FELLOW, DR. MIKOLA.
16             AND YOU CAN SEE IN OCTOBER OF '99, WHEN HE FIRST
17 SAW MR. BARNETT, MR. BARNETT WAS ON FELDENE.  AND DR. MIKOLA,
18 THE HUSBAND OF THE MERCK SALES REP, HE DIDN'T CHANGE HIM OFF
19 FELDENE.  HE LEFT HIM ON FELDENE BECAUSE IT WAS WORKING FINE.
20             THEN MR. BARNETT WENT TO SEE A DIFFERENT DOCTOR,
21 DR. MCCAFFREY, AND THIS WAS ON DECEMBER 30 OF 1999.
22 MR. BARNETT NEVER REALLY EXPLAINED WHY HE WENT TO SEE
23 MR. MCCAFFREY, BUT HERE IS HIS MEDICAL RECORD WHICH IS ALSO IN
24 EVIDENCE.  AND IT SHOWS THAT MR. BARNETT CAME IN COMPLAINING OF
25 A WORSENING IN THE RIGHT SHOULDER IN THE DELTOID.  SO

1   APPARENTLY THE FELDENE WASN'T WORKING SO WELL FOR THIS SHOULDER

2   PAIN AND DELTOID PAIN, AND SO IT WAS DR. MCCAFFREY WHO DECIDED

3   TO TRY VIOXX TO SEE IF THAT WOULD DO THE JOB.

4                 DR. MCCAFFREY IS ANOTHER DOCTOR THAT WAS

5   ATTACKED BY MR. ROBINSON IN THE OPENING STATEMENT.  I DON'T

6   KNOW IF YOU REMEMBER THIS SLIDE, BUT HE SAID HE WAS GOING TO

7   PROVE ALL OF THESE THINGS ABOUT DR. MCCAFFREY.  HE DID NOT

8   PROVE ONE OF THOSE THINGS ABOUT DR. MCCAFFREY.  NOT ONE.

9                 BUT WHAT'S EVEN MORE IMPORTANT THAN THE FACT

10  THAT THEY DIDN'T BACK UP THEIR SLANDER AGAINST DR. MCCAFFREY

11  WITH ANY EVIDENCE IS THE FACT THAT, IN A CASE INVOLVING A CLAIM

12  THAT WE DIDN'T WARN THE DOCTORS, AND THE DOCTORS DIDN'T KNOW

13  ENOUGH ABOUT VIOXX, THEY DIDN'T PUT IN ANY EVIDENCE WHATSOEVER

14  ABOUT WHAT DR. MCCAFFREY KNEW.  AND HE'S THE ONE WHO PRESCRIBED

15  VIOXX IN THE FIRST PLACE.  THEY DIDN'T PUT IN ONE SHRED OF

16  EVIDENCE ON THAT.  AND IT WAS THEIR OBLIGATION TO PROVE THIS.

17  THEY DIDN'T, AND THAT REALLY OUGHT TO BE ENOUGH TO END THE CASE

18  RIGHT THERE.

19                THEN MR. BARNETT, AFTER HE GOT THE VIOXX

20  PRESCRIPTION, HE WENT BACK TO DR. MIKOLA IN EARLY 2000.  ALL

21  DR. MIKOLA DID WAS LEAVE HIM ON MEDICINE THAT HE HAD BEEN

22  PRESCRIBED BY ANOTHER DOCTOR BECAUSE THE MEDICINE WAS WORKING.

23  IT WAS RELIEVING HIS PAIN AND NOT CAUSING ANY STOMACH PROBLEMS.

24                AND DR. MIKOLA DESCRIBED THAT HE VIEWED ALL THE

25  COX-2 INHIBITORS AS HAVING THE SAME CARDIOVASCULAR RISK, SO IT

```
 1    DIDN'T MATTER TO HIM WHETHER SOMEONE WAS VIOXX OR CELEBREX, AND
 2    AS WE KNOW FROM THE FDA, HE WAS RIGHT ABOUT THAT.  AND HE SAID
 3    HE REACHED HIS CONCLUSION TO LEAVE MR. BARNETT ON VIOXX BASED
 4    ON SCIENTIFIC LITERATURE, NOT BASED ON SALES BROCHURES.
 5                    ANOTHER THING THAT DR. MIKOLA SAID WAS THAT,
 6    BACK IN JANUARY OF 2000, HE ADVISED MR. BARNETT TO GO ON
 7    LOW-DOSE ASPIRIN.  EVERY DOCTOR IN THIS CASE AGREES, INCLUDING
 8    DR. ZIPES, THAT MR. BARNETT SHOULD HAVE BEEN ON LOW-DOSE
 9    ASPIRIN WHEN HE STARTED TAKING VIOXX.  AND THAT'S BECAUSE HE
10    HAD HAD THIS STRESS TEST AND HE HAD ISCHEMIA AND CHEST PAIN.
11    HE HAS ALL THESE RISK FACTORS.
12                    AND DR. ZIPES EVEN TESTIFIED THAT, IF HE HAD
13    BEEN ON LOW-DOSE ASPIRIN, HE MIGHT -- CERTAINLY IT WOULD
14    COUNTERACT THIS CLOTTING IMBALANCE THAT DR. ZIPES HAS A THEORY
15    ABOUT.  AND HE SAID THAT IF MR. BARNETT HAD BEEN ON LOW-DOSE
16    ASPIRIN FROM JANUARY OF 2000, HE MIGHT NOT HAVE HAD THAT LITTLE
17    HEART ATTACK IN SEPTEMBER OF '02.
18                    BUT MR. BARNETT DID NOT TAKE THE LOW-DOSE
19    ASPIRIN THAT DR. MIKOLA RECOMMENDED.  AND THAT WAS
20    MR. BARNETT'S RESPONSIBILITY.  THAT WAS NOT MERCK'S
21    RESPONSIBILITY.
22                    SO WHAT HAPPENS?  THE DOCTORS ATTACK -- THE
23    LAWYERS, RATHER, ATTACK DR. MIKOLA AGAIN.  AND THEY SHOWED
24    DR. ZIPES A WHOLE SERIES OF DR. MIKOLA'S MEDICAL RECORDS, AND
25    NONE OF THEM SHOWED THAT HE PRESCRIBED LOW-DOSE ASPIRIN.  WELL,
```

1    GUESS WHAT, YOU DON'T PRESCRIBE LOW-DOSE ASPIRIN.  IT'S NOT A

2    PRESCRIPTION MEDICINE.

3              IF YOU'RE A DOCTOR, AND YOU'VE GOT A PATIENT WHO

4    IS IN HIS 50S, WHO IS A MALE, WHO HAS GOT A FAMILY HISTORY OF

5    HEART ATTACKS AND WHO HAS GOT DECADES OF HIGH CHOLESTEROL AND

6    TELLS YOU THAT HE'S GOT STRESS EVERY DAY OF HIS LIFE, WHAT YOU

7    DO IS YOU SAY, "JERRY, GO ON DOWN TO THE DRUGSTORE AND BUY ONE

8    OF THOSE LITTLE JUGS OF BABY ASPIRIN AND TAKE ONE EVERY DAY."

9    AND THAT'S WHAT DR. MIKOLA DID.

10             YOU SAW HIM ON THE VIDEO.  YOU SAW A LOT OF HIS

11   OFFICE VISIT NOTES THAT WERE TYPED UP.  HE'S NOT THE KIND OF

12   DOCTOR WHO WOULD NEGLECT TO MENTION TO A MAN WITH MR. BARNETT'S

13   RISK FACTORS THAT HE OUGHT TO BE TAKING LOW-DOSE ASPIRIN.  BUT,

14   IF YOU BELIEVE THE ATTACK ON HIM, THAT HE NEGLECTED TO DO, IF

15   YOU GET THAT FAR IN THE VERDICT FORM, AND YOU GET TO THE PART

16   WHERE YOU ARE APPORTIONING RESPONSIBILITY, THEY'VE GOT A BOX

17   THERE THAT YOU CAN CHECK NEXT TO DR. MIKOLA'S NAME.

18             LET ME GET BACK TO THE WARNING MATERIALS, ONE

19   LAST THING, AND I'LL MOVE ON TO ANOTHER SUBJECT.  THE

20   PLAINTIFFS SHOWED YOU THAT FDA WARNING LETTER THE OTHER DAY.

21   AND MR. ROBINSON, I THINK, HE TALKED ABOUT IT ALREADY.  IF HE

22   DIDN'T, I'M SURE HE'LL TALK ABOUT IT WHEN HE GETS UP ON

23   REBUTTAL.

24             WHAT I ASK YOU TO REMEMBER IS THAT THIS IS FROM

25   THE ADVERTISING PEOPLE OF THE FDA.  IT'S NOT FROM THE DRUG

1   SAFETY PEOPLE.  AND IT INVOLVED THREE ISOLATED INCIDENTS OUT OF

2   WHAT MR. ROBINSON SAID WERE BILLIONS AND BILLIONS OF MESSAGES

3   ABOUT VIOXX.  AND WITH THE DOCUMENTS THAT ANDY PUT IN WITH

4   ALISE REICIN THE OTHER DAY, WE FIXED THE PROBLEM.  AND THE FDA

5   WROTE BACK AND SAID:  FINE.  YOU'VE ADDRESSED THE PROBLEM.

6   CASE CLOSED.  WE NEVER GOT ANOTHER COMPLAINT FROM THE FDA OUT

7   OF ALL THESE BILLIONS AND BILLIONS OF MESSAGES.

8               AND THE MOST IMPORTANT THING ABOUT THAT IS THAT

9   IT'S A SMOKESCREEN IN THE CASE, BECAUSE DR. MIKOLA AND THE

10  OTHER DOCTORS, THEY NEVER SAW ANY OF THESE MATERIALS THAT WERE

11  THE SUBJECT OF THAT ONE LETTER FROM THE FDA ADVERTISING PEOPLE.

12              HOW MUCH TIME DO I HAVE HERE?

13          **THE DEPUTY CLERK:**  YOU'VE USED 50 MINUTES.

14          **MR. BECK:**  I'VE USED 50 MINUTES?

15          **THE DEPUTY CLERK:**  YES.

16          **MR. BECK:**  I CAN'T DO THE ARITHMETIC.  THAT LEAVES

17  ME?

18          **THE DEPUTY CLERK:**  40 MINUTES.

19          **MR. BECK:**  40 MINUTES, OKAY.

20              I WANT TO TURN TO THE LABELS NOW.  THEIR BASIC

21  CLAIM IS THAT THE LABELS WERE DEFECTIVE.  JUDGE FALLON WILL

22  GIVE YOU THE LEGAL STANDARD.  HE'LL INSTRUCT YOU THAT, WHERE

23  PRESCRIPTION MEDICINES ARE INVOLVED, THE WARNINGS GO TO THE

24  DOCTORS, NOT TO THE PATIENTS.  THE PHARMACEUTICAL COMPANY'S

25  OBLIGATION IS TO WARN THE DOCTORS ABOUT KNOWN AND KNOWABLE

DAILY COPY

1    RISKS, AND THERE IS NO DUTY TO WARN DOCTORS ABOUT UNPROVEN

2    THEORIES OR UNANSWERED QUESTIONS.  IF EVERYBODY HAD TO DO THAT,

3    THEN THE LABELS THAT WE RECEIVE WOULD BE LITTLE BOOKS, AND THE

4    IMPORTANT INFORMATION WOULD BE BURIED IN ALL OF THE UNIMPORTANT

5    INFORMATION ABOUT WHO'S GOT WHAT THEORY AND WHO'S GOT WHAT

6    QUESTION AND WHO'S DOING WHAT EXPERIMENT.  THAT'S NOT WHAT GOES

7    IN TO A DRUG LABEL.

8              THE ORIGINAL 1999 LABEL REFLECTED THE KNOWLEDGE

9    THAT MERCK HAD AT THAT TIME.  THERE WERE NO CLINICAL TRIALS AT

10   THAT TIME SHOWING AN INCREASE IN THE CARDIOVASCULAR RISKS.  AND

11   IN FACT, ALL OF THE CLINICAL TRIALS SHOW THAT THERE WAS NO

12   DIFFERENCE BETWEEN VIOXX AND PLACEBO.

13             THERE WAS SOME TESTIMONY DURING THE CASE ABOUT

14   BLOOD PRESSURE AND WHETHER VIOXX CAN AFFECT BLOOD PRESSURE.

15   THE ORIGINAL LABEL HAD THE BLOOD PRESSURE INFORMATION IN IT AND

16   SAID VIOXX CAN INCREASE BLOOD PRESSURE, JUST LIKE OTHER COX-2

17   INHIBITORS AND OTHER NSAIDS.

18             DR. MOYE WAS PUT FORWARD AS THEIR LABEL WITNESS,

19   AND HE DID NOT SAY THAT THE 1999 LABEL FAILED TO WARN OF KNOWN

20   OR KNOWABLE CARDIOVASCULAR RISKS.  INSTEAD, WHAT HAPPENED IS

21   MR. BIRCHFIELD ASKED HIM TO ASSUME THAT THERE WERE A LOT OF

22   CARDIOVASCULAR RISKS.  AND THEN HE WAS ASKED, "WELL, IF MY

23   ASSUMPTION IS RIGHT, IS ALL THE STUFF THAT I SAID IN THE 1999

24   LABEL?"  AND HE SAID, "NO, IT'S NOT."

25             BUT LABELS ARE NOT ABOUT LAWYERS' ASSUMPTIONS.

1  MR. BIRCHFIELD CANNOT JUST ASSUME AWAY THE REQUIREMENT THAT

2  THERE BE ACTUAL KNOWN RISKS OR KNOWABLE RISKS USING GOOD

3  SCIENCE AND MEDICINE.

4            AND LABELS ARE ALSO NOT ABOUT INTERNAL E-MAILS

5  OR MEMOS WRITTEN WITHIN A COMPANY.  THE FDA WOULD THINK WE WERE

6  CRAZY IF WE WENT TO THEM AND SAID, "HERE IS OUR LABEL," AND IN

7  IT, WE SAID, "WE'VE GOT AN OUTSIDE CONSULTANT THAT WE HIRED,

8  AND WE DID AN EXPERIMENT ON URINE, AND HE HAS A HYPOTHESIS THAT

9  MAYBE IT'S FROM COX-2, BUT THAT'S GOING TO REQUIRE A LOT MORE

10  RESEARCH, HE SAYS.  WE'VE DONE RESEARCH ON RABBITS AND ARM

11  BLEEDS.  WE THINK HE'S WRONG, BUT WE'RE FOLLOWING UP ON IT."

12            THAT'S NOT WHAT YOU PUT IN A LABEL.  WHAT THE

13  FDA WANTS IN A LABEL IS USEFUL INFORMATION ABOUT THE RESULTS

14  FROM CONTROLLED CLINICAL TRIALS, AND THAT'S WHAT WAS IN OUR

15  LABEL.

16            THEN OUR 2002 LABEL, WHAT PEOPLE CALLED THE

17  VIGOR LABEL, THIS CAME OUT AFTER THE VIGOR RESULTS CAME.  AND

18  THE FDA CONVENED AN ADVISORY COMMITTEE IN 2001 OR -- YES, I

19  THINK IT WAS 2001.  AND THE PURPOSE OF THE ADVISORY COMMITTEE

20  WAS TO DISCUSS HOW THE INFORMATION FROM VIGOR SHOULD BE TREATED

21  IN OUR LABEL.  THAT WAS THE SPECIFIC PURPOSE OF THE ADVISORY

22  COMMITTEE.

23            THE ADVISORY COMMITTEE CAME TO A CONCLUSION.

24  THEY SAID THAT "WE CANNOT TELL WHETHER THE DIFFERENCE IN VIGOR

25  IS DUE TO A CARDIOPROTECTIVE EFFECT OF NAPROXEN OR DUE TO

1   SOMETHING IN VIOXX OR SOME COMBINATION OF THE TWO.  AND SINCE

2   WE CANNOT TELL, OUR RECOMMENDATION IS THAT YOU PUT THE

3   INFORMATION IN THE LABEL AND YOU LET DOCTORS, INDIVIDUAL

4   DOCTORS, MAKE UP THEIR OWN MIND."  AND MERCK'S LABEL DID

5   EXACTLY WHAT THE ADVISORY COMMITTEE RECOMMENDED.

6                   DR. MOYE WAS INTERESTING ON THIS SUBJECT BECAUSE

7   HE AGREED WITH ME THAT THE 2002 LABEL ACCURATELY SET FORTH THE

8   CARDIOVASCULAR INFORMATION FROM VIGOR.  HE ACTUALLY WENT BEYOND

9   THAT.  HE AGREED THAT THE 2002 LABEL ACCURATELY DESCRIBED THE

10  CARDIOVASCULAR RISKS OF VIOXX.

11                  AND THIS GOES TO THE HEART OF THE INSTRUCTIONS

12  THAT YOU'LL HEAR FROM THE JUDGE.  THE JUDGE WILL TELL YOU THAT

13  THE -- THAT WHAT YOU NEED TO DO IN A LABEL IS SET FORTH THE

14  KNOWN AND KNOWABLE RISKS IN A WAY THAT DOCTORS CAN UNDERSTAND.

15                  AND DR. MOYE SAID THAT THAT'S WHAT WE DID.  HIS

16  ONLY CRITICISM -- AND THIS WAS AT THE PROMPTING OF

17  MR. BIRCHFIELD -- WAS THAT ALL THIS INFORMATION IS UNDERNEATH

18  THE PRECAUTIONS HEADING INSTEAD OF THE WARNINGS HEADING.

19                  NOW, THERE IS NOTHING IN THE JUDGE'S INSTRUCTION

20  THAT SAYS THAT INFORMATION HAS TO BE UNDER ONE HEADING INSTEAD

21  OF ANOTHER HEADING.  JUST THAT IT HAS TO FAIRLY SET FORTH THE

22  RISKS SO THE DOCTORS CAN UNDERSTAND THEM.

23                  AND DR. MOYE ULTIMATELY ADMITTED THAT HE REALLY

24  DOESN'T KEEP UP WITH LABEL REGULATIONS.  WE SAW THAT THEY'VE

25  DONE AWAY WITH THE DISTINCTION BETWEEN WARNINGS AND PRECAUTIONS

DAILY COPY

1   BECAUSE THAT DISTINCTION IS NOT IMPORTANT TO DOCTORS IN REAL

2   LIFE.

3                   AND IN TRUTH, LABELING IS NOT REALLY HIS FIELD.

4   BIOSTATISTICS ARE HIS FIELD.  THAT'S WHAT HE'S REALLY QUALIFIED

5   IN.  BUT THEY DIDN'T ASK HIM ANYTHING ABOUT OUR STUDY.  HE

6   TESTIFIED PREVIOUSLY THAT HE'S NOT AN EXPERT IN LABELING.  YOU

7   SAW.  IT WAS AWKWARD.  HE COULDN'T EVEN REMEMBER WHAT HE HAD

8   SAID IN HIS REPORT ABOUT THE LABELS.  AND IT ENDED UP THAT HIS

9   REPORT WAS BASICALLY A CUT-AND-PASTE JOB WHEN IT CAME TO THE

10  LABELING ISSUES.

11                  DR. REICIN, TO CONTRAST, SHE KNOWS A LOT ABOUT

12  LABELS, AND SHE EXPLAINED THAT THE PRECAUTION SECTION WAS THE

13  CORRECT PLACE TO PUT THIS INFORMATION BECAUSE OF THE

14  UNCERTAINTY ABOUT WHAT THE EXPLANATION WAS.  IF THERE WAS NO

15  UNCERTAINTY, YOU PUT IT IN THE WARNINGS SECTION; IF THERE IS

16  UNCERTAINTY ABOUT WHAT THE CAUSE IS, YOU PUT IT IN THE

17  PRECAUTION SECTION.  THAT'S WHAT THE ADVICE ADVISORY COMMITTEE

18  SAID WE OUGHT TO DO, AND THAT'S WHAT WE DID.

19                  BUT THE MOST IMPORTANT THING ON ALL OF THIS IS

20  THE TESTIMONY OF OUR FRIEND DR. MIKOLA BECAUSE HE SAID HE READ

21  THE WHOLE LABEL.  I SUPPOSE THERE MIGHT BE DOCTORS OUT THERE

22  SOMEWHERE WHO ONLY READ THE WARNING SECTION AND HAVE BLOCKED

23  OUT EVERYTHING THAT COMES BEFORE THE WARNING SECTION AND

24  EVERYTHING THAT COMES AFTER THE WARNING SECTION, BUT DR. MIKOLA

25  IS NOT ONE OF THEM.  HE SAID HE READ THE ENTIRE LABEL AND THAT

1   HE UNDERSTOOD THE CARDIOVASCULAR INFORMATION IN IT.

2                   THE JUDGE IS GOING TO INSTRUCT YOU THAT, IN

3   ORDER FOR THEM TO PROVE THEIR WARNINGS CASE, THE PLAINTIFF MUST

4   SHOW THAT HIS DOCTORS WOULD NOT HAVE PRESCRIBED VIOXX TO HIM IF

5   MERCK HAD PROVIDED AN ADEQUATE WARNING.  AND HERE WHAT THEY ARE

6   TALKING ABOUT IS, WELL, IT SHOULD HAVE BEEN UNDER THE WARNINGS

7   SECTION INSTEAD OF UNDER THE PRECAUTION SECTION.

8                   MR. ROBINSON SAID SOMETHING THAT WAS NOT TRUE.

9   WHEN HE PUTS A SLIDE UP ON THE SCREEN, THAT DOESN'T MEAN THAT

10  THAT'S WHAT HAPPENED IN TRIAL.  HE PUT A SLIDE UP ON THE SCREEN

11  WITH A PICTURE OF DR. MIKOLA, AND NEXT TO THAT PICTURE HE SAID

12  THAT DR. MIKOLA TESTIFIED THAT IF THE CV INFORMATION HAD BEEN

13  IN THE WARNINGS SECTION INSTEAD OF THE PRECAUTION SECTION, HE

14  WOULD NOT HAVE PRESCRIBED VIOXX.  THAT'S FALSE.  THERE WAS

15  NEVER ANY TESTIMONY LIKE THAT AT ALL.

16                  WHAT THEY ASKED DR. MIKOLA IS, GEE WHIZ, IF YOU

17  KNEW EVERYTHING YOU KNOW TODAY BACK IN 2000, WOULD YOU HAVE

18  PRESCRIBED VIOXX?  THAT'S WHAT THEY ASKED.  AND HE LOOKED

19  PUZZLED AT THE QUESTION, AND HE SAID, "NO, BECAUSE VIOXX HAS

20  BEEN WITHDRAWN FROM THE MARKET."  AND THAT'S A COMMONSENSE

21  ANSWER TO GIVE.

22                  BUT WHAT THE -- THE LEGAL STANDARD IS DID THE

23  LABEL HAVE THE INFORMATION CONCERNING THE RISKS THAT WERE KNOWN

24  OR KNOWABLE AT THE TIME, NOT WHETHER SOMEBODY SIX YEARS LATER

25  WOULD SAY, "WELL, I WOULDN'T HAVE PRESCRIBED IT IF I KNEW THAT

1   IT WAS GOING TO BE TAKEN OFF THE MARKET."

2             BUT THE KEY THING IS THAT HE NEVER SAID WHAT

3   MR. ROBINSON SAID.  THAT WAS JUST NOT TRUE.

4             YOU KNOW, THERE WAS TALK ABOUT DR. SCOLNICK, AND

5   I WANT TO SPEND JUST A COUPLE MINUTES ON THAT BECAUSE MY TIME

6   IS RUNNING SHORT.  DURING THIS LABEL EXCHANGE, DR. SCOLNICK GOT

7   FRUSTRATED WITH THE FDA PEOPLE.  IT WAS TAKING A LONG TIME.  HE

8   CALLED THEM "BASTARDS."  HE DIDN'T ACTUALLY CALL THEM BASTARDS.

9   HE WROTE IN AN INTERNAL E-MAIL THAT THEY WERE BASTARDS.  SO

10  HE'S SORRY ABOUT THAT.  IT'S NOT AGAINST THE LAW TO SLUR ABOUT

11  THE GOVERNMENT.  AND HE NEVER ACTUALLY SWORE AT THE GOVERNMENT.

12  THIS WAS JUST SORT OF INTERNAL STUFF WHERE HE'S COMPLAINING

13  ABOUT THE PROBLEMS HE'S HAD ON THESE GOVERNMENT STAFFERS.  HE

14  NEVER SAID ANYTHING INAPPROPRIATE TO THE FDA.

15            THERE WAS ALSO NOTHING WRONG WITH WHAT HE SAID

16  ABOUT "GRADE-D HIGH-SCHOOL STUDENTS."  MR. ROBINSON SHOWED US A

17  SLIDE WHERE SCOLNICK SAID "GRADE-D HIGH-SCHOOL STUDENTS."  THAT

18  WAS A CHEAP SHOT.  DR. SCOLNICK EXPLAINED THAT ON THE STAND.

19  YOU SAW THAT ON THE VIDEO.

20            WHAT HE EXPLAINED WAS THAT THIS WAS SORT OF AN

21  INSIDE JOKE-TYPE REFERENCE TO HIS TEAM.  BECAUSE A COUPLE OF

22  YEARS EARLIER THEY HAD GONE DOWN TO THE FDA AND THEY MADE A

23  REALLY GREAT SCIENTIFIC PRESENTATION, AND ONE OF THE FDA PEOPLE

24  PAID THEM A COMPLIMENT AND SAID, "YOUR FOLKS WERE SO GOOD, THEY

25  MADE US LOOK LIKE GRADE-D HIGH-SCHOOL STUDENTS."

1                   SO WHEN HE WROTE THAT E-MAIL, HE WAS PAYING A

2     COMPLIMENT TO HIS TEAM REFERRING BACK TO SOMETHING THEY ALL

3     UNDERSTOOD.  HE WASN'T SLAMMING THE FDA, AND IT'S NOT FAIR TO

4     PRETEND THAT HE WAS.

5                   BUT THE MAIN POINT ON DR. SCOLNICK AND THIS

6     GIVE-AND-TAKE WITH THE FDA IS THAT, JUST LIKE WITH THE

7     "WARNINGS" VERSUS "PRECAUTION" HEADINGS, THE FACT THAT IT TOOK

8     A WHILE TO GET THE LABEL APPROVED, THAT HAD NO EFFECT ON THE

9     DOCTORS INVOLVED IN THIS CASE.

10                  THIS WAS THE LABEL THAT ACTUALLY WAS APPROVED.

11    AND THEN, YOU KNOW, WE DIDN'T KEEP IT SECRET.  WE SENT IT OUT

12    TO DOCTORS ACROSS AMERICA WITH THESE PRE-HIGHLIGHTING IN THE

13    YELLOW.  AND YOU SAW THIS WITH DR. REICIN.

14                  ONE OF THE THINGS THAT WAS IN THIS LABEL -- THIS

15    IS SPRING 2002 -- IS YOU SHOULD USE THIS WITH CAUTION WITH

16    PEOPLE WHO HAVE A HISTORY OF ISCHEMIC HEART DISEASE.  NOW,

17    MR. BARNETT HAD A HISTORY OF ISCHEMIC HEART DISEASE GOING BACK

18    TO JANUARY OF 2000, WHEN HE TOOK THAT STRESS TEST.

19                  AND DR. MIKOLA SAID HE READ THIS LABEL, HE READ

20    THIS INFORMATION, AND HE DECIDED --

21          MR. ROBINSON:  I'M GOING TO OBJECT, YOUR HONOR.  I

22    DON'T THINK -- THERE IS NO EVIDENCE THAT HE READ THIS LABEL

23    WITH THE YELLOW ON IT.  HE READ THAT --

24          THE COURT:  IT'S UP TO THE JURY TO FERRET THAT OUT.

25          MR. BECK:  DR. MIKOLA SAID HE READ THE 2002 LABEL AND

1   UNDERSTOOD IT, AND THE "CARDIOVASCULAR EFFECTS" SECTION.  AND

2   THIS IS THE FIRST SENTENCE OF THE CARDIOVASCULAR EFFECTS.  AND

3   DR. MIKOLA DECIDED IN 2002, WHEN THE LABEL CAME OUT, THAT HE

4   WAS GOING TO KEEP MR. BARNETT ON VIOXX.  SO THE TIMING OF WHEN

5   THE LABEL CAME OUT DIDN'T MAKE ANY DIFFERENCE BECAUSE, ONCE IT

6   CAME OUT, HE KEPT HIM ON VIOXX.  IT'S NOT LIKE HE TOOK HIM OFF.

7             **THE DEPUTY CLERK:**  MR. BECK, YOU HAVE 25 MINUTES.

8             **MR. BECK:**  THANK YOU.

9             AND THIS LABEL -- YOU'LL GET A CHANCE TO LOOK AT

10  IT -- THIS THERE IS NOTHING DECEPTIVE IN THE LABEL.  THERE IS

11  NOTHING INACCURATE IN THE LABEL.  IN FACT, THE LABEL DOES NOT

12  EVEN SAY THAT -- WHAT WE BELIEVE IS THAT NAPROXEN EXPLAINS THE

13  DIFFERENCE IN THE VIGOR STUDY.  WE DON'T SAY THAT AT ALL IN THE

14  LABEL.  WHAT WE SAY IN THE LABEL -- AND YOU SAW THIS WHEN

15  DR. REICIN WAS TESTIFYING -- WAS THAT THE SIGNIFICANCE OF THIS

16  INFORMATION IS UNKNOWN.

17            AND THAT'S EXACTLY WHAT THE FDA ADVISORY

18  COMMITTEE SAID THAT WE SHOULD SAY, BECAUSE THEY FOUND THAT THE

19  SIGNIFICANCE OF IT WAS UNKNOWN.

20            NOW, DR. MIKOLA READ THE LABEL WITH THE

21  ADDITIONAL CARDIOVASCULAR INFORMATION.  HE KEPT PRESCRIBING IT

22  AFTER THE LABEL CHANGE WAS MADE IN APRIL OF 2002.  HE DID SO

23  BECAUSE, IN HIS JUDGMENT, THE BENEFITS TO MR. BARNETT

24  OUTWEIGHED WHATEVER SMALL RISKS THERE WERE.

25            BECAUSE IT WORKED SO WELL TO CONTROL HIS PAIN.

1   AND SO THAT YOU DON'T FORGET ABOUT THIS, MR. BARNETT WAS

2   SOMEBODY WHO HAD A LOT OF PAIN WITHOUT MEDICATION AND WHO COULD

3   NOT FUNCTION AND LIVE A NORMAL LIFE UNLESS HE HAD PAIN

4   MEDICATION.

5               AND DR. MIKOLA KEPT PRESCRIBING THE MEDICINE,

6   EVEN AFTER THE SEPTEMBER '02 HEART ATTACK BECAUSE, AGAIN, IN

7   HIS JUDGMENT, THE BENEFITS OUTWEIGHED THE RISKS.

8               NOW, I WANT TO TALK ABOUT MR. BARNETT'S HEALTH,

9   SPEND A FEW MINUTES TALKING ABOUT THE SMALL HEART ATTACK IN

10  SEPTEMBER OF '02, AND THEN SOME MORE TIME TALKING ABOUT WHAT

11  THEY ARE CLAIMING ABOUT HIS CURRENT HEALTH SITUATION AND HIS

12  FUTURE.

13              WHAT CAUSED THE LITTLE HEART ATTACK BACK IN

14  SEPTEMBER OF '02?  THE REAL DOCTORS WHO TOOK CARE OF

15  MR. BARNETT ALL TOOK A COMMONSENSE VIEW OF THIS.  THEY SAID IT

16  RESULTED FROM DECADES OF PLAQUE BUILDUP AND THAT THE PLAQUE HAD

17  COME FROM THINGS LIKE AGE, SEX, FAMILY HISTORY, CHOLESTEROL,

18  STRESS.  AND THEY SAID THAT THE NORMAL THING WITH PLAQUE LIKE

19  THIS IS THAT IT TAKES YEARS AND YEARS AND YEARS TO DEVELOP.

20              AND THERE IS NO REASON TO THINK THAT MR. BARNETT

21  IS SOME KIND OF FREAK OF NATURE, WHERE HE HAD CLEAN ARTERIES IN

22  THE YEAR 2000 AND THEN, BY SEPTEMBER 2002, THEY ARE ALL 90

23  PERCENT CLOGGED.  THAT SIMPLY DOESN'T MAKE ANY SENSE AT ALL.

24              THE DOCTORS WHO TOOK CARE OF HIM KNEW THAT

25  MR. BARNETT ALREADY HAD ATHEROSCLEROSIS WHEN HE STARTED TAKING

1  VIOXX, AND THEY KNEW THAT BECAUSE OF THE CHEST PAINS AND THE
2  ISCHEMIA THAT SHOWED UP IN THAT JANUARY CARDIOLITE STRESS TEST.
3          DR. ZIPES SAID, "WELL, MR. BECK, THE CARDIOLITE
4  STRESS TEST, THAT PROVES MY CASE," JUST LIKE EVERYTHING ELSE
5  THAT I SHOWED HIM HE SAID PROVED HIS CASE.  AND WHAT HE SAID
6  ABOUT THAT TEST WAS THAT, WELL, IT SHOWS THAT ALL THE PIPES
7  WERE CLEAN EXCEPT ONE HAD A LITTLE BIT OF PLAQUE.
8          BUT THE REAL DOCTORS EXPLAIN THAT THAT'S NOT HOW
9  THAT TEST WORKS, AND DR. BRYAN WAS HELPFUL ON THAT JUST
10 YESTERDAY.  HE SAID THAT ALL THIS TEST SHOWS IS THAT ONE ARTERY
11 IS MORE CLOGGED UP THAN THE OTHER ONES, BUT IT DOESN'T SHOW
12 WHETHER THE OTHER ONES ARE 60 OR 70 PERCENT CLOGGED UP AND THIS
13 ONE IS 90, OR WHETHER THE OTHER ONES ARE ZERO AND THIS ONE IS
14 20.  YOU CAN'T TELL THAT FROM THE CARDIOLITE STRESS TEST THAT
15 HE HAD IN JANUARY OF 2000.
16          IN ORDER TO FIND THAT OUT, YOU NEED ONE OF THESE
17 CATHETERIZATIONS THAT WE HEARD ABOUT.  BUT MR. BARNETT DID NOT
18 WANT A CATHETERIZATION IN JANUARY OF 2000.  AND BECAUSE HE SAID
19 NO WHEN DR. MIKOLA RECOMMENDED ONE, THEN WHAT WE'RE LEFT WITH
20 IS UNCERTAINTY.  WE CAN'T BE 100 PERCENT SURE AS TO THE EXTENT
21 OF THE BLOCKAGE IN EACH ONE OF HIS CORONARY ARTERIES IN JANUARY
22 OF 2000.
23          THE BEST EVIDENCE, WE SUBMIT, COMES FROM THE
24 REAL DOCTORS WHO SAID HE WAS LIKE THOUSANDS OF THEIR OTHER
25 PATIENTS AND THAT THE LITTLE HEART ATTACK THAT OCCURRED IN

DAILY COPY

1    SEPTEMBER OF '02 WAS THE RESULT OF ATHEROSCLEROSIS THAT HAD

2    BEEN PROGRESSING SINCE HE WAS A TEENAGER, NOT SINCE HE WENT ON

3    VIOXX IN JANUARY OF 2000.

4                    AND EVEN THE PLAINTIFF'S EXPERTS AGREED THAT

5    THAT'S HOW IT WORKS IN THE NORMAL COURSE.  IT TAKES DECADES FOR

6    THAT AMOUNT OF PLAQUE TO BUILD UP, AND THE FIRST SIGN IS OFTEN

7    WHEN SOMEBODY HAS A HEART ATTACK.

8                    SO LET'S FAST-FORWARD TO TODAY.  AND WE HAVE A

9    CLAIM -- DIDN'T HEAR THAT MUCH FROM IT OR ABOUT IT FROM

10   MR. ROBINSON.  MAYBE WE'LL HEAR SOME MORE, BUT THE REAL CLAIM

11   IS THAT, WELL, HE'S AT RISK FOR A FUTURE HEART ATTACK.

12                   I SUPPOSE WE ALL HAVE A CLAIM LIKE THAT WANT.  I

13   SUPPOSE WE ALL MIGHT HAVE A HEART ATTACK IN THE FUTURE.  IF I

14   HAVE ONE, I HOPE IT'S GOING TO BE LIKE THAT JULY 2004 HEART

15   ATTACK THAT -- DR. ZIPES MADE UP FOR THIS CASE, THE KIND WHERE

16   YOU COME IN OFF THE GOLF COURSE AND YOU DON'T FEEL WELL.  THE

17   DOCTOR SAYS, "TAKE TWO ASPIRIN."  YOU SAY, "NO."  YOU GO HOME.

18   YOU NEVER THINK ABOUT IT AGAIN.  YOUR REAL DOCTORS SAY IT NEVER

19   HAPPENED.  THE ONLY TIME THE SUBJECT COMES UP IS IF YOU SUE

20   SOMEBODY.  IF I'M GOING TO HAVE A HEART ATTACK, I WOULD PAY A

21   LOT OF MONEY TO HAVE MY HEART ATTACK BE JUST LIKE THAT ONE THAT

22   DR. ZIPES SAID TOOK PLACE IN JULY OF '04.

23                   NOW, WHY IT THAT DR. ZIPES CLAIMED THAT THERE

24   WAS THIS JULY '04 HEART ATTACK?  WELL, IT'S KIND OF

25   COMPLICATED, BUT BEAR WITH ME HERE.  WHAT HAPPENED IS THAT

1    DR. KARAVAN FOUND OUT JUST ABOUT A MONTH AGO THAT MR. BARNETT

2    HAS GOT SIGNIFICANT PLAQUE TODAY IN HIS ARTERIES.  WE DIDN'T

3    KNOW THAT UNTIL A MONTH AGO WHEN DR. KARAVAN DID THE

4    CATHETERIZATION.  DR. ZIPES NEEDS A WAY TO BLAME PAST VIOXX USE

5    FOR MR. BARNETT'S CURRENT PLAQUE SITUATION, AND HE BASICALLY

6    INVENTED THIS JULY 4 HEART ATTACK IN ORDER TO DO THAT.

7                    AND HERE IS HOW THIS THING WORKS.  THIS IS THE

8    TIME LINE THAT YOU SAW THROUGHOUT THE CASE, AND YOU ALSO SAW IT

9    AGAIN TODAY.  AND HERE IS THE SITUATION DR. ZIPES IS FACED WITH

10   WHEN HE CAME IN TO TRIAL.  WE HAVE A CATHETERIZATION THAT WAS

11   DONE -- I'M GOING TO PUT A BLUE ARROW HERE -- IN SEPTEMBER OF

12   '02.  AND WE KNOW FROM THAT -- REALLY HAVE A GOOD IDEA HOW MUCH

13   PLAQUE HE HAD IN SEPTEMBER OF '02.

14                   AND THEN, AFTER DR. ZIPES WAS ON RECORD IN HIS

15   EXPERT RECORD AND HIS JUNE DEPOSITION, THEN WE GET A NEW

16   CATHETERIZATION IN JULY OF '06, AND WE SEE THAT THERE IS A LOT

17   MORE PLAQUE THAN THERE WAS BACK IN SEPTEMBER OF '02.  THIS MOST

18   RECENT ONE WAS RIGHT BEFORE THE STENT WAS PUT IN; THE OTHER ONE

19   WAS RIGHT BEFORE THE BYPASS TOOK PLACE.  SO THESE TWO TESTS

20   SHOW THAT THE PLAQUE HAS GOTTEN WORSE.

21                   AND WE ALSO HAVE SOMETHING ELSE; AND THAT IS, WE

22   HAVE THESE EXCELLENT RESULTS THAT MR. BARNETT GOT WHEN HE DID

23   THE CARDIOLITE STRESS TEST IN JULY OF '03, WHERE HE WALKED FOR

24   15 MINUTES AND AT 17 METS AND WAS BASICALLY OFF THE CHART.

25                   AND THIS GIVES DR. ZIPES A PROBLEM BECAUSE, IN

1   REAL LIFE, THE TRUTH IS, YOU CAN GET EXCELLENT RESULTS LIKE

2   THAT EVEN THOUGH YOU'VE GOT A LOT OF PLAQUE BUILDUP.  AND

3   THAT'S WHAT DR. BRYAN SAID THE OTHER DAY.  BUT DR. ZIPES CAN'T

4   ADMIT THAT BECAUSE DR. ZIPES WANTS TO SAY THAT THE JANUARY 2000

5   STRESS TEST, WHERE HE GOT EXACTLY THE SAME RESULTS, THAT THAT

6   PROVES HIS PIPES WERE CLEAN.  HE COULDN'T POSSIBLY HAVE HAD

7   PLAQUE BUILDUP IN JANUARY OF 2000 BECAUSE HE WALKED FOR 15

8   MINUTES ON THE TREADMILL AND HAD METS OF 17.  HE'S WRONG WITH

9   ABOUT THAT, BUT THAT'S WHAT HE'S CLAIMS.

10          SO THEN HE'S STUCK WITH THE JULY '03 STRESS TEST

11  WHERE YOU'VE GOT EXACTLY THE SAME RESULTS.  SO HE'S GOT TO SAY,

12  WELL, HIS ARTERIES WERE CLEAN THEN TOO.  AND SO THEN WHAT HE

13  WANTS TO DO IS SAY, WELL, THE PLAQUE THAT WE KNOW HAS BUILT UP

14  FROM THE -- FROM THE NEW CATHETERIZATION, THAT MUST HAVE BUILT

15  UP AFTER JULY OF '03.  BUT THEY DON'T WANT IT TO BUILD UP AFTER

16  SEPTEMBER OF '04, BECAUSE THAT'S WHEN HE STOPPED TAKING VIOXX.

17          SO WHAT DR. ZIPES SAID IS THAT THE PLAQUE BUILT

18  UP IN THIS PERIOD -- LET ME GET RID OF THAT AND CHANGE THE

19  COLOR -- JULY OF '03, WHERE HE HAD THE GOOD STRESS TEST; IN

20  SEPTEMBER OF '04, WHEN HE WENT ON VIOXX.  AND THIS IS

21  DR. ZIPES' THEORY ABOUT PLAQUE BUILDUP, IS THAT IT HAPPENED IN

22  THIS LITTLE SHORT WINDOW OF TIME.

23          NOW, IT DOESN'T MAKE A WHOLE LOT OF SENSE THAT

24  IT WOULD HAPPEN IN THIS SHORT PERIOD OF TIME.  IT WOULD MAKE A

25  LOT MORE SENSE THAT IT COULD HAVE HAPPENED -- INSTEAD OF IN

1  THAT 14-MONTH PERIOD, MAYBE IT HAPPENED IN THE TWO-YEAR PERIOD

2  AFTER HE STOPPED TAKING VIOXX.  BUT THAT WOULDN'T HELP

3  DR. ZIPES' CAUSE BECAUSE HE COULDN'T BLAME THE PLAQUE ON VIOXX.

4              THE TRUTH IS THE MOST SENSIBLE EXPLANATION IS

5  THE ONE DR. BRYAN GAVE; AND THAT IS, THE PLAQUE CONTINUED TO

6  PROGRESS WITH OR WITHOUT VIOXX.  VIOXX DIDN'T HAVE ANYTHING TO

7  DO WITH IT.

8              BUT DR. ZIPES NEEDS THE PLAQUE TO BUILD UP

9  INSIDE THIS RED SQUARE.  SO WHAT'S HIS EXPLANATION FOR HOW IT

10 IS -- WHY SHOULD WE THINK THAT SOMETHING SPECIAL HAPPENED IN

11 HERE?  WELL, HIS EXPLANATION IS:  "I'VE DISCOVERED THAT THERE

12 WAS A SECOND HEART ATTACK."  HE HAD HIS LITTLE RED ARROW THERE.

13 I'LL PUT MINE.

14              AND WHAT HE SAID IS, BECAUSE THERE WAS A SECOND

15 HEART ATTACK, WE KNOW THAT THE PLAQUE HAD BUILT UP BETWEEN THE

16 GOOD STRESS TEST AND THIS SECOND HEART ATTACK BECAUSE YOU DON'T

17 HAVE A HEART ATTACK WITHOUT PLAQUE BUILDING UP.  BUT HE'S GOT

18 PROBLEMS WITH THIS THEORY, AND THE BIGGEST PROBLEM IS IT WAS

19 MADE UP FOR LITIGATION.  I CALLED IT A LITIGATION CONCOCTION.

20              HOW DO WE KNOW THAT?  WELL, HE WROTE A REPORT IN

21 MAY THAT HE WAS VERY PROUD OF, BUT THIS WAS BEFORE WE HAD THE

22 NEW RESULTS.  AND HIS MAY REPORT DOESN'T TALK ABOUT A SECOND

23 HEART ATTACK.  IT DOESN'T SAY THERE WAS A SECOND HEART ATTACK

24 AT ALL.  AND THAT WOULD BE KIND OF IMPORTANT IN A CASE THAT'S

25 ABOUT HEART ATTACK.

2625

1          EVEN MORE, HE GAVE A SWORN DEPOSITION IN JUNE,
2   BEFORE HE FOUND OUT ABOUT THESE TEST RESULTS THAT DR. KARAVAN
3   GOT, AND IN JUNE, HE SWORE UNDER OATH THAT THERE WAS NOT A
4   SECOND HEART ATTACK BACK IN JULY OF '04.  HE SAID, "HOW I DO I
5   KNOW THAT?  BECAUSE WE TOOK BLOOD TESTS.  AND IF YOU HAVE A
6   HEART ATTACK, THE CELLS BREAK AND THE LITTLE ENZYMES GET INTO
7   THE BLOOD.  AND WE TOOK A BLOOD TEST AND THERE WAS NO ENZYMES
8   IN THE BLOOD, SO THERE WAS NO HEART ATTACK."  THAT WAS HIS
9   SWORN TESTIMONY.
10          SO THEN THESE RESULTS COME OUT AND HE'S GOT TO
11  CHANGE HIS TUNE.
12          I'M GOING TO SEE IF I CAN MAKE THIS THING DANCE.
13          SO HE TAKES HIS RED ARROW OVER HERE, WHEN HE
14  COMES TO TRIAL -- OR ACTUALLY, HIS DEPOSITION IN JULY, AFTER
15  THE RESULTS CAME OUT, AND HE SAYS, "YOU KNOW WHAT?  THERE WAS A
16  SECOND HEART ATTACK AFTER ALL.  AND THERE ARE NO BLOOD TESTS TO
17  PROVE I'M WRONG."  DO YOU REMEMBER THAT?  HE SAID, "THERE ARE
18  NO BLOOD TESTS TO PROVE THAT I AM WRONG."
19          THEN AT TRIAL HE SHOWED UP, AND I SAID, "WELL,
20  THERE WERE TWO BLOOD TESTS.  DON'T YOU REMEMBER ADMITTING THAT
21  IN JUNE?"  AND HE SAID, "WELL, THERE WERE BLOOD TESTS, BUT
22  THERE WEREN'T ENOUGH BLOOD TESTS."  SO THAT'S DR. ZIPES'
23  TESTIMONY ON THIS.
24          **THE DEPUTY CLERK:**  MR. BECK, YOU HAVE 12 MINUTES.
25          **MR. BECK:**  THANK YOU.

1            DR. ZIPES ALSO HAS NO SENSIBLE EXPLANATION FOR

2    HOW IT IS THAT ALL THIS PLAQUE COULD HAVE BUILT UP ON VIOXX'S

3    WATCH, AFTER THE STRESS TEST, WHERE HE GETS A CLEAN BILL OF

4    HEALTH IN JULY, BUT BEFORE HE GOES OFF VIOXX IN SEPTEMBER OF

5    '04.

6            HE STARTED OUT TALKING ABOUT MICE STUDIES.  DO

7    YOU REMEMBER THAT?  AND THEN I SHOWED HIM A BUNCH OF MICE

8    STUDIES THAT SAY THAT, EVEN WHEN YOU TURN OFF THE PROSTACYCLIN,

9    IT HAS NO EFFECT ON ATHERO.  HE SAID, "YOU'VE GOT THE WRONG

10   KIND OF MICE."

11            AND I SHOWED HIM A MOUSE STUDY THAT USED HIS

12   FAVORITE KIND OF MICE.  AND HE SAID, "WELL, YEAH, THERE ARE A

13   LOT OF MICE STUDIES THAT SHOW THAT KNOCKING OUT PROSTACYCLIN

14   DOES NOT CAUSE ATHEROSCLEROSIS.  BUT IF I PUT EVERY STUDY THAT

15   WAS FAVORABLE TO MERCK IN MY REPORT, MY 45-PAGE REPORT WOULD BE

16   A THOUSAND PAGES LONG."  THAT'S WHAT HE SAID WOULD HAPPEN IF HE

17   PUT IT IN THE FAVORABLE INFORMATION.

18            THEN HE WENT TO MY FAVORITE IN THE CASE, WHICH

19   WAS THE BLOOD PRESSURE SPIKES.  IN A CASE ABOUT DECEIT, THE

20   MOST DECEPTIVE THING THAT WAS SEEN WAS THE BLOOD PRESSURE

21   SPIKES CHART THAT DR. ZIPES COOKED UP WITH THE JURY CONSULTANT

22   THAT HE SAID HE NEVER MET BEFORE.  HERE WAS MY MAGNET VERSION,

23   AND HERE WAS DR. ZIPES' VERSION.

24            AND HERE'S THE PROBLEM WITH DR. ZIPES' BLOOD

25   PRESSURE SPIKES.  HE SAYS THAT THE BLOOD PRESSURE SPIKES IS

1    WHAT CAUSED THE ATHEROSCLEROSIS THAT CONTINUED ON AND CAUSED

2    THIS SECOND HEART ATTACK HE CLAIMED HAVING.  HERE'S THE PROBLEM

3    WITH HIS CHART.  HE LEFT OFF ALL THE RED DOTS SHOWING BLOOD

4    PRESSURE SPIKES BEFORE MR. BARNETT EVER TOOK VIOXX.

5                  AND THEN IT WAS INTERESTING BECAUSE, WHEN I PUT

6    THE RED DOTS ON, HE HAD A STORY ABOUT EVERY SINGLE ONE OF THEM

7    HE HAD MEMORIZED THE STORY ABOUT EVERY SINGLE ONE OF THE RED

8    DOTS THAT HE LEFT OFF THE CHARTS AND SAID THAT WAS DUE TO THE

9    FACT THAT HE HAD AN UPPER RESPIRATORY; THAT WAS DUE TO HIS

10   COLONOSCOPY.  HE HAD AN ANSWER FOR EVERYTHING.

11                 BUT THEN WHEN I ASKED HIM, "WELL, DON'T THE SAME

12   EXPLANATIONS APPLY TO THE RED DOTS THAT YOU PUT ON YOUR CHART?"

13   HE COULDN'T REMEMBER ANYTHING ABOUT THE RED DOTS THAT HE PUT ON

14   THE CHART.  IT'S STRANGE.  YOU'D THINK IT WOULD BE THE OTHER

15   WAY AROUND, THAT HE WOULD KNOW SOMETHING ABOUT THE DOTS THAT HE

16   PUT ON THE CHART.

17                 BUT HE CLAIMED NOT TO KNOW, AND THE REASON IS

18   BECAUSE OF EXACTLY THE SAME KIND OF EXPLANATIONS:  UPPER

19   RESPIRATORY PROBLEMS, SHOULDER PAIN, WHATEVER, ACCOUNTED FOR

20   THE BLOOD PRESSURE SPIKES.  AND WHAT WE SEE IS THERE WAS NO

21   CHANGE AT ALL IN TERMS OF WHAT WAS HAPPENING WITH THE BLOOD

22   PRESSURE BEFORE OR AFTER VIOXX.

23                 BUT THE KEY THING ABOUT THESE RED DOTS IS THAT

24   THEY STOP IN SEPTEMBER OF '02 WHEN THE HEART ATTACK TOOK PLACE.

25   WHY IS THAT IMPORTANT?  WELL, REMEMBER HIS THEORY ABOUT THIS.

1    I MEAN, THIS IS NOT A BLOOD PRESSURE CASE.  SO WHY ARE WE
2    LOOKING AT THESE RED DOTS?
3                    WELL, HIS THEORY WAS THAT THIS HEIGHTENED BLOOD
4    PRESSURE CAUSED PLAQUE TO BUILD UP THAT IS STILL WITH
5    MR. BARNETT TODAY.  BUT HERE IS THE PROBLEM WITH THAT.  THE
6    BLOOD PRESSURE SPIKES -- HERE IS THEIR TWO TIME LINES BACK TO
7    BACK.  ONE OF THEM ENDS IN SEPTEMBER '06, AND THE OTHER ONE
8    BEGINS -- I'M SORRY, SEPTEMBER '02, AND THE OTHER ONE BEGINS AT
9    SEPTEMBER 02.
10                    WELL, THE BLOOD PRESSURE SPIKES STOPPED IN
11   SEPTEMBER OF '02 BECAUSE HE WAS PUT ON BLOOD PRESSURE
12   MEDICATION.  AND SO THERE WERE NO BLOOD PRESSURE SPIKES AFTER
13   THAT.  AND YET THEIR THEORY IS THAT THERE WAS ALL THIS PLAQUE
14   BUILDUP BEGINNING AROUND THE TIME OF THE CARDIOLITE STRESS TEST
15   WHERE HE WAS CLEAN.
16                    NOW, IT'S NOT POSSIBLE FOR BLOOD PRESSURE SPIKES
17   THAT ENDED IN 2002 TO BE CAUSING PLAQUE TO START BUILDING UP IN
18   JULY OF 2003.  THE STORY ABOUT THAT JUST DIDN'T MAKE SENSE.
19                    THE SAME THING WAS TRUE WITH THE IMBALANCE
20   THEORY.  HE TALKED ABOUT, YOU KNOW, HE BELIEVES IN THE -- OR
21   SAYS HE DOES, IN THE FITZGERALD HYPOTHESIS AND THE
22   PROSTACYCLIN/THROMBOXANE IMBALANCE.  AND HE SAID THAT CAUSED
23   PLAQUE TO BUILD UP.
24                    NOW, REMEMBER, WE'RE TALKING ABOUT HIS THEORY
25   THAT PLAQUE BUILT UP IN THIS WINDOW OF TIME.  WELL, WHAT HE

2629

1    LEFT OUT IS THAT, IN SEPTEMBER OF '02, MR. BARNETT FINALLY

2    STARTED FOLLOWING HIS DOCTOR'S ADVICE ABOUT TAKING BABY

3    ASPIRIN.  AFTER HE HAD THE HEART ATTACK AND AFTER HE HAD THE

4    BYPASS, HE STARTED TAKING BABY ASPIRIN.

5                     AND DR. ZIPES SAID, ONCE YOU TAKE BABY ASPIRIN,

6    THAT RESTORES THE BALANCE.  ONCE YOU TAKE BABY ASPIRIN, THERE

7    IS NOT GOING TO BE THIS PROTHROMBOTIC STATE THAT HE SAYS

8    EXISTED.  SO WHAT WE HAVE HERE, DURING THE PERIOD WHERE THEY

9    SAY ALL THE PLAQUE BUILT UP AFTER THE BYPASS, IS WE HAVE NO

10   BLOOD PRESSURE SPIKES AND NO IMBALANCE, BECAUSE HE'S TAKING

11   BABY ASPIRIN LIKE HE SHOULD HAVE BEEN FROM JANUARY OF 2000.

12                     SO WHAT EXPLAINS THE FACT THAT HE'S GOT PLAQUE

13   TODAY?  IT'S NOT VIOXX.  IT'S MOTHER NATURE AND SCIENCE.  HOW

14   DO WE KNOW IT'S NOT VIOXX IS?

15                     AND HOW MUCH TIME DO I HAVE?

16          **THE DEPUTY CLERK:**  SIX.

17          **MR. BECK:**  SIX.  I'M GOING TO START TALKING FAST.  WE

18   KNOW FROM THE APPROVE FOLLOW-UP DATA -- REMEMBER THE APPROVE

19   FOLLOW-UP DATA?  THAT'S -- WHEN THE PEOPLE WENT OFF VIOXX, THEY

20   FOLLOWED HIM FOR A COUPLE OF YEARS.  AND IF THEY BUILT UP

21   PLAQUE LIKE THE PLAINTIFFS SAY HAPPENS WITH VIOXX, THEN THE

22   PEOPLE WHO WERE OFF VIOXX WOULD HAVE HAD MORE CARDIAC EVENTS

23   THAN THE PEOPLE WHO HAD BEEN TAKING A PLACEBO BILL, BECAUSE

24   THEY WOULD NOT HAVE BUILT UP PLAQUE.

25                     BUT WHAT DID WE SEE IN THAT REGARD.  THIS IS

1   FROM THE FOLLOW-UP DATA, WEEK 210, VIOXX VERSUS PLACEBO, 16 TO

2   16, TIE BALL GAME.  NO INCREASE WITH VIOXX.

3              OCTOBER 2005; AGAIN, TIE BALL GAME.  NO INCREASE

4   WHATSOEVER IN PEOPLE TWO WHO TOOK VIOXX IN CARDIAC EVENTS AFTER

5   THEY HAD BEEN OFF OF IT FOR A YEAR OR MORE.

6              AND THEN AS OF THE LAST DATE, MARCH OF THIS YEAR

7   AGAIN, IT WAS 21 TO 21.  SO WHAT WE SEE IS, WHEN THEY FOLLOWED

8   UP PEOPLE WHO STOPPED TAKING VIOXX -- AND THESE PEOPLE HAD BEEN

9   TAKING IT FOR A LONG TIME.  SOME OF THEM HAD BEEN ON IT FOR

10  FOUR YEARS THERE -- THERE WAS NO DIFFERENCE AT ALL IN THE HEART

11  ATTACK RATE BETWEEN THE PEOPLE WHO USED TO TAKE VIOXX AND THE

12  PEOPLE WHO USED TO TAKE THE SUGAR PILL.  AND THAT SHOWS THAT

13  THE PEOPLE WHO TOOK VIOXX DID NOT BUILD UP THIS PLAQUE THAT'S

14  SUBJECTED THEM TO FUTURE HEART ATTACKS.

15             NOW, DR. ZIPES HAD SOME OTHER WAY OF LOOKING AT

16  IT, BUT HE ADMITTED THAT -- THIS WAS WHEN I ASKED HIM ABOUT

17  WHETHER THIS IS THE -- STATISTICS THAT HE WAS USING WERE "LIKE

18  PRISONERS OF WAR.  IF YOU TORTURE THEM LONG ENOUGH, THEY'LL

19  TELL YOU ANYTHING YOU WANT TO HEAR."

20             BUT THEN HE SAID -- HE AGREED WITH ME THAT YOU

21  CAN LOOK AT THE APPROVE FOLLOW-UP DATA 100 DIFFERENT WAYS, AND

22  99 OF THEM SHOW THAT THERE IS NO INCREASED RISK FROM VIOXX

23  VERSUS PLACEBO, AND HE JUMPED ON THE ONE WAY THAT HE THOUGHT HE

24  COULD SHOW AN INCREASED RISK.

25             THE REAL EXPLANATION FOR WHY HE HAS PLAQUE TODAY

1    CAME FROM THE DOCTORS OTHER THAN DR. ZIPES.  DR. BRYAN, THE

2    HEART SURGEON WHO DID THE BYPASS, HE SAID THAT THE GRAFTS

3    THEMSELVES CAN RESULT IN ADDITIONAL ATHEROSCLEROSIS DOWN THE

4    ROAD, AND HE SAID THAT, ONCE PEOPLE GET PLAQUE, EVEN IF THEY

5    GET THEIR RISK FACTORS UNDER CONTROL, THE PLAQUE KEEPS GOING ON

6    AND ON.

7                   AND DR. POPMA, EVEN, ONE OF THEIR EXPERTS, HE

8    SAID THAT MOST HEART ATTACKS COME FROM PLAQUE RUPTURE AND

9    ATHEROSCLEROSIS.  HE SAID THAT 50 PERCENT OF THE PATIENTS THAT

10   HE SEES DON'T HAVE ANY RISK FACTORS AT ALL, AND ANOTHER 25 HAVE

11   RISK FACTORS UNDER CONTROL, AND YET THEY STILL HAVE THIS PLAQUE

12   BUILDUP AND THEY STILL HAVE THIS HEART ATTACK.

13                  AND DR. POPMA -- YOU SAW HIS PICTURE UP THERE A

14   WHOLE BUNCH OF TIMES.  A NICE GUY -- THEY NEVER ASKED HIM ONE

15   QUESTION ABOUT WHETHER VIOXX CONTRIBUTED TO MR. BARNETT'S

16   HEALTH CONDITION.  NOT ONE.  HE NEVER MENTIONED THE WORD

17   "VIOXX" ONCE DURING HIS ENTIRE EXAMINATION.  THAT ALL FELL ON

18   DR. ZIPES' SHOULDERS.

19                  BUT UNLIKE THE 75 PERCENT OF THE PATIENTS THAT

20   DR. POPMA DEALS WITH WHO HAVE NO RISK FACTORS AT ALL OR THEIR

21   RISK FACTOR IS UNDER CONTROL, MR. BARNETT DOES HAVE RISK

22   FACTORS FOR PLAQUE AND THEY ARE NOT ALL UNDER CONTROL.  HE'S

23   LIKE THE REST OF US, HE'S NOT GETTING ANY YOUNGER.  HE'S NOT

24   GOING TO CHANGE HIS SEX.  AT LEAST, HE DOESN'T SEEM LIKE THAT

25   KIND OF GUY WHO WOULD DO SOMETHING LIKE THAT.  HE'S NOT GETTING

1   A NEW FATHER.  YOU KNOW, HE INHERITED GENES FROM HIS MOTHER AND

2   FATHER, AND HE'S STILL GOT THOSE GENES.  AND HE'S NOT GETTING

3   RID OF THE STRESS THAT GOES ALONG WITH CARING FOR HIS WIFE WHEN

4   SHE HAS THE MEDICAL CONDITION THAT SHE HAS.

5            BUT THE GOOD NEWS IS THAT HE'S IN THE CAPABLE

6   HANDS OF DR. KARAVAN, THE CARDIOLOGIST THAT DR. ZIPES KEPT

7   DISAGREEING WITH.  DR. KARAVAN DID BOTH OF THOSE

8   CATHETERIZATIONS.  HE DID THE ONE IN JANUARY -- I'M SORRY, IN

9   SEPTEMBER OF '02 THAT LED TO THE BYPASS, AND HE DID THE

10  CATHETERIZATION IN JULY OF THIS YEAR THAT LED TO THE STENT.

11  BOTH THE BYPASS AND THE STENT, AS I SAID BEFORE, WERE

12  SUCCESSFUL.  DR. KARAVAN SAYS THAT MR. BARNETT'S OUTLOOK IS

13  GOOD.  AND ONE THING I HOPE FOR IN THIS CASE IS THAT, AFTER

14  WE'RE ALL DONE, MR. AND MR. BARNETT LISTEN TO DR. KARAVAN AND

15  NOT TO DR. ZIPES.

16            AND ON THAT NOTE, I WANT TO THANK YOU ALL FOR

17  THE CLOSE ATTENTION THAT YOU'VE PAID THROUGHOUT THIS TRIAL.

18  THE MEN AND WOMEN OF MERCK FEEL COMFORTABLE THAT OUR CASE IS IN

19  YOUR HANDS.  AND AS YOU LISTEN TO MR. ROBINSON, I ASKED YOU TO

20  PAY CLOSE ATTENTION ALSO.  HE DESERVES THAT, AND I'VE GOT AT

21  BIG STAKE IN HAVING YOU PAY CLOSE ATTENTION.  BUT HE'S GOT THE

22  BURDEN OF PROOF AND HE GETS TO GO FIRST AND LAST.

23            I DON'T GET TO COME UP AND TALK TO YOU EVER

24  AGAIN.  THIS IS MY LAST OPPORTUNITY.  SO I ASK YOU TO ACTUALLY

25  PAY EXTRA CLOSE ATTENTION WHEN MR. ROBINSON IS TALKING AND

```
1   THINK ABOUT SOME OF THE ANSWERS THAT I WOULD HAVE TO THE POINTS
2   THAT HE MAKES IF ONLY I WERE ALLOWED TO STAND UP AND MAKE THEM.
3             AGAIN, I WANT TO THANK YOU FOR YOUR ATTENTION.
4   I WANT TO THANK YOU FOR THE SACRIFICE THAT YOU'VE MADE IN ORDER
5   TO COME HERE AND ACT AS THE JUDGES IN THIS CASE.  AND WHEN
6   MR. ROBINSON IS DONE AND THE JUDGE IS FINISHED CHARGING YOU,
7   I'LL ASK YOU TO RETURN A VERDICT ON BEHALF OF MERCK.  THANK
8   YOU.
9             THE COURT:  THANK YOU, COUNSEL.  WE'LL TAKE A
10  10-MINUTE BREAK AT THIS TIME.  THE COURT WILL STAND IN RECESS.
11            THE DEPUTY CLERK:   EVERYONE RISE.
12            (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
13            THE DEPUTY CLERK:   EVERYONE RISE.
14            THE COURT:  BE SEATED, PLEASE.  YOU HAVE 28 MINUTES,
15  MR. ROBINSON.
16            MR. ROBINSON:  I FINALLY FOUND SOMETHING I AGREE ON
17  WITH MR. BECK.  I AGREE WITH HIM THAT I DON'T THINK JERRY
18  BARNETT IS THE KIND OF PERSON THAT WILL TURN INTO A WOMAN.  SO
19  I AGREE WITH THAT.  I DON'T AGREE WITH SOME OF THE OTHERS
20  THINGS HE SAID, HOWEVER.  FOR EXAMPLE, HE ATTACKED ME.  I'M IN
21  THE MIX HERE.  SO IT'S NOT JUST MY CLIENT, THE DOCTORS, THE
22  FDA, BUT ME.  LET'S SEE WHAT THE EVIDENCE DOES TELL YOU.
23            WHEN YOU -- I ASKED DR. MIKOLA -- I SHOWED HIM
24  THE PROPOSED LABEL FROM THE GOVERNMENT.  I SHOWED HIM THIS
25  LABEL RIGHT HERE, OCTOBER 15, 2001, PAGE 914 OF THE TRANSCRIPT.
```

1   AND THEN AT 915 I ASKED HIM, BASICALLY:

2            "Q.  IF YOU HAD KNOWN THAT INFORMATION FROM THAT

3        LABEL, WOULD YOU HAVE PRESCRIBED VIOXX FOR MR. BARNETT

4        GIVEN HIS HISTORY WITH POSSIBLE ANGINA IN JANUARY OF 2000?

5            "A.  I BELIEVE I WOULD HAVE KEPT HIM ON FELDENE."

6                THAT'S THE EVIDENCE IN THIS CASE.  END OF THAT

7   STORY.

8                WHY WOULD DR. MIKOLA SAY HE WOULD PUT HIM BACK

9   ON FELDENE, GIVEN THAT WARNING?  IT'S PRETTY OBVIOUS.  THAT'S

10  OUR PROOF.  THAT'S ALL WE HAVE TO PROVE.  WE BASICALLY HAVE TO

11  PROVE THAT HE WOULD HAVE PUT HIM BACK ON FELDENE.  AND THAT'S

12  THE WARNING HE SHOULD HAVE GOT.  THAT'S THE WARNING THAT THEY

13  FOUGHT.

14               THAT'S NOT A PRECAUTION WARNING.  THAT'S A

15  BILLION DOLLARS.  THAT WARNING COST THEM A BILLION DOLLARS.  BY

16  THEIR OWN FORECASTS.  BUT THEY SAY THEY JUST MAKE THOSE

17  FORECASTS FOR NO REASON AT ALL.  REMEMBER THAT?  "DR. REICIN,

18  DID YOU CONSIDER THE FORECAST?"

19               YOU KNOW DARN WELL GILMARTIN CONSIDERED THE

20  FORECAST AND SCOLNICK CONSIDERED THE FORECAST AND ANSTICE

21  CONSIDERED THE FORECAST, AND THEY SAID THAT -- HE SAID THERE

22  WAS NO TESTIMONY THAT -- AS TO REALLY WHAT HAPPENED -- WHAT WAS

23  GOING ON WITH GILMARTIN.

24               WELL, THAT'S NOT TRUE.  OUR FIRST WITNESS, DAVID

25  ANSTICE, WE PUT UP THERE, AND HE SAID -- HE HAD TO ADMIT.  HE

```
 1   GOT IMPEACHED, BUT HE KEPT GETTING -- HE HAD TO ADMIT FROM HIS
 2   OWN DOCUMENTS THAT IN '94 THEY ARE IN THE MIDDLE OF THE PACK;
 3   IN '97, THEY TURNED THINGS AROUND.  IT WAS ALL WITH GILMARTIN
 4   COMING IN.  HE ADMITTED THAT THEY HAD THE SIX DRUGS GOING OFF
 5   PATENT.
 6               NOW, HE GOES INTO THIS THING BACK IN 2005 FROM
 7   THE FDA.  THIS IS WHEN THE FDA HAS BEEN, YOU KNOW, SHOWN TO BE
 8   LESS THAN PERFECT WHEN IT COMES TO VIOXX.  SO NOW THEY ARE
 9   TRYING TO FIGURE OUT WHAT TO DO, AND THEY PUT BLACK BOXES IN
10   EVERYTHING, INCLUDING NAPROXEN, FLURBIPROFEN, ALL OF THESE
11   DRUGS THAT REICIN IS SEEING IS SAFE.
12               AND BY THE WAY -- REMEMBER THIS? -- THE ONLY
13   STUDY THAT YOU HAVE IN EVIDENCE THAT YOU CAN CONSIDER NOW ON
14   FELDENE IS THAT IT WAS EQUALLY SAFE -- REMEMBER THE STUDY PUT
15   IN BY DR. ZIPES -- THAT FELDENE AND NAPROXEN CAME OUT THE SAME.
16   SO THERE WASN'T A COMPARISON OF FELDENE TO VIOXX, BUT THERE WAS
17   A COMPARISON OF FELDENE TO NAPROXEN.  THEY WERE THE SAME.  SO
18   WE CAN INTERPRET THAT, IF WE COMPARED FELDENE TO VIOXX, YOU
19   WOULD HAVE FIVE TIMES THE INCREASED RISK.
20               AND WHAT DOES THE FDA IN THIS DOCUMENT THAT THEY
21   GO TO BAT WITH TO HELP THE MANUFACTURERS HERE, BASICALLY IS
22   WHAT'S GOING ON HERE?  THEY SAY, UNDER "NSAIDS," "SELECTIVE
23   NSAIDS," "LONG-TERM" -- THIS IS THAT ONE IN APRIL 2005 --
24   "LONG-TERM PLACEBO- AND ACTIVE-CONTROLLED TRIALS ARE GENERALLY
25   NOT AVAILABLE FOR NONSELECTIVE NSAIDS."  THAT'S IBUPROFEN,
```

1    FELDENE, MOBIC, ALL THESE OTHER DRUGS.  AND WITH THE EXCEPTION

2    OF THE STUDIES NOTED ABOVE WHERE CERTAIN NONSELECTIVE NSAIDS

3    WERE USED AS ACTIVE CONTROLS, SUCH AS NAPROXEN BEING CONTROLLED

4    AGAINST VIOXX, THEY HAVE NO STUDIES.

5                    BUT, IN THAT SAME DOCUMENT, THE FDA SAYS THE

6    STRONGEST DATA FROM THE LONG-TERM PLACEBO-CONTROLLED TRIAL FOR

7    AN INCREASED RISK OF SERIOUS ADVERSE CV EVENTS WITH ROFECOXIB,

8    VIOXX, CAME FROM THE APPROVE TRIAL IN WHICH ROFECOXIB,

9    25 MILLIGRAMS, ONCE DAILY WAS COMPARED TO PLACEBO FOR UP TO

10   THREE YEARS.  A RELATIVE RISK OF APPROXIMATELY 2 WAS SEEN FOR

11   VIOXX COMPARED TO PLACEBO FOR SERIOUS ADVERSE EVENTS.

12                   NO WAY VIOXX IS GETTING BACK ON THE MARKET, I'LL

13   TELL YOU RIGHT NOW.  THERE HAS BEEN NO EVIDENCE THAT THEY CAME

14   BACK AND TOLD THE FDA, "HEY, LET US PUT IT BACK ON THE MARKET,"

15   AFTER THEY TURNED IN THEIR WARNING AND THAT -- IT'S NOT ON THE

16   MARKET TODAY.

17                   NOW, HE TALKED ABOUT THE BLOOD PRESSURE THING.

18   THAT'S JUST -- THAT'S JUST MISLEADING.  MISLEADING.  LOOK, THE

19   APPROVE STUDY HAS A MARKER IN IT FOR PEOPLE THAT HAVE VIOXX

20   HEART ATTACKS.  THE PEOPLE IN THE APPROVE STUDY WHO HAD VIOXX

21   HEART ATTACKS, A HIGHER PERCENTAGE OF THEM HAD BLOOD PRESSURE

22   ELEVATIONS OVER 160 SYSTOLIC.  JERRY BARNETT HAD ONE, TWO,

23   THREE.

24                   WHILE ON VIOXX.  THAT'S THE KEY.  THAT'S HOW

25   WE'RE USING THAT.  IT'S A MARKER.  IT'S A FOOTPRINT.  IT'S SORT

1  OF IDENTIFIES HIS HEART ATTACK WITH A VIOXX HEART -- WITH

2  VIOXX.  AND IT'S GOING -- THE SPIKES WERE GOING UP BEFORE HIS

3  HEART ATTACK.  THAT'S IT.  THAT'S WHAT WE'RE SAYING.

4           NOW, I AGREE.  FROM HERE ON, FROM THE HEART

5  ATTACK ON, HE'S ON LOPRESSOR, SO HIS BLOOD PRESSURE IS DOWN.

6  BUT THAT DOESN'T -- THE BLOOD PRESSURE MAY BE DOWN, BUT VIOXX

7  IS STILL DOING ITS WORK.

8           REMEMBER, DR. AVORN HAD A STUDY THAT -- THAT

9  SHOWED THAT IT WAS -- I THINK IT WAS THE EVENT -- IT'S WHERE HE

10  TALKS ABOUT ADVANTAGE THAT SAYS THAT THE ADVANTAGE STUDY THEY

11  HAD ASPIRIN AND VIOXX STILL WAS CAUSING PROBLEMS, WITH -- WITH

12  ASPIRIN.  SO THERE IS NO GUARANTEE WITH VIOXX AND ASPIRIN HERE.

13           SO I BELIEVE THIS, THAT RIGHT HERE IS WHERE HE

14  GOES OFF VIOXX AND RIGHT HERE IS WHEN HE STARTS GETTING LIPITOR

15  80 MILLIGRAMS.  AND REMEMBER HOW HIS CHOLESTEROL STARTS ZOOMING

16  DOWN?  IT GOES TO 70 AND 60 AND 50 AFTER THAT.  I THINK THAT

17  THE WEIGHT OF THE EVIDENCE BEFORE YOU -- HE DIDN'T PUT ON AN

18  EXPERT TO CONTEST THIS.  THERE IS NO EVIDENCE.

19           YOU HAVE TO BALANCE IT.  IF THEY DON'T CALL AN

20  EXPERT -- THEY HAD ONE.  WHERE IS ROACH?  WHERE IS DR. ROACH

21  WHEN YOU NEED HIM?  BECAUSE DR. REICIN DIDN'T TALK ABOUT THIS.

22  DR. MORRISON DIDN'T TALK ABOUT THIS.  NOBODY DID.  ONLY

23  DR. ZIPES.  AND BASICALLY -- OH, AND DR. POPMA TALKED ABOUT HIS

24  RISK FACTORS AND THE LIPITOR CHANGE RIGHT HERE IN NOVEMBER.

25           SO YOU CAN -- THE WEIGHT OF THE EVIDENCE IS THAT

DAILY COPY

2638

1   HIS PLAQUE BUILT UP, UP TO THE TIME HE GOT OFF VIOXX.  THAT'S

2   IT.  THAT'S THE STATE OF THE RECORD.  THEY PUT NOTHING ON TO

3   COUNTER IT.

4                  THE SAME THING WITH THIS ATHEROSCLEROSIS.  THEY

5   DIDN'T PUT ON A COUNTER EVIDENCE TO DR. ZIPES ON THAT OR --

6   AND, BASICALLY, HE'S USING THEIR OWN DATA, THEIR OWN STUDIES

7   THAT APPROVE FOLLOW-UP DATA, BASICALLY WHAT THAT SHOWS IS THIS:

8   FOR THE FIRST SIX MONTHS, YOU HAVE A 3.74 STATISTICALLY

9   SIGNIFICANT INCREASED RISK OF MORE HEART ATTACKS WHILE OFF THE

10  DRUG.

11                 IN OTHER WORDS, THE PEOPLE ON VIOXX STOPPED

12  TAKING VIOXX, AND THEY FOLLOW THEM FOR SIX MONTHS, AND THEY

13  KEEP HAVING HEART ATTACKS, ALMOST FOUR TIMES MORE THAN THE

14  PEOPLE ON THE SUGAR PILL, FOR SIX MONTHS.

15                 REMEMBER DR. FITZGERALD SAID AT SOME POINT IT'S

16  GOING TO DISSIPATE, BUT HE SAID THE APPROVE FOLLOW-UP STUDY IS

17  GOING TO BE IMPORTANT TO TELL US WHAT'S GOING ON WITH THIS --

18  WITH VIOXX CAUSING PLAQUE BUILDUP.  AND THEN, IN 2006, HE

19  SAYS -- THE LAST WORD FROM FITZGERALD THIS YEAR SAYS, ONE

20  MECHANISM.  IT'S DROPPING PROSTACYCLIN FROM THE COX-2.  IT'S

21  CAUSING NOT ONLY THE HEART ATTACKS BUT THE ACCLERATION OF

22  PLAQUE BUILDUP.

23                 THAT'S THE STATE OF YOUR EVIDENCE RIGHT NOW.

24  YOU CAN SAY -- REMEMBER, WHAT HE SAID IS NOT EVIDENCE.  YOU

25  HAVE THAT EVIDENCE INTO THE RECORD RIGHT NOW.  THAT'S IT.

1       THE SECOND HEART ATTACK.  HERE IS WHAT'S GOING

2  ON HERE THAT I THINK THAT MAYBE WE'RE MISSING HERE, IS RIGHT

3  HERE.  HERE IS -- WHEN DR. ZIPES FIRST GETS THE CASE, HE STARTS

4  LOOKING BACK AT THESE RECORDS LIKE EVERYBODY ELSE, AND HE SEES

5  A HEART ATTACK BACK HERE, AND HE DOESN'T KNOW WHAT'S GOING ON.

6  SO WHAT HE DOES, HE SAYS, "I'M GOING TO DO AN EXAM."  INSTEAD

7  OF JUST DOING AN EXAM -- THAT WAS ABOUT THREE MONTHS AGO, HE

8  DOES HEART STUDIES, ECHOCARDIOGRAMS, CT ANGIO, NUCLEAR STRESS

9  TEST.  WHAT DOES HE FIND OUT?

10      AND DON'T FORGET, KARAVAN -- LOOK AT THAT DATE,

11 5/2/06.  REMEMBER KARAVAN'S FIRST DEPO?  WE READ IT.  "HE'S

12 FINE.  EVERYTHING IS FINE."  THAT WAS 5/4.  WE DIDN'T HAVE

13 THOSE RESULTS TO US YET FROM THESE TESTS.  SO DR. KARAVAN

14 THOUGHT HE WAS FINE.

15      NOW -- BUT WHEN KARAVAN GOT THE RESULTS OF THE

16 TEST, HE SAW THAT HE'S GOT TWO OCCLUDED VEIN GRAFTS AND HE'S

17 GOT -- AND THEN KARAVAN DOES THIS CATH THAT SHOWS ALL --

18 CONFIRMS THE OCCLUDED VEIN GRAFTS, SO NOW DR. ZIPES TRIES TO

19 PUT IT BACK -- HE TRIES TO GO BACK AND FIGURE OUT, WELL, WHEN

20 DID THIS HAPPEN, THESE TWO OCCLUDED VEIN GRAFTS?

21      AND HE GOES, WELL, LOOK, IT -- HERE IN '03,

22 THERE IS A NORMAL STRESS TEST.  HE'S 17 METS, 15 MINUTES.  BUT

23 HERE WHEN I SAW HIM, HE'S NINE MINUTES.  SO SOMEWHERE BETWEEN

24 HERE AND HERE, DID SOMETHING HAPPEN TO HIM?  DID HE GO TO THE

25 HOSPITAL?  WHAT HAPPENED TO HIM?  THE ONLY TIME HE WENT TO THE

1    HOSPITAL IS RIGHT HERE.

2              AND, YES, AT ONE POINT HE SAID IT WAS POSSIBLE,

3    BUT IT -- WHEN PUSHED BY MR. GOLDMAN AT HIS LAST DEPO, HE SAID,

4    "YEAH, I THINK IT'S MORE LIKELY THAN NOT."  "DO I KNOW THAT

5    THERE IS AN OCCLUSION?"  "YES."  I KNEW -- HE KNEW THAT.  DO I

6    KNOW THAT -- "THERE IS 100 PERCENT EVIDENCE OF AN OCCLUSION;

7    BUT, YES, I THINK IT'S MORE LIKELY THAN NOT THAT IT HAPPENED."

8    LET ME TELL YOU SOMETHING.  IT REALLY DOESN'T MATTER BECAUSE WE

9    KNOW THAT SOMETHING -- THAT THE OCCLUSION OCCURRED.  WE KNOW

10   THAT IT OCCURRED.

11             THE SAME THING THAT THEY TRY AND ATTACK

12   DR. ZIPES' CREDIBILITY ACROSS THE BOARD HERE.  I MEAN, THE

13   BOTTOM LINE IS HE -- HE -- HE'S THE GUY THAT, YES, JERRY

14   BARNETT SHOULD BE VERY HAPPY WITH DR. ZIPES.  DR. KARAVAN SAID

15   HE'S VERY HAPPY THAT DR. ZIPES FOUND THOSE OCCLUDED VESSELS.

16   WITHOUT THAT KARAVAN WOULD NEVER HAVE KNOWN.  NOW, YEAH, HE WAS

17   DOING THAT FOR LITIGATION PURPOSES, BUT HE FOUND THE TWO

18   OCCLUDED VEIN GRAFTS.

19             AND BY THE WAY, THIS THING ABOUT IN THE 2002

20   LABEL, IF THEY KNOW THAT IT'S A BILLION DOLLAR DIFFERENCE BY

21   PUTTING IN IT THE PRECAUTIONS SECTION VERSUS THE WARNING

22   SECTION, THEN THEY KNOW THAT DOCTORS AREN'T GOING TO PRESCRIBE

23   IF IT GOES INTO THE WARNING SECTION, AND THEY KNOW THAT

24   DR. MIKOLA IS GOING TO SAY WHAT HE SAID, "I KEPT HIM ON

25   FELDENE."  FELDENE IS SAFE AS NAPROXEN.  THAT'S THE EVIDENCE

2641

1   THAT YOU HAVE.

2               THE OTHER THING ABOUT -- YOU KNOW, THERE WAS --

3   JUST FOR THE RECORD HERE, I MEAN, I'M NOT SAYING ANYBODY IS

4   BEING FALSE OR TELLING -- I'M NOT ACCUSING ANYBODY HERE.  WE'RE

5   LAWYERS.  WE'RE NOT ALWAYS PERFECT HERE.  BUT THERE WAS ONLY

6   ONE BLOOD TEST, ONLY ONE ENZYME STUDY TEST.  THERE WAS JUST ONE

7   LEVEL OF TROPONIN, AND THEN THEY -- THEN THE EMERGENCY ROOM

8   SENT HIM HOME.

9               AS WE LEARNED FROM MR. BARNETT'S OTHER HEART

10  ATTACK, WE HAD TO HAVE A SERIES OF TROPONIN LEVELS TO FIND OUT

11  IF IT REALLY WAS A HEART ATTACK.  HE HAD ONE -- HE HAD ONE

12  LEVEL OF TROPONIN DRAWN.  REMEMBER THAT HIS HEART ATTACK -- ON

13  SEPTEMBER 6, WHEN HE HAD HIS HEART ATTACK, THE TROPONIN LEVEL

14  WAS DOWN.  BUT OVER THE NIGHT, IT CAME UP -- AFTER THREE --

15  DRAWING THREE BLOOD-ENZYME LEVELS, IT CAME UP TO 1.4.

16              WHAT I HEAR IS THIS, IS BASICALLY, YOU KNOW,

17  THAT THEY WANT TO SHIFT THE BLAME HERE.  I MEAN, I REALLY THINK

18  THAT -- THAT CORPORATIONS HAVE TO TAKE RESPONSIBILITY.

19              I MEAN, HE -- HE'S BASICALLY SAYING, WELL, THAT

20  DR. MIKOLA, YOU KNOW, SHOULD HAVE KEPT HIM ON ASPIRIN AND THAT.

21  THAT'S GREAT MORNING QUARTERBACKING, BUT AT THE TIME HE DIDN'T

22  KNOW.  HE BASICALLY, YOU KNOW, FELT THAT -- HE WAS VIOXX.  HE

23  WAS ON PRILOSEC.  HE WASN'T HAVING ANY PROBLEMS.  HE THOUGHT

24  THAT THE STRESS TEST WAS NORMAL.  HE HAD A MILD AREA OF LATERAL

25  ISCHEMIA.  IT DIDN'T MEAN ANYTHING TO HIM.

1          DR. SWAMI, A CARDIOLOGIST, WHO WORKED WITH

2    DR. KARAVAN'S OFFICE, THEY THOUGHT HE WAS FINE AND TOLD HIM HE

3    COULD GO SKIING.  HE WENT SKIING.  IN MARCH.  AFTER THIS.  SO I

4    DON'T THINK THAT MIKOLA SHOULD HAVE ANY RESPONSIBILITY HERE.

5    HE SAID HE COULD CHECK THE BOX AND GIVE THEM -- I DON'T THINK

6    SO.

7          AND JERRY, JERRY JUST FOLLOWED WHAT MIKOLA TOLD

8    HIM.  IF MIKOLA HAD TOLD HIM TO TAKE ASPIRIN EVERY DAY --

9    "JERRY, HAVE YOU TAKEN YOUR ASPIRIN?" -- HE WOULD HAVE TAKEN

10   IT.  HE DIDN'T KNOW HE HAD A HEART PROBLEM.  HE THOUGHT HE WAS

11   OKAY.

12         YOU KNOW, I REALLY THINK THAT THIS COMES DOWN TO

13   TRUST.  JERRY TRUSTED MERCK.  MIKOLA TRUSTED MERCK.  YOU KNOW,

14   I MEAN, IT'S AMAZING THAT THEY CAN SAY -- SAY THAT, YOU KNOW,

15   MIKOLA SHOULD HAVE DONE THIS OR THAT AND GIVEN HIM SOME

16   PERCENTAGE OF RESPONSIBILITY WHEN, YOU KNOW -- WHEN HE, OF ALL

17   PEOPLE, WAS CONNECTED TO MERCK.  AND YET -- AND JERRY TOOK

18   THEIR DRUG FOR 55 MONTHS.  TOOK PRILOSEC TOO.  THAT'S ONE OF

19   THEIR DRUGS.  HE'S A LOYAL CUSTOMER.

20         YOU KNOW, I THINK, ULTIMATELY, IT COMES DOWN TO

21   THIS:  THAT JERRY HE HAD A CARDIOLITE EXAM IN 2000 THAT SHOWED

22   HE WAS OKAY, REALLY BASICALLY OKAY.  NOW, IN MAY, HE STARTS ON

23   CHOLESTEROL MEDICATION.  HE LOWERS HIS CHOLESTEROL DOWN INTO

24   THE 101 AREA.  HE DID WHAT HE WAS SUPPOSED TO DO.  HE'S NOT --

25   HE'S RUNNING.  HE'S WORKING OUT.  HE'S EATING HEALTHY.

1          HE'S NOT -- HE'S GOT A 2 PERCENT -- THE WEIGHT

2    OF THE EVIDENCE RIGHT NOW, THEY DIDN'T PUT ON DR. ROACH.  THERE

3    IS NO DR. ROACH HERE.  THE WEIGHT OF THE EVIDENCE RIGHT NOW IS

4    THAT HE HAD A 2 PERCENT RISK OF HEART ATTACK AS OF

5    JANUARY 2000, WHEN HE STARTS ON VIOXX.  AND HE STAYS 31 MONTHS

6    ON VIOXX AND SOMETHING HAPPENS:  HIS PLAQUE GETS OUT OF WHACK

7    AND HE HAS A HEART ATTACK.  YOU'RE WEIGHING EVIDENCE HERE.

8          THEY DIDN'T PUT ON A -- THEY DIDN'T PUT ON A

9    CARDIOLOGIST.  THEY COULD HAVE.  THEY DIDN'T CALL HIM.  WEIGH

10   THE EVIDENCE.  WE PUT ON TWO:  ONE THAT SHOWED THAT HIS NATURAL

11   RISK FACTORS DON'T EXPLAIN THIS; ONE THAT SHOWED HE HAD -- THE

12   SAME ONE SHOWED THAT HE HAD A 2 PERCENT RISK FACTOR GOING INTO

13   THE CARDIOLITE IN JANUARY OF 2000; AND THE OTHER ONE SAYING

14   THERE IS NO OTHER EXPLANATION BUT VIOXX FOR WHAT HAPPENED HERE.

15         THAT'S WHAT HAPPENED HERE.  IT'S ACTUALLY ALMOST

16   BEYOND A REASONABLE DOUBT.  I REALLY BELIEVE THAT THE WAY THIS

17   EVIDENCE HAS COME IN, YOU'VE GOT TO REALLY EVALUATE -- YOU HAVE

18   TO WEIGH THE EVIDENCE.  IT'S CLEARLY MORE LIKELY THAN NOT.

19         **THE DEPUTY CLERK:**  MR. ROBINSON, NINE MINUTES.

20         **MR. ROBINSON:**  THANK YOU.

21         SO, YEAH, I THINK THE EVIDENCE SHOWS THAT VIOXX,

22   NUMBER ONE, CAUSED THE HEART ATTACK.  THAT'S TRUE.  HE WANTS TO

23   CALL THIS -- WE'RE NOT DISAGREEING IT WAS A SMALL HEART ATTACK.

24   BUT A HEART ATTACK IS A HEART ATTACK, AND YOU HEARD THAT, ONCE

25   YOU HAVE A RISK OF HEART ATTACK, YOU STILL HAVE A CHANCE OF A

2644

```
 1   SECOND HEART ATTACK.  THAT'S NUMBER ONE.
 2               NUMBER TWO, WE BELIEVE THE WEIGHT OF THE
 3   EVIDENCE IS THAT VIOXX CAUSED PLAQUE BUILDUP, CONTRIBUTED TO
 4   PLAQUE BUILDUP, ESPECIALLY GIVEN THE LIGHT OF HIS CHOLESTEROL
 5   COMING DOWN DURING THAT SAME PERIOD OF TIME.  THAT'S THE WEIGHT
 6   OF THE EVIDENCE.  THEY COULD HAVE PUT ON SOMEBODY TO REBUT
 7   THAT.  THEY DIDN'T.  JUST LAWYERS' WORDS.  THAT'S WHAT'S GOING
 8   ON HERE.  REMEMBER, YOU GOT TO GO WITH THE EVIDENCE.
 9               THE FACT THAT THEY DIDN'T CALL A CARDIOLOGIST, I
10   THINK, IS CRITICAL.  I THINK THAT -- YOU KNOW, I WOULD HAVE
11   GOTTEN TO CROSS-EXAMINE HIM.  YOU SAW WITH DR. REICIN, ON
12   DIRECT, IT'S ONE THING; ON CROSS, IT'S SOMETHING ELSE.  SO I
13   REALLY THINK THAT THE WEIGHT OF THE EVIDENCE IS --
14          MR. BECK:  JUDGE, THIS REPEATED THING ABOUT WHAT HE
15   REALLY THINKS REALLY IS IMPROPER.
16          THE COURT:  YES.  IT'S NOT REALLY WHAT YOU THINK,
17   MR. ROBINSON.  IT'S WHAT THE CASE AND WHAT THE EVIDENCE IS.
18          MR. ROBINSON:  IT'S NOT WHAT HE THINKS OR WHAT I
19   THINK, IT'S WHAT YOU THINK.  SO, ON BEHALF OF JERRY BARNETT, WE
20   THANK YOU FOR YOUR ATTENTION.  I WATCHED YOUR ATTENTION HERE.
21   I KNOW IT'S BEEN HARD WITH ALL OF THESE VIDEOS AND WATCHING ALL
22   OF THIS STUFF.  IT'S HARD.  BUT I SAW WHEN THE WITNESSES WERE
23   ON THE -- WHEN JERRY WAS ON THE STAND, YOU WERE REALLY
24   ATTENTIVE.  WHEN JOHN, HIS BROTHER, WAS ON THE STAND, YOU WERE
25   ATTENTIVE.  WHEN OUR EXPERTS -- WHEN ANDY HAD DR. MOYE ON THE
```

1    STAND, YOU WERE VERY ATTENTIVE.  AND FOR DR. ZIPES, IT WAS A

2    SPARRING MATCH WITH MR. BECK, BUT YOU WERE VERY ATTENTIVE.  IT

3    KEPT YOU AWAKE.

4                    THE BOTTOM LINE IS THIS, IS, FRANKLY, WHEN YOU

5    LISTEN TO DR. ZIPES' TESTIMONY, YOU KNOW, FRANKLY, THOSE --

6    THOSE ARE -- THOSE ARE STUDIES THAT MERCK DID.  THOSE ARE --

7    THOSE ARE ANIMAL STUDIES THAT THEY DID.  DR. EPSTEIN DID A

8    STUDY FOR MERCK THAT SHOWED ATHEROSCLEROSIS ACCELERATED.

9    THAT'S THE ONLY WITNESS WHO TESTIFIED ABOUT A STUDY THAT CAME

10   IN FROM THIS COURTROOM THAT HE DID.  DR. EPSTEIN.

11                    SO I REALLY THINK THE WEIGHT OF THE EVIDENCE IS

12   THAT -- THAT, REALLY, THE PLAQUE BUILDUP WAS CAUSED BY VIOXX.

13   AND SO I REALLY BELIEVE THAT --

14            **MR. BECK:**  YOUR HONOR, PLEASE.

15            **MR. ROBINSON:**  HOLD ON.

16                    -- THAT THE EVIDENCE SHOWS THAT JERRY BARNETT IS

17   ENTITLED TO YOUR VERDICT.  HE DID EVERYTHING IN HIS POWER TO

18   TRY AND REDUCE HIS RISK FACTORS.  HE DID -- HE DID MORE THAN

19   MOST PEOPLE.  DR. KARAVAN SAID HE CONTROLLED HIS RISK FACTORS

20   BETTER THAN 99 PERCENT OF HIS PATIENTS.  THAT'S DR. KARAVAN.

21                    AND YOU SAW THE DIFFERENCE IN DR. KARAVAN'S

22   TESTIMONY AFTER -- AT THE SECOND DEPO, AFTER HE HAD SEEN THE

23   OCCLUSIONS.  HE SAID, "IF VIOXX CAUSES ATHEROSCLEROSIS, THEN I

24   THINK THAT COULD EXPLAIN MR. BARNETT'S PLAQUE BUILDUP."

25                    AND DON'T FORGET, THE OTHER DOCTORS --

1          **THE COURT:** LET'S CONCLUDE, COUNSEL.

2          **MR. ROBINSON:** DR. BRYAN HADN'T SEEN HIM, YOU KNOW,

3   IN FOUR YEARS.  HE HADN'T SEEN HIM IN FOUR YEARS.

4               SO I THANK YOU FOR YOUR ATTENTION, AND I

5   APPRECIATE IT.  THANK YOU VERY MUCH.

6          **THE COURT:** MEMBERS OF THE JURY, YOU HAVE NOW HEARD

7   ALL THE EVIDENCE IN THIS CASE AS WELL AS THE FINAL ARGUMENT.

8   IT BECOMES MY DUTY TO INSTRUCT YOU ON THE RULES OF LAW THAT YOU

9   MUST FOLLOW AND APPLY IN ARRIVING AT YOUR DECISION IN THIS

10  PARTICULAR CASE.

11              AS I MENTIONED SEVERAL TIMES, IN ANY JURY TRIAL

12  THERE ARE, IN EFFECT, TWO JUDGES:  I AM ONE OF THE JUDGES; THE

13  OTHER IS YOU THE JURY.  IT IS MY DUTY TO PRESIDE OVER THE TRIAL

14  AND TO DETERMINE WHAT TESTIMONY AND OTHER EVIDENCE IS

15  ADMISSIBLE UNDER THE LAW FOR YOUR CONSIDERATION.  IT IS ALSO MY

16  DUTY AT THE END OF THE TRIAL TO INSTRUCT YOU ON THE LAW

17  APPLICABLE TO THE CASE.

18              YOU, AS JURORS, ARE THE JUDGES OF THE FACTS; BUT

19  IN DETERMINING WHAT ACTUALLY HAPPENED IN THIS CASE, THAT IS, IN

20  REACHING YOUR DECISION AS TO THE FACTS, IT IS YOUR SWORN DUTY

21  TO FOLLOW THE LAW I AM NOW IN THE PROCESS OF DEFINING FOR YOU.

22              AND YOU MUST FOLLOW MY INSTRUCTIONS AS A WHOLE.

23  YOU HAVE NO RIGHT TO DISREGARD OR GIVE SPECIAL ATTENTION TO ANY

24  ONE INSTRUCTION OR TO QUESTION THE WISDOM OR CORRECTNESS OF ANY

25  RULE I MAY STATE TO YOU; THAT IS, YOU MUST NOT SUBSTITUTE OR

1    FOLLOW YOUR OWN NOTION OR OPINION AS TO WHAT THE LAW IS OR

2    OUGHT TO BE.  IT IS YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO

3    YOU, REGARDLESS OF THE CONSEQUENCES.

4              BY THE SAME TOKEN, IT IS ALSO YOUR DUTY TO BASE

5    YOUR VERDICT SOLELY UPON THE TESTIMONY AND OTHER EVIDENCE IN

6    THE CASE WITHOUT PREJUDICE OR SYMPATHY.  THAT WAS THE PROMISE

7    YOU MADE AND THE OATH YOU TOOK BEFORE BEING ACCEPTED BY THE

8    PARTIES AS JURORS IN THIS CASE, AND THEY HAVE THE RIGHT TO

9    EXPECT NOTHING LESS FROM YOU.

10             THIS CASE SHOULD BE CONSIDERED AND DECIDED BY

11   YOU AS AN ACTION BETWEEN PERSONS OF EQUAL STANDING IN THE

12   COMMUNITY, OF EQUAL WORTH, AND HOLDING THE SAME AND SIMILAR

13   STATIONS IN LIFE.  ALL PERSONS, ALL CORPORATIONS, ALL PUBLIC

14   ENTITIES, STAND EQUAL BEFORE THE LAW AND ARE TO BE DEALT WITH

15   AS EQUALS IN A COURT OF JUSTICE.

16             AS I STATED EARLIER, IT IS YOUR DUTY TO

17   DETERMINE THE FACTS; AND IN SO DOING, YOU MUST CONSIDER ONLY

18   THE EVIDENCE I HAVE ADMITTED IN THIS CASE.  THE TERM "EVIDENCE"

19   INCLUDES THE SWORN TESTIMONY OF THE WITNESSES AND THE EXHIBITS

20   ADMITTED INTO THE RECORD.

21             REMEMBER THAT ANY STATEMENTS, OBJECTIONS, OR

22   ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE IN THE CASE.  THE

23   FUNCTION OF THE ATTORNEY IS TO POINT OUT THOSE THINGS THAT ARE

24   MOST SIGNIFICANT OR MOST HELPFUL TO THEIR SIDE OF THE CASE AND,

25   IN SO DOING, TO CALL YOUR ATTENTION TO CERTAIN FACTS OR

2648

1    INFERENCES THAT THEY ARE PARTICULARLY CONCERNED THAT YOU, THE

2    JURY, RECALL.  IN THE FINAL ANALYSIS, HOWEVER, IT IS YOUR OWN

3    RECOLLECTION AND INTERPRETATION OF THE EVIDENCE THAT CONTROLS

4    IN THIS CASE.  WHAT THE LAWYERS SAY IS NOT BINDING UPON YOU.

5              ALSO, DURING THE COURSE OF THE TRIAL, I

6    OCCASIONALLY MADE A COMMENT TO -- MADE A COMMENT TO A LAWYER OR

7    PERHAPS ASKED A QUESTION OF A WITNESS OR ADMONISHED THE WITNESS

8    CONCERNING THE MANNER IN WHICH HE OR SHE SHOULD RESPOND TO THE

9    QUESTION.  DO NOT ASSUME FROM ANYTHING I MAY HAVE SAID THAT I

10   HAVE ANY OPINION CONCERNING ANY OF THE FACTS OF THIS CASE.  IN

11   ARRIVING AT YOUR FINDING AS TO THE FACTS, YOU SHOULD DISREGARD

12   ANYTHING THAT I MAY HAVE SAID DURING THE TRIAL EXCEPT, OF

13   COURSE, MY INSTRUCTIONS TO YOU ON THE LAW.

14             NOW, THE LAW OF THE UNITED STATES PERMITS THE

15   JUDGE TO COMMENT ON EVIDENCE PRESENTED DURING A CASE.  I DO NOT

16   BELIEVE THAT I HAVE MADE ANY COMMENTS ON THE EVIDENCE IN THIS

17   CASE.  HOWEVER, IF YOU COULD POSSIBLY CONSTRUE ANY REMARKS

18   WHICH I MADE DURING THE COURSE OF THE TRIAL AS A COMMENT ON THE

19   EVIDENCE, THEN I INSTRUCT YOU THAT ANY SUCH COMMENT ON MY PART

20   IS ONLY AN EXPRESSION OF MY OPINION AS TO THE FACTS OF THE

21   CASE, AND REMEMBER THAT YOU, THE JURY, MAY DISREGARD SUCH

22   COMMENT OR COMMENTS ENTIRELY SINCE YOU, THE JURY, ARE INDEED

23   THE SOLE JUDGES OF THE FACTS IN THIS CASE.

24             NOW, WHILE YOU SHOULD CONSIDER ONLY THE EVIDENCE

25   IN THE CASE, YOU ARE PERMITTED TO DRAW SUCH REASONABLE

2649

1    INFERENCES FROM THE TESTIMONY AND THE EXHIBITS AS YOU FEEL ARE

2    JUSTIFIED IN THE LIGHT OF YOUR COMMON EXPERIENCE.  IN OTHER

3    WORDS, YOU MAY MAKE DEDUCTIONS AND REACH CONCLUSION THAT REASON

4    AND COMMON SENSE LEAD YOU TO DRAW FROM THE FACTS THAT HAVE BEEN

5    ESTABLISHED BY THE TESTIMONY AND THE EVIDENCE IN THIS CASE.

6              YOU MAY CONSIDER EITHER DIRECT OR CIRCUMSTANTIAL

7    EVIDENCE.  NOW, DIRECT EVIDENCE IS THE TESTIMONY OF ONE WHO

8    ASSERTS ACTUAL KNOWLEDGE OF A FACT, SUCH AS AN EYEWITNESS.

9    CIRCUMSTANTIAL EVIDENCE IS PROOF OF A CHAIN OF FACTS AND

10   CIRCUMSTANCES INDICATING A FACT TO BE PROVED.  THE LAW MAKES NO

11   DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR

12   CIRCUMSTANTIAL EVIDENCE.

13             IN DECIDING THIS CASE, YOU ARE EXPECTED TO USE

14   YOUR GOOD SENSE.  GIVE THE EVIDENCE AND THE TESTIMONY OF THE

15   WITNESSES A REASONABLE AND FAIR INTERPRETATION IN THE LIGHT OF

16   YOUR KNOWLEDGE OF THE NATURAL TENDENCIES OF HUMAN BEINGS.

17             IN WEIGHING THE TESTIMONY AND IN DETERMINING THE

18   CREDIBILITY OF ANY WITNESS, YOU MAY CONSIDER THE CONDUCT OF THE

19   WITNESS, HIS OR HER BEARING ON THE WITNESS STAND, HIS OR HER

20   PERSONAL FEELINGS AS DEMONSTRATED BY HIS OR HER TESTIMONY, AND

21   HIS OR HER ACTIONS, ANY INTEREST HE OR SHE MAY HAVE IN THE

22   OUTCOME OF THE CASE, ANY PREJUDICE OR BIAS HE OR SHE MAY HAVE

23   SHOWN, AND ANY PARTIALITY THAT HE OR SHE MAY HAVE DEMONSTRATED.

24             IF A WITNESS IS SHOWN TO HAVE TESTIFIED FALSELY

25   CONCERNING ANY MATERIAL MATTER, YOU, THE JURY, HAVE A RIGHT TO

1  DISTRUST SUCH WITNESS' TESTIMONY ON OTHER MATTERS, AND YOU MAY

2  DISTRUST ALL OF THE TESTIMONY OF THAT WITNESS.

3           YOU SHOULD KEEP IN MIND, OF COURSE, THAT A

4  SIMPLE MISTAKE BY A WITNESS DOES NOT NECESSARILY MEAN THAT THE

5  WITNESS WAS NOT TELLING THE TRUTH AS HE OR SHE REMEMBERS IT,

6  BECAUSE PEOPLE MAY FORGET SOME THINGS OR REMEMBER OTHER THINGS

7  INACCURATELY.  SO, IF A WITNESS HAS MADE A MISSTATEMENT, YOU

8  NEED TO CONSIDER WHETHER THAT MISSTATEMENT WAS AN INTENTIONAL

9  FALSEHOOD OR SIMPLY AN INNOCENT LAPSE OF MEMORY; AND THE

10 SIGNIFICANCE OF THAT MAY WELL DEPEND ON WHETHER IT HAS TO DO

11 WITH AN IMPORTANT FACT OR ONLY AN UNIMPORTANT DETAIL.

12          THE TESTIMONY OF A SINGLE WITNESS MAY BE

13 SUFFICIENT TO PROVE ANY FACT, EVEN IF A GREATER NUMBER OF

14 WITNESSES MAY HAVE TESTIFIED TO THE CONTRARY, IF, AFTER

15 CONSIDERING ALL THE OTHER EVIDENCE, YOU, THE JURY, BELIEVE THAT

16 SINGLE WITNESS.

17          NOW, WHEN KNOWLEDGE OF TECHNICAL SUBJECT MATTER

18 MAY BE HELPFUL TO THE JURY, A PERSON WHO HAS SPECIAL TRAINING

19 OR EXPERIENCE IN THAT TECHNICAL FIELD MAY BE CALLED AS AN

20 EXPERT WITNESS AND IS PERMITTED TO STATE HIS OR HER OPINION ON

21 THOSE TECHNICAL MATTERS.  SUCH WITNESSES HAVE TESTIFIED IN THIS

22 CASE.  YOU ARE NOT, HOWEVER, ARE NOT REQUIRED TO ACCEPT THAT

23 OPINION.  AS WITH ANY OTHER WITNESS, IT IS UP TO YOU TO DECIDE

24 WHETHER TO RELY UPON IT.

25          IF YOU SHOULD DECIDE THAT THE OPINION OF AN

1   EXPERT WITNESS IS NOT BASED UPON SUFFICIENT EDUCATION OR

2   EXPERIENCE, OR IF YOU SHOULD CONCLUDE THAT THE REASONS GIVEN IN

3   SUPPORT OF THE OPINION ARE NOT SOUND OR THAT THE OPINION IS

4   OUTWEIGHED BY OTHER EVIDENCE, THEN YOU MAY DISREGARD THAT

5   OPINION ENTIRELY.

6           IN DECIDING WHETHER TO ACCEPT OR TO RELY UPON

7   THE OPINION OF AN EXPERT WITNESS, YOU, THE JURY, MAY CONSIDER

8   ANY BIAS OF THE WITNESS, INCLUDING ANY BIAS YOU MAY INFER FROM

9   EVIDENCE, THAT THE EXPERT WITNESS HAS AN ECONOMIC, A

10  PHILOSOPHICAL, OR OTHER INTEREST IN THE OUTCOME OF THE CASE.

11          CERTAIN TESTIMONY HAS BEEN PRESENTED TO YOU BY

12  VIDEO DEPOSITIONS.  A DEPOSITION, AS I MENTIONED BEFORE, IS THE

13  SWORN, RECORDED ANSWER TO QUESTIONS ASKED TO A WITNESS IN

14  ADVANCE OF TRIAL.  UPON SOME CIRCUMSTANCES, IF A WITNESS CANNOT

15  BE PRESENT TO TESTIFY FROM THE WITNESS STAND, THAT WITNESS'

16  TESTIMONY MAY BE PRESENTED UNDER OATH IN THE FORM OF A

17  DEPOSITION.

18          SOMETIME BEFORE TRIAL, THE ATTORNEYS

19  REPRESENTING THE PARTIES IN THIS CASE QUESTIONED THE WITNESS

20  UNDER OATH.  A COURT REPORTER WAS PRESENT AND RECORDED THE

21  TESTIMONY.  THE QUESTIONS AND ANSWERS WERE PRESENTED BY VIDEO

22  TO YOU.  THIS DEPOSITION TESTIMONY IS ENTITLED TO THE SAME

23  CONSIDERATION, IS TO BE JUDGED BY YOU AS TO CREDIBILITY, AND

24  WEIGHED AND OTHERWISE CONSIDERED BY YOU, INSOFAR AS POSSIBLE,

25  IN THE SAME WAY AS IF THE WITNESS HAD BEEN PRESENT AND HAD

1    TESTIFIED FROM THE WITNESS STAND IN COURT.

2                   DURING THE COURSE OF TRIAL, YOU WILL HAVE HEARD

3    OBJECTIONS TO EVIDENCE.  SOMETIMES THESE HAVE BEEN ARGUED OUT

4    OF THE HEARING OF THE JURY.

5                   IT IS THE DUTY OF THE ATTORNEYS FOR EACH SIDE TO

6    OBJECT WHEN THE OTHER SIDE OFFERS TESTIMONY OR OTHER EVIDENCE

7    WHICH THE ATTORNEY BELIEVES IS NOT PROPERLY ADMISSIBLE.  YOU

8    SHOULD NOT DRAW ANY INFERENCE AGAINST OR SHOW ANY PREJUDICE

9    AGAINST AN ATTORNEY OR HIS CLIENT BECAUSE OF THE MAKING OF AN

10   OBJECTION.

11                  UPON ALLOWING THE TESTIMONY OR OTHER EVIDENCE TO

12   BE INTRODUCED OVER THE OBJECTION OF AN ATTORNEY, THE COURT DOES

13   NOT, UNLESS EXPRESSLY STATED, INDICATE ANY OPINION AS TO THE

14   WEIGHT OR EFFECT OF SUCH EVIDENCE.  AS STATED BEFORE, YOU ARE

15   THE SOLE JUDGES OF THE CREDIBILITY OF ALL WITNESSES AND THE

16   WEIGHT AND EFFECT OF ALL EVIDENCE.

17                  WHEN THE COURT HAS SUSTAINED AN OBJECTION TO A

18   QUESTION ADDRESSED TO A WITNESS, THE JURY MUST DISREGARD THE

19   QUESTION ENTIRELY AND MAY DRAW NO INFERENCE FROM THE WORDING OF

20   IT OR SPECULATE AS TO WHAT THE WITNESS WOULD HAVE SAID IF

21   PERMITTED TO ANSWER THE QUESTION.

22                  DURING THE COURSE OF THE TRIAL, I HAVE

23   OCCASIONALLY ASKED A QUESTION OF A WITNESS IN ORDER TO BRING

24   OUT FACTS THEN NOT FULLY COVERED BY THE TESTIMONY.  DO NOT

25   ASSUME AGAIN THAT I HOLD ANY OPINION AS TO THE FACTS TO WHICH

DAILY COPY

1  MY QUESTION OR QUESTIONS RELATED.  REMEMBER AGAIN, AT ALL

2  TIMES, YOU ARE THE SOLE JUDGES OF THE FACTS.

3          NOW, ANY NOTES THAT YOU HAVE TAKEN DURING THE

4  TRIAL, I REMIND YOU, ARE ONLY MEMORY AIDS.  IF YOUR MEMORY

5  DIFFERS FROM YOUR NOTES, YOU SHOULD RELY ON YOUR MEMORY AND NOT

6  YOUR NOTES.  THE NOTES ARE NOT EVIDENCE.  IF YOU HAVE NOT TAKEN

7  NOTES, YOU SHOULD RELY ON YOUR INDEPENDENT RECOLLECTION OF THE

8  EVIDENCE AND SHOULD NOT BE UNDULY INFLUENCED BY THE NOTES OF

9  OTHER JURORS.  NOTES ARE NOT ENTITLED TO ANY GREATER WEIGHT

10  THAN THE RECOLLECTION OR IMPRESSION OF EACH JUROR AS TO THE

11  TESTIMONY.

12          NOW, THIS LAWSUIT ARISES OUT OF GERALD BARNETT'S

13  USE OF VIOXX.  MERCK MANUFACTURED VIOXX.  THE PLAINTIFF, GERALD

14  BARNETT, CONTENDS THAT HE SUFFERED A HEART ATTACK AS A RESULT

15  OF HIS USE OF VIOXX.  THE PLAINTIFF SEEKS COMPENSATORY DAMAGES

16  PROXIMATELY CAUSED BY HIS INJURY.  HE SEEKS RECOVERY UNDER ANY

17  OF THREE SEPARATE THEORIES OF LIABILITY.

18          FIRST, THE PLAINTIFF ALLEGES THAT MERCK SHOULD

19  BE HELD STRICTLY LIABLE FOR HIS INJURIES BECAUSE MERCK PLACED

20  VIOXX ON THE MARKET WITH INADEQUATE WARNINGS, MAKING IT

21  UNREASONABLY DANGEROUS TO CONSUMERS.  SECOND, THE PLAINTIFF

22  ALLEGES THAT MERCK NEGLIGENTLY PLACED VIOXX ON THE MARKET WITH

23  INADEQUATE WARNINGS.  LASTLY, THE PLAINTIFF ALLEGES THAT MERCK

24  DECEIVED HIS PHYSICIANS BY CONCEALING THE SAFETY AND

25  EFFECTIVENESS OF VIOXX.

1          MERCK CONTENDS THAT VIOXX DID NOT CAUSE GERALD

2     BARNETT'S INJURIES.  MERCK CONTENDS, RATHER, THAT GERALD

3     BARNETT'S INJURIES WERE CAUSED BY HIS PRE-EXISTING CORONARY

4     ARTERY DISEASE AND HIS OWN INDEPENDENT HEALTH RISK FACTORS AND

5     NOT VIOXX.

6          FURTHER, MERCK CONTENDS THAT ITS WARNINGS AND

7     INSTRUCTIONS TO GERALD BARNETT'S PRESCRIBING PHYSICIANS AND TO

8     THE PUBLIC WERE ADEQUATE AND COMPLIED WITH THE RULES OF THE

9     FOOD & DRUG ADMINISTRATION.  MERCK ALSO ASSERTS THAT IT ACTED

10    REASONABLY AND THAT IT HAD DISCLOSED TO THE FDA ALL RELEVANT,

11    OBTAINABLE, AND RELIABLE INFORMATION AVAILABLE AT THE TIME

12    GERALD BARNETT'S PHYSICIANS PRESCRIBED VIOXX TO HIM.

13         IN ADDITION, MERCK CONTENDS THAT GERALD

14    BARNETT'S PRESCRIBING PHYSICIANS DID NOT DETRIMENTALLY RELY ON

15    ANY OF MERCK'S STATEMENTS OR OMISSIONS.

16         NOW, ALTHOUGH ALL THE PLAINTIFF'S THEORIES OF

17    RECOVERY HAVE BEEN TRIED TOGETHER, EACH IS SEPARATE FROM THE

18    OTHER, AND EACH PARTY IS ENTITLED TO HAVE YOU SEPARATELY

19    CONSIDER EACH CLAIM.  THEREFORE, IN YOUR DELIBERATIONS, YOU

20    SHOULD CONSIDER THE EVIDENCE AS IT RELATES TO EACH CLAIM

21    SEPARATELY, AS YOU WOULD HAVE IN -- IF EACH CLAIM HAD BEEN

22    TRIED -- JUST AS YOU WOULD BE DOING IF EACH CLAIM HAD BEEN

23    TRIED TO YOU SEPARATELY.

24         THE PLAINTIFF IS NOT REQUIRED TO PROVE ALL THREE

25    OF THESE THEORIES IN ORDER TO RECOVER.  PROOF OF HIS CLAIM

1  UNDER ANY ONE OF THESE THEORIES WOULD ENABLE YOU, THE JURY, TO

2  FIND THAT HE IS ENTITLED TO A VERDICT IN HIS FAVOR.  THE MERE

3  FACT THAT THE PLAINTIFF MAY HAVE BEEN INJURED, STANDING ALONE,

4  HOWEVER, DOES NOT PERMIT YOU, THE JURY, TO DRAW ANY INFERENCES

5  THAT SUCH INJURIES WERE CAUSED BY MERCK.

6          NOW, LET ME DISCUSS THE LAW APPLICABLE TO EACH

7  OF THE PLAINTIFF'S THEORIES OF RECOVERY.  FIRST STRICT

8  LIABILITY FAILURE TO WARN AND NEGLIGENT FAILURE TO WARN.  LET

9  ME SAY A WORD ABOUT BOTH OF THOSE TOGETHER FIRST.  I'LL DISCUSS

10 WITH YOU THE LAW GOVERNING THE PLAINTIFF'S FIRST TWO CLAIMS:

11 STRICT LIABILITY FAILURE TO WARN AND NEGLIGENT FAILURE TO WARN.

12         NOW, THE BURDEN OF PROOF IS ON THE PLAINTIFF IN

13 CIVIL ACTIONS SUCH AS THIS ONE TO PROVE EVERY ESSENTIAL ELEMENT

14 OF THESE TWO CLAIMS BY WHAT IS KNOWN AS "A PREPONDERANCE OF THE

15 EVIDENCE."  "A PREPONDERANCE OF THE EVIDENCE" MEANS SUCH

16 EVIDENCE, AS WHEN CONSIDERED AND COMPARED WITH THAT OPPOSED TO

17 IT, HAS MORE CONVINCING FORCE AND PRODUCES IN YOUR MINDS A

18 BELIEF THAT WHAT IS SOUGHT TO BE PROVED IS MORE LIKELY TRUE

19 THAN NOT TRUE.

20         IN OTHER WORDS, TO ESTABLISH A CLAIM BY A

21 PREPONDERANCE OF THE EVIDENCE MEANS TO PROVE THAT THE CLAIM IS

22 MORE LIKELY SO THAN NOT SO.

23         IN DETERMINING WHETHER ANY FACT HAS BEEN PROVED

24 BY A PREPONDERANCE OF THE EVIDENCE IN THIS CASE, YOU MAY UNLESS

25 OTHERWISE INSTRUCTED, CONSIDER ALL THE TESTIMONY OF ALL THE

1   WITNESSES, REGARDLESS OF WHO MAY HAVE CALLED THEM; AND ALL

2   EXHIBITS RECEIVED IN EVIDENCE, REGARDLESS OF WHO MAY HAVE

3   PRODUCED THEM.  IF THE PROOF SHOULD FAIL TO ESTABLISH ANY

4   ESSENTIAL ELEMENT OF THE PLAINTIFF'S CLAIM BY A PREPONDERANCE

5   OF THE EVIDENCE, YOU, THE JURY, SHOULD FIND FOR THE DEFENDANT

6   AS TO THAT CLAIM.

7            THE PLAINTIFF NEED NOT PROVE OR PRODUCE EVERY

8   POSSIBLE WITNESS, AND HE NEED NOT PROVE HIS CLAIM BEYOND A

9   REASONABLE DOUBT AS IS NECESSARY IN A CRIMINAL PROSECUTION.

10  BUT SPECULATION OR MERE POSSIBILITY OR EVEN UNSUPPORTED

11  PROBABILITY IS NOT SUFFICIENT TO SUPPORT A JUDGMENT IN HIS

12  FAVOR.

13           NOW, WITH STRICT LIABILITY FAILURE TO WARN, LET

14  ME TALK WITH YOU SPECIFICALLY ABOUT THE LAW ON THAT CLAIM.  IN

15  ORDER TO DECIDE THIS CLAIM, YOU MUST DETERMINE WHETHER VIOXX

16  WAS DEFECTIVE AND UNREASONABLY DANGEROUS BY REASON OF AN

17  INADEQUATE WARNING; AND, IF SO, WHETHER THE USE OF VIOXX AND

18  THE ABSENCE OF ADEQUATE WARNING WAS A LEGAL CAUSE OF THE

19  INJURIES SUSTAINED BY GERALD BARNETT.

20           PRESCRIPTION DRUGS OFTEN CAUSE UNWANTED SIDE

21  EFFECTS DESPITE THE FACT THAT THEY HAVE BEEN CAREFULLY DESIGNED

22  AND PROPERLY MANUFACTURED.  SUCH PRODUCTS ARE DEEMED

23  UNAVOIDABLY UNSAFE BUT ARE NOT DEFECTIVE OR UNREASONABLY

24  DANGEROUS IF THEY INCLUDE ADEQUATE WARNINGS OF POTENTIAL SIDE

25  EFFECTS.  A PRODUCT, HOWEVER, IS DEFECTIVE DUE TO INADEQUATE

1   WARNING IF THE MANUFACTURER FAILS TO GIVE A REASONABLY PRUDENT

2   PHYSICIAN ADEQUATE WARNINGS OF A PARTICULAR RISK THAT WAS KNOWN

3   OR KNOWABLE TO THE MANUFACTURER IN LIGHT OF THE GENERAL

4   RECOGNIZED AND PREVAILING BEST SCIENTIFIC AND MEDICAL KNOWLEDGE

5   AVAILABLE AT THE TIME OF THE MANUFACTURE AND DISTRIBUTION.  A

6   PRESCRIPTION DRUG MANUFACTURER'S DUTY TO WARN OF THE POTENTIAL

7   RISKS OF ITS PRODUCT IS DIRECTED ONLY TO THE REASONABLY PRUDENT

8   PHYSICIAN AND NOT THE CONSUMER.  HOWEVER, THE MANUFACTURER IS

9   DIRECTLY LIABLE TO THE PATIENT FOR BREACH OF SUCH DUTY.

10              IF A PRODUCT HAS A KNOWN OR REASONABLY

11  SCIENTIFICALLY OR MEDICALLY KNOWABLE RISK OF HARMFUL

12  CONSEQUENCES WHICH COMES FROM THE VERY NATURE OF THE PRODUCT

13  ITSELF, THE MANUFACTURER HAS A DUTY TO TAKE REASONABLE

14  PRECAUTIONS TO PROVIDE AN ADEQUATE WARNING THAT WOULD PLACE

15  PRESCRIBING PHYSICIANS ON GUARD AGAINST THE HARMFUL

16  CONSEQUENCES THAT MIGHT RESULT FROM THE USE OF THE PRODUCT.

17              TO PROVIDE AN ADEQUATE WARNING, THE MANUFACTURER

18  MUST DISCLOSE THE KNOWN OR REASONABLY SCIENTIFICALLY OR

19  MEDICALLY KNOWABLE RISK SO THAT A REASONABLY PRUDENT PHYSICIAN

20  CAN ACT IN LINE WITH THE POTENTIAL DANGER.

21              UNDER THE LAW APPLICABLE TO THIS CASE, A

22  MANUFACTURER HAS NO DUTY TO WARN OF POTENTIAL RISKS OR DANGERS

23  INHERENT IN A PRODUCT IF THE PRODUCT IS DISTRIBUTED TO WHAT THE

24  LAW CALLS A "LEARNED INTERMEDIARY," SUCH AS A PHYSICIAN, WHO

25  EITHER KNOWS THE RISKS OR IS IN A POSITION TO UNDERSTAND AND

1   ASSESS THE RISKS INVOLVED AND TO INFORM THE ULTIMATE USER OF

2   THE RISKS.  HOWEVER, THE "LEARNED INTERMEDIARY" RULE DOES NOT

3   SHIELD A DRUG MANUFACTURER FROM LIABILITY FOR INADEQUATE

4   WARNINGS TO THE PHYSICIAN WHO IS REASONABLY UNAWARE OF THE

5   RISKS.

6               THE DUTY TO WARN INCLUDES THE DUTY TO WARN WITH

7   A DEGREE OF INTENSITY THAT WOULD CAUSE A REASONABLE PRESCRIBING

8   PHYSICIAN TO EXERCISE THE CAUTION COMMENSURATE WITH THE

9   POTENTIAL DANGER.  IN DETERMINING THE SCOPE OF A MANUFACTURER'S

10  DUTY TO WARN OF DANGERS ASSOCIATED WITH THE USE OF ITS PRODUCT,

11  THE MANUFACTURER IS HELD TO THE KNOWLEDGE AND SKILL OF AN

12  EXPERT IN ITS FIELD.  THE MANUFACTURER MUST KEEP UP WITH

13  SCIENTIFIC KNOWLEDGE, DISCOVERIES, AND ADVANCES AND IS PRESUMED

14  TO KNOW WHAT COULD BE LEARNED BY DOING SO.

15              IN ORDER TO PROVE HIS *FAILURE TO WARN* CLAIM, THE

16  PLAINTIFF MUST NOT ONLY SHOW THAT MERCK'S WARNINGS REGARDING

17  VIOXX WERE INADEQUATE BUT, ALSO, THAT SUCH INADEQUACY AFFECTED

18  THE DECISION OF HIS PRESCRIBING PHYSICIANS TO PRESCRIBE OR NOT

19  TO PRESCRIBE VIOXX.  IN OTHER WORDS, THE PLAINTIFF MUST SHOW

20  THAT HIS DOCTORS WOULD NOT HAVE PRESCRIBED VIOXX TO HIM IF

21  MERCK HAD PROVIDED AN ADEQUATE WARNING.  AN ADEQUATE WARNING TO

22  THE PROFESSION MAY BE ERODED OR EVEN NULLIFIED BY OVERPROMOTION

23  OF THE DRUG THROUGH A VIGOROUS SALES PROGRAM WHICH MAY HAVE THE

24  EFFECT OF PERSUADING THE PRESCRIBING PHYSICIANS TO DISREGARD

25  THE WARNINGS GIVEN.

1          A MANUFACTURER MAY PREVENT A PRODUCT FROM BEING
2    UNREASONABLY DANGEROUS BECAUSE OF A FAILURE TO WARN IF IT
3    PLACES AN ADEQUATE WARNING ON THE PRODUCT REGARDING ITS USE.
4    WHEN ADEQUATE WARNING IS GIVEN, THE MANUFACTURER MAY ASSUME
5    THAT IT WILL BE HEEDED BY THE PRESCRIBER OR THE PRODUCT USER.
6    IF THE PRESCRIBER OR USER IGNORES THE WARNING, THE MANUFACTURER
7    IS NOT LIABLE FOR ANY INJURIES CAUSED BY THE USE OF THE
8    PRODUCT.
9          FURTHER, IF THE USER OR HIS TREATING PHYSICIAN
10   IS AWARE OF THE DANGER AND, NEVERTHELESS, PROCEEDS TO MAKE USE
11   OF THE PRODUCT, AND THE USER IS INJURED BY IT, THE USER MAY NOT
12   RECOVER FROM THE MANUFACTURER ANY DAMAGES CAUSED BY ITS USE.
13         IF THE GREATER WEIGHT OF THE EVIDENCE DOES NOT
14   SUPPORT THE CLAIM OF THE PLAINTIFF, YOUR VERDICT SHOULD BE FOR
15   MERCK.  IF THE GREATER WEIGHT OF THE EVIDENCE, HOWEVER, DOES
16   SUPPORT THE CLAIM OF THE PLAINTIFF, THEN YOUR VERDICT SHOULD BE
17   FOR THE PLAINTIFF.
18         NEGLIGENT FAILURE TO WARN, I'LL DISCUSS THAT
19   WITH YOU.  IN THIS CLAIM, THE PLAINTIFF ALLEGES THAT MERCK WAS
20   NEGLIGENT IN FAILING TO WARN GERALD BARNETT'S PRESCRIBING
21   PHYSICIAN OF A DANGEROUS CONDITION IN VIOXX AND THAT SUCH
22   NEGLIGENCE WAS A LEGAL CAUSE OF HIS INJURIES.
23         TO ESTABLISH MERCK'S LIABILITY FOR NEGLIGENT
24   FAILURE TO WARN, THE PLAINTIFF MUST PROVE THE FOLLOWING THREE
25   ELEMENTS:

1            FIRST, MERCK NEGLIGENTLY FAILED TO ADEQUATELY

2    WARN THE PLAINTIFF'S TREATING PHYSICIANS OR THE MEDICAL

3    COMMUNITY OF A KNOWN OR REASONABLY SCIENTIFICALLY OR MEDICALLY

4    KNOWABLE RISK ASSOCIATED WITH VIOXX; TWO, HE SUFFERED INJURIES

5    AS A RESULT OF MERCK'S ALLEGED FAILURE TO WARN; AND THREE,

6    MERCK'S NEGLIGENCE WAS THE PROXIMATE CAUSE OF HIS INJURIES.

7            NOW, NEGLIGENCE IS THE FAILURE TO USE REASONABLE

8    CARE.  IN THIS CASE, REASONABLE CARE IS THAT DEGREE OF CARE

9    WHICH A REASONABLY PRUDENT PHARMACEUTICAL COMPANY WOULD USE

10   UNDER LIKE CIRCUMSTANCES.  NEGLIGENCE MAY CONSIST EITHER IN

11   DOING SOMETHING THAT A REASONABLY PRUDENT PHARMACEUTICAL

12   COMPANY WOULD NOT DO UNDER THE CIRCUMSTANCES, UNDER LIKE

13   CIRCUMSTANCES, OR IN FAILING TO DO SOMETHING THAT A REASONABLY

14   PRUDENT PHARMACEUTICAL COMPANY WOULD DO UNDER LIKE

15   CIRCUMSTANCES.

16           USUALLY, THE DEGREE OF CARE REQUIRED DEPENDS

17   UPON THE RISK OF HARM FLOWING FROM THE NORMAL USE OF THE

18   PRODUCT OR IS PROPORTIONATE TO THE SERIOUSNESS OF THE

19   CONSEQUENCES REASONABLY TO BE ANTICIPATED.

20           WHILE AN EXTRAORDINARY DUTY OF CARE IS NOT

21   REQUIRED OF THE MANUFACTURER, THE DUTY ON THE PART OF THE

22   MANUFACTURER TO EXERCISE DUE CARE MUST BE COMMENSURATE WITH THE

23   RISK OF DANGER INVOLVED.

24           MOREOVER, IN DETERMINING WHETHER THE LEGAL

25   STANDARD OF CARE HAS BEEN SATISFIED, A MANUFACTURER IS HELD TO

1  THE SKILL OF AN EXPERT IN ITS BUSINESS AND TO AN EXPERT'S

2  KNOWLEDGE OF THE MATERIAL AND PROCESS IN ITS INDUSTRY.  A

3  MANUFACTURER OWES A DUTY TO CONDUCT ADEQUATE TESTS AND

4  INSPECTIONS OF ITS PRODUCTS SUCH AS WILL REVEAL LATENT DEFECTS

5  OR DEFECTS THAT ARE NOT APPARENT UPON A REASONABLE INSPECTION

6  SO THAT IT CAN GIVE ADEQUATE WARNINGS.  THE FAILURE TO EXERCISE

7  REASONABLE CARE IN FULFILLING ANY OF THESE DUTIES CONSTITUTES

8  NEGLIGENCE.

9              AGAIN, IF THE GREATER WEIGHT OF THE EVIDENCE

10  DOES NOT SUPPORT THE CLAIM OF THE PLAINTIFF, THEN YOUR VERDICT

11  MUST BE FOR MERCK.  IF THE GREATER WEIGHT DOES SUPPORT THE

12  CLAIM OF THE PLAINTIFF, THEN YOUR VERDICT SHOULD BE FOR THE

13  PLAINTIFF.

14              LET ME SAY A WORD ABOUT THE *DECEIT BY*

15  *CONCEALMENT* CLAIM.  UNLIKE THE PLAINTIFF'S OTHER CLAIMS WHICH

16  MUST BE PROVEN BY A PREPONDERANCE OF THE EVIDENCE, THE

17  PLAINTIFF MUST PROVE EACH ELEMENT OF HIS *DECEIT BY CONCEALMENT*

18  CLAIM BY CLEAR AND CONVINCING EVIDENCE.  CLEAR AND CONVINCING

19  EVIDENCE IS AN ELEVATED STANDARD OF PROOF WHICH LIES BETWEEN

20  THE LESSER STANDARD OF "PREPONDERANCE OF THE EVIDENCE," AND THE

21  HIGHER STANDARD OF "BEYOND A REASONABLE DOUBT," WHICH IS

22  REQUIRED IN CRIMINAL CASES.  CLEAR AND CONVINCING EVIDENCE IS

23  THAT DEGREE OF PROOF WHICH WILL PRODUCE IN YOUR MIND A FIRM

24  BELIEF AS TO THE ALLEGATIONS SOUGHT TO BE ESTABLISHED.

25              NOW, TO ESTABLISH THIS CLAIM, THE PLAINTIFF MUST

1    SHOW THAT MERCK KNOWINGLY MISREPRESENTED OR FAILED TO DISCLOSE

2    A MATERIAL FACT TO THE PLAINTIFF'S TREATING PHYSICIAN IN A

3    CIRCUMSTANCE WHERE IT WAS REQUIRED TO DO SO; THAT THE

4    PLAINTIFF'S TREATING PHYSICIANS WERE ENTITLED TO AND DID RELY

5    ON THAT MISREPRESENTATION OR NONDISCLOSURE; AND THAT THE

6    MISREPRESENTATION OR NONDISCLOSURE WAS A LEGAL CAUSE OF THE

7    PLAINTIFF'S CLAIMED INJURIES.

8              THE MISREPRESENTATION OR NONDISCLOSURE MUST BE

9    OF A FACT RATHER THAN OF AN OPINION.  THE DISTINCTION BETWEEN A

10   "MATTER OF FACT" AND A "MATTER OF OPINION" IS GENERALLY

11   CHARACTERIZED BY WHAT IS SUSCEPTIBLE OF EXACT KNOWLEDGE WHEN

12   THE STATEMENT OR OMISSION IS MADE.  STATEMENTS OR

13   NONDISCLOSURES OF OPINION, PREDICTIONS OF FUTURE EVENTS, MERE

14   PUFFING, SALES TALK, OR BROKEN PROMISES NORMALLY DO NOT AMOUNT

15   TO DECEIT BY CONCEALMENT.  BAD FAITH IS THE TEST OF FRAUDULENT

16   CONCEALMENT.  THE TRUTH OR FALSITY OF A REPRESENTATION MUST BE

17   DETERMINED AS OF THE TIME IT WAS MADE OR ACTED ON AND NOT AT

18   SOME LATER DATE.

19             NONDISCLOSURE OR SILENCE BECOMES FRAUDULENT WHEN

20   IT IS THE DUTY OF THE PARTY HAVING KNOWLEDGE OF THE FACTS TO

21   UNCOVER THEM TO THE OTHER.  WHERE MATERIAL FACTS ARE ACCESSIBLE

22   TO THE SELLER ONLY, AND THE SELLER KNOWS THAT THEY ARE NOT

23   WITHIN THE REACH OF THE DILIGENT ATTENTION, OBSERVATION, AND

24   JUDGMENT OF THE PURCHASER'S TREATING PHYSICIAN, THE SELLER IS

25   BOUND TO DISCLOSE SUCH FACTS AND MAKE THEM KNOWN TO THE

1    PURCHASER'S TREATING PHYSICIAN.  WHEN IN SUCH A SITUATION, THE

2    SELLER FAILS TO DISCLOSE THESE FACTS, THE SELLER'S

3    NONDISCLOSURE OF THESE FACTS IS EQUIVALENT TO FRAUDULENT

4    CONCEALMENT.

5                    THE MISREPRESENTATION OR NONDISCLOSURE MUST ALSO

6    BE MATERIAL.  IF AN OBJECTIVE REASONABLE PRESCRIBING PHYSICIAN

7    WOULD HAVE VIEWED THE REPRESENTATION OR NONDISCLOSURE AS

8    SUFFICIENTLY IMPORTANT AND SIGNIFICANT THAT IT WOULD HAVE

9    PLAYED A ROLE IN HIS DECISION TO PRESCRIBE THE DRUG, THE

10   REPRESENTATION OR NONDISCLOSURE MAY BE DEEMED MATERIAL.  TO SAY

11   IT ANOTHER WAY, THE MATTER IS MATERIAL IF A REASONABLE

12   PRESCRIBING PHYSICIAN WOULD ATTACH IMPORTANCE TO ITS EXISTENCE

13   OR NONEXISTENCE IN DETERMINING WHETHER OR NOT TO PRESCRIBE A

14   DRUG.

15                   NOW, TO RECOVER FOR DECEIT BY CONCEALMENT IN A

16   PHARMACEUTICAL CASE, THE PLAINTIFF'S PRESCRIBING PHYSICIANS

17   MUST HAVE RELIED ON THE ALLEGED MISREPRESENTATION OR

18   NONDISCLOSURE.  IF THEY KNEW THE MISREPRESENTATION WAS FALSE OR

19   KNEW THE ALLEGEDLY UNDISCLOSED FACTS, THERE IS NO CAUSE OF

20   ACTION FOR FRAUDULENT CONCEALMENT BECAUSE THERE COULD NOT HAVE

21   BEEN ANY RELIANCE.  A VICTIM OF FRAUD HAS A RIGHT TO RELY ON

22   THE INFORMATION PROVIDED SO LONG AS HIS RELIANCE IS NOT

23   RECKLESS OR GROSSLY NEGLIGENT.  THE RIGHT TO RELY MUST BE

24   DETERMINED IN THE LIGHT OF THE DUTY OF THE PLAINTIFF'S

25   PRESCRIBING PHYSICIANS TO USE REASONABLE PRUDENCE AND DILIGENCE

1    UNDER THE CIRCUMSTANCES IN ASCERTAINING THE TRUTH WITH RESPECT

2    TO THE REPRESENTATIONS OR OMISSIONS MADE TO HIM.  THE

3    LEGITIMACY OF THE PLAINTIFF'S PHYSICIANS' RELIANCE ON THE

4    MISREPRESENTATIONS OR OMISSIONS IS AN ISSUE TO BE DECIDED BY

5    YOU, THE JURY.

6                    AND LET ME SAY A WORD ABOUT CAUSATION.  IN ORDER

7    FOR THE PLAINTIFF TO PREVAIL ON ANY OF HIS CLAIMS, HE MUST

8    ESTABLISH THAT VIOXX WAS THE PROXIMATE CAUSE OF HIS ALLEGED

9    INJURIES.  "PROXIMATE CAUSE" MEANS THE EFFICIENT CAUSE OR

10   DIRECT CAUSE.  THE LAW DEFINES "PROXIMATE CAUSE" AS SOMETHING

11   THAT PRODUCES A NATURAL CHAIN OF EVENTS WHICH, IN THE END,

12   BRING ABOUT THE INJURY.  IN OTHER WORDS, PROXIMATE CAUSE IS THE

13   CAUSE WITHOUT WITH THE INJURY WOULD NOT HAVE OCCURRED.

14                   PROXIMATE CAUSE REQUIRES PROOF OF BOTH CAUSATION

15   IN FACT AND LEGAL CAUSE.  CAUSATION IN FACT IS PROVED BY

16   ESTABLISHING THAT THE PLAINTIFF'S INJURY WOULD NOT HAVE

17   OCCURRED "BUT FOR" THE DEFENDANT'S ACTIONS.

18                   LEGAL CAUSE IS PROVED BY ESTABLISHING

19   FORESEEABILITY.  THE TEST OF FORESEEABILITY IS WHETHER SOME

20   INJURY TO ANOTHER IS THE NATURAL AND PROBABLE CONSEQUENCE OF

21   THE COMPLAINED-OF CONDUCT.  FORESEEABILITY IS NOT DETERMINED

22   FROM HINDSIGHT, BUT RATHER, FROM THE DEFENDANT'S PERSPECTIVE AT

23   THE TIME OF THE COMPLAINED-OF ACT.

24                   THE LAW REQUIRES ONLY REASONABLE FORESIGHT.  IT

25   IS NOT NECESSARY FOR THE PLAINTIFF TO DEMONSTRATE THAT THE

1   DEFENDANT SHOULD HAVE FORESEEN THE PARTICULAR EVENT WHICH

2   OCCURRED, BUT MERELY THAT THE DEFENDANT SHOULD HAVE FORESEEN

3   HIS ACTIONS WOULD PROBABLY CAUSE INJURY TO SOMEONE.  THE

4   PLAINTIFF PROVES LEGAL CAUSE BY ESTABLISHING THE INJURY IN

5   QUESTION OCCURRED AS A NATURAL AND PROBABLE CONSEQUENCE OF THE

6   DEFENDANT'S ACTIONS.

7               IN ORDER TO BE REGARDED AS THE PROXIMATE CAUSE

8   OF THE INJURY, HOWEVER, THE DEFECT NEED NOT BE THE ONLY CAUSE.

9   A DEFECT MAY BE A LEGAL CAUSE OF AN INJURY EVEN THOUGH IT

10  OPERATES IN COMBINATION WITH THE ACTS OF ANOTHER, SOME NATURAL

11  CAUSE, OR SOME OTHER CAUSE IF SUCH OTHER CAUSE OCCURS AT THE

12  SAME TIME THE DEFECT HAD ITS EFFECT AND IF THE DEFECT

13  CONTRIBUTES SUBSTANTIALLY TO PRODUCING THE ALLEGED INJURY.

14  FURTHERMORE, A DEFENDANT MAY STILL BE HELD LIABLE WHEN THE

15  DEFENDANT'S FAULT OPERATES UPON A CONCEALED PHYSICAL CONDITION,

16  SUCH AS A LATENT DISEASE, TO PRODUCE CONSEQUENCES WHICH THE

17  DEFENDANT COULD NOT REASONABLY ANTICIPATE.

18              VOLUNTARY WITHDRAWAL OF VIOXX.  YOU HAVE HEARD

19  TESTIMONY ABOUT MERCK'S VOLUNTARY WITHDRAWAL OF VIOXX FROM THE

20  MARKET IN SEPTEMBER OF 2004.  YOU MAY NOT CONSIDER THAT FACT AS

21  EVIDENCE THAT VIOXX WAS DEFECTIVE OR DEFECTIVELY DESIGNED OR

22  THAT MERCK WAS NEGLIGENT OR ACTED CULPABLY.  YOU MAY ALSO NOT

23  CONSIDER THAT FACT AS EVIDENCE THAT MERCK DID NOT ADEQUATELY

24  WARN OF THE RISKS ASSOCIATED WITH TAKING VIOXX OR AS EVIDENCE

25  THAT VIOXX CAN CAUSE INJURIES SUCH AS THOSE ALLEGED BY GERALD

1    BARNETT.  YOU MAY, HOWEVER, CONSIDER THIS WITHDRAWAL FOR OTHER

2    PURPOSES, SUCH AS PROVING OWNERSHIP, CONTROL, OR FEASIBILITY OF

3    PRECAUTIONARY MEASURES.

4              FDA CERTIFICATION.  COMPLIANCE WITH AN FDA

5    REGULATION MAY ESTABLISH THAT THE MANUFACTURER MET THE

6    APPROPRIATE MINIMUM STANDARDS OF DUE CARE, BUT COMPLIANCE DOES

7    NOT NECESSARILY ABSOLVE THE MANUFACTURER OF ALL LIABILITY, NOR

8    DOES IT ESTABLISH THAT THE WARNINGS AT ISSUE WERE ADEQUATE.

9    EVEN IF YOU FIND THE DEFENDANT MERCK MET ALL GOVERNMENT

10   REGULATIONS AND REQUIREMENTS, SUCH COMPLIANCE IS NOT A DEFENSE

11   IF A REASONABLE AND PRUDENT MANUFACTURER WOULD HAVE TAKEN ADDED

12   PRECAUTIONS.

13             LET ME SAY A WORD ABOUT DAMAGES.  "DAMAGES" IS

14   THE TERM IN DOLLARS AND CENTS WHICH EXPRESSES THE INJURIES

15   SUSTAINED BY THE PLAINTIFF.  IF THE PLAINTIFF HAS PROVEN ONE OR

16   MORE OF HIS CLAIMS AGAINST MERCK, YOU MUST DETERMINE THE

17   DAMAGES TO WHICH THE PLAINTIFF IS ENTITLED.  YOU SHOULD NOT

18   INTERPRET THE FACT THAT I GIVE YOU INSTRUCTIONS ABOUT THE

19   PLAINTIFF'S DAMAGES AS AN INDICATION IN ANY WAY THAT I BELIEVE

20   THAT THE PLAINTIFF SHOULD OR SHOULD NOT WIN THIS CASE.  IT IS

21   YOUR TASK FIRST TO DECIDE WHETHER THE PLAINTIFF SUFFERED

22   DAMAGES AS A RESULT OF MERCK'S FAULT.  I AM INSTRUCTING YOU ON

23   DAMAGES ONLY SO THAT YOU WILL HAVE GUIDANCE IN THE EVENT THAT

24   YOU DECIDE MERCK IS LIABLE AND THE PLAINTIFF IS ENTITLED TO

25   RECOVER MONEY FROM MERCK.

1          THE PLAINTIFF CLAIMS THAT HE HAS SUFFERED

2   INJURIES AS A RESULT OF HIS USE OF VIOXX.  HE IS ENTITLED TO

3   RECOVER IF HE HAS PROVED ANY OF HIS THEORIES OF RECOVERY.  IF

4   YOU FIND THAT THE PLAINTIFF HAS PROVEN ONE OR MORE OF HIS

5   CLAIMS, THEN YOU MUST DETERMINE THE AMOUNT OF COMPENSATORY

6   DAMAGES TO WHICH HE IS ENTITLED.  COMPENSATORY DAMAGES ARE NOT

7   ALLOWED AS A PUNISHMENT AGAINST A PERSON OR A PARTY.  SUCH

8   DAMAGES CANNOT BE BASED ON SPECULATION, FOR IT IS ONLY ACTUAL

9   DAMAGES, WHAT THE LAW CALLS "COMPENSATORY DAMAGES," THAT ARE

10  RECOVERABLE.  HOWEVER, COMPENSATORY DAMAGES ARE NOT RESTRICTED

11  TO ACTUAL LOSS OF TIME OR MONEY.  THEY INCLUDE BOTH THE MENTAL

12  AND PHYSICAL ASPECTS OF THE INJURY, TANGIBLE AND INTANGIBLE.

13  THEY ARE AN ATTEMPT TO MAKE THE PLAINTIFF WHOLE OR TO RESTORE

14  HIM TO THE POSITION HE WOULD HAVE BEEN IN IF THE ACCIDENT HAD

15  NOT HAPPENED.

16          YOU SHOULD CONSIDER THE FOLLOWING ELEMENTS OF

17  DAMAGE TO THE EXTENT YOU, THE JURY, FIND THAT THE PLAINTIFF HAS

18  ESTABLISHED SUCH DAMAGES BY A PREPONDERANCE OF THE EVIDENCE.

19  PHYSICAL PAIN AND SUFFERING, INCLUDING PHYSICAL DISABILITY,

20  IMPAIRMENT, AND INCONVENIENCE, AND THE EFFECT OF THE

21  PLAINTIFF'S INJURIES AND INCONVENIENCE ON THE NORMAL PURSUITS

22  AND PLEASURES OF LIFE, AS WELL AS LOSS OF LIFE EXPECTANCY, IF

23  ANY; MENTAL ANGUISH AND FEELINGS OF ECONOMIC INSECURITY CAUSED

24  BY DISABILITY; MEDICAL EXPENSES; THE REASONABLE VALUE, NOT

25  EXCEEDING ACTUAL COST TO THE PLAINTIFF, OF MEDICAL CARE THAT

1   YOU MAY FIND FROM THE EVIDENCE WILL BE REASONABLY CERTAIN TO BE

2   REQUIRED IN THE FUTURE AS A PROXIMATE RESULT OF THE INJURY IN

3   QUESTION.

4                    SOME DAMAGES SUCH AS MENTAL OR PHYSICAL PAIN AND

5   SUFFERING ARE INTANGIBLE THINGS ABOUT WHICH NO EVIDENCE OF

6   VALUE IS REQUIRED.  IN AWARDING THESE DAMAGES, YOU ARE NOT

7   DETERMINING VALUE, BUT YOU SHOULD AWARD AN AMOUNT THAT WILL

8   FAIRLY COMPENSATE THE PLAINTIFF FOR HIS INJURIES.

9                    ALSO, IN THE EVENT YOU FIND THAT THE PLAINTIFF

10  IS ENTITLED TO RECEIVE AN AWARD FOR MENTAL OR PHYSICAL

11  DISABILITY, OR MENTAL OR PHYSICAL PAIN AND SUFFERING, PAST,

12  PRESENT, OR FUTURE, I INSTRUCT YOU THAT SUCH AN AWARD IS NOT

13  SUBJECT TO INCOME TAX.  NEITHER THE STATE NOR THE FEDERAL

14  GOVERNMENT WILL TAX IT.  THEREFORE, YOU SHOULD DETERMINE THE

15  AMOUNT THAT THE PLAINTIFF IS ENTITLED TO RECEIVE WITHOUT

16  CONSIDERING THE EFFECT OF TAXES UPON IT.

17                   IF YOU MAKE ANY AWARD FOR FUTURE MEDICAL

18  EXPENSES, YOU SHOULD ADJUST OR DISCOUNT THE AWARD TO PRESENT

19  VALUE BY CONSIDERING WHAT RETURN WOULD BE REALIZED ON A

20  RELATIVELY RISK-FREE INVESTMENT IF IT WERE INVESTED OVER THE

21  PERIOD OF TIME IN WHICH THE MEDICAL EXPENSES WERE LIKELY TO

22  OCCUR.  HOWEVER, YOU MUST NOT MAKE ANY ADJUSTMENT TO PRESENT

23  VALUE FOR ANY DAMAGES THAT YOU MAY AWARD FOR FUTURE PAIN AND

24  SUFFERING OR FUTURE MENTAL ANGUISH.

25                   YOU HAVE HEARD EVIDENCE ABOUT GERALD BARNETT'S

DAILY COPY

1  LIFE EXPECTANCY.  LIFE EXPECTANCY, AS SHOWN BY A STATISTICAL

2  TABLE, IS MERELY AN ESTIMATE OF THE PROBABLE AVERAGE REMAINING

3  LIFE OF ALL PERSONS IN THE UNITED STATES OF A GIVEN AGE AND

4  SEX, AND THAT ESTIMATE IS BASED UPON A LIMITED RECORD OF

5  EXPERIENCE.  SO, THE INFERENCE WHICH MAY REASONABLY BE DRAWN

6  FROM LIFE EXPECTANCY, AS SHOWN BY THE TABLES, APPLIES ONLY TO

7  ONE WHO HAS THE AVERAGE HEALTH AND EXPOSURE TO DANGER OF PEOPLE

8  OF THAT AGE AND SEX.

9            IN DETERMINING THE REASONABLY CERTAIN LIFE

10 EXPECTANCY OF THE PLAINTIFF, YOU SHOULD CONSIDER IN ADDITION TO

11 WHAT IS SHOWN BY THE TABLES ALL OTHER FACTS AND CIRCUMSTANCES

12 IN EVIDENCE BEARING UPON LIFE EXPECTANCY OF THE PLAINTIFF,

13 INCLUDING HIS OCCUPATION, HABITS, PAST HEALTH RECORD, AND

14 PRESENT STATE OF HEALTH.

15           SUGGESTIONS AS TO THE AMOUNT OF DAMAGES THAT

16 SHOULD BE AWARDED ARE MERE ARGUMENTS OF COUNSEL.  YOU MAY

17 CONSIDER THEM OR USE THEM AS GUIDELINES TO WHATEVER EXTENT THEY

18 MAY AID YOU IN ARRIVING AT A REASONABLE AND JUST AWARD, BUT YOU

19 ARE IN NO WAY BOUND BY, NOR SHOULD YOU USE, ANY RIGID

20 MATHEMATICAL FORMULA.  THE DETERMINATION OF DAMAGES IS SOLELY

21 YOUR FUNCTION AND MUST BE BASED ON COMPETENT EVIDENCE.

22           AGAIN I REMIND YOU THAT THE MERE FACT THAT I

23 HAVE GIVEN YOU INSTRUCTIONS ON THE LAW OF DAMAGES DOES NOT IN

24 ANY WAY SUGGEST THAT I BELIEVE THAT ANY DAMAGES ARE DUE IN THIS

25 CASE.  WHETHER OR NOT THE PLAINTIFF IS ENTITLED TO RECOVER AND

1    WHETHER OR NOT ANY DAMAGES ARE DUE IS FOR YOU, THE JURY, TO

2    DECIDE.

3              NOW, IT IS YOUR SWORN DUTY AS JURORS TO DISCUSS

4    THE CASE WITH ONE ANOTHER IN AN EFFORT TO REACH A UNANIMOUS

5    AGREEMENT, IF YOU CAN DO SO.  EACH OF YOU MUST DECIDE THE CASE

6    FOR YOURSELF BUT ONLY AFTER FULL CONSIDERATION OF THE EVIDENCE

7    WITH THE OTHER MEMBERS OF THE JURY.  WHILE YOU ARE DISCUSSING

8    THE CASE, DO NOT HESITATE TO RE-EXAMINE YOUR OWN OPINION AND

9    CHANGE YOUR MIND IF YOU BECOME CONVINCED THAT YOU ARE WRONG.

10   DO NOT, HOWEVER, GIVE UP YOUR HONEST BELIEFS SOLELY BECAUSE

11   OTHERS THINK DIFFERENTLY OR MERELY TO FINISH THE CASE.

12             REMEMBER, MEMBERS OF THE JURY, IN A VERY REAL

13   WAY, YOU ARE JUDGES, JUDGES OF THE FACTS.  YOUR ONLY INTEREST

14   IS TO SEEK THE TRUTH FROM THE EVIDENCE IN THIS CASE.

15             NOW, I HAVE PREPARED A SPECIAL VERDICT FORM FOR

16   YOUR CONVENIENCE TO AID YOU IN REACHING A UNANIMOUS DECISION.

17   YOU WILL TAKE THIS FORM WITH YOU TO THE JURY ROOM.  THE VERDICT

18   MUST REPRESENT THE CONSIDERED JUDGMENT OF EACH JUROR.

19             YOU WILL NOTE THAT THE FORM CONTAINS SEVERAL

20   INTERROGATORIES OR QUESTIONS.  THE ANSWERS TO EACH QUESTION

21   MUST BE THE UNANIMOUS ANSWERS OF THE JURY.  IN THE SPACE

22   PROVIDED BELOW EACH QUESTION, YOU WILL FIND DIRECTIONS WHICH

23   INSTRUCT YOU EITHER TO ANSWER THE NEXT QUESTION, TO ANSWER SOME

24   OTHER QUESTION, OR TO STOP AND RETURN TO THE COURTROOM WITH

25   YOUR VERDICT.  YOU MUST CAREFULLY FOLLOW THESE INSTRUCTIONS AS

1  YOU COMPLETE THE FORM.

2            AND IT READS AS:  "DO YOU FIND THAT MERCK &

3  COMPANY INC. FAILED TO ADEQUATELY WARN GERALD BARNETT'S

4  TREATING PHYSICIANS OF A KNOWN OR REASONABLY SCIENTIFICALLY OR

5  MEDICALLY KNOWABLE RISK ASSOCIATED WITH VIOXX AND THAT SUCH

6  FAILURE TO ADEQUATELY WARN WAS A LEGAL CAUSE OF AN INJURY TO

7  GERALD BARNETT?"  "YES" OR "NO."  YOU FILL IN THE APPROPRIATE

8  ONE.  AND THE INSTRUCTION, "PLEASE PROCEED TO QUESTION 2."

9            QUESTION 2, "DO YOU FIND THAT MERCK & COMPANY

10  INC. WAS NEGLIGENT IN FAILING TO ADEQUATELY WARN GERALD

11  BARNETT'S TREATING PHYSICIANS OF A KNOWN OR REASONABLY

12  SCIENTIFICALLY OR MEDICALLY KNOWABLE RISK ASSOCIATED WITH VIOXX

13  AND THAT SUCH NEGLIGENCE WAS A LEGAL CAUSE OF AN INJURY TO

14  GERALD BARNETT?"  "YES" OR "NO."  YOU FILL IN THE APPROPRIATE.

15  PROCEED TO QUESTION 3.

16            DO YOU FIND THAT MERCK & COMPANY INC. KNOWINGLY

17  MISREPRESENTED OR FAILED TO DISCLOSE A MATERIAL FACT TO GERALD

18  BARNETT'S TREATING PHYSICIANS IN A CIRCUMSTANCE WHERE IT WAS

19  REQUIRED TO DO SO, THAT GERALD BARNETT'S TREATING PHYSICIANS

20  WERE ENTITLED TO AND DID RELY ON THAT MISREPRESENTATION OR

21  NON-DISCLOSURE, AND THAT THE MISREPRESENTATION OR

22  NON-DISCLOSURE WAS A LEGAL CAUSE OF AN INJURY TO GERALD

23  BARNETT?"  "YES" OR "NO."  AND THEN THE INSTRUCTIONS TELL YOU

24  WHAT TO DO NEXT.

25            "DO YOU FIND THAT THERE WAS NEGLIGENCE ON THE

DAILY COPY

2672

1   PART OF GERALD BARNETT THAT WAS A LEGAL CAUSE OF HIS INJURY?"
2   "YES" OR "NO," AND THEN INSTRUCTIONS.
3           "DO YOU FIND THAT THERE WAS NEGLIGENCE ON THE
4   PART OF DR. MICHAEL MCCAFFREY THAT WAS A LEGAL CAUSE OF GERALD
5   BARNETT'S INJURY?"  "YES" OR "NO" AND INSTRUCTIONS.
6           "DO YOU FIND THAT THERE WAS NEGLIGENCE ON THE
7   PART OF DR. MICHAEL MIKOLA THAT WAS A LEGAL CAUSE OF GERALD
8   BARNETT'S INJURIES?"  "YES" OR "NO."  YOU FILL OUT THE
9   APPROPRIATE ONE.
10          7, "DO YOU FIND THAT THERE WAS NEGLIGENCE ON THE
11  PART OF DR. MARK KARAVAN THAT WAS A LEGAL CAUSE OF GERALD
12  BARNETT'S INJURY?  "YES" OR "NO."
13          AND THEN 8, "WHAT PERCENTAGE OF FAULT, IF ANY,
14  DO YOU ATTRIBUTE TO MERCK & COMPANY INC., GERALD BARNETT,
15  DR. MICHAEL MCCAFFREY, DR. MICHAEL MIKOLA, AND/OR DR. MARK
16  KARAVAN?"  AND IT HAS A PERCENTAGE WITH THEIR NAMES.  YOU FILL
17  OUT AS BEING APPROPRIATE.
18          "PROCEED TO 9:  "WHAT AMOUNT, IF ANY, DO YOU
19  FIND WILL FAIRLY AND ADEQUATELY COMPENSATE GERALD BARNETT FOR
20  DAMAGES SUFFERED DUE VIOXX?"  AND YOU FILL IN WHATEVER YOU FEEL
21  APPROPRIATE, IF ANYTHING.
22          AND THEN THE INSTRUCTIONS, IT'S TO BE DATED AND
23  SIGNED BY THE JURY FOREMAN -- FOREPERSON, FOREMAN.
24          WHEN YOU RETIRE TO THE JURY ROOM TO DELIBERATE
25  ON YOUR VERDICT, YOU MAY TAKE THE CHARGE WITH YOU, AND I'LL

1    GIVE YOU A COPY TO EACH OF YOU, A COPY OF THE QUESTIONNAIRE AND

2    ALSO ALL OF THE EVIDENCE.  YOU MAY ALSO BRING WITH YOU YOUR

3    BOOKS, YOUR NOTES.

4              THE FIRST THING TO DO IS TO SELECT A FOREPERSON

5    AND THEN BEGIN WITH YOUR DELIBERATIONS.  IF YOU RECESS DURING

6    DELIBERATIONS, FOLLOW ALL OF THE INSTRUCTIONS THAT THE COURT

7    HAVE GIVEN ABOUT YOUR CONDUCT DURING THE TRIAL.  AFTER YOU'VE

8    REACHED YOUR UNANIMOUS VERDICT, YOUR FOREPERSON IS TO FILL IN

9    ON THE FORM YOUR ANSWERS TO THE QUESTIONS.

10             DO NOT REVEAL YOUR ANSWERS UNTIL SUCH TIME AS

11   YOU'RE DISCHARGED UNLESS OTHERWISE DIRECTED BY ME.  YOU MUST

12   NEVER DISCLOSE TO ANYONE, NOT EVEN TO ME, ANY NUMERICAL

13   DIVISION OF ANY QUESTION, IF THERE BE ANY.

14             IF YOU WANT TO COMMUNICATE WITH ME AT ANY TIME,

15   PLEASE GIVE A SIGNED, WRITTEN MESSAGE OR QUESTION TO THE

16   UNITED STATES MARSHAL, WHO WILL BRING IT TO ME.  I WILL THEN

17   RESPOND AS PROMPTLY AS POSSIBLE EITHER IN WRITING OR HAVE YOU

18   BROUGHT BACK INTO THE COURTROOM SO I CAN ADDRESS YOU.  I WILL

19   ALWAYS FIRST DISCLOSE TO THE ATTORNEYS YOUR QUESTION AND MY

20   RESPONSE BEFORE I ANSWER YOUR QUESTION.

21             AFTER YOU HAVE REACHED A VERDICT, YOU ARE NOT

22   REQUIRED TO TALK WITH ANYONE ABOUT THE CASE UNLESS THE COURT

23   ORDERS OTHERWISE.

24             YOU MAY NOW RETIRE TO THE JURY ROOM.  WE HAVE

25   YOUR LUNCH.  RELAX, HAVE A NICE LUNCH, AND THEN BEGIN YOUR

1    DELIBERATIONS.

2              WE'LL STAND IN RECESS AS THE JURY LEAVES.

3              **THE MARSHAL:**  ALL RISE.

4              (WHEREUPON, THE COURT WAS IN RECESS, AWAITING WORD

5    FROM THE JURY.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY

1                      **<u>AFTERNOON SESSION</u>**

2                       **(AUGUST 16, 2006)**

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

4    CHAMBERS AND TRANSCRIBED BY TONI DOYLE TUSA, CCR, FCRR,

5    OFFICIAL COURT REPORTER.)

6              **THE COURT:**  I RECEIVED A QUESTION FROM THE JURY AT

7    4:45 P.M.  IT IS THE FIRST QUESTION THAT I RECEIVED FROM THE

8    JURY.  THE QUESTION IS:

9                    "CAN WE FIND OUT HOW LONG IT TOOK TO GET THE

10   FIRST FDA LABEL FOR VIOXX APPROVED, WHEN IT WAS SUBMITTED AND

11   WHEN APPROVED?  THANKS, JURY."

12                   I CONFERRED WITH COUNSEL AND I RESPONDED THE

13   FOLLOWING AT 5:05 P.M.:

14                   "DEAR JURY:  THE ATTORNEYS ADVISE ME THAT THERE

15   IS NO ONE DOCUMENT IN EVIDENCE THAT ANSWERS THAT QUESTION.  YOU

16   MUST RELY ON YOUR RECOLLECTION OF THE TESTIMONY AND EVIDENCE

17   ADMITTED IN THIS CASE.  JUDGE FALLON."

18                   ANYTHING ELSE FROM ANYBODY?

19              **MR. ROBINSON:**  NO, YOUR HONOR.

20              **MR. BECK:**  NO, YOUR HONOR.

21              (WHEREUPON, THE COURT WAS IN RECESS AWAITING FURTHER

22   WORD FROM THE JURY.)

23                         *  *  *

24

25

                            DAILY COPY