1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5    In Re: VIOXX PRODUCTS        *    MDL Docket No. 1657
            LIABILITY LITIGATION  *
6                                 *
                                  *
7    This document relates to     *    July 7, 2006, 9:00 a.m.
                                  *
8                                 *
     Gerald Barnett v. Merck      *    Case No. 06-CV-485-L
9      & Co., Inc.                *
     * * * * * * * * * * * * * * *

10

11                    PROCEEDINGS BEFORE THE
12                   HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15

16   For the Plaintiff:          Robinson, Calcagnie & Robinson
                                  BY:  MARK P. ROBINSON JR., ESQ.
17                                620 Newport Center Drive
                                  Newport Beach, California 92660

18

19   For the Plaintiff:          Beasley Allen Crow Methvin
                                    Portis & Miles
20                                BY:  ANDY D. BIRCHFELD, JR., ESQ.
                                  234 Commerce Street
21                                Post Office Box 4160
                                  Montgomery, Alabama 36103

22

23   For the Defendant:          Bartlit Beck Herman
                                    Palenchar & Scott
24                                BY:  PHILIP S. BECK, ESQ.
                                      ANDREW L. GOLDMAN, ESQ.
25                                54 W. Hubbard Street, Suite 300
                                  Chicago, Illinois 60610

1    Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room HB-406
2                                  New Orleans, Louisiana 70130
                                   (504) 589-7778
3

4

5
     Proceedings recorded by mechanical stenography, transcript
6    produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(July 7, 2006)**

**THE DEPUTY CLERK:**  Everyone rise.

**THE COURT:**  Be seated, please.  Good morning, Ladies and Gentlemen.  Good to see you all again.  It seems like I just left you.  This morning we have a couple of matters.  One is the Curtis Bryan motion, there are some exhibits that you had given to me to look at, and then we have the Pretrial Order.  Is that about right?

**MR. GOLDMAN:**  I think we also have Topol, Your Honor, if you think we can fit that in.

**THE COURT:**  Sure.  I'll listen to you all on Topol. I'm not going to rule on it because I do want to look at the material again, but I will hear your views.

Okay.  Curtis Bryan.  Now, as I understand, Dr. Bryan was the surgeon who performed heart surgery on the plaintiff.  The plaintiffs have taken his deposition for perpetuation purposes as part of his treatment and the defendants, under cross-examination, have discussed with the doctor various things.

The plaintiffs feel that the comments by the doctor, as well as the questions, ought to be removed from the deposition because the doctor is unqualified to testify under <u>Daubert</u>; if he were, it would be eliciting expert testimony. The defendants haven't produced a report of the doctor,

1  therefore, they shouldn't be able to elicit expert testimony to
2  support their side of the case.
3          **MR. ROBINSON:**  Yes, Your Honor.  That's a large part
4  of it.  I think that the context is important.  Dr. Bryan is
5  one of four doctors --
6          **THE COURT:**  Right.
7          **MR. ROBINSON:**  -- that are going to testify from
8  South Carolina.  I think it's important for the Court to
9  understand that Dr. Mikola, who treated Mr. Barnett from 1999
10 to 2004, was questioned extensively about Mr. Barnett's
11 condition from 1999 to 2004 and made a statement on cross, with
12 the defense lawyer asking questions, that his condition was
13 fine as of the time he last saw Mr. Barnett in 2004.
14          Dr. Karavan also testified.  He is the
15 cardiologist.  He saw Mr. Barnett from 2002 to 2006.  He is the
16 current cardiologist.  He has given opinions and there's an
17 hour and a half of testimony, or even more, designated by the
18 defense from him as to the care and condition of Mr. Barnett
19 during that period of time.
20          **THE COURT:**  You feel it's cumulative?
21          **MR. ROBINSON:**  I really feel, No. 1, it's cumulative.
22          **THE COURT:**  Yes.
23          **MR. ROBINSON:**  No. 2, I feel that what's going on
24 here is this:  Dr. Bryan basically saw Mr. Barnett from the
25 September 6 time period to October 10 four years ago.  He

1   didn't review the medical records subsequent to that; he didn't
2   review the records before that.  He was shown some documents by
3   defense counsel at the deposition and asked to give opinions on
4   that.
5              Now, I have no problem with his testimony
6   concerning the time period that he was treating the plaintiff
7   from September to October 2002, but I do think that, on top of
8   the other testimony that they have gotten regarding condition
9   from Mikola and Karavan, to get Dr. Bryan to give testimony for
10  the last four years about Barnett's condition without really
11  any proper foundation is not appropriate.
12             **THE COURT:**  I don't necessarily have any problem with
13  that reasoning.  The difficulty is when you put it in context.
14  They have him under cross.  If they were calling him as an
15  expert witness or calling him to testify to those matters, that
16  would be one thing, because they would have to prove that he
17  knew something about it.  It's a little different -- not
18  totally, but it's a little different when they have him under
19  cross and they are also trying, through their examination, to
20  impeach him.
21             **MR. ROBINSON:**  Your Honor, I really think that the
22  context with regard to that is a little different, too.  I
23  didn't even want to take his deposition.  If you remember,
24  defense counsel wanted to take the depo.  We set it later
25  because there was a scheduling problem.  At this point I would

1   not call Dr. Bryan.  This is their witness, basically.  I mean,

2   he is cumulative to what Dr. Karavan said.  Karavan goes into

3   the care and treatment in 2002, goes into the cath, angiogram,

4   goes into the surgery.

5          **THE COURT:**  I read the material.  Let me hear from

6   you on the question if he doesn't call him.

7          **MR. GOLDMAN:**  Well, Judge, if he doesn't call

8   Dr. Bryan --

9          **THE COURT:**  Right.

10         **MR. GOLDMAN:**  -- we want to call Dr. Bryan because

11  this is the man who actually conducted the heart surgery on the

12  plaintiff.

13         **THE COURT:**  You mean you are going to call him --

14         **MR. GOLDMAN:**  By deposition.

15         **THE COURT:**  Well, you see, I don't know about the

16  deposition because I think he has a point from the deposition

17  standpoint.  You have a right to call Dr. Bryan in person and

18  interrogate him.  The problem that you have is that, if you

19  call him, I have some difficulty with some of his comments when

20  I take out the context of credibility, when I take out the

21  context of your demonstrating, perhaps, that this person will

22  to some extent speculate.

23         You see, as I read the deposition, the

24  plaintiffs approach it from a treating standpoint, but they

25  also ask questions like, "Doctor, have you read articles about

1  the APPROVe study?  Have you read articles about the VIGOR

2  study," and he says, "Yes."  "Do you know that these articles

3  reflect," and then such-and-such, and he says, "Yes, I do know

4  that."  To some extent, he's leading with his chin at that

5  point.  You take a swipe at him and show not only that he

6  doesn't know anything about APPROVe or VIGOR, but then you push

7  him a little bit in the direction and he exhibits the fact that

8  he will speak on things even when he doesn't know a lot about

9  them.

10          Now, that's some credibility that you're making

11  hay out of, and I think it's legitimate when you have him under

12  cross.  When you flip it around and then use that as your

13  portion of the case, it's a problem for you just as it's a

14  problem for the plaintiff when they use that aspect.  Am I

15  making sense to you?

16          MR. GOLDMAN:  You are making sense.

17          THE COURT:  Do you see how I'm approaching that?

18          MR. BECK:  Your Honor, can I simply make one point?

19          THE COURT:  Sure.

20          MR. BECK:  There is other testimony from Dr. Bryan

21  that we would want to designate because he did do the heart

22  surgery and there's a lot of important testimony there --

23  whether they do or not -- and then we'll see what they

24  counter-designate.  If they counter-designate all this stuff

25  about APPROVe and all that sort of thing, then there will be a

1   question about credibility.  If they don't counter-designate

2   any of that, then maybe there won't be a question.  I think,

3   when we are talking about context, he is going to be designated

4   on certain issues regardless.  When we see what both sides

5   designate, we can figure out whether this thing is appropriate

6   or not.

7           **THE COURT:**  Maybe that's a way of approaching it.

8   All right.  Yes, the person can testify.  He is a treater, he

9   did the operation, so he can testify.  The question is what

10  areas he can testify to.  Mark, if you're not going to call

11  him, give them an opportunity to designate the material that

12  they say they want to put on under cross, and then take a look

13  at that and give me your thoughts on it and I will consider it.

14          **MR. ROBINSON:**  I would say something in response to

15  what Phil just said.

16          **THE COURT:**  Yes.

17          **MR. ROBINSON:**  I read Andy's cross of him on APPROVe.

18  Frankly, given even the Court's newer context on Daubert,

19  et cetera, I don't think he has enough experience, just because

20  he read one study, to give opinions about Vioxx.  That's one of

21  the reasons why I'm not going to call him.  Now, if they want

22  to call him and put on the surgery and what he did as a

23  treater, they should have a right to do that.

24          **THE COURT:**  Well, there's also an area where a

25  treater, even if they are a surgeon and they introduce

1  themselves and they start operating, meaning they don't know

2  the person a lot, they do generally -- and I suspect this

3  person did also -- look at his chart.  They know what his

4  weight is, what his blood pressure is, what his vital signs

5  are.  They know something about his past.  What they are

6  getting into is other risk factors, and a treater has to know

7  what risk factors are there because he has got to deal with

8  those factors.  That's part of what a treater knows or should

9  know.

10             They take the position that there's no imprint

11  on this clot that says Vioxx, so it's no such thing as a Vioxx

12  clot.  They bring that out.  They bring out the fact that a

13  clot forms over long periods of time.  He is the guy that

14  touched and felt the clot.  He has got to know whether it's

15  something immediate or not.  So those areas seem to me to be

16  legitimate areas.

17             MR. ROBINSON:  Your Honor, I understand those areas.

18  The areas I'm concerned about is when they take him -- I think

19  he stopped treating him October 10, 2002.  Now, you take him

20  and show him documents from 2004, 2003, 2006 --

21             THE COURT:  That's a legitimate problem.

22             MR. ROBINSON:  Okay.

23             THE COURT:  That's accurate.  I don't have any

24  problem with that.

25             MR. GOLDMAN:  Judge, can I just make one point?

1      **THE COURT:**  Sure.

2      **MR. GOLDMAN:**  Just in response to Mr. Robinson's

3   objection that we didn't disclose Dr. Bryan as an expert,

4   Dr. Bryan is not being called as an expert.

5      **THE COURT:**  You don't need to do that.

6      **MR. GOLDMAN:**  Okay.

7      **THE COURT:**  I ordered the defendants not to talk to

8   any doctors.  I let the plaintiffs talk to the doctors because

9   they are the treaters.  The defendants couldn't even ask them

10  for a report, much less hire them.  Secondly, I see this more

11  as a treater than I do as an independent expert or a hired gun,

12  as each of you would call the other's.  That's a different

13  situation.  You know, the rules carve out treating physicians

14  from even requiring reports, and obviously they do that because

15  we all know -- we have been there, done that -- oftentimes, if

16  you're a plaintiff, you inherit the treating physician.  He is

17  not even your doctor.  So when you start saying, "Give me a

18  report," he says, "Who are you?  I'm not going to do that," so

19  you can't get a report if you're a plaintiff.  From a

20  defendant's standpoint, they can't give you a report.  This

21  person is even more problematic --

22     **MR. GOLDMAN:**  Right.

23     **THE COURT:**  -- so I don't see that as an issue.

24     **MR. GOLDMAN:**  The other point, Judge, on the

25  cumulative question -- and this is really important.  When we

1    took the deposition of Dr. Karavan and when we took the

2    deposition of Dr. Mikola, in both of those cases -- by the way,

3    the plaintiffs' lawyers went first and we cross-examined -- we

4    were unable to ask those doctors about a very important

5    development that we didn't know about, and that is that the

6    plaintiffs' lawyers had a test done on Mr. Barnett.  In May of

7    2006, Dr. Zipes did these tests on Mr. Barnett.  Had we known

8    about those, I would have asked Dr. Karavan about those tests.

9    I would have asked Dr. Mikola about those tests.  So it was

10   only after we received the results of those tests that I went

11   and said to the man who operated on Mr. Barnett, "Do you see

12   the results of his EKG from May 2006?"  I didn't mention

13   Dr. Zipes.  "Based on your interpretation of the EKG test" --

14   that he is perfectly capable of interpreting as a surgeon --

15   "what do you think about Mr. Barnett's heart condition?"

16             THE COURT:  He is also a treater, from that

17   standpoint.

18             MR. GOLDMAN:  Yes.

19             THE COURT:  It's not only information, it's also

20   credibility issues.  It's also fleshing out what he knows and

21   how he knows it.  Also, it's more significant when a treater

22   says something than somebody who didn't treat.  The cumulative

23   part, I don't see that as an issue.

24             MR. ROBINSON:  Your Honor, I do have a problem with

25   him asking questions about 2006.  It's four years after he

1    treated him.

2            **THE COURT:**  I agree with that.

3            **MR. ROBINSON:**  He didn't show him the other three

4    tests that Dr. Zipes did, so I really feel there's a lack of

5    foundation.

6            **THE COURT:**  That could well be.  It's also

7    speculative.

8            **MR. ROBINSON:**  Okay.

9            **THE COURT:**  I don't see a doctor testifying about

10   somebody three or four years hence when they haven't even seen

11   him for three or four years.  That I wouldn't allow in the

12   courtroom.  The person's prognosis is one thing that you can

13   give, but what's his condition when you haven't seen him,

14   that's problematic.  Designate what you need to designate, and

15   then look at it and give me your input on it.  I will rule as

16   quickly as I can and give you all some heads-up on it.  Okay.

17   Do you want to talk to me about the exhibits?

18            **MR. ROBINSON:**  Your Honor, could I do one thing?

19            **THE COURT:**  Sure.

20            **MR. ROBINSON:**  I wanted to just play five minutes of

21   my redub or overdub, whatever it is, just to get that out the

22   way.

23            **THE COURT:**  Yes.  That's fine.  Give me the benefit

24   of that.  Just tell me what you did first, Mark.  It's the same

25   words, just your voice?

 1        **MR. ROBINSON:**  The only word I didn't use was "y'all"
 2   because I can't do it.
 3        **THE COURT:**  Well, you just use one syllable.  It's
 4   really two syllables.
 5        (WHEREUPON, the video was presented.)
 6        **THE COURT:**  Let me hear from the defendants.
 7        **MR. BECK:**  Your Honor, when you issued your recent
 8   order saying that Mr. Anstice would have to be brought here or
 9   appear remotely live, you talked about the importance of
10   credibility determinations and how a jury has to be able to
11   look at a witness, whether it's ideally live or on videotape,
12   and make credibility determinations and, in the crucible of the
13   courtroom or even in the deposition setting, see how the
14   witness responds to questions put to them by the
15   cross-examiner.  Of course, the credibility of Mr. Anstice,
16   whether they play this deposition or read a deposition or call
17   him live, is going to be very important.
18             Part of credibility is how a witness reacts to
19   the questions that are put to him by the examiner.  As
20   Your Honor noted in your order, it's not just the words that he
21   reacts with -- because if that were the only issue, we would be
22   reading the transcript from Mr. Anstice and there would be no
23   worries about all of this.  It's not just the words.  It's the
24   body language when he is responding to a question.  It's his
25   facial expression.  It's his tone of voice.  Does he answer the

 1   question directly or does he quibble a little bit?  All of
 2   those things bear on his credibility.
 3             If a witness physically recoils or if his voice
 4   catches or even if he quibbles with a question, this can be
 5   interpreted by a jury in a lot of different ways.  If the
 6   question is being put to him by a real nice guy with a
 7   mild-mannered tone of voice and yet the witness -- like, say,
 8   when Andy Goldman was asking questions of Dr. Topol and he was
 9   getting super-defensive, and Andy is asking these mild-mannered
10   questions in a mild-mannered tone, that reflects on Dr. Topol's
11   credibility.
12             It would reflect on Mr. Anstice's credibility if
13   he answered these questions -- not just these, of course,
14   because they show you an innocuous portion, but it would
15   reflect on Mr. Anstice's credibility if he gave the answers he
16   did if the questions were put to him by Mr. Robinson in this
17   mild-mannered, understated way.  But they weren't put by
18   Mr. Robinson; they were put by Mr. Lanier in a mad-dog way, in
19   a hostile way that was so obnoxious that Your Honor said you
20   didn't want to hear it in the courtroom.  When Mr. Lanier goes
21   over the top and does his mad-dog act and a witness reacts to
22   his tone of voice and aggression by being taken aback or by a
23   quiver in his voice or by his body language or even by
24   quibbling with one of his questions, then that reflects
25   differently on his credibility.

1           In fact, we all discussed that, when you play a

2    deposition where you hear Lanier being an attack dog and then

3    you hear the witness doing his best to answer it, his

4    credibility is enhanced.  He is doing the best he can against

5    an obnoxious lawyer who is a bully.  When you substitute for

6    the obnoxious lawyer who is a bully the world's nicest guy and

7    then play the same reaction, what you're doing is presenting

8    false evidence to the jury.

9           You know, we have a lot of problems with what

10   Your Honor ordered on Anstice and we'll have to deal with

11   those, but the last thing in the world that I want is to

12   present phoney evidence to the jury in the form of

13   Mr. Anstice's taped reaction to a mad dog when we substitute in

14   the world's nicest guy.

15           THE COURT:  Is he going to be live?  Is he coming

16   live?

17           MR. BECK:  Well, they won't tell us what they want to

18   do.  They said they don't want him live.  They would rather

19   play Mark's questions and his answers to Lanier.

20           MR. ROBINSON:  I've never given my statement on this.

21   Can I give it now?

22           THE COURT:  Let's get him live.  That's the way to do

23   it.

24           MR. ROBINSON:  That's fine, Your Honor.  The only

25   thing I was asking for was an understanding of the Court's

1    ruling regarding this deposition.

2              THE COURT:  Sure.

3              MR. ROBINSON:  The thought is this.  I'm concerned

4    that they may take a writ.

5              MR. BECK:  Yes, we may.

6              MR. ROBINSON:  I want to be able to play -- and if

7    there's a writ hanging this thing up, I'd still want to have

8    the right to put Anstice on in some form in this trial.

9              THE COURT:  Sure.

10             MR. ROBINSON:  Now, a third alternative, if we don't

11   get him live, is that maybe we read the transcript.  Someone

12   can sit up there and give the answers and I'll ask the

13   questions.  My concern is we are sitting with a writ up there,

14   Your Honor --

15             THE COURT:  That doesn't matter.  We'll let it in one

16   way or another.  Live would be the best way.  If you all can

17   agree on reading it, that's okay.  If you can't agree on

18   reading it and you're concerned about it, put Lanier back into

19   it, play it that way, or take the nice-guy approach, but we'll

20   get it in one way or another.

21             MR. BECK:  Your Honor, just by way of background,

22   Andy called Mark the other day and said, "Tell us which thing

23   you're going to elect so that we can figure out whether we are

24   going to take a writ," and he said, "My first choice is to play

25   Lanier, but substitute my voice."

1          THE COURT:  Right.  I think you have a point.  Yes, I

2     think that's a valid point.

3          MR. BECK:  Your Honor, I don't want to be sandbagging

4     anybody.  We want to get this cleared up before trial.  We may

5     very well take a writ.  We want them to serve him with a

6     subpoena so that we're not doing this at the last minute.  It's

7     already close to the last minute, but we want to be able to do

8     it in as orderly a way as we can.

9          THE COURT:  Right.

10         MR. BECK:  So we would ask, if they are going to do

11     him live, to serve the subpoena this week, so if we take a writ

12     we can do it quickly and we can find out from the appeals court

13     whether he has to show up or not.

14         THE COURT:  That's reasonable.

15         MR. ROBINSON:  May I ask this?  Phil, maybe you'd do

16     this.  Do you mind if you could inquire of Mr. Anstice whether

17     you would be able to accept service for him so we don't have to

18     try and follow the poor guy around?

19         MR. BECK:  Yes, we'll accept service for him.

20         MR. ROBINSON:  Okay.  That might save us --

21         THE COURT:  Sure.  Let's do it that way.  Think about

22     it from the plaintiffs' standpoint.  See whether or not you can

23     talk with the defendants.  If reading it is agreeable to them,

24     it then goes away.  If it's not agreeable, then we'll do it

25     another way.  Both of you all ought to know we are going to

1  have the testimony one way or another.

2          **MR. BECK:**  Reading it is agreeable to us if they want

3  to read in what they have.  We'll have objections to specific

4  questions, but reading is okay with us.

5          **MR. ROBINSON:**  Can I pick the witness?  Not Andy

6  Birchfield.  He is the nicest guy.

7          **MR. BECK:**  Andy has to be Anstice.

8          **THE COURT:**  Okay.  The point is the testimony will

9  come in one form or another.

10          **MR. BECK:**  Your Honor, if they want him, they are

11  going to give us a subpoena so that we can move expeditiously?

12          **THE COURT:**  Right.  Yes.  Let's do that, Mark, within

13  five days, one way or the other.

14          **MR. BECK:**  Well, five days, the problem is --

15          **THE COURT:**  Okay.  Let's do it sooner than that.

16          **MR. ROBINSON:**  We'll get you something on Monday.

17          **MR. BECK:**  Monday is fine.

18          **THE COURT:**  What else do we have?  How about the

19  documents?  Do you want me to deal with the documents now?

20          **MR. GOLDMAN:**  We can do that or Dr. Topol, whatever

21  you want to start with, Judge.  The documents will be quick.

22  Do you have, Your Honor, the --

23          **THE COURT:**  The ones that I need some help on are

24  PX1.1111, extracts from P3.0021-H, James Williams.

25          **MR. GOLDMAN:**  Yes.

1    THE COURT:  I don't understand what that is; the

2  documents, that is.

3    MR. GOLDMAN:  This is a printout, Your Honor, of

4  payments that were made to a doctor who has nothing to do with

5  this case.

6    THE COURT:  All right.  There's also some testimony.

7  What is that about?

8    MR. GOLDMAN:  Well, I think this is just an example

9  of a compilation of an exhibit that isn't accurate.  It

10  contains documents that shouldn't be part of it.

11    THE COURT:  Okay.

12    MR. GOLDMAN:  What I'm concerned about is the first

13  few pages.

14    THE COURT:  Few pages.  Okay.

15    MR. GOLDMAN:  This is just an example, Judge, of --

16    THE COURT:  All right.  I understand that.  Let's

17  see, then.  What I'm dealing with is *NEJM* manuscript, author's

18  responses to reviewer's comments.  My question there is:  Is he

19  going to testify or not testify?

20    MR. GOLDMAN:  Who?  The reviewer?  No.  That's one of

21  the problems, Judge.  These are comments by the *New England*

22  *Journal of Medicine* reviewers to Merck and the authors of the

23  APPROVe study.

24    MR. WITTMANN:  I see.

25    MR. GOLDMAN:  It's hearsay.  This is way after the

1    plaintiff's alleged injury, first of all, but the problem here

2    is we don't know who the reviewers are.  Your Honor may

3    remember that we asked you to have the *New England Journal of*

4    *Medicine* disclose the identities of these reviewers so we could

5    take their depositions, and Your Honor respected the privilege

6    that the *New England Journal of Medicine* asserted.  There are

7    many, many comments in here that are inflammatory, that are

8    without basis, that are full of hearsay, they lack foundation,

9    and they are particularly unreliable when we don't have the

10   chance to cross-examine the author.  For all I know,

11   Reviewer E, for example, is one of plaintiffs' experts.

12             **THE COURT:**  Correct.

13             **MR. GOLDMAN:**  We have no way of knowing whether it's

14   a plaintiffs' expert, Dr. Topol, or whom.

15             **THE COURT:**  Okay.  This is my ruling on all of them.

16   I'm going to give them to you.  CM.0005, E-mail regarding

17   physicians to neutralize, there's an objection to that.  The

18   objection is 401, 402, and 403.  I'm overruling those

19   objections.  I think they may have some relevance, and there's

20   no hearsay in them because it's 801(d)(2) material.

21             PX1.1111, which is extracts from P3.0021-8

22   regarding James Williams, I'm going to sustain the objection.

23   I think that this doctor is not going to testify.  It's hearsay

24   at best and misleading at worst.  It's 801, 802, and 403.

25             PX1.0755, this has to do with *NEJM* manuscript,

1   author's responses to reviewer's comments.  There's an
2   objection that it's 801, 802.  There's also an objection that
3   it's irrelevant under 401 and 403.
4           **MR. ROBINSON:**  Your Honor, which one is that one?
5           **THE COURT:**  It's PX1.0755.
6           **MR. ROBINSON:**  Can I see that for a second,
7   Your Honor?
8           **THE COURT:**  I've reviewed the material.  I think it
9   is hearsay and I'm going to sustain the objection.
10                The next exhibit is CM.0072, 2000 Profit Plan.
11   I think that if this has any relevance, it has relevance in the
12   punitive damage aspect of the case.  I think that its relevance
13   is trumped by the confusing, misleading, and inflammatory
14   aspect of it.  I'll sustain the objection in the liability
15   aspect of the case only.
16                The next exhibit is Krahe Exhibit 17.
17           **MR. ROBINSON:**  Your Honor, can I explain the context?
18   I didn't get to argue or give you any --
19           **THE COURT:**  All right.
20           **MR. ROBINSON:**  Okay.  I took one of the national
21   sales marketing persons' deposition, Ms. Krahe, who's a Merck
22   marketing principal.  She's on the national marketing team.  We
23   marked this exhibit at her deposition.  What this is is one of
24   the documents actually that Dr. Pechmann relies upon.  This is
25   one of the companies that Merck hired to track the responses of

1    doctors to Merck's sales and marketing integrated campaign, and

2    they were tracking whether or not the doctors thought there was

3    a CV risk or not.  That's what that document is.  We have laid

4    a foundation for it.  It's certainly relevant in the case.

5    It's relied upon by Dr. Pechmann.  Frankly, it goes to the core

6    of her opinion, Merck's tracking of the message.  They tracked

7    the message, in her opinion, and the message that they tracked

8    was Vioxx does not cause CV risks, CV events.

9            THE COURT:  Yes.  Okay.  This is the way I see that.

10   I really don't need it.  I sustain the objection, but let me

11   say this.  The reason I'm sustaining the objection is that

12   these are individuals who are not going to testify.  These are

13   individuals, who gave information to someone else who's not

14   going to testify who gave the information to you.

15            Now, having said that, if you look at the 703

16   situation, you have an expert who can base the opinion on

17   information that is not admissible.  I don't see this as being

18   admissible.  I think she can say, "I reviewed material and from

19   that material I gleaned such-and-such," but that's got to be

20   short, too.  I mean, you can't get the information.  "Facts or

21   data that are not otherwise admissible shall not be disclosed

22   to the jury by the proponent of the opinion or inference unless

23   the Court determines that their probative value in assisting

24   the jury are elevated."  So I'm not going to let her say what

25   this material is, but its existence is and may be relevant for

1    her under a 703 situation.  I don't see this coming in because

2    it seems to me to be at least double, if not triple, hearsay.

3              The next exhibit is PX1.1112, extracts from

4    P3.0021-M, Michael Wolfe.  Do you all have that?  This is,

5    again, payments made to someone who's not going to testify.

6    For the same reason, I sustain the objection, unless it comes

7    in under cross.  If somebody says, "We have never paid

8    individuals.  We have never done any of that," then it comes in

9    for another reason, but I don't see this coming in if a person

10   is not testifying.

11             PX1.1113, extract from Byron L. Cryer, for the

12   same reason I'm sustaining that objection.  These individuals

13   are not testifying.  It's irrelevant.  It's, at best, hearsay.

14   If it does get past the hearsay under the 801(d)(2) concept, it

15   seems to me that it's excluded under 401 or 403 unless it can

16   be used and shown to impeach somebody.  Under that type

17   situation, I'll reconsider its use.

18             MR. ROBINSON:  Your Honor, those numbers are flying

19   fast and furious.  I don't know the numbers they are talking

20   about, but I would say this.  We have a stipulation maybe the

21   Court was not aware of with regard to Merck's records regarding

22   Dr. McCaffrey and Merck's records regarding Dr. Mikola.  Are

23   any of those part of this?

24             MR. GOLDMAN:  No, those aren't part of this.

25             THE COURT:  Yes, that's different.  If a witness is

1    going to testify, then, again, what Merck has done for or to
2    that witness may well be relevant.  If they are not going to
3    testify, I don't see them -- unless somebody asks Merck, "Have
4    you ever done this," and they say, "Absolutely, there's a
5    policy against doing that sort of thing," then it comes in for
6    a different reason.
7              **MR. GOLDMAN:**  Your Honor, my only point of
8    clarification on the last statement that Mark made was that
9    Mr. Robinson used the document with Dr. McCaffrey.  He was
10   somebody who was actually paid some money to be a speaker for
11   Merck, and he was asked a bunch of questions about other
12   doctors who aren't going to be testifying.
13             **THE COURT:**  Yes.
14             **MR. GOLDMAN:**  We have objected to that testimony and,
15   based on your ruling today, I would expect you would sustain
16   that for the same reason.
17             **THE COURT:**  Right.
18             **MR. ROBINSON:**  You're talking about, just so I
19   understand, the questions regarding his partners, Dr. Williams?
20             **MR. GOLDMAN:**  And others.
21             **MR. ROBINSON:**  Okay.
22             **THE COURT:**  Pretrial Order.  Is that it?
23             **MR. BECK:**  Your Honor, I don't know if this is in the
24   Pretrial Order or not, but one of the issues that is still
25   hanging out there is plaintiffs' request concerning sequencing

1   of how the depositions are played.

2          **THE COURT:**  Yes.  Why don't you talk to me about

3   that, then if you can give me just a small thing on Topol, I'll

4   take that into consideration.  Mark, let me hear from you on

5   the sequencing.  I'm not quite sure I understand.

6          **MR. ROBINSON:**  Well, I think I can give an example

7   and then we can use that.  Let's say that I want to play a

8   deposition of Dr. Mikola, and I play the portions that I want

9   to play, and then they want to put on the defense designations.

10  I think that it would be better for the jury to treat it as if

11  it's a witness at trial; I'd put on the direct exam or

12  whatever, then they'd put on the cross.

13          Now, there was a suggestion that we could tell

14  the jury every time, "Well, this is a defense question," "Well,

15  this is a plaintiff question," "Well, this is a defense

16  question."  That would be too much of an interruption.  I think

17  that, for these trials, it would be simpler if plaintiff could

18  play their testimony as if the person was on direct, defense

19  puts on the cross, and then plaintiff puts on redirect.

20          I think the Court has discretion.  I know in the

21  previous trial you just played it chronologically right on

22  through.  The problem is this.  Take Dr. McCaffrey, for

23  example.  Andy did the direct and I did the cross.  Well, the

24  problem is I have to play his direct first before I get to my

25  cross.  I think that it's probably fairer for the jury to see

1   what I want to put on and then get to see what they put on.

2   That's just my thought.  That's what I have to say on

3   sequencing.

4           **THE COURT:**  Sure.

5           **MR. BECK:**  Your Honor, they have actually asked for

6   something a bit different from what Mark just indicated.  This

7   is their first page of their brief on this.  You can see here

8   that they say, "Plaintiff has requested that his designations

9   of witnesses be played first, followed by Merck's

10  designations," then they go on to say, "so that the jury can

11  understand which party is eliciting a particular testimony from

12  the witness."  They go on to say that everything should be

13  played separately and that -- where Mark said it's been

14  suggested that the jury be told who designated each question

15  and answer and he said that doesn't make any sense, I agree

16  with that, but it was in fact his suggestion, not ours.

17          Now, in terms of the basic idea about them

18  playing their designations first and then us playing our

19  designations, No. 1, Your Honor resolved this in <u>Irvin</u>, and we

20  are revisiting this question for the third time now.  No. 2, we

21  believe that their proposal violates Federal Rule of Evidence

22  106 which says, "When a writing or recorded statement or part

23  thereof is introduced by a party, an adverse party may require

24  the introduction at that time of any other part or any other

25  writing or recorded statement which ought, in fairness, to be

1   considered contemporaneously with it."  They actually proposed
2   at one point that they play their designations during their
3   case and that we not play ours until our case, so we have a
4   wide separation in time under the proposal that they actually
5   made.

6                    We think we are entitled to have our excerpts
7   read at the same time as theirs in the sequence in which the
8   testimony was given.  We think that plaintiffs' suggested
9   approach would cause jury confusion.  Taken at its extreme,
10  where they say that they ought to be able to play what they
11  like from Topol, and then a week later we play our excerpts
12  from Topol during our case, the jury would be wondering, "Why
13  are we hearing from Dr. Topol twice when the live witnesses are
14  only testifying once?"  Again, taken at its extreme, how is the
15  jury supposed to remember how the testimony in the second week
16  of trial from Dr. Topol relates to it in the first week?  I'm
17  going to set aside that extreme because I assume that's not
18  going to fly.  Even the notion of taking it out of order would
19  end up misleading the jury in a very substantial way.  I want
20  to show one example, Your Honor.

21            THE COURT:  Now, as I understand the issue, there are
22  some depositions where you took them for either discovery or
23  perpetuation or whatever, but you took the deposition and you
24  started first and you cross-examined the person, then they
25  followed, and the issue is whether to flip it or whether to

1  keep it in that sequence.

2         **MR. BECK:**  Let me give you an example of why that

3  would be unfair to flip it.  This is from --

4         **THE COURT:**  I understand the issue.  This is where I

5  see us going.  In the best of all possible worlds, you like to

6  take a deposition for discovery, and then you like to relax a

7  moment and spend a week or so thinking about it and then go

8  back and take a perpetuation deposition.  That's what we all

9  like to do.  Sometimes you can't do that.  When you see that

10  you want to perpetuate a deposition and it's noticed by your

11  opponent, the way to do it is to take the noticed deposition as

12  a discovery deposition, you ask whatever questions you need to

13  ask in that discovery deposition to cure it or to neutralize it

14  or whatever you need to do, then you get a cup of coffee while

15  everybody is there and then you go into the perpetuation and

16  you flip it.  You take the witness under perpetuation and then

17  they do the cross.  That's really what needs to be done in

18  these things.  If it's not done that way, then I don't have any

19  choice except playing the deposition the way it was taken.

20         Now, if I do that, I'll explain it to the jury.

21  I'll say, "Members of the Jury, you know from having sat

22  through a day or two of this that we are on the plaintiffs'

23  case and they get to call the witnesses.  Oftentimes a

24  deposition is used in lieu of testimony.  Oftentimes it is

25  noticed by the other side.  That's what's happened in this

1    particular case.  We are going to start with the other side,

2    but know that it's the defendants asking the questions.  They

3    may well be leading questions.  That's okay.  It's the

4    defendant's cross.  We are going to play it that way, and then

5    we are going to end up with the plaintiffs' portion.  Please

6    keep that in mind when we play the deposition."

7                    That's the best way of doing it.  It's really

8    the only way of doing it when I'm confronted with that

9    situation.  If I don't do that, I've seen and you've seen

10   depositions where, when you flip it, it doesn't make any sense

11   at all and it leads to more confusion than playing it the way

12   it came out with my explanation to the jury.  That's the best I

13   can do for you all, as I see it, so that's going to be my

14   ruling.

15               MR. BECK:  Thank you, Your Honor.  Do we need to talk

16   about Topol?

17               MR. GOLDMAN:  I'll try to be quick on Topol.  I know

18   you are familiar with him.

19               THE COURT:  I am.  I'm not going to be ruling on that

20   because I do want to study the deposition again, but just give

21   me your concerns.

22               MR. GOLDMAN:  Can I hand Your Honor just a couple

23   things?

24               THE COURT:  Sure.

25               MR. GOLDMAN:  What I have handed you, Judge, are two

1    exhibits from Dr. Topol's deposition, Exhibits 6 and 7, and

2    then after that are excerpts from Dr. Topol's deposition that

3    we are particularly concerned about.  We stand by all the

4    objections we have made for Dr. Topol, but for purposes of the

5    hearing today we wanted to focus on some specific ones that we

6    think, if you take aim in this case, that you will agree.  Even

7    though some of this was admitted in Plunkett 1 when you were

8    hip-shooting a little bit more, hopefully you will take aim

9    here and agree with us.

10              THE COURT:  Okay.

11         MR. GOLDMAN:  Let me start with Exhibit 6 and 7 and

12   then the testimony about it.  Exhibit 6 is an internal Merck

13   E-mail and Exhibit 7 is also an internal Merck E-mail.  Both

14   attach comments that Merck made internally to a manuscript of

15   the JAMA article that Dr. Topol published in August of 2001.

16   Dr. Topol published this article in JAMA in August of 2001.  He

17   sends Merck a copy of the manuscript.  Merck does some internal

18   comments, sends some comments to Dr. Topol, but not these.

19   Okay?

20              THE COURT:  Okay.

21         MR. GOLDMAN:  Mr. Kline then asks Dr. Topol about

22   these comments that he has never seen, that never made their

23   way into JAMA.  You can see from Dr. Topol's expression on his

24   face and the leading questions how inappropriate this line of

25   questioning is.

1        THE COURT:  Right.

2        MR. GOLDMAN:  If I can just play some quick clips of

3    this?

4        THE COURT:  I remember.  He seemed embarrassed and

5    then angry.

6        MR. GOLDMAN:  Yes.

7        THE COURT:  That's the first time that he has seen

8    this.

9        MR. GOLDMAN:  Correct.

10       (WHEREUPON, the video was presented.)

11       MR. GOLDMAN:  I can stop it here if you get the

12   point.

13       THE COURT:  Yes, I got it.  The plaintiffs would take

14   the position that this shows what Merck knew, when they knew

15   it, and how they reacted to it, and it goes to consistently

16   show what they did to neutralize the doctors and fits into

17   their part of the case.  That's what they would say.  How do

18   you respond to it?

19       MR. GOLDMAN:  Well, it's one thing for the plaintiffs

20   to cross-examine Dr. Reicin on comments she made when she

21   testifies here and ask whether that's appropriate and try to

22   suggest to the jury that it's not, but Dr. Topol's personal

23   views that have absolutely nothing to do with any material fact

24   in this case and whether he thinks Merck's comments are amazing

25   or working over a paper is somehow inappropriate, that doesn't

1   make it so.  He doesn't have expertise to make that judgment,

2   it is improper under Rule 702, and he is the wrong witness to

3   be testifying about documents he has never seen and conduct he

4   never knew about until he was led by Dr. Kline.

5          THE COURT:  I got it.

6          MR. GOLDMAN:  The next area, Judge, has to do with

7   Merck's state of mind, and this will be quick.

8          (WHEREUPON, the video was presented.)

9          MR. GOLDMAN:  Now, that is so problematic, I can't

10  even describe how problematic that is.  First of all, he is

11  being asked in a leading fashion to talk about what was known

12  to Merck, and then he makes up, without any foundation, the

13  fact that he claims Merck was aware of a 760 percent increase

14  in risk in a study that he doesn't even identify.  So here he

15  is talking about Merck's state of mind.  He has no foundation

16  for it, and it's irrelevant what Dr. Topol has to say about

17  what he thinks Merck knew.

18         THE COURT:  I understand.  When I was practicing, I

19  always recognized that there were, what is it, 1103 articles.

20  1103 is the end of the articles of evidence.  I always wanted

21  1104, which was an "ouch" objection.  I kept looking for that

22  and I couldn't find it.  That's the issue that you have to

23  confront, whether or not this is 1104.

24         MR. GOLDMAN:  It's not the "ouch" objection.

25         THE COURT:  Okay.

1       **MR. GOLDMAN:**  It's inappropriate because it lacks

2    foundation and it's inappropriate under 702.

3           **THE COURT:**  All right.  Let me hear from your

4    opponent.

5           **MR. BIRCHFIELD:**  Your Honor, first of all, in dealing

6    with the Topol deposition and what was played at trial, it was

7    not a matter of the Court being put in a position to shoot from

8    the hip.  If you will remember back to Houston, this was a

9    critical issue at trial.  You made a ruling on the eve of trial

10   that we would be allowed to play the deposition.  We got the

11   deposition cuts to the defense and submitted it to the Court.

12   We did not play Dr. Topol's deposition until I believe it was

13   Saturday.  This was not something where you were shooting from

14   the hip.

15          **THE COURT:**  I was working at night on that one.  I

16   remember.

17          **MR. BIRCHFIELD:**  So not only has the Topol deposition

18   been considered in Irvin 1, it also was considered in Irvin 2.

19   These issues that have been raised today are issues that have

20   been raised before.  They raised two primary points:  One, they

21   say that you should exclude everything that postdates the

22   relevant time period.  In the Irvin case, Dicky Irvin's death

23   was in May of 2001.  In this case, Mr. Barnett had a heart

24   attack in September of 2002 and was on the drug until right

25   before the drug was pulled off.  When looking at issues that

1   predate the injury, the deposition should be expanded on that

2   concept, not narrowed.

3          THE COURT:  The issue there -- and it's a difficult

4   issue in this particular case because, frankly, the stuff that

5   comes out after has to do with what existed before.  It's like

6   an archeologist finds a mummy of 3,000 years ago and says this

7   is what they found.  It's really not something that they are

8   testifying to about 2005; it's something that happened in the

9   7th Century B.C.  The fact that they found it in 2005 may

10  just be happenstance, and that's the problem that I see in the

11  case.  Now, there's some instances where, you know, they find

12  sand that's 2005 as opposed to 7th Century B.C.  Well, that may

13  not come in in evidence because it has nothing to do with what

14  happened in 7th Century B.C.  That's what I have to do in

15  this type situation.

16         MR. BIRCHFIELD:  Exactly.  In the matters that they

17  have raised saying that it predates the injury, there are no

18  instances where it's something that occurred afterwards.

19         THE COURT:  Right.

20         MR. BIRCHFIELD:  It involves studies or his analysis

21  of studies that took place either prior to the approval of the

22  drug -- certainly prior to Mr. Barnett's heart attack.

23              In regards to the article, this is Dr. Topol's

24  manuscript.  It is his article that's being published.  What we

25  have here are Merck's scientists coming in and making edits,

1    showing their attempt to soften or minimize the impact of what

2    he is telling the scientific community here.  It is certainly

3    something that is relevant.  He should be able to see what

4    Merck and Merck's scientists are doing.

5            We saw in the clip here or in a portion of this

6    manuscript where Merck scientists are proposing that they flip

7    the data, as they did when they published the VIGOR results.

8    Instead of publishing the relative risk is a 5.0, they propose

9    we flip the data, show it as a .2.  That is something that is

10   significant and it takes the expertise of a premier

11   cardiologist to explain that to the jury.

12           Mr. Goldman's argument and Mr. Beck's argument

13   to the Court yesterday I think really gets to the point of what

14   they are after here.  They want Dr. Reicin to take the stand

15   and say, "We acted appropriately."  They don't want us to put

16   on any testimony saying that they did bad, that they violated

17   any scientific standards, any standards that are appropriate

18   for a pharmaceutical company.  Mr. Beck said that should be

19   left to the plaintiffs' lawyers to argue.  That's the position

20   here.  He is highly qualified, and the testimony that they have

21   cited is appropriate.  It certainly does not postdate to the

22   relevant time period, Your Honor.

23           **THE COURT:**  I understand the issue.  Let me look over

24   Topol again.  I understand your position.

25           **MR. GOLDMAN:**  There are a couple more points.  I

1  thought you wanted to hear from Mr. Birchfield, so I shut it

2  down, but I have a few more areas, Judge.

3              THE COURT:  Sure.  Okay.

4              MR. GOLDMAN:  Just briefly, in response to what

5  Mr. Birchfield just said on the point about you need to be an

6  expert to interpret "flip the data," he didn't apply any

7  expertise at all.  He just acted disgusted with what Merck

8  never even did, never passed on the comments.  It's hardly

9  scientific misconduct to have some ideas internally that you

10  don't even pass on to a scientist that nobody ever knows about.

11             Throughout the deposition, this supposed

12  independent expert witness was repeatedly led by Mr. Kline, and

13  here's an example of two questions where he was led.  This is

14  really important because the answer is a little bit different

15  from the question, but what the jury will remember is the

16  question that Mr. Kline is asking.

17             THE COURT:  Where is that?

18             MR. GOLDMAN:  This is page 151.  I'm going to start

19  over so you can hear that question, sir.

20             THE COURT:  151, 8.

21             MR. GOLDMAN:  151, 8, right.

22             (WHEREUPON, the video was presented.)

23             MR. GOLDMAN:  Judge, there's so many problems with

24  that.  The first is that it was leading.  "Merck took after

25  you, sir?"  He could have asked the question the right way,

1    which was --

2          THE COURT:  "What did they do?"

3          MR. GOLDMAN:  "What did they do after you published

4    the article?"  "Did they go about trashing Jüni?"  Not only is

5    it leading, but it consists of hearsay and it lacks foundation.

6    He is talking about doctors complaining and what people said

7    and what Jüni said.  It's leading.  It's hearsay.  It lacks

8    foundation.  It's inappropriate under Rule 702.

9               You might remember, Judge, that in _Plunkett 1_ --

10   and let me just respond quickly to what Mr. Birchfield said

11   about you reviewing these issues in _Plunkett 1_ and _Plunkett 2_.

12   Your Honor has invited us on several occasions to come back to

13   you if we have particular questions or issues with the previous

14   rulings.

15         THE COURT:  Yes, both sides.

16         MR. GOLDMAN:  You demonstrated in _Plunkett 2_ that

17   some of the testimony in _Plunkett 1_ shouldn't have been

18   admitted.

19         THE COURT:  Right.

20         MR. GOLDMAN:  I could go through an example of that,

21   but it's wrong to say just because you admitted testimony in --

22         THE COURT:  I agree with that.

23         MR. GOLDMAN:  Okay.

24         THE COURT:  But each side takes that position.  When

25   you are in favor of my ruling, you call it to my attention and

1    say I have already decided it, no sense in looking at it again.

2    When he says it, they do the same.  I understand the issue.  I

3    do the best I can, and I review it for you and I make my call.

4                MR. GOLDMAN:  Here is the last question concerning

5    leading, and then I have some other reasons why this is

6    inadmissible.  This is page 221, Your Honor, line 22.

7                (WHEREUPON, the video was presented.)

8                MR. GOLDMAN:  So the question starts off by saying,

9    "My purpose is to go through the criticisms of VIGOR and what

10   Merck did that you think constitutes scientific misconduct."

11   That's a leading question.  He didn't ask the open-end

12   question, "What did you think about Merck's conduct," as if

13   that would be relevant.

14               The reason it's also inadmissible, besides being

15   leading, Judge, is this portion of Dr. Topol was played in

16   Plunkett 1 before Dr. Curfman's testimony was ever played.

17   You'll remember Dr. Curfman didn't get played in Plunkett 1,

18   but got played in Plunkett 2.  Here all Dr. Topol is doing is

19   saying the same thing that Dr. Curfman says.  Under 403, it's

20   cumulative.  You can hear it from the horse's mouth by having

21   Dr. Curfman testify by deposition.  You don't need Dr. Topol

22   saying the same thing again and expressing his views that Merck

23   and the *New England Journal of Medicine* publication was somehow

24   flawed or invalid the way it was presented.

25               Finally, Judge -- actually, I'm only going to

1   play the question and not bother you with the answer.  This is

2   on page 569.  It's in Mr. Kline's redirect.  I'm only going to

3   play the question and not bother you with the answer at

4   line 19.

5          (WHEREUPON, the video was presented.)

6          MR. GOLDMAN:  He was not only saying in his question

7   that I was challenging the witness on cross, but he raps in

8   that Merck challenges everybody.  Then, finally, on a real

9   substantive matter, too, he testified that in his view Merck's

10  label for Vioxx was inadequate, both the original label and the

11  April 2002 label.  He later conceded that he is not an excerpt

12  in warnings, he's not an expert in labeling.  The plaintiffs

13  will have other witnesses here at trial who supposedly have

14  that expertise and they will testify to that, but let me just

15  show you the clips real quick, only when he admitted where he

16  was not an expert.

17         (WHEREUPON, the video was presented.)

18         MR. GOLDMAN:  That's all I have on Dr. Topol,

19  Your Honor.

20         THE COURT:  Okay.  Thank you.

21         MR. BIRCHFIELD:  Your Honor, we are not offering

22  Dr. Topol as an expert on labeling to say, you know, what font

23  size and what font type and what colors must be used in

24  labeling or regulations or anything, but he is certainly

25  qualified to review a label for cardiovascular risks, compare

1    it to his knowledge of the studies and his understanding of the

2    drug, and to say whether or not that adequately advises and

3    apprises doctors of the known cardiovascular risk of the drug.

4    That's what he is doing here.  In regards to the last clip that

5    Mr. Goldman played, we'll agree just to strike that.  That

6    sentence where he says, "When he was challenging you like Merck

7    challenges everyone," we can strike that last part.

8                    In regards to Dr. Topol's testimony about what

9    Merck did in response to his publication and how they responded

10   when scientists challenged the safety of Vioxx, that is highly

11   pertinent testimony.  It is consistent with what we see from

12   Merck's own documents that have come out through their

13   marketing campaign and how they are tracking the information,

14   how they are trying to drown out Dr. Topol.  He has firsthand

15   knowledge of what they did in response to his publication, and

16   that is testimony that the jury needs to hear.

17                   Merck is coming out and saying, "Look, we got

18   everything out in the public, and we have published everything

19   and we told everybody what was going on here."  Dr. Topol is in

20   a unique position because he was publishing a study that raised

21   safety concerns about Vioxx, and he experienced firsthand how

22   Merck responded to that.

23                   In the testimony that was played for the Court,

24   he is talking about published correspondence through a medical

25   journal, the *Lancet*, about the attacks that were launched

1   against him, and he should be able to provide that testimony to
2   the Court.  Each of these segments are segments that the Court
3   reviewed in Irvin 1 and Irvin 2.

4                THE COURT:  Have you marked the transcripts?

5                MR. GOLDMAN:  We have.

6                THE COURT:  I haven't read that transcript, but I
7   will look it over.

8                MR. GOLDMAN:  Okay.  Just one follow-up point to what
9   Mr. Birchfield said:  Dr. Topol didn't just talk about, in
10  response to a leading question, what he thinks Merck did in
11  response to his article; he talked about what Merck allegedly
12  did in response to everybody.

13               MR. BIRCHFIELD:  But, Your Honor, Dr. Topol was
14  tracking this issue.  He was following what was going on in the
15  medical journals and he was highly attune to this issue, and so
16  he was in a position to observe what was going on and how they
17  responded.

18               THE COURT:  I got it.

19               MR. GOLDMAN:  My last word on this, Judge:  It was
20  plain hearsay and he lacks foundation.  It wasn't laid in the
21  deposition whether he was tracking it or not.  The plaintiffs
22  have the burden of establishing the foundation that establishes
23  he has the personal knowledge to opine on this.

24               THE COURT:  Okay.  Got it.  Let's take a 10-minute
25  break, and then we will come back and talk about the Pretrial

1    Order.  What's the plane situation, flying out of here?

2           **MR. ROBINSON:**  Your Honor, I have to leave here at

3    about five minutes to 11:00.

4           **THE COURT:**  Let's take a quick 10-minute break and

5    come back.  Andy, will you be able to handle the pretrial if he

6    has to leave?

7           **MR. BIRCHFIELD:**  Yes, Your Honor.

8           **THE COURT:**  All right.  The Court will stand in

9    recess for 10 minutes.

10          **THE DEPUTY CLERK:**  Everyone rise.

11                              * * *

12                          <u>CERTIFICATE</u>

13          I, Toni Doyle Tusa, CCR, FCRR, Official Court

14   Reporter for the United States District Court, Eastern District

15   of Louisiana, do hereby certify that the foregoing is a true

16   and correct transcript, to the best of my ability and

17   understanding, from the record of the proceedings in the

18   above-entitled and numbered matter.

19

20

21                            _____
                              Toni Doyle Tusa, CCR, FCRR
22                            Official Court Reporter

23

24

25