# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT LOUISIANA

In re: **VIOXX PRODUCTS LIABILITY LITIGATION**,

**This Document Relates To All Cases**

**MDL Docket No. 1657**

**SECTION L**
**JUDGE FALLON**
**MAGISTRATE JUDGE KNOWLES**

### MEMORANDUM IN SUPPORT OF CERTAIN PLAINTIFFS' AND THEIR COUNSELS' MOTION FOR DECLARATORY JUDGMENT THAT CERTAIN PROVISIONS OF THE SETTLEMENT AGREEMENT ARE UNENFORCEABLE

Carey & Danis, LLC, The Lowe Law Firm, Schaeffer & Lamere, and Evan Buxner as of counsel for the Walther Glenn Law Firm, and their clients ("Movants") on behalf of approximately 2600 plaintiffs (of that 305 were originally filed in the state of Illinois and nearly 1000 were originally filed in the state of Missouri) who have cases pending in this Court move for a Declaratory Judgment that certain provisions of the settlement agreement be held unenforceable and severed from the settlement agreement.

Movants file this motion on short notice because deadlines for complying with the terms of the Master Settlement Agreement (MSA) are fast approaching. If the settlement is to take effect, tens of thousands of claimants or their lawyers must file registration affidavits by January 15, 2008, submit completed enrollment documents including signed releases by March 1, 2008, and submit claims packages with supporting medical records by July 1, 2008.

Movants request the following specific relief:

-1-

1.      A declaration that the Settlement Agreement empowers the Court to modify provisions that are prohibited or unenforceable because they conflict with state bar rules in Missouri, Illinois and other states;

2.      A declaration that § 1.2.8.1 is prohibited and unenforceable under the state bar rules of all states because it prevents lawyers from giving clients the benefit of their independent professional judgment and candid advice, as required by Rule 2.1 of the Model Rules of Professional Conduct, as well as the laws of Missouri, Illinois and other states where Vioxx claims are filed;

3.      A declaration that § 1.2.8.2 is prohibited and unenforceable under the state bar rules of all states because it impermissibly restricts the right to practice law, in violation of Rule 5.6 of the Model Rules of Professional Conduct, as well as the laws of Missouri, Illinois and other states where Vioxx claims are filed;

4.      To set a date certain by which final settlement payments shall be made and/or make other similar equitable provisions;

5.      To declare that notwithstanding any provision of the Settlement Agreement purporting to require an assessment of "up to 8%," that as to counsel that entered contracts in compliance with PTO 19, those contracts shall be honored, binding, and controlling as to any assessment, and that legal work performed in Illinois state court cases be specifically included as eligible for compensation for common benefit work.

## I.      INTRODUCTION AND PROCEDURAL BACKGROUND

On November 9, 2007, Merck and Negotiating Plaintiffs' Counsel (NPC) announced in open court a Settlement Agreement that would create a program to resolve the vast majority of VIOXX® cases. Later that day, the Court entered Pretrial Order No. 31 (Registration of Claims) (document 12965) adopting and implementing the Settlement Agreement.

## II.     THE SETTLEMENT AGREEMENT EMPOWERS THE COURT TO MODIFY PROVISIONS WHICH ARE "PROHIBITED OR UNENFORCEABLE"

Section 16.4.2 of the Settlement Agreement governs the treatment and effect of

provisions which are "prohibited or unenforceable to any extent or in any particular context." It states, *inter alia*, that the invalidity of any provision "shall not invalidate any other provision of this agreement." It also states that "if the Chief Administrator … determines that any provision of this Agreement is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable, the Chief Administrator … shall have the power to, and shall, [] modify such provision for the purposes of such proceeding … to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding." Finally, § 16.4.2 obligates Merck and the NPC to negotiate in good faith to resolve problems created by invalid provisions.

Normally, a court has no power to modify the terms of a settlement agreement. For example, in a class action, a court may only approve a settlement as written or reject it. Evans v. Jeff D., 475 U.S. 717; 106 S. Ct. 1531; 89 L. Ed. 2d 747 (1986). This settlement is different. Merck and the NPC have authorized the Court to modify invalid provisions for the purpose of facilitating their enforcement, subject to the condition that the modification be minimal, an undefined term that appears to express the hope that any modification will be as fully in keeping with the spirit of the Settlement Agreement as possible.

## III. THE SETTLEMENT AGREEMENT IS "PROHIBITED OR UNENFORCEABLE" IN ALL STATES BECAUSE IT PREVENTS ATTORNEYS FROM GIVING CLIENTS THEIR INDEPENDENT PROFESSIONAL ADVICE

By entering into the Settlement Agreement and submitting it to this Court, Merck extended a settlement offer to all Eligible Claimants. In keeping with state bar rules in effect in all jurisdictions, counsel must communicate Merck's offer to their clients, explain its terms, and

offer advice regarding whether the settlement is in their best interest.  Section 1.2.8.1 of the Settlement Agreement prevents lawyers from performing the last service, and, therefore prohibited or unenforceable under the law of all 50 states.

To understand this, one must first see that § 1.2.2.1 requires Eligible Claimants to have Enrollment Forms submitted by their Counsel.  Section 1.2.4 then states that by submitting an Enrollment Form, a lawyer becomes Enrolling Counsel and agrees to be bound by all of the terms and conditions of the Settlement Agreement.  By enrolling a single client in the settlement, then, a lawyer incurs the obligations and responsibilities of the Settlement Agreement.

Section 1.2.8.1 of the Settlement Agreement sets out one of these responsibilities.  It requires each Enrolling Counsel to advise 100% of the lawyer's eligible clients to participate in the Program and to affirm that the lawyer has done so in the Enrollment Form.  No states' law allows a lawyer to make a contractual commitment like this.  Rule 2.1 of the ABA Model Rules of Professional Responsibility, a version of which is in force in every jurisdiction, requires every lawyer to give every client the benefit of the lawyer's independent professional judgment and to render candid advice.  The Restatement (Third) of the Law Governing Lawyers also recognizes this duty.  The essence of independent professional judgment is that each client must be counseled accordingly. As the ABA comment to Rule 2.1 puts it: "A client is entitled to straightforward advice expressing the lawyer's honest assessment." ABA Annotated Model Rules of Professional Conduct, Rule 2.1, Comment [1] (Fifth Ed.).

Indeed, in Illinois, which has adopted this ABA Model Rule, Rule 2.1 provides:   "In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other

considerations, such as moral, economic, social and political factors that may be relevant to the client's situation." 134 Ill. 2d R. 2.1 (Illinois Rules of Professional Conduct); see also Horwitz v. Holabird & Root, 212 Ill. 2d 1, 16 (Ill. 2004) (citing 134 Ill. 2d R. 2.1) ("in representing a client, Rule 2.1 mandates that a lawyer exercise independent professional judgment).

Moreover, the attorney-client relationship is a fiduciary relationship. See, e.g., In re Imming, 131 Ill. 2d 239, 252-53, 545 N.E.2d 715, 137 Ill. Dec. 62 (1989); In re Schuyler, 91 Ill. 2d 6, 11, 434 N.E.2d 1137, 61 Ill. Dec. 540 (1982). As fiduciaries, attorneys owe to their clients "the basic obligations of agency: loyalty and obedience." Restatement (Second) of Agency § 14N, Comment a, at 80 (1958). Horwitz v. Holabird & Root, 212 Ill. 2d 1, 9 (Ill. 2004).

Furthermore, Missouri law has as well adopted the ABA Model Rules of Professional Conduct as its own rules to govern the ethics and professional responsibility of Missouri attorneys. State ex rel. Horn v. Ray, 138 S.W.3d 729, 731 (Mo. App. 2002). Missouri Rules of Professional Conduct [hereinafter M.R.P.C.] Rule 2.1 provides: "In representing a client, a lawyer shall exercise independent professional judgment and render candid advice." In re Howard, 912 S.W.2d 61, 62 (Mo. 1995). Indeed, Mo. Sup. Ct. R. 4-1.4 requires a lawyer to keep a client reasonably informed about the status of a matter, to promptly comply with reasonable requests for information, and to explain matters to the extent necessary to allow the client to make informed decisions regarding the representation. In re Crews, 159 S.W.3d 355, 359 (Mo. 2005). The relation between attorney and client is highly fiduciary and of a very delicate, exacting and confidential character, requiring a very high degree of fidelity and good faith on attorney's part." In re Oliver, 365 Mo. 656, 285 S.W.2d 648, 655 (Mo. banc. 1956). In re Howard, 912 S.W.2d 61, 62 (Mo. 1995)

In an important respect, the duty to exercise independent judgment is unique. It cannot be waived or qualified.  It is unlike the duty to avoid interest conflicts, which clients can generally waive with disclosure and informed consent.  It goes without saying that a lawyer cannot waive this duty unilaterally either.  Section 1.2.8.1 of the Settlement Agreement appears to compromise the duty to exercise independent judgment by requiring a lawyer who would enroll even a single client in the Program to recommend participation to all clients.

All states' bar rules prohibit lawyers from allowing third parties to guide their judgment. See Restatement (Third) of the Law Governing Lawyers § 134, Comment d (2007) ("The principle that a lawyer must exercise independent professional judgment on behalf of the client [] is reflected in the requirement of the lawyer codes that no third person control or direct a lawyer's professional judgment on behalf of a client."). Obviously, the Settlement Agreement, which allows Merck to dictate the advice a lawyer will offer, is prohibited in all states.

As explained in Part II, the Settlement Agreement empowers the Court to modify provisions that are prohibited or unenforceable. Because § 1.2.8.1 is improper, the Court can correct the problems it creates by modifying it. At the same time, the Court can also protect Merck's legitimate interest in knowing (1) how many Eligible Claimants are participating in the Program and (2) that plaintiffs' attorneys are not undermining the intent of the program.  The Enrollment documents already accomplish this (1) by requiring Enrolling Counsel to report the identities of any clients Enrolling Counsel knows or believes will not participate in the Program. The Court can accomplish (2) by replacing the existing language in § 1.2.8.1 with language requiring Enrolling Counsel to use his or her best efforts to ensure participation by all Eligible Claimants for whom, in counsel's opinion, the Program affords the best option.

Finally, the Court should insert a reference to Model Rule 2.1 in Section 1.2.8.2 of the

Agreement.  That section already references Model Rules 1.16 and 5.6; adding Rule 2.1 would

reinforce that Enrolling Counsel is not abdicating responsibility to exercise independent

professional judgment on behalf of each of his clients.

## IV.   THE WITHDRAWAL REQUIREMENT IN § 1.2.8.2 OF THE SETTLEMENT AGREEMENT IS PROHIBITED OR UNENFORCEABLE IN ALL STATES BECAUSE IT IMPOSES AN IMPERMISSIBLE RESTRICTION ON THE RIGHT TO PRACTICE LAW

Model Rule 5.6 (Restrictions on Right to Practice) forbids a lawyer from "offering or

making: … an agreement in which a restriction on the lawyer's right to practice is part of the

settlement of a controversy between private parties." Section 13(2) of the Restatement (Third) of

the Law Governing Lawyers states the prohibition even more plainly: "In settling a client claim, a

lawyer may not offer or enter into an agreement that restricts the right of the lawyer to practice

law, including the right to represent or take particular action on behalf of other clients."

Comment b adds that settlement agreements that violate § 13(2) "are void and unenforceable."

All states' bar rules contain this prohibition.  For example, in Illinois,

Rule 5.6 provides:

Restrictions on Right to Practice
A lawyer shall not participate in offering or making:

(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of a relationship, except an agreement concerning either benefits upon retirement or an agreement pursuant to the provisions of Rule 1.17; or

(b) **an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties**.

134 Ill. 2d R. 5.6 (emphasis added).

Rule 5.6 of the Code, identical to its counterpart in the 1983 ABA Model Rules of Professional Conduct, was adopted by the Illinois supreme court on August 1, 1990.  Stevens v. Rooks Pitts & Poust, 289 Ill. App. 3d 991, 997 (Ill. App. Ct. 1997).  Rule 5.6 "is designed both to afford clients greater freedom in choosing counsel and to protect lawyers from onerous conditions that would unduly limit their mobility."  Mohanty v. St. John Heart Clinic, S.C., 225 Ill. 2d 52, 94 (Ill. 2006).

Likewise, in Missouri, RULE 4-5.6 provides:

RESTRICTIONS ON RIGHT TO PRACTICE

A lawyer shall not participate in offering or making:

(a) a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
**(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.**

RULE 4-5.6 (emphasis added); see also,  COMMENT, Rule 4-5.6(b) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client.

Rule 1.16, cited in the agreement, prohibits the blanket withdrawals mandated in the agreement.  A client's informed and conscientious decision to reject the settlement is not among the justifications given in the rule for withdrawal.  In addition, the fundamental protection imposed by the rule is that the withdrawal "can be accomplished without material adverse effect on the interests of the client." Rule 1.16 (b) (1).  By prohibiting the client's chosen counsel from continuing representation and requiring said counsel to "cause" all Enrolling Counsel to do the same, it is difficult to imagine how Rule 1.16 can not be violated.  In effect, every knowledgeable and experienced lawyer would be prohibited from continuing the representation of any client who

had good reason for rejecting the settlement.  Simply citing the rule cannot substitute for actual guidance on how this can be achieved ethically.

Advisory opinions issued by the ABA and state bar committees uniformly enforce this prohibition. They also reject strategic attempts to circumvent it.  For example, ABA Formal Opinion 93-371 examined a restriction on the right of plaintiffs' counsel to represent present clients and future claimants against a defendant that would have been imposed as part of a global settlement of some of counsel's existing clients' claims. It found that the proposed restriction could not be demanded or accepted without violating Model Rule 5.6(b).

Section 1.2.8.2 of the Settlement Agreement restricts the right to practice in ways that are plainly improper.  First, it requires Enrolling Counsel to withdraw from representing any client who fails to submit an Enrollment Form. This contravenes the Restatement (Third) of the Law Governing Lawyers, which prohibits a lawyer from "offer[ing] or enter[ing] into an agreement that restricts … [a lawyer's] right to represent or take particular action on behalf of other clients." Second, § 1.2.8.2 also requires Enrolling Counsel to forego any fee interest in cases involving clients who decline to enroll in the Program.  Because all jurisdictions enforce the ban on practice restrictions zealously, Movants submit that all other jurisdictions would follow the ABA model rule on this point.

Finally, the last provision of § 1.2.8.2 appears to require Enrolling Counsel to interfere with contracts dissenting clients have with other attorneys. It states that Enrolling Counsel must "forego any Interest in such Eligible Claimant…." and cause "each other counsel with an Interest …to do the same."  It would be hard to imagine a plainer example of interference with a contract. Perhaps recognizing some of the difficulties § 1.2.8.2 creates, Merck and the NPC attempted to

avoid any ethical impropriety by stating in § 1.2.8 that "nothing in this Agreement is intended to operate as a 'restriction' on the right of any Claimant's counsel to practice law within the meaning of the equivalent to Rule 5.6(b) of the ABA Model Rules of Professional Conduct in any jurisdictions in which Claimant's Counsel practices or whose rules may otherwise apply."

This precatory language is insufficient. The parties' statement of intent does not change the fact: § 1.2.8.2 unlawfully restricts the right to practice in several respects if enforced as written, and the Court should issue a declaration to this effect. The precatory language is helpful, however, as it states the intent of the parties. The Settlement Agreement empowers the Court to modify an unenforceable provision in a manner that is consistent with the parties' intentions, as shown in Part II. Because neither Merck nor the NPC intended to violate Model Rule 5.6, the Court can accommodate § 1.2.8.2 to the requirements of Rule 5.6 without doing violence to their aims.

## V.   SECTION 1.2.9 OF THE SETTLEMENT AGREEMENT PERMITS A THIRDPARTY TO INTERFERE IN THE LAWYER-CLIENT RELATIONSHIP, IN VIOLATION OF PREVAILING LAW

Section 1.2.9 of the Settlement Agreement allows Merck to have the Chief Administrator determine whether participating counsel has failed to withdraw from representing a non-enrolling client as required by the Settlement Agreement. The Chief Administrator's decision is final, binding and non-appealable.

According to § 134 of the Restatement (Third) of the Law Governing Lawyers, this contractual mechanism is impermissible. Section 134(2) states that a lawyer may allow "someone other than the client" to direct "a lawyer's professional conduct on behalf of a client" if, among other things, "the client consents" after receiving adequate disclosure. To satisfy § 134,

then, an Enrolling Counsel could agree to § 1.2.9 of the Settlement Agreement – but only with a non-enrolling client's consent. Because there is no self-interested reason for a non-enrolling client to agree to this interference, a lawyer could not recommend this approach to a non-enrolling client.

The Court should therefore declare § 1.2.9 of the Settlement Agreement prohibited and unenforceable.

## VI. SECTION 4.3 OF THE SETTLEMENT AGREEMENT FAILS TO IMPOSE FIRM DEADLINES BY WHICH CLAIMANTS WILL RECEIVE FINAL PAYMENTS

Clients are guaranteed to ask two questions: (1) How much will I receive under the proposed settlement? and (2) When will I receive it? Unfortunately, Movants cannot answer either question in this case. Although the Settlement Agreement is replete with fairly aggressive deadlines by which claimants must submit required documents and information, there are no deadlines for Merck to make final payment or for the Claims Administrator to process the claims at a certain rate or by a date certain. Movants submit that these omissions will likely result in serious delays in finally resolving all claims.

Tens of thousands of claimants are required to file registration affidavits by January 15, 2008, to submit complete enrollment documents including signed releases by March 1, 2008 (fewer than three months from today) and to submit claims packages with supporting medical records by July 1, 2008. See Settlement Agreement §§ 1.1 - 1.3.3.

In contrast, the only payment milestones contained in the Settlement Agreement are those that pertain to the "Interim Settlement Payments" -- payment to claimants on a rolling basis of 40% of their estimated final payment amount.  See Settlement Agreement Sections 4.1.1 and

4.1.2. The interim payment deadlines are infirm and are subject to contingencies (primarily, the Claims Administrator's completion of certain reviews and estimates) and also potential delays even after the contingencies are fulfilled.

While Movants have no objections to these interim payments, even these deadlines are uncertain. For MI claims, the Interim Settlement Payment is to occur "promptly after the later of" (1) August 1, 2008 and (2) the date on which 2,500 qualifying claimants have been assessed "pre-special review points awards." See Settlement Agreement Section 4.1.1. Likewise, for IS claims, this payment occurs "promptly after the later of" (1) February 1, 2009 and (2) the date on which 2,500 qualifying claimants have been assessed "pre-special review points awards." See Settlement Agreement Section 4.1.2.

Even more concerning is the fact that "Final Settlement Payment" is not scheduled under the Settlement Agreement until "[a]fter (and only after):" (1) all qualifying claimants have completed the claims valuation process and all points awards have become final, (2) all possible fixed payments and extraordinary injury payments have been determined and (3) all audits have been completed. See Settlement Agreement Sections 4.3.1 and 4.3.2. There are two major problems presented by this approach, and each presents the potential for significant delays in payment.

First, there are absolutely no deadlines by which (1) - (3) must occur and no requirement that the Claims Administrator complete its review according to any set timetable or by any date certain. This omission presents obvious issues both in projecting when claimants will be paid and in enforcing claimants' rights to payment in the event delays become unreasonable.

Second, requiring all claimants to wait for final payment until all of the above events take

place injects a probability of extreme delay in the final payment process for the vast majority of claimants.  Hinging final payment on the completion of every single claim will result in delays in payment for a large group of otherwise completed claimants. The great majority of claimants with completed and reviewed claims will have final payment delayed extensively while the final review of a small number of problem claims drags on for many months or longer. No one gets anything more than the interim settlement payment until every award is final, all appeals have been exhausted, all extraordinary injury payments are finally determined and all audits are completed.  This is simply unreasonable.

In the course of presenting the terms of the Settlement Agreement to counsel representing claimants, Negotiating Plaintiffs' Counsel have held informational meetings throughout the country. Mr. Orran Brown, of Brown Greer PLC, the initial Claims Administrator (Settlement Agreement Section 6.1.2), was present at the settlement informational meeting in Houston.   Mr. Brown was asked for his best estimate as to when claims could be expected to reach final payment.  On MI cases, his estimate was completion by December 2009. On stroke cases, Mr. Brown was less certain but his estimate seemed to be February 2010 or later. Of course, these were only estimates and there are no safeguards in the Settlement Agreement to require that even this "final payment over a full two years from now" be completed on time.

Several potential remedies would alleviate the shortcomings in the Settlement Agreement.  One clear and much needed fix is the establishment of claims processing requirements (such as a fixed number of claims per month) and firm deadlines for both the interim and final payments.

In addition, a second interim payment of 80-90% can be scheduled at a reasonable time --

such as six months -- after the first interim payment. That way, claimants would be assured of receiving at least a majority of their funds by a date certain in the event that final payment is delayed.

Movants understand that completing this settlement process presents challenging logistical issues; however, without any deadlines or milestones and with final payment contingent on completion of every last claim, the potential for delay is obvious, significant and certain.  Movants submit that this is a problem that can and should be fixed before claimants are required  to enter this settlement process with no reasonable assurances of prompt payment. Moreover, addressing this issue up front may prevent having to address it down the road once it is apparent that the lack of a framework has resulted in unreasonable delay.

In conclusion, there are a number of upcoming deadlines in the Settlement Agreement for tens of thousands of claimants to provide required documents and information or suffer severe consequences.  In contrast, there are no deadlines for these same claimants to receive their final payments.  Movants respectfully submit that this is a flaw in the Settlement Agreement that will result in significant delays in resolving these claims once and for all.

For the reasons stated above, Movants request that the Court appoint a small working committee of plaintiffs' and defense counsel to meet with the Claims Administrator on an expedited basis and return as soon as possible to this Court with a proposal for addressing these issues -- a proposal that at a minimum contains reasonable and specific deadlines and claims processing requirements.

## VII. SECTION 9.2 OF THE SETTLEMENT AGREEMENT PURPORTS TO NULLIFY PRETRIAL ORDER 19 AND THE CONTRACTS ENTERED PURSUANT TO IT

517197 / 004128

-14-

On June 29, 2005, the VIOXX® MDL PSC filed its "Petition for an Order Securing an Equitable Allocation of Counsel Fees and Costs for MDL Administration and Common Benefit Work." The petition stated in part:

> The purpose of this motion is to seek an Order creating a "fund" consisting of the recoveries in the federal court cases and claim payments to plaintiffs in state courts that agree to coordination, from which the PSC and other attorneys performing 'common benefit work' for plaintiffs may obtain compensation for the benefits which they confer on plaintiffs.

(Motion at 6.)

The PSC requested that the court implement an assessment "effective immediately" that allowed counsel 90 days to choose to opt in for all of their clients (whether filed in federal or state court, subject to a tolling agreement, or unfiled, past, present or future). (Motion at 14.)  The PSC called this the "Full Participation Option" ("FPO"). The FPO would subject counsel's clients to an across-the-board assessment of all their cases but would be limited to a maximum of 2% for fees and 1% for costs of any recovery made.  Id.  Plaintiffs' counsel agreed on behalf of all their clients at the time they opted in all of their clients to paid 2 percent for fees and 1 percent for costs.

After the initial 90 day period, a more traditional assessment would be implemented, the "Traditional Assessment Option" ("TAO"). For the TAO, the fund created by the Court would sequester 6% of plaintiffs' recoveries in federal court and 4% of the plaintiffs' recoveries in cases pending in state courts which consent to coordination under such terms.

For counsel that did not choose the FPO or TAO, there was the "Limited Waiver Option" whereby all of counsel's federal cases would be assessed 6% with the agreement they would not

receive MDL work product unless promising not to use it in counsel's state cases. (Motion at 15.)

The PSC "recognize[d] the need to have voluntary cooperation of counsel in connection with their state court cases." (Petition at 14, n 6.) The "plan of sequestering funds is designed to facilitate state and federal coordination." (Petition at 15.) For the PSC, it was "imperative that the court immediately enter the form of [the proposed] order." "This will create an immediate incentive for counsel to participate in the MDL." Id.

The PSC presented its petition for an assessment order to the Court on July 19, 2005. The PSC outlined the three options. With respect to the Full Participation Option, it was stated, "[t]his option is designed to foster cooperation and coordination between the lawyers that are litigating cases in the MDL and federal courts and those that are in state court litigation." (Status Conference Transcript, July 19, 2005, at 21.) Further, it was stated that the proposal that the PSC submitted "is to show our commitment to the work product and to create a situation where there is not competition among the jurisdictions, but a spirit of cooperation." (Id. at 23.) This Court granted the petition and signed the requested form Pretrial Order No. 19 on August 4, 2005.  The form agreements, attached to PTO 19 as Exhibits A, B & C, were incorporated by reference and made a part of the order.  The original deadline to accept the full participation option agreements was November 2, 2005.  On November 2, 2005, the Plaintiffs' Steering Committee requested an extension of the deadline for counsel to submit a full participation option agreement to November 16, 2005. That request was granted the same day. Movants executed FPOs with the PSC.

On November 16, 2005, Motley Rice filed a Motion for Clarification of Pretrial Order No. 19 in which it sought clarification of the PSC work product definition.   On January 27,

2006, the Plaintiffs' Steering Committee filed a response entitled Plaintiffs' Steering Committee's Response and Opposition to Motley Rice, LLP's Motion for Clarification of Pretrial Order No. 19.  The PSC's response argued that the assessment agreements and accompanying order "were chosen for their precision, clarity, and effect." (Response at 1.)  The response reiterated that "PTO No. 19 provides a means to compensate and reimburse attorneys for services rendered and expenses incurred for MDL administration and common benefit." The PSC also recognized its "fiduciary obligation" and that it had "been charged by this Court to create a work-product that they must make available to federal litigants." (Response at 8, n 5.)  This is consistent with this Court's order that the PSC has the responsibilities to "[n]egotiate and enter into stipulations with Defendants regarding this litigation," and "[e]xplore, develop, and pursue all settlement options pertaining to any claim or portion thereof of any case filed in this litigation." (Pretrial Order No. 6 at 3).

On November 9, 2007, at the regularly scheduled monthly status conference, counsel for Merck and the PSC announced a proposed settlement agreement "that will encompass the great majority of cases in this proceeding as well as in the New Jersey proceeding, the California proceeding, and the Texas proceeding." (Monthly Status At 4).

Shortly following the status conference, the settlement documents were made available. Article 9 of the Settlement Agreement is entitled "Attorneys Fees" and § 9.2 is entitled "Common Benefit Fees and Reimbursement of Litigation Costs." It states:

> 9.2.1.   To insure that NPC, PSC, PEC, PLC, and common benefit attorneys (hereinafter referred to as "common benefit attorneys") are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement. Any sum paid as a common

benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement. The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.

Section 9.2.4 provides that this Court will be asked to appoint a committee of eight plaintiffs' counsel to an "Allocation Committee," which "shall include all members of the NPC and two additional plaintiffs' attorneys to be responsible for recommending to the Honorable Eldon E. Fallon the allocation of awards of attorneys' fees from the settlement fee and cost account."  Common benefit allocations are subject to the approval of this Court in consultation with Judge Chaney, Judge Higbee and Judge Wilson. Id.

On November 20, 2007, this Court issued "Pre-Trial Order No. 32 (Appointment of Allocation Committee)" and noted that it had authority to appoint the Allocation Committee members because of the Settlement Agreement (Para. 9.2.4) and "pursuant to this transferee Court's inherent authority over this multidistrict litigation." Order at 1.

Movants accepted the FPO in complete compliance with PTO 19.  The assessment agreements entered in accordance with, and made an enforceable part of, PTO 19 should be honored, binding and controlling with respect to any assessment on the cases of participating counsel.  Even more importantly, failure to enforce these agreements would create a terrible precedent. In any future mass or class action, the incentive would be not to enter agreements to cooperate and share common benefit work and fees because they are not going to be recognized anyway.  This would not be a desirable outcome. Movants request that the Court recognize the original agreements entered into as a part of PTO 19; they were rationally conceived, carefully negotiated, and adopted as an enforceable order of this Court.

## VIII.  THE LEGAL WORK PERFORMED IN ILLINOIS STATE COURT CASES BE SPECIFICALLY INCLUDED AS ELIGIBLE FOR COMPENSATION FOR "COMMON BENEFIT" WORK FOR SECTIONS 9.2.1 AND 9.2.4 OF THE VIOXX SETTLEMENT AGREEMENT

The undersigned plaintiffs' attorneys have cases involving 66 claimants in Illinois state court.  One of the Illinois cases pending in Madison County is Richard Donohoo v. Merck and Walgreens (Case No. 05-L-118).  The MDL monthly status meetings contained several references to that case being set for trial.  The case was set for trial at the end of October 2007 but, in the Summer of 2007, the VICTOR data was published.  Based on that, the experts that were designated had additional expert opinions which resulted in the case being continued to its current trial setting of April 7, 2008 so the experts could be re-deposed.  Plaintiffs' counsel are in the process of obtaining discovery schedules and trial settings for all of the Illinois state court cases when the settlement was announced on November 8, 2007.

The Donohoo case set for trial in Madison County, Illinois has been exhaustively worked up for trial.  The case-specific cardiologists that plaintiffs used were Dr. Alan Maniet from St. Louis and Dr. Gary Sander from New Orleans.  Plaintiffs also hired Dr. Lemuel Moye and other "generic" experts they planned to call live in the Donohoo case.  Plaintiffs have taken the depositions of Merck's experts Dr. Marks, Dr. Waymack, Dr. Cohen, Dr. Saltman, and Dr. Dilsazian, a nuclear radiologist hired by Merck.  Plaintiffs' counsel have also defended the depositions of the clients, as well as family and fact witnesses.  In addition, plaintiffs' counsel has taken the depositions of the treating doctors, prescribing doctors, and various Merck sales representatives.

Plaintiffs' attorneys have also actively been working up a retinal vein occlusion case in

Cook County which is the Auslander v. Merck case.  That case has a discovery scheduling order in place and is being worked up for trial, and plaintiffs' counsel were in the process of obtaining a trial date when the proposed settlement was announced.

With respect to the 66 cases pending in Illinois state court, Merck and the other defendants filed numerous motions to sever and motions to transfer.  As one might expect, plaintiffs' counsel spent thousands of hours researching, briefing and arguing Merck's various procedural and substantive motions.  Some of the rulings in plaintiffs' favor have been appealed by Merck in the Illinois appellate court system, and those appeals are still pending.  By and large, movants have been successful in keeping numerous Vioxx cases pending in Illinois.

Thus, in addition to the Donohoo case, movants have expended considerable time and resources in our state court cases.  This included not only the time and attention of numerous Carey & Danis attorneys and staff, but those of our co-counsel as well.

As should be evident, much of the "common benefit" work that movants have performed has been in the Donohoo case that we are still actively working up for trial, along with our other Illinois state court cases.  In movants' view, the considerable work that movants exclusively performed in various Illinois state court jurisdictions put considerable additional pressure on Merck to ultimately make a settlement offer in should be considered common benefit work and not excluded from reimbursement by 9.2.4. of the settlement agreement.

## CONCLUSION

For the reasons stated, Movants request that the Court modify the Settlement Agreement and to find that certain provisions are prohibited and unenforceable.

The Lowe Law Firm

By:   \s\  Jeffrey J. Lowe
        Jeffrey J. Lowe EDMo #104508
        Francis J. "Casey" Flynn
        Attorney for Plaintiffs
        8235 Forsyth, Suite 1100
        St. Louis, Missouri 63105
        (314) 678-3400
        Fax: (314) 678-3401

        John Carey
        Joseph P. Danis
        Sarah Hale
        CAREY & DANIS, LLC
        8235 Forsyth Boulevard, Suite 1100
        St. Louis MO 63105
        Telephone: 314-725-7700
        Facsimile: 314-721-0905

        T. Evan Schaeffer
        Andrea B. Lamere
        SCHAEFFER & LAMERE, P.C.
        5512 Godfrey Road
        Highway 67, Suite B
        Godfrey, IL 62035
        618-467-8200

        Evan Buxner
        Walther Glenn Law Offices
        1034 S. Brentwood Blvd., Suite 1300
        St. Louis, MO 63117
        314-725-9595
        Fax: 314-725-9597

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that the above and foregoing has been served on January 3, 2008 on Liaison Counsel, Phillip Wittmann and Russ Herman, by U. S. Mail and e-mail, and that the foregoing was electronically filed with the Clerk of Court of the United States District court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established.

         \s\  Jeffrey J. Lowe