1                          *I  N  D  E  X*

2   *Witnesses*:              *Direct*      *Cross*      *Redir*.      *Recross*

3      (None this date)

4

5

6

7

8   *Evidence*:                                        *Ident*.   *Evid*

9      (None this date)

10

11

12

13

14

15

16

17

18   *Argument/Summation*:

19   Ms. Paolicelli                                    4/19/23

20   Mr. Seeger                                        15/22

21

22

23   *Ruling/Order*:

24   The Court                                         36

25

1          (March 14, 2008.  Digital recording at Time Index

2          #1:28:33 as follows:)

3                THE COURT:  You can be seated.  Okay.  This

4    is petition in the Vioxx litigation, petition by

5    Healthcare Recoveries, Inc. for pre-action discovery

6    basically.  Counsel, do you want to put your

7    appearances on the record.

8                MS. PAOLICELLI:  For the petitioners, Diane

9    Paolicelli.

10               MR. SHAWN:  And Erik Shawn, Your Honor.

11               MS. PAOLICELLI:  Levy, Phillips & Konigsberg.

12   Would you like a card?

13               MR. SEEGER:  And for the Vioxx plaintiffs,

14   Chris Seeger, Seeger Weiss, and with me Jeff Grand.

15               MR. MAYER:  And for Merck Ted Mayer of Hughes

16   Hubbard Reed, and Charlie Cohen of Hughes Hubbard Reed.

17               THE COURT:  Okay.  Basically petitioner has

18   requested that the Court order the Vioxx plaintiffs'

19   counsel to provide to the attorneys for Healthcare

20   Recoveries, Inc. the names of all plaintiffs who — the

21   addresses of plaintiffs for the last twelve years,

22   their social security numbers, their insurance

23   information, and just general information about their

24   healthcare coverage.

25               MS. PAOLICELLI:  Your Honor, I think —

1          THE COURT:  Counselor, is there anything you

2     want to say to —

3          MS. PAOLICELLI:  Yeah.  I think that's a

4     little bid broader than what we asked for.

5          THE COURT:  Okay.

6          MS. PAOLICELLI:  So let me sort of lay it

7     out.  What we would like, Your Honor — and we're here

8     because we tried to get this in other ways, and it was

9     refused, and we set this all forth in our papers, and I

10    don't have to rehash the history unless Your Honor

11    wants me to.

12          But what we would like, Your Honor, and what

13    we really need or else our clients' claims, many of

14    them will just be lost, is the names and addresses of

15    the settling plaintiffs.  At this point — or the

16    enrolling plaintiffs.  At this point the enrollments

17    have been made, and there really is no need to get

18    every single plaintiff in the whole litigation.  So the

19    names and addresses of the settling plaintiffs, their

20    social security numbers — and by that I mean for the

21    plaintiffs and also for, principally we need the

22    injured party and the spouse because sometimes a plan

23    might be in the name of the spouse.

24          THE COURT:  Mmhmm.

25          MS. PAOLICELLI:  We would like, if possible,

1    the healthcare provider's name, if that's possible, and

2    the docket number of the case that the individual

3    brought where that's applicable.  And when I say the

4    names and addresses of the settlers, Your Honor, I'm

5    including in that not just the ones, the plaintiffs who

6    have brought suit, but also the plaintiffs whose cases

7    have been — the claimants who have tolled cases and who

8    are participating in the settlement; and those we have

9    absolutely no way of even, you know, guessing at what

10   the name is.

11          And so that is the relief.  It's really very

12   modest relief, Your Honor, because we're not, we're not

13   trying to get any confidential information.  We're not

14   trying to find out about, you know, the medical

15   conditions.  We don't want to know what they're saying

16   in their settlement, you know, papers about their

17   condition.  We just need the names, addresses, and

18   social security numbers in order to find out, to

19   identify the names of the individuals who my clients

20   have claims against.

21          This is not a fishing expedition.  Everybody

22   here knows that all of the plaintiffs in the Vioxx

23   personal injury litigation have had medical expenses

24   and that their health insurers have paid for those

25   expenses.  For the most part those are health insurance

 1    plans through employers that are governed by ERISA.

 2    There is a right under ERISA for the plan to be

 3    reimbursed.  Virtually all plans, especially nowadays

 4    after the *Sereboff* case from the Supreme Court in 2006,

 5    the plans all provide that in the event of a recovery

 6    from a tort feasor the plan is entitled to be

 7    reimbursed, and that entitlement has been upheld by

 8    *Sereboff*, by the Supreme Court in *Sereboff* I should

 9    say, and it's been held to be an equitable relief that

10    the insurer can obtain through ERISA, and those rights

11    exist against the fund.  If we cannot obtain the names

12    and addresses, the identities of the individuals, Your

13    Honor, and if that money is distributed before we

14    obtain that information, then our clients are in danger

15    of just losing their rights outright.  Because if the

16    money is distributed, if the plaintiffs have spent that

17    money, then at least under the *Sereboff* case and some

18    of its progeny those rights are lost.

19          So this is an absolutely critical and

20    emergent petition that we're making because we have a

21    right to bring a case against those plaintiffs, a case

22    under ERISA — and by the way, there may be other state

23    law claims as well or contractual claims as well.  They

24    have the right to bring it, but they can't, not because

25    they don't know what the claim is — this is not a

 1    fishing expedition.  We know exactly what the case is.

 2    Give us the social security number, and our clients

 3    will be able to figure out, you know, in fairly short

 4    order whether any of these individuals are, in fact,

 5    you know, beneficiaries that owe them obligations,

 6    number one; and they'll be able to figure out in very

 7    short order exactly what the claim is, because they

 8    have the plan documents, they have everything.  What

 9    they don't have is the identities precisely of who

10    among the group of plaintiffs are their beneficiaries.

11         And so by defendants' refusing — or I should

12    call them the plaintiffs and the defendant — refusing

13    to give us this information, Your Honor, they're

14    really, they're really playing "hide the pea."  We all

15    know it's there, but where is it?  And we're playing

16    hide the pea with a time clock going, because if we

17    don't get this information in a timely fashion, then

18    that money will be disbursed and that's the end of that

19    for our clients.

20         So this is quite an important petition that

21    we're bringing and one that was actually invited by Mr.

22    Seeger at the December conference.  If you'll recall,

23    Your Honor, I had actually sent a letter to the Court

24    inquiring, and Mr. Seeger said that he would not,

25    without a court order, divulge the social security

1    numbers.  So, so here we are.  And —

2              MR. SEEGER:  And I still don't want one.

3              MS. PAOLICELLI:  And we, of course, Your

4    Honor, would be pleased to into any confidentiality

5    order about those social security numbers and the

6    information that we, that we receive.  We'll give back

7    the rest of it.  We'll destroy it.  We'll follow

8    whatever confidentiality limitations that, you know,

9    the Court believes are necessary here; but I think that

10   there's certainly ample case law support, case law

11   supporting the position that we make here.

12             Now the petitioners in Merck have argued that

13   Rule 4:11 doesn't permit this kind of thing; and if

14   Your Honor would like me to address that, I will.

15             THE COURT:  Okay.

16             MS. PAOLICELLI:  Okay.  So 4:11, Your Honor,

17   is a rule designed to permit disclosure by a non-party

18   anticipating bringing suit and under circumstances

19   where there would be manifest injustice if they were

20   not permitted the information.

21             Now interestingly New Jersey's rule is a

22   little bit different than the federal rule.  New

23   Jersey's rule allows both for testimony, to preserve or

24   perpetuate the testimony of someone dying or leaving

25   the country, but it also provides for the inspection,

1   Your Honor, of records.  And in this case, Your Honor,

2   the information that we're asking for is right there on

3   those fact sheets.  We're not looking to depose at

4   length anybody about anything.  The information we want

5   is very, very, very targeted.  It's right on those

6   documents.  I suspect that it's all been computerized

7   and that, you know, either Merck or the plaintiffs'

8   counsel can, you know, easily pull out the four or five

9   fields that we're asking for and provide that

10  information.

11          4:11 refers to 4:18 of the rules, Your Honor.

12  4:18 provides for the inspection of documents.  And

13  4:11 specifically says, Your Honor, that such

14  inspection of documents is permissible to prevent a

15  failure of justice, which brings me back to where I

16  started.  If we don't have this information our

17  client's rights will be lost, and there will be a

18  failure of justice.

19          The cases that we cite in our petition and

20  reply papers, Your Honor, are interesting as well.  It

21  turns out in New Jersey law there are really only,

22  unless I'm missing something, three cases really on

23  point here, and all of them are consistent with what

24  we're seeking here.  The *Hall* case, Your Honor, which

25  is the Supreme Court case that the plaintiffs and the

1    defendant make so much of in their papers, the *Hall*

2    case concerns the affidavit of merit statute, and at

3    the time the plaintiffs wanted to bring medical

4    malpractice actions, had a quandary of needing to file

5    this affidavit of merit without having information, and

6    so a petition was brought; and, in fact, the trial

7    judge in that case granted the petition.  So there were

8    appeals and stays of it all, and as Your Honor is

9    probably aware it was rendered moot because it actually

10   was filed against the hospital and the depositions in

11   question were had.  But the Supreme Court thought it

12   important enough to address the issue, and in so

13   addressing the issue the Court noted that the rules

14   should be flexible enough to avoid the risk that

15   meritorious cases be dismissed.  So while not ruling,

16   because the precise issue was moot, certainly the Court

17   understood that in exceptional circumstances where

18   you'd have a miscarriage of justice the rule was

19   flexible enough to permit that.  And, in fact, later on

20   the Legislature changed the rule for, you know, for the

21   medical malpractice cases.  That, of course, doesn't

22   apply here.  But what does apply is the principle

23   announced in *Hall*, which is that you have to be

24   flexible enough to prevent injustice to be able to

25   order this kind of relief, particularly where it's no

1    burden to the defendant or to the other side.

2         And on this point I want to say this.  Really

3    this settlement agreement, Your Honor, was designed to

4    thwart, to obstruct the health insurers' rights or ways

5    really to get to the information in order to enforce

6    their rights, and I say that because the settlement

7    agreement itself has aspects to it that will cut off

8    the rights of the insurers.  It provides that the, that

9    Merck would be held harmless from any claims, that the

10   plaintiffs and their counsel have to hold Merck

11   harmless from any claims by insurers.  It provides for

12   confidentiality, that is that the plaintiffs, if you

13   really take the release at its face value, are not

14   allowed to tell anybody about the amount or fact of

15   their settlement, which means that if the insurers ask

16   their beneficiaries — who, by the way, have contractual

17   obligations to give this information to their insureds

18   — if the insureds ask for it, the plaintiffs are bound

19   by this agreement not to give the information.  It's

20   hidden by the agreement itself.

21        So — And one other thing that the agreement

22   does, which really, I think, is an interference with

23   the contractual rights of the insurers and their

24   clients; but that's not an argument that we're making,

25   you know, today in these papers because it's really

1    not, not necessary to.  But the agreement, the

2    settlement agreement requires the plaintiffs to waive

3    their lien rights.  Now in some places if the plaintiff

4    waives their lien or subrogation rights, then an entity

5    that wants to bring a subrogation claim in certain

6    state courts, since they stand in the shoes of the

7    plaintiff, they're not going to — no shoes to stand in

8    because the plaintiff has waived the claim.

9            So without the insurers being a party to

10   this, their claims have really been set up by the

11   settlement agreement itself to be waived.  Of course,

12   Your Honor, it's — the settlement agreement is a little

13   bit ambiguous because it does seem to say that the

14   plaintiffs' counsel are supposed to advise their

15   clients, the injured plaintiffs, that there may be

16   these liens and to take it into account and to ask them

17   about it and just make sure that they're satisfied.

18   There seems to be language in the settlement agreement

19   to that effect as well, even for the private payer

20   liens.  But I got to tell you that, you know, precious

21   few lawyers have contacted us to tell us about the

22   settlements, and I don't know how it is that the

23   plaintiffs' counsel had the information to advise their

24   plaintiffs, you know, about these potential obligations

25   to lienholders.  You know, that if they take this money

1    now they may owe money to their, to their health

2    insurers.  I don't know how that could have been done,

3    but I guess, you know, that's not my issue or not my

4    issue for today.

5              But getting back to the New Jersey cases, the

6    other New Jersey case, *Sturm*, in the *Sturm* case again

7    the Court granted the relief.  That's the case where

8    the, I guess the stepchildren were in danger of being

9    disinherited by their stepmother, and they wanted to

10   preserve the testimony concerning the drafting of their

11   father, deceased father's and their stepmother's wills,

12   and in order to preserve that testimony they needed to

13   depose, I guess, the drafter and witness, who were very

14   on in years.  And the Court granted that, that relief

15   because it would be unjust, even though they were not

16   bringing the case tomorrow because the stepmother was

17   still alive, it would be unjust to just allow those

18   rights to fall away because the testimony wasn't taken.

19   And, again, in the same way here, to allow the

20   defendants affirmative — and the plaintiffs I should

21   say — affirmative concealment of the information,

22   because they're really hiding information from us, and

23   to allow that to cause the rights of our clients to

24   fall away would be, as in *Sturm*, unjust; and,

25   therefore, that's another reason why this relief is in

1    order.

2              Now the *Johnson* case, which to my mind is the

3    last of the Jersey cases that address this issue, in

4    the *Johnson* case the Court did not order disclosure;

5    but that case really was a fishing expedition and our

6    case is not.  In that case I guess the individual was

7    killed.  I think it was a motorcycle accident, and

8    there was a potential Dram Shop Act case, and the

9    plaintiffs for the decedent wanted to depose, you know,

10   everyone who ever went to the bar that night and ask

11   questions about this, that, or the next thing in order

12   to establish a Dram Act case.  Again, that's not what

13   we want to do here.  We just need one or two tiny

14   pieces of information, and we know how to frame the

15   complaint, we know how to get all of the underlying

16   data, we know how to evaluate it.  Maybe there will be

17   some of those claims that our insurers will decide not

18   to bring for one reason or another, but without that

19   piece of information we're not going to be able to, to

20   go forward.

21             So essentially, Your Honor, the rule

22   supports, and the cases, the New Jersey cases — Let me

23   take just one second to address the federal cases,

24   which are all over the place.  The —

25             THE COURT:  You don't have to address the

 1    federal cases.

 2            MS. PAOLICELLI:  Is there a specific question

 3    that Your Honor has, because I have more or less

 4    summarized what's already in our papers, but what I

 5    think are the major points here.  But basically that

 6    this is very modest relief.  We'll keep things

 7    confidential.  If Your Honor, you know, wants a

 8    confidentiality order we're happy to do that.  And

 9    without this our client's rights will be lost, and we

10    feel we're entitled to the relief we seek.

11            THE COURT:  Okay.

12            MR. SEEGER:  Judge, I think because of the

13    type of relief they're looking for, I feel compelled to

14    put this into a context.  Here's the, here is the real

15    world context.

16            The agreement reached between plaintiffs and

17    Merck specifically say nothing in that agreement

18    affects their rights.  They have subrogation rights.

19    What these lawyers would like to do is come in here and

20    create a fund that they can go after, and that's more

21    convenient than pursuing your contract rights under

22    your insurance policies.  That's all this is about.

23            If these attorneys don't get their way by

24    creating the fund, then HRI, which is a healthcare

25    recovery company — they are a subrogation company — are

1    just going to get their subrogation lawyers to go after

2    everybody.  This relief has never been granted in any

3    litigation I'm aware of, and I think we've looked at

4    all of them, where they can just come in and say give

5    us private information about your clients because we

6    think we can create a pot which makes life really nice

7    and rosy for insurance companies.  That is really

8    what's, what this is about.

9         So we should really, I think, keep the focus

10   on that, because there's nothing that we've done in our

11   deal with Merck that stops them from pursuing their

12   clients.  But here's what's most interesting about

13   this.  They don't even know who their insureds are.  A

14   minimal amount of work by these lawyers could have

15   identified who their insureds were.  They could also go

16   and do a search of the docket here in the court.  They

17   could find the complaints.  Everybody had to file a

18   complaint here.  Match up the names with their computer

19   system and, boom, you got your, you got your person.

20   Or even yet, better yet, wait until the money is

21   distributed and then go after those people for the

22   money that they got.

23        I mean it's, I don't think it's the Court's

24   responsibility.  I don't think it's our fault because

25   we didn't give them more rights than they already, they

1    have under their contracts.  They're the masters of the

2    their contracts with their insureds.

3            But the *Sereboff* case that keeps getting

4    throw out, there's an important piece of that case

5    that, that was left out of their papers that you need

6    to know about.  That was a case where somebody had

7    possession, custody, and control of the money.  What

8    Merck and the Plaintiffs Committee have created is a

9    qualified settlement fund.  That money isn't in

10   anybody's possession, custody, or control until it's

11   actually distributed.  So they have — and I think Jack

12   Weinstein in the Zyprexa litigation had some comments

13   on a transcript that even makes that pretty clear.

14   This is not really — I'm almost surprised that they

15   want to push this point because I think they're on the

16   verge of creating some bad law for themselves on this,

17   but I think that's pretty clear from the Supreme Court

18   decision.  They got to wait 'til somebody has the

19   money, and then they can go against it.

20           There's absolutely no showing in the papers,

21   just to hit quickly their points — and I know that

22   Charlie and Ted may have something to say.  There's no

23   showing that the evidence that they're looking for,

24   that the information they're looking for is going to be

25   lost or destroyed.  It's just that they, there — for

1    some reason client can't put this information together.

2    That doesn't mean that we have to start providing

3    social security numbers for people who are receiving

4    these settlements.  They can go to their own computers

5    and get this.

6          And then the, you know, the whole idea that

7    their client's rights, that this is somehow — there's

8    going to be some travesty of justice if you don't give

9    them all the plaintiff information they're looking for.

10   Oh.  Oh, here's another important thing.  I think in

11   their own papers they said that maybe ten percent of

12   the — So maybe of all the people out there maybe ten

13   percent of them are here in New Jersey.  Is that what

14   the claim was?

15         MR. MAYER:  That ten percent are represented

16   by the —

17         MR. SEEGER:  Oh, ten percent.  So there's a

18   hundred percent of the Vioxx claimants and ten percent

19   of them may, they may have a claim against ten percent

20   of them, and for that they want all the information

21   they can possibly get.  If that's not a fishing

22   expedition then there is — I mean I think you can look

23   up in the dictionary a fishing expedition.  We may now

24   have that as a definition.

25         But, you know, I don't really want to, you

1      know, belabor this.  I think that the most important

2      point is they have exactly the rights they had on

3      November 8th as they did on November 9th when we signed

4      the settlement agreement.  They just have to pursue

5      their subrogation rights.  That's not convenient for

6      the way I know they want to do it.  I know they'd to go

7      against the fund, but that is the way their contracts

8      are set up.

9                THE COURT:  Who is Healthcare Recoveries,

10     Inc.?

11                MS. PAOLICELLI:  Healthcare Recoveries is a

12     company that is a subrogation agent for a large number

13     of, of employers —

14                THE COURT:  It's a company that's been in

15     prior existence for years?

16                MS. PAOLICELLI:  I'm sure it has been.  I

17     can't tell you when they began to be in business, but

18     yes.  And they represent, again, numbers of insurance

19     companies, self-funded plans, employers.

20                THE COURT:  And how do they usually operate?

21     They usually file claims against individual people,

22     right?

23                MS. PAOLICELLI:  Yes.  And, Your Honor, —

24                THE COURT:  Well, do they file claims based

25     on the insurance company's plan saying, "We would like

1    you to file a claim," or —

2              MS. PAOLICELLI:  Usually, Your Honor —

3              THE COURT:  Or do they buy the claims from

4    the insurance companies?  What do they do?

5              MS. PAOLICELLI:  No.  I do not believe they

6    buy the claims from the insurance —

7              THE COURT:  Do they purchase these claims?

8              MS. PAOLICELLI:  I do not believe so.

9              THE COURT:  You don't know?

10             MS. PAOLICELLI:  Your Honor, no.  But what

11   usually happens, Your Honor, is there —

12             MR. SEEGER:  I know how they work.  They

13   directly — I know how it probably works.

14             THE COURT:  You have —

15             MR. SEEGER:  They get a percentage of the

16   recovery.

17             MS. PAOLICELLI:  I don't think that you

18   should talk for my client.

19             MR. SEEGER:  Well, I mean this is pretty well

20   known.  HRI is one of the largest subrogation companies

21   in the country.

22             MS. PAOLICELLI:  I mean they're under

23   contract, Your Honor.  They're agent and they're under

24   contract.  I'm sure they get paid for what they do.

25             MR. SEEGER:  Get paid a percentage.

1          MS. PAOLICELLI:  But, Your Honor —

2          THE COURT:  But they aren't the insurance

3    company?

4          MS. PAOLICELLI:  No.

5          THE COURT:  Well, you keep talking about,

6    "Give us the information.  Give me the information."

7    Number one, I get the impression — and I'm going to lay

8    this right out on the record — that this is simply a

9    law firm circling for the money, trying to be able to

10   capitalize on this settlement and be able to make money

11   for themselves, and that in order to do that you're

12   doing, you're trying to discover information.  I have

13   real questions about the, the legitimacy, I guess, of

14   your client and certainly the legitimacy of your saying

15   you represent Blue Cross & Blue Shield.  Do you have

16   any kind of agreement with any of these people?

17         MS. PAOLICELLI:  We have —

18         THE COURT:  All you have is Healthcare

19   Recoveries.  I mean you're listing it — you make it

20   look like you've been hired by a hundred companies, but

21   you don't —

22         MS. PAOLICELLI:  Your Honor, first of all —

23         THE COURT:  — really have any business

24   relationship with them, do you?

25         MS. PAOLICELLI:  That's not true.

1            THE COURT:  Are they your clients?

2            MS. PAOLICELLI:  Some of the ones on the

3    sheet are, in fact, clients of my firm, Levy Phillips &

4    Konigsberg, or clients of Crowell & Moring, who are co-

5    counsel in this petition.  They are direct.  In fact,

6    some of the entities on that list, Your Honor, have

7    consumer fraud claims before Your Honor which were

8    filed by my firm and which I guess are up for a

9    conference in April.  So, yes, and I've met with those

10   people in their offices —

11           THE COURT:  Consumer fraud claims?

12           MS. PAOLICELLI:  Consumer fraud.  The third-

13   party payer cases, yes, Your Honor.  Some, some of the

14   entities on the exhibit to the petition we're

15   representing —

16           THE COURT:  You represent them in the third-

17   party payer cases?

18           MS. PAOLICELLI:  Yes.

19           THE COURT:  So certain —

20           MS. PAOLICELLI:  Not all of them, but some of

21   them.  And I have direct relationships.  I have met and

22   spoken with them.

23           MR. SEEGER:  But, Your Honor, I mean I

24   address this to the Court.  I have asked this question,

25   not directly of Ms. Paolicelli, but I have had a number

1    of lawyers tell me they represent exactly the same

2    clients.  I've said, "Do you have retainer agreements?"

3    I can't get a straight answer.

4            You know, there is another issue, and maybe I

5    should put this on the table because this has to get

6    resolved.  I mean I want, I want my clients to be

7    compensated.  I don't want this holding it up.  But Ms.

8    Paolicelli's firm represents about 90 plaintiffs in the

9    settlement.  Is that a conflict?  It seems to me a

10   direct money-in/money-out.  Are they going after — Do

11   you have, do they have 90 names they could start with

12   because they have their own clients?  I mean I wasn't

13   going to say, you know, what Your Honor said, but I

14   agree with it.  That's what this looks like.  It looks

15   like trying to create a fund so that somebody can get a

16   contingent fee on some recovery that may one day come

17   out of that fund.  Because this, their clients have not

18   been hurt.  They've got their insurance contract.  We

19   went to great lengths in the agreement to not touch

20   them or affect them.  And, yes, Merck is indemnified,

21   but if there's a claim against Merck for healthcare

22   provided to my client, I think they're entitled to the

23   indemnification.

24           MS. PAOLICELLI:  Your Honor, I've already

25   addressed that last point.  The settlement agreement is

1   constructed in a way that plainly affects the rights of

2   my clients.  It plainly affects the rights.

3         I want to say also, Your Honor, that we're

4   not going after a fund.  We want the individual names

5   so that we can pursue the individuals.  That's why we

6   want the social security numbers.

7         MR. SEEGER:  Well, then they haven't been —

8         MS. PAOLICELLI:  Now Your Honor asked me a

9   question, and I don't think that I answered is, which

10  is how does HRI normally get this information.  Well,

11  normally they get notified by the claimants who are in

12  a lawsuit that a lawsuit exists.  How do they get

13  notified?  Either because records are sought or because

14  the plaintiffs or their lawyers are following their

15  contractual agreement — and it's in all these contracts

16  — to notify their insurer.  You know, it was good

17  enough for them when they needed the money to have the

18  insurer —

19        THE COURT:  Well, they don't go notifying

20  Healthcare Recoveries, Inc.

21        MS. PAOLICELLI:  They're not — No, no, no.

22  Not —

23        THE COURT:  They have no agreement with

24  Healthcare Recoveries, Inc.  So your client is not who

25  they notify.

1            MS. PAOLICELLI:  Your Honor, my — the

2     petitioner here is Healthcare Recoveries, but they are

3     the agent for all of those insurers on the list.

4            THE COURT:  No.  I don't accept that.  I

5     don't accept the fact that you represent all these

6     insurance companies.

7            MS. PAOLICELLI:  Well, Your Honor, I —

8            THE COURT:  You've listed a whole list of

9     companies, and — Do you have retainer agreements with

10    these people?  Do you have contracts with these

11    companies?

12           MS. PAOLICELLI:  I have —

13           THE COURT:  You've listed hundreds.  Now

14    you're telling me you represent a few of them in your

15    third-party payer case.

16           MS. PAOLICELLI:  I — Your Honor, I have a

17    retainer agreement with HRI, and I have retainer

18    agreements with some of the entities —

19           THE COURT:  And HRI has absolutely no

20    contractual rights other than if, lest they are hired

21    or they are engaged with a contract for some specific

22    recovery through some insurance company.  You don't

23    represent the insurance companies.

24           MS. PAOLICELLI:  Your Honor, HRI is hired by

25    those companies and has been asked by those companies

1    to pursue this claim.  They are the agent for them.

2    That's what they do for them, and they do it — you

3    know, for some of these they do it for medical

4    malpractice cases and the other cases, as well a

5    pharmaceutical tort case like this.

6            THE COURT:  Oh, I don't have any question

7    that a health insurer, knowing that they have a claim,

8    may notify H&R (sic) that they want them to pursue

9    their claim.  But here it's backwards.  It's the

10   lawyers getting the information to give to Healthcare

11   Recoveries so that they can get to the insurance

12   companies to then pursue the claims, isn't it?  Isn't

13   that what this is?

14           MS. PAOLICELLI:  No, Your Honor.  If, if the

15   plaintiffs and their, their counsel had followed their

16   contractual obligation to notify —

17           THE COURT:  How do you know if they haven't?

18           MS. PAOLICELLI:  Let's say MVP —

19           THE COURT:  How do you know they have?

20           MS. PAOLICELLI:  Because the plans have it,

21   because I'm told by HRI and I saw some of them, and I

22   just know this from what I've seen.  The plans have

23   agree — have provisions in there that plaintiffs, if

24   they're given benefits, medical benefits that are later

25   the subject of a recovery from the real tort feasor the

1    insurance company has the —

2              THE COURT:  No question.

3              MS. PAOLICELLI:  — the right to be notified.

4              THE COURT:  And those insurance companies

5    will be notified by those people who have the right to

6    notify them and duty, or those insurance companies can

7    pursue those people; but the bottom line is this should

8    not be pooled together in — I just, I have — I think

9    that this is, and I've said it, the way your whole

10   statement is written here I don't, I don't — I'm

11   telling you right now I don't really think you're

12   representing, quote, the insurance companies.  You're

13   representing a group, and it appears to me that this,

14   that you're trying to get the information so that you

15   can create litigation and so that you can come into

16   this fund.

17              The bottom line is, first of all, the Court

18   doesn't control the settlement and the Court didn't

19   create the settlement.  Second, there's nothing,

20   there's no case that would ever require me to release

21   social security numbers of multiple people who may or

22   may — you may or may not have a claim against.  You

23   don't even know whether you have a claim against them.

24   And I'm going to send to you somebody's social security

25   number so you can decide whether a possible client of

1    yours or your client's client may have a claim against

2    them?  And if you don't then —

3           MS. PAOLICELLI:  Then, Your Honor, we would

4    give you information back.  We would destroy — we would

5    follow the —

6           THE COURT:  No.  That's not how lawsuits are

7    create — that's not how things are done.  If your

8    insurance companies, if you represent them, if XYZ

9    Insurance Company believes they have a claim against a

10   certain person, then they can file that suit.  They

11   have a right to do that, and that person has certain

12   obligations and the attorneys have certain obligations.

13   But there's no obligation in that contract for them to

14   notify — If you can show me a contract that says that

15   anybody who has this insurance has to notify Healthcare

16   Recoveries —

17          MS. PAOLICELLI:  Your Honor, they don't have

18   to notify —

19          THE COURT:  — any time they settle a case —

20   They don't.  They have to notify their own companies.

21          MS. PAOLICELLI:  They have to notify — and

22   then the insurance company will notify —

23          THE COURT:  Those people who have —

24          MS. PAOLICELLI:  The insurance company, Your

25   Honor — Maybe I'm not making this clear.  The insurance

1    company —

2         THE COURT:  I understand exactly what we're

3    doing.

4         MS. PAOLICELLI:  — has hired, has hired HRI

5    to do their subrogation work.  The insurance company,

6    when they receive notice from a plaintiff pursuant to

7    the obligation, sends it to HRI —

8         THE COURT:  No.  If you hire somebody to do

9    subrogation work you say, "I have this claim against X.

10   Would you please handle it for me?"  You're saying, "We

11   don't know who X is.  We don't know who X is.  We don't

12   even know who we have claims against, but we're going

13   to try to jump into this — because we heard a billion

14   dollars and we're going to try to jump in there and get

15   some of this money."  They're entitled, the insurance

16   companies are entitled to their money, but this isn't

17   the way they get it.  They get it by filing claims

18   against the people.  They get it by being notified by

19   people under their contracts.  The insurance companies

20   know how to, to handle these.  They've been doing, they

21   created these contracts.  The people, the individuals

22   didn't.  They created the contract.  They've got

23   safeguards in there where they're protected.  They have

24   ways of finding out about that.  It's not this way.

25   It's not coming into Court and saying — Why should it

1    just be the Vioxx people?  Why not file a — why haven't

2    you made this broader and asked that everybody who

3    settled a case in the last year, that the Court be

4    required to tell you that the case has been settled,

5    this is the name and address of the people and this is

6    their, this is their thing; and now we believe that

7    they've gotten money and, therefore, they're going to

8    get money, and then they get money and therefore you

9    have to — We have cases settled every day.  I don't sit

10   there and say to those people, you know, what they do

11   or don't do with their insurance company.  If the

12   matter is brought before me, if the insurance company

13   sues their insured, they're paid.  If I speak to a

14   client, when I represented clients, I explained to them

15   their obligations, and I made sure that the people were

16   paid that should be paid.  That was my obligation as a

17   lawyer.  And these people have that obligation as a

18   lawyer.  You're assuming they're not doing it or not

19   going to do it, and I'm telling you I am not going to

20   make that assumption.  I'm not going to make the

21   assumption —

22            MR. SEEGER:  Well, I can, I represent we are

23   doing it, Your Honor.  We are —

24            THE COURT:  I'm not going to make the

25   assumption that they're not doing what they're supposed

1    to be doing with their clients.

2            MS. PAOLICELLI:  Your Honor, normally,

3    because —

4            THE COURT:  But if you have somebody who has

5    a claim against someone, file suit.  But to come in and

6    say we need the names of everybody so we can decide

7    whether we have a claim, to me it is improper.  It

8    certainly doesn't fit under this rule.  It certainly is

9    not the purpose of the rule.  This is not a rule where

10   you're supposed to be — it's for preserving testimony,

11   preserving evidence, preserving documents.  It is not

12   for deciding who we may have a claim against.

13           To do a search, a fishing expedition, to see

14   who you might have a claim against, and particularly,

15   particularly when you're asking for information about a

16   large number of people, many of whom or maybe most of

17   whom you absolutely don't have a claim against, and you

18   have no right to know that XYZ — nobody has a right to

19   know that XYZ so and so has been enrolled in a

20   settlement or settled their case.  Why, why should you

21   or Healthcare Recoveries have that information?  Why

22   should these insurance companies — because I assume

23   Healthcare Recoveries, if they get this information, is

24   then going to give this information to all these

25   companies in order to determine — Now all these

1      companies know that this person had a claim.  We know

2      that everybody in the settlement either has to be

3      claiming they had a heart attack or a stroke.

4              I understand they could enter confidentiality

5      things, but the bottom line is you have no standing to

6      get what you want.  You have no right to get what you

7      want.  You have no law to support that you get what you

8      want.  And I personally find it, you know, to have no,

9      just to have no legal basis.

10             MS. PAOLICELLI:  Well, Your Honor, I just

11     want to — I probably —

12             THE COURT:  I made that clear before on the

13     record when you sent a letter to me asking for this

14     information.  You've sent lien letters to lawyers,

15     haven't you?

16             MS. PAOLICELLI:  That's the point, and nobody

17     responds.  Or Mr. Seeger responded and said, "Sorry.

18     I'm not giving you," —

19             THE COURT:  Then file suit against them.

20     File suit against them.

21             MS. PAOLICELLI:  Against Mr. Seeger?

22             THE COURT:  If you want to and you've got a

23     case against them —

24             MS. PAOLICELLI:  Well, if we have to, then

25     maybe we, maybe we —

 1            THE COURT:  If you feel that you want a case

 2     against him, go ahead.

 3            MS. PAOLICELLI:  Your Honor —

 4            THE COURT:  But you don't have anything you

 5     can allege in a case against him because you don't know

 6     that he hasn't done anything improper.  How would your

 7     client even know whether he's, which of his clients

 8     have notified their companies and which haven't?  You

 9     have no idea what he has or hasn't done or what his

10     clients have or haven't done.

11            MS. PAOLICELLI:  I'm not trying to be

12     critical of Mr. Seeger about whatever he does with his

13     clients, but my clients in the normal course — This is

14     what insurers do, they send lien letters, and they

15     respond.  I have responded to the lien letters as a

16     plaintiffs' counsel.

17            MR. SEEGER:  Well, I think that's a little

18     bit of —

19            MS. PAOLICELLI:  But there's been no response

20     to —

21            MR. SEEGER:  No, that's not true, Your Honor.

22     I —

23            THE COURT:  First of all, there is no lien

24     letter from —

25            MR. SEEGER:  Exactly.

1          THE COURT:  — from the person who's — You

2     know, a lien letter is —

3          MR. SEEGER:  To the client.

4          THE COURT:  — "I am so and so.  You have

5     insurance policy X and, you know, we want our, we will

6     be reserving our rights."

7          MR. SEEGER:  By the way, we have about a

8     hundred —

9          THE COURT:  You have, you can get without

10    anything — It's all public record.  You can get the

11    name of every plaintiff and their address.  You can get

12    the name of every plaintiff and their address.  It's

13    all in the court records.  They're down — you know, if

14    you want to send somebody to physically look at them,

15    you could do that.  If you want to send somebody to

16    look at the dockets and buy it, because the Court will

17    sell you the electronic access for you to go to look at

18    complaints that have been filed.  You can, you can get

19    all that information.  It's public information.  Every

20    single person who files a claim, every single person

21    who says they had an injury and that they were treated,

22    you can get their name and their address and their

23    docket number.  It's public record.

24         MS. PAOLICELLI:  I'm not sure the addresses

25    are, Your Honor.

1          THE COURT:  What you want is social security

2     numbers, which you're not going to get unless they put

3     it in their complaint, which you're not entitled to

4     get; but if it's there you've got that, too.  Most of

5     them, I'm sure, didn't put that in.  If you have liens

6     against these people, then pursue them.  Send them lien

7     letters and file suit against them if they don't pay

8     you what they owe you.

9          MS. PAOLICELLI:  Your Honor, we would —

10         THE COURT:  And if you feel that an attorney

11    is attempting to defraud one of your clients on a mass

12    basis, file suit against the lawyer if that, if you

13    feel you have an obligation to do that.  I'm not going

14    to assume that the lawyers and the people aren't doing

15    what they want — what they're supposed to do, and I'm

16    certainly not going to assume — You know, I know that

17    the lawyers in the litigation in New Jersey — There are

18    no tolled cases in New Jersey, by the way.  There's

19    thousands of cases that were tolled.  There are

20    thousands of cases around the country that aren't even

21    part of this litigation.  I don't know if you've gotten

22    these lists from other courts or not.  I don't know if

23    you've been successful in federal court or anywhere

24    else.  Have you applied for the same thing from a

25    federal judge?

1           MS. PAOLICELLI:  We did, Your Honor.

2           THE COURT:  And what did he give you?

3     Nothing, right?

4           MS. PAOLICELLI:  Well, we — we haven't been

5     heard yet, Your Honor.

6           THE COURT:  Oh, okay.

7           MS. PAOLICELLI:  The 25th of March.

8           THE COURT:  Well, let me tell you, if he

9     gives you anything you can file a motion for

10    reconsideration, and I'll listen to his decision giving

11    it to you and I'll try to understand why he did that.

12          MS. PAOLICELLI:  Thank you for, for that,

13    Your Honor.

14          THE COURT:  Because I'm denying your

15    application.  But if I see that another judge has come

16    up with some reasoning that makes me re-think it, I'll

17    re-think it.  But I doubt you're going to, I don't see

18    how you can be successful anywhere with what you're

19    asking for.  It's not an appropriate request.  It's not

20    an appropriate request.  It's just wrong.

21          MS. PAOLICELLI:  Well, Your Honor, I thank

22    you for, for listening —

23          THE COURT:  And I don't really mean to — I'm

24    not — Well, I'm not going to say, I don't want to

25    insult — because there's part of it, I do find it

1    insulting if somebody says, "I represent all these,

2    some of these," — I mean the language is just, it cries

3    out for, "What? What are you talking about?" This

4    petition is submitted on behalf of over 80 public

5    insurers. And then it sort of talks about you've been

6    retained by most of these insurers. So you've

7    obviously listed some that haven't retained them.

8           MS. PAOLICELLI: Your Honor, I'll tell you

9    again because it's nothing I'm hiding. HRI is the

10    subrogation agent for a large number of those entities

11    on that list —

12           THE COURT: That's fine. And —

13           MS. PAOLICELLI: — and I personally am

14    retained by other —

15           THE COURT: And if HRI, if any of those —

16           MS. PAOLICELLI: — number of entities.

17           THE COURT: And if any of the insurance

18    companies have asked HRI to recover monies from any

19    individuals, they have the right to pursue that claim,

20    and they —

21           MS. PAOLICELLI: Except they don't, the

22    ability to, to target who the plaintiff is, is — that's

23    the part that's being frustrated —

24           THE COURT: And that's what you can't do.

25    This Court, it's not my job to — or the Court's job or

1    anyone's job to target people for you to sue because

2    these are people who are going to be receiving a

3    billion dollars and, divided up between them, and

4    they're a target.  People have contractual

5    relationships.  If they owe you something they have an

6    obligation, and I'm sure in their self — insurance

7    contracts they have ways of protecting themselves and

8    knowing.  The insurance companies, if anybody wants to

9    pursue a lien, and people have to notify them, they've

10   been notified by the lawyers that — You, you've sent

11   out liens.  I don't know on behalf of who.  You know,

12   it's just too easy to say, "I represent Healthcare

13   Recoveries, and they represent, they've sued on behalf

14   of hundreds of insurance companies, and now therefore I

15   represent those insurance companies, and I want the

16   name of anybody who might possibly be a potential

17   defendant in a case or a claim by them."  It's

18   ridiculous, I think.

19        MS. PAOLICELLI:  Your Honor, with all respect

20   I think my request —

21        THE COURT:  I think it has no merit and I'll

22   deny it.

23        MS. PAOLICELLI:  — is somewhat narrower than

24   you just characterized it.

25        THE COURT:  Everything that you want as far

1    as names and addresses and who filed cases you can get.

2    The names of which of the people have gone into the

3    settlement is not something I'm going to give you.  The

4    social security numbers is not something I'm going to

5    give you.  And —

6              MS. PAOLICELLI:  Your Honor, I understand

7    that the addresses aren't on many, if not most, of

8    those complaints.  I'll — you know, if I had the names

9    and addresses of the plaintiffs I would have something

10   more.  I don't know that that would really move the

11   ball very far, but it would move it farther than I have

12   it now.

13             MR. SEEGER:  Judge, I just have to point this

14   out.  I got to — I've just got to clean the record up

15   in case I do get sued on this.  On the web site of HRI

16   they boast that they can, right on their web site —

17   I'll produce it and send it to the Court — they say

18   that they can trace people by name alone.  That's on

19   their web site.  That's number one.

20             Number two, my office has received probably

21   north of a hundred letters already from Aetna, from

22   Guardian, from Equitable, from insurance companies

23   saying, "Our records indicate that your client was on

24   Vioxx.  We're aware of the settlement.  You're being

25   put on notice."  We are also going to reach out if we

1    see that there's private insurance companies, as we do

2    with any personal injury case.  This is no different

3    than any — just because we have, you know, a lot of

4    claims together.  Everybody that I know is doing

5    exactly that to protect their clients under their

6    contract.  I think it's, I just think the whole thing

7    is a farce.

8           THE COURT:  I'm sorry.  But this to me looks

9    like exactly what, what's been said.  It's H&R (sic) —

10   or H — this recovery company, once it has these names,

11   then contacting the insurance companies and saying, "We

12   can pursue these people for you."  Whereas these people

13   — if they have lawyers they know how to get them.

14   They've sent them to lawyers.  And either they're going

15   to respond or they're not going to respond, or the

16   insurance companies can take action against the

17   attorney or against the clients.  They know who their

18   subscribers are.  They know who they have contracts

19   with.  If they can match a name on their, their

20   subscriber list to a name that's been filed —

21          MS. PAOLICELLI:  Your Honor, I don't want the

22   record to stand —

23          THE COURT:  I'll tell you right now I don't,

24   I absolutely agree with you that insurance companies

25   have the right to be paid.  That I absolutely agree

1    with you.  And I absolutely believe that if there's a

2    proper lien it's got to be enforced, but the way to do

3    that is not to let you, on behalf of Healthcare

4    Recoveries, have personal information, have any

5    information about any of these people other than what

6    is public information, and public information is what's

7    in the court's files.  And you can have that.

8            MS. PAOLICELLI:  Your Honor, I just — I don't

9    want the, I don't want the record to stand that — I

10   want to correct something.

11           These companies hired HRI to do this.  It's

12   not HRI getting the names and then going, "Hey, by the

13   way, we can get you this."  That's not what this is.

14   These are the companies that have already asked HRI as

15   the agent, the one who does it for all of their injury

16   cases, to go and —

17           THE COURT:  And do what?

18           MS. PAOLICELLI:  — enforce, enforce their

19   equitable and reimbursement subrogation rights.  They

20   do it for all kinds of cases.  The companies went to

21   HRI and not the other way around.  This is not HRI

22   saying, "Oh, let's try to get this, and then we'll try

23   to sell it to these companies."  No.  That is not the

24   fact here.  In addition to which, the County of Erie,

25   the County of Chautauqua, and many other of the

1     entities on that, many locals' health and welfare

2     funds, 1199, those are direct clients of my firm's,

3     Excelis, Kaiser, direct clients of Crowell & Moring.

4     This is not, I just don't want Your Honor to think —

5               THE COURT:  And what have you done, what have

6     you done as a lawyer for the plaintiffs you represent?

7               MS. PAOLICELLI:  I have —

8               THE COURT:  What have you done for your

9     plaintiffs?

10              MS. PAOLICELLI:  For my plaintiffs, Your

11    Honor?  I filed the lien letters that I filed.  I filed

12    the follow-up lien letters.  I wrote the letters to the

13    Court.  I'm making this motion.

14              THE COURT:  No, no, no.  I'm talking about

15    your plaintiffs that —

16              MS. PAOLICELLI:  I filed complaints for them.

17              THE COURT:  — you represent in Vioxx.  Some

18    of them are in the settlement, right?

19              MS. PAOLICELLI:  The PI plaintiffs you're

20    talking about?

21              THE COURT:  Yes.

22              MS. PAOLICELLI:  I don't represent them

23    anymore.  We've referred those cases out.  We don't

24    have them anymore and, Your Honor, —

25              THE COURT:  When did this happen?

1            MS. PAOLICELLI:  Months ago.

2            THE COURT:  Months ago?

3            MS. PAOLICELLI:  Yes, Your Honor.  We are

4     not —

5            MR. SEEGER:  You're withdrawing from those

6     cases?  There's no substitution of counsel filed.

7     We've never seen a substitution or any additional

8     appearances.

9            THE COURT:  Right now you are of record

10    representing about 90 people in this litigation, aren't

11    you?

12           MS. PAOLICELLI:  I can tell you that my

13    partner, Moshe Maimon, was involved in those cases.

14    They are now being handled by the Lotts (phonetic) firm

15    and not by us.  And if it means anything, Your Honor,

16    because I have — I checked our files some time ago, and

17    as far as we can tell from the files that we have none

18    of the entities on that list were insurers for those

19    clients.

20           THE COURT:  Well, see, that just goes to

21    show.  You've got 90 people.  None of them —

22           MS. PAOLICELLI:  And I don't think it's 90,

23    Your Honor.  I think it's more like, you know, 45.

24           THE COURT:  Well, let's say you have 40

25    people, 20 people.  Not one of your clients is

 1    represented by any of these insureds.  So —

 2              MS. PAOLICELLI:  None of those 45 as far as I

 3    could tell, Your Honor.

 4              THE COURT:  And you still think that you

 5    would, as a lawyer, have no problem with me giving to

 6    some other company or some other entity your clients'

 7    names, addresses, social security number, and tell

 8    someone that they've enrolled in a settlement program

 9    where they've alleged they had a heart attack or stroke

10    and that they're going to be receiving monies?

11              MS. PAOLICELLI:  Your Honor, these

12    individuals weren't —

13              THE COURT:  You would have no problem on

14    behalf of your clients doing that?

15              MS. PAOLICELLI:  Your Honor, I'm not speaking

16    for those clients now.  They're not my clients now.

17              THE COURT:  Well, that's convenient.

18              MS. PAOLICELLI:  Your Honor, I —

19              THE COURT:  Sorry.  I have no time for this.

20    I think that this is wrong, and I don't think it's

21    based in the law, and I don't think it's proper.  First

22    of all, I just have questions about it altogether,

23    obviously.  Secondly, even if it were absolutely — it

24    was absolutely perfectly proper that you were

25    representing them and you were representing all those

1    insurance companies, and each of them had given you a

2    retainer agreement and hired you directly to pursue any

3    claims that they would, might have, it's still not

4    right.  It's still a fishing expedition.  It's still

5    not a proposition of this rule.  It's still not

6    something that this Court would ever, has ever in the

7    past or ever would just give out generally.  And,

8    again, I don't see how Vioxx is different than every

9    other case in this courthouse, or every other case in

10   the state.  Every judge is not, and the Court does not

11   provide you lists of people who've settled their cases

12   so that insurance companies can go to them before they

13   get their checks.  That's not the way it's done.  And

14   it's only because it's a pool of money that I think

15   people, you know, vultures tend to circle around.

16        I'm sorry.  I know I'm being offensive to

17   some degree, but I have — when I see a complaint that

18   says, you know, — I don't hide my feelings or my

19   opinions.  I say what I believe, and this is what I

20   think.  I think this is just wrong.  But separate and

21   apart from whether it's wrong, even if it's right it's

22   not, it's not — there's no legal basis for the relief

23   you requested.

24        COURT ATTENDANT:  All rise.

25        MS. PAOLICELLI:  Your Honor, thank you for

1    your time.

2         (Off the record)

3                    * * * * * * * * * *

4         I, Cheryl A. Bryson (CB Trialscript Service),

5    the assigned transcriber, do hereby certify the

6    foregoing transcript of proceedings digitally recorded

7    on March 14, 2008 at Time Index 1:28:33 to 2:17:45 is

8    prepared in full compliance with the current Transcript

9    Format for Judicial Proceedings and is a true and

10   accurate non-compressed transcript of the proceedings

11   as recorded.


                                        New Jersey AOC #202
     _____
     Cheryl A. Bryson, C.E.T., AD/T
     Agent For: CB Trialscript Service
     1606 Adams Avenue
     Linwood, NJ  08221               March 18, 2008
     Phone/Fax: 609-653-1971          (Date)
     Email: cbryson602@aol.com