UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: VIOXX
PRODUCTS LIABILITY LITIGATION

This document relates to:

The Petition of Healthcare Recoveries, Inc.,
on Behalf of, and in Coordination With
Numerous Health Insurers for Pre-Action
Disclosure Pursuant to Rule 27(a) Fed.R.Civ. P.
[No-08-1068]

MDL Docket No. 1657

Section L

Judge Fallon
Magistrate Judge Knowles

**PETITIONERS' MEMORANDUM IN OPPOSITION
TO DEFENDANT MERCK & CO., INC. AND
PLAINTIFFS' STEERING COMMITTEE'S MOTIONS
TO DISMISS AND IN FURTHER SUPPORT OF THEIR
PETITION FOR PRE-ACTION DISCLOSURE**

**LEVY PHILLIPS & KONIGSBERG, LLP**
800 Third Avenue - 13th Floor
New York, New York 10022

**CROWELL & MORING, LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

**GIBSON & SHARPS, P.S.C.**
1930 Bishop Lane
1400 Watterson Tower
Louisville, Kentucky 40218

**BECKER & ASSOCIATES**
40 Fulton Street - 7th Floor
New York, New York 10038

*Attorneys for Petitioners*

Of Counsel:
      Steven J. Phillips, Esq.
      Diane Paolicelli, Esq.
      Erik L. Shawn, Esq.

## I.     INTRODUCTION

Petitioners respectfully submit this Memorandum in further support of their application for pre-action disclosure pursuant to Fed.R.Civ. P. 27(a) and in opposition to motions filed by Merck & Co., Inc. ["Merck"] and the Plaintiffs' Steering Committee ["PSC"] pursuant to Fed.R.Civ. P. 12(b)(1) and (b)(6) seeking the dismissal of the instant Petition.

This Petition is a simple request for highly limited data that has already been assembled and which is wrongfully being withheld.[1]  In opposing this application both Merck and the PSC paint with an overly broad brush and mischaracterize both the nature of the Petition and the relief sought. It is important to appreciate what this Petition is, and what it is not.

What Petitioners actually seek is data that has already been compiled and produced pursuant to orders of this and other courts.  That data exists, and may be readily provided by either redacting the existing forms so that they only contain the requested information, or alternatively from a simple search of the databases that Merck or the PSC undoubtedly possess.

What this is not, is a fishing expedition.  Petitioners are not asking Merck or the PSC to go to any effort to seek new data, to develop new evidence, or to help frame a cause of action.  Nor are Petitioners seeking to uncover facts which may or may not reveal a claim.  It is a certainty that these Petitioners possess scores, if not hundreds or thousands of valid actions which might be commenced but for the fact that this data being concealed.  [*See* pp. 17-20, *infra.*]  *See also In the Matter of the Petition*

---

[1]     The data sought is (a) the name of each injured party or decedent; (b) their addresses over the last ten years; (c) their social security numbers; (d) their docket numbers; and (e) if known, the identity of their health insurers.  Items (a) through (d) were all collected pursuant to Orders of this and other courts [*see* Petition ¶ 5, Exhibit B] and are part of Plaintiff Profile Forms [Items II A-E] or their State Court equivalents.  Upon information and belief health insurance information was also compiled in response to Merck's demands for documentary disclosure.

*of Giuseppi Allegretti*, 229 F.R.D. 93 (S.D.N.Y. 2005) (distinguishing between a proper Rule 27(a) petition to perpetuate known testimony as opposed to one seeking unknown information).

Nor is this Petition a lawsuit, let alone a putative class action.  Petitioners have not yet sued anyone.  Nor have they sought disclosure on behalf of anyone but themselves.  No Petitioner now seeks to be a class representative, nor does counsel now seek to be class counsel.  Fed.R.Civ. P. 23 is irrelevant to this Petition.

No privacy interests are threatened by this Petition.  The names, addresses and social security numbers of litigants are hardly sensitive material, and are routinely produced.  [*See* pp. 22-23, *infra*.]  Nor is the identity of one's health insurer some deeply held commercial or personal secret.  Docket numbers are by definition public.  Petitioners do not seek medical records or any other personal data that might merit confidentiality.  And the idea that these plaintiffs who have filed Vioxx personal injury or wrongful death lawsuits might be possessed of a privacy interest to shield the fact that they took Vioxx and suffered some injury is preposterous.  The mere fact they filed their lawsuits revealed as much to all the world.

Similarly, the PSC's argument [PSC Mem. at 7-11] that no Petitioner can have valid subrogation or lien claims is absurd.  Petitioners possess well-established rights to bring suit both in this Court and elsewhere.  [*See* pp. 17-20, *infra*.]

Nor does this Petition fail merely because the evidence at issue may not be soon destroyed, or because no witness is either at death's door or about to flee the jurisdiction.  [PSC Mem. at 12-13; Merck Mem. at 6-9.]  For while those may be valid and common bases for granting a Rule 27(a) Petition, they are hardly exclusive conditions.  What the Rule in fact requires is a showing that a failure or delay of justice will likely result if the pre-action disclosure is denied.  Neither Merck, nor the

PSC seriously argue in their motions that the ends of justice will be served by concealing the information Petitioners seek.

Here, on the unique facts of this litigation, a failure of justice will occur if the PSC and Merck are able to succeed in their improper attempt to conceal the identities of settling claimants. [*See* pp. 13-15, *infra*.] For as surely as destroyed evidence or the unavailability of a witness may frustrate the ends of justice, so too will wrongfully concealed evidence. This is particularly true where, as here, time is of the essence. [*See* pp. 7-8, *infra*.] As the months progress and the milestones set forth in the Master Settlement Agreement are reached, the date is rapidly approaching when releases will be finalized and money will flow. Both or either of these events may gravely impair Petitioners' rights and injustice will occur if Petitioners are not given concealed information and the opportunity to timely assert and vindicate their legitimate rights.

Finally, it must be noted that this Petition is not made only on behalf of private insurers. One Petitioner, the County of Erie, is a governmental entity which under New York State law, *see* New York Social Service Law § 368-a, 18 N.Y.C.R.R. § 360-7.4, is responsible for providing Medicaid coverage for those eligible among a population of over one million people. Neither PSC nor Merck, perhaps deliberately, address this aspect of the Petition. However, as will be plain [*see* pp. 13-23, *infra*] most of their arguments do not apply to Erie County or other public health insurers.

## II.   FACTUAL BACKGROUND

### A.   The Vioxx Litigation

Heretofore, Petitioners have been strangers to the Vioxx litigation. Accordingly, it would be presumptuous to recite to this Court, Merck or the PSC anything of its history. This is true not only because this Court and the litigants have no doubt lived that history intensely and intimately;

but perhaps more importantly, because there may be significant aspects of that litigation, which occurred behind closed doors, that are unknown to Petitioners.

Nonetheless there are some matters which are known and which should be noted. These include: (1) the manner in which the data at issue was collected pursuant to Court Order; (2) the manner in which that data, as well as settlement and other critical proceedings were kept confidential; and (3) the manner in which the potential interests of Petitioners appear to have been prejudiced in these proceedings by counsel who had purported to represent them.

Turning first to the collection of data, pursuant to the Orders of this Court and State Courts in New Jersey, Texas and California, plaintiffs filed under oath, profile forms which *inter alia* contain the names, addresses, social security numbers and docket information for each injured or deceased party. In addition both plaintiffs' counsel and Merck now undoubtedly possess, through the discovery process, identities of the health insurers of many, if not most of these injured or deceased individuals. Petitioners ask nothing more than the production of data that has already been compiled and produced.

Accordingly, the simple act of redacting and producing in redacted form these discovery responses, would, without meaningful effort, provide Petitioners with necessary disclosure.

Insofar as confidentiality is concerned, there are two separate issues that deserve attention. The first of these concerns the Confidentiality Order(s) of this and other Courts pursuant to which the above-described disclosure has been shielded from the public at large and Petitioners specifically.[2]

---

[2]     The Orders in question include:  MDL Pretrial Order Nos. 13 and 18 and the New Jersey Amended Stipulation and Protective Order Regarding Confidential Information, dated December 16, 2004.

Of course, Petitioners recognize that Confidentiality Orders have a legitimate role to play, and also understand that some information which may be contained in these forms may deserve a confidentiality designation. On the other hand, this hardly means that all information in these forms, and particularly the limited data now at issue deserves this status. [*See* pp. 22-23, *infra*.] This is especially true since as a general matter the business of this or any court is public business, and there exists a weighty presumption that absent a compelling reason to the contrary, court proceedings should be transparent and open to the public. *See, e.g., Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 567-69 (1980); *Doe v. Steagall*, 663 F.2d 180, 184 (5th Cir. 1981).

The second, and somewhat different (but important) set of confidentiality concerns relate to the settlement process. Once again, Petitioners entirely understand why it was appropriate for Merck and plaintiffs' counsel to negotiate in secret and pursuant to mutual undertakings of confidentiality. They also understand how a court may properly participate in such negotiations to encourage or facilitate a desirable resolution of a costly, complex and difficult litigation. None of this is a basis for criticism.

The difficulty stems from the fact that the very counsel who were secretly negotiating this settlement on behalf of the injured and deceased parties, had also publically undertaken, or at least sought to represent on a class basis, both private and public health insurers, including presumably the very Petitioners now before the Court. [Petition ¶¶ 49-51.][3] Moreover, among the claims that were being asserted by these counsel were the very subrogation and lien interests which Petitioners now wish to vindicate. [*Id.*]

---

[3]     Indeed, as Petitioners understand it, the Master Class Action Complaint which articulates these claims was prepared at the Court's direction.

It seems plain [*see* pp. 20-22, *infra*] notwithstanding the duties owed by plaintiffs' counsel to third-party payers, including Petitioners, that the interests of Petitioners were either ignored, or more likely deliberately harmed by Merck and the PSC in fashioning the settlement agreement.

It is against this background that the otherwise proper secrecy that cloaked these proceedings becomes problematic. After all, as this Court well knows, until the very moment that settlement was announced, both Merck and the PSC frequently and persuasively claimed that this litigation would be one of unyielding case-by-case adjudication stretching endlessly into the future. It now appears that plaintiffs' counsel and Merck, may have come to know differently -- but Petitioners most certainly did not. From Petitioners' perspective, until the surprising day in November 2007 when settlement was announced, the prospects of such an outcome, especially at that time, seemed remote.

Accordingly, secrecy, which may otherwise have been proper, has been unfair to Petitioners in two respects. First, and particularly in light of the time schedules announced in the Master Settlement Agreement, Petitioners are placed at a significant temporal handicap in asserting and vindicating their rights, a handicap that is compounded by Merck and the PSC's refusal to release the data at issue.

Finally, it is undeniable that Petitioners, as members of a putative class that plaintiffs' counsel were seeking to represent, were entitled to expect plaintiffs' counsel to fulfill their duty to act on their behalf, or at a minimum to do no harm. The likely breach of those duties [*see* pp. 20-22, *infra*] must weight heavily here.

**B.    The Settlement**

The PSC takes pains to assert that the Master Settlement Agreement is a private contract which confers no third-party beneficiary status upon Petitioners. [PSC Mem. at 2-3.] Insofar as this

sometimes obscurely worded document can be understood by outsiders, these assertions appears to be inaccurate.

Petitioners are at a loss to understand how a settlement agreement that purports to globally resolve much of a mass tort litigation; that sought and received either the approval or acquiescence of a federal and three state court judges; that assigns to this Court supervisory and administrative responsibilities; and that has been the subject of ongoing and continuing judicial proceedings and oversight, can possibly be characterized as a purely private agreement.

Nor can the assertion that no third-party benefits have been conferred be accepted at face value. Certainly insofar as the public Petitioners are concerned, it does appear that both Merck and the PSC have voluntarily undertaken to effect, if not to protect and vindicate their lien interests. [*See* Merck Mem. at 2; Petition, Exhibit H at 44-46.]

In fact, the Master Settlement Agreement and supporting documents make plain that the potential claims of private health insurers, including Petitioners, were not only considered by Merck and the PSC, but that steps were taken by the parties to the Settlement Agreement, to effect, influence and frankly to prejudice Petitioners' rights. Given the complex web of contractual relationships and obligations existing between plaintiffs' and their health insurers [*see* pp. 20-22, *infra*], the duties of representation and fair dealing that exists between plaintiffs' counsel and the class of health insurers they seek to represent, it seems doubtful that third-party beneficiary or some quasi-contractual status is lacking.

In all events, both the settlement schedule, and the form of the negotiated releases, acting together, are prejudicial to Petitioners, particularly in the light of wrongfully withheld data.

As things now stand, to Petitioners' understanding, the following schedule exists:

| February 29, 2008: | In order to qualify for an Interim Settlement Payment, each claimant must deliver to the Claims Administrator a properly and fully executed Enrollment Form including a signed release. |
| March 31, 2008: | Deadline for submission of supporting papers related to Enrollment Form for those seeking Interim Settlement Payment. |
| May 1, 2008: | In order to participate in Settlement Program, all other eligible claimants must submit Enrollment Form by this date. |
| June 1, 2008: | By the latter of this date (or three months after the Walk Away Right has expired) Merck to submit the sum of $250,000,000 into MI Settlement Fund. |
| June 30, 2008: | Merck to deposit, within two days, $500,000,000 into MI Settlement Fund and $4,100,000,000 into an Escrow Fund. |
| August 1, 2008: | The first possible date by which Interim Settlement Payments will be made to Eligible Claimants. |

Moreover, the releases required by the Settlement Agreement purport to relieve Merck of any responsibility for Petitioners' claims. The Exemplar Release has claimants release Merck from responsibility for claims of all descriptions including specifically Third-Party Provider/Payor claims, and also contain an indemnification provision running to Merck's benefit in which both plaintiffs and counsel would hold Merck harmless with respect to these claims.

Once releases are executed and settlement monies have flowed, Petitioners' rights may be impaired both legally and factually. For this reason, as well as others, time is of the essence, for here, truly, justice delayed is justice denied. *See, Bombardier Aerospace Employees Welfare Benefit Plan v. Ferrer*, 354 F.3d 348 (5th Cir. 2003).

### C.   Petitioners

Petitioners,[*see* Petition at ¶¶ 1, 8-18] are a substantial number of health care insurers, both public and private, as well as Health Care Recoveries, Inc. ("HRI"), a company that has long been

retained by many of these health insurers, specifically for the purpose of pursuing on their behalf subrogation entitlements.[4]

Setting aside for the moment the County of Erie, which is a public entity providing Medicaid coverage, the private health insurer Petitioners are a diverse collection from all across this nation, and in the aggregate provide coverage to tens of millions of Americans.  In the aggregate, they undoubtedly provided coverage to thousands of plaintiffs in this litigation.  And while the insurance plans at issue may be variable as to their language and may be governed by variable provisions of state and federal law (or both), there is no doubt (and neither Merck nor the PSC deny) that these plans generally, if not universally, require covered insureds to notify the carriers when they bring, and certainly when they plan to settle lawsuits concerning personal injuries or conditions for which these insurers have provided coverage.  It is also beyond argument that these plans seek to bestow upon these carriers subrogation rights to recover out of the proceeds of any settlement or judgment some or all of the funds expended on their insureds.  Finally, it is not contested that claimants [insureds] who deliberately violate these contractual obligations of notification and cooperation in vindicating subrogation claims face potentially severe consequences, including the cancellation of coverage.

---

[4]      It should be understood that HRI was not newly retained by health insurers as a consequence of this Vioxx litigation.  Rather there are longstanding relationships, and HRI actively pursues subrogation claims for its clients in many contexts.  Again, to be clear, not all Petitioners listed in the Petition are HRI clients.  Some, such as the 1199 SEIU Greater New York Benefit Fund and the New York State Teamsters Council Health and Hospital Fund have simply retained Petitioners' counsel to independently pursue on their behalf, *inter alia* these subrogation claims.  In other instances, as the Petition indicated [Petition, ¶ 1, fn 1] a handful of insurers appear to have retained more than one entity to pursue these claims.  Thus, some of the health insurers represented by HRI had multiple relationships with respect to subrogation representation.  Accordingly, at this time the following entities will likely be prospectively represented by others and should not be subject to this Petition:  BBS of Massachusetts; HIP Health Plan; Arkansas Blue Cross Blue Shield; and Blue Advantage Administrators of Arkansas.  All of the other parties continue to seek relief.

Against this background, the PSC (but not Merck) has made the extraordinary argument in their Motion to Dismiss [PSC Mem. at 7-12] that none of these Petitioners (presumably including the County of Erie) possess even colorable claims that might be prosecuted in this or any court. This is untrue, as is acknowledged elsewhere by Merck [*see* Merck Mem. at 2] and as will be demonstrated below. [*See* pp. 17-20, *infra*.]

Indeed and just as a matter of illustration, set forth below at length is the relevant language of the insurance plan of but one of the Petitioners, 1199 SEIU Greater New York Benefit Fund which states as follows:

> When another party is responsible for an illness or injury, the Plan Administrator has rights to recover the full amount it has paid or will pay related to any claims which you may have against any person or entity. This means you are assigning your rights in any recovery to the Fund to the extent of the Fund's payments on your behalf. The Fund's right to recover the payments comes before you can recover. Therefore, the Fund has an independent right to bring an action in connection with such an injury or illness in your name and also has a right to intervene in any such action brought by you. It also means that the Fund has an equitable lien on the proceeds of any verdict or settlement reached in a lawsuit that you bring against someone for causing an illness or injury, when the Fund has paid for costs arising from that person's actions. The Fund has a right to be repaid from those proceeds. **You must notify the Fund of any accident or injury for which someone else may be responsible. Further, the Fund must be notified of initiation of any lawsuit arising out of the accident or incident.**
>
> **You are required to provide the Fund with any and all information and to execute and deliver all necessary documents as the Plan Administrator may require to enforce the Fund's rights.** Once the Fund learns that another party may be responsible, you must sign an agreement (or a "lien") affirming the Fund's rights with respect to benefit payments and claims. Benefit payments are not payable until this agreement is signed and received by the Fund.
>
> If you receive payments from or on behalf of the party responsible for an illness or injury, the Fund must be repaid from those payments. You must repay the Fund regardless of whether the total amount of the recovery is less than the actual loss and even if the party does no admit

responsibility, itemize the payments or identify payments as medical expenses. **You cannot reduce the amount of the Fund's payments to pay for attorneys' fees incurred to obtain payments from the responsible party.** The Fund's rights provide the Fund with first priority to any and all recovery in connection with the injury or illness. **The Fund has these rights without regard to whether you have been "made-whole."**

**If you fail or refuse to sign a lien or to comply with these terms, the Plan Administrator may suspend your eligibility for benefits and/or recovery from providers' money paid to them, until the Fund is fully repaid.** In addition, the Plan Administrator may bring a court action against you to enforce the terms of the Plan.

**By accepting the Fund's payments, you are consenting to a constructive trust being placed on the amount owed to the Fund out of any proceeds.** [emphasis added]

(Excerpt thereof attached as Exhibit A to attached Declaration of Steven J. Phillips.)

This particular plan (as are many if not most of Petitioners' plans) is a self-funded plan under ERISA. [*See* Petition ¶ 12.] Both the Supreme Court and the Fifth Circuit authority establish that such plans utilizing such language, give rise to claims that are cognizable in this Court and elsewhere. [*See* pp. 17-20, *infra*.]

In addition, moving beyond the matter of contractual, statutory and/or common law rights, a number of practical realities respecting health insurers and the vindication of subrogation interests also need to be aired.

Sooner or later plaintiffs' counsel or Merck are likely to argue, and plaintiffs' counsel did in New Jersey,[5] that Petitioners should just go out and figure out what liens to assert in the "regular" or "old fashioned" way, as if there were such a thing (which there is not); and as if such methodology might apply in the unusual context of this MDL litigation (which it most certainly does not).

_____

[5]     A Petition similar to this one was presented to Judge Higbee on March 14th and denied by her with leave to reargue should this Court reach a different conclusion.

As Petitioners have explained, with the rarest of exceptions,[6] the thousands of plaintiffs who undoubtedly received medical benefits from these Petitioners have wrongfully failed to notify them of these lawsuits or the impending settlements.  Moreover, counsel from the PSC, presumably writing on behalf of the plaintiffs' bar and plaintiffs, have wrongfully refused to respond to Petitioners' traditional request for information.  [*See* Petition ¶¶ 28-53.]

Moreover, in ordinary litigation, discovery responses and pleadings which routinely contain names, addresses and social security numbers, are not sealed or subject to confidentiality orders.  Nor will there exist under normal circumstances fourteen thousand claimants, subject to tolling agreements, whose names are hidden as are all other information about them.  In short this is not a normal situation.  In ordinary litigation, cases are not filed in, or transferred to multiple courts in distant locations.

This is also not a normal situation because of the nature of the "injuries" at issue.  Health insurers can develop algorithms to ferret out wrongfully concealed tort claims where traumatic or orthopaedic injuries are involved, because those injuries are of a sort that usually or often give rise to garden variety tort or workers compensation claims.  However, here, where the injuries most at issue are heart attacks or strokes, no such techniques exist.

In the end, the simple truth is that Petitioners have taken the reasonable steps including most notably asking plaintiffs' counsel to fulfill their and their clients' duties to provide data and identify and notify these carriers of these lawsuits and settlements.  The PSC has refused this proper and normal request, and attempts to use the confidentiality order of this Court to prevent disclosure.

---

[6]     A tiny handful of plaintiffs' counsel have voluntarily revealed to Petitioners' counsel the data requested.  [*See* Petition, Exhibit N.]  It may also be that a minuscule number of other liens have been serendipitiously uncovered.  However it cannot be denied that the overwhelming number of plaintiffs have, through counsel, wrongfully refused to reveal, and have actively sought to conceal this data.  [*See* Petition ¶¶ 31-37, *see also*, pp. 20-22, *infra*.]

This is not a game of hide and seek.  Petitioners are entitled to this data.

## III.    ARGUMENT

### A.    Disclosure Is Proper Under Fed.R.Civ. P. 27(a)

Fed.R.Civ. P. 27(a)(3) clearly states the circumstance where a court is required to authorize pre-action disclosure:

> If satisfied that perpetuating the testimony may *prevent a failure or delay of justice*, the court *must* issue an order . . . [emphasis added]

Thus, where the showings required by Rule 27(a)(1)(A) through (E) have been made, as they have been here (*see* pp. 16-17, *infra*), and where proper notice and service have occurred (*see* pp. 16-17, *infra*), the essential inquiry concerns failure or delay of justice, neither more nor less.

It may well be that the most commonly encountered circumstances where delay or failure of justice involve either witnesses who are elderly, infirm or about to leave the jurisdiction on the one hand; or alternatively situations where evidence is in danger of being destroyed (*e.g.*, PSC Mem. at 12-13; Merck Mem. at 6-9).  However both the commentators[7] and case law have long recognized that this rule is not strictly limited to disappearing witnesses or evidentiary spoliation.  For instance, in *Sunrise*

---

[7]       In this vein, two Law Review articles may be of some use to the Court.  The first, Hoffman, Access to Information, Access to Judgment: The Role of Presuit Investigatory Discovery, 40 U. Mich. J.L. Reform, 217 (2007), brought to our attention by this Court, is an empirical study of the efficacy of pre-action disclosure in the state courts of Texas, where, by rule and practice, relatively liberal pre-action disclosure is encouraged.  The conclusion reached by Professor Hoffman's research is that the interests of justice are better served by liberal, rather than stingy pre-action disclosure.  Of course the federal rules were written to promote  the same interests of justice and the principal message that may be taken from this article, in Petitioners' view, is that this Court ought to interpret Fed.R.Civ. P. 27(a) liberally, with the ends of justice in mind.
    Another article to the same effect is Kronfeld, The Preservation and Discovery of Evidence Under Federal Rule of Civil Procedure 27, 78 Geo. L.J. 593 (1990).  In this article Professor Kronfeld again sets forth the liberal purposes of Rule 27(a) as expressed both in the Advisory Committee notes and also commentator's analyses.  This article recognizes that some courts have nonetheless taken an exceedingly narrow,. and in the author's view an improperly restrictive view of this rule based upon four considerations that do not exist here: (1) the preference for live testimony at trial; (2) the coercive affect of discovery; (3) the unfairness of imposing the cost of disclosure on potentially adverse parties; and (4) the limited role that equity plays in the law.

*Shipping, Ltd v. American Chemist*, Civ. A. No. 96-2849, 1997 U.S. Dist. LEXIS 16377 (E.D. La. October 15, 1997) another jurist of this Court, in affirming a Magistrate's order granting a petition pursuant to Fed.R.Civ.  P.  27(a) quoted with approval the following language from Moore's Federal Practice, §  27.14[1]:

> The language of Rule 27 is quite broad, granting authority to courts to issue an order on a finding that the perpetuation of testimony may prevent a failure or delay of justice. This language has not been read as a grant to district courts to act independent of the rule's historical limits (citation omitted). Nonetheless, its broad language directly reflects the equitable origins of the device and the more specific requirements should be read through the eyes of a Chancellor with focus upon the malleable character of orders to perpetuate and their ability to be tailored to specific fact situations.

Similarly, in *In Re Richard L. Baxter*, Misc. No. 01-00026, 2001 U.S. Dist. LEXIS 26001 (W.D. La. December 19, 2001), the district court denied a motion to intervene and allowed a petition under Rule 27 to proceed for the purpose of providing  the names and identities of authors, editors and publishers of allegedly false and defamatory materials published on a website.  The petition stated that the petitioner expects to be a plaintiff in a lawsuit but was unable to bring the action because he did not know the identities of the persons who authored, edited and published the materials on the website, and that the proposed defendants were the website operator and the unknown authors, publishers and contributors to the website.  2001 U.S. Dist. LEXIS 26001 * 2-3.

In *Petition of Alpha Industries, Inc.*, 159 F.R.D. 456 (S.D.N.Y. 1995), the district court upheld permitted a Petition under Rule 27 in order to determine whether the wrongdoer (an entity allegedly committing trademark or copyright infringement) was the respondent or one of the petitioner's own distributors.  At oral argument, the respondent asserted, as does the PSC here, that Rule 27 was not a method of discovery to determine whether a cause of action existed.  The court rejected respondent's argument and stated that the mere fact that the petitioner must delay bringing suit until

receiving the information sought was a sufficient showing to allow the use of Rule 27 to perpetuate respondent's testimony.  159 F.R.D. at 457.[8]

What is clear from each of these decisions is that latitude is provided under federal rules with regard to petitions for pre-action discovery.[9]  Here, where granting the Petition would provide an easy means to resolve the outstanding issue of the rights of the insurer petitioners as weighed against the rights of the insured personal injury plaintiffs, the interests of justice clearly weigh in favor of granting the Petition.

---

[8]     *See also, In re Bay City Middlegrounds Landfill Site,* 171 F.3d 1044 (6th Cir. 1999) (Court granted Rule 27 Petition in finding that there was no requirement that the testimony sought not be available by other means and that Rule 27(a)(3) required only that the court hold that a failure of justice would result from Petitioner's denial).

[9]     *In Re Skylight Shipping Corp.,* 1999 WL 1293472 (E.D. La.), a case decided by this Court is readily distinguished from the instant Petition.  In *Skylight* an arbitration proceeding in an admiralty matter was underway in Great Britain.  The Petitioner wished to depose 11 crew members who resided in the Eastern District of Louisiana for the purpose of using that testimony in the arbitration, and only speculatively, to use the testimony in a future proceeding in the United States in the event that the arbitration somehow failed to resolve the matter.  The principal bases for rejecting the petition, as articulated by the Magistrate, appear to be twofold.  First, case law suggested that neither Rule 27(a) discovery, nor Rule 26 discovery were appropriate in aid of an arbitration context, since the essence of arbitration is to avoid the cost of formal discovery.  In the same vein, the pendency of the arbitration undercut the necessary assertion under Rule 27(a) that litigation would occur, but could not be brought at this time.  Another basis for defeating that petition concerned the fact that the witnesses to be deposed were neither aged nor likely to leave the jurisdiction, and thus the interests of justice did not require that the testimony be preserved.  None of these considerations apply here.
The same can be said of *Willis v. Cook,* 2008 WL 596007 (N.D. Tex.).  There the court adopted a Magistrate's report and denied an Fed.R.Civ. P. 27(a) petition where a convicted felon imprisoned in a Texas State correctional institution wished to depose the Clerk of the Tarrant County to assist him in prosecuting a claim against either that Clerk or the State Bar of Texas.  The purported purpose of the petition was to determine the names of potential defendants, and to frame a specific complaint.
The *Willis* court concluded that petitioner had failed to show that he is presently unable to file a federal action based upon the facts already known to petitioner, and accordingly did not even reach the other reasons articulated by the Magistrate.  In this case, unlike *Willis,* petitioners are not yet able to file an action both because the identities of their insureds remain hidden and also because, the funds and specific settlements which will be the subject matter of their suits, have not yet been finalized or come into existence.

1.     **The Criteria of Fed.R.Civ. P. 27(a)(1)(A)-(E) Have All Been Met**

The PSC has challenged the adequacy of Petitioners' showing under Fed.R.Civ. P. 27(a)(1)(A) by arguing that Petitioners' do not possess potential claims cognizable in American courts. [PSC Mem. at 7-12.]  The lack of merit to that contention is discussed both at pages 13-15, *supra* and also Point III. B. to follow.

That aside, neither Merck nor the PSC appear to question that Petitioners have fulfilled the remaining requirements of Fed.R.Civ. P. 27(a)(1).  Petitioners' subrogation and lien interests in the proposed settlement and the subject matter of the contemplated actions have surely been described, as are the facts that Petitioners intend to establish.

In addition the names of the adverse parties presently known to Petitioners, namely Merck and plaintiffs' counsel, as well as their addresses have also been identified.[10]  Of course the plaintiffs' themselves, who may be parties to these actions, cannot now be identified, which is precisely the point of the Petition.  However as will be discussed below, Fed.R.Civ. P. 27(a)(2) specifically contemplates this possibility and provides for the situation where a potential adverse party cannot be identified or served.

2.     **The Provisions Of Fed.R.Civ. P. 27(a)(2) Have Been Met**

Fed.R.Civ. P. 27(a)(2) requires that potential adverse parties to a contemplated lawsuit be served with a Rule 27(a) Petition so that they may oppose disclosure, or alternatively participate in whatever disclosure the court might order.  However, that rule expressly recognizes that there may be occasions where such adverse parties cannot be identified or served in the normal manner, and permits

---

[10]     It is well-established, that plaintiffs' counsel are a proper party as is any party holding funds (in this case Merck) in an equitable action under ERISA to enforce the terms of a subrogation lien or contract.  *See, Bombardier Aerospace Employees Welfare Benefit Plan v. Ferrer*, 354 F.3d 348 (5th Cir. 2003).

the court to authorize both alternative methods of service and, if necessary, the appointment of counsel to protect the interests of missing parties.

In this matter the attorneys for these "missing or unidentified" parties have been served, know the identities of their clients, and are capably appearing to represent the interests of these as yet unidentified or concealed individuals. Beyond question, the requirements of notice, the opportunity to resist the Petition, and representation at any ordered discovery have all been fully met.

### 3.    The Documentary Nature Of The Disclosure Sought Is Entirely Proper

As a practical matter, although Fed.R.Civ. P. 27(a) is phrased in terms of deposition disclosure, it is well-settled that documentary disclosure of the type here contemplated is proper under this rule. *See, e.g., Petition of Ingersoll Rand Co.*, 35 F.R.D. 122 (S.D.N.Y. 1964), on rehearing 35 F.R.D. 568 (S.D.N.Y. 1964); *In re Petition of Pacific Technology Corporation*, 00 Civ. 2622 (JSM) 2000 U.S. Dist. LEXIS 15797 (S.D.N.Y. October 31, 2000).

### B.    Petitioners' Possess Valid Claims Which They Are Entitled To Vindicate

Considerable effort was expended by the PSC in their motion arguing the extraordinary proposition that these Petitioners do not possess, even colorable, or actionable rights. [PSC Mem. at 7-12.] This position lacks merit.

In the first instance, it is beyond argument that the County of Erie, a public entity providing Medicaid coverage to its citizens pursuant to federal and state law, has the statutory right to recover the liens that exist as a consequence of any coverage it provided to injured claimants or decedents in this litigation. [Merck Mem. at 2.] Moreover, the Master Settlement Agreement expressly recognizes these rights.[11] [Petition Exhibit H at 44-46.]

---

[11]     The fact that the PSC and Merck have privately agreed to respect the rights of public third-party payors, is not binding upon these public payors, and specifically the County of Erie. In all events, if Merck and the PSC are sincere with respect to the public payors, one would expect that they

(continued...)

Insofar as the rights of the private third-party payor Petitioners are concerned, the PSC's motion papers notwithstanding, both the Master Settlement Agreement [Exemplar Release, *supra*], pleadings [Petition, Exhibit O], as well as the settlement materials assembled by the PSC [Petition Exhibit M] all repeatedly acknowledge that private health insurers can be expected, at least in some instances, to possess cognizable subrogation rights.

Finally, in submissions recently made in the Superior Court of the State of New Jersey counsel for the PSC, as well as counsel for Merck each tacitly conceded that Petitioners are certain to have in many cases valid subrogation or reimbursement claims which may be asserted [*see* letter brief of Christopher Seeger, Esq., dated March 6, 2008 at 4-5 (Exhibit B to attached Declaration of Steven J. Phillips) and letter brief of Hope S. Freiwald, Esq. on behalf of Merck, dated March 6, 2008 at 4 (Exhibit C to attached Declaration of Steven J. Phillips).

Moreover, it cannot be disputed that the Employee Retirement Income Security Act ["ERISA"] permits health insurers like Petitioners to require their beneficiaries to reimburse them for medical and other benefits received by that beneficiary from a tortfeasor alleged to have caused the injury for which the benefits were paid. Only recently, in *Sereboff v. Mid Atlantic Medical Services*, 547 U.S. 356 (2006), the United States Supreme Court clarified a previous dispute among circuit courts on this issue, and unequivocally upheld a health insurer's right to seek equitable relief under section 502(a)(3) of ERISA [29 U.S.C. § 1132(a)(3)] to enforce health plan provisions requiring reimbursement of benefits from a tort settlement. In so doing, the Court expressly found that the reimbursement language of a

---

[11](...continued)

would not resist this Petition insofar as the County of Erie is concerned, or would otherwise enter into a stipulation or order voluntarily providing the requested data to the County of Erie so that it can independently determine what liens it is entitled to prosecute.

properly worded plan constitutes an "equitable lien" against the proceeds of the lawsuit.  As plaintiffs and Merck do not deny, reimbursement language is a common feature of virtually all health plans.

The Fifth Circuit Court of Appeals, whose law controls this MDL, has long recognized the right of insurers under ERISA to be reimbursed from a personal injury settlement.  *In Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, et. al, supra*, the Court of Appeals affirmed the district court's grant of summary judgment to the plaintiff health plan, and enforced the terms of the plan's reimbursement provision.  There, the health plan brought suit against both the personal injury plaintiff and his attorney, and the Circuit Court held that the "the law firm, as counsel for the plan participant and stake holder of specifically identifiable settlement funds....fits comfortably within the 'universe of possible defendants' subject to suit under [ERISA section 502(a)(3)]."  *See also Walker v. Wal-Mart Stores, Inc.,* 159 F.3d 938 (5th Cir. 1998) (health plan entitled to 100% of recovery of all funds received by the plaintiff in the settlement, up to the full amount of benefits provided, without a set-off for attorneys fees and expenses).[12]

In short, it cannot be seriously disputed that health insurers have a substantial and legally cognizable interest – measured collectively in the many millions of dollars –  in the monies to be paid by Merck in the Vioxx Settlement.  Under ERISA, they are plainly entitled to pursue these funds in accordance, of course, with their plan provisions.

Even where the preemption provisions of ERISA do not apply, neither plaintiffs nor Merck deny that the law of many States also recognize the subrogation or lien rights of health insurers, even though the laws of other States may be hostile to such recoveries.  Thus, in the minority of cases

---

[12]     Indeed, in states where so-called "anti-subrogation" laws exist, *e.g., Perreira v. Rediger,* 169 N.J. 399 (N.J. 2001) the reimbursement claims of ERISA-covered providers are still viable under federal law.  The Third Circuit has squarely ruled that this New Jersey law is pre-empted by ERISA.  *Levine v. United Healthcare,* 402 R.3d 156 (3d Cir. 2005).  As such, health insurers' entitlements to reimbursement under ERISA cannot be defeated by contrary state law.

where federal law does not provide a cause of action, Petitioners may well be protected by applicable state laws.

**C.**     **The Requested Data Is Being Wrongfully Withheld**

It may be understandable that the PSC and Merck might wish to frustrate or impair Petitioners' ability to identify their liens or vindicate their subrogation rights. These liens, if vindicated, may diminish plaintiffs' recoveries, and in some cases may also diminish the attorneys' fees to which counsel might otherwise be entitled. *See, e.g., Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, et. al., supra; Walker v. Wal-Mart Stores, Inc., supra.* In addition Petitioners appreciate that the PSC, Merck, and perhaps the Court may have the concern that Petitioners in vigorously pursuing their legitimate subrogation rights may render more complicated the consummation of the settlement of this litigation.[13]

Those concerns, which are unarticulated in Merck and the PSC'S motions, nonetheless are the real reasons why they oppose this Petition. It is respectfully suggested, that these motivations remain unarticulated precisely because they have no lawful basis.

As was earlier related, and this cannot be denied by either Merck or the PSC, virtually every plaintiff or claimant has a contractual obligation to notify their health insurers of the fact of their claim or lawsuit, and certainly of the fact of impending settlement. With the rarest of exceptions, plaintiffs' and their counsel have deliberately and knowingly breached these contractual duties. This conduct is wrongful not only on the part of the plaintiffs, but also on the part of counsel.

---

[13]     Of course, Petitioners have no desire, and it is contrary to their ultimate interests to frustrate or impair settlement. Rather, their legitimate desire is to obtain a "seat at the table" so that their legitimate interests and rights might be fairly evaluated and recognized. At that time, Petitioners would hope and expect to act responsibly and cooperatively to advance the overall goal of achieving a global settlement. It is only because Merck and the PSC have refused to recognize Petitioners' legitimate interests, that they are compelled, and will be compelled to resort to litigation.

Moreover, misconduct is particularly problematic by virtue of counsel's purported representation of Petitioners, and the duties they assume, and then breached with respect to subrogation rights they now seek to frustrate or impair. *See, e.g., Piambino v. Bailey*, 757 F.2d 1112, 1144 (11th Cir. 1985).

Fed.R.Civ. P. 27(a)(3) looks to equity and concerns itself with the failure or delay of justice. Petitioners have shown that Merck and the PSC have wrongfully withheld information in an effort to frustrate Petitioners ability to bring and vindicate valid or potentially valid claims. That is unjust. Accordingly, as a matter of equity, this Court while perhaps understandably concerned about the settlement before it, nonetheless, has a duty to recognize that the interests of justice require that this Petition be granted.

Finally, it may be, although unstated, that the PSC and Merck view Petitioners as interlopers who are arriving after years of hard work to demand monies which psychologically, the PSC views as belonging exclusively to their injured clients and themselves. Such emotions may be understood, but nonetheless are misplaced.

Petitioners, when plaintiffs were in need, fulfilled their obligations and paid hundreds of millions of dollars to provide medical care to injured plaintiffs and their decedents. Indeed they still continue to pay for the ongoing medical care of these parties. Presumably, no injured plaintiff or their counsel complains about this. Viewed in this context, efforts to frustrate Petitioners' lawful efforts to recoup from tort recoveries some share of these expenditures, is neither seemly nor just.

Nor is this altered by the fact that it was plaintiffs' counsel, and not Petitioners' counsel who prosecuted the underlying litigation. That was the role of plaintiffs' counsel, and a role which may well have been capably performed. It was not Petitioners' role. Rather, Petitioners have timely

presented themselves at this point when their potential rights and the apparent attempt to violate those rights have first come into focus.

### D.   Alternatively, This Court Should Modify Or Relax Its Confidentiality Order To Make Available To The Public The Requested Data

The PSC and Merck repeatedly complain in broad conclusory terms that Petitioners are seeking to impermissibly violate highly sensitive privacy interests of plaintiffs and on this basis the Petition must be denied.   [*See* PSC Mem. at 14-15; Merck Mem. at 8-9.]  This is incorrect.

All Petitioners seek are names (which are already in some measure public for plaintiffs although not for claimants with tolling agreements); addresses; social security numbers; and the identities of plaintiffs' health insurers.  No one is seeking medical records, psychiatric records, or any sort of highly personal information of a type that might normally be worthy of confidentiality protection.

For instance, social security numbers, when they are a critical data field for identifying plaintiffs, are frequently disclosed in the context of complex multiparty or class action litigation.  *See, e.g., Patton v. Thomson Corp.*, 364 F. Supp. 2d 263 (E.D.N.Y. 2005) (social security numbers of putative class members ordered disclosed); *Upshaw v. Georgia Catalog Sales, Inc.*, 206 F.R.D. 694 (M.D. Ga. 2002) (in class action under RICO and state usury law, lender ordered to provide class list that included the names, last known addresses, telephone numbers and social security numbers); *Babbitt v. Albertson's Inc.*, 1992 U.S. Dist. LEXIS 19091 (N.D. Cal. 1992)(in Title VII class action, employer ordered to disclose names, addresses, telephone numbers and social security numbers of current and past employees); *Nat'l Assoc. for the Advancement of Colored People v. Boston Housing Authority*, 723 F. Supp. 1554 (D. Mass. 1989) (court approved settlement entered in class action under Title VII of Civil Rights Act whereby plaintiff's counsel would be provided with the names, last known addresses and social security numbers of all class members); *Johnson v. Heckler*, 604 F. Supp. 1070 (N.D. Ill. 1985) (in class action involving standard to

be applied under Social Security Act for determining whether severe impairment exists, Commissioner of Social Security ordered to report to plaintiffs' counsel every four weeks with a list of the names and social security numbers of identified class members).

Furthermore, the Petitioner insurers already know the social security numbers of their insured. An individual insurer is already in possession of the social security number of any one of the individuals on whose behalf medical bills are paid. In all events, and notwithstanding the exaggerated privacy concerns, Petitioners are quite willing to receive this information subject to whatever confidentiality requirements, if any that Merck received them.[14]

## CONCLUSION

For the reasons stated, the motions to dismiss the instant Petition should be denied, and an order should be entered directing Merck and plaintiffs' counsel to provide the requested pre-action disclosure.

Dated: New York, New York
        March 19, 2008

Respectfully submitted,

**LEVY PHILLIPS & KONIGSBERG, LLP**

By:   /s/ Steven J. Phillips
                    Steven J. Phillips
800 Third Avenue - 13th Floor
New York, New York 10022

**CROWELL & MORING, LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

*Attorneys for Petitioners*

---

[14]    Petitioners, of course, as a consequence of HIPPA [Pub. L. No. 104-191, 110 Stat. 1936 (1996)] are not at liberty to reveal to the PSC or Merck a list of all insureds who might have taken Vioxx or suffered heart attacks or strokes.