# *Law Office of Ronald R. Benjamin*
## ATTORNEYS AT LAW

*Ronald R. Benjamin\**
*Marya C. Young\**

*126 Riverside Drive, P.O. Box 607*
*Binghamton, NY 13902-0607*

*\*Also Admitted in the District of Columbia*

---

*Phone 607-772-1442*          *Fax 607-772-1678*          *Email:ronbenjaminlaw@stny.rr.com*

---

May 29, 2008

**By Electronic Filing and Regular Mail**
The Honorable Eldon E. Fallon
United States District Court for the
Eastern District of Louisiana
500 Poydras Street
Room C-456
New Orleans, LA 70130

Re:   In Re Vioxx Product Liability Litigation, MDL No. 1657

Dear Judge Fallon:

Please let this letter serve as a pre-motion recitation of reasons to vacate or amend
PTO 28, in part discussed below, and perhaps more importantly, to join the dialogue in
trying to achieve a solution regarding the same short of motion practice.

I had the opportunity to listen to the arguments at the Court's May 22, 2008 status
conference and set forth herein the position of the clients I represent in light of the
same.

I want to preface my discussion regarding potential vacation or amendment of PTO 28
by preserving for the record objections to the settlement itself, as well as the issue of
whether or not PTO 28 is a derivation of the settlement, as the clients I represent were
or would have been considered members of the class that were part of the settlement
entered into November 9, 2007.  If the parties presented the Master Settlement

Agreement (MSA) to the Court for approval there would have been objections to treating all plaintiffs as similarly situated when the circumstances were such that subclasses would necessarily have had to not only be created but would have been entitled to separate representation.  If this procedure were followed, litigants who have sustained cardiovascular injuries not included in the MSA would have been able to raise their objections in an adversarial proceeding, not necessarily a fair hearing, at which time individual counsel would have been able to flush out the factual circumstances surrounding numerous conflicts among class members, including the fact that certain types of cardiovascular injuries were not being pursued by the PSC.

I mention the above issues for purposes of record preservation in that if my clients are able to proceed with their individual claims on a level playing field the issue of the settlement as to them may well be permanently moot. Accordingly, I now turn to PTO 28.

It is only necessary to begin by observing that there are undoubtedly cases pending before the Court that will not be able to survive a summary judgment motion since they are alleging injuries that simply cannot be attributed to the use of Vioxx.  (In Merck's opposition to the motion they have cited plaintiffs who have alleged "heart flutters, kidney stones, nervous sleep, hypertension, gastrointestinal bleeding, shortness of breath, dizziness, headache, insomnia, nausea, nervous condition, enlarged heart, phlebitis, rash, viral meningitis and acid reflux.  *See* Merck's Supplemental Brief in Opposition to Certain Plaintiffs' and Their Counsel's Emergency Motion for Modification and/or Suspension of Pretrial Order No. 28 ["Merck's brief"], at 4-5.)  Judge Weinstein has referred to the same as the "honey pot" that is part of this type of litigation.  In Re Zyprexa Product Liability Litigation, 238 FRD 239, 541 (EDNY 2006).  Accordingly, while the problem can be acknowledged, it is respectfully submitted PTO 28 can be narrowed so that it can aim directly at this problem without producing the antithesis of the very purpose of an MDL, namely, by making litigation more expensive for individual plaintiffs due to driving up their litigation costs and resources of their counsel and having to duplicate the expert disclosure which is being sought now rather than as the case nears trial.

As such, the very first amendment of PTO 28 should be to abolish the dichotomy between those who have agreed to accept a settlement and those who have refused.  Instead, it is respectfully submitted, PTO 28 should be aimed at plaintiffs who are alleging injuries that have not been fully adjudicated in previous *Daubert* hearings before the Court, *i.e.*, injuries other than MI, sudden cardiac death and ischemic strokes.  Plaintiffs who have these injuries should be required to do no more than set forth basic facts regarding ingestion and injury and make their expert disclosure in accordance with Rule 26 which would be either 90 days before trial or some other

reasonable date to be agreed upon by the parties/*[1]

As this Court is no doubt aware from filings by individual counsel, it appears statements made by the PSC during presentations made to counsel around the country have been to the effect that, "Individual claimants who do not participate [in the MSA] must expect to wait a very long time before their cases actually come to trial"./*[2] *See* January 30, 2008 Amended Motion by Certain Florida Claimants To Be Included in the Vioxx MDL Settlement Agreement, at para. 8, p.4..  Giving credence to the PSC's prediction strongly suggests it would be naïve and disingenuous to assume that any disclosure made now will serve at time of trial since it does not appear the Court is going to be remanding cases anytime soon. Indeed, regardless of when the cases actually proceed to trial in transferor courts there will undoubtedly be changes made not only based on the factual circumstances of the individual client, as well as the science, given the number of recent publications, *e.g.*, the VICTOR study was only published in the New England Journal of Medicine in July 2007, and many others to be published soon in light of the intense study going on around the country.  No expert would have any credibility unless his or her report takes into account these changes and studies.  Accordingly,  securing an expert report on specific causation for each individual case as contemplated by PTO 28 requires these plaintiffs to absorb an expense at least twice when there is no useful purpose other than to give Merck yet an additional edge in the litigation.

It is only obvious by now that the battleground for these plaintiffs is going to be individual causation and if that battle has to be fought in this Court rather than the transferor court, it should be just before remand and certainly not before the plaintiffs' depositions have been completed, at which information may surface that the physician or expert on individual causation did not address and would require that the report be

---

[1]*/Indeed, PTO 28  imposes a burden not required by the federal rules, in that non-settling plaintiffs are also being required, upon pain of dismissal, to submit written reports of case specific causation experts at this time, even though it is well settled that Rules 26(a)(2)(A) and (a)(2)(B) require identification but not written reports for treating physicians who present opinions on  causation.  *See* Hamburger v. State Farm Mutual Auto. Ins. Co., 361 F.3d 875, 882 (5th Cir. 2004).

[2]T/Since most plaintiffs have been in this MDL for three years already and have not been deposed, at least for those plaintiffs who have established ingestion and injuries that have already been subject to Daubert hearings, scheduling Rule 16 conferences to complete all discovery in individual cases would not only be consistent with the MDL process, but dispel any notion that litigants are going to receive differential adverse treatment if they do not join the settlement, virtually the only inference that can be drawn from the PSC telling counsel around the country they are going to be indefinitely – or at least for a "very long time" – trapped in the MDL if they do not enter the resolution  program

amended to incorporate new information. This often happens in normal litigation and given the advanced age of many plaintiffs, the associated memory problems, and their lengthy medical histories, one can reasonably expect this eventuality to occur. Parenthetically, it is worth noting that based on my own experience in MDL litigation, upon remand to the transferor court, the defendant will take another bite at the apple by moving for summary judgment again based on changes that have occurred and if none occurred, based on the ingenuity of the defendant's counsel.

It is also worth noting that the successes Merck has achieved to date may be explained in the first instance by the fact that risk factors enumerated in the MSA present a virtual smorgasbord for defense counsel to blame a plaintiff's injury on something other than Vioxx ./*[3]  This factor coupled with the premise that this litigation may be immature, mitigating against issuing an order such as PTO 28 at this time in the litigation. *See, e.g.,* Advisory Committee on Civil Rules in the Working Group on Mass Torts, *Report on Mass Tort Litigation*, 22- 25, 39 (Feb. 15, 1999) ["plaintiffs in the prematurely aggregated mass torts may be denied appropriate compensation"]; Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum.L.Rev. 1343, at 1360-62 (Oct. 1995) (noting procedural problems and risks to plaintiffs' rights associated with premature aggregation of mass tort claims). To date there have been no trial injuries involving DVT or PE or other cardiovascular injuries that may be attributable to ingestion of Vioxx./*[4]

In turning to the particular injuries that are the subject of the motion discussed at this Court's May 22 conference, the thromboembolic injuries, DVT and PE, I would note it is grossly unfair to accuse individual counsel representing these litigants of doing nothing or warehousing their cases waiting for someone else to establish causation for them. (*See* Merck's brief, at 4.) The PSC's offer to have the plaintiffs' counsel review millions of documents to present to their experts is not only unrealistic, but thrusts upon such individual counsel the very task not only assigned exclusively to the PSC by this Court, but for which they are seeking substantial fees that will ultimately be paid, not only by the plaintiffs, but by the individual counsel.

Any discussion of the merits of these claims must begin by addressing the two tables

---

[3]*/ In New York proximate cause may be established by proving that a plaintiffs ingestion of Vioxx "was a substantial factor in bringing about plaintiff's injuries, *see* Velez v. Craine & Clarke Lumber Corp., 33 N.Y.2d 117, 122, 305 NE 2d, 750 (1973).

[4]*/Counsel is aware of this Court's conclusion this litigation is "extremely mature" as set forth in PTO 29 (C).  It is respectfully submitted the discussion concerning the scientific evidence regarding DVT and PE discussed below would warrant reconsideration of the Court's conclusion since none of the 17 trials referred to by the Court involved injuries that are at issue here.

Merck attached to its supplemental brief in opposition to the motion before the Court suggesting the incidence of DVT or PE is no higher in Vioxx users than in persons who were taking a placebo.  This is a totally contrived response that borders on frivolity and appears perilously close to deliberately misleading this Court for the following reasons.

Merck's counsel is fully aware that none of the studies cited in the tables were powered to detect either DVT or PE events.  There is an excellent discussion of "power" as a statistical concept in <u>Turpin v Merrell Dow Pharm., Inc.</u>, 959 F. 2d1349, 1353 (6th Cir. 1999), and which provides an explanation as to the contentions above that Merck is deliberately misstating data for purposes of exonerating Vioxx.

Indeed, in light of Merck's practices in generating research it is remarkable that even the limited data on adverse cardiovascular events surfaced in the first place.  Merck used rheumatologists, by and large, not the people who would receive reports of adverse cardiovascular events, or pay attention to them if they did  surface.  It also employed clinical research contractors who did not have professional relationships with patients, and none of the studies these groups employed were designed to even address cardiovascular issues.  Merck's feeble effort here to use the tables as exculpatory is worse than junk science because they are in effect manipulating data that was actually only probative in one direction, namely, inculpatory, because when an underpowered study does reveal an unexpected increase in, *e.g.*, cardiovascular events, it is statistically valid and is a strong signal of toxicity.

In fact, Merck was on notice of the potential for adverse cardiovascular consequences even before the drug hit the market when its consultants suggested as early as 1987, after the VIGOR trial, that a study be carried out to determine the magnitude of the effect of Vioxx on cardiovascular events.  Although I cannot be certain, I believe this study actually was planned as the VALOR study, it is clear Merck canceled the same.

It seems that Merck was undeterred by recent publications in the New England Journal of Medicine (for example, the "Expression of Concern" published by Curfman, GD, Morrisy, S, Drazen, JM. N. Engl. J. Med. 2005; 353;26, which was followed by having to republish the APPROVE study because Merck acknowledged using a statistical method different from what was reported in the publication, *see* Bresalier, R, et al; N. Engl. J. Med. 355;2, since the tables submitted to this Court all turned out to suggest Vioxx was blameless in bringing about adverse cardiovascular consequences.

Since this Court has discussed the scientific issues in some detail in its *Daubert* decisions it is respectfully submitted it is unnecessary to go into any detail as to mechanism here. It is, however, worth noting that there does not appear to be any dispute that Vioxx has the opposite effect of aspirin. Since aspirin has been proven to reduce episodes of DVT and PE there is considerable jury appeal to the commonsense premise that, because of the same, Vioxx is more likely than not going to produce

increased thromboembolic events.

It is respectfully submitted that Merck's use of these tables  requires some detailed discussion because employing these tables to exculpate Vioxx suggests it may be premature to have issued an order such as PTO 28 at this juncture, since it may be construed as a punitive measure against holdouts, and regardless of whether that is a permissible inference, it amounts to trial by ambush of the individual counsel who were under a reasonable belief their interests were being adequately represented by the PSC./*[5]

Virtually all of the cardiovascular injuries plaintiffs have sustained have had devastating effects on their lives and as such significant value in the tort system. They should not be orphaned by the twin requirements of presenting proof on an issue that was delegated to the PSC more than two years ago, and that counsel withdraw from representing plaintiffs who do not participate in the settlement.  Although the latter issue is not implicated by PTO 28 itself, it looms large in the overall scheme contemplated by the MSA and is adequately addressed in Ms. Oldfather's motion which specifically discusses this issue.

The reason for the above discussion regarding the science is to demonstrate that a simple physician's affidavit connecting the ingestion of Vioxx to, e.g. DVT, will serve no useful purpose other than to generate a motion to preclude by Merck.  Injuries which have been excluded either by the Master Settlement Agreement, or because the proof on causation has not been developed by the PSC, will undoubtedly require additional *Daubert* hearings for plaintiffs wanting to pursue their claims and who have experts who will make the causal connection between ingestion of Vioxx and onset of event.

In short, there should be a middle ground that permits an order such as PTO 28 to sift out injuries such as nervous condition, rash, and any other number of claims for which no reliable scientific proof can be presented, and to provide a full and fair opportunity to plaintiffs who do have injuries that can survive in the tort system to present their proof in a manner consistent with the way the heart attack and stroke claims have been adjudicated to date.

Although I agree with Ms. Oldfather that ideally a new PSC could be appointed to address those claims the current PSC has not pursued, the other alternative would be

---

[5]*/In light of the limited availability to participate directly in the litigation, individual counsel following this Court's *Daubert* rulings had every reason to believe proof on causation for these injuries was being adequately developed by the PSC. *See e.g.*, this Court's November 18, 2006 decision admitting Professor Ray's testimony on short-term use of Vioxx increasing the risk of adverse cardiovascular consequences, and that he could opine Vioxx accelerates aetheroslerosis based on the Fitzgerald hypothesis. *Id.*, at p19.

to have those individual counsel who want to proceed with claims they contend they can back up with proper expert proof to meet with Merck's counsel to provide a more balanced procedure to permit those claimants remaining to address general causation issues.

I would anticipate those plaintiffs' counsel seeking to move ahead could develop a single presentation by one or more experts that would address the issues on all claims such as was done with the heart attacks and strokes. Indeed it does not appear there is any other realistic way to accomplish this task since having each individual plaintiff duplicate affirmations on general causation is not only cost prohibitive, but would involve micromanaging the claims which as a practical matter " would be an impossible task for a single district judge to accomplish" In re: Phenylpropanolamine (PPA) Products Liability Litigation, 460 F.3d 1217, 1231 (6th Cir. 2006). This would be consistent with the Court's concern regarding the need to sift the wheat from the chaff, but to also provide a fair means of adjudicating those claims which presently are before the Court but have not been fully developed with regard to proof regarding general causation. Although there is no doubt that this Court has devoted considerable time and study to the scientific issues there does not appear there has been any adversarial presentation with regard to, e.g., DVT or PE.

In Amchem the Supreme Court recognized that when the parties to an agreement the size of this one combine in seeking approval of a particular settlement there is at least the possibility that "the court would face a bargain proffered for its approval without benefit of adversarial investigation, see, e.g., Kamilewicz v. Bank of Boston Corp., 100 F.3d 1348, 1352 (CA7 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (parties "may even put one over on the court, in a staged performance"), cert. denied, 520 U.S. [1204] (1997)." Amchem Products, Inc., v. Windsor, 521 U.S. 591, 621, 117 S. Ct. 2231, 2249 (1997). Counsel is aware this Court has been monitoring negotiations and does not suggest this eventuality occurred here. Nevertheless, the fact that settlement discussions occurred simultaneous to the running out of the statute of limitation in virtually all states is not mere coincidence, and permits the inference that Merck was marching according to its own drummer and no one else. The fact that the PSC elected to negotiate its fees at the same time it negotiated damages claims certainly opens the door to questioning what Merck received in return for its part of the bargain not to oppose what amounts to some $400 million in fees./*[6]

---

[6]*/This Court has made clear that it will be the ultimate arbiter of fee issues. However, Merck's agreement not to oppose any fee award is likely to result in the lack of an adversarial presentation on these issues which is significantly different than attorneys skirmishing about their own respective entitlement to common benefit fees. In any event, there is certainly the public perception that the PSC view of their own responsibilities may have become more myopic in light of the simultaneous negotiation of the fee issue.

When one throws into the mix the fact that in any settlement there are always going to be trade-offs, plaintiffs who believe they have viable claims which have been excluded cannot help but think the fee issue may have played a role in their being deprived of the vigorous advocacy to which they are entitled. Although this Court has made clear it will be the sole decision-maker on the issue of fees, and that will be the last issue the Court will address in resolving the litigation before it, one still cannot escape the fact that when these two parties sat across from each other and negotiated the settlement the fee issue was not inconsequential. This Court can and has in fact attested to the excellent performance of the PSC in the course of this litigation. Nevertheless, the circumstances under which the fees were negotiated provides all the more reason for taking a more balanced approach to the claims of the remaining litigants than is presently available under PTO 28.

I am by way of this letter inviting Merck's counsel to participate in and invite any individual counsel with non-settling or ineligible clients seeking to prove injuries such as discussed herein, to a meeting prior to the next scheduled conference before the Court to see if the issues can be narrowed and some middle ground achieved prior to any formal motions practice.

There is one additional issue I feel compelled to raise at this juncture in line with my responsibilities to my clients, namely, this Court's participation as Chief Administrator of the Master Settlement Agreement. It is respectfully submitted the Court should consider resigning from that position for reasons set forth below.

The Fifth Circuit has made clear that the Court's impartiality can be reasonably questioned even where there is no actual bias. In Re Faulkner, 856 F. 2d 716, 721 (5th Cir. 1988) (per curiam). It appears fairly certain that as Chief Administrator of the MSA, this Court would necessarily be bound by the terms of the MSA which exclude injuries for compensation that would likely be the subject of ongoing proceedings before the Court in its judicial role. While it is crystal clear the Court's impartiality is not questioned in any manner, it remains that many of the litigants in this MDL and nationwide have been actively following the litigation and there is certainly room for significant public misunderstanding in connection with the Court's performing the dual function of administrator and judge in light of the respective and potentially conflicting rulings that would have to be made in the different roles each position requires. Judge Smith in Flanagan v. Ahearn [In Re Asbestos Litigation], 90 F.3d 963, 975 (5th Cir. 1996), observed that this issue came up in connection with the duties of bankruptcy judges and resulted in Congress enacting legislation in 1978 limiting the role of the bankruptcy judge to that of administrators and mediators because of the inconsistency between the judicial and administrative roles involved in their functions.

The blurring between the judicial and administrative roles is reflected by the fact that in at least one of the motions pending before the Court relief was sought by appealing

to this Court in its capacity as Chief Administrator (*see* Motion by Certain Florida Claimants To Be Included in Vioxx MDL Settlement Agreement, dated January 28, 2008,, at pp. 1-2).

This Court is undoubtedly going to be ruling on summary judgment motions specifically addressing injuries excluded by the MSA, and plaintiffs respectfully submit that the Court's functioning in the dual role could cloud any decision rendered in its judicial role. Accordingly, plaintiffs respectfully request the Court consider resigning from the Chief Administrator role for these reasons.

Although I am hopeful that some dialogue among counsel will occur prior to the next scheduled conference, in the event that does not happen I would seek to move to vacate or amend PTO 28 in accordance with the positions described above.

Thank you for your consideration in this matter.

Respectfully,

Ronald R. Benjamin

RRB/mc
cc:  Russ Herman, Esq./ By ECF and Regular Mail
     Herman, Herman Lotz & Cotlar, LLP
     820 O'Keefe Avenue
     New Orleans, LA 70113.

     Phillip Wittman, Esq./By ECF and Regular Mail
     Stone Pigman Walther Wittmenn, LLC
     546 Carondelet Street
     New Orleans, LA 70130