UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AvMed, Inc.; Aetna, Inc.; Arkansas Blue Cross and Blue Shield, A Mutual Insurance Company; HMO Partners, Inc. d/b/a Health Advantage; USAble Life; BCBSD, Inc. d/b/a Blue Cross Blue Shield of Delaware; Blue Cross & Blue Shield of Mississippi; Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Arizona, Inc.; Blue Cross and Blue Shield of Kansas, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina; Blue Cross and Blue Shield of Vermont; Blue Cross Blue Shield Association; BlueCross and BlueShield of Florida, Inc.; BlueCross BlueShield of Tennessee; CareFirst, Inc.; Connecticut General Life Insurance Company; Government Employee's Health Association, Inc.; Great-West Life & Annuity Insurance Company; Group Health Incorporated; The Guardian Life Insurance Company of America; Harvard Pilgrim Health Care, Inc.; Hawaii Medical Service Association; Health Net, Inc.; Highmark, Inc.; Highmark West Virginia Inc. d/b/a Mountain State Blue Cross and Blue Shield; HIP Health Plan of New York; Humana, Inc.; Johns Hopkins Health Care LLC; KPS Health Plans; Medical Mutual of Ohio; Noridian Mutual Insurance Company; Premera Blue Cross; Priority Health; Regence BlueCross BlueShield of Oregon; Regence BlueCross BlueShield of Utah; Regence BlueShield of Idaho; Regence BlueShield; Asuris Northwest Health; Regence Life and Health Insurance Company; Trustmark Life Insurance Company and Trustmark Insurance Company; UnitedHealth Group Incorporated; Vista Healthplan, Inc.; | CIVIL ACTION<br><br>NO. 2:08-cv-1633<br><br>SECTION L   MAG. 3<br><br>In Relation to: Docket No. 1657<br><br>In Re: VIOXX<br><br>PRODUCTS LIABILITY LITIGATION<br><br>JUDGE FALLON<br><br>MAGISTRATE JUDGE KNOWLES |

}1

| | |
|---|---|
| Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa; Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota; Wellmark Health Plan of Iowa, Inc.; and WellPoint, Inc. | § § § § § § § § § § § § § § § § |
| v. | |
| BrownGreer PLC; U.S. Bancorp, Inc.; and John Does | |

## DECLARATION OF GLENN ALAN MELNICK, PH.D.

GLENN ALAN MELNICK, pursuant to 28 U.S.C.§ 1746, declares as follows:

My name is Glenn Alan Melnick, Ph.D. I am the Blue Cross of California Professor at the University of Southern California, where I teach health economics and health care finance. I am also a resident consultant at the RAND Corporation, a non profit research organization, where I conduct health economics and health services research. I have been at RAND for 25+ years. I have published extensively in the scientific peer reviewed literature on a wide range of health services and health economics related topics including health care utilization, pricing, managed care, health care cost analysis, health care reimbursement, health care insurance, health care financing and other related topics. I have professional experience in the health insurance industry and have consulted with the Federal Trade Commission, State's Attorneys General and international agencies, such as the World Bank and Agency for International Development and for governmental agencies in the US and internationally.

I have been asked to conduct analyses related to the characteristics of users of Vioxx (Vioxx users) in the US between 1999 and 2004. The analyses were designed to address the following questions:

}2

a. What are the characteristics of Vioxx users in the US in terms of number of prescriptions and number of pills purchased and age distribution each year?

b. What percentage of Vioxx users in the US had their medical expense coverage provided by private health insurance companies?

c. Does the percentage of Vioxx users with private health insurance coverage vary depending on age and/or number of pills purchased per year?

d. To a reasonable degree of scientific certainty, what is the estimated number of claimants participating in this settlement who had private health insurance provided by the Health Plans (i.e., the plaintiffs in this case)?

The analyses were conducted using a nationally representative database known as the Medical Expenditure Panel Survey (MEPS). This database is constructed by the Federal government Agency for Health Care Research and Quality using scientific research design and survey methods. It is widely used by researchers throughout the government and universities to study the US health care system. Key findings from my analysis of this robust data set include the following:

- **Vioxx users in the US are distributed across a wide age range and not highly concentrated among the Medicare eligible population**
    - Only 28 percent of US Vioxx users are age 65 and older making them eligible for Medicare insurance coverage
    - Approximately half of all US Vioxx users in the US have private health insurance coverage that pays for their medical expenses

- **The percentage of US Vioxx users with private health insurance coverage varies only slightly depending on the number of pills purchased per year**

- o Fifty-two percent of US Vioxx users purchasing 30 pills or more during the year had private health insurance coverage during the entire year
- o Forty-six percent of US Vioxx users purchasing 120 pills or more during the year had private health insurance coverage during the entire year

- **My results indicate that it is highly likely that a substantial fraction of the Vioxx injured claimants had their Vioxx injury related medical expenses paid for by one of the private insurance companies represented in this matter**
   - o Estimates were generated under three alternative approaches resulting in a range in the estimated number of US Vioxx users claiming in the settlement, as follows: 15,400, 16,204 and 17,604.

I have attached hereto a copy of my Curriculum Vitae as Appendix A that summarizes my academic and professional credentials. I am being compensated to perform this work at the rate of $500 per hour. I have reviewed documents related to this matter including: legal filings and documents, health insurance websites, pharmaceutical industry data, data pertaining to number of privately insured in the US, data from a US federal government, the Agency on Health Care Research and Quality (AHRQ) and research literature related to Vioxx use and effects. A full listing of the documents I reviewed is attached as Appendix B. A list of the cases in which, during the previous four years, I testified as an expert at trial or deposition is attached as Appendix C. A summary of my opinions are provided below. I reserve the right to amend my opinions as new information becomes available.

## **Summary of Opinions**

**Overview**

1.  Rising health care costs represent a significant and growing economic and social problem in the US. Most Americans receive their health insurance coverage as a fringe benefit from their employer. With the growth of global economic competition, employers are finding it more difficult to provide health coverage to their workers. This trend is contributing to the growing number of uninsured Americans which by 2007 had already reached 47 million. Public and private policy makers are searching for ways to contain rising health costs. The federal government is increasingly focusing on ways to improve the efficiency and effectiveness of the health care system. One area of growing attention is the excess cost related medical mistakes and injuries. The Medicare program has announced regulations to deny payments to hospitals and doctors for excess medical costs related to injuries resulting from their mistakes. The policy intent is to internalize the cost of mistakes and thereby provide health care providers to improve their effectiveness. This lawsuit by the health plans is consistent with these overall and specific approaches which seek to reduce the cost of health insurance and to assign the cost of mistakes to appropriate party within the system.   Private health plans, by seeking recovery of previous reimbursements made on behalf of their members for medical care that resulted from injuries as a result of their use of Vioxx will help to restrain the growth in health insurance premiums and help make private health insurance more affordable to everyone.

**Data Source - MEPS**

2.  The analysis I conducted used data from a national Federal government agency known as the Agency on Health Care Research and Quality (AHRQ). The data set is known in the field as MEPS or the Medical Expenditure Panel Survey. MEPS began in 1996 and it consists of a set of large-scale surveys of families and individuals, their medical providers (doctors, hospitals, pharmacies, etc.), and employers across the United States. MEPS collects data on the specific health

services that Americans use, how frequently they use them, the cost of these services, and how they are paid for, as well as data on the cost, scope, and breadth of health insurance held by and available to U.S. workers.

3. The MEPS data are widely used by governmental agencies, analysts, researchers, faculty and others interested in studying the US health care system. There have been hundreds of publications and reports using the MEPS data. It is one of the most trusted and reliable sources of data for analysis of the US health care system.

4. The reliability of MEPS data is due to the scientific nature of the design and implementation of the collection of the data. The sample design and data collection methods are carefully planned and evaluated based on scientific principles and standards. There is a team of AHRQ staff that oversees the MEPS to ensure its scientific validity and reliability.

5. Detailed information regarding MEPS is available from the government website dedicated to MEPS, http://www.ahrq.gov/data/mepsix.htm. The structure, process and contents of MEPS are summarized briefly here based on the MEPS website.

6. MEPS includes two major components: the Household Component (MEPS-HC) and the Insurance Component (MEPS-IC). The Household Component provides data from individual households and their members, which is supplemented by data from their medical providers. The Insurance Component is a separate survey of employers that provides data on employer-based health insurance. The Household Component collects data from a sample of families and individuals in selected communities across the United States, drawn from a nationally representative sub-sample of households that participated in the prior year's National Health Interview Survey (conducted by the National Center for Health Statistics).

7. Information collected during the household interviews includes: detailed information for each person in the household on the following: demographic characteristics, health conditions, health status, use of medical services, charges and source of payments, access to care, satisfaction with care, health insurance coverage, income, and employment.

8. Information is collected through multiple questionnaires. The MEPS Household Component fields questionnaires to individual household members and their medical providers to collect nationally representative data.

9. The Insurance Component collects data from a sample of private and public sector employers related to the health insurance plans they offer their employees. The collected data include the number and types of private insurance plans offered (if any), premiums, contributions by employers and employees, eligibility requirements, benefits associated with these plans, and employer characteristics. The IC is an annual survey of employer's health insurance offerings. There are two distinct samples fielded in the MEPS IC survey: the List sample and the Household (linkable) sample. The U.S. Census Bureau serves as the data collection agent for the MEPS-IC survey.

10. The MEPS-IC employs multiple data collection methods. Establishments and governmental units are screened by an initial telephone call to confirm mailing addresses and to establish a point-of-contact with a knowledgeable respondent. Establishment that do not offer health insurance to any of its employees are then asked the non-insurance questions about establishment and firm characteristics and the survey is completed by telephone for this subset.

11. MEPS does extensive follow up to minimize missing data. For example, establishments offering health insurance and those that do not respond to the initial telephone call are mailed survey questionnaires. The mailing includes an establishment-level questionnaire and separate, detailed questionnaires for each of the health insurance plans offered. If needed, a second mailing is sent to those who did not respond to the first mailing (within a three-week period). If the establishment does not respond to either mailing, a telephone follow up is done and they interviewed over the telephone using a computer-assisted telephone interview questionnaire. The results for the establishment's responses are entered directly into a database. In some cases, large companies and governments are interviewed on-site and in person due to the large amount of data being requested of them.

12. Data are collected for multiple plans and overlapping or multiple coverage for each person. For example, the health insurance plan questions are asked for each offered plan, up to a maximum of four plans. Most companies do not offer more than four plans. However, if an establishment indicates during the telephone prescreening interview that it offers more than four plans, the names of all the plans are collected and then plan-level questionnaires are sent for those plans with the largest enrollments—but making sure that MEPS has at least one plan of each type offered.

**Construction of Files for Analysis**

13. Multiple years of data were accessed and analyzed (2000, 2001, 2002, 2003, and 2004). Analyses were conducted separately for each year. The analysis process and the analyses were the same for each year. For purposes of brevity, the process and analysis results for 2002 are described in detail below including detailed record counts and sample characteristics and findings. The findings for the other years are included at the end of this report. In general, the findings are consistent throughout the years and with the 2002 findings.

14. The MEPS database includes a series of separate files that have been constructed to aid researchers. File construction required accessing several separate files and then merging them to create the analysis files. This process, described below, was done for each and all of the years. Data for all drug prescriptions for all MEPS sample participants were extracted from the event file to create a separate prescription file. This generated 339,308 records pertaining to individual prescriptions that were filled during the year by the MEPS sample in 2002 (n=39,000+). The prescription file included information on all drug prescriptions for the year, not only those related to Vioxx. An alpha character based algorithm was developed to identify and extract only those prescriptions related to Vioxx to create a Vioxx prescription only file. The algorithm used both Vioxx and ROFECOXIB and variations on the spellings to identify all Vioxx prescriptions resulting in a Vioxx only file that contained a sample of 2,715 prescriptions.

15. Several variables were extracted/created from this file for further analysis including: number of pills and strength of pills. The most common numbers of pills for individual prescriptions were 30, 60 and 90. Eighty-seven percent of the prescriptions had 25 mg as their strength (while 244 had 50 mg strength and 105 had 12.5 mg strength). Because of this variation in strength a "standardized pill" was constructed by dividing the total number of pills on the prescription by 25 mg.

16. Since the appropriate unit of analysis is the person level, individual prescriptions were aggregated up from the prescription level to the person level for each person. This generated 785 persons in the sample with Vioxx prescriptions during the year with an average of 4.46 prescriptions per person per year and average of 100.5 standardized pills per person per year.

**MEPS Sampling and Population Weighting**

17. The MEPS sample is not a random sample but, rather, it deliberately over samples some sub-groups. Over sampling within the MEPS sample is designed to increase the precision of estimates for some population subgroups of policy interest. Sample weights are calculated in the file to ensure that population estimates can be properly calculated and are not distorted by a disproportionate contribution from over sampled subgroups. For example, the over sampling of Hispanic and Black households used in the National Health Interview Survey (NHIS) is also used in MEPS. In the NHIS, Hispanic households were over-sampled at a rate of roughly 2 to 1, resulting in the probability of selecting a Hispanic household for participation in the NHIS was roughly twice that for households in the general population that were not over-sampled. The over-sampling rate for black households was roughly 1.5 to 1. Beginning in 2002 and beyond the MEPS includes an over sample for low income and Asian persons as well.

18. The MEPS sample and related weights are designed to be broadly representative of the non-institutionalized population of the US (in 2002, 288 million). To do this, MEPS relies on The MEPS sample is a sub-sample of respondents from the

previous year's National Health Interview Survey sponsored by NCHS. It is based on a stratified multistage sample design. In the first stage primary sampling units are selected and consist of counties or groups of counties. In the second stage area segments are selected within the primary sampling units (PSU's), and finally, housing units are selected within the area segments.

19. The MEPS files contain the sample weights that can be used to generalize from the MEPS sample to the broader US population. When these weights are applied to the sample estimates we see that Vioxx users are slightly underrepresented in the MEPS sample. In the sample data, Vioxx users are 2.0 percent. When the results are re-weighted based on the weights, the estimated percentage of the population in the US that were Vioxx users is 2.25 percent. In addition, the population weighted estimates other variables change slightly as follows: average prescriptions per person per year is 3.517, average total standardized pills per person per year is 102.13

20. Selected data regarding health insurance coverage at the person level were extracted from MEPS database and merged into previously constructed person level file prescription file. MEPS collects many different and detailed variables and measures related to health insurance coverage. For purposes of this analysis, the goal was use these data to identify Vioxx users who had private insurance that would have been the source of payment for their medical expenses including any increased medical expenses resulting from Vioxx related injuries. Individuals can have health insurance coverage from more than one source and the coverage can vary over time during the year. For purposes of this analysis the determination of which Vioxx users had private health insurance coverage during the year was done to be as conservative as possible -- that is, minimize the probability of misidentifying a Vioxx user as being privately insured and whose medical expenses including any Vioxx injury related medical expenses when in fact their medical expenses were not actually covered by private insurance.

21. For purposes of this study, the determination of who had private health insurance coverage was done using an operational definition that required both, 1) the person have only private coverage during the year and 2) that their private

coverage is for the entire 12 month period during the year. This definition is quite restrictive in that in all likelihood it omits some individuals whose medical expenses were paid by private insurance including Vioxx related medical costs but it minimizes the likelihood of coding someone as privately insured when their Vioxx related medical costs were not actually paid for by private insurance. If any bias is introduced by this definition, it is in favor of the null hypothesis (i.e. not privately insured). Seventy four percent of all US Vioxx users reported having some private health insurance coverage during the year. When the requirement that they have only private insurance coverage and that the coverage is in force for all 12 months during the year, the percentage drops to 50 percent. That is, about half of all Vioxx users in the US were privately insured (only) for the entire 12 month period during 2002. Part of this difference may reflect supplemental private health insurance coverage by Medicare covered Vioxx users as well as changes in insurance status during the year.

22. Next, I performed an analysis to examine the relationship between number of standardized "standardized" Vioxx pills per year and the prevalence of private health insurance coverage. Vioxx users were grouped into categories based on the total number of pills they reported for the entire year. The percentage that were covered by private insurance for the entire 12 month period was estimated within each group (based on their amount of Vioxx usage). Two private health insurance percentages were calculated: 1) a measure based on the MEPS sample which over weights low income population who are less likely to have health insurance coverage and 2) a populated weighted percentage that uses the MEPS weights to adjust the sample results to reflect the US population.

23. The results are in the Exhibit 1. Two trends are evident. First, the population weighted percentages for all thresholds of pill usage are greater than the sample based percentages. This reflects the underweighting of the sample of the privately insured population. The difference is generally about 5 percentage points. Second, as can be seen, regardless of the amount of usage during the year, almost half of all Vioxx users in the US were covered by private insurance for the entire year. A confidence interval was calculated for the estimated overall percentage of

Vioxx users with private insurance coverage for the entire year (based on the MEPS sample) regardless of the number of pills. The average, as seen in row one of Exhibit 1, is 45.7%. This value has a narrow confidence interval around that value (at the 95% level) of 42% and 49% or plus or minus about 4 percentage points.

**Exhibit 1: Percentage of US Population of Vioxx Users with Private Insurance Coverage (Entire Year) by the Number of Vioxx Pills Per Person, Per Year, 2002**

| # Vioxx Pills | % With Private Insurance Population Weighted/MEPS Sample |
|---|---|
| Any # | 50.3%/45.7% |
| >=30 | 52.3%/47.4 |
| >=60 | 47.3%/42.9 |
| >=90 | 45.3%/40.5 |
| >=120 | 46.3%/41.6 |

24. I also performed an analysis designed to examine the relationship between the age of Vioxx users and the prevalence of private health insurance coverage. Vioxx users were grouped into categories based on their age in 2002. Within each group, the percentage with private insurance for the entire 12 month period was estimated. The results are in Exhibit 2. As can be seen, the distribution of Vioxx users in the US is tends to go up with age, but it is not highly concentrated in a single age category. For example, age 65+ contains 28 percent of all Vioxx users, other age groups also contain large shares of Vioxx users. For example, age 55-65 contains 20 percent of all Vioxx users and age 45-54 contains 22 percent of all Vioxx users. In summary, 72 percent of US Vioxx users are under age 65.

**Exhibit 2: Percentage Distribution of All US Vioxx Users,
by Age Group, 2002**

| Age | % of All US Vioxx Users |
|---|---|
| Under 35 | 13% |
| 35-44 | 17% |
| 45-54 | 22% |
| 55-64 | 20% |
| 65+ | 28% |

25. Exhibit 3 presents the results for the analysis designed to measure the prevalence of private health insurance coverage of US Vioxx users by age category. As can be seen, a majority of all US Vioxx users, regardless of age category, have private insurance coverage. It is important to note that the definition of private health insurance is highly restrictive in that it only includes persons reporting only private insurance coverage and for the full 12 month period during the year. As such the percentages in this Exhibit and other Exhibits pertaining to private health insurance coverage of Vioxx users are likely to be conservative and represent lower bound estimates. There are likely to be additional Vioxx users who were injured and whose medical expenses were covered by private health insurance plans but due to the restrictive and conservative nature of the definition I employed here are excluded. For example, someone with private insurance for 11 months would not be included as privately insured but they have a greater than 90 (11/12 = .917) percent probability that if they were injured by Vioxx during 2002 that their medical expenses would have been paid for by private health insurance. As can be seen in Exhibit 3, above age 35, a very substantial share of all Vioxx users have private health insurance coverage -- the overall average for Vioxx users under age 65 is 72% (and this group represents 59 percent of all Vioxx users).

**Exhibit 3: Percentage of Vioxx Users in the US with Private Insurance Coverage (Entire Year) by Age Group, 2002**

| Age | (% With Private Insurance) |
|---|---|
| Under 35 | 55% |
| 35-44 | 72% |
| 45-54 | 77% |
| 55-64 | 68% |
| 65+ | NA |

26. Exhibit 4 presents the results of the analysis that combines both the number of pills and age in relation to private health insurance coverage. The age category of US Vioxx users used for this analysis restricts the sample to ages 45-64. As can be seen, there is almost no variation in the prevalence of private insurance coverage by the different number of pill categories within this age group. It ranges from 44 to 46 percent.

**Exhibit 4: Percentage of Vioxx Users in the US with Private Insurance Coverage (Entire Year) by Age Group (>=45 Years) and Number of Pills Per Person, Per Year, 2002**

| Age/ # of Pills | % With Private Insurance |
|---|---|
| >=45 Years/ Any Amount | 44% |
| >=45 Years/ >=30 Pills | 46% |
| >=45 Years/ >=60 Pills | 44% |
| >=45 Years/ >=90 Pills | 44% |
| >=45 Years/ >=120 Pills | 44% |

27. Exhibit 5 presents the results of the analysis that combines both the number of pills and age in relation to private health insurance coverage. The age category of

}14

US Vioxx users used for this analysis restricts the sample to ages 50-64. There is some variation in the prevalence of private insurance coverage by the different number of pill categories within this age group and ranges from 37 to 40 percent.

**Exhibit 5: Percentage of US Vioxx Users in the US with Private Insurance Coverage (Entire Year) by Age Group (>=50 Years) and Number of Pills (Per Person, Per Year), 2002**

| Age/ # of Pills | % With Private Insurance |
|---|---|
| >=50 Years/ Any Amount | 38% |
| >=50 Years/ >=30 Pills | 40% |
| >=50 Years/ >=60 Pills | 38% |
| >=50 Years/ >=90 Pills | 37% |
| >=50 Years/ >=120 Pills | 39% |

28. These various statistical results can be used to estimate the number of claimants in the Vioxx settlement who have filed suit (n = approximately 35,000) and the number who have not filed suit but have entered into agreements delaying applicable statues of limitation (n = approximately 15,000) who had their medical expenses paid for by private insurance companies. I am assuming for purposes of my analysis that these estimated numbers of claimants is correct. One approach is to assume that these two groups are similar to the overall Vioxx user population in the US. In that case one would calculate the fraction of these two groups with private health insurance coverage by multiplying the number in each group by the average percentage of US Vioxx users with private health insurance coverage taken from row one of Exhibit 1. This percentage is 50.3 percent. When applied to the number in each claimant group this would yield 17,605 and 7,545, respectively. This number is then adjusted for the fact that not all US health insurance companies are participating in this action and therefore not all injured Vioxx users with private health insurance coverage are represented in this matter. Companies participating in this matter pay for medical expenses for approximately 70 percent of all coverage lives within the private health insurance

sector in the US. When this percentage is used to adjust the estimated totals above, the adjusted values become 12,323 and 5,281, respectively.

29. Another approach is to assume that the two claimant groups are more similar to the Vioxx user population that used at least 120 pills per year. In that case one would calculate the fraction of these two groups with private health insurance coverage by multiplying the number in each of the two groups by the average percentage of US Vioxx users that purchased at least 120 pills with private health insurance coverage taken from row five Exhibit 1. This percentage is 46.3 percent of US Vioxx users. When applied to the number in each claimant group this would yield 16,250 and 6,945, respectively. This number is then adjusted for the fact that not all US health insurance companies are participating in this action and therefore not all injured Vioxx users with private health insurance coverage are represented in this matter. Companies representing and paying for medical expenses in this matter represent approximately 70 percent of all coverage lives within the private health insurance sector in the US. When the percentage is used to adjust the estimated totals above the values become 11,343 and 4,861, respectively.

30. Another approach is to assume that the injured two groups are more similar to the Vioxx user population that used at least 120 pills per year and is at least 45 years old. In that case one would calculate the fraction of these two groups with private health insurance coverage by multiplying the number in each of the two groups by the average percentage of US Vioxx users age 45 and above that purchased at least 120 pills with private health insurance coverage taken from row five of Exhibit 4. This percentage is 44 percent. When applied to the number in each claimant group this would yield 15,400 and 6,600, respectively. This number is then adjusted for the fact that not all US health insurance companies are participating in this action and therefore not all injured Vioxx users with private health insurance coverage are represented in this matter. When the adjustment is made, the estimated totals 10,780 and 4,620, respectively.

31. In conclusion, the analyses of MEPS data reveals that regardless of how the data pertaining to US Vioxx users is sub-divided in terms of number of pills and age,

there is a substantial fraction of US Vioxx users who had private health insurance coverage that would have paid their medical expenses including any excess medical expenses resulting from Vioxx related injuries.

32. Appendix D includes the statistical results from analysis of the data for other years including: 2000, 2001, 2003 and 2004. The analyses are similar to those performed described above using data for 2002. While the specific numbers and percentages vary from year to year, the overall conclusion based on the 2002 data holds for other years as well: analysis of MEPS data reveals that regardless of how the data pertaining to US Vioxx users is sub-divided in terms of number of pills and age, there is a substantial fraction of US Vioxx users who had private health insurance coverage that would have paid their medical expenses including any excess medical expenses resulting from Vioxx related injuries. As a result it is highly likely that a substantial number of individuals injured by Vioxx in the two claimant groups had their medical expenses paid for by one of the companies represented in this matter.

}17

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2008.

_____

GLENN ALAN MELNICK