UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| AvMed, Inc.; et al. | § | CIVIL ACTION |
| | § | |
| v. | § | NO. 08-1633 |
| | § | |
| US Bancorp; BrownGreer, PLC; and John Does | § | SECTION L, MAG. 3 |
| | § | |
| | § | JUDGE FALLON |
| | § | |
| | § | MAGISTRATE JUDGE KNOWLES |
| | § | |
| | § | In Relation to: MDL Docket No. 1657 |
| | § | |
| | § | In Re: VIOXX |
| | § | |
| | § | PRODUCTS LIABILITY LITIGATION |

## AFFIDAVIT OF BRUCE E. OGLE

Comes the affiant, Bruce E. Ogle ("Affiant") and do hereby state under penalty of perjury the following:

1. I am the President of the Subrogation Division for The Rawlings Company LLC ("TRC") located at One Eden Parkway, LaGrange, Kentucky 40031-8100 and have been employed by Rawlings for nearly eleven (11) years.

2. TRC provides subrogation/reimbursement services to national, regional and local health benefit providers. TRC is not a plaintiff in this action, but it provides these subrogation/reimbursement services to several of the entities who are.

### Background and Source of Rights

3. A health benefits subrogation/reimbursement right entitles health benefit plans to be reimbursed for medical expenses incurred due to the injuries of members that were the result of acts of liable third parties.

4. Health benefit contracts usually contain contractual subrogation or reimbursement language (or both), which create certain obligations on the part of the member. Exemplars of such Plan Language utilized by Plaintiffs in this action are attached in Appendix A. For most plans, these contracts are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

5. A health plan may seek recovery of a subrogation or reimbursement claim either by pursuing a liable third party directly (subrogation) or through the mechanism of reimbursement if a member receives funds through a settlement or judgment of a claim against the liable third party.

6. In my capacity as President of the Subrogation Division at TRC I am familiar with processes that health plans utilize to identify and pursue potential subrogation and/or reimbursement claims.

## The Identification Process

7. Health benefit plans identify most potential subrogation/reimbursement claims by searching electronic medical claims data for traumatic injury claims by using diagnosis codes, or ICD-9 codes, that indicate the nature of the injury. The data being searched for this purpose is generally less than ninety (90) days old.

8 Once a member is identified as having suffered a traumatic injury, the member is contacted through the mailing of a questionnaire to determine the cause and circumstances of the injury. Response rates to a single such questionnaires at TRC are typically less than 50%. Follow-up questionnaires are typically mailed to non-responders on 40 day intervals. Over a six to eight month period, if follow-up questionnaires are sent to non-responders on a continuous 40 day cycle, the cumulative response rate can reach 75%. If a plan member responds to a

questionnaire and indicates that his or her traumatic injury resulted from third-party misconduct, then the plans may pursue subrogation or reimbursement claims to recover the value of the medical benefits they provided on account of that injury.

9. For health benefit plans, the Vioxx litigation raises different issues than they typically encounter when pursuing subrogation/reimbursement claims. The injury to plan members arising from the ingestion of Vioxx was either a Myocardial Infarction or Ischemic Stroke. These conditions are not traumatic or accidental injuries, but instead nearly always occur in the absence of any act that would be related to a compensable third party liability claim. In fact, according to the American Heart Association, there are approximately 1.2 million incidents of new and recurrent coronary attacks on an annual basis.[1] Accordingly, the presence of diagnosis codes relating to a Myocardial Infarction or Ischemic Stroke would not normally highlight a potential subrogation/reimbursement claim for a health plan.

## Efforts Undertaken to Date Relating to Vioxx Reimbursement

10. TRC has undertaken substantial, but unsuccessful, efforts to reliably identify the Plaintiffs' members who are claimants in the Vioxx litigation. Counsel for the Plaintiffs supplied TRC with the names of 22,685 individuals who had filed state court Vioxx cases in New Jersey and Texas or who had filed cases that were transferred to the federal MDL, and we entered these names into an electronic database. TRC then obtained claims data from its health plan clients who were prescribed Vioxx. To date, after running 48% of the total membership insured under a pharmacy benefit plan for the Plaintiffs, there were 2,426,792 individuals who were prescribed.[2] We cross matched this pharmacy data with the 22,685 names identified from

---

[1] *2004 Heart Attack and AnginaStatistics*, American Heart Association Website, http:\\www.americanheart.org/presenter.jhtml?identifier=4591

[2] TRC is in the process of gathering the data covering the other 52% of individuals of the Plaintiffs' plans who took Vioxx. I believe that the data that we possess now, covering roughly one-half of all such individuals, is sufficient to

the docket sheets. This matching process revealed that, after reviewing just 48% of our member records, there were 40,340 individuals who (1) took Vioxx; (2) were insured by one of the Plaintiffs under a pharmacy benefit plan; and (3) shared a name with an individual who had filed a Vioxx lawsuit. The state of residency at the time the prescription was filled is also provided.

11. The raw data demonstrates that it is nearly impossible to identify with any certainty whether any one of the tens of thousands of name matches are plan members who filed a Vioxx case and are participating in the settlement. The vast majority of claimants have names that match multiple individuals within the health plans' records. This means that there is no way to know with certainty whether a particular plan member name "match" is the same person as a Vioxx plaintiff. A Vioxx plaintiff could be one of many different plan members. Or, given the commonality of many names proven by this exercise, a Vioxx plaintiff might not be a plan member at all, despite the fact that the plaintiff's name matched many plan members' names.

12. The fact that Vioxx complaints typically assert that a claimant is a resident of a certain state does not add any significant precision to this analysis. The state of residency data available in the Plaintiffs records is the state of residency at the time the Vioxx prescription was filled. Yet, as demonstrated by the data we analyzed, multiple plans oftentimes insured multiple individuals residing in the same state who shared a first and last name with a Vioxx plaintiff.. In addition, an individual's state of residency when Vioxx was prescribed does not necessarily always correlate with their state of residency when a Vioxx lawsuit was later filed.

13. The following examples are illustrative of the data matching problems we encountered:[3]

---

support the conclusions I draw in this affidavit. Indeed, adding the data for the other 52% of Vioxx-prescribed individuals would obviously only show even more name matches and an even greater difficulty in identifying Vioxx settlement participants.

[3] Due to HIPPA privacy laws, I provide here only the first and last initials of the individuals discussed.

a.) Matching the docket sheet name R__B__ with the claims data (again, for only approximately 48% of members that the Plaintiffs collectively insured) resulted in the discovery that fourteen (14) different Plaintiffs insured one-hundred and ninety (190) distinct individuals residing in over thirty (30) states who were prescribed Vioxx and shared that name. The R__B__'s identified on the docket sheet filed a lawsuit in California, Three (3) different Plaintiffs covered an individual with the same name residing in California at the time Vioxx was purchased.

b.) Matching the docket sheet name J__G__ with this claims data resulted in the discovery that eight (8) different Plaintiffs insured Thirty-Three (33) distinct individuals residing in over twenty (30) states which were prescribed Vioxx and shared that name. The J__G__'sidentified on the docket sheet filed a lawsuit in Arkansas. Two (2) different Plaintiffs covered an individual with the same name residing in Arkansas when Vioxx was purchased.

c.) Matching the docket sheet name J__L__ with this claims data resulted in the discovery that ten (10) different Plaintiffs insured Seventy-eight (78) distinct individuals residing in over thirty (30) states which were prescribed Vioxx and shared that name. The two (2) J__L__'s identified on the docket sheet had cases filed in Ohio and Missouri and three different Plaintiffs covered a J__L__ in those states.

d.) Matching the docket sheet name M__L__ with this claims data resulted in the discovery that eleven (11) different Plaintiffs insured fifty-four (54) distinct individuals residing in over fifteen (15) states which were prescribed Vioxx and shared that name. The M__L__'s on the docket sheet filed a case in Ohio and two (2) Plaintiffs covered a M__L__ in Ohio.

A full explanation of the process that was used to accomplish this matching appears at Appendix B.

14. In addition to the commonality of names, there are other reasons why it is not feasible to match Vioxx claimants' names with plan data to identify potential subrogation/reimbursement claims. Oftentimes, for example, the plan that paid for the Vioxx prescription may not be the same plan that processed and paid for a medical claim. Thus, an individual may be beneficiary under his or her spouse's pharmacy plan, but could have received treatment for a Vioxx-related event under their own medical coverage. Likewise, because of the fluidity of the U.S. economy, individuals change health plans all the time. Thus, the plan that provided pharmacy benefits for Vioxx may not be the same plan that later provided medical benefits relating to that individual's Myocardial Infarction or Ischemic Stroke. In short, it is quite common for a benefit plan to have prescription data, but not the medical data for an individual that was prescribed Vioxx. Or vice versa.

15. It is also my understanding that approximately 15,000 individuals who may be participating in the Vioxx settlement entered into private tolling agreements with Merck and never filed a public lawsuit. Because the identities of these tolled claimants are not public information, I know of no way for health plans to identify subrogation/reimbursement claims covering them.

16. A second method by which TRC can become aware of potential subrogation/reimbursement claims is via notice from plan members or their counsel that is pursuing a legal claim against a liable third party. Many (but not all) plans have language requiring plan members to notify their plans in the event they elect to pursue a recovery for injuries caused by a third-party.

17. It is my understanding that less than 50 potential settlement participants have given such notice to Plaintiffs or their counsel. Accordingly, the notice provisions of the Plaintiffs' plan documents have not been effective in identifying potential subrogation/reimbursement claims.

18. Based on the foregoing, it is my conclusion that health plans' rights to subrogation/reimbursement cannot be effectively enforced unless further information is provided to the health plans about the identities of Vioxx claimants and an opportunity is afforded the health plans to match that information with their records and assert appropriate liens. At a minimum, health plans require an identification of the name and social security number of the plaintiffs who have filed claims as part of the settlement process.

Further the Affiant Sayeth Naught

Dated: 6/9/2008

Bruce E. Ogle
President of Subrogation
The Rawlings Company, LLC