1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS         *    Docket MDL 1657-L
        LIABILITY LITIGATION        *
6                                   *    April 17, 2008
                                    *
7                                   *    9:00 a.m.
     * * * * * * * * * * * * * * * *

8

9
                        STATUS CONFERENCE BEFORE THE
10                       HONORABLE ELDON E. FALLON
                        UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13

14   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                   BY:  RUSS M. HERMAN, ESQ.
                                   820 O'Keefe Avenue
15                                 New Orleans, Louisiana 70113

16                                 Beasley Allen Crow Methvin
                                      Portis & Miles
17                                 BY: ANDY D. BIRCHFELD, JR., ESQ.
                                   234 Commerce Street
18                                 P.O. BOX 4160
                                   Montgomery, Alabama 36103
19
     For the Defendant:           Williams & Connolly, LLP
20                                 BY:  DOUGLAS R. MARVIN, ESQ.
                                   725 Twelfth Street, NW
21                                 Washington, DC 20005

22
                                   Stone Pigman Walther,
23                                    Wittmann & Hutchinson
                                   BY:  PHILLIP WITTMANN, ESQ.
24                                 546 Carondelet Street
                                   New Orleans, Louisiana 70130
25

1    <u>APPEARANCES</u>:

2    For the State Liason
     Committee:                    Neblett, Beard & Arsenault
3                                  BY:  RICHARD J. ARSENAULT, ESQ.
                                   2220 Bonaventure Court
4                                  Post Office Box 1190
                                   Alexandria, Louisiana 71309
5

6    Special Master:               Juneau Law Firm
                                   BY:  PATRICK A. JUNEAU, ESQ.
7                                  1018 Harding Street
                                   Suite 202
8                                  Lafayette, Louisiana  70503

9
     Claims Administrator:         BrownGreen, PLC
10                                 BY:  ORRAN BROWN, ESQ.
                                   BY:  LYNN GREER, ESQ.
11                                 115 South 15th Street
                                   Suite 400
12                                 Richmond, Virginia  23285

13
     Curator:                      Johnston, Hoefer, Holwadel &
14                                    Eldrige
                                   BY:  Robert M. Johnston, ESQ.
15                                 601 Poydras Street
                                   Suite 2490
16                                 New Orleans, Louisiana  70130

17
     Lien Resolution               The Garretson Firm
18   Administrator:                BY:  MATT L. GARRETSON, ESQ.
                                   7775 Cooper Road
19                                 Cincinnati, Ohio 45242

20
     Official Court Reporter:      Jodi Simcox, RMR, FCRR
21                                 500 Poydras Street
                                   Room B-406
22                                 New Orleans, Louisiana 70130
                                   (504) 589-7780
23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

1          **PROCEEDINGS**

2          **(April 17, 2008)**

3          **THE DEPUTY CLERK:**  All rise.

4          **THE COURT:**  Be seated, please.  Good morning, ladies

5   and gentlemen.  Call the case, please.

6          **THE DEPUTY CLERK:**  MDL 1567, in re:  Vioxx.

7          **THE COURT:**  Counsel, make your appearances for the

8   record.

9          **MR. HERMAN:**  May it please the Court, good morning,

10  Judge Fallon.  Russ Herman for plaintiffs.

11         **MR. WITTMANN:**  Good morning, Your Honor.  Phil

12  Wittmann for liaison counsel for the defense.

13         **THE COURT:**  We're here this morning on our monthly

14  status conference.  I received from the parties a joint report

15  and proposed agenda.  I've had an opportunity to meet with the

16  committees in advance of this meeting, and I will take the

17  agenda in the order in which it's presented.

18              First is the settlement agreement.  Any report

19  on that?

20         **MR. WITTMANN:**  Your Honor, we're going to defer to

21  Orran Brown of BrownGreer.

22         **THE COURT:**  All right.

23         **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

24  Brown from BrownGreer in Richmond.  We're the claims

25  administrator for the settlement program.  With me today is

 1   Lynn Greer.

 2                    What I'd like to do, Your Honor, is what we do

 3   each time at this status conference is go through where we

 4   stand in the submissions we're receiving in the settlement

 5   program through registration and the enrollment stages, and

 6   then Lynn will talk briefly about where we are on the claims

 7   front, because we're also receiving claims packages now as

 8   well.

 9                    We always start off looking at the total number

10   of claimants who have registered for the program pursuant to

11   the court's orders directing counsel to designate primary

12   counsel and tell us about their Vioxx claimants.  This slide

13   shows us the total number of people who have stepped forward in

14   that process.

15                    The Court's orders require registration by

16   January 15th, 2008.  So we always depict this as the number of

17   firms who gave us their information by January 15th, and then

18   the numbers that we're receiving after that.

19                    Because we are still receiving unrepresented

20   claimants and represented claimants from counsel who want to

21   sign up for the program each day; and we are encouraging those

22   counsel and unrepresented claimants to continue to send their

23   registration affidavits to us.

24                    Looking at where we stand as of yesterday, we

25   had a total of 58,842 claimants who had identified themselves

1    in the registration process.  And if we're looking for a rough

2    number of claimants who seem to be -- or may be eligible for

3    the program, we take out in that lower row the number of

4    claimants who told us in their spreadsheet that they were

5    "other injury".  Because the other injury that are not heart

6    attack or not stroke are not covered in the program.

7                    So we get to a number that's about 50,076 of

8    claimants who have registered who have, at least so far, not

9    stated that they had an ineligible injury to us.  There are

10   about three things we're pointing out at this stage about these

11   numbers.

12                   First of all, Your Honor, there are still some

13   folks known to Merck -- some Vioxx claimants or plaintiffs

14   known to Merck who have not yet registered.  They are scattered

15   around the country in various law firms that have not stepped

16   forward, not identified themselves to us, as the claims

17   administrator, in this process.

18            THE COURT:  Mr. Brown, do you know if those people

19   have filed suit, or have not filed suit, or is it a mix?

20            MR. MARVIN:  Your Honor, some did file suits.  Others

21   are on tolling agreements.

22            THE COURT:  Okay.

23            MR. BROWN:  At this stage, Your Honor, the Merck

24   folks are going to send out letters to those firms encouraging

25   them to comply with the Court's order to register their clients

 1   so that at least we have the whole census of all known Vioxx

 2   claimants.

 3                    The second thing worth mentioning is, is that we

 4   are still receiving registrations after January 15th, 2008.  We

 5   understand and have seen at least two motions filed with this

 6   court by firms seeking leave to register after January 15th,

 7   2008.

 8                    And tomorrow we're sending a letter out to those

 9   firms that's been approved by the parties explaining to them

10   that we have been directed by the parties to continue to accept

11   registrations and that there is no consequence, really, to

12   coming in after January 15th, and that would moot the pending

13   motion.

14                    There really is no need for it and we're asking

15   them to withdraw it so that it doesn't take up the court's

16   resources dealing with an issue that really is not an issue.

17   So we're always telling unrepresented claimants, and counsel,

18   to send us your registration affidavits, go ahead and get

19   started in the program, even if it's after January 15th.

20                    The third thing worth mentioning about these

21   numbers, Your Honor, is that 50,076 number is, at best, kind of

22   a rough picture right now of claimants who may be eligible for

23   the program.  For a number of reasons, a number of people who

24   presented themselves as "other injury", not MI, not stroke, in

25   their spreadsheets to us actually had information in their

1   lawsuits, or made assertions or allegations of a heart attack
2   or a stroke.  And Merck has that information.
3               And so there are a number of people who've said
4   they're "other injuries", but they really do belong in the
5   program under the terms of the settlement agreement.  And I
6   think there are also some folks who said "other injury" and
7   they go back and look at it and then they change their minds
8   about it.  So that's an exclusion that we make to give us a
9   rough number of people who should be in the program, but it's
10  not precise.
11              And other reasons it's not precise is that there
12  are some folks who did say they had an ineligible injury, but
13  they may be non-U.S. residents and their injury happened
14  outside the United States.  They're not really eligible for the
15  program under the terms of the settlement agreement.
16              There are some folks who didn't have a lawsuit
17  or a tolling agreement by November 9th, 2007, which is the
18  cutoff date.  So some of those folks are not eligible.  So that
19  50,000 number is, at best, kind of a rough judgment right now
20  about people who should be in the program.
21          THE COURT:  But whatever it is, it's clear that the
22  thresholds have been met.  Is that what Merck sees?
23          MR. MARVIN:  We certainly expect those thresholds to
24  be met, Your Honor.  We're still verifying the numbers, but
25  we're confident that -- we have every expectation that they

 1  will be met.

 2          **MR. BROWN:**  That gets us, Your Honor, to the next

 3  step in the program because the thresholds really start being

 4  measured by who enrolls in the program.

 5          This slide shows us the number of claimants who

 6  have presented themselves who want to go beyond registration

 7  and actually enroll in the program.  And this number still

 8  grows every day as well because we still receive enrollment

 9  materials from unrepresented claimants and primary counsel.

10          The deadline now -- I'm going to mention it

11  again in a few minutes -- for sending in their enrollment

12  materials is May 1st.  The Court has, and the settlement

13  agreement has, prescribed several deadlines effecting

14  enrollment, February 29th, and then March 31st, for people who

15  wanted to be considered for an interim payment if it's made.

16          And these numbers, today, collapse all of these

17  together to show us the numbers of people who enrolled at any

18  time.  And you can still enroll in the program.  And people

19  have until May 1st now to submit their enrollment materials to

20  us.

21          This slide shows us the number of folks who

22  said, "I want to enroll," by giving us an online statement,

23  signing up a claimant online, giving us an enrollment form, or

24  giving us a "yes" answer in that question in their claimant

25  spreadsheet, or giving us a claimant list, which is what the

1  second amendment allowed people to do, to indicate that they

2  wished to enroll.  And so we see 50,000 plus represented

3  claimants who have made that statement that they want to

4  enroll.

5           We have 332 pro se claimants who have enrolled

6  already.  And that number increases each day as we work with

7  the pro se curator to try to help the unrepresented folks

8  through the process, to send in the materials that they need to

9  send in to enroll.  It gives us a total of 50,683 claimants who

10 said, "I want to enroll in the program," and took the steps to

11 get that far in the program.

12          Again, we back out the number of claimants

13 who've told us in their spreadsheet they had an "other injury."

14 Again, not a precise or exact exclusion.  But that's what we

15 know so far about them until we get their claims packet in.  It

16 ends up with a net number of 46,697 claimants who said, "I want

17 to enroll," submitted themselves for enrollment as of

18 yesterday.

19          And running the numbers, based on that 50,000

20 number, it's 93.3 percent of the people who registered who have

21 said, "I want to enroll."  And that 93 number, for all the

22 reasons I've mentioned, is 93 and up to 94 -- maybe over 94 --

23 once we're finally able to tell for certain who's really an

24 other injury, who's not a U.S. resident, who doesn't belong in

25 the 50,000 denominator to make that calculation.

 1            But that's the best we can do today, as claims

 2   administrator, is 93.3 and probably north of 94 as of now.   And

 3   remember, these materials are still coming in.  People can

 4   still register and have until May 1st to register.

 5            This is a reminder for all of us, Your Honor,

 6   about what it takes to register, and we'll see in a minute why

 7   that matters.  Because there are several pieces of the

 8   enrollment package for people to -- and I said register.  I

 9   meant enroll -- people to enroll in the program.

10            You have to, as in row 1, say you want to enroll

11   online or give us that answer in a spreadsheet.  It takes an

12   enrollment from the primary counsel, if you're represented, to

13   indicate the statement of enrolling.  An enrolling claimant has

14   to send us a release.  They also have to send us some signed

15   medical records authorization form.  And then if they have a

16   pending lawsuit, give us a stipulation of dismissal.

17            Those first five steps are the primary pieces of

18   the enrollment package with the centerpiece of it really being

19   the release document that the claimant signs.  To complete the

20   entire package eventually, we have to have the certification of

21   final enrollment from the primary counsel, if you're

22   represented, and that is due by May 1st, 2008.

23            When we were here the last time, the parties

24   agreed upon, and we have now posted and made available to all

25   counsel, a revised version of the certification final

1   enrollment that allows counsel to state that all the claims in

2   which I have a financial interest are either enrolled by me, or

3   enrolled by someone else, or here's a list of the folks that I

4   haven't been able to locate, but I'm still trying to locate

5   them and advising them -- recommending to them to be in the

6   program.

7            So that accounts for people -- all the folks

8   that have a financial interest in it, that form allows them to

9   send that certification of final enrollment in by May 1st and

10  list the ones that they just haven't been able to talk with

11  yet.

12           The other thing worth remembering about this

13  enrollment package, Your Honor, is that documents themselves

14  still have to be reviewed for completeness.  The parties and we

15  have been working on the criteria to judge whether a document

16  is really the right document:  If it hasn't been changed, if

17  it's been signed, signed by the right person.

18           There's always a completeness review that has to

19  happen on all these materials.  We've been working with the

20  parties to agree on the criteria and that process is underway

21  with Merck's counsel, and we then looking at the documents and

22  then notifying the firms if there's something they need to cure

23  or fix up about one of these documents.  So this is what it

24  takes to be enrolled.

25           So far we wanted to point out the materials

 1   we've received with, again, starting in row 1, the number that

 2   we had from the other slide about claimants who said they want

 3   to be enrolled, and we back out the ones that say were another

 4   injury, and you get to this 46,697 number.  And already we have

 5   over 43,000 releases from those folks in hand in the door.

 6            Among the 43,000 releases, there are over 38,000

 7   people who have given us the total package.  They've given us

 8   all of rows 1 through 5 here.  And the only thing -- some of

 9   them have given us a certification of final enrollment.  But

10   for a lot of the firms who haven't yet finished with all of

11   their people, they give us the CFE by May 1.

12            So we already have 38,000 pretty much complete

13   packages -- enrollment packages from that group.  So it's high

14   numbers, and we're still receiving them each day.  We had a lot

15   of volume around the March 31 deadline to receive these

16   materials.  We're still getting hundreds -- thousands of them a

17   day.

18            And I'm asking all counsel and unrepresented

19   claimants to remember the May 1 deadline to complete their

20   enrollment package in to us and get us that certification of

21   final enrollment signed by primary counsel, if they're a

22   represented claimant.

23            Your Honor, that's the discussion of

24   registration and enrollment.  And Lynn is going to briefly talk

25   about the claims status.  Does the Court have any questions

 1    about --

 2              **THE COURT:**  Do you anticipate any particular problems

 3    in following that that we ought to avoid?

 4              **MR. BROWN:**  No, Your Honor.  Thus far, the process to

 5    get people registered and enrolled, don't see any bottlenecks

 6    in that.  We're now looking ahead, as the parties are, to the

 7    claims process.  We want to make sure that people -- and Lynn

 8    will mention a few things about how you ought to get your

 9    claims in to us.

10              On the enrollment side, the questions we're

11    getting primarily from counsel are when the certification final

12    enrollment is due, May 1st.  The new form, which requires the

13    list to indicate people you cannot locate.

14              And then some counsel are asking questions

15    about, "Well, the folks who refuse to participate, withdrawing

16    from, or seeking leave to withdraw from representation, and

17    then this claimant -- financial interest in those claims."

18              That issue requires some further explanation

19    with most firms to understand those pieces of the settlement

20    agreement.  I think the parties have submitted a suggested

21    procedure to the Court about the process for seeking leave to

22    withdraw from representation.

23              What we see, other than that issue, which still

24    needs some attention by all of us, counsel and the claims

25    administrator, we don't see any bottlenecks in the registration

 1    enrollment phase.  And now we're really starting to look ahead

 2    to the claims phase so we can move those claims through and get

 3    to the point the settlement agreement contemplates an interim

 4    payment after August 1, and we've got a lot of work to do to

 5    make that happen.

 6            THE COURT:  With the claims process, as I mentioned

 7    before, the special master and deputy special masters, if you

 8    can give them some dummy claims, so to speak, so that they can

 9    have some dry runs and get ready for it when they --

10            MR. BROWN:  Yes, Your Honor.

11            THE COURT:  That would be helpful to them, I know.

12            MR. BROWN:  Yes, Your Honor.

13            We're working with Mr. Juneau to make that

14    happen so that there's no delay downstream when we get ready to

15    hit that point in the process.

16            THE COURT:  Thank you very much for your work.

17            MR. BROWN:  Thank you, Your Honor.

18            MS. GREER:  Good morning, Your Honor.  Lynn Greer

19    from BrownGreer.  I would like to touch briefly on the claims

20    packages that we have received so far, with the reminder that

21    the claims package submission deadline is approaching.  It's

22    July 1st, 2008.  It seems a far way off, but it will be here

23    before we know it.

24            And so far what we have received from firms, 39

25    different firms have submitted so far 13 -- 1,317 electronic

1    claims package submissions; five firms have submitted hard-copy

2    submissions of 11 claims, for a total of 1,328 submissions from

3    law firms.

4                I would like to pause here, Your Honor, because

5    you asked about bottlenecks in the process.  And one processing

6    bottleneck that we will encounter is if we receive a large

7    number of hard-copy submissions.

8                And the reason for that, Your Honor, is that

9    when we receive those hard-copy submissions -- and we have

10   received 11 so far -- they usually come to us just in a box

11   with none of the components labeled to let us know where the

12   drug proof is, where the event records are.  And a lot of times

13   these are also coming with the accompanying claims forms.

14               We then stop and have to scan them into our

15   database, which can be done with this volume in a day; but as

16   the volumes increase, it will slow us down if we are receiving

17   hard-copy forms.  So right now, obviously, the vast majority

18   are coming electronically.  We would encourage firms, and do

19   encourage firms, to continue to submit those to us

20   electronically.

21               THE COURT:  Yes.  I urge the firms to do likewise.  I

22   can understand some pro se problems with doing it

23   electronically.  But the firms ought to be able to do it

24   electronically.  So from the Court's standpoint, I suggest that

25   they make every effort to do it electronically.

1          I don't want to issue any particular orders at

2   this time, but I am contemplating doing that if it's a problem.

3   So I first urge them to do it, and hope I don't have to issue

4   any orders.

5          **MS. GREER:**  Your Honor, we are available to help

6   firms, walk them through this process.  Several weeks ago we

7   sent out an e-mail blast to firms.  It was our first e-mail

8   blast related to the claims process.  And in that we give them

9   links to documents that we've created.

10         There's one document called Guidelines for the

11  Creation and Submission of Claims Packages, and in that we give

12  very specific instructions and helpful hints about how to label

13  the documents.  So we're hopeful that firms are using that and

14  that they will call us if they have any questions.

15         The pro se numbers are lower, as we would expect

16  at this point.  We do have two electronic claims packages and

17  one hard-copy claims package.  So our total number of claims

18  packages that we are able to review is 1,331.  There are

19  another 39 packages that we have received that are just medical

20  records and not claims forms.

21         What our process is, is we are unable to start

22  the review of a claim unless we have the claims forms.  So

23  we've also told firms that we really need that claims form

24  because it contains the certification that all of the records

25  are complete.  It also gives us information on injuries and

1  whether the claimant is claiming the extraordinary injury

2  relief.

3           **THE COURT:**  You can't make any payments until we get

4  this finished.  That's why I think this is a critical part of

5  the process.  I think that there are some folks that may be

6  concerned that they're never going to get money.  I think when

7  the claims begin to flow and people begin to receive funds in

8  the summertime, I think that's going to increase the interest

9  in this situation.

10           **MS. GREER:**  Yes, Your Honor.

11           And one final point that I would like to raise

12  is that even though the deadline is July 1st, we have heard

13  anecdotal comments from some firms that they are gathering all

14  of their records and they plan to submit them all to us at

15  once.  We really would encourage firms to submit these to us on

16  a rolling basis.  We are reviewing them on a

17  claimant-by-claimant basis, not on a law firm basis.

18           And we do want firms to take care to submit to

19  us to a complete package.  We don't want piecemeal event

20  records arriving in advance of the pre-produced records.  But

21  once they have a package for a claimant, if they could go ahead

22  and submit that to us one at a time, that is our preference;

23  and, obviously, that will allow us to meet the other deadlines

24  and get the money flowing.

25           Any other questions, Your Honor?

 1          **THE COURT:**  No.  Let's focus on first in, first out;
 2   and the people who delay longer, they delay receiving the
 3   funds.
 4          **MS. GREER:**  Yes, Your Honor.
 5          **THE COURT:**  The sooner they get it in, the sooner the
 6   funds would be flowing to them.
 7          **MS. GREER:**  Thank you, Your Honor.
 8          **THE COURT:**  Thank you.
 9          **MR. BIRCHFIELD:**  Judge, that's one point that I
10   wanted to emphasize and make sure that everyone is aware of:
11   The way that the claims are processed is first in.  Once you
12   submit a claim, then it goes in a queue to be processed; and it
13   will be handled throughout the process according to that queue,
14   including the receipt of the initial payment.
15              The point that you made about the electronic
16   records versus the hard-copy records, that puts another step
17   into the process.  When someone submits a hard-copy claims
18   package, BrownGreer can handle and process those, but it takes
19   another step.
20              So once those are received, they're actually
21   scanned and converted to an electronic format.  After that is
22   done is when they go into the queue for being evaluated and go
23   into the queue for receiving their initial payments.  So
24   there's an incentive.  There's a benefit to getting the claims
25   packages submitted on a rolling basis.

1        It's encouraging to see the numbers of claims

2   packages that have already been submitted.  But we have heard

3   from firms that are wanting to -- or at least initial thinking,

4   "We'll just hold these and submit them once we have them all

5   done."  We need to avoid that.  We need those coming in on a

6   rolling basis.

7        One other point, Judge, if I may, Orran

8   mentioned the deficiencies on the releases and the other

9   documentation.  I just want to make sure that everyone is aware

10  once those deficiency notices are sent out, there will be a

11  reasonable time to cure those deficiencies without interrupting

12  your eligibility for interim payment.

13        So you don't need to be alarmed about that.  But

14  once you receive the deficiency notices, they need prompt

15  attention.

16        **THE COURT:**  Okay.  Thank you.

17        **MR. MARVIN:**  Sorry, Your Honor.  Just to clarify one

18  other point.  You had asked about the thresholds.  As Orran

19  indicated, May 1 is the deadline for lawyers to submit their

20  certificates of final enrollments.  That's the best document

21  we'll see to determine who's into the program, who they still

22  cannot find, or for whatever other reasons there might be.

23        So it is important that that deadline be adhered

24  to so that we can have that document.  Because we need that

25  document to verify the numbers for the thresholds.

 1          **THE COURT:**  Okay.  All right.

 2          **MR. HERMAN:**  May it please the Court, just two other

 3  issues with regard to the settlement.  The BrownGreer Web site

 4  is browngreer -- one word -- .com/vioxxsettlement.  That's

 5  browngreer -- one word -- .com/vioxxsettlement.  There are

 6  various forms and the amendments to the settlement document are

 7  posted there.

 8              Secondly, both the plaintiffs and the defendants

 9  opposed Mr. Benjamin's appeal to the Fifth Circuit.  It was

10  dismissed on March 28th, '08.

11              The next issue for the Court on the prearranged

12  schedule would be a report by Mr. Garretson with regard to

13  liens, and then Mr. Johnston with a report on pro se issues.

14          **THE COURT:**  Do you have anything in between?

15          **MR. JOHNSTON:**  No, I can wait.

16          **THE COURT:**  Okay.

17          **MR. GARRETSON:**  Your Honor, I'm Matt Garretson with

18  the Garretson law firm.  I'm here to report as the Lien

19  Resolution Administrator.  I'd like to share with the Court, we

20  have encouraging news, and continue to have, I should say,

21  encouraging news.

22              We have received a verification of entitlement

23  information on over 43,000 claimants with respect to Medicare.

24  We expect the balance of that data to be processed by Medicare

25  inside the month of May.  So well before the August 1st,

1    deadline, we'll have a blueprint of who is a Medicare

2    beneficiary and who is not.

3              Right now, we're holding at about 70 percent of

4    the registrants as being Medicare beneficiaries.  We're also

5    continuing to meet with Medicare about a hold-back provision.

6    As I've reported in prior hearings, we're trying to get an

7    initial global resolution hold-back agreement.

8              And then that amount could be set aside as a

9    high-water mark.  And then as we learn more about the nature of

10   the claims being filed by the Medicare entitled plaintiffs and,

11   in fact, their points, we'll be able to calibrate, if you will,

12   that final amount that would be the global resolution for

13   Medicare.

14             With respect to Medicaid, at the last two

15   hearings we've reported that we've received, upon good counsel

16   from Special Master Juneau, the permission to submit to the

17   states voluntary protocols.  And those voluntary protocols were

18   to encourage the state and territory Medicaid agencies to

19   engage in a cost-effective and uniform program that best served

20   public policy and this settlement.

21             We thought these were necessary and agreed

22   they're necessary to insure timely and equitable compensation

23   both to the claimants and to Medicaid.  As you may recall,

24   those protocols include a hold-back provision.  That is setting

25   a maximum amount on each individual claimant's gross award that

1   can be targeted for reimbursement by the state and territory
2   Medicaid agencies.
3           We have been able to get the states to agree
4   that that amount should be 20 percent.  Now, that doesn't mean
5   that each plaintiff -- each claimant would pay 20 percent.  It
6   simply means that those claimants who are identified as being
7   entitled to Medicaid, we would set aside 20 percent of his or
8   her gross award and then satisfy the claim within that amount.
9           In the unlikely event the final lien amount
10  exceeds 20 percent, and I believe that is very unlikely, the
11  states have agreed to cap their recovery at 20 percent on that
12  individual lien.
13          **THE COURT:**  Any less goes back to the claimant?
14          **MR. GARRETSON:**  Yes, Your Honor.
15          We also recommended a uniform and nationwide
16  procurement offset, and that is that a standard percentage
17  would be offset.  Once we finalize that individual lien, a
18  standard percentage would be offset to reflect the fact that
19  attorney fees and case costs are also being taken out of the
20  claimant's award.  So, similarly, the states should offset
21  their final lien in recognition of that expense.
22          So, Your Honor, a letter was sent to each state
23  and territory on March 14th requesting their voluntary
24  agreement to these protocols.  I'm pleased to report to you
25  today, Your Honor, that as we sit here, we have now 88 percent

1    of the state agencies in just this short four-week time frame

2    have agreed to the protocols I've just described.

3                     Forty-six of the states and territories have

4    responded.  Forty-two agree in full with our protocol of a

5    standardized offset of the final lien and a maximum of

6    20 percent of a lien amount.  Only one state has outright

7    rejected the protocol.

8                     Three states have requested minor exceptions

9    that I believe are within reason.  And only six agencies have

10   yet to make a decision.  And I want to say with respect to

11   those six, I'm by no means implying here today that they have

12   rejected the protocol.

13                    I have learned through this process that for any

14   state this must travel through three or four different desks

15   and decision-makers before they can agree upon these protocols.

16   So I expect that we will be hearing from them shortly.  And so

17   by the next hearing, I think I'll have the complete blueprint

18   for the Court as to who has agreed and who has not.

19                    So continue to be encouraged.  The VA, the

20   Tricare, the Department of Defense liens, I've outlined that

21   program in prior hearings to the Court, and that appears to be

22   running very smoothly.  So we're encouraged.

23                    I really believe, Your Honor, that the agencies

24   have, indeed, embraced the fairness, and efficiency, and

25   compliance that the Court has mandated for this settlement

1  program.

2             **THE COURT:**  Okay.  Thank you very much.

3                   I appreciate the states doing that.  I think

4  it's good, obviously, for the program.  But it is very, very

5  good for those states.  I think it's efficient.  I think it's a

6  win/win situation for them.  They win in the sense that they

7  have served the people who are injured; and they win in the

8  sense that they have an efficient mechanism and resolution

9  process for their other citizens to get back a portion of their

10  amount.

11                 They need to know that the Court, not only

12  appreciates it, but will do whatever it can to police that

13  situation and make sure that they are fairly dealt with.  The

14  states that haven't come aboard yet, I urge them to come

15  aboard.

16                 Because I've given a lot of thought to this and

17  I think that they need to know that the Court feels that it's

18  appropriate, it's efficient, and it's the best way that they

19  have to resolve this particular problem.

20             **MR. GARRETSON:**  Thank you, Your Honor.

21                 And I will just remind the attorneys and the pro

22  se claimants that we have a Web site set up similar to the

23  BrownGreer site that explains the process, the FAQs, and the

24  documents, and that's at vioxxlienresolution.com.

25                 Thank you.

1      **THE COURT:**  Thank you very much.  I think that's just

2   another benefit, frankly, of a global approach to these types

3   of disputes, national in scope.  I think that you can see from

4   participating in this that there are many aspects of the

5   program.

6           I think when you look at it globally, efficiency

7   and fairness come to fore, and this is one of the ways that we

8   can deal with some of these complex things, such as liens.

9      **MR. WITTMANN:**  Your Honor, I think the next thing on

10  the agenda would be the report from Mr. Juneau.

11     **THE COURT:**  Okay.

12     **MR. WITTMANN:**  And then Mr. Johnston had a report

13  also.

14     **THE COURT:**  All right.

15     **MR. JUNEAU:**  Your Honor, I really don't have anything

16  to add.  I think it's been well articulated by Mr. Garretson

17  and Mr. Brown.  The interplay that we've had, we're constantly

18  communicating between the two to facilitate the process, either

19  through the lien resolution, and in particular, we're very

20  focused on reaching the point that you addressed earlier, to

21  get the information to us.

22          And the game plan, if you will, is to activate a

23  program in advance of actual determinations so that if there

24  are any bugs in the system insofar as efficiency, we want them

25  worked out.  I've talked to the people from BrownGreer again

 1    this morning and we're now attempting to see if we can target

 2    date as soon as we can that specific date.  We just don't have

 3    that data yet to make that determination.

 4                    I have already alerted Justice Trotter and Judge

 5    Corodemus of that program, and they're all on board about what

 6    we're attempting to do in that regard.  And everybody, from our

 7    perspective, is committed to activate immediately that training

 8    part of the program.  So I anticipate as soon as that

 9    information is available that we will be at the starting block,

10    ready to move the process.

11            THE COURT:  Good.  Well, I have no doubt that you-all

12    are going to be able to move it.  Because with the

13    recommendations that I have received from many of the counsel

14    here and the judges from that area, we selected the deputy

15    special masters, and they'll do an excellent job.

16                    I'm very confident that this aspect of the

17    program, as well as the other aspects, will work very

18    efficiently.

19            MR. JUNEAU:  Thank you, Your Honor.

20            THE COURT:  I appreciate your work.  I appointed

21    Mr. Johnston to represent the pro se people, and I'll hear from

22    him at this time.

23            MR. JOHNSTON:  Thank you, Your Honor.  Robert

24    Johnston, court-appointed curator for the pro se claimants.

25    We've provided to the Court the curator status report number 1.

1    We have many copies here.  So if anyone here wishes to have a
2    copy, it is available.
3                    But briefly, after the directive of the Court
4    and the order dated February 12th of this year, we -- and
5    following being provided with the lists of registered but not
6    enrolled claimants and unregistered claimants, totaling
7    1,295 -- so just a few under 1,300 -- on March 19th, 2008, we
8    commenced sending out communications and documents to all 1,295
9    individuals.
10                   As the Court, I'm sure, will expect, I can
11   report to you that we had a lot of action as a result of that.
12   In the curator's report, I think the one thing that is of some
13   significance to ask for some help from the Court is we received
14   61 mailings that were returned undeliverable.
15                   Because we had addresses, we at least knew where
16   in the country the last known addresses were.  So we are in the
17   process of preparing the three-day legal notices that we've
18   talked about to be published in the local newspaper.  That's
19   ongoing as I speak.
20                   We then had such problems as 11 potential
21   claimants, there was no address whatsoever.  There were another
22   11 for which there was an incomplete address.  And the proposal
23   that we put into the status report to the Court is that if
24   there is such a thing as a regional publication, then we might
25   go in that direction.

 1               But my thought is, is that unless somebody can

 2   tell me if there's another national newspaper, there are legal

 3   notices that USA Today publishes, and we would ask the Court

 4   for permission to utilize that vehicle to try to get

 5   information to those that have no addresses and we don't know

 6   where to go otherwise.

 7               So I think that that's something that, based

 8   upon what the Court has just indicated, that's where we're

 9   going to go.  As an aside, one of the individuals who we have

10   not been able to reach, but whose name is on one of the lists,

11   is Fidel Castro.

12               Now, I cannot tell the Court whether that is *the*

13   Fidel Castro or *a* Fidel Castro.  But I want you to know that as

14   part of the appreciation for picking my law firm and me as

15   curator, we do have a bilingual Spanish-speaking attorney.  So

16   if we ever get a call, we're ready to go in terms of that.

17          **THE COURT:**  Okay.  He may enter the case.

18          **MR. JOHNSTON:**  That's exactly right, and we'll bring

19   it to the attention of the Court if necessary.

20               We have, I think, interacted really well with

21   BrownGreer.  That's a really first-class group of individuals.

22   With regard to all the communications, all the phone calls, and

23   e-mails, and what have you, they have been logged into our

24   internal communication log.  They'll soon be entered into the

25   communication log that has just been created by BrownGreer.  So

1    it's all going to go where it needs to go.

2              We also got a call, a contact for 14 potential

3    pro se claimants who are not on any list.  My guess is they got

4    it off the Web site.  We have directed them to the claims

5    administrator, and we have provided them with the documentation

6    that they need.

7              I think that the only other thing is that there

8    have been some attorneys who have contacted us saying, "Nope.

9    I represent," you know, "Mr. Smith or Mrs. Jones."  So what,

10   obviously, we have done is we have pulled back and have no more

11   communication for those.  There were very few.

12             The only other bit of housekeeping is that we

13   had requested from defendant's and plaintiffs' liaison

14   committee permission to retain a paralegal at an hourly rate of

15   $95 to help with all of this newspaper publication and what

16   have you.  We just sent that out last week.

17             We'll follow up with them.  I don't anticipate

18   that being any kind of a problem.  So I think that from the

19   beginning to where we are today, I think we can report to the

20   Court that things are moving well.

21             **THE COURT:**  Okay.  Thank you very much for your help.

22             There are two aspects to the pro se situation

23   that we need to be focused on.  One is to help those pro se

24   people who need help and are interested in receiving help.

25   Secondly, it's to give the others due process.  Those who

 1   haven't responded, we'll make an effort to locate them.  A
 2   reasonable effort.
 3            But after a reasonable effort has been made and
 4   still no response, then I'll entertain motions to dismiss for
 5   lack of prosecution.  So there are two aspects to it.  I
 6   appreciate your help.
 7            **MR. JOHNSTON:**  All right.  Thank you, Judge.
 8            **MR. HERMAN:**  Your Honor, there is one pro se
 9   claimant, Mr. Harrison, who advises that his written
10   presentation to the Court, the Court should be receiving that
11   very soon now.  He has been given dates for access to the
12   depository.
13            **THE COURT:**  Thank you very much.
14            **MR. WITTMANN:**  Just to go back a little bit, Judge,
15   on the agenda.  There are no cases set for trial in state
16   courts through June 30th, 2008.
17            **THE COURT:**  Okay.
18            **MR. WITTMANN:**  We've got nothing new to report on
19   Item VI or VII in the status report agenda.  That's the class
20   action procedures or the discovery directed to Merck.  I think
21   Mr. Herman has something on discovery directed to third
22   parties.
23            **MR. HERMAN:**  May it please the Court, I want to
24   report that the FDA has advised it will deliver its documents
25   sometime today.

 1          **THE COURT:**  Okay.

 2          **MR. HERMAN:**  With regard to ESI, that matter is going

 3   very well.  We're in constant contact with them, and they are

 4   providing, on a regular basis, medical records.  Those are

 5   really the only two issues.  We did get some inquiries from the

 6   State of Oregon, the State of Washington, regarding problems

 7   with health care providers providing records.

 8               Those attorneys have been provided Your Honor's

 9   order with regard to medical authorizations, and we hope that

10   that matter is resolved.

11          **THE COURT:**  I do appreciate the help that the FDA has

12   given the Court on this one.  We had a bump in the road; but,

13   hopefully, we're able to navigate around it.  Things have

14   fallen into place very well.  I'm obliged for their

15   understanding and help, and also with ESI.

16          **THE COURT:**  Next item on the agenda.

17          **MR. WITTMANN:**  Your Honor, I don't see Ms. Barrios.

18          **THE COURT:**  Anybody from state liaison?

19          **MR. ARSENAULT:**  Good morning, Your Honor.  Richard

20   Arsenault for the plaintiffs.  Dawn Barrios couldn't be here

21   this morning.  She asked me to make the presentation regarding

22   the status of the remand motions and non-PI economic cases.

23               There are currently 748 remand motions pending.

24   The two-volume DVD that indicates where those -- what states

25   are involved and the basis for the remands have been provided

 1   to Your Honor's staff, and to the defendant's and the
 2   plaintiffs' counsel.
 3            The top five states in terms of numbers of
 4   motions pending are California, 207; Missouri, 121; Texas, 104;
 5   Illinois, 60; and Florida, 55.
 6            I've been advised by Ms. Barrios that she is
 7   coordinating with BrownGreer with regard to those 748 cases to
 8   see where those people are in the settlement process to see at
 9   the end of the day how many of these 748 motions Your Honor
10   will actually have to deal with.
11       **THE COURT:**  Right.  I think that's the key:  See how
12   many get through the gates or participate at least in the
13   program, and that may resolve those.  All of them, or some of
14   them, or most of them.
15       **MR. ARSENAULT:**  Yes, Your Honor.
16            With regard to the non-personal injury economic
17   class cases, her study shows that there are 52 pending in the
18   MDL.
19            There are eight nationwide consumer classes;
20   five nationwide third-party payor classes; one nationwide
21   medical monitoring class; 17 state consumer classes; eight
22   state consumer and medical monitoring classes; two state
23   consumer and third-party classes; 10 state third-party payor
24   classes; and one state medical monitoring class.
25            Apparently, this week Judge Higbee in New Jersey

 1  went through a similar exercise with the non-personal cases.

 2  And in the materials, she provided Dawn Barrios with a list of

 3  those type of cases that are pending before her.

 4        On that list, I think Nos. 2 and 3 are consumer

 5  cases.  The list is identified as third-party payors, but it

 6  also includes two consumer cases.  I believe that the second

 7  and third case on the list are consumer cases.

 8        There, apparently, were also three cases that

 9  were identified during the status conference that are not on

10  that list.  And that also includes one medical monitoring case

11  that she, apparently, lifted the stay on all of those and

12  they're going to proceed, except the medical monitoring case

13  that, apparently, she's waiting for a decision from the New

14  Jersey Supreme Court on.

15        The next status conference is going to take

16  place, apparently, on May 24th.  And she's instructed the

17  parties between now and then to develop a discovery plan and

18  move forward with discovery as quickly and efficiently as they

19  possibly can.

20        **THE COURT:**  Thank you very much.

21        **MR. ARSENAULT:**  Thank you.

22        **MR. HERMAN:**  Your Honor, may it please the Court,

23  Ms. Barrios, on behalf of those types of cases, requested

24  information as to what the PSC would recommend regarding access

25  to trial packages.  The PSC and the PNC met jointly last night.

1    We'll be presenting Your Honor an order for consideration, and

2    Your Honor should have that no later than Monday.

3                        With regard to the trial package, Your Honor,

4    we'd like to have a presentation in the afternoon of May 22nd.

5    I was advised by our co-chairs, Jerry Meunier and Shelly, that

6    that package is ready, and it should take somewhere between a

7    half hour and an hour presentation, if Your Honor would

8    entertain it then.

9             **THE COURT:**  That's the stroke cases?

10            **MR. HERMAN:**  The stroke cases, yes, Your Honor.  And

11   we are also submitting to Your Honor a draft proposal for Your

12   Honor to consider under what circumstances a request of a trial

13   package will be bound to confidentiality.

14                       Thus far, we've had three requests for trial

15   packages, and I'd like the record to illustrate that within

16   five days after May 22nd, those packages will be ready for

17   dissemination.

18            **THE COURT:**  Okay.  Thank you.

19            **MR. WITTMANN:**  We've been bouncing around quite a

20   bit, Judge, but basically we've covered the pro se claimants,

21   Mr. Johnston's report.  We have nothing further to report from

22   the defense side, anyway.  I don't think Mr. Herman does either

23   with respect to the remaining items on the agenda, with the

24   exception of the Vioxx statistics.

25                       They're the same as they were.  We've still got

1  December 31 statistics.  But we will have new statistics next

2  week when Merck makes it's quarterly SEC filing.  So I guess

3  we'll just have to wait until next week when we get those out,

4  because we can't give them out in advance, as Your Honor knows.

5           THE COURT:  Right.

6           MR. WITTMANN:  That's really all I think that we have

7  to report from the defendant's standpoint.

8           MR. HERMAN:  From the plaintiffs also, Your Honor.

9           THE COURT:  Anything further from anyone?

10          MR. BECNEL:  The date of the presentation, the 22nd,

11  is it here in the courtroom?

12          THE COURT:  Yes, here in the courtroom.  The next

13  meeting is on 22nd.  What time in the afternoon are you

14  scheduled for?

15          MR. HERMAN:  Immediately after the status conference,

16  or as Your Honor would --

17          THE COURT:  We'll start the status conference at the

18  same time.  I'll see counsel in the conference at 8:30, the

19  committees, and then we'll start the open court at 9:00.

20          MR. HERMAN:  One other issue, the U.S. Bank

21  representatives will coordinate with defense liaison, plaintiff

22  liaison, the special master, and BrownGreer.

23          THE COURT:  They'll be here too?

24          MR. HERMAN:  They'll be here on May 22nd.

25          THE COURT:  I do want to meet with them.  I think

1   it's important that we gear up the funds -- solve the aspect of

2   it.  That is to say we're going to focus on the delivery of the

3   funds to the banks, and what the banks are going to do with it,

4   and how we're going to be dealing with the payouts.

5           **MR. HERMAN:**  Your Honor, if I might suggest that that

6   take place immediately after the status conference and that the

7   presentation of the stroke trial package follow that, if that's

8   in accord with Your Honor's schedule.

9           **THE COURT:**  We've got to focus on the liquidity of

10  the funds and also security of the funds.  I don't know which

11  comes first.  Probably security first.  But everybody would

12  like to earn as much interest on the funds as possible, but

13  that has to be taken into consideration from the standpoint of

14  liquidity and security of the funds, but I know you know that.

15          **MR. HERMAN:**  Sure.

16          **THE COURT:**  Thank you very much.  Court will stand in

17  recess.

18          **THE DEPUTY CLERK:**  All rise.

19              **(WHEREUPON, the Court was adjourned.)**

20

21

22

23

24

25

1                                *****

2                            **CERTIFICATE**

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4   for the United States District Court, Eastern District of

5   Louisiana, do hereby certify that the foregoing is a true and

6   correct transcript, to the best of my ability and

7   understanding, from the record of the proceedings in the

8   above-entitled and numbered matter.

9

10

11                                  /s/ Jodi Simcox, RMR, FCRR
                                    Jodi Simcox, RMR, FCRR
12                                  Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25