1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  VIOXX PRODUCTS        *    Docket MDL 1657-L
      LIABILITY LITIGATION        *
6                                 *    March 25, 2008
                                  *
7                                 *    9:00 a.m.
    * * * * * * * * * * * * * * * *

8

9
                      STATUS CONFERENCE BEFORE THE
10                     HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13

14  For the Plaintiffs:          Herman Herman Katz & Cotlar
                                 BY:  RUSS M. HERMAN, ESQ.
                                 820 O'Keefe Avenue
15                               New Orleans, Louisiana 70113

16                               Beasley Allen Crow Methvin
                                   Portis & Miles
17                               BY: ANDY D. BIRCHFELD, JR., ESQ.
                                 234 Commerce Street
18                               P.O. BOX 4160
                                 Montgomery, Alabama 36103
19

20  For the Defendant:           Williams & Connolly, LLP
                                 BY:  DOUGLAS R. MARVIN, ESQ.
21                               725 Twelfth Street, NW
                                 Washington, DC 20005
22
    For the State Liason
23  Committee:                   Barrios, Kingsdorf & Casteix, LLP
                                 BY: DAWN M. BARRIOS, ESQ.
24                               701 Poydras Street
                                 Suite 3650
25                               New Orleans, Louisiana 70139

1   APPEARANCES:

2   Special Master:              Juneau Law Firm
                                 BY:  PATRICK A. JUNEAU, ESQ.
3                                1018 Harding Street
                                 Suite 202
4                                Lafayette, Louisiana  70503

5
    Claims Administrator:        BrownGreen, PLC
6                                BY:  ORRAN BROWN, ESQ.
                                 BY:  LYNN GREER, ESQ.
7                                115 South 15th Street
                                 Suite 400
8                                Richmond, Virginia  23285

9
    Curator:                     Johnston, Hoefer, Holwadel &
10                                 Eldrige
                                 BY:  Robert M. Johnston, ESQ.
11                               601 Poydras Street
                                 Suite 2490
12                               New Orleans, Louisiana  70130

13
    Official Court Reporter:     Jodi Simcox, RMR
14                               500 Poydras Street
                                 Room B-406
15                               New Orleans, Louisiana 70130
                                 (504) 589-7780
16

17

18  Proceedings recorded by mechanical stenography, transcript

19  produced by computer.

20

21

22

23

24

25

1                      <u>**PROCEEDINGS**</u>

2                   **(March 25, 2008)**

3          **THE DEPUTY CLERK:**  All rise.

4          **THE COURT:**  Be seated, please.  Good morning, ladies

5   and gentlemen.

6          **ALL LAWYERS:**  Good morning, Your Honor.

7          **THE DEPUTY CLERK:**  MDL 1657, in re:  Vioxx.

8          **THE COURT:**  Counsel, make their appearances.

9          **MR. HERMAN:**  Good morning, Your Honor, Judge Fallon.

10   May it please the Court, Russ Herman for the plaintiffs.

11          **MR. MARVIN:**  Douglas Marvin for Merck, Your Honor.

12          **THE COURT:**  We're here today for our monthly status

13   conference.  I met with the liaison committees in advance and

14   got from them a proposed agenda.  I'll take it and I'll hear

15   from the parties as to the agenda items.

16          **MR. HERMAN:**  Your Honor, all the orders regarding

17   settlement agreement are posted.  If Your Honor pleases, we'd

18   like to move to registration, and Mr. Marvin will introduce

19   that subject, followed by Mr. Birchfield, and then followed by

20   BrownGreer.

21          **THE COURT:**  That's Item II, registration of claims in

22   the settlement program.  Mr. Marvin?

23          **MR. MARVIN:**  Yes, Your Honor.  Orran Brown and Lynn

24   Greer, the claims administrators, are here today and they're

25   prepared to report to the Court on the number of registrations,

 1   as well as the number of enrollments in the resolution program.

 2                  For my part, I'll just go quickly to the bottom

 3   line and advise the Court that more than 94 percent of the

 4   claimants with eligible claims have enrolled in the program to

 5   date.  There are more claims that are being enrolled.  More

 6   claims are being received each day.

 7                  We know that there are pro se claimants who have

 8   until March 31 to enroll in the program in order to qualify for

 9   an interim payment.  Mr. Johnston will be able to report on

10   that with respect to contacting those pro se claimants.  So we

11   do expect more pro se claimants to be enrolling in the program.

12   There are also some firms that are still processing the claims,

13   those particularly with large inventories.  We're continuing to

14   review those claims and enroll the claims in the program.

15                  So we expect the numbers, more than 94 percent,

16   to rise even further.  To accommodate those continuing to

17   enroll in the program, Merck has served notice, as provided in

18   the master settlement agreement, to extend the deadline for

19   enrollments in the program, and that deadline is now extended

20   to May 1.  So the program is still open to those wishing to

21   enroll in the program.

22                  Mr. Birchfield is going to address another issue

23   that we'd like to bring to the Court's attention with respect

24   to the program as well.

25                  **THE COURT:**  All right.

 1              **MR. BIRCHFIELD:**  Thank you, Your Honor.  Andy
 2   Birchfield on behalf of the plaintiffs steering committee.
 3              I would like to discuss the issue of the timing
 4   of motions to withdraw that are contemplated under the
 5   settlement agreement; but before I do, I'd like to provide one
 6   point of clarification that goes along with the extension of
 7   the enrollment deadline date.
 8              We have received a number of questions about the
 9   timing of the final certification and when that should be filed
10   with BrownGreer.  Now that the enrollment deadline date has
11   been extended to May 1st, that is the deadline for filing the
12   final certification.
13              There's been a very slight modification that has
14   been made to the final certification that will be posted on the
15   BrownGreer Web site, and an e-mail will be sent to all primary
16   counsel regarding that modification.  But I would like to make
17   it clear that for those firms or those lawyers that have
18   already completed and executed their final certification, there
19   is no need to submit a new one.
20              The modification is made just to allow a firm
21   to -- if they have one or two clients where they are continuing
22   to pursue enrollment, that they can exercise or execute that
23   final certification.  But the final certification now is due by
24   May 1st, and we'll get notice out through the BrownGreer e-mail
25   lists, as well as posting it on their Web site.

1          In conjunction with that, we have -- the

2   settlement agreement contemplates that in a limited number of

3   circumstances, lawyers, where they have exercised their

4   independent judgment, determined that it's in the best interest

5   of their clients to enroll in the program, they have

6   recommended that the clients enroll in the program, yet for

7   some reason, the clients have not yet enrolled, then the

8   lawyers are to move to withdraw, provided they can do so within

9   equitable parameters.

10          We've received some questions about timing:

11  When is the deadline for filing those motions to withdraw?  We

12  have worked with Merck and we have extended that deadline to

13  June 1st.  So lawyers now have until June 1st, under the

14  settlement agreement, to move to withdraw in the limited number

15  of circumstances where that will be necessary.

16          We know from the number of releases and the

17  number of enrollments that the percentage of folks that will --

18  or lawyers that will need to file motions to withdraw is very

19  small.  But in those circumstances, they have until June 1st.

20          One of the reasons that we see the need for

21  extending that until June 1st is there are a small number of

22  cases where lawyers have yet to be able to locate or to

23  communicate with their clients.  So we want to encourage

24  lawyers to continue making those efforts before they file their

25  motion to withdraw.

1              So another circumstance where lawyers would need
2    to withdraw is if there is a disagreement between the lawyer
3    and how they should proceed and the client.  We would ask the
4    Court if you could provide some guidance, perhaps through a
5    case management order, about what you would expect to see in a
6    motion to withdraw and the circumstances where a lawyer, for
7    instance, has been unable to locate or communicate with their
8    client.
9              We could submit something to you, or ask you if
10   you would enter a case management order to provide that
11   direction.
12        **THE COURT:**  Yes, they will fall into two groups.  One
13   is the lost-client group.  In the lost-client group, we're
14   going to need to be a little more specific on it, but we'll
15   need what the lawyer has done thus far, and I would expect him
16   or her to try to locate the person by writing a letter and then
17   post it in local newspapers, and give me proof that they have
18   done that, and then the last known address, and, hopefully, the
19   last known address of someone else, kin of some kind.
20             I'll be a little more specific in the case
21   management order.  But then irreconcilable differences, I want
22   to make sure that the individual has an opportunity to get
23   other counsel, or make a decision as to whether or not to
24   proceed pro se, or to find other counsel.  Again, we'll give
25   them enough time to do so, and then we'll set their case for

 1    trial and proceed.

 2              **MR. BIRCHFIELD:**  Your Honor, in regards to providing

 3    a declaration about the efforts that have been undertaken, a

 4    lot of times that will involve a level of attorney-client

 5    communication.  We would ask the Court -- we think that that

 6    could be addressed in one of two ways.  It could be filed under

 7    seal.  But we think that would be an administrative burden on

 8    the Clerk's Office and as well as on the court.

 9              One possibility we would ask you to consider is

10    having the lawyer file the motion with the court, but the

11    declaration that's setting out the effort that had been

12    undertaken, the declaration that is submitted in support of

13    that motion be filed only with BrownGreer.

14              **THE COURT:**  That's fine, as long as I have the

15    opportunity to see it.

16              **MR. BIRCHFIELD:**  Yes, Your Honor, and BrownGreer

17    could make that available to the Court.  So the bottom line is

18    that the deadline for filing the motions to withdraw, under the

19    settlement agreement, is now June 1st.

20              **THE COURT:**  Okay.

21              **MR. BIRCHFIELD:**  Your Honor, Jason Wolf is here with

22    the Garretson Law Group and just wanted me to let the Court

23    know that they are continuing to make progress in working with

24    the governmental lien issue; and then BrownGreer is here and

25    prepared to give a report of the numbers that have been

1  received.

2          **THE COURT:**  All right.

3          **MR. BROWN:**  Good morning, Your Honor.  My name is

4  Orran Brown from BrownGreer in Richmond, and with me today is

5  Lynn Greer as well.

6              What we would like to do today, Your Honor, is

7  what we've done before is update the Court and the parties on

8  where we stand on the numbers, the materials, and the claimants

9  from whom we've received information so far; also talk about

10  other major activities that are underway right now at the

11  claims administrative level with the parties involved in this

12  settlement program; and then look ahead a little bit to the

13  next stages and what's on the horizon for all of us as we move

14  through the program.

15              First of all, let's talk about what we always

16  report, the people, the folks who submitted materials to

17  register for the program at the outset.  The Court's order

18  required those submissions by January 15th; but the parties

19  agreed to still receive submissions of people signing up for

20  the census, as the Court referred to it, after January 15th.

21              This table shows us how many more claimants we

22  have heard from, and how many law firms, and unrepresented

23  claimants have presented registration materials to us.  By the

24  15th of this year, we had heard from a total of 57,595 people.

25  In that process, the counsel were required to give us a

1   claimant spreadsheet that listed a lot of information about the
2   clients, including their injury assertions; and a number of
3   folks who signed up said that they had other injuries, which
4   are not eligible injuries under the settlement program.
5               So to give us an accurate picture of the census
6   results, we have to back out the folks who told us in the
7   spreadsheet that they were other injuries.  So if we're looking
8   for a rough ball park of eligible claimants to participate in
9   the program, we had 49,121 by the 15th of January, another 760
10  since then, for a total audience of 49,881 people who said they
11  had -- who signed up and said they had injuries that may
12  qualify for the program.
13              That is not an exact number because the
14  information at this stage is still subject to the medical
15  records and everything else coming in.  Some of the folks still
16  left the injury answer unanswered.  So the number is, as best
17  we could tell today, 49,881 people who registered in the
18  program who may have an injury that qualifies, or at least they
19  have told us that they do.
20        THE COURT:  You're counting the people who came in
21  after the deadline?
22        MR. BROWN:  Yes, Your Honor.  That total number of
23  49,000 includes the 760 potentially eligible people who have
24  come in since January 15th.  We still receive these.  We still
25  get some registration sign-ups here and there every day.

 1           **THE COURT:**  You're counting those?

 2           **MR. BROWN:**  Yes, Your Honor.  This is through

 3    yesterday.

 4           **THE COURT:**  I think that's appropriate.  As I

 5    remember the first census in Bethlehem, there were some people

 6    who were late and they seem to have done okay and were counted.

 7           **MR. BROWN:**  We're following that model, Your Honor.

 8    The parties have told us to count them and include them, and

 9    the volume has dropped off considerably, obviously, because now

10    people have moved really into the enrollment stage.

11           As the parties announced the last time we were

12    here, they had agreed to a second amendment to the settlement

13    agreement that specified what counsel had to do to enlist their

14    clients in the program by February 29th, 2008, which was the

15    date to be considered for an interim payment under the

16    settlement program.

17           And that was the key to get their initial

18    information by the 29th to us, which was they could sign up for

19    us online through their Web site portal that we created for

20    each firm; they could send us the claimant's spreadsheet, which

21    is CS up here, with the question 35, which is, is the claimant

22    enrolled, answered yes; or they could just send us a claimant

23    list attached to an enrollment form.  They also had to give us

24    an enrollment form by the 29th of February.

25           Now, coupled with that, they still have to send

1   us the other pieces of the enrollment package, which are the

2   release, the stipulation of dismissal if they have a pending

3   lawsuit, a medical authorization form, and then an employment

4   records authorization form if they're seek the extraordinary

5   injury payments.

6            So those are the pieces of the enrollment

7   package, and they were required to do the first part, the

8   informational part, the enrollment form by the 29th, and finish

9   out the rest of it by the 31st of March, which is soon, to be

10  in the running for consideration for an interim payment.

11       THE COURT:  The 3,108, is the hard copy that the

12  others can be hard copied or online?

13       MR. BROWN:  We're supposed to have a hard copy of

14  everything, Your Honor, except for the medical authorization

15  form and the employment authorization form, the parties have

16  told us we could accept electronic copies of those two

17  documents.  Everything else is supposed to be sent to us in

18  hard copy form, post-marked or handed to an overnight carrier

19  by the 31st to meet that deadline.

20            So looking at our enrollment numbers, first

21  we're going to break them down into folks that we heard from by

22  the 29th, and then I'll show the Court who we've heard from

23  since the 29th, and then we'll show the totals.

24            This is the group that really was enrolling

25  within the meaning of the second amendment, by the 29th of

1    February, to be considered for an interim payment.  As I

2    mentioned, they could come in online to us, which is the first

3    row, the 29,000 plus; they could send us their spreadsheet,

4    which a number of firms did that with their claimant's

5    spreadsheet, that's another 19,000 plus.  We had a few folks

6    who just sent us a claimant list attached to an enrollment

7    form.

8            If you pull out the folks that were turned in by

9    more than one firm or turned in twice, we had a total number of

10   claimants from law firms, from primary counsel, of 49,135 of

11   people who enrolled by the 29th.  By that time we'd already

12   heard from 233 of the pro se, unrepresented folks, which gave

13   us a total number of people who were enrolling by the 29th of

14   49,368.

15           But once again, to get a little bit better feel

16   for claimants who really may be eligible for the program, we

17   have to back out the claimants who told us in their spreadsheet

18   had an other injury, an ineligible injury.  So we get to a

19   number of 45,804 claimants from primary counsel and pro se's

20   who enrolled by the 29th.

21           Now, the pro se claimants themselves, they have

22   until March 31st to do all of this.  They were not bound by the

23   29th deadline.  They can enroll by the 31st of March and still

24   be considered by then for an interim payment.  We've still

25   received enrollments after the 29th.  We've got the numbers

1    shown here, coming in in the same methods, a net number of 480

2    folks who have signed up, enrolled since the 29th.  Because you

3    can still enroll after the 29th, you just won't be considered

4    for the interim payment.

5                    As we just heard from Mr. Marvin, the parties

6    now have -- or claimants now have until May 1st to send us

7    enrollment materials to sign up for the program and be

8    considered in the program.  They just won't be considered for

9    an interim payment if that occurs.

10                   So then we look at the total enrollments.  These

11   are the numbers of the total enrollments from before the

12   29th of February and after -- or since the 29th of February.

13   As of yesterday afternoon when we ran these numbers, we have a

14   total of 50,004 people, claimants, who are enrolled in the

15   program within the meaning of the second amendment, take out

16   the 3,720 folks who said they had an other injury, and we get

17   to the 46,284 claimants who have done what they need to so far

18   to enroll in the program.

19                   Now, the next step for all those claimants are

20   sending us the rest of the enrollment package, as we mentioned

21   earlier:  The releases, the stipulation of dismissal, the

22   medical authorization -- the medical records authorization

23   form, and the employment records authorization form.  Those are

24   the numbers as of yesterday afternoon that we had of those

25   documents.

1          We've already gotten almost 40,000 of the
2    release documents.  We've gotten over 27,000 stipulations of
3    dismissal, and over 39,000 medical authorization forms, and
4    then 25,000 -- almost 26,000 employment authorization forms.
5    These are the documents that are coming in every day now.
6          We receive shipments, mail, Fed Ex and UPS
7    deliveries every day.  Because these are the materials that are
8    required to be post-marked or delivered to an overnight
9    carrier, addressed to us, by the 31st of March -- or on before
10   the 31st of March to complete their enrollment package for
11   purposes of being considered for the interim payment.
12         Now, these materials, if you're not in line for
13   an interim payment, didn't make the 29th of February step to be
14   considered for that, as we just heard, you can still send these
15   materials through May 1st to sign up and enroll for the
16   program, just not for the interim payment step.
17         Looking ahead, Your Honor, to the next steps in
18   the program, one thing that has to happen is review of all
19   those enrollment materials.  We and the parties have been
20   working out the criteria and the process to look at the
21   releases and the stipulations and let the counsel know, or let
22   the pro se claimants know, if there's something wrong with
23   them, if they're not signed, if there's some material flaw in
24   them that keeps them from being a true, complete enrollment
25   document.

1          We've been working with the parties on those

2     criteria for completeness, and then the process for reviewing

3     them and how we transfer to claimants or counsel what they need

4     to do to remedy a problem in a document.

5          We're going to use the Vioxx portal as the

6     method to tell represented claimants what they have, what

7     they've sent us, and what's not complete, what they need to fix

8     about it.  We have been using this portal so much that we keep

9     adding functions to it; and I think that most of the counsel

10    are finding this to be an efficient, helpful way to receive

11    information from us and send us information.

12         So we have now and will post in the next couple

13    of days, a complete user manual and send an announcement to

14    each law firm about how to use all the functions on this.  It

15    will have screen shots in it and will explain how to go about

16    each function that's now available online through our processes

17    to handle claims, submit claims, find out about their

18    enrollment documents.

19         This is the system we're going to use to permit

20    firms to hear about that.  So far we're getting a lot of good

21    feedback from firms that are using this.  So we're getting

22    ready to issue a complete user manual to show them how that's

23    done.  One of the things that they will see on their portal now

24    is under the enrollment section -- we've rolled this out last

25    week -- a firm can go to their enrollment page and they can

1    search their clients.

2               This will now show them what enrollment

3    documents we have received and not received from each claimant.

4    They can look up each person, look up all their claimants.

5    This is where you go now if you're a primary counsel to see

6    what documents we have and don't have.

7               If you're wondering what we have by the 31st of

8    March and don't have for somebody, this is how you look it up.

9    Because right now what it shows for each firm is if we have

10   received a document, a release, a stipulation, a medical

11   authorization, or an employment authorization, as shown across

12   the bottom, for each claimant it will say, "received".  If we

13   haven't received it, it's blank.  We've explained that to the

14   firms.  That way they can tell what we're missing, we just

15   don't have yet.

16              As we do the completeness reviews, working with

17   the parties on the completeness reviews, this is where we'll

18   show a deficiency.  If we found something and the parties found

19   something wrong in the release, that it's not signed, for

20   example, it will say, "deficiency", here, as this example here

21   shows.  If it says, "NCD", that means no current deficiencies.

22   That means we've looked at it, the parties have looked at it

23   and it's okay.

24              If it says a deficiency, this is where they can

25   open it up and see what the problem is and what they have to do

 1   to correct it.  If someone didn't sign it, or it was the wrong

 2   signature, this is how you correct it.  This is a normal

 3   deficiency process for any document in the settlement program.

 4   Here, we're going to provide that online.  This will also allow

 5   the firms to print everything, print the deficiencies, print

 6   all of them, print them as to a particular claimant.

 7             We think this is the most efficient way to make

 8   that happen.

 9             THE COURT:  Each firm will be private?  That is to

10   say, no one else can go into that without the proper

11   authorization?

12             MR. BROWN:  Correct, Your Honor.  Each firm has a

13   secure password and an I.D. and can see only their claimants

14   and no one else's claimants.  Only the people in their firm

15   that they've authorized and given the password to can even do

16   that within their own firm.

17             Another area of activity, Your Honor, since we

18   last met is we've been working with Mr. Johnston, the pro se

19   curator, and folks in his office, to set up the processes to

20   enable him to have information about the unrepresented

21   claimants from whom we've already heard.

22             We are doing the same thing for him, to set up a

23   Web-based connection with us as a pro se curator portal.  It

24   will permit them to do the same sort of search on each of the

25   unrepresented claimants that we've heard from.  They will be

1  able to look them up and see what we have, see some basic

2  information on them.  This is all dummy information, not real

3  social security numbers.

4           They can access this and look up what those

5  claimants have sent us, if they need to see what we've received

6  and not received.  We'll also enable them to actually view the

7  images, the PDF image, of each document if they need to see it

8  or download it for themselves if  they'd like to have it.

9           The Court's order appointing the pro se curator

10  required the curator to keep a log of telephone calls with

11  unrepresented claimants.  We're setting up the process to

12  enable Mr. Johnston, and the folks at this office, to use our

13  call center screens and database so that they can log into our

14  system and record them directly into the database and keep

15  notes as to what the call was, what the purpose was, and the

16  outcome of it, to enable him to perform that function under his

17  order.

18           Your Honor, that carries us through

19  registration, enrollments, and recent activities in our office.

20  The next, and last, part of our presentation deals with the

21  claims status and where we are on that right now, the deadlines

22  for that, and Lynn is going to cover that for the Court.

23           **THE COURT:**  Thank you very much.

24           **MR. BROWN:**  Thank you.

25           **MR. BIRCHFIELD:**  Your Honor, before Lynn addresses

1   the claims package, if I could address one matter that

2   Mr. Brown raised, and that is using the portal to notify

3   lawyers regarding any deficiencies in the documents.  One area

4   where we have received a large number of inquiries, and I know

5   BrownGreer has as well, is the status of the documents that

6   have been received.

7              I know that lawyers are concerned about

8   receiving notice of a deficiency and it impacting that client's

9   eligibility for an interim payment.  So I want to make it very

10  clear that once BrownGreer notifies a firm of a deficiency,

11  they will be given a reasonable period of time to correct that

12  deficiency.  If that deficiency is timely corrected, it will

13  not impair the eligibility for their interim payment.

14             I know that there's been some concerns.  So I

15  wanted everyone to know that once you receive the notice of the

16  deficiency, there will be an opportunity, a window there, of

17  reasonable time to make that correction and not affect

18  eligibility for interim payment.

19             **THE COURT:**  Okay.

20             **MS. GREER:**  Good morning, Your Honor.  Lynn Greer

21  from BrownGreer in Richmond, Virginia.

22             I wanted to talk quickly about the next phase of

23  the process, which is the claims package submission phase, and

24  that deadline, the settlement agreement provides, is

25  July 1st of this year.

1          We have been talking with many firms about the

2   steps that they are taking to submit these packages.  It's

3   obviously a lot of work for the firms to compile the records

4   and to submit them to us.

5          So what I wanted to do was give the Court a

6   brief report of how many packages we've gotten to date; and

7   also to share with the Court some steps that we are taking to

8   simplify, we hope, the steps that the firms must take as they

9   compile and submit these packages to us.

10          The claims package contains the claims form; the

11   required pharmacy, medical and event records, which we call the

12   PME records; the profile forms, which were submitted in the

13   underlying litigation; and any additional claims information

14   that we may request.  These are the components of the claims

15   package that we look for when we receive packages from the

16   firms.

17          As of yesterday, we have received from 25

18   different firms and pro se claimants, 49 pro se's, 774 claims

19   packages.  The majority of these are coming to us in electronic

20   format, which is what we prefer, and I'll go into a little more

21   detail about that in a moment.  We have gotten 35 claims

22   packages by hard copy from primary counsel; 49 from pro se's.

23   The pro se's are submitting those in hard copy, which we would

24   have expected.  And a total today of 774 claims packages.

25          We are sharing with the firms and would like to

1    share with the Court our suggestions on how firms can submit

2    these packages to us most efficiently.  First and foremost is

3    that they should submit them electronically.  We will handle

4    and we can accommodate hard copy submissions.  But the easiest

5    way for the firm, and for us, is to process those upon receipt

6    is for the firm to use their own Vioxx portal to upload the

7    claims packages to us.

8                  We have many people at our firm who monitor that

9    and will download the claims packages as they come in to us.

10   It is also very important that as they send the packages to us

11   that they label each package with the client's VCN, or Vioxx

12   claims number, which is our unique identifier within our

13   system.

14                  The claims form is available in two places.

15   One, there is a hard copy form that's available on the Vioxx

16   claims administrator Web site that the firm can use and print

17   and fill in by hand.

18                  However, what we have made available to the

19   firms is, again, on their Vioxx portal, each claimant has a

20   claims form that is viewable by the firm when the firm logs in

21   and selects a claimant.  The claims form is prefilled with a

22   lot of information that we received as part of the enrollment

23   and registration phases.

24                  The goal here was to try to pre-populate as much

25   as possible so the firm would not have to continue to repeat

1   entering the same data on these claimants.  So the firm can

2   pull up a claims form, they can change the data if there has

3   been any change in address or any other demographic

4   information.

5               This is where the firm indicates the primary

6   injury.  We've recently changed this claims form to allow the

7   firm to input a secondary injury, if they are alleging a second

8   injury, and this is where they also provide the event date.

9               When it comes time to sign and submit the claims

10   form, one of the things that we have done, with the agreement

11   of the parties, is rather than have the firm fill this out,

12   print it, and then send it to us as part of the claims package,

13   we have provided a method for them to provide an electronic

14   signature.

15               So if, and only if, there has been a profile

16   form submitted in the litigation which contains the requisite

17   signatures, if we have record of a profile form, or if the firm

18   indicates that they are submitting a profile form, then they

19   will be able to get this box that confirms their electronic

20   signature.

21               They will be able to say that they agree that

22   this is the equivalent of an original signature, they submit

23   the claim form, and it automatically gets transmitted to our

24   server, and they need not include the claims form in the

25   package that they submit to us.

1            If there was not a profile form submitted in the

2    litigation, then the claimant has to complete Attachment A to

3    this claims form which asks family history and risk factor

4    information.  The claimant does have to provide his or her

5    original signature.  And in that instance, the firm would need

6    to print off a claims form, obtain the original signature and

7    send that to us.

8            The other area that is a challenge for many is

9    to be able to gather the proof of use information.  One of the

10   things that we have posted as of Friday of last week for each

11   firm to use is a pill count calculator.  This is a tool that on

12   the Web site is a live Excel document.

13           What it does is it allows the firm, as they're

14   looking through their claimant's records, to enter the claimant

15   name, the VCN, the event date, and then the firm can enter each

16   instance of a prescription or a sample having been provided to

17   a claimant.

18           The only areas that firm need enter are these in

19   the green areas here.  So they do have to enter the claimant

20   name, the VCN, and the event date.  Then they can list each of

21   the prescription dates, the number of pills dispensed, the

22   dose, and the prescriber pharmacy.

23           The calculator tool on the live Excel document

24   has a button that they can push once they have entered all the

25   information -- it's a calculate button -- and they push that

1   button and the rest of the spreadsheet is populated.  What this

2   calculator does, and what it will assist the firms with doing,

3   is it helps them access whether the claimant has met both

4   duration and the proximity gates under the gate criteria.  It

5   also provides information for the point calculation.

6                   What it does is it will shade, in pink, any

7   prescription that was dispensed within 365 days prior to the

8   event.  So that's the one-year look-back period where any

9   prescription that was dispensed -- I mean, any pills that were

10  dispensed within that 365 days are highlighted in pink.  If the

11  quantity satisfies one of the proximity gates, then those cells

12  are also highlighted in pink.

13                  So you see for this test claimant that it meets

14  the portion of the proximity gate that at least 90 pills were

15  dispensed within the 140 days prior to the eligible event.  And

16  it shows this firm then that their client has met the proximity

17  gate.  That is automatically prefilled once this is calculated.

18                  The other thing that this does for the points

19  criteria is it calculates the consistency of use adjustment

20  that the settlement agreement provides, as well as the label

21  adjustment.  So this is a one-stop shop for any of the duration

22  and the pill calculations that are relevant under the

23  settlement agreement.

24                  Finally, the things that we are -- other things

25  that we are encouraging the firms to do are to understand what

1   the settlement agreement provided in terms of the required

2   records, and this is posted -- it is an exhibit to the

3   settlement agreement, obviously, but we have also made this

4   available in a document that lists for each injury type,

5   specifically, what the records are that are required.

6            There's also a document on the Web site that is

7   a step-by-step guideline for submitting claims packages that

8   tells the firms in detail how to bookmark and highlight the

9   medical records.  Firms can go to our Web site and print this

10  and it goes through, step-by-step, how to put together the

11  claims packages in terms of Adobe folders, how to label those,

12  and send those to us.

13           So we are trying, Your Honor, to provide tools

14  for the firms to use that will assist them in making submission

15  of claims packages consistent.

16           **THE COURT:**  Okay.  Thank you very much.  That's very

17  good.  I appreciate your work.

18           **MS. GREER:**  Thank you, Your Honor.

19           **MR. BROWN:**  Thank you, Your Honor.

20           **MR. HERMAN:**  May it please the Court, Your Honor --

21           **THE COURT:**  Mr. Johnston had some comment.

22           **MR. JOHNSTON:**  Mr. Herman, can I get in front of you?

23           **MR. HERMAN:**  Absolutely.

24           **MR. JOHNSTON:**  I asked to speak briefly to the Court

25  because I have a 10:00 status conference in Jefferson, and we

1   all know how much time it takes to get over there.  All I want

2   to notify the Court is that last Thursday there was the initial

3   communication that was disseminated by our office, sent out to

4   those that have registered but not enrolled.

5                    I checked this morning with my office manager at

6   7:15 and was told either the next batch of letters, which are

7   some 900 of those who have not yet registered, either went out

8   yesterday or are going out this morning.  Russ and I have

9   talked and we have gotten great assistance from BrownGreer.

10  They're obviously way ahead of us in terms of that.

11                   The logging-in that you heard about is going to

12  be a great benefit to us.  We'll be able to provide reports to

13  the Court.  I think things are moving well from our standpoint.

14  If there's any questions that the Court --

15           **THE COURT:**  How many pro se claimants have you

16  written to so far?

17           **MR. JOHNSTON:**  So far it was 314, I think, went out

18  last Thursday, and we're having another 900-some that may well

19  have gone out yesterday.  I just was not in my office and I

20  wasn't able to verify it.  But hot off the press is it's either

21  yesterday or today in terms of my office manager.

22                   We're going to be dealing very closely with

23  BrownGreer and I think that we'll be able to provide additional

24  positive information to the Court the next time we're together.

25           **THE COURT:**  All right.  Thank you very much.

1          **MR. JOHNSTON:**  Thank you.  Thanks, Russ.

2          **MR. HERMAN:**  May it please the Court.  Your Honor,

3   just two quick references that relate to registration.

4                   We have had some problem with health care

5   providers of one type or another or pharmacies requiring

6   special medical authorizations, repetitively.  The plaintiffs

7   and defendants have worked on a proposed recommendation, Your

8   Honor, for a universal order that would remedy that, and we

9   should be able to get that to Your Honor before the week's end.

10                  Secondly, with regard to the medical

11  certification of records, preservation of records, as Your

12  Honor has pointed out, it's been a burden on the Clerk's Office

13  because those preservation certifications have been going to

14  the Clerk's Office, and we just wanted to make special note

15  that they should not go to the Clerk's Office.  They should go

16  to Merck's representatives.

17                  BrownGreer has agreed to pick up whatever there

18  is in the Clerk's Office to that effect and just store them for

19  the present.  But I do want to emphasize the necessity that

20  those preservation certifications not be sent to the Clerk's

21  Office.

22          **THE COURT:**  Okay.

23          **MR. HERMAN:**  Your Honor, the next matter on your

24  suggested agenda is the Item IV, special master and deputy

25  special masters.  On January 14th Your Honor appointed Mr. Pat

1   Juneau as a special master.

2              Then after Your Honor consulted with Judges

3   Chaney and Higbee, Your Honor on January 16th appointed as a

4   deputy special master, retired Justice John Trotter of

5   California and retired Judge Marina Corodemus of New Jersey.

6              Your Honor and Mr. Juneau directed that there be

7   an orientation, which was held on March 5th, 2008.  Mr. Juneau

8   and Your Honor, I believe, have some comments regarding that.

9              **THE COURT:**  I met with the special master and the

10  deputy special masters together with representative counsel

11  from both plaintiffs and defendants.  The deputy special

12  masters, with Mr. Juneau's direction, were given a course in

13  what to expect and how to handle the proceedings.  I thought it

14  went well.  It took the better part of a day.  Their questions

15  were answered and I think they went away with a good feeling

16  for their responsibility and duties.

17             I'm also directed that the appeals, if there be

18  any, be randomly divided between and among the special masters.

19  They will go to Mr. Juneau, and Special Master Juneau will then

20  randomly send them out.  I think the random approach is best

21  for consistency and also credibility.  It's just best for the

22  special masters, for the deputy special masters, as well as for

23  the litigation as a whole.

24             Mr. Juneau, do you have any comments?

25             **MR. JUNEAU:**  No, sir, Your Honor, other than the fact

1   that we've already gotten together and interfaced with
2   BrownGreer, and we've already started into that process, how
3   that will be done in a blind system.
4           The second thing is, we've already interfaced
5   and dealt with the forms and procedures we'll use in that
6   regard.  We're also putting in process in fairly short order,
7   we're going to have a dry-run process to make sure everybody's
8   on board with the mechanics -- a test run, if you will, of the
9   procedures.
10          So I think we're ahead of the learning curve in
11  that regard.
12      THE COURT:  I think that's very helpful.  They've
13  devised a program whereby we can have a dummy run, so to speak.
14  They'll get a couple of claims and be able to process those
15  claims and get input from the various parties as to the proper
16  way of doing it, the most efficient way of doing it from
17  BrownGreer's standpoint.  I think that will be very helpful.
18      MR. JUNEAU:  Just one last comment, Your Honor.
19  Pursuant to the Court's direction at the orientation program,
20  and I have verified this with the two deputy special masters,
21  the object after we've gotten the system established, we've got
22  the commitment that this thing will be done on an efficient,
23  prompt manner.  There won't be any delay in the reviewing
24  process.  We have a tracking mechanism to track all that.
25          So I think all that is in place to make this

1    thing run efficiently and on board as you've directed.

2              **THE COURT:**  Thank you very much.  The next item is

3    state court trial settings.

4              **MR. MARVIN:**  Your Honor, I guess for the first time

5    in three years, we're able to advise the Court that there are

6    no cases set for trial in any of the state courts through the

7    relevant period.

8              **THE COURT:**  I've been in touch with several of the

9    judges and I'm happy that the situation is working out.  I

10   think that throughout the country the program has been

11   well-received.  I know the state courts around the country

12   appreciate it, as well as the MDL court.

13             **MR. HERMAN:**  Your Honor, with regard to the next item

14   on your docket titled, class actions, Merck's motions to

15   dismiss have been briefed and replied to and have been

16   submitted.  Those motions have been submitted on brief and

17   they're under advisement.

18                  With regard to discovery directed to Merck, Item

19   VII, that discovery has been stayed.  With regard to discovery

20   directed to third parties, the FDA, through its counsel, has

21   indicated that it will provide a privilege log and documents

22   within the next two weeks.

23                  I believe that Dawn is here with a report on the

24   state liaison committee.  Ms. Barrios?

25             **THE COURT:**  I should say that I personally appreciate

1   the FDA's cooperation.  I think that that's very helpful that
2   they're doing that.  I appreciate their work.
3             **MR. HERMAN:**  Yes, Your Honor.
4             **THE COURT:**  Ms. Barrios for the state/federal
5   coordination liaison committee.
6             **MS. BARRIOS:**  Good morning, Your Honor.  Dawn Barrios
7   for the state liaison committee.
8                  I've provided to your law clerk today our usual
9   submissions.  We have two DVDs of cases that you have pending
10  remands for.  We have set up, Your Honor, a conference call
11  tomorrow with Lynn Greer at BrownGreer to review the cases
12  which you have before you with pending remands to see if those
13  claimants have actually been enrolled and registered so we can
14  whittle down the number of valid remands still before you.
15                 With regard to the other issue we've been
16  working on, the nonpersonal injury cases that are still before
17  you.  I've provided you with a spreadsheet of the cases in the
18  MDL.  There are, by my count, still 49.  We've been circulating
19  this list around the country for several weeks.  I think we're
20  going to wind up with just 49 nonpersonal injury cases before
21  you.
22                 Of those 49 on the spreadsheet, I've listed the
23  national ones first.  There are 15 cases that are nationwide in
24  scope, particularly with regard to class definitions.  There
25  are 35 that relate to state matters.  There's one case that

```
 1    alleges both national and one particular state issues.
 2              THE COURT:  What type of cases are they, basically?
 3              MS. BARRIOS:  I've broken them down in the chart,
 4    Your Honor.  They're third-party payor cases.  They're
 5    Medicaid/Medicare cases from state attorney generals, return of
 6    purchase price, unjust enrichment.  But we've broken those
 7    down.  We're continuing a dialogue with -- the PSC, through
 8    Ms. Cabraser, has set up a Friday call that we have every
 9    Friday.  We're just beginning that.  I've been invited to
10    participate in that call.
11              We're trying to get our arms around a method to
12    present to Your Honor that would be logical on how to group
13    these cases in any bellwether matter.
14              THE COURT:  The ones that you've mentioned, are they
15    a multiple-claims or just one claim?  You said there were 40 or
16    so.  Is that each of those have a number of claims with it?
17              MS. BARRIOS:  Yes, Your Honor.  Yes, Your Honor.
18              And that's what we're going to look at, the
19    complaints, individually, to see how best to group them.
20              I've also provided Your Honor something that
21    I've gotten from Judge Higbee yesterday.  It's a letter in your
22    packet.  She is having a status conference on April 14th for
23    the 14 nonpersonal injury claims before her.  I plan on
24    attending that status conference so that I can personally
25    witness what is going on in New Jersey and report back to you
```

 1   on that.

 2              THE COURT:  Okay.

 3         MS. BARRIOS:  Thank you, Your Honor.

 4              THE COURT:  Thank you very much.  The next item is

 5   the pro se claimants, and we've heard from Mr. Johnston on that

 6   previously.  Merck's motions is number IX.

 7         MR. HERMAN:  There are two motions pending, *Arnold*

 8   and *Gomez*, and I believe they're under advisement.

 9              THE COURT:  Okay.

10         MR. MARVIN:  Yes, Your Honor, they are under

11   advisement.  There's no change there.

12              THE COURT:  Any issues relating to Pretrial Order 9?

13         MR. HERMAN:  There are no new developments with

14   regard to that at this time, Your Honor.  I believe that's

15   because discovery, for the most part, has been stayed.

16              THE COURT:  Item XIII is Vioxx suits statistics.

17   Anything on that?

18         MR. MARVIN:  Your Honor, there's virtually no change

19   in the number of statistics.  We'll be having a new report on

20   statistics at the next conference.

21              THE COURT:  All right.  Item XIV is the trial

22   package.

23         MR. HERMAN:  Yes.  There's been a series of

24   conference calls and work done regarding the trial package,

25   particularly the outstanding stroke package.  Ms. Sanford and

1   Mr. Rafferty of that committee are here.

2                   Yesterday I spoke with Mr. Meunier, who gave me

3   a report that the stroke package would be ready for

4   presentation to Your Honor at Your Honor's selection of date

5   and time within the next two weeks, in camera.

6                   There would still be one expert report

7   outstanding.  We received an outline, but it won't be ready for

8   90 days.  Because there have been requests, the PSC believes it

9   would be important to go ahead and release the stroke trial

10  package, the MI trial package, now and then supplement the

11  stoke package when that additional expert report is ready.

12                  We've only had, thus far, two requests for trial

13  packages.  I'd like to get those expedited within the next

14  three weeks, a week post the time that Your Honor selects for a

15  review.

16          **THE COURT:**  I think, as I said before, one of the

17  advantages of the MDL process is, of course, the global

18  opportunity for the parties to look and see whether or not the

19  matter can be resolved.

20                  Another aspect of it is the trial packages.  It

21  gives the other claimants who choose to proceed in either their

22  respective state jurisdictions, or other jurisdictions, or in

23  this jurisdiction, an opportunity to benefit from all of the

24  discovery that has gone on in the matter.

25                  A trial package is prepared with various

1    documents and witnesses and it's trial-ready.  The individual

2    then can garnish that package with case-specific information

3    and their client and proceed to trial.  So this is a very

4    important aspect of the whole MDL process.

5                    I'll get with counsel and we'll set a date in

6    the very near future.

7                MR. MARVIN:  Your Honor, just for equal time, the

8    defense trial package is complete and ready to go.

9                THE COURT:  Okay.

10               MR. HERMAN:  Would counsel entertain an exchange?

11               THE COURT:  You want to see his, but you don't want

12   him to see yours?  I'm kidding.

13               MR. HERMAN:  Fair is fair.

14               THE COURT:  Other motions?

15               MR. HERMAN:  Your Honor, there are two matters.  One

16   is, actually, not in motion form, but I understand will be

17   either by letter or formal motion.  Mr. Harrison --

18               THE COURT:  Okay.

19               MR. HERMAN:  -- as Your Honor knows, has matters that

20   he wants to bring to the Court's attention.  The Court has

21   directed that they be placed in writing, and that's been

22   communicated to Mr. Harrison.  We would expect some filing

23   directed to Your Honor.  I will follow-up, personally, with

24   Mr. Harrison to see that he gets his opportunity to submit

25   whatever writings he deems are necessary.

1            **THE COURT:**  I know Mr. Harrison has been very

2     thorough in researching this particular matter.  I would profit

3     from his information that he has.  He's an articulate

4     individual and he can package it properly, and then I will look

5     at it and deal with it accordingly.

6                  The other motion of HRI, I'll take after we're

7     finished with this proceeding.  It's almost finished at this

8     time.

9            **MR. HERMAN:**  Your Honor, the third-party payor cases

10    have been previously discussed today by Ms. Barrios.  I do want

11    to point out that Ms. Cabraser has organized those efforts and

12    is present in the court.  Your Honor, the next status

13    conference --

14           **THE COURT:**  The next status conference is

15    April 17th at 9:00.  I'll see the committees at 8:30 that day.

16    My thinking on the other matters, right now, as you can see,

17    we're trying to focus everyone's attention and take all of

18    their time and effort and talent on trying to move the

19    settlement aspect of it.

20                  There's a lot of documents that have to be

21    collected.  A lot of information.  A lot of communication has

22    to be made.  A lot of effort and time goes into that.  I would

23    like for all the parties to focus on that aspect of the case.

24                  When we're finished with that aspect of the

25    case, I think we also have to recognize that when it gets to

1   the processing of these claims, people going through the gate,

2   hopefully, many will get through the gate; some may trip and

3   not get through the gate, that's going to be a problem that has

4   to be dealt with somewhat.  That's the appeal process and the

5   review process.

6               After some headway in that program, then I want

7   to figure out what's left.  I'll be meeting with the parties to

8   determine, first, what's left and then invite their input as to

9   the most efficient and effective way of packaging those

10  what's-left cases and see if we can bellwether some of them to

11  learn more about them in that way and give counsel an

12  opportunity to present the cases, and we'll see how that works

13  out.  But right now, I want to focus on the program.

14              Anything else from anybody?  Mr. Becnel?

15          MR. BECNEL:  Your Honor, one of the things I just

16  heard that brought back something is the people who are having

17  lawyer problems of getting enrolled and not getting enrolled.

18              Sometimes I find that we've all had those kind

19  of clients.  No matter what we say, no matter what legal

20  arguments we make, no matter what minefields they have, they're

21  just sort of at loggerheads.

22              I'm particularly concerned about those people

23  that might not be able to get enrolled by May 1st.  I was going

24  to suggest something that kind of worked in breast implant.

25  Mr. Levine, Ms. Cabraser and Mr. Blizzard knew that in breast

1    implant, when settlement was announced, nobody would take

2    anymore cases.  People were scrambling and looking try to find

3    a lawyer, couldn't find one.  Finally, Judge Pointer asked us

4    to volunteer to do that.

5                 I think our office did about 70 percent of them.

6    They're still, 13 years later right now, they're getting

7    checks.  So what I was going to suggest is, pro bono, that our

8    office would be willing to talk to those people once they get

9    here and you have to say, hey, you're out, Mr. Lawyer A.

10                We have a couple of retired state judges at our

11   office.  Judge Marino, who has worked almost two years on this

12   case almost exclusively, that could talk to them.  Sometimes a

13   judge, or even you could have one of your magistrates talk to

14   the people after you present the minefields that a pro se

15   claimant now has in the environment that we have concerning

16   preemption and all of the other potential defenses that

17   defendants may have.

18                I think that might help two people.  Number one,

19   it would help the client most of all.  Number two, it would

20   help that lawyer who's just kind of in a box of quicksand that

21   he can't get out of.

22                It would help the Court and the defendants,

23   trying to get these people in, even if it takes a long time and

24   they don't get the prepayment or what have you.  I can tell you

25   when we get these checks -- every week we get some of these

1    breast implant checks now for people and there's no fee in
2    them.

3                I mean, if it's under $10,000, you don't charge
4    them anything.  If it's over that, it was like are 5 percent or
5    10 percent.  I mean, it's unbelievable.  But I think that might
6    help get a lot of those people into this program where they
7    should and ought to be, especially after all of the work that
8    I've seen that all of these lawyers have done and having read
9    most of the transcripts of all the trials.

10                I think if people would spend time, independent
11   of the lawyer they hired, whether it's me or anybody else,
12   might help the situation.  We'd be more than happy to do that
13   pro bono.

14              **THE COURT:**  All right.  Thank you for your
15   suggestions, Mr. Becnel.  I appreciate it.

16                Anything else from anyone?

17                I'll take a five-minute break here and then
18   we'll come back and I'll have argument on the motion.  Court
19   will stand in recess.

20              **THE DEPUTY CLERK:**  All rise.

21                **(WHEREUPON, the Court took a recess.)**

22

23

24

25

```
 1                              *****

 2                          CERTIFICATE

 3          I, Jodi Simcox, RMR, Official Court Reporter for the

 4   United States District Court, Eastern District of Louisiana, do

 5   hereby certify that the foregoing is a true and correct

 6   transcript, to the best of my ability and understanding, from

 7   the record of the proceedings in the above-entitled and

 8   numbered matter.

 9

10

11                                 S/Jodi Simcox, RMR
                                   Jodi Simcox, RMR
12                                 Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25
```