# EXHIBIT 2

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| AvMed, Inc.; et al. | § | CIVIL ACTION |
| | § | |
| v. | § | NO.  08-1633 |
| | § | |
| US Bancorp; BrownGreer, PLC; and John Does | § | SECTION L, MAG. 3 |
| | § | |
| | § | JUDGE FALLON |
| | § | |
| | § | MAGISTRATE JUDGE KNOWLES |
| | § | |
| | § | In Relation to:  MDL Docket No. 1657 |
| | § | |
| | § | In Re:  VIOXX |
| | § | |
| | § | PRODUCTS LIABILITY LITIGATION |

## MEMORANDUM IN SUPPORT OF MOTION
### FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

**Preliminary Statement** ...................................................................................................1

**Background and Procedural History** ..........................................................................4

A.  Merck Settles Vioxx Personal Injury Litigation .................................................4

B.  The Plaintiffs Provided Vioxx-Related Health Benefits to the Vioxx Claimants Pursuant to Plan Documents Providing Reimbursement Rights .........................................6

C.  The Settlement Agreement Does Not Provide a Process to Resolve the ERISA Reimbursement Rights to Private, Non-Governmental Healthcare Payers .........................7

D.  Plaintiffs Cannot Assert Equitable Reimbursement Rights Based on the Publicly Available Information ...........................................................................8

E.  The Reimbursement Rights of Plaintiffs Have been Ignored ...........................11

**Argument** .......................................................................................................................12

A.  The Legal Standard for a Temporary Restraining Order and a Preliminary Injunction is Met Here ...................................................................12

    1.  Plaintiffs Are Likely to Succeed on the Merits of their ERISA Claims ...............13

    2.  Plaintiffs Will Suffer Irreparable and Irreversible Harm If the Requested Relief is Not Granted .......................................................................17

    3.  Plaintiffs' Impending Injuries Far Outweigh Any Possible Harm to Defendants .......................................................................................18

    4.  Granting the preliminary injunction will not disserve the public interest ............19

B.  This Court's Order on HRI's Motion for Pre-Suit Discovery Does Not Impact This Motion .......................................................................................20

    1.  This is Not a Rule 27 Petition ....................................................................21

    2.  Plaintiffs Have Responded to Concerns Expressed in This Court's Order With Substantial Evidence ...............................................................21

    3.  There Remains No Answer to the Tolled Claimants Issue ....................................22

    4.  This Motion Shows That the Burden Analysis Should Focus on the Defendants .......................................................................................22

C.  This Court Should Waive the Plaintiffs' Requirement to Post a Bond...........................23

**Conclusion** .....................................................................................................................25

i

## PRELIMINARY STATEMENT

Plaintiffs collectively provide healthcare benefits coverage to approximately 70% of all individuals in the United States who have private healthcare coverage.  The relief Plaintiffs seek here stems from the unambiguous healthcare reimbursement obligations of the claimants who are participating in the settlement fund established to resolve claims asserted in the *In re: Vioxx Products Liability Litigation*.  This motion is necessitated by the *In re: Vioxx* Plaintiff Steering Committee's ("PSC") refusal to set up a workable process to identify claimants – in a manner comparable to that established to resolve Medicare and Medicaid liens – in order to allow Plaintiffs to effectively assert the reimbursement rights to which they are plainly entitled under the Employee Retirement Income Security Act of 1974 ("ERISA") and other legal provisions.

Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction directing identification and disclosure of Plaintiffs' plan members who are participating in the settlement in order to allow Plaintiffs a short period in which to assert Plaintiffs' equitable reimbursement rights.  If and only if necessitated by delayed compliance, Plaintiffs further request a short enjoinment of settlement distributions until Plaintiffs' equitable reimbursement rights can be determined.  The identification Plaintiffs request ought to include, at a minimum, notice to counsel for Plaintiffs of: 1) the determination to make a distribution; and 2) the name, address, and personal identifying information (*i.e.*, social security number) for each qualifying claimant; and 3) the amount that such claimant would receive from the Settlement Fund, or such other quantification of the claimant's interest in the fund as is known to the Defendants.  Following such disclosure, Plaintiffs must be given at least thirty days within which to investigate and assert any equitable rights to reimbursement.

The reimbursement rights at issue here are significant. Conservative expert estimates suggest that at least 50 percent of the claimants participating in the *In re: Vioxx Products Liability* settlement had private health coverage, with Plaintiffs themselves insuring between 15,400 and 17,604 of the approximately 50,000 settlement claimants – approximately one-third. (*See* Melnick Declaration, ¶¶28-30.) The health plans represented in this action have coverage documents – contractual agreements with plan members – explicitly setting forth the plans' rights to reimbursement. (*See* Ogle Affidavit., Appendix A) Many of these coverage documents require plan members to provide notice and cooperation, but these contractual obligations have been flatly disregarded in favor of a rapid and secretive distribution process. Indeed, notwithstanding their repeated requests, Plaintiffs have received less than 50 notifications from covered claimants participating in the Vioxx settlement. (*See id.* at ¶17.)

Faced with the impending wholesale destruction of their rights, Plaintiffs have undertaken extraordinary efforts to ascertain, from publicly available data, the distributions to which their reimbursement rights attach. First, Plaintiffs undertook efforts to identify, and then contacted, counsel for every publicly identifiable claimant, informing them that the "medical expense payments incurred by [the represented health plans] on behalf of Vioxx Settlement Program claimants were provided under coverage contracts that give the Health Plans valuable legal rights to recover those expenditures" and inviting them to discuss "an appropriate process to exchange identifying information consistent with HIPAA requirements regarding your clients." (*See* Fischer Affidavit.) Plaintiffs received just one response from their outreach to the plaintiffs' lawyers. (*See* Fischer Affidavit.)

Next, Plaintiffs identified and cross referenced 22,685 names of claimants from public records against Plaintiffs' internal records of healthcare benefit recipients. This analysis

revealed more than 40,000 matches against just under half of Plaintiffs' member records alone –
even when such records were limited to members with covered Vioxx pharmacy purchases. (*See*
Ogle Affidavit, ¶10.) [1]  In other words, for every one of the claimants, there are likely an average
of <u>at least</u> four covered plan members with the same name.[2]  Further compounding the problem
is the fact that there is <u>no</u> publicly available data relating to the approximately 15,000 claimants
who entered into private tolling agreements with Merck and therefore never filed a public
lawsuit. (*See id.*, at ¶15.)

In short, without the benefit of personal identifying information, Plaintiffs have no means
for accurately determining the impending distributions that involve reimbursable healthcare
rights. (*See id.*, at ¶18.)  Defendants BrownGreer (the claims administrator) and US Bancorp
(the escrow agent) have or will have this information; they will undoubtedly create and maintain
electronic databases of claimants' identifying information which can easily be matched to the
electronic information about health benefits plan members maintained by Plaintiffs.  But absent
this Court's prompt direction ordering the relief requested herein, the settlement funds will be
distributed to claimants and Plaintiffs' potential remedies against those funds will disappear.

The familiar standard for granting preliminary injunctive relief is met:

First, Plaintiffs are likely to succeed on the merits of their equitable reimbursement
claims, which were confirmed in the United States Supreme Court's ruling in *Sereboff v. Mid
Atlantic Medical Services Inc.*, 547 U.S. 356 (2006) ("*Sereboff*") – a decision that is, in all
material respects, indistinguishable from the facts presented here.  Second, Plaintiffs will be

---

[1]  In reality, the number of duplicates is undoubtedly even greater, due to the complicating fact that entirely separate
health plans are often responsible for, respectively, providing pharmacy benefits or insuring against medical
expenses associated with a particular pharmacy purchase.

[2]  That is, after extrapolating the results from Plaintiffs' review of half their data to what a full data set ought to
reveal.

irreparably harmed if the requested relief is not granted. Once proceeds of the Settlement Fund are paid out to participating claimants, Plaintiffs have virtually no chance of recovering from them the substantial monies they are equitably owed. Lastly, the balance of hardships and public interest favors Plaintiffs. While Plaintiffs are at great risk of being deprived of millions of dollars in reimbursements to which they are equitably entitled, Defendants are either 1) disinterested stakeholders – neutral trustees and/or administrators – whose interests are in seeing that the Settlement Fund is distributed according to law, or 2) claimants against the fund (the John Doe defendants) who have contractual obligations to Plaintiffs that they cannot ignore. Moreover, had Defendants or the PSC considered or acknowledged the third party payers' rights in a manner similar to the method used to account for the analogous reimbursement rights of governmental third party payers, the requested relief would be moot. Even now, if Defendants promptly produce the requested information in all likelihood Plaintiffs' rights can be resolved without a need to enjoin distribution. Indeed, rather than contravening the public interest, the requested remedy furthers the public interest in finally resolving disputes arising from the injuries caused by Vioxx in an orderly fashion that is consistent with governing law. What's more, protecting the reimbursement rights of approximately 70% of the private health insurance market will maintain the fiscal integrity of the nation's health plans.

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    Merck Settles Vioxx Personal Injury Litigation

Merck obtained Food and Drug Administration (FDA) approval for Vioxx in or about May 1999, and began the distribution and sale of Vioxx throughout the United States

4

immediately thereafter. On September 30, 2004, Merck withdrew Vioxx from the market due to concerns that the drug increased the risk of heart attacks and strokes in users. By the time it was withdrawn from the market, more than 20 million people in the United States had taken Vioxx.

As a result of the safety issues associated with Vioxx, tens of thousands of individuals filed personal injury claims against Merck. On November 9, 2007, Merck and a group of personal injury lawyers, represented by the PSC, entered into a Settlement Agreement.

Pursuant to the Settlement Agreement, Merck is to create a $4.85 billion Settlement Fund to resolve certain personal injury claims alleged to be associated with Vioxx. *See Settlement Agreement*, § 5.1. The Settlement Agreement provides that an Escrow Agent, pursuant to an Escrow Agreement, will oversee various Escrow Funds into which Merck will pay the $4.85 billion. *See id.*, §§ 5.1.5-5.1.6, 5.1.8, 5.3.4, 5.3.6, 5.4, 17.1.6. The Agreement defines the Escrow Funds to include an Administrative Expenses Fund, an MI (Myocardial Infarction) Settlement Fund, and an IS (Ischemic Stroke) Settlement Fund. *See id.*, § 17.1.30. The Settlement Agreement defines "Escrow Agent" to mean U.S. Bancorp, a named Defendant in this action. *See id.*, § 17.1.28. BrownGreer PLC has been appointed to serve as the Claims Administrator for the Vioxx Settlement Program and is the other named Defendant.[3]

The claims that are subject to the Settlement Agreement include: (a) claims asserted in lawsuits pending in various state and federal courts, and (b) claims subject to tolling agreements with Merck. *See id.*, § 1.2. Individuals who own such claims are collectively referred to by the Settlement Agreement as "Eligible Claimants." *See id.*, § 1.2.1. Those "Eligible Claimants" who properly complete certain enrollment forms become "Enrolled Program Claimants." *See*

---

[3] In addition, Plaintiffs have sued the individual claimants who are their plan members, and those claimants' counsel. Because the identities of these individuals are unknown to Plaintiffs, they have been sued as "John Does."

*id.*, § 1.2.2.   And those Enrolled Program Claimants who then meet certain Eligibility Requirements will become "Qualifying Program Claimants" and will be entitled to varying levels of settlement payments from the Settlement Fund. *See id..*, Articles 3-4.

**B.      The Plaintiffs Provided Vioxx-Related Health Benefits to the Vioxx Claimants Pursuant to Plan Documents Providing Reimbursement Rights**

Plaintiffs have alleged that they paid medical expenses incurred by the Vioxx claimants as a consequence of Vioxx-related medical conditions.   As discussed below, because the parties to the settlement have refused to identify the claimants, and because publicly-available information does not allow Plaintiffs to effectively match names that appear in the captions of lawsuits with the names of their plan members, Plaintiffs cannot at this time identify those Vioxx claimants to whom they provided health benefits.   Plaintiffs can say, however, that that their plan members participating in the settlement certainly number in the thousands.   Attached to this memorandum is the declaration of Professor Glen Melnick – a world-renowned expert in health economics and finance.   Using government data, Professor Melnick performed a statistical analysis of the characteristics of Vioxx users, including their age and insured status.   (*See* Melnick Declaration, ¶¶2-27.)   Applying the 70% private health insurance market share represented by the Plaintiffs in this action to that data, Professor Melnick estimated that between 15,400 and 17,604 of the approximately 50,000 eligible claimants who have enrolled in the Vioxx settlement program were members of the Plaintiffs' health plans. (*See id.*, at ¶¶28-30.)

Plaintiffs provided health benefits to these thousands of Vioxx claimants under agreements and coverage documents that provide Plaintiffs: (a) a right of reimbursement, which creates a lien for restitution from any identifiable funds recovered by the plan member from a tortfeasor to the extent of the plan's Vioxx-related expenditures for healthcare benefits for the

plan member; (b) certain cooperation rights, which obligate plan members to assist Plaintiffs in the assertion of reimbursement liens, whether by providing notice to the Plaintiffs of third-party claims or otherwise; and (c) other similar rights that are necessary to protect plans' ability to enforce their reimbursement rights.   Exemplars of the reimbursement language from Plaintiffs' plan documents are attached as Appendix A to the declaration of Mr. Ogle. (*See* Ogle Affidavit, Appendix A.)   Most of the Plaintiffs' plan documents are governed by the Employee Retirement Security Act of 1974 ("ERISA").  (*See id.*, at ¶4.)

These reimbursement rights are of great importance to health plans, and, by extension, to the U.S. economy.   In this age of ever-rising health care costs, reimbursement provides a means for health plans to recoup expenses.   (*See* Melnick Declaration, ¶1.)  Absent such liens plan members would enjoy a double-recovery of their medical expenses – first when their health plans funded those expenses after the injury, and second when a tortfeasor paid or settled a claim by the plan member for the medical expenses incurred (by the plan) in connection with that injury. Because Plaintiffs here represent approximately 70% of the private health insurance market, the reimbursement rights they seek to enforce have indisputable significance.

### C.   The Settlement Agreement Does Not Provide a Process to Resolve the ERISA Reimbursement Rights of Private, Non-Governmental Healthcare Payers

The Settlement Agreement acknowledges the importance of the claimants' satisfying contractual reimbursement rights – but only if those rights are held by governmental, and not private, providers of health benefits.   For example, pursuant to §12.1.1 of the Settlement Agreement, each Enrolled Program Claimant must identify to Merck and a settlement administrator all governmental third-party payors who are known to hold or assert a statutory lien over any settlement payment to be made by the Settlement Fund.   The purpose of

7

reimbursing the government for such payments is that the claimants were already made whole for these economic damages when the government paid their healthcare claims, and an additional payment to the claimants for the same damages would create a windfall at the expense of the government.   The same of course holds true for private health benefit plans. Yet, no such reimbursement requirement exists in the Settlement Agreement with respect to non-governmental third-party payors' liens.   Similarly, pursuant to §12.1.3 of the Settlement Agreement, Enrolled Program Claimants must establish for Merck and the Claims Administrator the satisfaction of all governmental third-party payor liens before said Claimants may receive any settlement payments from the Settlement Fund.   But the Agreement provides no such mechanism for the satisfaction of non-governmental third-party payors' liens.

**D. Plaintiffs Cannot Assert Equitable Reimbursement Rights Based on the Publicly Available Information**

The traditional process by which Plaintiffs enforce their subrogation/reimbursement rights is to scan their claims data for certain diagnosis codes that are associated with accidental injuries. (*See* Ogle Affidavit, ¶¶7-8.)   The Plaintiffs then contact the member who has suffered such an injury and determine whether that member's injury is associated with any third-party liability.   If so, the Plaintiffs can assert their subrogation or reimbursement rights.  (*See id.*)

This process, however, does not work when applied to Vioxx injuries.   Because the universe of individuals who were prescribed Vioxx is so large, and because the adverse medical conditions (Myocardial Infarctions and Ischemic Strokes) associated with Vioxx are so common, an analysis of claims data will not indicate to Plaintiffs which of their plan members possess claims against Merck.  (*See id.*, at ¶9.)   Moreover, there is not necessarily a linkage in the Plaintiffs' data between individuals who were prescribed Vioxx and those who suffered Vioxx-

8

related medical conditions. For example, although one Plaintiff health plan may have provided medical benefits on account of injuries related to Vioxx usage, a different health plan (or pharmacy benefit manager) may have paid for the Vioxx. In that situation, there would be nothing in Plaintiffs' data set that would associate a particular individual's Myocardial Infarction or Ischemic Stroke with Vioxx usage. (*See id.*, at ¶14.)

Accordingly, the only feasible way for the Plaintiffs to identify their plan members who have claims against Merck related to Vioxx usage is to obtain identifying information about actual Vioxx claimants and compare that information to the Plaintiffs' records. Unfortunately, the identifying information available from publicly-filed litigation documents is insufficient for this purpose. Public documents, such as complaints and docket sheets, typically identify a claimant by name and provide some sort of an address (although oftentimes this is simply a state of residence, and not a street address). These documents do not also disclose a claimant's social security number. A name and partial address, however, is not enough to reliably match an individual with a health plan's membership records.

This is not speculation. Plaintiffs obtained the names of 22,685 Vioxx claimants from docket sheets in Texas, New Jersey, and this MDL. (*See id.*, at ¶10.) Plaintiffs then compared this identifying information with the information in their databases about individuals who were provided Vioxx pharmacy benefits. Based on a sample size of about half of the Plaintiffs' member population, Plaintiffs identified a total of 40,340 individuals who shared names with the names of the 22,685 Vioxx claimants (whose names were ascertainable from docket sheets). (*See id.*) Without social security numbers, it is not possible for the Plaintiffs to tell which, if any, of these 40,340 members are actual Vioxx claimants. (*See id.*, at ¶11.) Extrapolating these results from one-half of the Plaintiffs' claims data to the full data set, one would expect

approximately 80,000 name matches for the 22,685 individuals.   This means that, on average, each Vioxx claimant would match almost four names in the Plaintiffs' claims data.

Examples of these matching problems include:[4]

a.  Matching the docket sheet name R__B__ with the claims data (again, for only approximately 48% of members that the Plaintiffs collectively insured) resulted in the discovery that fourteen (14) different Plaintiffs insured one-hundred and ninety (190) distinct individuals residing in over thirty (30) states who were prescribed Vioxx and shared that name. The R__B__ identified on the docket sheet filed a lawsuit in California, Three (3) different Plaintiffs covered an individual with the same name residing in California at the time Vioxx was purchased.

b.  Matching the docket sheet name J__G__ with this claims data resulted in the discovery that eight (8) different Plaintiffs insured Thirty-Three (33) distinct individuals residing in over twenty (30) states who were prescribed Vioxx and shared that name. The J__G__ identified on the docket sheet filed a lawsuit in Arkansas.  Two (2) different Plaintiffs covered an individual with the same name residing in Arkansas when Vioxx was purchased.

c.  Matching the docket sheet name J__L__ with this claims data resulted in the discovery that ten (10) different Plaintiffs insured Seventy-eight (78) distinct individuals residing in over thirty (30) states who were prescribed Vioxx and shared that name.  The two (2) J__L__ identified on the docket sheet had cases filed in Ohio and Missouri, and three different Plaintiffs covered a J__L__ in those states.

d.  Matching the docket sheet name M__L__ with this claims data resulted in the discovery that eleven (11) different Plaintiffs insured fifty-four (54) distinct individuals residing in over fifteen (15) states who were prescribed Vioxx and shared that name.  The M__L__ on the docket sheet filed a case in Ohio, and two (2) Plaintiffs covered a M__L__ in Ohio.

(*See id.*, at ¶13.).

Vioxx claimants who entered into tolling agreements with Merck present an additional problem for Plaintiffs.  According to Merck, approximately 15,000 individuals entered into private tolling agreements with Merck in lieu of filing suit.  A large percentage of those tolled

---

[4] Due to HIPPA privacy issue, only the first and last initials of the individuals discussed are provided here.

plaintiffs will almost certainly be Qualifying Program Claimants. But the tolling agreements are not public documents, and Plaintiffs are aware of no source of _any_ identifying information for these tolled claimants. (_See id._, at ¶15.)    Accordingly, even if it were feasible to match the names of Vioxx claimants to the Plaintiffs' records (which it is not), Plaintiffs have no way of doing so for the tolled claimants.

### E.  The Reimbursement Rights of Plaintiffs Have Been Ignored

As discussed above, Plaintiffs' plan documents typically contain provisions requiring members to cooperate with Plaintiffs in pursuing the Plaintiffs' subrogation/reimbursement rights. For some plans, members must affirmatively provide notice to their plans if they pursue a third-party claim relating to an injury covered by the plan. But only a relative handful of Vioxx claimants have provided such notice. (_See id._, at ¶17.)

In any event, the Vioxx claimants and their counsel have _not_ cooperated with the Plaintiffs in the Plaintiffs' pursuit of their reimbursement rights. In January 2008, counsel for the Plaintiffs sent a notice to the PSC and to all of the law firms that Plaintiffs could identify as representing claimants in the Vioxx litigation. (_See_ Fischer Affidavit).  The notice informed those lawyers of the existence of Plaintiffs' reimbursement rights and demanded that the lawyers cooperate in identifying their clients to the Plaintiffs so that Plaintiffs could assert individual liens. (_See id._) Only one lawyer responded to Plaintiffs' letter. (_See id._)[5]

---

[5] Plaintiffs likewise sent a letter to Merck that informed Merck of Plaintiffs' subrogation rights. (_See_ Fischer Affidavit). Merck responded that it disputed Plaintiffs' rights as against Merck and it refused to cooperate. (_See id._)

## ARGUMENT

Unless judicial action is taken now to safeguard Plaintiffs' reimbursement rights, Plaintiffs will be irreparably harmed. Absent appropriate relief from this Court, Vioxx Claimants will receive settlement payments from the Settlement Fund, co-mingle those payments with other monies, and will thereby dissipate any identifiable corpus of settlement funds. Because Plaintiffs' rights under their contracts of insurance and under ERISA typically attach only to an identifiable corpus of funds, the effect of this would be to irrevocably destroy any hope of effectuating Plaintiffs' reimbursement rights.

**A.      The Legal Standard for a Temporary Restraining Order and a Preliminary Injunction is Met Here**

The purpose of a preliminary injunction is to preserve the status quo between the parties pending a final determination of the merits of the action. *Wenner v. Texas Lottery Com'n*, 123 F.3d 321, 326 (5th Cir.1997.) The Fifth Circuit employs a four-prong test for evaluating a request for a preliminary injunction. "To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *see also Seattle-First Nat. Bank v. Manges*, 900 F.2d 795, 799 (5th Cir. 1990.)

In this Circuit, as in others, the four factors are often described, not as separate requirements, but as a "sliding scale" – such that the degree of success on the merits that must be demonstrated will depend on the magnitude of the injury which would be suffered by the movant

in the absence of injunctive relief and the relative balance of threatened hardships faced by each of the parties. *See, e.g., Southerland v. Thigpen,* 784 F.2d 713, 715 & n.1 (5th Cir. 1986); *State of Tex. v. Seatrain Intern., S. A.,* 518 F.2d 175, 180 (5th Cir. 1975); *Canal Authority of State of Fla. v. Callaway,* 489 F.2d 567, 576-77 (5th Cir. 1974.)  Plaintiffs' request for a preliminary injunction and temporary restraining order more than satisfies each of these requirements, regardless of whether they are viewed in an interrelated or entirely separate fashion.

    **1.**    **Plaintiffs Are Likely to Succeed on the Merits of their ERISA Claims.**

"To determine the likelihood of success on the merits, [courts] look to the standards provided by the substantive law." *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir. 1997); *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir. 1990).  Those standards clearly demonstrate that Plaintiffs enjoy a "substantial likelihood" of succeeding on the merits of their equitable reimbursement claims under § 502(a)(3)(B) of ERISA.  Plaintiffs' claims are well-established under controlling United States Supreme Court precedent – namely, *Sereboff v. Mid Atlantic Medical Services, Inc.,* 547 U.S. 356 (2006).

The *Sereboff* plaintiffs comprised beneficiaries of an ERISA plan (the "Sereboffs") who were injured in an automobile accident in California.  Mid Atlantic Medical Services Inc. ("Mid Atlantic"), the insurer of the Sereboffs' health benefits plan, paid $74,869.37 of the Sereboffs' medical expenses resulting from the accident.  The Sereboffs filed a tort action in California state court against the driver responsible for their injuries as well as other third parties.  Thereafter, Mid Atlantic sent the Sereboffs' attorney a letter asserting a lien on the anticipated proceeds from the suit, in an amount sufficient to cover the $74,869.37 in medical expenses that Mid Atlantic had paid on the Sereboffs' behalf.  The Sereboffs' tort suit settled for $750,000.00, but

13

neither the Sereboffs nor their attorney sent any of the proceeds to Mid Atlantic. *Sereboff*, 547 U.S. at 359-61.

Mid Atlantic filed suit in the United States District Court for the District of Maryland under § 502(a)(3)(B) of ERISA. Because the Sereboffs' attorney had already distributed the settlement proceeds, Mid Atlantic sought a temporary restraining order and preliminary injunction requiring the claimants to retain and set aside the amount necessary to satisfy Mid Atlantic's lien. The district court approved a stipulation whereby the Sereboffs set aside $74,869.37 in a separate account pending the outcome of the merits of Mid Atlantic's suit and the exhaustion of all appeals. *Id.* The district court then ordered the Sereboffs to pay Mid Atlantic the $74,869.37, plus interest, and the Fourth Circuit Court of Appeals affirmed in relevant part. *Id.* at 360-61.

The United States Supreme Court granted certiorari and unanimously held that the claims of Mid Atlantic to reimbursement of the $74,869.37 in medical expenses it paid on behalf of the Sereboffs qualified as "appropriate equitable relief" under § 502(a)(3)(B) of ERISA, and that the reimbursement provision in the Sereboffs' plan created an "equitable lien" in favor of Mid Atlantic for such amount. *Id.* at 368-69.

Appellate courts since *Sereboff* have also recognized the equitable subrogation and reimbursement rights of health benefit plans under § 502(a)(3)(B) of ERISA for medical expenses paid on behalf of plan beneficiaries, and have imposed equitable liens on settlement proceeds paid to such plan beneficiaries by third-party tortfeasors. *See, e.g., Administrative Committee of the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Shank*, 500 F.3d 834, 838-39 (8th Cir. 2007) (enforcing plan's subrogation and reimbursement rights against amounts recovered by plan participant pursuant to judgment against third-party tortfeasor);

*Popowski v. Parrott*, 461 F.3d 1367, 1373 (11th Cir. 2006) (holding that employee benefit plan fiduciaries' reimbursement claim against plan beneficiary, seeking to recover amounts previously paid by plan for medical expenses, was cognizable under §502(a)(3)(B) of ERISA); *Moore v. Capital Care*, 461 F.3d 1, 11-12 (D.C. Cir. 2006) (holding that plan administrator was entitled to equitable lien under § 502(a)(3)(B) of ERISA against settlement funds, as beneficiary's health plan expressly provided for reimbursement in event of partial recovery from third party tortfeasor); *see also Amschwand v. Spherion Corp.*, 505 F.3d 342, 346 (5th Cir. 2007) (observing that in *Sereboff* "the Supreme Court held that the relief sought by the fiduciary would have been recognized as equitable . . . and was subject to the restitutionary remedy of an equitable lien on the settlement funds").

The Fifth Circuit in fact endorsed the *Sereboff* rule before *Sereboff* was written. In *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferer, Poirot & Wansbrough*, 354 F.3d 348 (5th Cir. 2003), the Fifth Circuit confronted a health plan's request for reimbursement under ERISA against a members' segregated lawsuit proceeds from a personal injury settlement.[6]   As the Fifth Circuit concluded, the health plan's pursuit of those segregated, identifiable funds, before they had been distributed, was the proper way to proceed under ERISA: "Thus, we hold the Plan's requested relief – the imposition of a constructive trust over specifically identifiable settlement funds held in the trust account of the law firm as agent for [the claimant/health plan member] to be equitable in nature.   Accordingly, we further hold that [ERISA] § 502(a)(3) authorizes the Plan's claim for relief . . . ." *Id.* at 358.[7]

---

[6] The *Sereboff* Court acknowledged that the *Bombardier* opinion was on the correct side of the circuit split that it was resolving. *See Sereboff*, 547 U.S. at 361 n.1 (citing *Bombardier*).

[7] The *Bombardier* opinion also confirms that the two named defendants that Plaintiffs have sued – US Bancorp and BrownGreer – are proper parties to this action because they control the Vioxx settlement funds in dispute, even if they are not plan members themselves. *See Bombardier*, 354 F.3d at 353 ("Therefore, even though in the instant
*(continued...)*

Here, Plaintiffs provided heath care benefits, and paid medical expenses and other costs associated with their plan beneficiaries' medical treatment. These health care benefits were provided to plan beneficiaries under agreements and coverage documents that provide Plaintiffs with various rights to be reimbursed for those benefits from settlement proceeds paid to such beneficiaries from third-party tortfeasors. (*See* Ogle Affidavit, at ¶4.)

Merck, a third-party tortfeasor, has agreed to pay $4.85 billion into the Settlement Fund for the purpose of resolving the personal injury claims asserted in the Vioxx Products Liability Litigation. Participating Claimants, beneficiaries of ERISA health benefit plans sponsored or administered by Plaintiffs, will be receiving proceeds from the Settlement Fund in resolution of their Vioxx related claims. Accordingly, pursuant to *Sereboff* and its progeny, Plaintiffs are entitled to be reimbursed for the Vioxx related medical expenses they paid on behalf of their plan beneficiaries from proceeds of the Settlement Fund which are set to be distributed to such beneficiaries. Covered plan participants are obligated not to do anything which will prejudice Plaintiffs' subrogation and reimbursement rights, and Defendants, as trustees and agents of the settlement fund, have the same obligations.

This case is in all material respects identical to the situation presented in *Sereboff* and *Bombardier*. Accordingly, Plaintiffs have a substantial likelihood of succeeding on the merits of their equitable reimbursement claims, brought under § 502(a)(3)(B) of ERISA.[8]

---

litigation, the law firm is not a 'party in interest,' as that term is defined by ERISA, the Supreme Court's reasoning in *Harris Trust [and Savings Bank v. Salomon Smith Barney, Inc*, 530 U.S. 238 (2000)] influences us to conclude that [ERISA] § 502(a)(3) authorizes a cause of action against a non-fiduciary, non-'party-in-interest' attorney-at-law when he holds disputed settlement funds *on behalf of* a plan participant client who is a traditional ERISA party.") (emphasis in original and citation added).

[8]  Plaintiffs hold additional rights of recovery, beyond those provided for in *Sereboff* and *Bombardier*. For example, the Plaintiff, Blue Cross Blue Shield Association (the "Association"), under the terms of its contract with the Federal Government, is the payer of benefits for federal employees which are paid under the terms mandated by the Federal Employee Health Benefit Act of 1959 ("FEHBA"). Pursuant to FEHBA, the Office of Personnel Management ("OPM") negotiates with private payers such as the Association and regulates health benefits plans for federal

*(continued...)*

16

2.    **Plaintiffs Will Suffer Irreparable and Irreversible Harm If the Requested Relief is Not Granted.**

It is firmly established that "the central purpose of a preliminary injunction, . . . is to prevent irreparable harm." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975.) Specifically, "[i]t is the threat of harm that cannot be undone which authorizes exercise of th[e] equitable power to enjoin before the merits are fully determined." *Id.* In the usual case, financial injuries are not considered irreparable. *See, e.g., Interox America v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984). It is equally well established, however, that the "absence of an available remedy by which the movant can later recover monetary damages," will be found "sufficient to show irreparable injury." *Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985.) In either case, the "lack of an available remedy" is a "deciding factor" that militates heavily in favor of maintaining the status quo. *Placid Oil Co. v. U.S. Dept. of Interior*, 491 F. Supp. 895, 906 (N.D. Tex. 1980) (citing *Brown v. Chote*, 411 U.S. 452, 457 (1973)).

Here, Plaintiffs will be irreparably harmed if the requested relief is not granted. Once proceeds of the Settlement Fund are paid out to the Vioxx claimants, Plaintiffs have virtually no practical ability to recover from them the substantial monies they are equitably owed under ERISA. This is because once funds are distributed to individual plan members and comingled

---

employees. 5 U.S.C. § 8902(a). FEHBA provides Government payment of approximately 75% of health benefit premiums, with the member being responsible for the remainder. 5 U.S.C. § 8906(b). The shared premiums are deposited into a Treasury Fund, from which the Association and other carriers draw to pay covered benefits. 5 U.S.C. § 8909(a). As part of this program, plans are free to include subrogation and reimbursement language in member contracts and, in fact, do so. Funds recovered by the FEHBA plan are refunded to the Federal Government's Treasury Fund for the purpose of paying future claims. In addition, Medicare Advantage plans such as Humana, have been granted regulatory authority by the Department of Health and Human Services to "exercise the same rights to recover from a primary plan, entity, or individual that the Secretary [for Health and Human Services] exercises under the MSP regulations in Subparts B through D of part 411 of this Chapter." 42 C.F.R. § 422.108(f). These rights include rights of reimbursement through the filing of private causes of action. 42 C.F.R. 411.010, et. seq.

with their general funds, the Plaintiffs' ERISA claims against those plan members would cease
to be equitable in nature and would instead require the attachment of personal liability to the plan
members.  The Supreme Court's decision in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534
U.S. 204 (2002), prohibits ERISA plans from pursing such "legal" relief.  *See id.* at 213-14
(holding that if proceeds sought to be recovered "have been dissipated so that no product
remains," then a health plan's "claim is only that of a general creditor, and the plaintiff 'cannot
enforce a constructive trust of or an equitable lien upon other property of the [defendant]'").

As discussed above, Plaintiffs have already made substantial efforts in attempting to
locate and contact Vioxx claimants, whose identities are unknown to them, in an effort to resolve
their ERISA equitable lien rights.  Those efforts, however, have not proven to be successful.
Plaintiffs attempted to conduct a matching between names they were able to locate in state and
federal Vioxx complaints and names in their claims records.  Because of the commonality of
names and other issues, however, this process proved not to be reliable.  Attempting to tackle the
problem from a different angle, Plaintiffs identified the names of lawyers who represent Vioxx
claimants (including the lawyers on the PSC) and sent them letters notifying them of Plaintiffs'
equitable liens and asking those lawyers to cooperate in identifying their clients.  But those
lawyers all ignored Plaintiffs' notice.

Accordingly, without imposition of the relief requested, Plaintiffs will have no effective
way of collecting the substantial reimbursements to which they are equitably entitled under
ERISA.  Plaintiffs will therefore be irreparably harmed if the requested relief is not granted.

### 3.  Plaintiffs' Impending Injuries Far Outweigh Any Possible Harm to Defendants.

The foregoing impending and irreparable harm to Plaintiffs far outweighs any possible
harm or disruption to Defendants.  While Plaintiffs are at great risk of being deprived of millions

18

in reimbursements to which they are equitably entitled under ERISA, Defendants are either disinterested stakeholders administering the distribution of Settlement Fund monies for the purpose of resolving the personal injury claims asserted in the Vioxx Products Liability Litigation or are claimants who have ignored their contractual responsibilities. Moreover, Defendants and the PSC have flatly ignored Plaintiffs' reasonable requests to handle the private third party payers in a manner similar to the governmental third party payers' claims, despite the fact that Plaintiffs' claims have no effect upon Defendants other than to ensure the settlement funds are paid to their rightful owners.

Defendants will likely argue that claimants who have no connection to Plaintiffs may be prejudiced by a delay in payment occasioned by Plaintiff's requested injunctive relief. Plaintiffs will not be denied the full amount of their settlement proceeds – those proceeds may only be briefly delayed (if at all) for the short time during which Plaintiffs' allegations are resolved. If this matter is promptly resolved, Plaintiffs' claims can be satisfied even before the scheduled distribution – in which case there will be no delay to claimants whatsoever. To the extent these "innocent" claimants have any complaint, it is against their lawyers who negotiated a faulty settlement with Merck that repudiated Plaintiffs' reimbursement rights and then failed to work to resolve the issue when first raised with them. The harm of a minor delay to these claimants is vastly outweighed by the complete destruction of Plaintiffs' reimbursement rights if the requested relief is not granted.[9]

### 4. Granting the preliminary injunction will not disserve the public interest.

---

[9] Equally unavailing is any suggestion by claimants that they might be "harmed" if their information is disclosed to Plaintiffs. Even assuming this Court found some potential harm from such disclosure, it could be obviated entirely by the entry of an appropriate Protective Order obligating Plaintiffs to maintain the information in confidence and use it solely for the purpose of identifying and asserting their reimbursement rights.

Finally, maintaining the status quo (*i.e.*, preventing the co-mingling of settlement funds with the claimants' personal funds) ensures that Plaintiffs' reimbursement rights are determined in an orderly and efficient manner, in keeping with controlling Supreme Court authority. Moreover, the PSC has already worked with governmental third party healthcare payers and established a program to resolve Medicare and Medicaid liens.  Establishing a comparable program to effectively resolve the reimbursement rights of, and liens held by, private, non-governmental healthcare payers in no way disserves the public interest.

To the contrary, the requested remedy furthers the public interest in finally resolving disputes arising from the injuries caused by Vioxx, in an orderly fashion that complies with applicable and governing law.   What's more, preserving the reimbursement rights of approximately 70% of the private health insurance market will contribute to cost control measures by the plans.  Allowing the Vioxx claimants to effectively enjoy double recoveries for their medical expenses, by contrast, would do great disservice to the public interest.

**B.**     **This Court's Order on HRI's Motion for Pre-Suit Discovery Does Not Impact This Motion**

On February 20, 2008, Healthcare Recoveries, Inc. ("HRI") filed a petition for pre-litigation discovery under Fed. R. Civ. P. 27 against the Plaintiffs' Steering Committee and Merck, seeking information about the identities of Vioxx claimants similar to what Plaintiffs seek here. On May 5, 2008, this Court issued an order dismissing the petition.  In so doing, the Court noted particularly the "'overwhelming weight' of authority" against HRI's attempted use of Rule 27 as a simple discovery tool rather than a means of perpetuating imperiled testimony. 5/5/08 Order, at 8.  The Court further noted that HRI could obtain the information it needed through an examination of its own records and the docket sheets in the MDL. *Id.* at 9.  For a

variety of reasons, this Court's ruling in the context of HRI's Rule 27 motion should not affect the disposition of this motion for a temporary restraining order and preliminary injunctive relief.

### 1.    This is Not a Rule 27 Petition

The most obvious distinction between this case and the HRI petition is that this matter has nothing to do with Rule 27.   As this Court recognized, the HRI petition attempted to stretch the bounds of Rule 27 to use it to obtain pre-suit discovery that was in no danger of disappearance and thus in no needs of perpetuation.   The voluminous case law that the Court cited in its Order prohibited such a tactic.   Here, by contrast, Plaintiffs have filed an actual complaint related to the Vioxx settlement, and thus are not attempting to use the Federal Rules as a shortcut around formal litigation.   And, more importantly, whereas the case law was firmly against HRI's petition, both the Supreme Court (in *Sereboff*) and the Fifth Circuit (in *Bombardier*) have expressly authorized the form of complaint that Plaintiffs have filed.

### 2.    Plaintiffs Have Responded to Concerns Expressed in This Court's Order With Substantial Evidence

In the course of denying HRI's petition for discovery, this Court made certain comments about HRI's presumed ability to discover identifying information about the Vioxx claimants on its own.   The Court made those comments in the context of HRI's petition – which, although verified, was not otherwise supported by any evidence.   As such, this Court drew conclusions about HRI's ability to identify Vioxx claimants that may well have been justified, given the state of the record on HRI's petition.

But the Plaintiffs here have considered this Court's order and have proffered very substantial evidence to answer its concerns.   As shown above, the vehicles available to Plaintiffs to identify the names of Vioxx claimants are simply inadequate for the task.   Although it may be

21

possible to match a few claimants to the Plaintiffs' medical records, the level of inaccuracy is so great that the endeavor is largely pointless. Plaintiffs thus have shown, through record evidence, that injunctive relief is necessary to protect their very substantial rights to reimbursement.

**3.    There Remains No Answer to the Tolled Claimants Issue**

HRI raised one issue in its petition that this Court did not address but which remains very critical – the identities of claimants who executed tolling agreements. According to Merck, approximately 15,000 claimants entered into tolling agreements in lieu of filing suit. Under Professor Melnick's analysis, Plaintiffs may have reimbursement rights as to between 4,620 and 5,281 of these tolled claimants. (*See* Declaration of Glenn A. Melnick, Ph.D. ¶¶28-30.) But there is no publicly-available source of information for Plaintiffs to consult to discern the names of those claimants. Even if it were somehow feasible for Plaintiffs to match claimants who filed suit with their records to identify potential reimbursement liens (which, as demonstrated above, it is not), that ability would be of no use with respect to the tolled claimants. Their names are secret, and will remain so unless this Court orders appropriate injunctive relief.

**4.    This Motion Shows That the Burden Analysis Should Focus on the Defendants**

This Court's May 5 order preceded from the assumption that it was HRI's burden to show no means of access to information about the claimants, and that any comparison in the burden of obtaining the information between HRI, on the one hand, and the PSC or Merck, on the other, was irrelevant. And Plaintiffs have no quarrel with that assumption, given the unique context of the Rule 27 petition that HRI was pursuing.

But the burden issue in the HRI petition is not analogous to the burden issue here. Whereas the presumption was against HRI in its effort to obtain discovery before it filed suit, the

22

presumption here – considering liberal post-suit discovery rules and the *Sereboff/Bombardier* claims that Plaintiffs raise – is the opposite. And Plaintiffs have proffered substantial evidence demonstrating that it infeasible, if not impossible, for them to discern the names of the Vioxx claimants from publicly available sources. By contrast, the Defendants' burden to provide this information to Plaintiffs is virtually non-existent. BrownGreer will obviously create an electronic database that contains identifying information for all the Vioxx claimants. All BrownGreer need do is provide a form of that database to Plaintiffs, under whatever confidentiality or protective order that this Court requires. What would be impossible for Plaintiffs to do on their own could be done by BrownGreer in a day.

Furthermore, Plaintiffs actually contracted with the Vioxx Claimants to <u>shift</u> the identification burden to the Claimants. As demonstrated above, many of the Plaintiffs' plan documents contain provisions requiring plan members to provide notice to Plaintiffs when they make a claim on a third-party to recover the value of medical benefits that have been provided by Plaintiffs. Only a handful of claimants have complied with those provisions. And most of the plan documents require claimants to cooperate with Plaintiffs when Plaintiffs seek to exercise their reimbursement rights. But all of the claimants' lawyers <u>refused</u> to cooperate with Plaintiffs when Plaintiffs provided them with notice of their equitable liens in January 2008. Thus, the Vioxx Claimants should not be heard to argue that it is the Plaintiffs' job to find the needle of their names in the haystack that is this Vioxx litigation, when the Claimants themselves undertook that burden (through either notice or cooperation) via their plan documents.

**C.     This Court Should Waive the Plaintiffs' Requirement to Post a Bond.**

Under Rule 65 of the Federal Rules of Civil Procedure, the Court is to determine an appropriate bond, if any, in the event it issues a preliminary injunction:

Case 2:05-md-01657-EEF-DEK   Document 14640-3   Filed 06/09/2008   Page 26 of 29

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. . . .

FED. R. CIV. P. 65(c).

While a court must expressly address the question of whether a bond is required as security for a preliminary injunction, "[t]he amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978.) Moreover, numerous courts have held that a district court does not abuse its discretion in dispensing with a preliminary injunction bond, where there is no showing by the defendant of a likelihood of harm in the absence of a bond. *See, e.g., Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm . . . .'"); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974) (*citing Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961) ("[T]he district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined.")); *see also Cosgrove v. Board of Educ.*, 175 F. Supp. 2d 375 (N.D. N.Y. 2001); *City of Hartford v. Hills*, 408 F. Supp. 879 (D. Conn. 1975); *Brookins v. Bonnell*, 362 F. Supp. 379 (E.D. Pa. 1973).

As set forth above, Defendants stand to suffer no harm if the relief requested herein is granted. Accordingly, Plaintiffs respectfully request that this Court dispense with the bond requirement, or require only a *de minimis* bond,  in accordance with established case law pronouncing it unnecessary and unwarranted in light of the facts presented here.

24

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that this Court grant Plaintiffs'
application for a temporary restraining order and preliminary injunction. Plaintiffs request that
this Court order immediate identification of claimants to Plaintiffs, and, if and only if necessary,
enjoin the impending distributions from the Settlement Fund established to resolve Vioxx-related
personal injury claims, so that Plaintiffs' equitable rights to reimbursement in accordance with
the Supreme Court's decision in *Sereboff* can be determined. The identification Plaintiffs request
ought to include, at a minimum, notice to counsel for Plaintiffs of: 1) the determination to make
a distribution; and 2) the name, address, and personal identifying information (*i.e.*, social security
number) for each qualifying claimant; and 3) the amount that such claimant would receive from
the Settlement Fund, or such other quantification of the claimant's interest in the fund as is
known to the Defendants. Distribution of the settlement proceeds can then commence after
Plaintiffs have been given thirty days to assert their reimbursement rights.

DATED this 9th day of June, 2008

<div style="margin-left: 40%;">

SUSMAN GODFREY L.L.P.

 Lexie G. White/s
Lexie G. White
Louisiana State Bar No. 29478
Neal S. Manne
Texas State Bar No. 12937980
William Christopher Carmody
Texas State Bar No. 03823650
Joseph S. Grinstein
Texas State Bar No. 24002188
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

</div>

OF COUNSEL:

Richard W. Cohen
Peter D. St. Phillip, Jr.
Gerald Lawrence
LOWEY DANNENBERG COHEN & HART, P.C.
1 North Broadway, 5th Floor
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

Mark D. Fischer
Mark M. Sandmann
Jeffrey C. Swann
RAWLINGS & ASSOCIATES PLLC
1 Eden Parkway
LaGrange, KY 40031
Telephone: (502) 587-1279
Facsimile: (502) 584-8580

Attorneys for Plaintiffs

## CERTIFICATION OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion for a Temporary Restraining Order and Preliminary Injunction has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657. Copies of all pleadings and other papers filed in the action to date have also been furnished to counsel for BrownGreer, PLC and counsel for all Defendants, by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and by electronic filing with the Clerk of Court of the United States District Court for the Eastern District of Louisiana via CM/ECF system which will send a Notice of Electronic Filing to counsel for all known Defendants in accord with the procedures established in MDL 1657 on this 9thth Day of June, 2008.

Lexie G. White/s
Lexie G. White
Louisiana State Bar No. 29478
Attorney for Plaintiffs
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
lwhite@susmangodfrey.com

27