UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | Case No. 08-1633 |
| | * | |
|     AvMed, Inc.; Aetna, Inc.; Arkansas Blue | * | SECTION L |
|     Cross and Blue Shield, A Mutual Insurance | * | |
|     Company; HMO Partners, Inc. d/b/a Health | * | JUDGE ELDON E. FALLON |
|     Advantage; USAble Life; BCBSD, Inc. | * | |
|     d/b/a Blue Cross Blue Shield of Delaware; | * | MAGISTRATE JUDGE |
|     Blue Cross & Blue Shield of Mississippi; | * | KNOWLES |
|     Blue Cross & Blue Shield of Rhode Island; | * | |
|     Blue Cross and Blue Shield of Arizona, Inc.; | * | |
|     Blue Cross and Blue Shield of Kansas, Inc.; | * | |
|     Blue Cross and Blue Shield of | * | |
|     Massachusetts, Inc.; Blue Cross and Blue | * | |
|     Shield of North Carolina; Blue Cross and | * | |
|     Blue Shield of Vermont; Blue Cross Blue | * | |
|     Shield Association; BlueCross and | * | |
|     BlueShield of Florida, Inc.; BlueCross | * | |
|     BlueShield of Tennessee; CareFirst, Inc.; | * | |
|     Connecticut General Life Insurance | * | |
|     Company; Government Employee's Health | * | |
|     Association, Inc.; Great-West Life & | * | |
|     Annuity Insurance Company; Group Health | * | |
|     Incorporated; The Guardian Life Insurance | * | |
|     Company of America; Harvard Pilgrim | * | |
|     Health Care, Inc.; Hawaii Medical Service | * | |
|     Association; Health Net, Inc.; Highmark, | * | |
|     Inc.; Highmark West Virginia Inc. d/b/a | * | |
|     Mountain State Blue Cross and Blue Shield; | * | |
|     HIP Health Plan of New York; Humana, | * | |
|     Inc.; Johns Hopkins HealthCare LLC; KPS | * | |
|     Health Plans; Medical Mutual of Ohio; | * | |
|     Nordia Mutual Insurance Company; | * | |
|     Premera Blue Cross; Priority Health; | * | |
|     Regence BlueCross BlueShield of Oregon; | * | |
|     Regence BlueCross BlueShield of Utah; | * | |
|     Regence BlueShield of Idaho; Regence | * | |
|     BlueShield; Asuris Northwest Health; | * | |
|     Regence Life and Health Insurance | * | |
|     Company; Trustmark Life Insurance | * | |
|     Company and Trustmark Insurance | * | |

Company; UnitedHealth Group                    *
Incorporated; Vista Healthplan, Inc.;          *
Wellmark, Inc. d/b/a Wellmark Blue Cross        *
and Blue Shield of Iowa; Wellmark of South      *
Dakota, Inc. d/b/a Wellmark Blue Cross and      *
Blue Shield of South Dakota; and Wellmark       *
Health Plan of Iowa, Inc.; Wellpoint, Inc.,     *
                                                *
                Plaintiffs,                     *
                                                *
    v.                                          *
                                                *
Brown Greer PLC; U.S. Bancorp, Inc.; and        *
    John Does,                                  *
                                                *
                Defendants.                     *
                                                *

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Defendants, US Bank National Association[1] and BROWNGREER, respectfully oppose plaintiffs' motion for a "preliminary" injunction.

The plaintiffs in this case are asking the Court to order, on an emergency basis, that they be provided with confidential information about settlement beneficiaries and to enjoin distribution of funds from a settlement they have known about for more than half a year.  Plaintiffs argue that "[u]nless judicial action is taken now to safeguard Plaintiffs' reimbursement rights, Plaintiffs will be irreparably harmed."  (Mem. in Supp. of Mot. for TRO and Prelim. Inj. ("Mot.") at 12.)

As set forth below, this plea is ill-founded.  For starters, plaintiffs' complaint improperly joins unrelated parties' claims in contravention of this Court's case management orders and should be severed before any further action is taken on their allegations.  But even if plaintiffs'

---

[1]    Plaintiffs have named the incorrect entity in this suit.  U.S. Bank National Association is the proper party that holds the Vioxx settlement funds in escrow.

complaint was procedurally proper, their motion would fail.  Plaintiffs can show neither a

substantial likelihood of success on the merits nor a plausible threat of irreparable harm.  All

their requested injunction stands to do is delay unnecessarily the disbursement of settlement

funds to thousands of personal injury claimants.  And what plaintiffs really seek – the disclosure

of private identifying and medical information of thousands of Vioxx claimants – is not in any

way "preliminary" relief.  For all of these reasons, the motion should be denied.

## BACKGROUND

On November 9, 2007, after several years of litigation that included discovery of millions

of documents, depositions of numerous company witnesses and experts, and several bellwether

trials – all conducted without the intervention of ERISA fiduciaries asserting subrogation rights –

the parties announced a private agreement to settle many Vioxx personal injury cases pending

in the MDL and other jurisdictions around the country.  (*See* Settlement Agreement, *In re Vioxx

Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007) ("Agreement").)

Consistent with federal and state law, which create statutory lien obligations under the

Medicare and Medicaid programs, the Agreement expressly provides that "satisfaction and

discharge of any and all Governmental Authority Third Party Providers/Payors statutory Liens

must be established to the satisfaction of the Claims Administrator and Merck before any

Settlement Payment can be disbursed" to any claimant.  (*Id.* § 12.1.3.)  *See, e.g.*, 42 U.S.C. §

1395y(b)(2)(B) (creating automatic statutory interest in third-party liability cases under

conditional Medicare payments).

No such lien is created by statute on behalf of private insurers.  It is simply not true that

health plans have been granted the same footing here as governmental entities.  Nonetheless, the

Agreement expressly contemplated that "satisfaction and discharge of any and all Liens, whether

past, present or future, whether known or unknown or asserted or unasserted, with respect to any

Settlement Payment (and/or the right to receive any Settlement Payment) are the sole

responsibility of the relevant Enrolled Program Claimant."  (Agreement § 12.1.3.)  Additionally,

in widely disseminated materials, each claimant was specifically instructed as follows:

> You may have a contractual obligation to notify your private
> healthcare provider or insurer of your claims against Merck and/or
> your anticipated Settlement Payment.  **If this applies to you,**
> **notify your attorney.  Similarly, if your insurance company,**
> **employee health plan, or other health provider has sent you**
> **any correspondence about your claims against Merck and/or**
> **anticipated Settlement Payment, notify your attorney**
> **immediately.**

(*Claimant Educational Materials on Government Medical Liens/Obligations* at 2 (emphasis in

original), attached as Ex. 1.)

On April 14, 2008, forty-eight plaintiff insurance companies jointly filed one complaint

seeking a constructive or equitable lien against the Settlement Fund in the Vioxx Product

Liability Litigation.  In their First Amended Complaint, plaintiffs invoke section 502(a)(3) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §

1132(a)(3).  Plaintiffs seek money from the Settlement Fund established to resolve the claims of

certain individuals with personal injury claims against Merck arising out of their use of Vioxx.

(First Am. Compl. ¶ 1.)  Specifically, plaintiffs seek "all available equitable relief as well as

relief under § 502(a)(3) of ERISA . . . entitling plaintiffs to restitution to the extent of

reimbursement of medical expenses they paid on behalf of settling plan members' medical

treatment attributed to their use of Vioxx."  (*Id.*)

On May 20, 2008, US Bank and BROWNGREER moved to sever.  They noted that

plaintiffs' filing ran afoul of this Court's Pre-Trial Order 26 ("PTO 26"), under which all

"unrelated plaintiffs" filing cases after September 5, 2007 are "required to file separate

complaints."  (PTO 26, at 1, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Sept. 5, 2007).)

It further noted that, even if PTO 26 did not apply to these plaintiffs, severance would still be

required because plaintiffs' claims do not arise from the same transaction or occurrence, as

required by Fed. R. Civ. P. 20.  Instead, because each plaintiff covers different claimants under

different plan terms that could implicate varying affirmative defenses and, indeed, plaintiffs'

entitlement to recover at all, individual treatment of each plaintiff would be far more

manageable.

Remarkably, plaintiffs seek plenary relief even though they do not know who their

"settling plan members" are (First Am. Compl. ¶ 1); nor do they know the "extent of

reimbursement of medical expenses" implicated by any payout under the Agreement (*id.*).

Indeed, in their own words, "Plaintiffs have no means for accurately determining the impending

distributions that involve reimbursable healthcare rights."  (Mot. at 3.)  But plaintiffs nonetheless

purport to be informed by an expert that "approximately one-third" of the claimants are insured

by them.  (*Id.* at 2.)

Plaintiffs now seek an injunction, ostensibly "to preserve the status quo" (*id.* at 12), that

would compel defendants to disclose substantial private information to them regarding claimants

enrolled in the Agreement and, "only if necessitated by delayed compliance," "a short

enjoinment of the settlement distributions" to any claimant (***including the two-thirds admittedly***

***not covered by plaintiffs***) "until Plaintiffs' equitable reimbursement rights" – if any – "can be

determined."  (*Id.* at 1.)

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied.  Plaintiffs have failed to

carry their burden as to each of the four prerequisites for issuing a preliminary injunction.

Indeed, plaintiffs have failed to show that the relief they seek is "preliminary" at all.  If this Court nonetheless determines that plaintiffs' requested injunction is appropriate, it should require plaintiffs to pay a bond in the amount of at least the initial payout (or $2,425,000), or in the alternative, $90 million, because Vioxx claimants should be protected from the potential damage that could result from their loss of the right to immediate disbursement of the settlement payments in accordance with the terms of the Agreement.

## I.      PLAINTIFFS' MOTION FOR AN INJUNCTION SHOULD BE DENIED.

As an initial matter, plaintiffs' motion should be denied because the primary relief it seeks – the disclosure of private identifying information of all settlement claimants – is not "preliminary."  Plaintiffs do not have that information now, and revealing it to them would thus not preserve the status quo.  Indeed, far from preserving the status quo, plaintiffs' desired injunction would grant them most of the ultimate relief that they seek.

Furthermore, even if plaintiffs' motion could be framed as one seeking only preliminary relief, plaintiffs have failed to carry their burden to establish the four showings required before an injunction will issue.  *First,* they cannot show a likelihood of success on the merits because they have not made a plaintiff-by-plaintiff showing that, under the terms of the plans they purport to administer, they are entitled to relief under ERISA.  In any event, under ERISA, no equitable lien right can be asserted in the absence of an identifiable fund – identifying an aggregate settlement is not sufficient.  And there is simply no support for plaintiffs' argument that they are entitled to receive Vioxx settlement claimants' identifying information.

*Second,* plaintiffs cannot show they will suffer irreparable harm.  Plaintiffs' delay in filing their motion for an injunction is dispositive of the issue.  Moreover, plaintiffs are incorrect that the mere disbursement of settlement funds portends the "impending wholesale destruction" of their putative reimbursement rights.  And even if disbursement did pose such a risk, plaintiffs

would still be unable to demonstrate irreparable harm because half the settlement fund will remain after the initial disbursement, an amount more than adequate to satisfy any reimbursement rights plaintiffs may eventually prove.

*Third,* plaintiffs similarly fail to show that any harm they will suffer in the absence of an injunction will outweigh the harm suffered by the claimants if such an injunction does issue. Plaintiffs' proposed relief will result in the wholesale disclosure of private information of a claimant pool that is admittedly composed primarily of persons as to whom plaintiffs have no reimbursement rights.  Furthermore, plaintiffs' request that the Court enjoin disbursement of settlement proceeds will force the entire pool to wait longer still for monetary relief for their asserted injuries.

*Finally,* plaintiffs fail to show how the public interest could possibly be served by further protracting this mass tort litigation, especially in light of the strong likelihood that any reimbursement rights they have would likely be preserved even if settlement disbursements proceed as scheduled.

A.      **Plaintiffs' Motion Should Be Denied Because It Does Not Seek "Preliminary" Relief.**

Plaintiffs' motion should be denied because the primary relief it seeks is the same relief it ultimately seeks in its complaint.  A preliminary injunction "should not grant relief properly awarded only in a final judgment, and it is an abuse of discretion for the district court to issue a preliminary injunction which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ." *Enter. Int'l, Inc. v. Corpotoracion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 476 (5th Cir. 1985) (citations and internal quotation marks omitted).

In *Enterprise International*, the U.S. Court of Appeals for the Fifth Circuit addressed a transaction between Enterprise International and C.E.P.E, the state-owned oil company of

Ecuador.  Under a contract, Enterprise agreed to sell liquid petroleum gas to C.E.P.E.  A

provision of the contract also required Enterprise to guarantee its performance.  It did so by

establishing an unconditional irrevocable guarantee with a bank in the amount of $1,700,000.

After some mutually agreed extensions, the guarantee was set to expire on June 21, 1984.  A

dispute arose as to whether Enterprise had performed, and C.E.P.E. threatened to draw down the

guarantee.  Enterprise sued and sought a temporary restraining order and a preliminary

injunction.  The hearing date was set for June 21, 1984.  The district court enjoined C.E.P.E.

from drawing on the guarantee, but it did not condition the injunction on Enterprise's agreement

to extend the guarantee or to secure it in the form of a bond.  *Id.* at 466-67, 475.

The Fifth Circuit reversed, finding that "[b]y its action, the court failed to maintain the

status quo and in effect, granted Enterprise International all of the relief it might have had on the

merits."  *Id.* at 476.  Accordingly, it had abused its discretion.

Plaintiffs seek precisely this kind of forbidden injunction.  Their request that the Court

require defendants to disclose private information of Vioxx settlement claimants is inextricably

bound to their ultimate request for relief on the merits.  Plaintiffs never articulate any

independent basis justifying the release of this information in their papers.  Instead, they simply

assert repeatedly that there is no other way for them to obtain the information they need to

determine whether they are entitled to relief against various individuals under ERISA.

For this reason alone, plaintiffs' requested injunction requiring defendants to disclose

Vioxx settlement claimants' private information should be denied.

**B.     Plaintiffs' Motion Should Be Denied Because They Have Not Carried Their
        Burden To Demonstrate That the Requirements of a Preliminary Injunction
        Are Satisfied.**

Plaintiffs' motion should also be denied because they have simply failed to demonstrate

that their request satisfies the requirements of a preliminary injunction.  "A preliminary

injunction is an extraordinary and drastic remedy," and "it is never awarded as of right." *Munaf v. Geren*, Nos. 06-1666 & 07-394, --- S. Ct. ----, 2008 WL 2369260, at *11 (U.S. June 12, 2008). Such relief "should only issue if the movant shows:  (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008).  These requirements are conjunctive; injunctive relief "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (citation and internal quotation marks omitted).

Plaintiffs bear a "heavy burden of persuading the district court that all four elements are satisfied." *Enter. Int'l*, 762 F.2d at 472 (citation and internal quotation marks omitted).  This already heavy burden is even more difficult to satisfy when, as here, plaintiffs seek mandatory injunctive relief.  "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

For several reasons, plaintiffs have not satisfied this very heavy burden, and their motion should therefore be denied.

1.     **Plaintiffs Are Not Likely to Succeed on the Merits.**

Plaintiffs' bid for an injunction fails because they have made no showing that they will prevail on the merits.

For starters, plaintiffs have made no showing they are entitled to relief under the plans they purport to administer.  Under ERISA, the text of the plan determines the fiduciary's entitlement to seek relief in the form of equitable restitution, which is what plaintiffs seek here.

Even if they could show such entitlement, plaintiffs' purported right to an equitable lien does not lie against the aggregate settlement fund, which is not an "identifiable fund" within the meaning of the cases on which they rely.  Finally, plaintiffs cite no authority to support their asserted entitlement to Vioxx settlement claimants' private information.  Accordingly, they cannot succeed on the merits.[2]

a.    **Entitlement to Equitable Restitution**

Plaintiffs have not shown that each and every one of them is entitled to the equitable restitution they seek.  As to each plan implicated by this suit, plaintiffs must make an affirmative showing that they are entitled to seek reimbursement via an equitable lien in this case.  They have made no such showing – simply attaching plan language does not suffice.

This is no small matter.  The Supreme Court has explained the right asserted by plaintiffs here in two recent cases, which reveal the extent to which plan language is important.  In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court explained that a fiduciary's right to recover under ERISA is limited.  Noting that section 502(a)(3) authorizes a

---

[2]    As a preliminary matter, plaintiffs have not shown they have standing to sue.  Such a showing is indispensable because this Court lacks the power to enter an injunction at all unless it has subject-matter jurisdiction over the case, which in turn depends upon a showing that plaintiffs have properly invoked ERISA.  "As we stated long ago in reviewing the injunctive power of the district court: The question of jurisdiction is always vital.  A court must have jurisdiction as a prerequisite to the exercise of discretion.  The question whether a court abused its discretion necessarily involves the question whether a court has any discretion to abuse."  *Enter. Int'l*, 762 F.2d at 470-71 (citation and quotation marks omitted).

Section 502(a)(3) of ERISA, under which plaintiffs assert their right to relief, states that an action may be brought "by a participant, beneficiary, or fiduciary."  Plaintiffs plainly are not suing in their capacity as participants or beneficiaries in an ERISA plan.  That leaves only their purported status as fiduciaries as a basis to sue.  But plaintiffs' standing is in serious doubt here because they have not shown that they are "fiduciaries" of ERISA plans.

Here, plaintiffs have submitted a series of affidavits attaching hundreds of pages of purported "exemplar plan language that [each plaintiff] employs relating to the plan's rights of subrogation and/or reimbursement."  (*See e.g.*, Affidavit of Trudy Tappan, ¶¶ 3, 4, 7.)  None of the "exemplars" identifies any of the plaintiffs as fiduciaries under ERISA.  Plaintiffs' affidavits also attest that for some ERISA plans in 2007, each plaintiff "exercises authority and control over decisions regarding the recovery of plan assets in connection with plan payments for medical expenses arising out of the alleged injuries to plan members from Vioxx ingestion."  (*See e.g.*, Tappan Affidavit, ¶¶ 3, 4, 7.)  The affidavits, however, fall short of establishing plaintiffs' status as plan fiduciaries for purposes of this suit because the complaint was filed in 2008.  There is nothing in the affidavits to support their fiduciary status for any year other than 2007.  In short, there is no factual support for plaintiffs' assertions that they are "fiduciaries" with standing to pursue this claim under ERISA.

fiduciary to file suit "to obtain other appropriate equitable relief," the Court explained that

"'equitable' relief must mean *something* less than *all* relief." *Id.* at 209 (citation and internal

quotation marks omitted) (emphasis in original).  Specifically, "the term 'equitable relief' in §

502(a)(3) must refer to those categories of relief that were *typically* available in equity." *Id.* at

210 (citation and internal quotation marks omitted) (emphasis in original).  The upshot of this

constraint is that a fiduciary seeking reimbursement must do so via a means of relief recognized

"[i]n the days of the divided bench." *Id.* at 212.

The petitioners in *Great-West* argued that they sought "restitution," a form of relief

recognized by courts of equity.  But the Court ultimately did not accept this characterization of

the desired relief.  Petitioners specifically sought what plaintiffs seek here – reimbursement from

one of their beneficiaries, who had reached a settlement in a suit against the party that had caused

her to incur medical expenses for which she had previously been reimbursed by her benefits

plan.  In her settlement, however, the beneficiary had kept no money for herself.  Instead, of a

$650,000 settlement, she had "allocated $256,745.30 to a Special Needs Trust . . . to provide for

[her] medical care; $373,426 to attorney's fees and costs; $5,000 to reimburse the California

Medicaid program (Medi-Cal); and $13,828.70 . . . to satisfy Great-West's claim under the

reimbursement provision of the plan." *Id.* at 207-08.  Great-West sought more than this – it

claimed entitlement to reimbursement in the amount of $411,157.11. *Id.* at 208.  It did so

pursuant to plan provision that expressly provided that the "Plan has 'a first lien upon any

recovery, whether by settlement, judgment or otherwise'" and that if the "beneficiary recovers

from a third party and fails to reimburse the Plan, 'then he will be personally liable to [the Plan]

. . . up to the amount of the first lien.'" *Id.* at 207 (quoting plan language) (alterations and

omissions in original).

11

The Supreme Court rejected this claim.  It explained that restitution is sometimes an equitable remedy, but it is sometimes a legal remedy, and only the former is available under ERISA.  The relief Great-West sought was of the legal sort.  The dispositive fact was that the beneficiary did not have control of the proceeds from the settlement from which petitioners sought their reimbursement and that Great-West was thus seeking to enforce the "personally liable" provision of the plan.  Restitution in *equity* – "ordinarily in the form of a constructive trust or an equitable lien," was available only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.* at 213.  When "the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor."  *Id.* at 214 (alterations, citation, and internal quotation marks omitted).  And a claim against a general creditor imposes "a merely personal liability upon the defendant to pay a sum of money" – *i.e.*, compensatory damages – and is thus a *legal* form of restitution.  *Id.* at 213 (citation and internal quotation marks omitted).

The Supreme Court further clarified the doctrine a few years later in *Sereboff v. Mid Atlantic Services, Inc.*, 547 U.S. 356 (2006).  *Sereboff*, like *Great-West*, involved a beneficiary who, along with her husband, settled a lawsuit against third parties who had caused them to incur medical expenses, which had previously been paid for by a health benefit plan.  In *Sereboff*, however, the beneficiaries themselves received a payout from the settlement.  Mid Atlantic brought suit, again seeking restitution, and pointing out that, unlike in *Great-West*, it could identify a particular fund in the possession of the beneficiaries out of which it was entitled to recover monies pursuant to a lien created in its favor under the terms of the plan.

12

The Supreme Court agreed.  It explained first that the relief Mid Atlantic sought was properly characterized as equitable because "it sought its recovery through a constructive trust or equitable lien on a specifically identified fund, not from the Sereboffs' assets generally, as would be the case with a contract action at law." *Id.* at 363.  It then confirmed that Mid Atlantic had an equitable basis for its claim.  "[T]he 'Acts of Third Parties' provision in the Sereboffs' plan specifically identified a particular fund, distinct from the Sereboffs' general assets—'[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)'—and a particular share of that fund to which Mid Atlantic was entitled—'that portion of the total recovery which is due [Mid Atlantic] for benefits paid." *Id.* at 364.  Although the Court had intimated in *Great-West* that strict tracing requirements might apply to an equitable claim to restitution, the Court rejected that argument, advanced by the Sereboffs:  "no tracing requirement" applies to "an equitable lien 'by agreement,'" which arises in the context of specific plan text like the sort at issue in *Sereboff*.  *Id.* at 364-65.  Finally, the Court was careful to distinguish an equitable lien by agreement from a subrogation claim, suggesting without deciding that "various limitations" might apply to a subrogation claim that would not apply to an equitable lien claim.  *Id.* at 368.

These divergent outcomes underscore the necessity of an affirmative showing by plaintiffs that they are indeed entitled by plan language to the relief they seek under the terms of the relevant plans.  Such entitlement is not automatic; *Sereboff* did not overrule *Great-West*.  One illustrative case in point, decided after *Sereboff*, is *Popowski v. Parrott*, 461 F.3d 1367 (11th Cir. 2006).  *Popowski* addressed two cases – *Popowski* and *BCBS v. Carillo*.  In the first case, the court held that equitable relief was available; in the second case, it held that it was not.  The divergent outcomes depended entirely on plan language.  The plan in *Popowski* read in relevant part as follows:

> [I]n any event, the Plan has a lien on any amount recovered by the Covered Person whether or not designated as payment for medical expenses.  This lien shall remain in effect until the Plan is repaid in full.
>
> The Covered Person . . . must repay to the Plan the benefits paid on his or her behalf out of the recover made from the third party or insurer.

*Id.* at 1370.

The plan in *Carillo*, meanwhile, read in relevant part as follows:

> If, however, the Covered Person receives a settlement, judgment, or other payment relating to the accidental injury or illness from another person, firm, corporation, organization or business entity paid by, or on behalf of, the person or entity who allegedly caused the injury or illness, the Covered Person agrees to reimburse the Plan in full, and in first priority, for any medical expenses paid by the Plan relating to the injury or illness.

*Id.* at 1371.

The basis for the divergent outcomes hinged on the second plan's failure to do what the first plan plainly did – *i.e.*, identify a fund out of which reimbursement was to be paid: "any amount recovered."  The second plan merely indicated that the Covered Person had an obligation to reimburse the Plan whenever there was a recovery.  No fund was identified.

The specifics of plan language can affect more than a fiduciary's entitlement to relief. Plan language can also implicate affirmative defenses, which in turn can bear on the extent of a fiduciary's recovery even if the right to recovery is established.  Some courts, for example, have observed that the "make whole" doctrine is available as an equitable defense if the relevant plan text does not specifically bar it.  *See, e.g.*, *Cagle v. Bruner*, 112 F.3d 1510, 1521 (11th Cir. 1997) ("As a default rule, the make whole doctrine applies to limit a plan's subrogation rights where an insured has not received compensation for his total loss and the plan does not explicitly preclude operation of the doctrine.").

Substantial differences in plan language reign here, demonstrating the necessity of a plan-by-plan showing of qualification for reimbursement.  Plaintiffs attached the affidavit of Bruce Ogle, President of the Subrogation Division for the Rawlings Company LLC.  (Mot. ("Ogle Aff. App. A").)  Attached to Ogle's Affidavit are excerpts from 68 plans[3] issued by 40 of the 48 plaintiffs.[4]  Merely attaching these plans does not provide the Court with the requisite evidence that plaintiffs are substantially likely to succeed on the merits.  Indeed, in many cases, the plans demonstrate the plaintiffs have no likelihood of success on the merits because the plans contain absolutely no reimbursement clause, and, therefore, do not provide plaintiffs with any right to recovery.

*First,* and most simply, it is not enough to supply one copy of each plan.  All plans, even though they may share some similarities, are different.[5]  It is well known that plans are commonly amended, and plaintiffs have neither proven nor even asserted that the same plan document governed during the entire time period.  This is especially relevant in light of the fact that many plans' reimbursement provisions may have been revised in light of the holding in *Sereboff*, which was not decided until 2006 – *i.e.*, after the vast majority of claims that would likely be implicated here.  Perhaps not coincidentally, the vast majority of the plans plaintiffs have provided either are dated after the withdrawal of Vioxx from the market or have no date at all.  This is not a sufficient showing, as the language of the plan at the time a plan member received treatment for his heart attack or stroke is what matters in this case.  *See Franks v.*

---

[3]     It appears that only one full plan has been attached to plaintiffs' Motion.  (Blue Cross Blue Shield of Florida Plan).  The remaining 67 exemplars are excerpts from plans.  For purposes of this brief, defendants will refer to these plans and plan excerpts as "the plans."

[4]     Plaintiffs filed a Supplemental Brief with the Court on June 18, 2008, attaching approximately 15 additional plans or plan excerpts.  The filing of these additional plans in no way improves plaintiffs' argument that they are entitled to an injunction in this case.

[5]     Attached, as Ex. 2, is Defendants' chart, entitled "Summary of Plan Materials Submitted by Plaintiff", that shows the multiple differences between plans.

*Prudential Health Care Plan, Inc.*, 164 F. Supp. 2d 865, 879 (W.D. Tex., 2001) (stating that the law of the Fifth Circuit indicates that "the extent to which [a beneficiary] has a reimbursement obligation under his ERISA plan . . . depends on what his ERISA plan said at the time he received that treatment."). In short, the plan documents provided to the Court may well be entirely irrelevant to plaintiffs' claims.

Relatedly, most of the plans do not reference the policyholder. A healthcare insurer tailors its plans depending on the particular policyholder. Plaintiffs cannot seriously contend that a plan issued to a company with 14,000 employees would in all instances be identical to a plan issued to a company with 25 employees. In support of this contention, the Court need look no further than the affidavits provided by plaintiffs with their Supplemental Brief in support of their Motion.

The listed policyholders vary from government entities (City of Fort Lauderdale) to large corporations (Weyerhauser, Inc., an international corporation with over 41,000 employees) to small financial institutions (American Bank of Texas, N.A., a Texas bank with just over 300 employees). Plaintiffs have not established that any of the Vioxx settlement claimants were beneficiaries under any of these plans when their Eligible Event occurred. For this additional reason, these plans may therefore be entirely irrelevant to the issues in this case. And because of the variety in the policyholders, plaintiffs' rights under the plans must be evaluated on a plan-by-plan basis, as defendants suggested in their motion to sever previously filed with the Court.

***Second,*** it is plain under the text of some of the plans plaintiffs did provide that the language does not entitle them to seek any recovery. For example, AvMed, the lead plaintiff in this case, has submitted a plan under which it would not be entitled to reimbursement. Its plan indicates in its "REIMBURSEMENT" section that, "[i]n the event that the Plan provides medical

benefits or payments to a Participant who suffers injury, disease, or illness by virtue of a negligent act or omission by a third party, the Plan is entitled to reimbursement from the Participant." (Ogle Aff. App. A at [4]. [6])  As is plain under *Great-West*, a simple demand for reimbursement is not cognizable equitable relief.  The plan does not identify a particular fund from which relief may be sought. [7]  The plan language presented by Blue Cross & Blue Shield of Massachusetts suffers from a similar problem.  Their reimbursement provision provides as follows: "If you recover money, the Plan is entitled to recover up to the amount of the benefit payments that it has made." (Ogle Aff. App. A at [38].)  Again, no specific fund is identified, failing *Sereboff*'s requirement.

Other plans are simply outside of ERISA entirely.  The Government Employee's Health Association, Inc., and Blue Cross Blue Shield Association, for example, are governed by the Federal Employees Health Benefits Act, 5 U.S.C. § 8901 *et seq.* – *not* ERISA.  (Aff. of Larry McEnroe ¶ 4; Aff. of Elizabeth J. Gant ¶ 4; ERISA § 4(b)(1), 29 U.S.C. § 1003(b)(1).)

Still other plans present text of a sort that has not yet been tested by the relevant decisional law.  The plan of the Hawaii Medical Service Association, for example, describes the medical benefits it disburses as an "interest-free loan," which must be repaid "from any recovery received from or on behalf of" responsible third parties.  (Ogle Aff. App. A at [91].)  While this plan text appears to identify a fund, it characterizes the reimbursement as one to repay a loan.  It

---

[6]      Plaintiffs did not paginate the Ogle Affidavit appendix.  Citations in brackets indicate the page of the appendix, assuming that the page with the vertically centered word "AvMED, INC." is page 1.

[7]      The plan does indicate in the conclusion of the same section that the "Participant shall hold such proceeds in trust for the benefit of the Plan and pay them to the Plan upon demand if the proceeds have been paid directly to the Participant." (Ogle Aff. App. A at [4].)  Assuming without conceding that this language would create a reimbursement right for AvMed, it is plainly inapplicable in this context, where plaintiffs seek to establish a lien against the settlement fund rather than against any particular Vioxx settlement claimant who has already received "such proceeds."

is unclear in light of existing case law whether reimbursement under such a provision would be considered "equitable."  It is plaintiffs' burden to demonstrate that it would be.

Thus, it is certainly not a foregone conclusion that plaintiffs would be entitled to recover under the lien they are attempting to assert here.

**_Third,_** it is equally plain that available equitable defenses to recover will vary widely from one plan to the next.  As noted above, equitable defenses may be available when they are not expressly disclaimed by the plan.  In particular, the "make whole" doctrine may operate to preclude reimbursement to some plaintiffs altogether in some cases.  "The 'make whole' doctrine is an insurance principle which mandates that, in the absence of contrary agreement, an insurance company may not enforce its subrogation rights until the insured has been fully compensated for the injuries – 'made whole.'"  *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 328 (5th Cir. 2008) (citation and internal quotation marks omitted).  Some of the plan provisions supplied by plaintiffs could be construed to bar the "make whole" defense, but many do not.  The AvMed plan is again illustrative as it contains no language barring resort to the defense.  (*See* Ogle Aff. App. A at [4].)

In light of these considerations, plaintiffs plainly have not carried their burden of demonstrating that they have an entitlement to reimbursement simply by bundling disparate plan provisions into an attachment to their motion.  Their task – one obviously complicated by their insistence on having all 48 plaintiffs sue in the same complaint – is to demonstrate a right to reimbursement on a plan-by-plan basis, for each plaintiff, for the entire relevant period.  They have not done this, and they thus have not carried their burden of showing substantial likelihood of success on the merits.  The motion therefore should be rejected out of hand.

b.      **Inability to Identify a Fund**

Plaintiffs cannot prevail on their equitable lien claim because they cannot identify a fund for which restitution will lie.  Plaintiffs assert that the settlement is an identifiable fund. Plaintiffs base their claim for an equitable lien against the aggregate settlement on *Sereboff*, a case that concerned an equitable lien against a single recovery by a couple in a settlement arising out of a single incident.  (Mot. at 13.)  That reliance is misplaced.

On the merits, a plaintiff would "bear[] the burden of proving the 'facts that give rise to the trust,' including the amount of the wrongfully converted funds and that the specifically identifiable funds it seeks to recover have not been dissipated."  *UNUM Life Ins. Co. of Am. v. Wolf*, No. 07-cv-00071, 2008 U.S. Dist. LEXIS 43735, at *17-18 (D. Colo. May 23, 2008) (citation omitted).  Plaintiffs could not make that showing on the merits here.  Plaintiffs rely on *Sereboff* to make their showing, but the facts there do not match the facts here.  *Sereboff* involved a particular share of an identifiable fund.  Specifically, vis-à-vis the Sereboffs, who were each beneficiaries of the same plan, Mid Atlantic had specifically reserved a right to assert an equitable lien against any recovery either of the Sereboffs received from a third party.  The identifiable fund was their personal recovery; the particular share was the extent necessary to reimburse the plan for medical expenses paid on behalf of the beneficiaries.

These plaintiffs propose a gargantuan, single lien against unidentified shares of unidentified funds.  *Sereboff* did not confront such a claim, nor has any case applying its rule.

Plaintiffs base their claim of a lien against the aggregate settlement fund on *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferer, Poirot & Wansbrough*, 354 F.3d 348 (5th Cir. 2003).  But the only distinct fact in *Bombardier* that is arguably helpful to plaintiffs is its acknowledgement that an equitable lien can lie against settlement funds "before they had been

19

distributed." (Mot. at 15.)  *Bombardier* does not reach the very different question presented by this case – whether a lien can be asserted against an aggregate settlement.

As an initial matter, it is plain that plaintiffs have not identified a particular share of any fund at this time.  They thus could not succeed on the merits because, under *Sereboff*, they cannot assert a lien unless they have identified a "particular share" of a fund that, in good conscience, belongs to them.  *Cf. Eastom v. Redmond*, 39 Employee Benefits Cas. (BNA) 1984, No. 1:03-CV-353-TS, 2006 U.S. Dist. LEXIS 57268, at * (N.D. Ind. Aug. 14, 2006) (plaintiff failed to identify specific fund when he did not even know whether the fund exists).

Even if plaintiffs knew that some of their beneficiaries were participating in the settlement and believed they were entitled to recover some share of the proceeds, however, their lien would still fail because an aggregate settlement is not an identifiable fund.  Under *Sereboff*, the "identifiable fund" was the particular fund established by the terms of the plan itself – *i.e.*, any recovery personal to the beneficiary.  Each such recovery is thus a separate fund.  Under the reasoning of *Sereboff*, it would not be enough to identify a general fund out of which recoveries might be paid; indeed, such a fund would be more akin to the general assets from which equitable relief could not be sought in *Great-West*.

A number of analogous cases support this point:

- In *Pell v. E.I. Dupont De Nemours & Co.*, for example, plaintiffs sought "restitution for unduly low pension payments already made to Mr. Pell."  39 Employee Benefits Cas. (BNA) 1270, Civil Action No. 02-21, 2006 U.S. Dist. LEXIS 73053, at *40 (D. Del. Oct. 6, 2006).  Plaintiffs alleged that "the funds they seek are from 'an identifiable fund . . . the amount of funds DuPont put aside to comply with ERISA funding requirements for Pensions.'"  *Id.* at *41.  The court rejected the argument because "there is no evidence that the Plaintiffs seek restitution of funds that are specifically identifiable."  *Id.* at *42.

- Similarly, in *Vacca v. Trinitas Hospital*, plaintiffs sought to recover overpayments made to a hospital for medical services provided to a plan beneficiary.  No. 05-CV-0368, 2006 U.S. Dist. LEXIS 82888, at *11-12 (E.D.N.Y. Nov. 14, 2006).

They claimed that the fund they sought was "identifiable" because they had identified the bank accounts into which the overpayment had been deposited.  But simply identifying the account in which many funds from different sources were deposited was insufficient.  Otherwise, plaintiffs' "interpretation of equitable restitution would encompass nearly every payment between two parties in which the source and destination of the funds paid could be identified."  *Id.*

- Finally, in *Union Labor Life Insurance Co. v. Olsten Corp. Health and Welfare Benefit Plan*, the plaintiff union sought benefits owed to a plan beneficiary on a restitution theory.  No. 01-CV-6259, 2008 U.S. Dist. LEXIS 24527, at *5-7 (E.D.N.Y. Mar. 26, 2008).  As in *Pell*, the plaintiff argued that the identifiable fund was the portion of the plan's general assets that had not been paid out to the beneficiaries.  The court rejected the argument: "Labeling the portion of defendants' assets that they refused to disperse a 'fund of money' does not remedy this deficiency."

Plaintiffs are attempting the same kind of claim rejected in all of these cases.  Rather than identifying particular funds or particular shares of those funds, they seek a lien against the entire settlement.  No authority supports such a lien.  In reality, plaintiffs seek to recover from the general assets of the settlement fund, relief that – if it is restitution at all – is the sort that is only cognizable as a *__legal__* remedy.  Because only equitable remedies are available under section 502(a)(3), plaintiffs' claims would necessarily fail on the merits.

### c.    No Showing of Entitlement to Identifying Information

Plaintiffs have shown no entitlement whatsoever to the release of Vioxx settlement claimants' identifying information.  They have cited no authority in support of such relief.  Nor have they explained how it could be done consistently with federal privacy laws, or with the terms of the Agreement itself, which expressly provides that such information "shall be kept confidential by the Parties . . . and shall not be disclosed except" in circumstances not present here.  (Agreement § 15.1.)  In cases in which a fiduciary has reason to believe that a particular plan beneficiary has secretly secured a settlement from which the plan would be entitled to a recovery, the ordinary course is for the fiduciary to bring suit against that beneficiary and seek details of his recovery through ordinary discovery.  *See, e.g.*, *UnitedHealth Group, Inc. v.*

21

*Dowdy*, No. 8:06-CV-2111, 2007 U.S. Dist. LEXIS 80090 (M.D. Fla. Oct. 29, 2007).

Defendants know of no precedent for the relief sought by plaintiffs here – essentially, a court-

ordered conscription of defendants to do plaintiffs' job for them of identifying plan beneficiaries

who have not complied with the plans that plaintiffs purport to be responsible for administering.

Plaintiffs' failure to carry their burden as to the first prong of the preliminary injunction

standard – likelihood of success on the merits – dooms their motion for an injunction.  Where "a

plaintiff cannot show a likelihood of success on the merits, it would take a very strong showing

with respect to the other preliminary injunction factors to turn the tide in plaintiff's favor."

*Newdow*, 355 F. Supp. 2d at 272.  Indeed, even if plaintiffs have some possibility of prevailing

on the merits, that showing is not sufficient.   "[T]here can be no substantial likelihood of success

where there exist complex issues of law, the resolution of which are not free from doubt."  *First

Nat'l Bank and Trust Co. of Mich. v. Fed. Reserve Bank of Chicago Detroit Branch*, 495 F.

Supp. 154, 157 (W.D. Mich. 1980).  This is just such a case.  For this reason alone, the motion

should be denied.

2.      <strong>Plaintiffs Will Not Be Irreparably Harmed.</strong>

Plaintiffs also fail to satisfy the second prong of the preliminary injunction standard --

irreparable injury – because plaintiffs can still pursue equitable relief once funds are disbursed.

Furthermore, plaintiffs' delay in filing for an injunction belies the urgency they now claim.

As plaintiffs rightly acknowledge, "financial injuries are not considered irreparable" in

"the usual case." (Mot. at 17.)  They nonetheless insist that it is "equally well established" that

"the 'absence of an available remedy by which the movant can later recover monetary damages,'

will be found 'sufficient to show irreparable injury.'"  (*Id*. at 17 (quoting *Enterprise

International*, 762 F.2d at 473).)

Plaintiffs fail to acknowledge, however, that it is a tall order to prove such an "'absence of an available remedy.'"  As their own authority clarifies, the mere possibility that monetary relief would later be available is enough to defeat a claim for an injunction.  In *Enterprise International*, the court considered whether an "absence" of an available remedy existed when the possibility of later recovery was admittedly doubtful.  There, the question was whether relief would be available in a foreign court.  The court noted that some courts had held that an injunction could issue when the only proper forum was Iran, having found that "any resort to Iranian courts to recover the movant's monetary loss, should the preliminary injunction be denied, would be futile."  762 F.2d at 473.  Otherwise, the rule from which plaintiffs here seek exception had been strictly enforced: "In settings other than the Iranian crisis, however, when it has been shown that foreign courts provide a legal remedy or, at worst, that access to foreign courts is speculative, injunctive relief has been refused."  *Id.*  Indeed, "[e]ven in some cases related to and arising after the Iranian revolution . . . federal courts have refused to grant preliminary injunctive relief, finding that the unsettled situation in Iran was simply insufficient."  *Id.* (citation and internal quotation marks omitted); *accord, e.g.*, *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) (preliminary injunction "should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury").  In other words, plaintiffs must affirmatively show that no possibility of relief exists if they do not receive it now.

They have not done so.  Plaintiffs' sole argument that an injunction is necessary to avoid irreparable harm is their claim that they will "have virtually no practical ability to recover" from Vioxx settlement claimants after funds are disbursed because at that point, their "claims against

those plan members would cease to be equitable in nature and would instead require the attachment of personal liability to the plan members." (Mot. at 17-18.) This is false.

Even if plaintiffs are correct that they cannot recover dissipated funds, the urgency of their case is doubtful. As an initial matter, the forthcoming disbursement, which is still over a month away, involves only half of the total payout. Plaintiffs certainly do not contend that they have an interest exceeding half the value of the settlement – by their own admission, their beneficiaries comprise at most only one-third of the claimant pool, and it is unlikely in the extreme that they can lay claim to the entirety of the recoveries by those claimants. Their interests are thus preserved by the status quo itself, without the need for an injunction.

In any event, plaintiffs' suggestion that they cannot pursue settlement funds after they are disbursed is entirely speculative. The argument is based on the outcome of *Great-West*, in which the Supreme Court denied relief because the plaintiffs had not sought recovery from an identifiable fund in the defendants' possession. But *Sereboff* added substantial caveats to that holding.

After *Sereboff*, it is clear that a fiduciary can pursue recovery of funds on equitable grounds even after settlement funds are disbursed. Nothing makes this more clear than *Sereboff* itself, in which "Sereboffs' attorney had already distributed the settlement proceeds to them" when Mid Atlantic brought suit. 547 U.S. at 360. Indeed, relief may well be available even when settlement moneys are fully "dissipated" by the claimant because any legitimate "fund" would exist by agreement (*i.e.*, under the terms of the plan) and, under *Sereboff*, not be subject to any tracing requirements.

In *Schultz v. Progressive Health, Life, & Benefits Plan*, for example, another district court of the Fifth Circuit confirmed that spent funds are still subject to equitable restitution under

ERISA.  481 F. Supp. 2d 594, 595-96 (S.D. Miss. 2007).  In *Schultz*, Aetna sought to recover overpayments from a plan beneficiary who had received social security payments, which under the plan terms were supposed to offset any benefits paid by the plan.  Schultz objected, arguing that "she does not have a specific identifiable asset which can be recovered by Aetna because she spent all of the overpaid funds, and therefore the funds are no longer in her possession or control."  The court rejected the argument.  Citing *Sereboff*, the court explained that "strict tracing rules do not apply to cases of equitable restitution when an equitable lien is imposed by agreement," as it was under the terms of the plan in that case.  *Id.* at 595.  At least one other court has reached the same conclusion since *Sereboff.  See Fregeau v. Life Ins. Co. of N. Am.*, 490 F. Supp. 2d 928, 931-32 (N.D. Ill. 2007).

Even if plaintiffs were correct that dissipation of the funds would extinguish their putative rights to equitable relief, it is still plaintiffs' burden to show that the funds would actually be dissipated in order to show irreparable harm.  In *Chicago Regional Council of Carpenters Welfare Fund v. Johnson*, for example, the Northern District of Illinois denied a motion for a temporary restraining order on the grounds that the plaintiff had not shown irreparable injury when "defendants have not yet received the settlement award from the third-party" because there was "no reason to believe that they intend to disperse the disputed funds, when collected, or that they otherwise intend to place them beyond the reach of this Court."  No. 00 C 4707, 2006 WL 2943623, at *2 (N.D. Ill. Oct. 6, 2006).  No such showing has been made here, either, and plaintiffs have thus failed to meet their burden on irreparable injury.

Finally, plaintiffs' claims of urgency also ring hollow in light of the many months they waited to file suit since the announcement of the settlement, which was in November 2007, and the two additional months that intervened between their filing of a complaint and their request

for an injunction.  As many courts have recognized, as little as even a few weeks delay in filing

suit and seeking preliminary injunction relief can preclude a showing of irreparable harm and

result in the denial of a preliminary injunction.  *See, e.g.*, *Charlesbank Equity Fund II v. Blinds

To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and

the filing of a motion for preliminary injunction, not attributable to intervening events, detracts

from the movant's claim of irreparable harm."); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121,

1123 (7th Cir. 1983) (A two-month "delay is inconsistent with a claim of irreparable injury.").

Plaintiffs may have been spurred into action by the recent filing by competing counsel of another

action in this Court asserting similar ERISA claims and seeking similar relief on behalf of a

putative class that purportedly includes all plaintiffs in this action.  But plaintiffs' desire to be

first in line should have no bearing on their entitlement to a preliminary injunction.

In sum, plaintiffs have failed to show that they will be irreparably injured without an

injunction, and for this reason too, their motion should be denied.

### 3.   The Balance of Harms Disfavors an Injunction.

The harms that plaintiffs' injunction threatens are far greater than those it would prevent.

Plaintiffs dwell solely on money, but there are obvious privacy issues implicated by what

plaintiffs propose as well.  Indeed, the Agreement was drafted to protect those interests.  (*See*

Agreement § 15.1.)  Serious fairness issues also obtain in light of the fact that plaintiffs would

force delayed payouts to two-thirds of the claimants while they attempt to discern their putative

rights against the other third (or so they estimate).  But even as to monetary considerations,

plaintiffs are off the mark.  The balance of harms weighs heavily against an injunction.

The settlement claimants' rights to medical privacy are protected by state and federal law.

Their interests in privacy are threatened by plaintiffs' proposed relief.  Plaintiffs have never

explained how defendants could ever comply with their requested relief without disclosing the

identity of every single claimant enrolled in the settlement.  Indeed, that is precisely the relief

they seek.  (Mot. at 1 ("The identification Plaintiffs request ought to include, at a minimum,

notice to counsel for Plaintiffs of . . . the name, address, and personal identifying information

(*i.e.*, social security number) for each qualifying claimant . . . .").)  What plaintiffs propose is an

astoundingly vast breach of privacy when one considers that plaintiffs admittedly cover no more

than one-third of the entire pool of claimants (and by extension could have claims against a

substantially smaller minority of claimants).

     Indeed, plaintiffs assign no weight at all to the fact that their injunction would also delay

payment to the substantial majority of the pool despite admittedly having no rights to recover

from it.  It is a simple but highly relevant point that plaintiffs are arguing that one-third of the

pool outweighs two-thirds of it in their balancing of the hardships.  That equation is wrong as a

matter of basic math.

     Plaintiffs also miscalculate the relative financial hardships.  Even if it is true that

"Plaintiffs are at great risk of being deprived of millions in reimbursements" (Mot. at 18-19) – a

claim without any supporting affidavit – plaintiffs have not gone so far to allege that any of them

will become insolvent, even if they never recover a dime of reimbursement.  For many claimants

in the settlement pool, the financial reality is more dire.  This balance of hardships – which

focuses on the harms as they will affect the relevant parties rather than an out-of-context, dollar-

to-dollar balancing – should guide the Court's assessment of this prong of the analysis.  Plaintiffs

have simply failed to demonstrate that the heavier burden falls on them – particularly in light of

the fact that they have greatly exaggerated the "irreparable harm" that they ostensibly face in the

absence of an injunction.

For both of these reasons, plaintiffs have failed to make the required showing that the balance of harms favors an injunction.

### 4.     A Preliminary Injunction Would Disserve the Public Interest.

Finally, plaintiffs' proposed injunction would not serve the public interest.  Plaintiffs would stop the clock in the eleventh hour of a resolution of one of the largest mass tort proceedings in U.S. legal history.  Claimants have waited years for relief.  They are waiting to get on with their lives.  They and the greater public have a significant interest in winding down this aspect of the litigation.

Plaintiffs, on the other hand, are only at this late hour awaking to their purported interest in a litigation that has been ongoing for the better part of a decade.  The Court should make no mistake – this is a test case about whether insurance companies can wait on the sidelines while their insureds and their insureds' counsel labor for years to secure a recovery for personal injuries arising out of a mass tort and then grab the compensation that they obtain.  Sanctioning this behavior will shift the considerable costs of enforcing whatever rights these companies may have onto plaintiffs' lawyers and substantially increase the costs of litigating mass torts.  That outcome is not in the public interest; it is in the interest of maximizing insurance company profits.

Accordingly, plaintiffs have failed to show that their requested relief is in the public interest.  For this reason too, their motion should be denied.

## II.     IF AN INJUNCTION IS PERMISSIBLE, PLAINTIFFS' MOTION SHOULD NOT BE GRANTED UNLESS THE SETTLEMENT IS SECURED BY A BOND.

Even if the Court were to determine that an injunction is warranted, it should not be entered without some sort of security.  For reasons detailed in this section, the Court should require a bond of $2,425,000,000.00 – the value of that portion of the settlement whose

disbursement plaintiffs' injunction would likely delay.  In the alternative, as a simple matter of preserving the value of the settlement to the claimants, a bond of at least $84,875,000.00 is required.

Plaintiffs assert that this Court should dispense with any security for potential damage caused by the requested injunction.  This assertion ignores the rights of the Vioxx settlement claimants.  The claimants have contractual, judicially-protected rights to immediate disbursement of the settlement payments in accordance with the terms of the Agreement.  The requested injunction seeks to nullify the claimants' rights.  Accordingly, the claimants should be protected from the potential damage that could result from the loss of those rights.[8]

The potential loss to the settlement claimants is immense, and the bond should reflect the severe harm the claimants could suffer.  According to plaintiffs' own experts, only 30 to 35% of the approximately 50,000 claimants are even possibly insured by plaintiffs.  Yet, plaintiffs ask this Court to enjoin settlement disbursements to 100% of the claimants, including the 65-70% against whom plaintiffs admittedly have no reimbursement rights.  Plaintiffs ask that the settlement payments be enjoined for a minimum of thirty (30) days as to each claimant.  Furthermore, the requested relief requires payments to be withheld indefinitely if plaintiffs assert reimbursement rights against a particular claimant.  Some payments, potentially thousands, could be withheld for years while the parties determine whether a plaintiff has valid reimbursement rights and, if so, the amount of such reimbursement.

---

[8]     The Vioxx settlement claimants are indispensable parties with an interest in the settlement monies and the enforcement of the Agreement.  *See, e.g.*, *B. Fernandez and Hnos, Inc. v. Kellogg USA, Inc.*, 440 F.3d 541 (1st Cir. 2006) (holding that party to contact was indispensable to party to proceeding requesting injunctive relief modifying distribution contracts); *Dawarendewa v. Salt River Project Agric. Power Dist.*, 276 F.3d 1150, 1155-56 (9th Cir. 2002) (holding that party to contract was indispensable party in action that sought injunction modifying contract terms); *Kettle Range Conservation Group v. U. S. Bureau of Land Mgmt.*, 150 F.3d 1083 (9th Cir. 1998) (holding that private parties buying land were necessary parties to injunction against seller to prohibit sale).

Under these circumstances, the security for the requested injunction should be in an amount sufficient to protect the Vioxx settlement claimants from any hardship, loss, or inconvenience that could result from the wrongful restraint of the settlement payments – and, by plaintiffs' own estimate, 65 to 70% of the restraints would inevitably be wrongful.  In setting the amount of the bond, the Court should consider that the bond will be an injured claimant's only recourse for damage from the wrongful restraint of a settlement payment.  *See, e.g., Sprint Comms. Co. v. CAT Comms. Int'l, Inc.*, 335 F.3d 235, 239-40 (3rd Cir. 2003); *Mead Johnson Co. v. Abbott Labs., Inc.*, 201 F.3d 883, 888 (7th Cir. 2000).  The bond cannot be retroactively increased once it is set.  *Sprint Comms.*, 335 F.3d at 239-40.  Since the party restrained by the bond must still prove his entitlement to damages, the party who posts the bond suffers no injury if the bond turns out to be too high.  *Mead Johnson*, 201 F.3d at 888.  Conversely, however, "an error in the other direction [setting the bond too low] produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond."  *Id.* Accordingly, the amount of the bond should be set on the "high side" of the potential exposure. *Id*.

Applying these fundamental principles, a bond equal to the amount plaintiffs propose to enjoin – at least the first payout, equal to $2,425,000,000.00 – is appropriate.  With 50,000 potentially injured claimants, a bond of that size provides security of only $50,000.00 per claimant.  This is a reasonable estimate of adequate security given the potential loss exposure of the claimants, and the fact that at least 65 to 70% of the claimants would be wrongfully restrained by this relief.  As the PSC's amicus brief vividly illustrates, such a bond, though substantial, is justified by the even more substantial hardship that would be placed on the settlement claimants by an injunction that would delay the initial payout.

At a minimum, plaintiffs must be required to secure the costs that the settlement claimants will endure by virtue of the delayed payout.  Again, they propose to enjoin (at a minimum) the payout of $2,425,000,000.00.  At an interest rate of 7%, even if plaintiffs were able to complete their work and the injunction could be lifted in just six months time, a bond of $84,875,000 would be required to secure the interest that would have accrued to the claimants during that time (3.5% of $2,425,000,000.00).  Thus, if the Court finds that a $2,425,000,000 bond is inappropriate here, it should find that a bond securing an amount no lower than $84,875,000 is required.[9]

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion or, in the alternative, enter an injunction only upon receipt of a bond for $2,425,000,000.

Respectfully submitted,

IRWIN FRITCHIE URQUHART & MOORE LLC

/s Monique M. Garsaud
JAMES B. IRWIN (Bar No. 7172), T.A.
MONIQUE M. GARSAUD (Bar No. 25393)
400 Poydras Street, Suite 2700
New Orleans, Louisiana  70130
Telephone:  (504) 310-2100
Facsimile:  (504) 310-2101
Email: jirwin@irwinllc.com
          mgarsaud@irwinllc.com

*Attorneys for BROWNGREER, PLC
and US Bank National Association*

## CERTIFICATE OF SERVICE

---

[9]      This amount is also necessary given the increased administrative costs the injunction would impose on US Bank and BrownGreer.  In addition, plaintiffs should be required to indemnify US Bank and BrownGreer fully against any liability for privacy violations or other claims that may result from the disclosure of personal information sought by plaintiffs' motion.  Further, plaintiffs should be required to assume responsibility for payment of any legal fees or other expenses that US Bank and BROWNGREER may incur in defending against such claims.  Defendants will be filing a motion seeking defense and indemnification should the Court grant plaintiffs' Motion.

I hereby certify that the above and foregoing Memorandum in Support of Motion to Sever has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 20th day of June 2008.

*/s Monique M. Garsaud*