# EXHIBIT A

**SUPERIOR COURT OF NEW JERSEY**
**LAW DIVISION, CIVIL PART**
**ATLANTIC COUNTY, NEW JERSEY**
**DOCKET NO.:  ATL-L-590-08**

IN RE:                                              )
                                                    )                    **Transcript**
VIOXX® LITIGATION, Case No.  619     )                          **of**
==========================  )     **Oral Argument On Petition By Plaintiff**
HEALTHCARE RECOVERIES, INC.,       )      **To Release Pre-Action Discovery**
                                                    )
                              **Plaintiff,**      )
           **v.**                                 )
                                                    )
MERCK & CO., INC.,                        )
                              **Defendant.**    )
                                                    )

Place:        **Atlantic County Courthouse**
                   **1201 Bacharach Boulevard**
                   **Atlantic City, NJ   08401**

Date:         **March 14, 2008**

**BEFORE:**

> THE HONORABLE CAROL E. HIGBEE, J.S.C.

**TRANSCRIPT ORDERED BY:**

> JEFFREY S. GRAND, ESQ.
> (Seeger Weiss, LLP)

**APPEARANCES:**

> DIANE PAOLICELLI, ESQ. and ERIK L. SHAWN, ESQ.
> (Levy Phillips & Konigsberg)
> Attorneys for Plaintiff
>
> CHRISTOPHER A. SEEGER, ESQ. and JEFFERY S. GRAND, ESQ.,
> (Seeger Weiss, LLP)
> Attorneys for Vioxx Plaintiffs
>
> THEODORE V. H. MAYER, ESQ. and CHARLES W. COHEN, ESQ.
> (Hughes Hubbard & Reed)
> Attorneys for Defendant Merck

CHERYL A. BRYSON, C.E.T., AD/T
CB TRIALSCRIPT SERVICE
1606 ADAMS AVENUE — LINWOOD, NJ   08221
PHONE/FAX: 609-653-1971
DIGITAL RECORDING BY LARISSA DIBONA

*I N D E X*

| *Witnesses*: | *Direct* | *Cross* | *Redir*. | *Recross* |
|---|---|---|---|---|
| (None this date) | | | | |

| *Evidence*: | | *Ident*. | *Evid* |
|---|---|---|---|
| (None this date) | | | |

*Argument/Summation*:

Ms. Paolicelli                          4/19/23

Mr. Seeger                              15/22

*Ruling/Order*:

The Court                                  36

1          (March 14, 2008.  Digital recording at Time Index

2          #1:28:33 as follows:)

3               THE COURT:  You can be seated.  Okay.  This

4     is petition in the Vioxx litigation, petition by

5     Healthcare Recoveries, Inc. for pre-action discovery

6     basically.  Counsel, do you want to put your

7     appearances on the record.

8               MS. PAOLICELLI:  For the petitioners, Diane

9     Paolicelli.

10              MR. SHAWN:  And Erik Shawn, Your Honor.

11              MS. PAOLICELLI:  Levy, Phillips & Konigsberg.

12    Would you like a card?

13              MR. SEEGER:  And for the Vioxx plaintiffs,

14    Chris Seeger, Seeger Weiss, and with me Jeff Grand.

15              MR. MAYER:  And for Merck Ted Mayer of Hughes

16    Hubbard Reed, and Charlie Cohen of Hughes Hubbard Reed.

17              THE COURT:  Okay.  Basically petitioner has

18    requested that the Court order the Vioxx plaintiffs'

19    counsel to provide to the attorneys for Healthcare

20    Recoveries, Inc. the names of all plaintiffs who — the

21    addresses of plaintiffs for the last twelve years,

22    their social security numbers, their insurance

23    information, and just general information about their

24    healthcare coverage.

25              MS. PAOLICELLI:  Your Honor, I think —

1        THE COURT:  Counselor, is there anything you

2   want to say to —

3        MS. PAOLICELLI:  Yeah.  I think that's a

4   little bid broader than what we asked for.

5        THE COURT:  Okay.

6        MS. PAOLICELLI:  So let me sort of lay it

7   out.  What we would like, Your Honor — and we're here

8   because we tried to get this in other ways, and it was

9   refused, and we set this all forth in our papers, and I

10  don't have to rehash the history unless Your Honor

11  wants me to.

12        But what we would like, Your Honor, and what

13  we really need or else our clients' claims, many of

14  them will just be lost, is the names and addresses of

15  the settling plaintiffs.  At this point — or the

16  enrolling plaintiffs.  At this point the enrollments

17  have been made, and there really is no need to get

18  every single plaintiff in the whole litigation.  So the

19  names and addresses of the settling plaintiffs, their

20  social security numbers — and by that I mean for the

21  plaintiffs and also for, principally we need the

22  injured party and the spouse because sometimes a plan

23  might be in the name of the spouse.

24        THE COURT:  Mmhmm.

25        MS. PAOLICELLI:  We would like, if possible,

1      the healthcare provider's name, if that's possible, and

2      the docket number of the case that the individual

3      brought where that's applicable.  And when I say the

4      names and addresses of the settlers, Your Honor, I'm

5      including in that not just the ones, the plaintiffs who

6      have brought suit, but also the plaintiffs whose cases

7      have been — the claimants who have tolled cases and who

8      are participating in the settlement; and those we have

9      absolutely no way of even, you know, guessing at what

10     the name is.

11             And so that is the relief.  It's really very

12     modest relief, Your Honor, because we're not, we're not

13     trying to get any confidential information.  We're not

14     trying to find out about, you know, the medical

15     conditions.  We don't want to know what they're saying

16     in their settlement, you know, papers about their

17     condition.  We just need the names, addresses, and

18     social security numbers in order to find out, to

19     identify the names of the individuals who my clients

20     have claims against.

21             This is not a fishing expedition.  Everybody

22     here knows that all of the plaintiffs in the Vioxx

23     personal injury litigation have had medical expenses

24     and that their health insurers have paid for those

25     expenses.  For the most part those are health insurance

 1    plans through employers that are governed by ERISA.

 2    There is a right under ERISA for the plan to be

 3    reimbursed.  Virtually all plans, especially nowadays

 4    after the *Sereboff* case from the Supreme Court in 2006,

 5    the plans all provide that in the event of a recovery

 6    from a tort feasor the plan is entitled to be

 7    reimbursed, and that entitlement has been upheld by

 8    *Sereboff*, by the Supreme Court in *Sereboff* I should

 9    say, and it's been held to be an equitable relief that

10    the insurer can obtain through ERISA, and those rights

11    exist against the fund.  If we cannot obtain the names

12    and addresses, the identities of the individuals, Your

13    Honor, and if that money is distributed before we

14    obtain that information, then our clients are in danger

15    of just losing their rights outright.  Because if the

16    money is distributed, if the plaintiffs have spent that

17    money, then at least under the *Sereboff* case and some

18    of its progeny those rights are lost.

19            So this is an absolutely critical and

20    emergent petition that we're making because we have a

21    right to bring a case against those plaintiffs, a case

22    under ERISA — and by the way, there may be other state

23    law claims as well or contractual claims as well.  They

24    have the right to bring it, but they can't, not because

25    they don't know what the claim is — this is not a

1   fishing expedition.  We know exactly what the case is.

2   Give us the social security number, and our clients

3   will be able to figure out, you know, in fairly short

4   order whether any of these individuals are, in fact,

5   you know, beneficiaries that owe them obligations,

6   number one; and they'll be able to figure out in very

7   short order exactly what the claim is, because they

8   have the plan documents, they have everything.  What

9   they don't have is the identities precisely of who

10   among the group of plaintiffs are their beneficiaries.

11        And so by defendants' refusing — or I should

12   call them the plaintiffs and the defendant — refusing

13   to give us this information, Your Honor, they're

14   really, they're really playing "hide the pea."  We all

15   know it's there, but where is it?  And we're playing

16   hide the pea with a time clock going, because if we

17   don't get this information in a timely fashion, then

18   that money will be disbursed and that's the end of that

19   for our clients.

20        So this is quite an important petition that

21   we're bringing and one that was actually invited by Mr.

22   Seeger at the December conference.  If you'll recall,

23   Your Honor, I had actually sent a letter to the Court

24   inquiring, and Mr. Seeger said that he would not,

25   without a court order, divulge the social security

1    numbers.  So, so here we are.  And —

2                 MR. SEEGER:  And I still don't want one.

3                 MS. PAOLICELLI:  And we, of course, Your

4    Honor, would be pleased to into any confidentiality

5    order about those social security numbers and the

6    information that we, that we receive.  We'll give back

7    the rest of it.  We'll destroy it.  We'll follow

8    whatever confidentiality limitations that, you know,

9    the Court believes are necessary here; but I think that

10   there's certainly ample case law support, case law

11   supporting the position that we make here.

12                Now the petitioners in Merck have argued that

13   Rule 4:11 doesn't permit this kind of thing; and if

14   Your Honor would like me to address that, I will.

15                 THE COURT:  Okay.

16                 MS. PAOLICELLI:  Okay.  So 4:11, Your Honor,

17   is a rule designed to permit disclosure by a non-party

18   anticipating bringing suit and under circumstances

19   where there would be manifest injustice if they were

20   not permitted the information.

21                Now interestingly New Jersey's rule is a

22   little bit different than the federal rule.  New

23   Jersey's rule allows both for testimony, to preserve or

24   perpetuate the testimony of someone dying or leaving

25   the country, but it also provides for the inspection,

1     Your Honor, of records.  And in this case, Your Honor,

2     the information that we're asking for is right there on

3     those fact sheets.  We're not looking to depose at

4     length anybody about anything.  The information we want

5     is very, very, very targeted.  It's right on those

6     documents.  I suspect that it's all been computerized

7     and that, you know, either Merck or the plaintiffs'

8     counsel can, you know, easily pull out the four or five

9     fields that we're asking for and provide that

10    information.

11          4:11 refers to 4:18 of the rules, Your Honor.

12    4:18 provides for the inspection of documents.  And

13    4:11 specifically says, Your Honor, that such

14    inspection of documents is permissible to prevent a

15    failure of justice, which brings me back to where I

16    started.  If we don't have this information our

17    client's rights will be lost, and there will be a

18    failure of justice.

19          The cases that we cite in our petition and

20    reply papers, Your Honor, are interesting as well.  It

21    turns out in New Jersey law there are really only,

22    unless I'm missing something, three cases really on

23    point here, and all of them are consistent with what

24    we're seeking here.  The *Hall* case, Your Honor, which

25    is the Supreme Court case that the plaintiffs and the

1    defendant make so much of in their papers, the *Hall*

2    case concerns the affidavit of merit statute, and at

3    the time the plaintiffs wanted to bring medical

4    malpractice actions, had a quandary of needing to file

5    this affidavit of merit without having information, and

6    so a petition was brought; and, in fact, the trial

7    judge in that case granted the petition.  So there were

8    appeals and stays of it all, and as Your Honor is

9    probably aware it was rendered moot because it actually

10   was filed against the hospital and the depositions in

11   question were had.  But the Supreme Court thought it

12   important enough to address the issue, and in so

13   addressing the issue the Court noted that the rules

14   should be flexible enough to avoid the risk that

15   meritorious cases be dismissed.  So while not ruling,

16   because the precise issue was moot, certainly the Court

17   understood that in exceptional circumstances where

18   you'd have a miscarriage of justice the rule was

19   flexible enough to permit that.  And, in fact, later on

20   the Legislature changed the rule for, you know, for the

21   medical malpractice cases.  That, of course, doesn't

22   apply here.  But what does apply is the principle

23   announced in *Hall*, which is that you have to be

24   flexible enough to prevent injustice to be able to

25   order this kind of relief, particularly where it's no

 1      burden to the defendant or to the other side.

 2              And on this point I want to say this.  Really

 3      this settlement agreement, Your Honor, was designed to

 4      thwart, to obstruct the health insurers' rights or ways

 5      really to get to the information in order to enforce

 6      their rights, and I say that because the settlement

 7      agreement itself has aspects to it that will cut off

 8      the rights of the insurers.  It provides that the, that

 9      Merck would be held harmless from any claims, that the

10      plaintiffs and their counsel have to hold Merck

11      harmless from any claims by insurers.  It provides for

12      confidentiality, that is that the plaintiffs, if you

13      really take the release at its face value, are not

14      allowed to tell anybody about the amount or fact of

15      their settlement, which means that if the insurers ask

16      their beneficiaries — who, by the way, have contractual

17      obligations to give this information to their insureds

18      — if the insureds ask for it, the plaintiffs are bound

19      by this agreement not to give the information.  It's

20      hidden by the agreement itself.

21              So — And one other thing that the agreement

22      does, which really, I think, is an interference with

23      the contractual rights of the insurers and their

24      clients; but that's not an argument that we're making,

25      you know, today in these papers because it's really

1    not, not necessary to.  But the agreement, the

2    settlement agreement requires the plaintiffs to waive

3    their lien rights.  Now in some places if the plaintiff

4    waives their lien or subrogation rights, then an entity

5    that wants to bring a subrogation claim in certain

6    state courts, since they stand in the shoes of the

7    plaintiff, they're not going to — no shoes to stand in

8    because the plaintiff has waived the claim.

9         So without the insurers being a party to

10   this, their claims have really been set up by the

11   settlement agreement itself to be waived.  Of course,

12   Your Honor, it's — the settlement agreement is a little

13   bit ambiguous because it does seem to say that the

14   plaintiffs' counsel are supposed to advise their

15   clients, the injured plaintiffs, that there may be

16   these liens and to take it into account and to ask them

17   about it and just make sure that they're satisfied.

18   There seems to be language in the settlement agreement

19   to that effect as well, even for the private payer

20   liens.  But I got to tell you that, you know, precious

21   few lawyers have contacted us to tell us about the

22   settlements, and I don't know how it is that the

23   plaintiffs' counsel had the information to advise their

24   plaintiffs, you know, about these potential obligations

25   to lienholders.  You know, that if they take this money

1    now they may owe money to their, to their health

2    insurers.  I don't know how that could have been done,

3    but I guess, you know, that's not my issue or not my

4    issue for today.

5            But getting back to the New Jersey cases, the

6    other New Jersey case, *Sturm*, in the *Sturm* case again

7    the Court granted the relief.  That's the case where

8    the, I guess the stepchildren were in danger of being

9    disinherited by their stepmother, and they wanted to

10   preserve the testimony concerning the drafting of their

11   father, deceased father's and their stepmother's wills,

12   and in order to preserve that testimony they needed to

13   depose, I guess, the drafter and witness, who were very

14   on in years.  And the Court granted that, that relief

15   because it would be unjust, even though they were not

16   bringing the case tomorrow because the stepmother was

17   still alive, it would be unjust to just allow those

18   rights to fall away because the testimony wasn't taken.

19   And, again, in the same way here, to allow the

20   defendants affirmative — and the plaintiffs I should

21   say — affirmative concealment of the information,

22   because they're really hiding information from us, and

23   to allow that to cause the rights of our clients to

24   fall away would be, as in *Sturm*, unjust; and,

25   therefore, that's another reason why this relief is in

1    order.

2              Now the *Johnson* case, which to my mind is the

3    last of the Jersey cases that address this issue, in

4    the *Johnson* case the Court did not order disclosure;

5    but that case really was a fishing expedition and our

6    case is not.  In that case I guess the individual was

7    killed.  I think it was a motorcycle accident, and

8    there was a potential Dram Shop Act case, and the

9    plaintiffs for the decedent wanted to depose, you know,

10   everyone who ever went to the bar that night and ask

11   questions about this, that, or the next thing in order

12   to establish a Dram Act case.  Again, that's not what

13   we want to do here.  We just need one or two tiny

14   pieces of information, and we know how to frame the

15   complaint, we know how to get all of the underlying

16   data, we know how to evaluate it.  Maybe there will be

17   some of those claims that our insurers will decide not

18   to bring for one reason or another, but without that

19   piece of information we're not going to be able to, to

20   go forward.

21             So essentially, Your Honor, the rule

22   supports, and the cases, the New Jersey cases — Let me

23   take just one second to address the federal cases,

24   which are all over the place.  The —

25             THE COURT:  You don't have to address the

1   federal cases.

2          MS. PAOLICELLI:  Is there a specific question

3   that Your Honor has, because I have more or less

4   summarized what's already in our papers, but what I

5   think are the major points here.  But basically that

6   this is very modest relief.  We'll keep things

7   confidential.  If Your Honor, you know, wants a

8   confidentiality order we're happy to do that.  And

9   without this our client's rights will be lost, and we

10  feel we're entitled to the relief we seek.

11         THE COURT:  Okay.

12         MR. SEEGER:  Judge, I think because of the

13  type of relief they're looking for, I feel compelled to

14  put this into a context.  Here's the, here is the real

15  world context.

16         The agreement reached between plaintiffs and

17  Merck specifically say nothing in that agreement

18  affects their rights.  They have subrogation rights.

19  What these lawyers would like to do is come in here and

20  create a fund that they can go after, and that's more

21  convenient than pursuing your contract rights under

22  your insurance policies.  That's all this is about.

23         If these attorneys don't get their way by

24  creating the fund, then HRI, which is a healthcare

25  recovery company — they are a subrogation company — are

1        just going to get their subrogation lawyers to go after

2        everybody.  This relief has never been granted in any

3        litigation I'm aware of, and I think we've looked at

4        all of them, where they can just come in and say give

5        us private information about your clients because we

6        think we can create a pot which makes life really nice

7        and rosy for insurance companies.  That is really

8        what's, what this is about.

9                So we should really, I think, keep the focus

10       on that, because there's nothing that we've done in our

11       deal with Merck that stops them from pursuing their

12       clients.  But here's what's most interesting about

13       this.  They don't even know who their insureds are.  A

14       minimal amount of work by these lawyers could have

15       identified who their insureds were.  They could also go

16       and do a search of the docket here in the court.  They

17       could find the complaints.  Everybody had to file a

18       complaint here.  Match up the names with their computer

19       system and, boom, you got your, you got your person.

20       Or even yet, better yet, wait until the money is

21       distributed and then go after those people for the

22       money that they got.

23               I mean it's, I don't think it's the Court's

24       responsibility.  I don't think it's our fault because

25       we didn't give them more rights than they already, they

1    have under their contracts.  They're the masters of the

2    their contracts with their insureds.

3            But the _Sereboff_ case that keeps getting

4    throw out, there's an important piece of that case

5    that, that was left out of their papers that you need

6    to know about.  That was a case where somebody had

7    possession, custody, and control of the money.  What

8    Merck and the Plaintiffs Committee have created is a

9    qualified settlement fund.  That money isn't in

10   anybody's possession, custody, or control until it's

11   actually distributed.  So they have — and I think Jack

12   Weinstein in the Zyprexa litigation had some comments

13   on a transcript that even makes that pretty clear.

14   This is not really — I'm almost surprised that they

15   want to push this point because I think they're on the

16   verge of creating some bad law for themselves on this,

17   but I think that's pretty clear from the Supreme Court

18   decision.  They got to wait 'til somebody has the

19   money, and then they can go against it.

20           There's absolutely no showing in the papers,

21   just to hit quickly their points — and I know that

22   Charlie and Ted may have something to say.  There's no

23   showing that the evidence that they're looking for,

24   that the information they're looking for is going to be

25   lost or destroyed.  It's just that they, there — for

 1    some reason client can't put this information together.

 2    That doesn't mean that we have to start providing

 3    social security numbers for people who are receiving

 4    these settlements.  They can go to their own computers

 5    and get this.

 6         And then the, you know, the whole idea that

 7    their client's rights, that this is somehow — there's

 8    going to be some travesty of justice if you don't give

 9    them all the plaintiff information they're looking for.

10    Oh.  Oh, here's another important thing.  I think in

11    their own papers they said that maybe ten percent of

12    the — So maybe of all the people out there maybe ten

13    percent of them are here in New Jersey.  Is that what

14    the claim was?

15         MR. MAYER:  That ten percent are represented

16    by the —

17         MR. SEEGER:  Oh, ten percent.  So there's a

18    hundred percent of the Vioxx claimants and ten percent

19    of them may, they may have a claim against ten percent

20    of them, and for that they want all the information

21    they can possibly get.  If that's not a fishing

22    expedition then there is — I mean I think you can look

23    up in the dictionary a fishing expedition.  We may now

24    have that as a definition.

25         But, you know, I don't really want to, you

1    know, belabor this.  I think that the most important

2    point is they have exactly the rights they had on

3    November 8th as they did on November 9th when we signed

4    the settlement agreement.  They just have to pursue

5    their subrogation rights.  That's not convenient for

6    the way I know they want to do it.  I know they'd to go

7    against the fund, but that is the way their contracts

8    are set up.

9              THE COURT:  Who is Healthcare Recoveries,

10   Inc.?

11             MS. PAOLICELLI:  Healthcare Recoveries is a

12   company that is a subrogation agent for a large number

13   of, of employers —

14             THE COURT:  It's a company that's been in

15   prior existence for years?

16             MS. PAOLICELLI:  I'm sure it has been.  I

17   can't tell you when they began to be in business, but

18   yes.  And they represent, again, numbers of insurance

19   companies, self-funded plans, employers.

20             THE COURT:  And how do they usually operate?

21   They usually file claims against individual people,

22   right?

23             MS. PAOLICELLI:  Yes.  And, Your Honor, —

24             THE COURT:  Well, do they file claims based

25   on the insurance company's plan saying, "We would like

1    you to file a claim," or —

2              MS. PAOLICELLI:  Usually, Your Honor —

3              THE COURT:  Or do they buy the claims from

4    the insurance companies?  What do they do?

5              MS. PAOLICELLI:  No.  I do not believe they

6    buy the claims from the insurance —

7              THE COURT:  Do they purchase these claims?

8              MS. PAOLICELLI:  I do not believe so.

9              THE COURT:  You don't know?

10             MS. PAOLICELLI:  Your Honor, no.  But what

11   usually happens, Your Honor, is there —

12             MR. SEEGER:  I know how they work.  They

13   directly — I know how it probably works.

14             THE COURT:  You have —

15             MR. SEEGER:  They get a percentage of the

16   recovery.

17             MS. PAOLICELLI:  I don't think that you

18   should talk for my client.

19             MR. SEEGER:  Well, I mean this is pretty well

20   known.  HRI is one of the largest subrogation companies

21   in the country.

22             MS. PAOLICELLI:  I mean they're under

23   contract, Your Honor.  They're agent and they're under

24   contract.  I'm sure they get paid for what they do.

25             MR. SEEGER:  Get paid a percentage.

1          MS. PAOLICELLI:  But, Your Honor —

2          THE COURT:  But they aren't the insurance

3     company?

4          MS. PAOLICELLI:  No.

5          THE COURT:  Well, you keep talking about,

6     "Give us the information.  Give me the information."

7     Number one, I get the impression — and I'm going to lay

8     this right out on the record — that this is simply a

9     law firm circling for the money, trying to be able to

10    capitalize on this settlement and be able to make money

11    for themselves, and that in order to do that you're

12    doing, you're trying to discover information.  I have

13    real questions about the, the legitimacy, I guess, of

14    your client and certainly the legitimacy of your saying

15    you represent Blue Cross & Blue Shield.  Do you have

16    any kind of agreement with any of these people?

17         MS. PAOLICELLI:  We have —

18         THE COURT:  All you have is Healthcare

19    Recoveries.  I mean you're listing it — you make it

20    look like you've been hired by a hundred companies, but

21    you don't —

22         MS. PAOLICELLI:  Your Honor, first of all —

23         THE COURT:  — really have any business

24    relationship with them, do you?

25         MS. PAOLICELLI:  That's not true.

1          THE COURT:  Are they your clients?

2          MS. PAOLICELLI:  Some of the ones on the

3     sheet are, in fact, clients of my firm, Levy Phillips &

4     Konigsberg, or clients of Crowell & Moring, who are co-

5     counsel in this petition.  They are direct.  In fact,

6     some of the entities on that list, Your Honor, have

7     consumer fraud claims before Your Honor which were

8     filed by my firm and which I guess are up for a

9     conference in April.  So, yes, and I've met with those

10    people in their offices —

11         THE COURT:  Consumer fraud claims?

12         MS. PAOLICELLI:  Consumer fraud.  The third-

13    party payer cases, yes, Your Honor.  Some, some of the

14    entities on the exhibit to the petition we're

15    representing —

16         THE COURT:  You represent them in the third-

17    party payer cases?

18         MS. PAOLICELLI:  Yes.

19         THE COURT:  So certain —

20         MS. PAOLICELLI:  Not all of them, but some of

21    them.  And I have direct relationships.  I have met and

22    spoken with them.

23         MR. SEEGER:  But, Your Honor, I mean I

24    address this to the Court.  I have asked this question,

25    not directly of Ms. Paolicelli, but I have had a number