1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  VIOXX PRODUCTS           *    Docket MDL 1657-L
           LIABILITY LITIGATION      *
6                                    *    March 25, 2008
                                     *
7   * * * * * * * * * * * * * * * *  *    9:00 a.m.

8

9

10                  MOTION HEARING BEFORE THE
                    HONORABLE ELDON E. FALLON
11               UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13

    For the Plaintiffs:          Herman Herman Katz & Cotlar
14                               BY:  RUSS M. HERMAN, ESQ.
                                 820 O'Keefe Avenue
15                               New Orleans, Louisiana 70113

16
                                 Levin, Fishbein, Sedrad & Berman
17                               BY:  ARNOLD LEVIN, ESQ.
                                 510 Walnut Street
18                               Suite 500
                                 Philadelphia, Pennsylvania  19106
19

20                               Branch Law Firm
                                 BY:  CYNTHIA ZEDALIS
21                               2025 Rio Grande Boulevard NW
                                 Albuquerque, New Mexico  87104
22

23  For the Defendant:           O'Melveny & Meyers, LLP
                                 BY:  JOHN H. BEISNER, ESQ.
24                               1625 Eye Street
                                 Washington, DC 20006
25

JODI SIMCOX, RMR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2

1  APPEARANCES:

2
   For the Petitioners:          Levy, Phillips & Konigsberg, LLP
3                                BY:  STEVEN J. PHILLIPS, ESQ.
                                 800 Third Avenue
4                                New York, New York  10022

5

6  Official Court Reporter:      Jodi Simcox, RMR
                                 500 Poydras Street, Room HB-406
7                                New Orleans, Louisiana 70130
                                 (504) 589-7780
8

9

10

11  Proceedings recorded by mechanical stenography, transcript

12  produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **PROCEEDINGS**

2                     **(March 25, 2008)**

3          **THE DEPUTY CLERK:**  All rise.

4          **THE COURT:**  Be seated, please.

5                This is a motion in this matter by Health Care

6    Recoveries, Inc., HRI.  By way of background, on February 20th,

7    2008, HRI filed a petition for pre-action depositions pursuant

8    to Federal Rule 27(a).

9                Pursuant to the petition, HRI, seeks an order

10   requiring all plaintiff counsel in the Vioxx MDL and/or

11   corporate representatives of Merck to provide the following

12   information:

13               One, names of all plaintiffs who allegedly took

14   Vioxx and suffered personal injury or wrongful death as a

15   consequence, including those plaintiffs who have entered into

16   tolling agreements;

17               Second, the address of these individuals for the

18   last ten years;

19               Third, the social security number of those

20   individuals;

21               Fourth, the docket numbers of the specific cases

22   filed by those individuals or by their personal representatives

23   in the event of a death of those people;

24               And finally, the identities of all health care

25   insurers who provided the coverage, either in whole or in part,

1   for some or all of the medical expenses incurred to treat the

2   injuries or conditions allegedly to have been caused by Vioxx.

3             On March 10th, 2008, the plaintiffs steering

4   committee filed a motion to dismiss this petition.  The next

5   day, the Court had a telephone conference with the parties, the

6   PSC, Merck, and HRI representatives to discuss the petition and

7   the plaintiffs' motion to dismiss.

8             At the status conference, I set the motion to

9   dismiss for hearing at the next monthly status conference,

10  which is now, and ordered that any opposition to the motion be

11  filed timely by March 19th.  On March 12th, Merck filed a

12  separate motion to dismiss the HRI petition, and HRI timely

13  filed their opposition.

14            I'll hear from the parties at this time.  Either

15  the plaintiffs or HRI.

16            MR. LEVIN:  Your Honor, procedurally, I would suggest

17  that the plaintiff, the steering committee, and Merck go first

18  since it's our Rule 12 motion against their Rule 27 motion.

19            THE COURT:  That's fine.

20            MR. LEVIN:  We've filed papers and we've given you

21  transcripts from New Jersey.

22            THE COURT:  Yes.  I've had an opportunity to read

23  those.

24            MR. LEVIN:  I realize that, Your Honor, and I'll be

25  very brief.  I think first you have to figure out in this

1  litigation who HRI is, and I think I have.  I think they're a

2  company that pursues subrogation liens for other companies.  So

3  that none of our claimants, if they ever do get any money, or

4  if there is a fund, have a nexus to HRI, and I do not believe

5  they have standing to bring this action under Article III.

6           Having crossed that bridge, the next bridge is:

7  Who do they represent?  They have List A in their petition of

8  many, many health insurance companies, ERISA plans, and they

9  tell us that they represent most of those plans.  In what

10  capacity, they don't tell us.  Perhaps as a collection agency,

11  because that's probably what they are.  But "most" doesn't mean

12  "all".

13           They tell us that some of the particular

14  entities listed on A, they have under private retention

15  agreements, but they don't tell us which ones.  They tell us

16  that they need this information to pursue claims, but they

17  don't tell us under what contract they need this information,

18  what ERISA plan.

19           In generalities, what they're trying to do --

20  it's clever -- is come into this litigation and attempt to

21  carve out a fund for whoever, most of Exhibit A perhaps.  In

22  carving out the fund, then they'll go to those carriers and

23  say, see what we've done?  We can get this money for you.

24  That's basically the way the scenario evolved itself in front

25  of Judge Higbee last week in New Jersey.

1        So in order to do this, they brought the claim

2   under -- the brought the petition under Rule 27.  Well, in

3   federal court, Rule 27 isn't for pre-complaint discovery, even

4   if they had standing, even if they had clients, even if the

5   claims were valid.  It's only to preserve testimony, a going

6   witness, vessels leaving the port, get the marshal to serve

7   them, get up there, arrest the vessel, take the deposition and

8   let it go.  That's not this kind of a case.

9        At some point in time, the claimants are going

10  to have money.  The claimants are listed on the docket.  They

11  can process their case, if they really do have a client, the

12  old-fashioned way, by doing the work themselves, rather than

13  asking every lawyer in this litigation to show their cards:

14  Social security numbers, medical records, addresses, claimants'

15  names, whether these claimants have a nexus to whoever is on

16  List A or not.  And thereby they're gathering information from

17  parties that have no nexus to even the clients that they

18  purport to represent or are attempting to represent.

19        There's confidentiality agreements here.  This

20  information is confidential.  If they have a claim under a

21  plan, there's a way to do it:  A, the carrier, brings the case

22  against B, the client; serves the notice; presents their lien,

23  and there's obligations to pay liens under plans and under

24  policies of insurance.

25        But not this way where 58,000 people give them

1     their social security numbers, their addresses, their medical

2     bills, their medical conditions, and then they determine which

3     of the 58,000 they have a claim against.

4                    Your Honor, Rule 27 is not new to this Court.

5     It's not new to the Fifth Circuit.  The Fifth Circuit has the

6     *Dresser* opinion.  This Court has *Skylight* and *Yancey*.  This

7     Court has, within this jurisdiction, other cases where there

8     was a need because information would be lost and Rule 27 was

9     invoked, but that's not the case here.  There's a docket.

10    There's a clerk.

11             **THE COURT:**  What about the tolling claimants with

12    regard to the clerk and the docket?  What's your position

13    there?

14             **MR. LEVIN:**  Well, life is not easy, Your Honor.

15    Litigation is not for sissies.  They have to go against those

16    people and find out who they are.  They have obligations.

17    Their attorneys may have obligations.  But there's no

18    obligation because there's a tolling agreement for them to get

19    all of this information.  There is going to be other means of

20    obtaining that information.

21                    At some point in time, there's going to be funds

22    that are created.  They're going to be in certain repositories,

23    but not what we have here now.  There's not even a claim under

24    ERISA here because nobody has control of those funds.  The

25    plaintiff doesn't have it.  The plaintiff's attorney doesn't

1   have it.  Under all of the ERISA cases, there has to be a

2   specific fund that's an equitable cause of action, and it just

3   doesn't exist.

4              I'm not going to go through -- we've quoted

5   Judge Higbee, and I don't think there's any need to go through

6   what was said by Judge Higbee.  But I can say this:  Judge

7   Higbee established more in 12 minutes than any lawyer could

8   establish against his adversary in 12 minutes, because you have

9   certain prerogatives when you're up there and we're down here,

10  Your Honor, and cross-examination of counsel is one of them.

11             I think it was established beyond peradventure

12  that this particular entity has no standing, is involved in a

13  fishing expedition, and is attempting to manufacture litigation

14  and claims, and they should not be capable of doing that.

15             **THE COURT:**  Thank you very much.

16             Do you want to say anything?

17             **MR. BEISNER:**  Just very briefly, Your Honor.

18             **THE COURT:**  All right.

19             **MR. BEISNER:**  Good morning, Your Honor.  John Beisner

20  for Merck.  I just wanted to make a couple of points and not

21  attempt to repeat anything that Mr. Levin has noted.

22             I did just want to echo, though, his observation

23  that this does strike us as being a fishing expedition that is

24  quite premature at this point.  It's certainly not authorized

25  under Rule 27.

1          One additional point I'd make is that the law

2  review article that HRI's counsel cites, I think really

3  summarizes as well by saying that the federal courts have long

4  and nearly unanimously found that Rule 27 authorizes a pre-suit

5  deposition only when the petitioner has demonstrated the

6  witness' testimony might otherwise be lost.

7          We really don't have any assertion here that any

8  individual possesses specific knowledge of any loss.  This is

9  all on the paper.  It's everything they're seeking, and would

10  be available at the right time.

11          The other thing I want to amplify, Your Honor,

12  is the point Mr. Levin made and that is if we had a situation

13  here where Merck had gone out and settled these cases

14  individually with the plaintiffs, what we have is a point, once

15  the settlement was reached, where the insurers may approach

16  their insured and say, you now have proceeds, we should talk

17  about how we divide those proceeds because we have some

18  entitlement here.

19          But if you think about it, that's really the

20  situation we have here.  A fund has been created, but the

21  claimants have been invited individually to come to the

22  process.  Their claims are going to be looked at individually.

23  Some of them won't receive any money.  Some of them will

24  receive varying amounts of money.  But we've established a

25  program where each of these cases will be looked at

1  individually.

2           So I respectfully submit, I don't see a reason

3  why this should be dealt with differently.  When a claimant is

4  paid, then these various subrogation rights may arise at that

5  juncture.  But that's the point at which this conversation

6  should occur.  As Judge Higbee noted, there's some

7  attractiveness here because this fund has been created and,

8  therefore, there's a certain attractiveness to it.

9           But as Mr. Levin has noted, it's nobody's fund

10 yet until we've gone through the process and the individual

11 claimants receive a determination about what sort of

12 compensation they will obtain.

13           Thank you, Your Honor.

14      **THE COURT:**  Thank you.

15      **MR. PHILLIPS:**  Good morning, Your Honor.  My name is

16 Steven Phillips.  I'm with the firm of Levy, Phillips and

17 Konigsberg.  I'm here on behalf of the petitioners.

18           Your Honor, I, with all respect, believe that my

19 worthy adversaries are casting our application rather more

20 narrowly than, in fact, it was made and are misapprehending.

21 We seek relief on one of two bases, and I propose to address

22 both.

23           The first bases relates to the Rule 27(a); but

24 the second bases, as we made clear in the petition, is an

25 application to ask the Court to lift, or modify, or alter its

1   confidentiality orders, because either will accomplish the
2   purpose that we seek.
3           Your Honor, with all respect, I hope I'm not a
4   sissy.  I've been at this for quite a while.  This is not a
5   business-as-usual situation.  Because Mr. Levin says -- and
6   we've all been there on various sides of this -- that there are
7   situations that arise every day across this nation where cases
8   are settled and where liens are addressed, quote, in the normal
9   course.
10          But when that happens, what usually occurs --
11  and I want to go through and explain to the Court why this is
12  not a normal situation -- what usually occurs, Your Honor, is
13  that the plaintiffs counsel -- and I am a plaintiff's counsel
14  in my normal everyday work -- mindful of the obligations that
15  exist, knowing that there is a lien, knowing that there are
16  responsibilities, find out what the lien is, and then enters
17  into a negotiation, usually with the court's involvement in
18  which the lien is, quote, compromised.
19          That's not what's happening here.  Here, the
20  releases are being signed in a situation where -- and now I
21  have to make a procedural point, and then I'll address the
22  standing.  This is a Rule 12 motion.  In a Rule 12 motion, as
23  Your Honor recognized in the *Yancey* case, you have to take our
24  petition and understand it to be true, and understand that the
25  inferences reasonably to be drawn from it are true.  So that's

1   the procedural posture.

2              So what's happening here then?  In our petition,

3   as we explain and we assert, and Your Honor must take this as

4   true, and common sense should tell you that it is true, most of

5   the 50,000 claimants that you've heard about earlier this

6   morning had health insurance.  The vast majority of them had

7   health insurance with private insurers.

8              There probably isn't an insurance policy out

9   there that doesn't have an obligation of notification, and an

10  obligation that the lien-holder, whether it's by contract,

11  common law, state law, ERISA, be brought into play.

12             THE COURT:  Doesn't the insurance companies know that

13  though?  They are the ones who sold the policies to these

14  people.  Don't you know your policyholders?

15             MR. PHILLIPS:  Your Honor, the problem that we have

16  is not that we don't know our policyholders or we don't know

17  our language, we don't know the claimants and have no normal

18  way of finding that.  In fact, the information has been

19  concealed, not wrongfully.

20             There's a lot of sort of harsh language that's

21  got into these papers.  I'm not suggesting that it was

22  inappropriate for the parties to agree that the forms would be

23  filed under seal.  Because, Lord knows, they contain lots of

24  information that I would agree should be confidential.  But

25  they also contain information that is not normally

1    confidential.

2               Again, I would suggest that in 98 percent of the

3    personal injury litigation that happens in this nation, whether

4    it's bills of particular, or client forms, or interrogatories,

5    they're filed publicly.  That's the usual course.

6               What's happened here, for reasons that I

7    understand and accept and respect, that didn't happen.  So what

8    we're asking the Court to do is to now recognize that we need

9    to, for us sissies, create a level playing field because it

10   didn't happen here.

11              Your Honor, there's a second thing that you have

12   to, I would respectfully say, accept in the nature of the

13   petition, which is that there is an inequity that potentially

14   exists, and, again, I want to be measured and respectful.

15              I am a card-carrying member for 30 years of this

16   bar.  I understand, accept and respect that the class action

17   that was filed -- or the class actions that were filed were

18   filed for very good and sound reasons.  I'm not critical of

19   that.  But it leaves the Court, and it leaves the petitioners,

20   in a peculiar situation.

21              Because the very attorneys who are here arguing

22   against disclosure are of record for, Your Honor, as I've

23   pointed out, as the punitive class representatives of a class

24   that includes the petitioners, and they have some obligations.

25              And they entered into an agreement, which Your

1  Honor, and, again, every lawyer in this room, but I, probably

2  knows much better than I do.  But from what I can see of it,

3  they undertook and considered the problem of these subrogation

4  liens.

5         They're going to represent to Merck at the end

6  of the day that they've investigated those liens and that

7  they've taken steps to satisfy them, and they're going to

8  indemnify Merck with respect to that.  All of that, again, I

9  understand.  I understand why Merck wants to do it.  I

10 understand why plaintiff's counsel feel that they had to agree

11 to do that, because otherwise they wouldn't have had a deal.

12        But where does that leave the petitioners who

13 have some right and expectation that they won't be mistreated

14 by those who purport to represent them, and who are entitled to

15 what Rule 27 tells them they're entitled to, which is justice,

16 that there not be a failure or a delay of justice?

17        THE COURT:  You don't believe they're going to do

18 that?

19        MR. PHILLIPS:  Well, not only do I don't believe that

20 they're going to do it, I've been told by Mr. Seeger, and my

21 partner was told by Mr. Seeger in New Jersey, that they're not

22 going to do it.  We have written letters to the counsel of --

23 to every counsel in this room, and as many counsel as seemed

24 reasonable to send letters to saying, look, we're writing on

25 behalf of 80 insurers.  We know they have liens.  We don't know

1   who your clients are, fulfill their obligations -- your

2   client's obligations, and your obligations.

3              And the letter that we got back from Mr. Seeger

4   on behalf of the plaintiffs steering committee was, again,

5   basically, what we used to call a "drop-dead" letter, we're not

6   doing it.

7              So we're told -- and, again, we so stated to

8   Your Honor.  We attached the letters to our petition.  And Your

9   Honor, again, under Rule 12, has to accept for the purpose of a

10  motion to dismiss that we've been told that we're not getting

11  this information.  So we operate with the belief and the

12  expectation that there's going to be a widespread, if not quite

13  universal, but nearly universal disregard of contractual

14  obligations.

15             Now, let me address, if I may, briefly the

16  standing issue so I can --

17        THE COURT:  Before you get there, aren't you trying

18  to utilize 27 to discover information rather than perpetuate

19  information?  You know and I know that 27 was really devised in

20  a setting, oftentimes in a maritime setting, where people are

21  leaving, in a setting where someone is about to die, that kind

22  of thing.

23             It's a very unusual article.  It allows

24  discovery before a lawsuit is even filed.  Because of that

25  situation, it's very, very narrowly construed and utilized.

1   The information that you're seeking to obtain is really, I

2   don't see it, other than a discovery attempt.  You're really

3   trying to discover the information; information which you

4   should have because you sold the policies.

5           In the old days, when you had to look through a

6   million boxes in a warehouse and go through all of those

7   crumbling papers that all of us know about, that's one thing.

8   But in these days and times, you put in a word like, "Vioxx",

9   and you put in your client's name, you hit a button and it

10  comes out.

11          **MR. PHILLIPS:**  Your Honor, you asked really --

12          **THE COURT:**  Two or three questions, right.

13          **MR. PHILLIPS:**  -- to my understanding, two questions;

14  and they're questions that I am eager to answer, and each

15  require a bit of an explanation.  So let me begin with the

16  second prong of it, which is the capacity of health insurers to

17  get this information, and then I'll be very pleased to talk

18  about Rule 27(a), jurisprudence.

19          Your Honor, here are the pragmatic difficulties

20  that make what may seem obvious, in fact, not obvious.  It is

21  correct that the health insurers have the capacity to look up

22  the Vioxx code and identify those of their users who have taken

23  Vioxx.

24          It is also true that they can search ICD codes

25  and identify those who have had either MIs or strokes.  It may

1    also be true, but often isn't, that they can match those two.

2    Let me explain why that isn't always the case and often isn't

3    the case.

4            In the complex world of health insurance

5    coverage, there are many plans.  For instance, one that I'm

6    well aware of, the City of New York provides health insurance

7    to some, I guess it's about 150,000 folks in my home city of

8    New York, and the City provides coverage for illnesses and

9    conditions.

10           The union, that's the American Federation of

11   State, County and Municipal Employees, provides coverage for

12   medications.  They're different entities.  They don't match.

13   There are numerous plans where pharmaceuticals are not covered

14   events, and so on and so forth.

15           So the notion that you could necessarily or

16   often get a match of medication and disease to then come up

17   with a universe of potential folks is very imperfect and not

18   very -- not, in fact, going to yield the results.

19           But let me take it a step further.  For those

20   carriers who can identify a universe of folks who, A, have

21   taken Vioxx and, B, suffered MIs or strokes, that will be a

22   much larger universe than the universe of plaintiffs and

23   claimants.

24           We now have been told, and we know as a

25   practical matter anyway, that if we attempt to notify those

1   folks and say, we know you took Vioxx.  We know you had a
2   stroke or a heart attack.  Do you happen to be a plaintiff?
3   Well, we've been told by their counsel that they're not going
4   to respond.
5           So we're telling Your Honor that they've told us
6   that they're not going to respond.  Because the functional
7   equivalent -- again, forget Rule 27, which I'll get to.  We've
8   written the lawyers of these people.  We've said to them, here
9   are the list of health insurers that we represent.  You know
10  who your people are.  You know that they're claimants.  You
11  know that they're settling, and you know who their health
12  insurers are, notify us, as you're obligated to do, and they've
13  said no.
14          So what profit would it be if we're in a world
15  where we're faced with recalcitrant insureds and recalcitrant
16  clients to even go through that exercise if we've already been
17  told that they won't respond.
18          **THE COURT:**  Before you leave, you and I know the
19  problem of what you're trying to accomplish.  You recognize
20  that it's doable.  You recognize that you can file suit as an
21  intervenor in the various cases.
22          The difficulty that you're faced with is that
23  you've got different contracts with different individuals.
24  You've got 50 state laws.  You sell a product.  You get a
25  premium for it.  The premium is computed based on risks.  One

1    of the risks that's computed into that is the risk of not

2    getting it back.

3              So you don't know who's covered, how much is

4    covered, because these individuals may have gotten medical

5    assistance for a broken arm or a broken leg and also for Vioxx.

6    That is problematic.

7              So looking at it, it's easier, from your

8    standpoint, to create a fund and then to negotiate percentages

9    and get everybody a percentage, rather than some none and some

10   a lot.  That's what you're trying to do in this situation.

11   Isn't that the whole bottom line?

12             MR. PHILLIPS:  Your Honor, both yes and no.  Let me

13   give you both the "yes" part and the "no" part.

14             Obviously, Your Honor, when $4.8 billion was

15   announced, that was going to cause the health insurance

16   industry to sit up and take note, and to understand that there

17   was a fund of money that was available, a very substantial

18   fund, against which the health insurance industry was going to

19   possess claims of varying validity and size.  No question about

20   that.

21             THE COURT:  I think even some lawyers took notice and

22   felt that this was potentially a percentage opportunity for

23   getting some of this money back.

24             MR. PHILLIPS:  Your Honor, that comment has been

25   made; and if it were true, I wouldn't be embarrassed of it.

1        **THE COURT:**  I'm not suggesting you should be.

2        **MR. PHILLIPS:**  It happens -- I want to be candid with

3    you.  Your Honor, it actually didn't happen that way.  The way

4    it happened was rather different.  And it was -- what happened

5    with the health insurance industry -- and this part I've

6    lived -- when Mr. Seeger, in a piece of very brilliant, but

7    ultimately unsuccessful lawyering, was able to persuade

8    Judge Higbee to certificate the class -- and I'm sure Your

9    Honor is familiar with all of that --

10       **THE COURT:**  Yes.

11       **MR. PHILLIPS:**  -- and created a class action that

12   appeared to have the wind in its back, because the appellate

13   division then upheld it, and there was a great deal of feeling

14   that the Supreme Court of New Jersey was the kind of court that

15   might view this with favor and affirm.

16           What, in fact, happened is that the health

17   insurance industry started taking note of the Vioxx situation

18   because they understood -- and I noted, with interest, that

19   Your Honor is going to be addressing that down the road.  In

20   fact, what happened was that health insurers, generally, began

21   retaining counsel.  I am among those counsel, and I was

22   retained.

23           It really actually -- again, not that it

24   necessarily matters, but since it's been brought up both in

25   this court and because Judge Higbee misapprehended it and

1   seemed agitated by that fact, let me tell you that the real
2   impetus here comes from the Blue Cross Blue Shields and the
3   Aetnas of the world who are themselves sophisticated,
4   intelligent people who are facing their own economic crises,
5   and who, from their perspective, have spent hundreds of
6   millions and billions of dollars and feel, with some reason,
7   that they have some rights here that are important to
8   vindicate.
9           And because of the size of it, we thought it
10  advisable to start with a Rule 27 application.  We think, for
11  reasons that I'll get to, that that's jurisprudentially sound
12  and wise.
13          But come what may, nobody should be under any
14  illusion that if this petition is denied that the health
15  insurance industry is going to say, you know, oh, we're
16  sissies.  We're gone.  This is too important a matter to them,
17  individually and collectively.  Which is one of the reasons
18  why, again, if the Rule 27 doesn't work, then the Court's
19  inherent power about its confidentiality might be a different
20  route to go or some other route would be the route to go.
21          Your Honor, let me segue, if I might, to the
22  Rule 27 jurisprudence, because I think that there's a curious
23  thing that happens with Rule 27.  And, again, it's
24  understandable, but I think I can provide Your Honor with a way
25  out of the thicket, and with a way to harmonize the language of

22

1   the rules, the desires of the commentators, with the

2   understandable caution that federal courts have taken with

3   respect to Rule 27.

4            So let me lay it out, if I may, this way --

5        **THE COURT:**  Now, I have read your pleadings, so you

6   don't have to restate some of them.

7        **MR. PHILLIPS:**  I don't purpose to do that.  But I

8   would make this observation:  The language of the rule is

9   broader than some of the case law is because it tells Your

10  Honor to look to the question of justice, either delay or

11  denial of justice.

12           Obviously, the most normal situation presented

13  are the ones that Mr. Levin spoke about, the dying witness, the

14  aged witness, the spoliation of evidence.  But occasionally in

15  unusual situations -- and I would urge Your Honor to conclude

16  that this is one such unusual situation -- the concealing of

17  evidence can accomplish the same injustice, the same

18  unfairness, that the rule seeks to prevent, and is articulated

19  broadly enough to comprehend.

20           The point becomes this:  My colleague from Merck

21  says we're premature.  Well, that is exactly why Rule 27 seemed

22  to us to be wise.  Anticipating that argument, he says that we

23  can't yet bring an ERISA action because the fund doesn't exist.

24  Fine.  Rule 27 contemplates people who are not yet ready or

25  able to bring an action.  So that makes the rule attractive to

1    us and it was part of our thinking.

2              The second thing is that temporal sequences

3    here, and the unusual, and I think wonderful, procedures that

4    Your Honor has crafted -- I just think it's very, very well and

5    properly done -- but it creates a problem for petitioners for

6    the health insurance industry because we find ourselves in a

7    situation where things are going to move very, very fast in

8    unusual ways, where releases are signed in advance of the

9    determination of the monies that flow, where the monies that

10   flow are, apparently, going to be calculated without anybody

11   knowing what the lien information is and what the facts on the

12   ground are.

13             This is very unusual.  And then, of course, once

14   the money flows, and by now, the petitioner's rights are

15   prejudiced.  So, Your Honor, in sitting -- you're really

16   sitting, I think, as a court of chancery.  And looking at it

17   from that perspective, I think that Your Honor has the

18   discretion, and I would argue, the duty, to see that the

19   interest of justice require some manner of getting this

20   information out.

21             **THE COURT:**  What do you do with it though?  I don't

22   see how if a fund is created, what do I do with the fund?  I

23   then sit as a judge and apply the law of 50 states, different

24   laws?  I look at independent contracts, each independent

25   contract?

1        You have to discover how much, if any, of that
2   medicine or medical services was for Vioxx, how much wasn't.
3   How can I do that?  What's the advantage of me, as a court,
4   creating a fund when you don't know who is entitled to it, how
5   much they're entitled to, which law is applicable?
6        **MR. PHILLIPS:**  Your Honor, I think very --
7        **THE COURT:**  Other than to deal with a percentage; and
8   then once you create a fund, then that's what you're trying to
9   do.
10       **MR. PHILLIPS:**  Well, Your Honor, that's what I'm
11  trying to do.  You see, Your Honor has assumed something that
12  we have not asked for.  All that we're asking for now, of
13  course, is information.
14       **THE COURT:**  But don't you have the information?  You
15  say they're hiding the ball, but it's your ball.  You know it.
16  Your insurance companies have sold policies to these
17  individuals.  Don't they know who they sold them to?  Don't
18  they know what's covered?  Why do you ask them to tell you who
19  your customers are?
20       **MR. PHILLIPS:**  Your Honor, the folks that I represent
21  have provided insurance to 25 to 30 million Americans.  We know
22  who the 30 million folks are.  We know what the policies are.
23  But we don't know amongst the 50,000 folks that you were being
24  told about this morning earlier today, just as an arithmetical
25  matter, 7,500 of them probably have coverage written by my

1  carriers.

2          My carriers have no way of -- they know all

3  about the 7,500 people.  They know what coverage they have.

4  They know what policy they have.  They know all that.  They

5  just don't know which ones they are; and there's no way, as

6  I've explained, for them to figure out from amongst their 25 or

7  30 million insureds which ones are the ones who happen to be

8  part of this settlement.

9          **THE COURT:**  Can't they pull up the ICD codes and they

10  know who's taken Vioxx and how much is involved; how much you

11  have into it, so to speak; how much you've paid for Vioxx?

12  Isn't that what you're getting back?  You get all that from the

13  ICD codes and then you proceed against those individuals.

14          **MR. PHILLIPS:**  Here's the problem --

15          **THE COURT:**  You match them up.

16          **MR. PHILLIPS:**  Well, there are two or three

17  difficulties with that and I'm trying to explain them, and I

18  fear that I'm not doing as good a job as I would hope.

19          In terms of who bought Vioxx, or who they bought

20  Vioxx, that isn't -- we're not even here worrying about the

21  cost of Vioxx.  That's the consumer fraud litigation.  You'll

22  be hearing about that in April -- Judge Higbee will.  That's a

23  different problem.

24          We can take a look at heart attacks and strokes

25  and figure out what we paid for heart attack and stroke care.

1    That we can figure out.  They could argue that, well, it wasn't
2    for a heart attack, it was for a broken leg.  But that's not
3    such a difficult -- you can figure out who the cardiologists
4    are and all of that.
5              What we can't figure out, and that's really why
6    we're here, and one way or another we've got to figure it out,
7    is who are the 7,000 people amongst those 50 who are amongst
8    the 25 million or 30 million that we've provided coverage for.
9              I do have to say one other thing, just as an
10   aside, one of our clients is a public payor, and they haven't
11   addressed that.  And I don't purpose to address it, but I did
12   in the brief make a point that presents a somewhat different
13   problem for Your Honor.  I don't need to dwell on that because
14   the big issue is what we've talked about.
15             Let me return to the problem that clearly and
16   understandably seems to be concerning Your Honor about creating
17   a fund.  I don't know what the best and most expeditious way of
18   resolving this lien problem is, assuming that we get the
19   information that we're determined to get one way or another.
20             The old fashioned way, as Your Honor suggests,
21   would be then to take in the 7,500 cases that I posited; but,
22   of course, if I prevail, somewhere in the back of the courtroom
23   is someone from other carriers who are listening to what's
24   going on.  I don't doubt that that's -- it's not just the folks
25   that we represent.

1    The old fashioned way would certainly be to
2    either litigate 40 or 50,000 liens with variable outcomes or
3    negotiate individual outcomes.  That's what the law would
4    require.  If that's what everybody thinks ought to happen, or
5    if somebody insists that it happen, then that's what will
6    happen, and it will be a headache for one and all.
7    I can pledge, on behalf of my petitioners, that
8    we seek nothing more than a seat at the table and the
9    opportunity to act responsibly to resolve these problems in
10   some way that seems fair and just to all concerned.
11            THE COURT:  I understand that.  We're going back
12   around now.  I've got to post some time limits, because I do
13   have one or two other matters to do today.
14            MR. PHILLIPS:  Your Honor --
15            THE COURT:  I've got your --
16            MR. PHILLIPS:  -- I think you have a flavor of what I
17   have to say --
18            THE COURT:  I understand.
19            MR. PHILLIPS:  -- and there is more that I might say.
20   But if Your Honor has anything that's concerning you that
21   remains, I would be pleased to address it.
22            Otherwise, I would make only one other very
23   important point, and I think that it's not a happy point, but
24   it has to be recognized, which is that to a certain extent
25   we're all playing with fire here in this respect.  Regrettably,

1  but it is true.

2          These health insurance policies have harsh

3  consequences that are out there if people breach; and not

4  notifying, resisting, not cooperating, would certainly

5  represent a breach.

6          One thing that the health insurance industry is

7  not anxious to see happen, and that this Court shouldn't see

8  happen is to have some aspect of this settlement exercise and a

9  concern about preserving funds, not creating funds and so on,

10  have the awful consequence of causing someone out there to lose

11  coverage, and not them but their family as well.

12          Again, I think it would be irresponsible of me

13  not to make that observation, too.  Because in the real world,

14  there are carriers and claims people who look to deny coverage;

15  and it would be a very sad thing if this litigation, which is

16  reaching a very fine conclusion, would have some unintended and

17  sad consequences.

18          I know we're a problem, and I know that we have

19  the potential of making settlement more difficult.  But I know

20  that Your Honor is a good problem-solver, and I hope you'll

21  help us solve this one.

22          **THE COURT:**  But both the litigants, both the

23  plaintiffs, as well as the defendant, recognize that and

24  there's an informational statement.  Many health care policies

25  provide for termination of the client's coverage if a claim

1  lien is not resolved.  Proper resolution of these liens is

2  critical.  That's in the obligation of the liens.  That's in

3  the FAQ, the frequently asked questions, that's being posted.

4  Everybody is being advised of that.

5              So I think it's a serious situation that

6  somebody has some responsibilities to pay their lien.  I would

7  think they would do that.

8              MR. PHILLIPS:  Again, we're asking Your Honor's help

9  because we perceive that that is not happening and that there's

10 a problem.  So that's why we sought your help this way.  If

11 not, we'll be back some other way.  But I appreciate Your

12 Honor's courtesy.

13             THE COURT:  Thank you very much for your comments.

14             MR. HERMAN:  Your Honor, I have just one short

15 comment.  Mr. Seeger is a co-lead in this case.  He's also

16 liaison counsel in New Jersey.  He's enjoying the first

17 vacation that he's had with his children in six years while

18 he's been litigating these cases, at his expense.

19             I'm certain that if he were here, he could make

20 a suggestion which would help learned counsel.  Because the

21 docket sheets are all available that give the names of the

22 plaintiffs; and certainly if an industrious client, such as

23 learned counsel represents, chose to, could go to the docket

24 sheets and the MDL sheets and compare those sheets with the

25 policyholders, which would assist in cutting through the

1  problem of going through hundreds of thousands of files.

2  But I do want to state this:  Mr. Seeger isn't

3  here; and I know him well enough, and I've followed this

4  litigation, and he would not tell anyone to drop dead.  He

5  takes his responsibilities to the court seriously.  We serve at

6  Your Honor's pleasure.

7  Certainly, we don't intend to hide anything, but

8  we do have the obligation to see this matter through and make

9  sure that it's resolved in the proper way.

10  **MR. LEVIN:**  I'll be very brief, Your Honor.

11  **THE COURT:**  Okay.

12  **MR. LEVIN:**  I don't think we have to be bullied to

13  know what our obligations are.  These plaintiffs are not

14  neophytes -- plaintiffs' counsel.  They've dealt with carriers

15  before and they've dealt with subrogation liens before.  They

16  know their obligations and their client's obligations.

17  But you've got to do it the right way; and

18  that's what Mr. Seeger was telling Mr. Phillips to do, to put

19  them on notice.  They have a policy.  Seeger has a client.  All

20  of us have clients.  And do it A versus B.  Not the way

21  Mr. Phillips is trying to do it.

22  Now, Mr. Phillips did say, this was a Rule 12

23  motion, you have to accept -- putting aside the fact that he

24  can't get the relief under Rule 27 and he's out as a matter of

25  law, but it's a Rule 12 motion and you have to take his

1    petition and all the averments and recognize them as being
2    true.
3                    Well, what we heard from Mr. Phillips is a lot
4    of facts and a lot of issues.  Some of his clients have this.
5    Some of his clients have that.  Some of them have this.  Some
6    policyholders have this.  Well, perhaps it's a Rule 56 motion
7    and we should take discovery of Mr. Phillips and not deal with
8    Rule 12.
9                    Lastly -- second from lastly, Mr. Phillips
10   mentioned that there were a third-party payor complaint in this
11   jurisdiction as part of this MDL.  For what purpose he
12   mentioned it, I don't know.  He mentioned that subrogation
13   interests were involved.
14                    But, Your Honor has recognized in Propulsid and
15   in this case, that those master complaints that you asked the
16   plaintiffs steering committee to file are not complaints in the
17   ordinary sense of the word.  They're administrative complaints.
18             THE COURT:  Yes.
19             MR. LEVIN:  They don't have any substantive value.
20   They don't confer any rights.  And Your Honor appoints a PSC to
21   manage the litigation.  Part of the managing the litigation is
22   managing all of the complaints involved.  The courts have
23   recognized that the ethical situation in class actions and mega
24   torts are different than ordinarily exist.
25                    There are competing and compensating values and

1    you have to look at the entire situation.  I cite to the Court,

2    *Corn Derivatives*, a Third Circuit opinion, concurring opinion

3    of Judge Adams, and also the *Lazy Oil* case, Third Circuit

4    opinion, the late Chief Judge Becker, that talks about dealing

5    with the ethics in multiple-party litigations.

6              Now, lastly -- and this really is lastly --

7    Mr. Phillips talks about there may be 7,500 people, may be,

8    amongst the clients that mostly he represents.  Not all that he

9    represents, but mostly that he represents.  That's what his

10   pleadings say, "most".

11             Out of 50,000 claimants, what's he want?  He

12   wants 50,000 social security numbers; 50,000 addresses; 50,000

13   medical records.  What about the abuse to the 42,500 people who

14   have no connection with anything that he's talking about, to

15   give them that type of information so that he could maybe find

16   7,500, maybe find 7,500, and figure out what to do with them

17   after he finds them for most of his clients?

18             **THE COURT:**  All right.  Anything?

19             **MR. PHILLIPS:**  Your Honor, just this, if I may.

20             I did not address the standing issue.

21   Mr. Levin, I think, misapprehends.  Would Your Honor like me to

22   address that?

23             **THE COURT:**  Well, you can do it briefly.

24             **MR. PHILLIPS:**  Yes.

25             Our pleadings may not have been artful and may

1  have confused both Judge Higbee and our adversaries.  But let

2  me, in a word, be clear:  Every single petitioner has retained

3  us to represent them with respect to this either directly, that

4  is to say there are a number of unions and counties and health

5  insurers who have retained Crowell and Moring and Levy,

6  Phillips and Konigsberg directly for that, or else they have

7  retained the company of HRI and its captive law firm of Gibson

8  Sharps as their counsel and service for this purpose

9  specifically, and Gibson Sharps have associated with us.

10              So I represent to this Court that there is no

11  petitioner whatever listed in our group that has not

12  specifically retained either HRI and Gibson Sharps, who then

13  have associated with us; or, alternatively, who have retained

14  directly my firm and the firm of Crowell and Moring to do this.

15  We have standing, and I apologize for the confusion that may

16  have come from inartful pleading.

17              Thank you.

18        **THE COURT:**  Thank you very much.  The Court will

19  stand in recess.  I'll take it under advisement.  I do have an

20  order to show cause, too.  Let me deal with that.  I almost

21  forgot that.

22        **MR. HERMAN:**  Your Honor, may it please the Court.

23  I'd like to introduce to the Court, Cynthia Zedalis, who is

24  with the Albuquerque firm of Turner Branch, who is here to

25  address the Court.

34

1     THE COURT:  What's the response to that?  Why haven't
2  you repackaged the pleadings?
3     MS. ZEDALIS:  We have ten plaintiffs listed on that
4  complaint, four of whom stipulations for dismissal have been
5  approved as of this morning.  One individual -- these are high
6  blood pressure cases.  They're not eligible under the
7  settlement program.
8          One of the individuals insists upon proceeding
9  with the litigation, so he will do that today, Your Honor.  The
10 other five --
11    THE COURT:  Okay.
12    MS. ZEDALIS:  -- we have had trouble reaching them to
13 communicate with them to see what they want to do with their
14 case.  I would appreciate it if we could have another 30 days
15 in which to accomplish that.
16    THE COURT:  Any problem with 30 days?
17    MR. HERMAN:  Not from the PSC.
18    THE COURT:  I'll give you another 30 days.  This is
19 the problem that I mentioned to the committees, both plaintiffs
20 and defendants.  It's really giving the MDL cases problems,
21 this packaging.  I don't have an answer to it, but I'm getting
22 a lot of feedback from throughout the country as to
23 difficulties that the courts are having.
24          It's not a difficulty initially because it's
25 easy to package them in large numbers; and everybody's

1    interested in the beginning of getting everybody in the

2    litigation so you can get a census and the feel, both sides, of

3    the scope and breadth of the litigation.

4                    The difficulty is, from the Court's standpoint,

5    later on down the road, some people are lost, some people are

6    not, some people want to proceed one way, some people do not,

7    and it's one pleading.  So those individuals, in a case like

8    this where you have thousands, it's very hard to find them.

9                    They're not listed alphabetically.  They're put

10   in some format, and some of them are dismissed, some of them

11   are not dismissed.  They're all under one number.  If the named

12   claim is dismissed and the other ones are not, it can dismiss

13   that claimant, but you've got to keep the pleading because

14   there's another 100, but they're not named in the pleading.  It

15   just makes it very, very confusing and difficult.

16                    We've got to figure out a better way of

17   packaging this in the future cases.  It's just really hard to

18   deal with just logistically.  I'll give you another 30 days to

19   deal with this.

20            MS. ZEDALIS:  I appreciate that, Your Honor.

21            THE COURT:  Thank you.

22            THE DEPUTY CLERK:  All rise.

23                (WHEREUPON, the Court was adjourned.)

24                              *****

25                            **CERTIFICATE**

JODI SIMCOX, RMR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

36

1          I, Jodi Simcox, RMR, Official Court Reporter for the

2   United States District Court, Eastern District of Louisiana, do

3   hereby certify that the foregoing is a true and correct

4   transcript, to the best of my ability and understanding, from

5   the record of the proceedings in the above-entitled and

6   numbered matter.

7

8

9                              _____

10                             Jodi Simcox, RMR
                               Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25