UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX® | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| | Judge Eldon E.. Fallon |
| | Magistrate Judge Knowles |

THIS DOCUMENT RELATES TO:

| | |
|---|---|
| David Agard, et al., v. Merck & Co. | Case No.: 2:05-cv-01089 |
| Glenn L. Dier, et al., v. Merck & Co. | Case No.: 2:05-cv-01088 |
| Adnan Aljibory, et al., v. Merck & Co. | Case No.: 2:05-cv-01090 |
| Rosemary Holobosky, et al., v. Merck & Co. | Case No.: 2:05-cv-01091 |
| Marjorie Connolly, et al., v. Merck & Co. | Case No.: 2:06-cv-02708 |
| Marilyn F. Core, et al. v. Merck & Co. | Case No.: 2:05-cv-02583 |
| Carlo Devincentiis, et al., v. Merck & Co. | Case No.: 2:05-cv-02297 |
| Kathleen Hoffner, et al., v. Merck & Co. | Case No.: 2:06-cv-02238 |
| Robert D. Gates, et al., v. Merck & Co. | Case No.: 2:05-cv-06221 |

AND TO ALL CASES

<u>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THEIR MOTION FOR THE COURT'S RESIGNATION
AS CHIEF ADMINISTRATOR OF THE MASTER SETTLEMENT AGREEMENT,
TO VACATE THE MASTER SETTLEMENT AGREEMENT, TO MODIFY AND
GRANT AN EXTENSION OF TIME AS TO PRE-TRIAL ORDER NOS. 28 AND TO
VACATE PTO 37, AND GRANT OTHER RELIEF REQUESTED THEREIN</u>

<u>INTRODUCTION</u>

Plaintiffs in the above-captioned actions, as and for themselves and all plaintiffs remaining in the instant multi-district litigation that have not elected to participate in the Master Settlement Agreement, have moved for the relief with respect to the Master Settlement

Agreement ("MSA") and this Court's Pre-Trial Orders Nos. 28 and 37, which are addressed in the separate arguments below.

## ARGUMENT

### I.

### The Actual Conflicts in the Roles of the Chief Administrator Under the MSA and Presiding Judge in MDL 1657 Raise Significant Issues Regarding the Court's Ability to Fulfill Both Roles Impartially Regardless of Whether There Is Any Existing Bias in Connection with Any Decision Made in Either Role, and Thus, This Court Should Resign as the MSA Chief Administrator.

The motion seeking to vacate the MSA evinces the significant conflict confronting this Court if it maintains the dual roles of presiding Judge in this litigation and Chief Administrator under the MSA. There is another key issue in which the roles conflict in that the MSA excludes certain injuries from compensation which this Court would be duty bound to uphold in its role as Chief Administrator; yet those same injuries are being pursued by litigants in MDL 1657 and the Court will have to rule on the viability of those injuries in the tort system. In view of the same it is respectfully submitted the Court should resign from the chief administrative position prior to adjudicating the remaining motions made herein since they are all related to the MSA, with the possible exception of the motion seeking relief from PTO 37.

It was precisely this type of circumstance that prompted Congress to promulgate legislation in 1978 limiting the role of bankruptcy judges to administrators and mediators because of the inconsistency between the judicial and administrative roles involved in their respective functions. *See,* In Re: Asbestos Litigation, 90 F. 3d 963, 975 (5th Cir. 1996), vacated

and remanded 117 S.Ct. 2503 (1997), aff'd on remand, 134 F.3d 668 (5th Cir. 1998(per curiam), cert. granted sub nom., Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999). Plaintiffs respectfully submit this issue does not require any further discussion except to note that it is clear impartiality may be questioned even when there is no actual bias. In Re Faulkner, 856 F.2d 716, 721 (5th Cir 1988 ) (per curiam).

Plaintiffs now turn to the argument to vacate the MSA.

## II.

### There Is No Authority to Approve a Settlement With as Large a Number of Diverse Plaintiffs as Exist in MDL 1657 Without Adhering to the Prerequisites of Fed.R.Civ.Pr. 23, and Any Effort to Do So Abrogates the Separation of Powers Doctrine, and to the Extent Claims are Extinguished Denies Plaintiffs Due Process of Law and Their Right to Trial by Jury.

The MSA cannot survive judicial scrutiny for the simple reason that "'a class is a class is a class'" based "in large part on the fact that 'there is no language in the rule that can be read to authorize separate, liberalized criteria for settlement classes.'" Georgine v. Amchem Products, Inc., 83 F.3d 610, 625 (3d Cir. 1996), quoting In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 799 (3d Cir.1995).

In its November 21, 2006 Order & Reasons, this Court has already ruled that personal injury claims of the litigants of MDL 1657 cannot proceed as a class action pursuant to Fed.R.Civ.Pr. 23. It is worth noting that the question of how the fact of settlement impacted certification was a source of conflict among the Courts of Appeals prior to the Supreme Court's resolution of that issue in Amchem Products, Inc., v. Windsor, 521 U.S. 591, 619, 117 S. Ct. 2231, 2248 (1997), siding with those courts that held "settlement is relevant to a class

certification."

Although the Supreme Court held that when confronted with a request for settlement–only class certification a district court need not inquire whether the case, if tried, would present intractable management problems, because the proposal was that there be no trial, and of singular importance in the case at bar is the holding:

> But other specifications of the rule--those designed to protect absentees by blocking unwarranted or overbroad class definitions-- demand undiluted, even heightened, attention in the settlement context.

*Id.,* 521 U.S. at 620, 117 S. Ct. 2248.  At this juncture is not necessary to speculate whether or not litigants who sustain strokes should be considered a separate subclass from those who sustain heart attacks since the former arguably includes significant long-term health-care expenses not ordinarily associated with heart attacks, because those litigants who sustain cardiovascular injuries such as transient ischemic attacks, hemorrhagic strokes, deep vein thrombosis and had their claims extinguished under the MSA were clearly deserving of judicial review for purposes of determining whether or not they constitute subclasses who are entitled to separate representation.

The Third Circuit observed that the concern with regard to subclasses is "particularly acute in settlement class situations" In Re: General Motors Corporation Pick-up Truck Fuel Tank Products Liability Litigation, *supra*, 55 F. 3d at 797, concluding that, "Without determining that the class actually was adequately represented, the district judge has no real basis for assuming that the negotiations satisfactorily vindicated the interests of all the absentees."  In the instant case plaintiff Agard and others contend they have experts who will link their injuries now excluded by the MSA to ingestion of Vioxx.  The only certainty now before the court is that it

never received an adversarial presentation as to either the fairness of the negotiations or the adequacy of representation with regard to the diverse interests among the litigants of MDL 1657, and this is true no matter how closely the courts tracked the negotiations as they ensued up to the culmination in the MSA.

As such while it may be a matter of speculation as to the extent to which the NPC's vision of the interests of their clients became myopic or even blinded by the prospects of the hundreds of millions of dollars in attorneys fees they negotiated for themselves, the Supreme Court observed that, "with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant. Ortiz v. Fibreboard Corp., 527 U. S. 815, 852 n.30, 119 S. Ct. 2295, 2318 n.30 (1999). In light of the diverse interests among the litigants of 1657, each differently situated group of plaintiffs should have had separate representation to negotiate their own unique interests./*[1]

Merck takes the position that the settlement agreement is a private agreement between two parties, the NPC and Merck./*[2] The routine orders appointing a plaintiffs liaison committee are simply a fact MDL life and a necessary tool to enable the District Court to manage the litigation. The Fifth Circuit described counsel's role as:

---

[1]*/ Indeed in its decision on class certification this Court concluded notwithstanding the Herculean efforts of the PSC the adequacy of representation requirement of rule 23 could not be met because in the absence of typical claims, the class representatives have no incentive to pursue the claims of other class members. It is respectfully submitted that the fact that a settlement did not change matters and to the contrary, required a heightened judicial scrutiny to make certain that all members of the class received structural protections that rule 23 is aimed at.

[2]*/Merck has taken this position several times in this litigation. *See, e.g.,* direct opposition to certain Florida claimants to be included in the Vioxx Master Settlement Agreement memorandum filed February 15, 2008,p.4; Merck

-5-

> To a degree, lead attorneys become officers of the court. By making manageable litigation that otherwise would run out of control they serve interests of the court, the litigants, the other counsel, and the bar, and of the public at large, who are entitled to their chance at access to unimpacted courts.

In re Air Crash Disaster at Florida Everglades on December 29, 1972, 549 F. 2d 1006, 1017 (5th Cir 1977) [footnote omitted]. As such the role of liaison or lead counsel does not in any respect include the ability to bind the litigants in an MDL to any settlement such counsel may believe feasible, fair, desirable, or otherwise beneficial without first being certified as class counsel on behalf of such litigants. Under current rules there simply is no procedure besides Rule 23 to permit counsel to enter into binding settlement agreements with another party on behalf of the class as wide and sprawling as the one before this Court.

The Supreme Court made this clear in Amchem when it stated:

> The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments--checks shorn of utility--in the settlement class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind--class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

*Id.*, 521 U.S. at 621, 117 S. Ct. at 2248. The Court went on to note that a fairness inquiry on the Rule 23 (e) is no substitute since:

> [T]he court would face a bargain proffered for its approval without benefit of adversarial investigation, see, e.g., *Kamilewicz v. Bank of Boston Corp., 100 F.3d 1348, 1352 (CA7 1996)* (Easterbrook, J., dissenting from denial of rehearing en banc) (parties "may even put one over on the court, in a staged performance"), cert. denied, 520 U.S. [1204] (1997).

*Id.*, 521 U.S. at 621, 117 S. Ct. at 2249.

It is respectfully submitted this Court should not reach the contractual principles that are implicated when parties to an agreement subsequently have a dispute about same since the

instant motion raises the threshold issue as to whether or not there was any authority by the PSC or NPC to enter into such agreement in the first instance without first being appointed class counsel. Currently there is no other authority for a district court to clothe counsel with such authority regardless of whether or not the MSA is binding on all litigants, without adhering to the prerequisites of Rule 23.

Plaintiffs submit that in light of the same permitting the MSA to go forward abrogates the separation of powers, and a further denies them due process and right to trial by jury by having their claims extinguished without benefit of an adversarial process. Since Congress has elected not to amend rule 23 or permit judicial approval of settlements of this size without adhering to the prerequisites of rule 23, the MSA should be vacated without prejudice to approval being sought within parameters permissible to the judiciary under current law.

### III.

#### Plaintiffs Respectfully Submit Two Alternative Means for Showing of Some Evidence That Their Ingestion of Vioxx Caused Them Personal Injury That They Ask This Court to Accept As Meeting the Requirements of Its May 30, 2008 Decision and Order.

In its May 30, 2008 Decision and Order, this Court made clear that it was requiring a showing of specific causation evidence that plaintiffs ingestion of Vioxx caused them personal injury. *Order, at p. 5*. Plaintiff respectfully submits the two alternative means of making such showing proposed herein meet the Court's requirement.

The first alternative plaintiffs respectfully suggest is an attorney affirmation that the plaintiff has an expert that will opine plaintiffs injury was in fact causally related to Vioxx should

meet this test without having the plaintiff incur the expense associated with having the expert prepare an affirmation that will have to be duplicated at least in part at a later time when amplified to meet the Daubert challenge that will undoubtedly come. This would be similar in nature to a Certificate of Merit which a plaintiff in New York state court is required by statute to file in conjunction with a medical malpractice action. The defendant would not be prejudiced given the Court's clarification of the limited purpose of the PTO No. 28 requirement in this regard, and Rule 11 would provide an adequate remedy to the defendant for any costs incurred should the attorney's certificate or affirmation of on the merits of specific causation prove to be baseless or otherwise amenable to invoking the sanctions provided by the rule.

Plaintiffs second alternative is to satisfy PTO 28 by submission of a single affirmation opining a causal relationship between ingestion of Vioxx and injury involving those injuries not yet subject to *Daubert* hearings, e.g. transient ischemic attacks. The only additional evidence that would be necessary is proof of the injury itself which plaintiffs could provide by submission of the medical records. This would satisfy the Court's requirement without subjecting plaintiffs to duplicative litigation expenses. Of equal, if not greater importance, this alternative would deprive the defendant of the fodder a short version affirmation that also opined regarding specific causation would provide for purposes of cross-examination at trial. For example: Q: "Doctor, Isn't it a fact you have previously opined Vioxx caused the plaintiff's injury without carrying out a differential diagnosis ruling out other potential causes of the plaintiff's injury, such as pre-existing cardiac disease, family history of cardiac disease, smoking, obesity, *etc.*?"

Thus, the relief from PTO 28 may be considered injunctive, at least in part. This is especially so with regard to precluding Merck from bringing either *Daubert* challenges or

otherwise moving to preclude any expert based on an affirmation provided pursuant to this Court's May 30, 2008 Decision and Order. It follows that plaintiffs must show (1) that there is a substantial likelihood of success on the merits; (2) there is a substantial threat of irreparable injury if the relief is not granted; (3) threatened injury to the plaintiff outweighs the threatened injury to the defendant; (4) granting the relief will not serve the public interest. Sierra Club Lone Star Chapter v FDIC, 992 F. 2d 545, 551 (5th Cir. 1993). Plaintiffs can satisfy this test because the court has made clear its latest modification of PTO 28 is designed to "strike a balance between efficiency and equity." *Order dated May 30, 2008, at p. 4.*

In the event the Court adheres to the present requirement it is respectfully submitted that, at minimum defendant should be precluded from using any affirmation submitted if that same expert testifies at trial, as well as precluding defendants from making either Daubert or other challenge to the reliability of the affirmation.

In seeking an extension of time to make whatever submissions the court ultimately will require from plaintiffs, it is only necessary to begin with the observation:

> Concentration of individual damage suits in one forum can lead to formidable problems, but the realities of litigation should not be overlooked in theoretical musings. Most tort cases settle, and the preliminary maneuverings in litigation today are designed as much, if not more, for settlement purposes than for trial.

In re School Asbestos Litig., 789 F.2d 996, 1009 (3d Cir.), cert. denied sub nom. *Celotex Corp. v. School Dist. of Lancaster, 479 U.S. 852, 93 L. Ed. 2d 117, 107 S. Ct. 182,* and *National Gypsum Co. v. School Dist. of Lancaster, 479 U.S. 915, 93 L. Ed. 2d 291, 107 S. Ct. 318 (1986).* The mere fact that plaintiffs have rejected the MSA should not in any respect diminish the logic of the Third Circuit's observation that the ultimate goal of all plaintiffs is to achieve a settlement and

only proceed to trial if there is no meeting of the minds at some point in the litigation. It follows as a matter of logic that while plaintiffs are prepared to demonstrate a causal relationship between ingestion of Vioxx and the individual injuries, an extension of time to do so until September 30, 2008 is not unreasonable in view of the posture of this litigation and the relief requested in the instant motion.

Plaintiff David Agard submits an affidavit addressing the issues, and he is in a posture that is similar to many of the plaintiffs who have either rejected the MSA or have injuries that have been declared ineligible. Although he initiated suit in 2004, as a practical matter the case has been frozen since being transferred to this Court December 6, 2004 not only because of the current stay at and precluding individual counsel from conducting discovery, but because up until November 9, 2007, individual counsel harbored the belief that proof regarding injuries now declared to be ineligible was in fact being developed by the Plaintiff's Steering Committee ("PSC").

Indeed, the motion brought by the Oldfather firm which triggered this Court's May 30, 2008 decision adhered to the position that it was the responsibility of the PSC to develop such proof and that not only the Oldfather firm, but many other individual counsel, did not develop the type of proof now required for non-eligible injuries under the MSA for the same reason.

Plaintiffs here submit there is no point in debating what the scope of the PSC responsibility is and what should have been done, since it is clear individual counsel are now responsible for developing the proof PTO 28 requires for injuries the PSC has elected not to pursue, including those which are now deemed ineligible under the MSA. The above factor would almost compel the conclusion that an additional 90 days to present such proof is not

unreasonable in light of the above circumstances. Moreover, there is one additional factor that should be considered in extending the time to provide the suggested expert disclosures that this Court may ultimately require under the alternatives herein as to compliance with the letter and spirit of PTO 28.

In this Court's May 30, 2008 decision it observed that the PSC has established a depository for discovery materials which have been made available to plaintiffs counsel in individual cases. Even if the Court's observation is accurate, reviewing more than 22 million pages of documents, aside from the depositions taken today, is a daunting task, and an extension of an additional 90 days in light of this factor alone is not unreasonable. This discovery is not now accessible to plaintiffs' counsel in the absence of executing a binding contract that consents to the PSC receiving 8% of any gross monetary recovery in each individual case pending before this Court.

PTO 37 on its face governs not only the trial package prepared by the PSC but also "access to and review documents produced by Merck and other third-parties". *See* PTO No. 37, Request form, at p. 5. It requires that individual counsel execute the Request form attached to PTO No. 37, which in turn requires counsel to agree to, *inter alia*, the 8% assessment as set forth in PTO No. 37 which would necessarily be construed as a contractual arrangement separate from any order of the Court. Undersigned counsel submits that this creates a "reverse free-rider" problem, particularly since the PSC has made clear it is not pursuing injuries that are noneligible under the MSA. This issue is discussed more fully below in the motion seeking relief from PTO 37.

-11-

## IV.

### The Court Should Vacate the Stay Imposed in PTO 28 and Require the Parties to Enter into Scheduling Orders for Completion All Discovery and Motion Practice So the Cases May Be Remanded to the Transferor Courts for Trial.

It would appear the statement required by PTO 28 was to enable the Court to determine the extent to which participation in the MSA was going to take place that seems to have been accomplished at this time. The PSC has utilized the fact that a statement has been implemented as a selling point to convince individual counsel to participate in the MSA stating that in the absence of the same cases would not be resolved for a "longtime". Since the initial purpose of this day has been accomplished, the Court cannot only dispel any notions that failure to participate in the MSA will result in the cases being unduly prolonged and MDL 1657, but also accomplished the purpose of transfer in the first instance, namely to ready the cases for trial and reman them to the transfer records.

Plaintiffs submit that any indefinite stay amounts to self-transfer and would be barred by the Supreme Court's decision in Lexecon, Inc., v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S. Ct. 956 (1998). Accordingly, it is respectfully submitted that the stay should be vacated and scheduling orders entered into for those plaintiffs who elected not accept the terms of the MSA.

Plaintiffs now turn to their argument seeking to modify or vacate the conditional requirement in PTO No. 37 (Terms of Access to the PSC Trial Package) that individual counsel sign over 8% attorney's fees to the PSC.

## V.

### Since the PSC Was Acting on Behalf of All Litigants in Carrying Out Discovery Any Materials Obtained Did Not Become the Property of the PSC and Should Be Accessible To All Individual Counsel Without Being Compelled to Execute Contracts Assigning 8% of Any Attorneys Fees to the PSC , and PTO 37 Should Be Modified to Permit the Same.

At the outset it is only necessary to begin by acknowledging that the PSC is going to be entitled to counsel fees for services performed an MDL 1657, but that the both the amount of such fees and methodology employed for awarding fees are issues that are not yet ripe. Thus, while it is not unreasonable to withhold and award 8% of any recovery in this litigation, that does not mean the PSC will be entitled to this amount at the end of the day. PTO No. 37 establishes an entirely separate basis for the PSC entitlement to 8% of the "gross monetary recovery"/*[3] by requiring individual plaintiffs' counsel to execute a contract agreeing to pay said 8% in return for access to discovery materials generated in the course of the litigation./*[4]

Undersigned counsel submits he cannot be compelled to execute such an agreement simply to secure access to materials that would otherwise be provided in the normal course of a product liability claim such as at bar. It is well settled the PSC acts as a proxy for individual counsel in connection with the conduct of multi-district litigation. In fulfilling the discovery portion of their responsibilities to PSC did not acquire a proprietary interest in materials that would ordinarily be exchanged between plaintiffs and defendants in the course of products

---

[3]*/Since the percentage is on the gross recovery, the PSC fee under the contract amounts to approximately 25% share of the fee earned on a one-third contingent retainer.

[4] The issue of whether or not such contract can be required for the trial package prepared by the PSC is not before the court since the trial package is not being sought.

liability actions such as the instant one. Indeed, even if one could argue there was such an interest, it is adequately protected by this Court's ultimate determination as to an award of fees to compensate the PSC for their services. As such, there is no basis to exact separate contractual agreement from individual counsel to pay 8% of the "gross monetary recovery" to the PSC simply to gain access to discovery such counsel could have obtained in the ordinary course.

It is also now clear the PSC has abandoned efforts to develop proof on claims that have been declared noneligible in the MSA. It would be a gross injustice to permit the PSC to exact 8% of the "gross monetary recovery" obtained in prosecuting these claims. This is true even if one acknowledges a public service component to the PSC's labors since even in cases involving civil rights attorneys fees may not be awarded to counsel who has not prevailed in the litigation. Hensley v Eckerhart, 461 US 424, 435–37 (1983).

The need for access to the discovery materials generated in MDL 1657 is only obvious for those plaintiffs who continue to prosecute the claims. (Indeed, lack of access is part of the reason plaintiffs seek an extension of time to comply with the disclosure requirements in PTO 28.) In light of the same, this Court should modify PTO 37 to permit individual counsel free access to all discovery materials without having to execute a contract that binds them to agreeing to pay over 8% of "gross monetary recovery."

## **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully ask that this Court grant their motions for the court's resignation as chief administrator of the Master Settlement Agreement, to vacate the master settlement agreement, to modify and grant an extension of time as to PTO No. 28 and to vacate PTO No. 37, and grant other relief requested by plaintiffs.

Respectfully submitted,

*/s/ Ronald R. Benjamin*

RONALD R. BENJAMIN Fed. No. 110131
LAW OFFICE OF RONALD R. BENJAMIN
126 Riverside Drive, P O. Box 607
Binghamton, New York 13902-0607
607/772-1442

Attorneys for Individual Plaintiffs
        in Above-Captioned Actions