UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  VIOXX | * | MDL Docket No.: 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| | * | |
| * * * * * * * * * * * * * * | | |
| THIS DOCUMENT RELATES TO | : | *David Agard v. Merck & Co., et al.*<br>Case No.: 2:05-cv-01089-EEF-DEK |

### AFFIDAVIT OF PLAINTIFF IN SUPPORT OF HIS MOTION TO DECLARE THE MASTER SETTLEMENT AGREEMENT NULL, VOID AND UNENFORCEABLE OR MODIFY THE SAME, TO VACATE THE INJURY DEFINITIONS IN PTO 28, AND TO MODIFY THE EXPERT OPINION PROOF REQUIRED

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF BROOME       )

DAVID L. AGARD, being duly sworn on oath according to law, deposes and says:

1. I am the plaintiff in the above individual action and make this affirmation in support of the instant motion seeking an order of this Court to:

   (1) declare null, void and unenforceable, or to modify, the Master Settlement Agreement ("MSA") that was entered into between certain attorneys and defendant Merck & Co., Inc., on November 9, 2007;

   (2) to vacate the injury definitions set forth in PTO 28; and

   (3) to modify the proof required on injury to permit either an affirmation from

counsel attesting that expert opinion proof is available linking the injury to ingestion of Vioxx, or permitting a single affirmation from an expert opining there is a causal relationship between a particular injury and ingestion of Vioxx in lieu of requiring expert affirmations for each individual plaintiff as a threshold to avoid dismissal of a claim.

2. I am further moving to have this Court resign from the position of Chief Administrator under the MSA in light of actual and potential conflicts between the duties of that position and the Court's position as presiding judge over the instant multi-district litigation.

3. I am further moving to have this Court vacate the stay presently in force to permit my case to proceed to trial in some timely manner since I am advised by my attorney that the only reason the case is not going to trial is because Merck currently does not have to engage in the normal discovery process that will allow information to be exchanged and the case presented to a jury. I submit this is especially significant since I am informed the attorneys who were responsible for negotiating the MSA have been traveling throughout the country advising that anyone who did not agree to accept the settlement would be in court for " a long time."

4. I am 67 years old and ingested Vioxx from April of 2000 to October of 2000, and subsequently from May of 2001 until August or September of 2002.

5. I sustained a stroke November 4, 2002 and subsequently sustained transient ischemic attacks on November 23, 2002 and January 25, 2005.

6. I commenced an action in New York State Supreme Court on or about November 8, 2004, and approximately one month later, Merck removed the action to the United States District Court for the Southern District of New York and it was subsequently transferred to this Court where it is currently pending.

7. I turn first to the relief sought with regard to the MSA.

8. I respectfully submit I have proceeded diligently in this regard and that I was advised since the MSA was either incorporated in part into this Court Pre-Trial Order ("PTO") 28, or in the alternative that PTO 28 demonstrated this Court placed its imprimatur on the MSA, an appeal could be taken from that Order.

9. I, together with certain other plaintiffs, thereafter did appeal PTO 28 and that appeal was dismissed by the Fifth Circuit for lack of jurisdiction.

10. I am advised myself and many other plaintiffs in this litigation would be entitled to the relief sought because the attorneys who entered into the agreement with Merck did not have authority to negotiate on behalf of all litigants in MDL 1657 without first securing approval from this Court to proceed as a class and then negotiate on behalf of a class.

11. I am further advised that such approval was in fact sought and this Court refused to certify a class in a decision and order in November 2006.

12. Since it is clear negotiations proceeded despite this Court's ruling a class could not be certified, I am further advised that some time prior to the consummation of the MSA, or, at minimum, subsequent to the agreement, express approval should have been sought from this Court to ensure all plaintiffs subject to the agreement had their interest adequately protected.

13. I am further advised the Court's role in approving an agreement involving thousands of diverse claims would have necessitated an inquiry into the merits of not only individual claims, such as people who sustained injuries such as transient ischemic attacks, but also the additional factors set forth in this Court's November 2006 decision denying class certification, but that this inquiry did not occur, and, nonetheless, the MSA entered into by the parties excluded compensation for injuries such as the transient ischemic attacks I sustained. I am

further advised that had the proper procedures been followed the Court would have been presented with proof that the transient ischemic attacks I sustained, while different from heart attacks, were also caused by ingestion of Vioxx and that as such, compensable under the tort law of the State of New York.

14. Upon information and belief, no evidence was ever presented to this Court in an adversarial posture that addressed the causal relationship between ingestion of Vioxx and onset of transient ischemic attacks, yet this injury is not only excluded from compensation by the MSA, but by the definitional section set forth in PTO 28 (see Section "III: Definitions").

15. I am advised that my attorney was not permitted to engage in individual discovery after this case was transferred to this Court and that the court-appointed attorneys are supposed to act in a representative capacity for purposes of prosecuting the individual claims coodinated in MDL 1657, at least through the discovery process, after which the cases will be remanded to the transferor courts for trial.

16. I am further advised by my attorney that he was unaware of the negotiations leading up to the MSA, and that when presented with the same as a *fait accompli*, he first learned that claims such as the transient ischemic attacks I sustained were being denied compensation.

17. Since I have an expert witness who holds the opinion that my injuries were closely related to my ingestion of Vioxx, in the first instance, I submit that if the attorneys this Court appointed to represent my interests in fact represented my interests there would have been no provision in the MSA that transient ischemic attacks are not compensable injuries.

18. I understand that the attorneys who were appointed to act in a representative capacity were not necessarily concerned with individual cases, but with generic issues, which in my case means they had to have addressed the scientific issues implicated in determining whether or not

there was a causal relationship between ingestion of Vioxx and onset of transient ischemic attacks. They obviously failed to do so.

19. I am advised that when dealing with as many litigants as have cases pending in MDL 1657, it is highly likely there will be many diverse types of claims and that to the extent they differ, a single attorney, or group of attorneys for that matter, should not be permitted to act on behalf of each such diverse claimant, but that separate attorneys should be appointed for people with different injuries, which are often characterized as subclasses within the entire class of litigants.

20. If proper procedures had been followed I am advised there would have been subclasses necessarily created and that those subclasses would have had their own individual counsel who would have the responsibility for prosecuting claims such as the transient ischemic attack I sustained.

21. Since there is no doubt regarding the viability in the tort system of claims such as the transient ischemic attacks I sustained, at least under New York law, I respectfully submit there is no lawful basis for excluding such claims under the MSA and more importantly perhaps, under PTO 28.

22. Although I am a layperson, I fully understand that in the process of coming to agreements, negotiations take place in which concessions are made, and can state I have participated in such negotiations many different times in my life in many different contexts ranging from negotiating major union contracts between performing arts organizations and musicians to negotiating the value of my services as a symphony conductor.

23. I have had an opportunity to review the MSA and note that among the items included are hundreds of millions of dollars to be paid to certain attorneys, including those who

negotiated the agreement.

24. I am also advised that the "American rule" is that under ordinary circumstances each side pays its own attorneys fees, though my attorney advises me that in litigation such as this there are additional provisions for compensating attorneys appointed by the Court to act in a representative capacity on behalf of all litigants as a means of permitting the Court to manage litigation of this size.

25. Since the Court clearly has authority to award compensation to the attorneys acting in a representative capacity, I question why such huge attorneys fees were part of the negotiation process that led to the MSA, and more importantly, what Merck received in return for agreeing to pay such humongous attorneys fees.

26. Indeed, it would appear the only thing these representative attorneys had to bargain away were claims such as mine, as well as perhaps other claimants who had injuries that were also excluded under the MSA, e.g., claims alleging injury such as deep vein thrombosis and pulmonary embolism.

27. I am further advised that both Merck and these representative attorneys are going to assert that this is a private agreement and that, since I am not bound by it, I have no right to challenge the same, and I submit that the Court should unequivocally reject this position in the first instance because it is highly likely that claims such as mine were used as part of the bargain that enabled these representative attorneys to secure an agreement from Merck to pay huge attorneys fees as noted above.

28. This argument should also be rejected because the only way this agreement was reached was by bypassing class action procedure under Rule 23 of the Federal Rules of Civil Procedure which I am advised was promulgated precisely for the purpose of protecting claimants

such as myself who sustained individual injuries, yet become involuntarily brought into an MDL because of the number of cases pending against the tortfeasor.

29. I now want to discuss my individual injuries, since it is apparent to me that a decision was made somewhere that my injury was somehow too minimal to warrant compensation.

30. I am a professional violinist and symphony conductor and on November 4, 2002, I sustained my initial stroke while sleeping. This diagnosis was confirmed by both a CT scan and an MRI, both done in the days following the stroke.

31. It was only a matter of weeks when I sustained the subsequent transient ischemic attack on November 23, 2002 while playing the violin during a concert. I was able to have my wife drive me to an emergency room where I was diagnosed, treated and kept overnight for observation. The following morning I was seen by Dr. Friedel who stated that, since I had recently suffered a stroke, the pressure of professional performance was a factor in triggering the transient ischemic attack. He further stated that I should seriously consider giving up professional performance immediately.

32. I consider myself fortunate in that the only permanent physical injury I have sustained from the initial stroke is peripheral vision loss.

33. I have spent my entire life performing music and that career came to an abrupt end when I was advised repeatedly, by several different healthcare professionals, that if I continued to perform professionally that I was a candidate for experiencing similar and perhaps fatal events, either onstage or elsewhere.

34. As a consequence of this advise I felt compelled to immediately discontinue my professional career and could not avail myself of numerous conducting opportunities as well as

appearances playing as a professional violinist.

35. This was a sudden termination of my career which had both significant financial and mental components which continue to cause me hardship and considerable distress to this day. I deeply miss performing and have lost income, which I would estimate could be not less than $300,000.00 to date.

36. In addition, I wish to state that my wife was also a professional violinist and for more than 48 years we traveled the country together performing in countless concerts (she also played in all of the concerts that I conducted). We both have sold our violins and are no longer able to share this unique and fulfilling experience. My daughter continues to perform professionally as a violinist. However, we are no longer able to share those very special experiences with her as we did in the past.

37. Although I am cognizant of the fact that there are many stroke victims who have far worse limitations than I, that in no way diminishes the devastating and permanent impact my injuries have had on my life as well as the lives of my wife and my daughter.

38. I cannot express the extent to which I am deeply offended by the fact that what I had hitherto believed was a civil justice system available to all citizens who sustained injury, is able to exclude claims such as I have sustained here without ever being afforded the opportunity to present the same to a jury of my peers.

39. I now want to turn to the quantum of proof required by PTO 28 in order for me to avoid a dismissal with prejudice and the reasons the same should be modified.

40. It is my understanding that PTO 28 is designed to cull out claims that have no merit, and while my attorney has advised me that in litigation of this size there are often claims brought by individuals who are unable to present proof that their ingestion of Vioxx is related to the

injury they sustained.

41. I respectfully submit this should not include cases where experts are ready, willing and able to provide opinions attesting to the causal relationship between ingestion and injury, and the only reason such disclosure has not gone forward is because individual cases such as mine have been placed on virtual hold pending resolution of issues that are considered generic in nature, as well as the stay imposed in this particular litigation.

42. I have had discussions with my counsel regarding the requirements PTO 28 imposes, as well as an explanation of the Court's need to ferret out cases that do not have merit and submit the proposal below achieves both goals without subjecting plaintiffs such as myself to duplicative costs associated with compliance.

43. My attorney advises me that he is in a position to affirm we have an expert available to opine that the injuries I have sustained were caused by my ingestion of Vioxx and it is respectfully submitted an attorney affirmation satisfies the Court's concern with ferreting out meritless claims since no affirmation could be made in the absence of the availability of such evidence.

44. This would avoid having to incur the expense of paying an expert to provide what I understand to be an opinion that is not going to be the final opinion provided, and that as such, would involve me having to incur duplicative expense of paying an expert to go over the same issues that will have to be addressed at a later time when full disclosure is made regarding opinions addressing ingestion of Vioxx and onset of injuries such as those I have sustained.

45. In the alternative, I am also advised that to the extent there is a contention particular injuries such as, e.g. transient ischemic attacks, are not causally related to ingestion of Vioxx, that a single affirmation from a qualified expert should suffice, leaving only the factual issues as

to whether or not there is proof of ingestion and onset of the actual injury claimed, none of which involves the need to expend funds and resources on having an expert present affirmations repeatedly with regard to individual cases.

46. I believe this strikes a reasonable balance between the interests the Court has in culling out meritless cases and the interests plaintiffs have in being able to proceed to trial without having their litigation expenses increased, in that the latter only serves to benefit Merck.

47. I would note that I have recently received a proposed affirmation from another plaintiff attorney, Ms. Oldfather, which represents an effort to comply with PTO 28. (I am annexing the same as **Exhibit A**).

48. Ms. Oldfather has apparently obtained a physician who is willing to do a cursory review of medical records and provide a qualified report for $500.00 for those cases that are deemed to be meritorious, i.e., cases in which ingestion can be linked to injuries.

49. It is truly difficult to see how this would carry any more weight than an attorney affirmation representing that he/she has an expert who will opine there is a causal relationship between the ingestion of Vioxx and onset of injury for the individual plaintiff.

50. Indeed, such an affirmation is likely to do nothing but generate yet additional litigation and expense and I have been advised any affirmation along the lines of Exhibit A is going to trigger a Merck motion to exclude the same based on lack of reliability, or as being otherwise inadmissible.

51. In view of the same, in the event the Court does adhere to the current requirements, there should be some additional provision that precludes Merck from moving to exclude the opinions provided, or otherwise avoid motion practice based on those limited opinions and permit the cases to proceed on the merits.

52. Although I am not directly impacted by the requirement in the MSA that an attorney withdraw from representing any plaintiff who does not agree to accept the settlement I believe it is relevant to the relief I am seeking here in that it should be considered clear and convincing evidence that Merck has been able to exact concessions that can only be explained by the huge attorney's fees they agreed to pay in return for not only excluding claims such as mine, but literally excluding the ability of any other plaintiff who refuses to participate in the settlement to prosecute his or her claim.

53. I am advised that wholly aside from ethical issues, an attorney withdrawing from representing a plaintiff in litigation as complex as this is repugnant to due process of law and simple commonsense notions of fair play and that it amounts to those plaintiffs being unable to go forward with litigation and having their cases dismissed for one reason or another.

54. I now turn to this Court's current dual positions as the Judge presiding over this litigation and the Chief Administrator of the MSA.

55. I am advised that in the latter position this Court is duty bound to uphold the provisions of the MSA.

56. As a layperson, I can see there are serious conflicts beginning with the one in which we contend the agreement should be set aside in the first instance, and the Court having to uphold the provisions of the agreement as Chief Administrator.

57. The same conflict I believe also exists with regard to claims such as mine which I believe are viable in the tort system but have been excluded for compensation under the MSA.

58. In view of the above, I respectfully submit that plaintiffs such as myself should be able to have full confidence in any rulings issued by the Court in its position as presiding Judge of this litigation and that the same would be lacking so long as the Court serves in the dual

capacity of MDL Judge and Chief Administrator of a "private" agreement.

59. The last issue I want to address is perhaps the most important issue to me, and that is being able to proceed to trial.

60. I understand the volume of cases before the Court necessarily requires departure from the ordinary schedule under which cases would proceed to trial. In New York, our courts are required to adjudicate cases within 15 months and in complex cases within 18 months.

61. I believe that the years that have passed since I initiated suit have been sufficient accommodation to the other cases presently pending before the Court and that no useful purpose would be served in delaying my case any further.

62. In view of the representations described above by the attorneys who participated in negotiating a settlement in the first place, namely, that if I did not agree to participate in the settlement my case would remain pending for a "long time," a scheduling order should issue to dispel any notions that absent agreeing to the settlement, the case will never see the light of day.

63. Since I am fully available for deposition and have signed numerous authorizations to enable Merck to obtain whatever records it deems appropriate, your affiant respectfully submits there should be no reason why a scheduling order cannot be issued, establishing a date to complete discovery and motion practice and then have the case returned to the transferor court for trial.

_____
DAVID AGARD, Plaintiff

SUBSCRIBED AND SWORN TO before me
this 25th day of June, 2008.

_____
Notary Public/State of New York

DIANE E. WALTER
Notary Public in the State of New York
Qualified in Broome County
No. 01WA6088956
My Commission Expires March 17, 2011