respectively) in the Federal Multidistrict Litigation; (2) the October 22, 2003 and March 28, 2005 Orders governing fact sheets in the New Jersey Coordinated Proceeding; (3) Case Management Order No. 4 (dated June 12, 2003), Amended Case Management Order No. 4 (dated September 29, 2005), and Order re: June 28, 2007 Hearing (dated September 5, 2007) in the California Coordinated Proceeding; and (4) Case Management Order No. 2 (dated October 19, 2005) and Pre-Trial Order No. 3 (dated November 28, 2005) in the Texas Multidistrict Litigation, (ii) a written request for information that a Person who is a party to a Tolling Agreement must complete pursuant to the Federal Multidistrict Litigation Tolling Agreement dated June 1, 2005 and attached thereto as Exhibit A, (iii) bills of particulars, answers to interrogatories or plaintiff fact sheets and (iv) any amendments or supplements or responses to deficiency letters or notices with respect to the items specified in the foregoing clauses (i) through (iii).

17.1.72.   "Program Claim" means all materials submitted by or on behalf of a Person (and/or his counsel) to attempt to enroll in, or to receive payments under, the Program, including any Claims Package submitted by or on behalf of such Person.

17.1.73.   "Program Claimant" means a Person who (as a purported "Eligible Claimant") has submitted an Enrollment Form (or on whose behalf an Enrollment Form has been submitted) to the Claims Administrator on or prior to the Enrollment Deadline Date.  For the avoidance of doubt, a Counsel to a Person is not (in such capacity) a "Program Claimant".

17.1.74.   "Registered Eligible Claimant" means an Eligible Claimant for whom data is provided in a properly completed, and submitted, Registration Affidavit.

17.1.75.   "Registration Affidavit" has the meaning ascribed to such term in the form of Registration Order attached hereto as Exhibit 1.1.

17.1.76.   "Related Eligible Event" means, in relation to any particular Program Claimant, the alleged Eligible Event referred to in Section 17.1.22.3, as specified in the Registration Affidavit submitted (or, if no such Registration Affidavit is submitted, in the Enrollment Form submitted) in relation to such Program Claimant (which specification shall be irrevocable for purposes of this Agreement).  It is understood and agreed that, subject only to Section 3.5, if such Program Claimant's Product User alleges to have suffered both an MI and an IS, and/or multiple MIs and/or multiple ISs, such Program Claimant nonetheless will be required to specify (as set forth in the preceding sentence) a single MI or IS to be the exclusive basis of such Program Claimant's Program Claim.

17.1.77.   "Released Claims and Liabilities" has the meaning ascribed to such term in the Release.

17.1.78.   "Released Parties" has the meaning ascribed to such term in the Release.

17.1.79.   "Remaining Administrative Expenses Estimate" means, at any date of computation, the sum (without duplication) of (i) all Administrative Expenses anticipated to become payable at any time thereafter, (ii) a reasonable reserve to provide for

62

unanticipated and/or contingent Administrative Expenses and (iii) to the extent that Merck is required pursuant to any Administrative Agreement, or determines in its discretion, to purchase liability insurance covering any Administrator, the anticipated aggregate cost thereof, all as determined and/or estimated in good faith by Merck.

17.1.80.   "SCD" means an instantaneous or near-instantaneous unexplained death that occurs without warning or within one hour of non-diagnostic symptoms, or an unexpected sudden death in which criteria for a fatal coronary, cerebrovascular event or other cause or event are not met.

17.1.81.   "Settlement Funds" means the MI Settlement Fund and the IS Settlement Fund.

17.1.82.   "Settlement Payment" means any MI Settlement Payment or IS Settlement Payment.

17.1.83.   "Special Master" means the Person or Persons from time to time appointed by the Chief Administrator based on a joint recommendation of Merck, on the one hand, and a majority in number of the NPC, on the other hand, to fulfill the functions of the "Special Master" under this Agreement (so long as such Person or Persons continues to serve in such capacity). If, at any time, two or more Persons constitute the "Special Master", then any determination of the Special Master shall be made by a majority of such Persons.

17.1.84.   "Special Review Marker" means (i) in the case of an MI Qualifying Program Claimant, 10 Points, and (ii) in the case of an IS Qualifying Program Claimant, 2 Points.

17.1.85.   "Supplementary Claims Form" means a claim form in the form determined, in accordance with Section 6.2, by the Claims Administrator.

17.1.86.   "Third Party Provider/Payor" means any provider or payor (public or private) of (i) health, hospital, medical, physician, healthcare and/or pharmaceutical services, products or expenses and/or (ii) any other form of compensation, including federal and state Governmental Authorities (or other Persons) providing Medicare and/or Medicaid services or benefits.

17.1.87.   "Tolling Agreement" means the specific agreement referenced in the Notice of Filing of Tolling Agreement which was filed in the MDL Court on June 9, 2005 and amended pursuant to the Notice of Amendment to Tolling Agreement filed in the MDL Court on March 7, 2007.

17.1.88.   "Tolling Agreement Party" means a Person who (i) as of the Execution Date was (directly or through counsel) a party to a Tolling Agreement with Merck or (ii) prior to the Execution Date was (directly or through counsel) a party to a Tolling Agreement with Merck which Tolling Agreement was terminated by Merck, and (in each case and for the avoidance of doubt) is not a party to any lawsuit pending (in any court of the United States) against Merck Connected With VIOXX.

63

17.1.89.   "<u>VIOXX</u>" or "<u>Vioxx</u>" means VIOXX (sometimes referred to as "rofecoxib").

17.1.90.   "<u>Walk Away Enrollment Deadline Date</u>" means March 1, 2008, <u>provided</u> that Merck may, from time to time prior to, on, or after, the Walk Away Enrollment Deadline Date then in effect and in its sole and absolute discretion, extend the Walk Away Enrollment Deadline Date to a date not later than June 30, 2008.

Section 17.2.   <u>Cross-Reference of Other Definitions</u>.

Each capitalized term listed below is defined in the corresponding Section of this Agreement:

## INDEX OF TERMS

<u>Section</u>

Additional Claim Information ................................................................................................. 1.4.1
Administrative Expenses Payables ........................................................................................ 5.1.6.2
Award Information ................................................................................................................. 15.1
Claims Valuation Process ...................................................................................................... 3.1
Completed .............................................................................................................................. 3.2.1.2
Coordinated Proceedings ...................................................................................................... Recitals
Documented ........................................................................................................................... 4.2.6.2
dollars .................................................................................................................................... 16.8
Double QPC ........................................................................................................................... 3.5.4
EI Payments ........................................................................................................................... 4.2.1
Eligibility Requirements ....................................................................................................... 2.2.1
Escrow Funds Report ............................................................................................................ 5.1.5
Estimated Aggregate IS Special Marker QPCs .................................................................... 4.1.2
Estimated Aggregate MI Special Marker QPCs ................................................................... 4.1.1
Estimated IS Non-Special Marker QPC Total Points .......................................................... 4.1.2
Estimated MI Non-Special Marker QPC Total Points ......................................................... 4.1.1
Execution Date ................................................................................................... Introduction
Final ....................................................................................................................................... 3.3.5
Final Settlement Payments .................................................................................................... 4.3.3
Fixed Payment ....................................................................................................................... 3.3.2
Funding Amount .................................................................................................................... 5.3.4
Funding Payments ................................................................................................................. 5.1
Future Evidence Stipulation .................................................................................................. 2.7.3
Gate Committee ..................................................................................................................... 2.4.1
IS EI Payments ...................................................................................................................... 4.2.1
IS EI Payments Cap Amount ................................................................................................ 4.2.3
IS Final Settlement Payment ................................................................................................. 4.3.2
IS Fixed Payment .................................................................................................................. 3.3.2
IS Initial Settlement Payments Commencement Date ........................................................... 4.1.2
IS Interim Payments Cap. ..................................................................................................... 4.1.2.2
IS Interim Settlement Payments ............................................................................................ 4.1.2.1

IS QPC Payables ................................................................................................................... 5.1.6.4
IS Special Review QPC ........................................................................................................ 3.4.1
MDL Court ............................................................................................................................ Preamble
Merck ..................................................................................................................................... Introduction
MI EI Payments .................................................................................................................... 4.2.1
MI EI Payments Cap Amount ............................................................................................. 4.2.2
MI Final Settlement Payment .............................................................................................. 4.3.1
MI Fixed Payment ................................................................................................................ 3.3.2
MI Initial Settlement Payments Commencement Date ...................................................... 4.1.1
MI Interim Payments Cap .................................................................................................... 4.1.1.2
MI Interim Settlement Payments ........................................................................................ 4.1.1.1
MI QPC Payables ................................................................................................................. 5.1.6.3
MI Special Review QPC ...................................................................................................... 3.4.1
Multiple Draw Drawing ....................................................................................................... 5.3.2
Non-Extension Drawing ...................................................................................................... 5.3.2
Parties .................................................................................................................................... Introduction
Party ...................................................................................................................................... Introduction
Payment Report .................................................................................................................... 5.1.5
Periodic Audit Start Date .................................................................................................... 10.2.1
Point Awards Criteria .......................................................................................................... 3.2.1
Points Award Process .......................................................................................................... 3.1
Pre-Special Review .............................................................................................................. 3.3.1
Program ................................................................................................................................. Recitals
PSC ........................................................................................................................................ Preamble
Qualifying Program Claimant ............................................................................................. 2.1
Registration Order ................................................................................................................ 1.1
Release ................................................................................................................................... 1.2.2.3
Required PME Records ........................................................................................................ 1.3.1
Second Eligible Event .......................................................................................................... 3.5.1
Section 11.1.5 Counsel ........................................................................................................ 11.1.5
Special Marker QPC ............................................................................................................ 3.3.2
Special Review QPC ............................................................................................................ 3.4.1
Specified Documented Economic Damages ...................................................................... 4.2.6.1
Threshold Exceeding Gate Push ......................................................................................... 2.5.5.4.1
Walk Away Right ................................................................................................................. 11.1

[The remainder of this page is intentionally left blank.]

65

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

MERCK & CO., INC.

By: _____
     Name:
     Title:

Address:

Telecopier:

**[Signature Pages for Settlement Agreement]**

NEGOTIATING PLAINTIFFS' COUNSEL

---

Andy D. Birchfield Jr.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

Address:  218 Commerce Street
            Montgomery, AL 36104

Telecopier:      (334) 954-7555

---

Edward F. Blizzard
Blizzard, McCarthy & Nabers, LLP

Address:  Lyric Centre, 440 Louisiana, Suite 1710
            Houston, Texas 77002-1689

Telecopier:      (713) 844-3755

---

Thomas V. Girardi
Girardi and Keese

Address:  1126 Wilshire Boulevard
            Los Angeles, California 90017-1904

Telecopier:      (213) 481-1554

---

Russ M. Herman
Herman, Herman, Katz & Cotlar, LLP

Address:  820 O'Keefe Avenue
            New Orleans, Louisiana 70113-1116

Telecopier:      (504) 561-6024

2

[Signature Pages for Settlement Agreement]

_____

Arnold Levin
Levin, Fishbein, Sedran & Berman

Address: 510 Walnut Street, Suite 500
         Philadelphia, Pennsylvania 19106-3697

Telecopier:     (215) 592-4663


_____

Christopher A. Seeger
Seeger Weiss LLP

Address: One William Street
         New York, NY 10004

Telecopier:     (212) 584-0799

[Signature Pages for Settlement Agreement]

Exhibit 1.1.
Form of Registration Order

**In re:  VIOXX®**                                      *
                                                       *
**PRODUCTS LIABILITY LITIGATION**        *
                                                       *
                                                       *
                                                       *
                                                       *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*      *


**THIS DOCUMENT RELATES TO ALL CASES**

### ORDER
### (Registration of Claims)

The Court hereby orders as follows with respect to the registration of claims:

(1)      The Court hereby orders the registration of claims as follows:

(a)      All Counsel of Record in this proceeding shall be responsible for designating Primary Counsel for any claim pending in this coordinated proceeding in which they have an Interest (as defined below in paragraph 5) and that Primary Counsel shall register such claims in accordance with this Order.

(b)      **[If the Order is for the Louisiana, MDL Docket No. 1657, then:]** All Counsel of Record in this proceeding who have at any time submitted a request for tolling for a claimant (hereinafter "Tolling Claimant") pursuant to the Notice of Filing of Tolling Agreement which was filed in Federal Multidistrict Litigation No. 1657 on June 9, 2005 (hereinafter "Tolling Agreement") shall designate Primary Counsel for each Tolling Claimant's claims, and that Primary Counsel shall register such claims in accordance with this Order.

(c)     All Counsel of Record with claims pending in this proceeding shall register (or ensure that other attorneys register) all claims in which they have an Interest (as defined below in Paragraph 5) that are pending in any court or other tribunal in the United States.

(d)     All persons who represent themselves *pro se* in this proceeding shall register their claims in accordance with Paragraph 4 below.

(2)     The registration of claims by counsel shall be provided in the form of a Registration Affidavit and its Exhibit 1, altogether set forth as Exhibit A to this Order.  Counsel shall provide the information required by Exhibit A completely and accurately.  The form shall provide the information required as of (a) October 1, 2007, (b) November 9, 2007, and (c) the date on which the Registration Affidavit is served and filed.  The Registration Affidavit shall be filed no later than January 15, 2008.

(3)     Registration Affidavits, along with their exhibits, shall be served on Defendant Merck & Co., Inc. ("Merck"), the Executive Committee to the Plaintiffs' Steering Committee ("PEC"), the Claims Administrator, and, if directed by the Court, with the Court.

(4)     Persons who represent themselves *pro se* in this proceeding shall complete the *Pro Se* Registration Affidavit attached hereto as Exhibit B and shall serve Defendant Merck, PEC, the Claims Administrator, and, if directed by the Court, with the Court, by no later than January 15, 2008.

(5)     Counsel shall be deemed to have an "Interest" in the claim of a Plaintiff or Tolling Claimant if Counsel or any person affiliated with, or related in any way to, Counsel: (a) has an engagement or retainer agreement with such Plaintiff or Tolling Claimant; (b) is listed as the counsel of record for such Plaintiff in filed pleadings related to Vioxx; (c) has entered a

Tolling Claimant into a Tolling Agreement; (d) has entered an appearance for such Plaintiff or Tolling Claimant in any legal action related to Vioxx; (e) would benefit directly or indirectly from any payment to settle any claim of such Plaintiff or Tolling Claimant connected with Vioxx; or (f) otherwise has any financial interest of any kind whatsoever in any claim of such Plaintiff or Tolling Claimant connected with Vioxx.

(6)     Primary Counsel shall file the Registration Affidavit and its Exhibit 1 in the manner applicable in this coordinated proceeding for filing documents with the Court under seal. *Pro Se* Claimants shall do likewise with respect to their *Pro Se* Registration Affidavit. Primary Counsel shall also serve the Registration Affidavit and its Exhibit 1 on Merck, the PEC, and the Claims Administrator via electronic mail.  Specifically, Primary Counsel shall attach three files to a single electronic mail message—(i) the executed Registration Affidavit in Adobe pdf format; (ii) Exhibit 1 to the Registration Affidavit in Excel format; and (iii) a certification of service in Adobe pdf format—and send that message to the following addresses:

a.     **For Merck:**  registration@hugheshubbard.com

b.     **For the PEC:**  [address]

c.     **For the Claims Administrator:**  claimsadmin@browngreer.com

(7)     The subject line in the email should state: "Registration Affidavit and Exhibit 1 for [insert name of firm]. *Pro Se* Claimants shall serve their Registration Affidavits on Merck, PEC and the Claims Administrator at the above email addresses. If the *Pro Se* Claimant does not have access to email, the Plaintiff or Tolling Claimant shall send the Registration Affidavit via U.S. Mail **postmarked no later than January 8, 2008** to:

Claims Administrator
115 S. 15th Street
Suite 400
Richmond, VA 23219-4209
Main Number: 804.521.7200

(8)     Primary Counsel and *Pro Se* Claimants must certify in lieu of oath [pursuant to 28 U.S.C. § 1746] that the information contained in the Registration Affidavit is true and correct to his or her knowledge.  Intentionally incomplete or misleading responses shall subject Primary Counsel and *Pro Se* Claimants to sanctions.

(9)     Primary Counsel shall serve a revised Registration Affidavit and Exhibit 1 when he or she acquires or loses his or her Interest in a Plaintiff's or Tolling Claimant's claim, when he or she becomes Primary Counsel or ceases to be Primary Counsel, or when because of changed circumstances his or her Registration Affidavit otherwise becomes materially untrue, in whole or in part.  In such instances, Primary Counsel must serve a true and correct Registration Affidavit within 30 days of the changed circumstances.  The revised Registration Affidavit shall identify all Plaintiffs and Tolling Claimants in whose claims Primary Counsel has an Interest as of the date that he or she executes the Registration Affidavit.  This obligation shall terminate on September 1, 2008.

(10)     The Court expects all Counsel and all *Pro Se* Plaintiffs and Tolling Claimants to comply with this Order.  Failure to meet the requirements of this Order by the deadlines set herein will subject non-compliant Counsel to a show cause hearing as to why they have not complied with this Order and as to why claims in which they have an Interest should not be dismissed.

_____, this _____ day of _____, 2007.

_____
JUDGE

# Exhibit A

## Registration Affidavit

I, _____ _____, hereby certify [pursuant to 28 U.S.C. § 1746] as follows:

       1.    I am an attorney in good standing who is admitted to practice law in the State of _____. The name and address of my law firm are:

_____
Law Firm

_____
Street

_____
City             State        Zip Code

       2.    I make this certification pursuant to Pretrial Order No. ____ entered in [the current coordinated proceeding].

       3.    Exhibit 1 to this certification contains a true and complete list of all of the Plaintiffs and/or Tolling Claimants in which I have an "Interest" and for whom I am "Primary Counsel" along with a notation of all firms with an Interest in Each Claim as of October 1, 2007.

I certify under penalty of perjury that the foregoing is true and correct.


_____
Primary Counsel

Sign ONE of the statements below:

1. I, _____, on behalf of myself and all other counsel with an Interest in the cases listed in Exhibit 1, agree to the terms of the MSA and will recommend all Plaintiffs and/or Tolling Claimants listed on Exhibit 1 should enroll in the Program.


_____

OR

2. I, _____, do not agree to the terms of the MSA and will not recommend that any of the Plaintiffs and/or Tolling Claimants listed on Exhibit 1 enroll in the Program.


_____

# Exhibit B

### *Pro Se* **Registration Affidavit**

I, _____, hereby certify pursuant to 28 U.S.C. § 1746 as follows:

        4.      I represent myself in the following lawsuit:

_____
Case Caption

_____      _____
Docket Number                    Date Filed

        5.      I make this certification pursuant to the November ___, 2007 Order regarding the registration of plaintiffs.

        6.      My date of birth, social security number, and current residential address are:

Date of Birth: ____/____/____

Social Security Number: _____

Current Address: _____
                    Street

                    _____
                    City            State          Zip Code

                    _____
                    Country

        7.      I claim that I sustained a personal injury as a result of taking Vioxx. I have marked the category of my injury and specified the date and place of my injury below:

        ____ Myocardial Infarction or Sudden Cardiac Death

        ____ Ischemic Stroke (not a hemorrhagic stroke or a transient ischemic attack)

        ____ All other Injuries

Date of the specified injury: ____/____/____

Place of Injury: _____

        8.      I took Vioxx before my claimed injury. I have specifically checked the category below that corresponds to my duration of Vioxx use:

        ____ Duration of use up until the specified injury of 12 months or less

        ____ Duration of use up until the specified injury of more than 12 months

I certify under penalty of perjury that the foregoing is true and correct.

_____

*Pro Se* Claimant

Executed on: _____

<u>Exhibit 1.3.1</u>

## <u>Required PME Records</u>

1.      Claimant's counsel shall include in the Claims Package all required PME records and corresponding certifications available through the Litigation Medical Records Depository

2.      The following applies to any PME Record not covered by paragraph one herein where the initial request for said records to the custodian of the record was made *on or after* November 9, 2007:

Each PME Record submitted by an Enrolled Program Claimant shall be produced with a dated and signed certification from the custodian of the records that swears to the following:

   a.      That he or she is the duly authorized custodian of the records of the facility producing the records and has the authority to certify said records.

   b.      That the annexed records are true and correct copies of the complete file for the Enrolled Program Claimant as kept in the ordinary course of business.

3.      The following applies to any PME Record not covered by paragraph one herein where the initial request for the PME Record from the custodian of the record was made *before* November 9, 2007:

Each PME Record submitted by an Enrolled Program Claimant shall be produced with a certification from the custodian of the records, which complies with requirements above in Paragraph 1, or if such a certification (in whole or in part) does not exist, then a certification from Claimant's Counsel, that swears to the following:

   a.      That the Counsel for the Enrolled Program Claimant requested a complete set of requested records as kept in the ordinary course of business from the particular healthcare provider whose records are being produced.

   b.      That the initial request to that provider for the complete records was made before November 9, 2007.

   c.      That the produced records are true and correct copies of the complete set of the records as requested and/or received by the Claimant's Counsel for the Enrolled Program Claimant and that Claimant's Counsel has not withheld or otherwise failed to provide any record in his/her possession relating to the Enrolled Program Claimant.

4.      Any Enrolled Program Claimant who alleges an injury of myocardial infarction or heart attack (MI)shall submit:

   a.      Event Records.

      b.     Pharmacy Records from all pharmacies that dispensed any medication to the Enrolled Program Claimant for the entire period of time spanning the first alleged use of Vioxx through 3 months after the Eligible Event.

      c.     Medical Records from all cardiologists who provided care and treatment to the Enrolled Program Claimant during the entire period of time spanning the date of the myocardial infarction or heart attack through one (1) year after.

5.     Any Enrolled Program Claimant who alleges an injury of stroke (IS) shall submit:

      a.     Event Records.

      b.     Pharmacy Records from all pharmacies that dispensed medication to the Enrolled Program Claimant for the entire period of time spanning the first alleged use of Vioxx through 3 months after the Eligible Event.

      c.     Medical Records from all neurologists who provided care and treatment to the Enrolled Program Claimant during the entire period of time spanning the date of the IS through one (1) year after.

      d.     Medical Records from all rehabilitation facilities (inpatient or outpatient) where the Enrolled Program Claimant received care and treatment during the entire period of time spanning the date of the IS through one (1) year after, if the Enrolled Program Claimant is seeking compensation for above IS Injury Level 5.

6.     All fatal injury claims (whether MI/SCD or IS) require the submission of the following:

      a.     Event Records.

      b.     Pharmacy Records from all pharmacies that dispensed medication to the Enrolled Program Claimant for the entire period of time spanning the first alleged use of Vioxx through 3 months after the Eligible Event.

      c.     Death Certificate.

      d.     Report of Autopsy, if one was performed.

      e.     Medical Records from the Enrolled Program Claimant's primary care physician(s) for the three (3) year period preceding the date of death.

7.     Any Enrolled Program Claimant who was unable to report his own medical history, or a complete medical history was not provided to the satisfaction of the Claims Administrator for the Enrolled Program Claimant, at the time of his alleged Eligible Event as evidenced in the Event Records, shall submit the records required to be submitted in paragraph 4 or 5 (depending on the Eligible Event) plus Medical Records from the Enrolled Program Claimant's primary care physician(s) for the three (3) year period preceding the date of his Eligible Event.

8.    In addition to the above requirements, any Enrolled Program Claimants who claims any use of samples to meet any requirement of the Program demonstrating that the Enrolled Program Claimant ingested Vioxx (e.g., Proximity Gate, Duration Gate, Overall Duration—as defined in Exhibit 3.2.1 of the Agreement—and Consistency of Use—as defined in Exhibit 3.2.1) shall submit the Medical Records of:

     a.    All physicians or other healthcare providers claimed to have dispensed the samples of Vioxx ingested for the entire time period spanning the alleged distribution of samples, and

     b.    Enrolled Program Claimants primary care physician(s), to the extent not included in 8a for the three (3) year period preceding the Eligible Event.

9.    In the event any Enrolled Program Claimant 's pharmacy records no longer exist because said records were destroyed pursuant to a records retention policy, natural disaster, or some other reason independent of the Enrolled Program Claimant, he must produce an affidavit or other notarized evidence from all applicable pharmacies that records evidencing the prescription of Vioxx for the Enrolled Program Claimant no longer exist and stating the reason such records do not exist. An "applicable pharmacy" is a pharmacy for which evidence exists that Enrolled Program Claimant previously filled his or her Vioxx prescriptions at that facility (e.g., references in insurance records, pill bottles, references in medical records; etc.). Enrolled Program Claimant must provide other contemporaneous Medical Records documenting Enrolled Program Claimant's Vioxx use and the amount of such usage shall be determined pursuant to Section 5(A) of Exhibit 2.2.2.

## Exhibit 1.5

### PME Records Submissions Completeness Provisions

1. General.

(a)     Nothing in this Exhibit absolves the Program Claimants and their respective Counsel from their responsibility timely to comply with the requirements of Sections 1.3 and 1.5.  In particular, neither any Administrator nor Merck shall have any responsibility or Liability for any failure of a Program Claimant and/or his Counsel to qualify as a Qualifying Program Claimant, nor for any impact on a Qualifying Program Claimant's Points award, as a result of any deficiency in such Program Claimant's submissions pursuant to either said Section.

(b)     The Claims Administrator shall communicate under this Exhibit with each Program Claimant by communication with such Program Claimant's Counsel or, if (and only if) such Program Claimant is without counsel, then directly with the Program Claimant.

(c)     The Claims Administrator may rely on the mailing, facsimile transmission and email addresses and/or numbers that were last provided by the Program Claimant or his Counsel and shall have no obligation to (but in its sole and absolute discretion may) take other steps to locate Program Claimants or Counsel whose mail, facsimile transmission or electronic mail has been returned as undelivered or undeliverable.  Each Program Claimant and (if applicable) his Counsel shall have the responsibility to keep the Claims Administrator informed of the correct mailing, facsimile transmission and e-mail addresses for both such Program Claimant and such Counsel.

(d)     Any information submitted in response to a First, Second or Third Deficiency Notice (as such terms are defined below) shall be submitted by means of a Claims Form (or, if a Claims Form already has been submitted by the relevant Program Claimant, Supplementary Claims Form) executed in the manner specified in Section 1.3.2.

(e)     If the last day on which any information is required to be submitted pursuant to this Exhibit is not a Business Day then the last day on which such information is required to be submitted pursuant to this Exhibit shall be deemed to be the next following Business Day.

2. Deficiency Determinations.

(a)     If the Claims Administrator determines that a Program Claimant has failed by July 1, 2008 fully to comply with the requirements of Section 1.3, then reasonably promptly after making such determination the Claims Administrator shall notify such Program Claimant (the "Deficiency Notice") of the relevant deficiency(ies).  The Deficiency Notice shall instruct the Program Claimant fully to comply with the requirements of Section 1.3 by September 1, 2008.

(b)     If the Claims Administrator determines that a Program Claimant has failed by September 1, 2008 fully to comply with the requirements of Section 1.3, then reasonably

promptly after making such determination the Claims Administrator shall notify such Program Claimant (the "Second Deficiency Notice") of the relevant deficiency(ies). The Second Deficiency Notice shall instruct the Program Claimant fully to comply with the requirements of Section 1.3 by November 1, 2008.

(c)     If the Claims Administrator determines that a Program Claimant has failed by November 1, 2008 fully to comply with the requirements of Section 1.3, then reasonably promptly after making such determination the Claims Administrator shall notify such Program Claimant (the "Third Deficiency Notice") of the relevant deficiency(ies). The Third Deficiency Notice also shall include notice to the effect set forth in the first sentence of section 2(d) of this Exhibit.

(d)     If the Claims Administrator determines that a Program Claimant has failed (i) by the Final PME Records Submission Deadline fully to comply with the requirements of Section 1.3 or (ii) by the time specified in the Agreement fully to comply with an Additional Claim Information requirement pursuant to Section 1.5, then (unless he is awarded an extension of the Final PME Records Submission Deadline pursuant to section 3 of this Exhibit) such Program Claimant shall be considered to constitute a "Non-Submitting Program Claimant" for purposes of this Exhibit. In such case, the Claims Administrator shall send a notice to such effect to such Program Claimant, which notice shall inform such Program Claimant of his right to appeal the Claims Administrator's decision as specified in section 2(e) of this Exhibit. "Final PME Records Submission Deadline" means November 30, 2008.

(e)     A Program Claimant may appeal to the Special Master the Claims Administrator's determination pursuant to section 2(d) of this Exhibit by delivering a written notice to such effect to the Special Master and the Claims Administrator within 15 Business Days of the date of the Claims Administrator's notice to such Program Claimant pursuant to said section 2(d). If the Program Claimant fails timely to effect such an appeal, the decision of the Claims Administrator shall be final, binding and Non-Appealable, and such Program Claimant shall be deemed to constitute a Non-Submitting Program Claimant for purposes of this Exhibit. Upon a timely appeal, the Special Master will determine only whether such Program Claimant fully has complied with (i) the requirements of Section 1.3 by the Final PME Records Submission Deadline or (ii) the requirements of Section 1.5 by the time specified in the Agreement, as the case may be. The Special Master shall rule on all such appeals on or before December 30, 2008. The Special Master's decision shall be final, binding and Non-Appealable. If the Special Master determines that the Program Claimant has not fully complied by the applicable deadline, such Program Claimant shall be deemed to constitute a Non-Submitting Program Claimant for purposes of this Exhibit.

3.   Deadline Extension Requests.

(a)     If a Program Claimant is unable (i) by the Final PME Records Submission Deadline fully to comply with the requirements of Section 1.3 or (ii) by the time specified in the Agreement fully to comply with any Additional Claim Information requirements pursuant to Section 1.5, then such Program Claimant may, prior to the Final PME Records Submission Deadline or the Section 1.5 deadline, respectively, apply in writing to the Claims Administrator for an extension of the applicable deadline. If the Program Claimant fails to apply for such an

extension, then such Program Claimant shall be deemed to constitute a "Non-Submitting Program Claimant" for purposes of this Exhibit.  If the Program Claimant files for such an extension, the Claims Administrator may grant an extension of up to an additional 30 days beyond the original applicable deadline where such Program Claimant demonstrates to the satisfaction of the Claims Administrator (i) that he has made a diligent attempt fully to comply with the requirements of Section 1.3 or 1.5, as the case may be, by the original applicable deadline and (ii) it appears likely that he would be able so fully to comply if given the extension. If a Program Claimant requests an extension after the expiration of the original Final PME Records Submission Deadline or Section 1.5 deadline, as the case may be, then the Claims Administrator may deny the extension on that reason alone.  The Claims Administrator shall serve a Program Claimant with the Claims Administrator's written decision to grant or deny a request by such Program Claimant for an extension.

(b)     If any extension of the original Final PME Records Submission Deadline or an original Section 1.5 deadline is granted to a Program Claimant by the Claims Administrator or the Special Master pursuant to this section 3 above, then sections 2(d) and (e) of this Exhibit (but not, for the avoidance of doubt, this section 3) shall apply anew to such Program Claimant as if references therein to the applicable deadline were deemed to refer to such deadline as extended by such extension.

4.  Discretionary Power

(a)     Anything in this Exhibit or the Agreement to the contrary notwithstanding, the Claims Administrator may, at any time prior to making a negative determination pursuant to section 4 of this Exhibit, upon an application to such effect by a Program Claimant received at any time prior to the Final PME Records Submission Deadline or an Section 1.5 deadline (as applicable and as the same may have been extended pursuant to section 3(a) of this Exhibit), deem any particular Program Claimant to have fully complied with the requirements of Section 1.3 or 1.5, as the case may be, if the Claims Administrator determines that (i) such Enrolled Program Applicant has made a diligent and good faith attempt fully to comply with, but nonetheless, due to special, unforseen or extraordinary circumstances, is not likely to be able fully to comply with, the requirements of Section 1.3 or 1.5, as applicable, within even the extended time frames contemplated by this Exhibit, (ii) such Enrolled Program Applicant has in fact substantially completely complied with the requirements of Section 1.3 or 1.5, as applicable, and (iii) under the circumstances to deem such Enrolled Program Applicant to be a Non-Submitting Program Claimant would thus be inequitable.  Subject to the requirements of clauses (i), (ii) and (iii) of the preceding sentence, exercise by the Claims Administrator of the authority granted to it pursuant to the preceding sentence shall be within the sole discretion of the Claims Administrator.  Any determination by the Claims Administrator not to, or any other failure by the Claims Administrator to, exercise the discretion afforded to it under this section 4(a) is Non-Appealable.

(b)     The Claims Administrator shall email to Merck and the NPC a pdf copy of any application from a Program Claimant pursuant to section 3(a) of this Exhibit, and shall not act on such application prior to the tenth (10th) Business Day after so notifying Merck and the NPC of such application. (By making such application, the Program Claimant consents to such action by the Claims Administrator and review of such application by Merck and the NPC.)

(c)     The Claims Administrator shall notify Merck and the NPC of any affirmative exercise of its discretion pursuant to section 4(a) of this Exhibit.  Either the NPC or Merck may appeal such action to the Special Master by delivering a written notice to such effect to the Special Master and the Claims Administrator within 10 Business Days of service of such notice on it; otherwise, the decision of the Claims Administrator shall be final, binding and Non-Appealable.  Upon appeal, the standard of review by the Special Master shall be limited to whether the Claim Administrator's action amounted to an abuse of discretion.  The Special Master's decision shall be final, binding and Non-Appealable.  If the Special Master overturns the Claims Administrator's determination, such Program Claimant shall be deemed to constitute a Non-Submitting Program Claimant for purposes of this Exhibit.

5. <u>Outside Discretionary Deadline</u>:. In no event shall any Program Claimant's deadline be extended pursuant to this Exhibit 1.5 beyond December 30, 2008

6. <u>Non-Submitting Program Claimant</u>.

A Non-Submitting Program Claimant immediately shall cease to have any further rights under the Program, but such Program Claimant's Release and Dismissal Stipulation shall be delivered to Merck and, without limitation, Merck shall be free to file or cause to be filed such Dismissal with Prejudice Stipulation and/or Release, in any relevant action or proceeding.

## EXHIBIT 2.2.1.1

### INJURY GATE CRITERIA

## Definition of Myocardial Infarction.

1.      A final or discharge diagnosis in contemporaneous medical records of a myocardial infarction or heart attack.

        OR

2.      A diagnosis or affirmative finding in the contemporaneous medical records (e.g., a report of consultation) by a cardiologist of a myocardial infarction or heart attack; or, within 14 days of discharge from the hospitalization related to the Event, an independent diagnosis by a treating cardiologist that the Event was a myocardial infarction or heart attack; provided that, in either instance, the final or discharge diagnosis does not rule out a myocardial infarction.

        OR

3.      If the medical records are silent as to whether or not there was a myocardial infarction, new pathological Q waves in two or more contiguous leads.

        OR

4.      If the medical records are silent as to whether or not there was a myocardial infarction, (a) signs and symptoms described in medical records of a heart attack (including but not limited to chest pain, pressure, tightness or discomfort, pain or discomfort in the upper areas of the body including but not limited to one or both arms, the back, neck, jaw or stomach, or shoulders; shortness of breath, weakness, dizziness, cold sweat, or excessive sweating, nausea, weakness, fatigue, loss of consciousness or posture, lightheadedness, feeling of faintness, heart-burn or indigestion sensations, feelings of restlessness or anxiousness, a sense of impending doom, disorientation, lips, hands or feet turning slightly blue, abnormal heart rhythms (arrhythmias), or loss of consciousness, cardiac arrest, blood pressure fluctuations or drops requiring medical intervention) or new ischemic ST-T wave changes on an electrocardiogram in two or more contiguous leads; AND

(b) a rise and fall of cardiac enzymes that includes a rise in serum creatine kinase MB (CK-MB) to greater than two times the upper limit of normal (based on the individual's laboratory's normal range) or a rise in serum cardiac troponin greater than two times the upper limit of normal that a given laboratory considers diagnostic for infarctions. (In the event that the laboratory records do not reflect the normal diagnostic range for troponin that is utilized by that specific laboratory, a rise in the troponin to greater than 1.5 ng/ml shall be deemed to indicate a myocardial infarction.)

5.      An event is **not** a myocardial infarction under definition Nos. 3 or 4 above, if myocardial infarction is ruled out as a diagnosis in the discharge summary or by an in-house cardiology consult at the time of the event, or the final diagnosis is angina or unstable angina.

**Definition of Sudden Cardiac Death.**

A witnessed instantaneous or near-instantaneous unexplained death that occurs without warning or within one hour of non-diagnostic symptoms, or, an unwitnessed, unexpected sudden death in which criteria for a fatal coronary, cerebrovascular event or other cause or event are not met.

**Definition of Ischemic Stroke.**

1.      A final or discharge diagnosis in contemporaneous medical records of an ischemic stroke or ischemic cerebrovascular event or accident (*i.e.*, ischemic stroke, intracranial thrombosis, cerebral embolism, thrombotic stroke, embolic stroke, lacunar infarct, lacunar stroke, thrombotic occlusion, cerebrovascular event or accident that is not a primary hemorrhagic event, and cerebral infarction; or a hemorrhagic stroke that is secondary to the terms previously listed), hereinafter defined as "Ischemic Stroke."

        OR

2.      If the final or discharge diagnosis is silent as to whether or not claimant had an Ischemic Stroke, a diagnosis or affirmative finding in the contemporaneous medical records (*e.g.*, a report of consultation) by a neurologist of an Ischemic Stroke; or, within 14 days of discharge from the hospitalization related to the Event, an independent diagnosis by a treating neurologist that the Event was an Ischemic Stroke.

3.      An Event is **not** an Ischemic Stroke if:

        a) stroke or cerebrovascular accident is ruled out as a diagnosis in the discharge summary or by a treating neurologist within 14 days of discharge from the hospitalization related to the Event;

        b) hemorrhagic stroke or hemorrhagic cerebrovascular accident is the diagnosis in the discharge summary or by a treating neurologist within 14 days of discharge from the hospitalization relate.d to the Event  This definition does not include a hemorrhagic stroke that is secondary to an Ischemic Stroke, or

        c) transient ischemic attack is the diagnosis in the discharge summary or is the diagnosis of a treating neurologist within 14 days of discharge from the hospitalization related to the Event.

**EXHIBIT 2.2.1.2**
**DURATION GATE CRITERIA**

<u>Minimum Duration</u>.  Program Claimants must produce evidence of the issuance of at least <u>thirty</u> (30) Vioxx pills, whether through prescription or samples, within a sixty (60) day period. The qualifying pills must have been dispensed prior to Product User's Eligible Event.

## EXHIBIT 2.2.1.3
## PROXIMITY GATE CRITERIA

Program Claimants must produce evidence that the Product User ingested Vioxx within 14 days of the Eligible Event.  This requisite proximity of usage may be established by producing evidence (in accordance with Exhibit 2.2.2) of one of the following:

(a)  at least **30 pills** dispensed in the **56 days** immediately preceding the Eligible Event;

(b)  at least **90 pills** dispensed in the **140 days**  immediately preceding the Eligible Event;

(c)  at least **120 pills** dispensed in the **180 days** immediately preceding the Eligible Event;

(d)  at least **250 pills** dispensed during the **12 months** immediately preceding the Eligible Event;  or

(e)  a notation in the contemporaneous Event Records identifying Vioxx as a current medication on the date of the Eligible Event, provided that there is contemporaneous evidence that Product User received Vioxx pills within ninety (90) days of the Eligible Event.  In the event that a contemporaneous blood test was conducted that would show the presence of Vioxx in the Product User's bloodstream and the results of the test indicate that Vioxx was not found in the blood, the requisite proximity of usage will not have been established.

### EXHIBIT 2.2.2
### EVIDENCE OF USAGE CONFIRMATION CRITERIA

For the elements of the Program that require a showing of Vioxx ingestion (e.g., Proximity Gate, Duration Gate, Overall Duration--as defined in Exhibit 3.2.1-- analysis), evidence of such Vioxx usage must be established in the following manner:

1.      *Pharmacy Records*.  The Program Claimant must produce contemporaneous Pharmacy Records showing the Product User had valid prescriptions or refills under which pills had been <u>dispensed</u> (credit will only be given for the number of pills actually dispensed); or

2.      *Contemporaneous Medical Records When Pharmacy Records Destroyed*.  In the event the Product User's pharmacy records no longer exist because said records were destroyed pursuant to a records retention policy, natural disaster, or some other reason independent of the Program Claimant or Product User, the Program Claimant must produce an affidavit or other notarized evidence from all applicable pharmacies that records evidencing the prescription of Vioxx for the Product User no longer exist and stating the reason such records do not exist. An "applicable pharmacy" is a pharmacy for which evidence exists that the Product User previously filled his or her Vioxx prescriptions at that facility (e.g., references in insurance records, pill bottles, references in medical records; etc.).  Program Claimants must provide other contemporaneous medical records documenting the Product User's Vioxx use to be eligible for this program, and the amount of such usage shall be determined pursuant to Section 5(A) of this section; or

3.      *Samples*.  Program Claimants relying on sample usage to meet an element of the Program that requires a showing that the Product User ingested Vioxx (e.g., Proximity Gate, Duration Gate, Overall Duration analysis) must provide contemporaneous documentation (in physician or hospital records) that the Product User was given samples in a specific quantity (credit will only be given for the number of pills noted as dispensed).  If no specific quantity is noted, then the Product User will be presumed to have received 8 days of pills for each notation of samples dispensed.  However, no more than a total of 30 days of pills may be presumed for a Program Claimant.

4.      *Appropriate Usage*.  Vioxx must have been legally provided to the Product User by a health care provider.

5.      <u>Limited Documentation Exception</u>:

        (A) If the Program Claimant is unable to satisfy documentation requirements (including either the Proximity Gate or the Duration Gate) based on the Product User's pharmacy records, the Program Claimant may elect to offer contemporaneous compelling evidence of usage to the Claims Administrator who will determine whether Program Claimant has established that the Product User took Vioxx as alleged and, if so, the Overall Duration which should be credited.  In review of the evidence, the Claims Administrator shall be required to follow the following guidelines:

1.  There must be medical records contemporaneous to the usage and the Eligible Event corroborating that there was Vioxx usage at the time alleged by the Program Claimant exceeding what is reflected in available pharmacy records;

2.  Medical records contemporaneous to the usage and/or Eligible Event must corroborate that the Vioxx which Program Claimant alleges was received must have been legally provided to the Product User by a health care provider.  For example, a Program Claimant cannot establish evidence of usage based on prescriptions or samples provided to friends, co-workers, or family members of the Product User, or otherwise outside a healthcare provider-patient relationship;

3.  The alleged usage may not be inconsistent with the PME Records or other evidence.  For example, a Program Claimant who alleges they received 30 samples shall not be able to demonstrate evidence of usage if the medical records provide that Product User received only 10 samples.

(B) A Program Claimant (and Counsel for the Program Claimant) who seeks to meet the Eligibility Requirements (including either the Proximity Gate or the Duration Gate) through the provision set forth in Section A shall be subject to dismissal with prejudice and shall be liable for sanctions and/or costs and legal expenses should the Special Master determine that Program Claimant's or Counsel's attempt to satisfy documentation requirements involved any form of deception, dishonesty, or fraud.

Exhibit 2.7.3

## FUTURE EVIDENCE STIPULATION

This Stipulation pertains to the Settlement Agreement ("the Agreement") dated November __, 2007, incorporated herein by reference, including but not limited to the program for resolution of claims relating to the use of Vioxx described therein (generally and collectively referred to herein as the "Resolution Program" or "the Program")

· I hereby stipulate and agree to the following:

1.      I have received a determination from the Claims Administrator that I have not been found to be a Qualifying Program Claimant under the terms of the Agreement.  I understand that the Claims Administrator has found under the terms of the Agreement that I [or the individual for whom I act as an agent or representative with respect to their claims, or as personal representative of their estate, or the individual with respect to whom I brought a derivative claim] (a) did not experience a myocardial infarction ("MI" or heart attack), sudden cardiac death ("SCD"), or ischemic stroke, as those injuries are defined by the Agreement; and/or (b) did not have sufficient evidence to establish receipt of thirty (30) Vioxx pills within a 60 day period as required by the Program; and/or (c) did not experience a MI, SCD or stroke within fourteen days of my last use of Vioxx as required by the Program.  I further understand that the Gates Committee has not subsequently overturned the determination of the Claims Administrator, or otherwise deemed me to be a Qualifying Program Claimant.

2.      I understand that I now have the option of (a) seeking an appeal within the terms of the Program or (b) exiting from the Program under the terms of the Agreement.

3.      By executing this Stipulation, I elect not to appeal the claim in the Program, and I understand that, under the terms of the Agreement, upon execution of this Stipulation, the Release and Stipulation of Dismissal I provided under the Agreement will be returned to me.

4.      I further understand and specifically acknowledge and stipulate that if I should decide to pursue the claim outside of the Program, I may not make any allegations or introduce any evidence regarding (a)  Vioxx usage, including but not limited to the dose, duration, consistency of Vioxx usage, and/or alleged proximity of use of Vioxx to the date of alleged injury; (b) medical history, and/or (c) alleged injury, other than as were made and included in the Program through the Claims Package associated with my claim.

5.      I further understand and stipulate that the limitations imposed under paragraph four, above, remain applicable even if I obtain new evidence or documentation after the date of this Stipulation.  However, I also understand that if I do obtain new evidence, I can re-submit the claim to the Program in which case the claim will be reviewed anew in accordance with the Program's criteria and procedures.    I understand that I may submit new evidence at any time prior to the Enrollment Deadline Date, but not thereafter.  New evidence will only be considered for the program if the Claims Administrator determines that (i) I was not aware of the new evidence at the time I submitted my original claims package, or that I had made a diligent and

good faith attempt to produce the new evidence as part of my original claims package, and (ii) the new evidence is material to a determination as to whether I meet the program's Eligibility Requirements. I also understand I will be required to execute and deliver a new Release and Dismissal With Prejudice Stipulation, as well as all other materials required for Enrollment.

6.      I stipulate that I will not attempt to introduce in any court of law or tribunal any evidence contrary to, or in addition to, the allegations, facts or records that were presented to the Program's Claims Administrator, as set forth in or appended to my Claims Package, or allege an injury connected with Product other than the injury I claimed through the Program.

Name _____
Address_____
Social Security No. _____
Program Claim No. _____

_____
Signature

Subscribed and sworn before me this _____ day of _____, 20__ .

_____
Notary Public

## EXHIBIT 3.2.1

## POINT AWARDS CRITERIA

        Below is the methodology and criteria that will be utilized by the Claims Administrator to evaluate the claims of Qualifying Program Claimants -- as set forth in Section 3.2 of the Agreement.  The claims of both the IS Qualifying Program Claimants and the MI/SCD Qualifying Program Claimants will be evaluated utilizing a system based on Points.  In short, each Eligible Program Claimant who satisfies the Eligibility Requirements will be assigned an initial number of Points ("Basis Points") which are set on a grid with variables of age; duration of use of Vioxx ("Overall Duration"); and the extent of the injury determined to have been sustained ("Injury Level").  The Basis Points will then be adjusted for (1) the status of the product label relative to the Eligible Event ("Label Adjustment"); (2) the Qualifying  Program Claimants' consistency of use of Vioxx ("Consistency Adjustment"); and (3) for the risk factors from which the Claims Administrator determines that the Qualifying Program Claimant suffered ("Risk Factor Adjustment").

        For purposes of applying the criteria discussed in this Exhibit 3.2.1, unless otherwise noted herein, the Claims Administrator shall review and analyze the Claims Package submitted by the Qualifying Program Claimant and may, to verify completeness or in cases of inconsistency, suspicion of irregularity, audit purposes and/or similarly appropriate circumstances, review and analyze other documents or materials that the Claim's Administrator has access to pursuant to the Agreement.

1.      *MI/SCD QUALIFYING PROGRAM CLAIMANT*

A.      Basis Points:  The Basis Points awarded to a MI/SCD Qualifying Program Claimant will depend upon:  (1) the age of the Qualifying Program Claimant at the time of the Eligible Event; (2) the Qualifying Program Claimant's Overall Duration; and (3) the Qualifying Program Claimant's Injury Level.

        1)      Overall Duration.  The MI/SCD Qualifying Program Claimant's Overall Duration of use of Vioxx shall be calculated in accordance with the following (and Exhibit 2.2.2 to the Agreement):

                a)      To establish placement in an Overall Duration category, the Qualifying Program Claimant must produce evidence of Vioxx prescriptions dispensed or samples dispensed in accordance with the following pill count definitions (and Exhibit 2.2.2 to the Agreement):

| Number of Pills Dispensed | Overall Duration Category |
|---|---|
| 42 pills or less | Less than 60 days |
| at least 43 pills but less than 128 pills | Over 2 months to 6 months |
| at least 128 pills but less than 389 pills | Over 6 months up to 18 months |
| at least 389 pills but less than | Over 18 months up to 30 months |

| 639 pills | |
|---|---|
| at least 639 pills | 30 months or more |

    b)    If the MI/SCD Qualifying Program Claimant is dispensed a number of pills at a time that exceeds the number of days remaining until the Eligible Event, the number of pills from that last filled prescription shall be prorated for purposes of calculating Overall Duration at one pill per day.

2)    <u>Injury Level</u>.  The Injury Level suffered by the MI/SCD Qualifying Program Claimant will be determined by the Claims Administrator utilizing the following criteria:

### MI/SCD INJURY LEVELS

| Level 1 | • Death; or<br>• Unresucitated Sudden Cardiac Death |
|---|---|
| Level 2 | • Ejection Fraction: ≤20%<br>• CABG plus resulting complications within 6 months of the Eligible Event (e.g. graft occlusion); or<br>• Hospitalization: ≥30 days |
| Level 3 | • Ejection fraction: 21-29%;<br>• Hospitalization: 15-29 days; or<br>• CABG |
| Level 4 | • Ejection fraction: 30-39%;<br>• Hospitalization: 10-14 days;<br>• PTCA (stent) plus re-stenosis at stent site within 6 months of Eligible Event; or<br>• Defibrillator or pacemaker placement |
| Level 5 | • Ejection fraction: 40-49%;<br>• Hospitalization: 4-9 days;<br>• PTCA (stent); or<br>• Angioplasty |
| Level 6 | • Ejection fraction: ≥50%;<br>• Hospitalization: 0-3 days; or<br>• Catherization |

    a.    If a MI/SCD Qualifying Program Claimant meets the criteria for more than one Injury Level, then the most serious Injury Level controls.

b.     With regard to Ejection Fraction ("EF"), if there is a nuclear isotope study measuring EF which is conducted at least 2 weeks post-Eligible Event, but within 1 year of the Eligible Event, then that study controls. If there is not such a nuclear isotope study, then the highest EF per echo performed at least 2 weeks post-Eligible Event but within 1 year of the Eligible Event controls.

c.     For a MI/SCD Qualifying Program Claimants assigned to an Injury Level more serious than Level 6 based on EF, if there exists an EF reading within 3 years prior to the Eligible Event, and the post-Eligible Event EF reduction is less than 5% from the pre-Eligible Event reading, then that Qualifying Program Claimant will move to the next lower (less serious) Injury Level.

3)     <u>Basis Points Grid</u>. Once the age, Overall Duration and Injury Level for the MI/SCD Qualifying Program Claimant have been determined, each MI/SCD Qualifying Program Claimant's Basis Points will be assigned utilizing the following grid: