UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| 1199 SEIU GREATER NEW YORK | * | CASE NO: 08-3627 |
| BENEFIT FUND, by its Trustees | * | |
| 330 West 42nd Street - 31st Floor | * | RELATED CASE: |
| New York, NY  10036 | * | 2:05-MD-1657 |
| | * | VIOXX MDL LITIGATION |
| and | * | |
| | * | |
| THE NEW YORK STATE TEAMSTERS | * | |
| COUNCIL HEALTH AND HOSPITAL | * | SECTION L |
| FUND, by its Trustees, | * | |
| 151 Northern Concourse | * | JUDGE ELDON E. FALLON |
| Syracuse, NY  08648 | * | |
| on behalf of themselves and all | * | MAGISTRATE JUDGE |
| others similarly situated, | * | KNOWLES |
| | * | |
| Plaintiffs, | * | |
| v. | * | |
| | * | |
| BROWNGREER, PLC; BEASLEY, ALLEN, | * | |
| CROW, METHVIN, PORTIS & MILES, P.C.; | * | |
| BLIZZARD, McCARTHY & NABERS, LLP; | * | |
| GIRARDI AND KEESE; | * | |
| HERMAN, HERMAN, KATZ & COTLAR, LLP; | * | |
| LEVIN, FISHBEIN, SEDRAN & BERMAN; | * | |
| JOHN DOE LAW FIRMS 1-100, etc.; | * | |
| and JANE DOE VIOXX CLAIMANTS 1-1000, etc., | * | |
| | * | |
| Defendants. | * | |

*************************************************************************

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Defendant, BROWNGREER, PLC, respectfully opposes plaintiffs' motion for a

"preliminary" injunction.

1

Contrary to plaintiffs' suggestion, this case is not "about the ability" of ERISA plans "to obtain reimbursement for medical benefits" paid to claimants in a mass-tort settlement.  (Mem. in Supp. of Mot. for Prelim. Inj. ("Mot.") at 2.)  Rather, it is about who bears the burden for establishing the right to such reimbursement.  Because there is no basis in law for plaintiffs to force BROWNGREER – who is not a party to any ERISA plan – to enforce plaintiffs' putative rights, and because plaintiffs cannot demonstrate any irreparable harm absent the requested injunction, plaintiffs' motion for a preliminary injunction should be denied.

## BACKGROUND

On November 9, 2007, after several years of litigation that included discovery of millions of documents, depositions of numerous company witnesses and experts, and several bellwether trials, the parties announced a private agreement to settle many Vioxx personal injury cases pending in the MDL and other jurisdictions around the country.  (*See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007 ("Agreement").)

Consistent with federal and state law, which create statutory lien obligations under the Medicare and Medicaid programs, the Agreement expressly provides that "satisfaction and discharge of any and all Governmental Authority Third Party Providers/Payors statutory Liens must be established to the satisfaction of the Claims Administrator and Merck before any Settlement Payment can be disbursed" to any claimant.  (*Id.* § 12.1.3.)  *See, e.g.*, 42 U.S.C. § 1395y(b)(2)(B) (creating automatic statutory interest in third-party liability cases under conditional Medicare payments).

No such lien is created by statute on behalf of private insurers.  Rather, the Agreement expressly contemplates that "satisfaction and discharge of any and all Liens, whether past, present or future, whether known or unknown or asserted or unasserted, with respect to any Settlement Payment (and/or the right to receive any Settlement Payment) are the sole

responsibility of the relevant Enrolled Program Claimant."  (Agreement § 12.1.3.)  Additionally, in widely disseminated education materials, each claimant was specifically instructed as follows:

> You may have a contractual obligation to notify your private healthcare provider or insurer of your claims against Merck and/or your anticipated Settlement Payment.  **If this applies to you, notify your attorney.  Similarly, if your insurance company, employee health plan, or other health provider has sent you any correspondence about your claims against Merck and/or anticipated Settlement Payment, notify your attorney immediately.**

(*Claimant Educational Materials on Government Medical Liens/Obligations* at 2 (emphasis in original), attached as Ex. 1.)

On April 14, 2008, forty-eight plaintiff insurance companies filed suit against BrownGreer, US Bank National Association, and "John Does," seeking a constructive or equitable lien against the Settlement Fund in the Vioxx Product Liability Litigation.  (*See* Compl., *AvMed, Inc. v. Brown Greer PLC*, No. 08-1633 (E.D. La. Apr. 14, 2008) ("AvMed Compl.").).  The *AvMed* plaintiffs invoked section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132(a)(3).  The *AvMed* plaintiffs specifically sought "all available equitable relief as well as relief under § 502(a)(3) of ERISA . . . entitling plaintiffs to restitution to the extent of reimbursement of medical expenses they paid on behalf of settling plan members' medical treatment attributed to their use of Vioxx."  (*Id.* ¶ 1.)

On June 3, 2008, the instant case commenced when two plaintiff benefit plans and their trustees filed a class action complaint seeking an equitable lien against the Settlement Fund.  In the complaint, these plaintiffs, like the *AvMed* plaintiffs, invoke section 502(a)(3) of ERISA. (Class Action Compl. ("CAC") Prelim. Statement.)  Specifically, plaintiffs seek declaratory and equitable relief confirming their purported rights "to receive notification of claims asserted and

settlements received by their plan beneficiaries" and "to be reimbursed by their plan beneficiaries," as well as identical relief for the class they purport to represent. (*Id.*)

Six days later, plaintiffs in the *AvMed* action filed a motion for "preliminary" injunctive relief. (Mem. in Supp. of Mot. for TRO and Prelim. Inj., *AvMed v. Brown Greer PLC*, No. 08-1633 (E.D. La. June 9, 2008) ("AvMed Mot.").) They sought an injunction that would compel defendants in that case to disclose substantial private information regarding claimants enrolled in the Agreement and, "only if necessitated by delayed compliance," "a short enjoinment of the settlement distributions" to any claimant "until Plaintiffs' equitable reimbursement rights" – if any – "can be determined." (*Id.* at 1.) The defendants in that case filed an opposition on June 20, explaining that none of the four requirements for injunctive relief was met and requesting that the Court deny the *AvMed* plaintiffs' motion.

Plaintiffs in the instant case now want an injunction too. They seek "limited interim injunctive relief" ostensibly "crafted" to avoid the fatal defects in the *AvMed* plaintiffs' prior request for the same relief. (Mot. at 2.) Still, like the *AvMed* plaintiffs, plaintiffs here seek an order that would effectively freeze payment from the settlement program until putative lien rights are sorted out. Specifically, plaintiffs would have the Court order that:

- The Settlement Administrator must notify all parties at least 20 days prior to disbursement of settlement funds;

- Each law firm representing Vioxx claimants must certify that it has conducted an investigation on plaintiffs' behalf into the existence of any liens against its clients and submit a list of any such clients to the Settlement Administrator and plaintiffs' counsel;

- The law firms must provide each client's name, social security number, employer, and health benefit plan;

- Claimants against whom no liens lie could receive settlement payments;

- Claimants against whom liens may lie could not receive payments unless they face a hardship or would be subject to a lien that could be covered in its entirety by the second settlement distribution; and

- Plaintiffs and the members of the class they purport to represent would have 45 days to assert a lien following their receipt of the information regarding the clients the law firms have identified as possibly subject to a lien.

(Proposed Order, *1199 SEIU Greater New York Benefit Fund v. BrownGreer, PLC*, No. 08-3627

(E.D. La. June 26, 2008).)

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied. Plaintiffs have failed to carry their burden as to each of the four prerequisites for issuing a preliminary injunction. Indeed, plaintiffs have failed to show that the relief they seek is "preliminary" at all. If this Court nonetheless determines that plaintiffs' requested injunction is appropriate, it should require plaintiffs to pay a bond in the amount of at least $90 million because Vioxx claimants should be protected from the potential damage that could result from their loss of the right to immediate disbursement of the settlement payments in accordance with the terms of the Agreement.

## I.   PLAINTIFFS' MOTION FOR AN INJUNCTION SHOULD BE DENIED.

As an initial matter, plaintiffs' motion should be denied because the primary relief it seeks – the disclosure of private identifying information of all settlement claimants – is not "preliminary." Since plaintiffs do not have that information now, revealing it to them would not preserve the status quo. Indeed, far from preserving the status quo, plaintiffs' desired injunction would grant them most of the ultimate relief that they seek.

But even if plaintiffs' motion could be framed as one seeking only preliminary relief, plaintiffs have failed to carry their burden of establishing the four showings required before an injunction will issue. *First,* they cannot show a likelihood of success on the merits because they have not made a class-member-by-class-member showing that, under the terms of the plans they

5

purport to administer, they and the class members they would represent are entitled to relief under ERISA.  In any event, under ERISA, no equitable lien right can be asserted in the absence of an identifiable fund – identifying an aggregate settlement is not sufficient, nor is the identification of funds that do not yet exist.  And there is simply no support for plaintiffs' argument that they are entitled to receive Vioxx settlement claimants' identifying information.

*Second,* plaintiffs cannot show they will suffer irreparable harm.  Plaintiffs' delay in bringing suit is dispositive of the issue.  Moreover, plaintiffs are incorrect that the mere disbursement of settlement funds will imperil their putative reimbursement rights.  And even if disbursement did pose such a risk, plaintiffs would still be unable to demonstrate irreparable harm because half the settlement fund will remain after the initial disbursement, an amount more than adequate to satisfy any reimbursement rights plaintiffs may eventually prove.

*Third,* plaintiffs similarly fail to show that any harm they will suffer in the absence of an injunction will outweigh the harm suffered by the claimants if such an injunction does issue. Plaintiffs' proposed relief will result in the disclosure of private information of many claimants as to whom plaintiffs have no reimbursement rights.  Furthermore, even under their "limited" approach that would ostensibly preserve the rights of the other claimants, plaintiffs' proposed injunctive relief would take substantial time to implement and would thus force the entire pool to wait longer still for monetary relief for their asserted injuries.

*Finally,* plaintiffs fail to show how the public interest could possibly be served by further protracting this mass tort litigation, especially in light of the strong likelihood that any reimbursement rights they have would likely be preserved even if settlement disbursements proceed as scheduled.

A. **Plaintiffs' Motion Should Be Denied Because It Does Not Seek "Preliminary" Relief.**

Plaintiffs' motion should be denied because the primary relief it seeks is the same relief it ultimately seeks in its complaint. A preliminary injunction "should not grant relief properly awarded only in a final judgment, and it is an abuse of discretion for the district court to issue a preliminary injunction which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ." *Enter. Int'l, Inc. v. Corpotoracion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 476 (5th Cir. 1985) (citations and internal quotation marks omitted).

In *Enterprise International*, the U.S. Court of Appeals for the Fifth Circuit addressed a transaction between Enterprise International and C.E.P.E, the state-owned oil company of Ecuador. Under a contract, Enterprise agreed to sell liquid petroleum gas to C.E.P.E. A provision of the contract also required Enterprise to guarantee its performance. It did so by establishing an unconditional irrevocable guarantee with a bank in the amount of $1,700,000. After some mutually agreed extensions, the guarantee was set to expire on June 21, 1984. A dispute arose as to whether Enterprise had performed, and C.E.P.E. threatened to draw down the guarantee. Enterprise sued and sought a temporary restraining order and a preliminary injunction. The hearing date was set for June 21, 1984. The district court enjoined C.E.P.E. from drawing on the guarantee, but it did not condition the injunction on Enterprise's agreement to extend the guarantee or to secure it in the form of a bond. *Id.* at 466-67, 475.

The Fifth Circuit reversed, finding that "[b]y its action, the court failed to maintain the status quo and in effect, granted Enterprise International all of the relief it might have had on the merits." *Id.* at 476. Accordingly, it had abused its discretion.

Plaintiffs seek precisely this kind of forbidden injunction. Their request that the Court require defendants to disclose private information of Vioxx settlement claimants is inextricably

bound to their ultimate request for relief on the merits.  Plaintiffs never articulate any independent basis justifying the release of this information in their papers.  Instead, they simply assert repeatedly that there is no other way for them to obtain the information they need to determine whether they are entitled to relief against various individuals under ERISA.

Plaintiffs suggest in their brief that "a preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."  (Mot. at 20 (citations and internal quotation marks omitted).)  That generic proposition does not address the argument made here.  In some cases, an injunction that preserves the status quo might well be the only relief ultimately sought and thus, under the appropriate circumstances, might issue preliminarily.

But plaintiffs here, like the plaintiff in *Enterprise International*, are not attempting to preserve the status quo.  Rather, they are seeking something they do not presently have – the names and identifying information of Vioxx settlement claimants.  All the other injunctive relief they request flows from that starting point.  In other words, plaintiffs are claiming an entitlement to the ultimate relief they seek on a mere showing of **likely** success on the merits – rather than actually proving entitlement to relief.  The lesson of *Enterprise International* is that the preliminary injunction cannot be used to bypass the inconvenience of proving one's case.  Here the distinction is an important one.  As suggested in defendant's motion to strike and the *AvMed* defendants' motion to sever, proving entitlement to relief requires an examination of individual plan language and, in light of plaintiffs' allegation that the class is composed of "hundreds, and likely thousands, of ERISA Health Plans," could be a rather laborious process.  (CAC ¶ 20.)  Plaintiffs are not entitled to skip that step, even if they were able to prove a likelihood of success on the merits (which, as demonstrated below, they cannot).

For this reason alone, plaintiffs' motion should be denied.

**B.      Plaintiffs' Motion Should Be Denied Because They Have Not Satisfied The Requirements For A Preliminary Injunction.**

Plaintiffs' motion should also be denied because they have failed to demonstrate that their request satisfies the requirements of a preliminary injunction.  "A preliminary injunction is an extraordinary and drastic remedy," and "it is never awarded as of right."  *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (U.S. 2008).  Such relief "should only issue if the movant shows:  (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest."  *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008).  These requirements are conjunctive; injunctive relief "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."  *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (citation and internal quotation marks omitted).

Plaintiffs bear a "heavy burden of persuading the district court that all four elements are satisfied."  *Enter. Int'l*, 762 F.2d at 472 (citation and internal quotation marks omitted).[1]  This already-heavy burden is even more difficult to satisfy where, as here, plaintiffs seek mandatory injunctive relief.  "Mandatory preliminary relief, which goes well beyond simply maintaining the

---

[1]      Plaintiffs downplay this burden, clinging to the assurance of *Texas v. Seatrain International* that none of the preliminary-injunction factors has a "fixed quantitative value" and that a "sliding scale is utilized, which takes into account the intensity of each in a given calculus."  518 F.2d 175, 180 (5th Cir. 1975).  (*See* Mot. at 13.)  That the scale slides does not mean it ultimately requires any less weight to satisfy plaintiffs' burden, however.  There is perhaps no better testament to this fact than *Seatrain International* itself, in which the plaintiffs, despite having proven a certainty of  "considerable economic loss" nonetheless lost their bid for an injunction based on "less-than-overpowering prospects of ultimate success" and equivocal findings on the other two factors.  *Id.* at 179-82.

status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

For several reasons, plaintiffs have not satisfied this very heavy burden, and their motion should therefore be denied.

1.     **Plaintiffs Are Not Likely to Succeed on the Merits.**

Plaintiffs' bid for an injunction fails first and foremost because they have made no showing that they will prevail on the merits.

For starters, plaintiffs have made no showing that they are entitled to relief under the plans they purport to administer.  Under ERISA, the text of the plan determines the fiduciary's entitlement to seek relief in the form of equitable restitution, which is what plaintiffs seek here. Even if they could show such entitlement, plaintiffs' purported right to an equitable lien does not lie against the aggregate settlement fund, which is not an "identifiable fund" within the meaning of the cases on which they rely, nor against individualized funds, which do not exist yet.  Finally, plaintiffs cite no authority to support their asserted entitlement to Vioxx settlement claimants' private information.  Accordingly, they cannot succeed on the merits.

a.     **Entitlement to Equitable Restitution**

Plaintiffs have not shown that they and the class members they purport to represent are each entitled to the equitable restitution they seek.  As to each plan implicated by this suit, plaintiffs must make an affirmative showing that they are entitled to seek reimbursement via an equitable lien in this case.  They have made no such showing.  Simply quoting reimbursement provisions from the two plaintiffs' plans does not suffice – particularly since at least one of them does not establish a right to an equitable lien.

This is no small matter.  The Supreme Court has explained the right asserted by plaintiffs here in two recent cases, which reveal the extent to which plan language is important.  In *Great-*

*West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court explained that a fiduciary's right to recover under ERISA is limited.  Noting that section 502(a)(3) authorizes a fiduciary to file suit "to obtain other appropriate equitable relief," the Court explained that "'equitable' relief must mean **something** less than **all** relief."  *Id.* at 209 (citation and internal quotation marks omitted) (emphasis in original).  Specifically, "the term 'equitable relief' in § 502(a)(3) must refer to those categories of relief that were **typically** available in equity."  *Id.* at 210 (citation and internal quotation marks omitted) (emphasis in original).  The upshot of this constraint is that a fiduciary seeking reimbursement must do so via a means of relief recognized "[i]n the days of the divided bench."  *Id.* at 212.

The petitioners in *Great-West* argued that they sought "restitution," a form of relief recognized by courts of equity.  But the Court ultimately did not accept this characterization of the desired relief.  Petitioners specifically sought what plaintiffs seek here – reimbursement from one of their beneficiaries, who had reached a settlement in a suit against the party that had caused her to incur medical expenses for which she had previously been reimbursed by her benefits plan.  In her settlement, however, the beneficiary had kept no money for herself.  Instead, of a $650,000 settlement, she had "allocated $256,745.30 to a Special Needs Trust . . . to provide for [her] medical care; $373,426 to attorney's fees and costs; $5,000 to reimburse the California Medicaid program (Medi-Cal); and $13,828.70 . . . to satisfy Great-West's claim under the reimbursement provision of the plan."  *Id.* at 207-08.  Great-West sought more than this – it claimed entitlement to reimbursement in the amount of $411,157.11.  *Id.* at 208.  It did so pursuant to a plan provision that expressly provided that the "Plan has 'a first lien upon any recovery, whether by settlement, judgment or otherwise'" and that if the "beneficiary recovers from a third party and fails to reimburse the Plan, 'then he will be personally liable to [the Plan]

11

. . . up to the amount of the first lien.'" *Id.* at 207 (quoting plan language) (alterations and omissions in original).

The Supreme Court rejected this claim.  It explained that restitution is sometimes an equitable remedy, but it is sometimes a legal remedy, and only the former is available under ERISA.  The relief Great-West sought was of the legal sort.  The dispositive fact was that the beneficiary did not have control of the proceeds from the settlement from which petitioners sought their reimbursement and that Great-West was thus seeking to enforce the "personally liable" provision of the plan.  Restitution in *equity* – "ordinarily in the form of a constructive trust or an equitable lien," was available only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.* at 213.  When "the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor."  *Id.* at 214 (alterations, citation, and internal quotation marks omitted).  And a claim against a general creditor imposes "a merely personal liability upon the defendant to pay a sum of money" – *i.e.*, compensatory damages – and is thus a *legal* form of restitution.  *Id.* at 213 (citation and internal quotation marks omitted).

The Supreme Court further clarified the doctrine a few years later in *Sereboff v. Mid Atlantic Services, Inc.*, 547 U.S. 356 (2006).  *Sereboff*, like *Great-West*, involved a beneficiary who, along with her husband, settled a lawsuit against third parties who had caused them to incur medical expenses, which had previously been paid for by a health benefit plan.  In *Sereboff*, however, the beneficiaries themselves received a payout from the settlement.  Mid Atlantic brought suit, again seeking restitution, and pointing out that, unlike in *Great-West*, it could

identify a particular fund in the possession of the beneficiaries out of which it was entitled to recover monies pursuant to a lien created in its favor under the terms of the plan.

The Supreme Court agreed.  It explained first that the relief Mid Atlantic sought was properly characterized as equitable because "it sought its recovery through a constructive trust or equitable lien on a specifically identified fund, not from the Sereboffs' assets generally, as would be the case with a contract action at law." *Id.* at 363.  It then confirmed that Mid Atlantic had an equitable basis for its claim.  "[T]he 'Acts of Third Parties' provision in the Sereboffs' plan specifically identified a particular fund, distinct from the Sereboffs' general assets—'[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)'—and a particular share of that fund to which Mid Atlantic was entitled—'that portion of the total recovery which is due [Mid Atlantic] for benefits paid." *Id.* at 364.  Although the Court had intimated in *Great-West* that strict tracing requirements might apply to an equitable claim to restitution, the Court rejected that argument, advanced by the Sereboffs:  "no tracing requirement" applies to "an equitable lien 'by agreement,'" which arises in the context of specific plan text like the sort at issue in *Sereboff*.  *Id.* at 364-65.  Finally, the Court was careful to distinguish an equitable lien by agreement from a subrogation claim, suggesting without deciding that "various limitations" might apply to a subrogation claim that would not apply to an equitable lien claim.  *Id.* at 368.

These divergent outcomes underscore the necessity of an affirmative showing by plaintiffs that they are indeed entitled by plan language to the relief they seek under the terms of the relevant plans.  Such entitlement is not automatic; *Sereboff* did not overrule *Great-West*.  One illustrative case in point, decided after *Sereboff*, is *Popowski v. Parrott*, 461 F.3d 1367 (11th Cir. 2006).  *Popowski* addressed two cases – *Popowski* and *BCBS v. Carillo*.  In the first case, the court held that equitable relief was available; in the second case, it held that it was not.  The

divergent outcomes depended entirely on plan language.  The plan in *Popowski* read in relevant part as follows:

> in any event, the Plan has a lien on any amount recovered by the Covered Person whether or not designated as payment for medical expenses.  This lien shall remain in effect until the Plan is repaid in full.
>
> The Covered Person . . . must repay to the Plan the benefits paid on his or her behalf out of the recover made from the third party or insurer.

*Id.* at 1370.

The plan in *Carillo*, meanwhile, read in relevant part as follows:

> If, however, the Covered Person receives a settlement, judgment, or other payment relating to the accidental injury or illness from another person, firm, corporation, organization or business entity paid by, or on behalf of, the person or entity who allegedly caused the injury or illness, the Covered Person agrees to reimburse the Plan in full, and in first priority, for any medical expenses paid by the Plan relating to the injury or illness.

*Id.* at 1371.

The basis for the divergent outcomes hinged on the second plan's failure to do what the first plan plainly did – *i.e.*, identify a fund out of which reimbursement was to be paid: "any amount recovered."  The second plan merely indicated that the Covered Person had an obligation to reimburse the Plan whenever there was a recovery.  No fund was identified.[2]

The specifics of plan language can affect more than a fiduciary's entitlement to relief. Plan language can also implicate affirmative defenses, which in turn can bear on the extent of a fiduciary's recovery even if the right to recovery is established.  Some courts, for example, have observed that the "make whole" doctrine is available as an equitable defense if the relevant plan

---

[2]    Plaintiffs also cite *Popowski* favorably, but they omit its second holding, in which the court denied a reimbursement claim based on plan language.  (Mot. at 15 n.12.)  Indeed, in plaintiffs' entire motion, they never mention *Great-West* or the other cases that have followed it, even after *Sereboff*.  Those cases indicate that the right to reimbursement is by no means as "clear" as plaintiffs suggest.  (*See* Mot. at 17.)

text does not specifically bar it.  *See, e.g.*, *Cagle v. Bruner*, 112 F.3d 1510, 1521 (11th Cir. 1997) ("As a default rule, the make whole doctrine applies to limit a plan's subrogation rights where an insured has not received compensation for his total loss and the plan does not explicitly preclude operation of the doctrine.").

Plaintiffs here offer reimbursement language from only two plans (despite purporting to represent a class of "hundreds, and likely thousands, of ERISA Health Plans" (CAC ¶ 20)), but even these plans exhibit critical differences that demonstrate the necessity of a plan-by-plan showing of qualification for reimbursement.  Simply quoting plan language does not prove that it establishes a right to reimbursement, and it certainly does not prove that other absent plans have such language.  Indeed, at least one of the plans here demonstrates no likelihood of success on the merits because the plan fails to identify a fund from which reimbursement is to be paid and, therefore, does not provide the plaintiff with any right to recovery.

*First,* and most simply, it is not enough to supply one copy of each plan.  It is well known that plans are commonly amended, and plaintiffs have neither proven nor even asserted that the same plan document governed during the entire time period.  This is especially relevant in light of the fact that many plans' reimbursement provisions may have been revised in light of the holding in *Sereboff*, which was not decided until 2006 – *i.e.*, after the vast majority of claims that would likely be implicated here.  Perhaps not coincidentally, plaintiffs do not state the operative period for the plan provisions they quote in their complaint.  (*See* CAC ¶¶ 42, 43.)  This is not a sufficient showing.  *See Franks v. Prudential Health Care Plan, Inc.*, 164 F. Supp. 2d 865, 879 (W.D. Tex. 2001) (stating that the law of the Fifth Circuit indicates that "the extent to which [a beneficiary] has a reimbursement obligation under his ERISA plan . . . depends on what his ERISA plan said at the time he received that treatment.").

15

Relatedly, neither of the plans references the policyholder; nor do plaintiffs offer such information on behalf of the putative class.  A healthcare insurer tailors its plans depending on the particular policyholder, suggesting even greater variation than is revealed by plaintiffs' reference to the "hundreds, likely thousands, of ERISA Health Plans" they purport to represent.

*Second,* it is plain under the text of the Teamsters Fund plan that the language does not entitle the plan's trustee to seek recovery.  It asserts a right to recover from "any and all amounts owed to you," but it does not specify a fund from which recovery can be sought.  (CAC ¶ 43.) Indeed, at best it suggests that the plan may recover from the ***beneficiary***, rather than from any fund: "we may recover the amount you are owed from the third party (or ***from you***, if the third party pays you)."  (*Id.* (emphasis added).)  It goes on to explain that, if a beneficiary fails to reimburse the plan, "we have the right to bring a ***legal action*** against you ***for reimbursement***." (*Id.* (emphases added).)  As is plain under *Great-West*, a simple demand for reimbursement is not cognizable equitable relief.  The plan does not identify a particular fund from which relief may be sought, failing *Sereboff*'s requirement.  If the Teamsters Fund's claim is indeed, as plaintiffs allege, "typical of the claims of the entire Class" plaintiffs would represent (CAC ¶ 22), there is a very good basis to doubt plaintiffs' likelihood of success on the merits.

*Third,* it is equally plain that available equitable defenses to plaintiffs' reimbursement claims will vary widely from one plan to the next.  As noted above, equitable defenses may be available when they are not expressly disclaimed by the plan.  In particular, the "make whole" doctrine may operate to preclude reimbursement to some plaintiffs altogether in some cases. "The 'make whole' doctrine is an insurance principle which mandates that, in the absence of contrary agreement, an insurance company may not enforce its subrogation rights until the insured has been fully compensated for the injuries – 'made whole.'"  *Benefit Recovery, Inc. v.*

16

*Donelon*, 521 F.3d 326, 328 (5th Cir. 2008) (citation and internal quotation marks omitted).

Helpfully, plaintiffs again illustrate this point despite providing plan language from just two

plans; the 1199 Fund expressly bars the "make whole" defense; the Teamsters Fund does not.

(*Compare* CAC ¶ 42 ("The Fund has these rights without regard to whether you have been

'made-whole.'") *with id.* ¶ 43 (no similar language).)

In light of these considerations, plaintiffs plainly have not carried their burden of

demonstrating that they have an entitlement to reimbursement. Their task – one obviously

complicated by their desire to represent a class of "hundreds, likely thousands, of ERISA Health

Plans" – is to demonstrate a right to reimbursement on a plan-by-plan basis, for each plaintiff

and class member, for the entire relevant period. They have not done this, and they thus have not

carried their burden of showing substantial likelihood of success on the merits.

### b.    **Inability to Identify a Fund**

Plaintiffs cannot prevail on their equitable lien claim because they cannot identify a fund

for which restitution will lie. Unlike the *AvMed* plaintiffs, plaintiffs here purport not to seek a

lien against the aggregate settlement.[3] Instead, they assert that "the Vioxx Claimants' attorneys

. . . will maintain separate accounts corresponding to each claimant's individual recovery" and

that plaintiffs seek recovery "from each beneficiary's ***independent*** Vioxx Settlement proceeds."

(Mot. at 17 n.15.)  In other words, plaintiffs seek recovery from funds that do not exist.

Plaintiffs base their identifiable-fund theory on *Sereboff* and *Bombardier Aerospace Employee*

*Welfare Benefits Plan v. Ferer, Poirot & Wansbrough*, 354 F.3d 348 (5th Cir. 2003), cases in

which identifiable settlement funds were already in the possession (or constructive possession) of

plan beneficiaries. That reliance is misplaced.

---

[3]    If plaintiffs revert to a claim of a lien against the Settlement Fund, that claim would fail for the reasons set forth in the *AvMed* defendants' opposition to the motion for a temporary restraining order and preliminary injunction in that case.

On the merits, a plaintiff would "bear[] the burden of proving the 'facts that give rise to the trust,' including the amount of the wrongfully converted funds and that the specifically identifiable funds it seeks to recover have not been dissipated." *UNUM Life Ins. Co. of Am. v. Wolf*, No. 07-cv-00071, 2008 U.S. Dist. LEXIS 43735, at *17-18 (D. Colo. May 23, 2008) (citation omitted).  Plaintiffs could not make that showing on the merits here.  Plaintiffs rely on *Sereboff* to make their showing, but the facts there do not match the facts here.  *Sereboff* involved a particular share of an identifiable fund.  Specifically, vis-à-vis the Sereboffs, who were each beneficiaries of the same plan, Mid Atlantic had specifically reserved a right to assert an equitable lien against any recovery either of the Sereboffs received from a third party.  The identifiable fund was their personal recovery, which already existed; the particular share was the extent necessary to reimburse the plan for medical expenses paid on behalf of the beneficiaries, which was precisely quantified.

Plaintiffs look to *Bombardier* for support of their theory that the plan beneficiaries have "possession and control" of settlement funds that have not been disbursed.  But while *Bombardier* involved a lien against settlement funds before they had been distributed, the fund in that case was already in the control of the plan beneficiary's lawyers, who were "indisputably his agent."  354 F.3d at 356.  That is not this case – *Bombardier* does not suggest that a beneficiary has control, constructive or otherwise, before a mass tort settlement fund administrator – essentially, an escrow service – disburses settlement moneys to beneficiaries or their lawyers.  Indeed, it suggests precisely the opposite.  The facts of the case before the court in *Bombardier* stood in "stark contrast" to those in *Great-West*, in which "the funds had been placed in a Special Needs Trust, as mandated by California law, to provide for the beneficiary's medical care, and

the trustee was totally independent of the plan beneficiary." *Id.* At present, the Vioxx claimants here stand in similar relation to the Settlement Fund.

Plaintiffs have thus failed to show any support for their claim that they have identified a particular share of a particular fund from which they seek to recover. As an initial matter, plaintiffs have failed to identify particular funds. Under *Sereboff*, the "identifiable fund" was the particular fund established by the terms of the plan itself – *i.e.*, any recovery personal to the beneficiary. Here there is only an aggregate fund; no individual recoveries yet exist. Plaintiffs claim they seek no lien against the Settlement Fund; but if they do not, they seek recovery against funds that do not exist, and a nonexistent fund is no fund at all for ERISA purposes. *Cf. Eastom v. Redmond*, 39 Employee Benefits Cas. (BNA) 1984, No. 1:03-CV-353-TS, 2006 U.S. Dist. LEXIS 57268, at * (N.D. Ind. Aug. 14, 2006) (plaintiff failed to identify specific fund when he did not even know whether the fund exists).

It is also plain that, having failed to identify a fund at all, plaintiffs have not identified a particular share of any fund at this time. They thus could not succeed on the merits because, under *Sereboff*, they cannot assert a lien unless they have identified a "particular share" of a fund that, in good conscience, belongs to them.

Thus, no authority supports the existence of the liens asserted here. Plaintiffs seek recovery from nonexistent funds, from which no recovery can be had. There is thus no chance that they could prevail on the merits.

### c.   No Showing of Entitlement to Identifying Information

Plaintiffs have also shown no entitlement whatsoever to the release of Vioxx settlement claimants' identifying information. They have cited no authority in support of such relief. Nor have they explained how it could be done consistently with federal privacy laws, or with the terms of the Agreement itself, which expressly provides that such information "shall be kept

19

confidential by the Parties . . . and shall not be disclosed except" in circumstances not present here.  (Agreement § 15.1.)  In cases in which a fiduciary has reason to believe that a particular plan beneficiary has secretly secured a settlement from which the plan would be entitled to a recovery, the ordinary course is for the fiduciary to bring suit against that beneficiary and seek details of his recovery through ordinary discovery.  *See, e.g.*, *UnitedHealth Group, Inc. v. Dowdy*, No. 8:06-CV-2111, 2007 U.S. Dist. LEXIS 80090 (M.D. Fla. Oct. 29, 2007). BROWNGREER knows of no precedent for the relief sought by plaintiffs here – essentially, a court-ordered conscription of BROWNGREER to do plaintiffs' job for them of identifying plan beneficiaries who have not complied with the plans that plaintiffs purport to be responsible for administering.

*        *        *

Plaintiffs' failure to carry their burden as to the first prong of the preliminary injunction standard – likelihood of success on the merits – dooms their motion for an injunction.  Where "a plaintiff cannot show a likelihood of success on the merits, it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff's favor." *Newdow v. Bush*, 355 F. Supp. 2d 265, 272 (Jan. 14, 2005).  Indeed, even if plaintiffs have some possibility of prevailing on the merits, that showing is not sufficient.  "[T]here can be no substantial likelihood of success where there exist complex issues of law, the resolution of which are not free from doubt." *First Nat'l Bank and Trust Co. of Mich. v. Fed. Reserve Bank of Chicago Detroit Branch*, 495 F.Supp. 154, 157 (W.D. Mich. 1980).[4]  This is just such a case. For this reason alone, the motion should be denied.

---

[4]       Plaintiffs cite *Chambers v. Coventry Health Care of Louisiana*, 318 F. Supp. 2d 382, 389 (E.D. La. 2004) – an "ERISA case" but not one dealing with the reimbursement issue presented by this case – for the proposition that they need only raise "legal questions that are sufficiently serious and substantial that a more thorough investigation is appropriate."  (Mot. at 13-14.)  But that case was very different from this one.  First, and most fundamentally, the

2.       **Plaintiffs Will Not Be Irreparably Harmed.**

Plaintiffs also fail to satisfy the second prong of the preliminary injunction standard – irreparable injury – because plaintiffs can still pursue equitable relief once funds are disbursed. Furthermore, plaintiffs' delay in filing their suit belies the urgency they now claim.

As plaintiffs rightly acknowledge, "purely economic damages generally are insufficient to establish an 'irreparable' injury." (Mot. at 18.)  They nonetheless insist that "'extraordinary circumstances may give rise to the irreparable harm required for the issuance of a preliminary injunction when money damages are involved.'"  (*Id.* (quoting *Citizens Savings Bank v. GLI Technical Services, Inc.*, No. Civ. A. 96-2307, 1996 WL 737008, at *4 (E.D. La. Dec. 23, 1996)).)

Plaintiffs fail to acknowledge, however, that it is a tall order to prove such an "'absence of an available remedy.'"  The mere possibility that monetary relief would later be available is enough to defeat a claim for an injunction.  In *Enterprise International v. C.E.P.E.*, for example, the court considered whether an "absence" of an available remedy existed when the possibility of later recovery was admittedly doubtful.  There, the question was whether relief would be available in a foreign court.  The court noted that some courts had held that an injunction could issue when the only proper forum was Iran, having found that "any resort to Iranian courts to

---

injunction in that case preserved the status quo.  An employee sued an ERISA plan after the plan denied coverage of a PET scan on the ground that PET scans are experimental.  He needed a PET scan to help prevent the return of cancer.  The injunction permitted the PET scan to go forward, but it was secured by a $500 bond; in other words, if the plaintiff ultimately lost on the merits, the plan's initial position would be restored by the value of the bond.  *Id.* at 392.  There is no such security here; once defendants disclose private information to the plaintiffs, the damage is done.

Second, the plaintiff in *Chambers* had demonstrated a likelihood of success on the merits.  The only question there was whether PET scans were experimental, and "the undisputed testimony" and the injunction hearing "reveals that the PET fusion is not an entirely new test."  *Id.* at 391.  The only reason "more thorough investigation [was] appropriate" in that case is because actual resolution of the factual dispute had to "await a trial on the merits."  *Id.*  Here there is no reason for a trial on the merits – plaintiffs have not offered any evidence of plan language beyond the language of their own plans quoted in their complaint and affidavits.  And for the reasons discussed above, these plan terms do not entitle plaintiffs to the relief they seek.

recover the movant's monetary loss, should the preliminary injunction be denied, would be futile." 762 F.2d at 473. Otherwise, the rule from which plaintiffs here seek exception had been strictly enforced: "In settings other than the Iranian crisis, however, when it has been shown that foreign courts provide a legal remedy or, at worst, that access to foreign courts is speculative, injunctive relief has been refused." *Id.* Indeed, "[e]ven in some cases related to and arising after the Iranian revolution . . . federal courts have refused to grant preliminary injunctive relief, finding that the unsettled situation in Iran was simply insufficient." *Id.* (citation and internal quotation marks omitted); *accord, e.g.*, *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) (preliminary injunction "should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury").

Plaintiffs' own authority bears this out. It is true that this Court denied a motion to dissolve an injunction in *Citizens Savings Bank* on the grounds of fund dissipation. But there, the risk of dissipation had been **proven**. The Court explained that "extraordinary circumstances exist where a corporation is insolvent and its fund in danger of depletion such that a failure to maintain the status quo would make any damages remedy moot." 1996 WL 737008, at *4. Extraordinary circumstances do not prove themselves; plaintiffs must affirmatively show that no possibility of relief exists if they do not receive it now.

They have not done so. Plaintiffs' only cognizable argument on irreparable harm[5] is their claim that injunctive relief is necessary "to prevent plan beneficiaries from dissipating settlement

---

[5] Plaintiffs also suggest separately that they will suffer irreparable harm if the Vioxx claimants' identifying information is not disclosed because, without it, "Plaintiffs will be unable to assert or enforce their ERISA reimbursement rights at all." (Mot. at 18.) But this is not an irreparable harm argument for **preliminary** relief, as explained previously. Instead, it is an argument for final injunctive relief. If plaintiffs stand to lose nothing by waiting, the argument that they need identifying information is not an argument for an injunction now.

proceeds before [they have] had the opportunity to have [their] claim for reimbursement adjudicated." (Mot. at 19.)  This is false.

Even if plaintiffs are correct that they cannot recover dissipated funds, the urgency of their case is doubtful.  As an initial matter, the forthcoming disbursement involves only half of the total payout.  Plaintiffs certainly do not contend that they have an interest exceeding half the value of the settlement.  Their interests are thus preserved by the status quo itself, without the need for an injunction.

In any event, plaintiffs' suggestion that they cannot pursue settlement funds after they are disbursed is entirely speculative.  The argument is based on the outcome of *Great-West*, in which the Supreme Court denied relief because the plaintiffs had not sought recovery from an identifiable fund in the defendants' possession.  But *Sereboff* added substantial caveats to that holding.

After *Sereboff*, it is clear that a fiduciary can pursue recovery of funds on equitable grounds even after settlement funds are disbursed.  Nothing makes this more clear than *Sereboff* itself, in which "Sereboffs' attorney had already distributed the settlement proceeds to them" when Mid Atlantic brought suit.  547 U.S. at 360.  Indeed, relief may well be available even when settlement moneys are fully "dissipated" by the claimant because any legitimate "fund" would exist by agreement (*i.e.*, under the terms of the plan) and, under *Sereboff*, not be subject to any tracing requirements.

In *Schultz v. Progressive Health, Life, & Benefits Plan*, for example, another district court of the Fifth Circuit confirmed that spent funds are still subject to equitable restitution under ERISA.  481 F. Supp. 2d 594, 595-96 (S.D. Miss. 2007).  In *Schultz*, Aetna sought to recover overpayments from a plan beneficiary who had received social security payments, which under

the plan terms were supposed to offset any benefits paid by the plan.  Schultz objected, arguing

that "she does not have a specific identifiable asset which can be recovered by Aetna because she

spent all of the overpaid funds, and therefore the funds are no longer in her possession or

control."  *Id.* at 595.  The court rejected the argument.  Citing *Sereboff*, the court explained that

"strict tracing rules do not apply to cases of equitable restitution when an equitable lien is

imposed by agreement," as it was under the terms of the plan in that case.  *Id.* at 595.  At least

one other court has reached the same conclusion since *Sereboff*.  *See Fregeau v. Life Ins. Co. of

N. Am.*, 490 F. Supp. 2d 928, 931-32 (N.D. Ill. 2007).

      Even if plaintiffs were correct that dissipation of the funds would extinguish their

putative rights to equitable relief, it is still plaintiffs' burden to show that the funds would

actually be dissipated in order to show irreparable harm.  In *Chicago Regional Council of

Carpenters Welfare Fund v. Johnson*, for example, the Northern District of Illinois denied a

motion for a temporary restraining order on the grounds that the plaintiff had not shown

irreparable injury when "defendants have not yet received the settlement award from the third-

party" because there was "no reason to believe that they intend to disperse the disputed funds,

when collected, or that they otherwise intend to place them beyond the reach of this Court."  No.

00 C 4707, 2006 WL 2943623, at *2 (N.D. Ill. Oct. 6, 2006).  No such showing has been made

here, either, and plaintiffs have thus failed to meet their burden on irreparable injury.

      Plaintiffs' authority does not hold otherwise.  *Diamond Crystal Brands v. Wallace*, for

example, which plaintiffs hold out as the leading example in support of their irreparable injury

argument (Mot. at 19), is not exactly a rigorous treatment of the issue.  Indeed, it says absolutely

nothing about irreparable injury beyond the sentence quoted by plaintiffs – simply that "[i]f a

preliminary injunction does not issue in this case, Plaintiff may not be able to obtain relief under

Section 1132(a)(3) because the funds at issue may no longer be traceable and under the control of Defendants."  531 F. Supp. 2d 1366, 1374 (N.D. Ga. 2008).  It does not appear that defendants in that case even joined issue on the question of irreparable injury; rather, they appeared to advance only three unrelated arguments.  *See id.* at 1370.  And the authority cited by plaintiffs from this Court makes clear that plaintiffs must "'***prov[e]*** that a claim for monetary damages would be difficult to collect'" due to "'potential distribution of assets.'"  (Mot. at 19 (quoting *Rudney v. International Offshore Services*, No. 07-3908, 2007 WL 2900230, at *5 (E.D. La. Oct. 1, 2007)) (emphasis added).)  None of plaintiffs' authority[6] establishes that the risk of dissipation can simply be presumed in order to satisfy plaintiffs' very heavy burden to prove the existence of "extraordinary circumstances" warranting an injunction for "purely economic damages."

Finally, plaintiffs' claims of urgency also ring hollow in light of the many months they waited to file suit in the first place.  As many courts have recognized, as little as even a few weeks delay in filing suit and seeking preliminary injunction relief can preclude a showing of irreparable harm and result in the denial of a preliminary injunction.  *See, e.g.*, *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm."); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (A two-month "delay is inconsistent with a claim of irreparable injury.").  Plaintiffs may have been spurred into action by the filing of the

---

[6]     Plaintiffs' remaining authority predates *Sereboff* and *Great-West* and thus plainly does not address the specific question presented in this case.  To take just one example, *Tri-State Generation and Transmission v. Shoshone River Power* found irreparable injury where Tri-State showed that, because of a Wyoming governmental indemnification statute, it might not be able to collect a money judgment from one of the defendants even if it prevailed on the merits of the case.  805 F.2d 351, 355 (10th Cir. 1986).  The case had nothing to do with the risk of dissipation of funds, and the irreparable injury analysis was done on the basis of a proven legal barrier to collection of damages.

*AvMed* action.  But plaintiffs' desire to stake out a piece of the pie should have no bearing on their entitlement to a preliminary injunction.

In sum, plaintiffs have failed to show that they will be irreparably injured without an injunction, and for this reason too, their motion should be denied.

3.      **The Balance of Harms Disfavors an Injunction.**

The harms that plaintiffs' injunction threatens are far greater than those it would prevent. Plaintiffs dwell solely on money, but there are obvious privacy issues implicated by what plaintiffs propose as well.  Indeed, the Agreement was drafted to protect those interests.  (*See* Agreement § 15.1.)  Serious fairness issues also obtain in light of the fact that plaintiffs would force delayed payouts for the entire pool while they attempt to discern their putative rights against some fraction of it that actually comprises the beneficiaries of their plans.  But even as to monetary considerations, plaintiffs are off the mark.  The balance of harms thus weighs heavily against an injunction.

The settlement claimants' rights to medical privacy are protected by state and federal law. Their interests in privacy are threatened by plaintiffs' proposed relief.  Plaintiffs trumpet the advantages of their "carefully tailored" injunction over the broader one sought in *AvMed* (Mot. at 21 n.17), but even under the injunction proposed here, the personal identifying and medical information of every Vioxx claimant against whom a lien might lie (presumably plaintiffs believe there are several such claimants) would be disclosed to the plaintiffs or their attorneys – with whom the vast majority of the claimants have no contractual agreement.  The same harm is thus inflicted.  Plaintiffs suggest that the privacy interest here is illusory because Vioxx claimants effectively consented to such disclosure by filing lawsuits and enrolling in benefit plans.  But that argument is frivolous.  The consent to disclosure under these scenarios is limited and specific – a person does not consent to disclose his private information to anyone who comes

26

along simply because he consents to disclose it to an adversary in litigation or to a particular

benefits plan.  Here, plaintiffs seek disclosure to themselves and their attorneys of information to

which they are not entitled by the terms of their plans – namely, the identifying information of

Vioxx claimants covered by other ERISA plans.

In any event, plaintiffs entirely gloss over the unjustified delay in payment their

injunction would occasion on the majority of the pool.  Plaintiffs insist that their injunction

"accommodates" the delay concern by "screening out, to the greatest extent possible, those

claimants who either did not participate in an ERISA health plan, or did not receive any benefits

from such a plan."  (Mot. at 21-22.)  But plaintiffs' requested relief cannot be performed

instantaneously.  And indeed, their injunction provides for a 20-day notice prior to disbursement

of any funds, as well as additional periods of time for each step of their proposed relief.  Even if

plaintiffs' injunction were entered today, the initial disbursement of funds would have to be

delayed.

Plaintiffs also miscalculate the relative financial hardships.  They take for granted that

they will lose their ability to pursue "tens and likely hundreds of millions of dollars in employee

benefit plan funds" if an injunction does not issue.  (Mot. at 21.)  As demonstrated above, this is

a doubtful proposition.  What they might lose is a convenience to which they are indisputably not

entitled and thus is not cognizable here – namely, to pursue such funds in a single, consolidated

proceeding.  But even if it is true that they face a risk of such loss, it must be disaggregated, and

the relative burden of the loss of each individual fund must be measured against the burden the

corresponding claimant would face.  There is no claim here that plaintiffs risk insolvency or

serious overall financial hardship without an injunction.  And although they would allow

"hardship" exceptions to some claimants, they offer no comfort for the delay in disbursement

they will cause to the entire pool (including those who might eventually prove eligible for a hardship payment).  This balance of hardships – which focuses on the harms as they will affect the relevant parties rather than an out-of-context, dollar-to-dollar balancing – should guide the Court's assessment of this prong of the analysis.  Plaintiffs have simply failed to demonstrate that the heavier burden falls on them – particularly in light of the fact that they have greatly exaggerated the "irreparable harm" that they ostensibly face in the absence of an injunction.

For both of these reasons, plaintiffs have failed to make the required showing that the balance of harms favors an injunction.

### 4. A Preliminary Injunction Would Disserve the Public Interest.

Finally, plaintiffs' proposed injunction would not serve the public interest.  Plaintiffs would stop the clock in the eleventh hour of a resolution of one of the largest mass tort proceedings in U.S. legal history.  Claimants have waited years for relief.  They are waiting to get on with their lives.  They and the greater public have a significant interest in winding down this stage of the litigation.

Plaintiffs, on the other hand, are only at this late hour awakening to their purported interest in a litigation that has been ongoing for the better part of a decade.  The Court should make no mistake – this is a test case about whether insurance companies can wait on the sidelines while their insureds and their insureds' counsel labor for years to secure a recovery for personal injuries arising out of a mass tort and then grab the compensation that they obtain.  Sanctioning this behavior will shift the considerable costs of enforcing whatever rights these companies may have onto plaintiffs' lawyers and substantially increase the costs of litigating mass torts.  That outcome is not in the public interest; it is in the interest of maximizing corporate profits.

Accordingly, plaintiffs have failed to show that their requested relief is in the public interest. For this reason too, their motion should be denied.

## II.   EVEN IF AN INJUNCTION WERE APPROPRIATE, IT SHOULD NOT BE ENTERED WITHOUT A SECURITY BOND.

Even if the Court were to determine that an injunction is warranted, it should not be entered without some sort of security. For reasons detailed in this section, the Court should require a bond of $2,425,000,000.00 – the value of that portion of the settlement whose disbursement plaintiffs' injunction would likely delay. In the alternative, as a simple matter of preserving the value of the settlement to the claimants and to offset the costs that the settlement administrator would incur in complying with any injunction, a bond of at least $89,875,000 is required.

Plaintiffs assert that this Court should dispense with any security for potential damage caused by the requested injunction. They contend that BROWNGREER would suffer no harm if the injunctive relief is granted because it is "limited." As discussed below, plaintiffs are incorrect. BROWNGREER would sustain increased administrative costs from the injunction.

More importantly, though, plaintiffs' assertion that no bond is necessary ignores the rights of the Vioxx settlement claimants. The claimants have contractual, judicially-protected rights to immediate disbursement of the settlement payments in accordance with the terms of the Agreement. The requested injunction seeks to nullify the claimants' rights. Accordingly, the claimants should be protected from the potential damage that could result from the loss of those rights.[7]

---

[7]     The Vioxx settlement claimants are indispensable parties with an interest in the settlement monies and the enforcement of the Agreement. *See, e.g.*, *B. Fernandez and Hnos, Inc. v. Kellogg USA, Inc.*, 440 F.3d 541 (1st Cir. 2006) (holding that party to contact was indispensable to party to proceeding requesting injunctive relief modifying distribution contracts); *Dawarendewa v. Salt River Project Agric. Power Dist.*, 276 F.3d 1150, 1155-56 (9th Cir. 2002) (holding that party to contract was indispensable party in action that sought injunction modifying contract

The potential loss to the settlement claimants is immense, and the bond should reflect the severe harm the claimants could suffer. Plaintiffs admittedly will not seek relief against the entire claimant pool; yet, plaintiffs ask this Court to enjoin settlement disbursements to 100% of the claimants. Plaintiffs ask that the settlement payments be enjoined for a minimum of twenty days, and in reality many more. Furthermore, the requested relief requires payments to be withheld at least another forty-five days if plaintiffs assert reimbursement rights against a particular claimant. And if a demand is made, the delay could stretch into years while the parties determine whether a plaintiff has valid reimbursement rights and, if so, the amount of such reimbursement.

Under these circumstances, the security for the requested injunction should be in an amount sufficient to protect the Vioxx settlement claimants from any hardship, loss, or inconvenience that could result from the wrongful restraint of the settlement payments. In setting the amount of the bond, the Court should consider that the bond will be an injured claimant's only recourse for damage from the wrongful restraint of a settlement payment. *See, e.g., Sprint Comms. Co. v. CAT Comms. Int'l, Inc.*, 335 F.3d 235, 239-40 (3rd Cir. 2003); *Mead Johnson Co. v. Abbott Labs., Inc.*, 201 F.3d 883, 888 (7th Cir. 2000). The bond cannot be retroactively increased once it is set. *Sprint Comms.*, 335 F.3d at 239-40. Since the party restrained by the bond must still prove his entitlement to damages, the party who posts the bond suffers no injury if the bond turns out to be too high. *Mead Johnson*, 201 F.3d at 888. Conversely, however, "an error in the other direction [setting the bond too low] produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed

---

terms); *Kettle Range Conservation Group v. United States Bureau of Land Mgmt.*, 150 F.3d 1083 (9th Cir. 1998) (holding that private parties buying land were necessary parties to injunction against seller to prohibit sale).

the amount of the bond." *Id.*  Accordingly, the amount of the bond should be set on the "high side" of the potential exposure. *Id.*

Applying these fundamental principles, a bond equal to the amount plaintiffs propose to enjoin – at least the first payout, equal to $2,425,000,000.00 – is appropriate.  With 50,000 potentially injured claimants, a bond of that size provides security of only $50,000.00 per claimant.  This is a reasonable estimate of adequate security given the potential loss exposure of the claimants.  As the PSC's amicus brief in *AvMed* vividly illustrated, such a bond, though substantial, is justified by the even more substantial hardship that will be placed on the settlement claimants by an injunction that would delay the initial payout.

At a minimum, plaintiffs must be required to secure the costs that the settlement claimants will endure by virtue of the delayed payout.  Again, they propose to enjoin (at a minimum) the payout of $2,425,000,000.00.  At an interest rate of 7%, even if plaintiffs were able to complete their work and the injunction could be lifted in just six months time, a bond of $84,875,000 would be required to secure the interest that would have accrued to the claimants during that time (3.5% of $2,425,000,000.00).

Additional funds would be required to secure the interests of BROWNGREER.  The costs of administering the Settlement Program would increase if the injunctive relief is granted.  These increased costs include but are not limited to:

1.  Redesigning the claims database software to comply with an order to withhold payments for all claimants;

2.  Identifying affected claimants who are the insureds of the plaintiff;

3.  Coding affected claimants to trigger payment withholdings;

4.  Writing computer code to pull requested claimant information from the database;

5.      Designing reports to the plaintiffs containing the requested information;

6.      Running and transmitting appropriate reports; and

7.      Dealing with ongoing follow-up questions and issues.

Plaintiffs' assertion that BROWNGREER is not harmed by the injunction is not accurate. The security for the injunction should include an amount sufficient to protect the settlement fund administrator.  Conservatively, the bond should be increased $5 million to secure its interest. Thus, if the Court finds that a $2,425,000,000 bond is inappropriate here, it should find that a bond securing an amount no lower than $89,875,000 is required.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny plaintiffs' motion or, in the alternative, enter an injunction only upon receipt of a bond for $2,425,000,000.

Respectfully submitted,

IRWIN FRITCHIE URQUHART & MOORE, LLC

*/s Monique M. Garsaud*
JAMES B. IRWIN (Bar No. 7172), T.A.
MONIQUE M. GARSAUD (Bar No. 5393)
400 Poydras Street, Suite 2700
New Orleans, Louisiana  70130
Telephone:  (504) 310-2100
Facsimile:  (504) 310-2101
Email:  jirwin@irwinllc.com
          mgarsaud@irwinllc.com

*Attorneys for BROWNGREER, PLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Opposition to Plaintiffs' Motion for Preliminary Injunction has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 10th day of July 2008.

_/s Monique M. Garsaud_