# Affidavit of Nicholas Underhill Q. C.

# Exhibit G



Nov 4 2005
11:08PM

**DECHERT LLP**
A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PRINCETON PIKE CORPORATE CENTER
(MAIL TO)          P.O. BOX 5218, PRINCETON, NEW JERSEY 08543-5218
(DELIVER TO)    997 LENOX DRIVE, BUILDING THREE, SUITE 210
                        LAWRENCEVILLE, NEW JERSEY 08648
                        (609) 620-3200

**HUGHES HUBBARD & REED LLP**
A NEW YORK LIMITED LIABILITY PARTNERSHIP
101 HUDSON STREET, SUITE 3601
JERSEY CITY, NEW JERSEY 07302-3918
(201) 5:16-9220

ATTORNEYS FOR DEFENDANT MERCK & CO., INC.

| In re: VIOXX® Litigation | SUPERIOR COURT OF NEW JERSEY |
|---|---|
| | LAW DIVISION: ATLANTIC COUNTY |
| | VIOXX® LITIGATION |
| | CASE NO.: 619 |
| | CIVIL ACTION |

## CERTIFICATION OF NICHOLAS UNDERHILL Q.C. FOR DEFENDANT'S MOTION TO DISMISS NON-U.S. PLAINTIFFS' SUITS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

**NICHOLAS UNDERHILL Q.C.**, by way of certification in lieu of affidavit, hereby certifies as follows:

## INTRODUCTORY

1.    I am a barrister in practice at the Bar of England and Wales, practising from Fountain Court Chambers in London. I have been asked by Lovells, solicitors acting for Merck & Co Inc. and Merck Sharp & Dohme Ltd. (together, "Merck"), to provide a certification for the purpose of proceedings filed in the Superior Court of New Jersey by a number of plaintiffs resident in England or Scotland who claim to have suffered injury as a result of their treatment with Merck's drug Vioxx ("the UK plaintiffs"). I understand that Merck is making applications to dismiss the claims by the UK plaintiffs on grounds of *forum non conveniens*. I am asked to assist the New Jersey Court by explaining what legal remedy would be available to the UK plaintiffs if they were to pursue claims in the English courts against Merck based on the same facts;

M001682

to outline the legal issues to which such claims would give rise; and to explain certain procedural matters.

2.    A copy of my *curriculum vitae* as it appears on my chambers' website is exhibited as NU 1. As there appears, I was called to the Bar in 1976 and I have held the rank of Queen's Counsel since 1992. I am a Recorder of the Crown Court and a deputy High Court Judge. I have a broad commercial practice, with particular specialities in product liability law and employment law. So far as my experience in product liability law is concerned, I appeared as leading counsel in the two principal medical/pharmaceutical product liability cases fought in the High Court in the last few years - *A v. National Blood Authority* [2001] 3 All ER 289 (which concerned blood products contaminated with the hepatitis C virus) and *XYZ v. Schering* (2003) 70 BMLR 88 (which concerned the alleged greater thrombogenicity of "third-generation" oral contraceptives). I have been involved over the years in advising on a number of other claims in this field, involving not only pharmaceutical products but also medical devices and tobacco. I am in this capacity very familiar with the English law of product liability.

3.    I have not been asked to consider the substantive issues in the New Jersey proceedings and have only been given a bare outline of the underlying facts. The only papers which I have seen relating to the proceedings are the Master Long Form Complaint (to which I will refer as "the Master Complaint"); the Summons and Abbreviated Individual Complaint filed by Jeffery and Barbara Jacobs, which I understand to be in substantially identical form to those issued by the other UK plaintiffs; and the Answer to that Summons.

4.    My certification is in two parts. Part I considers the substantive law that would be applied if a claim of the kind made in the Master Complaint were brought in the English courts. Part II deals with procedural matters.

SUMMARY

5.    It may be convenient if I give a brief summary here of the matters to which I depose in this certification:

*Substantive law*

(1)    On the basis of the facts alleged in the Master Complaint the UK plaintiffs would have an effective remedy in the English Courts under Part I of the Consumer Protection Act 1987, which represents the United Kingdom's implementation of the European Union "Product Liability Directive" dated 25th July 1985. However, although that cause of action gives claimants an effective remedy in claims for defective products,

M00168202

it does not correspond to any of the causes of action under New Jersey law pleaded in the Master Complaint.

(2)  The legal issues likely to arise on such a claim involve important questions on which the relevant law is unsettled. In particular, there are serious uncertainties (a) as to the approach which a Court should take in deciding whether a pharmaceutical product is "defective" because of its side-effects and (b) as to the scope of the "development risks defence". As regards (a), the areas of uncertainty include the relevance of the intermediary role of doctors in the administration of the drug and the legitimacy of "risk-benefit analysis". The UK regulatory system for pharmaceutical licensing will be very relevant to the Court's assessment.

(3)  Because the relevant law principally derives from the law of the European Union, it would be necessary in seeking to resolve those disputes to have regard not only to the terms of the Product Liability Directive but also to the case-law of the European Court of Justice and of the courts of the Member States of the European Union, and to the legislative history of the Directive (including the so-called *travaux préparatoires*). Ultimately the issues in question can only be authoritatively resolved by the European Court of Justice.

*Procedure*

(4)  The procedures of the English Courts would give the UK plaintiffs a fair and effective opportunity to advance their claims.

(5)  The United Kingdom has qualified its acceptance of the Hague Convention, so that if the claims were to proceed in New Jersey there would be some limitations on the extent to which the English Court would be able to offer judicial assistance.

I    **SUBSTANTIVE LAW**

**INTRODUCTORY**

6.  Part I of the Consumer Protection Act 1987 ("the CPA") introduces into English law a regime of (modified) no-fault liability for injuries caused by defective products (including pharmaceutical products): a copy of Part I of the CPA is exhibited marked NU 2. Any claim in the English courts based on facts of the kind pleaded in the Master Complaint would unquestionably be brought under the CPA. There are theoretically other causes of action available (most obviously common law

3

negligence), but they would be much more difficult to prove and would offer no substantive advantages over a claim under the CPA.

7.   I will therefore focus in what follows on the ingredients of a claim under the CPA. But it is necessary to deal with one preliminary matter of fundamental importance. The CPA was enacted in order to give effect to the "Product Liability Directive", which is legislation promulgated by the Council of Ministers of what was then the European Economic Community ("the EEC") but is now the European Union ("the EU"). In order to understand the jurisprudence relating to claims under the CPA it is necessary to understand the inter-relationship of EEC/EU legislation such as the Directive and the law of individual Member States. I accordingly address that first. (I know that David Anderson Q.C. has been asked to give a certification covering much of this ground, but I believe that some summary is necessary here.)


## (1)   EEC/EU LAW AND ENGLISH LAW


8.   The European Union is not itself a state. It is a grouping of independent sovereign states ("Member States") which have bound themselves by international treaty to accept the authority of various common institutions and to procedures for the promulgation of legislation binding on all Member States in certain specified fields. The governing treaties applicable first to the EEC and later to the EU are complex, and it is unnecessary to go into the details here. Also, for the sake of simplicity I will refer to "the EU", whatever the precise date being referred to, rather than distinguishing between the EEC and the EU. Three EU institutions have a central role in the legislative process - the Council of Ministers, the European Commission (which is the principal executive body of the EU) and the European Parliament.

9.   The EU at present comprises 25 Member States - Austria, Belgium, the Czech Republic, Cyprus, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Slovakia, Slovenia, Spain, Sweden and the United Kingdom ("the UK"). (England - strictly, England and Wales - is of course a part of the UK; but the other component countries of the UK - Scotland and Northern Ireland -- are legally distinct jurisdictions.)

10.  In the fields specified by the treaties - which include consumer protection - the EU has power to legislate so as to create what is in principle a common legal regime across all 25 Member States. However, the reality is less straightforward than that might suggest. I should make four points in particular.

M0001E

11.   <u>First</u>, there is no system of EU Courts equivalent to the Federal Courts in the United States.  Subject to the role of the European Court of Justice referred to in para. 15 below, rights deriving from EU legislation fall to be enforced in the ordinary Courts of each of the 25 Member States, using their own procedures and applying their own systems of remedies.  In this connection it is important to note that the Member States of the EU are countries with a wide variety of different legal systems and traditions (and, of course, languages).  The UK and Ireland (and to a lesser extent Malta) have systems based on the common law.  Most of the other Member States have systems based, in the broadest sense, on civil law traditions, but there are nevertheless wide differences between them, both as regards their legal institutions and in their substantive law and procedure.

12.   <u>Secondly</u>, EU legislation of the kind with which we are here concerned – "directives" – do not themselves confer rights or obligations on any person.  Instead, they operate by requiring the Member States (within a specified timescale) to enact their own national (or "domestic") legislation implementing the rights and duties prescribed by the directive.  It is only under that national legislation that enforceable rights and obligations are created.  Implementing legislation of this kind has to do more than simply transpose the provisions of the directive in question word-for-word into a domestic statute.  There will necessarily be a degree of adaptation and elaboration in order to make those provisions (which are often framed in fairly general language) understandable and workable in the legal system of the particular state.

13.   <u>Thirdly</u>, directives often leave a degree of discretion to Member States.  They are often expressed to be intended to achieve only an "approximation" or "partial harmonisation" of the laws of individual Member States in the field in question.

14.   <u>Fourthly</u>, directives are promulgated in the national languages of each of the Member States, each version having equal status.  Whatever care may be taken in the translation, there is often scope for divergences of interpretation as between different Member States as to the intended effect of a directive.

15.   All these factors tend to dilute the extent to which EU legislation in truth creates a common regime across all 25 Member States.  However, there is a crucial counter-balancing factor in the role of the Court of Justice of the European Communities (generally referred to as "the ECJ"), which is a single Court situated in Luxembourg.  Mr. Anderson's certification will describe the role of the ECJ in detail, and I will accordingly confine myself to noting that, so far as relevant for present purposes, the ECJ has two roles:

- *Infringement proceedings*.  The ECJ is the forum for the determination of proceedings brought by the Commission against Member States for infringement of their Treaty obligations.  Such infringements may include the

5

failure by a Member State correctly to implement the provisions of a directive in its national law.

- *"References"*. The ECJ has power -- under what was originally art. 177 of the relevant Treaty but is now art. 234 - to resolve disputes referred to it by the courts of Member States as to the correct interpretation of EU legislation. Since, as explained above, all EU law operates through the ordinary legal systems of the Member States, it is primarily for domestic courts to determine issues of EU law which arise in cases brought before them.   But that inevitably gives rise to the risk that the courts of different Member States may interpret identical EU legislation, or domestic legislation derived from the same EU directive, in different ways.  Accordingly, where a domestic court believes that there is some important uncertainty as to the meaning or effect of EU law, it has the right to refer that question to the ECJ for an authoritative ruling.

The ECJ thus has a fundamental role in ensuring uniformity of interpretation and application of directives throughout the EU, which is itself essential for the proper operating of the EU.

16.   Thus in all cases where a Member State legislates in order to implement the requirements of an EU Directive there is a potentially complex interplay of EU and domestic law.  It is the duty of a national Court in interpreting and applying domestic legislation derived from a directive to do so in such a way as to ensure conformity with the relevant EU law.  Specifically it must have regard:

(a)   most obviously, to the actual terms of the underlying directive; but also:

(b)   less obviously (at least to a common lawyer), but equally importantly, to the policy objectives of the directive.  It is the usual practice in drafting a directive to refer extensively in a preamble to the underlying policy objectives and to the formal *"travaux préparatoires"* (such as reports by the Commission or the European Parliament) which preceded its enactment.  Generally, Courts applying EU law are required to adopt a more "purposive" and policy-driven approach than is conventional at common law;

(c)   to any relevant case-law of the ECJ; and

(d)   in cases of ambiguity, to the text of the directive in the other EU languages.

(2)     THE PRODUCT LIABILITY DIRECTIVE

17.   Part I of the Consumer Protection Act 1987 was enacted, under the framework set out above, as the UK's implementation of its obligations under the Product Liability Directive – or, to give it its full name, EEC Directive 85/374 on the Approximation of the Laws, Regulations and Administrative Provisions of the Member States concerning Liability for Defective Products.  A copy of the English version of the Directive is exhibited as NU 3.  Because – for the reasons already given - they are relevant to my consideration of the issues which would arise in a claim by the UK plaintiffs in England I should summarise briefly (a) the genesis and principal provisions of the Directive and (b) the case-law of the ECJ in which the meaning of the Directive has been considered.

(a)     The Genesis and Principal Provisions of the Directive

18.   From the mid-1970s onwards, it was an aim of policy-makers in the EEC to introduce a form of strict liability regime (more accurately a no-fault liability regime) for injuries caused by defective products.   The introduction of such a scheme became something of a flagship project for the Commission.  This goal eventually bore fruit in the Product Liability Directive.  The drafting and eventual adoption of the Directive were extremely controversial, with different Member States, the Commission and other interested parties taking widely divergent views as to the extent of the obligations that it was right to impose on producers.  One consequence of this was the unusual feature that some of the provisions of the Directive were optional - that is, it was left to Member States to choose whether or not to incorporate them in their law. One such optional provision was the "development risk" defence referred to below.  These opt-outs were necessary in order to obtain the necessary unanimity in the Council of Ministers.

19.   Implementation of the Directive was required by 31st July 1988.  Although there were considerable delays in many Member States implementation has been effected throughout the EU for several years.  A useful guide to the situation as regards the application of the Product Liability Directive within the EU in 2002/3 (though limited to the then 15 Member States) is to be found in a report commissioned by the European Commission from Lovells entitled *Product Liability in the European Union*: a copy is exhibited as NU4.  (The discussion in the report illustrates the complex interaction of domestic and EU law described in para. 16 above.)

20.   The provisions of the Directive can be summarised as follows:

        (1)   *Defect-based liability*.  The essential basis of liability is that damage has been caused by a *defect* in the product - art. 1.  "Defect" is defined in art. 6:

M001

essentially, a product is defective "when it does not provide the safety which a person is entitled to expect, taking all circumstances into account".

(2)    *Burden of proof.* Art. 4 provides that:

> The injured person shall be required to prove the damage, the defect and the causal relationship between defect and damage.

(3)    *Defences.* While the mere fact of injury by a defective product affords a *prima facie* claim, the Directive provides for a number of defences, set out in art. 7. In particular, art. 7 (e) provides that it shall be a defence for the producer to prove

> that the state of scientific and technical knowledge at the time when [the producer] put the product into circulation was not such as to enable the existence of the defect to be discovered.

This is generally referred to as the "development risk" defence.

(4)    *Who is liable: definition of "producer".* The primary definition of "producer" is the manufacturer of the product - art. 3.1; but this definition is expanded in various ways.

(5)    *Damage.* Art. 1 of the Directive makes the producer liable for "damage" caused by a defective product. "Damage" is defined in art. 9 to cover (a) death or personal injury and (b) property damage (subject to a value threshold designed to exclude purely trivial cases).

(b)    Case-Law

21.    The ECJ has not yet had much opportunity to consider issues raised by the Product Liability Directive, so most of the problem areas to which it may give rise are uncharted. The Directive has been considered in three cases. I review these in turn, partly because they deal with particular issues to which I shall have to return but partly also because they further illustrate the relationship between EU and domestic law. (There are two further cases pending before the Court – C-402/03 *Skov Aeg v. Bilka Lavprisvarehus A/S* (from Denmark) and C-127/04 *Byrne v. Sanofi Pasteur SA* (from England) – but the ECJ has not yet ruled, and the issues are not ones which, so far as I understand, are likely to arise in the circumstances of the present claims.)

M00

*C-300/95: European Commission v. United Kingdom ("Commission v. UK")*

22.     The judgment is exhibited at NU5.   These were proceedings brought by the Commission, which argued (see judgment, para. 16) that:

> ... the United Kingdom legislature has broadened the defence under Article 7 (e) [i.e. the "development risks" defence] of the Directive to a considerable degree and converted the strict liability imposed by Article 1 of the Directive into mere liability for negligence.

The proceedings failed, essentially because the Court held that the terminology of the English legislation, which did not strictly follow that of the Directive, did not (or in any event did not necessarily) have the alleged effect.  The Opinion of the Advocate General contains an important commentary on the overall philosophy of the Directive and the difficulties to which the development risks defence gives rise; and this is reflected to some extent also in the judgment of the Court.  The Court acknowledged that there are still difficult questions to resolve about the scope and effect of art. 7 (e).  In relation to one issue (more fully considered at paras. 39-42 below) it said, at para. 29:

> ... Article 7(e) of the Directive, contrary to what the Commission seems to consider, raises difficulties of interpretation which, in the event of litigation, the national courts will have to resolve, having recourse, if necessary, to Article 177 of the EC Treaty.

*C-203/99: Veedfald v. Arhus Amstkommune*

23.     *Veedfald* was a reference by a Danish court in a case concerning a defective fluid used in a public hospital to preserve and wash a kidney preparatory to transplantation: because of the defect the kidney was damaged and could not be used.  One of the issues referred was whether damage to the kidney at a time when it had not yet been transplanted constituted either personal injury to the intended recipient or damage to property within the meaning of art. 9, and - importantly - whether that was an issue to be determined by EU law or by Danish law: see paras. 23-33.  The details of that debate are not relevant for present purposes, but they are a good illustration of the difficulty of demarcation between EU and domestic legal principles in cases under legislation implementing (or trying to implement) the Product Liability Directive.  The effect of the Court's ruling was that

(a)     a Member State in implementing the Directive must provide for claimants to recover "full and proper compensation" for death or personal injury caused by a defective product; and

(b)    whether it has done so is a matter of EU law; but

(c)    the "precise content" of such damages must be determined by national courts; and

(d)    reparation for "non-material damage", which includes damages for pain and suffering (in French law, *pretium doloris*; in German law *Schmerzensgeld*), is entirely governed by national law.

The interaction between these points is not straightforward. It seems that the ECJ may regard it as falling within the scope of EU law to define, for example, what constitutes "personal injury" and to lay down general principles governing such questions as (in common law language) foreseeability and remoteness. But no EU jurisprudence as to the assessment of damages for personal injury has been developed to date; and the approach of the ECJ can only be clarified by one or a number of references under art. 234.

*C-52/00/C-154/00/C-183/00: Commission v France; Commission v. Greece; Gonzalez Sanchez v. Medicina Asturiana SA*

24.    These three cases were, in effect, heard and decided together because in each case the Member State had, though in different ways, implemented the Directive so as to give claimants more favourable rights than the Directive itself. That raised the question whether the product liability regime introduced by the Directive was intended to be an exhaustive statement of the scope of no-fault liability for defective products, or whether it merely stated a minimum threshold of protection which could be supplemented by national legislation. The Court decided that the former was the case.

*Decisions in other EU Member States*

25.    The decisions of courts of individual Member States on issues arising under the Product Liability Directive, or their domestic legislation implementing the Directive, are – unlike decisions of the ECJ - not formally authoritative in the courts of other Member States. Since their use gives rise to difficulties not only because of language problems but also because of unfamiliarity with foreign terminology and procedures, they are not always referred to. Nevertheless, they are becoming increasingly accessible and are increasingly referred to in the academic literature. In important cases where an issue of principle is raised I should expect an English Court to wish to be referred to any decision of the Courts of another Member State which discussed or illustrated how the principle in question had been approached there. This was the approach of Mr. Justice Burton in the *National Blood Authority* case with which I deal in more detail below. He said, at para. 44 (p. 320):

M00168220

Leaving aside any English decisions, to which the ordinary rules of precedent would apply, so far as relevant, I would of course pay particular attention to any European decisions, not because they are binding upon me, but because not only does respect have to be paid, on the usual principles of comity, to reasoned decisions of competent foreign courts considering the same or similar issues, whatever the nature of the legislation, but particularly so where Community courts are applying the directive. In such a case, even though Community courts are entitled to come to different views, particularly on the facts, by reference to national and local conditions, and even though the Court of Justice can resolve and give a final opinion upon issues where different views have been taken in different Community countries on the same legislation, nevertheless harmony is desirable, particularly where it can be said that an autonomous or Community approach or meaning is required.

(3)     CLAIMS UNDER THE CPA

Introductory

26.    The structure of Part I of the CPA substantially, though not precisely, follows that of the Directive as summarised in para. 20 above.  In short:

- Sec. 2 (1) provides that:

    ... [W]here any damage is caused wholly or partly by a defect in a product, [the producer] shall be liable for the damage.

- Sec. 3 defines "defect".  The core definition is that a product is defective where "[its] safety ... is not such as persons generally are entitled to expect".  Sec. 3 (2) provides that in determining that question "all the circumstances shall be taken into account, including-

    o  "warnings with respect to ... the product" and

    o  the time when it was supplied.

    This broadly corresponds to, though it somewhat amplifies, art. 6.1 of the Directive.

- Sec. 4 (1) sets out the statutory defences, again broadly following the wording of the Directive (art. 7).  Para. (e) provides for the development risks defence, as follows:

M00168.

That the state of scientific and technical knowledge at the relevant time was not such that a producer of products of the same description as the product in question might be expected to have discovered the defect if it had existed in his products when they were under his control.

That is not identical to the wording in the Directive; and the disparity led to the Commission bringing the infringement proceedings referred to at para. 22 above. But, as there noted, the ECJ held that the wording of the statute was capable of being construed consistently with that of the Directive.

27.   Although Part I of the CPA has been in force for almost twenty years, there are few reported decisions of the English courts giving guidance as to its application and almost none concerning pharmaceutical products. By far the fullest consideration of the statutory regime is to be found in the judgment of Mr. Justice Burton in *A v. National Blood Authority* [2001] 3 All ER 289 (in which, as noted above, I appeared as counsel). The case concerned the liability of the UK public authority responsible for blood transfusion to patients who had been infected with hepatitis C from contaminated blood products. The claim succeeded. The judgment, which I exhibit marked NU6, contains a very full discussion of some aspects of the Act and the Product Liability Directive, with extensive consideration of the EU *travaux préparatoires*, the decision of the ECJ in *Commission v. UK* (including the original Italian version of the Opinion of the Advocate General), reported cases from the courts of other EU countries, the academic literature and the different-language versions of the Directive. These materials took many days to review and argue. Although the extent of the consideration of such material reflected the unusual difficulty of the issues and the importance of the case, the judgment affords a good illustration of the extent of the interpenetration of English and EU jurisprudence.

28.   However, despite its length the judgment in the *National Blood Authority* case can certainly not be regarded as giving authoritative guidance on the meaning of the CPA, either generally or specifically in a case such as might be brought by the UK plaintiffs. This is because:

(1)   It is not the decision of an appellate court.

(2)   Several aspects of its reasoning have been the subject of strong and cogent academic criticism. The most recent academic text-book, *Product Liability* by Miller and Goldberg (2nd ed., 2004) describes the judgment as "controversial" (see para. 10.86, at p. 385) and cites a number of articles in which it has been criticised: copies of those articles are exhibited marked NU 7-10.

(3)   The case was not concerned with a pharmaceutical product which was alleged to have a "design" defect but with the very specific case of blood and

M001682C

blood products occasional batches of which (what the judge described as "non-standard" doses) were infected with a virus (and, because of the peculiar nature of such products, not accompanied by product literature of the conventional kind). There is thus only passing reference in the judgment to the issue of the side-effects of pharmaceutical products which are present not as a result of occasional contamination but are inherent in the design.

29.    Accordingly many questions as regards the true interpretation and effect of the provisions of Part I of the CPA are unresolved by the case-law. Such questions can only be authoritatively resolved by decisions of the Court of Appeal or the House of Lords, probably (in most cases) after a reference to the ECJ. As Professor Howells put it in the Preface to his text-book on the subject, *The Law of Product Liability* (2001), "product liability in the UK is still a young subject".

30.    I turn to consider the issues which would arise under the CPA if patients who had been treated with Vioxx and had developed a medical condition which they attributed to that treatment were to bring proceedings against the producer (which I take to be a Merck entity) in the English courts. The issues can be summarised under the following heads:

    (a)    Was Vioxx "defective"?
    (b)    If so, did the defect cause the injury complained of?
    (c)    If so, can the producer invoke any of the statutory defences?

    (d)    If not, how are damages to be assessed?


(a)    Defect

31.    It would of course be necessary in any proceedings for the plaintiffs to be able to prove as a matter of fact that Vioxx carries the risk of causing the "cardiovascular and/or cardiothrombotic side effects" alleged in the Master Complaint. If they did so, the question would then be whether that characteristic made it less safe than "persons generally" were entitled to expect. What that test entails, at a general level, was set out – in one of the uncontroversial parts of his judgment – by Mr. Justice Burton in the *National Blood Authority* case: see para. 31 (pp. 310-1). He said:

        I turn then to consideration of art 6. There is a foundation of common ground.

        (i) Article 6 defines 'defective', and hence a defect. A harmful characteristic in
        a product, which has led to injury or damage, may or may not be a defect as
        so defined, and thus within the meaning of the directive. It is common ground

13

that the liability is 'defect-based' and not 'fault-based', i.e. that a producer's liability is irrespective of fault (Recitals 2, 6).

(ii) The purpose of the directive is to achieve a higher and consistent level of consumer protection throughout the Community and render recovery of compensation easier, and uncomplicated by the need for proof of negligence. ... .

(iii) The onus of proof is upon the claimants to prove the product to be defective.

(iv) The question to be resolved is the safety or the degree or level of safety or safeness which persons generally are entitled to expect.  The test is not that of an absolute level of safety, nor an absolute liability for any injury caused by the harmful characteristic.

(v) In the assessment of that question the expectation is that of persons generally, or the public at large.

(vi) The safety is not what is actually expected by the public at large, but what they are entitled to expect.  ...  The common ground is that the question is what the legitimate expectation is of persons generally, i.e. what is legitimately to be expected, arrived at objectively.  'Legitimate expectation', rather than 'entitled expectation', appeared to all of us to be a more happy formulation (and is analogous to the formulation in other languages in which the directive is published) ... .

(vii) The court decides what the public is entitled to expect: Dr Harald Bartl in *Produkthaftung nach neuem EG-Recht* (1989) described the judge (as translated from the German) as 'an informed representative of the public at large'.  ... Such objectively assessed legitimate expectation may accord with actual expectation; but it may be more than the public actually expects, thus imposing a higher standard of safety, or it may be less than the public actually expects.

(viii) There are some products, which have harmful characteristics in whole or in part, about which no complaint can be made.  The examples that were used of products which have obviously dangerous characteristics by virtue of their very nature or intended use, were, on the one hand knives, guns and poisons and on the other hand alcohol, tobacco, perhaps *foie gras*. ... Drugs with advertised side-effects may fall within this category.

14

(ix) Article 6 (2) means that such test must be applied as at the date when the product is put into circulation, i.e. tested against the safety then to be expected. It is apparent that a product may be compared with other products said to be safer, but will not be condemned simply because another safer product is subsequently put into circulation.

(It will be noted that Mr. Justice Burton's references are to the Directive rather than to the CPA. This would in an ordinary case be strictly incorrect; but there were reasons peculiar to the case which made it the more appropriate course, and it made no substantive difference since neither party argued that the CPA and the Directive diverged.)

32.  It will accordingly be seen that the role of the Court is to decide what levels of risk should be and are "socially acceptable" (see judgment para. 55) to an English, or UK, consumer. In deciding whether a product is defective according to those principles the Court is required by the Act to have regard to "all the circumstances". Accordingly what is required is necessarily a broad multi-factorial assessment. In the case of a drug, a factor of great importance would obviously be the adequacy of any warnings appearing in the product literature. Another would be the comparative risk of competitor products. It would not be helpful for me, even if it were possible, to enumerate all the factors which a Court would have to take into account. But I should mention three points which may raise issues of law or otherwise be relevant to the question of *forum non conveniens*.

33.  (a)    The Regulatory Background.  Drugs are of course a very particular kind of product. They almost invariably carry a greater or lesser risk of side-effects; but it has been judged appropriate to market them notwithstanding that risk because of their benefits. In any sophisticated society such as the UK that judgment is not left to manufacturers but is regulated by a system of licensing. In deciding whether the harmful characteristics of a drug were sufficient to render it "defective" I would expect an English Court to attach great weight to the decision of the relevant licensing authorities. As Miller and Goldberg put it (*op. cit.*, at para. 1077, p. 380):

> ... [C]ompliance with regulations which cover a product in a relevant respect will be evidence that the product is not defective for the purposes of ... [the CPA]. Such evidence will be regarded as particularly cogent, and indeed often effectively dispositive of the matter, where the regulations are regularly updated and detailed.

No doubt the UK plaintiffs would advance reasons why the fact that Vioxx had been licensed by the UK regulators was not, in the circumstances of the particular case, evidence that it was not defective. It would be necessary for the Court to consider

M001692

what weight should be attached to the marketing authorisation. The system of drug licensing in the UK forms part of a wider EU system: it is to be more fully described in the certification of Mr. Anderson.

34.    (b)    The Intermediary Role of Doctors.  Prescription-only drugs are supplied entirely through, and on the initiative of, doctors.  Unlike in the United States, in the UK such drugs cannot be advertised or marketed to the general public; and as a result, save in exceptional cases, patients' information and expectations about the drugs which they are prescribed are mediated entirely through their doctors (who have of course a professional responsibility to explain to patients, so far as appropriate, the characteristics of any drug which they prescribe).  It might be thought to follow that in the case of prescription drugs the "safety expectation" with which the Court should be primarily concerned is not that of the general public but that of doctors.  However in the *National Blood Authority* case Mr. Justice Burton held that it was irrelevant that most doctors were aware of the risk that blood and blood products carried the hepatitis C virus, because that knowledge was not generally shared with patients (see para. 55 of his judgment in the *National Blood Authority* case – p. 335).  But this is one of the aspects of the judgment that has proved particularly controversial.  I refer, for example, to the article by Dr. Christopher Hodges exhibited at NU7, and to the endorsement of Dr. Hodges' conclusions by Miller and Goldberg (*op. cit.*, para. 12.49), where they say:

> ... [I]t would ... be wrong to treat the decision as authoritatively denying the potential application of the learned intermediary rule in a strict liability context.

The question of "whose expectation?" in the case of a sophisticated product such as a drug has not been considered by an appellate Court and remains very much live in English law.  In any case in which it arises it is very likely to have to be referred to the ECJ, at least if the case goes on appeal.

35.    (c)    "Risk-benefit" Analysis.  It is very commonly contended that the consideration of whether a harmful characteristic inherent in a product renders it defective must involve balancing the risk of harm being caused by that characteristic against the potential benefits of the product.  But in the *National Blood Authority* case Mr. Justice Burton appeared to reject that approach, notwithstanding that it had been advanced (albeit extra-judicially) by Lord Griffiths, a Law Lord (i.e. a member of what is *de facto* the Supreme Court of the UK), and a senior official of the Law Commission (the public body with responsibility for law reform): see paras. 68 –69 of the judgment (p. 340).  This rejection of any "risk-benefit analysis" has also proved controversial.  It has been particularly trenchantly challenged by Professor Stapleton (perhaps the most highly-regarded of all the academic commentators on English product liability law) in her article exhibited at NU8: see esp. p. 1251.  Miller and Goldberg (*op. cit.*, para. 10.34, p.362) express the view that a risk-utility/risk-benefit approach is

M00168C

compatible with the CPA regime and is indeed "almost inevitable". They regard the judgment of Mr. Justice Burton in this regard as "problematic". This is another aspect on which the law awaits clarification by the appellate courts in the UK and ultimately by the ECJ.

36.    I should mention one other point. In two cases under the CPA – *Richardson v. LRC Products Ltd.* [2000] Ll. Rep. (Med) 280 and *Foster v. Biosil* (2000) 59 BMLR 178 - English Courts appear to have held that in order to show that a product is defective a claimant must not only show that it has caused injury but must identify the specific mechanism which caused it to do so and which constitutes the defect.   This approach is contrary to decisions of courts in other EU Member States (specifically France and Austria) and has been criticised by the text-book writers. I am not clear whether the correctness of these decisions would be in issue in any proceedings brought by the UK plaintiffs. If it were, a court of first instance would not be obliged to follow the decisions in *Richardson* and *Foster*, and it might well not do so. If it did, however, the issue is plainly one which would require consideration by the appellate courts.

(b)    Causation

37.    Plainly, in order to establish causation the UK plaintiffs would have to prove at least (i) that they took Vioxx and (ii) that they subsequently suffered a cardiovascular and/or cardiothrombotic injury. But that does not by itself prove a causal link. It is common knowledge that there is a substantial background incidence of cardiovascular and cardiothrombotic disease/injury in the general population. Further, it appears from the Master Complaint that it is accepted that other drugs in the class, which the plaintiffs would presumably have been prescribed if they were not prescribed Vioxx, carry some such risk but that the risk of Vioxx is said to be greater. In such circumstances, in English law as it is at present understood a claimant would have to prove that the relative risk of injury for persons taking the drug in question was more than double the background risk in the relevant population. It was on that basis that the claimants in the case of *XYZ v. Schering*, to which I refer in para. 2 above, failed, after some weeks of very sophisticated epidemiological and statistical evidence. Further, in so far as the defect in question took the form of inadequate warning the claimant would have to prove (on the balance of probabilities) that he/she would not have taken the drug had the warning been adequate.

38.    It has been argued that the logical strictness of such rules on causation should be relaxed to some extent in cases where the defendant has been negligent; and no doubt similar arguments might be advanced in the case of claims under the CPA. Such arguments would raise difficult problems of analysis in an area where English law is at present highly fluid, following the decisions of the House of Lords in *Fairchild v. Glenhaven Funeral Services Ltd.* [2003] 1 AC 32 and *Chester v. Afshar* [2005] 1

M001682

AC 134. Any attempt to relax the rules on causation would certainly have to be considered in the Court of Appeal and perhaps by the House of Lords. It is unclear to what extent the ECJ will think it appropriate to become involved in issues of this kind: cf. para. 23 above.

(c)     Statutory defences: the development risks defence

39.     Although I am not aware of the detailed factual background, it is apparent from the facts stated in the pleadings that it would be open to Merck in any English proceedings to invoke the development risks defence under sec. 4 (1) (e) of the CPA and art. 7 (e) of the Directive – see paras. 20 and 26 above. Adopting the less clumsy language of the Directive, the issue would be whether "the state of scientific and technical knowledge at the time when [the producer] put the product into circulation was ... such as to enable the existence of the defect to be discovered": I will use the shorthand "discoverability".

40.     As indicated in para. 22 above, the content of the "discoverability" test was discussed in some detail in the ECJ in *Commission v. UK*; but without any authoritative conclusion being reached. Problem areas were identified, but the ECJ did not seek to resolve them but instead said that they would have to be decided in future cases, with the likelihood of a further reference or references – see the passage cited at para. 22. The nature of the "difficulties of interpretation" to which the ECJ referred is summarised by Professor Howells and Dr. Mildred in the article exhibited at NU9. Referring to both the *Commission v. UK* and the *National Blood Authority* cases, they say (at pp. 103-4):

> Nor can [the ECJ] be taken to have resolved the classic difficulty of defining the "state of scientific and technical knowledge". When does a researcher's idea become knowledge? To what extent can a claimant argue that the conjunction of different strands of thought adds up to discoverability? How does this dilemma interact with the Provisions of Article 6.2? None of these difficulties are directly addressed in the judgment of either court. The [ECJ] qualified its view that Article 7 (e) is directed "... unreservedly, at the state of scientific and technical knowledge, including the most advanced state of such knowledge ..." by the requirement that such knowledge must have been accessible. No elucidation of the meaning of "accessible" was provided.

Some commentators, such as Professor Stapleton, believe that there is no useful alternative to the well-tried concept of "reasonableness", so that in practice the test would be the same as in the common law of negligence (subject to the reversal of the burden of proof). Others believe that that approach would give insufficient content to a measure which was plainly intended to enhance consumer protection. A crucial question is the extent to which economic constraints on research are admissible

M0016

considerations when assessing discoverability.  The debate is unresolved and reflects tensions between different interests which were present at the very genesis of the Directive.  Those difficulties will certainly arise in any claim of the kind brought by the UK plaintiffs, i.e. one involving an alleged defect in an innovative pharmaceutical product.

41.  Accordingly I have little doubt that if these issues emerged, as seems almost inevitable, in proceedings brought by the UK plaintiffs, they could only be ultimately resolved by a reference to the ECJ: they are precisely the kind of issues which the ECJ itself predicted.  The ECJ would indeed be in a unique position to assess the complicated legislative history (briefly referred to in para. 18 above) and to weigh the policy factors in the light of submissions from Member States as well as the parties themselves.

42.  I should say, for completeness, that the judgment of Mr. Justice Burton in the *National Blood Authority* case does contain some general consideration of the development risks defence (see paras. 64 and 74-77, pp. 338 and 341-2).  But it is of limited value as guidance in circumstances such as those of these claims.  The "discoverability" problem in that case was not about some previously unknown defect in blood and blood products – the risk of contamination with a hepatitis virus was well-known – but about the impossibility in the then state of technical and scientific knowledge of distinguishing "clean" from contaminated batches.  (It is noteworthy however that his decision that the defence was not available in those circumstances was directly contrary to that of a Dutch court in the case of *Scholten v. Foundation Sanquin* on essentially the same facts.  This divergence illustrates the lack of any EU consensus in this area.)

(d)   Damages

43.  Damages for personal injury in a claim under the CPA (or indeed in negligence or contract) are limited to compensatory damages.  English law does not in any circumstances permit the award of purely punitive damages, in the sense of damages whose purpose is to punish the defendant for his wrongdoing.  It does, in certain circumstances, permit the award of what are usually called "exemplary" damages (though, confusingly, they are occasionally also referred to as "punitive" damages).  Those circumstances are limited by current case-law to two categories – (1) oppressive, arbitrary or unconstitutional actions by servants of the Government, and (2) where

> ... the defendant's conduct has been calculated by him to make a profit for himself which may well exceed the compensation payable to the plaintiff ... Where a defendant with a cynical disregard for a plaintiff's rights has calculated that the money to be made out of his wrongdoing will probably

M0016I

exceed the damages at risk, it is necessary for the law to show that it cannot be broken with impunity. This category is not confined to moneymaking in the strict sense. It extends to cases in which the defendant is seeking to gain at the expense of the plaintiff some object - perhaps some property which he covets - which either he could not obtain at all or not obtain except at a price greater than he wants to put down. Exemplary damages can properly be awarded whenever it is necessary to teach a wrongdoer that tort does not pay.

That formulation is taken from the speech of Lord Devlin in *Rookes v. Barnard* [1964] AC 1129, at pp. 1226-7, which remains the classic formulation of the relevant principles. Claims for exemplary damages on this basis are exceedingly rare: I have never known exemplary damages to be claimed, let alone awarded, in a product liability case.

44.   Compensatory damages would be assessed by a judge and not a jury. The Court would apply principles which are strictly delineated in the case-law and would award damages under two broad headings:

-     *Non-pecuniary damage*. Compensation under this head would reflect so-called "pain, suffering and loss of amenity", which of their nature are not capable of being evaluated in pecuniary terms save on a conventional basis. Broad guidance as to levels of award, based on decisions in the courts, is given in guidelines issued by the Judicial Studies Board.  The suffering compensated for may in principle include any distress, and *a fortiori* any psychiatric illness caused by the initial physical injury.

-     *Pecuniary loss*. Compensation under this head would cover any loss of earnings (past and future projected), together with medical and care expenses of the plaintiff or those looking after him.  The UK has a comprehensive system of free medical care, the National Health Service ("the NHS"); and if the claimant has in fact been, or the Court believes that he or she will be, treated under the NHS, no claim for cost of medical treatment will arise.  Care expenses can include the notional reasonable cost of gratuitous care from relatives or others.

45.   In cases of fatal injury, there are two potential claims - (a) that of the deceased's estate in respect of any suffering or pecuniary loss prior to his or her death and (b) that of any dependants (including but not limited to the deceased's spouse) in respect of any financial loss which they may have suffered.  English law also provides for the payment of a conventional sum - currently £10,000 - to a widow or widower to compensate for the loss of his or her spouse's society.

M00168C

<u>(4)    THE COUNTS IN THE MASTER COMPLAINT</u>

46.    It follows from the foregoing that if the UK plaintiffs were to bring proceedings in the English Courts they would in principle have an appropriate remedy under the no-fault liability regime enacted by Part I of the CPA (and deriving from the Product Liability Directive).   However the nature of that cause of action does not appear fully to correspond with any of the heads of liability pleaded in the Master Complaint.   I will briefly comment on those as follows.

<u>Count I: Products Liability – Defective Design</u>

47.    There is plainly some similarity between the provisions of the New Jersey statute (of which I have seen a copy) and the provisions of the CPA inasmuch as both employ the concept of "defectiveness".   But there are important differences:

(a)    The CPA does not adopt the categorisation of defectiveness in the New Jersey statute, which I understand to be well-established in US jurisprudence, into manufacturing defects, design defects and warning defects.  Obviously all three kinds of defect would fall within the CPA, but Mr. Justice Burton in the *National Blood Authority* case expressly rejected this categorisation (what he called "boxes") as an appropriate tool of analysis (see paras. 39-41, pp. 316-8) – although this too is an aspect of his decision which has been criticised.

(b)    Conversely, so far as I understand it, New Jersey law does not provide for a separate statutory "development risks" defence.

(c)    Although I am not of course an expert in New Jersey law, I am aware from my experience in this area that there is a very extensive (and contentious) US jurisprudence on the correct approach to the concept of "defectiveness".  The concepts which are central to that jurisprudence – such as "consumer expectation" and "unreasonably unsafe" - have not been adopted in the (so far exiguous) EU and domestic case-law.

<u>Count II: Products Liability – Failure to Warn</u>

48.    I make the same general point as above.   The adequacy of any warnings would be an important issue in any proceedings under the CPA, but it is not recognised as a distinct head of defectiveness, and the elaborate US case-law on the issue is not directly transferable.  I should also note that in the *National Blood Authority* case Mr. Justice Burton expressed a doubt whether in some cases any warning would be

M0016820

sufficient to render a product non-defective and referred to the anti-waiver provisions
of the Directive (para. 65, p. 339).

## Count III: New Jersey Consumer Fraud Act

49.   There is no English statute equivalent to the New Jersey Consumer Fraud Act. The
possibility of a common law claim for fraudulent misrepresentation is addressed in
para. 52 below.

## Count IV: Breach of Express Warranty

50.   Although the heading to this count is "breach of express warranty" the particular
allegations made under it appear to be

- negligence – in a variety of different forms, and in particular covering both
  negligent manufacture/distribution and failure to warn (paras. 66-67)

- non-disclosure of risk (para. 70)

- breach of warranties (described as "express" but said to implied by conduct) of
  merchantable quality and fitness for purpose (paras. 71-72).

I take those in turn.

51.   As for negligence, English law certainly permits a consumer who is injured by a
negligently manufactured product to sue in tort; and until the coming in to force of the
CPA all product liability claims were indeed framed in negligence.  But the no-fault
liability regime of the CPA is plainly more favourable to claimants, and there is
nothing to be gained by taking on the greater burden of proving negligence.

52.   As for non-disclosure of risk, this would not by itself give rise to a cause of action in
English law.    There is however a little-used cause of action in fraudulent
misrepresentation, or "deceit", which is theoretically available in some cases of
defective products. Although generally in English law non-disclosure will not be
treated as a misrepresentation, "there is a representation of safety implied in the
issue of chattels for use where, to the knowledge of the party issuing it, it cannot
safely be used in the way in which he knows it is likely to be used" (Clerk & Lindsell
on Torts, 18th ed., para. 15-15): the conduct of the "issuer" is characterised as
fraudulent because in such a situation he will know that his (implied) representation
of safety is untrue.  Thus if the UK plaintiffs could prove (a) the requisite fraudulent
state of mind on the part of the defendant in question and (b) reliance (in the sense
that had they known the omitted facts they would not have taken Vioxx) an action in
deceit would lie.  But proof of fraud is always very difficult, and proving fraud carries
no advantages over proving a case under the CPA.  I am not aware of any modern
case in which claimants injured by a defective product have formulated their claim in

M0016820

deceit; and I think it extremely unlikely that if the UK plaintiffs were to sue in England they would be advised to do so.

53.     As for breach of warranty, warranties of merchantable quality and fitness for purpose are implied by statute into all contracts for the sale of goods. But that is for practical purposes an irrelevance in an English product liability claim against a pharmaceutical manufacturer, since in English medical practice it is extremely rare for a patient to purchase the drugs with which he or she is treated. The great majority of English patients receive their medication free under the NHS and do not enter into any relevant contract; and even patients being treated "privately" are most unlikely to buy their drugs from the producer (as opposed to having them dispensed by their doctor or a pharmacist).

## Count V: Punitive Damages

54.     I have dealt with the position about punitive damages in para. 43 above.

## Counts VI-VII: Wrongful Death and Survival Action

55.     I have dealt with these issues in para. 45 above. In short, the estate of any dependants of a person whose death is wrongfully caused can claim in respect of the financial loss caused to his dependants and for a solatium.

## Count VIII: Loss of Consortium

56.     English law does not recognise any claim by a spouse for loss of consortium. The heads of damage identified in paras. 44-45 above address some of the types of loss identified in paras. 86-87 of the Master Complaint, but there does not appear to be a full overlap and they do not afford any direct claim to the spouse.

## II.     PROCEDURE

## PROCEDURE GENERALLY

57.     It would be impracticable for me to attempt even a summary of English civil procedure as it would apply in a product liability claim. The essential point is that in my opinion those procedures would afford the UK plaintiffs a fair opportunity to pursue an effective claim against Merck. I confine myself to a few specific points on which the Court may wish to be informed.

58.     Obtaining evidence pre-trial. English procedural law has effective methods for requiring the disclosure and production of relevant documents. There is no equivalent of the American system of deposing witnesses; but there are procedures

for interrogating the opposite party about facts known to him but not apparent from documentary disclosure. Exchange of written witness statements well in advance of trial is also mandatory. There are effective procedures for obtaining discovery of relevant documents from third parties (such as doctors and other healthcare providers).

59.   Mode of trial. All substantial civil actions (subject to a few immaterial exceptions) are heard in the High Court by a professional Judge, sitting without a jury. Although the primary evidence of both factual and expert witnesses is given in the form of written statements or reports, there is where necessary very extensive cross-examination. The Judge is expected to acquire a full grasp of all factual and technical issues and to deliver a detailed reasoned judgment. The length of the trial will of course depend on the complexity of the issues and the nature of the evidence required.

60.   Multi-party actions. English procedure does not recognise class actions on the US model. But in circumstances where a number of claimants are bringing similar claims there are well-established procedures for the claims to be managed together to ensure that all common issues are determined fairly and economically in a single forum.

61.   Appeals.   There is a right of appeal, with permission, to the Court of Appeal: permission is granted wherever the appeal is judged to have a realistic prospect of success. There is a possibility of a further appeal to the House of Lords, but this is only permitted in cases raising an important issue of principle. (In cases involving EU law there is also, as explained above, the possibility of a reference to the ECJ.)

62.   Timing. In recent years, delays in the court system have not been a serious problem in England. The time which a case takes to come to trial is principally determined by the complexity of the preparation of evidence and of any pre-trial procedures, rather than by any unavailability of judicial resources. It will also be affected by the extent to which pre-trial procedures are contentious or can be dealt with by co-operation between the parties. Though each case is different, the present trend is away from wasteful pre-trial wrangling and towards a more consensual approach.   A straightforward claim in the High Court can usually be brought to trial within a year or 18 months. A complex claim might not be ready for trial for two or three years. In exceptional circumstances, the delay may be greater.

63.   Costs as between the parties.   The basic rule in English litigation is that the unsuccessful party is obliged to pay the successful party's costs, as assessed by the Court. In most cases the basis of assessment is such that the successful party is not awarded a 100% indemnity: generally the figure comes out at between 60% and 75% of what the successful party has had to pay his/her own lawyers. (In publicly funded cases - as to which, see below - the assessment tends to come out at or near 100%,

M00160

because of the very tight budgetary control exercised by the Legal Services Commission.) There are circumstances in which the award is higher or lower than that, but they are exceptional. The principal exception to that rule is that where the unsuccessful party is publicly funded (as to which see below) he or she will not generally have to pay the costs of the successful party.

64.   <u>Funding</u>. The normal method of funding personal injury actions is for claimants in individual personal injury actions to enter into a "conditional fee agreement" (a "CFA") with their lawyers, under which the client does not have to pay anything if the claim fails but the lawyers are entitled to an uplift on their normal rates (which has to be paid by the losing party) if they succeed. At the same time they will usually take out insurance against their potential liability for the defendants' costs if the claim fails. CFAs have not so far been commonly used in very big cases where the costs are likely to be high on both sides. There is provision for public funding, through a body known as the Legal Services Commission, in cases where CFAs are unlikely to provide access to justice. (The *National Blood Authority* and *XYZ* cases referred to above were both brought with public funding.)

<u>INTERNATIONAL ASPECTS</u>

65.   I address three areas:

(1)    the position if the substantive claim proceeded in New Jersey but the assistance of an English court were required;

(2)    the position if the substantive claim proceeded in England but the assistance of the New Jersey court were required; and

(3)    the enforceability of a New Jersey judgment in England.

<u>(1)     Proceedings in the US</u>

66.   The UK is a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, which is implemented in the UK by the Evidence (Proceedings in Other Jurisdiction) Act 1975 (a copy of which is exhibited as NU11). Accordingly, witnesses can be compelled to give evidence on commission, though not to attend trial outside England; and the English court will in principle make orders for documentary disclosure. The English Courts have on several occasions stated that it is "a duty and a pleasure" to assist a foreign court by giving appropriate assistance under the Act.

67.   There are however significant limits to what assistance is considered appropriate. The UK entered a reservation under art. 23 of the Convention in order to limit its undertaking to provide assistance in the obtaining of pre-trial discovery; and in

accordance with that reservation the broad approach of the 1975 Act is that the English Court should extend assistance only with requests intended (in whole or in part) to obtain <u>evidence</u> for use at trial as opposed to "investigatory" requests designed to produce <u>information</u> (even if the information in question might lead to the discovery of evidence): see in particular the decision of the House of Lords in *Rio Tinto Zinc v. Westinghouse Electrical Corporation* [1978] AC 547.  Likewise an order can only be made if it is of a kind which could be made by way of obtaining evidence for the purpose of English civil proceedings: see sec. 2 (3).

68.   In the context of requests to examine witnesses, the foregoing means that witnesses will not be compelled to give answers that cannot be shown to be directly relevant and admissible in relation to some matter that will be in issue at the trial; and if it does not appear that they will be asked admissible questions no order for examination will be made at all.  In order that the Court can be satisfied on this point, it is common practice for the application, and any consequent order, to specify the topics on which the witness is to be examined.  A "roving" deposition of an investigative character, such as I understand to be permitted by the rules of most US jurisdictions, will not be permitted.  Requests which fail to accord with these principles will be amended or, if this is not possible, simply refused.  An illustration of how letters of request from US Courts may founder on the rocks of this rule is contained in the decision of the Court of Appeal in *State of Minnesota v. Philip Morris Inc.* (30.7.97).

69.   Similarly, as regards requests for documentary disclosure, the Act expressly prohibits orders to be made for "general" discovery: requests must be limited to particular documents - see sec. 2 (4).   The documents must be individual documents separately identified (though a compendious description is acceptable if it is apt to cover and clearly identify each document).  This rule is strictly applied: for a recent example see *Genira Trade & Finance Inc and another v Refco Capital Markets Ltd* [2001] EWCA Civ 1733.

<u>(2)   Proceedings in England</u>

70.   If parties to proceedings in an English Court required evidence from other jurisdictions, the Court could and generally would invoke the Hague Convention procedures or, as regards an EU country, improved versions of these procedures which have recently been introduced by an EU Regulation.

<u>(3)   Enforcement</u>

71.   There is no treaty providing for the enforcement in the UK of judgments of US Courts.  The enforceability of such judgments in the English courts is governed by the common law.  Briefly, and subject to immaterial exceptions, a "final and conclusive" judgment of a US Court will be enforceable unless it is impeachable for fraud or if its

M00168

recognition or enforcement would be contrary to public policy or if the proceedings in which it was obtained were opposed to natural justice. Two aspects of the claim pleaded in the Master Complaint might infringe these principles, but the law is not clear.

72.     First, there is a conflict of authority as to whether an English Court would enforce the judgment of a US Court in so far as it was purely punitive. In *SA Textiles v. Sun and Sand Ltd.* [1978] QB 279 Lord Denning expressed the view that there was "nothing contrary to English public policy in enforcing a claim for exemplary damages", in a context where he could arguably have been held to be referring to punitive damages; but the passage is short and obscure and is in any event an *obiter dictum*. In the unreported case of *Raj v. Bank Sepah Iran* (23.5.88) Mr Justice Hirst held that it was "reasonably arguable", notwithstanding what Lord Denning had said, that an English court should not enforce an award of purely punitive damages. The question must be regarded as unsettled.

73.     Secondly, in the same case of *Raj* Mr Justice Hirst also held that there was an arguable question whether an English court should enforce a judgment for loss of consortium, such a cause of action being unknown to English law. The question has not to my knowledge been addressed by any Court subsequently.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Nicholas Underhill

DATED:  1ˢᵗ· November 2005