# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : |  |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO:**

*AvMed, Inc., et al. v. BrownGreer, PLC, et al.*, No. 08-1633

*1199 SEIU Greater New York Benefit Fund, et al. v. BrownGreer, PLC, et al.*, No. 08-3627

## ORDER & REASONS

Before the Court are several motions arising out of two non-governmental, third-party payor/provider cases consolidated within the Vioxx Multidistrict Litigation.  These cases involve two separate groups of plaintiffs, both of whom seek to enjoin distribution of interim payments in the Vioxx Settlement Program pursuant to §502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1132 (a)(3) ("ERISA").  *See* Rec. Docs. 14640, 14877.  As the named defendant in both actions, BrownGreer, PLC, the Vioxx Claims Administrator, opposes the motions for an injunction.  In addition, BrownGreer seeks to sever the AvMed Plaintiffs' claims and strike class allegations contained within the Greater New York

Plaintiffs' complaint.  The AvMed Plaintiffs filed their motion for a preliminary injunction on June 9, 2008, withdrew it without prejudice on June 27, and then refiled it on July 14.  The Greater New York Plaintiffs filed their motion for a preliminary injunction on June 26, 2008.

The Court heard oral argument on the motions on July 24, 2008, and took them under submission so that the Court could adequately study the thousands of pages of written material and hundreds of cases cited by the parties.  Nevertheless, the Plaintiffs felt that fourteen days was apparently too long for this Court to study the issues and draft an appropriate opinion, so on August 6, 2008, they filed a mandamus with the Fifth Circuit urging the Circuit to order the Court to deliver its opinion immediately.  The Plaintiffs state that a prompt response is necessary because their rights will be eroded if such a response is not forthcoming.  In fact, no partial payments are anticipated until the end of August or beginning of September, so their concern or panic is perhaps unwarranted.  Nevertheless, the Court has now had an opportunity to study the material and draft a considered response.

For the following reasons, the Plaintiffs' motions are DENIED.  The Court will issue a separate order regarding the Defendants' motions on severance and class action status.

## I.      BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate.  This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available

until September 30, 2004, when Merck withdrew it from the market after data from a clinical

trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular

thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes.

Thereafter, thousands of individual suits and numerous class actions were filed against Merck in

state and federal courts throughout the country alleging various products liability, tort, fraud, and

warranty claims.  It is estimated that 105 million prescriptions for Vioxx were written in the

United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is

thought that approximately 20 million patients have taken Vioxx in the United States.[1]

On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred

multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such

cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28

U.S.C. § 1407.  *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).  One

month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to

consider strategies for moving forward with the proceedings.  Shortly thereafter, the Court

appointed committees of counsel to represent the parties and to meet with the Court once every

month to review the status of the litigation.[2]

One of this Court's first priorities was to assist the parties in selecting and preparing

certain test cases to proceed as bellwether trials.  In total, this Court conducted six Vioxx

---

[1]For a more detailed factual background describing the events that took place before the inception of this Multidistrict Litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

[2]The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), and five attorneys to serve on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005).

bellwether trials.[3]  The first of the bellwether trials took place in Houston, Texas, while this

Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took

place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of

the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the

defendant.  During the same period that this Court conducted its six bellwether trials,

approximately thirteen additional Vioxx-related cases were tried before juries in the state courts

of Texas, New Jersey, California, Alabama, Illinois, and Florida.  With the benefit of experience

from these bellwether trials, as well as the encouragement of the several coordinated courts, the

parties soon began settlement discussions in earnest.[4]

On November 9, 2007, Merck and the NPC formally announced that they had reached a

Settlement Agreement.  *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657

(E.D. La. Nov. 9, 2007) ("Settlement Agreement"), *available at*

http://www.browngreer.com/vioxxsettlement.[5]  The private Settlement Agreement establishes a

pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck

---

[3]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. filed Feb. 16, 2006) (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. filed June 21, 2005) (sixth bellwether trial).

[4]In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences.  Although the parties met and negotiated independently, they kept this Court–as well as the coordinate state courts of Texas, New Jersey, and California– informed of their progress in settlement discussions.

[5]When the parties formally announced the settlement agreement, Vioxx-related discovery had been moving forward in the coordinate jurisdictions for more than six years.  Over 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had been taken, and counsel for both sides had filed thousands of motions and consulted with

as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of 4.85 billion dollars. *Id.* § "Recitals". Under the terms of the Settlement Agreement, Merck retains "walk away privileges" in the event that less than 85% of the total number of eligible claimants within each of several defined categories choose to enroll in the program. *Id.* § 11. In other words, if the requisite percentages of claimants do not elect to participate in the voluntary settlement program, Merck has the right to withdraw from the agreement and thereby terminate the program.

In order to determine eligibility and valuation of individual claims submitted for enrollment, the Settlement Agreement provides that an independent Claims Administrator will review claims and calculate the total number of points awarded to each claimant during the claims valuation process. *Id.* § 2. Pursuant to the terms of the Settlement Agreement, BrownGreer, PLC, the named Defendant herein, was appointed as the Claims Administrator. *Id.* § 6.1.2.[6]

In reviewing whether a claim is eligible for enrollment in the Vioxx Settlement Program, the Claims Administrator must decide whether the claim satisfies certain criteria set forth by each of three "gates": (1) evidence of a qualifying injury, (2) duration of use, and (3) proximity of injury to usage. *Id.* § 2.2. If the Claims Administrator determines that a claim is ineligible for enrollment in the program, the claim will automatically be reviewed by an independent Gates Committee, which consists of six members, three of whom are appointed by Merck and three of

---

hundreds of experts in the fields of cardiology, pharmacology, and neurology.

[6]BrownGreer, PLC, is a Virginia-based law firm specializing in multiple claims management and claims administration. The firm has created a comprehensive website containing resources for claimants and attorneys, as well as a limited-access Vioxx Portal by which attorneys may check on the status of their cases. The website can be accessed at

whom are appointed by the NPC.  *Id.* § 2.5.  The Gates Committee reviews each claim pursuant to the three gate requirements set forth in the Agreement.  *Id.*  In reviewing a claim previously deemed ineligible by the Claims Administrator, the Gates Committee has the authority to overrule the initial determination if it finds that the claim is eligible for enrollment.  *Id.*  If, however, the Gates Committee determines that the claim is ineligible for enrollment, the claimant may still appeal the Committee's decision to a Special Master, who will determine *de novo* whether the claim meets the three eligibility requirements.  *Id.* § 2.6.[7]  If the Special Master determines that a claim is ineligible for enrollment, the claimant may either sign a certification and pursue the claim in trial or release the claim.  *Id.*

The final claims valuation process involves an objective, numerical determination.  *Id.* § 3.2.  Each claimant is initially awarded a number of points based on such individual factors as: age, injury, duration of usage, consistency of use, the date of the relevant usage, whether the claimant used Vioxx pre- or post-label adjustment, and the claimant's general health and medical history.  *Id.*  Factors in the claimant's medical history that might affect the points award include smoking, cholesterol levels, and whether the claimant or the claimant's family has a history of heart attacks or ischemic strokes.  *Id.*  A claimant may appeal a points award determination to a Special Master, who will review the determination *de novo.*  *Id.* § 3.2.4.  After points awards have become final, the points will be converted into dollar amounts for use in calculating final settlement payments.  *Id.* § 4.3.

---

http://www.browngreer.com/vioxxsettlement.

[7]On January 14, 2008, the Court formally appointed Mr. Patrick A. Juneau to serve as Special Master under the terms of the Settlement Agreement.  On January 16, 2008, the Court appointed Justice John Trotter (Ret.) and Judge Marina Corodemus (Ret.) to serve as Deputy Special Masters to assist Special Master Juneau.

Pursuant to the requirements of federal and state laws creating statutory liens under the Medicare and Medicaid programs, the Settlement Agreement provides that a Lien Resolution Administrator shall establish "procedures and protocols... to identify and resolve Governmental Authority Third Party Payor/Provider Statutory Liens." *Id.* §12.1.[8]  The Settlement Agreement sets forth that each enrolled program claimant and the claimant's counsel must jointly and severally "represent and warrant that any and all statutory Liens with respect to any and all Settlement Payments have been satisfied and discharged." *Id.* § 12.1.2.  Further, "the satisfaction and discharge of any and all Governmental Authority Third Party Providers/Payors statutory Liens must be established to the satisfaction of the Claims Administrator and Merck before any Settlement Payment can be disbursed." *Id.* § 12.1.3.[9]  Although the Settlement Agreement does not establish the same requirements for resolution of non-statutory liens held by private insurers, the Agreement does provide that "satisfaction and discharge of any and all Liens, whether past, present or future, whether known or unknown or asserted or unasserted, with respect to any Settlement Payment are the sole responsibility of the relevant Enrolled Program Claimant." *Id.* § 12.1.3.

The Vioxx Settlement Agreement also provides for the disbursement of interim

---

[8] Pursuant to the terms of the Settlement Agreement, the Garretson Firm was appointed to act as the Lien Resolution Administrator.  The Garretson Firm is an Ohio-based firm specializing in lien evaluation and resolution, settlement allocation, and claims administration.

[9] On January 18, 2008, the Court entered a HIPPA-compliant Qualified Protective Order to allow the Liean Resolution Administrator to provide a list of claimants to federal and state agencies in order to determine which claimants are beneficiaries of federal Medicare and/or state/territory Medicaid health plans.  *See* Rec. Doc. 13262, Qualified Protective Order, Jan. 18, 2008.  At the July 17, 2008, Vioxx monthly status conference, the Lien Resolution Administrator reported that agreements had been reached in principle with all state and federal health plans regarding the resolution of statutory liens for Vioxx-related medical expenses.  *See* Rec. Doc. 15362, Minute Entry, July 17, 2008.

settlement payments to eligible claimants.  *Id.* § 4.1.  In order to qualify for interim payments,

claimants must fulfill certain registration and filing obligations according to the terms set forth in

the Agreement.  *Id.*  Pursuant to the terms of the Agreement, certain claimants who timely fulfill

all of their filing obligations may qualify to receive interim settlement payments beginning on

August, 1, 2008, or the date on which the Claims Administrator has determined pre-review

points awards for a specific number of claimants, whichever is later, conditioned on Merck's

waiver of its walk away privileges.  *Id.*

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds

necessary to trigger funding of the Vioxx Settlement Program would be met.  *See* Rec. Doc.

15362, Minute Entry, July 17, 2008.  Merck further advised that it intended to waive its walk

away privileges and would commence funding the Vioxx Settlement Program by depositing an

initial sum of $500 million into the Program's account, clearing the way for distribution of

interim payments to eligible claimants.  *Id.*

## II.   PRESENT MOTIONS

The Plaintiffs in the instant action are two separate groups of non-governmental, self-

funded, ERISA health benefit providers.  Both groups of Plaintiffs seek to enjoin distribution of

interim payments until such time as the Plaintiffs are able to assert equitable rights against any of

their clients who are enrolled in the Program and for whom they have paid Vioxx-related

medical expenses.

### A.   AvMed Plaintiffs

The first group of plaintiffs ("the AvMed Plaintiffs") consists of forty-eight non-

governmental sponsors and administrators of ERISA health benefit plans.  On April 14, 2008,

the AvMed Plaintiffs filed a complaint seeking equitable relief under §502(a)(3) of ERISA, and naming BrownGreer, PLC, U.S. Bancorp, and certain John Does as Defendants.

Although the AvMed Plaintiffs claim to provide healthcare coverage to approximately 70% of the individuals in the United States who have private health insurance, they assert that "only a handful" of their beneficiaries have reported participation in the Vioxx Settlement Program.   In support of their claims, the AvMed Plaintiffs offer the affidavit of Professor Glenn Alan Melnick, who based on a purely statistical analysis estimates that the AvMed Plaintiffs have provided Vioxx-related healthcare benefits for approximately 15,000 claimants currently enrolled in the Vioxx Settlement Program. *See* Rec. Doc. 14640-4, AvMed Pl.'s Mot. TRO & Prelim. Inj., Melnick Aff. ¶¶ 28-30.[10]

The AvMed Plaintiffs further assert that they have independently attempted to identify their insureds for whom they have provided Vioxx-related health benefits and who might be participating in the settlement, but the identity of their own insureds in this context is unknown to them.   To illustrate the extent of their efforts, the AvMed Plaintiffs have offered the affidavit of Bruce Ogle, President of the Subrogation Division of the Rawlings Corporation, a company that provides subrogation and reimbursement services to health benefit providers.  *See* Rec. Doc. 14640-13, AvMed Pl.'s Mot. TRO & Prelim. Inj., Ogle Aff. ¶¶ 10-18.  Mr. Ogle states that he attempted to use traditional methods of pursuing subrogation and reimbursement liens in order to identify Vioxx claimants on behalf of the AvMed Plaintiffs, but the methods were largely

---

[10]Professor Melnick used three different methods to arrive at estimates ranging from 15,400 to 17,604 claimants.  *See id.*  As of July 17, 2008, a total of 48,550 claimants had submitted materials for enrollment in the Vioxx Settlement Program.  *See* Rec. Doc. 15362, Minute Entry, July 17, 2008, at 5, *available at* http://vioxx.laed.uscourts.gov.  The AvMed Plaintiffs therefore claim to represent approximately one-third of the total claimants enrolled in

ineffective because of the particular circumstances of Vioxx litigation.  *See id.*[11]  As a result, the

AvMed Plaintiffs contend that, without the benefit of personal identifying information prior to

the distribution of interim settlement payments, they will have no means for accurately

determining the impending distributions, many of which may involve reimbursable healthcare

rights.  It is noteworthy to observe that, although this litigation has been proceeding in this Court

for over three years and in the state courts for at least five years, apparently none of the Plaintiffs

has until recently made any attempt to determine the identities of their own insureds for purposes

of evaluating their potential liens.

On June 9, 2008, the AvMed Plaintiffs filed a motion for a temporary restraining order

and preliminary injunction to compel BrownGreer as Claims Administrator: (1) to disclose the

identities of the Vioxx claimants participating in the settlement; and (2) to enjoin distribution of

settlement funds until such time as the AvMed Plaintiffs are able to assert reimbursement rights

against those claimants for whom they have paid medical expenses related to Vioxx.[12]

BrownGreer opposes the AvMed Plaintiff's request for a preliminary injunction, arguing that the

Plaintiffs cannot demonstrate a substantial likelihood of success on the merits and will suffer no

---

the Vioxx Settlement Program.

[11]According to Mr. Ogle, health benefit plans "identify most potential subrogation/reimbursement claims by using diagnosis codes... that indicate the nature of the injury."  *Id.*  Mr. Ogle claims that the injuries that qualify claimants for enrollment in the Vioxx Settlement Program–specifically myocardial infarctions and ischemic strokes–do not register  as "traumatic or accidental [injuries], but instead nearly always occur in the absence of any act that would be related to a compensable third party liability claim... Accordingly, the presence of diagnosis codes relating to a Myocardial Infarction or Ischemic Stroke would not normally highlight a potential subrogation/reimbursement claim for a health plan."  *See id.*

[12]On June 11, 2008, the Court held a status conference to address the AvMed Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.  *See* Rec. Doc. 14652, Minute Entry, June 11, 2008. For reasons stated during the conference, the Court denied the Plaintiff's motion in part with respect to the request for a temporary restraining order pursuant to

irreparable harm in the absence of an injunction.  BrownGreer further contends that balance of harms weighs against the Plaintiffs' request and that the issuance of an injunction would run counter to the public interest.

In addition to opposing the Plaintiff's motion for an injunction, BrownGreer filed a separate motion to sever the AvMed Plaintiffs' claims.  BrownGreer contends that, because the AvMed Plaintiffs' claims involve different healthcare providers, different healthcare contracts, and different claimants, the claims do not arise from the same transaction or occurrence and are therefore improperly joined under Rule 20 of the Federal Rules of Civil Procedure. [13]  The Court will deal with this severance motion in a separate opinion.

**B.      Greater New York Plaintiffs**

The second group of plaintiffs ("the Greater New York Plaintiffs") filed a class action complaint on June 3, 2008.  In response to objections to the class allegations, the Plaintiffs later filed an amended class action complaint on July 9, 2008, in which they purport to represent

> All self-funded ERISA-covered health benefit plans that (a) have paid or agreed to pay Vioxx-related medical benefits on behalf of plan beneficiaries who have enrolled or will enroll in the Vioxx settlement, and (b) whose plan documents contained at the time such benefits were paid or agreed to be paid, (1) notification provisions requiring beneficiaries to notify the plan of claims or settlements, and/or (2) reimbursement provisions requiring beneficiaries to reimburse the plan, out of recoveries from any third party, for benefits relating to such recovery which the plan has paid or agreed to pay on the beneficiaries behalf.

---

Federal Rule of Civil Procedure 65(b).  *See id.*

[13]At the monthly Vioxx status conference held on June 27, 2008, the parties indicated to the Court that they had agreed in principle to pursue settlement discussions and resolve their disputes extra-judicially.  The Court encouraged the parties to pursue a resolution in which both parties could benefit from the economy of scale present within this Multidistrict Litigation. Accordingly, the parties withdrew their motions without prejudice, reserving the right to refile at a later date.  The parties were apparently unable to reach an agreement, however, and on July 14, 2008, both parties reurged their previous motions.

*See* Rec. Doc. 15210, Greater New York Pl.s' Am. Compl. ¶ 18.  In their amended class action complaint, the Greater New York Plaintiffs  assert that there are "hundreds, and likely thousands," of self-funded ERISA health benefit plans whose plan documents provide for reimbursement rights and who have paid medical benefits on behalf of plan beneficiaries enrolled in the Vioxx Settlement Program.  *Id.* ¶ 20.

The Greater New York Plaintiffs name as Defendants in their complaint Browngreer, certain known and unknown law firms representing Vioxx claimants, and the unknown Vioxx claimants who have or will have enrolled in the Vioxx Settlement, are beneficiaries of ERISA health plans, and are obligated pursuant to their plan documents to notify and/or reimburse their health plan for Vioxx-related medical benefits they received.  *Id.* ¶¶ 4-12.  Similar to the AvMed Plaintiffs, the Greater New York Plaintiffs claim that, without the assistance of the named Defendants, they will be unable to identify claimants who received Vioxx-related health benefits from the purported class members.  On June 26, 2008, the Greater New York Plaintiffs filed a motion for a preliminary injunction to delay disbursement of interim payments under the Vioxx Settlement Program and to compel production of the identities of their own beneficiaries who have received benefits from purported class members.  *See* Rec. Doc. 14877, Greater New York Pl.'s Mot. Prelim. Inj. 2-3.

The Greater New York Plaintiffs' argument in support of their motion for a preliminary injunction is similar in many aspects to that of the AvMed Plaintiffs, but the injunction they request is different.  Under the terms of the Greater New York Plaintiffs' proposed injunction, law firms representing Vioxx claimants would be required to conduct a good-faith investigation

into whether each of their clients is insured by a self-funded ERISA health benefit provider.  *See id.*, "Proposed Order."  Prior to the release of any funds, law firms with clients represented by a purported class member holding an equitable lien over the funds would then provide to BrownGreer a database of the names of those claimants, as well as their social security numbers, employers, and health benefit plans.  BrownGreer could then release settlement funds within five business days of receiving such notice, and the firms would be permitted to disburse payments only to those claimants who are not beneficiaries of a self-funded ERISA health benefit plan.  With respect to claimants who are beneficiaries of self-funded ERISA health benefit plans, the appropriate class members would then have forty-five days to submit to the claimant's law firm all demands for reimbursement or restitution related to the plan's payment of Vioxx-related benefits.  With this proposal, the Greater New York Plaintiffs claim that they are not seeking an injunction against the unallocated settlement fund but instead against "each beneficiary's independent Vioxx settlement proceeds."  *See* Rec. Doc. 14877, Greater New York Pl.'s Mot. Prelim. Inj. 17, n. 15.  The NPC and BrownGreer each filed oppositions to the motion.

On the same day that the Greater New York Plaintiffs filed their motion for a preliminary injunction, the NPC and PSC filed a motion to dismiss the Greater New York Plaintiffs' complaint and strike class allegations contained within it.  Shortly thereafter, Defendant BrownGreer filed its own motion to strike class allegations in the Greater New York Plaintiffs' complaint.  Both parties argue that the purported class definition fails to satisfy the requirements set forth under Rule 23 of the Federal Rules of Civil Procedure.  In response, the Greater New York Plaintiffs filed an amended class action complaint accompanied by a single opposition to both motions to strike, arguing that the motions had become moot with the filing of the amended

complaint.  BrownGreer asserts that the amendments to the class definition fail to remedy the dispositive shortcomings that were present in the initial class allegations.  The Court will deal with the motion to strike class allegations in a separate opinion.  In this opinion, the Court will focus on the Plaintiffs' motions for a preliminary injunction.

## III.   LAW & ANALYSIS

### A.   Preliminary Injunction Standard

A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.*, 905 F.2d 63, 65 (5th Cir. 1990) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  Thus, "the decision to grant a preliminary injunction is to be treated as the exception rather than the rule."  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985), *quoted in Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363-64 (5th Cir. 2003).  The burden of persuasion requires that the movant show the existence of four separate factors: (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) a favorable balance of hardships; and (4) no adverse effect on the public interest.  *Black Fire Fighters Ass'n*, 905 F.2d at 65; *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988).  If the movant fails to sufficiently establish any one of these four factors, the court should decline to issue the preliminary injunction.  *See Enterprise Int'l, Inc. V. Corporacion Estatal Petrolera Excuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985); *see also Mississippi Power & Light*, 760 F.2d at 621 (stating that a motion for a preliminary injunction "should only be granted if the movant has clearly carried the burden of persuasion as to all four ... prerequisites").  The Court will

discuss each of these factors in turn.

### 1.    Substantial Likelihood of Success on the Merits

The first consideration is whether the movant can demonstrate a substantial likelihood of success on the merits in this forum. *See Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("[R]egardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits.").[14]  Both the AvMed and Greater New York Plaintiffs contend that they have a substantial likelihood of success on the merits in asserting equitable liens against the settlement funds of claimants for whom they have provided Vioxx-related medical benefits. The Plaintiffs argue that recent cases in the United States Supreme Court and the Fifth Circuit support the issuance of an injunction both to compel production of claimants' identities and to enjoin distribution of interim payments in order to protect Plaintiffs' right to recover reimbursement from their plan members.  BrownGreer counters that the Plaintiffs cannot show a substantial likelihood of success on the merits because they are not entitled to production of claimants' identities and there is no identifiable fund against which the Plaintiffs may assert their claims for reimbursement at this stage of the litigation.  BrownGreer further contends that the policy provisions in the exemplar health plan contracts offered by Plaintiffs differ from one another in material aspects and do not entitle Plaintiffs to the relief they seek.

The Plaintiffs' request for an injunction presents several unique issues, perhaps the most

---

[14] The Vioxx Settlement Program involves over 50,000 cases.  Most of these cases were filed in state courts or other federal courts.  This Court does not address the likelihood of success in these other jurisdictions but only in the present forum.

significant of which is the Plaintiffs' inability to define the precise scope of the injunction.  The

Plaintiffs are unable to identify their own insureds against whom they wish to proceed, the

precise amount of money they wish to collect, or the particular plan provisions they seek to

enforce.  Further, because each individual health plan is unable to identify which—if any—of

their insureds are participating in the settlement, the proposed injunctions will delay

disbursements to all enrolled claimants—not merely those who have received Vioxx-related

medical benefits from the Plaintiffs.  Although the instant case presents a matter of first

impression, the Court has several important precedents to which it may look for guidance.

 In two recent opinions, the United States Supreme Court has discussed the availability of

the type of remedy the Plaintiffs seek.  First, in *Great-West Life & Annuity Insurance Company

v. Knudson*, the Supreme Court held that §502(a)(3) permits only equitable relief—as opposed to

legal relief—and does not authorize an employee benefit plan to bring an action seeking to

impose personal liability on plan beneficiaries for reimbursement of medical expenses.  534 U.S.

204, 207, 122 S.Ct. 708 (2002).  After Mrs. Knudson suffered injuries resulting from a serious

car accident, her health plan paid for a total of $411,171.11 of her medical bills.  *Id.*  Mrs.

Knudson and her husband filed suit in state court and eventually settled the matter for $650,000.

*Id.*  Pursuant to California law, $256,745.30 of the Knudsons' settlement award went to

establishing a special needs trust to provide for Mrs. Knudson's continued medical care.  *Id.* at

208.  A significant remainder of the award went towards attorneys' fees and costs, leaving an

allocation of only $13,828.70 to satisfy the health plan's reimbursement request.  *Id.*

 The Knudsons' health plan contract contained a reimbursement provision giving the plan

"the right to recover from the [beneficiary] any payment for benefits" paid by the plan that the

beneficiary was entitled to recover from a third party tortfeasor.  *Id.* at 207.  Specifically, the plan reserved "a first lien upon any recovery, whether by settlement, judgment, or otherwise, that the beneficiary receives from a third party."  *Id.*  Seeking injunctive and declaratory relief under §502(a)(3), the health plan filed an action in federal court to enforce the reimbursement provision of the plan and recover the full amount of medical expenses.  *Id.*

        As the Supreme Court discussed, §502(a)(3) provides that a party may seek "appropriate equitable relief," which, according to the Court, "must mean something less than *all* relief."  *Id.* at 209 (quoting *Mertens v. Hewitt Associates*, 508 U.S. 251, 258 n.8, 113 S.Ct. 2063 (1993)) (emphasis in original).  The Court explained that whether a remedy is legal or equitable depends largely "on the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Id.* (quoting *Reich v. Continental Casualty Co.*, 44 F.3d 754, 756 (7th Cir. 1994)) (internal quotation marks omitted).  The Court further elaborated that one common feature of equitable restitution is that it seeks to impose a constructive trust or equitable lien on "particular funds or property in the defendant's possession."  *Id.* at 213.  Because the majority of the Knudsons' settlement award had already been placed in a special needs trust pursuant to California law, the Court found that the funds were not in the possession of the defendant.  *Id.* at 214.  Accordingly, the relief sought by the plaintiff health plan was "not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that [the health plan] conferred upon [the beneficiary]."  *Id.* The Court therefore held that §502(a)(3) did not authorize the health plan to seek reimbursement against its beneficiaries because the plan sought legal rather than equitable relief.  *Id.*

Four years later, the Supreme Court revisited the issue of what constitutes equitable relief under §502(a)(3) in *Sereboff v. Mid Atlantic Services, Inc.*, 547 U.S. 356, 359, 126 S.Ct. 1869 (2006).  After the Sereboffs were involved in a car accident and suffered injuries, their health plan carrier, Mid Atlantic Services, paid for their medical expenses.  *Id.* at 360.  Seeking compensatory damages from several third parties for injuries resulting from the accident, the Sereboffs filed suit in state court.  *Id.*  The couple eventually settled their lawsuit for $750,000. *Id.*  Prior to the parties' reaching a settlement agreement, however, counsel for Mid Atlantic sent several letters to the Sereboffs' attorney detailing the medical expenses paid by the plan and asserting a lien on a portion of the Sereboffs' recovery equal to the expenses, which totaled $74,869.37.  *Id.*  Despite Mid Atlantic's efforts, neither the Sereboffs nor their attorneys forwarded the disputed portion of the settlement funds to Mid Atlantic pursuant to the reimbursement provision.  *Id.*

The Sereboffs' health plan contract contained an "Acts of Third Parties" reimbursement provision, which by its terms was made applicable when a beneficiary became "sick or injured as a result of the act or omission of another person or party."  *Id.* at 359.  Under the "Acts of Third Parties" provision, the beneficiary who receives medical benefits from the plan for such injuries must "reimburse [the plan] from all recoveries from a third party (whether by lawsuit, settlement, or otherwise)."  *Id.*  The provision further states that Mid Atlantic's share of the recovery will not be reduced because [the beneficiary] has not received the full damages claim, unless [the plan] agrees in writing to a reduction."  *Id.*

Seeking to collect the full amount of medical expenses the plan had paid on the Sereboffs' behalf, Mid Atlantic filed suit against the Sereboffs in federal district court under

-18-

§502(a)(3) of ERISA.  *Id.* at 360.  In addition, Mid Atlantic moved for a preliminary injunction to require the couple to retain and set aside at least $74,869.37 of proceeds from the settlement. *Id.*  The parties agreed to a stipulation by which the Sereboffs would preserve the amount at issue in an investment account until such time as the district court ruled on the merits and all potential appeals were exhausted.  *Id.*  Reviewing the district court's decision, the Fourth Circuit had earlier noted that the Courts of Appeal were divided as to whether §502(a)(3) provides for recovery in the general circumstances of the Sereboffs' case.  *Id.* at 360, n.1.

The Supreme Court held that §502(a)(3) does provide for such recovery.  *Id.* at 363.  In clarifying the holding of *Knudson*, the Court in *Sereboff* stated that *Knudson* had not rejected "Great-West's suit out of hand because it alleged a breach of contract and sought money, but because Great-West did not seek to recover a particular fund from the defendant."  *Id.*  Indeed, "Great-West claimed a right to recover in restitution, and the Court concluded only that equitable restitution was unavailable because the funds sought were not in Knudson's possession."  *Id.*  In contrast, the Court in *Sereboff* found that Mid Atlantic did seek to recover from an identifiable fund in the possession of the defendants.  *Id.*  The Court noted that the "Acts of Third Parties" provision in the Sereboffs' plan "specifically identified a particular fund, distinct from the Sereboffs' general assets—'[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise'—and a particular share of that fund to which Mid Atlantic was entitled—'that portion of the total recovery which is due [Mid Atlantic] for benefits paid."  *Id.* at 364.  The Court found that the provision at issue permitted Mid Atlantic to "rely on a familiar rule of equity" and "follow a portion of the recovery into the Sereboffs' hands as soon as the settlement fund was

identified, and impose on that portion a constructive trust or equitable lien." *Id.* (citing *Barnes v. Alexander*, 232 U.S. 117, 34 S.Ct. 276 (1914)) (internal quotation marks omitted).

The Sereboffs argued that the Court should apply "strict tracing rules" to Mid Atlantic's request, which would have required Mid Atlantic to "trace" the funds it sought in restitution to a particular asset that the Sereboffs had improperly acquired and converted into their property. *Id.* at 364-65. Distinguishing equitable liens sought as restitution and equitable liens established by agreement, the Court initially noted that "no tracing requirement of the sort asserted by the Sereboffs applies to equitable liens by agreement or assignment." *Id.* at 365. Indeed, the Court found "plain indication" in earlier cases that "the fund over which a lien is asserted need not be in existence when the contract containing the lien provision is executed." *Id.* The Court further noted that, to the extent that Mid Atlantic sought equitable relief, its "inability to satisfy the 'strict tracing rules' for 'equitable restitution [was] of no consequence." *Id.* Accordingly, the Court held that Mid Atlantic properly sought equitable relief under §502(a)(3) of ERISA. *Id.*

Three years before the Court's ruling in *Sereboff*, the Fifth Circuit addressed a similar issue in *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot and Wansbrough*, 354 F.3d 348, 350 (5th Cir. 2003). In *Bombardier*, Mestemacher, an employee of Bombardier Aerospace, sought $13,643.63 in medical expenses after he was injured in an automobile accident. *Id.* The health plan paid Mestemacher's medical expenses, subject to a provision in the plan's documents reserving "'the right to recover or subrogate 100% of the Benefits paid … by the Plan for Covered Persons to the extent of … [a]ny judgment, settlement, or payment made or to be made, because of an accident, including but not limited to insurance.'" *Id.* Mestemacher retained the Ferrer law firm to seek damages from the tortfeasor responsible

for the accident.  *Id.*  After the parties reached a settlement agreement awarding Mestemacher $65,000, the law firm received the funds on behalf of Mestemacher and placed them in a trust account under the law firm's name.  *Id.*

Seeking reimbursement for the medical expenses it had paid on behalf of Mestemacher, the health plan filed suit in federal district court, naming as defendants the law firm, Mestemacher, and the bank holding the trust account.  *Id.*  In addition, the health plan moved for a preliminary injunction to prevent the law firm from disbursing a share of the settlement funds claimed by the plan for reimbursement.  *Id.*  Although the law firm agreed to hold enough money in the trust account to resolve the health plan's reimbursement request, the firm also moved to dismiss the plan's complaint for lack of subject matter jurisdiction.  *Id.* at 350-51.  In its motion to dismiss, the law firm argued that §502(a)(3) of ERISA does not permit the health plan to assert a cause of action against the law firm itself, because the defendant firm was neither a plan fiduciary nor a signatory to the health plan.  *Id.*  The firm further argued that the health plan may not seek a constructive trust over funds not directly in the possession of Mestemacher, the plan beneficiary.  *Id.*  In essence, the firm argued that, "[b]ecause it is not a signatory of the Plan … [the firm] owes no fiduciary duty to the Plan, and thus no cause of action can be maintained against it under 502(a)(3)."  *Id.* at 352.

The Fifth Circuit disagreed with the law firm's characterization of ERISA, holding instead that §502(a)(3) does authorize the type of relief sought by the Bombardier health plan. *Id.*  The court explained that, "even though … the law firm is not a 'party in interest' as that term is defined by ERISA … 502(a)(3) authorizes a cause of action against a non-fiduciary, non-party in interest attorney-at-law when he holds disputed settlement funds on behalf of a plan-

participant client who is a traditional ERISA party." *Id.*  In addition, the court elaborated that the law firm, "as counsel for the plan participant and stake holder of specifically identifiable settlement funds in a trust account—on that beneficiary's behalf—fits comfortably within the 'universe of possible defendants' subject to suit" under §502(a)(3) of ERISA.  *Id.* at 354.

The *Bombardier* court then addressed the issue of whether the health plan sought "appropriate equitable relief" under §502(a)(3) when it moved to secure a constructive trust over the settlement funds in the law firm's trust account.  *Id.* at 356.  The law firm argued that the health plan was actually attempting to impose personal liability on the firm, essentially seeking a form of legal relief—as opposed to equitable relief—not available under §502(a)(3).  *Id.*  The court disagreed, reasoning that, because the plan sought to recover "specifically identifiable funds that are in the constructive possession and the legal control of the participant but belong in good conscience to the Plan, its action for a constructive trust in no way seeks to impose liability" on the defendants.  *Id.*

In explaining the appropriate method of analysis, the court proceeded to consider a series of three fundamental questions in order to determine whether the plaintiff was seeking appropriate equitable relief under §502(a)(3): "Does the [plaintiff health plan] seek to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to the [plaintiff], and (3) that are within the possession and control of the defendant beneficiary?"  *Id.*  Employing this analysis, the court distinguished the facts in *Knudson* from those in *Bombardier*, reasoning that the defendant-beneficiary in *Knudson* did not have possession and control over the disputed funds, which in that case had been placed in a special needs trust pursuant to California law.  *Id.* Unlike the funds at issue in *Knudson*, however, the proceeds of Mestemacher's settlement were

being held in a trust account by his attorney, and were therefore still in the possession and legal control of the plan beneficiary. *Id.* Accordingly, the court in *Bombardier* held that the health plan's action against the law firm was equitable in nature and that 502(a)(3) authorized the plan's claim for relief. *Id.* at 356-57.

As an initial matter, the Court notes that the instant case differs in both kind and degree from the litigation at issue in the *Sereboff* and *Bombardier* line of cases. In *Sereboff*, for example, the Supreme Court dealt with a single plaintiff moving against a single defendant to enforce the terms of a single contract provision in order to recover a specified amount of money from a single, identifiable fund in the possession of the defendant. 547 U.S. at 359. In contrast, the AvMed and Greater New York Plaintiffs seek to enjoin distribution of an unallocated, multi-billion dollar settlement fund to enforce an unknown number of contract provisions against an unknown number of claimants to recover an unknown amount of money.

The Plaintiffs seek to define the issue more narrowly. Extrapolating from the Supreme Court's holding in *Sereboff*, the Plaintiffs argue that each individual health plan in the instant action has a substantial likelihood of success against each individual claimant who has received Vioxx-related medical benefits from that plan. For several reasons, the Court declines to accept the Plaintiffs' characterization. First, there are wide discrepancies between the provisions in the health plans Plaintiffs seek to enforce. Second, Plaintiffs attempt to enjoin distribution of funds to claimants who have no relation to the Plaintiffs, and against whom the Plaintiffs have no claim whatsoever, let alone a substantial likelihood of success on the merits. Third, the Court finds that the injunction sought by the Plaintiffs does not constitute appropriate equitable relief under the *Sereboff* and *Bombardier* line of cases. As a result, the Court finds that the Plaintiffs cannot

demonstrate a substantial likelihood of success on the merits in this forum for the following reasons:

### a.    Material Differences in Plan Language

First, the Plaintiffs' seek to enforce hundreds of thousands of different health plans, many of which differ considerably from one to the next.  Even the few health plans offered by the Plaintiffs as exemplars contain several material differences and variations.[15]  The Defendants contend that these health plans differ significantly from one another in ways that might defeat the availability of equitable restitution.  As a result, the Defendants assert that the numerous differences between the health plans—indeed, even between different versions of the same health plan over a period of several years—counsel against finding a substantial likelihood of success on the merits.

Although the Supreme Court did not base its holding in *Sereboff* on the particular language of the health plan's reimbursement provision, the Court took special care to demonstrate that the plan language complied with the equitable relief sought by the plaintiff.  *Id.* For example, the Court noted that the Sereboffs' health plan "identified a particular fund, distinct from the Sereboffs' general assets—'[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise.'"  547 U.S. at 363.  Importantly, the Sereboffs' health plan also

---

[15] The AvMed Plaintiffs, for example, have submitted 83 plan documents as representative samples of the nearly 1.1 million different plans they administer.  The AvMed Plaintiffs note that if they were required to provide all of their plans, which are often specifically tailored to each individual beneficiary and which often contain similar reimbursement provisions, the total amount of documents produced would approach 30 million pages for a single year.  The Greater New York Plaintiffs, for their part, can only estimate that they represent "hundreds, and likely thousands" of ERISA health plans, though they have named only two such plans in their complaint.  These representations do not, however, counsel in favor of the issuance

identified "a particular share of that fund to which Mid Atlantic was entitled—'that portion of the total recovery which is due [Mid Atlantic] for benefits paid.'"  *Id.*  Clearly the jurisprudence emphasizes the significance of the plan's language.

A recent, post-*Sereboff* case from the Eleventh Circuit provides further guidance.  *See Popowski v. Parrot*, 461 F.3d 1367 (11th Cir. 2006).  In *Popowski*, the Eleventh Circuit dealt with two separate cases, both of which were brought by fiduciaries of employee benefit plans seeking reimbursement for medical expenses paid on behalf of plan beneficiaries.  *Id.* at 1370.  One of the plans—the "United Distributors Plan"—contained a reimbursement provision granting the plan "a lien on any amount recovered by the Covered Person whether or not designated as payment for medical expenses."  *Id.*  The other plan—the "Mohawk Plan"— contained a provision requiring that the insured "reimburse the plan in full, and in first priority, for any medical expenses paid by the Plan relating to the [beneficiary's] injury or illness."  *Id.*  Considering the plans in light of *Sereboff*, the Eleventh Circuit held that, although the language in the United Distributors Plan satisfied the requirements for the assertion of an equitable lien, the language in the Mohawk Plan did not.  *Id.* at 1373.[16]  The court explained that the United

---

of an injunction.

[16] The Plaintiffs charge that *Popowski* presents a situation materially different from the case at hand.  As an initial matter, the Court notes that all of the cases cited by both parties may be described as "materially different" from the case at hand.  Nevertheless, the Plaintiffs charge that *Popowski* is distinguishable because the beneficiary of the Mohawk Plan had already spent most of the money he received from settlement, thus comingling funds and defeating any equitable right on behalf of the health plans.  *Id.*  The Eleventh Circuit, however, did not base its holding on the beneficiary's lack of possession over the funds.  *Id.* at 1374, n.8 ("Our conclusion is similar to that of the district court's alternative holding based upon [the plan's] failure to identify a specific fund, except that we do not depend upon the comingling or dissipation of funds.").

The Eleventh Circuit further suggested, without deciding, that the health plan may in fact

Distributors Plan, in "language essentially identical to the Supreme Court's characterization of the plan language in *Sereboff*, specifies both the fund (recovery from the third party or insurer) out of which reimbursement is due to the plan and the portion due … (benefits paid by the plan on behalf of the defendant)." *Id.*   In contrast, the court found that the Mohawk Plan "fails to specify that recovery come from any identifiable fund or to limit that recovery to any portion thereof, [and] fails to meet the requirements outlined in *Sereboff* for the assertion of an equitable lien." *Id.* at 1374.

Turning to the instant case, the Court notes that there are significant variations in the language of even the few plans provided by the Plaintiffs as representative samples.  For example, the Hawaii Medical Service Association plan describes the medical benefits it disburses as an "interest-free loan."  Some of the plans appear to contain reimbursement provisions that do not identify specific, identifiable funds from which the health plans may recover reimbursement.  Some of the plans are not even governed by ERISA.  For example, the Government Employee's Health Association, Inc., and Blue Cross Blue Shield Association plans are governed by the Federal Employees Health Benefits Act.  The Plaintiffs counter that ERISA actually *limits* the ability of health plans to collect reimbursement from plan beneficiaries, so these non-ERISA plans may be entitled to even greater reimbursement rights than the ERISA

---

have been able to collect from the beneficiary even though he had already spent the funds that he received from settlement.  *See id.*  Citing *Sereboff*, the Eleventh Circuit stated that "the fact that the third-party recovery triggering the Mohawk Plan's reimbursement provision was comingled, even absent tracing, would not have disqualified an equitable lien had that equitable lien been by *agreement* (i.e., had the Mohawk Plan specified that reimbursement come *from* the third-party recovery funds)." *Id.* (emphasis in original).  The Court notes that *Popowski* does not constitute binding authority, and the Court considers the opinion only as persuasive authority addressing a novel issue not directly before the courts in *Bombardier* or *Sereboff*.

plans initially giving rise to this litigation.  Determining whether Plaintiffs can demonstrate a

substantial likelihood of success as to these plans, however, dramatically changes the calculus at

issue.  Without reaching the merits of this argument, the Court notes simply that the Plaintiffs'

attempt to enforce these disparate plans in conjunction with the ERISA plans leaves the Court

with serious questions as to which other plans may potentially fall within the universe of plans

the Plaintiffs seek to enforce.[17]

The Court further notes that, even within a single ERISA health plan, there may be

material differences as to the plan language at the time that any individual beneficiary took

Vioxx, including whether the plan language differed pre- or post-label adjustment, or whether it

contained issues related to proof of causation.[18]  Even yearly amendments to a single

beneficiary's policy may be material.  *See*, *e.g.*, *Franks v. Prudential Health Care Plan, Inc.*, 164

F. Supp. 2d 865, 879 (W.D. Tex. 2001) (noting material differences in a beneficiary's plan over

several years and stating that the law of the Fifth Circuit indicates that "the extent to which [a

beneficiary] has a reimbursement obligation under his ERISA plan for his medical treatment

depends on what his ERISA plan said at the time he received that treatment").  These

considerable uncertainties surrounding the Plaintiffs' request counsel in favor of finding that the

---

[17] The Court does not, however, base its findings today solely on the discrepancies
contained within the health plan provisions, or the fact that several of the exemplar plans are not
governed by ERISA.  The Court merely notes that these wide discrepancies are one of many
factors considered by the Court in determining whether the Plaintiffs can demonstrate a
substantial likelihood of success on the merits.

[18] Several of the exemplars provided by the Plaintiffs either are dated after the withdrawal
of Vioxx from the market or are not dated at all.  It is possible, therefore, that the plans reflect
language that was adopted in response to the Supreme Court's holding in *Sereboff*, and do not
accurately reflect the plan language at the time that an individual beneficiary may have taken
Vioxx.

Plaintiffs cannot show a substantial likelihood of success on the merits.

### b.      Enjoining Distribution of Funds to All Claimants

In addition to the Court's hesitation regarding Plaintiffs' fundamental argument that they have a substantial likelihood of success against all of their beneficiaries, irrespective of plan language or whether a particular plan is even governed by ERISA, the Court is troubled by what the Plaintiffs' argument leaves unsaid.  Even assuming that the Plaintiffs can assert equitable liens against all claimants for whom they have paid medical expenses, the Plaintiffs are unable to tailor their proposed injunction to apply to only those claimants.  The Court has no reliable means of determining how many non-ERISA claimants might be affected by the proposed delay.  By their own estimation, however, the AvMed Plaintiffs seek to enjoin distribution of settlement funds to approximately 35,000 plaintiffs against whom they have no claim whatsoever, let alone a substantial likelihood of success on the merits.  With respect to the Greater New York Plaintiffs, the Court does not even have the benefit of a rough estimate as to how many non-ERISA Vioxx claimants their proposed injunction might impact.

The Court further questions the appropriateness of the Plaintiffs' request to compel identification of claimants who are participants in a private, contractual settlement like the one reached by the parties in the Vioxx cases.  The Court can find no authority—and the Plaintiffs have provided none—to support the contention that the Plaintiffs have a right to the claimants' identifying information, including their social security numbers, dates of birth, employers, etc.  The fact that the Plaintiffs have encountered substantial hardships in locating this information does not give rise to a legal right to compel its production here.  The Court harbors serious doubts concerning the appropriateness of the Plaintiffs' attempt to enjoin payments to so many

thousands of claimants against whom the Plaintiffs have no claim.  These doubts counsel in favor of finding that the Plaintiffs cannot demonstrate a substantial likelihood of success on the merits.

**c.      Appropriate Equitable Relief**

With little precedent bearing directly on the uncertainties in the instant case, the Court turns to the fundamental, three-part analysis set forth in *Bombardier* to ground its inquiry.  In *Bombardier*, the Fifth Circuit established three considerations for determining whether a plaintiff seeks appropriate equitable relief under §502(a)(3) of ERISA: "Does the [plaintiff health plan] seek to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to the [plaintiff], and (3) that are within the possession and control of the defendant beneficiary?" 354 F.3d at 373.  Pursuant to this analysis, the Fifth Circuit held that the Bombardier health plan sought appropriate equitable relief under ERISA when it asserted an equitable lien against settlement funds held in a trust account by the beneficiary's attorney.  *Id.*

Turning to the case at hand, the Court first looks to see whether the Plaintiffs are seeking to recover funds that are specifically "identifiable" within the contemplation of the *Sereboff* and *Bombardier* line of cases.  In most of those cases, the specifically identifiable funds were already awarded to the beneficiary pursuant to a judicial award or extra-judicial settlement agreement. The Supreme Court noted in *Sereboff*, for example, that the fund at issue was the same fund that had been "identified" by the terms of the plan itself—the beneficiary's recovery from the third-party tortfeasor.  547 U.S. at 364.  At this early stage of the Vioxx Settlement proceedings, however, the Claims Administrator has not finished determining which claimants are eligible for funds or allocating points to individual claimants so as to determine the amount of recovery pursuant to a formula for translating points to dollar amounts.  As a result, the Court has no

-29-

reliable means of determining which claimants will even receive funds, much less the amount of money that they will receive.  Further, none of the exemplar health plans offered by the Plaintiffs designates an unallocated settlement fund like the one in the Vioxx Settlement as an "identifiable" fund from which the plan may collect, and this Court doubts very much whether such a provision would be enforceable.  As a result, the Court finds that there is no "identifiable" fund against which the Plaintiffs may assert their liens.

Proceeding to the second prong of the *Bombardier* analysis, this Court is unable to determine whether any portion of the funds at issue might belong in good conscience to the Plaintiff health plans.  The Court's difficulties in this respect are attributable in large part to the uncertainties inherent in the Plaintiffs' request.  As a threshold matter, the Court recognizes that it is possible, even likely, that a significant portion of the settlement funds do—or, perhaps more accurately, will at some point in the future—belong to some of the Plaintiff health plans.  Whether those funds belong in good conscience to the Plaintiffs at this stage of the settlement proceedings, however, is doubtful.  In addition, it is beyond dispute that the settlement funds of claimants who have not received benefits from the Plaintiffs do not—and will never—belong to the plans.  Because the Plaintiffs are unable to tailor their proposed injunctions to apply to only those claimants for whom they have provided medical benefits, the Court finds that the Plaintiffs' proposed injunctions will delay disbursement of funds that do not in good conscience belong to them.

Finally, in response to the third question raised by *Bombardier*, the Court finds that the funds in the Vioxx Settlement Program are not currently within the possession or legal control of the plan beneficiaries against whom the Plaintiffs seek restitution.  In *Knudson*, the Supreme

Court found that the funds were not within the beneficiary's control when the funds had been placed in a special needs trust pursuant to California law.  534 U.S. at 215.  Similarly, claimants in the Vioxx Settlement Program do not have possession over the lump, unallocated settlement fund currently held by BrownGreer.  At this early stage of the proceedings, with no final determination regarding valuation of claims or even total points awarded, the Court harbors serious doubts as to whether any individual claimant even has a legal right to a portion of the fund.  Even if the claimants do have such a right, however, the Plaintiffs would not be entitled to enjoin the funds of claimants who are not their beneficiaries.  As a result, the Court finds that the Plaintiffs seek to enjoin funds that are not within the possession or legal control of their plan beneficiaries.

For the reasons listed above, the Plaintiffs cannot demonstrate a substantial likelihood of success on the merits.  First, the wide discrepancies between some of the plans, including the threshold determination of whether the plans are governed by ERISA at all, raise serious doubts as to the enforceability of all plans at issue for equitable relief.  Second, the Plaintiffs' proposed injunction would delay distribution of interim payments to claimants against whom the Plaintiffs have no claim at all.  Third, pursuant to the analysis set forth in *Bombardier*, there is no identifiable fund; the funds at this time do not belong in good conscience to the Plaintiffs; and individual claimants do not have possession or legal control over the lump, unallocated settlement fund.   In consideration of all of these factors, the Court finds that the Plaintiffs in the instant action have failed to carry their burden of persuasion in showing a substantial likelihood of success on the merits.

### 2.    Irreparable Injury

The Court now turns to the second requirement for a preliminary injunction and looks to see whether the Plaintiffs can demonstrate that they will suffer irreparable injury in the absence of injunctive relief.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (internal citations and quotations omitted).

The Plaintiffs assert that they will suffer irreparable injury if the Court does not grant injunctive relief.  This contention rings hollow for several reasons.  First, the Plaintiffs have provided no evidence to show that the claimants or their attorneys will disperse settlement funds before resolving private healthcare liens.  Second, the Plaintiffs are attempting to assert and protect equitable reimbursement rights that they do not have at this stage of the proceedings.  Third, the *Sereboff* line of cases makes clear that the Plaintiffs may still pursue equitable reimbursement after interim payments have been distributed to claimants and their attorneys.  Finally, the Supreme Court's decision in *Sereboff* suggests that the Plaintiffs may even be able to seek equitable reimbursement from their beneficiaries in the event that the beneficiaries or their attorneys do spend or comingle settlement funds.

As an initial matter, the Court notes that the Plaintiffs have made no showing that either the attorneys for the beneficiaries or the beneficiaries themselves will improperly disperse settlement funds prior to the resolution of healthcare liens.  *See Chicago Regional Council of Carpenters Welfare Fund v. Johnson*, No. 06-C-4707, 2006 WL 2943623, at *2 (N.D. Ill. Oct. 6, 2006) (denying motion for temporary restraining order for failure to show irreparable harm

-32-

because "defendants have not yet received the settlement award from the third-party" and there was "no reason to believe that they intend to disperse the disputed funds, when collected, or that they otherwise intend to place [those funds] beyond the reach of this Court").  The Settlement Agreement makes clear that the resolution of private healthcare liens is solely the responsibility of each individual claimant and that claimant's attorney.  At this stage of the proceedings—when there has been no final determination as to which claimants will receive money, how many points they will be awarded, or how much money they will receive—the Court has no reason to doubt that individual claimants or their attorneys will attend to the resolution of these liens.  Nevertheless, the Plaintiffs would have this Court assume the worst—at once second guessing the intentions of the claimants and their attorneys without justification, while also placing the burden and cost of such doubt upon the claimants themselves by enjoining disbursement of their interim payments.  The Court rejects this position.

Second, the Plaintiffs' assertion that they will lose their right to equitable relief when BrownGreer distributes interim payments is equally flawed.  It bears repeating that the Plaintiffs likely do not have any right to pursue reimbursement at all at this stage of the settlement proceedings: there is no identifiable fund against which the Plaintiffs may assert their equitable liens; the unallocated settlement fund at issue does not belong to the health plans; and the beneficiaries do not have possession or legal control over the unallocated settlement fund.  The Plaintiffs therefore seek to assert and protect rights that they do not currently have, while at the same time attempting to place both the burden and the cost of their protection on the claimants awaiting interim payments.

Third, even a cursory reading of *Sereboff* reveals that whatever equitable rights the

Plaintiffs may have in the future will not be impaired when BrownGreer distributes interim payments.  In *Sereboff*, the health plan sought to recover reimbursement for medical expenses from the beneficiary only *after* the identified settlement fund had already been distributed to the plan's insured.  547 U.S. at 363.  Similarly, in *Bombardier*, the Fifth Circuit held that the plaintiff health plan could pursue equitable relief against identifiable funds held in a trust account by the beneficiary's attorney.  354 F.3d at 360.  These binding precedents clearly indicate that the Plaintiffs' potential rights to reimbursement will not be impacted when interim payments are made to claimants and their attorneys.  This determination alone weighs heavily against a finding of irreparable injury.

Finally, the Supreme Court's decision in *Sereboff* suggests that the Plaintiffs might still be able to seek equitable restitution from beneficiaries who spend or comingle settlement funds prior to an action for equitable reimbursement.  In *Sereboff*, the Court clarified the standard for equitable relief under ERISA by stating that equitable liens by agreement are not subject to "strict tracing rules."  547 U.S. at 363.  Several courts have interpreted *Sereboff* to mean that ERISA health plans may seek equitable reimbursement from plan beneficiaries who have comingled or spent funds recovered from third-party tortfeasors.  *See, e.g., Popowski*, 461 F.3d 1373-74 (noting that, in light of *Sereboff*, "the fact that the third-party recovery … was comingled … would not have disqualified an equitable lien had that equitable lien been by *agreement* (i.e., had the health plan specified that reimbursement come *from* the third-party recovery funds)") (emphasis in original).

Another recent, post-*Sereboff* case decided by a district court within the Fifth Circuit provides further guidance.  *See Schultz v. Progressive Health, Life & Benefits Plan*, 481 F. Supp.

-34-

2d 594, 595-96 (S.D. Miss. 2007).  In *Schultz*, a health plan sought to recover equitable reimbursement from a plan beneficiary who had received both benefits from the plan and social security payments for the same injury.  *Id.*  Pursuant to the terms of the plan, the social security payments offset any plan benefits provided to the beneficiary.  *Id.* at 595.  When the plan sought to recover the overpayments, the beneficiary argued that the health plan did not have an equitable right to recover funds that had already been spent.  *Id.*  The beneficiary asserted that there were no "specific identifiable asset[s] which [could] be recovered by [the health plan] because she spent all of the overpaid funds, and therefore the funds are no longer in her possession or control."  *Id.*  Citing the Supreme Court's decision in *Sereboff*, the district court rejected the beneficiary's argument, finding that "strict tracing rules do not apply to cases of equitable restitution when an equitable lien is imposed by agreement."  *Id.*  The district court noted that the health plan at issue—which clearly identified the funds from which recovery might be sought—satisfied the requirements for such an equitable lien by agreement.  *Id.*  Without reaching the merits of this argument, the Court merely notes that these post-*Sereboff* cases are persuasive factors that counsel against finding that the Plaintiffs can demonstrate irreparable injury.

For the reasons listed above, the Court finds that the Plaintiffs do not face the threat of irreparable injury in the absence of injunctive relief.  Indeed, what the Plaintiffs actually seek is not to avoid irreparable harm but to benefit from the convenience and economy of scale presently available within this multidistrict litigation proceeding at the expense of the claimants, many of whom owe nothing to the Plaintiffs.  That the Plaintiffs now stand to lose this benefit—a benefit to which they were never entitled in the first place—does not warrant the "extraordinary and drastic remedy" of a preliminary injunction.  Accordingly, the Court finds

that the Plaintiffs have failed to show that they will suffer irreparable harm in the absence of injunctive relief.

### 3. Balance of Harms

The Court now turns to the third prerequisite for a preliminary injunction and looks to see whether the Plaintiffs can demonstrate that the balance of harms favors the issuance of an injunction. The Plaintiffs argue that the balance of harms weighs in their favor because they stand to lose a considerable amount of money in the absence of injunctive relief, whereas individual claimants stand to suffer only minimal delays in the disbursement of their settlement funds. The Court rejects the Plaintiffs' argument and finds that the Plaintiffs do not currently stand to lose anything other than the benefit of convenience and economy of scale presently available within this multidistrict litigation. Because the Plaintiffs have no right to this benefit— especially at the expense of the claimants—the Plaintiffs' allegations of harm ring hollow.

In contrast, the Court finds that the proposed injunctions may cause considerable harm to the Vioxx claimants, many of whom are not beneficiaries of the Plaintiff health plans. Tens of thousands of federal Vioxx plaintiffs have been waiting years for this disbursement; a similar number of plaintiffs in the state court cases have been waiting even longer. Now, at perhaps the most critical juncture in the proceedings, and after being silent during the many years of this litigation's development, the Plaintiffs seek to enjoin distribution of interim payments to all claimants, regardless of whether or not the claimants are beneficiaries of the Plaintiff health plans. In what can only be characterized as an attempt to get their foot in the door, the Plaintiffs blindly assert that any delays caused by their proposed injunctions will be "minimal." Under scrutiny, this argument fails for two reasons.

First, the Court notes that a preliminary injunction does not somehow become anything less than an "extraordinary and drastic remedy" simply because the Plaintiffs characterize its impact as minimal.  This is especially true in the instant case, where the "minimal" impact of the injunctions would apply to thousands of claimants against whom the Plaintiffs have no cause of action at all.  Contrary to the Plaintiffs' representations, enjoining distribution of interim payments at this stage of the proceedings would constitute a remedy of unprecedented proportions.

Second, from the inception of this Vioxx Multidistrict Litigation, this Court has carefully overseen all aspects of the pretrial development of Vioxx cases, working closely with counsel for both parties as well as judges in the state courts to address every issue arising in the litigation. With the benefit of this experience and an intimate knowledge of the issues involved in Vioxx cases, the Court declines to accept the Plaintiffs' haphazard suggestion that their proposed injunctions will result in only "minimal" delays.  The Plaintiffs are attempting to open a door that, once opened, cannot be closed.  Without knowing how many claimants they represent, how many plans they seek to enforce, how much money they hope to recover, or what obstacles might lie ahead in attempting to enjoin distribution of an unallocated, multi-billion dollar settlement fund to thousands of claimants, the Plaintiffs suggest that their injunctions will only briefly delay a settlement process that has taken counsel for both parties tens of thousands of hours to navigate to the very eve of interim payments.  The countless, unforeseen intricacies involved in the distribution process alone may easily frustrate the Plaintiffs' estimates, at which point this Court would be powerless to undo any harm caused to the claimants.

To provide an example of only one such possible delay, the Court notes that the Greater

New York Plaintiffs purport to represent "hundreds, and likely thousands" of self-funded ERISA health benefit plans containing "reimbursement provisions requiring beneficiaries to reimburse the plan, out of recoveries from any third party, for benefits relating to such recovery."  The Greater New York Plaintiffs' proposed injunction—which the Greater New York Plaintiffs themselves describe as a less intrusive alternative to the AvMed Plaintiffs' proposal—would require the claimants' law firms to determine which claimants are required to satisfy equitable liens held by purported class members.  After making such a determination, the law firms would then have to submit good-faith certifications revealing the identities of those claimants to BrownGreer.  As noted earlier, however, recent cases suggest that there may be a legal issue as to whether material differences in plan language will affect an ERISA health plan's right to recover equitable reimbursement.  If such differences do affect the rights of health plans—and the cases suggest that they might—it will be nearly impossible for law firms to make consistent, accurate determinations with regard to the hundreds of thousands of potentially unique health policies at issue.  Not only would such confusion lead to inconsistent and inaccurate reporting, but it could also potentially derail the Vioxx Settlement Program for an indefinite period of time.  And this is but one example of the obstacles facing such an injunction.  At this critical point, the settlement proceedings could be derailed by even the most carefully tailored injunction, much less an injunction as rife with uncertainty as those proposed by the Plaintiffs.  If the Plaintiffs' injunctions were to issue and such an unforeseen problem derailed the Settlement Program, this Court might be powerless to close the door opened by the Plaintiffs or undo the harm suffered by the claimants.  The Court is simply not prepared to take that risk.  Accordingly, the Court finds that the Plaintiffs have failed to show that the balance of harms favors the issuance of an

injunction.

### 4.      The Public Interest

Finally, the Court looks to see whether the proposed injunctions will have an adverse effect on the public interest.  For many of the reasons already set forth above, the Court finds that the issuance of these injunctions would have a considerable negative impact on the public interest.  The Court further finds that members of the public who suffered Vioxx-related injuries have an interest in obtaining efficient and appropriate relief within this multidistrict litigation forum.  To allow the Plaintiffs in this action to wait on the sidelines for years and then enjoin the settlement proceedings at the last minute of the eleventh hour would betray this interest.

In addition, the Court finds that the public interest is not served by placing private healthcare providers such as the Plaintiffs on the same footing as governmental providers such as Medicare/Medicaid.  The Plaintiffs essentially argue that this Court should rewrite the terms of the private, contractual Settlement Agreement to put them in the same position as the governmental providers.  To the extent that any claimants who are not beneficiaries of the Plaintiff health plans will suffer harm resulting from the proposed injunctions, the Plaintiffs blame the NPC and Merck for failing to provide a mechanism to resolve non-governmental, non-statutory healthcare liens prior to disbursement.  This assertion is meritless.

The Vioxx Settlement Agreement is a private, contractual agreement between Merck and the NPC.  The terms of the Settlement Agreement provide for the mandatory, pre-disbursement resolution of all governmental statutory liens.[19]  In order to resolve these statutory liens, the

---

[19] *See generally* 42 U.S.C. § 1395y(b)(2) (providing statutory subrogation rights for recovery of Medicare expenses and reimbursement).

parties appointed a Lien Resolution Administrator to coordinate negotiations with federal and state Medicare/Medicaid agencies.  In contrast, the parties chose not to adopt the same requirements for the resolution of private, non-statutory liens.  Instead, the Settlement Agreement makes clear that each claimant and the claimant's attorney will be responsible for resolving these liens.  The Court can find no authority that casts doubt on the parties' freedom to structure their contract in this fashion.  On the contrary, requiring the negotiating parties to resolve all private, non-statutory healthcare liens prior to disbursement would have shifted a burden of such magnitude onto the parties that it could have potentially frustrated settlement discussions.  Indeed, the Greater New York Plaintiffs alone purport to represent a class of "hundreds, and likely thousands" of private, self-funded ERISA health benefit plans.  To hold that the negotiating parties were required to provide for the mandatory, pre-disbursement resolution of so many private, non-statutory healthcare liens would represent a sea change in the law of contract that this Court is not prepared to endorse.  Further, such a holding could potentially limit the ability of members of the public to obtain quick and effective relief within the forum of multidistrict litigation proceedings.  Finally, as between the parties to this litigation, the public interest would be far better served by requiring the private health insurance companies to devise a more effective means for identifying their own insureds against whom they seek to assert a claim.

For the reasons listed above, in addition to those already set forth in other sections of this order, the Court finds that the proposed injunctions would have a severe negative impact upon the public interest.

## IV.    CONCLUSION

The Court finds that the Plaintiffs have failed to carry their burden of persuasion as to any of the requirements for a preliminary injunction.  Accordingly, IT IS ORDERED that the Plaintiffs' Motions are DENIED.

During oral arguments, counsel for the AvMed Plaintiffs orally moved for a stay of the proceedings pending appeal in the event of such a denial.  For the reasons listed above, the Court finds that this motion is meritless.  Accordingly, IT IS ORDERED that the Plaintiffs' oral motion to stay the proceedings pending appeal is DENIED.

New Orleans, Louisiana, this 7th day of August, 2008.


_____
UNITED STATES DISTRICT JUDGE