## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | : : | CASE NO. 07-31164 |
| | : | |
| DAVID AGARD, EDWARD HENDERSON, RONALD R. O'CONNOR, ROBERT D. GATES, RICHARD F. CORE, | : : : : | In the Court Below: United States District Court for the Eastern District of Louisiana |
| APPELLANTS, | : | |
| - v. - | : | MDL NO. 1657 |
| | : | |
| MERCK & CO., | : : | HON. ELDON E. FALLON |
| APPELLEE. | : : | |

## APPELLANTS' OPPOSITION TO SEPARATE MOTIONS OF APPELLEE MERCK & CO., AND PLAINTIFFS' STEERING COMMITTEE SEEKING TO DISMISS THE INSTANT APPEAL OF PRETRIAL ORDER 28 ENTERED IN AID OF A "MASTER SETTLEMENT AGREEMENT"BETWEEN THE MOVANTS IN THE MULTI-DISTRICT PRODUCT LIABILITY LITIGATION BELOW.

### I. INTRODUCTION

Appellants, by and through counsel, hereby oppose the separate motions of

appellee Merck & Co. ("Merck") and the Plaintiffs' Steering Counsel ("PSC"), seeking to

dismiss the instant appeal (which is related to Appeal Cases No. 07-31161).

Appellants are among the approximately 26,000 plaintiffs with personal injury

claims pending in MDL No. 1657, and, with the aid of orders of the court below, the PSC

has bargained away valuable rights by entering into a Master Settlement Agreement

(MSA) in which Merck will pay $4.85 billion to resolve all pending litigation on its

Vioxx drug, not only in the MDL but throughout the nation. It is their contention the

M00D960320

MSA extinguishes valuable claims that would be cognizable under state tort law due to diversity jurisdiction,/*[1] and, not only were their interests not adequately represented in connection with the negotiations that led to the agreement, but the only certainties in the MSA are that Merck achieves global peace and the PSC receives hundreds of millions of dollars in attorney's fees upon consummation.  It is appellant's contention the only reasonable interpretation of Pre-Trial Orders ("PTOs") No. 28 and 31 is that they are either judicial approval or judicial ratification of the MSA, and, regardless of whether so interpreted, for purposes of invoking this Court's jurisdiction it cannot be gainsaid the district court has placed its imprimatur on the MSA./*[2]

The PSC contends the MSA is a "private settlement agreement" and PTOs 28 and 31 were issued merely in "aid of the settlement." PSC Motion, at p. 1.  Merck's motion echoes these contentions but in fact acknowledges a substantial number of plaintiffs will be excluded from receiving compensation under the MSA by observing that under its terms "a substantial number of the plaintiffs whose cases were pending in the multidistrict litigation would be eligible." Merck Motion, at p. 3.  Appellants submit the interests of

---

[1]*/In addition, 13,000 claims are subject to tolling agreements with Merck.  The PSC contends orders similar to PTO 28 and 31 were issued by court's overseeing Vioxx litigation in California, New Jersey and Texas.  (PSC's Motion, at p.1, n4.)

[2]*/ Appellants agree with the PSC since PTO 31 has been superseded and rendered moot for purposes of the instant appeal and may be dismissed.  *Id.,* at p. 5.  Nevertheless, PTO 31 remains relevant to demonstrate the movants' attempt to bring a complete end to this litigation since PTO 31 required individual counsel recommend to 100% of their Vioxx clients that they accept the terms of the MSA, and to withdraw from representing clients who would not agree to accept the terms of the MSA.  Accordingly, whether or not this Court has jurisdiction depends exclusively on the interpretation given to PTO 28.

M00D980321

both eligible and ineligible plaintiffs are implicated in that those who are eligible have had their claims significantly devalued and those who are ineligible receive nothing at all.

The instant motions of Merck and the PSC are based on a literal reading of PTO 28, with the PSC asserting the order is "the equivalent of a standard case management order that would be entered at the beginning stages of any other binary litigation" (PSC Motion, at p.4), and Merck contending the orders are "modest in their reach" as if PTO 28 does no more than order certain parties to produce plaintiff profile forms and respond to interrogatories (Merck Motion, at p. 4). Both movants contend the appeal should be dismissed on the grounds the orders are merely interlocutory and do not fall within the ambit of the collateral order doctrine.

It is ironic neither movant makes any mention of the "Definitions" section in PTO 28, and focus their discussions only on the preservation and discovery sections in the order. This is because PTO 28's definitions render it an order of exclusion extinguishing many of the claims presently pending in MDL 1657. As such, independent from that aspect of the order which permits the MSA to go forward as a private settlement agreement, PTO 28 is a final order extinguishing thousands of viable claims based on nothing more than the fact that it imported definitions of injuries that were stipulated to by the parties to the MSA and will inevitably result in dismissal of thousands of claims pending in MDL 1657.

Appellants recognize the general test for a final decision is one "that ends the litigation on the merits and leaves nothing for the court to do but execute judgment."

-3-

M00D980322

Coopers & Lybrand v. Livesay, 437 US 463, 467, 98 S. Ct. 2454, 2457, 57 L. ED. 2d 351
(1978) (citation omitted). Appellants contend the aftermath of PTO 28 will result in the
court performing functions that are more administrative in nature rather than judicial and,
as such, it is a final order.

   In the alternative, the discrete legal issue appellants raise is whether one of Merck
and the PSC, together with the District Court authority to bind such a large and diverse
group of plaintiffs without first adhering to the requirements of Rule 23, an issue that is
separate from the merits of the litigation. Appellants also cross move to treat the instant
appeal's seeking a writof mandamus/because they believed the district court's Rule 23
duties are straightforward and his failed to exercise the same prior to permitting the
parties to go forward with the MSA./*[3]

## II.  FACTS

   On November 9, 2007, Merck and the PSC executed MSA, which provides for
Merck to pay $4.85 billion to resolve all claims pending throughout the nation, and
includes attorney's fees to be paid to the PSC under which Merck agreed not to oppose
the PSC receiving up to 8% of the total settlement amount in attorney fees. The 8% fee is
set forth in section 9.2 .1 of the MSA, and the clear sailing provision at 9.2.6. *See* MSA
annexed to PSC Motion as Exhibit C.

---

   [3]*/ It is important to note appellants do not contend the district court did not have
authority to approve a settlement this size, but that it had a duty to do so through the
procedural and structural protections embodied in Rule 23 first, regardless of whether at
some point down the road settlement may be deemed to be fair, since at present, to the
extent it is any type of solution of all, it is a legislative and not judicial type solution.

M00D980323

On the same day, November 9, the district court issued four separate orders including PTO 28, the subject of this appeal. It is significant PTO 28 is subtitled "*Prima Facie* Evidence of Usage, Injury and Causation," thus signaling one does not need a compass to see the direction in which the order is heading. This is underscored by the fact that PTO 28 is aimed at only those plaintiffs who elect *not* to participate in the resolution program established by the MSA since it exempts a plaintiff who accepts the terms of the MSA from the requirements of Section I, "PRESERVATION NOTICE REQUIREMENT" (at pp. 2-3), and Section II, "DISCOVERY REQUIREMENTS" (at pp. 3-5). Appellants are concerned primarily with Section III, "DEFINITIONS" (at pp. 5-7), but the preservation section merits discussion since it exemplifies the Merck-driven nature of the MSA and the inadequacy of PSC representation in submitting to the same.

On February 17, 2005, shortly after the transfer by the Judicial Panel on Multi-District Litigation, the Honorable Eldon E. Fallon as MDL judge, issued PTO No. 1, which directed the parties to take appropriate measures to ensure the preservation of materials relevant to this litigation, and from that time until the issuance of PTO 28 almost three years later, neither party made any claim there was a risk records being lost or destroyed. Despite the same, PTO 28 directs non-settling plaintiffs to notify, by registered mail, all pharmacies, physicians, medical facilities and/or health care providers who either treated the plaintiffs or provided plaintiffs Vioxx or any other drugs from January 1, 1995 to present, of and include a copy of PTO 1, and notify each provider the records must be preserved. Thereafter, plaintiffs must serve a compliance statement, and

-5-

M00D980324

upon failing to meet the various requirements, be subject to show cause why their claim should not be dismissed with prejudice.

Under the settlement scheme, Article 2 of the MSA contains the threshold requirements that must be met before a plaintiff may receive compensation, which are divided into three separate "gates": "Injury Gate," "Duration Gate," and "Proximity Gate." *See*, respectively, Exhibits 2.2.1.1, 2.2.1.2, and 2.2.1.3 to the MSA in PSC's Exhibit C. It is likely, if the MSA were reviewed for settlement-only class certification, plaintiffs subject to exclusion by the duration or proxmity gate would be subclasses entitled to separate representation. Since the instant motions raise jurisdictional issues only, the focus will be on the definitions used for the injury gate, in that the magnitude of the number of potentially excluded claims renders PTO 28 a final order.

The "Definitions" section of PTO 28 imports virtually verbatim the most expansive exclusionary provision in the MSA, namely, the "Injury Gate," which defines three separate eligible injuries, namely, "Myocardial Infarction" ("MI"), "Sudden Cardiac Death ("SCD"), and "Ischemic Stroke" ("IS"). PTO 28, at 5-6. The only express exclusions set forth in PTO 28 are angina or unstable angina, hemorrhagic stroke, and transient ischemic attack, but by implication the definition excludes all cardiovascular injuries with the exception of MI, SCD, and IS, and thus mirrors the MSA "Injury Gate" inclusions.

## III. ARGUMENT

### A.    PTO 28, Joined with the MSA, Realizes Movants' Intentions to Bring an End

MOD9603025

**to Vioxx Litigation, Leaving the District Court to Perform Administrative Acts Even If Clothed in the Garb of Judicial Decision-Making.**

This Court has made clear the appealability of an order normally depends on its effect, and not merely its language. Le Compte v. Mr. Chip, Inc., 528 F. 2d 601 (5th Cir. 1984). *See also*, Sigalas v. Lido Maritime, Inc., 776 F.2d 1512, 1516 (11th Cir. 1985) (holding finality of dismissal must be determined by analyzing effect not "parsing of the language" of order). Because movants Merck and PSC are defending an allegedly private agreement affecting thousands of plaintiffs using the same definitions of injuries as appear in PTO 28, this Court's previous observation is pertinent here, namely, "Despite the apparent clarity of the general test, however, finality in the context of appealability has proved to be an elusive concept." Koke v Phillips Petroleum Co., 730 F.2d 211, 214-15 (5th Cir. 1984). The Tenth Circuit recently observed that the label used to describe the judgment is not controlling. Graham v. Hartford Life & Accident Ins. Co., 501 F. 3rd 1153, 1157 (10th Cir. 2007). Appellants recognize the "death knell" or "effectively out of court" doctrine, as well as the practical finality exception, are for the most part defunct, *see* Kmart Corp., v. Aronds, 123 F.3d 297 (5th Cir. 1997), but assert PTO 28 is final, because there is simply nothing more to do that is not administrative in nature.

Although appellants contend that if Rule 23 requirements were followed they would have received adequate protection in the district court, this appeal nevertheless raises the deprivation of their constitutional rights as well since they never received either adequate notice or representation prior to the MSA and PTO 28 which significantly

-7-

M00D980326

reduced the value of their claims or entirely extinguished claims which are viable in the

tort system. Mullane v. Central Bank & Trust Co., 399 US 306, 70 S. Ct. 652, 94 L. Ed.

865 (1950); Phillips Petroleum Co. v. Shutts, 472 US 797, 105 S. Ct.. 2965, 86 L.Ed2d

628 (1985). During the Civil War era, Justice Field wrote, "The Constitution deals with

substance, not shadows." Cummings v. Garland, 71 U.S. 277, 325 (1866). Accordingly,

this Court should reject the wooden reading of PTO 28 urged by Merck and the PSC. /*[4]

Appellants begin this discussion with the preservation section for several reasons.

First, "[i]t is true that the issuance of a preservation order is by no means automatic, even

in a complex case." Treppel v Biovail Corp., 223 F.R.D. 363, 369 (SDNY 2006), so the

issuance of such an order without benefit of an adversarial proceeding raises a significant

danger the desire of the court below to resolve the numerous personal injury claims

before it diverted it from carrying out its judicial responsibilities by acting more as an

administrator participating in what amounts to a legislative and not judicial solution.

Secondly, by requiring the use of registered mail, non-settling plaintiffs are

subjected to significant expense which may in fact be largely unnecessary, and without

any showing plaintiffs, rather than Merck, should bear the expense of any preservation

should the same became necessary. Indeed, movants will not dispute that Merck presently

maintains a large depository of medical records, so, for at least thousands of plaintiffs,

---

[4]*/Since this Court has made clear that a party who inadequately presents issues
waives a claim, Cinel v. Connick , 15 F.3rd 1338, 1345 (5th Cir. 1994), in the interests of
brevity, appellants respectfully request the Court consider the arguments made in each
section of the instant brief as they pertain to the issues of finality and plaintiffs'
entitlement to a writ of mandamus.

-8-

MOOD960327

being required to incur time and expense serving notices to healthcare providers who already produced the records is a needless and wasteful expense to hoist upon non-setting plaintiffs. Thirdly, contrary to Merck's contention, the instant preservation requirements are, in fact, a grant of injunctive relief. (See Merck Motion, at pp. 5-6), and thus appealable pursuant to 28 USC 1292 (a) (1). In Humble Oil & Refining Co., v. Harang, 262 F.Supp. 39, 42-43 (EDLa 1966), the district court observed:

> It is apparent that the plaintiff may be irreparably injured if the evidentiary documents necessary to prove its claim are destroyed or otherwise put beyond the reach of the court. But this is true in every situation in which proof of a claim rests on documentary evidence; the parties may be irreparably injured if the documents are destroyed. Were the fact that a party to a law suit would suffer irreparable injury if a document were destroyed the sole test for the issuance of an injunction to prevent its destruction, injunctions should issue in every case in which important documents are within the control of either party. Obviously, this is not done and it cannot and should not be done. When the party who seeks an injunction shows potential irreparable injury, he has established merely one essential condition for relief. He must demonstrate in addition that there is real danger that the acts to be enjoined will occur, that there is no other remedy available, and that, under these circumstances, the court should its discretion to avoid the unusual relief provided by its injunction.

Accordingly, this Court should reject Merck's argument that PTO 28 does not contain injunctive relief./*[5]

Appellants recognize it is at least debatable whether there is appellate jurisdiction

---

[5]*/In addition, it imposes a duty on the instant appellants where none exists under New York law since in New York, medical and pharmaceutical records are the property of the particular provider. Moreover, the question of whether or not such a duty exists is a matter of state law which, pursuant to Hanna v. Plumer , 380 US 460, 85 S. Ct. 1136, 14 L.Ed. 2d 8 (1985), would require the district court to have followed New York law. *See* State Farm Fire and Casualty Co., v. Frigidaire, 146 F. R. D. 160 (ND Ill. 1992).

M00D960328

pursuant to 28 USC §1291(a)(1) (*see, e.g.,* <u>Metex Corp. v.Ace Industries Inc.</u>, 748 F. 2d

150 (3d Cir. 1984)), but submit this Court need not consider this issue because appellants

are not claiming this Court has jurisdiction pursuant to §1291(a)(1), and do not intend to

raise this argument in opposition to the instant motions. Rather, the Court is asked to

consider the impact of the preservation requirements on the issue of finality.

Although it is a matter of speculation as to how many plaintiffs will be subject to

dismissal for failure to meet the preservation requirements of PTO 28, it is not speculative

to infer that some plaintiffs as well as their counsel will be driven to inertia after

reviewing the definitions section of PTO 28 after finding the type of injury that he/she

sustained is excluded.. Thus, claims that are viable in the tort system may become

unknowable, let alone unreviewable by this Court, because the plaintiffs or their counsel

did not have the wherewithal or resources to continue with their claims. Moreover, to the

extent claims survive, many may take the form of dismissals for failure to show good

cause for lack of compliance with the preservation requirements of PTO 28 despite

having a claims that are viable under state tort law.

Appellants now turn to the definitions section of PTO 28. Movants Merck and

PSC will not be able to dispute the fact that definitions by their nature set forth the criteria

that identify what is or is not included in the object or concept being defined./*[6]

---

[6]*/The *Random House Webster's College Dictionary (1995 ed.), at p. 355,*
defines the words "define" and "definition" in the following manner:
   ***define*** ...1. to state or set forth the meaning of; .... 2. to explain or identify the
   nature or essential qualities of; describe. 3. to specify: *to define responsibilities.*
   4. to determine or fix the boundaries or extent of. ...

M00D980329

Similarly, the movants may not dispute the PTO 28 definitions identify those injuries which are, and are not, going to be considered related to ingestion of Vioxx..

There is no doubt the definitions appearing in PTO 28 did not result from adversarial proceedings or prior *Daubert* rulings by the district court,/*[7] but were merely imported virtually verbatim from the MSA. PTO 28 exclusions are simply the mirror image of the injury gate. Thus, the MSA is the "yin" that will extinguish claims of those plaintiffs who agree to abide by its terms, and PTO 28 the "yang" that will capture those plaintiffs who refused to accept the terms of the MSA. In short, the exclusions will exclude with the only difference being the mechanism.

The reason for this is that while the PTO 28 definitions are replete with medical terminology, they are not based on science, and to the extent they coincide with sound science that is mere happenstance. The definitions in PTO 28 are stipulated definitions, and a part of the bargain made by the parties to the MSA. It follows that in § C.3(b) of PTO 28, hemorrhagic strokes are excluded, not because plaintiffs cannot demonstrate a causal relationship between ingestion of Vioxx and onset of hemorrhagic stroke based on sound scientific principles, but because they are part of the "done deal" that the movants entered into when they executed the MSA.

The definitions section is not descriptive in the sense that it represents an objective

---

*definition* . . . 1. the act of making definite; distinct or clear. 2. The formal statement of the meaning or significance of a word, phrase, etc. ...

[7]*/See* In re Vioxx Prods. Liab. Litig., 401 F.Supp.2d 565 (E.D. La. 2006).

M00090330

scientific endeavor or inquiry to establish causal relationship between ingestion of Vioxx and certain described cardiovascular injuries, but is a contrived set of characteristics aimed at extinguishing claims that arise from a wide range of cardiovascular injuries. Any other interpretation of PTO 28 would render the language meaningless or superfluous.

Once these contrived definitions are incorporated into a court order, as here in PTO 28, it is too late for plaintiffs to argue the very same scientific principles and empirical evidence that will support those claims included in the definitions is equally compelling as to those injuries excluded by the definitions. Indeed, it would make no difference if the included claims are based on junk science and the excluded claims resting on nothing more than the prospect of hundreds of millions in attorney's fees, the litigants in MDL 1657 will be unable to turn back the clock and revisit PTO 28.

When the inevitable motions to be filed by Merck seeking to dismiss claims of non-settling/excluded plaintiffs who cannot demonstrate their injuries are within parameters of PTO 28's "Definitions," appellate review, if any, is unlikely reach behind PTO 28 to review the factual predicate upon which it rests. This is because in litigation this size conflicts are inherent and inevitable and plaintiffs are unlikely to be able to defeat the arguments that will be made by the PSC asserting they did the best they could for the class as a whole. Kincade v. General Tire and Rubber Co., 635 F.2d 501, 508 (5th Cir. 1981).

Another argument that reaches the same result is the PSC asserting that the

-12-

M00980331

conflicts being raised by the plaintiffs are no more than an "accepted structural risk" inherent in litigation. Mendoza v. United States, 623 F2d 1338, 1344 (9th Cir. 1980), *cert. denied*, 450 US 912 (1981). Appellants submit that even those plaintiffs who are hearty enough to reach appellate review will be met with arguments such as set forth above, rendering appellate review an exercise in futility. Indeed, even the constitutional claims are likely to fail based on the argument plaintiffs received all the process they were due through the "representation" they were afforded by the appointed representatives in the MDL pre-trial discovery proceedings.

Thus, although MDL 1657 will have an active docket, in that Merck motions to dismiss will have to be "adjudicated," the reality is the district court will simply be carrying out *pro forma* administrative functions by issuing dismissal orders against plaintiffs do not fall within the parameters of the definitions section of PTO 28. Accordingly, these *pro forma* functions should not preclude this Court from looking at the true effect of PTO 28, and holding PTO 28 has sufficient indicia a finality for purposes of invoking this Court's jurisdiction.

**B.      PTO 28 Is Conclusive as to the Viability of the MSA and, Completely Separate from the Merits Raise an Issue of Significant National Importance in an Unsettled Area of Law, and Where Plaintiffs Will Lose Valuable Rights Which Would Be Effectively Unreviewable on Appeal from a Final Judgment.**

At the outset any notion the MSA is a private agreement is belied by the fact it will include these appellants who did not give the PSC the right to stipulate the courtroom was open, let alone to bargain away their claims. The source of the PSC's authority to

-13-

MODD960332

negotiate in the first instance stems from PTO 6, which gave it responsibility to explore, develop pursue all settlement options pertaining to any claim or portion thereof in MDL 1657. Appellants submit even the PSC did not believe it could enter into a settlement agreement such as is before the Court without first obtaining class certification, as is reflected by the motion they brought seeking the same. Having failed to persuade the district court they could meet the requirements of Rule 23 with regard to personal injury claims (*see* In re Vioxx Prods. Liab. Litig., 239 F.R.D. 450 (E.D.La. 2006). the PSC went ahead and entered into the instant MSA without a passing glance to Rule 23.

Since appellants contend the district court was without authority to approve such a large settlement class without first ensuring that the requirements of Rule 23 were met, it should make no difference whether the district court's allowing the agreement to go forward is delineated as an approval, ratification, or simply placing the court's imprimatur on the MSA. It is the legality of the decision appellants raise here. It is doubtful anyone will dispute the fact that this issue is discreet and separate from the merits. Accordingly, the purely legal question being raised is precisely the type of issue that is within the purview of this Court's appellate jurisdiction. Kinney v. Weaver, 367 F.3d 337, 343 (5th Cir. 2004 (en banc).

The public importance of the issues appellants raise is best reflected by the fact that there has never been an effort by private parties, with the aid of the court, to bind thousands of plaintiffs who have viable actions for personal injuries which are diverse in virtually every facet of their claims – ranging from initial ingestion to state law

M00090333

applicable to the claims -- without first adhering to the requirements of Rule 23.

Moreover, the movants were able to limit the settlement fund to $4.85 billion by nothing

more than their own agreement to do so, and under circumstances where defendant Merck

was able to withstand a judgment for many times that amount. The unsettled law in this

area is exemplified by the fact that the movants/parties to the MSA, as well as the district

court, believe they were acting lawfully in moving forward with the MSA.

In Amchem Products, Inc., v. Windsor, 521 US 591, 117 S. Ct. 2231, 138 L. Ed.

2d 689 (1997), rejected the Third Circuit's position a litigant seeking settlement class

certification still had to meet all of the requirements of Rule 23(a) and (b) (3) and held

"settlement is relevant to a class certification." Id., 521 US at 619, 117 S. Ct. 2247-48.

Although this brought the Third Circuit in line with the other Courts of Appeals in the

country just how settlement is to be considered remains an unsettled area. Amchem

instructs a court confronted with a settlement–only class certification need not inquire

whether the case, if tried, would present intractable management problems for the

proposal is that there be no trial, but went on to state that unwarranted overbroad class

definitions "demand undiluted, even heightened, attention in the settlement context".

Id., 521 US at 620, 117 S. Ct. 2248. The courts are disagreeing about how much

significance to attach to a settlement, an area of appellants need not delve into on the

instant motion. Suffice it to say, no matter how laudable the goal of settlement may be, it

can never be of such importance Rule 23 may be discarded in its entirety.

One of the reasons Amchem required heightened scrutiny of settlement class

-15-

M00D980334

action certification motions is because it believed, "Such attention is of vital importance, for a court asked to certify a class will lack the opportunity, present when the case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.,* 521 US at 620, 117 S. Ct. 2248. This issue looms large in the instant case because many of the claims appellants contend will be lost and not even knowable by this Court stem, at least to some degree, from the fact the district court did not have the benefit of an adversarial proceeding with counsel setting forth the merits of claims by individual plaintiffs who have cardiovascular injuries that are being excluded from the MSA yet remain viable in the tort system. Moreover, when Merck moves to dismiss a plaintiff's claims because the injuries don't fit definitions in PTO 28, it is simply unrealistic to suggest the district court will revisit the circumstances surrounding the issuance of PTO 28, but rather it will adhere to its terms, with the inevitable result of assembly line, *pro forma* dismissals on the merits. Appellants submit many viable claims will be unknowable since it is likely at least some plaintiffs will not submit opposition to the motions, and it is equally likely any appellate review would be of issues far different from those that could can be raised now, imposing the loss of valuable rights in the process. Accordingly, PTO 28 should be reviewable pursuant to the collateral order doctrine.

C.  **Appellants Are Entitled to a Writ of Mandamus to Compel the District Court to Meet its Rule 23 Duties Before Permitting the MSA to Be Implemented.**

Appellants must traverse this road beause, despite the district court's ruling the PSC could not meet the adequacy requirement of Rule 23, both movants and the court

-16-

MOD980335

below believed they could nevertheless lawfully go forward with the MSA. Appellants submit nothing has occurred that would permit the execution of the MSA without first seeking settlement class certification under Rule 23, and the district court had an unequivocal duty to determine whether or not the parties, or the PSC in particular, could meet the requirements of Rule 23 prior to permitting the MSA to go forward.

Appellants now turn to several factors to demonstrate the reasons adherence to Rule 23 makes a significant difference to them as well as thousands of other litigants in MDL 1657. The PSC asserts, and Merck does not dispute, the purpose of PTO 31 was to permit Merck to determine the number of claims eligible to participate in the resolution program created by the MSA. PSC Motion, p. 3-4. It necessarily follows the parties to the agreement are lacking information regarding the number and nature of the claims./*[8] This raises a very preliminary issue with regard to subclasses among the claims that have not been excluded by either the MSA or PTO 28.

There has been no explanation for the allocation of $4 billion toward heart attacks and SCDs with the balance allocated to ischemic strokes and presumably other costs associated with the administration of the MSA. (It is not clear from which pot the attorneys fees come from.) Strokes are the third leading cause of death in the United States and a major contributor to disability; accordingly, it is highly likely stroke victims are going to incur significant long-term costs of medical care and institutionalization, as

---

[8]*/The district court acknowledged uncertainty with regard to the number of claims in PTO 29, at p. 6. A copy of PTO 29 is annexed hereto as "Exhibit A."

-17-

M00D980336

well substantial claims for lost wages../*[9]   It will undoubtedly be useful to hear the

parties' factual basis for their allocation, but whatever it is, appellants submit it breathes

real meaning into the observations by the Supreme Court in <u>Amchem</u> that there should be

intense scrutiny of motions seeking settlement class certification where "individual stakes

are high and disparities among class members great." *Id.*, 521 U.S. 591 at 625.  Indeed

the need becomes more compelling with regard to the claims of excluded by definition.

     The exclusions fly in the face of the *Daubert* rulings below which permitted

plaintiffs to present expert testimony that short-term ingestion of Vioxx at 25 mg

increases the risk of blood clots, and creates a prothrombotic state because of the

imbalance created between thromboxane and a prostacyclin which in turn leads to

thromobogenesis, hypertension and promotion of aetheroslcerosis.  *See* <u>In re Vioxx Prods.</u>

<u>Liab. Litig.</u>, *supra*, 401 F.Supp.2d at 586-87. At this juncture, appellants submit no one

but Merck and the PSC are in a position to determine the trade-offs that were made in

consummating the MSA.  As the parties to the MSA, they disregarded judicial admonition

to reduce the danger of an actual or apparent conflict of interest by delaying fee

negotiations until after class action settlement terms have been finalized , see e.g.,

<u>Prandini v. National Tea Co.</u>, 557 F. 2d 1015, 1021 (3rd Cir. 1977).  Appellants here are

left with precious little to explain why their claims were either significantly reduced in

---

    [9]*/Data indicates some 75% of stroke victims who were not institutionalized have
suffered sufficient disability to impair their employability.  Coffey, C. Edward, et al.,
*Stroke- The American Psychiatric Press Textbook of Geriatric Neuropsychiatry, Second
Ed.,* American Psychiatric Press, Washington, DC (2000), at 601–617.

M00D980337

value or extinguished altogether, but for the prospect of humongous attorneys fees for the PSC.

Appellants turn briefly to some considerations by Judge Fallon and PTO 29 in the context of making suggestions regarding attorneys fees for counsel coming in post-MSA. The reason discussing these observations is they are findings that might be part of a class certification decision so they deserve mention, keeping in mind that the district court was not thinking of a class certification at the time they were made. The court observed:

> On September 30, 2004, Merck was withdrew Vioxx from the market. The withdrawal of Vioxx led to extensive publicity nationwide in newspapers and magazines, on television and radio, and across the Internet. While plaintiffs' counsel had extensively advertised seeking clients to pursue claims against Merck relating to the use of Vioxx before September 30, 2004, that advertising increased markedly throughout the country after the withdrawal. Like the publicity relating to the withdrawal, the advertising apprised the public of possible claims they might have against Merck in connection with the use of Vioxx.

PTO 29, Exhibit A hereto, at p. 5. Appellants submit under no circumstances could the court's observation be equated to or substitute for the Rule 23 requirement that class members receive notice that will be neutral and fully inform them of their rights. In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104-05 (5th Cir. 1977).

Appellants take issue with Judge Fallon's conclusion the Vioxx litigation is "an extremely mature litigation." (PTO 29, p.6.) That conclusion was based on the extensive discovery undertaken by the parties, and the trials of some 17 cases. Appellants submit that whatever lessons may have been learned from bellwether trials, they could only have provided some guidance for heart attack and SCD cases which were the only injuries tried

M0OD980338

to date. More importantly, appellants submit this litigation cannot be considered mature

in light of the developing science based on the intense study of Cox-2 inhibitors since

studies are regularly appearing in peer-reviewed journals and yielding evidence

significantly in favor of the plaintiffs. *See, e.g., Circulation*, 2006; 114:1028-1035; and

*Circulation*, 2007; 115:326-332.   In light of the procedural posture of this case,

appellants will not pursue the issue further except to note that this Court acknowledged

the pitfalls of certifying a class when litigation is immature. Castano v. The American

Tobacco Co., 84 F.3d 734, 747 (5th Cir. 1996). The district court's duties in connection

with meeting its Rule 23 responsibilities are not discretionary and a writ of mandamus

should issue directing it to do so.

## IV.   CONCLUSION

Appellants respectfully submit the failure to adhere to its Rule 23 responsibilities

has left plaintiffs in MDL 1657 subject to the yin-yang effect of the MSA and PTO 28,

and permits the PSC and Merck not only to circumvent Rule 23 protections, but deprives

plaintiffs of the due process of law guaranteed by the Constitution of the United States.

Respectfully submitted,

MARYA C. YOUNG/Fed. Bar No. 301339
(Application for admission pending)
LAW OFFICE OF RONALD R. BENJAMIN
Attorneys for Appellants
126 Riverside Drive
Binghamton, New York 13905
607/772-1442

-20-

M00D960339