UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX®                           MDL Docket No. 1657

PRODUCTS LIABILITY LITIGATION           SECTION L

                                        Judge Eldon E. Fallon
                                        Magistrate Judge Knowles

THIS DOCUMENT RELATES TO:

| | |
|---|---|
| David Agard, et al., v. Merck & Co. | Case No.: 2:05-cv-01089 |
| Glenn L. Dier, et al., v. Merck & Co. | Case No.: 2:05-cv-01088 |
| Adnan Aljibory, et al., v. Merck & Co. | Case No.: 2:05-cv-01090 |
| Rosemary Holobosky, et al., v. Merck & Co. | Case No.: 2:05-cv-01091 |
| Marjorie Connolly, et al., v. Merck & Co. | Case No.: 2:06-cv-02708 |
| Marilyn F. Core, et al. v. Merck & Co. | Case No.: 2:05-cv-02583 |
| Carlo Devincentiis, et al., v. Merck & Co. | Case No.: 2:05-cv-02297 |
| Kathleen Hoffner, et al., v. Merck & Co. | Case No.: 2:06-cv-02238 |
| Robert D. Gates, et al., v. Merck & Co. | Case No.: 2:05-cv-06221 |

-----------------------------------------------------------------------------------------

**PLAINTIFFS' CORRECTED REPLY MEMORANDUM OF LAW TO
MERCK'S OPPOSITIONS TO PLAINTIFFS' MOTION**

## INTRODUCTION

Plaintiffs have contended from the outset that the Master Settlement Agreement ("MSA") and Pre-Trial Orders ("PTO") Nos. 28–31 should be construed in *pari materia*. In the instant reply, the issues are addressed sequentially in the interest of clarity and brevity, however, each argument is just one aspect of the plaintiffs' threshold position that an aggregation of this size cannot be judicially permitted without adhering to Rule 23, that PTO 28 is not independent of the MSA, and that, to the extent it is construed as a simple discovery order, PTO 28 constitutes an abuse of judicial discretion.

Thus, while plaintiffs contend they should be granted an extension of time in part because of the conduct of the PSC, the argument with regard to the damage to the traditional

binary structure contemplated by the federal rules is also a byproduct of permitting an aggregation of this size to go forward without adhering to the structural protections set forth in Rule 23.

## REPLY STATEMENT OF FACTS

As proof showing that the requirements of PTO 28 do not advance the litigation in any respect and serve no purpose other than to provide the defendant with a predicate for dismissing claims that are otherwise viable in the tort system, plaintiffs note that, on August 8, 2008, their counsel received a letter from defendant's counsel indicating the intent to move to dismiss with prejudice for failure to provide with proof plaintiffs' counsel complied with the preservation requirements set forth in PTO 28 which includes sending a statement listing all pharmacies health-care providers and/or employers plaintiffs' counsel served notice on to preserve records as well as copies of the notices themselves in a certification that they were sent. *See letter annexed as **Exhibit 1**.*

This letter relies on an order issued without notice to plaintiffs' counsel, without any notice of motion seeking the same, and despite the fact there was no reason to believe all evidence which is the subject matter of PTO No. 28 is not being preserved to the best of the party's abilities in this litigation. Defendant at no time suggests it does not have the information already being sought, nor that there is conduct on the part of plaintiff that would suggest information relevant to the plaintiff's claim is not being maintained.

Indeed, even if some relevant records were not maintained depending on the importance, the remedy in the ordinary course of litigation would simply be preclusion not dismissal. It follows the primary purpose the order serves is to drive up plaintiffs' litigation expenses and time devoted to matters that could otherwise be deployed in prosecuting the action against defendant.

The draconian nature of PTO No. 28 is further evinced by the requirements plaintiffs

undertake the time and expense to provide an abbreviated expert opinions which adds nothing to the information contained in fact sheets that afford both the Court and the defendant notice of the nature of the injury being claimed. Counsel has prepared an expert disclosure regarding plaintiff Agard (*see Exhibit 2 annexed hereto*) and respectfully submits the same does nothing but open plaintiff's expert to attack at deposition and/or cross examination at trial. Plaintiffs incurred an expense of $1,500 to have this preliminary report prepared (*id.*), causing plaintiff unnecessary and duplicative costs since it is going to be inadequate for the full disclosure that will be required prior to trial. Plaintiffs also annex hereto a second report for plaintiffs Mary Ann Bozich as well as the thousand dollar expense incurred for that report (*see Exhibit 3*). The aforesaid exhibits are presented to demonstrate that regardless of the motivation underlying the issuance of PTO 28 its effect is to distort the discovery process in favor of the defendant under circumstances where it does not advance the litigation in any respect other than driving up non-settling plaintiffs litigation costs and providing defendant to the tools to extinguish claims without ever reaching the merits .

Since there are no significant factual issues disputed in the defendant's response plaintiffs now proceed to their reply argument.

## REPLY ARGUMENT

I.  **Merck's Response to Plaintiffs' Motion Adds Nothing to the Arguments Now Before the Court Concerning Its Authority to Permit an Agreement This Size to Go Forward Without Adhering to Rule 23.**

The focus should now turn to the dangers inherent in allowing a small group of private attorneys to enjoy unfettered discretion in bargaining away the rights of thousands of plaintiffs under the guise of a private settlement agreement– since those dangers are not only real but very present in this case. The fact that this settlement could occur under the auspices of the Court's oversight should drive home the premise that a court should not substitute its

own notions of what is fair or reasonable for the checks imposed by Rule 23.

This Court recently predicted that:

> With large corporations now seeking to achieve global peace by resolving mass tort litigation simultaneously in state and federal courts, settlement agreements such as the one currently before the Court will likely become more common.

In re Vioxx Prod. Liab. Lit., Order & Reasons, Docket No. 15722, at p. 11 (Aug. 27, 2008) [citation excluded].   This sentiment is echoed by Merck in its opposition to the instant motion.  *See* Merck Opposition Memorandum ("Opp.Mem."), at p.12 .  It is beyond the scope of the instant motion to enter the fray about the desire to have in place devices such as the "quasi-class action."  Plaintiffs submit that in the absence of  Congressional action courts must reject the same as legislation "masquerading as judicial innovation."  Castano v. American Tobacco Co., 84 F.3d 734, 750 (5th Cir. 1996), citing Georgine v. Amchem Prods., Inc. , 83 F.3d 610, 634 (3d Cir. 1995), *aff'd* 521 U.S. 591 (1997).

In Castano, the Fifth Circuit observed the judicial concern with certifying a tort such as this one included the possibility that a single trial could "hold the fate of an industry in the palm of its hand" observing that in addition to skewing trial outcomes, class certification creates an insurmountable pressure on defendants to settle, noting that at least one court has observed the settlements have been referred to as "judicial blackmail."  Castano, 84 F.3d at 746.  Although that may well be the case in some instances this Court's observation regarding large corporations attempting to achieve global peace by settlement agreements such as the instant one evinces a trend captured by Professor Coffee who observed:

> The modern mass tort class action is thus less a device to empower plaintiffs and more a tool for defendants to manage (and sometimes quell) mounting litigation.

John C. Coffee Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum.L.Rev. 1343, 1350 (1995).   Plaintiffs submit the instant settlement falls into the latter category.

It is only obvious that every global settlement begins as a zero-sum in which allocations

must be made. *See* Charles Silver and Lynn Baker, *I Cut, You Choose: The Role of Plaintiffs'*

*Counsel in Allocating Settlement Proceeds*, 84 Va. L. Rev. 1465, 1470–72 (1998 ). To be sure,

the instant settlement is no different and trade-offs were made. The only issue is whether

these trade-offs were permissible or of a type that the Supreme Court barred in <u>Amchem</u>

<u>Products Inc., v. Windsor</u>, 524 US 591, 117 S. Ct. 20 to 31, 138 L. Ed. 2d 689 (1997). Or

perhaps more to the point here, were the plaintiffs in MDL No. 1657 with their divergent

interests adequately protected in the negotiations that culminated in the MSA. Plaintiffs

submit the answer is no, and in the absence of an adversarial presentation to this Court it has

no reasonable basis for  assuming the negotiations satisfactorily vindicated the interests of all

plaintiffs in this litigation. *See* <u>General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab.</u>

<u>Lit.</u>, 55 F. 3d 768, 797 (3d Cir. 1995).

The known facts are that the MSA negotiated by the NPC and Merck establishes a

compensation scheme for plaintiffs who have sustained heart attacks, ischemic strokes and

sudden cardiac death excluding all other plaintiffs who sustained cardiovascular injuries. To

date, the only reason given for excluding plaintiffs with  the other cardiovascular injuries, such

as deep vein thrombosis and hemorrhagic strokes, is the PSC's explanation that they elected

not to pursue the same./[*1] There is no evidence to suggest the latter claims are not viable in

the tort system, and rulings made by this Court in *Daubert* hearings suggest the contrary. *See*

<u>In re Vioxx Products Liab. Lit.</u>,421 F.Supp.2d 265, permitting plaintiffs' expert to testify short-

term use of Vioxx can cause adverse cardiovascular consequences. Indeed, if one puts to one

side the Court's own notion of what is fair and just, there is little to refute the inference that a

small private group of attorneys was doing little more than acting as some type of "philosopher

king" splitting differences between plaintiffs who had sharply divergent interests at stake.

---

[1]*/*See* the PSC Memorandum of Law in response to the Oldfather firm's motion.

*See* John C. Coffee, Jr., *Class-Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum.L.Rev. 370, 393–394 (Mar. 2000).  Merck attempts to duck this issue by suggesting those plaintiffs who have had their claims traded off have no due process rights to challenge the MSA that washed those rights away because this is a "voluntary opt–in settlement."  Merck Opp.Mem., pp. 13-14./*2  What, if anything, remains of those rights will be addressed in the discussion of PTO No. 28.  If, as the plaintiffs contend, PTO No. 28 is an offspring of the MSA, if it goes, so goes PTO No. 28.  Accordingly plaintiffs now turn to what may well be  the determining factor in achieving the MSA, namely, the prospect of close to half a billion in fees for the PSC.

It is a matter of both logic and ethics that counsel secure the best possible resolution for his or her clients.  *See* Coffee, *Class-Action Accountability, supra*, at 450. This simple maxim alone should have precluded the NPC from negotiating fees simultaneously with the benefits for their clients. *See* Re: Prudential Ins. Co. Amer. Sales Practice Litigation Agent Actions, 148 F. 3d 283, 335 (3d Cir. 1998), warning the parties should reduce "the danger of an actual or apparent conflict of interest" by delaying the negotiations until after the clients' settlement terms have been finalized. *See*, similarly,  Prandini v National Tea Co., 557 F. 2d 1015, 1021 (3d Cir 1977) (only after court approval of the damage settlement should discussion and negotiation of appropriate compensation for the attorneys begin). *See also*, General Motors, 55 F.3d at 803-04, 819.  Indeed, plaintiffs submit it is difficult to escape the conclusion that attorney compensation did play a significant role in shaping the position taken by the NPC in

---

    2*/ This would be consistent with Merck's notion plaintiffs have no standing to challenge the agreement since they are not required to participate in it.  If their rights were bargained away in the process of reaching the MSA they would be able to show "plain legal prejudice" sufficient to confer standing.  See Mayfield v. Burr, 995 F.2d 1090, 1093 (D. C. Cir 1993). Wholly aside from being excluded from the compensation scheme, a showing that PTO No. 28 is included in the bargain which resulted in the MSA could also confirm standing.

the negotiations./*[3]

Plaintiffs submit that in large part the current circumstances stem from this Court's conclusion that this litigation is "extremely mature."  PTO No. 29, at p.6.  The Fifth Circuit has made clear there should be a sufficient litigation record, in the absence of which a mass tort should be considered immature.  Castano, 84 F.3d at 747.  Whether one characterizes this as a private agreement or a quasi-class-action, there is no doubt the Court has permitted an aggregation of claims.  To date, the only cases that have gone to trial are heart attacks, a factor that mitigates against the conclusion this litigation is sufficiently mature to permit aggregation.  In its Report on Mass Tort Litigation (February 15, 1999), at 22–25, 39, the Advisory Committee on Civil Rules and the Working Group on Mass Torts has concluded that plaintiffs in a prematurely aggregated mass tort may be denied appropriate compensation. . See also, Coffee, Class Wars, supra, at 1360–62, observing the procedural problems and risks to plaintiffs' rights associated with premature aggregation of mass tort claims.

Plaintiffs respectfully submit this Court's recent assessment that the risks associated with pursuing these cases is becoming even more daunting in light of the verdicts returned by juries in the Court's bellwether trials (see In re Vioxx Prod. Liab. Lit., supra, 2008 WL 328591 *2 (E.D.La. Aug. 7, 2008), may not accurately set forth the real risks in light of the fact that Merck's victories have invariably rested on the premise that the plaintiff could not establish a sufficient causal relationship between ingestion and onset of injury.  These are but some of the problems in permitting aggregation without the Court having the benefit of an adversarial

---

[3]*/ It is hardly a coincidence that the PSC has sided with Merck in making war on the plaintiffs remaining in MDL No.1657 but outside the MSA in each and every instance that relief has been sought by plaintiffs in the aftermath of the MSA. See, e.g., the PSC attempting to limit their role in representing the litigants in MDL No. 1657 by asserting PTO No. 6 afforded them wide latitude to negotiate "any claim or portion thereof" in their opposition to the motion by certain Florida claimants to be included in the MSA.  PSC Memorandum dated February 14, 2008, p. 5 citing p. 3 of PTO No.6.

presentation and adjudication./*[4]

II.   **There Is No Place for a Lone Pine Order in this Litigation, Which Is Daunting Enough on a Level Playing Field, and If Non-Settling Plaintiffs Are Going to Have to Labor Under the Yoke of PTO No. 28, the Court Should Modify the Same by Adopting the Proposals Submitted by These Plaintiffs.**

It should not be surprising that the arguments in opposition to modifying PTO No. 28 are procedural, with the closest thing to any substantive issue being Merck's contention that the plaintiffs' proposed alternatives are either "nothing short of a proposal to vacate the Lone Pine requirement" (Merck Opp.Mem., at p. 17), or to strip PTO No. 28 "of any value" (*id.*, at p.18). However, if in fact the only purpose of PTO No. 28 was to permit this Court to identify and cull potentially meritless claims, plaintiffs' proposal would be wholly satisfactory for that purpose, and the fact that Merck rejects the same should make it patently clear PTO No. 28 is not merely a discovery order, but should be interpreted as judicial approval and/or ratification of the MSA by virtue of both its timing and its substance.

PTO No. 28 goes way beyond even a Lone Pine order in that the definitional section either extinguishes claims not recognized by the settlement or its language is entirely superfluous. Similarly, it is difficult to interpret the preservation requirements as anything other than needlessly requiring non-settling plaintiffs to incur time and wasteful expense since this very issue was covered by this Court's issuance of PTO No. 1 which directed the parties to take appropriate measures to ensure preservation of materials relevant to the litigation, and there is not a scintilla of evidence plaintiffs failed to comply with the same./*[5]

---

[4]*/*See* John A. Henderson, Jr., *Settlement Class Actions and the Limits of Adjudication*, 80 Cornell L. Rev. 1014, 1016 (May 1995).

[5]*/ Is worth noting that in PTO No. 1 the Court underlined the following language "Counsel is under an obligation to the court to exercise all reasonable efforts to identify and notify parties and nonparties, including employees of corporate and institutional parties"

It is respectfully submitted that PTO No. 28 is the antithesis of the uniform and expeditious treatment in the pretrial procedures contemplated as the *raison d'être* of multidistrict litigation. Instead of affording the benefits of economy and speed PTO No. 28 simply establishes insurmountable and costly hurdles at the same time it freezes litigants in MDL No. 1657 in their tracks. Even if not the intended result, the only ostensible purpose is to permit Merck to begin motion practice, not for the purpose of weeding out meritless claims, but for seeking dismissal of claims viable in the tort system on the grounds of failing to meet one or another of the draconian requirements imposed by PTO No. 28./[*6]

In this circuit the only Lone Pine-type orders reaching the Fifth Circuit involve toxic torts where both the alleged substance as well as the disease were not set forth by plaintiffs in a manner that precluded both the court and the defendant from ascertaining the nature of claims. In sharp contrast, these plaintiffs not only set forth their injuries in the complaints, but have provided fact sheets setting forth the ingestion and onset of injury and authorizations for records release./[*7]   Thus, in <u>Acuna v Brown and Root Inc.</u>, 200 F.3d 335 (5th Cir. 2000), the

---

PTO No. 1 , para 13. In the absence of any proof the Court's mandate has not been followed by plaintiffs' counsel, and under circumstances where this Court already found that the defendants' attorneys were claiming attorney- privilege without adequate documentation and for materials that were already seen in TV presentations or otherwise already part of the public domain (see <u>In re Vioxx Products Liab. Lit.</u>,2006 U.S.App. LEXIS 27587, *18 (5th Cir. 2006) (dissent), to unilaterally impose the burdens inherent in the preservation requirement set forth in PTO No. 28 on plaintiffs' counsel only, permits the inference it is simply another tool being provided to Merck to achieve global peace without having to reach the merits of the claims of those plaintiffs who rejected the settlement.

[6]*/*See, e.g.,* the August 8 letter to counsel from Merck threatening to seek dismissal for failing to provide Merck with the documentation required in the preservation section of PTO No. 28, annexed hereto as Exhibit 1.

[7]*/ To be sure, some claims have been asserted that appear to have little merit or border on frivolity. However, these isolated claims cannot be reasonably employed as a justification for PTO No. 28, and would be just as readily sifted out by the proposal plaintiffs have submitted for purposes of complying with PTO No. 28 should the Court leave the order in place.

Court, observing that the district court had "wide discretion" in the issuance of discovery orders pursuant to Rule 16, approved a Lone Pine order where the court was facing some 1600 plaintiffs suing more than 100 defendants for injuries that occurred over span of over 40 years. The pleadings did not put either the defendants or the court on notice as to which diseases were being claimed as injuries, or which defendants in fact caused the injuries. *Id.,* at 340. The only other case plaintiffs have identified in the Fifth Circuit is <u>Steering Committee v. Exxon Mobil Corp.</u>, 461 F.3d 598 (5th Cir. 2006), which involves claims that plaintiffs were exposed to either oil fumes or other unknown hazardous substances, again claiming unspecified injuries.

> Indeed the Ohio appellate court, in reviewing a Lone Pine order, observed:

> A review of the handful of cases[] in which state courts have addressed the Lone Pine issue shows that the facts in those cases reveal the difficulty of managing cumbersome and expensive mass toxic-tort litigation cases with extremely large numbers of parties and often unknown defendants. The injuries complained of are largely speculative and unsubstantiated. They have occurred over a long period of time. The cases present multiple theories of recovery and unique causation issues, and they require extensive medical and scientific expert testimony. Traditional tort law, in these cases, overlaps with statutory environmental law. Thus, efficiency and case management are cited as the primary justifications of the issuance of Lone Pine orders. (See Burnett, Lone Pine Orders: A Wolf in Sheep's Clothing for Environmental and Toxic Tort Litigation (1998), 14 J.Land Use & Envtl.Law 53, 74.)

<u>Simeone v. Girard City Bd. of Edn.</u>, 171 Ohio App.3d 633, 641-42, 872 N.E.2d 344 Ohio App. 11 Dist.,2007.  In short, neither logic nor reason would support importing a Lone Pine order into litigation where there is sound science to support the injuries being claimed by the plaintiffs and both the court and the defendant are on notice of the specific injuries being alleged by the plaintiffs.

Plaintiffs have submitted two affidavits in an effort to comply with the Lone Pine portion of PTO No. 28.  *See* Exhibits 2 and 3 hereto.  They add nothing to information already provided in fact sheets for discovery purposes; hence, regardless of how the purpose is

-10-

characterized, the effect is to set up the plaintiffs' experts in depositions and attempt to destroy their credibility at trial if the court permits use of the abbreviated opinions to cross examine plaintiffs' experts at trial. The bill for services in Exhibits 2 and 3 demonstrate the further benefit to Merck of driving up the plaintiffs' litigation costs with no benefit to the Court in managing this litigation, or toward moving the cases to a trial. In short, if PTO 28 stands, plaintiffs claims will fall.

III.     **Since Individual Counsel Were Caught Off Guard by the Fact That the PSC Elected to Abandon All Claims Except Heart Attacks, Ischemic Strokes, and Sudden Cardiac Death, the Court Should Grant an Extension of Time to Comply with Pto No. 28 Dependent Upon Precise Contours of What the Court Requires Plaintiffs to Undertake in Order to Comply with the Same.**

The appointment of the PSC is simply a part of MDL life, and the Ninth Circuit recently observed:

> As part of its duties, the Plaintiffs' Steering Committee was to assist all plaintiffs in MDL 1407 by overseeing discovery, communicating with plaintiffs' lawyers, making court appearances, attending status conferences, and preparing motions and responses regarding casewide discovery matters.

In re: Phenylpropanolamine (PPA) Prod. Liab. Lit.,460 F.3d 1217, 1223 (9th Cir. 2006).

Plaintiffs, as well as the Ninth Circuit above, anticipated the motion practice by the PSC would be on their behalf rather than functioning as the alter ego of the defendant.   (A comparison of Merck's opposition to the instant motion with the submission of the PSC compels the conclusion there either was collaboration between the two, or the PSC merely regurgitated the arguments in Merck's brief.)

In further describing the role of the PSC, the Ninth Circuit has noted that:

> Counsel must, for their part, "collaborate with the trial judge from the outset in fashioning workable programmatic procedures, and thereafter alert the courts, in a timely manner as operating experience points up infirmities warranting further judicial attention."

In re: Phenylpropanolamine (PPA) Prod. Liab. Lit.,*supra*, 460 F.3d at 1232, citing Massaro

v. Chesley (In re San Juan Dupont Plaza Hotel Fire Litig.), 111 F.3d 220, 229 (1st Cir.1997),

and *Manual For Complex Litigation*, § 10 at 7.

Although the record is not clear exactly when the PSC decided to abandon the

cardiovascular injuries other than those covered by the MSA, individual counsel had no

notice of the same before the announcement of the MSA  November 7, 2007./[8] When the

announcement did come, individual counsel were immediately saddled with time-consuming

tasks ranging from evaluating not only the merits of their own individual cases, but the

dilemma presented by the requirement that they withdraw from all cases in which they

represent the plaintiffs who refuse to participate in the settlement, to undertaking the

tedious task of complying with the preservation portion of PTO No. 28.

It is well settled that:

> In the class setting it has been recognized that the class itself often speaks in
> several voices and that it may be impossible for the class attorney to do more
> than what he believes to be in the best interest of the class as a whole.

Kincade v General Tire and Rubber Co., 635 F.2d 501, 508 (5th Cir 1981).  It is one thing for

the PSC to take steps and make tactical decisions that may not be in the best interests of all

plaintiffs in light of the wide disparity of interests of the individual plaintiffs in the

litigation; it is quite another, however, for the PSC to literally join forces with the defendant

as has happened here.

The Fifth Circuit noted that, "Consolidated discovery of MDL litigation, with its huge

---

[8]*/PTO No. 1 charges the PSC with preparing periodic status reports and
submitting the same to liaison counsel who was to promptly distribute copies to other
plaintiffs' attorneys.  *Id.*, at 10.  Although this could have readily been accomplished
without jeopardizing any  negotiations that may have been going on and given individual
counsel notice of where they stood in connection with cardiovascular injuries now outside
the settlement agreement.. They did not do so.  It is therefore disconcerting at best to find
the PSC joining Merck in opposing the plaintiffs' request for additional time.

aggregation of cases, sorely taxes the processes attending our traditional binary structure in civil cases." In re: Vioxx Products Liab. Lit., *supra*, 2006 U.S.App. LEXIS 27587, *10.   The Court went on to note that while it recognizes there were many trade-offs, "there are limits to the adaptability of our trial processes, flexible as they are." *Id.,* at *11.   Plaintiffs submit that wherever the outer parameters lie, they have been exceeded in this case.

This is especially so when the PSC has no discernible interest in opposing the relief sought by the plaintiffs herein with the exception of a potential concern the fees negotiated in the MSA may either be in jeopardy, or that Merck's promise not to oppose such fees in any future application by the PSC had a corresponding obligation to side with Merck in any relief sought by plaintiffs outside the settlement.   Indeed, regardless of motive, no rationale can be mustered up to support the PSC effectively joining Merck in that the same turns the trial process on its head.

In view of this factor alone, it is respectfully submitted that if the Court adheres to imposing the requirements of PTO 28 upon non-settling plaintiffs, a reasonable extension of time should be granted in order to permit plaintiffs to comply with the same.

IV.    **Merck's Opposition to Lifting the Stay Fails to Address the Fact That Non-Settling Plaintiffs Want Nothing To Do With the MSA.**

Merck's opposition to lifting the stay imposed by PTO No. 28 is purportedly to permit the parties to determine who will be participating in the settlement and who will pursue their claims.   Merck Opp.Mem., p. 21.   Surely this cannot apply to plaintiffs' instant motion since it is crystal clear these plaintiffs want nothing to do with the MSA and have made that intention known in no uncertain terms.

Plaintiffs' cases have been virtually frozen since 2005 and it is clear Merck has no intention of taking depositions anytime soon, an inference that may be drawn from its

assertion that, "the stay should remain in place until implementation of settlement is complete." *Id.,* p 20. This Court recently observed that with respect to the instant settlement:

> At this early stage of the proceedings, with no final determination regarding valuation of the claims or even total points awarded, the Court harbors serious doubts as to whether any individual claimant even has a legal right to a portion of the fund.

In re Vioxx Products Liab. Lit., *supra*, 2008 WL 3285912, *15.   This Court went on to note that there could be "countless unforeseen intricacies involved in the distribution process alone" (*id.,* at *19), making it clear Merck is seeking to freeze these plaintiffs for at least another several years despite their unequivocal assertion they want no part of the MSA.

Since no other reason is set forth for continuing the stay against plaintiffs who are not participating in the MSA, the Court should vacate the stay presently in place.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully submit that this Court should GRANT their motions for the court's resignation as chief administrator of the Master Settlement Agreement, to vacate the master settlement agreement and PTO 28 or in the alternative, to modify and grant an extension of time as to PTO No. 28, and grant the other relief requested by plaintiffs./*[9]

Respectfully submitted,

_____
RONALD R. BENJAMIN Fed. No. 110131
LAW OFFICE OF RONALD R. BENJAMIN
126 Riverside Drive, P O. Box 607
Binghamton, New York 13902-0607
607/772-1442

Attorneys for Individual Plaintiffs
in Above-Captioned Actions

---

[9]*/ Since the PSC has indicated it will afford the plaintiffs' counsel access to discovery without executing the attachment to PTO 37 the plaintiffs' request for relief in this regard appears to be moot.

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2008, the above and foregoing Plaintiff's Reply Memorandum of Law to Merck's Oppositions to Plaintiff's Motion, Corrected, with Exhibits 1, 2, & 3, has been served on Liaison Counsel, Russ Herman and Phillip Wittman, by U.S. Mail and upon all parties by electronically uploading the same to LexisNexis File& Serve in accordance with Pre-Trial Order No.8B, and that the foregoing was electronically filed with the Clerk of the District Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send notification of such filing to the following:

1. Russ Herman, Esq.

2. Phillip Wittmann, Esq.

_____
Ronald R. Benjamin, Fed. No. 110131
LAW OFFICE OF RONALD R. BENJAMIN
126 Riverside Drive, P.O. Box 607
Binghamton, NY 13902-0607
607/772-1442

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX®                                    MDL Docket No.  1657

PRODUCTS LIABILITY LITIGATION                    SECTION L

                                                 Judge Eldon E. Fallon
                                                 Magistrate Judge Knowles

THIS DOCUMENT RELATES TO:

David Agard, et al.,  v. Merck & Co.             Case No.: 2:05-cv-01089

Glenn L. Dier, et al., v. Merck & Co.            Case No.: 2:05-cv-01088

Adnan Aljibory, et al., v. Merck & Co.           Case No.: 2:05-cv-01090

Rosemary Holobosky, et al., v. Merck & Co.       Case No.: 2:05-cv-01091

Marjorie Connolly, et al., v. Merck & Co.        Case No.: 2:06-cv-02708

Marilyn F. Core, et al. v.  Merck & Co.          Case No.: 2:05-cv-02583

Carlo Devincentiis, et al., v. Merck & Co.       Case No.: 2:05-cv-02297

Kathleen Hoffner, et al., v. Merck & Co.         Case No.: 2:06-cv-02238

Robert D. Gates, et al., v. Merck & Co.          Case No.: 2:05-cv-06221

--------------------------------------------------------------------------------

## NOTICE OF MANUAL ATTACHMENT

Plaintiffs hereby submit this Notice of Manual Attachments to its Reply Memorandum of Law to Merck's Opposition to Plaintiff's Motion for the Court's Resignation as Chief Administrator of the Master Settlement Agreement.

Exhibit 1

Exhibit 2

Exhibit 3

Respectfully submitted,


 /s/ Ronald R. Benjamin
RONALD R. BENJAMIN Fed. No. 110131
LAW OFFICE OF RONALD R. BENJAMIN
126 Riverside Drive, P O. Box 607
Binghamton, New York 13902-0607
607/772-1442

Attorneys for Individual Plaintiffs
     in Above-Captioned Actions

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

August 8, 2008

BY FIRST CLASS MAIL & TELECOPY (607-772-1678)

Ronald R. Benjamin, Esq.
Law Office of Ronald R. Benjamin
126 Riverside Drive, P.O. Box 607
Binghamton, NY 13902-0607

Subject:   *In Re Vioxx Products Liability Litigation,* MDL No. 1657
Dufresne, Lori v. Merck & Co., Inc.
2:08-cv-03220-EEF-DEK
Pertaining to:  Frank Spencer

Dear Mr. Benjamin:

We represent defendant Merck & Co., Inc. ("Merck") in the action referenced above.  Because this action was pending in MDL Docket No. 1657 as of November 9, 2007, and either is not eligible for the Resolution Program, or is eligible but has not been submitted to the Resolution Program, it is subject to the provisions of Pretrial Order No. 28 ("PTO 28"), entered by the Honorable Eldon E. Fallon on November 9, 2007.

Among the requirements of PTO 28, Section I.C required that plaintiff serve a statement listing the names of all pharmacies, healthcare providers and/or employers to whom counsel served a notice to preserve records pertaining to the plaintiff, along with copies of the notices themselves, and a certification that they were sent.  The full details of these requirements are set forth in Section I, subsections A-C of that same order.

Page 2

       The date set by the Court for compliance with the requirements summarized above was March 15, 2008.  However, Merck has not received service of any of the materials required by Section I of PTO 28.  Accordingly, notice is hereby given to cure the failure to comply with Section I of PTO 28 within thirty (30) days.  If any failure to comply with PTO 28 is not cured, Merck will file a Motion for Order to Show Cause why the complaint should not be dismissed with prejudice, in accordance with Section I.D of PTO 28.

       Very Truly Yours,

       M. Elaine Horn

cc:    Phillip A. Wittman, Esq. (via electronic mail)
       Russ M. Herman, Esq. (via electronic mail)

# Steven A. Rich, M.D.

## *Internal Medicine-Geriatrics*

*4884 North Road Canandaigua, NY 14424*
*srich@rochester.rr.com*
*Voice: 585-922-0392*
*Fax: 585-396-0849*

**August 2, 2008**

Ronald R Benjamin
PO Box 607
126 Riverside Drive
Binghamton, NY 13902

**Re:  David Agard**
**DOB:  8/31/41**
**Date of Injury: Ischemic Stroke 11/2/2002**

Thank you for the opportunity to review records regarding Mr David Agard and the
events surrounding his ischemic November 2, 2002 and his use of VIOXX®.

I have reviewed the patient's statements, physicians, notes, laboratory reports and
prescription records for this report.

My education includes a Doctor of Medicine Degree as well as a degree in
Pharmacokinetics.  My training includes certifications in Internal Medicine and Geriatric
Medicine by the American Board of Internal Medicine.  A copy of my Curriculum Vitae
is attached.  My experience includes 21 years of direct patient care including primary,
secondary and tertiary care of acute coronary syndromes, rheumatoid conditions and the
consequences of these diseases.  I have treated patients similar to Mr. Agard during the
course of my career.  I have been active in clinical pharmacology for 21 years, and have
authored peer-reviewed and published articles.  I have also reviewed published medical
literature and Merck documents relating to VIOXX®.

Mr. David Agard was 65 years of age when he experienced sudden onset of loss of vision
in his right visual field. His evaluation by CT scanning and MRI showed a corresponding
stroke in his right occipital lobe. At the time of this stroke the patient had been taking
VIOXX® for 31 months for the treatment of osteoarthritic pain. Prior to his event the
patient had high blood pressure which was under excellent control, an elevation of his
cholesterol level which was under effective treatment, and had a prior history of coronary
artery disease status post. He also had cardiomyopathy and was followed by a
cardiologist. He had only a brief and distant history of cigarette smoking

1

It is my opinion that the ischemic stroke  that Mr. David Agard suffered on November 2.2002   was caused by his ingestion of VIOXX®. Furthermore, that as a result of his ischemic stroke Mr. Agard suffered permanent loss of vision. The ischemic stroke he suffered has reduced his ability to continue to work as a musician which can lead to other strokes.

All of my opinions are stated within a reasonable degree of medical certainty.  My opinions are based on my education, training, and experience.  My opinions may be modified based on review of subsequent medical information not currently available to me.

Sincerely,

Steven A. Rich, M.D.
Chief of Geriatrics and Director of the Geriatric Consultative Service
ViaHealth Health System/Rochester
Clinical Assistant Professor of Medicine
University of Rochester School of Medicine and Dentistry

2

Statement 9-11-08

## Steven A. Rich M.D.,
*4884 North Road Canandaigua NY 14424*
*srich@rochester.rr.com*
*Voice:585-922-0392*
*Fax:585-389-0849*

Law Office of Ronald Benjamin
126 Riverside Drive
P.o. Box 607
Binghamton, NY 13902-0607

September 11, 2008

Dear Mr. Benjamin:

Please accept this as a statement for services rendered and expenses incurred regarding the issue of Mr. David Agard

| Firm | Expense | Service | Activity | Time | Rate/hr | Issue | Date |
|------|---------|---------|----------|------|---------|-------|------|
| R.Benjamin | | 1000 | Review/report | 1.5 | 500 | Agard,David | 8/2/2008 |
| **Subtotal Expense** | **0** | | | | | | |
| **Subtotal Service** | | | 1500 | | | | |
| **Total;** | | | 1500 | | | | |

Sincerely,

Steven A Rich MD

# Steven A. Rich, M.D.
## *Internal Medicine-Geriatrics-Clinical Pharmacology*
*4884 North Road Canandaigua, NY 14424*
*srich@rochester.rr.com*
*Voice: 585-922-0392*
*Fax: 585-396-0849*

August 2, 2008

Ronald R Benjamin
PO Box 607
126 Riverside Drive
Binghamton, NY 13902

**Re: Mary Ann Bozich**
**DOB: 7-16-1940**
**Date of Injury: 9/1/03**

Thank you for the opportunity to review records regarding Ms. Mary Anne Bozich and the events surrounding her ischemic heart disease and VIOXX® usage.

My education includes a Doctor of Medicine Degree as well as a degree in Pharmacokinetics. My training includes certifications in Internal Medicine and Geriatric Medicine by the American Board of Internal Medicine. A copy of my Curriculum Vitae is attached. My experience includes 21 years of direct patient care including primary, secondary and tertiary care of acute coronary syndromes, rheumatoid conditions and the consequences of these diseases. I have treated patients similar to Ms. Bozich during the course of my career. I have been active in clinical pharmacology for 21 years, and have authored peer-reviewed and published articles. I have also reviewed published medical literature and Merck documents relating to VIOXX®.

Ms. Bozich was 59 years old when she first developed single-vessel coronary artery disease which was successfully treated with angioplasty and stenting. She had risk factors of diabetes, hypertension, and elevated cholesterol. Subsequent to her initial coronary procedure 4/20/00 she significantly improved her control of these risk factors. A subsequent coronary angiogram on 8/28/01 showed no significant coronary artery disease. She initiated using VIOXX® with samples provided from her physician. Her first prescription is noted to have been filled 1/21/02 at a CVS pharmacy. In July of 2003 she was noted to have increased symptoms of dyspnea and was found to have a reduced of heart function (left ventricular ejection fraction 20%). She underwent repeat angiography in July of 2003 with findings of significant coronary artery disease of the left anterior descending artery, the right coronary artery, and recurrent disease in the left

1

circumflex artery. This required treatment with angioplasty and stenting, but she had recurrent symptoms in September 2003 requiring additional angioplasty and stenting. Subsequent to that time the patient has undergone on carotid endarterectomy, and additional angiograms for progressive symptoms of coronary and cerebrovascular insufficiency. She developed problems with falling and short-term memory deficit and now resides in a skilled nursing facility.

It is my opinion that the rapid progression and occlusion of the coronary arteries experienced by Ms. Bozich after starting VIOXX® is related to selective cyclooxygenase-2 inhibition due to ingestion of VIOXX®. Ms. Bozich suffered permanent heart damage that required ongoing cardiac medical treatment documented in the medical records and will require future cardiac medical treatment and medications. The ischemic heart disease suffered by Ms. Bozich has contributed to the loss of functional capacity that makes it necessary for her to reside in a skilled nursing facility. The congestive heart failure will likely adversely affect Ms. Bozich's life expectancy

All of my opinions are stated within a reasonable degree of medical certainty. My opinions are based on my education, training, and experience. My opinions may be modified based on review of subsequent medical information not currently available to me.

Sincerely,

Steven A. Rich, M.D.
Chief of Geriatrics and Director of the Geriatric Consultative Service
  ViaHealth Health System/Rochester
Clinical Assistant Professor of Medicine
  University of Rochester School of Medicine and Dentistry

2

Statement 9-11-08

## Steven A. Rich M.D.,

*4884 North Road Canandaigua NY 14424*
*srich@rochester.rr.com*
*Voice:585-922-0392*
*Fax:585-389-0849*

Law Office of Ronald Benjamin
126 Riverside Drive
P.o. Box 607
Binghamton, NY  13902-0607

September 11, 2008

Dear Mr. Benjamin:

Please accept this as a statement for services rendered and expenses incurred regarding the issue of Ms. Maryane Bozich.

| Firm | Expense | Service | Activity | Time | Rate/hr | Issue | Date |
|------|---------|---------|----------|------|---------|-------|------|
|  R Benjamin | 1000 | | record review/report | 2.5 | 500 | Bozich, | 8/2/2008 |
| **Subtotal Expense** | **0** | | | | | | |
| **Subtotal Service** | | **1000** | | | | | |
| **Total;** | | **1000** | | | | | |

Sincerely,

Steven A Rich MD