IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
DADE COUNTY, FLORIDA

CASE NO:

FLAVIO MONTENEGRO,

     Plaintiff,

vs.

MERCK & CO., INC., DAVID C. SOSA
and ALEXANDER A. MURIAS,

     Defendants.

_____/

THE ORIGINAL FILED
IN THE OFFICE OF

CLERK CIRCUIT & COUNTY COURTS
DADE COUNTY, FLORIDA

ON_____

### PLAINTIFF'S COMPLAINT

Plaintiff, FLAVIO MONTENEGRO (hereinafter "MONTENEGRO") hereby sues

Defendants, MERCK & CO., INC., (hereinafter "MERCK");   DAVID C. SOSA and

ALEXANDER A.  MURIAS, and alleges as follows:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000.00 exclusive of interest

and costs and within the jurisdiction of this Court.

2.     At all times material hereto MONTENEGRO was residing in Miami-Dade

County, Florida.

3.     On October 24, 2002, MONTENEGRO suffered a stroke as a result of his

ingestion of the prescription drug Vioxx, which had been prescribed (and also provided

in the form of samples) to him by Roberto A. Moya, M.D. a physician located in Dade

County, Florida.

4.     This action arises out of the Defendants' manufacturing, selling,

distributing, marketing and/or otherwise promoting Vioxx without proper warnings as to

the dangers associated with its use, and said Defendants' fraud regarding the hazards

of Vioxx.

PLAINTIFF'S
EXHIBIT
B

Montenegro vs. Merck & Co., Inc. et al
Complaint

     5.     The pharmaceutical drug Vioxx, manufactured by MERCK and marketed by Defendants, DAVID C. SOSA and ALEXANDER A. MURIAS (hereinafter "SOSA and MURIAS") is defective, dangerous to human health, and unfit and unsuitable to be marketed and sold in commerce.

     6.     MERCK is a New Jersey Corporation with its principal place of business located in Whitehouse Station, New Jersey. At all times material hereto, MERCK was authorized to and did in fact conduct business within the State of Florida and Dade County, Florida.

     7.     At all times material, MERCK was in the business of developing, manufacturing, selling, distributing, labeling, marketing and/or promoting Vioxx for consumer use by prescription. Additionally, MERCK did develop, manufacture, design, package, market, sell and distribute Vioxx in the State of Florida at all times relevant to this action, but recalled Vioxx from the market on September 29, 2004.

     8.     It was not until the date of the said recall that MONTENEGRO knew, or should have known, that Vioxx was defective, unreasonably dangerous, and was responsible for causing his stroke.

     9.     Upon information and belief and at all times relevant hereto, SOSA and MURIAS were residents of and/or worked within the confines of Dade County, Florida. SOSA and MURIAS are currently, or were in the past, employed by MERCK as sales representatives, detail persons, or sales managers in the State of Florida to promote, market, sell, distribute and encourage physicians to prescribe Vioxx, and, in doing so, had an obligation to likewise warn prescribing physicians, including MONTENEGRO'S prescribing physicians, of the known and reasonably discoverable risks associated with

2

Montenegro vs. Merck & Co., Inc. et al
Complaint

the product Vioxx.

10.     Vioxx is a pain medication and a Cox-2 inhibitor, a drug that is designed to produce prostaglandins at inflammatory sites and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

11.     MERCK submitted an Application to Market a New Drug for Human Use ("NDA") for Rofecoxib (Vioxx) to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets at doses of 12.5mg and 25mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

12.     MERCK also submitted an NDA for rofecoxib to the FDA on November 23, 1998, for oral suspension at doses of 12.5 rng/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted as NDA 2 1-052 by the FDA.

13.     · On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 for rofecoxib, for the relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

14.     At the time that Vioxx was approved by the FDA, the labeling for rofecoxib (in the section entitled "Special Studies - Upper Endoscopy in Patients with Osteoarthritis") stated "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

3

Montenegro vs. Merck & Co., Inc. et al
Complaint

15.    The "Warnings" section of the labeling for rofecoxib at the time the drug was approved by the FDA contains a section, "Gastrointestinal (GI) effects—Risk of GI Ulceration, Bleeding and Perforation."

16.    MERCK submitted a Supplemental New Drug Application ("SNDA") with the goal of establishing a gastrointestinal safety claim for rofecoxib. In conjunction with the SNDA, MERCK conducted a study known as the VIGOR (VIOXX GI Outcomes Research) Protocol, No. 08 8-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUB'S During Chronic Treatment With IVJK-09 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was conducted from January 6, 1999 through March 17, 2000.

17.    The objectives of the VIGOR study were to "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking Vioxx 50mg daily compared to patients in the group taking naproxen 1000 mg/day" and to "study the safety and tolerability" of Vioxx in patients with rheumatoid arthritis.

18.    The VIGOR study demonstrated that Vioxx is associated with a lower incidence of serious upper gastrointestinal adverse events of major bleeding, perforation, and obstruction compared to naproxen.

19.    However, the VIGOR study also showed a higher cumulative rate of serious cardiovascular thromboembolic adverse events (such as heart attacks, angina pectoris, and peripheral vascular events) in the Vioxx group compared to the naproxen group.

20.    An FDA report, written by Shari L. Targum, M.D., a Project Manager for the FDA'S Division of Anti-Inflammatory Drug Products, dated February 1, 2000, states:

4

"By November 18, 1999, the Data and Safety Monitoring Board of the VIGOR study, a committee independent from MERCK, the sponsor, had become concerned over the "excess deaths and cardiovascular events experienced in Group A [Vioxx] compared to Group B [naproxen]."

21.    In June of 2000, in connection with industry-sponsored studies presented at the European United League against Rheumatism (EULAR), an organization in which MERCK is a member and corporate sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Defendants do nothing to accurately publish these studies, or warn consumers and prescribing doctors, MERCK and the other Defendants herein, also denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today *Spin War Aside, Lessons Emerge from COX-2 Trials,* in August of 2000.

22.    Defendants concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for the success of MERCK. Safety concerns over hypertension, thrombosis, edema, and/or cardiovascular events would have drastically impacted MERCK'S positioning in the market as compared to its competitor drug, Celebrex (celecoxib), which had been placed into the market by Pharmacia and Pfizer three months prior to the launch of Vioxx.

23.    Defendants continued to deny the ill health effects associated with Vioxx while at the same time reaping benefits obtained through its non-disclosure and concealment. Defendants engaged in a massive physician and direct-to-consumer advertising and sampling program and gained continued increases in Vioxx's market

share, which enhanced MERCK'S financial stability to the detriment of its consumers. As a result of Defendants' scheme, MERCK reaped more than $2 billion in profit in the year 2000 alone, and garnered approximately a 23% percent share of the market.

24.    The FDA sent a letter to MERCK dated December 16, 1999, stating that certain Vioxx promotional pieces "are false and misleading because they contain representations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

25.    On June 22, 1999, MERCK contracted with Peter Holt M.D., to conduct Vioxx promotional audio conferences, using content provided by MERCK, which were to be presented to health care professionals as educational programs.

26.    Dr. Peter Holt conducted six Vioxx promotional audio conferences (one on June 8, 2000; one on June 13, 2000; one on June 16, 2000, and three on June 21, 2000), which were arranged by Defendants, presented on behalf of MERCK, and moderated by MERCK employees. Some of the content of these conferences was later found by the FDA to be "false or misleading in that they minimized the MI results of the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and "an unapproved dosing regimen."

27.    In response to the growing public expressions of concern over the cardiovascular safety profile of Vioxx, MERCK issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001. This press release states that Vioxx has a "favorable cardiovascular safety profile." The FDA would later tell MERCK: "Your claim in the press release that Vioxx has a 'favorable

6

cardiovascular profile' is simply incomprehensible, given the rate of MI (myocardial infarction) and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs is misleading; in fact, serious cardiovascular events were twice as frequent in the Vioxx treatment group... as in the naproxen treatment group... in the VIGOR study."

28.    Despite admonishments from the FDA for its fraudulent marketing, Defendants continued to increase sales of Vioxx and profits by withholding information from MONTENEGRO'S prescribing physician, the consuming public, and the health care industry.  For example, in November of 2000, MERCK orchestrated the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with ingestion of Vioxx versus naproxen.

29.    On or about August 29, 2001, the Journal of American Medical Association (JAMA) published a peer reviewed epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, showing that MERCK had concealed the risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in MERCK'S trials, including VIGOR. The study found a statistically increased risk (of the magnitude of four to five-fold) of developing serious cardiovascular events, including heart attacks, over placebo and naproxen.

30.    In the JAMA study, the authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between promrombotic thromboxane A2

7

Montenegro vs. Merck & Co., Inc. et al
Complaint

and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events".

31.     On September 17, 2001, Thomas W. Abrams, R. Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of Defendant MERCK, relating to "promotional activities and materials for the marketing of Vioxx (refecoxib) tablets."

32.     The Warning Letter, MERCK'S *third* such letter from the FDA concerning Vioxx, stated that Defendant MERCK had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx." The letter further states: "Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (Mi's) compared to patients on the Comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)".

33.     The eight-page Warning Letter outlines, in detail, the conduct of Defendants that supports the FDA'S issuance of the Warning Letter, and makes the following "Conclusions and Requested Actions":

a.     "The promotional activities and materials described above minimize the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omits crucial risk information associated with Vioxx therapy, contains unsubstantiated comparative claims, and promotes unapproved uses. On December 16,

8

1999, we also objected to your dissemination of promotional materials for Vioxx that misrepresented Vioxx's safety profile, contained unsubstantiated comparative claims, and lacked fair balance;

b.   "Due to the seriousness of these violations, and the fact that your violative promotion of Vioxx has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001";

c.   "This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

- Immediately ceasing all violative promotional activities, and the dissemination of all violative promotional materials for Vioxx;

- Issuing a "Dear Healthcare Provider" letter to correct false or misleading impressions and information. The proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

34.   Defendants knew the warnings contained in the label were ineffective and

used its sales force and other marketing efforts to downplay (rather than inform about) the risks posed by Vioxx.

35.    In its 2001 annual report, MERCK states:

> "The Company also noted that a number of state and federal lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx . . . these lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are without merit and will vigorously defend them."

36.    An article entitled "Why Do Cyclooxygenase-2 Inhibitors cause Cardiovascular Events?" authored by Dr. Bing, Dr. Lomnicka, and others at the Department of Experimental Cardiology at the Huntington Medical Research Institute was published in the journal *Pharmacology* on February 6, 2002. The authors explained that a selective Cox-2 inhibitor, such as Vioxx, can promote adverse cardiovascular events by tipping the balance of prostacyclin and thromboxane in favor of thromboxane. This imbalance promotes both platelet aggregation and vasoconstriction, which can lead to catastrophic cardiovascular events, including stroke, heart attack, and pulmonary embolism.

37.    In response to a growing body of evidence of Vioxx's safety problems, MERCK attempted to obfuscate this negative information by authoring and sponsoring reviews that set forth the unsubstantiated claim that naproxen had a cardioprotective effect and therefore accounted for the cardiovascular risks noted in these negative studies among its Vioxx users. However, this theory was debunked in January of 2002,

10

Montenegro vs. Merck & Co., Inc. et al
Complaint

by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in *Lancet*. The *Lancet* article concluded that there is an absence of a protective effect of naproxen or other non-aspirin, non-steroidal anti-inflammatory drugs on the risk of coronary heart disease.

38.    In approximately April of 2002, MERCK was required to place cardiovascular warnings on its Vioxx labeling based on the results of the VIGOR study. In addition, MERCK was required to place new label warnings relaying that the 50 mg per day dose of Vioxx was not recommended for chronic use.

39.    An article by Dr. Solomon and others at Harvard Medical School, entitled "Relationship between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults", was published in the April of 2004 edition of the journal *Circulation.* The Harvard authors concluded the following from their study: "[Rofecoxib [Vioxx] use was associated with an elevated relative risk of AMI [acute myocardial infarction] compared with celecoxib [Celebrex] use and no NSATD use. Dosages of rofecoxib [greater than] 25 mg were associated with a higher risk than dosages [less than or equal to] 25 mg".

40.    An article by H.K. Choi in the May 2004 edition of the *American Journal of Medicine*, entitled "Effects of Rofecoxib and Naproxen on Life Expectancy Among Patients with Rheumatoid Arthritis: A Decision Analysis," concludes the following: "Our analysis suggests a longer life expectancy with naproxen than rofecoxib [Vioxx] .... except those at low risk for myocardial infarction or at a high risk for gastrointestinal toxicity".

41.    David Graham, M.D., an employee of the Food & Drug Administration,

11

Montenegro vs. Merck & Co., Inc. et al
Complaint

gave a poster presentation entitled "Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDs" at the 20th International Conference on Pharmacoepidemiology and Therapeutic Risk Management, held from August 22-25, 2004, in Bordeaux, France. The data for the presentation was taken from a study done by Kaiser Permanente under a contract funded by the FDA, and concluded that Vioxx taken at more than 25 mg per day increased the risk of heart attack and sudden cardiac death by 300%.

42.    On August 26, 2004, Peter Kim, President of Merck Research Laboratories, issued a press release stating the following:

> "Merck strongly disagrees with the conclusions of an observational analysis by Graham, et al., presented at an international meeting this week..." "Merck stands behind the efficacy and safety, including cardiovascular safety of Vioxx".

43.    On September 27, 2004, MERCK informed the FDA that the Data Safety Monitoring Board for an ongoing long-term study of Vioxx, known as THE APPROVE STUDY, had recommended that the study be stopped early for safety reasons.

44.    THE APPROVE STUDY was not intended to be a cardiovascular risk assessment study. It was commissioned by MERCK to look at the effect of Vioxx on people at risk for developing recurrent colon polyps.

45.    THE APPROVE STUDY demonstrated an increased risk of cardiovascular adverse events, including heart attacks and strokes, for the Vioxx population relative to the placebo population in the study, particularly for patients taking Vioxx for more than 18 months.

12

46.     MERCK representatives informed the FDA in a September 28, 2004, meeting that MERCK would recall Vioxx from the United States market.

47.     MERCK and the FDA each announced the recall of Vioxx from the United States market on September 30, 2004. MERCK also announced the worldwide recall on the same day.

48.     An FDA analysis, based on data from the Kaiser Pennanente study, projects that 27,785 heart attacks and sudden cardiac deaths "would have been avoided" had Celebrex, another Cox 2 inhibitor, been used instead of Vioxx.

49.     Approximately 20 million people in the United States took Vioxx between its introduction in 1999 and its withdrawal in 2004.

50.     From approximately 1999 through 2004, Defendants engaged in a common scheme of marketing, distributing and/or selling Vioxx under the guise that it was safe and efficacious for persons such as MONTENEGRO.

51.     At all times relevant to this litigation, MERCK enjoyed a significant market share based upon claims of Vioxx's efficacy, safety, and superiority as a result of the actions of Defendants, including a very aggressive marketing program that included financial incentives to sales teams, the hiring of approximately 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program. Defendants encouraged the prescription and use of Vioxx through aggressive marketing campaigns, including detailing of physicians by the SOSA and MURIAS and others as well as direct-to-consumer advertising. As such, Defendants had a duty not only to provide MONTENEGRO'S prescribing physician with adequate warnings, but also to provide MONTENEGRO himself with adequate warnings regarding Vioxx and

13

the safety risks associated with ingestion of the drug.

52.    Defendants intentionally and knowingly misrepresented the safety and effectiveness of Vioxx to Plaintiff's prescribing physician, Roberto A. Moya, M.D. prior to his prescribing same to MONTENEGRO, and concealed or understated the dangerous side effects associated with ingestion of Vioxx to Dr. Moya, to wit:  SOSA and  MURIAS explicitly dismissed the concerns voiced by Dr. Moya in regard to the safety of Vioxx, particularly in regard to the Vigor study;  claimed the Vigor study was "biased," that the numbers reported in the study in regard to the increased risk of heart attack and strokes were "wrong," and that the Vigor study was made up of "older people" who already had an increased risk of heart attack and stroke;  claimed that the negative information in the medical community about Vioxx's safety was false and was being put forth by the "Celebrex" people;  showed Dr. Moya bogus safety information in regard to Vioxx;  called upon Dr. Moya in an aggressive manner in an effort to talk him into using Vioxx on his patients, approaching him weekly, and taking Dr. Moya and his wife out for expensive dinners in chauffeured limousines.  As a direct and proximate result of these acts and misrepresentations, Dr. Moya prescribed Vioxx to MONTENEGRO.  But for the said acts and misrepresentations, Dr. Moya would not have prescribed said drug to MONTENEGRO.

53.    As a direct and proximate result of the said acts and/or omissions of the Defendants as aforesaid, MONTENEGRO was prescribed and ingested Vioxx between (at least) February, 2000  and October 24, 2002.

54.    On October 24, 2002, MONTENEGRO suffered a massive stroke. A CT scan of the head evidenced an acute stroke involving multiple vascular distributions of

14

Montenegro vs. Merck & Co., Inc. et al
Complaint

the posterior cerebral system including both cerebellar hemespheres as well as the right occipital lobe.

## COUNT 1 - STRICT LIABILITY AGAINST MERCK ON BEHALF OF MONTENEGRO

55.   Plaintiff adopts by reference all of the General Allegations contained in Paragraphs 1 through 54 above, each inclusive, as though fully set forth herein, pursuant to Rule 1.130(b), Florida Rules of Civil Procedure.

56.   The Vioxx ingested by MONTENEGRO was defective and unreasonably dangerous when it left the possession of MERCK in that:

a.    When placed in the stream of commerce, Vioxx contained unreasonably dangerous design defects and was not reasonably safe for its intended use, subjecting Plaintiff to risks which exceeded the benefits of the drug;

b.    When placed in the stream of commerce, Vioxx was defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with Plaintiff's ailment;

c.    Vioxx contained insufficient warnings to alert MONTENEGRO, consumers, and prescribing physicians of severe and life threatening complications and side effects including, but not limited to arterial thrombus;

d.    There was misleading advertising and promotion concerning

15

Montenegro vs. Merck & Co., Inc. et al
Complaint

the benefits of using Vioxx;

e.    There were inadequate post-marketing warnings or instructions for Vioxx because, after Defendant knew or should have known of the significant risks associated with the use of Vioxx, Defendants failed to provide adequate warnings to MONTENEGRO, consumers, and prescribing physicians, and continued to aggressively promote and advertise directly to consumers the sale and use of Vioxx;

57.    The Vioxx ingested by MONTENEGRO had not been materially altered or modified prior to its use.

58.    MONTENEGRO used the drug for its intended purpose.

59.    MERCK, as a manufacturer of a prescription drug, is held to the level of knowledge of an expert in the field. Prescribing physicians and consumers did not have substantially the same knowledge as MERCK, or that which would have been gleaned from an adequate warning from the manufacturer and its sales force to prescribing physicians and/or consumers.

60.    The warnings that were given by Defendants to MONTENEGRO, the consuming public, and prescribing physicians were not accurate, clear, and/or unambiguous but instead were misleading and untrue.

61.    MERCK had a continuing duty to warn MONTENEGRO, prescribing physicians, other dispensing entities, and the consuming public of the dangerous risks and reactions associated with Vioxx.

62.    MONTENEGRO could not have discovered any defect in the product

16

Montenegro vs. Merck & Co., Inc. et al
Complaint

through the exercise of care.

63.    On October 24, 2002, MONTENEGRO suffered a massive stroke as a direct and proximate result of his ingestion of Vioxx, MONTENEGRO has suffered severe and debilitating injuries and disability including right sided hemiparesis and brain damage as a result of his ingestion of Vioxx.

64.    As a further direct result of the defective and dangerous product, Vioxx, MONTENEGRO was injured in and about his body, suffered aggravation of pre-existing conditions, pain and suffering, disability disfigurement, mental anguish, loss of enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of past earnings, loss of future earnings, loss of ability to earn money; all of said injuries are permanent within a reasonable degree of medical probability and will be sustained in the future.

WHEREFORE; Plaintiff, FLAVIO MONTENEGRO demands judgment for damages against MERCK for an amount in excess of Fifteen Thousand Dollars ($15,000.00), plus costs and interest and further demands trial by jury on all issues so triable. Plaintiff hereby reserves the right to assert a claim for punitive damages upon a showing of the applicable pre-requisites.

## COUNT TWO - NEGLIGENCE (AGAINST ALL DEFENDANTS) ON BEHALF OF MONTENEGRO

65.    Plaintiff adopts by reference all the General Allegations contained in Paragraphs 1 through 54 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

66.    At all times material hereto, Defendants had a duty to MONTENEGRO to

17

exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, assembling, packaging, distribution, sale, and warning in regard to Vioxx.

67.    Defendants were negligent in their actions, misrepresentations, and omissions toward MONTENEGRO and his prescribing physicians in the following ways:

a.    In failing to include adequate warnings with the drug that would have alerted consumers and physicians to the potential risks and serious side effects of Vioxx;

b.    In failing to adequately and properly test Vioxx before placing the drug on the market;

c.    In failing to provide adequate post-marketing warnings or instructions after the Defendants knew of the significant risks of personal injury and death as identified herein among other serious side effects from the use of Vioxx;

d.    In failing to adequately warn MONTENEGRO and his physicians that Vioxx should not be used in conjunction with any risk factors for these adverse effects;

e.    In failing to adequately disclose and warn MONTENEGRO that he undertook the risk of adverse events and death as described herein; and

68.    In failing to adequately and timely inform the health care industry and the consuming public of the risks of serious personal injury and death from Vioxx ingestion as described herein.

69.    Defendants knew or should have known that Vioxx caused unreasonably

dangerous risks and serious side effects of which MONTENEGRO and his prescribing physicians would be unaware. Defendants nevertheless aggressively advertised, marketed, sold and distributed Vioxx knowing that there were safer methods and products for treatment of pain due to inflammation.

70. On October 24, 2002, MONTENEGRO suffered a massive stroke as a direct and proximate result of his ingestion of Vioxx, MONTENEGRO has suffered severe and debilitating injuries and disability including right sided hemiparesis as a result of his ingestion of Vioxx.

71. As a further direct result of the ingestion of, Vioxx, MONTENEGRO was injured in and about his body, suffered aggravation of pre-existing conditions, pain and suffering, disability disfigurement, mental anguish, loss of enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of past earnings, loss of future earnings, loss of ability to earn money; all of said injuries are permanent within a reasonable degree of medical probability and will be sustained in the future.

WHEREFORE, Plaintiff, FLAVIO MONTENEGRO demands judgment for damages against all Defendants for an amount in excess of Fifteen Thousand Dollars ($15,000.00), plus costs and interest and further demands trial by jury on all issues so triable. Plaintiff hereby reserves the right to assert a claim for punitive damages upon a showing of the applicable pre-requisites.

## COUNT 3 - FRAUD AGAINST ALL DEFENDANTS

72. Plaintiff adopts by reference all of the General Allegations contained in Paragraphs 1 through 54 above, each inclusive, as though fully set forth, pursuant to Rule 1.130 (b), Florida Rules of Civil Procedure.

73.   Defendants    fraudulently    or    intentionally    misrepresented    to
MONTENEGRO and/or his prescribing physician the safety and effectiveness of Vioxx
and/or fraudulently or intentionally concealed material information regarding the drug
and/or fraudulently or intentionally misrepresented adverse information regarding the
safety and effectiveness of Vioxx.

74.   Defendants'   fraudulent   or   intentional   misrepresentations   were
communicated to MONTENEGRO'S prescribing physicians with the intent that they
reach MONTENEGRO.

75.   Defendants knew that their representations were false.

76.   Defendants made the fraudulent or intentional misrepresentations and/or
actively concealed this information about the risks and efficacy of Vioxx with the
intention and specific desire that MONTENEGRO, his prescribing physician, dispensing
entities, and the consuming public would rely on such false information in selecting
treatment for pain and inflammation.

77.   Defendants   intentionally   concealed   material,   adverse   information
regarding the safety and effectiveness of Vioxx.

78.   Defendants made these fraudulent or intentional misrepresentations and
actively concealed adverse information at a time when the Defendants knew that Vioxx
had defects, dangers, and characteristics that were other than what the Defendants had
represented to the prescribing doctors or other dispensing entities, the FDA, and the
consuming public (including MONTENEGRO). Specifically, Defendants fraudulently or
intentionally misrepresented to and/or actively concealed from MONTENEGRO, his
prescribing physician or other dispensing entities, the FDA, and the consuming public

Montenegro vs. Merck & Co., Inc. et al
Complaint

the following adverse information regarding the Vioxx ingested by MONTENEGRO:

    a.    Failed to advise MONTENEGRO, his prescribing physician, and others that Vioxx carried risks of serious adverse effects;

    b.    Failed to advise MONTENEGRO, his prescribing physician, and others that there were serious risks of thrombotic events associated with Vioxx, and, instead, Defendants aggressively marketed, promoted, advertised directly to consumers, and/or sold Vioxx as if there was no risk; and

    c.    Failed to advise MONTENEGRO, his prescribing physician, and others that prior studies, research, reports and/or testing had been conducted linking Vioxx to serious adverse actions.

79.     The fraudulent or intentional misrepresentations and/or active concealment by Defendants were perpetuated directly and/or indirectly by the Defendants, employees, agents and/or other detail persons.    The fraudulent or intentional misrepresentations and/or concealment by The Defendants constitute a continuing tort.

80.     Through the Defendants' product insert and aggressive marketing efforts, Defendants continued to fraudulently or intentionally misrepresent the potential risks associated with Vioxx.

81.     Defendants had a post-sale duty to warn the consuming public and MONTENEGRO'S prescribing physician of the risks of Vioxx in their labeling, advertising, product inserts, promotional materials, direct-to-consumer advertising, and other marketing efforts.

82.     Defendants fraudulently or intentionally misrepresented the safety and

efficacy of Vioxx in their labeling, advertising, product insert, promotional materials, direct-to-consumer advertising, or other marketing efforts.

83.    MONTENEGRO, his prescribing physician, and other dispensing entities justifiably relied on and/or were induced by the fraudulent or intentional misrepresentations and/or active concealment of Defendants to the detriment of MONTENEGRO.

84.    On October 24, 2002, MONTENEGRO suffered a massive stroke as a direct and proximate result of his ingestion of Vioxx, MONTENEGRO has suffered severe and debilitating injuries and disability including right sided hemiparesis as a result of his ingestion of Vioxx.

85.    As a further direct result of the defective and dangerous product, Vioxx, MONTENEGRO was injured in and about his body, suffered aggravation of pre-existing conditions, pain and suffering, disability disfigurement, mental anguish, loss of enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of past earnings, loss of future earnings, loss of ability to earn money; all of said injuries are permanent within a reasonable degree of medical probability and will be sustained in the future

WHEREFORE, Plaintiff, FLAVIO MONTENEGRO demands judgment for damages against all Defendants for an amount in excess of Fifteen Thousand Dollars ($15,000.00), plus costs and interest and further demands trial by jury on all issues so triable. Plaintiff hereby reserves the right to assert a claim for punitive damages upon a showing of the applicable pre-requisites.

Montenegro vs. Merck & Co., Inc. et al
Complaint

## COUNT 4- NEGLIGENCE PER SE PURSUANT TO
## FLA. STAT. §499.077 AGAINST MERCK

86.     Plaintiff adopts by reference all of the General Allegations contained Paragraphs 1 through 54 above, each inclusive, as though fully set forth, pursuant to Rule 1.130(b), Florida Rules of Civil Procedure.

87.     Defendant, MERCK, had an obligation not to violate the law in the manufacture, testing, processing, labeling, packaging, advertising, marketing, distribution and sale of Vioxx.

88.     Pursuant to Florida Statute §499.007, MERCK had a statutory duty to all consumers, including MONTENEGRO to not misbrand Vioxx, to not label in a false and misleading manner, and to include within the label of Vioxx adequate warnings against use in those pathological conditions in which its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such a manner and form as are necessary for the protection of users, including the MONTENEGRO

89.     MERCK knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects, including but not limited to significantly increasing the risks of cardiovascular events.

90.     Despite its knowledge or what it should have known, MERCK, aggressively advertised, marketed, sold and distributed Vioxx, knowing that there were safer methods and products for use with pain and inflammation.

91.     MERCK violated and breached the statutory duties contained within Florida Statute §499.007, including but not limited to the following:

23

a.  Manufactured, processed, labeled, packaged, advertised, marketed, distributed and sold Vioxx with a false, misleading and misbranded label;

b.  Failure to include adequate warnings with Vioxx that would alert consumers to the potential risk and serious side effects of Vioxx;

c.  Failure to warn that use of Vioxx statistically significant increases cardiovascular events, stroke and death;

d.  Failure to warn that the mechanism by which these thrombotic and cardiovascular events occurred was discovered and scientifically confirmed;

e.  Failure to provide adequate after-market warnings or instructions after MERCK knew or should have known of the significant risks associated with the use of Vioxx.

92.  The Plaintiff, MONTENEGRO. used Vioxx in a manner for which it was intended and/or in a reasonably foreseeable manner.

93.  The Plaintiff, MONTENEGRO was not aware of, and reasonably could not have discovered, the dangerous and/or defective nature of Vioxx.

94.  As a direct and proximate result of MERCK'S misbranded, false, misleading label and violation of Florida Statute §499.007, on October 24, 2002, MONTENEGRO suffered a massive stroke as a direct and proximate result of his ingestion of Vioxx, MONTENEGRO has suffered severe and debilitating injuries and disability including right sided hemiparesis as a result of his ingestion of Vioxx.

95.  As a further direct and proximate result of MERCK'S misbranded, false, misleading label and violation of Florida Statute §499.007, MONTENEGRO was injured

in and about his body, suffered aggravation of pre-existing conditions, pain and suffering, disability disfigurement, mental anguish, loss of enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of past earnings, loss of future earnings, loss of ability to earn money; all of said injuries are permanent within a reasonable degree of medical probability and will be sustained in the future.

WHEREFORE, Plaintiff, FLAVIO MONTENEGRO demands judgment for damages against all Defendants for an amount in excess of Fifteen Thousand Dollars ($15,000.00), plus costs and interest and further demands trial by jury on all issues so triable. Plaintiff hereby reserves the right to assert a claim for punitive damages upon a showing of the applicable pre-requisites.

## COUNT 5 VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (AGAINST MERCK)

96.     Plaintiff adopts by reference all of the General Allegations contained in Paragraphs 1 through 54 above, each inclusive, as though fully set forth, pursuant to Rule 1.130(b), Florida Rules of Civil Procedure.

97.     This is an action brought pursuant to the Florida Deceptive and Unfair Trade Practices Act contained at Fla. Stat. §501.201 et seq.

98.     MERCK had an obligation not to violate the law in the manufacturing, testing, processing, labeling, packaging, advertising, marketing, distribution and sale of Vioxx.

99.     As detailed more specifically in the "Warning Letter" attached as Exhibit "A", MERCK, engaged in marketing and promotional activities that were found to be "false, lacking in fair balance, or otherwise misleading" in violation of the Federal Food,

Drug and Cosmetic Act and applicable regulations.

100.   Such "false, lacking in fair balance, or otherwise misleading" advertising and promotional activities violate the Florida Deceptive and Unfair Trade Practices Act which makes it unlawful to engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. §501.204.

101.   As a direct and proximate result of MERCK'S violations of the Florida Deceptive and Unfair Trade Practices Act, on October 24, 2002, MONTENEGRO suffered a massive stroke as a direct and proximate result of his ingestion of Vioxx, MONTENEGRO has suffered severe and debilitating injuries and disability including right sided hemiparesis as a result of his ingestion of Vioxx.

102.   Further, Pursuant to Section 501.211(2), of the Florida Deceptive and Unfair Trade Practices Act, Plaintiff seeks actual damages plus attorney's fees and Court costs.

103.   The Plaintiff has retained the law firm of Searcy Denney Scarola Barnhart & Shipley, P.A., and has agreed to pay reasonable attorney's fees for such  services.

WHEREFORE, Plaintiff, FLAVIO MONTENEGRO demands judgment for damages against MERCK, SOSA and MURIAS in excess of Fifteen Thousand Dollars ($15,000.00) plus attorney's fees and costs, as well as interest, and further demands trial by jury on all issues so triable.  Plaintiff hereby reserves the right to assert a claim for punitive damages upon a showing of the applicable pre-requisites.

26

Montenegro vs. Merck & Co., Inc. et al
Complaint

## COUNT 6 NEGLIGENCE PER SE. MISLEADING ADVERTISING
## FLORIDA STATUTE §817.41
## (AGAINST MERCK, SOSA and MURIAS)

104.   Plaintiff adopts by reference all of the General Allegations contained in Paragraphs 1 through 54 above, each inclusive, as though fully set forth,   pursuant   to Rule 1.130(b), Florida Rules of Civil Procedure.

105.   MERCK had an obligation not to violate the law in the manufacturing, testing, processing, labeling, packaging, advertising, marketing, Distribution and sale of Vioxx.

106.   Pursuant to Florida Statute §817.41, MERCK, had a statutory duty to all consumers, including the Plaintiff, MONTENEGRO not to disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement.

107.   MERCK knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects, including but not limited to significantly increasing the risks of cardiovascular events, and should have including such risks in its advertisements.

108.   Despite its knowledge, MERCK aggressively advertised, marketed, sold and distributed Vioxx, knowing that there were safer methods and products for use with pain and inflammation.

109.   MERCK, violated and breached the statutory duties contained within Florida Statute §817.41, including but not limited to the following:

   a.   Manufactured, processed, labeled, packaged, advertised, marketed, distributed and sold Vioxx with a false and misleading advertisements;

27

Montenegro vs. Merck & Co., Inc. et al
Complaint

> b.  Failure to include in such advertisements adequate warnings with Vioxx
>     that would alert consumers to the potential risk and serious side effects of
>     Vioxx;
>
> c.  Failure to warn that use of Vioxx statistically significant increases
>     cardiovascular events, myocardial infarctions and death;
>
> d.  Failure to warn that the mechanism by which these thrombotic and
>     cardiovascular events occurred was discovered and scientifically
>     confirmed;
>
> e.  Failure to provide adequate after-market warnings or instructions after
>     MERCK knew or should have known of the significant risks associated
>     with the use of Vioxx.

110.   SOSA and MURIAS unlawfully and in violation of Florida Statute 817.41 disseminated MERCK'S misleading advertisements to the general public of this State, including but not limited to the Plaintiff, MONTENEGRO.

111.   The Plaintiff MONTENEGRO used Vioxx in a manner for which it was intended and/or in a reasonably foreseeable manner.

112.   The Plaintiff, RAYMOND N. GRIFFIN, JR. was not aware of, and reasonably could not have discovered, the dangerous and/or defective nature of Vioxx.

113.   As a direct and proximate result of MERCK'S misleading advertisements, and SOSA and  MURIAS' dissemination of MERCK'S misleading advertisements, in violation of Florida Statute §817.41, on October 24, 2002, MONTENEGRO suffered a massive stroke as a direct and proximate result of his ingestion of Vioxx, MONTENEGRO has suffered severe and debilitating injuries and disability including

right sided hemiparesis as a result of his ingestion of Vioxx.

114.  As a further direct and proximate result of MERCK'S misleading advertisements, and SOSA and MURIAS' dissemination of MERCK'S misleading advertisements, in violation of Florida Statute §817.41, MONTENEGRO was injured in and about his body, suffered aggravation of pre-existing conditions, pain and suffering, disability disfigurement, mental anguish, loss of enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, loss of past earnings, loss of future earnings, loss of ability to earn money; all of said injuries are permanent within a reasonable degree of medical probability and will be sustained in the future.

115.  Further, pursuant to Florida Statute Sec. 817.41(6), Plaintiff seeks actual damages, plus attorney's fees and costs.

116.  The Plaintiff has retained the law firm of Searcy Denney Scarola Barnhart & Shipley, P.A. to represent his interests in this matter, and has agreed to pay reasonable attorney's fees for such services.

WHEREFORE, Plaintiff, FLAVIO MONTENEGRO demands judgment for damages against MERCK, SOSA and MURIAS in excess of Fifteen Thousand Dollars ($15,000.00) plus attorney's fees and costs, as well as interest, and further demands trial by jury on all issues so triable.  Plaintiff hereby reserves the right to assert a claim for punitive damages upon a showing of the applicable pre-requisites.

## DEMANDS FOR JURY TRIAL

The Plaintiff, FLAVIO MONTENEGRO, herein requests a trial by jury of all issues so triable by right.

29

Montenegro vs. Merck & Co., Inc. et al
Complaint

Dated this 17th day of December, 2007.

_____
CHRISTIAN D. SEARCY
Florida Bar No.: 158298
TODD R. FALZONE
Florida Bar No.: 0975184
DARRYL L. LEWIS
Florida Bar No.  818021
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409
Telephone: (561) 686-6300
Facsimile:   (561) 478-0754
Attorneys for Plaintiff

30

# IMPORTANT INFORMATION
# FOR PATIENTS TAKING VIOXX® (rofecoxib)



September 30, 2004

## *Merck Voluntarily Withdraws VIOXX*

Dear VIOXX Patient:

Merck & Co., Inc. announced today a voluntary withdrawal of VIOXX®.

This decision is based on new data from a three-year clinical study. In this study, there was an increased risk for cardiovascular (CV) events, such as heart attack and stroke, in patients taking VIOXX 25 mg compared to those taking placebo (sugar pill). While the incidence of CV events was low, there was an increased risk beginning after 18 months of treatment. The cause of the clinical study result is uncertain, but our commitment to our patients is clear.

Patients who are currently taking VIOXX should contact their health care providers to discuss discontinuing use of VIOXX and possible alternative treatments. In addition, patients and health care professionals may obtain information from merck.com and vioxx.com or may call 1-888-368-4699.

Merck will reimburse all patients for their unused VIOXX. All dosage strengths and formulations of VIOXX are affected by this voluntary withdrawal. Information can be found at vioxx.com or at 1-888-368-4699.

Merck is notifying physicians and pharmacists and has informed the Food and Drug Administration of this decision.

We are taking this action because we believe it best serves the interests of patients. That is why we undertook this clinical trial to better understand the safety profile of VIOXX. And it's why we instituted this voluntary withdrawal upon learning about these data.

Be assured that Merck will continue to do everything we can to maintain the safety of our medicines.

Raymond V. Gilmartin,
Chairman, President & CEO

EXHIBIT
A

Please read the Patient Prescribing Information for VIOXX.

Where patients come first ⊕ MERCK