```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
        ****************************************************************
 3

 4    IN RE:  VIOXX PRODUCTS              MDL No. 1657
      LIABILITY LITIGATION               Section: "L"
 5                                        New Orleans, Louisiana
                                          Tuesday, September 23, 2008
 6

 7      ****************************************************************

 8
             TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
 9            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
10

11
      APPEARANCES:
12
      FOR THE PLAINTIFFS
13    LIAISON COMMITTEE:                 HERMAN, HERMAN, KATZ & COTLAR
                                         BY:  RUSS M. HERMAN, ESQ.
14                                            LEONARD A. DAVIS, ESQ.
                                         820 O'Keefe Avenue
15                                       New Orleans, LA 70113

16
                                         SEEGER WEISS, LLP
17                                       BY:  CHRISTOPHER A. SEEGER, ESQ.
                                         One William Street
18                                       New York, NY 10004

19
                                         LEVIN, FISHBEIN, DEDRAN & BERMAN
20                                       BY:  ARNOLD LEVIN, ESQ.
                                         510 Walnut Street, Suite 500
21                                       Philadelphia, PA 19106-3697

22
                                         BEASLEY, ALLEN, CROW, METHVIN,
23                                       PORTIS & MILES
                                         BY:  ANDY D. BIRCHFIELD, JR., ESQ.
24                                       218 Commerce Street
                                         Montgomery, AB 36104
25
```

```
 1                        GIRARDI AND KEESE
                          BY:  THOMAS V. GIRARDI, ESQ.
 2                        1126 Wilshire Boulevard
                          Los Angeles, CA 90017-1904
 3

 4                        BLIZZARD, McCARTHY & NABERS, LLP
                          BY:  EDWARD F. BLIZZARD, ESQ.
 5                        440 Louisiana
                          Lyric Centre, Suite 1710
 6                        Houston, TX 77002-1689

 7
                          LEVIN, PAPANTONIO, THOMAS,
 8                        MITCHELL, ECHSNER & PROCTOR
                          BY:  TROY A. RAFFERTY, ESQ.
 9                        316 South Baylen Street, Suite 600
                          Pensacola, FL 32502-5996
10

11                        ASHCRAFT & GEREL
                          BY:  CHRISTOPHER V. TISI, ESQ.
12                        2000 L Street, NW, Suite 400
                          Washington, D.C.  20036
13

14                        ROBINSON, CALCAGNIE & ROBINSON
                          BY:  KEVIN F. CALCAGNIE, ESQ.
15                        620 Newport Center Drive, 7th Floor
                          Newport Beach, CA 92660
16

17                        KLINE & SPECTER
                          BY:  LEE B. BALEFSKY, ESQ.
18                        1525 Locust Street
                          The Nineteenth Floor
19                        Philadelphia, PA 19102

20
                          BARRIOS, KINGSDORF & CASTEIX
21                        BY:  DAWN M. BARRIOS, ESQ.
                          701 Poydras Street, Suite 3650
22                        One Shell Square
                          New Orleans, LA 70139
23

24                        THE KAISER FIRM, LLP
                          BY:  GRANT KAISER, ESQ.
25                        8441 Gulf Freeway, Suite 600
                          Houston, TX 77017-5051
```

```
 1

 2   FOR 08-3627 PLAINTIFFS:        CROWELL & MORING
                                    BY:  ANDREW H. MARKS, ESQ.
 3                                  1001 Pennsylvania Ave., N.W.
                                    Washington, D.C., 20004
 4

 5

 6   FOR THE DEFENDANTS
     LIAISON COMMITTEE:             STONE, PIGMAN, WALTHER, WITTMANN
 7                                  BY:  DOROTHY WIMBERLY, ESQ.
                                    546 Carondelet Street
 8                                  New Orleans, LA 70130

 9
                                    HUGHES HUBBARD & REED, LLP
10                                  BY:   THEODORE V.H. MAYER, ESQ.
                                          CHARLES COHEN, ESQ.
11                                  One Battery Park Plaza
                                    New York, NY 10004-1482
12

13                                  WILLIAMS & CONNOLLY
                                    BY:  DOUGLAS R. MARVIN, ESQ.
14                                       M. ELAINE HORN, ESQ.
                                    725 12th Street, N.W.
15                                  Washington, D.C. 20005

16
                                    O'MELVENY & MYERS
17                                  BY:  BRIAN C. ANDERSON, ESQ.
                                    1625 Eye Street, N.W.
18                                  Washington, D.C. 20006

19

20   CLAIMS ADMINISTRATOR:          BROWN GREER
                                    BY:  ORRAN L. BROWN, ESQ.
21                                       LYNN C. GREER, ESQ.
                                    115 South 15th Street, Suite 400
22                                  Richmond, VA 23219-4209

23

24   LIEN ADMINISTRATOR:            THE GARRETSON LAW FIRM
                                    BY:  MATTHEW L. GARRETSON, ESQ.
25                                  7775 Cooper Road
                                    Cincinnati, OH 45242
```

```
 1
       CURATOR FOR PRO SE
 2     PLAINTIFFS:                     JOHNSON, HOEFER, HOLWADEL &
                                       ELDRIDGE
 3                                     BY:  CLAUDIA P. SANTOYO, ESQ.
                                       601 Poydras Street, Suite 2490
 4                                     New Orleans, LA 70130

 5

 6
       Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
 7                                     500 Poydras Street, Room HB-406
                                       New Orleans, Louisiana 70130
 8                                     (504) 589-7776

 9

10
            Proceedings recorded by mechanical stenography, transcript
11     produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                 (TUESDAY, SEPTEMBER 23, 2008)

 3                 (STATUS CONFERENCE PROCEEDINGS)

 4

 5            THE COURT:  Good morning, ladies and gentlemen.  Call

 6    the case, please.

 7            THE DEPUTY CLERK:  MDL No. 1657, in re:  Vioxx.

 8            THE COURT:  Counsel make their appearance for the

 9    record, please.

10            MR. HERMAN:  May it please the court, Russ Herman for

11    plaintiffs.

12            MR. MARVIN:  And Douglas Marvin for Merck.

13            THE COURT:  We're here today for our monthly status

14    conference.  I've met with the liaison committees to discuss the

15    agenda.  I've supplemented it in some aspects, we'll take it in

16    the order in which it was given.

17            Settlement agreement is the first item on the agenda.

18            MR. HERMAN:  Your Honor, if I may I've been accused

19    sometimes of talking so much I could talk a chicken off the

20    bone.  But Mr. Wittmann who I've had the pleasure and

21    consternation of litigating against and with for a long time

22    just received this year the Louisiana's highest award from the

23    bar association 2008 Boisfontaine Award.

24            Phil is not here but I did want to note for the record

25    and extend to him our congratulations for an award that's well
```

1    received and well given.  Please extend to Phil our best

2    respects.

3           THE COURT:  The court is very familiar with that

4    award.  It came in I think during my administration many, many,

5    many years ago and I am delighted that he received it.  And I

6    know Curtis Boisfontaine would be very happy that Phil has

7    received it, he certainly deserves it.

8           MR. HERMAN:  Just one more brief comment.  As your

9    Honor knows, Phil was a graduate of the Tulane University Law

10   School, and I wore a purple tie this morning and I want to make

11   it very clear.  My colleague Bob Johnson, who is not with us

12   today, we were part of that law school class that went to LSU on

13   a train and I believe we lost 63 to 0.  Nevertheless, my blood

14   is green.

15          THE COURT:  And that's not unusual either.

16          MR. HERMAN:  Well, what was unusual is when their

17   quarterback kicked the extra point.

18          MR. LEVIN:  Russ, we're green, too, for the

19   Philadelphia Eagles.

20          MR. HERMAN:  Well, I don't talk about those birds.

21          I'd like, your Honor, Doug Marvin for Merck and then

22   Andy Birchfield for plaintiffs would like to address and

23   emphasize some deadlines that are very important to the

24   agreement.

25          THE COURT:  Okay.

1          MR. MARVIN:  Your Honor, we do have a deadline coming

2     up in about 40 days, it's October 30th, and that is the deadline

3     for claimants to enroll in the program.  We are aware of a

4     number of claimants who are eligible for the program that did

5     incur a heart attack or a stroke or sudden cardiac death and

6     have not enrolled in the program yet.  The program is still open

7     but it does close on October 30th and that is a firm hard

8     deadline.

9          I know in the past we've had a number of extensions

10    for interim payments and other extensions in the program, but

11    this deadline is a hard one that's been set by the agreement.

12    And in order for the smooth functioning of the program so that

13    we can continue the program and make sure that people are paid

14    in a timely manner, we do need to adhere to that deadline.

15          THE COURT:  How many of those individuals that are

16    eligible but have not enrolled as yet?

17          MR. MARVIN:  There are about 900.  Now, of that 900

18    there is a fairly large percentage who have not been found or

19    are not responding to their counsel.  Some of those cases

20    haven't filed, a lot of those cases were tolled.  But there's a

21    total of about 900.  And in addition to those who cannot be

22    found, there are some out there who have been filed by counsel

23    that some of us have reached out to and really have not been

24    familiar with the program, and so we have thought about

25    contacting them and perhaps we could use the court's assistance

1    so that everyone has the opportunity.

2         THE COURT:  Yes.  I would like to at least meet with

3    those individuals, and it's a little difficult with an MDL in

4    the sense that it's covering the nation.  And so I hate to order

5    someone from Alaska to come down to talk with me for a couple of

6    minutes about these matters, but I'd like you to get together

7    the group and let's see where they are and then I'd like to

8    start setting up some meetings.

9         I really don't care whether anyone wants to accept or

10   not accept the program or enroll or not enroll.  If they choose

11   not to enroll, that's their choice and they have a right to try

12   their case, and I will respect that and put them on track to try

13   their case.  But I would like them at least to understand the

14   whole scope of the matter and I think it would be beneficial not

15   only to the litigant but also to the lawyer to at least hear the

16   court discuss these matters and make sure that the client

17   understands what the situation is both with potential preemption

18   plus the costs plus the risk involved.

19        And if they wish to take that risk and they fully

20   understand it, that's fine.  But if they don't understand it, if

21   they haven't focused on it, if a lawyer who has been busy with

22   other things has not had a chance to either look at this

23   complicated agreement or understand it, then that's another

24   thing.  I hate to see some individuals slip through the cracks

25   when they simply just didn't know it.  So I'd like to satisfy

1    myself with that.  So let's get together that list and I'll set
2    up some meetings.
3              MR. MARVIN:  We will do that, your Honor.  I think as
4    Mr. Brown will be reporting, more than 98 percent have enrolled
5    in the program and so it's just with respect to this last two
6    percent that we want to make sure that they understand the
7    program, they're focused it, and setting up that conference will
8    be very helpful.  We'll get that list together.
9              THE COURT:  Okay.
10             MR. MARVIN:  So that's the first deadline October 30th
11   for enrolling, it's a hard deadline.
12             The second deadline is December 30th, that is for
13   claims packages.  That is for people who have already enrolled
14   in the program.  And once they've enrolled then they need to
15   submit claims packages showing their proof of use and their
16   injury, along with other facts relating to their claim.  Again,
17   December 30th is a hard deadline and again it is a deadline that
18   has to be held firm if everyone in the program is going to be
19   paid in a timely manner.
20             So again, it's a situation where counsel representing
21   parties as well as those who are acting pro se need to comply
22   with that deadline in getting their enrollment packages in and
23   complete.
24             MR. BIRCHFIELD:  Judge, on the December the 30th, that
25   is, that's an absolute deadline, no extensions beyond that,

1   that's an essential part of the master settlement agreement.

2   But no one should look at December the 30th and say that's the

3   real deadline because you do not even get to December the 30th

4   unless you can show cause, you know, to BrownGreer, the efforts

5   that you have made to get records and how it's not your fault as

6   to why you do not already have those records.  The initial

7   deadline was July the 1st, deficiencies notices were posted to

8   those that did not have complete claims packages saying that you

9   have until September the 1st.

10          Now for those that have still to complete a claims

11  package, another notice went out and said that you have an

12  extension till November the 1st.  And so one of the things

13  that's very important is that lawyers view the portal, see these

14  deficiency notices and respond quickly to complete those claims

15  packages.

16          One of the things that we as a Plaintiffs Steering

17  Committee are doing right now, we're reaching out to lawyers,

18  offering our assistance to anyone who needs help in completing

19  these claim packages.  And so they can contact Russ Herman's

20  office or Chris Seeger's office or my office and we will

21  coordinate assistance for anyone who needs that in completing

22  these claims packages.

23          But it's crucial that lawyers be working diligently

24  now to complete these claims packages because you cannot wait

25  until the last minute, you would not be able to get the records

1    in time, and it's an absolute deadline.

2           THE COURT:  I would from the court's standpoint

3    reinforce that.  Often times lawyers, after they agree to a

4    settlement, they put that case away and go to the next case

5    which is nipping at their heels and that's not the situation in

6    this case.

7           I think that you need to get a small committee

8    together to focus on that and do some hands-on.  But if you get

9    to the point where you're not getting their attention, you can

10   send out e-mails but if they're not reading them or they're not

11   even opening them, then that's a real problem.  So if that

12   doesn't work, in time you have to let me know so that I can rule

13   them into court to show cause why their case should not be

14   dismissed in lieu thereof to contact BrownGreer or take care of

15   the deficiencies, and that way we'll get their attention.

16          MR. BIRCHFIELD:  Thank you, your Honor.

17          MR. MARVIN:  Your Honor, if I may also jump ahead to

18   another issue that came up at the last status conference, and

19   that relates to releases and stipulations of dismissals where

20   there have been some deficiencies.  A number of lawyers have

21   brought to our attention a number of issues, Tom Gerardi, Grant

22   Kaiser and several others with respect to deficiencies in the

23   releases and the stipulations of dismissal.

24          Your Honor, to enroll in the program a claimant

25   basically has to sign four documents:  One is a release, second

 1   is a stipulation of dismissal, a third is a medical

 2   authorization, and a fourth is an employment authorization.  The

 3   parties established criteria to govern the review of those

 4   documents to ensure that the documents, once executed are valid

 5   documents.

 6        And the purpose of the criteria is to serve basically,

 7   well, there are two purposes:  The first is to make sure the

 8   right person is getting paid.  And the second purpose is to

 9   ensure that the document can be filed in a court of law and the

10   case proceed through its course and be enforceable as a

11   necessary document to complete the litigation.

12        As I say, at the last conference a number of concerns

13   were raised about the deficiencies and over the marking of

14   documents as deficiencies, and over the past several weeks we

15   have been engaged in a painstaking exercise in reviewing all of

16   those criteria, we've been meeting with BrownGreer, meeting with

17   a number of plaintiff representatives and others, and the

18   emphasis is on the word painstaking as part of that exercise and

19   we've reviewed all of the criteria.

20        As a result of that review we've made a number of

21   adjustments and clarifications to those criteria, and I believe

22   it was on Friday that BrownGreer sent an e-mail to all counsel

23   setting out what a number of those adjustments are.  And I think

24   once counsel has the opportunity to review those, and I believe

25   that either Orran Brown or Lynn Greer is going to review those

1    adjustments that have been made, but it should clear up a number

2    of deficiencies.

3          For example, the four documents, the employment

4    authorizations, the medical authorizations, we're taking those

5    off the table at this stage, not requiring people to work on

6    those deficiencies and instead focus on the releases and

7    stipulations of dismissal.  We'll only come back to them with

8    respect to cures to the medical authorizations and employment

9    authorizations if we need those documents down the road.  So

10   that in itself is clearing up thousands of documents for

11   deficiencies.  And we've made a number of other steps, too, that

12   Mr. Brown will be able to outline.

13      So we've been looking at it, we've been working hard to

14   try to streamline that process, and if there are any other

15   suggestions or ideas that still will ensure that a document will

16   be enforceable, we're happy to talk to others to address those

17   issues

18          THE COURT:  I've seen some of the documents, and

19   there's some room, there was some room originally for the

20   objection that this being too nitpicking and things of that

21   sort.  But the ones that are still, that are outstanding now

22   with those two areas, the release and the dismissal, those are

23   key.  And I've seen some releases that come through that are not

24   even signed, I mean the release is not signed.  That's a

25   deficiency if the release is not signed.  If the release is

1  signed saying subject to approval by client and it's signed by

2  the lawyer, that's a deficiency.  How can that release work?  So

3  these are serious issues that, and they're very simple issues

4  that ought to be focused on and gotten through.  There are about

5  11,000 of these, with those two areas taken off of the table it

6  reduces it to maybe about 4,000; but to send a release back

7  that's not even signed, that's pushing the envelope a little

8  bit.

9         Okay.  Anything?

10        MR. HERMAN:  Your Honor -- I'm sorry.

11        THE COURT:  Yes.

12        MR. HERMAN:  Excuse me, your Honor.

13        THE COURT:  That's all right.

14        MR. HERMAN:  I do want to again mention that there are

15 three web sites that can be accessed to look at the settlement

16 agreement and the deadlines:  Vioxx.laed.uscourts.gov, that's

17 the court's web site; and browngreer.com/vioxx settlement; and

18 claimsadmin@browngreer.com.

19        I further want to point out to lawyers and on the

20 record that they're going to lose almost a week of workdays with

21 Thanksgiving and the Christmas holidays, so that December 30th

22 date does not really give a great deal of time if you wait until

23 December 1st to begin your work on it.

24        I want to again, as Doug has, thank Tom Gerardi and

25 Grant Kaiser for pointing out deficiencies; for Chris Seeger,

 1   Andy Birchfield and others and BrownGreer for working with Doug

 2   Marvin to do what we can to minimize the types of deficiencies

 3   which are not paramount.

 4          Your Honor, with respect to page four in the fee

 5   guidelines which your Honor ordered in Pretrial Order 6D on

 6   September 15th, 2008, Mr. Blizzard, Mr. Lanier will undertake to

 7   make sure that the Texas contingency state lawyers, I should say

 8   contingent state lawyers are fully advised.  Mr. Gerardi has

 9   already done that in California and is going to repeat, and

10   Mr. Seeger and Mr. White will undertake to make sure that the

11   New York/New Jersey lawyers -- and I'm speaking now of state

12   lawyers -- are fully advised of the guidelines.

13          And in the event that there are other states involved

14   which are not part of the MDL, our office is going to undertake

15   to search those out and make sure they're aware of Trial Order

16   6D and their obligation to file certain materials as well as an

17   affidavit by the October deadline set forth in Pretrial Order

18   6D.

19          At page five your Honor has under advisement without oral

20   argument Mr. Ronald R. Benjamin's June 30th, 2008, motion to

21   vacate Pretrial Order No. 28.

22          THE COURT:  I invited Mr. Benjamin to come to the

23   court to make an oral presentation, but he suggested that it be

24   submitted by documentation only.

25          MR. HERMAN:  Yes.  And on behalf of the PSC, I'm

```
 1   certain that Mr. Levin would welcome his appearance or
 2   discussion.
 3        On September 12th, 2008 Mr. Stratton addressed a letter
 4   motion to your Honor, and your Honor will need a briefing
 5   schedule, if the matter is not resolved before then.  Mr. Marvin
 6   will address Mr. Stratton's letter.
 7        THE COURT:  I'd like Merck to respond to the letter
 8   setting forth your response to it, and then if it persists, I'll
 9   set it down as a motion and deal with it.
10        MR. MARVIN:  Very good, your Honor.  We will go ahead
11   and prepare a written response to that letter.  Hopefully get it
12   to you before the end of the week.
13        THE COURT:  All right.  Let's do that within one week
14   from today.
15        MR. MARVIN:  Okay.  I believe also, your Honor, that
16   Lynn Greer will also be addressing a couple of those points as
17   well.
18        THE COURT:  Registration enrollment of claims, is that
19   the next item?
20        MR. HERMAN:  There is also, it was a request from
21   Grant Kaiser and Shelly Sanford regarding an issue that's purely
22   a plaintiff issue, and we'll attempt to, our office will attempt
23   to mediate that.  If Mr. Kaiser, who is here, will get in touch
24   with Shelly and just arrange a date that's convenient for you
25   folks before the next status conference.
```

1          THE COURT:  I suggested that you try to mediate.  If

2     that's not satisfactory to both sides, then I'll do it.

3          MR. KAISER:  Thank you.

4          MR. HERMAN:  Your Honor, the registration and

5     enrollment of claims in the settlement program, I'd like to call

6     on BrownGreer to make their presentation at this time.

7          MR. BROWN:  Good morning, your Honor, Orran Brown from

8     BrownGreer, the claims administrator of this program.  And with

9     me today, as usual, is Lynn Greer; and as usual, we will cover

10    the registration enrollment phase, I'll speak to that, including

11    talking a little bit about enrollment deficiency process that

12    you and Mr. Marvin have already discussed; and then Lynn will

13    cover where we are in the claims world and the payments, the

14    interim payments that we have been making.

15         This slide again is familiar to the court, we use this

16    each time, just to remind us as to the number of folks who

17    initially registered for the settlement program.  And each time

18    we're here, that number creeps up a little bit because the court

19    set the target date originally of January 15th for law firms to

20    step forward and identify their Vioxx claimants.  We have been

21    receiving new firms and new claimants at certain levels since

22    January 15th, and we still today we receive each week still some

23    law firms who show up for the first time with their clients to

24    register for the program.

25         As you can see in row three, that number of 59,392 is

1    up 93 from when we were last here on August the 20th, and we are

2    still open to receiving registrations for the very first time.

3    This has to be finished though by the deadline that Mr. Marvin

4    mentioned of October 30 of this year, because not only do you

5    have to register by then you have to finish enrollment by then.

6    So this issue is still open.

7          On row four we get down to the number that we look at

8    each month we're here of people who have registered for the

9    program, who appear to be actually eligible to proceed in the

10   program; and that's based on information that Merck had about

11   these folks from the litigation primarily, whether they had a

12   lawsuit filed by November 9 of last year, whether they had a

13   tolling agreement by the end, whether they were U.S. citizens,

14   whether they have an injury that seems to qualify for the

15   program.  And that gets us down to the 49,761 number of people

16   who registered who appear to be eligible based on that

17   information to go forward in the settlement program.

18         Then we look at, well, who has been to the next step,

19   we look at this each month as well.  And again, this number

20   creeps up each week, each day.  In row five we see 48,791 folks

21   now who are enrolled in the program.  And out of the 49,761 that

22   we just looked at who appear to be eligible based on the

23   information that Merck has about them, it gives us about

24   98 percent of the community that seems to be eligible for the

25   program have actually stepped forward and sent us some materials

1    to enroll in the program.

2         And we stop here, it's worth mentioning two things

3    about the two percent and the other folks we're looking at on

4    this slide.  Mr. Marvin has already mentioned this and the court

5    has addressed it.  The about 900 to 1,000 people that's in that

6    two percent there who seem to be eligible but they haven't yet

7    enrolled in the program, this is a clean-up issue, as the court

8    mentioned, trying to impress upon folks that the program is

9    here, you can enroll if you wish to.  We still think about half

10   of that group are people that cannot be found, they simply are

11   claimants that cannot be located anymore.

12        And for the rest of them, we are working with counsel

13   and with the courts involved to try to find out why they're not

14   enrolled if they are eligible to make sure that people don't

15   miss the opportunity, again knowing that it has to be fixed and

16   cleaned up by October 30 of this year.

17        Another couple of clean up things about this slide and

18   the people it shows.  In row four, that group of ineligible

19   people, some those folks can still come back into the program

20   because a lot of lawyers or the claimants, once they get all of

21   their medical records they see an injury that qualifies when

22   they didn't think they had one previously.  So some of that

23   number comes back in to enrolling that 3,689 can actually

24   enroll.  For example, if you're not a U.S. citizen but had an

25   injury in the United States, you're eligible for the program.

1    And so sometimes the records show us things and show the counsel

2    things that were not known before.

3            The last clean-up issue on this is that there are about

4    1,500 people whose enrollment packages are not yet complete.

5    And by that I don't mean the signature issues or the deficiency

6    issues but we're missing one of the four key components, either

7    the release or the stipulation of dismissal if you have a

8    lawsuit or the medical authorization form or the employment

9    authorization form if you're seeking extraordinary injury

10   payments.  One of those four components is not present yet, and

11   so we've been going out to the firms to try to get them to

12   realize that they're missing a piece of the puzzle for some of

13   their clients and to get that cleaned up, too, by October 30.

14           We hope to clean up most of them, some of them may

15   never get their whole package in to us by that deadline, but as

16   Mr. Marvin mentioned, that is our deadline now we all need to

17   have our eyes on to get this clean-up operation finished for all

18   of us.

19           Then we want to talk a little bit more about the

20   deficiency process.  The court mentioned when we were here on

21   August 20, it's already been the subject of some discussion this

22   morning, Mr. Marvin mentioned it, the court's addressed it,

23   Mr. Herman has addressed it.  This is an area in every program

24   that is a painstaking process for everybody involved to try to

25   get the paperwork in complete order.  And since we were here on

1    August 20, we have been working a lot with the Merck counsel and

2    with claimants' counsel, people who send us issues and

3    questions, we've been addressing them, going over with them with

4    Merck and its advisors to try to make sure that we do everything

5    we can to reduce the level of pain in the painstaking process to

6    get this finished.

7          And as we said on August 20, every program sees

8    adjustments as you go along.  And Merck has been working really

9    hard to make some adjustments in this process to try to speed it

10   up, streamline it and let's get it finished.  I want to go

11   through quickly what they are.  Mr. Marvin has mentioned some of

12   the key ones.

13         But one thing, the medical authorization forms which

14   are part of the enrollment package, Merck has now determined to

15   defer reviewing them for now and basically allow us and the

16   claimants' lawyers to stop working on them right now.  That took

17   about over 14,000 of those documents that were not pipeline to

18   be addressed, to be reviewed, or to be cleaned up by counsel,

19   had something wrong with them, missing signature, missing name,

20   something, they're now off the table on the shelf, we don't have

21   to work on them now.  We'll come back to them later, if and

22   when, we or Merck decides to use one of those medical

23   authorizations to go get some records, and we'll deal with it at

24   that time.  So that takes a lot of work that was staring us and

25   the lawyers in their faces off the table for now.

1      Same thing true of these employment authorization

2   forms, Merck has determined that we can defer reviewing them

3   now, stop working on them now.  There are over 7,000 of those

4   that were left to be finished and cleaned up, they're now off

5   the table and we can focus on other things now.  And again for

6   those, we will come back to them.  If someone submits a claim

7   for extraordinary injury payments and we need to go behind them

8   and get their employment records, we'll look then to see if

9   their employment authorization form is complete and have them

10   fix it up if it's not.  So it will be deferred until later and

11   then done only if really necessary.  That also is going to save

12   some resources and time around the table now to let us focus on

13   getting the rest of the job done.

14      The other point worth mentioning about this is,

15   claimants can seek extraordinary injury payments for past wages

16   that are lost as well as extraordinary medical bills.  We've had

17   some claimants who want to seek extraordinary injury payments

18   from that fund but they're for medical pills and not past wages.

19   If that's the case, we have a form now that's posted on our web

20   site under the form section that they can sign and just waive

21   any claim for past wages and then they don't need an employment

22   authorization form at all, not even as part of the package.  So

23   that's another way to streamline what people have to send in to

24   us or get signed by their clients.

25      Those two steps right there are two big things that

1    will allow us all now to focus on the releases and the

2    stipulations of dismissal and get them finished and get this

3    part of it behind us.  We will now and the Merck counsel

4    reviewing only releases and stipulations of dismissal and only

5    the cures that come back in on those so that we can now really

6    focus on getting that process finished.

7            There are some other things that were adjusted that are

8    also important.  One of the issues that has generated a lot of

9    activity back and forth is the effort to confirm the identity of

10   people, because Merck has been trying to match up the folks that

11   we have with each person that they had from the litigation phase

12   or the tolling agreement phase to make sure they're all

13   accounted for.  And where there was differences or they were

14   unable to confirm the social security number or the name or

15   there was a name change or an address change or a date of birth

16   that didn't match, they haven't been able to make sure it's the

17   right person, to make sure that everybody is accounted for in

18   the program if they're supposed to be or can be, and then that

19   the right person gets paid.

20           And so it's generated some deficiencies back asking

21   folks to tell us who they are basically and send us something to

22   confirm their identity.  This started out with really asking for

23   Social Security card to get the Social Security number and name

24   off of it.  It has gradually evolved into a lot more than that

25   because now claimants can send us other documentation that shows

1   identity, driver's license, some other government issued

2   document like a Medicare card and then send us the social

3   security card only if they already have it.  Because people were

4   wondering and feeling that they need to go down if they didn't

5   have their card and wait in the Social Security Administration

6   Office and get it, and Merck has said, no, you don't have to do

7   that.  Send that if you have it; if not that, send us one of

8   these other things and we've told everybody what that can be.

9          That are also about 2,200 out of the 3,200 people that

10  have been told that need to be identify themselves like this

11  that we're now going, Merck has said we can -- they don't have

12  to send any of that documentation, instead the law firm can just

13  send us a letter vouching that this is the same person that we

14  had in the prelitigation phase.  We are going to send them a

15  form letter they can give us, it's a cure that the law firm can

16  take care of and not have to bother their client with at all.

17  This is another adjustment that Merck has made since we were

18  here on August the 20th.

19          They're also not dealing with any of the derivative

20  claimants on this identity issue.  This is focussing on the

21  primary claimant, the main releasor, not the family members that

22  are the secondary claimants.  They have scaled down the scope of

23  this a lot.  It is a painstaking process, this is in particular,

24  but it has been evolving so that it is, we're trying to make it

25  as fast and as easy as it can be made to pin down who these

1   folks are.

2        Another issue that has come up a lot is where the

3   notary dates on the release where the releasor signed or

4   derivative claimant signed don't match.  And that originally

5   meant, well, it looked like the person didn't sign in the

6   presence of a notary if the dates don't go together, are not the

7   same, and we had a lot of issues with that because a lot of

8   times the dates do vary.  Merck has agreed now that if the

9   notary date is after the claimant date or the derivative date

10  that they signed, that will not be marked as a deficiency, it

11  will be accepted as a valid release.

12        So now this is going to generate a deficiency only if

13  the notary date is before the signature of either the releasor

14  or the claimant, which means obviously there's something wrong

15  there and that has to be fixed.  But this is another issue where

16  Merck has agreed to not make people re-sign if the dates don't

17  match, if the date comes later.

18        Representative capacity documentation, another big area

19  that takes a lot of work, the deceased claimants and deceased

20  derivative claimants are always an area in these programs that

21  are the hardest things to pin down.  And in every program,

22  including this one, people have to submit documents that show

23  that whoever is acting as the executor or the representative of

24  a deceased person has the authority to act.  We get those in

25  English, we get them in Spanish, we get them in other languages.

1          Until recently the Spanish ones were generating a

2     deficiency that we needed an English translation, Merck wanted

3     an English translation.  Now Merck has agreed to accept them in

4     Spanish which takes care of most of that problem that comes up

5     with these representative capacity documents, that the language

6     that they're in.

7          Another thing that Merck has agreed to is that if

8     somebody has a derivative claimant that they do not want to or

9     cannot have signed the actual release page, they can, if they

10    have a lawsuit, dismiss that derivative claimant now with

11    prejudice instead of getting them to sign.  And a lot of people

12    are using that alternative rather than getting them to sign just

13    dismissing that person out of the case now to take care of that

14    issue.

15         Another area has been an area where notary commission

16    expiration dates has generated a lot of activity back and forth

17    where the notary did not put down a date by which their

18    commission expires.  Some states require that to be shown.  Most

19    states require that to be shown to be a valid notarization.

20    Merck is marking and we're marking that as a deficiency only

21    where it's required in the state that it has to be shown.  And

22    the cure for that is easy, the lawyer just can send us something

23    telling us the date and we put it on the release, it does not

24    require the whole thing to be resigned all over again.

25         So those eight areas, your Honor, are the primary areas

```
 1   where there have been adjustments made since we were here on
 2   August 20.  It's not over, it's not finished.  This is still an
 3   ongoing process.  We are working really hard, as are the Merck
 4   lawyers and representatives now, as are the primary counsel, to
 5   finish releases and stipulations of dismissal.  We want anyone
 6   who has a question, an issue, if you feel like something has
 7   been posted as deficient on your portal and you feel like you
 8   sent in something to fix it and it's still posted as deficient
 9   or it comes back posted as deficient again, that usually means
10   Merck has looked at it and it's still not right.  But if you
11   have any question about that, notify your CA contact at our firm
12   by e-mail or phone, or send me an e-mail at
13   obrown@browngreer.com and we will look into it, and we are
14   taking these immediately to Merck and Merck is immediately
15   looking at them.  We will sleuth out any question you have.
16           And some firms have one question, some firms have
17   hundreds because they have hundreds of claimants.  But this
18   process is not finished, but we are all determined to make it
19   finished and get it behind us so that we and the counsel can all
20   focus on getting your claims packages complete and then getting
21   your claims reviewed and paid, if eligible.
22           That gets us, your Honor, to the claims phase.  Unless
23   the court has further questions of me about any of that, I'll
24   let Lynn address the claims of payments issues
25           THE COURT:  Okay.  Thank you.
```

1       MS. GREER:  Good morning, your Honor, Lynn Greer from

2   BrownGreer.  I would like to review with the court where we are

3   in terms of the claims materials that we have received to date

4   and what is going on with the deficiency notices that have

5   alluded to this morning.

6           Right now we have approximately 36,000 claims

7   packages that contain enough information for us to conduct some

8   sort of claims review on them.  And the next slide will show you

9   where those 36,000 are in our process.  The rows on this slide,

10  rows 2 through 6 reflect the number of claims submissions that

11  are deficient in some way, and the level of detail here shows

12  you where the deficiencies are.

13          Row two, we have received from 4,600 people who we

14  were expecting to receive claims materials from, we have

15  received nothing.  Row three shows that 2,500 claimants have

16  submitted only a claims form, not the required medical records.

17  Row four shows that there are 500 who've sent us some medical

18  records but no claims form.  Row five, 225 we have received some

19  sort of a medical record, an office note, but it does not

20  satisfy the PME requirement, the pharmacy medical record or

21  event record, and 225 of those have some sort of record but

22  without a claims form.  And then row six shows that 2,200 we've

23  received some sort of record with the claims form, but again the

24  records do not qualify as PME records.

25          The firms who've submitted materials, there are 944

1    firms who have submitted or have attempted to submit some sort

2    of claims material and 263 pro se claimants.

3            This slide shows that there are over 10,000 claims that

4    have pending deficiency notices and Mr. Marvin and

5    Mr. Birchfield have already told the court that we have

6    generated now deficiency notices under Exhibit 1.5 of the

7    settlement agreement which required us to identify claims that

8    were missing the required elements and to give claimants three

9    opportunities to cure those deficiencies, and we have now sent

10   two deficiency notices to approximately 11,000 people, and of

11   those about 10,000 deficiencies remain.

12           And what I would like to highlight again is the

13   importance of primary counsel going to their portals and opening

14   these deficiency notices.  We did a query in our database after

15   we had generated the first deficiency notice to about 11,000

16   claimants, and after a couple of weeks we were able to determine

17   that only 19 percent of those deficiency notices had actually

18   been viewed by counsel.  And so it obviously is a concern.  We

19   are sending, whenever we post notices to a portal we do send a

20   daily e-mail reminder saying that something has changed on the

21   claims portal, to please go look at it.

22           And on the record here I would like to encourage firms,

23   if those e-mails are going to the wrong recipient within a firm,

24   please let us know who we should direct those e-mails because it

25   is of the utmost importance that these deficiency notices be

viewed and acted upon and these deadlines are running.  They are

generous opportunities within Exhibit 1.5 to cure the

deficiencies, but once we get to November 30th and the

December 30th, that deadline will run and it is a drop-dead

deadline.

THE COURT:  See, that's a critical situation, because

if only 11 percent of the e-mails are being opened.  I mean, the

deficiency e-mails go out.  If the lawyers are not even opening,

how are they going to cure it?  That's a problem.  And then all

of a sudden the deadlines are going to fall and then people will

be unable to collect money that they are entitled to receive

because their lawyers didn't open the e-mails.  That's something

that we have to get the word out.

And if not, as I say, I will have to order them into

court to show cause why their case should not be dismissed for

failure to open e-mails to cure deficiencies, that's an

embarrassing situation.

MS. GREER:  Your Honor, the PSC, we have given them a

list of the firms who have received these e-mails.  There are

certain pockets that we do know that they will be reached out to

to be able to offer assistance and to see if there's anything

that any of us can do to help.

One thing that we do know has arisen, there are firms,

I don't want to paint the picture that no one is attempting to

cure, there are firms who have run into legitimate problems

 1    trying to get their records.  There is an isolated -- actually,

 2    it's not isolated, it is an issue where there is a deceased

 3    claimant and the medical provider or the pharmacy record

 4    provider is unwilling to honor the medical authorization because

 5    they can't determine if the proper person has signed the medical

 6    authorization.  We will be working with the PSC and presenting a

 7    draft order for your Honor's consideration to enable those

 8    medical providers to be able to release the records and not risk

 9    running afoul of HIPAA or releasing the records to the wrong

10    person.

11             THE COURT:  Okay.

12             MS. GREER:  Your Honor, just real briefly.  The

13    remaining around 36,000 people who have enough for us to review,

14    this slide shows that there are about 21,500 in the que waiting

15    for us to review.  As we told the court before, there was about

16    30, 33, 34 percent of all of the claims materials came in right

17    around the July 1 deadline, so we've obviously moved the claims

18    that were received before the deadline further along in the

19    process.

20             There are 11,000 claims that are somewhere in the

21    gates review process.  We reviewed the claims at the gate stage

22    thoroughly, and actually we review them and then we QC review

23    them to make sure that that eligibility determined, which is the

24    threshold determination, is absolutely correct.  There are

25    11,000 in the gates review process.  And 3,500 that are at

1    various stages in the points review process.

2            It also bears mentioning, your Honor, that the points

3    review process is where we actually look at the claims package

4    to see if there is a medical record missing that was not a

5    technical deficiency.  For example, when a claim gets to the

6    points process, it has a claims form, it has pharmacy records,

7    it has medical records, but if there is something that prohibits

8    our further review of the claim to be able to do the points

9    assessment, that takes place in the points review process as

10   well.

11           So when I say that a claim is in the points review

12   process, it's either in the points review process because we're

13   evaluating it for points or we're looking at it for more

14   substantive deficiency than just a technical deficiency in the

15   package.

16           Your Honor, Mr. Marvin mentioned that there had been a

17   motion filed by the Stratton Law Firm for a motion for

18   transparency that I do know a letter will be prepared and

19   presented to the court.  I would like to address some of the

20   issues that were raised in that brief paragraph.

21           One of the things I wanted to share with your Honor,

22   and with counsel, is that we are making every effort to make

23   this claims process transparent.  The use of the secure portals,

24   the availability of our CA contacts, the e-mail blasts that we

25   try to send to outline what counsel can expect in the claims

1    process are all efforts that we are making to have firms be able

2    to access their portal, to access their claim, and be able to

3    try to tell where the claims are in process.  We welcome any

4    suggestions from firms, if there is something we can do more to

5    make it more transparent.

6         We have not published cue numbers for review of claims

7    because of the expectations that that could create and because

8    there are so many areas in the process for a claim to either be

9    deficient for it to go into gates and go to the gate committee,

10   so a que number would be misleading we fear, but we have tried

11   to make every effort in the use of the portals to let claimants

12   know generally where their claims stand, And specifically if a

13   claim has been found eligible or as it proceeds through the

14   process.

15        The other thing that I would like to address is the

16   suggestion in the Stratton paragraph that there could be some

17   not favoritism but that there were certain claims that may be

18   being reviewed before others.  I just wanted to make it

19   abundantly clear that we review claims in the order in which a

20   claims package was submitted, that it was found complete, and

21   that a claim then for points was found to be a qualified program

22   claimant.  Our database is set up to run in que order, we have

23   no input from any parties in terms of priority.  Our reviewers

24   pick the next claim that comes up in the cue.  And what we do is

25   we follow the criteria, the objective criteria in Exhibit 3.1 in

1    evaluating these claims.

2            And so to the extent that anyone is scared that a

3    certain firm or firms are being pushed forward, it's purely by

4    claims order in the que how we review those claims.

5            Once a calculation is made, the firm will get a notice

6    of points award that is very detailed.  So if there's ever a

7    question about why the points are what they are, the notice of

8    points award itself will show them risk factors, how much was

9    taken off for risk factor and what their injury level was, and

10   it's a very detailed document.  And I think this process was

11   designed to build due process, and at every juncture they can

12   always ask us if they get a notice of points award that they

13   don't understand.  And if they end up not liking it or being

14   satisfied with it, there is the appeal route to the special

15   master.

16           So I know that the letter will address in more detail,

17   but I did want to highlight those four areas.  Thank you, your

18   Honor.

19           THE COURT:  Okay.  Thank you very much.  And people

20   have been paid a number of them, do you want to tell us about

21   that?

22           MS. GREER:  Yes, thank you.  Very important.  We have

23   issued two rounds of interim payments.  We issued one round in

24   August and actually payments were made again yesterday.  These

25   will be made on a rolling basis every month.  And obviously

1    claims will be paid only if they've gone through the process,

2    have been found eligible, have been issued a notice of points

3    award and have chosen not to appeal that.  And the firms who

4    have gone through that process for the claimants will receive

5    payments on a rolling basis, generally the third to fourth week

6    of the month.  Thank you, your Honor.

7              THE COURT:  Okay.  In advance of the payments, as you

8    all know, I issued an order and reasons capping the primary

9    counsel's fee at 32 percent plus reasonable costs.  Later after

10   an opportunity to be heard, I will set a common benefit fund.

11   The common benefit fund will include the costs and fees of the

12   common benefit attorneys, the PSC and others, and that will come

13   out of the 32 percent.

14             I know that's made me unpopular, the marshals wanted

15   to know whether I needed more marshals this morning, but I

16   declined.  I know that no one minds my preaching, but they don't

17   want me to meddle and this is probably going beyond the

18   preaching and into the meddling part and I am aware of that.  I

19   gave it a lot of thought.

20             As all of us know, everybody represents somebody.

21   You've heard me say before that the plaintiff lawyers represent

22   the plaintiffs, and they have done a good job with that; defense

23   lawyers represent Merck and they've done a good job.  I, too,

24   represent somebody, and as many of you have heard me say before,

25   I represent this room and the room contains the flags and

```
 1    200 years, or 600 years of jurisprudence if you put in England.

 2    And I consider all of that when I am dealing with this, and in

 3    representing the room I have to look over not only the attorneys

 4    and the profession but also the claimants.

 5          And I gave it a serious thought, researched as I do,

 6    and wrote an opinion on it.  I didn't intend to offend anybody,

 7    although reading blogs I understand I have, but that's my job

 8    and I did that.

 9          I expect it to be followed, and if it comes to my

10    attention that it is not followed, I will treat it seriously and

11    take serious action.  I talked with members of the PLC and they

12    suggest that I need not put out any rules or regulations to

13    enforce that, they currently feel that the opinion is clear and

14    that people will follow it.  But if it comes to my attention

15    that that hasn't been followed, then I will be offended and I'll

16    take appropriate action.

17          Next item on the agenda, the lien administrator.

18          MR. HERMAN:  Your Honor, if I may, I'd like to note in

19    connection with your Honor's comment about your Honor's opinion

20    regarding fees and your ruling, that there have been no

21    reduction or withholding of any common benefit costs or fees

22    from the interim payment.  And after your Honor makes a ruling

23    as to common benefit and fees, they will come out of the last

24    payment.

25          THE COURT:  Okay.
```

```
 1              MR. HERMAN:  Your Honor, there is a matter, two

 2     motions, Document No. 15702 and 15857, regarding healthcare

 3     providers who have not complied with requests for records.  That

 4     matter is set for argument today.  Your Honor, it might be to

 5     your Honor's, for your Honor's view something that should be

 6     postponed until after this conference because it may take some

 7     time.

 8              THE COURT:  Okay.  I'll do that.

 9              MR. HERMAN:  Thank you, your Honor.

10              With regard to the lien administrator, Mr. Matt

11     Garretson, he is here, has a report to make.

12              THE COURT:  Mr. Garretson called to my attention last

13     week that Texas was one of the only states that had not

14     complied.  I contacted Texas and talked with them, or their

15     representatives, and I think that they understand the

16     significance of the matter and I think Mr. Garretson has their

17     attention and I hope that will resolve it.  So keep me in the

18     loop if it doesn't.

19              MR. GARRETSON:  I will, your Honor, thank you.  Your

20     Honor, I am Matt Garretson with the Garretson Law Firm to give

21     you a brief report this morning on the lien resolution process.

22              I really wanted to focus today on just two issues

23     which are two common questions we're hearing from primary

24     counsel and claimants who are phoning the lien resolution

25     administrators call center.  One is why there may be holds
```

1   placed on certain claims by the lien resolution administrator at

2   this time; and the second issue is an issue that attorneys have

3   asked whether or not they need to do anything to help perfect

4   these liens and insure that the federal and state agencies are

5   paid.  And so I'll address those shortly just so there is more

6   instruction available.

7        Let me just start by saying our primary focus right now

8   has been to get waves of data to the federal and state agencies.

9   Because of the way in which we're coordinating this with 54

10  agencies, we try to only send three to four waves of claims data

11  during any settlement program.  The states and the federal

12  government would simply be inundated if we tried to do this on a

13  piecemeal basis.  And of course, part of the reason they've come

14  to the table to embrace these process of protocol is because

15  we've assured them it will be efficient and we need to stay true

16  to that commitment.

17       So we sent the first wave of claim data to, for

18  instance, to Medicare in early February, we sent the second wave

19  in June, and we still have a wave of around 10,000 that have yet

20  to be able to be sent to the Centers for Medicare and Medicaid

21  Services.  Of this, approximately 7,000 have yet to be sent

22  because our instructions have been to hold them because they

23  have not claimed a compensable injury, it's not marked as an

24  ischemic stroke, MI or SCD claim.  So those are, of course,

25  being held.

1        There are 3,000 that have not been sent in those first

2    or second waves because we did not have sufficient data to send

3    to the Centers for Medicare and Medicaid Services, and that

4    would be because those claims were submitted to the claims

5    administrator without a social security number or date of birth

6    or both.

7        With respect to those who are pro se, we're taking a

8    little extra effort with those and working with BrownGreer to

9    devise a plan to make sure we contact all of those pro se

10   plaintiffs so we can get their information just as soon as

11   possible to hit this third wave of data.  And of course we're

12   working to get these deficiencies corrected from primary

13   counsel.

14       But I did want to point that out because it shows that

15   there is, in fact, a ripple effect of these deficiencies and it

16   will take, once we get this next group into the hands of the

17   agencies, it could take them 30 or 40 days to respond to us with

18   who is entitled so we can apply these procedures and protocols.

19       So that, your Honor, is just a quick update with

20   respect to Medicare.  The same is true with Medicaid, we still

21   have to get that third wave of data out.  So there are going to

22   be attorneys or claimants who see that their claim is on hold,

23   it's a small percentage, but that will explain or hope will help

24   explain why certain claims are on hold.

25       Brief note on claims data with respect to Medicaid.  We

1   are now, as I mentioned in the last hearing, in the process of

2   getting claims data back from these states.  The states have

3   been very responsive.  We have received claims paid data from 23

4   agencies associated with that first wave of data and about a

5   dozen associated with that second wave of data.  This, of

6   course, is several thousand individual lien files, which include

7   these individuals' entire claims medical history, not from a

8   medical records standpoint but from a billing standpoint, which,

9   of course, will be the bulk of the materials we review to

10  finalize these Medicaid liens.

11          I did want just to point out that we will, we expect to

12  receive the entire claims files for all of the claimants that

13  have been submit to the state agencies within 60 days.  So

14  everything is running very smoothly with respect to that issue.

15          We will not be able to finalize liens because we are

16  getting a lot of phone calls with people asking, I understand

17  you have this hold back of 15 percent or 20 percent in this

18  state and I want to understand what my claimant's final lien

19  amount would be.  And we're just not simply able to finalize

20  that and I think it's important for people to know until they

21  have a fully audited claim through the claims administration

22  process.  That is a condition precedent to us finalizing a lien.

23          The only other issue I wanted to bring to the court's

24  attention is we're getting a lot of questions from counsel that

25  they received the notice of points award and they see that there

1  is a hold back in place for the Medicaid lien and a dollar

2  figure denominated for the Medicare reimbursement claim.  And

3  some of the attorneys are mistakenly withholding that amount

4  from the money they are receiving.  And I just wanted to assure

5  everyone that with respect to federal Medicare and with respect

6  to the state and territory Medicaid obligations, we are, in

7  fact, working with BrownGreer to hold that money back to ensure

8  those state and federal agencies are paid and there is nothing

9  with respect to those two federal programs that counsel needs to

10 do.

11        Finally, with respect to the other governmental liens

12 which are within our assignment, Veterans Administration or

13 V.A., Tri-Care or Department of Defense, or Indian Health

14 Services, we did get a big spike of activity early on in the

15 program where counsel was giving to us any notice that they had

16 received directly or any notice that their clients had received

17 directly.  I just want to remind everybody that with respect to

18 those programs, not the federal Medicaid and state Medicaid

19 where we were affirmatively work with them to verify who has

20 benefits.  With these other programs, the V.A., the Tri-Care,

21 the Department of Defense and Indian Health, we can only respond

22 and satisfy that obligation if counsel tells us of the notice

23 they've received.  So I just want to encourage people to not, as

24 busy as everyone is, to make sure they keep that process going

25 of notifying us when they, in fact, receive notice from those

1    other agencies.

2            So in sum, your Honor, I am pleased to report I believe

3    we're where we need to be.  I think your assistance is greatly

4    appreciated with Texas.  I know from hearing from them they're

5    very committed to this program as well.  And obviously thanks to

6    BrownGreer for all of their help in getting us the data we need.

7            THE COURT:  Okay.  Thank you very much.

8            The next item was special and deputy special master.

9    I met with the special master this morning early and he's filled

10   me in on the present status of it, and in short, they're waiting

11   to be called, if necessary, on the appeal and they have their

12   programs and they're ready.  At this time there is nothing else

13   to report.

14            State court trial settings.  Anything?

15            MR. HERMAN:  There is nothing, no trials set, your

16   Honor.

17            And under the next issue, class actions, those

18   matters, motions are under advisement.

19            THE COURT:  Discovery directed to third parties,

20   anything there?

21            MR. HERMAN:  Yes.  With respect to ESI, your Honor,

22   and the furnishing of pharmaceutical records, Ms. Lynn Greer

23   reported to you earlier today the problem that ESI and others

24   have with regard to releases from claimants who are deceased.

25   And we're working on an order that your Honor has suggested for

```
 1    your Honor to review.

 2             THE COURT:  My suggestion is that you consider an

 3    order from the court ordering ESI and similarly situated

 4    individuals or entities to send that in to the court, directly

 5    into the registry of the court, and I'll keep it under seal and

 6    protect them from the standpoint of their concerns of privacy.

 7             MR. HERMAN:  Mr. Arnold Levin will work with

 8    BrownGreer to have such an order for you, to be recommended to

 9    your Honor.

10             THE COURT:  Okay.

11             MR. HERMAN:  With regard to pro se claimants, Claudia

12    Santoyo is here on behalf of Mr. Johnson, who I understand is

13    having a second honeymoon.

14             THE COURT:  Okay.  There is a State/Federal

15    Coordination.  Any State Liaison Committee meeting?

16             MR. HERMAN:  Oh, excuse me, did I miss that?

17             THE COURT:  Yes.

18             MR. HERMAN:  I did, I'm sorry.

19             MS. BARRIOS:  Mr. Herman.

20             MR. HERMAN:  I don't know how I missed that, Dawn, I

21    apologize.

22             MS. BARRIOS:  Apology accepted.  Good morning, your

23    Honor, Dawn Barrios for the State Liaison Committee.  I've

24    provided the parties and your Honor through your law clerk with

25    updated CDs -- I'm sorry, DVD's on the remands.  We are looking
```

1    at still over 700 remand cases, and as I explained to your

2    Honor, we are changing the paradigm and not looking so much at

3    cases as claimants to determine if any of these remands will

4    remain an issue for your Honor after the conclusion of the

5    program.

6           I wanted to give your Honor one statistic that I

7    thought was incredible:  Missouri, the state of Missouri had 117

8    cases that had remand orders in them, or remand motions rather.

9    Those 177 (SIC) cases had 1,298 plaintiffs.  So it's an

10   incredible job to go through each of these claimants and it's

11   very deceiving if you look at just the number of remands there.

12          But with the assistance of BrownGreer, particularly

13   Bill Atkinson who has been helping us tremendously with this

14   project, we're happy to say that we're through half of the

15   states now, and that's the paperwork that I've provided with

16   everyone this morning.

17          We expect that we should be finished all of the states

18   by the end of the year, and especially given the extensions of

19   time will have concrete numbers for you we hope then.  Also,

20   Mr. Johnston's office has been helping us because we're running

21   into many pro se plaintiffs and they don't know what to do with

22   their motions to remand.

23          Your Honor, my second item of business regards your

24   appointment as a coordinator of the AG cases in the particular

25   common discovery.  I wanted to report to the court that all is

1    going well, that we have had a very large conference call on

2    September 11th with all defense counsel and most of the AG's

3    participated.  We agreed to exchange letters to spell out the

4    exact discovery we thought would be undertaken, we did that last

5    Friday, and we're to set up another meet and confer with Merck.

6    So I wanted to report to you that that is going along well.

7           One issue that I bring to your attention, reviewing all

8    of the discovery that the attorneys for the Attorneys General

9    have given to me, it's apparent that there may not be any common

10   discovery.  Everything is really state specific.  So I just

11   wanted to raise that issue with you.  We have undertaken a

12   review of the allegations and causes of action in each of the

13   AG's cases, shared that information with Mr. Seeger and

14   Mr. Davis, and we're trying to see if there's any grouping

15   that's possible pursuant to your Honor's request a couple of

16   status conferences ago.

17          THE COURT:  Some of the things that I see

18   opportunities from the standpoint of the attorney generals.  We

19   have now approximately 30 million documents that have been

20   produced by Merck.  The 30 million documents are generally

21   housed in the document depository of the plaintiffs.  I have

22   decided 1,000 motions, discovery motions.  It just seems to me

23   that there's a lot of material that's available and a lot of

24   decisions have gone out on these documents.

25          That material, it seems to me, the Attorney Generals

1    can benefit from that material and they also can benefit from

2    some of the rulings that I made rather than have to re-urge

3    rulings, particularly rulings where they've already won, or

4    their side has won.

5           The benefit of having the 30 million documents, which

6    would fill up this room, in an organized, searchable way in a

7    document depository is an enormous opportunity.  If they get

8    even new documents, 30 million documents that are disorganized

9    that they have to organize and put in some searchable format, it

10   will be ten years before any of them are able to try their case.

11          So before they march off or try to march off back to

12   their home states, they ought to look around to see the

13   opportunities before they do that.  Now, if they say we don't

14   need them then I understand that.  But even if there's not some

15   commonality in issues or law, there may well be some commonality

16   in general causation and things of that sort that they can

17   profit from.  And it just makes sense to me money wise as well

18   as time wise that they look over what has taken place in the

19   last three years in this court.

20          MS. BARRIOS:  Your Honor, perhaps I gave a

21   misimpression to the court and counsel.  The attorneys for the

22   AG's are very interested in that material and they've been

23   talking to Mr. Seeger weekly about access to it, so that's not

24   the issue.  They want to take advantage of the material that's

25   already been produced in a searchable format and the trial

```
 1   package, and they recognize your Honor's and all counsel's work
 2   in the area and they are certainly not turning that down at all.
 3            THE COURT:  Right.  And I understand there's costs
 4   involved, but I can handle that, just bring that to me if there
 5   is a problem and I can handle that.  And it ought to be some
 6   economy or scale.  It's one thing if you have 50 Attorney
 7   Generals wanting this material as opposed to one Attorney
 8   General wanting this material.  It may work out if one Attorney
 9   General wants the material the cost may be the same amount that
10   if 50 do it.  If they do it each separately, then it looks to me
11   like it might be 50 requests as opposed to one request.  So
12   that's a potential problem.
13            MS. BARRIOS:  Yes, your Honor.  And I'll pass that
14   word along.
15            And the third matter that I report to you on are the
16   economic loss cases that are still standing after the
17   announcement of the fabulous settlement.  Those are contained on
18   your DVD's.  We have sections on consumer protection, the third
19   party payor, and medical monitoring.
20            THE COURT:  Okay.  And I do appreciate all of the work
21   that you've been doing, and you need to know I appreciate what
22   you've done with the Attorney Generals.  I know that that is a
23   thankless task, but it's at my request that you've done that and
24   I appreciate it.
25            MS. BARRIOS:  Thank you, your Honor.
```

1          MR. HERMAN:  Your Honor, if I might, I want to also

2     echo what your Honor said and thank Dawn for her work and also

3     Chris Seeger on behalf of the committee you've appointed.

4          I do want to make a couple of things clear.  From the

5     PSC's point of vantage, the 30 million documents are there,

6     they're in a searchable fashion.  We have more than a dozen

7     computers available, we have personnel there that can answer

8     questions.  We don't have a problem with the AG's coming in and

9     doing their own search and if they want to tell us what they

10    want put on a disc, we can even arrange to do that at their

11    cost.

12         Mr. Meunier and Mr. Rafferty were cochairs of our trial

13    package committee.  That offer does not include the trial

14    package.  The trial package contains substantial information

15    that's not public as well as information which is public, and we

16    would at some point, if that matter cannot be negotiated, may

17    come to your Honor with a representative of the AG's to, should

18    they want access to the trial package, for some determination by

19    you.  And I think that that really, those issues handle Item 14,

20    XIIII at page 11.

21         So I want to go back now with your Honor's permission

22    to page seven -- I'm sorry, to page nine and Claudia Santoyo

23    from Mr. Johnston's office is here with us.  Claudia.

24         MS. SANTOYO:  Thanks.  Good morning, your Honor.  I am

25    here to make the sixth report of the curator and basically to

1    give you the highlights of the report that was filed yesterday.

2         Essentially we have now completed 273 total legal

3    notice publications.  We believe that this may be the total

4    number of publications that will be needed.  There are still

5    nine newspapers who will refuse to publish both the first and

6    the last name of a claimant.  They will only will publish the

7    last name citing some sort of privacy concern, although they

8    can't explain to me what.  So we are working with those

9    newspapers and if we're not able to go through them, we will do

10   a publication more regional or nationally to assure that the

11   information gets out.

12        We have gotten quite a number of responses coming in,

13   especially recently, from the legal notice publications.  And we

14   are communicating with both the claims administrator and counsel

15   for Merck to inform them of the updated information, as well as

16   resending registration and enrollment packages to the people

17   that request it.

18        The 900 claims that Mr. Marvin mentioned earlier, the

19   approximately 900 claims that are not yet enrolled, of that

20   number I believe 115 are pro se claimants, 16 of which are

21   actually plaintiffs in their own litigation, the rest of which

22   are tolling claimants.  We have received a list from

23   Mr. Marvin's office of those people and their most recent

24   addresses, some of them have already contacted our office and

25   have been sent registration enrollment packages.  The remainder

```
 1   we will be sending another mailing next week to assure that they
 2   understand that October 30th deadline is right around the corner
 3   and that they need to make all haste to attempt to get their
 4   enrollment completed.
 5          I would like at this time to point out especially the
 6   efforts of BrownGreer and in more particular Diann Bates and
 7   Ms. Tamera Blankenship who have been of great assistance in
 8   getting repeat sending of some duplicate documents that pro ses
 9   misplace or neglect to submit back to the claims administrator
10   in the appropriate fashion.
11          We're also, as Ms. Barrios stated, conferring with her
12   office to resolve any issues with pro se remands, as some of
13   those claimants maybe are not aware yet of their ability to take
14   part in the settlement program.  We are working with her office
15   and we will continue to do so and should have some more
16   information on that by the next status conference.
17          Additionally, we have received quite a number of
18   contacts and inquiries from attorneys seeking to withdraw under
19   Pretrial Order 36 who are attempting to comply with the
20   requirements and attachments thereto.  As those have come in, we
21   are reviewing our records, both in hard copy and the online
22   version.  I do need to note that a few attorneys have contacted
23   us this week or during the evacuation for Gustov where we lost
24   approximately 11 days of working time, and as a result there may
25   be some attorneys who are awaiting a response that, you know, we
```

1   would ask that they notify the court in some way if they're

2   going to be late because they're waiting on a response from us.

3   We are turning them around as quickly as possible, but we did

4   want to note that delay.

5        Additionally, we've been assisting pro se litigants and

6   claimants who have had difficulty getting medical records or

7   difficulty getting documents to prove their representative

8   status.  Part of that process has been using the pleadings and

9   other filings and orders that have been filed in the record.

10  Some of the pro se claimants have been successful by taking, for

11  example, the order in Mr. Ranier's case where your Honor

12  compelled several medical providers to show cause why they

13  should not be in contempt.  They used the order from that

14  litigation in order to facilitate the provider to provide them

15  records promptly without the need to actually file anything with

16  your Honor.

17       There are some subpoenas that I believe have been

18  issued by pro ses, and we're dealing with the attorneys directly

19  who have called with questions about that.

20       Lastly, we are making every effort to contact any

21  remaining claimant who may have registered but not yet completed

22  enrollment to make them aware of this October 30th deadline and

23  that it cannot be extended.  We assure every caller knows that

24  information when we either receive or return a call.  We will

25  continue to keep the court and the parties and the claims

1    administrator advised if we learn of any claimant who has chosen

2    not to take part in the settlement program proactively.

3         We understand that soon after the October 30th deadline

4    Merck will likely move to dismiss any of the pro se claims that

5    were not enrolled as of that time.  I'm sure before then we will

6    receive a date and that date will again be communicated to any

7    individuals who have not yet enrolled or who have not responded

8    to our request for information.

9         Essentially all of the publications, save the nine that

10   I mentioned, have been done.  We continue to receive new

11   requests and new registration materials.  When we get a

12   registration we have encouraged and facilitated the affidavit to

13   be either faxed or e-mailed to the claims administrator, and

14   they have been extremely helpful in turning around sometimes

15   within mere minutes an enrollment package to those newly

16   registered claimants so that they have the opportunity to get

17   their forms completed by the deadline.  So essentially I'd

18   really like to thank the claims administrator's efforts in that

19   regard.

20        With the online communication log, we are still

21   uploading our information.  We received quite a number of calls

22   per day and over the weekend, so much so that I accept them on

23   my home phone, on my cell phone.  I give out the number to

24   anyone who calls so that we don't get a backlog in come in

25   Monday morning with some 90 voice mails.  But as a result of the

1    sheer number, we've only uploaded through the middle of June the

2    contacts and claims.  So if you believe that your claimant may

3    have contacted us, especially this is directed to attorneys who

4    are seeking to withdraw, please send us an e-mail or call our

5    number and contact information is on the court's web site, and

6    we will go through our hard copy documents to assure that we can

7    tell you definitively whether or not your claimant contacted our

8    office.

9            And I believe that's all that we need to report at this

10   time.  We will continue as such and be prepared for the next

11   conference.

12           THE COURT:  Okay.  Thank you very much.  And thank you

13   for your work.  I've made every effort to contact pro se

14   claimants, it's a very important part of the process.  But if

15   they do not respond then I am going to have to act accordingly

16   and dismiss their case.  But your work is very vital to the

17   process and I appreciate it.

18           MS. SANTOYO:  Thank you, your Honor.

19           THE COURT:  Merck's motion is the next item on the

20   agenda, ten.

21           MR. MARVIN:  Yes, your Honor, there is no change

22   there.  Those motions have been submitted under advisement.

23           THE COURT:  How about issues relating to Pretrial

24   Order No. 9, item 11?

25           MR. HERMAN:  Nothing new there, your Honor.

 1          THE COURT:  Vioxx suit statistics, anything there?

 2          MR. MARVIN:  No, your Honor.  Next month we will be

 3   releasing the new statistics.  September 30th is the end of the

 4   quarter, and so we will be releasing those in mid October.

 5          THE COURT:  We covered the trial package and third

 6   party payor cases.

 7          MR. HERMAN:  Yes, your Honor.

 8          THE COURT:  And the next item is the motion to dismiss

 9   foreign individual cases, that's under submission.

10          MR. HERMAN:  Yes, your Honor.

11          THE COURT:  All right.  Determination of tolling

12   agreement is the next item.

13          MR. MARVIN:  Your Honor, the notice period for

14   termination of the tolling agreement has now passed and the

15   tolling agreement has been terminated.

16          THE COURT:  Let's make sure that's on the web site.

17   Third party payor motions.

18          MR. HERMAN:  Yes, your Honor.  On September 11th of

19   this year AvMed third party payors filed in the Fifth Circuit.

20   The Fifth Circuit has, United States Fifth Circuit Court of

21   Appeals has now asked for designations.  And I don't believe

22   there is anything to address in that regard.  But Monique,

23   you're here, you may want to discuss that.  Ms. Garsaud will

24   speak to the court on that.

25          MS. GARSAUD:  Good morning, your Honor, Monique

1   Garsaud on behalf of BrownGreer and U.S. Bank.  Just to update

2   the court, as you know the AvMed suit is on appeal with the

3   Fifth Circuit.  They have filed their brief as of this week, our

4   briefs are due I believe, the exact date is October 9th.  The

5   Fifth Circuit has asked the parties to work together because of

6   the voluminous size of the record to work together to pare that

7   down to something reasonable that they can review.  So we are,

8   in fact, working with counsel for AvMed to do that and that will

9   be submitted this week.

10          THE COURT:  Okay.

11          MS. GARSAUD:  Thank you, your Honor.

12          THE COURT:  All right.  Thank you.

13          MR. HERMAN:  And, your Honor, I would like to thank

14  Chris Seeger and Arnold Levin, Ed Blizzard and those that have

15  met with third-party payors in an attempt to resolve matters,

16  and sorry to report no headway has been made in that regard.

17  But we are still open to discussions should they wish to

18  initiate them.

19          THE COURT:  Next item is Merck's motion to dismiss

20  cases of non-registrants.

21          MR. MARVIN:  Yes, your Honor.  There were a number of

22  claimants who failed to abide by the court's order to register

23  their claims.  Merck moved to, of course, show cause as to why

24  those claims have not been registered and the court granted that

25  motion and dismissed those claims.

```
1           THE COURT:  Right.  The next item is the Greater New
2    York Benefits Fund.
3           MR. HERMAN:  Yes, your Honor.  Arnold Levin will
4    address that for plaintiffs, but Mr. Marks is here.
5           MR. MARKS:  Good morning, your Honor.
6           THE COURT:  Good morning.
7           MR. MARKS:  Andrew Marks on behalf of the self-funded
8    ERISA plans.  Your Honor, we're asking the court to undertake
9    three actions this morning.  The first, as the court knows,
10   correspondence has been sent.  There is a motion to dismiss
11   pending filed by the law firms.  There's never been a response
12   of any kind by BrownGreer to the amended complaint, I assume
13   they're going to join with the motion to dismiss, but we would
14   ask the court to promptly set a hearing date so we can get that
15   motion to dismiss heard.
16          MR. LEVIN:  If I remember the motion to dismiss, it
17   tracks our response to the preliminary injunction, that being
18   that there is no cause of action.  I don't know that there's
19   necessarily a need for a hearing after Mr. Seeger argued the
20   injunction, and I would say that we should just submit it to the
21   court for the court's ruling.
22          THE COURT:  I don't have any problem if BrownGreer
23   doesn't have any problem on it because I don't think that they
24   were heard on that.
25          MS. GARSAUD:  No, your Honor.  Actually we are filing,
```

1    we are preparing basically a "me, too" brief to adopt the NPC's

2    motion to dismiss some of the arguments made.

3          But before we do that, our first position though, your

4    Honor, is that you've already ruled on the motion to dismiss.

5    You issued a minute entry, I have it, it's dated July 24th that

6    says NPC defendant's motion to dismiss and strike class

7    allegations in the complaint granted with written reasons to

8    follow.

9          So our first position is that you've already ruled on

10   this, we are just waiting for your written reasons.  But if you

11   haven't ruled, then we will be filing a "me, too" brief.

12         MR. MARKS:  Can I?

13         THE COURT:  Sure, go ahead.

14         MR. MARKS:  I would like to address the first point,

15   your Honor.  On page four of the transcript of the hearing

16   July 24th the court identified the three motions that you were

17   hearing, it was the TRO, preliminary injunction, the class

18   action motion and the severance motion, there was no mention

19   made of the motion, the 12(b)(6) motion.  Then again, your

20   Honor, on page 2 of your August 7th opinion you said you were

21   denying the preliminary injunction motion and you would issue a

22   separate order regarding the severance and the class action.

23   Again there was nothing regarding the motion to dismiss.

24         We then wrote to your Honor on August 22nd with

25   respect to calling to the court's attention that there was a

1    motion to dismiss, we want to move the case forward.  There was

2    no objection by BrownGreer at that point in time.  And, in fact,

3    the response by Mr. Davis was, yes, there is a motion to dismiss

4    pending, let's talk about getting it set.

5           There is nothing in the record -- it is true, your

6    Honor, that the minute order which you entered reflected that

7    the motion that was, that you ruled on which was class action

8    and it also included the words motion to dismiss, but your Honor

9    I'm sure will recall there was no ruling at all on the motion to

10   dismiss.

11          If we're wrong, if the court did rule on the merits,

12   then we would ask the court to promptly enter an order so we can

13   pursue our appellate rights, including that.

14          THE COURT:  Sure.

15          MR. MARKS:  But we think, your Honor, particularly in

16   light of the court's repeated statements recognizing that there

17   was a timing issue that led you to deny the preliminary

18   injunction but recognizing that at least with respect to plans

19   where there is a proper plan language that there is a lien

20   right, that it's hard to imagine this court would have ruled

21   based on the argument before you then on the merits dismissing

22   as a 12(b)(6) motion but.

23          So our view is we would like to respond in writing

24   since the motion that was addressed was not addressed to the

25   amended complaint.  We think the court would benefit from

1    hearing from us, we would welcome that opportunity.  Obviously

2    that's in the court's discretion, but one way or the other with

3    respect to the merits of the case, we would like to know are we

4    going forward or not.

5            THE COURT:  Let me take a look first at the class

6    actions, I should be able to get that out this weekend and I'll

7    write and I'll send that to you all and see where we are with

8    that.  I think that seems to me to be the right way to do it.

9            MR. MARKS:  Certainly, please.

10           MR. LEVIN:  Your Honor, I would just take exception to

11   his arguing individual plans when he brought a class action and

12   never identified the individual plans, that's why I think your

13   Honor is correct in ruling on the class first.

14           THE COURT:  I think we need to first deal with the

15   class and see where we are at that point one way or the other

16   with the class.  If you've got a class action then we'll deal

17   with the individuals.  If you don't, we will have to look at

18   that.

19           MR. MARKS:  Well, we have two named plaintiffs, your

20   Honor, there is no doubt, I am not sure what Mr. Levin is

21   talking about.  They intend to pursue their claims, they have

22   stated claims.  And irrespective of how the court rules on the

23   class action, those are the claims that we're talking about

24   moving forward.

25           MR. LEVIN:  They are barred by the merits of the

 1    preliminary injunction ruling.

 2              MS. GARSAUD:  Right.

 3              THE COURT:  I do understand the issue, I really do,

 4    I've been down this road a couple of times.  Let me look at

 5    class actions and I'll deal with the others, with that other

 6    issue.

 7              MR. MARKS:  Okay.  There are two other issues, your

 8    Honor.

 9              THE COURT:  Okay.

10              MR. MARKS:  One related to the class action, which if

11    we submitted a proposed order, the court said from the bench

12    that you did not look favorably on our class allegations.  We

13    asked -- there was no ruling except what the court expressed a

14    view that you were writing an opinion.

15              THE COURT:  Right.

16              MR. MARKS:  And we would ask the court, we proposed an

17    order to the court, it sounds like the court is going to issue a

18    written opinion in the next couple of days?

19              THE COURT:  I will, yes.

20              MR. MARKS:  So we don't need to press you for entry of

21    an order, we'll get that?

22              THE COURT:  No, right, I will get that out for you.

23              MR. MARKS:  Great.  And secondly, your Honor, or

24    thirdly I should say, we've asked for a discovery conference to

25    move forward on the claims of the two named plaintiffs, and the

1    rules are clear that the pendency of a Rule 12(b)(6) motion does

2    not stay the parties' obligation under 26(f) to confer.  We've

3    sought to do that in good faith, we would like to do that and

4    pursue that and then present to this court under Rule 16 should

5    present a scheduling order.

6              So again, we would like to move that forward.  We

7    believe we have a claim on the merits, we want to pursue the

8    discovery, and we would like to do that in an orderly process,

9    your Honor.

10             MR. LEVIN:  If the case is dismissed there is no

11   discovery.

12             THE COURT:  Let's see where we are at the end of the

13   class action opinion and I will get with you all, I will set a

14   status conference.

15             MR. MARKS:  Would you do that, your Honor, I think

16   that would be helpful.

17             THE COURT:  Yes, I will do that in the next couple of

18   weeks, ten days or thereabouts I'll get you all together and

19   talk about it.  I can do it on the phone, I'll set a status

20   conference up.

21             MR. MARKS:  Whatever is convenient.

22             THE COURT:  And we'll see where we are.

23             MR. MARKS:  Great.  Thank you, your Honor.

24             THE COURT:  Okay.  Thank you.

25             MR. MARVIN:  Your Honor, a number of plaintiffs have

1    moved to withdraw from representation of the client because the

2    client cannot be located or is non-responsive.  This is Item 20

3    on the agenda, and Merck has moved or filed a cross motion with

4    respect to those same claims where the plaintiffs cannot be

5    found to dismiss those claims for failure to prosecute.

6              THE COURT:  I think I have dismissed those; but if

7    not, I will be doing so.

8              MR. MARVIN:  And then, your Honor, Item 21 there,

9    there are a number of plaintiffs who have failed to comply with

10   the discovery requirements set forth in PTO 28.  We have filed a

11   motion to show cause why those cases should not be dismissed.

12             THE COURT:  Let me set that motion to show cause on

13   October the 15th.

14             MR. MARVIN:  Thank you, your Honor.

15             THE COURT:  And we will do that at 9 o'clock and I

16   will put the notice out.

17             MR. MARVIN:  Thank you, your Honor.

18             THE COURT:  Anything on Decision Quest?  I think we

19   discussed that.

20             MR. HERMAN:  May it please the court, we recognize

21   Mr. Miles Clements of this bar who represents Decision Quest and

22   is in the courtroom.  We've asked this matter be deferred, we've

23   attempted to set up a mutual meeting, we're in the process of

24   doing that.

25                 In the meantime the PSC, the PNC and the PEC have to

1    be coordinated, and during our PEC meeting yesterday the

2    consensus was that the attorneys that actually tried the 18

3    cases in state court and the MDL be surveyed as to what

4    materials Decision Quest provided, what the billings were, et

5    cetera, and what the payments were and that all of this be done

6    under seal.  We will also at the same time the same inquiry to

7    Mr. Clements so that he can contact his clients, we'll have a

8    meeting, and then at your Honor's next status conference the

9    matter will either be resolved by then or we'll ask your Honor

10   for your Honor to deal with it.

11          THE COURT:  Okay.

12          MR. HERMAN:  Your Honor's requested that liaison

13   counsel respond with respect in a letter form regarding the

14   Decision Quest controversy, and we respectfully ask that that

15   matter be deferred until we can go through this process.

16          THE COURT:  Okay.  All right.  Anything else on the

17   agenda, anyone have anything else on the agenda?

18          MR. HERMAN:  That's it.

19          THE COURT:  Okay.  The next meeting, October the 17th,

20   9 o'clock, I'll meet in open court; 8:30 I'll meet with the

21   liaison counsel.

22          MR. HERMAN:  Your Honor, there are two post status

23   conference motions to show cause regarding medical records to be

24   heard, one filed by our firm and one filed by Ms. Sanford, and I

25   don't think there's been any opposition.  And Mr. Davis will

1   address the court when the court is ready to hear that.

2           THE COURT:  Why don't we take that.  What's the

3   problem, Lenny?

4           MR. DAVIS:  Good morning, Leonard Davis from the law

5   firm of Herman, Herman Katz and Cotlar.  I am here in connection

6   with two motions, one by our firm regarding certain plaintiffs'

7   motion to show cause why certain medical record providers should

8   not be held in contempt for failing to comply with Pretrial

9   Order No. 35 and requests made for the production of medical

10  records.

11          In a similar motion that I've been asked to assist

12  Shelly Sanford, her firm filed and unfortunately due to the

13  hurricane she is not able to be here today but asked if I would,

14  with the court's permission, be allowed to go forward and argue

15  that motion.

16          With respect to the Herman, Herman, Katz and Cotlar

17  motion which relates to Case No. 05-4416, Case No. 05-0903, Case

18  No. 06-4468, Case No. 07-7078, Case No. 05-0859, Case

19  No. 05-4422, Case No. 05-4450 and Case No. 05-6215.  There are a

20  number of claimants, and I can provide to the court a packet of

21  material, if I may.  There are a number of claimants identified

22  in that motion and a number of providers who have outstanding

23  medical requests.  Basically they are broken down into four

24  categories.  There are some providers who have had no contact

25  with us despite being mailed, pursuant to the court's

1    directives, a copy of the motion, and we do not have any

2    responses from those providers.  They're listed on the sheet

3    that says outstanding medical requests.  We have not received a

4    response from those providers, and we would request that they be

5    forced to provide the records or held in contempt as the court

6    deems appropriate pursuant to the motion.  That's one category

7    and there are a limited few of those.  And again that's

8    identified on that sheet.

9         With respect to some of the providers who have asked

10   for a different authorization, in other words, they have not

11   accepted that the court issued Pretrial Order 35 or they don't

12   recognize Pretrial 35 applies to them, we would request that the

13   court give some guidance further or hold those providers in

14   contempt for failing to comply with Pretrial Order 35.  That's

15   the second category, and again, on that list those are

16   identified.

17        With respect to the third category, there are a number

18   of providers who require death certificate or state papers or

19   something like that, and again that's identified on the list.  I

20   believe your Honor's previous comments regarding the order

21   similar to ESI should provide some assistance in that regard,

22   and I would hope that that order will be sufficient for those

23   providers.  We have had communication with those providers and I

24   think that once they receive an order from the court, if it's so

25   inclined to issue that order, then that category should be

1    satisfied.

2          The fourth are providers who claim that they're in the

3    process.  I would suggest that the be pushed off until a later

4    date because we expect that we will be getting documents from

5    those providers.

6          And that should take care of all of them, except

7    there's 1 or 2 where mail was returned and they didn't get

8    response.  And again, those are identified on here, and we will

9    attempt to communicate further with those, one of them being or

10   two of them actually being facilities that as a result of

11   Katrina here in New Orleans they were shutdown and we sent the

12   mail to them expecting that it would be forwarded to the

13   appropriate Eckerds or Winn-Dixie or K-Mart or whatever it was.

14   But we will follow-up on those and try to make better service on

15   those.

16         And that's the extent of that motion, your Honor.

17         THE COURT:  All right.  With respect to the first

18   providers in which there has been no response, I am going to

19   issue a Rule to Show Cause by October 15th why they should not

20   be held in contempt of court and required to pay $1,000 a day

21   until the records are received.  I'll give them an opportunity

22   to contact you and present the records.  If they don't do so,

23   I'll enforce it and it will be required to pay $1,000 a day

24   until they do deliver the records.

25         With respect to the second and third providers,

1    prepare some order consistent with what I said about delivering

2    the material in the registry of the court, particularly with the

3    death certificates and the representatives.  Something of that

4    sort can also be done with the second grouping, too.  I think

5    that if I can give them some comfort as to privacy and

6    confidence that they are not going to get sued for delivering

7    materials for failure to file some particularly detailed

8    request, I'll do so.  But you need to give me a list of those

9    individuals and talk with me about an order tailored to those.

10           But the first one, I will issue that, I'll require

11   them to show cause on October the 15th.  The others I will deal

12   with in the form of an order.  And the fourth grouping, I'll

13   give you enough time to talk with them.

14           MR. DAVIS:  I do want to point out to the court that

15   one of the parties mentioned in this motion is MediConnect.  I

16   have had a number of discussions with either representatives or

17   counsel from MediConnect, as early as this morning I had

18   communication with counsel from MediConnect, and I advised them

19   that I would advise the court that MediConnect is not a provider

20   of medical records.  They, in fact, are a gatherer and we have

21   been working with MediConnect and they have been involved and

22   hopefully they'll continue to assist in this process, but they

23   were concerned because of the motion and the implications that

24   they were, in fact, a medical provider.  And I just wanted the

25   record to be clear.

1        THE COURT:  Give me by today a list of the first

2    categories so that I can directly serve them with the rule.

3        MR. DAVIS:  Yes, your Honor.

4        Moving to the second motion, the Shelly Sanford or the

5    Sanford Pinedo, LLP motion.  This relates to Case No.

6    2:06-CV-08375 and 2:06-CV-219.  With respect to this motion, the

7    issue with respect to Wegman's Pharmacy has been resolved, so

8    that is not at issue.

9        The other is with respect to Rite Aid.  Rite Aid was

10   contacted by Court Record Research and Rite Aid was sent an

11   institution specific authorization form.  When Rite Aid was

12   notified of PTO 35, they stated that it would still not

13   necessary or that it would not provide the medical records and

14   it wasn't required to provide the records.  In further that it

15   had no proof that the plaintiff was deceased and was not

16   authorized to release the records.

17       Court Records Research thereafter sent Rite Aid a copy

18   of the death certificate and the affidavits of heir of the

19   surviving four children and Rite Aid complained that it couldn't

20   read the death certificates and a new one was sent.  Thereafter,

21   Rite Aid said that the only person who could sign for the

22   records was "the informant" who was listed on the death

23   certificate.  That informant was a police officer who arrives on

24   the scene after the death was reported and unrelated in any way

25   to the estate of the deceased.  Although Rite Aid was provided a

1    death certificate and an affidavit of facts concerning the

2    identity of the heirs of the decedent, Rite Aid continues to

3    refuse to release the records.

4         I believe that some guidance from the court might be

5    very helpful in this regard.  Again, that order regarding death

6    and heirship may also help, but Rite Aid has refused to provide

7    the medical records?

8              THE COURT:  Where is Rite Aid, here?

9              MR. DAVIS:  I believe they're in Texas in this

10   particular one.

11             THE COURT:  All right.  That's fine.  All right.  Get

12   that to me and I'll issue an order to them specifically on that.

13             MR. DAVIS:  Thank you, your Honor.

14             THE COURT:  Thank you.

15             MR. HERMAN:  Your Honor, since Ms. Sanford isn't here,

16   I want to reserve her firm's right to sue Rite Aid in the event

17   that they have an eligible claim that's been thwarted due to

18   their failure to comply with this court's order.

19             THE COURT:  Okay.  All right.  Anything further?  All

20   right, folks, thank you very much.  The court will stand in

21   recess.

22             THE DEPUTY CLERK:  Everyone rise.

23        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

24

25                         *  *  *  *  *  *

1

2

3                    REPORTER'S CERTIFICATE

4

5     I, Karen A. Ibos, CCR, Official Court Reporter, United States

6  District Court, Eastern District of Louisiana, do hereby certify

7  that the foregoing is a true and correct transcript, to the best

8  of my ability and understanding, from the record of the

9  proceedings in the above-entitled and numbered matter.

10

11

12

13     _____

14                    Karen A. Ibos, CCR, RPR, CRR

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25