```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2    ***********************************************************

 3
      IN RE:  VIOXX PRODUCTS              MDL No. 1657
 4    LIABILITY LITIGATION               Section: "L"
                                         New Orleans, Louisiana
 5                                       Friday, October 17, 2008

 6    ***********************************************************

 7
              TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
 8            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
 9

10
      APPEARANCES:
11
      FOR THE PLAINTIFFS
12    LIAISON COMMITTEE:               HERMAN, HERMAN, KATZ & COTLAR
                                       BY:  RUSS M. HERMAN, ESQ.
13                                          LEONARD A. DAVIS, ESQ.
                                       820 O'Keefe Avenue
14                                     New Orleans, LA 70113

15
                                       SEEGER WEISS LLP
16                                     BY:  CHRISTOPHER A. SEEGER, ESQ.
                                       One William Street
17                                     New York, NY 10004

18
                                       LEVIN, FISHBEIN, SEDRAN & BERMAN
19                                     BY:  ARNOLD LEVIN, ESQ.
                                       510 Walnut Street, Suite 500
20                                     Philadelphia, PA 19106-3697

21
                                       BEASLEY, ALLEN, CROW, METHVIN,
22                                     PORTIS & MILES
                                       BY:  ANDY D. BIRCHFIELD, JR., ESQ.
23                                     218 Commerce Street
                                       Montgomery, AB 36104
24

25
```

```
 1                                      BARRIOS, KINGSDORF & CASTEIX
                                        BY:  DAWN M. BARRIOS, ESQ.
 2                                      701 Poydras Street, Suite 3650
                                        One Shell Square
 3                                      New Orleans, LA 70139

 4
     FOR 08-3627 PLAINTIFFS:           KING, KREBS & JURGENS
 5                                      BY:  HENRY A. KING, ESQ.
                                        Place St. Charles, 45th Floor
 6                                      201 St. Charles Ave.
                                        New Orleans, LA 70170
 7

 8   FOR THE DEFENDANTS
     LIAISON COMMITTEE:                 STONE, PIGMAN, WALTHER, WITTMANN
 9                                      BY:  PHILLIP A. WITTMANN, ESQ.
                                            DOROTHY WIMBERLY, ESQ.
10                                      546 Carondelet Street
                                        New Orleans, LA 70130
11

12                                      WILLIAMS & CONNOLLY
                                        BY:  DOUGLAS R. MARVIN, ESQ.
13                                      725 12th Street, N.W.
                                        Washington, D.C. 20005
14

15   CLAIMS ADMINISTRATOR:             BROWN GREER
                                        BY:  ORRAN L. BROWN, ESQ.
16                                          LYNN C. GREER, ESQ.
                                        115 South 15th Street, Suite 400
17                                      Richmond, VA 23219-4209

18

19   LIEN ADMINISTRATOR:               THE GARRETSON LAW FIRM
                                        BY:  MATTHEW L. GARRETSON, ESQ.
20                                      7775 Cooper Road
                                        Cincinnati, OH 45242
21

22
     CURATOR FOR PRO SE
23   PLAINTIFFS:                        JOHNSON, HOEFER, HOLWADEL &
                                        ELDRIDGE
24                                      BY:  ROBERT M. JOHNSON, ESQ.
                                        601 Poydras Street, Suite 2490
25                                      New Orleans, LA 70130
```

```
 1
 2    FOR BROWNGREER AND
      U.S. BANCORP, INC.:              IRWIN, FRITCHIE, URQUHART & MOORE
                                       BY:  MONIQUE M. GARSAUD, ESQ.
 3                                     400 Poydras Street, Suite 2700
                                       New Orleans, LA 70130
 4

 5    SPECIAL MASTER:                  PATRICK A. JUNEAU, ESQ.
                                       1018 Harding St., Suite 202
 6                                     Lafayette, LA 70503

 7

 8

 9    Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
                                       500 Poydras Street, Room HB-406
10                                     New Orleans, Louisiana 70130
                                       (504) 589-7776
11

12

13        Proceedings recorded by mechanical stenography, transcript
      produced by computer.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2                 (FRIDAY, OCTOBER 17, 2008)

 3                  (STATUS CONFERENCE)

 4

 5          THE COURT:  Be seated.  Good morning, ladies and

 6   gentlemen.  Call the case, please.

 7          THE DEPUTY CLERK:  MDL No. 1657, in re:  Vioxx.

 8          THE COURT:  Counsel make their appearance for the record.

 9          MR. HERMAN:  May it please the court, Russ Herman for the

10   plaintiffs.

11          MR. WITTMANN:  Good morning, your Honor, Phil Wittmann and

12   Doug Marvin for Merck.

13          THE COURT:  We're here today for two reasons, one is our

14   monthly status conference which we have been having now since the

15   commencement of this litigation on February the 16th, 2005.

16          And secondly, after we deal with that, which we should be

17   able to do in a short order, we have an abbreviated meeting today

18   so that we can devote some time to the litigants and their

19   attorneys, who I've asked to come today.

20          We'll start with the monthly status conference.  Let me

21   hear from the parties.

22          MR. HERMAN:  May it please the court, Doug Marvin for

23   Merck will make the initial remarks regarding Item 1 on the agenda

24   and then introduce BrownGreer for a report.

25          THE COURT:  And I have received an agenda from the
```

1    parties, I've added to it, and I am able to discuss it with them in

2    the order in which it's been presented.

3            Item 1 is Settlement Agreement.

4            MR. MARVIN:  Your Honor, there is an important deadline

5    that is just 13 days away, and that's the October 30th deadline for

6    enrollment in the program.  That is a hard and fast deadline.  And

7    in order to be enrolled in the program, a claimant must advise

8    Brown & Greer, the claims administrator, of their indication that

9    they are enrolling in the program and submit a release as well as a

10   stipulation of dismissal.  Both the release and stipulation of

11   dismissal will be held by the claims administrator pending further

12   processing of the claim.

13           But this is a hard and fast deadline.  We know that there

14   are some of those who are eligible for the program, we know that

15   there are some who are eligible for compensation under the program

16   who have not yet enrolled.  And I know that your Honor has set

17   conferences both today as well as Monday and Tuesday to ensure that

18   those individuals are fully informed and make a conscience decision

19   about the program.

20           But as I say, October 30th is the final deadline.  It is a

21   hard and fast deadline, and so that will be the last date that

22   anyone can enroll in the program.

23           THE COURT:  Up until now, how many who are eligible have

24   chose to enroll?

25           MR. MARVIN:  Your Honor, it's approaching 99 percent, if

1     not 99 percent of those who are eligible.  So we are down to less

2     than probably 500 at this point who are eligible.  But in many

3     instances we have found that when we have made phone calls to their

4     counsel some had thought that they had enrolled when, in fact, they

5     had not.  Others thought that another attorney was handling it and

6     that sort of fell through the cracks.

7           And in other instances some claimants simply didn't know

8     how to determine and their lawyers didn't know how to determine

9     what would be an estimated amount that they would receive under the

10    program.  In some instances we've been able to address those

11    questions, I expect today we'll be able to address more of them.

12          But in many most instances, when the program has been

13    explained, when we've been able to sit down and talk to individuals

14    to give them an estimate as to what they'd receive, they have

15    enrolled in the program.

16          THE COURT:  That's one of the reasons that I did want to

17    meet with the claimants and their attorneys themselves because of

18    this impending deadline.  I have on occasion been called upon to

19    relax a deadline, but this deadline cannot be relaxed.  This is a

20    hard and fast deadline.  It's sort of like prescription from the

21    standpoint of the law.  Once it's passed, it's passed.  So I wanted

22    to have the opportunity to meet and talk with the litigants to make

23    sure that they're informed, not to speak on behalf or against the

24    program in any way, but just to make sure that everybody is

25    informed of it.  But I'll do that afterwards.

1          Let's go to the next item.

2          MR. MARVIN:  Your Honor, one other point is that there is

3    another deadline, it's more than 13 days away, but it's still a

4    deadline that needs to be met, and that is the deadline of

5    December 30 for enrollment packages -- I'm sorry, for claims

6    packages.

7          THE COURT:  Yes.  That in the program once the enrollment

8    is initiated, there are certain requirements to present certain

9    information.  The claims are made, the information, if it's not

10   satisfactory the administrator gives deficiency notices and

11   deficiency notices have to be taken care of.  If they're not taken

12   care of, then the person who has enrolled may not be eligible for

13   the program.

14         That is an important deadline and that's one that I am

15   going to ask later on that the attorneys, the PSC members who are

16   available for that purpose, I don't want any members who are

17   involved in the negotiation aspect of the program, but those

18   members of the PSC who are available, I want them to be available

19   for attorneys who can get some assistance from them to flesh out

20   that deficiency and take care of the deficiency.  It's very

21   important that those deadlines be made.

22         And I am going to ask Mr. Birchfield to get together some

23   individuals on the PSC and make them available to the litigants and

24   their attorneys.

25         MR. BIRCHFIELD:  Yes, we will do that.  And if someone

1    needs the assistance of the PSC, they can contact Russ Herman's

2    office or they can contact me, but we will coordinate that through

3    Russ's office so that we can arrange for everyone to get the

4    assistance that they need.

5            The deadline was actually July the 1st and these are

6    actually deficiency notices.  And extensions can be granted for

7    cause.  If someone has made diligent efforts and additional time

8    will be fruitful, then under those circumstances they can be

9    granted an extension up to December 30th.  But the time for

10   urgency, your Honor, is now.

11           THE COURT:  That's a separate and distinct deadline from

12   the October 30th deadline.

13           MR. BIRCHFIELD:  Yes, sir.

14           THE COURT:  What you're speaking about now is the deadline

15   for those who have already enrolled but they haven't tied up, they

16   haven't given all of the information.  But from the standpoint of

17   whether or not you enrolled, that's a deadline that's October 30th

18   and that is the final deadline.  Okay.

19           MR. BIRCHFIELD:  Thank you, your Honor.

20           THE COURT:  Yes.

21           MR. HERMAN:  Your Honor, with respect to both Item No. 1,

22   Settlement Agreement, and No. 2, Registration Enrollment, I want to

23   make a couple of quick comments, your Honor.

24           There is a new order to assist in obtaining medical

25   records.  There is a deadline of October 17th under a current order

1   for healthcare providers to provide records.  Those that are

2   concerned about any HIPAA will provide the records to the court,

3   liaison counsel will pick them up and get them in to wherever they

4   need to go.

5         Secondly, the Benjamin motions are fully briefed, under

6   advisement, Mr. Benjamin filed a new motion last night.

7         Mr. Stratton's letter motion has been answered by Merck.

8   We have a list of those healthcare providers who are supposed to

9   provide records by end of business today; if they don't, we will

10  see your Honor Monday.  The conference your Honor has set for

11  October 20th at nine o'clock, I believe that's Central, in New

12  York.  Mr. Seeger, Mr. Weiss, Mr. Lanier will be present.  I

13  understand that Mr. Juneau, the Special Master has also, I know at

14  a great trouble, rescheduled his presence there.

15        In Chicago on the next day, the 21st, Mr. Levin,

16  Mr. Seeger, Mr. Blizzard, Mr. Lanier, Mr. Birchfield and I will be

17  in New Orleans in the event your Honor has further orders or

18  questions.

19        With respect to Item No. 2, I'll call on Doug Marvin

20  who'll introduce the claims administrator.

21        MR. MARVIN:  Your Honor, I would like to introduce Orren

22  Brown and Lynn Greer who will report on the claims administration.

23        THE COURT:  Okay.

24        MR. BROWN:  Good morning, your Honor, I'm Orren Brown and

25  Lynn Greer is with me with today.  We're from BrownGreer, we're the

1    claims administrator for the settlement program.  We will update

2    the court, as we usually do, on where we are and status on our

3    numbers.  We will go through this very quickly and then focus,

4    first, on the enrollment; and then on the claims, Lynn will spend a

5    few minutes talking about where we are now on the claims review

6    picture.

7            This is our slide we look at every time about the folks

8    who haven't registered for the program.  Just to point out that we

9    still get a few people who register.  You are permitted to still

10   register for the very first time for the settlement program

11   provided that you also get in your enrollment materials to us by

12   October 30.  We see 11 people in row three who we've picked up

13   since we were last here on September 23rd.

14           On the enrollment picture, we look at this slide every

15   time, we now have gained another 32 people when we did this slide

16   yesterday morning.  We've gained more since then.

17           The actions, Merck's working with the folks who have been

18   ordered to appear at your court and in other courts, and so folks

19   are enrolling still.  When we did this slide it was above

20   98 percent of the claimants that seem to be eligible for the

21   program are enrolled, it is creeping up around the 99 percent

22   level.  There is just a few hundred left that we and the parties

23   are trying to determine whether they will come into the program.

24           I wanted to mention briefly this number because we always

25   see this number in row four of the claimants who appear to be

ineligible but nonetheless are enrolling and this is why.  Based on
the information really that Merck has that they're ineligible but
yet they have enrolled, and point out only that the folks in the
first row, if they didn't have a lawsuit or tolling agreement, they
are not eligible to be in the program unless they can show us that
they did.  And we have told everyone that they are ineligible on
that basis, and some folks are coming forward with copies of
complaints that they never served and we're giving those to Merck.
Some of those may come back into the program if they can prove that
they were, in fact, eligible.

        Folks that are foreign residents, non-U.S. citizens and
did not have, as far as Merck knew, an eligible injury, they might
come back into the program if they dig out their records and file a
claim and it turns out their injury was in the United States or, in
fact, they had an eligible injury.  Some that number is still
something we have to keep up with, but it moves around a little bit
as well.

        Mr. Marvin and the court have already mentioned the final
enrollment deadline of October 30.  We and the parties, as the
court has been, are on a full-court press now to make sure that all
claimants and the lawyers know about that deadline.  We can't read
this on the screen, but this is just a sample of a report that
we've been sending out for sometime to all primary counsel.  It
lists all of their clients that they registered with us and breaks
them down into four groups, either they are interim payment

1    enrolled in Section A; or B, they're enrolled but didn't make the

2    March 31 interim payment deadline; and then C and D are the

3    claimants that we're focused a lot on now.  People in C start

4    enrollment, they send us one piece of the package or two pieces but

5    not the whole enrollment package.  And then D are claimants who

6    have never sent us anything.

7            We have done these reports for counsel to inventory their

8    clients periodically throughout the program.  We sent out a full

9    set of reports to all counsel on September 30 so they could tell

10   which of their clients were safely enrolled and which were not and

11   what they had to do.

12           On the 10th of October we sent out another spreadsheet to

13   all of the counsel who had anyone who is not enrolled, not safe

14   harbored enrolled and needs to do something by October 30th, we

15   call that the last chance enrollment spreadsheet.  And we sent it

16   out to 317 firms, some them had one person, to show them what they

17   were missing and ask them to tell us if they're going to enroll and

18   what we can do to help them.  On the 15th, Wednesday of this week,

19   we called all of those firms, our people, our contacts called each

20   firm to make sure they're aware of this and on top of what they

21   need to do.  So we and the parties and the court are working with

22   all of these folks trying to get them enrolled.

23           And we have amidst the number of enrolled people, we are

24   also working with this group shown on this slide of about 1,300

25   plus, almost 1,400 people who have sent us their intention to

enroll, they have sent us some materials but they're missing
something.  They're the people in Section C of that report we just
looked at.  We've been working with the law firms to make sure they
realize that there are people who are still missing a piece of the
package and need to get it in to us, even though they've taken some
of the steps.

And on the right-hand side we see the 417 that were on the
certification of final enrollment, Exhibit A, those are people that
the firms have told us they really cannot locate, and that's the
group of people that are going to be the most troublesome to ever
pin down; and most of them by this time will never be found and
probably will not conclude their enrollment.

But that's another group that we're working with as part
of this October 30 deadline date to make sure they realize what
still they need to do, if anything.

I want to mention briefly the pro se claimants because
this slide shows us that we had 866 unrepresented people who signed
up for the program during registration.  These are claimants who
have been pro se all along, this does not include any of the
claimants that the court has allowed their counsel to withdraw.
We're working with the pro se curator Mr. Johnson and Merck and the
claimant's counsel to see where they come out.

But this is people who have been pro se all along.  We had
251 of them register, but they seem to be ineligible; and then we
end up with 615 pro ses who registered with us, of whom 379 are

1    safely enrolled.  So we've been working with this 236 pro ses as

2    well, sending them letters, all of them have gotten multiple

3    letters from us with the forms they need to enroll.  We sent

4    another round of letters yesterday to all of these folks to make

5    sure they're aware of the October 30 deadline to enroll.

6    Mr. Johnson and his office have been very diligent working with

7    these folks as well; again, trying to make sure they have ample

8    notice and opportunity to get their papers ready to participate in

9    this program, if that's what they want to do.

10           Your Honor, that takes us up to the claims report, and

11   Lynn will take care of that.

12           MS. GREER:  Good morning, your Honor, Lynn Greer from

13   BrownGreer, and I would like to review with the court the current

14   claims status.

15           As of yesterday we had received packages from over 39,000

16   people, 39,575, that had enough material in them for us to be able

17   to commence gates review.  Rows two through six show the court the

18   materials that we have received that fall short of being complete

19   enough for us to commence review.  Row two shows that as of

20   yesterday there are still over 6,000 people from whom we've

21   received nothing, no claims form, no medical records of any kind.

22           Row three shows that there are 2,400 people that we have

23   received only a claims form.  Row four shows that we have 500

24   people, we have received some type of medical record, it is not the

25   full required set of PME records, but it is something, but that

1    does not have with it a claims form.

2         Row five shows 215 claimants where we don't have any of

3    the PME records or claims form.  And row six shows those that we

4    have 2,000 where we have a claims form but we don't have the full

5    PME records set.  Row seven shows that we've received materials

6    from 954 firms, and row eight shows that we have materials from 286

7    pro se claimants.

8         When we were here last, your Honor, we discussed the

9    original, the first claims package deficiency notices that we had

10   issued to now over 12,000 claimants, and these were notices that

11   went out to folks who were represented on that first slide where we

12   didn't have enough to begin our review.  We have issued 12,430 such

13   notices.  Of those, 2,665 have cured so they have joined the queue

14   for us to be able to review.  And there are 9,765 deficiencies

15   still out there that need to be cured.

16        Last time we also talked about the phenomenon where we had

17   issued a lot of notices and only 19 percent of those individual

18   notices had been viewed on the portals.  The picture is a little

19   better today.  We received notices to 386 firms and of those 293

20   firms have opened at least one notice.  And so what that tells us

21   and in our discussions with firms what they have said is the

22   notices often look alike, they are talking about the claims forms

23   that haven't been submitted, so when a firm opens one, in essence

24   they can sort of ascertain what is wrong with maybe 1,000 others.

25        And the 293 firms represent 11,716 of the 12,000, so the

1   picture is better.  We do feel like firms are opening these and

2   they are working we know very hard to try to submit the packages.

3          This shows general overview of the claims review status as

4   we just discussed.  9,700 still have uncured material deficiencies.

5   There are 18,500 approximately in the queue that we have not yet

6   reviewed or even pulled out of the queue to begin review.  There

7   are over 15,000 in the gates review process, and I want to spend

8   just a moment to explain what can be going on in that category of

9   claims.

10          In our gates review process we review the claim once, and

11   because this threshold determination of gates is so critical, we

12   will review it a second time, we put it through a quality control

13   review.  The other thing that the Settlement Agreement contemplates

14   is if we fail a claim at gates, because we don't have discretion,

15   we have to apply objective criteria, when we fail the claim at

16   gates, it is going to the Gates Committee for them to review.  And

17   the Settlement Agreement does not provide notice at that point to

18   the claimants for the very good reason that the Gates Committee has

19   a lot more discretion to put a claim in the program than we do.

20          And I think wisely so, the Settlement Agreement did not

21   want to generate unnecessary concern among claimants who ultimately

22   could come into the program either at the hand of the Gates

23   Committee or ultimately Merck's unilateral push.

24          And so when a firm sees that a claim is in the gates

25   review process, it can mean that we've looked at it once or twice

1   or that it's with the Gates Committee.  But no one should infer

2   that their claim has failed or that it will never enter the program

3   if they see this status on their portal.

4        Row four shows that there are 4,600 claimants that we are

5   reviewing for points that have made it through the gates process.

6   And row five shows that we have paid or will pay by next week over

7   1,000 claimants, 1,315.

8        THE COURT:  That's the total number who have thus far been

9   paid?

10        MS. GREER:  Yes, or by next week will have been paid.

11        THE COURT:  Do you have any idea of money totals?

12        MS. GREER:  Yes, I have a slide on that, your Honor, that

13   will be at the very end.

14        The notice of points awards that we have issued to date

15   exceed 2,000, and of those there are still 378 that the firms are

16   considering -- actually have accepted but they are in line to be

17   paid, they will most likely be paid in November.  202 have

18   preliminarily appealed our decision.

19        And just to review real quickly that process.  When a firm

20   appeals a decision, they are able to submit additional

21   documentation that we will review again.  And if we decide that the

22   additional materials or that the response that the firm gives us

23   when we go back and take another look we are able to look at it a

24   little differently, we will go back to the firm and they do not

25   need to then proceed on to the Special Master, we will issue an

1    amended notice of points award and the claim will then be accepted.

2         There are 200 from whom we have not received a decision,

3    they are still within their window of time to let us know what they

4    want to do.  And again, 1,315 have been paid or 63 percent of all

5    of the notices issued to date.

6         This is the last slide that shows the 1,315 receiving

7    payment.  This has gone to over 100 firms, 105 firms.  The current

8    per point value -- these are just MI claims, your Honor, because IS

9    claims do not start interim payment until February of '09.  The

10   current point value for an MI claim is $1,915.  I think it is

11   everybody's estimate and best guess that that point value will

12   increase, but right now the current payments are going out at 1,915

13   per point.

14        We have paid or by next week will have paid over a hundred

15   million dollars, 103,401,308.

16        There are 46 special markers that we have paid.  A special

17   marker is a claim that if it has come through our process and

18   receives less than ten points, they can elect a $5,000 fixed

19   payment to receive all of that now.  And we've paid 46 such special

20   marker claims and the total amount paid to those exceeds 207,000.

21   The reason that's not a round number is that there are some lien

22   withholdings that come out of these payments because they are the

23   final payment for these special marker claimants.

24        So the total paid or to be paid, the next payment will go

25   out on the 22nd, next week, is $103,609,207.

1          Thank you, your Honor.

2          THE COURT:  Thank you very much.  Just a couple of

3   comments.  One, for those of you who have just arrived, I mentioned

4   at the outset that today we have two things going on:  One is the

5   monthly status conference, which I am meeting with all of the

6   lawyers who wish to appear at the conference, including

7   particularly the members of the various committees.

8          But I have it in open court, I've been having them in open

9   court once a month, every month for the last three or four years

10  since the commencement of this litigation.  That's what's going on

11  now.  This will be an abbreviated meeting and then we will go into

12  the meeting which I have set with the claimants and the claimants'

13  attorneys, and we'll take that up shortly.

14         You've heard from the claims administrator.  For those of

15  you who are not familiar with this, this is a program that is

16  administered by a claims administrator.  The claims administrator

17  is not associated with either the plaintiff or the defendant.  They

18  are professionals who do this type of work and have done a yeoman

19  job thus far on it.  It's somewhat involved and that's why I have

20  them here today so that those of you who are interested can speak

21  with them and ask them any questions that you may have.

22         The next item on the agenda.

23         MR. BROWN:  I had one final comment that ties in with what

24  the court just mentioned that the parties had asked me to mention.

25  And this is not a statement about us, it is a statement about this

1   program and this courts' and the parties' efforts as a whole.  The

2   numbers that we have reached with folks registering for this

3   program really in January and then reaching the point by August

4   with the first payments and payments each month having paid out

5   over $103 million, in that amount of time from January to

6   August/October is really unprecedented in a facility of this nature

7   to be able to reach the point of actually paying claims in that

8   volume in that short amount of time.  It is an attractive aspect of

9   this program and something that is attributed to the way it was

10  designed by the parties and this court's effort in keeping people

11  on task.

12          THE COURT:  Along that line, I might say also that this is

13  unprecedented that a case, an MDL case, a case involving 50, 60,

14  70,000 people can be resolved and paid out within about a

15  three-year period.  I got this case or this court was designated

16  transferee court in February of 2005, and before February of 2008

17  the matter had proceeded through six trials here, a number of

18  trials in state court, millions of documents presented, and a lot

19  of work done, and through the efforts of counsel for both sides the

20  matter was able to be resolved.  So I am proud of their work and

21  happy that they have come to resolve this matter shortly.

22          MR. HERMAN:  Your Honor, may it please the court, two

23  quick comments.  First of all, I want to thank Tom Girardi who

24  travels further than anybody else who volunteered to go to New York

25  and Chicago, and we relieved him of that because he's had to travel

1    a lot farther and we thank him for that.

2            Secondly, your Honor, in view of the global financial

3    markets and the markets in the U.S., I just want to report that

4    liaison counsel has undertaken with regard to the Royal Bank of

5    Scotland who has issued letters of credit, Merck and U.S. Bank I

6    have to report at this point we do not see any jeopardy whatsoever

7    to this settlement.  We will continue to monitor it.  I do want to

8    make it clear that U.S. Bank is not UBS.  U.S. Bank has no

9    difficulty in their reporting.  So I did want to make that quick

10   report.

11           And Mr. Johnson, your Honor, assistant Special Master for

12   pro se or the lawyer representing pro se, would like to make a very

13   quick report out of order if your Honor will permit.

14           THE COURT:  Yes.

15           MR. HERMAN:  Thank you, your Honor.

16           MR. Johnson:  Your Honor, Bob Johnson, court-appointed

17   curator.  In this abbreviated status conference, I have very little

18   to add to the Curator Status Report No. 7, which has been provided

19   to the court.

20           The only thing I would like to have the court focus on is

21   that since the last status conference, my office as curator had

22   sent additional mailings to 127 individuals that were identified by

23   Merck and state/federal liaison counsel as having been potentially

24   eligible, having potentially eligible claims who had not yet

25   completed enrollment.  We sent all of the materials and it is

1    specified and contained in the status report.

2            The only thing I would like to add to that is the fact

3    that in chambers we had a brief discussion this morning about the

4    circumstances concerning claimants whose attorneys have been

5    allowed by the court to withdraw.  And as we indicated and as I say

6    now in open court, we stand ready to assist those people in any way

7    that we can.  But just briefly, based upon the discussions with the

8    court, it is going to be the responsibility of the claimants to

9    come to us and we do not have independent responsibility to

10    essentially go forward in a much more positive way as we've done in

11    the past.

12            And with that I am finished.  And thank you very much.

13            THE COURT:  Good.  Well, thank you very much.  I've been

14    very conscious of the fact that there are many people who may not

15    have an attorney, and I wanted those individuals to at least have

16    access to an attorney so I've appointed a special counsel to serve

17    as curator, but the people who want a curator, who want an attorney

18    must make the initial contact, they must contact him.  If their

19    attorney has withdrawn and they wish to pursue the claim or wish to

20    get information, they have a contact, they can contact Mr. Johnson,

21    he is the court-appointed curator.  He doesn't represent the

22    plaintiffs or plaintiffs' committee, he would represent or at least

23    be able to advise any individual who does not have an attorney who

24    needs some information.

25            Next item on the agenda.

1          MR. HERMAN:  Yes, your Honor, the lien, Mr. Garretson is

2    here and will follow Mr. Juneau, the Special Master.

3          MR. JUNEAU:  Your Honor, very briefly.  I've been in

4    contact with BrownGreer, they've given you an extensive report on

5    the statistics that have developed thus far.

6          Based on what we see right now, next week there will be a

7    funneled down number of cases that will be appealed.  Those will be

8    addressed to my office and we've committed time, resources, and

9    effort to take those appeals independently, evaluate those appeals

10   and make rulings in a prompt manner so that this progress continues

11   on track in an efficient manner.  So that will occur and that will

12   actually occur next week.  We're in the pipeline to do that.

13         And the last comment, your Honor, as Mr. Marvin or

14   Mr. Herman has said, I will participate in at least one of these

15   meetings with regard to assisting people.  We want people to know

16   exactly what the role is of the respective parties.  Of course I

17   represent the interest of the court at those meetings and strictly

18   from an independent standpoint to evaluate whatever appeals or

19   positions that are taken by the people that they find some

20   objection to.  Thank you, your Honor.

21         THE COURT:  Thank you very much, Mr. Juneau.  I've

22   appointed Mr. Juneau, as well as a former justice of the Supreme

23   Court in California, as well as a judge from New Jersey, a former

24   judge from New Jersey to serve as Special Masters and Deputy

25   Special Masters to handle an appeal through the process.

1    There are certain gates that must be passed through.  If

2    the administrator applying the objective criteria decides that

3    someone does not fall through a gate or does not go through a gate,

4    that individual may appeal that decision to the Gates Committee as

5    well as the Special Masters, and that's the part of the process

6    that is available to you.

7        Now, we have the lien administrator.

8        MR. GARRETSON:  Thank you, your Honor.  I am Matt

9    Garretson with the Garretson Firm, and I'll give a brief report on

10   the status of the lien resolution and administration part of this

11   settlement program.

12       With respect to Medicare, your Honor, I would just like to

13   speak for one moment regarding an item that comes up.  We get a lot

14   of phone calls from counsel asking why there may be a hold on their

15   case related to lien resolution administration.  Just real briefly.

16   As I reported at the last hearing, part of the reason why some, a

17   very small set, about 3,000 cases were not sent originally to

18   Medicare for verification of entitlement, we now have that in front

19   of Medicare, there's about 3000 cases on which we're waiting for

20   them to tell us if they have an interest in those cases.

21       Further, we have a small -- well, not too small, a

22   relatively large actually subset of people who are missing Social

23   Security numbers or have given us amended data regarding social

24   security numbers, and so that creates another set of several

25   thousand.  So there is an LRA hold, as we call it, on about 5,000

1   to 6,000 cases currently.  We expect that to be cleared.  And many

2   of those haven't gone through the process yet to receive notice of

3   points awards letters, so there are certainly not that many being

4   held back but I wanted to bring that to everyone's attention.

5        We're obviously working with BrownGreer to clear as many

6   of those discrepancies as is possible in advance of those letters,

7   notice of points awards letters being issued to those individuals.

8        I'd also with respect to Medicare just give some good

9   news.  So far through this process we have only heard from 13

10  claimants who have any objection at all or have inquired about

11  their Medicare reimbursement amount.  I think that's a real

12  testament to the results and how these individuals have or the

13  lion's share of these people have appreciated the amounts and are

14  in complete satisfaction with the numbers that have been presented

15  to them.

16       With respect to those 13 people, I would also mention that

17  most of those inquiries to our office have been dismissed by just

18  explaining to people why they even owe a reimbursement claim back.

19  So again I think that's very good news.

20       With respect to Medicaid, your Honor.  Last time we were

21  together I reported that we were making considerable progress

22  gathering the actual claims data from the 53 state and territory

23  Medicaid agencies.  As of today we have close to 4,000 individual

24  files complete with Medicaid claims history from 31 agencies.  We

25  expect a large influx of the remaining claims histories in in the

1   next 30 to 45 days.  And through this process we now are in the --

2   we now know for sure we'll be auditing 17,500 claims histories.

3        And what's important to note on that is some people will

4   be calling our office asking when they'll have their final Medicaid

5   lien amount because they've been informed that there's, in fact,

6   this 20 percent holdback if they're a Medicaid entitled individual.

7   And I just want to reiterate that we cannot finalize a lien until

8   those claims histories are audited and that cannot occur until

9   they're approved for a notice of points award.  So there's always

10  going to be a lag, by the time that you clear the gates, get your

11  notice of points award letter before we can lock down a final

12  Medicaid number within that 20 percent holdback or the relative

13  holdback.

14       With respect to other governmental liens such as V.A.,

15  Tri-Care, the Department of Defense, I think it's worthy to remind

16  everybody that unlike Medicare and Medicaid where we're able to get

17  information and exchange information with those agencies about who

18  is entitled, with respect to those other governmental liens we need

19  those claimants and those attorneys that received notice from those

20  agencies to speak up.

21       We are getting a lot of traffic in that regard.  We have

22  700 claimants who have come forward with other governmental liens,

23  but I expect through this process the firms involved will continue

24  to get notice, the claimants may continue to get notice.  And if

25  it's not Medicare or Medicaid, it's one of those other governmental

```
1    liens, they have to keep sending that information through the web
2    Site and instructions on the website at vioxxlra.com.
3              So in sum, let me just conclude with some statistics to
4    give everybody a feel for the scope of what's going on with respect
5    to this lien data.  I checked in yesterday and was informed that
6    we've now performed over 2.7 million touch points with the federal,
7    state and military health plans with respect to these liens, and
8    that number will keep compounding as we've only touched about 4,000
9    final liens in the Medicaid side.  So it just gives you a feel for
10   the amount of data being exchanged between those healthcare
11   agencies and the lien resolution administration.
12             THE COURT:  All right.  Thank you.
13             MR. GARRETSON:  Thank you.
14             THE COURT:  Thank you very much.
15             MR. WITTMANN:  Your Honor, the next item on the agenda is
16   the State Court Trial Settings, and there are no state court trial
17   settings at all anywhere in the country.
18             THE COURT:  All right.  Class Actions have been taken
19   under advisement.
20             Discovery Directed to Third Parties, anything there?
21             MR. HERMAN:  Yes.  They are continuing to produce and we
22   ask that the matters pending before your Honor be continued to the
23   next meeting date.
24             THE COURT:  All right.  State Liaison Committee.
25             MR. HERMAN:  Yes.  Ms. Barrios is here to report, your
```

1    Honor.

2           MS. BARRIOS:  Good morning, your Honor, Dawn Barrios for

3    the State Liaison Committee.  Your Honor, we're continuing to work

4    hard on the remands, BrownGreer is being incredibly cooperative

5    with us.  We're also working with Mr. Johnson's office to identify

6    some pro se plaintiffs in these cases, and to date I believe that

7    we're 100 percent, we have 100 percent participation of all remands

8    through mid-state of Michigan.  I expect that we'll have everything

9    complete by the end of the year and will be very excited to give

10   you a holiday boxed set of all of the remands that have been taken

11   care of.

12          THE COURT:  Okay.

13          MS. BARRIOS:  Your Honor, with regard to the Attorney

14   General issues, there has been an incredible amount of work and

15   movement on all parties' part.  I want to particularly thank Mr.

16   Brian Anderson and John Beisner and Ben Barnett from Merck, they

17   have been working with us.  Yesterday we had a very, very

18   productive Attorney Generals meeting with the Plaintiff Steering

19   Committee's heavy participation, and I thank all of the Attorney

20   Generals who came in for that meeting.

21          We have entered an agreement on some basic rules regarding

22   discovery that I won't go into because of the expedited nature of

23   this hearing, but I do want to report that Mr. Anderson from Merck

24   and I are going to work on a joint motion to your Honor to lift the

25   discovery stay with regard to those AG cases that we've identified,

```
 1   we have 14 of them, under particular conditions and circumstances
 2   and we welcome your input on that.  But we hopefully will get that
 3   to you before the next status conference.
 4              THE COURT:  Okay.  Thank you very much.
 5              MS.  BARRIOS:  Thank you, your Honor.
 6              THE COURT:  Pro se, we've already heard.
 7              MR. HERMAN:  Mr. Seeger is going to give a very brief
 8   report on behalf of the PSC with respect to the AG meeting
 9   yesterday.
10              MR. SEEGER:  Judge, Dawn is right.  Dawn has done a great
11   job, by the way, of organizing everybody.  Dawn, thank you for
12   that.
13              But we did have a brief meeting.  I think we've made it
14   clear that what we have in the depository is now available to all
15   of the AG's.  We don't have an agreement in place regarding
16   confidentiality and work product and stuff, but we'll work that
17   out.  We're going to do that.  And as far as access to depositions
18   of corporate witnesses and exhibits, they have access to that right
19   now.
20              THE COURT:  Okay.  Anything from Pro Se further?  We've
21   already heard from Mr. Johnson?
22              Merck's Motions, anything?
23              MR. WITTMANN:  Your Honor, there is no change in that from
24   the last status conference.
25              THE COURT:  Pre-Trial Order No. 9 Issues.  Anything on
```

1   that?

2           MR. HERMAN:  Your Honor, with respect to motions also, I

3   want to indicate to the court the fact that the Benjamin motions

4   have been fully briefed and responded to, and Mr. Stratton's letter

5   motion addressed to Merck, Merck has fully responded to.  And last

6   night Mr. Benjamin filed an additional motion, which your Honor is

7   aware of, regarding the presence of his clients at the various

8   meetings your Honor has directed.

9           There is no issue as regards to Pre-Trial Order No. 9.

10          Merck will be filing its quarterly report next week on

11  suit statistics.

12          MR. WITTMANN:  Right, we won't have any new suit

13  statistics until next week when the quarterly report comes out,

14  your Honor.

15          THE COURT:  Okay.  And the Trial Package, anything on

16  that?

17          MR. HERMAN:  Nothing new on that, your Honor.

18          THE COURT:  What about Third Party Payor Cases?

19          MR. HERMAN:  Yes.  We have no change.  The PSC has made

20  the depository available under certain circumstances, we will make

21  depos available, and Ms. Barrios and Mr. Seeger have previously

22  reported as regarding the AG matter.

23          MR. WITTMANN:  Mr. Marvin is going to report on the

24  foreign individual cases, as well as the termination of tolling

25  agreements.  Doug.

```
 1              THE COURT:  All right.

 2              MR. MARVIN:  Your Honor, I can be very quick.  There is a

 3    pending motion to dismiss the foreign individual cases.

 4              As to the termination of the tolling agreement, the

 5    tolling agreement did serve its purpose, but at this stage that

 6    purpose having been served has been terminated.  And everyone has

 7    been receiving notice of that the termination since last April.

 8              THE COURT:  Thank you.  Anything on Third Party Payor

 9    motions?

10              MR. WITTMANN:  No change since last report, your Honor;

11    and no change on the next item either on the Greater New York

12    Benefit Fund matter.

13              THE COURT:  All right.

14              MR. WITTMANN:  Mr. Marvin also is going to report on the

15    Nonresponsive Plaintiffs' Cross-Motion and Rule.

16              MR. KING:  Your Honor, Henry King on behalf of the Greater

17    New York and Teamsters self-funded ERISA healthcare plans.  We did

18    have three matters that we wanted to bring to the court's attention

19    today that we would like some assistance on.

20              As you recall from the last hearing, we had requested an

21    order on the class action denial, and we would ask that the court

22    please enter an order.  We provided a proposed one.

23              THE COURT:  Yes, I will.  I am in the process of writing

24    that now.  I should get it out by Monday.  I've had a couple of

25    trials in-between.
```

```
 1        MR. KING:  Thank you.  The other item that we wanted to

 2   bring up, the NPC defendants have filed a motion to dismiss.  We

 3   would like either to set that motion or have a status conference

 4   with your Honor next week so that we could get that set for hearing

 5   as soon as possible.

 6        THE COURT:  Okay.  I'll set a status conference then with

 7   it.  What's convenient for you, Wednesday, Thursday?

 8        MR. KING:  Let me check, if I can, with my counsel, and

 9   I'll get with Nathan on that.

10        MR. HERMAN:  May it please the court, Mr. Birchfield and I

11   will be here Monday and Tuesday, and if it's convenient for your

12   Honor sometime Monday or Tuesday and counsel.

13        THE COURT:  That'll be fine, I'll work that in.

14        MS. GARSAUD:  Your Honor, and on behalf of U.S. Bank, the

15   same for us, Monday or Tuesday would be best.  Thank you.

16        THE COURT:  Sure, okay.

17        MR. LEVIN:  Your Honor, I think that motion was argued and

18   we are just waiting for an order.

19        THE COURT:  That could be, but if he wants a status

20   conference, I'll give it to him.

21        MR. LEVIN:  It's wrapped into the preliminary injunction

22   denial.

23        MR. KING:  And we've already brought up before the

24   transcript, we don't think that the motion to dismiss aspect was

25   heard by the court.
```

```
 1          THE COURT:  That's why I am not setting anything, I want

 2   to have a status conference first and we'll talk about that,

 3   whether or not it's over or not.

 4          MR. KING:  And the last thing, I guess, tied into it,

 5   Judge Fallon, is that we filed a motion for a preliminary

 6   conference as we would like to get a scheduling order.  There are

 7   two viable self-funded pension plans or healthcare plans, and we

 8   would like to proceed with that and we understand it's intertwined

 9   with the other ruling, but we'd ask that that proceed as quickly as

10   possible.

11          MR. LEVIN:  May I address that, your Honor?

12          THE COURT:  Sure.

13          MR. LEVIN:  Arnold Levin.  There is an appeal pending in

14   the Fifth Circuit, I don't think there's any need for a discovery

15   conference down here while the appeal is pending.

16          MR. KING:  Thank you, Judge.

17          THE COURT:  Okay.  Thank you very much.  Merck's Rule to

18   Show Cause.

19          MR. MARVIN:  Your Honor, Merck filed motions that are

20   covered by Items 19, 20 and 21 on the agenda.  Those motions fall

21   into two categories.  The first was a motion directed at those

22   plaintiffs who their counsel reported they could not be found or

23   did not respond to numerous contacts from their counsel.  So as to

24   those claims, Merck moved to dismiss those claims for those who

25   could not be found.
```

```
 1            The second category related to those who were required to

 2    comply with PTO, Pre-Trial Order No. 28, which requires production

 3    of medical records by claimants as well as expert reports, that

 4    motion was directed against those who failed to comply with this

 5    court's order.  Those motions were heard as reported in the status

 6    conference and ruled on last week.

 7            THE COURT:  All right.  Decision Quest.

 8            MR. HERMAN:  May it please the court, I've had several

 9    communications, as has Mr. Davis, with Mr. Miles Clements who

10    represents Decision Quest --

11            MR. CLEMENTS:  I heard my name.

12            MR. HERMAN:  It's a fine name.

13            MR. CLEMENTS:  How are you?

14            MR. HERMAN:  Fine.  And we're going to be meeting Monday

15    and we're going to attempt to resolve this matter.  Any attorneys

16    that have tried cases or used Decision Quest material may let me

17    know if they want to participate in person.  If they want to

18    participate by phone, we can arrange to do that.

19            THE COURT:  Good.

20            MR. HERMAN:  I will be here in your Honor's court at

21    nine o'clock and then proceed over to my office to meet with

22    Mr. Clements and his client.

23            THE COURT:  Good.  With two reasonable people I know we'll

24    get this finished.

25            MR. CLEMENTS:  I think that is the report, your Honor, and
```

```
1    we look forward to resolving this Monday at the ten o'clock

2    meeting.  Mr. Cobo, one of the officers of Decision Quest has flown

3    in from California to attend this conference this morning and will

4    also be there Monday.

5              THE COURT:  Good.  I appreciate your help, Miles, on this.

6              MR. HERMAN:  I want to thank Mr. Clements who is a

7    distinguished member of this bar for his, not only his tenacity but

8    his professionalism and look forward to meeting with him.

9              MR. CLEMENTS:  Thank you, Russ, I repeat that for you.

10             THE COURT:  Next status conference, November the 21st.

11             MR. HERMAN:  Yes.

12             THE COURT:  Nine o'clock and I'll meet with the committees

13   at 8:30.  Anything further on this?

14             MR. WITTMANN:  No, your Honor.

15             MR. HERMAN:  Just one thing.  Your Honor has allowed us

16   the use of a jury conference room.  I need a ten minute PSC

17   Court-Appointed Plaintiff Management Committee meeting to discuss

18   the assistance of folks that need help assembling their claims

19   material; and, secondly, following that a very short Allocation

20   Committee meeting in the same room.

21             I do want to make it clear for the record, if I may, your

22   Honor, that no member of the Negotiating Committee or the

23   Allocation Committee or the Gates Committee will be participating

24   in assisting other lawyers in getting their claims packages

25   together in order to avoid any appearance of conflict, but we will
```

1    rely on PSC members who are not on that committee and that's why we

2    have this short meeting.

3          THE COURT:  All right.  And give me the names of them and

4    I'll put out an order creating a committee, assistance committee,

5    I'll put the names out.

6          MR. HERMAN:  I will be happy to supply that to your Honor

7    after this meeting.

8          THE COURT:  I didn't want to overdo -- yes, something on

9    this?

10          MR. BURFORD:  Excuse me, your Honor.  I have a question

11    regarding the dismissal of the claimants, about the expert witness

12    report.

13          THE COURT:  Okay.

14          MR. BURFORD:  I don't know exactly what is the status of

15    that.  I know three people that I need to talk about, one expert

16    witness report has been filed before this motion was filed, I

17    wanted to get a chance to speak to that so that person wouldn't be

18    dismissed, I know they are trying to dismiss them with prejudice.

19          THE COURT:  Let's do this, you and Mr. Marvin get together

20    and talk about that.  And then if you do have any issues after you

21    speak with him and Mr. Herman, I'll take it up and I'll deal with

22    it.  So I'll reserve your right to make anything on the record.

23          MR. BURFORD:  Okay.  Thank you, your Honor.

24          THE COURT:  But I would like you to at least talk with

25    Mr. Herman and Mr. Marvin and see whether you have any problem or

1    not.  You may not have any.

2         Okay.  I didn't want to run through the meeting too fast,

3    but I do want to get to the next item on the agenda.  And the next

4    item on the agenda is the meeting which I set with the litigants

5    and their attorneys.  I know we have a number of litigants and

6    their attorneys present in the courtroom.

7         Just for the record, I am going to ask that you stand and

8    put your name at least on the record.  And if it's an attorney

9    representing you, the attorney should give his name and then

10   followed by the people they represent.

11        I'd like to start on the left-hand side, your right, my

12   left, on the first row.  If there is anybody in the first row who

13   is a litigant?  Yes, ma'am, would you give us your name.

14        MS. LEE:  Geraldine Lee.

15        THE COURT:  Speak a little louder, please.

16        MS. LEE:  Geraldine Lee.

17        THE COURT:  Geraldine Lee, okay.  And you're a litigant,

18   ma'am?

19        MS. LEE:  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

20        THE COURT:  Okay.  Anyone else on that row?  How about the

21   second row?

22        MS. RODRIGUE:  Cassie Rodrigue, I am an attorney here on

23   behalf of Michael Delaune --

24        THE DEPUTY CLERK:  Judge, we're going to need them to come

25   to the microphone.

```
 1          THE COURT:  I'm sorry, we are going to need that because

 2   we have people on the phone and we should do that.  I am going to

 3   have to ask --

 4          THE DEPUTY CLERK:  Come and put your appearance on the

 5   microphone, thank you.

 6          THE COURT:  And the reason for that is that I have people

 7   on the phone who are monitoring this and they ought to at least

 8   have the opportunity to hear you.  Let's clear some space, please.

 9          Let me take a ten-minute break here and then we'll

10   re-assemble in ten minutes.  Actually I have a list now and I'll go

11   through the names, and if you're present you can indicate.  So I'll

12   take a ten-minute break here.

13          THE DEPUTY CLERK:  Everyone rise.

14      (WHEREUPON, A RECESS WAS TAKEN.)

15      (OPEN COURT.)

16          THE COURT:  Be seated, please.  I have a list of those I

17   think that are present.  I'll call the ones that I have.  I have a

18   list of those who are on the phone, so if I call your name and you

19   can't answer because you're on only conference mode, we'll pick it

20   up and we'll note that you're here because I do have a list of all

21   of the people who are on the phone.

22          The attorney Mr. Burford, Robert Burford & Associates.

23   Would you come to the microphone and make an appearance and tell us

24   who you're here to represent, Mr. Burford.

25          Do you have a list?  I have a list if you need it.
```

1          MR. BURFORD:  I have that.  Yes, your Honor, if it please

2    the court, my name is Robert Burford.  I represent Mr. John

3    Bereskie, Mr. Lloyd Bishop, Mr. Robert Culp, Ms. Lisa England,

4    James Hallman, Mr. Fredrick Hendley, Timothy Herron, Barbara

5    Lawrence, Gary Morgan, Franklin Morrison, Mr. Cecil Munday,

6    Mr. Julian Page and Mr. Robert Phillips.

7          THE COURT:  Okay.  Thank you very much, sir.  And Mr. Mark

8    Cantu, anyone here for Mr. Mark Cantu?

9          Frank D'Amico, Jr.

10         MR. EXNICIOS:  Good morning, your Honor, Richard Exnicios

11   here from -- on behalf of Frank D'Amico.  For today's matter, your

12   Honor, we're here on behalf of Alger MacKenzie, Lynette Paul, Carol

13   Robertson, Kimberly Taylor, Olga Torres and Lloyd Williams.

14         THE COURT:  Okay.  Thank you very much, sir.  Stephen

15   Fabbro, anyone here from Stephen Fabbro's office?

16         Fears and Nachawati.  May have these on the phone.

17         Hill, Dianne Hill.

18         Michael Hingle and Associates.

19         MR. PFLEEGER:  Good morning, your Honor, Bryan Pfleeger on

20   behalf of the Michael Hingle clients, and I am here today

21   representing Luverdia Bell, Geraldine Billiot, Eunice Bleier,

22   Elaine Campbell, Edward Carter, Carolyn Chapman, Robert Clay,

23   Edward Deffes, Jr., James Faull, William (SIC) Flato, Louise

24   Fremin, Annie Gerald, Leon Gilbert, Arthur Granier, Barbara Jasber,

25   Helen Johnson, Yolanda Jones, Eugenia Loverde, Amintas Major,

```
 1    Lucille McGinnis, Joe Miller, Alton Morris, Debra Randle, Rita
 2    Robichaux, Mary Anne Sanders, Patricia Schexnayder, Mose Simmons,
 3    Lewis Slaughter, Willie Smith, Pearl Sparks, Martha St. Germaine,
 4    Saralyn Ann Stevenson, Pamela Thomas, Nathan Watson, Michael White
 5    and Clarence Williams.
 6              THE COURT:  Okay.  Thank you very much.  Jones, Swanson,
 7    anyone here?
 8              Kelley Uustal?
 9              MR. GARRISON:  Your Honor, Eberhard Garrison here on
10    behalf of the Jones, Swanson, Huddell & Garrison clients, who are
11    Clarence Abrams, Grace Clennon on behalf of Elvina Clennon, Katina
12    Duffie on behalf of Joe Duffie, Sr., Birdie Catherine Gabbard,
13    Cynthia Taylor-Green on behalf of Leslie Green, and Annie Johnson
14    on behalf of Avie Johnson, Jr.
15              We're also here on behalf of Dorothy Cole, Jelonda
16    McCraine, Nicole Dorsey and Gregory Allen on behalf of Alice Allen.
17              THE COURT:  Thank you very much.  Kelley Uustal?
18              MR. FALZONE:  Good morning, Judge.  Todd Falzone here on
19    behalf of Kelley Uustal, and our client is Louise Griffin.
20              THE COURT:  Okay.  Thank you very much.
21              MR. FALZONE:  Thank you, Judge.
22              THE COURT:  Laine, Kevin.
23              MR. LAINE:  Yes, my name is Kevin Laine, and I am present
24    for Freddy Blanchard and he is present as well.
25              THE COURT:  Okay.  Thank you very much.  Langston, anyone
```

```
 1    here for Langston and Langston?

 2            Murray Law Firm.

 3            MS. HAYES:  Your Honor, Jessica Hayes, I'm here in the

 4    Joseph Jaques case.

 5            THE COURT:  Okay.

 6            MR. PLYMALE:  Good morning, your Honor, Douglas Plymale.

 7    I'm here on behalf of Alma Allen, Elizabeth Armstrong, Mohan

 8    Baskaran, Brenda Clark, Thomas Dreher, Deborah Dunn, Ruthie Gipson,

 9    Leroy Howard, Glenda Johnson, Barbara Lamb, Marilyn Ruffino, Roy

10    Saucer, Ruth Sullivan, Betty-Jo Sumler, Ebert Van Buren, Charlie

11    Watson and Christine White.

12            THE COURT:  And Sanford Pinedo.

13            MS. SANFORD:  Good morning, your Honor.  Shelly Sanford

14    here.  I believe we've resolved ours with Mr. Cohen.

15            THE COURT:  Thank you.  So that would be with Amaya and

16    Lasky and Street?

17            MS. SANFORD:  Yes, your Honor, that's correct.

18            THE COURT:  Okay.  All right.  Schonekas?

19            Singleton, Singleton Law Firm?

20            Stallworth, Arthur?

21            Marion Tabor?

22            Vaughn Bowden -- excuse me.

23            MR. TABOR:  Two cases, your Honor, Manero, Armando Manero

24    and Margaret Schunior who is now deceased.

25            THE COURT:  Okay.  And your name my name is?
```

```
 1              MR. TABOR:  My name is Marion Jackson Tabor.

 2              THE COURT:  Okay.  Thank you.  Vaughn, Bowden?

 3              Wiggins?  Wiggins Childs?

 4              MR. DOYLE:  Good morning, your Honor.  I'm Jimmy Doyle on

 5    behalf of Morgan Ero here today.  Thank you.

 6              THE COURT:  Okay.  And Woody Falgoust?

 7              MR. RODRIGUE:  Good morning, your Honor, Cassie Rodrigue

 8    from Woody Falgoust, a law corporation, on behalf of Michael

 9    Delaune and Bonita Peltier.

10              THE COURT:  Okay.  And the Young Law Firm?

11              All right.  Those are the ones that I have, and of course

12    I have the ones on the phone.  Anyone in the audience whom I have

13    not called or who is present and I didn't get your name?  If so,

14    please come forward.

15              MR. SONNIER:  Good morning, your Honor, Chris Sonnier from

16    the McKay Law Firm.  We're here on behalf of Lloyd Johnson and Gary

17    Guy this morning.

18              THE COURT:  All right.  Thank you.  Yes, sir.

19              MR. ANDERSON:  Your Honor, I am John Anderson.  I am here

20    on behalf of Lamont Blankenship, Jr.  I did speak with Mr. Marvin

21    last night and possibly that's why I wasn't on the list.  Thank

22    you.

23              THE COURT:  All right.  Fine.  Thank you for being here.

24              Any litigants who are in the audience who I have not

25    listed or don't have you on the list?  Anyone?
```

 1        All right.  Seeing no one, let me first of all, I should

 2   introduce myself, I am Eldon Fallon.  I am the judge who has been

 3   assigned to this MDL case.  I appreciate your being here.

 4        I requested that you be here today because of the

 5   significance of this impending deadline that we have talked about

 6   earlier today.  You in your complaints and your papers and your

 7   filings have indicated that you have a qualifying injury, so you're

 8   eligible to enroll in the settlement program, but the enrollment

 9   must be done on or before October the 30th of 2008.  That's a hard

10   and fast deadline, it cannot be extended.

11        Now, the purpose here today is not to encourage or

12   discourage the settlement.  The purpose is to inform you.  I feel

13   obligated as the judge who is assigned to this case to do the best

14   I can to inform you of this, the areas that I think are significant

15   so that you can make an informed decision and decide whether or not

16   to enroll or whether or not to proceed with the settlement.

17        For those of you, particularly litigants, here today and

18   on the phone, let me just say a short word or two about the history

19   of this litigation.  The MDL panel designates cases that have

20   similar fact situations and they group those cases and designate a

21   judge in the United States in order that all of the cases

22   throughout the United States be transferred to that particular

23   judge.  I was the judge who was designated to handle the Vioxx

24   litigation.

25        We received the designation on February the 16th of 2005.

1    Now, much has happened during that period of time, and I've tried

2    to record that information and make it available to everybody by

3    creating a website and putting everything on the website.  Millions

4    of documents have been produced over that period of time, hundreds

5    of depositions, many thousands of depositions have now been taken.

6    Six trials have gone on in federal court, five cases, I had to try

7    one case twice, but we've had six trials, and we've had at least

8    ten trials in the state courts.  I've issued over 1,000 opinions in

9    this case since the time that I began handling it, either in

10   writing or verbally, but I've delivered over 1,000 opinions.

11           I've had weekly meetings with the parties and I have had

12   monthly meetings in open court with anyone who wishes to appear.

13   I've noticed the meetings well in advance, posted it on my website,

14   and all of my opinions I've posted on the website, all of the forms

15   I've posted on the website, and the transcripts of the meetings

16   that I've had with the parties I've all posted on the website.

17           In this particular case, there are really two areas of

18   discovery:  One is what we call general causation and the other is

19   specific causation.  There's been a lot of discovery on whether or

20   not Vioxx was problematic and whether or not Merck who manufactured

21   Vioxx knew that it was problematic and when they knew it.  This

22   helps everybody, all of the litigants; and so a lot of the work

23   that's been done you may not have been aware of it, not been kept

24   advised of it, or not had an opportunity to view it from the

25   website.

1          But you need to know that the work was done and you need

2    to know that it was of help to your case because every case has a

3    general causation and a specific causation issue, and you need to

4    get over general causation before you get to specific causation;

5    that is to say, whether or not it caused you damage in that

6    particular incident.

7          I might say that during the course of time that I handled

8    this matter, I had the good fortune to have colleagues in state

9    court who were also handling the case.  They had many cases before

10   I got involved in the case, so some of this litigation has been

11   going on longer than three years in state court.  But I had the

12   good fortune of being able to communicate and work with some very

13   talented judges in state court.  I've talked to many judges in the

14   state court.  The ones that I've worked closely with were judges

15   from Texas, New Jersey and California, and we kept in constant

16   contact, shared information, shared thoughts and ideas, and handled

17   our own independent cases, but we had at least the benefit of the

18   scope of the entire litigation.

19         After a certain period of time I felt that enough

20   discovery had taken place and enough trials had taken place that it

21   would be helpful to the parties, to the litigants, to the lawyers,

22   but primarily to the litigants, to take a look at this case from a

23   global standpoint to see whether or not it could be resolved from a

24   global standpoint.  Often times it's easier to resolve a case of

25   this magnitude by looking at it globally than it is by looking at

1  each individual case, at least the discussions part.

2        So I convened a meeting here in New Orleans and invited my

3  colleagues in state court, and they showed me the respect to come

4  and they were here, and I ordered the parties, a representative

5  from the Merck board with decision-making authority and their

6  lawyers and a representative group of the Plaintiffs' Committee to

7  meet in my conference room.  And I encouraged the parties at that

8  meeting to view the matter globally to see whether or not it could

9  be resolved in some fashion.

10       They began serious negotiations and almost a year later

11  with meetings sometimes daily, weekly, into the wee hours of the

12  morning in many instances, they were able to craft a program that

13  each side, the plaintiffs' and the defendants' representatives felt

14  that they could recommend to their respective parties.

15       You claimants have met certain criteria, and the parties

16  have agreed that when a claimant meets certain criteria they are

17  eligible to enroll in the program.  The choice is yours, ladies and

18  gentlemen, both from the lawyers' standpoint and the litigants.  I

19  am not here to advise you on which choice you make.  I respect

20  whatever choice you do make, but I do feel, as I said, obligated to

21  do the best, the very best I can to inform you so that you can make

22  an informed choice.

23       I've also requested that parties be here today, your

24  attorneys, the program administrator.  Those of you who have sat

25  through the short meeting that we had heard the program

administrator.  The program administrator is not associated with either the plaintiffs or the defendants.  They're retained for the special purpose of administering this program, and they're given certain criteria and they just apply the criteria that have been agreed upon to the cases as they see them.  I've asked that they be here today.

And also representatives from Merck, representatives from the PSC, the lien people, and individuals who you may talk to, talk off the record to; that is to say, you can ask them questions and flesh out whatever information that you feel is necessary.

I would like to make a couple of comments to you from at least my seat in the bus.  I have been trying this case and working on this case now since 2005, February 16th.  I have been closely connected with the case, that is to say, intimately involved in, hands-on in this particular case, and I've seen a lot of documents and I've heard a lot of testimony and I've ruled, as I say, on a lot of motions.

I call to your attention that between 98 and 99 percent of those eligible have thus far enrolled in the program.  As I mentioned, I've had six trials, five cases have been tried.  Four cases have been won by the defendants, one case has been won by the plaintiffs; 20 percent of the cases in federal court won by the plaintiffs, 80 percent by the defendants.  From the state courts throughout the country, one third of the cases have been won by the plaintiff, two thirds of the cases have been won by the defendants.

1          All of the cases are now on appeal that have been tried.

2     No one from those cases have received any money other than if the

3     case were settled or resolved.  So the cases are not finished yet,

4     they're still on appeal.

5          The program basically, for those eligible, that is to say,

6     a person who alleges, claims that they have had a heart attack,

7     ischemic stroke, or sudden cardiac death are eligible to enroll in

8     the program.  To enroll in the program the parties have agreed that

9     you must fit through or come through several gates, three gates.

10    First, the medical records must confirm that the claimant suffered

11    a heart attack, an ischemic stroke, or a sudden cardiac arrest.

12    That's the first gate.

13         The second gate is that the records, some records must

14    confirm that the claimant received at least 30 pills within 60 days

15    of the incident.  That's the second gate.

16         The third gate is that some documentation must be

17    presented confirming that Vioxx was being used within 14 or so days

18    before the heart attack, stroke or sudden death.

19         If you don't get through the gates, as you know from our

20    discussion, you can appeal.  You can do one of three things, in

21    fact.  If you find out that you don't get through the gates, you

22    can return to the tort system and proceed with the case.

23         Secondly, you can appeal the negative determination with

24    the Special Master or the Gates Committee.

25         Or third, you can do nothing and have the case dismissed.

1    But you're going to have to make that decision one way or the other

2    before October the 30th.

3         And the purpose of meeting with you here today and

4    requesting that you be here -- and for those on the phone I've

5    gotten a telephone number that we can call back or you can be

6    contacted and ask any questions privately that you wish to ask to

7    the respective parties.

8         But the purpose today is to allow you to meet with any of

9    these individuals.  First meet with your attorneys, and I suggest

10   that you meet with the Plaintiffs Committee and the attorneys; and

11   then you can talk with the program administrator and find out, for

12   example, the likelihood of getting through the gates or if you get

13   through the gates what are you looking at, what amount are you

14   likely to get.  Now they can't write it in stone because you're not

15   there yet, but they've dealt with a lot of cases thus far and they

16   can give you some idea.  So I want that opportunity to at least be

17   afforded to you.

18        I know that coming here today or participating on the

19   phone for now over an hour has been time consuming to you and it's

20   been probably inconvenient for you, but I wouldn't have asked you

21   to come here if I didn't feel that it was in your best interest, at

22   least to get information.  As I say, it's not the purpose of the

23   court to tell you to settle or to tell you not to settle, but I do

24   feel an obligation to you to do the very best I can to allow you to

25   get informed, to hear from me from my experience in trying these

```
 1   cases, to hear from me to assure you that a lot of the work that

 2   has been done has been done for your behalf, even though you didn't

 3   participate, you will reap some benefit from that.  And also to

 4   afford you an opportunity to ask any of these individuals questions

 5   that either the attorney who is here with their clients or the

 6   clients can discuss the matter with the parties.

 7          So the deadline, and that's why we're here today, it's

 8   critical that you make some informed decision before October the

 9   30th.  Thereafter, it will be too late.

10          Now, what I suggest is that the attorneys, perhaps the

11   best way of doing it is to have the attorneys and their clients

12   meet for a very brief time with the plaintiff PSC and then you

13   folks can see who they want to meet with, whether they want to meet

14   with the program administrator or the Special Master or Merck or

15   someone else.

16          Anything?  Okay.  And with regard to the people on the

17   phone, we will contact each of you and see whether or not you have

18   any questions; and if you have a question, you will be placed with

19   the party who can answer that question for you.

20          THE DEPUTY CLERK:  Judge, those meetings will be in our

21   courtroom and in the jury room.

22          THE COURT:  Yes.  We have a meeting arranged here in the

23   courtroom, you can get on the side.  We also have Judge Lemmon's

24   courtroom across the hall, we also have jury rooms in each side

25   that so that you can have some privacy in your meeting.
```

```
 1            Okay.  Well, thank you again for being here -- yes, what's
 2    that?
 3            Yes, it would be helpful, too, if at the end you just let
 4    us know before you leave and just check out, tell us, let me know
 5    whether or not you've enrolled or not enrolled so I can then keep
 6    that record.
 7            All right, fine.  Thank you very much.  Would the
 8    plaintiff PSC make sure you know who they want to talk to and then
 9    we'll get the parties.  Thank you.
10            THE DEPUTY CLERK:  Everyone rise.
11        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)
12
13                          *  *  *  *  *  *
14
15                       REPORTER'S CERTIFICATE
16
17      I, Karen A. Ibos, CCR, Official Court Reporter, United States
18    District Court, Eastern District of Louisiana, do hereby certify
19    that the foregoing is a true and correct transcript, to the best of
20    my ability and understanding, from the record of the proceedings in
21    the above-entitled and numbered matter.
22
23
24            Karen A. Ibos, CCR, RPR, CRR
25            Official Court Reporter
```