```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2     **************************************************************

 3
       IN RE:  VIOXX PRODUCTS                 MDL No. 1657
 4     LIABILITY LITIGATION                   Section: "L"
                                              New Orleans, Louisiana
 5                                            Thursday, July 24, 2008

 6
       **************************************************************
 7

 8                   TRANSCRIPT OF MOTION PROCEEDINGS
                 HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                   UNITED STATES DISTRICT JUDGE

10

11     APPEARANCES:

12
       FOR PLAINTIFFS:
13     FOR 08-1633 PLAINTIFFS:          SUSMAN GODFREY
                                        BY:  JOSEPH S. GRINSTEIN, ESQ.
14                                           ALEXANDRA G. WHITE, ESQ.
                                        5100 First Interstate Bank Plaza
15                                      1000 Louisiana Street, Suite 5100
                                        Houston, TX 77002
16

17
       FOR 08-3627 PLAINTIFFS:          CROWELL & MORING
18                                      BY:  ANDREW H. MARKS, ESQ.
                                        1001 Pennsylvania Ave., N.W.
19                                      Washington, D.C., 20004

20
                                               - AND -
21

22                                      LEVY, PHILLIPS & KONIGSBERG
                                        BY:  STEVEN J. PHILLIPS, ESQ.
23                                      Quakerbridge Executive Center
                                        101 Grovers Mill Road
24                                      Lawrenceville, N.J. 08648

25
```

```
 1

 2   FOR NPC DEFENDANTS:                SEEGER WEISS LLP
                                       BY:  CHRISTOPHER A. SEEGER, ESQ.
 3                                     550 Broad Street
                                       Newark, N.J., 07102
 4

 5
     FOR BROWNGREER AND
 6   U.S. BANCORP, INC.:               IRWIN, FRITCHIE, URQUHART & MOORE
                                       BY:  JAMES B. IRWIN, V., ESQ.
 7                                     400 Poydras Street, Suite 2700
                                       New Orleans, LA 70130
 8

 9

10

11   Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
                                       500 Poydras Street, Room HB-406
12                                     New Orleans, Louisiana 70130
                                       (504) 589-7776
13

14

15       Proceedings recorded by mechanical stenography, transcript
     produced by computer.
16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                   (THURSDAY, JULY 24, 2008)

3                    (MOTION PROCEEDINGS)

4

5          THE COURT:  Be seated, please.  Good afternoon, ladies and

6    gentleman.  Let's call the case, please.

7          THE DEPUTY CLERK:  MDL 1657, in re:  Vioxx.

8          THE COURT:  Counsel make their appearance for the record,

9    please.

10         MR. GRINSTEIN:  Your Honor, Joe Grinstein with my

11   colleague Lexie White representing the AvMed plaintiffs.

12         MR. PHILLIPS:  Your Honor, Steven Phillips with my

13   colleagues Diane Paolicelli, Andrew Marks, Rebecca Dietz and Aryeh

14   Portnoy here for the 1199 plaintiffs.

15         MR. IRWIN:  Good afternoon, your Honor, Jim Irwin for

16   BrownGreer and U.S. Bank.

17         MR. SEEGER:  Good afternoon, your Honor, Chris Seeger for

18   the negotiating committee.

19         THE COURT:  The court has before it several motions

20   related to two nongovernmental third-party payor cases, entities.

21   These cases were consolidated in the Vioxx MDL.  The cases involve

22   two separate groups of plaintiffs, both of whom seek to enjoin

23   BrownGreer from distributing interim payments under the Vioxx

24   Resolution Program.

25          The greater New York claimants have also filed a class

1    action.  The Plaintiffs Committee and BrownGreer oppose the issuance

2    of an injunction and move to strike the class action claim.  In

3    addition, the plaintiffs committee moves to sever the claims brought

4    by the New York claimants and the AvMed claimants.  As I see it,

5    they're in essence three motions before the court, various issues in

6    each motion, but the injunction or TRO/preliminary injunction

7    motion, class action motion, the severance motion.  I'd like to take

8    them up in that order, and I'll hear from counsel on the injunction,

9    TRO/preliminary injunction.

10            MR. GRINSTEIN:  Good afternoon, your Honor.  Joe Grinstein

11    again representing the AvMed plaintiffs.  With me is my colleague

12    Lexie White.  Ms. White will be handling the motion to sever, I'll

13    be focussing on the injunctive issues.

14            THE COURT:  Okay.

15            MR. GRINSTEIN:  Before we get into the substance of the

16    motion I would like to address two preliminary matters which I think

17    will be helpful to the court.

18            THE COURT:  Sure.

19            MR. GRINSTEIN:  First of all, who we are; and second of

20    all, how we came to be here.  As far as who we are is concerned, the

21    plaintiffs in the AvMed case collectively represent 70 percent of

22    the United States private health care market.  If you look at the

23    complaint, just about every major health insurer you've ever heard

24    of is a plaintiff in the complaint, Aetna, Humana, CIGNA, United

25    Health Care, WellPoint, a host of Blue Cross Blue Shield plans.  The

1    affidavits that we've submitted to this court substantiate that our

2    plans cover 1.1 million different employer based plans, our plan

3    administers those employer based plans, covering more than 120

4    million Americans.

5            And I mention this because I think it underscores the

6    importance of the relief that we're seeking.  This relief is

7    indisputably important to the U.S. health care economy.  And in

8    large part because we represent many employers' self-funded plans,

9    the dollars that my clients are potentially going to be denied here

10   are dollars that ultimately come out of the pockets of American

11   employers and employees.

12           Second, let's talk about how we came to be here.  We

13   originally filed, I should say actually back in January of this year

14   we contacted the PSC, every plaintiffs Vioxx lawyer whom we could

15   identify, put them on notice of our reimbursement claims.  We were

16   ignored.  In April of this year we filed our motion for -- we filed

17   a complaint in the MDL asserting those liens, and again we were

18   ignored.  Finally on June the 9th of 2008 we filed our motion for

19   temporary injunction and temporary restraining order, And only then

20   did we finally catch the attention of the PSC.

21           And in opposing our motion for temporary injunction, the

22   PSC said that the relief that we were requesting was way too broad,

23   but that if we wanted to assert some form of relief that was

24   narrower that might be more appropriate.  And the narrower form of

25   relief that they suggested was that our clients submit to BrownGreer

1  a list of our plan members who were prescribed Vioxx and BrownGreer

2  would tell us who is or isn't in the settlement.  I think perhaps a

3  little bit to the PSC's surprise, we agreed with that compromise.

4         And as a result before the June 27th status conference, we

5  entered into an oral agreement with them whereby we would take down

6  our motion for preliminary injunction in exchange for BrownGreer

7  doing that data matching that we requested.  At the hearing at the

8  status conference that oral agreement was read into the record, and

9  your Honor made certain comments about your Honor's views that going

10  forward it would be appropriate for my clients to cap their

11  recoveries on their ultimate liens against individual plaintiffs in

12  exchange for this deal.

13         I said on the record that we weren't in a position to

14  agree to that at this point, we might some day later, but at this

15  preliminary stage we wouldn't agree to that as a prerequisite for

16  getting the data.  The PSC came up after I spoke and reconfirmed

17  that there was a deal despite the absence of any agreement on the

18  caps.

19         Nevertheless, in the weeks that followed the hearing, the

20  PSC changed course and decided that there wouldn't be a deal without

21  caps.  And that's what brings us here today.  As far as my clients

22  are concerned, we certainly are open to a compromise at some later

23  date with respect to our liens, but we're not willing to blindly

24  place caps on those liens now before we have done this data

25  collection because this is data we think we have a right to and so,

1   therefore, shouldn't have to give up our claims in order to get the

2   data we think we have a right to.

3         THE COURT:  Let me just interrupt you on that, and I'll

4   try not to interrupt you.  But the point of caps -- because you

5   mentioned that it originated with me and it did -- this is the

6   reason that I felt that it was something that really had to be

7   looked at and it's something that is significant from the standpoint

8   of maybe both of you, but certainly the plaintiffs.

9         The plaintiffs are in a position, and I say the

10  plaintiffs, I mean the plaintiff committee is in a position,

11  fiduciary position representing 100,000 individuals or thereabouts.

12  They are being asked by you to either voluntarily or with their help

13  deliver certain information to you.  And I am not talking about

14  their cases necessarily as much as in their fiduciary responsibility

15  the cases that they represent that are not theirs, their cases they

16  can get some permission from their clients, but they're not able to

17  get permission from the large number of people that they represent a

18  fiduciary responsibility.

19        So it seems to me that they have to give those individuals

20  something in order to cooperate fully and vigorously with you.  If

21  they do and get nothing from it, then it seems to me that they're in

22  a position where they may have breached their fiduciary

23  responsibility.  And to get around that problem, which is both a

24  responsibility that they have which is legal perhaps, but it's also

25  ethical; and I think that that is an answer, may not be the only

1    answer, but it is certainly an answer that they can justify

2    participating with you vigorously if they get something from it.

3    They can explain this is why they did it.

4         And because of that I just from a practical standpoint

5    that to me was a way of your getting their voluntary and

6    enthusiastic corporation.  That's why I mentioned it to you.

7         MR. GRINSTEIN:  And we certainly appreciate that, your

8    Honor.  In our view there was a quid pro quo to the deal in the

9    sense that we were taking down our motion and taking down the

10   request to enjoin distributions in exchange for the data, but I can

11   understand your viewpoint that you've expressed.

12        And I am not here to enforce that deal, I am here to ask

13   for our relief that we put forth in the papers.  And I am not

14   casting aspersions on anybody for getting out of the deal, people

15   did what they had to do.

16        So let's talk about the substance of our request.  And I

17   think the first thing we have to do when we talk about the substance

18   is hone in on exactly what my clients are asking for.  I've got with

19   me today a disc, password protected disc, that contains 4.5 million

20   names.  Those are individuals who my health plans paid for Vioxx

21   prescriptions.  The disc we intend to submit into the registry of

22   the court.  There are very serious HIPAA issues and the like with

23   respect to the disc, that's why we're treating it very carefully,

24   it's password protected, encrypted, so on and so forth.

25        What we're asking is that this court order BrownGreer to

1    look at the names on the disc, look at identifying information on

2    the disc, compare those names to the names of people who are

3    participating in the settlement.

4             As to those people who are not our plan members and whom

5    we have nothing to do, we request no relief whatsoever.  As those

6    individuals who are our plan members, we want the opportunity, the

7    fair opportunity to assert our reimbursement rights against them.

8    This is a very narrow, very limited form of relief.  It doesn't

9    implicate any privacy concerns whatsoever.  We are not going to get

10   any information about people who aren't our plan members.  The only

11   information that's going to come back to us is information we

12   already know about the people who we insured, it's just a simple are

13   they in the settlement or not, which isn't a private issue, it's a

14   matter of record at BrownGreer.  And it will have little or no

15   impact on the people who are not our plan members.

16            So with that narrow form of relief in mind, let's talk

17   about the four factors that go towards the preliminary injunction.

18   The first and maybe the most important factor is the likelihood of

19   success on the merits.  That issue centers on really one question,

20   which is what are the merits of this particular litigation for which

21   we have to show a substantial likelihood of success.  And the merits

22   in this particular litigation that we are talking about are

23   individualized actions that the health plans are going to file

24   against individual claimants asserting individual health plan

25   documents and individual liens.  And those would be resolved in

1    individual trials, bench trials because we're talking equity here,

2    on a claimant-by-claimant basis.  Those are the ultimate merits to

3    which we have to show a substantial likelihood of success.

4           With those ultimate merits in mind, it almost can't be

5    disputed that we have that substantial likelihood of success.  We've

6    put forward into the record representative plan language from every

7    single one of our clients showing that they have strong

8    reimbursement rights in their plan documents.  Pursuant to the

9    Supreme Court's opinion in Sereboff and the Fifth Circuit's opinion

10   in Bombardier, it's almost indisputable that those plan documents

11   and those plan provisions must be enforced.

12          In response, BrownGreer and the PSC make a few merits

13   related arguments, but those merits related arguments are really

14   arguments that miss the point.  The first argument that they make

15   is, well, we've looked at the plan documents that you've submitted,

16   and we think three of the 83 that you've submitted have deficient

17   plan language.  My initial response to that is we disagree as to

18   those three, and we explain our disagreements in our reply papers.

19          But more to the point, the fact that they only picked out

20   three of the 83 shows that we've got 80 plans that we put into the

21   record for which they don't dispute our entitlement to

22   reimbursement.  And given that, it's very difficult to assert that

23   we don't have at least a likelihood, a pretty significant likelihood

24   of ultimate success on the merits.  Plainly my clients know how to

25   write reimbursement provisions to go into plan documents and we've

1   more than proven up that those reimbursement provisions exist within

2   my clients' plans and are enforceable.  So, you know, at this stage

3   I don't have to prove 100 percent entitlement to relief and try my

4   case before you in order to get relief.  I have to show substantial

5   likelihood of success on the ultimate merits.  And I would submit

6   that we've made that showing at this point.

7           The second argument that they make is that we have no

8   rights right now as against an unsegregated, unallocated, enormous

9   large settlement fund.  That argument, however, ignores what the

10  standard is here and what we're asking for.  The standard here is

11  ultimate success on the merits.  Those merits will come down to when

12  we are asserting and seeking individualized relief against

13  individualized people based upon our plan documents.  We are not

14  here asserting some gargantuan $1 billion lien against the $4.85

15  billion fund.  What we are doing is proposing to get this

16  information and then go individualized against allocations that are

17  to be made for the plaintiffs.

18          Now it's true that right now we are here seeking

19  preliminary relief that relates to a fund in the larger sense of the

20  word, but the relief that we're seeking right now is really a

21  creature of timing.  If we need this preliminary relief, not this

22  ultimate relief, not this ultimate success on the merits now, we

23  need this preliminary relief in order to guard the availability that

24  we eventually one day be able to succeed on these individualized

25  claims.

1      Essentially what the defendants are arguing right here is

2  that there's this $4.85 billion fund and that we concede that we

3  aren't owed every dollar of that $4.85 billion fund, which we

4  concede.  And so they argue that because the fund that is out there

5  is larger than our ultimate claim to recovery, it's, therefore, not

6  a fund against which we can claim any relief.  Two answers to that:

7  The first one, as I've described, the only relief we want right now

8  is preliminary to guard our availability of later individualized

9  relief.

10      But secondly, the Fifth Circuit dealt with this issue in

11  Bombardier.  In Bombardier, there was a fund of $18,500 that had

12  been set up and set aside by the plaintiffs' attorneys.  The health

13  plan in Bombardier only claimed $13,500 of that particular fund.  So

14  there was plenty of money in that fund, a full third more than what

15  the health plan was claiming; but you didn't see any argument from

16  the Fifth Circuit or any complaint about jurisdiction from the Fifth

17  Circuit there that somehow or other that there were no rights that

18  can attach to this fund of money simply because there were dollars

19  in that fund that the health plan wasn't claiming.

20      There was no jurisdictional problem in that case, there

21  was no argument to that effect in that case.  And I would submit

22  that basically disposes of "there's too much money in the fund, you

23  have no rights to it" argument.

24      THE COURT:  They also take the position though that there

25  are people in the fund that you have no claim against and this would

1   interfere with their receiving their funds.  How do you deal with

2   that?

3             MR. GRINSTEIN:  Your Honor, the only impact we could

4   possibly have on these people who are not our members of our plans

5   and not our insureds, would be that if in this data matching process

6   somehow or other people's distributions got delayed some minor

7   amount of time.  That is it.  There is nothing else, there is no

8   other impact.  We don't want any money from them, we don't want

9   their names, we want nothing.

10            I'll submit that this data matching process is not

11  complex, it can be done relatively quickly by BrownGreer and could

12  have been done long ago if we hadn't had this long tortured path to

13  get to this particular day where we're arguing this motion.  The

14  data matching can be done quickly, quickly enough that it ought not

15  to impact anybody's ultimate settlement distribution.  Once we get a

16  list of people that say not our plan members, moneys can go out to

17  them.  To the extent that there's going to be any delay that's

18  related to that, it's going to be extraordinarily minor.

19            THE COURT:  What do you do with the people that are claim

20  members, do you pursue them in their states?

21            MR. GRINSTEIN:  Well, your Honor, there is a fund that's

22  set up, it's under the jurisdiction of this court, and so we've

23  asserted our claims under the jurisdiction of this court.  This

24  court's administering the allocation of those moneys and as a result

25  we think that this court is the proper place for the litigation of

1    those particular liens.  What we would do, I think if we want to

2    flash forward to what our ultimate relief would look like down the

3    road, I think we would probably be in some situation where we would

4    have a special master or someone like that who we could all agree

5    would deal with this issue, and we'd litigate individual liens in

6    front of that individual with appeal to you or however it would

7    work.

8            But I think jurisdiction is appropriate here, particularly

9    because there is plenty of people who haven't even filed a lawsuit

10   who are going to be participating in the settlement because they're

11   subject to tolling agreements, so there is no state to which to send

12   back their case anyway.

13           THE COURT:  Well, there are a couple of different groups,

14   there is the groups in the states and they have claims from a number

15   of states that are lodged in state courts that are probably going to

16   participate in the settlement, don't know how many of them will get

17   through the gates or not, that's another issue.  But that will be a

18   group.  I would imagine that those claims would have to be dealt

19   with under the laws of that particular state.

20           There are some cases that are federal case s that -- I've

21   got cases now from the federal system from every district in this

22   country.  I could send them back to those districts and let you

23   pursue them in the 94 district courts of federal court.  I don't see

24   this court having 100,000 or 1,000 or 1,500 or 15,000 trials on the

25   question of liens.

1          MR. GRINSTEIN:  You know, your Honor, I guess there are a

2    couple of points to respond to right there.  Number one, these are

3    all going to be federal cases because to the extent that we're

4    not -- we're talking about ERISA plans which is the large portion of

5    our plan membership, we're talking about federal claims in federal

6    court.  So even if they filed in state, we're talking about them

7    being in federal court.

8          Also because of that, ERISA preempts most state laws to

9    the contrary.  So as a Fifth Circuit has held, for example, in the

10   Bombardier case, you can't roll in and assert a state common fund

11   argument and try to get fees off an ERISA recovery because ERISA

12   preempts that, and there is plain language that says no fees, no

13   fees regardless of what the state says.

14         As to where these cases belong, we can talk about that at

15   some later state.  I strongly believe that the jurisdiction is

16   proper in this case, in this court because this court has

17   jurisdiction over the res., and the res. is 4.85 billion.  I don't

18   think the Eastern District of Texas or the Northern District of

19   California can order us to provide relief with respect to that res.

20   given that the res. is centered in this court.  But that is an

21   ultimate issue down the road on merits, and we are not there yet.

22         Going back to the factors for injunctive relief.  I've

23   talked about likelihood of success on the merits.

24         The second factor is whether or not we're subject to

25   irreparable harm.  Our reading of the case law is that once the

1   moneys go out the door, once they're commingled with the plaintiffs'

2   generalized assets, our rights to reimbursement under our plan

3   documents are seriously imperiled.  There are two responses that the

4   defendants give to this argument.  The first one is that there is

5   some case law out there, post Sereboff and post Knudson which

6   suggests that even if someone commingles these moneys with their

7   generalized assets that we still have relief available to us because

8   liens have been set up by agreement and so we can still go after

9   people in their individualized capacity.

10          Well, that's not the law in the Fifth Circuit.  And until

11  it is the law in the Fifth Circuit, those other cases from other

12  jurisdictions don't give us comfort.

13          And more to the point, I haven't heard the PSC get up here

14  and say that on behalf of all plaintiffs, the ones that they

15  represent, the ones that are their fiduciaries that hereby waive any

16  argument that we will ever have any problem with attaching our liens

17  to individualized recoveries once the moneys have been disbursed and

18  dissipated.  Until they make that concession in a binding and

19  enforceable way, we face irreparable harm.  And the fact that

20  they're not willing and won't make that concession proves that

21  what's going on here really is an effort to send the money out the

22  door as quickly as possible so that we are unable to assert our

23  rights with respect to it.

24          The second argument on this irreparable harm point we hear

25  is that, well, only 40 percent of the money is going out the door in

1   August, the rest the other 60 percent will be available later so you

2   can attach your liens to that.  But the health care costs that we're

3   talking about are extraordinary costs, I mean these are people who

4   had heart attacks, could require years and years of follow on care.

5   Just the heart attack care itself is a serious intensive hospital

6   stay.  Our plan documents as interpreted by various courts around

7   the country give us rights to every single dollar of health care

8   expenditures that we've made.  And so the timing of this plan to

9   send certain amounts of money out in August is not something that

10  could override our rights to seek and pursue every single dollar

11  that we're owed.  Our rights are what are stated in the plan

12  document as enforced by ERISA and some argument that, well, you

13  should be happy to confine yourself to 60 percent of your potential

14  recovery is inconsistent with our rights in the plan document

15  language.

16          The third injunctive issue is the balance of harms.  The

17  harm to us, I think I've described it earlier, it's significant, we

18  could have our rights evaporate unless we're given relief now.  The

19  defendants have suggested two separate harms.  First of all, is the

20  privacy interest that our relief would invade people's rights to

21  privacy.  I think I've described plainly that's not the case.  We

22  are not going to get any information we really don't already have

23  other than a simple yes, no, somebody's is in the settlement.  There

24  is no privacy right that attaches to that.

25          The second defendants argue is a complaint about delay,

1    and they say that our request for relief is going to cause delay and

2    that's a substantial harm to the VIOXX claimants.

3            And I've got five things to say about that, some of which

4    I've already touched on.  Number one, there is no reason why this

5    matching can't be done very, very quickly.  We've got the data right

6    now, it's a simple computer run.  We can work with BrownGreer.

7    We've got the algorithms is already in our system, help them do this

8    data match, should not take that long.

9            Number two, for those people who are not our plan members,

10    they're out of here, we have no claim with respect to them, we are

11    not to do anything to impede their money.

12            Number three, with those people who are our plan members,

13    we're going to assert our liens up to a certain amount of money, and

14    if the defendants are right and that our liens aren't that big, then

15    the rest of the money can go out the door and we won't do anything

16    to stop it.  As to the liens themselves, we're going to have to

17    resolve those and will take how long it takes to resolve the liens.

18            But number four, to the extent that any settlement moneys

19    are going to get held up here, there is no reason why those

20    settlement moneys won't be sitting there in an account at U.S.

21    Bancorp earning interest.  Just like the Settlement Agreement has

22    provisions for things like the common benefit fees that they can be

23    set up in separate bank accounts to earn interest, there is no

24    reason why the disputed moneys here can't also earn interest.  And

25    as such there isn't any economic harm from the moneys being delayed

```
1   because the moneys will be compensated for that delay.

2              And, number five -- I should add that we're talking about

3   equity right here.  And as long as we're talking about equity, the

4   PSC is in an inferior position to be complaining about delay because

5   they have very unclean hands in this regard.  If the PSC really

6   cared about the delay of the August distributions, they would have

7   dealt with this issue or attempted to deal with this issue back in

8   January when we first raised it or in April when we filed our

9   complaint.  If the PSC was really concerned about delay back in

10  March when HRI filed its discovery motion, they would not have got

11  up before this court and said, no, no, HRI is too early, there is no

12  fund set up, we're way premature, let's do this later.  If the PSC

13  were really concerned about delay, when we filed our TRO motion on

14  June the 9th, 2008, the PSC would not have come here on June the

15  11th of 2008 and said don't grant any relief right now, there's

16  plenty of time before the August distributions to brief this thing

17  on the merits, we can take care of it then.

18             And if the PSC were really concerned about delay, they

19  would not have made the deal that they made on June the 27th to

20  compromise our issues and then back out of it costing a full other

21  month to the process.

22             So to the extent that there is delay and that anybody is

23  going to suffer some non-economic harm from that delay, the PSC's

24  hands are very unclean in complaining about it.

25             Last issue is whether or not our injunction will benefit
```

1    the public interest.  And as we put forth the evidence in the record

2    from Professor Melnick and from the case law, it recognizes that

3    these ERISA reimbursement rights are very important to the health of

4    the nation's health plans and the fiscal integrity of them.  These

5    are not insignificant rights, we're talking about very vital and

6    important rights.  The public interest harm that the plaintiffs

7    point to, that the claimants point to is that people are going to

8    have their money delayed, and I think I already discussed why that

9    really doesn't attach here.

10           And I should also emphasize that the individual claimants

11   themselves should not be in a position of being able to argue that

12   they're allowed to forsake the plan documents, forsake their

13   contractual obligations to the plans and essentially enjoy double

14   recoveries of their medical expenses by not following the

15   reimbursement terms of the ERISA plans.  That's certainly not in the

16   public interest.

17           Let me conclude by talking just briefly about the bond

18   issue.  The PSC and the defendants' apparent goal right here is to

19   have us denied relief either on the merits or through the imposition

20   of such a large bond that it's impracticable to continue to pursue

21   this relief.  And that is the purpose of a bond.  The purpose of a

22   bond as reflected in rules and in case law is to guard against any

23   economic harm that might befall the party against whom an injunction

24   is improperly granted.

25           So the question is what's the economic harm that will hit

1    the Vioxx claimants if an injunction is granted here improperly.

2    Well, the money is not going to go away.  That's as safe and secure

3    at U.S. Bancorp as it could possibly be, we heard a couple of status

4    conferences ago about how lovely and perfect U.S.  Bancorp's

5    protection for money is.  So the money is not going anywhere.

6            As far as some economic harm from delay, the money can

7    just as easily earn interest while it's at U.S. Bancorp.  So it's

8    not like there's going to be any diminishment in the value of the

9    corpus of money; if anything, there is going to be interest that

10   attaches to it.

11           Under the Fifth Circuit's decision in the Corrigan case,

12   it's simply not proper to order a bond of any amount in these

13   circumstances where there is no economic harm that's been shown.

14   The Corrigan case involved a situation in which there were two

15   parties fighting an interpleader action over some coffee in the

16   court's registry.  The Fifth Circuit held that under that situation

17   under Rule 65 there should not be security that should have to be

18   posted by the party who is fighting over that coffee, because while

19   it's sitting there in the court registry, it is not going anywhere

20   and so it's not imperiled.  Same situation right here, the money

21   that we're fighting about, it's not going anywhere and it's actually

22   earning interest.  So in that sense there shouldn't be a bond.

23           We've already offered to pay BrownGreer's reasonable

24   expenses in doing this data collection, so if you put that together

25   with the fact that the money is not going anywhere and it ought to

1    be earning interest, there simply is no economic harm against which

2    a bond.  And the only purpose of a bond at that point would be to

3    deter us from pursuing our rights, not actually guarding against any

4    harm.

5         So with that in mind, your Honor, we ask you to grant the

6    preliminary injunction in the manner in which we've requested.

7         THE COURT:  Thank you.  Do you want to argue as a

8    plaintiff or do you adopt the argument or?

9         MR. MARKS:  If I may, your Honor.

10        THE COURT:  Okay.

11        MR. MARKS:  My name is Andrew Marks and I represent the

12   two union health and welfare funds that are named plaintiffs in the

13   class action.  With the court's permission, I do want to adopt

14   virtually everything that Mr. Grinstein said, but we are a different

15   group.  And more importantly, largely in response I would say to the

16   complaints that were made by the NPC and by BrownGreer in terms of

17   the form of relief that was initially asserted, we filed an amended

18   complaint, as your Honor knows, and specifically limited and

19   tailored the injunctive relief that we're asking the court to enter.

20        And I would like to explain to you what that relief is and

21   why it's different and we think significantly different from the

22   relief than Mr. Grinstein's clients seek.  We think it's more

23   limited, we offer it as an alternative, and we think it really

24   addresses and puts to bed the concerns that have been raised.  If

25   the court would permit me to use a power point, your Honor, and just

1    go through some of these points, would that be okay?

2            THE COURT:  Sure.

3            MR. IRWIN:  Your Honor, I would just like to point out --

4    this is Jim Irwin, counsel for BrownGreer and U.S. Bank -- we have

5    not seen this power point.  I mentioned that to Mr. Marks.  I assume

6    that there is nothing in here that's new; if there is, we want to

7    preserve our objections, if there is something that we're shown here

8    that's new.

9            THE COURT.  Okay, that's fine.

10           MR. SEEGER:  Your Honor, we join in that objection.

11           THE COURT:  Yes.

12           MR. MARKS:  Thank you, your Honor.  First, let me say who

13   we are.  The two named plaintiffs, as you know, your Honor, are

14   relatively small union health and welfare funds, they're self-funded

15   ERISA plans.  And what that means, of course, is that the money that

16   actually pays those expenses comes from the unions, there is no

17   insurance.  If there are heavier medical expenses in a given year,

18   they come from the union funds; it's not insured at the end of the

19   day by an insurance company.

20           Likewise, thousands of plans like this by unions as well

21   as by employers where it's self-funded by the employer or by the

22   union, and just to give you an example our expert Mr. Johnson whose

23   affidavit was submitted as part of this was the, ran the American

24   Airlines self-funded plan, you can imagine sort of the other end of

25   the spectrum from our small union named plaintiffs.  But it's an

```
 1    identical type of thing which is that American Airlines own money
 2    would pay if there were high costs as a result as an example, Vioxx
 3    injuries in a given year, and ultimately the money that's needed to
 4    fund that plan would go up or down based on the employer or the
 5    union if they're able to enforce their reimbursement rights.  And
 6    that's why these provisions are so important to the operation of
 7    ERISA plans because they provide the funding and they prevent some
 8    members of the plan, the beneficiaries, here the Vioxx claimants,
 9    really from a double recovery because what our plaintiffs and our
10    class have done is they have funded the payments of Vioxx related
11    health care.  The same type of injuries for which the Vioxx
12    claimants are receiving substantial money and/or releasing all of
13    their claims.
14            So we're self-funded health plans.  We all provided Vioxx
15    related medical benefits, it's already been paid or agreed to be
16    paid.  And the critical thing, your Honor, is that we defined the
17    class so it is limited to those plans that have the specific type of
18    provisions that Sereboff and Bombardier have already said are
19    enforceable under ERISA's 502(a)(3).  And that's a critical
20    limitation, your Honor, although the fact is as our expert says, and
21    as one can tell from frankly looking at the Sereboff, the Bombardier
22    case, look at all of the cases that are decided and cited to you,
23    all of those plans with maybe one outlier, I can talk about the
24    outlier later, but well north of 95 percent of all plans are going
25    to have this language.
```

1          But the language is important because it's that

2     distinctional language that the Sereboff court said distinguished

3     where you got an identifiable fund, that important notion of

4     identifiable fund which the NPC makes a lot of, and understandably

5     because for it to be an equitable right under ERISA it has to be an

6     identifiable fund.

7          And what Sereboff said is where you have a plan that by

8     agreement gives the plan the right to recover against, specifically

9     against the proceeds of a settlement from a third party or the

10    proceeds of a recovery from a third party, that is by definition an

11    identifiable fund.  And so we have limited ourselves specifically so

12    any plan that does not have that type of language would fall outside

13    of the class definition and obviously we would not be seeking relief

14    for them.

15         THE COURT:  They take the position though that there is no

16    identifiable fund because nobody has been assigned any money yet on

17    your lien.  The Sereboff case, you've got one or just several

18    claimants, the amount of recovery is known, there is one policy

19    involved, and there is nobody who is not covered by that policy.

20         MR. MARKS:  Your Honor, what is absolutely undisputed,

21    okay, is that in three weeks or four weeks or whenever it is that

22    BrownGreer does the allocation, the settlement moneys its received

23    from Merck will be divided in some way according to a formula that

24    is none of our business.  Once that division take place and is

25    allocated, there is a process that is going to go from an allocation

1    and it's going to be sent to the lawyers -- and by the way, not just

2    the lawyers here, but obviously there are other lawyers as well.

3            Once that allocation takes place, there is an identifiable

4    fund.  And it's striking, your Honor, because if you look at the

5    Sereboff case and look at Justice Holmes' opinion in the Barnes case

6    which Justice Roberts relies on, and the language of that case is

7    instructive and on all fours here.  What Barnes said and what

8    Justice Roberts said in Sereboff is the lien that we are here to

9    enforce has already been created.  It's a lien by agreement, it's in

10   the plan documents.  That lien exists.  As soon as there is the race

11   that property to attach it to, at that moment in time the lien is

12   perfected.

13           Now, we believe actually your Honor that that perfection

14   will take place before it even gets to the plaintiffs, it becomes an

15   identifiable fund while it's still at BrownGreer.  But for purposes

16   of the preliminary injunction that we seek, and I'll talk about

17   this, we want to leave BrownGreer as much out of this as we can.  We

18   think BrownGreer obviously is acting as an administrator under the

19   court's supervision.

20           We believe that the obligation is on the plaintiffs'

21   lawyers, and I'll explain why.  It's an obligation that they've

22   already undertaken that they have contracted with Merck to provide,

23   they've told this court what they're going to do.  And it's an

24   ethical obligation they have, and if I can I'll show you why.

25           But going to the identifiable fund, that fund is

1    undisputable will exist within a couple of weeks.  All we're talking

2    about is timing.  And I would adopt what Mr. Grinstein said.  On a

3    preliminary injunction, we are here, we do not have to show that --

4    we're talking about the ultimate relief.  Are we ultimately going to

5    be able to show an identifiable fund, that's undisputed.  There is

6    absolutely no doubt, no one can stand up here with a straight face

7    and say that there will not be an identifiable fund, as soon as the

8    money goes to the lawyers, if not sooner.  And moreover, and I'll

9    show you, your Honor, mixing plaintiffs -- defendants in our case,

10   the underlying plaintiff lawyers have already conceded that in their

11   papers.

12         Let me, if I can, talk about what we're seeking and what

13   we're not seeking.  Our preliminary relief seeks the identification

14   of the claimants, only the claimants who may have received money

15   from the self-funded ERISA plans.  We want no information at all by

16   anyone who did not receive any money from a self-insured ERISA plan.

17   And the plaintiffs' lawyers --

18         THE COURT:  Wait, you've agreed with your colleague?

19         MR. MARKS:  I do, although we overlap somewhat but we're

20   different universes.

21         THE COURT:  I understand, right.  But certainly someone

22   who received no money from any of our class we don't want their

23   information.

24         One of the complaints that the NPC made was there were

25   some people who really will be harmed because of some extreme cases

1   of hardship.  Our proposed relief puts it in the hands of the

2   plaintiffs lawyers to give us certification that says this person

3   has a real hardship, they need the money right away, we carve them

4   out, they don't have to be part of the preliminary injunction.

5          The plaintiffs, the NPC said, you know, in some cases the

6   60 percent is not yet going to be distributed, will be more than

7   enough.  Now, here we differ from Mr. Grinstein because we're

8   prepared to take their word for it.  If the lawyer will certify that

9   any potential ERISA claim, which is just a medical benefits that

10  were received from the ERISA plan, are less than the 60 percent that

11  will remain, we let them certify it, we carve them out.  And all we

12  ask for is a short window of opportunity, we say 45 days, to allow

13  those plans where, who did have beneficiaries who received benefits

14  to allow them to assess and make a decision will they or will they

15  not assert what we believe is an undisputed right under their plan

16  documents.

17         So we do not seek any delay for Vioxx claimants who are

18  not ERISA plan beneficiaries, we do not seek any delay of payment in

19  hardship cases, we do not seek any delay of payment if there is

20  sufficient undisbursed funds.  We don't want any protected health

21  information.  The only information that is being sought is the name,

22  the employer, the name of the fund, and the social security number.

23  There is no HIPAA protected information in there whatsoever and we

24  address that in our briefs.

25         And the information will be strictly given to the lawyers

1   as class counsel to give only to the plan that's affected, not more

2   generally.

3          Finally, there will be no public disclosure of any

4   information whatsoever.

5          Just to emphasize what I said before, because our proposed

6   order, and I hope the court will look at that order itself, there is

7   no requirement, no burden placed on BrownGreer.  BrownGreer, the

8   only thing BrownGreer is asked to do is, say, give 20 days notice

9   before you send the money.  And we picked that arbitrarily because

10  we figured that's enough time for the plaintiffs lawyers then to,

11  underlying plaintiffs' lawyers to be able to do the certifications.

12         So I think we have addressed and responded constructively

13  to the suggestion where the Plaintiff Steering Committee said that

14  the AvMed relief requested was too intrusive.  We have come up with

15  I think a very well crafted, carefully tailored non-intrusive

16  injunction that will not burden BrownGreer.  And frankly is going to

17  put a very limited burden even on the plaintiffs' lawyers and here

18  is why.

19         The first step, the first step is the plaintiffs' lawyer

20  have to certify that they made an investigation, and I'll show in a

21  minute why they've already agreed to that.  Second proposed step is

22  to make a list, here are the people who do not get any funds, any

23  medical benefits from their ERISA funds, pay them.  Those who did,

24  put them on a list.  For those who are on the list, give us the

25  limited information I already talked about.

1          Now, with step three, the lawyers can go ahead and

2    disburse the settlement funds to anyone who is not an ERISA

3    beneficiary, anyone who is not on the list of potential

4    beneficiaries, anyone demonstrating hardship where the lawyer

5    certifies there is something, a real hardship there, and anyone

6    where there's 60 percent is sufficient.

7          I agree with Mr. Grinstein here.  Any money that is

8    withheld from this limited 45 day period is all, should be put in an

9    interest-bearing account, there should be no harm there at all, the

10   money should earn interest.  Unfortunately with today's interest

11   rates we know that's not a lot of money, but any interest that can

12   be earned ought to be earned and that's part of our relief.

13         Step four.  We will undertake as class counsel the burden

14   of notifying all of the plans who are identified in the lists that

15   the plaintiffs' lawyers provide and to give them the information,

16   only information associated with their beneficiaries, no one else's

17   beneficiaries.  And they will be told they have 45 days to either

18   assert a claim or not.  And if they don't assert a claim within that

19   45 days, then the plaintiffs' lawyers under our proposed relief have

20   the right to disburse the money.

21         Those plans will be left to their own devices whatever

22   remedies they may have, they are not going to waive any remedies,

23   but obviously they'll have the difficulties and we think the

24   irreparable injury of having to go chase the money once it's

25   distributed and commingled.

1          The thing that I want to emphasize, your Honor, is the

2     lack of burden.  If you'll look, your Honor, the relief we sought

3     prior to disbursement, which is a good faith investigation to the

4     existence, the amount of liens and the certification of counsel.  On

5     the right-hand side, your Honor, is what the obligations that the

6     plaintiffs lawyers have already undertaken.  They admit in a

7     document called the Frequently Asked Questions, and I'll show it to

8     you in a second, your Honor, that in the Settlement Agreement

9     themselves they have committed themselves to do a good faith

10    investigation and they promise Merck, they've represented to Merck

11    and we think to this court as part of the Settlement Agreement being

12    approved by this court, that they're going to undertake an

13    investigation and certify that all of their liens have been taken

14    care of to third-party payors, including our clients, including the

15    class.  And that's all part of the settlement release.

16          So the settlement, the claimants themselves in

17    Exhibit 1 -- there's a lot of exhibits to that agreement, 1.2.2.3 on

18    page four, says, "For the settling claimants, prior to the first

19    time, if any, that a settlement payment is made to me, I shall

20    jointly and severally along with respective counsel, represent and

21    warrant that any and all liens with respect to all settlement

22    payments have been satisfied or discharged.  Obviously to do that,

23    your Honor, the claimants with their counsel, have to undertake

24    investigation.

25          Next, and perhaps more important for purposes of the

1    relief we're seeking here because we ask that the burden be placed,

2    and it's a light burden, on the plaintiffs lawyers because they've

3    already undertaken it, same exhibit.  There is a certification of

4    counsel attached, every one of the lawyers here and every one of the

5    other lawyers representing a settlement claimant has to sign.

6            And it says, "personally, I further agree to be bound by

7    my joint and several obligations to provide representations and

8    warranties regarding the satisfaction of and indemnification with

9    respect to liens, set forth under liens and other third-party payor

10   claims."  Those are exactly the liens that we are seeking to

11   enforcement; in other words, they have promised already to undertake

12   an investigation.  I take them at their word, I assume they have

13   undertaken that investigation.  If they have, there is absolutely no

14   burden on them to live up to the mild relief that we ask this court

15   to enter.

16           Also, the next slide, it repeats.  In their own brief they

17   cite this frequently, this FAQ, and they say, they repeat exactly

18   what the terms of the Settlement Agreement is.  They've told

19   everyone of the plaintiff lawyers out there that they have this

20   obligation.

21           And finally, your Honor, in terms of burden, we

22   respectfully submit that the Louisiana rules of professional

23   responsibility here are absolutely clear.  These lawyers know that

24   the amounts that they'll be receiving are subject to a lien and

25   third party dispute and they must safeguard those funds under

1    Louisiana State Bar Association Public Opinion 05-RPCC-004, they

2    have an ethical obligation to safeguard those funds.  Therefore,

3    again, we think there is no burden whatsoever for them to simply

4    comply with what their existing obligations and undertakings are.

5          THE COURT:  They would say what makes you think they

6    won't?

7          MR. MARKS:  Your Honor, the issue, if they are doing it --

8    I don't question whether they will or they won't.  The only point

9    that I submitted for your Honor is for them to come up and tell you

10   that it's a burden for them to comply with the relief we seek; seems

11   to be a hollow argument, because unless they're going to take the

12   position they're not going to live up to their obligations under the

13   Settlement Agreement and the ethics rules, then it's something that

14   they have already done or will be doing in any event.  And that's

15   the only point.  I take them at their word.

16         The question is do they -- are they credible when they say

17   that the burden that we ask this court to impose is a hardship?  The

18   answer is they're not credible because they've already undertaken

19   that obligation as a precondition to the settlement.

20         Now, I want to just touch briefly because I thought

21   Mr. Grinstein touched cogently on the likelihood of success on the

22   merits.

23         As I said before, under Sereboff and Bombardier the law is

24   very clear, the language, we would have language like we do in our

25   plans and that most plans do around the country that says that a

1    plan has a right to recovery against funds from a settlement, from a

2    third party or received from a third party.  There will be and is a

3    right to recovery the moment those funds are allocated.

4            THE COURT:  I read your brief on that.

5            MR. MARKS:  I'll move on.  So I just want to emphasize,

6    your Honor, that here we have several times in the NPC defendant's

7    own brief, which I am sure you also read, where they concede that.

8            It's all a question of timing.  Their only issue here,

9    your Honor, is whether in terms of success on the merits.  They want

10   to say we're too early.  That's a game of gotcha because they

11   recognize that they want to get the money distributed and disbursed

12   before we can exercise our rights, where it is undisputed that it's

13   going to happen that we have a right and will have a right and we

14   believe we have the right to a preliminary injunction to protect

15   that right.  We don't have to wait for the harm to happen to protect

16   that right.

17           And the one thing I would also emphasize, your Honor, is

18   where they argue that it's premature.  We brought not only a claim

19   for injunctive relief but our complaint on the merits seek a

20   declaratory judgment.  And it is absolutely clear and concrete

21   controversy that calls out for this court to declare what the rights

22   are under these plans, although I think given their concessions

23   frankly it will be a matter of summary judgment.  But it's simply a

24   question of timing in terms of the ultimate success on the merits.

25   And unless --

1    And it seems to me, your Honor, that the ultimate issue

2    here then as Mr. Grinstein points out is there irreparable injury

3    and there is.  For the reason he says nobody has taken the position

4    that under Fifth Circuit law it is clear that the plans have a right

5    to collect the money from individuals after the money is disbursed

6    and commingled and spent.  Now, that's an argument that we would

7    make obviously, but the law is unsettled on that.

8    But more importantly we are here to enforce an equitable

9    right, a right created by statute.  That right is what's being

10   compromised.  We have a right to assert the lien on the money before

11   it is distributed and disbursed and commingled.  And it's the

12   impairment of that right.  This is not a case about money damages,

13   this is a case to enforce an equitable right.  And if we have an

14   equitable right, which we clearly do under the statute, then the

15   impairment of that right is irreparable injury because there are no

16   money damages that can fix the elimination of a statutory equitable

17   right.  And the District of Columbia circuit in the Foltz case made

18   that clear in the ERISA context, but it seems to me that it's a

19   matter of straightforward logic.

20   If we had a money damages case and we were here seeking an

21   injunction to protect that, then the argument that you might be able

22   to collect the money damages later would hold weight.  But this is a

23   case founded entirely in equity and it's the impairment of that

24   equitable right that is the essence of our claim and where we

25   believe it's clear we have an ultimate likelihood of success on the

1   merits.

2           THE COURT:  Don't you still have a right, I mean, doesn't

3   the lien follow the person and can't you collect from the person?

4   That's what they would say to you that your liens are not

5   demolished, they simply go with the individual who got the money or

6   the lawyer who is representing the individual is not abolished.

7           MR. MARKS:  I would agree that we have the ability to seek

8   that, whether we have a right to seek that against an individual

9   after they've commingled it.  I think under Bombardier we have a

10  right to go after the lawyers every day of the week.  I think once

11  the lawyers have taken that money and sent to it out with the notice

12  they have here, I have no doubt whatsoever.  But we are not assured

13  that whatever the lawyers have taken as their fees will be

14  sufficient to make us whole under our ERISA reimbursement rights,

15  so.

16          THE COURT:  Does it really matter?

17          MR. MARKS:  If we're made whole?

18          THE COURT:  No.  If they're responsible, whether it's from

19  the fees or from their office?

20          MR. MARKS:  It doesn't if it's sufficient money, but there

21  is no assurance it's sufficient.

22           But more than that, your Honor, ERISA gives us a right to

23  assert the lien and not to have to undertake the expense of chasing

24  all of the individuals.  We have a right under ERISA to go after the

25  money as soon as it becomes identifiable.  And to say that we then

1    have to follow it all the way down and chase it is to inflict on us

2    an injury and a burden that ERISA does not require.   ERISA's

3    equitable right is I think very clear and under the Supreme Court's

4    ruling in Sereboff it attaches immediately.   We don't have to wait.

5           Your Honor, I am not going to go through, unless there are

6    questions, about the terms of our plans because I think they are

7    very clear.   And I think that in terms of, I think finally

8    address -- I agree with Mr. Grinstein in terms of the lack of harm,

9    we've talked about the interest-bearing account, we talked about no

10   burden, the public interest in enforcing a federal statute is clear

11   and well established.

12          I guess I would just close again by emphasizing, I frankly

13   think the spurious and tactical nature of the bond request

14   particularly given the relief that we seek.   There is no monetary

15   damage or injury to anybody, and, therefore, any bond would be

16   inappropriate.   But moreover, as this court well knows, the bond is

17   well within this court's discretion, we are talking about

18   short-term, we're talking about limited money, we're talking about

19   interest-bearing accounts, so we respectfully submit, your Honor,

20   that there is no basis for the imposition of any bond.   And the

21   notion of a $6 billion bond, your Honor, is frankly laughable.

22          THE COURT:  All right.  Thank you very much.

23          MR. MARKS:  Thank you, your Honor.

24          THE COURT:  All right.  Let me hear a response.

25          MR. IRWIN:  Good afternoon again, your Honor, Jim Irwin

1    for BrownGreer and U.S. Bank.  I will take up first the response to

2    the AvMed argument and then next the New York unions.

3              I'll say it's a little bit of an unusual feeling to be

4    sitting at the table over there with these world class plaintiff

5    lawyers.  I feel like I have to check for bullet holes every now and

6    then but I am okay.

7              I am going to start off, your Honor, and focus mostly on

8    what I think is the lack of proof that is required to support a

9    drastic and extraordinary remedy.  You have to have proof.  There is

10   virtually no proof here.  I call it nano-proof and I am going to

11   focus on that a little bit.  And then a discussion about this

12   aggregate settlement.  It is not under anybody's possession and

13   control that as required by the Supreme Court, it is not under mine,

14   I am BrownGreer, I have to do what the settlement agreement does;

15   it's not under the plaintiff attorneys, they haven't realized it,

16   Mr. Seeger will speak more to that, he knows the terms of the

17   settlement better than I do; they're not under yours, your Honor,

18   you will enforce the rules and make sure that they're played out

19   properly.

20             But a very key element to any ability to get a 502(a)(3)

21   lien against a settlement fund is that it must be in the possession

22   and the control of the plaintiff or the plaintiffs' agent

23   indisputably would be the lawyer.  It is not.

24             And we're here today to talk about a preliminary

25   injunction, not final relief but preliminary relief.  And in order

1    for this court to enter preliminary relief it must be against a

2    specific and identifiable fund in the possession and control of the

3    plaintiff or the plaintiff lawyer.  There is no such race today to

4    enjoin.

5            So what are these injunctions that are before your Honor

6    today?  I'll talk about that, too.  But there is certainly not

7    502(a)(3) injunctions, they're fish of an entirely different

8    pedigree.

9            And then I guess the next thing I heard and I have to talk

10   about that a little bit is AvMed's argument.  It seems to me like we

11   have a new motion for an injunction from AvMed this morning, or this

12   afternoon, where they're now asking that the court issue some order

13   that BrownGreer process these 4 million names in a CD deposited in

14   the registry of the court that BrownGreer's lawyer, me, has not

15   seen, I have no idea what those 4 million names contain.  But I

16   detect that that's yet a new motion before your Honor to order

17   BrownGreer to do something with those 4 million names.

18           I am going start off, Judge, by giving you ten numbers

19   which I think relate to the factual issues in this case.  These

20   numbers come from the plaintiffs themselves.  These are the AvMed

21   plaintiffs.  First number is 49, that's the number of AvMed

22   plaintiffs in the lawsuit.

23           The next number is 1.1 million.  That's the number of

24   plans that they purport to represent.  That's on page three of their

25   reply brief.

1        The next number is 100 million.  That's the number of

2   members across the United States, or maybe the world, that they

3   claim their 1.1 million plans comprise.  The number I heard a few

4   minutes ago it rose to 120 million.

5        The fourth number is this:  They seek to recover, "tens of

6   millions of dollars."  That's from their reply brief, page six.

7        The next number is this:  2.45, actually I guess it's

8   $2.425 billion, that's from their injunction motion.  In the name of

9   tens of millions of dollars they seek to enjoin at least $2.45

10  billion.

11       The next number is 15,000.  That's the number of people

12  that according to their expert Melnick may have some ERISA based

13  lien obligations in this settlement.  Possibly 15,000 people.

14  That's page four of their reply.

15       Here is my number 35,000.  That's the number of people

16  that they haven't paid a penny to whose money they want to enjoin

17  today, at least 35,000 people.  That's the number of people, 35,000,

18  whose money is commingled into this aggregate settlement.  35,000,

19  that's the number of people that they would like to get an

20  interest-free loan from while they do all of this.  I'll talk more

21  about that when we talk about the bond, but they're basically

22  asking, these insurance companies are asking for an interest-free

23  loan from 35,000 people.

24       83, that's No. 7, the seventh number.  That's the number

25  of exemplars that have been offered in evidence in support of this

1    extraordinary relief, 83.

2         The next number, No. 8, is 2000 to 2004.  According to the

3    declaration of Melnick, their statistician expert, that is the

4    relevant time period.  That was the time period that Professor

5    Melnick used to make his estimates that there were 15,000 people

6    potentially implicated.  2000 and 2004.

7         Here is the ninth number, 13.  Out of the 83 exemplars

8    that they have presented in support of this motion for a drastic and

9    extraordinary remedy, only 13 of them are within the relevant time

10   period.

11        And here is the last number, six.  Of the 13 there are

12   only six that have the <u>Sereboff</u> language.  What happened to the

13   other seven?  We submitted a spreadsheet to your Honor looking at

14   all, breaking out all of the 83 exemplars and we showed you the

15   differences, viva la difference, in all of those 83 exemplars.  Of

16   the seven out of the 13 that are subtracted leaving six, two of

17   those seven, and those are numbers 25a and 25c, the Health Net

18   plans, did not have any reimbursement provisions at all.  One

19   allowed only for excess payments.  That's number 48c, the WellPoint

20   plan, payments in excess of what the patient or the plaintiff would

21   have received.

22        Two more plans, number 28a and 28b, required that they are

23   entitled to reimbursement only if the settlement "specifically

24   identifies monetary sums directly attributable to the expense for

25   which the plan had paid," which I don't think this settlement is

1    going to do, your Honor.

2          And then another plan described the recovery as an

3    interest-free loan.  And then another plan, number 22b, the Guardian

4    Life Insurance Company, required the beneficiary to agree in writing

5    before there would be any reimbursement.

6          Which leaves us with six plans to support an injunction

7    today to protect tens of millions of dollars against a sum of money

8    that totals at least two and a half billion dollars.  All for six

9    plans.

10          Your Honor knows the standards.  Today's request is an

11    extraordinary and drastic remedy.  The plaintiffs bear a "heavy

12    burden," and the injunction that they're asking for largely is a

13    mandatory injunction, and I'll speak to that in a little while, and

14    that's particularly disfavored under the Martinez case."

15          The first day we talked about this on June 11th at a

16    telephone conference where your Honor heard arguments on the TRO.

17    AvMed said we just want to be treated like the government, page

18    seven from that transcript.  Well, they're not the government,

19    Judge.  They're private insurers, they write contracts.  They can

20    put in those contracts things that they want to do to protect

21    themselves.  They have obligations under those contracts themselves.

22    They have burdens under those contracts themselves.

23          The evidence that you've been given is largely set forth

24    by AvMed in this affidavit by Mr. Ogle, O-G-L-E, talking about how

25    hard it has been, how hard it would be for them to do their due

```
 1    diligence.  I would suggest, your Honor, that this affidavit is not
 2    proof of the work that they did, it's proof of the work that they
 3    haven't done.  The affidavit is an excuse to not do the work that
 4    their contracts obligate them to do.  This whole effort here today
 5    is an effort to conscript the plaintiff lawyers to do the work that
 6    they're supposed to do.  It's an effort to ask the court to modify
 7    basically at the end of the day the Settlement Agreement to put them
 8    at the table.  That's in effect what this injunction is.
 9            They gave an example of some of the things they say were
10    too hard for them to do in the Ogle affidavit, they gave several,
11    I'll just touch upon one.  Ogle's affidavit, paragraph 13B, he said
12    that, you know, they got names from docket sheets, which is
13    something they should have done, and then they tried to match these
14    names.  One particular individual was JG.  I guess they felt they
15    wanted to protect the privacy of that individual.  I think that's
16    something that Mr. Seeger will speak to also.
17            They said that this individual named JG when they ran him
18    through their databases resulted in eight plaintiffs insuring 33
19    persons over 20 states.  Well, where does it say they can't write 33
20    letters?  That's what the contracts obligate them to do, it's not
21    that hard to write 33 letters.
22            The same paragraph described how two plaintiffs, I guess
23    this is two of their member plans, covered a single individual with
24    the same name in Arkansas.  Why not write two letters?  You know you
25    had the person, write two letters and then come to court and show
```

1    your Honor some evidence.

2           They said in Ogle's affidavit, paragraph eight, that

3    letters that they send out typically with their questionnaires, this

4    is their typical procedure, produce something "less than 50 percent

5    of a response."  I don't know if that means 45 or 49 or 40 or

6    whatever.  But they say with subsequent mailings we can get a

7    response up to 75 percent.  They've made no effort to do any of that

8    here today, they've offered no evidence to your Honor that they have

9    tried to do what their contracts require them to do.  They want the

10   plaintiff lawyers to do it.

11          Next the fund.  I'll only touch briefly upon it.  I know

12   your Honor has read and knows Sereboff and all of the others.  But

13   there was mention made of this fund being in a trust or being in the

14   hands of BrownGreer and somehow that creates a race, and somehow I

15   don't know if the inference from the comment was that creates

16   possession and control.  Well, it does not.  Both in Great-West and

17   in Bauhaus, in Great-West the money was in the hands of a special

18   needs trust, and the court said, well, the plaintiffs have no

19   control in a special needs trust.  And Bauhaus it was in the

20   registry of the Mississippi court.  The court said there is no

21   control there.  There is no control here either.

22          And AvMed says -- and I'll make this one comment and move

23   to the next argument.  AvMed says that the aggregate settlement fund

24   is "the money owing to the plaintiffs is unquestionably in the

25   defendant's possession."  This is on page six of their brief in

1    reply to us, "The money owing to the plaintiffs is unquestionably in

2    the defendant's possession," BrownGreer's possession, "and without a

3    doubt a specific identifiable fund not commingled with the

4    defendant's general assets."

5           Well, indeed it is not commingled with BrownGreer's

6    assets, but it is commingled with the assets of at least 35,000

7    people that they haven't paid a penny to.

8           Irreparable harm is something that Mr. Seeger will speak

9    to more knowledgeably than me.  But I have seen no evidence

10   whatsoever, no letters, no proof, no claims, no plaintiffs that

11   they've shown here to indicate that the 60 percent, or maybe it's

12   the 50 percent hold back which is way over two, perhaps $3 billion,

13   isn't going to protect their interest, their tens of millions of

14   dollars of claim here.

15          Finally, on the subject of the injunction and the format

16   itself with respect to AvMed.  The AvMed brief in reply to our

17   motion, our brief, said that the mandatory discovery here, the

18   mandatory injunction here is, "the most extreme form of relief".  It

19   is indeed the most extreme.  It is way beyond what happened in

20   Sereboff where there was a specific identifiable fund that could be,

21   was known to be possessed and in the hands of plaintiff counsel that

22   could be enjoined, and while it was enjoined the parties sorted out

23   the issues.

24          Here we're looking at something entirely different.  We're

25   not talking about enjoining the fund and sorting out issues, we're

1    talking about this court entering an order which is in effect a

2    trial order.  We're going to do this, BrownGreer is going to do

3    that, plaintiff lawyers are going to do that, and by the way there

4    aren't going to be any distributions to at least 35,000 people who

5    have no interest in any of these transactions.

6            U.S. Bank, and I'll just say something on the side for

7    U.S. Bank.  U.S. Bank has, to borrow a phrase from a plaintiff

8    lawyer I knew a long time ago, has no business being in this case.

9    U.S. Bank is simply holding the money.  They have no information,

10   Judge, about what the social security numbers are of these folks.

11   All they're doing is investing and protecting these funds.

12           The bond.  We proposed to your Honor several arguments

13   concerning the bond.  The AvMed injunction would at least at this

14   point enjoin the first half of this distribution, which is over two

15   and a half billion dollars.  It could be fairly stated that when

16   they want to enjoin two and a half billion dollars, they should put

17   up a bond of 125 percent of that, that is not an unreasonable

18   conclusion.

19           We had pointed out, nonetheless, that at the very least I

20   think it's fantasy to think that this process advocated by AvMed is

21   going to take a matter of days.  It never does.  We've suggested a

22   reasonable period of time to expect a delay would be six months.  If

23   it were a six-month delay, this delay is not answerable by simply

24   saying that the money can be put in an interest-bearing account.  I

25   almost have to pinch myself when I think about that.  An

1    interest-bearing account these days, according to the internet this

2    afternoon, at government security rates is 2.09 percent for six

3    months.

4            The loss of this money to these people is not compensated

5    for by what this money would earn for them at 2.09 percent.  The

6    only thing that balances out for these people is what it would take

7    them to go borrow it and have it.  That's the real loss of the value

8    of this money for them having to borrow it.

9            The prime rate right now, and I don't think very many of

10   these folks can get the prime rate, is five percent.  Louisiana

11   judicial interest is eight and a half percent.  So even if it did

12   earn two percent, the difference between two percent and eight and a

13   half percent is really the loss in value of this money to these

14   people of being delayed by six months.  You do the math and that

15   comes to $77,720,250,000.  And if you did the standard 125 percent

16   bond, you're looking at a least $100 million, and I would

17   respectfully suggest that no matter what that would be the minimum

18   appropriate bond.

19           With respect to the New York motion, and I'll move on to

20   that, your Honor.  Whatever else the injunction is that they seek,

21   the New York unions, it's not a Sereboff injunction.  It is in all

22   probability, and I am going to try to hand up a copy to you, Judge,

23   if you don't have the order in front of you, I'll get to it, it is I

24   think a class certification order, I think it's an order to compel

25   discovery, and I think it's also an order and a judgment on the

1    merits, basically describing how they're going to submit their

2    demands to the plaintiff attorneys, when they're going to submit the

3    demands to the plaintiff attorneys.  And after the demands get

4    submitted, I'm not sure what happens.  But it's far more than a

5    Sereboff injunction, which is what we're here to talk about today,

6    preliminary.

7            They say on page three, this is the New York brief, this

8    is their response to the NPC.  They say bullet point two,

9    "plaintiffs requested preliminary relief," that's the New York

10   unions, "plaintiffs requested preliminary relief does not seek to

11   enforce any liens at all."  Well, Judge, that's the only thing we

12   talk about when we talk about a preliminary injunction today under

13   Sereboff.  The issue before your Honor and the only authority that I

14   would think the court has would be to issue a Sereboff injunction on

15   a preliminary basis today, preliminary, against some identifiable

16   specific lien, et cetera, et cetera.

17           They say here on page three, bullet point two, "plaintiffs

18   requested preliminary relief does not seek to enforce any liens at

19   all."  Then why are we here?  We're here because they want a whole

20   lot more than a lien on a specific sum in the possession and control

21   of plaintiff attorneys, which I'll get to.

22           Let me take a look at their nano-proof, Judge.  Their

23   affidavit of Mark Johnson in support of their motion, he is their

24   ERISA consultant.  He is an art history -- pardon me.  He is an art

25   history major, masters in communication.  He is not a lawyer, but he

1   offers legal opinions on the _Sereboff_ language in the two New York

2   plans, in the Service Employees plan and in the Teamsters plan.

3   Unquestionably his opinions are wrong and he is not qualified to

4   render them.

5          Having said that, he says in his affidavit, paragraph 21,

6   that some of the problems that they've had in doing their due

7   diligence and trying to find out who the potential Vioxx claimants

8   are is that their company, their plans, "in my experience, these

9   records," referring to medical and pharmaceutical records, "these

10  records that would ordinarily be maintained by the claims payor or

11  only maintained for a relatively short period of time sufficient to

12  enable them to pay the claim and to deal with the appeals."

13         So they say, well, we had these medical records, we had

14  the pharmaceutical records but we didn't keep them.  Well, that's

15  not our fault.  If they choose not to keep the records that they

16  retrieve that they would use under their contractual obligations to

17  investigate and prove their liens, that's not our fault.  We

18  shouldn't be required by virtue of some injunction to resurrect

19  their failure to maintain their medical and pharmaceutical records.

20         Then he also says -- pardon me.  The next affidavit Mr.

21  Adelman, he is the agent for the service union in New York.  He says

22  that they have scrutinized their database, this is paragraph six of

23  Mr. Adelman's affidavit.  They have scrutinized their database and

24  they have discovered that they have paid more than $400,000 in

25  medical benefits to more than 20 plan members who took Vioxx and

1    have suffered from heart attacks.

2            Well, they did a little homework there, they looked at

3    their database, they found out how much money they spent on Vioxx,

4    they found out how much money they spent, I guess, on people who had

5    heart attacks, they looked at their ICD-9 codes, which is pretty

6    basic, and they concluded that there were 20 people who fit into

7    that category who took Vioxx and had heart attacks and they paid a

8    sum of $400,000.

9            Why didn't they write 20 letters?  Where were they in 2005

10   when your Honor and Phil Beck and Chris Seeger and Andy Birchfield

11   were relocating to Houston and trying the heck out of cases?  Where

12   were they?  And I have to gag a little bit when I hear about delay.

13   Where were they in 2006 when you guys were trying cases over here?

14   Where were they in 2007 when everybody was here knocking each

15   other's brains out?  Where were they?  They have some obligations.

16   Where is the delay?  There is the delay.  Why don't they write 20

17   letters?

18           You know, I went to the International Subrogation

19   Management web site, that is the web site of Mr. Johnson -- is it

20   Mr. Johnson?  Let me see.  No -- yes -- pardon me, Mr. Ives.

21   Mr. Ives was the other deponent.  Mr. Ives is I believe the

22   president of International Subrogation Management.  His affidavit

23   was offered in support of this New York motion.  And I'll talk more

24   about his affidavit in a minute.

25           But I went to his web site, International Subrogation

```
 1   Management.  According to his web site and according to this
 2   affidavit, International Subrogation Management retained the Levy,
 3   Phillips firm to represent these two plaintiffs.  If you go to their
 4   web site it talks about what they customarily do to recover payments
 5   to Vioxx -- pardon me, to claimants, to ERISA claimants.
 6           There is a flow chart.  They upload client claims and
 7   membership data, they import data into the system, they filtered
 8   accident related ICD-9 diagnoses codes, and then they create call
 9   letters.  Why didn't they create 20 call letters in this case?  Why
10   didn't they come before your Honor with some proof?
11           And then the two plans themselves.  The next plan -- by
12   the way, I'll drop back for a second.  Mr. Adelman from the Service
13   Union plan, which appeared to have language consistent with
14   Sereboff, that plan that is before your Honor is dated November
15   2006, page three.  Obviously outside of the relevant time period.
16   So that plan doesn't prove anything.
17           The next, the Teamsters plan.  This was offered in
18   conjunction with Mr. Stilwill's affidavit.  This plan clearly does
19   not contain the Sereboff language, it's under the heading Claims
20   Involving Third Party Liability (subrogation).  It's a subrogation
21   plan.
22           Moreover, this plan also talks about they did some
23   research and determined they had $750,000 of Vioxx prescriptions
24   during the time that, they paid for during the time the drug was on
25   the market.  They didn't take the time to look at their ICD-9 codes
```

1    to see of that $750,000 how much of that was paid for ICD-9 codes

2    that might be for heart attacks.  All you have to do is look at your

3    ICD-9 codes on the internet and you can see that the ICD-9 codes for

4    heart attacks are 410 to 414.  All of these databases maintain these

5    ICD-9 codes in these plans, so how much of this $750,000 that they

6    spent on Vioxx plaintiffs, pardon me, on ERISA plan members was for

7    ischemic heart disease?  I don't know, they didn't take the time to

8    find that out.

9            And then finally this.  Also from their web site.  When

10   they talk about public interest, the lofty public interest of

11   preserving the integrity of these plans, I would suggest to your

12   Honor that the lofty public interest is really the bottom line,

13   that's what's at stake here, it's all about the money.  If you go

14   again to the International Subrogation Management web site, this is

15   what the home page says:  "International Subrogation Management

16   recovery efforts insure that risk-bearing entities are able to

17   recover funds from the responsible parties.

18          Our extensive knowledge of complex medical and

19   property/casualty coverage and liability issues, understanding of

20   client relationships, and dedication enable us to recover monies

21   that other firms have abandoned."

22          I would suggest that these other firms abandon this money

23   in 2005 and 2006 and 2007 and they should have been doing their

24   work, it was abandoned.  "And it results in lower loss levels and

25   improving our clients' bottom line."  So that's what this is about.

1    It's not about preserving ERISA health care plans, it's about the

2    bottom line.  And it's about found money.  It's about money that was

3    abandoned and now all of a sudden after all of the people on this

4    side of the courtroom who did all of the work for three and a half

5    years put together an enormous settlement, now they come with their

6    hands out.

7          So I would suggest to your Honor that it is not before,

8    whatever is before the court today is not a request for a

9    preliminary injunction against a specifically identifiable fund in

10   the possession and control of the plaintiff or his or her attorney.

11   It's a beast of an entirely different character.

12         I'll mention one more thing, I said I was going to talk to

13   your Honor about the order.  May I hand up a copy?

14         THE COURT:  Yes.

15         MR. IRWIN:  This is the proposed order.  If you look at

16   paragraph one it says, the New York order:  "The settlement

17   administrator shall notify all parties at least 20 days prior to any

18   distribution of Vioxx settlement funds."  Who are all parties?  Who

19   are they?  I am the settlement administrator.  Somehow I am supposed

20   to tell the folks at BrownGreer that they have to notify all

21   parties.  I would suggest that all parties may be the people

22   described in paragraph seven and eight, which are class counsel and

23   the class members.

24         This order certifies a class, it appoints class counsel, I

25   guess, and we have class members.  I don't know what else paragraph

1    one does.

2            And then you get to paragraph two, which is really the

3    kind of operative paragraph.  This is the discovery order paragraph.

4    This is the paragraph that says that the plaintiff attorneys are

5    supposed to make a good faith investigation.  And at the bottom of

6    that first page and into the existence and the amount of any

7    potential lien, not just an ERISA lien but any potential lien.

8            First of all, I think that any potential lien, ERISA or

9    not, is sort of the ultimate question.  I don't know how the

10   plaintiff attorneys or anybody else can determine what the potential

11   liens are right now.  That's decided at the end of the day as

12   counsel for AvMed said.

13           And then it goes on to say on the top of the next page,

14   "including any potential lien on behalf of any self-insured ERISA

15   health plan."  And then it breaks it down into two groups, I call

16   them the 2A group and the 2B group.  If you are a plaintiff attorney

17   under 2A you can certify that you have no clients who are potential

18   ERISA plan claimants, whatever that means.  So your 2A certification

19   is for people who are not involved.

20           Then you have your 2B certification.  You submit a list of

21   the people who may, whatever that means, have some ERISA obligations

22   to class counsel for attorneys' eyes only.  Mr. Seeger is going to

23   speak to the privacy issues dealing with that.

24           And then you go, Judge, to paragraph 4.  And I don't

25   understand this paragraph and paragraph 4 with respect to 2A -- now

1    these are the people who have no Vioxx related liens, no ERISA liens

2    at all.  In 2A BrownGreer makes the distribution within five days, I

3    don't know why the five days because these people aren't implicated

4    at all, and then the plaintiff attorneys are required to take this

5    distribution for the non-ERISA claimants and put that distribution

6    into a segregated, separate interest-bearing escrow account.

7           Now, if these people are not implicated for any ERISA

8    obligations, why do their attorneys have to put this settlement

9    award into a separate-interest bearing escrow account and create a

10   risk?  It feels like mischief to me, Judge.

11          Paragraph five -- pardon me.  Paragraph six is the

12   concomitant 2B paragraph where the claimants who are identified as

13   "potential" settlement ERISA claimants, their funds have to be put

14   in separate interest-bearing accounts creating a race for each one

15   of them.

16          And then finally, here is where the final and ultimate

17   relief comes in.  In paragraph seven and eight and nine, the order

18   sets up a system providing for notice and timing and delivery of

19   demands.  Notice is to be given by class counsel to all of the class

20   members who have 45 days to submit claims.  I guess that notice is

21   going to go out to hundreds, if not thousands of plan members,

22   that's what the New York brief said that their plan members are

23   hundreds if not thousands, and I don't know how many members they're

24   talking about, but they're going to get all of this done in 45 days.

25   This is the group that couldn't write 20 letters in three and a half

1     years.  How are they going to get this done in 45 days?

2              And then in paragraph nine they submit a demand to the

3     plaintiff attorneys.  I don't know what the demand is, but what if

4     the plaintiff attorneys say no?  I don't agree with it, the demand

5     is inflated.  I don't know what happens here.  Maybe it then comes

6     to your Honor who has to sort out every single one of these things.

7     So what's why I say whatever else this order may be, it is not a

8     Sereboff injunction.

9              Unless your Honor has any questions, I'll take my seat.

10    Thank you.

11             THE COURT:  No, I don't.  Thank you.

12             MR. SEEGER:  Judge, I'll be very brief.  When we were

13    preparing our amicus brief against this injunction, I noticed the

14    word chutzpah put in there by my friend Fred Longer and Arnie Levin.

15    I obviously being from New York and my ethnic makeup, I know what

16    chutzpah means.  I never knew that the definition was a kid who

17    kills his parents and throws himself on the mercy of the court

18    claiming he was an orphan.

19             But I have to tell you, it never really fit so well, that

20    definition, until I really heard that presentation by the

21    plaintiffs, which is weird for me to call somebody else plaintiff,

22    the plaintiffs in this case.

23             I am not going to duplicate what's been said and I know

24    you read the papers, Judge, but Mr. Irwin really nailed it.  Andy

25    Birchfield and I and Mark Lanier, another lawyer, started filing

1   these cases in 2002, even then there was press about it.  September

2   of 2004 when the company withdrew the drug, I don't think in the

3   history of mass tort litigation there was ever more coverage or

4   press about the withdrawal of a drug or litigation.  By then we had

5   10 million pages of documents produced, as you know, your Honor.  We

6   then completed another 15 million pages and we took another thousand

7   depositions between then and the time we settled.

8         But the lawyers sitting behind me are phenomenal lawyers,

9   they are very good, I respect them very much.  Where were they?  We

10  could have used their help.  It would have been nice to have the

11  insurance companies carrying a little bit then and helping us push

12  the litigation; but I didn't see any of them, any them of them until

13  the announcement of the settlement.  And, in fact, it even took

14  months after the announcement of the settlement before they got

15  their carriers lined up.

16        Mr. Levy's firm, again, phenomenal lawyers, I know their

17  reputation in New York.  They had at one point 90 Vioxx clients.  I

18  understand now they dropped them in favor of bringing these cases.

19  That's up to them.  I really don't care what they do.

20        But I am just a little bit confused by why we're here, and

21  this really just at the end of the day is just an attempt, I think,

22  to leverage some dollars on the backs of the lawyers who worked the

23  case, but more importantly the clients.  If you look in the papers,

24  Judge, and I know you've seen it, we reference a couple of clients

25  of mine and Andy's.  If you want to really talk about balancing the

1    harms here, let's talk about Mr. Feasel's (PHONETIC) case, where he

2    is basically on the verge of bankruptcy waiting for compensation.

3           Because of his heart attack he doesn't work anymore.  He's

4    got $280,000 in medical bills and he has no insurance.  So he is no

5    bother to them.  Or Mrs. Pennington, Andy Birchfield's client, who

6    lost her husband and she has two minor children and they're on the

7    verge of losing their home, they can barely pay their bills or eat,

8    they're borrowing money at exorbitant rates.

9           So when I have a bunch of insurance companies come in here

10   and I hear Mr. Grinstein, great lawyer, say things like where is the

11   harm, it's just a few months of interest.  Well, it's phenomenal

12   harm to the people who have been waiting for years to realize the

13   money from this litigation because they went out and hired lawyers

14   who actually litigated the case.  We didn't wait for somebody else

15   to create a value and then come in and try to climb on to it.  We

16   litigated, we created the value, we want to pass it on to our

17   clients and we would like to complete it.

18          Again, focussing on the balancing, putting aside the

19   financial hardship.  What about this court's time?  There is a

20   public policy interest at this point in finalizing this settlement.

21   Everybody has worked hard, your Honor has coordinated judges

22   throughout the country, you've pushed the lawyers on both sides to

23   bring this to a point where we are.  Are we going to allow insurance

24   companies with their billions of dollars and their lawyers all over

25   the country now to come and slow down payments to these people who

1    went and hired lawyers in 2002, 2003, 2004, 2005 and they were out
2    trying cases and litigating.
3            And where were they when the press was predicting our
4    death, the plaintiffs' lawyers death when we were losing two thirds
5    of the cases and we won a third.  Nobody stepped up and said, hey,
6    let us give you a hand because it's in our interest that you recover
7    those dollars.  We didn't hear from anybody.  But now we have a big
8    fund and they would like to get their piece of it and we're hearing
9    from them.
10           I would also like to remind your Honor again consistent
11   with my very short presentation here and my theme of chutzpah.  The
12   Levy firm attempted to get precomplaint discovery alleging almost
13   exactly the same facts, irreparable harm, assets were going to be
14   squandered.  Your Honor denied it.  What did they do?  They come
15   back with an injunction.
16           Susman Godfrey firm, now they have a bunch of clients that
17   have been funneled to them through Rawlings, which is a subrogation
18   firm.  And by the way, Mr. Levy gets his clients from HRI, another
19   subrogation firm.  These are companies that know how to chase people
20   down.
21           As Mr. Irwin showed in their web site, I think they boast
22   their ability to do that, let us run down the dollars, we'll get
23   those people.  The only harm here is to this court, to the lawyers,
24   and most importantly to the clients who have been waiting for their
25   funds.  There is no harm to them, they are in exactly the same

1   position if you deny their injunction as they were before we ever

2   settled it.  They have their contracts, they can pursue their

3   rights, and they know how to do it.  These companies do it day in

4   and day out.

5        Our settlement gave them something extra.  Maybe we made a

6   mistake.  We alerted every lawyer in the country, said, hey, by the

7   way, you are responsible for resolving these private -- I don't want

8   to call them liens because they're not liens -- but these private

9   rights of reimbursement, so make sure you do it.

10       Let me just tell you what we do in my office, I won't talk

11  for others.  We are right now in the process of having negotiations

12  with private health care carriers, just like they represent, because

13  we went through the medical records, we see that Aetna provided

14  care.  What do we do?  Like any personal injury lawyer, we contact

15  Aetna.  We say, hey, we have to make you whole, tell us what we owe

16  you.  Put a letter in the file.  When a check comes in, we pay them.

17       That's how this has been done, as far as I know, for many,

18  many years, that's how I've always done it.  We have always paid on

19  behalf our clients and resolved these liens.  I have to imagine

20  almost every personal injury knows how to do this.  There is no

21  magic to this.  And if there is somebody out there that makes a

22  mistake and doesn't pay it, these companies specialize in running

23  them down and suing them and getting the money from them.

24       So, you know, really what they've attempted to do is to

25  use this settlement to increase their rights to give themselves

1  something that they didn't have before and that their own contracts

2  don't give them, and that is what they call a fund.  There is no

3  fund, they fail there again.  Their claim to relief is <u>Sereboff</u>.

4  <u>Sereboff</u> says you have to have custody, possession and control, and

5  it has to be an identifiable fund and you need to have the language.

6  Well, we don't have any of that.  I think that ends it for them.

7        So I want to also say one other thing because, your Honor,

8  I think it's important for the record to be clear on this.  There

9  was some confusion over whether we agreed to provide them data or

10  not.  I think I made it very clear on the record after your Honor's

11  comments and your concern about the ethical implications, which we

12  took to heart, about caps and having a quid pro quo.  I think I made

13  it clear on the record, and maybe Mr. Levin got up and he was a

14  little confused at that moment and over spoke, but we told them

15  right away, they knew right away that we didn't intend to honor that

16  without any caps in place.

17        And here is the reason why.  I have no obligation on

18  behalf of my clients to alert other people that they may have a

19  claim against my client.  Why would I ever go out and say to

20  somebody, come sue my client, we owe you money.  That's a

21  ridiculous, preposterous position for me to be in.

22        And I think also Mr. Irwin's words really summed it up

23  with what they are really attempting to do is to get us to do their

24  work.  Look at the order they proposed, which I guess in about five

25  minutes we're arguing the class action allegations.  But it was a

1    little ironic, and I'll just skip ahead a little bit, it was a

2    little ironic that the Levy firm who brought a class action then

3    proposes an order that shows that relief is anything but formulaic

4    and it's case by case and it's plan by plan.  So I think they've

5    blown their own class action out of the water by doing that.

6           But the last thing that these lawyers that work with us

7    are going to do is go out and tell the world, hey, come and sue our

8    clients.  Let us help you, by the way, we'll give you their home

9    address, we'll give your their social security numbers.  I am not

10   doing that, I have no obligation to do it.  In fact, Mr. Levy's firm

11   did send notice to my law firm, which I believe was by e-mail, I

12   ultimately got the notice.  I wrote back to him right away and said

13   this is not proper notice under your contract, your own contract

14   with your insureds, you have to provide notice to them.  You just

15   can't write a letter to the lawyer saying tell me who your clients

16   are.

17          That's how ridiculous this is, Judge, this is where we

18   are.  That's is exactly what they did and they won't deny it.  No

19   lawyer responded.  Maybe one or two did, but they're crazy, and I

20   think they ought to make sure they have their liability policy paid

21   up-to-date.

22          So I think where we are at the end of the day is just

23   calling it what it is, it's chutzpah, it was a good chance and it

24   was a good shot, and, Judge, we would appreciate it if you would

25   deny the injunction.

1          THE COURT:  All right.  Folks we have to move on.  I'll

2    give you five minutes each for any response.

3          MR. GRINSTEIN:  I appreciate the opportunity to give a

4    reply, and I'll move it along hopefully quicker than five minutes.

5          First of all, responding to Mr. Irwin's arguments.  He

6    started out by citing a bunch of numbers, many of which only

7    emphasized the importance of these reimbursement rights to my

8    clients and, in fact, the entire United States health care economy.

9          He pointed to some line in one of our briefs speaking of

10   tens of millions of dollars in potential recoveries.  I think that

11   line was intended to respond to refer to each individual plaintiff

12   plan.  To the extent that it suggested that my plans collectively

13   only want tens of millions of dollars, I apologize, that's not what

14   was intended.

15         But the real point behind Mr. Irwin's numerical argument

16   was to suggest that we failed as a matter of proof to prove up our

17   plan language, and he launches into, he launched into an argument

18   with respect to 13 plans that had improper plan language.  I will

19   say they only identified three plans in their actual text of their

20   brief, and we responded and proved that they were wrong as to that

21   text in the brief.  If the court wants to hear argument about those

22   other plans, I am happy to do so.

23         But the fact of the matter is, if we step back for a

24   second, we put in exemplar plan language from each of our clients

25   and showed via affidavit that this is the kind of language that all

1    of their representative plans have.  Now, Mr. Irwin certainly

2    wouldn't have wanted me to put in 1.1 million different plan

3    documents covering every particular year that's possibly at issue

4    here, flooding him with probably ten, 15 million separate plan

5    documents that he could read through and confirm that we had our

6    reimbursement rights.  It would have been silly.  So instead we put

7    in these exemplar plan documents and used the affidavit route to

8    prove up that this is essentially our reimbursement rights as our

9    plan as a whole.

10            And it's really like an ostrich putting his hand in the

11   sand to say these largest health plans in the United States don't

12   have reimbursement language and don't have thousands upon thousands

13   of people who are participating in this settlement who owe us money

14   via the plan language.  It almost is a point that doesn't need to be

15   proven, even though we've undertaken to prove it.

16            As far as Mr. Ogle's affidavit is concerned, Mr. Ogle's

17   affidavit proved that if you undertake the process of just looking

18   through the docket sheets to identify people's names, on average you

19   will come up with eight different names of plan members that we

20   insure for every one name you find on a docket sheet.  At that point

21   it's simply pointless to go about the process of pursuing each

22   individual of those eight names to go assert health care liens

23   against them when we have no idea which one of those people actually

24   is our plan member.

25            If you take Mr. Irwin's argument out to its ultimate

1    place, we should have just sent a letter to every single American in

2    the United States, because somewhere within those people are

3    somebody we have liens over and that's one way we could have done

4    this to insure that we wouldn't have missed anyone.   Obviously

5    that's kind of silly.

6            As far as the fund argument is concerned, we heard

7    Mr. Irwin make a very forceful argument that the fund is not in the

8    possession and control of the plaintiffs' lawyers and of plaintiffs

9    themselves, and thus we don't have a proper ERISA claim right here.

10   But Mr. Irwin is focussing on ERISA cases in which the plan sued the

11   beneficiary directly and only the beneficiary directly.

12           That's not the case right here.   We have sued U.S. Bancorp

13   and BrownGreer who are holding the moneys.   And the Knudson case,

14   actually which Mr. Irwin cited in support of this argument, shows

15   why the defendants we've chosen in this lawsuit are the right

16   defendants.   At 534 U.S. 204, page 220, the Knudson court talks

17   about the fact that even though we've denied this plan's claim

18   against this particular beneficiary in this case, we note though it

19   is not necessary to our decision that there may have been other

20   means for the petitioners, the health plan, to obtain the

21   essentially legal relief that they seek.

22           It says one thing they could have done is intervened in

23   the state court lawsuit.   And the second thing is, "nor do we decide

24   whether the petitioners could have obtained equitable relief against

25   the respondent's attorney and the trustee of a special needs trust."

1    So basically the Supreme Court right there was inviting

2  health plans to go and sue trustees who oversee money to assert your

3  claims against them because those people have possession and control

4  of the money.  That's essentially exactly what we've done in this

5  situation.  And, in fact, that's a move that is endorsed both by the

6  Bombardier opinion from the Fifth Circuit and by the Harris Trust

7  opinion from the U.S. Supreme Court, which says you can go out and

8  go after non-ERISA beneficiaries and seek to attach the moneys that

9  they control and possess in order to enforce your rights.

10    THE COURT:  You have two minutes, counsel.

11    MR. GRINSTEIN:  Finally I'll speak to the bond issue.

12  Mr. Irwin mentions the fact that this bond is going to cause a six

13  month delay in settlement distributions, which I think is sort of

14  interesting given that last month when we were announcing the

15  settlement before the court, BrownGreer agreed to this procedure

16  whereby they would run our data in 90 to 120 days.  So I am not

17  quite sure how the 90 to 120 days, which we think is long and

18  excessive and it can be done more quickly, how the 90 to 120 days

19  somehow stretched out to six months.

20    In any event, Mr. Irwin's argument is that there should be

21  some increased rate of interest beyond what the funds are earning in

22  U.S. Bancorp in order to compensate the plaintiffs for any delay.

23  But there is no principle in the law that says that plaintiffs who

24  are injured by passage of time with respect to their money deserves

25  something like what they would achieve if they borrowed money on the

1    open market or something like that.  In fact, you get what is the

2    market rate of interest for your moneys that are being held while

3    your rights are being litigated.

4           That's just the way post judgment interest works.  I have

5    a $36 million verdict I have up on appeal right now.  I would love

6    to get a higher interest rate by that, but I am stuck back at the

7    federal post judgment statute which basically gives you the prime

8    rate and not much more.  And if there is a problem that somehow or

9    another the interest that's being earned at U.S. Bankcorp on these

10   monies is inadequate to compensate people for the time it takes to

11   get the money, then maybe there was a problem with selecting U.S.

12   Bancorp, which I submit there probably was.

13          THE COURT:  All right.  Thank you very much.  Let me hear

14   from your colleague.

15          MR. GRINSTEIN:  Thank you.

16          MR. MARKS:  Thank you, your Honor, I'll also be brief.

17   Andrew Marks again for the ERISA self-funded plans.

18          Mr. Irwin stated that the relief we seek is not a Sereboff

19   injunction, and he said to you that the only relief you can give on

20   a preliminary basis is an interim order that looks like a final

21   Sereboff order.  There is absolutely no basis in fact or in law for

22   that statement.  The ultimate Sereboff injunction or equitable

23   relief, which is the enforcement of the lien, is down the road.

24          The preliminary injunctive relief we seek is to preserve

25   the ability of the plans to seek that.  There is nothing in the law,

1   there is no case law to support the notion that a preliminary

2   injunction to preserve an ultimate remedy has to look exactly like

3   the ultimate remedy.  I frankly don't understand the argument, it

4   doesn't make any sense, and I think he just is way off track on

5   that.

6       We welcome, invite and urge the court to look at our

7   order, which is an endeavor to be constructive and to address the

8   panoply of issues, and we think we've done so well.  If there are

9   particular issues -- this is the first, by the way, the first time

10   we've heard anything from Mr. Irwin or any other lawyers that they

11   have any problem with our order now.  No one said, you know, we have

12   a question about this, we have an issue about that.  Let's work

13   together and find out.  We're prepared to do that.  We think it can

14   be done.

15       I can address very quickly, frankly some of the made-up

16   arguments here just that he made, for example, he is uncertain who

17   all parties are in paragraph 1.  All parties, of course, are all

18   parties to the litigation.  An order directing someone to notify all

19   parties is not ambiguous, and if he has some concern about that, we

20   can obviously rectify that.

21       The notion that the due diligence that the inquiry that is

22   required here is in the nature of permanent relief.  Again, it is an

23   interim relief, it is designed only to ask them, the plaintiff

24   lawyers to do what they're already obligated to do and what their

25   clients are obligated to do.  And the language of the plans that we

1    have, which are representative just to read aloud the 1199 plan to

2    every claimant, "you must notify the fund of initiation of any

3    lawsuit arising out of an accident or incident."  Teamsters Fund,

4    "you must inform us of the filing of a claim of the commencement of

5    any action."

6              The argument that the plans have an obligation to go chase

7    all of these people is spurious.  It is all of the beneficiaries of

8    these plans who have already received tens of thousands of dollars

9    of health benefits and who as part of their contract with the plans

10   agree to provide notice and to provide reimbursement.  The

11   obligation is on the beneficiaries as a matter of contract, that's

12   what Sereboff says, that's what Bombardier says, and the plaintiff

13   lawyers as agents of the claimants have that obligation.

14             Mr. Seeger suggested that they maybe were being

15   beneficient including in the Settlement Agreement with Merck that

16   they would undertake to investigate and discharge the liens.

17   Nothing of the kind.  Merck insisted on it.  There was no altruism

18   and that's because Merck understands and we all understand that they

19   have these beneficiaries and their lawyers as their agents have an

20   obligation under their plans to notify and reimburse the plans such

21   as we represent.

22             So, your Honor, again, I think we've crafted a narrowly

23   tailored plan.  There is no -- you heard nothing from them at all,

24   nothing today that suggests that the plans don't have the right

25   under Sereboff to enforce against the funds allocated to the

1    individuals --

2          I correct myself, if I may.  Mr. Irwin did make the

3    argument under the Teamsters plan suggesting that Teamsters does not

4    meet Sereboff.  He is simply wrong.  The Teamsters plan says we have

5    a lien on any and all amounts owed to you by or from a third party.

6    Absolutely down the middle of Sereboff.  Sereboff didn't say there

7    is a magic formula.  Nothing of the kind.  Sereboff said you need

8    language that creates a fund that is specified.  It's not the

9    general assets of the beneficiary.  This language which says that we

10   have a lien on amounts that you get from a third party is exactly

11   the type of separate fund.

12         We do not have an obligation to nor do we seek to recover

13   the health benefits paid against the general assets of any of the

14   beneficiaries.  We only seek to enforce what is a clear contractual

15   federally enforceable right under ERISA.  We believe that this court

16   should enter a preliminary injunction to insure that that right is

17   not impaired.

18         And we are prepared, as our order indicates, to find a

19   flexible and common sense way to make sure that everyone's interests

20   are protected.  And we respectfully request your judge's order in

21   that regard.

22         THE COURT:  I am going to have to take a break here for

23   ten minutes.  I have another matter that I have to deal with.  And

24   then I'll come back and I'll hear the other matters.  The proponent

25   will have a half an hour to present -- I want to finish both of them

1  in hopefully an hour, maybe a little over that.  So we'll break it

2  up to 15 minutes, 15 minutes, 15 minutes, 15 minutes.  Okay.  Thank

3  you very much.

4          MR. MARKS:  Thank you, your Honor.

5          THE COURT:  We'll stand in recess.

6          THE DEPUTY CLERK:  Everyone rise.

7      (WHEREUPON, A RECESS WAS TAKEN.)

8      (OPEN COURT.)

9          THE COURT:  Be seated, please.  Let's take up the class

10  action complaint.  I'll hear from the plaintiffs first.

11          MR. SEEGER:  Your Honor, again, I'll be brief because I

12  know you've read the papers.

13          THE COURT:  Yes, I have.

14          MR. SEEGER:  And I am trying to catch a 5:30 plane.

15  Biggest reason.

16          Judge, just to start with just to briefly summarize our

17  arguments as to the dismissal of the complaint itself.  Again,

18  relying on their claim to relief, which is the Sereboff case, what

19  they have at this point in time at best is an inchoate right.  It's

20  a right that doesn't exist, it's a lien that doesn't exist.  There

21  is no identifiable settlement fund in no one's possession and

22  control, so we would submit initially that they don't even have

23  jurisdiction, subject matter jurisdiction before your Honor.

24          At this point there is, as Arnie would say, there is no

25  there there.  So until that is created then maybe would be a proper

1   time for them to file a complaint, but at this point I really think

2   that the entire complaint should be dismissed for that basis.

3            They definitely don't state a claim against the

4   Negotiating Committee because what they're seeking we don't have.

5   We don't have possession, custody, or control over the fund or the

6   ability to create a fund or make it anymore identifiable.  That

7   money, that fund just doesn't exist at this point.  So it's the same

8   argument.

9            As to the ERISA claim, we looked long and hard and

10  couldn't find a case or anything in the statute that entitles them

11  to private medical information about our clients.  So that claim as

12  well should be dismissed for that basis, there is just no support

13  for it.

14           Now to get to the class allegations, I think we could get

15  through this pretty quickly because I think things have been done

16  and said today and in their papers that really defeats their own

17  class.  There isn't really one element, maybe other than numerosity,

18  under Rule 23(a) that they satisfy.  They don't satisfy common

19  questions, they are not typical, the claims aren't typical, and

20  their class reps aren't adequate because they don't share the same

21  interests as the class they've identified.  Their class reps are

22  trustees, the class they identify are ERISA plans, so there is a

23  lack of connection or cohesion between or homogeneity between the

24  class reps and their class.

25           But more importantly, the only way that you're going to

1    ever get to the bottom of the relief they seek is really based,

2    although we don't agree with the order they submit, their order

3    highlights, the order that was submitted by the Levy firm today and

4    comments made by Mr. Grinstein about how you to have to go through

5    every single plan to:  (A) determine if there is an entitlement; you

6    have to read the plan language, which differed greatly amongst the

7    plans; and then you have to determine if there is an entitlement,

8    you know, what amount would be, of relief would the plan be entitled

9    to.  So it's a very intensive individualized analysis of each and

10   every plan, impossible for class certification.

11          I mean, believe me, it hurts to me say this, it's the

12   first time in my life I've ever argued against a class, but this is

13   a pretty clear case.

14          As to the Rule 23(b)(2) factors, you don't require

15   predominance but what you do need is cohesion, and what they don't

16   have here is cohesion.  There is an important reason for the

17   cohesion, because as the (b)(2) class injunctive relief class you

18   don't have to provide notice or an opportunity to opt out.  So

19   cohesion has to even be greater to make sure that you're not

20   violating anybody's due process rights.

21          So if to undertake this plan by plan, case by case,

22   individual claimant by individual claimant analysis you would have

23   so many individual issues you could never try this case as a class,

24   it couldn't be certified as class, and you can't provide class wide

25   relief on damages, that is acknowledged by the plaintiffs themselves

1    in the order that was submitted to you.

2           Finally, on the class points.  The amount of money that

3    they're claiming is in the millions of dollars.  I don't know if

4    it's millions or billions, but it's a really, really big number that

5    they claim they're owed.  Each and every one of these funds has the

6    resources to pursue these claims individually.  These claims are

7    being pursued before your Honor on an individual basis by other

8    lawyers who have these and have not sought to certify a class.  And

9    it has been acknowledged in those papers that, you know, the

10   intensity you have to scrutinize each and every plan with.

11          So at end of the day, there's just no basis to certify the

12   class, and we request that you strike the class allegations and

13   dismiss the class complaint as well, your Honor.  Thank you

14          THE COURT:  All right.  Thank you very much.  Any

15   argument?

16          MR. IRWIN:  Yes, your Honor.  Jim Irwin for BrownGreer.

17   In response to our motion to strike the class allegations, they

18   have, as far as I know, done no more than to amend their petition to

19   file an amended petition.  Our three arguments were, number one,

20   that the class was not ascertainable, you have to try the case to

21   determine who the class members are, they are not ascertainable.

22          Number two, that they're not typical.  Mr. Seeger touched

23   upon that.  The plaintiffs are trustees.  The members of the class

24   are sought to be plans.  Only trustees have standing.  And then most

25   importantly they are not cohesive.  In fact, they're in combat.

1    They're in different sides of the ring.  On this issue they're on

2    different sides of the ring.  We heard counsel for AvMed this

3    afternoon say that these would have to be tried on a case-by-case

4    basis, a plan-by-plan basis, and every trench and in every hedge

5    route.  Well, that's not the spiel we're going to hear from counsel

6    for the New York plans.  They're going to say it can all be handled

7    homogeneously and as a 23(b)(2) class.  So even they don't agree.

8         The reason the class definition is not ascertainable is

9    because of the complications in the definition itself.  You've got

10   to try the case to figure out who the members of the class are that

11   they would ask your Honor to define.  For example, their class

12   definition in the amended complaint actually is even more

13   complicated than it was in the original complaint.  Their elements

14   of the class definition are:  One, that you must be a self-funded

15   ERISA plan; two, that benefits must have been paid to Vioxx

16   settlement plaintiffs; three, the benefits had to be paid during the

17   relevant time period; and four, the plans must contain a

18   notification provision -- which I would suggest, your Honor, doesn't

19   satisfy Sereboff -- or a reimbursement provision.  And for purposes

20   of my discussion here, I'll assume that the reimbursement provision

21   does satisfy Sereboff.

22        The fact of the matter is you're not going to know who

23   those people are until this case is over.  It's not a definable

24   class, not, for example, like your Murphy oil class where one could

25   readily define the people who were at possible risk of the spill in

1    Meraux by a mere geographic description.  It's more like Judge

2    Barbier's oyster fisherman class in the Barasich case.

3         In the Barasich case a class of oyster fisherman brought a

4    lawsuit, putative class.  The class was sought to be defined in

5    three categories:  One, members whose leases were damaged by oil

6    spilled as a result of Katrina -- not just any old oil on your

7    oysters, it had to be Katrina oil; number two, it had to come from

8    Shell Oil; and three, it had to be due to the negligence of Shell

9    Oil.  Judge Barbier concluded, "you can't define the class without

10   trying it on the merits."  And the class action was stricken on the

11   pleadings.  Which is not commonly done but it's not uncommonly done

12   either.  If the pleadings don't clearly satisfy certain criteria,

13   it's appropriate to strike a class on the pleadings.  Your Honor has

14   done it, your Honor did it in the Murphy Oil case when they sought

15   to certify 23(b)(3) class.

16        I think the most significant issue is the lack of

17   cohesiveness, Judge.  In order for a class, as Mr. Seeger said, the

18   requirements are really more rigorous than they are in a (b)(3)

19   class because there is no opt out and notice provisions.  In order

20   for a class to be cohesive in a (b)(2) class, you need to be able to

21   grant appropriate relief for the class as a whole.  Well, we heard

22   counsel for AvMed say this afternoon that you can't do that.

23        And you're going to have competing plans, a competing

24   interest.  We've already seen that from the counsel who stood up

25   here for New York and the counsel for AvMed.  There was a case, an

1  interesting case that we cited in our brief, Dr. Ford v. The New

2  York Life Health Plans.  Those health plans were sued under the

3  Lanham Act for false advertising.  And they sought to certify a

4  class of doctors, physicians, and the argument was that these false

5  advertising claims to hospitals, employers and ERISA plans that

6  represented that they would save money by capitation and some other

7  techniques falsely induced these plans into enrolling people.  And

8  the result was is that the plan beneficiaries got poor medical

9  treatment and ultimately that the class of doctors, plaintiff class

10 of doctors didn't get the proper fees they should have gotten

11 because they didn't get to treat the people as fully as they should

12 have been able to treat them.

13       The court said that this group of doctors is not

14 homogeneous, primarily because the plans themselves are competing

15 plans, they're competing for different patients, for the same

16 patients, for different doctors' organizations, and that's exactly

17 what we have with these competing plans here, Judge, the plans

18 whether it's AvMed, New York, the Teamsters they're all in

19 competition, they all have different language, they all have

20 different interests.

21       And finally, from your Honor's Propulsid decision.

22 Looking back at that it reminded me when we all looked at the

23 question of whether a (b)(2) is class appropriate, you have to make

24 sure that equitable relief, not monetary relief, dominates if you're

25 looking to certify a (b)(2) class.

1          And your Honor discussed that in Propulsid.  And you

2     concluded that liability for incidental damages -- and incidental

3     damages will predominate over equitable relief -- liability for

4     incidental damages should not require additional hearings to resolve

5     the merits of each individual's case.  It should neither introduce

6     new and substantial legal or factual issues, nor entail complex

7     individualized determinations.  If we face those challenges, then

8     equitable relief does not predominate under (b)(2), monetary relief

9     predominates.

10          We heard today these challenges that will have to be

11     determined on a case-by-case basis, so that's why this class cannot

12     be certified under (b)(2), your Honor.

13          THE COURT:  Thank you very much.  Let me hear from

14     opposing counsel.

15          MR. PHILLIPS:  May it please the court, I am Steve

16     Phillips, I am here on behalf of the proposed class.

17          Your Honor, there is a huge disconnect between what my

18     colleagues argue against me and what we actually ask for and what we

19     say.  But first let me just very quickly.

20          The standard to strike a class on the pleadings is an

21     unbearable standard they can't begin to meet.  I'm entitled to every

22     inference, and where there is a fact dispute, the fact dispute has

23     to be resolved in my favor.

24          Mr. Irwin wants you to believe something that isn't true.

25     But even if it were debatable, it's something that you can't at this

1    point assume the way that Mr. Irwin wants, which is that for ERISA

2    self-funded plans that the language is disparate.  Mr. Irwin went

3    through a whole elaborate discussion in the first branch of this

4    argument about pre 2004, only six out of 83, nonsense.  Post 2004,

5    if we're still paying for heart attacks, that language is relevant.

6    We have given you the testimony of an expert, and it's not for your

7    Honor with respect at this point to make a credibility

8    determination, that says that the language is the same.  And common

9    sense tells you that it ought to be because these funds are big and

10   sophisticated, and I'll get to that in a moment.  They're reading

11   the same federal statute and the same Supreme Court authority and

12   motivated by the same motives, whether it's bottom line or the

13   public interest.

14           So doesn't it make sense, and it's certainly more than

15   plausible to say what I assert, which is that the class, that the

16   language of the plans is functionally identical.  Different

17   paragraphs, different clauses, maybe the semicolons change, but the

18   language is geared time and again to be Sereboff language.

19           So that takes us to ascertainability, a point that

20   Mr. Seeger makes.  Well, your Honor, the law is very clear, the

21   class doesn't need to be ascertainable when you file the lawsuit.

22   Usually it isn't.  The question is can it be ascertained.  And we

23   spell it out very clearly.  The universe of self-funded ERISA's is a

24   known universe.  Known by us, known by everybody.  It's publicly

25   available.  The universe of claimants is a known universe,

1   BrownGreer has it at the flip of a computer switch.  You put those

2   two together and you then get the subset of self-funded ERISA's who

3   have repaid benefits to claimants.  We're there.  Very

4   ascertainable, no big deal, essentially ministerial.

5        The next step is, what's the language of their plans?

6   That's also ministerial.  Once you tell the plans out there that,

7   yeah, you have a claimant, they're going to be able to pull their

8   language, and whether it's 100 sets of language or 1,000 sets of

9   language it's there.  All that that leaves, your Honor, all that

10   that leaves, your Honor, is essentially a legal exercise in the form

11   of a declaratory judgment action.  Your Honor would be charged with

12   the task and the duty of interpreting Sereboff and declaring what

13   constitutes an enforceable lien or not an enforceable lien under

14   Sereboff and Bombardier.  Once you do that, which is a task that's

15   proper and appropriate for some court and for this court to do.

16        And incidentally, your Honor had asked whether this has to

17   then go to courts across the country and whether there have to be

18   thousands, 94 federal courts.  With all respect, and I don't speak

19   to AvMed because they have a different universe of plaintiffs with

20   different issues and problems, this is the way we crafted it.  You

21   know I represent HRI and could have filed the same complaint.  We

22   made the judgment that the proper step -- we can talk about

23   settlement classes and how to settle this and make this go away, but

24   right now we're arguing law.  We crafted very carefully what we

25   think is the proper plaintiffs to be before you.  They are trustees

1   on behalf of their plans.

2          There has to be a way to bring that suit.  The way my

3   adversaries say, well, the trustees can't sue for the plans and the

4   plans can't sue, so this can't be done.  Well, we cite to your Honor

5   scores of cases in every circuit, including the Fifth Circuit, that

6   time and again recognize that there has to be a way to do this.  So

7   I don't even want to waste my precious time dwelling on that.  The

8   argument, frankly, and I don't mean to be demeaning, but it seemed

9   to me to be a silly argument to be perfectly honest.

10          So we're back to cohesion and ascertainability.  And

11   they're really flip sides of the same thing.  Because what they're

12   saying is because you can't ascertain and because all plans are

13   different, they say, therefore, there is no cohesion or it's

14   unascertainable.  It really is the same thing.

15          The answer to that really becomes this:  We have three

16   prongs of relief.  The reason that ascertainability by the way

17   doesn't apply in a (b)(2) class is that the purpose of

18   ascertainability, and if you read that ascertainability

19   jurisprudence, it really concerns itself with the problem of opt

20   outs.  We don't have that problem here because if your Honor issues

21   injunction, either a preliminary or permanent injunction, it's

22   available to everybody and it doesn't prejudice anybody's rights.

23          Because at the end of the day, we're not asking you to

24   adjudicate the dollar value of any lien, we're asking you to

25   determine what liens are enforceable.  And it's a distinction not of

1   my invention and it's a distinction that they gloss over, but it's

2   the Supreme Court of the United States' distinction in <u>Sereboff</u> when

3   they drew the distinction between equity and legal damages and said

4   that the ascertainment of the enforceability of a lien lies in

5   equity.  That's the law binding on all of us coming from the Supreme

6   Court.

7          But where we end up here is this.  One way or another

8   these are, if I can use another term out of my and Mr. Seeger's

9   heritage, these are kosher claims, and I think that everybody

10  recognizes it on both sides of the aisle.  And I take some umbrage

11  when they talk about our duty to investigate.  The contractual

12  language says it's their duty to inform.  Mr. Seeger tells you that

13  he's doing it.  I am telling you and my clients are telling you and

14  the class is telling you it hasn't happened.

15         Why is all of America, whether they're 70 percent of

16  America or not, and I don't think they are because my clients tell

17  me that we're 70 percent of America.  And it turns out that there

18  are 600 million insured people in America because every time a boy

19  scout goes on a trip it becomes another life.  But they're big chunk

20  of life, the AvMed people, and we're a big chunk of it whether we

21  overlap or not.

22         And why are we here?  We're here because we've been told

23  to drop dead by the plaintiffs bar, they're not honoring their

24  contractual obligations.  We're asking for three things, and the

25  first two they don't even talk about cohesion.  Every ERISA plan in

1   America is entitled to the information that we're seeking so that

2   they can figure out what to do.  Every ERISA plan in America is

3   entitled to some opportunity, some opportunity to evaluate and

4   decide what they want to do once they have the information.  So

5   those two they don't even talk about.

6         The cohesion problem they have is with the third prong of

7   our relief which is a prong of relief that we don't even ask for in

8   the preliminary injunction, which is the declaratory relief that

9   asserts, yes, this is good language, this is bad language, these are

10  enforceable, these are not.  So insofar as we move for preliminary

11  injunction and they move to strike, let's -- and they don't even

12  challenge cohesion or ascertainability for the first two prongs

13  because all ERISA plans need the information so that we can drill

14  down to get to the subuniverse.

15        All ERISA plans in the second prong need whether it's 45

16  days or 60 days or 20 days, some period of time so that they can

17  evaluate what they want to do.  That's what we're asking for now --

18        THE COURT:  Well, you were asking for class certification

19  though, what's what I am hearing.

20        MR. PHILLIPS:  Well, the answer to that, your Honor, is

21  that what we're asking for actually, and we address this in a

22  footnote, we're not asking for ultimate class certification, we're

23  asking for interim relief.  And under Rule 23(g) we might have moved

24  but the cases told us we didn't really need to, move to be appointed

25  interim class counsel.  But there's ample authority that can allow

1   your Honor in effect in granting the preliminary relief to at least

2   with respect to that preliminary relief conclude that there is a

3   basis for granting the emergent application.

4           THE COURT:  Right.

5           MR. PHILLIPS:  Your Honor, the last point of that is, with

6   respect to the fact dispute that exists between my colleagues and

7   myself about whether the class language is all over the place, once

8   we have the class language, which will flow from the preliminary

9   relief, we can have at it and your Honor can decide whether to

10  certify the class for final relief or not in the normal course.

11  They're seeking extraordinary relief of striking a class before

12  there is that point.  We're seeking the extraordinary relief of a

13  preliminary injunction.

14           I don't want to go back over the arguments about

15  preliminary injunction.

16           THE COURT:  No, I don't want you to either.

17           MR. PHILLIPS:  So, your Honor, unless you have any further

18  questions.

19           THE COURT:  No, I sure don't.  Thank you very much.  You

20  have two minutes, five minutes.

21           MR. SEEGER:  I have less.

22           THE COURT:  Okay.  Let me hear you.

23           MR. SEEGER:  First, your Honor, the cases are in our

24  papers, but there's overwhelming authority that you have the ability

25  to strike a class action complaint before discovery and strike class

1    allegations.  Just a couple of quick points though.

2          I think it's the Great-West case in the brief that we

3    submitted, but when you typically see cases being certified

4    involving ERISA plans or insurance policies, it's uniform language

5    like in the Prudential Life Insurance case, which we don't cite to

6    but I am using it by way of example only, they were life insurance

7    policies sold to consumers of Prudential exactly identical policy,

8    exactly identically representations throughout, and, in fact,

9    figuring out damages was formulaic.

10         Here different policies, different plans, different

11   languages and different types of reliefs.  So I think that is pretty

12   well laid out in our papers, I won't belabor that.

13         But as to the "drop dead" point, I do have to address that

14   in 20 seconds.  And that is we didn't tell anybody to drop dead.  We

15   said they did not properly serve notice under their own plans and

16   contracts.  They have the right to do that and when they do it, in

17   fact, several companies have sent my office or they've sent them to

18   my clients letters.  Those letters come to us, we take care of it,

19   that's my only point, the lawyers know how to take care of this.

20         THE COURT:  Okay.  Thank you very much.  Let's move on to

21   the severance.

22         MR. IRWIN:  Your Honor, this is Jim Irwin again, this is

23   with respect to the AvMed case.  This was the first motion we filed.

24   I will not speak long or forcefully on this, I will simply address a

25   few of the points, please.

1        Rule 26 -- pardon me, Pretrial Order 26 is the pretrial

2    order that your Honor signed involving joining different plaintiffs

3    in a single case.  We believe that this joinder, this Pretrial Order

4    No. 26 would apply to this joinder.

5        The substantive question is whether all of these claims,

6    all of these claimants, all of these 49 plaintiffs in AvMed, their

7    claims involve the same transaction or occurrence.  That's really

8    the substantive analysis that is before your Honor today.

9        In some respects it heralds your Pretrial Order 26 in the

10   same sense.  But I am reminded again of the words of able opposing

11   counsel that this is a trial by trial, this is a trench by trench,

12   this is a claim-by-claim determination at the end of the day.  And

13   so long as it is that, and I maintain it is that, it is not properly

14   accumulated into one giant case and, therefore, it should be served.

15       We've given you cases that point out how different plan

16   language can be determinative of results, the Popowski case and the

17   Carillo case, two descendants of Sereboff, Great-West duo.  I won't

18   go into all of the 83 exemplars again or how some plans have 14,000

19   people and some have 25, but I think it's important that every one

20   of these plans is going to have to stand on its own two feet.  And

21   whether a claim is paid during the relevant time period or, for

22   example, as was just said might be paid after the relevant time

23   period, one is going to have to determine whether it arose out of

24   events in the relevant time period.  All of these things are

25   individual determinations.

1          Finally, there have been suggestions, I'll call them,

2   well, arguments that our motion here is simply intended to delay,

3   diversify, defeat, frustrate judicial efficiency.  Well, it is not.

4   Judicial efficiency is no substitute for me, for your Honor, or for

5   opposing counsel for the burdens of proof.  The burdens of proof and

6   the duty of diligence are not to be sacrificed on the altar of

7   judicial efficiency.  All of us are here to serve judicial

8   efficiency, but you still have to prove your case, and proving their

9   case is an individual matter I think that they pointed that out

10  better than I can, and that's why we believe the cases should be

11  served, your Honor.

12          THE COURT:  Okay.

13          MR. SEEGER:  Judge, can I just apologize for leaving out?

14          THE COURT:  Yes.

15          MR. SEEGER:  Thank you.

16          MS. WHITE:  My name is Lexie White and I represent the

17  health plans.  I'll address each of the points raised by Mr. Irwin,

18  many of which are flushed out in our response to this motion, but I

19  want to make one point very clear first.  We are not here claiming

20  that we must be permitted an opportunity to pursue ultimate relief

21  on the merits of our reimbursement claims in a consolidated fashion.

22  Regardless of whether that is permitted by the federal rules, there

23  may be many reasons related to judicial administration why that

24  would be undesirable or unwielding.

25          But that is not the stage that this case is in.  This is

1   the preliminary injunction stage where your Honor must determine

2   whether our client should be given an opportunity and some very

3   limited information that would enable them to later pursue ultimate

4   relief on the merits.  And the questions at this stage are discrete

5   and they are common.

6         And it bears emphasizing here that the standard under Rule

7   20(a) of the Federal Rules of Civil Procedure is not whether there

8   are an identical set of common issues but whether there is any one

9   common question of law or fact arising from events that come from

10  the same transaction or occurrence.

11        Everything that we have been arguing about today, at least

12  three of the four prongs are certainly common, irreparable harm,

13  balance of hardship and the public interest, apply the same

14  regardless of whether the plaintiff is Humana or United or Aetna or

15  any of the other plaintiffs in the AvMed action.  Any one of these

16  common questions is sufficient to satisfy that prong of the Rule

17  20(a) analysis.

18        The second prong under Rule 20 asks whether the claims

19  arise from the same transaction or occurrence.  This court, like

20  every court that I am aware of, analyzes that under the same

21  standard that's used under Rule 13(a) compulsory counterclaims,

22  which asks whether there is a logical relationship between events

23  giving rise to the claim.  Another court in the Eighth Circuit said

24  the claims must be reasonably related in order to satisfy the same

25  transactional occurrence.

1          The occurrences we pointed to are the settlement between

2    Merck and our plan members, the creation of a fund out of which

3    moneys attributable to medical expenses that we paid out on behalf

4    of claimants to that fund will be distributed and the impending

5    distribution of those settlement moneys, each of those transactions

6    or occurrences grieves all of the plaintiffs in the AvMed action in

7    precisely the same way.  And again, any one of those common

8    transactions or occurrences are sufficient to satisfy the very

9    liberal standards under Rule 20.

10         And they are liberal requirements for good reason.  The

11   federal rules strongly encourage and favor addressing common

12   questions once rather than in a piecemeal fashion.  For this reason

13   the rules do place a very high burden on defendants seeking to sever

14   to demonstrate that not one common question of law exists and not

15   one transaction or occurrence is common to all of the claims.

16         To meet this burden, defendants have pointed only to the

17   fact that there are individualized issues related to each plans

18   right of reimbursement, which could only be understood by examining

19   the individual plan documents.  Respectfully, your Honor, that does

20   not negate the common occurrences that still remain in this case,

21   any one of which suffices under Rule 20.

22         But more importantly, since that objection was first

23   raised, we have submitted to the court sworn affidavits, without

24   objection by defendants or the PSC, attesting to each plan on a

25   plan-by-plan basis, their fiduciary status and their claim language

1   memorializing their reimbursement rights.  And this probably bears

2   some emphasis because we are not seeking here today to proceed on a

3   class-wide basis and we're not seeking to proceed under just one of

4   our clients plan language.

5          Our affidavits that we submitted in connection with the

6   motion for preliminary injunction, which is the only thing that's

7   before your Honor at this stage of the proceeding, demonstrate that

8   our clients have a common right to injunctive relief.  What is not

9   authorized under the federal rules and what seemed like a tremendous

10  waste of judicial and party resources to us is to file nearly 50

11  motions identical in all respects, except for the fact that they

12  each attach a separate client affidavit.

13         The question for this court right now at this the

14  preliminary injunction stage is precisely the same whether the case

15  is presented under one caption or under 50, and the clock is

16  ticking, both defendants and the PSC have voiced serious concerns

17  about that, and our goal has always been to minimize that delay.

18  And this consolidated filing does so in a way that allows your Honor

19  to both fully explore the issues and defendants, as Mr. Irwin has

20  done, to seek and attack the basis of this preliminary injunction on

21  an individualized basis.  So there is no prejudice here by virtue of

22  the consolidated filing, And for that reason defendants haven't even

23  articulated any.

24         There can be no serious doubt that plaintiffs have

25  demonstrated that common right to injunctive relief using this

1  court's four factor test and based on an individualized showing of a

2  likelihood that they will succeed on the merits of their

3  reimbursement claims.  And there are two sort of obvious ways that

4  your Honor can rule on that motion:  You can deny it, in which case

5  the severance motion is essentially mooted; or you may grant it, in

6  which case this action is an entirely different posture.  And no one

7  I think would legitimately dispute that it would be appropriate at

8  that instance to hold a thorough case management conference to

9  address the administrative issues and how we will proceed on the

10 ultimate relief as to the merits of each of these claims.

11          But it's far too early to take that up now, precisely

12 because we don't even know what we're talking about until this data

13 match can occur.  Fortunately, nothing in the federal rules or this

14 court's order hamstring this court's ability to look at this issue

15 with a view of the entire picture.  And Mr. Irwin raised Pretrial

16 Order 26, which addresses claimants to the settlement.  We, of

17 course, are not claiming anything directly from the settlement fund

18 but rather are seeking reimbursement from claimants to that fund.

19          And I think it's also worth mentioning as defendants

20 allude somewhat in their papers, that even if your Honor were to

21 sever this action into 50 some odd separate reimbursement claims by

22 each of the plaintiffs right now, that would be later met by another

23 severance motion when defendants object to the fact that Aetna is

24 proceeding against thousands of its plan members in a single

25 consolidated proceeding.  I think the far wiser course at this stage

1    of the game is to rule on the preliminary injunction, which is

2    before your Honor and has been fully addressed by all of the

3    parties, and stay your hand on the severance motion, deny it without

4    prejudice to revisit the issue once it is clear precisely what stage

5    the case is in.  Thank you, your Honor

6             THE COURT:  Thank you.

7             MR. IRWIN:  Your Honor, I am reminded that what we deal

8    with here is our stock and trade, it's lawsuits.  And this is at the

9    beginning and the end a lawsuit.  And it's really 49 lawsuits, I

10   guess, and what one would customarily do is divide these into 49

11   cases.  One good example is one of these cases involves a Florida

12   plan or set of plans which is governed by a particular Florida

13   statute.  That's in that spreadsheet that we gave your Honor in

14   conjunction with the injunction motion, which we referenced in this

15   severance motion.

16             Another plan is a plan governed by the Federal Health

17   Benefits Act, which is going to be governed by a different set of

18   rules.  So I asked myself what would we customarily do in a

19   circumstance like this?  It's a lawsuit, we would divide it into 49

20   lawsuits since they're different, and then we would probably

21   consolidate them for discovery.  But we wouldn't try that Florida

22   case together with that Federal Health Benefits Act case.  And I

23   think when we come back to the proposition that we got lawsuits

24   here, I think it really brings into focus the practicality behind

25   our motion.

1          THE COURT:   Okay.  Thank you very much.  I have before me

2     three motions.  The motion for injunction:  TRO/preliminary

3     injunction is first, the class action is second, severance is third.

4          Let me address first of all the class action.  The issues

5     here involve independent insurance policies.  The language is

6     different in each policy, recovery really depends upon the language.

7     But some of the plans provide only for reimbursement to the

8     participant of the plans; some only give excess amounts, other plans

9     require specific writing.  In all of the cases there is a causation

10    element.  The date of the expenditure is a significant issue because

11    we're dealing with settlement that involves both prelabel changes,

12    post label changes.

13          We're dealing with situations involving some individuals

14    who may have been in the hospital for a broken arm and kept in the

15    hospital for a broken arm for weeks or months and during the time

16    that they were in the hospital for a broken arm some cardiovascular

17    difficulty arose.  It was handled within hours or it was handled

18    within a day or two, but the hospital stay was for a broken arm or

19    broken leg and not for the Vioxx related matters.  They may well

20    have a lien for a period of time for Vioxx related conditions, but

21    not for the entire hospitalization.  That's a specific issue.

22          There are different state laws that apply in many of these

23    regarding the policyholders and the rights of the policyholders, not

24    necessarily in the ERISA sense, but in the sense of survivors in

25    some cases or interdicts in some cases.  There's some plans that are

1   governed by ERISA, some plans that are outside ERISA, some plans

2   that are governed by the Federal Health Benefits Act.  There's

3   burden of proof differences.  Even in the same plan there are

4   amendments to the plan and the amendments either expand, contract,

5   put other requirements on them.

6            Therefore, there are significant problems with

7   cohesiveness, with commonality, with typicality.  There's also

8   problems with defining the class; predominance of the equitable

9   remedies over the economic remedies.  I recognize that it is very

10  unusual for a court to look at pleadings and make a decision on

11  class allegations, on the vitality, viability of class assertions,

12  but I am familiar with this case, I've lived with it now for over

13  three years, I've tried at least six cases, monitored a number of

14  other state cases, I know the issues involved in the specific cases

15  and I know the issues involved in these various plans.

16           For that reason, I am able to look at the pleadings, look

17  at the documentation that has been presented to me and strike the

18  class actions.

19           I turn next to the severance issues.  With regard to the

20  severance issues, counsel makes a point, and I think a valid point,

21  that it's helpful to have some efficiency and to have some handle on

22  the cases.  I don't think I am deprived of the handle on those

23  cases.  I would tend to consolidate the cases, at least for

24  discovery if discovery is necessary.  But I can't get over the fact

25  that they're different lawsuits.  For the same reason that I see

1  different lawsuits in the class action analysis, I see different

2  lawsuits here.  This court particularly is conscience of the

3  different lawsuits.

4        We've had thousands of Katrina cases.  It would have been

5  easy simply to have one judge handle all of the cases, all of the

6  Katrina cases.  But frankly, there were different policies in each

7  of those cases, different damages in each of those cases, different

8  issues in each of those cases.  And so we required that the claims

9  be filed separately in those cases.

10       I've lived with this issue in the MDL setting and I

11  initially allowed claims to be filed in a consolidated fashion under

12  one title.  Until I recognize the difficulty that that poses -- I

13  might also say in the MDL setting there is some initial interest in

14  trying to get all of the cases filed and all of the cases on the

15  census so that there is some other reason for allowing them to be

16  filed in one pleading.  But to file the cases in one pleading when

17  there are separate independent distinct cases creates problems, not

18  only from the standpoint of the administrative difficulties that the

19  court has to live with, but also because of the difficulties in

20  trying the case, dealing with each case, effectively handling the

21  case with burdens of proof, with notice requirements and things of

22  that nature.

23       I feel that the cases should be served.  If they are

24  served and it's necessary to consolidate, I'll consolidate them for

25  specific reasons.

1          I turn finally to the injunction.  I want to write on the

2     injunction issues.  I am not going to make any ruling on the

3     injunction.

4          But all of us recognize that TRO's and preliminary

5     injunctions are an extraordinary and drastic remedy and not to be

6     granted routinely, but only when the movant by a clear showing

7     carries the burden of persuasion.  And generally the movant must

8     satisfy four traditional criteria in order to get a TRO or a

9     preliminary injunction:  First, he must show irreparable injury;

10     second, of course substantial likelihood of the success; third, a

11     favorable balance of hardships; fourth, no adverse affect on the

12     public interest.

13          The denial of a preliminary injunction will be upheld by

14     at least this circuit when the movant has failed sufficiently to

15     establish any one of those four criteria.  I do want to analyze the

16     criteria informed by some of the comments made today.  I think they

17     were well made and I will take them to heart.

18          I do recognize, however, that financial injuries generally

19     are not considered irreparable, particularly when the plaintiff can

20     pursue their remedy.  The issue of harm in this case is a bit fuzzy,

21     but there is no question that each side has some significant point

22     to make on the harm; but the insurers indicate that they will be

23     harmed, but the harm that they may sustain if an injunction is

24     denied is the ease perhaps in either settling the matter or in

25     pursuing the matter.  They do not lose any liens, they do not lose

1    any rights, they do not lose any methods of pursuing the

2    individuals.

3         I also note that in this particular case there is no fund

4    yet.  No one knows any amounts that they're going to receive, if

5    they're going to receive anything.  That I think has to at least

6    come into play.

7         There is no question in my mind that under the terms of

8    many of the contracts, if not all of the contracts, but certainly

9    the vast majority of them, the individual companies that have paid,

10   whether it's union or companies, that have paid the medical have a

11   lien against the individuals under the terms of most of the policies

12   that I have become familiar with, and they have a right to satisfy

13   that lien.  And in many cases they have a right to get that lien

14   satisfied from the attorneys.  I think that the settlement document

15   itself goes into that with some specificity and recognizes it,

16   highlights it, alerts everyone to it.  So I don't dispute that.

17        The issue that has to be focused on, at least at this time

18   by the court, is whether an injunction is the appropriate method of

19   dealing with that issue.  You know and I know that it's not just

20   going to take a day or two or a week or a month, it's probably not

21   even doable within a year's time.  It takes a considerable period of

22   time and it may well be in order, but it would be theoretical for

23   someone to say and maybe professorial to say that it can be done

24   quickly.  In the real world these matters just are not done quickly.

25   I've been in too many of them to know that, too many issues come up,

1    and so that I think has to be factored into it.

2             But I do want to review and look at and consider some of

3    the well-made comments written and stated by counsel for all of the

4    parties.  I do tell you though, as I have several times, I think

5    that it is to the benefit of both sides in this case that some

6    resolution be made of this problem.  I think that you can fashion a

7    non-judicial solution to this problem that is better than the

8    judicial solution, and this is an opportunity for both sides I think

9    to serve their clients by trying to do that.  But if you can't do

10   it, I'll resolve it.  I will resolve it by judgment and there's a

11   winner and a loser, and I think that that's not the best way of

12   handling this matter.

13            But I will get on it and I will finish it in due course,

14   as quickly as is necessary.  But in the meantime, I do think that

15   you all, both sides ought to take a look at this and see whether you

16   can fashion some non-judicial solution that protects the interests

17   of all of the parties.

18            I have received from you very adequate briefs, you've

19   cited to me much of the cases that I found helpful.  There are some

20   law review articles that also focused on this particular point but

21   not so much in the MDL setting, and so I do want to have the

22   opportunity to put my comments in writing on that issue.  Counsel.

23            MR. GRINSTEIN:  Your Honor, if I can just make two very

24   quick points to clean up the record.

25            THE COURT:  Sure.

1          MR. GRINSTEIN:  First of all, we have filed a motion to

2    put our disc with names under seal.  We would ask --

3          THE COURT:  I'll grant that and I'll put it under seal.

4          MR. GRINSTEIN:  Thank you.  Secondly, I am in no way

5    predicting how this court is going to rule, but just for purposes of

6    the record and only for purposes of the record, in the event that

7    your Honor rules against our plans, I need to make a motion under

8    Rule 8 to ask you to stay effective your ruling and stay

9    distributions pending appeal.  Just for the record I have to do that

10   your Honor.

11         THE COURT:  I don't know which way I am going to go

12   either, but I don't stay my motions.

13         MR. PHILLIPS:  Your Honor, again for the record, as to the

14   other plaintiffs, we would do the same thing.

15         THE COURT:  Sure.  Thank you all very much.  Your briefs

16   were very helpful to me and I appreciate your oral argument.  The

17   court will stand in recess.

18         THE DEPUTY CLERK:  Everyone rise.

19       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

20

21                        *  *  *  *  *  *

22

23

24

25

1

2

3                          REPORTER'S CERTIFICATE

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United States

6   District Court, Eastern District of Louisiana, do hereby certify

7   that the foregoing is a true and correct transcript, to the best of

8   my ability and understanding, from the record of the proceedings in

9   the above-entitled and numbered matter.

10

11

12          _____

13              Karen A. Ibos, CCR, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25