1           UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5  IN RE:  VIOXX PRODUCTS      *      Docket MDL 1657-L
     LIABILITY LITIGATION     *
6                     *      November 21, 2008
                     *
7                     *      9:00 a.m.
  * * * * * * * * * * * * * * * *

8

9

10        STATUS CONFERENCE BEFORE THE
         HONORABLE ELDON E. FALLON
11        UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13

14  For the Plaintiffs:       Herman Herman Katz & Cotlar
                     BY:  RUSS M. HERMAN, ESQ.
15                    820 O'Keefe Avenue
                     New Orleans, Louisiana 70113

16

17  For the Defendant:       Williams & Connolly
                     BY:  DOUGLAS R. MARVIN, ESQ.
18                    725 Twelfth Street N.W.
                     Washington, D.C. 20005

19

20  Also Participating:      Thomas P. Anzelmo,Esq.
                     Orran L. Brown, Esq.
21                    Lynn C. Greer, Esq.
                     John Eddie Williams, Esq.
22                    Daniel E. Becnel Jr., Esq.
                     Matt L. Garretson, Esq.
23                    Patrick A. Juneau, Esq.
                     Arnold Levin, Esq.
24                    Dawn M. Barrios, Esq.
                     Claudia P. Santoyo, Esq.
25                    Monique M. Garsaud, Esq.
                     Rebecca H. Dietz, Esq.

1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room B-406
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5

     Proceedings recorded by mechanical stenography, transcript
6    produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         <u>PROCEEDINGS</u>

2                      (November 21, 2008)

3          THE DEPUTY CLERK:  All rise.

4          THE COURT:  Be seated, please.  Good morning, ladies

5  and gentlemen.

6               Call the case, please.

7          THE DEPUTY CLERK:  MDL 1657, In Re: Vioxx.

8          THE COURT:  Counsel make their appearance for the

9  record.

10         MR. HERMAN:  May it please the Court.  Russ Herman

11 for plaintiffs.

12         MR. MARVIN:  Your Honor, Douglas Marvin for Merck.

13         THE COURT:  We have a number of people in the

14 courtroom and also a number on the phone.  I met with the

15 liaison committee and received from them a proposed report.  I

16 have added some material to it.  I will take it in the order

17 they are given.

18              First, the Settlement Agreement.  Any report on

19 that?

20         MR. HERMAN:  Yes, Your Honor.  On October 31, 2008,

21 the Court entered Pretrial Order 6E to set forth guidelines

22 regarding the effect of submitting common benefit affidavits.

23 We have had 108 affidavits submitted.  All of the pretrial

24 orders, in connection with settlement and corollary issues, are

25 stated in the order and will be posted on the Web site.

1  Mr. Benjamin has written the Court.  Mr. Marvin will address

2  that.

3           **MR. MARVIN:**  Your Honor, I understand there has been

4  correspondence that Mr. Benjamin and Merck have both sent to

5  the Court, and I understand that that would be taken under

6  advisement.

7           **THE COURT:**  I'll be ruling on those hopefully this

8  coming week.  I have reviewed them and done the necessary

9  research, and I will be writing my opinion over the weekend.

10          **MR. MARVIN:**  Thank you, Your Honor.

11          **THE COURT:**  Thank you.

12               With regard to the common benefit, what I have

13  done with common benefit is that I have been meeting with the

14  CPA group that has been appointed by the Court in this matter.

15  I have received from them at least four or five booklets so far

16  bringing me up to date on the material that they have received

17  and that they are organizing.

18               The next step will be for the parties to have an

19  opportunity to express themselves to the fee committee that I

20  have appointed.  They will either take testimony or let anybody

21  say what they need to say to explain their position.  The fee

22  committee will make some recommendations and then that will all

23  be posted.

24               Anybody having any objections to the

25  recommendations, if there be any, then I will go into the next

1    step.  I will appoint several either ex-judges or individuals

2    who have experience in this.  I will also appoint at least one

3    attorney to get evidence, and then they will make a

4    recommendation to me.  Based on that, I will make the necessary

5    ruling.  If there's agreement, that's important to me.  If

6    there isn't, then I will do it that way.

7                    How about the settlement statistics?  Anything

8    on that?

9              MR. HERMAN:  Your Honor, on page 6, before we get to

10   that, the Court has requested a protocol on medical records.

11   That's in the works.  I wanted to report that to Your Honor.

12             THE COURT:  Good.  With regard to that, I have been

13   receiving a number of medical records.  The various doctors and

14   institutions have been forwarding records to me.  I have been

15   giving those to liaison counsel to transmit to the parties that

16   requested it.

17                  I'm also receiving calls from, generally, the

18   CEOs of the pharmacy companies or the hospitals.  They want to

19   know whether they have to be in court on a particular day.

20   They received my order, but that's the first request.  Nobody

21   has asked for the records; instead, they are sent the order

22   that I have prepared in the matter.  So that's creating some

23   difficulty.

24                  I don't know whether requests were made

25   downstream of that individual or whether requests were made at

1    all, but that's presenting some problems.  So I have to come up

2    with a protocol that sets forth the way in which I would like

3    counsel to proceed in getting the records.  They will have to

4    maybe attach an affidavit showing that they have requested,

5    they have been denied, and so forth.  We will proceed along

6    that line.

7            **MR. HERMAN:**  Immediately before Your Honor convening

8    court, Tommy Anzelmo of the bar is here.  He advises that he

9    has been contacted by general counsel of Walgreens.  He will be

10   working with Mr. Davis.  The general counsel of Walgreens would

11   like to coordinate all of the commercial sellers of

12   pharmaceuticals and pharmacies and perhaps that will speed the

13   process.

14           **THE COURT:**  Good.  Tommy, I'm glad you're on board

15   with that.  If they need to meet with me, I'll meet with them,

16   but we do need the records.  That's very important.

17           **MR. ANZELMO:**  Yes, Your Honor.  The plan would be to

18   assemble a list of national counsel for the larger pharmacies,

19   or as many as we can get, and that way national counsel can be

20   alerted as to the requests for the records as opposed to what

21   may be happening now, where a single pharmacist may get it and

22   slow it down.

23           **THE COURT:**  Okay.  Once we do that, if there are any

24   other pharmacies, I'll get with the CEO and we'll try to break

25   through some of the deadlock.  I'll need the number of the

```
 1    pharmacies and somebody to tell me the CEO and then I will make
 2    arrangements for them to come visit with me.
 3            MR. HERMAN:  Mr. Anzelmo and Mr. Davis will report to
 4    you on that.  Your Honor, I did want to mention for the record
 5    that approximately 14 individuals who have submitted affidavits
 6    for common benefit today have signed up.  On December 1, 2, 3,
 7    and 5 we will be first in Atlantic City, then in New Orleans,
 8    then in Houston, then in Los Angeles.  At least five members of
 9    the committee which you have appointed will be there.  There
10    will be a court reporter there.  Of the approximately 10 to 15
11    individuals that wish to make oral presentations, they have
12    been notified and they have elected where they want to appear.
13    So that's in process.
14            Now, I believe as Your Honor called for,
15    BrownGreer is here to advise Your Honor.
16            THE COURT:  Registration and enrollment of claims in
17    the settlement program.
18            MR. BROWN:  Good morning, Your Honor.  I'm Orran
19    Brown, and with me today is Lynn Greer, as usual, from
20    BrownGreer in Richmond.  We are the claims administrator for
21    the settlement program.  Today we would like to cover with the
22    Court where we are on the sign-ups, the enrollment for the
23    program after our October 30 deadline to enroll in the program
24    has passed, and then Lynn will cover where we stand now on
25    claims processing and payments as well.
```

1    When we were here last on October 17, we were

2    looking ahead to the October 30 deadline for eligible claimants

3    to sign up or enroll in the program.  Now that we are past that

4    deadline, we can tell the Court kind of where we have fallen

5    and where the dust is settling now on the number of folks who

6    have signed up for this program.

7    As this slide shows us, we have 48,316 people

8    that have enrolled in the program, *pro se's* and represented

9    claimants, in Row 1.  Then we have been working with Merck and

10   its counsel to make sure that we understand the claimants that

11   ought to be in the program, and you have to take out the ones

12   that are not eligible for the program that Merck was aware of.

13   There have been a number of claimants who, as

14   the deadline approached, just simply withdrew their claims or

15   dismissed their cases.  They have withdrawn from tolling

16   agreements and are not going to pursue their claims, which gets

17   us down to the number narrowed down in Row 2 of the 48,419

18   claimants, of which Merck had and we are aware, who are

19   seemingly eligible for the program.  Then that tells us the

20   difference between those two is only 103 people.

21   So as of October 30, as it has passed, in Row 3

22   we have 99.79 percent of the population of people that should

23   be enrolled in the program have stepped forward and enrolled in

24   the program.  As the smaller text in Row 3 shows us, 91 percent

25   of them had done so by March 31 so that they're interim payment

1   enrolled or they are eligible for these interim payments that
2   are coming out now monthly.
3                That's where we are after October 30.  That
4   percentage is a result of a lot of work by this Court with the
5   hearings and explaining to claimants the program and the impact
6   or significance of the deadline; a lot of work by Merck and its
7   counsel talking to lawyers and claimants to try to explain the
8   program; folks in our office; folks with the PSC.  That push
9   leading up to October 30 has placed us in the position now of
10  making people aware of the deadline and having achieved that
11  99.79 percent enrollment level.
12               There is still some work to be done on the
13  enrollment front.  There are some folks that have sent us
14  enrollment materials, but their packages are not complete yet.
15  They're still missing something.  This slide shows us, for
16  example, in Row 3 there are 302 people who have sent us some
17  enrollment materials, but they still need to fill out their
18  packages.  They got in enough by October 30 for us to know
19  about them, they want to enroll, but they are missing some
20  piece of it.  They are missing a release.  They are missing a
21  stipulation.
22               The ones in Row 3, those 302 people are people
23  that are missing more than one of those things.  The Row 4
24  sections and the ones below that show us people who are missing
25  one thing.  There's 159 people that are missing one piece, like

1  nine of them are missing the release, 150 of them are missing

2  the stipulation of dismissal.

3           The column on the right shows us that a number

4  of those folks are ones that the law firms told us in Exhibit A

5  to their certification of final enrollment that they had

6  trouble locating.  So we still think that 151 people, on the

7  right, there will be tough for the firms to find, tough to get

8  this filled out and get their packages filled out completely if

9  they are missing one of the components.

10           **THE COURT:**  What's going to happen to those?

11           **MR. BROWN:**  I think, Your Honor, that if they are not

12  enrolled, cannot be found, those are some of the ones where

13  counsel are moving to withdraw.  The Court is considering

14  those, entering orders to withdraw.  Those folks that end up

15  unrepresented, without counsel, and have a lawsuit pending, I

16  think Merck is probably going to end up doing motions to

17  dismiss those cases.  There has got to be a cleanup program for

18  those eventually because they can't be located.

19           The rest of these, where counsel have the

20  ability to get in touch with them, we have been working with

21  the law firms and with the *pro se* folks to get their materials

22  in.  Even though October 30 has passed, we have instructions

23  from the parties that we can still work with them to fill out

24  their packages.  If they are missing a medical authorization

25  form, we are pointing that out to them.  We are trying to get

1  all that in to get those few hundred people that still have

2  some little component or a component of the package missing to

3  get them in.

4              This slide shows us -- although you cannot read

5  it really in the courtroom, it's the report we are using for

6  counsel, where we send that report to every law firm on a

7  regular basis.  It lists all of their claimants.  It lists in

8  Section A the folks that are successfully IP enrolled, in

9  Section B the ones that are enrolled but not IP and are payment

10 enrolled.

11             Section C are the ones we are talking about, the

12 ones that have some of the parts of the package in but not all

13 of them.  So we are working with them to tell them what they

14 need to send in and to get that in so that they round out their

15 packages because their claims don't move forward in the claims

16 process until we have this in order.  So that's the real

17 impetus now, to get that finished.  We will continue to do that

18 to try and clean up all of those missing pieces.

19             The last part of the enrollment front, before we

20 turn to claims, is that we -- Merck and its counsel and the

21 claimants' counsel and the unrepresented claimants -- have been

22 working through, making sure those enrollment documents are

23 complete, that the release is signed by the right people, the

24 pages are all there and all.  This has been a long process for

25 all the parties, the lawyers.  It is always, in every

1  settlement, a fairly tedious process to get the paperwork in

2  order.  We are nearing the end of the enrollment deficiency

3  phase.  Merck and its counsel have been working through these

4  documents.  We have been working with the unrepresented and the

5  claimants' counsel to make them complete and help them through

6  that process.

7          This example on the slide is a report, our 4061

8  report, that we send to a counsel, a primary counsel, that

9  lists all of their people that have any sort of outstanding

10 release deficiencies.  These numbers all have a meaning.  They

11 are all tagged to a particular condition in the release or a

12 stipulation and to help them understand what they still need to

13 do.

14         Ideally, these things were supposed to all be

15 cleaned up by November 30, and we have been out explaining the

16 November 30 deadline to counsel.  We are working with Merck and

17 the PSC to help people finish these packages.  If firms need

18 more time beyond November 30 to get this done, we and the

19 parties are going to work with them to make that happen.

20         This is something we all want to finish.

21 There's been a lot of work by a lot of people to get us to this

22 point, but we are very close to the end of the process on the

23 enrollment deficiency documents and making sure that they are

24 ready and the claims can keep moving.  Unless we get all of

25 this cleared up, claims can't go forward in the claims process,

1   for the most part, so we are trying to keep all of that on

2   track.

3            Your Honor, Lynn now will cover where we are on

4   the claims process.

5            **THE COURT:**  Fine.  Thanks very much for your report.

6            **MR. BROWN:**  Thank you.

7            **MS. GREER:**  Good morning, Your Honor.  Lynn Greer

8   from BrownGreer.  I would like to cover with the Court where we

9   are in the claims process.  This is our slide that we put up

10  every month showing the Court the progress that firms have made

11  in submission of claims materials.

12           You will see in the first row that 41,273

13  claimants have submitted a claims form and the PME records,

14  which are the pharmacy, medical, and event records that we need

15  to be able to commence the gates review process in our system.

16           Rows 2 through 6 show various levels of

17  deficiencies in claims package submission, with the most

18  glaring being Row 2, where we have received nothing from over

19  4,000 claimants.  This means even the minimum claims form or a

20  piece of a medical record we have not received from over 4,000

21  claimants.

22           Row 3 shows that 1,900 claimants have submitted

23  a claims form, but we can't commence a review and the claims

24  package cannot be deemed complete with just a claims form.  We

25  do need either proof of Vioxx use or an event record to

1    accompany that.

2                   Row 4 shows 521 claimants who have not submitted

3    a claims form but submitted some form of claims material.

4                   Rows 5 and 6 also show a breakdown of various

5    components of claims packages, either with or without claims

6    forms, but not constituting enough for us to begin review.

7                   We have, over the past couple of weeks, received

8    a lot of claims submissions, which is good.  Our team is

9    working through receiving those and coding those in the

10   database.  There are about 400, 380 claims packages that as of

11   yesterday were still in our system being coded.  We have

12   received materials from 935 different firms and *pro se's* have

13   submitted 347 material submissions.

14                   This next slide shows our efforts and the firm's

15   efforts to comply with deficiency notices that we have sent.

16   Your Honor, this started back in the summer under Exhibit 1.5

17   of the Settlement Agreement.  We were to notify claimants with

18   material deficiencies of claims package deficiencies and give

19   them three opportunities to submit cure documents.  We have now

20   sent three separate official notices from the claims

21   administrator that have been posted on the firm's secure Web

22   site.  We have sent notices to 176 unrepresented claimants.

23   These notices have given them the built-in extensions to the

24   July 1 claims package deadline.

25                   Since we have sent those out -- and we have sent

1   those to a total of 13,446 persons who did not comply with the

2   July 1 claims package deadline.  Of those 13,000, over 5,000

3   have submitted documents that cure those deficiencies.  As of

4   yesterday, there were still 8,347 claimants from whom we had

5   not received the requisite materials.

6                For the record, Your Honor, just to make sure

7   that counsel understand, we are not looking for the perfect

8   claims package here.  What we need to be able to take them off

9   the deficiency list is a claims form and either proof that they

10  used Vioxx or an event record, a record surrounding the care

11  and treatment of the event.  That's all we need.  We are not

12  saying that that comprises a complete claims package for full

13  review, but that's what counsel need.  We have tried to urge

14  firms in the notices and in our e-mail last reminders that

15  that's all we are looking for and encouraging them not to hold

16  on to what they have, to go ahead and send whatever they have

17  to us.

18               Your Honor, Row 6 shows that of the 13,446

19  notices that we have posted, we were trying to figure out -- we

20  had this phenomenon a few months ago where we were worried that

21  a lot of the notices had not even been opened on the secure

22  portal.  We have determined that 345 firms who represent 12,785

23  of the 13,000 claimants have viewed at least one notice.

24  Theoretically, if they view one notice, they know what the

25  others contain.

1          We are going to have an effort over the next few

2    days to identify the firms who represent the remaining thousand

3    and make sure they understand the significance of the deadline.

4    The deadline is fast approaching.  It is November 30, which is

5    the Sunday after Thanksgiving.  Firms have either got to submit

6    us their claims packages, upload them, send them to us

7    postmarked by that date, or they have to request an extension

8    from that deadline.  We have to have that request for extension

9    also by November 30.

10          In that request for extension, they need to be

11   able to show good cause, even just a paragraph showing their

12   efforts, and they have to show that further efforts will likely

13   yield results.  If we find those two components in a request,

14   we are granting extensions currently until December 15.  We can

15   in no event extend the deadline beyond December 30.

16          **THE COURT:**  Are you receiving any late-filed claims,

17   that is to say, who missed the October 30 deadline?

18          **MS. GREER:**  We have not, Your Honor.  We have tried

19   to -- those who had enrolled by October 30, we have caught up

20   with those notices and have sent those to them because they

21   would not have received the first two notices of claims package

22   deficiencies.  Every day we redouble our efforts, as we have

23   gotten in materials that were postmarked by October 30 for

24   enrolled claimants, to make sure they are aware of this claims

25   package deadline as well.

1            Your Honor, the consequences of not meeting the

2    November 30 deadline are that, in the week following

3    November 30, we will send a notice of nonsubmitting program

4    claimant to each claimant who remains on this list of

5    deficiencies.  That will have the effect of ceasing their

6    rights, ending their rights under the settlement program.  We

7    will then deliver their release and any stipulation of

8    dismissal to Merck, and Merck may file that stipulation of

9    dismissal.

10           If we send a notice of nonsubmitting program

11   claimant, the Settlement Agreement gives claimants 15 business

12   days to appeal that determination, and those appeals go

13   directly to the special masters for decision.

14           **THE COURT:**  Of course, the last time, we had tried to

15   focus everybody on the October 30 deadline.  I said something

16   about it during our meeting here and then I issued an order for

17   everyone from the southern states to come to New Orleans so

18   that I could talk with them.  We had about 100 people that

19   showed up here.  Also, from the East Coast, I arranged with the

20   New York courts to get a courtroom there.  With their help, we

21   were able to communicate with the people there via television

22   hookup.  About 100, 150 people showed up in New York.  Then,

23   for the Midwest, I contacted a courthouse in Chicago and we did

24   that in Chicago.  I was able to discuss it with people who were

25   present in Chicago.  Another 100 or so showed up.  Do we have

1    any feeling as to whether or not those conferences helped in
2    any way?
3            **MS. GREER:**  Yes, Your Honor, they did.  They did.  I
4    believe -- and Orran can speak to this more definitively, but
5    that had the result of bringing in many of the remaining
6    nonenrollees who were eligible to enroll by that time.  So they
7    yielded a lot of really positive results.
8                This slide shows where we are generally with
9    claims in the claims process.  Row 1 is the same 8,300
10   claimants that still have material deficiencies.  Row 2 shows
11   that there are over 14,000 that are in the queue for gates
12   review.  As you know, Your Honor, around the July 1 deadline,
13   we had about a third of all of the submitted claims packages
14   come in in a two-day period.  We are now pulling from the queue
15   claims packages that were submitted on July 1 itself, the
16   claims package deadline.  So any claim that is in Row 2 should
17   be claims packages that were either submitted on that day or
18   after.
19               Now, that doesn't mean that claimants have heard
20   yet what the results of our gate determination is.  Row 3 shows
21   that over 17,000 are still somewhere in the gates process.
22   That can be either in our initial review for the gates, it can
23   be in our QC review, some of these claims are with the gate
24   committee, some of these claims are ones where we have notified
25   the firms of their gate determination and they are either

1    trying to give us more information or they are somewhere in

2    that process, which is a long process.

3                    Row 4 shows that over 4,000 claims have moved

4    beyond the gate process and are now being reviewed for points.

5    When we do the points review, we are obviously looking for the

6    points assessments, but this is also where we do a more

7    substantive claims deficiency package review to make sure we

8    have, within the proof of use records, all of the records that

9    we need to be able to identify overall duration of drug use.

10                   Row 5 shows that from August, when interim

11   payments began, through October we paid 1,315 claimants.  The

12   claims that are scheduled to be paid next week, which is one

13   month's work, is 1,740.  What this slide shows, Your Honor, is

14   that we are now at a point -- with both the claims filings, the

15   complete claims, our review process, information that we have

16   been able to get from the lien administrator, and the work of a

17   lot of people, we are on pace to pay between 1,500 and 2,000

18   claims a month.  In fact, that is what we are doing next week.

19                   THE COURT:  How much money has gone out so far?

20                   MS. GREER:  The last slide will give you the specific

21   dollars, Your Honor.  Through next Tuesday, then, we will have

22   paid over 3,000 claims.  Our goal, then, would be by the end of

23   the year to have made interim payments to 5,000 claimants.

24                   This is a slide, Your Honor, that we have not

25   shown before.  We have obviously been gathering data as we

1   review the claims.  What this slide shows is that based on our

2   review of claims -- and I want to make it very clear.  These

3   are average points by injury level for MI claims.  These are

4   claims that have been found eligible at gates and have been

5   through our process.  This does not purport to show the average

6   points across all claims.  This is a very small group,

7   relatively speaking, of over 3,000 claims that have reached the

8   point of being final.

9            What this shows is that Injury Level 1, the

10  average points -- a point, now, Your Honor, is $1,915.  That's

11  how it equates to a point.  Injury Level 1, the average points

12  there -- and these are the fatal injury claims -- are 233.89

13  point average; Level 2, 200.56 point average; Level 3, 153.61;

14  Level 4, 106.99; Level 5, 89.61.  I'll stop here, Your Honor.

15  The majority of claims are falling on Injury Level 5.  Injury

16  Level 6, 60.34 average points.

17           Row 7 is the special marker percentage.  Special

18  marker claims are ones that, after our review, have less than

19  ten points.  A special marker claimant has different options.

20  They are able to elect a fixed payment of $5,000 and end their

21  claim at that point.  About 5 percent of the total claims we

22  have reviewed for these purposes are coming in at less than ten

23  points and are special marker claims.

24           Of the 3,811 notice of points awards that we

25  have issued, this slide shows where they are falling.  There

1    are about 200 -- 197 that have accepted, and they were just

2    accepted in the last few days.  They didn't make it on the

3    November pay list.  These are ones that will definitely be paid

4    in December.

5              211 have filed preliminary appeals to us asking

6    us to look again at their claims.  In many instances this is a

7    time where the firm submits additional documentation to us for

8    review.  Nine have gone ahead and proceeded all the way to the

9    special master.  The special masters within the last week have

10   been assigned nine claims.  We assign those to the three

11   special masters on a random rolling basis.

12             Ten are in special review, and these are special

13   marker claimants who have not elected a fixed payment.  At the

14   very, very end of the process, the special masters will review

15   the claims.  These, again, are ones where the initial point

16   value is less than 10.  329 have not given us their decision on

17   how they are going to proceed.  Then the 3,055 are those who

18   are paid or will be paid.  So what this shows, with the

19   80 percent there of the payment row, once a claim has a notice

20   of points award, very quickly they are able to be paid if they

21   accept that report.

22             This is the payment slide, Your Honor, that you

23   were asking about.  The total dollars that will be paid through

24   next Tuesday are $247,819,343.  That will have gone to 3,055

25   claimants, 167 law firms.  Again, the current MI point value

1   that we used to compute the payment is $1,915.  The total

2   interim payment paid to nonspecial markers is that $247,000,300

3   figure.  113 are those that have been paid to the special

4   markers, the $5,000 fixed payment, for about $500,000, bringing

5   the total to the $247,819,343.  Payments are going out every

6   month, usually the third week of the month, and will continue

7   going forward.

8               The point projection for the stroke points will

9   be made in February 2009, so no stroke claim has been paid.  We

10  are reviewing stroke claims now to be able to work on the

11  projection for the stroke point value.

12              Do you have any questions?

13          **THE COURT:**  No.  Thank you very much.

14          **MS. GREER:**  Thank you.

15          **MR. HERMAN:**  Your Honor, Mr. Garretson is here to

16  report --

17          **MR. WILLIAMS:**  John Eddie Williams.  Your Honor, is

18  it appropriate, since I'm an advocate for almost 2,000 people,

19  to ask some questions at this time because we are getting calls

20  from clients legitimately?

21          **THE COURT:**  Sure.  From the administrators?

22          **MR. WILLIAMS:**  If we could, Your Honor.

23          **THE COURT:**  Yes.

24          **MR. WILLIAMS:**  That way people could read it on the

25  record.

 1            **THE COURT:**  Sure.  What's on your mind?

 2            **MR. WILLIAMS:**  Judge, as I see it -- I did a rough

 3   math -- about 5 percent of the money has been paid out.  By the

 4   end of the year, only about 10 percent of the claimants will

 5   have received 40 percent of their payment.  So people are

 6   asking -- and when this thing was revealed to us, people said

 7   we would be getting money to the clients this past September.

 8                 I understand the lawyers have drug their feet in

 9   some ways or worked hard in others to get the stuff, but the

10   question I get from clients is:  When will this money be paid?

11   At this pace, if you could do 1,500 a month and you have 45,000

12   to do, the math seems to be another 30 months, 2.5 years, to

13   get this wrapped up at this pace.  So I think clients

14   legitimately want to know:  When do we expect this to be

15   wrapped up?

16                 The statistics are very revealing and

17   educational.  They want to know:  When do I get my money?  So

18   when do we anticipate, A, I guess, the heart attacks all being

19   paid, the heart cases?  When will that be wrapped up?  When

20   will the strokes get their first payment and when will that be

21   wrapped up?  That's kind of where I'm headed, Your Honor.

22            **THE COURT:**  Can you answer that?

23            **MS. GREER:**  Yes.  Your Honor, the estimate now is

24   that the final payment for the MI claims will be summer of

25   2009.  The 40,000 figure is right in terms of the claimants

1    that are coming in the door, but not all of those will be paid.

2    We do have a gates process where a percentage of those will

3    ultimately be found ineligible.  So, as we do our projections,

4    we count on obviously fewer than the 40,000 being paid.

5                So much of this process depends on the gate

6    failure rate, the rate of appeals, and what we are trying to do

7    is to take and pay at least 2,000 claimants, with a goal being

8    that as we do that faster for the MI claims we believe that

9    summer 2009 is a realistic projection for when MI claims are

10   going to be paid.

11               **THE COURT:**  With regard to some of the claims, we all

12   know that there's some process involved.  If the claim sails

13   through the process, then they will get paid, of course.  If

14   they fail from the administrative standpoint, there's still

15   hope for them.  They can go to the gates committee.  If they go

16   to the gates committee and fail, there's still some hope for

17   them.  They can go to the special masters for appeal.  So

18   that's going to take a little time.

19               I would hope that we would pick the speed up a

20   bit from the 1,700, maybe 2,000 or 3,000 or 4,000.  So what

21   you're saying is that you would project that by the summer of

22   2009 you will finish paying the MI claims?

23               **MS. GREER:**  Right.  Right.  That all depends,

24   Your Honor, too, on holding firm on this claims package

25   submission deadline.  We, obviously, cannot complete our

1    reviews if packages aren't coming in and records aren't coming
2    in.  That's why this deadline is so very important.
3            THE COURT:  That's why I've been speaking out
4    publicly as much as I can and also from here, as well as the TV
5    presentations in the other courts.  Some of this is being
6    delayed because documents haven't been forthcoming.  They
7    haven't been submitted.  Occasionally, the lawyer will send in
8    the first set of documents and then go on to the next case or
9    go on into some trials.  It's important that they stick with
10   the process and finish it up.  If they finish it up, they will
11   get paid quickly.
12            Do you have any other questions?
13            MR. WILLIAMS:  I do, Your Honor.  I failed to
14   understand.  The summer of 2009, is that for the first
15   40 percent payment?
16            MS. GREER:  That's the final payment.
17            MR. WILLIAMS:  So the MI claimants, by summer of
18   2009, should get a full 100 hundred percent of their payment?
19            MS. GREER:  That is what we are currently projecting.
20   You also asked about the stroke claims.  The first interim
21   payment for stroke claims will be in February of 2009.  So,
22   under the Settlement Agreement, we are to fully review 2,500
23   stroke claims and come up with a point projection for the
24   stroke claims by February 1, 2009.  We anticipate it will
25   follow the same pattern as the MI claims.  We came up with that

1  point value on August 1 and paid MI claims in August of this

2  year.  So the stroke claims, we anticipate, will start being

3  paid in February.

4          THE COURT:  Probably the pace will pick up because

5  they will have a lot more experience and the lawyers will have

6  a lot more experience.  Conceivably, the stroke claims will be

7  paid faster.

8          MR. WILLIAMS:  I'm not sure what percentage of the

9  48,000 are MI claims, but if we are doing 1,500 or 2,000 a

10  month and, say, there's another nine months, if you do the

11  math, even at 2,000 a month, that equals 18,000 claims between

12  now and the end of the summer of 2009.  I don't know how that

13  math works out.  The math doesn't work out to me is what I want

14  to point out.  It leaves me to --

15          THE COURT:  Lynn, do you have any comments on that?

16          MS. GREER:  We are committed to making the MI final

17  payments next summer.  There's still a lot we don't know in

18  terms of the rate of gate failures that are coming in.  Right

19  now, we can't even say what the gate failure rate will be

20  because the gate cases haven't gone all the way through the

21  gate committee and Merck hasn't made decisions yet on which

22  claims they are going to push back into the program.  Based on

23  what we are seeing now, we believe we will be able to make the

24  MI final payments next summer.  The rate of MI claims versus

25  stroke claims, it's about 70/30, so the stroke claims are fewer

1    in number.

2                    There are a lot of nuances, too, that may affect

3    an MI claimant's ability to be paid.  If, for example, claims

4    assert dual injuries, an MI and an IS claim, and one fails and

5    one passes -- and there are a lot of things that, on an

6    individual claimant level, you may be getting questions about

7    that on the face appears that the claim should be paid, but

8    there may be some procedural reasons why it can't be.  So we

9    encourage counsel with specific requests to always call us, and

10   we can try to give you an estimate of a place in the queue or

11   what's going on with an individual claim.

12             MR. WILLIAMS:  Judge, I don't mean to be tough on

13   this, but this is my clients who are calling me.  If I do the

14   math, if 70 percent of the claims -- roughly, 37,000 -- are MI,

15   you have nine months until the end of next summer, and you're

16   doing it max 2,000 a month, that's 18,000.

17             THE COURT:  That's what she's doing now, though.

18   Don't you understand?  That's what she's doing now, but it

19   picks up.  She may be doing 5,000 or 10,000 a month.  It picks

20   up.  That's why she's committed to do it in the summer of 2009.

21                    The first month was like 100.  Now they are

22   1,700.  Hopefully, by the next couple weeks, it will be 5,000 a

23   month.

24             MR. WILLIAMS:  I understand, Your Honor.  We were

25   also told, when the settlement was done, that these people

 1    should expect their first payment this past September.  I'm

 2    being tough and it's because I'm being an advocate for these

 3    people because they call us.  I want to make sure that -- if we

 4    are committed to the end of next summer to get 100 percent

 5    paid, that's more information than I knew, and that's great

 6    news.  I will do everything we can.  I compliment them if they

 7    can achieve that goal, but at least now we know so I can tell

 8    my clients.  I appreciate --

 9            THE COURT:  Well, you can tell them.  You can also

10    tell them that your colleagues -- lawyers -- that they have to

11    get the material in because the only thing that can interfere

12    with this is if they don't respond and don't send in the

13    documents.

14            MR. WILLIAMS:  Absolutely.

15            MS. GREER:  That's correct.

16            MR. WILLIAMS:  Thank you.

17            THE COURT:  Thank you very much.

18            Let me say at the outset this is one of the

19    largest MDLs that has come down thus far in this country.

20    Within a year, the bellwether trials started.  Within two

21    years, six cases were tried.  Before three years, the parties

22    had reached a settlement program.  Shortly after three years,

23    settlement payments have been started, and now the MIs will be

24    finished by 2009 because of the hard work of the claims

25    administrator, the lien administrator, and more particularly

1   the lawyers.

2              The efforts of the lawyers in this case have

3   been monumental, and it's because of their efforts and their

4   experience and their ability that this has been able to be

5   accomplished.  It's interesting to me that 99.7 percent of all

6   eligible claimants have joined the program.  That is important,

7   and I think that we see that the claims are being paid.

8              I do want to take the opportunity to compliment

9   the lawyers in this on a case of this sort.  We have heard a

10  lot about the black hole of litigation in MDLs, and this has

11  not been the case.  It's not been the case because of the work

12  of the lawyers on both sides.  You need to know the Court

13  appreciates all of the work and effort that's been given.

14         **MR. BECNEL:**  Judge, are we having any problems

15  between the two settlements, the Bextra/Celebrex portion and

16  the Vioxx, where they interface, in offsetting?  Are we finding

17  any problems at all?

18         **MR. HERMAN:**  None.  None, Your Honor.

19         **THE COURT:**  Okay.

20         **MR. HERMAN:**  May it please the Court.  I want to say

21  that the co-lead counsel, Mr. Birchfield and Mr. Seeger, have

22  made it their personal mission throughout -- and they meet and

23  talk daily, as do other members of this gate committee, with

24  our counterparts.  They have made it their mission to see that

25  these cases are processed and paid rapidly.  I want to commend,

1    again, BrownGreer for the excellent job that they have done.

2    Without their administration, I think we would be suffering a

3    great deal.

4              In addition to that, we appreciate Mr. Williams'

5    presence and the questions that he has asked that clarifies to

6    him, but he is about to hear that there are other reasons why

7    Texas payments -- and I suspect a lot of your cases are in

8    Texas -- are going to be delayed.

9              Your attorney general's office refuses, as among

10   all the other attorneys general, to deal with issues which

11   affect payment.  I think Mr. Garretson will address that.  So

12   there is a reason for your clients to have more concern than

13   clients in other states.

14             **MR. WILLIAMS:**  Let's order him over here, Judge.

15             **THE COURT:**  I'll speak on that.

16             **MR. MARVIN:**  Your Honor, Mr. Herman beat me to the

17   podium to commend the work that BrownGreer has done.  It

18   really, truly has been extraordinary, and we thank them.

19             There is a lot that's really going on.  We only

20   have the MDL status conferences to talk about the results, but

21   the amount of work that goes on every single day on this

22   program is monumental, as Your Honor indicated.

23             **THE COURT:**  In this program we have also brought in

24   the states.  This is not only the MDL but it's the states.

25   It's the entire country the cases are being resolved in this

 1   case.

 2          **MR. MARVIN:**  Your Honor referred to the conferences

 3   that took place in three cities.  I don't know if that's ever

 4   been done before, but that was exceedingly useful.  We found

 5   many instances where claimants really didn't know about the

 6   program.  We found other instances where claimants didn't fully

 7   understand the program.  So at these conferences they did learn

 8   more about the program, how it works, and we know what the

 9   results were.

10          **THE COURT:**  That was my concern and that's why I did

11   it because I got the feeling that there were many people who

12   for various reasons were not kept up to speed on the

13   developments, either the claimants, the litigants, maybe even a

14   lawyer didn't keep in touch with the Web site or keep in touch

15   with his e-mails or keep in touch with the litigation

16   committees.  It just happens that way, and so I felt duty bound

17   not to push the settlement.

18                I told them at the outset I wasn't speaking in

19   favor or disfavor of the settlement, but I wanted them to know

20   about it.  I wanted them to know it was important that if they

21   made a decision to join it that they do it now, as opposed to

22   later, because of various deadlines that would not and could

23   not be extended because it was part of the agreement.  I went

24   into the pros and cons of the settlement, and I felt that in

25   doing that I had satisfied my responsibility as the judge who

```
 1   was overseeing this process to at least communicate that to the
 2   litigants.
 3                   After I finished speaking to the people in
 4   New Orleans and the people in New York and the people in
 5   Chicago, I had at the courtroom in the courthouse the claims
 6   administrator, the lien administrator, representatives from the
 7   plaintiffs' committee, representatives from the defendant's
 8   committee, and these individuals could talk with those people
 9   to find out how much they would get if they enrolled in the
10   program.  Many of them, it was the first time they had really
11   focused on it.  And, of course, a large percentage of them
12   signed up before leaving that particular day.  It was their
13   choice, but at least I felt that they knew about it and made
14   some informed decision.
15           MR. MARVIN:  If I might add to the list of those who
16   contributed to the program, in addition to BrownGreer and
17   members of the PSC, special masters also were present.  I know
18   that Mr. Juneau was here in New Orleans on fairly short notice.
19   My fault.  He was also in New York.  Judge Corrrodemus was in
20   Chicago.  So they had that resource available to them as well
21   as the work done by the curators.
22           THE COURT:  Okay.
23           MR. HERMAN:  Your Honor, just one more comment on
24   this issue of claims payment.  We regularly get 50, sometimes
25   as many as 100, inquiries a week from attorneys on behalf of
```

 1    their clients or *pro se's*, and we uniformly direct them to

 2    BrownGreer.  We have never had a situation where BrownGreer was

 3    not immediately responsive, and I mean immediately.

 4                    For all lawyers who are concerned about the

 5    individual cases, the surest way to get specific information is

 6    to contact BrownGreer.  You will get an immediate, direct

 7    response to your inquiry.  They have been terrific about it.  I

 8    did want to state that on the record because I'm certain there

 9    are other attorneys listening in in the courtroom who may have

10    the same questions Mr. Williams had.

11              **THE COURT:**  Okay.  How about the lien administrators?

12    That's the next item.

13              **MR. GARRETSON:**  Thank you, Your Honor.  I'm Matt

14    Garretson of The Garretson Firm.  I'll be brief.  Not a lot of

15    new news to report.  A lot of new statistics.

16                    As we reported at our last hearing, with respect

17    to Medicare, the primary objective right now is just to clean

18    up the wave of data we have had to send to them over the last

19    couple of months that contains about 2,400 changes in

20    Social Security numbers or dates of birth.  I share that with

21    you because we have some -- even though we have an arrangement

22    with Medicare that covers all claims that are eligible for

23    payment, without that piece of verification completed for that

24    small subset of claims, some counsel may see that there's lien

25    resolution administrator holds on some clients that wouldn't

1  make sense to them absent knowing that bit of information.  We

2  expect to have a lot of those issues resolved within 30 days.

3              I also wanted to report that as of today, with

4  the number of claims that have received notice of points

5  awards, we have only received 30 requests by claimants for a

6  redetermination, which is effectively our appeals process.

7  That's, by my statistics, less than one percent of the

8  claimants have had any pushback against the Medicare process

9  that's been established.  I view that as a very positive sign.

10             I also am encouraged because many of those who

11  have requested a redetermination have only required education

12  as to why they have a reimbursement obligation in the first

13  place, and we have been able to satisfy many of those claimants

14  who have called in.  So I'm pleased to report that progress.

15             With respect to Medicaid, our whole game with

16  Medicaid now is just getting in data.  Claims data is what this

17  is about for us on the balance of this project.  Throughout the

18  project, we will have close to 17,500 individual claims files

19  from the Medicaid agencies.  To date we have secured 5,750 of

20  those.  That's up almost 50 percent from the last hearing.  As

21  I have reported, we are able to turn those around with an

22  analyst on those files within five days of receiving the data

23  and we continue to mark that rate.

24             We also expect a large chunk of the balance,

25  which is about 12,000 individual claims files, to come in very

1    rapidly as we are still waiting on some of the larger states

2    who have had to pull an immense amount of data and send it to

3    us at once.  What I wanted to make sure people understood is,

4    while we have these holdbacks in place that we have discussed

5    at great length at prior hearings, we still are not going to be

6    able to present to the attorneys or the claimants who call us a

7    final lien amount because we're not able to do that until

8    somebody goes through the process of being approved for a

9    notice of points award letter, but things continue to work well

10   there.

11            With respect to all the other governmental liens

12   such as VA, TRICARE, and Department of Defense, we seem to have

13   leveled off at about 800 claimants who have reported

14   obligations.  We are going to coordinate with BrownGreer to go

15   back to the population of attorneys to see if they have had any

16   more information come in because we think those agencies, as we

17   have worked with them, have reported that they are sending out

18   some late notices that still should be honored in this program.

19   So we will be coordinating with counsel to make sure we gather

20   any late notices.

21            So as I said I would be brief, those are the

22   statistics as of today.  We continue to be encouraged.

23   Mr. Herman did raise a point about Texas.  We will continue to

24   push forward on that.  I would like folks to know that there is

25   no hold currently on Texas claimants that have no obligation,

1   and we do have claims information coming in from Texas which we

2   continue to audit daily.  So as those are audited, assuming

3   they are below the proposed cap, they are, in fact, being

4   processed.

5          **THE COURT:**  Let me just make a couple of comments.

6   First, the idea of a lien administrator is a win/win situation.

7   Matt has been able to negotiate with the various departments a

8   satisfactory amount and it's beneficial to the claimant.  This

9   is the economy of scale that I talked about on several

10  occasions that an MDL affords.  These individuals, by law, have

11  to pay back the liens.  With the economy of scale, you're able

12  to negotiate a lesser amount, so it's good for the claimant.

13  It's good for the lienholder because he gets it from one source

14  as opposed to thousands and thousands of sources, so his

15  collection costs are down.  It's a win/win situation.

16          Now, the unfortunate thing is that in 49 other

17  states the attorneys general have approved the program and they

18  have come aboard.  Texas has not as yet.  I have spoken to the

19  attorney general's office and explained it to them.  I was

20  hopeful that they would see fit to come aboard.

21          You need to talk to them, Matt, and tell them

22  I'm going to put a hold on all Texas claims until they focus on

23  this issue.  I'm going to have no other choice.  I will write

24  the attorney general telling him that -- and I will send a copy

25  to the governor and senators -- claimants in Texas are not

1  going to get paid because we haven't heard from the attorney

2  general's office at that point.

3            Now, I would like you to tell them before I

4  write the letter, and hopefully the letter will not be

5  necessary.

6            **MR. GARRETSON:**  Yes, Your Honor.  I will do so today.

7            **THE COURT:**  The special master.  Anything?

8            **MR. HERMAN:**  Mr. Juneau is here, Your Honor.

9            **THE SPECIAL MASTER:**  Patrick Juneau, special master,

10  Your Honor.  Very briefly, my report is in the context I would

11  like to address one point.  You inquired earlier about the

12  meeting.  I was, in fact, present at these meetings that were

13  held, from my perspective, at two different locations.

14            I can report to the Court that the meetings were

15  extremely instructive to people from an informational

16  standpoint.  Really, your verbal presentation through the tape

17  recording and mine to the people conveyed the same message.  It

18  was not to tell anybody what they had to do or should do, but

19  to make sure that they understood what was here and what was

20  available to them.

21            Through personal engagement with people

22  directly, through their attorneys, I can tell you that was

23  extremely instructive.  Once it was discovered what this

24  program was, people were very enthusiastic about enrolling in

25  this program.  So my report to the Court is it did serve a very

 1   useful purpose.

 2          **THE COURT:**  I appreciate you being there on that,

 3   Pat.  I'm sorry I had to give you such short notice.

 4          **THE SPECIAL MASTER:**  We had a few bumps in the road

 5   at a few of these meetings, but that's the experience of

 6   meeting people.

 7              Ms. Greer reported, Your Honor, that there are

 8   nine actual appeals.  Those appeals have actually been

 9   allocated pursuant to the Court's instruction.  I have talked

10   to and communicated -- because we are in communication.  We

11   have regular kind of conferences to make sure we are all in

12   sync about consistency in applying the program.  That's, I

13   think, extremely important with the other two deputy special

14   masters.

15              Those have been assigned and are being worked on

16   as we speak.  I would anticipate in very, very short order,

17   Your Honor -- we just got those this week -- that those rulings

18   are going to be independently made on those cases.  So there is

19   no delay with regard to those claims.

20              The final matter I would like to report, there's

21   a second phase of this case, and I think it's important that

22   this be conveyed to the Court and to the people who are

23   involved in this litigation.  There is a very, very, very

24   technical, well-developed, precise program that BrownGreer has

25   developed with regard to the gathering of this data and how

1  that filters through the following process, if you follow the

2  case all the way through, which includes various stages of the

3  gates committee, when it gets to the special master in terms of

4  review, then there is an elaborate software program that's

5  developed that we utilize to make the actual determination.

6           We are able to retrieve and actually look at

7  data through this whole system through the communications they

8  have developed.  For me, who is electronically challenged, it

9  was quite an experience, but I can tell you, Your Honor, it has

10  and will lead to efficiency and prompt rulings in this case,

11  and that's the final point.

12          We have one more session -- and that's with Lynn

13  on December 3 -- with Justice Trotter, Judge Corrrodemus, and

14  myself, to be educated on the final software part of this thing

15  because it's a very involved process, but it's an extremely

16  useful process.  It literally saves months of time in getting

17  all this done.  It's not the flow of 10,000 pages of paper, but

18  we're actually looking at the data and can make quick decisions

19  in locales where we don't have to travel to make those

20  decisions, which I think is financially beneficial to the

21  class.

22          So finally, Your Honor, we are now at the point

23  where appeals have been made, appeal decisions will be made,

24  and we are moving into the second phase, and as soon as that's

25  done -- it strikes me, from my observation looking at the whole

1   process, that the process has been working extremely well.  As

2   one who has been involved in a lot of national cases as a

3   special master, I can assure you we are on a fast track in this

4   case.

5               I'm not going to mention the case, but I can

6   think of one that outlast the dates of birth of my children.

7   So we are far ahead of the schedule and I'm optimistic that we

8   will meet it.  I was encouraged by Mr. Williams' question and

9   the response.  That's a very optimistic projection, but they

10  have performed.  They have done what they said they were going

11  to do.  That's my report.

12              **THE COURT:**  As everyone knows, I appointed Mr. Juneau

13  as the special master and Justice Trotter and Judge Corrodemus

14  as deputy special masters.  Their job is to deal with appeals.

15  Before they reach these nine, they have had some exposure and

16  some experience and they have had some dry runs to get them

17  ready.  So they are up to speed, and I look forward to your

18  finishing.

19              **THE SPECIAL MASTER:**  Thank you, Your Honor.

20              **THE COURT:**  Thank you very much.

21              Any state court trial settings?

22              **MR. MARVIN:**  Your Honor, there are no state court

23  trial settings.

24              **THE COURT:**  What about the class action issue?

25              **MR. HERMAN:**  Your Honor, we have met with Mr. Marvin

```
 1  and we will be filing, before the next status conference,
 2  motions to withdraw the master complaints for medical
 3  monitoring and purchase claims -- state actions.
 4              THE COURT:  Discovery directed to third parties.
 5              MR. HERMAN:  Yes, Your Honor.  Not purchase claims.
 6  I'm sorry.  The state actions with regard to medical
 7  monitoring.
 8              MR. LEVIN:  As well as the personal injury state
 9  actions, Your Honor, which you did not dismiss.
10              MR. HERMAN:  Thank you very much.
11              With respect to discovery to third parties,
12  Express Scripts has continued to produce records and they have
13  been posted by BrownGreer as received.  There appear to be no
14  problems with that.  That's going smoothly.
15              With regard to the state/federal coordination,
16  state liaison committee, I believe that Dawn has a report.
17  Your Honor, there are actually two sections.  There's one at
18  page 9 of the report at roman numeral VIII and the other is
19  roman numeral XIV at page 12, basically regarding potential
20  common issues for discovery and it involves the attorneys
21  general.
22              Dawn, do you want to report on that?
23              MS. BARRIOS:  Good morning, Your Honor.  Dawn Barrios
24  for the state liaison committee.
25              I have to echo Mr. Herman and Mr. Marvin's
```

1   compliments on BrownGreer, and I would like to give the Court
2   an example of what happened to me just this week.  I had gotten
3   a points award.  I disputed it because I had some other
4   contradictory information in the medical records, so I did an
5   internal appeal.  Your Honor, within 13 days of making that
6   appeal, I got a resolution from BrownGreer.  I think that's
7   spectacular in light of the 45,000 claims that they have to
8   process.
9                   I would also like to give thanks to
10  Mr. Garretson because his work, particularly on Medicaid, has
11  allowed me to present to my clients -- particularly one, with a
12  situation where he had many, many thousands in Medicare
13  reimbursements, and it was only 1,000-something-dollars that we
14  actually had to pay through Mr. Garretson.  So he has done a
15  wonderful job in helping the claimants.
16                  With regard to my formal report and after all my
17  kudos to everyone, I want to report that the remands we have
18  given to your law clerk, we continue to go through them in
19  terms of the claimants because we will have a deadline of
20  November 30.  We will have a better cleanup for you along the
21  way.  We have submitted to BrownGreer all the remands that we
22  had, and they have responded to almost 80 percent.  We are
23  continuing to work with them and with the curator as well.
24                  I would like to bring to your attention,
25  Your Honor, a case that I had handed to your law clerk.  I have

1  been contacted by counsel for the physician in this case, and

2  the case name is *Olivia Robinson v. Merck*.  It is a case out of

3  Texas.

4        Lemle Kelleher locally represents the physician

5  in this case.  It was filed in Texas state court.  It was

6  removed by Merck.  The judge in the transferor court issued an

7  opinion and order on October 20, 2006, in which he denied the

8  remand, but he ruled that the physician was improperly joined.

9        So we have a situation now the case is before

10  Your Honor.  The physician has been sitting in the case without

11  formal dismissal.  We have, we believe, a law of the case

12  situation where he has already ruled.  The physician has had to

13  continue to report this pending case on all of his

14  credentialing applications and his insurance.  Lemle Kelleher

15  has asked me to bring this to your attention to see if you

16  would enter an order of dismissal based upon that.

17        I do need to report to Your Honor that Olivia

18  Robinson, her original counsel, you had granted their motion to

19  withdraw.  They are not in the *pro se* database yet.  I spoke

20  with Ms. Wimberly yesterday about it, and her case is going to

21  come up in a month or so for total dismissal.  Lemle Kelleher

22  is seeking some immediate relief on behalf of the physician.

23        **THE COURT:**  Do I have the number of the case?

24        **MS. BARRIOS:**  Yes, Your Honor.  I gave Nathan a copy

25  of the remand order.

1      **THE COURT:**  I do have it.  Okay.

2      **MS. BARRIOS:**  Thank you, Your Honor.  As for the

3  governmental action in attorneys general cases that you have

4  asked me to help coordinate, I'm very pleased to report that --

5  with great help from Merck and Mr. Seeger and Mr. Davis and

6  your law clerk -- I filed a joint motion to lift the stay of

7  discovery with regard to the governmental actions.  It

8  specifically applies to the 11 governmental actions technically

9  before you.  There are three additional ones on the way.  We

10  seek Your Honor's signature on the order.

11      **THE COURT:**  I would like to have a status conference

12  also, Dawn, if you can arrange it, with you and Merck and any

13  representatives of the attorneys general, and we will take a

14  look at this and see whether I can work out some kind of

15  scheduling order that's agreeable to the parties and satisfies

16  the Court.  Either next time or before next time, I'll be

17  contacting you to get a date.

18      **MS. BARRIOS:**  Okay, Your Honor.  I will be happy to

19  do it.  I know that many of the attorneys for the attorneys

20  general have asked to come and perhaps the day before the next

21  status conference --

22      **THE COURT:**  All right.  Let's do it at that time.

23      **MS. BARRIOS:**  Thank you, Your Honor.

24      **THE COURT:**  Anything from the *pro se* claimants?

25      **MS. SANTOYO:**  Good morning, Your Honor.

1    Claudia Santoyo here on behalf of the curator for *pro se*

2    claimants.

3              As a preliminary note, I would like to let

4    everyone know that we are moving offices to just across the

5    street.  As of December 1, we will be at 400 Poydras Street.

6    The telephone numbers, however, will be the same.  We will be

7    open through the holiday weekend, despite the move, and

8    available to help any *pro se's* or other callers who need

9    assistance during that time.

10             Your Honor, since the last conference, we have

11   undertaken an additional mailing to the claimants that

12   Ms. Greer talked to you about who have submitted some sort of a

13   claim package but it is either deficient or incomplete.  We

14   have sent them a letter reminding them of the November 30

15   deadline, advising them that we are here to help them, giving

16   them also a copy of the request for extension form -- I

17   believe, it's Form V2033 -- and advising them that this

18   November 30 deadline is a very hard deadline.

19             In addition to that 176 mailing to those

20   claimants, we have also sent out a similar letter to 62

21   additional claimants who are *pro se* claimants that are enrolled

22   but have not submitted any form of claim package material; or

23   maybe they submitted a claim form but no medical record.  In

24   other words, there's not enough even to consider it as a claim

25   package submission.  Similarly, we have attached a copy of the

 1   request for extension in anticipation that these folks will

 2   have the need for that form.

 3              We continue to receive contacts from claimants

 4   who are seeking information about the status of their claim.

 5   Some of those claimants have outstanding deficiencies that

 6   require cure.  The claims administrator has been very prompt

 7   and attentive to our request for remailings of release

 8   documents, enrollment documents, as well as claim forms and

 9   instructions.  Sometimes they are able to send them out within

10   30 minutes of our request.

11              Additionally, we have gotten a few calls from

12   claimants who, for a reason unknown to me, have not registered

13   or enrolled in the settlement program at all but appeared to

14   have had what would have been an eligible claim.  We have

15   coordinated with counsel for both parties, as well as the

16   claims administrator, in having a unified strategic response to

17   these calls that advises them that they have missed the

18   enrollment deadline and that no additional forms will be sent

19   out to them.

20              To the extent the people have already received

21   enrollment claims and simply failed to send them in, we do

22   encourage them to send them in; that they will be sent to the

23   parties, but that there is no guarantee the parties will accept

24   them into the program.  It simply could be or it could be not;

25   it's simply not up to us.

1           Additionally, we will continue to forward any

2   more enrollment materials that do come into our office;

3   although untimely, we send them to the claims administrator for

4   their forwarding on to the parties.

5           In addition to those types of calls, we are

6   receiving calls for remailings and for assistance in clearing

7   deficiencies.  In particular, the main deficiency that we tend

8   to see is that people have sent in forms with only the page

9   that they signed and notarized and not the entire document, or

10  they are not quite understanding the need for compiling all of

11  the medical records together in the different types of PME

12  records that are required.

13          We go through the instructions for the claims

14  form with the individual caller and in some circumstances have

15  actually had local claimants come into the office with their

16  forms and gone through the process with them so that we could

17  hopefully assist as much as possible.

18          There are some stumbling blocks, I think, for

19  some claimants who have difficulty in obtaining records because

20  the prescription records from some major pharmacies have been

21  purged.  We are doing everything possible to assist those

22  callers and claimants with other sources to where the

23  information may be located, such as their regular doctor, the

24  prescribing physician, etc., even so far as bank records, which

25  sometimes indicate things you purchased.  That is probably

1    going to be a problem down the line for individuals, and they

2    may need to have something to do in the claims process if they

3    don't meet the gate sometimes.  I'm not sure what more we could

4    do to assist those; however, we are taking those calls.

5            Another large part of the calls that we receive

6    are callers asking for their position in the queue for review.

7    In particular, we have a couple of callers or e-mail that

8    contact us on a weekly basis to just check in.  We are able to

9    pull up their information on the claimant information page on

10   the portal.

11           We can see the status of their claims.  We can

12   see if any deficiencies exist or if they have been cured.  We

13   are able to give them the information they require every time

14   they call even if it hasn't really changed.  We will continue

15   to offer that service, as well, going forward.  As the claims

16   are pushed through the different steps of the process, we will

17   be able to see that on the portal and have that information

18   available to *pro se* callers.

19           Lastly, I would like to add some calls that we

20   have received from *pro se* litigants who are not part of the

21   settlement program, who either opted out intentionally or who

22   missed the deadline and who now do not desire to take part in

23   it, they have called and written seeking assistance with

24   understanding the requirements of Pretrial Order 28 as well as

25   some of the deficiency notices that have been sent by counsel

1    for Merck.  To the extent we have the information -- because,

2    thankfully, Mr. Marvin's office has been kind enough to copy us

3    on those deficiency notices -- we do advise them as best as

4    possible of what those requirements are.

5              We also advise them to get an attorney, if at

6    all possible, and offer referrals from the referral list that

7    was given to us by the PLC.  As of this date, however, I don't

8    believe that any of the attorneys for whom we have referral

9    information have actually taken on any new claimants.

10             Going forward, we do anticipate that there will

11   be an additional mailing in December for those *pro se* claimants

12   who are either deficient or who have requested an extension of

13   time, reminding them of the final December 30 deadline should

14   they receive that extension of time, and in the meantime we

15   will continue to offer assistance as we have done so before.

16        **THE COURT:**  Good.  Thank you very much.  Also, in

17   this case, as you can imagine, with 60,000 claimants, there are

18   many people who either for one reason or another do not have

19   attorneys to represent them.  So we tried something new, also,

20   in this area, and that is to appoint a curator to represent

21   those individuals.  You're doing a good job and I appreciate

22   all the work you're doing.

23             Merck's motions is next.

24        **MR. MARVIN:**  Your Honor, under roman numeral X,

25   Merck's motions, there's nothing to be changed there.

1          **THE COURT:**  All right.  Roman numeral XI.

2          **MR. HERMAN:**  No new issue, Your Honor, for discussion

3     under roman numeral XI.

4          **THE COURT:**  The suit statistics on roman numeral XII,

5     anything?

6          **MR. MARVIN:**  Very briefly, Your Honor.  The numbers

7     are in the joint status report.  There are 11,575 lawsuits

8     currently with 29,200 plaintiffs.  25,100 plaintiffs have been

9     dismissed as of September 30.  A large number of those were

10    dismissed in New Jersey for administrative reasons because they

11    enrolled in the program.

12         **THE COURT:**  The trial package.

13         **MR. HERMAN:**  No further discussion, Your Honor, with

14    respect to the trial package.  Both the MI and stroke trial

15    packages have been completed and reviewed previously by the

16    Court in camera.

17         **THE COURT:**  Anything on third-party payor?

18         **MR. HERMAN:**  This has been discussed previously by

19    Dawn with regard to the attorneys general and there are ongoing

20    discussions on those issues.

21              With regard to roman numeral XV --

22         **THE COURT:**  I have that under advisement.  I'll be

23    ruling on that very shortly.

24         **MR. HERMAN:**  With regard to third-party payors'

25    motions under roman numeral XVI, I'm going to call on attorney

1   Monique Garsaud to just report to the Court their efforts in
2   the admin issues.
3           **MS. GARSAUD:**  Monique Garsaud on behalf of BrownGreer
4   and U.S. Banc.  This week the Fifth Circuit has handed down its
5   opinion in the *AvMed* case and affirming your ruling that
6   AvMed's preliminary injunction has been denied.  My client is
7   ready to go forward from here, and hopefully the matter has
8   been resolved.  We are working, though, with AvMed's attorneys
9   on a deadline as to when and if they will file separate
10  pleadings in each specific case.
11          **MR. HERMAN:**  May it please the Court.  With regard to
12  AvMed, Mr. Seeger, on behalf of your Court-appointed
13  committees, has been in negotiations with Mr. Sobol, on behalf
14  of AvMed.  They would like to meet briefly with you following
15  the status conference.
16          **THE COURT:**  Certainly.
17          **MR. HERMAN:**  With regard to 1199SEIU Greater New York
18  Benefit Fund, page 13, that's roman numeral XVII, they have
19  requested a hearing on their motions, Your Honor.
20          **MS. GARSAUD:**  Your Honor, Monique Garsaud again on
21  behalf of BrownGreer in this case.
22          **MS. DIETZ:**  Rebecca Dietz on behalf of the plaintiff.
23          **MS. GARSAUD:**  Your Honor, as you know, we have a
24  Motion to Dismiss pending on behalf of my client, as well as
25  the NPC, and New York has opposed it.  They filed a surreply

1    and we have had several filings recently.  What we would like
2    to do is ask the Court to set that for a hearing.
3              THE COURT:  Do you want oral argument on it?
4              MS. DIETZ:  Yes.
5              THE COURT:  Okay.  I'll do that.
6              MR. LEVIN:  Your Honor, may I suggest that we have
7    the hearing the next status conference?
8              THE COURT:  Are you all okay that?
9              MS. DIETZ:  The only request we had had -- and we
10   discussed it with the parties earlier -- is that if the status
11   conference is on a Friday that we have the oral argument prior
12   to the status conference, like the day before.  I didn't know
13   when the next status conference would be.
14             MR. LEVIN:  It's the 18th.  I don't know what day of
15   the week that is.
16             THE COURT:  That's a Thursday.  Is that all right?
17             MS. DIETZ:  That's fine.
18             MS. GARSAUD:  That's fine.
19             THE COURT:  Okay.
20             MR. HERMAN:  May it please the Court.  Merck has
21   several motions at page 15 and 16, roman numerals XVIII, XIX --
22             THE COURT:  We'll take those after we finish.
23   Anything other than those motions?
24             MR. HERMAN:  Just one statement on behalf of the PSC,
25   Your Honor.  We, as usual, make our continuing objection to any

1    dismissals with prejudice.  We object to any dismissals with
2    prejudice.
3              **THE COURT:**  Anything further?  Anything from anyone?
4              **MR. CLEMENTS:**  Good morning, Your Honor.  For the
5    record, Miles Clements on behalf of Decision Quest, one of the
6    last items on Your Honor's agenda.  I'll try and keep this
7    brief.
8              The primary purpose of addressing this with you
9    this morning, Your Honor, is to seek some guidance; not to
10   argue the case, not to argue facts that are in dispute, but
11   simply to frame my client's issue.  To Decision Quest it is a
12   significant issue because it involves about $2.4 million, about
13   $550,000 of which represent out-of-pocket costs which have been
14   out of pocket for over two years.  The fees have been unpaid
15   for about two and a half years, so it's significant in that
16   regard.
17             Decision Quest, a jury consulting firm, was
18   retained to do work in this case.  Just who retained
19   Decision Quest and to do what, I don't want to get into that.
20   I don't want to invite other people to debate all of that.
21   They were paid a fee by the PSC, and they were paid some fees
22   by some of the members of the PSC and nonmembers of the PSC
23   with respect to work done in individual cases.  This is the
24   amount that's left.  Okay.  That's the problem.
25             The solution that Russ Herman and I and other

1    members of the PSC and the fee allocation committee have been

2    trying to work out is -- without having to unravel questions of

3    who said what when, who had authority, who had apparent

4    authority, who ratified the relationship, and who benefited

5    from it, where I think we can go towards a solution is simply

6    this.  I think there may be a consensus -- that remains to be

7    determined -- what Decision Quest did was a common benefit.

8    Hopefully, we can come to a stipulation in that regard.  If we

9    can't, then there will have to be some sort of a fact-finding

10   exercise.

11                  If Decision Quest and the PSC and all interested

12   parties can come to an agreement, to a stipulation, that the

13   good work that Decision Quest did -- it's not disputed they did

14   the work, they incurred the expenses, it was valuable, it was

15   used by many, and it contributed to a good result.  If it is

16   deemed to be a common benefit expense, then it can be submitted

17   in one form or another for payment to be drawn from a common

18   benefit expense fund.

19                  Well, that's where Your Honor, I think, would

20   come in.  We would need to have a fund to draw from.  I think

21   that's probably the best solution to deal with this problem.  I

22   would ask for some guidance from Your Honor.

23                  **THE COURT:**  Let me hear from the PSC.

24                  **MR. HERMAN:**  May it please the Court.  We had a

25   conference since the last status conference.  Mr. Clements'

1   clients came in.  They made a presentation.  Mr. Ranier was

2   present.  Mr. Levin participated.  Mr. Robinson participated.

3   I asked a number of questions, requested some documents.  They

4   came in.

5               I made that report to your Court-appointed

6   allocation committee.  The allocation committee has met twice

7   now on this issue, once in California early in the week and

8   then again yesterday.  We are going to have an informational

9   meeting only among PSC members who are here and allocation

10  committee members who are here in the jury room immediately

11  following.

12              After we have advised the PSC of what our

13  position is so far, I have invited Mr. Clements to come in so

14  that he can make his points.  We do not have a resolution.  I

15  don't feel comfortable at this time disclosing what the

16  allocation committee's recommendations are because it has to go

17  to the PSC first.  It's a complicated question.  I don't want

18  to get into the facts, but we have been working at this now

19  tenaciously over the last month.

20              My response is, Your Honor, that I would hope

21  before the next status conference, in the interim, I can give a

22  report to Your Honor in which the PSC and the allocation

23  committee have a joint recommendation and will have met with

24  Mr. Clements at that time to see what their position is and we

25  can both report to you.

1          Because the negotiations are complex -- indeed,

2    I had a call from Mr. Robinson, who is on the PSC committee,

3    who is in trial in California and asked that there be no formal

4    discussion without his presence.  In addition, Mr. Ranier has

5    been very vocal on the issue and is a PSC member.  He and

6    Mr. Williams will be meeting with you, at their request,

7    following this.  So the bottom line is we're working towards

8    resolving it and it's not resolved at the current time.

9          THE COURT:  Get with me within two weeks, you and

10   Miles.  If it's not resolved, then I will resolve it.

11         MR. HERMAN:  Yes, Your Honor.

12         MR. CLEMENTS:  Thank you, Your Honor.

13         MR. MARVIN:  Your Honor, may we just approach the

14   bench very briefly?

15         THE COURT:  Yes.

16         (WHEREUPON there was a conference at the bench

17   outside the presence of the court reporter.)

18         THE COURT:  We were just talking about logistics.

19   There's some problem with the date of the status conference.

20   It looks like a better date is the 19th, and then we will have

21   the hearing on the 18th.

22         MR. LEVIN:  Your Honor, may we do the hearing in the

23   afternoon of the 18th?

24         THE COURT:  Sure.

25         MS. BARRIOS:  Excuse me, Your Honor.  When would you

1  like to see the attorneys general if you move that date, the
2  day before or in the morning of the status conference?
3      **THE COURT:**  Why don't we try to do it the day before.
4      **MS. BARRIOS:**  Yes, sir.  I will work with Nathan on
5  it.
6      **MR. HERMAN:**  We'll be available both days,
7  Your Honor.
8      **THE COURT:**  I first have to deal with these motions.
9  Let me meet with the people first and then we will come back
10 and do the motions.
11     **MS. WIMBERLY:**  Your Honor, I don't think they will
12 take more than five minutes.
13     **THE COURT:**  Let's do the motions first.  Let me take
14 a break so those who want to leave can leave.  I'll take five
15 minutes and then come back.
16     **THE DEPUTY CLERK:**  Everyone rise.
17     (WHEREUPON the status conference was concluded.)
18                           * * *
19                      __CERTIFICATE__
20         I, Toni Doyle Tusa, CCR, FCRR, Official Court
   Reporter for the United States District Court, Eastern District
21 of Louisiana, do hereby certify that the foregoing is a true
   and correct transcript, to the best of my ability and
22 understanding, from the record of the proceedings in the
   above-entitled and numbered matter.
23
24
                         s/ Toni Doyle Tusa
25                       Toni Doyle Tusa, CCR, FCRR
                         Official Court Reporter