UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX PRODUCTS<br>         LIABILITY LITIGATION<br><br><br>**This document relates to All Cases** | CIVIL ACTION<br><br>NO. 2:05-MD-01657-EEF-DEK<br><br>SECTION L<br>JUDGE ELDON E. FALLON<br><br>DIVISION 3<br>MAGISTRATE DANIEL E. KNOWLES III |

## MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION/REVISION OF ORDER CAPPING CONTINGENT FEES AND ALTERNATIVELY FOR ENTRY OF JUDGMENT

The motion associated with this memorandum asks that this Court reconsider and vacate or revise its Order and Reasons of August 27, 2008 (the "Capping Order").  The Capping Order changes the percentage fee in private contingent fee contracts.  This motion presents the Court with three issues:

(1)     The Constitution gives federal courts jurisdiction to decide "cases" and "controversies."  In the Capping Order the Court limited recovery under private fee contracts that were not at issue in this MDL, as to which no contracting party had complained, and which were not part of the Vioxx Settlement Agreement.  Did the Court have subject matter jurisdiction over the VLC's private fee contracts?

1

If the Court answers this question No, then the Court need go no further.  If the Court answers this question Yes, then it must consider a second issue:

(2)     Absent express law, a client's incapacity, or sanctionable conduct committed in the case, courts have no authority to override private fee contracts.  Additionally, state law governs fee contracts.  Here, the Court *sua sponte* capped all MDL attorneys' fee contracts at 32% without express legal authority and without considering the laws of the various states.  Did the Court have authority to cap contingent fees in the VLC's individual fee agreements, and if so, did it apply the correct law correctly?

Again, if the Court answers this question No, then the Court need go no further.  If the Court answers this question Yes, then it must decide a final issue:

(3)     The minima of due process are notice and a hearing.  The VLC has property interests in its individual fee agreements.  Here, the Court issued the Capping Order with no prior notice or opportunity to be heard.  Did the Court deprive the VLC of its property without due process?

Should the Court decline to reconsider and vacate the Capping Order, the VLC alternatively asks that the Court place its ruling in a form that the VLC may appeal.

## FACTS

The VLC is a group of five law firms who have worked together on their clients' Vioxx claims.  Four firms are from Texas; one is from Louisiana.  One of the VLC's members, Drew Ranier, is a member of the Plaintiffs' Steering Committee.  The VLC represents approximately 2,000 plaintiffs in the Vioxx Settlement MDL.  These law firms invested millions of dollars and thousands of hours identifying meritorious cases, creating databases, developing the factual and medical basis for the individual cases, developing expertise in the subject matter, helping and communicating with their clients, and actually bringing Vioxx cases to trial.

These attorneys have binding contingent fee contracts with all of their clients.  None of their clients has voiced a complaint about the fee contracts.  The attached affidavits reveal that the VLC and their clients negotiated each fee contract at the outset of the representation, and as-

sessed the potential risks and benefits existing at that time, including the potential for MDL con-

solidation.  Every plaintiff knew the terms by which his attorney would be paid.  Further, every

plaintiff chose his attorneys and freely entered into a legally binding fee contract.  Each plaintiff

in the Vioxx Settlement had the opportunity to shop for an attorney in a competitive marketplace

for legal services.  Each selected an attorney based upon factors and qualities that were person-

ally important to that plaintiff.

No provision in the Settlement Agreement addresses the fee rates provided for in the pri-

vate contingent fee contracts, except to say (1) that it leaves all such matters to the attorneys and

their clients, and (2) that disputes regarding individual attorney's fees do not affect the Settle-

ment Agreement.  The Settlement Agreement provisions relating to fees address only common

benefit work.

On August 27, 2008, this Court issued the Capping Order.  This was the first any member

of the VLC knew that the Court was considering modifying any private fee contracts.

## LAW AND ARGUMENT

**I.     This Court had no jurisdiction over the Capping Order's subject matter because there was no "Case or Controversy" concerning the VLC's contingent fee contracts.**

Federal district courts may only decide those questions arising in a "case" or "contro-

versy."[1]  This constitutional principal limits federal courts to the exercise of "the power . . . to

decide and pronounce a judgment and carry it into effect between persons and parties who bring

a case before it for decision."[2]  The Capping Order pretermitted consideration of whether a "case

or controversy" existed.  The VLC submits that there was no "case or controversy" concerning

their fee contracts and that the Court lacked jurisdiction over the subject matter of the Capping

---

[1]      U.S. CONST. art. III, § 2.

[2]      *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129, 131 (5th Cir. 1979) (quoting *Muskrat v. United States*, 219 U.S. 346 (1911)).

Order.

Before the issuance of the Capping Order, no one challenged the validity or reasonableness of the VLC's contingent fee contracts. Nor had anyone presented evidence that the VLC's clients were incapable (legally or mentally) of contracting.

In *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129, 130 (5th Cir. 1979), the Fifth Circuit reversed a district court's decision "to adopt as the court's ward a minor represented by a duly qualified guardian, fix the compensation of the guardian's attorney, and direct his payment out of a tort judgment previously rendered by the court." The Fifth Circuit wrote: "The case or controversy in the federal forum ended with payment of the judgment into the registry of the court."[3] Importantly, in *Brown*, no party challenged the contingent fee agreement; instead, the district court acted on its own to force the parties to accept "a remedy that they did not seek."[4]

Judge Posner, writing for the panel, reached a similar conclusion in *U.S. v. Vague*, 697 F.2d 805 (7th Cir. 1983). In that case, the district judge on his own initiative ordered a defendant's lawyer to return part of his fee because the judge considered it excessive. The Seventh Circuit reversed. Judge Posner wrote that the district judge had improperly assumed a prosecutor's role given that:

> [n]o one complained to him about [the attorney's] fee. The judge decided there might be a violation of the code of ethics, conducted the examination of [the attorney] and other witnesses, determined that a violation had in fact occurred, and prescribed the remedy. He assumed the role that the [defendant's] lawyer would have played had they sued for restitution of the excessive fee paid [the original at-

---

[3] *Brown*, 596 F.2d at 132.

[4] *Id.* Fifth Circuit cases distinguish *Brown* in those limited circumstances where district courts traditionally intervene, as in cases involving "wards" of the court: minors and seamen. *See Karim v. Finch Shipping Co.*, 374 F.3d 302, 304 (5th Cir. 2004); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 162 (5th Cir. 1981); *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1109 (7th Cir. 1982). Yet, this case lacks those individuals typically afforded special protection; the fee contracts at issue here involved adults. And, "[a]n agreement between two freely consenting, competent adults will most often be controlling." *Rosquist*, 692 F.2d at 1111.

torney].[5]

Judge Posner wrote that federal courts may decide only those controversies presented by the parties in litigation. "No doubt a great deal goes on in the world which ought not to go on. If courts had general investigatory powers, they might discover some of these things and possibly right them."[6] But, absent contempt of court committed before the court, the judge lacked the power to initiate an investigation into the attorney's fees charged by the defendant's lawyer:

> A judge cannot be made to approve an unethical transaction, but the district judge in this case was not asked to do any such thing; he was just asked to decide Steven Vague's punishment for a crime. To reach the fee question the judge had to start a separate proceeding.[7]

The "case or controversy" at issue in the Vioxx litigation did not extend to the prelitigation contingent fee contracts between plaintiffs and the VLC attorneys.[8] No client complained of the agreed-upon fees. The Court changed the rate of the fee contracts in the Capping Order absent any expressed dissatisfaction or challenge to their validity by anyone. The VLC's contingent fee contracts presented no justiciable "case or controversy."[9] Therefore, the Court was without jurisdiction to modify them in the Capping Order.

## II. The Court should reconsider and vacate the Capping Order on substantive grounds.

A. The Court lacks authority to *sua sponte* change the terms of the VLC's privately-negotiated fee contracts.

This Court acknowledged the necessity of contingent fee contracts in our justice system, pointing out that without them many litigants could not secure legal services to enforce their

---

[5]      *Vague*, 697 F.2d at 807.

[6]      *Id*. (internal citation and quotation marks omitted).

[7]      *Id.* at 808.

[8]      *Cf. Rosquist*, 692 F.2d at 1110 (discussing *Brown* and noting that only the release of funds to the plaintiff remained in *Brown*).

[9]      *See Brown*, 596 F.2d at 131-32 ("If no party before a court makes or suggests any contest, but rather all litigants desire precisely the same result, there can be no case or controversy within the meaning of Article III." (citing *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971))).

claims.  But, the Court then erroneously asserted that it had authority to inquire into a fee contract's reasonableness to effectuate public policy concerns regarding the amount of fees for attorneys who successfully try or settle mass tort litigation.[10]  The Court also expressed concern about a potential public perception that fees in mass tort litigation are "excessive."[11]  Regardless of the reality or validity of such public policy concerns, and with due respect, it is not a court's function to rewrite private, binding fee contracts based on preliminary, unsupported policy theories or potential public perceptions.

 The Court cited three sources of authority for the Capping Order.  Respectfully, none supports that authority, as discussed below.

  1. The Vioxx MDL is not a class action, and Rule 23 does not apply either expressly or by analogy.

 This Court characterized the settlement as a quasi-class action "giving the Court equitable authority to review contingent fee contracts for reasonableness."[12]  Respectfully, this is incorrect. This MDL is not a class action.  This Court, although presented with the opportunity, declined to

---

[10] As a predicate to its analysis of authority to regulate contingent fees, this Court cited a 2006 article by the Task Force on Contingent Fees of the American Bar Association's Tort Trial & Insurance Practice Section: *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105 (2006).  While the Task Force theorized that there were two possible justifications for courts' regulation of contingent fees in mass tort litigation – that the market for mass tort plaintiffs' lawyers is not competitive and that those lawyers therefore may charge unreasonable fees and bring marginal cases – the Task Force emphasized that there was no empirical evidence supporting the veracity of these theories.  The Task Force therefore recommended the collection and study of data about the contingent fee system so that "policy makers [could] make informed decisions in the future to try to balance the competing interests."  *Id.* at 128.  No study appears to have been conducted nor have any policy makers made any informed decisions on the issue.

[11] *Cf.* 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1803.1 ("Although some judges, media people, and the defense bar have characterized attorney fees in class actions as a source of abuse and a stain on the escutcheon of the administration of civil justice, in reality there is a virtual absence of empirical data showing any significant incidence of excessive fees.").

[12] Capping Order at *4.

certify personal injury claims as a class action.[13]  Neither has it been – nor can it be – certified as

a class action for settlement purposes.[14]  Class action rules do not become applicable simply be-

cause a large number of cases settle.  Individual differences remain, not only as to the character-

istics of each individual claim, but also as to the relationship between each plaintiff and his at-

torney.

Rule 23(e) *requires* that the court approve any settlement of a class action.  No compara-

ble provision is found in 28 U.S.C. § 1407, the statute that created the Judicial Panel on Multidis-

trict Litigation and MDL procedure.  Had Congress intended to include a provision empowering

transferee courts to supervise attorney's private fee contracts in MDL settlements, it would have

done so.  Without express authority by rule or statute, and without complaint from any party to

these fee contracts, this Court is without authority to rewrite them.

Additionally, the policy bases for court review of attorney's fees in class action settle-

ments do not exist in this MDL.  In a class action, court review "protect[s] the nonparty members

of the class from unjust or unfair settlements affecting their rights as well as … minimize[s] con-

flicts that may arise between the attorney and the class, between the named plaintiffs and the ab-

sentees, and between various subclasses."[15]  Unlike a class action, there are no "nonparty" or

"absentee" plaintiffs in this MDL.  Each plaintiff is personally represented by the attorney of his

choice.[16]

---

[13]     Order and Reasons, November 22, 2006 (Rec. Doc. No. 8875) (Denying Plain-
tiffs' Steering Committee's Motion for Certification of a Nation-Wide Class Action for Personal
Injury and Wrongful Death ) (Rec. Doc. No. 2171).

[14]     *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

[15]     *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th
Cir. 2008) ("*In re High Sulfur*") (quoting *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849
(5th Cir. 1998)).

[16]     Or, represents himself and will pay no fee.

This MDL also differs from a negative-value class action.[17]  That type of class action is susceptible to an appearance of abuse because the value of class members' claims may be individually very small while the aggregate attorney's fees may be very large.  This may lead to the perception that class counsel benefits to the class members' detriment.  In contrast, in this MDL every plaintiff who is awarded a settlement suffered a "life-threatening injur[y]".[18]  The potential value of each claim is high.  The risk of loss, to each plaintiff and his individual counsel was likewise high.[19]  The Vioxx MDL claims are neither frivolous nor marginal, and the plaintiffs are receiving substantial benefits in the settlement.  The red flag of the "negative value" suit does not exist here.

> 2.    The Court's inherent powers do not include a power to *sua sponte* – and after-the-fact – determine what a reasonable fee percentage should have been in place of the fee percentage bargained for between the VLC attorneys and their clients at the beginning of their engagement.

A federal court's inherent powers consist of those necessary to the exercise of the judicial power.[20]  Constitutionally, they derive from Article III, § 1, which vests "the judicial power" in the Supreme Court and in such other federal courts as Congress establishes.  Courts lack the power to extend inherent authority beyond powers necessary to their judicial function.  Only Congress, under the "Necessary and Proper" Clause in Article I, may authorize additional "beneficial" powers by statute, taking into account policy considerations.  As prominent constitutional scholar, Professor Robert Pushaw, explains:

> [T]he Necessary and Proper Clause can most sensibly be interpreted as authorizing Congress only to effectuate such *indispensable* inherent powers – not to eliminate or materially impair their exercise and thereby effectively destroy the executive and the judiciary.

---

[17]    *In re Monumental Life Ins. Co.*, 365 F.3d 408, 411 n.1 (5th Cir. 2004).
[18]    Capping Order at *6.
[19]    As this Court has noted, only one of the Court's six bellwether trials resulted in a verdict for the plaintiff.  Capping Order at *9.
[20]    *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).

However, federal judges and executive officials cannot, on their own, assert incidental powers that they believe will be merely *beneficial* and appropriate in fulfilling their constitutional functions.  Rather, the [Necessary and Proper] Clause gives Congress sole authority to make such policy determinations, either directly or by delegation.[21]

The Fifth Circuit implicitly aligned itself with this view in *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566 (5th Cir. 2008).  In *Maxxam,* the district court invoked Rule 11 and inherent authority to sanction the FDIC for improperly requesting that the Office of Thrift Supervision pursue frivolous administrative proceedings against Mr. Charles Hurwitz.  The district court awarded the entire costs of the administrative proceedings (over $56 million) as sanctions against the FDIC.

After rejecting Rule 11's applicability as justification for the sanction, the Fifth Circuit examined the concept of inherent authority.  The Fifth Circuit stressed that a federal court's inherent powers consist of those *necessary* for the courts to manage their affairs and extend only to litigation before the court or, in the case of a sanction, to disobedience of the sanctioning court's orders.  Finding that the Office of Thrift Supervision's administrative proceedings were (1) not before the district court and (2) did not threaten the district court's authority, the Fifth Circuit reversed the sanction.

Here, the Court went beyond case management in the Capping Order.  Modifying the VLC's contractual relationships was unnecessary to the management of the MDL.

"Inherent powers are the exception, not the rule, and their assertion requires special justification in each case."[22]  In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court authorized a district court's exercise of inherent power to impose attorney's fees as a sanction for bad faith conduct occurring in the proceeding before the court.  Here, the Capping Order reduces

---

[21]    Robert J. Pushaw, *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 833-34 (2001) (footnotes omitted and emphasis added).

[22]    *Chambers v. NASCO, Inc.*, 501 U.S. 32, 64 (1991) (Kennedy, J., dissenting).

attorney's fees earned by the VLC not because of any bad faith conduct and not for matters affecting the MDL proceeding before this Court. The Capping Order, therefore, goes beyond the limits of inherent power set out in *Chambers*.

Because of their potency, courts must exercise inherent powers with restraint and discretion.[23] The Fifth Circuit has stated: "To the extent that inherent power is seen as a product of necessity, it contains its own limits. It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function."[24]

A court's authority to invoke an "inherent power" is a question of law.[25] It was legal error to invoke an inherent power to change VLC fee contracts when that invocation was unnecessary to the functioning of the Court. In the words of Professor Pushaw, this Court sought to exercise a "beneficial" power as a matter of perceived policy interests, not an "indispensable" power necessary to the Court's very functioning. A court cannot exercise merely "beneficial" powers without express Congressional authority. Additionally, the fee contracts were not before the Court,[26] nor did performance of these fee contracts threaten the Court's authority. Thus, the Court lacked the prerequisites for invoking inherent power here.

*Karim* and *Rosquist* do not support the exercise of inherent authority here. *Karim* involved a seaman, a traditional ward of the Court. The Fifth Circuit affirming this Court cited the duty of the district court sitting in admiralty to protect seamen – traditional wards of the Court.[27] *Rosquist* involved children, a guardian *ad litem*, and a minor's settlement requiring court ap-

---

[23]     *Id.* at 44.
[24]     *NASCO, Inc. v. Calcasieu Tele. & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).
[25]     *Maxxam*, 523 F.3d at 590.
[26]     *See* discussion *supra* regarding lack of subject matter jurisdiction.
[27]     *Karim*, 374 F.3d at 304.

proval.  The Seventh Circuit in *Rosquist* explained:  "We do not, of course, imply that the court should *sua sponte* review every attorney's fee contract.  An agreement between two freely consenting, competent adults will most often be controlling."[28]

Injured claimants in the Vioxx MDL and Settlement generally are not seamen, children, or others who may lack legal capacity.  While the Court suggested that "many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts,"[29] there is no record evidence that any VLC client, young or elderly, healthy or ill, lacked legal capacity to enter a fee contract.  Would not such incapacity require re-examination of the 85% threshold of the Settlement Agreement?  If a plaintiff lacked capacity to contract with counsel, how could he or she have capacity to accept the settlement?  Courts have not placed the elderly, the unhealthy, or the seriously injured in the same category as wards of the court or legal incompetents.  If they did, it is difficult to imagine any serious personal injury case in which the Court would not then be duty-bound to oversee the affairs of every plaintiff.

This Court has a duty to "exercise ethical supervision over the parties."[30]  When a court observes unethical conduct, the court may punish that conduct.  But no unethical conduct exists here.  The Court recognized that, "[o]n a single-case basis … reasonable contingent fees might range from 33% to 40% of the total recovery for each claimant."[31]  Here, each claimant's case began as a "single case" and each claimant was represented individually.  The Court deemed the original fee rate excessive only after the fact of settlement.  Yet, no ground exists for asserting

---

[28]     *Rosquist*, 692 F.2d at 1111.
[29]     Capping Order at *6.
[30]     *Id.* at *5.
[31]     *Id.* at *9.

unreasonableness because of a large settlement.[32]  Nothing between the injured party and his at-
torney has changed, except that now the party will receive compensation for his injuries and his
attorney will receive the fee he has earned.  The Court must gauge the fee's reasonableness by
weighing each particular case's potential benefits and risks *at the time* that the parties negotiated
the fee contract.[33]

Thus, the Court's power to supervise unethical conduct is not a basis for changing the
terms of the VLC's fee contracts.

> 3.    The Settlement Agreement does not give the Court express authority to
>        adjust the VLC's privately-negotiated fee contracts.

This Court cites the Settlement Agreement as another source for its authority to change
the VLC's fee contracts:  Sections 9.2 and 16.4.2.  But these sections do not concern private fee
contracts.  Only Section 9.1 addresses "Individual Counsel Attorneys' Fees" and makes it quite
plain that the Settlement Agreement does not regulate private fee contracts.  Section 9.1 provides
that the Claims Administrator must make settlement payments subject only to reduction for
*common benefit fees and costs*.  The individual plaintiff and his counsel are to determine the di-
vision of the settlement payment *between themselves*, and that division or any dispute concerning
that division explicitly cannot affect the validity of the Settlement Agreement:

> Any division of any Settlement Payment with respect to, and as between, any en-
> rolled Program Claimant, any related Executing Derivative Claimants and/or his
> or their respective counsel *is to be determined by such Persons* and any such divi-
> sion, or any dispute in relation to such division, shall in no way affect the validity
> of this Agreement or the Release or Dismissal With Prejudice Stipulation exe-
> cuted by such Enrolled Program Claimant (and any related Executing Derivative

---

[32]    Subject to the narrow exception afforded to those deemed to be wards of the
Court or legal incompetents such as children.

[33]    ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 94-389, p. 12
(1994) ("It is important to keep in mind that the reasonableness as well as the appropriateness of
a fee arrangement necessarily must be judged at the time it is entered into.").

Claimants) or his Counsel, as applicable.[34]

Section 9.2 governs "Common Benefit Fees and Reimbursement of Litigation Costs." This provision addresses common benefit fees and expenses withheld from settlement payments. This provision does not address the private contingent fee contracts.

Section 16.4.2 grants "the Chief Administrator" the power to modify any provision of the Settlement Agreement in certain limited circumstances if the Chief Administrator determines that the provision "is prohibited or unenforceable to any extent or in any particular context." This provision gives the Court power to modify the Settlement Agreement's provisions.  But, it does not expand the Court's powers beyond "the capacities specified" in this "private agreement."[35]

None of "the capacities specified" in the "private agreement" purport to regulate the private fee contracts at issue.  The Settlement Agreement explicitly leaves those matters to the plaintiffs and their individual attorneys.  Thus, the Settlement Agreement does not contain any provision regarding the private fee contracts for the Court to modify.  To the contrary, the Settlement Agreement provides that disputes between plaintiffs and their individual attorneys over private fee arrangements "shall in no way affect the validity of this Agreement."[36]

In short, the Settlement Agreement does not assert dominion over private fee contracts. The fact that the Settlement Agreement may be viewed by some to "result[] in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts" does not authorize its modification.[37]  Nothing in the Settlement Agreement gives the Court – acting as Chief Administrator or otherwise – authority to change the private fee contracts.

---

[34]    Section 9.1 (emphasis added).
[35]    Section 6.1.1.
[36]    Section 9.1.
[37]    Capping Order at *6.

III.    **Even if the Court had authority to examine the fee contracts at issue, a choice of law analysis is required.**

      A.    The Settlement Agreement does not set the law applicable to the VLC's private contingent fee contracts.

Because the Settlement Agreement excludes from its purview any regulation and consideration of private fee contracts, the text of the Settlement Agreement does not supply the governing law for those contracts.  Therefore, the law applicable to private fee contracts can be determined only by reading the contracts themselves (in the event that they contain choice of law provisions) and/or by conducting a choice of law analysis.

      B.    A choice of law analysis was necessary.

While the Court in its Capping Order looked to various sources, including state statutes and rules, "for guidance" in fashioning what it believed to be a reasonable limitation on individual contingent fee contracts, the Court did not conduct a choice of law analysis.  The Court did not examine the individual contracts for choice of law provisions, nor did the Court select and apply any particular state's law according to choice of law rules.

The VLC filed cases on behalf of residents of all 50 states.  In MDL cases, the MDL court must apply the transferor court's law, that is, the law of the state in which the plaintiff filed the action, including the transferor forum's choice-of-law rules.[38]  Many of the cases covered by the Capping Order were not filed in the MDL at all, but rather were filed in state courts. Whether filed in the MDL or in state court, the Court should have examined each state's choice of law rules to determine the law applicable to each fee contract, and then determined whether

---

[38]     *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897 (E.D. La. 2007) (citing *Ferens v. John Deere Co.*, 494 U.S. 516 (1990)).  *Accord In re Conagra Peanut Butter Prod. Liab. Litig.*, No. 07-MD-1845, 2008 WL 2885951 (N.D. Ga. July 22, 2008); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008); *In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 329 (S.D.N.Y. 2005).  *See also* MULTIDISTRICT LITIGATION MANUAL § 9:18 (2008).

that state's law (a) would permit the Court to modify private fee contracts, and, if so, (b) would provide decisional or statutory law as to what constitutes a reasonable fee in that state.

In applying the cap to all cases regardless of the state where originally filed, the Court deprived the parties to these private fee contracts of the law that should have been accorded them under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Although the Settlement Agreement brings both MDL and non-MDL cases within its management to resolve plaintiffs' injury claims, it does not abrogate the law applicable to private fee contracts.

In *Ferens v. John Deere Co*., 494 U.S. 516 (1990), the Supreme Court explained *Erie's* importance in the context of a case transferred from one federal court to another as follows:

> The *Erie* rule remains a vital expression of the federal system and the concomitant integrity of the separate States.  We explained *Erie* in *Guaranty Trust Co. v. York* . . . as follows:
>
>> "In essence, the intent of [the *Erie* ] decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result."
>
> …..
>
> By creating an opportunity to have venue transferred between courts in different States on the basis of convenience, an option that does not exist absent federal jurisdiction, Congress, with respect to diversity, retained the *Erie* policy while diminishing the incidents of inconvenience.[39]

Similarly, while an MDL may promote certain efficiencies in handling of these cases, nothing abrogate *Erie*'s requirement that a diversity case requires application of the same substantive law applicable to a case filed in state court.  A "one-size-fits-all" approach in lieu of examination and

---

[39]     *Ferens,* 494 U.S. at 325-26 (internal citation omitted).

application of relevant state law violates *Erie*'s requirements.

      C.     The applicable state law, in turn, may have prohibited the Court from changing the fee contract's terms absent a complaint by one of the contracting parties.

*Erie* requires that this Court apply state law to the VLC's private fee contracts. Those state laws, if examined, may have prohibited the Capping Order altogether or provided their own distinct rules on regulating private fee contracts. By omitting any choice of law analysis, this Court applied a solution that may have conflicted with state law.

For example, decisional law in Texas directly addresses this issue and prohibits the Capping Order. *In re Polybutylene Plumbing Litig.*, 23 S.W.3d 428 (Tex.App.-Hous. (1 Dist.) 2000) ("*In re Polybutylene*"), was a mass tort case involving 37,000 plaintiffs, each of whom had individual fee contracts negotiated before the filing of their suits. The case was not a class action. The trial court attempted to limit the contingent fee contract percentage. The appellate court reversed the trial court and held that contingent fee contracts are legally enforceable in Texas, with two exceptions: (a) fraud or breach of fiduciary duty by the attorney or (b) the presence of a minor or incompetent plaintiff. Specifically, the appellate court held that the trial court could *not* "properly modify otherwise perfectly legal fee contracts because the judge concludes it is not 'fair' for the attorneys to receive the percentage of each recovery that was agreed upon in advance with each client."[40]

Importantly, the Texas court in *In re Polybutylene* considered several of the rationale advanced by this Court in the Capping Order, but rejected them as a matter of Texas law. For example, the court rejected the inherent authority argument, stating that the federal and out-of-state cases cited in favor of that argument did not bind Texas courts:

      Appellees have not cited one Texas state court case holding that a trial judge has the power, inherent or otherwise, to void or rewrite a fully-performed attorney fee

---

[40]     *In re Polybutylene,* 23 S.W.3d at 436.

contract in the absence of pleading and proof of barratry, fraud, breach of fiduci-ary duty, incapacity, illegality, class action, or the applicability of the "common fund doctrine."[41]

The Texas appellate court also considered and rejected an argument that the settlement agreement in *In re Polybutylene* authorized the court to intervene in the private attorney fee contracts. That settlement agreement contained a provision allowing distribution of the settlement funds from an escrow account according to a formula developed by plaintiffs' counsel and approved by a special master. Because the trial judge supervised the special master, the trial judge contended that he therefore had authority to inquire into and change the private fee contracts' terms. The Texas appellate court disagreed. While the parties could, by agreement, give the trial court power to act, an examination of the settlement agreement revealed that the settlement agreement did not place private fee contracts within the purview of the special master and therefore were not within the purview of the court. Similarly, the Vioxx Settlement Agreement does not purport to govern private fee contracts. Section 9.1 provides that the contracting parties should be the sole decision-makers regarding those contracts. Thus, the result reached by this Court is inconsistent with Texas law.[42]

The Court's citation to TEX. LAB. CODE ANN. § 408.221 (regulating fees in worker's compensation cases), and CAL. BUS. & PROF. CODE § 6146(a) (regulating fees in actions against health care providers) provides no authority to limit fees in cases not subject to those statutes. Had the Texas or California legislatures intended to authorize the regulation of attorneys' fees in

---

[41]    *Id.* at 439. Note: The issue presented by the Capping Order is *not* a common fund issue. While the Settlement Agreement contains provisions regarding a common fund, a limitation of private contingent fee contracts does not relate to the common fund doctrine. Rather, it pertains only to the amount an attorney can retain from his personal client's recovery, because of prior written agreement with that client for compensation for the attorney's efforts on his client's behalf.

[42]    Although the Texas Supreme Court did not decide *In re Polybutylene*, given the extensive supporting Texas case law cited in support of the opinion, there is no reason to believe that the Texas Supreme Court would decide the issue otherwise.

personal injury cases like Vioxx, they would have expressly said so.  The Court's citation of N.J. R. CT. 1:21-7 (regulating fees in New Jersey products liability actions) likewise offers no authority to regulate fees in cases governed by the laws of states other than New Jersey.  When viewed in this perspective, the Court's citation to the laws of various states only serves to highlight the need and importance of a case-by-case choice of law analysis.

A choice of law analysis would have applied each state's own chosen solution to the issue of private fee contracts.  In contravention of *Erie*, the Capping Order applies a single rule for all jurisdictions.

> D.      State courts and bar associations provide remedies to the plaintiffs if the fee contracts are found to be illegal or violate ethical rules.

State courts and bar associations are the proper venues for any party who has a complaint concerning a fee contract.  No reason exists to preempt state prerogatives.  Many of the fee contracts contain arbitration provisions, which provide yet another agreed-upon forum for resolution of disagreements.  Because no party raised this issue with the Court, this Court has no evidentiary record upon which to conclude that any of the private contracts are illegal or unethical.  Absent any alleged and proven ethical misconduct, the Court should not modify the fee contracts.

**IV.     The Capping Order is procedurally defective and deprives the VLC of property without due process of law.**

No party or attorney raised any complaint by motion or otherwise to the Court regarding the private contingent fee contracts.  The VLC is unaware of any rule, statute, jurisprudence, or prior accepted court practice providing a framework for the procedure by which the Court decided the issue embodied in the Capping Order.

The VLC learned of the Court's decision only after the Court issued its Order.  Before that, the VLC did not know that the Court was considering the matter.  The VLC is unaware of any notice of this issue as an agenda item or a matter otherwise to be submitted to the Court for

resolution.

An attorney's right to fees under a contingent fee contract is a recognized property right. The VLC submits that because its contingent fee contracts constituted property, the VLC was entitled to the procedural minima of due process before the court rendered the Capping Order: effective notice and an opportunity to be heard.

In a class action where a common fund for attorney's fees was being distributed, the Fifth Circuit recently vacated a district court's order issued after an *ex parte* hearing and without supporting data.[43]  In *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008) ("*In re High Sulfur*"), the district court accepted lead counsel's fee recommendation without affording non-fee committee members the opportunity to be heard.[44]  While fee committee members (who sought to uphold the district court's order) argued that the other attorneys' failure to object to appointment of the fee committee constituted an agreement to such proceedings, the Fifth Circuit disagreed:

> Ex parte proceedings are an exception to the rule in our judicial system and contrary to its adversarial nature….  Attorneys cannot simply agree to hold secret hearings before the court.  Moreover, the attorneys in this case made no agreement that ex parte hearings would be part of the fee allocation process.  The court's order appointing the Fee Committee included no such provision, and there is no basis to infer an agreement.[45]

While *In re High Sulfur* is very different from this case, there are similarities to certain aspects of the procedure that the Fifth Circuit condemned.  In both cases, not all affected counsel received notice or an opportunity to be heard.

---

[43]   *In re High Sulfur*, 517 F.3d at 227 & 231.
[44]   *Id.* at 231.
[45]   *Id.* at 231-32 (citations and footnotes omitted).

With one exception,[46] the individuals in the VLC are not members of the Plaintiffs'
Steering Committee, the Plaintiffs' Negotiating Committee, or the Fee Allocation Committee,
and thus do not have the same access to information.  Of course, they would have been very in-
terested to have learned that the Court was considering reducing their personal contingent fee
contracts with their clients across the board.  In short, the Court should have notified all inter-
ested counsel that the Court was considering capping contingent fees so that the issue could have
been briefed and evidence presented.  The attached affidavits include this type of testimony.

The Capping Order's effect also falls more heavily on lawyers like those in the VLC,
who vigorously worked up their cases, as opposed to those attorneys who may have simply col-
lected cases and warehoused them while waiting and hoping for a settlement.  The Court's Cap-
ping Order provides for no deviation from the 32% cap – regardless of individual circumstances
– exacerbating the disproportionate effect.  One size does not fit all.

Several unproven factual assumptions underlie the Court's Capping Order.  "Reasonable-
ness" of attorney's fees is at least in part (if not wholly) a factual issue.[47]  In addition to the tradi-
tional process of motion, briefing, and argument, the VLC should have been allowed an eviden-
tiary hearing to present evidence as to key facts necessary to determining the "reasonableness" of
their contingent fee contracts.

Additionally, in order to support modification of the privately-negotiated fee contracts,
and in reaching the conclusion that attorney's fees in excess of 32% are unreasonable, the Court
may have assumed that there was some failure in the market, *i.e.*, that (a) the VLC's contingent

---

[46]     Drew Ranier, a member of the VLC, serves on the Plaintiffs' Steering Committee
but not on the Plaintiffs' Negotiating Committee or the Fee Allocation Committee.  He did not
participate in, or know of, the possibility that the Court would cap fees.
[47]     *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 822 (5th Cir. 1996) ("The determination
of a fair attorney fee award is not a 'purely legal issue.'").

fee did not fairly take into account the "economies of scale" due to the MDL format; and (b) individual plaintiffs lacked real choices in the legal marketplace and thus had to accept the terms of the VLC's fee contract or go without counsel.  As evidenced by the attached affidavits, neither supposition is correct.

The Task Force on Contingent Fees of the American Bar Association's Tort Trial & Insurance Practice Section confirms that no empirical evidence of a market failure for attorney's fee contracts exists in mass tort litigation that is not a class action.[48]  Lawyers and clients prefer (and are required in most jurisdictions) to make their fee arrangements up front, rather than leaving the arrangements uncertain as litigation proceeds.  Each plaintiff in a non-class MDL possesses the opportunity at the outset of his case to seek and hire an attorney who offers the best combination of quality, efficiency, price, and a record of success.  Courts should enforce fairly-negotiated fee contracts that at inception take into account the possibility of MDL proceedings and factor in whatever efficiencies they may bring.

In the class action context, the Task Force has said:  "Most markets work ex ante, and it would be easier (and more legitimate) for all concerned if the market would set class counsel fees."[49]  Unlike the typical class action in which class members often have too little at stake to seriously negotiate with counsel, in a non-class MDL where each individual has a claim of significant value, courts lack justification for inserting themselves into privately-negotiated fee contracts.  Exertion of normal market forces insures a fair balance in those contracts considering all factors, including, among others, litigation costs (and efficiencies achieved by an MDL), risks of

---

[48]     This contrasts with the same Task Force's conclusion that market failure exists in class actions.  *Compare Report on Contingent Fees in Class Action Litigation*, 25 REV. LITIG. 459, 477 (2006) *with Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. at 128.

[49]     *Report on Contingent Fees in Class Action Litigation*, 25 REV. LITIG. at 477.

loss, and potential for a substantial recovery.

The attached affidavits reveal some of the operative facts that the VLC would have intro-duced at an evidentiary hearing.  The VLC also would have offered evidence concerning a lively and competitive legal market for drug products liability cases predictably consolidated into MDLs.[50]  In the Vioxx MDL alone, the Claims Administrator has reported that more than 935 different firms represent claimants in the Settlement.[51]  The VLC would have offered evidence that the terms of its contingent fee contracts were set at fair market value for the client's specific geographic locations.  It could also have offered evidence of its clients' capacity, that its clients were fully informed regarding the fee contracts' terms, and that the clients freely entered into the fee contracts.  The VLC would have introduced the fee contracts themselves as the most basic evidence of reasonableness.  "The reasonableness of a contract, including an attorney fee agree-ment, is to be evaluated at the time it was made."[52]  A contingent fee contract represents the freely-negotiated result of a client's willingness to pay a percentage of his potential recovery for effective representation and an attorney's willingness to accept the case with a real risk of failure

---

[50]     An internet search using the name of the drug and the word "lawyers" turns up multiple websites of attorneys offering free consultations to potential clients in the following MDLs:  MDL-1742, *In re Ortho Evra Prods. Liab. Litig.* (search "Ortho Evra lawyers"); MDL-1760, *In re Aredia and Zometa Prods. Liab. Litig.* (search "Aredia and Zometa lawyers"); MDL-1769, *In re Seroquel Prods. Liab. Litig.* (search "Seroquel lawyers"); MDL-1789, *In re Fosamax Prods. Liab. Litig.* (search "Fosamax lawyers"); MDL-1836, *In re Mirapex Prods. Liab. Litig.* (search "Mirapex lawyers").

[51]     Tr., *In re Vioxx Products Liability* MDL 1657, Nov. 21, 2008, at p. 14.

[52]     *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).  *See also Jones v. Harris Assoc. L.P.*, 527 F.3d 627, 633 (7th Cir. 2008) (In *dicta*:  "Lawyers have fiduci-ary duties to their clients but are free to negotiate for high hourly wages or compensation from any judgment.  Rates over $500 an hour and contingent fees exceeding a third of any recovery are common.  The existence of the fiduciary duty does not imply judicial review for reasonable-ness; the question a court will ask, if the fee is contested, is whether the client made a voluntary choice ex ante with the benefit of adequate information.  Competition rather than litigation de-termines the fee-and, when judges must set fees, they try to follow the market rather than de-mand that attorneys' compensation conform to the judges' preferences.").

and the loss of the amount of time and money invested.  The Court should have considered these factors in an evidentiary hearing.

The Court should have evaluated the fee contracts' reasonableness at the time they were made and after review of evidence such as that submitted in the attached affidavits.  If the Court remains set in re-evaluating the fees after the fact of the settlement in light of perceived "economies of scale," then the Court should also provide the opportunity for the VLC to demonstrate their actual efforts in pursuing their clients' claims.  As it stands, however, there is no record evidence to support any limit on the VLC's attorneys' fees.

In both *In re Guidant* and *In re Zyprexa*, the courts allowed attorneys whose contingent fees were affected to challenge the cap and obtain an upward variance by demonstrating their efforts on behalf of their clients.  In *In re Guidant*, the review that Judge Frank undertook of the attorney's submissions resulted in his raising the original cap of 20% to a maximum of 37.18% potentially available to *all* attorneys.[53]  He also concluded that, "[i]n the majority of cases in this MDL, the Court believes that contingency fee contracts have worked just as they should."[54]  The evidence presented by the attorneys gave Judge Frank a fuller picture and on this more complete record, he changed his view of the percentage that would be fair and reasonable.

It is unknown whether this Court reviewed *In re Guidant II* before issuing the Capping Order; Judge Frank issued *In re Guidant II* only a few days before the Capping Order.  *In re Guidant II* demonstrates that the purported "economies of scale" in an MDL do not tell the full

---

[53]     *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 3896006 (D. Minn. Aug. 21, 2008) (hereafter "*In re Guidant II*").  Judge Frank devised a formula that resulted in plaintiffs paying no more on a percentage basis for attorney fees (contingency plus common benefit attorney fees) than: (1) the percentage contracted for in their contingency/retainer agreement; (2) 37.18%; or (3) the state-imposed limit, whichever of these three was less.

[54]     *Id.* at *9.

story of an individual attorney's efforts.  Some attorneys may be content to collect clients and then "free-ride" while others do the heavy lifting.  But many more individual attorneys "were required to complete a great deal of work on behalf of their clients, some work that was inherent in the MDL and some work that could not be attributed specifically to the MDL."[55]

> MDL attorneys do have a right to recover reasonable attorney fees, especially for actual work performed for Claimants, including, but not limited to, reviewing medical records and performing preliminary research; drafting and filing pleadings prior to cases joining the MDL; creating databases, newsletters, and websites to facilitate communication with clients; assisting with probate and bankruptcy proceedings; and using their best efforts to complete all of the necessary settlement-related paperwork.[56]

Unlike *In re Guidant* and *In re Zyprexa*, the Capping Order provides no relief mechanism allowing for departure from the 32% cap based upon individual circumstances.  *In re Guidant* and *In re Zyprexa* both provided a procedure for varying the fee cap through submissions to a Special Master.  But here, the Capping Order treats all attorneys the same, regardless of whether they actively worked for their clients or were free-riders who risked little because the bulk of their work occurred post-settlement and they had little time or money at risk before.  Put simply, one size does not fit all, and the attached affidavits reveal the extent to which the VLC actively advocated for and prosecuted their clients' interests.

Last, as previously noted, most of the VLC's fee contracts contained arbitration provisions.  Without benefit of the fee contracts, this Court could not enforce the stated wishes of the contracting parties for dispute resolution by arbitration (if any dispute existed).

In sum, the Capping Order deprives the VLC of property without providing due process.

---

[55]        *Id.* at *5.
[56]        *Id.* at *7.

**III.    Alternatively, if the Court declines to reconsider its ruling, the Court should enter a judgment under Rule 54(b) and/or Rule 58 embodying its capping of contingent fees at 32% so that the VLC may take a direct appeal of the ruling to the Fifth Circuit.**

The Court's issuance of the Capping Order *sua sponte* and in the form of an opinion obscures the correct method for seeking its review.  The confusion caused highlights the problems created "by reliance on undefined inherent powers rather than on Rules and statutes that proscribe particular behavior."[57]  Had the Court awarded (or denied) attorney's fees authorized by statute or upon a motion by a party, these circumstances would dictate the appealability and the deadline for appeal of such an order.[58]

Federal Rules of Civil Procedure 58 governs the procedure for entry of judgment and requires in most cases that a court set out the judgment in a separate document.  Rule 58's amendment in 2002 was intended to "impose a clear line of demarcation between a judgment and an opinion or memorandum."[59]  This amendment helped parties determine when a "judgment" was "appealable" and simplified issues concerning delay.  But certain exceptions exist to the "separate document" requirement, including orders "disposing of a motion: . . . (3) for attorney's fees under Rule 54."  Because the Capping Order does not fall into any traditional category, the method for obtaining appellate review remains unclear.[60]

The VLC wants to avoid any risk of losing its appeal rights.  Therefore, the VLC requests that the Court enter a final judgment pertaining to the capping of contingent fees under FED. R. CIV. P. 54(b) (because it fully disposes of the issue of contingent fee contracts) and/or set out a

---

[57]    *Chambers*, 501 U.S. at 76 (Kennedy, J., dissenting).
[58]    *See* FED. R. CIV. P. 54(d), 58(a)(3).
[59]    *In re Cendant Corp. Sec. Litig.*, 454 F.3d 235, 243 (3d Cir. 2006) ("*In re Cendant*").
[60]    The Fifth Circuit interprets rules "to prevent loss of the right of appeal, not to facilitate loss."  *See Hammack v. Baroid Corp.*, 142 F.3d 266, 269 (5th Cir. 1998) (quoting *Bankers Trust Co. v. Mallis*, 435 U.S. 381 (1978)).  *See also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 337 (5th Cir. 2004) (citing *Hammack*, 142 F.3d at 269).

"separate document" under Rule 58(a), *i.e.*, a self-contained and separate order, noting the "relief" granted, and omitting the reasons for the order.[61]

Importantly, granting this request will not delay disbursement of initial settlement proceeds to claimants.  Section 9.1 of the Settlement Agreement establishes that disputes over an individual counsel's attorneys' fees do not affect the settlement.[62]  And, regardless of an appeal, the Claims Administrator will continue to disburse initial payments to claimants according to the settlement terms.  Nor will immediate review alter the procedure for disbursement of initial proceeds because the Capping Order, unless overturned, will preclude attorneys from withholding fees in excess of 32% from initial payments.

## IV.    Conclusion

As stated, the VLC wants their clients to receive their initial payments forthwith.  Accordingly, the VLC does not seek a stay or injunction with respect to disbursements pending resolution of these issues, but reserves the right to do so.  Instead, it simply desires that the Court reconsider its Order and, upon reconsideration, permanently withdraw and set it aside as to all VLC clients and their attorneys.  In the alternative, the VLC requests that in the event the Court holds that it (1) has jurisdiction and (2) the authority to regulate private fee agreements, the Court withdraw and set aside the Capping Order as to all VLC clients and their attorneys, schedule an evidentiary hearing on the matter, set a briefing schedule, and thereafter rule based on the record evidence.   In the further alternative, in the event the Court denies all other requested relief, the VLC requests that the Court facilitate Fifth Circuit review of the Court's determinations by issuing an order certifying the Capping Order as final under Rule 54(b) and/or a "separate document" under Rule 58(a).

---

[61] *See In re Cendant*, 454 F.3d at 243.
[62] *See* Section 9.1.

Respectfully submitted,


_____/s_____
HARRY S. HARDIN (# 6540)
MADELEINE FISCHER (# 5575)
ERIC MICHAEL LIDDICK (# 31237)
JONES, WALKER, WAECHTER, POITEVENT,
CARRÈRE & DENÈGRE, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana  70170-5100
Telephone:    (504) 582-8208
Facsimile:    (504) 589-8208

*Attorneys for John Eddie Williams, Jr., Drew
Ranier, Walter Umphrey, Mikal Watts, and
Grant Kaiser (the "Vioxx Litigation Consortium")*


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsels, Phillip Wittmann and Russ Herman, by U.S. Mail and e-mail, or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing in accordance with the procedures established in MDL 1657 on December 10, 2008.

Respectfully submitted,


_____/s_____
Grant Kaiser
Texas Bar #11078900
The Kaiser Firm, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone:    (713) 223-0000
Facsimile:    (713) 223-0440

## AFFIDAVIT OF WALTER UMPHREY

BEFORE ME, the undersigned authority, on this day personally appeared WALTER

UMPHREY, and after having first been duly sworn upon oath, states as follows:

1.  My name is Walter Umphrey.  I am over eighteen years of age, of sound mind, and
    in all respects legally competent and duly authorized to make this affidavit.  I have
    personal knowledge of the statements made herein.

2.  In considering whether to take on Vioxx cases initially, I, as a member of the Vioxx
    Litigation Consortium (VLC) gave serious consideration to certain "constants" –
    factors known to be true regardless of the litigation's outcome – and "variables" –
    factors that were unknown or changeable.

3.  Some of the known factors considered by me and discussed with other VLC
    members at the inception included demographic and health information for each
    potential client, Merck's public position of forcing every case to trial, the
    knowledge that Merck, as a Fortune 500 company, had the capability and incentive
    to mount a vigorous defense, the realization that I and other VLC members would
    be precluded from accepting other representation because of the amount of time,
    effort and money that we would devote to this litigation, the difficulty in
    scientifically proving that Vioxx caused any particular client's heart attack, stroke,
    or other injury, and the fact that the Vioxx cases that reached federal court would be
    joined in an MDL.

4.  I also knew from the outset that regardless of the efficiencies that would likely be
    achieved in the MDL process, I and other members of the VLC would not depart
    from our practice of treating each client individually.  Our intention in this regard
    was realized as the cases proceeded and we frequently spoke with our clients by
    telephone, sent individualized correspondence to our clients by mail, and, where
    urgent, by overnight courier.  We created and staffed a call center to service our
    clients, and created a custom database to track communications, pharmacy and
    medical information, statutes of limitations and many other data points applicable to
    each client.  In accordance with our plans, every Vioxx client had and still has their
    own file, both paper and electronic, and each file is individualized.

5.  I recognized and discussed with other VLC members at the outset that we would
    have to be fully prepared to try every case, no matter how costly and no matter how
    time-consuming, in order to achieve the best results for each of our clients.  Our
    plan, which we carried out in practice, was to fully develop, prepare and try every
    case if necessary, keeping concerted and consistent pressure on Merck.

6.  We knew that proving causation would be difficult, because, unlike some other
    pharmaceutical litigation, Vioxx had no "signature injury" to definitively link the
    use of Vioxx to our clients' injuries.  Heart attacks and strokes have a variety of
    causes more often than not acting in concert.

7.   The 40% contingent fee (my standard fee in these types of cases) represented a "constant" – a factor that we relied upon in accepting these cases.  We had no reason to anticipate that our fees would be capped at 32% and that our contingent fee contracts would not be enforced as written, especially given that it was done after the intensive investment of our time and money and with no notice early in the litigation that a reduction might occur.  In addition, we in no manner sought class action status in the Vioxx litigation, nor was a class action certified.

8.   Approximately half of our Vioxx cases enrolled in the Vioxx settlement were referred and the rest were originated by our group.  The risks inherent in the Vioxx cases were so significant that we altered the customary arrangements with referring attorneys.  In these cases the VLC jointly determined that we would generally accept only those cases in which referral counsel would agree to accept 25% of the fee.

9.   Before deciding to embark on this litigation and to take on any particular case, I participated in the VLC's consideration of other factors that were less predictable.  The VLC could not predict the outcome or the length of the litigation.  There was also a significant, but unquantifiable, risk that a jury in any particular client's case would not be persuaded that that particular client's heart attack or stroke was caused by Vioxx.  We also had to consider the somewhat unpredictable prospect of adverse legal rulings on key issues such as federal and state preemption and *Daubert* challenges.  Had Merck been successful on its federal and/or state preemption defense or in its *Daubert* challenges, the cases of all of our clients could have been dismissed.

10.  The outcome of any litigation is the ultimate "variable" in any case.  Having adopted a full-bore nationwide strategy, I understood that unsuccessful litigation here would result in substantial personal loss in terms of money, time, and effort.  All of the VLC members are involved in the ongoing Welding Fume Litigation, MDL 1535, where we have expended similar amounts of effort and money in cases that involve difficulties proving causation that are similar to those in Vioxx cases.  We have had little success in that litigation, emphasizing the risky nature of these cases.  In the 25 cases tried, plaintiffs' verdicts have been obtained in only three, two of which are currently on appeal.

11.  We also understood that the Vioxx litigation could be protracted.  Comparable litigation, like Fen-Fen, lasted for approximately nine years.  The potential for lengthy litigation increased the already considerable risks.

12.  In sum, at the outset of this case I, and the VLC as a group, balanced the potential for a large recovery against the substantial risks of failure.  We considered the factors discussed above, including the efficiencies, if any, that would be achieved through an anticipated MDL.  We made a considered determination that a 40% fee was reasonable under the circumstances.

13. Although I believe that the reasonableness of a contingent fee can properly be assessed only at time the contingent fee contract is executed, my efforts in prosecuting our clients' cases also justify a 40% contingent fee if viewed in retrospect according to the *Johnson* factors.

14. I am an attorney licensed in, and in good standing with, the State of Texas. I am doubly board-certified by the Texas Board of Legal Specialization, which is the official organization for specialization authorized by the Supreme Court of Texas, in Personal Injury Trial Law and in Labor & Employment Law. I am also the Senior Managing Partner in the Provost ★ Umphrey Law Firm, which has a reputation as one of the leading trial law firms in the country. As one noteworthy example of my experience, I, along with John Eddie Williams, Jr. and Grant Kaiser, represented the State of Texas in its historic tobacco litigation where we achieved one of the largest legal recoveries in history. This highlights not only my experience, but also that I possess the necessary skills to represent plaintiffs in large and complex litigation.

15. The following are some of the issues raised in the Vioxx litigation that were novel and/or difficult: liability, general causation, specific causation, federal and state preemption, and *Daubert* issues.

16. I invested significant efforts and resources in this litigation. I personally invested at least 650 hours managing the day-to-day decisions relating to VLC's litigation efforts prior to the November 9, 2007 settlement. I was involved in management decisions of our Vioxx docket, met regularly with other VLC principals, and supervised the work of three other attorneys at our firm. I also participated in efforts to solve significant ethical problems with the settlement, without which the Vioxx settlement program would have failed. My individual efforts, as well as the efforts of other members of the VLC, assisted the VLC's clients in receiving substantial settlements from Merck.

17. The time I committed to this litigation has caused me to take time away from other litigation and litigation potential.

18. Generally, personal injury plaintiffs do not place time limitations on their cases. But, all plaintiffs want their cases handled quickly and if they come to believe that they are not, they can discharge counsel thus increasing the risks to counsel.

19. The VLC accepted representation on a contingency fee basis only. Customary fees in these types of cases are forty percent of the total recovery for the client. Despite the attendant risk that our clients would be unsuccessful, our team's commitment of time and money never waned. Indeed, in October 2004, we formed the VLC and committed to investing whatever time, talent, and resources were needed to represent persons injured by Vioxx. We battled Merck in Louisiana, New Jersey, and California, and spent additional time and money developing cases in Florida, Wisconsin, Maryland, and Illinois.

20.   In all, the VLC invested more than $13.5 million in out-of-pocket expenses – all *before* settlement. This includes the more than $527,000 out-of-pocket spent in preparing the MDL bellwether trial of *Smith*, which was one of the VLC's clients and was hand-selected by Merck. The cost to try *Smith* exceeded $1 million. The only way to justify spending $1 million to try one Vioxx case is that you must represent a large number of clients. The VLC also invested more than $460,000 in trying the *Schwaller* case in Illinois. We also selected quality trial cases in New Jersey and California, and began preparing these cases for trial. Finally, we provided trial assistance and support in the trials of other bellwether cases, including *Irvin*, *Barnett*, and *Mason*.

21.   Although *Smith* and *Schwaller* were unsuccessful, these defense verdicts highlight the significant risk involved in accepting representation on a contingent fee basis. Nevertheless, our commitment to representation of our clients, and willingness to contribute significant financial resources to this litigation never wavered.

22.   In the five bellwether cases tried in this MDL, only one was successful in achieving a verdict against Merck. Merck secured defense verdicts on all but one case, *Barnett*, which verdict Judge Fallon *sua sponte* set aside as excessive, just a few days after it was handed down. This emphasizes the risk that many plaintiffs would not have succeeded at trial against Merck.

23.   Even though Merck continued to gain trial victories, making this litigation less attractive to other plaintiffs' attorneys, the VLC continued to vigorously represent its clients by investing financial resources, selecting cases, and preparing those cases for trial.

24.   Because these cases presented extreme risks of failure and required such a large investment of time and money to the preclusion of other work, they were not desirable trial cases for many plaintiffs' attorneys. The risk of failure related to difficulty in persuading juries and judges that Merck's warnings were "inadequate," that Vioxx generally increased the risk of cardiovascular injury, that Vioxx caused the CV injury in a particular client, that a client's prescribing physician was not legally responsible (learned intermediary defense), and that a particular client was deserving of a significant jury award. The majority of plaintiffs' attorneys would never undertake such cases as trial counsel.

**25.**   The VLC developed a sophisticated computerized client communication system to ensure that their clients were timely apprised of important developments in their cases. This system included, among other things, individualized client letters and individual periodic calls to clients.

26.   I certify and declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

Walter Umphrey

SUBSCRIBED AND SWORN TO BEFORE ME on the 9th day of December, 2008.



BETTY GAYLE BOUILLION
Notary Public, State Of Texas
My Commission Expires
09-12-2010

Notary Public in and for the State of Texas

## AFFIDAVIT OF JOHN EDDIE WILLIAMS, JR.

BEFORE ME, the undersigned authority, on this day personally appeared JOHN EDDIE

WILLIAMS, JR., and after having first been duly sworn upon oath, states as follows:

1. My name is John Eddie Williams, Jr. I am over the age of eighteen years, of sound mind, and in all respects legally competent to make this affidavit. I have personal knowledge of the factual statements made herein.

2. In considering whether to take on Vioxx cases initially, I, as a member of the Vioxx Litigation Consortium (VLC) gave serious consideration to certain "constants" – factors known to be true regardless of the litigation's outcome – and "variables" – factors that were unknown or changeable.

3. Some of the known factors considered by me and discussed with other VLC members at the inception included demographic and health information for each potential client, Merck's public position of forcing every case to trial, the knowledge that Merck, as a Fortune 500 company, had the capability and incentive to mount a vigorous defense, the realization that I and other VLC members would be precluded from accepting other representation because of the amount of time, effort and money that we would devote to this litigation, the difficulty in scientifically proving that Vioxx caused any particular client's heart attack, stroke, or other injury, and the fact that the Vioxx cases that reached federal court would be joined in an MDL.

4. I also knew from the outset that regardless of the efficiencies that would likely be achieved in the MDL process, I and other members of the VLC would not depart from our practice of treating each client individually. Our intention in this regard was realized as the cases proceeded and we frequently spoke with our clients by telephone, sent individualized correspondence to our clients by mail, and, where urgent, by overnight courier. We created and staffed a call center to service our clients, and created a custom database to track communications, pharmacy and medical information, statutes of limitations and many other data points applicable to each client. In accordance with our plans, every Vioxx client had and still has their own file, both paper and electronic, and each file is individualized.

5. I recognized and discussed with other VLC members at the outset that we would have to be fully prepared to try every case, no matter how costly and no matter how time-consuming, in order to achieve the best results for each of our clients. Our plan, which we carried out in practice, was to fully develop, prepare and try every case if necessary, keeping concerted and consistent pressure on Merck.

6. We knew that proving causation would be difficult, because, unlike some other pharmaceutical litigation, Vioxx had no "signature injury" to definitively link the use of Vioxx to our clients' injuries. Heart attacks and strokes have a variety of causes more often than not acting in concert.

7.  The 40% contingent fee (my standard fee in these types of cases) represented a "constant" – a factor that we relied upon in accepting these cases. We had no reason to anticipate that our fees would be capped at 32% and that our contingent fee contracts would not be enforced as written, especially given that it was done after the intensive investment of our time and money and with no notice early in the litigation that a reduction might occur. In addition, we in no manner sought class action status in the Vioxx litigation, nor was a class action certified.

8.  Approximately half of our Vioxx cases enrolled in the Vioxx settlement were referred and the rest were originated by our group. The risks inherent in the Vioxx cases were so significant that we altered the customary arrangements with referring attorneys. In these cases the VLC jointly determined that we would generally accept only those cases in which referral counsel would agree to accept 25% of the fee.

9.  Before deciding to embark on this litigation and to take on any particular case, I participated in the VLC's consideration of other factors that were less predictable. The VLC could not predict the outcome or the length of the litigation. There was also a significant, but unquantifiable, risk that a jury in any particular client's case would not be persuaded that that particular client's heart attack or stroke was caused by Vioxx. We also had to consider the somewhat unpredictable prospect of adverse legal rulings on key issues such as federal and state preemption and *Daubert* challenges. If Merck were successful on its federal and/or state preemption defense or *Daubert* challenges, the cases of all of our clients could have been dismissed.

10. The outcome of any litigation is the ultimate "variable" in any case. Having adopted a full-bore nationwide strategy, I understood that unsuccessful litigation here would result in substantial personal loss in terms of money, time, and effort. All of the VLC members are involved in the ongoing Welding Fume Litigation, MDL 1535, where we have expended similar amounts of effort and money in cases that involve difficulties proving causation that are similar to those in Vioxx cases. We have had little success in that litigation, emphasizing the risky nature of these cases. In the 25 cases tried, plaintiffs' verdicts have been obtained in only three, two of which are currently on appeal.

11. We also understood that the Vioxx litigation could be protracted. Comparable litigation, like Fen-Fen, lasted for approximately nine years. The potential for lengthy litigation increased the already considerable risks.

12. In sum, at the outset of this case I, and the VLC as a group, balanced the potential for a large recovery against the substantial risks of failure. We considered the factors discussed above, including the efficiencies, if any, that would be achieved through an anticipated MDL. We made a considered determination that a 40% fee was reasonable under the circumstances.

13. Although I believe that the reasonableness of a contingent fee can properly be assessed only at the time the contingent fee contract is executed, my efforts in

prosecuting our clients' cases also justify a 40% contingent fee if viewed in retrospect according to the *Johnson* factors.

14. I am an attorney licensed in, and in good standing with, the State of Texas. I am the managing partner of the law firm of Williams, Kherkher, Hart and Boundas, LLP, a firm I founded in 1983 after leaving Fulbright & Jaworski. I, and my firm, have been representing plaintiffs in personal injury litigation for the past 25 years. I am board-certified in Personal Injury Trial Law by the Texas Board of Legal Specialization and am a past President of both the Houston Trial Lawyers Association and the Texas Trial Lawyers Association. Our firm has a reputation for accepting and trying tough cases while being able to marshal the resources, trial skills, and determination necessary to pursue litigation against the most formidable defendants. Our firm represented the State of Texas in its lawsuit against the tobacco industry, a lawsuit accepted at great risk and at a time when most considered such litigation unwinnable. And, in the past several years, our attorneys have tried over a dozen pharmaceutical cases.

15. The following are some of the issues raised in the Vioxx litigation that were novel and/or difficult: liability, general causation, specific causation, federal and state preemption, and *Daubert* issues.

16. I actively directed the efforts of the VLC and the efforts of our firms' attorneys, and spent hundreds of hours on the Vioxx litigation. I oversaw and made key decisions relating to our cases. I also routinely met with our attorneys and with VLC staff members to ensure that we were doing all that we could to advance the litigation for our clients. When significant ethical issues were raised by the proposed settlement agreement, I personally assumed a leadership role to try to resolve these issues so that we would have a settlement that works practically for the parties yet also meets the letter and spirit of the ethics rules of our profession. While settlement is important, giving our clients the best legal representation also means adhering to the highest ethical standards.

17. We were highly active in the Vioxx litigation. Our attorneys collectively spent thousands of hours on the Vioxx litigation, participating in Vioxx trials, taking and defending depositions, developing expert witnesses, attending hearings, preparing cases for trial, and many other tasks. This obviously precluded us from employing these significant efforts in other litigation.

18. Generally, personal injury plaintiffs do not place time limitations on their cases; however, all plaintiffs want their cases handled quickly and if they come to believe that they are not, they can discharge counsel thus increasing the risks to counsel.

19. The VLC accepted representation on a contingency fee basis only. Customary fees in these types of cases are forty percent of the total recovery for the client. The VLC members, including me personally, took on enormous risk in pursuing this litigation, a point highlighted by the defense verdicts in *Smith* and *Schwaller*. Our

firm alone committed the work of over ten lawyers and many thousands of hours of attorney time.

20. The VLC collectively invested over $13.5 million before the settlement was announced, including over $1 million devoted to trial, pretrial discovery, and expert witness expenses incurred in actively pursuing cases. Two of my partners, Steve Kherkher and John Boundas, tried the *Smith* MDL bellwether case, and, along with many other attorneys at our firm, were otherwise highly engaged in the litigation. The cost to try *Smith* exceeded $1 million. The only way to justify spending $1 million to try one Vioxx case is that you must represent a large number of clients. Our VLC team tried two Vioxx cases to verdict and assisted on several others. In addition, we were actively pushing the litigation in jurisdictions across the country (in the MDL, Texas, New Jersey, California, and elsewhere). We also tried a case in Illinois, we submitted 45 cases for pretrial discovery in New Jersey so that more cases could be set for trial, were preparing to submit 30 more cases for trial, and we were preparing for another upcoming trial on behalf of two Vioxx plaintiffs when the settlement was announced.

21. Judge Fallon ordered a total of five bellwether trials in the federal MDL. Merck secured defense verdicts on all but one case, *Barnett*, which verdict Judge Fallon *sua sponte* set aside as excessive, just a few days after it was handed down.

22. Because these cases presented extreme risks of failure and required such a large investment of time and money to the preclusion of other work, they were not desirable trial cases for many plaintiffs' attorneys. The risk of failure related to difficulty in persuading juries and judges that Merck's warnings were "inadequate," that Vioxx generally increased the risk of cardiovascular injury, that Vioxx caused the CV injury in a particular client, that a client's prescribing physician was not legally responsible (learned intermediary defense), and that a particular client was deserving of a significant jury award. The majority of plaintiffs' attorneys would never undertake such cases as trial counsel.

23. The VLC developed a sophisticated computerized client communication system to ensure that their clients were timely apprised of important developments in their cases. This system included, among other things, individualized client letters and individual periodic calls to clients.

24. I certify and declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

John Eddie Williams, Jr.

SUBSCRIBED AND SWORN TO BEFORE ME on the *10th* day of December, 2008.



Notary Public in and for the State of Texas

MARTHA CORIE
Notary Public, State of Texas
My Commission Expires
September 19, 2010

## AFFIDAVIT OF DREW RANIER

BEFORE ME, the undersigned authority, on this day personally appeared DREW

RANIER, and after having first been duly sworn upon oath, states as follows:

1. My name is Drew Ranier. I am over eighteen years of age, of sound mind, and in all respects legally competent and duly authorized to make this affidavit. I have personal knowledge of the statements made herein.

2. In considering whether to take on Vioxx cases initially, I, as a member of the Vioxx Litigation Consortium (VLC) gave serious consideration to certain "constants" – factors known to be true regardless of the litigation's outcome – and "variables" – factors that were unknown or changeable.

3. Some of the known factors considered by me and discussed with other VLC members at the inception included demographic and health information for each potential client, Merck's public position of forcing every case to trial, the knowledge that Merck, as a Fortune 500 company, had the capability and incentive to mount a vigorous defense, the realization that I and other VLC members would be precluded from accepting other representation because of the amount of time, effort and money that we would devote to this litigation, the difficulty in scientifically proving that Vioxx caused any particular client's heart attack, stroke, or other injury, and the fact that the Vioxx cases that reached federal court would be joined in an MDL.

4. I also knew from the outset that regardless of the efficiencies that would likely be achieved in the MDL process, I and other members of the VLC would not depart from our practice of treating each client individually. Our intention in this regard was realized as the cases proceeded and we frequently spoke with our clients by telephone, sent individualized correspondence to our clients by mail, and, where urgent, by overnight courier. We created and staffed a call center to service our clients, and created a custom database to track communications, pharmacy and medical information, statutes of limitations and many other data points applicable to each client. In accordance with our plans, every Vioxx client had and still has their own file, both paper and electronic, and each file is individualized.

5. I recognized and discussed with other VLC members at the outset that we would have to be fully prepared to try every case, no matter how costly and no matter how time-consuming, in order to achieve the best results for each of our clients. Our plan, which we carried out in practice, was to fully develop, prepare and try every case if necessary, keeping concerted and consistent pressure on Merck.

6. We knew that proving causation would be difficult, because, unlike some other pharmaceutical litigation, Vioxx had no "signature injury" to definitively link the use of Vioxx to our clients' injuries. Heart attacks and strokes have a variety of causes more often than not acting in concert.

7.  The 40% contingent fee (my standard fee in these types of cases) represented a "constant" – a factor that we relied upon in accepting these cases. We had no reason to anticipate that our fees would be capped at 32% and that our contingent fee contracts would not be enforced as written, especially given that it was done after the intensive investment of our time and money and with no notice early in the litigation that a reduction might occur In addition, we in no manner sought class action status in the Vioxx litigation, nor was a class action certified.

8.  Approximately half of our Vioxx cases enrolled in the Vioxx settlement were referred and the rest were originated by our group. The risks inherent in the Vioxx cases were so significant that we altered the customary arrangements with referring attorneys. In these cases the VLC jointly determined that we would generally accept only those cases in which referral counsel would agree to accept 25% of the fee.

9.  Before deciding to embark on this litigation and to take on any particular case, I participated in the VLC's consideration of other factors that were less predictable. The VLC could not predict the outcome or the length of the litigation. There was also a significant, but unquantifiable, risk that a jury in any particular client's case would not be persuaded that that particular client's heart attack or stroke was caused by Vioxx. We also had to consider the somewhat unpredictable prospect of adverse legal rulings on key issues such as federal and state preemption and *Daubert* challenges. Had Merck been successful on its federal and/or state preemption defense, or in its *Daubert* challenges, the cases of all of our clients could have been dismissed.

10. The outcome of any litigation is the ultimate "variable" in any case. Having adopted a full-bore nationwide strategy, I understood that unsuccessful litigation here would result in substantial personal loss in terms of money, time, and effort. All of the VLC members are involved in the ongoing Welding Fume Litigation, MDL 1535, where we have expended similar amounts of effort and money in cases that involve difficulties proving causation that are similar to those in Vioxx cases. We have had little success in that litigation, emphasizing the risky nature of these cases. In the 25 cases tried, plaintiffs' verdicts have been obtained in only three, two of which are currently on appeal.

11. We also understood that the Vioxx litigation could be protracted. Comparable litigation, like Fen-Fen, lasted for approximately nine years. The potential for lengthy litigation increased the already considerable risks.

12. In sum, at the outset of this case I, and the VLC as a group, balanced the potential for a large recovery against the substantial risks of failure. We considered the factors discussed above, including the efficiencies, if any, that would be achieved through an anticipated MDL. We made a considered determination that a 40% fee was reasonable under the circumstances.

13. Although I believe that the reasonableness of a contingent fee can properly be assessed only at time the contingent fee contract is executed, my efforts in prosecuting our clients' cases also justify a 40% contingent fee if viewed in retrospect according to the *Johnson* factors.

14. I am a member of the Louisiana and Texas bars and am a senior partner of the Ranier, Gayle and Elliot, LLC law firm. In my over 30 years of practice, I have served as lead counsel and on plaintiffs' steering committees in several nationally important cases. I have extensive complex litigation experience and special expertise in insurance coverage. I served as the national insurance counsel for all Attorneys General in the tobacco litigation and lead counsel for the State of Louisiana. I also represented the State of Louisiana in thousands of asbestos abatement claims.

15. The following are some of the issues raised in the Vioxx litigation that were novel and/or difficult: liability, general causation, specific causation, federal and state preemption, and *Daubert* issues.

16. I expended significant time, labor, and resources in this litigation. With the other four VLC members, we created the Vioxx Litigation Center (with its own offices, lawyers, nurses and other staff), solely dedicated to representing people injured by Vioxx. The VLC firms, including my firm, combined the manpower, resources, and experience necessary to reduce approximately 30,000 potential Vioxx claimants to approximately 2,000 highly screened quality cases that could be tried. The Vioxx Litigation Center implemented a comprehensive program to medically and legally evaluate these 30,000 potential clients. The Vioxx Litigation Center obtained pharmacy records to confirm Vioxx use at or around the time of the heart attack or stroke. Once use was established, treating facilities' medical records were obtained and reviewed by medical experts to confirm the injuries claimed by clients. Individuals who did not meet the Vioxx Center's strict requirements were notified and released as clients. This entire process entailed 126,000 hours of staff/paralegals, 10,000 hours of nurse paralegals, 850 hours of expert/doctors review, and 23,300 hours of attorney screening. In all, the Vioxx Center assembled one of the largest groups of high quality cases. And, in doing so, the Vioxx Center created one of the country's most advanced and thorough client databases. Additionally, the Vioxx Center developed key experts against Merck, including the retention of the leading econometric firm, LECG of Cambridge, Massachusetts, which, under my direction, analyzed Merck's financial reasons for rushing Vioxx to market, the use of Dr. Martin Wells, a statistician from Cornell University, who provided evidence that Vioxx was at its worst for high-risk patients, and the mounting of a major attack on Merck's epidemiological position with leading experts.

17. I worked on MDL trials and expert preparation, important insurance discovery, and ethics issues necessary to achieve an ethically acceptable settlement. I personally prepared written discovery on insurance issues, uncovered the London Insurance Arbitration evidence, and deposed the Merck Insurance Vice President. I also

analyzed Merck's insurance policies, which proved Merck's ability to pay as well as what Merck knew and when it knew it. I spent hundreds of hours on this issue alone. Moreover, we retained one of the country's leading insurance experts to consult on insurance issues.

18. My professional and financial commitment to the Vioxx MDL precluded my work and my firm's work on other cases as a leading national trial lawyer with over 30 years of experience.

19. Generally, personal injury plaintiffs do not place time limitations on their cases. But, all plaintiffs want their cases handled quickly and if they come to believe that they are not, they can discharge counsel thus increasing the risks to counsel.

20. The VLC accepted representation on a contingency fee basis only. Customary fees in these types of cases are forty percent of the total recovery for the client. I personally contributed over $3.1 million to the VLC's efforts, and the VLC itself has invested more than $13.5 million and over 160,000 hours to this litigation. My firm and the four other firms bore the costs of trying one MDL bellwether trial, *Smith* (a Merck selected case), and one state trial in Illinois, *Schwaller*, both of which involved clients of the VLC. Both cases were tried to a verdict. Two other MDL bellwether cases, *Jones* and *Cooper*, were nominated for trial in the MDL by my firm and the Vioxx Plaintiffs' Steering Committee, but were vetoed by Merck. The *Smith* bellwether case was a particularly difficult case selected by Merck's lawyers. The VLC dedicated all of its resources to this costly trial. The cost to try *Smith* exceeded $1 million. The only way to justify spending $1 million to try one Vioxx case is that you must represent a large number of clients. I fully participated in the fifteen day *Smith* trial as a senior attorney. My duties included jury venire investigation and analysis, witness selection, order of proof, focus group work, shadow jury work, meeting with Merck lawyers on discovery issues, work with the Court, a variety of strategic and tactical work with trial attorneys, and work with the principals and supporting counsel from all VLC firms. The *Smith* and *Schwaller* trials entailed approximately 30 days of trial, approximately 20 live witnesses, 25 video witnesses, 40 depositions, 400 exhibits, and the customary voluminous pleadings, motions, etc. My firm alone contributed over 1,400 hours to the *Smith* trial. Moreover, VLC members assisted in supporting roles in the *Irwin*, *Barnett*, and *Mason* MDL bellwether trials. My firm and the other VLC members were leaders in developing MDL trials.

21. Even though many of the bellwether trials were unsuccessful, my firm and the other VLC members continued to nominate and prepare cases for trial. We were on the eve of trial in the *Sanderson* and *Romans* cases in New Jersey at the time of settlement. Indeed, many other VLC cases were being actively prepared for trial when the settlement was announced. Our group alone had nominated 45 cases for trial in the New Jersey State MDL and was preparing another 30 at the time the settlement was announced. Because I was told about a possible settlement only two weeks before settlement, most of my efforts were high risk, pre-settlement work.

22. Judge Fallon ordered a total of five bellwether trials in the federal MDL. Merck secured defense verdicts on all but one case, *Barnett*, which verdict Judge Fallon *sua sponte* set aside as excessive, just a few days after it was handed down.

23. The VLC recognized the risk involved in accepting these cases. All of the cases were difficult cases, some more than others, as evidenced by the *Smith* bellwether trial. Nevertheless, in contrast to several other firms, who dismissed plaintiff and defense MDL bellwether selection cases rather than try them, my firm and the VLC members continued to nominate and prepare cases for trial.

24. Because these cases presented extreme risks of failure and required such a large investment of time and money to the preclusion of other work, they were not desirable trial cases for many plaintiffs' attorneys. The risk of failure related to difficulty in persuading juries and judges that Merck's warnings were "inadequate," that Vioxx generally increased the risk of cardiovascular injury, that Vioxx caused the CV injury in a particular client, that a client's prescribing physician was not legally responsible (learned intermediary defense), and that a particular client was deserving of a significant jury award. The majority of plaintiffs' attorneys would never undertake such cases as trial counsel.

25. The VLC developed a sophisticated computerized client communication system to ensure that their clients were timely apprised of important developments in their cases. This system included, among other things, individualized client letters and individual periodic calls to clients.

26. I certify and declare under penalty of perjury under the laws of the State of Louisiana that the foregoing is true and correct.

_____

Drew Ranier

SUBSCRIBED AND SWORN TO BEFORE ME on the \10^{th} day of December, 2008.

_____
Notary Public in and for the
State of Louisiana

## AFFIDAVIT OF MIKAL C. WATTS

BEFORE ME, the undersigned authority, on this day personally appeared MIKAL C.

WATTS, and after having first been duly sworn upon oath, states as follows:

1.   My name is Mikal C. Watts.  I am over eighteen years of age, and I am of sound mind and capable of making this affidavit.  The information and facts stated herein are within my personal knowledge.

2.   In considering whether to take on Vioxx cases initially, I, as a member of the Vioxx Litigation Consortium (VLC) gave serious consideration to certain "constants" – factors known to be true regardless of the litigation's outcome – and "variables" – factors that were unknown or changeable.

3.   Some of the known factors considered by me and discussed with other VLC members at the inception included demographic and health information for each potential client, Merck's public position of forcing every case to trial, the knowledge that Merck, as a Fortune 500 company, had the capability and incentive to mount a vigorous defense, the realization that I and other VLC members would be precluded from accepting other representation because of the amount of time, effort and money that we would devote to this litigation, the difficulty in scientifically proving that Vioxx caused any particular client's heart attack, stroke, or other injury, and the fact that the Vioxx cases that reached federal court would be joined in an MDL.

4.   I also knew from the outset that regardless of the efficiencies that would likely be achieved in the MDL process, I and other members of the VLC would not depart from our practice of treating each client individually.  Our intention in this regard was realized as the cases proceeded and we frequently spoke with our clients by telephone, sent individualized correspondence to our clients by mail, and, where urgent, by overnight courier.  We created and staffed a call center to service our clients, and created a custom database to track communications, pharmacy and medical information, statutes of limitations and many other data points applicable to each client.  In accordance with our plans, every Vioxx client had and still has their own file, both paper and electronic, and each file is individualized.

5.   I recognized and discussed with other VLC members at the outset that we would have to be fully prepared to try every case, no matter how costly and no matter how time-consuming, in order to achieve the best results for each of our clients.  Our plan, which we carried out in practice, was to fully develop, prepare and try every case if necessary, keeping concerted and consistent pressure on Merck.

6.   We knew that proving causation would be difficult, because, unlike some other pharmaceutical litigation, Vioxx had no "signature injury" to definitively link the use of Vioxx to our clients' injuries.  Heart attacks and strokes have a variety of causes more often than not acting in concert.

7. The 40% contingent fee (my standard fee in these types of cases) represented a "constant" – a factor that we relied upon in accepting these cases. We had no reason to anticipate that our fees would be capped at 32% and that our contingent fee contracts would not be enforced as written, especially given that it was done after the intensive investment of our time and money and with no notice early in the litigation that a reduction might occur. In addition, we in no manner sought class action status in the Vioxx litigation, nor was a class action certified.

8. Approximately half of our Vioxx cases enrolled in the Vioxx settlement were referred and the rest were originated by our group. The risks inherent in the Vioxx cases were so significant that we altered the customary arrangements with referring attorneys. In these cases the VLC jointly determined that it would generally accept only those cases in which referral counsel would agree to accept 25% of the fee.

9. Before deciding to embark on this litigation and to take on any particular case, I participated in the VLC's consideration of other factors that were less predictable. The VLC could not predict the outcome or the length of the litigation. There was also a significant, but unquantifiable, risk that a jury in any particular client's case would not be persuaded that that particular client's heart attack or stroke was caused by Vioxx. We also had to consider the somewhat unpredictable prospect of adverse legal rulings on key issues such as federal and state preemption and *Daubert* challenges. Had Merck been successful on its federal and/or state preemption defense or in its *Daubert* challenges, the cases of all of our clients could have been dismissed.

10. The outcome of any litigation is the ultimate "variable" in any case. Having adopted a full-bore nationwide strategy, I understood that unsuccessful litigation here would result in substantial personal loss in terms of money, time, and effort. All of the VLC members are involved in the ongoing Welding Fume Litigation, MDL 1535, where we have expended similar amounts of effort and money in cases that involve difficulties proving causation that are similar to those in Vioxx cases. We have had little success in that litigation, emphasizing the risky nature of these cases. In the 25 cases tried, plaintiffs' verdicts have been obtained in only three, two of which are currently on appeal.

11. We also understood that the Vioxx litigation could be protracted. Comparable litigation, like Fen-Fen, lasted for approximately nine years. The potential for lengthy litigation increased the already considerable risks.

12. While the VLC's vetting process occurred after Merck recalled Vioxx, I personally expended significant effort sifting through more than 4,000 leads to generate more than 400 cases *before* recall. Acceptance of representation before the recall presented additional risks because until the announcement of the recall, Merck had not acknowledged a problem with Vioxx.

13. In sum, at the outset of this case I, and the VLC as a group, balanced the potential for a large recovery against the substantial risks of failure. We considered the

factors discussed above, including the efficiencies, if any, that would be achieved through an anticipated MDL. We made a considered determination that a 40% fee was reasonable under the circumstances.

14.  Although I believe that the reasonableness of a contingent fee can properly be assessed only at time the contingent fee contract is executed, my efforts in prosecuting our clients' cases also justify a 40% contingent fee if viewed in retrospect according to the *Johnson* factors.

15.  I am an attorney licensed in, and in good standing with, the State of Texas. I am the founding partner of the Watts Law Firm, L.L.P. I am Board Certified in Personal Injury Trial Law by the Texas Board of Legal Specialization and am an "AV" rated lawyer in Martindale-Hubbell. I have served as Chair of the State Court Liaison Committee of the Ford Explorer/Firestone Tire federal multi-district litigation. I was named by Federal Judge Hilda Tagle as lead trial counsel for the consolidated cases arising from the Queen Isabella Causeway barge/bridge collapse disaster. I am a member of the Silica MDL 1553 Plaintiffs' Executive Committee and am the Plaintiffs' Liaison Counsel. I obtained the nation's first jury award involving the withdrawn diabetes drug Rezulin (*Margie Sanchez, et al. v. Parke-Davis, et al.*); the nation's first jury award involving the recalled Sulzer hip implants (*Rupp, et al. v. Sulzer Orthopedics, Inc.*); and settled *Bailey v. Ford Motor Company and Bridgestone/Firestone* on the eve of the first national post-recall trial in the tread separation/vehicle stability cases.

16.  The following are some of the issues raised in the Vioxx litigation that were novel and/or difficult: liability, general causation, specific causation, federal and state preemption, and *Daubert* issues.

17.  I expended significant time and effort in this litigation. I personally spent over 1,000 hours working on the Vioxx litigation. Included in this time is the effort that I spent accepting cases *before* the announcement of the recall of Vioxx. Prior to the recall, we sifted through in excess of 5,000 phone calls and leads to generate in excess of 400 cases. We ordered medical records, began extensive medical research on Vioxx and other drugs in its class, and contacted cardiologists to begin formulating our theory of the case. After Merck recalled Vioxx, I spent significant effort vetting more than 29,000 leads into approximately 2,000 high quality Vioxx cases. I participated in the formulation of trial strategy, and personally organized, wrote, and conducted the cross examination of Merck's trial witnesses. I also tried both the *Smith* and *Schwaller* cases. In preparing for *Smith*, I read every transcript of testimony given and every paper written by Dr. Briggs Morrison and Dr. Alise Reicin, and read every document produced by Merck mentioning either doctor. I drafted a cross examination for both Dr. Morrison and Dr. Reicin, and conducted the cross examinations of both at trial. In *Schwaller*, I read every transcript of testimony given and every paper written by Dr. Nancy Santanello, and read every document produced by Merck mentioning Dr. Santanello. Dr. Santanello's cross examination, which I conducted, lasted several days. This evidence highlights my time and efforts on behalf of just two of the Vioxx Litigation Consortium's many

clients.   In addition, since the settlement agreement was announced, I have continued to participate in systematic meetings to ensure that our clients were included in the agreement.

18.   My professional and financial commitment to the Vioxx MDL precluded my work and my firm's work on other cases

19.   Generally, personal injury plaintiffs do not place time limitations on their cases. But, all plaintiffs want their cases handled quickly and if they come to believe that they are not, they can discharge counsel thus increasing the risks to counsel.

20.   The VLC accepted representation on a contingency fee basis only. Customary fees in these types of cases are forty percent of the total recovery for the client. The VLC invested more than $13.5 million in the Vioxx litigation and in representing its clients. I have personally funded 25% of that financial investment. I tried the *Smith* bellwether case, which was a "defense pick". The cost to try *Smith* exceeded $1 million. The only way to justify spending $1 million to try one Vioxx case is that you must represent a large number of clients. I also tried the *Schwaller* case, which involved a 290-pound plaintiff. Although I knew that *Schwaller* was a difficult case, I believed that Merck needed to understand that some plaintiffs' lawyers were willing to try all of the cases – good and bad. This helped to create litigation pressure that contributed to an outcome that benefited not only our clients, but all claimants.

21.   In addition to the more than $13.5 million invested in this litigation (almost $4 million of which I personally funded), I offered to assist other attorneys in New Jersey try cases that did not involve clients of my own.

22.   In the five bellwether cases tried in this MDL, only one was successful in achieving a verdict against Merck. Judge Fallon *sua sponte* set aside the plaintiff's verdict in *Barnett* as excessive, just a few days after it was handed down. This emphasizes the possibility that many plaintiffs might not have succeeded against Merck at trial.

23.   Despite the setbacks occasioned by the defense verdicts, I was prepared to continue my efforts to force Merck to trial over and over again. While I risked significant financial loss, at a time when numerous other lawyers nonsuited or dismissed difficult cases, I decided to adopt an opposite approach of trying cases that everyone knew would be difficult. Indeed, when Merck settled, I had focused my attention on cases in California and New Jersey, and was in the process of preparing to try other cases in New Jersey.

24.   Because these cases presented extreme risks of failure and required such a large investment of time and money to the preclusion of other work, they were not desirable trial cases for many plaintiffs' attorneys. The risk of failure related to difficulty in   persuading juries and judges that Merck's warnings were "inadequate," that Vioxx generally increased the risk of cardiovascular injury, that Vioxx caused the CV injury in a particular client, that a client's prescribing

physician was not legally responsible (learned intermediary defense), and that a particular client was deserving of a significant jury award.  The majority of plaintiffs' attorneys would never undertake such cases as trial counsel.

25.   The VLC developed a sophisticated computerized client communication system to ensure that their clients were timely apprised of important developments in their cases.  This system included, among other things, individualized client letters and individual periodic calls to clients.

26.   I certify and declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

MIKAL C. WATTS

SUBSCRIBED AND SWORN TO BEFORE ME on the 9th day of December, 2008.



PAMELA M. FLORES
MY COMMISSION EXPIRES
June 22, 2011

Notary Public in and for the State of Texas

## **AFFIDAVIT OF GRANT KAISER**

BEFORE ME, the undersigned authority, on this day personally appeared GRANT

KAISER, and after having first been duly sworn upon oath, states as follows:

1.  My name is Grant Kaiser. I am over the age of eighteen years, of sound mind, and in all respects legally competent and duly authorized to make this affidavit. I have personal knowledge of the factual statements made herein.

2.  In considering whether to undertake representing clients in Vioxx cases initially, I, as a part of the Vioxx Litigation Consortium (VLC) gave serious consideration to certain "constants" – factors known to be true regardless of the litigation's outcome – and "variables" – factors that were unknown or changeable.

3.  Some of the known factors considered by me and discussed with the VLC members at the inception included demographic and health information for each client, Merck's public position of forcing every case to trial, the knowledge that Merck, as a Fortune 500 company, had the capability and incentive to mount a vigorous defense, the realization that I and the VLC members would be precluded from accepting other representation because of the amount of time, effort and money that we would devote to this litigation, the difficulty in scientifically proving that Vioxx caused any particular client's heart attack, stroke, or other injury, and the fact that the Vioxx cases that reached federal court would be joined in an MDL.

4.  I also knew from the outset that regardless of the efficiencies that would likely be achieved in the MDL process, I and other members of the VLC would not depart from our customary business practice of treating each client individually. Our intention in this regard was realized as the cases proceeded and we frequently spoke with our clients by telephone, sent individualized correspondence to our clients by mail, and, where urgent, by overnight courier. We created and staffed a call center, to service our clients, and created a custom database to track communications, pharmacy and medical information, statutes of limitations and many other data points applicable to each client. In accordance with our plans, every Vioxx client had and still has their own file, both paper and electronic, and each file is individualized.

5.  I recognized and discussed with other VLC members at the outset that we would have to be fully prepared to try every case, no matter how costly and no matter how time-consuming, in order to achieve the best results for each of our clients. Our plan, which we carried out in practice, was to fully develop, prepare and try every case if necessary, keeping concerted and consistent pressure on Merck.

6.  We knew that proving causation would be difficult, because, unlike some other pharmaceutical litigation, Vioxx had no "signature injury" to definitively link the use of Vioxx to our clients' injuries. Heart attacks and strokes have a variety of causes more often than not acting in concert.

7.   The 40% contingent fee (my standard fee in these types of cases) represented a "constant" – a factor that we relied upon in accepting these cases. We had no reason to anticipate that our fees would be capped at 32% and that our contingent fee contracts would not be enforced as written, especially given that it was done after the intensive investment of our time and money and with no notice early in the litigation that a reduction might occur. In addition, we in no manner sought class action status in the Vioxx litigation, nor was a class action certified.

8.   Approximately half of our cases enrolled in the Vioxx settlement were referred and the rest were originated by our group. The risks inherent in the Vioxx cases were so significant that we altered our customary arrangements with referring attorneys. In these cases the VLC jointly determined that we would only accept cases in which referral counsel would agree to accept 25% of the fee.

9.   Before deciding to embark on this litigation and to take on any particular case, I participated in the VLC's consideration of other factors that were less predictable. The VLC could not predict the outcome or the length of the litigation. There was also a significant, but unquantifiable, risk that a jury in any particular client's case would not be persuaded that that particular client's heart attack or stroke was caused by Vioxx. We also had to consider the somewhat unpredictable prospect of adverse legal rulings on key issues such as federal and state preemption and *Daubert* challenges. Had Merck been successful on its federal and/or state preemption defense or in its *Daubert* challenges, the cases of all of our clients could have been dismissed.

10.  The outcome of any litigation is the ultimate "variable" in any case. Having adopted a full-bore nationwide strategy, I understood that unsuccessful litigation here would result in substantial personal loss in terms of money, time, and effort. All of the VLC members are involved in the ongoing Welding Fume Litigation, MDL 1535, where we have expended similar amounts of effort and money in cases that involve difficulties proving causation that are similar to those in Vioxx cases. We have had little success in that litigation, emphasizing the risky nature of these cases. In the 25 cases tried, plaintiffs' verdicts have been obtained in only three, two of which are currently on appeal.

11.  We also understood that the Vioxx litigation could be protracted. Comparable litigation, like Fen-Fen, lasted for approximately nine years. The potential for lengthy litigation increased the already considerable risks.

12.  In sum, at the outset of this case I, and the VLC as a group, balanced the potential for a large recovery against the substantial risks of failure. We considered the factors discussed above, including the efficiencies, if any, that would be achieved through an anticipated MDL. We made a considered determination that a 40% fee was reasonable under the circumstances.

13.  Although I believe that the reasonableness of a contingent fee can properly be assessed only at time the contingent fee contract is executed, my efforts in

prosecuting our clients' cases also justify a 40% contingent fee if viewed in retrospect according to the *Johnson* factors.

14. I am an attorney duly licensed in, and in good standing with, the State of Texas. I have practiced plaintiffs' personal injury trial law for more than 26 years and I am doubly board-certified by the Texas Board of Legal Specialization in Personal Injury Trial Law and in Civil Appellate Law. I have directly participated in some of the largest and most complex litigation in the United States, including being Plaintiff's Liaison Counsel and Coordinating Counsel in the State of Texas' historic claim against the tobacco industry to recoup payments the State made to treat diseases caused by smoking. I am also Coordinating Counsel for the Welding Fume Consortium and thus responsible for all day-to-day activities of this nationwide litigation.

15. The following are some of the issues raised in the Vioxx litigation that were novel and/or difficult: liability, general causation, specific causation, federal and state preemption, and *Daubert* issues.

16. I began working on Vioxx on October 7, 2004, just days after Vioxx's withdrawal on September 30, 2004. I have continued to work on Vioxx through today. Since October 2004, I have devoted 80% of my professional efforts to the prosecution of Vioxx cases. Based on a conservative 50-hour work week, that equals 6,240 hours I personally worked on the Vioxx litigation – *before* settlement. This includes my overall responsibility for the efforts of the Vioxx Litigation Consortium. I was ultimately responsible for coordinating and managing *all* day-to-day activities in handling the VLC's docket, which included (a) developing case screening criteria, (b) liaising and negotiating with 217 referring attorney firms from 20 different states, (c) developing strategies about where to file the cases and whom to sue, and (d) managing statutes of limitations for clients from *all* 50 states for multiple causes of action against multiple types of defendants. I did significant work in the Texas Vioxx MDL litigation and participated in three of the MDL bellwether trials: *Irvin*, *Barnett*, and *Smith*. I also personally worked to amend the Settlement Agreement so that it was consistent with attorneys' ethical responsibilities and, therefore, the VLC and other firms across the nation could then recommend the settlement to its clients and meet the Agreement's 85% participation threshold.

17. Given that I committed 80% of my professional efforts to this litigation and my responsibilities in the Welding Fume Litigation, I had no time to devote to other new litigation or new potential clients.

18. Generally, personal injury plaintiffs do not place time limitations on their cases. But, all plaintiffs want their cases handled quickly and if they come to believe that they are not, they can discharge counsel thus increasing the risks to counsel.

19. The VLC accepted representation on a contingency fee basis only. Customary fees in these types of cases are forty percent of the total recovery for the client. The VLC's charge was to prosecute Vioxx cases – and *only* Vioxx cases. The VLC

engaged 47 personnel, including 5 nurse paralegals and 4 attorneys – all in addition to the combined resources of the five VLC firms. The VLC opened new, stand-alone offices, hired the necessary personnel, bought furniture and equipment, created and implemented a robust, networked custom database to manage extensive data on our clients, implemented appropriate accounting and financial controls, and performed all other activities associated with running such an organization. The VLC performed intake for and processed 28,815 contacts from all 50 states. After staff paralegals worked 126,000 hours, nurse paralegals worked 10,000 hours, expert/doctors worked 850 hours, and attorneys engaged by the VLC worked 23,300 hours, we had one of the largest dockets of well-screened and trial ready Vioxx cases in the nation. After our intense screening, we filed or tolled 2,249 Vioxx cases, or 7.8% of the cases reviewed. We filed 805 cases in Louisiana, 738 cases in New Jersey, and 80 cases in California. All of this was done in recognition of the substantial financial investment and efforts that would be lost if the VLC was unsuccessful in litigation.

20. In addition to my work in the Texas Vioxx litigation, and preparation for trials in Louisiana, New Jersey, and California, I was involved in four trials, three of which were MDL bellwether trials: *Irvin*, *Barnett*, and *Smith*. *Smith*, one of Merck's selections for bellwether trial, involved one of the VLC's clients. In *Smith*, I personally worked on the jury questionnaire, liaised with defense counsel on various pretrial matters, conducted pretrial discovery, prepared motions to compel discovery, consulted on jury selection, prepared experts for trial, ordered proof, consulted on graphics, debriefed the shadow jury, and attended trial on most, but not all, days. The cost to try *Smith* exceeded $1 million. The only way to justify spending $1 million to try one Vioxx case is that you must represent a large number of clients. I was also involved in the *Schwaller* trial in Illinois, which involved another VLC client. In *Schwaller*, I personally negotiated the agreement with local/co-counsel to secure the case and oversaw the necessary pretrial preparation of the case. The VLC also nominated two other cases for trial, *Cooper* and *Jones*, but Merck struck both cases from the list.

21. Even though *Smith* and *Schwaller* resulted in defense verdicts, the VLC continued to pursue litigation against Merck on behalf of our clients. In fact, at the time the settlement was announced, our consortium was set to try two cases in New Jersey.

22. Judge Fallon ordered a total of five bellwether trials in the federal MDL. Merck secured defense verdicts on all but one case, *Barnett*, which verdict Judge Fallon *sua sponte* set aside as excessive, just a few days after it was handed down.

23. Because these cases presented extreme risks of failure and required such a large investment of time and money to the preclusion of other work, they were not desirable trial cases for many plaintiffs' attorneys. The risk of failure related to difficulty in persuading juries and judges that Merck's warnings were "inadequate," that Vioxx generally increased the risk of cardiovascular injury, that Vioxx caused the CV injury in a particular client, that a client's prescribing physician was not legally responsible (learned intermediary defense), and that a

particular client was deserving of a significant jury award.   The majority of plaintiffs' attorneys would never undertake such cases as trial counsel.

24.   The VLC developed a sophisticated computerized client communication system to ensure that their clients were timely apprised of important developments in their cases.   This system included, among other things, individualized client letters and individual periodic calls to clients.

25.   I certify and declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

Grant Kaiser

SUBSCRIBED AND SWORN TO BEFORE ME on the 9th day of December, 2008.

GERILYN GORDON
Notary Public, State of Texas
My Commission Expires
March 14, 2010

Notary Public in and for the State of Texas