1                   UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  VIOXX PRODUCTS        *        Docket MDL 1657-L
        LIABILITY LITIGATION      *
6                                 *        December 19, 2008
                                  *
7                                 *        9:00 a.m.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8

9
                      STATUS CONFERENCE BEFORE THE
10                    HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:        Herman Herman Katz & Cotlar
                                BY:  RUSS M. HERMAN, ESQ.
14                              820 O'Keefe Avenue
                                New Orleans, Louisiana 70113
15
     For the Defendant:         Williams & Connolly
16                              BY:  DOUGLAS R. MARVIN, ESQ.
                                725 Twelfth Street N.W.
17                              Washington, D.C. 20005

18   Also Participating:        Christopher A. Seeger, Esq.
                                Madeleine Fischer, Esq.
19                              Orran L. Brown, Esq.
                                Lynn C. Greer, Esq.
20                              John Eddie Williams, Esq.
                                Andy D. Birchfield, Esq.
21                              Terry McRoberts, Esq.
                                Matt L. Garretson, Esq.
22                              Patrick A. Juneau, Esq.
                                Dawn M. Barrios, Esq.
23                              Robert M. Johnston, Esq.
                                Elizabeth J. Cabraser, Esq.
24                              Miles P. Clements, Esq.

25

1   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, Room B-406
2                                   New Orleans, Louisiana 70130
                                    (504) 589-7778
3

4

5
    Proceedings recorded by mechanical stenography, transcript
6   produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(December 19, 2008)**

1 

2 

3      **THE DEPUTY CLERK:**  Everyone rise.

4      **THE COURT:**  Be seated, please.  Good morning, ladies

5 and gentlemen.

6           Call the case, please.

7      **THE DEPUTY CLERK:**  MDL 1657, In Re: Vioxx.

8      **THE COURT:**  Counsel, make your appearance for the

9 record.

10     **MR. HERMAN:**  Russ Herman, Your Honor, for the

11 plaintiffs.

12          **MR. MARVIN:**  Douglas Marvin, Your Honor, for Merck.

13     **THE COURT:**  I see we have a full house and also a

14 number of people on the phone.  This is our monthly status

15 conference.  I met with the liaison committee to discuss the

16 agenda with them.  I have the proposed agenda.  I have added

17 some things to it.  I will take it in the order in which it was

18 set forth.

19          First, the Settlement Agreement, any comments on

20 that?

21     **MR. HERMAN:**  May it please the Court.  Judge Fallon,

22 if we could take one thing out of order?

23     **THE COURT:**  Sure.

24     **MR. HERMAN:**  One of our members, faced with a

25 snowstorm, has a report to make on the AvMed issue, Mr. Seeger.

1      **THE COURT:**  Okay.

2      **MR. HERMAN:**  Thank you, Your Honor.

3      **MR. SEEGER:**  Good morning, Judge.  Not to take up a

4  lot of the Court's time, Judge, but since you brought this

5  issue up many months ago, we have spent many, many hours

6  talking and meeting, trying to work through some of the issues

7  that you posed.  We believe we are pretty close.  We are not

8  there to report anything today, but we were all, I think,

9  hoping that maybe if we reached an impasse on an issue or two,

10  if we could get the Court's guidance sometime next week, if

11  that would be okay.

12      **THE COURT:**  Certainly.  I'm available next week and

13  the following week.  This is an opportunity, folks, for both

14  sides to get the benefit of this opportunity.  I hope you seize

15  on it.  Otherwise, it's going to just be a difficult situation

16  for both sides.  There are opportunities here that each side

17  ought to partake of, and I really urge you to give it your best

18  shot.

19      **MR. SEEGER:**  Thank you, Your Honor.

20      **MR. HERMAN:**  May it please the Court.  With regard to

21  the Settlement Agreement, roman numeral I, at page 6 of the

22  report, and also at roman numeral XXIII, a new motion for

23  reconsideration has been filed.  It's noted at the top of

24  page 6, Your Honor.

25      **THE COURT:**  What is noted at the top of page 6?

1          **MR. HERMAN:**  A motion for reconsideration of your

2     order.

3          **THE COURT:**  Right.  I met with the attorneys

4     representing the movant.  As we all know, I set a 32 percent

5     cap on all fees that are to be charged in this matter.  Of

6     course, from that comes any common benefit fees.  The total cap

7     is 32 percent plus reasonable costs so that the claimants

8     themselves would get 68 percent minus reasonable costs.

9               I looked over the country and I noted that some

10    states had less than that, some states didn't mess with it at

11    all, and there were some in between.  I felt in this particular

12    case that the 32 percent was a fair amount.  It's not as low as

13    some of the states and it's not as high as other states, but I

14    felt that that was a good balance to take and I expressed

15    myself.

16              The lawyers representing some of the claimants

17    felt that this was maybe overstepping judicial bounds, that it

18    was up to them to reach an agreement with their clients, and

19    the sanctity of a contract is a part of American law.  For

20    whatever reason, they asked that it be reconsidered.

21              When they take that position, if I do reconsider

22    it and if there is an increase in the fee, then it comes from

23    the clients.  So I felt that at that particular point, on that

24    particular issue, that there was some conflict of interest;

25    they were not in a position to represent their clients on that

1   particular matter.

2              I first thought that, well, perhaps the PSC

3   could represent the other side, but that's not workable either

4   because the people who made the motion had representation on

5   the PSC.  It would be like having one law firm represent the

6   interests of both sides, so that obviously is improper.  I

7   appointed outside counsel to represent the fee interests of

8   those clients.  The outside counsel is the Tulane Law Clinic.

9   They are organizing the staff of professors and students to

10  look over the matter.

11             It's possible that there will be amicus briefs

12  on each side of the issue.  There's some interest in attorneys

13  fees, as you can well imagine, in cases of this sort.  There's

14  a lot of discussion in the country involving MDLs and attorneys

15  fees in MDLs and class actions, so perhaps there will be some

16  amicus briefing on each side of that issue.

17             I will be setting a status conference with the

18  lawyers representing the attorneys who filed the motion and the

19  clinic.  I will set some briefing schedules and argument

20  schedules and we will take it from there.  This may well be an

21  opportunity for a court, the Fifth Circuit or the

22  Supreme Court, to weigh in on attorneys fees in MDL matters and

23  class action matters.

24             I know and you know that Congress is always

25  interested in this with a 1407 provision.  There's always some

1   discussion as to whether or not there should be some caps in

2   that particular statute and also whether or not there should be

3   some caps in the new Class Action Fairness Act.  There's been a

4   lot of discussion on that.  So everybody will be able to focus

5   on this and weigh in on it and we'll see where we go.

6           MS. FISCHER:  Your Honor, may I be heard briefly on

7   one point?

8           THE COURT:  Sure.

9           MS. FISCHER:  I represent the movants on that.

10          THE COURT:  Certainly.

11          MS. FISCHER:  My name is Madeleine Fischer.  I'm with

12  Jones Walker and I represent the movants on that motion.

13              Your Honor, we understand your decision to

14  appoint the Tulane Law Clinic to brief this issue and we have

15  no problem or objection to that.  However, Your Honor has

16  stated that he believes there's a conflict of interest.  We do

17  not believe there's a conflict of interest, and we would like

18  the opportunity to set forth that position in briefing as well.

19          THE COURT:  All right.

20          MS. FISCHER:  Thank you.

21          THE COURT:  Maybe so, but I have appointed them to

22  represent the people.  Maybe you can team up with them and

23  represent the people for the opposite side.  Maybe you can have

24  some of the attorneys at Jones Walker take their side and ask

25  for less and have the other attorneys ask for more and we will

1    put a Chinese wall between them.  The issue is whether it
2    should be more or it should be less.  That's really the issue
3    in the case.

4              MR. HERMAN:  Your Honor, Mr. Marvin correctly pointed
5    out page 5, Mr. Benjamin's June 30, 2008 motion.  Your Honor
6    entered an Order and Reasons on December 11, 2008, denying
7    those motions and requests.  I would like, for the benefit of
8    the record and particularly those listening in, to again
9    indicate that at http://vioxx.laed.uscourts.gov the joint
10   report is posted and at http://browngreer.com/vioxxsettlement
11   information concerning the settlement is available.

12             At page 6, Judge Fallon, we indicate that your
13   orders have been working.  Various folks have reported that
14   there are more medical records and pharmacy records coming in
15   as a result of those orders.  We have a December 30 deadline
16   that's unalterable.  For those in the courtroom and those who
17   look at the Web site, if you have problems with a health-care
18   provider or a pharmacy providing pharmacy records, please
19   advise our office and advise the Court so that we can act very
20   quickly on your request.

21             Your Honor, we have, of course, with us today
22   Brown Greer.  We also have a representative of U.S. Bank to
23   make a report.  Would you prefer to hear from Brown Greer first
24   or --

25             THE COURT:  It doesn't matter.

1         **MR. HERMAN:**  Orran Brown.

2         **THE COURT:**  Yes.

3         **MR. BROWN:**  Good morning, Your Honor.  Orran Brown,

4  and Lynn Greer is with me today.  We are from Brown Greer and

5  we are the claims administrator for the Vioxx Settlement

6  Program.  We are here today, Your Honor, to give our monthly

7  report.

8         We are now primarily focused on claims review,

9  review of the heart attack claims, and payment of those interim

10  payments as they become available.  We are also focused on

11  claims review on the stroke claims, looking ahead to our

12  ability to make interim payments or begin interim payments on

13  stroke claims in February.

14         Today, we will pause briefly on the enrollment

15  phase because we are still trying to clean up the enrollment

16  phase.  We mention it today only because it affects our ability

17  to continue our claims processing.  That's why we want to

18  remind everyone where we are on the enrollment phase because we

19  are looking ahead to not interrupting our ability to do claims.

20         We looked at this last time, Your Honor.  We

21  talked about the number of folks who are enrolled in the

22  program.  This is not really changing much now.  It's more or

23  less finished.  Our enrollment deadline was October 30.  It's

24  passed.  We last time looked at the numbers that showed we had

25  99.79 percent of eligible claimants enrolled.  That number is

1    still around there, slightly above that now, because the number

2    moves around a little bit as we learn more about eligibility.

3    The percentage of eligible claimants who have enrolled is

4    obviously a function of how many eligible claimants there are.

5    Eligibility for lawsuit or tolling agreement by November 9 of

6    last year, or their U.S. citizenship or residence during the

7    injury, at the time of injury, or an eligible heart attack or

8    stroke injury, we learn more about those claimants as time

9    goes, and so this number moves around a little bit.  This is

10   where we were last time, in November, and this is still where

11   we are.

12             We also have picked up a few enrollees.  We had

13   20 late enrollments since November 20.  We and the parties are

14   now looking at each of those.  If they come to us now, after

15   October 30, after the final enrollment deadline date, we are

16   evaluating each one under something akin to an excusable

17   neglect type analysis to see if they should be allowed in.  Of

18   all the folks that we have enrolled, over 91 percent of them

19   enrolled by March 31, which means they are in line to receive

20   the interim payments.

21             What we have left on the enrollment phase to

22   finish this out, there are really two things that I want to

23   mention briefly today.  There are some claimants who are still

24   missing parts of their enrollment package.  That's the missing

25   enrollment documents:  A stipulation of dismissal if they have

1  a lawsuit or a release from a claimant.  The second issue that
2  we have is we are still finishing up the folks who have sent in
3  those documents to us and we have a release and we have a
4  stipulation of dismissal to make sure that they are binding and
5  complete and tidied up and signed by the right people.  We are
6  still working with Merck's counsel and the *pro se's* and the
7  claimants' counsel to get those finished.
8          The reason we mention these now is that both of
9  these issues affect our ability to move the claims of those
10 folks through the claims review process.  We want to make sure
11 that we get this all cleaned up so that we don't delay anyone's
12 claim in the process and don't impair our ability to meet our
13 goal of making the final payments on the heart attack claims by
14 the end of next year.
15         What we are looking at here deals with the first
16 issue.  These are claimants who are missing an enrollment
17 document, part of their package.  This only affects a thousand
18 or fewer people that we think are eligible for the program and
19 need to send us a release or a stipulation of dismissal yet.
20 This is not the deficiency process, not the people who didn't
21 sign the release.  We still need the document.
22         We still need the release or the stipulation,
23 and we need these in or we cannot review a claim from someone.
24 If they don't have a release in and don't have a stipulation of
25 dismissal in, if they have a pending lawsuit, we cannot move

1    their claim through the process, so we need to get this

2    finished.  So we are on a program -- and have been for some

3    time -- to work with the *pro se's* and work with counsel for

4    these claimants to explain what it is we are missing still from

5    their enrollment package, a release or a stipulation, and help

6    them get it to us.

7              This right here, that we are looking at on the

8    slide, is this 4132 report.  It's a template of what we have

9    sent out to the firms about their claimants.  If a firm still

10   has someone who is missing a release or missing a stipulation,

11   we give them a report, list each person and what we have from

12   them and what we don't have.  If it says "not received," we

13   still need it.  We are focusing on the release, the

14   stipulation, and the medical authorization form, which is a

15   necessary component of the enrollment package.

16             We sent out this report to 104 firms that still

17   have one or more people missing part of the package back on

18   December 12.  We are working with them and making calls to them

19   and trying to get this done.  We want these documents in, if we

20   can get them, by December 30.  We know that some of them we'll

21   never get because we still have firms that cannot locate some

22   of these folks, but we are trying to mop this up, clean up

23   people who still need to send us a document so that there's no

24   risk that their claim -- if they have filed it, if they haven't

25   yet completed it -- can move along in the claims process.

1       The other piece of the enrollment phase that we

2   are still finishing out deals with the enrollment deficiencies.

3   Those are folks who have sent us a release or stipulation of

4   dismissal and we and Merck's counsel have been through all of

5   those documents, and there are still folks that have a release

6   or in some cases a stipulation that still has something that

7   needs to be finished.

8       This template report, the 4061, is what we have

9   sent the firms to identify each person that still has an open

10  issue about the formalities or the material aspects of the

11  document that's not tidied up yet.  Over 83 percent of the

12  people who have enrolled in the program have finished all of

13  this.  They have a release and a stipulation that was either

14  clean and perfectly done when it came in or we have been

15  working with Merck's counsel to tell the claimants what was

16  wrong with it and they have since cured it.  So we are still

17  working with about the 17 percent, 7,300 people, that still

18  need to get some of these things finished.

19      A lot of what's left -- you see that R-30, R-37,

20  those are deficiency numbers assigned to each aspect of the

21  document that's a problem.  Those deal with representative

22  capacity issues.  These are always the hardest things to finish

23  about these documents in a program like this or where you have

24  a deceased claimant and the question is:  Is the person who

25  signed the release the authorized executor or representative of

1    the estate?  We have a process in place that allows claimants
2    to keep their claim moving, a procedure that allows them to
3    send us a release signed by a surviving spouse or someone while
4    they open an estate and the claim keeps moving.
5              About a little less than half of our outstanding
6    deficiencies that are left in releases deal with that issue
7    about deceased claimants, so we are trying to help firms clean
8    this up.  We are sending these reports to firms that identify
9    each person.  About 75 percent of these enrollment deficiencies
10   that are left are lodged with about 20 firms that have a lot of
11   claimants.  So we are working particularly with those firms and
12   have a program now to call each firm, walk through each issue,
13   and explain exactly what needs to be done to get these things
14   finished.
15             Again, if folks have a release that's not
16   finished, for the most part, their claims can't move along
17   either.  So we are trying to get this wrapped up and cleaned up
18   so that we can all -- me and the counsel and claimants -- focus
19   just on our claims process.
20             That takes us up to where we are on claims,
21   Your Honor, and Lynn will update us on those.
22        MS. GREER:  Good morning, Your Honor.  Lynn Greer
23   from Brown Greer.
24             Since we were here on November 20, there's been
25   a lot of activity on the claims side, in large part because of

1    firms and claimants who have been successful in getting us what

2    they needed to for us to be able to begin review of their

3    claims.  This slide shows that since last month there are

4    almost 5,000 people who were conditioned or who had incomplete

5    claims packages who have since cured those to be able to allow

6    those claims to join the gate queue.

7              Row 1 shows that as of yesterday there are

8    46,000 claimants whose claims packages have enough for us to be

9    able to at least begin gates review.  Most of these have

10   actually started gates review, but the number has risen

11   remarkably by 4,728 since we were here on November 20.

12             Rows 2 through 6 show the various components of

13   what are incomplete aspects of the remaining incomplete claims

14   packages.  The negative numbers on the far right-hand column

15   again show the movement.  There are, in each of these

16   categories, fewer deficiencies than there were a month ago.

17   So, again, there's been a lot of activity, mostly by firms, who

18   surrounding the November 30 final claims package deadline

19   submitted materials to us.

20             Row 8 shows that in the last month there have

21   been 22 additional firms who have submitted materials, so we

22   are up to 957 firms who submitted materials.  We have 400

23   *pro se's* who have submitted materials, 53 new ones in the last

24   month.

25             Your Honor, starting in the summer, we began

1    issuing notices of incomplete claims packages, as we were
2    required to do under Exhibit 1.5 of the Settlement Agreement.
3    We started with a finite population of over 13,000 people to
4    whom we sent this notice.  It went to 437 firms.  It went to
5    258 *pro se* claimants.  There have been a total of over 9,000
6    incomplete claims packages that were incomplete on or before
7    September 1 that have now been cured.  There are still
8    approximately 3,700 claims packages that are deficient as of
9    this time or still incomplete.
10             Your Honor, several months ago we discussed a
11   possible problem in our posting the notices on the secure Web
12   portals and firms not viewing the notices.  That concern has
13   been alleviated.  Most every firm saw the notices, responded to
14   it.  We also embarked on a program prior to the November 30
15   deadline where our CA contacts, our claims administrator
16   contacts, call each firm for whom we had no record that they
17   had viewed the notice to make sure they understood the severity
18   of the deadline and got in contact with each such firm.
19             However, after the passage of the November 30
20   deadline, we issued the notice of nonsubmitting program
21   claimant.  When we were here last, we described how Exhibit 1.5
22   required us to send three separate notices of incomplete claims
23   package giving claimants a chance to cure those by November 30.
24             In addition to those formal notices, we sent
25   weekly e-mail blast reminders to firms, again prodding them and

1   reminding them of this deadline.  We also told the firms that
2   if they requested an extension to the November 30 deadline, as
3   long as we were convinced that the extension request was made
4   in good faith, that we would grant that.  Nevertheless, as of
5   today there are a total of 1,524 claimants who are technically
6   nonsubmitting program claimants, meaning they have not
7   submitted to us a claims form and an event record or a proof of
8   Vioxx use record.
9              90 of those individuals have appealed that
10  decision.  Most of the appeals deal with claims that, in fact,
11  they have submitted materials by the deadline.  We are
12  researching those, researching our archives.  There are also
13  some issues, Your Honor, where folks filed claims forms
14  electronically, they did that on time, they then asked to
15  unlock those claims forms and never resubmitted those.  So it's
16  showing up in our database as not being a submission, but we
17  are going through those and giving the firms the benefit of the
18  doubt if that's what occurred.
19             We received over 5,000 requests for extension.
20  We received over 5,000 requests in the last month.  Most of
21  those or many of those, at least half of those, we denied as
22  moot requests because they didn't need to request the
23  extension.  They had everything they needed.
24             There are currently 2,077 people who are subject
25  to a timely extension request.  What this means is that they

1    have until December 30 to cure their incomplete claims package.

2    They have been told this.  We have communicated this with them.

3    We are hopeful that many of these claims packages will be

4    cured.  If they are not, then at the end of the month, after

5    December 30, the final row, Row 4, shows there could be as many

6    as 3,600 nonsubmitting program claimants.

7              Once that deadline passes, we will then issue

8    new notices of nonsubmitting program claimants to the folks who

9    had an extension request on file.  They will be able to appeal

10   that.  So by the end of January we should have a better sense

11   of how many claimants are nonsubmitting, and what that means is

12   that they are out of the program.

13             Real briefly, to give a general overview of

14   where we are in the claims review process, again, Row 1 shows

15   that there are still approximately 3,600 uncured incomplete

16   claims packages.  There are approximately 16,500 claims that

17   are in the queue waiting for gates review.  This number has

18   risen.  It's a fluid number because claims come out of the

19   queue and go into review, but about 5,000 claims have been

20   added to this queue in the last month.

21             Row 3 shows that there are approximately 20,000

22   claims somewhere in the gates process.  As I have described

23   before, that process starts with our initial review.  It

24   proceeds with our quality control check of that review.  Claims

25   can be with the gate committee.  It's the part of the process

1    that is the longest part and that's why you see so many claims
2    there.
3                There are 4,000 claims, both MI and stroke
4    claims, currently in the points review process.  Through
5    November, we had paid 3,048 claims.  Next Tuesday, we will pay
6    1,537 claims.  So by the end of this year we will have paid
7    4,585 claimants.
8                We showed this slide last month, Your Honor, for
9    the first time, and this is just an update of what we are
10   finding on the heart attack claims by injury level.  For those
11   on the phone who are unable to see the slides, what we are
12   looking at now, after reviewing thousands of these MI claims,
13   is that the average points value for a Level 1 claim currently
14   is at 222.49 points.  The average points for a Level 2 claim is
15   198.88; Level 3, 149.86; Level 4, 105.90; Level 5, 86.52;
16   Level 6, 56.82; and the special marker percentage is at
17   4.83 percent.
18               Again, the special markers are claimants who
19   have come through the process and either have point averages or
20   point values of less than 10 for a stroke claim and less than 2
21   for -- I'm sorry, less than 10 for an MI claim, and when we get
22   to the strokes less than 2 points.
23               We have issued a total of 5,480 notice of points
24   awards to date.  Of those, there are 90 who have just been
25   issued.  They have accepted.  They did not accept in time to

1   make the December payment list.  These folks will be paid in

2   January.

3               There are 326 who have filed preliminary appeals

4   to their notice.  These appeals first come to us, for us to

5   review, and that percentage is at about 6 percent.  13 have

6   proceeded on towards appeal to the special master.  21 have

7   gone into what is called special review.  Those are the special

8   marker claims, the less-than-10-point claims, who did not want

9   to elect the $5,000 fixed payment.  They are now in a bucket of

10  claims that, after everything is over, will be reviewed by the

11  special master.

12              There are 445 where we have just not received a

13  decision.  Claimants have 15 days after the issuance of a

14  notice of points award to appeal or accept, and so these are

15  just in that 15-day window.  Again, 4,585, or 84 percent, of

16  the 5,480 have or will be paid by next Tuesday.

17              Your Honor, this slide shows a breakdown of the

18  claims that have or will be paid.  There are 4,436 claimants

19  who are nonspecial marker claimants who have or will receive

20  interim payments for a total amount of $392,828,372.  There are

21  149 special marker elections.  These are, again, the lower

22  value claimants who have elected $5,000.  The total special

23  marker money paid or to be paid is over $667,000 for the total

24  claimants 4,585.  This is going to 239 law firms.  The current

25  per point MI value still is at $1,915 and the total dollars to

1    be paid by next Tuesday exceeds $393 million.

2              Your Honor, the pace of the MI reviews, we are

3    still confident and are shooting for the final MI payment next

4    summer.  It depends on a lot of things.  It depends on making

5    these deadlines stick.  It depends on, throughout the process,

6    a good exchange between us and the firms in terms of various

7    deficiencies that may arise in our review of the claims

8    packages.

9              I also want to mention that, hand in hand with

10   the MI claims, we have also done preliminary reviews of over a

11   thousand stroke claims, and we are on target for being able to

12   issue stroke interim payments in February.  Thank you.

13             **MR. WILLIAMS:**  Your Honor, if I may, John Eddie

14   Williams.  I just noted, Judge, that the goal, as stated from

15   my notes from the last meeting, was not fulfilled.  The goal

16   was to pay 2,000 claims by this date and it was approximately

17   1,500 claims.

18             The other thing I note, Judge, is if you total

19   the cases that are in queue for the gates process or that are

20   in the gates review process, those total 36,000 cases, I

21   believe, and that's 75 percent of all the claims,

22   approximately.  I'm rounding this off.

23             So my question, Judge, is -- and I know

24   Brown Greer is doing their very best, but my question is do we

25   or should we be looking -- do we have a hurdle in the process

1   that is stopping things?  I know it's not just Brown Greer.  It
2   has to get through the Bryan Cave law firm that the defendants
3   hired to look at things and it has to get through the gates
4   committee and I don't know -- there's not enough information to
5   decide this, but when I see that the gates process, 75 percent
6   of the claims are either in queue or in the gates process
7   review, that tells me there's a hurdle somewhere stopping those
8   75 percent of the claimants getting to the point where they get
9   paid.  That's what I'm trying to figure out is, you know, where
10  in the process we are having our problem, where in the pipeline
11  is there a blockage.

12          **THE COURT:**  Do you want to respond?

13          **MS. GREER:**  I can respond to that.  First of all, the
14  16,500, I wouldn't call that a hurdle.  Those are just in the
15  queue and most of those were submitted, actually, after the --
16  most all of them, with the exception of about a thousand, were
17  submitted to us after the initial claims package deadline of
18  July 1.  So we have been able to go through our initial gate
19  review for all timely filed claims to about a thousand.  I
20  think we are pulling for initial gate review claims filed at
21  the very end of July 1, which was the initial claims package
22  deadline.  So that queue is just the normal review queue.

23          The gate review hurdle, as you describe it, the
24  19,000, is just the longest part of the process.  There may be
25  a member of the gate committee who can speak to this better

1   than I, but that process is -- from our standpoint the initial

2   gate review goes very quickly.  The QC gate review that we do

3   to make sure -- because it's a threshold matter once it passes

4   the gates.  That is the critical review for us and so we do

5   spend more time there, on the QC review, than we did on the

6   initial.

7            A lot of the firms are now the recipients of our

8   notices of ineligibility, so a lot of -- what I was trying to

9   describe was the length of time of the process.  It's not that

10  all the claims are being reviewed.  It could be that thousands

11  of those are actually in the hands of claimants who have been

12  told, "You have failed gates.  You now have 14 days to submit

13  additional documentation."  We have -- and I wish I had those

14  numbers -- thousands of those notices that have gone out where

15  claimants have asked us for extensions to be able to go get

16  more records so that they can pass gates.

17           So that number -- and I will be happy to break

18  that down further in upcoming months -- includes claims that we

19  are reviewing.  It includes claims that the gate committee is

20  reviewing.  It includes claims that Merck is reviewing to do

21  its first unilateral pushes that they have a deadline that has

22  not yet run to do that on the first batch of claims.  It also

23  includes thousands of claims where the firms know their claims

24  have failed and they are within their right to submit

25  additional documentation.

1          THE COURT:  Well, the difficulty, also, is that when

2     you look at it, you're looking at it from the standpoint of

3     objective material, and so you fail a person and they can't go

4     through the gates.  Then it goes to the gate committee that is

5     made up of both plaintiff and defense lawyers, who look at the

6     matter and try to look at it in a little broader sense.  So

7     it's to the claimants' benefit that they go to the gates

8     committee because they get another review from the lawyers who

9     are interested in this particular case.

10          So, although it takes some time, it's really

11     beneficial, I think, to the claimant as opposed to anyone else,

12     but that's my read on it.

13          MR. WILLIAMS:  Judge, I would just note that where we

14     stand today, we have less than 10 percent of the people -- we

15     have 4,585, which is less than 10 percent -- have gotten their

16     first interim payment.  The goal stated last meeting was 5,000

17     by the end of the year and that's been scaled back.  We haven't

18     made that goal.

19          There was also a representation that we would

20     boost things, the rapidity.  That was said last time, that we

21     would ramp things up, and obviously that hasn't happened.  I'm

22     not faulting Brown Greer at all because I think they do

23     excellent work.  There are numerous hurdles, Judge, and I'm

24     just thinking at some point maybe we ought to be able to break

25     it down and look -- putting aside those things where the

1    claimant is at fault or the claimant's lawyers for not getting

2    the documents, I'm looking at things where people have gotten

3    all the information.  Is our hurdle the gates committee?  Is it

4    the Bryan Cave law firm?  Is it something other than the

5    process?  I'm trying to be an alarmist because we haven't met

6    our goals.

7              **THE COURT:**  Well, one way of doing it is to take the

8    gates committee out and just fail the people.  That would get

9    them through, but then it wouldn't be to their advantage.

10   That's the big problem.

11             **MS. GREER:**  Your Honor, if I can speak to one

12   point --

13             **MR. WILLIAMS:**  How do we speed it up is the bottom

14   line.

15             **MS. GREER:**  Just so that everybody knows, our sense

16   of urgency is just as great.  We evaluate this absolutely every

17   day to make sure that we are moving things along and that all

18   members -- because it's a very collaborative, cooperative

19   effort, this whole process, and that's why we try to urge

20   claimants to do whatever it is that may rest with them and

21   firms to be able to give us information.

22             The goal that we stated last month, it is our

23   goal, obviously, to pay these as quickly as possible, and it is

24   a goal.  We set between 1,500 to 2,000.  The actual daily pace

25   which I have monitored -- the actual daily pace of claims

1  maturing to payment has picked up considerably since November.
2  What we saw in November, we had -- and I broke it down to
3  working calendar days.
4              The number of claims we were able to mature to
5  payment in the November payment cycle was 30 working days and
6  in the December payment cycle, with Thanksgiving and the way it
7  fell when we had to get both the lists to U.S. Bank, was 20
8  working days.  The actual average number of claims per day is
9  much higher and that continues to go up.
10             Just so everybody knows, we do work overtime
11 shifts to try to get this done.  With the seriously high
12 deficiency rate we were experiencing with claims packages, when
13 that November 30 deadline hit, we spent a lot of our resources
14 getting those materials so that we would not have to issue
15 notices of nonsubmitting program claimants.
16             So there's been a lot of activity, while at the
17 same time the daily pace of the points awards is going up, and
18 it is our goal to continue to have that go up so that we can
19 make these payments by the end of next summer.
20        THE COURT:  I think it's also necessary that
21 everybody, from the standpoint of the lawyers, do their best to
22 get the material in in the proper form and fashion because if
23 we minimize the deficiencies that will increase getting through
24 the gates.
25        MR. WILLIAMS:  Judge, my basic point is I think it's

1   a fact that I wrote down last time the goal was 5,000 to be
2   paid by the end of the year and now we hear that that goal
3   has -- we are far short.  We are 10 percent short of that goal.
4   We know that 1,500 to 2,000 a month does not get us through
5   things for 30 months.

6            I would submit that perhaps we ought to have a
7   goal so that we can see.  I'm pointing out we didn't meet our
8   goal last time.  So we get these things about, you know,
9   there's a percent or a number per day or something, but what
10  would be our goal in the upcoming month for number of people
11  paid?  I think that's a reasonable thing for claimants to have
12  that information so we can see what our goal is and see if we
13  achieve it.

14           **THE COURT:**  I think it is, but two things.  One of
15  the reasons they are not getting paid is because the lawyers
16  are not submitting the material.  Secondly, one of the reasons
17  they are not getting paid or a lot of them going through the
18  gates is because the process favors getting through the gates.
19  If they get through the gates the first go-around, from an
20  objective viewpoint, they clear up.

21           If we just use the objective viewpoint, there
22  would be no bottleneck because you either get through it or you
23  don't get through it, but there has been created a second
24  opportunity to get through by having lawyers look at it and by
25  them having a broader view at it.  So that complicates it and

1   makes it a little more of a bottleneck.  One way of doing it is

2   to do away with the gates committee, but I don't know whether

3   that's going to be helpful to the litigants.

4           MR. WILLIAMS:  But if we have no goal, we don't have

5   a standard to test it by.  I think it was good that we had a

6   goal, and we know that we didn't make the goal.  I don't know

7   the reason.  My point is that, if we have a goal, we can start

8   to study why we don't reach that goal to see if there's a

9   solution to the bottleneck.

10          THE COURT:  Well, the only problem is you have to

11  recognize that the way to make the goal is to do away with the

12  appeals process.  That will shorten the process.  It's just

13  like litigation.  If you take out the appeals, we have no

14  backlog.  It's the appeal and the going through the process

15  that creates a backlog.  You can do away with the appeal

16  process.  That's one way of doing it.

17          MR. WILLIAMS:  Even if it's the appeals that are

18  causing the backlog and us not to achieve our goals, that gives

19  us that information.  What I'm just saying is if we have a

20  goal -- and I don't know that it's the appeals.  The Court may

21  know better than I do.  All I'm saying is if we have goals, and

22  then we can look, start to study where in the process, why we

23  aren't reaching our goals, is my only thing.

24          THE COURT:  That's a good point.

25          MR. BIRCHFIELD:  Your Honor, if I could just address

1    what Mr. Williams describes as failure to meet the goal, there
2    are a couple points there.  One, as far as Brown Greer
3    processing the claims to meet that goal, we were there.  But
4    once someone receives a points award notice, they have several
5    options.  One, they have a period of time to evaluate and
6    decide if they want to appeal or if there's additional
7    information that needs to be submitted.  When you factor those
8    in, the ones that were available, if they had immediately
9    accepted their points, then we would have been at our 5,000
10   mark.  We would have met that goal.
11               So failing to meet the 5,000 is in part because
12   we wanted and structured the settlement to provide clients and
13   their lawyers the opportunity to evaluate the claim and make
14   sure that they are comfortable with it and did not want to
15   appeal.  We built that in.  That's one reason why we didn't
16   actually pay 5,000, but there were 5,000 that would have been
17   available to be paid had they elected to accept their points
18   awards and receive their interim payment.  Instead, some chose
19   to appeal it.  Some wanted additional time to consider it and
20   they will be moved to the January payment.
21               Another important part of this is that there
22   were a thousand cases evaluated for strokes that are not
23   included in the number that are being paid because those
24   interim payments will not start until February.  Brown Greer's
25   pace is on track to make the final MI payments in the summer.

1          There is not a bottleneck at this point,

2     Your Honor, with the gates committee.  We recognize that it's

3     an important role, as you have pointed out, and that's a role

4     that we are taking seriously.  We recognize the load that is

5     currently there and that will be coming, and we are prepared to

6     step up to meet those goals on a timely basis.

7          **THE COURT:**  All right.  The observation is that we

8     ought to have some goals to know whether we are meeting them or

9     failing them.

10         **MR. HERMAN:**  May it please the Court.  Your Honor, we

11    have met the goal.  The analysis is that, in fact, the 5,000

12    were met.  In addition to that, we can't control if lawyers

13    don't tag the gate material in the thousands of sheets of paper

14    that they submit.  My purpose for speaking now is that

15    Brown Greer has done a superb job given the complexity of a

16    nonclass action settlement that's unique.  This matter has

17    moved as swift as any matter in my experience, and I commend

18    Brown Greer.

19         As far as the gates committee is concerned,

20    Your Honor has correctly observed if you have a chemical

21    pipeline without a safety valve, some people are going to get

22    injured.  We appreciate the cooperation that the members of the

23    gates committee and Brown Greer have given in this process.

24         The main issue is, when you talk about goals,

25    how do you set a goal when every lawyer and judge in this

1    country, if you want a goal for next month, knows that there's

2    a dark hole between December 20 and around January 10, where

3    it's very difficult to get any work done in any process.  I

4    think that by the next time Your Honor has a status conference

5    you're going to see a significant increase in the number of

6    claims.

7                I might point out, as liaison counsel, we have

8    had less than five complaints about this process since it

9    began, and we keep track of them.  So obviously the lawyers out

10   there are doing their job.  I'm sorry some lawyers don't

11   believe it's moving fast enough, but Brown Greer should not

12   have to take it on their shoulders to set a goal every month

13   and particularly under the circumstances that we are operating.

14          **THE COURT:**  Let's do it this way.  Next time, when

15   you give us a review, let's have a projection as to what you

16   anticipate coming up next time.  We'll see where we are with

17   that.

18                Let me make a comment.  Orran said something

19   about the problem with the state courts appointing or not

20   appointing a particular representative in the event somebody

21   dies and, as we know, needs a special representative or an

22   administrator or something of that sort.  Let's not have that

23   create any serious problems because, under 17(c) of the Federal

24   Rules, I can do something about that.

25                It says "a minor and/or incompetent person who

1   does not have a duly appointed representative may sue by next

2   friend or by guardian *ad litem*.  The Court must appoint a

3   guardian *ad litem* or issue another appropriate order to protect

4   a minor or incompetent person who is unrepresented in an

5   action."

6              I can interpret that to appoint someone guardian

7   *ad litem* to receive the funds.  We'll put those funds in the

8   registry of the Court or in some place, to then be distributed

9   at the time the state court appoints the appropriate person.

10  We'll get them through the gates and we'll get them through

11  your program and have some other place for them to be.  That

12  would be workable, I would think, so let's keep an eye on that.

13  The lawyers who have that problem, let's think about filing the

14  appropriate motion so I can handle it under 17(c).

15              MR. BROWN:  Yes, Your Honor.  It's Orran Brown again.

16  Thank you for that.  We have been considering that sort of

17  procedure.  We have been working with the parties.  There is

18  our own procedure, Claims Administration Procedure 2008-1, that

19  allows claimants to keep their claims moving without a formal

20  appointment.  We are trying to clean this up and, for the most

21  part, it's working.

22              Two things worth mentioning, Your Honor, and

23  then I am going to set up the process here for the U.S. Bank to

24  make its report.  One thing to clarify, the Bryan Cave firm

25  that has been working on the enrollment deficiency documents,

1    they are caught up.  They have been through all those

2    documents, and now what they review are cure documents that

3    come back to us, go to them, when people are sending in

4    something to fix something wrong in a release.  They are caught

5    up with that.  They do it now on almost the same day, so that's

6    not a delay.  It's been a long, tedious process, but they have

7    plowed through all of this.  That firm, as Merck's counsel, is

8    not involved in the claims process or gates process at all, so

9    that's not an issue or hurdle for anyone going forward in the

10   claims process.  They are caught up and have done a ton of work

11   to get us to the point where we are.

12               The other thing worth mentioning again, as

13   Mr. Herman pointed out, is having the documents that come to us

14   highlighted and segregated as to drug proof, as to the parts of

15   the claim, is a tremendous help to speed up the claim that goes

16   through the process.  That is something that we obviously

17   encourage firms to do.  It does keep the process oiled and

18   moving a lot better.  Unless the Court has any further

19   questions of us --

20          **THE COURT:**  No.

21          **MR. WILLIAMS:**  Judge, I again compliment everybody

22   for their hard work on this.  I just think that goals make

23   sense and that accountability and monitoring the situation

24   benefits everyone.  That way the Court will see and claimants

25   will see if there is something in the pipeline that we can fix

1   to streamline things at all.  Again, I get back to

2   accountability and monitoring and goals.

3          **MR. BROWN:**  Your Honor, we'll be ready next session

4   to address this even further.

5          **THE COURT:**  Okay.  Fine.  Let's go to the bank.

6          **MR. HERMAN:**  Orran, thank you.

7              May it please the Court.  U.S. Bank is the

8   depository for funds.  Given the financial market situation

9   among major banks, U.S. Bank is here to report on the soundness

10  of the bank and the funds and how much funds they have received

11  in escrow, how much have been paid out.  I would like to

12  introduce Terry McRoberts, who is an executive vice president

13  of the bank, who will make that representation.

14         **THE COURT:**  Mr. McRoberts, thank you for being here.

15  As you can imagine, the Court, as well as counsel, as well as

16  the litigants, are concerned about what they have been reading

17  in the newspaper.  You have nearly a billion dollars, or at

18  least half that much, in your bank.  We wanted to make sure

19  that when these people pass through the gates their check

20  doesn't bounce.

21         **MR. McROBERTS:**  Absolutely, Judge.  It's an honor to

22  be here.  Thank you for inviting us back again to report on the

23  status.  I think the first time we were here was prefunding and

24  certainly pre any distributions that were going on, so we have

25  had a lot of activity that we can report on now.  Given your

1    preliminary comments, I did want to take a few moments to talk
2    about U.S. Bank since the overall bank itself is important to
3    our depository and disbursement and escrow duties.
4              Since the credit crunch hit last year, only a
5    few banks have managed to maintain their equillibrium and one
6    of those has been U.S. Bank.  We have achieved this through
7    conservative, well-documented lending.  We have had a strong
8    credit culture which has resulted in our pristine balance
9    sheet, and we have an income stream that's more than 50 percent
10   based on fees revenue.
11             We continue to enjoy high ratings from both S&P
12   and Moody's of AA, which is what we were last year and the year
13   before, so we have had no reduction in our ratings.  U.S. Bank
14   has $247 billion dollars in assets and over $40 billion in
15   market cap, which makes us one of the sixth largest banks in
16   the country.
17             More important than our size, we have earned
18   more than $1.5 billion in profit in the first nine months of
19   2008, and the board just approved our quarterly dividend to be
20   paid out on January 15, 2009.  Our performance metrics are
21   simply the best in the industry.  So these are very different
22   resultants in the year 2008 than what we all read about in the
23   financial press for the industry.
24             U.S. Bank actually benefited greatly from the
25   recent economic and market turmoil.  We have become the "flight

1   to quality" bank, as we are frequently referred to in the

2   industry.  Again, unlike reports that we read and hear daily of

3   unfortunate demise, dividends being cut, and employees being

4   fired, U.S. Bank has actually added 4,000 employees over the

5   past year and we continue to invest in our products and

6   services.  As a result of our stability, we are able to

7   continue to focus on our clients and on our services as a top

8   priority.

9           In terms of the escrow, the investment vehicle

10  set up for the Vioxx escrow is highly rated and safe.  It's AAA

11  rated by both rating agencies.  It has a daily liquidity with

12  about $13 billion today in the fund in assets.  It has no

13  market fluctuation in that it maintains a $1 net asset value

14  each and every day.  The portfolio is composed of government

15  agencies and repurchase agreements.  As a belt and suspenders,

16  the fund has been put under the Treasury guarantee program for

17  money market funds.

18          In terms of the escrow activity, I can report

19  the following transactions from the claims processing, claims

20  payment side.  On August 5 we received $500 million, for those

21  on the phone that can't see the slide, $500 million on

22  August 5, which was placed into that government obligation

23  money market fund, where it resides as the host investment

24  vehicle.

25          On August 28 we disbursed $15 million and did an

1   additional $300,000 as an accommodation on August 29.  On

2   September 22 we did a $52.8 million distribution.  On

3   October 23, $36.2 million.  Per the agreement, Merck further

4   funded the escrow at $250 million on October 27.  On

5   November 25 we disbursed $144.2 million.  On December 23 we

6   will be ready to disburse an additional $146 million.  So, as

7   you can see, money is getting out the door.  Also reflected on

8   this slide under ICG fees are the claims processing fees that

9   U.S. Bank charges for our services.

10              The MI settlement escrow account has earned

11  interest monthly.  This fund pays out a monthly interest as it

12  sustains its $1 net asset value to principal.  In August the

13  interest paid and collected in the escrow was $671,000;

14  September, $714,000; October, $550,000; and November, $619,000.

15              Obviously, Your Honor, the rates are going to be

16  decreasing here with money market rates and Treasuries and

17  Treasury obligations being reduced in rate, but the escrow will

18  continue to earn some handsome interest that goes right back

19  into the escrow.  In terms of the balance in the account as of

20  12-9, we have $501.4 million currently being held in the money

21  market deposit account that I described for the investment.

22              The escrow and disbursement process I can report

23  is running very, very smoothly, Your Honor.  In compliments to

24  Brown Greer, who is our input window in terms of the process,

25  their excellent work and cooperation have made our job as a

1   disbursement agent, an escrow agent, that much easier.  We
2   appreciate working with them.  Their professionalism and their
3   work product has made our job much easier to get the money out
4   to these beneficiaries.

5                   I did want to comment on the U.S. Treasury Asset
6   Relief Program, commonly known as TARP, that many or most of
7   you probably read about.  U.S. Bank did participate in the U.S.
8   Treasury program, again commonly known as TARP.  Even though we
9   didn't need the relief, as our balance sheet was and continues
10  to be very strong, we were persuaded to participate.  This does
11  help us to engage in more lending.  It does help us to invest
12  in future growth, as well as acquisitions that are going to be
13  necessary as we go through the first half of 2009, and enhances
14  our ability to just generally support the credit services
15  activities to try to get things back to a normal basis.

16                  U.S. Bank is operating from a position of
17  strength.  Our balance sheet is very strong.  We have strong
18  capital.  We have strong revenue flow.  The bank is very
19  stable.  So in conclusion, Your Honor, I am pleased to report
20  that both the bank and the escrow are safe and sound as we sit
21  here today.  I'll be certainly available for any questions or
22  comments anyone has.

23              **THE COURT:**  Okay.  Thank you very much.  I appreciate
24  you being here.

25              **MR. McROBERTS:**  Thank you.

1           **THE COURT:**  Let's get back to the agenda.

2           **MR. HERMAN:**  Yes, Your Honor.  Page 7.  Matt

3    Garretson is here.

4           **MR. GARRETSON:**  Your Honor, I'm Matt Garretson with

5    The Garretson Firm to give the report as the lien resolution

6    administrator.  Again, this month I will be short and sweet and

7    get to the point, just give you the highlights.

8                 With respect to Medicare, we are still sorting

9    out about 2,500 changes in data that require us to reverify

10   certain information with the Centers for Medicare & Medicaid

11   Services.  During this time that those items are being

12   reverified, the cases associated with those data points will be

13   on hold.  It hasn't caused, as I will get to in a moment, a

14   terrific backlog, but I just want to alert counsel that, again,

15   any holds on any case that would otherwise be approved are

16   likely due to a change of Social Security number or data.

17                I also want to report on the status of claimants

18   and their requesting a redetermination of their category for

19   purposes of the Medicare reimbursement plan.  To date, of 3,000

20   approved claims, we have only received 49 requests for

21   redetermination and those appear to be handled -- well, it's a

22   proof process, where they are able to show that they should not

23   be participating in a certain category because they had another

24   primary payor.  So that process seems to be going very well.

25   With 49 out of 3,000, it appears we are only having a

1   redetermination rate of about 1.5 percent.

2                  With respect to Medicaid, I think the good news

3   to report this month is that Texas, who we have spent a lot of

4   time speaking about at these hearings, has agreed in full to

5   the resolution protocol, and I thank Your Honor for the

6   assistance in that regard.

7              **THE COURT:**  Well, I appreciate Texas coming aboard.

8   I particularly appreciate the work and the help of the Attorney

9   General of Texas, as well as the Governor's Office.  They were

10  both very helpful and the Court appreciates their cooperation.

11             **MR. GARRETSON:**  Absolutely.  On the topic of

12  Medicaid, with respect to claims data, we continue, as I report

13  each month, to get in the data from the 53 state and territory

14  Medicaid agencies.  We have received data from 40 of the 53

15  agencies.  That's up from 37 last hearing.  We have secured

16  close to 8,200 individual claims files, which is up from 5,750

17  last hearing, which is a good clip.  This represents greater

18  than 50 percent of all the files that contain Medicaid liens.

19  As you would imagine, that will continue to move very rapidly

20  as some of the larger states are beginning to provide us their

21  data.  Texas and California have begun to do that, which are

22  the largest states, and so those numbers will catch up quickly.

23                 So, in sum, I continue to be pleased with the

24  process.  I think, as kind of a testament to the resolution

25  protocols and procedures the Court has helped implement, that

1    we have been able to approve for payment 98.5 percent of the

2    claims that have been approved for payment to date by

3    Brown Greer.  Thank you, Your Honor.

4            **THE COURT:**  Thank you for your work.  It's very

5    helpful.

6            **MR. HERMAN:**  Special Master Juneau is here to report,

7    Your Honor.

8            **THE SPECIAL MASTER:**  Your Honor, Patrick Juneau,

9    special master.  As indicated by one of the charts earlier,

10   there have actually been 13 appeals.  All but one of those

11   cases has been looked at pretty closely already.  I can report

12   to the Court that I have coordinated and talked to the two

13   deputy special masters.  We anticipate within the next two

14   weeks there will actually be rulings in all 13 cases, so there

15   won't be any delay in that regard.

16           We continue and have initiated a process that we

17   have communications between the three of us so we can develop

18   some degree of uniformity, consistency, and understanding of

19   the process to be followed.  I can also report to you that we

20   have completed and have met with Brown Greer and had extensive

21   training now in all phases, including the stroke aspect of the

22   case.

23           The last comment that I will make -- and

24   Mr. Williams was inquiring about the process.  In our last

25   appearance with a meeting with Brown Greer, I, along with

1    Brown Greer, inquired and will continue to inquire about the
2    developmental processes and the review process, including the
3    gate committee, the review process.  I'll say this to
4    Mr. Williams and anybody else involved.  We took it upon our
5    own selves -- I know I did for sure, and Brown Greer was
6    intimately involved in it -- and we are looking at the actual
7    processes that are in place all through the process to make
8    sure that if there's a glitch in that process that we change
9    that up.  We even have ideas about that.
10                 I think those are things that have to be
11   addressed, continue to be addressed, and have to be looked at
12   on a continuing basis because it is true that, with the
13   complexity and the number of people in claims, the number of
14   attorneys involved in this case, it's very easy to create a
15   hole.  I'm reporting to the Court that there is an island of
16   people outside, not even reflective in the protocol that's
17   established, to keep that process moving.  We are talking about
18   things that maybe can assist in that regard.  So I concur in
19   the concern, I concur in the effort because I think everybody
20   is trying to achieve the same goal, and I think we will be able
21   to do that and increase that rapidity.
22                 I know it sounds like Christmas bouquets for
23   Brown Greer, but they were extremely cooperative with us -- and
24   I echo the thoughts of the other two deputy special masters --
25   in bringing us on line electronically to get this done in a

1    rapid fashion, which we anticipate being done in the next two

2    weeks.

3            THE COURT:  That's one of the reasons I have monthly

4    meetings, so that we can keep up, and I think the monthly

5    meetings serve a purpose of keeping us focused on issues.  When

6    we do have a problem, we are able to solve it before it gets to

7    be a crisis.  Thank you for your efforts.

8            THE SPECIAL MASTER:  Thank you very much, Your Honor.

9            THE COURT:  The next item is state court trial

10   settings.

11           MR. MARVIN:  Your Honor, with respect to that item,

12   there are no cases set for trial in the state courts through

13   June 30.  Ms. Snapka reminded me this morning that in the *Garza*

14   case the court of appeals reversed its prior ruling,

15   overturning the verdict, and has remanded that case for trial.

16   Merck is considering an appeal.  I don't think a trial date has

17   actually been set yet.

18           MS. SNAPKA:  That's correct.

19           THE COURT:  Okay.  Thank you.

20           MR. HERMAN:  Your Honor, we have worked with Merck on

21   motions for class certification dismissals and expect to submit

22   a joint order for your consideration next week.

23           THE COURT:  All right.  On discovery directed to

24   third parties, anything?

25           MR. HERMAN:  Your Honor, no issues regarding that.

1          **THE COURT:**  State Liaison Committee, anything?

2          **MR. HERMAN:**  Ms. Barrios will report, Your Honor.

3          **MS. BARRIOS:**  Good morning, Your Honor.  Dawn Barrios

4    for the State Liaison Committee.  I was able to provide both

5    the Court and the parties our holiday box set of remand CDs

6    that includes all the pending remands.  We also have on that

7    chart, Your Honor, the list of cases in the government actions

8    and then the list of cases, the third-party payor and consumer

9    cases, because those three categories are really the only cases

10   you have open and left on the MDL docket.

11          I do have to echo Mr. Juneau and everyone else's

12   sentiments about Brown Greer.  We have been working with them

13   and they have been very diligent in assisting us to determine

14   how many remands will be alive and well after the whole claims

15   process.  We exchange e-mails and lists with them monthly and

16   we are on target with that.  I hope in January to be able to

17   give you a full report as to details.  Likewise, I want to

18   thank Mr. Johnston's office.  The curator has assisted us

19   because many people with remands are *pro se* and so he helps us

20   with that as well.

21          My major report today, Your Honor, concerns the

22   additional assignment of the coordination of the governmental

23   action cases.  As you know, we had a very productive status

24   conference before Your Honor yesterday.  I would like to report

25   that after the status conference we went to Mr. Herman's office

1    and we were able to negotiate the confidentiality order that we

2    spoke of yesterday with the PSC.  I have already gotten e-mails

3    about it today from Mr. Fox.  I will be dealing with Merck on

4    exchanging those versions with them.  I would like to thank

5    both Randy Fox and James Young from Florida.  They are the two

6    attorneys who were in charge of actually drafting that order

7    for Your Honor's signature.

8              As for the scheduling order prepared for Merck,

9    we will be speaking with the PSC about issues regarding that.

10   I would like to thank the people who have volunteered to be on

11   that committee to assist with the scheduling order.  That's

12   Mr. Lanier's firm, particularly Catherine Heacox and Rick

13   Meadow for the states of Alaska, Colorado, Utah, and Michigan;

14   Erik Shane for some counties in New York; Randy Fox for the

15   state of New York; Vince McKnight for D.C.; Dave Dickens for

16   Montana; and Sheila Bossier from Mississippi.  We are hard at

17   work on trying to get that scheduling order.

18             **THE COURT:**  Fine.  Thank you.  I'm beginning to focus

19   on the cases that have not resolved to begin to finalize

20   discovery on those cases and then to begin to set up some

21   method of trying those particular cases, determining where to

22   try them and how to try them.  I met with the attorney generals

23   yesterday, with counsel, and at least began the process.  I

24   focused them on issues of common interests.  Hopefully, they

25   can find some benefit from this forum.

1               We have dealt with this case now since
2     February 16, 2005.  We have had six trials.  9 million
3     documents have been produced.  I have ruled about 1,000 times
4     on preliminary issues.  There are trial packages and some
5     common issues that I think they can benefit from in this forum.
6     I discussed that with them and dealt with some issues of trial
7     package and accessibility to databases.
8               I'll be focusing with them shortly on some
9     methods of trial so that we can deal with those issues if trial
10    is necessary and also their remand motions.  I will, in time,
11    consider those too.  Presently, I'm looking at common issues,
12    I'm looking at common discovery, I'm looking at common
13    arguments, things of that sort, that this Court can be of
14    assistance to everyone.
15              Also, with the third-party payors, that's
16    important too.  They ought to get together with the attorney
17    general group and see whether or not there's some common
18    interests there.  If there are, we can deal with those common
19    issues, and then I will direct my attention on the payor cases
20    and have a status conference with them and see how we can go
21    about trying those cases.
22              There are some cases that will be sent back to
23    other federal courts because they were not filed here.
24    Judge Motz is the chair of the inter-circuit committee and I
25    will be contacting him to schedule my moving to New York.

1   There are some other areas that I will move out there and we

2   will try some cases in that particular area.  Hopefully, we

3   will be able to do them in the same way.  I'll find the cases.

4   I'll see if we can package the cases into various compartments,

5   and then we will try some bellwether cases and take a look at

6   them after that.  That's some methods that I'm focusing on

7   presently.

8               *Pro se* claimants.

9               **MR. JOHNSTON:**  Your Honor, Bob Johnston, curator for

10  the *pro se* claimants.  Since the last status conference, we

11  have had some increase of activity.  On December 8 we sent 262

12  reminder letters to the *pro se* claimants who had incomplete

13  claim packages and who may have requested relief from the

14  deadline.  As the Court knows, Merck has filed a motion to

15  dismiss numbers of cases that include about 44 *pro se*

16  claimants.

17              The order to show cause, which was filed on

18  December 10, provides the *pro se's* with my name, telephone

19  number, who to call.  As the Court can imagine, it has

20  triggered many calls.  What we have done is to do our very best

21  to try to assist those *pro se's*, explaining what the situation

22  is, what their responsibilities are, the deadlines that are set

23  forth in the Court's order.

24              Just to try to give the Court a basis for

25  appreciating how we log all of this in, we had one from

 1    yesterday in which we got a phone call from one of the *pro se's*
 2    that said he had been formerly represented by counsel.  He was
 3    told that his case didn't meet the requirements for the
 4    Settlement Agreement.  As you might expect, he wanted to pursue
 5    his federal suit and requested a copy of Pretrial Order 28 so
 6    that he could respond to Merck's motion to dismiss.
 7                   We sent him this.  We sent him information.  We
 8    did the very best we could to give him a clear communication of
 9    what his responsibilities were.  We logged this into our
10    communications log, which will obviously be available to show
11    the efforts that have been made in our system to try to assist
12    the *pro se* plaintiffs.
13                   I don't think there's anything else.  You're an
14    advocate for efficiency, so I don't have anything else to say
15    unless you have any questions.
16         **THE COURT:**  No.  I appreciate your help on this.
17    Part of the process is to make sure that people have access to
18    the system.  That's a big thing.
19         **MR. JOHNSTON:**  We understand our role, and I think
20    that we have tried as efficiently as we can to assist these
21    people.  Thank you.
22         **THE COURT:**  You sure have, and I appreciate your
23    help.
24                   Merck's motions.  Next item.
25         **MR. MARVIN:**  Your Honor, there's no change there.

 1          **THE COURT:**  Issues relating to Pretrial Order 9.

 2          **MR. MARVIN:**  No issue, Your Honor.

 3          **THE COURT:**  Vioxx statistics, anything?

 4          **MR. MARVIN:**  No, Your Honor.  There's no change

 5   there.  After the end of this quarter, Merck will be reporting

 6   on the fourth quarter, and we will be able to update those

 7   statistics at that time.

 8          **THE COURT:**  I think in the future, not necessarily

 9   the next one but the beginning part of the year, we have got to

10   now focus on what's left.  There are three categories:  The AG

11   cases, the third-party payors, and the cases that haven't opted

12   in.  We have to look at those and first build a census and see

13   how many we are looking at and then see where they are and the

14   issues.  We'll deal with whether there's any more discoveries

15   necessary; and, if not, then they should be set up for trial so

16   we can process them.  Hopefully, we can get through the whole

17   litigation by next year.  Thank you.

18          **MR. HERMAN:**  Your Honor, with respect to the trial

19   package, roman numeral XIII at page 11, if I may, Your Honor, I

20   want to combine that with roman numeral XXII.  At the direction

21   of Your Honor, there were 106 individual firms of lawyers that

22   have applied for common benefit.  On December 1 the allocation

23   committee heard oral presentations in Atlantic City,

24   New Jersey; on December 2 in New Orleans, Louisiana; on

25   December 3 in Houston, Texas; on December 5, 2008 in

1   Los Angeles.  56 firms appeared to give presentations.

2             During the course of those presentations, we

3   learned that there were a number of expert reports and other

4   analyses that had not, for one reason or another, been found in

5   the depositories.  We requested those.  Those are going to be

6   utilized by the trial package committee and integrated into the

7   trial package and prepared to discuss trial package issues with

8   representatives of the AGs and third-party payors.

9             As I indicated to Your Honor, I wanted to state

10  on the record we feel, because of our position as liaison and

11  the other positions, we would be in a potential conflict in

12  representing, our firm would, attorneys general or third-party

13  payors.  Therefore, in the two cases we had been sought to be

14  joined as co-counsel, we are withdrawing.

15            That takes us through, Your Honor, motions by

16  Merck at page 12.  I'm sorry.  The third-party payor cases at

17  roman numeral XIV at page 12.  I believe Ms. Cabraser earlier

18  met with you and has agreed to coordinate with the AGs.

19            **THE COURT:**  Anything further on that, Ms. Cabraser?

20            **MS. CABRASER:**  No, Your Honor.  We have met.  We

21  continue to meet and coordinate.  We have intersecting

22  interests, obviously, with the AGs.  To the extent that the

23  public and private payor claimants can get together on proposed

24  orders, stipulations, and agreements, we will do that.

25            **THE COURT:**  Okay.  You have to begin thinking about a

1    grouping.  Let's see how many there are and whether or not they
2    can be grouped by issue or by portion of the country or
3    something of that sort so that, if a trial is necessary, we
4    would be able to at least do some bellwether trials on those
5    issues.
6         **MS. CABRASER:**  Yes, Your Honor.  We will do that and
7    we are under way on that process.
8         **THE COURT:**  Thank you very much.
9              There was mention of roman numeral XXII, which
10   is the fee allocation committee.  I have appointed a fee
11   allocation committee to look into the fee aspect of the case.
12   I have also been meeting on a number of occasions with the CPA
13   who I appointed at the outset to collect data and other
14   information.
15             The CPA has been preparing reports for me to
16   look at.  I have forwarded copies of those to my colleagues in
17   the state court to keep them advised of it.  It's to some
18   extent an ongoing process because the lawyers are beginning to
19   sharpen their documentation and things of that nature.
20             I recognize that some of them, in addition to
21   documenting their fee and common benefit costs, need to express
22   themselves.  So I asked the committee to set up an opportunity
23   for any attorney who did any work in the MDL to be able to meet
24   and present their case, so to speak, and supplement their
25   documentation with any oral presentations.  At my request the

1    committee has come to New Orleans.  They have gone to Houston.

2    They have gone to California and New Jersey, I think --

3          **MR. HERMAN:**  That's correct, Your Honor.

4          **THE COURT:**  -- and have announced it.  I announced it

5    on my Web site.  Some 50 or 60 lawyers came forward and made

6    their presentations.  All of this has been recorded.  So that's

7    going to be important to me when I look at deciding the total

8    amount of the common benefit fees and costs.

9               What I see happening at this level is that when

10   that is completed and when the total material has been

11   collected by the CPA and organized in some form or fashion that

12   I'm comfortable with, then I expect the allocation committee to

13   present to the Court a motion and order seeking common benefit

14   fees and costs.

15              When they do that, I will post it on the Web

16   site.  I will give anybody an opportunity to object to it.  I

17   will set oral argument.  I'll hear from the committee and any

18   objectors, as well as any other people who have an interest in

19   it, and then I will make a decision on that and at that point

20   the total amount will be determined.  Who gets what then will

21   be focused on next.

22              I'll look to the fee allocation committee to

23   make the first recommendation.  They will make a

24   recommendation.  I will post that and give everybody an

25   opportunity to look at it, question, make some sense of it, and

1  then make objections to it.  I will set those objections and

2  deal with those in some form or fashion.  I will either appoint

3  another outside group, maybe the special masters that I have

4  appointed so far, and I will garnish that group with an

5  attorney, perhaps a former U.S. Attorney, to be of assistance

6  to them.  I expect that group, then, to take some testimony

7  from the individuals involved and pursue their positions that

8  way.

9              That will then be given to me.  I will have the

10  benefit of the fee allocation committee.  I will also have the

11  benefit of the remarks of the opposition.  I will also have the

12  benefit of the special masters.  Then I will make the decision

13  as to who gets what.  That's the way I see it.

14              Next item.

15        MR. HERMAN:  Your Honor, there's a motion at roman

16  numeral XV at page 12 to dismiss foreign individual cases.

17              Do you want to address that, Doug?

18        MR. MARVIN:  It's pending before the Court,

19  Your Honor.

20        THE COURT:  Okay.  That will be submitted.

21        MR. HERMAN:  With regard to third-party payors'

22  motions, on November 17, 2008, the United States Court of

23  Appeal for the Fifth Circuit concluded that the district court

24  did not abuse its discretion in denying AvMed motions, and

25  Mr. Seeger has discussed earlier ongoing discussions.

1          Roman numeral XVII, the Greater New York Benefit
2   Fund issues were argued before Your Honor yesterday and that
3   matter is now under advisement by Your Honor.
4          **THE COURT:**  I will be ruling on that unless the
5   parties tell me that they want to determine whether or not they
6   want to fold that into the AvMed, but otherwise I will be
7   ruling on that shortly.
8          **MR. HERMAN:**  Thank you, Your Honor.  With regard to
9   roman numerals XVIII, XIX, and XX, they are all Merck motions.
10  If Your Honor --
11         **THE COURT:**  We'll take those after this meeting is
12  over.
13          Decision Quest, anything on that?
14         **MR. HERMAN:**  With respect to roman numeral XXI, we
15  have had several meetings with Decision Quest.
16         **MR. CLEMENTS:**  Good morning, Your Honor.
17  Miles Clements for Decision Quest.  We are working within the
18  protocol which has been outlined and which we have been
19  requested to do, and any further matter we would pass this
20  morning.
21         **THE COURT:**  I think that's the way to go about it.
22  The people who know what you have done and how well you have
23  done it are the people you have done it for.  When you work out
24  something with them, then they are in a position to look to the
25  PSC to get some common benefit relief.  I think that's the way

1    of doing it.  If you deal with the PSC, they are not close

2    enough to it, at least in some instances they are not, so I

3    think the right way to do it is the way you are doing it.

4              MR. CLEMENTS:  Yes, sir.  Thank you.

5              MR. HERMAN:  I want to thank Mr. Clements -- who I

6    misidentified earlier this morning, who I have known for some

7    years -- for his cooperation.  He has met several times with

8    us, brought his clients in, and we appreciate it.

9              MR. CLEMENTS:  Back at you, Russ.

10             MR. HERMAN:  Thank you.

11             The next would be the new item at page 18, which

12   Your Honor has already addressed, a motion for reconsideration.

13             THE COURT:  Right.  I've dealt with it enough.

14             Merck's motion on PTO 29.

15             MR. HERMAN:  There's an additional Merck motion and

16   those are the only issues left on your agenda, Your Honor,

17   other than to set the next hearing.

18             THE COURT:  The next meeting will January 22.  We'll

19   meet at the same time, at 8:30 with the committees and I'll

20   meet at 9:00 in open court.  I appreciate all the work that

21   you-all have done.  I'll take a break at this point and come

22   back and meet with Dorothy and take care of the motions.

23             In concluding, let me take the opportunity, on a

24   personal note, to not only thank each of you but to also wish

25   you and your family a happy holiday.  So be safe and have a

1    great holiday.  Court is in recess.

2              **THE DEPUTY CLERK:**  Everyone rise.

3              (WHEREUPON the Court was in recess.)

4                             * * *

5                         <u>**CERTIFICATE**</u>

6              I, Toni Doyle Tusa, CCR, FCRR, Official Court

7    Reporter for the United States District Court, Eastern District

8    of Louisiana, do hereby certify that the foregoing is a true

9    and correct transcript, to the best of my ability and

10   understanding, from the record of the proceedings in the

11   above-entitled and numbered matter.

12

13

14                              <u>s/ Toni Doyle Tusa</u>
                                Toni Doyle Tusa, CCR, FCRR
15                              Official Court Reporter

16

17

18

19

20

21

22

23

24

25