Program. Herman Affid., ¶49 (these educational seminars took place in Philadelphia, New Orleans, Los Angeles, Houston, Puerto Rico, Las Vegas and other locations). Further, tremendous outreach was conducted to encourage *pro se* Vioxx claimants to participate in the Settlement Program. These efforts precipitated the extraordinary and overwhelming participation levels experienced.

### 6.    The Post-Settlement Efforts to Defend the Settlement Program

Despite the overwhelming acceptance of the Settlement Program by the majority of Vioxx claimants at the rate of 99.79%, there has been some remonstration. The settlement therefore remains under the watchful supervision of the NPC, PSC and common benefit counsel who continue to monitor and address the various challenges occurring at a real time pace. *See* Herman Affid., ¶30. For example, following the announcement of the Settlement, the law firm of Stratton, Faxon sought a prospective declaratory judgment against Merck and each of the individual members of the NPC. Stratton, Faxon contended that it was not ethically required to observe Section 1.2.8 of the Settlement Agreement, which required "enrolling counsel to affirm that he has recommended . . . to 100% of the Eligible Claimants represented by such a enrolling counsel that such Eligible Claimants enroll in the program." Settlement Agreement §1.2.8.1. *See Stratton Faxon v. Merck & Co., Inc., Andy D. Birchfield, Jr., et al.*, 2007 WL 4554190 (D.Conn. Dec. 21, 2007). This case was dismissed for lack of jurisdiction, *i.e.*, there was no case or controversy. *Id.* at *2.[13]

---

[13]The Court held: "Stratton Faxon merely has a difficult decision to make about an ethical rule. It must either recommend that all of its client accept the private and consensual settlement, none of its clients accept the settlement, or trust its interpretation of the Connecticut ethical rules that would place it, and its clients, in the safe harbor. There indeed may be adverse future
(continued...)

Other litigants represented by Ann Oldfather challenged this Court's "Lone Pine" order, Pretrial Order No. 28, which was entered in aid of the settlement. *See* Herman Affid., ¶31. The PSC responded to the motion and participated in argument. *See In re Vioxx Products Liability Litigation*, 557 F.Supp.2d 741, 744 (E.D.La. May 30, 2008)(extending deadlines). Litigants represented by Ronald Benjamin also challenged PTO No. 28, in addition to moving to vacate or modify the Master Settlement Agreement by having this Court recuse itself from its administrative role in the settlement. On September 15, 2008, the PSC prepared an extensive memorandum opposing the Benjamin motion and was prepared to argue the motion before the Court. The Court declined argument, but denied the motion in its entirety. *See In re Vioxx Products Liability Litigation*, MDL No. 1657, Order & Reasons (E.D.La. Dec. 10, 2008).

In addition, common benefit counsel are still working to resolve outstanding issues that have surfaced after the announcement of the settlement addressing liens and other post-settlement disputes. *See* Herman Affid., ¶32. Several such disputes have appeared. On February 20, 2008, Healthcare Recoveries, Inc. filed a Rule 27 Petition against the PSC seeking information regarding the identities of all insureds enrolled in the settlement. In response, the PSC filed a motion to dismiss. On May 6, 2008, this Court dismissed the HRI Petition. *In re Vioxx Products Liability Litigation*, 2008 WL 1995098, *6 (E.D.La. May 6, 2008).

Subsequently, 1199SEIU Greater New York Benefit Fund, filed a class action against BrownGreer LLC and the NPC. *See* Herman Affid., ¶33. The NPC moved to dismiss that suit

---

[13](...continued)
consequences to any potential decision Stratton Faxon makes. But lawyers make difficult decisions about ethical rules on a daily basis. Not every difficult decision constitutes a "case of actual controversy."

and to strike the class allegations.  In addition, another non-governmental Third Party Payor, Avmed Inc., filed suit against BrownGreer LLC.  Both parties sought preliminary injunctive relief.  The NPC and PSC were actively involved in opposing the challenges brought by these TPPs, participated in the hearing, filed amicus papers and other briefs.  The Court refused to grant the injunctions.  *See In re Vioxx Products Liability Litigation*, 2008 WL 3285912 (E.D.La. Aug. 7, 2008), *aff'd, Avmed Inc. v. BrownGreer PLC*, 2008 WL 4909535 (5th Cir. Nov. 17, 2008).  *See also In re Vioxx Products Liability Litigation*, *supra*, 2008 WL 4681368 (granting motions to sever and strike class allegations).

Given the ongoing dispute over these insurer's subrogation interests, the common benefit counsel have worked extraordinarily hard to resolve the non-governmental TPP lien claims. Without resolution of these subrogation interests, extraneous litigation and dissipation of client recoveries could continue for extended lengths of time.  Following lengthy negotiations, a tentative settlement agreement with Avmed Inc. has been reached which is expected to favorably resolve these claims by capping recoveries on favorable terms to all Vioxx claimants.  *See* Herman Affid., ¶34.

\*   \*   \*

As a matter of public policy, even though the Settlement Agreement is a private settlement, the agreement dictates that judicial approval be obtained with respect to attorneys fees and reimbursement of expenses.  The Settlement Agreement therefore provides for common benefit attorneys to be compensated by assessing claimants' recoveries, depositing those assessments into a Settlement Fee and Cost Account, and having that account "administered by this Court in consultation with the coordinated state judges from New Jersey, Texas and

28

California, in accordance with established Fifth Circuit precedent, *e.g,. Blum v. Stenson*, 465 U.S. 886, 900 (1984); *Copper Liquor, Inc. v. Adolph Coors, Co.*, 624 F.2d 575, 583 n. 15 (5th Cir. 1980); *Johnson*, 488 F.2d at 717-19; *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 851-52 & n. 5 (5th Cir. 1998); *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir.1996); *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830 (E.D.La. 2007)." Settlement Agreement §9.2.3 (the MSA contemplated that class action and aggregate attorney fee jurisprudence would apply to this award). The Settlement Agreement sets the assessment at no more than 8% of any recovery, as follows:

> To ensure that NPC, PSC, PEC, PLC, and common benefit attorneys (hereinafter referred to as "Common Benefit Attorneys") are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement. Any sum paid as a common benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement. The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.

Settlement Agreement §9.2.1.

After years of litigation of the highest caliber, against quite a formidable opponent and equally impressive defense counsel,[14] the largest private settlement of its kind was achieved by

---

[14]Among the many excellent firms representing Merck around the country in this matter included: Williams & Connolly LLP; Hughes Hubbard & Reed LLP; O'Melveny & Myers LLP; Stone Pigman Walther Wittmann LLC; Dechert LLP; Bartlit Beck Herman Pelanchar & Scott LLP; Baker Botts L.L.P.; Fulbright & Jaworski L.L.P.; Sedgwick, Detert, Moran & Arnold LLP; and Reed Smith LLP.

the NPC for the victimized plaintiffs.[15]  And while some work is ongoing, just as our efforts

handsomely benefitted the plaintiffs, we now request that we be rewarded the 8% assessment

deservedly obtained to assure that compensation can be furnished for work already performed

and that adequate funds are reserved to compensate counsel still laboring for the common benefit

of all Vioxx plaintiffs.[16]

---

[15]Commentators have already begun to favorably remark upon the novel approach
employed to resolve the individual personal claims with the unique aggregate settlement
program. *See* Issacharoff, *Private Claims, Aggregate Rights,* 2008 Supreme Court Rev. 1, 31
(Oct. 24, 2008), available at http://ssrn.com/abstract=1289505 ("What Vioxx offered . . . was a
novel means of using private ordering to bring sensible closure to common claims, with court
supervision, but outside the boundaries of formal procedural law.").

[16]The issue of the amount to be reserved for future common benefit work is a matter that
will be addressed by the Allocation Committee when it makes its recommendation to the Court.
The Allocation Committee was appointed by this Court in PTO No. 32 and is comprized of Russ
Herman (Chairman); Andy D. Birchfield, Jr. (Secretary); Christopher A. Seeger; Edward F.
Blizzard; Thomas V. Girardi; W. Mark Lanier; Arnold Levin; Troy Rafferty; and Perry Weitz.  It
is important to note, however, that significant work remains to be performed by the Gates
Committee in connection with the thousands of Eligible Claimants subject to review by the
Gates Committee.  The NPC still remains active and confers regularly to insure that the
Settlement Agreement is being implemented properly and efficiently.  In this regard, the NPC is
still negotiating the terms of the tentative settlement with Avmed regarding liens.  Also, the NPC
regularly answers inquiries by counsel, resolves disputes that arise over matters related to the
settlement and other matters.  The Allocation Committee also has additional responsibilities
including the preparation of a report to the Court recommending an appropriate division of
whatever fees result from the instant award request.

III.   **ARGUMENT**

A.   **PRINCIPLES GOVERNING THE DETERMINATION OF THE
      AMOUNT OF A MASS TORT MDL COMMON BENEFIT FEE AWARD**

Over one century ago, in *Trustees v. Greenough*, 105 U.S. 527 (1881), the United States
Supreme Court made it clear that the federal trial courts possess equity power to reach beyond the
confines of formal joinder, case captions and attorney fee contracts, to ensure that all who are the
beneficiaries of litigation efforts undertaken for the common good would contribute proportionately
to those services.  This doctrine was further articulated and applied in a series of landmark Supreme
Court decisions, including *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague
v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970);
*Boeing v. Van Gemert*, 444 U.S. 472 (1980); and *Blum, supra.*

In essence, the common benefit doctrine acknowledges "the original authority" of the courts
"to do equity in a particular situation" to prevent unjust enrichment. *Sprague v. Ticonic,* 307 U.S.
at 166.  As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the
plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the
others unjustly at the plaintiffs' expense." *Mills v. Electric Auto-Lite*, 396 U.S. at 392.

While the common benefit doctrine is routinely invoked as the basis for the award of
attorneys' fees from common funds or benefits generated in class actions, it is clear that its
application is not limited to the class context. The Supreme Court's opinion in *Sprague* illuminates
this point. *Sprague* involved a trust fund that was jeopardized when a bank went into receivership.
After the plaintiff successfully sued for a lien establishing her right to recover from the trust, she
sought reimbursement of attorneys' fees from the trust.  Although the suit was not a class action

31

(like the case *sub judice*),  had only indirectly established the rights of others, and had not created

a fund, the Court held that the plaintiff was entitled to compensation from those benefitted by her

efforts:

> That the party in a situation like the present neither purported to sue
> for a class nor formally established by litigation a fund available to
> the class, does not seem to be a differentiating factor so far as it
> affects the source of the recognized power of equity to grant
> reimbursements of the kind for which the petitioner in this case
> appealed to the chancellor's discretion. Plainly the foundation for the
> historic practice of granting reimbursement for the costs of litigation
> other than the conventional taxable costs is part of the original
> authority of the chancellor to do equity in a particular situation.
>
> Whether one sues representatively or formally makes a fund available
> for others may, of course, be relevant circumstances in making the
> fund liable for his costs in producing it. But when such a fund is for
> all practical purposes created for the benefit of others, the formalities
> of the litigation - the absence of an avowed class suit or the creation
> of a fund, as it were, through stare decisis rather than through a
> decree - hardly touch the power of equity in doing justice as between
> a party and the beneficiaries of his litigation.

*Sprague*, 307 U.S. at 166.  *See also Guidant Corp. Implantable Defibulators Products Liability*

*Litigation*, 2008 WL 682174, *5 (D. Minn. March 7, 2008), *citing, Awarding Attorneys' Fees and*

*Managing Fee Litigation* at p. 51 (Fed. Jud. Ctr. 1994)("[a]lthough many common fund cases are

class actions, . . . the doctrine is not limited to class actions"); MANUAL FOR COMPLEX LITIGATION,

FOURTH, § 14.121 at 186 (Fed. Jud. Ctr. 2004)("The common-fund exception to the American Rule

is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust

enrichment.")[hereafter the "MCL"].

The courts have generally used a percentage-of-recovery methodology to determine the

amount of the common benefit fee in a mass tort setting where a fund is created.  *See In re Thirteen*

*Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295, 308 (1st Cir. 1995)("the court below did not err in proposing to allocate fees based on the POF method, emphasizing the attorneys' 'relative contribution' to the creation of the Fund"); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)("The trend in this Circuit is toward the percentage method"); *In re General Motors Corporation Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 821 (3d Cir. 1995) (recognizing application of the "percentage-of-recovery method" in mass tort cases "which do not actually generate a common fund"); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 774-75 (9th Cir. 1977); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 526 (D. Nev. 1987)("When calculating a fee under the 'Common Benefit Doctrine,' 'a reasonable fee is based on a percentage of the Fund.'").[17]

An example of percentage awards permitted in recent large litigations are set forth in the following chart:[18]

_____

[17] Since the issuance of the *Report of the Third Circuit Task Force, Court Awarded Attorneys Fees,* 108 F.R.D. 237 (1985) in 1985, virtually every circuit court has joined the United States Supreme Court in approving use of the percentage-of-the-fund method in common fund cases. *See, e.g., In re Thirteen Appeals,* 56 F.3d at 307; *In re GMC,* 55 F.3d at 821-22; *Rawlings v. Prudential-Bache Props.,* 9 F.3d 513, 515-17 (6th Cir. 1993); *Florin v. Nationsbank, N.A.,* 34 F.3d 560, 564-65 (7th Cir. 1994); *Johnston v. Comerica Mortgage Corp.,* 83 F.3d 241, 246 (8th Cir. 1996); *In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1296 (9th Cir. 1994); *Gottlieb v. Barry,* 43 F.3d 474, 487 (10th Cir. 1994)(authorizing percentage approach and holding that use of lodestar/multiplier method was abuse of discretion); *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991)("After reviewing *Blum,* the [Third Circuit] Task Force Report, and...cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case."); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C. Cir. 1993)(percentage of the fund recovered is the *only* permissible measure of awarding fees in common fund cases).

[18] Similar analyses are provided in *In re Enron Corp. Securities, Derivative & ERISA Litigation,* 2008 WL 4178130, *31 (S.D.Tex. 2008) and *In re Diet Drugs Products Liability*

(continued...)

| Case | Fund Value | Percentage Award | Lodestar Multiplier |
|---|---|---|---|
| *In re Enron Corp. Securities, Derivative & ERISA Litigation,* 2008 WL 4178130 (S.D.Tex. 2008) | $7.2 billion | 9.52% | 5.2 |
| *In re Nasdaq Market-Makers Antitrust Litigation,.* 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 billion | 14% | 3.97 |
| *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp. 2d 942 (E.D.Tex. 2000) | $1 to $1.1 billion | 15% | not available |
| *In re Sulzer Hip Prosthesis and Knee Prosthesis liability Litigation,* 268 F.Supp. 2d 907 (N.D.Ohio 2003) | $1.045 billion | 4.8% | 2.4 |
| *DeLoach v. Philip Morris Cos.,* 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | >$1 billion | 5.9% | 4.45 |
| *Visa Check/Mastermoney,* 297 F.Supp. 2d 503 (E.D.N.Y. 2003), *aff'd, Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.,* 396 F.3d 96 (2nd Cir. 2005) | $3.383 billion | 6.5% | 3.5 |
| *In re WorldCom, Inc. Sec. Litig.,* 388 F.Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.5% | 4 |

[18](...continued)

*Litigation,* 553 F.Supp.2d 442, 480 (E.D.Pa. Apr. 9, 2008). As the petitioners have the burden of demonstrating that the proposed percentage fee is fair and reasonable, our summary chart demonstrates that the average percentage award is 9.125%. Since Petitioner's 8% request is below the average percentage award it should be deemed presumptively fair and reasonable. *See Murphy Oil,* 472 F.Supp.2d at 864 n. 31 (To establish benchmark percentage, the Court considered empirical studies, including Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27 (2004) and Stuart J. Logan, et al., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169 (2003). Under the "reported data set"percentage awards of 3.9% to 20.1% are presumptively reasonable. Under the "CAR data set" percentage awards of 7% to 28.2% are presumptively reasonable.) Employing either data set referenced by *Murphy Oil,* reveals that the proposed 8% fee request is presumptively reasonable.

| | | | |
|---|---|---|---|
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 3057232 (S.D.N.Y. 2006) | $2.65 billion | 5.9% | 3.69 |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F.Supp. 2d 383 (D.Md. 2006) | $1.1 billion | 12% | 2.57 |
| *In re Tyco Int'l, Ltd.*, 535 F.Supp 2d 249 (D.N.H. Dec. 19, 2007) | $3.3 billion | 14.5% | 2.697 |
| *In re Diet Drugs Products Liability Litigation*, 553 F.Supp.2d 442 (E.D.Pa. Apr. 9, 2008) | $6.44 billion | 6.75% | 2.6 |
| **AVERAGE** | $3.129 billion | 9.125% | 3.5 |

These courts realize the efficiencies and practicalities that accompany the percentage method. Indeed, in *Blum*, 465 U.S. at 900 n.16, the landmark decision that began the trend towards percentage awards, the United States Supreme Court indicated that "under the common fund doctrine . . . a reasonable fee is based on a percentage of the fund bestowed upon the class . . ." Several positive externalities are generated by the percentage method. Notably, lawyers have no incentive to work excessive hours. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000)("the lodestar method . . . arguably encourages lawyers to run up their billable hours"). More importantly, courts are relieved of the time-consuming burden of reviewing fee applications and evaluating billing records. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000)("the primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in gimlet-eyed review of line item fee audits. There was an inevitable waste of judicial resources."); *In re Educational Testing Service, Etc.*, 447 F.Supp.2d 612, 628 (E.D.La. 2006)("The method has been called difficult to apply, time-consuming to administer, inconsistent in result, and capable of

manipulation.").

In class action settlements generating a common fund, the Fifth Circuit adheres to the more

traditional lodestar analysis set forth in *Johnson*, 488 F.2d at 717-19. *See In re High Sulfur*, 517

F.3d at 227-28. Even in class cases, however, the Fifth Circuit "seems to allow considerable

flexibility in approving combined percentage and lodestar approaches." MCL §14.121 at 187. *See*

*Strong*, 137 F.3d at 852 & n.5; *Longden*, 979 F.2d at 1099-1100; *In re Enron*, 2008 WL 4178130,

*10 - *11.[19] And where, as here, there is a private, mass tort settlement that does not employ the

class action device, district courts in this Circuit facing novel situations are not reluctant to employ

---

[19]Anticipating the trend away from the lodestar method, Judge Vance of the Fifth Circuit stated in his separate opinion in *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 337 n.1 (5th Cir. 1978):

> [I]f mechanically applied, the hourly rate approach almost inevitably leads to an unsatisfactory result in this type of litigation. This method of compensation—which equates professional services to those of laborers and mechanics—frequently has little or no relationship to the value of the services performed in anything but the most routine work. A flash of brilliance by a trial lawyer may be worth far more to his clients than hours or days of plodding effort. Few among us would contend that an operation by a gifted surgeon who removes an appendix in fifteen minutes is worth only one-sixth that performed by his marginal colleague who requires an hour and a half for the same operation.

In fact, "since *Blum* was decided [in 1984], there has been no Fifth Circuit decision that would preclude this Court from employing the percentage of the fund approach endorsed in *Blum* and the circuit and district court decisions that followed and applied *Blum*." *In re Prudential-Bache Energy Income Partnership Securities Litigation*, 1994 WL 150742, *4 (E.D.La. April 13, 1994); *see also Batchelder v. Kerr-McGee Corp.*, 246 F.Supp. 2d 525, 531 (N.D. Miss. 2003)("A percentage fee approach, as opposed to a lodestar computation, is the preferred method for determining awards of attorneys' fees in common fund, or class action, cases."); *Shaw*, 91 F.Supp. 2d at 967 n. 15 ("the Fifth Circuit has *never*... reversed a district court judge's decision to award a fee as a percentage")(emphasis in original); *Longden*, 979 F2d at 1100 N. 11 (affirming district court's percentage fee award in securities class action, noting that the district court stated its preference for the percentage of recovery approach "as a matter of policy").

36

percentage fee awards, provided that some reference to the more traditional lodestar analysis is employed. *See Murphy Oil*, 472 F.Supp.2d at 860 ("Likewise, though the Fifth Circuit has not explicitly accepted the percentage method, it does appear to be amenable to its use, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable.")(citing cases).[20] *Compare Camden I Condominium Assoc., Inc. v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991)(establishing 20% - 30% as a benchmark when awarding a common fund fee).

In the *Murphy Oil* case, the plaintiffs' steering committee ("PSC") negotiated a class settlement resulting in a common fund valued at approximately $195 million. The settlement agreement provided, however, that the defendant would pay attorneys fee separate and apart from the common fund, pursuant to an award to be determined by the court. *Murphy Oil*, 472 F.Supp.2d at 856. The court decided that the proper methodology for calculating attorneys fees would be based upon a blended percentage approach. Under the blended percentage approach an initial benchmark percentage was selected, followed by adjustments based upon the *Johnston* factors.[21] The Court also conducted a rough lodestar analysis to cross-check the reasonableness of its percentage award. *Id.* at 861.

---

[20] Following the adjudication of the 17% award, this Court appointed a special master to recommend the proper allocation of the award to the petitioning counsel. Upon review of that report and recommendation, the Court made determinations of specific allocations in *Murphy Oil, supra*, 2008 WL 4661806.

[21] The twelve *John*ston factors are well known to courts in this circuit: (1) The time and labor required. (2) The novelty and difficulty of the questions. (3) The skill requisite to perform the legal service properly. (4) The preclusion of other employment by the attorney due to acceptance of the case. (5) The customary fee. (6) Whether the fee is fixed or contingent. (7) Time limitations imposed by the client or the circumstances. (8) The amount involved and the results obtained. (9) The experience, reputation, and ability of the attorneys. (10) The "undesirability" of the case. (11) The nature and length of the professional relationship with the client. (12) Awards in similar cases. *Johnson*, 488 F.2d at 717-19.

37

Employing this methodology, the Court looked to what customary fees and awards existed in similar cases. The court utilized an empirical study of attorneys' fees in class action settlements in a effort to mimick the market for attorneys fees. *Id.* at 863-64, *citing*, Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 21 (2004). Based upon that study's findings, the court concluded that a benchmark of 15% would be the appropriate percentage to apply to the common fund. *Id.* This percentage was adjusted upward by the court after finding that six of the twelve *Johnson* factors favored such an increase. The court was impressed by the intensive efforts, expedited priority and pace of counsel and favorable results obtained. Based upon its findings, the court increased the benchmark upward to 17%. *Id.* at 869.

Other district courts in the Fifth Circuit have employed similar analyses in class action settlements to arrive at varying percentage awards in cases involving common funds of varying sizes compared to that presented here. *See e.g., Enron,* 2008 WL 4178130 at * 6-*7; *In re: Bayou Sorrel Class Action,* 2006 WL 3230771 (W.D.La. Oct. 31, 2006)(36% of $28 million common fund); *In re Educational Testing Service,* 447 F.Supp.2d at 633 (29% of $11.1 million common fund); *In re Catfish Antitrust Litigation,* 939 F.Supp. 493, 504 (N.D.Miss. 1996)(25% of $27.5 million common fund).

The opinion in *En*ron is especially helpful in this regard. After the financial collapse of the Enron Corporation, affected investors, led by the Regents of the University of California, instituted a barrage of litigation against Enron, its auditors and other agents. Following 6 years of extensive litigation, settlements were obtained in excess of $7.2 billion, representing the largest recovery ever in a class action. *Enron,* 2008 WL 4178130 at *1 n.3. When petitioning for attorneys fees for all counsel, lead Plaintiff's counsel requested fees consistent with its contingent fee agreement with

the lead plaintiff. That fee agreement contained an increasing fee schedule which provided that counsel could seek 8% from the first billion obtained, 9% from the second billion and 10% of the balance. Considering the size of the recovery, the fee schedule resulted in a blended rate of 9.52%. *Id.* at *26. Finding that the "percentage method is properly applied here as a matter of law," the district court sustained the request. *Id.* at *23.[22]

Notably, the *Enron* court also engaged in a hybrid analysis that evaluated the *Johnson* factors and a lodestar cross-check to arrive at a percentage fee award. The court considered each of the *Johnson* factors to conclude that the work performed by lead counsel was exceptional. Throughout its analysis, the court focused on the skill of counsel and the "unparalleled results" obtained. *Id.* at *40. After expending over 289,500 hours over 6 years at a blended hourly rate of $456 based upon current billing rates, counsel's lodestar was $131,971,583.20, and reasonably supported the 9.52% award requested. *Id.* at 32-33, 37. The lodestar cross-check proved the reasonableness of the award as the multiplier of 5.2, "only marginally higher than the 4.50 average multiplier in settlements over $100 million." *Id.* at *48 (quoting Affidavit of John Coffee and noting that "there has been a general recognition that multipliers in the range of 3 to 4.5 have become relatively common in cases with recoveries over $1 billion." *Id., citing In re NASDAQ*, 187 F.R.D. at 489.

---

[22]The *Enron* court eschewed the application of a sliding scale that diminishes the permissible percentage fee award as the value of the recovery increases. The court acknowledged that other courts in "megafund" cases capped fee percentages at low figures as recoveries became quite large. *Id.* at *12, *citing, In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). Nevertheless, the court rejected a mechanical, *per se* application of a "megafund rule." The court was instead persuaded that "the megafund rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award." *Id., citing In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185 (S.D.Fla. 2006); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D.Pa. May 10, 2005).

Elsewhere, in the *Guidant* case, the court addressed the application of a common benefit assessment in a setting similar to that presented by this case. In *Guidant*, the Judicial Panel for Multidistrict litigation consolidated litigation involving several implantable defibrillator products. The district court appointed a PSC to undertake the administrative and substantive tasks of pretrial activities. Several months after the transfer order, the court issued a pretrial order establishing a common benefit fund to compensate the PSC. The court created a regime whereby assessments of 2% for fees and 2% for costs would be subtracted from any recovery in the individual cases. The MDL then proceeded through discovery and substantive motions practice in contemplation of bellwether trials. As the bellwether trials' starting dates approached, the parties announced that a non-class global settlement had been obtained under judicial supervision.[23] The settlement contemplated that a $240 million fund would be created to compensate 8,550 plaintiffs, as well as the common benefit attorneys' fees.

To evaluate the appropriate common benefit fees, the *Guidant* court chose to employ a blended percentage approach, much like this Court did in *Murphy Oil*. *Id.* at *6 ("Here the Court will exercise its discretion to utilize both the percentage of the fund method and the lodestar method, each cross-checking the other"). The court reviewed the common benefit doctrine and its modern interface with complex MDL litigation. *Id.* at *5, *citing, In re Diet Drugs Products Liability Litigation*, 2002 WL 32154197, *17 (E.D.Pa. Oct. 3, 2002)(noting that the appointment of a PSC necessarily correlates with the authority to compensate that committee). It then engaged in an extensive analysis of the *Johnson* factors to arrive at a 15% percentage factor award. The court

---

[23]The negotiations were supervised by Magistrate Judge Boylan and a Special Master, Patrick Juneau.

noted the extensive efforts that were applied by common benefit attorneys in a relatively compressed time frame and the favorable results achieved. Id. at *7-*10. The court later determined through a lodestar cross-check that its percentage award was well supported since the calculated lodestar required only a minimal 1.19 multiplier enhancement. Id. at *14-*16.

While there are obvious differences between these cases and the Vioxx litigation, *Enron, Murphy Oil,* and *Guidant* establish a range of common benefit awards between 9.52 and 17 percent. Based upon this established range, the potential awards would reflect the following:

| Billion | 8% | 10% | 12% | 15% | 17% |
|---------|-----|------|------|------|------|
| $4.85 | $388 million | $485 million | $582 million | $727.5 million | $824.5 million |

The NPC submits that the smaller 8% award requested is presumptively fair, especially in light of our further analysis, which follows.

**B.     THE PRESENT CASE IS APPROPRIATE FOR A
        COMMON BENEFIT FEE AWARD**

Pursuant to PTO No. 19, the amount of the common benefit fee imposed upon certain federal cases that have been part of MDL 1657 and those coordinated state court cases is 3% of the gross recoveries by the plaintiffs. This assessment was imposed to provide a mechanism to compensate the PSC and other common benefit attorneys for services performed and expenses incurred for MDL administration and common benefit services for cases that were being prepared for trial. Aside from the global fund created here, there is ample authority for awarding a fee to the plaintiffs' management structure appointed by the court[24] payable out of the fees derived from the

_____

[24] In conformity with the Manual for Complex Litigation, the management structure appointed by an MDL Transferee court usually includes liaison counsel, lead counsel, and a
                                                                                    (continued...)

41

representation of the individual litigants whose cases are subject to coordinated pretrial proceedings in the MDL transferee court.  *See Vincent v. Hughes Air West, Inc.*, 557 F.2d 759,769 (9th Cir. 1977); *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977); *In re MGM, supra*; *In re Orthopedic Bone Screw Product Liability Litigation*, 1996 WL 900349 (E.D. Pa. Jun.17, 1996); *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606-07 (1st Cir. 1992); *Smiley v. Sincoff*, 958 F.2d 498, 501 (2nd Cir. 1992); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1317 (E.D.N.Y. 1985), *mod'd on other grounds*, 818 F.2d 226 (2nd Cir. 1987); *In re Diet Drugs Products Liability Litigation*, 1999 WL 124414 (E.D.Pa. Feb. 10, 1999);  *In re Ephedra Products Liability Litigation*, MDL No. 1598, Case Management Order No. 7 (S.D.N.Y. Nov. 29, 2004);[25] *In re Zyprexa Products Liability Litigation*, 2007 WL 2340790 (E.D.N.Y. Aug. 17, 2007);  *In re Propulsid Products Liability Litigation*, MDL No. 1355, PTO No. 16 (E.D.La. Dec. 26, 2001)[26]; MANUAL FOR COMPLEX LITIGATION (FOURTH), § 14.215 at 202.  Such "common benefit" fee awards have, in fact, become commonplace in mass tort litigation.  *Id.*  Two distinct doctrinal grounds support this "assessment power" and serve to inform its exercise.

The first basis for the exercise of a district court's assessment prerogative derives from the court's docket management powers.  As the Supreme Court said nearly half a century ago, a federal court has inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. North American Co.*, 299 U.S. 248, 254

---

[24](...continued)
"management," "legal" or "steering" committee.  *See* MANUAL FOR COMPLEX LITIGATION (THIRD), §20.22.

[25]Attached hereto as Exhibit "B".

[26]Available at http://propulsid.laed.uscourts.gov/Orders/order16.pdf.

(1936). Given the pressing demands imposed on federal courts by civil litigation of increasing volume and complexity, such "[m]anagerial power is not merely desirable. It is a critical necessity." *Florida Everglades,* 549 F.2d at 1012. The crucial need for the intensive exercise of the federal court's docket management powers was explicitly  recognized by Congress when it enacted  28 U.S.C. § 1407, which created the Judicial Panel on Multidistrict Litigation and empowered it to transfer all federal cases involving "common questions of law or fact"  to a single federal district judge for "coordinated or consolidated pretrial proceedings."  Such a transfer would accomplish little in terms of economy or efficiency if counsel for thousands of individual plaintiffs in the transferred cases engaged in pretrial activities in whatever manner they saw fit.

Therefore, the creation and appointment of a plaintiffs' leadership structure to coordinate discovery and other pretrial activities has long been considered  an essential element in the proper management of MDL litigation. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 10.221; *Vincent,* 557 F.2d at 774 (noting "[t]he benefits achieved by consolidation and the appointment of general counsel, i.e., elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled"); *MacAlister v. Guterma,* 263 F.2d 65, 68 (2nd Cir. 1958)("Certainly, overlapping duplication in motion practices and pre-trial procedures occasioned by competing counsel representing different plaintiffs in separate . . . actions constitute the waste and inefficiency sought to be avoided by [the Federal Rules of Civil Procedure] . . .  An order consolidating . . . actions during the pre-trial stages, together with the appointment of a general counsel [for the plaintiffs] may in many instances prove the only effective means of channeling the efforts of counsel along constructive lines and its implementation must be considered within the clear contemplation of the

43

rule[s]"); *Smiley,* 958 F.3d at 499 ("Plaintiffs' Committee formed to avoid duplicate discovery and widely varying pretrial rulings"); *Nineteen Appeals,* 982 F.2d at 605 ("Court appointed a plaintiffs' committee to organize the plaintiffs' side of the litigation"); *In re Bendectin Litig.,* 857 F.2d 290, 297 (6th Cir. 1988), *cert. denied,* 488 U.S. 1006 (1989) ("in complex case judge may create a plaintiffs' committee for lead counsel"). The members of such a leadership structure assume a quasi-public function similar to court-appointed masters, arbitrators and experts:

> To a degree, lead attorneys become officers of the court. By making manageable litigation that otherwise would run out of control they serve interests of the court, the litigants, the other counsel, and the bar, and of the public at large, who are entitled to their chance at access to unimpacted courts.

*Florida Everglades,* 549 F.2d at 1017.

The inherent power of the federal courts to appoint a plaintiffs' management structure in complex litigation necessarily includes the power to provide a means of compensation for the services provided by the members of the management structure separate and apart from the private fee arrangements with their individual clients:

> [I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation. *** The interests to be served are too important to be left to volunteers (or draftees) who are unpaid in the sense that they get nothing additional. The limitations of relying upon unpaid lead or liaison counsel are demonstrated by...history....

*Florida Everglades,* 549 F.2d at 1016. *Accord, e.g., Vincent,* 557 F.2d at 774-75; *Smiley,* 958 F.2d at 499 ("Court can establish fee structure to compensate members of plaintiffs' committee for their work on behalf of all plaintiffs"); *In re Swine Flu Immunization Prod. Liab. Litig.,* 89 F.R.D. 695,

44

699 n.3 (D.D.C. 1980) (court's authority to appoint and compensate steering committee is "beyond question"); *Nineteen Appeals*, 982 F.2d at 607 (Court may devise way to compensate steering committee); *In re Diet Drugs* , 2002 WL 32154197 at *17 ("It is now commonly accepted in complex multiparty litigation that a court can and in fact should appoint a committee such as the PMC to coordinate the litigation and ease the administrative burden on the court. As a corollary to this appointment, the court must be permitted to compensate fairly the attorneys who serve on such a committee.").

The second basis for the exercise of federal court power to access recoveries by individual plaintiffs' counsel in order to compensate the members of a court-appointed management structure derives from the equitable powers of the courts to prevent unjust enrichment through application of the same common fund doctrine that supports the award of counsel fees in class actions. Absent an order shifting payment of fees to those who actually perform the work that is common to all cases in a mass tort MDL, each of the individual plaintiffs' attorneys has an "incentive to rely on others to do the needed work, letting those others bear all the costs of attaining the parties' congruent goals." *Nineteen Appeals*, 982 F.2d at 606. Federal courts may properly bring the common fund doctrine to bear to remedy this "incipient free rider" problem. *Id.* at 607 (court essentially used common fund fee award in trying to avoid free-rider problem); *Seaman v. Spring Lake Park Indep. Sch. Dist. No. 16*, 387 F. Supp. 1168, 1173 (D. Minn. 1974) (purpose of common fund doctrine is to apportion fees among beneficiaries and thereby prevent free-riding). This procedure now has become the established normative practice in pharmaceutical liability litigation. *See Vioxx, supra; Orthopedic Bone Screws, supra; Diet Drugs, supra; Propulsid, supra; Zyprexa, supra*; and *In re Copley Pharmaceutical, Inc.*, MDL 1013, 158 F.R.D. 485 (D.Wyoming 1994).

### C.    UNDER ALL CIRCUMSTANCES AN 8% FEE IS JUSTIFIED

With the advent of the global settlement with Merck, the ability of the Court to award compensation to common benefit counsel is facilitated by access to a common fund.  At the initiation of the litigation, when access to such a common fund was purely speculative, the PSC anticipated that the compensation scheme may need to be altered in the event circumstances changed.  On June 29, 2005, at the time the PSC petitioned the Court for such an MDL assessment, the PSC stated, "It is not intended that the Court's Order be applied to any global or class action settlement reached in the litigation." *In re Vioxx Products Liability Litigation*, MDL No. 1657, Memorandum of Law in Support of the PSC's Petition for an Order Securing and Equitable Allocation of Counsel Fees and Costs for MDL Administration and Common Benefit Work at 3 n. 2 (E.D.La. June 29, 2005).   In light of Merck's contention that it would try every case, the original assessment of PTO No. 19 contemplated that the PSC would be compensated to the extent that its work-product for as many as 30,000 trials would be available.  The Order did not contemplate that a global settlement would inure to the benefit of common benefit counsel and their 60,000 clients.  Nor did it contemplate that, if such an alternative by Global settlement existed, it would assure substantial and prompt payment of legitimate claims without the necessity of spending millions of dollars in expenses, in thousands of trials in which ultimate resolution would be substantially more expensive and less certain for claimants.  Thus, the PSC's perspicacious reservation – that the MDL assessment may require revision in the event that a global fund was created that resolved the litigation – is appropriately addressed by the terms of the Settlement Agreement which provides for

a larger award of up to 8%.[27]

It is not uncommon, therefore, that Courts revisit common benefit assessments when circumstances warrant, especially in light of a global settlement. *See, e.g., Guidant*, 2008 WL 682174 at *12 (increasing assessment from 4% to 15% percent of fund award); *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, MDL No. 1699, Pretrial Order No. 8A: Amendment to Order Establishing Common Benefit Fund (N.D.Cal. July 7, 2008)(court allowed assessment to be increased between 8% fee/2% costs and 10% fee/2% costs, "[g]iven the extensive work, including discovery, expert, and bellwether trial preparation, that has been conducted by Court-designated counsel, including Plaintiffs' Liaison Counsel and the members of the PSC (including its subcommittees), and given the size and length of the litigation, the Court finds that the current 2% costs and 2% fees assessment is inadequate to properly reimburse members of the PSC for their out-of-pocket costs and to pay for appropriate and necessary common benefit work.")[attached hereto as Exhibit "C"]. Employing similar reasoning, this Court initially imposed a 12% assessment in a local consolidated property damage litigation that later became a 17% percent of fund award. *See Turner v. Murphy Oil USA, Inc.*, 422 F.Supp.2d 676, 683 (E.D. La. Mar. 27, 2006)(PTO No. 8).

An eight percent common benefit award falls well below the *Guidant, Bextra* and *Murphy Oil* assessment or award and puts us in a good standing with other MDL assessments in the mid-range of such fee awards in even non-global settlement, mass tort MDLs. *See Vincent*, 557 F.2d at 769 (5% assessment); *Florida Everglades*, 549 F.2d 1006 (8% assessment); *MGM*, 660 F. Supp. 522

---

[27]The PTO No. 19 assessment remains in place for those cases not in the settlement program.

(7% assessment); *Orthopedic Bone Screw,* 1996 WL 900349 (12% fee/5% cost assessment); *Diet Drugs,* 1999 WL 124414 (9%/6% assessment), *modified by Diet Drugs,* 2002 WL 32154197 (6%/4% assessment); *In re Diet Drugs,* 2008 WL 942592 at *40 (E.D.Pa. April 8, 2008); *In re St. Jude Medical, Inc.,* MDL 1396, 2002 WL 1774232 (D.Minn. 2002) (6% assessment); *In re Protegen Sling and Vesica System Prods. Liab. Litig.,* MDL 1387, 2002 WL 31834446 (D.Md. 2002) (9%/6%); *In re Baycol Prods. Litig.,* MDL 1431, 2002 WL 32155266 (D.Minn. 2002) (6% assessment); *In re Rezulin Prods. Liab. Litig.,* MDL 1348, 2002 WL 441342 (S.D.N.Y. 2002) (6%/4% assessment); *Ephedra,* MDL No. 1598, Case Management Order No. 7 (S.D.N.Y. 2004) (6% assessment); *Zyprexa,* 2007 WL 2340790 (3% assessment); *Propulsid,* MDL No. 1355, PTO No. 16 (6%/4% assessment).[28]

The reasonableness of an eight percent common benefit award is underscored by the overwhelming agreement of 99.79% of Vioxx claimants and their counsel that voluntarily chose to participate in the Settlement Agreement with Merck, which agreement clearly denotes the 8% assessment. *See* Vioxx Settlement Agreement §9.2.1 (Noting that "the maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.").[29]  These counsel and claimants had an alternative to paying the 8% award provided for in the contract, *i.e.,* they could use the MDL work-product, pay the PTO No. 19 assessment of 3%, and take the chance of trying their case to verdict before a jury. The decision of these counsel and claimants to accept the terms of the Settlement Agreement justifies its

---

[28] Available at http://propulsid.laed.uscourts.gov/Orders/order16.pdf.

[29]Available at
http://www.officialvioxxsettlement.com/documents/Master%20Settlement%20Agreement%20-%20new.pdf

reasonableness. Indeed, it would be unreasonable to allow such counsel or claimants to accept the benefits of the Settlement Agreement while simultaneously disregarding the obligations that accompany the terms of the contract.[30]

In addition to being reasonable, the 8% assessment is also necessary to provide sufficient compensation to all of the common benefit counsel that are now being incorporated into this effort from the coordinated jurisdictions, *e.g.*, California, New Jersey and Texas. When motions practice was presented that resulted in PTO No. 19's MDL assessment of 3% of client recoveries, it was then contemplated that the award from any such assessment in a non-global settlement would be allocated only amongst the assemblage of counsel closely associated with the MDL. The appointment of the NPC and the development of the global Settlement Agreement greatly expanded the constituency of common benefit attorneys. Following the issuance of PTO No. 6C, this Court permitted open participation, by the reporting of contemporaneous and reconstructed time reports, of state court counsel from many jurisdictions other than the MDL that had not been appointed by this Court to perform common benefit. Philip A. Garrett's Affidavit reports these submissions and reveals that these state court counsel contributed over 130,976 common benefit hours with a collective lodestar value between $58,934,170.06 and $87,819,338.98, as compared with MDL-only time of over 372,208 hours and a lodestar value between $158,194,630.34 and $234,078,195.97. *See* Affidavit of Philip A. Garrett, C.P.A., ¶¶14-17 [hereafter "Garrett Affid., ¶__"]. These state court counsel will now share in the fees obtained by this multi-venue, global settlement. To accommodate this originally unaccounted for increase in billable hours, the Settlement Agreement acknowledged the

---

[30]Only one vocal group of lawyers challenged the terms of the Settlement Agreement by lodging an objection. That objection is not well founded. If their position was to be accepted, they would derive all the benefits of the settlement program but below its cost.

need for the assessment at 8%, and for the 8% assessment to supercede the original assessment of PTO No.19. Increasing the number of attorneys participating in common benefit work, the percentage fee for a successful common benefit result will naturally increase to fairly recognize the contribution of those lawyers not in a leadership position.

The circumstances here are informed by the court in the seminal *Florida Everglades* MDL, when it awarded an eight percent common benefit fee to the committee it appointed to manage that litigation:

> [T]he Court remains singularly unimpressed with the position that the Plaintiffs' Committee and its Authorized Counsel will be receiving a "bonus" or be unjustly enriched by this Court's awarding attorney fees of the type requested by appointed counsel. Delegated with the responsibility of preparing and prosecuting an action, on behalf of all plaintiffs, replete with complex case, statutory and regulatory law, and opposed by formidable defense counsel, the appointed counsel had to completely disassociate themselves from any responsibilities to other clients. Their initiation of proceedings for the production of, and consequent actual inspection of voluminous documents,...; their initiation and conduct of the examination of twenty-six (26) witnesses in liability depositions; their committee conferences to analyze the discovered information for use in pretrial proceedings and preparation for trial; their preparation of legal memoranda in support of the plaintiffs' position in opposition to defendants' motion; their diligently informing the Court of the status of the litigation and their recommendations for expediting it; their attendance at, and participation in, numerous judicial hearings; all of the foregoing activities on the part of the...counsel involved, are well documented.
>
> After careful scrutiny of such conscientious execution of appointed counsels' preparation of the plaintiffs' case, this Court is constrained to observe that if, in fact, an element of unjust enrichment exists in the Court's percentage award of attorneys fees, the beneficiaries are the attorneys whose time was not so consumed in the manner outlined above, but who shall receive all but eight percent (8%) of the attorneys fees originally contemplated by them.