*Florida Everglades*, 549 F.2d at 1011. This conclusion is entirely appropriate, especially in light

of the valuable fund created by the common benefit counsel that will finance the assessments.

**D.    PRINCIPLES GOVERNING DETERMINATION
OF AN APPROPRIATE FEE AWARD UNDER *JOHNSON***

The application of the *Johnson* Factors to the requested assessment supports the 8% award.

This percentage represents a multiple of 1.21 to 1.79 times the composite lodestars of the several

common benefit counsel participating in this petition (using the highest billing rate standard  and

actual billing rate standards, respectively).  The award is especially proper and consistent with the

Fifth Circuit edict where the attorneys have created a fund as was accomplished in this case *sub*

*judice*.  In recent experience, district courts within the Fifth Circuit allowed a 17% award in *Murphy*

*Oil* where the common fund created was valued at $195 million, and in *Enron*, counsel were

awarded 9.52% of a fund valued at $7.2 billion.[31]  As demonstrated below, the requested award here

is fully justified by an evaluation of each of the *Johnson* Factors, irrespective of whether it is viewed

as a percentage of the fund or not.

_____

[31]*See also Shaw v. Toshiba*, 91 F.Supp.2d at 972, where the court also found: "The
evidence concerning fee awards in mega-fund cases is more limited since there are fewer such
cases to study. However, this court is aware that awards of fifteen percent (15%) of the recovery
or more are frequently awarded in these cases. Several mega-fund settlements in the Fifth Circuit
and Texas have involved fees of fifteen percent (15%) or more. *See In re Shell Oil Refinery,* 155
F.R.D. 552 (E.D.La.1993) (eighteen percent (18%) of $170 million); *In re Combustion*, 968
F.Supp. 1116 (W.D.La.1997) (thirty-six percent (36%) percent of $127 million); *In re Lease Oil
Antitrust Litigation (No. II),* 186 F.R.D. 403 (S.D.Tex.1999) (twenty-five percent (25%) of more
than $190 million); *Weatherford Roofing Co. v. Employers National Insurance Co.*, No. 91-
05637-F, 116th Judicial District (Dallas) (thirty percent (30%) of $140 million); *see also In re
NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y.1998) (awarding fee of
fourteen percent (14%) of $1 billion). Given these guiding principles and the size of the class
settlement at issue in this case this Court concludes that fifteen percent (15%) is the appropriate
percentage for application of the percentage method in this case."

### 1.   **The Time and Labor Required.**

Assembling, administrating and successfully resolving an MDL of the magnitude of this case is a very tall order.  As of the time of the settlement, approximately 8,800 cases were on file in the MDL, representing approximately 25,800 plaintiff groups, and 14,100 claimants were on Tolling Agreements with Merck with numerous counsel representing these litigants.   Consequently, countless tasks existed that were necessary to marshal such a large, disparate group.[32]  Indeed, given the adversary nature of this litigation, much attention had to be expended to manage the docket and develop the caseload for matters both expected and unexpected.  Given so many moving parts, to direct the assemblage efficiently and effectively, the PSC was obliged to negotiate case management orders, engage in extensive discovery involving millions of documents from Merck and third parties, develop Plaintiff Profile Forms as well as Merck Profile forms, and expend tens of thousands of hours on pleadings and complex motions practice.

Early on, the PSC was responsible for preparing Master Class Action complaints, which required sweeping efforts to investigate and compile the material allegations.  Extensive motions practice, including motions to dismiss, motions to strike class allegations, and actual class certification were briefed and argued.

Subsequently, summary judgment motions, including efforts to have claims dismissed on statute of limitations and the death-knell grounds of preemption, were comprehensively covered.  Addressing the preemption defense became increasingly important as other courts were allowing such defenses. *See, e.g., Colaccico v. Apotex, Inc.,* 432 F.Supp.2d 514 (E.D. Pa. May 25, 2006*),*

---

[32]*See* Joint Report No. 29 of Plaintiffs' and Defendants' Liaison Counsel at 8 (Doc #12888 Nov. 7, 2007).  In the coordinated New Jersey litigation approximately 15,850 lawsuits had been filed. *Id.*

*aff'd*, 521 F.3d 253 (3d Cir. Apr. 8, 2008), *reh'g denied*, 06-3107 (3rd Cir. May 5, 2008), *cert. pending*, 08-437 (U.S.). To defend against the preemption motion, the PSC filed a Rule 56(f) affidavit stating the need for additional discovery. The PSC subsequently engaged in that discovery against the FDA and other entities to find evidence controverting Merck's argument that the FDA's Preamble to the newly promulgated labeling regulations, 71 Fed.Reg. 3922 (Jan. 24, 2006), should be entitled to deference and its compliance with Executive Order No. 13132, 64 Fed. Reg. 43255 (1999). We are not aware of any other similar discovery or defense to such a motion of its kind. Coupled with the other arguments presented by the PSC, the motion was successfully defeated. *See In re Vioxx Products Liability Litigation*, 501 F.Supp.2d at 781 n.5. Absent this decision, the settlement would have likely been disrupted. Instead, the settlement proceeded. In order to avoid a premature appeal to the Fifth Circuit Court of Appeals, the aforementioned Rule 56(f) affidavit prevented the granting of a 28 U.S.C. §1292(b) appeal. *See* Herman Affid., ¶27.

As the bellwether trials approached, the PSC was constantly briefing and addressing motions. All told, the PSC expended over 26,000 hours performing pre-trial pleadings and motions practice. *See* Herman Affid., ¶51. When joined with the coordinated states, this number expands to 37,958 hours. *Id.*

In addition, the PSC was responsible for challenging the *bona fides* of one of the most respected pharmaceutical manufacturers in America, which manufacturer denied any liability and was insistent that each case would be tried individually to verdict. To meet this daunting challenge, the PSC had to assemble counsel with the incentive and abilities to develop and prosecute claims whose risks were at all times real. In short order, the PSC engaged in significant discovery of Merck to quickly get up to speed so that the MDL could catch up to the trial experience of other

jurisdictions where trials were scheduled or underway. Development of a trial package became a top priority of the PSC and approximately 72,521 hours of attorney time were devoted to discovering the material for the trial package. *Id.* The trial package was needed to provide to trial counsel a comprehensive guide to Merck's liability, a thorough overview of the science and medical issues in the case, an extraordinary amount of information on all witnesses (Merck employee, fact and expert), expert reports and depositions on every issue of general liability, together with a vast amount of important background information.

Remarkably, discovery of non-retained expert witnesses also played a vital role. *See* Herman Affid., ¶38. The PSC spearheaded the effort to depose some of the most prominent physicians in America, whose expertise had drawn them into the ambit of the Vioxx story. These witnesses provided some of the most compelling testimony in the litigation, at least in part because of the enormous amount of work done by MDL attorneys in preparing for their depositions. Among the most significant of these were:

> Gregory Curfman, M.D., editor of the New England Journal of Medicine, who testified regarding Merck's attempts to understate the cardiovascular risks of Vioxx in the publication of the VIGOR study;

> James Fries, M.D., noted Stanford University professor and rheumatologist, who testified about the efforts Merck had taken to intimidate and "neutralize" him and his colleagues;

> David Graham, noted drug safety expert and FDA scientist who testified regarding Merck's manipulation of the regulatory process;

> Steve Nissen, M.D., the Chair of Cardiology at the Cleveland Clinic, the premier heart hospital in the world, who participated in two FDA Advisory Committees which considered the cardiovascular implications of VIGOR and the APPROVe trails respectively. Along with Eric Topol, MD, he wrote an important article in JAMA in 2001 which raised the specter of Cardiovascular risk associated with COX-2s;

Eric Topol, M.D., former Chairman of Cardiovascular Medicine at the Cleveland Clinic, who testified regarding Merck's scientific misconduct and evidence that Vioxx increases the risk of heart attack. Dr. Topol also offered compelling testimony refuting the key Merck defense that naproxen's alleged cardioprotective effect explained the results seen in the VIGOR trial.

Once the discovery was completed, pressure was further brought to bear on Merck through the effective use of bellwether trials. Enormous resources were expended preparing for and conducting trials. Of the 19 trials that occurred, counsel expended over 108,345 hours. *Id.*, ¶51. Often this time was devoted in compressed intervals of intense effort reflecting the crucible of trial by jury.

Overall, counsel spent approximately 503,185 hours of attorney and para-professional time expended on Vioxx litigation as of January 14, 2009. The common benefit efforts will also continue for some time to come, thus necessitating the proposed reserve for such purposes. For purposes of the defined period in this fee petition, the lodestar is $217,128,800.40, using the actual billing rate standard, or $321,897,534.95, using the highest billing rate standard. *See* Garrett Affid., ¶15; Herman Affid., ¶¶54-55 Using both standards, the requested fee represents a multiplier of either 1.21 or 1.79, both of which are well within the norm of accepted multipliers. *See* discussion *supra* at 39-40.

## 2. The Novelty and Difficulty of the Questions Involved.

As Merck strenuously defended the safety profile of Vioxx based upon published medical literature in highly regarded medical journals, the common benefit attorneys were confronted with a strong adversary that was well entrenched with powerful defenses. Undaunted by their adversary, common benefit counsel carefully dissected the clinical trial data and developed the complex scientific arguments necessary to controvert Merck's medical arguments. These arguments were

highly technical and difficult, yet due to the perseverance of common benefit counsel corrections
to the public's knowledge of the flawed science created by Merck was accomplished. *See
Correction*, N Engl J Med 2006; 355(2): 221.

Throughout this litigation, the Court has repeatedly been reminded of the complex nature of
this prolix multi-district, multi-party, multi-state litigation.  Although this Court presided over 6
trials in this MDL, at the conclusion of the first trial it noted how involved, complicated and
"complex" these cases really were. *In re Vioxx Products Liability Litigation*, 489 F.Supp.2d 587,
591 (E.D.La. 2007).  Moreover, the record in this case will attest that novel matters of law
continually presented themselves throughout the duration of the litigation. *See, e.g., In re Vioxx
Products Liability Litigation*, 239 F.R.D. 450, 454 n. 5 (E.D.La. 2006)(Commenting on plaintiffs'
"novel" proposals involving class action procedure); *In re Vioxx Products Liability Litigation*, 2008
WL 3285912 at *7 (Recognizing the preliminary injunction sought by Avmed and 1199 SEIU
presented "unique" claims of "first impression"); *In re Vioxx Products Liability Litigation*, 501
F.Supp.2d at 781 n. 4 ("The PSC went so far during argument as to equate the FDA's recent
preemption statements with ancient attempts by various oligarchies and aristocracies to elevate
property rights over the human rights of individuals. While, ultimately, the Court will rely on more
contemporary sources, the PSC's voyage through the history of law in civilization as it relates to this
ongoing struggle was nonetheless interesting.").  Always at the ready, common benefit counsel were
at the forefront of these developments to make cogent presentations to the Court through briefing,
argument and evidential presentations.

Finally, the novel Settlement Agreement itself reflects the creativity of counsel who
developed a platform by which this mass tort litigation could be resolved in the absence of a class

action vehicle.  Following the Supreme Court's rulings in *Amchem Products, Inc. v. Windsor*, 521

U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1989), the availability of a Rule 23

class to individual personal injury claimants has proven to be a remote possibility.  One need look

no further than this Court's Order & Reasons addressing the national, personal injury class to see

the trend away from personal injury class actions.  *See In re Vioxx Products Liability Litigation*, 239

F.R.D. at 461-62 (denying that predominating common questions were present).  Nevertheless,

common benefit counsel marshaled the law and facts necessary to develop a "novel" means of

accomplishing an aggregate private settlement while avoiding the pitfalls of class action

jurisprudence.  *See* Issacharoff, *Private Claims, Aggregate Rights,* 2008 Supreme Court Rev. at 31.

Such original and innovative thinking was essential to achieve the tremendous accomplishment

demonstrated by the Settlement Agreement.

Accordingly, this factor supports a favorable percentage award.

### 3.     The Skill Requisite to Perform the Legal Service Properly.

The skill demonstrated by the common benefit counsel in this litigation is not established by

*ipse dixit.*  Rather, it has been acknowledged by the Court and its coordinated brothers and sisters

of the bench and demonstrated by the common benefit counsel's success in confronting the difficult

and complex issues presented by this litigation and in ultimately obtaining so much relief for so

many individuals.  At the presentation of the Settlement Agreement Judge Higbee favorably

commented on the skill of plaintiffs' counsel:

> This is a resolution where people have sat down, some of the
> most intelligent lawyers in the country, have sat down and advocated
> for their client's position. . . . The plaintiffs' lawyers were some of
> the top lawyers in the country, have in fact fought hard for their
> clients, and in fact have done everything in their power to protect

> their clients and to advocate their client's positions. In the end, they
> came together and spent a long, long time coming to what they
> believe and what I believe, having looked it over, is a fair resolution
> of this huge dispute.

Status Conference Hearing Transcript at 31-32 (E.D.La. Nov. 9, 2007). The Court's comments were

echoed and joined by Judge Chaney, *id.* at 36 ("I would like to acknowledge the incredible attorneys

that I dealt with in California") and by this Court:

> Secondly, this successful conclusion was due to the work of the
> lawyers. I practiced law for 33 years as an active litigator before
> taking the bench 13 years ago. I know what it is to be in the foxhole
> during the trial of a lawsuit. I lived in those foxholes, and I know
> that it is harder work to be a lawyer than it is to be a judge. I also
> know that a large portion of the credit for resolving litigation belongs
> to the lawyer and not the judge.
>                           *   *   *
> It's important for judges to recognize that it is the workhorse, the
> lawyer, who get us through litigation, and all of us personally
> appreciate that in this case.

*Id.* at 40-41.

   This litigation required considerable skill and experience to bring it to such a successful

conclusion. In this regard, due respect is owed to the highly experienced counsel representing

Merck. This litigation "was not conducted against mediocre adversaries" and the standing of

opposing counsel should be factored into determining this *Johnson* factor because such standing

reflects the challenge faced by plaintiffs' attorneys. *See In re King Resources Co. Sec. Litigation,*

420 F.Supp. 610, 634 (D.Colo. 1976). The ability of plaintiffs' counsel to obtain this innovative and

"unparalleled" settlement for the Vioxx Claimants in the face of such formidable legal opposition

confirms the superior quality of our representation. *See Enron,* 2008 WL 4178130 at *40.

Accordingly, this factor supports the requested percentage.

**4.    The Preclusion of Other Employment by the
        Attorney Due to Acceptance of the Case.**

Whether and to what extent counsel were precluded from other employment due to their commitments involved in litigating this case is an important factor in fixing the percentage award. Amongst the leadership of counsel in the MDL and coordinated states, the time spent on this case was plainly at the expense of time that counsel could have devoted to other matters. To say that common benefit counsel in this matter were committed to this litigation would be a gross understatement. Facing the crucible of trial, again and again, required enormous concentration of attention and time. As the time reports of Wegman-Dazet and common benefit counsel reflect, common benefit counsel dedicated a total of 503,185 hours of compensable time to this litigation. *See* Garrett Affid., ¶14. This enormous commitment amply supports the requested percentage.

**5.    The Customary Fee.**

In *Murphy Oil*, this Court pronounced that the customary fee factor focuses on counsel's expectations at the outset of the case when measuring the risks attendant to the prospective litigation. *Murphy Oil*, 472 F.Supp.2d at 866. There, the Court referenced *In re Shell Oil Refinery*, 155 F.R.D. 552, 571 (E.D.La. 1993), as support for class counsels' argument that personal injury suits, like those here, have customary fees between 33% and 40%. *Id.* Recently, this Court determined that reasonable fees for all counsel in this litigation would be subject to a 32% cap, while also noting that it was separately intending to address the common benefit award contemplated by this motion. *In re Vioxx Products Liability Litigation*, 574 F.Supp.2d 606, 607 (E.D.La. 2008).[33]

---

[33]Certain counsel, including a member of the PSC, sought reconsideration of this Order and currently have sought mandamus relief from the 5th Circuit in connection with the Court's rulings on the matter. *See In re Vioxx Litigation Consortium*, Docket No. 08-31255 (5th

(continued...)

At the outset of this litigation, in PTO No. 19, the Court ruled that a 3% assessment would be sufficient to address the discovery and docket management obligations of the committee.[34] Even then, however, the PSC recognized that circumstances would change in the event that a global or class action resolution was obtained. *See* discussion *supra* at 46. And the circumstances, indeed, have changed as, not only has a global settlement been obtained, but common benefit counsel from all coordinated jurisdictions are now participating in the award provided by the Settlement Agreement. This aggregation of counsel and their collective work product and additional common benefit time necessarily demands a higher assessment to permit a reasonable fee to counsel. As previously discussed, in such circumstances courts have permitted increased assessments in the range of 10% to 17%. *See Guidant, supra; Bextra, supra; Murphy Oil, supra.*[35] Thus, this factor also supports the requested percentage.

### 6.   Whether the Fee Is Fixed or Contingent.

Common benefit counsel undertook this litigation on a contingent fee basis, assuming a

---

[33](...continued)
Cir.)(pending).

[34]It should be noted that the 3% assessment applicable to the "Full Participation Option"(2% fee/1% cost) was designed to entice counsel to coordinate with the MDL by offering a lower assessment for a limited period of time of 90 days from the issuance of the order. *See* PTO No. 19 at 3. For those counsel not taking advantage of this selection, other options, including the "Traditional Assessment Option" (6% federal/4% state cases) and the "Limited Waiver Option" (6% federal cases), assessed counsel at the more common, *i.e.*, "traditional" rate of 6%. *Id.* at 4.

[35]In the *Toshiba* litigation, the court determined that this factor actually did not apply to the court's analysis. *Toshiba*, 91 F.Supp.2d at 970 ("This factor either does not pertain to this case, does not suggest any modification to the lodestar or benchmark percentage, or is already accounted for in the lodestar or benchmark percentage."). Ultimately, this same reasoning applied in *Murphy Oil*, as the court found that the customary fee was incorporated into the benchmark percentage analysis. *Murphy Oil*, 472 F.Supp.2d at 866.

substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys fees. *See, e.g, Enron,* 2008 WL 4178130 at *42.

The time in which to evaluate the risk is *ex ante, i.e.,* as of the time suit was initiated, not with the benefit of hindsight. *See Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir. 1991); *Diet Drugs,* 2002 WL 32154197 at *19. Indeed, as this litigation progressed the risk of non-recovery seemed to enlarge, not diminish. Merck was having tremendous success in the bellwether trials. Only one of the MDL trials resulted in a plaintiff's verdict. In the states trials, Merck won defense verdicts for most of the cases or, if a plaintiff received a verdict, Merck was successful in reversing the verdict on appeal. In addition, the litigation became endangered with the threat of Merck's Motion for summary judgement involving preemption. Fortunately, this Court disagreed with Merck. *See In re Vioxx Products Liability Litigation,* 501 F.Supp.2d 776 (E.D.La. 2007).[36] Nevertheless, the threat of preemption still looms large in this type of litigation given the pendency of *Wyeth v. Levine,* Docket No. 06-1249 (U.S. argued on Nov. 3, 2007) at the United States Supreme Court. *Cf. In re Vioxx Products Liability Litigation,* MDL No. 1657, Video Conference Transcript at 8 (E.D.La. Oct. 21, 2008)(Court advising persons not yet enrolled in the settlement program of the risks posed by *Wyeth v. Levine*). Where counsel face such substantial risks and recover significant compensation for their clients courts find this factor to favor the fee applicant. *See*

---

[36]Many other courts have found claims like those presented here to have been preempted. *See, e.g., Dobbs v. Wyeth Pharmaceuticals,* 530 F.Supp.2d 1275 (W.D.Okla. 2008). Indeed, in its last term the Supreme Court issued an opinion finding preemption under the Medical Device Act that is having widespread repercussions. *See Riegel v. Medtronic, Inc.,* 128 S.Ct. 999 (U.S. Feb. 20, 2008). *See also In re Medtronic, Inc. Sprint Fidelis Leads Products Liability Litigation,* 2009 WL 35467 (D.Minn. Jan. 5, 2009).

61

*Enron*, 2008 WL 4178130 at *46 ("In sum, the risk factor not only supports the reasonableness of the 9.52% fee agreement, but warrants application of a significant multiplier for a lodestar analysis.").

Common benefit counsel have received no fee compensation to date and have incurred significant unreimbursed expenses. The present fee award has always been at risk and completely contingent upon the result achieved. Thus, the contingent nature of the litigation supports the requested percentage.

### 7. <u>Time Limitations Imposed by the Client or the Circumstances.</u>

This Court has frequently noted the potential for MDL litigation to become so bogged down as to warrant the appellation of a "black hole." Mindful of this potential morass, the Court has used every device available to it to avoid such a consequence. The Court has regularly held monthly status conferences and employed "hands on" management to see that discovery was being conducted promptly and that the litigation was progressing at an appropriate rate. As the state courts were initially ahead of the MDL, after the Court seized upon its plan to conduct bellwether trials in rapid succession, counsel's feet were held to the fire. The trials themselves were conducted under strict time constraints. Always, counsel worked extremely hard to meet the Court's deadlines. Although not on the expedited pace imposed upon counsel in the *Murphy Oil* litigation, counsel were always aware of this Court's fierce determination to force them to obtain trial verdicts, mature the litigation, and get to point where compromise could be accomplished.

The fact that millions of documents were reviewed, tens of thousands Plaintiff fact sheets prepared, thousands of depositions taken, six trials were conducted, and a global settlement was reached in the span of only three years (even in the face of natural disaster), speaks volumes about

the pace of this litigation.  This factor therefore supports the requested percentage.

### 8.    The Amount Involved and the Results Obtained.

The eighth Johnson factor – the amount involved and the results achieved – is entitled to significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the plaintiffs.  As the Supreme Court has observed, " 'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  *See also Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir.1998) (". . . Where recovery of private damages is the purpose, . . . consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern.").  The Settlement Agreement provides funding of $4.85 billion to resolve thousands of victims' claims.  It is the largest non-class personal injury resolution of any mass tort.  By any measure, the settlement is an outstanding result.  Given such an outstanding result, this, the most important factor, amply supports the requested percentage.

### 9.    The Experience, Reputation, and Ability of the Attorneys.

When this MDL litigation began, the Court underwent an arduous vetting and selection process to obtain experienced, reputable and able counsel to participate on the PSC.  The initial criteria focused upon counsels' "(a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation."  *See* PTO No. 1.  In PTO No. 6, after careful consideration, this Court made its selections for the PSC.   These selections proved themselves to be accurate.  Recently, this Court, along with its coordinated state judges, recognized the high caliber of professionalism demonstrated by plaintiffs' counsel.  *See* discussion *supra* at 57-59.  Common benefit counsel used "impressive

legal skill and knowledge based on years of experience with similar-type cases." *Murphy Oil*, 472

F.Supp.2d at 866. This factor supports the requested percentage here.

### 10.    The "Undesirability" of the Case.

The risks presented by taking on a pharmaceutical giant such as Merck were daunting at the

inception of this litigation. Only the intrepid few were willing to institute litigation prior to the

withdrawal of Vioxx from marketing. At that time, there were substantial risks presented which

made the case undesirable.

Circumstances changed modestly for the better when the APPROVe results confirmed that

Vioxx was sufficiently associated with causing thromboembolic events that the drug was taken off

the market. At that point in time, with all of the attendant publicity, the number of cases filed and

the number of applications for positions on the PSC reflected the increased desirability of the

litigation. *See* Monthly Status Conference Transcript at 20 (E.D.La. March 18, 2005)(Clerk of court

received more than 30 applications). Even then, the risks associated with the litigation were still

great. This case was not a "slam dunk." Merck was well postured to defend itself and the Vioxx

franchise, and, indeed, it vehemently defended itself by asserting that the company would try every

case to verdict. With prosecution costs between $1 - 2 million per trial for some of the bellwether

trials, Oct. 21, 2008 Video Conference Transcript at 8, the barriers to entry into Vioxx litigation

were considerable.

At the outset of the litigation this Court cautioned counsel of the tremendous commitment

they were taking on:

> I remind you that this is a case that will take considerable time and
> considerable resources. You have to go in this position with your
> eyes open and be willing to commit both time and resources into a

> project of this type. It's not going to be interminable, but it's not going
> to end in six months or a year, it will take a considerable period of
> time that you'll need to know.

*See* Monthly Status Conference Transcript at 18-19 (E.D.La. March 18, 2005).  These comments

correspond well with the "undesirability" factor.  Given the undesirability and financial commitment

involved, this factor supports the requested percentage.  *See Enron,*  2008 WL 4178130 at *47.

### 11.    The Nature and Length of the Professional Relationship with the Client.

This *Johnson* factor was designed to consider those instances when, "a lawyer in private

practice may vary his fee for similar work in the light of the professional relationship of the client

with his office."  *Johnson,* 488 F.2d at 719.  This factor is therefore neutral as it relates to the

requested percentage since there are few, if any, longstanding client relations with the Vioxx

Claimants.  As this Court pointed out in *Murphy Oil,* "'the relationship did not antedate the

litigation, nor will it likely continue beyond the closure of this case,' other than as it relates to this

litigation."  *Murphy Oil*, 472 F.Supp.2d at 866-67, *quoting, In re ETS*, 447 F.Supp.2d 612, 632

(E.D.La. 2006).  Accordingly, little weight is to be afforded this factor.

### 12.    Awards in Similar Cases.

All but two of the *Johnson* fee adjudication factors are abstract in that they do not purport

to have any mathematical correlation to the computation of an appropriate percentage award.  The

final *Johnson* factor provides guidance as to how to concretize abstract consideration of the other

factors into a definitive percentage award.  That factor prescribes consideration of "awards in similar

cases."  *Johnson*, 448 F.2d at 719.  Such consideration is a dominant feature of contemporary

percentage-of-the-fund fee adjudication.  *See, e.g., Enron, supra; Murphy Oil, supra.*

As demonstrated above, the requested percentage is significantly less than the percentages

that have been awarded by courts in this Circuit as well as numerous other courts throughout the country. *See* discussion *supra* at 31-41. Accordingly, the "awards in similar cases" factor powerfully argues in support of the reasonableness of the fee requested.

* * *

Because this Court must "scrutinize the fee award under the *Johnson* factors" consistent with *High Sulpher Content,* 517 F.3d at 228, there is no doubt that the percentage award requested is well within the range of awards established by other courts employing the same rigorous analysis. Indeed, the requested percentage award falls in the lower end of such awards. As the other *Johnson* factors fully endorse the requested fee, the percentage fee requested should be awarded.

### E.   A LODESTAR CROSS-CHECK ANALYSIS DEMONSTRATES THAT THE REQUESTED PERCENTAGE AWARD IS REASONABLE

Using the time submissions audited by Wegman-Dazet to perform the calculation of the total lodestar value of the time devoted by all common benefit counsel in MDL No. 1657 was between $217,128,800.40 and $321,897,534.95, as of January 14, 2009. *See* Herman Affid., ¶¶54-55; Garrett Affid., ¶15. The total fee award requested from the Settlement Fund of $4.85 billion is 8% or $388 million. Thus, the cross-check multiple applicable to the requested award for all eligible common benefit counsel is either 1.21 or 1.79.

A cross-check multiple of either 1.21 or 1.79 is soundly within the range of multiples that demonstrate a reasonable fee in novel, complex, risk-laden litigation such as this. As noted by the Court in *Murphy Oil*, the lodestar cross-check is an abbreviated review of the time and rates submitted by counsel:

> In recognition of the noted disadvantages of the lodestar method as the principle means for determining attorneys' fees, such as the taxing

66

of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check:

> The lodestar cross-check calculation need entail neither mathematical precision nor bean counting. For example, a court performing a lodestar cross-check need not scrutinize each time entry; reliance on representations by class counsel as to total hours may be sufficient.... Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate....

*Murphy Oil,* 472 F.Supp.2d at 867, *quoting* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,* 18 Geo. J. Legal Ethics 1453, 1463-64 (2005).

Given the facts in *Murphy Oil,* this Court observed that "a lodestar multiplier range of 2.5 to 3.5 would be appropriate and reasonable in this case." *Id.* at 869. This lodestar multiplier range is consistent with the trending range found by other courts in recent mega-fund litigation. *See* Chart *supra* at 34-35. *See also Diet Drugs,* 553 F.Supp.2d at 486 (2.6 multiplier); *AOL Time Warner,* 2006 WL 3057232 at *28 (3.69 multiple), *citing VisaCheck / Mastermoney,* 297 F. Supp. 2d at 524 (3.5 multiple) and *WorldCom,* 388 F. Supp. 2d at 354 (4.0 multiple); *NASDAQ,* 187 F.R.D. at 489 (3.97 multiple; and observing that "multipliers of between 3 and 4.5 have become common"); *DeLoach,* 2003 WL 23094907 at *11 (4.45 multiple); *In re Rite Aid,* 396 F.3d at 303-04 (It is not an abuse of discretion for district courts to award fees that are at least four times the lodestar value).

The cross-check multiple of 1.21 or 1.79 that would result if the Court granted the instant Petition is, therefore, soundly within the range of all of the established cross-check parameters that signal a reasonable fee award.

**F.     COMMON BENEFIT COUNSEL SHOULD
         BE ENTITLED TO REIMBURSEMENT OF EXPENSES**

The common fund doctrine authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of plaintiffs' in MDL litigation. *See Sprague v. Ticonic*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d at 771 ("In accordance with the well-established common fund exception to the American Rule,...class counsel...are entitled to an award of their...expenses out of the fund that has been created for the class by their efforts"; *In re Quintus Sec. Litig.*, 148 F. Supp. 2d 967, 973 (N.D. Cal. 2001); *Orthopedic Bone Screw*, 2001 WL 1622741 at *9-*10 (awarding 5% of the gross recovery for reimbursement of litigation expenses); PTO No. 19 (authorizing 3% "assessment" in MDL 1657 for fees and repayment of costs and expenses).

The Settlement Agreement also provides for reimbursement of common benefit expenses from the clients' share of their recovery, as follows:

> In addition to those amounts provided in Section 9.2 above, Common Benefit Attorneys shall also be entitled to reimbursement of their reasonable common benefit expenses. Reimbursement of these expenses shall be deducted from the clients' net recovery. The PLC shall submit to the Claims Administrator the audited common benefit expenses of Common Benefit Attorneys,' which sum will be deducted on an equal percentage basis from the MI Settlement Fund and IS Settlement Fund.

Settlement Agreement §9.2.2. This provision was agreed to by all Vioxx claimants that registered and should be enforced by the Court in its administrative and oversight role over the Settlement program. *See* Settlement Agreement §9.2.3.

In the Vioxx litigation, the court-appointed auditor has reported that common benefit counsel

incurred $30,508,021.87 in properly documented[37] "held expenses" and $3,881,646.38 in properly documented "shared expenses" for the common benefit of all Vioxx Claimants in MDL 1657.[38] The sum of these expenses equals $34,389,668.25.   This amount represents .71 percent of the gross amount of recoveries that are subject to a common benefit award here and is thus unquestionably reasonable.  Accordingly, reimbursement of costs in this amount should be separately recognized and provided for in any common benefit award by the Court.

## VI.    CONCLUSION

For all the reasons set forth herein, Liaison Counsel respectfully submits on behalf of all Plaintiffs Common Benefit Counsel that this Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses should be granted.

Respectfully submitted,

Date:   January 20, 2009

By:   /s/ Leonard A. Davis
**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
820 O'Keefe Avenue
New Orleans, Louisiana  70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

**PLAINTIFFS' LIAISON COUNSEL**

---

[37] In order to be eligible for reimbursement, expenses were required to be within the limitations set forth in PTO 6 (as amended) and documented as required by the Order(s).

[38] *See* Garrett Affid., ¶¶18 - 21.

69

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 20th day of January, 2009.

/s/ Leonard A. Davis
Leonard A. Davis (Bar No. 14190)
*Herman, Herman, Katz & Cotlar, LLP*
820 O'Keefe Avenue
New Orleans, LA  70113
PH:    (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhkc.com