## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  VIOXX | : | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION L |
| This document relates to ALL ACTIONS | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

## AFFIDAVIT OF RUSS M. HERMAN IN SUPPORT OF
## THE PLAINTIFFS' LIAISON COUNSEL'S MEMORANDUM IN
## SUPPORT OF MOTION FOR AWARD OF PLAINTIFFS' COMMON
## BENEFIT COUNSEL FEES AND REIMBURSEMENT OF EXPENSES

STATE OF LOUISIANA    :
                                          SS
PARISH OF ORLEANS    :

RUSS M. HERMAN, ESQUIRE, being duly sworn according to law deposes and says:

## I.  INTRODUCTION

1.    I am an attorney admitted to practice before the bar of the Supreme Court of the United States, the United States Courts of Appeals for the Fifth Circuit, the United States District Courts for the Eastern District of Louisiana and the Supreme Court of the State of Louisiana, among others.  I received my L.L.B. from Tulane University Law School in 1966.  A copy of my Biography is attached hereto as Exhibit "A".

2.    I make this affidavit in support of the Plaintiffs' Liaison Counsel's Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses.[1]  The purpose of this affidavit is to describe the work performed by the common benefit counsel in the

---

[1]One member of the PSC does not subscribe to the relief requested in this motion.

coordinated pretrial proceedings in MDL 1657 and those common benefit counsel in coordinated state jurisdictions.

3.     I was appointed by the Court to the position of Plaintiffs' Liaison Counsel (PLC) and a member of the Executive Committee (PEC) to the Plaintiffs' Steering Committee's (PSC). Since my appointment in MDL 1657, I assumed responsibility for coordinating and supervising all pretrial activities in the litigation, including discovery, motion practice, strategy, committee appointment and overview, state-federal coordination, development, disclosure of "generic" expert testimony, and preparation of a trial package. My activity included but was not limited to review, editing, approval of every motion, brief and pleading in the MDL and an awareness and review of a number of such papers in the coordinated litigations. I also monitored trials in Texas, Louisiana and New Jersey. I was also appointed by the Court to participate as Chairman of the Negotiating Plaintiffs Counsel (NPC) and have had a major role in each activity involved in negotiating the settlement and settlement administration. The Court also appointed me to Chair the Allocation Committee and I am responsible for the filing of the instant motion. I am either personally familiar with the facts set forth herein by virtue of my involvement in virtually all of the phases of pretrial activity in MDL 1657 and negotiation and implementation of the Settlement Agreement entered into by Merck & Co., Inc. on November 9, 2007, or have become informed of these facts in my capacity as PLC through communications with members of state counsel, the PSC, the NPC and the activities of the Allocation Committee. I am therefore the person most knowledgeable as to the overall accomplishments and activities of the various committees and their efforts in MDL No. 1657.

4.     Through this affidavit, I will provide a fairly detailed overview of the work

2

performed in the MDL and coordinated state jurisdictions of New Jersey, Texas and California.

The following narrative of the plaintiffs common benefit attorney's work is intended to provide

the Court with an appreciation of the general objectives we pursued in the management of this

litigation and our approach to carrying out those objectives.  Natural limitations of space and

time, however,  limit the ability of a narrative to fully convey the magnitude of our undertaking.

## II.     WORK PERFORMED IN MDL 1657 & THE COORDINATED STATES

### A.     Litigation Efforts by Common Benefit
####        Attorneys in New Jersey, Texas and California

5.     Prior to the establishment of MDL 1657 in February 2005, discovery and trial

efforts were underway in state courts, including those in New Jersey, Texas and California.

Indeed, many of the attorneys who initially litigated in these three state-court venues continued

their work cooperatively after Vioxx was removed from the market in 2004 in both State and

Federal Courts through the coordinating administration of the MDL.

6.     For example, the first Vioxx case filed in New Jersey state court began in January

2002.  After numerous additional cases were filed in various Superior Courts in New Jersey, on

May 20, 2003, the Supreme Court of New Jersey ordered that Vioxx litigation be accorded

"Mass Tort" treatment, and coordinated all pretrial proceedings before Judge Carol Higbee, in In

Re: Vioxx Litigation, Case Code 619 (New Jersey Super Ct., Atlantic County).  Through the

efforts of a working group of excellent trial lawyers from New Jersey and elsewhere, Vioxx

individual cases were litigated aggressively before Vioxx was withdrawn from the US market in

September 2004.  These lawyers engaged in extensive motions practice before Judge Higbee,

coordinated discovery of corporate documents, and conducted multiple corporate depositions.

These beginning efforts generated an initial and partial platform for the more extensive and elaborate work that was to become the hallmark of the nationwide coordinated efforts performed in the MDL. These early pre-MDL New Jersey efforts included, but are not limited to, the following efforts:[2]

* Prosecution of motions to compel prior to withdrawl of Vioxx that led to the production by Merck of its clinical trial database (litigated to the New Jersey Appellate Division); statistical analysis files for its clinical trials—SAS files; ARCOXIA science data and information; data held by Merck's research affilliate in Canada (Merck Frosst); numerous other databases, including Merck's sales communication database and adverse event database; documents created after April 2002; and numerous additional custodial witness productions.

* The establishment of a large, multi-user electronic document depository maintained at Seeger Weiss in New York. This depository made available to Vioxx litigants the millions of pages of then-produced documents in searchable format, as well as multiple databases and raw clinical trial data produced by Merck, as well as deposition transcripts and exhibits. The Common Benefit applicants created a unified document and reviewing protocol such that reviewers could review for the common good.

* The coordinated review and culling of countless pages of Merck and third party documents, yielding many of the "hot" documents that were central to the MDL trial package.

* Motions to unseal and de-designate documents and data designated as Confidential by Merck, which led to the unsealing of thousands of documents and paved the way for public discourse and scientific investigation concerning Merck's contentions.

* Development of the electronic work product document database—internally referred to as the "Theme Grid"—that ultimately became the MDL Exhibit Database, an integral component of the MDL 1657 "Trial Package."

---

[2]Many of these activities were also performed by or involved assistance from MDL attorneys after the formation of the MDL.

4

    \*        Development of other core work product, such as the Vioxx
Backgrounder, Science Primer, Cast of Characters, and Glossary,
which were shared with counsel throughout the country after
withdrawal of Vioxx to both train and consolidate counsel new to
the litigation.

    \*        Conducting numerous pivotal depositions, including, but not
limited to David Anstice, Edward Scolnick, Ray Gilmartin, Alise
Reicin, Briggs Morrison, Alan Nies, Louis Sherwood, Beth
Seidenberg, Deborah Shapiro, Carolyn Canuscio, Brian Daniels,
Thomas Bold, Douglas Watson, Adam Schecter, Susan
Baumgartner, Wendy Dixon, Eliav Barr, and Jennifer Ng, and
Peter Honig.

    \*        Development of numerous experts who ultimately became MDL
experts, including Richard Kronmal, Ph.D., and Benedict Lucchesi,
M.D., and Wayne Ray, Ph.D.

7.        Similarly, in Texas, Vioxx litigation began before Vioxx was removed from the
market or the Federal MDL was formed. In fact, the first cases brought in the nation were
brought in Texas by Carlene Lewis and Shelly Sanford in the summer of 2000.[3] Throughout the
next several years, these Texas lawyers retained and prepared experts, established a document
depository, propounded interrogatories, and had produced to them 10.5 million pages of
documents.

8.        These pioneering counsel, Lewis and Sanford, associated themselves with trial
counsel on certain cases. They also took a number of the original depositions of Merck
witnesses, including Alice Reicin, Deborah Shapiro and Adam Schechter. Moreover, they helped
develop experts such as Benedict Lucchesi, Wayne Ray, Cheryl Blume, Joye Carter and David

---

[3] Ms. Lewis and her partner Shelly Sanford were widely credited for filing the first Vioxx
lawsuit. As a result of Ms. Lewis's early efforts, which continued after Vioxx was withdrawn from
the market, she was widely supported as a member of the MDL PSC. Tragically, Ms. Lewis passed
away before this litigation was resolved.

Egilman.

9.      Prior to the withdrawal of Vioxx from the market on September 30, 2004, there were several hundred Vioxx cases pending in federal and state courts in Texas. The Texas MDL was established on September 6, 2005. *See In re Texas State Vioxx Litigation*, No. 2005-59499 (District Ct., Harris County, Tx, 157th Judicial District). Ultimately, the Texas MDL involved approximately 900 cases that were filed for pre-trial. Judge Wilson appointed his own PSC comprized of 11 counsel. Under Judge Wilson's guidance, these counsel were actively preparing 5 waves of cases for trial to begin in the Spring of 2007. On April 19, 2007, however, after extensive briefing and argument, Judge Wilson granted Merck's Motion for Summary Judgment on the Texas "Presumption" Statute and all discovery and trials in Texas courts were stayed pending appeal of the Order. The matter was in the Texas Appellate Courts when the Vioxx Settlement Agreement was announced in November of 2007.

10.      In addition, Texas common benefit counsel attended and gave presentations to the FDA Advisory Committee in 2004. They also reached an agreement with Merck's counsel that cases filed in Texas would not be removed to Federal Court if filed against Merck alone, which encouraged the development of the Texas docket.

11.      The California coordinated proceedings began in 2002. *See In re Vioxx Coordinated Cases*, No. JCCP 4247 (Los Angeles Co., Calif., Super. Ct. Oct. 30, 2002). The California common benefit counsel developed three Vioxx cases for early trial. This effort involved significant discovery, expert development and motions practice which ultimately resulted in a combined sixteen weeks of trial. All three trials resulted in defense verdicts or hung

6

jurys. But the court's efforts in the Summer of 2007 to accelerate 80 trial settings for California residents subject to preferential trial settings under California Code of Civil Procedure §36 created tremendous incentives for the parties to conclude the litigation. *See Individual Vioxx Cases*, Case No. JCCP No. 4247, Order re: June 1, 2007 General Status Conf. (Los Angeles Co., Calif., Super. Ct. June 28, 2007).

12.     It is important to note that significant trial and discovery work initiated in New Jersey, Texas and California <u>before</u> the withdrawal of Vioxx in September of 2004 continued in these State Courts <u>after</u> Vioxx was withdrawn from the U.S market and <u>after</u> the establishment of MDL 1657. The exemplary work performed in these venues was always fashioned in coordination with the MDL attorneys. It included numerous motions to compel, document productions, coordinated depositions, motions *in limine* and evidentiary motions in advance of the various state trials, and expert development.

13.     In New Jersey, for example, the New Jersey common benefit counsel pursued their generic discovery program outlined above; took the depositions of numerous additional sales, marketing, and science witnesses; pressed discovery challenges at monthly status conferences held before Judge Higbee; pursued substantial and aggressive case-specific discovery, including obtaining orders for the production of custodial files for thousands of sales representatives; issued commissions and subpoenas for third-party discovery; sought and conducted early trials reflecting several different plaintiff and case characteristics; and crafted creative trial groupings and structures in an effort to accelerate resolution of the approximately 16,000 New Jersey Vioxx injury cases. Ultimately, five cases were tried in New Jersey, resulting in substantial compensatory damage verdicts in two of the cases–*Hummeston* and *McDarby*. The

verdicts were likewise significant in that, in *Humeston*, the plaintiff was a short-term user of

Vioxx (approximately two months use), while in *McDarby*, the 75 year-old plaintiff suffered

from significant other cardiac risk factors. Notably, in four of the five New Jersey trial cases, the

juries found that Merck had failed to provide an adequate warning to the medical community of

the cardiac risks of Vioxx of which it was then aware.

14.     Similarly in Texas, two cases were tried to verdict with two verdicts for plaintiffs

in the *Ernst* and *Garza* cases. Both verdicts were substantial, $253 million and $32 million,

respectively. These verdicts helped to establish that liability could be obtained despite Merck's

formidable defenses. In addition, Judge Wilson scheduled five waves of cases for trial which

were to begin in the spring of 2007. This scheduling of cases for trial also applied pressure upon

Merck.

15.     In California, three cases were tried to verdict. While the first case of *Grossberg*

*v. Merck & Co., Inc.* that tried in California resulted in a defense verdict, that verdict was not on

the "generic issues." Rather, that verdict was a result of usage issues by the plaintiff.

Significantly, in the *Grossberg* case the jury found that Vioxx was defective and that Merck

engaged in wrongful and willful misconduct.

16.     All of these state litigations generated significant discovery, expert development,

document production, and motion practice which directly contributed to the global resolution of

this case.

### B.     MDL 1657—ORGANIZATION, COORDINATION AND SUPERVISION OF GENERIC AND INDIVIDUAL CASE DISCOVERY AND EXPERT DEVELOPMENT

17.     From a management standpoint, MDL 1657 was an enormous undertaking. As of

8

September 2004 when Vioxx was withdrawn from the market, there were less than 200 cases filed in the state and Federal Courts with most cases pending in New Jersey. By the date of the third MDL Monthly Status Conference in May 2005, the number of cases filed had expanded to 3,168, including cases filed in Texas, California and numerous Federal Courts throughout the nation. By the time the MDL settlement was announced in November 2007, the number of claimants (both filed cases and cases on the PSC-negotiated "tolling" agreement) had exploded to over 60,000 claimants. The sheer breadth of cases and the number of jurisdictions involved made the management and coordination of this litigation a significant challenge for common benefit counsel and the Court. It was the MDL No. 1657's PSC's and Liaison counsel's efforts, which made this massive case manageable and settlement possible.

18.     Remarkably, common benefit counsel managed to successfully coordinate this litigation notwithstanding the devastating ravages of hurricanes Katrina and Rita in 2005. Faced with one of the worst natural disasters in the history of this country, this MDL Court was forced to evacuate to Houston, Texas and sit temporarily in the Southern District of Texas from summer to late 2005. Despite this adversity, the court maintained its regular activities that allowed common benefit counsel to persevere and litigate this case without disruption. For instance, although PLC were also forced to abandon their New Orleans offices after Katrina and establish other temporary offices, including in Houston, Texas, common benefit counsel and the MDL court were able to continue their MDL activities and conduct the trial of the *Plunkett* case in Houston, Texas. By pushing on in the face of extreme adversity, common benefit counsel were able to maintain pressure on Merck without any loss of the momentum established prior to the hurricanes.

19.     Shortly after the Plaintiffs Steering Committee was appointed,[4] the PSC sought to organize itself into several important committees, including the "PSC Discovery Committee," the "PSC Science and Expert Committee," the "PSC Law and Briefing Committee" and the "The Sales and Marketing Committee."  Later committees were added including the "Privilege Subcommittee" and the "Trial Package Committee."  These committees took the early findings of the litigation that preceded them and expanded the scope of these efforts using the more forceful tools available through the MDL and federal procedural devices.  At all times, the MDL coordinated with the other venues by appointing state liaison counsel to assure a seamless transition.  As a consequence, the MDL became the center of gravity of Vioxx litigation.  Although it is impossible to describe the day-to-day and sustained efforts of these committees for over many years, I will attempt to highlight the major significant pretrial accomplishments of these committees and the various subcommittees that were established.

20.     The PSC Discovery Committee:  Shortly after the PSC was formed, the PSC Discovery Committee was charged with overseeing all aspects of pretrial discovery and coordination.  One of the first actions of the "PSC Discovery Committee" chairs was to organize and "import" the significant state depositions and document production already performed and analyze what work should be done in order to prepare for the federal trials that this Court planned to have in 2005-2006.  These efforts included, but were not limited to the following:

*       A major document depository was established by Liaison Counsel

---

[4]In PTO No. 6, the Court appointed the Plaintiffs' Steering Committee ("PSC") originally comprised of Andy D. Birchfield, Jr. (Co-Lead), Christopher A. Seeger (Co-Lead), Arnold Levin, Thomas R. Kline, Richard J. Arsenault, Carlene Rhodes Lewis, Elizabeth J. Cabraser, Gerald E. Meunier, Troy A. Rafferty, Mark P. Robinson, Jr., Drew Ranier and Christopher V. Tisi.  Later, Shelly Sanford was substituted for Ms. Lewis.

in New Orleans which acted as a accumulation center for depositing material from California, Alabama, New Jersey and on an on-going basis retained coding and additional material in the MDL. The MDL depository acted as the nerve and communication center for all litigation nationally. The depository inhabited separately rented office space nearby the offices of Herman, Herman Katz & Cotlar, LLP. It was equipped with modern office equipment including photocopiers, computers, faxes and telephones. Rent and equipment costs were borne by the PSC and have not yet been reimbursed. The depository was administered by Penny Grisamore[5] and staffed by attorneys and capable paralegals. Salaries of these professionals and para-professionals were borne by members of the PSC. Oversight of the depository on behalf of the PSC was performed by the Depository Executive Committee comprized of Leonard Davis, Fred Longer and Anthony Irpino.

\* The service of 78 third-party subpoenas. These include those directed to the United States Food and Drug Administration (FDA); Eric Topol, MD and Steven Nissen, MD, who were COX-2 researchers at the Cleveland Clinic; Garrett FitzGerald, the namesake for the "Fitzgerald Hypothesis"; James Fries, MD, professor *emeritis* at Stanford University; The New England Journal of Medicine which published the VIGOR and APPROVe studies; and various scientists and clinical trial investigators involved in the VIGOR, APPROVe, VICTOR, and VIP trials. In addition, the PSC Discovery Committee issued third party subpoenas to IMS (which collects pharmaceutical usage data), Ogilvy DDB (Public relations company hired by Merck) and the members of the committee that issued the Martin Report.

\* The drafting and service of a First Set of over 50 tailored Master Interrogatories that directed Merck to reveal important information, concerning, among other things, its sales and marketing data and studies lists (clinical and preclinical) concerning Vioxx, as well as a Master Request for Production of Documents. As a result of these requests, and the requests served in the various state court proceedings, Merck ultimately produced approximately 50,000,000 pages of documents. In addition, a Second Set of Interrogatories

---

[5]Ms. Grisamore was retained as administrator based upon her extensive experience supervising the depositories in other litigation, including: Rezulin, Scott Tobacco, and Propulsid. Ms. Grisamore has a Bachelors degree from Tulane and a Masters degree from John Jay College of Criminal Justice (Summa Cum Laude) in Forensic Psychology.

and Document Requests were subsequently served that were
directed to information gathered in the Martin report.  A Third Set
of Interrogatories and Document Requests were subsequently
served addressing other matters.

\*     The drafting and negotiation of a Plaintiff Profile Form (PPF) and
Merck Profile Form (MPF) to be used to guide the discovery of
individual cases.  See PTO 18A, 18B, 18C, and 18D.  It should be
noted that the MPF, which markedly improved and accelerated
case-specific discovery, was a PSC innovation that had not been
used previously in a pharmaceutical MDL.  One of the innovations
of the MPF was access to the files of Merck's detailers.  After
determining that prior efforts to produce complete records of
Merck's field representatives had failed, the MDL was successful
in obtaining the complete production of Merck's detailers
nationwide.

\*     The negotiation with the FDA regarding production of the agency's
documents, including numerous in-person meetings, some of
which occurred in New Orleans and Washington, D.C.  In addition,
the MDL Court organized telephonic conferences and otherwise
prompted communications between the FDA and the MDL.  These
arduous negotiations resulted in an early production of over 35,000
FDA documents exclusively in the MDL

\*     The taking of 170 key corporate and third-party fact depositions.
These generic depositions included, but are not limited to:  David
Graham, MD (FDA Medical Officer),[6] Eric Topol, MD (Cleveland
Clinic Cardiologist), Steven Nissen, MD (Cleveland Clinical and
President of Medical College of Cardiology), Gregory Curfman,
MD (Editor for the New England Journal of Medicine which
published the VIGOR and APPROVe studies), Gil Block, MD
(Alzheimer Study Director), Mal Mixon (president of Cleveland
Clinic), James Fries (professor or Medicine and Rheumatology,
Stanford University), Martin Carroll (executive vice President
Sales), James Dunn (national Sales Representative), Jo Jermain
(National Sales Executive, Merck), and Ned Braunstien.  The fact
that most of these depositions were shown to the Jury in multiple

---

[6]    It should be noted that, to the PSC's knowledge, the deposition of Dr. Graham is the first
time in which the FDA was compelled to produce a sitting FDA official in a pharmaceutical case.
The production of Dr. Graham for deposition followed an Order of this Court after significant
briefing and argument by the parties and FDA.

States and Federal Vioxx Trials demonstrates the skill employed
by the PSC discovery Committee and common benefit attorneys.

\*      The taking of 1757 case specific depositions in trial cases were
significant in the resolution of this case on a global basis. These
include cardiologists, prescribing physicians and/or
rheumatologists, experts, Merck sales representatives and other
technical witnesses. In total, the PSC has record of approximately
1,900 days of depositions taken by common benefit attorneys in the
generic and bellwether cases.

\*      The PSC filed numerous motions regarding discovery with the
MDL Court, including motions (a) for the testimony of Eric Topol,
(b) relating to FDA's compliance with PSC subpoena for
documents, (c) regarding the production of a sitting FDA medical
officer, David Graham, MD, for deposition, Motions with respect
to the "Martin Report," (d) regarding the production of Foreign
Evidence from Merck Affiliates abroad, and (e) for the production
of evidence relating to Merck's other COX-2 inhibitor, Arcoxia.

\*      The PSC discovery chairs took the lead in coordinating discovery
efforts, where appropriate, with the State counterparts in
California, New Jersey, and Texas.

21.     <u>The PSC Privilege Subcommittee:</u> As an adjunct of the Discovery Committee,

the PSC established the Privilege Subcommittee. The PEC specifically decided that the

"privilege" issue should be put on a front burner. It appeared to the PEC that Merck was

attempting to conceal or obfuscate important documents through the use of flawed and

improperly designated uses of privilege. In this connection, Merck's privilege logs, which

identified over 30,000 privileged documents, were equally flawed, confusing, and inadequate.

Initially, that committee worked with the MDL Court to have judicial review of exemplar

documents that Merck had withheld for privilege. This Court devoted in excess of two weeks of

its valuable time to reviewing *in camera* Merck's purportedly privileged documents before

ordering that certain documents be declassified and produced. Merck appealed the Court's ruling

13

on these documents. *See In re Vioxx Product Liability Litigation*, 2006 WL 1726675 (5th Cir. May 26, 2006). The Fifth Circuit recognized the "herculean efforts" that the Court engaged in and noted the documents at issue to be "crucial to these many cases." *Id.* at *1. Nevertheless, the Fifth Circuit ordered that a different procedure of review occur, without issuance of a writ of mandamus. As a result, the Court appointed Special Master Rice to review documents and address disputes concerning their privilege status. The PSC lawyers and their affiliated counsel met repeatedly with the Special Master and embarked on an ambitious briefing schedule that ultimately resulted in the release of a significant number of documents that were improperly withheld on the basis of privilege. *See, e.g., In re Vioxx Prod. Lib. Litig..*, 501 F Supp 2d 789 (E.D. La 2008). This result was considered a major coup on the part of the MDL. Only through the foresight and perseverance of the PSC were these clandestine documents made available. To our knowledge only a handful of MDLs have carefully scrutinized defendants' privilege logs and endeavored to make available otherwise withheld documents through the use of improper assertions of privilege.

22. <u>The PSC Generic Expert Witness Committee</u>: At the same time the PSC set up the Discovery Committee, it set up the Generic Expert Witness Committee ("GEWC"). The GEWC was tasked with the identification of potential expert witnesses, the development of the witness, the submission of Rule 26 (or analogous state) expert reports, and the defense of the witnesses at deposition and in any <u>Daubert</u> hearing. Early on, the GEWC identified the numerous complex areas of science and medicine that could be implicated in individual Vioxx cases, state or federal. These included experts in specialties such as Biostatistics, Cardiology, Cardiac Surgery, Epidemiology, FDA Regulatory Affairs, Internal Medicine, Nephrology,

14

Neurology/Stroke, Pathology, Pharmacology, Toxicology, Rheumatology, and Marketing. The

GEWC, and coordinated state Common Benefit lawyers, met regularly and, in total, reviewed the

qualifications of over 100 physicians and other experts. After this extensive vetting process, the

PSC identified the following "Generic" expert witnesses who had issued reports or whose report

was in the process of completion at the time of settlement.[7] These include, but are not limited to,

the following:

Jerome Avorn, MD—Professor of Medicine, Epidemiologist*#
Colin Bloor, MD--Professor of Pathology, University of San Diego* #
Cheryl Blume, MD—FDA Regulatory Expert*
Les Cleland, MD–Rheumatologist*
David Egilman, MD—Community Health Specialist, Wake Forest*#
John Farquhar, MD—Professor of Cardiology and Epidemiology, Sanford University*
Edward Feldmann, MD—Professor of Neurology, Brown University[8]
Robert Fletcher—Epidemiologist*
Egil Fossilien, MD—Pathologist, University of Illinois*
Colin Funk, MD–Pharmacologist
Ira Gelb, MD—Cardiologist, University of Florida* #
John Gueriguian, MD---Former FDA Medical Officer*
Michael James, MD–Pharmacologist
Dean Kapit, MD--Former FDA Medical Officer* #
Richard Kronmal, PhD—Professor of Biostatistics, University of Washington*#
Benedict Lucchesi, MD— Cardiologist, University of Chicago* #
Lemuel Moye, MD—Epidemiologist, University of Texas*#
Connie Peschman—Marketing expert* #
Wayne Ray, PhD—Professor of Epidemiology, Vanderbilt University*#
Michael Snapes, MD–Cardiologist
Douglas Zipes, MD—Professor Cardiology, University of Indiana*

These generic and other Plaintiffs' experts, 51 in total, were identified in the PSC's trial

package.

_____

[7] Those experts delineated with a (*) were produced  a deposition.  Those delineated with
(#) appeared live at a bellwether trial
[8] At the time the settlement was announced, Dr. Feldmann's report on the risk of Stroke was
in the process of being written.  He was used extensively as a consultant on the Stroke issues in the
Vioxx Settlement

23.     In addition to MDL's development of these experts, the PSC and state common benefit attorneys filed numerous motions and oppositions relating to the testimony of these experts, including *Daubert* Motions. Due to the efforts of the Common Benefit Attorneys, a majority of the defense challenges to these experts were rejected in *both* Federal and State Courts. See, *In re Vioxx Products Liability Litig*, 401 F. Supp. 565 (E.D. La 2005).

24.     Finally, the PSC Science and Expert Committee, and state common benefit attorneys, deposed and cross-examined numerous Defense Experts, including but not limited to the following generic Merck witnesses in areas of Biostatistics, Cardiology, Epidemiology, FDA Regulatory, Pharmacology, Rheumatology, and Toxicology: Janet Arrowsmith-Lowe, MD; David Celemajer, MD; Richard Feldman, MD; Nicholas Flavahan, MD; John Gaziano, MD; John Keaney, MD; Kim Klancke, MD; Lisa Rarick, MD; David Silver, MD; Theodore Tyberg; and Douglas Vaughn. These and other defense experts, 41 in total, are identified in the PSC's trial package.

25.     <u>PSC Law and Briefing Committee</u>: To support the MDL and any state substantive motions that would need to be filed or opposed, the PSC established a "Law and Briefing Committee." This Committee masterminded the development of the overall legal stratagems and tactics employed by the PSC during the litigation. In the MDL, the law and briefing committee drafted over 45 substantive motions, pretrial orders and the like addressing significant matters ranging from statutes of limitations and the subpoena authority of the court to preemption.  An Index of the substantive Motions of the PSC is attached hereto as Exhibit "B".  In addition, over 100 substantive motions were filed by individual plaintiffs that were monitored or assisted by the committee.   An Index of the substantive Motions of these Plaintiffs is attached hereto as Exhibit

"C". Similarly, the PSC was required to respond to well over 200 substantive motions filed by Merck and others. An Index of the substantive Motions of Merck and others is attached hereto as Exhibit "D". The PSC Law and Briefing Committee also assisted in numerous state trials drafting Motions *In Limine* or oppositions to Merck's Motions *In Limine*.

26.    The Law and Briefing Committee was responsible for preparing Master Class Action complaints, which required sweeping efforts to investigate and compile the material allegations. Extensive motions practice, including motions to dismiss, motions to strike class allegations, and actual class certification were briefed and argued.

27.    Summary judgment motions, including efforts to have claims dismissed on statute of limitations and the death-knell grounds of preemption, were comprehensively covered by the Law & Briefing Committee. To defend against the preemption motion, a Rule 56(f) affidavit was filed stating the need for additional discovery. The PSC subsequently engaged in that discovery against the FDA and other entities to find evidence controverting Merck's argument that the FDA's Preamble to the newly promulgated labeling regulations, 71 Fed.Reg. 3922 (Jan. 24, 2006), should be entitled to deference that the FDA had complied with Executive Order No. 13132, 64 Fed. Reg. 43255 (1999). We are not aware of any other similar discovery or defense to such a motion of its kind. Coupled with the other arguments presented by the PSC, Merck's motion based on preemption was successfully defeated. *See In re Vioxx Products Liability Litigation*, 501 F.Supp.2d at 781 n.5. Absent this decision, the settlement would have likely been disrupted. Instead, the settlement proceeded. In order to avoid a premature appeal to the Fifth Circuit Court of Appeals, the aforementioned Rule 56(f) affidavit prevented the granting of a 28 U.S.C. §1292(b) appeal.

28.     There were literally thousands of oral and written rulings on issues in this MDL. As of January 13, 2009, the docket reflected 4,177 such orders.   An Index of the Court's orders is attached hereto as Exhibit "E".   A sampling of these opinions, 51 in all, are available on Westlaw, as follows:  (1) *In re Vioxx Products Liability Litigation*, 2008 WL 4681368 (E.D.La. Oct. 21, 2008) (order and reasons granting BrownGreer, LLC's motions to server and to strike the class action allegations with regard to the ERISA proceedings initiated by AvMed, Inc., et al); (2) *In re Vioxx Products Liability Litigation*, 574 F.Supp.2d 606 (E.D.La. Aug. 27, 2008) (order and reasons capping individual contingent fee arrangements for attorneys representing claimants at 32% plus reasonable costs); (3) *In re Vioxx Products Liability Litigation*, 2008 WL 3285912 (E.D.La. Aug. 7, 2008) (order and reasons denying motions by ERISA plans, AvMed and Greater New York, to enjoin the distribution of settlement proceeds); (4) *In re Vioxx Products Liability Litigation*, 557 F.Supp.2d 741 (E.D.La. May 30, 2008) (order and reasons denying emergency motion to modify the Court's Lone Pine order); (5) *In re Vioxx Products Liability Litigation*, 2008 WL 1995098 (E.D.La. May 6, 2008) (order and reasons granting motions to dismiss the verified petitions filed by Healthcare Recoveries, Inc., seeking pre-action discovery); (6) *In re Vioxx Products Liability Litigation*, 2007 WL 4234237 (E.D.La. Nov. 28, 2007) (order denying an individual plaintiff's, Stuart, motion for reconsideration of order dismissing complaint); (7) *In re Vioxx Products Liability Litigation*, 2007 WL 3354112 (E.D.La. Nov. 9, 2007) (order temporarily staying activity in the MDL in order to give eligible plaintiffs sufficient time to determine whether they wish to participate in the resolution program); (8) *In re Vioxx Products Liability Litigation*, 2007 WL 3354137 (E.D.La. Nov. 9, 2007) (Lone Pine order); (9) *In re Vioxx Products Liability Litigation*, 522 F.Supp.2d 799 (E.D.La. Nov. 8, 2007)

(granting motions to dismiss on statute of limitations grounds under Pennsylvania, Louisiana and Illinois law); (10) *In re Vioxx Products Liability Litigation*, 2007 WL 3334339 (E.D.La. Nov. 8, 2007) (granting motions for summary judgment, on statute of limitations grounds under California, Texas and Indiana law); (11) *In re Vioxx Products Liability Litigation*, 2007 WL 3353404 (E.D.La. Nov. 8, 2007) (granting motions for summary judgment, on statute of limitations grounds, regarding plaintiffs from Kentucky and Tennessee); (12) *In re Vioxx Products Liability Litigation*, 2007 WL 3104220 (E.D.La. Oct. 23, 2007) (order and reasons denying plaintiff's, Petty, motion to remand and granting Merck's motion to dismiss); (13) *In re Vioxx Products Liability Litigation*, 2007 WL 2461628 (E.D.La. Aug. 21, 2007) (denying Merck's motion to vacate order granting substitution of parties following the death of the named plaintiff); (14) *In re Vioxx Products Liability Litigation*, 2007 WL 2406850 (E.D.La. Aug. 20, 2008) (denying Merck's second motion for new trial in Barnett); (15) *In re Vioxx Products Liability Litigation*, 501 F.Supp.2d 789 (E.D.La. Aug. 14, 2008) (order and reasons granting, in part, and denying, in part, Merck's motion for approval of the Special Master's Report and Recommendation for resolution of discovery dispute involving materials for which Merck had asserted privilege); (16) *In re Vioxx Products Liability Litigation*, 501 F.Supp.2d 776 (E.D.La. July 3, 2007) (order and reasons denying Merck's motion for summary judgment on preemption grounds); (17) *In re Vioxx Products Liability Litigation*, 523 F.Supp.2d 471 (E.D.La. June 5, 2007) (order and reasons remitting verdict in Barnett and denying Merck's motions for judgement as a matter of law and for a new trial); (18) *In re Vioxx Products Liability Litigation*, 489 F.Supp.2d 587 (E.D.La. May 30, 2007) (order and reasons granting new trial in Plunkett); (19) *In re Vioxx Products Liability Litigation*, 2007 WL 1558700 (E.D.La. May 30, 2007)

19

(denying PSC's motion to compel return of attorney work product); (20) *In re Vioxx Products Liability Litigation*, 478 F.Supp.2d 897 (E.D.La. March 22, 2007) (order and reasons denying Merck's motion for summary judgment, on statute of limitations grounds, as to plaintiffs with claims governed by the laws of Alabama, Tennessee and Kentucky); (21) *In re Vioxx Products Liability Litigation*, 2007 WL 854251 (E.D.La. March 6, 2007) (order and reasons granting Merck's motion for protective order and denying the PSC's motion to compel with respect to discovery questions pertinent to the Martin Report); (22) *In re Vioxx Products Liability Litigation*, 2006 WL 3759648 (E.D.La. Dec. 18, 2006) (order and reasons granting plaintiff, Frank Pescatello's, motion to vacate order of dismissal); (23) *In re Vioxx Products Liability Litigation*, 239 F.R.D. 450 (E.D.La. Nov. 22, 2006) (order and reasons denying class certification motion as to the personal injury class); (24) *In re Vioxx Products Liability Litigation*, 2006 WL 2726786 (E.D.La. Sept. 8, 2006) (order with case-specific ruling regarding expert testimony in Smith v. Merck); (25) *In re Vioxx Products Liability Litigation*, 448 F.Supp.2d 737 (E.D.La. Aug. 30, 2006) (order and reasons granting motion for new trial on damages in Barnett); (26) *In re Vioxx Products Liability Litigation*, 448 F.Supp.2d 741 (E.D.La. Aug. 30, 2006) (order and reasons dismissing foreign class action on basis of forum non conveniens); (27) *In re Vioxx Products Liability Litigation*, 2006 WL 5159147 (E.D.La. July 31, 2006) (granting Merck's motion to exclude certain expert testimony in Barnett); (28) *In re Vioxx Products Liability Litigation*, 438 F.Supp.2d 664 (E.D.La. July 21, 2006) (order and reasons denying motion to quash subpoena issued to David Anstice); (29) *In re Vioxx Products Liability Litigation*, 439 F.Supp.2d 640 (E.D.La. June 29, 2006) (order and reasons granting the PSC's motion in limine, in Barnett, requesting contemporaneous transmission at trial through use of videoconferencing of

the testimony of David Anstice); (30) *In re Vioxx Products Liability Litigation*, 2006 WL 795855

(E.D.La.March 23, 2006) (summary of monthly pretrial conference held on March 23, 2006);

(31) *In re Vioxx Products Liability Litigation*, 235 F.R.D. 334 (E.D.La. March 15, 2006) (order

and reasons denying FDA's motion to quash and granting PSC's motion to compel with respect

to subpoena issued for the testimony of David Graham, M.D.); (32) *In re Vioxx Products*

*Liability Litigation*, 2006 WL 344997 (E.D.La. Feb. 6, 2006) (ordering and reasons adopting the

court's prior rulings on the motions in limine from Irving I with regard to Irving II); (33) *In re*

*Vioxx Products Liability Litigation*, 414 F.Supp.2d 574 (E.D.La. Feb. 2, 2006) (order and reasons

granting, in part, Merck's motions to exclude expert testimony in Plunkett); (34) *In re Vioxx*

*Products Liability Litigation*, 2006 WL 300435 (E.D.La. Feb. 1, 2006) (order setting dates for

the *Diaz* and *Borowitz* trials); (35) *In re Vioxx Products Liability Litigation*, 2006 WL 91916

(E.D.La. Jan. 3, 2006) (summary of monthly pretrial conference held on January 3, 2006); (36) *In*

*re Vioxx Products Liability Litigation*, 2005 WL 3665985 (E.D.La. Dec. 16, 2005) (order setting

trial date in *Plunkett*); (37) *In re Vioxx Products Liability Litigation*, 2005 WL 3541045 (E.D.La.

Dec. 6, 2005) (order and reasons denying motion for reconsideration of order excluding

testimony of Dr. Thomas Baldwin re: *Plunkett*); (38) *In re Vioxx Products Liability Litigation*,

2005 WL 3309757 (E.D.La. Dec. 1, 2005) (summary of monthly pretrial conference held on

December 1, 2005); (39) *In re Vioxx Products Liability Litigation*, 2005 WL 3542885 (E.D.La.

Nov. 23, 2005) (order and reasons granting motion to remand in *Felicia Garza, et al. v. Michael*

*D. Evans, M.D., et al.*); (40) *In re Vioxx Products Liability Litigation*, 2005 WL 3164254

(E.D.La. Nov. 21, 2005) (order ruling on eighteen motions in limine in *Irvin*); (41) *In re Vioxx*

*Products Liability Litigation*, 401 F.Supp.2d 565 (E.D.La. Nov. 18, 2005) (order and reasons

with rulings on cross-motions to exclude experts/expert testimony in *Plunkett*); (42) *In re Vioxx Products Liability Litigation*, 2005 WL 3164251 (E.D.La. Nov. 18, 2005) (order with rulings on plaintiff's motions in limine in *Plunkett*); (43) *In re Vioxx Products Liability Litigation*, 230 F.R.D. 473 (E.D.La. July 22, 2005) (order permitting plaintiffs to conduct ex parte interviews of plaintiff's prescribing physicians); (44) *In re Vioxx Products Liability Litigation*, 2005 WL 2036797 (E.D.La. July 22, 2005) (order and reasons limiting, with regard to plaintiffs only, the application of a prior order that permitted opposing counsel to attend interviews with a prescribing physician to circumstances where the prescribing physician is a named defendant); (45) *In re Vioxx Products Liability Litigation*, 2005 WL 1662043 (E.D.La. June 23, 2005) (summary of monthly pretrial conference held on June 23, 2005); (46) *In re Vioxx Products Liability Litigation*, 230 F.R.D. 470 (E.D.La. June 6, 2005) (order and reasons disallowing unilateral interviews of prescribing physicians by either party); (47) *In re Vioxx Products Liability Litigation*, 2005 WL 1018036 (E.D.La. April 28, 2005) (summary of monthly pretrial conference held on April 28, 2005); (48) *In re Vioxx Products Liability Litigation*, 2005 WL 928538 (E.D.La. April 15, 2005) (pretrial order number nine re: deposition guidelines); (49) *In re Vioxx Products Liability Litigation*, 2005 WL 850962 (E.D.La. April 8, 2005) (order appointing members of the Defendants' Steering Committee); (50) *In re Vioxx Products Liability Litigation*, 2005 WL 850963 (E.D.La. April 8, 2005) (order appointing Plaintiffs' Steering Committee); (51) *In re Vioxx Products Liability Litigation*, 2005 WL 756742 (E.D.La. Feb. 18, 2005) (order setting initial conference).

29.     There are also two reported opinions available on Westlaw from the Fifth Circuit: *In re Vioxx Products Liability Litigation*, 2006 WL 1726675 (5th Cir. May 26, 2006)(Mandamus

proceeding involving privileged documents); *Avmed Inc. v. BrownGreer PLC*, 2008 WL
4909535 (5th Cir. Nov. 17, 2008)(Appeal from denial of preliminary injunction).

30.     Despite the overwhelming acceptance of the Settlement Program by the majority
of Vioxx claimants at the rate of 99.79%, there has been some remonstration. The settlement
therefore remains under the watchful supervision of the NPC, PSC and common benefit counsel
who continue to monitor and address the various challenges occurring at a real time pace.  The
Law & Briefing Committee assists in this regard.  For example, following the announcement of
the Settlement, the law firm of Stratton, Faxon sought a prospective declaratory judgment against
Merck and each of the individual members of the NPC.  Stratton, Faxon contended that it was
not ethically required to observe Section 1.2.8 of the Settlement Agreement, which required
"enrolling counsel to affirm that he has recommended . . . to 100% of the Eligible Claimants
represented by such a enrolling counsel that such Eligible Claimants enroll in the program."
Settlement Agreement §1.2.8.1. *See Stratton Faxon v. Merck & Co., Inc., Andy D. Birchfield,
Jr., et al.*, 2007 WL 4554190 (D.Conn. Dec. 21, 2007).  After briefing, this case was dismissed
for lack of jurisdiction, *i.e.*, there was no case or controversy. *Id.* at *2.

31.     Other litigants represented by Ann Oldfather challenged this Court's "Lone Pine"
order, Pretrial Order No. 28, which was entered in aid of the settlement.  The PSC responded to
the motion and participated in argument. *See In re Vioxx Products Liability Litigation*, 557
F.Supp.2d 741, 744 (E.D.La. May 30, 2008)(extending deadlines).   Litigants represented by
Ronald Benjamin also challenged PTO No. 28, in addition to moving to vacate or modify the
Master Settlement Agreement by having this Court recuse itself from its administrative role in
the settlement.   On September 15, 2008, the PSC prepared an extensive memorandum opposing

23

the Benjamin motion and was prepared to argue the motion before the Court. The Court declined

argument, but denied the motion in its entirety. *See In re Vioxx Products Liability Litigation*,

MDL No. 1657, Order & Reasons (E.D.La. Dec. 10, 2008).

32.     In addition, the Law & Briefing Committee, on behalf of the common benefit

counsel, is still working to resolve outstanding issues that have surfaced after the announcement

of the Settlement Agreement regarding liens and other post-settlement disputes. Several such

disputes have appeared. On February 20, 2008, Healthcare Recoveries, Inc. filed a Rule 27

Petition against the PSC seeking information regarding the identities of all insureds enrolled in

the settlement. In response, the PSC filed a motion to dismiss. On May 6, 2008, this Court

dismissed the HRI Petition. *In re Vioxx Products Liability Litigation*, 2008 WL 1995098, *6

(E.D.La. May 6, 2008).

33.     Subsequently, 1199SEIU Greater New York Benefit Fund, filed a class action

against BrownGreer LLC and the NPC. The NPC moved to dismiss that suit and to strike the

class allegations. In addition, another non-governmental Third Party Payor, Avmed Inc., filed

suit against BrownGreer LLC. Both parties sought preliminary injunctive relief. The NPC and

PSC were actively involved in opposing the challenges brought by these TPPs, participated in the

hearing, filed amicus papers and other briefs. The Court refused to grant the injunctions. *See In

re Vioxx Products Liability Litigation*, 2008 WL 3285912 (E.D.La. Aug. 7, 2008), *aff'd, Avmed

Inc. v. BrownGreer PLC*, 2008 WL 4909535 (5th Cir. Nov. 17, 2008). *See also In re Vioxx

Products Liability Litigation, supra*, 2008 WL 4681368 (granting motions to sever and strike

class allegations).

34.     Given the ongoing dispute over these insurer's subrogation interests, the common

24

benefit counsel have worked extraordinarily hard to resolve the non-governmental TPP lien claims. Without resolution of these subrogation interests, extraneous litigation and dissipation of client recoveries could continue for extended lengths of time. Following lengthy negotiations, a tentative settlement agreement with Avmed Inc. has been reached. Although still not final, the proposed settlement is expected to favorably resolve these claims by capping recoveries on favorable terms to all Vioxx claimants.

35.     <u>Sales and Marketing Committee</u>: The PSC also set up a Sales and Marketing Committee to investigate and develop the case concerning Merck's deceptive promotion of Vioxx. In addition to meeting periodically, the committee issued subpoenas to the Marketing Firm for Merck (Ogilvy-DDB) and took the depositions of numerous sales representatives.

36.     <u>Trial Package Committee</u>: Liaison Counsel with the support of lead counsel required a substantial trial package to be produced which would enable any attorney to move forward with discovery, preparation and trial of a case at reasonable costs and resources, particularly to make it clear to Merck that plaintiffs' counsel would and could try thousands of cases successfully and well.

37.     As in any case of this type, it is the PSC's charge to synthesize the most important and relevant documentary and testimonial evidence, motions, briefs, rulings, jury instructions other useful materials for litigants who may need to try a pharmaceutical case. This task was particularly arduous in this case as the PSC sought to synthesize the material for nineteen (19) state and federal Vioxx trials across the state and federal landscape. Nevertheless, the PSC committee did an exemplary job in creating a state of the art trial package (for both Heart Attack and Stroke Cases) that could allow any lawyer to easily master the "Vioxx case" in a short period

of time.

38.     After many months of work, the trial package was presented to the Court on two

separate occasions.  These presentations afforded the Court the opportunity to consider the trial

package's "real world" usefulness.  Among the key components of the trial Package are:

A.     Liability case: The liability case section of the trial package provides an

easy to understand overview of Merck's liability, explaining the development of COX-2

inhibitors, the "rush to market" for Vioxx, Merck's' marketing blitz verses Celebrex, the VIGOR

controversy, APPROVe and the drug withdrawal.  Among other things it contains:

* *The Vioxx "Theme Grid,"* –The Theme Grid is an easy to use electronic database
  guide to the 1500 most important documents culled from the 50 million-page
  Merck production.  This Theme grid alone constitutes thousands of hours of work
  to identify important documents, squib them, organize them by theme, and
  identify the depositions and trials in which they were offered (including any
  evidentiary rulings pertaining to them).

* *The Liability Case Backgrounder*–This section of the Trial package
  also contains a factual narrative introducing the case and the
  defenses, the "liability playbook" containing a Master Order of
  Proof, a thoroughly detailed "cast of characters," a "Vioxx
  dictionary" of critical terms and a "Vioxx timeline" of important
  events.

B.     The Science Case:  The Science case section of the Trial Package contains

the core and reference science information.  It contains:

       i.     *The "Science Backgrounder"*—This backgrounder
            is  primer of the Science of Vioxx, including
            explanations of cyclooxenegenase , selective
            inhibition of COX 2, the prostacylcin/
            Thromboxane imbalance issue ("the FitzGerald
            Hypothesis), Merck's Clinical Trials, the label
            Changes and FDA negotiations, APPROVe and
            Vioxx withdrawal, and post-withdrawal issues like
            the 18-month hypothesis and the off –drug risk seen

in the APPROVe extension data

    ii.    *The Medical Science Database*—The Medical Science Database is an electronic and easy to manage database of numerous articles pertaining to science and medial issues relation to COX 2 inhibition, NSAIDS, Cardiovascular disease and other relevant topics. The collection and synthesis of this database constituted hundreds of hours of work and contains every article that one would conceivably need to have in a Vioxx case.

    iii.    *The Science Compendium*—A desktop reference book with the key articles, organized by topic.

    C.    <u>Case Presentation and Themes</u>:  The Trial package brings together the liability and science components of the case and provides suggested presentations of testimonial and documentary evidence.  Included are:

    i.    *Trial Ready Video Presentations of Key Witnesses-* The trial of a Pharmaceutical case of the magnitude of a Vioxx case is driven in large part by the videotaped testimony of key witnesses. In this regard, the PSC Trial package committee provided trial-ready "clips" of videotaped testimony for seventeen (17) Merck witnesses, five (5) non-retained  experts and five (5) generic experts. It also provides a compendium of all evidentiary rulings that were made concerning each of these witnesses

    ii.    Cross examination and Defense "Modules":  One of the benefits of the trial expertise of the key member of the Trial package Committee was a remarkably detailed cross examination outline for the primary corporate witnesses the company had ever called at trial including: Alise Reicin, Briggs Morrison, Nancy Santanello, and David Anstice.  In addition, the PSC provided cross examination outlines for key Merck experts.  Further, the PSC provided a series of "defense modules" which provide

documents, deposition testimony, Medical articles
and other evidence that would reply to the common
Merck themes including, *e.g.*, the Naproxen
Hypothesis.

D.    <u>Motions Practice</u>:  Finally, the trial package Committee provides a

compendium of twenty-five (25) Merck Motions *in Limine*, Briefs in Opposition and important

Rulings. In addition, it provides twelve (12) plaintiff motions *In Limine* and corresponding

orders.

**C.    Bellwether Trials**

39.    The Texas trial of Ernst v. Merck, was the first Vioxx trial against Merck.  The

case was tried for 8 weeks in the Summer of 2005.  The jury returned with a verdict for the

plaintiff in the amount of $253 million.

40.    The premier trial in the MDL of Plunkett took place in Houston, Texas due to the

devastating disruptions caused by Hurricane Katrina.  That trial resulted in a hung jury.

Thereafter, the Plunkett retrial and the remaining bellwether trials took place in the recovering

New Orleans.  One of the MDL trials, Barnett, resulted in a $51 million plaintiff's verdict that

was subject to remitittur.   All the others resulted in defense verdicts won by Merck.

41.    The MDL trials and the other 13 trials are captured in the following chart:

| CAPTION | RESULT |
|---|---|
| *Evelyn Irvin Plunkett, Individually, and as the Personal Representative of the Estate of Richard Irvin, Jr. v. Merck & Co., Inc.*, Case No. 05-4046 | (S.D.Tex., Houston Div., Dec. 13, 2005) (hung jury), *retried* (E.D.La., Feb. 13, 2006) (judgment for defendant), *vacated* (E.D.La., May 29, 2007) |
| *Barnett et al v. Merck & Co., Inc.*, Case no. 06-485 | (E.D.La., June 28, 2007) ($51 million verdict for plaintiff, $1 million as punitive damages, with $1.6 million remittitur award accepted by plaintiff), *appeal dismissed*, Case No. 07-30897 (5th Cir., Apr. 18, 2008) |
| *Smith v. Merck & Co., Inc.*, Case No. 05-04379 | (E.D.La., Oct. 4, 2006) (defense verdict) |
| *Mason v. Merck & Co., Inc.*, Case No. 06-00810 | (E.D.La., Nov. 20, 2006) (defense verdict) |
| *Dedrick v. Merck & Co., Inc.*, Case No. 05-02524 | (E.D.La., Dec. 15, 2006) (defense verdict) |
| *Ernst et al v. Merck & Co., Inc.*, Trial Court Cause No. 19961*BH02 | (Dist. Ct., Brazoria County, Tx. Aug. 15, 2005) (awarding Ernst's estate $26 million after a verdict of $253 million), *reversed*, 2008 WL 2201769 (Tex. App. May 29, 2008) |
| *Garza v. Merck & Co., Inc.*, Trial Court No. DC-03-84 | (Dist. Ct., Starr County, Tx. Apr. 21, 2006) (awarding Garza's estate $7.75 million following a verdict of $32 million), *reversed*, 2008 WL 5169577 (Tex. App. Dec. 10, 2008) |
| *Humeston v. Merck & Co., Inc.*, No. ATL-L-2272-03 | (N.J. Sup. Ct., Atlantic County, Nov. 3, 2005) (defense verdict), *vacated*, No. ATL-L-2272-03 (N.J. Sup. Ct., Atlantic County, Aug. 17, 2006), *retried* (N.J. Sup. Ct., Atlantic County, Mar. 12, 2007) ($47.5 million verdict) |

29

| | |
|---|---|
| *McDarby (and Cona) v. Merck & Co., Inc.*, No. ATL-L-1296-05 | (N.J. Sup. Ct., Atlantic County, April 5, 2006) ($15.7 judgment for McDarby, awarding compensatory and punitive damages, as well as attorneys' fees and costs; $2.27 million judgment for Cona, awarding damages of $135 and the remainder as attorneys' fees and costs), *affirmed in part, reversed in part*, 949 A.2d 223 (N.J. Sup. Ct., Appellate Division, May 29, 2008) (affirming award of compensatory damages to McDarby pursuant to the New Jersey Products Liability Act ("PLA"); reversing the award of punitive damages pursuant to the PLA as preempted by the Federal Food and Cosmetic Act; reversing the awards of damages to McDarby and Cona and the awards of attorneys' fees pursuant to the New Jersey Consumer Fraud Act ("CFA"), determining that plaintiffs' CFA claims are subsumed within the PLA) |
| *Doherty v. Merck & Co., Inc.*, No. ATL-L-638-05 | (N.J. Sup. Ct., Atlantic County, July 13, 2006) (defense verdict) |
| *Hermans v. Merck & Co., Inc.*, No. ATL-L-5520-05 | (N.J. Sup. Ct., Atlantic County, Mar. 12, 2007) (defense verdict) |
| *Albright v. Merck & Co., Inc.*, Case No. CV05-2316 | (Alabama Circuit Ct., Jefferson County, Dec. 15, 2006) (defense verdict) |
| *Grossberg v. Merck & Co., Inc.*, Docket No. BC 327729 | (Superior Ct. of California, County of Los Angeles, Aug. 2, 2006) (defense verdict) |
| *Arrigale v. Merck & Co., Inc.*, No. 05CC03136 | (Superior Ct. of California, County of Los Angeles, Jan. 18, 2007) (hung jury) |
| *Appell v. Merck & Co., Inc.*, No. BC328858 | (Superior Ct. of California, County of Los Angeles, Jan. 18, 2007) (hung jury) |

| | |
|---|---|
| *Schwaller v. Merck & Co., Inc.*, Case No. 05-L-687 | (Illinois Circuit Court, 3rd Judicial Circuit, Madison County, March 27, 2007) (defense verdict) |
| *Kozic v. Merck & Co., Inc.*, Case No. 03-9248 | (Circuit Court for the 13th Judicial Circuit, Hillsborough City, Florida, October 5, 2007) (defense verdict) |

**D.    Settlement Negotiations**

42.    During the Bellwether trials, this Court along with coordinate Judges from New Jersey, Texas, and California, directed certain plaintiffs' counsel from each respective litigation center to focus their efforts on a negotiated resolution with Merck. *See* Hearing Transcript at 5 (E.D.La. Nov. 9, 2007). The NPC, myself, Andy Birchfield, Christopher Seeger, Arnold Levin, Edward Blizzard and Thomas Girardi, were selected by the Court based upon recognition of our core responsibility for strategic and tactical decisions in our relevant jurisdictions.

43.    The NPC began negotiating in earnest on behalf of the plaintiffs' interests with counsel for Merck beginning in December 2007. The negotiations leading up to the Settlement Agreement involved extraordinary efforts by Merck, the NPC, the MDL court, and by the coordinated Judges from New Jersey, Texas, and California. During the eleven month period of secret negotiations, there were twenty-three face-to-face meetings in New Orleans, Memphis, Montgomery, Washington DC, New York, Philadelphia, Los Angeles and Houston between NPC and counsel for Merck. *See* Hearing Transcript at 10 (E.D.La. Nov. 9, 2007). There were an additional twenty-six meetings that transpired during this time period. *Id.* Further, there were also 123 conference calls in which negotiations between the NPC and Merck occurred. *Id.* On

31

top of these demands, there were at least 200 internal NPC telephone conferences as well as monthly conference calls and monitoring by the state and federal courts.  In addition, there were over 200 additional conferences calls amongst the NPC alone.

44.     After a year of hard fought, "robust" and very arms-length negotiations, the Settlement Agreement was reached.  It was presented to the Court, sitting along with its brother and sister Judges, on November 9, 2007.

45.     The Settlement Agreement was posted on the Court's website and is described in accompanying Memorandum of Law.

46.     The Settlement also provides for a Lien Resolution Administrator, Matthew L. Garretson and the Garretson Law Firm.   Mr. Garretson was selected after careful review by the NPC to act as the Lien Resolution Administrator under the Settlement Agreement.   Mr. Garretson has already favorably resolved the governmental liens on behalf of all Vioxx Claimants, which in and of itself affords claimants an extraordinary benefit.

47.     BrownGreer, LLC, after careful review was selected by the NPC to act as the Claims Administrator of the Settlement Agreement.  BrownGreer regularly reports to the Court at its monthly status conferences.  Therein, BrownGreer reports the status of interim settlement payments amongst its several reports on the progress of claims administration.  A copy of the most recent the Claims Administrator Court Report No. 13 (December 19, 2008) is attached hereto as Exhibit "F".

48.     In addition, the Settlement Agreement contemplated the use of a bank to provide financial services attendant to funding the Settlement Program.  The MDL common benefit counsel conferred with and interviewed several prospective institutions before selecting and

retaining U.S. Bank as the escrow agent to provide these financial services. Significant

negotiations and collaboration have taken place between MDL common benefit counsel and U.S.

Bank in connection with its role as escrow agent. U.S. Bank has been and remains a financially

sound financial institution despite the current financial crisis within the banking industry.

49.     Following the announcement of the Settlement Agreement at the monthly status

conference on November 9, 2007, the NPC worked tirelessly to explain and encourage claimants

and their counsel to participate in the settlement program. These efforts were essential in order

to trigger Merck's obligation to fund the settlement upon eighty-five percent of eligible claimants

agreeing to participate in the settlement program. In furtherance of this objective, NPC hosted

conferences in Philadelphia, New Orleans, Los Angeles and Houston. These conferences were

open to claimants and their attorneys. During these conferences, NPC members and/or their

representatives distributed comprehensive packets, provided general information, and answered

questions regarding the Settlement Agreement. NPC provided similar informational sessions at

conferences held by the American Association for Justice in Puerto Rico, Mass Torts Made

Perfect in Las Vegas and Mealey's and Harris Martin at other locations. On top of all of these

efforts to explain and educate the public about the settlement program, individual members of the

NPC held countless telephone conferences or visited with attorneys interested in obtaining more

information regarding the settlement program for their clients. Further, tremendous outreach was

conducted to encourage *pro se* Vioxx claimants to participate in the Settlement Program. The

NPC's vigilance in describing and educating others about the settlement program had the desired

effect as a remarkable 99.79% of eligible claimants actually agreed to participate in the

settlement program and become contractually bound by the terms of the Settlement Agreement.

33

50.     In order to facilitate the enrollment process, as the absolute deadline for enrollment approached, the Court directed that there be certain presentations made with the Court or the Special Master to counsel and their clients that had not yet enrolled in the Settlement Program.  These presentations took place in New Orleans, New York, and Chicago.

**E.     Time Expended By Common Benefit Counsel**

51.     In my role as PLC, I received reports describing the work performed by common benefit counsel from Philip A. Garrett of Wegman Dazet & Company, the court-appointed accountant for MDL No. 1657, and the underlying time records of these counsel, consistent with PTO No. 6.  Based upon this information (as of January 14, 2009), time records reflect the following summary information:

| | |
|---|---|
| Pre-trial pleadings and motions practice (MDL) | 26,028 hours |
| Pre-trial pleadings and motions practice (States Only) | 11,930 hours |
| Discovery | 72,521 hours |
| Preparing for and conducting trials | 108,345 hours |
| Total attorney and para-professional time | 450,498 hours |

**F.     The Reasonable Hourly Rates of Common Benefit Counsel**

52.     In *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 868 (E.D.La. 2007), after considering the *Johnson*[9] factors and an analysis of prevailing rates, the Court allocated funds to counsel based on a range of low to high billing rates.   In this litigation, the collective lodestar of common benefit counsel has been calculated using actual billing rates and senior partner billing rates to simulate the methodology employed by the Court in *Murphy Oil.*

---

[9] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974).

53. In *Murphy Oil*, this Court referenced Judge Vance's opinion in *In re Educational Testing Service, Etc.*, 447 F.Supp.2d 612, 628 (E.D.La. 2006), and noted that court's consideration of the rate paid the *ETS* special master when it calculated the prevailing market for partners. In contrast to the $250/hr paid to the special master in *ETS*, when appointing Special Master Rice, this Court afforded him compensation at the rate of $600/hr. *See In re Vioxx Products Liability Litigation*, MDL No. 1657, Order Appointing Special Master at 4 (E.D.La. April 26, 2007). The compensation of Professor Rice was not paid on a contingent basis, rather he was paid by the hour. Professor Rice has virtually no overhead expenses in comparison to plaintiffs' counsel in these litigation. Taking Special Master Rice's rate into account is valid considering the caliber and experience of the counsel on the PSC, NPC, Allocation Committee and common benefit counsel.

54. Based on the time reports and hourly billing rates provided by common benefit counsel as of January 14, 2009, the collective lodestar of all counsel using the highest billing rate standard results in a collective lodestar of $321,897,534.95

55. Based on the time reports and hourly billing rates provided by common benefit counsel as of January 14, 2009, the collective lodestar of all counsel using the actual billing rate method results in a collective lodestar of $217,128,800.40

56. In my experience, the billing rates employed by common benefit counsel are fair and reasonable and represent the market rates for counsel performing the type of services provided in this complex, multi-district litigation.

57. In my experience, the expenses compiled and reported in the Affidavit of Philip A. Garrett ¶¶18-20, are fair and reasonable and represent "held" and "shared" expenses that were

incurred for the common benefit of all plaintiffs in the coordinated litigations.

RUSS M. HERMAN

Sworn and subscribed before
me this 19th
day of January, 2009.

_____(SEAL)
Notary Public   BAR # 14190