UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX PRODUCTS<br>LIABILITY LITIGATION<br><br><br>**This document relates to All Cases** | CIVIL ACTION<br><br>NO. 2:05-MD-01657-EEF-DEK<br><br>SECTION L<br>JUDGE ELDON E. FALLON<br><br>DIVISION 3<br>MAGISTRATE DANIEL E. KNOWLES III |

## MEMORANDUM IN SUPPORT OF MOTION FOR
## RECONSIDERATION/revision of order capping contingent fees
## AND ALTERNATIVELY FOR ENTRY OF JUDGMENT

The motion associated with this memorandum asks that this Court reconsider and vacate or revise its Order and Reasons of August 27, 2008 (the "Capping Order"). The Capping Order changes the percentage fee in private contingent fee contracts. This motion presents the Court with three issues:

(1)     The Constitution gives federal courts jurisdiction to decide "cases" and "controversies." In the Capping Order the Court limited recovery under private fee contracts that were not at issue in this MDL, as to which no contracting party had complained, and which were not part of the Vioxx Settlement Agreement. Did the Court have subject matter jurisdiction over The Miller Firm's private fee contracts?

If the Court answers this question No, then the Court need go no further. If the Court answers this question Yes, then it must consider a second issue:

(2)     Absent express law, a client's incapacity, or sanctionable conduct committed in the case, courts have no authority to override private fee contracts. Additionally, state law governs fee contracts. Here, the Court *sua sponte* capped all MDL attorneys' fee contracts at 32% without express legal authority and without considering the laws of the various states. Did the Court have authority to cap contingent fees in The Miller Firm's individual fee agreements, and if so, did it apply the correct law correctly?

1

Again, if the Court answers this question No, then the Court need go no further.  If the Court answers this question Yes, then it must decide a final issue:

(3)     The minima of due process are notice and a hearing.  The Miller Firm has property interests in its individual fee agreements.  Here, the Court issued the Capping Order with no prior notice or opportunity to be heard.  Did the Court deprive The Miller Firm of its property without due process?

Should the Court decline to reconsider and vacate the Capping Order, The Miller Firm alternatively asks that the Court place its ruling in a form that The Miller Firm may appeal.

## Facts

As lead counsel for several hundred Vioxx Plaintiffs for over four years, The Miller Firm, LLC, a twelve lawyer firm in Virginia & Pennsylvania has worked on their clients' Vioxx claims. The Miller Firm is currently serving on the PSC for four different Mass Tort Programs. The Miller Firm invested millions of dollars and thousands of hours identifying meritorious cases, creating databases, developing the factual and medical basis for the individual cases, developing expertise in the subject matter, helping and communicating with their clients. The Miller Firm offered to bring several of its Vioxx cases to trial in New Jersey.  The Miller Firm conducted numerous depositions in Vioxx.

The Miller Firm has binding contingent fee contracts with all of their clients.  None of their clients has voiced a complaint about the fee contracts.  The attached affidavits reveal that The Miller Firm and their clients negotiated each fee contract at the outset of the representation, and assessed the potential risks and benefits existing at that time, including the potential for MDL consolidation.  Every plaintiff knew the terms by which his attorney would be paid. Further, every plaintiff chose his attorneys and freely entered into a legally binding fee contract. Each plaintiff in the Vioxx Settlement had the opportunity to shop for an attorney in a

2

competitive marketplace for legal services.  Each selected an attorney based upon factors and qualities that were personally important to that plaintiff.

No provision in the Settlement Agreement addresses the fee rates provided for in the private contingent fee contracts, except to say (1) that it leaves all such matters to the attorneys and their clients, and (2) that disputes regarding individual attorney's fees do not affect the Settlement Agreement.

On August 27, 2008, this Court issued the Capping Order.  This was the first any member of The Miller Firm knew that the Court was considering modifying any private fee contracts.

## LAW AND ARGUMENT

**I.     This Court had no jurisdiction over the Capping Order's subject matter because there was no "Case or Controversy" concerning The Miller Firm's contingent fee contracts.**

Federal district courts may only decide those questions arising in a "case" or "controversy."[1]  This constitutional principal limits federal courts to the exercise of "the power . . . to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision."[2]  The Capping Order pretermitted consideration of whether a "case or controversy" existed.  The Miller Firm submits that there was no "case or controversy" concerning their fee contracts and that the Court lacked jurisdiction over the subject matter of the Capping Order.

Before the issuance of the Capping Order, no one challenged the validity or reasonableness of The Miller Firm's contingent fee contracts.  Nor had anyone presented evidence that The Miller Firm's clients were incapable (legally or mentally) of contracting.

---

[1]     U.S. CONST. art. III, § 2.
[2]     *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129, 131 (5th Cir. 1979) (quoting *Muskrat v. United States*, 219 U.S. 346 (1911)).

In *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129, 130 (5th Cir. 1979), the Fifth Circuit reversed a district court's decision "to adopt as the court's ward a minor represented by a duly qualified guardian, fix the compensation of the guardian's attorney, and direct his payment out of a tort judgment previously rendered by the court." The Fifth Circuit wrote: "The case or controversy in the federal forum ended with payment of the judgment into the registry of the court."[3]  Importantly, in *Brown*, no party challenged the contingent fee agreement; instead, the district court acted on its own to force the parties to accept "a remedy that they did not seek."[4]

Judge Posner, writing for the panel, reached a similar conclusion in *U.S. v. Vague*, 697 F.2d 805 (7th Cir. 1983).   In that case, the district judge on his own initiative ordered a defendant's lawyer to return part of his fee because the judge considered it excessive.   The Seventh Circuit reversed.   Judge Posner wrote that the district judge had improperly assumed a prosecutor's role given that:

> [n]o one complained to him about [the attorney's] fee.  The judge decided there might be a violation of the code of ethics, conducted the examination of [the attorney] and other witnesses, determined that a violation had in fact occurred, and prescribed the remedy.  He assumed the role that the [defendant's] lawyer would have played had they sued for restitution of the excessive fee paid [the original attorney].[5]

Judge Posner wrote that federal courts may decide only those controversies presented by the parties in litigation.  "No doubt a great deal goes on in the world which ought not to go on.  If courts had general investigatory powers, they might discover some of these things and possibly

---

[3]       *Brown*, 596 F.2d at 132.

[4]       *Id.*  Fifth Circuit cases distinguish *Brown* in those limited circumstances where district courts traditionally intervene, as in cases involving "wards" of the court:  minors and seamen. *See Karim v. Finch Shipping Co.*, 374 F.3d 302, 304 (5th Cir. 2004); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 162 (5th Cir. 1981); *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1109 (7th Cir. 1982).  Yet, this case lacks those individuals typically afforded special protection; the fee contracts at issue here involved adults.  And, "[a]n agreement between two freely consenting, competent adults will most often be controlling." *Rosquist*, 692 F.2d at 1111.

[5]       *Vague*, 697 F.2d at 807.

4

right them."[6]  But, absent contempt of court committed before the court, the judge lacked the

power to initiate an investigation into the attorney's fees charged by the defendant's lawyer:

> A judge cannot be made to approve an unethical transaction, but the district judge in this case was not asked to do any such thing; he was just asked to decide Steven Vague's punishment for a crime.  To reach the fee question the judge had to start a separate proceeding.[7]

The "case or controversy" at issue in the Vioxx litigation did not extend to the prelitigation

contingent fee contracts between plaintiffs and The Miller Firm attorneys.[8]   No client

complained of the agreed-upon fees.  The Court changed the rate of the fee contracts in the

Capping Order absent any expressed dissatisfaction or challenge to their validity by anyone.  The

Miller Firm's contingent fee contracts presented no justifiable "case or controversy."[9]  Therefore,

the Court was without jurisdiction to modify them in the Capping Order.

## II.    The Court should reconsider and vacate the Capping Order on substantive grounds.

A.    The Court lacks authority to *sua sponte* change the terms of The Miller Firm's privately-negotiated fee contracts.

This Court acknowledged the necessity of contingent fee contracts in our justice system,

pointing out that without them many litigants could not secure legal services to enforce their

claims.  But, the Court then erroneously asserted that it had authority to inquire into a fee

contract's reasonableness to effectuate public policy concerns regarding the amount of fees for

---

[6]       *Id.* (internal citation and quotation marks omitted).

[7]       *Id.* at 808.

[8]       *Cf. Rosquist*, 692 F.2d at 1110 (discussing *Brown* and noting that only the release of funds to the plaintiff remained in *Brown*.).

[9]       *See Brown*, 596 F.2d at 131-32 ("If no party before a court makes or suggests any contest, but rather all litigants desire precisely the same result, there can be no case or controversy within the meaning of Article III." (citing *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971))).

attorneys who successfully try or settle mass tort litigation.[10]  The Court also expressed concern about a potential public perception that fees in mass tort litigation are "excessive."[11]  Regardless of the reality or validity of such public policy concerns, and with due respect, it is not a court's function to rewrite private, binding fee contracts based on preliminary, unsupported policy theories or potential public perceptions.

The Court cited three sources of authority for the Capping Order.  Respectfully, none supports that authority, as discussed below.

The Vioxx MDL is not a class action, and Rule 23 does not apply either expressly or by analogy.  This Court characterized the settlement as a quasi-class action "giving the Court equitable authority to review contingent fee contracts for reasonableness."[12]  Respectfully, this is incorrect.

This MDL is not a class action.  This Court, although presented with the opportunity, declined to certify personal injury claims as a class action.[13]  Neither has it been – nor can it be –

---

[10]     As a predicate to its analysis of authority to regulate contingent fees, this Court cited a 2006 article by the Task Force on Contingent Fees of the American Bar Association's Tort Trial & Insurance Practice Section:  *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105 (2006).  While the Task Force theorized that there were two possible justifications for courts' regulation of contingent fees in mass tort litigation – that the market for mass tort plaintiffs' lawyers is not competitive and that those lawyers therefore may charge unreasonable fees and bring marginal cases – the Task Force emphasized that there was no empirical evidence supporting the veracity of these theories.  The Task Force therefore recommended the collection and study of data about the contingent fee system so that "policy makers [could] make informed decisions in the future to try to balance the competing interests." *Id.* at 128.  No study appears to have been conducted nor have any policy makers made any informed decisions on the issue.

[11]     *Cf.* 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1803.1 ("Although some judges, media people, and the defense bar have characterized attorney fees in class actions as a source of abuse and a stain on the escutcheon of the administration of civil justice, in reality there is a virtual absence of empirical data showing any significant incidence of excessive fees.").

[12]     Capping Order at *4.

[13]     Order and Reasons, November 22, 2006 (Docket No. 8875) (Denying Plaintiffs' Steering Committee's Motion for Certification of a Nation-Wide Class Action for Personal Injury and Wrongful Death (Rec. Doc. 2171).

certified as a class action for settlement purposes.[14]  Class action rules do not become applicable simply because a large number of cases settle.  Individual differences remain, not only as to the characteristics of each individual claim, but also as to the relationship between each plaintiff and his attorney.

Rule 23(e) *requires* that the court approve any settlement of a class action.  No comparable provision is found in 28 U.S.C. § 1407, the statute that created the Judicial Panel on Multidistrict Litigation and MDL procedure.  Had Congress intended to include a provision empowering transferee courts to supervise attorney's private fee contracts in MDL settlements, it would have done so.  Without express authority in a rule or statute, and without complaint from any party to these fee contracts, this Court is without authority to rewrite them.

Additionally, the policy bases for court review of attorney's fees in class action settlements do not exist in this MDL.  In a class action, court review "protect[s] the nonparty members of the class from unjust or unfair settlements affecting their rights as well as … minimize[s] conflicts that may arise between the attorney and the class, between the named plaintiffs and the absentees, and between various subclasses."[15]  Unlike a class action, there are no "nonparty" or "absentee" plaintiffs in this MDL.  Each plaintiff is personally represented by the attorney of his choice.[16]

This MDL also differs from a negative-value class action.[17]  That type of class action is susceptible to an appearance of abuse because the value of class members' claims may be individually very small while the aggregate attorney's fees may be very large.  This may lead to

---

[14]    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

[15]    *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) ("*In re High Sulfur*") (quoting *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998)).

[16]    Or, represents himself and will pay no contingent fee to anyone.

[17]    *In re Monumental Life Ins. Co.*, 365 F.3d 408, 411 n.1 (5th Cir. 2004).

the perception that class counsel benefits to the class members' detriment.  In contrast, in this MDL every plaintiff who is awarded a settlement suffered a "life-threatening injur[y]".[18]  The potential value of each claim is high.  The risk of loss, to each plaintiff and his individual counsel was likewise high.[19]  The Vioxx MDL claims are neither frivolous nor marginal, and the plaintiffs are receiving substantial benefits in the settlement.  The red flag of the "negative value" suit does not exist here.

      2.      The Court's inherent powers do not include a power to *sua sponte* – and after the fact – determine what a reasonable fee percentage should have been in place of the fee percentage bargained for between The Miller Firm attorneys and their clients at the beginning of their engagement.

A federal court's inherent powers consist of those necessary to the exercise of the judicial power.[20]  Constitutionally, they derive from Article III, § 1, which vests "the judicial power" in the Supreme Court and in such other federal courts as Congress establishes.  Courts lack the power to extend inherent authority beyond powers necessary to their judicial function.  Only Congress, under the "Necessary and Proper" Clause in Article I, may authorize additional "beneficial" powers by statute, taking into account policy considerations.  As prominent constitutional scholar, Professor Robert Pushaw, explains:

  [T]he Necessary and Proper Clause can most sensibly be interpreted as authorizing Congress only to effectuate such *indispensable* inherent powers – not to eliminate or materially impair their exercise and thereby effectively destroy the executive and the judiciary.

However, federal judges and executive officials cannot, on their own, assert incidental powers that they believe will be merely *beneficial* and appropriate in fulfilling their constitutional functions.  Rather, the [Necessary and Proper]

---

[18]     Capping Order at *6.

[19]     As this Court has noted, only one of the Court's six bellwether trials resulted in a verdict for the plaintiff.  Capping Order at *9.

[20]     *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).

Clause gives Congress sole authority to make such policy determinations, either directly or by delegation.[21]

The Fifth Circuit implicitly aligned itself with this view in *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566 (5th Cir. 2008). In *Maxxam,* the district court invoked Rule 11 and inherent authority to sanction the FDIC for improperly requesting that the Office of Thrift Supervision pursue frivolous administrative proceedings against Mr. Charles Hurwitz. The district court awarded the entire costs of the administrative proceedings (over $56 million) as sanctions against the FDIC.

After rejecting Rule 11's applicability as justification for the sanction, the Fifth Circuit examined the concept of inherent authority. The Fifth Circuit stressed that a federal court's inherent powers consist of those *necessary* for the courts to manage their affairs and extend only to litigation before the court or, in the case of a sanction, to disobedience of the sanctioning court's orders. Finding that the Office of Thrift Supervision's administrative proceedings were (1) not before the district court and (2) did not threaten the district court's authority, the Fifth Circuit reversed the sanction.

Here the Court went beyond case management in the Capping Order. Modifying The Miller Firm's contractual relationships was unnecessary to the management of the MDL.

"Inherent powers are the exception, not the rule, and their assertion requires special justification in each case."[22] In *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court authorized a district court's exercise of inherent power to impose attorney's fees as a sanction for bad faith conduct occurring in the proceeding before the court. Here, the Capping Order reduces attorney's fees earned by The Miller Firm not because of any bad faith conduct

---

[21]     Robert J. Pushaw, *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L. Rev. 735, 833-34 (2001) (footnotes omitted and emphasis added).

[22]     *Chambers v. NASCO, Inc.*, 501 U.S. 32, 64 (1991) (Kennedy, J., dissenting).

and not for matters affecting the MDL proceeding before this Court.  The Capping Order, therefore, goes beyond the limits of inherent power set out in *Chambers*.

Because of their potency, courts must exercise inherent powers with restraint and discretion.[23]  The Fifth Circuit has stated:  "To the extent that inherent power is seen as a product of necessity, it contains its own limits.  It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function."[24]

A court's authority to invoke an "inherent power" is a question of law.[25]  It was legal error to invoke an inherent power to change Miller Firm fee contracts when that invocation was unnecessary to the functioning of the Court in this MDL and the Vioxx Settlement.  In the words of Professor Pushaw, this Court sought to exercise a "beneficial" power as a matter of perceived policy interests, not an "indispensable" power necessary to the Court's very functioning.  A court cannot exercise merely "beneficial" powers without express Congressional authority.  Additionally, the fee contracts were not before the Court,[26] nor did performance of these fee contracts threaten this Court's authority.  Thus, the Court lacked the prerequisites for invoking inherent power here.

*Karim* and *Rosquist* do not support the exercise of inherent authority here.  *Karim* involved a seaman, a traditional ward of the Court.  The Fifth Circuit affirming this Court cited the duty of the district court sitting in admiralty to protect seamen – traditional wards of the

---

[23]     *Id.* at 44.

[24]     *NASCO, Inc. v. Calcasieu Tele. & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

[25]     *Maxxam*, 523 F.3d at 590.

[26]     *See* discussion *supra* regarding lack of subject matter jurisdiction.

Court.[27]  *Rosquist* involved children, a guardian *ad litem*, and a minor's settlement requiring court approval.  The Seventh Circuit in *Rosquist* explained:  "We do not, of course, imply that the court should *sua sponte* review every attorney's fee contract.  An agreement between two freely consenting, competent adults will most often be controlling."[28]

Injured claimants in the Vioxx MDL and Settlement generally are not seamen, children, or others who may lack legal capacity.  While the Court suggested that "many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts,"[29] there is no record evidence that any Miller Firm client, young or elderly, healthy or ill, lacked legal capacity to enter a fee contract.  Would not such incapacity require re-examination of the Settlement Agreement?  If a plaintiff lacked capacity to contract with counsel, how could he have capacity to accept the settlement?  Courts have not placed the elderly, the unhealthy, or the seriously injured in the same category as wards of the court or legal incompetents.  If they did, it is difficult to imagine any serious personal injury case in which the Court would not then be duty-bound to oversee the affairs of every plaintiff.

This Court has a duty to "exercise ethical supervision over the parties."[30]  When a court observes unethical conduct, the court may punish that conduct.  But no unethical conduct exists here.  The Court recognized that, "[o]n a single-case basis … reasonable contingent fees might range from 33% to 40% of the total recovery for each claimant."[31]  Here, each claimant's case began as a "single case" and represented individually.  The Court deemed the original fee rate excessive only after the fact of settlement.  Yet, no ground exists for asserting unreasonableness

---

[27]    *Karim*, 374 F.3d at 304.

[28]    *Rosquist*, 692 F.2d at 1111.

[29]    Capping Order at *6.

[30]    *Id.* at *5.

[31]    *Id.* at *9.

11

because of a large settlement.[32]  Nothing between the injured party and his attorney has changed, except that now the party will receive compensation for his injuries and his attorney will receive the fee he has earned.  The Court must gauge the fee's reasonableness by weighing each particular case's potential benefits and risks at the time that the parties negotiated the fee contract.[33]

Thus, the Court's power to supervise unethical conduct is not a basis for changing the terms of The Miller Firm's fee contracts.

> 3. The Settlement Agreement does not give the Court express authority to adjust The Miller Firm's privately negotiated fee contracts.

This Court cites the Settlement Agreement as another source for its authority to change The Miller Firm's fee contracts:  Sections 9.2 and 16.4.2.  But these sections do not concern private fee contracts.  *Only Section 9.1* addresses "Individual Counsel Attorneys' Fees" and makes it quite plain that the Settlement Agreement does not regulate private fee contracts.  Section 9.1 provides that the Claims Administrator must make settlement payments subject only to reduction for *common benefit fees and costs*.  The individual plaintiff and his counsel are to determine the division of the settlement payment *between themselves*, and that division or any dispute concerning that division explicitly cannot affect the validity of the Settlement Agreement:

> Any division of any Settlement Payment with respect to, and as between, any enrolled Program Claimant, any related Executing Derivative Claimants and/or his or their respective counsel *is to be determined by such Persons* and any such division, or any dispute in relation to such division, shall in no way affect the validity of this Agreement or the Release or Dismissal With Prejudice Stipulation

---

[32]     Subject to the narrow exception afforded to those deemed to be wards of the Court or legal incompetents such as children.

[33]     ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 94-389, p. 12 (1994) ("It is important to keep in mind that the reasonableness as well as the appropriateness of a fee arrangement necessarily must be judged at the time it is entered into.").

executed by such Enrolled Program Claimant (and any related Executing Derivative Claimants) or his Counsel, as applicable.[34]

Section 9.2 governs "Common Benefit Fees and Reimbursement of Litigation Costs." This provision addresses common benefit fees and expenses withheld from settlement payments. This provision does not address the private contingent fee contracts.

Section 16.4.2 grants "the Chief Administrator" the power to modify any provision of the Settlement Agreement in certain limited circumstances if the Chief Administrator determines that the provision "is prohibited or unenforceable to any extent or in any particular context." This provision gives the Court power to modify the Settlement Agreement's provisions. But, it does not expand the Court's powers beyond "the capacities specified" in this "private agreement."[35]

None of "the capacities specified" in the "private agreement" purport to regulate the private fee contracts at issue. The Settlement Agreement explicitly leaves those matters to the plaintiffs and their individual attorneys. Thus, the Settlement Agreement does not contain any provision regarding the private fee contracts for the Court to modify. The Settlement Agreement also provides that any disputes between plaintiffs and their individual attorneys over private fee arrangements "shall in no way affect the validity of this Agreement."[36]

In short, the Settlement Agreement does not assert dominion over private fee contracts. The fact that the Settlement Agreement may be viewed by some to "result[] in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts"

---

[34]    Section 9.1 (emphasis added).
[35]    Section 6.1.1.
[36]    Section 9.1.

does not authorize its modification.[37]   Nothing in the Settlement Agreement gives the Court –

acting as Chief Administrator or otherwise – authority to change the private fee contracts.

**III.     Even if the Court had authority to examine the fee contracts at issue, a choice of law analysis is required.**

      A.      The Settlement Agreement does not set the law applicable to The Miller Firm's private contingent fee contracts

Because the Settlement Agreement excludes from its purview any regulation and

consideration of private fee contracts, the text of the Settlement Agreement does not supply the

governing law for those contracts.  Therefore, the law applicable to private fee contracts can only

be determined by reading the contracts themselves (in the event that they contain choice of law

provisions) and/or by conducting a choice of law analysis.

      B.      A choice of law analysis was necessary.

While the Court in its Capping Order looked to various sources, including state statutes

and rules, "for guidance" in fashioning what it believed to be a reasonable limitation on

individual contingent fee contracts, the Court did not conduct a choice of law analysis.  The

Court did not examine the individual contracts for choice of law provisions, nor did the Court

select and apply any particular state's law according to choice of law rules.

The Miller Firm filed cases on behalf of residents of many states.  In MDL cases, the

MDL court must apply the transferor court's law, that is, the law of the state in which the

plaintiff filed the action, including the transferor forum's choice-of-law rules.[38]   Many of the

---

[37]     Capping Order at *6.

[38]     *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897 (E.D. La. 2007) (citing *Ferens v. John Deere Co.*, 494 U.S. 516 (1990)).  *Accord In re Conagra Peanut Butter Prod. Liab. Litig.*, No. 07-MD-1845, 2008 WL 2885951 (N.D. Ga. July 22, 2008); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008); *In re Rezulin Prods. Liab. Litig.*, 390 F. Supp. 2d 319, 329 (S.D.N.Y. 2005).  *See also* MULTIDISTRICT LITIGATION MANUAL § 9:18 (2008).

cases covered by the Capping Order were not filed in the MDL at all, but rather were filed in state courts.  Whether filed in the MDL or filed in state court, this Court should have examined each applicable state's choice of law rules to determine the law applicable to each fee contract, and then determined whether that state's law a) would permit the Court to modify private fee contracts, and, if so, b) would provide decisional or statutory law as to what constitutes a reasonable fee in that state.

In applying the cap to all cases regardless of the state where originally filed, the Court deprived the parties to these private fee contracts of the state-law advantages that should have been accorded them under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).   Although the Settlement Agreement brings both MDL and non-MDL cases within its management to resolve plaintiffs' injury claims, it does not abrogate the law applicable to private fee contracts.

In *Ferens v. John Deere Co*., 494 U.S. 516 (1990), the Supreme Court explained *Erie's* importance in the context of a case transferred from one federal court to another as follows:

> The *Erie* rule remains a vital expression of the federal system and the concomitant integrity of the separate States.  We explained *Erie* in *Guaranty Trust Co. v. York* . . . as follows:
>
>> "In essence, the intent of [the *Erie* ] decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result."
>
> .....
>
> By creating an opportunity to have venue transferred between courts in different States on the basis of convenience, an option that does not exist absent federal

jurisdiction, Congress, with respect to diversity, retained the *Erie* policy while diminishing the incidents of inconvenience.[39]

Similarly, while MDL promotes efficiencies in handling of these cases for both the courts and the litigants, it cannot abrogate *Erie*'s requirement that a diversity case requires application of the same substantive law applicable to a case filed in state court. A "one-size-fits-all" approach in lieu of examination and application of relevant state law violates *Erie*'s requirements.

     C.    The applicable state law, in turn, may have prohibited the Court from changing the fee contract's terms absent a complaint by one of the contracting parties.

*Erie* requires that this Court apply state law to The Miller Firm's private fee contracts. Those state laws, if examined, may have prohibited the Capping Order altogether or provided their own distinct rules on regulating private fee contracts. By omitting any choice of law analysis, this Court applied a solution that may have conflicted with state law.

For example, decisional law in Texas directly addresses this issue and prohibits the Capping Order. *In re Polybutylene Plumbing Litig.*, 23 S.W.3d 428 (Tex.App.-Hous. (1 Dist.) 2000) ("*In re Polybutylene*"), was a mass tort case involving 37,000 plaintiffs, each of whom had individual fee contracts negotiated before the filing of their suits. The case was not a class action. The trial court attempted to modify the contingent fee contracts, limiting the contingent fee percentage. The appellate court reversed the trial court and held that contingent fee contracts are legally enforceable in Texas, with two exceptions: (a) fraud or breach of fiduciary duty by the attorney or (b) the presence of a minor or incompetent plaintiff. Specifically, the appellate court held that the trial court could *not* "properly modify otherwise perfectly legal fee contracts

---

[39]    *Ferens,* 494 U.S. at 325-26 (internal citation omitted).

because the judge concludes it is not 'fair' for the attorneys to receive the percentage of each recovery that was agreed upon in advance with each client."[40]

Importantly, the Texas court in *In re Polybutylene* considered several of the rationale advanced by this Court in the Capping Order, but rejected those rationale as a matter of Texas law.  For example, the court rejected the inherent authority argument, stating that the federal and out-of-state cases cited in favor of that argument did not bind Texas courts:

> Appellees have not cited one Texas state court case holding that a trial judge has the power, inherent or otherwise, to void or rewrite a fully-performed attorney fee contract in the absence of pleading and proof of barratry, fraud, breach of fiduciary duty, incapacity, illegality, class action, or the applicability of the "common fund doctrine."[41]

The Texas appellate court also considered and rejected an argument that the settlement agreement in *In re Polybutylene* permitted the court to intervene in the private attorney fee contracts.  That settlement agreement contained a provision allowing distribution of the settlement funds from an escrow account according to a formula developed by plaintiffs' counsel and approved by a special master.  Because the trial judge supervised the special master, the trial judge contended that he therefore had authority to inquire into and change the private fee contracts' terms.  The Texas appellate court disagreed.  While the parties could, by agreement, give the trial court power to act, an examination of the settlement agreement in its entirety revealed that the settlement agreement did not place private fee contracts within the purview of the special master and therefore were not within the purview of the court.  Similarly, the Vioxx

---

[40] *In re Polybutylene,* 23 S.W.3d at 436.

[41] *Id.* at 439.  Note:  The issue presented by the Capping Order is *not* a common fund issue.  While the Settlement Agreement contains provisions regarding a common fund, a limitation of private contingent fee contracts does not relate to the common fund doctrine.  Rather, it pertains only to the amount an attorney can retain from his personal client's recovery, because of prior written agreement with that client for compensation for the attorney's efforts on his client's behalf.

Settlement Agreement does not purport to govern private fee contracts.  Section 9.1 provides that the contracting parties should be the sole decision-makers regarding those contracts.  Thus, the result reached by this Court is inconsistent with Texas law.[42]

The Court's citation to Tex. Lab. Code Ann. § 408.221 (regulating fees in worker's compensation cases) and Cal. Bus. & Prof. Code § 6146(a) (regulating fees in actions against health care providers) provides no legislative authority to limit fees in cases not subject to the statutes.  Had the Texas or California legislatures intended to authorize the regulation of attorneys' fees in personal injury cases like Vioxx, it would have expressly said so.  The Court's citation of N.J. R. Ct. 1:21-7 (regulating fees in products liability actions) likewise offers no support for regulating fees in cases governed by the laws of states other than New Jersey.  When viewed from a different perspective, the Court's citation to the laws of various states only serves to highlight the need and importance of a case-by-case choice of law analysis.

A choice of law analysis would have applied each state's own chosen solution to the issue of private fee contracts.  In contravention of *Erie*, the Capping Order applies a single rule for all jurisdictions.

D.      State courts and bar associations provide remedies to the plaintiffs if the fee contracts are found to be illegal or violate ethical rules.

State courts and bar associations are the proper venues for any party who has a complaint concerning a fee contract.  No reason exists to preempt state prerogatives.  Some of the fee contracts contain arbitration provisions, which provide yet another agreed-upon forum for resolution of disagreements.  Because no party raised this issue with the Court, this Court does not have any evidentiary record upon which to conclude that any of the private contracts are

---

[42]      Although the Texas Supreme Court did not decide *In re Polybutylene*, given the extensive supporting Texas case law cited in support of the opinion, there is no reason to believe that the Texas Supreme Court would decide the issue otherwise.

illegal or unethical.  Absent any alleged and proven ethical misconduct, the Court should not modify the fee contracts.

**IV.    The Capping Order is procedurally defective and deprives The Miller Firm of property without due process of law.**

No party or attorney raised any complaint by motion or otherwise to the Court regarding the private contingent fee contracts.  The Miller Firm is unaware of any rule, statute, jurisprudence, or prior accepted court practice providing a framework for the procedure by which the Court decided the issue embodied in the Capping Order.

The Miller Firm learned of the Court's decision only after the Court issued its Order. Before that, The Miller Firm did not know that the Court was considering the matter.  The Miller Firm is unaware of any notice of this issue as an agenda item or a matter otherwise to be submitted to the Court for resolution.

An attorney's right to fees under a contingent fee contract is a recognized property right. The Miller Firm submits that because its contingent fee contracts constituted property, The Miller Firm was entitled to the procedural minima of due process before the court rendered the Capping Order:  effective notice and an opportunity to be heard.

In a class action where a common fund for attorney's fees was being distributed, the Fifth Circuit recently vacated a district court's order issued after an *ex parte* hearing and without supporting data.[43]  In *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008) ("*In re High Sulfur*"), the district court had accepted lead counsel's recommendation without affording non-fee committee members the opportunity to be heard.[44] While fee committee members (who sought to uphold the district court's order) argued that the

---

[43]      *In re High Sulfur*, 517 F.3d at 227 & 231.
[44]      *Id.* at 231.

19

other attorneys' failure to object to appointment of the fee committee constituted an agreement to such proceedings, the Fifth Circuit disagreed:

> Ex parte proceedings are an exception to the rule in our judicial system and contrary to its adversarial nature…. Attorneys cannot simply agree to hold secret hearings before the court. Moreover, the attorneys in this case made no agreement that ex parte hearings would be part of the fee allocation process. The court's order appointing the Fee Committee included no such provision, and there is no basis to infer an agreement.[45]

While *In re High Sulfur* is very different from this case, there are similarities to certain aspects of the procedure that the Fifth Circuit condemned. In both cases, not all affected counsel received notice or an opportunity to be heard.

The individuals in The Miller Firm are not members of the Vioxx Plaintiffs' Steering Committee, the Plaintiffs' Negotiating Committee, or the Fee Allocation Committee, and thus do not have the same access to information discussed in the ongoing meetings with the Court concerning the management of this case. Of course, The Miller Firm would have been very interested to have learned that the Court was considering reducing their personal contingent fee contracts with their clients across the board. In short, the Court should have notified all other interested counsel that the Court was considering capping contingent fees so that the issue could have been briefed and evidence presented. The attached affidavits include this type of testimony.

The Capping Order's effect also falls more heavily on lawyers like those in The Miller Firm, who vigorously worked up their cases, as opposed to those attorneys who may have simply advertised and collected cases, warehousing them while waiting and hoping for a settlement. The Court's Capping Order also allows for no deviation from the 32% cap – regardless of individual circumstances – exacerbating the disproportionate effect.

---

[45]     *Id.* at 231-32 (citations and footnotes omitted).

Several unproven factual assumptions underlie the Court's Capping Order. "Reasonableness" of attorney's fees is at least in part (if not wholly) a factual issue.[46]  In addition to the traditional process of motion, briefing, and argument, The Miller Firm should have been allowed an evidentiary hearing to present evidence as to key facts necessary to determining the "reasonableness" of their contingent fee contracts.

Additionally, in order to support modification of the privately negotiated fee contracts, and in reaching the conclusion that attorney's fees in excess of 32% are unreasonable, the Court may have assumed that there was a market failure, *i.e.*, that (a) The Miller Firm's contingent fee did not fairly take into account the "economies of scale" due to the MDL format; and (b) individual plaintiffs lacked real choices in the legal marketplace and thus had to accept the terms of The Miller Firm's fee contract or go without counsel.  As evidence by the attached affidavits, neither supposition is correct.

The Task Force on Contingent Fees of the American Bar Association's Tort Trial & Insurance Practice Section states that there exists no empirical evidence of a market failure for attorney's fee contracts in mass tort litigation that is not a class action.[47]  Lawyers and clients prefer to make their fee arrangements up front, rather than leaving the arrangements uncertain as litigation proceeds.  Each plaintiff in a non-class MDL possesses the opportunity at the outset of his case to seek out and hire an attorney who offers the best combination of quality, efficiency, price, and a track record of success.  Courts should enforce fairly negotiated fee contracts that take into account the possibility of MDL proceedings and factor in those efficiencies up front.

---

[46]    *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 822 (5th Cir. 1996) ("The determination of a fair attorney fee award is not a 'purely legal issue.'").

[47]    This contrasts with the same Task Force's conclusion that market failure exists in class actions.  *Compare Report on Contingent Fees in Class Action Litigation*, 25 REV. LITIG. 459, 477 (2006) *with Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. at 128.

In the class action context, the Task Force has said:  "Most markets work ex ante, and it would be easier (and more legitimate) for all concerned if the market would set class counsel fees."[48]  Unlike the typical class action in which class members often have too little at stake to seriously negotiate with counsel, in a non-class MDL where each individual has a claim of significant value, courts lack justification for inserting themselves into privately-negotiated fee contracts.  Exertion of normal market forces insures a fair balance in those contracts considering all factors, including, among others, litigation costs (and efficiencies achieved by an MDL), risks of loss, and potential for a substantial recovery.

The attached affidavits reveal some of the operative facts that The Miller Firm would have introduced at an evidentiary hearing.  The Miller Firm also would have offered evidence concerning a lively and competitive legal market for drug products liability cases predictably consolidated into MDLs.[49]  In the Vioxx MDL alone, Brown Greer has reported that more than 935 different firms represent claimants in the Settlement.  Transcript, *In re Vioxx Products Liability* MDL 1657, Nov. 21, 2008 at p. 14.  It would have offered evidence that the terms of its contingent fee contracts were set at fair market value for the client's specific geographic locations.  It could also have offered evidence of its clients' capacity, that its clients were fully informed regarding the fee contracts' terms, and that the clients freely entered into the fee contracts.  The Miller Firm would have introduced the fee contracts themselves as the most basic evidence of reasonableness.  "The reasonableness of a contract, including an attorney fee

---

[48]     *Report on Contingent Fees in Class Action Litigation*, 25 REV. LITIG. at 477.

[49]     An internet search using the name of the drug and the word "lawyers" turns up multiple websites of attorneys offering free consultations to potential clients in the following MDLs:  MDL-1742, *In re Ortho Evra Prods. Liab. Litig.* (search "Ortho Evra lawyers"); MDL-1760, *In re Aredia and Zometa Prods. Liab. Litig.* (search "Aredia and Zometa lawyers"); MDL-1769, *In re Seroquel Prods. Liab. Litig.* (search "Seroquel lawyers"); MDL-1789, *In re Fosamax Prods. Liab. Litig.* (search "Fosamax lawyers"); MDL-1836, *In re Mirapex Prods. Liab. Litig.* (search "Mirapex lawyers").

agreement, is to be evaluated at the time it was made."[50]  A contingent fee contract represents the freely negotiated result of a client's willingness to pay a percentage of his potential recovery for effective representation and an attorney's willingness to accept the case with a real risk of failure and the loss of the amount of time and money invested.  The Court should have considered these factors in an evidentiary hearing.

The Court should have evaluated the fee contracts' reasonableness at the time they were made and after review of evidence such as that submitted in the attached affidavits.  If the Court remains set in re-evaluating the fees after the fact of the settlement in light of "economies of scale," then the Court should also provide the opportunity for The Miller Firm to demonstrate their actual efforts in pursuing each client's claim.  As it stands, however, there is no record evidence to support any limit on The Miller Firm's attorneys' fees.

In both *In re Guidant* and *In re Zyprexa*, the courts allowed attorneys whose contingent fees were affected to challenge the cap and obtain an upward variance by demonstrating their efforts on behalf of their clients.  In *In re Guidant*, the review that Judge Frank undertook of the attorney's submissions resulted in his raising the original cap of 20% to a maximum of 37.18% potentially available to *all* attorneys.[51]  He also concluded that, "[i]n the majority of cases in this

---

[50]  *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).  *See also Jones v. Harris Assoc. L.P.*, 527 F.3d 627, 633 (7th Cir. 2008) (In *dicta*:  "Lawyers have fiduciary duties to their clients but are free to negotiate for high hourly wages or compensation from any judgment.  Rates over $500 an hour and contingent fees exceeding a third of any recovery are common.  The existence of the fiduciary duty does not imply judicial review for reasonableness; the question a court will ask, if the fee is contested, is whether the client made a voluntary choice ex ante with the benefit of adequate information.  Competition rather than litigation determines the fee-and, when judges must set fees, they try to follow the market rather than demand that attorneys' compensation conform to the judges' preferences.").

[51]  *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 3896006 (D. Minn. Aug. 21, 2008) (hereafter "*In re Guidant II*").  Judge Frank devised a formula that resulted in plaintiffs paying no more on a percentage basis for attorney fees (contingency plus common benefit attorney fees) than: (1) the percentage contracted for in

MDL, the Court believes that contingency fee contracts have worked just as they should."[52]  The evidence presented by the attorneys gave Judge Frank a fuller picture and on this more complete record, he changed his view of the percentage that would be fair and reasonable.

It is unknown whether this Court reviewed *In re Guidant II* before issuing the Capping Order, because Judge Frank issued *In re Guidant II* only a few days before the Capping Order. *In re Guidant II* demonstrates that the purported "economies of scale" in an MDL do not tell the full story of an individual attorney's efforts.  Some attorneys may be content to gain clients through massive advertising efforts and then "free-ride" while others do the heavy lifting.  But many more individual attorneys "were required to complete a great deal of work on behalf of their clients, some work that was inherent in the MDL and some work that could not be attributed specifically to the MDL."[53]

> MDL attorneys do have a right to recover reasonable attorney fees, especially for actual work performed for Claimants, including, but not limited to, reviewing medical records and performing preliminary research; drafting and filing pleadings prior to cases joining the MDL; creating databases, newsletters, and websites to facilitate communication with clients; assisting with probate and bankruptcy proceedings; and using their best efforts to complete all of the necessary settlement-related paperwork.[54]

Unlike *In re Guidant* and *In re Zyprexa*, the Capping Order provides no relief mechanism allowing for departure from the 32% cap based upon individual circumstances.  *In re Guidant* and *In re Zyprexa* both provided a procedure for varying the fee cap through submissions to a Special Master.  But here, the Capping Order treats all attorneys the same, regardless of whether they actively worked for their clients or were free-riders who risked virtually nothing because the

---

their contingency/retainer agreement; (2) 37.18%; or (3) the state-imposed limit, whichever of these three was less.

[52]  *Id.* at *9.
[53]  *Id.* at *5.
[54]  *Id.* at *7.

bulk of their work occurred post-settlement and spent little time or money in the process.  Put simply, one size does not fit all, and the attached affidavits reveal the extent to which The Miller Firm actively advocated for and prosecuted their clients' interests.

In sum, the Capping Order deprives The Miller Firm of property without providing due process.

**III.    Alternatively, if the Court declines to reconsider its ruling, the Court should enter a judgment under Rule 54(b) and/or Rule 58 embodying its capping of contingent fees at 32% so that The Miller Firm may take a direct appeal of the ruling to the Fifth Circuit.**

The Court's issuance of the Capping Order *sua sponte* and in the form of an opinion obscures the correct method for seeking its review.  The confusion caused highlights the problems created "by reliance on undefined inherent powers rather than on Rules and statutes that proscribe particular behavior."[55]  Had the Court awarded (or denied) attorney's fees authorized by statute or upon a motion by a party, these circumstances would dictate the appealability and the deadline for appeal of such an order.[56]

Federal Rules of Civil Procedure 58 governs the procedure for entry of judgment and requires in most cases that a court set out the judgment in a separate document.  Rule 58's amendment in 2002 was intended to "impose a clear line of demarcation between a judgment and an opinion or memorandum." [57]  This amendment helped parties determine when a "judgment" was "appealable" and simplified issues concerning delay.  But certain exceptions exist to the "separate document" requirement, including orders "disposing of a motion: . . . (3) for attorney's

---

[55]        *Chambers*, 501 U.S. at 76 (Kennedy, J., dissenting).
[56]        *See* Fed. R. Civ. P. 54(d), 58(a)(3).
[57]        *In re Cendant Corp. Sec. Litig.*, 454 F.3d 235, 243 (3d Cir. 2006) ("*In re Cendant*").

fees under Rule 54." Because the Capping Order does not fall into any traditional category, the method for obtaining appellate review remains unclear.[58]

The Miller Firm desires to avoid any risk of losing its appeal rights. Therefore, The Miller Firm requests that the Court enter a final judgment pertaining to the capping of contingent fees under Federal Rules of Civil Procedure 54(b) (because it fully disposes of the issue of contingent fee contracts) and/or set out a "separate document" under Rule 58(a), *i.e.*, a self-contained and separate order, noting the "relief" granted, and omitting the reasons for the order.[59]

Importantly, granting this request will not delay disbursement of settlement proceeds to claimants. Section 9.1 of the Settlement Agreement establishes that disputes over an individual counsel's attorneys' fees do not affect the settlement.[60] And, regardless of an appeal, the Claims Administrator will continue to disburse payments to claimants according to the settlement terms. Nor will immediate review alter the procedure for disbursement of proceeds because the Capping Order, unless overturned, will preclude attorneys from withholding fees in excess of 32%.

## IV.   Conclusion

The Miller Firm does not seek a stay or injunction with respect to disbursement pending resolution of these issues but reserves the right to do so if necessary. Instead, it simply desires that the Court reconsider its Order and, upon reconsideration, permanently withdraw and set it aside as to all Miller Firm clients and their attorneys. In the alternative, The Miller Firm requests that in the event the Court holds that it (1) has jurisdiction and (2) the authority to regulate

---

[58]     The Fifth Circuit interprets rules "to prevent loss of the right of appeal, not to facilitate loss." *See Hammack v. Baroid Corp.*, 142 F.3d 266, 269 (5th Cir. 1998) (quoting *Bankers Trust Co. v. Mallis*, 435 U.S. 381 (1978)). *See also Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 337 (5th Cir. 2004) (citing *Hammack*, 142 F.3d at 269).

[59] *See In re Cendant*, 454 F.3d at 243.

[60] *See* Section 9.1.

private fee agreements, the Court withdraw and set aside the Capping Order as to all Miller Firm

clients and their attorneys, schedule an evidentiary hearing on the matter, set a briefing schedule,

and thereafter rule based on the record evidence.    In the further alternative, in the event the

Court denies all other requested relief, The Miller Firm requests that the Court facilitate in

obtaining Fifth Circuit review of the Court's determinations without further delay by issuing an

order certifying the Capping Order as final under Rule 54(b) and/or a "separate document" under

Rule 58(a).

Respectfully submitted,


/s/ Michael J. Miller
MICHAEL J. MILLER
THE MILLER FIRM, LLC
108 Railroad Avenue
Orange, VA 22960
(540) 672-4224
(540) 672-3055
Attorneys for Vioxx Claimants

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on Liaison Counsels, Phillip Wittmann and Russ Herman, by U.S. Mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing in accordance with the procedures established in MDL 1657 on January 22, 2009.

Respectfully submitted,

/s/ Michael J. Miller
MICHAEL J. MILLER
THE MILLER FIRM, LLC
108 Railroad Avenue
Orange, VA 22960
(540) 672-4224
(540) 672-3055
Attorneys for Vioxx Claimants