**EXHIBIT 2**

COPY

NO. _____
FILED
A.M. _____ P.M. *4:30*

MAR 2 0 2005

J. DAVID NAVARRO, CLERK
BY _____ DEPUTY

RICHARD H. GREENER, ISB # 1191
FREDRIC V. SHOEMAKER, ISB # 1687
LADAWN MARSTERS, ISB # 5663
GREENER BANDUCCI SHOEMAKER P.A.
Counselors and Attorneys at Law
The Carnegie Building
815 West Idaho Street
Boise, Idaho 83702
Telephone (208) 319-2600
Facsimile (208) 319-2601

Attorneys for the Plaintiff Class

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| CALVIN KINGHORN, on behalf of himself and all others similarly situated,<br><br>                                    Plaintiff,<br>v.<br><br>MERCK & CO., INC.,<br><br>                                   Defendant. | Case No. **CV OC 0502142**<br><br>**CLASS ACTION COMPLAINT** |

This is an action brought by Plaintiff on behalf of himself and all others similarly situated, who have ingested the non-steroidal, anti-inflammatory pain medication called Vioxx (chemical name "rofecoxib") manufactured and distributed by Merck & Co., Inc. ("Merck" or "Defendant"). This action seeks a judgment requiring Merck & Co. to disgorge all funds paid by residents of Idaho for Vioxx, damages and the establishment of a medical monitoring program on behalf of the Plaintiff and the Class to ensure prompt diagnosis and treatment for Vioxx-related adverse health effects for all residents of Idaho who acquired and used Vioxx.



**CLASS ACTION COMPLAINT**

p. 1

## NATURE OF ACTION

1.      Plaintiff Calvin Kinghorn brings this Civil Action for damages and medical monitoring as a result of economic harm suffered from the purchase and use of Vioxx and the increased risk of health problems causally connected to the consumption of Vioxx.

2.      Plaintiff purchased Vioxx and ingested the drug, on a regular basis, as prescribed by his physician, for 17 months.

3.      Ingestion of Vioxx has been linked to an increased risk of adverse health effects for users, including the increased risk of cardiovascular events such as heart attack and stroke.

4.      The Food and Drug Administration ("FDA") approved Vioxx in 1999 for the reduction of pain and inflammation caused by osteoarthritis, as well as for acute pain in adults and for the treatment of menstrual pain. The FDA accelerated the approval process of Vioxx because of a perceived benefit to consumers over the available alternatives at the time, including and naproxen. Subsequently, the FDA approved Vioxx to treat the signs and symptoms of rheumatoid arthritis in adults and children.

5.      In June 2000, Merck submitted to the FDA a safety study called VIGOR (Vioxx Gastrointestinal Outcomes Research) that found an increased risk of serious cardiovascular events including heart attacks and strokes, in patients taking Vioxx compared to patients taking naproxen. Defendant attributed these results to a purported "cardio-protective effect" of naproxen.

6.      Despite reports over the next few years to the contrary, Defendant continued to maintain that Vioxx did not increase a user's risk of cardiovascular events such as heart attack and stroke.

**CLASS ACTION COMPLAINT**                                                    **p. 2**

7.     On September 30, 2004, Defendant revealed that Vioxx doubled the risk of heart attack and stroke to consumers who took the drug for longer than 18 months, as compared to subjects taking a placebo. As a result of this revelation, Vioxx was withdrawn from the market worldwide.

8.     However, the withdrawal from the market came after Plaintiff Calvin Kinghorn and other similarly situated residents of Idaho ingested the drug without notice of the inherent risks to their health. As such, Plaintiff and the Class, as a result of the misleading representations by Defendant, are at an increased risk of cardiovascular events such as heart attack and stroke and thus require medical monitoring.

## THE PARTIES

9.     Plaintiff Calvin Kinghorn is a resident of Jefferson County, Idaho.

10.     Defendant is a global pharmaceutical company which develops, manufactures and markets a broad range of products to improve human health. Merck is incorporated under the laws of the State of New Jersey with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey. Defendant was in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-named prescription drug Vioxx.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action because Defendant transacted business within the State of Idaho at all times relevant hereto; had continuous and systematic contacts with the State of Idaho; and committed tortious acts within the State of Idaho.

12.     Venue is proper in Jefferson County District Court because Defendant was engaged in the business of marketing and distributing Vioxx in Jefferson County, Idaho. In

**CLASS ACTION COMPLAINT**

p. 3

addition, a substantial part of the events giving rise to the claims occurred in Jefferson County.

## FACTUAL ALLEGATIONS

13. At all times relevant, Defendant Merck researched, developed, manufactured, created, designed, tested, labeled, packaged, distributed, supplied, marketed, sold, promoted, advertised, and otherwise distributed Vioxx.

14. Vioxx belongs to a class of drugs called "non-steroidal anti-inflammatory drugs," or "NSAIDs." NSAIDs reduce pain by blocking the body's production of enzymes called cyclooxygenase, or "COX," of which there are two forms: COX-1 and COX-2. Most traditional NSAIDs (Such and ibuprofen and naproxen) work by blocking the COX-1 enzyme, which reduces pain but may lead to gastrointestinal perforations and bleeds.

15. It is believed that Vioxx blocks the COX-2 enzyme that triggers pain and inflammation while sparing the COX-1 enzyme that helps maintain normal stomach lining. It is indicated for treating the signs and symptoms of osteoarthritis and rheumatoid arthritis, management of acute pain in adults, and treatment of primary dysmenorrhea.

16. Vioxx did not promise to be any more effective that traditional NSAIDs, like ibuprofen and naproxen, at treating inflammation and pain. The sole advantage of Vioxx over other NSAIDs was its purported improved safety profile.

17. Vioxx is a brand name used by Merck to market and distribute rofecoxib. Vioxx was approved for marketing based on information in the New Drug Application submitted by Merck to the FDA. The FDA put Vioxx on a fast-track approval process that lasted approximately six months. Defendant obtained FDA approval on Vioxx in or around May 1999 and began its distribution and sale throughout the United States, including Idaho, in May 1999.

**CLASS ACTION COMPLAINT**                                                    **p. 4**

18.    Defendant concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck and safety concerns over hypertension, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market as compared to the competing drug, Celebrex, which was placed into the market by Merck competitors Pharmacia and Pfizer some three months prior to the launch of Vioxx.

19.    Merck knowingly chose to place these adverse health risks on its consumers despite its knowledge at product launch and in post-marketing data thereafter that use of Vioxx carried significant risk factors. These adverse effects were realized in adverse event reports, in clinical trials adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch, which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

20.    On or about December 16, 1999, the FDA called Defendant to task for its materially false and misleading marketing and promotional materials. The FDA sent Defendant an official letter (the "First FDA Warning Letter") admonishing them that the "promotion pieces...that promote Vioxx (rofecoxib) are false and misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance".

21.    In March, 2000, Defendant released the results of a Merck-sponsored VIGOR Study, which had begun in or around January 1999. The VIGOR Study revealed, among other things, "significantly fewer heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking Vioxx 50 mg (0.5 percent) in the Study. There was no difference in cardiovascular mortality between the group treated with Vioxx or naproxen."

**CLASS ACTION COMPLAINT**                                                      **p. 5**

22.     Defendant attributed the difference in the rate of cardiovascular events to the fact that naproxen has "cardio-protective effects," and not to an increased risk of cardiovascular events attributable to Vioxx.

23.     In designing the VIGOR Study, Merck took the exceptional step of including an external Vascular Event Committee ("VEC"), containing three separate subspecialty committees (cardiac, cerebrovascular, and peripheral),...for surveillance, monitoring, and adjudication of vascular events occurring in COX-2 inhibitor trials." According to a July 13, 2002 article that appeared in the British medical journal, *The Lancet,* Merck "apparently was aware of possible myocardial toxicity before the [VIGOR] trial, because it set in place a separate adjudication procedure to study the event."

24.     While VIGOR did demonstrate that Vioxx reduced the incidence of serious gastrointestinal side effects as compared to naproxen, it did not demonstrate an improved safety profile for Vioxx. The VIGOR data revealed that:

a.     Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on naproxen;

b.     Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on naproxen;

c.     According to the FDA, "[e]valuation of safety by routine parameter showed no advantage of [Vioxx] rofecoxib over naproxen; and

d.     Patients on Vioxx actually suffered more cases of serious disease (either gastrointestinal or cardiovascular) than did naproxen users (61 and 57 cases respectively).

**CLASS ACTION COMPLAINT**

25.     In industry-sponsored studies presented at the European United League Against Rheumatism ("EULAR"), an organization in which Merck is a member and corporate sponsor, in June 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck denied these studies as to the hypertension problems in the official publication of the American Pharmaceutical Association, Pharmacy Today. (*Spin War Aside, Lessons Emerge From COX-2 Trials,* August 2000, page 3).

26.     Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the profits obtained through nondisclosure. Merck engaged in a massive advertising and sampling program and gained continued increases in market share, which enhanced Merck's financial bottom line. The effect was a more than $2 billion profit for Merck in 2000 and a 23 percent market share.

27.     Merck continued to withhold relevant data from the public throughout the Class Period. For example, in November 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

28.     On February 8, 2001, Merck submitted the results of the VIGOR Study to the FDA Arthritis Advisory Committee as part of Merck's application to modify the prescribing information for Vioxx to reflect the Drug's purported gastrointestinal ("GI") benefits.

29.     In considering the VIGOR Study results, however, the FDA Advisory Committee concluded (in February 2001) that Vioxx has no safety advantage over the generic drug naproxen, a drug that sells for a fraction of the cost of Vioxx. According to the *FDA Advisory Committee Briefing Document, VJOXX Gastrointestinal Safety,* dated February 8,

**CLASS ACTION COMPLAINT**                                                      **p. 7**

2001: "[I]n the VIGOR Study the potential advantage of decreasing the risk of complicated [GI side effect] was paralleled by the increased risk of developing cardiovascular and thrombotic events."

30.     According to a memo prepared by an Advisory Committee member, Lourdes Villalba, M.D., dated February 8, 2001, which discusses the "Overall Safety" of Vioxx, the VIGOR Study found there were more overall deaths among Study participants taking Vioxx than those taking naproxen (22 and 15, respectively).

31.     The VIGOR results showed that 50 mg doses of Vioxx increased the risk of heart attacks and cardiovascular disease. Faced with this threat to the success of its new blockbuster drug, Defendant offered an unfounded explanation for the negative cardiovascular findings of the VIGOR Study. Defendant asserted that the dramatically increased risk of heart attacks in persons taking Vioxx 50 mg. was not due to Vioxx; rather, Defendant claimed naproxen was cardio-protective and thus dramatically reduced the risk of heart attacks. Tellingly, the marketers of naproxen have never promoted their drug as being cardio-protective.

32.     On August 22, 2001, the *Journal of the American Medical Association* ("JAMA") published an article authored by cardiologists, Eric J. Topol and Steven E. Nessen, of the Cleveland Clinic Foundation entitled *"Risk of Cardiovascular Events Associated With Selective COX-2 Inhibitors,"* which reported the results of a study of Vioxx and Celebrex. The JAMA article reported the findings of the Cleveland Clinic's study that "[C]urrent data would suggest that use of these so-called 'COX-2 inhibitors' might lead to increased cardiovascular events."

33.     The day before the JAMA article was published, *Bloomberg News* reported that Merck commented, with regard to the article, "We have additional data beyond what they

**CLASS ACTION COMPLAINT**                                                                 **p. 8**

cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo." Further, on August 23, 2001, the day after the article was published, Merck stated in a press release, "the Company stands behind the overall and cardiovascular safety profile of Vioxx.

34.    In a follow-up study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events.

35.    In September 2001, the FDA sent Defendant another warning letter (the "Second FDA Warning Letter") which again warned Defendant that Merck's marketing of Vioxx was "false, lacking in fair balance, or otherwise misleading...." The Second Warning Letter went on to advise Defendant that Merck's Marketing, "minimize[s] the potential serious cardiovascular findings that were observed in the VIGOR Study, minimize[s] the Vioxx/Coumadin drug interaction, omit[s] crucial risk information associated with Vioxx therapy, contain[s] unsubstantiated comparative claims, and promote[s] unapproved use."

36.    The Second Warning Letter also reprimanded Merck for "assert[ing] that Vioxx does not increase the risk of [heart attacks] and that the VIGOR finding is consistent with Naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."

37.    Defendant denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive. For example, on May 22, 2001, Merck issued a press release through the PR *Newswire* that stated, among other things: "In response to news

**CLASS ACTION COMPLAINT**                                                        p. 9

and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

38.     The theory that naproxen had a cardioprotective effect and therefore accounted for higher cardiovascular risks among Vioxx users was debunked in approximately January 2002 by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study. The study was published in *The Lancet,* and concluded that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drug on risk of coronary heart disease. Ray, W., et al., *Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: Ail Observational Cohort Study, The Lancet,* 359: 118-123, Jan. 12, 2002.

39.     The FDA's Adverse Reporting System ("AERS") database is a computerized system for collecting and maintaining information about adverse events reported by drug manufacturers, health professional, and others. The system contains adverse events detected and reported after marketing of the drug.

40.     According to AERS, through October, 2003, almost 2,000 adverse cardiovascular events were experienced by persons taking Vioxx, including, myocardial infarctions, cardiac arrests, and cardiac failures. These cardiac events reported to the FDA, which, according to some measures, represent underreporting of as much as 99 percent, resulted in such outcomes as hospitalization, life threatening conditions, and even death.

41.     On October 22, 2003, *Reuters* published an article that stated "arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks, and the growing perception that its pain-fighting capabilities are no better than traditional painkillers."

**CLASS ACTION COMPLAINT**                                                              p. 10

42.     On October 30, 2003, in an article entitled "Vioxx Study Sees Heart-Attack Risk," *The Wall Street Journal* reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]." According to *The Wall Street Journal* article, within the first 30 days of taking Vioxx, the risk of a heart attack was increased 39% as compared to Vioxx's competitor, Celebrex.

43.     At all times relevant to this litigation, Merck has a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which involved financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive advertising and sampling program.

44.     If Defendant had not engaged in this conduct, consumers, including Plaintiff and members of the Class, would have known the true risk of ingesting Vioxx and would have switched from Vioxx to safe products or refrained wholly from its use.

45.     The marketing strategies of the Defendant targeted Plaintiff and other Class members to induce them to purchase Vioxx. At the time Merck distributed, manufactured, and marketed Vioxx. Merck intended that Plaintiff would rely on the marketing, advertisements, and product information propounded by Merck, as well as Merck's omission of relevant negative information from such materials.

46.     From the initial marketing of Vioxx until April 2002, the safety label for Vioxx set forth an explicit warning concerning "Gastrointestinal ("GI") Effects." Specifically, the safety label warned of the "Risk of GI Ulceration, Bleeding, and Perforation." Nowhere within the safety label did Defendant make full or adequate disclosure of the cardiovascular safety Issues related to Vioxx.

**CLASS ACTION COMPLAINT**                                                    p. 11

47.    After reviewing the results of the VIGOR Study and other available data from controlled clinical trials, the FDA consulted with the Arthritis Advisory Committee. In April 2002, pursuant to the review by the FDA and resultant instructions, Merck implemented labeling changes for Vioxx to reflect the findings from the VIGOR Study. The labeling changes included information about the occurrence of cardiovascular events, including heart attacks and stroke, in some patients. At no time did the safety label disclose the level of risk that consumers were subjected to as a result of their ingestion of Vioxx. In fact, Merck continued to stand by the "safety profile" of Vioxx.

48.    The April 2002 labeling changes were insufficient to put the consuming public on notice of the extent of the risk of adverse health effects that use of Vioxx presented.

49.    Thus, despite knowledge in its clinical trials and post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Defendant promoted and marketed Vioxx as safe and effective for persons such as Plaintiff and members of the Class.

50.    Merck failed to reveal the true connection between the use of Vioxx and the increased risk of cardiovascular events until September 30, 2004.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action pursuant to the Idaho Rules of Civil Procedure, Rules 23(a) and (b)(2) and/or (b)(3), on behalf of a state-wide Class consisting of all Idaho residents who acquired and ingested Vioxx from May 1999 to September 30, 2004, inclusive, who have not been diagnosed with a heart attack or stroke since the day before the first ingestion of Vioxx. Excluded from the Class are the officers and directors of Defendant, members of the immediate family of any excluded person, the legal representatives, heirs, successors, and assigns of any excluded person.

**CLASS ACTION COMPLAINT**                                                              **p. 12**

52.     The members of the proposed Class are geographically disbursed throughout the State of Idaho and are so numerous that joinder of them is impracticable.

53.     Plaintiff's class claims are typical of Class members' claims because each Class member was subject to a common course of conduct and pattern of practice perpetrated by Defendant.

54.     No conflict exists between Plaintiff and Class members because:

a.     the claims of the named plaintiff are typical of the absent Class members' claims;

b.     virtually all of the questions of law or fact as to liability are common to the class and predominate over any individual issues, such that by prevailing on his own claims, Plaintiff necessarily will establish Defendant's liability as to all Class members; and

c.     without the representation provided by Plaintiff herein, few class members will receive legal representation or redress for their injuries.

55.     Plaintiff can and will fairly and adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of the Class.  Plaintiff has retained attorneys competent and experienced in class action litigation, consumer law and product liability.

56.     There are issues of law common to the Class that predominate over any individual issues in the claims, including, but not limited to:

a.     whether Defendant designed, manufactured and/or marketed Vioxx with knowledge that it was a dangerously defective product;

b.     whether Defendant acted negligently in marketing and selling Vioxx;

**CLASS ACTION COMPLAINT**                                                    **p. 13**

c.   whether Defendant conducted, either directly or indirectly, adequate testing of Vioxx;

d.   whether Defendant failed to adequately warn consumers of the adverse health hazards caused by using Vioxx;

e.   whether Defendant falsely and fraudulently misrepresented in their advertising, promotional materials and other materials, among other things, the safety of using Vioxx;

f.   whether Defendant knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Vioxx from governmental regulators, the medical community and/or the consuming public;

g.   whether Defendant's conduct constituted unfair and/or deceptive trade practices;

h.   whether Defendant's conduct constituted the knowing or intentional concealment, suppression or omission of material information intended to be relied upon by others in connection with the sale of Vioxx;

i.   whether Plaintiff and members of the Class were significantly exposed to a proven hazardous substance through the negligent actions of Defendant;

j.   whether as a proximate result of exposure, Plaintiff and members of the Class suffer a significantly increased risk of contracting a serious latent disease;

k.   whether the increased risk makes periodic diagnostic medical examinations, such as a stress echocardiogram and/or nuclear echocardiogram, reasonably necessary;

l.   whether monitoring testing procedures exist which make the early detection and treatment of the disease possible and beneficial; and

**CLASS ACTION COMPLAINT**                                             **p. 14**

m.    whether Plaintiff and members of the Class are entitled to a return of the purchase price of Vioxx or other such relief.

57.    Virtually all of the issues of fact in the class claims are common to the Class and predominate over any individual issues in the class claims.

58.    A class action is superior to any other available method for the fair and efficient adjudication given that:

a.    common questions of law and fact overwhelmingly predominate over any individual questions that may arise, such that there would be enormous economics to the Courts and to the parties in litigating the common issues on a class-wide basis as opposed to a repetitive, individual basis, which Could result in conflicting judgments and obligations for the parties;

b.    the size of each Class member's individual damage claim typically is too small to make individual litigation against Defendant an economically viable alternative;

c.    despite the relatively small size of individual Class members' claims, their aggregate volume, coupled with the economics of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with the burden on the courts and the parties of conducting an enormous number of individual litigations; and

d.    no unusual difficulties are likely to be encountered in the management of this action as a class action.

59.    Class certification is also appropriate pursuant to the Idaho Rules of Civil Procedure, Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the

**CLASS ACTION COMPLAINT**

Class, making appropriate equitable injunctive relief in the form of court-ordered medical monitoring and treatment of medical conditions which may befall those who used Vioxx.

## COUNT I

### STRICT LIABILITY (FAILURE TO WARN)

60. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth here and further alleges as follows.

61. As defined in I.C. § 6-1404, Defendant is a manufacturer and/or supplier of Vioxx.

62. The Vioxx manufactured and/or supplied by Defendant was not accompanied by proper warnings regarding all possible adverse side effects associated with the use of Vioxx and the comparative severity and duration of such adverse effects.

63. The warnings and information did not accurately reflect the symptoms, scope, or severity of the possible adverse side effects.

64. Defendant failed to perform adequate testing in that adequate testing would have shown that Vioxx possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope, and severity should have been made.

65. The Vioxx manufactured and/or supplied by Defendant was defective

due to inadequate post-marketing warning or instruction because, after Defendant knew or should have known of the risk of injury and death from Vioxx, Defendant failed to provide adequate warnings, and, despite their inadequate post-marketing warnings and instructions, continued to aggressively promote and sell the product.

**CLASS ACTION COMPLAINT**

66.     As a direct and proximate result of Defendant's conduct as described above, Plaintiff and members of the Class purchased and/or ingested Vioxx, and Plaintiffs and members of Class suffered economic loss, personal injuries and harm, were required to pay for necessary health care, attention, and services, along with incidental and related expenses, or forgo such necessary health care, attention, and services, and will require medical monitoring of the injuries and harm they have suffered, and will be required to pay for additional necessary health care, attention, and services, along with additional incidental and related expenses to monitor their condition, or forgo such necessary health care, attention, and services.

## COUNT II

## STRICT LIABILITY (UNREASONABLY DANGEROUS)

67.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth here and further alleges as follows.

68.     The Vioxx manufactured and/or supplied by Defendant was defective in design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

69.     Alternatively, the Vioxx manufactured and/or supplied by Defendant was defective in design or formulation, in that, when it left the hands of the manufacturer and/or Suppliers, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than the other available alternatives, including, ibuprofen and naproxen. The Vioxx manufactured and/or supplied by Defendant was defective due to inadequate warning and/or inadequate clinical trials, testing, study, and inadequate reporting regarding the results of same.

**CLASS ACTION COMPLAINT**

**p. 17**

70.    The Vioxx manufactured and/or supplied by Defendant was defective due to inadequate warning or instruction because the manufacturer and/or supplier knew or should have known that Vioxx created an unreasonable risk of harm to consumers and the Defendant failed to adequately warn of said risks.

71.    As a direct and proximate result of Defendant's conduct as described above, Plaintiff and members of the Class purchased and/or ingested Vioxx, and Plaintiffs and members of Class suffered economic loss, personal injuries and harm, were required to pay for necessary health care, attention, and services, along with incidental and related expenses, or forgo such necessary health care, attention, and services, and will require medical monitoring of the injuries and harm they have suffered, and will be required to pay for additional necessary health care, attention, and services, along with additional incidental and related expenses to monitor their condition, or forgo such necessary health care, attention, and services.

## COUNT III

### NEGLIGENCE/GROSS NEGLIGENCE/RECKLESSNESS

69.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth here and further alleges as follows.

70.    Defendant had a duty to exercise reasonable care in the design, formulation, manufacture, sale, promotion, supply, and/or distribution of the drug Vioxx, including the duty to assure that the product does not cause users to suffer from unreasonable, dangerous side effects.

71.    Defendant was negligent in the design, manufacture, testing, advertising, marketing, promoting, labeling, warnings given, supply, and sale of Vioxx in that it:

**CLASS ACTION COMPLAINT**

a.   Failed to accompany the drug Vioxx with proper warnings regarding all possible adverse side effects associated with its use;

b.   Failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the drug Vioxx;

c.   Failed to provide adequate training and instructions to medical care providers for appropriate use of the drug Vioxx;

d.   Failed to warn Plaintiff and the Class members, prior to actually promoting the sale of Vioxx about the need for comprehensive, periodic medical monitoring to ensure early discovery of the potential side effects caused by Vioxx;

e.   Failed to warn that the risks associated with Vioxx would exceed the risks of other comparable forms of treatment such as ibuprofen and naproxen;

f.   Negligently marketed Vioxx despite the fact that the risk of the drug was so high and the benefits of the drug were so speculative that no reasonable pharmaceutical company, exercising, due care, would have placed it on the market;

g.   Recklessly, falsely, and deceptively represented or knowingly omitted, suppressed, or concealed, material facts regarding the safety and efficacy of Vioxx to or from the FDA and/or the FDA's advisory committee such that, had the FDA or its advisory committee members known of such facts, Vioxx would never have been approved and no physician would have been able to prescribe the drug to Plaintiff and members of the Class;

h.   Remained silent, despite their knowledge of the growing public acceptance of their information, misrepresentations and omissions regarding the safety and

**CLASS ACTION COMPLAINT**

efficacy of Vioxx, and did so because the prospect of profits outweighed health and safety issues;

i.   Failed to comply with their post-manufacturing duty to warn, which arose when they knew, or with reasonable care should have known, that Vioxx was being prescribed without warning of the true risks of side effects; and

j.   Were otherwise careless, negligent, grossly negligent, reckless, and acted with willful and wanton disregard for the rights of Plaintiff and Class members.

72.   Despite the fact that Defendants knew, or should have known, that Vioxx caused unreasonable, dangerous side effects, Defendant continued to market Vioxx to consumers, including Plaintiff and members of the Class, when there were safer alternative methods and treatments such as ibuprofen and naproxen.

73.   Defendant knew, or should have known, that Vioxx users would suffer foreseeable injuries as a result of Defendant's failure to exercise ordinary care, as described above.

74.   Defendant knew or reasonably should have known that the Vioxx designed, formulated, manufactured, and/or supplied by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

75.   Alternatively, Defendant knew or should have known that the Vioxx manufactured and/or supplied by Defendant was defective in design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other alternatives such as ibuprofen and naproxen.

76.    As a direct and proximate result of Defendant's negligent, grossly negligent and reckless conduct as described above, Plaintiff and members of the Class purchased and/or ingested Vioxx, and Plaintiffs and members of Class suffered economic loss, personal injuries and harm, were required to pay for necessary health care, attention, and services, along with incidental and related expenses, or forgo such necessary health care, attention, and services, and will require medical monitoring of the injuries and harm they have suffered, and will be required to pay for additional necessary health care, attention, and services, along with additional incidental and related expenses to monitor their condition, or forgo such necessary health care, attention, and services.

## COUNT IV

## BREACH OF IMPLIED WARRANTY

77.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth here and further alleges as follows.

78.    At the time Defendant marketed, sold, and distributed the drug Vioxx for use by Plaintiff and the Class, Defendant knew of the use for which Vioxx was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

79.    Defendant breached the implied warranty of merchantability because Vioxx was not of merchantable quality, and was not safe or fit for its intended use because the product was and is unreasonably dangerous and unfit for the ordinary purpose for which it was intended.

80.    Plaintiff, members of the Class and their physicians, respectively, reasonably relied upon the skill and judgment of Defendants as to whether Vioxx was of merchantable quality and safe and fit for the intended use of Plaintiff and members of the Class.

**CLASS ACTION COMPLAINT**

81.     Contrary to such implied warranty, Vioxx was not of merchantable quality or safe or fit for its intended use because Vioxx was and is unreasonably dangerous and unfit for the ordinary purpose for which it was used as described above.

82.     As a direct and proximate result of Defendant's conduct as described above, Plaintiff and members of the Class purchased and/or ingested Vioxx, and Plaintiffs and members of Class suffered economic loss, personal injuries and harm, were required to pay for necessary health care, attention, and services, along with incidental and related expenses, or forgo such necessary health care, attention, and services, and will require medical monitoring of the injuries and harm they have suffered, and will be required to pay for additional necessary health care, attention, and services, along with additional incidental and related expenses to monitor their condition, or forgo such necessary health care, attention, and services.

## COUNT V

## BREACH OF EXPRESS WARRANTY

83.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth here and further alleges as follows.

84.     Defendant expressly warranted that Vioxx was safe and well-tolerated by patients studied and therefore was safe for Plaintiff and members of the Class who ingested Vioxx.

85.     Plaintiff and members of the Class purchased Vioxx so that Plaintiff and members of the Class who ingested Vioxx would obtain health benefits therefrom.

86.     Plaintiff and Class members' physicians reasonably relied upon the skill and judgment of Defendant as to whether Vioxx was of merchantable quality and safe and fit for its intended use.

87.     Defendant made affirmations of fact and promises, including but not limited to those stated herein above, regarding the Vioxx they sold to Plaintiff and the Class, which became the basis for the bargain between the parties and were express warranties.

88.     Vioxx did not conform to Defendant's express representations because Vioxx is not safe and has high risk of serious side effects, including life-threatening side effects.

89.     As a direct and proximate result of Defendant's conduct as described above, Plaintiff and members of the Class purchased and/or ingested Vioxx, and Plaintiffs and members of Class suffered economic loss, personal injuries and harm, were required to pay for necessary health care, attention, and services, along with incidental and related expenses, or forgo such necessary health care, attention, and services, and will require medical monitoring of the injuries and harm they have suffered, and will be required to pay for additional necessary health care, attention, and services, along with additional incidental and related expenses to monitor their condition, or forgo such necessary health care, attention, and services.

## COUNT VI

### UNJUST ENRICHMENT

90.     Plaintiff incorporates by reference all preceding, paragraphs as if fully set forth here and further alleges as follows.

91.     As a direct, proximate, and foreseeable result of Defendant's acts and otherwise wrongful conduct, Plaintiff and the Class were economically harmed. Defendant profited and benefited from the sale of Vioxx, even as Plaintiff and the Class suffered this harm.

92.     Defendant has voluntarily accepted and retained these profits and benefits, derived from consumers with full knowledge and awareness that, as a result of Defendant's

**CLASS ACTION COMPLAINT**                                                                 p. 23

wrongdoing, consumers, including Plaintiff and members of the Class, were not receiving the products of the quality, nature, fitness, or value that had been represented by Defendant or that reasonable consumers expected. Plaintiff and the Class purchased medicine that they expected would improve their health, and instead found their health negatively affected.

93. Plaintiff and the members of the Class did not receive a safe and effective drug for which they paid.

94. It would be inequitable for the Defendants to retain this money because Plaintiff and members of Class did not in fact receive a safe and efficacious drug.

95. By virtue of the conscious wrongdoing alleged in this Complaint, Defendant has been unjustly enriched at the expense of Plaintiff and the Class, who are entitled to in equity, and hereby seek, disgorgement and restitution.

96. Plaintiff, on behalf of himself and for all others similarly situated, demand judgment against Defendant for injunctive relief in the form of restitution of Defendant's unjust enrichment, and/or disgorgement of funds paid to Defendant to buy Vioxx.

**COUNT VII**

**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT**

97. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth here and further alleges as follows.

98. Defendant violated the Idaho Consumer Protection Act by acting in a misleading, false or deceptive manner in labeling, packaging, supplying, marketing, selling, advertising, warning or otherwise distributing Vioxx, when the Defendant knew or should have known that Vioxx could cause side effects including disease and fatality.

99.     Defendant engaged in unfair or deceptive acts or practices when it represented, through its advertising, warranties, and other express representations, that Vioxx was a reasonably safe and effective product.

100.    Defendant's conduct or pattern of conduct, including the issuance of the false and misleading representations and omissions of material facts regarding Vioxx's capabilities and the side effects of Vioxx constitute unfair or deceptive practices and are outrageous or offensive to the public conscience.

101.    By all these actions, Defendants violated the Idaho Consumer Protection Act, damaging Plaintiff and the Class.

102.    Defendant's deceptive practices were specifically designed to induce physicians to prescribe Vioxx, and to induce Plaintiff and Class members to buy Vioxx.

103.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff and members of the Class suffered economic damages, harm, or physical injury, and are threatened with the risk of potential future economic damages, harm, or physical injury.

104.    As a result of Defendant's acts or omissions, Plaintiff and the Class are entitled to all the remedies afforded under the Act (I.C. § 48-601, *et seq.*), including but not limited to, statutory damages, actual damages, and/or injunctive relief in the form of restitution of Defendant's unjust enrichment, and/or disgorgement of funds paid to Defendant to buy Vioxx.

## NON-ECONOMIC DAMAGES

105.    Plaintiff requests a determination that Defendant's conduct herein was reckless and/or willful and, therefore, the limitation on non-economic damages set forth in I.C. § 6-1603 is inapplicable to the proceedings herein.

**CLASS ACTION COMPLAINT**                                        p. 25

## INTEREST

106.   Plaintiff requests pre-judgment interest pursuant to Idaho Code § 28-22-104 on damages suffered by the Class as allowed by law.

## ATTORNEY FEES

107.   By reason of the Defendant's wrongful conduct as alleged herein, Plaintiff has been required to engage the service of the undersigned law firm and has and will incur costs, expenses and fees related thereto, in all phases of representation, and by virtue of which is entitled to reasonable reimbursement of such costs and expenses, and an award of attorney fees, as the law and the circumstances of this case allow, in such sums as will be proven and shown following trial.  Plaintiff is entitled to attorney fees pursuant to Idaho Code §§ 12-120, 12-121, 12-123 and Idaho Code § 48-608, or other applicable law.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests the following relief on behalf of the Class:

A.   Judgment against Defendant on all Counts in an amount in excess of the minimum jurisdictional limits of this Court but not to exceed $75,000, exclusive of interest and costs;

B.   Certification of the Class pursuant to I.R.C.P. Rule 23(b)(2) and/or 23(b)(3);

C.   An order requiring Defendant to fund a medical monitoring program to address the needs of the Class associated with the use of Vioxx;

D.   Full refund of all sums paid by Plaintiff and the Class for Vioxx;

E.   Compensatory damages and/or statutory damages according to proof;

F.   Prejudgment and Postjudgment interest as provided by law;

G.   Attorney fees, expenses, and costs of this action; and

H.     Granting such other and further relief as the Court deems just and proper.

DATED this 28 day of March, 2005.

GREENER BANDUCCI SHOEMAKER P.A.

By: _____

Attorneys for the Plaintiff Class

**CLASS ACTION COMPLAINT**