IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BLUE CROSS OF NORTHEASTERN PENNSYLVANIA, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. |
| | ) ) | _____ |
| MERCK & CO., INC., | ) ) | CV-05-PWG-1070-S |
| Defendant. | ) | |

## COMPLAINT

1.     Plaintiff Blue Cross of Northeastern Pennsylvania ("BCNEPA"), on

behalf of itself, its beneficiaries/insureds, and all other similarly situated third-party

payers nationwide ("Third-Party Payers"), brings this action against Merck & Co.,

Inc. ("Merck") for claims relating to the manufacturing, marketing, and sale of a drug

(rofecoxib) used to treat arthritis and muscle pain, which was marketed in the United

States under the brand name "Vioxx."

## PARTIES

2.     BCNEPA is a Pennsylvania corporation.  BCNEPA's principal place of

business is located in Wilkes-Barre, Pennsylvania.  BCNEPA was injured as a result

of the unlawful conduct alleged herein.

M001BO0000

3.     BCNEPA provides healthcare benefits, including prescription drug coverage, to its members under various arrangements, including employer sponsored health plans that contract with BCNEPA to administer claims on their behalf.

4.     BCNEPA paid, on behalf of its members, for some or all of the cost of the prescription drug Vioxx; for services such as physicians' visits and diagnostic tests required to switch its members from Vioxx to another prescription drug once Vioxx was taken off the market; for Vioxx that was unusable after September 30, 2004; for various health services and products required to diagnose, monitor, and treat its members as a result of their ingestion of Vioxx, including, but not limited to, diagnostic services, such as physicians' visits and lab tests; hospitalization and acute care services, such as emergency room treatments, hospital admissions and intensive care treatment; and for other services related to treatment of injuries resulting from the ingestion of Vioxx.

5.     BCNEPA has contracted with employers to administer healthcare benefits for their employees pursuant to group healthcare plans.  These group healthcare plans constitute "employee welfare benefit plans" ("ERISA plans") with the meaning of Section 3(1) of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1002(1) ("ERISA").  A significant portion of BCNEPA's business

2

M001BO0001

consists of either providing administrative services or a funding vehicle to employee welfare benefit plans.

6. The vast majority of the employee welfare benefit plans administered by BCNEPA contain subrogation provisions. BCNEPA has authority to bring subrogation claims on its own behalf and on behalf of the plans it administers.

7. Defendant Merck is a global company engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling, and marketing, either directly or indirectly through third parties or related entities, the drug Vioxx.

8. Defendant Merck is a corporation existing under the laws of the State of New Jersey with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

## JURISDICTION AND VENUE

9. BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

10. This Court has exclusive jurisdiction over the matters complained of herein pursuant to 29 U.S.C. §§ 1132(a) and 1132(e) of ERISA, because this is an action by administrators of employee welfare benefit plans to enforce the subrogation provisions of the plans.

3

M001B00002

11.     This Court has jurisdiction over the matters complained of herein pursuant to 28 U.S.C. § 1331, because BCBS's and the Class's claims arise under the laws of the United States and the federal common law of ERISA.

12.     This Court has jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. § 1367, and the doctrines of pendant, ancillary, and/or supplemental jurisdiction.

## CLASS ALLEGATIONS

13.     BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

14.     BCNEPA brings this action on its own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, as a class action on behalf of a class of all similarly-situated entities that, from a point in time to be determined in accordance with further proceedings in this matter, and continuing through the present, have purchased, or reimbursed for their beneficiaries'/insureds' purchases of, Vioxx that is unusable and have incurred additional expenses associated with the ingestion of Vioxx and Vioxx's recall (the "Class").

15.     Included in the Class are all health insurers, health maintenance organizations ("HMOs") and other managed care providers, insurance companies, third-party healthcare coverage providers, other healthcare coverage collectives such

4

M001B00003

as union health and welfare plans, self-insured employers and their coverage plans, and all other third-party payers.

16.    Excluded from the Class is the Defendant and the Defendant's subsidiaries and affiliates.

17.    Rule 23(a)(1)'s numerosity requirement for class certification is met. According to media reports, Vioxx generated sales of approximately $2.5 billion in 2003 alone. Merck estimates that 105 million Vioxx prescriptions were written in the United States from May 1999 to August 2004, and about 20 million patients in the country have taken the drug. Vioxx is listed as one of the 30 most prescribed drugs in the United States.    Accordingly, joinder of the members of the Class is impracticable.

18.    Rule 23(a)(2)'s commonality requirement for class certification is met. All putative Class members were and are similarly affected by having purchased and reimbursed for purchases of Vioxx and having paid for the effects of the ingestion of Vioxx, and the relief sought herein is for the benefit of BCBS and members of the putative Class. Common questions of law and fact predominate over any questions that may affect only individual members.

19.    Questions of law or fact common to the Class include:

        a.    Whether the members of the Class are subrogated to the rights of
              their members/insureds;

5

M001BO0004

b.      Whether the Class conferred a benefit on the Defendant, and whether retention of that benefit by the Defendant would be unjust;

c.      Whether the Class is entitled to restitution and/or disgorgement from the Defendant; and

d.      Whether the Class is entitled to costs and expenses in connection with its purchases, reimbursements, or other costs related to their purchases of Vioxx and their members'/insureds' consumption of Vioxx.

20.     Rule 23(a)(3)'s typicality requirement for class certification is met. BCNEPA's claims are typical of the claims of absent Class members because BCNEPA and absent Class members have sustained losses in the same way arising out of the Defendant's actions and because BCNEPA and absent Class members have the same subrogation and equitable claims against the Defendant.  BCNEPA's interest is to obtain relief for itself and the Class for the damages they have suffered arising from the Defendant's conduct as set forth herein.

21.     BCNEPA's claims are also typical of the Class's in that they arise under the same common law equitable principles of subrogation, unjust enrichment, restitution, and disgorgement.  There is little or no variation in these equitable principles between state common law, the federal common law of ERISA, which is informed by state common law, and ERISA's enforcement remedy.

M001B00005

22.    Rule 23(a)(4)'s adequacy of representation requirement for class certification is met.  BCBS will fairly and adequately protect the interests of the Class.  BCNEPA seeks no relief and has no interests that are antagonistic to the interests of the Class.  In addition, BCNEPA is represented by counsel who are competent and experienced in the prosecution of class actions.

23.    Rule 23(b)(3)'s requirements for class certification are met.  The common questions of law and fact noted above predominate over any questions affecting only individual members. A class action is the superior method for the fair and efficient adjudication of this matter, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.  The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practicable to pursue individually, outweigh any difficulties that might be asserted with regard to the management of this class action.

M001B00006

## FACTUAL ALLEGATIONS

24.     BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

25.     Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins" which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.  Prostaglandins are COX (cyclooxygenase) inhibitors.  COX enzymes metabolize arachidonic acid to produce prostaglandins.

26.     Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammation sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

27.     At the time the drug was approved by the FDA, the labeling for rofecoxib stated, in the section outlined "Special Studies—Upper Endoscopy in Patients with Osteoarthritis," "Treatment with Vioxx 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofin 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers with comparing VIOXX to placebo."

8

M001B0007

28.    The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects—Risk of GI Effects—Risk of GI Ulceration, Bleeding, and Perforation."

29.    Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol NO. 088-04, entitled:

> A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBS During Chronic Treatment with MK-0966 or Naproxen in Patients with Rheumatoid Arthritis: U.S. Cohort.

The VIGOR study was performed from January 6, 1999 through March 17, 2000.

30.    The objectives of the VIGOR study were to (a) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (b) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

31.    In industry-sponsored studies presented in June 2000, at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and sponsor, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to

M001B0008

further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the August 2000 official publication of the American Pharmaceutical Association, *Pharmacy Today*, in the article entitled "Spin War Aside, Lessons Emerge from Cox-2 Trials."

32.   Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment.

33.   Merck engaged in a massive advertising and sampling program and gained continued increase in the market share, which enhanced Merck's financial revenue to the detriment of its consumers.

34.   As a result of Merck's activities as described above, it reaped more than 2.5 billion dollars in profit in the year 2003 alone.

35.   Prior to withdrawing Vioxx from the market on September 30, 2004, the predicted earnings for Vioxx were $700 to $750 million dollars for Merck's last quarter sales.

36.   Merck continued to profit from its scheme by withholding information from BCBS, the Class, the consuming public and the health care industry.   For example, in November of 2000, Merck caused the publication of a study in the *New England Journal of Medicine* in which it knowingly downplayed and/or withheld the

10

M001B00009

severity of cardiovascular risks associated with Vioxx consumption versus naproxen consumption.

37.    On or about August 29, 2001, the *Journal of the American Medical Association* ("JAMA") published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio. The story showed that Merck had concealed the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials.

38.    In the JAMA study referred to in the preceding paragraph, the authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at 957.

39.    In a follow-up peer reviewed study reported in the *Journal of the American College of Cardiology* on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the COX-inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular

11

M001BO0010

and thrombotic events." Bing, R., & Lomnicka, *M., Why do you Cyclo-Oxyegnase-2 Inhibitors Cause Cardiovascular Events?* J.A.C.C, 39-3, Feb. 6, 2002.

40.     On September 17, 2001, Thomas W. Abrams, R. Ph, MBA, Director of the FDA division of Drug Marketing, Advertising and Communications issued a "Warning Letter" to Merck concerning the minimization of the potentially serious cardiovascular findings observed in the VIGOR study and finding that Merck's promotional materials were "false, lacking in fair balance, and otherwise misleading."

41.     The FDA warning letter described in the preceding paragraph stated that Merck had "engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx."

42.     On April 11, 2002, the FDA approved a supplemental application for the use of Vioxx for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain.   The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert.   The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

M001BO0011

43.     Vioxx's initial labeling and the revised labeling were ineffective because they did not properly advise physicians and patients of the potential side effects of Vioxx.

44.     Despite knowledge of the ineffectiveness of the warnings, Merck continued to sell its product, and concealed and downplayed the dangers of Vioxx.

45.     On August 25, 2004, a report from a study, (retrospective database analysis of 26,748 patients who took Vioxx and 40,405 patients who took Celebrex), financed by the FDA at an epidemiology conference in France found that patients taking Vioxx had a 50 percent greater chance of heart attacks and sudden cardiac death than patients taking Celebrex, and that patients taking the highest recommended dosage of Vioxx had three times the risk of heart attack and sudden cardiac death as patients not taking standard painkillers.

46.     On September 28, 2004, the FDA was informed that Merck was voluntarily withdrawing Vioxx from the market.

47.     On September 30, 2004, public healthcare providers and pharmacists were notified by Merck that Vioxx was being recalled and would no longer be sold.

13

M001BO0012

48.     Merck has acknowledged on its website that it has a responsibility to reimburse purchasers of Vioxx. However, Merck has not acknowledged a similar responsibility to third-party payers.

49.     Third-party payers have paid a significant portion of all monies expended for the purchases of Vioxx.

## FRAUDULENT CONCEALMENT

50.     The unlawful actions of Merck were wrongfully concealed and carried out in a manner which precluded detection. Merck conducted activities in furtherance of its attempt to suppress truthful information concerning the use, effectiveness and risks of Vioxx from reaching the market.

51.     Because of the fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by BCNEPA or members of the Class has been tolled.

## COUNT ONE
## ERISA SUBROGATION

52.     BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

14

M001B0013

53.    BCNEPA and the Class have made and will make payments on behalf of their members for some or all of the cost of Vioxx and for various medical expenses arising from the use of Vioxx.

54.    These payments were and will be made pursuant to the terms of employee welfare benefit plans administered by BCNEPA and the Class.

55.    These employee welfare benefit plans contain subrogation provisions that put BCNEPA and the Class in the shoes of their members as to these drug and medical expense payments against the Defendant.

56.    Alternatively, in those instances where the employee welfare benefit plans administered by BCNEPA and the Class are silent on the issue of subrogation, the federal common law of ERISA supplies the subrogation remedy sought here.

57.    BCNEPA and the Class are entitled to subrogation against the Defendant to the extent of such payments on the facts and liability theories as set forth herein.

## COUNT TWO
## STATE LAW SUBROGATION

58.    BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

15

M001BO0014

59.     BCNEPA and the Class have made and will make payments on behalf of their members for some or all of the cost of Vioxx and for various medical expenses arising from the use of Vioxx.

60.     These payments were and will be made pursuant to the terms of health care arrangements and plans administered by BCNEPA that are not subject to ERISA due to ERISA's statutory exclusion of plans such as those sponsored by governmental entities.

61.     These plans contain subrogation provisions that put BCNEPA and the Class in the shoes of their members as to these drug and medical expenses payments against the Defendant.

62.     Alternatively, in those instances where the plans administered by BCNEPA and the Class are silent on the issue of subrogation, equity supplies the subrogation remedy sought here.

63.     BCNEPA and the Class are entitled to subrogation against the Defendant to the extent of such payments on the facts and liability theories as set forth herein.

16

M001B0015

## COUNT THREE
## ERISA DIRECT CLAIM FOR UNJUST ENRICHMENT

64.     BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

65.     BCNEPA and the Class have conferred on the Defendant a benefit in the form of the consideration of that portion of the purchase price paid by BCNEPA and the Class for Vioxx. The Defendant appreciated the benefit of this consideration and the profits it made from Vioxx.

66.     These payments were made pursuant to the terms of employee welfare benefit plans administered by BCNEPA and the Class.

67.     The payment by BCNEPA and the Class for this benefit to the Defendant was erroneously made, and would not have been made under the terms of the employee welfare benefit plans administered by BCNEPA and the Class had the true facts regarding Vioxx been known to BCNEPA and the Class, the medical community, and consumers.

68.     Retention of this benefit by the Defendant would be inequitable and unjust in this case because Vioxx had no value when it was paid for by BCNEPA and the Class, and because the Defendant was aware of the serious health risks posed by Vioxx, yet nonetheless aggressively marketed the drug, misrepresented and omitted

17

M001B0016

facts regarding the safety of the drug, and failed to adequately warn BCNEPA and the Class, the medical community, and the general public of the risks posed by Vioxx.

69.     In fairness, the Defendant should be required to disgorge its profits from the purchase of Vioxx by BCNEPA and the Class.

**COUNT FOUR**
**STATE EQUITABLE DIRECT CLAIM FOR UNJUST ENRICHMENT**

70.     BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

71.     BCNEPA and the Class have conferred on the Defendant a benefit in the form of the consideration of the purchase price paid by BCNEPA and the Class for Vioxx. The Defendant appreciated the benefit of this consideration and the profits it made from Vioxx.

72.     These payments were made pursuant to the terms of health care arrangements and plans administered by BCNEPA and the Class that are not subject to ERISA due to ERISA's statutory exclusion of plans such as those sponsored by governmental entities.

73.     The payment by BCNEPA and the Class for this benefit to the Defendant was erroneously made, and would not have been made under the terms of the plans

18

M001B0017

administered by BCNEPA and the Class had the true facts regarding Vioxx been known to BCBS and the Class, the medical community, and consumers.

74.     Retention of this benefit by the Defendant would be inequitable and unjust in this case because Vioxx had no value when it was paid for by BCNEPA and the Class, and because the Defendant was aware of the serious health risks posed by Vioxx, yet nonetheless aggressively marketed the drug, misrepresented and omitted facts regarding the safety of the drug, and failed to adequately warn BCNEPA and the Classes, the medical community, and the general public of the risks posed by Vioxx.

75.     In fairness, the Defendant should be required to disgorge its profits from the purchase of Vioxx by BCBS and the Class.

## COUNT FIVE
## ERISA DIRECT CLAIM FOR UNUSED PORTION OF VIOXX

76.     BCNEPA incorporates and realleges, as if set out in full herein, each and every allegation contained in the above paragraphs.

77.     Vioxx was withdrawn from the market by Merck on September 30, 2004. Users of Vioxx were instructed by Merck to consult their physicians about discontinuing their use of Vioxx and to be switched to another drug.

78.     As of September 30, 2004, BCNEPA and the Class had paid for Vioxx that was unusable, due to the recall, by their members.

19

M001BO0018

79.    These payments were made pursuant to the terms of employee welfare

benefit plans administered by BCNEPA and the Class.

80.    In fairness, the Defendant should be required to make restitution to

BCNEPA and the Class for the unused portions of Vioxx as of September 30, 2004,

and for the costs of switching their members to another drug.

## COUNT SIX
## STATE LAW DIRECT CLAIM FOR UNUSED PORTION OF VIOXX

81.    BCNEPA incorporates and realleges, as if set out in full herein, each and

every allegation contained in the above paragraphs.

82.    Vioxx was withdrawn from the market by Merck on September 30, 2004.

Users of Vioxx were instructed by Merck to consult their physicians about

discontinuing their use of Vioxx and to be switched to another drug.

83.    As of September 30, 2004, BCNEPA and the Class had paid for Vioxx

that was unusable, due to the recall, by their members.

84.    These payments were made pursuant to the terms of health care

arrangements and plans administered by BCNEPA and the Class that are not subject

to ERISA due to ERISA's statutory exclusion of plans such as those sponsored by

governmental entities.

20

85.    In fairness, the Defendant should be required to make restitution to

BCNEPA and the Class for the unused portions of Vioxx as of September 30, 2004,

and for the costs of switching their members to another Drug.

### PRAYER FOR RELIEF

**WHEREFORE, THESE PREMISES CONSIDERED**, BCNEPA, on behalf

of itself and the Class, prays for relief as follows:

a.    That this Court enter an order certifying this action for class treatment under Rule 23, Fed. R. Civ. P.

b.    That an award be made to the Class in an amount representing their payments: (1) for the purchase price of Vioxx; (2) for past and future medical expenses on behalf of their members related to the ingestion of Vioxx; (3) for services such as physicians' visits and diagnostic tests required to switch its members from Vioxx to another prescription drug once Vioxx was taken off the market; and (4) for Vioxx that was unusable after September 30, 2004.

c.    That an award be made to the Class of interest, attorneys' fees, expenses, and costs of this action.

d.    That an award be made to the Class of such other and additional relief to which it may be entitled.

M001BO0020

Plaintiff demands trial by struck jury of all claims on which it is entitled to a jury.

_Kimberly R. West_

Kimberly R. West
E-mail: kw@wallacejordan.com

Attorney for Plaintiff Blue Cross of Northeastern Pennsylvania

Of Counsel:

Wallace, Jordan, Ratliff & Brandt, LLC
800 Shades Creek Parkway, Suite 400
Birmingham, Alabama 35209
Telephone: (205) 870-0555
Facsimile: (205) 871-7534

Mr. Michael J. Laffey
Laffey & Associates
210 Mary Street
Carnegie, Pennsylvania 15106
Telephone: (412) 429-7079
Facsimile: (412) 429-7079

**Please serve Defendant by certified mail:**

Merck & Co., Inc.
c/o The Corporation Company
2000 Interstate Park Drive, Ste. 204
Montgomery, AL  36109

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| Blue Cross of Northeastern Pennsylvania, )<br>individually and on behalf of all others )<br>similarly situated, )<br><span style="margin-left:3em">Plaintiffs,</span> )<br> )<br><span style="margin-left:3em">v.</span> )<br> )<br>Merck & Co., Inc., )<br> )<br><span style="margin-left:3em">Defendant.</span> ) | **Summons**<br>(Issued pursuant to Rule 4 of<br>the Federal Rules of Civil<br>Procedure or other appropriate<br>law.)<br><br>**CIVIL ACTION CASE NUMBER:**<br><br>CV-05-PWG-1070-S |

TO DEFENDANT      **Merck & Co., Inc., c/o The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, AL 36109**

You are hereby summoned and required to serve upon plaintiff's attorney(s):

**Kimberly R. West, Esq., Wallace, Jordan, Ratliff & Brandt, L.L.C., P.O. Box 530910, Birmingham, AL 35253 PHONE: 205.870.0555**

a response to the complaint which is herewith served upon you, within **twenty (20)** days after service of the summons upon you, exclusive of the day of service. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.** A signed copy of your response MUST also be filed with the court.

DATE: 5/25/05

PERRY D. MATHIS, CLERK

By:

<u>SEE REVERSE SIDE FOR RETURN</u>

Deputy Clerk

(SEAL OF COURT)

NOTE: A separate summons must be
          prepared for each defendant.

CLERK, U. S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
1729 5th Avenue North
Birmingham, Alabama 35203

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/26/2005
Log Number 510249952



| | |
|---|---|
| **TO:** | Debra A Bollwage |
| | Merck & Co., Inc. |
| | One Merck Drive |
| | Whitehouse Station, NJ, 08889-0100 |
| **RE:** | **Process Served in Alabama** |
| **FOR:** | Merck & Co., Inc. (Domestic State: NJ) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Blue Cross of Northeastern Pennsylvania, Pltf. vs. Merck & Co., Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | US District Court for the Northern District of Alabama Southern Division, AL |
| | Case # CV-05-PWG-1070-S |
| **NATURE OF ACTION:** | Product Liability Litigation - Complaint alleges fraudulent concealment in regards to Vioxx |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 05/26/2005 postmarked on 05/23/2005 |
| **APPEARANCE OR ANSWER DUE:** | 20 days |
| **ATTORNEY(S) / SENDER(S):** | Kimberly R. West |
| | Wallace Jordan Ratliff & Brandt |
| | PO Box 530910 |
| | Birmingham, AL, 35253 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex Priority Overnight, 791085262371 |
| **SIGNED:** | The Corporation Company |
| **ADDRESS:** | 2000 Interstate Park Drive |
| | Suite 204 |
| | Montgomery, AL, 36109 |
| **TELEPHONE:** | 334-387-7680 |



Page 1 of 1 / LP

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal
opinion as to the nature of action, the amount of damages, the
answer date, or any information contained in the documents
themselves. Recipient is responsible for interpreting said
documents and for taking appropriate action.

Arrow



FROM: Laura Payne (334)387-7680
Alabama GT Reps
2000 Interstate Park Drive
Suite 204
Montgomery, AL 36109

TO:  **Debra A Bollwage (908)423-1688**
**Merck & Co., Inc.**
**One Merck Drive**

**Whitehouse Station, NJ 08889**
Ref: SOP--/610249962/Laura Payne

DELIVERY ADDRESS (FedEx-EDR)

TRK# 7910 8526 2371   FORM
0201

08889   -NJ-US

FedEx Express

FedEx Revenue Barcode

CAD#: 8279871
SHIP DATE: 28MAY05
WEIGHT: 1 LB

**PRIORITY OVERNIGHT**

EWR

XA JVIA

FRI
A2
Deliver by:
27MAY05

CL9122904