UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re VIOXX PRODUCTS LIABILITY LITIGATION<br><br><br><br>**This document relates to all cases** | CIVIL ACTION<br>NO.  2:05-MD-01657-EEF-DEK<br><br>SECTION L<br>JUDGE ELDON E. FALLON<br><br>DIVISION 3<br>MAGISTRATE DANIEL E. KNOWLES III |

**MEMORANDUM IN OPPOSITION TO MOTION FOR
RECONSIDERATION/REVISION OF ORDER CAPPING CONTINGENCY FEES**

The Vioxx Litigation Consortium (VLC) no doubt consists of some of the finest lawyers

in the country.  As reflected in the affidavits submitted by VLC counsel, the VLC's expertise in

complex litigation and its commitment of resources to the litigation of difficult, protracted cases

involving challenging and novel issues is beyond reproach.  VLC lawyers have served their

clients and the public immeasurably by prosecuting important mass tort and products liability

cases, cases that many lawyers would find themselves ill-prepared and ill-equipped to handle.

The issue before this Court, of course, is not whether the VLC lawyers are competent,

ethical, or even among the most prominent and accomplished members of the Bar.  No

suggestion has been made to contradict any of these points.  The issue before this Court is

whether, given the unique circumstances of an MDL in which the parties have requested the Court to exercise an ongoing role in presiding over the Vioxx Settlement Program, the Court had the power to regulate and determine contingency fees.  For the reasons set forth below, and as contemplated in the VLC's Contract for Representation, the Court had the power to review and determine contingency fees pursuant to the Court's equitable powers, its inherent authority, and the Vioxx Settlement Agreement.  Further, the Court's decision to cap contingent fee arrangements at 32% was reasonable under the circumstances.

## I.  THIS COURT HAS JURISDICTION OVER ATTORNEYS' FEES IN THE CONTEXT OF ONGOING MULTIDISTRICT LITIGATION.

The Vioxx Products Liability Litigation is an ongoing MDL within the Court's continuing and ancillary jurisdiction, and the jurisprudence recognizes an Article III case or controversy without a client complaint about fees.

### A.  The case or controversy requirement is satisfied by the existence of the ongoing Vioxx MDL, which is within the jurisdiction of this Court.

This Court's Capping Order does not require independent jurisdiction when, as in this case, the underlying litigation itself presented a case or controversy within the meaning of Article III.

The question of whether a case or controversy exists arises in the context of a specific case, here a mass tort MDL still under active administration and within the continuing jurisdiction of this Court.  None of the cases cited by the VLC involve an MDL; they are all individual cases, generally involving a settlement, which established liability and distributed damages to one plaintiff.  In contrast, the settlement in the Vioxx MDL creates a Vioxx Resolution Program, which establishes a process for the determination of thousands of individual

damage claims.[1]  That process has been ongoing over a year since settlement; interim payments began in late August 2008 and continue to be distributed on a rolling basis.  *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606, 610 (E.D. La. 2008).  The initial disbursement of interim settlement payments was the trigger prompting this Court to address the issue of individual attorneys' fees in its Capping Order of August 27, 2008.

Continuing jurisdiction over the Vioxx MDL is illustrated by the fact that the parties' Settlement Agreement requests that this Court preside over the Vioxx Resolution Program.  *See* Settlement Agreement at § 6.1.  Within a month of the announcement of the Settlement Agreement on November 9, 2007, this Court issued seven orders illustrating the Court's authority to supervise the settlement.  *In re Vioxx*, MDL No. 1657 (E.D. La. Nov. 9, 2007) ( Pre-trial Orders 28-34), available at http://www.laed.uscourts.gov.  The record also reflects a high level of ongoing oversight in the case subsequent to the execution of the Settlement Agreement.  The Court continues to hold status conferences on a monthly basis in open court.  *See id*. Plaintiffs' and Defendants' Liaison Counsel regularly submit Joint Reports to the Court on the status of the litigation and issues in need of resolution.  (*See* Joint Reports of Liaison Counsel.)[2]

---

[1] The Vioxx Resolution Program encompasses all claims that allege a heart attack, sudden cardiac death, or stroke.  *See* Settlement Agreement , *In re Vioxx Prods. Liab. Litig.,* MDL 1657 (E.D.La. Nov. 9, 2007) (hereinafter "Settlement Agreement"), *available at* http://www.browngreer.com/vioxxsettlement.  In order to determine eligibility and valuation of individual claims submitted for enrollment, the Settlement Agreement provides that an independent Claims Administrator will review claims and calculate the total number of points awarded to each claimant during the claims valuation process.  *Id.* at § 2.  The final claims valuation process involves an objective, numerical determination.  *Id.* at § 3.2. Each claimant is initially awarded a number of points based on such individual factors as: age, injury, duration of usage, consistency of use, the date of the relevant usage, whether the claimant used Vioxx pre-or post-label adjustment, and the claimant's general health and medical history.  *Id.* A claimant may appeal a points award determination to a Special Master, who will review the determination *de novo*.  *Id.* at § 3.2.4. After points awards have become final, the points will be converted into dollar amounts for use in calculating final settlement payments.  *Id.* at § 4.3.

[2] Fourteen Joint Reports have been submitted to the Court subsequent to the Settlement Agreement.

Most significantly, the Court continues to decide motions and issue orders on a wide variety of topics relating to the implementation of the Vioxx Resolution Program.[3]

It is clear that this Court has continuing jurisdiction over the underlying claims in the Vioxx MDL and over the funds in escrow that will be used to pay claimants.  In addition, because the Settlement Agreement is a private contract creating a mechanism for resolution of disputes, the Court has ancillary jurisdiction over its implementation.

The case or controversy requirement is therefore satisfied by the existence of the ongoing Vioxx MDL, which is within the jurisdiction of this Court.  No independent case or controversy over attorneys' fees need be found in order to create Article III jurisdiction.

### B.      A case or controversy exists without a complaint about attorneys' fees.

The VLC argues that there was no case or controversy under Article III and that this Court lacked jurisdiction to issue its capping order because no clients challenged the validity or reasonableness of the VLC contingent fee contracts.  This argument is belied by this Court's continuing and ancillary jurisdiction as set forth above and by Fifth Circuit jurisprudence.

The Fifth Circuit recognized a court's jurisdiction to regulate contingency fees in *Hoffert v. General Motors*, where the district court *sua sponte,* without complaint from a client, limited plaintiffs' counsel contingency fee to 20% in spite of a 40% contingent fee contract. 656 F.2d 161, 164-66 (5th Cir. 1981).  Similarly, in *Karim v. Finch Shipping Co*, a case or controversy

---

[3] *See, e.g., In re Vioxx*, MDL No. 1657 (E.D. La. Aug. 7, 2008) (order denying Motions for Preliminary Injunction filed by two separate private health benefit providers who sought to enjoin distribution of interim payments from the Vioxx Settlement Program).  *See also id.* (E.D. La. Feb. 10, 2009) (order granting the Plaintiffs' Steering Committee's Motion to Establish the 468B Qualified Settlement Fund and approving fund administrator) (reciting that the escrow fund had an initial deposit of $500 million by Merck on August 7, 2008 and provided that the Court retain continuing jurisdiction over the escrow fund and holding settlement sub-fund and over the Fund administrator); *id.* (E.D. La. Feb. 10, 2009) (order granting Merck's Motion for Order to show Cause Why the Foreign Individual Claims should Not Be Dismissed Under the Doctrine of *Forum non Conveniens*); *id.* (E.D. La. Oct. 27, 2008) (order granting the Vioxx Claims Administrator's Motion to Sever and Motion to Strike Class Allegation against private health benefit providers); *id.* (E.D. La. Feb. 12, 2008) (order appointing a Curator for *pro se* claimants).

existed despite the lack of protest about fees from the client.  374 F.3d 302, 306-07 (5th Cir.

2004).  In *Karim,* the court prohibited the plaintiff's attorney from claiming fees pursuant to a

contingent fee contract that, together with costs, would have left the plaintiff with nothing.  *Id.*

      The VLC has attempted to distinguish *Hoffert* and *Karim* because of the plaintiffs'

respective status as minor and seaman, groups typically afforded special protection by the courts.

(VLC's mem. 3-5.)  However, the plaintiff's minority status in *Hoffert* was not the basis for the

Fifth Circuit's finding of jurisdiction to cap the attorney's fees.[4]  Although the court in *Karim* did

invoke a heightened concern for protection of absent seamen when it sits in admiralty, those facts

were not fundamental to its finding of jurisdiction.  In both cases, the status of the party was

completely irrelevant to the existence of a case or controversy and to the express holding that the

courts' review of attorneys' fees was constitutionally sound.

      In both *Hoffert* and *Karim,* the parties took action that created a case or controversy.  In

*Hoffert*, the plaintiffs' attorney invoked the equitable jurisdiction of the court "by asking it to

approve the terms of a settlement agreement, to decree the proper allocation of the settlement

proceeds, and to order their distribution to the appropriate parties."  656 F.2d at 165.  Similarly,

in *Karim,* the plaintiff's attorney invoked the equitable power of the court by filing a motion for

disbursement of funds deposited into the registry of court for plaintiff's benefit.  In both cases, a

case or controversy was created by a request from the parties' counsel.  Such requests distinguish

these cases from that relied upon by the VLC, *Brown v. Watkins Motor Lines, Inc.,* 596 F.2d 129

(5th Cir. 1979).  In *Brown*, there was no case or controversy because the parties did not request

---

[4] The VLC incorrectly refers to the minor in *Hoffert* as a "ward" of the court.  (VLC's Mem. 4.)  The
minor was not an unrepresented ward of the court; his father was a co-plaintiff.  *Hoffert*, 656 F.2d at 164-
66.  The more significant fact is that the court was concerned about a possible conflict of interest between
the minor and his father in apportioning the settlement.  *Id.*

that the court take action in the form of either approval of a settlement agreement or administration of a settlement fund.[5]

In the Vioxx MDL, as in *Hoffert* and *Karim*, Plaintiffs' counsel themselves have invoked the Court's exercise of jurisdiction, thereby establishing a case or controversy. In the Settlement Agreement, the parties request that the Court preside over the Vioxx Settlement Program. Settlement Agreement § 6.1.1. Thus, all counsel have requested that the Court play an ongoing role in the administration of the Settlement Agreement, including the disbursement of a global settlement fund. Further, the parties give the Court express authority to modify the Settlement Agreement in certain circumstances. Settlement Agreement § 16.4.2. The VLC argument that no live case or controversy exists over which the Court exercises ongoing jurisdiction is belied by the parties' own actions, and the Court's ongoing and extensive involvement in presiding over the Vioxx MDL.

## II.   THE VLC AND ITS CLIENTS CONTRACTED FOR THIS COURT'S EXERCISE OF JURISDICTION IN DETERMINING ATTORNEYS' FEES

The VLC has characterized its contingent fee contract as a private document over which the Court has no authority. However, review of a typical VLC contingent fee contract demonstrates that the VLC promised its clients that it would abide by any court order governing attorneys' fees, if such an order conflicted with its continent fee agreement. The VLC also promised that in no event would attorneys' fees exceed forty percent. In other words, the VLC's contingent fee contract not only contemplates the Court's exercise of jurisdiction in determining attorneys' fees, it includes a promise to abide by this Court's exercise of such authority up to a

---

[5] The Seventh Circuit's decision in *U.S. v. Vague*, 697 F.2d 805 (7th Cir. 1983), is equally unhelpful to the VLC. Judge Posner, in a criminal case involving a fixed-fee contract, specifically distinguished cases like Vioxx: "This was not . . . a case where even though there is no dispute over fees the judge is required to take some judicial action – approve a class-action settlement, or approve the distribution of a fund in the court's possession – before a fee can lawfully be paid to the lawyer." *Id.* at 808.

*ceiling* of forty percent.

The VLC attached a sample of its contingent fee Contract for Representation as Exhibit A to an Affidavit submitted in support of its Motion for Reconsideration of Order Appointing Tulane Civil Litigation Clinic. *See* (Ex. A at 4.)  According to paragraph 3 of the Affidavit of Basile J. Uddo, this sample contract is representative of "the vast majority of the VLC contingency fee contracts."  (Ex. A at 2.)  Section 3 of the fee contract, entitled "Attorneys' Fees," acknowledges this Court's authority to modify the contractual contingent fee of 40%:

> In the absence of court order or administrative claim processing in which attorneys' fees are otherwise governed, we agree, in consideration of the services to be rendered by Attorneys, client does hereby assign, grant and convey to Attorneys an [sic] forty percent (40%) undivided interest in all of clients claims. . . .
>
> We understand some portions of our case may be handled through class actions, court-approved settlements, administrative claims processing, or as a result of bankruptcy proceedings, and the attorneys' fee to be paid to the Attorneys in those situations will be determined or awarded by order of the court or under the provisions of the court-approved settlement or administrative process.  The amount of the attorneys' fees permitted under such group recovery varies in each instance, and the Attorneys agree to be bound by the amount of attorneys' fees awarded by the court or through the administrative claims procedure, but in no event shall attorney's fees exceed the agreed upon forty percent (40%).
>
> If the provisions of this agreement for payment of attorneys' fees are in conflict with <u>any court order</u>, settlement agreement, provision of law or code of professional responsibility which dictates the amount of attorneys' fees that may be recovered, such court order, settlement agreement, provision of law or code of professional responsibility <u>shall govern the recovery of attorneys' fees under this contract</u>, but in no event shall attorneys' fees exceed the agreed upon forty percent 40%.

(Ex. A at 5) (emphasis added).

Thus, the VLC and its clients contracted for the possibility that this Court would exercise its authority to issue orders determining attorneys' fees.  The VLC contract provides that if the contingent fee contract of 40% is in conflict with "any court order" governing the amount of

attorneys' fees, "such court order . . . shall govern the recovery of attorneys' fees under this contract." (Ex. A at 5.) The fact that the VLC contract creates a *ceiling* of 40% suggests that the VLC contemplated that a court could determine attorneys' fees at a rate *below* 40%.

The cited contractual provision demonstrates not only that the VLC contemplated the possibility that the Court could intervene on the matter of attorneys' fees, but also promised their clients that they would abide by the Court's ruling on fees. Rather than setting the 40% contingent fee as an absolute rate, therefore, the VLC contract rate resembles more of a default rate in the absence of court order, and a ceiling rate in the event of court order.

## III.   AS CONTEMPLATED BY THE VLC'S CONTRACT OF REPRESENTATION, THIS COURT HAD AUTHORITY TO REVIEW AND CAP ATTORNEYS' FEES.

This Court's authority to issue an order capping contingency fees derives from its equitable authority, its inherent authority, and the Settlement Agreement.

### A.   The Court had equitable authority, invoked by the parties, to review and cap attorneys' fees.

As contemplated by the VLC's Contract of Representation, there are myriad instances where courts exercise equitable authority in determining attorneys' fees.[6] For example, the VLC's own fee contract expresses: "We understand some portions of our case may be handled through class actions, court-approved settlements, administrative claims processing, or as a result

---

[6] This Court used the phrase "quasi-class action" to describe MDLs and used that analogy to invoke the court's equitable powers to review the Vioxx Resolution Program. *In re Vioxx*, 574 F. Supp 2d 606, 611-12 (E.D. La 2008). This Court is not alone; several other courts have used the "quasi-class action" analogy to confer equitable authority to review attorneys' fees. *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* MDL No. 05-1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008), *amended in part by In re Guidant*, 2008 WL 3896006 (D. Minn. Aug. 21, 2008); *In re Zyprexa Prods. Liab. Litig.,* 424 F. Supp 2d 488, 491 (E.D.N.Y. 2006). These courts point out that policies and reasons supporting strictly monitoring contingency fees in class actions also apply to MDLs, such as the high volume of plaintiffs subject to one settlement matrix, use of court-appointed special masters to help administer a settlement, a large escrow fund, and other court interventions. *See In re Guidant*, 2008 WL 682174, at *18; *In re Zyprexa*, 424 F. Supp 2d at 491). However, even without relying on the class action analogy, this Court had equitable authority to determine attorneys' fees.

of bankruptcy proceedings, and the attorneys' fee to be paid to the Attorneys in those situations will be as determined or awarded by order of the court or under the provisions of the court-approved settlement or administrative process." (Ex. A. at 5.) Of course, the Court did not approve the settlement agreement in this case, but the fee contract provides examples of the many instances in which courts may determine fees.

The Court's equitable authority to administer a global settlement fund, including the payment of attorneys' fees out of claimants' recoveries, is contemplated by the MDL statute and the Settlement Agreement. The statute directs the MDL panel to centralize cases only when it is possible to strike a balance between efficiency and fairness. 28 U.S.C. § 1407(a) (2000). However, because the MDL Panel has no power to ensure that the proper balance is actually struck, the statute places the responsibility squarely on the shoulders of this Court, as the transferee court, to use its equitable authority to afford the required fairness to all claimants. *Id.* § 1407(a)-(b). As a transferee court, this Court is encouraged to be innovative, as "the complexity, diversity, and volume of mass tort claims require adapting traditional procedures to new contexts." Manual for Complex Litigation (Fourth) § 22.1 (2004). However, innovation must be driven by an attempt "to achieve both fairness and efficiency." *Id.* Regarding fairness, the Manual for Complex Litigation emphasizes two goals for an MDL proceeding: "providing a forum for all parties to have a fair test of the merits of their claims and defenses," and "affording similar treatment to similar cases in order to promote public confidence in the courts through consistent, predictable, and cost-effective outcomes." *Id.* The MDL statute thus reinforces this Court's equitable authority to foster an efficient and fair resolution of the Vioxx MDL.

This Court's equitable authority to promote fairness and efficiency is perhaps no where better exercised than in this Court's administration of the Settlement Agreement and global

settlement fund.[7]  Equitable powers can be invoked in this context to support outcomes that are consistent, predictable, and cost-effective.  The Court has strived to achieve consistent outcomes across claimants by pursuing uniformity and reasonableness in attorneys' fees.  *In re Vioxx*, 574 F. Supp. 2d at 613-14.

As noted in Section I, *supra*, the parties invoked this Court's equitable powers by requesting that the Court preside over the Vioxx Resolution Program.  This equitable authority extends to review of attorneys' fees for reasonableness.  In *Hoffert v. GMC*, the United States Court of Appeals for the Fifth Circuit recognized that in exercising review of a settlement agreement, the court's equitable powers extended to the *sua sponte* review of attorneys' fees. 656 F. 2d 161, 164 (5th Cir. 1981).  In the context of the Vioxx MDL, this Court's equitable power to preside over the Settlement Agreement, invoked by request of the parties, similarly extends to the review of attorneys' fees.

Therefore, as this Court retains jurisdiction of the Vioxx MDL in order to oversee the mechanics and operations of the settlement, it has equitable authority to oversee contingent fee contracts and determine attorneys' fees.

**B.      The Court had the inherent power to review and cap attorneys' fees.**

The inherent of the judiciary extends to the enforcement of the professional responsibilities of lawyers, the defense of the integrity of the judicial system and public perception of mass tort litigation, and the protection of vulnerable claimants.  This Court's Capping Order falls squarely within the inherent powers of the court.

---

[7] The "endgame" of mass tort litigation is a global settlement.  Richard Nagareda, *Mass Torts in a World of Settlement* ix (2007).  As Judge Fallon has recently observed, "the centralized forum created by the MDL Panel truly provides a '*once-in-a-lifetime*' opportunity for the resolution of mass disputes by bringing similarly situated litigants from around the country, and their lawyers, before one judge in one place at one time." Eldon E. Fallon, Jeremy T. Grabill, Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2340 (2008) (emphasis added).

**1.      The Court has the inherent power to review contingency fees.**

The inherent power of this Court generally to enforce lawyers' professional responsibility and regulate the bar includes the specific right to review the reasonableness of contingency fees. *See, e.g.*, Task Force on Contingent Fees of the ABA's Tort Trial & Ins. Prac. Section, *Contingent Fees in Mass Tort* Litigation, 42 Tort Trial & Ins. Prac. L.J. 105, 127 (2006) [hereinafter "Task Force"] ("[A] court that exercised inherent power to prevent a violation of the lawyers' professional responsibility to charge only reasonable rates would be acting within the parameters of inherent authority as described by the Supreme Court."). The Court's power to monitor contingency fees for reasonableness is well recognized. *See, e.g., Karim v. Finch Shipping Co. Ltd.,* 374 F.3d 302, 309 (5th Cir. 2004) ("[T]his appeal does *not* present the issue of a federal court's well-recognized power, in general, to reform contingent fee contracts. Indeed, this power is reflected in the contingent fee contract's providing a fixed percentage for counsel, 'or as allowed by law.'"); *Rosquist v. The Soo Line R.R.,* 692 F.2d 1107, 1111 (7th Cir. 1982.); *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.,* 623 F.2d 1255, 1277 (8th Cir. 1980).

This Court's inherent power to regulate contingency fees stems from a lawyer's ethical duty to charge reasonable fees. Model Rules of Prof'l Conduct R. 1.5(a) (2002). Contingency fees in particular are subject to a reasonableness standard. Id. R. 1.5(a) cmt. 3. "Contingency fee agreements are of special concern to the courts" and thus subject to heightened review. *Allen v. U.S.*, 606 F.2d 432, 435 (4th Cir. 1979).

The salutary impact of contingency fees is significant, as it gives access to the court to those who might not otherwise be able to afford counsel. At the same time, contingency fees are subjected to close judicial supervision due to the potential for conflict between attorney and client. A court has authority to inquire into fee arrangements to protect clients from excessive

fees and suspected conflicts of interest.  *See In re Michaelson*, 511 F.2d 882, 888 (9th Cir. 1975).

This Court properly made such inquiry, stating, "District courts necessarily retain the authority to

examine attorney fees *sua sponte* because the attorneys' interests in this regard are in conflict

with those of their clients."  *In re Vioxx*, 574 F. Supp. 2d at 612.  This Court cited two MDL

cases for the proposition that plaintiffs' counsel have a built-in conflict of interest.  *See id.* (citing

*In re Guidant,* 2008 WL 682174, at *18 (D. Minn. March 7, 2008); *In re Zyprexa*, 424 F. Supp.

2d 488, 491-92 (E.D.N.Y. 2006)).  A conflict need not have matured prior to judicial

intervention, given a court's inherent authority to supervise contingent fees.  As the court stated

in *Rosquist v. Soo Line R.R.*, "Courts have a stake in attorney's fees contracts; the fairness of the

terms reflect directly on the court and its bar."  692 F.2d 1107, 1111 (7th Cir. 1982).  *See also*

*Farmington Dowel Prods. Co. v. Forster Mfg. Co*., 421 F.2d 61, 87, 90 n.62 (holding that a court

has the authority to examine contingency fee contracts in order to ensure that it is not an

unwitting accessory to excessive, unreasonable fees being charged).

The VLC has a difficult time mounting a challenge to this Court's well-established

inherent authority to regulate the professional responsibility of lawyers and supervise

contingency fees for reasonableness.  Instead, the VLC parses words and posits constrained and

artificially narrow definitions.  For example, the VLC discusses the need for courts to exercise

only those powers that are indispensable, without explaining how regulation of the legal

profession in general, or contingency fees in particular, exceeds a court's indispensable, inherent

power. (VLC's Mem. 8-9).  Further, the VLC cites cases involving sanctions for bad faith

conduct, *e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 64 (1991), to suggest other limitations on

the Court's exercise of inherent authority, such as the notion that a finding of bad faith is a pre-

requisite showing to invoke a court's inherent powers.  (VLC's Mem. 9-10.)  In fact, *Chambers*

is inapposite because it imposes no such pre-requisite and does not even address contingency fees. *Chambers*, 501 U.S. at 42-44.

Moreover, the inherent power of this Court to regulate the legal profession and determine fees is not limited to instances involving parties needing special protection from the Court. The VLC misses the mark in its attempt to pigeonhole this Court's exercise of its inherent power into those narrow circumstances involving wards of the court. (VLC's Mem. 10.) The Court is not required to wear such blinders when addressing the reasonableness of attorneys' fees. Although the "[p]ower flowing from this [supervisory power] source has been exercised more frequently to protect those unable to bargain equally with their attorneys and who, as a result, are especially vulnerable to overreaching," many courts have also "exercised [the power] *whenever* a contingent fee agreement yields an unreasonable fee." *Allen*, 606 F.2d at 435 (citing *In re Michaelson*, 511 F.2d at 888; *Farmington Dowell*, 421 F.2d at 87) (emphasis added).

This Court's power to regulate the legal profession is not derived from the special vulnerability of those before it. What is more, protection from unreasonable fees is afforded to every class of plaintiff, not just traditional wards of the court. This power arises from the courts' responsibility to enforce compliance with the rules of professional conduct, especially important in contingency fee arrangements, because "[a] court abuses its discretion if it allows a fee without carefully considering the factors relevant to fair compensation[,] . . . [which] apply even where the fee request is based on a private fee agreement." *Allen*, 606 F.2d at 435-36 (citing *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978); *Evans v. Sheraton Park Hotel*, 503 F.2d 177, 187-88 (D.C. Cir. 1974)). This principle is the same whether or not those before it are "seamen, children, or others who may lack legal capacity." (VLC's Mem. 11.) Therefore, even though "all of the claimants in the global settlement have suffered life-threatening injuries," *In re*

13

*Vioxx*, 574 F. Supp. 2d at 613, the inherent power of the judiciary to regulate attorneys' fees is not limited to cases involving plaintiffs with special vulnerabilities.

> **2.      Matters specific to the Vioxx MDL also grant this Court inherent authority to review contingency fees.**

This Court acted within its inherent authority to supervise members of the bar and review their contingent fee contracts based on facts peculiar to the practice of law in a large mass tort MDL such as Vioxx. These facts include the grouping of lawyers into categories depending on the nature of their work, and protecting the public's trust in the judiciary and the mass tort MDL process.

> **a.      This Court acted within its inherent authority to regulate the bar and its fees based on the unique divisions of labor within an MDL.**

One factor in a court's determination of the reasonableness of a given attorney's fees includes consideration of "the time and labor required." Model Rules of Prof'l Conduct R. 1.5(a)(1). In mass tort litigation such as the Vioxx MDL, the workload, time, and labor of lawyers representing claimants differ dramatically depending on the lawyers' role in the litigation. As the VLC points out, "Some attorneys may be content to collect clients and then 'free-ride' while others do the heavy lifting." (VLC's mem. 24.) This Court, in exercising its inherent authority to review contingent fees for reasonableness, considered the various categories of lawyers in the MDL.

An MDL proceeding standardizes and delegates many functions traditionally handled by an individual attorney in a traditional tort cases. These include "pursuing individual discovery, filing individual motions, engaging in individual settlement negotiations, or preparing individual trial plans." *In re Vioxx*, 574 F. Supp. 2d at 617. Individual attorneys become part of an aggregate pool of lawyers and find many of their functions delegated to other lawyers and third

party administrators.  They benefit from the work of other lawyers who speak in a representative capacity for all plaintiffs.  Some lawyers perform common benefit work by preparing and trying bellwether trials, where outcomes in turn help set the parameters for settlement negotiations. Others may assist in the management of the MDL.

This nontraditional division of labor in the provision of legal services to Vioxx MDL claimants forms the backdrop for and supports this Court's exercise of inherent power to regulate the practice of law and determine reasonable contingent fees.

The Court recognized that individual lawyers benefit from the economies of scale in an MDL.  In this context, the Court recognized the differences between work in individual tort cases and mass tort cases.  *In re Vioxx*, 574 F. Supp. 2d at 616-18.  In an ordinary tort case with a single client, the contingency fees plaintiffs' lawyers earn are often reasonable based on the work performed and the inherent risk of taking the case; however, in the mass tort context, the nature and extent of the legal services provided differ in ways that reduce both the amount of risk and the workload a lawyer must assume.  *See id.* at 617 ("The attorneys have benefited from a uniform and highly efficient resolutions procedure; the claimants should similarly benefit from fees reduced to reflect that uniformity and efficiency.").  *See also In re Zypreza*, 424 F. Supp. 2d at 494 ("[T]hese firms all benefitted from the effectiveness of coordinated discovery carried out in conjunction with the plaintiffs' steering committee and from other economies of scale, suggesting a need for reconsideration of the fee arrangements that may have been fair when the individual litigation commenced.").  The Court's inherent authority to review and cap attorneys' fees extended to the Vioxx MDL, where lawyers benefitted from non-traditional divisions of labor.

**b.    This Court's inherent authority to review and cap fees helps preserve the public's trust in the judiciary and in a mass tort MDL process.**

In addition, in reviewing contingent fees in the Vioxx MDL for reasonableness, this Court also acted within its inherent authority to preserve the public's trust in the judiciary and the mass tort MDL process.

Two central goals governing the exercise of judicial authority are to create just results and protect the appearance of fairness.  See Fed. R. Civ. P. 1; *Berger v. U.S.*, 255 U.S. 22 (1921). Courts must not only be fair; they must appear fair.  If the legal system is to continue using the vehicle of consolidation of claims to resolve disputes and remedy wrongs, courts must not only promote a fair result for claimants but also strengthen the public perception concerning the fairness of mass tort litigation.  *See In re Zypreza*, 424 F. Supp. 2d at 494 ("[MDLs] are an important tool for the protection of consumers in our modern corporate society, and they must be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled.").

This Court properly exercised its inherent power to regulate contingency fees in the context of this mass tort MDL. The Court tailored its exercise of inherent power to the particular circumstances of this case, to which much attention has been drawn because of the large number of claimants and the substantial global settlement fund at issue.  Accordingly, this Court recognized its responsibility to protect the public trust by maintaining the appearance of fairness in the judicial process generally and in the Vioxx MDL specifically.  This Court must safeguard against perceptions of abuse that "allegedly flow from the amount of money to be made in this type of litigation, money that is generated largely by the contingent fee."  *See* Task Force, *supra*, at 124, 152 (stating also that "there is a perception of abuse out there and that perception is powerful").

This Court was concerned that "[d]isproportionate results and inconsistent standards threaten the public's faith in the judicial resolution of mass tort litigation by creating an impression of inherent unfairness." *In re Vioxx*, 574 F. Supp. 2d at 613 (citing *In re Zypreza*, 424 F. Supp. 2d at 494). By capping the attorneys' fees in this case, this Court acted within its inherent power to preserve the public's trust in the judiciary and the judicial process in the MDL setting.

### C.  The Settlement Agreement authorizes the Court to review attorneys' fees for reasonableness and to cap fees.

Several discreet sections of the Settlement Agreement grant this Court authority to modify contingent fee contracts. Section 6.1 includes the joint request of the parties that the Court preside over the Settlement Program. Settlement Agreement § 6.1.1. In this capacity, the Court is authorized to take actions that modify attorneys' fees.

For example, Section 9.2 of the Settlement Agreement directs the allocation of fees from individual claimants' attorneys' fees to the common benefit fund. *Id.* at § 9.2. The Court is given authority to determine common benefit fees for services performed for MDL administration and otherwise for plaintiffs' general benefit. The Court is also given authority to decide how those fees are distributed to attorneys who performed common benefit work. *Id.* at § 9.2.5. The VLC argues that this provision "does not address the private contingent fees contracts." (VLC's Mem. 13). This is correct only in the most narrow sense, as Section 9.2 does not expressly mention contingency fees. However, it does most certainly affect private contingent fees contracts. Fees for common benefit work will be deducted from all individual attorneys' fees: "Any sum paid as a common benefit fee shall be deducted from the total payment of counsel fees payable under individual plaintiff's counsel's retainer agreement." *Id.*

at § 9.2.1.  Thus, the Settlement Agreement clearly authorizes the Court to modify individual attorney-client fee agreements.

## IV.    THE COURT DETERMINED FEES PROPERLY IN THE CONTEXT OF THE VIOXX GLOBAL SETTLEMENT

After determining that it had authority to inquire into the reasonableness of contingent fee agreements between claimants and their attorneys, this Court examined contingent fee amounts generally in the context of the Settlement Agreement and found "that the individual contingent fee arrangements for attorneys representing claimants enrolled in the Vioxx global settlement should be capped at 32% plus reasonable costs."[8]  *In re Vioxx*, 574 F. Supp. 2d at 617.

As this Court noted, the Vioxx global settlement presents unique features that affect the determination of reasonable contingent fees in the MDL context.  This Court properly highlighted the primary impact of MDLs on attorneys fees: "the fact that the economies of scale have led to a global settlement offering considerable benefit to the attorneys."  *Id.*  The economies of scale affect the attorney client relationship and the reasonableness of attorneys' fees.

### A.    When capping individual attorneys' fees, this Court properly considered features of the Vioxx MDL that significantly affected the attorney-client relationship

This Court was appropriately vigilant in capping attorneys' fees in the context of an MDL that substantially altered the attorney-client relationship between Vioxx claimants and their attorneys.   The MDL process renders inapposite the contingency fees that would ordinarily be reasonable in an individual tort case.  Because most of the alterations to the attorney-client

---

[8] This Court noted that there is a second step to the process – allocating a percentage of those fees for the Common Benefit Fees to be distributed to those who performed common benefit work.  *In re Vioxx*, 574 F. Supp 2d at 610.  A separate order will issue addressing that point after notice and hearing.  *Id.*  The sole topic of the Court's fee capping order at issue herein is the reasonableness of contingent fee contracts in the context of the global settlement.  *Id.*

relationship are produced as a result of the efficiencies afforded by the Vioxx MDL, this Court, as aforementioned, has a duty to ensure that these efficiencies promote the appearance of fairness from the point of view of individual claimants and the public.   This Court, therefore, properly considered the impact of the MDL process when deciding upon a reasonable contingent fee award in the Vioxx MDL.

        1.      Centralization and enrollment in the Vioxx MDL increased efficiency and reduced costs and is relevant to the determination of a reasonable contingency fee.

One of the first steps in the Vioxx MDL process was the MDL Panel's centralization of all present and future suits.  *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). This produced an immediate impact on the individual claimants and their attorneys who had filed suits up to that point.  Both past and future claimants' choice of forum is irrevocably disrupted. This inescapable consequence or cost played a significant role in Judge Frank's reasoning to monitor and eventually cap fees in the *Guidant* MDL.  He stated:

> Claimants and their attorneys may believe that they are forced into the MDL when they would rather proceed on an individual basis, either in state or federal court. . . . [S]ome attorneys complain about the time spent completing forms that may have been drafted by others without much thought given to the time needed to complete them. In this sense, some MDL attorneys are left feeling more like claims administrators than litigators.

*In re Guidant*, 2008 WL 3896006, at *6.

    Moreover, because the Settlement Agreement was global in nature, it also brought both federal and state court plaintiffs before this Court in a manner that affected the attorney-client relationship.  According to the Settlement Agreement, all attorneys who wish to participate in the settlement must enlist 100% of their clients, and cannot represent non-participant clients on any Vioxx claims.[9] Attorneys seeking to join the settlement must therefore recommend that all of their Vioxx clients join, or withdraw from representation of any holdouts.  Individualized

---

[9] Settlement Agreement, §§ 1.2.8.1-1.2.8.2.

counseling regarding choice of forum is superseded by this MDL settlement process; clients face a take-it-or-leave-it decision.  The 100% enrollment requirement is one of several examples of both the aggregation of claimants and the efficiencies of MDLs.  The Court took proper note of these features of the Vioxx MDL when fixing contingent fees for individual attorneys on a global basis.

> 2.    The Vioxx MDL's centralized system of advocacy altered the traditional attorney client relationship and the role of the individual lawyer and is relevant to the determination of a reasonable contingency fee.

The MDL process standardizes many functions traditionally handled by individual clients' attorneys and substitutes representative counsel for individual representation.  Both features have a significant impact on the attorney-client relationship and were properly considered by this Court in the determination of appropriate attorneys' fees for individual lawyers within the Vioxx MDL.

At the time the MDL Panel centralized the Vioxx MDL, there were already 4000 individual suits filed in various federal courts, a number that grew to over 20,000.[10]  Efficient judicial management required the selection of a representative voice for the numerous parties and lawyers.  Therefore, individual lawyers selected, and the Court approved, various categories of representatives.

Plaintiffs' Liaison Counsel (PLC) perform administrative tasks for all parties in their liaison group, such as receiving and distributing pleadings, notices, and orders from the Court, coordinating service and filing, and maintaining a document depository.  *In re* Vioxx, MDL No. 1657 (E.D. La. Mar. 8, 2005) (Pretrial Order No. 2); *id.* (E.D. La. Feb. 28, 2005) (Pretrial Order No. 4).  Members of the steering committees conducted and coordinated the entire pretrial stage

---

[10] At the time of the Settlement Agreement, there were over 30,000 state court suits, and at this point, there are approximately 50,000 total claimants.

of the Vioxx litigation.  *Id.*  Members of the Plaintiffs' Steering Committee (PSC) acted as

spokespersons for all claimants at all pretrial proceedings, including discovery, evidentiary

hearings, meetings, motions, negotiation, stipulations, and settlement; in addition, a subset of the

PSC was appointed as Negotiating Plaintiff Counsel (NPC). *Id.* (E.D. La. April 10, 2008)

(Pretrial Order No. 6C; *id.* (E.D. La. April 8, 2005) (Pretrial Order No. 6); *id.* (E.D. La. Feb. 17,

2005) (Pretrial Order No. 1).

Moreover, the use of representative lawyers for all plaintiffs is also reflected in the work of

common benefit attorneys (CBA).  These attorneys similarly advocated for all Vioxx claimants

during a series of trials of test cases that served as bellwether trials.  *In re Vioxx*, 574 F. Supp. 2d

at 608-09.

These administrative features of the Vioxx MDL had a dramatic effect on the original

attorney-client relationship between claimants and their attorneys.  Individual attorneys who do

not serve on the steering committee or perform common benefit work do not perform the

traditional pretrial and trial tasks of an attorney in an individual tort case and do not estimate and

argue for the proper amount of damages for each individual client.  Clients of individual

attorneys enter into an administrative process where the value of each claimant's case is

calculated by the Claims Administrator, based upon known criteria approved by representative

counsel.[11]   The traditional trial and pretrial activities of the individual lawyer are performed for

the entire group by representative counsel on the PSC, PLC, NPC and CBA.

Although the VLC states that "every plaintiff chose his attorneys and freely entered" into

her contracts (VLC's Mem. 3), the Vioxx MDL restructures the attorney-client relationship.

Despite the VLC's contention that "[e]ach [plaintiff] selected an attorney based upon factors and

qualities that were personally important to that plaintiff" at the time of contracting (VLC's Mem.

---

[11] Vioxx Settlement Agreement, Section 2.3 Claims Administrator; 3.2 Claim Assessment Process.

3), these factors – an attorney's particular skills and attributes that would stand out in a competitive market – are significantly diminished after the onset of the MDL process.  As Professor Judith Resnik describes, there now exist layers of lawyers, such that "[c]lients had lawyers but those lawyers were no longer their only lawyers, nor were those lawyers necessarily allowed to speak to the court on behalf of 'their' clients."  Judith Resnik, *Money Matters: Judicial Market Interventions Creating Subsidies and Awarding Fees and Costs in Individual and Aggregate Litigation*, 148 U. Pa. L. Rev. 2119, 2152 (2000).  The restructuring of the attorney-client relationship in MDLs thus has direct bearing on the question of the reasonableness of attorneys' fees for individual attorneys.

In addition to creating a group of representative attorneys, the MDL process also creates a group of claimants.  The individual client becomes part of an aggregate group represented by layers of lawyers, a model very different from what claimants likely envisioned when contracting for a contingency fee.  In the Vioxx MDL, once representative counsel was designated, there was no longer an individual client with a cause of action; in the individual's stead, there was an "aggregate" with "group interests," for whom the representative counsel now speaks.  In exchange for certain common benefits of the Vioxx MDL, the individual plaintiff and attorney relinquished control of the litigation and became bound by decisions that are directed to all MDL parties within the litigation.  Pretrial Orders No. 2 and 6.

The efficiencies produced by the aggregation of discovery and settlement negotiations is staggering.  "Counsel for Merck and the NPC met together more than fifty times and held several hundred telephone conferences."  *In re Vioxx*, 574 F. Supp. 2d at 609 n.5.  Vioxx-related discovery in the coordinate jurisdictions proceeded for more than six years, and "[o]ver 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had

been taken, and counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology." *Id.* at 609 n.6. The efficiencies produced by the aggregation of claimants and the use of representative lawyers supports this Court's determination that a cap was reasonable.

> 3.     The VLC will be separately compensated for common benefit work.

In affidavits supporting its Motion for Reconsideration, VLC attorneys cite some common benefit work as justification for a base fee of 40% fee.[12]  Of course, the Court will allow compensation of common benefit work in addition to the 32% contingent fee set by the Court. *See* Capping Order at 6.  Common Benefit fees compensate attorneys for services performed and expenses incurred for the general benefit of all plaintiffs.  Pretrial Order No. 19.

Attorneys in the VLC will benefit from the common benefit compensation to be awarded in the Vioxx MDL.  One member of the VLC is a member of the PSC; three of the five VLC members worked on bellwether trials, as did members of the firms of the two other VLC members.  VLC will be compensated for time and expenses on common benefit work, but this compensation will be paid by the claimants collectively, not by individual VLC clients.[13]

> 4.     The impact of the Vioxx MDL on spreading the risk and costs for high volume plaintiffs' firms is relevant to the Court's determination of contingency fees.

The Court has articulated, as discussed in Part III.B., *supra*, the economies of scale present

---

[12] See VLC Memo.  Affidavit of Walter Umphrey, para. 20 (discussing VLC involvement in bellwether trials); Affidavit of John Eddie Williams, Jr., para. 17 (discussing participation in Vioxx trials, depositions, and developing expert testimony); Affidavit of Drew Ranier, para. 17 (discussing MDL trials, expert preparation, and discovery);  Affidavit of Mikal C. Watts, para. 17 (discussing trial preparation and trial work, including the cross-examination of experts); Affidavit of Grant Kaiser, para. 16 & 20 (discussing trial work).

[13] Affidavits submitted by the VLC do not distinguish between common benefit work and work performed on individual cases.  The attorney time devoted by VLC members to the Vioxx MDL ranged from 650 hours to 6,240 hours.  *See* (Kaiser Aff. ¶ 16); (Rainer Aff. ¶ 16-17); (Umphrey Aff. ¶ 16); (Watts Aff. ¶ 17); (Williams Aff. ¶ 16).

for individual plaintiff's lawyers.  These economies of scale apply, not only in the case of individual lawyers representing individual plaintiffs, but also in high-volume plaintiffs' practices.

Mass tort litigation is expensive, and risks are high.  There is potential for a very large recovery, but also significant risk of failure that would cause substantial personal loss for plaintiffs' attorneys working under contingency fee contracts.  This is nowhere clearer than in the Vioxx MDL.  The VLC invested over $13.5 million in expenses prior to settlement.[14]  Only one of the six bellwether trials returned a verdict for the plaintiff.  *See* Fallon, Grabill, Wynne, *supra*, at 2335-36.   Therefore, in order for a plaintiff's attorney to justify taking the financial risk in accepting a large number of mass tort litigation clients on a contingency fee basis, there must be a way to increase the potential for return on investment.

In mass tort MDLs, some attorneys spread their risk and investment by accumulating large numbers of clients with solid causes of actions and spreading costs across the group.[15]  In terms of reducing risk, the large number of claimants has the advantage of establishing "a credible threat to prevail" and can increase the plaintiffs' attorneys' leverage in settlement negotiations.  Nagareda, *supra*, at 18.   In terms of reducing costs, the larger the base of clients that plaintiffs' attorneys can amass, the greater the extent to which investments of labor and capital can be

---

[14] The VLC was created to handle Vioxx cases exclusively.  As Kaiser's affidavit states, "[t]he VLC engaged 47 personnel, including 5 nurse paralegals and 4 attorneys – all in addition to the combined resources of the five VLC firms" and further "[t]he VLC opened new, stand-alone offices, hired the necessary personnel, bought furniture and equipment, created and implemented a robust, networked custom database to manage extensive data on our clients, implemented appropriate accounting and financial controls, and performed all other activities associated with running such an organization." (Kaiser Aff. ¶ 19).

[15] For example, the cost to try one Vioxx bellwether case, *Smith v. Merck & Co.,* No. 05-4379 (E.D. La. Filed Sept. 29, 2005), exceeded $1 million.  Affidavit of Drew Ranier 20.  As all VLC affiants agree, "The only way to justify spending $1 million to try one Vioxx case is that you must represent a large number of clients."  *Id.*

spread.[16]  Therefore, the market necessity for large volume plaintiffs' attorneys is to regard

individual claimants as part of a growing aggregate, an increasing number of high-quality clients

that has the dual advantage of reducing risk while simultaneously reducing costs.[17]  The risks and

costs are greatly reduced as each new client is added.  Once the MDL Panel has consolidated the

cases and the transferee judge has issued the order concerning lead counsel, the plaintiffs'

attorneys' stable of clients becomes part of a larger aggregate, for which representative counsel

now speaks, further reducing risks and costs.  This new model of lawyering in an MDL is driven

largely by economic efficiency.

This Court's rationale that "economies of scale must cut both ways" is just as applicable to

high volume plaintiff's practices as to smaller scale practice settings.  *In re Vioxx*, 574 F. Supp.

2d at 617.  The MDL has afforded plaintiffs' lawyers in high volume practices the same benefits

"from a uniform and highly efficient resolution procedure," *id.*, as their smaller firm

counterparts.  Therefore, as this Court correctly noted, "the claimants should similarly benefit

from fees reduced to reflect that uniformity and efficiency."  *Id.* at 617.

For all these reasons, this Court was correct in considering the impact of the MDL on the

work of individual plaintiffs' attorneys in the Vioxx MDL and in recognizing that considerations

that support contingency fees as high as 40% in traditional individualized litigation are not

present in this case.

---

[16] *See* Nagareda, *supra*, at 16 ("[A] plaintiff's law firm will have every reason to search for the one thing that stands between it and the maximizing of its return from that investment: *additional clients*.  In economic terms, the goal is to spread the fixed costs of generic assets over ever more units and, in doing so, to achieve economies of scale.").

[17] This explains the extensive efforts of the VLC to attract a large pool of potential clients and then to select those for representation that fit best with the VLC's tort theory.  According to the affidavit of Drew Rainer, the VLC screened approximately 30,000 prospective clients and decided that 2000 from this group fit within their litigation plan.  (Rainer Aff. ¶ 16).  The screenin process "entailed 126,000 hours of staff/paralegals, 10,000 hours of nurse paralegals, 850 hours of expert/doctors review, and 23,300 hours of attorney screening."  *Id.*

5.   This Court considered appropriate sources in limiting individual contingent fee contracts; the resulting contingent fee cap of 32% was reasonable.

The long-standing authority of the trial court judge to review and determine attorneys' fees is particularly appropriate in the context of MDL actions.  Part of the justification for MDL transfer is to prevent claimants' settlements from being unnecessarily consumed by attorneys' fees.[18]  In the Vioxx MDL, Judge Fallon was very involved in all aspects of litigation for more than four years and was therefore especially well placed to able to determine the reasonableness of attorneys' fees.

This Court's contingency fee rate cap in the Vioxx MDL is generous when compared to comparable orders from other courts.  The Court considered several sources in determining a reasonable limitation on individual contingent fee contracts, including state statutes and regulations and decisions by courts in similar cases.  These decisions reflect a burgeoning federal common law on fee arrangements in MDLs.

Two other federal district courts have issued opinions in MDLs that support this Court's capping order.  *See In re Guidant Corp. Implantable Defibrilators Prods. Liab. Litig*., MDL No. 05-1708, 2008 WL 682174 (D. Minn., March 7, 2008); *In re Zyprexia Prods. Liab. Litig*., 424 F. Supp. 2d 488 (E.D.N.Y. 2006).  Additionally, a district court in Minnesota has recently issued a capping order limiting contingency fees to one third of the settlement, and in so doing relied upon similar reasoning as can be found in this Court's own capping order.  *See In re Medtronic, Inc., Implantable Defibrillator Prod. Liab. Litig.*, MDL No. 05-1726, 2008 WL 4861693

---

[18] "[The MDL] protects to some extent the funds that are available to respond to the claims of those who feel that they have been injured; otherwise you would have races to the courthouse trying to be the first to reach judgment in order to satisfy the claim, and more than likely producing a bankruptcy petition . . ." Statement of Wm. Terrell Hodges, Senior US District Judge, MDFL, and Chairman of the Judicial Panel on MDL, at the Hearing before the Subcommittee on Administrative Oversight and the Courts of the Committee on the Judiciary, US Senate, 109th Congress, 2d session, June 29, 2006.

(D.Minn., Nov. 10, 2008) (order capping fees).  The court in that case approved the Special

Master's recommended cap on individual contingency fees, which cited Judge Fallon's order in

the Vioxx MDL.

Although it did not apply state law, this Court properly looked to state law for guidance

in determining a fair and reasonable contingent fee, especially in states that are primary

coordinate jurisdictions in the Vioxx litigation.[19]  As the Court noted, there is a trend in the states

to limit contingent fees to one-third or less in substantial cases with large recoveries.  574 F.

Supp. 2d 606, 615 (E.D. La. 2008).  Therefore the Court's fee capping order is consistent with

state trends.

The VLC suggests that this Court should apply a choice of law analysis.  This would be

an unproductive endeavor.  Specific state law, in establishing contingency limits in specific areas

of law, does not contemplate a procedure like the mass tort MDL.  Therefore, if this Court were

required to look only at a specific state's law on the reasonableness of fees in the MDL context,

there would be no authoritative source.  Further, a choice of law analysis would defeat some of

the fundamental objectives of an MDL.  The Court determined the reasonableness of

contingency fees for claimants as an aggregate group based on the unique context of the

administration of a global settlement in the Vioxx MDL.  The Court's approach promotes

efficiency and reflects the values of fairness and consistency across claimants – the same values

promoted by MDLs generally.   Applying the law of fifty states to review contingency fees for

---

[19] The Court cited Tex. Lab. Code Ann 408.221 limiting contingency fees in workers' compensation cases
to 25% of net recovery.  The reference is apt in light of what has been described as a trend in global
settlements towards a quasi-worker's-compensation model, with lawyers on both sides of the negotiating
table attempting to establish "grids to match medical conditions with compensation payouts in a
systematic manner."  *See* Nagareda, *Mass Torts in a World of Settlement*  97, 223-24. (2007) ("a rough
consensus has emerged about the desirability of moving toward some manner of grid-based solution" for
global settlements.).

each individual claimant, as the VLC suggests, would eliminate the efficiencies provided by the MDL process and eliminate one of the main benefits of an MDL -- producing uniform results.

**CONCLUSION**

For the reasons enumerated above, the VLC and its clients contracted for the Court's exercise of jurisdiction in determining attorney's fees, and the Court had authority to determine attorneys' fees pursuant to its equitable powers, its inherent authority, and the Settlement Agreement.  In addition, the Court's order capping fees at 32% was reasonable under law and the facts of this case.

> Respectfully submitted,
>
> TULANE LAW CLINIC
>            6329 Freret Street
> New Orleans, La. 70118
> (504) 865-5153
> (504) 862-8753 (fax)
>
>
> By:
>
> /s/ Jane Johnson_____
> JANE JOHNSON, Bar No. 7300
> E-Mail: jjohnso5@tulane.edu
> (504) 865-5157
>
> Stacy E. Seicshnaydre, Bar No. 22193
> E-mail: sseicshn@tulane.edu
> (504) 865-5158
> Supervising Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2009, the above and foregoing Memorandum in Opposition to Motion for Reconsideration of Order Capping Contingent Fees has been served on Counsel for the VLC, Harry S. Hardin III, by e-mail (hhardin@joneswalker.com), and upon Liaison Counsel, Phillip Wittmann and Russ Herman by e-mail (rherman@hhkc.com, pwittmann@stonepigman.com), and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a notice of electronic filing in accordance with the procedures established in MDL 1657.

Respectfully submitted,

By:

/s/ Jane Johnson
JANE JOHNSON, Bar No. 7300
E-Mail: jjohnso5@tulane.edu
TULANE LAW CLINIC
6329 Freret Street
New Orleans, La. 70118
(504) 865-5157
(504) 862-8753 (fax)