324 C Street #156
Chula Vista, Ca.
91910
Jan. 15, 2008

Phillips & Associates
Attorneys At Law
Suite 1100
3030 North Third Street
Phoenix, AZ. 85012

Dear Mr. L W. Finson:

I have enclosed a copy of the first two pages of the list of prescriptions from CVS's Home Office. The second page excludes the section regarding "Current Conditions of record", as I did mention to you in my last letter dated December 17, 2007. (I did wonder what record they obtained their, " Current Conditions of Record").

The last time I talked to your assistant, Ms. Maxwell, I did make an inquiry about the suit against my previous physician Dr. Lina Lacsamana-Schein.  (I gave your assistant my previous doctor's address, in La Mesa, Ca.)  I was a patient of Dr. Schein for approximately fifteen (15) years. Did you obtain copies of my medical records, using one of the "release notices" I signed a couple of years ago? If you have not filed a suit against my previous physician  - perhaps, now would be a good time to do so.

As you may remember,  I explained to you, On August 9, 2004 I called my doctor. I was told by the doctor – "No, you did not have a heart attack. – you have heartburn". I disagreed with the doctor. This was a pain I had never felt before. I even explained how my thighs hurt, too. So, the doctor did make arrangements to see me within a couple of days or so.

- 1 -

I kept my appointment. I was given an exam. Then I received a B-12 injection. I was given more Vioxx samples. Then I stayed at my daughter's home in Coronado. My daughter thought I might eat better while receiving a lot of TLC. Later, about a week or so, I called for another appointment with Dr. Schein, because I was getting weaker and weaker. I was given an appointment for August 22, 2004. A friend of mine drove me to La Mesa, Ca. I was so weak she had to help me walk to the car. Then the same ordeal as I was going into the doctor's office. The doctor took me into the examination room. I was told to climb on the exam table. I could not do that, because I was so weak. It was then that the doctor said-"You have to go to the hospital." I asked, "When?" I was told, "Immediately!" so, the doctor called Grossmont Hospital and made arrangements.

When we arrived at the hospital curb, there were about three people at the front of the hospital with a wheelchair. I could hardly get out of the car, then the three attendants helped me out of the car, and into the wheelchair. They pushed me through the double doors. But then I do not remember going up in the elevator- or much else after that point. The next thing I remember, I was in a bed, in a hospital room. My daughter was standing by my bed. I know I had I.V.s, a catheter, oxygen, and I was flat on my back. I was so happy to see my daughter. (I have no idea how much time had passed since I entered the hospital.) I do remember asking my daughter, "Why were all those people running around like crazy?" My daughter said, "Mother, they were trying to save your life."

Then, within a couple of days, there were tests after tests- pills and more pills. I could not sit up without being propped up by the nurses. I could not move my legs. I could not walk or bend my legs.

I was in a hospital for about 18 weeks, and had a Physical Therapist, for about a month, come to my apartment, for sessions. I also had to have Meals-on-Wheels, before the hospital would release me. I had a showerhead on a hose, plus a special chair for the bathtub. I did finally, learn to use a walker and then I gave up my wheel chair. But, I still cannot stand long enough to prepare my own meals. I think you have copies of the findings of the hospital.

- 2 -

Actually, I was told, by the doctors, that my organs were cascading. They were shutting down my liver; my kidneys, my lungs and my heart were all failing.

I never did hear from the doctor since August 22, 2004, when she sent me to the hospital.

I think if you review the letters I have sent to you, that it would refresh your memory. My physician, of fifteen (15) years, never did indicate I had heart problems. high blood pressure, kidney problems, or lung problems, or
any other organ failures.

Also, this past Monday, January 7, 2008, I watched a forum on television (C-span). This was a panel regarding Vioxx Court Settlement. They were all lawyers. The M.C. was John Calfree. The panel members were: George Cohen, Richard Nagareda, Ted Frank, Mark Herrmann, and Andy Bunchfield (A member of a twelve member Steering Committee for Vioxx plaintiffs).

Evidently, there are a few problems with the proposal as set forth by Merck's attorneys. Even the loyalty of the attorneys, representing plaintiffs being accused of "Cherry Picking" and not really considering what would be best for their clients. This may be unethical.

Then there are a couple of "phrases" that need to be explained. But there were parts of the proposal, that a couple of the lawyers, identified as illegal.

I guess, in May of 2008, there will be a hearing, before Judge Fallon in New Orleans. They will debate the subjects I mentioned, and more.

Also, I have enclosed some in formation I downloaded from the Internet, for you to review. "Vioxx Heart Attack Class Action Lawsuit"

- 3 -

Hopefully, this letter will refresh your memory and also add to your information regarding my situation.

Sincerely,

S. Anne Hamilton

Enclosures:

    1) Two (2) pages from R.I.(CVS) Office
       Re: My Prescriptions
    2) Internet Article re: Vioxx Litigation

4/16/08

# Two studies allege Merck manipulated Vioxx research data

**By David Brown**
THE WASHINGTON POST

WASHINGTON — Two teams of researchers with access to thousands of documents gathered in lawsuits over the painkiller Vioxx allege that Merck & Co. waged a campaign of deception to promote its drug, moving slowly to warn of possible hazards while at the same time dressing up in-house research as the work of independent academic researchers.

The reports in today's *Journal of the American Medical Association* in effect accuse one of the world's biggest pharmaceutical makers of various forms of scientific fraud.

One study alleges Merck gave an incomplete accounting to the Food and Drug Administration of deaths in a clinical trial of Vioxx in people with mild dementia. Federal regulators got the data, which added to the growing evidence Vioxx increased the risk of heart attack or stroke.

Simultaneously, Merck was using what the studies' authors termed "guest authorship and ghostwriting" to make it appear research done by its employees or contractors was the work of scientists in medical schools and universities. That presumably gave the findings more credibility when published in medical journals, boosting Vioxx's profile in the crowded painkiller market.

Vioxx, whose generic name is rofecoxib, went on the market in 1999. It became a "blockbuster" with $2.3 billion in sales in 2003, but it was voluntarily withdrawn in September 2004 after several studies showed it increased the risk of heart attacks and strokes.

Since then, Merck has been named in 26,500 lawsuits by people saying they were harmed by the drug. Last fall, the company created a $4.85 billion fund to settle the claims while not admitting Vioxx caused heart attacks, strokes or deaths.

The two published studies — based on access to company documents made public through the lawsuits — claim to provide a look at practices widespread in the pharmaceutical industry.

This view was endorsed in an editorial signed by the journal's editor, Catherine DeAngelis, who wrote, "But make no mistake — the manipulation of study results, authors, editors, and reviewers is not the sole purview of one company."

Although the two studies question the integrity of dozens of physicians and scientists, the authors did not seek responses from them. Several of those people yesterday called the conclusions incorrect, incomplete or unfair. A Merck legal spokesman dismissed the authors as "people in the pay of trial lawyers."

A6

The San Diego Union-Tribune | NATION | WORLD | Thursday, May 15, 2008

*SAVE*

*5-15-08 Thurs.*

# Quaid testifies to Congress about drug mix-ups

## 'Courts are often the only path to justice,' actor says

**By Pete Yost**
ASSOCIATED PRESS

WASHINGTON — Actor Dennis Quaid told Congress yesterday that taking away the right to sue pharmaceutical companies would turn consumers into "uninformed and uncompensated lab rats."

Quaid's comments came as he described a harrowing, near-fatal drug mix-up in which his newborn twins received 1,000 times the correct dose of the blood thinner heparin.

The actor said his family's brush with tragedy underscores the need to hold pharmaceutical companies accountable through lawsuits. That remedy is becoming increasingly problematic for injured consumers.

The drug maker, Baxter Healthcare Corp., said it regrets that a product intended to save and sustain life was at the center of a medication error.

Beginning with the Bush administration, the Food and Drug Administration has stepped into suits on the side of defendant pharmaceutical companies, arguing that federal regulation of drugs pre-empts state suits.

"The regulatory cop is off the beat," Georgetown University law professor David Vladeck told the House Reform and Government Oversight Committee.

The issue of federal pre-emption of suits against the drug industry will come before the Supreme Court this year in a case from Vermont.

About 7,000 people in the United States die every year because of medication errors.

The Quaid family is suing Baxter Healthcare, which is seeking dismissal of the case on grounds that the FDA approved the labeling.

"Like many Americans, I believed that a big problem in our country was frivolous lawsuits," Quaid testified. "But now I know that the courts are often the only path to justice."

The committee's top Republican, Rep. Tom Davis of Virginia, sympathized with Quaid, saying that if this had happened to the Davis family, "I'd be suing everybody in sight." Apart from Quaid's case, Davis urged a middle ground between total pre-emption and unrestrained litigation.

Quaid told the committee his family's life-altering story began in November 2007 when the twins Thomas and Zoe, at the time 12 days old, developed a staph infection and had to be hospitalized.

Quaid's children were mistakenly administered the wrong version of the blood thinner; two concentrations of the drug were bottled with similar labels and size. When routinely as they often are stored, the light blue 10,000-unit bottle and the dark blue 10,000-unit bottle are virtually indistinguishable, Quaid said.

The children recovered, though "we don't know what the longer-term effects will be," the actor said.

Fourteen months earlier, a similar mix-up occurred at an Indianapolis hospital; three infants died. Baxter did not take the similarly appearing packages off the market.

# Your AARP   The Law

## By Emily Sachar

**■ The issue:** Can a patient use state law to collect damages from a manufacturer whose drug label had FDA approval?

No one expected Diana Levine to lose her right forearm eight years ago. But it had to be amputated, and she blames Wyeth Laboratories' failure to properly label an anti-nausea drug administered intravenously to treat her migraine headache. The drug, Phenergan, was injected in Levine's arm and accidentally injured an artery, leading to gangrene and forcing doctors to amputate.

"It was very traumatic because it meant not only losing my limb and all the things that go with that, but losing my career," says Levine, 62, a guitarist from Marshfield, Vt., who has released 16 albums.



"To find out later that it didn't have to happen was pretty shocking."

In Vermont state Supreme Court, Levine successfully argued that the Phenergan warning label was inadequate even though it had been approved by the Food and Drug Administration. For its part, Wyeth insisted that FDA regulation preempts state laws and lawsuits filed under those laws.

At stake is the right of Levine and potentially millions of other consumers to seek monetary damages in state and local courts when they are injured by drugs that are improperly labeled.

The case is especially disturbing, ac-

**A drug that injured Diana Levine was improperly administered.**

cording to attorneys for Levine, because Wyeth had known for decades that there were risks associated with the method used to administer the drug to Levine—a method called "IV push" that injects medication directly into a vein. Had the emergency room caregivers treating Levine also known of the risks, they could have used a simple IV drip instead. But Wyeth never changed the drug label to indicate the dangers of IV push.

"Since older persons use prescription drugs in far greater numbers than their younger counterparts, they stand to lose the most," says Stacy Canan, senior AARP Foundation attorney. "If the U.S. Supreme Court grants immunity for the pharmaceutical companies, injured consumers will no longer have their day in court."

Wyeth argued that FDA action prevails because state law would interfere with the FDA role of balancing therapeutic benefits against safety risks of prescription medicines.

Canan says that Wyeth's argument boils down to this: Levine is out of luck. It doesn't matter that the company knew its instructions were causing injuries and did not inform the FDA or change the label.

Levine has won two state court rulings and been awarded more than $6 million in damages, but Wyeth appealed to the U.S. Supreme Court. The case will be argued in November.

**■ What it means to you:** A ruling for Wyeth could mean that FDA actions are the final word on safety and effectiveness, foreclosing your right to sue a drugmaker if you suffered injury or illness as a result of taking a drug. For a preview of upcoming U.S. Supreme Court cases with significance for older Americans, go to www.aarp.org/litigation. □

**Emily Sachar** is a journalist and author based in Brooklyn, N.Y.