UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION<br><br>**This document relates to All Cases** | CIVIL ACTION<br><br>NO. 2:05-MD-01657-EEF-DEK<br><br>SECTION L<br>JUDGE ELDON E. FALLON<br><br>DIVISION 3<br>MAGISTRATE DANIEL E. KNOWLES III |

**THE VIOXX LITIGATION CONSORTIUM'S
SUPPLEMENTAL SUBMISSION WITH AFFIDAVITS TO
<u>ITS MOTION FOR RECONSIDERATION OF CAPPING ORDER</u>**

In its Motion for Reconsideration, the VLC asserted that it had been deprived of its property interest in its fee agreements without due process. When the Court agreed to reconsider the Capping Order, it permitted the VLC an opportunity to submit not only a reply to any opposition to the motion, but also evidence in the form of affidavits in supplementation of the motion.[1] Accordingly, the VLC in this Supplemental Submission attaches several affidavits and exhibits. These are the factual and expert opinion materials the VLC submits as evidence.

---

[1] *See* Rec. Doc. No. 17882.

{N1948654.5}                                 1

**EXPERT AND FACT AFFIDAVITS**

The VLC asks that the Court consider the attached affidavits and their exhibits in full.

The affidavits are summarized here.

## I.    AFFIDAVIT OF PROFESSOR HERBERT M. KRITZER

- Herbert Kritzer is a professor of law at William Mitchell College of Law and professor of political science and law at the University of Wisconsin-Madison. He has a Ph.D. in political science and is considered to be one of the foremost authorities on empirical legal studies, specifically focused on civil justice and legal practice. He has worked extensively on plaintiff contingency fee practice and attorneys' fees in the United States more generally. He has written comprehensively on the subject of contingency fees in many different fora, including a book devoted to the subject: *Risks, Reputations, and Rewards: Contingency Fee Legal Practice in the United States* (Stanford University Press, 2004). His curriculum vita is attached as Exhibit A to his affidavit.

- Professor Kritzer reviewed various orders, pleadings and reports filed in this case, data regarding the VLC's clients and the VLC's trials, and a variety of publicly available materials pertinent to the subject.

- In Part B of his affidavit, Professor Kritzer explains the fundamental concepts of the American contingent fee system. Some types of cases are demonstrably riskier than others. Medical malpractice and products liability claims are two examples and the attorney's fee percentage in these cases tends to be higher. A 40 percent fee in these cases is common.

- Attorneys and clients must agree on the terms of a contingency fee agreement *ex ante* because almost all states require that such agreements be reduced to writing at or near the beginning of the representation. Attorneys selectively evaluate whether to accept representation in a case and the terms of the representation based on the information available at that time. Attorneys are not permitted in most instances to increase the fees during the representation because of a change in the level of risks.

- Cases have an "expected value" at outset. The expected value is the average outcome the case would yield if handled to a conclusion (by trial or settlement) many times. Factors influencing the expected value are: the probability of recovery (by trial or settlement), the potential recovery amounts, the out-of-pocket costs the attorney will incur in developing the case, the direct expenses the attorney will lose if there is no recovery, and the percentage to be paid as the attorney's fee. Anything that affects these components affects the attorney's decision to accept representation.

- In Part C of his affidavit, Professor Kritzer considers the impact of limiting amounts that can be collected as attorneys' fees. In the absence of systematic national data, Professor Kritzer examined this issue in several discrete contexts. He first looked at the effects of Texas's adoption in 2003 of a $250,000 limit in malpractice cases against physicians.

> Nearly half of all Texas jury awards in medical malpractice cases before 2003 exceeded that limit. A 2006 survey of plaintiffs' attorneys in Texas found a dramatic decline in the willingness of attorneys to accept a medical malpractice case depending upon whether the case arose before or after the enactment of the limit. Although medical malpractice filings are not tracked by the Texas Judiciary, Harris County (Houston area) does collect that data. The number of medical malpractice cases filed in Harris County after the damage limits went into effect dropped by 40 to 50 percent. Thus, the available data from the fourth largest city in the United States compels the conclusion that limits on recoveries, which necessarily translate into a limit on attorneys' fees (a *de facto* cap), decrease the number of cases plaintiff attorneys accept and file.

- Professor Kritzer cites several other studies to the same effect.

- Professor Kritzer then discusses two studies aimed directly at the impact of limits on contingency fees in medical malpractice cases. Both studies conclude that attorneys abandon medical malpractice cases in increasing numbers when contingent fees are artificially limited.

- In Part D, Professor Kritzer reviews data and information regarding the Vioxx cases in general and the VLC cases specifically. Professor Kritzer considers factors that would influence the "expected value" of the VLC's cases, including the rates charged by the VLC in its agreements, the jurisdictions where the cases were filed or whose law applied (including the existence of statutory fee limits), and the investment of the VLC's time and money in all aspects of the Vioxx litigation from initial client contact to jury verdict.

- Professor Kritzer considers various risk factors involved in the VLC's cases. First there are risks that can be evaluated at the outset, like Merck's announced litigation strategy not to settle any case and to try every case. Other factors include that the Vioxx litigation never developed beyond "an immature area marked by a great deal of risk and uncertainty",[2] and the risk of total failure presented by the general and specific medical causation issues, *Daubert* challenges, and federal preemption.[3]

- Professor Kritzer cites as evidence of the VLC's assessment of risk at the outset of the Vioxx litigation, the fact that the VLC accepted 95 percent of the cases referred to it at more than a customary 50 percent split. Professor Kritzer notes that the outcomes of the Vioxx trials confirm *ex post* that the VLC's view of the risks *ex ante* was accurate.

---

[2] Although this Court has characterized the Vioxx litigation as a "mature tort," it would not qualify as one under the definition of a "mature" mass tort offered by Frances E. McGovern in *Resolving Mature Mass Tort Litigation*, 69 B.U.L. REV. 659 (1989). Kritzer Aff., ¶ 46. As Professor Kritzer puts it, "no one had come up with a winning formula for Vioxx cases." ¶47.

[3] The preemption issue was recently resolved by the United States Supreme Court on March 4, 2009 in *Wyeth v. Levine*, No. 06-1249, 2009 WL 529172.

- Professor Kritzer acknowledges that MDLs may bring certain economies of scale, but notes that the economies of scale benefit the courts and the defendant more than plaintiffs and their counsel. He also cites commentators who have found that judges tend to undervalue attorneys who actually serve individual clients when courts are empowered to *award* fees. Kritzer Aff., ¶ 53.

- In Part E of his affidavit, Professor Kritzer considers whether 40 % contingency fees in the Vioxx MDL are objectively reasonable. He examines the fees that would result from the $4.85 billion settlement if all plaintiffs' counsel contracted for a 40 % fee and there were no state limits. This figure is $1.94 billion. But, when adjusted for the large number of cases that would be subject to limits set by law (primarily those filed in New Jersey), the fees would range between $1.80 to $1.85 billion.

- Professor Kritzer then compares the hypothetical total plaintiffs' fees to two objective standards: 1) the cost of Merck's defense; and 2) Merck's profits from Vioxx. First, he shows that plaintiffs' fees at 40 % are nearly identical to the total defense fees incurred by Merck, without taking into account 1) that Merck's counsel took little to no risk of nonpayment (of fees or expenses); and 2) the value of the banking and insurance services provided by plaintiffs' counsel to their clients. Second, Professor Kritzer shows that Merck's net profits from Vioxx alone appear to far exceed the total plaintiffs' fees at 40 %. Using either objective standard, plaintiffs' counsel's recovery of their agreed upon fees is reasonable.[4]

- In Part F, Professor Kritzer discusses existing state laws that limit contingency fees *ex ante*. He notes that most limits occur in the area of medical malpractice cases, and that the impetus for such laws comes not from consumers seeking to reduce costs of litigation, but from groups whose interests are antithetical to injured consumers. Instead, these limits are designed to limit or even eliminate an injured party's right to compensation by placing strong economic disincentives that preclude attorneys from accepting representation. When fee-limiting measures are proposed by popular referendum, they have more often been defeated than approved. Since 1988, citizens in various states have had seven opportunities to limit contingency fees and have passed them only twice.

- Professor Kritzer then addresses the Court's stated concern that Vioxx claimants are 1) elderly, 2) in poor health, and 3) that those conditions make it more difficult for them to negotiate fair agreements. Professor Kritzer observes that courts often review fees for certain classes of plaintiffs, but notes that this occurs where legally required as in case of minors or mental incompetents. Physical injury does not destroy a party's ability to contract nor does it constitute mental incapacity. Professor Kritzer summarizes that, using age 70 as the delineation of the "elderly", approximately 75 % of the VLC's clients are not elderly. Using age 75, 90 % of the VLC clients are not elderly.

- Professor Kritzer concludes in Part G that based on the evidence, limiting potential fees tends to limit the public's access to the courts by reducing the ability of attorneys to

---

[4] Subject to any applicable state fee limits.

{N1948654.5}                                        4

accept cases on a contingency fee, particularly cases involving significant risk and uncertainty. These measures tend to deprive plaintiffs of qualified counsel with the economic capability to litigate expensive claims against well-financed defendants with virtually unlimited litigation budgets.

## II. AFFIDAVIT OF PROFESSOR GEOFFREY P. MILLER

- Geoffrey P. Miller is a professor of law at New York University. He is a recognized authority in the analysis of attorney's fees and expenses in American civil litigation including related issues of legal ethics and professional responsibility. Professor Miller has studied and written on these subjects, including having co-authored the leading statistically-controlled analysis of attorneys' fees in class action cases. His curriculum vita attached to his affidavit.

- Professor Miller has reviewed a variety of materials in preparation for rendering his opinion including various pleadings and orders, the Settlement Agreement, and other materials.

- Professor Miller divides his affidavit into two principal sections: 1) an analysis of fee limits outside MDLs; and 2) an analysis of fee limits within MDLs.

- In the first section, Professor Miller observes that under the American Rule, each party pays his own attorney and privately-negotiated fee arrangements are generally upheld. Courts are authorized to play a role in setting fees only in certain unusual circumstances: 1) disputes between attorney and client over fees; 2) fees as a sanction for bad faith conduct; 3) fee-shifting statutes; 4) agreements which provide that the prevailing party pay the other's attorneys' fees in contract disputes; and 5) class actions and shareholders' derivative cases. Because none of these circumstances are present here, and the individual cases are classic examples of ordinary private product liability cases, there is no authority to limit fees in this case.

- Professor Miller next considers whether in a non-MDL setting, a reduction of fees to 32 % would be unreasonable, assuming the court had authority to limit fees. After addressing the benefits of contingent fees, Professor Miller finds that the percentage fees in risky cases are often higher than in "safe" cases. He next explains why Vioxx cases fall on the high end of the risk scale. The cases are expensive to try, Merck was committed to trying every case, and there were risks in proving general and specific causation, in proving damages, in defeating the learned intermediary defense, preemption and *Daubert* challenges. The outcomes of actual Vioxx trials validate the risky nature of the cases. Given this risk profile, a fee of 40 % is reasonable under the circumstances of an individual Vioxx case.

- In the second section of the affidavit, Professor Miller shifts his analysis to an examination of fee limits *within* MDLs to determine whether the result *should* be different because of MDL status. He observes first that the MDL statute was not intended to expand the authority of the transferee court, and that the MDL process is focused on consolidating related cases for pretrial purposes.

- Professor Miller then examines the purported analogy between an MDL and a class action. This MDL is not a class action. This Court denied class certification because of diverse individual issues.

- Professor Miller also points out several important differences in a class action that make regulation of fees appropriate there but that do not apply in this MDL. In the class action context, courts do not abridge substantive rights when they exercise control over fees because no one has a substantive right to obtain any particular fee out of the common fund. However in the instant MDL, the Capping Order impairs obligations under private fee agreements between attorneys and clients. Moreover, the defining feature of a class action is that there are absent class members who are not represented by individual counsel and who have not entered fee agreements. In this MDL, all but a few plaintiffs are represented by counsel of their own choosing pursuant to privately negotiated fee agreements.

- Professor Miller refutes the argument that the court has general equitable authority outside Rule 23. He notes that the Vioxx cases are legal in nature and are not transformed into actions at equity by their consolidation in an MDL.

- Professor Miller also describes the limits on inherent power and states that they do not grant the Court authority to regulate the VLC's fees. He reviews the terms of the Settlement Agreement and finds no such authority given to the Court in the terms of that agreement.

- Professor Miller examines state laws on contingent fees. While some states regulate fees statutorily or by formal rulemaking in certain cases, they do not authorize their courts to reject fee agreements or impose fee limits. The great majority of states do not limit contingent fees to any particular percentage. Furthermore, to the extent that some states do impose limits, each case has to be examined individually for the application of appropriate law in order to follow the requirements of *Erie*.

- Citing the *Lexecon* case, Professor Miller notes that the judiciary is bound by the terms of the MDL statute, no matter how desirable judicial modifications may seem. Any expansion of a court's power under the statute is a matter for Congress to address.

- Professor Miller next turns to the issue of whether a 32 % limit is unreasonable, assuming the Court had the power to limit fees in an MDL. Professor Miller asserts that the reasonableness of a fee is properly analyzed at the time the fee was negotiated. He discusses and reiterates the many risks of the Vioxx cases. He notes that consolidation in an MDL in some respects increased the risks, since plaintiffs' attorneys who outside the MDL process might experience a small loss if one case was unsuccessful, whereas within an MDL they face the prospect of losing all of their cases at once. Professor Miller explains that in light of the efforts, risk and expense undertaken by the VLC, the VLC should be compensated at a fee greater than 32 %, despite the settlement.

- In conclusion, Professor Miller opines that imposing fee limits *ex post* in MDL litigation would tend to discourage attorneys from taking such cases in the future knowing that

{N1948654.5}                                    6

their fee agreements may not in the end be honored.  The consequence would be that plaintiffs may not be able to find legal representation in matters that are likely to be consolidated in an MDL proceeding.[5]

### III. AFFIDAVIT OF PROFESSOR JOSHUA D. WRIGHT

- Joshua D. Wright is an assistant professor at the George Mason University School of Law and professor (by courtesy) at the George Mason University Department of Economics. He has a Ph.D. in economics as well as a law degree.  His area of expertise is in the branch of economics devoted to understanding the incentives of firms and individuals, the operation of markets, competition, and the impact of regulation.  His curriculum vita is attached to his affidavit.

- Professor Wright was supplied with two datasets by the VLC.  The first dataset contained information regarding the 28,816 potential clients that contacted the VLC.  The second dataset was a subset containing information only about the VLC's current 1830 cases. He used these datasets in conducting econometric analyses.

- Professor Wright's affidavit is divided into several sections.  Following introductory sections in which he sets forth his qualifications and summary conclusions, Section IV of his affidavit discusses fundamental economic concepts related to the competitive analysis of contract terms in general, and in evaluating contingent fee agreements in products liability cases specifically.  Section V presents his qualitative and quantitative analysis of the competitive conditions in the market for the legal services offered by the VLC. Section VI presents the results of a multivariate regression analysis demonstrating that the VLC's clients' fees are not higher for elderly or sicker claimants or in geographic areas where there is less competition between providers of legal services.

- Professor Wright presents a summary of his conclusions at the beginning of his affidavit in Section 1.  These conclusions are set forth briefly here.

- Professor Wright demonstrates that the VLC contingent fee agreements are reasonable under an *ex ante* analysis.

- Professor Wright shows that the market for plaintiffs' mass tort litigation services is highly competitive.

- Because the VLC anticipated that many if not most of its cases would be coordinated in an MDL, Professor Wright concludes that the VLC anticipated the economies of scale in an MDL.

- Because the economies of scale were anticipated and the market was demonstrably highly competitive, Professor Wright concludes that cost reductions attendant to an MDL were

---

[5] The VLC adopts in full Professor Miller's points as if incorporated into its memorandum of reply.

reflected in the VLC contingent fee agreements and do not generate an unreasonable profit.

- Professor Wright shows that claimant age and health have no significant impact on either the probability that a claimant would sign an agreement with the VLC or on the fee percentage in the agreement.

- Professor Wright's economic analysis shows that reducing fees will reduce incentives for firms to prosecute complex and risky mass tort cases. That reduced incentive will likely impair the ability of clients to access quality legal representation. It will reduce the ability of the mass tort litigation system to achieve its goals of deterring harmful behavior and compensating victims.

- Professor Wright also states that *ex post* judicial modification of prices generated by a competitive market process reduces fees without evidence of market failure, and thus imposes a substantial risk of social harm without any apparent offsetting benefit.

### IV. AFFIDAVITS OF MEMBERS OF VLC

#### A. Affidavit of Grant Kaiser

- Grant Kaiser is a member of the VLC and has primary responsibility for the VLC Database. He describes generally the information that is included in the VLC Database concerning the VLC's contacts and clients. He also states what information or subsets of the database were provided to Professors Kritzer and Wright who used the information as a basis for their opinions.

- Mr. Kaiser also sets forth certain information about the VLC clients' contingent fee agreements and the original filing and applicable law jurisdictions of the VLC's cases which are summarized in Tables 1 through 3.

- Mr. Kaiser also provides factual information about the hours and expenses of two VLC Vioxx cases that were taken through trial, other cases being prepared for trial at the time of the settlement, referral fees, wrongful death versus injury cases, age of Vioxx clients, and dates of signing of VLC agreements.

- Mr. Kaiser concludes by explaining that because of the expense, time and risk involved in a serious drug product liability case, such cases are only potentially economically viable in the context of mass tort treatment and would not be accepted as a single case. He then states that he personally would not undertake representation in a large number of high risk cases that were likely to be coordinated in an MDL in the future if he knew that his fee agreements would not be honored and that a court might reduce the fees after substantially all of the work had been performed.

### B. Affidavits of Drew Ranier and John Eddie Williams

- Drew Ranier and John Eddie Williams are also members of the VLC, and Mr. Ranier is a member of the PSC.

- Mr. Ranier and Mr. Williams also explain that because of the expense, time and risk involved in a serious drug product liability case, such cases are only potentially economically viable in the context of mass tort treatment and would not be accepted as a single case. They both state that they personally would not undertake representation in a large number of high risk cases that were likely to be coordinated in an MDL in the future if they knew that their fee agreements would not be honored and that a court might reduce the fees after substantially all of the work had been performed.

- Additionally, Mr. Ranier states that his firm accepts more routine cases at percentages of less than 40 %.

### CONCLUSION

The VLC respectfully requests that the Court review the attached Affidavits and their exhibits in full, and after reconsideration, withdraw the Capping Order; or alternatively release the VLC from the Capping Order based on the proof offered; or in the final alternative institute a procedure by which any interested plaintiffs' attorney can apply for a variance from the Capping Order.

Respectfully submitted,

/s/ *Harry S. Hardin III*
HARRY S. HARDIN III (# 6540)
MADELEINE FISCHER (# 5575)
ERIC MICHAEL LIDDICK (# 31237)
JONES, WALKER, WAECHTER, POITEVENT,
CARRÈRE & DENÈGRE, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:   (504) 582-8208
Facsimile:   (504) 589-8208

*Attorneys for John Eddie Williams, Jr., Drew Ranier, Walter Umphrey, Mikal Watts, and Grant Kaiser (the "Vioxx Litigation Consortium")*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann and Russ Herman, by U.S. Mail and e-mail, or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing in accordance with the procedures established in MDL 1657 on the 31st day of March, 2009.

      /s/ *Eric Michael Liddick*
      ERIC MICHAEL LIDDICK