UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:  VIOXX PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | NO. 2:05-MD-01657-EEF-DEK |
| | SECTION L |
| | JUDGE ELDON E. FALLON |
| | DIVISION 3 |
| **This document relates to All Cases** | MAGISTRATE DANIEL E. KNOWLES III |

**COUNTY OF RAMSEY**

**STATE OF MINNESOTA**

**AFFIDAVIT OF HERBERT M. KRITZER**

BEFORE ME, the undersigned authority, on this day personally appeared HERBERT M. KRTIZER, and after having first been duly sworn upon oath, states as follows:

**A.  Affiant's Background**

1.  I am Professor of Law at William Mitchell College of Law, Saint Paul, Minnesota, and Professor of Political Science and Law *emeritus*, at the University of Wisconsin-Madison. Effective July 1, 2009, I will be Professor of Law at the University of Minnesota. I hold a Ph.D. in Political Science from the University of North Carolina at Chapel Hill (1974).

Kritz-1

2.  Over the last 30 years the primary focus of my research and scholarly writing has been on civil justice processes, including extensive work related to contingency fee practice and the role of attorneys' fees more generally. My research related to legal practice has employed a variety of methodologies including structured surveys, semi-structured interviews, and observation of lawyers as they work.

3.  I have testified before committees of the United States Congress regarding contingency fees, and will make a presentation in London in July in connection with the Civil Costs Review which is considering, among other things, the adoption of a percentage-based fee system for England and Wales.

4.  My curriculum vita is attached as Exhibit A.

5.  To assist me in preparing this Affidavit, I was provided with the following items by the attorney representing the Vioxx Litigation Consortium (VLC):

   a.  A copy of Judge Fallon's order dated August 27, 2008, capping fees to be paid to plaintiffs' lawyers

   b.  A copy of the motion for reconsideration of the Judge Fallon's order with all attachments

   c.  A copy of the Plaintiffs' Liaison Counsel's Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses, dated January 20, 2009, along with attached exhibits

   d.  Several joint reports for the Plaintiffs' and Defendant's Liaison Committee

   e.  Several reports of the Claims Administrator

   f.   Notice dated September 17, 2008, issued by Judge Higbee concerning fees in the New Jersey cases

   g.  Information concerning fees, referral fees, costs, and time of the VLC firms in the Vioxx litigation

   h.  Data concerning ages of current VLC Vioxx clients

   i.  Information on states where VLC Vioxx cases were filed

   j.  Information on Vioxx trials involving VLC clients

   k.  Information regarding fee arrangement practices of the VLC firms

   l.  Affidavits submitted to the Fee Allocation Committee by VLC lawyers

   m. Table showing sales of Vioxx and its competitors (attached as Exhibit B of this Affidavit)

Kritz-2

n.  Document entitled "Profit Plan 2002 – Merck A & A Franchise"

o.  Information on the numbers of medical malpractice cases filed in Harris County, Texas, in 2006, 2007, and 2008, obtained at my request by one of the VLC firms using the Harris County Justice Information Management System (JIMS)

**B.  The Contingency Fee System**

6.  The American contingency fee system compensates lawyers for at least three different services they provide to their clients: legal services, banking services (i.e., advancing the costs of the legal services and expenses), and insurance services (i.e., insuring the costs of those legal services and expenses against the risks of nonpayment or inadequate payment).

7.  While traditional discussions of contingency fees describe them as a system where the lawyer assumes the risk of receiving *no* payment for his or her efforts on behalf of the client, the major risk faced by lawyers working on a contingency fee basis in many cases is that of receiving *inadequate* compensation for their efforts. The risk of inadequate compensation arises from two factors: uncertainty about the amount of compensation that will be recovered and uncertainty about the resistance the defendant (or the defendant's insurer) will put up before paying compensation which will determine the amount of time the lawyer will have to devote to the case.

8.  In certain areas, the risk of nonpayment is very significant. Two such areas are medical malpractice and products liability. Even though a small portion of cases are tried, the risk in these areas can be illustrated by trial outcomes. A Bureau of Justice Statistics (BJS) study of federal tort trials in 2002-2003 found that motor vehicle cases produced plaintiffs' verdicts in 56.9 percent of trials compared to 36.7 percent plaintiffs' verdicts in products liability cases and 33.5 percent in medical malpractice cases (Thomas H. Cohen, Federal Tort Trials and Verdicts, 2002-03, 3 [2005], available at http://www.ojp.usdoj.gov/bjs/pub/pdf/fttv03.pdf, last visited March 7, 2009). Similarly, a BJS study of tort trials concluded in 2001 in a sample of the 75 most populous counties found that plaintiffs won 61.2 percent of motor vehicle cases compared to 40.3 percent of non-asbestos products liability cases and only 26.8 percent of medical malpractice cases (Thomas H. Cohen, Tort Trials and Verdicts in Large Cities, 2001, 4 [2004], available at http://www.ojp.usdoj.gov/bjs/pub/pdf/ttvlc01.pdf, last visited March 7, 2009).

9.  The high risk in medical malpractice and products liability cases exists even though lawyers handling such cases tend to be very selective in which cases they take on. That selectivity is based on a combination of the lawyer's estimate of the probability of recovery, the likely amount of recovery, and the likely investment of time and money the lawyer will have to make in the case.

Kritz-3

10. A study of plaintiffs' practitioners in Texas found that those whose practice was 50 percent or more medical malpractice accepted only 13 percent of potential clients compared to 27 percent for all plaintiffs' practitioners surveyed; the authors note that the 13 percent figure almost certainly overstates the percentage of medical malpractice cases accepted (Stephen Daniels & Joanne Martin, *The Texas Two-Step: Evidence on the Link between Damage Caps and Access to the Civil Justice System*, 55 DEPAUL L. REV. 635, 657 [2006]). My own work shows that the criteria for acceptance of a medical malpractice case is much more stringent, with a higher minimum damage figure than other types of cases (see HERBERT M. KRITZER, RISKS, REPUTATIONS, AND REWARDS: CONTINGENCY FEE LEGAL PRACTICE IN THE UNITED STATES, 86-88 [2004], henceforth "KRITZER, RISKS, REPUTATIONS, AND REWARDS").

11. In high risk areas such as medical malpractice and products liability, the percentage of recovery charged as the lawyer's fee tends to be high compared to other more routine areas. In medical malpractice and products liability cases a 40 percent fee is very common, if not typical; in contrast, in routine auto accident cases or premises liability fees are more likely to be 33 percent if not less. If not limited by state law, fees may go as high as 50 percent in very high risk cases.

12. The ABA Model Rules, and the rules of professional conduct of almost all states, require that representation on a contingency fee basis be memorialized by a written contract at the outset of the representation. Lawyers and clients thus *must* agree upon terms of the fee *ex ante* and the reasonableness of that fee arrangement "must be judged at the time it is entered into" (*Contingent Fees*, ABA Comm. on Ethics and Prof;l Responsibility, Formal Op. 94-389, §H [1994]).

13. Contingency fee legal practice can be thought of as a form of "portfolio management" where cases constitute the elements of the portfolio. The "investment" is the value of the time a lawyer devotes to a case plus any expenses the lawyer advances in the course of representation. The return from the investment is the amount the lawyer receives in fees and expenses when a case is concluded. Returns relative to investments vary from case to case, with some cases producing positive returns (i.e., the fee exceeds the value of the lawyer's time plus expenses) and some producing negative returns (i.e., the fee is less than the value of the lawyer's time plus expenses). The most extreme negative outcome arises when no recovery is obtained, representing a 100 percent loss on the lawyer's investment (see KRITZER, RISKS, REPUTATIONS, AND REWARDS , ¶9 *supra*, 10-16).

14. At the time the retainer contract is entered into the lawyer will make an assessment of the uncertainties of the case, make an estimate of the "cost" of handling the case (i.e., amount of time and expense the case is likely to entail), and will set the fee percentage and other terms based on the combination of the estimated cost of handling the case and the uncertainty regarding its outcome. As with any risky investment, the lawyer will want a higher return for

higher risk cases. This accounts in part for the higher percentages charged in cases such as medical malpractice and products liability.

15. It is useful to apply the concept of the "expected value" of a case from the lawyer's perspective. In the simplest terms, assume a case that will have to be resolved through a trial, will produce a recovery of $100,000 if the lawyer is successful at trial, has a 70 percent chance of success at trial, and involves a 40 percent contingency fee on the gross recovery. For this case, the "expected value" from the lawyer's perspective is $100,000 × .70 × .40 = $28,000. What this means is that if the case could be tried many times, on average the lawyer would receive $28,000 (in 70 percent of the cases, the lawyer would receive $40,000 and in 30 percent of the cases $0).

16. The calculation above does not take into account the costs the lawyer will have to absorb in the trials that are unsuccessful. If one assumes those costs are $20,000, the expected value computation above can be adjusted to be ($100,000 × .70 × .40) – ($20,000 × .30) = $22,000. If the lawyer's fee is computed based on recovery net of expenses, the calculation will be ({$100,000-$20,000} × .70 × .40) – ($20,000 × .30) = $16,400.

17. The example above is highly simplified, but can be adjusted to reflect a variety of alternative outcomes, some involving trial and some involving settlements. The table below shows such an analysis, reflecting several trial outcomes and several settlement outcomes. The table assumes a 40 percent fee, and shows the value both for a fee computed on the gross recovery and on the recovery net of expenses. The table also assumes that the lawyer will not ask the client to pay any of the costs if the case yields no recovery.

Kritz-5

|  | Recovery | Expenses | Probability | Expected Value | |
| --- | --- | --- | --- | --- | --- |
|  |  |  |  | On Net | On Gross |
| Trial | $100,000 | $20,000 | 0.02 | $640 | $800 |
| Trial | $80,000 | $20,000 | 0.02 | $480 | $640 |
| Trial | $60,000 | $20,000 | 0.03 | $480 | $720 |
| Trial | $40,000 | $20,000 | 0.03 | $240 | $480 |
| Trial | $0 | $20,000 | 0.03 | -$600 | -$600 |
| Settlement just before trial | $60,000 | $15,000 | 0.20 | $3,600 | $4,800 |
| Settlement after winning summary | $50,000 | $10,000 | 0.20 | $3,200 | $4,000 |
| Lose Summary Judgment Motion | $0 | $10,000 | 0.07 | -$700 | -$700 |
| Settlement | $40,000 | $7,500 | 0.15 | $1,950 | $2,400 |
| Settlement | $30,000 | $7,500 | 0.10 | $900 | $1,200 |
| Settlement | $20,000 | $7,500 | 0.10 | $500 | $800 |
| Abandon after investigation | $0 | $5,000 | 0.05 | -$250 | -$250 |
| **Expected Value** |  |  |  | $10,440 | $14,290 |

18. The three primary factors that drive the expected value are the risks as measured by the probabilities associated with each outcome, the potential recovery amounts, and the percentage to be paid as the attorney's fee. These, combined with the out-of-pocket costs the lawyer will incur if there is no recovery, are the factors that the lawyer considers in deciding whether to take on the representation. Anything that affects these components will change the lawyer's calculation in making decisions regarding representation.

## C. Impact of Limiting Amounts that Can Be Collected as Attorneys' Fees

19. As part of so-called tort reform many states have imposed caps on the amount of damages that a tortfeasor has to pay. These caps are most common in medical malpractice cases and are most often applied to noneconomic damages and/or punitive damages. Some states apply caps more broadly to all types of damages and/or all types of cases. Some states have special damage limits that apply to claims against the state government or against local governmental units. (Information on caps and other tort reforms passed in recent years can be

Kritz-6

found in the American Tort Reform Association's Tort Reform Record, published semi-annually on their website, www.atra.org; information on caps created in earlier years can be found in Thomas J. Campbell, Daniel P. Kessler, and George C. Shepherd, Liability Reforms' Causes and Economic Impacts, Stanford University Center for Economic Policy Research Publication No. 404, May 1994).

20. There is a substantial body of research on the impact of caps on noneconomic damages in medical malpractice cases the great majority of which concludes that such caps reduce the average recoveries plaintiffs obtain in such cases (Patricia M. Danzon, *The Frequency and Severity of Medical Malpractice Claims*, 27 J. L. & ECON. 115, 139 [1984]; Patricia M. Danzon, *The Frequency and Severity of Medical Malpractice Claims: New Evidence*, 49 LAW & CONTEMP. PROBS. 57, 59 [1986]; Frank A. Sloan, et al., *Effects of Tort Reform on the Valued of Closed Medical Malpractice Claims: A Microanalysis*, 14 J. HEALTH POL., POL'Y & L. 663, 667-68 (1989); Albert Yoon, *Damage Caps and Civil Litigation: An Empirical Study of Medical Malpractice in the South*, 3 AM. L. & ECON. REV. 199, 2003 [2001]; NICHOLAS M. PACE, ET AL., CAPPING NON-ECONOMIC AWARDS IN MEDICAL MALPRACTICE TRIALS 20-21 [2004]; David M. Studdert, et al., *Are Damages Caps Regressive? A Study of Malpractice Jury Verdicts in California*, 23 HEALTH AFFAIRS 54, 58 [2004]). Other studies show this indirectly in finding that medical malpractice premiums decrease (Stephen Zuckerman, et al., *Effects of Tort Reforms and Other Factors on Medical Malpractice Insurance Premiums*, 27 INQUIRY 167, 175 [1990]), the losses paid by medical malpractice insurers decrease (Kenneth E. Thorpe, *The Medical Malpractice 'Crisis': Recent Trends and the Impact of State Tort Reforms*, 23 HEALTH AFFAIRS 20, 26 [2004]; W. Kip Viscusi & Patricia H. Born, *Damages Caps, Insurability, and the Performance of Medical Malpractice Insurance*, 72 J. RISK & INS. 23, 25 [2005]; Patricia H. Born, et al., *The Effects of Tort Reform on Medical Malpractice Insurers' Ultimate Losses*, J. RISK & INS. 197, 212 [2009]), and/or the profits of medical malpractice insurers increase after caps are imposed (W. Kip Viscusi & Patricia Born, *Medical Malpractice Insurance in the Wake of Liability Reform*, 25 J. LEGAL STUD. 463, 488 [1995]).

21. Many of the studies cited above also looked at the impact of caps on punitive damages in medical malpractice cases, and they generally found no evidence that such caps had any effect. Given the extremely low incidence of punitive damages in medical malpractice cases, this is not surprising. (A Bureau of Justice Statistics study of civil trials concluded in 2001 in 46 of the nation's largest 75 counties found only 15 punitive damage awards in the 1,156 medical malpractice cases that were tried in those counties; 307 of those trials were plaintiffs' verdicts. See Thomas H. Cohen, Punitive Damages Awards in Large Counties 2001, 2 [2005], available at http://www.ojp.usdoj.gov/bjs/pub/pdf/pdalc01.pdf, last visited March 3, 2009).

22. Directly measuring the impact of damage caps on the likelihood that lawyers will take cases is difficult because of the absence of systematic, national data on claims that are brought.

However, recent research in Texas provides some stark evidence of these impacts. In 2003 Texas adopted a $250,000 cap on noneconomic damages in cases brought against physicians ($500,000 if a hospital or other health care institution is the defendant). A recently published study estimates that this cap would have impacted almost half of the jury awards in medical malpractice cases tried in Texas prior to the cap's adoption (see David A. Hyman, et al., *Estimating the Effect of Damages Caps in Medical Malpractice Cases: Evidence from Texas*, 1 J. LEGAL ANALYSIS 355, 358 [2009]).

23. It is not surprising then that a 2006 survey of plaintiffs' lawyers in Texas found a significant change in the willingness of those lawyers to take on medical malpractice cases. This survey asked the respondents to indicate whether they would take a case with a particular set of characteristics that varied along three dimensions: when the case had arisen (before or after the damage cap came into effect, 2001 *or* 2006), the age and gender of the potential client (a 45 year-old male with dependents who was fully employed, a 45-year-old "stay-at-home" mom, *or* a 70-year-old retired male with no dependents), and how the injury occurred (from a traffic accident involving an automobile and an 18-wheel tracker-trailer truck *or* from medical negligence). For the traffic accident scenario, 80 percent or more of the respondents would take the case regardless of the year, with an additional 5 percent who said they would take the case and refer it to another lawyer. For the medical malpractice scenario the differences between the two years was stunning.  If the case had arisen in 2001, about 84 percent would have taken or referred the case of the 70-year-old male, compared to about 25 percent in 2006. For the 45-year-old "stay-at-home" mom, more than 90 percent would have taken or referred the case in 2001 compared to about 45 percent in 2006. For the 45 year-old-male, 90+ percent would have taken or referred the case in 2001 compared to 55 percent in 2006. If one only considers cases the lawyer would have taken and *not* referred, the specific numbers change but the pattern is the same (see Stephen Daniels & Joanne Martin, "The Juice Simply Isn't Worth the Squeeze in Those Cases Anymore:" Damage Caps, 'Hidden Victims,' and the Declining Interest in Medical Malpractice Cases," 46, paper presented at the 2008 Law and Society Association Meeting, Montreal, Canada, available at http://ssrn.com/abstract=1357092, last visited March 11, 2009).

24. The Texas Department of Insurance publishes an annual report on closed claims for various lines of commercial insurance, including medical malpractice (the reports are available online at http://www.tdi.state.tx.us/reports/report4.html). The most recent report available (as of March 15, 2009 is for 2006). Because these are closed claim reports, the lag between the imposition of caps in 2003 and the working through the system of cases not covered by the cap takes some time. Nonetheless, the reports show evidence of the decline in claims. The 2006 report (http://www.tdi.state.tx.us/reports/pc/documents/taccar2006.pdf) shows about 900 claims closed with payments over $10,000 involving medical professionals (p.21) plus another 156 claims closed with payments between $1 and $10,000 (p. 25). The comparable

figures in the preceding eight years ranged between 1,144 and 1,325 for claims over $10,000 and between 193 and 328 for claims between $1 and $10,000.

25. Unfortunately the Texas court system does not report statistical data separately for medical malpractice cases. However, Harris County (Houston) has in the past compiled this information. An article in the *ABA Journal* reported that the average number of cases filed between 1997 and 2002 was 435 per year compared to 204 cases in 2004 and 256 in 2005; in 2003 there was a rush to file before the new law went into effect, and 1,203 were filed that year (Terry Carter, *Tort Reform Texas Style*, 92 ABA JOURNAL 30, 33 [October 2006]).  I extended this time series by obtaining information from Harris County's Justice Information Management System (JIMS). The number of medical malpractice cases filed in 2006, 2007, and 2008 were 255, 226, and 218 respectively. Clearly the number of medical malpractice cases in Harris County has dropped by 40 to 50 percent since the caps on noneconomic damages went into effect.

26. The University of Texas Professional Medical Liability Plan which insures about 7,000 MDs publishes annual reports on the number of claims received and number of lawsuits filed (these reports are available at http://www.utsystem.edu/OGC/health/annualreports.htm, last visited March 4, 2009); their reporting period is a fiscal year running from September 1 through August 31 (hence FY 2004 includes the last four months of 2003). The table below shows the number of claims (notices typically precede a possible lawsuit) and lawsuits filed each fiscal year since 2002:

| FY | Claims | Lawsuits |
|------|--------|----------|
| 2002 | 163 | 60 |
| 2003 | 187 | 89 |
| 2004 | 98 | 112 |
| 2005 | 107 | 27 |
| 2006 | 121 | 28 |
| 2007 | 110 | 40 |
| 2008 | 96 | 26 |

Both claims and actual lawsuits have dropped sharply in the wake of the damage cap coming into force. The spike in 2004 represents a rush of lawsuits filed just before the cap came into effect, many of which were probably claims that would have never been filed as suits were it not for the looming cap.

27. Taken together the research and data trends in Texas make it clear that the decrease in potential recoveries and the commensurate reduction in potential fees to be earned on a percentage basis resulted in a decrease in cases being pursued by lawyers.

Kritz-9

28. Several studies have examined the impact of a variety of tort reforms beyond the specific area of medical malpractice. One study relied on tort filings data for 19 states from 1984-1990, and assessed the impact of a variety of tort reforms, including noneconomic damage caps and punitive damage caps, on the rate of tort filings (cases per 100,000 population). That study found that caps on noneconomic damages reduced the rate of filings while caps on punitive damages had no discernible effect (Joan T. Schmit, et al., *The Effect of State Tort Reforms on Claim Filings*, 1 RISK MGMT. & INS. REV. 1,12-13 [1997]).

29. A second study relied upon a dataset of paid auto accident injury claims compiled by the Insurance Research Council; the claims in the dataset were closed in 1992. The study looked at both whether a lawsuit was filed and the amount paid to resolve the claim (Mark J. Browne & Robert Puelz, *The Effect of Legal Rules on the Value of Economic and Non-Economic Damages and the Decision to File*, 18 J. RISK & UNCERTAINTY 189 [1999]). The analysis found that caps on non-economic damages significantly decreased the odds (by about two-thirds) that a lawsuit would be filed (p. 208-09). The results also showed that the amount paid in damages, after controlling for a variety of factors including attorney representation, decreased by an average of 13 percent when a cap on noneconomic damages was in place (p. 207).

30. A third study relied upon three other Insurance Research Council auto accident injury closed claims studies, for 1977, 1987, and 1997. Again, all studies were closed claims where a payment was made. This study examined whether an attorney was hired and whether a lawsuit was filed. The study found that caps on noneconomic damages depressed both the hiring of lawyers and the filing of lawsuits (Mark J. Browne & Joan T. Schmit, *Litigation Patterns in Automobile Bodily Injury Claims 1977-1997: Effects of Time and Tort Reforms*, 75 J. RISK & INS. 83, 93 [2008]).

31. There are very few studies that look directly at the impact of limits on contingency fees. One study that does is an early examination of settlements in medical malpractice cases. That study found that limits on contingency fees were associated is a 9 percent decrease in the amount of the settlement and a five percent increase in the rate at which malpractice cases were abandoned (Patricia M. Danzon & Lee A. Lillard, *Settlement Out of Court: The Disposition of Medical Malpractice Claims*, 12 J. LEGAL STUD. 345, 363 [1983]). The implication of cases being abandoned is open to different interpretations. My interpretation is that it reflects the lawyer's assessment of expected fee at the time the decision to drop is made, and that the expected fee has fallen below what the lawyer deems to be acceptable, either because the damages are too low or the likelihood of success is too low (or a combination of those factors). Crucial to this is that the fee percentage is limited which is the other part of the expected value calculation.

32. A second study relies on two datasets to examine the impact of fee limits in medical malpractice cases. The first is a study of cases disposed in the courts of 45 of the 75 most

populous U.S. counties in 1992. Comparing states with limits on contingency fees in medical malpractice cases with states with no such limits, the study found that 18.3 percent are dropped in the former and 4.9 percent in the latter (Eric Helland & Alexander Tabarrok, *Contingency Fees, Settlement Delay, and Low-Quality Litigation: Empirical Evidence from Two Datasets*, 19 J.L. ECON. & ORG. 517, 529 [2003]). While the specific numbers change, the basic pattern holds up when the authors of the study add controls for other factors (p. 534). The second dataset is a time series in Florida from the mid 1980s when fee limits were adopted; the analysis of that data set found that drops increased about 3½ percentage points after the limits on contingency fees were introduced (p. 529). This suggests that, after additional investigation, the lawyers determined that the expected value of the case fall below an acceptable level.

### D. The Vioxx Litigation Consortium and the Consortium's Risky Vioxx Cases

33. The foregoing discussion provides the background to consider the specific issue of limiting fees paid in the Vioxx Litigation. Specifically, I address the issue of the fees to be paid to the group of attorneys who comprise the Vioxx Litigation Consortium (VLC). Over 90 percent of the retainer agreements that VLC attorneys have with their clients specify a fee that is to be 40 percent of any recovery obtained on the client's behalf.

34. About one third of the VLC cases in total were filed in New Jersey, and thus are subject to the New Jersey fee limitations. The decision to file in New Jersey was carefully calculated on the basis of an expectation of a higher probability of success. Under the logic of the expected value discussed above (¶¶14-18, *supra*), a higher probability of success will offset a lower fee percentage. As a simplified example, consider a $100,000 case with a 40 percent chance of success in a jurisdiction that allows a 40 percent fee but a 60 percent chance of success in a jurisdiction that limits fees to 1/3. In the higher fee percent jurisdiction, the expected value is $16,000 while in the jurisdiction that limits the fee percent the expected value is $20,000. In actual terms, the calculation involving New Jersey is more complex because the rules require that the fee be computed net of expenses while many, if not most, contingency fee contracts call for the fee to be computed on the gross recovery.

35. At the time the Vioxx settlement was announced, the members of the VLC represented approximately 2,000 clients. The VLC lawyers had tried two cases of their Vioxx clients, both unsuccessfully, at a cost of $1.86 million in expenses and over 8,500 hours of attorney and paraprofessional time for trial preparation and trial alone; an additional 1,550 hours had been invested in these two cases for case evaluation, pleadings and motions not related to the trial itself, and discovery. The VLC had approximately 25 cases ready or nearly ready for trial which involved the investment of many thousands of hours.

36. To obtain their approximately 2,000 clients, the VLC firms reviewed the potential claims of almost 30,000 individuals who had contacted or had been referred to those firms. This screening process involved 160,000 hours of effort (126,000 hours by staff/paralegals, 10,000 hours by nurse practitioners, 23,300 hours by attorneys, and 850 hours by MD's and other medical experts) plus $12 million in expenses (*Affidavit of Drew Ranier*, ¶ 4 [December 10, 2008]).

37. All members of the VLC use a 40 percent fee as their standard fee in complex products liability cases because they take on cases that carry very substantial risks. This does not mean that the members of the VLC charge all of their contingency fee clients a standard fee of 40 percent. Some individual VLC lawyers report that the fees they charged do vary depending on circumstances.

38. As noted previously (¶12, *supra*) the ABA Model rules and almost all state rules of professional conduct require that a contingency fee contract be established *ex ante*, and that the contract specify the terms by which the fee will be computed including the percentage. Given the high risk cases that members of the VLC handle a 40 percent fee set *ex ante* is entirely reasonable.

39. One of the lawyers in the VLC began screening and accepting Vioxx cases well before Vioxx was removed from the market. Mikal Watts took on 400 cases out of 5,000 contacts seeking representation to September 30, 2004 (*Affidavit of Mikal C. Watts*, ¶15, [October 15, 2008]).

40. While the removal of Vioxx from the market by Merck represented a signal that there were probably some potentially strong claims, there was little certainty regarding which claims, and what proportion of claims, would be viable.

41. The risks associated with the Vioxx cases were enhanced by the stance assumed by Merck in defending those cases. Merck was very vocal in its position that it would "defend itself vigorously," suggesting an intention to fight every Vioxx case through trial and appeal (Barnaby J. Feder, *Federal Panel Consolidates Vioxx Suits*, N.Y. TIMES [Feb. 17, 2005]; see also Matthew Herper, *Merck Outlines Vioxx Defense* December 14, 2004, http://www.forbes.com/2004/12/14/cx_mh_1214mrklegal.html, lasted visited March 6, 2009]; Aaron Smith, *Merck Holds the Line on Vioxx*, CNNMoney.com, [October 24, 2005], http://money.cnn.com/2005/10/24/news/fortune500/merck_earnings/index.htm, last visited March 6, 2009). While one might be tempted to dismiss these public statements as simply what one would expect Merck to say, Merck's actions were consistent with its statements. According to 10-K's filed with the SEC, between 2005 and 2007 Merck expended $1.4 billion in defending the suits brought on behalf of Vioxx users (reported in *Plaintiffs; Liaison Counsel's Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses*, 4n3 [January 20, 2009] henceforth "*PLC*

Kritz-12

*Memorandum*"). Furthermore, as discussed below (see ¶45 *infra*), Merck won 9 of 14 trials producing verdicts, and appealed the five cases won by plaintiffs.

42. An indication of the VLC's *ex ante* assessment of risk is evident in how the VLC handled cases referred by other lawyers (which constitute just under half of the VLC cases). In such referrals, it is customary to split any fee 50-50 with the referring attorney. However, due to the risks and uncertainties of the Vioxx cases, in more than 95 percent of the cases that the VLC lawyers took on referral the agreed fee split specified that the VLC lawyers would receive more than the standard 50 percent. In fact, in 60 percent of the referred cases, the VLC lawyers would receive 75 percent or more of the fee.

43. Referral fees are controversial in some quarters. However, those who have analyzed the practice of referral fees have concluded that they in fact serve a positive function for litigants. Specifically, the lawyers who make the referrals share the interests of the client in terms of obtaining the highest possible recovery. Unlike the lawyer who does the primary work on a case, the referring lawyer does not have to worry about whether the time investment is exceeding the potential return; as is true of the client, the referring lawyer cares only about the recovery. Moreover, while tort litigants are not likely to have direct knowledge of the quality of lawyers, the referring lawyer, who is usually a repeat player, does have that knowledge, and hence should make referrals that will best serve the client's and the lawyer's common interest (see Sara Parikh, Professionalism and Its Discontents:  A Study of Social Networks in the Plaintiff's Personal Injury Bar 146-51 [2001], Ph.D. thesis, University of Illinois at Chicago; Bruce L. Hay, The Economics of Lawyer Referrals  [1996], Discussion Paper No. 203, Center for Law, Economics, and Business, Harvard University; and KRITZER, RISKS, REPUTATIONS, AND REWARDS , ¶9 *supra*, 61).

44. An issue that can arise concerning attorneys' fees in mass tort litigation involves the development of the claims of harm. Mass torts typically follow a developmental process whereby early cases involve a great deal of uncertainty with later cases involving less uncertainty. An extreme example would be mesothelioma claims in the asbestos litigation. In the early years of the asbestos litigation the asbestos manufacturers were able to successfully defend many mesothelioma cases; over time the defense of these claims became less and less successful, ultimately reaching the stage where there was essentially no practical defense. Arguably a 40 percent fee in a 1978 mesothelioma case was reasonable while the same fee, and perhaps even a 33 percent fee, in a 2009 case is not. The 2009 case involves what may be characterized as a "mature" mass tort while in 1978 mesothelioma and asbestos cases more generally were still an immature mass tort. Frances McGovern has defined a mature mass tort as one "where there has been full and complete discovery, multiple jury verdicts, and a persistent vitality in the plaintiffs' contentions. Typically at the mature stage, little or no new evidence will be developed, significant appellate review of any novel legal issues has been concluded, and at least one full cycle of trial strategies has been exhausted" (Frances E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U.L. REV. 659 [1989]).

45. The Vioxx litigation never went beyond the status of being an immature area marked by a great deal of risk and uncertainty. That is, no one had come up with a winning formula for Vioxx cases. That is evident in the results of the Vioxx trials that occurred prior to the announcement of the proposed settlement. Specifically, of the 16 cases tried to verdict, in only 3 cases was there a plaintiff's verdict standing on the date of the settlement announcement (all presumably pending appeal). Nine cases produced verdicts for the defendant (one on a second trial after a hung jury), two had not yet been retried after trials resulting in a hung jury, two resulted in plaintiffs' verdicts that had been reversed (see *Plaintiffs; Liaison Counsel's Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses*, 18-12 [January 20, 2009], henceforth *PLC Memorandum*). That is, as of the date of the settlement announcement, plaintiffs and their lawyers had received a total of $0 in compensation and fees in the Vioxx litigation.

46. While even mature mass torts such as mesothelioma involve individualized issues, those issues revolve around questions of damages and perhaps exactly what entity should be held responsible. In the Vioxx litigation the individualized nature of the causation issues greatly enhanced the risk and uncertainty of cases. Those individualized issues turned on question such as the exact nature of the injury, how long Vioxx had been used, preexisting conditions that may have predisposed the claimant to the injuries claimed, complex issues related to warnings the client did or did not receive, etc. The favorable resolution of these issues requires a significant amount of individualized case preparation as well as expert testimony geared to the individual's specific situation.

47. General causation issues were also very significant in Vioxx trials. There is no signature injury associated with Vioxx. While research was making progress regarding the general causation issues surrounding at least some types of harms alleged to be caused by Vioxx, by the time of the settlement announcement those issues still had not been resolved in a way that made them unproblematic at trial. The state of the scientific research raised the very serious specter of successful *Daubert* challenge's directed at the plaintiffs' causation experts.

48. Yet additional uncertainty and risk in the Vioxx cases related to legal issues. In particular there were major issues related to whether claims regarding harm due to Vioxx were preempted under federal law and regulations, an issue that was only very recently resolved by the Supreme Court (see *Wyeth v. Levine*, __ U.S.___ [Mar. 4, 2009]).

49. Thus, it is not surprising that the plaintiffs' lawyers trying Vioxx cases continued to face a great deal of uncertainty and risk regarding the outcomes of the case they took to trial, even when they carefully selected what they believed to be strong, solid cases.

50. The fee capping order (Order and Reasons of August 27, 2008, p. 19, henceforth the "Capping Order") cites the efficiencies of scale created by the MDL procedure as a

Kritz-14

justification for limiting the fees to be paid to the attorneys representing plaintiffs. It is undoubtedly true that the MDL procedure creates efficiencies, and that was in fact the logic behind its creation (see HEARINGS BEFORE SUBCOMMITTEE NO. 5 OF THE COMMITTEE ON THE JUDICIARY, HOUSE OF REPRESENTATIVES, 89TH CONGRESS, 2ND SESSION ON H.R. 8276, 20-36 [August 31, 1966]). However, it is important to ask how the benefits of the MDL process are distributed among the courts, the defendant(s), and the plaintiffs. The greatest beneficiary of the MDL procedure in terms of efficiency is the courts. Without the MDL the same motions and disputes would need to be dealt with in case after case and district after district. In cases involving a single defendant, that defendant comes next in terms of the benefits of efficiency because it makes it much easier for the defendant to coordinate its handling of cases. The defendant can coordinate the planning of its defense and the preparation for trials, and rather than having to dispatch counsel to many locations can focus its attention on proceedings in a single court; a single local counsel can be hired to handle day-to-day activities in the court or to take a lead role.

51. While the attorneys representing plaintiffs do enjoy some benefits of economies of scale through the MDL, they benefit much less than either the courts or the defendant. Plaintiffs' lawyers are less able to benefit from a single site because many, probably most, of the lawyers representing clients are not from that one locale, and they personally must bear any cost of traveling to the location of the MDL court. Moreover, the primary focus of the counsel for individual plaintiffs must remain on those individual clients they represent, and the specific issues faced by those clients. The attorneys who are not members of the coordinating committee must monitor the activities and products of that committee both to be sure that the coordinating committee is doing a responsible job and in order to know how developments will impact their own clients. Those attorneys must read all depositions of the defense witnesses and most of those for plaintiffs' witnesses (see Judith Resnik, *Money Matters: Judicial Market Interventions Creating Subsidies and Awarding Fees and Costs in Individual and Aggregate Litigation*, 148 U. PA. L. REV. 2119, 2167 [2000], commenting on the role played by lawyers for individual clients and noting that "when awarding fees, judges tend to undervalue lawyers who actually serve individual clients"). The MDL provides no assistance in the difficult screening process to identify viable claims, in the resolution of issues regarding specific causation, or in assessing the value of individual claims. The problems of individualization continue into settlement with the complexities of documenting and then resolving individual claims. Lastly, while the defense is unitary, the plaintiffs' side in an MDL almost inevitably will involve competing and conflicting views and interests. Moreover not all cases are in the federal MDL proceeding and those cases must be developed even more independently by plaintiffs' counsel while defense counsel can rely on the products from the MDL

**E. Fees for Plaintiffs' Lawyers in the Vioxx Litigation**

52. The Capping Order limits fees to be paid to plaintiffs' counsel to a maximum of 32 percent of a claimant's recovery; assuming that no plaintiffs' counsel had contracted for a fee less than 32 percent, this would produce an aggregate payment to the plaintiffs' lawyers of $1.55 billion. In fact, the aggregate will be somewhat less because some states have more restrictive caps. If all plaintiffs' counsel had contracted for a 40 percent fee and there were no state caps, plaintiffs' attorneys would collect a maximum of $1.94 billion in fees in the absence of the Capping Order. However, a significant number of Vioxx cases were filed in New Jersey which is one of the states that caps contingency fees, and additional cases were filed in the other states with fee caps applicable to a products liability case.

53. Assessing the reasonableness of fees computed on some basis other than "time and expenses" presents challenges. What standards might be employed in this assessment? Or, stated another way, how does one determine the value of the service provided by the attorneys? Below I suggest two alternative standards: the cost of defense and the profits generated by the product that caused the harm.

### The Cost of Defense as a Standard

54. As noted by Dennis Curtis and Judith Resnik, it is the fees paid to plaintiffs' lawyers that come under criticism in mass torts. The amounts paid by the defendant to the lawyers hired to fight the claims of harm typically go uncommented upon, in no small part because they are not put on prominent public display (Dennis E. Curtis and Judith Resnik, *Contingency Fees in Mass Torts: Access, Risk and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients*, 47 DePaul L. Rev. 425, 454 [1998]).

55. As discussed below there is good reason to see the fees and costs incurred by the defendant as an indicator of the value of the service provided by the plaintiffs' representatives. In fact cost of defense is one method mentioned in the Manual for Complex Litigation for evaluating plaintiffs' fee requests, although it is noted as primarily used in the context of applications under the lodestar approach (MCL4th §14.231; see also Alan Hirsch and Diane Sheehey, AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION, 108 [2nd Edition, 2005], accessed at http://www.fjc.gov/public/pdf.nsf/lookup/AttFees2.pdf/$File/AttFees2.pdf, last visited, March 6, 2009).

56. In terms of effort, litigation follows an action-reaction logic, with the time investment of one side driven largely by the decisions of the opposing side and the resultant time investment of that side (Herbert M. Kritzer, *The Justice Broker: Lawyers and Ordinary Litigation* 111-20 [1990]). That is, litigation is a process of interaction: if the defense side chooses to file a motion, the plaintiff's side must respond, and vice versa. This means that the investment in

Kritz-16

effort on the two sides should be expected to roughly balance. One factor that might create an imbalance such that the defense lawyers spend more time than do the plaintiffs' lawyers is that plaintiffs' lawyers working on a contingency fee basis have an incentive to work efficiently while defense lawyers working on an hourly fee do not have the same incentive (KRITZER, RISKS, REPUTATIONS, AND REWARDS , ¶9 *supra*, 137-38). Arguably, the plaintiffs' lawyers should not be penalized for achieving efficiencies, which means that the fact that those lawyers might have actually spent considerably less time than did the defendant's lawyers should not reduce the plaintiffs' lawyers' fee.

57. This argument is enhanced in the MDL setting because of the distribution of efficiencies of scale discussed above (see ¶¶50-51, *supra*). Specifically, given that defendants benefit considerably more from the efficiencies achieved in the MDL process than do plaintiffs, using the defendant's costs as a yardstick is an even greater underestimate than one would expect from the natural pressures for efficiency produced by the contingency fee compared to the hourly fair.

58. Moreover, leaving aside the issue of efficiencies, either those produced by the incentives associated with working on a contingency fee basis or the differential efficiencies of the MDL for the plaintiff and defense sides, the fees paid to the plaintiffs' lawyers should, if anything, be greater than those paid to the defense lawyers on the grounds that the plaintiffs' lawyers assume the risk of nonpayment which is not true for the defense lawyers. Another way to state this was suggested previously: under the contingency fee arrangement, the lawyer provides not only legal services (which is all that is provided by the defense lawyers), but also provides insurance services by assuming the risk of nonpayment or inadequate payment and banking services by advancing all costs until the conclusion of the case.

59. How does this analysis work out in the Vioxx case? Estimates of Merck's defense costs for 2005, 2006, 2007, and the first three quarters of 2008 are approximately $1.6 billion (*PLC Memorandum*, 4). During the first three quarters of 2008, Merck's defense costs were running at the rate of approximately $25 million per month. If one assumes that they continue at that rate through the first quarter of 2009, drop to $15 million per month for the second quarter, $10 million for the third and fourth quarter, and then $5 million per month through 2010, the ultimate costs, *not considering expenditures prior to 2005*, will come to $1.915 billion. In fact according to Merck's SEC 10-K filing for the year 2008 (http://www.sec.gov/Archives/edgar/data/64978/000095012309003688/y74217e10vk.htm, p. 19, last visited March 7, 2009), defense costs for 2008 totaled $305 million, indicating that during the fourth quarter those costs ran at the rate of $27.7 million per month. Adjusting for the $7 million underestimate for the fourth quarter, yields a total starting in 2005 of $1.922 billion. No public information is available regarding Merck's defense costs prior to 2005; as rough estimate, it would seem reasonable to assume that total defense costs over the prior years would have come to 25 percent of what was expended in 2005 (keeping in mind that Vioxx was went off the market at the very end of the third quarter of 2004); given that the

defense costs in 2005 were $285 million, this would be approximately $71 million which would bring the total defense costs up to $1.993 billion.

60. Merck's reports refer to their defense costs as being "worldwide"; the reports do not indicate what percentage is U.S. and what percentage is foreign. My best guess is that the foreign costs were somewhere between 5 and 10 percent of the total. This would put Merck's U.S. defense costs at between $1.794 and $1.893 billion. For purposes of the discussion that follows, I will split the difference and assume that the total defense costs will be $1.844 billion.

61. As noted previously (¶52, *supra*), if there were no state caps and all fees were at 40 percent, total attorneys' fees would come to $1.94 billion. However, New Jersey, where large numbers of cases were filed, caps fees for recoveries of $500,000 or less at 33.3 percent of the net recovery after deducting expenses; lower percentages are mandated for the portions of recoveries exceeding $500,000 (N.J. Court Rules, R. 1:21-7(c) [2008]). A small number of other states also have caps, but relatively few cases are affected by those caps, and I ignore those cases in the discussion that follows.

62. Some adjustment is needed to estimate the fees that would be paid in the absence of the Capping Order. As of December 2007, there were approximately 26,600 Vioxx cases involving 47,000 individual "plaintiff groups" which I will refer to as "claimants." Approximately 25,800 claimants were in the federal MDL and 15,850 in proceedings in the New Jersey Superior Court; an additional 14,100 claimants had entered into Tolling Agreements with Merck (*Joint Report No. 30 of Plaintiffs' and Defendants' Liaison Counsel* 8 (December 12, 2007).  This indicates a total of 60,100 potential claims in the settlement as of December 2007.

63. According to the Claims Administrator, about 48,500 claims had been submitted as of February 9, 2009 (*Claims Administrator Court Report No. 15*, 15 [February 10, 2009]); regrettably no information is provided on the percentage of claims involving cases filed in New Jersey or involving New Jersey residents. It is unlikely that the attrition of claims came equally from the filed and tolled cases. For purposes of estimation, I will assume that the attrition for tolled cases was at a rate twice as great as for filed cases; I also assume that none of the tolled cases would be subject to the New Jersey cap. Based on these assumptions, I estimate that 21 percent of the cases in the settlement are subject to the New Jersey cap. A second complication is that the fee in New Jersey is computed *net of disbursements* (N.J. Court Rules, R. 1:21-7(d) [2008])). Because disbursements are unknown at this time, I have made estimates using different assumptions about the average of the disbursements. The table below shows the estimates of the amount of fees lawyers would receive in the absence the capping order. Note that an additional assumption is that all fees other than the New Jersey cases are at the rate of 40 percent; in fact, the figure is likely to be somewhat lower because some other states impose fee caps, some lawyers may have taken cases with a

Kritz-18

retainer of less than 40 percent, and a small number of lawyers may have retainers that call for a percentage greater than 40 percent.

|  | New Jersey Cases | Other Cases | Total Fees |
|---|---|---|---|
| 20% expenses | $272 million | $1,533 million | $1,804 million |
| 10% expenses | $306 million | $1,533 million | $1,838 million |
| 5% expenses | $323 million | $1,533 million | $1,855 million |

Based on the analysis in the table, the most that would be paid in fees is $1.855 billion which is virtually identical to Merck's estimated total defense costs of $1.844 billion.

64. As noted above, if plaintiffs' fees are capped at 32 percent as proposed, the payment to plaintiffs' lawyers for their fees would total a maximum of $1.55 billion, considerably less than Merck's total defense costs. This figure is a maximum because it does not take into account cases where the fees will be lower due to fee agreements or state fee limits. In particular, the Capping Order (at 20n15) specifies that fees will be the *lesser* of 32 percent or the fee allowable under state rules or the retainer agreement. In the New Jersey cases, which figure will be lower will depend on the amount of costs.  Thus, under the Capping Order, plaintiffs' lawyers will be paid considerably less than the ultimate costs incurred by Merck.

65. The figures for Merck's defense costs include expenses in addition to attorney's fees (e.g., expert witness fees, travel, copying, etc.). Common Benefit counsel claim expenses of $34.4 million *(PLC Memorandum*, 69). If one assumes that these expenses constitute only one quarter of the total of the allowable expenses for all plaintiffs' attorneys involved in the litigation, the total allowable expenses would be $137.6 million. Adding this figure to the maximum estimate of total fees derived above, $1.855 billion, produces a total of $1.99 billion, only 8 percent more than my estimate of Merck's ultimate defense costs.

66. If the cost of defense is a reasonable standard against which to assess the value of the **legal services** provided by plaintiffs' counsel, then the fees (and expenses) that would be paid in the absence of the capping order are, if anything, under compensation for **all** of the services provided by the plaintiffs' representatives. Simply adding interest to some valuation of the costs advanced and the salaries paid to lawyers and their staffs to cover the banking services would add substantially to the value of the overall services provided. As a simple exercise, assume that the total "value" of time plus expenses is triple the expenditure of the Plaintiffs' Liaison's Counsel's lower estimate ($217 million in time plus $34 million in expenses); this

comes to about $750 million. Assuming that half of this cost was carried for one year, one quarter for two, and the remainder for three, and using an interest rate of 6 percent, the value of the **banking** services (i.e., the advance of costs of both time and disbursements) is approximately $79 million. Adding that to the $1.844 billion for **Merck's** U.S. defense costs yields $1.923 billion.

67. That leaves the question of how to value the **insurance services** (i.e., the risk of nonpayment, or inadequate payment). The plaintiffs' relative lack of success at trial shows the very real risk involved in these cases. If that bearing of risk is taken to be worth even 10 percent of the value of the legal services, and we use Merck's cost of defense as our estimate of that value, that increases the total value for all services combined by $184 million, which would put **the total value of the services provided by the plaintiffs' attorneys at $2.107 billion**, *which is more than they would receive even in the absence of the Capping Order*.


### Merck's Profits from Vioxx as a Standard

68. Another perspective from which to consider the reasonableness of the aggregate fees to be paid to plaintiffs' counsel in the Vioxx litigation is to focus on the profits Merck generated from its Vioxx sales. News articles around the time of Merck's withdrawal of Vioxx reported 2003 Vioxx worldwide sales of $2.5 billion (see Milt Freudenheim, *Merck and Vioxx: A Blow to Efforts to Close in on Rivals*, N.Y. TIMES [October 1, 2004]). Analysts were reported to estimate that these sales produced $1.2 billion in profits for that one year (*id.*).

69. Data obtained from IMS Health, a company that collects health and healthcare related information, shows the following sales information for Vioxx and two of its competitors:

| Drug | Vioxx | Celebrex | Bextra |
|---|---|---|---|
| 2004 | $1,342,236 | $2,748,611 | $1,248,550 |
| 2003 | $1,813,391 | $2,567,873 | $935,657 |
| 2002 | $1,837,680 | $2,586,215 | $453,295 |
| 2001 | $2,048,736 | $2,549,101 | ------ |
| 2000 | $1,526,382 | $2,166,603 | ------ |
| 1999 | $372,697 | $1,417,391 | ------ |
| **TOTAL** | **$8,941,122** | **$14,035,794** | **$2,637,502** |

These figures are somewhat less than what was reported in the press, although it is not clear whether they are worldwide sales or U.S.-only sales. For purposes of assessing the reasonableness of fees in the U.S. cases, one would want to look at the U.S. sales and profits. For the analysis below I assume that the information above represents U.S. sales. (Note that these data were obtained from the IMS website on May 12, 2008, but have subsequently been

removed; Exhibit B is a print out of what was captured on that website on that date. The web address was:

http://67.66.217.81/exchweb/bin/redir.asp?URL=http://www.imshealth.com/ims/portal/front/articleC/0,2777,6599_18731_63237611,00.html).

70. I was provided with a document obtained in discovery entitled "Profit Plan 2002 – Merck A & A Franchise." This document speaks of projected revenue from Vioxx on the order of $1.9 billion for the year 2002 at one place (p. 1), and "net sales" of 1.75 billion at a second place. The figure in the table above for 2002 is approximately halfway between the figures in "Profit Plan 2002".  The costs associated with manufacturing the product and marketing total about $250 million (about 80 percent of that is marketing), leaving revenue net of costs ("net revenue") at about $1.5 billion (p. 13). "Profit Plan 2002" also shows net revenue for 2001 and 2001 totaling about $2.75 billion. Sales for 2003 (see table above) are about the same as for 2002; assuming approximately the same net revenue, $1.5 billion, for 2003 and 2002 seems reasonable. This leaves 2004, when Vioxx was withdrawn at the end of the third quarter; not surprisingly, sales drop by almost exactly 25 percent. Assuming that Merck incurred significant costs associated with the withdrawal (and already had stock in hand for the remainder of 2004), I conservatively estimate net revenue for 2004 as half of what it would have been in the absence of the withdrawal; assuming sales and net revenue in 2004 would have approximated 2003 without the withdrawal, I estimate $0.75 billion for 2004. Combining the figures for net revenue for 2000-2004, I estimate that Merck's total net revenue for Vioxx during those years came to **$6.5 billion.**

71. I do not assume that the total net revenue of $6.5 billion is the profit from Vioxx. I have not factored in the development cost. I do not know the specific development cost of Vioxx, but one source estimates the typical cost from concept to market for a new drug as $850 million (http://www.mynippon.com/vioxx/index.php?paged=32; last visited March 6, 2009). A 2001 news release from the Tufts Center for the Study of Drug Development reported that the average cost of developing a new drug was $802 million (http://csdd.tufts.edu/NewsEvents/RecentNews.asp?newsid=6, last visited March 6, 2009). It seems reasonable to assume that the development costs of Vioxx were at least $800 million; how much more than that is hard to estimate, but a generous estimate might be that the costs of developing Vioxx was on the order of $1.5 billion. Using this figure puts Merck's profits from Vioxx at $5 billion, and Merck's total costs associated with developing, manufacturing, and marketing Vioxx at approximately $2.65 billion ($1.5 billion for development, $1 billion for marketing, and $150 million for production).

72. Comparing the fees and estimated total reimbursable expenses of the plaintiffs' lawyers in the absence of the capping order, $1.99 billion (¶65, *supra*) to either Merck's profit from Vioxx or Merck's costs associated with Vioxx (other than defense costs), one would

conclude that paying plaintiffs' counsel their contracted fees as capped by applicable state law is very reasonable.

## F.  Other Issues

73. The Capping Order (pp. 15-16) makes reference to state rules that place limits on contingency fees. In fact, a number of states do have such limits, but very few impose such limits in anything other than medical malpractice cases or certain administrative proceedings such as workers' compensation, and no state has imposed caps on contingency fees in cases other than medical malpractice in recent years.

74. According to information compiled by the National Conference of State Legislatures, as of 2005 (http://www.ncsl.org/standcomm/sclaw/statelaws1.htm, last visited March 7, 2009), 15 states (California, Delaware, Florida, Illinois Indiana, Maine, Massachusetts, Nevada, New Hampshire, New York, Tennessee, Utah, Wisconsin, and Wyoming) specifically limit the percentages that can be charged as contingency fees in medical malpractice cases. For Indiana this applies only to payments out of a state patient compensation fund. In Florida, the cap was imposed as a constitutional amendment in 2004, but the Florida Supreme Court ruled the following year that as with any other constitutional right, the cap may be waived by clients (*In Re: Amendment to The Rules Regulating The Florida Bar – Rule 4-1.5(f)(4)(B) of the Rules of Professional Conduct*, case no. SC05-1150, available at http://www.floridajusticeassociation.org/files/FMAPetition-SupremeCourtOrder(12-14-2005).pdf, last visited March 7, 2009). Thus, only 13 states have effective caps that apply specifically to medical malpractice cases. Moreover, several of these states allow fees of 40 percent for at least some of the amounts that will be paid under the Vioxx settlement: California and Nevada for the first $50,000, Massachusetts for the first $150,000, and Wyoming for the first $1 million if resolved 61 days or later after filing. Many the other states have caps for at least some amounts that are between 33 percent and 39 percent.

75. Another four states (Connecticut, Michigan, New Jersey, and Oklahoma) limit contingency fees in all cases (ALEXANDER TABARROK & ERIC HELLAND, TWO CHEERS FOR CONTINGENT FEES, 16-17 [2005]). In Oklahoma at present the contingency fee can be up to 50 percent although efforts are currently underway to reduce that to 33 percent of the first $1 million and 20 percent for amounts over $1 million. In Florida a state bar rule (rule 4-1.5(f)(4)(B), available at http://www.floridabar.org/divexe/rrtfb.nsf/FV/A8644F215162F9DE85257164004C0429, last visited March 7, 2009), imposes limits on contingency fees in both medical malpractice cases and more generally; however, the schedule allows fees of up to 40 percent of the first $1 million if the case is not resolved before the defendant's answer is filed.

76. In summary, only 12 states have restrictions that limit those fees to less than 40 percent, and in most of those states the caps apply only to medical malpractice cases. Only three states,

Connecticut, Michigan, and New Jersey, in fact have limits that would apply in state courts except in special circumstances.

77. The impetus for fee caps comes not from consumers who constitute the plaintiffs' side in litigation but from interests that appear on the defendants' side. Typically the proponents of limits, as with other "tort reforms," are groups such as insurance companies, medical providers, manufacturing corporations, or groups which receive significant support from such groups (e.g., the Manhattan Institute, Common Good, the American Tort Reform Association). The goal of these groups is not to help those who have been injured but to discourage lawyers from handling malpractice or other types of cases, and hence reduce the threat these groups see from lawsuits (WILLIAM HALTOM & MICHAEL MCCANN, DISTORTING THE LAW: REFORM POLITICS, MASS MEDIA, AND THE LITIGATION CRISIS, 39-51 [2004]). Not surprisingly, one never sees proposals to limit the fees that defendants can pay to their lawyers; one only sees proposals to limit the fees of the lawyers bringing claims.

78. The only states in which limits on contingency fees have been adopted by popular referendums are Florida and Nevada. Not surprisingly, the primary supporters of these referendums were state medical societies (see http://volusia.org/elections/proscons.htm#amend3, last visited March 7, 2009, and http://findarticles.com/p/articles/mi_m0CYD/is_23_39/ai_n8581194, last visited March 7, 2009, "In Nevada, physicians won a big victory when nearly 60% of voters approved an initiative that included reforms such as removing exceptions to the current $350,000 cap on noneconomic damages, limiting contingency fees for attorneys, and reducing the statute of limitations for filing a medical liability claims."). Insurance companies backed referendums that would have imposed such reforms in California in 1988 but those proposals were soundly defeated (see THOMAS F. BURKE, LAWYERS, LAWSUITS, AND LEGAL RIGHTS: THE BATTLE OVER LITIGATION IN AMERICAN SOCIETY 112-118 [2002]).  In total, since 1988 voters have had seven opportunities to vote to impose limitations on contingency fees, and have done so only twice.

79. The Capping Order asserts (p. 12) that "many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts."

80. Some courts do limit contingency fees for specific classes of litigants. For example, the New Jersey rules limit the fee percentage to a maximum 25 percent regardless of the amount recovered when the claimant is "a minor or [is] *mentally* incapacitated" [emphasis added] and the case is resolved without trial (N.J. Court Rules, R. 1:21-7(c)(6) [2008]). There are a number of courts around the country that impose similar restrictions either based on state procedure (see, e.g.,  Pa. R. Civ. Proc., No. 2039). or local rule (e.g., Superior Court of California, County of Orange, Local Rules of Court, Rule 368, available at http://www.occourts.org/directory/local-rules/2009/09Div3.pdf, last visited March 7, 2009; or Superior Court of California, County of Los Angeles, Court Rules, Rule 10.79(c)(3),

available at http://www.lasuperiorcourt.org/courtrules/Chapter10.htm, last visited March 7, 2009).

81. Crucial to these rules and policies is that the claimant is not legally competent, either due to age or mental incapacity. Illness, either mental or physical, is not sufficient to trigger these limits. Advanced age in the absence of mental incapacity is not adequate nor is "poor health" unless that rises to mental incapacity.

82. I do not have information on all of the claimants in the Vioxx settlement, but I was provided with some information on the ages of the clients represented by the VLC lawyers. The Capping Order does not provide a definition for "elderly"; consequently, I considered two possible definitions, 70 and older and 75 and older. For purposes of analysis, I treat as 70 and older (at the time the retainer agreement was signed) those born before January 1, 1935 (effectively assuming that all retainer agreements were signed January 1, 2005); I treat as 75 and older those born before January 1, 1930. Using the age 70 criterion 25.1 percent of the VLC clients might be categorized as "elderly"; using the age 75 criterion, the figure is 14.4 percent. To these figures, one might add claimants younger than either 70 or 75 on whose behalf someone else signed the contingency fee contract as indicating that the claimant was not competent to sign; however doing so produces virtually no change in the figures: 25.2 percent for the age 70 criterion and 14.6 percent for the age 75 criterion.

83. The figures in the above paragraph lump together two groups: claims filed by the survivors of  Vioxx users for whom the claimed injury is death ("death cases") and those filed by or on behalf of Vioxx users whose claimed injury is something other than death ("nondeath cases"). Looking only at the death cases, and hence the ages of the survivors who filed those claims, 14.3 percent meet the age 70 criterion and only 8.0 percent meet the age 75 criterion; there were 11 death cases missing information on the age of the actual claimant and they are omitted from these calculations. For the nondeath cases, 28.7 percent meet the age 70 criterion and 16.6 percent meet the age 75 criterion. There is one additional case where the victim was over 75 but the retainer contract was signed by someone under 70, and two other cases where the victim was under 70 but the contract was signed by someone other than the victim.

84. If the clients of the VLC are at all typical of the universe of Vioxx claimants, this analysis, which uses a very generous definition of "elderly," presents the question of whether it is fair to say that "many" claimants are "elderly and in poor health." While if either 14.3 or 25.0 percent of the claimants are elderly according the alternative criteria used above, only some fraction of those groups would be in poor health.

85. Another way to state this is to reverse the percentages: at least 75 percent, and probably something more on the order of 90 (or more) percent of the claimants are **not** "elderly and in poor health."

Kritz-24

**G. The Potential Harms of Limiting Fees in the Vioxx Settlement**

86. Given the evidence that limiting potential fees reduces the willingness of lawyers to take on cases on a contingency fee basis, particularly cases involving significant risk and uncertainty, reducing the fees *ex post* that lawyers and their clients contracted for *ex ante* has a very substantial possibility of limiting the availability of top-quality, adequately-resourced counsel in future mass tort cases. The clearest evidence of this possibility is the impact of the reforms in Texas which has driven many experienced and successful medical malpractice attorneys out of that area of practice (see Stephen Daniels & Joanne Martin, *The Texas Two-Step: Evidence on the Link between Damage Caps and Access to the Civil Justice System*, 55 DePaul L. Rev. 635, 662-63 [2006].

HERBERT M. KRITZER

Subscribed and sworn to
before me on the
31 day of *March*, 2009.

Notary Public in and for
The State of Minnesota

My commission expires  1.31.10

JANE E. ANDREWS
Notary Public
State of Minnesota
My Commission Expires
January 31, 2010

Kritz-25

# EXHIBIT A

Kritz-26

**Vita**

# HERBERT M. KRITZER

February 2009

herbert.kritzer@wmitchell.edu
http://www.wmitchell.edu/faculty/kritzer/

*Home Addresses:*
1412 Como Blvd E.
Saint. Paul, Minnesota  55117
651-312-0264
cell: 651-895-5182

*Office Address:*
William Mitchell College of Law
875 Summit Avenue
Saint Paul, Minnesota 55104
651-290-6394
fax: 651-290-6414

**CURRENT POSITIONS:**

Professor of Law and Director of the Center
  for the Empirical Study of Legal Practice
William Mitchell College of Law

Adjunct Professor of Political Science
University of Minnesota

**TEACHING INTERESTS:**

Empirical Legal Studies
Legal Profession
Law and Politics, Legal Policy
Civil Justice (including civil procedure and torts)

**RESEARCH INTERESTS:**

Civil Justice
Legal Profession
Legal Policy/Law and Politics

**EDUCATION AND PROFESSIONAL TRAINING:**

| School | Dates | Degree |
|---|---|---|
| Faculty Development Grants: | | |
| University of Wisconsin | 1999-2000 | (Law) |
| Madison, Wisconsin | 1983-84 | (Statistics) |
| NDEA Title IV Fellow: | | |
| University of North Carolina | 1971-74 | Ph.D. |
| Chapel Hill, North Carolina | | Political Science |
| Haverford College | 1965-69 | BA, Magna Cum Laude |
| Haverford, Pennsylvania | | Sociology (Honors) |

-2-

**AWARDS AND EXTERNALLY FUNDED RESEARCH GRANTS:**

| Award | Source | Date |
|---|---|---|
| Research Grant | ABA Litigation Research Fund | 2008-10 |
| Research Grant | Project on Scientific Knowledge and Public Policy | 2006-07 |
| Research Grant | Project on Scientific Knowledge and Public Policy | 2004-06 |
| Editor's Choice Award | American Library Association | 2002 |
| Outstanding Reference Source | Reference and User Services Association | 2002 |
| Research Grant | National Science Foundation | 1997-99 |
| Research Grant | National Science Foundation | 1995-98 |
| C. Herman Pritchett Award | Law & Courts Section, American Political Science Association | 1993 |
| Glenn B. and Cleone Orr Hawkins Professorship | University of Wisconsin, Department of Political Science | 1992-97 |
| Research Grant | National Science Foundation | 1992-95 |
| Research Grant | Canadian Studies Grant, Canadian Embassy | 1988-90 |
| Research Grant | National Science Foundation | 1988-91 |
| Data Development Grant | National Science Foundation | 1985-87 |
| Research Grant | National Science Foundation | 1984-86 |
| Research Grant | National Institute of Dispute Resolution | 1984 |
| Research Contract | U.S. Department of Justice | 1979-81 |
| Grant-in-Aid (dissertation research) | Society for the Psychological Study of Social Issues | 1974 |

**PREVIOUS PROFESSIONAL EXPERIENCE:**

| Institution | Position | Dates |
|---|---|---|
| Department of Political Science & Law School University of Wisconsin | Professor *emeritus* | as of 2007 |
| | Professor | 1985-2007 |
| | Department Chair | 1996-99 |
| | Associate Professor | 1980-85 |
| | Assistant Professor | 1978-80 |
| | Visiting Assistant Professor | 1977-78 |
| Legal Studies Program University of Wisconsin | Director | 2000-04 |
| William Mitchell College of Law | Affiliated Professor of Law | 1999-2000 |
| Faculty of Law University College - London | Visiting Fellow | 1986-87 |
| Data and Computation Center University of Wisconsin | Director | 1982-86 |

-3-

**PREVIOUS PROFESSIONAL EXPERIENCE (continued):**

| Institution | Position | Dates |
|---|---|---|
| Department of Political Science Rice University | Assistant Professor | 1975-78 |
| Department of Political Science Indiana University | Visiting Assistant Professor | 1974-75 |
| Summer Institute, ICPSR University of Michigan | Instructor | 1974-77 |

**OTHER CURRENT AND RECENT PROFESSIONAL ACTIVITIES:**

Associate Editor, *Journal of Empirical Legal Studies*

Reviewer for the *American Political Science Review*, *Journal of Politics*, *American Journal of Political Science*, *American Politics Research*, *Justice System Journal*, and *Judicature*.

**PUBLICATIONS:**

**Books:**

*Risk, Reputations, and Rewards: Contingency Fee Legal Practice in the United States* (Stanford University Press, 2004).

*Legal Advocacy: Lawyers and Nonlawyers at Work*  (Ann Arbor:  University of Michigan Press, 1998).

(Herbert Jacob, Erhard Blankenburg, Herbert M. Kritzer, Doris Marie Provine, and Joseph Sanders) *Courts, Law and Politics in Comparative Perspective* (New Haven:  Yale University Press, 1996).

*The Justice Broker:  Lawyers and Ordinary Civil Litigation* (New York:  Oxford University Press, 1990).

*Let's Make a Deal:  Negotiation and Settlement in Ordinary Litigation* (Madison:  University of Wisconsin Press, 1991).  [Co-winner of the 1993, C. Herman Pritchett Award]

**Edited Works:**

Peter Cane and Herbert M. Kritzer, *The Oxford Handbook of Empirical Legal Studies* (Oxford: Oxford University Press, 2009), in preparation.

*Law & Society Review*, Volumes 39-42.

-4-

Herbert M. Kritzer and Susan S. Silbey (eds.), *In Litigation: Do the Have's Still Come Out Ahead?* (Stanford:  Stanford University Press, 2003).

*Legal Systems of the World* [4 volumes] (Santa Barbara: ABC-CLIO, 2002).

"Why the Have's Come Out Ahead: Twenty-five Years Later," Special Symposium Issue of *Law & Society Review* (1999), coedited with Susan Silbey.


**Journal Publications:**

"The Arts of Persuasion in Science and Law: Conflicting Norms in the Courtroom," *Law and Contemporary Problems* (2009) forthcoming [prepublication version available at http://ssrn.com/abstract=1024520].

"Examining the Real Demand for Legal Services," *Fordham Urban Law Journal* (2009), forthcoming [prepublication version available at http://ssrn.com/abstract=1289828].

"To Lawyer, or Not to Lawyer: Is That the Question?" *Journal of Empirical Legal Studies* 5 (2008), 875-906 [prepublication version available at http://ssrn.com/abstract=1004773].

"*Daubert* in the Law Office: Routinizing Procedural Change," *Journal of Empirical Legal Studies* 5 (2008), 109-142 [prepublication version available at http://ssrn.com/abstract=933668].

(with Darryn Beckstrom) "*Daubert* in the States: Diffusion of a New Approach to Expert Evidence in Court," *Journal of Empirical Legal Studies* 4 (2007), 983–1006 [prepublication version available at http://ssrn.com/abstract=912780],

"Defending Torts: What Should We Know?" 1 (3) *Journal of Tort Law* (2007), Art. 3  [prepublication version available at http://ssrn.com/abstract=975321].

"Toward a Theorization of Craft," *Social and Legal Studies* 16 (2007), 321-340 [prepublication version available at http://ssrn.com/abstract=906340].

(with Paul Brace, Melinda Gann Hall, and Brent Boyea) "The Business of State Supreme Courts, Revisited," *Journal of Empirical Legal Studies* 4 (2007), 427-439 [prepublication version available at http://ssrn.com/abstract=952795].

"'Law Is the Mere Continuation of Politics by Different Means': American Judicial Selection in the 21st Century," *DePaul Law Review* 56 (March 2007), 423-467 [prepublication version available at http://ssrn.com/abstract=949946]

-5-

"The Commodification of Insurance Defense Practice," *Vanderbilt Law Review* 59 (2006), 2053-2094 [prepublication version available at http://ssrn.com/abstract=906338]. Reprinted in *Defense Law Journal* 56 (2007), 647-92.

(Mark J. Richards, Joseph Smith, and Herbert M. Kritzer) "Does *Chevron* Matter?" *Law and Policy* 28 (October 2006), 444-469. [http://ssrn.com/abstract=906329, prepublication version available at http://ssrn.com/abstract=928998]

"The American Public's Assessment of the Rehnquist Court," *Judicature* 89 (November-December 2005), 168-176 [http://ssrn.com/abstract=906341].

"'Loser Pays' Doesn't," *Legal Affairs* (November/December 2005), pp. 24-25.

(Herbert M. Kritzer and Mark J. Richards) "The Influence of Law in the Supreme Court's Search and Seizure Jurisprudence," *American Politics Research* 33 (January 2005), 33-55.

"Disappearing Trials?  A Comparative Perspective," *Journal of Empirical Legal Studies* 1 (2004), 735-754.

"Advocacy and Rhetoric vs. Scholarship and Evidence in the Debate over Contingency Fees: A Reply to Professor Brickman," *Washington University Law Quarterly* 82 (2004), 477-507.

"American Adversarialism" [review essay focusing on Robert Kagan's *Adversarial Legalism*], *Law & Society Review* 38 (2004), 349-383.

"The Impact of Law: A View from North of the Border [A Review Essay focusing on *Consequences: The Impact of Law and its Complexity*, by W.A. Bogart]" *Judicature* 88 (September-October 2004), 38-41.

(Herbert M. Kritzer and Mark J. Richards) "Jurisprudential Regimes and Supreme Court Decision Making: The Lemon Regime and Establishment Clause Cases," *Law & Society Review* 37 (2003), 827-840.

(Mark J. Richards and Herbert M. Kritzer) "Jurisprudential Regimes in Supreme Court Decision Making," *American Political Science Review* 96 (June 2002), pp. 305-320.

"Lawyer Fees and Lawyer Behavior in Litigation:  What Does the Empirical Literature Really Say?" *Texas Law Review* 80 (June 2002), pp. 1943-1983.

"The Future Role of 'Law Workers': Rethinking the Forms of Legal Practice and the Scope of Legal Education," *Arizona Law Review* 44 (2002), pp. 917-938.

"Seven Dogged Myths about Contingency Fees?" *Washington University Law Quarterly* 80 (2002), pp. 739-794.

-6-

"The Fracturing Legal Profession: The Case of Plaintiffs' Personal Injury Lawyers," *International Journal of the Legal Profession* 8 (2001), pp. 225-250.

"From Litigators of Ordinary Cases to Litigators of Extraordinary Cases: Stratification of the Plaintiffs' Bar in the Twenty-first Century," *DePaul Law Review* 51 (Winter 2001), 219-240.

"Public Perceptions of Civil Trial Verdicts," *Judicature* 85 (September-October 2001), 78-82.

"The Impact of *Bush v. Gore* on Public Perceptions and Knowledge of the Supreme Court," *Judicature* 85 (July-August 2001), 32-38; reprinted in Elliot Slotnick, *Judicial Politics: Readings from Judicature* [Third Edition] (Washington, DC: CQ Press, 2005).

(Joel Grossman, Herbert M. Kritzer, Stewart Macaulay) "Do the Haves Come Out Ahead?" *Law & Society Review* 33 (1999), 803-810.

"The Professions Are Dead, Long Live the Professions: Legal Practice in a Post-Professional World," *Law & Society Review* 33 (1999), 713-759.  Selections reprinted in *Beyond Degrees: Professional Learning for Knowledge Services*, Guy St. Clair (ed.),  Munich: K.G. Saur Verlag, 2003; *Before the Law: An Introduction to the Legal Process* [7th edition], John Bonsignore *et al*. (eds.), New York: Houghton Mifflin, 2002.

(Herbert M. Kritzer and Jayanth Krishnan) "Lawyers Seeking Clients, Clients Seeking Lawyers: Sources of Contingency Fee Cases  and Their Implications for Case Handling," *Law & Policy* 21 (1999), pp. 347-375.

"Contingent-Fee Lawyers And Their Clients:  Settlement Expectations and Settlement Realities." *Law & Social Inquiry* 23 (1998), pp. 795-821. Reprinted in *Lawyers and the Legal Profession, Volume 2* [International Library of Essays in Law and Society], Tanina Rostain (ed.) [Austin Sarat, gen. Ed.]. Aldershot, England: Ashgate Publishing, 2008.

(Herbert M. Kritzer and John Voelker) "Familiarity Breeds Respect: Evaluating the Wisconsin Courts," *Judicature* 82 (1998), pp. 58-64.

"Evaluating the American Law Institute: Research Issues and Prospects," *Law & Social Inquiry* 23 (1998), pp. 667-671.

(Herbert M. Kritzer and Frances K. Zemans) "The Shadow of Punitives: An Unsuccessful Effort to Bring It into View." *Wisconsin Law Review* (1998), pp. 157-168.

"The Wages of Risk:  The Returns of Contingency Fee Legal Practice." *DePaul University Law Review* 47 (1998), pp. 267-319.

"Rethinking Barriers to Legal Practice: It Is Time to Repeal Unauthorized Practice of Law Statutes." *Judicature* 81 (November-December 1997), pp. 100-103.

-7-

"Investing in Justice: Can You Profit from Contingency Fee Work?" *The Wisconsin Lawyer* 70 (August, 1997), pp. 10-13, 44-45.

"Contingency Fee Lawyers as Gatekeepers in the American Civil Justice System." *Judicature* 81 (1997), pp. 22-29 reprinted in Elliot Slotnick, *Judicial Politics: Readings from Judicature* [Third Edition] (Washington, DC: CQ Press, 2005).

"Holding Back the Flood Tide:  The Real Role of Contingent Fee Lawyers?"  *The Wisconsin Lawyer* 70 (March 1997), pp. 10-13, 62-64. Reprinted in *MTLA* [Michigan Trial Lawyers Association] *Quarterly* 31, No. 3 (Summer 1997), pp. 21-26.

"'Data, Data, Drowning in Data!'  Crafting *The Hollow Core*." *Law & Social Inquiry* 21 (Summer 1996), pp. 761-804.

"The Data Puzzle:  The Nature of Interpretation in Quantitative Research." *American Journal of Political Science* 40 (February 1996), pp. 1-32

"Interpretation and Validity Assessment in Qualitative Research:  The Case of H.W. Perry's *Deciding to Decide*."  *Law & Social Inquiry* 19 (Summer 1994), pp. 687-724.

"Lawyers' Fees and the Holy Grail:  Where Should Corporations Search Next?" *Judicature* 77 (January-February 1994), pp. 187-190.

(Herbert M. Kritzer, Helen Marks Dicks, and Betsy J. Abramson, "Guardianships in Wisconsin:  How Is the System Working?"  *Marquette Law Review* 76 (1993), pp. 549-575.

(Herbert M. Kritzer and Frances K. Zemans) "Local Legal Culture and the Control of Litigation." *Law & Society Review* 27 (1993), pp. 535-557.

"The English Rule."  *ABA Journal* 78 (November 1992), pp. 54-58

(Lawrence C. Marshall, Herbert M. Kritzer, Frances K. Zemans) "The Use and Impact of Rule 11." *Northwestern Law Review* 86 (Spring, 1992), pp. 943-986.

(Herbert M. Kritzer, Lawrence C. Marshall, and Frances K. Zemans) "Rule 11:  Moving Beyond the Cosmic Anecdote." *Judicature* 75 (February-March 1992), pp. 269-272.

(Herbert M. Kritzer, Neil Vidmar, and W.A. Bogart) "To Confront or Not to Confront:  Measuring Claiming Rates in Discrimination Grievances."  *Law & Society Review* 25 (1991), pp. 875-887.

(Herbert M. Kritzer, W.A. Bogart, and Neil Vidmar) "The Aftermath of Injury:  Cultural Factors in Compensation Seeking in Canada and the United States." *Law & Society Review* 25 (1991), pp. 499-543.

"Propensity to Sue in England and the United States:  Blaming and Claiming in Tort Cases." *Journal of Law and Society* 18 (1991), pp. 452-479.

-8-

"Abel and the Professional Project:  The Institutional Analysis of the Legal Profession." *Law & Social Inquiry* 16 (1991), pp. 529-552.

"Substance and Method in the Use of Ratio Variables, or the Spurious Nature of Spurious Correlation?" *Journal of Politics* 52 (February 1990), pp. 243-254.

"A Comparative Perspective on Settlement and Bargaining in Personal Injury Cases [A Review Essay of *Hard Bargaining:  Out of Court Settlement in Personal Injury Actions*, by Hazel Genn]."  *Law & Social Inquiry* 14 (Winter, 1989), pp. 167-186.

"Public Notification Campaigns in Mass Litigation:  The Dalkon Shield Case." *Justice System Journal* 13 (1988-89), pp. 220-239.

"Fee Arrangements and Negotiation:  A Research Note." *Law & Society Review* 21 (1987), pp. 341-348; selections reprinted in *Negotiation and Settlement Advocacy: A Book of Readings*, Charles B. Wiggins and L. Randolph Lowry (eds.).  St. Paul, MN: West Publishing Company, 1997  [2nd edition published 2005]; selections reprinted in *Negotiation: Theory, Practice and Law* [2nd Edition], Jay Folberg and Dwight Golann (eds.).  New York: Aspen Publishers, 2006.

"Adjudication to Settlement:  Shading in the Gray." *Judicature* 70 (October - November, 1986), pp. 161-165.   Excerpts reprinted in Michael Palmer and Simon Roberts, *Dispute Processes: ADR and the Primary Forms of Decision Making* (London: Butterworths, 1998), pp. 185-188; Simon Roberts and Michael Palmer, *Dispute Processes: ADR and the Primary Forms of Decision Making* (Cambridge: Cambridge University Press, 2005).

(Herbert M. Kritzer, William L.F. Felstiner, Austin Sarat, and David M. Trubek) "The Impact of Fee Arrangement on Lawyer Effort." *Law & Society Review* 19 (1985), pp. 251-278.

"Mothers and Fathers, and Girls and Boys:  Socialization in the Family Revisited." *Political Methodology* 10 (1984), pp. 245-265.

(Herbert M. Kritzer, Austin Sarat, David M. Trubek, Kristen Bumiller, and Elizabeth McNichol), "Understanding the Costs of Litigation:  The Case of the Hourly Fee Lawyer." *American Bar Foundation Research Journal* 1984 (Summer), pp. 559-604.

"The Dimensions of Lawyer-Client Relations:  Notes Toward a Theory and a Field Study."  *American Bar Foundation Research Journal* 1984 (Spring), pp. 409-425.

"Testing for Change in Relational Measures." *Political Methodology* 10 (1984), pp. 143-164.

(Herbert M. Kritzer, Joel B. Grossman, Elizabeth McNichol, David M. Trubek, and Austin Sarat) "Courts and Litigation Investment:  Why Do Lawyers Spend More Time on Federal Cases." *Justice System Journal* 9 (1984), pp. 7-22.

-9-

"Fee Arrangements and Fee Shifting:  Lessons from the Experience in Ontario." *Law and Contemporary Problems* 47 (Winter 1984), pp. 125-138.

"The Identification Problem in Cohort Analysis." *Political Methodology* 9 (1983), pp. 35-50.

(Herbert M. Kritzer and Jill Anderson) "The Arbitration Alternative:  A Comparative Analysis of Case Processing Time, Disposition Mode, and Cost in the American Arbitration Association and the Courts." *Justice System Journal* 8 (Spring 1983), pp. 6-19.

(David M. Trubek, Austin Sarat, William L. F. Felstiner, Herbert M. Kritzer, and Joel B. Grossman) "The Costs of Ordinary Litigation." *UCLA Law Review* 31 (1983), pp. 72-127.

"The Judge's Role in Pretrial Case Processing:  Assessing the Need for Change." *Judicature* 66 (June-July 1982), pp. 28-38.

"Court Reform Through Role Reform:  The Role of the Judge as an Instrument of Reform." *Policy Studies Journal* 10 (June 1982), pp. 701-711.

(Joel B. Grossman, Herbert M. Kritzer, Kristin Bumiller, Austin Sarat, Stephen McDougal, and Richard E. Miller), "Dimensions of Institutional Participation: Who Uses the Courts and How?"  *Journal of Politics* 44 (February 1982), pp. 86-114.

"Problems in Estimating the Optimal-Cost Prison Size:  A Comment." *Law & Society Review* 16 (1981-82), pp. 139-142.

(Herbert M. Kritzer, Richard E. Miller, and William L. F. Felstiner), "Studying Disputes by Survey." *American Behavioral Scientist* 25 (September 1981), pp. 67-74.

"Methods for Studying Disputes:  Learning from the CLRP Experience." *Law & Society Review* 15 (1980-81), pp. 503-524.

(Joel B. Grossman, Herbert M. Kritzer, Kristin Bumiller, and Stephen McDougal) "Measuring the Pace of Litigation in Federal and State Trial Courts." *Judicature* 65 (August 1981), pp. 86-113.

"Comparing Partial Rank Order Correlation Coefficients from Contingency Table Data." *Sociological Methods & Research* 8 (May 1980), pp. 420-433.

(Thomas M. Uhlman and Herbert M. Kritzer) "The Presidential Ambition of Democratic Senators: Its Timing and Impact." *Presidential Studies Quarterly* 9 (Summer 1979), pp. 316-328.

(Herbert M. Kritzer and Robert B. Eubank) "Presidential Coattails Revisited:  Partisanship and Incumbency Effects." *American Journal of Political Science* 23 (August 1979), pp. 615-626.

"Federal Judges and Their Political Environments:  The Influence of Public Opinion." *American Journal of Political Science* 23 (February, 1979), pp. 194-205.

-10-

"Approaches to the Analysis of Complex Contingency Tables:  A Guide for the Perplexed." *Sociological Methods & Research* 7 (February 1979), pp. 305-329.

(A. Paul Hare, Herbert M. Kritzer, and Herbert H. Blumberg) "Functional Analysis of Persuasive Interaction in a Roleplaying Experiment." *Journal of Social Psychology* 107 (1979), pp. 77-88.

"Ideology and American Political Elites." *Public Opinion Quarterly* 42 (Winter 1978), pp. 484-502.

"Analyzing Contingency Tables by Weighted Least Squares:  An Alternative to the Goodman Approach." *Political Methodology* 5 (1978), pp. 277-326.

"Enforcing the Selective Service Act:  Deterrence of Potential Violators." *Stanford Law Review* 30 (July 1978), pp. 1149-1176.

"Political Correlates of the Behavior of Federal District Judges:  A 'Best Case' Analysis." *Journal of Politics* 40 (1978), pp. 25-58.

"An Introduction to Multivariate Contingency Table Analysis." *American Journal of Political Science* 22 (February 1978), pp. 187-226.

"The Representativeness of the 1972 Presidential Primaries." *Polity* 10 (Fall 1977), pp. 121-129. Reprinted in William Crotty (ed.), *The Party Symbol* (San Francisco:  W. H. Freeman, 1980), pp. 148-154.

"Analyzing Measures of Association Derived from Contingency Tables." *Sociological Methods & Research* 5 (May 1977), pp. 387-418.

(Herbert M. Kritzer and Thomas M. Uhlman) "Sisterhood in the Courtroom:  Sex of Judge and Defendant as Factors in Criminal Case Disposition." *Social Science Journal* 14 (April 1977), pp. 77-88; reprinted in K. O. Blumhagen and W. D. Johnson (eds.), *Women's Studies:  An Interdisciplinary Collection* (Westport, Connecticut:  Greenwood Press, 1978), pp. 75-86.

"Simultaneous Equations in Path Analysis:  A Comparison of Goodman's Technique to the Traditional Econometric Solution." *Political Methodology* 4 (Winter 1977), pp. 1-21.

"Political Protest and Political Violence:  A Nonrecursive Causal Model." *Social Forces* 55 (March 1977), pp. 630-640.

"NONMET II:  A Program for the Analysis of Contingency Tables and other Types of Nonmetric Data by Weighted Least Squares." *Behavior Research Methods and Instrumentation* 8 (June 1976), pp. 320-321.

"Problems in the Use of Two Stage Least Squares:  Standardization of Coefficients and Multicollinearity." *Political Methodology* 3 (Winter 1976), pp. 71-93.

-11-

"Sources of Role Orientations:  Reality or Chance?" *Journal of Politics* 37 (November 1975), pp. 1048-1055.

(Lewis Lipsitz and Herbert M. Kritzer) "Unconventional Approaches to Conflict Resolution: Erikson and Sharp on Nonviolence." *Journal of Conflict Resolution* 19 (December 1975), pp. 713-733.

"Sanctions and Deviance:  Another Look." *IUSTITA* 3 (1975), pp. 18-28.

(Herbert H. Blumberg, A. Paul Hare, Carolyn Fuller, Charles C. Walker, and Herbert M. Kritzer) "Evaluation of Training for Nonviolent Direct Action." *Mental Health and Society* 1 (1974), pp. 364-375.

"After Prison:  The Thoughts of Resisters." *WIN Magazine* (September l2, 1974), pp. 14-15.

"Nonviolent National Defense:  Concepts and Implications." *Peace Research Reviews* 5 (April 1974), pp. 1-57.

(Herbert M. Kritzer, A. Paul Hare and Herbert H. Blumberg) "The General Survey:  A Short Measure of Five Personality Dimensions." *Journal of Psychology* 86 (January 1974), pp. 165-172.

"The Military as a Target of Protest." *Gandhi Marg* 17 (January 1973), pp. 58-73.

"NONMET:  A Program for the Analysis of Nonmetric Data by Linear Models." *Behavioral Science* 17 (January 1973), pp. 74-75.

"The JCCLIB Statistical Programs." *Behaviorial Science* 16 (November 1971), p. 576.

-12-

**Book Chapters, Encyclopedia Entries, and Published Conference Proceedings:**

"Empirical Legal Research in the 1920s and 30s," in Peter Cane and Herbert M. Kritzer (eds.), *The Oxford Handbook of Empirical Legal Studies* (Oxford: Oxford University Press, forthcoming 2009).

"'Research Is a Messy Business'": An Archeology of the Craft of Socio-legal Research," in Simon Halliday and Patrick Schmidt (eds.), *Conducting Law and Society Research: Reflections on Methods and Practices* (New York: Cambridge University Press, forthcoming 2009) [prepublication version available at http://ssrn.com/abstract=1288063].

"Settlement of Claims," pp. 1075-76 in Peter Cane and Joanne Conaghan (eds.), *The New Oxford Companion to Law* (Oxford: Oxford University Press, 2008).

"Access to Justice for the Middle Class," pp. 257-268 in W.A. Bogart, Frederick Zemans, and Julia Bass (eds.), *Access to Justice for the New Century: The Way Forward* (Toronto: Law Society of Upper Canada, 2005).

"The Government Gorilla:  Why Does Government Come Out Ahead in Appellate Courts?" pp. 342-370 in Herbert M. Kritzer and Susan S. Silbey (eds.), *In Litigation: Do the Have's Still Come Out Ahead?* (Stanford:  Stanford University Press, 2003).

"Anticipating the New Institutionalism: The Pioneering Work of Martin Shapiro," pp. 387-417 in Nancy Maveety (ed.), *The Pioneers of Judicial Behavior* (Ann Arbor: University of Michigan Press, 2003).

"Stories from the Field: Collecting Data Outside Over There," pp. 143-159 in June Starr and Mark Goodale (eds.), *Practicing Ethnography in Law: New Dialogues, Enduring Practices* (New York: Palgrave/St. Martin's, 2002).

"San Marino," in Herbert M. Kritzer (ed.), *Legal Systems of the World* (Santa Barbara, California: ABC-CLIO, 2002),  pp. 1400-1403.

"Litigation," in Neil J. Smelser and Paul B. Baltes, (eds.-in-chief), *International Encyclopedia of the Social and Behavioral Sciences* (Elsevier, 2001), Vol 13, pp. 8989-8995.

"Paralawyers: Other Legal Occupations," in Neil J. Smelser and Paul B. Baltes, (eds.-in-chief), *International Encyclopedia of the Social and Behavioral Sciences* (Elsevier, 2001), Vol. 16, pp.11027-11031

(Herbert M. Kritzer, Austin Sarat, David M. Trubek, and William L.F. Felstiner) "Winners and Losers in Litigation:  Does Anyone Come Out Ahead?"  Pp. 516-524 in Sheldon Goldman and Austin Sarat (eds.), *American Court Systems* (Second Edition)  (New York:  Longman, 1988).

"Using Categorical Regression to Analyze Multivariate Contingency Tables."  Pp. 157-201 in William D. Berry and Michael S. Lewis-Beck (eds.),  *New Tools for Social Scientists:  Advances and Applications in Research Methods* (Beverly Hills, California:  Sage Publications, 1986).

-13-

"The Civil Litigation Research Project:  Lessons for Studying the Civil Justice System." Pp. 30-36 in Alan Gelfand (ed.), *Proceedings of the Second Workshop on Law and Justice Statistics* 1983, (Washington:  U.S. Department of Justice, Bureau of Justice Statistics, 1984).

"The Pace of Arbitration in Cases Processed by the American Arbitration Association." Pp. 114-123 in Jane W. Adler, William L. F. Felstiner, Deborah R. Hensler, and Mark A. Peterson (eds.), *The Pace of Litigation:  Conference Proceedings*  (Santa Monica:  The Rand Corporation, 1982).

"Political Culture, Trial Courts, and Criminal Cases." Pp 131-169 in Peter Nardulli (ed.), *The Study of Criminal Courts* (Cambridge, Massachusetts:  Ballinger, 1979).

"A Theory of Unconventional Political Action:  The Dynamics of Confrontation." Pp. 108-132 in Marjo Hoefnagels (ed.), *Repression and Repressive Violence* (Amsterdam:  Swets & Zeitlinger, 1977).


**Monographs, Research Reports, and Other Minor Publications:**

"The Risks of Recidivism: An Employment Perspective," a Report Prepared for the Wisconsin Legislature Pursuant to 1999 Wisconsin Act 9, s. 9111 (4xx), June 2001.

(John Voelker and Herbert M. Kritzer) "Court User Opinions: Incorporating Consumer Research into Strategic Planning" (Madison: Wisconsin Supreme Court, Office of Court Operations, 1997); report prepared for submission to the State Justice Institute.

(Marc Galanter and Herbert M. Kritzer) "Analysis of the Empirical Basis for Proposed Reforms of New Jersey's Lawyer Disciplinary System."  (Report submitted to the State Bar of New Jersey, January 1994).

*Adult Guardianships in Wisconsin:  An Empirical Assessment*.  (Madison:  Center for Public Representation, 1992).

*NONMET II Plus:  A Program for the Analysis of Contingency Tables and other Types of Nonmetric Data by Least Squares* (Madison:  WiscWare, 1988).

(David M. Trubek, Herbert M. Kritzer, Karen Holst, and William L.F. Felstiner) "Costs, Processes, and Outcomes:  Lawyers' Attitudes Towards Courts and Other Dispute Processing Options,"  Report to the National Institute for Dispute Resolution (Madison, Wisconsin:  Disputes Processing Research Program, University of Wisconsin Law School, 1984) [Available as a DPRP Working Paper 1984-9].

(David M. Trubek, Joel B. Grossman, William L.F. Felstiner, Herbert M. Kritzer, and Austin Sarat) *Civil Litigation Research Project Final Report* (Madison, Wisconsin:  University of Wisconsin Law School, 1983)

*NONMET II:  A Program for the Analysis of Contingency Tables and other Types of Nonmetric Data by Least Squares* (Houston:  Social Science Program Library, Rice University, 1976).

-14-

"Judicial Response to Protest:  The Sentencing of Draft Resisters and Its Impact" (unpublished Ph.D. Dissertation available from University Microfilms, 1974).

**Recent Book Reviews:**

Thomas Marshall, *Public Opinion and the Rehnquist Court*,  *Judicature* 92 (2008), pp. 84-85.

Fred Prichard, *Experts in Civil Cases: An Inside View*, appearing in the *Law and Politics Book Review* (2005).

M.C. Mirow, *Latin American Law: A History of Private Law and Institutions in Spanish America*, review appearing in  *The Latin Americanist* 48 (Spring 2005), pp. 133-136.

Jeffrey A. Segal and Harold J. Spaeth, *The Supreme Court and the Attitudinal Model Revisited,* part of a review symposium appearing in the *Law and Courts Newsletter* (Summer 2003), pp. 19-22 (available at http://www.law.nyu.edu/lawcourts/pubs/newsletter/summer03.pdf).

Jerry Van Hoy (ed.), *Legal Professions: Work, Structure and Organization,* review appearing in *Law and Politics Book Review* (2002).

Richard Susskind, *Transforming the Law: Essays on Technology, Justice and the Legal Market Place,* review appearing in *Law and Politics Book Review* (2001).

J.A. Jolowicz*, On Civil Procedure* review appearing in *Law and Politics Book Review* (2000).

Adrian A.S. Zuckerman (ed.), *Civil Justice in Crisis: Comparative Perspectives of Civil Procedure* appearing in *Law and Politics Book Review* (2000).

Lawrence Friedman, *The Horizontal Society*, review appearing in *Law and Politics Book Review*  (1999).

Susan Sterett, *Creating Constitutionalism?  The Politics of Legal Expertise and Administrative Law in England and Wales*, review appearing in *Law and Politics Book Review*  (1997).

Carroll Seron, *The Business of Practicing Law:  The Work Lives of Solo and Small-Firm Attorneys*, review appearing in *Law and Politics Book Review*  (1996).

Cornell W. Clayton (ed.), *Government Lawyers:  The Federal Legal Bureaucracy and Presidential Politics*, review appearing in *American Political Science Review* (1996).

Stephen Daniels and Joanne Martin, *Civil Juries and the Politics of Reform*, review appearing in *Law and Politics Book Review*  (1995).

Roy B. Flemming, Peter F. Nardulli, and James Eisenstein, *The Craft of Justice:  Politics and Work in Criminal Court Communities*, review appearing in *American Political Science Review*  (1994).

-15-

Robert E. Litan (ed.), *Verdict: Assessing the Civil Jury System*, review appearing in *Legal Studies Forum* (1994).

Carol Harlow and Richard Rawlings, *Pressure through Law*, review appearing in the *Law and Politics Book Review* (1994).

**OTHER RESEARCH AND WRITING**

**Papers Presented at Conferences and Professional Meetings, 2001-2008:**

"Examining the Real Demand for Legal Services," paper presented at the ABA Litigation Section Symposium, Access to Justice, Atlanta, Georgia, December 4-5, 2008.

"Fee Regimes," paper presented at Workshop on Lawyer Fee Regimes, Australian National University, Canberra, Australia, August 6, 2008.
(Herbert M. Kritzer and Robert Drechsel) "Reporting Civil Litigation on Local Television News," paper presented at the Annual Meeting of the Law and Society Association, Montreal Canada, May 29-June 1, 2008, and at the 3rd annual Conference on Empirical Legal Studies, Ithaca, New York, September 12-13.

(Herbert M. Kritzer and Robert Drechsel) "Lawyers in the News," paper presented at the Annual Meeting of the Law and Society Association, Montreal Canada, May 29-June 1, 2008.

"Fee Regimes," presented at workshop on legal fees, Australian National University, Canberra, August 6, 2008.

"Experiencing Litigation in the U.S.," paper presented at International Symposium on Dispute Resolution and Civil Justice in the Legalizing Society, Institute of Law and Social Sciences, Meiji University, Tokyo, Japan, March 1-2, 2008.

"Studying Negotiation by Observation," paper presented at Association of American Law Schools Annual Meeting, New York, January 3-6, 2008.

"To Lawyer, or Not to Lawyer: Is That the Question?" paper presented at W.G. Hart Workshop, Institute for Advanced Legal Studies, London, June 26-28, 2007, at Law and Society Association Annual Meeting, Berlin, Germany, July 25-28, 2007, and at Conference on Empirical Legal Studies, New York University, November 9-10, 2007.

"The Arts of Persuasion in Science and Law: Conflicting Norms in the Courtroom," paper prepared for the 2007 Coronado Conference of the Project on Scientific Knowledge and Public Policy, May 3-4, Bretton Woods, New Hampshire.

(with Darryn Beckstrom) "*Daubert* in the States," paper presented at Empirical Legal Studies

-16-

Conference, Austin, Texas, October 27-28, 2006.

"Defending Torts: What Should We Know?" paper presented at conference on Tort Law and the Modern State, Columbia Law School, September 15-16, 2006.

"*Daubert* in the Law Office: Routinizing Procedural Change," paper presented at Annual Meeting of Law and Society Association, Baltimore, Maryland, July 6-9, 2006.

"'Law Is the Mere Continuation of Politics by Different Means': American Judicial Selection in the 21st Century," paper presented at the Clifford Symposium, DePaul Law School, April 20-21, 2006.

"The Commodification of Insurance Defense Practice," revised paper presented at Empirical Legal Studies Symposium, Vanderbilt Law School, February 17, 2006. Portions also presented at conference on The Plaintiffs' Bar, New York Law School, March 31-April 1, 2006.

"The Commodification of Insurance Defense Practice," paper presented at the annual meeting of the Law & Society Association, Los Vegas, Nevada, June 2-5, 2005, and at the W G Hart Workshop, Institute for Advanced Legal Studies, London, England, June 28-29, 2005.

"Disappearing Trials?  A Comparative Perspective," paper presented at the Symposium on the Vanishing Trial, San Francisco, California, December 12-14, 2003.

"Access to Justice for the Middle Class," paper presented at Symposium on Access to Justice for the New Century, Toronto, Ontario, May 28-29, 2003.

"A Good Reputation *Is* Money for the Contingency Fee Practitioner," Paper presented at the annual meeting of the Law & Society Association, Pittsburgh, Pennsylvania, June 5-8, 2003.

(Mark J. Richards, Herbert M. Kritzer, and Joseph L. Smith} "Deciding the Supreme Court's Administrative Law Cases: Does Chevron Matter?"  Paper presented at the annual meeting of the Midwest Political Science Association, Chicago, April 3-5, 2003.

(Herbert M. Kritzer, Mark J. Richards and Joe Smith) "Deciding the Supreme Court's Administrative Law Cases: Does *Chevron* Matter?" paper to be presented at meetings of the American Political Science Association, Boston, Massachusetts, August 29-September 1, 2002.

"Jurisprudential Regimes and Decision Making by the United States Supreme Court," paper presented at conference on Sociological Approaches to Constitutional Law. Socio-legal Construction of Constitutional Systems, International Institute for the Sociology of Law, Õnati, Spain, 23 - 24 May 2002.

(Mark J. Richards, Joe Smith, and  Herbert M. Kritzer) "Deciding Administrative Law Cases: Deference in Supreme Court Decision Making," paper presented at meetings of the Midwest Political Science Association, Chicago, Illinois, April 25-27, 2002.

-17-

"Seven Dubious Myths About Contingency Fees." paper presented at a symposium on Litigation in a Free Society, sponsored by the University of Pennsylvania Law School, the Washington University School of Law, and the Institute for Law and Economic Policy, Hollywood, Florida, March 15-16, 2002.

"Lawyer Fees and Lawyer Behavior in Litigation:  What Does the Empirical Literature Really Say?" paper presented at conference on What we Know and Don't Know about the Impact of Legal Services on the American Economy and Polity, University of Texas Law School, Austin, Texas, February 1-2, 2002.

"The Future Role of 'Law Workers': Rethinking the Forms of Legal Practice and the Scope of Legal Education," paper presented at conference on The Future Structure and Regulation of Law Practice, University of Arizona, James E. Rogers College of Law, Tucson, Arizona, February 22-23, 2002.

(Mark J. Richards and Herbert M. Kritzer) "Jurisprudential Regimes in Supreme Court Decision Making," paper presented at the 2001 Annual Meeting of the American Political Science Association, San Francisco, California, August 30- September 2.

(Herbert M. Kritzer and Mark J. Richards) "Conceptualizing Law for Empirical Analysis: Jurisprudential Regimes and Supreme Court Decision Making," paper presented at the 2001 Annual Meeting of the Law & Society Association, Budapest, July 4-7.

"The Impact of *Bush v. Gore* on Public Perceptions and Knowledge of the Supreme Court,"paper presented at 2001 Annual Meeting of the Law & Society Association, Budapest, Hungary, July 4-7.

"The Fracturing Legal Profession: The Case of Plaintiffs' Personal Injury Lawyers," paper presented at the 2001 W.G. Hart Workshop, Institute for Advanced Legal Studies (London), June 26-28, 2001.

"From Litigators of Ordinary Cases to Litigators of Extraordinary Cases: Stratification of the Plaintiffs' Bar in the Twenty-first Century," paper presented at the 2001 Clifford Symposium, DePaul Law School, April.

**CONSULTANCIES**

Consultant to the American Association for Justice, preparation of a critique of *Jackpot Justice*, November 2007-February 2008.

Consultant to the State Bar of Wisconsin's Access to Justice Study Committee, 2005-06.

Expert witness retained by Wienner & Gould, P.C. (Rochester, Michigan), in connection with a lawsuit concerning fees for consulting services regarding Medicare reimbursement, 2004-05.

Association of Trial Lawyers of America, survey of plaintiffs' practitioners, 2003-05.

-18-

World Bank, quality assessment of docket profiling study, Dominican Republic, 2001.

Herbert Smith (London solicitors), consultant on possible cross-national study of commercial litigation, 2001

World Bank, docket profiling study, Argentina, 2000.

Dinsmore and Shohl (law firm), Cincinnati, Ohio,  in connection with health monitoring law suit in West Virginia (propensity to sue), 2000-01.

Colorado Trial Lawyers Association (litigation patterns related to challenges to damage cap litigation), 1999-2000.

World Bank, use of public opinion surveys for institutional evaluation, 1999-2000.

Consultant in connection of attorney fee arbitrations in tobacco litigation settlements, 1998.

Consultant to a group of Wisconsin lawyers regarding proposed 30-day restriction on direct mail solicitation of potential clients, 1997.

Wisconsin Education Association Council (legal fees in class action settlement of pension case), 1997.

Wisconsin Supreme Court (State Justice Institute funded study of "consumer satisfaction" with Wisconsin courts), 1995-97.

Dow Chemical Company (propensity to sue issues in Dow Corning bankruptcy proceedings), 1996

American Judicature Society (punitive damages study), 1995-6

Consumer Lawyers of California (contingent fee issues regarding ballot referendum), 1995-96

Illinois Trial Lawyers Association (litigation patterns related to challenges to tort reform legislation), 1995

State Bar of Wisconsin (evaluation of pro bono survey), 1995

State Bar of Wisconsin (Commission on Legal Services), 1995-96

Alaska Judicial Council (study of Alaska's version of the English Rule), 1994-95

State Bar of New Jersey (analysis of disciplinary system), 1993-94

Center for Public Representation (National Institute of Justice funded study of adult guardianship in Wisconsin), 1991-93

-19-

State Bar of Wisconsin (analysis of State Bar's survey of Wisconsin jury verdicts), 1990

American Judicature Society (study of Rule 11), 1989-92

Ralph Knowles, Esq. (survey of Alabama lawyers concerning remititur in large damage awards), 1989

California Trial Lawyers Association (contingent fee issues regarding ballot referendum), 1988

Samuel Porter, Esq., Guardian ad Litem in Bendectin litigation (analysis of propensity to sue issues), 1984

Manville Corporation (analysis of propensity to sue issues), 1982, 1984

# EXHIBIT B

| Rank | Drug | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|------|------|------|------|------|------|------|------|
| Class Total | | $5,339,397 | $5,316,921 | $4,877,190 | $4,597,837 | $3,692,986 | $1,790,628 |
| 1 | Celebrex | $2,748,611 | $2,567,873 | $2,586,215 | $2,549,101 | $2,166,603 | $1,417,391 |
| 2 | Vioxx | $1,342,236 | $1,813,391 | $1,837,680 | $2,048,736 | $1,526,382 | $372,697 |
| 3 | Bextra | $1,248,550 | $935,657 | $453,295 | ------ | ------ | ------ |

| Rank | Drug | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|------|------|------|------|------|------|------|------|
| Class Total | | 50,742 | 53,890 | 53,261 | 52,465 | 45,541 | 22,384 |
| 1 | Celebrex | 23,893 | 23,556 | 26,006 | 27,060 | 24,911 | 17,539 |
| 2 | Vioxx | 13,994 | 19,959 | 22,044 | 25,406 | 20,630 | 4845 |
| 3 | Bextra | 12,856 | 10,374 | 5211 | ------ | ------ | ------ |