UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:   VIOXX PRODUCTS LIABILITY LITIGATION<br><br>**This document relates to All Cases** | CIVIL ACTION<br>NO. 2:05-MD-01657-EEF-DEK<br>SECTION L<br>JUDGE ELDON E. FALLON<br>DIVISION 3<br>MAGISTRATE DANIEL E. KNOWLES III |

**COUNTY OF NEW YORK**

**STATE OF NEW YORK**

### AFFIDAVIT OF GEOFFREY P. MILLER

BEFORE ME, the undersigned authority, on this day personally appeared GEOFFREY P. MILLER, and after having first been duly sworn upon oath, states as follows:

### Background and Qualifications

1. I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York. I have been retained to provide an expert opinion as to the appropriateness of this Court's capping order of August 27, 2008. In that capacity, I make the following representations on the basis of my own personal knowledge. If called as a witness, I could and would competently testify to the matters stated herein.

1

Mille-1

2.  I graduated from Columbia University Law School in 1978, where I served as Editor-in-Chief of the Law Review.  I was a judicial clerk to Judge Carl McGowan of the U.S. Court of Appeals for the District of Columbia Circuit and to Justice Byron R. White of the United States Supreme Court.  After two years as an Attorney-Advisor in the U.S. Department of Justice Office of Legal Counsel, where I provided legal advice to the President and to the heads of government departments, I practiced civil litigation at the Washington D.C. law firm, Ennis, Friedman, Bersoff & Ewing.  I joined the faculty of the University of Chicago Law School in 1983 and there served as Associate Dean, Kirkland & Ellis Professor, Director of the Program in Law and Economics, Director of the Legal Theory Workshop, and Editor of the Journal of Legal Studies.  I joined the faculty of NYU Law School in 1995.  Among other courses, I teach Civil Procedure, Complex Litigation, Banking Regulation, Corporations, and Legal Ethics/Legal Profession.

3.  I am the author, co-author, or editor of five books and nearly two hundred scholarly articles, as well as many shorter publications.  I have served as a member of the board of directors of the American Law and Economics Association and am co-founder, board member, and former co-president of the Society for Empirical Legal Studies, an organization devoted to promoting the study of legal problems through empirical or statistical techniques.

4.  One of my principal areas of scholarship has the analysis of attorneys' fees and expenses in American civil litigation.  My publications dealing with attorneys' fees and expenses include the following:

- A New Look at Judicial Impact:  Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., ___ Washington University

2

Journal of Law & Public Policy ___ (2009) (with Theodore Eisenberg and Michael Perino);

- Judicial Review of Class Action Settlements, Journal of Legal Analysis (Winter 2009) (with Jonathan R. Macey) (on-line peer-reviewed journal from Harvard Law School, viewable at https://ojs.hup.harvard.edu/index.php/jla/article/view/6/21);

- Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg);

- Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003);

- Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey);

- The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997);

- The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989);

- The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, University of Texas Law and Economics Research Paper No. 147; NYU Law and Economics Research Paper No. 09-09; available at SSRN: http://ssrn.com/abstract=1352732 (with Charles Silver).

5. My 2004 article on attorneys' fees, co-authored with Professor Theodore Eisenberg, was featured on the first page of the business section of the *New York Times* and was referred to during congressional debates on the legislation now known as the Class Action Fairness Act. It is the leading statistically controlled analysis of attorneys' fees in class action cases.

6. I have testified or provided affidavits, declarations, or expert reports on attorneys' fees issues in class actions, shareholders' derivative suits, bankruptcy

3

Mille-3

proceedings, and other major civil litigation, in federal and state courts, both in support of and in opposition to plaintiffs' counsel's requests for fees.

7.  I also possess expertise in the area of legal ethics and professional responsibility.  I have taught classes in this area numerous times since entering academics in the early 1980s.  I have acted as a consulting or testifying expert in legal ethics matters and have lectured on professional responsibility topics at continuing legal education seminars, law firms, and academic conferences.

8.  My publications on legal ethics include:

- Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007);

- From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005);

- Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005);

- Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003);

- Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003);

- Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey);

- Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998) (with Michael Klausner and Richard Painter);

- Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998);

- An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in

Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004);

- Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey);

- Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987).

9. I have appeared as a guest on television and radio programs, including NBC Nightly News, CNN, and Court TV, and have been quoted as an expert on legal issues in the New York Times, the Wall Street Journal, and many other periodicals. My resume is included as Appendix A.

## **Materials Reviewed**

10. In preparing this opinion I have reviewed materials and documents pertinent to this case, including but not limited to (1) Settlement Agreement dated November 9, 2007; (2) Order and Reasons, August 27, 2008; (3) Memorandum in Support of Motion for Reconsideration/Revision of Order Capping Contingent Fees and Alternatively for Entry of Judgment; (4) Order dated December 19, 2008; (5) Affidavit of Harry S. Hardin, III; (6) Memorandum in Opposition to Motion for Reconsideration/Revision of Order Capping Contingency Fees. I have also reviewed pertinent case law and academic commentaries, and have discussed this matter with counsel for the Vioxx Litigation Consortium.

## **Summary of Opinion**

11. As set forth more fully below, it is my opinion that there was no basis for the Court to issue an order capping attorneys' fees at 32%.

Mille-5

**Opinion**

12. My opinion is organized as follows. I first examine whether a fee cap would be appropriate *outside* the MDL setting, looking at both the authority of the Court to cap fees in this context and – assuming the Court has the authority – the reasonableness of a 32% cap. My conclusion is that outside the MDL context the Court would have no authority to issue a capping order and that, if the Court had authority, a 32% cap would be unreasonable. I then consider whether the analysis changes given that the Vioxx cases have been consolidated under the multidistrict litigation process and that a global settlement agreement has been achieved. I conclude that the analysis does not change: the MDL process gives the Court no greater authority than it would have in an individual case, and – if the Court has such authority – a 32% cap is not reasonable.

<u>Analysis of Fee Caps Outside the MDL Process</u>

<u>Judicial Authority</u>

13. Attorneys' fees in the United States are governed by the "American Rule" under which each party pays his or her own attorney regardless of outcome. The American Rule contrasts with the "English Rule," applicable in the United Kingdom, continental Europe, and other countries, under which the loser pays the winner's reasonable fees.

14. The American Rule recognizes and privileges privately-negotiated fee arrangements between lawyer and client. Unlike the English Rule, which injects courts or court-associated taxing masters into the process, the American Rule removes the task of setting or scrutinizing fees from the judicial purview.

Mille-6

15. Courts in the United States play a role in setting attorneys' fees only in unusual circumstances. These include the following:

(a) Retainer agreements between lawyer and client are contracts and are enforced on the same general terms as other contracts. In the event of a dispute between lawyer and client, the court may be asked to interpret the terms of a retainer agreement or to assess the validity to any defenses asserted to the validity or enforceability of such an agreement. Relevant considerations in this context may include the attorney's professional obligation not to charge an unreasonable fee and the impact of state statutes, if any, regulating the fees that an attorney may charge in defined categories of cases.

(b) Judges have authority to award fees or costs against attorneys or parties who have displayed bad faith in their conduct of litigation.

(c) A number of state and federal statutes contain "fee-shifting" provisions requiring defendants to pay the reasonable fees of prevailing plaintiffs. In cases involving such statutes the courts may be required to determine the amount of a reasonable fee for plaintiffs' attorneys.

(d) Many contracts contain clauses setting forth fee arrangements that differ from the background American Rule. For example, commercial loan contracts may require the debtor to pay the creditor's fees in the event litigation under the contract results in a judgment for the creditor. In cases brought under such contracts courts may be required to determine the amount of a reasonable fee.

(e) Courts are often required to award reasonable fees to prevailing plaintiffs in class actions and shareholders' derivative cases. The rationale for judicial involvement in these cases is that the ordinary procedures for clients contracting about legal fees are

Mille-7

absent. In class actions, the clients are dispersed and do not negotiate with the attorney at all. In shareholders' derivative cases, the client – the corporation – is dominated and controlled by defendants who cannot be expected to negotiate in good faith over the matter of fees for derivative counsel.

16. None of these exceptions to the general American Rule of judicial non-involvement is present here. This Court is not asked to address fee disputes between attorneys and clients; there are no allegations of bad faith; no fee-shifting statutes are in issue; no contractual exceptions to the American Rule are involved; and these cases are neither class actions nor shareholder derivative suits. This multidistrict proceeding involves nothing but individual actions which have been consolidated for pre-trial purposes. The individual cases are classic examples of ordinary private litigation in which the courts play no substantive role over the issue of fee-setting.

17. Accordingly, outside the context of an MDL proceeding, it is clear that traditional rules and practices applicable in American litigation provide no authority to cap fees in Vioxx cases.

<u>Reasonableness of a 32% Cap</u>

18. Even if the Court did have authority to cap fees in individual, non-MDL Vioxx cases, a 32% cap would be unreasonable.

19. Percentage fees are the best means for compensating counsel in these cases. Percentage fees offer important advantages: they align the interests of attorney and client; reward the attorney for exceptional results; are easy to calculate and known in advance; reduce the risk of *ex post* disputes between attorney and client; protect against the danger that attorneys will "run up the hours;" and reduce the client's risk by sharing

8

the consequences of good and bad outcomes with the attorney.  This Court's capping order recognizes that percentage fees are an appropriate means for compensating counsel.

20.  Percentage fees are higher in risky cases than in safe ones.  This pattern is observed across categories of litigation.  Modest percentages – 15% to 20% – are observed in airline disaster cases where liability and damages are not in doubt.  But as risk increases, so does the percentage.  Attorneys in personal injury cases charge fees of between 33% and 40% with expenses separately reimbursed.  Fees in asbestos cases, which may be more challenging due to problems of establishing exposure and causation, run between 33% and 45% of total compensation and average about 39%.  James S. Kakalik et al., Variation in Asbestos Litigation Compensation and Expenses 83-84 (Rand Institute for Civil Justice 1984).  Contingent fees of 50% are observed in medical malpractice cases, which are generally thought to be among riskiest types of litigation. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tulane Law Review 1809, 1842-43 (2000).

21.  Vioxx cases fall on the high end of the risk scale.  Litigation of a Vioxx case on an individual basis would require the plaintiff's attorney to investigate the client's claims and obtain demographic and health information, retain expensive expert and consulting witnesses, engage in deposition and document discovery, brief and argue motions to dismiss and motions for summary judgment, and expend hundreds if not thousands of hours obtaining and analyzing the results of discovery – all with no assurance of payoff at the end of the day.  This was not litigation for the poorly funded or the faint of heart.

22. Merck was a committed and fierce adversary with billions of dollars at stake. It announced and for a substantial period carried through on its plan to try each and every case. Thus a plaintiffs' attorney who took on a Vioxx case faced the prospect of having to litigate the matter all the way through trial and even an eventual appeal.

23. Although Merck had removed Vioxx from the market, this was not an admission of liability. Establishing general and specific causation was challenging, especially because events such as heart attack or stroke have many causes other than Vioxx. Damages would be an issue in every case. The learned intermediary defense was a potential obstacle. Merck's pre-emption defense threatened to destroy the entire case. Plaintiff's expert witnesses would face inevitable *Daubert* challenges, which if successful would bar the experts from testifying.

24. Events in the present proceeding underscore the magnitude of the risks. Only one of the six bellwether cases resulted in a verdict against Merck, and this Court set aside the verdict as excessive only a few days after it was handed down.

25. In light of these considerations, contingent fees larger than 32% would clearly be appropriate and enforceable in individual litigation. It is my opinion that, outside the MDL context, a fee of 40% – commonly found in the retainer agreements affected by this Court's capping order – is appropriate and enforceable given the risk profile of these cases. This Court, in fact, recognized in its August 27 Order that on an individual case basis, a fee of up to 40% could be reasonable.

26. Accordingly, outside an MDL proceeding there is no basis for a court to impose a 32% cap on a contingent fee in these cases.

Mille-10

<u>Analysis of Fee Caps Within the MDL Process</u>

27.  The remaining question is whether the MDL context changes the analysis and justifies a fee cap which would otherwise be inappropriate.  In my opinion the MDL context does not alter the analysis: a fee cap is not appropriate either outside of or within the MDL setting.

<u>Authority</u>

28.  The MDL process consolidates related cases for pretrial purposes and thereby achieves efficiencies and cost-savings, protects defendants against vexatious discovery and inconsistent orders, promotes consistency in pretrial judicial decisions, and facilitates settlements.  The MDL process was never intended, however, to expand the authority of the transferee court.  The transferee court has only those powers that a federal district court would otherwise exercise over pretrial proceedings in individual cases brought originally in that court.  Thus there is no basis, by virtue of the fact of MDL transfer, for a district court to exercise regulatory authority over attorneys' fees.

29.  Apparently recognizing that authority to cap fees cannot be derived from the MDL statute, this Court's Order of August 27, 2008 concluded, citing the *Zyprexa* case, that the Vioxx global settlement "may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness."  The Court thus derived its authority to cap fees from the similarity it perceived between this MDL proceeding and a class action.

30.  Although the Court refers to the present proceeding as a quasi-class action, this is *not* a class action – not even one "softened with a quasi." *City of Yonkers v.*

11

*United States*, 320 U.S. 685, 695 (1944). These cases were not brought under Rule 23 and this Court has never certified a class, even for settlement purposes. The fact that these cases, in their present procedural posture, may have points of *similarity* to a class action does not establish that they are the *same* as a class action. Nothing is gained, analytically, by describing one as a "quasi" version of the other.

31. Not only are these cases not a class action: they *could not have been brought* on a class basis. The Supreme Court's decision in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) was a putative nationwide class action brought on behalf of persons exposed to asbestos. The Supreme Court held that the case could not be certified, even as a settlement class, because of differences among the claims of class members – claims which arose under different state laws and which involved plaintiffs exposed to different products, in different ways, over different periods, for different amounts of time, and who suffered health consequences which ranged from the minor to the devastating. Likewise, in the present cases, the claims alleging injury from Vioxx are diverse, involving people with different pre-existing health conditions, different levels of exposure to Vioxx, different adverse health events, different family health histories, different ages, genders, and races, and different levels of post-event impairment. *Amchem* thus makes it clear that these cases could not be certified as a class action. In fact, this Court, recognizing the individual nature of the underlying claims, denied a motion for class certification in these cases.

32. Equating this mass-tort proceeding with a class action – and then using the powers granted to courts in class actions as a justification for capping fees – would, in effect, amend Rule 23 to include within its terms a type of litigation which the Rule does

Mille-12

not encompass. But such an extension of power is unwarranted. As the Supreme Court stressed in *Amchem*, it is of "overriding importance" that federal courts not "amend a rule outside the process Congress ordered. . . ." Id. at 620.

33. Even if Rule 23 authorized the Court to cap fees in the present cases – which it does not – its use for this purpose would violate the Rules Enabling Act, 28 U.S.C. § 2072(b), which authorizes only such procedural rules as do not "abridge ... any substantive right." In the class action context, courts do not abridge substantive rights when they award attorneys' fees out of a common fund because no one has a substantive right to obtain any particular fee out of the common fund. But the fee cap imposed in the present case *does* abridge substantive rights: it impairs obligations under private fee contracts between attorneys and clients.

34. In short, the concept of a "quasi-class action" seeks to have it both ways: to *equate* the MDL cases with class actions in order to obtain the benefit of the powers that flow from class certification, on the one hand; and to *separate* the MDL cases from class actions in order to avoid complying with the requirements of Rule 23 and the Rules Enabling Act, on the other. But having it both ways is not consistent with the intent of Congress or the drafters of the federal rules.

35. In any event, the analogy between a consolidated MDL proceeding and a class action is fundamentally flawed. The defining feature of a class action is the presence of absent class members – parties whose legal rights are subject to determination in the action but who are not represented by individual counsel. Concerns about protecting absent class members inform many important features of class action practice. The requirements of typicality, adequacy, commonality, and predominance all

Mille-13

address these concerns. So does the requirement that the court assess whether a proposed settlement is fair, adequate and reasonable to the class. Most importantly for present purposes, judicial control over counsel fees in class action cases is also designed to protect absent class members: the concern is that class attorneys will otherwise appropriate too much of the settlement funds for themselves at the expense of the class.

36. These concerns about absent class members are not pertinent, however, to aggregated individual cases. The plaintiffs in this Court *are* represented by individual counsel. All or virtually all have negotiated private retainer agreements with their attorneys which include explicit understandings as to fees. Accordingly, the rationale for the class action requirement of judicial scrutiny of attorneys' fees does not carry over into the MDL context.

37. This Court's August 27 Order also suggests that a power to cap fees can be inferred from the Court's general equitable powers. The argument here is that because the class action procedure is inherently equitable in nature, the powers exercised by courts when adjudicating class actions are merely instances of a more general equitable jurisdiction. Therefore, given that these consolidated MDL cases resemble class actions, the Court has equitable authority in MDL cases similar to the authority it exercises in class actions – including the authority to control attorneys' fees. This argument seeks to avoid the difficulties inherent in attempting to derive powers from Rule 23 when the present proceeding is not governed by that rule. But this more general equitable theory also fails.

38. Federal courts do not have free-floating equitable jurisdiction to exercise extraordinary powers when administering aggregate litigation. It is doubtful that the

Mille-14

equitable power of federal courts would ever extend so far as to authorize the courts to trump privately negotiated fee agreements in the absence of fraud, overreaching, or duress. But even if federal courts did have such powers, those powers would be curtailed by Rule 23, which specifies and limits that types of cases within which such powers can be exercised.

39. Nor can equitable authority to cap fees be derived from the MDL statute. That statute does not confer any powers on the transferee court which the court did not otherwise possess. An action legal in nature is not magically transformed into an equitable action when sent to a transferee court. It remains an action in law; and the transferee court has only such adjudicatory authority as it would have had if the action had been filed first in the transferee court.

40. In a related argument, the Tulane Legal Clinic contends that a power to cap fees stems from the Court's inherent authority to control the conduct of litigation pending before it. But inherent authority is limited to matters such as the prevention of bad faith conduct, the enforcement of settlements, the prevention of abusive tactics, the control of frivolous litigation, and the administration of technical details and policies inherent in the litigation process. Inherent authority does not confer an unfettered authority to regulate privately-negotiated attorneys' fees. The exercise of such authority is particularly inappropriate given the fact that attorneys' fees *are* regulated by other means – the prohibition against unreasonable fees administered by courts and bar disciplinary committees, and, in some states, specific statutes that set or limit fees for particular categories of cases.

15

Mille-15

41.  The Tulane Legal Clinic also suggests that authority to regulate fees may be derived from the terms of the settlement agreement itself, or from clauses in specific contingent fee contracts.  I have examined the settlement agreement and representative retainer agreements and find no authority in either for the Court to cap fee percentages.

42.  The Court also justifies its authority to cap fees by citing state statutes that impose limits on contingent fees in certain categories of cases.  These statutes do not provide the requisite authority.  While they do impose limits on contingency fees in certain cases, they do not authorize courts to reject fee agreements *sua sponte* or to set fee caps.  Nor do fee statutes in a few states provide persuasive evidence of a nationwide policy.  On the contrary, the fact that only a few states seem to have rules on point indicates that the general consensus among the states is that contingent fees should *not* be capped.

43.  Although this Court's Order appears to draw on state fee statutes as sources of information about policy rather than as controlling rules of decision, it should be noted that the cited statutes cannot be used as direct sources of law.  To the degree state law provides the rule of decision on the question of fee caps, the Court's task is to investigate and apply the law applicable to *each individual case*.  The "Esperanto" approach to state law in aggregate litigation – discerning a nationwide standard from a composite of state rules – has rightly been rejected as inconsistent with the fundamental principle of the *Erie* doctrine.  See *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).

44.  This Court's fee capping order was undoubtedly undertaken with a view to protecting what the Court perceived as the best interests of the MDL clients.  But it is not the judicial task to rewrite legal rules, even if doing so would serve desirable policy

Mille-16

goals. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), is instructive in this regard. The Judicial Panel on Multidistrict Litigation transferred a lawsuit to a federal district court judge. After adjudicating pretrial matters, the judge invoked the federal change-of-venue statute to assign the case to himself for trial. There were potentially sound policy reasons for the court maintaining jurisdiction: having managed the pretrial proceedings, the judge may have been well qualified to handle the trial. But these arguments were unavailing in light of statutory language requiring that the case be sent back to the court where it originated: "[the defendant] may or may not be correct that permitting transferee courts to make self-assignments would be more desirable than preserving a plaintiff's choice of venue . . . , but *the proper venue for resolving that issue remains the floor of Congress.*" Id. at 964 (emphasis added). By the same reasoning, the proper venue for resolving questions about judicial power to regulate fees in MDL proceedings is the Congress or the federal rulemaking procedure – not this Court.

<u>Reasonableness of a 32% Cap</u>

45. Even if this Court has *power* to regulate attorneys' fees in this MDL proceeding, the decision to cap fees at 32% is unreasonable.

46. In general, the proper perspective from which to evaluate the reasonableness of an attorneys' fee – or indeed the fairness of any contractual promise – is that of the time the term was negotiated. Many of the fee agreements here were negotiated prior to the action of the Judicial Panel consolidating the Vioxx cases in this Court. As already noted, the trial of any individual Vioxx case would be extraordinarily risky and expensive, involving contingent outlays by the attorney of potentially millions of dollars

17

in expenses and thousands of hours of work. Thus, fee agreements negotiated before the transfer order had to take account of the possibility that the case would have to be litigated on an individual basis.

47. The litigation also presented daunting risks for attorneys who signed clients after the transfer order. There was no assurance, at the time of the transfer, that the parties would reach a global settlement, or that they would reach any settlement at all. Merck vowed to undertake a scorched earth litigation strategy, and demonstrated, during the early phases of this proceeding, that it possessed the resources and tenacity to carry through on the threat. The problems of establishing causality and damages were significant obstacles, as were defenses such as pre-emption and the learned intermediary doctrine.

48. In some respects, in fact, the transfer to a single court increased, rather than decreased, the plaintiffs' attorneys' risk. Facing "break the bank" damages exposure, Merck announced it would undertake an all-out effort to avoid liability. Further, plaintiffs' attorneys with inventories of Vioxx cases, who outside the MDL process might experience only a small loss if one case was unsuccessful, now confronted the prospect of forfeiting their investments in all cases – a risk heightened by the fact that only one of six bellwether trials resulted in a verdict for the plaintiff.

49. Although courts appropriately evaluate the reasonableness of attorneys' fees from the perspective of the time the fees are negotiated, some jurisdictions also consider the impact of subsequent developments. In these jurisdictions, a fee reasonable when negotiated may still be rejected if later events make the lawyer's compensation so grossly disproportionate to the value of the services rendered and the risks undertaken as to shock

Mille-18

the conscience.   Even viewed from an ex post perspective, however, a 32% fee cap is unwarranted.

50.   Attorneys in these cases undertook tremendous efforts, at great personal risk and expense, to litigate these cases prior to the global settlement – including, as the Tulane Legal Clinic acknowledges, the investment of more than $13.5 million in expenses alone.  Those efforts properly deserve to be compensated.  Moreover, significant tasks remain for counsel even in the wake of the global settlement.  Counsel must monitor the settlement for compliance, must continue to represent, inform, and advise their individual clients, must assist clients in filing claims and complying with the settlement procedures, and must advocate for clients whose claims are rejected in whole or in part.  In light of these facts, a fee greater than 32% is reasonable even though the global settlement relieved plaintiffs' attorneys of costs, risk and expense that they would otherwise have incurred.

51.   Imposing a cap on attorneys' fees in the present cases because of ex post developments would have potentially harmful incentive effects for future MDL litigation.  Any contingent fee reflects the attorney's evaluation about the risks in the case at the time the retainer agreement is signed.  But if the attorney knows that a fee contract may not be honored ex post, he or she may decide not to take on a case in the first place.  The consequence could be that clients may not be able to find legal representation in matters that are likely to go to an MDL proceeding, and to reduce the efficiency of private enforcement of law.

Conclusion

52.  For the reasons stated above, it is my conclusion that there was no basis for the Court to issue an order capping attorneys' fees at 32%.



GEOFFREY P. MILLER

Subscribed and sworn to
before me on the
30th day of March, 2009.

Notary Public in and for
the State of New York

O. Patricia O'Brien
Notary Public, State of New York
No. 01OB6174350
Qualified in Queens County
Commission Expires September 17, 2011

My commission expires _____

# Geoffrey P. Miller

New York University Law School                      37 Washington Sq. West
40 Washington Square South Suite 411G               Apartment 3A
New York, New York 10012                            New York, N.Y. 10011
(212) 998-6329 (office)                             (212) 228-1926
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

Work Experience:

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)

Visiting Professor, Harvard Law School, Fall 2009 (invited)
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
        Summer 2009 (invited)
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008
Visiting Scholar, University of Minnesota Law School, Spring 2008
Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of Frankfurt,
        Germany, Summer 2004, Summer 2005
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006; Spring
        2009 (invited)
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
        2004, 2005, 2007, 2008.
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992, Spring

Mille-21

1996; Winter 1997, Summer 2005, Spring 2008
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Scholar, Universidad Tocurata de Tella, Buenos Aires, Argentina, Fall 1994
Visiting Professor of Law, New York University, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

Education:

Columbia Law School, J.D. (1978)

Editor-in-Chief, Columbia Law Review (1977-78)

Princeton University, A.B. *magna cum laude* (1973)

Publications:

Books:

The Economics of Ancient Law (editor) (Edward Elgar, forthcoming 2009)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic
Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in
Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre
and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI
Press 1993) (with Jonathan R. Macey)

2

The Law of Banking and Financial Institutions, Little, Brown & Co. 1992 (with Jonathan R. Macey, under title Banking Law and Regulation); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey, under title Banking Law and Regulation), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell, under title Banking Law and Regulation); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey)

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles:

Legal Ethics/Legal Profession

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008 (manuscript) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action

Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

<u>Civil Procedure:</u>

Managing Lead Attorneys' Compensation In Multi-District Litigations: Problems And A Proposal (manuscript) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 179 (2009) (with Samuel Issacharoff)

Preliminary Judgments, __ Illinois Law Review __ (forthcoming)

A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., ___ Washington University Journal of Law & Public Policy ___ (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), ___ Analisi Giuridica dell'Economia ___ (forthcoming)

Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement (forthcoming).

Pleading after *Tellabs*, __ Wisconsin Law Review ___ (forthcoming)

4

Mandatory Arbitration For Customers But Not For Peers: A Study Of Arbitration Clauses In Consumer And Non-Consumer Contracts. 92 Judicature 118 (November-December 2008) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, ___ Boston University Law Review ___ (with Theodore Eisenberg) (forthcoming)

All-or-Nothing Versus Proportionate Damages, Journal of Legal Studies  (with Shmuel Leshem)

Judicial Review of Class Action Settlements, Journal of Legal Analysis (Winter 2009) (with Jonathan R. Macey) (on-line journal viewable at https://ojs.hup.harvard.edu/index.php/jla/article/view/6/21)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane

Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996)(with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

Corporate, Contract and Securities Law:

A Simple Theory of Takeover Regulation in the United States and Europe, __ Cornell International Law Journal __ (with Guido Ferrarini) (forthcoming)

Bargains Bicoastal: New Light on Contract Theory, __ Cardozo Law Review __ (forthcoming)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, __ Cardozo Law Review __ (forthcoming) (with Theodore Eisenberg)

The Market for Contracts, __ Cardozo Law Review ___ (forthcoming) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today

629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990)(with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987)(with Jonathan R. Macey)

Constitutional Law:

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

Mille-28

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

Financial Institutions:

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, __ Journal of Corporation Law ___ (forthcoming 2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law  (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic

Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund's Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998)(with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Mille-30

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction Des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito.  El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

Legal History:

The Common Law Origins of the Necessary and Proper Clause, forthcoming in Gary Lawson, ed., The Origins of the Necessary and Proper Clause (Cambridge University Press)

*Meinhard v. Salmon*, in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

Jurisprudence:

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George
Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the
Competition Between Liberalism and Democracy, 25 Cornell International Law Journal
277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law
Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public
Policy 401 (1987)

Ancient Law:

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of
Exodus 32 (manuscript)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and
Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East
113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law
Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and
Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law
Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and
Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related
Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern
Studies 105 (1995)

Mille-34

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

Law and Society:

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Norm Enforcement in The Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

Other:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

Book Reviews:

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The

Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

Major Lectures:

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

Journal Referee Reports

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization

Conferences Organized:

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, scheduled for Fall 2008).

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic

policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors. Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007). Major conference (425 participants) exploring all aspects of the empirical study of law. Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007). Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard. Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006). Major conference exploring all aspects of the empirical study of law. Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997. This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions. Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996). This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and

Mille-37

scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995). This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995). This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law. The proceedings are being published as two special issues of the Chicago-Kent Law Review, and as a book published by the Robbins Collection, Berkeley, California.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994). This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

Shorter Works:

A list of shorter publications is contained as Appendix A.

Professional Memberships and Positions:

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Advisory Committee, American Law Institute Project on Principles of the Law
    of Complex Litigation
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and

Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
    Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
    Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
    of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

Courses:

Legal Profession (1985-93; 1996-98; 2003-2005)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93) (with Merton Miller); 1996-97
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004)
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)

Litigation:

Brief and Reply Brief for Plaintiff-Appellant, Glancy v. Taubman Centers, Inc.
No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., In Re: Visa
Check/Mastermoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued Moran v. Household Finance Corp. (the "Poison Pill" case) in
the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District
Courts, and state trial and appellate courts.  Conducted depositions and other pretrial
discovery.  (1982-1983)

Mille-39

Briefed and argued <u>Hodges v. Metts</u>, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of <u>American Psychological Association v. Birch Tree Press, et al</u>. (U.S. District Court, Washington, D.C. 1983).

<u>Expert Witness Experience (past five years)</u>:

<u>Miller v. De Rance</u>, No. 662-911, Milwaukee County Circuit Court (Wisconsin) (1987) (deposition).

<u>900 Service Corporation v. Bishop</u>, 18th Judicial Circuit Court, Du Page County, John Teschman, Judge (1988) (deposition and testimony).

<u>Ventre v. Datronic Rental Corporation</u>, No. 92 C 3289 (N.D. Ill.) (1993) (testimony).

<u>Isaacson v. Keck, Mahin & Cate</u>  No. 92 C 3105, United States District Court, Northern District of Illinois (1995) (written opinion).

<u>Ashcraft v. Highland Partners, et al.</u>  Case No. 91 L 2249, Cook County, Illinois Circuit Court (1995) (deposition and testimony).

<u>Frailan Sendejo, et al. v. Texas Farmers Insurance Company, et al.</u>, No. 95-08-09165-CV, 365th Judicial District, Zavala County, Texas; and <u>Armando Martinez, Jr., et al. v. Allstate Insurance Company, et al.</u>, No. 95-08-09169-CBV, 365th Judicial District, Zavala County, Texas (1996) (deposition and testimony).

<u>Weatherford Roofing Company v. Employers National Insurance Company et al</u>, No. 91-05637, District Court of Dallas County, Texas (1996) (deposition and testimony).

<u>State Farm Mutual Automobile Ins. Co., et al. v. The Attorney General of Texas et al.</u>, No. 9601410, District Court, Travis County, Texas, 98th Judicial District (1996) (deposition and testimony).

<u>First American Corp. et al. v.  Clark Clifford, et al.</u>, Civil Action No. 7071-95, Superior Court, District of Columbia (1997)(deposition).

<u>Kolsrud v. Equitable Life Insurance Company of Iowa</u>, Arizona Superior Court, Pima County, No. 320838; <u>Elkins v. Equitable Life Insurance Company of Iowa</u>, United States District Court, Middle District of Florida, Civ. Action. No. 96-296-CIV-T-17B (1997) (declaration).

<u>Duhamie v. John Hancock Mutual Life Insurance Co.</u>, United States District Court, District of Massachusetts, No. 96-10706-GAO (1997) (declaration).

Mille-40

In re: New England Mutual Insurance Company Sales Practices Litigation, United States District Court, District of Massachusetts, MDL-1105 (REK)(1997) (declaration).

Grove v. Principal Mutual Life Insurance Co., United States District Court, Southern District of Iowa No. 40976-CV-70224 (1998) (declaration).

In re: General American Sales Practices Litigation, United States District Court, Eastern District of Missouri, No. MDL 4:97md1179CDP (1998) (declaration).

Bradley v. Equitable Variable Life Insurance Company, Supreme Court of the State of New York, Kings County, No. 96-25667 (1998) (declaration).

State of Texas v. Mobil Oil Co., No. 95-08680-B, Travis County, Texas (1998) (testimony).

Russo v. Massachusetts Mutual Life Insurance Company, Index No. 96-0368-WJR, New York State Supreme Court, County of Tompkins (1998) (declaration).

Zarrella v. Minnesota Mutual Life, C.A. No. 96-2782, Superior Court, State of Rhode Island, Providence S.C. (1998) (declaration).

Lugrin v. American Home Shield, C.A. No. 9755341, 295th Judicial District Court, Harris County, Texas (1998) (testimony).

Richard P. Ieyoub v. Philip Morris Inc. et al., No. 98-6473, 14th Judicial District Court, Parish of Calcasieu, Louisiana (Louisiana Tobacco Litigation) (affidavit and videotaped testimony).

Shawn Henry v. Sears, Roebuck and Co., et al., Case No. 98 C 4110, United States District Court, Northern District of Illinois (declaration and testimony).

State of Texas v. The American Tobacco Company, et al., No. 5:96-CV-0091, United States District Court, Eastern District of Texas (affidavit)

In re Mexico Money Transfer Litigation, Nos. 98 C 2407 and 98 C 2408, United States District Court, Northern District of Illinois (declaration and testimony)

Benchmark Holdings, et al. v. Duane, Morris & Hecksher, No. 1584, Court Term July 1999 (Circuit Court, Cook County, Illinois) (declaration and deposition).

Shaw v. Toshiba America Information Systems, No. 1:99CV0120 (U.S. District Court, Eastern District of Texas) (declaration and testimony)

S1 Corporation Securities Litigation, No. 1:00-CV-1156-BBM, United States

District Court, Northern District of Georgia (declaration)

Perryman v. ExxonMobil Corporation, No. 1:00-CV-00168-TH, United States District Court, Eastern District of Texas (declaration)

Thurmond v. Compaq Computer Corp., No. 1:99-CV-711, United States District Court, Eastern District of Texas (declaration and deposition)

In Re Auction Houses Antitrust Litigation, No. 00 CIV 0648 (LAK), United States District Court, Southern District of New York (declaration)

Rowe v. National Western Life Insurance Company, No. 00-00704, District Court of Texas, 345th Judicial District (2001) (affidavit and deposition)

LaPray v. Compaq Computer Corp., Cause No. A-162, 152 (2001) (60th Judicial District, Jefferson County, Texas (report)

Weil v. Long Island Savings Bank, 94 Civ. 1292 (TCP)(E.D.N.Y. 2001)(report and deposition)

Kropinski v. Johnson & Johnson, No. L-8886-96 (N.J. Supr., Camden County 2001)(affidavit)

In re: Triton Energy Litigation Securities Litigation, No. 598CV256 (E.D. Tex. 2001)(report, deposition, and testimony)

Triad Industries, Inc. v. United Parcel Service, Inc., Case No. 00 L 600 (Circuit Court, Third Judicial Circuit, Madison County, Ill. 2001)(report)

Martindale v. Southwestern Life Insurance Co., No. 1:00-CV-687 (E.D. Tex. 2001)(report and deposition on certification; report on attorneys fees).

Carter v. Unilever United States, Inc. et al., No. 00-L.41 (First Judicial Circuit, Saline County, Illinois)(affidavit)

Scott v. Blockbuster, Inc., No. D 162-535 (District Court of Jefferson County, Texas, 136th Judicial District)(affidavit and testimony)

Verdin v. R&B Falcon Drilling USA, Civ. Action No. G-00-488 (S.D. Texas. Galveston Div.)(2002)(report)

Notzen v. The College Life Insurance Company, No. 99-CVF-00697, 111th Judicial District, Webb County, Texas (2002) (affidavit).

In Re Boeing Securities Litigation, No. C97-17152 (Western District of Washington)(2002)(declaration)

Mille-42

Crandon Capital Partners v. Stuart J. Shelk, Jr, No. 0011-11691 (District of Oregon)(2002)(declaration)

Fragin v. Fleet Bank, No. 605946/98 (Supreme Court of the State of New York, County of New York) (2002) (expert witness report and affidavit)

DeHart v. Dell Computer Corporation, No. C200100168, 18th Judicial District, Johnson County Texas (2002) (affidavit)

Naevus International, Inc. v. AT&T Corp., No. 99/602191 (New York Supreme Court) (2002) (affidavit)

Shubert v. Federal Express Corporation, No. 97-CH 6431, Circuit Court, Cook County, Illinois (2002) (affidavit)

In re: Shook & Fletcher Insulation Co., No. 02-02771-BGC-11, United States Bankruptcy Court, Northern District of Alabama (2002) (testimony)

Daugherity v. International Business Machines, Cause No. 23,162, District Court of Burleson County, Texas (2003) (deposition, affidavit, and testimony on class certification; testimony in connection with attorneys fee dispute)

Alvis v. Hewlett-Packard Co., Cause No. A-164,880, 58th Judicial District Court of Jefferson County, Texas (2003) (affidavit and deposition)

Curtis v. Hollywood Entertainment Corp., No. 01-2-36007-8 SEA, Superior Court of the State of Washington for King County (2003) (declaration)

Waldbaum v. Provident Financial Group, No. C-1-03-166, United States District Court for the Western District of Ohio (2003) (affidavit)

In re High Risk Opportunities Hub Fund Limited (in liquidation), Grand Court of the Cayman Islands, Cause No. 521 of 1998 (affidavits)

Warmack-Muskogee Limited Partnership v. PriceWaterhouseCoopers LLP et al., No. E2001-504-3, Miller County, Arkansas (affidavit and deposition)

Packard v. eMACHINES, Inc., No. E-165,336, District Court of Jefferson County, Texas, 172nd Judicial District (affidavit and deposition)

Klein v. Salvi, No. 02 Civ. 1862 (AKH), Southern District of New York (declaration)

In re Florida Microsoft Antitrust Litigation, No. 99-27340 CA 11, 11th Judicial

Mille-43

Circuit, Miami-Dade County (2003) (declaration, deposition, trial testimony on settlement approval, trial testimony on fees)

In re California Microsoft Antitrust Litigation, J.C.C.P. No. 4106, Superior Court of the State of California, City and County of San Francisco (declaration) (2004)

In re Medco Managed Care LLC Litigation, MDL Docket No. 1508, United States District Court for the Southern District of New York (2003) (declaration)

In re Western Union Money Transfer Litigation, No. CV 01 0335 (CPS) (VVP), United States District Court for the Eastern District of New York (2004) (declaration)

H&R Block, Inc. v. Haese, No. 13-97-673-CV, District Court of Kleberg County, Texas (2005) (affidavit and deposition on attorneys fees)

Gold Seal Termite and Pest Control Co. v. PrimeTV and DirecTV, Inc., Cause No. 49D10-0304-CP-0702, Marion Superior Court, Marion Indiana (2004) (affidavit)

Samples v. Conoco, Inc., No. 01-631-CA-01, Circuit Court of the First Judicial Circuit in and for Escambia County, Florida (2004) (affidavit and testimony on fees)

Williams v. Conoco, Inc., No. 01-000866-CA-01, Circuit Court of the First Judicial Circuit in and for Escambia County, Florida (2004) (affidavit and testimony on fees)

In re Minnesota Microsoft Antitrust Litigation, Nos. 00-5994, 03-4162, District Court for the Fourth Judicial District, Hennepin County, Minnesota (2004) (affidavit on fees; affidavit on settlement).

In re Cox Communications Inc. Shareholders Litigation, C.A. No. 613-N, Court of Chancery of the State of Delaware in and for New Castle County (2005) (affidavit)

Elkins v. Microsoft Corporation, Windham Superior Court, State of Vermont (2005) (affidavit on fees; affidavit on fairness of settlement)

Camp Gilliam v. BP America Production Company F/K/A Amoco Production Company TOC, et al., Cause No. 03-445-D, District Court of Kleberg County, Texas (2005) (affidavit and deposition on certification)

Chance v. United States Tobacco Company, Case No. 02 C12, District Court of Seward County, Kansas (2005) (declaration and trial testimony at fairness hearing)

Estate of Hampton v. Beverly Enterprises, No. CV 2004-95-3, Circuit Court of Bradley County, Arkansas, Civil Division (2006) (affidavit on fees)

Mille-44

In re Enron Corporation Securities Litigation, Civil Action No. H-01-3624, United States District Court, Southern District of Texas (2006) (expert report and deposition on attorney liability)

Parker v. Time Warner Entertainment Co., No. CV-98-4265 (ILG) (JMA), Eastern District of New York (2006) (declaration and testimony)

In re AT&T Wireless Tracking Stock Securities Litigation, Civil Action No. 1:00-cv-08754, Southern District of New York (2006) (declaration)

Cox v. Microsoft Corp., Index No. Index No. 105193/00, New York State Supreme Court (2006) (affidavit and testimony on settlement and fees)

Lundell v. Dell, Inc., Civil Action No. C05-3970 JW/RS, Southern District of California (2006) (declaration on fees)

Kehoe v. Fidelity Federal Bank, Case No. 03-80593, United States District Court for the Southern District of Florida (2006) (affidavit and testimony on fees)

Acosta v. Trans Union LLC, Case No. CV 06-05060 DOC (MLG), United States District Court for the Central District of California (2006) (declaration on fees)

Lasker v. Kanas (North Fork Bancorporation Litigation), Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

John Hancock Life Insurance Co. v. Goldman, Sachs & Co., No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

Comes v. Microsoft Corp., No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

Love v. Blue Cross & Blue Shield Association, et al., No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

Feuerabend v. UST, Inc., Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

White v. Experian Information Solutions, Inc., Case No. 05-cv-1070, United States District Court for the Central District of California (2008) (declaration on fairness of settlement)

In re Trans Union Corp. Privacy Litigation, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

Hoffman v. American Express, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

In re Pet Foods Products Liability Litigation, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (declaration on attorneys' fees)

Hensley v. Computer Sciences Corp., No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009)

Tucker v. Scrushy, et al., Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

In Re: 2007 Wildfire Class Litigation, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (affidavit on certification) (2009)

In re: Columbia Hospital for Women Medical Center, Inc., Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

Other Consulting Experience:

Deposit Insurance for Thailand.  Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

Schatz v. Blanchard.  Neutral arbitrator in a commercial arbitration (2000)

Other Activities:

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Mille-46

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

Awards:

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

Personal:

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Mille-47

Appendix

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, l989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (l989)

Mille-49

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program 1987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson: Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson: Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors: Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case: Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case: Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case: What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen: Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)