UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:   VIOXX PRODUCTS LIABILITY LITIGATION<br><br><br>**This document relates to All Cases** | CIVIL ACTION<br><br>NO. 2:05-MD-01657-EEF-DEK<br><br>SECTION L<br><br>JUDGE ELDON E. FALLON<br><br>DIVISION 3<br><br>MAGISTRATE DANIEL E. KNOWLES III |

**COUNTY OF TRAVIS**

**STATE OF TEXAS**

### AFFIDAVIT OF JOSHUA D. WRIGHT

BEFORE ME, the undersigned authority, on this day personally appeared JOSHUA D. WRIGHT, and after having first been duly sworn upon oath, states as follows:

1

1.  I am Joshua D. Wright, Assistant Professor at George Mason University School of Law and Professor (by courtesy) at the George Mason University Department of Economics. I have been retained by the Vioxx Litigation Consortium (VLC) to address several issues relating to this Court's order and reasons reducing the fee percentages the VLC's clients agreed to pay at the outset of the litigation.

2.  I have considered the available qualitative and quantitative evidence and concluded that the VLC contingent fee contracts are reasonable in light of the substantial risks associated with bringing these claims and the vigorous competition between providers of legal services in products liability cases at the time of contracting. I conducted an econometric analyses relying on two datasets. The first is a containing 28,816 observations representing each potential claimant communicating with the VLC about potential representation in the Vioxx litigation. The dataset contains various demographic characteristics about each claimant, whether the claimant was referred, whether the potential claimant ultimately signed a contingent fee contract with the VLC, and the fee associated with the contract. The second dataset is a subset of the first and includes only the individuals that ultimately signed contingent fee contracts with the VLC and submitted claims packages to the Vioxx settlement program. The second dataset includes all of the same information, including the fee. While the VLC contracts generally specify a 40 percent recovery of any judgment, there are a significant number of contracts that specify fees both greater than and less than 40 percent.

3.  The evidence establishes that the market for the provision of the legal services offered by the VLC is very competitive. There is no evidence that the age or health of the VLC's clients changed the competitive bargaining process. From an economic perspective there is no evidence to support the contention that whatever economies of scale are associated with the MDL process would result in unreasonable profits for the VLC because (a) the market is competitive and (b) any efficiency associated with the MDL process was anticipated by the market at the time of contracting.

4.  My testimony is organized as follows. In Section I, I provide an overview of my findings with respect to the reasonableness of VLC's contingent fee contracts. Section II provides my qualifications as an expert. Section III describes my assignment. Section IV discusses fundamental economic concepts related to the competitive analysis of contract terms in general, and in evaluating contingent fee contracts in products liability cases specifically. These concepts provide the foundation of the analysis in the remainder of this affidavit. In Section V, I present qualitative and quantitative analysis of the competitive conditions in the market for the legal services offered by the VLC. In Section VI, I present the results of a multivariate regression analysis demonstrating that VLC claimants' fees, contrary to the

Wrigh-2

court's expressed concerns, are not higher for elderly or sicker claimants or in geographic areas where there is less competition between providers of legal services.  Section VII concludes.

## I.    SUMMARY OF OPINIONS

5.  I have evaluated the available qualitative and quantitative empirical evidence, including a representative VLC contingent fee contract.  Based on my analysis, I have formed the following opinions:

6.  The VLC contingent fee contracts are reasonable under the circumstances existing at the time the contracts were entered.

7.  The market for the plaintiffs' mass tort litigation services is highly competitive according to conventional economic standards.  For example, there are 957 firms participating in the Vioxx litigation alone.  Using conventional measures of market concentration and competitiveness, such as those adopted by the *Horizontal Merger Guidelines* to analyze competitive conditions, this market does not raise competitive concerns.

8.  Whatever economies of scale were associated with the MDL were anticipated by the VLC.

9.  Because economies of scale were anticipated and the market is highly competitive, it is my opinion that any cost reductions were reflected in the VLC contingent fee contracts at the time they were entered and do not generate any windfall profit.

10. Contrary to the Court's expressed concerns, claimant age and health have no significant practical impact on fee levels or the probability that a potential claimant will ultimately reach a fee agreement with the VLC.  For example, a ten year increase in age results in only a 1.4 to 2.1 percent increase in the likelihood of signing a contract with the VLC.

11. Client age has virtually no impact on fees.  While the effect is practically trivial, the data show that age is correlated with *lower* fees.  This result should alleviate the Court's concern that the VLC and other firms might exploit elderly potential claimants in order to extract higher fees.

12. Injured claimants do not pay higher fees than wrongful death claimants, which are negotiated by individuals without injuries.

13. The Court's order reducing fees will significantly reduce the incentive of firms like the VLC to bring complex and risky mass tort cases.  This reduced incentive is likely to impair the

ability of clients to access quality legal representation and reduce the mass tort litigation system's ability to achieve its goals of deterring harmful behavior and compensating victims. Further, *ex post* judicial modification of prices generated by a competitive market process would reduce fees without any evidence of market failure, and thus impose a substantial risk of social harm without any apparent offsetting benefit.

## II. QUALIFICATIONS

14. I earned a Ph.D. in economics from the University of California at Los Angeles in 2003. I earned a JD from the University of California at Los Angeles School of Law in 2002. I received a B.A. in economics from the University of California at San Diego in 1998.

15. My fields of primary economic research involve industrial organization, a branch of economics devoted to understanding the incentives of firms and individuals, the operation of markets, competition, and the impact of regulation.

16. I am an Assistant Professor at the George Mason University School of Law and am currently a Visiting Professor at the University of Texas School of Law. I also hold a courtesy appointment in the George Mason University Department of Economics. I teach courses on antitrust and contract law. In these courses I teach a wide variety of topics. In antitrust law we focus extensively on how the competitive process benefits consumers by generating lower prices and higher quality products and services, how to identify possible market failures requiring antitrust or other regulatory intervention, and economic analysis designed to assess the competitiveness of markets.

17. I was recently appointed as the inaugural Scholar in Residence at the Federal Trade Commission Bureau of Competition, where I served until Fall 2008. At the Federal Trade Commission my duties included conducting legal and economic analysis, both quantitative and qualitative, on issues relating to competition, the operation of markets, and regulation. These analyses were used to inform decision-making on the costs and benefits of potential regulatory action by the Commission.

18. I have authored more than fifteen articles in a variety of areas including economics, regulation, antitrust and contracts. Those articles have been published in leading academic journals, including the *Journal of Law and Economics, Antitrust Law Journal, Competition Policy International, Supreme Court Economic Review, Yale Journal on Regulation, Journal of Competition Law and Economics, Review of Law and Economics*, and the *UCLA Law Review*. I have also testified on antitrust and competition related issues at the joint Department of Justice/ Federal Trade Commission Hearings on Section 2 of the Sherman Act as well as the Federal Trade Commission's FTC at 100 Conference.

Wrigh-4

19. I currently serve on the editorial boards of the *Antitrust Law Journal*, *Global Competition Policy*, *Supreme Court Economic Review* and *Competition Policy International*. I am a member of the National Science Foundation Advisory Panel for Law and Social Sciences. I am also a Contributor to the Hoover Project on Commercializing Innovation, was a Visiting Fellow at the Searle Center at the Northwestern University School of Law in October 2008, a Senior Fellow at the George Mason Information Economy Project, and served as a consultant to the Federal Trade Commission on issues related to economic analysis of regulation and competition.

20. My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report as Appendix A.

## III.   ASSIGNMENT

21. This Court issued an order and reasons which reduced the individual fee agreements of all attorneys participating in the Vioxx settlement agreement to 32 percent plus reasonable costs. The Court listed three specific features of the contracting process in support of its *ex post* reduction: (1) the age of claimants, (2) the poor health of claimants, and (3) economies of scale in the MDL process.

22. I have been asked to analyze the reasonableness of the VLC contingent fee contracts in light of the available quantitative and qualitative evidence. Specifically, I've been asked to analyze whether contracts allowing for fees in excess of the 32 percent limit imposed by the Court are unreasonable.

## IV.   GENERAL PRINCIPLES OF ECONOMIC ANALYSIS OF CONTINGENT FEE CONTRACTS

23. Economic analysis of contracts generally requires that contract terms are evaluated in light of market conditions existing at the time the relevant contracts were formed. This principle captures the economic concept that all market conditions facing transactors at the time of contracting influence the terms, including the price, generated in the competitive bargaining process. In other words, economic analysis requires an *ex ante* view of the contracts at issue.

24. Deviating from this "*ex ante*" approach is unsound primarily because it risks errors associated with condemning contract prices as too high or too low based on market conditions that are substantially different from those faced by the parties at the time of contracting.

6

Wrigh-5

25. This fundamental economic principle is both well recognized in economics and also in the mass tort context. See, e.g. *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999) ("the reasonableness of a contract, including an attorney fee agreement, is to be evaluated at the time it was made").

26. Application of this principle to the VLC contingent fee agreements is straightforward. The fees generated by the competitive bargaining process will reflect the market conditions at the time of contracting, including the risk of significant losses faced by plaintiffs' attorneys, litigation costs, any efficiency associated with the MDL process, and probabilistic assessments of a substantial recovery.

27. However, as demonstrated in Section V, the market for the legal services relevant to representation in the Vioxx litigation was very competitive. Market failure in the form of lack of meaningful competition can render reliance on the competitive market process a less reliable indicator of reasonableness of fees.

28. Further, in Section VI there is no evidence that the VLC contracting process was biased in any manner against the oldest or sickest potential claimants which the Court suggests may not be able to meaningfully participate in the competitive bargaining process.

29. An extension of the *ex ante* principle is that any economic analysis of the reasonableness and/or competitiveness of contract prices must incorporate the costs faced by sellers in terms of risk. In the mass tort litigation context, the risks faced by VLC and other plaintiffs' attorneys are substantial. See *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L. J. 105, 113-14 ("another economic reality for mass tort lawyers is that it can be a risky business" and stressing that a high contingency fee reward might be necessary to attract "plaintiffs' firms to the world of mass torts and keeps them there despite the substantial investments necessary on the front end and despite the risks that some or all of that investment would be lost if the mass tort fails to develop").

30. Risk of substantial loss is one important *ex ante* market condition that will be reflected in contingent fee contracts. The fact that Merck was able to secure defendant verdicts in all but one federal MDL bellwether trial (and the single plaintiffs' verdict was set aside as excessive) confirms the high risk of failure and significant losses. Similarly, there were a total of 13 state trials. Out of the 13 state trials, plaintiffs won 4. However, 2 of these 4 victories were reversed or reversed in part, leaving 2 true plaintiffs' victories, neither of which are final. In sum, plaintiffs prevailed in 3 of 18 trials.

31. The methodology of comparing VLC's contract prices, which generally specify 40 percent recovery, to some benchmark derived from other mass tort litigation is unsound without

Wrigh-6

controlling for differences in attorney quality, risk and likelihood of recovery across cases. This approach is susceptible to underestimating the risks faced by the parties at the time of contracting only after outcomes, in this case a successful settlement, are observed.

32. Computing a "risk-adjusted" rate of return for VLC attorneys is one method for assessing the reasonableness of fees. However, data limitations inherent to mass tort litigation render that approach impracticable here because it would require systematic data on risk in a large number of MDLs to construct a benchmark for competitive fees.

33. I apply another standard approach to assessing the reasonableness of fees by analyzing the competitive conditions in the relevant market. The evidence shows that those groups that the Court hypothesized might not be able to participate in the market benefited from the competitive contracting process.

34. A second application of the general *ex ante* analysis principle is that the transactors' expectations of various risks and rewards will be built into contract prices. For example, the Court asserts that "the fact that the economies of scale have led to a global settlement offering considerable benefit to the attorneys" and that "the claimants should similarly benefit from fees reduced to reflect that uniformity and efficiency." *In re Vioxx*, 574 F. Supp. 2d at 617. My understanding of the Court's argument is that it reflects a concern that whatever efficiencies were associated with the MDL process, those efficiencies were not reflected in the bargained for contingent fee prices and thus, upon access to the MDL process, those fees are unreasoinable.

35. The established principle of *ex ante* analysis conflicts with the Court's hypothesis that cost savings afforded by the MDL process if two conditions are satisfied. First, if competing providers of legal services reasonably anticipate the likelihood of future access to cost savings associated with the MDL procedures, those costs savings will be reflected in contract prices. This condition is satisfied. The likelihood that the Vioxx claims would be consolidated in an MDL was anticipated by the VLC and other parties. See, e.g., Affidavit of Drew Ranier ¶ 3 (describing as a "known factor considered by [Ranier] and discussed with other VLC members at the inception … the fact that the Vioxx cases that reached federal court would be joined in an MDL"). Anticipating that the Vioxx cases would be consolidated also makes sense in light of the fact that 89 percent of the products liability transfer motions decided by the MDL from 2000 to August 2006 were granted. See Mark Herrmann and Pearson Bownas, Making Book on the MDL Panel: Will It Centralize Your Products Liability Cases?, *BNA Class Action Litigation Report* (February 9, 2007); Deborah Hensler, The Role of Multi-Districting in Mass Tort Litigation: An Empirical Investigation, 31 *Seton Hall L. Rev.* 883 (2001).

8

36. The second condition that must be satisfied if any cost savings associated with economies of scale are to be reflected in contingent fee contracts is that the market must be adequately competitive. In other words, cost savings afforded to the parties by the MDL process will be competed away in the form of lower prices and higher quality in competitive markets. I demonstrate in Section V that this condition is also easily satisfied.

37. If the market is competitive at the time of contracting, and the parties were able to make reasonable assessments as to the likelihood that there would be an MDL, then the prices generated by competition for claimants in the Vioxx litigation are likely to be reasonable from an economic perspective.

38. This economic principle is not limited to the mass tort litigation context or contingent fee contracts. From an economic perspective, any cost savings from the MDL process are like any other cost reducing innovation. As a general economic principle, competitive markets convert cost reductions to increases in consumer welfare in the form of lower prices and higher quality. In this context, given that the VLC anticipated the MDL process and that there was no market failure associated with lack of competition, standard economic analysis provides that those economies of scale are reflected in a reasonable manner in the VLC contingent fee contracts.

## V. STRUCTURAL ANALYSIS OF COMPETITION IN THE LEGAL SERVICES MARKET

39. I now analyze whether the market for provision of legal services such as those required in the Vioxx litigation was competitive and likely to generate competitive fees.

40. The most common statistic in industrial organization economics used to assess structural competitiveness is industry concentration as measured by the Herfindahl-Hirschman Index ("HHI"). The HHI ranges from 0 to 10,000 and is calculated by summing the squares of market shares for firms competing in the relevant market. For example, a monopolist with 100 percent market share would result in an HHI = 100*100 = 10,000. A market with four firms with 25 percent market share would result in an HHI = 4*(25*25) = 2,500. This measure is commonly used in antitrust analysis and is the basis of horizontal merger policy articulated in the joint Federal Trade Commission/ Department of Justice Horizontal Merger Guidelines. See *Horizontal Merger Guidelines* § 1.5 (1997).

41. The Horizontal Merger Guidelines are endorsed by the Federal Trade Commission and Department of Justice for conducting structural competitive analysis. The Merger Guidelines divide the spectrum of market concentration as measured by the HHI into three categories: unconcentrated (HHI <1000), moderately concentrated (HHI between 1000 and 1800), and

Wrigh-8

highly concentrated (HHI>1800).  Mergers in industries with HHI levels below 1000 are "unlikely to have adverse competitive effects and ordinarily require no further analysis." *Horizontal Merger Guidelines* § 1.5.

42. Calculating a precise HHI in this setting is impossible because the market shares for all firms in the market are not available.  Nonetheless, there is substantial quantitative evidence that the market is unconcentrated and vigorously competitive.

43. An important feature of structural competitive analysis is that firms currently participating in the market and those that could participate without substantial delay or in response to a price increase are considered as competitors.  This makes economic sense in the present context because it is not only those firms that succeed in signing contingent fee contracts in the Vioxx litigation that discipline prices but also those that could compete if current participants' prices were above competitive levels.  In other words, this economic principle captures the concept that firms that do not win the competition are still likely to have an impact on the competitive process.

44. There are a very large number of attorneys and firms that participate in the relevant market for the provision of legal services required in mass tort litigation.

45. If the analysis is limited to attorneys and firms that have actually brought (as plaintiffs) products liability cases which have also gone through the MDL process, there is a reasonable proxy for possession of the skills and resources necessary to develop, manage and try cases such as those in the Vioxx litigation.

46. Using data from the United States Judicial Panel on Multi-District Litigation website, http://www.jpml.uscourts.gov/Docket_Information/docket_information.html, one finds that the number of products liability plaintiffs' attorneys is 3050 and the number of unique firms is 1832.[1]  This is a very large number.  As demonstrated below, under reasonable assumptions about the distribution of market shares between these firms, the resulting HHI would be trivially above zero and nowhere near the 1,000 level at which the Merger Guidelines conclude that market failure *is still not a practical possibility*.

---

[1] The number of firms is the sum of unique plaintiff products liability firms in MDL actions from 2004-2008.  The 1832 figure is adjusted for the possibility of double counting of firms that represent multiple clients in MDL actions. Focusing exclusively on the number of these firms in any given year, the number of firms ranged from 239 to 489. The HHI within any given year never exceeds 42.  Note that we used the JPML website in collecting the MDL product liability cases from 2004-2008.  We collected plaintiff attorneys and firms by searching the particular docket through Pacer or Courtlink.

Wrigh-9

47. A second source of data for the number of competitive suppliers of the relevant services is those firms participating in the Vioxx litigation itself as plaintiffs' attorneys. This figure is obviously a more direct proxy for possession of the skills and resources necessary to compete in this market than general MDL data. It is also intuitively underinclusive, as it is obvious that at least some firms that did not participate in the Vioxx litigation have the requisite resources or perhaps even competed for claimants without success. Thus, use of the Vioxx litigation data provides a lower bound on the number of possible competitors.

48. As of November 2008, the Claims Administrator reported 957 firms submitting claims packages. See *Brown Greer Report* (December 19, 2008). Beginning with the simplifying assumption that the share of claimants is uniformly distributed among these firms results in an HHI of only 10.45, trivially above zero and far less than necessary to suggest even the possibility of inadequate competition. However, this figure is likely to substantially underestimate the concentration levels because it incorrectly assumes that the claims are uniformly distributed among the 957 firms. It is likely that the distribution includes both small firms representing as few as one claimant as well as larger firms representing many. To generate a more realistic estimate of industry concentration and competitiveness, I consider two alternative possible market structures. In the first, I assume that five firms each control 10 percent of the market each with the remaining half of the claims distributed uniformly among the remaining 952 firms. In the second, I assume that 10 firms control 5 percent of the market each with the remaining half of the claims distributed uniformly among the remaining 947 firms.

49. Chart 1 summarizes this information. Under each of the market structure scenarios, the HHIs are well below 1000, the level at which the Horizontal Merger Guidelines conclude is sufficiently *unconcentrated* to obviate the need for further analysis. Even the most aggressive assumptions about market structure generate an HHI of 510.64, still more than three times lower than 1800, the level the Horizontal Merger Guidelines associate with high concentration.

Wrigh-10

## CHART 1

| | Lawyers | Firms | HHI (Uniform) | HHI (Top 5 with 10% each) | HHI (Top 10 with 5% each) |
|---|---|---|---|---|---|
| MDL-Products Liability | 3050 | 1832 | 5.46 | 505.47 | 255.49 |
| Vioxx Litigation | | 957 | 10.45 | 510.64 | 260.70 |

50. Based on this structural competitive analysis, the market for legal services of the type provided by the VLC is highly competitive and judicial intervention to regulate the VLC contingent fees on the basis of inadequate competition is unnecessary and likely to be counterproductive.

51. I also conclude that, both because the market is highly competitive and because any economies of scale associated with the MDL process were likely anticipated by the parties, the conditions for those cost savings to be reflected in the VLC contracts are satisfied. From an economic perspective, this analysis suggests that the Court's proposed fee reduction will "double-count" any MDL savings which are already incorporated into the contract prices.

## VI.   ECONOMETRIC ANALYSIS OF VLC CONTINGENT FEE CONTRACTS

52. I performed additional econometric analyses to address the Court's specific concerns about the possibility that the competitive contracting process cannot be relied upon to generate reasonable fees. The Court stated that "many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts." *See In re Vioxx,* at 491.

53. The Court also noted that "in order to qualify for the settlement, a claimant or the claimant's representative must first demonstrate that the claimant suffered a heart attack, ischemic stroke, or sudden cardiac death after taking Vioxx. As a result, all of the claimants in the global settlement have suffered lifethreatening injuries." *Id.*

54. The Court expressed concern that economies of scale will generate unreasonable fees for attorneys because the economies of scale will not be passed on to claimants. In order for

Wrigh-11

attorneys to receive unreasonable compensation from any cost savings associated with the MDL process, there must be a lack of competition. If sufficient competition were present, failure to pass on these cost savings in the form of lower prices or higher quality would be unprofitable because potential claimants would retain legal services from the attorneys' competitors.

55. The Court's concerns generate three testable hypotheses about the relationship between age, health and competition on the one hand, and the existence of a VLC contract and the level of the contingent fee on the other.

56. With respect to potential claimant age, the Court's concern predicts that the VLC is more likely to sign contracts with older potential claimants and that fees will be higher for the older claimants that do sign contracts.

57. Similarly, with respect to health, the Court's concern predicts that the competitive bargaining process with injured claimants will be more likely to generate higher fees than negotiations with wrongful death claimants who themselves have no injuries.

58. I explore these two areas of potential concern and the corresponding hypotheses about the incidence of VLC contracts and fees with two sets of econometric analyses. The first econometric analysis focuses on whether the likelihood that a particular potential claimant for whom a claims package was submitted would be more likely to sign a contingent fee contract is influenced by age and health. These models predict the probability that a potential claimant will sign a contract with the VLC which is submitted for a claims package as a function of the potential claimant's age or health.

59. For this first mode of analysis ("Contract Analysis"), the data set contains 28,816 observations. The dataset contains each potential claimant communicating with the VLC about representation in a Vioxx claim, various demographic characteristics about each claimant, whether the claimant was referred, the level of competition between products liability attorneys,[2] whether the potential claimant ultimately signed a contingent fee contract

---

[2] Data on the number of products liability attorneys in each state comes from a nationwide search of Martindale.com for attorneys who list "product liability" as a practice area. This search generates 21,754 attorneys and 6,987 firms (search conducted March 22, 2009). While this figure overstates the relevant number of market participants (see Chart 1) because it includes both plaintiff and defense attorneys, it is a statistically useful control for our analysis because it is reasonable to assume that the number of plaintiffs' products liability attorneys is positively correlated with the total figure. For the purposes of our regression analyses, including this control variable improves the statistical confidence we can assign to conclusions concerning our variables of interest: health and age at the time of contracting.

13

with the VLC, and the fee associated with the contract.[3]  These variables serve as controls in our regression analysis to allow us to isolate the impact of health and age on the contracting process and outcomes.

60. The second mode of analysis ("Fee Analysis") focuses exclusively on those claimants for whom claims packages were submitted and who signed contingent fee contracts with the VLC.  In short, I analyze whether age and health impact contingent fee levels controlling for a number of other factors.  The dependent variable in these analyses is always the fee level in percentage terms.

61. Tables 1-3 in Appendix B present results from the Contract Analysis.[4]  Table 1 presents the basic analysis, which examines the possible influence of the following key factors on the probability that the VLC signed a contract with the potential claimant and ultimately submitted a claims package to the Vioxx settlement program: whether the potential claimant is bringing a wrongful death claim, age at the time of claim, and the claimant's health status.[5]

62. As demonstrated in the First Column of Table 1, labeled "Linear," the overall results suggest that the variables of interest do not have a significant practical impact on the probability of contracting.  While four of the five variables are significant in the statistical sense, the practical impact of the observed correlations is trivial.  The most significant correlation is is the wrongful death claimant indicator, which has a coefficient of 0.048.  This means that the probability of a contract being signed between the VLC and the wrongful death claimant is about 4.8 percentage points higher than if the claimant is alive and injured.

---

[3] There are 8,895 potential claimants in the dataset who claim no injuries.  None of these claimants ultimately signed a contract with the VLC.  In econometric terms, claiming zero injury perfectly predicts the outcome of no contract. We eliminated these observations from the dataset because they provide no useful information for our analysis. From a qualitative perspective, the exclusion of these observations is justifiable on the grounds that a potential claimant without any injuries cannot claim damages.

[4] In the text, we discuss results in Linear Probability models in the first column of all tables.  We also attempted common alternative probability models such as logistic and probit as robustness checks.  The results are consistent across these specifications and all are presented in Appendix B.

[5] Potential claimants' health status at the time of contract is measured by self-reported allegations of one or more of five injury types: stroke, heart attack, kidney damage, liver damage and other.  It is not a measure of severity of injury but controls for differences between potential claimants and allows more precise estimation of our coefficients of interest, i.e. age and health.  The presence of all five injuries perfectly predicts the existence of a contract, and so does not add useful information for our analysis from a statistical perspective.  Twenty potential claimants with all 5 injuries are thus excluded from our analysis.

14

63. The fact that wrongful death claimants are *more* likely to sign contracts with the VLC disproves the Court's hypothesized concern that attorneys were likely to take advantage of elderly and infirm claimants. This is because contract bargaining and negotiation with wrongful death claimants occurs with a non-injured representative. If the Court were correct that those unable to negotiate their own contingent fee contracts or participate in the process in a meaningful way would pay higher fees, one would expect that death would reduce the likelihood of contract because the VLC would be bargaining with a non-injured party rather than increase it.

64. The impact of age on the likelihood of contracting is of trivial practical significance. The coefficient in Column 1 of Table 1 indicates that a one year difference in age at the time of claim translates to an increase of 0.19 *percentage points* in the probability of a contract being signed.   While this result is significant from a statistical perspective, it is trivially above zero.

65. Table 2 reports the identical regressions, but controls for the underlying health status of the potential claimant with an alternative measure. Rather than a variable that accounts for the presence of multiple categories of injuries, the specifications in Table 2 separately control for the presence of different combinations of injuries. This is a robustness check to ensure that the results in Table 1 are not the result of spurious correlations. Indeed, the results in Table 1 are robust to this alternative specification.

66. Table 3 presents the results from the same regressions, but as an additional robustness check, includes state effects designed to control for unobserved differences between state environments (such as state legislation limiting contingent fee recoveries). Inclusion of these "state effects" does not significant alter the results in Tables 1 and 2.

67. On the basis of the analysis of the data discussed and presented in Tables 1-3 (Appendix B), the Contract Analysis establishes that the VLC did not take advantage of any claimant's age or infirmity.

68. Claimant age has practically no effect on the likelihood of contracting. The coefficient on this variable is stable across models and very small in magnitude (0.0014-0.0021), implying that a 10 year difference means a small difference of about 1.4-2.1 percentage points in the likelihood of a contract being signed.

69. Wrongful death claimants are more likely to sign contracts with the VLC and submit claims packages than potential claimants with injuries.

Wrigh-14

70. Our second analysis, the Fee Analysis, is conceptually similar to the Contract Analysis in that it tests the influence of certain characteristics on a dependent variable of interest. Like the Contract Analysis, we employ multivariate regression analysis to control for and isolate various factors that might influence fees. However, the Fee Analysis differs in two important ways from the Contract Analysis. The first is that we limit our observations to only those potential claimants that actually signed contingent fee contracts with the VLC that were submitted claims packages to the Vioxx settlement program. The second difference is that our dependent variable is the fee level in percentage terms rather than whether a contract was signed. These tests are designed to rigorously test whether fees vary with the same characteristics. If the Court's hypotheses are correct, one expects to observe higher contingent fee contracts associated with potential claimants who are older and injured.

71. Table 4 presents the results. The only difference between the regressions in Table 4 and Table 1 is that the dependent variable in Table 4 is the contingent fee (e.g. 33 percent or 40 percent) rather than whether the parties ultimately entered into a contract.

72. The primary conclusion that I draw from Table 4 is that none of the variables of interest have a significant practical effect on contingent fees in VLC contracts.

73. First, wrongful death claimants do not pay different fees than injured claimants. Statistically speaking, the death indicator variable is not statistically different from zero. There is no evidence that injured claimants who bargain with VLC pay higher fees than wrongful death claimants whose contracts are negotiated by non-injured parties. If the Court's analysis were correct, one would expect higher fees for non-death injuries because in wrongful death claims the injured party is not negotiating the contract. The data does not support this hypothesis.

74. Claimant age has no practical impact on the contingent fee. To the extent that there is any relationship between age and fee, the coefficient on the age variable is negative. This implies that, all else held constant, older clients get a lower fee.

75. If the Court is correct that elderly potential claimants are unable to participate in the competitive market for legal services in the Vioxx litigation, one would expect older claimants to pay higher fees. In fact, older claimants pay lower fees. However, it should be noted that the size of this effect is trivial, i.e. a 10 year difference implies only a 0.17 percentage point difference in the fee.

76. Table 5 corresponds to the regressions in Table 2 and is a robustness check which substitutes the multiple injury indicator variable with separate variables that distinguish between

Wrigh-15

individuals with 2, 3 or 4 injuries.  The results in Table 5 are consistent with those reported in Table 4.

77. Table 6 corresponds to the regressions in Table 3 which add state effects.  Inclusion of state effects is another robustness check that allows one to control for unobserved differences between the states that might influence the contingent fee bargaining process but are constant over time.  Comparing Table 6 to Tables 4 and 5 demonstrates that the Fee Analysis results are stable across specifications.

78. Based on the analysis discussed above and presented in Tables 4-6, I offer the following conclusions about the VLC's contingent fees:

79. Age has no practical impact on fee levels.  Statistically, there is a trivially small negative relationship between claimant age and fee.  In other words, older clients receive slightly *lower* contract fees on average and holding all else constant.  This result should alleviate the Court's concern that elderly potential claimants would not be in a position to benefit from the competitive market and receive lower fees.  Nonetheless, the effect is trivially small.  The coefficient on this variable is stable across models and varies between 0.010 and 0.017, implying that a 10 year difference means a small difference of about 0.10-0.17 percentage points in the fee.

80. Injured claimants and wrongful death claimants do not pay meaningfully different fees.  Again, this result should alleviate concerns that claimants sufficiently injured that they cannot participate in the competitive market for provision of legal services in the Vioxx litigation will pay higher fees.  To the contrary, this result suggests that all potential claimants receive the benefits of competition regardless of age or health.

81. The methodology used to determine the reasonableness of fees depends on an analysis of the competitive conditions in the marketplace.  The evidence shows that market conditions are structurally competitive and the contracting process for contingent fee arrangements is competitive.

82.  In light of the evidence that the VLC contracts arise from a competitive process, the data support the conclusion that the fees generated from that process balance the risks, complexities, potential for substantial return, and the likelihood of any cost savings from the MDL process in a reasonable manner.

83. There are alternative methods that one might utilize with different data to assess the reasonableness of the VLC contingent fees.  For example, one might compare the risk adjusted rate of return for plaintiffs' attorneys across a large sample of cases with similar

Wrigh-16

characteristics. Then, assuming access to detailed billing data, one could theoretically compare the VLC rate of return to that competitive benchmark. In light of the data requirements of that approach, and the difficulty of controlling for important differences in the quality of lawyers and risk profiles across cases in a rigorous way, the methodology selected here fits well.

84. An appropriate methodology for assessing the reasonableness of contingent fees must evaluate contracts from an *ex ante* perspective, including the risk faced by the attorneys at the time of contracting. As discussed, *ex ante* analysis ensures that that evaluator captures the relevant economic forces influencing the contracting process. This approach also has the benefit of minimizing the temptation to allow *ex post* market conditions, or the realization of a successful outcome such as the settlement here, to influence the judgment of the contracts' reasonableness *ex ante*.

85. The Court's methodology falls short of satisfying these requirements. The Court's blanket reduction of fees to 32 percent across all contingent fee contracts is unsound for at least two methodological reasons. The first is that the reduction cannot account for market conditions at the time of contracting. The Court does not, for example, demonstrate that the risks of bringing the Vioxx claims or other conditions facing transactors at the time of contract fail to warrant fees in excess of 32 percent.

86. The second fundamental methodological weakness of the Court's analysis is that it assumes-- without evidence-- various forms of market failure in order to bolster its argument that the fees are excessive relative to some "competitive" benchmark. As discussed in Sections V and VI, the Court's suspicions that attorneys would take advantage of injured potential claimants are not supported by the data. To the contrary, the data show that the relevant market is highly competitive by objective standards and that injured claimants do not pay higher fees.

87. Age and health status do not have any practically significant influence the VLC contingent fee. Rather, the primary driver of fees appears to be the level of risk associated developing the Vioxx claims. Without a detailed quantitative analysis of the risks faced by VLC and other attorneys in the Vioxx litigation relative to others in cases involving privately negotiated fees of 32 percent (the Court's benchmark), conclusions that fees negotiated in the excess of that benchmark are supra-competitive, the result of market failure, or unreasonable in light of market conditions at the time of contracting are not well-grounded.

Wrigh-17

## VII. CONCLUSIONS

88.   Based on the analysis above, I conclude that the market for legal services provided in the Vioxx litigation is highly competitive.

89.   VLC's contingent fee contracts are the product of this robust competition and are economically reasonable.

90.   The vigorous competition between providers of the relevant set of legal services for Vioxx claimants among attorneys, combined with the fact that the VLC anticipated that the Vioxx claims would be joined in an MDL, establish that any economies of scale reducing the costs of developing and litigating the claims is reflected in the VLC contracts. Therefore, as an economic matter, the fact that economies of scale accrue to the parties once the claims were joined into an MDL does not create an unreasonable fee for the VLC.

91.   Older and injured claimants do not pay different fees and receive the benefits from the vigorous competition in this market.

92.   *Ex post* judicial regulation of attorneys' fees in MDLs reduces an incentive for plaintiffs' attorneys to prosecute similar complex products liability claims. See, e.g. Affidavit of Drew Ranier ¶ 24 ("the majority of plaintiffs' attorneys would never undertake such cases as trial counsel").

93.   The reduced incentive to bring these claims is contrary to the purposes of the mass tort litigation system to "deter activities that harm people and to compensate people who are harmed." *Contingent Fees in Mass Tort Litigation*, at 111.

94.   This reduction in incentives to develop and litigate mass torts such as those arising in the Vioxx litigation, in this context, is not offset by any important benefits. Here, where vigorous competition ensures that any cost savings and risks are reflected in the contingent fee, judicial reduction of those fees is unnecessary and likely to be counterproductive. As with other forms of price and wage controls, basic economic and historical analysis predicts that judicial reduction of privately negotiated fees in a competitive market is likely to have substantial deleterious consequences in the form of distorting the allocation of resources, reducing quality, and decreasing welfare. See Hugh Rockoff, *Drastic Measures: A History of Wage and Price Controls in the United States* (Cambridge University Press, 1984). This is a fundamental lesson of basic microeconomics and industrial organization economics. See, e.g., N. Gregory Mankiw and Mark P. Taylor, Principles of Microeconomics 118 (2006) ("when policy makers set

19

Wrigh-18

prices by legal decree, they obscure the signals that normally guide the allocation of society's resources"); Fiona M. Scott Morton, *The Problems of Price Controls*, Regulation at 53 (Spring 2001) ("Competition is a better tool than price controls for protecting consumers.").  In this context, judicial reduction of fees in MDLs is likely to have the effect of discouraging highly capable plaintiffs' firms from accepting representation in complex and risky mass tort litigation, reducing access to the civil justice system for low income plaintiffs, and increasing the incidence of frivolous suits. See, e.g. Eric Helland and Alex Tabarrok, *Contingency Fees, Settlement Delay, and Low-Quality Litigation: Evidence from Two Datasets*, 19 (2) Journal of Law, Economics and Organization 517 (2003).

Wrigh-19

# APPENDIX A

## Curriculum Vitae of Joshua D. Wright

## ACADEMIC APPOINTMENTS, POSITIONS AND AFFILIATIONS

Professor (Courtesy Appointment), George Mason University Department of Economics

Visiting Professor, University of Texas School of Law (August 2008-May 2009)

Visiting Fellow, Searle Center on Law, Regulation and Economic Growth at Northwestern University School of Law (September 22-26, 2008)

Senior Fellow, George Mason University Information Economy Project

Contributor, Hoover Project on Commercializing Innovation

Scholar in Residence, Federal Trade Commission, Bureau of Competition (January 2007 – July 2008)

Assistant Professor of Law, George Mason University School of Law (August 2004- Present)
- Antitrust, Contracts
- Teaching interests also include: Law and Economics,  Quantitative Methods, Economic Reasoning for Lawyers, Antitrust Economics, Sales, Intellectual Property and Antitrust, Advanced Antitrust

## EDUCATION

**University of California, Los Angeles, Department of Economics (1999-2003)**
- Ph.D., Economics (2003)
- Dissertation: *"The Law and Economics of Slotting Arrangements and Category Management"* Committee: Benjamin Klein (Chair), Armen Alchian, Harold Demsetz, and John S. Wiley
- High Honors in Microeconomic Theory
- C. Phil. in Economics (2002); M.A. in Economics (2001)

**University of California, Los Angeles, School of Law (1998-2002)**
- J.D. (May 2002)
- Managing Editor, UCLA Law Review

**University of California, San Diego (1995-1998)**
- B.A., Economics (June 1998)

Wrigh-20

- Highest Departmental Distinction in Economics

## RESEARCH INTERESTS
- Antitrust Law and Economics
- The Law and Economics of Contracts
- Industrial Organization
- Empirical Law and Economics

## TEACHING EXPERIENCE

Adjunct Professor, Pepperdine University Graduate School of Public Policy
- Law and economics (Fall 2003)

Lecturer, UCLA Department of Economics
- Law and economics (Fall 2003)

Teaching Assistant, UCLA Department of Economics
- Introductory, intermediate, advanced and graduate level microeconomic theory courses (2000-2003)
- Departmental Teaching Assistant Award (2001-2003)

## HONORS, GRANTS AND AWARDS

Research Grant, Northwestern Searle Center on Law, Regulation, and Economic Growth for research project on state consumer protection legislation (Co-Principal Investigator)

Research Grant, Tilburg Law and Economics Center for research on Competition and Innovation (Co-Principal Investigator with Bruce H. Kobayashi)

Research Grant, the Microsoft Corporation for research on Competition Policy and Innovation

Research Grant, Institute for Humane Studies' Hayek Fund for Scholars

Honorable Mention, First Annual Jones Day William Swope Antitrust Law Writing Competition for "Antitrust Law and Competition for Distribution," 23 Yale Journal on Regulation 169 (2006)

## PROFESSIONAL EXPERIENCE

Director, Law and Economics Consulting Group (LECG) (2008-Present)

Consultant, Federal Trade Commission (July 2008-April 2009)

Law Clerk to the Honorable James V. Selna, U.S. District Court for the Central District of California (2003-2004)

Consultant, Economic Analysis, LLC (currently LECG, LLC) (1998-2002)

Summer Associate, Latham and Watkins (San Francisco) (2001)

Summer Associate, Jones Day Reavis & Pogue (Washington) (2000-01)

Honors Paralegal, Federal Trade Commission, Bureau of Competition (1998)

Intern, Federal Trade Commission, Bureau of Economics (1997)

Wrigh-21

## PUBLICATIONS

**Books and Book Chapters**

Co-Editor, PIONEERS IN LAW AND ECONOMICS (with Lloyd R. Cohen) (Edward Elgar Publishing Limited, forthcoming 2009)

Co-Editor, RESEARCH HANDBOOK IN THE LAW AND ECONOMICS OF THE FAMILY (with Lloyd R. Cohen) (Edward Elgar Publishing, forthcoming 2009).

Co-Editor, REGULATING INNOVATION: COMPETITION POLICY AND PATENT LAW UNDER UNCERTAINTY (with Geoffrey A. Manne) (Cambridge University Press, forthcoming 2010).

*Benjamin Klein,* in PIONEERS IN LAW AND ECONOMICS (Cohen and Wright, eds., Edward Elgar Publishing Limited, forthcoming 2009).

*Antitrust Analysis of Exclusive Dealing and Tying Arrangements* (with Alden F. Abbott), in THE LAW AND ECONOMICS OF ANTITRUST (Keith N. Hylton ed., Edward Elgar Publishing Limited, forthcoming 2009).

*The Chicago School, Transaction Cost Economics, and the Roberts Court's Antitrust Jurisprudence,* in THE ELGAR COMPANION TO TRANSACTION COST ECONOMICS (Peter Klein and Mike Sykuta, eds., Edward Elgar Publishing Limited, forthcoming 2009).

*Antitrust, Multi-Dimensional Competition, and Innovation: Do We Have An Antitrust Relevant Theory of Competition Now?, in* REGULATING INNOVATION: COMPETITION POLICY AND PATENT LAW UNDER UNCERTAINTY (with Geoffrey Manne) (Cambridge University Press, forthcoming 2010).

*Antitrust, Intellectual Property and Standard Setting* (with Bruce H. Kobayashi) (forthcoming chapter in the American Bar Association Antitrust Section Handbook on ANTITRUST AND STANDARD SETTING).

**Articles & Essays**
***Antitrust Law and Economics***

*Overshoot the Mark? A Simple Explanation of the Chicago School's Influence on Antitrust,* __ COMPETITION POLICY INTERNATIONAL (forthcoming 2009) (review of *Did the Chicago School Overshoot the Mark The Effect of Conservative Economic Analysis on U.S. Antitrust Policy,* Pitofsky ed, Oxford University Press 2008).

Wrigh-22

*Why the Supreme Court was Correct to Deny Certiorari in FTC v. Rambus*, GLOBAL COMPETITION POLICY (March 2009, Release Two).

*Federalism, Substantive Preemption, and Limits on Antitrust: An Application to Patent Holdup* (with Bruce H. Kobayashi), JOURNAL OF COMPETITION LAW AND ECONOMICS (2009), reprinted in REGULATING INNOVATION: COMPETITION POLICY AND PATENT LAW UNDER UNCERTAINTY (with Geoffrey A. Manne) (Cambridge University Press, forthcoming 2010).

*Antitrust Analysis of Category Management: Conwood Co. v. U.S. Tobacco*, 17 SUPREME COURT ECONOMIC REVIEW __ (2009)

*Antitrust (Over-?) Confidence* (with Thomas A. Lambert) 20(2) LOYOLA CONSUMER LAW REVIEW 219 (2008)

*The Roberts Court and the Chicago School of Antitrust: The 2006 Term and Beyond, 3(2) COMPETITION POLICY INTERNATIONAL 25 (2007)*

*The Roberts Court's Antitrust Jurisprudence: Chicago Marches On, 8(4) ENGAGE 29 (2007)*

*The Economics of Slotting Contracts* (with Benjamin Klein), 50 JOURNAL OF LAW AND ECONOMICS 421 (2007)

*Slotting Contracts and Consumer Welfare*, 74(2) ANTITRUST LAW JOURNAL 439 (2007)

*MasterCard's Single Entity Strategy*, 12 HARVARD NEGOTIATION LAW REVIEW 225 (2006)

*Antitrust Law and Competition for Distribution*, 23 YALE JOURNAL ON REGULATION 169 (2006)

*Missed Opportunities in Independent Ink*, 2005-06 CATO SUPREME COURT REVIEW 333 (2006)

*Sui Generis?: An Antitrust Analysis of Buyer Power in the United States and European Union* (with Richard Scheelings), 39 AKRON LAW REVIEW 207 (2006)

*Singing Along: A Comment on Goldberg and Muris on the Three Tenors*, 1 (3) REVIEW OF LAW AND ECONOMICS 4 (2005)

*Vons Grocery and the Concentration-Price Relationship in Grocery Retail*, 48 UCLA LAW REVIEW 743 (2001)

**Contracts and Contract Theory**

*Behavioral Law and Economics, Paternalism, and Consumer Contracts: An Empirical Perspective* 2
NYU JOURNAL OF LAW AND LIBERTY 470 (2007)

**Others**

*The Constitutional Failure of Gang Databases,* 2 STANFORD JOURNAL OF CIVIL RIGHTS AND
CIVIL LIBERTIES 115 (2006).

**Commentary**

*Hell No, Don't Let Them Go!,* CHICAGO TRIBUNE (May 8, 2008) (with Thomas W. Hazlett)

## WORKING PAPERS

*Is Antitrust Too Complicated for Generalist Judges? The Impact of Economic Complexity and Judicial
Training on Appeals* (with Michael Baye) (submitted to Journal of Political Economy)

*Tastes Great, Less Filling: The Effects of Contract Regulation on Beer Consumption* (with Jonathan
Klick)

*Collusion in the Alcoholic Beverage Industry?: Evidence from Post and Hold Statutes*

*The Antitrust Law and Economics of Loyalty Discounts*

## RESEARCH PROJECTS IN PROGRESS

*Antitrust Contests* (with Michael Baye and Paul Pautler)

*Detecting Corruption: Evidence from the Ultimate Fighting Championships* (with Jonathan Klick)

*Testing the DOJ's Unilateral Effects Theory in Oracle/ Peoplesoft* (with Thomas W. Hazlett)

*The Law and Economics of Payola Revisited*

*Empirical Analysis of State Consumer Protection Acts* (with Henry Butler and Jason Johnston)

*The Self-Enforcing Range and Contract Interpretation*

*Private Equity, Club Deals and Collusion* (with Katherine Litvak)

## ACADEMIC PRESENTATIONS

*Is Antitrust Too Complicated for Generalist Judges?  The Impact of Economic Complexity and Judicial Training on Appeals*
    UCLA Law and Economics Workshop (September 2008)
    Northwestern University Law and Economics Workshop (September 2008)
    Stanford Law and Economics Workshop (January 2009)
    University of Texas Law and Economics Workshop (December 2008)
    George Mason University Economics Department Public Choice Seminar (April 2009)
    American Law and Economics Association Meetings (May 2009)

*Federalism, Substantive Preemption, and Limits on Antitrust: An Application to Patent Holdup*
    Duke University Law School Intellectual Property Symposium (February 2008)
    George Mason/ Microsoft Annual Conference on the Law and Economics of Innovation ( May 2008)
    Tilburg Law and Economics Center (December 2008)

*The Effects of Contract Regulation in the Alcoholic Beverage Industry*
    Southern Economic Association 2007 Annual Meeting (November 2007)

*Antitrust, Multi-Dimensional Competition, and Innovation: Do We Have An Antitrust Relevant Theory of Competition Now?*
    George Mason/ Microsoft Annual Conference on the Law and Economics of Innovation (May 2007)

*The Antitrust Law and Economics of Category Management*
    American Law & Economics Association 2004 Annual Meeting

*The Economics of Slotting Contracts*
    Silicon Flatirons New Institutional Economics Conference
    Peking University Conference on Chinese Competition Policy and Anti-Monopoly Law (October 2007)
    American Law & Economics Association 2005 Annual Meeting
    International Society of New Institutional Economics 2004 Annual Meeting
    George Mason University Law School Levy Workshop

*Antitrust Law and Competition for Distribution*
    George Mason Law Review Fall 2005 Antitrust Symposium

*Slotting Contracts and Consumer Welfare*
    George Mason University Law School Levy Workshop (March 2006)
    University of Texas Law School Center for Law, Business, and Economics (January 2006)

Wrigh-25

International Industrial Organization Conference (April 2006)
American Law & Economics Association 2006 Annual Meeting (May 2006)
Southeastern Association of Law Schools Annual Meeting (July 2006)
Southern Economic Association Annual Meeting (September 2006)
First Annual Conference on Empirical Legal Studies (October 2006)

*Behavioral Law and Economics, Paternalism, and Consumer Contracts: An Empirical Perspective*
NYU Journal of Law and Liberty Symposium (October 2006)

*The Roberts Court and the Chicago School of Antitrust: The 2006 Term and Beyond*
*University of Missouri-Columbia School of Law (February 2008)*
*William S. Boyd School of Law, UNLV (April 2008)*

## CONFERENCES AND TESTIMONY

Panelist, FTC Workshop on Resale Price Maintenance (2009)
Panelist, Searle Center Conference on Antitrust Law and Economics (September 2008)
Panelist, FTC at 100 Conference (September 2008)
Panelist, Federalist Society Conference on Intellectual Property (July 2008)
Panelist, Stanford Institute of Economic Policy Research and the Hoover Institution Conference
on the Modernization of Antitrust (May 2008)
Panelist, Searle Center Research Roundtable on the Theory of the Firm (March 2008)
Panelist, Searle Center Research Roundtable on the Law and Economics of Innovation (January
2008)
Panelist, Searle Center Conference on The End of the Microsoft Consent Decree (November
2007)
Panelist, Joint DOJ/FTC Hearings on Sherman Act Section 2 and Single Firm Conduct on
Exclusive Dealing
Panelist, George Mason Law Review Fall 2006 Antitrust Symposium

## PROFESSIONAL ACTIVITIES

Member, National Science Foundation Law and Social Science Advisory Panel
Member, Global Competition Policy Magazine Advisory Board
Senior Editor, *Global Competition Policy Magazine*
Editor, *Supreme Court Economic Review, Antitrust Law Journal*
Referee, *Review of Law and Economics; Supreme Court Economic Review, Review of Industrial
Organization, Journal of Legal Studies*
Contributor, *Truth on the Market* (a blog dedicated to academic commentary on law, business,
and economics)
Co-Founder and Conference Organizer, Microsoft and George Mason Series on the Law and
Economics of Innovation (2007-2011) (www.innovationforum.gmu.edu)
Conference Organizer, Merger Analysis in High Technology Markets (Feb. 1, 2008) (with
Thomas W. Hazlett)

## AFFILIATIONS AND MEMBERSHIPS

International Industrial Organization Society
American Economics Association
Southern Economic Association
International Society of New Institutional Economics
Sloan Foundation Industry Studies Affiliate
American Law and Economics Association
California Bar Association
American Bar Association Antitrust Section

## APPENDIX B
## TABLE 1

| Variable | Linear | Logit-MEM | Probit-MEM |
|----------|--------|-----------|------------|
| Death | 0.0486*** | 0.0415*** | 0.0434*** |
| Age at Claim | 0.0019*** | 0.0019*** | 0.0021*** |
| Case originating with VLC | -0.1681*** | -0.1669*** | -0.1676*** |
| Multiple Injuries Indicator | 0.0317*** | 0.0311*** | 0.0317*** |
| Count of Lawyers | 0.0000 | 0.0000 | 0.0000 |
| Constant | 0.1236*** | | |
| N | 14146 | 14146 | 14146 |
| R-squared/Pseudo R-Sq. | 0.06 | 0.07 | 0.07 |

* p<0.05; ** p<0.01; *** p<0.001.

## TABLE 2

| Variable | Linear | Logit-MEM | Probit-MEM |
|----------|--------|-----------|------------|
| Death | 0.0518*** | 0.0447*** | 0.0466*** |
| Age at Claim | 0.0019*** | 0.0019*** | 0.0020*** |
| Case originating with VLC | -0.1657*** | -0.1620*** | -0.1635*** |
| 2 injuries | 0.0459*** | 0.0437*** | 0.0450*** |
| 3 injuries | -0.0219* | -0.0227* | -0.0233* |
| 4 injuries | -0.0555*** | -0.0597** | -0.0599** |
| Count of Lawyers | 0.0000 | 0.0000 | 0.0000 |
| Constant | 0.1213*** | | |
| N | 14146 | 14146 | 14146 |
| R-squared/Pseudo R-Sq. | 0.06 | 0.07 | 0.07 |

* p<0.05; ** p<0.01; *** p<0.001

29

Wrigh-28

## TABLE 3

| Variable | Linear | Logit-MEM | Probit-MEM |
|---|---|---|---|
| Death | 0.0523*** | 0.0446*** | 0.0468*** |
| Age at Claim | 0.0019*** | 0.0018*** | 0.0020*** |
| Case originating with VLC | -0.1577*** | -0.1461*** | -0.1508*** |
| 2 injuries | 0.0447*** | 0.0414*** | 0.0432*** |
| 3 injuries | -0.0190 | -0.0196 | -0.0193 |
| 4 injuries | -0.0575** | -0.0588** | -0.0597* |
| Count of Lawyers | -0.0001 | 0.0000 | 0.0000 |
| Constant | 0.3201 | | |
| N | 14146 | 14134 | 14134 |
| R-squared/Pseudo R-Sq. | 0.07 | 0.08 | 0.08 |

* $p<0.05$; ** $p<0.01$; *** $p<0.001$.  OLS with robust standard errors.

## TABLE 4

| Variable | Coefficient | Standard Error |
|---|---|---|
| Death | 0.1068 | 0.1051 |
| Age at Event | -0.0169*** | 0.0038 |
| Case originating with VLC | 0.5008*** | 0.0919 |
| Multiple Injuries Indicator | -0.0644 | 0.0874 |
| Count of Prod. Liability Lawyers | 0.0002* | 0.0001 |
| Constant | 40.4214*** | 0.2400 |
| N | 1980 | |
| R-squared | 0.03 | |

* $p<0.05$; ** $p<0.01$; *** $p<0.001$.  OLS with robust standard errors.

Wrigh-29

**TABLE 5**

| Variable | Coefficient | Standard Error |
|---|---|---|
| Death | 0.1062 | 0.1053 |
| Age at Event | -0.0169*** | 0.0038 |
| Case originating with VLC | 0.4995*** | 0.0916 |
| 2 injuries claimed | -0.0714 | 0.0925 |
| 3 injuries claimed | 0.0011 | 0.1605 |
| 4 injuries claimed | -0.0563 | 0.0854 |
| Count of Prod. Liability Lawyers | 0.0002* | 0.0001 |
| Constant | 40.4241*** | 0.2401 |
| N | 1980 | |
| R-squared | 0.03 | |

* $p<0.05$; ** $p<0.01$; *** $p<0.001$.  OLS with robust standard errors.

**TABLE 6**

| Variable | Coefficient | Standard Error |
|---|---|---|
| Death | 0.1015 | 0.0918 |
| Age at Event | -0.0114*** | 0.0031 |
| Case originating with VLC | 0.2657** | 0.0965 |
| 2 injuries claimed | -0.0158 | 0.0821 |
| 3 injuries claimed | 0.0924 | 0.1732 |
| 4 injuries claimed | -0.1423 | 0.0793 |
| Count of Prod. Liability Lawyers | -0.0002 | 0.0001 |
| Constant | 40.6974*** | 0.2182 |
| N | 1980 | |
| R-squared | 0.25 | |

* $p<0.05$; ** $p<0.01$; *** $p<0.001$.  OLS with robust standard errors.

Wrigh-30

_____
JOSHUA D. WRIGHT

Subscribed and sworn to

before me on the

30th day of March, 2009.


_____

Notary Public in and for

The State of Texas

SYLVIA REYNA RAMIREZ
Notary Public, State of Texas
My Commission Expires
November 11, 2009

My commission expires November 11, 2009

2

Wrigh-31