UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re:  VIOXX PRODUCTS LIABILITY LITIGATION<br><br><br>**This document relates to All Cases** | CIVIL ACTION<br><br>NO. 2:05-MD-01657-EEF-DEK<br><br>SECTION L<br>JUDGE ELDON E. FALLON<br><br>DIVISION 3<br>MAGISTRATE DANIEL E. KNOWLES III |

**THE VIOXX LITIGATION CONSORTIUM'S
MEMORANDUM IN REPLY TO THE OPPOSITION OF THE TULANE LAW CLINIC
TO MOTION FOR RECONSIDERATION OF CAPPING ORDER**

The VLC's Motion for Reconsideration asks this Honorable Court to consider:  1) whether this Court has subject matter jurisdiction over the VLC's individual written fee agreements; 2) whether this Court has the authority to modify the VLC's individual written fee agreements, and if so, what is the correct law to be applied; and 3) was the VLC deprived of its property without due process.  As will be shown below:  1) the Court does not have subject matter jurisdiction over the private written fee agreements of the VLC; 2) no term in the contingent fee agreements supplies any authority to modify them; 3) 28 U.S.C. § 1407 does not

empower an MDL transferee court to modify written contingent fee agreements; 4) Rule 23 is not applicable;  5) there is no inherent power to modify these agreements; and 6) no term in the Settlement Agreement empowers the Court to modify written contingent fee agreements.[1]

## I.      THE COURT HAS NO SUBJECT MATTER JURISDICTION OVER THE PRIVATE FEE AGREEMENTS

This Court issued the Capping Order *sua sponte*, despite the fact that no party or attorney brought to the Court any dispute over the private fee agreements.  In so doing, the Court acted without a case or controversy and thus lacked constitutional jurisdiction to modify those contracts.  The principles of limited federal court jurisdiction have been well expressed by Justice Scalia, writing for a unanimous Supreme Court:

> Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.  It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.[2]

### A.      Neither the existence of an MDL nor the Vioxx Settlement Agreement creates jurisdiction over private fee agreements that are not at issue in the MDL and are specifically excluded from the purview of the Settlement Agreement.

No doubt this Court had jurisdiction over the subject matter of the Vioxx MDL cases. But the subject matter of these cases was a dispute between discrete individual plaintiffs and Merck, not between discrete individual plaintiffs and their own attorneys.  These were drug product liability cases brought by plaintiffs who claimed they had been harmed by Merck's product Vioxx.  No contract claim over attorneys' contingent fees was at issue.

Tulane agrees that according to Fifth Circuit precedent there is no case or controversy when "the parties did not request that the court take action in the form of either approval of a

---

[1] The VLC incorporates its previously-filed memorandum and affidavits by reference.

[2] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

settlement agreement or administration of a settlement fund."[3]  Tulane concedes that the Court was not asked to approve the settlement ("Of course, the Court did not approve the settlement agreement in this case . . . .").[4]  And as for "administration," Tulane ignores the fact that the Settlement Agreement is by its express terms a "private agreement" and that the involvement of Judge Fallon is as an individual – as the chief claims administrator – and then only in the capacities specified in the Settlement Agreement (*e.g.*, common benefit issues, not private fee agreements).

Tulane reads the Settlement Agreement far too broadly when it suggests that when the parties[5] asked Judge Fallon to act as Chief Administrator over certain aspects of the settlement, they asked the Court to approve their private fee agreements.  No party to the Agreement has moved the Court requesting that it set private fee agreement limits.  This is in contrast to the fact that a motion has been filed concerning common benefit fees.

The Settlement Agreement establishes a program to resolve disputes asserted by plaintiffs against Merck.[6]  The Settlement Agreement explicitly excludes private fee agreements between plaintiffs and their counsel from its purview.[7]

---

[3] Tulane Memorandum, Rec. Doc. No. 17999 at pp. 5-6 of 29 (citing *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129 (5th Cir. 1979)).

[4] Tulane Memorandum, Rec. Doc. No. 17999 at p. 9 of 29.

[5] The VLC assumes for purposes of this filing, but does not concede, that the "parties" to the Settlement Agreement are Merck and Plaintiffs' Negotiating Committee.

[6] "This Agreement establishes a program to resolve the actions, disputes and claims that these, and other plaintiffs' counsel have asserted against Merck on behalf of their clients related to their clients' alleged use of *VIOXX*."  Settlement Agreement, Preamble.

[7] Settlement Agreement, § 9.1.

Article 9 addresses attorneys' fees in two sections:  Section 9.1 ("Individual Counsel Attorneys' Fees") and Section 9.2 ("Common Benefit Fees and Reimbursement of Litigation Costs").  Section 9.1 creates no role for the Court:

> Any division of any Settlement Payment with respect to, and as between, any Enrolled Program Claimant, any related Executing Derivative Claimants and/or his or their respective counsel is to be determined by such Persons . . . .[8]

Section 9.2 describes Judge Fallon's contractual role in assessing and awarding common benefit fees.[9]

The language of the Settlement Agreement is express that division of any settlement is to be determined by the claimant and his counsel.  This is consistent with the "private" nature of the agreement, in which the Court is asked to perform expressly defined activities:

> This is a private agreement.  At the joint request of the Parties, the Honorable Eldon E. Fallon has agreed to preside over the Program *in the capacities specified herein*.[10]

If the Settlement Agreement had been intended to ask the Court to modify individual attorneys' fees agreements, it would have expressly said so.  Just as the parties made clear the Court's role in common benefit fees, they could have written that individual attorneys' fees are "subject to the

---

[8] *Id.*

[9] For example, "[t]he Honorable Eldon E. Fallon" is directed to appoint an Allocation Committee to make recommendations on common benefit fee and cost awards.  Their recommendations are "*subject to the approval of Honorable Eldon E. Fallon* in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson."  *Id.*, § 9.2.4 (emphasis added).  Further, "[t]he Honorable Eldon E. Fallon shall provide appropriate notices governing the procedure by which *he shall determine common benefit attorneys' fees and reimbursement of common benefit expenses*...."  *Id.*, § 9.2.5 (emphasis added).  And, "[t]he Honorable Eldon E. Fallon shall insure that there is ample opportunity for objections and comments to the application and notice of a hearing regarding the same.  The Honorable Eldon E. Fallon shall set time and place of said hearing."  *Id.*

[10] Amendment to Settlement Agreement (1/17/08), § 6.1.1 (emphasis added).

approval of Honorable Eldon E. Fallon" and "[t]he Honorable Eldon E. Fallon shall provide appropriate notices governing the procedure by which he shall determine individual attorneys' fees" as they did in the very next paragraph.[11]  The Settlement Agreement does not ask the Court to consider reducing individual attorneys' fee agreements and is no basis whatsoever to assume this mantle.

Tulane's suggestion that the Court has ancillary jurisdiction over the VLC's fee agreements "because the Settlement Agreement is a private contract creating a mechanism for resolution of disputes" is just wrong.  A rule of law, often described as elementary, is that a private agreement cannot give a federal district court subject matter jurisdiction it did not already have.[12]  Jurisdiction can derive only from a statute or the court's inherent power, sometimes referred to as ancillary jurisdiction.[13]

The Supplemental Jurisdiction Act, 28 U.S.C. § 1367, is the obvious candidate source of statutory jurisdiction over the VLC's fees.  The statute is, however, plainly inapplicable.  First, the statute confers supplemental jurisdiction only over "claims."[14]  No "claim" relating to the VLC's fees exists, the VLC's clients not having asserted one.  Second, the statute confers jurisdiction only when the supplemental "claim" (assuming there is one) is "so related to" the main action as to "form part of the same case or controversy under Article III of the United

---

[11] Whether such terms would be enforceable against "nonparties" is another matter.

[12] *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167 (1939) ("The jurisdiction of the federal courts – their power to adjudicate – is a grant of authority to them by Congress and thus beyond the scope of litigants to confer.").

[13] 13 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE §3523.3 (2008).

[14] 28 U.S.C. § 1367(a) (2008).

States Constitution."[15]  There is no nexus whatsoever between the clients' product liability claims against Merck and the VLC's contractual fees.

Inherent power is the other possible basis for ancillary jurisdiction, but it does not apply either.  As the United States Supreme Court explained in *Kokkonen v. Guardian Life Ins. Co. of America*,[16] ancillary jurisdiction may be based on the inherent power only when required to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.  The VLC's collection of its contractual fees does not impair this Court's functioning.  The settlement program would conclude every bit as successfully without the Capping Order as it will with it.  The Capping Order does not state otherwise.  It asserts that the Court has "the inherent authority and concomitant duty to exercise ethical supervision over the parties,"[17] but it neither says the collection of contractual fees would interfere with the Court's operation nor explains how interference could occur.

Given the history of multi-district litigation (MDL), impairment must be impossible.  District court judges have presided over scores of settled MDLs.  Yet, they capped plaintiffs' attorneys' contingent fees only twice – in *Zyprexa* and *Guidant* – before this Court issued the Capping Order.  In all other cases, settlements which date back decades, MDL courts functioned effectively without regulating contingent fees. The Capping Order identifies no idiosyncratic feature of this case that creates an unacceptable risk of impairment not present in other settled MDLs.  To the contrary, economies of scale, state statutes limiting fees, and vulnerable clients are present in most MDLs.  Therefore, regulation of the VLC's contingency fee agreements

---

[15] *Id.*

[16] 511 U.S. 375 (1994).

[17] Capping Order, Rec. Doc. No. 15722 at p. 9 of 21.

cannot be "essential to the conduct of federal-court business"[18] and *Kokkonen's* condition for ancillary jurisdiction is not met.[19]

In *Zyprexa*, *Guidant*, and here, the factor motivating the decision to reduce contingent fees was (and is) the desire to protect plaintiffs from what the courts perceived as excessive charges. This desire provides no basis for subject matter jurisdiction. The inherent power doctrine does not authorize federal judges to right all the wrongs they perceive. It empowers them to act in ways reasonably needed to ensure compliance with their orders and otherwise protect their courts from interference.

In *Broughten v. Voss*,[20] the Fifth Circuit struck down a district court judge's attempt to determine the reasonableness of a fee when doing so was not required to protect the court's ability to function. The law firm representing the plaintiff sought to withdraw from the case on the grounds that it had not been paid. The Fifth Circuit noted that in considering a motion to withdraw, it was necessary only that the court assure itself that the prosecution of the lawsuit before it was not disrupted by the withdrawal, and that the withdrawal was for good cause. The Fifth Circuit went on to say:

> Here, on its own initiative the court broached the subject of the reasonableness of fees. All that was before the court, however, was the propriety of the motion to withdraw. To stray from that

---

[18] *Kokkonen*, 511 U.S. at 381.

[19] *Cf. Crisp v. I/N Tek, L.P.*, 2009 WL 624256, *2 (N.D. Ind. Mar. 10, 2009) ("Even if the Crisp/I/N Tek settlement agreement addressed the fee issue, the controversy over the assessment and allocation of fees and expenses wasn't necessary to resolution of the 'case or controversy' presented to this court, so the court declines to exercise supplemental jurisdiction in this instance.").

[20] 634 F.2d 880 (5th Cir. 1981).

issue was beyond the pale of existing jurisdiction, and thus must be a nullity.[21]

The result was correct.  The fee dispute was unrelated to the issues in the underlying securities case; consequently, resolution of the fee dispute was unnecessary to the court's functioning.  In keeping with the doctrine that a private agreement cannot confer jurisdiction that is otherwise lacking, the Fifth Circuit "add[ed], perhaps unnecessarily, that it is elementary that a party cannot confer subject matter jurisdiction on a court, and thus that counsel's letter acquiescing in the district court's actions is irrelevant to determination of this appeal."[22]

### B. Fifth Circuit cases cited by Tulane do not support the existence of a case or controversy over the VLC's fee agreements here.

The *Hoffert* and *Karim* cases cited by Tulane do not support jurisdiction over the VLC's fee agreements here.  Tulane's reliance on these two cases is misplaced because it is premised on the erroneous assumption that the VLC asked the Court to approve their fees in the Settlement Agreement.[23]

In *Hoffert v. General Motors Corp.*[24] the plaintiff's attorney, with the support of the court-appointed guardian, submitted a minor's settlement to the district court for approval.  The district court approved the total amount of the settlement but disapproved plaintiff's counsel's one-third contingency fee.  The Fifth Circuit found that the district court had jurisdiction to reduce the fee because the parties' request for court approval of the settlement necessarily required the court to examine the attorney's fee.

---

[21] *Id.* at 883.

[22] *Id*. (citations omitted).

[23] *See supra* Section I.A.

[24] 656 F.2d 161 (5th Cir. 1981).

The facts here differ from *Hoffert*.  Here the Court did not appoint a guardian for the VLC's clients.  To the contrary, the Court recognized there was no generalized need for a guardian by allowing all participants in the MDL to decide whether to settle without one.  If the plaintiffs were sufficiently incompetent as to require guardians, the Court would have to invalidate the entire settlement.

Further, the parties to the Vioxx agreement did not request the Court to approve the settlement.  Unlike *Hoffert*, there is nothing in the Vioxx agreement that would permit the Court to invalidate the settlement if the Court came to believe that $4.85 billion was too little compensation.  Without a request to approve the settlement, there is no case or controversy for this Court to decide.

Tulane also relies on *Karim v. Finch Shipping Co.,*[25] an admiralty case.  *Karim* does support some important propositions.  It shows that when assessing the reasonableness of a contingent fee, a district court must decide which law applies, provide the attorney an opportunity to be heard, and ground its decision in evidence.  But *Karim* does not establish the Court's jurisdiction to control the VLC's fees.  First, because admiralty law treats seamen as wards of the court, the power to control fees in admiralty is the same as the power that exists in a case like *Hoffert*, where a guardian is appointed.  This not being an admiralty case, *Karim* is not relevant.  Second, unlike the defendant in *Karim*, Merck did not deposit any funds in the district court's registry.  Disbursements of settlement payments to claimants require no court action or approval, and those payments are made directly to each claimant, in the name of the claimant and

---

[25] 374 F.3d 302 (5th Cir. 2004).

his counsel and any division between them is decided by them.[26]  Consequently, there is no "*res*" with respect to which the Court must act.[27]

Tulane's attempt to equate the facts here to those in *Hoffert* and *Karim* is a house of cards.  The Vioxx Settlement Agreement does not ask for or agree to the Court's intervention in the private fee agreements.  The requested involvement is expressly confined to those "capacities specified herein," and private fee agreements are specifically excluded from the purview of the Settlement Agreement.

## II.   THE VLC'S CONTINGENT FEE AGREEMENTS DO NOT AND CANNOT CONFER AUTHORITY UPON THE COURT TO MODIFY THE AGREEMENTS

In a novel argument, Tulane suggests that the VLC's professional disclosure to its clients that it would abide by a valid court order changing the fee agreement proves that the VLC "contemplated the possibility that the Court could intervene on the matter of attorneys' fees."[28]  Besides being taken out of context, a mere statement that a court order will control is no agreement that this Court has authority to modify the Vioxx fee agreements.

Additionally, Tulane separately reads these three paragraphs when it should have interpreted them as a whole.  While the first paragraph provides that "[i]n the absence of court order" the client agrees to a forty percent fee, the "court order" phrase is limited by the following paragraph, which reads:

> We understand some portions of our case may be handled through
> *class actions, court-approved settlements, administrative claims*

---

[26] Settlement Agreement, § 9.1.

[27] The Fifth Circuit also noted that the plaintiff's attorney had waived his right to object to the Tulane Law Clinic's appointment, *by waiting until his reply brief to contend that the clinic had been improperly appointed*.  As this Court knows, the VLC has timely objected to the appointment of the Tulane Law Clinic and maintains its objection to that appointment.

[28] Tulane Memorandum, Rec. Doc. No. 17999 at pp. 6-8 of 29.

> *processing, or as a result of bankruptcy proceedings*, and the
> attorneys' fee to be paid to the Attorneys *in those situations* will be
> determined or awarded by order of the court . . . .[29]

The italicized portion represents an exhaustive list of circumstances wherein courts regularly (and with explicit authority) award or review attorneys' fees, none of which apply here.

Tulane's argument that by including this language, the VLC *expected* that this Court might alter the fee agreements assumes that at the time the agreements were entered, MDL courts routinely modified individual fee agreements.  This assumption is incorrect.  *In re Zyprexa* represents the first time that an MDL court modified *sua sponte* a contingent fee agreement.  But, by the time this decision was issued in March of 2006, the VLC had already entered into over 94% of its contingent fee agreements.[30]  Even then, because *In re Zyprexa* was the first case in the nearly 40 years of the MDL's existence that an MDL court altered contingent fee agreements, it was an anomaly, not an established principle of law.  And, by the time Judge Donovan issued his decision capping fees in *In re Guidant* in February 2008 – after the Vioxx settlement – the VLC had entered 100% of its contingent fee agreements.  Thus, even if it were legally relevant, which it is not, at the time the VLC and their clients signed the contingent fee agreements, neither the clients nor the attorneys had any reason to anticipate that an MDL court would cap fees in the face of privately-negotiated fee agreements.

## III.   THIS COURT LACKS AUTHORITY TO REVIEW OR REDUCE ATTORNEYS' FEES

### A.   The Court cannot exercise its equitable powers to review and modify the VLC's contingent fee agreements under the circumstances presented here.

---

[29] *See* Tulane Memorandum, Rec. Doc. No. 17999, Ex. A at p. 5 (emphasis added).

[30] *See* Affidavit of Grant Kaiser, ¶ 12.  Mr. Kaiser's affidavit is attached to the VLC's Supplemental Submission, filed separately from this reply.

In its Capping Order, this Court based its ability to exercise general equitable powers on a quasi-class action argument.[31]  In doing so, this Court relied upon the Federal Rules of Civil Procedure, *Zyprexa*, and *Guidant*.  The VLC challenged the notion of a *quasi*-class action in its original motion to reconsider.[32]  Tulane appears to concede the point by relegating its only discussion of "quasi-class action" to a footnote, followed by a comment that such an analogy is unnecessary.[33]  But, as it was part of the Court's rationale for the Capping Order, the VLC will address it.

The language used in Rule 23 and Section 1407 exemplifies the distinction between class actions and MDL actions.  One prerequisite for class certification is the presence of common questions of *law or fact*.[34]  Conversely, Section 1407 uses the phrase "common questions of *fact*."[35]  The singular focus on questions of "fact" reveals the limited scope Congress intended for Section 1407.  Notably, Section 1407 applies to *pretrial* proceedings only,[36] which necessarily implies that actions consolidated under Section 1407 retain their individual character.  One cannot reach the same conclusion when viewing Rule 23's focus on common questions of

---

[31] *See* Capping Order, Rec. Doc. No. 15722 at p. 8 of 21.

[32] *See* VLC's Motion for Reconsideration, Rec. Doc. No. 17330 at pp. 6-8 of 52.

[33] *See* Tulane Memorandum, Rec. Doc. No. 17999 at p. 8 n.6 of 29.

[34] *See* Fed. R. Civ. P. 23(a).

[35] 28 U.S.C. § 1407(a) (2008) (emphasis added).

[36] *See id.  See also infra* pp. 17-22.

"law or fact."  Judge Higginbotham correctly remarked during a meeting of the ABA Task Force that, "[i]n mass tort litigation the plaintiffs are simply set up differently than in class litigation."[37]

A class action is "[a] lawsuit in which the court authorizes a single person or a small group of people to represent the interests of a larger group[.]"[38]  An MDL, conversely, is "[f]ederal-court litigation in which civil actions pending in different districts and involving common fact questions are transferred to a single district for coordinated pretrial proceedings, after which the actions are returned to their original districts for trial."[39]

By definition, class actions and MDLs are widely-different proceedings.  Judges have to set fees for class counsel because the market cannot do so, it being impossible for all class members and class counsel to contract directly.  The option of letting class counsel set its own fees is plainly unworkable; no one gets to decide his own wage.  Judges do not have to set individual attorneys' fees in MDLs, however, because agreements are already in place.  Because the market controls individual attorneys' fees, there is no danger of over-charging; individual attorneys cannot and do not fix their own wages.

Class actions are representative litigation.  The "defining feature of a class action is the presence of absent class members – parties whose legal rights are subject to determination in the action but who are not represented by individual counsel."[40]  These concerns are reflected by the prerequisites for class certification:  (1) numerosity; (2) commonality; (3) typicality; and (4)

[37] *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105, 152 (2006) (Statement of Judge Higginbotham, ABA Task Force Meeting Minutes, Austin, Texas, May 5, 2006).

[38] BLACK'S LAW DICTIONARY 267 (8th ed. 2004).

[39] *Id.* at 1041.

[40] Affidavit of Geoffrey P. Miller, ¶ 35.  Professor Miller's affidavit is attached to the VLC's Supplemental Submission, filed separately from this reply.

adequacy of representation.[41]  In the context of class settlement and attorneys' fees awards, the features of class actions produce a unique need for special protection of absentee or unrepresented class members.  Rule 23(e) provides this protection by demanding that courts assess whether proposed settlements are fair, adequate, and reasonable to the class.[42]

Similarly, Rule 23(h) commands that courts award "reasonable" fees.[43]  This duty rests on the notion that in class actions, "the ordinary procedures for clients contracting about legal fees are absent."[44]  That is, the "clients" in a class action often do not negotiate with an attorney.[45]  Court intervention into fee matters does "not abridge substantive rights . . . because no one has a substantive right to obtain any particular fee out of the common fund."[46]

The issue of attorneys' fees in an MDL lacks the same predicate for court intervention: absentee or unrepresented class members.  An MDL is *not* representative litigation; it is a consolidation of *individual* actions.[47]  "The plaintiffs in this Court *are* represented by individual counsel.  All or virtually all have negotiated private retainer agreements with their attorneys which include explicit understandings as to fees."[48]  Thus, unlike court supervision in the class action context, where many class members go unrepresented, court supervision over fee agreements in the MDL context, "abridge[s] substantive rights:  it impairs obligations under

---

[41] *See id.  See also* FED. R. CIV. P. 23(a) (2009).

[42] *See* FED. R. CIV. P. 23(e).  *See also* Affidavit of Geoffrey P. Miller, ¶ 35.

[43] *See* FED. R. CIV. P. 23(h).

[44] Affidavit of Geoffrey P. Miller, ¶ 15(e).

[45] *See id.*

[46] *See id.*, ¶ 33.

[47] *See id.*, ¶ 16.

[48] *See id.*, ¶ 36 (emphasis in original).

private fee agreements between attorneys and clients."[49]  This elemental feature is not changed by the appointment of committees to perform special functions nor does "[t]he fact that these cases, in their procedural posture, may have points of *similarity* to a class action . . . establish that they are the *same* as a class action."[50]

Concerns of over-reaching by attorneys that may be present in class actions are not present in MDLs.  One proponent of reform of class actions suggested that class members serve the interests of attorneys in class actions rather than the other way around.[51]  But, because of the *individualized* nature of MDLs, where virtually all individuals choose to pursue actions and are represented by attorneys, MDLs do not present the same concern.

*Similarities* between the two do not create a Congressional grant of authority over MDLs as "quasi-class actions."  Such a conclusion ignores foundational differences in the two procedures.  The "quasi-class action" label overlooks these differences and, in the end, is a misnomer.

Instead of arguing class action similarities, Tulane, without citation to any authority, seeks to persuade this Court that equitable powers "to promote fairness and efficiency" permit

---

[49] Affidavit of Geoffrey P. Miller, ¶ 33.

[50] *See id.*, ¶ 30 (emphasis in original).

[51] "Class actions are supposed to be brought on behalf of class members – usually consumers.  But in the class actions we are seeing today, class members are the forgotten participants.  No one checks to see if the putative class members really want to have their claims asserted in a class action.  No one asks the class members how or where they wish their claims to be asserted.  No one confers with class members to find out if they wish to have their claims litigated.  And most importantly, no one obtains input from class members about how they wish to have their claims settled (if at all).  In short, consumers' claims are being used by attorneys as business ventures."  *A Bill to Provide for Class Action Reform, and for Other Purposes: Hearing on S. 353 Before the Subcomm. on Admin. Oversight and the Courts of the S. Comm. on the Judiciary*, 106th Cong. 111 (1999) (prepared statement of Stephen G. Morrison).

*sua sponte* review of attorneys' fee agreements in MDLs.[52]  This argument, though, is erroneous and ignores not only the basis for the Court's exertion of equitable authority, but also general principles of equitable authority.

This equitable power is not unlimited; specifically, the flexibility of equity "is confined within the broad boundaries of traditional equitable relief."[53]  Equitable authority is further constrained by *Erie*.[54]  Because state laws govern attorneys' fees, there is no room for resort to equity.

Tulane erroneously argues that 28 U.S.C. § 1407, and Judge Fallon's role as a private administrator, give the Court free reign to fashion any remedy it views as promoting fairness and efficiency.  Nowhere in the statute itself, or in the history surrounding its enactment (as discussed more fully in the VLC's supplemental memorandum), does Section 1407 discuss administration of a global settlement fund.   The text of Section 1407 confines a transferee court's powers to pretrial proceedings.  Had Congress intended otherwise it would have provided such authorization in Section 1407.  But it plainly did not.  In addition to there being no express grant of authority, the legislative history of the MDL statute reinforces the conclusion that Congress never intended to grant a transferee court the power to revise ethical fee agreements.

Congress adopted Section 1407 in 1968 on the tails of the *ad hoc* procedure used to efficiently dispose of discovery issues created by the flood of electrical equipment antitrust cases

---

[52] *See* Tulane Memorandum, Rec. Doc. No. 17999 at pp. 9-10 of 29.

[53] *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999).

[54] *See* 19 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 4513 (2d ed. 1996).

in the 1960s.[55]  The electrical equipment cases comprised an unprecedented 1,800 plus actions (a total of more than 25,000 claims) filed in thirty-five districts.[56]  The cases threatened to engulf the federal district courts in a morass.  These circumstances demanded "extraordinary measures to minimize duplication of judicial effort."[57]

In response to the antitrust cases, the Judicial Conference of the United States created a new committee – the Co-ordinating Committee for Multiple Litigation of the United States District Courts (the "Committee") – to consider "discovery problems arising in multiple litigation with common witnesses and exhibits."[58]  Although the Committee grew from the pressures created by the electrical equipment cases, it became clear that the "problems of multiple related cases might extend beyond the immediate pressures . . . and that the general problem merited sustained attention from the conference."[59]

With respect to the electrical equipment litigation, the Committee "decided to direct its initial efforts toward developing a program for co-ordinating the pretrial stages of the cases" by developing "suggested uniform pretrial procedures designed to avoid repetitious and overlapping

---

[55] *See* H.R. REP. NO. 90-1130 at 2 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898.

[56] *See* Phil C. Neal & Perry Goldberg, *The Electrical Equipment Antitrust Cases:  Novel Judicial Administration*, 50 A.B.A. J. 621, 622 (1964).  Phil Neal acted as Executive Secretary to the Co-ordinating Committee for Multiple Litigation.  Perry Goldberg served as Administrative Assistant to the Co-ordinating Committee for Multiple Litigation.  *Accord A Proposal to Provide Pretrial Consolidation of Multidistrict Litig.:  Hearing on S. 3815 Before the Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary*, 89th Cong. 5 (1966) (statement of Hon. Edwin A. Robson, Judge, U.S. District Court, N.D. Ill.).

[57] Neal & Goldberg, 50 A.B.A. J. at 622.

[58] *Id.* at 623.

[59] *Id.*

discovery."[60]  These efforts resulted in voluntary, *ad hoc* consolidation and coordination amongst

the various district courts for the purpose of conducting national discovery.[61]  This included

"master" sets of written discovery requests, singular depositions of key witnesses, which were

presided over by district court judges who issued evidentiary rulings, and the creation of a central

document depository.[62]  The electrical equipment litigation, which could have consumed more

than twenty years absent consolidation, concluded in roughly seven years.[63]

The overwhelming success of this procedure served as a catalyst for judicial mechanisms

that could "make[] it easier in future instances of multiple litigation to employ the techniques

that have been developed in connection with the electrical equipment litigation."[64]  Congress,

therefore, sought to enact "statutory authority for the kind of pretrial consolidation and

coordination successfully implemented in the electrical cases."[65]  Such a statute would "provide

centralized management under court supervision of pretrial proceedings of multidistrict litigation

to assure the 'just and efficient conduct' of such actions."[66]  The centralized management of

---

[60] *Id.*

[61] *See generally id.*

[62] *See generally id.*

[63] *See* Mark Herrmann & Pearson Bownas, *An Uncommon Focus on "Common Questions": Two Problems with the Judicial Panel on Multidistrict Litigation's Treatment of the "One or More Common Questions of Fact" Requirement for Centralization*, 82 TULANE L. REV. 2297, 2303 (2008).

[64] *A Proposal to Provide Pretrial Consolidation of Multidistrict Litig.:  Hearing on S. 3815 Before the Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary*, 89th Cong. 7-8 (1966) (statement of Phil C. Neal, Dean, Univ. of Chicago Law School).

[65] H.R. REP. NO. 90-1130 at 2.

[66] *Id.*

pretrial proceedings would avoid or minimize the conflict and duplication of discovery and other pretrial procedures in related cases.[67]

This history reveals that Congress viewed Section 1407 as codifying the procedures employed in the electrical equipment cases. Specifically, Congress intended Section 1407 to solve the "problems involved in conducting pretrial deposition and discovery proceedings efficiently and economically."[68] Congress was not interested in broad-reaching powers over all aspects of multi-district litigation; instead, Congress created a statute satisfying a "limited purpose":[69] the coordination of pretrial proceedings. Indeed, the United States Supreme Court in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach* recognized the limited authority of transferee courts when it held that a transferee court lacked the power, after the termination of pretrial proceedings, to assign a transferred case to itself for trial.[70]

Congress' objectives in adopting Section 1407 were two-fold: (1) centralized control over pretrial proceedings and (2) efficiency in pretrial dispositions. Section 1407 fulfills these objectives by coordinating, for efficiency's sake, "repetitive and identical proceedings"[71]

---

[67] *Id.*

[68] *Id.* at p. 6.

[69] *Id.* at p. 2.

[70] 523 U.S. 26, 40 (1998).

[71] *To Provide for the Temporary Transfer to a Single District for Coordinated or Consolidated Pretrial Proceedings of Civil Actions Pending in Different Districts Which Involve One or More Common Questions of Fact, and for Other Purposes: Hearing on H.R. 8276 Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 89th Cong. 29 (1966) (memorandum from Coordinating Committee on Multiple Litigation of the Judicial Conference of the United States).

occasioned by processes involving "the same witnesses and . . . the same exhibits."[72]  Otherwise, duplicative pretrial discovery on a district-by-district basis would create staggering "duplication, waste and expense to the judiciary, to the Bar, and to the parties."[73]

Congress was not willing to sacrifice private rights and choices of litigants to achieve efficiency or uniformity at all costs.  The Committee observed that despite consolidation, each action, under Section 1407, would remain an *individual* suit:

> The statute's objectives of eliminating conflict and duplication and assuring efficient and economical pre-trial proceedings would thus be achieved without losing the benefits of local trials in the appropriate districts.  An advantage of this statute is that *each action remains as an individual suit with the litigants retaining control over their separate interests.*[74]

Congress' requirement that a transferee court remand the individual suits to the transferor court upon termination of the pretrial proceedings reflects the preservation of these separate interests.[75]

The desire for efficiency, but not necessarily uniformity, can also be seen from references in congressional testimony to the United States Supreme Court's holding in *Van Dusen* that "cases could be transferred to a common forum where to do so would not deprive the plaintiffs in the transferred cases of the benefits of applicable law in the District where the case was brought."[76]  Even where a transferee court does adjudicate "local" claims, the court must still

---

[72] *Id.* at 26 (statement of William H. Becker, Chief Judge, U.S. District Court, W.D. Mo.).

[73] *Id.* at 27 (statement of Charles A. Bane, Esq.) (emphasis added).

[74] *Id.* at 24 (Comment on Proposed Section 1407 Multidistrict Litigation by Coordinating Committee on Multiple Litigation of the Judicial Conference of the United States) (emphasis added).

[75] *See* 28 U.S.C. § 1407.

[76] *Accord A Proposal to Provide Pretrial Consolidation of Multidistrict Litig.:  Hearing on S. 3815 & S. 159 Before the Subcomm. on Improvements in Judiciary Machinery of the S.*

apply the law of the transferor court's forum.  In sum, Section 1407, while seeking efficiency, maintains critical safeguards over private rights and choices of litigants, even though doing so precludes complete uniformity.

Congress' adoption of Section 1407 reveals a concern for unrestrained, duplicative discovery regarding common questions of fact in multiple districts.  Section 1407 remedies this problem.  During hearings on the propriety of adopting Section 1407, Congress did not discuss broad notions of "uniformity."  Congress did not discuss a transferee court's exercise of power over disposition of a pretrial settlement.  Nor did Congress contemplate the authority of a transferee court to supervise private attorneys' fee agreements.  Finally, the Judicial Panel on Multidistrict Litigation, which possesses the general authority to promulgate rules governing MDL proceedings, has not issued a rule allowing transferee courts to supervise attorneys' fees after a global pretrial settlement.  Quite simply, any dispute over attorneys' fee agreements (assuming that such a dispute in fact exists) does not present the type of "repetitive and identical proceedings"[77] at which Section 1407 is directed.

Moreover, supervision of private attorneys' fee agreements falls outside of concerns voiced during congressional hearings.  Such supervision has no effect on the centralization and consolidation of discovery over common questions of fact.  In fact, these agreements are "local"

---

*Comm. on the Judiciary*, 89th & 90th Cong. 117 (1966) (report of Section of Antitrust Law to the House of Delegates of American Bar Association).  *See generally Van Dusen v. Barrack*, 376 U.S. 612 (1964).

[77] *To Provide for the Temporary Transfer to a Single District for Coordinated or Consolidated Pretrial Proceedings of Civil Actions Pending in Different Districts Which Involve One or More Common Questions of Fact, and for Other Purposes:  Hearing on H.R. 8276 Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 89th Cong. 29 (1966) (memorandum from Coordinating Committee on Multiple Litigation of the Judicial Conference of the United States).

in nature, subject to the law of the transferor court's forum, and, absent MDL-wide complaint over the fee set by these agreements, affect the private litigant (and her attorney) only.

A transferee court's supervision (and revision) of attorneys' fee agreements is at odds with the authority granted by Section 1407.  Until Congress revises Section 1407 to insert a provision granting transferee courts power to supervise attorneys' fee agreements after pretrial settlement (*e.g.*, Federal Rule of Civil Procedure 23(h)), transferee courts lack the power to limit attorneys' fees under privately-negotiated agreements.[78]  Therefore, the Court's Capping Order exceeds the authority, scope, and purpose of Section 1407, and, accordingly, should be vacated.

**B.**    **The inherent authority of this Court does not empower it to upset the private contingency fee agreements of the VLC under the facts of this case.**

Inherent authority was described by the Supreme Court in *Chambers v. NASCO, Inc.*[79] thusly:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."  For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."  These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[80]

---

[78] Unless, of course, the circumstances presented involve: (1) complaints by clients; (2) traditional "wards" of the court; (3) unethical conduct committed before the court; and/or (4) requests for approval of the court.

[79] 501 U.S. 32 (1991).

[80] *Id.* at 43 (internal citations omitted).

In *Kokkonen* the Supreme Court referred to inherent power as "the court's power to protect its proceedings and vindicate its authority" and "what courts require in order to perform their functions."[81]

Without defining what inherent authority is, Tulane posits that this Court's inherent power is nearly without limit.  This is contrary to the teaching of *Chambers* that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."[82]  It is also contrary to the Fifth Circuit's observation in the same case that inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function."[83]

Tulane's assertion that a court may or should *sua sponte* involve itself in private contingent fee arrangements absent special circumstances goes too far and overstates the import of the cases it relies upon.  While these cases contain broad *dicta*, each case cited by Tulane involved either an individual lacking legal capacity,[84] a request for approval of a fee submitted to the court,[85] or a fee-shifting statute in which the court awarded attorneys fees and examined and

---

[81] *Kokkonen*, 511 U.S. at 380.

[82] *Chambers*, 501 U.S. at 44.

[83] *NASCO, Inc. v. Calcasieu Tele. & Radio, Inc*., 894 F.2d 696, 702 (5th Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc*., 501 U.S. 32 (1991).

[84] *Karim*, 374 F.3d 302 (seaman); *Rosquist v. Soo Line R.R*., 692 F.2d 1107 (7th Cir. 1982) (child).

[85] *Allen v. U.S.*, 606 F.2d 432, 436 (4th Cir. 1979) ("[T]he fee agreements on which counsel relied in these cases required them to seek the court's guidance.).  The *Allen* case was remanded for the district court to develop a record sufficient for the appellate court to assess whether the district court based its fee awards on a careful consideration of the relevant facts.

reduced contingent fee agreements in the course of setting a reasonable award.[86]  As the Seventh

Circuit stated in *Rosquist v. Soo Line R.R.*:

> We do not, of course, imply that the court should sua sponte
> review every attorney's fee contract.  An agreement between two
> freely consenting, competent adults will most often be controlling;
> courts rarely interfere with such contracts.  But that restraint is
> based on the presumption that the parties can identify their own
> interests, can assess their bargaining position, and are equally able
> to assert their position.  But those normal assumptions are not
> fulfilled here; in the circumstances of this case [involving a child's
> claim], the district court was right to be wary not to become an
> unwitting accessory to an excessive fee.[87]

The case here involves no exceptional circumstances such as existed in Tulane's cited cases.

Tulane charges that the VLC has not explained how regulation of contingency fees

exceeds a court's indispensable, inherent power.[88]  Because exercise of inherent power is the

exception, and not the rule, its assertion requires special justification in each case.[89]  Given that

necessary predicate, the question would be more appropriately posed as, "What is the special

justification for exercising inherent power in this case?"  To answer Tulane's question,

---

[86] *Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980), *cert. denied*, 449 U.S. 1063 (1980) (Section 4 of the Clayton Act, 15 U.S.C. § 15); *Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61 (1st Cir. 1969) (same).  In each of these cases, the courts heard testimony regarding fee arrangements as part of its statutory duty to award a reasonable attorney's fee to a successful antitrust plaintiff.  Thus, the particulars of counsel's fees and their concomitant efforts on behalf of their clients were brought squarely to the attention of the court.  "[C]ourt intervention in fee dispositions is bound to be confined to exceptional circumstances."  *Int'l Travel*, 623 F.2d at 1278 n.27 (internal quotation marks and citation omitted).  "We are not saying that a court should inquire *sua sponte* into actual counsel fees in every case which comes before it…."  *Farmington*, 421 F.2d at 87-88 (citing Canon 13, since repealed).  And:  "[S]ince the court is already immersed in the counsel fee inquiry under section 4, it is not a great step further to measure the actual counsel fee against the Canons of Ethics."  *Id.* at 88 n.60.

[87] *Rosquist*, 692 F.2d at 1111.

[88] Tulane Memorandum, Rec. Doc. No. 17999 at p. 12 of 29.

[89] *Chambers*, 501 U.S. at 64 (Kennedy, J., dissenting).

modification of the VLC's private contingency fee agreements is not necessary to the Court's function in this case.  Insofar as the Court is involved in certain aspects of the Settlement Agreement, it need not reduce (or even consider) contingent fees to carry out its supervision of common benefit fees.  The Settlement Program can be processed without the Court extending its reach beyond the Settlement Agreement into fee agreements that are exempted from its terms.

Only the recent district court decisions in *Zyprexa* and *Guidant* offer support for the Court's reduction of the VLC's contracted-for fees.  As discussed in the VLC's original memorandum in support,[90] the courts in those cases expressly provided a relief mechanism allowing for departure from the court-imposed cap based upon individual circumstances.  Although, the relief mechanism in those cases served to partially mitigate the harsh effect of those orders, the VLC submits that at bottom those cases were wrongly decided, blazing a new trail that this Court should not follow.  Both *Zyprexa* and *Guidant* relied heavily on quasi-class action and inherent power arguments.[91]  Undoubtedly district courts handling MDL cases must develop innovative techniques for dealing with massive litigation, but innovation must not come at the expense of legal rights.

Tulane also asserts that courts have inherent power to do things that promote the appearance of fairness in the eyes of the public.  Tulane argues that "[c]ourts must not only be fair; they must appear fair."  Without empirical evidence of public clamor, Tulane boldly asserts that the public has a perception of abuse in the Vioxx MDL because VLC attorneys are to be well compensated.  But courts should not be swayed by public perceptions that are not supported

---

[90] VLC's Motion for Reconsideration, Rec. Doc. No. 17330 at pp. 23-24 of 52.

[91] Notably, Tulane does not make the quasi-class action argument, instead relying on the Court's inherent power and Settlement Agreement rationale.

in fact or law.[92]  Rule 1 of the Federal Rules of Civil Procedure, contrary to Tulane's citation, says nothing about the *appearance* of fairness.  Rule 1's concern is with *actual* fairness.  *Berger v. U.S.*,[93] also cited by Tulane in this section of its argument, dealt with interpretation of Section 21 of the Judicial Code concerning the procedure for recusing a judge.  It says nothing about inherent authority flowing from concerns of the "appearance" of fairness.

Tulane's citation of the Report on Contingent Fees in Mass Tort Litigation by the Task Force on Contingent Fees of the American Bar Association's Tort Trial & Insurance Practice Section[94] is also wide of the mark.  While the Task Force does opine (incorrectly and overbroadly) that courts have inherent power to regulate contingent fees, it does not reach that conclusion based upon "perceptions of abuse."  Furthermore, the Task Force makes no recommendation that contingent fees in non-class action mass torts should be regulated.  In this context, the Task Force comments that while attorneys and "observers" (presumably some members of the public) have strong opinions as to whether attorneys who handle mass tort litigation earn fees that are too high, "there is precious little data from which one can conclude that contingent fees generally are too large or, if so, what the 'correct' percentage should be."[95] And further:  "At this point, however, too little is known, empirically, about the operation of the market for legal services in the context of mass torts.  We do not know if the suspicions are

---

[92] For example, Canon 3(B)(2) of the Model Code of Judicial Conduct provides that "[a] judge shall be faithful to the law and maintain professional competence in it.  *A judge shall not be swayed by* partisan interests, *public clamor* or fear of criticism."  (emphasis added).

[93] 255 U.S. 22 (1921).

[94] *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105 (2006).

[95] *Id*. at 128.

correct or, if they are, how to address the problems."[96]  Thus, contrary to Tulane's argument, the Task Force does not recommend measures such as fee limits based on public perceptions. Instead, the Task Force recommends study to determine actual facts before any action is taken one way or another.

Tulane's reference to a "powerful" "perception of abuse" is out of context.  First, that reference is not included in the report, but is taken from minutes of a Task Force meeting at which Judge Higginbotham made the remark about *class actions*, not non-class action mass torts.[97]  Second, if minutes of the meeting are persuasive the VLC fully agrees with Judge Higginbotham's further statement that "he has a problem with courts saying to clients that the fee is too large unless that question is brought to the court by someone with standing to contest the fee"; and his additional point that, "[o]ne problem is that with mass torts the court may have to look at the law on attorney's fees in all fifty states."[98]

While the VLC fully agrees that public trust in the judiciary and in the MDL process are laudable goals, a first and equal concern is faithful application of the law.  Public perceptions of a few, particularly those not based upon fact or law, should not sway a court, nor do they create an independent basis of jurisdiction or validate exercise of powers beyond those indispensable to the court's function.

## IV.     EVEN IF THIS COURT HAD JURISDICTION AND AUTHORITY TO ISSUE THE CAPPING ORDER, THE COURT APPLIED AN IMPROPER METHODOLOGY IN DETERMINING FEES

### A.     Evaluating reasonableness *ex post* rather than *ex ante* is erroneous.

---

[96] *Id.*

[97] Judge Higginbotham also stated that "[i]n mass tort litigation the plaintiffs are simply set up differently than in class litigation."  *Id.* at 152.

[98] *Id.* at 148.

Even if the Court had jurisdiction and authority to impose a fee limit in the Vioxx MDL, the appropriate point in time to gauge reasonableness is the time when the agreement was entered, not after all risks have been resolved through concluded litigation or settlement. The views of the VLC's experts Professors Kritzer, Miller, and Wright concerning *ex ante* are uniform and supported by sound legal authority.[99]

In 1994, the ABA Committee on Ethics and Professional Responsibility issued a formal opinion on contingent fee agreements[100] and strongly endorsed the *ex ante* approach to evaluating whether a contingent fee is reasonable:

> It is important to keep in mind that the reasonableness as well as the appropriateness of a fee arrangement necessarily must be judged at the time it is entered into. All contingent fee agreements carry certain risks: the risk that the case will require substantially more work than the lawyer anticipated; the risk that there will be no judgment, or only an unenforceable one; the risk of changes in the law; the risk that the client will dismiss the lawyer, and the risk that the client will require the lawyer to reject what the lawyer considers a good settlement or otherwise to continue the proceedings much further than in the lawyer's judgment they should be pursued. If a lawyer accepts a given risk – for example, the risk posed by the fact that the opposing party has a reputation for being intransigent in its approach to settlement – and offers a fee contract reflecting that risk, which is accepted by a fully informed client, the lawyer should not be required as a matter of ethics to give up the benefit of the agreement because the opposing party, to everyone's surprise, offers an early settlement that is acceptable to the client. By the same token, a later development that increases the risk to the lawyer – for example, a statutorily imposed cap on liability, the loss of a summary judgment motion everyone expected to win, or the need to take three times the number of depositions originally anticipated – should not permit the lawyer to demand a new, more generous fee arrangement.[101]

---

[99] Affidavits of these experts are attached to the VLC's Supplemental Submission, filed separately from this reply.

[100] ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 94-389 (1994).

[101] *Id.* at Section H (internal footnotes omitted).

The principle that the reasonableness of price can only be determined *ex ante* is not unique to attorneys' fee agreements. In a competitive market, the conditions facing the contracting parties at the time of contracting influence their terms, including price, and result in a reasonable price in economic theory.[102] Attempting to value the agreement at some other time is problematic, because it runs the risk of setting a price that does not reflect the market conditions that the parties considered at the time of the agreement.[103] The market price will be reasonable if the market is competitive.

In the ABA's Task Force on Contingent Fees' report on contingent fees in *class actions*, the Task Force recognized that court intervention in the regulation of attorneys' fees is necessary because the market for legal services in class actions is usually not competitive.[104] In contrast, in

_____

[102] *See* Affidavit of Joshua D. Wright, ¶¶ 23 & 37.

[103] *See id.*, ¶ 24.

[104] *Report on Contingent Fees in Class Action Litigation*, 25 REV. LITIG. 459, 477 (2006) (citations omitted):

> It is crucial to realize at the outset of this discussion that courts are involved in setting fees for class actions because of a failure in the market for legal services. If all the members of a class could bind together without cost and negotiate as a group for representation, the group could hire attorneys who offered the best combination of quality, efficiency, and price. There are enough attorneys, even in the sub-market of representing plaintiff classes, that competition in such a hypothetical transaction would provide a market solution. Naturally, the parties would (like all other lawyers and clients) make the deal ex ante. No party would want the uncertainty of what they would pay or be paid as the litigation proceeded. The class and the lawyers could make a deal, and the court would never have to become involved. The courts would not have to trouble themselves if the deal turned out to be "too good" for the lawyers. They would be entitled to the benefit of the bargain. So, too, if the negotiated fee turned out to be a good deal for the class, lawyers would be expected by both the principles of contract and their professional responsibilities to render the services they had undertaken. Most markets work ex ante, and it would be easier

*non-class action mass tort litigation*, the Task Force's report states that there is no proof of a market failure and only if and when such proof is made should there be consideration of regulation of fees in mass torts.[105]  Unlike many class actions, the individual cases in the Vioxx MDL are of substantial value such that plaintiffs had an interest in seeking out the best counsel they could find at a competitive price.  Likewise, although risky, there were a sufficient number of firms competing for the business so that the field was competitive.  Professor Wright's structural analysis of competition in the relevant legal services market, based both on the number of plaintiffs' firms in the Vioxx MDL, and in product liability MDLs in general, demonstrates that the market is highly competitive – the opposite of a market failure that might be used to rationalize regulation of prices.[106]

While the three cases proposing fee limits in MDLs (*Zyprexa*, *Guidant*, and this Court) have not discussed the merits of *ex ante* versus *ex post*, the Seventh Circuit has provided a clear analysis of this issue, albeit in the context of class actions.  Recognizing that Rule 23 authorizes, and indeed requires, the district court's involvement in fee-setting in class actions, in *In re Synthroid Marketing Litigation*,[107] the Seventh Circuit held that district courts should apply a

---

(and more legitimate) for all concerned if the market would set class counsel fees.

The market will do so.  Class members have too little at stake (usually) to come together or otherwise to negotiate directly with class counsel.  The fees must be set in some other way.

[105] *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. at 127.

[106] *See* Affidavit of Joshua D. Wright, ¶¶ 39-51.  *See also* Rec. Doc. No. 17330 at p. 22 & n.50 of 52.

[107] 264 F.3d 712 (7th Cir. 2001) ("*Synthroid I*").  *See also Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*"); *People Who Care v. Rockford Bd. of Educ., School Dist. No. 205*, 272 F.3d 936, 938 (7th Cir. 2001).

market-based approach.  In setting reasonable fees, district courts should determine what a

plaintiff and a law firm would have negotiated at the outset of the representation:

> On remand the district court must estimate the terms of the
> contract that private plaintiffs would have negotiated with their
> lawyers, had bargaining occurred at the outset of the case (that is,
> when the risk of loss still existed).  The best time to determine this
> rate is the beginning of the case, not the end (when hind-sight
> alters the perception of the suit's riskiness, and sunk costs make it
> impossible for the lawyers to walk away if the fee is too low).
> This is what happens in actual markets.  Individual clients and their
> lawyers never wait until after recovery is secured to contract for
> fees.  They strike their bargains before work begins.  Ethically
> lawyers must do this, but the same thing happens in markets for
> other professional services with different (or no) ethical codes….
> Only *ex ante* can bargaining occur in the shadow of the litigation's
> uncertainty; only *ex ante* can the costs and benefits of particular
> systems and risk multipliers be assessed intelligently.  Before the
> litigation occurs, a judge can design a fee structure that emulates
> the incentives a private client would put in place.  At the same
> time, both counsel and class members can decide whether it is
> worthwhile to proceed with that compensation system in place.
> But in this case the district judge let the opportunity slip away,
> turning to fees only *ex post*.  Now the court must set a fee by
> approximating the terms that would have been agreed to *ex ante*,
> had negotiations occurred.[108]

Class actions generate economies of scale that exceed those in MDLs because class

members' claims are essentially identical.  Even so, Judges Easterbrook and Posner, both leading

scholars of law and economics, endorse the *ex ante* "mimic the market" approach in class

actions.[109]  They understand that competitive markets price scale economies correctly.

---

[108] *Synthroid I*, 264 F.3d at 718-19.

[109] *See Synthroid II*, 325 F.3d at 975 ("A court must give counsel the market rate for legal services."); *Synthroid I*, 264 F.3d at 718 ("[W]hen deciding on appropriate fee levels in common-fund cases, *courts must do their best to award counsel the market price for legal services*, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." (Easterbrook, J.) (emphasis added)); *In re Cont'l Ill. Sec. Litig.*, 985 F.2d 867, 868 (7th Cir. 1993) ("[C]lass counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." (Posner, J.)); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992) ("[I]t is not the

Consequently, when setting fees in class actions, judges cannot do better than imitate the market. The same is true in MDLs, where markets actually determine how much attorneys can charge. The *ex ante* market approach remains the rule.  "Competition rather than litigation determines the fee – and, when judges must set fees, they try to follow the market rather than demand that attorneys' compensation conform to the judges' preferences."[110]

In the Vioxx MDL it is not necessary for this Court to attempt to replicate what the plaintiffs and their attorneys *would have done* in a competitive market at the outset of these cases; the actual fee agreements show what they *did do* in a competitive market.  Professor Wright's analysis of available data in the Vioxx MDL proves that there is a thriving competitive market for legal services.[111]

Like the district court in *In re Synthroid*, this Court erred by applying an *ex post* methodology reducing fees.  The *ex post* reduction of fees is analogous to the so-called "mega-fund exception" rejected by the Seventh Circuit in *Synthroid I*.  In other words, a large recovery does not justify *ex post* evaluation of a fee's reasonableness.

Even were this Court, or other courts, to disagree with the Seventh Circuit's market approach in class actions, its approach is necessary and desirable in cases like the Vioxx MDL.

___

function of judges in fee litigation to determine the equivalent of the medieval just price.  *It is to determine what the lawyer would receive if he were selling his services in the market* rather than being paid by court order." (Posner, J.) (emphasis added)).  *See also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 409 (7th Cir. 2000); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998); *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995) ("*Florin II*"); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994) ("*Florin I*").  Other courts also endorse this view.  *See, e.g., RJR Nabisco, Inc. Sec. Litig.*, Current Transfer Binder, Fed. Sec. L. Rep. (CCH) ¶ 96,984 at 94,268 (S.D.N.Y. 1992) ("What should govern [fee] awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases.").

[110] *Jones v. Harris Assoc. L.P.*, 527 F.3d 627, 633 (7th Cir. 2008).

[111] *See* Affidavit of Joshua D. Wright, ¶¶ 3, 7, 9, 27, 39-51, 82, 86, & 88.

If mimicking the market isn't the right approach, what is?  As Judge Posner wrote in *In re Continental Illinois Securities Litigation*, "[i]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  *It is to determine what the lawyer would receive if he were selling his services in the market* rather than being paid by court order."[112]

Class actions do not just permit courts to set fees – they require it.  Rule 23 requires that the court independently review the case and set a reasonable fee.  Settlement in a non-class action MDL, on the other hand, *does not require court approval*.  In an MDL there is certainly *no requirement that a court approve individual claimant's attorneys' fee agreements*.  Just as the market sets an appropriate fee in non-MDL tort cases (absent a statutory fee limit), the market rate is reasonable in an MDL.

> **B.    The Court's methodology assumed that economies of scale brought by MDL consolidation were not anticipated when the VLC agreements were negotiated.  This led the Court to improperly "double count" this factor resulting in an unfair penalty to the VLC.**

The likelihood of MDL consolidation and any resulting economies of scale were anticipated by the VLC at the outset of these cases.[113]  The record of past decisions of the Judicial Panel on Multidistrict Litigation reveals an increasing trend of granting centralization to products liability actions.  From 1992 through mid-August 2006, the panel considered 94 products liability transfer motions; it granted 87 percent of these motions.[114]  And, looking only at those transfer motions considered between 2000 and mid-August 2006 (a total of 55), the

---

[112] *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 568 (emphasis added).

[113] *See* VLC's Motion for Reconsideration, Rec. Doc. No. 17330 at Affidavit of Walter Umphrey, ¶ 3, Affidavit of John Eddie Williams, Jr., ¶ 3, Affidavit of Drew Ranier, ¶ 3, Affidavit of Mikal C. Watts, ¶ 3 & Affidavit of Grant Kaiser, ¶ 3.

[114] Mark Herrmann & Pearson Bownas, *Making Book on the MDL Panel:  Will It Centralize Your Products Liability Cases?*, BNA CLASS ACTION LIT. REPORT, p. 2 (Feb. 9, 2007).

percent of motions granted increases to 89 percent.[115]  On these statistics alone, without reference to their personal experience with MDLs, the VLC concluded that the Vioxx litigation would in all probability be consolidated into an MDL.

But, the 89 percent statistic likely *underestimates* the likelihood, at the time the VLC entered into fee agreements, of the Vioxx litigation being consolidated.  "[A] key factor in the panel's determination whether to [centralize] is how many actions are pending."[116]  And, while there is no "magic number," the panel will likely consolidate where there are "between three and seven pending actions."  The Vioxx litigation presented thousands of different plaintiffs and hundreds of different attorneys' firms.  In sum, while 89 percent of motions for transfer were granted between 2000 and 2006, the Vioxx litigation represented the "perfect storm," encompassing all of the factors that made consolidation a certainty.

Competition for clients forced the VLC to take account of the economies of scale likely to be created by consolidation when deciding how much to charge for legal services.  As Professor Wright points out, because economies of scale were factored in initially, limiting the fee through an *ex post* perspective "double counts" the effect of these economies to the detriment of the VLC, resulting in a penalty.[117]

**C.  The Vioxx MDL did not alter the attorney-client relationship so as to divest individual attorneys of their responsibilities and duties to the client.**

Tulane assumes that MDLs resemble class actions where a class of litigants advances as one collective group.  A litigant's claim in an MDL remains an individual claim.  While MDL judges task various committees to perform particular functions for purposes of efficiency, all

---

[115] *Id.*

[116] *Id.*

[117] *See* Affidavit of Joshua D. Wright, ¶¶ 3, 8-9, 35-36, 38, 51, 54, 82, & 90.

litigants in MDLs continue to have their individual case handled by the counsel of their choosing.[118]  Committee activities do not supplant the individual attorney-client relationship. These committees serve simply to foster efficient management of administrative proceedings that otherwise might be hampered by the uncoordinated activities of countless attorneys.  Similarly, while the work of common benefit attorneys may benefit other claimants than the clients of those individual attorneys, it is incorrect to suggest that those attorneys represent *all* claimants in conducting "bellwether trials."  These attorneys do not function as representatives of all claimants.  They instead try a one-on-one product liability suit.  While these trials may facilitate settlement, each outcome binds only the individual litigants involved.  The trials do not adjudicate the claims of other MDL claimants.

Individual attorneys continue to provide valuable services to their individual clients. Since MDLs consolidate claims solely for pretrial purposes, individual attorneys must continue to prepare their own clients' cases for trial, with all of the labor and outlay that that entails.

Even when parties to an MDL reach a settlement, the individual attorney's work does not cease.  These individual attorneys continue to work to obtain fair and adequate compensation for each individual client.  For example, individual attorneys must submit claims packages, PME records, and any additional information to the Claims Administrator or Special Master.[119]  The Settlement Agreement establishes a "points" system for determining the relative value of each claimant's claim.  Disputing and appealing the ultimate valuation for each claimant rests in the hands of that claimant's attorney.  The advocacy necessary to obtain the largest point award possible for each client is not a simple "administrative" task.

---

[118] With the exception of those proceeding in proper person.

[119] *See* Settlement Agreement, §§ 1.3 & 1.4.

The individual attorney's effort remains as valuable as when the client first selected that attorney as a representative.  The VLC did not "free-ride" on the efforts of the committees or other attorneys.  Indeed, one member of the VLC, Drew Ranier, serves on the PSC.  The VLC also tried two "bellwether" cases and assisted in the trial and preparation of others.  Whatever might be said about other attorneys, members of the VLC actively, aggressively, and zealously advocated on behalf of their clients by constantly and continually participating in this litigation.  The VLC's clients received the representation that they expected (and deserved) when they hired these experienced and hard-working trial attorneys.

Professor Judith Resnik of Yale Law School has written and spoken on the problem that courts that set fees in large aggregate cases often undervalue the efforts of individual attorneys on behalf of individual clients.  Speaking to the ABA's Task Force on Contingent Fees, Professor Resnik stated that "services rendered to individual clients should receive more recognition."[120]  This concern was well stated by the district court in the *In re Beverly Hills Fire Litigation*:

---

[120] *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. at 123. The minutes of the meeting at which Professor Resnik spoke reflect her remarks more fully: "Professor Resnik noted that the fee literature does not value the relationship between attorney and client.  This relationship should be compensated.  Fee law in the last thirty years has been an economic model that does not value this.  The value of lawyers is not just lawyers talking to other lawyers and the judges.  In a tort case, somebody should be asking, did somebody get something, and was it what they were suppose to get?"  *Id.* at 161.  And:

> Lawyers for groups advance group interests, sometimes even to the detriment of individual interests.  When lawyers working for individual clients discharge their obligations properly, they play key roles in enabling clients to participate in and to understand the justice system.  Such lawyering is often invisible to judges, who are focused on the lawyers responsible for the group as a whole.  Thus, when awarding fees, judges tend to undervalue lawyers who actually serve individual clients.  We urged courts to pay for process and for the delivery of legal services to litigants, to value lawyers being in relationship to their clients, and to structure

> In a very real sense these attorneys have continued to provide valuable services to their clients and to the PLCC [the Plaintiffs' Lead Counsel Committee]. These are the attorneys that have answered the many "... when will I get my money?" telephone calls, the personal conferences at their offices, homes, as well as inquiries on the street. This has been most exasperating to many people because this complex litigation has spanned nearly a decade. The ordinary citizen simply cannot understand why it would take so long to wind these matters up. We are confident that many times these attorneys felt that they had lost credibility with their clients. They have been required to administer files and they stood ready, willing and able to actively develop their clients' damage claims had that eventually ever become necessary.[121]

Simply put, the tendency of courts to undervalue the efforts of attorneys on behalf of individual clients in mass tort litigation stems from the fact that it is only the efforts that are put on public display or that the judge is personally involved in that the court can possibly know. A court cannot know the details of an attorney's interaction with or work on behalf of an individual client insofar as it takes place "behind the scenes."

At the time of the settlement, the VLC had readied or nearly-readied an additional 25 individual cases for trial.[122] These and other efforts on behalf of individual clients deserve compensation.

> **D.     This Court had no data upon which to base any fee reduction when it rendered the Capping Order.**
>
> 1.     The Court had no evidence as to when the agreements were signed. The VLC's agreements were all entered into before the settlement, and most were signed very early in the litigation.

---

aggregate litigation to maximize the role of individually-retained plaintiffs' attorneys.

Judith Resnik, *Money Matters:  Judicial Market Interventions Creating Subsidies and Awarding Fees and Costs in Individual and Aggregate Litigation*, 148 U. Pa. L. Rev. 2119, 2167 (2000).

[121] 639 F. Supp. 915, 925 (E.D. Ky. 1986).

[122] *See* Affidavit of Grant Kaiser, ¶ 8.

The Court imposed the fee reduction on virtually *all* contingent fee agreements in this litigation based on assumptions, rather than on empirical data.  The time when the agreements were entered into is significant.

When the Settlement Agreement was announced, this Court urged counsel who submitted claims *after* that date to reduce the fees they might have charged had they participated from the outset of the case.[123]  Yet, when reducing fees on every agreement across the board in the Capping Order, the Court made no distinction between the efforts of attorneys who worked actively on behalf of clients from the beginning of the litigation versus those who began Vioxx work post-settlement.  In the case of the VLC, almost every client signed an agreement in the early stages of the litigation.[124]  Yet, the Court had no evidence as to when the VLC's agreements were entered into, a factor that, by the Court's own reckoning, bears directly on the reasonableness of the fee.

> 2. There was no data as to how many of the Vioxx claimants were in poor health and no evidence as to whether any were mentally incapacitated.  Evidence shows that the VLC made no distinction in fees based on health and that there is no reason to believe its clients were mentally incapacitated.

---

[123] Pretrial Order No. 29, Rec. Doc. No. 12963 at p. 6:

> D. Given the extensive amount of discovery and trial preparation that has been undertaken and already achieved – as well as the work on, and lessons learned from, bellwether trials conducted in this Court and others over the last several years – counsel filing new claims can reasonably expect to expend must less time and resources prosecuting those cases than counsel who have been involved in those proceedings from the beginning, and I encourage counsel to consider such disparity in negotiating attorneys' fees.

[124] *See* Affidavit of Grant Kaiser, ¶ 12.

Similarly, the Court based its case-wide fee limitation on the idea that "many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts."[125]  Leaving aside whether, if true, these concerns grant the Court the authority to regulate fees, the Court had no data concerning the number of claimants that might fit into these categories.[126]  Although the Court intuitively believed this to be the case, this "finding" omits consideration of the wrongful death cases filed by clients not injured by Vioxx. There is no basis to find that derivative claimants are elderly or in poor health.  More than 500 of the VLC's 1830 cases are wrongful death cases – approximately 27 %.[127]  The Court's rationale does not apply to these clients.  Furthermore, the fact that the VLC's customary agreement provides a 40 % fee, regardless of whether the case was for a living Vioxx victim or wrongful death beneficiaries, undermines the Court's conclusion that injured or elderly claimants were less able to negotiate than those who were neither sick nor old.  The fee was the same for both groups.[128]

While the VLC's living injured clients doubtless suffered significant health events as a result of taking Vioxx, that they were "potentially life-threatening" does not provide any basis to conclude that they were mentally incapacitated and legally unable to contract.[129]  The Vioxx

---

[125] Capping Order, Rec. Doc. No. 15722 at p. 12 of 21.

[126] Nor is there any legal authority as discussed *infra* Section IV.D.4.

[127] *See* Affidavit of Grant Kaiser, ¶ 11.

[128] Affidavit of Joshua D. Wright, ¶¶ 10-12, 52-87, & 91.

[129] As observed in the VLC's original memorandum, such an assumption might cast doubt on the ability of the Vioxx claimants to enter into the Settlement Agreement in the first place.

MDL is different from the *Zyprexa* case, where the drug was intended to treat the seriously

mentally ill.  Judge Weinstein explained this as follows:

> Zyprexa is an atypical antipsychotic medication whose on-label
> uses include treatment of schizophrenia, bipolar mania, and bipolar
> disorder.  Almost all of the plaintiffs in the present action are
> mentally ill, some severely so.  Some are completely unable to
> work, and a large number have very limited resources.[130]

There is no evidence that the VLC's clients lack mental capacity.

3.   There was no evidence as to how many Vioxx claimants are elderly.  Most of the VLC clients are not elderly.

Although the Court's ruling is based on the idea that the Vioxx claimants are elderly, the

Court does not define the term "elderly," nor did the Court have before it evidence as to the age

of the Vioxx claimants.  In fact, 75 % of the VLC's clients are under age 70, and 90 % of its

clients are under age 75.  Putting aside for the moment the issue of whether simply being elderly

means a client is unable to bargain for fees, a 32 % limit based upon age is not empirically

supported, because most of the VLC's clients are not elderly.

Although the VLC does not agree that age and physical health bear on the ability to

contract, if the Court believed otherwise, the Court should look to empirical evidence rather than

assumptions.

4.   In any event, courts do not treat the elderly or the infirm as wards of the court or as legal incompetents.

The Capping Order adapts the supervisory authority traditionally applicable to cases

involving seamen, minors, and incompetents to a new class of individuals:  the elderly and

infirm.  The Capping Order, for example, relies on *Karim*, a case involving the court's protection

of seamen.  For more than two centuries, the "wards of the admiralty" doctrine served to protect

---

[130] *In re Zyprexa Prods. Liab. Litig.*, 451 F. Supp. 2d 458, 462 (E.D.N.Y. 2006).

injured seaman.  Justice Story long ago set forth the policy reasons for a court's jealous guardianship over seamen's interests:

> Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached.  But courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship.  They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees.[131]

This doctrine is not an archaic anachronism.  Courts throughout the country continue to resort to the doctrine as justification for special protection.  As the Fifth Circuit wrote:  "The sailor's life is usually neither exhilarating nor salutary; frequently it is grim and dangerous."[132]

While the same descriptive terms might not apply to minors or incompetents, similar underlying concerns evidence an understandable desire to extend to them the same special supervisory protection.  "It is an ancient precept of Anglo-American jurisprudence that infant and other incompetent parties are wards of any court called upon to measure and weigh their interests."[133]

Minors and incompetents are generally considered immature, improvident, and of unsound mind, and, therefore, incapable of handling their own affairs.[134]  This incapacity is

---

[131] *Harden v. Gordon*, 11 Fed. Cas. 480 (C.C.D. Me. 1823).

[132] *Litherland v. Petrolane Offshore Constr. Servs.*, 546 F.2d 129, 130 (5th Cir. 1977).

[133] *Dacanay v. Mendoza*, 573 F.2d 1075, 1079 (9th Cir. 1978).

[134] *Cf. Carter v. Fenner*, 136 F.3d 1000, 1007 (5th Cir. 1998) (noting "'the general policy of our law to protect all minors from the possible consequences of immaturity[.]"  (quoting *Johnson v. Ford Motor Co.*, 707 F.2d 189, 194 (5th Cir. 1983) (quoting *State in Interest of Dino*, 359 So. 2d 586, 593 (La. 1978) (footnote omitted), *cert. denied*, 439 U.S. 1047 (1978))).

recognized, for example, by Federal Rule of Civil Procedure 17, which requires that a court appoint a guardian ad litem to protect an unrepresented minor or incompetent.[135]  Similarly, this relative incapacity generally precludes minors and incompetents from entering into agreements, such as settlement agreements, thereby justifying court inquiries into fairness and reasonableness.  It cannot be said that these same concerns arise when a contracting party is of mature age or infirm in health.

The crucial presumption inherent in these protections, be it grounded in jurisprudence or statutes, is that "the claimant is not legally competent, either due to age or mental incapacity."[136] Seamen, although perhaps no longer described as "thoughtless" and "indulgent," presumably engender special protection, in part, because of the nature of their profession.  And, the protections afforded minors and incompetents do not exist because of age or physical illness alone.

While some elderly or ill persons may possess the characteristics found in these three groups, there is no *presumption* under law that they lack the capacity to act in their own best interest.  Absent any evidence or determination that elderly or ill persons are incompetent, the general legal presumption is to the contrary.

The procedure to declare an individual "incompetent" is highly state specific, but no state presumes incompetence as a result of age or physical illness.  "Statutes in many jurisdictions lay down, in more or less general language, tests of the state of incompetency necessary to be shown before a guardian or conservator of property may be appointed, and it is well settled that

---

[135] *See* Fed. R. Civ. P. 17(c) (2008).

[136] Affidavit of Herbert M. Kritzer, ¶ 81.

statutory language is controlling."[137]  And:  "Proceedings for an adjudication of insanity or mental incompetency are required to be in strict compliance with the statutory requirements."[138] A judgment of incompetency that fails to comply with statutory requirements is void.[139]

Incompetency can only be determined "in a proceeding brought for that purpose."[140] And, the proceeding itself falls solely within province of the presiding judge.  But, in general, "no person should be adjudged insane or mentally incompetent, and his or her person or property disposed of, without a hearing."[141]  This "hearing should not be formal and perfunctory."[142]  And the presiding judge must ensure that "the rights of the person whose sanity is questioned are fully protected."[143]

This principle is echoed by jurisprudence throughout the country.  For example, *In re Gruske* involved an elderly woman who, one year after having a stroke, removed a joint tenant on her savings account.[144]  The Appellate Court of Illinois affirmed the lower court's determination that the woman was competent, writing, "[p]ersons of mature age are presumed to be mentally competent; *their incompetence cannot be inferred merely from old age, physical illness or defective memory*."[145]  The Court continued:  "Impairment of the mind incident to old

---

[137] 9 A.L.R.3d 774 at § 3(a).

[138] 56 C.J.S. Mental Health § 24 (2008).

[139] See *id.*

[140] *Id.*

[141] 56 C.J.S. Mental Health § 32 (2008).

[142] *Id.*

[143] *Id.*

[144] *In re Gruske*, 534 N.E.2d 692, 693-94 (Ill. App. Ct. 1989).

[145] *Id.* at 695 (emphasis added).

age and disease will not invalidate a transaction so long as the person in question was able to comprehend the nature of the transaction and to protect her interests."[146]

Similarly, in *Estate of Wenzel-Mosset*, the Supreme Court of North Dakota upheld the lower court's determination that an elderly woman possessed the necessary capacity to add beneficiaries to her financial accounts.[147]  The Court held that "[o]ld age alone does not render a person incompetent, even if the mind is weak or impaired or even if capacity to transact general business may be lacking."[148]

These cases illustrate that elderly and infirm persons do not, generally, lack the capacity to contract.  The Vioxx claimants, about whom no evidence has been presented, cannot be presumed incompetent.  This Court has no basis to conclude that the Vioxx claimants – young or old, sick or healthy – are incapable of negotiating or contracting for representation.

### E.    Desire for uniformity cannot override variations in state substantive law.

---

[146] *Id.  See also McAllister v. Schettler*, 521 A.2d 617, 621 (Del. Ch. 1986) ("A gradual weakening of mental capacity, even when accompanying extreme old age and serious illness, will not alone disable someone from making a contract."  (citing *Sims v. Slovin*, 207 A.2d 597, 602 (Del. Ch. 1965), *aff'd*, 213 A.2d 903 (Del. 1965))); *Gulf Life Ins. Co. v. Wilson*, 181 S.E.2d 914, 916 (Ga. Ct. App. 1971) ("There have been many cases dealing with attacks on contracts, particularly deeds, under claim of incompetency of the grantor, and a reading of these leads to the conclusion that one is not to be held incompetent to execute a contract merely because of illness, or because he is not 'bright,' or because at times he was clear about matters and at others he was not."); and *Hinton v. Robinson*, 364 S.W.2d 97, 100-01 (Tenn. Ct. App. 1962) ("[I]t is likewise the rule in Tennessee that the fact that a bargainor [*sic*] is old-of infirm mind-likely to yield to importunity-or to become the victim of impositions, will not of itself invalidate a conveyance made by such grantor, unless it be shown also that such improper influences were actually exerted to obtain the conveyance.").

[147] *See generally Estate of Wenzel-Mosset*, 1998 ND 16, 575 N.W.2d 425 (N.D. 1998).

[148] *Id.* at 429.  In a particularly extreme example, the New York Appellate Division in *Feiden v. Feiden* concluded that a presumption of incompetence does not even arise as to individuals afflicted with Alzheimer's disease.  151 A.D.2d 889, 890 (N.Y. App. Div. 1989).

      1.     The circumstances of this case do not support developing federal common law to displace state law.

Tulane's characterization of the Capping Order and the decisions in *In re Zyprexa*, *In re Guidant*, and *In re Medtronics* as "burgeoning federal common law" [149] is an important concession that reducing private contingency fees in MDLs lacks authority in any statutory law or written rule.  More importantly, for over half a century it has been well-settled that there is "no federal general common law." [150]  Federal courts generally lack the "power to develop and apply their own rules of decision." [151]  This is especially true in diversity cases, where *Erie* recognizes that federal courts cannot "generally apply a federal rule of decision, despite the existence of jurisdiction, in the absence of an applicable Act of Congress." [152]  Lawmaking authority, that is, rests with Congress, not "the federal judiciary, purposefully insulated from democratic pressures." [153]

Although a federal court may, "in a 'few and restricted' instances," [154] develop federal common law, these instances generally involve uniquely federal issues or areas "where Congress has given the courts the power to develop substantive law." [155]  And, where Congress is silent on a particular issue, a federal court should first look to state law, unless "there exists a 'significant

---

[149] *See* Tulane Memorandum, Rec. Doc. No. 17999 at p. 26 of 29.

[150] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[151] *City of Milwaukee v. Illinois*, 451 U.S. 304, 312 (1981).

[152] *Id.* at 313.

[153] *Id.*

[154] *Id.*

[155] *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 & 641 (1981).

conflict between some federal policy or interest and the use of state law.'"[156]  Absent these circumstances, a federal court may not "fill the interstices of federal legislation" at whim.[157]

Here, no "uniquely federal interests" are implicated, no federal policy conflicts with state law, and Congress has not authorized the development of substantive law.  Section 1407 does not authorize developing new rules of decision in place of applicable state law.

Tulane resorts to vague goals of "uniformity" as allowing this Court to fashion federal common law.  In the context of a federal lending program, the Supreme Court, in *U.S. v. Kimbell Foods, Inc.*, announced that "when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision."[158]  In fact, the Supreme Court rejected "generalized pleas for uniformity" as a basis for creating federal law.[159]  And, if "uniformity" did not justify the creation of federal common law in *Kimbell Foods, Inc.*, where the federal government argued that "effective administrative of . . .lending programs" required uniform federal rules, then surely resort to a claimed policy of "uniformity" regarding attorneys' fees in MDLs must fail.[160]

The fact that application of different state laws to different cases is more cumbersome than applying an across-the-board fee reduction, and the fact that it will result in different determinations of "reasonableness" for attorneys who represent clients living in different states, does not justify abandoning *Erie* in the name of efficiency and uniformity.  In fact, the solution is

---

[156] *City of Milwaukee*, 451 U.S. at 313.

[157] *Cf. U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 727 (1979).

[158] *Kimbell Foods, Inc.*, 440 U.S. at 728.

[159] *Id.* at 730.

[160] *Id.* at 729.

much simpler.  Courts should refrain from regulating fees under private fee agreements.  In the event a client and his attorney have a dispute over a fee, that dispute can be handled in state courts, by state mediators, and by state bar associations.  These fora can efficiently handle any disputes and apply appropriate state law.

    2.  The *Erie* doctrine requires application of pertinent state law to each case.

  The rights and obligations of the parties under a contingency-fee agreement are governed by state law.[161]  This Court acknowledged this basic *Erie* principle when it stated, "[b]ecause this MDL proceeding is essentially a series of diversity jurisdiction cases, it is appropriate for the Court to consider state statutes in examining whether the contingent fee contracts are fair or reasonable."[162]  This Court erred, however, when it chose to "*consider*" state statutory laws, rather than actually *apply* state statutes, state policies, and state case law.  The blanket application of a single rule for contingent fees in these diversity cases does not comply with *Erie*.

    3.  State laws applicable to the VLC cases.

  The VLC's standard agreement provides that if an applicable provision of law or code of professional responsibility requires a lower percentage than 40 %, the provision of law or code of professional responsibility will govern the fee.  Thus, not all VLC clients will pay the standard 40 % fee, regardless of the Capping Order.

---

[161] *See U.S. v. $303,718.73 Seized*, 62 Fed. Appx. 556 (5th Cir. 2003); *Marre v. U.S.*, 117 F.3d 297, 307 (5th Cir. 1997); *Augustson v. Linea Aerea Nacional-Chile S.A.*, 76 F.3d 658, 662 (5th Cir. 1996).  The Fifth Circuit holds that where state law supplies the rule of decision for a case, state law also controls both the award of attorneys' fees and review of the reasonableness of the award.  *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

[162] Capping Order, Rec. Doc. No. 15722 at p. 15 of 21.

The VLC's 1830 current clients live in 47 different states.[163]  Their cases were originally filed in courts in 18 different states.[164]  The Court has ruled that the substantive law applicable to each individual case is the state where the plaintiff (or plaintiff's decedent) "was prescribed, purchased, ingested, and allegedly harmed by Vioxx."[165]  Likewise, the same substantive law governs the contingent fee agreements between the VLC and each individual plaintiff.

4.     The great majority of states do not impose fee limits in product liability cases.

Fee limits are generally supported not by consumers who seek to lower costs of litigation, but rather by various special interests who seek to discourage lawsuits by injured individuals.[166]

In the fee capping order, this Court cited New Jersey's court rule as support for limiting contingent fees here.  The Court also cited the laws of Connecticut and Michigan for their general fee limits, as well as California law capping fees in medical malpractice cases and a Texas law capping fees in worker's compensation cases.  A Vioxx case is neither a medical malpractice case nor a worker's compensation case – therefore the law of California and Texas in those types of cases is irrelevant and not controlling.  If anything, the imposition of fee limits by California and Texas in only these specialty areas – and not in others – could just as appropriately be interpreted that California and Texas have chosen not to impose fee limits in cases such as this.

The Court did not cite the laws of Florida or Oklahoma.  Both of these states have enacted fee limits, but under either state's law a 40 % fee would be deemed presumptively

---

[163] *See* Affidavit of Grant Kaiser, ¶ 6 & Table 3.

[164] *See* Affidavit of Grant Kaiser, ¶ 6 & Table 2.

[165] *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 458 (E.D. La. 2006).

[166] Affidavit of Herbert M. Kritzer, ¶¶ 77 & 78.

reasonable.  Further, in a multitude of states there are no fee limits (32)[167] and there are a substantial number of states that regulate fees only in medical malpractice cases (13).  Instead, only a handful of states limit fees generally (5), and among those, only two impose fee limits lower than the VLC's standard 40 % agreement.

A table of all states' laws on general fee limits and medical malpractice fee limits is attached.[168]  As that table shows, a 32 % limit adopts a standard similar to only three states and rejects the vast majority of states that have not set a fee limit in this type of case.  Even if it were appropriate to devise a "blended" limit that would apply to all cases in this MDL (as opposed to applying the law of each pertinent state), which it is not, 32 % does not reflect the majority view of the states in this diversity litigation.

5.    Case law also supports the validity and enforceability of attorneys' contingency fee agreements when the client is a consenting and competent adult.

The prevailing policy and practice of honoring contingent fee agreements as written is demonstrated not only by the absence of fee caps in most states, but also by case law.

An example precisely on point in the Texas is the case of *In re Polybutylene Plumbing Litigation*,[169] which was discussed at greater length in the VLC's original Motion for Reconsideration.[170]  The Texas appellate court in *In re Polybutylene* held that a court may not

---

[167] One of these states, New Hampshire, does not impose a percentage cap but requires that all fees and costs for actions, resulting in settlement or judgment of $200,000 or more, shall be subject to approval by the court.  *See* n. 3, *infra*.  The VLC has only one case in New Hampshire.

[168] *See* State Fee Law Chart, attached as Exhibit A.  (Limits on fees in worker's compensation cases, or in cases involving minors or incompetents have been excluded for obvious reasons.)

[169] 23 S.W.3d 428 (Tex.App.-Hous. (1 Dist.) 2000).

[170] *See* Rec. Doc. No. 17330 at pp. 16-17 of 52.

"properly modify otherwise perfectly legal fee contracts because the judge concludes it is not 'fair' for the attorneys to receive the percentage of each recovery that was agreed upon in advance with each client."[171]   In a detailed opinion, the court rejected arguments based on 1) analogy to class action; 2) inherent power; and 3) the settlement agreement in that case.  The court explicitly found that the contingent fee agreements, many of which were at 40 %, were enforceable under Texas law.

A Connecticut case illustrates that valid contingent fee agreements should be enforced once the contingency occurs, regardless of other factors.[172]   In *McCullough v. Waterside Associates*,[173] a client hired an attorney under a written one-third contingency fee agreement. After the case had settled, the client refused to pay the full third claiming that the attorney had not done all that he had agreed to do.  The client accused the attorney of delaying the case, not working the case up properly and failing to hire an expert until the last minute.  The client argued that the attorney was only entitled to be paid on the basis of quantum meruit.  While both the trial court and the appellate court harshly criticized the attorney's "unprofessional" conduct, the contingent fee agreement was enforced.  The court opined that quantum meruit recovery is available to an attorney who is discharged before he can fulfill performance of his agreement.

---

[171] *In re Polybutylene*, 23 S.W.3d at 436.  *See also Fulbright & Jaworski, L.L.P. v. Mariner Health Care, Inc.*, No. 05-1127, 2006 WL 4007923, *9 (W.D. Tex. May 22, 2006) ("Texas law also provides that a contract, including an attorney fee contract, with terms expressed in plain and unambiguous language must be enforced as written.  An attorney fee contract 'will be enforced as written if [it has] been fully performed by the attorneys.'  In addition, Texas law provides that '[i]f an attorney fee contract was valid when made, and it was made by and between mentally competent persons, it is to be enforced without court review of the reasonableness of attorney's fees so fixed.'") (footnote omitted).

[172] CONN. GEN. STAT. § 52-251c provides a fee cap of 33 1/3 % of the first $300,000, 25% of next $300,000; 20% of next $300,000; 15% of next $300,000; and 10% of any amount which exceeds $1,200,000.  The fee cap is waiveable by the client up to a maximum of 33 1/3%.

[173] 925 A.2d 352 (Conn. App. Ct. 2007), *cert. denied*, 931 A.2d 264 (Conn. 2007).

However, quantum meruit, which might take into account an evaluation of the attorney's performance, is an equitable remedy available *only when there is no contract remedy.* The attorney was not discharged by the client until after the settlement was reached, and therefore was entitled to recover under the terms of the written agreement. Accordingly, the court refused to "ignore the most basic tenet of contract theory and to rewrite the terms of the agreement on the basis of the [attorney's] less than professional conduct."[174] And, "[o]ur conclusion in no way condones the conduct of the plaintiff or justifies his performance. As we must, we merely follow the law as settled and refrain from allowing any disapproval of the plaintiff's methods or practices to replace an inviolate rule of law."[175]

Here, there has been no suggestion that the VLC has done a poor job for its clients or acted unprofessionally. The VLC has performed its duties under the agreement (and continues to represent its clients through the settlement program) and a settlement is now in place. Its clients have not sought to void the agreements, and the terms of the agreements should be permitted to stand.

> 6. The limited uniformity that would be achieved by imposing the same fee limit across all cases in the Vioxx MDL is a false uniformity.

Would it be unfair for attorneys doing the same kind of work on the same kinds of cases to be paid different rates simply because one case may fall in a fee-reduction state such as New Jersey while another does not? Would a uniform fee structure for all plaintiffs' attorneys participating in the Vioxx Settlement Program produce a more desirable result?

First, it is not unfair, because at the outset of this litigation every attorney knew the law applicable to his fees in each of his cases and made an informed decision whether to accept

---

[174] *McCullough*, 925 A.2d at 356.

[175] *Id.* at 357.

representation in each case.  Second, a uniform fee structure applied after-the-fact in Vioxx leads

to undesirable results because it violates the expectation of the attorneys and their clients when

they entered into the fee agreements, and promotes unpredictability in MDL litigation.

At the time of contracting, the VLC had a reasonable expectation that the laws of the

state that were applicable to the client's claim would also govern the reasonableness of fees.

More than 94 % of the VLC's agreements were signed before Judge Weinstein's decision in

*Zyprexa*.  Up until that point, no court in the nearly four decades of the MDL statute's existence

had ever suggested that it had the authority to reduce privately contracted-for fees simply

because of MDL status.  Judge Donovan's decision in *Guidant*, the second court to do so, was

rendered after the Settlement Agreement when all of the VLC's agreements were in place.  In

short, at the time of contracting, the VLC reasonably believed that a 40 % contingency fee rate

would be enforced in all of its cases, save for those it filed in New Jersey and save for those in

which the substantive law of Michigan or Connecticut applied.  As to the latter three states, the

VLC knew that specific lower rates supplied by court rule and/or statute would apply.  The VLC

took these matters into account when determining whether to accept representation in these

cases.  The VLC did not know and had no reason to know that all of its other fee agreements,

otherwise enforceable under applicable state law at 40 %, would be reduced to a "uniform" level

when the cases were consolidated into an MDL.  Accordingly, it is not unfair to apply different

state laws to different fee agreements.  Rather, it would be unfair to change the rules at the end of

the case.

The imposition of a "uniform" fee in this case in fact promotes the opposite of uniformity

– unpredictability – in the larger picture of MDL Litigation.  Under the precedent set by *Zyprexa*,

*Guidant*, and now the Capping Order there is no way for an attorney considering potential MDL

cases to know the rate at which he will be paid if he is successful.  The courts that have imposed fee limits in MDLs thus far have all set different limits, and in some respects have provided for different procedures (some allowing deviation from the limit and some not).  Until the Judicial Panel on Multidistrict Litigation decides to confer MDL status and transfer the cases, an attorney cannot know what court and what judge will handle the case.  Once the court and judge are assigned, unless the case is sent to Judge Weinstein, Judge Donovan or this Court, the attorney will not know whether the particular judge will be inclined to reduce contracted-for fees or not. According to this trio of cases, it is completely within the discretion of the district court to pick a fee limit at the end of the case and it is also within the discretion of the district court to decide whether to allow deviations from the fee limit and on what terms.

> 7.    Allowing courts in MDLs to impose fee reductions *ex post* leads to unpredictability and potential clients will have greater difficulty finding competent counsel to take their cases.

Waiting until after the settlement to decide whether to impose a fee cap and deciding the percentage cap at that time based upon what the court believes is fair after the result in the case is known means that attorneys who are thinking of accepting cases likely to be MDL'd have no way of assessing the value of a case.  This is because the fee percentage is unknown at the time they have to make a decision.  Attorneys who have no way of knowing what a successful outcome will bring will be discouraged from devoting their time to complex, time-consuming cases in which they already risk nonpayment of fees and millions of dollars in litigation expenses.  Thus, the VLC's expert witnesses Kritzer, Miller, and Wright all conclude that the imposition of fee limits is likely to make it more difficult for injured plaintiffs whose cases are likely to be consolidated in an MDL to obtain quality representation.

## V.    THE VLC'S STANDARD CONTRACTUAL 40 % FEE IS REASONABLE AND SHOULD BE HONORED WHERE NO OTHER FEE LIMIT IS IMPOSED BY LAW

As demonstrated by the evidence and the expert opinions submitted here and in its original memorandum, the VLC's standard fee of 40% is reasonable when evaluated according to appropriate methodology.  The mere fact that fees may be large does not mean they are unreasonable.[176]  Professor Judith Resnik described these concerns colorfully as follows:

> Some of the concerns around contingency fees in aggregation come from a view that lawyers simply should not make so much money.  (Whatever sums defense attorneys make in these transactions are shielded from public view so the visible attorneys – plaintiffs' attorneys – take the brunt of the criticism.)  This distress is not animated by nuanced concerns about the relationship of risks to reward or the value of services rendered.  It is, put simply, a basic revolt against the "big ticket" known when percentages are calculated from multi-million dollar recoveries.  (One might call this the problem of "stunning sums.")[177]

The extreme risk in this litigation of completely losing an enormous investment of money and time fully justifies a 40 % fee.

Testing plaintiffs' fees overall (assuming 40 % agreements and fee limits only where imposed by law) against Merck's attorneys' fees shows that the amounts are nearly identical.[178]  And comparing plaintiffs' same overall fees with Merck's profits from Vioxx, the plaintiffs' fees are far lower.[179]

It is reasonable to use Merck's fees and profits as a standard.  By limiting plaintiffs' fees without also reducing defendants' fees, courts institutionalize an imbalance of resources which

---

[176] Just as the fact that the attorneys that represented Merck in this were paid handsomely provides no basis to change them.

[177] Judith Resnik, *Contingency Fees in Mass Torts:  Access, Risk, and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients*, 47 DEPAUL L. REV. 425, 454 (1998).

[178] *See* Affidavit of Herbert M. Kritzer, ¶¶ 54-67.

[179] *See id.*, ¶¶ 68-72.

gives defendants a decided advantage in litigation. Unless both sides' fees are limited, the defendant can spend whatever it wants to avoid the loss while the plaintiffs can spend only the court-allowed amount to acquire the gain. For example, suppose $10 billion was at stake in an MDL. The defendant might find it economically advantageous to spend up to $10 billion to avoid the loss, and would be free to spend the entire amount because its fees were not limited. If plaintiffs' fees were limited to 32 %, however, the plaintiffs would have been able to spend at most $3.2 billion. Limiting only plaintiffs' fees thus gives the defendant in this example a 3-fold spending advantage.[180]

This spending advantage creates a due process problem. It converts a level playing field on which plaintiffs and defendants can both spend what they want into a field tilted in favor of defendants, whose opponents are financially hamstrung. This is another reason why tort reform groups financed by manufacturers and other repeat defendants like fee limits. They want to be able to outspend plaintiffs.

Both of the courts in *Zyprexa* and *Guidant* permitted plaintiffs' attorneys to request a variance from the limits in those cases. This Court's Capping Order does not. However, the VLC has demonstrated that the methodology and assumptions underlying the Capping Order are unsound and incorrect as applied to the VLC's 1830 cases. The VLC has also submitted evidence of its vigorous efforts on behalf of its clients – efforts that clearly place the VLC in a different category than attorneys who are described by some as "free-riders" and who have done virtually no work prior to the Settlement Agreement's announcement. Accordingly, even if the

---

[180] See John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 COLUMBIA L. REV. 669, 686-690 (1986) (showing that defendants enjoy economic advantages in class actions because defendants can spend without limitation while plaintiffs can pay their lawyers only the court-awarded fee, which ranges from 20% to 30% of the recovery).

Court leaves the 32 % limit in place as to those attorneys who have raised no challenge to the limit and have presented no evidence as to their individual case attributes, the Court should permit the VLC and its clients to comply with their agreements of a 40 % fee.

## VI.    CONCLUSION

Perhaps more than any other reason, the Court should change its mind because of the effect that imposing fee reductions after-the-fact will have on future MDL cases.  As attested to by Professors Kritzer, Miller and Wright, the likely impact of fee-reduction will be the same as the impact of price-fixing in other economic contexts:  consumers looking for quality, reasonably-priced representation will have difficulty finding it.  Instead of promoting MDL treatment of related cases, the Court's ruling will discourage it.

Thus, the VLC urges this Court to withdraw the Capping Order; or alternatively to release the VLC from the Capping Order based on the proof offered; or in the final alternative to institute a procedure by which any interested plaintiffs' attorney can apply for a variance from the Capping Order.

Respectfully submitted,

/s/ *Harry S. Hardin III*
HARRY S. HARDIN III (# 6540)
MADELEINE FISCHER (# 5575)
ERIC MICHAEL LIDDICK (# 31237)
JONES, WALKER, WAECHTER, POITEVENT,
CARRÈRE & DENÈGRE, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana  70170-5100
Telephone:     (504) 582-8208
Facsimile:      (504) 589-8208

*Attorneys for John Eddie Williams, Jr., Drew*
*Ranier, Walter Umphrey, Mikal Watts, and Grant*
*Kaiser (the "Vioxx Litigation Consortium")*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on Liaison Counsel, Phillip Wittmann and Russ Herman, by U.S. Mail and e-mail, or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing in accordance with the procedures established in MDL 1657 on the 31st day of March, 2009.

Respectfully submitted,

/s/ *Eric Michael Liddick*
ERIC MICHAEL LIDDICK