# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX<br>      PRODUCTS LIABILITY<br>      LITIGATION | MDL NO. 1657<br><br>Section: L<br><br>Judge Fallon<br>Magistrate Judge Knowles |
| THIS RELATES TO:<br>      Bob Stephens,<br>      Individually, and as the<br>      Administrator for the Estate of<br>      Johnie Stephens, deceased<br><br>      v.<br><br>Merck & Co., Inc.<br><br><br>Civil Action No. E.D. La. 06-CV-1678<br>                ARE 4-06-CV-0259 WRW | |

**DECLARATION OF BOB STEPHENS**

       My name is Bob Stephens. I am over eighteen (18) years of age and am fully competent to make this declaration. I have personal knowledge of the facts stated herein and they are all true and correct.

       On August 29, 2005, I visited the office of Gary Eubanks & Associates ("Eubanks"). I met with Robert L. Rountree, an attorney with Eubanks about taking a case for my deceased father who had been taking Vioxx for approximately 27 months, from on or about November 26, 2000 until the date of his death from a heart attack on March 15, 2003. (See Exhibits "B" & "C" attached hereto) After Mr. Rountree and I had signed a "Contract for Legal Services; Pharmaceutical," (Exhibit "A"), I gave Mr. Rountree a large package of medical records that I had obtained on my father. One of these records was from an emergency room visit to the

1

Baptist Medical Center where my father was seen by Frank H. Ma, M.D. on November 26, 2000, and was given a prescription for Vioxx, 50mg to be taken daily**.** (See Exhibit "B")  I also gave him a printout of prescriptions that had been filled by the Kroger Pharmacy 02500639 located at 2509 McCain Boulevard, North Little Rock, Arkansas 72116 ("Kroger") showing that Vioxx had been filled on the following dates, (1) 07/08/2002; (2) 08/10/2002; (3) 09/13/2002; (4) 10/14/2002; (5) 11/13/2002; (6) 12/12/2002; (7) 01/10/2003; (8) 02/08/2003 and (9) 03/12/2003.  The last prescription was filled just three days prior to his death.  (See Kroger printout attached as Exhibit "C" which was signed by Woodrow Hill, a pharmacist that had worked at this location from May 1997 until his retirement in June 2007. See Exhibit "X ")  I explained to Mr. Rountree that we had Dr. Ma's prescription filled at Kroger and that before the 10-day prescription written by Dr. Ma ran out we had a new 30-day prescription for Vioxx called in to Kroger by my father's treating physician, Dr. Michael Church.  I also explained to Mr. Rountree that from that point (very early December 2000) until his death in March 2003, my father had refilled his prescription for Vioxx every month and that all of them had been filled at Kroger, but that the computer at that store did not go back any further than 07/08/2002.  I told him that I wanted him to obtain the records for the period between December 2000 and July 2002 as soon as possible because my father had been taking Vioxx on a daily basis for approximately 27 months from November 27, 2000, through the morning of his heart attack on March 15, 2003 and I had obtained records for only 8 months of that 27 months.  Mr. Rountree assured me that he would obtain the records from Kroger.

     On October 3, 2005, Mr Rountree wrote a letter to Susan Clayton, Kroger Division Office, requesting the preservation of Pharmaceutical Records for Johnie Stephens, SSN 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**.** (See Exhibit "D")

2

On February 7, 2006, Susan Clayton, Kroger Division Office, contacted Eubanks to obtain an estimated time as to when Kroger could start their purge process again (i.e. Destroy their Pharmaceutical Records for Johnie Stephens, SSN 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).  Ashley Ohlde, Trial Assistant to Mr. Rountree and an employee of Eubanks, informed Ms. Clayton that all motions would be filed by 5/1/06 and that Kroger could enable their purge process after that date. (See Exhibit "F")

On February 23, 2006, Case No. EDAR 4-06-CV-0259 WRW, Estate of Johnie Stephens, Deceased, et al v. Merck & Co., Inc was filed in the United States District Court for the Eastern District of Arkansas.  (See Exhibit "E")

On May 1, 2006, Susan Clayton, Kroger Division Office, contacted Ashley Ohlde again to confirm Kroger's ability to begin the purge process. She was told all motions had been filed and that Kroger could reinstate the purge process-which it did immediately. (See Exhibit "F")

After suit was filed, not much happened. The case was sent to multidistrict litigation where, from my perspective, it pretty much sat until the nationwide settlement was reached.

On or about December 12, 2007, I went to Eubanks' office and met with Ashley Ohlde, Trial Assistant to Robert L. Rountree, to discuss the Vioxx Settlement Calculator with her and to answer the questions to determine the Qualifying Claimant's Basis Points.  When we got to a question concerning "How long did the Qualifying Claimant take Vioxx?," Ashley already had the answer filled in as "Over 6 months but less than 18 months."  I told Ashley that the answer she had was incorrect and that my father had taken Vioxx for much longer than that.  She responded that the records only showed 8 months of use.  I explained to her that I had given Mr. Rountree the printout mentioned earlier (Exhibit "C") and that I had asked him to obtain the records for the period between December 2000 and July 2002 as soon as possible.  I told Ashley

3

that Mr. Rountree had assured me that he would obtain the records from Kroger. I asked Ashley to obtain the file and see if Mr. Rountree had complied with my request. At that point Ashley became very nervous, called the meeting to an end, and said that I would have to meet with Mr. Eubanks to complete the Vioxx Settlement Calculator.

Sometime later I returned to meet with Mr. Eubanks' assistant and complete the calculator. This time, the calculator showed that a total of 275 points with the length of use being "Over 18 months but less than 30 months." I signed off on the document stating that "I have read the above answers and they appear to be correct to the best of my knowledge and belief." I signed because I knew the duration of use to be correct even though I still had not been allowed to review my case file to see if Eubanks had ever obtained the pharmacy records as I had requested. (See Exhibit "G")

On December 14, 2007, Mr. Eubanks wrote Ms. Susan Clayton at the Kroger Division Office a letter enclosing a copy of the letter written by Mr. Rountree on October 3, 2005, wherein Mr. Rountree had requested that the pharmaceutical records of Johnie Stephens be preserved. (See Exhibits "D" & "S") He informed her that he needed Kroger's pharmacy records dating back to November 26, 2000, that it was very important and that he would be willing to pay for any inconvenience. (See Exhibits "D" & "S")

On January 8, 2008, I received a letter from Jeff Webber, an attorney with Eubanks, notifying me that he was leaving the law firm and that I would be receiving a letter very soon notifying me which attorney had been assigned to continue my case. (See Exhibit "T") The very same day, Susan Clayton at the Kroger Division Office had sent Exhibit "F" to Angie Flournoy, Legal Assistant to Mr. Eubanks. Therein, she listed a breakdown of events in reference to File No. GE & A 213867 - Johnie Stephens, showing that Kroger had given Eubanks every chance to

4

obtain the records of my father's Vioxx use, but that Eubanks had authorized their destruction before ever doing so. (See Exhibit "F") With Mr. Webber's employment at Eubanks ending the same day, it appears that Mr. Eubanks held him responsible for this unfortunate chain of events. (See Exhibits "F", "S" & "T")

On January 18, 2008, I received a letter from Mr. Eubanks confirming that Jeff Webber was no longer with the firm and informing me that he, Mr. Eubanks, would now be handling my claim personally. (See Exhibit "U")

In Exhibit "F" Susan Clayton at Kroger suggested that Mr. Eubanks should contact the insurance company that processed the prescription claims for Johnie Stephens, and have them release their records. (See Exhibit "F") Mr. Eubanks contacted me to see if I could find what insurance company processed the prescription claims. Since my father was on my mother's insurance policy and she had passed away on June 13, 2007, the task was not an easy one, but after several phone calls and hours of research I was able to track down that the Insurance company was Great-West Life & Annuity Ins. Co., but that AdvancePCS (RxBin #610415, Carrier Group #H069-7037) was the company that actually processed the prescription claims. I later learned that this company no longer existed because it had been bought out by CAREMARK, whose home office was located in Tennessee. After contacting the home office I learned that the office in San Antonio, Texas was the office that had the prescription records that had been processed by AdvancePCS. I gave this information to Mr. Eubanks, but he was unsuccessful in obtaining any prescription records for Johnie Stephens. (See Exhibits "V" & "W")

On November 24, 2008, Mr. Eubanks called me and informed me that he had received the Notice of Points Award issued by the Administrator in the Vioxx Settlement Program which

5

showed an award of 157.5 points at $1900.00 per point. (See Exhibit "H") This award was based on my father using Vioxx 6 to 18 months, rather than the 18 to 30 months he actually used it, and would mean the dollar amount of the settlement would be $299,250.00. If Eubanks had not allowed Kroger to destroy their records (see Exhibit "F"), the Claims Administrator would have awarded 198 points at $1900.00 per point and the amount of the award would have been $376,200.00. (See Exhibit "M" with note written by Eubanks' legal assistant, Angi Flournoy) This is a difference of $76,950.00. The reason 198 points would have been awarded, instead of the original 275, is the Administrator deducted some points for risk factors that had not been figured into the original calculation. (See Exhibit "J")

      The "deal" I discussed with Mr. Eubanks, referenced in his motion, was a confidential settlement communication, protected by Rule 408, wherein I offered to release Eubanks from liability for its malpractice and breach of fiduciary duty if he reduced his fee to make up for the $76,950 his firm's conduct had cost me.

      On November 24, 2008, after discussing the Points Award and Settlement with Mr. Eubanks, I agreed not to accept the points award (see Exhibit "I") and to appeal to the Claims Administrator.

      On December 4, 2008, Mr. Eubanks lodged an Appeal with the Claims Administrator concerning notice of points award dated 11/20/2008, (see Exhibit "J") and submitted a General Affidavit, signed by Woodrow Hill (the same pharmacist that had given me the printout in Exhibit "C") and myself. (See Exhibits "X", "Y" & "H")

      On February 17, 2009, Eubanks notified me that the Claims Administrator had issued his Post-Appeal Notice of Points Award on 2/13/2009 and that there was no change in the number of points awarded. (See Exhibits "O" & "P")

6

On February 19, 2009, I agreed to allow Eubanks to appeal the Post-Appeal Notice of Points Award to the Special Master. (See Exhibits "Q" & "Z-4") That appeal is still pending. At my meeting with Mr. Eubanks on February 19, 2009, and again by letter dated March 3, 2009, I instructed Mr. Eubanks to continue all efforts to obtain records showing my father's Vioxx use from December 2000 through July 2002. (See Exhibit "Z-2") By letter dated March 6, 2009, Mr. Eubanks refused to do so. (See Exhibit "Z-3") Thereafter, by letter dated March 18, 2009, I fired Mr. Eubanks and his firm. (See Exhibit "Z-5")

I know that my father took Vioxx on a daily basis from the time he was first given a prescription for it by Dr. Ma in November 2000, through the day he died on March 15, 2003. I picked up many of his prescriptions for him, drove and accompanied him to all medical appointments, and was in contact with him on a daily basis throughout at least the last 5 years of his life as he lived only a few blocks from me and we both were retired. I also know that Kroger had, and may still have, additional records of my father's Vioxx use. Since terminating Eubanks, I have been in contact with Kroger myself and just last week obtained certain records that Eubanks never obtained. (See Exhibit "N") While these records do not state specifically that Kroger dispensed Vioxx to my father during the period of December 2000 through July 2002, they do prove that Kroger keeps certain paper records going back at least 6 years from the time of my request. This demonstrates that records from December 2000 through July 2002 would have been available had Eubanks obtained them in 2005 when I instructed Mr. Rountree to do so, in January 2006 when I was appointed Administrator of my father's estate, and even in May 2006 when Eubanks authorized Kroger to reinstate its purge process.

Eubanks' claim that Kroger only keeps records for two years is false. I have spoken to several individuals with Kroger who have stated that Kroger's normal policy is to keep paper

records for seven years. Additionally, just last week in April 2009, I was able to obtain records from Kroger dating back to July 2002. (See Exhibit "N")

Eubanks' claim that my father's records could not have been obtained until I was appointed administrator of his estate is also false. Eubanks admits that during my first appointment, I provided Eubanks with copies of many of my father's medical records and a computer printout from Kroger. I had obtained all of those records simply by signing medical release forms as the surviving son of Johnie Stephens. As I am sure the Court is aware, one does not need a court order to obtain the medical records of a deceased member of his immediate family. Indeed, Eubanks felt it had sufficient authority to instruct Kroger to preserve and not destroy its records on October 3, 2005 before any proceeding was filed in the probate court to appoint me as administrator and before suit was filed against Merck. (See Exhibit "D")

I realize that I have attached certain attorney-client communications as exhibits to this declaration. It is not my intent to waive the attorney-client privilege and I have done so only out of the necessity of responding to Eubanks' motion. If and to the extent I am found to have waived the privilege by doing so, such waiver should be limited only to the exhibits attached and my testimony pertaining to specific communications and should not be construed as a blanket or subject-matter waiver.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated April 15, 2009

                                               */s/ Bob Stephens*
                                               Bob Stephens