# EXHIBIT 1-R




February 19, 2009

Bob Stephens
4005 Royal Oak
North Little Rock, AR 72116

Re: Vioxx Settlement

Dear Bob:

After speaking with you yesterday, I am writing this letter at your request regarding the decision as to whether or not to appeal the Points Award to the Special Master pursuant to Article 3.4 of the Vioxx settlement.

I am enclosing a copy of article 3.4 for your benefit.

I was convinced that our original appeal containing your affidavit and that of the pharmacist who filled the Vioxx would be determinitive, and that the Points Award would be raised. Their response seems to appear that it was not even considered.

As you will notice from the enclosed rules, the decision of the Special Master would require a complete de novo hearing. In order to make the de novo hearing, they would definitely have to go back and start from scratch and completely review the entire file. At that time we could be certain that your affidavit and the affidavit of the pharmacist would definitely be considered.

On the other hand, the de novo trial carries with it certain risks. As we previously discussed, on February 19, 2003 - less than a month before your father's death - he was put on a new drug, Risperdal, by Dr. Henson. This drug has since been linked to heart failure, sudden death and pneumonia in older adults with dementia-related conditions. This, of course, does not mean that Vioxx was not a cause of your father's heart attack. It does, however, lend doubt to the certainty of Vioxx being the only cause of the heart attack and could indeed add a significant "risk factor" to the other elements. This has not been an issue up to now, and an appeal to the Special Master could possibly open it up. The consideration as to whether to appeal to the Special Master the Points Award of the Claims Administrator is, indeed, a close one. I have concluded that the risk of the Special Master reducing the award while possible, are not great, and that there is every reason to believe that a de novo ruling by the Special Master would certainly require a reading of the affidavits. As a result of that, I am inclined to recommend that we go ahead and appeal to the Special Master, however that is a decision which is, and rightly should be, yours. The downside to any appeal would be a delay for an indefinite period of time in the receipt of any money.

Please review this and let me know what your decision is.

Sincerely yours,

Gary L. Eubanks
Attorney at Law

"R"

GLE/af

Enclosures: Article 3.4
Rough Estimate Work-up of Points Award

708 West Second Street ◆ P.O. Box 3887 ◆ Little Rock, Arkansas 72203-3887
(501) 372-0266 ◆ (800) 522-5260 ◆ FAX (501) 688-7741 ◆ Web site: www.garyeubanks.com
622 Malvern Ave. ◆ Hot Springs, Arkansas 71901 ◆ (501) 623-2234 • FAX (501) 623-4596

Pre-Special Review, unless such Qualifying Program Claimant is a Special Review QPC (as defined below), and (ii) if such Qualifying Program Claimant is a Special Review QPC, after (and as) such Special Review QPC's Pre-Special Review Points award is adjusted pursuant to Section 3.4. For the avoidance of doubt, a Points award having become Pre-Special Review or Final does not in any manner or to any extent affect the applicability of Article 10 to the related Program Claim.

Section 3.4. Special Review

3.4.1. If a Special Marker QPC fails timely to elect to receive a Fixed Payment, such Qualifying Program Claimant's claim shall be reviewed de novo by the Special Master, in accordance with this Section 3.4. Such a Special Marker QPC is generally referred to herein as a "Special Review QPC". A Special Review QPC that is an MI Qualifying Program Claimant may be referred to herein as an "MI Special Review QPC". A Special Review QPC that is an IS Qualifying Program Claimant may be referred to herein as an "IS Special Review QPC".

3.4.2. The de novo review mentioned in Section 3.4.1 shall only be conducted (i) for MI Special Review QPCs, after all MI Qualifying Program Claimants have been awarded Points pursuant to the Points Award Process, and such Points awards have become Pre-Special Review, and (ii) for IS Special Review QPCs, after all IS Qualifying Program Claimants have been awarded Points pursuant to the Points Award Process, and such Points awards have become Pre-Special Review.

3.4.3. In performing the de novo review of the Special Review QPC's EC Claim, the Special Master is not bound by the Point Award Criteria specified in Section 3.2 and Exhibit 3.2.1. As a result, because the Special Master may weigh and assess the evidence, including the Special Review QPC's duration of use of the VIOXX, the extent of the Special Review QPC's injury and the risk factors, differently than those criteria are valued under the Point Award Criteria as stated in Section 3.2 and Exhibit 3.2.1, the Special Master's relative evaluation of the Special Review QPC's EC Claims, as compared to one another, may be different than the relative evaluation of those EC Claims by the Claims Administrator.

3.4.4. In performing this de novo review of the Special Review QPC's EC Claims, the Special Master shall award Points to the Special Review QPCs ranging from 0 to 5 points for MI Special Review QPCs, and 0 to 1 point for IS Special Review QPCs, with the average Points being awarded to said Special Review QPCs to be equal to 2.5 Points for MI Special Review QPCs and 0.5 Points for IS Special Review QPCs.

3.4.5. All actions of the Special Master, and all adjustments of Pre-Special Review Points awards, pursuant to this Section 3.4 shall be binding, final and Non-Appealable.

3.4.6. For the avoidance of doubt, Special Review QPCs shall be entitled to receive Final Settlement Payments in the same manner (including at the same time) as







other Qualifying Program Claimants that are not Special Marker QPCs, on the basis of their respective Final Points awards after adjustment in accordance with this Section 3.4.

Section 3.5. Possible Additional Points Award For Second Eligible Event.

3.5.1. Notwithstanding anything in this Agreement to the contrary, an Enrolled Program Claimant may allege a second Eligible Event, in addition to his Related Eligible Event (the "Second Eligible Event" ), solely for the purposes of this Section 3.5.

3.5.2. Notwithstanding the assertion of a Second Eligible Event, all of the terms and conditions of this Agreement shall continue to apply to the relevant Enrolled Program Claimant and his Related Eligible Event except only as otherwise specifically provided in this Section 3.5. Accordingly, an Enrolled Program Claimant asserting a Second Eligible Event may, but is not required to, produce any particular PME Records that he desires to have considered by the Claims Administrator and the Gate Committee for purposes of this Section 3.5.

3.5.3. An Enrolled Program Claimant's Second Eligible Event will be evaluated by the Claims Administrator (both in the context of Article 2 and Article 3) and the Gate Committee at the same time as such Enrolled Program Claimant's Related Eligible Event is evaluated. If, and only if, the Claims Administrator or the Gate Committee determines that such Enrolled Program Claimant meets the Eligibility Requirements with respect to both his Related Eligible Event and his Second Eligible Event (such an Enrolled Program Claimant, a "Double QPC"), such Double QPC will be eligible to receive bonus Points as described in the following Section.

3.5.4. The Claims Administrator, in his discretion, may award a Double QPC an additional number of MI Points or IS Points, as the case may be, up to an amount equal to 30% of the number of Points that such Double QPC is awarded by the Claims Administrator solely on the basis of his Related Eligible Event. The Double QPC's combined base and (if applicable) additional awards of Points shall, after any appeal and adjustment of the base Points award pursuant to Section 3.2.4, constitute the Double QPC's Pre-Special Review Points award for all purposes of this Agreement.

3.5.5. For the avoidance of doubt, a Double QPC's status as an MI Qualifying Program Claimant or an IS Qualifying Program Claimant, and the resultant nature of any Settlement Payments to him as MI Settlement Payments or IS Settlement Payments, shall be determined based solely on the nature of such Double QPC's Related Eligible Event.

Section 3.6. No Punitive Damages

By enrolling into the Program, each Program Claimant waives the right to receive any punitive damages pursuant to the Program and each Program Claimant understands and agrees that no Settlement Payment paid hereunder is, or shall be deemed to be, attributable to punitive damages.







Article 4
Payment to Qualifying Program Claimants

Section 4.1. Interim Settlement Payments

4.1.1. Promptly after the later of (i) August 1, 2008, and (ii) the date on which 2,500 MI Qualifying Program Claimants (including those constituting Special Marker QPCs) have Pre-Special Review Points awards (the later of (i) and (ii), the "MI Initial Settlement Payments Commencement Date"), the Claims Administrator shall estimate (x) the number of Points that ultimately will be awarded to all MI Qualifying Program Claimants (other than Special Marker QPCs) ("Estimated MI Non-Special Marker QPC Total Points") and (y) the number of MI Qualifying Program Claimants that will be Special Marker QPCs (the "Estimated Aggregate MI Special Marker QPCs"), in each case based on the Points awarded to all MI Qualifying Program Claimants (including those constituting Special Marker QPCs) who to such date have a Pre-Special Review Points award and such other factors as the Claims Administrator considers to be appropriate under the circumstances. Merck and the NPC each shall be entitled to make submissions to the Claims Administrator with respect to such determinations of the Claims Administrator.

4.1.1.1. From and after the MI Initial Settlement Payments Commencement Date (and such determinations of the Estimated MI Non-Special Marker QPC Total Points and the Estimated Aggregate MI Special Marker QPC), each MI Qualifying Program Claimant (other than a Special Marker QPC) who has a Pre-Special Review Points award shall be paid (in accordance with Article 5) an amount equal to 40% of his estimated *Final Settlement Payment* pursuant to Section 4.3 determined (A) based on his Pre-Special Review Points award, the Estimated MI Non-Special Marker QPC Total Points and the Estimated Aggregate MI Special Marker QPCs (and the estimated MI Point Value derived from all the foregoing), (B) disregarding the reference in Section 4.3 to deducting Interim Settlement Payments and (C) assuming that all Special Marker QPCs will elect to receive Fixed Payments, that the *MI EI Payments* will aggregate the *MI EI Payments Cap Amount* and that the *MI Aggregate Settlement Amount* will not be increased pursuant to Section 5.4.1. The payments made pursuant to this 4.1.1 may be referred to herein as the "MI Interim Settlement Payments".

4.1.1.2. Anything in Section 4.1.1.1 to the contrary notwithstanding, in the event that the MI Interim Settlement Payment(s) otherwise to be paid at any time to one or more MI Qualifying Program Claimants would (but for this sentence) result in the aggregate of all MI Interim Settlement Payments to date exceeding an amount equal to 40% of the MI Aggregate Settlement Amount (the "MI Interim Payments Cap"), then all such MI Interim Settlement Payment(s) in question shall be reduced pro rata to the extent necessary so that the MI Interim Payments Cap is not exceeded, and no further MI Interim Settlement Payments shall be made.





