1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS        *        Docket MDL 1657-L
        LIABILITY LITIGATION        *
6                                   *        March 27, 2009
                                    *
7                                   *        9:00 a.m.
     * * * * * * * * * * * * * * * *

8

9

10                   STATUS CONFERENCE BEFORE THE
                        HONORABLE ELDON E. FALLON
11                   UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13

14   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                   BY:  RUSS M. HERMAN, ESQ.
15                                 820 O'Keefe Avenue
                                   New Orleans, Louisiana 70113
16

17   For the Defendant:           Williams & Connolly
                                   BY:  DOUGLAS R. MARVIN, ESQ.
18                                 725 Twelfth Street N.W.
                                   Washington, D.C. 20005
19

20   Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room B-406
21                                 New Orleans, Louisiana 70130
                                   (504) 589-7778
22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

1                    <u>**PROCEEDINGS**</u>

2                  **(March 27, 2009)**

3          **THE DEPUTY CLERK:**  Everyone rise.

4          **THE COURT:**  Be seated, please.  Good morning, ladies

5   and gentlemen.

6          **THE DEPUTY CLERK:**  MDL 1657, In Re: Vioxx.

7          **THE COURT:**  Counsel, make your appearance for the

8   record, please.

9          **MR. HERMAN:**  May it please the Court.  Good morning,

10  Judge Fallon.  Russ Herman for plaintiffs.

11         **MR. MARVIN:**  Douglas Marvin for Merck.

12         **THE COURT:**  It's good to see you, Russ.  I know all

13  your colleagues are happy that you're back, as well as the

14  Court.

15              This is a monthly status conference.  I received

16  from the parties a suggested agenda.  I have added to it.  I

17  met with the committees in advance to see what was anticipated,

18  and I will take them in order.

19              The first is the Settlement Agreement.  Anything

20  to report on that?

21         **MR. HERMAN:**  Yes, Your Honor.  I think at this time a

22  report from BrownGreer on the progress itself would be in order

23  if Your Honor will entertain it.

24         **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

25  Brown.  With me today, as usual, is Lynn Greer.  We are from

1    BrownGreer.  We are the claims administrator for the Vioxx

2    Settlement Program.

3                    We are happy to be here this morning to give the

4    Court and the parties an update on where we stand in the

5    Settlement Program.  The slides that we will show today and

6    show each month when we are here, we post those on our general

7    settlement Web site.  It's www.browngreer.com/vioxxsettlement.

8                    Anyone can access this report and see these

9    slides.  After we finish, we post these.  In particular,

10   there's a number of points where we show numbers and data in

11   here that we don't read out loud for the folks on the phone,

12   but they can see this when we are finished.  They are all

13   posted and they are public.

14                   Today, I'm going to update the Court and the

15   parties on where we are on the enrollment side of things -- we

16   are still cleaning up the release and stipulation documents for

17   persons to be in this program -- a few comments about the

18   Extraordinary Injury Program that we have now rolled out, and

19   then some changes and enhancements we are making in the way we

20   communicate with primary counsel through their secure Vioxx

21   portal Web sites that we have created for them.  Lynn will

22   cover where we are on the progress of our claims review and our

23   payments.

24                   Your Honor, on the release and stipulation

25   documents that are required to be a participant in the

1    Settlement Program, we have reported many times on this.  We

2    have been working with the parties, *pro se* claimants, and all

3    the lawyers who represent these claimants for about a year now

4    to get these documents clean, in place, and no questions about

5    who signed them or where they are signed.

6              The parties established a deadline of March 6,

7    2009, for all the claimants to clean up those for real, to get

8    them all done.  We are talking about the release of all claims

9    and the stipulation of dismissal for claimants who have a

10   lawsuit.  Those are the key pieces of that enrollment package,

11   and we have been working a long time to get them in shape, get

12   everything done, have the documents final and binding.

13             We rolled out in February the announcements to

14   *pro se's* and by letter and on e-mails to the primary counsel

15   that March 6 was the chance to get all these things cleaned up.

16   We had a lot of response to that effort.  We had a lot of

17   material sent to us by March 6.  We have processed that with

18   Merck's counsel at Bryan Cave to see what's still missing, see

19   what's fixed up, let counsel or the *pro se's* know they are

20   done.

21             That deadline went a long way to getting a lot

22   of these cleaned up.  Now, we still have some folks left.  We

23   still don't have them finished.  It's a small number.  I will

24   show you in a moment how many.  Merck has filed six motions

25   this week, six separate motions with the Court here and served

1    it on the counsel or the claimants who still do not have their
2    release and stipulation in final shape to ask them to show
3    cause why the documents are not yet complete.

4                   I think this morning the Court has set a hearing
5    on all six of those motions for April 15 at 9:00.  The idea is
6    that these are grouped in six different filings by kind of the
7    nature of the problem.  The signature issues on a release are
8    grouped together and other aspects of the release.  The notary
9    issues are grouped together.  The six motions are categories
10   that are sort of defined by a subject of what's wrong.

11                  The idea behind these motions is that we still
12   want people to cure the documents.  We are still getting in
13   cures.  We are reviewing testimony and cleaning them up with
14   the parties if they send those in.  If they do that, they will
15   be removed from these motions and be told that they are now off
16   the hook for the April 15 hearing.

17                  The goal is to get the documents cleaned up, not
18   to close out the claims, or at least the goal is to finish them
19   because, as we mention each time, to the extent we still have
20   this going on and have holes in the release, it impairs our
21   ability to review the claims and get the payments out.  So we
22   are trying to finish this out so that the parties can be safely
23   in the program, but also so that we don't have any impediment
24   to being able to finish out the MI payments in September and
25   keep going on the stroke claims, to get them done as well.

1    That's the idea behind these.

2             The fact that the motions were filed has

3    generated a lot of activity even since they came down this

4    week.  As we said, we are going to take people off of the

5    motions if we get the documents cleaned up.

6        **THE COURT:**  That's really important because everybody

7    has to understand that we can't deprive people who have done

8    what they were supposed to do with their final payment.  That's

9    going to present a problem.  If we have delinquent cases, it

10   will stop the whole train, and that's something that I'm very

11   conscious of.

12            A rule to show cause is important.  If it is

13   simply delinquent and it can be cured but it hasn't been cured,

14   then I'm going to have to dismiss the case.  If it can't be

15   cured notwithstanding good-faith efforts, perhaps there's

16   another way of dealing with it and handling that particular

17   matter.  We have got to focus some attention on it.

18       **MR. BROWN:**  Your Honor, this slide, which is Slide 3

19   in the slide presentation, shows us who is still at stake here.

20   We see in the top row here on the release that there are about

21   2,865 people who still have some hole in their release.  What

22   this means here, where it says "Deficiency," that means that

23   that 2,834, they are now out in the field, posted to the firms,

24   or sent to the individual claimants.

25            There's 113 *pro se* claimants who have still a

1    problem with their release, and we are waiting on them to send

2    us back a cure.  This is as of yesterday, so some of those

3    numbers have probably gone down since yesterday because we get

4    this material every day.

5                    The "Pending" row here means there's 31 people

6    who have sent us something and we and Merck's counsel are

7    looking at it, and that's all happening very quickly.  That

8    number goes down to zero about every day.

9                    The idea here is that there's about 2,800-plus

10   people who still have a release problem.  There's 187 people

11   who still have a stipulation that they need to sign and give to

12   us.  That sounds like a lot of people, 3,000 people total, that

13   we see here in Row 7.  It's really not because, remember, we

14   have over 50,000 people who enrolled in this program.  These

15   are the only folks left who haven't gotten their paperwork

16   complete yet.

17                   We look at it a little further to get a little

18   bit better picture about what's really still at stake.  This

19   next slide, Slide 4, shows us that on Row 2 that about

20   1,600-plus of those folks are people who have estate-related

21   deficiencies, meaning that they haven't gotten a representative

22   appointed yet for a deceased claimant or a deceased derivative

23   claimant family member, and those take the longest.  They are

24   the hardest to get cleaned up.

25                   We have this Court Approved Procedure 2008-1

1    that the parties agreed to that allows claimants to get a

2    surviving spouse or estate successor to sign the paperwork, and

3    it keeps the claim moving.  Recently, the parties announced and

4    we announced a change to that that allows, if a claim goes all

5    the way through and is compliant with that CAP, you can get a

6    points award notice.  If you're under 25 points if you're

7    testate and 15 points if you're intestate, you can get paid.

8    So it's a situation here where a lot of these folks who have

9    still a release problem are using this CAP to keep going in the

10   process, and they may get paid without having to clean it up.

11            We get down to the bottom of this in Row 5, and

12   we see there's really only 777 folks who have nonestate

13   deficiencies that still need to get it cleaned up.  415 folks

14   that have an estate problem haven't used the CAP yet.  So we

15   are down into relatively small numbers here out of 50,000

16   people.  After all the work we and the parties and claimants

17   and lawyers have done, we are in good shape on getting this

18   finished.  We think a lot of these folks that are left are

19   claimants that the counsel cannot locate anymore and they will

20   eventually have to be closed out.

21            When we were here last time, Your Honor -- we

22   were here on February 10, I think -- we announced that we were

23   going to roll out the Extraordinary Injury Program.  These are

24   two funds that the Settlement Agreement created, $195 million

25   for MI claimants and $105 million for IS claimants, that create

1   separate funds for persons with truly extraordinary, unique

2   injuries, economic losses, past wages, out-of-pocket medical

3   expenses of $250,000 or more, or a special medical injury

4   that's not covered on the underlying grid.

5                   We did roll out that program on March 2 as we

6   had promised.  We had an e-mail blast that we sent to all

7   primary counsel, and we sent letters to *pro se* claimants that

8   described the program and its deadline because the parties

9   established a June 1 deadline to send us their EI claim

10  materials.  That's an EI claims form that we have created on

11  line for law firms to actually fill out on line and a hard copy

12  claim form that individual claimants, *pro se* claimants will

13  use.  If a *pro se* claimant wants information on the program, we

14  have asked them to contact us, and some have.

15                  We have developed an extensive instruction

16  manual because the Settlement Agreement itself did not really

17  define the contours of the Extraordinary Injury Program.  We

18  worked with the parties to embellish upon that, to lay out the

19  provisions for what's covered, what's not, and try to explain

20  the documents, the sets of documents that are necessary to show

21  lost wages, past out-of-pocket medical expenses to set up that

22  program.

23                  So we prepared a lengthy instruction manual for

24  counsel and a separate one for *pro se* claimants with

25  step-by-step instructions about how to fill out the claim form,

1    what documents are needed, how to label them, how to get them

2    into us, and that those materials are due by June 1.

3         A person doesn't qualify for extraordinary

4    injury payments unless they qualify on the underlying grid at

5    some level.  There still are some people who don't know the

6    final outcome of their underlying MI claim or particularly

7    their stroke claims, but nonetheless we want these materials by

8    June 1.

9         I think at this stage counsel or claimants, if

10   they feel like they have got economic losses or they feel like

11   they have a medical injury that's not going to be adequately

12   covered on the underlying grid, they need to go through their

13   records and follow these instructions and get us these

14   materials by June 1 so that we can then be processing these

15   funds, which are also pro rata funds, and determine each

16   person's individual award and then how that pro rata allocation

17   is going to work out.

18        The program is up and running.  We did get it

19   out.  The letters to the *pro se's* actually were mailed on

20   March 3.  March 2 was a very rare snow day in Richmond.

21   Everything was shut down.  We got everything else launched, but

22   we mailed the letters on March 3 to the *pro se's*.

23        **THE COURT:**  An extraordinary injury fund is really

24   important in cases of this sort.  One thing that's always

25   troublesome is when you have litigation that contains 50,000,

1    60,000 people, whatever it is, you have to recognize that the

2    top end is potentially problematic because those cases, if

3    tried by themselves, might do better.  Might do better.  So you

4    have to be concerned, from a judge's standpoint, that those

5    individuals have an opportunity to get an increase in

6    compensation to recognize their extraordinary injuries.  They

7    are over and above the average; not only over and above the

8    average, but they are extraordinary.

9              At the same time, it's not a second bite at the

10   apple.  Somebody who doesn't fall into the extraordinary injury

11   fund, that doesn't mean that they have another opportunity to

12   get additional compensation.  It's just to take into

13   consideration that in a case like this you're going to have

14   some people who don't fit in.  It's fair and appropriate to

15   recognize those individuals, and that's what this does.

16             I think for every large case there ought to be

17   some thought given by lawyers, as well as courts, for the fact

18   that there are going to be extraordinary injuries and they

19   should be compensated for or have some mechanism to receive

20   additional compensation.  This, to me, is an adequate way of

21   doing it.

22             **MR. BROWN:**  Yes, Your Honor.  I think that was

23   exactly the intent of the parties here.  We tried to define it

24   working with the parties to achieve that goal.  The manual

25   describes that, I think, in detail to the parties.  It is some

 1    steps to applying for those funds.  The manual answers a lot of
 2    questions, but we are encouraging for them to call us or e-mail
 3    us if they have questions.  We want to help folks understand
 4    what they need to do to get in that program.
 5              Your Honor, the last thing I will mention before
 6    I turn it over to Lynn and go through where we are on claims
 7    and payments is a brief comment about enhancements to this
 8    Vioxx portal interface that we use with primary counsel.
 9              We talk with counsel on the phone all the time,
10    we e-mail back-and-forth, but the primary way we communicate
11    back and forth with the lawyers who represent claimants in this
12    program, whether they have one claimant or thousands of
13    claimants, is through the secure interface that we created.
14    Firms can log onto a secure Internet Web site and go to their
15    unique portal where they see information about only their
16    clients.  They can send us information.  We send them
17    information.  This is the main mechanism for us to share
18    progress status, what is going on with the claims.
19              It's in a constant state of evolution because as
20    the program has evolved, as it has expanded, the portal and its
21    functionality have expanded.  We are rolling out on Monday a
22    new change to this that we think will help firms a lot.
23              Now, the program has gotten through so many
24    phases.  It used to be this dealt only with registration and it
25    dealt only with enrollment.  Now it's dealing with claims, and

1    it's dealing with liens, and it will be dealing with the

2    Extraordinary Injury Program, and it is dealing with payments.

3                    We had designed this to cover those different

4    phases.  Now we are rolling out something that integrates it

5    all together.  What we see here in this slide is what a firm

6    sees when it signs onto the portal and enters their

7    information.  Then if they go to the claimant's search feature

8    on the left menu, they will now get a claimant's -- or starting

9    Monday will get a claimant's search feature that allows them to

10   look up all their claimants or one of them and then see the

11   various phases of the program that those folks may be in.  It's

12   a one-stop-shopping opportunity on the portal so that you don't

13   have to go look in the claims section for claims status,

14   enrollment in the enrollment section.  This will take you

15   there.

16                   We will soon have, after the claims section

17   here, an EI program.  Assuming we have data to put up there and

18   have claims and statuses, there will be an extraordinary injury

19   status button here.  If you click on one of these buttons, for

20   example, if you went through status on this particular

21   claimant -- for example, this is a claimant -- this is all

22   artificial data.  This is a claimant who is closed, a

23   nonsubmitting program claimant for not submitting the

24   materials, the claims package by the applicable deadlines, and

25   this will tell them that person's status.

 1             If you click on the demographic section, this is
 2   where you see all the information about claimant; can change
 3   the claimant's name and address.  If you click on the
 4   enrollment button, it will take you to the enrollment world,
 5   tell you exactly where they are on their release and
 6   stipulations.  If you click on the claimant claims section, it
 7   will take you to where that claimant is in the claims world and
 8   everything that's happened to that claim in the claims world.
 9   Whether they are at gates, if they are at gates denial, this is
10   where you see that.  If you go to payment, it will show whether
11   the claim has been paid and, if so, how much and when.
12             So this is our effort to make the portal even
13   easier to use so that a law firm can check a claimant or all
14   their claimants through one window, one-stop shopping to get
15   them exactly with what they need to know about that person's
16   status.
17             Your Honor, that concludes my portion of this,
18   and then Lynn will go over where we are on claims.
19             THE COURT:  Okay.  Thank you.
20             MS. SNAPKA:  Your Honor, I would ask for permission
21   to address the Court.  I didn't want to interrupt Mr. Brown.
22             THE COURT:  Okay.
23             MS. SNAPKA:  Your Honor, with regard to the
24   extraordinary injury fund, this Court has crystallized what I
25   think is the essential part of the extraordinary injury fund,

1    which is for truly, truly extraordinary and not adequately

2    compensated cases under the program.  However, I would ask the

3    Court, in reviewing the guidelines that were sent out, there is

4    a provision in there that I believe needs clarification and/or

5    modification.

6              Under I(C)(5)(c) it talks about the EI payment

7    determinations of the claims administrator shall be made

8    according to guidelines to be established by the claims

9    administrator in consultation with Merck and the negotiating

10   plaintiff committee and shall be final, binding, and

11   nonappealable.

12             I called BrownGreer and, as always, received a

13   call back almost immediately to discuss the nonappealable

14   nature of it.  It is my understanding that once the claim is

15   submitted, then the claims administrator makes a determination

16   in consultation with Merck and the NPC, and under the terms

17   stated that's it.

18             Mr. Brown indicated that there was some

19   discussion about maybe a rereview by the same people.  However,

20   I would urge the Court that given the extraordinary nature of

21   these claims, coupled with the Settlement Program's review

22   processes in other areas, certainly for a truly extraordinary

23   claim we would be able to set up some sort of review by special

24   master instead of just the NPC and Merck and the claims

25   administrator.  If we are able to do that for the attorneys fee

1   issue, surely we are able to do that for the clients that we

2   represent, to have some measure of review after a determination

3   is made.

4             I wanted to bring this to the Court's attention,

5   and I would be happy to visit with the Court later or the NPC,

6   but this came up and I asked Mr. Brown for clarification.  I

7   wanted to bring this to the Court's attention.

8         **THE COURT:**  Thank you very much.  Any comments from

9   anybody about that to flesh it out for me?  Any reason not to

10   do that?

11         **MR. HERMAN:**  May it please the Court.  I think if

12   Ms. Snapka would address a letter to both Merck and the

13   negotiating committee, we can meet on it and attempt to resolve

14   it.

15         **THE COURT:**  Well, let's dispense with the letter.  I

16   will take it as a request.  I would like Orran and the

17   committee to get together, and let's see what we can do to at

18   least deal with that issue.

19         **MS. SNAPKA:**  I'll be happy to meet with them,

20   Your Honor.

21         **THE COURT:**  Fine.  Let me know by next time what's

22   happened.

23         **MS. SNAPKA:**  Yes, Your Honor.

24         **MS. GREER:**  Good morning, Your Honor.  Lynn Greer

25   from BrownGreer.  I today would like to give the Court an

1    overview of where we are in the progress on claims review and

2    payment and, also, towards the end of my presentation alert the

3    Court and those in the courtroom and on the phone to some very

4    significant changes to some of our claims policies that will

5    affect deadline extensions, going forward, to claims deadlines.

6                    This first slide shows -- and it has not

7    differed much since last month.  It shows that there are

8    approximately 48,520 individuals who have filed claims forms

9    with BrownGreer.  62 percent are MI claims; 37 percent IS

10   claims, stroke claims.  We still have about 1 percent where we

11   have a claims form but we don't know what injury the claimant

12   is alleging.  We have embarked on a campaign this week, with

13   the assistance of the NPC, to contact these firms by phone to

14   try to work with them to let us know what injury it is that

15   they are claiming because these claims cannot even enter our

16   queue for being able to review them unless we know what injury

17   it is that we are looking for.

18                    Your Honor, we are all focused on the heart

19   attack claims to be able to reach our goal of a final payment

20   in September of this year.  Accordingly, you will see a lot of

21   progress in the gates queue and also with the gate committee

22   that I will talk about also towards the end of the

23   presentation.

24                    The first row here shows that there are just a

25   little over 2,000 claims that still await our first review for

1  gates review.  This has dropped about 5,400 since we were here

2  back in February.  That number is actually a little misleading

3  because other claims have come into the queue.  So we are

4  really working that down and have just over 2,000 heart attack

5  claims to touch for the first time.

6         Row 2 shows that there are about 4,000 that we

7  have reviewed once.  As I explained to the Court before, we put

8  all of these through a second review because this threshold

9  question of eligibility is so very important.  We have about

10  4,000 pending now to be able to do that second review on.  When

11  we look at those, if they pass, we immediately review those for

12  points.  If they fail, we issue notices to the claimants that

13  they have failed and give the claimants an opportunity to

14  submit documentation.

15         To date, there are 12,668 claims that are

16  eligible for points review, and these have passed either the

17  claims administrator or they have passed at the hands of the

18  gate committee or by Merck, who has pushed some into the

19  program.  We have issued, though, 8,902 notices of

20  ineligibility or gate failure.  2,000 claims are currently with

21  the gate committee with no vote yet, although they are

22  considering these at a very aggressive pace on a weekly basis.

23         We issued the March payment on Monday of this

24  week.  Through March we have paid 8,275 MI claims.  We have

25  gone to a schedule, Your Honor, of closing out the time for

1    when firms can accept notice of points award and be put on the

2    next payment list.  That is now the end of every month.  So

3    this coming Monday, which is March 30, will be the window that

4    closes for claims to be paid in April.

5              Right now there are 2,423 claims that could

6    possibly be paid in April.  Almost 1,200 of those have already

7    accepted, so we know for sure they will be paid.  There are

8    another 772 that could still come in and decide to accept

9    between now and Monday, so those could also be paid.  There are

10   463 who are currently on appeal, and those are unlikely to be

11   paid in April because we review those, and the special reviews

12   obviously cannot be paid until the end of the program.

13             Row 3 shows that there are 369 claims that are

14   about ready to have notice of points awards issued.  These are

15   those that we have completed our final step.  There are some

16   for administrative reasons why we cannot issue a notice.  This

17   sometimes has to do with lien data that we need.  In the past

18   it has to do with some enrollment deficiencies, although that

19   is less and less of an issue, as Orran discussed before.

20             Row 4, there are 121 claims that we still need

21   to put through our final QC review, and as soon as we do that

22   notices of points awards will issue.  There are 671,

23   Your Honor, where we have reached a point where we cannot go

24   forward on our points review because they are incomplete.

25   These are claims obviously that were complete enough to get

1   through gates, but as we get into points they're missing

2   follow-up records.  They're missing some sort of proof-of-use

3   records that will allow us to either assess injury level or

4   risk factors.

5            So these have stopped in our process.  We have

6   issued notices of incomplete claims packages to these

7   individuals, and I will discuss later what our plan is for

8   being able to deal with these types of claims to ensure our

9   final payment.

10            There are 203 claims where we have begun points

11   review and another -- you can't see this on the screen, but

12   another 386 that are in the queue waiting for us to be able to

13   review.

14            Each month for the past few months, Your Honor,

15   we have tried to project our pace and what we need to be doing

16   collectively to be able to get to a final payment in September.

17   This slide is this month's version of this, which incorporates

18   payments we have now made.  What it shows as you go down is

19   that we -- Row 8 is significant.  We have been experiencing up

20   until recently a 10 percent appeal rate from a notice of points

21   awards.  That has now jumped to 15 percent.

22            We are watching that very carefully.  Obviously,

23   the more claims that appeal, the longer it takes to resolve

24   those, and so we are watching those to make sure that that in

25   and of itself does not cause a delay that we can't handle as we

1   approach September.

2               We need to be on pace to bring 2,514 claims to

3   points award monthly.  We are confident that we will do that.

4   We are running just slightly under that now, but we feel

5   confident that this is an average that we need to meet over the

6   next few months and we are on track to do that.

7               **THE COURT:**  It's important when you see something

8   like that, a blip from 10 to 15 percent, that you alert the

9   special masters to that blip.

10              **MS. GREER:**  Yes, Your Honor.

11              **THE COURT:**  They are the ones that will in the future

12  be dealing with it.  So if they can get ready for it, they can

13  deal with it more easily.

14              **MS. GREER:**  Yes, Your Honor.  I'm not going to read

15  these average points this month.  What this slide shows -- and

16  this is Slide 18 for those who will later view this on the Web

17  site.  This just gives what the average points value is for

18  each level on the MI grid and what the special marker

19  percentage is currently running.  We tracked this and hope that

20  it's useful to firms in dealing with the notice of points

21  awards that they get to see where their claim falls along this

22  average.

23              Your Honor, this slide updates the Court on the

24  payments and the potential payments that we have made or hope

25  to make in April.  As I mentioned before, we have paid 8,275 MI

1    claimants for a total of $712,944,809, pending April payments

2    of 1,188, potential April payments of another 772.  So we could

3    pay almost 2,000 claims in April, which would bring our total

4    payments through April up to over 10,000.

5                This slide describes the progress on the stroke

6    claims.  We have been prioritizing the heart attack claims.

7    That does not mean that we have not continued our efforts on

8    the stroke side.  We have not lost sight, obviously, of the

9    importance of continuing to review those aggressively.

10                We are now down to 4,073 claims that are in the

11    queue for gates review for stroke that we have not reviewed.

12    We have 7,000 that we have reviewed once that are pending our

13    second review.  We made progress on 800 of those claims.  To

14    date, almost 4,000 have gotten to the point where they are

15    eligible for a points review that they have passed and are

16    eligible for, and a lot of those have notices issued.  Some of

17    those have also been paid.  We have issued 1,316 notices of

18    ineligibility, and the gate committee currently has about 1,243

19    claims with no decision yet that are on the portal or before

20    the gate committee.

21                The points review status for stroke claims, we

22    have paid 482 stroke claims to date.  Again, Your Honor, these

23    payments did not begin until February.  We have paid 482.  For

24    April we could possibly pay another 500.

25                Going down -- and I won't read each row -- this

 1   also shows the progress we are making with our points reviews
 2   on strokes.  The biggest group here obviously are those that
 3   are pending our QC.  869 we have reviewed for points, and we
 4   are reviewing those once again.
 5              As with the MI claims, Your Honor, in the
 6   beginning of them we start issuing points awards and payments
 7   on the stroke claims.  We are taking very careful looks at
 8   those.  The stroke claims are a little bit harder to evaluate
 9   than the heart attacks.  They have some more subjective
10   components.  So we are taking every effort in the beginning to
11   obviously get it right and to keep that appeal rate down.
12              A summary in terms of dollars, we have paid
13   $14,214,878 to stroke claimants so far.  Again, with the
14   pending April payments, we could almost reach 1,000 IS claims
15   paid through April.
16              Your Honor, over the past few months, we have
17   discussed in court potential bottlenecks to the process and to
18   our ability to pay in September.  Questions have been asked
19   about the gate committee's progress, and we created this slide
20   to show the Court and those in the courtroom the tremendous
21   progress the gate committee has made.
22              To date, the gate committee has decided over
23   11,000 cases.  Right now -- and these were figures that were
24   run last night -- there are 2,820 claims pending before the
25   gate committee.

1          The next row shows that only 337 have been with

2    the gate committee for more than 60 days.  A big percentage of

3    those are stroke claims because, consistent with what we are

4    doing, the gate committee, while they are reviewing stroke

5    claims aggressively, they are prioritizing the heart attack

6    claims.  You'll see, Your Honor, that almost 1,200 have been

7    with the gate committee less than a week.  The average votes

8    that the gate committee is conducting, they are running about

9    1,200 a week, which is tremendous, significant progress by the

10   gates committee.

11          The other big area of potential bottleneck is

12   within the claims process itself there are several junctures

13   and decisions that require the firms to decide quickly and to

14   provide documentation quickly.  We have identified this as an

15   area where if we do not enforce the deadline the Settlement

16   Agreement prescribes and that we internally, in using our

17   discretion, prescribe, we are in great jeopardy of not being

18   able to issue the payments in September.

19          This is going to be a sea change for many firms

20   who have gotten very accustomed to asking for more time to

21   submit records, to make a decision about whether to accept a

22   notice of points award, but I think I speak for the parties

23   when I say we are all very, very committed to making sure these

24   deadlines stay firm.  So what I would like to do is walk the

25   Court through what these decisions are.

1          The first is when we issue a notice of

2    ineligibility, the firm to date has had 14 days to give us

3    additional documentation.  What they can do, though, is they

4    can ask for more time, and almost 30 percent of the claimants

5    who have received a gate failure notice have asked for more

6    time.  That's about 3,500 claims.  Of those, about 1,200 have

7    asked for even more time.  So we have been in situations where

8    firms have asked for 120 additional days, or four months, to

9    submit records that everyone knew starting on 11-9-07 they

10   needed to submit.

11          It's important to remember against the backdrop

12   for all of this that the initial claims package deadline was

13   July 1 of last year, the final claims package deadline was

14   December 30 of last year, so by definition we are at a point

15   now where these records should have been before us for months.

16          So what we have done internally and what we will

17   do starting on April 1 is rather than give people 14 days to

18   submit documents or to make a decision about whether just to go

19   ahead and send their claim to the gate committee, we are

20   extending that to 21 days for everybody.  So firms who get a

21   notice of ineligibility have 21 days to submit records, and

22   that is it.  There will be no further extensions.  If firms

23   cannot give us these documents within 21 days, those documents

24   cannot be considered by the claims administrator, by the gate

25   committee, by Merck, or by the special master.

1          **THE COURT:**  Let's have the committee prepare some

2     notice for me to post on my Web site because the Court is going

3     to have to get involved in this.  If I don't get involved in it

4     and I don't take some action on those claims, then those claims

5     are going to retard the progress of the whole process because

6     the people are not going to be able to get paid, the people who

7     have done timely what they were supposed to do, and that's not

8     fair to them.  Give me something that you're comfortable with

9     and I will look it over.  If I'm satisfied with it, I will put

10    it on the Web site.

11         **MS. GREER:**  Your Honor, the second notice that we are

12    enforcing the deadline for is when we get to the point in the

13    points review process where we have enough to review it for

14    eligibility, obviously, and we have enough to glean something

15    about the injury level, but we cannot do a full points review

16    on the claim, we will issue and have issued a notice of

17    incomplete claims package.

18              Firms will have 30 days from the date that the

19    notice is posted on the secure portal to supply the missing

20    information.  At that point, again, no extensions will be

21    granted.  Firms, if they pass the 30 days and they have not

22    responded or they come back to us and say, "These are all the

23    records I have.  The records you're looking for simply don't

24    exist," they have either been destroyed or the patient never

25    went to see a cardiologist in follow-up, then we will issue a

1   final notice of incomplete claims package.

2                   That notice will give the claimant two options.

3   The first is to acknowledge and to go down the road of a

4   nonsubmitting program claimant because by definition that is

5   what they are.  They have not complied with Section 1.3 of the

6   Settlement Agreement.

7                   The other option the claimant will have is to

8   elect to have us continue with our review and do the best we

9   can to assess injury level, to assess risk factors using the

10  documents we have, and also to apply some sort of standard

11  deduction, average deduction that we will design to make sure

12  that these folks do not get better treatment or do not benefit

13  from their lack of records vis-à-vis those who submitted claims

14  packages.

15                  The details of that are still to be worked out,

16  but the option to that, the only alternative to that is to be a

17  nonsubmitting program claimant.  The goal of that will be to

18  permit us to continue to review these claims and to get points

19  issued on claims that are technically incomplete.

20                  The third row describes the decision that a firm

21  has when they get a notice of points award.  They have 15

22  days -- and this is a Settlement Agreement deadline.  They have

23  15 days to decide whether to accept or appeal it.  That is a

24  deadline that many people have asked to extend.  We have

25  actually had firms, once the 15 days passes, come back and say,

1    "I didn't mean to accept it.  I meant to appeal it."

2                The message here is that you have 15 days to

3    decide and firms need to communicate with their clients early,

4    upon the receipt of a notice of points award, to find out what

5    the claimant intends to do.  After the 15 days, if they have

6    not notified us of an intent to appeal the claim, the notice of

7    points award is deemed accepted and it goes on the next payment

8    list.

9                The fourth row is there are a lot of claimants

10   who wish to appeal, that they wish to give us additional

11   documentation, and that's fine because a lot of times the

12   notice of points award will show them something that they had

13   not focused on.  If a firm wants to submit additional

14   documentation on appeal, they will have 30 days to do so from

15   the date the notice of points award is posted.  No extensions

16   will be granted to that.  If documentation does not come in

17   within 30 days from the posting of the notice, we will not

18   consider it and the special master will not be able to consider

19   it.

20               Finally, after we review a claim on appeal, we

21   do a first review, as the claims administrator, on any appeal

22   that's filed and we issue a postappeal notice of points award.

23   Again, a firm has 15 days to decide whether to go forward to

24   the special master or whether to accept the claim, and no

25   extensions will be granted to that 15-day period as well.

1          The consequences for failing to meet these
2  deadlines I've discussed briefly as I discussed what the time
3  periods are.  If a firm does not submit documentation within 21
4  days after a gate failure notice, the claim will automatically
5  go to the gate committee and the late documents will not be
6  considered further in the process.

7          A firm who does not respond within 30 days to a
8  notice of incomplete claims package either becomes a
9  nonsubmitting program claimant or can elect the points review
10 with conditions.  If someone does not decide within 15 days to
11 accept or appeal a notice of points award, we will deem that
12 notice of points award accepted.  If a firm does not accept
13 documentation for appeal within 30 days, those documents will
14 not be considered.  If a firm does not decide within 15 days of
15 our appeal notice of points award whether to accept it or go
16 further with the special master, that award will be deemed
17 accepted.

18         So important reminders to firms:  They have to
19 check the portals daily.  These notices get posted daily.  All
20 of these deadlines run from the date the notice is posted on
21 the portal.  We still hear too often of firms who never check,
22 or they let weeks go by and they haven't checked, and then the
23 14 days or the 21 days has run.  The message here is that we
24 can't go and undo that anymore.

25         The second message here is that firms who know

1    they are still missing documentation and claimants who know

2    they are still missing documentation, they have got to gather

3    it now.  We are not asking for anything new that has not been

4    part of the Settlement Agreement from the beginning.

5    Obviously, if on appeal we find a new risk factor and the firm

6    has never had an opportunity to submit documents to that, we

7    are going to give people a chance to submit documentation upon

8    appeal when we find something new for the first time.  Other

9    than that, nothing is new.  Nothing should be a surprise at

10   this point.

11              The other reminder is for firms to contact their

12   clients as soon as a notice of appeal is issued.  We

13   understand -- and especially with the summer coming up and

14   vacation schedules -- a lot of times it is difficult to reach a

15   client in 15 days and to get a decision.  But if firms start on

16   Day 1 or Day 2, our hope is that they will be able to get the

17   client's intention and to know whether to appeal or whether to

18   accept.  If there is any question in a firm's mind, they should

19   appeal.  They can always withdraw that appeal.  If there is any

20   question on Day 14 about what their client wants them to do,

21   they should note an appeal.

22              No extensions will be granted.  There is an

23   existing CAP, Your Honor, that was implemented.  CAP 2008-3 was

24   implemented mostly to deal with deficient enrollment documents.

25   This is what has given rise to extension requests in the claims

1  process.  We are revising that CAP, with the agreement of the

2  parties, to make it inapplicable to these claims deadlines.

3  Finally, the obvious point is that we have made

4  a determination the volume of these deadline extensions that we

5  have experienced so far, if they were to continue, would

6  seriously jeopardize and inhibit our ability to make payments

7  in September.

8  THE COURT:  We just can't do that.  The attorneys

9  have to recognize that if they don't do it and the case is

10  either dismissed or their clients are not afforded what they

11  should be afforded, there's going to be some lawsuits against

12  the attorneys.  We have given enough notice, and the Court will

13  make it the Court's notice.  If they violate it, then they will

14  have their own insurance company to advise.

15  MS. GREER:  Your Honor, at this point, too, if there

16  are firms who have questions about how to use their portal, how

17  to see a notice, we encourage them to call their CA contact at

18  BrownGreer.  We are standing by to help any who are not

19  familiar with it or who do not understand the importance or

20  even where to see these notices, although most firms by this

21  point do know that.  Thank you, Your Honor.

22  THE COURT:  Thank you very much.

23  MR. MARVIN:  Your Honor, if I may just briefly

24  address the six motions that Merck filed on the order to show

25  cause why the releases and stipulations have not been cured.

1    As Orran Brown indicated, more than 45,000 have

2 complied, but we are down to now about 2,000, including those

3 who have estate issues.  As to those 2,000, we have moved for

4 the order to show cause why those have not been cured.

5    All that needs to be done is to go ahead and fix

6 the cure.  In some instances it's getting the right signature.

7 In other instances it's getting a complete signature.  All that

8 needs to be done is to submit the proper documentation to

9 BrownGreer.  BrownGreer will then notify us, and then we will

10 take the name off the order to show cause and they need not

11 appear.  As I understand, the Court has set April 15 for that

12 appearance.

13    **THE COURT:**  Yes.

14    **MR. MARVIN:**  If that's not done by April 15 and there

15 is an order to show cause and there is not good reason, we will

16 have to ask for additional relief.  Right now, all we have

17 asked is that they show cause why they haven't complied; but if

18 they haven't complied, then I will have to ask for additional

19 relief.

20    **THE COURT:**  Yes.  Including dismissal of the case.

21    We have gone through the Settlement Agreement

22 and registration and enrollment of claims.  Anything on the

23 lien administrator?

24    **MR. HERMAN:**  Your Honor, at page 2 of the report, I

25 just want to indicate that we have not had any additional

1    problems with the medical record gathering.  Also, U.S. Bank

2    requested an amendment to the Qualified Settlement Fund Escrow

3    Agreement and we, with Merck, have agreed to such.  It's not a

4    problem.

5            Then at the top of page 3, Your Honor, I

6    understand that Ms. Oldfather has filed a motion or a pleading

7    with respect to the joint motion to lift the Pretrial Order on

8    discovery and may be participating by phone.

9          **THE COURT:**  Right.  I think she is.

10           Ms. Oldfather, after the conference here today,

11    I would like to be able to call you, with defense counsel and

12    members of the committee, and set a date for an immediate

13    status conference.  Hopefully, in the next week or 10 days, I

14    will meet with you as well as all of the other lawyers who are

15    involved.  I understand there are not many of them, maybe two

16    or three in addition to yourself, and I would like to then

17    establish some scheduling order to move these cases on to

18    trial.

19          **MR. HERMAN:**  At page 4, the lien administrator,

20    Mr. Wolf, is here to make a report.  I believe Mr. Seeger also

21    has some comments as well.

22          **MR. WOLF:**  Good morning, Your Honor.  I am Jason

23    Wolf, director of operations, The Garretson Firm, and I'm here

24    to report as the lien resolution administrator to the Vioxx

25    program.

1          I will provide a brief report on the lien

2     resolution administrator work as it relates to the

3     consideration and satisfaction of the federal, state, and

4     military obligations on behalf of the over 78 percent of

5     claimants entitled to the programs.  In addition, I will cover

6     the status of the third-party payor lien resolution program.

7          As for Medicare, The Garretson Firm is actively

8     applying the global resolution categories and the associated

9     reimbursement amounts to all entitled claimants as they're

10    approved and receive notice of points award letters.

11         In one of Lynn's slides, it did note PAN letters

12    that cannot be issued.  One of the issues would be a lien

13    resolution administrator hold where there's a discrepancy on

14    our end to ensure that the agencies are being properly

15    considered.  The primary reason for a lien resolution

16    administrator hold at this point of the program was the

17    introduction of the ischemic stroke category.

18         We did have global resolution categories in

19    place prior to the launch of ischemic stroke, but we have found

20    one small subsection of ischemic stoke, low-value ischemic

21    stroke claimants that fall in between two categories.  We

22    expect to have that fixed prior to the next hearing.  We are

23    working with CMS to address that.

24         As for the Medicaid programs, all Medicaid

25    programs are actively engaged.  In response to your request

1   last hearing to know of any agencies that are delinquent and
2   considered nonresponsive, we are pleased to report that all
3   states and territories and their Medicaid agencies, including
4   the five that we were considering somewhat delinquent this time
5   last month, are actively transferring claims data and/or have
6   in place to have us the necessary claims data within the next
7   month.
8            The only agency that we are somewhat struggling
9   with, due to an unusual turnover rate, is the Puerto Rico
10  Medicaid agency, but we have established what we think is a
11  sound contact there and have plans in place to get the claims
12  data.  This speaks specifically to the claims data.  We have
13  all programs secured to ensure that holdbacks and proper
14  resolution are against those that were exposed as entitled.
15           For all the Medicaid programs, we have secured
16  over 12,000 paid claims.  As has been discussed in the past,
17  the current protocol is to audit a claim as an eligible
18  claimant processes through and is approved by BrownGreer for an
19  injured category.
20           As it relates to the third-party payor program,
21  as the Court is aware, this program was launched on January 29.
22  E-mails were sent to all primary counsel introducing the
23  program with an explanation of that program and instructions to
24  send to their claimants, at their discretion, the claimant
25  education materials that were crafted specifically for that

1    audience.

2              Those materials explain the terms and the

3    conditions of the program, and the education materials

4    reiterated that some claimants may receive health-care coverage

5    from insurance sources other than government programs.  The

6    sources could include health-care programs by a claimant

7    employer or a health insurance policy, disability insurance,

8    Medigap and/or Medicare or Medicaid replacement supplemental --

9              THE COURT:  Do you have any feeling for how many?

10   What's the percentage of those that you have had so far, third

11   parties?

12             MR. WOLF:  Third parties?

13             THE COURT:  Nongovernmental liens.

14             MR. WOLF:  Yes.  There is a current rate of federal,

15   state, or military client participation of 78.75 percent

16   entitled to that.  The balance were either insured by a private

17   plan and/or uninsured and had self-pay rates.  The notation in

18   there, in the education materials, was even if someone was on

19   Medicare, they might have had a supplemental plan and,

20   therefore, might also have had a private payor obligation as

21   well.  We do have statistics on that population as well.

22             As far as plan participation, we sent out with

23   the notice of third-party payor plan a list of participating

24   plans that went out with the notice and also went out with a

25   supplemental notice.  There was an e-mail blast, as you're

1    aware, ten days prior to the March 20 deadline.  That went out

2    with a new supplemental list of additional plans that have

3    agreed to participate since the launch of the plan.  That was

4    up to 70 additional plans agreeing to the program and the terms

5    of the program.  So that was favorable news to introduce to the

6    primary counsel and their claimants.

7            As for eligible claimant participation, the

8    enrollment has been favorable.  The enrollment rate and the

9    communication that we have had with primary counsel is evidence

10   that it has been widely supported by primary counsel.  The

11   enrollment rate, again, has been favorable and also suggests a

12   strong participation and receptiveness by the claimants

13   themselves.

14           In the event that the program moves forward, we

15   feel that an extension of the program, in addition to

16   supplemental information to some targeted groups, can further

17   enhance the participation rate in the third-party payor

18   program.

19           **THE COURT:**  What's the percentage that you need to

20   make the program a go?  What is that?

21           **MR. SEEGER:**  Your Honor, the way the agreement is

22   defined right now, it's 90 percent of those eligible.

23           **THE COURT:**  Eligible.  In this particular matter,

24   because of the census, it's older people by and large.  You

25   have a lot of governmental liens, so you may not have as many

1    nongovernmental liens.  Is that what you're finding?

2            **MR. SEEGER:**  That's what we think.  Tom, who is

3    representing the other side of this, I think needs to be

4    satisfied that our numbers are correct.  The way it's looking

5    to us, that's correct.

6            **THE COURT:**  Tom, what's your view of this?

7            **MR. SOBEL:**  Thank you, Your Honor.

8            **THE COURT:**  Give us your name.

9            **MR. SOBEL:**  Tom Sobel for the third-party payor group

10   in connection with the reimbursement program.  I think it's the

11   classic situation where we are very happy -- I think everybody

12   should be very happy about where we are in this stage.  There's

13   been a huge amount of effort, obviously, as The Garretson Firm

14   has indicated and as Mr. Seeger and the rest of the PSC have

15   done.  There's been enormous progress in a very novel program.

16   That's the good part of it.

17            There are some issues that need to be grappled

18   with, and let me explain what I think that is.  Of the

19   approximate 48,000 overall population of participants in the

20   program, to date approximately 17,000 persons have indicated

21   participation in the private lien program.  Of that 17,000, we

22   don't know yet, at least from the third-party payor

23   perspective -- that 17,000, we don't know if that is purely

24   people who only have private liens on the one hand or, on the

25   other hand, is a sampling of the population as a whole on the

1   other --

2          THE COURT:  Right.

3          MR. SOBEL:  -- number one.  Second, as to the 30,000

4   that are left, we similarly have an issue, which is are those

5   only people who don't have any kind of private lien or are they

6   the opposite.

7              Now, we do know that this population of

8   participants appears to have a higher participation in federal

9   and state health-care programs than is normal in the population

10  as a whole.

11         THE COURT:  Sure.  Because it's the purpose of the

12  drug.

13         MR. SOBEL:  For any myriad of things.  So we know

14  it's a higher population.  That's helpful, number one.

15             The second thing we know, on the other hand, is

16  that when people participate in Medicare, Medicare does not pay

17  everything.  That is very common for people who have a MediGap

18  policy or sometimes a shortfall issue.  Sometimes that's paid

19  by Medicaid, but about half the time or more often it's paid

20  also by private insurance.

21             To make a long story short, I think what the

22  parties are going to try to do -- and I would like to talk a

23  little bit further about the details of this -- is for us to

24  learn more information about the population of participants we

25  have right now and maybe try to do some kind of an audit or

1    census of the participants who have not yet participated

2    because everybody wants this program to be successful.

3              The one thing we don't want to have in this is

4    thousands of eligible claimants not knowing that they have the

5    opportunity to participate in this, not appreciating that they

6    might have a piece of their insurance that was paid privately

7    and have that as a legacy issue that has to be addressed after

8    this MDL.

9              So there are other more draconian ways to

10   address this issue, but I think that the parties have been

11   trying to say, "No, let's not go there yet.  Let's look at some

12   things to understand a little bit more first what we have.

13             Is that fair to say?

14        **MR. SEEGER:**  Yes.  I think Tom is correct.  It's a

15   question of I think we have a better sense of what the data

16   looks like and the information than you do standing here today,

17   and we have to work together to get them comfortable.  Speaking

18   with Jason and keeping in touch as I have -- Jason can address

19   this -- we are pretty confident that the group we have, the

20   17,000, includes both the purely private and the combination of

21   government/private.

22             In addition to that, one of the things we are

23   going to discuss, Judge, is maybe doing another mailing to say

24   to people even if you have gotten Medicaid and Medicare, for

25   people listening and reading the transcript, if they haven't

1   covered all your questions -- it could be a private wanting to

2   enroll -- let us take a look at it.

3           THE COURT:  As I said before, this is an opportunity

4   for both sides because with the governmental liens we know that

5   the claimants have to pay it back.  It's a lien.  They have to

6   pay it back.  So in a case of this sort, because of the

7   numbers, those liens can be discounted because the

8   transactional cost is down, it's a one-stop-shopping kind of

9   thing, and so you are taking advantage of that.

10          In the nongovernmental liens, there's also not

11  only a moral but a legal duty to pay them back, so those

12  individuals can and will be sued to get the money back.

13  Because of the numbers, the plaintiffs' committee has been able

14  to negotiate with the third-party insurers a very good deal so

15  that the amounts that they will be paying back are

16  substantially less than they would have to pay back in the

17  normal circumstance.  From the insurer's standpoint, it's a

18  good deal, too, because their transactional cost is down and

19  their opportunities for getting them is better.

20          So it's a win/win situation.  A person has to

21  make their own decision and a lawyer has to make his or her own

22  decision, but this is an opportunity that you ought to look at.

23  It seems to me to be one that is favorable to both sides.

24          MR. WOLF:  Your Honor, to Chris' point, our

25  experience would suggest that supplemental information to

1   target groups, in the event that this moves forward, would be

2   very well received and assist in stimulating participation.

3   Specifically, because when it was first introduced, it was

4   introduced that, you know, once the deadline passes we'll

5   determine if it goes, it's a green light/red light, and there

6   was a limited number of plans.  There's many more plans, and

7   introducing this plan is going forward and "Here's an

8   additional chance for you to recover" I think, again, would be

9   well received.  Our experience would suggest that.

10            One of the things that The Garretson Firm did

11  put together was a call center to ensure that primary counsel

12  and all claimants did have an opportunity to make an informed

13  decision.  We have logged over 4,000 calls to date in that call

14  center, and the call center remains open to take new calls to

15  educate anyone relative to the terms of the program.

16            So in sum, Your Honor, I'm pleased to report the

17  Medicare/Medicaid compliance program is progressing efficiently

18  and effectively.  In addition, third-party payor lien

19  resolution program results have been positive to date.

20       **THE COURT:**  Thank you very much.

21            The next item is the special master and deputy

22  special masters' report.

23       **THE SPECIAL MASTER:**  Your Honor, as of today there

24  have been 234 appeals that have been filed.  They have been 166

25  decided.  I would like to make note of the fact that that would

1    be 68 undecided, but I was just informed this morning -- I know

2    these things are being logged as we speak, and that number

3    probably is more like a 50 number as opposed to the 68.

4              It's proceeding very rapidly.  We have a

5    conference every two weeks, Your Honor, with the special master

6    and the deputy special master, and what we do at that

7    conference is take random cases from each special master and

8    run through the cases.  The object of that exercise is to make

9    sure that, for the integrity of the program, there is

10   uniformity and a common understanding of what the standards are

11   being applied across the board so that we have a left-hand and

12   a right-hand approach.  That's worked very well.

13             We also have kept abreast with BrownGreer.  We

14   are aware of the amount of appeals bump that Lynn referred to,

15   that 15 percent bump.  I have discussed that with the special

16   masters.  We have made arrangements and are making arrangements

17   to take care of any increase so they will not affect the flow

18   of this, and I think this reflects what we have done thus far.

19             We have also made internal arrangements,

20   Your Honor, with the deputy special masters.  If there's any

21   particular problem that comes up with regard to any one person,

22   we have instituted a mechanism to flow, for that given period

23   of time, those cases so we can continue to get the cases out on

24   a rapid process.

25             I will note, though, Your Honor -- and I do want

1     this abundantly clear for the record -- in a lot of these cases
2     especially -- I say "especially."  It's true in all cases, but
3     certainly true in the review of these points awards, that it
4     involves a very meticulous look at a lot of medical documents,
5     and we are doing that.  We have reiterated that amongst the
6     three of us.
7                  It takes a considerable amount of time because
8     these records come in volumes and it's not a single thing.  I
9     might add that that review is a very important part of this
10    whole aspect of this program.  I know it's expected by us.
11    It's expected by the claimants.  It's expected by the
12    attorneys.  I want to give the Court assurance because I have
13    confirmed that on each and every call that we have made that
14    that is, in fact, the process that is taking place.  I know
15    that from personal experience in the cases I have reviewed.
16                  So an overall report, Your Honor, is we are on
17    target.  We are doing, I think, what's been assigned to us by
18    the Court.  We are aware of the various issues.  Another issue
19    came up this morning that's been addressed.  We are prepared to
20    deal with those issues.  The flow is occurring as we thought it
21    would.
22                  I might add one observation.  Lynn talked about
23    what could happen to possibly delay the thing.  From my
24    observation, we have seen this in some of the correspondence
25    that comes through the appeals, is this delay thing comes up

1    kind of in the mode of appeal.

2                    From my perspective, Your Honor, I want the

3    Court to know I totally concur on your comments that there are

4    thousands and thousands and thousands of people who have

5    complied and are complying with the program, and it would not

6    be just or right for someone for whatever the reason --

7    whatever it is, a lack of attention -- to delay that process.

8    That's kind of how we are viewing this program.  We are

9    affording as much due process as can be given to people, but

10   there's a flip side to due process.  You don't want to

11   prejudice somebody who has done what should be done.

12                   We have reviewed very carefully with BrownGreer

13   the various notices they have made.  There's plenty notice in

14   this case what is required, when it's required, and when it has

15   to be done.  That's substantially what the report is today.

16            **THE COURT:**  Thanks very much.

17            **THE SPECIAL MASTER:**  Thanks very much.

18            **THE COURT:**  I've been particularly conscious of the

19   significance and importance of the procedure in this particular

20   Settlement Program.  The program calls for administrative

21   review.  After the administrative review, it goes through the

22   gates committee.  The gates committee consists of both

23   plaintiff and defendant lawyers fully knowledgeable of the

24   terms of the settlement, and they look at it, and then finally

25   outside individuals.  A highly experienced lawyer is our

1    special master, a former justice of the Supreme Court in

2    California is a deputy master, and a former district court

3    judge from New Jersey is another special master.

4              Not everybody is, obviously, going to get

5    through, but at least everyone ought to be satisfied that they

6    have had a number of look-sees at their particular case.

7    That's the best you can do in a case of this sort.  I

8    appreciate all the work that you have done.

9         **THE SPECIAL MASTER:**  And that's being afforded,

10   Your Honor.  Thank you.

11        **THE COURT:**  State court trial settings, anything?

12   Class actions?

13        **MR. HERMAN:**  Yes, Your Honor.  On February 2, 2009,

14   the Court granted a motion to dismiss without prejudice the

15   amended class action complaints -- personal injury, wrongful

16   death, and medical monitoring -- and I believe we await a final

17   order on that.

18              With respect to discovery directed to third

19   parties, the controversy between the PSC and ESI has been

20   resolved in terms of their outstanding bill.  We have nothing

21   new to report on that.

22              Ms. Barrios is here with regard to the state

23   liaison.

24        **THE COURT:**  Okay.

25        **MS. BARRIOS:**  Thank you, Mr. Herman.  It's nice to

1    have you back.

2              **MR. HERMAN:**  Nice to be back.  Thank you.

3              **MS. BARRIOS:**  Good morning, Your Honor.  Dawn Barrios

4    for the State Liaison Committee.

5              We have been plugging away on our remand

6    project, and I would like to give special recognition to my

7    assistant Dena Folts and to Bill Atkinson of BrownGreer.  They

8    have worked tirelessly going through the list of plaintiffs

9    again and again and again to see if they're claimants in the

10   process.  We hope to have some new numbers for you at our next

11   status conference.  BrownGreer and my office are through the

12   state of Mississippi, but we had to stop there because we

13   didn't have any more data to go on.

14             We are providing everyone now with only one DVD,

15   which I'm very happy to also add.  This DVD goes up to Transfer

16   Order 149.  We are able now to highlight on the DVD those cases

17   which still have pending remands that could be alive.  We feel

18   at the end of the day you will be down to less than 50 if we

19   take out the attorneys general and the third-party payor cases.

20             Your Honor, while I'm here I would also like to

21   report on the governmental action activity.  We have been

22   having numerous discussions -- always weekly, sometimes every

23   other day -- with Merck and with the PSC on the issues.  We

24   hope by next Friday, with regard to the discovery track for the

25   governmental action cases, we'll present you with an

1    agreed-upon discovery order.

2            **THE COURT:**  That's fine.

3            **MS. BARRIOS:**  Thank you, Your Honor.

4            **THE COURT:**  How about the third-party payors?

5            **MR. SEEGER:**  Your Honor, I'm going to bring up Jim

6    Dugan.

7            **THE COURT:**  Jim, you have some input there?

8            **MR. DUGAN:**  Yes, Your Honor.  Thank you.  Just to

9    report to you, since our March 5 status conference, Ms. Barrios

10   is correct we have been working with defense counsel and all

11   parties to get to Your Honor a proposed scheduling order, so we

12   are going to continue to work on that.  By next Friday, we will

13   submit either a joint case management order or each side will

14   submit them to Your Honor.

15           The only other thing I would ask, Your Honor, to

16   keep the ball rolling here, is that you would set another

17   status conference for maybe April 10.  From the plaintiffs'

18   perspective, we think these cases will be ready for trial in

19   November, and we would like to not wait a month before getting

20   to --

21           **THE COURT:**  Sure.  Do you have any problem with that?

22           **MR. BEISNER:**  John Beisner for Merck.  I think we

23   need to talk about a date for that.  That probably won't work

24   for us, but I agree to having a status conference.

25           **THE COURT:**  Let's get a date in the near future so

1    that we can deal with that.  I am interested in some input from

2    you as to which case should go first and what scheduling order

3    that we need to do.

4              MR. BEISNER:  The orders we are working on,

5    Your Honor, just to fill in a little bit, with respect to the

6    private TPP cases, we have taken the suggestion you made about

7    the trial selection process in the last hearing.  What we are

8    working on is actually a schedule for getting everything done

9    leading up for them being ready for trial.

10             THE COURT:  Great.  Okay.

11             MR. DUGAN:  Lastly, Your Honor, we have identified

12   ten third-party payor bellwether trials.  We are going to have

13   some cases to try, Your Honor.

14             THE COURT:  Thank you.

15             MR. HERMAN:  Mr. Johnston is here, Your Honor, on the

16   *pro se* claimants.

17             THE COURT:  Okay.

18             MR. JOHNSTON:  Bob Johnston, curator for the *pro se*

19   plaintiffs.

20             As we have done each month, Judge, we have

21   provided the Court with the Curator Status Report 11.  It

22   summarizes the basic year of communications that we have been

23   providing to the *pro se* plaintiffs.

24             Last month, as you know, we provided a mailing

25   to approximately 700 *pro se's* pertaining to the private lien

1    resolution program, its requirements, the deadline for

2    participation, the forms required, etc.  As with all of our

3    communications, this has resulted in much communication back

4    from the *pro se's*.

5              Really, I'm not sure over the months that I have

6    been here for these statuses that I have indicated to you the

7    volume, but I want you to get the flavor of it.  We are

8    averaging upwards of 150 to 200 communications a week back from

9    *pro se's*.

10             Claudia Santoyo, who is an associate attorney,

11   and Ira Rosenzweig, another associate attorney of mine, have

12   done an excellent job of communicating with them, assisting

13   them, working in liaison with BrownGreer, and the compliment is

14   well warranted.

15             What I just want you to understand is that we

16   have multiple questions that come up, and I feel that we have

17   accomplished an efficient, clear level of communication to

18   assist them.  We feel good about it.  As you know, we will

19   continue to do the best we can throughout the reminder of the

20   process.

21             **THE COURT:**  Thank you very much.  I know your office

22   has done an outstanding job.  It's a very difficult task

23   because it's a wide variety of people and they are located in

24   all regions of the country, some of whom are living at the

25   expense of the government presently, and they have various

1   facilities available to them for communicating and researching

2   and they have questions.  I'm sure you have been able to help

3   all people, including those individuals.  It's hard sometimes

4   to deal with it, but you have been doing a good job and I

5   appreciate it.

6          MR. JOHNSTON:  Well said.  I couldn't say it better.

7   Thank you.

8          THE COURT:  Next is PSC MDL trial package.  Anything

9   on that?

10          MR. HERMAN:  Yes, Your Honor.  We have made a request

11  of DecisionQuest, through their counsel, to provide us with all

12  DecisionQuest work product so that it may be included in the

13  trial package.  That will be the only addition once we receive

14  that material.  Again, the trial package is available as well

15  as the depository.  It will just take one call.  That's all.

16          THE COURT:  I've heard that before.  Third-party

17  payor cases, anything that we haven't talked about?  Foreign

18  individual cases?

19          MR. MARVIN:  The only thing new there, Your Honor, is

20  that counsel for certain plaintiffs, who were subject to the

21  order of dismissal on the grounds of *forum non conveniens*, have

22  filed a notice of appeal.  That's the only new item since the

23  last conference.

24          THE COURT:  We talked about the third-party payors.

25          MR. HERMAN:  Yes.

1          **THE COURT:**  What's the next item, Russ?

2          **MR. HERMAN:**  The Vioxx suit statistics, which I think

3     are reported at page 7.

4          **MR. MARVIN:**  Those items are in the report,

5     Your Honor.  I think the next item is Item XV, which is Merck's

6     motion on PTO 28, and then there are several other items with

7     respect to motions regarding other pretrial orders.  As before,

8     Your Honor, would you like to take those after this?

9          **THE COURT:**  We'll take those after this meeting.

10         DecisionQuest, anything on that?

11         **MR. HERMAN:**  The matter has been resolved,

12    Your Honor, by stipulation and order.  The PSC has been

13    assessed and first payment has been made.

14         **THE COURT:**  Fee allocation committee, anything?

15         **MR. HERMAN:**  We continue to meet.  Your Honor has

16    directed us to meet with you again this afternoon.

17         **THE COURT:**  The motion for reconsideration/revision

18    of the order capping contingent fees, that is going to be

19    argued April 7.  I received a brief from the Tulane law clinic,

20    and that's on tap at that time.

21         **MR. HERMAN:**  Your Honor, with the request of

22    Ms. Snapka for an additional review process, I'll speak with

23    Mr. Marvin and Mr. Juneau before we leave here today.

24    Hopefully, we can make a recommendation for Ms. Snapka to

25    consider and report to you on April 7 since she will be here.

1        **THE COURT:**  What's the next item?  PTO 29 and 31,

2   that goes to the motions which we will take in ten minutes.

3   Any other motions?

4        **MR. HERMAN:**  The other motions that are pending, on

5   February 20 Stratton Faxon filed a motion to transfer cases not

6   participating in the global settlement.  Ron Benjamin has filed

7   a motion for a suggestion of remand.  Although the PSC has been

8   mentioned prominently in those papers, we choose not to reply

9   as it's not an issue that concerns us.  It might be helpful,

10  Your Honor, if Mr. Stratton and Mr. Benjamin appeared before

11  Your Honor in connection with those matters.

12       **THE COURT:**  I'm going to set a status conference for

13  those cases.  What I'm interested in doing is to get a grouping

14  of those cases, get some census information on those cases, see

15  how many, what type of cases they are, and then what additional

16  discovery needs to be done on those particular cases.

17            I would like to see if I can get those cases

18  package ready before they are sent back to wherever they are

19  going to be sent back to so that the judge trying those cases

20  would simply get the package, the lawyers would know that this

21  is a full and complete package, and they would simply impanel a

22  jury and then start the trial.

23            I haven't made a decision yet as to whether I

24  will go back to those cases.  I will certainly be talking to

25  the chief judges in those districts.  I have also spoken with

1   the judge who is the intercircuit representative so that I have

2   an opportunity to go to those areas and try those particular

3   cases.

4         **MR. MARVIN:**  Your Honor, we will be able to provide

5   the census information as to the remaining cases at the next

6   status conference.

7         **THE COURT:**  I'll be setting a status conference for

8   those individuals.  Anything further?  Anything on anybody

9   else's agenda?

10         Our next meeting is on Wednesday, April 29.  I

11  will meet again with the committees at 8:30, and I'll start

12  this meeting at 9:00.  Thank you very much.  Court will stand

13  in recess for ten minutes.

14         **THE DEPUTY CLERK:**  Everyone rise.

15         (WHEREUPON the Court took a brief recess.)

16                            * * *

17                        <u>**CERTIFICATE**</u>

18         I, Toni Doyle Tusa, CCR, FCRR, Official Court
    Reporter for the United States District Court, Eastern District
19  of Louisiana, do hereby certify that the foregoing is a true
    and correct transcript, to the best of my ability and
20  understanding, from the record of the proceedings in the
    above-entitled and numbered matter.

21

22

23
                                <u>s/ Toni Doyle Tusa</u>
24                              Toni Doyle Tusa, CCR, FCRR
                                Official Court Reporter
25