UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX®                                    MDL Docket No.  1657

PRODUCTS LIABILITY LITIGATION                    SECTION L

-------------------------------------------------

Judge Eldon E. Fallon
Magistrate Judge Knowles

-------------------------------------------------

THIS DOCUMENT RELATES TO:

**Gene A. Weeks, II**                           2:05-cv- 4578-EEF-DEK

-------------------------------------------------

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO RESCIND, VACATE OR DECLARE NULL, VOID AND UNENFORCEABLE THE RELEASE AND CONSENT PLAINTIFF GAVE TO PARTICIPATE IN THE SETTLEMENT PROGRAM, AND, IF THE STIPULATION OF DISCONTINUANCE HAS BEEN FILED, TO REOPEN AND RESTORE HIS INDIVIDUAL ACTION TO THE DOCKET OF THE INSTANT PROCEEDINGS. AND FOR THIS COURT'S RECUSAL AND REFERRAL OF THESE MOTIONS FOR DETERMINATION BY ANOTHER JUDGE

### INTRODUCTION

Although plaintiff did not ingest Vioxx within 60 days of his heart attack in 2004, between the time the settlement program was announced in November 2007 and January 2008 when he signed the papers releasing his claims in exchange for participating in the program, his retained attorneys repeatedly made representations to him and advised him about his eligibility for compensation despite his expressed concerns about his failure to meet that proximity gate criteria in order to coerce him into consenting on the belief it was the only option available to him.  Indeed, given the facts of his ingestion of Vioxx based on which the proximity gate criteria set forth in the settlement program     could not met, there was *never* a time when his retained attorneys should have suggested, recommended, advised or otherwise induced or coerced plaintiff into signing onto the settlement program,

and the fact that he did evinces that they were operating under a conflict of interest with respect to the plaintiff's right as their client to independent advice unencumbered by the interests of other plaintiffs or of the defendant or of the firm itself.

At no time prior to his signing of the release papers based on his attorney's advice did plaintiff's retained attorneys disclose to him the fact that they were operating under the restraints and conflicts imposed on them by the terms of the Master Settlement Agreement requiring them to enroll all of their clients and withdraw from representing any client who did not elect to participate.  The threat by his retained counsel not to continue representing him in his action if he did not enter the program did not disclose the conflict in the legal advice they were giving plaintiff at that time on which he relied to his detriment in signing onto the program as the best and only option available to him.

Only after his claim was rejected in December 2008 on the grounds he did not meet the proximity gate criteria did plaintiff's retained counsel inform him that if he wanted to take any action other than appeal through the settlement program they would withdraw, did plaintiff seek other counsel and learn of the conflict his retained attorneys had when representing him at the time he signed the release papers.

Plaintiff moves to vacate the release and related waivers he signed to consent  to enter the settlement program, and return him to the pre-release status in which his action against Merck was an active case on the docket of this Court.  The conduct of plaintiff's retained attorneys in failing to disclose the conflict under which they were operating prior to coercing him into signing the release papers directly resulted from terms of the Master Settlement Agreement that required his counsel to withdraw and the subsequent conduct by his counsel can and must be imputed to Merck as a direct corollary of that Agreement. Otherwise, Merck benefits from the coercive conduct knowing that plaintiffs, such as the

instant plaintiff, would rely to their detriment on misinformation and advice intended to coerce participation in the settlement program and deprive the plaintiff of his right to a trial.

Plaintiff respectfully submits that his motion to vacate and have his case restored if it has been discontinued by the stipulation signed by his counsel at the time he signed the release should be decided by another judge given this Court's role as Chief Administrator of the settlement program, and for that purpose, asks that this Court recuse itself and refer those motions to another judge for determination.

## STATEMENT OF FACTS

On or about March 5, 2004, at the age of 47, plaintiff Gene Weeks sustained a heart attack and has been unable to work since then. *Affidavit of Gene Weeks, at para. 6.*

Plaintiff had ingested Vioxx on a regular basis during the period 1999 to 2001. *Id., at para. 11.* As a result of advertisements he saw in or about the fall of 2004 when Vioxx was taken off the market, plaintiff contacted and ultimately retained the firm of Martinez Manglardi Diez-Arguelles & Tejedor to represent him in seeking a recovery from defendant Merck & Co., Inc., and the firm filed a Complaint against Merck & Co., Inc. ("Merck") in or about October 2005. *Id., at paras. 8 and 10.* Throughout the firm's representation of plaintiff, they were aware of the fact that he had stopped taking Vioxx for more than two years before sustaining the heart attack in March 2004. *Id., at para. 9.*

While the lawsuit was in progress in this Court, plaintiff's counsel submitted things such as the Plaintiff Profile Form ("PPF") that confirmed the timing and nature of his ingestion of Vioxx. *Id., at paras. 11-13.*

Around November 9, 2007, plaintiff found out about the possibility of a settlement and did some basic research on the internet, in the process of which he went to the website

calculator and concluded he met only two of the three criteria gates set forth in the information, and did not meet the third criteria, namely, the proximity requirement since he did not ingest Vioxx at all within 60 days of his heart attack. Id., at para. 14.

From that time until the day in or about January 2008 when plaintiff signed the Release of All Claims that put him into the settlement program, he had a series of communications with the attorneys and paralegals at his retained counsel's firm regarding his eligibility under the terms of the settlement, and repeatedly expressed to them his concern about not meeting the proximity requirement of the settlement program. *Id., at para. 15.* His concerns were met with their assurances about his eligibility for payment and how his claim would be treated under the settlement program, and caused him to indicate his initial willingness to enter the program based on their advice. *Id.*

In this regard, his attorney Maria Tejedor, sent him two letters dated November 21, 2007. *Id., at para. 16.* In one of the letters, attorney Tejedor states:

> As your legal counsel, we have carefully reviewed the details of the Settlement Program Agreement and believe that it is in the best interest of each of our qualifying clients. We therefore strongly recommend that you agree to participate.

*Id., at para. 17.* In the second letter, she states, "In order to recover monies in the Vioxx settlement we will need to get past three gates." *Id.* Despite the facts of his ingestion and injury readily available in the file, her letter directs plaintiff to provide proof that he "took at least 30 pills of Vioxx within 60 days of the event." *Id.* In conclusion, the letter states, "Without this proof of documentation you will be unable to recover in this case." *Id.*

The two letters confused plaintiff because they ignored the concerns he had already expressed to the firm's employees about the proximity requirements and the records confirming he did not ingest Vioxx at the time of, nor within 60 days of, his heart attack in

2004. *Id., at 18.* Plaintiff spoke directly to attorney Tejedor about the contradictory letters and his serious concern about eligibility under the program given the facts, and she represented to him that the firm's best estimate, based on medical evaluation of his case by their consultants as being viable under the program, was that it was in his best interest to sign onto the settlement, and that he really had no option but to join the settlement. *Id., at para. 19.* His counsel also advised him his case would never get to trial if he did not participate in the settlement, and that if he did not agree to the terms of the settlement the firm would not represent him any further in my action.  Id., at para. 20.

Based on his counsel's communications over the next couple of months, plaintiff was led to believe he had no choice but to execute the settlement documents. *Id., at para. 21.* His counsel continued to demand that he accept the terms of the settlement and further advised him that a medical person was contracted to review my case, and in a telephone conversation in January of 2008 insisted he comply and sign onto the settlement program under the M.S.A., and said she understood the M.S.A. would be lenient on these type cases. *Id., at para. 23.* Despite his reluctance, his counsel insisted it was the only way to go, so he agreed to sign on. *Id.*

Plaintiff indicates he would never consent to an agreement that excluded him from any compensation, but indicated his willingness to participate in the settlement program based on his counsel's legal advice at that time, and only later realized that she misrepresented his eligibility and lack of options and other matters to convince him to sign onto the program because his counsel was working under the terms in the MSA under which Merck required attorneys to withdraw from representing any of their Vioxx clients who did not elect to participate in the program. *Id., at para. 24.*

Plaintiff relied on his counsel to provide independent advice on all the circumstances

involved, and to make full disclosure of any conflicts of interest the agreement caused in the firm's attorney-client relationship with and obligations to him as their client, but prior to my signing the Release and other consent papers in or about January 2008, the firm made no disclosures to me about the settlement terms requiring them to withdraw from my case while at the same time recommending that I enter the settlement because I allegedly had no other option. *Id., at para. 25.*

After signing the Release, plaintiff's counsel continued to demand that he produce pharmacy or medical records which obviously did not exist. *Id., at para. 26.* In any event, in a letter dated December 18, 2008, his counsel notified plaintiff that: "Your claim has been denied by the claims administrator." *Id., at para. 27.* In a subsequent letter from his counsel dated December 20 2008, he was informed her office had "determined that there are no grounds to dispute your notice of ineligibility as you do not meet the proximity factor of the Settlement Agreement." *Id., at para. 28.* The letter went on to set forth the process after an ineligibility determination, including:

1.  You may withdraw your settlement claim and seek relief through the tort system. Please be advised, however, that our firm will not represent you in such an action. Furthermore, if you pursue a separate tort claim, you may not admit any additional medical or pharmacy records as part of your case, other than the ones submitted to the Claims Administration. You will also need to complete the attached form entitled "future evidence stipulation."

*Id.* After advising of the appeal process, the letter stated that if plaintiff had no additional records, he should "select one of the three options", including the following:

____ - I am choosing to withdraw my claim under the Settlement Agreement and preserve my right to file an independent tort action against Merck. ...I further understand that the law firm of Martinez, Manglardi, Diez-Arguellas & Tejedor will not be representing me in this independent tort action and that upon the withdrawal of my claim, I will no longer be represented by the law firm of Martinez, Manglardi, Diez-Arguelles & Tejedor.

*Id.* At no time during the process before the denial did plaintiffs counsel inform him, nor

did he understand that, his consent to enter the settlement program was irrevocable and

that Merck could pay him no compensation whatsoever even though he met two of the three

criteria gates, while at the same time he would lose any right to continue pursuing his

lawsuit against Merck.  *Id., at para. 29.*  After meeting with his counsel on January 7, 2009,

plaintiff received a letter from her dated January 16, 2009, which, in self-serving terms,

underestimate the firm's conflict and brow-beating and attributes voluntary statements to

plaintiff that are not true in the following text:

> During our meeting, you confirmed and did not dispute the fact that you do not
> meet the proximity gate since it had been over two years since you had last
> ingested Vioxx prior to your heart attack.  Therefore, you have elected to allow
> us to withdraw as your counsel and you have elected to seek alternative
> counsel to file your lawsuit.  We will be filing a notice of withdrawl [sic] in the
> very near future and provide you with notice of the same.

*Id., at para. 30.*  Plaintiff disputes the above statements, averring that, at the January 7

meeting, Ms. Tejedor and co-counsel John and plaintiff were in attendance and at no time

did plaintiff knowingly want or "elect" to allow his counsel to withdraw, and he was not

aware the firm's withdrawal was required by the settlement agreement.  *Id.*  Furthermore,

it was their emphatic statements about withdrawing that forced plaintiff to ask his counsel,

"Can you refer me if you elect to withdraw?", to which counsel replied, "Yes, we have been

working on your referral."  *Id.*

Plaintiff now turns to his arguments.

## ARGUMENT

### I.

**This Court Should Grant Plaintiff's Motion Seeking to Have the Release and All Other Consents and Waivers He Signed and Stipulations Regarding His Participation in the MSA Settlement Program Rescinded, Vacated and Declared Null, Void and Unenforceable Because It Was the Product of His Counsel's Coercive Conduct That Should Be Imputed to Merck Given the Terms of the MSA That Interfered With and Deprived Plaintiff of Independent Advice and Representation by His Retained Counsel On Which He Detrimentally Relied to Defendant Merck's Benefit.**

Given the facts of his ingestion of Vioxx based on which the proximity gate criteria set forth in the settlement program that could not met, there was *never* a time when this plaintiff's retained attorneys should have suggested, recommended, advised or otherwise induced or coerced plaintiff into signing onto the settlement program, and the fact that he did evinces that they were operating under a conflict of interest with respect to the plaintiff's right as their client to independent advice unencumbered by the interests of other plaintiffs or of the defendant or of the firm itself.   It is doubt that, absent the terms of the MSA requiring it to enter 100% of its clients in the settlement program, plaintiff's counsel may have given him independent advice that would clearly have been that he should <u>not</u> sign any release papers that tied the fate of his claims against Merck to a settlement program that, on its face, would reject his claim.

It is respectfully submitted that it is a well settled principle that, "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties.".  Howell v. Exxon Corp., 103 F.3d 125 (5th Cir. 1996), quoting Model Code of Professional Responsibility EC 5-1 (1980). An elaborate discussion of law is unnecessary since every jurisdiction in the United States

has some version of the ABA rule 2.1 of the model rules of professional responsibility which requires lawyers to exercise their independent professional judgment to make recommendations to their respective clients. Similarly, the requirement in section 1.2.8.2 of the MSA that an attorney withdraw flies in the face of Model Rule 5.6 which inhibits an attorney from "offering or making... an agreement in which restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties. *See also* Section 13 (2) of the Restatement (Third) of the Law Governing Lawyers.

In Zichichi v. Jefferson Ambulatory Surgery Center LLC, 2008 WL 2859232 (E.D.La.), the Honorable Susan Vance stated:

> Although federal courts may adopt state or ABA rules as their ethical standards, whether and how these rules apply are questions of federal law. *See American Airlines,* 972 F .2d at 610. The ethical canons that are relevant to this Court's opinion include (1) the local rules for the Eastern District of Louisiana, (2) the ABA's Model Rules of Professional Conduct, (3) the ABA's Model Code of Professional Responsibility, and (4) the Louisiana State rules of conduct. *See Horaist v. Doctor's Hospital of Opelousas,* 255 F.3d 261, 266 (5th Cir.2001); FDIC v. United States Fire Ins. Co., 50 F.3d 1304, 1311-12 (5th Cir.1995).
> The United States District Court for the Eastern District of **Louisiana** has adopted the Rules of Professional Conduct adopted by the Supreme Court of the State of Louisiana for its Rules of Disciplinary Enforcement. *See* LR 83.2.10E.

*Id.,* at *1-2. Under the Louisiana professional code, an attorney is an "Advisor" and is charged with the following obligation to a client:

> In representing a client, a lawyer shall exercise independent professional judgment and render candid advice.

LA ST BAR ART 16 RPC Rule 2.1.

It is respectfully submitted that the Tejedor firm failed to act in plaintiff's best interest, and, in fact, repeatedly cajoled him into signing onto the settlement program by giving him advice that distorted his actual legal options, telling him his case would never get

to trial, and insisting he agree because it was his only option.  On the face of the firm's communications with the plaintiff before he signed the release papers, it is apparent the firm's loyalty to plaintiff was displaced by other considerations related to terms of the MSA which required counsel to recommend to each of their clients they participate in the settlement or withdraw from representing their clients who did not cooperate, including clients who, like plaintiff Gene Weeks, could not meet the proximity gate criteria but relied on his attorney's advice when it was flatly against his interests to enter an irrevocable settlement process under which his claim was not eligible and would be rejected, leaving him with no compensation and no lawsuit.  Under the circumstances, the agreement was illusory and the only consideration given to plaintiff was the pleasure of engaging in an exercise in futility perpetrated by his counsel's conducting a charade and Merck allowing a patently ineligible plaintiff to be sucked into the program so that it could escape paying him any compensation and force a dismissal of his action against Merck.  The release papers plaintiff Weeks signed were the result of fraud and duress and should be rescinded.

There can be no doubt that, given the rejection of his claim based on the parameters Merck negotiated with the Negotiating Plaintiffs' Attorneys, plaintiff's reasonable reliance on his attorney's advice was detrimental to his interests.   It was also clearly foreseeable that the MSA would place plaintiff attorneys in this conflict with their obviously ineligible clients, such as Gene Weeks, and Merck should not be allowed to benefit from and enforce any release or other consent that plaintiff signed as a result of the same.

Plaintiff respectfully submits that this Court should grant the relief he seeks by rescinding, vacating and declaring his release and consents that placed him in the settlement program null, void and unenforceable, and by vacating the stipulation of dismissal and, if already filed, restoring his action to the Court's docket.

## II.

### This Court Should Recuse and Refer the Instant
### Motions To Be Heard by Another Judge

The record in MDL No. 1657 makes clear this Court entered orders consistent with the terms of the agreement that required retained counsel such as my attorneys to recommend 100% participation of all of their clients in the settlement and to withdraw from representing any client who refused to accept the terms of the settlement.   Moreover, the Court incorporated certain terms of the settlement including compensating plaintiffs who sustained heart attacks, or ischemic strokes or sudden cardiac death, but excluded plaintiffs who sustained other cardiovascular injuries, as well as prerequisites such as the duration and proximity gate in the MSA

This Court is also Chief Administrator under the MSA and will be enforcing terms and conditions including those that have rejected and would exclude this plaintiff from compensation under the MSA and result in dismissing his lawsuit.   According to the release papers plaintiff was coerced into signing, apparently the only consideration Merck exchanged with this plaintiff was having set up the settlement program in the first place for which he was not eligible, but into which his retained counsel steered him.  In light of the same, it is respectfully submitted this Court cannot fairly and impartially adjudicate any of the issues that are the subject matter of the instant motion.

This is especially true in connection with the terms of the MSA that either required or played a significant role in causing plaintiff's counsel to repeatedly recommend to plaintiff that he participate in the settlement agreement despite the obvious ineligibility, when in the exercise of independent professional judgment as to the circumstances of his individual case and the lack of probability of recovery under the program, no lawyer in his or her right mind would give any advice that would recommend the settlement to him.

It is only necessary to assert that the plaintiff has a constitutional right to a fair trial. Aetna Life Insurance Co. v. Vavoie, 475 US 813, 821-22 (1986), and due process requires that the trial judge be neutral and detached.  Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,  508 US 602, 617 (1993). Especially significant in the instant case is the premise that, "Justice must satisfy the appearance of justice".  Offutt v. United States, 348 US 11, 14 (1954). The Supreme Court has made clear that the rule may bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  See Concrete Pipe & Prods., supra, 508 U.S. at 618 [citation excluded].

This court has already addressed the issue of recusal in the context of a previous motion by other plaintiffs based on the Court's serving as Chief Administrator of the MSA and denied the same on the grounds that, in the first instance the Court serves in an administrative capacity with no substantive effect on managing the MDL proceedings, among other bases, and ruled that as such the motion for recusal was "without merit."  See Agard v. Merck & Co., Inc., Order and Reasons dated December 10, 2008, at p. 6.

Plaintiff does not contend that this Court is biased in the sense of any type of personal animus or malice but does believe the Court may have become too close to the settlement negotiations which, as the Third Circuit has observed, can take on a life of its own and  have caused the Court to issue a series of orders without benefit of adversarial presentation which in the context of their issuance did not appear to stem from neutral and detached jurisprudence and may well lead a reasonable person to harbor doubts about the courts impartiality.   It is respectfully submitted that:

> It is precisely because it is virtually impossible to prove actual bias that due process is denied by circumstances that create a likelihood or appearance of bias' because such a possibility of judicial bias creates a constitutionally unacceptable risk of actual bias.

Peters v. Kiff, 407 US 493, 502 (1972) [plurality opinion of  Marshall J.].

Although there is certainly a subjective element, it is respectfully submitted that the issue of whether there is an appearance of impropriety in the Court's hearing of the instant motion is objective and must be approached from the vantage point of a reasonable litigant, not that of a lawyer or a judge.

## CONCLUSION

Plaintiff respectfully submits that plaintiff's motions for rescinding, vacating and declaring his release and consents that placed him in the settlement program null, void and unenforceable, and for vacating the stipulation of dismissal and, if already filed, restoring his action to the Court's docket, should be granted, but that the determination of the same should occur after recusal of this Court and referral of the motions to another Judge in this district.

Respectfully submitted,

RONALD R. BENJAMIN Fed. No. 110131
LAW OFFICE OF RONALD R. BENJAMIN
126 Riverside Drive, P O. Box 607
Binghamton, New York 13902-0607
607/772-1442

Attorneys for Individual Plaintiff Gene Weeks
in Above-Captioned Action