**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  VIOXX | ) | MDL NO. 1657 |
|      Products Liability Litigation | ) | |
| | ) | SECTION: L |
| This Document Relates to: | ) | |
| | ) | HON. ELDON E. FALLON |
| Louisiana Health Service Indemnity | ) | |
| Company d/b/a BlueCross/BlueShield | ) | |
| Of Louisiana | ) | MAGISTRATE JUDGE |
| | ) | DANIEL E. KNOWLES, III |
|      Plaintiffs, | ) | |
| | ) | |
|     versus | ) | |
| | ) | |
| MERCK & CO., INC., | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |
|    Case No. 05-0713 | ) | |

**PLAINTIFF, LOUISIANA HEALTH SERVICE INDEMNITY COMPANY d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA'S, THIRD AMENDED COMPLAINT**

NOW COMES Plaintiff, Louisiana Health Service & Indemnity Company d/b/a BlueCross/BlueShield of Louisiana ("BC/BS Louisiana"), and respectfully amends its previous Complaint as follows:

**NATURE OF THE ACTION**

1.     BC/BS Louisiana brings this action on its own behalf because it paid or provided or will pay or provide health benefits to its plan insureds or its plan members, as a result of one or more of their members or insureds being prescribed and supplied with, and having taken and ingested the drug Vioxx.

2.     This is an action for damages brought by the Plaintiff who has paid and provided, health care benefits to their members and insureds as a direct and proximate result of its

1

members and insureds having been prescribed, supplied with, and taken the drug Vioxx, as researched, designed, formulated, compounded, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed or otherwise placed in the stream of interstate commerce by the Defendant.  This action seeks, among other relief, general and special damages and equitable relief, including but not limited to restitution, refunds, and/or for equitable, injunctive and declaratory relief against the defendant, Merck & Co., Inc. (Hereinafter "Merck", "the company" or "defendant"), which tested, marketed, distributed, promoted and sold Vioxx.

## PARTIES AND INTRODUCTORY FACTS

3.      BC/BS Louisiana is a domestic health insurance corporation licensed to conduct business in the State of Louisiana. BC/BS Louisiana provides insured benefits, third party administrative services and manages health care services for its insureds and members.  BC/BS Louisiana has paid and provided and will in the future pay and provide, health care benefits to its members and insureds as a direct result of the wrongful conduct of the Defendant as fully alleged herein.

4.      Merck is a New Jersey corporation with its principal place of business in New Jersey.  At all times relevant hereto, Merck was engaged in the business of licensing, manufacturing, distributing, and/or selling, either directly or indirectly, through third-parties or related entities, the pharmaceutical prescription drug Vioxx ("Vioxx" or the "Product").  Plaintiff alleges on information and belief that Merck does business in Louisiana and this Federal District and at all times relevant hereto it developed, manufactured, marketed, promoted, and sold in interstate commerce and in Louisiana and this federal district, the aforementioned product.

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff and the Defendant.  The Defendant is amenable to service of process in Louisiana, and the Defendant is doing business in Louisiana, has committed a tort in whole or in part in Louisiana, and/or has continuing minimum contacts with the State of Louisiana.  The injuries to Plaintiff were caused by the wrongful acts, omissions, and fraudulent misrepresentations of the Defendant, which occurred, in whole or in part, within the State of Louisiana or were directed, in whole or in part, toward or in the State of Louisiana.

6.     Venue is proper in the United States District Court for the Eastern District of Louisiana in that the acts and omissions at issue in this case occurred in the United States and within the geographical boundaries of this Federal District.

7.     BC/BS Louisiana filed the instant lawsuit within one year after it discovered, or reasonably should have discovered by the use of reasonable care, any negligent, wrongful and/or culpable conduct and injury to the Plaintiff; and applicable tolling provisions apply.

## FACTUAL ALLEGATIONS

### A.     Background

8.     On May 20, 1999, the FDA approved the sale and distribution of Vioxx, the brand name for rofecoxib, by Merck.

9.     Vioxx is a member of a class of pain relievers called non-steroidal anti-inflammatory drugs ("NSAIDs").

10.     Other pain relievers in this class of drugs include, among others, aspirin, naproxen (such as ALLEVE®), ibuprofen (such as ADVIL® and MOTRIN®), and diclofenac (such as VOLTAREN®).

11.     NSAIDs act to relieve pain and inflammation by inhibiting production of an enzyme called prostaglandin G/H synthase.   This enzyme consists of two similar forms, cycloozygenase-1 ("COX-1") and cycloozygenase-2 ("COX-2").     In the medical and pharmacological literature, COX-2 is generally associated with effects on pain and inflammation; and COX-1 is associated with, among other things, platelet aggregation and the integrity of the gastrointestinal tract.   Traditional NSAIDs inhibit both COX-1 and COX-2 enzymes.   Traditional NSAIDs have been associated with negative gastrointestinal side effects including perforations, ulcers, and bleeding in the gastrointestinal ("GI") tract.

12.     Merck distinguished Vioxx from other NSAIDs as a selective COX-2 inhibitor, that only targets and inhibits the COX-2 enzyme to control pain and inflammation.   Merck's working hypothesis and market theory was that Vioxx would decrease the GI complications commonly associated with traditional NSAIDs because of it did not alter COX-1 enzymes, and reduce pain and inflammation by selectively inhibiting the COX-2 enzymes.

13.     Vioxx continued to pose a risk of adverse GI side effects, including perforations, bleeds, and ulcers in the GI tract.   Unlike other members of the NSAID class of drugs, Vioxx contributes to the aggregation of blood platelets, thereby increasing blood clotting.   Most significantly, unlike other NSAIDs, Vioxx significantly increases the incidence of adverse cardiovascular and cerebrovascular events, such as myocardial infarctions (heart attacks), ischemic strokes, hypertension, and deep vein thrombosis.

    **B.**    **Merck Knew and Concealed the Risks of Serious Adverse Events Associated with the use of Vioxx when Planning Its Vioxx Pre-Marketing Clinical Trials.**

14.     On December 16, 1994, Merck filed an Investigational New Drug Application (an "IND") for Vioxx with the FDA.  This IND included data and analyses from approximately two years worth of pre-clinical testing.

15.     In May 1996, Merck announced that it was developing a selective COX-2 inhibitor, publicizing it as miracle drug for arthritis sufferers.  At the time, Merck faced patent expirations on three of its ten most successful drugs – Mevacor, Pepcid, and Prilosec, which represented $4 billion a year in U.S. drug sales. *Vioxx the Victor* (Med Ad News, February, 2000); and Gloria Lau, *Merck Promises to Remain Healthy Even As Blockbuster Patents Expire*, Investor's Bus. Daily, at 1 (November 16, 2000).

16.     At the same time, Merck faced significant competitive threats from Monsanto and Pfizer, who were, in combination, developing a competitive selective COX-2 inhibitor, Celebrex® ("Celebrex"), scheduled to hit the market months ahead of Vioxx.  Merck understood its precarious financial position – if Vioxx could not go to market quickly, Merck would face serious financial constraints.  "If those first two [Vioxx] compounds had failed… we would be a very different company."  Gardiner Harris, *the Cure:  With Big Drugs Dying, Merck  Didn't Merge – It Found New Ones*, Wall Street Journal, Jan. 10, 2001, quoting, Dr. Edward Scolnick, then President of Merck Research Laboratories.

17.     To corner the huge NSAID market, Merck recognized the crucial need to demonstrate that Vioxx had significant superiority over the competition.

18.     In 1996, Merck announced the initiation of its clinical trials for MK-966, the internal designation for Vioxx.

19.     After learning that Pfizer was initiating a large outcome study to support a post-launch label change indicating the GI superiority of Celebrex, Merck was forced to reconsider its

own studies.   Ultimately, Merck proposed a large-scale, long-term, double-blind study of gastrointestinal toxicity in patients taking Vioxx.   That study was intended to mimic the large-scale Celebrex clinical trial to be conducted by Pfizer.   This Vioxx G.I. Outcomes Trial ("VIGOR") was designed specifically to demonstrate the GI superiority of Vioxx as compared to another of the NSAID competitors, naproxen.

20.     In the VIGOR planning stages, Merck suspected that Vioxx might cause cardiovascular problems.   On November 21, 1996, a Merck internal memorandum, discussing the design of the VIGOR trial, suggested that participants be permitted to use aspirin during the study to moot the cardiovascular risks of Vioxx because, "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx group.

21.     On February 25, 1997, Merck scientist Briggs Morrison sent another internal email about the design of the VIGOR trial.   In that email, Morrison suggested that VIGOR participants be allowed to take aspirin to avoid flagging the cardiovascular risks of Vioxx. Unless patients in the Vioxx group could take aspirin, he warned, "without COX-1 inhibition you will get more thrombotic events and kill drug [*sic*]."

22.     Merck researcher Alise Reicin, now a Merck Vice President for clinical research, responded in an internal Merck email that Merck was in a "no-win situation":

23.     This is a no win situation!  The relative risk of [adverse GI events with] even low dose aspirin may be high as 2-4 fold.   Yet, the possibility of increased CV events is of great concern (I just can't wait to be the one to present those results to senior management!).   What about the idea of excluding high risk CV patients – *i.e.* those that have already had an MI, CABG, PTCA?   This may decrease the CV event rate so that a difference between the two

groups would not be evident.  The only problem would be – Would we be able to recruit any patients?

24.      Even years before approval of the drug, Merck met with the FDA officials to determine what type of studies would be necessary to demonstrate that Vioxx really possessed the safety benefits that Merck claimed the drug promised.  (Minutes of End-of-Phase II Conferences with the FDA (May 22, 1996)).  Senior FDA representatives advised Merck that in order to get the label it wanted, Merck would have to demonstrate the safety of the drug as compared to a placebo, or sugar pill, in a large scale outcomes trial.

25.      At first, Merck contemplated comparing the safety of Vioxx to Tylenol (acetaminophen), because of Tylenol's placebo-like safety perception.  However, two Merck executives, "questioned the advisability of an acetaminophen arm, because the findings could highlight the favorable properties of acetaminophen."  (COX-2 Inhibitor Consultants' Meeting Minutes (September 28, 1996)).  As a result, Merck quickly scrapped the recommendation to compare Vioxx to Tylenol in such a trial.

26.      In October 1997, Merck sponsored one of the clinical studies in healthy human subjects led by Dr. Garrett FitzGerald from the University of Pennsylvania.  The study was known as Protocol 023.  During the study, Dr. FitzGerald observed that patients taking Vioxx had significantly lower levels of prostacyclin metabolites in their urine than patients taking placebo.  In the medical literature, it is believed that prostacyclin in the bloodstream inhibits platelet aggregation (i.e. blood clotting).  Dr. Fitzgerald suggested to Merck that if Vioxx, a selective COX-2 inhibitor, was causing reduced prostacyclin levels in blood vessels, as well as in urine, then COX-2 inhibitors are likely to cause increased blood clots and associated cardiovascular events.

27.     In December 1997, Merck appointed a "Task Force" to investigate the incidence of cardiovascular serious adverse events in the ongoing Vioxx clinical trials.  The reason for the investigation was the unexpected result of an early clinical trial, which showed a decline in the levels of PGI 2, the most potent of all inhibitors of platelet aggregation, but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx.  This imbalance triggered a concern over the potential for thrombotic events.

28.     The Task Force agreed to investigate the incidence of thrombotic events by analyzing the ongoing osteoarthritis ("OA") trials.  Because the trials were still blinded as to treatment groups, it could not be determined whether the adverse events in the database had occurred in the Vioxx, placebo, or compared to drug populations.  Therefore, the Task Force designed a study in which cardiovascular events from all arms of the OA trials would be added together, and the combined groups' incidence rate would be compared to placebo patients from trials of other Merck drugs.  An expedited time frame was established for completion of the analysis, because of the rush to get Vioxx to market ahead of competitors.

29.     In January 1998, the analysis pursuant to the Task Force plan showed a statistically significant increased relative risk of 2.16 for females in the Vioxx study versus the placebo group selected by Merck for comparison.  These results constituted a clear signal of cardiovascular toxicity that should have triggered immediate investigation and concern.  Instead, Merck made an after-the-fact claim that the placebo comparison group must have had an "atypically low" incidence of cardiovascular events, such that the higher rate in the Vioxx group was downplayed.  Further, Merck changed the rules after the game had been played, by deciding to compare the rate in the Vioxx group to a so-called "background" rate, even though no such comparison was stated in the plan for the study.  Merck intentionally chose an inappropriate

8

"background" rate for comparison, from a published study of older patients at high risk of cardiovascular disease.  Based upon the result of this comparison, Merck incorrectly dismissed the signal as of no concern.  Merck failed to disclose the results of this pre-marketing analysis, and instead, has misrepresented that it had no indication of cardiovascular risk before Vioxx was marketed.

30.     Merck knew that due to the mechanism by which the drug inhibited COX-2, but not COX-1, use of Vioxx could result in increased platelet aggregation (blood clotting) and, thus, could cause increased rates of heart attacks and strokes.  However, key to the successful marketing of Vioxx was the ability to claim that Vioxx was just as effective but safer than traditional NSAIDs and safer than Celebrex.  This superior modeling would allow Merck to steal market share from Pfizer, which had beaten Merck to market with their own COX-2 inhibiting drug, Celebrex.

31.     Merck failed to conduct any study prior to FDA approval demonstrating that Vioxx reduced the incidence of clinically meaningful side effects of NSAID therapy.  At the time of approval, the FDA required that Vioxx carry the traditional warning concerning GI safety risks that accomplished all NSAIDs.

32.     Even without a label that allowed Merck to legitimately claim superior safety, Merck and its representatives and agents misrepresented the safety profile of Vioxx to consumers, the medical community, healthcare providers, and third party payors.  (December 16, 1999 Warning Letter from FDA to Merck, concerning misrepresentation of safety information for Vioxx.)  Merck promoted, marketed, sold, and distributed Vioxx as a much safer and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

### C.     Merck's Pre-Market Knowledge of Vioxx's Cardiotoxicity and

**Prothrombotic Effects.**

33.     The potential for cardiovascular risk of selective COX-2 inhibitors was known to Merck long before the FDA granted market approval in May of 1999.  By 1997, and prior to the submission of the New Drug Application (the "NDA") for Vioxx, Merck was aware that, by inhibiting COX-2, Vioxx altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it.  Although all COX-2 inhibitors have this mechanism of action, Vioxx was the most selective COX-2 inhibitor on the market in 1999.  Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

34.     Nevertheless, on November 23, 1998, Merck submitted an NDA to the FDA for Vioxx, omitting information about the extent of the risks associated with Vioxx.  Without a complete picture of the potential hazards associated with the drug, the FDA approved Vioxx on or about May 20, 1999.

D.     **Merck Engaged in Unconscionable and Deceptive Marketing Practices in Connection With the Marketing and Sale of Vioxx.**

35.     Merck's Pre-Release Marketing Campaign Catapulted Vioxx Into Blockbuster Status.

36.     In anticipation of approval, Merck put into place one of the most massive marketing campaigns in pharmaceutical history.  Once the drug was approved, scores of sales representatives fanned out across the country with samples, asserting that Vioxx had a better safety profile than other NSAIDs.  At the time the drug was approved, Merck's labeling indicated that Vioxx, taken at the 12.5mg, 25 mg, and 50 mg daily dosage, "was associated with

10

a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than with treatment with ibuprofen 2400 mg daily."

37.     From 1996 through 1998, Merck issued dozens of public statements that pre-publicized the efficacy and gastrointestinal safety of Vioxx.  Merck's pre-release marketing campaign conveyed the uniform message that Vioxx provided safe and effective pain relief while omitting any mention of cardiovascular risks.

38.     Merck galvanized its army of sales representatives.  In the *Merck & Co., Inc. 1998 Annual Report*, CEO Raymond Gilmartin wrote that "[i]n 1998, to prepare for the introduction of Vioxx, as well as to meet other marketing challenges, we began adding 700 new and talented professional representatives to our already strong U.S. sales force."

39.     Merck targeted consumers and third party payors.  In order to achieve formulary status/access for Vioxx which was equal to or better than Celebrex and branded NSAIDS, Merck recognized that placement on the formularies of the third party payors was critical to successful market share.

40.     The pre-launch price of Vioxx was 800% more than the competing non-selective NSAIDs that were equally as effective in alleviating pain and inflammation associated with arthritis.  Therefore, in order to get and keep Vioxx on the formularies of the third party payors, despite this extreme overpricing, Merck authored studies designed to demonstrate that Vioxx was more cost-effective than other NSAIDs as a result of its decreased GI toxicity.  Merck sent summaries of its positive clinical findings to formularies to demonstrate that the increased cost of Vioxx would be more than offset by the decreased expenses in treating negative GI side-effects associated with traditional NSAIDs.

41.     None of the materials and summaries of clinical studies sent to third party payors, medical care organizations or prescription benefit managers even remotely raised the potentially devastating cardiovascular and cerebrovascular side effects.

42.     Merck's pre-release marketing campaign showed positive results.   Sales projections for Vioxx based on early orders and inquiries surpassed $2 billion per year.   Merck based this calculation on a proposed wholesale price of $2.02 per tablet – about one hundred times the cost of a generic aspirin.

### E.     FDA Approval of Vioxx

43.     On November 23, 1998, Merck submitted a New Drug Application for Vioxx to the FDA.  The FDA gave priority to the review of Merck's Vioxx submission, including through its Arthritis Drugs Advisory Committee ("the Advisory Committee").

44.     On April 20, 1999, the Advisory Committee recommended approval of Vioxx for the relief of the signs and symptoms of osteoarthritis and acute pain but, in light of Merck's failure to substantiate its claims of the GI superiority of Vioxx, required that its package insert bear the same GI warnings as traditional NSAIDs.

45.     On May 20, 1999, the FDA accepted the Advisory Committee's recommendations and approved Vioxx for the relief of signs and symptoms of osteoarthritis[1], for the management of acute pain in adults and for the treatment of primary dysmenorrhea.

46.     On April 26, 2004, the FDA approved an additional indication for the use of Vioxx: relief of the signs and symptoms of rheumatoid arthritis in adults, which afflicts over two million Americans.

---

[1] It is estimated that over 20 million Americans currently suffer from osteoarthritis, a chronic swelling and painful joint disease affecting one or more joints.

47.     On March 26, 2004, the FDA approved a third indication for the use of Vioxx: treatment of the signs and symptoms of juvenile rheumatoid arthritis in patients aged 2 to 17 years of age.

### F.     Merck's Unprecedented Post-Launch Marketing Campaign

48.     Within days of receiving market approval to launch the drug, Merck began to aggressively promote Vioxx.  4,500 Merck sales representatives were sent to detail the drug to physicians.  Merck had a huge budget for targeting physicians and consumers.  Merck recognized the need to increase public demand for the drug by convincing consumers and medical professionals of the purported superior safety profile – and effectiveness.  Merck's message was clear:  Vioxx was safer than – and just as effective as – traditional NSAIDs.

49.     In 2000, Merck spent nearly $161 million on direct-to-consumer advertising for Vioxx – more than PepsiCo spent to advertise Pepsi Cola.  Over the next few years, until market withdrawal, Merck spent an unprecedented $100 million a year to continue to market Vioxx directly to consumers.  As stated by U.S. Senator Grassley of Iowa, Chairman of the Senate Committee on Finance at a congressional hearing on Vioxx held on November 18, 2004:  "It's been said that in the history of pharmaceutical advertising, Vioxx was one of the most directly-marketed-to-consumers prescription drugs ever."

50.     Merck marketed Vioxx as a safe and effective pain reliever, while conspicuously omitting any mention of increased cardiovascular or cerebrovascular risk.  Merck's promotional campaign falsely touted Vioxx's benefits while concealing its true health risks through false and misleading direct-to-consumer advertisements, sales promotions, press releases, and lectures at professional conferences.

51.     From the beginning of this post-launch campaign, Merck was on notice of the fraudulent nature of its marketing tactics.

52.     On July 16, 1999, the FDA's Division of Drug Marketing, Advertising, and Communications ("FDA-DDMAC") issued a letter to Merck, warning that its advertisements failed to provide adequate risk information.  The FDA-DDMAC informed Merck that certain of its Vioxx promotional materials were "lacking in fair balance or otherwise misleading."

53.     For example, Merck's direct-to-consumer print ad for Vioxx, which appeared in the July 7, 1999 issue of *El Nuevo Dia*, failed, *inter alia*: "to include risk information" or to provide "necessary information related to side effects, contraindications, and effectiveness."  The FDA-DDMAC concluded that the materials violated the Federal Food, Drug and Cosmetic Act and its implementing regulations, and it urged Merck to cease making such representations immediately.

54.     Merck's massive and misleading campaign continued unabated.

55.     On December 16, 1999, the FDA-DDMAC issued another letter to Merck, stating that its promotional pieces entitled "TEN REASONS WHY Vioxx IS BETTER THAN CELEBREX" and "Vioxx vs. Celebrex Poem" were "false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."  For example, Merck claimed that Vioxx was safer than placebo in the incident rate of gastroduodenal ulcers.  FDA-DDMAC observed that: "this claim is in direct contrast with the approved product labeling (PI)," which showed that there was an increased risk of ulcers with Vioxx use as compared to placebo.  The FDA-DDMAC: "object[ed] to this claim because it minimizes the GI warning associated with Vioxx and is inconsistent with the data in the PI."

56.     With respect to Merck's "TEN REASONS WHY Vioxx IS BETTER THAN CELEBREX," the December 16, 1999 letter stated that the promotional material contained several unsubstantiated comparative claims of Vioxx with Celebrex, including the assertion that Vioxx was more effective and safer than Celebrex, even though this claim had "not been demonstrated by substantial evidence."  The FDA-DDMAC concluded that Merck's claims were "misleading."

57.     The FDA-DDMAC December 16, 1999 letter asserted that Merck had failed entirely in its promotional materials to include a "fair balance with respect to the content and presentation of risk information related to the use of Vioxx."   The FDA-DDMAC uncategorically stated that, in  these materials, Merck had "not presented any risk information concerning the contraindications, warnings, precautions, or adverse events associated with Vioxx's use.

58.     Merck's internal documents also reveal its massive efforts to blitz doctors' offices with promotional material, while expertly training its sale representatives to dodge any questions regarding the safety of Vioxx.

59.     "Dodge Ball Vioxx," was another Merck sales representative training bulletin.  In "Dodge Ball Vioxx," there was a list of hypothetical questions doctors might ask the sales representative about Vioxx, such as:  "I am concerned about the cardiovascular effects of Vioxx" or "the competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than with Celebrex."   Merck's instructions to be followed in response to these questions consisted of but a single word:  "DODGE!"

60.     Merck's most egregious attempt to deceive physicians was through a pamphlet called the "Cardiovascular Card," which was also given to sales representatives to convince

physicians that Vioxx did not pose any health risks.  The Cardiovascular Card indicated that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks.  However, the card did not present any statistical tests of significance that are standard within the medical community, nor did it mention the VIGOR study.  Instead, the information used on the Cardiovascular Card was pooled from pre-approval clinical trials that were conducted to test the efficacy of the drug to treat pain, not to assess whether the drug caused heart attacks.

61.     The FDA also expressed "serious concerns" about the data on the Cardiovascular Card.  A FDA medical reviewer said that the relevance of Vioxx's pre-approval studies to the drug's cardiovascular safety was "nonexistent" and that it would be "ridiculous" and "scientifically inappropriate" to present this data to physicians.  As new evidence continued to surface showing the cardiovascular risks of Vioxx, Merck relentlessly pressured its field representatives to push the faulty data on the Cardiovascular Card.

62.     In October, 2001, Merck learned of the publication of an article stating that there was a higher reporting rate for adverse events relating to renal and cardiovascular effects in Vioxx as compared to Celebrex.  Merck responded by conducting an internal analysis of reported adverse events for Vioxx and Celebrex.  Merck's analysis showed a greater reporting rate of myocardial infarction, as well as congestive heart failure and related illnesses, for Vioxx in comparison to Celebrex.  Merck disregarded this signal of cardiovascular toxicity and failed to disclose it to the public.  Instead, Merck blamed the result on an alleged discrepancy in the number of events entered into the regulatory database for the two drugs.  As in the case of the Task Force analysis of 1997 and the VIGOR study of 2000, Merck once again searched for and

found a reason to exonerate Vioxx in order to omit, suppress, and conceal material information about Vioxx's safety risks to keep it on the market.

63.     In 2001, after the FDA Advisory Committee voted in favor of informing doctors of the increased incidence of cardiovascular events seen in the VIGOR study, Merck disregarded the vote and instead, instructed its sale representatives to continue to use the Cardiovascular Card – with its inaccurate data intact.

64.     U.S. Congressman Henry A. Waxman described Merck's total disregard for the FDA Arthritis Drug Committee's unanimous vote that physicians should have been made aware of Vioxx's cardiovascular results.   In the *New England Journal of Medicine*, Congressman Waxman wrote: "[t]he next day, Merck sent a bulletin to its rofecoxib sales force of more than 300 representatives.  The bulletin ordered, 'DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE … OR THE RESULTS OF THE … VIGOR STUDY.'  It advised that if a physician inquired about VIGOR, the sales representative should indicate that the study showed a gastrointestinal benefit and then say, 'I cannot discuss the study with you.'"  6/23/05 *N.Eng.J.Med* 2576, 2005 WLNR 9915749.

## G.     The VIGOR Trial

### 1.     The Vioxx Gastrointestinal Research ("VIGOR") Study

65.     In early 1999, Merck initiated the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study comparing Vioxx's efficacy and GI safety profile to a traditional NSAID, naproxen, in more than 8,000 rheumatoid arthritis patients.

66.     By early November 1999, there were indications in the VIGOR study that Vioxx carried serious cardiovascular risks.  Merck's preliminary internal calculations demonstrated a four-fold increase of acute myocardial infarction ("MI") with once-daily 50 mg doses of Vioxx

compared with twice daily 500 mg doses of naproxen (0.4% compared with 0.1% with naproxen). In fact, retrospective analysis of the data demonstrated a five fold increase in heart attacks in patients taking Vioxx versus those taking naproxen.

67.     Merck's scientists understood that the difference in cardiovascular events was so great that it could not have arisen by chance, and that it had to involve some sort of risk inherent to Vioxx.

68.     Rather than acknowledge the increased risk associated with Vioxx demonstrated by the study, the Merck apologists hypothesized that the reason for the results was not that Vioxx increased the risk of heart attacks, but that naproxen reduced the risk of cardiovascular events by having a cardioprotective benefit, similar to (but far more powerful than ) aspirin. The final conclusion of the article emphasized the GI benefits of Vioxx over other NSAIDS, instead of acknowledging important information about the increased cardiovascular risks.

69.     In the months that followed the publication of the VIGOR results, Merck continued to maintain in many different forums and diverse ways that Vioxx had a satisfactory cardiovascular safety profile. Through direct-to-physician sales representative speeches to physicians, Merck spun the VIGOR results by claiming that they were either a result of chance or the result of the "cardioprotective effect of naproxen."

70.     Despite having information regarding the cardiotoxicity of Vioxx, Merck did not mention the VIGOR results in its label for over two years. Further, Merck strongly objected to the warning language proposed by the FDA, and instead, lobbied and battled with the FDA to obtain the least restrictive label. Direct-to-consumer advertising continued unabated and undisturbed, failing to disclose the true risk-benefit profile of Vioxx.

71.     In June of 2000, at the pharmaceutical industry-sponsored European United League Against Rheumatism ("EULAR"), Merck scientist Dr. Claire Bombardier presented the VIGOR study.  Her presentation highlighted the beneficial GI profile of Vioxx, and buried the critical evidence of Vioxx users' statistically significant increased hypertension and myocardial infarction rate compared to naproxen users.

72.     Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the financial rewards of its deception and concealment.  Merck engaged in a massive advertising campaign designed to increase its market share.  As a result of this scheme, Merck reaped more than $2 billion in profits in the year 2000 alone.

73.     Merck continued to profit from its failure to disclose crucial health information for years after the last VIGOR study participant had ceased taking the medication.  In  November 2000, Merck physicians published a study in the New England Journal of Medicine that again knowingly downplayed the severity of cardiovascular risks associated with Vioxx consumption. Then, on May 22, 2001, Merck issued a PR Newswire press release that selectively stated:  "In response to news and analyst reports of data the Company released a year ago, Merck & Co., Inc., today reconfirmed the favorable cardiovascular safety profile of Vioxx."

74.     In response to information in 2001 demonstrating a significant increase in the risk of heart attacks as a result of taking Vioxx, Merck spokeswoman Christine Fanelle continued to publicize the fiction that the statistic could be accounted for by the cardioprotective effect of comparator drugs.

**H.**   **Merck Continued To Withhold Accurate VIGOR Results From The Health Community and The Public.**

75.     In March 2000, the results of the VIGOR Study came in, showing that Vioxx patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot-related problems – precisely the sort of result anticipated in the 1996-97 internal documents. The heart- attack rate in the Vioxx group appeared to be four times as high as the naproxen group.  (Later analysis would show it to be five times as high.)

76.     Merck continued to purposefully withhold this information from the public.  In a news release that month, Merck said the VIGOR trial results were "consistent with" naproxen's favorable effects, implying that this could explain why Vioxx did not do as well.

77.     Similarly, the next month Merck issued another news release, headlined "Merck confirms favorable cardiovascular safety profile of Vioxx."  While acknowledging the Vigor results, it said other trials and data had shown "NO DIFFERENCE in the incidence of cardiovascular events" between Vioxx and a placebo or between Vioxx and older painkillers.

78.     In April 2000, Merck responded to early news reports that Vioxx posed serious cardiovascular risks by simply denying that any such risks existed:  "Extensive review of data from the completed osteoarthritis trials and on-going clinical trials with Vioxx … have shown *no difference* in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx …" (emphasis in original).

79.     In June 2000, the same month that Merck released the results of the damaging VIGOR study to the FDA, Merck announced that the trial results were "consistent with" naproxen's cardio-protective effects.  Contrary to Merck's assertions, no clinical study had ever proven that naproxen had a cardio-protective effect.  According to a report from the FDA's

Center for Drug Evaluation and Research released the day Vioxx was withdrawn from the market, naproxen would have had to be one of the most potent and effective cardio-protectants known in order to legitimize Merck's interpretation of the VIGOR results. Thus, not only was Merck's justification baseless and incorrect, but the recent naproxen study further reveals that the opposite may be true.

80.     Also in June 2000, Merck minimized the results of the VIGOR study in a promotional conference by falsely asserting that Vioxx posed no greater risk of heart attacks than its competitor drug, Celebrex. Merck's representative stated: "Now if you remember the crude [heart attack] rate of Vioxx in VIGOR that number was 0.4 percent which is basically the same or in fact a little bit less  than the crude [heart attack] rate of Celebrex in [the Celebrex Long-Term Arthritis Safety Study] CLASS which is 0.5 percent." This comparison was false and misleading because the studies had different patient populations, with the Celebrex CLASS trial including patients at higher risk for heart attacks.

I.     **Merck Continues to Dodge Disclosure of Vioxx Cardiovascular Risks Even When Faced with Additional Pressure from the FDA.**

81.     In February 2001, the FDA presented its analysis of the VIGOR data to an FDA Advisory Committee. The analysis showed that the number of people who had a digestive problem while taking naproxen was about double the figure for Vioxx takers – but that difference was almost exactly the same as the additional number of Vioxx users who suffered a cardiovascular problem.

82.     In February 2001, a full 19 months after Vioxx went on the market, the FDA published a Memorandum on the Vioxx cardiovascular safety data gathered during VIGOR. In this Memorandum, the FDA concluded that there, "is an increased risk of cardiovascular

thrombotic events, particularly [heart attacks], in the [Vioxx] group compared with the naproxen group."  The FDA considered and rejected each of the defenses raised by Merck to explain the statistically significant increase of cardiovascular incidents among Vioxx users.

83.     Merck immediately responded to the FDA's Memorandum with a press release announcing its confidence in "the excellent safety profile of Vioxx."

84.     In February 2001, the FDA also concluded that Merck should add a cardiovascular warning to its Vioxx packaging:  "it would be difficult to imagine inclusion of VIGOR results in the [Vioxx] labeling without mentioning cardiovascular safety results in the study description as well as the Warnings sections."  Merck responded immediately with a press release directly contradicting the FDA's findings by claiming that:  "there was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen… [and] *no difference* in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx …" (emphasis in original).

85.     Behind closed doors, Merck entered into negotiations with the FDA concerning the warning language to be used in its Vioxx labeling.  FDA officials wanted to highlight the cardiovascular risk prominently on Vioxx's label.  Merck resisted, complaining that the FDA was putting more weight on the negative findings than on the positive gastrointestinal aspects.

86.     While these negotiations ensued, starting on May 22, 2001, Merck issued the first of a relentless series of publications publicizing the "favorable cardiovascular safety profile of Vioxx."  In the first release, disregarding the results of its own trial and the FDA's review, Merck repeated: "there was no difference in cardiovascular mortality between the groups treated with Vioxx or naproxen… [and] *no difference* in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx …" (emphasis in original).  These statements were

repeated again and again in countless continuing medical education symposiums and complemented by numerous papers in peer-reviewed medical journals authored by Merck employees and paid consultants, all of which attempted to debunk concerns about the adverse cardiovascular effects of Vioxx.

87.     Simultaneously, Merck continued to instruct its sale representatives to ignore the safety risks.  For example, in June 2001, at the 119th Annual Meeting of the Maryland Pharmacists Association in Ocean City, Maryland, a sales representative attempted to explain away the VIGOR study's finding that Vioxx increased the risk of heart attack by stating that it was due to the fact that naproxen works like aspirin by inhibiting clotting and platelet aggregation.  This had no basis in fact.

88.     Similarly, at an Annual Meeting of the American Society of Health Systems Pharmacists in Los Angeles, California in June 2001, a Merck sales representative represented that Vioxx's greater rate of heart attacks in the VIGOR study was because of naproxen's cardioprotective properties.  Again, this had no basis in fact.

89.     Finally, on September 17, 2001, the FDA's DDMAC issued a 'WARNING LETTER" ("2001 Warning Letter") to  Raymond Gilmartin, President and CEO of Merck, demanding that Merck correct false and misleading statements made in the course of its Vioxx promotional campaign.  Specifically, the 2001 Warning Letter cited Merck's promotional audio conferences, a press release, and oral representations made by Merck's sales representatives to promote Vioxx.  DDMAC stated that it had: "reviewed [Merck's] promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading" in violation of the FDCA and applicable regulations.

90.    Most, if not all, of the cited misrepresentations concerned Merck's failure to apprise the public of Vioxx's danger of heart attacks.  The FDA-DDMAC charged:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of Vioxx.  Specifically, your promotion campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drugs (NSAID), Naprosyn (naproxen).

91.    The 2001 Warning Letter also cautioned: "Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns.  Your misrepresentation … is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile."

92.    The 2001 Warning Letter delineated the following misrepresentations made by and/or on behalf of Merck about Vioxx:

a.    Merck minimized Vioxx's risk of heart attacks in Merck's promotional audio conference,  including conferences held on June 8, 2000, June 13, 2000, June 16, 2000 and June 21, 2000.  Merck misrepresented that the use of naproxen decreased the chance of heart attack, as compared to Vioxx, because it thinned the blood.  However, as the DDMAC observed, it could have just as easily been the case that Vioxx actually produced blood clotting.  Moreover, Merck knew the difference between the heart attack outcomes for the Vioxx users while the naproxen users' outcomes had not yet been determined.

b.    Merck concealed Voxx's possible pro-thrombotic properties, which may

reasonably explain the increase in adverse cardiac events.

c.     Merck made inaccurate claims that the heart attack rate for naproxen and Vioxx was .2% and .1% respectively.  The 2001 Warning Letter declared that "the [heart attack] rate for Vioxx in this subpopulation was 12 [heart attacks] among 3877 patients (0.3%) as compared to 4 [heart attacks] among 3878 patients (0.1%) for naproxen.

d.     Merck made false statements comparing the heart attack rate associated with the use of Vioxx in the VIGOR study to the crude heart attack rate of Celebrex in another study.  Merck concealed the fact that the patient populations in the two studies were different in that the VIGOR study excluded patients with heart problems, whereas the Celebrex study did not.  Thus, it was more likely that the Celebrex study included patients with a higher risk for myocardial infarctions prior to their ingestion of Celebrex.

e.     Merck concealed the fact that Vioxx's less expensive alternative, naproxen, caused half as many heart attacks.

f.     Merck concealed the dangerous interaction of Vioxx with warfarin, an anticoagulant.  For example, at an audio conference on June 16, 2000, Merck stated, "if you look at the tromboembolic events, it's very clear that these selective COX-2 inhibitors (of which Vioxx is a member) have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin."  This statement directly contradicts the precaution in the Package Insert and published in the Physicians' Desk Reference, which states:  "[I]n post-marketing experience, bleeding events have been

25

reported predominantly in the elderly, in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin."

g.      Merck concealed contraindications in patients who have experienced asthma, uticaria or allergic type reactions after taking aspirin or other NSAIDS.

h.      Merck concealed the risk of serious GI toxicity such as bleeding, ulcerations or perforation in patients taking Vioxx.

i.      Merck concealed certain precautions for use in patients with liver and kidney disease, as well as failed to disclose information about which  patient populations should not use Vioxx, including women in late-term pregnancy.

93.      The FDA also warned Merck that its recent press releases:  "confirming the favorable cardiovascular safety profile of Vioxx" were "simply incomprehensible" given the rate of heart attacks and "serious cardiovascular events compared to naproxen."  Merck responded to this Warning Letter by pulling or revising the complained-of promotional materials, but persisted in refusing to include a cardiovascular warning in any of its direct-to-consumer advertisements. Merck's misleading statements had already infiltrated the market and influenced the ongoing demand for Vioxx.

94.      The FDA expressed increasing concern about Merck's marketing of the drug to physicians and medical professionals.  In the September 17, 2001 Warning letter, the FDA expressed concern over the representations made in a Merck-sponsored presentation by a doctor in June 2000.  The doctor had said that the VIGOR trial showed that naproxen was "a wonderful drug" for reducing the risk of heart problems – not that there was anything wrong with Vioxx. Such statements, the FDA said, "minimized potentially serious cardiovascular findings" of VIGOR.

95.     In April 2002, after fourteen months of negotiations with the FDA, the new Vioxx label, which went into effect in April 2002, listed the good news about fewer upset stomachs first.  Then, the Product Insert listed in the Precautions section – not Warnings – two tables setting forth certain data from the Vigor study concerning increased incidence of cardiovascular events observed in the VIGOR study.

96.     With the introduction of the April 2002 label, Merck issued a press release that minimized the importance of the risks it had been required to disclose:  "the significance of the cardiovascular findings from [the VIGOR study] is unknown … Merck is confident in the efficacy and safety profile of Vioxx."  Merck was still engaged in a campaign designed to deceive the average consumer and the medical community by downplaying and suppressing any association between Vioxx and any serious cardiovascular risk.

**J.      Merck Attempts to Silence its Critics**

97.     During its ongoing effort to conceal the negative cardiovascular effects of Vioxx, Merck officials repeatedly lashed out against and threatened dissenting voices within the medical community.

98.     In October 2000, a prominent COX-2 expert, Dr. Gurkipal Singh of Stanford University, who frequently gave lectures sponsored by Merck, repeatedly and publicly pressed Merck for more cardiovascular data on Vioxx.  Merck responded by canceling several of Dr. Singh's presentations that it had been scheduled to sponsor.  Still not satisfied, a senior Merck official, Louis Sherwood, called James Fries, MD, a Stanford University Medical School professor, to complain that Dr. Singh's lectures were "irresponsibly anti-Merck and specifically anti-Vioxx."  According to Dr. Fries' letter to Mr. Gilmartin dated January 9, 2001, Sherwood threatened that, "if this continued, Dr. Singh would flame out and there would be consequences

27

for [Dr. Fries] and for Stanford."   Dr. Fries responded by writing a letter to Merck CEO, Raymond Gilmartin, complaining about a consistent pattern of intimidation of investigators by Merck on  Vioxx.

99.     In that same letter, Dr. Fries reported that he had learned of repeated other incidents where employees of Merck had attempted to intimidate critics of Vioxx, and reported what he had learned to Mr. Gilmartin.

100.     Perhaps the most aggressive action taken by Merck to attack its critics was against Dr. Joan-Ramon Laporte of the Catalan Institute of Pharmacology in Barcelona, Spain.  In the summer of 2002, a publication of the Catalan Institute edited by Dr. Laporte criticized Merck's handling of Vioxx's cardiovascular risks.   Soon after, Merck officials sent Dr. Laporte a "rectification" to publish, but Dr. Laporte refused to print a correction.  After repeated efforts to correct the study, Merck filed suit in a Spanish court against Dr. Laporte and the Institute under a Spanish law that allows plaintiffs to demand a public correction of inaccurate published information.  In January 2004, a judge ruled that Dr. Laporte's publication accurately reflected the medical debate about the cardiovascular safety of Vioxx, and ordered Merck to pay court costs.   To punish Dr. Laporte, Merck withdrew funding for a pharmaceutical conference in Spain, which it had financed for the previous eight years, because the organizer would not remove Dr. Laporte from the list of speakers.

**K.     Merck Wrestles With Additional Studies Exposing Vioxx's Safety Concerns.**

101.     Following the VIGOR trial, Merck was confronted with study after study that demonstrated increasing evidence of Vioxx's serious and significant health risks.

28

1.      **The JAMA Study**

102.    Despite Merck's efforts to prevent negative information about Vioxx from seeing the  light of day, some continued to question Vioxx's safety profile.  The concerns that Vioxx significantly increased cardiovascular risk in Vioxx users were described by Drs. Mukherjee, Nissen and Topol in their August 2001 *Journal of the American Medical Association* ("JAMA") article.  The authors specifically highlighted the dangerous cardiovascular adverse event profile of COX-2 inhibitors, particularly Vioxx.

103.    In August 2001, Merck again publicly denied the validity of the adverse cardiovascular results of the VIGOR study, while persistently touting the gastrointestinal safety profile demonstrated by VIGOR.  In two press releases, Merck attempted to refute the Mukherjee study, and repeatedly stated:  "Merck stands behind the cardiovascular safety  profile of Vioxx."

104.    Merck indicated in its August 21, 2001 press release: "… Merck believes that extensive cardiovascular data already exist on Vioxx and that these data – which were not incorporated into the Cleveland Clinic's analysis – suggest that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx."

105.    The day before the Mukherjee JAMA article was published, Merck stated in a Bloomberg News piece:  "We have additional data beyond what [Topol and the Cleveland clinic study] cite, and the findings are very, very reassuring… Vioxx does not result in any increase in cardiovascular events compared to placebo."

106.    The August 2001 JAMA published a peer-reviewed human epidemiological study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al. (the "JAMA Study").  The JAMA Study demonstrated that Merck had concealed the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as

"myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR.  The VIGOR trial, at 95% confidence interval, ranged from 2.2 for event-free survival analysis, 2.35 compared to naproxen users, and a 4.89 for developing serious cardiovascular events among aspirin-indicated patients.  *See* Mukherjee, D., et al., *Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors*, JAMA, 286.8.  954-959, August 22/29, 2001.  The myocardial infarction rates for Vioxx users compared to placebo revealed a statistical increase among Vioxx users.

107.    In the JAMA Study, the authors stated that "by decreasing PGI 2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI 2, potentially leading to an increase in thrombotic cardiovascular events." *Id.* At 957.

108.    On August 23, 2001, the day after the JAMA article was published, Merck stated in another press release:  "The Company stands behind the overall … cardiovascular safety profile of Vioxx."

109.    Merck asked the Cleveland Clinic to run a rebuttal to this article.  When it refused, Merck sent "Dear Doctor" letters to thousands of physicians nationwide that "strongly supported the cardiovascular safety profile" of Vioxx.  Merck also sent "Dear Patient" letters to thousands of consumers nationwide (identified from a prescription database) wherein it specifically minimized the risk of "heart attacks and strokes" and emphasized that Vioxx was "innovative, effective and safe."

## 2.    The Advantage Study

110.    In 1999, Merck's marketing department commissioned its own 12 week clinical trial, as a promotional tool, to show that Vioxx caused fewer stomach problems than naproxen.

This trial, called Advantage, also revealed a link between Vioxx and an increased risk of heart attacks and stroke.  Faced with yet another threat to Vioxx's commercial success, senior Merck officials pressured their own researchers to change the trial results, so as to avoid concerns over the adverse cardiovascular effects of Vioxx.

111.    Merck intentionally distorted and omitted data from the Advantage study so that it could continue marketing and selling Vioxx without an FDA warning regarding its known cardiovascular risks.  Any such warning would have made Vioxx far less commercially attractive when compared to its closet competitor, Celebrex, which does not list heart risks on its label.

112.    In October 2003, more than three years after the study's completion, Merck reported the results of the flawed Advantage study in the *Annals of Internal Medicine*.  Although the report stated that five patients taking Vioxx had suffered heart attacks, the report failed to mention three additional heart-related deaths.

### 3.    The Kaiser Permanente Study

113.    In August of 2004, Dr. David Graham, Associate Director for Science, Office of Drug Safety, FDA Center for Drug Evaluation and Research, together with Dr. Wayne Ray and co-authors, presented an observational study at an international medical meeting, which evaluated the rate of cardiovascular events in patients taking Vioxx versus Celebrex versus non-selective NSAIDs.  This analysis was a retrospective study of the Kaiser Permanente database and was funded by the FDA.  The results of this study were published in February 2004 in the *Lancet*.

114.    On August 25, 2004, Dr. David Graham reported that based on his study, Vioxx increased the chance of heart attacks in patients.  This was the result of a retrospective study in which Dr. Graham and a team of researchers reviewed the medical records for approximately 1.4

million patients belonging to Kaiser-Permanente California HMO.  Of these patients, 27,000 were taking Vioxx, and 40,000 were taking Celebrex.  Other patients were taking other NSAIDs such as aspirin, ibuprofen and naproxen.

115.    Dr. Graham studied the cardiovascular risks of Vioxx in his review.  According to Dr. Graham's findings, which were reported at the international conference in Bordeaux, France:

a.    Patients taking over 25 mg of Vioxx daily had a three-fold risk of suffering a heart attack or sudden cardiac death;

b.    Patients taking lower doses of Vioxx were more likely to suffer serious cardiac problems compared to those taking Celebrex and other NSAIDs;

c.    Naproxen increased the risk of serious cardiac events by 18%; and

d.    Celebrex and ibuprofen had no effect on the risk of serious cardiac events.

116.    In fact, Dr. Graham and his collaborators linked Vioxx to more than 27,000 heart attacks or sudden cardiac deaths nationwide from the time it was introduced on the market in 1999 through 2003.

117.    Shortly after the Graham-Ray study was presented at the international medical meeting, Merck issued a press release that it:  "strongly disagrees with the conclusions of the observational analysis presented at the international medical meeting:  Merck stands behind the efficacy, overall safety and cardiovascular safety of Vioxx."

118.    Despite Merck's strenuous objections to the findings published from the Kaiser Permanente study, asserting that it was not definitive because it was not a full-blown clinical trial, one month later, Merck did an "about face" when its own clinical trial largely confirmed the results of Dr. Graham's study.

119.    In the interim, Merck had failed to conduct a planned study to directly investigate Vioxx's cardiovascular toxicity, but instead chose to collect cardiovascular event data from studies designed for other purposes.  In particular, Merck collected information about adverse events from trials to support applications to the FDA to expand the approved uses of Vioxx including the study that ultimately and belatedly caused the drug to be withdrawn.

### 4.    The APPROVe Study

120.    The Adenomatous Polyp Prevention on Vioxx ("APPROVe") Study was a multi-center, randomized, placebo-controlled study investigating the effects of Vioxx on the recurrence of neoplastic large bowel polyps in 2600 patients with a previous history of colorectal adenoma. Commencing in 2000, the APPROVe trial studied these 2,600 patients to evaluate whether Vioxx 25 mg doses prevented the recurrence of colorectal polyps in patients with a history of colorectal adenomas.  The primary purpose of the study was to add another indication for the use of Vioxx and thereby increase the market potential of Vioxx for previously unapproved uses. However, during the trial, Merck collected data concerning adverse events experienced by the subjects.  As in other clinical trials, high-risk patients were intentionally excluded, which weakened the ability to detect significant differences in cardiovascular event rates.

121.    In mid-September 2004, APPROVe was halted suddenly when the data showed that Vioxx caused a marked increase in the risk of heart attacks and strokes.  In fact, patients taking Vioxx had double the risk of heart attacks as compared to patients taking placebo. APPROVe revealed 15 cases of heart attack, stroke or blood clots over one year for Vioxx users as compared to 7.5 cases per year for those on placebo.

122.    Merck has claimed since the release of the APPROVe results in September, 2004, that the risk of heart attack and stroke did not appear until after subjects had taken Vioxx for

more than 18 months, based on so-called "adjudicated" events.  However, Merck has concealed from the public its internal analysis of "investigator reported" cardiovascular events, which showed that the Vioxx rate exceeded placebo throughout the entire period of the study. Furthermore, Merck has concealed its internal analysis of such events showing a statistically significant risk for Vioxx versus placebo in the 0 to 18 month segment as well as the 19 to 36 month segment of the study.  In a graph of the "Kaplan-Meier cumulative rate curves" for Vioxx versus placebo, the Vioxx curve begins to exceed the placebo curve at approximately 2 to 3 months, and separates from the placebo incidence curve by an increasing margin for the remainder of the 36 month study.  Merck's concealment of this data has been willful, intentional, deliberate, and designed to minimize its potential liability to Plaintiff and the public.

### L.      Merck's Belated Withdrawal of Vioxx

123.      On September 30, 2004, the Center for Drug Evaluation and Research of the FDA issued a Memorandum concluding that Vioxx has adverse cardiovascular effects, which were evident long before Merck's withdrawal of the drug.

124.      Rofecoxib [Vioxx] increases the risk of serious coronary heart disease defined as acute myocardial infarction and sudden cardiac death …The observation of an increased risk was first noted with the VIGOR trial, where a 5-fold difference in risk was found between high-dose rofecoxib and naproxen.  The manufacturer attributed this difference to a never before recognized protective effect of naproxen.  To explain a 5-fold difference, naproxen would have had to be one of the most potent and effective cardio-protectants known.  Three cohort studies and the present nested case-control study found no evidence of cardio-protection with naproxen.

The three case-control studies that reported a protective effect were misleading.  When analyzed in a manner comparable to the present study, no protective effect is shown.[2]

125.    On that same day, September 30, 2004, Merck issued a press release announcing the withdrawal of Vioxx based on "new" data indicating an increased risk of cardiovascular events, such as heart attack and stroke for those taking the drug eighteen months or longer.[3]  The decision came after the Data Safety Monitoring Board for the APPROVe trial recommended that the study be stopped early for safety reasons based on the first three years of results.[4]

126.    However, the totality of information available to Merck suggests that Vioxx should have been taken off of the market years before Merck's recall.  In fact, an article in *The Lancet*, a respected British medical journal, pointed out that the "voluntary withdrawal of rofecoxib by its manufacturer, Merck, on the basis of a fairly small trial that was designed for a difference purpose raises several questions."[5]  The critical question is why Merck waited so long to pull from the market a drug that it knew was associated with an unacceptably high risk of adverse cardiovascular and cerebrovascular events, such as heart attack and stroke.

127.    *The Lancet* set out to find its own answers by conducting a meta-analysis of randomized controlled trials and observational studies.  It concluded that:

> Our cumulative meta-analysis of randomized controlled trials indicates that an increased risk of myocardial infarction was evident from 2000 onwards.  At the end of 2000, the effect was both substantial and unlikely to be a chance finding. We found an increased risk of myocardial infarction in trials of both short and long

---

[2]   David J. Graham, MD, MPII, Associate Director for Science, Office of Drug Safety, Center for Drug Evaluation and Research, FDA, *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-selective NSAIDs* 13 (Sept. 30, 2004).

[3]   Merck, Merck Announces Voluntary Withdrawal of Vioxx, available at http:www.Vioxx.com/Vioxx/documents/English/Vioxx_press_release.pdf (accessed Nov. 5, 2004).

[4]   FDA, *FDA Public Health Advisory:  Safety of Vioxx*, available at http:/www.fda/gov/cder/drug/infopage/Vioxx/PHA _ Vioxx.htm (accessed Nov. 5, 2004).

[5]   Peter Juni, et al., *The Lancet*, "Risk of Cardiovascular Events and Rofecoxib:  Cumulative Meta-Analysis 4" (Nov. 5, 2004).

duration, which is in contrast to the unpublished results from the APPROVe trial …

[T]he reassuring statement by Merck, that there is no excess risk in the first 18 months, is not supported by our data… [D]ata from these studies indicate that if a protective effect of naproxen exists, it is …not large enough to explain the findings of VIGOR.  By contrast to our findings, two earlier meta-analyses from Merck Research Laboratories showed no evidence of a rise in cardiovascular risk or an increase in risk that was restricted to trials comparing rofecoxib with naproxen…

128.     To clarify the reasons behind the misleading results of Merck's meta-analysis of cardiovascular events in clinical trials of rofecoxib will be important…if Merck's statement in their recent press release that 'given the availability of alternate therapies, and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take' was appropriate in September, 2004, then the same statement could and should have been made several years earlier, when the data summarized here first became available.  Instead, Merck continued to market the safety of rofecoxib.[6]

129.     In 2005, Dr. Levesque and her colleagues at McGill University published their study in the online edition of the *Annals of Internal Medicine*, to be followed by the print edition in April 2005.   The McGill University study examined pharmacy prescriptions and cardiovascular adverse events among users of Vioxx and other pain medications in a large population of more than 100,000 elderly persons (mean age of 75; 55 years at entry).

130.     Dr. Levesque reported that there were 5 times as many Vioxx-exposed case patients with MIs as reported by Dr. Juni in his study, and that Vioxx users had a significantly higher relative risk for MIs as compared to other NSAID users.  The large size of the Levesque study database increases the reliability of the analysis, and these results provide strong,

---

[6] Peter Juni, et al., *The Lancet*, "Risk of Cardiovascular Events and Rofecoxib:  Cumulative Meta-Analysis 5-7" (Nov. 5, 2004) (emphasis supplied).

confirmatory evidence that the use of Vioxx is associated with an increased risk for an acute MI. The magnitude of the risk observed for users of Vioxx was even higher for individuals prescribed a dosage greater than 25 mg per day.  However, even the patients who took lower doses of Vioxx had an elevated risk of a cardiovascular event.  Further, Dr. Levesque wrote that, "[w]e have also shown that the cardio toxic effect of Rofecoxib previously observed in older and sicker populations extends to a healthier elderly population."

131.    According to Dr. Levesque, "the totality of the current evidence confirms the increased cardiovascular risk associated with Rofecoxib and the sagacity of its withdrawal." These results were consistent with the results of the VIGOR study and the APPROVe results, as well as the studies of Ray (2000), and Graham and Ray (2005).

132.    In November 2004, the United States Senate Finance Committee held hearings on Vioxx and related drugs approved by the FDA and then withdrawn because of significant health risks.  Dr. David Graham testified about his experience with Vioxx:

> Graham:  "Prior to approval of Vioxx a study that was performed by Merck, named 090, which found a nearly seven-fold increase in heart attack risks with low-dose Vioxx.  The labeling at approval said nothing about these heart attack risks.  In November 2000, another Merck trial named VIGOR found a five-fold increase in heart attack risk with the high-dose from Vioxx.
>
> About 18 months after the VIGOR results were published, FDA made a labeling change about heart attack risk.  But it did not place this in the "Warnings" section of the labeling.  Also, it did not ban the high dose formulation and its use.
>
> I believe such ban should have been implemented.
>
> *    *    *
>
> In March 2004, another epidemiology study reported that both high-and low-dose Vioxx increased heart attack risks compared to CELEBREX, Vioxx's leading competitor.  Our study found similar results.

A study report describing our work was put on the FDA website.  This report estimated that nearly 28,000 excess cases of heart attack and sudden cardiac deaths have been caused by Vioxx.

I must emphasize to the committee that this is an extremely conservative estimate.

FDA always claims that randomized clinical trials provide the best data.

If you apply the risk level seen in the two Merck clinical trials, VIGOR and APPROVe, you obtain a more realistic and likely range estimates for the number of excess cases.

This estimate ranges from 88,000 to 139,000 Americans.  Of these, 30 to 40% probably died; for the survivors, their lives were changed forever.

This range does not depend at all on the data from our Kaiser-FDA study.  Indeed, Dr. Eric Topol at the Cleveland Clinic recently estimated 160,000 cases in the article that was published in the new England Journal of Medicine."

133.    In February 2005, a 32-member FDA Advisory Panel conducted hearings to determine whether or not COX-2 inhibitors should be made available to the public and, if so, on what terms.  The Panel criticized the label change made by Merck in 2002, which the Panel deemed insufficient to warn the public about the cardiovascular risks of Vioxx use.

134.    During the Panel hearings, the senior director of Merck Research Laboratories, Dr. Ned Braunstein, tried to portray Vioxx's dangerous effects as a class effect of all COX-2 inhibitors.  This attempt to characterize the dangers of Vioxx as a class effect represents a critical admission of the risk of Vioxx use that directly contradicts Merck's prior statements and omissions about the safety and the unique characteristics of its product.

135.    At the conclusion of the hearings, the members of the Advisory Panel, a third of whom had worked for Merck in the past, voted by the narrowest of margins (17-15) to recommend that Vioxx be allowed to return to the market, with severe limitations on use.  If the panelists who had not previously worked for a pharmaceutical company had not voted, Vioxx

38

would have been prevented from returning to the market by a margin of 14-8.  To date, the FDA has not accepted the Panel's recommendations.

136.     Merck publicly acknowledged on its website that it is responsible to reimburse patients for their unused portions of Vioxx.  To this end, Merck has instituted a reimbursement program that is fundamentally flawed, does not fully and effectively reimburse End-Payors, and does not make them whole.

**M.**     **Merck's Continued Fraudulent Marketing Campaign Caused Active Concealment of Vioxx' Deficiencies and Inflated Payments by End-Payors for Vioxx.**

137.     As a result of Merck's claims, Plaintiff purchased and/or paid for Vioxx even though, at $72 for a monthly supply (in 1999), Vioxx was much more expensive than other NSAIDs, which sold for $9 or less for the same month's supply.

138.     To justify the disparity of Vioxx's pricing as compared to other NSAIDs and to ensure that physicians would prescribe and that third party payors would purchase and pay for the drug, Merck misrepresented the safety and efficacy of Vioxx and omitted, concealed, and suppressed the risks, dangers, and disadvantages of the drug.  Consequently, Vioxx captured a large market share of anti-inflammatory drugs prescribed for and used by patients.  In 2000 alone, sales of Vioxx exceeded $2 billion, which represented 23% of the total NSAIDs market, despite the significantly higher cost of Vioxx as compared to other pain relievers in the same family of drugs.

139.     Merck's deceptive and misleading marketing campaign resulted in inflated payments by consumers and third party payors, including Plaintiff for, in whole or in part, the costs of Vioxx.  Millions of third party payors including Plaintiff, have already paid for, and/or

purchased and consumed Vioxx at prices based on the proposed wholesale price, which was about one hundred times the cost of a generic aspirin. These third party payors paid more than they would have or should have because Vioxx was promoted and advertised as a premium drug with reduced side effects for the purpose of deceiving consumers and third party payors about Vioxx's adverse cardiovascular and cerebrovascular effects.

140. In fact, the economic effects of being required by the FDA to disclose the side effects and cardiovascular risks of Vioxx were known to Merck. In its internal documents, Merck calculated and included the expected losses in Vioxx sales and market share that could be anticipated to result when Merck would be required to include the risks in the Vioxx label. The projections estimated, at least, a $229 million loss in sales in 2002 and a loss in market share of, at least, 10 to 20 percent. Merck continued its game of deception well into 2004, finally withdrawing Vioxx from the market on September 30, 2004, years after it knew of, but omitted, suppressed, and concealed the increased serious health risks associated with Vioxx use.

### N. Merck's Settlement of Numerous Criminal and Civil Lawsuits with Governmental and Personal Injury Claimants.

141. In 2004, the U.S. Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") launched investigations of Merck's handling of Vioxx. On November 19, 2004 a U.S. Senate Committee held hearings in its investigation of Vioxx. Governmental investigations continued for several years, with close cooperation between the DOJ, SEC, state attorneys general and other law enforcement entities including the Medicaid Fraud Control Units, and the Office of Inspector General of the Department of Health and Human Services ("HHS-OIG").

142.    In February of 2007, Merck disclosed in its regulatory filings that the DOJ issued a subpoena requesting information relating to the company's research, marketing and sales of Vioxx as part of a federal investigation under criminal statutes.  The health-care-fraud unit of the US Attorney's Office in Massachusetts spearheaded the federal grand-jury probe.

143.    In November of 2007, Merck agreed to settle approximately 27,000 lawsuits by individuals who claimed they or their family members suffered injury or died after taking Vioxx. The $4.85 billion global Vioxx settlement is being overseen by U.S. District Judge Eldon E. Fallon of New Orleans.

144.    In February of 2008, the DOJ announced a settlement for more than $650 million to resolve claims of fraudulent price reporting and kickbacks by Merck involving Vioxx.  The settlement addressed allegations that Merck failed to pay proper rebates to Medicaid and other government health care programs and paid illegal remuneration to health care providers to induce them to prescribe the company's products.  The allegations were brought in two separate lawsuits filed by whistleblowers under the *qui tam* provisions of the Federal False Claims Act. Under the two settlement agreements, the federal government was awarded more than $360 million, and forty-nine states and the District of Columbia over $290 million.  As part of the resolution of the two cases, the HHS-OIG and Merck entered into a five-year Corporate Integrity Agreement including provisions designed to ensure that Merck will market, sell, and promote its products in accordance with all federal health care program requirements.

145.    In May of 2008, Merck entered into a $58 million civil consumer fraud settlement with Attorneys General from 28 states and the District of Columbia.  In addition to payments to the states, significant remedial provisions of the settlement affect a broad swath of pharmaceutical company activities, including advertising and promotion, continuing medical

education, drug safety monitoring boards, journal authorship and clinical trial posting.  As part of the settlement, Merck agreed to:

    a.      Pay 58 million dollars to the states involved.

    b.      No longer engage in "ghostwriting."

    c.      Refrain from using scientific data deceptively when marketing to doctors.

    d.      Delay any direct-to-consumer television advertising for a pain medication if recommended by the FDA.

    e.      Submit all television advertising campaigns to the FDA before release for review and to adhere to any recommendations by the FDA.

## CAUSES OF ACTION

### COUNT I:     FRAUDULENT CONCEALMENT

146.    Throughout the relevant time period, Merck affirmatively and fraudulently concealed its unlawful conduct from Plaintiff.

147.    Plaintiff did not discover, and could not discover through the exercise of reasonable diligence, that Merck had unlawfully concealed, omitted, and suppressed the serious adverse effects of Vioxx until September 30, 2004, when Merck withdrew Vioxx from the market.  Merck conducted its unlawful activities in secret, concealed the nature of its unlawful conduct, and attempted to confine information concerning the adverse effects of Vioxx.  Merck attempted to withhold such information from Plaintiff, the medical community, regulators and the public.  Merck fraudulently concealed its activities through various means and methods designed to avoid detection.

148.   Plaintiff could not have discovered Merck's unlawful conduct at an earlier date through the exercise of reasonable diligence because Merck actively and purposefully concealed its unlawful activities.

149.   Merck engaged in a successful, illegal fraud on consumers, third party payors and the general public, by which it deliberately and affirmatively concealed material information on the risks, dangers, defects, and disadvantages of Vioxx, in at least the following respects:

a.   By failing to disclose adverse effects of Vioxx to Plaintiff, the medical community, regulators and the public;

b.   By failing to warn Plaintiff, the medical community, regulators, and the public of those adverse effects;

c.   By agreements among senior Merck officials in meetings and in communications not to discuss publicly, or otherwise reveal, the totality of the adverse effects caused by Vioxx, Merck's concealment of those adverse effects, and the nature and substance of other acts and communications in furtherance of Merck's illegal scheme; and

d.   By giving false and pretextual reasons for the existence of apparent adverse effects in studies of Vioxx, including, for example, by claiming that naproxen's cardioprotective effect was responsible for a noted increase in cardiovascular events in the VIGOR study in Vioxx versus naproxen patients, when, in fact, Vioxx was the cause of the reported increased incidence of cardiovascular effects.

150.   By giving false and pretextual reasons for the existence of apparent adverse effects in studies of Vioxx, including, for example, by claiming that naproxen's cardioprotective effect was responsible for a noted increase in cardiovascular events in the VIGOR study in

43

Vioxx versus naproxen patients, when, in fact, Vioxx was the cause of the reported increased incidence of cardiovascular effects.

151.    As a result of Merck's fraudulent concealment, Plaintiff purchased and/or paid for Vioxx and could not reasonably have discovered Merck's misconduct regarding Vioxx prior to September 30, 2004.  Plaintiff therefore asserts the tolling of any applicable statue of limitations affecting Plaintiff's rights of action.

## COUNT II:  <u>VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT</u>

152.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth herein, and further allege as follows:

153.    The acts committed by the Defendant as alleged herein violate the provisions of the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. Ann. § 51:1401, et seq. Each of the previously described acts by the Defendant were "unlawful" in that they were "unfair methods of competition and[/or] unfair or deceptive acts or practices in the conduct of [Defendant's] trade or commerce," as prohibited by La. Rev. Stat. Ann. § 51:1405.

154.    As a direct and proximate result of the Defendant's wrongful conduct in violation of LUTPA, Plaintiff has sustained financial losses in amounts as will be established at the trial of this matter, which amounts Plaintiff is entitled to recover from the Defendant.  Plaintiff, which, due to the Defendant's unlawful conduct in violation of LUTPA, spent substantial sums to purchase Vioxx for persons covered under its plans and/or policies, is entitled to all remedies afforded under La. Rev. Stat. Ann. §51:1409, including actual damages, reasonable attorney's fees, and costs.  Finally, Plaintiff seeks any and all other and further remedies to which it is entitled under LUTPA.

**COUNT III:  <u>VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT</u>**

155.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

156.    At all relevant times material hereto, Defendant conducted trade and commerce within the meaning of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.* ("CFA").

157.    Plaintiff and Defendant are "persons" within the meaning of the New Jersey CFA, N.J.S.A. § 56:8-1.

158.    Section 56:8-1 of the New Jersey CFA provides that unconscionable and deceptive conduct in connection with the sale or marketing of a product is unlawful, *e.g.*:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice …

159.    Defendant's practices in connection with the marketing and sale of Vioxx violate the New Jersey CFA for, among others, one or more of the following reasons:

a.      Defendant knowingly suppressed, concealed, and omitted from Plaintiff, and the medical community, truthful and complete efficacy and safety information regarding Vioxx, particularly comparative information between Vioxx and traditional NSAIDs;

b.      Defendant provided, disseminated, marketed, and otherwise distributed direct-to-consumer advertising and other information to Plaintiff and the medical community that omitted, concealed, suppressed, and otherwise downplayed

45

adequate warnings and material medical information regarding the use of Vioxx;

c.      Defendant misrepresented, knowingly concealed, omitted, and suppressed the safety and efficacy of Vioxx in its advertising, promotional, and safety materials and information disseminated to Plaintiff and the medical community; and/or

d.      Defendant engaged in unconscionable commercial practices in promoting Vioxx as a drug with a greater safety and efficacy profile as compared to its NSAID competitors when the purported safety and efficacy benefits were unfounded; and/or

e.      Defendant engaged in unconscionable commercial practices in its concealment, suppression, and omission of important information about the safety and efficacy of Vioxx in its advertising, promotional, and safety materials and information disseminated to Plaintiff and the medical community.

160.    Defendant's concealment, suppression, omissions, misrepresentations, and practices had the tendency, capacity, and likelihood to deceive Plaintiff and the medical community.

161.    Defendant intended, or consciously disregarded, that Plaintiff would rely on its omissions, misrepresentations, and practices so that they would authorize the purchase of, and indeed purchase and/or pay for, Vioxx.

162.    The foregoing omissions, knowing concealment, misrepresentations, and practices caused Plaintiff to suffer ascertainable losses in that Plaintiff authorized the purchase of, and purchased, and/or paid for, Vioxx without knowing the true and complete risks, dangers,

disadvantages, and benefits of Vioxx, in general, and specifically in comparison to alternative and significantly less expensive NSAIDs.

163.    Plaintiff would not have authorized the purchase of, or payment for Vioxx, on the terms that they did, had they known the true and complete risks, dangers, disadvantages, and benefits of Vioxx, in general, and specifically in comparison to alternative and significantly less expensive NSAIDs.

164.    Defendant's unlawful conduct arose, was directed by, and emanated from New Jersey, to the detriment and injury of Plaintiff.

165.    As a proximate cause of Merck's violations of the New Jersey CFA, Plaintiff suffered ascertainable losses, injuries, and damages as described herein, in an amount to be determined at trial.  Defendant is liable to Plaintiff for a refund and reimbursement of all moneys acquired from Plaintiff by reason of Defendant's unlawful conduct as set forth herein under Section 56:8-2.12 and 2.13 of the New Jersey CFA, treble damages, and such other further relief as is warranted for violations of the New Jersey CFA.

## COUNT IV:  UNJUST ENRICHMENT

166.    Plaintiff re-alleges and incorporates all preceding paragraphs of this Complaint as if fully set forth here, and further alleges as follows:

167.    The Defendant has been enriched from the selling and manufacturing of a defective product, and Plaintiff has been correspondingly impoverished by purchasing or paying for the defective product.  There is no justification or cause for Defendants' enrichment or Plaintiff's resulting impoverishment.

168.    Defendants' enrichment at the expense or impoverishment of Plaintiff is inequitable.  Although Plaintiff has alleged that it enjoys remedies at law against Defendant, to

47

the extent that Plaintiff does not enjoy a remedy at law, Defendant should be made to return all sums unjustly obtained from Plaintiff.

169.    Plaintiff demands that Merck & Co., Inc. return all such monies acquired from Plaintiff through the selling of Vioxx.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter a judgment against the Defendant and in favor of the Plaintiff and grant the following relief:

1.    Declare, adjudge, and decree the conduct of Merck as alleged herein to be unlawful;

2.    Grant Plaintiff an award of actual, compensatory, punitive, and/or exemplary damages in such amount to be determined at trial as provided by applicable law;

3.    Grant Plaintiff its costs of suit, including reasonable attorneys' fees, and expenses as provided by law; and

4.    Grant Plaintiff such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

5.    Plaintiff prays that all deposition and travel expenses be taxed as costs.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted, this 27th day of April, 2009.

**MURRAY LAW FIRM**

_____/s/ James Dugan_____
James R. Dugan, II,  T.A. (LSBA No. 24785)
Douglas R. Plymale (LSBA No. 28409)
Justin Bloom
Stephen B. Murray, Jr. (LSBA No. 23877)
Stephen B. Murray, Sr. (LSBA No. 9858)
650 Poydras Street
Suite 2150
New Orleans, LA 70130
Telephone:     (504) 648-0180
Facsimile:      (504) 648-0181

Charles A. O'Brien (LSBA No. 10143)
HMO Louisiana, Inc.
5525 Reitz Ave.
P.O. Box 98029
Baton Rouge, Louisiana 80809
Telephone:     (225) 295-2454
Facsimile:      (225) 297-2760

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Notice of Change of Firm Name has this day been served on all counsel of record by e-mail or by e-mail by electronically uploading same to Lexis/Nexis File & Serve Advance in accordance with Pre-Trial Order No. 8, this 27th day of April, 2009.

_____/s/ James Dugan_____