# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In Re: VIOXX

PRODUCTS LIABILITY LITIGATION

This document relates to ALL ACTIONS

MDL Docket No. 1657

Section L

JUDGE FALLON
MAG. JUDGE KNOWLES

## MEMORANDUM IN OPPOSITION OF
## PLAINTIFFS' LIASON COUNSEL'S MOTION FOR
## AWARD OF COMMON BENEFIT COUNSEL FEES AND
## REIMBURSMENT OF EXPENSES

Date: May 6, 2009

Richard J. Weiner (**Bar No. 9015**)
**Weiner, Carrol & Strauss**
136 Summit Ave.
Montvale, NJ 07645
Telephone: (201) 930-0400
Facsimile: (201) 930-0600

## INTRODUCTION

This court has already set the standard for what shall be deemed a fair and reasonable fee between a Vioxx attorney and his or her client.  The same application of fairness and reasonableness should likewise apply to the determination of the common benefit fee. Specifically, this court has said in PT Order No. 9 the following:

> "the potential harm to the public's perception of the judicial process is especially acute in the instant case because of the large number of claimants participating in the settlement. ("The risk of **excessive fees** is a special concern here because of the mass nature of the case."). The approximately 50,000 plaintiffs and the $4.85 billion settlement fund have captured the public's attention, resulting in a heightened degree of public scrutiny on the settlement proceedings and the judicial process in general.  Disproportionate results and inconsistent standards threaten to damage the public's faith in the judicial resolution of mass tort litigation by creating an impression of inherent unfairness." *See* PT Order 8/27/08, p. 11.

Heeding his Honor's own words, the various attorneys such as this firm ought to be treated in the same manner as the claimants.  Generally, class counsel and MDL lead counsel, in reality respond to few masters and little oversight.  Their actions arguably bind the individual cases, for clients and their lawyers respectively.  They do not take polls of their clients nor the lawyers who represent them.  Although, we may take comfort in the use of an opt-out right (if it is a Rule 23(b)(3) class or Settlement Agreement), such a right as a means of expressing disagreement with the vision of the leaders is often phantom.  As poorly as any guidance is spelled out for class lead counsel's conduct either in ethical or legal decisions, there is still less guidance spelled out for multidistrict litigation counsel.  This firm argues that MDL lead counsel owe the same fiduciary duty to the entire group of claimants and attorneys alike.

1

Likewise it is of the utmost importance that lawyers such as myself be given the opportunity to question and probe the supposed reasonableness of this 8% common benefit fee that is requested by the Plaintiffs' Liason Committee.

This firm takes no issue with the fact that a **reasonable fee** for the Plaintiffs' Negotiating Committee's work in settling the case is warranted. However, said common benefit fee should be set by this Court after careful deliberation by all parties. Clearly, an 8% fee represents a huge windfall on top of the 500 – 1,500 Vioxx cases (or more) that each attorney of the Negotiating Plaintiffs' Committee (NPC), Plaintiffs' Liason Committee (PLC) and Plaintiffs' Steering Committee (PSC) have of their own on which they are also collecting their 32% contingency fees.

The same fiduciary duties that claimants are afforded by class counsel in which his Honor espouses above dictates the same type of scrutiny and analysis in terms of the 8% common benefit fee requested from the PLC as well.

## ARGUMENT

**I.      The PLC's request for an 8% common benefit fee is both unjustified and unreasonable under the given circumstances.**

The Plaintiffs' Liason Committee disingenuously provides a chart of examples of percentage awards permitted in most recent large litigations to support their request of an 8% common benefit fee. *See* PLC Brief at p. 34. The cases they list, however, are for the most part inapposite and quite distinguishable from the instant matter. First and foremost, the instant litigation was not class certified such as: *In re Enron Corp. Securities Derivative & ERISA Litigation,* 2008 WL 4178130, *Shaw v. Toshiba* and *Deloach v. Philip Morris Cos.*2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) which they cite. Furthermore, the cases mentioned in the

2

chart did not also receive a 32% contingency fee on top of the 8% common benefit fee. The majority of the cases listed dealt with class action securities litigation in which lead counsel performed all the discovery from the beginning as opposed to the Vioxx MDL where most of the discovery was performed prior and merely: rehashed, catalogued and organized by the PSC.

Their position that, the "amount requested here reflects a relatively modest percentage of recovery compared to the benchmark range in other class actions and global settlements and to percentage awards in these other large settlements that compare to this settlement only in terms of dollar value.", is also quite misleading. *See* PLC Brief at P. 4. The *Enron* case, in which they cite, was a class action and took six years to litigate by class lead counsel not MDL lead counsel such as Vioxx. The Vioxx MDL litigation began in 2005 and ended in a settlement in November of 2007

In fact out of the seven cases in the chart only one of them can be considered relevant and analogous for purposes of determining a reasonable common benefit fee, this is *In re Sulzer Hip Prosthesis and Knee Prosthethis liability Litigation,* 268 F.Supp.2d 907 (N.D. Ohio 2003). There the Judge granted a 4.8% common benefit fee award. Not only was this case the only MDL similar to the Vioxx case but it also deals with medical toxic tort litigation rather than securities class action lawsuits.

Clearly only similar cases concerning the amount of common benefit fees attributable to the PSC should be considered as guidelines for this Court. For instance, *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006), the Court awarded a 3% common benefit fee. In fact this Court's Order and Reasoning set forth on August 27, 2008 comparing *Zyprexa* to the instant matter not only speaks volumes as to the delicate nature and concern which

warrants in depth scrutiny and analysis of attorney's fees and in this instance common benefit fees as well.

        Quoting your Honor, you stated that, "in the *Zyprexa* MDL, the court found that several factors counseled in favor of treating the case as a quasi-class action, subjecting the settlement program to review under the court's general equitable powers. As a result, the court found that the settlement was subject to the court's "imposition of fiduciary standards to **ensure fair treatment to all parties and counsel regarding fees and expenses.**" *See* PT Order 8/27/08, p. 8.

Your honor went on further to state,

"...that there are substantial similarities between the global settlement currently before the Court and the global settlement at issue in *Zyprexa*. First, the large number of plaintiffs subject to the same settlement matrix approved by the court. Similarly, there are approximately 50,000 eligible claimants currently enrolled in the Vioxx Settlement Program, all of whom are subject to the same settlement matrix for awarding points and valuating claims. Second, like the court in *Zyprexa*, which utilized special masters to control discovery and to assist in reaching and administering a settlement, this Court has benefited from the efforts of special masters throughout the course of the MDL proceedings and the settlement administration. See, e.g., Order, Rec. Doc. 13228 (Jan. 14, 2008) (appointing Mr. Patrick A. Juneau to act as Special Master pursuant to the terms of the Settlement Agreement). Moreover, the $4.85 billion settlement fund in the instant case is similar to the large settlement fund held in escrow in *Zyprexa*. In light of these factors, your honor found that the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness." *Id* at p. 9.

Following your Honor's analysis and findings that the *Zyprexa* case is strikingly similar to the *Vioxx* litigation, it would seem only natural to assume that the 3% common benefit fee in *Zyprexa* would also be reasonable and fair under the circumstances in the *Vioxx* litigation.

Other similar cases such as, *In re Diet Drugs Products Liability Litigation*, MDL docket 1203, the Court awarded 6.75% in common benefit fees on a $3.75 billion settlement. The PSC, however, performed much more substantial work from the inception of the case than in the

4

present case. There, the steering committee performed most, if not all, of the original discovery as opposed to our case in which the PSC merely compiled and catalogued the majority of discovery that was taken prior to the MDL litigation from other State and Federal courts.

The PLC believes that their work product specifically their discovery efforts should be included for purposes of calculating the common benefit fee despite it not being utilized by us plaintiffs' attorneys . However, even in cases where some of the MDL work product was used, courts did not deem it necessary to attribute a blanket common fund fee across the board. Judge Bechtle's analysis in terms of common benefit fees in the, *Diet Drugs Products Liability Litigation,* is of great interest because it is an instance where an MDL court did not fully protect the work product of the plaintiffs' steering committee and did not sanction completely the right of the committee to be paid if its discovery product was used in state court cases.

In that case, the steering committee (known as the PMC) sought an order from the court that every federal case in the MDL have 9% of its recovery withheld at the time of a settlement or payment of a verdict, to be used to create a fund to pay for the common benefit services of the PMC. Similarly, any state court case, which utilized any part of this work product would have to pay 6%. (These sums would come out of the fee going to the plaintiffs' attorney and not the plaintiff's recovery.) The proposal, so far as state court cases went, was opposed by the chief defendant (reasoning no doubt that it would ultimately pay more to settle cases) and also the state court plaintiffs' attorneys.

Judge Bechtle, in the beginning, ordered the 9% withholding from the federal cases but refused an across-the-board 6% "tax" on state court cases, unless the cases were coordinated within the state and the supervising judge had ordered their participation in the federal discovery

5

in lieu of doing their own work. The latter applied to the California cases, and there they had to pay the 9% charge, 6% going to the PMC and 3% to the state coordinating counsel.  Other state court cases were free of the charge but also could not directly use the federal work product in their case. After large sums had been paid into the common fund, the PMC applied for payment for its service. Judge Bechtle, however, determined that an appropriate amount for counsel would be 6% rather than the 9% withheld, and the amount that equaled the 3% over withholding was paid back to counsel. See *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, 1999 WL 124414 (E.D. Pa. 1999), MDL No. 1203, Order No. 467, 2/10/99.

Again, the major difference between the *In re Diet Drugs Products Liability Litigation* and the *Vioxx Litigation* is the former utilized, most if not all, of the steering committee's discovery, which was original and not merely duplicated and catalogued in depositories from prior litigation efforts as in the present case.  Furthermore, the MDL pre trial discovery was disseminated to trial counsel once the cases were remanded back to the original transferor courts thus warranting a 6% common fee fund assessment for the MDL's work product.  It is argued that in the Vioxx cases no such work product was ever used by counsel such as myself and therefore does not even warrant the 6% common fund assessment as Judge Bechtle ordered in the *Diet Drugs Products Liability Litigation.*

See also *In re Rezulin Products Liab. Litig.*, MDL 1348, where the Court awarded 6% of the total award as a common benefit fee.  However, once again the *Rezulin* case was a class action where lead counsel performed all of the discovery efforts from the inception of the case and plaintiff's attorneys such as myself actually used the MDL's work product.  Thus warranting a 6% common benefit fee.

6

In, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737-38 (3d Cir.2001), the Third
Circuit Court of Appeals reviewed "the range of attorneys' fee awards in common fund
settlements of class actions. The *Cendant* court noted that "district courts setting attorneys' fees
in cases involving large settlements must avoid basing their awards on percentages derived from
cases where the settlement amounts were much smaller" because, "absent unusual
circumstances, the percentage [should] decrease as the size of the fund increases." *Id.* at 736
(quoting *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237,
242 (1986)).   Following this logic one would assume that the Vioxx litigation, more specifically
the MDL lead counsel should not receive the maximum common benefit fee allowed under the
settlement agreement.

## II.   PLC has failed to meet its burden in proving that an 8% common benefit fee is necessary.

The PLC's sub heading in their memorandum that states, "under all circumstances an 8%
fee is justified," begs the question as to the truthfulness and sincerity of this supposed reasonable
8% common benefit fee request.  It not only warrants a full accounting and scrutiny by your
Honor, but also the hundreds of attorneys that will be assessed this supposed 8% common benefit
fee as well.

It is very important to find out whether the individual attorney's in the PSC, NPC, and the
various other committees are also assessed the same 8% common benefit fee in which they
themselves have hundreds of clients who are also claimants in the settlement fund.

The PT Order No. 19, dated June 29, 2005, afforded the PSC with an original 2% from
the individual attorney's and a 1% fee from the claimants once MDL was complete and the cases
were remanded back to the original transferor courts.  However, the PSC graciously points out

that the original 3% fee was "in light of Merck's contention that it would try every case, [and that] the original assessment in PTO No. 19 contemplated that the PSC would be compensated to the extent that its work product for as many as 30,000 trials would be available."

However, given that attorneys such as myself **never** benefited from the discovery and work product of the PSC, how could they now argue that the maximum 8% fee in the settlement agreement is reasonable and that their discovery efforts ought to be included in calculating the fee for the common benefit of all?

Their argument that counsel and claimants alike "had an alternative to paying the 8% award provided for in the [settlement] contract, i.e. [we] could use the MDL work-product, pay the PTO No. 19 assessment of 3% and take the chance of trying [our] case to verdict before a jury." *See* PLC Brief at P. 48, is ludicrous and a disingenuous argument to say the least. The PLC is in essence talking out of both sides of their mouth. Counsel such as myself had little or no alternative than to acquiesce and recommend to my hundred twenty clients to accept the settlement. If I had not then most if not all of them would not have lived to see the day of a potential recovery. If we are to use PLC's argument, then extending it to the next logical step, would necessitate that only the work done during the settlement negotiations and thereafter should be attributable in terms of calculating the reasonable assessment of a common benefit fee for all. Furthermore, this firm could not have made a reasonably informed choice as the PLC would like to paint between choosing to litigate versus to opt into the settlement, because this firm had no means of access to pre trial discovery to make an informed decision in the first place, and no say as to the reasonableness of the settlement.

In fact, this firm on several occasions attempted to reach out time and time again to one of the six major firms spear heading the MDL. *See* Affid. Lavery ¶1-5 and Affid. Cindy ¶1-6.

We requested the ability to review depositions and the discovery they ascertained at one point in time in order to better assess our cases. The response was quite disparaging to say the least. *See* Affid. Lavery ¶1-6.   It is quite interesting how this same firm that offered little to no help despite our multiple requests is now seeking from this firm a common benefit fee of 8%. .

It is not uncommon that Courts revisit common benefit assessments when circumstances warrant this.   Especially in light of a global settlement, however, it does not in and of itself warrant the maximum amount afforded under the settlement agreement at a cataclysmic 8%, which amounts to $388 million dollars in common benefit attorney's fees notwithstanding the reimbursement of their expenses at $36 million dollars in addition to their 32% contingency fee.

Other than expenses which may have been incurred in producing the actual settlement of this matter, it is unclear how this law firm benefitted from any other expenses which plaintiffs' liaison counsel expended and now seeks to recover.   It is suggested that proof of these documented "held expenses" and "shared expenses" should be provided so that a determination can be made as to how, and if, such expenditures were truly for the benefit of <u>all</u> plaintiffs nationwide.

The courts analysis in *In re Sulzer Hip Prosthesis and Knee Prosthethis liability Litigation,* 268 F.Supp.2d  907 (N.D. Ohio 2003), ought to be heeded. Unlike in the instant case, the *Sulzer* Court required the, plaintiffs' liaison counsel to keep direct and open communications with all the attorney's.  They were required to forward copies of motions, including a copy of the proposed settlement agreement, to counsel for all plaintiffs whose cases had been consolidated in the MDL proceedings.  In addition, plaintiffs' liaison counsel made available the same materials to virtually every plaintiffs' counsel pursuing litigation against Sulzer Orthopedics, both in federal and state court.

That was not the case here.  Only a very select few namely the PSC and the various other committees had a direct and meaningful tie to the activities of the MDL and the fruits of pre trial discovery.  Furthermore, it can be argued that some of the pre trial discovery may have only helped their individual clients rather than all the plaintiffs as a whole.

In fact, one member of the PSC referred to in Russ Herman's affidavit does not subscribe to the relief requested in their motion. *See* Affid. Herman P. 1.  This material statement, which happens to be only a footnote, is very important. This rogue member lends support to the argument that a more detailed analysis and discovery is warranted before his Honor grants this 8% fee.  Perhaps this one dissenter realizes the inherent inequity that is about to be committed.  No longer is this being committed against claimants like in class actions but now it is being perpetuated between members of the bar, that is the MDL lead counsel and its "common benefit attorneys" who arguably are practically the same people directly and or indirectly and the hundreds of attorneys that represent the claimants.

The *Sulzer* Court determined that given the total value of the Settlement at approximately $1.045 billion, the $50 million amount set aside for Common Benefit Fee Awards was about 4.8% of the total Settlement value, and the amount set aside for Common Benefit Expense Awards was about 0.7% of the total Settlement value.   This is strikingly different from the 8% common fund request that the PLC seeks to justify.

**III.    The Litigation Efforts by Attorneys in New Jersey, Texas and California, Illinois, Alabama and Florida especially the discovery derived therefrom should not be attributable to the common benefit fee given because it mostly predated the MDL litigation and it provided little to no common benefit to all plaintiffs.**

**A.  Pre MDL Discovery**

The PLC fails to realize that most of the herculean discovery efforts were

10

already completed before the MDL was ever instituted.

Quoting at length Russ Herman:

Vioxx litigation was developed in state jurisdictions prior to the JPML's initial transfer order: California was the first state jurisdiction to aggregate Vioxx litigation. There, the Judicial Council of California agreed to coordinate all of the California Vioxx proceedings in one Superior Court, *In re Vioxx Coordinated Cases,* No. JCCP 4247 (Los Angeles Co., Calif.,Super. Ct. Oct. 30, 2002). *See* Herman Affid., ¶11.

In Texas, Carlene Lewis and Shelly Sanford (who happen to also be members of the PSC) first began representing clients against Merck in the summer of 2000 and by September of 2001 they were representing several hundred individuals. Throughout 2001 and 2002, they **retained and prepared experts, took depositions of Merck executives, and had produced to them 10.5 million pages of documents**. *Id.,* ¶7-8.

These counsel associated themselves with trial counsel [PSC] on certain cases. They also took a number of the original depositions of Merck witnesses, including **Alice Reicin**, **Deborah Shapiro** and **Adam Schechter**. Moreover, they helped develop experts such as **Benedict Lucchesi**, **Wayne Ray**, **Cheryl Blume**, **Joye Carter** and **David Egilman**.

In preparation for the trial of *Ernst* v. *Merck,* the firm also examined thousands of documents, hired, and deposed experts and conducted several mock trials. The case was significant as it was the first Vioxx trial against Merck. The case was tried for 8 weeks in the Summer of 2005. The jury returned with a verdict for the plaintiff in the amount of $253 million. *Id.* at ¶14.

Ultimately, the Texas MDL involved approximately 900 cases that were filed for pretrial.Judge Wilson appointed his own PSC comprised of 11 counsel. Under Judge Wilson's

11

guidance, these counsel were actively preparing 5 waves of cases for trial to begin in the Spring

of 2007." *Id. at* ¶19.  The question remains whether these attorneys ought be allowed to

piggyback their own litigation efforts for purposes of calculating the common benefit fee for all.

Are the same 11 counsel for the Texas PSC the very same members directly or indirectly with

this MDL?

Likewise, Russ Herman states that, in New Jersey, where Merck is headquartered, the

New Jersey Supreme Courtcentralized for management purposes all Vioxx cases filed in the state

court system on May 20,2003.  In New Jersey, Seeger Weiss (also a member of this PSC and

Allocation Committee) was appointed as Liaison Counsel of the coordinated proceedings in

2003. Through the efforts of a working group of excellent trial lawyers, these common benefit

lawyers litigated the case aggressively **long before Vioxx was withdrawn from the US market**

**in September 2004**. *Id.* at ¶6.  They engaged in extensive motions practice, coordinated

discovery of corporate documents and multiple corporate depositions. These early New Jersey

efforts included, but are not limited to, the following efforts:

> The. **establishment** of a large, multi-user **electronic document depository** maintained at Seeger Weiss in New York. This depository made available to Vioxx litigants the **millions of pages** of then-produced documents in searchable format, as well as multiple databases and raw clinical trial data produced by Merck:, as well as **deposition transcripts** and **exhibits**. The Common Benefit applicants created a unified document and reviewing protocol such that reviewers could review for the common good.

> The coordinated review and culling of countless pages of Merck and third party documents, yielding many of the "hot" documents that were **central to the MDL trial package**.

> Development of the electronic work product document database-internally referred to as the "Theme Grid"-that ultimately became the MOL Exhibit Database, an **integral** component of the MDL 1657 **"Trial Package,"**

> Conducting numerous pivotal depositions, including, but not

12

limited to David Anstice, Edward Scolnick, Ray Gilmartin, **Alise Reicin**, Briggs Morrison, Alan Nies, Louis Sherwood, Beth Seidenberg, **Deborah Shapiro**, Carolyn Canuscio, Brian Daniels, Thomas Bold, Douglas Watson, **Adam Schecter**, Susan Baumgartner, Wendy Dixon, Eliav Barr, and Jennifer Ng, and Peter Honig.Development of numerous experts who ultimately became MDL experts,. including **Richard Kronmal**, Ph.D., and **Benedict Lucchesi**,M.D. and **Wayne Ray**, Ph.D.

It is important to note that the names highlighted in bold are the very same "pivotal" depositions and experts completed by Texas counsel as well. Again this begs the questions of whether these "common benefit attorney's" in both New Jersey and Texas get credit for deposing **Adam Schecter** twice, perhaps even a third time by this PSC, and is it included for purposes of assessing a common benefit fee of work product which this firm **never received or utilized**? This is clearly a win-win situation on behalf of these "common benefit attorney's" who presumably, many of which, are also members of the: PSC, NPC, PLC and whatever other made up acronym committee for the purpose of this MDL. These players, all of whom, seemingly somehow happen to intersect as "common benefit attorney's" as well.

These small group of players also win if no settlement is achieved and the cases are disseminated back to the original transferor courts wherein counsel such as myself will pay them a percentage of my fee for this so called "trial package" and the use of their "work product." Although, there is no guarantee of success, the PLC argues that this very same pre trial discovery, "directly contributed to the global resolution of this case." *See* Herman Affid. ¶16. Plaintiffs' counsel, therefore, would presumably have been somewhat successful with the use of this arsenal of pre trial discovery. However, it is unknown and as to what extent this pre MDL discovery is the same type and rehashed work product of post MDL discovery. Arguably the pre MDL discovery was for the benefit of their hundreds of clients years prior to when the MDL was ever instituted. But at the same time this PLC is now applauding themselves for achieving a

13

settlement in which they piggy back a majority of pre trial discovery work which was done prior to the MDL for the sheer purpose of trying to substantiate a huge amount of hours for this 8% common fund fee request.

### B. MDL Discovery practically indistinguishable from Pre-MDL Discovery

Out of the six bellwether trials, only one returned a verdict in favor of the plaintiff. This was quite the opposite from the thirteen trials within the various state courts that met with much better success. It is hard to imagine how the PLC can argue that the five losses in the bellwether trials ought to be included in calculating the common benefit fee.

As a result of various State actions that predated and were not encompassed by this MDL, and after the bellwether trials in late 2005 and 2006, this Court directed certain Plaintiff's Counsel to form The Negotiating Plaintiff Committee (NPC) to focus their efforts on a negotiated settlement with Merck.

It is submitted that hours expended by any of these individuals prior to the dates when the MDL or the various committees were established (whether for discovery, depositions, motions, trial prep, etc.) should **not** be compensable as common benefit fees. Such work was undertaken by various firms acting on behalf of <u>their</u> clients and for the benefit of <u>their</u> clients, not for the common benefit of all. The only true common benefit in this Vioxx litigation has been the successful accomplishment of the settlement agreement that took approximately one year by the NPC.

From a review of the documents submitted in Plaintiffs' memorandum, it is not clear that the 503,000 legal, paralegal and clerical hours cited is truly comprised of work attributable to the common benefit of all plaintiffs.

It is impossible to differentiate the litigation efforts in state courts versus that of the MDL, especially with respect to discovery. It would seem inappropriate that prior MDL actions in which counsel arguably received attorney's fees for their copious and diligent litigation efforts also be afforded the opportunity to in essence "double dip" a second time around and receive an additional 8% common benefit fee as well. Furthermore, as Plaintiffs attorneys we are all well aware of the risks involved beforehand that our attorney's fees are contingent upon a successful verdict. It seems quite clear that the PLC is attempting to tack on fees and expenses that have little or nothing to do with the true calculation for purposes of a common benefit fee.

Herman states, for purposes of the MDL, the following pre trial discovery was undertaken: "three comprehensive sets each of Interrogatories and Requests for Production of Documents were prepared and served upon Merck. *See* Herman Affid. ¶20. Seventy-eight (78) subpoenas were prepared and served upon third parties. From this discovery, review of approximately 50 million pages of documents produced by Merck and third parties took place. Depositions of 170 key witnesses were noticed, prepared for and taken within the MDL and another **1757 relevant depositions were collected and reviewed by the PSC**. *See* Herman Affid. ¶20. One must ask whether the 10 million pages reviewed by the Texas litigation was also included in arriving at this 50 million page number.

In fact Herman's Affidavit broadly and generally states that "overall, more than 2000 depositions were conducted. *See In re Vioxx Products Liability Litigation,* 2008 WL 4681368 at *2 n.6. The PSC prepared over 45 substantive motions, **monitored** well over 100 substantive motions prepared **by other plaintiffs in the MDL**, and similarly **monitored** or responded to the almost 200 substantive motions filed by Merck. *See* Herman Affid, ¶25,   Exhibits B, C, & D.

15

In addition, the PSC **monitored** as appropriate the **hundreds of non-substantive and procedural motions** routinely filed within the MDL. *See generally* Hearing Transcript at 39-40 (E.D.La. Nov. 9, 2007).

To support the PSC, a document depository that was coordinated with the New Jersey, Alabama and California depositories was established in New Orleans to house the substantial forest of documents produced. *See* Herman Affid. ¶20.  The MDL depository acted as the nerve and communication center for all litigation nationally. *See* PLC Brief at p. 17.  The availability of this depository to all litigants is not entirely accurate; in fact, PT Order No. 37 dated one year after the settlement agreement addresses this issue and created guidelines for how plaintiffs' attorneys such as myself could go about to successfully gain access to this information.  It would be disingenuous, to say the least, for these same individuals to change their tune after the fact and state that the pre trial discovery which was truly for the benefit of their clients is now for the common benefit of all.  Such a picture painted to this court is behavior akin to a wolf in sheep's clothing.

This court needs to distinguish the work comprised by the PSC during MDL from the work of various attorneys' firms pre MDL as well as analyze the work attributed by the NPC prior to the settlement agreement and the PSC's post settlement efforts.  In doing so, the court, as well as all parties involved will be able to better ascertain a reasonable fee as opposed to the maximum common benefit fee allowed under the settlement agreement.  The PLC's seventy-page memorandum submitted is truly all form rather than substance.  It furnishes the reader with the appearance of propriety when in fact it is a carefully cloaked "get rich quick" scheme for a handful of firms at the expense of all the other firms who apply their trade and put in a lot of time, patience and effort with their clients as well.

16

The courts analysis *In re Sulzer Hip Prosthesis and Knee Prosthethis liability Litigation,* 268 F.Supp.2d 907 (N.D. Ohio 2003), ought to be heeded. Unlike in the instant case, the *Sulzer* Court required the, plaintiffs' liaison counsel to keep direct and open communications with all the attorney's.  They were required to forward copies of motions, including a copy of the proposed settlement agreement, to counsel for all plaintiffs whose cases had been consolidated in the MDL proceedings.  In addition, plaintiffs' liaison counsel made available the same materials to virtually every plaintiffs' counsel pursuing litigation against Sulzer Orthopedics, both in federal and state court. *Id.* at 914.

That was not the case here.  Only a very select few namely the PSC and the various other committees had a direct and meaningful tie to the activities of the MDL and the fruits of pre trial discovery.  Furthermore, it can be argued that most of the pre trial discovery helped their individual clients rather than all the plaintiff's as a whole.

The *Sulzer* Court held that, in awarding attorney fees in common fund products liability class action, a given attorney fee was reimbursable only if it actually advanced the interests of the entire plaintiff class; fees that were charged for counsel's efforts taken primarily for the benefit of a given individual plaintiff, or even a smaller group of plaintiffs, and not the entire class of plaintiffs as a whole, did not qualify for reimbursement, as they did not provide a true "common benefit". *Id* at 925.

It is important to note that the *Sulzer* Court scrutinized and distinguished the efforts of class counsel that was attributable to the common benefit for all versus the benefit to their own clients.  For instance, the court determined that "in the Final Guidelines: 'Only fees and costs associated with MDL or state discovery that were authorized by Class Counsel, the leadership of the California Consolidated Proceedings, or the leadership of the Texas Consolidated

17

Proceedings will be considered.' One reason the Court deemed this restriction reasonable was that counsel's efforts made on behalf of individual class members were compensated through the payment of contingent fees tied to the value of the amounts paid to the individual claimants out of the settlement trust." *Id.*

Second, the Court also found that fees charged by an attorney merely to attend a meeting or conference related to the Multi-District Litigation, when the attorney's presence was not reasonably necessary, were not reimbursable. Other examples of attorney fees disallowed by the *Sulzer* Court included:

> (1) fees related to attendance at the initial MDL Panel hearing in Washington, D.C., unless the attorney actually presented argument in relation to the Motion to Consolidate the Sulzer cases; (2) fees related to attendance at conferences sponsored by ATLA, Mealey's, or similar groups, unless the attorney was authorized to make a presentation to the group by MDL lead counsel or the Special State Counsel Committee; (3) fees related to attendance at depositions by more than one attorney per law firm, unless the law firm actually conducted the deposition; (4) fees related to attendance at any meeting that was related primarily to an individual case, and not the MDL; and (5) fees related to attendance at any MDL conference or hearing, unless the attorney: (a) was Class Counsel, Special Counsel, a member of the Plaintiffs' Steering Committee, or a member of the Special State Counsel Committee, or (b) actually engaged in material, substantive participation at the conference or hearing. *Id* at 925.

Unlike in the *Sulzer* Court the PLC's memorandum and the affidavits they provide do not differentiate what efforts are truly attributable to the common benefit for all. They are in essence throwing everything under the kitchen sink, so to speak, in order to justify the absurdity of such a huge fee. It would be unfair to have the NLC receive credit for litigation and discovery efforts i.e. work product where arguably a majority of it was completed prior to the MDL.

The most important and telling part of the case in *In re Sulzer* is the great lengths the court went into in analyzing the common benefit fee. The court stated: "First, and primarily, a

given attorney fee was reimbursable only if it actually advanced the interests of the *entire* Plaintiff Class. Fees that were charged for counsel's efforts taken primarily for the benefit of a given individual plaintiff, or even a smaller group of plaintiffs, and not the entire class of plaintiffs as a whole, did not qualify for reimbursement, as they did not provide a true "Common Benefit."  Although, it could be argued that the activity associated with a certain fee did provide *some* benefit to the entire class, the Court disallowed that fee if the asserted beneficial connection to the entire Plaintiff Class was tenuous, or if the associated activity may be fairly said to benefit an individual plaintiff or group of plaintiffs more than the *entire* Plaintiff Class. *Id.* at 925.

For example, the Texas Vioxx litigation that began before Vioxx was removed from the market and the Federal MDL was formed, Carlene Lewis and her partner Shelly Sanford represented them.  In Herman's affidavit he states, "throughout the next several years, these Texas lawyers retained and prepared experts, established a document depository, propounded interrogatories, and had produced 10.5 million pages of documents." *See* Herman Affid. ¶7. Ms. Lewis also happened to be a member of this MDL's Plaintiff Steering Committee.  It would seem important to find out whether or not the efforts and work product of the Texas Vioxx litigation was included in calculating the common benefit fee?  Did both partners also receive their contingency fee in the case they tried for 8 weeks during the Summer of 2005 where the jury returned a verdict for the plaintiff in the amount of $253 million dollars?  It is so important to scrutinize and ask these questions in order to determine if these select six law firms that have a huge hand in the Vioxx litigation prior to the MDL is in essence double or even triple dipping in their various different capacities as attorney's in this global settlement.

In attorney Russ Herman's affidavit and supporting exhibits, he indicates that he **reviewed** many motions.  However, how can reviewing motions submitted by other counsel truly

be for the common benefit of all plaintiffs?  In paragraphs (5) though (16) of his Affidavit, he

provides a multitude of pre-MDL work completed, however, one can very well argue that this

should also not be compensable to the common benefit of all claimants.  This court, along with

the many participants, need to scrutinize and determine what work is and is not attributable in

terms of calculating a fair determination of the common benefit fee.

      Herman's affidavit states that the subcommittees, particularly the PSC Discovery

Committee's  job function, "was to **organize** and '**import**' the significant state depositions and

document production **already performed** and analyze what work should be done in order to

prepare for the federal trials that this Court planned to have in 2005-2006." *See* Herman Affid. ¶

20.  Given that this was already performed prior to the MDL, it begs the question of whether it

should truly be attributable to calculating the common benefit fee.  In fact, he states further, that

a major depository was established by the accumulation of material from, "California, Alabama,

New Jersey and on an on-going basis retained coding and additional material in the MDL." *See*

Herman Affid. ¶20.

      Reading his affidavit, one cannot ascertain whether the taking of 170 key corporate and

third party fact depositions was either pre or post MDL.  Herman does however state, that "most

of these depositions were shown to the Jury in multiple States and Federal Vioxx Trials,", *See*

Herman Affid ¶20, which might lead us to the conclusion that many of these depositions were

taken prior to when the MDL came into effect.  Likewise, Hermann's reference to, "the taking of

1757 **case specific** depositions in trial cases w[as] significant in the resolution of this case on a

global basis" and  "in total PSC has **a record** of approximately 1,900 days of depositions taken

by common benefit attorneys in the generic and bellwether cases" lends support to the tangled

web he creates of misleading the Court of what truly was for the common benefit of all. *See* Herman Affid. ¶20.

In Exhibit E of Mr. Herman's Affidavit, he provides a list of all supposed legal work completed. A quick review of the 341 pages indicates that a majority of the legal work provided was to review the following: Orders granting motions for Stipulations of Dismissal (submitted by other attorney's for their respective clients), Orders granting motions for substitution of attorneys and Orders granting motions for withdrawal by Plaintiffs' attorneys. These efforts should not be compensable as there was no common benefit to the settling of Plaintiffs case. It is just another way of padding the bill in order to attempt to substantiate an 8% common benefit fee.

The approximate five hundred documents needed to put the case trial ready offered no help and no ability to find the documents that were crucial in the case. Secondly, as to the thousand plus depositions that were taken none of the attorneys were ever told the essential depositions to be read were 50 some odd depositions that I could use at the time of trial. No one to my best knowledge was supplied with a summary of the thousand depositions. Basically, I was on my own. If any of these depositions involved depositions of plaintiffs representative of the common committee in their own cases against Merck they should automatically be excluded. This is because it was only for their own benefit and not that of my clients or this firm. They owed an obligation to us as a client to divulge key information in every deposition or whether the deposition disclosed nothing.

If the Court, the PLC and all interested parties do not agree on a fee that is less than 8%, then limited discovery is clearly mandated in this situation to ascertain the true breakdown of

what the common benefit fee ought to be.  The hours and expenses submitted by each firm that comprise the PSC and PLC need to be audited to determine those hours and expenses actually incurred for the common benefit of the plaintiff's nationwide.

While the plaintiffs' liaison counsel was instrumental in producing a settlement of this multi-district litigation, it is argued that expenses, other than those attributable to the settlement, should not be borne by the clients that this firm represents.  Likewise, this firm has had numerous clients found to be ineligible for compensation and thus has had to absorb the loss of thousands of dollars advanced on behalf of these clients who are receiving no recovery.

Not only is the PSC receiving reimbursement for expenses from the common benefit fund, but they are also presumably taking expenses from their own client's settlement fund as well.  There is an inherent conflict, given the fact that these six firms who are all members of a committee for purposes of the MDL, also have clients and are receiving their contingency fee on top of the common benefit fee.

Early on, all the talk, especially at the Vioxx Seminar conducted in Atlantic City, estimated the settlement to be somewhere around $25 billion dollars.  It appears that, based on Appellate Division reversals, and the anxiety of the court to get rid of these cases, significant pressure was put on all parties to settle in full.  The deal with Merck was struck without any consultation or communication with other plaintiff attorneys.

## CONCLUSION

We recognize and agree that significant work was done on our behalf and on behalf of all plaintiffs by achieving the Settlement Agreement in lieu of the prospect of many years trying one case at a time.  However, any common benefit fee should be reasonable and based on hours and expenses actually expended for the common benefit of all.  The 8% common

22

benefit fee requested of the gross settlement equates to $388 million dollars in addition to $34 million dollars in litigation related expenses. This proposed fee is so substantial that it warrants a detailed review in order to ascertain what is and is not attributable to the common benefit of all plaintiffs. The Plaintiff's Steering Committee (PSC), a group of essentially six firms, will also receive a 32% contingency fee from their many client settlements as well, notwithstanding, the additional proposed 8% common benefit fee. This in turn affords a group of six law firms with a windfall recovery at the expense of the countless attorneys representing their clients throughout the country.

I look forward to the Court convening a status conference with objectors as well as representatives of the PSC to "discuss an appropriate schedule for discovery, briefing, and argument."

Respectfully submitted,

Date: May 6, 2009            By:_____ /s/  Richard_J. Weiner___

**Richard J. Weiner (Bar. No. 9015)**

**Weiner, Carroll & Straus**
136 Summit Ave.
Montvale, NJ 07645
Telephone: (201) 930-0400
Facsimile: (201) 930-0600