# SETTLEMENT AGREEMENT

**Between**

**Merck & Co., Inc.**

**And**

**The Counsel Listed on the Signature Pages Hereto**

**Dated As Of November 9, 2007**

## **TABLE OF CONTENTS**

**Page**

TABLE OF EXHIBITS AND SCHEDULES............................................................... iv

PREAMBLE ..............................................................................................................1

RECITALS ...............................................................................................................1

Article 1 Required Submissions...............................................................................2
    Section 1.1.    Registration ..............................................................................2
    Section 1.2.    Enrollment................................................................................3
    Section 1.3.    Claims Package and Submissions of PME Records ...............6
    Section 1.4.    Additional Claim Information...................................................7
    Section 1.5.    Submissions Review/Completeness Provisions........................7
    Section 1.6.    Pro Se Enrolled Program Claimants ........................................7

Article 2 Eligibility for Claims Valuation ..............................................................8
    Section 2.1.    Eligibility for Claims Valuation...............................................8
    Section 2.2.    Eligibility Requirements...........................................................8
    Section 2.3.    Claims Administrator...............................................................8
    Section 2.4.    The Gate Committee .................................................................9
    Section 2.5.    Determinations of the Gate Committee ....................................9
    Section 2.6.    Appeal from Determinations of the Claims Administrator
               and the Gate Committee..........................................................11
    Section 2.7.    Resolution ..............................................................................12
    Section 2.8.    New Evidence .........................................................................13
    Section 2.9.    Qualifying Program Claimant Status as Eligible Claimants.....13

Article 3 Claims Valuation ...................................................................................14
    Section 3.1.    General....................................................................................14
    Section 3.2.    Claim Assessment Process.....................................................14
    Section 3.3.    Fixed Payment .......................................................................15
    Section 3.4.    Special Review........................................................................16
    Section 3.5.    Possible Additional Points Award For Second Eligible
               Event......................................................................................17
    Section 3.6.    No Punitive Damages .............................................................17

Article 4 Payment to Qualifying Program Claimants .............................................18
    Section 4.1.    Interim Settlement Payments .................................................18
    Section 4.2.    Extraordinary Injury Payments ..............................................20
    Section 4.3.    Final Settlement Payments.....................................................22
    Section 4.4.    Satisfaction of Liens ..............................................................22

Article 5 Merck Funding Obligations ...................................................................22
    Section 5.1.    Merck Funding Obligations ...................................................22
    Section 5.2.    Limitations on Merck Funding Obligations............................25
    Section 5.3.    Certain Letter of Credit Provisions ........................................26
    Section 5.4.    Administrative Expenses Fund Excess ....................................28

Section 5.5.    Form of Notices to Escrow Agent ................................................................29

Article 6 Administrators ................................................................................................................29
    Section 6.1.    Appointment and Replacement of Administrative Personnel...................29
    Section 6.2.    Certain General Authority of the Claims Administrator...........................30
    Section 6.3.    Liability of Administrative Personnel........................................................30

Article 7 Certain Litigation Matters.............................................................................................31
    Section 7.1.    Merck Defenses ........................................................................................31
    Section 7.2.    Tolling.......................................................................................................31
    Section 7.3.    Use of Dismissal With Prejudice Stipulations and Releases
                  Prior to Certain Events..............................................................................31
    Section 7.4.    Pursuit of Certain Claims.........................................................................32

Article 8 Submission to Authority ...............................................................................................33
    Section 8.1.    Submission to Authority of Chief Administrator and
                  Special Master..........................................................................................33

Article 9 Attorneys' Fees ............................................................................................................35
    Section 9.1.    Individual Counsel Attorneys' Fees.........................................................35
    Section 9.2.    Common Benefit Fees and Reimbursement of Litigation
                  Costs..........................................................................................................35

Article 10 Quality Control and Audit Procedures........................................................................37
    Section 10.1.    Prevention and Detection of Fraud - General ...........................................37
    Section 10.2.    Mandatory Periodic Audits......................................................................37
    Section 10.3.    Merck/NPC Audit Right ...........................................................................38
    Section 10.4.    Relief  39
    Section 10.5.    Inaccuracy of Representations, Warranties or Certifications ..................40
    Section 10.6.    No Misrepresentation of Program.............................................................41

Article 11 Walk Away Rights and Termination of the Agreement ..............................................41
    Section 11.1.    Walk Away Rights and Termination of the Agreement ...........................41
    Section 11.2.    Time to Exercise Walk Away Right .........................................................43
    Section 11.3.    Notice of Exercise ....................................................................................43
    Section 11.4.    Effects of Termination ..............................................................................43

Article 12 Liens............................................................................................................................44
    Section 12.1.    Liens   44

Article 13 No Admission of Liability or Lack of Merit................................................................46
    Section 13.1.    No Admission of Liability or Lack of Merit.............................................46

Article 14 Reporting Obligations; Merck and NPC Access to Data............................................46
    Section 14.1.    Reporting Obligations...............................................................................46
    Section 14.2.    Merck and NPC Access to Data................................................................46

Article 15 Public Statements; Confidentiality .............................................................................47
    Section 15.1.    Program Claimant Confidential Information .............................................47
    Section 15.2.    Accurate Public Statement........................................................................47

Article 16 Miscellaneous .............................................................................................................47
    Section 16.1.    Notice by Parties.......................................................................................47

Section 16.2.   Receipt of Documentation .......................................................49
Section 16.3.   Governing Law. ..............................................................................49
Section 16.4.   Waiver of Inconsistent Provisions of Law; Severability .........................49
Section 16.5.   Facsimile Signatures. .....................................................................50
Section 16.6.   Construction. ................................................................................50
Section 16.7.   Entire Agreement ..........................................................................50
Section 16.8.   Headings; References.....................................................................50
Section 16.9.   No Third Party Beneficiaries; Assignment ..............................................51
Section 16.10. Amendments; No Implied Waiver .........................................................51
Section 16.11. Counterparts ...................................................................................52
Section 16.12. Tax Matters ....................................................................................52
Section 16.13. Further Assurances...........................................................................52

Article 17 Definitions ....................................................................................52
Section 17.1.   Definitions.......................................................................................52
Section 17.2.   Cross-Reference of Other Definitions. ....................................................64

TABLE OF EXHIBITS AND SCHEDULES

Exhibit 1.1 — Form of Registration Order
Exhibit 1.2.2.3 — Form of Release
Exhibit 1.3.1 — Required PME Records
Exhibit 1.5– Submissions Review/Completeness Provisions
Exhibit 2.2.1.1 — Injury Gate Criteria
Exhibit 2.2.1.2 — Duration Gate Criteria
Exhibit 2.2.1.3 — Proximity Gate Criteria
Exhibit 2.2.2 — Evidence of Usage Confirmation Criteria
Exhibit 2.7.3 — Form of Future Evidence Stipulation
Exhibit 3.2.1 — Points Award Methodology/Criteria
Exhibit 17.1.12 — Claims Form
Exhibit 17.1.27 — Enrollment Form
Exhibit 17.1.29 — Form of Escrow Agreement
Exhibit 17.1.46 — Form of Letter of Credit

Schedule 17.1.22 — List of Excluded Persons

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT, dated as of November 9, 2007 (the "Execution Date"), between (i) Merck & Co., Inc., a New Jersey corporation (together with its successors and assigns, "Merck"), and (ii) the counsel listed in the signature pages hereto under the heading "Negotiating Plaintiffs' Counsel" (collectively, the "NPC"; the NPC and Merck, each a "Party" and collectively the "Parties").

Certain terms used in this *Agreement* are defined in Article 17. These terms are italicized the first time that they appear in the text of this Agreement.

## PREAMBLE

This is an agreement between (i) Merck and (ii) the NPC, which includes all counsel appointed to the Executive Committee of the Plaintiffs' Steering Committee in In re VIOXX Products Liability Litigation, MDL No. 1657, a federal multi-district litigation which is venued in the United States District Court for the Eastern District of Louisiana (such court, the "MDL Court", and such steering committee, the "PSC") and representatives of plaintiffs' counsel in the *Coordinated Proceedings* in the state courts of New Jersey, California, and Texas. This Agreement establishes a program to resolve the actions, disputes and claims that these, and other, plaintiffs' counsel have asserted against Merck on behalf of their clients related to their clients' alleged use of *VIOXX*.

## RECITALS

A.      Merck voluntarily withdrew VIOXX from the market on September 30, 2004.

B.      As of October 1, 2007, there were approximately 26,000 active VIOXX personal-injury actions filed against Merck nationwide, representing approximately 47,000 claimant groups.

C.      Approximately 14,500 additional claimants asserted direct claims against Merck but agreed to refrain from filing suit while their claims were tolled. Approximately 13,250 of those agreements remain in effect.

D.      More than 95% of the active plaintiffs are presently coordinated in one of the following four "Coordinated Proceedings":

        a.      In re VIOXX Products Liability Litigation, Federal MDL No. 1657, venued in the MDL Court;

        b.      In re VIOXX Coordinated Cases, JCCP No. 4247, venued in the Superior Court of California, County of Los Angeles;

        c.      In re VIOXX Litigation, Cases No. 619 and 273, venued in the Superior Court of New Jersey, Law Division, Atlantic County; and

      d.        In re Texas State VIOXX Litigation, Master Docket No. 2005-59499, venued in the District Court of Harris County, Texas, 157th Judicial District.

      E.       The NPC and Merck have agreed to establish a pre-funded, structured private settlement program, as set forth herein, to resolve pending or tolled (and certain previously tolled) VIOXX claims against Merck involving heart attacks, ischemic strokes and sudden cardiac deaths for an overall amount of $4,850,000,000 (the "Program").

      F.       The Program is intended to resolve, in lieu of further litigation, the claims of all *Eligible Claimants* (including both Eligible Claimants within the Coordinated Proceedings and Eligible Claimants with pending lawsuits against Merck in any District of Columbia court, any Puerto Rico court or any court or tribunal of the United States outside the Coordinated Proceedings) who participate in the Program (except only as otherwise set forth in Section 2.7.3.1).

      G.      A key objective of the Program is that, with respect to any counsel with an *Interest* in the claims of any *Enrolled Program Claimant*, all other Eligible Claimants in which such counsel has an Interest shall be enrolled in the Program.

      H.      No claims brought against Merck after the date of this Agreement will be eligible to participate in the Program or receive any payment under the Program.

      I.      The Program will not be construed as evidence of, or as an admission by, Merck or any *Released Party* of any fault, *Liability*, wrongdoing or damages whatsoever or as admission by any Enrolled Program Claimant of any lack of merit in their claims.

Merck and the NPC hereby agree as follows:

Article 1
Required Submissions

Section 1.1.    Registration

The Parties agree to apply jointly in each of the Coordinated Proceedings for an order, substantially in the form of Exhibit 1.1 (the "Registration Order"). According to the terms of the Registration Order, all counsel of record in cases filed in any of the Coordinated Proceedings must take such steps as are necessary to ensure that all *Claims* asserted on behalf of a *Person* asserting a personal injury Claim (either in a pending action or the subject of a *Tolling Agreement*), and all Claims derivative thereof, *Connected With VIOXX* in which such counsel had an Interest as of October 1, 2007 (subject to the updating requirements set forth therein) are registered and all counsel with an Interest in any such Claim are identified. Such registration requirement will apply regardless of (i) whether such Claims are Eligible Claims, (ii) whether such counsel intend to enroll any such Claims in the Program, and (iii) whether such Claims are filed in any court other than the Coordinated Proceedings. Counsel shall register such Claims by filing and serving in accordance with the Registration Order a *Registration Affidavit* no later than January 15, 2008 covering each Plaintiff and Tolling Claimant (as such terms are defined in the Registration Order) asserting such Claims. Pro se claimants must also file and serve a

Agreement i

Registration Affidavit by January 15, 2008.  Registration Affidavits shall be in the form set forth in Exhibit 1.1.  Counsel shall be required to update, within 30 (thirty) days of any change thereto, the information provided by them in their Registration Affidavit and simultaneously serve a copy of any such update in accordance with the Registration Order.

Section 1.2.     <u>Enrollment</u>

     1.2.1.        Only Eligible Claimants (and, to the extent required pursuant to Section 1.2.2, *Derivative Claimants*) may enroll in the Program.

     1.2.2.        In order for an Eligible Claimant to participate in the Program, such Eligible Claimant must deliver to the *Claims Administrator* an *Enrollment Form* (including all exhibits and attachments thereto), all properly and fully completed, and properly and fully executed by the various Persons specified therein, not later than the *Enrollment Deadline Date*, which, subject to extension as provided herein, is March 1, 2008.

        1.2.2.1.        The Enrollment Form for an Eligible Claimant who is represented by counsel must be submitted on his behalf by his *Counsel*.  (For the avoidance of doubt, references herein to Enrollment Forms submitted "by" a *Program Claimant(s)* shall be deemed to include Enrollment Forms so submitted on behalf of such Program Claimant.)  However, in any event, all *Releases* (as defined below), Medical Record Authorization Forms (as such term is used in the Enrollment Form) and Employment Record Authorization Forms (as such term is used in the Enrollment Form) must be properly and fully executed by the Eligible Claimants themselves (in addition to being executed by Counsel as specified therein).  *Dismissal With Prejudice Stipulations* shall be executed by the Eligible Claimants' (other than Eligible Claimants who do not have a lawsuit pending against Merck Connected With VIOXX) respective Counsel (or, if not represented by counsel, by the Eligible Claimants).

        1.2.2.2.        In order to qualify for an Interim Settlement Payment, an Eligible Claimant must deliver to the Claims Administrator a properly and fully executed Enrollment Form (including all exhibits and attachments thereto) no later than February 29, 2008.  The Claims Administrator, by no later than March 15, 2008, shall give to counsel for *Registered Eligible Claimants* (or, if not represented by counsel, directly to the Registered Eligible Claimants) who have not enrolled in the Program by February 29, 2008 notice of such failure to enroll.  Neither the Claims Administrator, Merck nor the NPC shall have any Liability for any failure of the Claims Administrator to give any notice described above in this Section.  In any event, Eligible Claimants who have not enrolled by the Enrollment Deadline Date shall not be eligible to participate in the Program except by consent of Merck.

        1.2.2.3.        As part of enrollment, each Eligible Claimant will be required to execute a Release, in the form of Exhibit 1.2.2.3 (a "<u>Release</u>"), to

(without limitation) release, and indemnify and hold harmless, each Released Party according to the terms set forth therein.

> 1.2.2.4.     All Derivative Claimants that have a lawsuit pending against Merck Connected With VIOXX, or who are *Tolling Agreement Parties* Connected With VIOXX, also must execute and deliver to the Claims Administrator their respective Program Claimant's Release and (unless they are Tolling Agreement Parties) Dismissal With Prejudice Stipulation (provided that if such Derivative Claimant is represented by counsel, then only such counsel shall be required to execute such Dismissal With Prejudice Stipulation) in order for such Eligible Claimant to enroll in the Program.  The Program Claimant may submit his Enrollment Form without there being full compliance with the preceding sentence at the time of such submission.  However, (i) any term of this Agreement to the contrary notwithstanding, such Program Claimant shall not be eligible to receive any Settlement Payment until such full compliance is achieved and (ii) if such full compliance is not achieved by November 30, 2008, such Program Claimant immediately shall cease to have any further rights under the Program, and the Claims Administrator shall deliver such Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding). *Executing Derivative Claimants* have no direct rights or standing under the Program, and their status under the Program is totally derivative of that of their related Enrolled Program Claimant.

1.2.3.     Submission of an Enrollment Form is irrevocable.  No Program Claimant (or related Derivative Claimant specified in Section 1.2.2) may under any circumstances or reason withdraw an Enrollment Form, request the return of his Release or Dismissal With Prejudice Stipulation (other than as specified in Section 2.7.3.1), or otherwise unilaterally exit the Program.

1.2.4.     By submitting an Enrollment Form, the *Enrolling Counsel*, and all Program Claimants covered by such Enrollment Form (and all related Executing Derivative Claimants), shall be deemed to have agreed to be bound by all of the terms and conditions of this Agreement.

1.2.5.     Without limitation of Section 1.2.6 or Article 10, each of Merck in its sole and absolute discretion, and the Claims Administrator (with Merck's consent), may accept or reject an Enrollment Form in relation to any particular Program Claimant at any time on or prior to the 30th day after the Enrollment Deadline Date if (i) the Enrollment Form is not properly completed and executed by each Person required to execute such Enrollment Form, or (ii) such Enrollment Form (x) fails to provide the information required therein to be provided in relation to such Program Claimant, (y) fails to include a Release, Medical Record Authorization Form or Employment Record Authorization Form (the latter for applicants for EI Payments) executed by such Program Claimant and each other Person herein and/or therein required in relation to such Program Claimant to execute such Release (except as otherwise provided in Section 1.2.2.4) or (z) fails to

4

include a Dismissal With Prejudice Stipulation executed on behalf of such Program Claimant, and (except as otherwise provided in Section 1.2.2.4) all related Executing Derivative Claimants (in each case other than Tolling Agreement Parties), by their Counsel.

1.2.6.    Enrolling Counsel may submit Enrollment Forms for Eligible Claimants on a rolling basis.  However, without limitation of Section 1.2.5, at any time on or prior to the 60th day after service of the Certification of Final Enrollment included in the "Enrollment Materials" included in the Enrollment Form, Merck in its sole and absolute discretion may reject any or all Enrollment Forms submitted by an Enrolling Counsel, in relation to any or all of the Program Claimants covered thereby, for the following reasons:

1.2.6.1.    Such Enrolling Counsel has failed to file a Registration Affidavit complying with the Registration Order; or

1.2.6.2.    Such Enrolling Counsel has been determined pursuant to Section 1.2.9 to have failed in any respect to comply with the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3;

1.2.6.3.    Such Enrolling Counsel has since the Execution Date received compensation (or entered into any agreement or arrangement to receive or potentially to receive compensation) for relinquishing his or her Interest in any Claim Connected With VIOXX of any Eligible Claimant who has not enrolled in the Program as of the date of service of the Certification of Final Enrollment (or, if earlier, June 30, 2008).

1.2.7.    The parties agree that a key objective of the Program is that, with respect to any counsel with an Interest in the claims of any Enrolled Program Claimant, all other Eligible Claimants in which such counsel has an Interest shall be enrolled in the Program.

1.2.8.    While nothing in this Agreement is intended to operate as a "restriction" on the right of any Claimant's counsel to practice law within the meaning of the equivalent to Rule 5.6(b) of the ABA Model Rules of Professional Conduct in any jurisdictions in which Claimant's Counsel practices or whose rules may otherwise apply, it is agreed that (except to the extent waived by Merck in its sole discretion in any instance):

1.2.8.1.    By submitting an Enrollment Form, the Enrolling Counsel affirms that he has recommended, or (if such Enrollment Form is submitted prior to February 28, 2008) will recommend by no later than the earlier of the date of service of the Certification of Final Enrollment and February 28, 2008, to 100% of the Eligible Claimants represented by such Enrolling Counsel that such Eligible Claimants enroll in the Program.

1.2.8.2.    If any such Eligible Claimant disregards such recommendation, or for any other reason fails (or has failed) to submit a non-

Agreement i

deficient and non-defective Enrollment Form on or before the earlier of the date of service of the Certification of Final Enrollment and June 30, 2008, such Enrolling Counsel shall, on or before the earlier of June 30, 2008 and the 30th day after the date of service of the Certification of Final Enrollment (or, if such Enrolling Counsel first becomes an Enrolling Counsel after June 30, 2008, shall have, by the date such Enrolling Counsel so first became an Enrolling Counsel), to the extent permitted by the equivalents to Rules 1.16 and 5.6 of the ABA Model Rules of Professional Conduct in the relevant jurisdiction(s), (i) take (or have taken, as the case may be) all necessary steps to disengage and withdraw from the representation of such Eligible Claimant and to forego any Interest in such Eligible Claimant and (ii) cause (or have caused, as the case may be) each other Enrolling Counsel, and each other counsel with an Interest in any Enrolled Program Claimant, which has an Interest in such Eligible Claimant to do the same.

        1.2.8.3.     Each Enrolling Counsel, by submitting an Enrollment Form, agrees to abide by Section 1.2.8.2 in relation to any Eligible Claimant in which such Enrolling Counsel is an "other Enrolling Counsel" referenced in clause (ii) of said Section 1.2.8.2 (and to do so in the same time frame as is applicable to the Enrolling Counsel who represents such Eligible Claimant).

        1.2.9.     Upon request from Merck at any time, the Chief Administrator will determine whether an Enrolling Counsel has failed to comply with the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3 in any respect.  The Chief Administrator's decision on this matter shall be final, binding and Non-Appealable.

        1.2.10.     Without limitation, for purposes of Sections 1.2.6, 1.2.7, 1.2.8, 1.2.9, 2.5.3.1, 3.2.1.1 and Section 11.1.5, (i) any Person that would be considered to be an "Eligible Claimant" based on the information set forth in such Person's (or such Person's *Product User's*) complaint, *Profile Form* and/or PME Records shall be considered to constitute an "Eligible Claimant" and (ii) a lawyer or law firm shall be considered to have an Interest in each Person in which such lawyer or law firm claims to have, or have had, an Interest in a Registration Affidavit.

Section 1.3.     <u>Claims Package and Submissions of PME Records</u>

        1.3.1.     Each Enrolled Program Claimant shall submit to the Claims Administrator a fully completed *Claims Package*, including all of the *PME Records* and other records or other documentation specified in Exhibit 1.3.1 (the "<u>Required PME Records</u>") but excluding *Additional Claims Information* (which is covered by Section 1.4), by July 1, 2008.

        1.3.2.     Each *Claims Form* (and *Supplementary Claims Form*) must be submitted on behalf of the Program Claimant by his Counsel.  If a Program Claimant is not represented by Counsel, such Claims Form (or Supplementary Claims Form) must be executed by the Program Claimant.

6

1.3.3.     Any portion of any or all of the Enrollment Forms and/or Claims Packages may be required to be filed electronically.

1.3.4.     In relation to any particular Enrolled Program Claimant, Merck will provide to the Claims Administrator, the *Gate Committee* and the *Special Master*, and to such Enrolled Program Claimant and his Counsel, such access to the *Litigation Medical Records Depository* as is available to plaintiffs via the Internet at www.lmi-med.com.

1.3.5.     The *Administrators* and the Gate Committee, and their respective representatives and others deemed necessary by each to assist them and/or their representatives, will have unlimited access to all submitted Enrollment Forms and Claims Packages.

Section 1.4.     Additional Claim Information

1.4.1.     The Claims Administrator or the Special Master may require such additional records or other documentation (including further documentation) as either of them may determine is material and necessary (i) to determine whether a particular Enrolled Program Claimant meets the *Eligibility Requirements* or (ii) for purposes of the *Claims Valuation Process* (any such further required records or other documentation, the "Additional Claim Information" ).  In such cases, the Claims Administrator or the Special Master shall issue a written request to the Enrolled Program Claimant's Counsel, or if without counsel, to the Enrolled Program Claimant.

1.4.2.     An Enrolled Program Claimant must produce Additional Claim Information requested pursuant to Section 1.4.1 either within 60 days of service of such request or by the deadline set forth in Section 1.3.1, whichever is later.

1.4.3.     Additional Claim Information shall be submitted by means of a Supplementary Claims Form executed and delivered as specified in Section 1.3.2.

Section 1.5.     Submissions Review/Completeness Provisions

Exhibit 1.5 is hereby incorporated into this Agreement by this reference as if set forth in full herein.

Section 1.6.     Pro Se Enrolled Program Claimants

1.6.1.     Enrolled Program Claimants who are not represented by counsel may request assistance with the claims process from the PSC.

1.6.2.     Enrolled Program Claimants who are not represented by counsel may, at any time, obtain legal counsel in connection with this Agreement.

Agreement i

Article 2
Eligibility for Claims Valuation

Section 2.1.    Eligibility for Claims Valuation

The Claims Valuation Process in the Program is open only to those Enrolled Program Claimants who are determined or deemed to meet the Eligibility Requirements, or otherwise are deemed to be "Qualifying Program Claimants," in each case as set forth below in this Article 2 (any such Enrolled Program Claimant, a "Qualifying Program Claimant").

Section 2.2.    Eligibility Requirements

2.2.1.    The "Eligibility Requirements," with respect to any particular Enrolled Program Claimant, are the following:

2.2.1.1.    such Enrolled Program Claimant or Enrolled Program Claimant's Product User shall meet the Injury Gate criteria specified in Exhibit 2.2.1.1 in relation to his *Eligible Event*;

2.2.1.2.    such Enrolled Program Claimant or Enrolled Program Claimant's Product User shall meet the Duration Gate criteria specified in Exhibit 2.2.1.2 in relation to such Eligible Event; and

2.2.1.3.    such Enrolled Program Claimant or Enrolled Program Claimant's Product User shall meet the Proximity Gate criteria specified in Exhibit 2.2.1.3 in relation to such Eligible Event.

2.2.2.    For purposes of the Eligibility Requirements and for purposes of Claims Valuation Process, evidence of VIOXX usage shall be determined in accordance with the criteria set forth in Exhibit 2.2.2.

2.2.3.    Exhibits 2.2.1.1, 2.2.1.2, 2.2.1.3 and 2.2.2 are hereby incorporated into this Agreement by reference.

Section 2.3.    Claims Administrator

2.3.1.    The Claims Administrator initially will determine whether an Enrolled Program Claimant meets the Eligibility Requirements.  In that connection, the Claims Administrator shall review and analyze the Claims Package submitted by the Enrolled Program Claimant and may, to verify completeness or to verify the presence or absence of a condition suggested in the Claims Package, or in cases of inconsistency, suspicion of irregularity, for audit purposes and/or similarly appropriate circumstances, review and analyze other documents or materials that the Claims Administrator has access to pursuant to this Agreement.

2.3.2.    Any Enrolled Program Claimant who the Claims Administrator determines meets the Eligibility Requirements is a Qualifying Program Claimant, and such Enrolled Program Claimant shall have his *EC Claim* assessed, and be eligible to

Agreement i

receive payments, as set forth in Article 3 and Article 4.  The Claims Administrator promptly shall notify the Gate Committee and such Enrolled Program Claimant of such determination of the Claims Administrator.

2.3.3.    Any Enrolled Program Claimant who the Claims Administrator determines not to meet the Eligibility Requirements will be subject to the procedures set forth in Section 2.5 and Section 2.6.

Section 2.4.    The Gate Committee

2.4.1.    There is hereby established for purposes of this Agreement a committee called the "Gate Committee".

2.4.2.    Merck shall have right to appoint, remove and replace in its discretion (at any time or from time to time) three representatives to the Gate Committee.  The NPC shall have right to appoint, remove and replace in their discretion (at any time or from time to time) three representatives to the Gate Committee.

2.4.3.    Merck's representatives on the Gate Committee may discuss any matter relating to the Gate Committee and its affairs, or otherwise relating to Section 2.5, with Merck.  The NPC's representatives on the Gate Committee may discuss any matter relating to the Gate Committee and its affairs, or otherwise relating to Section 2.5, with the NPC.

Section 2.5.    Determinations of the Gate Committee

2.5.1.    The Claims Administrator shall inform the Gate Committee on a regular basis of the Enrolled Program Claimants that it has determined fail to meet the Eligibility Requirements.  The Gate Committee subsequently will determine whether such Enrolled Program Claimants will be deemed to be Qualifying Program Claimants notwithstanding the contrary conclusion of the Claims Administrator.

2.5.2.    The Gate Committee shall have the right to receive and review any or all of the records made available to the Claims Administrator concerning any particular Enrolled Program Claimant that the Claims Administrator determined failed to meet the Eligibility Requirements, as well as any additional materials that such Enrolled Program Claimant may wish to provide, any material in the Litigation Medical Records Depository available to the Gate Committee pursuant to Section 1.3.4 or any material otherwise available.

2.5.3.    The Gate Committee shall commence meeting after the Claims Administrator informs the Gate Committee of its first determinations that an Enrolled Program Claimant has failed to meet the Eligibility Requirements.  For the first six months after being so informed, the Gate Committee shall meet on a monthly basis. Thereafter, the Gate Committee shall meet on a quarterly basis.  The Gate Committee may elect to meet more often if necessary to properly discharge its responsibilities.

9

2.5.3.1.      The Gate Committee shall process Program Claims in the order in which they are provided to the Gate Committee by the Claims Administrator, <u>provided</u> that the Gate Committee shall not consider the case of any particular Enrolled Program Claimant until full compliance with the first sentence of Section 1.2.2.4 has been, or is, achieved in relation to such Program Claimant.  However, neither the Gate Committee nor Merck shall have any Liability for any failure to comply with the preceding sentence.

2.5.4.      An Enrolled Program Claimant that the Claims Administrator has determined not to meet the Eligibility Requirements nonetheless will be deemed to be a Qualifying Program Claimant if a majority of the Gate Committee so determines (for the avoidance of doubt, with or without regard to the Eligibility Requirements).  Conversely, subject to Section 2.5.5, an Enrolled Program Claimant will be deemed not to be a Qualifying Program Claimant if three or more members of the Gate Committee determine that the determination of the Claims Administrator should not be overturned.  Members of the Gate Committee shall establish procedures to prevent the NPC representatives thereon from voting on cases where they have an Interest.  The Gate Committee shall inform the Claims Administrator on a periodic basis of its determinations.

2.5.5.

2.5.5.1.      Regardless of any contrary decision of the Claims Administrator and/or the Gate Committee (including any such decision in which any Merck representative on the Gate Committee may have concurred), an Enrolled Program Claimant also will be deemed to be a Qualifying Program Claimant if Merck's representatives on the Gate Committee, in their sole and absolute discretion, deem (by timely (as specified in Section 2.5.5.2) notice to such effect to the Claims Administrator) such Enrolled Program Claimant to constitute a Qualifying Program Claimant (for the avoidance of doubt, with or without regard to the Eligibility Requirements).  For the avoidance of doubt, action taken by the Gate Committee as a whole shall not be considered to constitute action taken by Merck's representatives pursuant to this Section 2.5.5.1; Merck's representatives on the Gate Committee shall be considered to have taken action pursuant to this Section 2.5.5.1 only when such representatives shall send a notice to such effect, specifically citing this Section 2.5.5.1, to the Claims Administrator.

2.5.5.2.      Any action pursuant to Section 2.5.5.1 shall be taken:

2.5.5.2.1.      within six (6) months of the first monthly meeting of the Gate Committee held pursuant to Section 2.5.3, with respect to each Enrolled Program Claimant whose Qualifying Program Claimant status is determined (subject to this Section 2.5.5) by the Gate Committee at such first monthly meeting and/or any intervening monthly meeting held at least twenty (20) days prior to the expiration of such six-month period; and

10

2.5.5.2.2.    within 30 days following each subsequent meeting of the Gate Committee held pursuant to Section 2.5.3, with respect to each Enrolled Program Claimant whose Qualifying Program Claimant status is determined (subject to this Section 2.5.5) by the Gate Committee at such meeting.

2.5.5.3.    Merck's representatives on the Gate Committee may unilaterally deem any particular Enrolled Program Claimant to be a Qualifying Program Claimant pursuant to Section 2.5.5.1 only if there is evidence in the Claims Package and/or any of the other records or other documentation available to the Claims Administrator or the Gate Committee that such Enrolled Program Claimant's Product User suffered an Eligible Event and used VIOXX before such Event.

2.5.5.4.    Merck's representatives on the Gate Committee may unilaterally deem any particular Enrolled Program Claimant to be a Qualifying Program Claimant pursuant to Section 2.5.5.1 only so long as, at such time (and immediately after giving effect to such action), the aggregate number of *Threshold Exceeding Gate Pushes* does not exceed 2,500.

2.5.5.4.1.    A "Threshold Exceeding Gate Push" shall be deemed to occur when Merck's representatives on the Gate Committee unilaterally deem an Enrolled Program Claimant to be a Qualifying Program Claimant pursuant to Section 2.5.5.1 at a time when the quotient of (i) the then aggregate number of Qualifying Program Claimants divided by (ii) the sum of (A) the then aggregate number of Qualifying Program Claimants plus (B) the then aggregate number of Enrolled Program Claimants whom have been determined not to be a Qualifying Program Claimant (which determination has not effectively been overridden pursuant to this Section 2.5.5) exceeds 0.7.

2.5.6.    If the Gate Committee determines that a particular Enrolled Program Claimant is not to be deemed to be a Qualifying Program Claimant and Merck's representatives on the Gate Committee do not take a contrary action pursuant to Section 2.5.5 within the time period specified therein, then the Claims Administrator thereafter will give written notice to such effect to the Enrolled Program Claimant's Counsel or, if the Enrolled Program Claimant is without Counsel, to the Enrolled Program Claimant directly.

Section 2.6.    Appeal from Determinations of the Claims Administrator and the Gate Committee

2.6.1.    Subject to Section 2.5 and this Section 2.6, determinations of the Claims Administrator pursuant to Section 2.3 shall be final, binding and *Non-Appealable*. Subject to Section 2.5.5 and this Section 2.6, determinations of the Gate Committee pursuant to Section 2.5 shall be final, binding and Non-Appealable.

11

Agreement i

2.6.2.      If the Gate Committee determines that a particular Enrolled Program Claimant is not to be deemed to be a Qualifying Program Claimant (and Merck's representatives on the Gate Committee do not take a contrary action pursuant to Section 2.5.5 within the time period specified therein), the Enrolled Program Claimant may appeal the Gate Committee's determination to the Special Master by submitting a written notice to such effect to the Claims Administrator and the Special Master within fifteen (15) days of service by the Claims Administrator of the Gate Committee's determination to the Enrolled Program Claimant.  Such notice shall be in such form as determined by the Claims Administrator.

2.6.3.      If the Enrolled Program Claimant serves a timely written notice of appeal, the Special Master will determine de novo whether the Enrolled Program Claimant meets the Eligibility Requirements, based solely on (i) the Claims Package submitted by such Enrolled Program Claimant, and (ii) in the Special Master's discretion, any records or other documentation in the Litigation Medical Records Depository available to the Special Master pursuant to Section 1.3.4 that the Special Master deems relevant.  The Special Master's decision on this matter shall be binding, final, and Non-Appealable.  The Special Master shall notify the Claims Administrator of its decision, and the Claims Administrator shall, promptly following receipt of such notice, notify the Gate Committee and the Enrolled Program Claimant of the Special Master's decision.

Section 2.7.      <u>Resolution</u>

2.7.1.      If (i) an Enrolled Program Claimant receives a notice from the Claims Administrator pursuant to Section 2.5.6, and (ii) such Enrolled Program Claimant makes and wins an appeal to the Special Master pursuant to Section 2.6, such Enrolled Program Claimant shall have his *EC Claim* assessed, and be eligible to receive payments, as set forth in Article 3 and Article 4.

2.7.2.      If (i) an Enrolled Program Claimant receives a notice from the Claims Administrator pursuant to Section 2.5.6, and (ii) such Enrolled Program Claimant makes and loses an appeal to the Special Master pursuant to Section 2.6, such Enrolled Program Claimant immediately shall cease to have any further rights under the Program, and the Claims Administrator shall deliver the Enrolled Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding).

2.7.3.      If (i) an Enrolled Program Claimant receives a notice from the Claims Administrator pursuant to Section 2.5.6 and (ii) such Enrolled Program Claimant does not make an appeal to the Special Master pursuant to Section 2.6, such Enrolled Program Claimant must determine whether to execute and deliver to the Claims Administrator (for Merck) a Future Evidence Stipulation in the form of Exhibit 2.7.3 (the "<u>Future Evidence Stipulation</u>").

2.7.3.1.      If such Enrolled Program Claimant executes and delivers a Future Evidence Stipulation to the Claims Administrator within thirty (30) days

Agreement i

of delivery to such Enrolled Program Claimant or its Counsel of the Claims Administrator notice described in Section 2.5.6, then such Enrolled Program Claimant's Release and Dismissal With Prejudice Stipulation shall, subject to Section 7.2, be returned to such Enrolled Program Claimant.

       2.7.3.2.      If such Enrolled Program Claimant fails to execute and deliver a Future Evidence Stipulation to the Claims Administrator within thirty (30) days of delivery to such Enrolled Program Claimant or its Counsel of the Claims Administrator notice described in Section 2.5.6, then promptly thereafter the Claims Administrator shall deliver the Enrolled Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding).

Section 2.8.    <u>New Evidence</u>

       Anything in this Article 2 above to the contrary notwithstanding, the Claims Administrator may, at any time prior to the Enrollment Deadline Date, upon an application to such effect by an Enrolled Program Claimant, permit such Enrolled Program Claimant to be re-considered for Qualifying Program Claimant status based on new evidence submitted by such Enrolled Program Claimant, if the Claims Administrator determines that (i) such Enrolled Program Applicant was not aware of such new evidence at the time he submitted his original Claims Package, or had made a diligent and good faith attempt to produce such new evidence as part of his original Claims Package, and (ii) such new evidence is material to a determination as to whether such Enrolled Program Claimant meets the Eligibility Requirements.  In such cases, such Enrolled Program Claimant's Program Claim shall be considered anew in accordance with the provisions of this Article 2 above, <u>provided</u> that such Enrolled Program Claimant (and his related Executing Derivative Claimants) shall be required to execute and deliver a new Release and Dismissal With Prejudice Stipulation (provided that if such Person is represented by counsel, then only such counsel shall be required to execute such dismissal With Prejudice Stipulation) if the prior Release and Dismissal With Prejudice Stipulation were returned to such Enrolled Program Claimant pursuant to Section 2.7.3.1 (and may be required to execute and deliver a new Medical Record Authorization Form and Employment Record Authorization Form).  Any determination by the Claims Administrator not to, or any other failure by the Claims Administrator to, exercise the discretion afforded to it under this Section 2.8 is final, binding and Non-Appealable.

Section 2.9.    <u>Qualifying Program Claimant Status as Eligible Claimants</u>

       A Person who has been determined or deemed to be a Qualifying Program Claimant pursuant to this Article 2 shall be deemed, for all purposes of Article 3 through and including Article 5 to constitute an "Eligible Claimant" and a "Qualifying Program Claimant" notwithstanding that such Person, for whatever reason, did not meet the Eligibility Requirements.  Such Person shall not, however, for the avoidance of doubt, be deemed for purposes of Section 10.4 or Section 10.5 to be an "Eligible Claimant" or a "Qualifying Program Claimant".  Nothing in this Section 2.9 limits Merck's rights and remedies in the event of fraud or other intentional misconduct.

Agreement i

Article 3
Claims Valuation

Section 3.1.    General

Each Qualifying Program Claimant shall receive a monetary payment based (unless such Qualifying Program Claimant elects to receive a *Fixed Payment* pursuant to Section 3.3) on the number of *Points* awarded to such Qualifying Program Claimant during the Claim assessment process described in Section 3.2.1 (including Exhibit 3.2.1) and Section 3.4 (the "Points Award Process") and the value of those Points as determined after all Qualifying Program Claimants have completed the Claims Valuation Process.  The Points Award Process, together with the *EI Payment* process set forth in Section 4.2, may be referred to herein as the "Claims Valuation Process".

Section 3.2.    Claim Assessment Process

3.2.1.    After an Enrolled Program Claimant has been determined or deemed to be a Qualifying Program Claimant and such Person's *Program Claim* has been *Completed* (as defined below), the Claims Administrator shall determine the number of Points that should be awarded to the Qualifying Program Claimant.  The criteria, methodologies, formulae, guidelines and other terms and conditions for determining Points awards (collectively, the "Point Awards Criteria") are (except for the terms of Section 3.4) set forth in Exhibit 3.2.1. The analysis performed by the Claims Administrator shall be based solely on the terms and conditions of Exhibit 3.2.1.

3.2.1.1.    The Claims Administrator shall process Program Claims in the order in which all of the following are satisfied in relation to Enrolled Program Claimants:  (i) such Enrolled Program Claimant is determined or deemed to be a Qualifying Program Claimant pursuant to Article 2; and (ii) such Enrolled Program Claimant's Program Claim is Completed.  However, neither the Claims Administrator nor Merck shall have any Liability for any failure to do so.

3.2.1.2.    A Program Claim shall be considered to have been "Completed" when the Claims Administrator determines that such Enrolled Program Claimant's entire Claims Package has been provided to the Claims Administrator and such materials are not defective or deficient (or, if applicable, when such Enrolled Program Claimant is given a special dispensation pursuant to section 4(a) of Exhibit1.5, and such dispensation has become final, binding and Non-Appealable).

3.2.2.    As outlined in Exhibit 3.2.1, Points assessment will consider (without limitation and among other factors as set forth in Exhibit 3.2.1) the extent of injury, age, consistency of VIOXX usage, duration of VIOXX usage, risk factors, and the date of the Related Eligible Event.

3.2.3.    The Claims Administrator shall notify each Qualifying Program Claimant, Merck and the NPC of such Qualifying Program Claimant's Points award using a form developed for such purpose by the Claims Administrator.  Such Points

14

Agreement i

award shall be subject to (i) appeal to the Special Master as set forth in Section 3.2.4, (ii) adjustment as set forth in Section 3.4 and (iii) Article 10, but otherwise shall be final, binding and Non-Appealable.

3.2.4.    A Qualifying Program Claimant may appeal its Points award determination of the Claims Administrator to the Special Master by submitting a written notice to such effect to the Claims Administrator and the Special Master within fifteen (15) days of service of the Points award determination.  The Special Master thereupon shall review such determination de novo.  If, upon any such timely appeal, the Special Master determines that a determination of the Claims Administrator was in error, the Special Master either may return the matter to the Claims Administrator for a further determination (which itself may be appealed in the same manner as specified above) or may substitute its own determination for that of the Claims Administrator.  All such determinations of the Special Master shall be final, binding and Non-Appealable.  The Special Master shall notify the Claims Administrator of its determination, and the Claims Administrator shall, promptly following receipt of such notice, notify Counsel for the relevant Qualifying Program Claimant (or, if such Qualifying Program Claimant is without counsel, such Qualifying Program Claimant itself), Merck and the NPC of the Special Master's determination.

Section 3.3.    <u>Fixed Payment</u>

3.3.1.    A Qualifying Program Claimant's Points award shall be considered to be "<u>Pre-Special Review</u>" when the entire process described in Section 3.2 for determining such award (including any appeals to the Special Master) has been completed with respect to such Qualifying Program Claimant.

3.3.2.    If a Qualifying Program Claimant's Pre-Special Review Points award is less than the *Special Review Marker* (any such Qualifying Program Claimant, a "<u>Special Marker QPC</u>"), then such Qualifying Program Claimant shall have the right, by delivering a notice to such effect to the Claims Administrator within 30 days of his receipt from the Claims Administrator of the last notice sent to him pursuant to Section 3.2, to elect to receive (in lieu of all other *Settlement Payments*) a fixed payment of $5,000 (a "<u>Fixed Payment</u>"; any Fixed Payment with respect to an *MI Qualifying Program Claimant*, the "<u>MI Fixed Payment</u>"; and any Fixed Payment with respect to an *IS Qualifying Program Claimant*, the "<u>IS Fixed Payment</u>").

3.3.3.    If a Special Marker QPC timely elects to receive the Fixed Payment, such Fixed Payment thereafter shall be paid in accordance with Article 5, <u>provided</u> that no Fixed Payment shall be paid prior to the expiration of Merck's *Walk Away Right* (without such right having been exercised).

3.3.4.    For the avoidance of doubt, this Section 3.3 is subject in all respects to Article 12 (including in particular Section 12.1.3).

3.3.5.    A Qualifying Program Claimant's Points award shall be considered to be "<u>Final</u>" when (i) such Qualifying Program Claimant's Points award is considered to be

15

Agreement i

Pre-Special Review, unless such Qualifying Program Claimant is a Special Review QPC (as defined below), and (ii) if such Qualifying Program Claimant is a Special Review QPC, after (and as) such Special Review QPC's Pre-Special Review Points award is adjusted pursuant to Section 3.4.  For the avoidance of doubt, a Points award having become Pre-Special Review or Final does not in any manner or to any extent affect the applicability of Article 10 to the related Program Claim.

Section 3.4.    <u>Special Review</u>

3.4.1.    If a Special Marker QPC fails timely to elect to receive a Fixed Payment, such Qualifying Program Claimant's claim shall be reviewed <u>de novo</u> by the Special Master, in accordance with this Section 3.4.  Such a Special Marker QPC is generally referred to herein as a "<u>Special Review QPC</u>".  A Special Review QPC that is an MI Qualifying Program Claimant may be referred to herein as an "<u>MI Special Review QPC</u>".  A Special Review QPC that is an IS Qualifying Program Claimant may be referred to herein as an "<u>IS Special Review QPC</u>".

3.4.2.    The de novo review mentioned in Section 3.4.1 shall only be conducted (i) for MI Special Review QPCs, after all MI Qualifying Program Claimants have been awarded Points pursuant to the Points Award Process, and such Points awards have become Pre-Special Review, and (ii) for IS Special Review QPCs, after all IS Qualifying Program Claimants have been awarded Points pursuant to the Points Award Process, and such Points awards have become Pre-Special Review.

3.4.3.    In performing the <u>de novo</u> review of the Special Review QPC's EC Claim, the Special Master is not bound by the Point Award Criteria specified in Section 3.2 and Exhibit 3.2.1.  As a result, because the Special Master may weigh and assess the evidence, including the Special Review QPC's duration of use of the VIOXX, the extent of the Special Review QPC's injury and the risk factors, differently than those criteria are valued under the Point Award Criteria as stated in Section 3.2 and Exhibit 3.2.1, the Special Master's relative evaluation of the Special Review QPC's EC Claims, as compared to one another, may be different than the relative evaluation of those EC Claims by the Claims Administrator.

3.4.4.    In performing this <u>de novo</u> review of the Special Review QPC's EC Claims, the Special Master shall award Points to the Special Review QPCs ranging from 0 to 5 points for MI Special Review QPCs, and 0 to 1 point for IS Special Review QPCs, with the average Points being awarded to said Special Review QPCs to be equal to 2.5 Points for MI Special Review QPCs and 0.5 Points for IS Special Review QPCs.

3.4.5.    All actions of the Special Master, and all adjustments of Pre-Special Review Points awards, pursuant to this Section 3.4 shall be binding, final and Non-Appealable.

3.4.6.    For the avoidance of doubt, Special Review QPCs shall be entitled to receive Final Settlement Payments in the same manner (including at the same time) as

Agreement i

other Qualifying Program Claimants that are not Special Marker QPCs, on the basis of their respective Final Points awards after adjustment in accordance with this Section 3.4.

Section 3.5.    Possible Additional Points Award For Second Eligible Event

      3.5.1.    Notwithstanding anything in this Agreement to the contrary, an Enrolled Program Claimant may allege a second Eligible Event, in addition to his Related Eligible Event (the "Second Eligible Event" ), solely for the purposes of this Section 3.5.

      3.5.2.    Notwithstanding the assertion of a Second Eligible Event, all of the terms and conditions of this Agreement shall continue to apply to the relevant Enrolled Program Claimant and his Related Eligible Event except only as otherwise specifically provided in this Section 3.5.  Accordingly, an Enrolled Program Claimant asserting a Second Eligible Event may, but is not required to, produce any particular PME Records that he desires to have considered by the Claims Administrator and the Gate Committee for purposes of this Section 3.5.

      3.5.3.    An Enrolled Program Claimant's Second Eligible Event will be evaluated by the Claims Administrator (both in the context of Article 2 and Article 3) and the Gate Committee at the same time as such Enrolled Program Claimant's Related Eligible Event is evaluated.  If, and only if, the Claims Administrator or the Gate Committee determines that such Enrolled Program Claimant meets the Eligibility Requirements with respect to both his Related Eligible Event and his Second Eligible Event (such an Enrolled Program Claimant, a "Double QPC"), such Double QPC will be eligible to receive bonus Points as described in the following Section.

      3.5.4.    The Claims Administrator, in his discretion, may award a Double QPC an additional number of MI Points or IS Points, as the case may be, up to an amount equal to 30% of the number of Points that such Double QPC is awarded by the Claims Administrator solely on the basis of his Related Eligible Event.  The Double QPC's combined base and (if applicable) additional awards of Points shall, after any appeal and adjustment of the base Points award pursuant to Section 3.2.4, constitute the Double QPC's Pre-Special Review Points award for all purposes of this Agreement.

      3.5.5.    For the avoidance of doubt, a Double QPC's status as an MI Qualifying Program Claimant or an IS Qualifying Program Claimant, and the resultant nature of any Settlement Payments to him as MI Settlement Payments or IS Settlement Payments, shall be determined based solely on the nature of such Double QPC's Related Eligible Event.

Section 3.6.    No Punitive Damages

By enrolling into the Program, each Program Claimant waives the right to receive any punitive damages pursuant to the Program and each Program Claimant understands and agrees that no Settlement Payment paid hereunder is, or shall be deemed to be, attributable to punitive damages.

17

Article 4
Payment to Qualifying Program Claimants

Section 4.1.    Interim Settlement Payments

4.1.1.    Promptly after the later of (i) August 1, 2008, and (ii) the date on which 2,500 MI Qualifying Program Claimants (including those constituting Special Marker QPCs) have Pre-Special Review Points awards (the later of (i) and (ii), the "MI Initial Settlement Payments Commencement Date"), the Claims Administrator shall estimate (x) the number of Points that ultimately will be awarded to all MI Qualifying Program Claimants (other than Special Marker QPCs) ("Estimated MI Non-Special Marker QPC Total Points") and (y) the number of MI Qualifying Program Claimants that will be Special Marker QPCs (the "Estimated Aggregate MI Special Marker QPCs"), in each case based on the Points awarded to all MI Qualifying Program Claimants (including those constituting Special Marker QPCs) who to such date have a Pre-Special Review Points award and such other factors as the Claims Administrator considers to be appropriate under the circumstances.  Merck and the NPC each shall be entitled to make submissions to the Claims Administrator with respect to such determinations of the Claims Administrator.

4.1.1.1.    From and after the MI Initial Settlement Payments Commencement Date (and such determinations of the Estimated MI Non-Special Marker QPC Total Points and the Estimated Aggregate MI Special Marker QPC), each MI Qualifying Program Claimant (other than a Special Marker QPC) who has a Pre-Special Review Points award shall be paid (in accordance with Article 5) an amount equal to 40% of his estimated *Final Settlement Payment* pursuant to Section 4.3 determined (A) based on his Pre-Special Review Points award, the Estimated MI Non-Special Marker QPC Total Points and the Estimated Aggregate MI Special Marker QPCs (and the estimated MI Point Value derived from all the foregoing), (B) disregarding the reference in Section 4.3 to deducting Interim Settlement Payments and (C) assuming that all Special Marker QPCs will elect to receive Fixed Payments, that the *MI EI Payments* will aggregate the *MI EI Payments Cap Amount* and that the *MI Aggregate Settlement Amount* will not be increased pursuant to Section 5.4.1.  The payments made pursuant to this 4.1.1 may be referred to herein as the "MI Interim Settlement Payments".

4.1.1.2.    Anything in Section 4.1.1.1 to the contrary notwithstanding, in the event that the MI Interim Settlement Payment(s) otherwise to be paid at any time to one or more MI Qualifying Program Claimants would (but for this sentence) result in the aggregate of all MI Interim Settlement Payments to date exceeding an amount equal to 40% of the MI Aggregate Settlement Amount (the "MI Interim Payments Cap"), then all such MI Interim Settlement Payment(s) in question shall be reduced pro rata to the extent necessary so that the MI Interim Payments Cap is not exceeded, and no further MI Interim Settlement Payments shall be made.

4.1.2.      Promptly after the later of (i) February 1, 2009, and (ii) the date on which 2,500 IS Qualifying Program Claimants (including those constituting Special Marker QPCs) have Pre-Special Review Points awards (the later of (i) and (ii), the "IS Initial Settlement Payments Commencement Date"), the Claims Administrator shall estimate (x) the number of Points that ultimately will be awarded to all IS Qualifying Program Claimants (other than Special Marker QPCs) ("Estimated IS Non-Special Marker QPC Total Points") and (y) the number of IS Qualifying Program Claimants that will be Special Marker QPCs (the "Estimated Aggregate IS Special Marker QPCs"), in each case based on the Points awarded to all IS Qualifying Program Claimants (including those constituting Special Marker QPCs) who to such date have a Pre-Special Review Points award and such other factors as the Claims Administrator considers to be appropriate under the circumstances.  Merck and the NPC each shall be entitled to make submissions to the Claims Administrator with respect to such determinations of the Claims Administrator.

4.1.2.1.      From and after the IS Initial Settlement Payments Commencement Date (and such determinations of the Estimated IS Non-Special Marker QPC Total Points and the Estimated Aggregate IS Special Marker QPCs), each IS Qualifying Program Claimant (other than a Special Marker QPC) who has a Pre-Special Review Points award shall be paid (in accordance with Article 5) an amount equal to 40% of his estimated Final Settlement Payment pursuant to Section 4.3 determined (A) based on his Pre-Special Review Points award and the Estimated IS Non-Special Marker QPC Total Points and the Estimated Aggregate IS Special Marker QPCs (and the estimated IS Point Value derived from any of the foregoing), (B) disregarding the reference in Section 4.3 to deducting Interim Settlement Payments and (C) assuming that all Special Marker QPCs will elect to receive Fixed Payments, that the *IS EI Payments* will aggregate the *IS EI Payments Cap Amount* and that the *IS Aggregate Settlement Amount* will not be increased pursuant to Section 5.4.1.  The payments made pursuant to this  may be referred to herein as the "IS Interim Settlement Payments".

4.1.2.2.      Anything in Section 4.1.2.1 to the contrary notwithstanding, in the event that the IS Interim Settlement Payment(s) otherwise to be paid at any time to one or more IS Qualifying Program Claimants would (but for this sentence) result in all IS Interim Settlement Payments to date exceeding an amount equal to 40% of the IS Aggregate Settlement Amount (the "IS Interim Payments Cap"), then all such IS Interim Settlement Payment(s) in question shall be reduced pro rata to the extent necessary so that the IS Interim Payments Cap is not exceeded, and no further IS Interim Settlement Payments shall be made.

4.1.3.      Anything in this Agreement to the contrary notwithstanding:

4.1.3.1.      a Qualifying Program Claimant (i) that is a Special Marker QPC, (ii) that did not submit an Enrollment Form on or prior to February 29, 2008 or (iii) in relation to which full compliance with the first sentence of

Section 1.2.2.4 was not achieved by February 29, 2008, shall not receive any Interim Settlement Payment;

   4.1.3.2. for the avoidance of doubt, no Settlement Payment shall be paid prior to the expiration of Merck's Walk Away Right (without such right having been exercised); and

   4.1.3.3. the making of Interim Settlement Payments to Qualifying Program Claimants that are the subject of an audit are prohibited to the extent specified in Section 10.1.4.

  4.1.4. The making of any Interim Settlement Payment to any Qualifying Program Claimant shall not create any right or expectancy in favor of such (or any other) Qualifying Program Claimant as to the amount of such Qualifying Program Claimant's Final Settlement Payment or as to the value of Points.

  4.1.5. Merck or the NPC may at any time require that the Claims Administrator provide updated Estimated MI Non-Special Marker QPC Total Points, Estimated Aggregate MI Special Marker QPCs, Estimated IS Non-Special Marker QPC Total Points and/or Estimated Aggregate IS Special Marker QPCs figures based on Pre-Special Review Point awards made through a specified date, and from and after any delivery of any such updated figure(s), such updated figure(s) prospectively shall be used for making MI Interim Settlement Payments or IS Interim Settlement Payments, respectively.

Section 4.2. <u>Extraordinary Injury Payments</u>

  4.2.1. MI Qualifying Program Claimants and IS Qualifying Program Claimants may apply to receive extraordinary injury payments ("<u>MI EI Payments</u>" and "<u>IS EI Payments</u>", respectively, and, collectively, "<u>EI Payments</u>").

  4.2.2. MI EI Payments for all MI Qualifying Program Claimants cannot in the aggregate exceed $195 million (the "<u>MI EI Payments Cap Amount</u>").

  4.2.3. IS EI Payments for all IS Qualifying Program Claimants cannot in the aggregate exceed $105 million (the "<u>IS EI Payments Cap Amount</u>").

  4.2.4. Each MI Qualifying Program Claimant that desires to seek an MI EI Payment, and each IS Qualifying Program Claimant that desires to seek an IS EI Payment, shall have the burden of proving to the Special Master's satisfaction such Qualifying Program Claimant's *Specified Documented Economic Damages* and, in that connection, may be required by the Claims Administrator to produce further documentation.

  4.2.5. To be eligible to be considered for an MI EI Payment, an MI Qualifying Program Claimant must (i) have a Pre-Special Review Points award in excess of the Special Review Marker and (ii) have (or be a Qualifying Program Claimant in respect of a Product User that has) Specified Documented Economic Damages of not less

than $250,000.  To be eligible to be considered for an IS EI Payment, an IS Qualifying Program Claimant must (i) have a Pre-Special Review Points award in excess of the Special Review Marker and (ii) have (or be a Qualifying Program Claimant in respect of a Product User that has) Specified Documented Economic Damages of not less than $250,000 or submit PME Records reflecting an injury that is not adequately reflected by Basic Activities of Daily Living or Instrumental Activities of Daily Living (as such terms are defined in Exhibit 3.2.1).

4.2.6.	Each Qualifying Program Claimant that is eligible for, and properly and timely applies for, an EI Payment shall (subject to Section 4.2.8 and to all of the other terms and conditions of this Agreement) receive an EI Payment according to criteria to be determined by the Claims Administrator, provided that no Qualifying Program Claimant's EI Payment shall exceed $600,000.  EI Payments are in addition to the Final Settlement Payments pursuant to Section 4.3.

4.2.6.1.	"Specified Documented Economic Damages" means, in relation to any Product User, (i) such Product User's past out-of-pocket medical expenses and (ii) such Product User's past lost wages, in each case to the extent that such expenses or lost wages, as the case may be, are (x) a result of such Product User's Eligible Event, (y) *Documented* and (z) have neither been reimbursed nor are eligible for reimbursement.

4.2.6.2.	"Documented" means *Medical Records*, billing records, tax returns, social security earnings statements or any other documentation or evidence requested, or otherwise found acceptable, by the Claims Administrator.

4.2.7.	All determinations concerning a Qualifying Program Claimant's eligibility for an EI Payment, and the amount thereof, shall be made by the Claims Administrator.  The Claims Administrator shall promptly notify each Qualifying Program Claimant, Merck and the NPC of such Qualifying Program Claimant's EI Payment determination.  All EI Payment determinations of the Claims Administrator shall be made according to guidelines to be established by the Claims Administrator in consultation with Merck and the NPC, and (in any event) shall be final, binding and Non-Appealable.

4.2.8.	EI Payment awards shall be determined in the first instance without regard to the MI EI Payments Cap Amount or the IS EI Payments Cap Amount, as the case may be, but no MI EI Payment or IS EI Payment shall be made until all possible MI EI Payments or IS EI Payments, respectively, eligibility and awards determinations have (subject only to the remainder of this Section 4.2.8 below) been made.  However, any term of this Agreement to the contrary notwithstanding, if, after such process has been fully completed, the aggregate MI EI Payments or aggregate IS EI Payments, respectively, so awarded in the first instance would (but for this sentence) exceed the MI EI Payments Cap Amount or the IS EI Payments Cap Amount, respectively, all such initial MI EI Payment awards or initial IS EI Payment awards, respectively, shall be reduced pro rata to the extent necessary so that such aggregate MI EI Payment awards or IS EI Payment awards, respectively, exactly equal the MI EI Payments Cap Amount or IS EI Payments Cap Amount, respectively.  After completion of the entire process set forth

Agreement i

in this Section 4.2.8 with respect to MI EI Payments or IS EI Payments, as the case may be, the final MI EI Payment awards or IS EI Payment awards, respectively, shall be paid in accordance with Article 5.

Section 4.3.    <u>Final Settlement Payments</u>

      4.3.1.    After (and only after) (i) all MI Qualifying Program Claimants have completed the Claims Valuation Process and all Points awards to MI Qualifying Program Claimants have become Final, (ii) the actual aggregate dollar amount of all possible MI Fixed Payments and MI EI Payments has been definitively determined and (iii) the final round of audits pursuant to Article 10 have been completed with respect to all MI Qualifying Program Claimants (or, if earlier, the 60th day after the conditions specified in clauses (i) and (ii) have been satisfied), each MI Qualifying Program Claimant (other than those who elected to receive a Fixed Payment pursuant to Section 3.3) shall be paid an amount equal to (x) the product of such MI Qualifying Program Claimant's MI Points multiplied by  the *MI Point Value*, minus (y) the amount of any Interim Settlement Payment made to such Qualifying Program Claimant (each such payment, an "<u>MI Final Settlement Payment</u>").

      4.3.2.    After (and only after) (i) all IS Qualifying Program Claimants have completed the Claims Valuation Process and all Points awards to IS Qualifying Program Claimants have become Final, (ii) the actual aggregate dollar amount of all possible IS Fixed Payments and IS EI Payments has been definitively determined and (iii) the final round of audits pursuant to Article 10 have been completed with respect to all IS Qualifying Program Claimants (or, if earlier, the 60th day after the conditions specified in clauses (i) and (ii) have been satisfied), each IS Qualifying Program Claimant (other than those who elected to receive a Fixed Payment pursuant to Section 3.3) shall be paid an amount equal to (x) the product of such IS Qualifying Program Claimant's IS Points multiplied by the *IS Point Value*, minus (y) the amount of any Interim Settlement Payment made to such Qualifying Program Claimant (each such payment, an "<u>IS Final Settlement Payment</u>").

      4.3.3.    The MI Final Settlement Payments and the IS Final Settlement Payments may be referred to herein as the "<u>Final Settlement Payments</u>").

Section 4.4.    <u>Satisfaction of Liens</u>

      For the avoidance of doubt, this Article 4 is subject in all respects to Article 12 (including in particular Section 12.1.3).

Article 5
<u>Merck Funding Obligations</u>

Section 5.1.    <u>Merck Funding Obligations</u>

      Merck agrees, subject to the terms and conditions hereof (including in particular Section 5.2 and Article 11), to make the payments that it is required from time to time to make pursuant to this Section 5.1 (collectively, the "<u>Funding Payments</u>"

22

5.1.1.       Within fifteen (15) days after the entry of the Registration Order, Merck shall deposit the sum of $3,000,000 into the *Administrative Expenses Fund*;

5.1.2.       By not later than the second *Business Day* after the Walk Away Right shall have expired without any exercise thereof by Merck:

   5.1.2.1.       Merck shall deposit the sum of $500,000,000 into the *MI Settlement Fund*; and

   5.1.2.2.       Merck shall (i) deposit into the *Escrow Fund* an amount equal to, (ii) deliver to the Claims Administrator one or more *Letters of Credits* with an aggregate "Maximum Draw Amount" (as defined in the form of Letter of Credit attached hereto) equal to, or (iii) effect any combination of (i) and (ii) equal in the aggregate to, $4,100,000,000.

Any cash deposited into the Escrow Fund pursuant to Section 5.1.2.2 shall be divided 79.2683% to the MI Settlement Fund and 20.7317% to the *IS Settlement Fund*; and

5.1.3.       By not later than the later of (i) June 1, 2008 and (ii) three months after the Walk Away Right shall have expired without any exercise thereof by Merck, Merck shall deposit the sum of $250,000,000 into the MI Settlement Fund.

5.1.4.       On a monthly basis, an amount equal to the Net Investment Earnings (as defined in the *Escrow Agreement*) with respect to the MI Settlement Fund and the IS Settlement Fund, respectively, shall be transferred from such *Settlement Funds* to the Administrative Expenses Fund.

5.1.5.       Promptly after the end of each calendar month, the *Escrow Agent* shall submit to Merck, the NPC and the Claims Administrator a report, in such form and in such detail as Merck (in consultation with the NPC) reasonably from time to time may specify (an "Escrow Funds Report"), itemizing and certifying all payments or transfers out of the Escrow Funds during the preceding calendar month, the Net Investment Earnings transferred to the Administrative Expenses Fund during the preceding calendar month and the balance on hand in each Escrow Fund as of the end of such calendar month.

5.1.6.       Within three (3) Business Days after the end of each calendar month, the Claims Administrator shall submit to Merck, the NPC and the Escrow Agent a report, in such form and in such detail as Merck (in consultation with the NPC) reasonably from time to time may specify (a "Payment Report"), itemizing and certifying the following:

   5.1.6.1.       a reconciliation of the *Administrative Expenses* and Settlement Payments made during such calendar month against the projected payments for such calendar month specified in the immediately preceding Payment Report;

23

Agreement i

5.1.6.2.      all Administrative Expenses then due and payable, or anticipated to become due and payable during the following calendar month (the "Administrative Expenses Payables");

5.1.6.3.      all Interim Settlement Payments, Fixed Payments, EI Payments and Final Settlement Payments which, as of the end of such calendar month, have been finally determined, and otherwise are timely for payment (including there having been complete compliance with, and satisfaction of, Article 12 (including in particular Section 12.1.3) with respect thereto), pursuant to this Agreement (but have not yet been paid) in respect of MI Qualifying Program Claimants (collectively, the "MI QPC Payables"); and

5.1.6.4.      all Interim Settlement Payments, Fixed Payments, EI Payments and Final Settlement Payments which, as of the end of such calendar month, have been finally determined, and otherwise are timely for payment (including there having been complete compliance with, and satisfaction of, Article 12 (including in particular Section 12.1.3) with respect thereto), pursuant to this Agreement (but have not yet been paid) in respect of IS Qualifying Program Claimants (collectively, the "IS QPC Payables").

Without limitation, the Payment Report shall provide the information necessary for the Escrow Agent actually to make the payments specified in the Payment Report and, in the case of MI QPC Payables and IS QPC Payables, to do so in accordance Article 9.  The Claims Administrator forthwith shall provide Merck with such further information concerning any Payment Report as Merck reasonably shall request.

5.1.7.      Subject to Section 5.2.2, within twelve (12) Business Days of its receipt of the Escrow Funds Report and the Payment Report for any particular calendar month, Merck shall make such payments into each of the Escrow Funds as are necessary so that, based solely on the information set forth in such Escrow Funds Report and after giving effect to such Merck payment, the amounts on deposit in each of the Escrow Funds will be sufficient to make all the payments specified in such Payment Report to be paid out of such Escrow Fund (other than any such payment, or any portion thereof, that Merck disputes in good faith (including on the basis that such payment, or portion thereof, does not constitute an Administrative Expenses Payable, a MI QPC Payable or an IS QPC Payable, as the case may be)); provided, however, that in no event shall Merck shall be obligated to pay more than $250,000,000 pursuant to this Section during any single calendar month (excluding from such calculation payments pursuant to this Section in respect of Final Settlement Payments).

5.1.8.      As specified in more detail in the Escrow Agreement, the Escrow Agent will be authorized, subject to having sufficient funds on hand in the applicable Fund, on or promptly after the thirteenth (13th) Business Day following receipt by the Escrow Agent of any particular Payment Report, to pay (i) out of the Administrative Expenses Fund, the various Administrative Expenses Payables specified in such Payment Report, (ii) out of the MI Settlement Fund, the various MI QPC Payables specified in such Payment Report, and (iii) out of the IS Settlement Fund, the various IS QPC

24

Payables specified in such Payment Report; provided, however, that the Escrow Agent will be prohibited from making any payment set forth in any particular Payment Report, or portion thereof, which Merck is in good faith disputing (including on the basis that such payment, or portion thereof, does not constitute an Administrative Expenses Payable, a MI QPC Payable or an IS QPC Payable, as the case may be).

5.1.9.     For the avoidance of doubt, subject only to Section 5.4, the Net Investment Earnings (as defined in the Escrow Agreement) shall not increase the *Overall Settlement Amount*, the MI Aggregate Settlement Amount or the IS Aggregate Settlement Amount.

Section 5.2.     Limitations on Merck Funding Obligations.

5.2.1.     Any term of this Agreement (or the Escrow Agreement) to the contrary notwithstanding, Merck shall have no financial obligation under this Agreement other than its express obligations to make Funding Payments and/or to post Letters of Credit, in each case as described in Section 5.1.  Merck shall have no obligation to pay (or to make any Funding Payment on account of), or reimburse any Program Claimant or Enrolling Counsel for, any costs or expenses incurred by such Program Claimant or Enrolling Counsel in connection with the Program.  Neither Merck nor any of the other *Merck Released Parties* shall have any responsibility for the management of any of the Escrow Funds or Letters of Credit or any Liability to any Program Claimant arising from the handling of Program Claims by the Special Master and/or the Claims Administrator.

5.2.2.     Any term of this Agreement (or the Escrow Agreement) to the contrary notwithstanding, (i) in no event shall Merck be required to make any Funding Payment to the extent that the making of such Funding Payment would result in, and (ii) in no event shall the Claims Administrator made any draw under any Letter of Credit to the extent that the deposit into the MI Settlement Fund and/or the IS Settlement Fund (as the case may be pursuant to such draw) of the funds drawn pursuant to such draw would result in:

5.2.2.1.     the aggregate deposits (by Merck or from the proceeds of any draw under any Letter of Credit) into the MI Settlement Fund and/or the IS Settlement Fund, less (if applicable) the aggregate amount returned to Merck pursuant to Section 4.4 of the Escrow Agreement, exceeding the Overall Settlement Amount;

5.2.2.2.     the aggregate deposits made (by Merck or from the proceeds of any draw under any Letter of Credit) into the MI Settlement Fund, less (if applicable) the aggregate amount returned to Merck from the MI Settlement Fund pursuant to Section 4.4 of the Escrow Agreement, exceeding the MI Aggregate Settlement Amount; or

5.2.2.3.     the aggregate deposits made (by Merck or from the proceeds of any draw under any Letter of Credit) into the IS Settlement Fund, less (if applicable) the aggregate amount returned to Merck from the IS Settlement

25

Agreement i

Fund pursuant to Section 4.4 of the Escrow Agreement, exceeding the IS Aggregate Settlement Amount.

5.2.3.　　Any term of this Agreement (or the Escrow Agreement) to the contrary notwithstanding, in no event shall:

5.2.3.1.　　(i) the aggregate of all Settlement Payments exceed the Overall Settlement Amount;

5.2.3.2.　　the aggregate of all *MI Settlement Payments* exceed the MI Aggregate Settlement Amount; or

5.2.3.3.　　the aggregate of all *IS Settlement Payments* exceed the IS Aggregate Settlement Amount.

Section 5.3.　　<u>Certain Letter of Credit Provisions</u>

5.3.1.　　If Merck shall fail to comply with its funding obligations under Section 5.1.7 with respect to either Settlement Fund, and Merck shall have failed to cure such failure within five (5) Business Days following receipt of written notice from the Claims Administrator to such effect, then the Claims Administrator may, at any time thereafter so long as such failure continues to exist, make a draw under the Letter of Credit (or, if more than one Letter of Credit is delivered to the Claims Administrator, make draws under each of such Letters of Credit in proportion to the respective "Maximum Draw Amounts" thereunder) in an aggregate amount equal to the amount necessary to cure such failure. The "Drawing Certificate" in respect of any such draw shall (among other things required by such Certificate) (i) properly specify the instructions in order for the proceeds of such draw to be transferred directly to the Escrow Agent for deposit into the Escrow Fund and (ii) specify the division of the proceeds of such draw between the MI Settlement Fund and the IS Settlement Fund, according to the respective amounts which Merck has failed to fund in relation to each such Fund. The Claims Administrator also will notify the Escrow Agent of such proper division.

5.3.2.　　If on or prior to the tenth Business Day prior to the "Expiration Date" of any Letter of Credit, Merck shall not have caused the issuing bank of such Letter of Credit to deliver an "Extension Notice" thereunder extending such Expiration Date, then the Claims Administrator shall on the next Business Day make a draw under such Letter of Credit in the full amount of the "Maximum Draw Amount" thereunder (any such draw, a "<u>Non-Extension Drawing</u>"). If the Claims Administrator makes draws under one or more Letters of Credit on three separate occasions with respect to three separate failures described in Section 5.3.1, then at any time thereafter when the Claims Administrator shall be entitled to make a further draw on a Letter of Credit pursuant to Section 5.3.1, the Claims Administrator in its discretion may make a draw under such Letter of Credit in the full amount of the "Maximum Draw Amount" thereunder (any such draw, a "<u>Multiple Draw Drawing</u>"). The "Drawing Certificate" in respect of any draw under this Section 5.3.2 shall (among other things required by such Certificate) (i) properly specify

26