<pre>
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3


 4     *********************************
       IN RE:  VIOXX PRODUCTS            *      MDL No. 1657
 5                                       *      SECTION "L"
                                         *
 6     PRODUCTS LIABILITY                *
                                         *
 7                                       *      NEW ORLEANS, LOUISIANA
                                         *      April 29, 2009
 8     *********************************

 9

              TRANSCRIPT OF THE MONTHLY STATUS CONFERENCE
10         HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     FOR THE PLAINTIFFS'           Herman, Herman, Katz & Cotlar, LLP
       LIAISON COMMITTEE:            BY:  RUSS HERMAN, ESQ.
14                                        LEONARD A. DAVIS, ESQ.
                                     820 O'Keefe Avenue
15                                   New Orleans, Louisiana  70113
                                     (504) 581-4892
16
                                     Seeger Weiss
17                                   BY:  CHRISTOPHER SEEGER, ESQ.
                                     1515 Market Street, Suite 1380
18                                   Philadelphia, Pennsylvania  19102
                                     (215) 564-2300
19
                                     Hagens Berman Sobol Shapiro LLP
20                                   BY:  THOMAS M. SOBOL
                                     One Main Street, 4th Street
21                                   Cambridge, Massachusetts
                                     (617) 482-3700
22
       PLAINTIFF'S STEERING          Beasley, Allen, Crow, Methvin,
23     COMMITTEE:                    Portis & Miles, PC
                                     BY:  ANDY BIRCHFIELD, Jr., ESQ.
24                                   218 Commerce Street
                                     Montgomery, Alabama 36104
25                                   (800) 898-2034
</pre>

```
 1    FOR THE STATE LIAISON          Barrios, Kingsdorf & Casteix, LLP
      COMMITTEE:                     BY:  DAWN BARRIOS, ESQ.
 2                                   701 Poydras Street
                                     Suite 3650
 3                                   New Orleans, Louisiana 70139-3650

 4

      FOR THE DEFENDANT'S            Stone Pigman Walther
 5    STEERING COMMITTEE:            Witmann, L.L.C.
                                     BY:  DOROTHY WIMBERLY, ESQ.
 6                                   546 Carondelet Street
                                     New Orleans, Louisiana  70130
 7                                   (504) 581-3200

 8                                   Williams & Connolly
                                     BY:  DOUGLAS MARVIN, ESQ.
 9                                   725 Twelfth Street, NW
                                     Washington, DC  20005
10

11    CLAIMS ADMINISTRATOR:          BrownGreer
                                     BY:  ORRAN L. BROWN, ESQ.
12                                        LYNN C. GREER, ESQ.
                                          BILL ATKINSON, ESQ.
13                                   115 South 15th Street, Suite 400
                                     Richmond, Virginia  23285
14

15    LIEN ADMINISTRATOR:            The Garretson Firm
                                     BY:  MAT GARRETSON, ESQ.
16                                   7775 Cooper Road
                                     Cincinnati, Ohio 45242
17                                   (513) 794-0400

18

      CURATOR FOR PRO SE             JOHNSON, HOEFER, HOLWADEL &
19    PLAINTIFFS:                    ELDRIDGE
                                     BY:  CLAUDIA SANTOYA, ESQ.
20                                   601 Poydras Street
                                     Suite 2490
21                                   New Orleans, Louisiana  70130
                                     504-561-7799
22

23

24

25
```

```
 1      SPECIAL MASTER:              Juneau Law Firm
                                     BY:  PATRICK A. JUNEAU, ESQ.
 2                                   The Harding Center
                                     Suite 202
 3                                   P. O. Drawer 51268
                                     Lafayette, Louisiana 70505-1268
 4                                   337-269-0052

 5      FOR THE LOUISIANA           THE DUGAN LAW FIRM
        ATTORNEY GENERAL            BY:  JAMES R. DUGAN, II, ESQ.
 6                                   1181 W. Tunnel Boulevard
                                     Suite A
 7                                   Houma, Louisiana 70360
                                     (985) 580-4573
 8

 9      Also Present:               James Young, ESQ.
                                     Wincent McKnight, ESQ.
10                                   Mark Scultz, ESQ.
                                     Richard A. Freese, ESQ.
11                                   Brad Cotlin, ESQ.
                                     Will Riley, ESQ.
12                                   Ann Oldfather, ESQ.
                                     Clark Trout, ESQ.
13                                   Roxanne DeFrancesco, ESQ.

14

15      COURT REPORTER:             Pinkey Ferdinand,
                                     Official Court Reporter
16                                   500 Poydras Street, Room HB-406
                                     New Orleans, Louisiana  70130
17                                   (504) 589-7781

18

        Proceedings recorded by mechanical stenography, transcript
19      produced by computer.

20

21

22

23

24

25
```

**PROCEEDINGS**
**(April 29, 2009, Monthly Status Conference)**

1
2
3          THE DEPUTY CLERK:  MDL 165, In re:  Vioxx.

4          THE COURT:  Counsel, make your appearances.

5          MR. MARVIN:  Good morning, Your Honor, Douglas Marvin

6     for Merck.

7          MR. HERMAN:  May it please the Court, good morning,

8     Judge Fallon, Russ Herman for plaintiffs.

9          THE COURT:  We're here today for our Monthly Status

10    Conference.  I've received from the parties the suggested

11    agenda.  I've added some matters to it.  I've met with the

12    Liaison Counsel in advance of the meeting.  I've discussed the

13    meeting with them.  We will start with the first item on the

14    agenda, Settlement Agreement.

15          MR. HERMAN:  Your Honor, if we might have Brown Greer

16    report on Items 1 and 2, the Settlement Agreement and

17    Registration.

18          THE COURT:  All right.

19          MR. BROWN:  Good morning, Your Honor, I'm Orran Brown,

20    and with me today is Lynn Greer.  And we also have with us one

21    of our other counsel, Bill Atkinson, who's been working on

22    enrollment matters.  We're from Brown Greer.  We're the Claims

23    Administrator for the Settlement Program.  We're happy to be

24    here to make our report on the status of the Settlement Program

25    and where we stand on several fronts.

1        First, I will cover very briefly where we are on the

2    enrollment cleanup stage, with which the Court, I know, is very

3    familiar because we've had some proceedings on that recently.

4    And then some brief remarks about our Extraordinary Injury

5    Program and its status, and then Lynn will update us all on

6    where we are on claims review and on our payment schedule.

7        On the enrollment front, Your Honor, we have been

8    working with the parties and all the counsel for claimants to

9    get this finished.  We are near the end of the enrollment road.

10   We're still trying to get all the claimants safely in the

11   program, the paperwork in order so that they can -- their claims

12   can be processed, and we will not keep anything off track.

13       The parties set this March 6th deadline and really fix

14   up everything that was wrong in any of the release or

15   stipulations of dismissal that was necessary to enroll in the

16   program.  And then Merck's counsel has been working on forcing

17   the issue out by filing these motions.  The first six were filed

18   about -- well, for 880 claimants, and we had the hearing here on

19   April 15th, and that process is working to really force

20   resolution of these numbers.  We, after that April 15 hearing, I

21   think there were 82 claims that were closed out.  Dismissed --

22   cases dismissed or claims distinguished that were Tolling

23   Agreement claims.  And a number of them, I think about 330 that

24   were carried over to the hearing, further hearing today, I think

25   after this session.  And then there were about 400 people who

1    got resolved, who fixed the problem in their documents or

2    otherwise that claimed issues, they became compliant with the

3    CAP 2008-1, the procedure that allows certain estate

4    deficiencies to be taken care of for the time being.  And so the

5    process is working to try to clean this up.

6         Merck's counsel, is still working to identify anyone

7    else who has still a lingering problem, because as people

8    continue to submit materials to us, they might submit a release

9    that still has a problem, and so there are still things that

10   we're still working down to get to the final word on this.

11        Merck filed two additional motions on the 21st for

12   about 180 people with release problems, and the Court has set

13   them for hearing May 8th.  And, again, the goal is to get these

14   documents clean, get the claimants in the program.  And we're

15   working with counsel in pro se, that as they submit materials

16   and as they cure their problems, they come off the motions.  And

17   many, many claimants have done that.

18        THE COURT:  And these are deficiencies, frankly, that

19   are just type deficiencies that really need and should be

20   cleaned up.  There are deficiencies such as, an attorney fails

21   to sign the release or a notary fails to sign a release, or they

22   put the wrong claimant's name on a release, things of that sort.

23   I mean, we -- you know, these are matters that, after we give

24   them two and three notices to do something about this and they

25   still don't do it, you know, I just -- I have to dismiss the

 1     case, because it's not a question of something that can't be

 2     cured, it's just somebody's attention has to be directed to it.

 3              MR. BROWN:  Yes, Your Honor, that is what we're

 4     seeing, and these motions are really helping to focus that

 5     attention and the Court's rulings on this.  This slide here

 6     shows us that of the over 50,000 claimants who are in this

 7     program and who enroll in the program, these are the only

 8     numbers we're still dealing with on that issue.  And we see

 9     2,342 people still have a release question, but over 1700 of

10     them have taken advantage of this procedure, the CAP 2008-1,

11     that allows them to sort of work around estate-related problems

12     to get the claim all the way up to the point of payment.  And

13     for some claimants, payment, even though the estate hasn't been

14     opened.  So we're down to only 590 people that have problems

15     unrelated to estates, and only 448 of them who have the problems

16     that you mentioned, where there are signature problems and

17     notary problems.  I mean, this is really the end of the road on

18     this.  And with the Court's assistance  and a lot of work by

19     Merck and its counsel and claimants and their counsel, we're

20     going to finish this.  And eventually we will have one of these

21     status conferences where we never mention the word "enrollment."

22     I promise that that day will eventually come.

23              A few brief remarks about our Extraordinary Injury

24     Funds, the two funds that are set up in the Settlement Agreement

25     to provide further compensation for catastrophic or

1    extraordinary injury situations, one for heart attack claimants

2    and one for the stroke claimants.  We announced that program on

3    March 2nd by email blast to all primary counsel about the

4    existence of the program, that it was ready to receive claims.

5    We sent letters to unrepresented claimants to tell them about

6    the program.  We've been working with the parties on this.  We

7    originally announced a deadline of June 1 for claimants to

8    submit their Extraordinary Injury Claims.  The parties decided

9    to move that deadline to September 1st from June 1.

10           We announced that by email blast to counsel and

11   letters to the unrepresented claimants on April 14.  The

12   reasoning behind that is that we and the parties realize that a

13   lot of the counsel are focused on getting their underlying

14   claims in order, finishing out this enrollment and getting their

15   Claims Packages all complete with no further deadline

16   extensions, and we're focused really on making that happen.

17           The Extraordinary Injury Program does not have the

18   extreme time sensitivity, our goal of making final MI payments

19   by September 30th, so the deadline was moved.  Plus, the idea is

20   that, to submit an EI claim, you have to fill out a claim form.

21   It's available online.  And there is a list of documentation

22   that you have to submit to us, much of which has not been

23   submitted before, because to show economic losses, medical

24   expenses and loss wages or income requires those kind of

25   documents, tax returns, W-2s, that have not been in the program

1    before.  And the parties and we want to have those packages

2    together.  We want the EI claim form.  To fill that out

3    correctly it requires going through those documents to get the

4    numbers and the losses and put them in the form.  And the goal

5    is to have that form and their documentation together, all

6    submitted at one time rather than people submitting just a claim

7    form to try to hold a place in line and then fill in with the

8    documents later.

9           So the party extended the deadline to September 1st

10   with the instruction that you have to have a claim form and your

11   documentation together by September 1st.  You can submit them in

12   piecemeal until then, but we have to have by September 1st the

13   form filled out and the documentation that we have specified in

14   the list is necessary for the type of claim you're submitting.

15   You need the whole package.  And the goal is, is that we'll have

16   all those claims then and can processed them quickly rather than

17   documentation filling in after September 1st.  So we wanted the

18   message out to counsel and unrepresented claimants that that

19   needs to be a complete package by September 1st not just sending

20   in a claim form to try to hold a place in line.

21          And, again, Your Honor, we mentioned this last time.

22   We have a lengthy, detailed instruction manual that we have

23   posted to each counsel on their portal.  It's on our general

24   website, and a manual for unrepresented claimants.  It explains

25   the whole program and all the provisions, the documentation, the

1    damages that are recoverable.  We update that regularly.  We

2    will be updating it.  We've been working with Ms. Snapka on the

3    issue, or the question she raised at our last conference about

4    whether there is any sort of appeal process from decisions made

5    on claims.  And I think Ms. Snapka is going to report on that

6    today when we finish our report.  That will eventually be in

7    this manual, so we're urging everyone continually to check the

8    manual that's available on the website because there are

9    updates, and they're very clear which version is posted, what

10   the date of it is.  We want everyone to see how this program is

11   working, what's required, and that manual is the best place to

12   look.

13       Your Honor, that takes us to the last mention about

14   the EI Program.  We do not have a lot of these claims yet.  This

15   slide shows us how many we've gotten so far.  We've received 35

16   forms, claim forms so far, but a little over half of them do not

17   pass the basic eligibility.  And of that 18, 17 of them are pro

18   se claimants.

19       To be able to seek Extraordinary Injury Payments, you

20   have to have qualified at some level on your underlying heart

21   attack or stroke claim.  And these 18 people have sent in an EI

22   claim, but did not qualify on their underlying claim.  And the

23   program is not designed to be sort of a second chance, it's for

24   catastrophic injuries.  And the purpose of this slide is just to

25   show, this is what we've gotten so far.  We do not expect to

1    have many claims at this stage, particularly now with the

2    deadline being moved to September 1st.  But as we get these

3    claims, we're sorting through them.  We're getting ready to

4    process them.  We'll be ready to go on them, but this all we

5    have on that front so far.

6          Your Honor, that takes us up to the claims section of

7    our report, and Lynn will cover that.

8          THE COURT:  I think it is important with the

9    Catastrophic Injury Claims to recognize that it is not a

10   second bite in the apple, and I think that's the part that

11   the Court has to reinforce.  It's a special type fund for

12   special circumstances, and not a reevaluation of what

13   Points have been given.

14         MS. GREER:  Good Morning, Your Honor.  Lynn Greer

15   from Brown Greer, and I'm going to provide the Court with

16   an update today of where we are on our claims review and

17   the payments of both the MI and the stroke claims to date.

18         This slide shows -- and this has not varied much since

19   last month or prior months.  We now have over 48,000 claims who

20   are in the program.  Those roughly breakdown to 62 percent heart

21   attack claims and 37 percent stroke claims.  There is still 1

22   percent where we are working with the firms and the claimants to

23   tell us what injury it is that they are asserting.  We've

24   continued to work with firms to try to get them to complete

25   their claims form to let us know which injury it is that they're

1    seeking.

2             I'd like to focus first on our progress with the heart

3    attack claims, because as the Court knows, we are on progress

4    and working towards the final payment at the end of the third

5    quarter of this year.  We are on pace to be able make that final

6    payment.

7             This slide shows that for the Gates process, we're

8    down almost 2000 claims from where we were last month in our

9    initial Gate review, and this is when the -- our claims

10   reviewers pull the claims and review them for the first time.

11   We have only 213 remaining.  Many of these are ones that we have

12   had to place on hold to seek clarification from the firms about

13   various aspects of the claim.  But we expect for both rows one

14   and two by the end of this week -- which was our goal, the end

15   of in April -- to finish our Claim Administrator Gates Review,

16   that those rows should be down to zero.

17            Row two shows that since last month we have reviewed

18   and quality control checked almost 3000 heart attack claims.

19   And this is when we do one final review before we issue a Notice

20   of Ineligibility or a Passing Notice for the claimant or before

21   a claim goes to the Gate Committee.  The 1,094 that remain in

22   that que, many of those are claims that have failed initially,

23   but the firm has submitted additional documentation and we are

24   reviewing that.  And so it's the second time through for the

25   review of those claims.  But as I said, we expect for those rows

1    to be down to zero by the end of this week, which will put the

2    ball in the court of the claimants to be able to see what it is

3    that their claim is doing, whether it's passing or failing.  And

4    if there is additional documentation that needs to be submitted,

5    they can submit that, or the claim will go to the Gate Committee

6    if the firm has already submitted documentation.

7            We have moved almost 2,500 claims to the point of

8    being able to be evaluated for Points Review.  Ten Thousand of

9    those 15,000 have already been paid.  We have issued 11,967 Gate

10   failure notices to claimants, and we've issued 3,000 more of

11   those in the last month.

12           There are currently 1,744 heart attack claims pending

13   on the Gate Committee portal.  That number that shows a decrease

14   of 394 since last month is a little bit misleading, simply

15   because claims go in and out of Gate Committee so quickly.  And

16   my last slide of this presentation will actually show the great

17   progress that the Gate Committee has made voting on more than a

18   1000 claims a week since February.

19           The Points Review Status, as I mentioned, there are

20   15,000 claims that have advanced to the place of being able to

21   be evaluated for Points.  10,003 of those claimants have been

22   paid and are on payments or Special Marker Fixed payments of

23   $5,000.

24           For May payments, and the deadline to accept awards to

25   be paid in May is tomorrow at midnight, and we are sending a

1    reminder email to firms this morning that they can accept and be

2    paid in May.   There are already 1,492 who have been accepted,

3    and they will be paid in May.   Another 532, we are still waiting

4    on a decision from.   And 465 who have appealed or who are

5    Special Marker Claims who've moved in the Special Review.

6            So, we have over 2,489 with current Points Awards

7    outstanding.   Almost 2000 of those could be eligible for payment

8    in May.   We will, as we do every day, issue more Points Awards

9    today, and some of those could be accepted by midnight tomorrow

10   and still be paid in May.

11           There are 348 where we have moved the claim to the

12   point of being fully reviewed, but we cannot issue it for some

13   administrative reason.   Those reasons in the past have included

14   lien issues or remaining enrollment deficiencies, although, as

15   the Court knows, are down to really just estate issues at this

16   point.

17           There are 360 claims that are pending QC.   And what

18   that means is that they've gone through our process.   We take

19   one more look at those to make sure the Points are accurate.

20   And those are within days of being able to be issued.

21           There are 818 where we have reviewed them for Points,

22   but we've had to stop because there is not enough information in

23   the Claims Package to be able to do a complete Points Review.

24   And this is about 10 percent of all the claims that we get in

25   Points, we have to stop and work with the firms to try to go

1    obtain more records.

2              There are 243 where we have begun the review of the

3    Points, and 851 waiting in the que for us to be able to review.

4              This is a slide we developed several months ago to

5    show the current pace of what we need to do to be able to make a

6    September 30th payment, or end of the third quarter payment.

7    From slide 1 we know that there are 29,891 MI claims on file.

8    We estimate a Pass Rate when we and the Gate Committee and Merck

9    have made its final decisions on eligibility to be around 70

10   percent, and that's currently what it is running.

11             That would result in us needing to pay 20,924 claims.

12   We've already paid 10,003.  And potential claimants for May is

13   2,024 that could be paid, which means we have about 9,000 that

14   we need to move to the point of being able to issue payment

15   between now and the end of September, or 2200 and -- 2,224 that

16   we need to move each month.  We are on pace to do that.  When

17   the initial Gates que ends this week, we'll be able to transfer

18   many of our claims reviewers to do nothing but Points.  As we

19   juggled the Points Review and the Gates Review, obviously our

20   resources have been divided in terms of trying to tackle both

21   fronts.  But now that we are through the Gates Review, those

22   trained heart attack claims reviewers will be able to devote

23   exclusively to the Points Review.  So, as with many of these

24   programs, when a program starts and you have several items that

25   you're tackling, the volumes go up each month, and that's what

1    we're seeing.  As the resources can be moved over to Points, we

2    fully expect that things will fall into place for us to be able

3    -- and we are actually moving over 2000, almost 2,200 claims to

4    Points each month already.

5            I'm not going to read the slide, but we do post these

6    slides, Your Honor, on our website under "MDL Court

7    Presentations."  This slide is the current average Points for MI

8    Injury Level.  And it shows that right now the Special Marker

9    Rate is running about 5 percent.  And those are claims that for

10   MI claimants have total Points less than 10.

11           Paid through April, we've paid 10,003 claimants, over

12   $854 million.  The pending May payments to date are 1,492, and

13   the total dollar amount for those would be over $121 million.

14   The potential May payments -- and those are the ones that could

15   accept between now and the end of tomorrow -- another 40,000,

16   532, claimants for a total of 2,024 potential May payments.

17   This could be higher; it could be lower depending on who accepts

18   between now and midnight tomorrow.  So the total potential May

19   payments could run in excess of 161 million, which would mean

20   that through May we have paid over a billion dollars.

21           Our stroke progress has been steady.  We have been

22   focused mostly, Your Honor, on the MI claims, however, we have a

23   dedicated team who continues to review stroke claims with

24   importance and urgency.  We have reduced the initial stroke que

25   by almost a 1000 since March 26.  There are many claims pending

1    our QC reviews, 7,977, that are pending our second review of

2    stroke claims.  This is -- we will tackle this que to try to

3    keep moving the stroke claims forward as we have continued to

4    do.  We have a stroke review team that focuses only on our

5    stroke claims.

6         We have 4,567 stroke claims that have advanced to the

7    point of Points Review.  We've issued 1,692 Notices of

8    Ineligibility, and the Gate Committee has 420 stroke claims

9    currently pending with no vote yet.

10        We have paid through April, and we just started

11   payments of stroke claims in February, so February, March and

12   April we paid a total of 868 stroke claims.  There are 696

13   stroke claimants with Points Awards outstanding for payment in

14   May.  Four Hundred of those, 398 have already accepted, and

15   another 200 could accept between now and tomorrow, and 98 have

16   appealed.

17        This slide also walks through the other stages of

18   progress for the stroke claims and Points Review.  We've

19   completed QC of 337, but again, those same issues that prevent

20   our being able to issue the Points Awards Notice apply here as

21   well.

22        There are 1710 that are pending QC.  A Hundred and

23   Thirteen, again, roughly around 10 percent of all that we've

24   reviewed are incomplete where we have to stop and ask the firms

25   to submit more records.  Three Hundred and Ten, their reviews,

1     as of yesterday, were underway, and 533 in the que to be

2     reviewed for the first time for Points.

3           This shows the summary of our payments on stroke

4     claims.  Again, 868 claimants have been paid $26 million.

5     There are 398 claimants pending payment in May for over 12

6     million.  Two Hundred additional ones could be paid for a total

7     of 598 stroke claims that could be paid through May, $17

8     million.  And that would bring our total stroke claimants to

9     almost 1500.

10          Again, this is a breakdown of the average Points by

11    stroke injury level.  The Special Marker Rate for strokes is

12    6.66 percent, and to be a Special Marker and a stroke claimant,

13    you have to have less than two Points when the final review of

14    the stroke claim is completed.

15          Finally, Your Honor, I'd like to show the Court and

16    those in the courtroom the progress of the Gate Committee.  We

17    do know, and we've always anticipated that the Gate Committee

18    was an important piece of this program.  We have found many

19    claims to be ineligible that the Gate Committee has found to be

20    eligible, but they have worked very, very hard in voting, as the

21    last row shows, on an average of 1000 a week.  And it shows that

22    they've decided almost 16,400 claims, 16,399 claims.

23          There are 2,530 current total claims pending.  Those

24    are stroke and heart attack claims pending.  165 of those are

25    more than two months old.  Only one of those is a heart attack

1    claim.  So, the Gate Committee has also prioritized the heart

2    attack claims as we have.

3           And there are over 2,500 that are pending, 2,196 have

4    been with the Gate Committee for less than seven days.  So, the

5    Gate Committee is on task.  They are reviewing claims very

6    quickly and helping us to be able to move claims along for the

7    final September payment.

8           THE COURT:  Thank you very much.  One of the reasons

9    I have monthly meetings is to get a feeling for what's happening

10   and other reason is to bring transparency as much as we can

11   possibly do.  In addition to the monthly meetings, this is all

12   posted on the website so people have access to it, and they can

13   be kept up to speed with it.

14          So the long and short of it, you feel you're on target

15   to finish out the heart attack cases by September?

16          MS. GREER:  Yes, we do, Your Honor.  We -- obviously,

17   many things have to fall to into place.

18          THE COURT:  Yes.

19          MS. GREER:  And one of the things that we've done --

20   as the Court is aware -- last month we announced tightening up

21   of claims deadlines that were really starting to cause a problem

22   because some claimants were getting a lot of time to submit

23   records that they really needed to have submitted last July.  We

24   have tightened up those deadlines, and we believe that by doing

25   that, that task -- that step alone will be able to help us get

1    finality on this.  There are still, in the Gates process, there

2    are still 14 percent of the claims that are missing either a

3    Basic Event Records or Proof of Use Records.  Those claimants

4    will certainly fail Gates.  And the question is, will they be

5    able to get us records that will satisfy Gates within 21 days?

6    Because that's what they'll have, and they'll have no more than

7    that.  When they get the notice of ineligibility have 21 days

8    and we are holding firm on that deadline.

9         10 percent, again, of the Points Reviews that we do

10   have incomplete records.  And so we're giving firms 30 days to

11   submit those records.  So it's a very delicate balance between

12   moving forward and giving claimants every opportunity they can

13   to perfect their Claims Packages.  But we have really tightened

14   up on that and feel confident that that will help us meet the

15   goal.  The Gate Committee's progress has been great, and we feel

16   like we're poised to be able to make that payment.

17        THE COURT:  Okay.  All right.  Thank you very much.

18        MS. GREER:  Thank you, Your Honor.

19        MR. HERMAN:  May it please the Court, within the Items

20   1 and 2, we're pleased to report that the U.S. Bank Escrow

21   Amendment establishing a Qualified Settlement Fund has been

22   signed off by all parties to date.

23        Your Honor also had indicated that you wanted to

24   discuss from the bench the Rule 17, New York inquiries which we

25   had.

1          THE COURT:  Yeah, we're getting some inquiries from

2     the Court on -- from New York claimants.  In New York, a court,

3     a judge, has to approve the settlement before the Circuit Court

4     will sign the necessary documents.  And the issue is, how do we

5     go about doing that?  I talked to the parties about perhaps

6     having the MDL weigh in on it on a Rule 17 Motion.  There is

7     some newness about that.  That hasn't happened before, and there

8     is some jurisprudence, at least one case, that seems to question

9     whether or not it would be efficient or effective.

10          So, the first step is to see whether or not these

11     matters can be expedited in the normal way, namely, through the

12     New York Court.  And I suggested to counsel that they see if

13     they can group those cases and get about 15 or 20 of them and

14     bring them to one judge there.  And if the Court can -- if I can

15     weigh in on it, I'll talk to that judge and explain what the

16     situation is and what needs to be done, and we'll try to do it

17     that way.  If not, then I'll look again at whether or not I can

18     do it by Rule 17 and do it a little faster.

19          MR. HERMAN:  Your Honor, if it please the Court.

20          THE COURT:  Yes.

21          MR. HERMAN:  It might be the appropriate part in the

22     agenda for Ms. Snapka, Kathryn Snapka, and Mr. Birchfield to --

23          THE COURT:  Okay.

24          MR. HERMAN:  -- report to Your Honor about the

25     Extraordinary Injury.

1          THE COURT:  Okay.  This is a fund that's created,

2     because in matters of this sort, as we all know, there are some

3     cases that fall outside the -- I don't want to say normal, but

4     fall outside the regular matter, and they're extraordinary

5     injuries which result in extraordinary losses, primarily in

6     connection with wage loss and things of that sort.  And a fund

7     has to be created, in my judgment, in complex litigation cases

8     of this nature to recognize those individuals, and so we've

9     tried to do that in this case.

10          One problem that has arisen is that when you do that,

11     when you create that fund, it is a fixed fund, it's not a

12     continuing, expanded fund.  It is a whole piece of pie, so to

13     speak, or a whole pie.  And so whatever slice you take out of

14     the pie, reduces the rest of the pie.  You can't make it a

15     bigger pie each time.  So, when you evaluate a particular claim,

16     that's a slice of that pie.  That means that there is less of a

17     pie to go around for the rest of the claimants.

18          When you reevaluate that slice and increase the slice,

19     that takes away from the other claimants.  So the issue

20     oftentimes in matters of this sort is, how do you deal with that

21     problem and also make sure that you have some due process, which

22     we've tried to do in this particular case?  We've not only tried

23     to give some transparency, which I've been very sensitive to,

24     but also due process.  And due process in a case of this sort

25     means appeal mechanisms.  In the typical case you go through

1      Brown Greer, which is the Administrative Review, and then you go

2      through the Gates Committee, which is the attorney's review, and

3      then you have another appeal to a Special Master.  So, I feel

4      comfortable that that presents some appeal mechanism.

5            The difficulty is, how do you deal with appeal in the

6      Extraordinary Fund case?  And that's the issue that we have been

7      focusing attention on at this point.

8            MS. SNAPKA:  Your Honor, Kathryn Snapka.  I appreciate

9      the Court's recognition of the nature of the Extraordinary

10     Injury Fund.  After a hearing in early April, we met with a

11     representative of Merck and the Plaintiffs' Steering Committee,

12     and yesterday afternoon I received a draft of some proposed

13     language, and I certainly think that it is something that we can

14     work with, and I want to express my appreciation.  I know that

15     Merck also wants an opportunity to take a look at the language

16     as well.  And since we do have a little bit of time on the

17     Extraordinary Injury Fund deadline, I would ask the Court if we

18     could make the final report at the next meeting since we've just

19     had an opportunity to look at it.  But I certainly do think it's

20     something that we can work with and provide some due process for

21     those claimants who wish to avail themselves of an additional

22     review.

23           THE COURT:  Okay.  Any problem with that,

24     extending it, Andy?

25           MR. BIRCHFIELD:  No, Your Honor.  Following the

1     last status conference we met and we, dis -- and what the

2     draft language -- Andy Birchfield.  And what the draft

3     language does is just reflects the agreement that we had at

4     that point.  So, I don't think that the language is going

5     to be a big issue.

6                    THE COURT:  Okay.

7                    MR. BIRCHFIELD:  But since the deadline is September,

8     I don't see any problem --

9                    THE COURT:  Okay.  All right.  Fine.

10                   MR. BIRCHFIELD:  -- with us finalizing that and

11    posting it as part of the manual by the next status

12    conference.

13                   THE COURT:  All right.  Thank you.  Kathryn, I

14    appreciate your weighing in on that.  I think you've

15    focused our attention on it, and I think that that's made a

16    better plan for everyone.  Thank you.

17                   THE COURT:  Lien Administrator?

18                   MR. HERMAN:  Yes, Your Honor, Mr. Garretson is

19    here.

20                   THE COURT:  All right.

21                   MR. GARRETSON:  Thank you, Your Honor.  Matt

22    Garretson with The Garretson Firm here to report on the

23    status of the Lien Resolution Programs.

24                   Let me jump right in with the governmental liens, and

25    then I'll touch on the Private Lien Resolution Program.

1            With respect to the governmental liens, as the Court

2      is aware, we have arrangements in place with Medicare for the

3      both the MI and now the IS injury categories.  To date, we have

4      only received 133 requests for redeterminations, as I report

5      each month.  We're very pleased with this number.  It represents

6      still approximately 1 percent of the Medicare entitled claimants

7      that have been assigned Points Awards by Brown Greer.  Also, as

8      I've reported in previous hearings, we still see the trend of

9      the vast majority of these being taken care of just through

10     claimant education.  The process on our call center seems to be

11     working well for these individuals who object, who largely just

12     need to understand why they owe a Medicare reimbursement claim

13     philosophically.

14            Also as reported last month, we're still trying to

15     isolate a subset of Low Point ischemic stroke cases.  These are

16     cases that are above this Special Marker level, yet low in Point

17     value.  And the arrangement we have with Medicare has perhaps a

18     disproportionately large amount of these individuals awards

19     dedicated to the Medicare reimbursement claim.  So, we've begun

20     a process with Brown Greer where we're putting a hold on anybody

21     who is an ischemic stroke claimant who's Medicare reimbursement

22     obligation approaches 20 percent of their gross award.  Medicare

23     has been very cooperative with us and understands that the

24     program has to work for all claimants.  And this was something

25     we couldn't identify until we began to apply the Medicare

1    numbers to the ischemic stroke Point claimants.  So, I'll

2    continue to report on that and do not anticipate any problem

3    solving that issue.

4          With respect to Medicaid, at the last hearing you

5    asked that we provide you a list of all the states that have

6    been non-responsive in providing us Medicaid claims data so we

7    could complete our audit process.  I'm pleased to report that

8    all this -- that all five states who were slow responders as of

9    last month are now actively transferring all their claims data

10   to us, or have a plan in place and a time line that's acceptable

11   to us, Your Honor, to get those materials to us.

12         THE COURT:  I need to express appreciation from

13   the bench to those states.  We have been in contact with

14   many of them, and they've been very understanding and very

15   responsive, and I appreciate the efforts that both the

16   governors' offices in those states as well as the insurance

17   offices have given to the Court.  They, I think, helped

18   their constituents very well, and has also helped move this

19   program along, and I appreciate it.

20         MR. GARRETSON:  I agree completely, Your Honor.  And

21   now we're pleased to have over 75 percent of all the Medicaid

22   claims data that we need to complete the task for tens of

23   thousands of claimants in-house.

24         With respect to the other governmental liens, we

25   do continue to get a good buy-in from all of these other

1    governmental programs like the VA, Tricare, Indian Health

2    Services, Department of Defense.  I'll just remind the

3    parties that these programs, unlike Medicare and Medicaid,

4    are decentralized, meaning we have to actually make contact

5    with all the downstream medical facilities for many of

6    these programs to gather the medical records that we need,

7    but that seems to be moving well.

8         Now I turn my attention, as I mentioned, from the

9    governmental health care programs to the recently-announced

10   Private Liens Resolution Program.  We're continuing to work with

11   the Plaintiffs' Steering Committee the group of Third Party

12   Payors to implement the procedures and protocols called for in

13   the Memorandum of Understanding.  As the Court and the parties

14   are aware, this program is a voluntary program that allows

15   claimants to participate in a program that would match potential

16   lien obligations to a group of plans that have committed to

17   participate in this program.  I won't go back through the

18   parameters of the program, but I did want to give some report on

19   the launch, the subsequent administrative process and some of

20   the new participants.

21        With respect to the launch of the program, we drafted

22   several documents that would assist plaintiff's counsel with the

23   introduction and participation phase of this program.  Those

24   materials included a notice to primary counsel that was provided

25   to them through their web portal for primary counsel, a claimant

1      information package, as well as forms for claimants to sign,

2      including a HIPPA release, to allow them to participate in the

3      program.

4              These materials were sent out via email on January

5      30th of 2009, to all primary counsel.  In addition to the email,

6      alerts were posted on the front page of the administrator's web

7      portal.  The announcement also placed on the Court's Vioxx MDL

8      website, and we also provided these materials to pro se curator.

9              We are now, having had those out the door for several

10     months, we are now in the stage of actively managing the

11     participation process.  To date, our firm has received over

12     16,500 claimant participation forms.  That's as of April 28th of

13     2009.  And while the program was officially launched January

14     30th, the time lag, it took several months to get the materials

15     out through primary counsel.  Many of the counsel then, and

16     their firms, had to process these back out to the plaintiffs,

17     the claimants.  Those had to be reviewed, brought back in-house

18     and many discrepancies and data cured.  So we think that that's

19     actually a pretty quick turnaround when you're dealing with a

20     1,058 primary counsel disseminating mailings of this magnitude

21     to thousands of claimants.

22             Further, as reported last hearing, we did commit to

23     contacting any health care provider for a claimant who said, "I

24     want to participate, yet I do not see my plan listed on the

25     exhibit of participating health plans."  I'm pleased to report

1    that since the program's inception, an additional 134 plans have

2    been added to the participating plan list through these efforts.

3    We have close to 1,000 more names of plans we're trying to match

4    to see if, in fact, that're already participating and perhaps

5    the claimant did not know the correct name, or if there are

6    other plans to be approached.  But we have not had a plan yet

7    reject the program that's been approached with the momentum that

8    it has.

9         With respect to exchanging the claimant data, I think

10    this is the most significant point of the program to report.  On

11    April 7, 2009, the participating private health insurance

12    providers, both the original group and these additional 134,

13    elected not to exercise their Walk-Away Rights, and now the

14    Vioxx Private Lien Resolution Program is, in fact, moving

15    forward.

16         Accordingly, we were able to take 15,686 claimant

17    names and begin to exchange those with the participating plans

18    that have elected not to walk away.  We have over 1,000 more

19    currently in-house that we've not been able to share with the

20    plans yet because we're waiting to cure a material defect with

21    their HIPPA release.

22         We will continue to work with Brown Greer to insure

23    the program is coordinated into the, and integrated into the web

24    portal, and that appropriate hold backs and finalized liens are

25    noted in their system as well.

1          Your Honor, despite the fact that the program was

2     announced as going forward, at the Court's direction, we sent to

3     primary counsel a set of letters for primary counsel to then in

4     turn send to a very targeted group of non-participating

5     claimants, informing them of the extended deadline that the

6     parties have agreed to, to allow them to participate in the

7     program.  These materials, as the Court is aware, ask the

8     claimants who have yet to participate, to reconsider their

9     decision, largely based upon new information concerning the

10    greater list of plans that have agreed to sign up since the

11    original list of plans was circulated.

12          So another email, with the Court's supplemental

13    letters, was sent on April 23rd to plaintiff's counsel with

14    instructions to have them return the forms by May 29th of 2009,

15    this being the extended deadline.  The supplemental mailing to

16    primary counsel included an access to a very specific spread

17    sheet of claimants who are most likely to have private lien

18    program -- lien obligations that have yet to elect to

19    participate if the program, and we've also been able to earmark

20    those who have governmental obligations.  So by process of

21    elimination, this has become a very targeted list of claimants

22    so firms can understand of their of clients who are those that

23    likely have obligations who have yet to participate.

24          These supplemental letters that I've described really

25    get to what we think are claimants who could benefit from some

1    further education.  Mainly claimants who are eligible for

2    Medicare, but we've determined that they're not on governmental

3    Medicare, they're under a Medicare Part C or HMO or Advantage

4    Plan, which is actually administered by a private health care

5    program and so it is, in fact, a Medicare type of obligation

6    that would have to be resolved under the Private Lien Resolution

7    Program.  And we wanted to, in the abundance of caution,

8    eliminate any chance that these claimants thought that the

9    supplemental programs that they purchased through a private

10   entity were somehow otherwise being resolved in the Governmental

11   Lien Program.

12           We've also included a list of claimants who have

13   been -- there was a stream of notices that were put out to

14   primary counsel that contained an exhibit of claimants who

15   certain plans thought they had a reimbursement obligation in.

16   And if those plaintiffs have yet -- those claimants have yet to

17   participate, we've informed primary counsel of that fact so they

18   can, again, educate that group.

19           And then there is a balance of others, Your Honor,

20   that have not participated that we have sent this program --

21   this updated extension to as well, just to inform them of the

22   extended deadline and let them know, again, of the additional

23   plans and the fact that the program is moving forward.  We've

24   also supplied the pro se curator with that same spreadsheet and

25   information and letters for them to process to the unrepresented

1    claimants.

2          So, in conclusion, we're pleased with the progress to

3    date.  As I think everyone is aware, this Private Lien

4    Resolution Program has not been implemented before, and so there

5    is no road map.  And so as these issues are confronted, we'll

6    bring them to everyone's attention and try to find a logical way

7    to solve them.

8          THE COURT:  The focus in the past has been on the

9    governmental liens because the governmental liens are statutory

10   liens, and not only individuals but their counsel and the

11   parties are responsible for those liens.  A discounted program

12   has not posed a problem necessarily or a large problem from the

13   lien holders in those matters, but private liens have created

14   some difficulty.

15         In this particular case, I wanted to see whether  a

16   negotiated deal with the governmental liens could set sort of a

17   base to move forward on private liens.  Through the efforts of

18   Mr. Garretson's firm, the litigants were able to get a good

19   deal, so to speak, for both sides in the governmental liens.

20   The government has an opportunity, on one fell swoop, to get all

21   of their liens taken care of.  But it is also a good deal for

22   the individuals because the liens are substantially discounted.

23         When that was solidified, then Matt stepped it out to

24   see whether or not the same kind of approach would work with

25   private liens.  The individuals who receive the benefits have

1    both a legal as well as a moral responsibility to pay them.  The

2    individuals who receive the benefits have both a legal and moral

3    responsibility to pay those liens.

4         The transactional cost of the lienholder is a

5    significant transactional cost.  So it was to their benefit to

6    see whether or not they could use this litigation as a focal

7    point for getting their liens paid.  Because of that interest,

8    however, there was also some opportunity for the claimant to

9    benefit from that.  And that was negotiated, and so it's a good

10   deal for the claimants to do this.  I expressed myself in those

11   letters to that extent, and I also think, obviously, it's a good

12   deal for the lienholder.  But if the matter is not resolved at a

13   discounted, a highly discounted rate here, then the claim is

14   going to be pursued in the appropriate jurisdiction, and

15   claimants won't have the opportunity at that point to get a

16   discount.  So, I urged them at least to consider it.  What they

17   decide is up to them, but this is an opportunity for them to get

18   a great discount, a large discount on their lien, which they

19   have against their funds.

20        So, I appreciate all the work that you've done on

21   that.

22             MR. GARRETSON:  Thank you, Your Honor.

23             MR. HERMAN:  Your Honor, Item 14 on your --

24             THE COURT:  Thank you.

25             MR. MARVIN:  Your Honor, I just want to note that in

1    connection with the liens, there is a new law that now requires

2    defendants to notify a certain lienholders when a settlement has

3    been reached.   And we will be working with the Lien

4    Administrator, Mr. Garretson, and with the Claim Administrators

5    to come into compliance with that additional requirement.

6          THE COURT:  All right.  Yeah, that has been on the

7    horizon for a while, and that presents a problem for the

8    claimants, and I wanted to see whether or not we could focus

9    them on joining this program, at least think about joining the

10   program, because it's to their benefit.

11         MR. HERMAN:  Does this statute provide, Mr. Marvin,

12   that defense counsel is responsible for the lien if they don't

13   notify?

14   (Laughter.)

15         MR. MARVIN:  Yeah, it does.

16         MR. HERMAN:  I'm glad we have balance.

17         Your Honor, if I might call the Court's attention to

18   Item 14, which also relates to the AvMed issue and the lien

19   issue.  Mr. Seeger and Mr. Sobol are here, and this may be --

20         THE COURT:  Okay.

21         MR. HERMAN:  -- a more appropriate time to --

22         THE COURT:  Sure.

23         MR. HERMAN:  -- deal with that.

24         THE COURT:  Okay.

25         MR. SEEGER:  You know, I -- Chris Seeger.  Sorry.

1          Your Honor, I think that Matt did a really thorough

2     job in reporting where the program is.  Mr. Sobol and I have an

3     issue we've been working through very hard, and that is trying

4     to come up with some audit procedures because we built into the

5     arrangement that the group that is represented by Mr. Sobol will

6     have an opportunity -- and our side -- to really kind of take a

7     look behind the curtain.  We now, with the 16 or

8     17,000 enrollees -- I'm not sure what that final -- where are we

9     at, Matt?

10          MR. GARRETSON:  Right here.

11          MR. SEEGER:  How many enrollees do we have?

12          MR. GARRETSON:  We are up to about 16,600.

13          MR. SEEGER:  That's a -- that's a, you know, pretty

14    big group that I think we can start to look at it.  So, I mean,

15    we have some open issues there, but I don't think there is much

16    to report at this time.

17          THE COURT:  Okay.  Well, if there is an open issue

18    and y'all can't resolve it, bring it to me and I'll resolve

19    it.

20          MR. SEEGER:  Thank you, Judge.

21          THE COURT:  Thank you.

22          MR. HERMAN:  Your Honor, Mr. Juneau, our Special

23    Master is here.

24          THE COURT:  Special Master.  Okay.  As I said before,

25    part of the process to insure that the parties have some due

1    process in this particular matter, is to have a Special Master

2    appointed as a final review in these matters.  And Mr. Juneau is

3    a nationally recognized attorney, with a lot of experience in

4    cases of this sort.  I've appointed him as Special Master, and

5    also some Deputy Special Masters who are also very experienced

6    in mass tort, mass litigation from New Jersey and from

7    California to be of assistance to him.

8              MR. JUNEAU:  Your Honor, Patrick Juneau, Special

9    Master.

10             Very briefly report, Your Honor.  We've had currently

11   414 appeals.  We have -- there has been rulings in all but 27 of

12   those, and of those 27, some of those are just in the recent few

13   days.  I'm pleased to report to the Court that we continue to

14   have these conference calls with myself and the Deputy Special

15   Master reviewing and attempt to develop some uniformity in terms

16   of the rulings in this matter.  But I'm happy to report that

17   we're on target, that what we anticipated to be done is being

18   done.  I have met with the respective parties in the PSC and

19   Merck.  Mr. Birchfield has advised me of projections in the

20   future, and the Court is acutely aware of that.

21             There are some bubble periods that we expect to occur

22   in terms of the numbers of appeal, and they've been very

23   diligent in providing me with that information so that we would

24   be geared up to address those, the number of appeals we expect.

25             I want to continue to report to the Court though, that

1    in some of these matters -- it varies on the case, obviously.

2    It varies on what the issues is, but some of these matters are

3    quite extensive in terms of medical records.  Some of them are

4    very isolated, depending on what the appeal is.  But through my

5    discussions with the other Deputy Special Masters, they are

6    acutely aware of what the issues are.  They're acutely aware of

7    what needs to be looked at, and they have addressed those issues

8    that they deemed, you know, appropriate for review and have

9    acted accordingly.

10          THE COURT:  Good.  Okay.  Thank you very much.

11          MR. JUNEAU:  Thank you, Your Honor.

12          THE COURT:  Part of the process, as I mentioned,

13   is to achieve due process, but at the same time, we can't

14   get bogged down in a matter of this sort.  We have 50,000

15   cases that have to be processed or thereabouts, and we

16   can't have any aspect of the program serve as a bottleneck

17   to hurt the development and the moving of the whole

18   program.  But we've been able to achieve that because of

19   the expertise of the parties, and particularly the work of

20   the Special Masters.

21          I've asked Mr. Birchfield, who's acutely involved with

22   the Gate Committee to be in communication with the Special

23   Masters.  When he sees a particular bubble coming through,

24   rather than surprise the Special Masters with several thousand

25   cases, he gives them a heads-up that you've got a bubble coming

1    out and it's going to look like it's going to be about two

2    weeks, or a week, or 10 days, or whatever it is, or three weeks

3    before it gets to you.  They can beef up their staffs; they can

4    clear their deck; they can be ready for it.  And that's what

5    we've been trying to achieve with this communication.

6         MR. JUNEAU:  One item I maybe should address, I think

7    would be informative, Your Honor.  The way the system is set up

8    through the meetings we've had with Brown Greer, when those

9    appeals are filed, we are immediately notified of the appeal, so

10   we know instantaneously what the matter is.  So, it's not a

11   matter of delay or waiting for something in the mail, or waiting

12   for something to come.  We know exactly what's pending and can

13   accordingly adjust.  So, that has a tremendous affect and

14   ability for us to address on a quick order, these appeals.  In

15   other words, to get them, put them in order, and address them so

16   that there is not a long delay period.

17        THE COURT:  And electronically, has very helpful with

18   that too, because you get it electronically, and you're able to

19   look at it and everybody's able to look at it rather than move

20   paper around the country.

21        MR. JUNEAU:  My old excuse doesn't work anymore,

22   Your Honor.  Thank you.

23        MR. BIRCHFIELD:  Judge, if I could, I wanted to

24   express my appreciation to Mr. Juneau.  He's been very

25   cooperative in working with us to anticipate what may be

1    coming to the Special Masters.  And as we had discussed, we

2    are seeing an uptick in the number of cases that are being

3    considered by the Special Masters.  They're doing a very

4    good job of staying on top of those cases and giving us

5    prompt rulings, and prompt decision, which is necessary for

6    us to stay on track for the September final payment.

7         What we do anticipate, even though we're picking up

8    and the pace and we'll continue to pick up, there will be a very

9    significant bubble that will be addressed by the Special Masters

10   beginning the first of July.  The potential is there for as many

11   as 4,000 cases that they will not see until the first of July,

12   but must be decided between the first of July and August 15th in

13   order for us to stay on track.  That is a very large number of

14   cases, but we know from the Gates Committee experience that that

15   can be done.  We're reviewing over a 1000 cases a week.  So

16   4,000 cases certainly can be handle in that six-week period,

17   provided the resources are in place to do that and the Special

18   Masters, we've talked about what's necessary, what kind of

19   resources are required.  And so I'm very pleased that they are

20   on track, they're committed to getting that done so that we'll

21   be on pace for the September payment.

22        Thank you, Judge.

23        THE COURT:  Thank you very much.  Next item, State

24   Court Trial settings.

25        MR. MARVIN:  Your Honor, there is nothing new there.

1          THE COURT:  Okay.

2          MR. MARVIN:  No State Court Trial settings through

3     August.

4          THE COURT:  Okay.  There are some claims afoot in New

5     Jersey with the Third Party Payors' claims, and that I

6     anticipate if some of those cases can't be worked out, they may

7     have some trial settings either in the latter part of this year

8     or beginning of next.  I've got the same issues, and I'm going

9     to be coordinating that with New Jersey to see that -- make sure

10    that we don't have the trials on the same date.

11         Class Actions?

12         MR. HERMAN:  May it please the Court, nothing new on

13    that.  With respect to Discovery Directed to Third Party, the

14    ESI issue is completely resolved.  We are going to remove that

15    from the next status report.  And we thank the Court for the

16    Court's intervention in that issue.

17         THE COURT:  Well, I appreciate the ESI's

18    understanding, and I'm glad that that was resolved.

19         MR. HERMAN:  Your Honor, since the general discovery

20    article was removed from the status reports at a prior time, I'm

21    wondering if this might by the appropriate time for the -- your

22    address as to the meeting you had yesterday and the appointment

23    of Ms. Ann Oldfather for the non-enrolled cases.

24         THE COURT:  Yes, I have been dealing with, as you

25    know, about 50,000 cases or thereabouts.  A settlement has been

1    arrived at for a large portion of the cases, the major portion

2    of the cases, but not all of the cases, because the Settlement

3    Program dealt with certain MIs and strokes and another matter or

4    two, malady or two.  So they left -- there are other cases which

5    either didn't want to enroll in the program or wasn't qualified

6    to enroll in the program.  And those cases total approximately

7    114, I think.  That's what I've been able to glean from the

8    documents that I have in court, and maybe more.

9          In any event, I convened a conference of all

10   interested parties in those particular cases and notified the

11   attorneys who represent those 114 cases.  And I convened the

12   conference and had it yesterday.  My thinking on those cases is

13   that we've got to focus now on those cases.  While we're dealing

14   with the Settlement Program, I'm able to get some time to focus

15   on those particular cases and put those in order for trial.

16         So, the first thing that's necessary is get a census

17   of those cases and to see what we're dealing with, and then to

18   put some structure into it so that I can have individuals to

19   talk to and deal with them.  Then my thinking is that we'll have

20   a period of time for discovery in those particular cases, and

21   then I'll be calling upon the parties to pick some cases for

22   trial.  I'll give everybody an opportunity to pick their cases.

23   I'll give them an opportunity also to veto, and we'll come up

24   with two cases in each category, and I'll pick the one that will

25   go to trial from that particular category.

1    Probably, I'll have some cases that I can try and

2    hear.  There may be some cases that may have to be tried in

3    other parts of the country, and I'm in the process of talking

4    with the judges in those areas to see whether or not I can go

5    out there and try those cases.  I haven't talked to any state

6    court yet, but we've got a committee for state and a Federal

7    Coordination, and I'm told that it's possible that I could be

8    appointed a state judge to try a particular case.  If that's

9    possible, I'll try to do that.

10    But in any event, we're moving along that line, and

11    I'm now in the process of calling upon the parties to give me a

12    census.  I've appointed Ann Oldfather, liaison, for that group

13    of cases because I think that they are outside of the program.

14    And I don't know whether there is any conflict or not conflict

15    between the PSC and these cases, but in any event the PSC is not

16    a part of that of those particular cases, and I wanted to have

17    someone outside of the PSC to coordinate those matters.  So Ann

18    is going to be liaison counsel, and Doug Marvin is going

19    represent Merck.  And I'm going to meet with them in two weeks,

20    at which time they will have had an opportunity to focus on the

21    census, communicate with all of the interested parties and give

22    me some grouping.  I can see maybe come up with about five

23    groups or subgroups.  And my thinking is that, as I say, I will

24    set a period for open discovery in all of those cases with the

25    view towards picking some of the cases in each of those

1    subgroups and teeing them up for trial.

2            I hope we can do that with the discovery of four to

3    six, seven months of discovery, and then we'll begin honing them

4    down to try the cases.  Hopefully, I can begin trying cases in

5    either the latter part of this year or probably more likely, the

6    first part of next year, and we'll get those cases knocked out.

7    In addition to that, we're dealing with the Attorney General

8    cases and the Third Party Payor cases which I will be trying

9    also, hopefully the latter part of this year.

10           MR. HERMAN:  Your Honor, since we have a lot of

11   new folks here, I do want to repeat the Court's website,

12   http://vioxx.laed.uscourts.gov.  And all of the Court's

13   rulings and filings have been posted serially to date.

14           Ms. Dawn Barrios is here, Your Honor, with regard to

15   the State Federal Coordination.  I do want to state on behalf of

16   the PSC, the -- we don't have a participation in any of the

17   cases that haven't enrolled.  But the depository of documents is

18   open for lawyers to explore, and should Ms. Old father and her

19   group have need, please contact our office, and we'll make it

20   available.

21           THE COURT:  With regard to the website, if you can't

22   remember the website, go to the website of the Eastern District

23   of Louisiana, and I have a link on that which will get you to

24   our website.  I found the website very helpful in MDL.  We post

25   all of our material on the website.  And even transcripts of

1    these hearings, they go on the website so people who want to

2    know what the Court has said or what the individuals have said,

3    have access to it.   I think it's been very helpful to -- for

4    transparency in this particular case, and I would urge all MDLs

5    to do that.

6           Next item is State/Federal.   Dawn?

7           MS. BARRIOS:   Good morning, Your Honor, Dawn Barrios

8    for the State Liaison Committee.   I've provided the parties and

9    Your Honor with a CD ROM as well as a printout on the statistics

10   on the remaining remands.   And if you turn to the second page

11   you'll see that there were 1,901 claimants who have filed for

12   remands.   Those that have been disposed of because of enrollment

13   and resolution in the program equals 90 percent.   So 90 percent

14   of that number have effectively had their remand rendered moot.

15          The other percentage, Your Honor, is broken down.   And

16   the plaintiffs or claimants who are registered only but not

17   enrolled in the program, that's two percent.   And I'm sure at

18   some point the parties will address the disposition of these

19   cases.   Those plaintiffs or claimants who have not enrolled or

20   registered equals eight percent of that total.   And if you'll

21   notice in the latter columns, we have 20 that were post

22   settlement filings.

23          THE COURT:   Right.

24          MS. BARRIOS:   And we have many -- 35 who are

25   Government Action, T.P.P. and consumer cases.   The large number

1   of, if you'll notice, 43 pending remands for the State of New

2   York.  Those cases, Your Honor, will be dealt with under Roman

3   Numeral XX of your joint report today, so that's why that number

4   is so large there.

5           THE COURT:  Okay.

6           MS. BARRIOS:  But as you can see, every month we seem

7   to be whittling down the number of remands.

8           THE COURT:  I think that that's important for me

9   to comment on that.  You get, in matters of this sort, in

10  MDLs, when the cases are transferred in, they come in

11  either with a Motion for Remand or Motion for Remand is

12  filed shortly thereafter.  And as the case proceeds,

13  discovery proceeds, and I usually keep these cases until at

14  least discovery has reached a point where they can profit

15  from the discovery.  Because a single case of this sort is

16  very difficult to handle, either state or federal court.

17  It's a rather difficult case; it's a rather expensive

18  case.

19          As you know, I've tried six of these cases.  The

20  plaintiffs have spent between one and two million dollars

21  per case.  The defendants have spent between two and three

22  million dollars per case.  No attorney fees involved, just

23  expenses.  It's a case that's hard -- that -- now these

24  were Bellwether cases, so all of the bells and whistles

25  have been utilized in those Bellwether cases.  And probably

1        it would not have cost that much for single cases.

2              But it's a substantial case.  It's a product

3        liability case, a very significant expense.  So I've tried

4        to keep them as long as I -- is reasonable, so that these

5        individuals can get some benefit from the discovery, if

6        indeed they do go back.  But it also gives them an

7        opportunity to decide whether or not they want to settle

8        their case.  And if they're part of a large group, their

9        chances are better.

10             MS. BARRIOS:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MR. HERMAN:  Your Honor has appointed Robert Johnson

13       and his firm to represent pro se claimants.  Ms. Claudia Santoyo

14       for the firm is here to report.  We have received one more pro

15       se since the last meeting, which we will forward to Ms.

16       Santoyo.

17             MS. SANTOYO:  Good morning, Your Honor.

18             THE COURT:  Good morning.

19             MS. SANTOYO:  Claudia Santoyo here for the Curator's

20       Office.

21             Initially, I'd like to just to report that we've

22       continued responding and assisting the calls, faxes, emails and

23       mail that we receive from pro se's and from those claimants who

24       are either represented and in the course of becoming pro se, or

25       wish to become pro se.

1          The call link and contact link has increased

2    continually.  But at this point now we can say that the pool of

3    callers and people that we are speaking with has sort of

4    plateaued.  So in that regard, I think we're getting closer to

5    where we can say that those people are being assisted and will

6    be well on their way to understanding the issues.

7          Essentially the main things we're dealing with now is

8    the deficiencies in enrollment, specifically the release

9    documents.  We've been able to work with counsel for Merck, who

10   is doing the review of those documents and they have been

11   extremely -- of great assistance in allowing us some flexibility

12   in assisting pro se claimants and clearing those deficiencies,

13   especially when the situation is such that the claimant mailed

14   in the portions of the release which needed their signature or

15   writing, but didn't send in those pages that were, I guess they

16   thought informational.  And, of course, the entire release needs

17   to be submitted.  We now have the authority and under agreement

18   with counsel for Merck to review the whole document, speak with

19   that claimant, assure that we have their permission to resubmit

20   the entire document and, in fact, can clear those deficiencies

21   fairly quickly.  So I'd like to thank counsel for Merck,

22   especially the folks over at Brian Cave, Williams Connolly and

23   Stone Pigman in assisting.

24         The next part of our calls usually resolve -- I'm

25   sorry, revolve around representative capacity issues.  As the

1    Court and parties are aware, there was a form Cap 2008, I think

2    dash 1 that was informational and gave the claimants sort of the

3    starting point to assure that they are the appropriate party to

4    represent either a deceased claimant or an incompetent claimant.

5           Now we're at the point where, although the form may or

6    may not have been completed, the second part of that, which is

7    getting the actual document of authority from a Court in the

8    jurisdiction in which the claimant resides, that's the part

9    that's not yet done.  So we are working towards that.  It's

10   complicated because of the fact that state law applies to each

11   individual claimant.  But, again, counsel for Merck as well as

12   the Claims Administrator is assisting with advising us the

13   precise name and type of document that each person may need by

14   state.  So we're working closely with them so that we can advise

15   the pro se where to go specifically, what the name of the

16   document is that they need, and how to go become about getting

17   it and facilitate that for them.

18          We continue to receive ongoing questions about claim

19   status, the pro se's option if they've received some type of

20   notice, either eligibility, ineligibility or Points Awards.  And

21   we also continue to receive calls and assist people who are

22   receiving notices of deficiencies as to pretrial Order 28

23   and/or are the subject of a Motion to Dismiss.  We process these

24   on a rolling basis, and as previously stated, all of our

25   communications are uploaded to the communications log available

1    through the secure portal.

2        We do have a special class of claimants who are either

3    switching to become pro se's voluntarily or who are in the

4    process of becoming pro se's because of a motion to withdraw

5    filed by their attorney.  We're assisting those claimants.  If

6    the claimant is the person requesting to become pro se, we've

7    been able to have the claim administrator immediately change

8    their status in the secure portal so that our office can see the

9    relevant information and give that person the update.  Where

10    it's an attorney withdrawal, we facilitate communication between

11    that claimant and the attorney if, depending on the basis of

12    the withdrawal.  And once the orders are signed, we inform them

13    of any pending deadlines, any other appeal requirements,

14    options, et cetera, as they come in.

15        I'd like to, in particular, thank the Court for taking

16    the time earlier to give us some guidance as to some of the

17    special claimants we have, such as claimants who may have had a

18    post attorney withdrawal appeal and have some questions about

19    that.  We also have questions regarding the folks that were on

20    the list from yesterday's conference.  There was only one pro se

21    in the exhibit listed therein, and we have spoken with him.  But

22    from our conversations, I do believe there may be some other pro

23    se claimants who could fall into the ambit of that category.

24    However, I think that they've not filed suit, they were Tolling

25    Claimants.  So on that issue, we're going to get with counsel

1   for Merck and report to the Court as to the names and the

2   potential on those claims.

3            THE COURT:  Okay.

4            MS. SANTOYO:  As the Lien Administrator stated, we

5   have been provided with the extended deadline for the Private

6   Lien Resolution Program.  We are forwarding that information to

7   those pro se claimants who have either not who responded at all,

8   or who had questions about the program but had not yet enrolled.

9   As to the pro se's who have contacted our office and stated that

10  they did not wish to take part in that program, we are not

11  re-mailing the information since it -- we hope it's clear that

12  they don't want to participate.

13           THE COURT:  Okay.  All right.  Thank you very much.

14           In matters of this sort, the Court recognized early on

15  that there would by some people, a considerable number of

16  people, who might be pro se, and my interest in pro se claimants

17  is that we need to provide some mechanism for at least allowing

18  them to have someone to talk to, to ask questions of.  And so I

19  appointed a curator, and the curator has done a great job in

20  communicating with them.  I thank you very much.

21           MS. SANTOYO:  Thank you, Your Honor.

22           THE COURT:  Next, Vioxx Statistics.  Anything on that?

23           MR. MARVIN:  Not really, Your Honor.  The numbers are

24  set out in the Court report.

25           THE COURT:  Trial Package, anything on that one?

1        MR. HERMAN:  Yes, Your Honor.  Your Honor, we recently

2    received from Decision Quest their work product, which includes

3    some substantial jury research demonstrative exhibits, time

4    lines, et cetera.  And we will be going through that material to

5    add it to the Trial Package, either those parts that are

6    significant for future trials, or the entire Decision Quest

7    package.

8        THE COURT:  All right.

9        MR. HERMAN:  Other than that, nothing further to

10   report on the Trial Package.

11       THE COURT:  The next item is Third Party Payor

12   cases.  Anything on that?

13       MR. HERMAN:  The Third Party Payor cases, Your

14   Honor, Elizabeth Cabraser has headed up those issues and

15   Your Honor has had submitted a Scheduling Order with regard

16   to those cases.  And I believe discovery has already been

17   served -- written discovery by Merck.

18       THE COURT:  Right.  We have certain deadlines in

19   that discovery on that Scheduling Order, so hopefully

20   they'll be able to be met and we'll move forward with those

21   cases.

22       MR. HERMAN:  Your Honor, with regard to the

23   Attorneys General's issues -- Attorneys General issues,

24   I've had several conference in person, by phone

25   correspondence.  They've requested a meeting this

1     afternoon.  As soon as this conference is over I will meet

2     with them.  If we can't resolve it today, since this issue

3     has been ongoing for eight months now, then we'll submit it

4     to Your Honor for a decision.

5              THE COURT:  Okay.  All right.

6              MR. HERMAN:  With respect to the Motion to

7     Dismiss foreign individual cases, there is nothing new.  I

8     see that Mr. --

9              THE COURT:  We talked about Decision Quest

10    already.

11             The Fee Allocation Committee, anything on that?

12             MR. HERMAN:  Yes, Your Honor.  We have been

13    meeting on cost now for four weeks, daily.  With respect to

14    the Fee Allocation Committee, Your Honor has issued an

15    order that any firm objecting to the eight percent

16    assessment should file an objection by May 8, 2009, and

17    thereafter, as I understand it, Your Honor will set forth a

18    Scheduling Order for motion practice and argument.

19             THE COURT:  Right.  That's my thinking on it.  The

20    committee has filed a motion requesting that the Common Benefit

21    Fee be set at 8 percent.  This 8 percent, or whatever amount the

22    Court allows, will be coming from the principle attorneys

23    portion of the fees.  So I want to have everybody focused on

24    that.  And if there is any objection to it, they need to make

25    the objection, then I'll hear their objections and set some

1    scheduling orders so that -- I just need a notice of objection.

2    If they notice the objection, then I'll set a conference and

3    we'll set a schedule or ask them -- ask people what they need to

4    do, the discovery, whether it's argument, whether it's briefing,

5    that they wish to give to the Court, and I'll set some dates and

6    we'll move on that.

7            Motion for Reconsideration/Revision of Capping Fees.

8    I had an oral argument on that matter.  The consortium of

9    attorneys asked that I refocus on that particular matter.  I set

10   a cap of 32 percent on the principle attorneys fees.  They filed

11   a brief in support of their position.  I appointed the Tulane

12   Law Clinic to represent the claimants on that particular issue,

13   and I had heard oral argument on it about 10 days, two weeks

14   ago, and I'm in the process of focusing on that issue.

15           Merck's Motion for Rule PT, Order 29, Non-Compliance,

16   that's going to be next.  We'll do that.  Is that the motions

17   that we're going to take up after this meeting?

18           MR. MARVIN:  It is, Your Honor.

19           THE COURT:  Okay.   And same way with the 31?

20           MR. MARVIN:  That's correct.

21           THE COURT:  Any other matters before the Court?

22           MR. DUGAN:  Yes, Your Honor.

23           THE COURT:  Okay, Jim.

24           MR. DUGAN:  James Dugan.  Just reminding the Court

25   that you issued an order on April 17 setting the status

1  conferences in both of the private Third Party Payor cases and

2  the Governmental Action cases.

3           THE COURT:  Right.  Yeah.  Okay.  We're going to

4  do that after this meeting, right?

5           MR. DUGAN:  Yes, sir.

6           THE COURT:  Yeah.  Okay.  Anything else?

7           MR. HERMAN:  Your Honor, the date for next

8  conference?

9           THE COURT:  The next date May 29th.

10           THE DEPUTY CLERK:  Friday.

11           THE COURT:  May 29th, 9 o'clock and 8:30.  I'll take a

12  ten-minute break at this time, and I'll come back and I'll deal

13  with the motions.  When we finish the motions, we'll do a status

14  conference.

15           THE DEPUTY CLERK:  Everyone rise.

16

17           (The proceedings were concluded for the day.)

18                          **CERTIFICATE**

19           I, Pinkey Ferdinand, Official Court Reporter, United

20  States District Court, Eastern District of Louisiana, do hereby

21  certify that the foregoing is a true and correct transcript, to

22  the best of my ability and understanding, from the record of the

23  proceedings in the above-entitled and numbered matter.

24                                   S: PINKEY FERDINAND
                                   _____
25                                       Pinkey Ferdinand,
                                     Official Court Reporter