# **EXHIBIT B**

As filed with the Securities and Exchange Commission on February 27, 2009

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D. C. 20549

# FORM 10-K

(MARK ONE)

☑ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the Fiscal Year Ended December 31, 2008

or

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the transition period from _____ to _____

Commission File No. 1-3305

# Merck & Co., Inc.
One Merck Drive
Whitehouse Station, N. J. 08889-0100
(908) 423-1000

*Incorporated in New Jersey*     *I.R.S. Employer Identification No. 22-1109110*

**Securities Registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on which Registered |
|---|---|
| Common Stock ($0.01 par value) | New York Stock Exchange |

Number of shares of Common Stock ($0.01 par value) outstanding as of January 30, 2009: 2,107,712,364.

Aggregate market value of Common Stock ($0.01 par value) held by non-affiliates on June 30, 2008 based on closing price on June 30, 2008: $80,729,000,000.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check One):

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐     Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

**Documents Incorporated by Reference:**

| Document | Part of Form 10-K |
|---|---|
| Proxy Statement for the Annual Meeting of Stockholders to be held April 28, 2009, to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this report | Part III |

## Table of Contents
| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 18 |
| | Cautionary Factors that May Affect Future Results | 26 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 42 |
| | Executive Officers of the Registrant | 42 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 45 |
| Item 6. | Selected Financial Data | 49 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 85 |
| Item 8. | Financial Statements and Supplementary Data | 86 |
| | (a) Financial Statements | 86 |
| |     Notes to Consolidated Financial Statements | 89 |
| |     Report of Independent Registered Public Accounting Firm | 141 |
| | (b) Supplementary Data | 142 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 143 |
| Item 9A. | Controls and Procedures | 143 |
| | Management's Report | 143 |
| Item 9B. | Other Information | 144 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 144 |
| Item 11. | Executive Compensation | 145 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 145 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 145 |
| Item 14. | Principal Accountant Fees and Services | 145 |
| **Part IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 146 |
| | Signatures | 161 |
| | Consent of Independent Registered Public Accounting Firm | 162 |
| | Independent Auditors' Consent | 163 |

- Increased focus on privacy issues in countries around the world, including the United States and the EU. The legislative and regulatory landscape for privacy and data protection continues to evolve, and there has been an increasing amount of focus on privacy and data protection issues with the potential to affect directly the Company's business, including recently enacted laws in a majority of U.S. states requiring security breach notification.
- Changes in tax laws including changes related to the taxation of foreign earnings.
- Changes in accounting pronouncements promulgated by standard-setting or regulatory bodies, including the Financial Accounting Standards Board and the SEC, that are adverse to the Company.
- Economic factors over which the Company has no control, including changes in inflation, interest rates and foreign currency exchange rates.

This list should not be considered an exhaustive statement of all potential risks and uncertainties. See "Risk Factors" above.

**Item 1B.   Unresolved Staff Comments.**

None

**Item 2.   Properties.**

The Company's corporate headquarters is located in Whitehouse Station, New Jersey. The Company's U.S. commercial operations are headquartered in Upper Gwynedd, Pennsylvania. The Company's U.S. pharmaceutical business is conducted through divisional headquarters located in Upper Gwynedd and Whitehouse Station, New Jersey. The Company's vaccines business is conducted through divisional headquarters located in West Point, Pennsylvania. Principal research facilities for human health products are located in Rahway, New Jersey and West Point. The Company also has production facilities for human health products at seven locations in the United States and Puerto Rico. Outside the United States, through subsidiaries, the Company owns or has an interest in manufacturing plants or other properties in Australia, Canada, Japan, Singapore, South Africa, and other countries in Western Europe, Central and South America, and Asia.

Capital expenditures for 2008 were $1.3 billion compared with $1.0 billion for 2007. In the United States, these amounted to $946.6 million for 2008 and $788.0 million for 2007. Abroad, such expenditures amounted to $351.7 million for 2008 and $223.0 million for 2007.

The Company and its subsidiaries own their principal facilities and manufacturing plants under titles which they consider to be satisfactory. The Company considers that its properties are in good operating condition and that its machinery and equipment have been well maintained. Plants for the manufacture of products are suitable for their intended purposes and have capacities and projected capacities adequate for current and projected needs for existing Company products. Some capacity of the plants is being converted, with any needed modification, to the requirements of newly introduced and future products.

**Item 3.   Legal Proceedings.**

The Company is involved in various claims and legal proceedings of a nature considered normal to its business, including product liability, intellectual property, and commercial litigation, as well as additional matters such as antitrust actions.

*Vioxx* **Litigation**

*Product Liability Lawsuits*

As previously disclosed, individual and putative class actions have been filed against the Company in state and federal courts alleging personal injury and/or economic loss with respect to the purchase or use of *Vioxx*. All such actions filed in federal court are coordinated in a multidistrict litigation in the U.S. District Court for the Eastern District of Louisiana (the "MDL") before District Judge Eldon E. Fallon. A number of such actions filed in state court are coordinated in separate coordinated proceedings in state courts in New Jersey, California and Texas,

and the counties of Philadelphia, Pennsylvania and Washoe and Clark Counties, Nevada. As of December 31, 2008, the Company had been served or was aware that it had been named as a defendant in approximately 10,800 lawsuits, which include approximately 26,800 plaintiff groups, alleging personal injuries resulting from the use of *Vioxx*, and in approximately 242 putative class actions alleging personal injuries and/or economic loss. (All of the actions discussed in this paragraph and in "Other Lawsuits" below are collectively referred to as the "*Vioxx* Product Liability Lawsuits".) Of these lawsuits, approximately 8,850 lawsuits representing approximately 22,050 plaintiff groups are or are slated to be in the federal MDL and approximately 165 lawsuits representing approximately 165 plaintiff groups are included in a coordinated proceeding in New Jersey Superior Court before Judge Carol E. Higbee.

Of the plaintiff groups described above, most are currently in the *Vioxx* Settlement Program, described below. As of December 31, 2008, 70 plaintiff groups who were otherwise eligible for the Settlement Program have not participated and their claims remained pending against Merck. In addition, the claims of 1,400 plaintiff groups who are not eligible for the Settlement Program remained pending against Merck. A number of the 1,400 plaintiff groups are subject to motions to dismiss for failure to comply with court-ordered deadlines. Since December 31, 2008, hundreds of these plaintiff groups have since been dismissed.

In addition to the *Vioxx* Product Liability Lawsuits discussed above, the claims of over 27,400 plaintiffs had been dismissed as of December 31, 2008. Of these, there have been over 4,925 plaintiffs whose claims were dismissed with prejudice (i.e., they cannot be brought again) either by plaintiffs themselves or by the courts. Over 22,475 additional plaintiffs have had their claims dismissed without prejudice (i.e., subject to the applicable statute of limitations, they can be brought again). Of these, approximately 13,750 plaintiff groups represent plaintiffs who had lawsuits pending in the New Jersey Superior Court at the time of the Settlement Agreement described below and who enrolled in the program established by the Settlement Agreement (the "Settlement Program"), Judge Higbee has dismissed these cases without prejudice for administrative reasons.

On November 9, 2007, Merck announced that it had entered into an agreement (the "Settlement Agreement") with the law firms that comprise the executive committee of the Plaintiffs' Steering Committee ("PSC") of the federal *Vioxx* MDL as well as representatives of plaintiffs' counsel in the Texas, New Jersey and California state coordinated proceedings to resolve state and federal MI and IS claims filed as of that date in the United States. The Settlement Agreement, which also applies to tolled claims, was signed by the parties after several meetings with three of the four judges overseeing the coordination of more than 95% of the U.S. *Vioxx* Product Liability Lawsuits. The Settlement Agreement applies only to U.S. legal residents and those who allege that their MI or IS occurred in the United States.

The entire Settlement Agreement, including accompanying exhibits, may be found at www.merck.com. The Company has included this website address only as an inactive textual reference and does not intend it to be an active link to its website nor does it incorporate by reference the information contained therein. Under the Settlement Agreement, Merck will pay a fixed aggregate amount of $4.85 billion into two funds ($4.0 billion for MI claims and $850 million for IS claims) for qualifying claims that enter into the Settlement Program. Individual claimants will be examined by administrators of the Settlement Program to determine qualification based on objective, documented facts provided by claimants, including records sufficient for a scientific evaluation of independent risk factors. The conditions in the Settlement Agreement also require claimants to pass three gates: an injury gate, a duration gate, and a proximity gate (each as defined in the Settlement Agreement).

The Settlement Agreement provides that Merck does not admit causation or fault. The Settlement Agreement provided that Merck's payment obligations would be triggered only if, among other conditions, (1) law firms on the federal and state PSCs and firms that have tried cases in the coordinated proceedings elect to recommend enrollment in the program to 100% of their clients who allege either MI or IS, and (2) by June 30, 2008, plaintiffs enroll in the Settlement Program at least 85% of each of all currently pending and tolled (i) MI claims, (ii) IS claims, (iii) eligible MI and IS claims together which involve death, and (iv) eligible MI and IS claims together which allege more than 12 months of use. Under the terms of the Settlement Agreement, Merck could exercise a right to walk away from the Settlement Agreement if the thresholds and other requirements were not met. The Company waived that right as of August 4, 2008. The waiver of that right triggered Merck's obligation to pay a fixed total of $4.85 billion. Payments will be made in installments into the settlement funds. The first payment of

$500 million was made in August 2008 and an additional payment of $250 million was made in October 2008. Interim payments have been made to certain plaintiffs who alleged that they suffered an MI and the Company anticipates that interim payments to IS claimants will begin shortly. Additional payments will be made on a periodic basis going forward, when and as needed to fund payments of claims and administrative expenses.

Merck's total payment for both funds of $4.85 billion is a fixed amount to be allocated among qualifying claimants based on their individual evaluation. The distribution of interim payments to qualified claimants began in August 2008 and will continue on a rolling basis until all claimants who qualify for an interim payment are paid. Final payments will be made after the examination of all of the eligible claims has been completed.

After the Settlement Agreement was announced on November 9, 2007, judges in the Federal MDL, California, Texas and New Jersey State Coordinated Proceedings entered a series of orders. The orders: (1) temporarily stayed their respective litigations; (2) required plaintiffs to register their claims by January 15, 2008; (3) required plaintiffs with cases pending as of November 9, 2007 to preserve and produce records and serve expert reports; and (4) required plaintiffs who file thereafter to make similar productions on an accelerated schedule. The Clark County, Nevada and Washoe County, Nevada coordinated proceedings were also generally stayed.

As of October 30, 2008, the deadline for enrollment in the Settlement Program, more than 48,100 of the approximately 48,325 individuals who were eligible for the Settlement Program and whose claims were not 1) dismissed, 2) expected to be dismissed in the near future, or 3) tolled claims that appear to have been abandoned had submitted some or all of the materials required for enrollment in the Settlement Program. This represents approximately 99.8% of the eligible MI and IS claims previously registered with the Settlement Program.

On April 14, 2008 and June 3, 2008, two groups of various private insurance companies and health plans filed suit against BrownGreer, the claims administrator for the Settlement Program (the "Claims Administrator"), and U.S. Bancorp, escrow agent for the Settlement Program (the "AvMed" and "Greater New York Benefit Fund" suits). The private insurance companies and health plans claim to have paid healthcare costs on behalf of some of the enrolling claimants and seek to enjoin the Claims Administrator from paying enrolled claimants until their claims for reimbursement from the enrolled claimants are resolved. Each group sought temporary restraining orders and preliminary injunctions. Judge Fallon denied these requests. In AvMed, the defendants moved to sever the claims of the named plaintiffs and, in Greater New York Benefit Fund, to strike the class allegations. Judge Fallon granted these motions. AvMed appealed both of these decisions. The Fifth Circuit heard argument on AvMed's appeal on November 4, 2008. On November 17, 2008, the Court of Appeals affirmed the district court's ruling that denied the two motions for preliminary injunctive relief. Greater New York Benefit Fund has served a notice of appeal. On January 22, 2009, the PSC and counsel for certain private insurers announced that they reached a settlement agreement. The agreement provides a program for resolution of liens asserted by private insurers against payments received by certain claimants who have enrolled in the Settlement Program. The agreement can be terminated by the private insurers if fewer than 90% of eligible claimants participate. The plaintiffs in the AvMed and Greater New York Benefit Fund lawsuits have agreed to participate in the settlement.

There are two U.S. *Vioxx* Product Liability Lawsuits currently scheduled for trial in 2009. The Company maintains a list of such trials at its website at *www.merck.com*, which it will periodically update as appropriate. The Company has included its website address only as an inactive textual reference and does not intend it to be an active link to its website nor does it incorporate by reference the information contained therein.

The Company has previously disclosed the outcomes of several *Vioxx* Product Liability Lawsuits that were tried prior to 2008.

Juries have now decided in favor of the Company twelve times and in plaintiffs' favor five times. One Merck verdict was set aside by the court and has not been retried. Another Merck verdict was set aside and retried, leading to one of the five plaintiffs' verdicts. There have been two unresolved mistrials. With respect to the five plaintiffs' verdicts, Merck filed an appeal or sought judicial review in each of those cases. In one of those five, an intermediate appellate court overturned the trial verdict and directed that judgment be entered for Merck, and in another, an intermediate appellate court overturned the trial verdict, entering judgment for Merck on one claim and ordering a new trial on the remaining claims.

All but the following three cases that went to trial are now resolved: McDarby v. Merck, Ernst v. Merck, and Garza v. Merck.

The first, McDarby, was originally tried along with a second plaintiff, Cona, in April 2006, in Superior Court of New Jersey, Law Division, Atlantic County. The jury returned a split verdict. The jury determined that *Vioxx* did not substantially contribute to the heart attack of Mr. Cona, but did substantially contribute to the heart attack of Mr. McDarby. The jury also concluded that, in each case, Merck violated New Jersey's consumer fraud statute, which allows plaintiffs to receive their expenses for purchasing the drug, trebled, as well as reasonable attorneys' fees. The jury awarded $4.5 million in compensatory damages to Mr. McDarby and his wife, who also was a plaintiff in that case, as well as punitive damages of $9 million. On June 8, 2007, Judge Higbee denied Merck's motion for a new trial. On June 15, 2007, Judge Higbee awarded approximately $4 million in the aggregate in attorneys' fees and costs. The Company has appealed the judgments in both cases and the Appellate Division held oral argument on both cases on January 16, 2008. On May 29, 2008, the New Jersey Appellate Division vacated the consumer fraud awards in both cases on the grounds that the Product Liability Act provides the sole remedy for personal injury claims. The Appellate Division also vacated the McDarby punitive damage award on the ground of federal preemption and vacated the attorneys' fees and costs awarded under the Consumer Fraud Act in both cases. The Court upheld the McDarby compensatory award. The Company has filed with the Supreme Court of New Jersey a petition to appeal those parts of the trial court's rulings that the Appellate Division affirmed. Plaintiffs filed a cross-petition to appeal those parts of the trial court's rulings that the Appellate Division reversed. On October 8, 2008, the Supreme Court of New Jersey granted Merck's petition for certification of appeal, limited solely to the issue of whether the Federal Food, Drug and Cosmetic Act preempts state law tort claims predicated on the alleged inadequacy of warnings contained in *Vioxx* labeling that was approved by the FDA. The court denied the plaintiff's cross-petition. On December 4, 2008, the New Jersey Supreme Court granted Merck's motion to stay the appeal pending the issuance of a decision from United States Supreme Court in Wyeth v. Levine.

As previously reported, in September 2006, Merck filed a notice of appeal of the August 2005 jury verdict in favor of the plaintiff in the Texas state court case, Ernst v. Merck. On May 29, 2008, the Texas Court of Appeals reversed the trial court's judgment and issued a judgment in favor of Merck. The Court of Appeals found the evidence to be legally insufficient on the issue of causation. Plaintiffs have filed a motion for rehearing *en banc* in the Court of Appeals. Merck filed a response in October 2008. In January 2009, plaintiffs filed a reply in support of their rehearing motion.

As previously reported, in April 2006, in Garza v. Merck, a jury in state court in Rio Grande City, Texas returned a verdict in favor of the family of decedent Leonel Garza. The jury awarded a total of $7 million in compensatory damages to Mr. Garza's widow and three sons. The jury also purported to award $25 million in punitive damages even though under Texas law, in this case, potential punitive damages were capped at $750,000. On May 14, 2008, the San Antonio Court of Appeals reversed the judgment and rendered a judgment in favor of Merck. On December 10, 2008, the Court of Appeals, on rehearing, vacated its prior ruling and issued a replacement. In the new ruling, the Court ordered a take-nothing judgment for Merck on the design defect claim, but reversed and remanded for a new trial as to the strict liability claim because of juror misconduct. On January 26, 2009, Merck filed a petition for review with the Texas Supreme Court.

Merck voluntarily withdrew *Vioxx* from the market on September 30, 2004. Most states have statutes of limitations for product liability claims of no more than three years, which require that claims must be filed within no more than three years after the plaintiffs learned or could have learned of their potential cause of action. As a result, some may view September 30, 2007 as a significant deadline for filing *Vioxx* cases. It is important to note, however, that the law regarding statutes of limitations can be complex and variable, depending on the facts and applicable law. Some states have longer statutes of limitations. There are also arguments that the statutes of limitations began running before September 30, 2004. New Jersey Superior Court Judge Higbee and Federal District Court Judge Fallon have issued orders in cases from New Jersey and eight other jurisdictions ruling that the statutory period for making *Vioxx* personal injury claims has passed. Judge Higbee's order was issued on October 15, 2007 and Judge Fallon's was issued on November 8, 2007.

*Other Lawsuits*

As previously disclosed, on July 29, 2005, a New Jersey state trial court certified a nationwide class of third-party payors (such as unions and health insurance plans) that paid in whole or in part for the *Vioxx* used by their plan members or insureds. The named plaintiff in that case sought recovery of certain *Vioxx* purchase costs (plus penalties) based on allegations that the purported class members paid more for *Vioxx* than they would have had they known of the product's alleged risks. On March 31, 2006, the New Jersey Superior Court, Appellate Division, affirmed the class certification order. On September 6, 2007, the New Jersey Supreme Court reversed the certification of a nationwide class action of third-party payors, finding that the suit does not meet the requirements for a class action. Claims of certain individual third-party payors remain pending in the New Jersey court, and counsel purporting to represent a large number of third-party payors have filed additional such actions. Judge Higbee lifted the stay in these cases and the cases are currently in the discovery phase. A status conference with the court took place in January 2009 to discuss scheduling issues in these cases, including the selection of early trial pool cases.

The New Jersey Superior Court heard argument on plaintiffs' motion for class certification in Martin-Kleinman v. Merck, which is a putative consumer class action, on December 5, 2008.

There are also pending in various U.S. courts putative class actions purportedly brought on behalf of individual purchasers or users of *Vioxx* and claiming either reimbursement of alleged economic loss or an entitlement to medical monitoring. The majority of these cases are at early procedural stages. On June 12, 2008, a Missouri state court certified a class of Missouri plaintiffs seeking reimbursement for out-of-pocket costs relating to *Vioxx*. The plaintiffs do not allege any personal injuries from taking *Vioxx*. The Company filed a petition for interlocutory review on June 23, 2008, which was granted on July 30, 2008. Briefing is now complete. During the pendency of the appeal, discovery is proceeding in the lower court. On February 3, 2009, Judge Fallon dismissed the master personal injury/wrongful death class action master complaint and the medical monitoring class action master complaint in the MDL.

Plaintiffs also have filed a class action in California state court seeking class certification of California third-party payors and end-users. The parties are engaged in class certification discovery and briefing. The court heard oral argument on the class certification issue on February 19, 2009.

The Company has also been named as a defendant in eighteen separate lawsuits brought by Attorneys General of ten states, five counties, the City of New York, and private citizens (whom have brought *qui tam* and taxpayer derivative suits). One of the lawsuits brought by the counties is a class action filed by Santa Clara County, California on behalf of all similarly situated California counties. These actions allege that the Company misrepresented the safety of *Vioxx* and seek (i) recovery of the cost of *Vioxx* purchased or reimbursed by the state and its agencies; (ii) reimbursement of all sums paid by the state and its agencies for medical services for the treatment of persons injured by *Vioxx*; (iii) damages under various common law theories; and/or (iv) remedies under various state statutory theories, including state consumer fraud and/or fair business practices or Medicaid fraud statutes, including civil penalties.

With the exception of a case filed by the Texas Attorney General (which remains in Texas state court and is currently scheduled for trial in November 2009), a case filed by the Michigan Attorney General (which was ordered remanded to state court in January 2009), a case recently filed by the Pennsylvania Attorney General (which has been removed to federal court but is the subject of a pending motion to remand), and one case which has not been removed to federal court, the rest of the actions described in the above paragraph have been transferred to the federal MDL and are in the discovery phase.

*Shareholder Lawsuits*

As previously disclosed, in addition to the *Vioxx* Product Liability Lawsuits, the Company and various current and former officers and directors are defendants in various putative class actions and individual lawsuits under the federal securities laws and state securities laws (the "*Vioxx* Securities Lawsuits"). All of the *Vioxx* Securities Lawsuits pending in federal court have been transferred by the Judicial Panel on Multidistrict Litigation (the "JPML") to the United States District Court for the District of New Jersey before District Judge Stanley R. Chesler for inclusion in a nationwide MDL (the "Shareholder MDL"). Judge Chesler has consolidated the *Vioxx*

31

Securities Lawsuits for all purposes. The putative class action, which requested damages on behalf of purchasers of Company stock between May 21, 1999 and October 29, 2004, alleged that the defendants made false and misleading statements regarding *Vioxx* in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and sought unspecified compensatory damages and the costs of suit, including attorneys' fees. The complaint also asserted claims under Section 20A of the Securities and Exchange Act against certain defendants relating to their sales of Merck stock and under Sections 11, 12 and 15 of the Securities Act of 1933 against certain defendants based on statements in a registration statement and certain prospectuses filed in connection with the Merck Stock Investment Plan, a dividend reinvestment plan. On April 12, 2007, Judge Chesler granted defendants' motion to dismiss the complaint with prejudice. Plaintiffs appealed Judge Chesler's decision to the United States Court of Appeals for the Third Circuit. On September 9, 2008, the Third Circuit issued an opinion reversing Judge Chesler's order and remanding the case to the District Court. On September 23, 2008, Merck filed a petition seeking rehearing *en banc,* which was denied. The case was remanded to the District Court in October 2008, and plaintiffs have filed their Consolidated and Fifth Amended Class Action Complaint. Merck filed a petition for a writ of certiorari with the United States Supreme Court on January 15, 2009. Merck expects to file a motion to dismiss the Fifth Amended Class Action Complaint.

In October 2005, a Dutch pension fund filed a complaint in the District of New Jersey alleging violations of federal securities laws as well as violations of state law against the Company and certain officers. Pursuant to the Case Management Order governing the Shareholder MDL, the case, which is based on the same allegations as the *Vioxx* Securities Lawsuits, was consolidated with the *Vioxx* Securities Lawsuits. Defendants' motion to dismiss the pension fund's complaint was filed on August 3, 2007. In September 2007, the Dutch pension fund filed an amended complaint rather than responding to defendants' motion to dismiss. In addition in 2007, six new complaints were filed in the District of New Jersey on behalf of various foreign institutional investors also alleging violations of federal securities laws as well as violations of state law against the Company and certain officers. Defendants are not required to respond to these complaints until after Judge Chesler resolves any motion to dismiss in the consolidated securities action.

As previously disclosed, various shareholder derivative actions filed in federal court were transferred to the Shareholder MDL and consolidated for all purposes by Judge Chesler (the "*Vioxx* Derivative Lawsuits"). On May 5, 2006, Judge Chesler granted defendants' motion to dismiss and denied plaintiffs' request for leave to amend their complaint. Plaintiffs appealed, arguing that Judge Chesler erred in denying plaintiffs' leave to amend their complaint with materials acquired during discovery. On July 18, 2007, the United States Court of Appeals for the Third Circuit reversed the District Court's decision on the grounds that Judge Chesler should have allowed plaintiffs to make use of the discovery material to try to establish demand futility, and remanded the case for the District Court's consideration of whether, even with the additional materials, plaintiffs' request to amend their complaint would still be futile. Plaintiffs filed their brief in support of their request for leave to amend their complaint in November 2007. The Court denied the motion in June 2008 and closed the case. Plaintiffs have appealed Judge Chesler's decision to the United States Court of Appeals for the Third Circuit.

In addition, as previously disclosed, various putative class actions filed in federal court under the Employee Retirement Income Security Act ("ERISA") against the Company and certain current and former officers and directors (the "*Vioxx* ERISA Lawsuits" and, together with the *Vioxx* Securities Lawsuits and the *Vioxx* Derivative Lawsuits, the "*Vioxx* Shareholder Lawsuits") have been transferred to the Shareholder MDL and consolidated for all purposes. The consolidated complaint asserts claims on behalf of certain of the Company's current and former employees who are participants in certain of the Company's retirement plans for breach of fiduciary duty. The lawsuits make similar allegations to the allegations contained in the *Vioxx* Securities Lawsuits. On July 11, 2006, Judge Chesler granted in part and denied in part defendants' motion to dismiss the ERISA complaint. In October 2007, plaintiffs moved for certification of a class of individuals who were participants in and beneficiaries of the Company's retirement savings plans at any time between October 1, 1998 and September 30, 2004 and whose plan accounts included investments in the Merck Common Stock Fund and/or Merck common stock. On February 9, 2009, the Court denied the motion for certification of a class as to one count and granted the motion as to the remaining counts. The Court also limited the class to those individuals who were participants in and beneficiaries of the Company's retirement savings plans who suffered a loss due to their investments in Merck stock through the plans and who did not execute a settlement releasing their claims. On October 6, 2008, defendants filed

a motion for judgment on the pleadings seeking dismissal of the complaint. On December 24, 2008, plaintiffs filed a motion for partial summary judgment against certain individual defendants. Both motions are pending. Discovery is ongoing in this litigation.

As previously disclosed, on October 29, 2004, two individual shareholders made a demand on the Company's Board to take legal action against Mr. Raymond Gilmartin, former Chairman, President and Chief Executive Officer and other individuals for allegedly causing damage to the Company with respect to the allegedly improper marketing of *Vioxx*. In December 2004, the Special Committee of the Board of Directors retained the Honorable John S. Martin, Jr. of Debevoise & Plimpton LLP to conduct an independent investigation of, among other things, the allegations set forth in the demand. Judge Martin's report was made public in September 2006. Based on the Special Committee's recommendation made after careful consideration of the Martin report and the impact that derivative litigation would have on the Company, the Board rejected the demand. On October 11, 2007, the shareholders filed a lawsuit in state court in Atlantic County, New Jersey against current and former executives and directors of the Company alleging that the Board's rejection of their demand was unreasonable and improper, and that the defendants breached various duties to the Company in allowing *Vioxx* to be marketed. The current and former executive and director defendants filed motions to dismiss the complaint in June 2008. On October 30, 2008, proceedings in the case were stayed through March 1, 2009. On November 21, 2008, the pending motions to dismiss were denied without prejudice.

*International Lawsuits*

As previously disclosed, in addition to the lawsuits discussed above, the Company has been named as a defendant in litigation relating to *Vioxx* in various countries (collectively, the "*Vioxx* Foreign Lawsuits") in Europe, as well as Canada, Brazil, Argentina, Australia, Turkey, and Israel.

On May 30, 2008, the provincial court of Queen's Bench in Saskatchewan, Canada entered an order certifying a class of *Vioxx* users in Canada, except those in Quebec. The class includes individual purchasers who allege inducement to purchase by unfair marketing practices; individuals who allege *Vioxx* was not of acceptable quality, defective or not fit for the purpose of managing pain associated with approved indications; or ingestors who claim *Vioxx* caused or exacerbated a cardiovascular or gastrointestinal condition. On June 17, 2008, the Court of Appeal for Saskatchewan granted the Company leave to appeal the certification order. That appeal was argued before that court, and the court has reserved decision. On July 28, 2008, the Superior Court in Ontario denied the Company's motion to stay class proceedings in Ontario, which had been based on the earlier certification order entered in Saskatchewan, and decided to certify an overlapping class of *Vioxx* users in Canada, except those in Quebec and Saskatchewan, who allege negligence and an entitlement to elect to waive the tort. On November 24, 2008, the Ontario Divisional Court granted the Company's motion for leave to appeal the Superior Court's decision denying the stay of the Ontario class proceedings and denied the Company's motion to appeal the certification order. The Company's appeal was heard by the Ontario Divisional Court in February 2009. On February 13, 2009, the Divisional Court declined to set aside the order denying the stay. The Company intends to seek leave to appeal from the Ontario Court of Appeal. Earlier, in November 2006, the Superior court in Quebec authorized the institution of a class action on behalf of all individuals who, in Quebec, consumed *Vioxx* and suffered damages arising out of its ingestion. As of December 31, 2008, the plaintiffs have not instituted an action based upon that authorization.

A trial in a representative action in Australia is scheduled to commence on March 30, 2009, in the Federal Court of Australia. The named plaintiff, who alleges he suffered an MI, seeks to represent others in Australia who ingested *Vioxx* and suffered an MI, thrombotic stroke, unstable angina, transient ischemic attack or peripheral vascular disease. On November 24, 2008, the Company filed a motion for an order that the proceeding no longer continue as a representative proceeding. During a hearing on December 5, 2008, the court dismissed that motion and, on January 9, 2009, issued its reasons for that decision. On February 17, 2009, the Company's motion for leave to appeal that decision was denied and the parties were directed to prepare proposed lists of issues to be tried.

*Additional Lawsuits*

Based on media reports and other sources, the Company anticipates that additional *Vioxx* Product Liability Lawsuits, *Vioxx* Shareholder Lawsuits and *Vioxx* Foreign Lawsuits (collectively, the "*Vioxx* Lawsuits") may be filed against it and/or certain of its current and former officers and directors in the future.

*Insurance*

As previously disclosed, the Company has product liability insurance for claims brought in the *Vioxx* Product Liability Lawsuits with stated upper limits of approximately $630 million after deductibles and co-insurance. This insurance provides coverage for legal defense costs and potential damage amounts in connection with the *Vioxx* Product Liability Lawsuits. Through an arbitration proceeding and negotiated settlements, the Company received an aggregate of approximately $590 million in product liability insurance proceeds relating to the *Vioxx* Product Liability Lawsuits, plus approximately $45 million in fees and interest payments. The Company has no additional insurance for the *Vioxx* Product Liability Lawsuits. The Company's insurance coverage with respect to the *Vioxx* Lawsuits will not be adequate to cover its defense costs and losses.

The Company has Directors and Officers insurance coverage applicable to the *Vioxx* Securities Lawsuits and *Vioxx* Derivative Lawsuits with stated upper limits of approximately $190 million. The Company has Fiduciary and other insurance for the *Vioxx* ERISA Lawsuits with stated upper limits of approximately $275 million. As a result of the arbitration, additional insurance coverage for these claims should also be available, if needed, under upper-level excess policies that provide coverage for a variety of risks. There are disputes with the insurers about the availability of some or all of the Company's insurance coverage for these claims and there are likely to be additional disputes. The amounts actually recovered under the policies discussed in this paragraph may be less than the stated upper limits.

*Investigations*

As previously disclosed, in November 2004, the Company was advised by the staff of the SEC that it was commencing an informal inquiry concerning *Vioxx*. On January 28, 2005, the Company announced that it received notice that the SEC issued a formal notice of investigation. Also, the Company has received subpoenas from the DOJ requesting information related to the Company's research, marketing and selling activities with respect to *Vioxx* in a federal health care investigation under criminal statutes. This investigation includes subpoenas for witnesses to appear before a grand jury. In addition, as previously disclosed, investigations are being conducted by local authorities in certain cities in Europe in order to determine whether any criminal charges should be brought concerning *Vioxx*. The Company is cooperating with these governmental entities in their respective investigations (the "*Vioxx* Investigations"). The Company cannot predict the outcome of these inquiries; however, they could result in potential civil and/or criminal dispositions.

As previously disclosed, on May 20, 2008, the Company reached civil settlements with Attorneys General from 29 states and the District of Columbia to fully resolve previously disclosed investigations under state consumer protection laws related to past activities for *Vioxx*. As part of the civil resolution of these investigations, Merck paid a total of $58 million to be divided among the 29 states and the District of Columbia. The agreement also includes compliance measures that supplement policies and procedures previously established by the Company.

In addition, the Company received a subpoena in September 2006 from the State of California Attorney General seeking documents and information related to the placement of *Vioxx* on California's Medi-Cal formulary. The Company is cooperating with the Attorney General in responding to the subpoena.

*Reserves*

As discussed above, on November 9, 2007, Merck entered into the Settlement Agreement with the law firms that comprise the executive committee of the PSC of the federal *Vioxx* MDL as well as representatives of plaintiffs' counsel in the Texas, New Jersey and California state coordinated proceedings to resolve state and federal MI and IS claims filed as of that date in the United States. The Settlement Agreement, which also applies to tolled claims, was signed by the parties after several meetings with three of the four judges overseeing the coordination of more than 95% of the current claims in the *Vioxx* Litigation. The Settlement Agreement applies only to U.S. legal residents and those who allege that their MI or IS occurred in the United States. In 2007, as a result of entering into

34

the Settlement Agreement, the Company recorded a pretax charge of $4.85 billion which represents the fixed aggregate amount to be paid to plaintiffs qualifying for payment under the Settlement Program.

The Company currently anticipates that two U.S. *Vioxx* Product Liability Lawsuits will be tried in 2009. Except with respect to the product liability trial scheduled to be held in Australia, the Company cannot predict the timing of any other trials related to the *Vioxx* Litigation. The Company believes that it has meritorious defenses to the *Vioxx* Lawsuits and will vigorously defend against them. In view of the inherent difficulty of predicting the outcome of litigation, particularly where there are many claimants and the claimants seek indeterminate damages, the Company is unable to predict the outcome of these matters, and at this time cannot reasonably estimate the possible loss or range of loss with respect to the *Vioxx* Lawsuits not included in the Settlement Program. The Company has not established any reserves for any potential liability relating to the *Vioxx* Lawsuits not included in the Settlement Program or the *Vioxx* Investigations. In each of those cases the Company believes it has strong points to raise on appeal and therefore that unfavorable outcomes in such cases are not probable. Unfavorable outcomes in the *Vioxx* Litigation could have a material adverse effect on the Company's financial position, liquidity and results of operations.

Legal defense costs expected to be incurred in connection with a loss contingency are accrued when probable and reasonably estimable. As of December 31, 2007, the Company had an aggregate reserve of approximately $5.372 billion (the"*Vioxx* Reserve") for the Settlement Program and the Company's future legal defense costs related to the *Vioxx* Litigation.

During 2008, the Company spent approximately $305 million in the aggregate, in legal defense costs worldwide related to (i) the *Vioxx* Product Liability Lawsuits, (ii) the *Vioxx* Shareholder Lawsuits, (iii) the *Vioxx* Foreign Lawsuits, and (iv) the *Vioxx* Investigations (collectively, the "*Vioxx* Litigation"). In the fourth quarter, the Company recorded a charge of $62 million solely for its future legal defense costs related to the *Vioxx* Litigation. In addition, in the fourth quarter the Company paid an additional $250 million into the settlement funds in connection with the Settlement Program after having paid $500 million into the settlement funds in the third quarter. Consequently, as of December 31, 2008, the aggregate amount of the *Vioxx* Reserve was approximately $4.379 billion. In adding to the *Vioxx* Reserve solely for its future legal defense costs, the Company considered the same factors that it considered when it previously established reserves for the *Vioxx* Litigation. Some of the significant factors considered in the review of the *Vioxx* Reserve were as follows: the actual costs incurred by the Company; the development of the Company's legal defense strategy and structure in light of the scope of the *Vioxx* Litigation, including the Settlement Agreement and the expectation that certain lawsuits will continue to be pending; the number of cases being brought against the Company; the costs and outcomes of completed trials and the most current information regarding anticipated timing, progression, and related costs of pre-trial activities and trials in the *Vioxx* Litigation. The amount of the *Vioxx* Reserve as of December 31, 2008, allocated solely to defense costs represents the Company's best estimate of the minimum amount of defense costs to be incurred in connection with the remaining aspects of the *Vioxx* Litigation; however, events such as additional trials in the *Vioxx* Litigation and other events that could arise in the course of the *Vioxx* Litigation could affect the ultimate amount of defense costs to be incurred by the Company.

The Company will continue to monitor its legal defense costs and review the adequacy of the associated reserves and may determine to increase the *Vioxx* Reserve at any time in the future if, based upon the factors set forth, it believes it would be appropriate to do so.

**Other Product Liability Litigation**

As previously disclosed, the Company is a defendant in product liability lawsuits in the United States involving *Fosamax* (the "*Fosamax* Litigation"). As of December 31, 2008, approximately 779 cases, which include approximately 1,158 plaintiff groups had been filed and were pending against Merck in either federal or state court, including one case which seeks class action certification, as well as damages and/or medical monitoring. In these actions, plaintiffs allege, among other things, that they have suffered osteonecrosis of the jaw, generally subsequent to invasive dental procedures, such as tooth extraction or dental implants and/or delayed healing, in association with the use of *Fosamax*. On August 16, 2006, the JPML ordered that the *Fosamax* product liability cases pending in federal courts nationwide should be transferred and consolidated into one multidistrict litigation (the "*Fosamax* MDL") for coordinated pre-trial proceedings. The *Fosamax* MDL has been transferred to Judge John Keenan in the