**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Vioxx | ) | MDL Docket No. 1657 |
| | ) | |
| PRODUCTS LIABILITY | ) | SECTION L |
| LITIGATION | ) | |
| | ) | JUDGE JALLON |
| *This document relates to:* | ) | |
| | ) | MAGISTRATE JUDGE |
| SHARON FLOWERS, | ) | KNOWLES |
| individually and as personal Representative | ) | |
| of the Estate of MEL FLOWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERCK & CO., INC., | ) | |
| | ) | |
| Defendant. | | |
| _____/ | | |

**AMENDED COMPLAINT**

Now Comes SHARON FLOWERS, individually and on behalf of the Estate of

MEL FLOWERS ("Plaintiff" and/or "the Estate"), by and through undersigned counsel,

and brings this Amended Complaint against Merck & Company, Inc. for damages

suffered by MEL FLOWERS caused by his ingestion of the pharmaceutical drug

VIOXX® and states as follows:

**PARTIES**

1.      Plaintiff is the duly appointed, qualified and acting personal representative

of the estate of MEL FLOWERS.  MEL FLOWERS ("Decedent"), at all times relevant

herein until his death, resided in Polk County, Florida.   The potential beneficiaries of the

recovery in this action and the relationship of each to the decedent are: Sharon Flowers,

widow and Cheryl M. Barry, daughter.

2.      At all times relevant herein, defendant Merck & Co., Inc. ("Merck") was and is a domestic pharmaceutical company incorporated under the laws of the state of New Jersey with its principal place of business at One Merck Drive, P.O. Box 100, Whitehouse Station, New Jersey and can be served with process through its registered agent, C.T. Corporation, 1200 S. Pine Island Road, Plantation, FL  33324.  Defendant was and is in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug VIOXX® (rofecoxib).

## JURISDICTION

3.      Jurisdiction is proper in the federal district court, pursuant to 28 U.S.C. §1332 because this is an action for damages in excess of $75,000 exclusive of interests and costs, and there is diversity of citizenship among the parties.

4.      This Court has jurisdiction over the corporate defendant, Merck, because the company has conducted business in the State of Florida, committed a tort in whole or in part in the State of Florida, and/or has continuing contacts with the State of Florida.

5.      Venue of this case is proper in United States District Court for the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391 because part or all of the acts or omissions giving rise to the claims asserted accrued in Citrus County, Florida.

## FACTUAL ALLEGATIONS

6.      This action arises from the sale and efficacy of VIOXX®, a pain-relief drug containing rofecoxib.

7.      Decedent first began taking VIOXX® on approximately February 19,2002 for pain pursuant to prescriptions written by and at the direction of Decedent's physician, and continued taking VIOXX® until on or about March 24, 2004.

2

8.      On or about March 19, 2003, Plaintiff suffered a Myocardial Infarction and died as a result of his ingestion of VIOXX®.

9.      VIOXX® is a member of a class of drugs known as "NSAIDs" (non-steroidal anti-inflammatory drug), but more specifically contains cyclooxygenase 2 ("COX-2") inhibitory properties.  Generally, NSAIDs prevent the formation of fatty acid cyclooxygenases, of which there are two known types ("COX-1" and "COX-2"). VIOXX® is generally different than NSAIDs in that it is solely a COX-2 inhibitor, the rationale being that if the COX-1 enzyme is unaltered, the patient will experience fewer gastrointestinal complications commonly associated with NSAIDs.   Further, the inhibition of COX-2 enzymes is said to decrease pain and inflammation.  VIOXX® is a selective COX-2 inhibitor marketed by defendant as an anti-inflammatory analgesic.

10.      Merck obtained FDA approval on VIOXX® in approximately May of 1999 and began its distribution and sale throughout the United States in approximately May of 1999.   VIOXX® is a brand name used by Merck to market and distribute rofecoxib.

11.      Merck distributed and sold VIOXX® to consumers such as Plaintiff. VIOXX® was approved for marketing based on information in the New Drug Application (hereinafter "NDA"), which was on a fast-track, six month approval process to FDA.

12.      Despite knowledge in its clinical trials and post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Merck promoted and marketed VIOXX® as safe and effective for persons such as Plaintiff.

13.     Merck concealed the serious cardiovascular risks associated with VIOXX® because a successful launch of VIOXX® was viewed as critical for Merck and safety concerns over hypertension, thrombosis, edema and/or cardiovascular events would have drastically impacted Merck's positioning in the market as compared to its competition drug, Celebrex® (celecoxib), which had been placed into the market by Merck competitors Pharmacia and Pfizer some three (3) months prior to the launch of VIOXX®.

14.     Merck knowingly chose to market this product despite its knowledge at product launch and in post-marketing data thereafter that use of VIOXX® carried significant risk factors.  These adverse effects were realized in adverse event reports, in clinical trials where such events were adjudicated by primary investigators with Merck's assistance, and in one or more studies conducted shortly after market launch which showed statistically significant increases in adverse cardiovascular events among VIOXX® users.

15.     In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that VIOXX® use resulted in a statistically significant increase in hypertension and myocardial infarction.  Merck did nothing to publish these studies, which were again reported and denied by Merck as to the hypertension problems in the official publication of the American Pharmaceutical Association, *Pharmacy Today*, Spin War Aside, Lessons Emerge From COX-2 Trials, in August 2000, page 3.

16.     Merck continued to deny the ill health effects associated with VIOXX®
while at the same time reaping the profits obtained through non-disclosure.   Merck
engaged in an aggressive and expansive advertising and sampling program and gained
continued increases in market share, which enhanced Merck's financial stability to the
detriment of its consumers.   The resultant effect to Merck in concealing and failing to
reveal and warn of the risks was a more than $2 billion profit in 2000 alone to Merck and
an approximately 23 percent share of the market.

17.     The profits to Merck were realized as it continued to withhold relevant
data from Plaintiff and the health care industry generally.   For example, in November of
2000, Merck caused the publication of a study in the *NEW ENGLAND JOURNAL OF
MEDICINE* and knowingly downplayed and/or withheld from this publication the
severity of cardiovascular risks associated with VIOXX® consumption over naproxen
consumption.

18.     On or about August 29, 2001, the *JOURNAL OF THE AMERICAN
MEDICAL ASSOCIATION* published a peer-reviewed human epidemiologic study by the
Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukherjee, et al., showing what
Merck had concealed – that the relative risk of developing a "confirmed adjudicated
thrombotic cardiovascular event" (defined in the article as "myocardial infarction,
unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained
death, ischemic stroke, and transient ischemic attacks") among VIOXX® users in
Merck's trials at a 95% confidence interval ranged from 2.2 for event-free survival
analysis, 2.38 compared to naproxen users, and 4.89 for developing serious
cardiovascular events among aspirin-indicated patients.   See Mukherjee, D., et al., *Risk of*

*Cardiovascular Events Associated With Selective Cox-2 Inhibitors,* JAMA. 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for VIOXX® users compared to placebo revealed a statistically significant increase among VIOXX® users. *Id.*

19. In the JAMA study the authors set forth the theory that "by decreasing PG12 production [VIOXX®] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events." Id. at 957. In a follow-up peer-reviewed study reported in the *JOURNAL OF THE AMERICAN COLLEGE OF CARDIOLOGY* on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This biological plausibility is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2, JOURNAL OF SCIENCE*, V. 296:539-541, Apr. 19, 2002.

20. In responsive Merck-authored and sponsored reviews, Merck set forth the theory that naproxen had a cardioprotective effect and therefore accounted for the cardiovascular risks among its VIOXX® users. However, this theory was debunked in approximately January of 2002, by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed study published in *The Lancet*, concluding that based upon information previously available there is an absence of a protective effect of naproxen or

other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et al., *Non-Steroidal Anti-inflammatory Drugs and Risks of Serious Coronary Heart Disease:  An Observational Cohort Study, THE LANCET,* 359:118-123, Jan. 12, 2002.

21.     In mid-September, 2001, Merck received a ***third*** Warning Letter from FDA stating in part that Merck's promotional activities and materials are "false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations."   The FDA stated that Merck's promotional campaign "minimizes the potentially serious cardiovascular findings" from a VIOXX® study and "misrepresents the safety profile for VIOXX®."   Also in the Warning Letter, the FDA wrote, as to Merck's May 22, 2001 press release, "your claim in the press release that VIOXX® has a 'favorable safety profile' is simply incomprehensible, given the rate of MI [myocardial infarction] and serious cardiovascular events compared to naproxen.   The implication that the VIOXX® cardiovascular profile is superior to other NSAIDS is misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX® treatment group … as in the naproxen treatment group…."

22.     In approximately April of 2002, Merck was required by the FDA to place cardiovascular warnings on its VIOXX® labeling based on the results of the VIGOR study.  "VIGOR" stands for VIOXX® Gastrointestinal Outcomes Research.  Merck had sponsored the VIGOR study to obtain information regarding clinically meaningful gastrointestinal events and to develop a large controlled database for overall safety assessment.   At the conclusion of the VIGOR study, it was reported that serious

cardiovascular events occurred in 101 patients who took VIOXX®, compared to 46 patients who took naproxen (a type of over-the-counter NSAID).    Additionally, myocardial infarctions ("MI") occurred in 20 patients in the VIOXX® treatment group as opposed to only four patients in the naproxen treatment group.   In addition, Merck was required to place new label warnings relaying that VIOXX® 50 mg per day is not recommended for chronic use.  These warnings were based on information that had been in Merck's possession by approximately January of 2000 at the latest and, as such, Merck did not meet its obligation to provide adequate "direction or warnings" as to the use of VIOXX® within the meaning of Section 402 of the Restatement (Second) of Torts or otherwise.  Neither did Merck fulfill its alleged obligation to warn the prescribing health care provider of these risks.

23.    On September 30, 2004, VIOXX® was withdrawn from the market worldwide when the data safety monitoring board overseeing a long-term study of VIOXX® recommended that the study be halted because of an increased risk of serious cardiovascular events, including heart attacks and strokes, among patients taking VIOXX®.

24.    At all times relevant to this litigation, defendant Merck had a significant market share based upon claims of VIOXX's® efficacy, a very aggressive marketing program which included financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive direct-to-consumer advertising and physician sampling program.

25.    As a result of such marketing, VIOXX® gained a significant market share in competition with Celebrex and others that Merck would not have gained if Merck had

not suppressed information about VIOXX® and/or made false representations of VIOXX's® superiority and efficacy.

26.    On April 7, 2005, the FDA asked Pfizer to withdraw BEXTRA® (valdecoxib), a Cox-2 inhibitor in the same class of drugs as VIOXX®, from the market "because the overall risk versus benefit profile for the drug is [was] unfavorable." FDA has also asked Pfizer to include a boxed warning in the Celebrex (celecoxib) label.  The actions taken by the FDA further demonstrate the dangerous adverse health effects associated with consumers' use of VIOXX® and the other Cox-2 inhibitors in this class of drugs.

27.    If Merck had not engaged in this conduct, prescribers such as Plaintiff, would not have been prescribed VIOXX® and patients, such as Plaintiff, would have switched from VIOXX® to safer products or would have refrained wholly from any use of VIOXX®.

28.    From approximately 1999 through present, Merck engaged in a common scheme in marketing, distributing and/or selling VIOXX® under the guise that it was safe and efficacious for persons such as Plaintiff.

29.    Plaintiff alleges that the suppression of this information constituted a common scheme by Merck to conceal material information from him.

30.    Plaintiff alleges that the marketing strategies, including without limitation the detail and sampling programs and direct-to-consumer advertising, of Merck targeted him to induce Plaintiff's purchase of VIOXX®.   At the time Merck distributed, manufactured and marketed VIOXX®, Merck intended that Plaintiff and Plaintiff's

health care providers would rely on the marketing, advertisements and product information propounded by Merck.

31.     The actions of Merck, in failing to warn of the clear and present danger posed to others by the use of its drug VIOXX®, in suppressing evidence relating to this danger, and in making deliberate and misleading misrepresentations of fact to minimize the danger or to mislead prescribers and patients as to the true risk, constitutes such clear, blatant and outrageous conduct as to warrant the imposition of exemplary damages against defendant Merck.

## COUNT I: NEGLIGENCE

32.     Plaintiff realleges each and every preceding paragraph of this Complaint and incorporates each by reference as if fully set forth herein.

33.     Defendant, directly or indirectly, negligently manufactured, designed, tested, labeled, packaged, distributed, promoted, marketed, advertised, or sold VIOXX® (rofecoxib) in the stream of commerce, when the defendant knew, or in the exercise of ordinary care, should have known that VIOXX® posed a significant risk to Plaintiff's health and well being, which risk was not known to Plaintiff or Plaintiff's prescriber.

34.     At all times material hereto, defendant had a duty to the decedent to exercise reasonable care in the design, testing, labeling, packaging, distribution, promotion, marketing, advertisement, sampling or sale of VIOXX® (rofecoxib).

35.     Defendant breached its duty and was negligent in its actions, misrepresentations, and omissions toward decedent in that the defendant:

a.     Failed to include adequate warnings with the medications that would alert Plaintiff and other consumers to the potential risks and serious side effects of VIOXX® ingestion;

b.  Failed to include adequate information or warnings with the medication that would alert Plaintiff and the health care community to refrain from use of VIOXX® without first prescribing traditional NSAIDS such as naproxen or ibuprofen;

c.  Failed to adequately and properly test VIOXX® before and after placing it on the market;

d.  Failed to conduct sufficient testing on VIOXX® which, if properly performed, would have shown that VIOXX® had serious side effects, including, but not limited to the cardiovascular events described above;

e.  Failed to adequately warn Plaintiff and Plaintiff's health care providers that use of VIOXX® carried a risk of cardiovascular events, stroke and death;        among other serious side effects;

f.  Failed to provide adequate post-marketing warnings or instructions after the defendant knew or should have known of the significant risks of personal injury and death as identified herein among other serious side effects from the use of VIOXX®;

g.  Failed to adequately warn Plaintiff that VIOXX® should not be used in conjunction with any risk factors for these adverse effects such as a family history of ischemic heart disease, or risk factors for ischemic cardiovascular disease;

h.  Failed to adequately disclose and warn Plaintiff that they undertook the risk of adverse events and death as described herein;

i.  Failed to adequately and timely inform the health care industry of the risks of serious personal injury and death from VIOXX® ingestion as described herein.

36.    Defendant knew or should have known that VIOXX® caused unreasonably dangerous risks and serious side effects, including death, of which Plaintiff would not be aware.  Yet, with reckless disregard for Plaintiff's rights and safety, Defendant nevertheless willfully and wantonly acted in gross negligence when it advertised, marketed, sold and distributed the drug knowing that there were safer methods and products.

37. Defendant owed a duty to Plaintiff to use reasonable care in their actions. Defendant' failure to use reasonable care proximately caused Plaintiff's injuries.

38. As the direct and proximate result of Merck's failure to warn Plaintiff of the defective condition and hazards that could result from the use of VIOXX®:

    a. Plaintiff suffered serious personal injuries resulting in their untimely death;

    b. Plaintiff suffered economic loss; and

    c. Plaintiff expended fair and reasonable expense for necessary health care, attention and services, and incurred incidental and related expenses.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT II: STRICT LIABILITY
## Failure to Warn

39. Plaintiff realleges each and every preceding paragraph of this Complaint and incorporates each by reference as if fully set forth herein.

40. Defendant Merck manufactured, marketed, distributed, and/or placed into the stream of commerce the drugs described herein. Plaintiff would show that the drug VIOXX® was defectively designed, marketed, manufactured and was unsafe for its intended purposes at the time such drug left the control of Merck. The drug VIOXX® was unaccompanied by proper warnings regarding injuries associated with the use of it and the comparative severity and duration of such injuries. The warnings given did not accurately reflect the symptoms and scope of severity of such injuries such as

cardiovascular events, strokes, high blood pressure, congestive heart failure and renal failure or insufficiency. The drug VIOXX® was unaccompanied by proper warnings regarding the classes of potential consumers with *pre-existing* health problems who were at risk for serious injury if they consumed the drug VIOXX®. Defendant failed to perform adequate testing, and/or timely adequate testing, in that adequate testing would have shown that VIOXX® possessed risks of serious injuries with respect to which full and proper warnings accurately and fully reflecting the symptoms, scope and severity should have been made with respect to the use of this drug.

41.     Merck knew, or should have known, that VIOXX® was a dangerously defective drug which posed unacceptable risks of serious injury unknowable by Plaintiff.

42.     VIOXX® was defective due to inadequate warnings or instructions because, after Merck knew or should have known of the risk of serious injury from VIOXX® use, it failed to provide adequate warnings to Plaintiff and/or Plaintiff's physicians and continued to aggressively promote the dangerously defective product. Merck failed to give warnings (1) that could reasonably be expected to catch the attention of a reasonably prudent person, in the circumstances that the product was used; (2) that were comprehensible to the average user; and (3) that conveyed a fair indication of the nature and extent of the danger. The failure to give these warnings rendered VIOXX® dangerous to an extent beyond that which would be contemplated by the ordinary users of the product with ordinary knowledge common to the community.

43.     The drug VIOXX® was defective in design or formulation in that, when it left the hands of the manufacturer and/or distributor, the foreseeable risks exceeded the benefits associated with the design or formulation. Alternatively, the drug VIOXX® was

defective in design or formulation, in that, when it left the hands of the manufacturer and/or supplier, it was unreasonably dangerous, it was more dangerous than an ordinary consumer would expect, and was more dangerous than other drugs of the same class as VIOXX®.

44.      Merck acted unreasonably in failing to provide adequate warning or instructions to Plaintiff and other users of VIOXX®.  At the time VIOXX® left the control of Merck, the absence of adequate warnings or instructions created an unreasonably dangerous condition that Merck knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to Plaintiff who was a user of VIOXX®.

45.      Further, at the time VIOXX® left the control of Merck, the design or formulation of VIOXX® was so unreasonable that a reasonable person, including a user or consumer, aware of relevant risks or facts of using VIOXX®, would not use or consume an anti-inflammatory analgesic of this design.

46.      As the direct and proximate result of Merck's failure to warn Plaintiff of the defective condition and hazards that could result from the use of VIOXX®:

   a.      Plaintiff suffered serious personal injuries resulting in their untimely death;

   b.      Plaintiff suffered economic loss; and

   c.      Plaintiff expended fair and reasonable expense for necessary health care, attention and services, and incurred incidental and related expenses.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the

costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

### COUNT III: STRICT LIABILITY
### Defective Design

47.     Plaintiff realleges each and every preceding paragraph of this Complaint and incorporates each by reference as if fully set forth herein.

48.     Plaintiff ingested VIOXX®, a medication that was either manufactured, distributed, sold, prescribed and/or otherwise put into the stream of commerce by Merck. The defective condition of VIOXX® rendered it unreasonably dangerous, and VIOXX® was in this defective condition at the time it left the hands of Merck.

49.     Merck engaged in the manufacture, distribution, sale and/or prescription of pharmaceutical medications.  VIOXX®, without substantial change in the condition in which it was sold, was a proximate cause of Plaintiff's injuries.

50.     Plaintiff was unaware of the significant hazards and defects in the VIOXX® medication.  If Plaintiff had been aware of the significant hazards and defects in the VIOXX® medication, he would not have purchased or consumed VIOXX®. Therefore, the VIOXX® medication was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user.  During the periods that Plaintiff was taking VIOXX®, the medication was being utilized in a manner which was intended by Merck.

51.     VIOXX® was defectively designed because the foreseeable risks exceeded the benefits associated with the design or formulation.

52.     VIOXX® was defectively designed because defendant Merck unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable

alternative design or formulation which would have prevented or substantially reduced the risks of consumers, such as Plaintiff, from experiencing heart attacks, strokes, renal failure, congestive heart failure and/or high blood pressure after ingestion of the drug.

53.     Defendant Merck acted unreasonable in the following ways:

    a.     Merck conducted inadequate clinical trials, testing, study, and inadequate reporting regarding the results of same;

    b.     Merck designed, manufactured and/or placed into the stream of commerce the product, which reached Plaintiff in the same or substantially the same condition in which it was sold.   Upon purchase by Plaintiff, the product in question was represented to be safe and free from latent defects;

    c.     Merck designed, manufactured, and placed into the stream of commerce the product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Merck because of the design defects which were a producing cause of the occurrence in question;

    d.     The product in question was defectively marketed by Merck with respect to its failure to warn, adequately warn, or instruct in the safe use of the product and such defect was a producing cause of the occurrence in question.

    e.     Merck knew, or in the exercise of ordinary care should have known, that the product was defective and unreasonably dangerous to those persons likely to use the product for the purpose and in the manner for which it was intended to be used.   Defendant was negligent in the particulars set forth in this and the preceding paragraphs and such negligence was a proximate cause of the occurrence in question.

54.     Merck owed Plaintiff the duty of reasonable care when they tested, designed, manufactured, and marketed the product in question.   Merck violated its duty and was negligent in the particulars set forth herein.

55.     As a direct and proximate result of Merck's failure to warn Plaintiff of the defective condition and hazards that could result from the use of VIOXX®:

    a.      Plaintiff suffered serious personal injuries resulting in their untimely death;

    b.      Plaintiff suffered economic loss; and

    c.      Plaintiff expended fair and reasonable expenses for necessary health care, attention and services, and incurred incidental and related expenses.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT IV:  FRAUD AND MISREPRESENTATION

56.    Plaintiff realleges each and every preceding paragraph of this Complaint and incorporates each by reference as if fully set forth herein.

57.    Merck misrepresented to Plaintiff and the health care industry the safety and effectiveness of VIOXX® and/or fraudulently or intentionally concealed material information, including adverse information regarding the safety and effectiveness of VIOXX®.

58.    As discussed herein, Merck made misrepresentations and actively concealed adverse information at a time when Merck knew, or should have known, that VIOXX® had defects, dangers, and characteristics that were other than what Merck had represented to Plaintiff and the health care industry generally.  Specifically, Merck misrepresented to and/or actively concealed from Plaintiff, the health care industry and consuming public that:

    a.      VIOXX® had statistically significant increases in cardiovascular side effects, including, without limitation, thrombosis, myocardial

infarction and sudden onset death, identified herein which could result in serious injury or death;

b. There had been insufficient and/or company-spun studies regarding the safety and efficacy of VIOXX® before and after its product launch;

c. VIOXX® was not fully and adequately tested for the cardiovascular side effects at issue herein;

d. Other testing and studies showed the risk of or actual serious adverse risks;

e. There was a greatly increased risk of such cardiovascular events and death; and/or that

f. There was a confirmed mechanism by which these thrombotic or cardiovascular events occurred as reported in the scientific literature.

59. The misrepresentations of and/or active concealment alleged were perpetuated directly and/or indirectly by Merck.

60. Merck knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiff would rely on them, leading to the use of VIOXX®.

61. At the time of Merck's fraudulent misrepresentations, Plaintiff was unaware of the falsity of the statements being made and believed them to be true. Plaintiff had no knowledge of the information concealed and/or suppressed by Merck.

62. Plaintiff justifiably relied on and/or was induced by the misrepresentations and/or active concealment and relied on the absence of safety information which Merck did suppress, conceal or failed to disclose to Plaintiff's detriment.

63. In addition, Merck had a post-sale duty to warn Plaintiff and the public about the potential risks and complications associated with VIOXX® in a timely manner.

64.     The misrepresentations and/or active fraudulent concealment by Merck constitute a continuing tort against Plaintiff, who ingested VIOXX®.  Merck made the misrepresentations and actively concealed information about the defects and dangers of VIOXX® with the intention and specific desire that Plaintiff's health care professionals and the consuming public would rely on such or the absence of information in selecting VIOXX® as treatment.

65.     Merck's conduct in misrepresenting and actively concealing information about the defect and dangers of VIOXX® was willful, reckless, intentional and maliciously fraudulent.

66.     As a direct and proximate result of the fraudulent acts and omissions, suppression and misrepresentation of Merck, Plaintiff suffered significant and ongoing injury and damages and is entitled to an award of exemplary damages in order to punish such conduct and to deter such conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT V: FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

67.     Plaintiff realleges each and every preceding paragraph of this Complaint and incorporates each by reference as if fully set forth herein.

68.     Defendant was engaged in commercial conduct by selling the subject product.

69.     In violation of the Florida Deceptive and Unfair Deceptive Trade Practices Act, Merck explicitly and impliedly represented that VIOXX® therapy was a safe and effective anti-inflammatory analgesic.  Merck engaged in direct to consumer advertising promoting the drug as a safe and effective pain reliever superior to other Cox-2 Inhibitors on the market; and, willfully withheld the risks of cardiovascular events and death, which risks were known to Merck at time of launch and post launch trials.  This willful misleading conduct deceived physicians and consumers like Plaintiff.  Merck's actions as described above had the capacity or tendency to deceive.  In addition, Merck's actions were in or affecting commerce.

70.     Defendant's misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or the knowing concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission in connection with the sale and advertisement of the subject product, in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.201, et seq.

71.     Merck's conduct, as alleged herein, induced Plaintiff to purchase and use VIOXX® through the use of false and/or misleading advertising, representation and statements and, thus, entitles Plaintiff to an award of punitive damages, attorney fees and reasonable costs.

**WHEREFORE**, Plaintiff prays this Court for the following relief:

1.     That the Court enter a judgment in favor of Plaintiff against Defendant for damages to compensate Plaintiff for injuries the Deceased sustained as a result of VIOXX® use, including medical expenses as proven at trial;

2.      That the Court award damages for the physical pain and suffering of the deceased;

3.      That the Court award all statutory damages;

4.      That the Court order payment of exemplary, punitive, and/or treble damages;

5.      That the Court award prejudgment and post judgment interest on Plaintiff's damages;

6.      That the costs of this action, including attorneys' fees be paid by Defendant;

7.      That all issues of fact be tried by jury; and

8.      For such other relief that the Court deems just and proper.

### COUNT VI: WRONGFUL DEATH

72.     Plaintiffs re-allege and reaffirm paragraphs 1-71 as if fully set forth herein.

73.     At all times material hereto, Defendant owed a duty to Decedent to protect him against reasonably foreseeable harms which a prudent person would anticipate were likely to result from the Defendants' acts or omissions.

74.     Defendant breached that duty when they acted in the negligent and/or tortious manner set forth in Paragraphs above.

75.     Defendant's negligent and tortious conduct was the direct and proximate cause of Decedent's death.

76.     If death had not ensued, Decedent would have been entitled to maintain a cause of action and recover damages against Defendant because of the above alleged negligent and tortious conduct.

77.     As a direct, foreseeable and proximate result of Defendant's conduct, Decedent has incurred medical and funeral expenses.

78.    As a direct, foreseeable and proximate result of the Defendants' conduct, Decedent's estate has been deprived of prospective net accumulations and loss of earnings.

**WHEREFORE**, Plaintiffs demand judgment for damages against Defendant, including, but not limited to:

1.    The value of lost support and services from the date of Deceased's injury to his death, with interest, and future loss of support and services from the date of death and reduced to present value;

2.    As to Sharon Flowers, individually, losses as a surviving spouse of Mel Flowers, including, for loss of companionship and protection and for mental pain and suffering from the date of injury;

3.    Medical or funeral expenses due to the decedent's injury or death may be recovered;

4.    As to Sharon Flowers, as Personal Representative of the Estate of Mel Flowers: loss of earnings of the deceased from the date of injury to the date of death, less lost support of survivors excluding contributions in kind, with interest; loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death; and medical or funeral expenses due to the decedent's injury or death that have become a charge against the estate.

This the 27th day of July, 2009.

### JURY TRIAL DEMANDED

Respectfully submitted,

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC

By: /s/ Justin G. Witkin
Justin G. Witkin, Esq. – FL Bar No.:  0109584
Bryan F. Aylstock, Esq.- FL Bar No.:  78263
Debra Renee Sherrer Baggett, Esq. - FL Bar No.: 038186
Aylstock, Witkin, Kreis & Overholtz, P.L.L.C.
803 North Palafox Street
Pensacola, FL 32501
(850) 202-1010 Phone
(850) 916-7449 facsimile