# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|   |   |   |
|---|---|---|
|   | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |   |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|   | : |   |
|   | : | **JUDGE FALLON** |
|   | : |   |
|   | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : 

**THIS DOCUMENT RELATES TO ALL CASES**

## <u>ORDER & REASONS</u>

On August 27, 2008, the Court issued an Order and Reasons capping contingent fee arrangements for all counsel representing claimants in the Vioxx global settlement program at 32% plus reasonable costs.  (Rec. Doc. 15722)  On December 10, 2008, a group of five attorneys, identified as the Vioxx Litigation Consortium ("VLC"), filed a Motion for Reconsideration/Revision of the Court's Order Capping Contingent Fees and Alternatively for Entry of Judgment.  (Rec. Doc. 17395).  The Court appointed the Tulane Civil Litigation Clinic ("the Clinic") to represent the interests of claimants whose settlement awards will be affected by the Court's Capping Order.  On December 31, 2008, the VLC filed an emergency petition for a writ of mandamus and stay with the United States Court of Appeals for the Fifth Circuit requesting that the Fifth Circuit vacate the appointment Order pending further proceedings.  On January 23, 2009, the Fifth Circuit denied the petition for writ of mandamus and stay.  On March 17, 2009, the Clinic filed its opposition to the VLC's memorandum.  (Rec. Doc. 18016).  On

March 31, 2009, the VLC filed a memorandum in reply to the Clinic's opposition.  (Rec. Doc.

18176).  In addition to the extensive briefing filed by the parties, the Court heard oral arguments

regarding the issue on April 7, 2009, and took the matter under submission.  After

reconsideration, IT IS ORDERED that the VLC's Motion for Reconsideration/Revision of the

Court's Order Capping Contingent Fees and Alternatively for Entry of Judgment (Rec. Doc.

17395) is GRANTED IN PART and DENIED IN PART.

## I.      FACTUAL BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate.  This

multidistrict products liability litigation involves the prescription drug Vioxx, known generically

as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed

and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid

arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug

Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available

until September 20, 2004, when Merck withdrew it from the market after data from a clinical

trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular

thrombotic events such as myocardial infarction (heart attack) and ischemic stroke.  Thereafter,

thousands of individual suits and numerous class actions were filed against Merck in state and

federal courts throughout the country alleging various products liability, tort, fraud, and warranty

claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States

between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that

approximately 20 million patients have taken Vioxx in the United States.[1]

On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407.  *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).  One month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to consider strategies for moving forward with the proceedings.  Shortly thereafter, the Court appointed committees of counsel to represent the parties and to meet with the Court once every month to review the status of the litigation.[2]

One of this Court's first priorities was to assist the parties in selecting and preparing certain test cases to proceed as bellwether trials.  In total, the Court conducted six Vioxx bellwether trials.[3]  The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the

---

[1]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

[2]The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), and five attorneys to serve on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005).

[3]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006) (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

defendant. During the same period that this Court conducted six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida. With the benefit of experience from these bellwether trials, as well as the encouragement of the several coordinated courts, the parties soon began settlement discussions in earnest.[4]

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D.La. Nov. 9, 2007) ("Settlement Agreement"), *available at* http://www.browngreer.com/vioxxsettlement.[5] The private Settlement Agreement establishes a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion. *Id.* § "Recitals".[6] The Settlement Agreement is a voluntary opt in agreement and expressly contemplates that this Court shall oversee various aspects of the administration of settlement proceedings, including

---

[4]In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court-as well as the coordinate state courts of Texas, New Jersey, and California-informed of their progress in settlement discussions.

[5]When the parties formally announced the Settlement Agreement, Vioxx-related discovery had been moving forward in the coordinate jurisdictions for more than six years. Over 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had been taken, and counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology.

[6]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

appointing a Fee Allocation Committee, allocating a percentage of the settlement proceeds to a

Common Benefit Fund, approving a cost assessment, and modifying any provisions of the

Settlement Agreement that are otherwise unenforceable.[7]  Accordingly, this Court has

consistently exercised its inherent authority over the MDL proceedings in coordination with its

express authority under the terms of the Settlement Agreement to ensure that the settlement

proceedings move forward in a uniform and efficient manner.[8]

The Settlement Agreement provides a schedule for the disbursement of interim payments

to certain eligible claimants.  *Id.* §4.1.  In order to qualify for interim payments, eligible

claimants must fulfill specific registration and filing obligations.  *Id.*  Pursuant to the terms of the

Settlement Agreement, eligible MI claimants who timely fulfill all of their filing obligations may

qualify to receive interim payments beginning on August 1, 2008, or the date on which the

Claims Administrator has determined pre-review points awards for at least 2,500 MI claimants,

whichever is later.  *Id.*  The schedule for distributing interim payments to claimants is

conditioned on Merck's decision to waive its walk away privileges.  *Id.*

---

[7]*See, e.g.,* Settlement Agreement § 9.2.4 (establishing that the Court shall appoint a Fee
Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices
governing the procedure by which [it] shall determine the common benefit attorneys' fees and
reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify
any provision of the Agreement under certain limited circumstances if the Court determines that
the provision "is prohibited or unenforceable to any extent or in any particular context but in
some modified form would be enforceable").

[8]*See e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's
"inherent authority over this multidistrict litigation" as well as its express authority under
Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving
the right to "issue subsequent Orders governing the procedure by which the Allocation
Committee shall carry out its function"; and providing that members appointed to the committee
may not be substituted by other attorneys "except with the prior approval of the Court").

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met. *See Minute Entry, July 17, 2008*, Rec. Doc. 15362 (July 17, 2008). Merck further advised that it intended to waive its walk away privileges and that it would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the settlement fund, clearing the way for distribution of interim payments to eligible claimants. *Id.* On August 20, 2008, the Claims Administrator reported to the Court that it had successfully reviewed approximately 2,750 claims for interim payments. *See Minute Entry, August 20, 2008*, Rec. Doc. 15674 (Aug. 20, 2008).

Against this backdrop, the Court issued an Order & Reasons on August 27, 2008, which ordered "that contingent fee arrangements for all attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs." *Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 20-21 (Aug. 27, 2008). The Court concluded that its authority to implement a fee cap derived from three sources.

First, any court presiding over a mass tort proceeding possesses equitable authority to examine fee arrangements. The Federal Rules of Civil Procedure expressly grant this power to district courts in class actions. *See* Fed. R. Civ. P. 23(g)(1)(C)(iii); Fed. R. Civ. P. 23(h); *see also* Manual for Complex Litigation (Fourth) § 22.927 (2004). While an MDL is distinct from a class action, the substantial similarities between the two warrant the treatment of an MDL as a quasi-class action. *Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 8-9 (Aug. 27, 2008). Accordingly, this Court found that "the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness." *Id.* at 9; *see also In re Guidant Corp. Implantable Defibrillators*

*Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008)

(relying on the quasi-class action nature of an MDL proceeding and the court's equitable

authority to implement a reasonable cap on contingent fees); *In re Zyprexa Prods. Liab. Litig.*,

424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (exercising the court's inherent power to "impos[e] ...

fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and

expenses.")

    Second, the Court recognized that inherent authority, and a concomitant duty, exists to

review contingent fee arrangements *sua sponte*, especially where there is a built in conflict of

interest. *Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 9-12 (Aug. 27, 2008); *see also*

*Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982); *Hoffert v. General Motors Corp.*,

656 F.2d 161, 164-66 (5th Cir. 1981); *In re Zyprexa*, 424 F. Supp. 2d at 492; *Karim v. Finch*

*Shipping Co.,* Ltd., 233 F. Supp. 2d 807, 810 (E.D. La. 2002), *aff'd*, 374 F.3d 202 (5th Cir. 2004).

In the instant case, the Court recognized that the claimant's attorneys were unlikely to question

the propriety of their own fees, and the defendant had no incentive to jeopardize the settlement

agreement by raising the issue. Accordingly, the Court found it necessary to exercise its inherent

authority to protect the large number of elderly Vioxx claimants by capping contingent fee

agreements. *Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 11-12 (Aug. 27, 2008).

    Finally, the Court held that the terms of the Vioxx Settlement Agreement voluntarily

entered into by the parties in this case provided a further source of authority to examine the

reasonableness of the contingent fee contracts. *Id.* at 13-14. Unlike a traditional settlement

agreement, which the parties execute without the assistance of the Court, the parties in this case

clearly contemplated that this Court would be heavily involved in the administration of the

-7-

Settlement Agreement. Furthermore, the parties expressly granted the Court authority to affect the distribution of the settlement fund. *See* Settlement Agreement § 9.2 (outlining the Court's role in determining the amount of money to be placed in, and distribution of, the Common Benefit Fund). Further, the parties gave the Court express authority to modify any provision of the Agreement under certain circumstances. *See id.* § 16.42 (allowing modification if a provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable."). Thus, the parties have invoked the jurisdiction of this Court to act in administering the Settlement Agreement and to ensure the enforceability of that agreement. Accordingly, the Court held that:

> To the extent that the Settlement Agreement would be unenforceable if it resulted in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts, this Court may address those fees in order to ensure fairness to all parties. As a result, the Court finds that it may examine the reasonableness of contingent fee contracts in order to protect the claimants and enforce the Settlement Agreement."

*Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 13-14 (Aug. 27, 2008). Thus, the power to cap contingent fee contracts inheres in the Court and has also been invoked by the parties in this case.

After concluding that the Court possesses the authority to act, the Court examined the contingent fee contracts in this case and set a reasonable limit on the amount that individual attorneys may charge claimants enrolled in the global settlements, regardless of whether their cases were filed in state or federal court. In making this assessment, the Court weighed a number of factors, including past fee caps implemented by MDL courts facing global settlement agreements. *See In re Guidant*, 2008 WL 682174, at *17-19 (capping contingent fees at 20% subject to appeal to a special master for an upward departure based on certain limiting factors);

*In re Zyprexa*, 424 F. Supp. 2d at 496 (capping contingent fees at 35% but allowing for departure in either direction based on the unique facts of a given case); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D. Ala. 1994) (capping contingent fees at 25% of a $4.2 billion settlement fund). The Court also considered state law caps on contingent fee agreements in both products liability actions and other cases. *See* N.J. R. Ct. 1:21-7 (providing that an attorney in a products liability action "shall not contract for, charge, or collect a contingent fee in excess of the following: (1) 33 1/3 % on the first $500,000 recovered; (2) 30% on the next $500,000 recovered; (3) 25% on the next $500,000 recovered; (4) 20% on the next $500,000 recovered."); Cal. Bus. & Prof. Code § 6146(a) (providing a sliding scale framework for limiting contingent fees in actions against healthcare providers); Tex Lab. Code Ann. § 408.221 (limiting contingent fee arrangements in worker's compensation lawsuits to 25% of the plaintiff's net recovery). Finally, the Court considered the unique contours of the Vioxx litigation with which the Court is intimately familiar. *Order & Reasons, August 27, 2008,* Rec. Doc. 15722, 15-20 (Aug. 27, 2008). The Court recognized that without the work of the attorneys from across the country involved in this litigation a global settlement would not have been possible. Further, the Court was mindful that certain attorneys may have expended a great deal of time and effort on behalf of their clients. However, the Court ultimately pointed to the many economies of scale which benefitted attorneys across the board, which meant that "[i]nstead of pursuing individual discovery, filing individual motions, engaging in individual settlement negotiations, or preparing individual trial plans, attorneys for eligible claimants who wish[ed] to participate in the settlement need[ed] only [to] enroll the claimants in the settlement and then carefully monitor their progress through the claims valuation process." *Order & Reasons, August*

*27, 2008,* Rec. Doc. 15722, 19 (Aug. 27, 2008). Since the efficiency of the MDL process leads

to substantial economies of scale, the Court reasoned that justice requires that the claimants

enjoy some of this benefit. Accordingly, the Court held that a contingent fee cap of 32% allowed

attorneys to be fairly compensated for their hard work while also providing a benefit to the

claimants. *Id.*

Following this Order, a group of five attorneys, identified as the Vioxx Litigation

Consortium ("VLC"), filed a Motion for Reconsideration/Revision of the Court's Order Capping

Contingent Fees and Alternatively for Entry of Judgment. (Rec. Doc. 17395). The Court

appointed the Tulane Civil Litigation Clinic ("the Clinic") to represent the interests of claimants

whose settlement awards will be affected by the Court's Capping Order. On December 31,

2008, the VLC filed an emergency petition for a writ of mandamus and stay with the Fifth

Circuit requesting that the Fifth Circuit vacate the appointment Order pending further

proceedings. On January 23, 2009, the Fifth Circuit denied the petition for writ of mandamus

and stay. On March 17, 2009, the Clinic filed its opposition to the VLC's memorandum. (Rec.

Doc. No. 18016). On March 31, 2009, the VLC filed a memorandum in reply to the Clinic's

opposition. (Rec. Doc. 18176). In addition to the extensive briefing filed by the parties, the

Court set the matter for hearing on April 7, 2009, afforded the parties an opportunity to present

evidence, heard oral arguments, considered evidence, and took the matter under submission.

At the most recent status conference, held on July 31, 2009, the Claims Administrator

reported that interim payments totaling $1,231,091,500 had been issued to 14,977 MI claimants.

Additionally, payments totaling $64,260,521 had been issued to 2,086 IS claimants.

Accordingly, payments are on track to be completed by the end of September, 2009. As these

payments continue to be disbursed, the VLC's Motion for Reconsideration/Revision of the Court's Order Capping Contingent Fees and Alternatively for Entry of Judgment (Rec. Doc. 17395) is ripe for decision.[9]

## III.    LAW & ANALYSIS

After reconsideration, and in light of the extensive briefing, evidence, and oral argument provided by the VLC and the Clinic, the Court finds that its reasoning in the initial Order capping contingent fees was sound.  Accordingly, the Court finds that it has the authority to implement a reasonable cap on contingent fee agreements *sua sponte*.  Further, the Court finds that it is fair and reasonable to cap contingent fees at 32% plus reasonable costs based on the unique contours of this litigation.  However, the Court also recognizes the possibility that extraordinary circumstances may exist which could warrant a departure (in either direction) from the 32% cap in individual cases.  At this time, the Court will address the arguments presented by the VLC in opposition to the initial Order capping contingent fees.

### A.    This Court has subject matter jurisdiction to consider the reasonableness of contingent fee agreements

The VLC first argues that no claimant has challenged the reasonableness of any contingent fee agreement prior to the Court's capping order, and thus, no Article III "case" or

_____

[9]It should be pointed out that addressing the issue of attorneys' fees in the context of the Vioxx global settlement will require a two-step process.  The first step involves examining the reasonableness of all the contingent fee contracts in the global settlement and setting an appropriate limitation on the amount of fees that attorneys may charge claimants.  The second step of the process will involve allocating a percentage of those fees for the Common Benefit Fund to be distributed to those who provided services that benefitted all claimants and their attorneys.  After notifying the parties and all counsel and offering them an opportunity to be heard, the Court will issue a separate order addressing the Common Benefit Fund.  At this time, the Court will only address the VLC's Motion for Reconsideration/Revision of the Court's Order Capping Contingent Fees and Alternatively for Entry of Judgment.

"controversy" exists and the Court therefore lacks subject matter jurisdiction to consider the issue. Memorandum in Support of Motion for Reconsideration/Revision of Order Capping Contingent Fees and Alternatively for Entry of Judgment at 3-4, *In re Vioxx Prods. Liab. Litig.*, No. 05-1657 (E.D. La. Dec. 10, 2008) [hereinafter Memorandum in Support]. In support of their argument, the VLC relies on *Brown v. Watkins Motor Lines, Inc.*, an automobile crash case in which a four year old plaintiff obtained a $500,000 jury award. 596 F.2d 129, 130 (5th Cir. 1979). The funds were placed into the registry of the court and the Fifth Circuit held that "[t]he case or controversy in the federal forum ended with payment of the judgment into the registry of the court." *Id.* at 132. Accordingly, the district court subsequently lacked subject matter jurisdiction to consider the reasonableness of fees *sua sponte*. *Id.*

In the first place, this is not an accurate assessment of the facts. The Clinic reported that they had received correspondence and calls from numerous claimants protesting a fee higher than 32%. However, even if no claimant had challenged the reasonableness of a fee in excess of 32%, given the Fifth Circuit's jurisprudence, the VLC's argument is not persuasive. In *Hoffert v. General Motors Corp.*, a minor plaintiff and his father settled a products liability claim against General Motors for $2.5 million. 656 F.2d 161, 162 (5th Cir. 1981). The parties then submitted the agreement to the district court for approval. *Id.* The court approved the settlement itself but decided to cap attorneys fees *sua sponte*. *Id.* The Fifth Circuit affirmed the district court's decision and expressly distinguished *Brown* by pointing out that the parties had "invoked the equitable jurisdiction of the district court by asking it to approve the terms of the settlement agreement." *Id.* at 165. Thus, the VLC's argument ignores the importance of the parties' own invocation of this Court's authority to oversee the settlement agreement.

Where the parties to a lawsuit have invoked the jurisdiction of a district court to preside over a settlement agreement or the distribution of funds in the court registry, the Fifth Circuit has held that courts have subject matter jurisdiction to examine the reasonableness of contingent fee contracts. *Karim v. Finch Shipping Co.*, 374 F.3d 302, 306-07 (5th Cir. 2004) (holding that subject matter jurisdiction existed to consider reasonableness of contingent fee agreements where the plaintiff had filed a motion for the disbursement of funds in the court's registry); *Hoffert*, 656 F.2d at164-65 ("That no party questioned the propriety of the ... contingent fee and that the injured plaintiff's guardian ad litem acquiesced in its reasonableness did not shield the fee from the Court's scrutiny as a part of the overall settlement which the court had before it."). Further, past MDL courts have deemed it appropriate to cap contingent fees even though no claimants had challenged the reasonableness of their agreement. *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) ("[T]his Court has the inherent right and responsibility to supervise the members of its bar in both individual and mass tort actions, including the right to review contingency fee contracts for fairness."); *see also In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 492 (E.D.N.Y .2006) ("A federal court may exercise its supervisory power to ensure that fees are in conformance with codes of ethics and professional responsibility even when a party has not challenged the validity of the fee contract.").

In this case, the parties have done more than simply ask the Court to approve a settlement agreement or move for a disbursement of funds. In fact, this Court is expressly authorized to be the Chief Administrator of the Settlement Agreement. Settlement Agreement § 6.1. In this capacity, the Court is empowered to determine the amount and allocation of common benefit

fees, which has a direct impact upon the overall level of attorney compensation. *Id.* § 9.2. In addition to these powers, the Court has been highly involved in the day-to-day administration of the Settlement Agreement and continues to entertain motions, issue orders, and hold monthly status conferences. Thus, there is no doubt that the parties in this case, like the parties in *Karim* and *Hoffert* who involved the court in dispersing funds and overseeing a settlement, have invoked the jurisdiction of this Court. Therefore the Court has subject matter jurisdiction to consider the reasonableness of fee agreements.

**B. This Court has authority to review contingent fee contracts for reasonableness**

In the initial capping Order, as discussed above, the Court identified three independent sources of its authority to implement a cap on all contingent fee agreements: 1) the Court's equitable powers; 2) its inherent supervisory authority; and 3) its express authority under the terms of the Settlement Agreement. The VLC challenges all three of these asserted sources. Their arguments will be addressed in turn.

**1. In light of the nature of MDL proceedings, treatment of the Vioxx MDL as a quasi-class action is appropriate**

The VLC argues that even if this Court has subject matter jurisdiction to consider the reasonableness of contingent fee contracts, the Court lacks the authority to alter the terms of the VLC's fee arrangements. In mounting this challenge, the VLC attacks each of the asserted justifications propounded by the Court in its initial Order. First, the VLC challenges the Court's equitable authority by arguing that classifying an MDL as a quasi-class action is inappropriate. *See* Memorandum in Support, at 6-8; *see also* Memorandum in Reply to the Opposition of the Tulane Law Clinic to Motion for Reconsideration of Capping Order at 12-22, *In re Vioxx Prods.*

*Liab. Litig.*, No. 05-1657 (E.D. La. Dec. 10, 2008) [hereinafter Reply Memorandum]. Focusing

on the differences between a class action and an MDL, the VLC points out that the underlying

actions in an MDL remain individual in nature while a class action is a representative

proceeding. Reply Memorandum at 14-15. This difference, they maintain, is the reason that fee

capping is appropriate in a class action but not in an MDL. *Id.*

Admittedly, the Federal Rules of Civil Procedure expressly provide that district courts

may require reasonable fees in class actions while the MDL statute lacks an analogous

provision.[10] *Compare* Fed. R. Civ. P. 23(g)(1)(C)(iii), *and* Fed. R. Civ. P. 23(h), *with* 28 U.S.C. §

1407. This statutory difference, however, is not the end of the story. First, the MDL statute

requires that transferee courts "promote the just and efficient conduct of such actions." 28

U.S.C. § 1407(a). In the context of contingent fee arrangements, implementing a reasonable cap

promotes justice for all parties by allowing claimants to benefit (as their attorneys have) from the

economies of scale and increased efficiency that an MDL provides. Certainly, this statutory

language lends support to the proposition that MDL courts, like class action courts, can exercise

equitable authority to examine the reasonableness of fees.

Furthermore, several previous MDL courts have considered the issue and have accepted

the classification of an MDL as a quasi-class action and proceeded to exercise their equitable

powers to cap contingent fees.[11] *See In re Zyprexa*, 424 F. Supp. 2d at 491; *see also In re*

---

[10] Interestingly, express statutory authority to regulate fees in the class action context has
not always existed. Fee regulation was a judicially created doctrine that later gained statutory
endorsement. *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105, 124
(2006).

[11] On the other hand, the VLC is unable to cite to a single case in support of their
contention that the quasi-class action analogy is inappropriate.

*Guidant*, 2008 WL 682174, at *18. In *Zyprexa*, for example, the court noted that an MDL "has many of the characteristics of a class action and may be properly characterized as a quasi-class action subject to general equitable powers of the court." *In re Zyprexa*, 424 F. Supp. 2d at 491. The court went on to point out a number of factors which favored this classification, including the payment of claimants out a massive escrow fund, the universal applicability of a uniform settlement matrix, the court's use of special masters in discovery and settlement administration, and other elements of court control. *Id.*

The global settlement in this case bears a significant resemblance to the global settlement in *Zyprexa*. First, there are approximately 50,000 eligible claimants currently enrolled in the Vioxx Settlement Program. These claimants, like those in *Zyprexa*, are all subject to a universal settlement matrix for awarding points and valuating claims. Second, in order to administer the Vioxx Settlement Program, this Court, like the court in *Zyprexa*, has control over a large settlement fund. Finally, both *Zyprexa* and the Vioxx MDL have made use of special masters throughout the litigation process. *See, e.g.*, *Order*, Rec. Doc. 13228 (Jan. 14, 2008) (appointing Mr. Patrick Juneau to act as Special Master pursuant to the term of the Settlement Agreement.) Given these similarities, and § 1407's mandate of just and efficient treatment, it is correct to consider this MDL a quasi-class action. Accordingly, it is appropriate for the Court to exercise its equitable authority to examine fee agreements for reasonableness.

> **2.      This Court's exercise of its inherent authority to inquire into the reasonableness of fee agreements was justified**

While the VLC recognizes that certain powers inhere in district courts, they challenge the notion that these powers allow an MDL court to implement a reasonable cap on contingent fee agreements. Arguing that "a federal court's inherent powers consist of those necessary for the

courts to manage their affairs," the VLC asserts that this Court has failed to justify the use of inherent power to act in this case. Memorandum in Support, at 9. While the VLC is correct that the exercise of inherent power is limited and requires justification, their argument fails because the exercise of inherent authority to inquire into the reasonableness of fee agreements in this case was justified.

Contingent fee contracts have long been accepted in the United States because "they provide many litigants with the only practical means by which they can secure legal services to enforce their claims." *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir. 1970).[12] While permissible, these contracts are subject to a requirement of reasonableness. Model Rules of Prof'l Conduct R. 1.5(a) (2002); *see also Gair v. Peck*, 160 N.E. 2d 43, 48 (N.Y. 1959). Courts that have considered the issue have nearly unanimously concluded that the power to consider the reasonableness of contingent fees is inherent in a federal court.[13] *See, e.g., Hoffert*, 656 F.2d at 164. In the context of mass tort litigation, "a court that exercised inherent power to prevent a violation of the lawyers' professional responsibility to charge only reasonable rates would be acting within the parameters of inherent authority as described by the Supreme Court." *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105, 127 (2006)

---

[12]For a detailed analysis of the history of contingent fee arrangements in mass tort litigation as well as the effects that these arrangements might have on the future of mass tort actions, see *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105 (2006).

[13]Once again, the VLC fails to point to any case holding otherwise. Instead, they base their argument on certain narrow dicta regarding inherent powers generally. The focal point of their argument, *Chambers v. Nasco*, is a case involving the assessment of attorney's fees for bad faith conduct, not the power to inquire into the reasonableness of contingent fee agreements. 501 U.S. 32, 45-46 (U.S. 1991).

[hereinafter *Contingent Fees*][14]; *see also In re Guidant*, 2008 WL 682174, at *18([T]his Court has the inherent right and responsibility to supervise the members of its bar in both individual and mass tort actions, including the right to review contingency fee contracts for fairness.").

Several justifications exist for the exercise of inherent authority to implement a reasonable cap on attorneys' fees. First, when it comes to the percentage or amount of the contingency fee, a conflict of interest necessarily exists between the claimants and their attorneys who both seek to maximize their own percentage of an award. Accordingly, court supervision is necessary. *In re Guidant*, 2008 WL 682174, at *18 ("[A]s for the representative counsel involved, Plaintiffs' counsel have a built-in conflict of interest that is directly opposed to that of their clients."); *In re Zyprexa*, 424 F. Supp. 2d at 491-92 ("[P]laintiffs' counsel have a built-in conflict of interest; and the defendant is buying peace and is generally disinterested in how the fund is divided so long as it does not jeopardize the settlement."). In this case, like in *Guidant* and *Zyprexa*, the plaintiffs' attorneys had no incentive to challenge the reasonableness of their own fees on behalf of their clients. In fact, there is a strong monetary incentive for the attorneys to remain silent. Had this Court not stepped in, the issue would therefore have gone unaddressed.

---

[14]In 2003, the American Bar Association created a Task Force for the purpose of studying contingent fee contracts. After considering contingency fees in medical malpractice cases in 2004 and in class actions the following year, the Task Force turned their attention to mass tort litigation including multidistrict litigation such as the instant case. *Contingent Fees*, at 105. After a thorough examination of the issue, the Task Force concluded that the court's inherent power of Court's to remedy problems with contingency fee agreements is "relatively clear." *Id.* at 128. However, they concluded that they did not have sufficient empirical evidence to determine whether unreasonable fees were being assessed on a large scale. *Id.* This concern is not a problem in the instant case, however, as the Court is in a uniquely intimate and familiar position regarding the work conducted by the attorneys involved.

Additionally, the magnitude of these MDL proceedings and the resulting publicity creates a concern that disproportionate results and inconsistent standards would damage the public's faith in the judicial process. *In re Zyprexa*, 424 F. Supp. 2d at 494 ("Litigations like the present one are an important tool for the protection of consumers in our modern corporate society, and they must be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled."). Accordingly, exercising inherent powers to maintain public faith in the judicial process would be justified. In this case, with 50,000 claims from all over the country, and a $4.85 billion settlement in place, public scrutiny is particularly intense. Accordingly, this Court was compelled to act to maintain the confidence of the public.

Finally, where the claimants in a particular case are vulnerable, courts have used their inherent power to examine contingency fees to protect them. *See id.* at 491 (capping fees where many of the claimants were mentally or physically ill); *see also Karim*, 374 F.3d at 312 (affirming a district court's decision to amend a seamen's contingent fee contract); *Hoffert*, 656 F.2d at 165-66 (affirming a district court's decision to cap a minor's contingent fee contract); *In re Guidant*, 2008 WL 682174, at *18 (capping fees to protect physically ill and aging claimants). In order to qualify for the Vioxx Settlement Agreement, a claimant must have suffered a heart attack, ischemic stroke, or sudden cardiac death. Accordingly, like the elderly and physically ill claimants in *Zyprexa* and *Guidant*, Vioxx claimants have all suffered some form of physical injury and many are elderly. Accordingly, the Court was justified in exercising its inherent authority and responsibility to examine  contingent fee contracts for fairness and consistency.

**3.    The parties to the Vioxx Settlement Agreement implicitly authorized this Court to review their fee agreements for reasonableness**

Finally, the VLC challenges the contention that the Vioxx Settlement Agreement authorizes this Court to implement a reasonable cap on contingent fees.  Arguing that no provision in the agreement "purport[s] to regulate the fee contracts at issue," the VLC goes as far as asserting that the agreement expressly divests this Court of the authority to act.  For support, they point to Section 9.1, which states in part:

> Any division of any Settlement Payment with respect to, and as between, any Enrolled Program Claimant, any Executing Derivative Claimants and/or his or their respective counsel is to be determined by such Persons and any such division, or any dispute in relation to such division, shall in no way affect the validity of this Agreement or the Release or Dismissal With Prejudice Stipulation executed by Such Enrolled Program Claimant (and any related Executing Derivative Claimants) or his Counsel, as appliciable.

Settlement Agreement § 9.1.  However, the VLC's argument misstates the nature of the Settlement Agreement as a whole and Section 9.1 in particular.

The Vioxx Settlement Agreement is replete with examples of the parties' desire to grant authority to this Court.  First, the agreement contemplates that this Court will act as the "Chief Administrator" of the Settlement Program, and will "preside over the Program in the capacities specified herein."  *Id.* § 6.1.  Acting as the Chief Administrator, the Court is given express authority to make decisions affecting the amount and allocation of attorneys' fees.  Pursuant to Section 9.2, the Court is responsible for determining the amount and allocation of common benefit fees for services performed for MDL administration and for the general benefit of all claimants.  *Id.* § 9.2.  Furthermore, these common benefit fees are to be paid out of the aggregate attorneys' fees.  *Id.* § 9.2.1.  Accordingly, this Court is expressly authorized to alter the amount

of fees paid under individual contingency arrangements.

Further, the Settlement Agreement provides that this Court has the express authority to modify any provision of the Agreement in certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable." *Id.* § 16.4.2. To the extent that the Settlement Agreement would be unenforceable if it resulted in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts, this Court may address those fees in order to ensure fairness to all parties.

While Section 9.1 also deals explicitly with "Individual Counsel Attorneys' Fees," it refers only to the responsibilities of Merck and the Claims Administrator regarding these fees. *Id.* § 9.1. This provision serves only to require that Merck and other released parties will not be liable for claimant's attorney's fees, to dictate that any dispute over payment of attorney's fees shall not jeopardize the Settlement Agreement, and to outline a procedure for the Claims Administrator to make payments. *Id.* In fact the only reference to this Court contained in section 9.1 is to say that attorney's fees are subject to reduction based on the Court's determination of common benefit fees and reimbursement of costs. *Id.* In no way can this provision be construed to limit the authority of the Court to examine unreasonable contingent fee agreements.[15]

_____

[15]To the extent that the provision might be construed as an attempt by the parties to prohibit such an examination, it is noted that the parties cannot contractually strip this Court of its equitable and inherent authority to act. Further, the parties expressly authorized this Court to modify any provision of the Agreement if it was determined that the provision were "prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable." Settlement Agreement § 16.4.2. Accordingly, if this provision is an attempt by the parties to strip this Court of its equitable and inherent authority to act, this Court can modify

Accordingly, the VLC has failed to persuade this Court that it lacks the authority to examine individual fee arrangements and implement a reasonable universal cap. Given the need for efficiency, fairness, and uniformity, the Court finds that it is both necessary and desirable to have a single court consider the issue of reasonableness of fees. In light of this Court's involvement with the proceedings in this MDL and the administration of the Vioxx Settlement Program, the Court will now proceed to consider the VLC's arguments regarding the reasonableness of a universal fee cap of 32%.

**C.    The Court applied the proper methodology in determining that a universal fee cap of 32% was reasonable**

The VLC next argues that, even if the Court had authority to examine the fee contracts at issue, the methodology used in the Court's inquiry was faulty. Memorandum in Support, at 14. Because the Vioxx MDL consists of diversity jurisdiction cases from all fifty states, the VLC asserts that after this Court determined that an inquiry into the reasonableness of fees was necessary, the Court should have undertaken a separate analysis of reasonableness for each and every state. Memorandum in Support, at 14-18. Further, they claim that the reasonableness analysis should have been conducted *ex ante* instead of *ex post*. Reply Memorandum, at 28-33. In addition to being judicially impractical, the VLC's methodological suggestions are squarely at odds with the mandate of justice and efficiency established by the MDL statute. *See* 28 U.S.C. § 1407.

As previously mentioned, the MDL statute requires that transferee courts "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). In part, this outcome can be

that provision.

-22-

achieved simply through the consolidation of pretrial and discovery proceedings, which leads to tremendous economies of scale for the lawyers who would otherwise be responsible for preparing thousands of individual cases for trial. In the Vioxx MDL, for example, a comprehensive discovery depository was created for the benefit of all plaintiffs' attorneys. Attorneys did not have to pursue individual discovery, nor did they have to file individual motions, engage in individual settlement negotiations, or prepare individual trial plans. Instead, many of the plaintiffs' attorneys in the Vioxx MDL were able to simply wait while a $4.85 billion settlement was negotiated and then do no more than enroll their clients in the settlement and monitor their progress through the claims valuation process.[16]

Because the attorneys in this case benefitted greatly from the efficiency provided by the MDL structure, the justice mandate of the MDL statute requires that the claimants receive a similar benefit, in the form of reasonable attorneys' fees. Furthermore, the claimants' attorneys were all tasked with navigating their clients through an identical settlement matrix and in accomplishing this they all faced similar challenges, regardless of in which state their fee arrangement was consummated. Accordingly, the MDL statute's mandate of fairness requires a uniform, consistent result for all attorneys and their clients. Any other result would be impractical from the standpoint of judicial economy. Conducting fifty independent analyses of reasonableness would drain judicial resources and would eliminate the efficiency that the MDL was designed to create.

---

[16]The Court is mindful that this process required careful monitoring of the Claim's Administrator's website and in some cases demanded the provision of additional medical records on demand. However, in the vase majority of cases, the increased efficiency provided by the MDL structure far outweighed the work involved in this process.

In the interests of justice, previous MDL courts have also determined the reasonableness of fees by conducting an *ex post* analysis.  *In re Guidant*, 2008 WL 682174, at *19 ("[A]lthough the fee arrangements may have been fair when the individual litigations were commenced, the Court concludes that many of the fee arrangements are likely not fair now because of the common benefit work and economies of scale noted above."); *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 3896006, at *6 ("[I]t is apparent that many of the Claimants' attorneys expended additional hours of work that the Court did not anticipate [at the time of this initial fee cap].  Thus, what was a fair cap [then] is no longer fair now."); *In re Zyprexa*, 424 F. Supp. 2d at 493 ("[T]hese firms all benefitted from the effectiveness of coordinated discovery carried out in conjunction with the plaintiffs' steering committee and from other economies of scale, suggesting a need for reconsideration of fee arrangements that may have been fair when the individual litigations were commenced.").  While the contingent fee arrangements at issue here may or may not have been fair at the time they were entered into, the great weight of authority in MDL proceedings suggests that an *ex post* analysis is proper.  To ensure a consistent and fair result for all plaintiffs, the fee agreements must be reexamined in light of the economies of scale and other efficiencies afforded by consolidation into an MDL.

Accordingly, the Court is not persuaded that the methodology employed to determine the reasonableness of fees in the initial capping order was in error.  In examining the reasonableness of contingent fees in an MDL, it is appropriate to consider several factors.  First, past fee caps implemented by MDL courts facing global settlement agreements are relevant.  *See In re Guidant*, 2008 WL 682174, at *17-19 (capping contingent fees at 20% subject to appeal to a

special master for an upward departure based on certain limiting factors)[17]; *In re Zyprexa*, 424 F. Supp. 2d at 496 (capping contingent fees at 35% but allowing for departure in either direction based on the unique facts of a given case); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D. Ala. 1994) (capping contingent fees at 25% of a $4.2 billion settlement fund). State law caps on contingent fee agreements in both products liability actions and other cases are also relevant. *See* N.J. R. Ct. 1:21-7 (providing that an attorney in a products liability action "shall not contract for, charge, or collect a contingent fee in excess of the following: (1) 33 1/3 % on the first $500,000 recovered; (2) 30% on the next $500,000 recovered; (3) 25% on the next $500,000 recovered; (4) 20% on the next $500,000 recovered."); Cal. Bus. & Prof. Code § 6146(a) (providing a sliding scale framework for limiting contingent fees in actions against healthcare providers); Tex Lab. Code Ann. § 408.221 (limiting contingent fee arrangements in worker's compensation lawsuits to 25% of the plaintiff's net recovery). Finally, in light of these other factors, the unique contours of a particular MDL will ultimately determine what is reasonable in that case.

Of course, this Court is mindful of the substantial contributions made by the plaintiffs' attorneys in the Vioxx litigation. The VLC and the rest of the plaintiffs' attorneys involved are some of the finest lawyers in the country, and without their contribution the Vioxx Settlement

---

[17]This order was later amended in *In re Guidant Corp. Implantable Defibrillators Products. Liability Litigation*, MDL No. 05-1708, 2008 WL 3896006, at *10 (D. Minn. Mar. 7, 2008). While the court did increase the previously implemented 20% cap, the fact remained that "the maximum amount of contingency fees that any firm will be allowed to collect is approximately 28%" under a new and complex formula. *Id.* This decision was based on changed circumstances, and did not reflect a significant change in the court's reasoning. *Id.* at *6-7.

Agreement would not have been possible.[18]  Nonetheless, based on this Court's intimate knowledge of the Vioxx litigation, along with the briefing and evidence presented by the VLC in conjunction with their Motion to Reconsider, the Court finds that a 32% cap on contingent fee agreements is reasonable and appropriate in most, if not all, of the cases.  After all, in a 4.85 billion dollar settlement, a 32% attorney fee means that the fee is over 1.5 billion dollars.  This should be adequate compensation for the attorneys.

However, upon further reflection this Court recognizes that, simply because of the large number of claims in this case, in theory and perhaps in reality there may be one or more cases in which special treatment might be justified.  In this particular case there are over 50,000 claims originating in all fifty states.  Accordingly, it is not unreasonable to conclude that certain rare circumstances might exist which would warrant a departure, in either direction, upwards or downwards, from the universal fee cap.  If an attorney believes that such a departure is appropriate in a particular case, it will be incumbent upon that attorney to file an objection with the Court on or before September 15, 2009, and to serve the involved client.  The Court, in due course, will set the matter for hearing and will appoint a special master who will take evidence at the hearing and make recommendations to the Court.  Of course, the client will be advised of the hearing date and also allowed to present contrary evidence.  If the Court determines that a departure is warranted in a particular case, either upward or downward, the Court will determine a reasonable fee based on the unique circumstances presented after deducting the cost associated with this process.

---

[18]It should be pointed out, of course, that many of the attorneys who contributed significantly to this MDL will receive compensation in the form of common benefit fees.

## IV.    CONCLUSION

For the above stated reasons, as well as those expressed in the initial capping order (Rec. Doc. 15722), the VLC's Motion for Reconsideration (Rec. Doc. 17395) is GRANTED IN PART and DENIED IN PART.  Accordingly, IT IS ORDERED that contingent fee arrangements for all attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs.  IT IS FURTHER ORDERED that in the rare case where an individual attorney believes a departure from this cap is warranted, he shall be entitled to submit evidence to the Court for consideration.

New Orleans, Louisiana, this 3rd  day of  August , 2009.

_____

United States District Judge