**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

———————————————————
In Re: VIOXX                                   :
                                               :        **MDL Docket NO. 1657**
**PRODUCTS LIABILITY LITIGATION**   :
                                               :        **SECTION L**
                                               :
**This document relates to ALL CASES**    :        **JUDGE FALLON**
                                               :        **MAG. JUDGE KNOWLES**
———————————————————   :


**MEMORANDUM IN SUPPORT OF CERTAIN HEALTH PLANS'**
**REVISED MOTION FOR PRELIMINARY INJUNCTION**


The Health Plans listed on the attached Exhibit A (hereinafter the "Health Plans"), seek an order enjoining those Primary Counsel (as defined in the Master Settlement Agreement) who represent the 6,418 Eligible Claimants ("ECs") appearing on Exhibit F to the Declaration of Mark D. Fischer – which list identifies by name Eligible Claimants who are privately insured but who have not agreed to participate in the private Lien Resolution Program ("LRP") – from disbursing any portion of the final 15% of settlement proceeds to said ECs until such time as either (i) Primary Counsel (as defined in the Master Settlement Agreement) certifies in writing to The Garretson Firm that such EC has received actual written notice of the LRP, communicated with counsel about the program, and affirmatively communicated to counsel that he or she declines to participate in the LRP, or (ii) the EC elects to participate in the LRP.

The 6,418 ECs to which this motion is narrowly tailored are identified on Exhibit F to the Declaration of Mark D. Fischer, Esq. in Support of Motion for Preliminary Injunctive Relief, filed herewith ("*Fischer Decl*.")  Each of these individuals appears to be participating in the Master Settlement Agreement and have been identified as an insured of one or more of the Health Plans.

However, these EC's apparently were not sent actual written notice of the LRP, or were sent notice but did not get any follow up to determine whether they are interested in participating, or affirmatively declined to participate in the LRP.  The relief sought by the Health Plans will not impact those claimants who have already enrolled in the LRP or any claimant who is not an insured of the Health Plans.

In addition, the Health Plans move that the injunction also apply to counsel for any additional Health Plan members who, although not identified to the Health Plans, are readily identified by The Garretson Firm through a definitive matching process previously approved by the Court as privately-insured claimants under the Master Settlement Agreement who have not elected to participate in the LRP.  Many Vioxx Plaintiffs do not have publicly-filed cases, but instead are participating in the Master Settlement Agreement as EC's through inventories of Plaintiffs' counsel.  Those inventory Plaintiffs who carry private insurance but who have not yet received notice of the LRP should be granted the similar protections that are sought in this Motion for 6,418 Health Plan members who can be identified by the Health Plan.

## I.  PRELIMINARY STATEMENT

In conjunction with the PSC and with the Court's assistance, the Health Plans voluntarily created the LRP to administer the mountain of private liens that will be imposed on plaintiffs' recoveries from the Vioxx Settlement Fund.   Pursuant to the LRP, the Health Plans agreed to reduce by 50% their liens against individual participating ECs to the Vioxx Settlement Fund, and further agreed to cap total recoveries so that no EC would see more than 15% of their recovery go back to their Plan[1].  The *quid pro quo* for this to the Health Plans, of course, was that they would save the

---

[1] The maximum lien amount any EC would need to pay to resolve all liens under the LRP is 15% of the EC's gross recovery up to the first $100,000, 12.5% of the EC's gross recovery between $100,000 and $250,000 and 10% of the

time and expense of pursuing thousands of individual lien claims against ECs.  This Court and ECs would also save that same time and expense.

To date, however – and despite this Court's urging – participation by ECs in the LRP has been very uneven and much lower than expected.  The Settlement Agreement, through which the LRP was created, contemplated in excess of 90% participation by ECs and to date less then 50% of ECs have enrolled.  It is now clear that while many plaintiffs' firms are participating fully in the LRP, many other firms are not. Several firms with large case inventories have enrolled virtually none of their clients in the LRP (it appears that their co-counsel may have sent some notices, but they have refused to communicate anything to their clients about the opportunity).  With the disbursement of remaining recoveries to ECs quickly approaching, a few large firms have adopted a strategy of not providing notice of the LRP to claimants or not following up with their clients to whom they have sent notice, in hopes of avoiding their lien obligations altogether.

But the Plans know – at least to a certain extent – who is not participating in the LRP.   After having obtained the names of individuals who filed Vioxx lawsuits across the country, matched those names to their membership records, and received additional input from counsel for some ECs, the Plans have identified 6,418 claimants who are likely ECs but who have not opted into the LRP. The next step for the Health Plans, therefore, is to sue each of those 6,418 ECs and their counsel[2] in the appropriate forum and seek to enforce a lien against each of them.   Given that the Health Plans now have the names of the specific ECs that they insure, any jurisdictional problems to this approach

---

EC's gross recovery exceeding $250,000.  If the EC's actual lien amounts, based upon Health Plan records, is less than the maximum lien amount, the EC is only obligated to pay this lesser amount.

[2] Counsel for plaintiffs are proper defendants to the extent that they are holding funds on their clients' behalf that are subject to the Health Plans' liens. *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferer, Poirot & Wansbrough*, 354 F.3d 348 (5th Cir. 2003),

suggested by *Avmed v. Browngreer PLC*, 2008 WL 4909535 (5th Cir. Nov. 17, 2008) have been solved.

The Health Plans believe, however, that the low enrollment rate results from either (i) the failure of some firms to communicate the offer of settlement set forth in the LRP to their clients or (ii) a lack of follow up with clients who have been provided the offer of settlement to ensure that the clients have affirmatively declined to participate in the LRP.  The Plans, this Court, the PSC, and the LRP Administrator (The Garretson Firm Resolution Group, Inc. (hereinafter "The Garretson Firm")), have all made significant efforts to get the word out to ECs about the benefits of the LRP. However, the Health Plans believe, and have evidence to support the belief, that many attorneys only provided notice of the LRP to a portion of their eligible clients, or did not provide any notice at all.

For that reason, and before burdening the judicial system with an avalanche of additional ERISA-related litigation, the Plans seek relief from this Court intended to ensure that the 6,418 ECs identified by the Health Plans have made informed decisions as to their participation in the LRP and to guarantee that funds will be available to the Health Plans while the EC's take that time to decide. Accordingly, the Health Plans request that this Court issue an order The Health Plans listed on the attached Exhibit A (hereinafter the "Health Plans"), seek an order enjoining those Primary Counsel who represent the 6,418 Eligible Claimants ("ECs") appearing on Exhibit F to the Declaration of Mark D. Fischer from disbursing any portion of the final 15% of settlement proceeds to said ECs until such time as either (i) Primary Counsel certifies in writing to The Garretson Firm that such EC has received actual written notice of the LRP, communicated with counsel about the program, and affirmatively communicated to counsel that he or she declines to participate in the LRP, or (ii) the EC elects to participate in the LRP.

The Health Plans ask for this injunction to ensure that all 6,418 Eligible Claimants (and any other insureds that may be determined through a second matching process with The Garretson Firm) have been provided information about this settlement opportunity and made an informed decision after understanding the benefits of enrolling in the LRP.  The Plans merely seek confirmation that the un-enrolled ECs have had an opportunity to participate.

Because the requested injunction applies only to counsel for those identified Health Plan members who are eligible to participate in the LRP but have not enrolled in the LRP, this relief will have no effect on those ECs who either are not matched as members of the Health Plans or who have already opted into the LRP, or who have no private insurance.  As to those who are non-participating and who are among the 6,418 likely ECs identified, 85% of their funds would still be paid to them. The remaining 15% would be delayed only so long as needed for their Primary Counsel to make the required certification.  As such, the burden on the 42,000 unaffected ECs is non-existent, and the burden on the 6,418 non-participating ECs (and any other ECs that may be uncovered by a second matching process with The Garretson Firm) would be minimal.

The familiar standard for granting preliminary injunctive relief is therefore met:

First, the Health Plans are highly likely to succeed on the merits of their claims for reimbursement, which were confirmed in the United States Supreme Court's ruling in *Sereboff v. Mid Atlantic Medical Services Inc*., 547 U.S. 356 (2006) ("*Sereboff*") – a decision practically indistinguishable from the facts presented here.  Second, the Health Plans will be irreparably harmed if the requested relief is not granted.  Once the final proceeds are paid out to claimants, the Health Plans will be forced to file separate suits against each EC to enforce their liens, incurring great expense of time and money in order to do so.  To the extent that ECs are not participating simply for lack of knowledge of the LRP, or lack of follow up by their counsel, that expense could be saved.

Lastly, the balance of hardships and public interest favors the Health Plans. This Court has already acknowledged the benefits to all parties, and the court system, of having the LRP successfully resolve claimants' lien obligations at a reduced amount, with no or very little burden on the courts. The alternative -- thousands of individual lien enforcement actions -- will be a burden to the Health Plans, the claimants, and the courts.

For the foregoing reasons, the Health Plans' motion for a preliminary injunction should be granted.

## II.  FACTS

On January 15, 2009, the PSC and the Health Plans entered into a Settlement Agreement that established the LRP for EC's. *See* Settlement Agreement, attached as Exhibit A to the Fischer Declaration (hereinafter "*Fischer Decl.*"). The Garretson Firm was charged with implementing the LRP.

On February 10, 2009, the PSC reported to the Court: (i) that an information package including a list of participating insurers, a HIPAA compliant release, and a LRP participation form had been made available online and emailed to all relevant parties; (ii) that all claimants' attorneys had also received a draft letter outlining the program that could be sent to their clients; and (iii) that the Garretson Firm had set up a toll free number to answer attorneys' questions about the program. *See* Minute Entry on February 10, 2009 Status Conference. On March 27, 2009, the PSC informed the Court that approximately 16,000 eligible claimants had elected to participate in the program. This represented a participation rate of approximately 35% of eligible claimants. *Fischer Decl.* ¶ 3.

Due to this low participation rate, the Garretson Firm extended the participation deadline to May 29, 2009, and sent another email to EC attorneys containing a supplemental list of approximately 70 additional private health plans that had by then agreed to participate in the

program.  On April 23, 2009, the Garretson Firm sent additional letters to a targeted group of nonparticipating claimants' attorneys informing them of the extended response deadline and asked them to reconsider having their clients join the program in light of new insurers that had agreed to participate.  The extended deadline generated an additional 4,363 enrollees, bringing the overall participation rate up to approximately 44%.  *Fischer Decl.* ¶4.

The Health Plans, however, suspected that a large number of the remaining 56% of ECs were Plan members and were subject to valid liens.  Accordingly, at the Health Plans' request, on May 19th, 2009, the Court ordered that the PSC and the Health Plans engage in a matching exercise to determine the extent to which the Health Plans covered nonparticipating ECs. *See* Pretrial Order No. 40, *Fischer Decl.*, Exhibit C.  On June 5th, 2009, representatives from the Garretson Firm and Rawlings & Associates (on behalf of the Plans) met at the Garretson Firm offices and matched a partial list of nonparticipating ECs against the Health Plans' enrollment data. *Fischer Decl.* ¶6.  Of the approximately 27,000 nonparticipating ECs, a sample of 19,130 nonparticipating ECs was chosen to match against the Health Plans' enrollment data (by social security number or when available, by the combination of first name/last name/date of birth).  The Plans identified 6,713 nonparticipating ECs from the partial list.  *Fischer Decl.* ¶7.  The Garretson Firm reported these results to the Court on June 29, 2009. *Id.*

On an entirely separate track, over the last year the Health Plans have reviewed filed Vioxx complaints from the consolidated MDL, New Jersey, and Texas courts and have identified 6,418 of their insured who are filed Vioxx plaintiffs but who are not participating in the LRP.  *Fischer Decl.* ¶8.  Although the Health Plans were not permitted to retain any identifying information from the matching they conducted with the Garretson Firm, through this separate match the Health Plans

therefore know the names of the individuals who are likely ECs.  The Health Plans can and will

institute litigation against them to enforce their contractual lien obligations.

## III.  <u>ARGUMENT</u>

A.      <u>An Injunction is Necessary to Ensure ECs Have an Opportunity to Participate</u>

The Court has previously recognized the "win-win" nature of the LRP:

> …it seems to me that it is a benefit to each side to utilize the economy of
> scale that an MDL affords and get benefits for each side.  On the side of
> the insurance companies, they minimize or exclude their transactional
> costs, so they come to benefit.  They've got a focal point from which
> they can collect all of their liens at one time…the plaintiffs or the
> claimants will get a tremendous discount on their liens, which they have
> to pay….and if they're not in this program they have to pay 100 percent
> of the liens.  They're going to be sued and the…amount is going to be
> collected.  So you have caps and you have tremendous discount.  So the
> claimants benefit from it….I think that this is a good program and I hope
> that future MDLs piggyback on this approach…

Hearing Tr., January 22, 2009 at 27-28.   The LRP will only be a success, however, with a high

participation rate.

        To ensure adequate participation, all potential participants must be provided written notice of

the existence and benefits of the LRP.  To be clear, the Health Plans are not accusing any plaintiffs'

attorneys of bad faith.  But there is ample evidence that some Primary Counsel have failed to provide

the Offer of Settlement included in the LRP to their clients either because of the purely voluntary

nature of the previous requests or because they mistakenly believed that the LRP only applied to

clients who had "private" insurance and did not apply to clients who were covered, for example, by

"Medicare" (but many Medicare enrollees receive pharmacy benefits through private insurers and

thus these ECs are still eligible to participate in the LRP).

        Furthermore, the Health Plans have matched the original list of 15,686 <u>participating</u> ECs, by

name, to the docket lists of filed plaintiffs in the New Jersey and Texas state courts as well as in the

MDL.  As a result, the Plans have been able to estimate the rates at which the clients represented by individual law firms have agreed to participate in the LRP.[3]  For example, of the top ten plaintiffs' firms by filed case volume, Seeger & Weiss has the highest participation rate with 42.72% of its claimants with filed cases appearing on the participating EC list.  Weitz & Luxenberg and the Lanier Law Firm, by contrast, have the lowest participation rates, at 5.97% and 6.97% respectively. *Fischer Decl*., Exhibit E.  The average participation rate of the top 20 firms is only 25.68% -- meaning that there is a substantial amount of untapped LRP participation lurking within a relatively small number of firms.

It appears that plaintiffs' firms fall into three categories: (i) those firms that sent LRP notices to *all* of their clients[4]; (ii) plaintiffs' firms that sent LRP notices to some of their clients[5]; i.e. those that they assumed to have only private reimbursement obligations; and (iii) those plaintiffs' firms that did not send any of their clients the LRP notice.[6]

If plaintiffs' firms are required to certify that their clients have been provided written notice of the existence and benefits of the LRP and that their client has affirmatively declined to participate and a 15%  holdback is imposed on those clients' recoveries while this certification is pending, no doubt participation will improve substantially.  This, in turn, will forestall the need for the Health Plans to file thousands upon thousands of lien enforcement actions, thus conserving the resources of the Health Plans, the court system, and the ECs themselves.  What's more, the Health Plans – if

---

[3] These estimates are based on the original list of approximately 16,000 participating ECs, before the Garretson Firm obtained an additional approximately 4,000 participants.

[4] Some plaintiffs firms have participation rates in excess of 80%.  It appears those firms sent notices to all their clients.
[5] Many firms have participating rates of approximately 30-40%.  It appears that these firms sent the notice to those clients they surmised might have private reimbursement obligations.  However, many ostensibly Medicare obligations are insured by private insurers, thus creating a private reimbursement obligation.
[6] Those plaintiff firms with only single digit participation rates appear to only have participating claimants because they are co-counsel with firms that in fact sent out the notice.

forced to sue – will of course be under no obligation to abide by any of the discounts or the caps that are part of the LRP.  Thus, this Court should order the requested relief to avoid the very real possibility of an EC's losing his or her entire recovery to a lien simply because they did not know of the benefits associated with the LRP.

         B.       <u>The Request for Injunctive Relief Meets the Requirements of *AvMed*</u>

The Health Plans' request for injunctive relief at this stage of the proceedings is proper under the reasoning of the United States Court of Appeals for the Fifth Circuit in *AvMed v. Browngreer PLC*, 300 Fed. Appx. 261, No. 08-30802, 2008 WL 4909535 (C.A. 5 Nov. 17, 2008).  In *AvMed*, the Court evaluated certain plans' preliminary injunction request under its prior decision in *Bomardier*, 354 F.3d 348.  The *AvMed* Court found that the funds that those plans were seeking to recover were not "specifically 'identifiable'" because "[a]t this early stage of the Vioxx Settlement proceedings . . . the Claims Administrator has not finished determining which claimants are eligible for funds or allocating points to additional claimants so as to determine the amount of recovery pursuant to a formula for translating points to dollar amounts." *AvMed*, *supra*, 300 Fed. Appx. at 266.  But the claims administration has now progressed to the point that specific amounts have been determined for each claimant.

Further, the *AvMed* Court concluded that under the second prong of the *Bombadier* test, "the Court is unable to determine whether any portion of the funds at issue might belong in good conscience to the Plaintiff health plans," *Id*, because the plans were at that time unable to tailor their injunction to apply only to those claimants for whom they have provided medical benefits.  Here, by contrast, the Health Plans are now able to specifically identify 6,418 ECs who are eligible to participate in the LRP but have not done so.  In addition, the June match ordered by this Court showed a similar number, 6,713 ECs, who were insured by the Health Plans but were not

participating in the LRP.  Because the requested injunction will not "delay disbursement of funds that do not in good conscience belong to [Plaintiffs]," *AvMed*, *supra*, 300 Fed. Appx. at 267, the second prong of the *Bombadier* analysis is now satisfied by this request.[7]

The final concern of the *AvMed* Court was its uncertainty that the commingled funds in the possession of the claims administrator were not identified to any particular claimant, and as such, such claimants did not have sufficient possessory interest in the yet-undistributed monies to satisfy the third prong of *Bombardier*.  The Court explained that "[a]t this early stage of the proceedings, with no final determination regarding valuation of claims or even total points awarded, the Court harbors serious doubts as to whether any individual claimant even has a legal right to a portion of the fund." *AvMed*, *supra*, 300 Fed. Appx. at 267.  This concern has passed.  The settlement administration has matured to the point that specific, identifiable funds have been determined to be payable to the 6,418 ECs who can participate in the LRP.  Settlement funds will be shortly disbursed to counsel for payment to ECs.  Hence, the third *Bombardier* prong is satisfied as these individuals now have a sufficient possessory interest in their portion of the settlement fund.

As the above discussion shows, each of the concerns expressed by the Fifth Circuit in connection with the prior appeal have now been satisfied.  The Health Plans' current request for preliminary injunctive relief should be granted.

C.      The Legal Standard for an Injunction is Met Here

The purpose of a preliminary injunction is to preserve the status quo between the parties pending a final determination of the merits of an action.  *Wenner v. Texas Lottery Com'n*, 123 F.3d 321, 326 (5th Cir.1997.)  The Fifth Circuit employs a four-prong test for evaluating a request for a

---

[7] If there is any question as to whether the individuals identified by the Health Plans as insureds are in fact those individuals identified as claimants, the Health Plans would agree to limit the list of ECs to which the requested injunction would apply to those individuals who appear on both the Health Plans' list of 6,418 ECs and the list of 6,713 EC's generated by the matching exercise conducted as a result of Pretrial Order No. 40.

preliminary injunction.  "To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest."  *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *see also Seattle-First Nat. Bank v. Manges*, 900 F.2d 795, 799 (5th Cir. 1990.)

In this Circuit, as in others, the four factors are often described, not as separate requirements, but as a "sliding scale" – such that the degree of success on the merits that must be demonstrated will depend on the magnitude of the injury which would be suffered by the movant in the absence of injunctive relief and the relative balance of threatened hardships faced by each of the parties.  *See, e.g., Southerland v. Thigpen*, 784 F.2d 713, 715 & n.1 (5th Cir. 1986); *State of Tex. v. Seatrain Intern., S. A.*, 518 F.2d 175, 180 (5th Cir. 1975); *Canal Authority of State of Fla. v. Callaway,* 489 F.2d 567, 576-77 (5th Cir. 1974.)  The Health Plans' request for a preliminary injunction more than satisfies each of these requirements.

1.      **The Health Plans Are Likely to Succeed on the Merits of their ERISA Claims.**

"To determine the likelihood of success on the merits, [courts] look to the standards provided by the substantive law." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997); *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).  Those standards clearly demonstrate that the Health Plans enjoy a "substantial likelihood" of succeeding on the merits of their equitable reimbursement claims under § 502(a)(3)(B) of ERISA.  The Health Plans' reimbursement claims are well-established under controlling United States Supreme Court precedent – namely, *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006).

The *Sereboff* plaintiffs comprised beneficiaries of an ERISA plan (the "Sereboffs") who were injured in an automobile accident in California.  Mid Atlantic Medical Services Inc. ("Mid Atlantic"), the insurer of the Sereboffs' health benefits plan, paid $74,869.37 of the Sereboffs' medical expenses resulting from the accident.  The Sereboffs filed a tort action in California state court against the driver responsible for their injuries as well as other third parties.  Thereafter, Mid Atlantic sent the Sereboffs' attorney a letter asserting a lien on the anticipated proceeds from the suit, in an amount sufficient to cover the $74,869.37 in medical expenses that Mid Atlantic had paid on the Sereboffs' behalf.  The Sereboffs' tort suit settled for $750,000.00, but neither the Sereboffs nor their attorney sent any of the proceeds to Mid Atlantic.  *Sereboff*, 547 U.S. at 359-61.

Mid Atlantic filed suit in the United States District Court for the District of Maryland under § 502(a)(3)(B) of ERISA.  The district court ordered the Sereboffs to pay Mid Atlantic the $74,869.37, plus interest, and the Fourth Circuit Court of Appeals affirmed in relevant part.  *Id*. at 360-61.

The United States Supreme Court granted certiorari and unanimously held that the claims of Mid Atlantic to reimbursement of the $74,869.37 in medical expenses it paid on behalf of the Sereboffs qualified as "appropriate equitable relief" under § 502(a)(3)(B) of ERISA, and that the reimbursement provision in the Sereboffs' plan created an "equitable lien" in favor of Mid Atlantic for such amount.  *Id*. at 368-69.

Appellate courts since *Sereboff* have also recognized the equitable subrogation and reimbursement rights of health benefit plans under § 502(a)(3)(B) of ERISA for medical expenses paid on behalf of plan beneficiaries, and have imposed equitable liens on settlement proceeds paid to such plan beneficiaries by third-party tortfeasors.  *See, e.g., AT&T, Inc. v. Flores*, 322 Fed. Appx. 391, No. 08-50630, 2009 WL 1067953 (5th Cir. Apr. 22, 2009) (rejecting "made whole" doctrine and imposing constructive trust over settlement proceeds under *Sereboff*); *Administrative Committee of*

*the Wal-Mart Stores, Inc. Associates' Health and Welfare Plan  v. Shank*, 500 F.3d 834, 838-39 (8th Cir. 2007) (enforcing plan's subrogation and reimbursement rights against amounts recovered by plan participant pursuant to judgment against third-party tortfeasor); *Popowski v. Parrott*, 461 F.3d 1367, 1373 (11th Cir. 2006) (holding that employee benefit plan fiduciaries' reimbursement claim against plan beneficiary, seeking to recover amounts previously paid by plan for medical expenses, was cognizable under  §502(a)(3)(B) of ERISA); *Moore v. Capital Care*, 461 F.3d 1, 11-12 (D.C. Cir. 2006) (holding that plan administrator was entitled to equitable lien under § 502(a)(3)(B) of ERISA against settlement funds, as beneficiary's health plan expressly provided for reimbursement in event of partial recovery from third party tortfeasor); *see also Amschwand v. Spherion Corp*., 505 F.3d 342, 346 (5th Cir. 2007) (observing that in *Sereboff* "the Supreme Court held that the relief sought by the fiduciary would have been recognized as equitable . . .  and was subject to the restitutionary remedy of an equitable lien on the settlement funds").

The Fifth Circuit in fact endorsed the *Sereboff* rule before *Sereboff* was written.  In *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferer, Poirot & Wansbrough*, 354 F.3d 348 (5th Cir. 2003), the Fifth Circuit confronted a health plan's request for reimbursement under ERISA against a members' lawsuit proceeds from a personal injury settlement.   The *Sereboff* Court acknowledged that the *Bombardier* opinion was on the correct side of the circuit split that it was resolving.  *See Sereboff*, 547 U.S. at 361 n.1 (citing *Bombardier*).

Here, the Health Plans provided heath care benefits, and paid medical expenses and other costs associated with their plan beneficiaries' medical treatment.  These health care benefits were provided to plan beneficiaries under agreements and coverage documents that provide the Health Plans with various rights to be reimbursed for those benefits from settlement proceeds paid to such beneficiaries from third-party tortfeasors.  Pursuant to *Sereboff* and its progeny, the Health Plans are

entitled to be reimbursed for the Vioxx related medical expenses they paid on behalf of their plan beneficiaries from proceeds of the Settlement Fund.

This case is in all material respects identical to the situation presented in *Sereboff* and *Bombardier*. Accordingly, the Health Plans have a substantial likelihood of succeeding on the merits of their equitable reimbursement claims, brought under § 502(a)(3)(B) of ERISA.

## 2. The Health Plans Will Suffer Irreparable Harm If the Requested Relief is Not Granted.

It is firmly established that "the central purpose of a preliminary injunction . . . is to prevent irreparable harm." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975.) Specifically, "[i]t is the threat of harm that cannot be undone which authorizes exercise of th[e] equitable power to enjoin before the merits are fully determined." *Id.*

Here, the Health Plans (and the claimants who have not yet been informed of the LRP) will be irreparably harmed if the requested relief is not granted. As discussed above, the Health Plans, The Garretson Firm, and this Court have already made substantial efforts in attempting to inform Vioxx claimants of the benefits and existence of the LRP. The results, however, have been uneven and participation very low. The distribution of participating ECs among plaintiffs' firms as outlined above indicates that one of the reasons for the low participation rate is the lack of written notice of the existence and benefits of the LRP to the clients of some plaintiffs' firms.

Without an order enjoining Primary Counsel for the 6,418 ECs from releasing the final 15% of settlement proceeds to these ECs while these claimants consider whether or not to participate in the LRP, the final settlement proceeds will be paid out to these claimants and the Health Plans will have no recourse but to file thousands of individual enforcement actions in this and other courts, as appropriate. The cost to the Health Plans, in terms of time, effort and money, of pursuing individual

enforcement actions against all identified likely ECs is enormous and wasteful  The Health Plans will therefore be irreparably harmed if the requested relief is not granted.

Similarly, some privately-insured ECs are not, at this time, identifiable by the Health Plans because such Plaintiffs were never publicly filed with a court (but are instead participating in the Master Settlement Agreement through an inventory process).  Many of these persons are privately insured but have not received adequate notice of the LRP.  Because the Garretson Firm and this Court have the methodology available to determine with precision who those ECs are, the Garretson Firm should conduct an additional matching process to determine the additional insureds so that they may be included in this additional process.

### 3. The Health Plans' Impending Harm Far Outweigh Any Possible Harm to Claimants.

The harm to the Health Plans - the need to prosecute thousands of separate suits in order to enforce their Vioxx related liens- far outweighs any possible harm from a slight disruption in payments to any of the effected claimants.  The requested injunction would not mandate any payments be made to the Health Plans nor deprive any claimant of the full amount of their settlement proceeds should they choose not to participate in the LRP.  The requested relief would mean only a slight delay in the final 15% of payments of settlement proceeds to the 6,418 identified ECs – a delay that could be lessened considerably, or avoided completely, by their counsel who need only certify that the claimant has been provided actual written notice of the LRP and has affirmatively declined to participate, in order obtain final payment.  Alternately, the delay would also be shortened by the EC's agreement to participate in the LRP.

The harm of a minor delay in the final distribution of proceeds to these claimants is vastly outweighed by the costs to the Health Plans of enforcing thousands of separate liens.  In considering and weighing the competing harms, the Court should also be mindful of the benefit that would inure

to those claimants who have not yet been made aware of the LRP and who, if given the opportunity, would choose to participate.  The Court has already acknowledged the benefits conferred on participating claimants in the form of a 50% reduction in their total lien obligations and a cap on total lien amounts offered by the LRP.

      **4.   Granting the preliminary injunction will not disserve the public interest.**

Finally, maintaining the status quo (*i.e.*, enjoining counsel from distributing the final 15% of settlement proceed payments to the 6,418 identified claimants) for a brief period while these ECs consider whether or not to participate in the LRP furthers the public interest in finally resolving disputes arising from the injuries caused by Vioxx in an orderly fashion that complies with applicable and governing law without undue administrative wrangling and costly litigation.  It will promote efficiency and cost savings for the Health Plans, the claimants, and – importantly -- the judicial system and in so doing provides a public benefit.

## IV.  CONCLUSION

For the reasons set forth above, the Health Plans respectfully request that the Court order enjoining those Primary Counsel (as defined in the Master Settlement Agreement) who represent the 6,418 ECs appearing on Exhibit F to the Declaration of Mark D. Fischer – which list identifies by name Eligible Claimants who are privately insured but who have not agreed to participate in the LRP – from disbursing any portion of the final 15% of settlement proceeds to said ECs until such time as either (i) Primary Counsel (as defined in the Master Settlement Agreement) certifies in writing to The Garretson Firm that such EC has received actual written notice of the LRP, communicated with counsel about the program, and affirmatively communicated to counsel that he or she declines to participate in the LRP, or (ii) the EC elects to participate in the LRP.

The Health Plans also request this Court to order that the injunction apply to counsel for any additional Health Plan members who, although not identified to the Health Plans, are readily identified by The Garretson Firm through a definitive matching process previously approved by the Court in Pretrial Order No. 40 as privately-insured claimants under the Master Settlement Agreement who have not elected to participate in the LRP.

The Health Plans have provided a Proposed Order and Certification Form for the Court's consideration and convenience.  *See* [Proposed] Order Concerning Certain Health Plans' Motion for Preliminary Injunction, attached as Exhibit B.

Respectfully submitted,

Dated:  September 22, 2009              By:  _/s/ Mark D. Fischer_____
                                       Mark D. Fischer
                                       RAWLINGS & ASSOCIATES, PLLC
                                       325 West Main Street
                                       Suite 1700
                                       Louisville, KY  40202
                                       Telephone: (502) 814-2139

                                       /s/ Richard Cohen_____
                                       Richard W. Cohen
                                       Peter St. Phillip
                                       LOWEY DANNENBERG COHEN & HART, P.C.
                                       White Plains Plaza - 5th Floor
                                       One North Broadway
                                       White Plains, NY  10601
                                       Telephone: (914) 997-0500

                                       /s/ Joseph S. Grinstein_____
                                       Joseph S. Grinstein
                                       SUSMAN GODFREY LLP
                                       Suite 5100
                                       1000 Louisiana
                                       Houston, TX 77002-5096
                                       (713) 651-9366

*Counsel for Health Plans Listed on "Exhibit A"*

  _/s/ Thomas M. Sobol_____
Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700

*Of Counsel*

# EXHIBIT A

| Health Plans |
|---|
| Aetna, Inc. |
| AMERIGROUP Corporation |
| Arkansas Blue Cross and Blue Shield |
| AvMed, Inc. |
| Blue Cross & Blue Shield of Mississippi |
| Blue Cross & Blue Shield of Rhode Island |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Kansas, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of North Carolina |
| Blue Cross and Blue Shield of Vermont |
| Blue Cross Blue Shield Association |
| Blue Cross Blue Shield of Delaware |
| BlueCross BlueShield of Tennessee |
| CareFirst, Inc. |
| CIGNA |
| Government Employee's Health Association, Inc. |
| Great-West Life & Annuity Insurance Company |
| Group Health Incorporated |
| Guardian Life Insurance Company of America (The) |
| Hawaii Medical Service Association |
| Harvard Pilgrim Health Care, Inc. |
| Health Net, Inc. |
| HealthPartners, Inc. |
| Highmark Inc. |
| HIP Health Plan of New York |
| Horizon Blue Cross Blue Shield |
| Humana |
| Johns Hopkins HealthCare LLC |
| KPS Health Plans |
| Medical Mutual of Ohio |
| Mountain State Blue Cross and Blue Shield |
| Noridian Mutual Insurance Co. |
| Premera Blue Cross |
| Priority Health |
| The Regence Group |
| Trustmark Life Insurance Company and Trustmark Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| United HealthCare Services, Inc. |
| Verizon |
| Vista Healthplan, Inc. |
| WellCare Health Plans, Inc. |
| Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa |
| WellPoint, Inc. |

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: VIOXX | : | |
| | : | **MDL Docket NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | : | |
| | : | **SECTION L** |
| | : | |
| **This document relates to ALL CASES** | : | **JUDGE FALLON** |
| | : | **MAG. JUDGE KNOWLES** |
| | : | |


**[PROPOSED] ORDER CONCERNING CERTAIN HEALTH PLANS'**
**MOTION FOR PRELIMINARY INJUNCTION**

WHEREAS, on January 15, 2009, the Plaintiffs' Steering Committee ("PSC") and the Negotiating Third Party Payor Counsel ("TPPC") entered into a Settlement Agreement that establishes a private lien resolution program ("LRP"); and

WHEREAS, the Court has kept apprised of the LRP's progress and has previously elected to exercise its supervisory authority over the LRP; and

WHEREAS, the matching program previously ordered by this Court in Pretrial Order No. 40 revealed the existence of at least 6,713 claimants who are privately insured but have not yet agreed to participate in the LRP; and

WHEREAS, the health plans participating in the LRP (the "Health Plans") have separately matched the names of Vioxx plaintiffs with the names of their insureds and have separately identified 6,403 claimants who are members of one or more of the Health Plans but have not agreed to participate in the LRP; and

WHEREAS, it appears that a number of firms representing Vioxx plaintiffs are not fully participating in the LRP; and

WHEREAS, the Court has considered the Memorandum In Support of Certain Health Plans' Motion for Preliminary Injunction as well as supporting material submitted

by the Health Plans;

**IT IS HEREBY ORDERED:**

Primary Counsel for Eligible Claimants are hereby enjoined from making payments of any portion of the final 15% of settlement proceeds to (i) the 6,418 Eligible Claimants identified on Exhibit F to the Declaration of Mark D. Fischer, Esq. in Support of Motion for Preliminary Injunctive Relief (the "Fischer Declaration"), and (ii) such additional Eligible Claimants who are determined to be insureds of the Health Plans (through the definitive matching process previously approved by this Court in Pretrial Order No. 40) and have not elected to participate in the Private Lien Resolution Program. Primary Counsel is so enjoined until such time as (i) Primary Counsel certifies in writing to The Garretson Firm that such Eligible Claimant has received actual written notice of the LRP and affirmatively communicated to counsel that they declined to participate in the LRP, or (ii) the Eligible Claimant elects to participate in the LRP, or (iii) further order of this Court.

The Garretson Firm shall provide a copy of the certification attached hereto to each of the firms identified on Exhibit F to the Fischer Declaration for use by Primary Counsel in making the required certification to The Garretson Firm.

New Orleans, Louisiana, this ___ day of September, 2009.

_____
ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

*In Re: VIOXX Products Liability Litigation*
MDL No. 1657

**CERTIFICATION BY PRIMARY COUNSEL REGARDING WRITTEN NOTICE TO CLIENTS OF THE PRIVATE LEIN RESOLUTION PROGRAM AND CLIENT'S AFFIRMATIVE DECISION REGARDING PARTICIPATION IN THE PROGRAM**


Client's Name: _____
                First         Middle         Last


Principal Attorney: _____
                    First         Middle         Last


Firm Name: _____


In accordance with the Order Concerning Certain Health Plans' Motion For Preliminary Injunction entered on [DATE] in *In Re: Vioxx Products Liability Litigation*, MDL Docket No. 1657, I hereby certify as follows: (check each statement that applies)


_____   I am Primary Counsel (as Defined in the Master Settlement Agreement) for the above referenced client (the "Client");

_____   I have previously provided written notice to the Client by mailing a copy or copies of the materials regarding the existence and benefits of the private Lien Resolution Program, including the Private Lien Resolution Program Offer and Acceptance, to the Client; and

          _____   The Client has affirmatively represented to myself or a member of my firm that they received the materials regarding the Lien Resolution Program and have elected not to participate in that program

    OR

          _____   The Client has agreed to participate in the Lien Resolution Program and I am including herewith a copy of the Private Lien Resolution Program Offer and Acceptance, executed by the Client.

Signed this _____ day of _____, 20___, under the PAINS and PENALTIES of perjury.

                                    _____
                                    NAME: _____