```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3


 4
   IN RE:  VIOXX PRODUCTS              *    MDL Docket 1657
 5         LIABILITY LITIGATION        *
                                       *
 6 This Document Relates to:           *    Section L
                                       *
 7     05-CV-3700                      *
                                       *    New Orleans, Louisiana
 8     STATE OF LOUISIANA,             *
       ex rel. JAMES D. CALDWELL,      *
 9     ATTORNEY GENERAL                *    September 17, 2009
                                       *
10 * * * * * * * * * * * * * * * * * *

11
                      STATUS CONFERENCE BEFORE THE
12                     HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
13

14 APPEARANCES:

15
   For the Plaintiffs:           Murray Law Firm
16                               BY:  JAMES R. DUGAN II, ESQ.
                                      STEPHEN BARNETT MURRAY, ESQ.
17                                    DOUGLAS R. PLYMALE, ESQ.
                                 650 Poydras Street, Suite 2150
18                               New Orleans, Louisiana 70130

19
   For the Defendant:            O'Melveny & Myers
20                               BY:  BRIAN ANDERSON, ESQ.
                                 1625 Eye Street N.W.
21                               Washington, D.C. 20006

22
   For the Defendant:            Dechert, LLP
23                               BY:  EBEN S. FLASTER, ESQ.
                                 2929 Arch Street
24                               Philadelphia, Pennsylvania 19104

25
```

```
 1  APPEARANCES:

 2
    For the Defendant:          Skadden Arps, LLP
 3                              BY:  JOHN H. BEISNER, ESQ.
                                1440 New York Avenue, NW
 4                              Washington, D.C. 20005

 5
    Also Present:               Leonard A. Davis, Esq.
 6                              Dawn M. Barrios, Esq.

 7
    Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
 8                              500 Poydras Street, Room HB-406
                                New Orleans, Louisiana 70130
 9                              (504) 589-7778

10

11

12

13
    Proceedings recorded by mechanical stenography, transcript
14  produced by computer.

15

16

17

18

19

20

21

22

23

24

25
```

## PROCEEDINGS

### (September 17, 2009)

(WHEREUPON the following proceedings were held in chambers.)

**THE COURT:** Have a seat, please. Thank you.

We are in the conference room to discuss the various motions that are before me. First, Merck has a motion to compel discovery on certain issues. I read Merck's motion.

The gravamen of the plaintiffs' position or response is prematurity. Also, there's some indication that you have given all the material that you have. The latter, namely, that you have given all the material you have, I understand that. You can't give any more than what you have, and it may well have to be supplemented.

What's the basis of prematurity? We are facing a trial date relatively soon. Why is it premature?

**MR. DUGAN:** Judge, it goes into the second issue here, which is the proposed case management order. What Merck is trying to do here is to put the cart before the horse. Yes, Your Honor, we have had access to the PSC's product. If you remember, Your Honor, through Merck's response, they have been saying, you know, "Louisiana has been jumping up and down for a trial date for a long time now."

If Your Honor remembers, I requested three things: I needed an index of the documents in the MDL and in

1  New Jersey; I needed the governmental investigation documents,
2  which Your Honor just ruled against us last month; and I needed
3  the IMS data for our damages experts, which we are still trying
4  to work out.
5             In addition, Your Honor, just on September 10 we
6  requested to take 15 depositions of people identified in
7  discovery.  Merck has requested to take five depositions.  We
8  haven't taken one deposition yet in the case, Your Honor.  I
9  think from what Merck is requesting, it's information that is
10 already in their possession and it's information that is going
11 to be taken out in actual discovery.  So the motions and the
12 CMO are both kind of intertwined.
13        **THE COURT:**  I don't have any problem from the
14 standpoint of taking depositions, but it does seem to me that
15 if you have information -- they say the identity of Merck's
16 employees who you allege provided false and misleading
17 information to the State of Louisiana.  If you don't know the
18 names of the individuals, then you just say, "I don't know," at
19 this point.
20            It seems to me that if you say that certain
21 employees of theirs provided false information, they ought to
22 know the employees that you say, then take their deposition.
23 If you need to take a 30(b)(6) to answer it, I understand that
24 too.
25        **MR. DUGAN:**  Absolutely.

1         **THE COURT:** If you don't know it, you don't know it.
2         **MR. DUGAN:** As you said, the gravamen, Your Honor,
3    is -- Doug Plymale has been handling discovery issues.
4              We have given them everything we know; is that
5    correct?
6         **MR. PLYMALE:** First of all, Your Honor, the complaint
7    alleged a lot of broad-stroked factual allegations about what
8    Merck did that was false and misleading in terms of its
9    national marketing campaign.  To get down to the individual
10   conversations and transactions that Merck employees had with
11   doctors in Louisiana or with the P&T committee members that
12   controlled Vioxx status on formulary and so forth, that goes
13   into information that is contained within the database of
14   Merck's sales reps' notes of those individual meetings with the
15   doctors.
16             We received 275,000 of those "call notes," as
17   they are called, July 6, and we are busy reviewing those.
18   Those will provide the details that Merck is requesting:  The
19   who, what, where, when, and how of what was communicated to the
20   individual doctors.
21             Another source of the information is going to be
22   the files of the account representatives at Merck, of Merck
23   employees that were assigned to the Louisiana Department of
24   Health and Human Hospitals.  We have received a document
25   production from those custodial files, and we are well under

1  way in reviewing those.  Those people are all going to be the
2  subject of depositions that they are trying to set in October.
3  What they say they said to representatives of the State of
4  Louisiana is going to be responsive to or may be responsive to
5  the information Merck is seeking here.
6        **THE COURT:**  Well, I can see that you may develop some
7  additional facts or additional information.  You can supplement
8  the interrogatories or supplement the production, whatever it
9  is.  I don't think by answering their interrogatories or by
10  giving them production that you're saying, "I can't give you
11  any more information."
12        As the information unfolds, it seems to me you
13  can update them, if necessary.  But to say, "I'm not going to
14  give you anything, even though I have some of it, until we take
15  depositions" -- you all know the first thing you do is get
16  documents, and then from the documents you decide who you're
17  going to take in depositions.  Sometimes you don't know all of
18  the documents, so you take a 30(b)(6) and say, "What are the
19  documents?  Explain the documents to me," and you take
20  additional depositions.  We have to break this impasse because
21  nothing is being done and time is ticking away.  You are going
22  to be trying the case in a couple months.
23        **MR. ANDERSON:**  Brian Anderson representing Merck.
24  That's precisely our point.  This lawsuit was filed four years
25  ago.  The State presumably had a Rule 11 basis for making these

1  allegations of misconduct four years ago.  They should have
2  known what kind of damages or penalties or punitive damages or
3  whatever kind of relief they are seeking in this case, and they
4  ought to have been able to get a lot of these facts from their
5  own files.  If the logic of this lawsuit is they feel they have
6  been deceived and damaged, they should be able to at least make
7  initial specific allegations from their own files.
8              As Mr. Plymale indicates and as we talked about
9  in our papers, the allegations are quite vague, so we don't
10 know concretely what it is we are supposed to be responding to.
11 We produced thousands of pages of documents to the State years
12 ago.  They have access to millions of pages of documents and
13 many, many depositions that have been taken on substantive
14 issues in other cases like this.  As Mr. Plymale says, we
15 completed the production of the custodial documents in early
16 August.
17             We have the same problem as the State does.  We
18 have a deadline to complete fact discovery.  Until we know with
19 some level of concreteness what the State's merits allegations
20 are and what kind of damages they are seeking, we don't know
21 which State witnesses we need to depose.  We don't know what
22 kinds of questions to ask them.  We don't know what kind of
23 follow-up discovery requests to serve.  We can't give our
24 experts assignments to respond to the specificity of their
25 allegations.

1  So it's a two-way street here.  We can't be in a
2 position where we get radio silence from the State until after
3 the completion of fact discovery because they keep coming up
4 with new kinds of discovery that they would like to take of us;
5 and then by the time we learn what the substance of their case
6 is about and the substance of their damage allegations, it's
7 too late for us to effectively develop a defense.
8  There is a provision for supplemental responses.
9 We would think that four years into this litigation, given all
10 the information they have, that we are at least entitled to
11 their best efforts at this point.  If any subsequent discovery
12 generates new facts, they can certainly supplement the
13 response.
14  **THE COURT:**  What I'm concerned about is if you get
15 motions to dismiss your case, I don't know how you're going to
16 respond to it.  I'm going to be dismissing the case because
17 there's no response given.  It seems to me you can't put
18 yourself in that position.  You make broad allegations, and he
19 says now, "Give me some specifics," and you say, "We don't have
20 any specifics."  How are you going to get to the trial with
21 that type situation?  They are going to move to dismiss your
22 claims.
23  **MR. DUGAN:**  Your Honor, we will take a stab at
24 responding.
25  **THE COURT:**  Let's respond, then.  What's reasonable?

1    Can you do that in two weeks?
2                Now, from their standpoint, though, they have --
3    I don't want to stop depositions until all the documents are
4    produced.  That's a little too late.  I think they ought to be
5    able to take some depositions.  You ought to be able to take
6    some depositions if you need to.  You can't just say, "I don't
7    know yet," because if you don't know, really -- I don't mean it
8    in a mean way, but you shouldn't have filed a suit.  You can't
9    just say, "I'm going to file a suit," and then figure out what
10   the damages are and what the theories are and what this is.
11   That's a problem that you don't want to get into because I'm
12   going to hear motions from them pretty soon to dismiss your
13   case.
14                Let's look at it in two weeks.  I would like to
15   have another status conference, though, at that time so that we
16   can flesh out more of it.  In the future, when you run into a
17   problem, long before you file a motion, get to me, and I'll set
18   a status conference.  I'll hear what the problem is, and I'll
19   hear what the response is, and we'll cut through this.  We
20   could have done this three or four weeks ago.  If I understand
21   what your position is and I understand what your position is,
22   I'll tell you what my position is.
23                The same way from your standpoint.  If you have
24   a problem that you need some material from them, call them and
25   ask them.  If they don't give it to you, get to me.  I'll get

1  both sides on the phone and I'll say what do you want, why
2  won't you give it, give it to them, don't give it to them,
3  whatever it is.
4          **MR. ANDERSON:**  Your Honor, we are happy to proceed in
5  that way.  I will say that we did meet and confer substantially
6  on this issue, as well as the next issue that we will talk
7  about, before we brought it to you.
8          **MR. DUGAN:**  Do you want to talk about the IMS issue
9  now, Doug, or do you want to talk about that later?  Evan?
10 That's an outstanding issue for us.
11         **MR. PLYMALE:**  That's one of the critical pieces of
12 information that we are seeking from Merck, and we understand
13 that IMS has not consented to Merck producing that to us.
14         **THE COURT:**  Okay.
15         **MR. PLYMALE:**  I sent a letter late last night.  I've
16 been asking for final confirmation or any updated status
17 between Merck and IMS on that issue.
18         **THE COURT:**  Give me a feel for what.  What's the
19 situation?
20         **MR. FLASTER:**  Evan Flaster on behalf of Merck.  IMS
21 data is not a new issue in this litigation.
22         **THE COURT:**  Right.
23         **MR. FLASTER:**  In the past, as we have said, Merck has
24 certain IMS data products.  We are not in a position to
25 disclose that information, because it's propriety to IMS,

1  without the consent, express authorization of IMS.
2  　　　　　We communicated that fact to plaintiffs as far
3  back as May in our first meet-and-confer.  We gave them the
4  contact information for in-house counsel.  Kristen Furtak is
5  in-house counsel at IMS Health.  Our expectation was that
6  plaintiffs would reach out to Ms. Furtak and get some
7  information or explain the nature of the data they were
8  requesting and that would essentially move forward this
9  disagreement.
10 　　　　**THE COURT:**  Have you called her at all?
11 　　　　**MR. PLYMALE:**  Yes, I have spoken with Ms. Furtak.
12 　　　　**THE COURT:**  What's her position?
13 　　　　**MR. PLYMALE:**  She advised me Merck had an agreement
14 to release some data, in the context of Vioxx litigation, in
15 2006.  As part of the back-and-forth with Merck, Merck asked us
16 to go to our damage experts and to identify really what they
17 needed, the nuts and bolts, what data products they needed.  We
18 did that, and that was relayed to Ms. Furtak at IMS.
19 　　　　　She responded to me and said that that those
20 products are outside the previous agreement IMS has with Merck,
21 and so Merck and IMS were going to have to see if IMS was
22 willing to come up with a new agreement to allow Merck to
23 release that data or if we are going to have to bring it to
24 you, Judge.
25 　　　　**MR. FLASTER:**  I don't think that they are outside of

1  the licensing agreement that prohibits Merck's disclosure of
2  the data.  They may be out of the negotiated agreement for
3  disclosure within litigation that was sort of worked out
4  between plaintiffs and IMS.
5         I feel that to some extent Merck is being placed
6  in the middle of this and asked to be made as a go-between
7  between IMS and plaintiffs' counsel when I think that this may
8  be expedited with a direct discussion/agreement between IMS and
9  plaintiffs.  Merck is happy to be involved and facilitate, as
10 we have done in the past.  We are willing to do that now and we
11 are trying to do that now, but I believe for Merck to sit here
12 and tell you IMS' position with respect to disclosure of their
13 proprietary data is probably not appropriate.
14     **THE COURT:**  This is what we will do.  Let's set
15 something up.  Get the IMS person.  I'll either have her come
16 here or on the phone with the two of you.  We will talk it
17 through whenever you can do that.  Next week is fine with me.
18 I can't do it tomorrow, so it will have to be next week.  Set
19 something up.
20         First, tell her what you need so that she is not
21 blind-sided.  Tell her what you need, and tell her that the
22 Court wants to talk with her.  I will talk with her and
23 you-all.  I'll find out what her position is.  If you're
24 entitled to it, you will get it.  Now, if I have to give them
25 some comfort by putting it under seal or some kind of document

1  that protects them, I'll do that.
2          **MR. PLYMALE:**  Yes, Your Honor.  In my letter
3  yesterday to Evan, I said we would work with both IMS and Merck
4  to put any protections in place that they need to protect their
5  interests.
6          **THE COURT:**  Sure.  Okay.
7          **MR. DUGAN:**  Your Honor, the next issue we feel very
8  strongly about, which is the proposed CMO.  The big difference
9  between the two proposals is that we think it's appropriate to
10 have the discovery done in the case first and then have the
11 expert reports done.
12              As I said before, we haven't taken one
13 deposition in the case yet.  We have allocated it looks like
14 going to be the whole month of October in doing depositions.
15 As Your Honor knows being a trial lawyer, we are going to have
16 to get those depositions transcribed.
17         **THE COURT:**  I have that.  What's the problem with it?
18 Usually, we take the depositions first, we deal with all the
19 discovery, and then give it to the experts and say, "Take all
20 this information and give me an opinion on it."
21         **MR. ANDERSON:**  That might happen if we weren't under
22 an expedited trial schedule, but we are under an expedited
23 trial schedule where we don't have the luxury of sitting back
24 until after all fact discovery is done and then get their
25 expert report, as they now propose, in December, which is less

1  than four months before trial, with the holidays intervening,
2  and then us have to scramble to respond to that, get that
3  information to our experts, get their expert reports, complete
4  expert discovery two months before trial, and then try to do
5  all the *Daubert* motions and the summary judgment motions as to
6  which we need rulings to do in limine and trial plan.  We're
7  trying to compromise.
8         **THE COURT:**  How do we deal with that, though?  Both
9  of you are right.  We have a short period of time, but you
10 can't have experts give reports before they have any basis for
11 the reports.  They are going to then supplement them.  You are
12 going to get 15 reports as opposed to one because every time
13 you take a deposition they are going to have to supplement the
14 report and say:  In consideration of this, this is my new
15 report.
16        **MR. ANDERSON:**  Well, the other thing that's odd about
17 this is that, again, plaintiffs originally proposed, I believe,
18 a July 31 deadline for them to produce expert reports.  We came
19 to a day before that deadline, when ostensibly they were going
20 to produce all of their expert reports the next day, and we
21 agreed to put that off based in large part, I think, on their
22 desire for the IMS data; which at most would pertain to a
23 damages expert report, shouldn't affect substantive expert
24 reports, as to which, again, they have had the information
25 about what they think Merck did wrong for years.

1   **MR. DUGAN:**  That's when we were operating under a
2   November trial date, Your Honor, and at that particular time
3   everybody thought we were going to trial in November.  We had
4   no idea that the defense had no intentions of going to trial in
5   November.  Travis Sales and the Baker Botts firm came in, when
6   we said we need to bring this to the Court's attention, and
7   said they couldn't try the case until the summer.  That's when
8   Your Honor got involved, and we ultimately settled on April.
9              So it wouldn't have been fair for us to do all
10  of those reports and then after that time Merck come in and
11  say, "Well, we can't try the case until six to eight months
12  later," and then a new schedule be in place and they already
13  have the benefit of foreseeing what our expert reports were.
14             **THE COURT:**  Well, I think the problem here is just
15  time-wise.  I think both sides profit from having some
16  discovery before the experts come in.  I think Merck is right
17  about the fact that you can't wait until the eleventh hour and
18  then give your expert reports, and then they have a very short
19  time to give you their experts and motion practice and *Daubert*
20  motions.  We are going to just have to shorten the period some
21  kind of way.
22             **MR. ANDERSON:**  In an effort to compromise this, we
23  have gone from July 31 to August 15 to September 15, and now
24  the proposal that we put before the Court is October 15 for
25  this process to begin and end in December.  If we could get

```
 1   their expert reports by Halloween, we can live with that.
 2   Again, if they need to supplement them with anything they find
 3   out the last half of October, fine.
 4             THE COURT:  The same way from your standpoint.
 5   That's reasonable to me.
 6             MR. DUGAN:  Judge, these experts are extremely
 7   expensive.  To have them go back and supplement reports is a
 8   serious burden.
 9             THE COURT:  Well, I understand.  If you don't need to
10   supplement it, don't supplement it, but let's get it done by
11   the 30th of October.  That's fair.  It's fair for both sides.
12             MR. DUGAN:  With the understanding those will be
13   first reports due October 30; if we need to supplement, we will
14   be able to supplement them.
15             THE COURT:  Both sides.  We are trying to do this in
16   a reasonable way.  If you take additional discovery, you may
17   have to deal with a brief supplement or a quick follow-up
18   deposition of the expert.  I really look to both of you-all to
19   kind of cooperate along the lines.
20             MR. DUGAN:  Judge, can I bring to your attention what
21   we had requested is a fact discovery cutoff of December 1.
22   Merck's actual proposal was, I believe, January 12.  Could we
23   combine the fact discovery cutoff of December 1 and the expert
24   reports of December 1?  That would be somewhat meeting
25   everybody in the middle.
```

1     **THE COURT:**  Well, if you all still want to negotiate
2 it, I think you ought to negotiate it.  When you get to the
3 point when you can't decide on it, then I'll make the decision.
4     **MR. DUGAN:**  We had suggested December 21 as our
5 expert reports.  They had suggested October 15.  Somewhere in
6 the middle would be around Thanksgiving, actually, or at the
7 end of fact discovery cutoff.
8     **MR. ANDERSON:**  We have been back-pedaling from July
9 to now we are at October.  How about November 7?
10    **MR. DUGAN:**  November 7?
11    **MR. ANDERSON:**  If that's a weekday.
12    **THE COURT:**  Guys, I have to leave you-all.  I have
13 some other things to do.  Where are we with this?  Has this
14 been resolved or do you need me more?
15    **MR. DUGAN:**  Can we make it an even November 15?
16    **THE COURT:**  Now you're negotiating too closely.
17 Let's go with the 6th.
18    **MR. ANDERSON:**  Okay.
19    **THE COURT:**  What else is there?  Is that it?
20    **MR. DUGAN:**  Thank you, Your Honor.
21    **MR. ANDERSON:**  Thank you, Your Honor.
22    (WHEREUPON the Court was in recess.)
23                        * * *
24
25

**CERTIFICATE**

    I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.


                                      s/ Toni Doyle Tusa
                                      Toni Doyle Tusa, CCR, FCRR
                                      Official Court Reporter