1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS              *    Docket 05-MD-1657-L
              LIABILITY LITIGATION       *
6                                        *    September 17, 2009
                                         *
7    This Document Relates to All Cases  *    9:00 a.m.
     * * * * * * * * * * * * * * * * * * *

8

9                    STATUS CONFERENCE BEFORE THE
10                   HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13

14   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                   BY:  RUSS M. HERMAN, ESQ.
                                   820 O'Keefe Avenue
15                                 New Orleans, Louisiana 70113

16

17   For the Defendant:           Williams & Connolly
                                   BY:  DOUGLAS R. MARVIN, ESQ.
                                   725 Twelfth Street N.W.
18                                 Washington, D.C. 20005

19

20   Also Participating:          Orran L. Brown, Esq.
                                   Lynn C. Greer, Esq.
                                   Andy D. Birchfield, Esq.
21                                 Matt L. Garretson, Esq.
                                   Patrick A. Juneau, Esq.
22                                 Dawn M. Barrios, Esq.
                                   Robert M. Johnston, Esq.
23                                 John H. Beisner, Esq.
                                   James R. Dugan, Esq.
24                                 Ann B. Oldfather, Esq.

25

1   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, Room B-406
2                                   New Orleans, Louisiana 70130
                                    (504) 589-7778
3

4

5
    Proceedings recorded by mechanical stenography, transcript
6   produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     <u>**PROCEEDINGS**</u>

2                   **(September 17, 2009)**

3         **THE DEPUTY CLERK:**  Everyone rise.

4         **THE COURT:**  Be seated, please.  Good morning, ladies

5  and gentlemen.

6              Call the case, please.

7         **THE DEPUTY CLERK:**  MDL 1657, *In Re: Vioxx*.

8         **THE COURT:**  Counsel make their appearance for the

9  record.

10        **MR. HERMAN:**  May it please the Court.  Good morning,

11 Judge Fallon.  Russ Herman for plaintiffs.

12        **MR. MARVIN:**  Douglas Marvin, Your Honor, for Merck.

13        **THE COURT:**  We are here today for our monthly status

14 conference.  I met with the liaison counsel to discuss with

15 them the proposed agenda.  I have added some things to it.  I

16 will take it first in the order given.

17             Settlement Agreement, any report on that?

18        **MR. HERMAN:**  May it please the Court.  Good morning,

19 Your Honor.  This is the occasion of our 50th status

20 conference.  Some folks have asked that I address Your Honor

21 and the Court, and I will do so briefly.

22             With regard to the efforts of Your Honor and

23 Judges Chaney, Higbee, and Wilson, from *The Merchant of Venice*,

24 I quote:

25             "Wrest once the law to your authority;

1      "To do a great right, do a little wrong."

2      In terms of all of the lawyers in the case in

3   creating a fund creatively that 99.5 percent of claimants have

4   entered, Angelo from Act 2, Scene 1, in *Measure for Measure*,

5   Shakespeare's great cry against precedent and the common law:

6      "We must not make a scarecrow of the law,

7      "Setting it up to fear the birds of prey,

8      "And let it keep one shape, 'til custom make it,

9      "Their perch and not their terror."

10      In fashioning this resolution, all of the

11   lawyers and the judiciary are to be commended for fashioning

12   something new.

13      Lastly, if it was not for Pericles, a statesman

14   and a general and also a lawyer, who indicated that juries are

15   to be egalitarian and, therefore, for the first time legislated

16   jurors to be paid fees so that not just the wealthy could

17   serve -- Plato hated juries, but our Socrates rose and said,

18   "Nothing done with intelligence is done without speech.  It is

19   the marshal of all actions and thoughts," in reference to the

20   rejection of Plato's derision of jury trials and in supporting

21   a trial bar in the adversary system.

22      So on this 50th status conference, these remarks

23   are salutatory for everyone, no matter what part of the

24   controversy they played, and particularly to the bench, which

25   directed in appropriate ways that this matter be resolved.

1          **THE COURT:**  Well, just a brief response.  I'm not

2    going to cite Pericles or Socrates or any of the other good

3    folks we all admire and look up to.

4               You know, in a case like this -- and you have

5    heard me say this before.  I've walked in your shoes.  I was

6    practicing law for 33 years before I became a judge.  I know

7    that the work and resolution of cases are really more because

8    of the lawyers than judges.  You know the case better.  You've

9    come up with it, created solutions, and you put them in place.

10              I was very fortunate in this particular case to

11   have not only great lawyers on both sides, but the assistance

12   of some very talented state court judges who worked with the

13   MDL court.  I think it was largely because of the lawyers and

14   the assistance that I got from the judges that this case was

15   able to be resolved in the fashion that it was.

16              This has been one of the largest MDL cases in

17   the history of the country.  To resolve the case in three years

18   was a monumental job, and it's because of the talent and

19   creative views of the lawyers that really brought this to

20   fruition.  I do appreciate it.

21              Also, in these matters, if any lawyers have some

22   comments to make either to me privately or whatever in giving

23   the MDL courts throughout the country some assistance in things

24   you feel worked or didn't work, I'm speaking again at the MDL

25   group.  They get tired of hearing me.  They have me too much

1    now.  I always mention that not to let you know I'm speaking,

2    but I see it as an opportunity to give any thoughts that you

3    might have to the MDL group.

4              Every MDL judge in the country appears at those

5    meetings.  Unfortunately, they don't have an opportunity to

6    hear from lawyers.  I always mention it so that if you have any

7    comments, you can filter them through me, and I will make them

8    known to the rest of the country for you.

9              Let's take the agenda, then, in order.

10   Settlement Agreement, anything?

11        MR. HERMAN:  BrownGreer has reports to make as to

12   Items I and II, the Settlement Agreement and registration.

13   Your Honor, I again want to mention the Web sites:

14   vioxx.laed.uscourts.gov and browngreer.com/vioxxsettlement.

15        MR. BROWN:  Good morning, Your Honor.  I am Orran

16   Brown, and with me today is Lynn Greer.  We are from BrownGreer

17   in Richmond, and we are the claims administrator for the Vioxx

18   Settlement Program.  We are happy to be here on the occasion of

19   our 21st -- not 50th but 21st report.

20             What we want to do today, Your Honor, is cover

21   where we stand on the administration of the Extraordinary

22   Injury Program as a piece of the Settlement Program, and then

23   Lynn will cover where we are now on the processing of the

24   IS/stroke claims and our plans for final payments on completing

25   the processing of the heart attack/MI claims.

1          Your Honor, first on the Extraordinary Injury

2    Program, we have discussed this at several of our recent status

3    conferences.  We, on March 2, announced that that program was

4    underway, where we had done all the work to enable *pro se's* and

5    represented claimants, through their law firms, to file

6    extraordinary injury claims on an extraordinary injury claim

7    form seeking payments from the funds that were allocated or at

8    least earmarked for potential use for extraordinary

9    catastrophic injury claims within the MI settlement fund and

10   the IS settlement fund.

11         We announced it here on March 2 of this year

12   first with a deadline of June 1 for all claimants to submit a

13   claim to that program with their claim form and their

14   documentation and tax forms and other materials that we need to

15   be able to process them.  We very soon after that, on April 14,

16   announced that that claim final deadline was moved, extended to

17   September 1.  Then through the course of the summer, we were

18   gearing up for that, and then the deadline has now passed on

19   September 1.

20         What we had advised everyone and announced

21   several times was that to be able to seek benefits in that

22   program, you had to submit an EI claim form that we had

23   designed and made available as well as the types of required

24   documentation, we called it, to support the type of claim you

25   were presenting to those funds, whether it was an economic loss

1    claim or a claim of some catastrophic physical injury not

2    adequately reflected on the underlying MI and IS grids.

3                We had made it very clear that that was a time

4    line, and we monitored that very carefully because most all of

5    the claims from law firms were submitted online through the

6    Vioxx portal.  We monitored it down to allowing claims and law

7    firms until midnight on the 1st of September local time of

8    wherever the person was who was submitting that claim for the

9    claimants.  So we have monitored that very carefully and now

10   that deadline has passed.

11               Now, with the passing of the deadline, this

12   slide shows us how many claims we have received seeking

13   benefits from these potentially available funds from either IS

14   claimants or heart attack/MI claimants.  We have a total of

15   3,630 claims.

16               This slide shows us how they break down among

17   the types of claims that could be asserted in the Extraordinary

18   Injury Program, the first one being a claim for past lost wages

19   or income with claimants who had an eligible event, a heart

20   attack or a stroke, and then are asserting that they lost

21   income or wages from that event up through the date of the

22   Settlement Agreement, which was 11-9-07, and that's the past

23   period.  That's the period for asserting economic loss.

24               It has to be above $250,000 of unreimbursed lost

25   wages or income to be able to seek benefits in this program.

1   You see we have a total of 841 claimants who are asserting
2   those kinds of economic losses for that past period.
3           The Settlement Agreement also contemplated that
4   you could seek reimbursement for catastrophic past medical
5   expenses for that period if they exceeded $250,000, and we have
6   286 claimants total who have submitted claims of that nature.
7           The Settlement Agreement also contemplated that
8   you could seek benefits from this fund if you had a special
9   medical injury, some sort of physical injury resulting from
10  your heart attack or stroke that you felt was not adequately
11  reflected on the underlying heart attack or stroke grids.
12          We have 1,857 claimants who have asserted that
13  type of injury, something that they felt they had sustained as
14  a result of their Vioxx use and their underlying eligible
15  event, heart attack or stroke, that they felt was not
16  adequately covered on the existing injury grids for their
17  underlying claim.
18          Row 4 here is what we have called additional
19  extraordinary damages, and this is really folks who are
20  claiming that in addition to those past economic losses, they
21  had suffered or will suffer, they think, a continuing loss of
22  income or continuing medical expenses that are not reimbursed
23  or covered by insurance for the future.  We have said from the
24  beginning that those types of losses, if they were presented
25  and proven, would be a factor in evaluating the individual

1   award to be made from these available funds on an extraordinary

2   injury claim.  We have 646 claimants who asserted those types

3   of claims.

4            Now, some claimants asserted more than one of

5   these, so some claimants appear in more than one of these rows.

6   There's not 3,630 people because some claimants asserted

7   special injury and economic loss and future, so they are

8   counted in more than one row.  This does give us a total number

9   of claims that we are now looking at in this program.

10           As is typical of these programs, the bulk of

11  these claims came in in the last period.  We received about

12  81 percent of these claims in the last week before the

13  deadline.  We got 60 percent of them in the last two days, and

14  we got almost 37 percent of them on the very last day, which is

15  typical when there's a deadline for a program of this nature.

16           We are now reviewing these claims.  We have

17  teams trained to review the particulars of economic losses and

18  the special medical injury.  That review process is underway.

19  We will continue to report to the Court each month as to how

20  that process proceeds.

21           THE COURT:  Okay.  Now, Orran, just so that we are

22  clear on it, this special fund is a pot, so to speak; it's not

23  replenished.  It is kind of like a pie, and it depends on how

24  big the pie is as to how big a slice you get of the pie.

25  That's why we had to say that's the end; there's no more claims

1  that can go in that.

2  **MR. BROWN:**  Correct, Your Honor.  The Settlement

3  Agreement makes it very clear that there are funds out of the

4  original MI fund that are potentially available to pay

5  extraordinary claims for MI claimants.  It also says that

6  there's a sum of money, $105 million, potentially available to

7  pay stroke claimants who felt that they had extraordinary

8  injury, and those are capped funds.

9  The Settlement Agreement is clear that if those

10  funds are not needed, depending upon how these evaluations turn

11  out, they stay in the original funds and they are distributed

12  on the underlying claims, but it is a capped limit that the

13  Settlement Agreement makes available for these types of

14  claimants.

15  **THE COURT:**  That's the point of saying that we have

16  deadlines and if you have a claim, you have to get it in before

17  the deadline.  If you don't get in before the deadline, then

18  you lose your claim.

19  **MR. BROWN:**  Yes, Your Honor.  We have talked to a lot

20  of people about that who asked that question.  We have made it

21  very clear from the beginning that these deadlines are firm.

22  **THE COURT:**  Okay.

23  **MR. BROWN:**  Your Honor, If the Court has no further

24  questions on this, Lynn will come up and then tell us where we

25  are now on our stroke reviews and our MI reviews and final

1    payments.  Thank you, Your Honor.

2              **THE COURT:**  Thank you.

3              **MS. GREER:**  Good morning, Your Honor.  Lynn Greer

4    from BrownGreer.  Today we will cover where we are with the

5    strokes and the MI's and talk about the final payment, as Orran

6    said.

7                   This is, as of yesterday, the distribution of

8    the claims that had been filed between the two injury types,

9    still with roughly 63 percent claiming heart attack and

10   37 percent claiming stroke.

11                  I'm going to do something a little different

12   this month, Your Honor.  I would like to focus on the stroke

13   claims first, which will then leave the MI final payments to

14   the end.  The stroke reviews, although we have been focused on

15   the MI's, we have continued to make progress on reviewing the

16   stroke claims both at the gates level and the points level.

17                  This slide shows that there are currently 6

18   claims that are in the queue for our original gates review on

19   strokes.  There are 504 that are awaiting our second review,

20   our quality control review.  There are 1,916 where we have done

21   our full reviews of the claims.

22                  We have been rolling out our claims

23   administrator notices of ineligibility in sort of batches over

24   the last few weeks.  The reason for that is because these

25   notices are the notices that counsel need to respond to if they

1   need to go get additional information to be able to prove

2   eligibility.  This is often, in the process, one of the hardest

3   junctures for firms, if they get a lot of notices at one time,

4   because they then have to go try to gather records on hundreds

5   of claims at once.

6              So what we have done is we have tried to roll

7   these out to be able to give firms a chance, on an ongoing

8   basis, to go get documentation, if any exists.  So this almost

9   2,000 claims represents a pocket where we have done our

10  reviews, and we are releasing those in batches of several

11  hundred a week.  So those will shortly be released over the

12  next few weeks.

13             The results of the claims that we have reviewed

14  to date are that there are 7,258 that have been eligible for

15  points review.  There have been 7,650 notices of ineligibility

16  already issued to claimants.  There are 543 that are currently

17  with the gate committee that they have not voted on yet.

18             This slide shows that through this month we will

19  have paid over 2,500 stroke claims, and the interim payments

20  for the stroke claims will go out next week.  There are 300

21  additional stroke claims where we have completed our reviews,

22  and these will be paid in October.  This number grows every

23  day.

24             This is just a snapshot of where we were

25  yesterday.  129 of those have already been accepted and will be

1    paid.  126 are still within a time to decide whether to accept

2    or appeal.  There are 45 stroke claims that have either already

3    appealed or are in special review.  Those special review claims

4    are ones with stroke points of less than 2 points.

5                    134 points awards, we have reached a point where

6    we are almost ready to issue the notice.  There are

7    administrative issues that we need to clear up before we can

8    actually issue a notice.  There are 2,100 that are pending our

9    level of quality control review on the points side.  There are

10   524 claims that are incomplete.  We can no longer complete the

11   points process.  These have received notices.  These firms have

12   received notices telling them exactly what is missing and what

13   we need to be able to complete points.  We have started reviews

14   on 366 claims, and there's a queue of about 1,021 that are in

15   the queue waiting for our review.

16                    Through September, we will have paid over 2,500

17   claimants over $69 million.  What is pending that could

18   possibly be paid in October is another $8 million or 255, but

19   again that number will grow significantly because there are

20   still three to four weeks where people can accept their stroke

21   awards and be paid in October.  So through October it is

22   possible that we will be able to pay another 2,500 claims.  I'm

23   sorry.  That's actually another 500 claims, which would bring

24   the total up to about 3,000.

25                    I will not read this into the record,

1   Your Honor, but this is available on our slides, which we do

2   post after every status conference.  What this shows is just

3   the average points by stroke injury level.  There are five

4   injury levels on the stroke grid, and the special marker

5   percentage is 5.91 percent as of yesterday.

6               Turning our attention to the heart attack

7   claims, these are the ones that we have all been focused on

8   collectively to try to reach our goal of the payment at the end

9   of this quarter.  What this slide shows is that we are almost

10  done.  From the gates perspective, we have no more MI claims

11  waiting to be reviewed for gate.  There are 6 claims that we

12  have issued a notice of ineligibility on that are in the works

13  and that firms are responding to, and we expect a response to

14  those soon.

15              What this slide shows us is that we expect that

16  there will be 20,419 heart attack claimants paid.  It also

17  shows us that through this process of almost 30,000 heart

18  attack claims that were filed, there have been notices of

19  ineligibility or final gate failure notices issued on 9,885

20  claimants.

21              Through August, we had paid interim payments to

22  17,699 claimants.  There are another 2,719 that will be paid

23  and these are ones we are not -- I will announce this later.

24  We are not making interim MI payments in September.  We are

25  going to pay them all at the same time we make the final

1   payments.

2             Out of the 2,719 MI claimants with unpaid points

3   awards, 2,407 are accepted.  They are fully resolved.  They

4   will be paid when we make the final payment.  There are 43 that

5   are still within the time limit to decide whether to accept the

6   award or to appeal.  We are working very hard and diligently

7   with these firms and these claimants to get them to make their

8   decision so that if they appeal, we can expedite the review of

9   that; and if they ultimately appeal to the special master, they

10  will be able to expedite their review to be able to resolve

11  these claims.

12            There are only 27 appeals currently pending with

13  the special master.  Those are points appeals.  We expect

14  resolution of those within the week.  There are 242 claims that

15  will not be paid at the same time we make the final payment.

16  These are the heart attack special review claims, and the

17  process calls for all of the special review claimants -- and

18  these are, again, claimants with special marker valued claims

19  that have elected to go through the special review process with

20  the special master.

21            What has to happen is that population has to be

22  defined.  Those all get sent to the special masters to review

23  at the end of the process.  They have to look at each of those,

24  and they have to award an average across that population of 2.5

25  points.  So at the end, when we fully have resolved everything

1    and can figure out exactly how many people are in that bucket,

2    we will send those to the special master, they will do their

3    review, and those claimants will be paid.

4              There is currently one claim that is the subject

5    of an audit, and that is pending with the special master.  The

6    response from the firm is due tomorrow.  So, again, we expect

7    resolution of that claim as soon as the response is filed and

8    the special master is able to resolve that.

9              This slide shows the points by entry level for

10   the heart attack claims.  Again, I will not read this in the

11   record, but this is available on our Web site in the slide

12   presentation from today.

13             This shows that through August we have paid over

14   $1.4 billion to over 17,000 MI claimants.  Those break down to

15   over 16,000 interim payments and 850 $5,000 fixed payment

16   elections.  Again, this just reiterates the earlier slide which

17   shows that there are another 2,649 people who are resolved and

18   who will be paid.  It focuses us on the 71 people who we still

19   need to resolve before we can make the final payment.  This,

20   again, brings us to the bottom line, which is that we expect

21   over 20,000 MI claimants to receive payment.

22             Important reminders about what we need to have

23   happen before the final payment can be issued, the first two

24   items deal with reports that we have recently sent to firms.

25   The first is a claims status report that we issued most

1    recently at the end of August giving each firm the status of

2    each of their claimants, whether the claimant is open or

3    whether the claimant is closed.  The onus is really on the firm

4    at this point if they see anything wrong with our reporting of

5    where we have their claimants.

6              The second report is one that we issued last

7    week that was a summary by claimant of each payment that we

8    have made on behalf of each claimant.  Again, this is just to

9    be able to try to spot some glaring error.  We do not expect

10   there will be any.  U.S. Bank has been very good about wiring

11   the right amount of money, obviously, and I think we would have

12   heard by now if something had happened that was not correct.

13             Again, on Friday we issued reports.  We urge

14   firms to look at them carefully, make sure the dollars match

15   their records and that all of the information is correct.  We

16   are going to assume, if we do not hear from firms by the end of

17   the day tomorrow, that those two reports are accurate and that

18   we can move forward on that basis.

19             Again, the special marker claimants will not be

20   paid at the end of the third quarter.  This is the group I

21   talked about that will go to the special master for resolution

22   of payment shortly thereafter.

23             Again, there will be no separate MI interim

24   payments issued in September.  Instead, we will collapse those

25   all in the final payment.

1          We are worried about the timing of the final

2     payment.  We are still on track.  It has been a tremendous

3     effort by firms, by the parties, by the Court, and we feel that

4     those 71 claimants, obviously, still have their Settlement

5     Agreement rights to respond and to be able to make their

6     decision within a certain window.

7          We still feel that we will be able -- assuming

8     that they will respond and allow us to, that we will be able to

9     get all of the final payment information finalized by the end

10    of this month.  We will then send the list to U.S. Bank.  It

11    will be October before the payments actually come.  We will

12    need time to make sure that none of these deadlines extend

13    beyond October 1.

14         We have to be able to quantify points.  These

15    point values will come down to the penny.  Until we know

16    absolutely everybody who is in the category, we cannot make the

17    final payment.  Again, we have been working with these firms.

18    We encourage folks who are still sitting on these awards to

19    contact their clients and to try to get a resolution.  We will

20    do everything within our power to be able to get the list to

21    the bank, and then it will be just a matter of the payments

22    being able to be issued in October.

23         **THE COURT:**  You feel that you'll be able to get all

24    of your paperwork to the bank by the end of this month?

25         **MS. GREER:**  We do; depending, Your Honor, on these

1    unresolved claims, yes.

2              We have been working, obviously, to be able to

3    get to the point where we are now down to the 71 that are

4    unresolved.  We do feel now that we can give a projection of

5    the final point value.  Right now, again, we cannot name this

6    precisely because we have to wait until every claimant is

7    resolved, but we believe now that the current point value is

8    projected to be somewhere in the range of $1,860 and $1,870.

9    This is different than what we projected last year.  It's 2 to

10   3 percent less than the value projected last year.

11        **THE COURT:**  The reason it's less is because you have

12   more people.

13        **MS. GREER:**  We have more people.  Your Honor, we did

14   the projection last year based on data of about 2,500 people,

15   which we extrapolated.  We feel really good that the point

16   value is coming in only between 2 and 3 percent because what

17   the next item shows is that there have been over 3,000

18   additional people who, through the adequacy of their firms and

19   lawyers, were able to come into the program, were able to

20   perfect their claims packages, and they are getting paid.

21              So to have it be 2 to 3 percent less when 3,000

22   more people are being paid is something that we are really

23   encouraged about and also the claims themselves.  We are paying

24   over 117,000 more points than were in the original projection.

25   So this shows the quality of the claims and the number of

1   claims are greater, which inures to the benefit of more people.

2              We do expect for the final point value to come

3   in somewhere in this range and, obviously, will let firms know

4   as soon as we know what the dollar amount is to the penny.  If

5   your Honor has no further questions --

6              **THE COURT:**  No.  I appreciate it.  Again, I think the

7   concept of having a number of different reviews has helped in

8   this particular case.  You folks have given it the

9   administrative review, that is to say, to make sure that the

10  Settlement Agreement by and between the parties was satisfied.

11  Then the attorneys for both sides created the concept of

12  plugging in some humanistic view of it, that is to say, see

13  whether or not there's some gray areas that they could work

14  with.  That, I think, has pushed more people through the gates.

15  Then we have the special master review.  There's another aspect

16  of the review, an independent group review, that makes sure

17  that everything else is worked out.

18              It's taken us a little time from the standpoint

19  of these reviews, but I think the claimants have profited from

20  it because 3,000 more people got through because of those extra

21  reviews.  I think that was very helpful.  Thank you very much.

22              **MS. GREER:**  Thank you, Your Honor.

23              **MR. BIRCHFIELD:**  I think this is absolutely

24  remarkable, the job that BrownGreer has done.  I mean, to be

25  able to take a settlement program that involves 50,000 people,

1    50,000 claimants, and to process those and make a projection a

2    year in advance that comes within 2 to 3 percent of the point

3    values that were projected, especially in the light of when the

4    parties at the very beginning rolled this out, we were looking

5    at a threshold of 85 percent, and we had 99.5 percent of the

6    eligible participants to elect to participate in this program,

7    and from my standpoint -- and I've been working very, very

8    closely with this throughout the course of this Settlement

9    Program.  From what I hear from lawyers that have been involved

10   in the program, this is a remarkable result.

11            We are thrilled to see that we are in a place

12   where we can issue the final payment on time and that it has

13   come in at so close to the projected value.  I just want to

14   extend my thanks to BrownGreer and to Merck and to the special

15   masters, who did a phenomenal job in making sure that we could

16   stay on track for this final payment.

17            **THE COURT:**  Notwithstanding that, I know that there

18   are some people who may be disappointed because they didn't get

19   through those reviews; they didn't pass the first one or they

20   didn't pass the second one or they didn't pass the third one or

21   didn't pass any of them.  Obviously, there's going to be some

22   people who are upset.  The best I can do is to create a process

23   and to make sure that due process and opportunity is there.

24   Not everybody is going to be able to partake of the opportunity

25   to get through it.  I think everybody ought to be satisfied

1    that they had the opportunity and it was a fair shot.

2              The next item is the lien administrator.

3              **MR. GARRETSON:**  I'm Matt Garretson here to report as

4    the lien resolution administrator.  Appreciating the timing of

5    MI and SCD cases that are eligible for final payment, I have

6    isolated just those data points for purposes of this report as

7    this is our current priority.

8              Further, I would like to reinforce to everyone

9    that there is now a feature on the primary counsel Web portal

10   through BrownGreer that allows each primary counsel to export

11   to an Excel spreadsheet the lien resolution detail that I am

12   covering for their category of claimants.

13             With respect to Medicare, the current number of

14   active claimants with a notice of points award, I believe, is

15   23,271 claimants.  The current number of points award notice

16   claimants that are active that have a Medicare obligation is

17   approximately 16,000 of those or 70 percent.  Out of the 16,000

18   total Medicare entitled claimants who received a points award

19   notice, 87.2 percent of them have an MI or sudden cardiac death

20   primary injury.  So those are the claimants who are ready for

21   payment.

22             I'm pleased to inform the Court that we have

23   completed the Medicare resolution for approximately 99 percent

24   of these cases.  The unfinalized cases largely involve

25   unfinalized redeterminations.  As you may recall from my

1     monthly reports in the past, we have received about 288

2     requests by claimants for us to take another look at their

3     Medicare reimbursement category.

4            Many of these will be resolved just, again,

5     through education.  What we are finding is they have been

6     categorized correct; it is just a group of claimants largely

7     who has a fundamental misunderstanding of the necessity to

8     repay Medicare, thinking that they shouldn't have a Medicare

9     reimbursement.  So, again, very positive signs that we are only

10    dealing with 288 redeterminations.

11           Furthermore, a few hearings ago, the Court asked

12    me to report that we are in compliance with this new Medicare

13    reporting statute, the Medicare/Medicaid SCHIP Extension Act or

14    MMSEA.  We have been working closely with defense counsel Doug

15    Marvin and Merck, and more specifically we have been working

16    with the Centers for Medicare & Medicaid Services to ensure

17    that the process by which we are finally reporting Medicare

18    claims will meet Merck's obligation under this new statute.  Of

19    course, we will continue to report to the Court and Merck and

20    to the plaintiffs' steering committee about the specifics, but

21    we are right on track with having this new statutory

22    requirement satisfied.

23           With respect to Medicaid, approximately

24    28.8 percent of all active claimants have Medicaid obligations.

25    The current number of points award notice active claimants with

1    a Medicaid obligation -- so those that are ready to be paid
2    out -- are approximately 4,812.  There are 4,812 active
3    claimants who have an MI or SCD primary injury that are ready
4    for payment.  Interestingly, these 4,812 claimants have
5    generated over 5,200 liens, and that's because from some point
6    from the date of their injury to the date of their settlement
7    they have treated in two separate states.
8                    We have finalized Medicaid obligations for
9    91 percent of these cases.  We are in the process of updating
10   this information into the Web portal so that information can be
11   downloaded by primary counsel.
12                   The unfinalized Medicaid cases are due -- I'll
13   just list these in order of importance:  One, because they are
14   close to hitting their cap.  If you recall, there's a
15   20 percent cap on a Medicaid obligation in most of the states.
16   That is part of the protocols we have put in place.  We have a
17   group of Medicaid claimants that are approaching that cap, and
18   we can't finalize their lien until we have the finalized
19   numbers, which are, of course, just coming down the pike.  So
20   as soon as we are able to apply the math, we will be able to
21   finalize those liens.
22                   We also have a few states that did not agree to
23   these protocols.  If the Court will recall, there were a few
24   states who would not agree to these caps and offsets, and so we
25   have to have those claims on hold again until we have their

1    final award so that we can satisfy the Medicaid claim.

2              Also, we are dealing with an issue I need to

3    bring to the Court's attention with Kentucky.  Kentucky

4    Medicaid has over 100 liens, and they have yet to provide us

5    their inbound claim detail.  They work with a contractor.  The

6    contractor submitted data four times that we have audited, and

7    then they have told us it's the wrong data.  So we are spinning

8    our wheels, Your Honor.  We are going to need probably some

9    help from the Court to tell them it's time to get the right

10   data in our hands.

11             **THE COURT:**  Why don't you get me the name of the

12   individual who is in charge of the office, and I'll handle it.

13             **MR. GARRETSON:**  Yes, sir.  That's the biggest issue

14   with respect to Medicaid that I would like to report.  Of

15   course, we can apply the holdback to those cases.  So there is

16   a solution to allow money to flow to those, but they can't be

17   finalized within that 20 percent holdback until we actually get

18   their claims data.  That is the only state or territory we are

19   still struggling with.

20             In this regard, with respect to all the Medicaid

21   obligations for the claimants who have a points award notice

22   letter, we are pleased to report that we have finalized

23   approximately 98 percent of all the Medicaid liens, so that's

24   an encouraging number.  If we could just get that last slug of

25   cases in, I think we will be in good shape.  The rest of those

1   that we have yet to finalize could also be areas where we have

2   a discrepancy that we are still trying to cure with the

3   Social Security number provided.

4             With respect to other governmental liens, the

5   VA, TRICARE, Department of Defense, we have received for the

6   claimant population that has the points award notice

7   approximately 606 claims files.  As I have reported in the

8   past, we have to actually go to the individual treating

9   facilities for each of these.  So we are 60 percent complete

10   with those obligations at this point.  We continue to try to

11   get the data in, but again we have the holdbacks in place

12   there.

13             What we would ask is that we are still getting

14   from primary counsel notice on a weekly basis of new claims.

15   We may have to come to the Court to ask for a deadline for

16   people to submit, perhaps in October, so that we are not

17   dealing with this issue since we are now 18 months into the

18   process.

19             That concludes the governmental lien.  Let me

20   shift for a few moments to the private lien resolution program.

21             We continue to work with the plaintiffs'

22   steering committee and the third-party payor committee to

23   administer the terms of the memorandum of understanding.  We

24   now have 477 private health-care plans that have agreed to

25   participate according to the terms and conditions of the

1    program, and we continue to see that grow every week.  So we

2    have added successfully, since the program has been in place,

3    300 plans.  We have nearly tripled the participant pool.  The

4    majority of plans are still represented by two main consortiums

5    who have been very active in the program.

6            Total participating claimants to date:  We have

7    20,381 claimants who have elected to participate in the

8    program.  The first wave of data that we sent to the plans

9    consisted of the first 15,000 claimants that signed up.  We

10   have sent subsequent waves of data to these plans, and we are

11   now still in the process of receiving back what we are calling

12   "matches," the actual plan matches.

13           A couple other statistics:

14           Of the 20,381, we have already determined that

15   approximately 3,300 of the claimants are inactive in the

16   program at this point, so they will be dropped or put on the

17   side of this program.  We are only going to be working with

18   17,000 participating claimants.

19           12,600 of the over 17,000 claimants have been

20   matched with one or more of the 477 plans, so we have 12,600

21   claimants with a match and a lien to be resolved pursuant to

22   this program.

23           We have asked that all the plans give us their

24   matching data by September 21, assuming that no other -- well,

25   at that point we can lock down 15 percent holdbacks on all the

1   claimants that are participating in the program, but we are

2   hoping to have a match.  We will then inform the claimants and

3   their counsel if there is not a match so that they're aware

4   that even though there was not a match to the plaintiff

5   participating in this program, they may have obligations to the

6   plan on their own that they will have to resolve outside of

7   this program.

8               With respect to the plans providing us the

9   actual claims data for us to audit, 7,600 of the files have

10  been shipped to our office relative to the 12,600 active

11  claimants that have been matched, so we have approximately

12  60 percent of the claims in-house.  Actually, I should say for

13  the 7,600 claims, because many of them have multiple plans

14  during the period of date of injury to date of settlement, we

15  are actually auditing about 11,000 files.

16              We have completed approximately 3,337 claim

17  summaries to date.  This is going on, as you would imagine,

18  daily.  We are in a position where we think, as the data comes

19  in, we are only running 48 to 72 hours for us to audit a lien

20  when it comes into our shop.  We have those claims in front of

21  the plans for their approval.

22              Due to the extension provided for claimants to

23  participate in the program, we will be working closely with

24  BrownGreer to figure out who has come into the program to see

25  if there is now a match to one of these 477 plans.  We will

1    work with them to apply this 15 percent holdback so money can

2    continue to flow, final payments can continue to flow while we

3    work through this matching and resolution process.

4              Your Honor, that concludes my report as the lien

5    resolution administrator for this month.  I apologize for the

6    length of it, but there's a lot of data to report here in the

7    final hours.

8              **THE COURT:**  I appreciate your work on this.  As

9    everybody knows, the statutory federal liens, they will come

10   out one way or the other, lawyers on either side or the

11   claimants.  They have to be paid back.  The opportunity that

12   this case presented is that if you grouped them, you were able

13   to negotiate for a lesser payment, so that's what has happened.

14   They were able to negotiate for a lesser payback of these

15   liens, so it was a win/win situation.  The lien holder got back

16   money, and the claimant paid less.  I think it was very helpful

17   to both sides, certainly to the claimants.  I appreciate your

18   help.

19             **MR. GARRETSON:**  Thank you, Your Honor.

20             **MR. HERMAN:**  Your Honor, Special Master Juneau is

21   here.

22             **THE SPECIAL MASTER:**  Your Honor, Patrick Juneau,

23   special master.  I will make my report very brief.  Part of

24   that was covered by Lynn Greer.

25             It is true, Your Honor, we are down to 27

1    appeals.  Those matters are being addressed as we speak.  I

2    anticipate this week or by early next week all of that will be

3    cleared out of here.

4              We have processed close to -- not quite but

5    nudging on 7,000 appeals in this matter between the three

6    special masters appointed in this case.  Obviously, the

7    overwhelming bulk has been handled because we are down to 27.

8    So we have fallen within the deadlines I think that the Court

9    has set forth as goals to make payments to people in a prompt

10   and efficient manner.  I think we have met with all of those

11   criteria.

12             There is one matter that I do want to call

13   attention to.  There was a series of audit claims that were

14   submitted.  All of those claims have been addressed in findings

15   and rulings made on those claims save and except one.  The

16   reason that's not done is because the expiration time for the

17   response to the audit notice is tomorrow.  I'm assuming I will

18   receive that tomorrow, and then we will determine what will be

19   necessary to address that.  We are down to one, so that's not

20   going to be an obstacle in what we are talking about.

21             Beyond that, Your Honor, we are working now with

22   BrownGreer in trying to project and target into the future,

23   since the concentration has been on heart attack claims, of

24   what we can anticipate in the future in terms of what will

25   occur or when will it occur and when will there be, as we refer

1    to it, "bubble periods," will be intense work efforts required.

2              They were able to do that very, very accurately

3    to allow us to be where we are today.  Based on that experience

4    factor, I anticipate that being the same result we will be able

5    to do in the future.  It looks like maybe sometime in November,

6    probably, is maybe what we are looking at as the first phase of

7    that bubble period.

8              Based on experience that I have seen thus far,

9    Your Honor, I think we will be on target to address the matters

10   that have been addressed thus far, and that is succinctly where

11   we are.

12             THE COURT:  I know the special masters did yeoman

13   work in this case.  I might also mention that it was very

14   helpful in this case that they had electronic access to the

15   records so that they didn't have to mail the records back and

16   forth.  Thank you very much.

17             Any state court trial settings?

18             MR. MARVIN:  No, Your Honor.  That's the fifth item

19   on the agenda.

20             THE COURT:  Class actions?

21             MR. MARVIN:  There's nothing new on the class

22   actions, Your Honor.  That then brings us to Ms. Barrios as the

23   chair of the state liaison committee.

24             THE COURT:  The state liaison committee.

25             MS. BARRIOS:  Good morning, Your Honor.  Dawn Barrios

1    for the state liaison committee.

2                    Unlike last time when we didn't have any new

3    remands to report, we do have three new ones that were recently

4    filed.  Two were filed in the governmental actions:  One by the

5    County of Chautauqua, the other by the County of Orange.  The

6    third remand that was recently filed was done, I believe, this

7    week from a case out of CDC, so we don't have too much

8    information on it.

9                    To succinctly let Your Honor know where we stand

10   on the remands, the majority of remands that we have

11   outstanding that are what I consider live remands are in the

12   governmental action and TPP arena.  We have 29 there.  There

13   are 26 postsettlement filing cases that have remands.  There

14   are 18 that are represented by counsel and 14 *pro se* remand

15   matters.

16                   There is a limbo area.  If Your Honor will look

17   at the second page, the fifth column that says "Plaintiff

18   Claimants Registered Only But Not Enrolled In The Resolution

19   Program," we have 42 represented by counsel and 16 *pro se*.

20   These people have filed motions for remand.  They have not gone

21   through the program.

22                   I have been working with BrownGreer, who has

23   been incredibly cooperative in providing this information to

24   us.  I can only assume that these people's claims will

25   ultimately be extinguished and, therefore, the remands will go

1 │ away.

2 │        **THE COURT:**  Okay.

3 │        **MS. BARRIOS:**  Thank you, Your Honor.

4 │        **THE COURT:**  Thank you very much.

5 │        Anything on *pro se* claimants?

6 │        **MR. HERMAN:**  Mr. Johnston is here.

7 │        **MR. JOHNSTON:**  Bob Johnston, court-appointed curator

8 │ for the *pro se* claimants.  As we have done every month since

9 │ the Court appointed me as curator, we have filed with the Court

10 │ the curator status report.  The only change a little bit is

11 │ that with the filing by Merck of the multiple motions to

12 │ dismiss, with regard to the curator, the transmittal

13 │ communication provided my name for the *pro se's* to call, which

14 │ as the Court certainly can understand has created an uptick.

15 │ We sometimes have had as many as 10 calls a day.

16 │        As we have done throughout the time that the

17 │ Court has asked me to be the curator, the communications that

18 │ we have had have been to assist them to understand the nature

19 │ of the motions in this instance that Merck has filed and

20 │ essentially try to assist them through the process.

21 │        You know, from the time that the Court appointed

22 │ me, we do believe that curator communications that have been

23 │ had by my firm, attorneys who work with me in terms of this,

24 │ with the *pro se* claimants have positively assisted them in

25 │ participation in the Settlement Program.  As the Court has

1    required, we do believe that has afforded due process to the

2    *pro se's*.

3            The only other thing is, as the Court I believe

4    knows, there has been some informal discussions regarding the

5    possibility of mediating some issues between *pro se's* with the

6    former attorneys pertaining to the issues of fees and costs.

7    We have had some activity in terms of that in the last two

8    months.  In addition to my litigation practice, I also have a

9    mediation practice and stand ready to assist in the event that

10   there is an agreement by both the *pro se* and the former

11   attorney to see if it can be resolved through mediation.

12           **THE COURT:**  Thank you very much.  It's been very

13   helpful.  The best I can do for the *pro se's* is to give them

14   someone to talk to and some direction.  You have helped

15   immensely in that way, and I appreciate your help.

16           **MR. JOHNSTON:**  It's been a wonderful experience.

17           **THE COURT:**  The next item is the MDL trial package.

18   Anything on that?

19           **MR. HERMAN:**  Yes.  Your Honor established PTO 37 with

20   regard to access to the trial package, and we have afforded

21   access to the trial package upon request.

22           The next issue is the third-party payor cases.

23   I believe that Mr. Beisner will address that.

24           **MR. BEISNER:**  Good morning, Your Honor.  John Beisner

25   on behalf of Merck.

1          Your Honor, I just wanted to advise the Court

2   that the parties have finalized a settlement agreement that

3   will resolve all of the pending lawsuits in which U.S. private

4   third-party payors have sought reimbursement for covering Vioxx

5   purchased by their plan members.  These are both cases that are

6   here in the MDL proceeding and also other cases that are around

7   the state courts, particularly in New Jersey, and there are

8   some other claims that have been included in this settlement as

9   well.  This to some extent is old news, Your Honor, inasmuch as

10  there was some press coverage of this earlier, when Merck

11  disclosed the reserve for this several weeks ago, but I did

12  want to advise the Court that this has been finalized at this

13  point.

14          I also wanted to note, Your Honor, that a number

15  of people have been involved in negotiating this, some of whom

16  are not here this morning, but I just wanted to advise the

17  Court.  Chris Seeger, Tom Sobol, Doug Marvin, and a number of

18  other people have been involved in this negotiation effort over

19  the past couple months.

20          We have provided a copy of the agreement to the

21  Court.  It's a private agreement.  It is not a class agreement.

22  It doesn't require the Court's approval, although there are

23  some provisions that, with the Court's indulgence, will

24  probably require Your Honor's involvement in certain issues as

25  we go forward in implementing the settlement.

1          **THE COURT:**  I've been advised throughout the process
2     and I saw it unfold, so I know the work of both sides that has
3     gone into this.  So now that is finished, so the only
4     outstanding group now is the AG's?
5          **MR. BEISNER:**  Your Honor, we also have some of the
6     consumer class actions that are still pending as well.
7          **THE COURT:**  Jim, you had something?
8          **MR. DUGAN:**  Thank you, Your Honor.  James Dugan on
9     behalf of the private third-party payor committee.  That's
10    correct, Your Honor.  That program is being implemented.  All
11    the attorneys who have been involved in that case have received
12    the Settlement Agreement and Escrow Agreement.  We hope to have
13    that resolved by the end of this month, Your Honor, and have a
14    full report by the next status conference.
15         **THE COURT:**  That's the third-party payors?
16         **MR. DUGAN:**  Yes, sir, that's correct.  That's the
17    private third-party payor cases, with some 200 companies that
18    are participating in it, with filed cases in New Jersey state
19    court and filed cases in the MDL.
20              You're correct, Your Honor, the other piece, the
21    governmental action cases, which include state AG cases and
22    cities and counties, is still going on.
23         **THE COURT:**  All right.  Thank you.
24         **MR. HERMAN:**  Your Honor, may it please.  I want to
25    supplement just one remark.  There have been other folks

1    involved in this process.  Recently, Your Honor, there was a
2    conference call with Mr. Sobol as lead.  He had a motion
3    pending, which he advised is now withdrawn.  I don't know
4    whether formally papers have been filed, but his pending motion
5    is withdrawn.
6              In connection with that, Your Honor, if I might
7    skip to page 10, Item XIV, third-party payors' motions,
8    Your Honor issued PTO 48 on September 15, 2009.  I want to
9    repeat that.  On September 15, 2009, Your Honor issued PTO 48,
10   which requires every attorney to notify their clients who are
11   eligible claimants of the private lien reimbursement program.
12             We are advised that a number of lawyers may not
13   have notified their clients of the program or have not followed
14   up with written or other notice to their claimants.  In
15   connection with the resolution, there appear to be a
16   substantial number of claimants who have not been included in
17   this private lien program, which essentially is to their
18   detriment.  I know that Your Honor wanted to address that
19   following the phone conference.
20             **THE COURT:**  I spoke with Mr. Sobol on this.  My
21   concern is that both from the standpoint of law and ethics,
22   there are some issues that are involved.  The Court is
23   concerned about both of those situations.
24             I really don't care whether the claimant chooses
25   to partake of the program or to enter the program.  That's

1   their choice and that's up to them, but I do think that they

2   ought to be advised of the opportunity.  They ought to be

3   advised of the program.

4              If they want to go into it, fine.  If they don't

5   want to, fine.  To not tell them about it is problematic.  It's

6   a problem for the attorney who has that responsibility both

7   from the standpoints of ethics and law.  These individuals have

8   the opportunity to enter a program and pay back substantially

9   less than they will have to pay back later on.

10             Now, they may skate, they may get away from it,

11  they may not have to pay back anything, but that's a decision

12  that they ought to make.  They have an opportunity to enter a

13  program where they can pay back less than they are required to

14  pay back.  Whether or not they want to enter the program, as I

15  say, is up to them, but to not tell them about it is a real

16  problem.

17             I know I'm speaking to the choir now because

18  these attorneys who are in the room and hopefully on the phone

19  have done that.  If you haven't, you have to tell them about

20  it.  If you haven't told them about it, that's going to be a

21  problem, and I'm going to have to get involved in it.  I expect

22  Mr. Sobol to give me some motions to that effect, and I'll look

23  into it.

24             **MR. HERMAN:**  Your Honor, back now to the agenda,

25  Item XI at page 7.

1    **THE COURT:**  Government actions.

2    **MR. HERMAN:**  Government actions.  I want to advise on

3    the record that the PSC is going to make available to the AG's,

4    on a request and at their cost, hard drives of all raw

5    documents and materials in the depository so that they don't

6    have to go into the depository and they don't have to get to

7    the depository in some remote electronic way.

8    Secondly, there were two Oklahoma government

9    actions added when we initiated the status report for today,

10   and we are advised today that there is now a third Oklahoma

11   government action.  That brings us to Item XII.

12   **THE COURT:**  With the government actions, I know we

13   have some motions that both Merck and the AG's have filed.  I

14   will take those motions up after this meeting, and perhaps we

15   can do it in the conference room.

16   **MR. DUGAN:**  That's correct, Your Honor.  Those

17   motions are case specific to the Louisiana Attorney General

18   case.

19   The government action cases, along with the

20   assistance of Ms. Barrios and James Young in Florida and Randy

21   Fox in New York and all of the attorneys, we have been working

22   on the discovery process.  That process is going well,

23   Your Honor.

24   **MR. HERMAN:**  Item XIII, pending personal injury cases

25   reference *Lone Pine* orders at page 9 of the report,

1   Ms. Oldfather is present.  Under PTO 45, Ms. Oldfather was

2   appointed as lead for those matters.  On 8-20-09, the Court

3   issued PTO 46 with a case management order, and Ms. Oldfather

4   may wish to address this issue.

5           **THE COURT:**  I had two motions.  One was to assure

6   that she received notices.  I agree with that.  The way that it

7   should be done, though, is LexisNexis ought to be forwarding

8   those to you immediately.

9               Dorothy is here.  Why don't you meet with Ann

10  later on and work out a protocol so that she gets all of the

11  material immediately.  It's quicker that way than if the Court

12  sends it.  It's just easier for LexisNexis to do it.

13          **MS. OLDFATHER:**  Thank you, Your Honor.  Good morning.

14  Ann Oldfather for the plaintiffs' steering committee for the

15  ineligible and nonenrolled claims.  Thank you, Mr. Herman.

16              I have been appointed to be responsible as

17  liaison counsel and also as lead counsel for claims that are

18  under the management of PTO 28 and PTO 29.  It looks,

19  Your Honor, like that count -- and I think Jared was getting

20  some information for me on the cases that have been filed since

21  November 9, and those are under PTO 29.  Did we get that

22  number?  I'll talk with Jared about that afterwards.

23              In addition to those, Your Honor, we have had

24  cases that are ineligible because they ultimately could not

25  qualify under the resolution program, as we heard Lynn report

1  this morning, and some of those that are ineligible elect to
2  file an appeal with the special master.  The other route the
3  cases can take is to file a future evidence stipulation and
4  then come back into the litigation.
5          It appears as if -- and we have had a hard time
6  getting exact data -- somewhere in the neighborhood of 200 or
7  so future evidence stipulations have been filed.  I'm working
8  with Mr. Marvin and with Lynn Greer to try to get that number.
9  It's a little tough because some have been withdrawn.  Then
10 after those are filed, there is a 30-day period within which
11 certain compliances are supposed to take place under PTO 43.
12         So it looks like there may be anywhere between
13 another 15 to 100 cases that would come back into the
14 litigation through that route so that, Your Honor, I think
15 ultimately that my liaison responsibilities and our plaintiffs'
16 steering committee on these cases will probably be responsible
17 for somewhere in the neighborhood of 300 cases.  That is a wild
18 guess, but it looks to be where it is going.
19         Then, Your Honor, I do have a motion filed to
20 address the future evidence stipulations, and I don't know when
21 the Court would like to take those up.  I could either mention
22 it now or wait until the next --
23         MR. MARVIN:  Your Honor, the motion, I believe, was
24 filed yesterday or the day before, and we would like to have
25 the opportunity to respond.  I would also like to have the

1    opportunity to talk to Ms. Oldfather about it and see if we can

2    resolve it.

3              **THE COURT:**  Okay.  Why don't you do that, then get to

4    me.  We can either do it next time or if you need to do it

5    sooner, we can do it sooner.

6              **MS. OLDFATHER:**  All right.  Your Honor, just for the

7    benefit of those persons that are listening, this does deal

8    with the issue of allowing a cure in the event a future

9    evidence stipulation was rejected by BrownGreer as not having

10   met one of the technical requirements of that route.

11             **THE COURT:**  Okay.

12             **MS. OLDFATHER:**  Thank you, Your Honor.

13             **THE COURT:**  Thank you.

14             **MR. HERMAN:**  Your Honor, we have discussed the

15   third-party payor motions, Item XIV at page 10, and the issue

16   of an attorney's responsibility to notify eligible claimants in

17   accord with Your Honor's remarks today.

18             Item XV is the fee allocation committee.  I'm

19   pleased to report that the subcommittee to review costs, after

20   four months of examination and frequent discussion with the CPA

21   on that committee, as well as the PSC executive committee

22   members Arnold Levin and Ed Blizzard, out of 112 applications

23   for costs, all but 6 are resolved.

24             Your Honor, we have submitted for your

25   consideration a 1 percent holdback for costs, indicating what

1    each firm has agreed to after audit and review.  I do want to
2    indicate to the Court that Mr. Clements -- I haven't seen Miles
3    Clements today but, of course, he is very interested in this
4    issue.  In addition to the attorneys' costs to be reimbursed,
5    also Mr. Clements' client is to be reimbursed out of the
6    1 percent.  Even though his client doesn't appear with the
7    attorneys, we will send Mr. Clements a copy of the proposed
8    order.  He has the actual amount that his clients are entitled
9    to plus interest.
10           We want to thank the cooperation of all 112
11   attorneys who submitted common benefit costs.  They have
12   appeared in person.  There have been numerous conversations;
13   there have been a lot back and forth.  We are satisfied that we
14   applied consistent treatment to every one of those submissions
15   on an individual basis.
16           With regard to Item XVI, a motion for
17   reconsideration/revision of the order capping contingent fees,
18   this relates to the 32 percent fee maximum order.  Notices of
19   appeal have been filed, and Your Honor has requested a
20   submission for a 32 percent escrow of funds.  That has been
21   submitted to Your Honor.
22           With respect to other motions, Ms. Oldfather
23   submitted two motions.  Of course, the PSC has no objection
24   whatsoever to her utilizing LexisNexis for purposes of
25   notification, etc.  The other motion Mr. Marvin has addressed.

1          With respect to appeals, there have been four

2     motions to dismiss Your Honor has granted by Merck on different

3     issues since exceptions.

4          With respect to Item XX, a motion for attorney

5     fees and to enforce an attorney's lien, Your Honor has that

6     matter set out in PTO 47.  It's been addressed.  Unless

7     Your Honor has other questions or comments, the next issue

8     would be the date for the next status conference.

9          **THE COURT:**  The next status conference is October 23.

10          **MR. HERMAN:**  Excuse me.  I do want to correct the

11     record.  I'm in error.  32, on cost reimbursement, is

12     DecisionQuest, the sum of money that is to DecisionQuest, and

13     we'll notify Mr. Clements of that.

14          **THE COURT:**  One moment on the date.  We have a

15     problem.

16          I'm told that we have some work going on in the

17     courtroom, so we may be in a different courtroom.  I'll have to

18     put it on the Web site on October 23.  When I say "courtroom,"

19     I mean this building, just a different room.  I'll post it, in

20     any event, so everybody knows.

21          **MS. OLDFATHER:**  Your Honor, just given my role as

22     liaison counsel, I wanted to make sure I would have leave of

23     court to miss that.  I'm going to be in trial in Kentucky on

24     that date.

25          **THE COURT:**  Sure.  That's fine.

1          **MS. OLDFATHER:**  Thank you, Judge.

2          **THE COURT:**  Anything else from anybody we haven't

3     covered?  Okay.  Folks, I'll come back and we'll take up the

4     motions in a moment.  The Court will stand in recess.

5          **THE DEPUTY CLERK:**  Everyone rise.

6          (WHEREUPON the Court took a brief recess.)

7                              * * *

8                          **CERTIFICATE**

9          I, Toni Doyle Tusa, CCR, FCRR, Official Court

10    Reporter for the United States District Court, Eastern District

11    of Louisiana, do hereby certify that the foregoing is a true

12    and correct transcript, to the best of my ability and

13    understanding, from the record of the proceedings in the

14    above-entitled and numbered matter.

15

16

17                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
18                              Official Court Reporter

19

20

21

22

23

24

25