```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   ***********************************************************

 3
     IN RE:  VIOXX PRODUCTS              MDL No. 1657
 4   LIABILITY LITIGATION               Section: "L"
                                        New Orleans, Louisiana
 5                                      Thursday, January 22, 2009

 6
     ***********************************************************
 7

 8          TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                    UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12   FOR THE PLAINTIFFS
     LIAISON COMMITTEE:              HERMAN, HERMAN, KATZ & COTLAR
13                                   BY:  LEONARD A. DAVIS, ESQ.
                                     820 O'Keefe Avenue
14                                   New Orleans, LA 70113

15
                                     SEEGER WEISS LLP
16                                   BY:  CHRISTOPHER A. SEEGER, ESQ.
                                     One William Street
17                                   New York, NY 10004

18
                                     LEVIN, FISHBEIN, DEDRAN & BERMAN
19                                   BY:  ARNOLD LEVIN, ESQ.
                                     510 Walnut Street, Suite 500
20                                   Philadelphia, PA 19106-3697

21
                                     BEASLEY, ALLEN, CROW, METHVIN,
22                                   PORTIS & MILES
                                     BY: ANDY D. BIRCHFIELD, JR., ESQ.
23                                   218 Commerce Street
                                     Montgomery, AB 36104
24

25
```

```
 1                              BARRIOS, KINGSDORF & CASTEIX
                               BY:  DAWN M. BARRIOS, ESQ.
 2                              701 Poydras Street, Suite 3650
                               One Shell Square
 3                              New Orleans, LA 70139

 4
                               LIEFF CABRASER HEIMANN & BERNSTEIN
 5                              BY:  ELIZABETH J. CABRASER, ESQ.
                               Embarcadero Center West
 6                              275 Battery Street, Suite 3000
                               San Francisco, CA 94111-3339

 7

 8   (BY TELEPHONE:)           BROWN CHIARI
                               BY:  THERESA M. WALSH, ESQ.
 9                             5775 Broadway
                               Lancaster, New York 14086-2360

10

11

12   FOR THE DEFENDANTS
     LIAISON COMMITTEE:        STONE, PIGMAN, WALTHER, WITTMANN
13                             BY:  DOROTHY H. WIMBERLY, ESQ.
                               546 Carondelet Street
14                             New Orleans, LA 70130

15
                               O'MELVENY & MYERS
16                             BY:  JOHN H. BEISNER, ESQ.
                                    BRIAN ANDERSON, ESQ.
17                             1625 Eye Street, N.W.
                               Washington, D.C. 20006

18

19                             WILLIAMS & CONNOLLY
                               BY:  DOUGLAS R. MARVIN, ESQ.
20                             725 12th Street, N.W.
                               Washington, D.C. 20005

21

22                             DECHERT
                               BY:  BENJAMIN R. BARNETT, ESQ.
23                                  EBEN S. FLASTER, ESQ.
                               Cira Centre
24                             2929 Arch Street
                               Philadelphia, PA 19104-2808

25
```

```
CLAIMS ADMINISTRATOR:          BROWN GREER
                               BY:  ORRAN L. BROWN, ESQ.
                                    LYNN C. GREER, ESQ.
                               115 South 15th Street, Suite 400
                               Richmond, VA 23219-4209


LIEN ADMINISTRATOR:            THE GARRETSON FIRM
                               BY:  JASON A. WOLF, ESQ.
                               7775 Cooper Road
                               Cincinnati, OH 45242


CURATOR FOR PRO SE
PLAINTIFFS:                    JOHNSON, HOEFER, HOLWADEL & ELDRIDGE
                               BY:  ROBERT M. JOHNSTON, ESQ.
                                    CLAUDIA P. SANTOYO, ESQ.
                               601 Poydras Street, Suite 2490
                               New Orleans, LA 70130




Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
                               500 Poydras Street, Room HB-406
                               New Orleans, Louisiana 70130
                               (504) 589-7776



     Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

<u>P R O C E E D I N G S</u>

(THURSDAY, JANUARY 22, 2009)

(STATUS CONFERENCE)


1          THE COURT:  Be seated, please.  Good morning, ladies and

2   gentlemen.  Counsel make your appearance for the record.

3          MR. BIRCHFIELD:  Good morning, your Honor.  Andy

4   Birchfield on behalf of the Plaintiffs Steering Committee.  In Mr.

5   Herman's absence, Chris Seeger and I will be covering or dividing

6   the issues from the plaintiffs' side.

7          MR. MARVIN:  And Douglas Marvin for Merck, your Honor.

8          THE COURT:  We are here today for our monthly status

9   conference.  We have a number of items.  I met with the liaison

10   committee to discuss the agenda, added some things to them, and will

11   take it in the form and fashion given to me.

12           Settlement agreement first.  Any reports on that?

13          MR.  BIRCHFIELD:  Your Honor, under the settlement

14   agreement, the administration of the settlement is moving

15   efficiently.  Once the settlement was announced in November of 2007

16   we indicated that we anticipated heart attack interim payments would

17   begin in August and they did.  And the interim payments on the heart

18   attack cases continue on a monthly basis.

19               Under the settlement agreement, the interim payments

20   for ischemic stroke cases are scheduled to begin in February, and

21   we're pleased to report that those are on track and the interim

1                  <u>P R O C E E D I N G S</u>

2                  (THURSDAY, JANUARY 22, 2009)

3                  (STATUS CONFERENCE)

4

5          THE COURT:  Be seated, please.  Good morning, ladies and

6   gentlemen.  Counsel make your appearance for the record.

7          MR. BIRCHFIELD:  Good morning, your Honor.  Andy

8   Birchfield on behalf of the Plaintiffs Steering Committee.  In Mr.

9   Herman's absence, Chris Seeger and I will be covering or dividing

10   the issues from the plaintiffs' side.

11          MR. MARVIN:  And Douglas Marvin for Merck, your Honor.

12          THE COURT:  We are here today for our monthly status

13   conference.  We have a number of items.  I met with the liaison

14   committee to discuss the agenda, added some things to them, and will

15   take it in the form and fashion given to me.

16           Settlement agreement first.  Any reports on that?

17          MR.  BIRCHFIELD:  Your Honor, under the settlement

18   agreement, the administration of the settlement is moving

19   efficiently.  Once the settlement was announced in November of 2007

20   we indicated that we anticipated heart attack interim payments would

21   begin in August and they did.  And the interim payments on the heart

22   attack cases continue on a monthly basis.

23               Under the settlement agreement, the interim payments

24   for ischemic stroke cases are scheduled to begin in February, and

25   we're pleased to report that those are on track and the interim

1    payments for strokes will begin next month.

2             In the joint report, your Honor, on page five, there is

3    one correction that needs to be noted.  On August the 27th the court

4    entered an order capping contingent free arrangements at 32 percent.

5    A group of attorneys that identifies themselves as the Vioxx

6    Litigation Consortium filed a motion for reconsideration, and in the

7    joint report on page five we indicate that the court denied that

8    motion for reconsideration; and that is incorrect and we wanted to

9    make sure that everyone was aware of that mistake.  In fact, the

10   court also entered an order that appointed the Tulane Civil

11   Litigation Clinic to represent the clients of the Vioxx Litigation

12   Consortium as it pertains to this issue.

13            The Vioxx Litigation Consortium filed a motion to

14   reconsider that appointment and that was the issue that the court

15   denied, and the Vioxx Litigation Consortium filed a writ of mandamus

16   to the Fifth Circuit seeking a stay of that order and the Fifth

17   Circuit entered that stay.

18         THE COURT:  Right.  I granted the motion for

19   reconsideration.  And my thinking on the reconsideration was that I

20   anticipated convening a hearing and hearing from the parties either

21   by way of affidavits or evidence or argument.  I hadn't really met

22   with them to see what they intend to do.  But my first step was to

23   grant the motion for reconsideration.  They indicated they had

24   something to say, and throughout this litigation I've looked to you

25   in good faith, all of you, and when you tell me that you have

1   something to say that means I have something to listen to.  So they

2   felt that they needed to say something to me, and, therefore I

3   needed to listen.

4            For a hearing it seemed to me that it's best to have

5   two people or two sides represented at the hearing, and I didn't see

6   it being feasible to have the Liaison Committee or the Plaintiffs'

7   Committee participate in it because they are in some fiduciary

8   relationships, and also the attorneys for the consortium have some

9   representation on that committee.  Also, I did not feel it was

10  appropriate to pull in a lawyer who conceivably could have an

11  interest in getting clients or having some agenda, so I felt it was

12  best to get some group to speak at least on the issue for the other

13  side.

14           I was not in a position to take the other side of the

15  issue, so to speak, to generate some discussion, and if I tweak the

16  order or I change it or I modify it, to have some credibility for

17  that position, I felt it was important to have the sides represented

18  who might have some interest in the matter; and so I appointed the

19  Tulane committee, but the Fifth Circuit has stayed that appointment.

20  There have been some briefs filed, and I am waiting to hear from

21  them at that point.

22           MR.  BIRCHFIELD:  Thank you, your Honor.  And Orran Brown

23  and Lynn Greer are here this morning, and Lynn Greer is prepared to

24  give a report on the claims administration process.

25           THE COURT:  Okay.

1          MR. BROWN:  Good morning, your Honor, I am Orran Brown,

2     and with me today is Lynn Greer.  We're from BrownGreer and we are

3     the claims administrator for the Vioxx settlement program.

4          As Mr. Birchfield mentioned, the main focus of the report

5     today is on claims review and claims payment, that is our main focus

6     in the program now.  And Lynn will cover that full territory in just

7     a moment.

8          We will not today present the usual presentation on

9     enrollment registration.  The numbers have not changed appreciably

10     in that area since we were here last time.  We continue to just work

11     on the mop-up in the enrollment area, we are still around 50,000

12     claimants who are enrolled in the program.  We still are working

13     with pro ses and with counsel to try to clean up any of the

14     remaining enrollment deficiencies, most of which now have gotten to

15     the point where they involve state issues, in cleaning up issues

16     about the release.  But we will not spending time today showing the

17     numbers on that because they have not changed and we are really

18     geared now towards the claims review.

19          Also, worth mentioning today is that we've been working

20     ourselves and working with the parties on developing the contours of

21     the extraordinary injury payments program.  Those are two separate

22     funds set up under the settlement agreement for extraordinary

23     injuries, either past economic losses of lost wages or medical

24     expenses of $250,000 or more; or a special injury, an extraordinary

25     injury not covered by the existing injury grids.  We've been

1    developing the criteria and the process for that program, too,

2    alongside the other claims review programs we're doing.  We hope by

3    the next conference to be able to announce further details on that

4    and then to have that program rolled out in the very near future.

5              So unless the court has any questions about --

6              THE COURT:  One thing that I mentioned in the prior

7    conference that I am getting calls from individuals who say that

8    their attorneys have told them they have certain points but they

9    want to make sure that their attorney's comments are accurate.  This

10   type case is not like the case where one attorney has one client and

11   there's a long-term relationship or a lot of confidence based on the

12   relationship.  Some attorneys have a large number of cases and the

13   clients don't know them as well as they do when it's a one-on-one

14   relationship.

15             So it's not necessarily unusual that this happens, but in

16   a case of this sort where you're dealing with thousands or 50,000

17   individuals, they want to test their lawyer.  I am not saying they

18   don't trust their lawyer, they just want to make sure they got it

19   right.  And so they're calling the court and it's difficult to say,

20   well, call your lawyer because they've talked to their lawyer, they

21   don't want to talk to their lawyer anymore, they want to talk to

22   somebody else to make sure what their lawyer told them was accurate.

23             So we've got to figure out a mechanism by which they can

24   be satisfied, because if they're not, the lawyer's going to have

25   grief and it's going to be problematic.  So I would like you to get

1   involved in it in some way that I can direct them to you or find

2   some way you can deal with it.

3        MR. BROWN:  We have spoken with the parties about that

4   issue and a couple of things that I think will help deal with that

5   situation.  One is we arm the counsel with documentation that shows

6   the points award notice and the reasons for it.  Those are documents

7   that counsel can print, send to their clients.  We will dress them

8   up to look a little more official so that they are clearly from the

9   claims administrator and clearly the independent judgment that has

10  derived the claims evaluation.

11        We also have been very careful when claimants contact

12  us directly who are represented by counsel, we've been very careful

13  not to try to intrude upon their relationship with their counsel,

14  but we can provide and do provide information, not advice but just

15  information about their claim and we can confirm the analysis that

16  their counsel has told them.

17        So we invite the court to forward those questions to us,

18  and we will place something on the more general website to which all

19  of the claimants have access that describes that process more fully

20  and describes that what the counsel have is coming directly from us

21  but also directing them if they want confirmation of that they can

22  contact us directly.

23        THE COURT:  If they call me and I send them to you, what

24  will you do?  Will you send them a copy of the letter that you've

25  given to the attorney or will you check with the attorney or how --

1    what procedure do you anticipate?

2            MR. BROWN:  I think there, your Honor, we would check

3    first with their counsel and make sure that we have the full picture

4    and that counsel may have already taken care of it, has already

5    talked to the person and we need do nothing.  Because we want to

6    have that opportunity first to make sure the counsel are aware of

7    the inquiry and maybe they've already taken care of it or would like

8    to.  We'll make sure that gets done.

9             If it's something that is purely informational and the

10   counsel have not taken care of it or don't object to us confirming

11   it, we will then reach out to that claimant probably by a phone call

12   or an e-mail if we have that e-mail because sometimes we get those

13   inquires from those claimants from e-mail.

14           THE COURT:  I think we have to watch bottlenecks because

15   if we have too many people on the phone answering questions, you're

16   not going to be able to have anybody fixing the points and keep the

17   matter moving.

18           MR. BROWN:  That's right.

19           THE COURT:  But we've gotten 20 or 30 calls, so probably

20   not a lot, but we have to keep an eye on that.  If there is some

21   way, if it becomes problematic, then we have to come up with a plan.

22           MR. BROWN:  And that's why, your Honor, we have not

23   invited that because of the level of activity it might encourage.

24   And the primary counsel have done a very good job of keeping their

25   people informed and we don't want to tread on that in any way.  So

1    we will respond to inquiries as they come up.  We will make sure

2    that everybody is comfortable with the information they've gotten,

3    but we've been very careful not to try to encourage the sort of

4    mushroom effect of those numbers of calls.

5            THE COURT:  Okay.

6            MR. BROWN:  Thank you, your Honor.  And now Lynn will

7    cover where we are in the claims process.

8            THE COURT:  Okay.

9            MS. GREER:  Good morning, your Honor, Lynn Greer from

10   BrownGreer.  In response to questions from your Honor last month, we

11   have changed the format and the content of the claims portion of the

12   presentation in large part because we have now passed some critical

13   deadlines and a lot of the information I used to present on how many

14   configurations of claims packages have come in are now behind us.

15           So what I would like to do today is very quickly tell the

16   court where we are in terms of claims packages that we have received

17   that can join the claims queue.  We have also broken apart the

18   presentation to address the heart attack claims separately from the

19   stroke claims because they are on different processing tracks.  And

20   finally, we have, in response to your questions last month, come up

21   with projections of what we need to do each month to be able to

22   issue an interim payment in the third quarter of this year.

23           This first slide shows that as of last night there are

24   approximately 48,000 claimants who have submitted enough information

25   for us to be able to begin their claims review.  I want to pause

1    here for a moment to stress that this does not mean that these are

2    complete claims packages, does not mean that they have everything we

3    ultimately need to be able to review the claim even at the Gates

4    analysis; because what we did to get this number and to allow people

5    into the queue was to require only a claims form, which was a very

6    simple document, to complete, and either one proof of Vioxx use or

7    an event record or medical record.

8            So it is very likely and, in fact, as we go through the

9    process we see that a lot of people are in row one who actually

10   don't have enough to even pass the Gates.  And, for example, in

11   looking at the claims that are currently pending in the queue, which

12   means that we haven't even looked at them yet, there's 16 percent

13   that have either proof of Vioxx use or an event record but not both,

14   and that is clearly not enough to even be found eligible.  So this

15   48,000 number is good because it allows us to begin review of the

16   claim but it does not mean that the claims packages are complete.

17           At the end of December, we were able to finalize the

18   non-submitting program claimant status for 1,238 claims, and these

19   were persons who had received notices that we did not have enough

20   for them to be able to join the claims queue.  They were given three

21   notices, opportunities to submit their packages, they were sent the

22   final notice of non-submitting program claimant on December 5th, and

23   they did not appeal or object to that, And so as of today, the 1,238

24   claimants who are no longer in the program.  And these releases and

25   stipulations of dismissal will be sent to Merck.

1     Row three shows that there are another 665 who are what

2  we call potential non-submitting program claimants.  These were

3  people who asked for a timely extension request, which the

4  settlement agreement allowed us to give.  We gave them until

5  December 30th to submit their packages, and after that date we still

6  had not received enough information for them.  And so what is

7  happening with the 665 is the settlement agreement gives them 15

8  business days to appeal our decision.  That time period runs on

9  February the 2nd.  So there may be folks within the 665 who will

10 appeal and ultimately not be found non-submitting, but that's the

11 number of potential non-submitting people who are out there now.

12     And just in summary, 961 firms have submitted materials

13 and 364 pro ses.

14     We have looked at the claims forms submissions that

15 have been filed where the claimants and their counsel can indicate

16 what injury it is that they are alleging.  And this slide shows that

17 based on a total of 48,037 claimants who have submitted a claims

18 form, roughly 62 percent, or almost 30,000, are claiming heart

19 attack; 37 percent, or 17,574, are claiming stroke; and there's one

20 percent who have submitted a claims form but they have not indicated

21 what injury it is they are claiming so we don't know.  For a total

22 of 48,037.

23     This is a overview, your Honor, shows where the claims

24 are, the heart attack claims are in and through the Gates review

25 process, and this is a different slide from what we have shown

1    before.   This only address the heart attack claims.

2         The first row shows that there are 9,337 claims that have

3    not been touched yet by us.  Over 4,000 of these were claims

4    packages that we received after November 1st, and all of these are

5    claims packages that we received after the original July 1st claims

6    package deadline.

7         Row two shows 3,189 claimants where we have looked at

8    the claim once and we have made our initial Gates determination, but

9    in previous conferences I've explained that this is the juncture at

10   which we do another review to make sure that our initial Gates

11   review is absolutely correct.  And so 3,189 are claimants who we've

12   looked at the claim once and we need to look at it again to make

13   sure our determination is correct.

14        There have been 8,902 claimants who have come through

15   Gates have been found eligible for points, and I'll talk in a minute

16   about where those 8,902 claimants are in the points process.

17        There are 3,364 who have come through the Gates process

18   and have failed and have received a notice of Gates failure from us.

19   And what happens when that notice is issued is the claimant is then

20   aware that they have failed Gates review, they are told that at that

21   point the claim is going to go to the Gates review.  They have 14

22   days to give us additional documentation.  If there's some missing

23   piece of evidence that they believe will make their claim eligible,

24   they can submit it within that 14 days and we will re-review that

25   claim.

1        It's important here, your Honor, there are a lot of

2    times after we send out the claims administrator notice of

3    ineligibility where we tell the claimants you have 14 days, and at

4    that point we start getting requests for extension of that 14-day

5    window.  And it's understandable, it's the first time counsel has

6    learned that there's something possibly fatally wrong with their

7    claim.  But we are very vigilant about monitoring that 14-day window

8    because if we don't then we will run into problems being able to

9    process claims for points of issuing and issue the final payment.

10        Row 4B show, and this is just a snapshot of where we were

11    last night, there are over 4,000 claims that are currently with the

12    Gates Committee where we have not received a final vote from the

13    Gates Committee.  And, your Honor, the Gates Committee has been

14    working very hard to vote on the claims that we send to them.  They

15    have come up with a plan and a goal of processing 4,000 claims a

16    month to be able to keep us in line with being able to issue the

17    final MI payment in the third quarter.

18        MR. SEEGER:  Very nice of you not to throw us under the

19    bus on that one, thank you.

20        MS. GREER:  This slide summarizes the 8,902 claims that

21    were on the previous slide.  I apologize that that last row is a

22    little bit cut off.

23        What this shows us is that the 8,902 claims break down as

24    follows:  Row one are claims that have already been paid, so through

25    December we've paid 4,582 claimants.  Row two shows that as of today

1   we have advanced to the point of points 2,575 claims.  And it is

2   from this population where we can make payments in January.

3          And, your Honor, the deadline for accepting a notice of

4   points award to be paid in January is actually tonight at midnight.

5   And so what we have as of last night is row 2A, the 1,418 claimants

6   are those that will definitely be paid.  They have accepted and

7   they've accepted the notice of points.  Row B shows that there are

8   another 769 people who theoretically could come in by midnight

9   tonight and accept their notice of points award and be paid next

10  week.  And so that totals 2,187 claimants who are potentially

11  eligible for payment this month.

12          There are 388 who have appealed or who are special

13  marker claims, which are points less than ten for MI claims who have

14  elected to go into special review.  And those are claimants that

15  will not be paid this month because they are in that appeal status.

16          Row three shows that there are 494 claims where we have

17  done what we need to do from a review standpoint, but there is some

18  administrative reason for why the notice of points award cannot

19  issue.  These reasons include perhaps that we have not gotten final

20  clearance from the lien resolution administrator on the claim

21  because we have to have that information before we can issue a

22  notice of points award.  But the majority of these are or close to

23  the majority are a combination of issues ranging from there are

24  still enrollment deficiencies that have to be cleared.  For example,

25  a lot of the claims in this category are death claims and so we have

1    the representative capacity issue on the enrollment documents that

2    are holding up our ability to issue points.

3            Row four shows that there are 77 claims as of last night

4    that we had reviewed initially for points that we need to do our QC

5    on.

6            Row five shows 602 claims and these are claims that we

7    have started points review on and we found a problem in the content

8    of the records.  Our goal in any process that we handle is that the

9    settlement agreement does layout very specific requirements about

10   the types of records that have to be submitted.  For example, in

11   this settlement, a claimant must submit a year's worth of follow-up

12   records.

13           If we are able when we look at the claim to glean

14   everything we need to glean and there are only six months of

15   follow-up records, we are not going to hold up that claim and insist

16   on a year's worth.  But 602 claims we have started review on and

17   there's something missing that we need to look at again to be able

18   to see if we can go forward with the review of the claim.  This is

19   about a seven percent deficiency rate on the claims side, in

20   complete claims package side, and what that means is it just takes

21   us longer and a lot of times we have to go back to the firm and

22   request more records.

23           Row six shows that as of last night there were 187

24   claims where we were doing the points review, and that last number

25   is 385 that are currently pending in the points review queue.

1        Your Honor, this slide is a projection slide that we

2  have developed to address your Honor's questions from last month,

3  and what this does is it takes the total MI claims that we started

4  with on the first slide of 29,903, and what we have done is we have

5  estimated and what we have done is we estimated a Gates pass rate of

6  70 percent.  What we are finding is that when we review a claim

7  because we don't have a lot of discretion, we have to apply the

8  criteria of the settlement agreement, the claims administrator pass

9  rated Gates is much lower than 70 percent.  But that doesn't mean

10 much because the Gates Committee has a lot of discretion to put

11 claims into the program.  And, in fact, they have been putting a lot

12 of claims into the program.

13        THE COURT:  Do you have a feel for how much or what's a

14 percentage that gets through you?

15        MS. GREER:  It's a little less than 40 percent.  We feel

16 that at the end of the day as we look at these claims packages and

17 we're looking at the quality of packages that are coming and we're

18 reviewing, we believe it's a fair estimate that 70 percent of the

19 claims will ultimately pass through the Gates.  So when you multiply

20 the 70 percent by the 29,903 what that means is that there will

21 probably at the end of the day be a total of 20,932 claims that will

22 be eligible for points.

23        If you then subtract the 4,582 that we've already paid and

24 you subtract the 2,187 that theoretically could be paid and we've

25 done all you can do on those, you end up with 14,163 that we must

1    review and move towards points award between now and the end of

2    August.  That comes down to roughly 2,023 claims that we need to

3    review and advance to points award per month.

4            But that's not the whole picture because we know that

5    there are going to be claims where we issue notice of points where

6    the claimants will appeal.  The appeal rate is running about ten

7    percent.  And for the special marker claims, there's a group of

8    about .7 percent of the total group who will actually ask to be

9    delayed to special review.  So we need to add another 216 claims

10   because we need to issue that many to be able to glean the 2,023.

11   So what we need to be doing every month is advancing 2,239 claims to

12   notice of points award on average.

13           There will be months where we will exceed that, there

14   may be months where we don't hit that; but the important thing is

15   that we believe, and certainly this past month we've progressed

16   2,575, so we believe that this is a number that we will be able to

17   meet and certainly average over the next seven months.

18           Your Honor, this slide shows us that in the points

19   awards that we have reviewed and issued to date, the average points

20   per level are as follows:  And I'll go through this for the benefit

21   of those listening on the phone who can't see the slides.  Injury

22   Level 1, the average points now are running at 226.30; Level 2,

23   207.21; Level 3, 147.55; Level 4, 102.09; Level 5, 86.28; Level 6,

24   57.58, and the rate of special markers, which again are the claims

25   that have less than 10 points, is 4.70 percent.

```
 1              I would like to spend some time now on the stroke
 2   progress, and these again are on a separate track.  These payments
 3   will not begin until February, and what this shows us is that of the
 4   17,000, roughly 17,000 stroke claims there are 5,776 that we have
 5   not reviewed yet, they are in the initial Gates queue.  There are
 6   8,015 that we have done our initial review that we need to go and do
 7   our QC review.  2,623 have passed through the Gates and have been
 8   eligible for points.  202 we have issued notice of ineligibility to,
 9   and the Gates Committee has 748 that they have not issued a final
10   vote on yet.
11              We have to by February 1st, your Honor, review 2,500
12   stroke claims to be able to come up with a dollar value per stroke
13   point.  And we are, as of last night, we have reviewed 2,290, so we
14   have 210 left to go between now and the February 1st.  We are on
15   track to meet that and we hope by the next status conference we will
16   be able to announce the point value for stroke claim.
17              This final slide is a summary of the payments and the
18   dollars that have been issued.  We have to date, as I've reported,
19   paid 4,582 claims for a total of $393,241,611.  There are pending
20   payments of 1,418 claims, these are the ones who definitely accepted
21   and the dollars that will be paid to those claims is over 137
22   million.  There are another 769 claimants for 61 million who could
23   accept by midnight tonight.  And so the total potential January
24   payments, again, is 2,187 for almost 200 million.
25              Does your Honor have any questions?
```

```
 1                 THE COURT:  No.  Anyone else?  Okay.  Thank you.

 2                 MS. GREER:  Thank you.

 3                 THE COURT:  The next item is registration enrollment of

 4   claims in the settlement program.  Have we covered that?

 5                 MR.  BIRCHFIELD:  Yes, your Honor.

 6                 THE COURT:  Lien administrator.

 7                 MR.  BIRCHFIELD:  Yes, sir.  Under the settlement

 8   agreement calls for the appointment of a lien resolution

 9   administrator, and the Garretson firm serves in that role.  And

10   today we have Jason Wolfe who is here to report on that progress,

11   the negotiations for the and the resolution of the governmental

12   healthcare liens.

13                 THE COURT:  Okay.

14                 MR. WOLF:  Your Honor, I'm Jason Wolf, Director of

15   Operations with the Garretson firm.  I am here to report as the lien

16   resolution administrator for the Vioxx settlement program.  In the

17   capacity of lien resolution administrator, our focus remains to

18   insure the compliance with federal, state and military healthcare

19   programs, that includes over 60 agencies in all.  We're also to make

20   certain that the compliance program is integrated seamlessly into

21   the claims administration process, work closely with BrownGreer and

22   insure that the compliance work does not interrupt interim payments.

23                 I am pleased to announce to the court and the parties that

24   we do have an agreement in place with the Centers for Medicare &

25   Medicaid Services to address all ischemic stroke claims that are
```

1    scheduled to be paid, start being paid in February.

2           We are now concentrating our efforts in administrating the

3    ischemic stroke program in concert with the miocardial infarction

4    program as claimants progress and are scheduled to be paid.

5           As for Medicare, as reported in our last hearing, we

6    continue to drive entitlement exchanges with the federal government

7    to identify claimants that have an obligation to Medicare to ensure

8    that we're in a position through our global resolution program to

9    satisfy those obligations.

10           Your Honor, considerable efforts are focused on

11    addressing two areas that our past experience shows commonly will

12    result in delays if not addressed quickly and appropriately.  Those

13    are addressing key variable changes with the claimant population;

14    for instance, there's close to 2,600 claimants that key data points

15    that tie to our work change; for instance, social security number

16    changes throughout the process, 2,600 claimants, their social

17    security numbers changed, therefore, we work closely to identify

18    that change and then put them back in the system to ensure that

19    their appropriate Social Security number funnels through the

20    program.

21           In addition to that, another form of discrepancy that

22    we work to cure as quickly as possible with the related party is

23    claimants that do not have a social security number or do not have

24    an appropriate date of birth to ensure that we're employing a

25    compliance program for the appropriate person.

1          The Medicare compliance program, the global resolution

2     program is working efficiently and productively.  Evidence of that

3     is in the re-determination process that's been provided in detail in

4     the past.  There's only 67 claimants to date that have elected to

5     seek a re-determination of their global reimbursement application or

6     category, and that program and the re-determination activity is

7     very, very low and working well with the claimants.

8               As for Medicaid, the work with the agencies continues

9     to be a cooperative nature.  I think we've reported on Texas at the

10    last status hearing, and that proved to end with their agreeing to

11    the program.

12              The procedures and protocols developed well in advance of

13    the myocardial infarction payments have proven to be very effective

14    for all of the agencies as the claims activity for well over 18,000

15    Medicaid entitled beneficiaries has proven quite a bit of work and

16    demands upon the agencies and their limited staff and resources.

17              With respect to other governmental liens, as you recall

18    not only Medicare and Medicaid, but this program was also introduced

19    to insure compliance of military programs and Indian healthcare

20    programs, that was through self-reporting through claimant and/or

21    counsel.  There's over 800 that have self-reported which we've taken

22    that self-report and then worked directly with the agency, the

23    respective agency to insure their interests are satisfied.  All of

24    those programs that this is truly their first participation in a

25    program of this sort has proven to be, continued to have great

1    cooperation with them.

2              So in sum, your Honor, I will conclude that we're

3    pleased to report that the Medicare and Medicaid compliance program

4    is moving efficiently and mechanics are continuing to be in place to

5    process claims as they become available.

6              THE COURT:  Okay.  Thank you.  Let's talk about the

7    private liens.  I met with representatives from Avmed and the

8    Plaintiffs Committee.  What's the result of that?

9              MR. SEEGER:  Your Honor, would you mind if I bring

10   Mr. Sobol up with me as well so we can report to your Honor?

11             THE COURT:  Yes.

12             MR. SEEGER:  Judge, we are happy to report that we've

13   reached an agreement really on a first of its kind, an agreement

14   between plaintiffs' attorneys and the insurers to make an offer in

15   effect to the universe of Vioxx claimants to participate in a

16   privately lien resolution program.  And if you have a minute, I'll

17   take you through some of the basic terms, your Honor.

18             THE COURT:  Sure.

19             MR. SEEGER:  Mr. Sobol and his group we believe represent

20   about, you know, most of the insurers that have covered Vioxx --

21   people who took Vioxx as well as who sustained injuries.  We think

22   the number, he represents somewhere around 70 percent of the covered

23   lives out there.  We put together a program, although it would

24   require 90 percent participation voluntarily by plaintiffs' lawyers

25   and their clients for everyone to participate in a streamlined

1    resolution process that would do a few things:  First, it would save

2    a huge traction cost between the clients, the lawyers, and the

3    carries.  I think we've agreed on a file review amount with the

4    Garretson law firm about $300 and about only 150 of that has to be

5    to the claimant as a cost.

6              In addition to that, the agreement would provide for

7    pretty steep discounts in the liens.  We would have a determination,

8    a lien determination process, that's going to be coordinated by the

9    Garretson law firm, very much participated in by Mr. Sobol and his

10   clients, as well as the negotiating committee and the PSC to come up

11   with procedures for how to determine what these liens really are

12   because that is a process we have to go through.  Once we determine

13   what the liens are, anybody participating would get a 50 percent

14   discount of their lien.

15             Now, in addition to that there would be an ultimate cap

16   on what could be recovered out of any claims recovery.  For example,

17   once that 50 percent, that lien has been reduced 50 percent,

18   claimants who have 100,000 or less will not pay more than 15 percent

19   of the recovery no matter what the lien is and will receive a full

20   discharge of Vioxx liens.  That number then goes down to 12 and a

21   half percent for claims that are valued between 100 and 250,000.

22   And then it's capped at ten percent for people receiving 250,000 or

23   more.

24             Now, the other thing about this is the carriers have

25   agreed that the payments for this will come out of the back-end

1  payments, so it's not going to hold up the settlement, it's not

2  going to hold up interim payments and will be taken out of the back

3  end.

4          In addition to that, your Honor, we've created an audit

5  and appeal procedure where there will be random auditing of the

6  files to make sure that it's being implemented and administered

7  correctly.  And then the attorneys on behalf of their clients will

8  have an opportunity to appeal to your Honor if they believe that the

9  lien amounts are incorrect or there's been a problem.

10          The offer, by the way, and I haven't had a chance to

11  really coordinate with Mr. Johnston on this, but it will be extended

12  also to pro se claimants.  I guess we need to coordinate how that

13  notice will be provided, maybe through your office, Mr. Johnston.

14          In exchange for participating, as I said, they will get

15  a fuel release from the carriers.

16          Now, right now this does not, the agreement does not

17  encompass 100 percent of the private healthcare world, we think it

18  encompasses two thirds or more.  But it is available to any private

19  health care carrier, whether it's a small union fund or a big

20  insurance company, to come in now and participate and to actually

21  have their liens administered through this.

22          And hopefully everyone will avail themselves of it and it

23  will be a nice and efficient way of using the size of this MDL to

24  pass on great value to the claimants but also to save the carriers

25  substantial transaction costs, and we think it does that.

```
 1          That's really -- I think I hit all of the salient points.
 2   I do have to say, your Honor, when Mr. Sobol became involved, this
 3   process has taken many months, it really wasn't until his
 4   involvement -- and I don't want to compliment him too much -- that
 5   we really started to make tremendous movement here, so I would like
 6   to give him credit for that.
 7          THE COURT:  I give credit to both of you.  A matter of
 8   this sort really is worked out because of the attorneys involved and
 9   because of the work and diligence of the attorneys.
10          The governmental liens, as we all know, are statutory
11   liens, and therefore, the transactional cost is nil because they
12   have to be paid out and they're paid out through the attorneys or
13   through the litigants or in some way, but they're paid out because
14   they're statutory.
15          The private liens are not.  But the private liens are
16   liens.  They're legitimate liens, they're debts owed by the person
17   who received the services, and they have to be paid.  They can be
18   paid the easy way or the hard way.
19          In a matter of this sort where the claims are grouped
20   together, it seems to me that it is a benefit to each side to
21   utilize the economy of scale that an MDL affords and get benefits
22   for each side.  On the side of the insurance companies, they
23   minimize or exclude their transactional costs, so they get some
24   benefit.  They've got a focal point from which they can collect all
25   of their liens at one time or at a focal point.
```

1           But the litigants, the plaintiffs, the claimants ought

2    to also receive some benefit, and so through the efforts of counsel,

3    each side has benefited from it, the plaintiffs or the claimants

4    will get a tremendous discount on their liens, which they have to

5    pay.  And if they're not in this program they have to pay

6    100 percent of the liens.  They're going to be sued and the lien is

7    going to be collected, the amount is going to be collected.  So you

8    have caps and you have tremendous discount.  So the claimants

9    benefit from it.

10          So I think that this is a good program and I hope that

11    future MDLs piggyback on this approach because I do think it's a

12    benefit to both sides.

13          And I have one other group that is looking at this, the

14    New York group, I've had some motions with them and their numbers

15    are not as big as Avmed, but hopefully they can come in on this; and

16    I really urge them to take a close look at this program and see

17    whether or not they can resolve their issues rather than have the

18    court speak on them.

19          MR. SEEGER:  Let me just say one other thing.  Judge, so

20    people sitting in the crowd here know and people reading the

21    transcript, we expect within the next couple of days to have a

22    notice completed that will go out to all of the attorneys and to the

23    pro se claimants explaining the terms of the deal.

24          For people sitting here right now, we are very much aware

25    and we tried to build in things, this is just by way of example,

1    certain states don't have a right of equitable subordination, we've

2    carved those states out.  So we've tried to anticipate all of the

3    issues, we tried not to let perfect get in the way of really, really

4    good.  We think it's really, really good.

5          THE COURT:  I'd ask that you as a representative of the

6    Plaintiffs Committee to contact the Greater New York Benefit Fund

7    and open negotiations with them.  If I can meet with you all, as

8    I've done with the Avmed, let me know and I'll do so.

9          MR. SEEGER:  Thank you, your Honor.

10          MR. SOBOL:  I would just add, your Honor, as to other

11    insurers other than the Avmed group, we are already reaching out to

12    them to get the fullest participation we possibly can of all private

13    insurers, and also the process anticipates that there will be some

14    information that guides us to some of the smaller insurers so then

15    we can also know who to target in terms of the smaller insurers, the

16    smaller health and welfare funds that might be out there.

17          The other thing I would add, your Honor, in terms of

18    the benefits I think it's important, this also reaches for all

19    parties certainty within a reasonable period of time measured in

20    several months hopefully, or in that ball park, as Mr. Seeger

21    indicated not holding up any dollars because the dollars would be

22    paid on the back end.  That certainty is also very important for

23    everybody, they'll get closure, particularly for some of the large

24    inventories that some of the attorneys have.

25          THE COURT:  I would appreciate it if you can also make a

```
 1    call to the New York group, and sometimes insurance companies have
 2    this language that they speak to each other and no one else knows
 3    what they're saying, kind of like Harry Potter's group, so maybe you
 4    can encourage them to take a closer look at the program, too.
 5              MR. SOBOL:  Of course, your Honor.
 6              MR. SEEGER:  And, your Honor, thank you for kicking our
 7    butts on this and suggesting that we needed to get this done.  It
 8    was helpful.
 9              THE COURT:  The truth of the matter is that the attorneys
10    and not the courts really moved this matter, and I appreciate all of
11    the work that you've done.
12              MR. SEEGER:  Thank you.
13              MR. SOBOL:  Thank you.
14              THE COURT:  Special Master.  Anything?
15              MR. JUNEAU:  Good morning, your Honor.  Patrick Juneau,
16    your Honor, the Special Master in this case.  Your Honor, there have
17    been actually 20 appeals that have been assigned to the Special
18    Master and Deputy Special Masters in this case.  There have been 14
19    rulings already issued on those 20.  The balance are relatively
20    close to being decided in different phases, but it has to do with
21    documentation and so forth.  So the progress is being made in that
22    regard, and I would anticipate similar results in the future.  And
23    that's pretty much where we are, your Honor.
24              THE COURT:  I appreciate the work of the Special Masters.
25    And, Pat, I think it would be helpful if you, Doug, and Andy met and
```

```
 1   you got each other up to speed on any issues that you need to talk

 2   about so that they can anticipate.

 3            MR. JUNEAU:  We preliminary discussed that a little bit

 4   this morning.  Thanks, your Honor.

 5            THE COURT:  Okay.  Good.  Any state court trial settings,

 6   Andy?

 7            MR. BIRCHFIELD:  No, your Honor.  The next item is the

 8   class action.

 9            THE COURT:  The class actions.

10            MR. BIRCHFIELD:  I think Mr. Levin will handle that.

11            THE COURT:  Arnold, you're on that?

12            MR. LEVIN:  Your Honor, you will be presented a

13   stipulation to dismiss the master class action complaint, personal

14   injury and medical monitoring.  You will also be -- will receive an

15   order, Rule to Show Cause order.  Since the complaints were

16   administrative complaints, the underlying complaints and the

17   underlying litigation should also be dismissed, but the PSC did not

18   have the authority to dismiss them.  So we'll set that up by rule.

19            THE COURT:  Right.  File the rule, I'll hear from the

20   parties on it if we need any oral argument.  I'll post a notice and

21   then I'll deal with it.

22            Discovery directed to third parties, anything on that?

23            MR. BIRCHFIELD:  The only issue relating to third-party

24   discovery pertains to ESI.  The PSC had issued a subpoena to ESI for

25   the production of some medical records, some records have been
```

1    produced and BrownGreer has posted those records.  The PSC received

2    a letter late last night, I know the court --

3              THE COURT:  I received a copy of the letter.

4              MR. BIRCHFIELD:  -- pertaining to the cause, the PSC will

5    be discussing that and responding promptly, your Honor.

6              THE COURT:  Okay.

7              MR. BIRCHFIELD:  And then the next item is the

8    State/Federal coordination.

9              THE COURT:  Anything from Dawn?

10             MS. BARRIOS:  Good morning, your Honor.  Dawn Barrios for

11   the State Liaison Committee.  I've handed your law clerk this month

12   only one CD of remands, and I am very excited that we're down to

13   one.

14             THE COURT:  Good.

15             MS. BARRIOS:  Attached to that, your Honor -- oh, I'm

16   sorry.  On the CD we're now starting to put the MDL numbers so that

17   when we're whittling it down to the remand cases, you will have that

18   at your fingertips.

19             THE COURT:  Right.

20             MS. BARRIOS:  Attached to the CD, your Honor, is a

21   statistical spreadsheet.  We have 685 remand cases or cases with

22   pending remands still pending.  In that group there's a total

23   claimants of 2,045.  Of that 2,045, only 104 have not registered or

24   enrolled in the program, and of that 104, about 34 or 35 fall into

25   the third-party payor or governmental action group.  So we're

1   looking at really only about 65 remaining claimants that have cases

2   with pending remands.  And we're working very closely with

3   BrownGreer and Merck and the pro se office in whittling that down

4   for your Honor.

5            THE COURT:  Okay.

6            MS. BARRIOS:  A remand issue came to my attention, your

7   Honor, from an attorney in Alabama.  His case name is Wanda Hill v.

8   Merck, and I am going to speak with Merck about it more in detail

9   after the status conference, but I believe the issue merits the

10  court's at least notice at this time.

11            Wanda Hill has gone through the program and has been

12  awarded points.  It is a death case.  Under state law the state

13  district court must divide the proceeds.  At the present time

14  because the case was removed, there's no underlying state court

15  action.  The counsel contacted me to seek a remand.  He has not

16  filed one yet, he asked me what the procedure would be, and what

17  we're looking at is a possible procedure that your Honor would put

18  into place to allow the cases that have gone through the program but

19  need some action by a state district judge to remand those cases.

20  That is more paperwork on our parts, but it will save the claimant

21  another filing fee, in this particular case about $300.

22            So I wanted to bring that issue to your attention, and

23  I'll be talking to Mr. Marvin about it after the conference.

24            THE COURT:  The issue really, if it were just one case I

25  think you could carve that out and deal with it.  The problem that

```
 1   you have in MDL is just numbers, just shear numbers because

 2   everything I do potentially affects everybody else.  And we're

 3   dealing with 50,000 claims, and I don't know how many are death

 4   claims or not.  So we have to watch dealing with it in a way that is

 5   going to cause a large movement into remand territory or into state

 6   court.

 7            I hadn't really thought it through, but when you're

 8   speaking, I'm thinking perhaps under Rule 17 I can do something with

 9   appointing a next of friend, guardian ad litem to receive the funds

10   and then maybe some ancillary procedure can be opened in the state

11   for the purpose of distributing those funds in accordance with the

12   appropriate state law.  I don't know whether that would work, but I

13   would like to think about that.

14            There's some opportunities that I have to appoint some

15   guardian ad litem to at least get the funds and then deal with them

16   in some way.

17            MS. BARRIOS:  Yes, your Honor.

18            THE COURT:  If I can do it in a way that keeps the cases

19   here, that would be my preference.  If we have to tweak it in some

20   way, I'll try to do that.  But I don't want to have a mass exodus,

21   that's my only concern.

22            MS. BARRIOS:  Yes, your Honor, I'll brainstorm with

23   Mr. Marvin and we'll get back to you to learn of your desires.

24            THE COURT:  Okay.

25            MS. BARRIOS:  The other thing that I would like to report
```

```
 1    is just that 11 o'clock we've scheduled a telephone status
 2    conference with the governmental action plaintiffs, and I understand
 3    that several will participate and several are in court today.
 4            THE COURT:  Okay.
 5            MS. BARRIOS:  But just for statistics purpose, we have 13
 6    now governmental action plaintiffs, the case for the Michigan
 7    Attorney General was remanded by the Michigan district court.  We
 8    have approximately 50 consumer cases, purchase claims in the MDL,
 9    and of the public third-party payor, there's approximately 11 cases.
10            THE COURT:  And with those particularly, I guess to some
11    extent it would be limited to the cases that were initially filed
12    here; if not, then the parties can stipulate and get the court's
13    jurisdiction here.
14             But I think we're close to the point where I am going to
15    look to you and your group to see whether there are any particular
16    case or cases that express the interest and the issues of the common
17    group, and then I would like to meet with you all and Merck and talk
18    with you about putting it up for trial, which would involve your
19    focussing on the amount of discovery that's still necessary or is
20    necessary to get a case of this sort ready.  It's a lot different
21    than the PI's that we've been dealing with, and whether or not there
22    are any motions, any motion practice that's necessary, the
23    substantive motion or procedural motions, and how long it will take
24    to try it, and I'll issue a scheduling order after conferring with
25    you all and then we'll pick a trial date and try it.
```

1          MS. BARRIOS:  Yes, your Honor.

2          THE COURT:  Okay.  Pro se claimants.

3          MR. DUGAN:  Your Honor, on that particular subject we have

4     one other item on the agenda, a request from myself to -- would you

5     like me to address that or at this particular time?

6          THE COURT:  No, that's fine, we're already talking about

7     that.  That's the issue that I would like you to focus on.

8          MR. DUGAN:  Yes, thank you, your Honor, and that's what

9     I'm suggesting to the court is that at this point you have two types

10    of cases:  The governmental action cases and the private cases.  I

11    have requested, and it's in the agenda, I sent a letter to Russ

12    Herman requesting that the Blue Cross/Blue Shield of Louisiana case

13    would be interested in serving as a bellwether trial.  It was the

14    first third-party payor case filed, it has original jurisdiction

15    here.

16          Your Honor, in April of 2006 I had requested your Honor to

17    set a trial at that particular time.  I had requested it on behalf

18    of Blue Cross and the Louisiana Attorney General case.  We have

19    conducted discovery already in that case.  As far as the PSC's

20    personal injury trial package is a tremendous work effort.  Your

21    Honor is absolutely right in that a TPP trial package is going to

22    need to be tweaked for that particular type of case.  Myself and

23    Mr. Sobol have probably the most experience in trying these types of

24    cases.

25          And another reason that I thought the Blue Cross case

```
 1    makes more sense to try first is that all of the governmental action

 2    cases also have motions to remand pending, so we won't have that

 3    particular issue with the Blue Cross case.

 4              THE COURT:  Let's do this, Jim.  Let me set a status

 5    conference with you and Merck and anyone else that you need, and

 6    we'll talk about those issues.  I am interested at the status

 7    conference hearing from you all as to how much discovery you need,

 8    the nature, type of discovery for both sides.  And whether or not

 9    there are any significant motions that you can you can anticipate,

10    meaning substantive motions and then procedural motions, and give me

11    some feel for how long it will take to try the case, and then I'll

12    set some trial dates consistent with your calendars and we'll do it.

13              MR. DUGAN:  That'll be very easily done, your Honor.

14    Thank you.

15              MR. BEISNER:  Your Honor, I just wanted to note on that,

16    and obviously this will be dealt with at the status conference.

17              THE COURT:  Make your appearance.

18              MR. BEISNER:  I'm sorry, John Beisner for Merck, I

19    apologize.

20               Your Honor, the one note I did want to make on that is

21    just defining the universe for that status conference.

22              THE COURT:  Sure.

23              MR. BEISNER:  As I understand it, the third-party payor

24    claims here are part of the purchaser class action that's pending

25    here.  I think Ms. Cabraser and a group of the plaintiffs involved
```

1    in those cases have been talking about what to do with those, and so

2    I think that all needs to be analyzed as part of that.

3              THE COURT:  Okay.  Together.

4              MR. BEISNER:  The bigger universe, because as a technical

5    matter the Blue Cross claim I guess is part of the class action

6    pending and they filed separately.

7              THE COURT:  Get in on this, Elizabeth.  And we can have a

8    status conference and I would like you to be present, too, so you

9    can give us some input.

10             MS. CABRASER:  Thank you, your Honor.  Elizabeth Cabraser

11   for plaintiffs, and wearing -- wearing no hat, but wearing my

12   Purchase Claims Committee hat.

13             Counsel is correct.  This is an intersecting set of

14   interests, and has coalesced around the AG's and governmental entity

15   claims, and the private third-party payor claims.  And we are now at

16   a point where the lien resolution program clears out some underbrush

17   and enables us all to focus on these claims.

18             And as your Honor has indicated and as we have discussed

19   in other sessions, what we need to do is get together with those

20   governmental entities and private third-party payors who are

21   interested in proceeding to set their cases for trial to make sure

22   the necessary discovery is done effectively and efficiently to see

23   if we can respond to your Honor's stated requests for some

24   informative representative trial, if there are going to be judicial

25   resources expended on a trial, to see whether that should be

1    structured as a jury trial and/or a bench trial, and to make sure

2    that everyone is interested in going forward in this forum can

3    participate in that process, without creating duplication or

4    distraction.

5         So we will continue our discussions on the plaintiffs

6    side, be happy to attend and participate in any status conferences

7    so that we all know that we are on the same page and we're

8    responding to what your Honor wants us to do.

9         THE COURT:  Let's get a status conference in about ten

10   days.

11        MR. BEISNER:  Your Honor, if I may make a suggestion, I

12   don't want to leap ahead, but I am wondering if perhaps doing it in

13   conjunction with the next status conference.

14        THE COURT:  Well, I am moving the status conference up a

15   little bit --

16        MR. BEISNER:  That's why I was suggesting that.

17        THE COURT:  -- so that might work pretty well, yeah.  I'll

18   have a status conference then -- when is the next meeting?  Tuesday,

19   February 10th, status conference after that meeting.

20        And before then, Elizabeth, you and Jim and whoever else

21   is interested in it.  Get together and talk about it.  My thinking

22   is, I don't think we need to just try one case.  You know, in the

23   heart attack cases we tried six.  So I am not suggesting we try six,

24   but at least focus on several cases to see whether or not it makes

25   sense to try several of those cases and then learn from those cases

1    to see whether or not we need to try all of the other ones.

2           But I'll look to you all to at least discuss that with me.

3    I am not going to set any deadlines or discovery at this time, I am

4    looking for you to give me some input on that procedure.  My

5    thinking, as I said, one thing you have to focus on is that some of

6    these cases, either the parties may not be entitled to it or

7    interested in a jury trial, so that's something that needs to be

8    focused on.  There's some jury trials, some non-jury trials, and

9    there's some got to be common issues of evidence or discovery or

10   something that you can profit from, the whole group can profit from

11   having two or three cases teed up for discovery and then trial.

12          MS. CABRASER:  Thank you, your Honor.  Our next plaintiff

13   side status or conference call is set for Monday morning.  I'll make

14   sure that the necessary people can be on that call so that we'll be

15   fully prepared to address all of these issues on the 10th.

16          THE COURT:  All right.

17          MR. BEISNER:  Your Honor, I just wanted to note on behalf

18   of Merck that we're quite happy, and we would hope that we would

19   have some opportunity to have some discussion on both sides of this

20   as well before the status conference.

21          I say that in part because we also need to take account of

22   the fact that Judge Higbee in New Jersey is setting some cases,

23   getting ready to set some cases for trial on the third-party payor

24   area; and I think in the same way that courts work together so well

25   in planning the bellwether cases among the jurisdictions, that's an

```
1    important consideration to have here as well.

2              THE COURT:  Sure.  Okay.  And I'll touch base with her and

3    see what her calendar is.

4              MR. SEEGER:  Your Honor, it's a little out of order.  I

5    was going to give you an update also on the AG side.  I think the

6    parties have come to an agreement on a confidentiality order that we

7    need to submit to your Honor to take a look at.

8              THE COURT:  Okay.

9              MR. SEEGER:  Also, I guess the last point from the PSC's

10   perspective that we expect to be filing a motion with the court to

11   establish some type of an assessment or a hold back with regard to

12   both the private third parties and the AG's as well, but we will be

13   making that motion shortly.

14             THE COURT:  Okay.  And then the foreign individual claims,

15   I am working on that and I should be getting that out to you

16   shortly.

17             MR. BIRCHFIELD:  Yes, your Honor.  We also had the pro se

18   claimants.

19             THE COURT:  Right.

20             MR. BIRCHFIELD:  The court appointed curator Bob Johnston

21   is here.

22             MR. JOHNSTON:  Your Honor, Bob Johnston, curator for the

23   pro se claimants.  We are providing the court with this month's

24   status report, so let me just be very brief.

25              We continue to get lots of calls and it has not tapered
```

```
 1   off.  In fact, I think it may be even increasing in some times.  We
 2   do our very best to assist these individuals through accessing the
 3   claims administrator's curator's portal.  We maintain communication
 4   and have a terrific relationship with the claims administrator.  The
 5   high quality there is deeply appreciated.
 6            I think the only other unique situation as regarding
 7   the Merck motion to dismiss, which includes a number of pro se
 8   claimants, that has generated interests, shall we say, from those
 9   that we are representing in the curator status; and we are working
10   with counsel for Merck to insure that all communications and
11   documents received by the curator's office are forwarded to counsel
12   for Merck as well as the claims administrator.  And we've had some
13   claimants who expressed a desire not to proceed with the pending
14   suit, we obviously passed that information on.
15            So I think it continues to go well.  We have a lot of
16   activity and I feel that we provide valuable assistance to these
17   individuals.
18            THE COURT:  I do, too.  I think you provided valuable
19   assistance to the people, the pro se people, and I think that that's
20   an important part of this process, to make sure that they're
21   represented.
22            MR. JOHNSTON:  They have a lot of questions and they don't
23   have a lawyer to represent them, and we try in as clear a
24   communication and common sense as we can to help them.  So, thank
25   you, Judge.
```

```
 1              THE COURT:  We've received some calls, too.

 2              MR. JOHNSTON:  You too, huh?

 3              THE COURT:  We received one from a person living at the

 4    government's expense, wanted to advise us that he was being

 5    waterboarded and wanted to know whether Vioxx participated in some

 6    way in making that --

 7              MR. JOHNSTON:  A lot of suspicion there.

 8              THE COURT:  -- so we passed it on to the appropriate

 9    people.

10              MR. JOHNSTON:  Well, we also deal with those who are

11    living through government assistance, shall we say, and they seem to

12    have a high interest in this.  I'm sure it provides them with some

13    mental activity and what have you that they otherwise would not

14    have.  Thank you, Judge.

15              THE COURT:  Okay.  Thank you.

16              MR. MARVIN:  Your Honor, I think we're up to item 18 on

17    page 15.

18              THE COURT:  Yes.

19              MR. MARVIN:  Merck has a number of motions to present to

20    your Honor.  Will your Honor want to hear those after the status

21    conference?

22              THE COURT:  We'll finish this and then I'll come back out

23    and hear those.

24               Decision Quest.

25              MR. BIRCHFIELD:  Yes, your Honor.  The PSC has had
```

1    numerous discussions with counsel for Decision Quest, and currently

2    the trial counsel that retained Decision Quest for particular

3    bellwether trials are working out a resolution with Decision Quest

4    and will report back to the PSC on that.

5            THE COURT:  Okay.  And there's a Fee Allocation Committee.

6            MR.  BIRCHFIELD:  Yes, your Honor.  The Fee Allocation

7    Committee has met and as was reported last month we held

8    presentations, we've received presentations, all of those were

9    transcribed by a court reporter, and the last round of presentations

10   are scheduled for tomorrow.  Mr. Levin.

11           MR. LEVIN:  Your Honor, the PSC and the Allocation

12   Committee, sans one member, filed a motion, a global motion for the

13   eight percent and reimbursement of costs.  We did not file a motion

14   with regard to allocation.  The motion was filed two days ago, it

15   was an affidavit of Russ Herman and an affidavit of Phil Garrett,

16   the accountant, and there is also CD's of the work papers of Phil

17   Garrett that have been filed under seal so that Mr. Beisner doesn't

18   see them.

19            But they are available and it's my understanding your

20   Honor will be establishing a procedure where people can come, other

21   attorneys can comment with regard to the motion.

22           THE COURT:  Yes.  Two issues:  One is, I was trying to see

23   how big the pie is before I decide how big the slices of the pie

24   ought to be, and that is the reason for the issue that we have to

25   deal with with the motion for reconsideration of the 32 percent.

1          But my thinking on the request that you filed is that I

2     will be posting that, I'll be advising everybody who has any

3     interest in it that that is the request and invite, if they have

4     any, objections; and whatever objections there are, then I'll meet

5     with all parties and we'll set a hearing, a briefing schedule,

6     whatever you need so that we can deal with any objections.

7          But since whatever the percentage is comes out of the

8     attorney's fee, it's not fair for people to deal with it unless they

9     know what the percentage is, the whole percentage is so that they

10    can make some decision on it.  So that's what I am trying to think

11    through and deal with.  Okay.

12         MR. BIRCHFIELD:  Your Honor, Item 22, the motion for

13    reconsideration, we discussed that earlier.

14         I think that brings us to the final item on the agenda,

15    Merck's motion and rule under Pretrial Order 29.

16         THE COURT:  Okay.  And we'll deal with that in a moment.

17    The next meeting will be Tuesday, February 10th at two o'clock.

18    I'll meet with the committees, with the liaison committee at 1:30 as

19    we usually do.

20         MR. BIRCHFIELD:  Thank you, your Honor.

21         THE COURT:  Anything from anyone else?  Anything from

22    anybody?  Okay.  Thank you very much.  The court will stand in

23    recess and I'll be back in about ten minutes.

24         THE DEPUTY CLERK:  Everyone rise.

25       (WHEREUPON, A RECESS WAS TAKEN.)

REPORTER'S CERTIFICATE

     I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

_____

Karen A. Ibos, CCR, RPR, CRR

Official Court Reporter