1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2    ********************************************************************

3
     IN RE:  VIOXX PRODUCTS              MDL No. 1657
4    LIABILITY LITIGATION                Section: "L"
                                         New Orleans, Louisiana
5                                        Tuesday, February 10, 2009

6
     ********************************************************************
7

8          TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
9                   UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12   FOR THE PLAINTIFFS
     LIAISON COMMITTEE:                  HERMAN, HERMAN, KATZ & COTLAR
13                                        BY:  LEONARD A. DAVIS, ESQ.
                                         820 O'Keefe Avenue
14                                        New Orleans, LA 70113

15
                                         SEEGER WEISS LLP
16                                        BY:  CHRISTOPHER A. SEEGER, ESQ.
                                         One William Street
17                                        New York, NY 10004

18
                                         LEVIN, FISHBEIN, DEDRAN & BERMAN
19                                        BY:  ARNOLD LEVIN, ESQ.
                                         510 Walnut Street, Suite 500
20                                        Philadelphia, PA 19106-3697

21
                                         BEASLEY, ALLEN, CROW, METHVIN,
22                                        PORTIS & MILES
                                         BY:  ANDY D. BIRCHFIELD, JR., ESQ.
23                                        218 Commerce Street
                                         Montgomery, AB 36104

24

25

```
 1                                    BARRIOS, KINGSDORF & CASTEIX
                                      BY:  DAWN M. BARRIOS, ESQ.
 2                                    701 Poydras Street, Suite 3650
                                      One Shell Square
 3                                    New Orleans, LA 70139

 4

 5                                    LIEFF CABRASER HEIMANN & BERNSTEIN
                                      BY:  ELIZABETH J. CABRASER, ESQ.
 6                                    Embarcadero Center West
                                      275 Battery Street, Suite 3000
 7                                    San Francisco, CA 94111-3339

 8

 9

10   FOR THE DEFENDANTS
     LIAISON COMMITTEE:              STONE, PIGMAN, WALTHER, WITTMANN
11                                    BY:  DOROTHY H. WIMBERLY, ESQ.
                                      546 Carondelet Street
12                                    New Orleans, LA 70130

13                                    O'MELVENY & MYERS
14                                    BY:  JOHN H. BEISNER, ESQ.
                                          BRIAN ANDERSON, ESQ.
15                                    1625 Eye Street, N.W.
                                      Washington, D.C. 20006
16

17
     CLAIMS ADMINISTRATOR:           BROWN GREER
18                                    BY:  ORRAN L. BROWN, ESQ.
                                          LYNN C. GREER, ESQ.
19                                    115 South 15th Street, Suite 400
                                      Richmond, VA 23219-4209
20

21
     LIEN ADMINISTRATOR:             THE GARRETSON FIRM
22                                    BY:  MATTHEW GARRETSON, ESQ.
                                      7775 Cooper Road
23                                    Cincinnati, OH 45242

24

25
```

```
 1   CURATOR FOR PRO SE
     PLAINTIFFS:                      LAW OFFICE OF ROBERT M. JOHNSTON
 2                                    BY:  ROBERT M. JOHNSTON, ESQ.
                                      601 Poydras Street, Suite 2490
 3                                    New Orleans, LA 70130

 4

 5
     SPECIAL MASTER:                  PATRICK A. JUNEAU, ESQ.
 6                                    1018 Harding St., Suite 202
                                      Lafayette, LA 70503
 7

 8

 9

10
     Official Court Reporter:        Karen A. Ibos, CCR, RPR, CRR
11                                    500 Poydras Street, Room HB-406
                                      New Orleans, Louisiana 70130
12                                    (504) 589-7776

13

14
         Proceedings recorded by mechanical stenography, transcript
15   produced by computer.

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(TUESDAY, FEBRUARY 10, 2009)

(STATUS CONFERENCE)


1    THE COURT:  We're here today for our monthly status

2 conference.  I have a number of people in the courtroom and also on

3 the phone.  I'll hear from the parties.  Make your appearances,

4 please.

5    MR. BIRCHFIELD:  Good afternoon, your Honor.  Andy

6 Birchfield.  In Russ Herman's absence, Chris Seeger and I will be

7 covering the agenda items for the Plaintiff's Steering Committee.

8    THE COURT:  Okay.

9    MR. BEISNER:  Your Honor, John Beisner for defendant

10 Merck, and in several folks absence I'll be stepping in in that

11 role.

12    THE COURT:  I met with liaison counsel in advance of the

13 meeting and discussed with them the monthly status agenda.  The

14 first item on the agenda is the Settlement Agreement.  Any reports

15 on that?

16    MR. BIRCHFIELD:  Yes, your Honor, just a couple of items

17 to point out.

18     First, since the inception of the litigation, the court

19 has maintained a court web site and on that web site there is an

20 important notice about the private lien resolution program, and

21 Mr. Seeger is going to be talking about that in more detail today,

1     but I wanted to alert everyone about that notice that is posted on

2     the court's web site.

3              And also want to urge all primary counsel to be diligent

4     about checking their portal, the BrownGreer portal.  Notices are

5     being posted daily and it's important that you check those notices,

6     notices of points awards that require prompt attention to review

7     those claims and notices of any deficiencies or any errors that

8     need to be cleared up.  So it's important that those are checked

9     daily and given prompt attention so we can keep the settlement

10    program on track.

11         THE COURT:  What happens if somebody doesn't, some primary

12    attorney doesn't do that, what happens to the plaintiff?

13         MR. BIRCHFIELD:  Well, it depends on the nature of the

14    claim.  We have had -- there are several deadlines that would, like

15    for submitting your enrollment package, submitting your releases,

16    and there have been multiple notices that go out and BrownGreer has

17    contacts there that would also reach out to those lawyers.

18              But now we're at a place where the claimants are

19    receiving points awards notices and it shows how many points, how

20    much compensation they will receive.  And there is a window of time

21    for them to review those points award notices and see if there are

22    any, if they agree or if there's any corrections that need to be

23    made.  And so they have a period of 14 days to review that, so they

24    need to check those promptly.  I mean, otherwise, the points awards

25    would be deemed accepted.

1        THE COURT:  Okay.

2        MR. BIRCHFIELD:  As far as dealing with deficiencies, then

3    BrownGreer reaches out; I mean, if there are significant issues,

4    then BrownGreer reaches out to those folks.

5        THE COURT:  Okay.

6        MR. BIRCHFIELD:  And we have Orran Brown and Lynn Greer

7    here to give us a report from the claims administrator.

8        THE COURT:  All right.  And that is the Registration and

9    Enrollment of the Claims in the Settlement Program, the second item

10   on the agenda.

11       MR. BROWN:  Good afternoon, your Honor.  I am Orran Brown,

12   and with me today is Lynn Greer; and we're from BrownGreer and

13   we're the claims administrator for the Vioxx settlement program.

14       In our report this month, your Honor, we would like to

15   cover three areas.  First of all, a few brief comments about where

16   we are in the enrollment cleanup stage that Mr. Birchfield

17   mentioned.

18       Also, I want to highlight the upcoming extraordinary

19   injury program.  We've been working with the parties to fashion

20   that program and we're about to roll that out, and we'll talk a

21   little bit about the details and the timetable for that program.

22       And then Lynn will cover where we are on the claims

23   processing and payment for the MI and the stroke claims.

24       First of all, your Honor, on our enrollment world.  We

25   used to talk about this a lot at the hearings, but we're pretty

1   much past the enrollment stage.  We, and the claimants counsel, and

2   the parties to the settlement agreement continue to work on mopping

3   up the enrollment issues.  The two issues that are highlighted on

4   this slide, the first one being there are about 1,200 people who

5   started the enrollment process and sent us some material, sent us a

6   release but no stipulation of dismissal or a stipulation and no

7   release, and never finished out the package.  Those folks had a

8   series of deadlines to complete that work.  The main one being

9   October 30th of last year, which was a final enrollment deadline.

10          We gave them another set of deadlines beyond that, the

11   last one being December 31 of 2008.  And we repeatedly worked with

12   the firms telling the firms who was not in the program yet, who

13   didn't have all of the pieces of the package in.  We're left now

14   with about 1,200 people.  Most of those have counsel, there are

15   very few pro ses in that group.  But most of them are claimants

16   that are not eligible for the program or the law firms have told us

17   they can no longer locate them.

18          There's a very few number of these that ended up actually

19   being people who should be in the program, were eligible, and were

20   trying to be in the program and they have missed a deadline now to

21   enroll.  We have very little activity now coming back on those

22   claims.  If anyone does send in a release or stipulation that is

23   now this late and they haven't done it before, we have to go over

24   it with the parties of the Settlement Agreement to see if it can be

25   accepted at this late date.

1        We're at the stage where the door is pretty much closed

2   on finishing out those packages to get the pieces in because we

3   don't want it to disrupt the track that we're on for claims;

4   because if people come into the program late, they're off the track

5   that everybody has been on now for some time.

6        The second group here concerned the enrollment deficiency

7   process.  And we've just about reached the end of that after a lot

8   of work at our office, at the law firms' offices, and primary

9   counsel office, and parties of the Settlement Agreement have really

10  put a lot of time to get this paperwork in order.  Now these are

11  people who did send us a release and stipulation of dismissal, did

12  send it to us on time but it had something wrong with it, its

13  signature or notarization or some problem with it, and we've been

14  working with firms and sending those deficiencies and working with

15  Merck counsel to try to clean that up.

16       There are about 5,000 claimants left that still have some

17  hole in their stipulation of dismissal or their release; primarily

18  these are questions about the release that each claimant has to

19  sign.  They've also had a series of deadlines.  We have been

20  regularly sending out reports to firms to show them whose involved

21  in this stage, who doesn't have everything all cleaned up, what's

22  not cleaned up about it, and giving deadlines to try to cure them

23  and get them finished.  The most recent set of reports went out on

24  the 4th of February to all of the primary counsel listing all of

25  these folks telling them they had until February 20th to try to

1    clean this up.

2         Now of those 5,000 people, about 3,300 of them have

3    issues relating to estates.  They have deceased claimants and

4    questions relating to the paperwork about whether the person whose

5    pursuing the claim is the authorized representative for all of the

6    estate and all of the beneficiaries to bring that claim and make

7    decisions relating to it.  We have this procedure, the claims

8    administration procedure 2008-1 and a form that goes along with it,

9    the form V-2031 that law firms and claimants can use as a stopgap

10   measure.

11        And most of these folks have.  Of the 3,300 people that

12   have a question still about their representative paperwork about

13   18, 1,900 of them have used that process to keep their claim moving

14   in the claims process and get up to the point of knowing whether

15   they pass gates and get up to the point of getting a points award.

16   We've been working with the law firms on that front.

17        The parties I know have been working on also trying to

18   bring this closure, trying to make sure that we identify every

19   deficiency that's left, whether it matters.  I think they're in

20   discussions right now, the parties are, to design a program to

21   bring this to closure and try to get all of this cleaned up within

22   the next few weeks so that we can just look forward to claims

23   review and payment and have all of this behind us.

24        There will be a few of these folks who never finish

25   because they are people that turned out not be eligible, they are

1   people the law firm can't contact.  We've been canvassing the law

2   firms this past week trying to get information on that to see how

3   many of them really are still trying, really plan to finish, or how

4   many they've lost contact with and they may never actually get

5   these papers finished.

6           Beyond that, your Honor, we have been working with the

7   parties on the extraordinary injury program.  And the Settlement

8   Agreement in Section 4.2 of the Settlement Agreement created two

9   funds, one for the heart attack claimants that is funded, or will

10  be funded, with $195 million and a separate fund for extraordinary

11  injury payments of $105 million for the stroke claimants.  And the

12  way the Settlement Agreement defines this is that claimants who are

13  entitled to a points award on their underlying claim, either an MI

14  or an IS claim who receives a points award on their underlying

15  claim that is in excess of a special marker level -- which is ten

16  points for an MI claim and two points for an IS claim -- those

17  claimants are eligible to submit claims for extraordinary injury

18  out of these two separate funds.

19          And the Settlement Agreement gives the claims

20  administrator, working with the parties, discretion to fashion the

21  details of this program about what qualifies and what paperwork is

22  necessary.  And we've been working on that for sometime now and are

23  ready to roll that out effective March 2nd.

24          The idea of the plan right now is that we are developing,

25  have developed a claim form for persons to use to seek

1   extraordinary injury payments, and we've defined the documentation

2   that they need to give us to support those claims, and we will

3   announce to all primary counsel and send a letter separately to

4   each pro se claimant before March 2nd that the program begins on

5   March 2nd and that the deadline for submitting extraordinary injury

6   claims will be June 1, 2009.

7            And a little bit more about the program and how it works.

8   The settlement agreement tells us in Section 4.2 that extraordinary

9   injury claims consist of really three separate types of claims.

10  The first two are economic loss claims.  You can submit an

11  extraordinary injury claim if you had past out-of-pocket lost wages

12  or income, if you had past out-of-pocket medical expenses.  And the

13  Settlement Agreement tells us that to qualify, to get in the door

14  to be an extraordinary injury claimant you have to have past

15  out-of-pocket lost wages or income or medical expenses of $250,000

16  or more.  That's what gets you in the door.

17           You have to have at least $250,000 of paid out-of-pocket

18  lost income or medical expenses that were not paid by a third

19  party.  If your health insurance covered your medical expenses,

20  they don't count.  If you had disability insurance that paid some

21  of your lost income, then that's a deduction.  It has to be amounts

22  that the claimant actually paid or lost without reimbursement or

23  capable of being reimbursed by a third party to get to this

24  $250,000 threshold for economic loss.  And it has to result from

25  the eligible events, from the eligible events that qualify the

1    claimant on the underlying grid.

2          And the past period is going to run for measuring the

3    past lost income or medical expenses, is going to run from the date

4    of that claimant's first eligible event, heart attack, or stroke,

5    through the date of the Settlement Agreement, November 9, 2007, is

6    the past period that we're looking at to measure whether a claimant

7    who qualified on the underlying grid above the special marker level

8    incurred lost wages, lost income caused by their eligible event or

9    medical expenses that were not paid by a third party through

10   November 9, 2007.

11         The other type of special, extraordinary injury the

12   Settlement Agreement defines is we're calling special medical

13   injury.  And the Settlement Agreement describes this as a type of

14   injury that's not adequately reflected in the underlying heart

15   attack or stroke grids.  And this is designed to provide the

16   potential for compensation for truly extraordinary injury that a

17   claimant feels was not adequately covered on the underlying grid.

18   It has to be someone who qualified on the underlying grid, the

19   Settlement Agreement tells us that much, but there are some

20   additional injury that didn't put them on a level they expected or

21   didn't qualify them for the level of compensation that they

22   expected or feel like they deserve, that's where they should tell

23   us about their special medical injury.

24         And in both of these instances, they have to submit

25   documentation to us that shows it.  And we have defined with the

1    parties the set of medical records or income records or tax records

2    that we will need to be able to evaluate these claims.

3            A little bit more detail about this, and then we'll be

4    finished with this area.

5            There are few things that we all need to be thinking

6    about as the law firms and the claimants start preparing these

7    claims to send to us.  The past lost wages or medical expenses have

8    to result from the eligible event and we're going to count the

9    dollars that they show us they paid that were not paid by a third

10   party.  And that's how we're going to quantify these economic

11   losses based on the proof that they give us.

12           In the evaluation of their total losses, other extraordinary

13   damages, such as future lost wages or future medical expenses that

14   a person who is disabled or deceased would have earned or would

15   incur if you're disabled, they will also be a factor in this

16   evaluation.  We cannot tell yet until we see the claims to what

17   extent those futures will be compensable.  We all know it cannot be

18   a dollar for dollar compensation because, as we'll see in a minute,

19   the pro rata division at the end of the available funds among all

20   qualifying claims.

21           But that will be a factor in the valuation and the claims

22   form process will enable claimants to submit to us claims that they

23   feel are compensable for future lost wages and medical expenses.

24   We're going to end up -- I think at the end of the day once we see

25   all of the claims making some sort of what we're calling a relative

1   points value adjustment, to try to preserve in the extraordinary

2   injury fund the relative positions that claimants had to each other

3   based on their underlying points score, because the underlying

4   points score takes into account the risk factors and alternative

5   causes and so it adjusts the person's amount by other factors.

6           We're going to preserve that adjustment, I think, in the

7   extraordinary injury fund.  Although this is an area where we have

8   a lot of discretion working with the parties and a number of the

9   details of that will depend upon the nature and the quantity of

10  these claims that we actually receive and what we find when we

11  review them.  We will be assigning -- on the special medical injury

12  claim, we will have to work with the parties to assign a value to

13  them, if someone has an injury not covered on the underlying grid,

14  how we quantify what the dollar value of that is worth.  We are

15  going to work with the parties on that factor after we see how many

16  claims we get and what they're alleging.

17          And then at the end of the day, once we determine the

18  base value of every claim, we will have to do a pro rata adjustment

19  out of the 195 million available to heart attack claimants and 105

20  million available to stroke claimants to make sure that everyone

21  shares proportionately according to the available funds at the end

22  of the day.

23          Now, when we start this program in March with a deadline

24  of June 2nd to send in the materials, we don't know how long it

25  will take us to implement this program.  We're hoping by the end of

 1    the year we will have received all of these claims and have them

 2    all evaluated and be able to make the pro rata adjustment, and

 3    we're going to do it as fast as we can.  There will also be a

 4    process that claimants and the law firms can submit these claims to

 5    us online through their portal.

 6              These are just some screen shots of what that will look

 7    like.  This is the extraordinary injury claim form where they can

 8    look up the claimants, start submitting a claim for them.

 9              We're adding a new section on the portal to the left-hand

10    side that is a direct entry into the extraordinary injury program.

11    It will enable them to change information about the claimant if

12    they need to, and here is where they'll actually get the claim

13    form.  We're looking at a mockup of the claim form as it will

14    appear online where they start filling in their information about

15    lost wages, lost income, which transactions, which dates they're

16    claiming for.  This is a live organic document online that they

17    will fill in online with us, and sign it online.  This will also

18    tell them specifically what documents we need for each category of

19    injury that they're seeking.

20              And all of this will be done online and submitted online

21    without them having to send us the paper, and they can upload to us

22    electronic images of their medical records or tax records through

23    their portal, as they've done in the claims process, and we will

24    mimic that process to process these claims.

25              A little look at numbers, although these don't tell us

1   too much.  The original underlying claims form had a section in it

2   where people were asked if you're claiming extraordinary injury,

3   and these are the folks who said yes.  There were originally about

4   9,375 claimants, broken down, as we see, of 6,069 heart attack and

5   3,306 stroke claimants, who said they would seek extraordinary

6   injury benefits.  We know a little bit more about them now since

7   the time those claim forms came in because we can back out

8   claimants who are finally non-submitting program claimants who

9   never finished their claims package, people who are already final

10  special marker eligible, and we get down to a little bit lower

11  number; and then we have some current people that are in the gate

12  failure status, not all of them final, but if you take out about

13  2,109 of them, we get down to 7,170 people who we think may be the

14  audience who may submit these claims to us, although when we roll

15  this out we're going on to announce it to everyone, and anyone can

16  submit an extraordinary injury claim form regardless of whether

17  they checked yes in the claims form originally.  This is just to

18  give us a ball park idea that we may see 7,000 people who may be

19  interested in submitting these claims.

20         This has taken a lot of work to get us to this point, but

21  we're excited about getting this rolling and we will work with the

22  parties of the Settlement Agreement and all counsel to make sure

23  that this runs smoothly as well.

24         Your Honor, that's all I have on those fronts, and Lynn

25  will now review where we are on the claims.

1          THE COURT:  All right.  Thank you.

2          MS. GREER:  Good afternoon, your Honor, Lynn Greer from

3     BrownGreer, and I would like to update the court on where we are.

4     We were here last less than three weeks ago, so we've had a lot of

5     activity and here to update you on the current numbers.

6          We are still where we were a few weeks ago, which is

7     approximately 4,800 claimants have sufficient submissions to join

8     the claims queue.  We now know a little bit more about folks who

9     are final non-submitting program claimants.  These were claimants

10    who received three notices that we did not have enough to begin

11    reviews of their claims.  This number has risen slightly since we

12    were here last because there were a second group of claimants who

13    were given a chance, they actually had asked for timely extension

14    to 1230 to submit claims material.  When that deadline passed, we

15    still didn't have enough information.  They have since then since

16    the notice of non-submitting program claimants and not appealed

17    that.

18         There are 184 claimants, however, who did receive that

19    notice of non-submitting program claimants and are currently on

20    appeal for that determination.

21         We are still where we were a few weeks ago, although the

22    numbers have shifted slightly, still about 62% of the claims that

23    have been filed overall are MI claims, 37% stroke claims.  We still

24    don't know what injury 1% of the claimants are asserting on the

25    claims form, that this is where we get the approximate 48,535 total

1    claims submissions.

2              This slide shows us the various stages of the MI gates

3    process.  And when we were here last, the number that were pending

4    in the current gate queue was about 1,800 more than it is today.

5    We currently have 7,536 claimants who submitted their materials

6    well after the July 1st deadline whose claims we have not yet

7    reviewed.

8              Row two shows us that we have reviewed initially 2,534

9    claims packages for gates and those are awaiting our second QC

10   review.

11             The third row shows that 9,832 claimants have passed

12   through the gates and they are eligible for points awards.

13             Row four shows that we have issued 4,376 notices of

14   ineligibility, and these are with claimants now who are in varying

15   stages of response.  Claimants can ask for additional time to

16   submit information if they realize that the reason their claim

17   failed was that they had failed to provide us with enough

18   information.

19             And row 4B shows that there are 5,137 claims currently

20   with the Gates Committee that do not have a vote yet.

21             One thing that I would like to caution those looking at

22   the slide about though that these are very fluid numbers, and it

23   looks like, for example, with the Gates Committee there have been

24   604 claims that have gotten to the Gates Committee without a vote.

25   There have actually been a lot more than that to go to the Gates

1    Committee but a lot have come out.  The Gates Committee is on pace,

2    they're reviewing over 1,000 claims a week to be able to move

3    claims through the gates process with the realization that there

4    will be a lot of claims volume there, and they are working very

5    fast and the volumes have increased steadily over the last six

6    weeks in terms of the Gates Committee volume.

7            Points review status.  We have now paid 6,108 claimants,

8    they're MI points awards.  Today there are 1,856 claimants who

9    theoretically could be paid in February.  These numbers are, I

10   think, seem smaller than the past months because again it's only

11   been a couple of weeks or almost three weeks since we were here

12   last.  The claimants still have and we still have half of the month

13   yet to go with being able to issue points awards and have claimants

14   be able to accept them, have appeals resolved.  So that 1,856

15   number of claimants with points awards outstanding to be paid will

16   increase dramatically over the next few weeks before the MI

17   payments in February, which will occur on February the 27th.

18        Row three shows that there are 666 claims where we have

19   completed our final review.  There are still some reasons that we

20   are unable to issue a points award.  A lot of the claims in this

21   bucket go back to what Orran was talking about where there are

22   enrollment deficiencies that relate to estates, there are a lot of

23   sudden cardiac death claims in this population where we cannot

24   issue a notice of points award because of remaining issues.

25            Row four shows there are 186 claims in our points process

1    where we have conducted a preliminary review and we need to do a

2    second QC review.

3            604 claims have reached a point in our process where we

4    cannot complete our points review because the claims packages have

5    some area that is incomplete.  And we are working with the firms,

6    we issue notices telling them specifically what is missing, and

7    that's still running around 7% of the claims that reach this stage

8    where we are just unable to proceed through with the full points

9    review because of missing documentation.

10           177 claims we have started our review.  And although it's

11   cut off, there are 237 that are sitting there waiting for us to

12   pick up for the first time to review for points.

13           THE COURT:  What do we do with the claims that haven't

14   submitted, that haven't done anything?  Do I issue an order to show

15   cause why they shouldn't be dismissed?

16           MS. GREER:  The ones that have reached the stage in the

17   points process --

18           THE COURT:  No, the ones that you can't do anything with,

19   nobody will respond to you.

20           MS. GREER:  A lot of this, your Honor, we have issued

21   them, for example, saying you're missing follow-up records, and

22   they are trying their best to go back and get those records.  And I

23   do believe, your Honor, that we will come to a point where a firm

24   comes to us, and we've already had this happen, where a firm comes

25   to us and say this is all there is, either the records have been

1    destroyed or I've tried using my best efforts to get records.

2           We will have to come up with a proposal for dealing with

3    those claims.  It's not fair to review those claims as we could a

4    complete claim, we simply can't review those claims.  So we're

5    probably going to have to hold those claims until the end and try

6    to come up with an equitable approach to try to review those.

7           THE COURT:  Okay.

8           MS. GREER:  Our point projection slide for the MI claims

9    is very similar to what it was a few weeks ago.  The number of

10   total of MI claims has risen only slightly.  We are still

11   estimating for purposes of this projection about a 70% overall

12   gates pass rate for MI, which gives us 21,094 claims that we will

13   need to review for points.  We've already paid 6,108.  We have a

14   potential population of 1,856 for payment in February, which will

15   leave us 13,130 claims to review in the remaining weeks of February

16   and through August, and I use a six and a half month time period

17   here.  Which means that we have to bring 2,020 claims to the point

18   of points review each month.

19          We do know that about 10% appeal and .7% are the special

20   markers who elect the special review, which -- so we need to add

21   about 216 claims.  So we need to be running around 2,236 MI points

22   awards per month.  We are still encouraged and still on pace for

23   that to be able to make our final payment by the end of the third

24   quarter or by the end of the summer of this year 2009.

25          This slide has changed only slightly.  These point

1    averages by injury level for the MI claims shift every day back and

2    forth, but only slightly.   Injury Level 1, the average points are

3    running 224.91; Injury Level 2 - 205.34; Injury Level 3 - 147.62;

4    Injury Level 4 - 100.88; Injury Level 5 - 85.01, Injury Level 6 -

5    56.25.   And special marker, again the claims where the MI points

6    are less than ten is at 4.95%.

7            This slide summarizes the completed and the pending heart

8    attack payments, and this summarizes that through January we had

9    paid 6,108 claims for a total of $532,197,875.   There are another

10   760 claimants who have accepted to be paid this month, another 660

11   who are eligible to be paid this month, we don't yet have a

12   decision.   So right now there are another 1,420 claimants who could

13   potentially be paid in February, and again, we still have two weeks

14   yet for notices to be issued and acceptances to be made.   So this

15   number when we are here in March we will be able to report on a

16   much higher number than these slides show today.

17           THE COURT:   What's the value of the point in dollars at

18   this time?

19           MS. GREER:   An MI point is $1,915 per point.

20           Now, we're turning to the slide of the stroke claims, and

21   this shows the status of the stroke gates claims, and it shows that

22   there are still 4,760 claims pending in the stroke queue.   We've

23   initially reviewed 1,016 since we were here last.

24           There are a lot in row two, 7,863 where we have reviewed

25   and the QC, they're waiting QC.   We have gotten 3,087 to the point

1  where they can be reviewed for points.  We have issued 783 notices

2  of ineligibility, and there are 967 stroke claims currently pending

3  on the Gates Committee portal where they have not been able to cast

4  a final vote yet.

5         And this is an overview of our stroke point slide.  This

6  is the first time we have given this slide because the stroke

7  claims, we issued our first notice of points awards on the stroke

8  claims the week of January the 26th.  Obviously the pay column is

9  empty now because the first stroke payments will be made on

10  February the 27th.

11         There we have issued 478 notice of points award for the

12  stroke claims; 137 have already accepted, they will be paid on

13  February 27th; another 321 can accept and will stand to be paid on

14  the 27th.  There are 20 who have appealed.

15         There are 323 where we have completed our review, but

16  again for some reason, I spoke of in the MI claim where we are

17  unable to issue the notice of points award because of an

18  administrative or enrollment deficiency issue.  There are 1,664

19  points reviews that are pending QC, 152 we have gotten to the point

20  where we are unable to complete the review because there is a

21  claims package deficiency, 191 where we have started our initial

22  points review, and 122 that are currently in the queue awaiting

23  review.

24         Your Honor, as I've mentioned, we are on schedule to

25  start stroke payments this month.  Section 4.1.2 of the Settlement

 1   Agreement required us to have completed a review of 2,500 stroke

 2   claims by February 1st to be able to come up with a projection of

 3   what the stroke point value would be.  And we did, we reached that

 4   goal by the deadline February the 1st.  Since then we have been

 5   working with the parties, looking at various projections, looking

 6   at pass rates to try to come up with an estimate of the point

 7   value.

 8          And as of today, the point value, the estimated point

 9   value for the stroke claims is $1,810 per point.  I would like to

10   point out, however, that the final point value, as of the MI point

11   value, the Settlement Agreement contemplates it may be higher or

12   lower at the time of final payment depending on what the claims

13   experience shows to be the value of these claims at the end of the

14   process.

15          And again, the payments on the stroke claims at the 1,810

16   level per point will commence on February the 27th.

17          THE COURT:  Okay.

18          MS. GREER:  Your Honor, one other thing I would like to

19   point out, we are now posting on our web site copies of these

20   presentations that we make every month.  The people here obviously

21   get to see them, the people on the phone may have a hard time

22   following, and so those are available on our web site.

23          THE COURT:  Do you have any projection as to what you

24   expect next month?

25          MS. GREER:  In terms of?

 1          THE COURT:  Numbers.

 2          MS. GREER:  Numbers, I think we'll have -- we'll probably

 3    estimate another 3,000 MI claims to have reached the point of

 4    points award.  And the stroke claims I would imagine we will exceed

 5    1,000 that will actually be paid in the month of March.

 6          THE COURT:  All right.

 7          MR. WILLIAMS.  If I may, John Eddie Williams.  I

 8    compliment BrownGreer on their extraordinary work and the gates

 9    committee on what they're doing.  But, your Honor, I remain

10    skeptical about some our of deadlines, and I'd just like to --

11    because my clients especially in these extraordinarily difficult

12    financial times are pressing for payment, as one would expect.  The

13    settlement is for the clients.  And I note that we've now after

14    some 15 months, 11% of the settlement amount, approximately the 532

15    million has been paid out, so 89% has not reached the claimants.

16          And I guess what we asked some 14, 15 months ago for some

17    goals, and I asked I think at the -- two months ago we brought up

18    some goals, and we have heard a goal of paying the MI's by the end

19    of the third quarter.  It's kind of slipped from the end of the

20    summer to the end of the third quarter.  That's not worth quibbling

21    about, of course.

22          But as I see where there's 10% of the people are

23    appealing the situation and the people that go through all of these

24    queues, those are nice, but as I understand it, one or two or even

25    1% of the people hold up the other 29,000 or 30,000 MI's.  I just

1    want an assurance, I guess, I would like from BrownGreer, the PSC,

2    or the court for my client's sake that they really think this 60%

3    will be paid by the third quarter, because I think people need to

4    know that they can count on that if they're in arrears on their

5    mortgages or been laid off or things of that nature.

6         And if we've really taken into account all of these

7    extraordinary appeals and things like that.  Because it seems to me

8    like the way it's set up, virtually 100% of the people have to get

9    through all of the appeals and all of the processes.

10        And secondly, maybe if we could have an estimate of when

11   we think the stroke cases will be wrapped up so that we can,

12   everybody can see when this whole thing will be paid out and 100%

13   of the money, not just 89%, if the court thinks those issues are

14   appropriate for discussion.

15        THE COURT:  Can you answer any of that?

16        MS. GREER:  Yes.  I am not prepared today to give a

17   projection on when the strokes will be wrapped up.  We still don't

18   have enough of a track record on what that appeal rate is likely to

19   be.  And part of the MI projection is being able to have several

20   months of experience saying that 10% appeal rate for MI claims is

21   holding pretty steady.  So I would be very reluctant to give a

22   projection on the IS ultimate final payment.  Although that's

23   something that we look at, and as soon as we feel comfortable with

24   some trend that we can count on, I will certainly address that.

25        There is no doubt it, this is a very aggressive time

1   line.  All I can do is assure you from a processing standpoint we

2   can meet our goals.  I know from witnessing the Gates Committee

3   activity on both Merck and the PSC side that they will meet their

4   goals, there is no doubt about it.  But the dynamic is that it

5   takes one claimant who has an incomplete claims package or who has

6   submitted a fraudulent claim whose claim gets audited.

7           I will tell the court we are not finding -- we are

8   auditing, we are not finding a problem right now with the fraud

9   situation.  But it takes one.  And so that is why we are working

10  very, very aggressively to try to control what we can to work with

11  the claimants on claims package deficiencies, to come up with a

12  program at the end where we don't have a group of 100 claimants

13  holding up payment for everybody.

14          But you're exactly right, the way it's set up, it has to

15  work for everybody.  And it's a very dynamic process:  It's not

16  just the claims administrator, it's not just the Gates Committee,

17  it's not just the hard work of these firms, it's the claimants and

18  everybody doing what they need to do, not asking for extensions

19  that we have to then debate whether we should give, not trying to

20  delay this process, you know, when an appeal is granted, having

21  that be the final say and not leading clients to believe that they

22  can appeal yet again.

23          So there's a lot here in terms of communication,

24  managing, and expectations that we are working very hard on.  And I

25  can assure you that we are, the claims that we have to review we

1    are meeting our goals of 2,000 - 2,200 a month.  But it takes a

2    group effort here on all fronts to be able to get us to that point.

3           THE COURT:  We have to recognize though that some people

4    are going to either delay for good reason or no reason at all, and

5    we're going to have to have a point where the PSC comes to the

6    court and indicates that this individual has had a long time and no

7    response or hasn't done it and then I'll just get them out of the

8    system, I'll dismiss their case so that they don't hold up

9    everybody.  I don't want to stop anybody from appealing because

10   that's part of the process.

11          MS. GREER:  Right.

12          THE COURT:  But from the standpoint of cleaning up

13   deficiencies, there's got to be a point where enough is enough, and

14   if they haven't responded, then we have to take them out of the

15   system so that it doesn't retard things.

16          Again, I urge counsel, all counsel, to comply as quickly

17   as possible.  I think the point is well taken that one individual

18   can at least retard for some period the whole process.  But that's

19   where you need to let me know because I'll take them out of the

20   system and we'll deal with it in that way.

21          MR. WILLIAMS:  Thank you, Judge.  And that point that one

22   person holds up 29 or 30,000 MI claims seems to be a core issue

23   that I hope we don't ignore.  I know the court's not, the court's

24   well aware of it.  It seems to me that because of the 10% appeals

25   and other things that maybe now with seven months to go before the

1    goal is met, and maybe the PSC already has a strategy on this, but

2    I bring this up because I think it's important, we're still at 11%

3    payment to the victims and we still don't have a deadline for the

4    stroke people to get paid.

5           And I think that deadlines are important and goals, and

6    I'm -- when somebody says, on the phone, am I really a claimant, am

7    I really going to get paid by the end of September, I don't want a

8    surprise that July, in July we're here and say we didn't anticipate

9    all of these other things.  I think we've got to have a strategy

10   ahead of time.  And maybe there is one and I am not aware of it.

11   And I can share it with my clients if there is one, if not we

12   should perhaps get one moving.

13          THE COURT:  Maybe the way to do it, too, is to have some

14   kind of subcommittee of attorneys to deal with some of those after

15   a period of time, that needs to be flushed out.

16          MR. BECNEL:  Judge, there were 1,100 lawyers registered

17   for -- I just left the meeting of the Vioxx litigation group and

18   Celebrex litigation group.  There was not one complaint from

19   anybody concerning the appeals.  In fact, I had an appeal that we

20   appealed and within ten days we got a turnaround and got first

21   strokes today.

22          So there was, you know, out of those lawyers by in large

23   I would say represent a vast majority of people around the country

24   and are here for not just for that case but all others, but there

25   was no complaints about appeals, there was no complaints about not

1    getting paid, there was no complaints about anything.  In fact,

2    everybody was amazed.

3              THE COURT:  Okay.  Well, that's always good to hear.

4              MR. WILLIAMS:  And, Judge, if I may, is there some -- when

5    somebody says, "Am I really going to get paid in September?"  Do we

6    feel a confidence level of 50%, 80% or 90%.  How do we really do

7    this because the people want their money.

8              THE COURT:  I got it.  Does the PSC want to respond?

9              MR. BIRCHFIELD:  Yes, your Honor.  I can tell you that

10   this is a matter, the settlement, the implementation of this

11   settlement program is something that we are attending to every day.

12   There is no aspect of this Settlement Agreement that we are not

13   paying very careful attention to.  The Settlement Agreement

14   provides for certain aspects, including an appeal.  And the appeal

15   is very limited in scope and that is matters that are going to

16   Mr. Pat Juneau and Justice Trotter and Justice Corodemus.  And the

17   numbers that they have so far are very limited, they have had a

18   very quick turnaround.

19              So you have different segments of this Settlement

20   Agreement that must come in place before final payment is reached.

21   First is a decision by the claims administrator, and that is being

22   handled on a very timely and efficient basis.  Then the claims come

23   to the Gates Committee.  Before we have a final payment, the claims

24   must be decided by the Gates Committee.  The Gates Committee is

25   deciding 1,000 claims a week, and so we're on pace to have all of

1   the MI cases appear before the Gates Committee decided by June.  So

2   that will put us in a place where a final payment can be reached by

3   the end of the third quarter.

4        So the other aspect is the number of cases that are

5   appealed and those must be decided by the special masters.  But the

6   area or the role of the special masters, according to the

7   Settlement Agreement, is that the Settlement Agreement is designed,

8   the language in the Settlement Agreement is crafted so that their

9   review is very narrow.  And this is strict, it's a strict review.

10  So it is a review that can take place on a very quick basis, and

11  they have been very prompt in addressing the appeals.

12       And so with their narrow scope of review and their

13  careful attention, we will be able to have all of those appeals

14  decided on a timely basis.  All of those appeals must be, on the MI

15  cases must be to them by June, just by the fact that the Gates

16  Committee has decided those.

17       So, I mean, I have -- I can speak to you personally, I

18  was very involved in crafting the Settlement Agreement and I have

19  been very involved in its implementation every day, and I can tell

20  you that I am confident that we will have an MI final payment by

21  the end of the summer.

22       MR. WILLIAMS:  That's great.  Thank you, your Honor.

23  Thank you.

24       MS. GREER:  Thank you, your Honor.

25       THE COURT:  Thank you.  Let's go to the Lien

```
 1    Administrator, is that the next item on the agenda?

 2         MR. SEEGER:  Good afternoon, Judge, Chris Seeger for the

 3    PSC.  I am up here with Matt Garretson.

 4         Going forward, Judge, Mr. Garretson will be reporting to

 5    the court and to the people in attendance and reading the

 6    transcripts on not just the governmental liens but also the private

 7    lien resolution program that we signed, the settlement that we did,

 8    which is now in the process of being implemented.

 9         The private lien resolution program was launched on

10    January 29th, and we need responses from attorneys and their

11    clients by March 20th is the date, right, Matt?

12         MR. GARRETSON:  Correct.

13         MR. SEEGER:  A couple of things that I want people to be

14    aware of is we have put some information, most of the information

15    has been posted on the BrownGreer web site and also notices have

16    gone out to everybody's e-mail account through the portal, through

17    the settlement program.  We've given them an information package

18    about the settlement, explains the entire deal.  There is a letter

19    that was drafted, and has been reviewed by ethics professors, that

20    attorneys can use to send to their client, they can adapt it anyway

21    they want if they think it's appropriate.  But there is a

22    recommended letter the lawyers can use when they send the

23    information to their clients to explain it.

24         Importantly, Mr. Garretson also has a toll free number

25    that's been set up for attorneys if they have questions about the
```

1    private lien resolution program.  And I can put that on the record,

2    your Honor, it's 877-774-1130.

3            Also I wanted to report that Mr. Garretson had a meeting

4    which he led this morning where about 40 or 50 attorneys appeared

5    and about 200 dialled in where he went through the terms of the

6    settlement.  We are going to be hosting conference calls, maybe

7    three or four throughout the country; and if we think it's

8    necessary for your Honor, we can do that in a teleconferencing way

9    so that people that have questions of the court that can be dealt

10   with.

11           The two most common problems that I think or questions

12   that we have been getting, which I would like to talk about and

13   Matt can also spend time addressing, is people have asked what if

14   someone doesn't make it through the gates, so why should I enroll

15   my client if I don't think they'll get through the gates because of

16   the lien resolution program.  The problem is we have to get started

17   on this stuff and there is really "no harm, no foul" if somebody is

18   bounced out of the program, they're not going to be charged an

19   administrative fee for the lien resolution program unless they

20   avail themselves of it.  So there is really no downside to doing

21   that.

22           We have also been asked, you know, will the private

23   carriers get our information if we decide to opt out and not do the

24   private lien resolution program.  The answer is no.  The only

25   information that will be exchanged is for the claimants that have

1    decided that they want to avail themselves of this program.  We

2    hope everybody does, but I wanted to make that clear.

3              And, Matt, if you have anything you would like to address

4    on what you're doing on both sides.

5              THE COURT:  Let me say at the outset that we're dealing

6    with liens now, Medicare liens, Medicaid liens, that's governmental

7    liens.  And also some private liens, Blue Cross and so forth.

8              The governmental liens are statutory liens.  They have to

9    be paid out.  The advantage of an MDL, as I've said several times,

10   one advantage is the economy of scale with regard to liens.  It's

11   an opportunity for the lien holders to get a focal point from which

12   all of their liens can be paid.  However, for that advantage they

13   also have to recognize that they have to pay something for it, and

14   the way they pay something for it is to reduce their liens.

15             So the individual claimant gets the benefit of this

16   economy of scale with the statutory lien because he or she will

17   have to pay the lien, it's statutory.  Their liens must be paid.

18   But because they're participating in this program, they will pay

19   less than if they did not participate in the program.

20             Now, the non statutory liens create a particular

21   challenge because they're not statutory.  That doesn't mean the

22   lien holders do not have a claim, they have a valid claim.  They

23   paid medical expenses and the individual is receiving money for the

24   medical expenses, so they expect their medical expenses that

25   they've paid to be paid back.  And the only way they can do that is

1    to pursue these individuals in separate states, the 50 states, and

2    file suit against them.

3            Well, again, this is an opportunity for them to receive

4    payment of their liens.  But at the same time, the claimants also

5    have an advantage to this because they won't get sued, they won't

6    have attorney's fees in that regard, and also they'll have to pay

7    less.  And so that's where we are at this point.  And the

8    non-statutory liens, the non-governmental liens have made claims,

9    I've spoken on those claims, and they were appealed and the appeal

10   was affirmed.  So following that they entered into discussions with

11   the Plaintiffs Committee and they worked out a settlement that's

12   advantageous to both the lien holders as well as the claimants.

13   And so they created a program and any claimant who is interested

14   can opt into the program.  With that, let's hear it.

15           MR. SEEGER:  Actually, your Honor, there is something I

16   left out.  Like everything we tried to do with the Vioxx

17   settlement, we've built in a lot due process and opportunities for

18   people to bring their claims to somebody else to get a ruling.

19           It's the same thing here.  We've also gotten questions

20   from attorneys who have said what if I'm in a state that doesn't

21   recognize these liens, what if I have plan language that doesn't

22   support the liens.  Well, I think that's going to get screened out

23   through the procedures that Mr. Garretson is now putting in place;

24   but if for any reason that were missed and an attorney sees an

25   issue there, he can appeal his claim to you and you would rule on

```
 1    the plan language or the law of that state.

 2              THE COURT:  Right.

 3              MR. SEEGER:  That's just something I wanted to make sure

 4    of.

 5              There's so much good news to report I forgot about this.

 6    The gentleman that represents Greater Benefit, the other group that

 7    was --

 8              MR. KING:  Yes, your Honor, Henry King on behalf of the

 9    Greater New York Benefit Fund and the New York State Teamsters.  As

10    you know, we were one of the private payors and also we represent

11    about 83 or 84 other either privately funded insurers or privately

12    funded healthcare funds.

13              We wanted to advise the court that we are fully embracing

14    the settlement program that's been reached and will move forward in

15    doing that.  We expect to add a few more claimants, our clients in

16    the next few weeks; but we appreciate the court's efforts in this

17    regard, and we embrace your thoughts on it and know it's a good

18    resolution.

19              THE COURT:  I'm glad you came aboard because I do think

20    that this is a good program for your claimants, and I am glad that

21    you've come aboard.

22              MR. KING:  Well, we appreciate your help in this regard.

23              MR. GARRETSON:  Thank you.  I am going to take a few

24    moments, your Honor, and just layout the basic terms and conditions

25    of the program.  I'll keep it short, as many of the people
```

1    listening in here today were also on the teleconference this

2    morning or in the meeting.

3         As many of the people have asked, you know, why are we

4    sending this out to all of the claimants?  Well, it's because 70%

5    of the claimants have government benefits.  Well, so many of our

6    population that's on government benefits also have supplemental

7    plans, Medicare supplemental plans, Medicare HMO's, different plans

8    that fill in the gaps between these government plans.  And those

9    too are included in this program.  So this program will encompass

10   healthcare benefits, benefits received through their employers that

11   they purchased privately, perhaps disability insurance programs

12   they've participated in, and as I mentioned, MediGap or Medicare

13   type of replacement or HMO policies.

14        With respect to the initial eligibility, as Chris

15   mentioned that we sent out materials to all primary counsel as well

16   as with BrownGreer's assistance have this on the portal.  With

17   those educational materials was a list of the initial group of

18   insurers that have agreed to participate according to the terms and

19   conditions.  But I will note that many times claimants will not

20   know the name of their actual insurer.  They'll think, for

21   instance, if they work at a manufacturer that it is the

22   manufacturer who insures them.

23        THE COURT:  Right.

24        MR. GARRETSON:  So we have encouraged claimants that if

25   they do not see their insurer on their list or they're unsure to go

1   ahead and choose to participate in this program, and that we as

2   administrator will take steps to verify if their plan is a

3   participant.

4          Furthermore, if claimants find that their insurer is, in

5   fact, not on the list, I remind everyone that it is an initial list

6   and we think it's very likely, as we've just seen here today, that

7   other plans will recognize the benefit and will join the program

8   according to the terms and conditions.

9          However, throughout this process, your Honor, we will

10  keep confidentiality at the utmost importance.  We will have in our

11  shop a list of all of the people who've chosen to participate.  Not

12  until a plan has agreed to the terms and conditions and has agreed

13  that the participation threshold has been met as to their

14  agreement, not until it's solidified will we exchange privacy

15  protected information or medical type information with any plan.

16  So I want to reiterate that no information is going to go out about

17  a claimant until the plan has agreed to participate exclusively

18  according to the terms.

19          Further, I wanted to explain to those in attendance, as

20  well on the phone, that we are auditing all of these claims.  The

21  plans are working with us very diligently to make sure, similar to

22  the way we've done with the government agencies, that a very

23  targeted list of diagnoses codes or injury related medical codes

24  are included in an electronic format that we will exchange with

25  these plans so that according to the injury for which the claimant

 1    is being compensated, only those codes will be subject to a lien.

 2              So once we have that audited lien amount so it's just

 3    injury related codes, we will then apply an automatic 50% reduction

 4    of that audited lien amount subject to a 15% cap on the claimant's

 5    gross settlement amount, and that 15% cap applies to the first

 6    $100,000 of the total settlement payments to a claimant; from

 7    100,000 to 250,000 there will be a 12.5% cap; and from 250,000 and

 8    above, there will be a 10% cap that the liens cannot exceed over

 9    and above the total settlement payments.

10              So this cap lien amount, they'll pay obviously the lesser

11    of that 50% reduction of the strictly audited lien or this capped

12    amount.

13              Further as Chris said, we will be applying the

14    anti-subrogation laws that exist in a handful of states, so we will

15    be very deliberate about that, your Honor.  And then as Chris

16    mentioned, we will do for liens that come in over $50,000 we'll

17    automatically review a set of plan documents.  But there are

18    appeals processes and other processes involved to insure that the

19    claimants who participate in this process leave this experience

20    feeling like no obligation was created were none otherwise existed.

21              So we have appeals process we will be working out the

22    final details on, and I'll be in a position to report that to the

23    court at the next hearing.

24              I would also say that for the attorneys and the claimants

25    with respect to the payment of the final lien amount, there's

1    nothing that they must do.  These lien amounts through the work of

2    BrownGreer and the coordination with them will be paid

3    automatically to the plans out of the claimant's final settlement

4    payment, as will the administrative expenses will be paid out of

5    the claimant's final settlement payment.

6         And I would note that the plans, according to the terms

7    here, will split those administrative expenses 50/50 with the

8    claimants.

9         The plan does have a participation rate requirement, and

10   so we encourage everyone to sign up and at least get themselves

11   into the program.  There's a participation rate of 90% required in

12   this program, but I would reiterate until these plans have

13   committed to the terms of the program and have acknowledged that

14   the rate has been met, not until that event will we share data.

15        These educational materials we sent out also explain how,

16   obviously how to participate, they contain the HIPAA compliant

17   release, as well as a participation form in addition to these

18   educational materials.

19        We also informed the claimants what will happen if he or

20   she chooses not to participate in this program.

21        The deadline, as was mentioned, we need the materials

22   postmarked by March 20th of 2009, and that should give us ample

23   time before the next hearing to report to you what type of

24   participation we have had.

25        All that being said with the participation rate and the

 1   requirements, this is still a voluntary program and firms can

 2   choose to enroll -- it's not their choice, they can inform their

 3   clients.  But there's no requirement that every client of a firm

 4   choose to participate.  So I wanted to make that clear as well,

 5   your Honor.

 6         We can make ourselves available, many firms have reached

 7   out and asked us to participate on conference calls with their

 8   clients that they'll be hosting or other informational sessions.  I

 9   just want to reiterate our availability to do that for counsel.

10         THE COURT:  How are you getting the material, is it coming

11   in on time?

12         MR. GARRETSON:  Your Honor, the material has just gone out

13   to primary counsel through the portal January 29th it started, so

14   we're starting to hear of it being sent out, our call center is

15   receiving dozens of calls each day on this issue from clients and

16   counsel alike.  And from what I understand, the process has been

17   implemented appropriately.  I would just remind counsel --

18         MR. SEEGER:  Just to be clear for the people listening in,

19   most of the information, your Honor, will be exchanged from the

20   carrier to us once the deal goes effective.  So we are not asking

21   for additional submissions.

22         MR. GARRETSON:  Yes, all we need is their participation

23   form.  And just to reiterate, it's up to counsel to get that either

24   through the e-mail we sent or from the portal and send it out

25   themselves to their clients.  The clients will then, as it says in

1       the materials in detail, send them back to us.

2                  THE COURT:  All right.

3                  MR. GARRETSON:  A quick note on the governmental liens.

4       With respect to Medicare, I believe at the last hearing my

5       colleague Jason Wolf announced the agreement in principle with

6       respect to the ischemic stroke categories.  I am very pleased with

7       those results and we have heard only positive things about those

8       results from counsel.

9                   To date we have received now only 77 requests for

10      redeterminations.  And again, as I've mentioned in the last status

11      conference, we view this as a very positive sign that there's less

12      than 1% request.  And we don't call this an appeal at this stage,

13      this is just a redetermination to see if we had all of the dates

14      and the information correctly.  And the lion share of these, your

15      Honor, are disposed of just by way of education.

16                  With respect to Medicaid, I would report that we're

17      making good progress on our claims data.  We are in the process, as

18      this court is aware, of gathering claims data from 53 agencies, the

19      state and territory Medicaid agencies.  Throughout the process we

20      need to gather about 20,000 complete medical files from these

21      Medicaid agencies with respect to what they've paid.

22                  To date we've secured about 10,300 of that group of

23      20,000 that we need to receive.  So while it's understandable some

24      of the larger states with a larger number of claimants may still be

25      in the process of sending that information in and we understand

 1   that they may need more time, we just, you know, are asking them

 2   repeatedly to get that information to us as soon as possible so we

 3   can insure we have a seamless process of disbursement when these

 4   final payments begin.

 5            THE COURT:  You need to get me a list by next time as to

 6   who is outstanding.  I want to give them enough time, but if they

 7   are delinquent then I am going to have a Rule to Show Cause why

 8   their lien should not be dismissed for waiver or for forfeiture.

 9            MR. GARRETSON:  Yes, your Honor.

10            THE COURT:  I want to give them enough time to send it in,

11   but again, the time after cajoling and asking, if they don't want

12   to send it in then I'll declare their lien waived.

13            MR. GARRETSON:  Yes, your Honor, I will report next status

14   hearing on that.

15            THE COURT:  Okay.

16            MR. GARRETSON:  With respect to the other governmental

17   liens, we did have the final government program agree exclusively

18   to the terms of the program with the government lien holders,

19   Indian Health Services agreed in full to the lien resolution

20   protocols last week completing the loop of all of the ancillary

21   federal programs with respect to military services and Indian

22   Health Services.

23            So, your Honor, that would conclude my status report for

24   this month.  At our next hearing I believe I'll be in a position,

25   as I mentioned before, to give the court a status of how many

1  people have selected to participate in the private lien program,

2  and I'll continue to report this progress as we go along.

3          THE COURT:  Okay.  Thanks very much for your work, you're

4  doing a fine job.

5          Anything from the special master?

6          MR. JUNEAU:  Yes, your Honor.

7          THE COURT:  Part of the program is that if someone does

8  not get through the Gates Committee there are some limited appeals

9  that the individual can take, and from a due process standpoint I

10  felt that there should be some opportunity that they could make an

11  appeal, at least appeal under whether or not the terms of the

12  settlement were properly followed.

13          And in order to process these appeals, I've appointed Pat

14  Juneau, as well as two judges, two ex-judges, one from New Jersey

15  and the other one from California, to assist in this regard.  I'll

16  hear from the Special Master.

17          MR. JUNEAU:  Your Honor, Patrick Juneau, Special Master in

18  this matter.

19          To date, your Honor, there have been 28 appeals to the

20  special master for the notice of points awards, 14 of those have

21  been decided and there are 14 that are on an active review as we

22  speak to be decided.  I anticipate all of that being done very,

23  very shortly.

24          There are appeals to the special master from a final gate

25  failure notices, that's kind of a later filing, but those appeals

1   have been filed, there are 23 total, one of those have been

2   decided, they have 22 of those to be decided.  They have actually

3   been allocated amongst the three people serving in this capacity,

4   and I anticipate that being done very shortly.

5           One brief comment, your Honor, because I think it would

6   be instructive for everyone to know.  Each and every one of those

7   appeals, particularly talking about the points award, involves a

8   very, very detailed analysis in many cases of a lot of medical

9   records because that is referenced here and it comes in a lot of

10  different sources.  With the good services of BrownGreer, we're

11  able to access that information.

12          But through regular calls that I have had with Justice

13  Trotter and Judge Corodemus, they are dutifully spending a lot of

14  time in detail examining those records to make sure they're

15  complete and thorough adjudication can be made of those issues.

16  It's a tedious process but a very worthwhile process because I

17  think it assures, and in some cases not the case, that the prior

18  decisions were made correctly.

19          We're doing that as we speak, but I did want to assure

20  anyone that may be participating by phone to know that a meticulous

21  detail is being applied to each and every one of those appeals that

22  have taken place.  And we're going to continue to do that on an

23  ongoing basis.

24          We've also established a process where we talk between

25  the three of us, we discuss the type of appeals, we don't

1   necessarily talk about the individual, but so that we'll know

2   things to look for, the type of documents we find that are

3   instructive in answering some of these questions.  And it's

4   certainly been enlightening for me to find out three minds are

5   better than one.  And I think all of us have shared in that

6   experience so that we'll get a strong degree of uniformity in

7   applying equity and justice to the application of these cases.

8           And that's pretty much where we stand.  But there is no

9   delay where I see, your Honor, in the process that's been laid out

10  as far as the appeals.  They've been quickly and efficiently and

11  promptly handled.

12          THE COURT:  Okay.  Fine.  Thank you very much.  I think

13  that point is well taken.  In a case like this where we're dealing

14  with 48 or 50,000 individuals, oftentimes viewed from a public

15  standpoint one might get the feeling that the lawyers just look

16  upon this as one big case and they do it in a faceless manner and

17  do not take into account individuals.  That hasn't been the case in

18  this litigation.  Each individual's case is looked at with a fine

19  tooth comb and a lot of effort is put into it and there's many

20  levels of reviewing the case.  And even from an appeal's

21  standpoint, you see that each individual is looked at.

22          And the best that we as a profession can do is to design

23  processes, fair processes that take into account individual claims,

24  and I feel that it's been done in this particular case.

25          Let me hear from the State Court Trial Settings,

1    anything?

2              MR. BEISNER:  No settings to report, your Honor.

3              THE COURT:  Any Class Actions?

4              I have an opinion in process regarding the foreign class

5    actions, I've already written the foreign class action opinion and

6    now I have individual claims from about 15 countries that have

7    started to come into the program, and I will be issuing an opinion

8    on that this week.

9              MR. LEVIN:  Arnold Levin, sir.  On February 2nd your Honor

10   entered an order dismissing the master complaints for both personal

11   injury and medical monitoring.  We reached that point in the

12   litigation where the settlement took care of all of the claimants.

13   However, they were administrative complaints.  There is before you

14   your order, a Rule to Show Cause, why the underlying complaint

15   should also be dismissed.  Some of them make up various allegations

16   in the master complaints, others are standalone.  That rule is due

17   on March 5th.

18              Attached to that order is some 200 civil actions.  If

19   you're not on that attachment, your complaint remains.  If you are

20   on that attachment and you have a problem, such as joining a

21   personal injury or a medical monitoring with a third party payor,

22   you've got to bring it to the attention of liaison counsel.  And

23   that will be resolved on March 5th.

24              THE COURT:  Okay.  And the notice has gone out, we've put

25   it on the web site, and I set that date so I'll hear from anybody

1    that has any objections.

2            Discovery Directed to Third Parties, the next item.

3            MR. BIRCHFIELD:  The only issue under the discovery

4    directed to third parties involves Express Scripts.  The PSC issued

5    a subpoena for the production of certain medical records from

6    Express Scripts and Express Scripts had been producing documents on

7    a continuing basis and the PSC has been paying for those documents.

8    But now there has been a dispute otherwise and there are several

9    such records that are being held up, and we need to bring that to

10   the court by way of a motion and need to do that on an expedited

11   basis, if we could, your Honor.

12           THE COURT:  Right.  Let's do that.  From the standpoint of

13   the PSC, file a motion to have those documents produced, and if

14   Express Scripts feels that they need to be compensated for it, then

15   they can respond on that basis I'll hear from the parties and I'll

16   make a decision.

17           MR. BIRCHFIELD:  Okay.  Thank you, your Honor.

18           THE COURT:  State/Federal Coordination.

19           MS. BARRIOS:  Good afternoon, your Honor, Dawn Barrios for

20   the State Liaison Committee.

21           Because of the short period of time between this and the

22   last status conference, I don't have a whole lot different

23   statistics to report; but because I believe the statistics are so

24   impressive, I would like to restate them.

25           Through the existence of the MDL, your Honor had over

1    2,000 plaintiffs who had sought motions to remand.  Because of the

2    voluntary settlement program and other issues, you now only have

3    approximately 50 persons who have pending remands before you.  And

4    we're going to use the time in the next 60 days to try to clean up

5    those 60.  We believe with the help of BrownGreer, who has been

6    incredibly helpful to us, and with the pro se's office, we'll be

7    able to narrow that down to maybe just a handful.

8         And these statistics, your Honor, for the record are

9    current through the transfer order on February 4th, 2009, in which

10   19 cases were transferred, although all of those cases had remands

11   pending.

12        With regard, your Honor, to the governmental action

13   matter that I routinely report on to you, I understand there will

14   be a special governmental action status conference following this

15   status conference and Merck's routine motions.  And for those on

16   the call, I would like to advise that it's a different call in

17   number, and that number for the conference for the governmental

18   actions is (866) 213-7163, the conference ID number is 85050211

19   being the conference ID number and Judge Fallon as the chairperson.

20        THE COURT:  Let's repeat that so they can get it again.

21        MS. BARRIOS:  Yes, your Honor.  The toll free number is

22   (866) 213-7163.  The conference ID number is 85050211 and Judge

23   Eldon Fallon is the chairperson.

24        The last item of business in this status conference, your

25   Honor, will be just reporting to you the number of cases that we

1    have on the charts that I've given your law clerk.   There are 14

2    governmental actions pending and 63 third-party payor consumer and

3    medical monitoring actions pending.   And of course after the

4    March 5th deadline on your Rule to Show Cause why some should not

5    be dismissed, those numbers will go down.

6              THE COURT:   Okay.   Thank you very much.

7              MS. BARRIOS:   Thank you.

8              THE COURT:   Pro se Claimants, anything from pro se?

9              One of the areas that we've taken care of in this

10   particular litigation is to design a program for the pro se

11   individuals.   Many individuals have not had an opportunity or a

12   desire to retain an attorney.   To make sure that those individuals

13   had access to the court, I appointed an attorney to represent the

14   pro se individuals, and I'll hear from Mr. Johnston at this time.

15             MR. JOHNSTON:   Thank you, your Honor, Bob Johnston,

16   curator for the pro se claimants.   As I have informed the court on

17   a monthly basis in these status conference, my office continues to

18   receive numerous calls from pro se claimants.

19             I just want to make sure that the court and everyone

20   understands that to facilitate due process for these individuals,

21   we receive all of these communications, and for the court's notice,

22   we log all of these communications into an internal communication

23   log and also on to an online communication log.   And at the end of

24   the whole process, we will be submitting to the court the entire

25   communication log with the court.

1          I think other than that generality, the one thing that's

2  happened since January 22 when I was last here and spoke to you is

3  the fact that we have been asked to provide pro se claimants with

4  the information and the data and documentation for the private lien

5  resolution program.  We are going to be sending out, I believe,

6  somewhere between 819 pro ses, the information and also the forms

7  that the court knows about.

8          And other than that.  I guess the only other thing to

9  tell you is that we continue to, among the numerous calls that we

10  have, we have what we call the regulars who are calling us and

11  wanting to know the status on a weakly and sometimes less than

12  weekly basis.  Judge, we take all of those calls, we're going

13  continue to do so.  Thank you.

14          THE COURT:  Thank you very much.  I know sometimes it can

15  get frustrating, but I appreciate your patience and your good work.

16          MR. JOHNSTON:  Thank you.

17          THE COURT:  Merck's Motion for Summary Judgment.

18          MR. BEISNER:  Nothing new to report there, your Honor.

19          THE COURT:  Vioxx Statistics, anything on that?

20          MR. BEISNER:  No, your Honor.  On that front the company's

21  quarterly report has not yet been issued; as soon as it is, we will

22  provide that information to the court.

23          THE COURT:  Anything on the Trial Package from the PSC?

24          MR. BIRCHFIELD:  Nothing new, your Honor, both trial

25  packages are complete.

```
 1              THE COURT:  The Third Party Payor Cases, we'll have that
 2   meeting after --
 3              MR. SEEGER:  Oh, is that --
 4              MS. BARRIOS:  Your Honor, when I spoke with your law clerk
 5   he just referred to it as governmental actions, but recognizing
 6   we're working very closely and the committees are working closely
 7   together, so it's your pleasure.
 8              THE COURT:  That's fine.
 9              MR. SEEGER:  I have a quick update on that.
10              THE COURT:  Sure, okay.
11              MR. SEEGER:  As Dawn said, there have been a series of
12   phone calls and meetings.  We had a meeting yesterday with a number
13   of counsel for third party payers and counsel representing AG's.
14   The group's unanimous about what it wants to do.
15              We have put together a scheduling order that would move
16   certain bellwether private third party payor cases toward trial as
17   your Honor requested.  We've put together that scheduling order,
18   we've given ours to Merck, Merck has a draft they have given us.
19   We have not yet had an opportunity to meet and first we need to do
20   that.
21              I do want to just publicly thank Mr. Dugan because he's
22   actually helped us put this together and he's been instrumental in
23   us coming together as a group.
24              THE COURT:  Okay.  Fine.  Where we do we go from here?  I
25   don't want to just let this lay.  When can I where get together
```

1    with you all and hear from you?

2           MR. SEEGER:  I think we need a week or less to meet and

3    talk and confer.

4           MR. BEISNER:  Your Honor, we have exchanged drafts, we've

5    received the plaintiffs draft I think three or four days ago.  We

6    have provided a counter proposal.  So we need to confer about that,

7    and we're hoping to schedule --

8           THE COURT:  We'll have a status conference then in about

9    two weeks just to see where we are and see what needs to be done,

10   whether or not we need to set some trial dates and which cases and

11   things of that sort, for example, a protocol for those cases and so

12   forth.

13          MR. BEISNER:  And, your Honor, I think one of the things I

14   did want to note is the need to look, as you had also requested, at

15   what's left there.

16          THE COURT:  Right.

17          MR. BEISNER:  And just to be clear about the statistics,

18   although we need to compare notes on numbers that Ms. Barrios has

19   been dutifully keeping, but if I am reading all of this correctly,

20   we have 13 governmental actions that are before the court at the

21   moment.  There are 45 TPP's that are out there, private third

22   payors that are named somewhere, some of them are in individual

23   complaints, some of them are in class action complaints, and so on.

24   But there are 45 floating around there.

25               Then we also have a class action and master complaint

1    that asserts claims on behalf of all TPP's, as well as all

2    consumers who purchased the product.  So we've got kind of three

3    groups of cases, although there is an overlap between the consumer

4    cases and TPP's, so I think one of the things we need to talk about

5    even though it involves different counsel are how to deal with all

6    of those.

7            My sense is that the governmental cases, thanks to Dawn's

8    organizational effort, are kind of off on one discussion track

9    because we've got a lot of issues to deal with there in terms of

10   access to documents and other issues.  And then the private claims,

11   both of the TPP and consumer variety.

12           So we've got a number of different kinds of cases we need

13   to deal with here.  But I think our thought is to make sure we have

14   orders to propose to the court going forward on all of those

15   fronts.

16           THE COURT:  I think that's important.  And also with the

17   third parties, we ought to see whether or not we can package those

18   two together or not, whether we can or we can't.

19           MR. BEISNER:  The third party payor, the private third

20   party.

21           THE COURT:  The private third party.

22           MR. SEEGER:  And, Judge, I think the way this is going to

23   come out, at least our proposal, I need to speak with John in

24   fairness to him, is to push the private third party payor cases --

25   which has been in your court for about four years now --

```
 1              THE COURT:  Right.

 2              MR. SEEGER:  -- forward quickly.  The AG's I think need

 3   some time to get some things together, but we need to sit and talk

 4   about that.  And then we need to make a decision about whether

 5   we're going to move for class at all in the private third party

 6   payors.

 7              THE COURT:  Right, okay.

 8              MR. BEISNER:  We'll be out in the hallway, your Honor.

 9              MR. SEEGER:  For the next two weeks.

10              THE COURT:  What about two weeks?  Let me give you a date.

11              MR. SEEGER:  I think two weeks is more than enough.

12              MR. BEISNER:  I think that's --

13              THE COURT:  Let's get a status conference in two weeks and

14   talk about packaging.

15              THE DEPUTY CLERK:  Two weeks is Mardi Gras week.  Do you

16   want to go to the next week?

17              THE COURT:  I'm told we have Mardi Gras.

18              THE DEPUTY CLERK:  Do you want to go to the next week?

19              THE COURT:  Okay.

20              THE DEPUTY CLERK:  Three weeks, Judge, would be Tuesday,

21   March the 3rd.

22              THE COURT:  March 3rd, can you all make it then?

23              THE DEPUTY CLERK:  But we have something on March the 5th

24   in Vioxx, the show cause hearing.

25              THE COURT:  We do have something I understand on the 5th
```

```
 1   of March.

 2              MS. CABRASER:  Your Honor, if we could do any day but a

 3   Monday or Tuesday, that would be good.

 4              THE DEPUTY CLERK:  Thursday, March the 5th, Judge.

 5              MR. BEISNER:  The 5th would work fine, we do have other

 6   things scheduled.

 7              THE COURT:  We have other things that day.

 8              THE DEPUTY CLERK:  At nine or after the nine o'clock?

 9              THE COURT:  We'll do it after the nine o'clock.

10              MR. BEISNER:  Sounds like that works fine.

11              MR. SEEGER:  Thank you, Judge.

12              THE COURT:  Okay.

13              And I talked about the foreign individual cases, I'll be

14   issuing that shortly.

15              We talked about third party Greater New York Benefit.

16              Merck's motion PTO non-compliance 28.

17              MR. BEISNER:  Your Honor, I understand that will be heard

18   after the conference.

19              THE COURT:  Right.  Okay.

20              Decision Quest, can we talk about that now?

21              MR. BIRCHFIELD:  Yes, your Honor.  Lenny Davis on behalf

22   of the PSC has been continuing discussions with Decision Quest and

23   making progress there I report to the court.

24              THE COURT:  And the Fee Allocation Committee.  I received

25   a motion from the Plaintiff's Committee seeking a common benefit
```

1    fee and costs.  The difficulty I am having at this point is that my

2    thinking on it was that I needed to first decide the principle

3    attorney's fees, that is to say the pie as I've called it.  And

4    then I am going to determine a slice of the pie.  It's hard for me

5    to determine the slice without determining what the pie is, and I

6    set a cap of 32 percent as being the size of the pie, so to speak.

7    And I was then going to focus on the slice of the pie, which is the

8    common benefit fee and cost.

9         The issue presently before me is complicated by the fact

10   that I've had a motion for reconsideration of the size of the pie,

11   and I think I should deal with that first because it has some

12   relevance regarding the size of the slice.  You can't determine the

13   slice before you decide how big the pie is.  It's not fair to any

14   counsel because I want to give everybody an opportunity to speak,

15   object, whatever, on the amount of the common benefit fee.  And I

16   don't think it's fair to the individuals who are not partaking in

17   the common benefit fee or even for those who do, but certainly for

18   the people who may not be participating in the common benefit fee

19   or whatever, to determine what their position is because they don't

20   know how much, how big the pie is, and, therefore, they don't know

21   how much fee they'll be left with.

22        Because remember that the slice comes out of the pie,

23   it's not in addition to the pie.  It's a slice of the pie.  And so

24   I am at the point now where I have to focus on the reconsideration

25   motion first and then I'll be getting to the common benefit motion.

1    And let me explain where I am on that.

2         I met with counsel requesting a reconsideration, I met

3    with counsel and I also met with the Tulane Law Clinic that I

4    appointed to represent that aspect of the claimants' case.  As I

5    mentioned to them, when I received the motion for reconsideration I

6    felt they were in good faith and they asked me to look at it again

7    and reconsider it.  And my practice in this case has been that when

8    the attorneys ask me to hear a matter, I assume they have something

9    to say and so I listen and give them an opportunity to be heard.

10        But having done that, I thought about, well, if I am

11   going to have a hearing to consider increasing the 32% then it's

12   coming from the claimants themselves.  I am not going to take it

13   from some other claimants and give it to these claimants, so it's

14   coming from them; therefore, these claimants will be paying more if

15   I reconsider and adjust the fee upward.  Because of that I felt

16   that the claimants should be represented at any hearing that I

17   have, otherwise it's not a fair hearing, it's just a speech from

18   one side.  And I felt that that would not be the way for a court to

19   proceed, that is to just hear one side.

20        I could not appoint the Plaintiff's Committee to

21   represent the claimants as to that aspect of the claimants' case

22   because there's a conflict, they're in a fiduciary position and

23   also the consortium that asked me to reconsider has representation

24   on the Plaintiff's Committee.  So that did not seem to be an

25   option.

1          I thought next about appointing an attorney who had

2     nothing to do with this particular case, but I felt that a

3     practicing lawyer would be subject to criticism if they wound up

4     with some cases from that consortium's group, so that did not seem

5     to be viable to me.  So I appointed the Tulane Law Clinic to

6     represent that discrete limited aspect of that issue.  And frankly,

7     a decision on this issue will likely have an affect on all of the

8     claimants because I am not going to be able to say for the

9     consortium it's one fee and for everybody else it's another fee.

10    So there is some interest in all of the parties, and indeed three

11    other attorneys have filed a so-called "me too" motion for

12    reconsideration.

13          And I met today with the parties to get from them some

14    suggested scheduling and I set the schedule, so we'll be dealing

15    with that shortly.  That deals with the motion for reconsideration.

16          Merck's Motion and Rule PTO 29.

17          MR. BEISNER:  That will be dealt with later, your Honor.

18          THE COURT:  Okay.  28 and 29 will be dealt with.

19          MR. SEEGER:  Judge, I am sorry to interrupt you.  There

20    was a letter to the court by Michael Miller, I just wanted to

21    indicate that the PSC would be responding to that.

22          THE COURT:  I did receive a motion or a letter from

23    Mr. Miller indicating that he intends to conduct some discovery of

24    the PSC and wishes to take the depositions of various members of

25    the PSC seeking their explanation for their common benefit request.

```
 1    And I'll hear from the PSC on that and I'll deal with it.
 2              MR. SEEGER:  Thanks, Judge, we will be responding to it.
 3              THE COURT:  Also, I've received a number of letters from
 4    claimants.  Sometimes the letters are informational, they're
 5    seeking information; others may not, may feel that they haven't had
 6    a response from their attorneys or for several other reasons and
 7    they write the court.  I don't want to just not respond to those
 8    individuals and I am not in a position to give them any advice, so
 9    what I have done is to periodically group those letters and send
10    them to the PSC and instruct the PSC to respond or deal with them
11    as they see fit.  And some of them they forwarded to pro se
12    attorney, some of whom they've gotten in contact with the
13    individual's attorney or in turn put them in closer relationship to
14    their client and we're dealing with it in that way.
15              I don't feel that a claimant who writes a United States
16    District Court should not have any response given to them, so I do
17    take those seriously and I do seek to respond or have someone
18    respond to their requests or needs.
19              Our next meeting is March 27th --
20              THE DEPUTY CLERK:  Friday.
21              THE COURT:  -- at nine o'clock and I'll meet with the
22    committees at 8:30.
23              Anything from anybody that I haven't covered?  Anything
24    from anybody that's on their minds that they wish to bring up?
25              One of the reasons I have the meeting in open court is to
```

1    afford anybody an opportunity in the audience to address the court

2    if they feel the need to.

3            Okay.  Thank you very much.  The court will stand in

4    recess for ten minutes, and I'll come back and deal with the other

5    things.

6        (WHEREUPON, A RECESS WAS TAKEN.)

7        (OPEN COURT.)

8            THE COURT:  Be seated, please.  We're back in court

9    dealing with the various motions and orders.  I'll hear from the

10   parties regarding the PT 28.

11           MS. WIMBERLY:  Your Honor, Dorothy Wimberly representing

12   Merck.

13           MR. DAVIS:  Your Honor, Leonard Davis on behalf of the

14   PSC.

15           THE COURT:  Okay.

16           MS. WIMBERLY:  Your Honor, the five matters that are set

17   on the docket today are all matters that were deferred from prior

18   hearing dates to give the plaintiffs additional time.  The first is

19   the sole remaining plaintiff from the first Lone Pine motion, which

20   was record Document 16032, and involved the claim of a plaintiff

21   Hugo Bua, which is Case No. 05-1552.  This, as the court may

22   recall, Mr. Bua actually was on our first Lone Pine.  He was

23   ordered to appear at one of the conferences that this court held to

24   discuss the settlement program.  He appeared but ultimately

25   declined to enroll.

1          We have deferred the motion to today.  His counsel filed

2     a response yesterday requesting an additional 45 days in which to

3     submit Mr. Bua's expert report.  He did have some extenuating

4     circumstances.  He had initially decided to enroll then there was

5     points issues and he ultimately did not enroll.  We agree and we

6     will allow this matter to be deferred and reset for March 27th

7     following the next conference, that gives Mr. Bua exactly 45 days.

8          And in the response that was filed yesterday, Mr. Bua's

9     counsel conceded that if he did not have a report at that time,

10    dismissal would be appropriate.

11         THE COURT:  Okay.  Counsel is on the phone at this time?

12         MR. GODOSKY:  Yes, your Honor.  And I did, in fact, do so

13    and I think that would be appropriate.  I appreciate Mr. Wimberly's

14    consent to that time.

15         THE COURT:  Okay.  Then we'll continue as to that time.

16         MR. GODOSKY:  Thank you.

17         THE COURT:  Thank you very much for being with us on the

18    phone.

19         MR. GODOSKY:  I appreciate it, your Honor, thank you.

20    Thank you, Ms. Wimberly.

21         MS. WIMBERLY:  Thank you.  Next up is Merck's second Lone

22    Pine motion, which was record Document 16033.  Again, there was one

23    plaintiff remaining from this motion, and that is Elizabeth Ricks

24    No. 06-2200.

25         Ms. Ricks made some contact with the pro se curator in

1   response to the court's orders that they contact the curator by

2   January 9th and indicated they intended to proceed.  She took that

3   initial step but she has done nothing since that time.  She did not

4   submit an expert report, she did not obtain new counsel, and we

5   would request that the court grant our order and dismiss her claim

6   with prejudice.

7          I would note that we do have confirmation that she was

8   served with the order resetting this matter for today.

9          MR. DAVIS:  Your Honor, as with the other motions similar

10  to this, the PSC would oppose the dismissal.

11         THE COURT:  Okay.  I look in the record and I see that she

12  has indeed been served.  She has this information.  We've given her

13  enough time to respond.  If he has any interest in responding she

14  has not responded.  I have no alternative but no dismiss her case

15  with prejudice.

16         MS. WIMBERLY:  Next up, your Honor, is the remaining 47

17  plaintiffs from Merck's fourth cross motion, record Document 17136.

18  All 47 plaintiffs are represented by John Swanson.  Mr. Eberhard

19  Garrison is here.

20         As your Honor may recall, these plaintiffs were ones to

21  whom Mr. Garrison had overlooked the original order requiring that

22  he send it to his clients by a certain date, and he asked at the

23  January 22nd hearing that we defer this matter for an additional

24  two weeks.  We agreed to do that.  And we would ask at this point

25  since none of these parties have contacted the curator to indicate

1   an intention to proceed, none have submitted reports or made any

2   compliance, we would ask that the court enter an order dismissing

3   their cases with prejudice.

4           MR. GARRISON:  Judge, Eberhard Garrison here on behalf of

5   plaintiffs.  Although with regard to these plaintiffs we have moved

6   withdraw, followed the court's instructions pursuant to I think

7   it's PTO 36.  We did subsequently issue notice, the consent notice

8   advising these people of the deadlines to contact the pro se

9   curator and/or file a report or get a new attorney.  So we've

10  jumped through all of the hoops.

11          And just for the record I would oppose any dismissal with

12  prejudice.

13          THE COURT:  Okay.  And I do recognize that counsel has

14  done everything he possibly can to bring this to their attention to

15  encourage them to participate and respond, and notwithstanding his

16  good efforts, no response has been forthcoming.  I think these

17  individuals have had proper representation during the time that

18  they've had representation, but didn't follow through with that

19  representation and decided not to respond on their own.

20          I've taken all of that into consideration, I dismiss the

21  cases with prejudice.  Thank you, Mr. Garrison.

22          MR. GARRISON:  Thank you.

23          MS. WIMBERLY:  Next up, your Honor, are the two remaining

24  plaintiffs from Merck's second late comers' motion, which is record

25  Document 17302.  The first plaintiff remaining was Emma Sadler,

1   Case No. 08-3665.  This matter was deferred at the request of

2   plaintiff's counsel Dan Gruber to enable him to withdraw.  There

3   were some special circumstances relating to the delay in

4   withdrawal, and the withdrawal motion has been filed and it was

5   based upon fundamental disagreements with counsel.

6          And we would ask the court to defer this matter to enable

7   the court to enter the order of withdrawal and then on March the

8   5th bring it back up and ask that the court dismiss at that time.

9          THE COURT:  Okay.  I will enter the order of discharge and

10  then I'll deal with it the next time.  Okay.

11         MS. WIMBERLY:  The second plaintiff on that motion is

12  Shannon Thibault, No. 08-3572.  We had deferred this to enable

13  Merck to determine whether the documents previously produced by

14  plaintiff's counsel constituted substantial compliance with

15  Pretrial Order 29.  After review, Merck has determined that it will

16  withdraw without prejudice this motion as to plaintiff Shannon

17  Thibault.

18         THE COURT:  Okay.  That's 08-3572?

19         MS. WIMBERLY:  Yes, your Honor.

20         THE COURT:  Okay.

21         MS. WIMBERLY:  And that brings us to the final matter,

22  which was the matters deferred from Merck's fourth Lone Pine

23  motion, record Document 17303.  There are two categories of

24  plaintiffs on this motion remaining.  The first is Ramon Bonilla,

25  Case No. 07-2014, at the request of Mr. Bonilla's counsel we had

1    agreed to defer the matter to today to enable counsel Theresa Walsh

2    to attempt to substitute a contempt fiduciary.  The order resetting

3    this matter was sent to Ms. Walsh on February the 3rd.  There's

4    been no response and we would ask that the court dismiss the case

5    with prejudice.

6            THE COURT:  Okay.

7            MR. DAVIS:  Again, your Honor, PSC would oppose the

8    dismissal.

9            THE COURT:  This individual has had enough time to respond

10   if she planned to respond.  I've looked at the material and find

11   that she has not responded notwithstanding proper notification, and

12   I'll dismiss the case with prejudice.

13           MS. WIMBERLY:  The final is a remaining group of eight

14   plaintiffs who are pro se.  In compliance with the court's

15   December 12th order, they made some sort of contact with the pro se

16   curator, whether it was to say I am going to proceed or could you

17   give me the names of some counsel, I might try to get a lawyer.

18   But nothing has occurred since that time and there's been no

19   further contact with the curator.

20            There also have been no substitutions of counsel and

21   there have been no expert reports, with one exception, and that is

22   plaintiff Anna Cannioto, who provided written notice to the curator

23   as of this morning that she did, in fact, had decided that she did

24   not intend to pursue the case.

25            So we have an affirmative representation there as to no

1    intent to pursue, and we would ask that that case be dismissed with

2    prejudice.  And that is Anna Cannioto, 06-2195.

3              As to the remaining seven plaintiffs --

4              THE COURT:  First I will dismiss that with prejudice and

5    grant her wish.

6              MS. WIMBERLY:  As to the remaining seven plaintiffs,

7    Ronnie Allen, that's Case No. 06-2212; Michael Beltrami, Case

8    No. 06-2219; Yvonne Bradley, Case No. 06-2214; Leonard Burnett,

9    Case No. 06-2212; Nathaniel Collins, Case No. 06-2195; Robert Lee,

10   Case No. 06-10174; and Elaine Williams, Case No. 05-4435.  Again,

11   none of these plaintiffs have done any further steps in compliance

12   with the court's December 12th order.  They have long since

13   defaulted in their applications under the Lone Pine orders, and we

14   would ask that the cases be dismissed with prejudice.

15             MR. DAVIS:  And the PSC has the same objection.

16             THE COURT:  Over this particular matter they've had a lot

17   of time to deal with it, notwithstanding proper notice and efforts

18   on the part of counsel to advise them and cajole them in to taking

19   some position.  They have ignored countless requests and I conclude

20   that they're not interested in pursuing their claim and I'll

21   dismiss the claim with prejudice.

22             MS. WIMBERLY:  Thank you, your Honor, that concludes our

23   matters set for today.

24             THE COURT:  Thanks very much.  Let's go to the next item

25   on the agenda is the Attorney General cases.  Let's see if we can

```
 1    hook in the phone first.

 2              Everybody with us on the phone?  All right.  We're here

 3    in the courtroom.  Let me hear from the parties.

 4         MR. DAVIS:  Afternoon, your Honor, Leonard Davis on behalf

 5    of plaintiff's liaison counsel.

 6         MR. ANDERSON:  Brian Anderson representing Merck.

 7         MS. BARRIOS:  Your Honor, Dawn Barrios, the special

 8    liaison counsel for the government action plaintiffs.

 9         MS. CABRASER:  Elizabeth Cabraser from the Plaintiff

10    Steering Committee's Purchase Claims Committee.

11         MR. DUGAN:  Good afternoon, your Honor, James Dugan on

12    behalf of the Louisiana Attorney General.

13         THE COURT:  All right.  I wanted to have a status

14    conference to keep the cases moving.  I think that it's helpful to

15    have periodic meetings with counsel so that we can make sure that

16    it's moving along, and also give everybody an opportunity to

17    participate in the conference, bringing up any particular issue

18    that they feel the court needs to address or they feel that could

19    be of help in moving this litigation.

20              I'll hear from the Plaintiff's Committee.

21         MR. DAVIS:  Your Honor, I am happy to report that as a

22    result of the efforts of everyone who is involved in this matter

23    and the meetings that we've had, in particular over the phone and

24    over the last few days, we were able to report to the court

25    progress that's been made that was reported during the earlier
```

 1   status conference.

 2          As a result, I don't know that there are added issues

 3   that are needed to go over in this particular conference, except

 4   for the fact that we will be submitting to the court the proposed

 5   order that your Honor is aware of from the last status conference

 6   that deals with access to the PSC document depository for

 7   government action plaintiffs.  We have worked with Merck and with

 8   Ms. Barrios and other folks, including Jim Dugan and others and

 9   Elizabeth Cabraser to get this order in shape and will be able to

10   present it.

11          But other than that, I don't believe that there are

12   additional items.

13          THE COURT:  What about dates from the standpoint of

14   trials, have you all talked about that?

15          MR. DAVIS:  We have, your Honor.  And as reported earlier

16   today in the status conference, we will be having additional

17   discussions and will report back to the court on the additional

18   discussions.

19          THE COURT:  All right.  We need to pick some cases to try

20   and some dates that those cases can be tried in.  We'll move those

21   along.

22          How about another status conference in this case, do you

23   want me to set it for following the next meeting or do we need one?

24          MR. DAVIS:  You know, your Honor, my own personal view is

25   I think that we will cover it at the status conference.  I think we

1   will let the court know, and Merck agrees with this, that if there

2   is a need -- and I am seeing everybody else shake their head -- if

3   there is a need, we will report to the court.

4           THE COURT:  Jim, how do you feel?

5           MR. DUGAN:  I was just thinking, your Honor, it might make

6   some sense, March 5th is the private third party payor status

7   conference, in my opinion we can probably combine these.

8           THE COURT:  No problem if you all feel that's helpful, you

9   can just give me a report.  If there's nothing to report, there's

10  nothing to report.  But you be present at it, Jim, so you can deal

11  with that.  And, Dawn, you, too.

12          MR. DAVIS:  We'll communicate with Dawn and Jim, and if

13  there's a need to report something, on March the 5th we will be

14  happy to do that.  If not, then we'll deal with it at the next

15  status conference.

16          MR. DUGAN:  Perfect.

17          THE COURT:  If anyone on the phone wishes to come into

18  that meeting, let me know and we'll plug you in by phone.

19          MR. ANDERSON:  Your Honor, Brian Anderson, I should report

20  as counsel reported at our last status conference that entry of

21  this access order will allow the plaintiffs and the government

22  actions to start reviewing the massive collection that is in the

23  PSC document repository.  Once informed about what material already

24  exists and is available to the government action plaintiffs to

25  prosecute their cases, that will allow us to negotiate a scheduling

1    order that will provide for common and mutual discovery in those

2    cases, and indeed we've already exchanged draft scheduling orders.

3            And I think with the access order now in place, we can

4    move directly to that exercise of negotiating a discovery

5    scheduling order for the government actions and present that to the

6    court when that's done.

7            THE COURT:  All right.  That sounds good.

8            Anything else from anyone?  Anything from anybody on the

9    phone?

10           MR. FOX:  Yes, your Honor.  This is Randy Fox from the New

11   York State Attorney General's office.

12           THE COURT:  Yes, go ahead, Randy.

13           MR. FOX:  The PSC has filed a motion, I think it's termed

14   to extend Pre-Trial Order No. 19 which deals with granting access

15   to the PSC's work product, and I just wanted to find out what the

16   court's intentions were as far as scheduling a hearing on that and

17   taking any comment from the states.

18           THE COURT:  Let me hear from the plaintiffs.

19           MR. DAVIS:  Yes.  In response to Mr. Fox's question, your

20   Honor, the PSC over the last few days received a number of comments

21   from various folks, and we are considering the comments and we'll

22   be able to report back to the court at the next status conference.

23   We are not going to delay and we may even be able to do that

24   earlier.

25           THE COURT:  If we can do that on the 5th, let's do it.

1    And, Randy, you come in on the 5th and hear whatever needs to be

2    said.

3             MR. DAVIS:  We'll get back to Randy Fox before then.

4             THE COURT:  All right.

5             MR. FOX:  Thank you.

6             THE COURT:  Anyone else?  Any other problems?  Okay.

7    Thank you very much.  The court will stand in recess.

8             THE DEPUTY CLERK:  Everyone rise.

9        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

10

11                          *  *  *  *  *  *

12

13                       REPORTER'S CERTIFICATE

14

15     I, Karen A. Ibos, CCR, Official Court Reporter, United States

16   District Court, Eastern District of Louisiana, do hereby certify

17   that the foregoing is a true and correct transcript, to the best of

18   my ability and understanding, from the record of the proceedings in

19   the above-entitled and numbered matter.

20

21

22   _____

23             Karen A. Ibos, CCR, RPR, CRR

24             Official Court Reporter

25