Stacey A. Evering
23 Circle Dr
Arnold, MO 63010
September 11, 2009



The Honorable Judge Eldon E. Fallon
United States District Court
Eastern District of Louisiana
500 Poydras Street Room C-456
New Orleans, LA 70130

Dear Judge Fallon:

I have listened to several of the conference calls in the Vioxx Settlement matter and have gained an appreciation for your desire for fair treatment of litigants by their respective attorneys and their attorney's firms.

I am writing you in desperation regarding the firm handling my case and their treatment of me during the course of the litigation process. I wish I could provide you with the name of the firm, but they refuse to identify themselves to me. I contacted the Vioxx Litigation Consortium in 2004 regarding the death of my mother (Pamela Tarpley), and was assigned one of the firms in that group. I know no names of the attorneys representing me, as they simply refuse to identify themselves in any manner. Until I informed the intern answering the phone that my husband works in E-Discovery for Thompson Coburn, LLP in St. Louis, I was told, in essence, not to call anymore. If they heard anything they would call me. Now, at least the office manager calls me back.

Sir, this firm has had my case since 2004. I received little to no correspondence from them for about two years. I suddenly received an enrollment packet informing me there was a settlement agreement. It stated the completed, notarized packet was due back *the next day*. I called the 1-800 number, and asked if signing this bound me to anything. They said no. I clarified, "You're saying that if I sign this, I am not bound to *anything* and I can back out of it at any time without jeopardizing anything?" They told me that was correct.

I signed it, had it notarized, and *overnighted* it back to their office. That was February 2008. They didn't file my paperwork until June. Even then, they filed it incomplete. They re-filed it wrong *again* later that year. They didn't tell me anything about their blunder. We were in severe financial straits. We inquired about a loan through Oasis, a company that loans money based on anticipated judgments or settlements. The firm flat out *refused* to cooperate. And here I thought they worked for me. I told them I would just look for another attorney to represent me there on in. They said I was bound to them, and that *you* wouldn't allow me to fire them this far into the case.

I understand you've ruled they are entitled to 32% of my settlement amount plus reasonable expenses. I have asked them repeatedly for an itemized expense report to date. They have sent me form letters telling me how you've made such awful decisions regarding the case and my agreement with the firm for 40% and that they're fighting for justice in having your order revoked. I don't think I should have to pay them to pat themselves on the back. The letters had no direct bearing on my case and were self-serving. They even asked me to tell you I wanted my original agreement with them left intact.

My husband tells me that clients ask for expense reports before the normal billing cycle all the time. That their clients dispute charges all the time. Why am I not being given that option? I feel they don't *want* me to know their firm's name so I cannot report them to an Ethical Committee in the bar in their state (wherever that is).

I asked them in January 2009 if I should start going through probate. I just figured it'd be one less thing to deal with later. They told me I shouldn't do that because it could hurt my settlement amount. Now, they not only tell me I have to go through probate, but I need to go through *their* probate attorney since they have already sent them my file *without my permission*. I told them we were looking at doing it ourselves or asking one of my husband's co-workers to help. They said it was too late. They told me that they already sent the file to their probate person and *would not* send it to anyone else but them. The person from the 1-800 office said the attorney *could not* release my portion of the settlement until probate was finished. I asked if that meant they would get all the money, hold it, wait for probate, and then issue me my 68%. He said yes, minus reasonable expenses. I asked if I would receive interest during the time they held the entire settlement sum. He said no.

Sir, I simply cannot see that this is either ethical or professional on their part. I see no reason why a firm, having had my case for four years can mess up the initial filing. They falsely advised me that I could back out of the settlement agreement. They refuse to identify themselves. They did not get me my enrollment packet in a timely manner. They advised me to not go through probate when they knew it was necessary. They have been rude and outright offensive on the phone. They refused to let me seek financial relief through Oasis. They refuse to let me see what kind of expenses I am accruing. They extorted me to use their probate attorney when I had the ability to go through probate for free (filing and publication costs excluded). I wanted to fire them, but they falsely advised that I was incapable of doing so. They have not updated me on any important issues regarding my case. They refuse to let me access the portal to see what is going on for myself. They have disparaged you and your rulings and have sent me letters that were merely pats on their own back. I have learned more about the settlement agreement from online groups than from my own, nicely paid attorneys.

I do not know what recourse you have in this matter. Even if it's a stern tongue-lashing like I've heard you give on the conference calls, I would like this firm to be disciplined in some fashion. I simply do not think I deserve to be treated this way, and I hope they get something to teach them to value their clients as people and not just their clients' money. I am more than a paycheck, or at least I should be.

Thank you for your time.

Sincerely,

Stacey A. Evering

Stacey A. Evering
Mother of four children and wife of one, none of whom have met nor ever will meet my mother.

P.S. As of 09-13-09 I have not received a call back that I requested on 09-02-09. I wanted to talk to them about what needed to be done after the probate hearing.

## THE VIOXX® LITIGATION CONSORTIUM[1]

| | | |
|---|---|---|
| **PROVOST ★ UMPHREY**<br>**LAW FIRM L.L.P.** | | **WILLIAMS KHERKHER**<br>**HART & BOUNDAS, L.L.P.** |

**WATTS LAW FIRM L.L.P.**

| | | |
|---|---|---|
| **RANIER, GAYLE & ELLIOT**<br>**L.L.C.** | | **THE KAISER FIRM,**<br>**L.L.P.** |

P.O. Box 56708, Houston, Texas 77256-6708
Telephone: 1-800-706-8667  or  713-403-7800
Facsimile: 713-960-6096  Email: info@vioxxgroup.com
Attorneys may not be certified by the Texas Board of Legal Specialization

January 5, 2009

Stacey A. Tarpley-Evering
23 Circle Drive
Arnold, MO  63010

Re:    Mrs. Pamela A. Tarpley Potential Vioxx® Claim
       Vioxx® Settlement Update

Dear Stacey:

Season's greetings!  We trust and hope that you and your loved ones have had a happy holiday and we wish you all the best for 2009.  With the New Year upon us, we wanted to update you on the status of your Vioxx case.  We know that the fight against Merck took a long time and we also know that the settlement process has dragged out too long.  But, we appreciate your cooperation, patience, and understanding, and we look forward to completing your case in the very near future.

We have been doing everything we can to get your settlement funds to you as soon as possible and we will continue to do so.  As you know, after years of hard work, yours and ours, the settlement was announced in November 2007.  While we were pleased that there was a process to possibly settle your case, we had serious problems with several provisions of the settlement.  In fact, unless the Settlement Agreement was changed in important ways, we could not have, consistent with our ethical obligations to you and to the legal profession, recommended that you accept the settlement.  A month after the settlement was announced, in December 2007, we filed a motion asking Judge Fallon, in New Orleans (the federal judge overseeing the Vioxx settlement), to change the agreement in three important ways.

- First, the agreement required us to recommend the settlement to 100% of our clients or to none.  In other words, even though we thought that the settlement was good for some clients, but not all, we could not accept the settlement for the clients we felt should be in the settlement unless we enrolled the client it wasn't good for.  Agreeing to this "all or nothing" approach violates the ethical duty of every attorney to give every client the benefit of our independent professional judgment and to render candid advice.

- Second, the agreement required us to withdraw from representing you if you rejected the settlement.  This provision is contrary to the ethics codes in every state.  An attorney cannot agree not to represent someone merely because they rejected the settlement.  Agreeing to limit who could get legal services is an unethical limitation on making legal services available to those that need them.

007751FL

Vioxx® Settlement Update
January 5, 2009
Page 2 of 7

- Third, the agreement had no deadlines as to when you would be paid. We asked Judge Fallon to change that and put a firm deadline as to when every claim would be paid. While not having deadlines did not violate any ethical code, we felt that it was important for you to know when you would receive your money.

We were successful in changing the "all or nothing" provision and the mandatory withdrawal provision. The result was that we could exercise our independent judgment for each client and recommend that some clients accept the settlement (if we thought that was best for them) while preserving the right to recommend to other clients that they not accept the settlement (if that is what we thought best for them). Unfortunately, we were not able to secure any final deadlines as to when clients will receive their money. And, as we predicted more than a year ago when the settlement was first announced, the settlement process is dragging out way too long.

In addition to changing the settlement agreement so that we could recommend that most of you accept it, we have worked in other ways to get you paid as soon as possible. As you probably know from our phone calls and letters, we have worked hard preparing and submitting all of the claims materials for clients with potentially meritorious cases. Even though we have met every deadline in the settlement agreement, Merck and the Claims Administrator do not have deadlines in the agreement as to when they must pay you. It is taking much too long for us to get your money from Merck so that we can get it to you.

Payments for heart attack victims were supposed to begin in August 2008. Technically, they did, but there were very few paid (approximately 255) and it was just a couple of days before the end of the month. We noticed that the Claims Administrator and/or Merck were taking the position that some of the claims materials we had submitted were "deficient." We believed they were wrong and we wrote a letter to the judge advising him that the deficiency process could "spin out of control" and derail the settlement, or at least slow down payments unnecessarily. In response to our letter, the judge recommended at the August status conference that a deficiency committee be formed to report to the judge about the status of deficiencies and that we "have a focus on it every month."

In September, again few claims were paid (about 500). In fact, from August through October, only 1,315 claims were paid. That is 483 per month. At that rate, it would take 76 months—over 6 years—to pay just the heart attack claims. Our concern that you were not being paid quickly enough was growing. We decided to speak to the judge about it. No other attorneys have raised these issues. And, while we may not be making friends by asking these questions, we are doing so for your benefit.

At the November 21, 2008 status conference, one of our members, John Eddie Williams, founding partner of Williams, Kherkher, Hart & Boundas, LLP, pressed the Claims Administrator to explain why clients had not been paid more quickly.

MR. WILLIAMS: John Eddie Williams. Your Honor, is it appropriate, since I'm an advocate for almost 2,000 people, to ask some questions at this time because we are getting calls from clients legitimately? * * * Judge, as I see it -- I did a rough math -- about 5 percent of the money has been paid out. By the end of the year, only about 10 percent of the claimants will have received 40 percent of their payment. So people are asking -- and when this thing was revealed to us, people said we would be getting money to the clients this past September. I understand the lawyers have

Vioxx® Settlement Update
January 5, 2009
Page 3 of 7

drug their feet in some ways or worked hard in others to get the stuff, but the question I get from clients is: When will this money be paid?

At this pace, if you could do 1,500 a month and you have 45,000 to do; the math seems to be another 30 months, 2.5 years, to get this wrapped up at this pace. So I think clients legitimately want to know: When do we expect this to be wrapped up? The statistics are very revealing and educational. They want to know: When do I get my money? So when do we anticipate, A, I guess, the heart attacks all being paid, the heart cases? When will that be wrapped up? When will the strokes get their first payment and when will that be wrapped up? That's kind of where I'm headed, Your Honor.

THE COURT: Can you answer that?

MS. GREER: Yes. Your Honor, **the estimate now is that the final payment for the MI claims will be summer of 2009.** * * * We believe that summer 2009 is a realistic projection for when MI claims are going to be paid.

THE COURT: * * * I would hope that we would pick the speed up a bit from the 1,700, maybe 2,000 or 3,000 or 4,000. So what you're saying is that you would project that by the summer of 2009 you will finish paying the MI claims?

* * *

MR. WILLIAMS: So the MI claimants, by summer of 2009, should get a full 100 hundred percent of their payment?

MS. GREER: That is what we are currently projecting. You also asked about the stroke claims. **The first interim payment for stroke claims will be in February of 2009.**

* * *

MR. WILLIAMS: I'm not sure what percentage of the 48,000 are MI claims, but if we are doing 1,500 or 2,000 a month and, say, there's another nine months, if you do the math, even at 2,000 a month, that equals 18,000 claims between now and the end of the summer of 2009. I don't know how that math works out. The math doesn't work out to me is what I want to point out. It leaves me to --

* * *

MS. GREER: We are committed to making the MI final payments next summer. * * * Based on what we are seeing now, we believe we will be able to make the MI final payments next summer. The rate of MI claims versus stroke claims, it's about 70/30, so the stroke claims are fewer in number.

* * *

Vioxx® Settlement Update
January 5, 2009
Page 4 of 7

MR. WILLIAMS:  Judge, I don't mean to be tough on this, but this is my clients who are calling me.  If I do the math, if 70 percent of the claims -- roughly, 37,000 -- are MI, you have nine months until the end of next summer, and you're doing it max 2,000 a month, that's 18,000.

THE COURT:  * * * The first month was like 100.  Now they are 1,700.  Hopefully, by the next couple weeks, it will be 5,000 a month.

MR. WILLIAMS:  I understand, Your Honor.  We were also told, when the settlement was done, that these people should expect their first payment this past September.  I'm being tough and it's because I'm being an advocate for these people because they call us.  I want to make sure that -- if we are committed to the end of next summer to get 100 percent paid, that's more information than I knew, and that's great news.  I will do everything we can.  I compliment them if they can achieve that goal, but at least now we know so I can tell my clients.

At the December 19, 2008 Status Conference, the judge's hope that 5,000 a month would be paid didn't happen.  Even the goal of paying 2,000 wasn't met.  Mr. Williams again raised the issue about you and the other clients getting paid quickly:

MR. WILLIAMS:  Your Honor, if I may, John Eddie Williams.  I just noted, Judge, that the goal, as stated from my notes from the last meeting, was not fulfilled.  The goal was to pay 2,000 claims by this date and it was approximately 1,500 claims.  The other thing I note, Judge, is if you total the cases that are in queue for the gates process or that are in the gates review process, those total 36,000 cases, I believe, and that's 75 percent of all the claims, approximately.  * * * When I see that the gates process, 75 percent of the claims are either in queue or in the gates process review, that tells me there's a hurdle somewhere stopping those 75 percent of the claimants getting to the point where they get paid.  That's what I'm trying to figure out is, you know, where in the process we are having our problem, where in the pipeline is there a blockage.

MS. GREER:  I can respond to that.  First of all, the 16,500, I wouldn't call that a hurdle.  * * * The gate review hurdle, as you describe it, the 19,000, is just the longest part of the process.  There may be a member of the gate committee who can speak to this better than I . . .

* * *

MR. WILLIAMS:  Judge, I would just note that where we stand today, we have less than 10 percent of the people – we have 4,585, which is less than 10 percent -- have gotten their first interim payment.  The goal stated last meeting was 5,000 by the end of the year and that's been scaled back.  We haven't made that goal.  There was also a representation that we would boost things, the rapidity.  That was said last time, that we would ramp things up, and obviously that hasn't happened.  I'm not faulting Brown Greer at all because I think they do excellent work.  There are numerous hurdles, Judge, and I'm just thinking at some point maybe we ought to be able to break it down and look -- putting aside those things where the claimant is at fault or the claimant's lawyers for not getting the documents, I'm looking at things where people have gotten all the information.  Is our hurdle the Gates Committee?  Is it the Bryan Cave law firm?  Is it something other than the process?  I'm trying to be an alarmist because we haven't met our goals.

* * *

Vioxx® Settlement Update
January 5, 2009
Page 5 of 7

MR. WILLIAMS:  How do we speed it up is the bottom line. * * * Judge, my basic point is I think it's a fact that I wrote down last time the goal was 5,000 to be paid by the end of the year and now we hear that that goal has -- we are far short.  We are 10 percent short of that goal.  We know that 1,500 to 2,000 a month does not get us through things for 30 months.

I would submit that perhaps we ought to have a goal so that we can see.  I'm pointing out we didn't meet our goal last time.  So we get these things about, you know, there's a percent or a number per day or something, but what would be our goal in the upcoming month for number of people paid? I think that's a reasonable thing for claimants to have that information so we can see what our goal is and see if we achieve it. * * *

But if we have no goal, we don't have a standard to test it by.  I think it was good that we had a goal, and we know that we didn't make the goal.  I don't know the reason.  My point is that, if we have a goal, we can start to study why we don't reach that goal to see if there's a solution to the bottleneck. * * *

Even if it's the appeals that are causing the backlog and us not to achieve our goals, that gives us that information.  What I'm just saying is if we have a goal -- and I don't know that it's the appeals. The Court may know better than I do.  All I'm saying is if we have goals, and then we can look, start to study where in the process, why we aren't reaching our goals, is my only thing.

THE COURT:  All right.  The observation is that we ought to have some goals to know whether we are meeting them or failing them. * * * Let's do it this way.  Next time, when you give us a review, let's have a projection as to what you anticipate coming up next time.  We'll see where we are with that.

As you can see, we have worked hard to speed up clients getting paid.  We'll just have to wait until the next status conference on January 22, 2009, to see if clients are getting paid more quickly.

During this time, while we were working hard on your case, the judge issued an order which cuts our compensation in this case.  As we see it, his actions would rewrite your and our written agreement – made years ago – as to what we would be paid if we won.  The judge did not give us any advance notice that he was even considering cutting our compensation until he issued the order.  He didn't even allow us an opportunity to discuss it with him before he did it.

A similar situation would be if you agreed to work for $100 per day, and, after you had worked hard all day, your employer told you he was going to pay you $80, even though he knew the agreement was to pay $100.  You obviously wouldn't think this was fair and we think the attempt to reduce our compensation isn't fair either.  In addition to that 20% "haircut" on our compensation, the group of attorneys that negotiated the settlement agreement (without our knowledge or involvement), is trying to change our prior written agreement as to how much they receive for coordinating with us to prosecute Vioxx cases.  In 2006, we agreed in writing to pay about 5% of our fees for this coordination.  In the settlement agreement they *quadrupled* what they would get paid; it went from 5% to 20% of our fees! That is another 15% "haircut" off of our compensation.  Between the judge's order and the negotiating lawyers' fees, they are trying to reduce our compensation by some 40%!  Imagine your daily pay being arbitrarily cut even more, to $60!

Vioxx® Settlement Update
January 5, 2009
Page 6 of 7

Obviously, we were bothered about the judge's order and the negotiating attorneys' attempt to change our written agreements. So, we recently filed a motion asking the judge to reconsider his order, and not rewrite our agreement with you. In our motion, we made the following major points:

1.  The judge did not have the right or the power to rewrite our agreement with you. He cannot rewrite private fee agreements that were not the subject of any dispute before the judge; no client has complained; and the power to rewrite our agreement was not part of the Vioxx Settlement Agreement.

2.  Even if the judge had the power to rewrite the contracts, he didn't follow the law in doing so. State law governs fee contracts. Here, the judge rewrote fee agreements without considering the laws of the various states.

3.  The judge deprived us of our Constitutional right to due process, that is, <u>notice</u> that he might change our fee agreements and <u>an opportunity for us to present our arguments</u> before he rewrote our agreements.

In contingent fee agreements such as we have with you, you pay us nothing if we are not successful for you. In other words, we take *all* of the risk and get paid *only* if we are successful for you. However, if we do get money for you, we have agreed beforehand that a certain percentage will be for attorneys' fees. We are only trying to preserve that agreement; we do not seek anything more or less. While some may want the attorneys to receive less compensation than what was agreed to, no one complained years ago, before we did all the work and spent all of our time and money to get to this point.

We feel that "a deal is a deal" and we live with that rule ourselves. And, we believe there's nothing wrong in asking to have our agreement honored. Our efforts to preserve our agreements are not in conflict with our obligations to you as is shown by the work we have done and continue to do to achieve the best result for you in the settlement. We trust and hope you feel the same way. If you have any questions about this aspect of your case – or any other aspect — please call us at 1-800-706-8667 so that we can answer any questions you have.

In our efforts to get you paid as soon as possible, you will soon receive a letter and information regarding how to preserve any governmental benefits you may be receiving. If you are currently receiving or seeking to receive Medicaid, SSI or any other needs-based public assistance benefits, it may be necessary for you to do "Exemption Planning" or to create a "Special Needs Trust," which can be set up to receive settlement proceeds and protect your individual rights to receive and/or continue to receive financial assistance or benefits from a need-based public assistance program. Unlike SSI and Medicaid, Social Security Disability Income (SSDI) and Medicare are entitlement programs. Because SSDI and Medicare are entitlement programs based on work history as measured by payment into the Social Security System and do not involve income or resource eligibility tests, the <u>receipt</u> of **your award should not affect your eligibility for these programs because they are not needs-based.**

In addition, the letter will give you the option of setting up a "structured" settlement. This may be a way to take part of your settlement as immediate cash to cover expenses now and part of the settlement as a series of guaranteed, income <u>tax-free</u> future payments to meet your future needs later. Of course, the decision to take a structured settlement is yours.

Vioxx® Settlement Update
January 5, 2009
Page 7 of 7


      In closing, we will continue to work hard for you to maximize your recovery under the Settlement Agreement and get you paid as quickly as possible.  We hope you will continue to support us in this effort.  Again, best wishes for the New Year.

                              Sincerely,

                              Provost Umphrey Law Firm, L.L.P.

                              Williams Kherkher Hart Boundas, L.L.P.

                              Ranier Gayle & Elliot, L.L.C.

                              Watts Law Firm, L.L.P.

                              The Kaiser Firm, L.L.P.