-UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL DOCKET No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L – DIVISION 3 |
| | * | |
| This document relates to the following cases: | * | JUDGE FALLON |
| | * | |
| KURELIC, NOLA W. (05-02101) | * | |
| KJONAAS, JOAN OBO | * | MAG. JUDGE KNOWLES |
|    LONNIE LEE KJONAAS (06-05654) | * | |
| CENTRELLA, KATHRYN OBO | * | |
|    JOSEPH CENTRELLA (05-03164) | * | |
| HEAVNER, BARBARA (tolled) | * | |
| HUNT, ROBERT (06-01505) | * | |
| ROGERS, HOWARD (tolled) | * | |
| | * | |
| Individuals, | * | |
| | * | |
|    Plaintiffs, | * | |
| | * | |
|    v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
|    Defendant. | * | |

## MOTION FOR RELIEF FROM
## PRIVATE LIEN RESOLUTION AGREEMENT

On January 22, 2009, the Plaintiffs' Steering Committee and counsel for various third party insurance providers ("TPPs") announced to this Court that a Private Lien Resolution Agreement ("PLR Agreement") was reached to resolve potential Vioxx-related liens of third-party private health insurance providers. Plaintiffs voluntarily agreed to participate in the Private Lien Resolution Program ("PLR Program"). The TPPs have breached the PLR Agreement by failing to provide lien data in a timely fashion before the heart attack final payment, by asserting liens for expenses unrelated to the Vioxx injury, and by asserting an ultra vires right to audit the findings of the Lien Resolution Administrator ("LRA"). Therefore, Plaintiffs seek relief from

1

the PLR Agreement and move the Court for an order finding that the private liens asserted against them are deemed waived.

While the Vioxx Master Settlement Agreement required that liens asserted by TPPs be satisfied from each claimant's settlement proceeds, few private liens had been asserted prior to entering the PLR Agreement, and this Court had rejected the TPPs' broad attempts to obtain the identities of claimants without their consent for the purpose of asserting liens. The PLR Agreement provided the means by which TPPs could recoup medical expenses from eligible claimants even in cases where a lien had not been asserted or where the TPPs had insufficient identifying information to properly assert liens. In return, Eligible Claimants were given the opportunity to voluntarily participate in the lien resolution program and to have liens resolved at a significant discount. In recommending to Eligible Claimants that they should participate in the lien resolution program, Primary Counsel relied on the representations of the TPPs that the PLR Program would fairly and efficiently resolve potential liens.

Nola Kurelic, Joan Kjonaas, on behalf of her deceased husband, Lonnie Kjonaas, Kathryn Centrella on behalf of her deceased husband, Joseph Centrella, Mrs. Barbara Heavner, Mr. Robert Hunt and Mr. Howard Rogers (hereinafter collectively the "Moving Claimants") each agreed to participate in the PLR Program, not because formal liens had been asserted by any private third party insurance provider, but because the PLR Program, as represented to them, offered an opportunity to resolve potential liens – liens that could be asserted against them in the future – in a fast, efficient, and fair manner. To date, $487,239.56 has been withheld from these claimants' final settlement payments – the Moving Claimants have discovered that the PLR Program is not as fair and efficient as it was represented to be.

While the PLR Program was designed to efficiently and fairly resolve potential private healthcare liens, to date, the TPPs have failed to properly and timely submit claims data related

to the claimants' medical event giving rise to settlement payments, thereby unduly prejudicing each claimant participating in the PLR Program. First, due to the TPPs' delay and the manner in which they produced claims data to the LRA, 15% of the gross settlement amount has been withheld from the Moving Claimants' final settlement payments, amounts significantly greater than the unaudited, inbound lien amounts received from TPPs. Second, the TPPs, in violation of agreements previously reached with the PSC and the LRA regarding reimbursable diagnostic codes and the protocol regarding production of claims data and the development and finalization of lien amounts, have objected to the manner in which the LRA is reaching audited, final lien values. Third, the TPPs have unilaterally read into the PLR Agreement the right to approve all audited lien amounts before settlement funds can be released to Eligible Claimants. For these reasons, the TPPs are in breach of the PLR Agreement, and the Moving Claimants, who voluntarily enrolled in the PLR Program, are entitled to relief and urge the Court to deem all private liens waived.

    **I.**    **The TPPs Failure to Exercise Reasonable Diligence in Providing Lien Data to the Lien Resolution Administrator Resulted in 15% of the Moving Claimants' Gross Settlement Being Unfairly Withheld from their Final Payment**

The PLR Agreement required the TPPs to exercise "reasonable diligence" to finalize liens and to ensure that TPP Capped Lien Amounts[1] withheld from settlement payments were released to claimants expeditiously.[2] The TPPs have failed to exercise reasonable diligence and

---

[1] *See* PLR Agreement Part A.6. at pp. 6-7 ("The TPP Capped Lien Amount shall be calculated by taking the sum of (i) 15% of the EC's Gross Recovery up to the first $100,000, (ii) 12.5% of the EC's Gross Recovery over $100,000 and up to $250,000, and (iii) 10% of the EC's Gross Recovery exceeding $250,000.").

[2] *See* PLR Agreement Part A.10. at p. 8 ("Each participating health plan **shall** be required to exercise reasonable diligence so as to ensure expeditious payment of the actual TPP Capped Lien Amount so as to facilitate the expeditious release of any remaining amounts under those holdback provisions to every EC.") (emphasis added).

to use their "reasonable best efforts" to ensure that lien data was timely submitted to the LRA, as required by the PLR Agreement. In many cases, the lien data submitted to the LRA was later retracted by the TPPs as inaccurate. More commonly, claims data was submitted to the LRA on a rolling basis, effectively preventing the LRA from finalizing audited lien amounts. Despite the well published final payment deadline of September 30, 2009, many TPPs submitted significant amounts of data to the LRA on September 29, 2009, and some TPPs failed to submit any usable data until after the MI Final Payment date. Due to the nature of the TPPs' production of lien data to the LRA, the LRA was forced to withhold 15% of the gross settlement of all Eligible Claimants, including the settlement payments of the Moving Claimants.

The obvious result of the TPPs conduct was to effectively prohibit final lien amounts to be reached, causing significant lien holdbacks even in instances where the medical expenses covered were minimal at best. For example, Mr. Lonnie Kjonass died of sudden cardiac death and was pronounced dead in the emergency room. The only expenses the TPP incurred as a result of Mr. Kjonass' death were for the ambulance transport and the pronouncement of death at the hospital totaling $1,657.64. Instead of using due diligence to provide the LRA with lien data on a timely basis, 15% of Mr. Kjonass' total recovery or $80,469.45 – which is more than *48 times* the actual lien amount – was withheld from Mr. Kjonass' settlement payment.

Mr. Joseph Centrella also died of sudden cardiac death and was pronounced dead in the emergency room. The actual medical expenses incurred were $557.50. However, because the TPP failed to timely provide the LRA with lien data, $76,690.01 – more than *137 times* the actual lien amount – was withheld from Mr. Centrella's settlement payment.

Mrs. Barbara Heavner died of sudden cardiac death at her home. Even though the private lien holder only incurred expenses totaling $13.76, more than *6,158 times* the actual lien amount or $84,746.85 was withheld. Mr. Howard Rogers and Mr. Robert Hunt suffered the same undue

4

prejudice when the private lien holder withheld *20 times* Mr. Rogers' actual lien amount, and *56 times* Mr. Hunt's actual lien amount.

As a result of the TPPs' failure to exercise reasonable diligence, the Moving Claimants have suffered undue prejudice as TPP Capped Lien Amounts have been withheld from their final settlement checks in amounts far in excess of any lien that could have been asserted. Had the TPPs abided by the terms of the PLR Agreement and used their reasonable best efforts to gather and submit claims data for eligible claimants, audited, finalized lien values could have been withheld from the Moving Claimants' final payments. The TPPs' failure to do so has caused these, and many other Eligible Claimants, to suffer undue prejudice. As a result, these liens should be deemed waived.

## II. The TPPs Have Sought Reimbursement for Claims Unrelated to Injuries Compensated through the Vioxx Settlement Program

Where lien data has been submitted by the TPPs to the LRA, it is apparent that the TPPs have failed to limit the claims data to medical treatment relating to the injury compensated through the Vioxx Settlement Program, consistent with the agreement previously reached regarding approved diagnostic codes and the PLR Program protocol. Specifically, Part A.5. of the PLR Agreement provides that the "TPPC, the PSC, and [the LRA] shall, on or before March 30, 2009, agree upon a set of automated diagnosis and procedure codes with which to establish lien amounts for each EC [Eligible Claimant]." *See* Settlement Agreement at p. 6. Accordingly, the LRA sent the TPPs the codes to be used in the reimbursement process, and those codes were approved by the TPPs in March 2009. Further, the LRA sent the TPPs the PLR Program protocol (the "Protocol") in March 2009. Specifically, the Protocol specified the method of claims production, development, and finalization – including the process for auditing for pre-existing conditions and code hierarchy (primary, secondary and tertiary). The Protocol requested claims history for the year prior to the compensated event so that pre-existing conditions and

injuries could be identified. After approving the reimbursable diagnostic codes and having reviewed the Protocol in March, the TPPs chose not to walk-away from the PLR Agreement.[3]

Nevertheless, the TPPs have submitted claims data to the LRA seeking reimbursement for medical expenses clearly unrelated to the injury compensated through the Vioxx Settlement Program. For example, Mrs. Nola Kurelic suffered a level 3 injury, defined by the Vioxx Settlement Agreement as 15-29 days of hospitalization or coronary artery bypass surgery (CABG). Based on the nature of her injury, the duration of VIOXX use, and the proximity between the use and the injury, Mrs. Kurelic was awarded a total of 214.67 points equaling a settlement value of $400,361.70. The private lien holder asserts that this level 3 injury resulted in reimbursable medical expenses of $2,961,519.06 – more than 7 *times* the amount of Mrs. Kurelic's total award. While we have requested detailed information related to the exact expenses for which the private lien holder is seeking reimbursement, it is clear that 15-29 days of hospitalization or a coronary artery bypass surgery would not cost almost 3 million dollars.

As evidenced above, the TPPs are clearly seeking reimbursement for charges unrelated to the injury compensated through the Vioxx Settlement Program in breach of the PLR Agreement. The TPPs have failed to use reasonable diligence and their best efforts to comply with the terms of the PLR Agreement. As a result, the liens asserted by these TPPs for medical expenses unrelated to Vioxx injuries should be deemed waived.

### III. The TPPs Have Unilaterally Insisted Upon Auditing All Liens Prior to the Release of Settlement Funds in Violation of the PLR Agreement

While the LRA has now audited over 90% of the inbound liens, the TPPs have unilaterally read into the PLR Agreement the right to audit every audited lien amount prior to the release of settlement funds to Eligible Claimants. Thus, while the Moving Claimants have

---

[3] *See* PLR Agreement Part A.2. at p. 4 ("In the event that less than 90% of ECs [Eligible Claimants] elect to participate in the LRP, the TPPC shall have the right to terminate this Agreement on or before March 31, 2009.").

inbound lien amounts far less than the TPP Capped Lien Amounts which have been withheld from their settlement payments, the TPPs are prohibiting the release of the settlement funds to which the Moving Claimants are entitled, in breach of the PLR Agreement.

As discussed above, the TPPs agreed to the approved diagnostic codes and the PLR Program Protocol in March. Further, part B.1 of the PLR Agreement sets forth an appeal process if a party disagrees with the results of an audited, finalized lien. The TPPs are not using this process and are instead asserting a right to review and approve each audited lien amount before the lien is finalized and the settlement funds are released to Eligible Claimants. As a result, thousands of Vioxx claimants, many with nominal inbound lien amounts, are now waiting for the LRA to release tens of thousands of dollars withheld from settlement payments. Many more have tremendous inbound lien amounts that clearly have no relation to the Vioxx injury. Settlement funds are now being kept from claimants by the TPPs because they refuse to approve any audited lien amounts as a result of their newly expressed disagreement over audit terms.

## CONCLUSION

The Moving Claimants voluntarily agreed to participate in the PLR Program based upon representations that the PLR Program would be fair and efficient. In agreeing to participate, the Moving Claimants, none of whom had been formally notified of a lien, agreed to disclose their identities to the TPPs and to abide by the terms of the PLR Agreement. Rather than focus on the fair and efficient resolution of potential liens associated with Eligible Claimants who chose to participate in the program, the TPPs focused their efforts on persuading other claimants to participate. While the TPPs have clearly benefited from this process – the identities of thousands of Vioxx claimants have been disclosed – the TPPs continue to hinder the realization of a fair process to resolve potential third party payor obligations. The TPPs have failed to act in good faith and to use reasonable diligence. The Eligible Claimants are entitled to relief, and request

that the Court deem the liens asserted against them under the PLRP to be waived. Any other result exposes the Moving Claimants to future action by the participating plans and results in undue prejudice to these unwitting victims.

Dated: October 26, 2009

        Respectfully submitted,

        */s/ P. Leigh O'Dell*
        ANDY D. BIRCHFIELD, JR.
        W. ROGER SMITH, III
        P. LEIGH O'DELL
        **BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
        234 Commerce Street
        Montgomery, AL 36104
        Telephone (334) 269-2343
        Facsimile (334) 954-7555

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Plaintiffs' Motion for Relief from Private Lien Resolution Agreement has been served on Liaison Counsel, Phillip A. Wittman and Russ Herman, by e-mail, on Merck's Counsel, Douglas R. Marvin, by e-mail, on Counsel for Third Party Payor Counsel, Thomas M. Sobol, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this the 26th day of October, 2006.

/s/ P. Leigh O'Dell
P. Leigh O'Dell
Attorney for Plaintiffs
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.