## THE VIOXX® LITIGATION CONSORTIUM[1]

PROVOST ★ UMPHREY
LAW FIRM L.L.P.

WILLIAMS KHERKHER
HART & BOUNDAS, L.L.P.

WATTS LAW FIRM L.L.P.

RANIER, GAYLE & ELLIOT
L.L.C.

THE KAISER FIRM,
L.L.P.

P.O. Box 56708, Houston, Texas 77256-6708
Telephone: 1-800-706-8667  or  713-403-7800
Facsimile: 713-960-6096  Email: info@vioxxgroup.com
Attorneys may not be certified by the Texas Board of Legal Specialization

October 22, 2009

Mrs. Stacey A. Evering
23 Circle Drive
Arnold, MO 63010

VIA HAND DELIVERY
FEDERAL EXPRESS

Re:    Your Letter to the Honorable Eldon E. Fallon

Dear Mrs. Evering:

We received a copy of your letter to the Honorable Eldon E. Fallon on October 13, 2009, in which you express several concerns.  It is regrettable that you did not speak with us regarding these issues with us before involving Judge Fallon.  While we understood you were frustrated with how long the settlement process took, you never expressed any complaints to us about our work.  In fact, you thanked us as the case progressed, especially upon receiving the Notice of Points Award.

Before receiving a copy of your letter to Judge Fallon, we had reason to believe you appreciated our work in successfully getting your mother's claim into the Vioxx settlement, not the least of which was that your mother's case did not qualify for any payment under the Vioxx Settlement Agreement.  Her claim did not satisfy the Injury and Proximity Gate Criteria.  Only heart attacks, sudden cardiac deaths, and strokes are compensable under the Settlement Agreement.  Your mother did not suffer a heart attack or stroke, as made clear in the Autopsy Report (attached).  Neither did she suffer a "Sudden Cardiac Death" as defined in the Settlement Agreement; this requires that the death be "unexplained."  Your mother's death was not "unexplained."

[1]This is not a partnership of the attorneys specified above; it is a consortium of attorneys working together on the development of the Vioxx® claims.

Mrs. Stacey A. Evering
October 22, 2009
Page 2

The autopsy established that her death was caused by a prescription medication other than Vioxx. She did not, therefore, meet the Injury Gate Criteria.

Likewise, your mother's medical and pharmacy records did not satisfy the Proximity Gate Criteria. These require that the medical and pharmacy records establish that your mother took Vioxx within 14 days of her Eligible Event. Your mother's medical records establish that her doctors at the Skaggs Southside Family Clinic ordered her to stop taking Vioxx on September 30, 2002, almost exactly a year before her death on September 29, 2003 (attached). There is no evidence she ever filled another Vioxx prescription or took another Vioxx pill.

The Claims Administrator denied your claim for failing to meet the Proximity Gate. We appealed that decision to the Gates Committee and, after many months, won. We were extremely pleased with this result and thought you were too.

Turning to the complaints raised in your letter, your letter first says that you do not know the names of the firms that comprise the Vioxx Litigation Consortium. You state: "they refuse to identify themselves to me," and "I know of no names of the attorneys representing me, as they simply refuse to identify themselves in any manner." This is not correct. The contract of representation you signed with us on March 21, 2005, specifically identifies our firms:

WE HAVE READ AND UNDERSTAND THIS CONTRACT AND AGREE.

CLIENT SIGNATURES:

Stacey A. Tarpley

Printed Name:

Stacey A. Tarpley

S.S.N.:
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

Printed
Name:

S.S.N.:

ATTORNEY SIGNATURE:

Grant Kaiser

PROVOST ★ UMPHREY LAW FIRM, L.L.P.

WILLIAMS ✦ BAILEY LAW FIRM, L.L.P.

WATTS LAW FIRM, L.L.P.

RANIER, GAYLE & ELLIOT, L.L.C., and

THE KAISER FIRM, L.L.P.

P.O. Box 56708
Houston, Texas 77256-6708
(713) 403-7800
(713) 225-0515 Fax
E-mail: info@vioxxgroup.com
http://www.vioxxgroup.com

Date: March 21st                    2005.

Mrs. Stacey A. Evering
October 22, 2009
Page 3

On July 25, 2007, we sent you a letter notifying you that one of the firms had changed

names. In February 2008, the Release you signed agreeing to the Vioxx settlement has the

names of the firms just above your signature accepting the Vioxx settlement:

Sincerely,

Provost Umphrey Law Firm, L.L.P.
Williams Kherkher Hart Boundas, L.L.P.
Watts Law Firm, L.L.P.
Ranier, Gayle & Elliot, L.L.C
The Kaiser Firm, L.L.P.

\*\*\*\*\*\*\*\*\*\*\*

**PLEASE CHECK ONLY ONE:**

X      I ACCEPT the VIOXX® Settlement as explained in this letter, the Description of Settle-
          ment and Release of All Claims.

**OR**

           I REJECT the VIOXX® Settlement as explained in this letter, the Description of Settle-
           ment and Release of All Claims.

Stacey A. Langley                    2-19-08
Claimant's Signature                 Date

On March 5, 2009, we sent you another copy of the client representation agreement list-

ing the firms at your request. Even the letter attached to your letter to Judge Fallon identifies the

five firms involved in the Vioxx Consortium. By March 24, 2009, you authorized another attor-

ney to represent you regarding any fee issues you might have with our group. If you truly had

any doubt as to our firms, your other attorneys certainly knew and could have identified our

firms had you asked.

Moreover, one of our consortium's lead attorneys has personally spoken to you several

times during your case including on February 26, 2009, March 5, 2009, April 9, 2009, and Au-

gust 10, 2009 (and left voicemails for you at other times). Each time he identified himself as one

of the lead attorneys working on your mother's Vioxx claim.

Mrs. Stacey A. Evering
October 22, 2009
Page 4

Our records contain not one single instance where you requested additional information regarding our firms. We do not hide who we are; we have no reason to. We are proud of our organization and of the job that we have done representing our Vioxx clients, including you.

With regard to your husband working for an attorney, you did inform us of that on August 10, 2009, when you called not wanting to open probate. You told us that your husband worked for an attorney, the attorney had reviewed the Vioxx settlement agreement, and he found no requirement for probate. You told us you "don't want to do probate" and didn't "think you should have to." One of our lead attorneys returned your call the same day at 1:02 p.m. and explained where on the Claims Administrator's website you could find the probate requirements of CAP 2008-1.

Further, our records and our policies do not support that you were "told, in essence, not to call anymore." What we do tell clients is that we will notify them when important events occur during their case and, that until the Claims Administrator, Gates Committee, etc., takes some action, we will have no new information to tell them. Unfortunately, the Claims Administrator does not tell us where in line a particular claim is in the process. Our effort to have this information available to all claimants was rejected. Not having this information has been extremely frustrating to us, as well as our clients. When clients call for an update, we often have no new information on their claim from the Claims Administrator and we cannot tell them when we will.

Unfortunately, processing the Vioxx settlement claims has taken a very long time. There have been long periods when we had no new information and would not have any until the Claims Administrator or others took action. We filed your claims material on June 30, 2008. It was not until July 9, 2009 -- more than a year later -- that your claim was processed enough to determine eligibility for the settlement. Even so, you called us during that time, on April 9,

Mrs. Stacey A. Evering
October 22, 2009
Page 5

2009, and May 14, 2009, and were given updates on the status of your claim.  We know that you, along with many other claimants, were frustrated with how long it took for the Claims Administrator to complete its review of the 30,480 heart attack claims.  The good news is that your claim finally qualified and you will be compensated for your loss.

Regarding our work on your case, your letters states that you received little to no correspondence from 2004 to 2006 while we worked on your claim, and then you suddenly received an enrollment packet.  We began working for you in March 2005, not 2004.  Leaving aside for the moment the issue of our letters to you, we took steps to prosecute your claim that many firms would not have taken.  For example, your claim is controlled by the laws of the State of Missouri.  We learned that the Missouri laws (so-called "tort-reform") were going to change on August 28, 2005.  These changes would seriously damage your rights.  The changes included limits on non-economic damages, restrictions on joint and several responsibility, and limits on punitive damages.

Because of these upcoming changes, one of our staff flew to New Orleans on August 25, 2005, personally to file your claim.  We took this extra step to make sure your claim was filed before those changes took effect; we did not take any chance it would not be filed timely by sending it through the U.S. Mail or even by Federal Express.  While the risk that Federal Express would not deliver the package timely was small, we considered even this small risk to be too high to take.  Now, for you to imply that we did not care about you and how your case was handled, when we went to these lengths for you, is unfortunate.

Returning to our communications with you, we did communicate with you as was necessary to properly handle your claim, when important events occurred in your case and to give general status updates.  Many times our communications were not by letter.  We spoke by tele-

Mrs. Stacey A. Evering
October 22, 2009
Page 6

phone and/or exchanged correspondence with you more than twenty times from March 2005

through 2007. When not speaking with you, we were still working on your case, gathering the

necessary records, analyzing them to determine whether you had a case and, if so, determine how

strong your case was. In addition to our telephone contacts, we did correspond with you but we

did not do so unnecessarily. Some of our clients have told us that we send them too much infor-

mation. You imply we sent too little. The overwhelming majority of our clients had no com-

plaints about our communication with them and the attention we paid to them and their claims.

During the same period, we were busy establishing that Merck & Co., Inc., failed to warn

of the hazards associated with the use of Vioxx and that Vioxx caused cardiovascular problems,

not to mention gathering the necessary medical and pharmacy records on all of our other clients

to assess whether they have a good case to try. Our group tried two Vioxx cases to verdict our-

selves, helped in the trials of at least four other cases, and had formally offered to try many oth-

ers before the settlement was announced. We regret that you felt that you received too little

communication, but hope this additional information places matters in context.

Your letter next states that you received the enrollment packet and were told that it was

due back to us "*the next day.*" The records show otherwise. From the day the settlement was

announced on November 9, 2007, until February 2008, we busily accomplished all the steps nec-

essary for us to be in the position to send your enrollment documents. On February 9, 2008, we

sent you a letter enclosing the information about enrollment and the actions you needed to take to

enroll. We wrote that returning the documents to us as soon as possible would allow us to file

them with the Claims Administrator by February 29, 2008. This was the deadline for filing to

receive an Interim Payment; it was not the deadline to *accept* the settlement. On page 3, our let-

ter stated:

Mrs. Stacey A. Evering
October 22, 2009
Page 7

> **If you (1) accept the settlement** and return the necessary documents to us **AS SOON AS POSSIBLE -- BEFORE FEBRUARY 15TH -- and (2) are enrolled in the Settlement by February 29, 2008, you will receive an early payment**. The early payment for claimants that accept the settlement and have their documents submitted quickly will be about forty percent (40%) of what the Claims Administrator estimates your final gross settlement value to be. The first payments may be made as early as September 2008 for heart attack claimants, and may be as early as March 2009 for qualifying stroke claimants. **If you do not return your documents to us by February 15th we may not be able to meet the February 29, 2008, deadline and you may not receive the early first payment.**

As you can see, our letter said that (1) "**if** you accept the settlement" and (2) return the documents to us quickly, then we could file them by February 29, 2008, the deadline to receive an Interim Payment.  To make that deadline, we asked for the packets to be returned to us no later than February 15th, so we would have enough time to receive the packets, check them to see if they were completed correctly, and, if they were not completed correctly, we would have time to correct any problems and still file them by February 29, 2008.  On February 19, 2008, we wrote you again asking if you wanted to accept the settlement because we had not received your enrollment documents.

You could have held your enrollment documents for months after February 29, 2008, if you had asked for or needed more time to decide whether to accept the settlement.  The *final* deadline to submit enrollment documents was eight months later, on October 30, 2008.  The only consequence of waiting until after February 29, 2008, would be that you would not be eligible to receive an Interim Payment.

Further, your claim that you called us in February 2008 and were told that you would not be bound to "anything" by signing the documents is nonsensical and contradicted by all of the documentary evidence including (1) the letter we enclosed with the enrollment packet, (2) the "Description of Settlement Agreement" that was included in the enrollment packet, (3) the docu-

Mrs. Stacey A. Evering
October 22, 2009
Page 8

ments you signed and stated that you understood, (4) our policies and procedures, and (5) our

documented files.

The cover letter to the enrollment packet we sent you on February 9, 2008, states: "The

enclosed Description of Settlement Program and Claim Valuation Examples" explain the Settle-

ment in more detail. Please review these documents carefully." The Description of Settlement

Agreement we enclosed specifically states:

## Irrevocability of the Submission of a Release

**Submission of a Release by an Eligible Claimant or the Eligible Claimant's Primary Counsel is irrevocable.** No Eligible Claimant may under any circumstances or for any reason request the return of his/her Release or Dismissal Stipulation, or otherwise unilaterally exit the Settlement Program, unless specifically provided for in the Settlement Program Agreement.

**By submitting the Release, the Eligible Claimant is agreeing to be bound by all terms and conditions of the Settlement Program, including agreeing to accept the final value accorded the Eligible Claimant's claim under the Program's claim valuation process, if the Eligible Claimant qualifies for compensation through the Settlement Program.**

Description of Vioxx Settlement at page 7 (bold and underscore original). In addition to

informing you that submission of enrollment documents was irrevocable, the Description

also stated the only circumstance under which you could return to the court system -- if

you did not qualify for payment:

If the Eligible Claimant does not qualify for payment from the Settlement, he or she may:

1. return to the court system (after signing a Future Evidence Stipulation); or
2. take no action for thirty (30) days, after which the VIOXX case will be dismissed; or
3. appeal the decision to the Special Master, who will review the Eligible Claimant's complete Claims Package again.

Mrs. Stacey A. Evering
October 22, 2009
Page 9

The Release you signed stated that you understood what you were signing, you were not "pressured" to sign it and that you did not sign it in reliance of any statement by any person:

> 8. **ACKNOWLEDGMENT OF COMPREHENSION; NO GUARANTEE OF PAYMENT. I AM ENTERING INTO THIS RELEASE FREELY AND VOLUNTARILY, WITHOUT BEING INDUCED, PRESSURED OR INFLUENCED BY, AND WITHOUT RELYING ON ANY REPRESENTATION OR OTHER STATEMENT MADE BY OR ON BEHALF OF MERCK OR ANY OTHER PERSON.**

A copy of the Release is attached. Your signature accepting the settlement states: "I ACCEPT the VIOXX Settlement as explained in this letter, the Description of Settlement and Release of All Claims."

Further, our records do not support your statement that you called us in February 2008. You did call in April 2008 but that was to give us your new phone number and obtain an advance on your case, not to discuss whether you should accept the settlement.

Your letter next states that "they didn't file my paperwork until June." This statement confuses two different deadlines. The date by which "enrollment packets" had to be filed in order to receive an Interim Payment was February 29, 2008. You sent your enrollment packet to us on February 19, 2008. We received it on February 21, 2008, reviewed it for completeness, and filed it on February 29, 2008. We did not, in other words, sit on your enrollment materials for four months before filing them; we filed them within days of receiving and reviewing them.

The filing date you mention in your letter was for submission of "claims packages." The original deadline for filing claims packages stated in the Settlement Agreement was July 1, 2008. We filed yours on June 30, 2008.

You are correct that we did not "cooperate" with your request for a loan from Oasis Legal Funding on your mother's case. We communicated our position on these types of companies to

Mrs. Stacey A. Evering
October 22, 2009
Page 10

you on April 30, 2008, very soon after you contacted us.  It is our firm policy not to encourage

clients to deal with companies that advance money on cases.  These companies' fees are exorbi-

tant for the amount received and the loans create other problems that would not otherwise exist.

But, Oasis could have lent you money without our help.  All they have to do is place us on notice

that they have loaned funds on a case and that they have a lien.  We are then obligated to deal

with the lien if we receive funds for you.

As it concerns fees and expenses, our records do not support your claim that you "asked

them repeatedly for an itemized expense report."  You did call once, on March 5, 2009, and ask

for a copy of your agreement with us and a list of expenses.  One of our lead attorneys spoke

with you and explained that our customary process is to send itemized expenses when we receive

settlement funds and send checks; you told us that was fine.  We sent you another copy of the fee

agreement.

Thompson & Coburn's experience with clients asking for "expense reports before the

normal billing cycle" is not analogous.  Thompson & Coburn in all probability charges fees by

the hour and their clients pay fees and expenses monthly.  Providing detailed, monthly expense

and fee statements is required for hourly attorneys.  That is not the same situation when we do

not charge you for anything monthly and you do not pay us anything monthly.  Even so, you told

us that our customary policy to send expense statements at the end was fine with you.

Your statement that you "should not have to pay" us "to pat ourselves on the back" mis-

understands how we are compensated.  The amount you agreed to pay us does not depend on

how many letters we send you.  We are paid only for results -- only if we obtain a recovery for

you.  The letter we did send you – and that you sent to Judge Fallon – did pertain to your case.

In it, we explained our efforts to have you and all of our other clients paid more quickly.  At

Mrs. Stacey A. Evering
October 22, 2009
Page 11

times you complain that we did not communicate enough but when we did, you complain about that.

You say the letter had no "bearing" on your case. This is difficult to understand, especially given your repeated calls that you needed money because of your credit card debt, your in-default school loans, your wage garnishment notice, and your request on January 5, 2009, to participate in the "hardship program." You told us that stroke clients should not be paid until all heart attack claimants are paid. You wrote on an Internet blog that no one at the Vioxx Consortium should take even a short vacation until you are paid. (You learned one of our staff was on vacation because we were working with you to obtain additional information about the status of your claim. You were told that a particular member of our staff would not be able to return your call because he would be on vacation the following week. Despite being on vacation, this individual made several calls to various people regarding your claim, and called you to update you on the developments.)

We have never asked any client, including you, to tell Judge Fallon that he or she wanted to keep their original fee agreement. And, we have never disparaged Judge Fallon, no matter how much we may disagree with him on certain issues. As Judge Fallon has said in open court, we are serious professionals fighting for the important legal principles of due process and the sanctity of contracts. We do not wage these battles by asking clients to call the court. Some of our clients have asked us to tell Judge Fallon that we "deserve a raise." We did not advise that client to call Judge Fallon either. The overwhelming majority of our clients consider that 'a deal is a deal" and that signed, written agreements should be reliable.

You next allege that we advised you not to start probate in January 2009 because it "would hurt [your] settlement amount." We do not understand how opening probate could affect

Mrs. Stacey A. Evering
October 22, 2009
Page 12

your claim's settlement amount. The value of a Vioxx case depends on the information in the

medical and pharmacy records and how many points those records support. Opening probate

would have no impact on the number of points assessed for your case and we would not tell any-

one that it does.

We did advise you in writing about probate issues. In our May 22, 2008 letter (attached),

we advised you that Merck may require that probate be opened and that we were awaiting

Merck's decision on this. On October 28, 2008, you called and we advised you to wait to open

probate to keep expenses down, in the event your claim would be deemed ineligible. On August

10, 2009, we returned your call asking about probate. You told us you "don't want to do pro-

bate" and didn't "think you should have to," citing the attorney with whom your husband works.

You never expressed any complaints about not starting probate earlier.

Your allegation that we "extorted" you to use specific probate counsel is contrary to the

documented record. In our May 22, 2008, letter regarding probate (attached), we wrote:

> If Merck does require that probate be opened, our consortium of firms has found a
> probate attorney in your state who is willing to help you with this process. **You
> are not required to work with this attorney** and we make no representations
> whatsoever regarding this firm and the associated attorneys. We will simply pro-
> vide the name of an attorney in your state that might be able to assist you with
> opening the probate estate. **Please feel free to use the attorney of your choice** to
> assist you with this process.

We would never insist that a client hire a particular attorney; it is just bad business prac-

tice. And, the client always makes the choice of whom to hire. Most of our clients asked for a

recommendation and appreciated our assistance. Although we did not agree to handle probate

matters in our client agreement, we found probate counsel and made them available to our clients

as a courtesy. When probate is required in a case, we do not distribute assets of an estate until a

probate court approves the distribution.

Mrs. Stacey A. Evering
October 22, 2009
Page 13

As for interest on settlement funds, if there is a significant amount that will be tied up for a lengthy period, we can put the funds into an interest-bearing account. We did put your funds in an interest bearing account and no one would have told you that you would not receive the interest. If your letter implied that we earn interest on client funds held in our trust accounts, you are misinformed.

In sum, we did not "mess up the initial filing," we did not "falsely advise you that [you] could back out of the settlement," and we did not "refuse to identify ourselves." We sent your enrollment packet in a timely manner; we did not inappropriately advise you not to begin probate proceedings; we have not been offensive to you on the telephone; we did not refuse to let you "seek financial relief through Oasis;" we did not refuse to advise you of the expenses; we did not extort you to use any probate attorney; we did not advise you that you could not discharge us (you have been represented by other counsel on fee matters relating to us since at least March 24, 2009); we have kept you updated on all important developments in your case; we have not "disparaged" Judge Fallon or his rulings; and we did not send letters merely to "pat ourselves on the back." Further, we have not yet received a dime from our work on your case despite spending a significant amount of our time and resources to reach a successful outcome for you.

Your allegation that we did not allow you access to the Claims Administrator's portal is true. The reason for this is that the Claims Administrator, who owns and runs the website, prohibits us from giving access to unauthorized people for security and client confidentiality reasons.

Lastly, your letter requests information about "what needs to be done after the probate hearing." On September 1, 2009, your probate counsel informed us that a hearing had been scheduled for October 19, 2009. We followed up with your probate counsel on October 15,

Mrs. Stacey A. Evering
October 22, 2009
Page 14

2009, before we learned of your letter to Judge Fallon, to ensure that the hearing was still on

schedule and there were no other problems. We received confirmation that your hearing was still

set for October 19, 2009. On October 20, 2009, we received confirmation that the hearing was

conducted and that the court entered appropriate orders.

The procedure following the hearing is that we must (1) receive a signed order from the

probate court directing us how to distribute the proceeds so that we know that the funds are paid

to the right people, (2) make sure that any deductions the Claims Administrator made in your

case are correct, (3) make sure that we received the proper amounts from U.S. Bank, and (4)

complete our final accounting of expenses and fees on your specific case. Once these tasks are

completed, we will send all of the final fee and expense accounting information and a check to

you.

We hope that our letter allows you to better appreciate the circumstances relating to the

issues you expressed in your letter. We have done everything reasonably possible to quickly and

properly prosecute your Vioxx settlement claim and secure the settlement funds. We understand

the anger and frustration that often accompanies the upsetting aftermath of losing a loved one.

We also understand that so long as a case like this is still open, the surviving family cannot com-

plete processing their feelings of grief. All we ask is that you leave room for the possibility that

we did everything we reasonably could to prosecute your Vioxx claim as quickly and properly as

possible.

Because you chose to involve Judge Fallon with your complaints against us instead of

addressing them with us, we feel obligated to send him a copy of this letter so that he will have a

full understanding of the issues you raised. Please let us know within seven days of the date of

Mrs. Stacey A. Evering
October 22, 2009
Page 15

this letter if you object to us sending Judge Fallon our response to your letter.  Otherwise, we

will at that time send him a copy.

      We will continue to work on your case as always and look forward to a final resolution in

the very near future.

                  Sincerely,

                  Provost ★ Umphrey Law Firm, L.L.P.

                  Williams Kherkher Hart Boundas, L.L.P.

                  Ranier, Gayle & Elliot, L.L.C.

                  The Watts Law Firm, L.L.P.

                  The Kaiser Firm, L.L.P.

cc:    VIA EMAIL
       Stacy Seicshnaydre

MDL 07751

### KEITH N. NORTON, M.D.
### SOUTHWEST MISSOURI FORENSICS
### P. O. BOX 1695
### NIXA, MO  65714

| NAME | AGE | DOB | AUTOPSY # | F/P |
|------|-----|-----|-----------|-----|
| **TARPLEY, PAM** | **45** | **05-28-58** | **A03-157** | **F** |

| ID# | SS# | | RACE | SEX |
|-----|-----|--|------|-----|
| | | | **CAUCASIAN** | **F** |

| DATE & TIME OF DEATH | PLACE OF DEATH | PERMIT |
|----------------------|----------------|--------|
| **09-28-03** | **STONE COUNTY** | **RICK STUMPFF** |

| DATE & TIME OF AUTOPSY | PLACE OF AUTOPSY | LIMITS TO PERMIT |
|------------------------|------------------|------------------|
| **09-29-03  11:00 AM** | **COX SOUTH** | **NONE** |

ATTENDING AT AUTOPSY
**DR. NORTON, RON YODER – SMF**
**LT. TIM GIDEON – STONE COUNTY SHERIFF'S DEPARTMENT**

TOXICOLOGY:  **BL, BR, V, L**

**FINAL DIAGNOSES**

- Citalopram intoxication, lethal
- Coronary atherosclerosis, concentric, moderate to severe
- Pulmonary emphysema, moderate to severe
- Splenomegaly, 250 grams
- Aortic atherosclerosis, moderate
- Leiomyoma uteri, 1 cm, incidental
- Cutaneous contusions and abrasion, incidental

*Keith N. Norton, m.D.*
**KEITH N. NORTON, M.D.**
**FORENSIC PATHOLOGIST**

DISTRIBUTION

7751

A03-157
Tarpley, Pam

## CIRCUMSTANCES

This 45-year-old Caucasian female has a long history of chronic obstructive pulmonary disease and depression.  On the day of her death, she was in her usual state of health until she complained of a burning sensation in her chest for which she took "Tums".  This seemed to relieve the feeling for a period of time, but when it returned she asked for more "Tums" and went to the bathroom where her partner heard her collapse.  The partner attempted CPR, but this was unsuccessful and had not revived her by the time that the emergency squad arrived.  She was pronounced dead after EKG electrodes and defibrillator pads showed no electrical rhythm.  An autopsy was requested by Rick Stumpff, the coroner of Stone County, to rule out foul play.  There is some suggestion that this lady had a history of drug abuse.

**CLOTHING:**  The body is clothed in a gray tee shirt and white Hanes "Her Way" jockey style panties.

**JEWELRY:**  There is a fine gold-colored chain necklace with a "Bugs Bunny" pendant.  In addition, there are pierced earrings which are horseshoe shaped with silver-colored beads on the ends.

## EXTERNAL EXAMINATION

**EXTERNAL:**  The body is that of a Caucasian female whose appearance suggests an age somewhat greater than the stated age of 45 years.  The height is 67 inches.  The weight is estimated at 160 to 170 pounds.  Rigor mortis is full.  Lividity is posterior and fixed.  The body temperature is cool.  The physique is endomorphic.  The hair is dark brown with some gray.  The eyes are brown with peripheral gray.  There are no conjunctival hemorrhages.  The external auditory meati are free of blood.  The nose contains no blood and shows no evidence of bony fracture.  The mouth shows no evidence of intra-oral injury.  The teeth are the decedent's natural teeth inferiorly, but the upper teeth are represented by a denture.  The head, neck, chest, abdomen, back, arms and legs are unremarkable except for the below-described Injuries, Findings, Therapeutic Modalities, Scars and Identifying Marks.  The genitalia are those of the normal adult female.  The

Page 2
Tarpley, Pam

pubic hair has been shaven.  The gluteal fold is free of debris, but there are two hemorrhoidal tags.

**INJURIES**
**EXTERNAL:**  There are two contusions on the medial aspect of the left upper arm distally.  There is a small abrasion on the lateral aspect of the right breast, close to the aerola.

**INTERNAL:**  There is no evidence of internal injury.

**THERAPEUTIC MODALITIES:**  There is an EKG electrode on the anterior aspect of the left shoulder.  There is an EKG electrode on the left hip.  There are defibrillator pads on the right upper medial chest and the left lower lateral chest.  There is an identification bracelet on the right wrist.

**FINDINGS:**  There is shaving of the pubic hair.  There are two piercings of each earlobe, only one of which has an earring through it.  The heart is slightly enlarged at 350 grams.  There is 200 cc of blood in the right pleural cavity, but this is probably an artifact.  The myocardium is red/brown with some mottling.  There is moderate to severe atherosclerotic narrowing of the right coronary artery and of branches of the left anterior descending coronary artery.  The aorta shows moderate atherosclerosis distally.  The lungs are somewhat heavy and there is a black reticular pattern of anthracosis on the pleural surfaces.  There is a slight hemorrhagic discoloration of the tail of the pancreas, but this appears to be between the lobules.  There is a slight gastritis present, but this is mild.  There is slight granularity to the surface of the kidneys after the capsules strip with slight difficulty.  There is a 1 cm in diameter leiomyoma in the uterine wall.  The spleen is enlarged at 250 grams.

**SCARS AND IDENTIFYING MARKS:**  There are two old scars on the lower lip, just along the vermilion border.  There is a tattoo that says "Connie" on the upper inner quadrant of the left breast.  There is a small round old scar on the volar aspect of the left forearm, close to the left antecubital fossa.  There is a tattoo of roses on the volar aspect of the left forearm distally.  There are multiple round old scars that are rounded on the

Page 3
Tarpley, Pam

anterior aspects of both lower legs.  There are two piercings of each earlobe.
There are multiple round old scars on the dorsa of both forearms.  There is
an elongated, somewhat oval-shaped, old scar on the left side of the upper
mid back.  There is a tattoo of a "dream catcher" on the lateral aspect of the
left upper arm.

**INTERNAL EXAMINATION**
**GENERAL:**  The ribs, spine and pelvis are intact.  There are no fluids in
any body cavity other than the 200 cc of blood in the right pleural cavity
which is probably artifactual.  The only adhesions noted are on the lateral
and anterior aspect of the right lung.

**CARDIOVASCULAR:**  The heart weighs 350 grams.  The external surface
is remarkable for slight enlargement.  The myocardium is red/brown with
some evidence of mottling with the darker area being in the left ventricular
wall.  The valve cusps and leaflets are thin and well formed and the mitral
valve measures 10.0 cm in circumference.  The coronary arteries arise and
branch in the usual fashion with moderate to severe eccentric and, focally,
concentric narrowing of the right coronary artery and of branches of the left
anterior descending coronary artery.  The left circumflex coronary artery
appears to be spared.  The aorta arises and branches in the usual fashion with
moderate atherosclerosis distally.

**RESPIRATORY:**  The right lung weighs 550 grams.  The left lung weighs
440 grams.  The pleural surfaces are remarkable for the adhesions of the
right lung anteriorly and laterally and for a reticular pattern of anthracotic
pigment on the pleural surfaces bilaterally.  The parenchyma is red/blue.
The trachea is free of debris.  There is no evidence of pulmonary emboli.
No emphysematous blebs are noted.

**LIVER, GALLBLADDER, PANCREAS:**  The liver weighs 1975 grams.
The capsule is intact and the parenchyma is red/brown.  The gallbladder
contains 20 cc of brown bile.  No calculi are noted.  There is no evidence of
cholesterolosis.  The pancreas is tan with slight hemorrhage into the tail, but
this is between lobules and appears to be artifactual.

Page 4
Tarpley, Pam

**GASTROINTESTINAL TRACT:** The stomach contains 20 cc of green liquid. There is slight gastritis or capillaritis involving the gastric mucosa. The gastric serosa is unremarkable. The esophagus and duodenum are normal in their mucosal and muscular walls. The distal small bowel and colon show no abnormality. The vermiform appendix is present.

**GENITOURINARY:** The right kidney weighs 140 grams. The left kidney weighs 130 grams. The capsules strip with slight difficulty to leave a slightly granular surface. The corticomedullary junction is well demarcated. There is congestion of the medulla. The urinary bladder is empty. The uterus, tubes, and ovaries together are estimated to weigh 80 grams. The endometrium is tan and there is a 1 cm in diameter leiomyoma in the myometrium. The Fallopian tubes and ovaries show no abnormality.

**HEMATOPOIETIC:** The spleen weighs 250 grams. The capsule is intact. The parenchyma is a dark red/blue.

**NERVOUS SYSTEM:** The brain weighs 1350 grams. There is no evidence of cerebral edema. No abnormality is noted on sectioning the cerebral hemispheres, the cerebellum or the brain stem. The vessels at the base of the brain show no abnormality.

**MISCELLANEOUS:** The base of the skull is intact. The thyroid is the usual bilobed shape and its parenchyma is a light red/brown. The adrenal glands each consist of a yellow outer cortex stretched in a tent-like shape over a brown inner cortex. The lymph nodes are enlarged in the pulmonary hila and near the carina. In those places, the lymph nodes are anthracotic and near the left hilum of the lung, there is a fibro-calcific nodule in the lymph node. There is a similar fibro-calcific nodule near the interlobar fissure on the left, but in the upper lobe. The neck organs show no evidence of trauma. The hyoid bone has one fully fused and one partially fused pseudarthroses. The thyroid cornua are intact. The trachea is free of debris.

**HISTOPATHOLOGY:** During the autopsy, portions of each of the major organs were retained in formalin. Sections were submitted for histologic examination.

Page 5
Tarpley, Pam

## HISTOPATHOLOGY FINDINGS
**Slide key:** #1 – Liver, pancreas, brain, kidney, spleen
#2 – Coronary arteries, lung, heart
#3 – Lung, heart
#4 – Heart
#5 – Heart, lung

Brain: No abnormality

Coronary: More than 80 % concentric atherosclerotic narrowing

Heart: Many hypertrophic muscle fibers. Fatty infiltration of the right ventricular wall, but no adipocytes abutt the endocardium.

Lung: Anthracosis. Foci of interstitial chronic inflammation. Moderate to severe emphysematous change. Slight fibrous thickening of arteriolar walls. Edema. Variable atelectasis.

Liver: Rare cells contain large, nucleus-displacing, cytoplasmic vacuoles.

Pancreas: Complete autolysis.

Spleen: Increased neutrophils in the red pulp.

Kidney: Congestion. Fibrous thickening of the arteriolar walls.

**TOXICOLOGY:** Specimens of blood, brain, vitreous humor and liver were submitted to St. Louis University Toxicology Laboratory for analysis.

**TOXICOLOGY FINDINGS:** Analysis by the St. Louis University Toxicology Laboratory revealed a lethal blood level of citalopram (0.94 micrograms/ml). No other abnormal chemicals were found in spite of testing for ethanol, acetone, isopropanol, methanol, amphetamines, antidepressants, barbituates, benzodiazepines, cannabinoids, cocaine and its metabolites, lidocaine, methadone, non-opiate narcotic analgesics, opiates, phencyclidine, phenothiazines, propoxyphene, acetaminophen and salicylates.

**Skaggs Southside Family Clinic**
590 Birch, Suite 1C  Hollister, MO 65672
417-239-3400  Fax: 417-239-3410

*August 21, 2006*
*Page 1*

**PAMELA A TARPLEY**
Female  DOB:05/25/1958                    31861

Home: (417)272-6334 Office: (417)272-6334
MRN: **22-04-01**

**09/30/2002 - Office Visit: migraine**
**Provider: Holli K Ruby DO**
**Location of Care: Skaggs Family Health Clinic**

**Chief Complaint:** migraines,  swelling Left foot

**Vital Signs**
**Weight:** 192.25 pounds
**Temperature:** 98.0 degrees  F (oral)
**Pulse rate:** 80
**Pulse rhythm:** regular
**Respirations:** 16
**Blood Pressure:** 130/80 mm Hg

**Pain Assessment**
The patient is currently experiencing pain.
**Location:** migraine
**Intensity (0-10):** 10
**Comment:** woke up with it

**Medications (including medications added during this visit):**
PAXIL 20 MG TAB (PAROXETINE HCL) 1 po qam, 2po qhs
METHOTREXATE 2.5 MG TAB (METHOTREXATE SODIUM) 1po 5 days per week (RX by Dr. Hayes)
FOLIC ACID 5 MG/ML SOLN (FOLIC ACID) 1 po qday ( Rx by Dr. Hayes)
SINGULAIR 10 MG TAB (MONTELUKAST SODIUM) 1 po qhs (9/21/00)
IMITREX 6 MG/0.5ML KIT (SUMATRIPTAN SUCCINATE) (Rx by Dr. Sharlin)
COVERA-HS 240 MG CR TAB (VERAPAMIL HCL)
TOPAMAX 100 MG TAB (TOPIRAMATE) 1 po qhs (Rx by Dr. Sharlin)
DITROPAN XL 5 MG CR TAB (OXYBUTYNIN CHLORIDE) 1 po qday
EPIPEN 1:1000 DEVICE (EPINEPHRINE HCL (ANAPHYLAXIS)) as directed for reaction
OXYGEN 2 liters by nasal canula qhs and prn
WELLBUTRIN SR 150 MG CR TAB (BUPROPION HCL) 1 po BID
ZYPREXA 2.5 MG TAB (OLANZAPINE) 1 qhs ( by Dr. Sharlin)
KLONOPIN 2 MG TAB (CLONAZEPAM) 1 po tid (by Dr. Sharlin)
LASIX 40 MG TAB (FUROSEMIDE) 2 po qday
K-DUR 20 MEQ CR TAB (POTASSIUM CHLORIDE) 1 po bid
VICODIN 5-500 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po qday prn (max 10 per month)

**Allergies:**
PCN
VASOTEC
BEE STINGS

**History of Present Illness**
Pam's main concern today is the continued L foot pain and edema. The last time she fell in the shower, she injured her left foot. Instead of improving, it seems to be worsening. It is now so severe that she cannot stand for anyone to touch it.

They have made a couple adjustments to her medications. She was starting to have some symptoms of

**Skaggs Southside Family Clinic**
590 Birch, Suite 1C  Hollister, MO 65672
417-239-3400  Fax: 417-239-3410

*August 21, 2006*
Page 2

**PAMELA A TARPLEY**
Female  DOB:05/25/1958                    31861

Home: (417)272-6334 Office: (417)272-6334
MRN: **22-04-01**

urinary retention so she stopped the ditropan and is doing much better. She is now urinating every 15-30 minutes due to the  Lasix.

Overall, her edema is improving. She still swells in the legs towards the end of each day. Some of the joint pains are improving with the decreased edema.

They started Celexa about 3 days ago at the 20mg dose. The MCD would not cover the Lexapro so Dr. Sharlin switched her to this. She is currently at the 10mg dose of Zyprexa.

**History from:** patient and Connie

**Plan**

**New Prescriptions/Refills:**
VICODIN 5-500 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po qday prn (max 10 per month)
09/30/2002 #10 x 0 : Holli K Ruby DO

1. Stay off the ditropan.
2. Discontinue the vioxx and the ibuprofen
3. Will start a vicodin rx for maximum 10 tablets per month

**[Prescriptions:**
VICODIN 5-500 MG TAB (ACETAMINOPHEN-HYDROCODONE) 1 po qday prn (max 10 per month)
09/30/2002 #10 x 0
        Entered, Authorized and Signed by:     Holli K Ruby DO
        Method used:   Print then Give to Patient

**Laboratory Results**

**Routine Urinalysis**
**Color:** yellow
**Appearance:** clear
**Leukocytes:** negative
**Nitrite:** negative
**Urobilinogen:** 0.2
**Protein:** negative
**pH:** 6.0

Sincerely,

Provost Umphrey Law Firm, L.L.P.
Williams Kherkher Hart Boundas, L.L.P.
Watts Law Firm, L.L.P.
Ranier, Gayle & Elliot, L.L.C
The Kaiser Firm, L.L.P.


\*\*\*\*\*\*\*\*\*\*\*

**PLEASE CHECK ONLY ONE:**


X____   I **ACCEPT** the VIOXX® Settlement as explained in this letter, the Description of Settlement and Release of All Claims.

**OR**

 ____   I **REJECT** the VIOXX® Settlement as explained in this letter, the Description of Settlement and Release of All Claims.


_Stacey A. Tarpley_                    _2-19-08_
Claimant's Signature                     Date


Stacey A. Tarpley
PRINTED NAME OF CLAIMANT


007751 MO
1101458

- 5 -

## THE VIOXX® LITIGATION CONSORTIUM[1]

**PROVOST ✶ UMPHREY**
**LAW FIRM L.L.P.**

**WATTS LAW FIRM L.L.P.**

**WILLIAMS KHERKHER**
**HART BOUNDAS, L.L.P.**

**RANIER, GAYLE & ELLIOT**
**L.L.C.**

**THE KAISER FIRM,**
**L.L.P.**

P.O. Box 56708, Houston, Texas 77256-6708
Telephone: 1-800-706-8667  or  713-403-7800
Facsimile: 713-960-6096   Email: info@vioxxgroup.com
Attorneys may not be certified by the Texas Board of Legal Specialization

### *ATTORNEY-CLIENT PRIVILEGED CONFIDENTIAL COMMUNICATION*

May 22, 2008

Stacey A. Tarpley-Evering
23 Circle Drive
Arnold, MO  63010

Re:     Mrs. Pamela A. Tarpley Vioxx® case

Dear Stacey:

As you know, we registered and enrolled your Vioxx® claim in Merck's Settlement Program.  Based upon new information received about the Settlement Program, Merck, the maker of Vioxx®, and the Claims Administrator have requested additional information regarding this claim.  In addition, Merck and the Claims Administrator may require that someone be appointed administrator of the estate of Mrs. Pamela A. Tarpley, if one has not already been appointed.  Based upon prior conversations with you or a member of your family, it is our understanding that the probate estate of Mrs. Pamela A. Tarpley has <u>not</u> been opened.  If we are incorrect, please submit a copy of the Letters Testamentary and other probate documents to our office within the next 20 days and contact our office at 1-800-706-8667 and speak with the probate team.

Assuming that the probate estate has <u>not</u> been opened, and while we await Merck's decision on this matter, Merck is currently requesting a copy of the will of Mrs. Pamela A. Tarpley.  This information needs to be submitted to Merck within the next 20 days.  Please return a complete copy of the will of Mrs. Pamela A. Tarpley in the enclosed envelope.  You will need to attach the appropriate postage to ensure delivery.  If you believe that you have already submitted a will, please call our office at 1-800-706-8667 and ask to speak with the probate team to confirm it was received.  <u>**YOUR FAILURE TO ACT QUICKLY WILL DELAY YOUR CLAIM.**</u>

---

[1] ¹This is not a partnership of the attorneys specified above; it is a consortium of attorneys working together on the development of the Vioxx® claims.

If Mrs. Pamela A. Tarpley did not have a will, we need for you to sign the attached sheet and return it to us in the enclosed envelope.  You will need to attach the appropriate postage to ensure delivery. We only need this form returned to us if Mrs. Pamela A. Tarpley died without a valid will.

If Merck does require that probate be opened, our consortium of firms has found a probate attorney in your state who is willing to help you with this process.  You are not required to work with this attorney and we make no representations whatsoever regarding this firm and the associated attorneys.  We will simply provide the name of an attorney in your state that might be able to assist you with opening the probate estate.  Please feel free to use the attorney of your choice to assist you with this process.

Please feel free to contact the probate team at 1-800-706-8667 if you have any questions.

Sincerely,

Provost ★ Umphrey Law Firm L.L.P.

Williams Kherkher Hart Boundas, L.L.P.

Ranier, Gayle & Elliot, L.L.C.

Watts Law Firm, L.L.P.

The Kaiser Firm, L.L.P.

007751 MO 1101458
180166.3 PRJ_07 5/22/08 5:08 PM

# STATEMENT REGARDING WILL
# FOR VIOXX SETTLEMENT® CLAIM

I, Stacey A. Tarpley-Evering, hereby represent and declare, to the best of my knowledge, that Mrs. Pamela A. Tarpley had no will or no valid will at the time of his/her death.  **Under penalty of perjury**, I hereby certify that this statement is true and accurate.

BY: _____

Name: Stacey A. Tarpley-Evering

Title:  Child

Dated: _____

## NOTARIZATION OR CLAIMANT'S SIGNATURE

State of _____, COUNTY OF _____

I hereby certify that on _____(month), _____(day), 2008, Stacey A. Tarpley-Evering personally came before me and acknowledged under oath to my satisfaction that this person: (a) is named and personally signed this document; and (b) signed, sealed and deliver this documents as his or her act and deed.

_____
Notary Public of the State of _____

Mrs. Pamela A. Tarpley
**007751 MO 1101458**

# THE KAISER FIRM L.L.P.

October 17, 2009

The Honorable Eldon E. Fallon                              *Via Email Only*
U.S. District Court
500 Poydras Street, Room C-151
New Orleans, LA 70130

Re:    *In re Vioxx Products Liability Litigation*, MDL-1657
         Claimant: Stacey A. Evering

Dear Judge Fallon:

Thank you for sending us a copy of Mrs. Stacey A. Evering's letter to you on October 13, 2009.  We will respond to her concerns directly to her.

Yours truly,

*Grant Kaiser*

Grant Kaiser


dg


cc       VIA EMAIL
         Plaintiffs' Liaison Counsel
         Defendants' Liaison Counsel
         Stacy Seicshnaydre

         VIA U.S. CERTIFIED MAIL
         Mrs. Stacey A. Evering