1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5

6   IN RE:   VIOXX PRODUCTS          *     Docket 05-MD-1657-L
            LIABILITY LITIGATION     *
7                                    *     October 23, 2009
                                     *
8   This Document Relates to All Cases  *   9:00 a.m.
    * * * * * * * * * * * * * * * * * *

9

10

11                STATUS CONFERENCE BEFORE THE
                  HONORABLE ELDON E. FALLON
12                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Plaintiffs:            Beasley Allen
                                    BY:  ANDY D. BIRCHFIELD JR., ESQ.
16                                  218 Commerce Street
                                    Montgomery, Alabama 36104

17

18   For the Defendant:            Williams & Connolly
                                    BY:  DOUGLAS R. MARVIN, ESQ.
19                                  725 Twelfth Street N.W.
                                    Washington, D.C. 20005

20

21   Also Participating:          Lynn C. Greer, Esq.
                                    Orran L. Brown, Esq.
22                                  Matt L. Garretson, Esq.
                                    Michael J. Juneau, Esq.
23                                  Dawn M. Barrios, Esq.
                                    Heather E. Reznik, Esq.

24

25

1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room B-406
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5
     Proceedings recorded by mechanical stenography, transcript
6    produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

***(October 23, 2009)***

1

2

3    **THE DEPUTY CLERK:**  Everyone rise.

4    **THE COURT:**  Be seated, please.  Good morning, ladies

5 and gentlemen.  Sorry for any inconvenience that we have had in

6 moving courtrooms, but they are beginning to do some work on

7 mine.  Judge Berrigan allowed us to use hers.

8    Let's call the case, please.

9    **THE DEPUTY CLERK:**  MDL 1657, *In Re: Vioxx*.

10    **THE COURT:**  Counsel make their appearance for the

11 record.

12    **MR. BIRCHFIELD:**  Good morning, Your Honor.  Andy

13 Birchfield on behalf of the plaintiffs steering committee.

14    **MR. MARVIN:**  Good morning, Your Honor.  Douglas

15 Marvin on behalf of Merck.

16    **THE COURT:**  We are here today for our monthly status

17 conference.  I met with the committees beforehand to discuss

18 the agenda with them.  I have the proposed agenda, and I will

19 take them in the order submitted.

20    The Settlement Agreement, anything on that?

21    **MR. BIRCHFIELD:**  Your Honor, the first two items, the

22 Settlement Agreement and the Settlement Program, we have Orran

23 Brown and Lynn Greer here from the claims administrator to give

24 a report.

25    **MS. GREER:**  Good morning, Your Honor.  I'm Lynn

1    Greer.  Orran Brown and I are here today to make the 22nd

2    claims administrator report to the Court about the claims

3    administrator activity in the Vioxx Settlement Program.

4              Since we were here last month, a major milestone

5    has been reached in the program.  On September 30, we were able

6    to issue, through the work of a lot of people, the final

7    payment instructions to the escrow agent, U.S. Bank, for the

8    distribution of the final payments for the heart attack claims.

9              We submitted that to U.S. Bank on September 30.

10   U.S. Bank then took several days to process the payments.  As

11   you can imagine, the paperwork and the technology demands of

12   issuing these payments were great, but U.S. Bank on the 7th of

13   October -- so a week later -- put checks in the mail to 293

14   firms who had requested that they receive payment by check.  At

15   the same time, they sent to us directly checks for *pro se*

16   claimants so that we could stuff those in envelopes and submit

17   to the *pro se* claimants explanatory materials about payment.

18             On the 8th of October, wire transfers were made

19   to 400 firms who had requested payments by wire.  So by the end

20   of the day on Thursday, the 8th of October, payments had been

21   issued on schedule and without incident.

22             Your Honor, some details about this payment:

23             $1.7 billion was actually issued to the firms on

24   behalf of claimants.  There was an additional $700 million,

25   approximately, withheld for various withholdings such as liens,

1    the common benefit fees and costs, and attorneys' fees pursuant

2    to PTO 49.  So a total of about $2.4 billion was processed,

3    either paid or withheld, in this payment.

4               Over 20,000 MI claimants have been paid to date.

5    Some did not receive a final payment because they had been

6    special marker claimants who did not have a final payment

7    forthcoming, but over 20,000 claimants have been paid their MI

8    final payments or their payment.  About $3.1 billion has

9    actually been issued on behalf of heart attack claimants in the

10   program.

11              Your Honor, the payment went out.  There have

12   been questions that have arisen since the payment has been

13   distributed, and this slide is an attempt to show counsel --

14   and for those listening on the phone, these slides will be

15   available on our Web site this afternoon.

16              One of the issues that has arisen from attorneys

17   is how to calculate the common benefit fees and costs and

18   attorneys' fees out of the check that they sent to their

19   claimant.  A lot of this may be old news because we trust the

20   payments have now gone out, but there is a disbursement

21   schedule on the Court's Web site, as well as our Web site, that

22   guides counsel through the different steps and considerations

23   they need to take when calculating common benefit fees and

24   costs and their attorneys' fees.

25              We have also set up just for convenience an

1    e-mail that has a BrownGreer name on it, but it actually is

2    monitored by members of the NPC, and they have responded to

3    questions that attorneys have submitted.  That e-mail address

4    is npc@browngreer.com.

5               The second issue that has created some questions

6    are just the various withholdings on the various liens.  You

7    can imagine that this is complicated.  The LRA has done a

8    fabulous job being responsive to these questions.  We do have a

9    section on our firm's portal, each firm's secure portal, that

10   is an LRA page where firms can go and get very specific,

11   detailed information about liens.  The lien resolution

12   administrator also has a call center, and they have been

13   fielding calls and questions.  The number here is

14   (877)774-1130.

15              The third area or question was just on an

16   individual claimant level.  There were some questions from the

17   firms based on claimants wanting to know various aspects of

18   their payments.  We did submit to the firm on the 6th of

19   October a payment report that showed the firm each of its

20   claimants, the various withholdings, the total amount that

21   would be forthcoming, so that is a resource for the firm.

22              The other thing that we did was to provide to

23   each firm individual reports by claimant that, if they chose,

24   they could print and send to their claimants that explained the

25   various aspects of their payment.

1          This is an example, although rather hard to
2   read, of one of those individual claimant's summary reports.
3   Again, the goal was to just create a very generic report, but
4   one that was focused on the plaintiff specifics.  You'll see
5   the final award.  This is where the claimant was reminded again
6   of the final point value, $1,865.01 per point, and their point
7   award.  This particular example, which is not a live one,
8   121.49 points, it then walks through for the claimant all of
9   the various withholdings for previous payments that have been
10  made.
11          The other report that we provided for the firm,
12  if they chose to give it to their claimant, was a very detailed
13  lien report.  This was where each of the liens was listed.
14  Resolution categories were provided.  The claimant was told
15  whether the lien resolution was complete or whether it was
16  still pending.  So these reports are available/were available
17  to firms if they so chose to send them on to their clients.
18          There's still a few wrap-up issues for MI
19  claims.  One very small one, although it is a little over 100
20  claims, the special marker claimants who elected to go into
21  special review, those claims are now being reviewed by the
22  special master.  These were all claims with MI point totals
23  less than 10 points, and we expect payments to be issued on
24  those claims in November.  The special master is working hard
25  to review those.

1        The other thing that we wanted to assure
2   everyone of is that the lien amounts that have been withheld --
3   that are not complete and they are not final, that still show
4   as pending -- the lien resolution administrator will speak to
5   this, but there are efforts underway every day to resolve the
6   liens.
7        If they get resolved in an amount lower than
8   what we withheld, those balances will be remitted on a monthly
9   basis.  What we will do is, at the end of each month, we will
10  see what liens have been resolved, and we will put those on a
11  payment report and they will be issued the following month.
12  Those payments will come out on the normal monthly payment
13  cycle, which is usually the third week of the month.  In
14  October, those balances will actually be remitted on the 30th
15  of October, so a week from today.  That is also when the IS
16  payments will be paid this month rather than this week.
17  Because of the MI final payment, we needed to bump that to next
18  week, but those will go out next week.
19        Your Honor, this is now a historical slide.  It
20  does reflect where the different MI injury levels ended up in
21  terms of average points.  I will not go through this level by
22  level, but this is across the population the MI claims that
23  reached the level of points award.  These are the average
24  points award per claim.
25        Turning now to the strokes, we have now turned

1    our attention to the stroke reviews.  This slide shows where we

2    are in terms of the gates process.  There are no stroke claims

3    currently in the queue for us to pick up and review for the

4    first time.

5                  There are 309 stroke claims that have been found

6    preliminarily ineligible; but when we sent the notice out to

7    the firms, the claimants have been able to submit additional

8    documentation.  So those 309 claims are those that we are

9    reviewing, in essence, for a second time with new information.

10                 There have been 7,710 gate claims that have

11   passed for points review.  The next, Row 4, A and B, are claims

12   that are right now ineligible.  So there are 8,850 where

13   notices of ineligibility have been issued.

14                 It's important to note, though, Your Honor, that

15   these are preliminary denials.  These are claims that have not

16   yet gone to the gate committee or they are still within their

17   time where Merck is considering whether to push those.  So

18   these are ones that there is a subset of these claims that will

19   ultimately be found payable.  It's just that we have found

20   them, under our rigid criteria, to not pass the gates.

21                 There are 725 that are currently with the gate

22   committee for review and for voting.  The total IS claims now

23   in the process -- and this number has stayed constant -- is

24   17,594 stroke claims that are under review.

25                 Through October we will have paid over 3,000

1    stroke claims.  There are another 724 where we have issued the

2    notice of points award, and these are ones that could

3    potentially be payable in November when those payments are

4    made.  You will see that 147 of those are definitely to be paid

5    in November.  Another 506 could accept between now and the end

6    of this month to be paid in November.

7                      71 are on appeal.  We are finding that the

8    appeal rate for the stroke claims is virtually the same as it

9    was for the heart attack claims.  Around 15 percent ultimately

10   get appealed to us or then on to the special master.

11                     There are 126 claims where we have finished what

12   we need to do but there is some issue that is holding up the

13   issuance of notice of points award, be it receipt of lien

14   information, some of these are under audit review, but these

15   are claims that we expect will be reviewed and released

16   shortly.

17                     A large number, 2,575, are pending what we call

18   QC.  These are ones that have gone through our initial review.

19   This is our focus now.  We are going back now and doing our

20   second review so that we can move these along to payment.

21                     973 have been found incomplete for us to be able

22   to finish the points review.  This number represents a higher

23   percentage than we found in the heart attack claims.  About

24   22 percent of each claim that we pick up, of the stroke claims

25   that we review, are found incomplete.  That's a big number.  It

1   means that, in essence, one out of every four we have to stop

2   and go out to the firm.

3           **THE COURT:**  That's not a good situation.  The

4   attorneys have to focus on that because that's going to really

5   slow up matters.  They have to be able to comply with the

6   requirements.  To just put this on the back burner is not going

7   to work.

8           **MS. GREER:**  I think the focus that we now have,

9   Your Honor, and everybody I think needs to have is that we are

10  now reviewing the strokes, we are in the throes of it, and

11  everyone needs to do what it takes to get these claims paid as

12  well.

13          **THE COURT:**  Let's keep a close eye on that.  If it

14  hasn't gotten better by the next meeting, you are going to have

15  to let me know, and I'm going to have to get involved with it.

16  Now, perhaps people are just either exhausted because of the MI

17  claims or they have done a lot of work and they are catching up

18  now.  If it's a trend, I'm going to have to get involved in it.

19          **MS. GREER:**  I think, Your Honor, it may be that in

20  the efforts before the Settlement Program more progress had

21  been made in gathering heart attack records versus strokes, so

22  it may be that it's just naturally lagging behind.

23              Row 6 and 7 just show stroke claims:  148 where

24  we are reviewing those, doing our initial review, and 31 where

25  we have not yet reviewed the claims for stroke.

1        These are the average points by injury level for

2    stroke.  One thing that I also wanted to mention, because we

3    have heard some questions about it, it appears when you compare

4    this slide to the same slide on the heart attack claims that

5    these points are lower.  The reason for that in large part is

6    because the grids were different.  There were different grids

7    that governed.  The MI grid, for the most part, had higher

8    point totals on it.  We don't want to alarm anyone by thinking

9    that the stroke claims are inherently worse claims; it's just

10   that they are governed by different point structures.

11       This slide shows the dollars that have been

12   paid.  It's the same claims, 3,133, that will be paid through

13   October.  The total amount that will go out through that date

14   is over $96 million.  Through November, if a lot of these

15   claims accept and get paid, the number that would be paid out

16   on stroke claims would be in excess of $112 million.

17       We are now at a point where we can project when

18   the final payments for stroke claims will be.  A lot of this

19   depends on completion rates of claim packages, depends on the

20   pace of the reviews, but we are confident that the final

21   payments for stroke claims will be by the end of the first

22   quarter of 2010.  We are on pace to do that and do not foresee

23   any problems at this point in reaching that goal.

24       It is important, though -- and this goes to what

25   we were saying earlier -- for everyone to focus in on the

1    deadlines that have governed this process from the beginning.

2    I did want to reiterate that there are certain deadlines that

3    apply to each aspect of these reviews.  Counsel are very aware

4    of them, but we wanted to reiterate what they are.

5              When a claim first gets a notice of

6    ineligibility, the claimant has 21 days to respond.  If we

7    review the claim for points and we have to stop the review, we

8    issue a notice, and the firm has 14 days to respond.  If a

9    notice of points award is issued and the firm wishes to appeal

10   the award, they have to do so within 15 days.  They also have

11   to submit whatever additional documentation they need for

12   consideration on the appeal within 15 days.  If they have

13   received our notice of postappeal review and they wish to go on

14   to the special master, they have to decide that in five days.

15             This is one of the things that we learned in the

16   heart attack claims:  It's imperative that these deadlines be

17   adhered to.  It runs very smoothly.  We have tried to tailor

18   these deadlines to reflect what counsel really needs to be able

19   to comply with them and feel like these deadlines are

20   reasonable.

21             **THE COURT:**  Good.

22             **MS. GREER:**  These are the consequences for not

23   meeting the deadline.  I will not go through these, but

24   basically the message is that if the deadline is not met, the

25   consequence is that the claim keeps going with whatever we have

1    and goes to completion that way.

2                    Finally, Your Honor, we have received -- and I

3    know firms have received them and the Court has as well --

4    questions from claimants who did not get paid, questions from

5    claimants who failed gates and were ultimately denied from the

6    program.  We wanted to announce it here but will also issue an

7    e-mail blast.  We have drafted a letter, with the help of the

8    parties and the review of the Court, to explain the different

9    levels of due process that were inherent in this program, the

10   different levels of review by us, by the gate committee, by the

11   special master, and we have templets of those letters available

12   on each firm's secure portal.

13                   This is the page where firms can go to if they

14   wish to use this letter with any of their claimants.  Number 2

15   here, this is the main claims page that firms are very familiar

16   with.  Number 2 is where firms can go to find copies of the

17   letter.  One is a Word templet that if a firm wants to

18   customize the letter to his or her client to talk about what

19   happened in that claim, they may do so.  There's also an Adobe

20   pdf that's more of an official letter from us that just

21   outlines the various stages of the process.

22                   So these are tools for counsel to use.  They

23   certainly do not have to, but we found it helpful in responding

24   to questions from unrepresented claimants to describe for them

25   the levels of care and detail that each claim has received.

1          **THE COURT:**  I know we are dealing with about 50,000

2    or thereabout claims, and not everybody is going to get through

3    the gates.  This is a program that is a voluntary program.  You

4    don't need to join if you don't wish to join; but if you join

5    it, then you have certain requirements, duties, and

6    responsibilities.  People have decided to take advantage of the

7    program, but not everybody gets through all of the gates.  The

8    best that the Court can do and the best that the parties can do

9    is to give them some due process.  In this particular matter,

10   we have had three levels of due process:

11          We have the administrative review, which the

12   claims administrator conducts, and they do at least two reviews

13   at the administrator stage to make sure that the Settlement

14   Program is carried out to the letter.

15          Then, if people proceed further, they can have

16   an attorney review.  The attorney review is a body comprised of

17   plaintiff and defendant attorneys who again look at the case.

18          The final review is a review by judges and

19   excellent lawyers who I have appointed to review this.  They

20   are third parties.  They are not associated with either

21   plaintiff or defendant.  They look at it.  That's the best you

22   can do from the standpoint of a claimant.

23          The claimants write in and they ask about

24   things.  Sometimes they can get some assistance from the

25   standpoint of money, but oftentimes they just didn't get

1   through the gates.  They need an explanation, kind of a

2   shirtsleeve explanation of why they didn't get through the

3   gates.  If you give them that and explain it to them, they may

4   be disappointed, but at least they don't feel like nobody is

5   responding.  When I get these letters, I pass them out to the

6   appropriate parties so that they can respond, and then you get

7   involved in it, your office.  That's the best, from that

8   standpoint, that we can do.

9           I think one of the things we have all tried to

10  do and certainly the Court has tried to do in this particular

11  case is give it maximum transparency.  I put everything on my

12  Web site.  It's accessible to everybody, not just lawyers in

13  the case.  They can look at this.  They can read transcripts of

14  these hearings.  They can know all of the motions that have

15  been filed, all of the briefs, all of the forms.  I think that

16  that goes a long way to giving people some confidence that

17  things are proceeding.

18          This case originated in the MDL in February of

19  2005.  Within three years, with the help of the lawyers, the

20  case was settled.  Now, within four years, almost $4.5 billion

21  has been paid out.  I think that's a tribute to all of the

22  people who have worked on the case.  You played a big role in

23  it, and I appreciate it.

24          MS. GREER:  Thank you, Your Honor.  We have also a

25  dedicated team at BrownGreer in Richmond who have been

1    dedicated to this, and they deserve a lot of the credit for

2    getting through the claims.  Orran is going to speak to other

3    aspects of the final payments and others who helped get us

4    there and also on the Extraordinary Injury Program.  Thank you,

5    Your Honor.

6              **THE COURT:**  Thank you.

7              **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

8    Brown, and I'm happy to be here.  What I want to report on

9    today, Your Honor, are a few takeaways from the MI final

10   payment progress that we were able to achieve and then update

11   the Court on where we are on the Extraordinary Injury Program,

12   which is the other segment of the program that is underway

13   right now and we have to finish.  First, a few takeaways or

14   thoughts about the final payments:

15             The parties asked us if we could come up with

16   some examples or illustrations from other multiple-claim

17   facility programs to try to key in on the progress and the

18   efficiency of this program, so we have done this.  It's

19   difficult to draw direct comparisons because all the programs

20   and claim facilities, voluntary and coercive class action

21   settlements, all have their different issues, different

22   injuries, different benefit structure, different proof

23   requirements, so it's hard to make apple-to-apple comparisons.

24             You can get a feel, as to looking to other

25   programs, as to how successful this phase of the program has

1    been.  We put together this slide, which does not identify any

2    of these other programs by name because the goal is not to be

3    critical of any other program.  They each have their individual

4    challenges, and a number of these we have worked on ourselves.

5    This shows us some barometer of this program and the success

6    which it has achieved so far because it gives us an idea, by

7    looking at other programs, about how long it took between the

8    time the parties agreed to some settlement and money going out

9    to the claimants, to the beneficiaries of the program, both in

10   an initial payment level and a final payment level.

11           On this slide we have identified eight different

12   other programs and the number of claims involved in them; some

13   very large, some not as large as this one.  The peach color on

14   those cells indicates where some initial money went out.

15   Usually, it's a quick pay.  It's a lower-proof option where

16   claimants can submit a simplified form to get a quick pay; it's

17   not a full evaluation.  That's what usually happens.  In this

18   instance, we were able to achieve interim payments to claimants

19   within the first year after the Settlement Agreement was signed

20   that were based on a full review and another instance in which

21   this program was ahead of the game.

22           The sort of lavender or purple color shows us

23   when final payments are made in the programs.  For most of

24   these, they have yet to occur or happened years after the

25   Settlement Agreement.  Here we were able to achieve the final

 1  payment on the heart attack claimant segment of the program
 2  within two years from the November 2007 Settlement Agreement.
 3              This is in a program where there are over 30,500
 4  MI claimants who submitted material.  The final payments to
 5  that group of claimants happened within 11 months of the last
 6  date to enroll in the program, October 31, 2008.  Those
 7  payments went out within nine months of the last time to submit
 8  a claims package.  The final claims package materials deadline
 9  was December 31, 2008.
10              This is in a program that had several phases,
11  like they all do, from registration, enrollment, submission of
12  materials, our review of those materials, review by the gates
13  committee, appeals to the special master, an audit program to
14  detect fraudulent claims, and then getting to the point of
15  finalizing those claims and getting the money out.
16              In a program where we have received over
17  1.4 million separate images -- and each one of those could have
18  hundreds of pages in them.  It's millions of pages of documents
19  and 3.7 terabytes of data, which if you tried to transfer it to
20  CDs would be 6,600 CDs.  So it's a lots of information, a lot
21  of program, but we are very happy that those final payments
22  went out to claimants on schedule in September and early
23  October.
24              There are a few takeaways from that about how it
25  happened, how so much was paid to so many in what is relatively

1    little amount of time, and I want to mention them briefly
2    because there are lessons learned for us for the remainder of
3    this program and for other programs in the future.
4              The first thing is a tribute to the design of
5    the Settlement Agreement.  The lawyers and the parties involved
6    in crafting the Settlement Agreement were aware of a lot of
7    these other programs and had seen pitfalls in those programs
8    that did lead to taking more time or delay, so they devised a
9    Settlement Agreement structure here that avoided a lot of the
10   instances or the prompts for delay in these programs.
11             I think a couple of key ones there are having a
12   system that is as objective as possible.  Making these medical
13   decisions based on contemporaneous medical records rather than
14   after-the-fact created documents was a key to allow our review
15   to go smoothly.  It also was designed to have these steps that
16   I mentioned -- from registration, enrollment, submission,
17   review -- not to have to happen in a linear way.  It didn't
18   have to follow in that order on every claim.  It all happened
19   concurrently, so everything happened within that compressed
20   time period.  The design of the Settlement Agreement was really
21   the predicate for making this happen on that kind of schedule.
22             Another thing, Your Honor, was the diligence of
23   the people involved in this for the parties.  Merck and its
24   counsel, the PNC, the lead negotiating claimants counsel,
25   worked with us every day on making this work, giving us

1    guidance and instructions in what they intended this program to

2    do.  The spirit of cooperation that we saw between those two

3    sides of this agreement really lent a lot to making this

4    happen.  They were committed to reaching common ground, and

5    that does not happen in every program.  Where it does not

6    happen, conflict leads to delay.  Here we had none of that.

7              Going through the rest of the players in this,

8    Your Honor, it's really a tribute to all the players who have

9    made this happen:

10             The gates committee and the members of the gates

11   committee who reviewed thousands of claims through that process

12   on time and on schedule and allowed them to keep moving in the

13   process;

14             The three special masters, Special Master

15   Juneau, Corodemus, and Trotter, who had to learn the program,

16   learn how to use the portal, reviewed thousands of claims of

17   three different types of appeals from the gates committee

18   decisions, from points awards, and the nonsubmitting program

19   claimants that were out of the program and could appeal to the

20   special masters.

21             We had to have answers on all of them for the MI

22   claimants to be able to reach the final payments in a pro rata

23   system, and they did a remarkable job.

24             We have to mention the primary counsel, the

25   lawyers for all these claimants, who had to round up all this

1   information, send it into us, get the releases cleaned up to

2   enable us to pay, claims materials, react to elections and

3   notices from us.  It took a lot of work by the lawyers involved

4   in this and over 1,100 firms to keep this program moving.

5           The lien resolution administrator, Mr. Garretson

6   and Mr. Wolf, have done a remarkable job mastering the

7   governmental liens, resolving them in all of the jurisdictions,

8   the private lien program and making it work, and working with

9   us hand in hand to get that data correctly reported to

10  U.S. Bank to get these withholdings and the payments done

11  correctly.

12          U.S. Bank, the escrow agent, has done a

13  remarkable job, as well, of mastering all of the information we

14  give them.  They have really worked hard to make what seemed

15  impossible possible to get this money out to the claimants.

16          The *pro se* curator.  There are a lot of *pro se*

17  claimants that are involved in this process and received these

18  payments.  The *pro se* curator has shepherded really well a lot

19  of those people through the program.

20          Then, of course, Your Honor, the Court's

21  guidance and direction, encouragement, instructions keeping us

22  all on task and making this program work.

23          All of those factors went into permitting us to

24  reach the lavender payments within two years of the Settlement

25  Agreement and really within nine months of when the claims had

1    to come in for the MI claimants.  We are committed to making

2    the rest of the program just as successful as we have seen in

3    the MI world.  Lynn has reported on where we are on the stroke

4    and our projection for final payments on the stroke claimants.

5              I want to mention briefly the EI world,

6    extraordinary injury claim.  We have these two phases of the

7    Settlement Agreement left to finish:  The stroke claims and the

8    extraordinary injury claims.

9              This slide shows us how many extraordinary

10   injury claims we received by the September 1 deadline for

11   submission of claim forms and documentation to support them.

12   It gives them to us by type because there are claims for past

13   lost wages and income, claims for past medical expenses, claims

14   for special medical injury not adequately reflected on the

15   underlying injury grids as the Settlement Agreement describes

16   it.  You could submit claims for additional extraordinary

17   damages, which were futures, future lost wages, future medical

18   injuries, medical expenses.

19             It shows us we have 3,678 total claims.  Now,

20   that is 2,605 claimants because you could submit one or more of

21   these types of EI claims, and a lot of folks did.  Some

22   presented them all.  So it boils down to 2,605 unique people

23   from 211 different law firms.

24             Now, we are working on these claims now because

25   the first thing we have to do is go through the basic threshold

1   steps to get into the program and be eligible for payments.

2   The first will be that you have to have a recoverable claim on

3   your underlying claim.  You have to have a points award.  You

4   would have to be a qualified program claimant on your heart

5   attack claim or your stroke claim to be in this program.  You

6   have to receive a points award above the special marker level

7   to be in the extraordinary injury program.  You have to have

8   sent us the material and the claim form and documents by

9   September 1 to be in the program.  The documents and the claim

10  form both were supposed to be to us in our hands by

11  September 1.

12                  We now are reviewing these claims to do this

13  analysis.  You have to have the economic loss above $250,000 or

14  above to be compensable in the program.  You have to establish

15  what we call a special medical injury that's extraordinary to

16  be compensated in this program.

17                  We have devised the processing steps to take us

18  through all of this, through our review, and we are going to

19  issue a notice to claimants on their EI claims.  We are not

20  going to spend the time going through a lengthy deficiency

21  process.  If we are missing documents, we are going to tell

22  claimants and their counsel, "This is what your award appears

23  to be and this is why."

24                  Part of it may be because you didn't send us a

25  tax return.  These claims are very complicated because they

1   have mountains of financial records for us to go through.  They

2   get a second review request with us to send us additional

3   information, and that's where we are going to fold the

4   deficiency process into the claims evaluation process.

5               We will issue a second review after that.  If

6   the claimant is still unhappy with that, we have a chance for

7   appeal on a $700 fee for appeal to Special Master Juneau.  We

8   have already worked with Special Master Juneau and his team to

9   be ready for those when they happen.  Once the special master

10  rules on it, we will issue a final award if there is an appeal.

11  We are hoping that we won't have a lot of appeals because we

12  think the second review process will straighten out most of the

13  gaps in the proof and the evaluation issues.

14              We are going to use the Vioxx portal for primary

15  counsel in this program just as we have done throughout.  They

16  will be able to see information and status on their EI claims

17  on the portal.  All of this will be out in about two weeks time

18  and live.  We will announce that to the claimants and their

19  counsel.  They will be able to search and determine their

20  statuses just as they have done throughout the program on the

21  MI and stroke claims.

22              We are reviewing these claims right now.  We

23  have been since they came in.  They started coming in over the

24  summer.  We are going to issue our notices of our evaluations

25  on a rolling basis as we get through them.  We are not going to

 1  wait until the end.  Our projection right now is that we will
 2  be able to go through those claims, all those processing steps,
 3  and issue final EI payments in June of 2010, the second
 4  quarter.  If all the stars get aligned, we may can do it sooner
 5  than that, depending on how many second reviews we get, but our
 6  goal is to have final payments out by June 2010 on the
 7  extraordinary injury claims.  That's all I have, Your Honor,
 8  unless you have any questions.
 9          THE COURT:  Thank you very much.  As I mentioned to
10  Lynn, I really appreciate all of the work that you have done on
11  this.
12          MR. BROWN:  Thank you, Your Honor.
13          THE COURT:  It's worked well because of your
14  experience, diligence, and good work.  I appreciate it.
15          MR. BROWN:  Thank you very much.  We are delighted to
16  be involved in it.
17          MR. BIRCHFIELD:  Your Honor, the next item on the
18  agenda is the lien resolution administrator.  We have Matt
19  Garretson with the Garretson Firm to give a report.
20          MR. GARRETSON:  Good morning, Your Honor.
21  Appreciating the timing of the myocardial infarction and sudden
22  cardiac death cases that are now being processed as the claims
23  administrator has explained this morning, I'm going to just
24  focus this report on those claims.
25                  I would also like to reinforce, as we did last

1    hearing, that we have continued to work with BrownGreer to make
2    sure that primary counsel has access to their clients' lien
3    obligations available on the Web portal.  I would encourage
4    counsel to continue to check that at least twice a week.  We
5    have new functionality, as Lynn explained, on the Web portal
6    that allows primary counsel to actually now export to an Excel
7    spreadsheet all of their client lien obligations.
8              Let me first speak this morning about the
9    governmental liens.  I will then turn my attention to the
10   private lien resolution program.
11             With respect to Medicare, we have now completed
12   Medicare resolution for 97.6 percent of all the active cases.
13   There are 328 cases with unfinalized Medicare obligations.
14   Those are largely the cases that have yet to be through the
15   redetermination process or cases that have Social Security
16   number changes that we are in the process of reverifying.
17             With respect to Medicaid, we have finalized
18   94.8 percent of the Medicaid obligations.  The unfinalized
19   Medicaid obligations are due to the fact that those are
20   obligations that have hit the cap that is in place, and now
21   they are working with the states on finalizing cases that have
22   hit that cap or there are a variety of cases in that mix that
23   also have Social Security number issues.  We continue to work
24   with primary counsel and the claims administrator to rectify
25   those.

1          With respect to other governmental obligations

2    such as military plans, we have 432 other governmental lien

3    obligations that remain outstanding.  This is a major focus of

4    our attention right now.  We have been having considerable

5    trouble getting the claims histories from these military

6    agencies.  As I mentioned before, it's because those agencies

7    actually have to go out to well over 100 facilities that treat

8    our veterans and active military personnel to get their claims

9    histories.  We have made great strides, but it's still a big

10   issue that I wanted to bring to the Court's attention.

11         With respect to the private lien program, we

12   have 477 private health-care plans that have agreed to

13   participate in the program according to its terms and

14   conditions.  I believe that that probably covers 80 to

15   85 percent of the active lives in America would be

16   represented -- insured lives in America would be represented by

17   these plans from what I'm told.

18         As of today, 21,418 claimants have signed

19   acceptance forms in order to participate in the private lien

20   resolution program.  These claimants can be segregated into two

21   categories.  The first category are those who signed the

22   acceptance forms prior to June 19, 2009.  That's Category 1,

23   and there's approximately 20,000 claimants in that first

24   category.  Category 2 are those claimants who signed acceptance

25   forms as a result of this Court's first extension of the

1    enrollment period or on account of PTO 48 or most recently PTO

2    54.

3              I'm going to first speak about the time line

4    associated with those claimants in the first category.  As Lynn

5    mentioned, on September 29 we released holdbacks for the

6    Category 1 claimants who were not matched by any of the 477

7    plans.  Those have been released and have largely all been

8    swept in the October or November cycle for payment.

9              On October 2 we submitted to BrownGreer maximum

10   holdbacks for participating claimants that had a match to one

11   of the participating plans.  These holdbacks for Category 1

12   claimants are being reduced now in one of the two following

13   ways:

14             First, if there was no valid lien data or claims

15   produced/submitted to us by October 14, we will have released

16   already or will release within the next week the holdback for

17   those claimants.  Those are those Category 1, had a match of a

18   participating plan, but the plans failed to produce any

19   injury-related claims data.

20             For those Category 1 claimants for whom a lien

21   was asserted, the holdback will be reduced to the lesser of the

22   cap, which is 15 percent or 50 percent of the total amount

23   asserted by the participating plans.  That 50 percent number is

24   because, under the terms of this program, the claimants will

25   ultimately have a cap of 15 percent or 50 percent of the

1   audited lien value.  For now, because the liens are in the
2   process of being audited, we have been able to at least cap it
3   at 50 percent of the inbound claim value.
4              If a holdback or lien value is reduced by either
5   of these scenarios, the funds will be available for
6   disbursement in the November monthly payments.  For many of the
7   primary counsel who have seen these holdbacks on these
8   claimants, many of them who signed up had their Medicaid
9   obligation, and then stacked on top of that was a private
10  health-care insurance 15 percent obligation.  So we are working
11  very hard for those claimants who either have no match or a
12  *de minimis* payment inbound lien to really ratchet down that
13  holdback so there's some relief in the November payment cycle.
14             It is also important to note that this amount
15  held back now for all these claimants who have been matched,
16  who have valid inbound claims -- that this holdback that we
17  have worked through over the last week with the claims
18  administrator will now be potentially reduced, as we go through
19  the audit procedure, to ensure that only injury-related care is
20  subject to the lien.  We will finalize these audits on a
21  rolling basis and are in the process of doing that.
22             To date we have audited approximately 8,600
23  private lien files out of approximately 9,100 submitted as of
24  October 14.  I think it's important to point out not all of
25  those have been sent to the plans for their consideration yet,

1    but we are in the process of returning these summaries to the
2    respective plans for their approval of our audit.

3                    I should bring to the Court's attention here
4    that we have an issue with many of the plans with how
5    preexisting conditions impact the audit process.  I also want
6    to say that the issue is a very significant one.  However, we
7    are actively and I believe constructively working with the
8    parties through these actual claims.  We are certainly not at
9    an impasse, but this is a very important point to bring to the
10   Court's attention.

11                   As we work through that issue with the plans
12   that have brought the preexisting injury issue to our
13   attention, the finalized liens will be posted to each primary
14   counsel's Web portal.  Again, I would encourage counsel to
15   check the Web portal at least twice weekly for updated lien
16   amounts as we will be finalizing these audits on a rolling
17   basis.

18           **THE COURT:**  I would like to move on that.  So if
19   there is a way that a claim can be filed for immediate payment
20   and it's representative of the issues of whether and how much,
21   if any, prior conditions play a part in this lien process, it
22   needs to be brought to me so that I can deal with it
23   immediately.  I don't think that issue ought to be tabled.  I'm
24   ready to move on it.

25                   This case involved Vioxx.  This case involves

1    taking Vioxx and the allegations resulting from the taking of

2    Vioxx.  It's not any other medication.  Nobody else contributed

3    but Merck, and the only reason they contributed is with regard

4    to Vioxx and the problems alleged that Vioxx caused.  Give me

5    something and I can focus on that immediately.

6              **MR. GARRETSON:**  Yes, Your Honor.  Your Honor, I would

7    also let the Court and primary counsel know that the time lines

8    I have just articulated were e-mailed to primary counsel on our

9    behalf, I believe, in the last 24 hours by BrownGreer.

10             Your Honor, let me speak briefly about the time

11   line for the second category of claimants.  Those are the

12   claimants who enrolled after the extension or on account of

13   PTO 48 or PTO 54.

14             As of today we have received 154 signed

15   certifications from the primary counsel identified on the

16   exhibit to PTO 54.  Your Honor, we would like the agreement of

17   the parties that the final deadline for all claimants to submit

18   acceptance forms in response to PTO 54 should be set at

19   November 16, 2009.  That time line for us is not an arbitrary

20   one, but that would allow us to get as much done by year-end as

21   possible on this universe of the claimants who signed up later

22   in the program.

23             Further, we would like the Court to acknowledge

24   that it is assumed under PTO 54 that if a firm has mailed

25   acceptance forms to their clients and a three-week time period

1   has transpired, that that is acceptable as a reasonable amount

2   of time for counsel to have sent these materials to their

3   clients and for their clients to have responded.

4          **THE COURT:**  I think that is reasonable and that's the

5   appropriate period.

6          **MR. GARRETSON:**  Thank you.  We can report on this at

7   the next hearing, but we would like to go out to the plans with

8   this next wave of claimants who sign up and request that all of

9   their claims data be provided to us by December 18, 2009, so we

10  have a fighting chance to complete all the audits by the end of

11  the year for this later category of claimants.

12         **THE COURT:**  That's fine.

13         **MR. GARRETSON:**  Your Honor, there's two more

14  administrative matters I would like to draw the Court's

15  attention to.  The first is a Medicaid-related topic, special

16  needs trusts.  Because of our role that touches Medicaid, we

17  are brought in, as I have mentioned to the Court before, to

18  request to assist with the process of establishing a special

19  needs trust to preserve Medicaid eligibility.

20             We have defined a proposal and a protocol that

21  we have brought to the Court's consideration and to the

22  consideration of the defendants and the PSC.  It is just a

23  process that we have refined in our experience in other MDL

24  settlement programs.  Basically, we submitted a proposal for a

25  procedure that we, in our capacity as the lien resolution

1   administrator, would file a petition for claimants who desired
2   to have these trusts established.
3               So, for instance, as the disability lawyers who
4   are working with these claimants throughout the country address
5   this issue, that we would on behalf of the Court -- to ensure
6   that the Court is not bogged down with these issues, that we'll
7   review those documents and sign a petition that attests to the
8   fact they would meet the state and federal requirements.
9               I believe that probably the most effective thing
10  to do would be as that procedure is worked out -- and I can
11  work with Jared in the coming weeks or the coming days --
12  perhaps that could be posted on the Court's Web site.
13          **THE COURT:**  Yes, I will do that.
14          **MR. GARRETSON:**  Your Honor, the last item is probate
15  and bankruptcy issues that I wanted to point out.  This
16  morning, after the motion and order had been reviewed by the
17  defendants and the PSC, we have submitted to the Court a motion
18  and order that will establish procedures to help us address
19  liens related to claimants with probate or bankruptcy issues.
20  This order establishes the fact that the assets that have been
21  held back at BrownGreer, the claims administrator, to satisfy
22  the state, federal, and other governmental lien obligations --
23  and the private lien obligations, for that matter -- should be
24  held back and are not intended to be part of the probate or
25  bankruptcy estates of the claimants.

1         In this matter we can ensure the orderly flow of
2  the settlement proceeds both to the probate estates, the
3  bankruptcy estates, as well as to the state and federal
4  governments who have participated in this program.  As the
5  Court is well aware, our commitment to them is to send one
6  check, not 30,000 checks.  Unless we have this procedure in
7  place, the program cannot meet that objective.
8         So in conclusion, Your Honor, that is the report
9  of the lien resolution administrator.  If there's any
10 questions, I'm certainly happy to take them.
11      THE COURT:  Last time you mentioned that you were
12 having some problem with Kentucky.  Has that worked itself out?
13      MR. GARRETTSON:  Your Honor, I'm very pleased to
14 report everything is well in order with Kentucky at this time.
15      THE COURT:  The Court should express appreciation to
16 Governor Beshear as well as Attorney General Conway from the
17 great state of Kentucky.  I know that they looked after their
18 people and they did it well.  I appreciate it.
19      MR. GARRETTSON:  Yes, Your Honor.  Thank you.
20      MR. BIRCHFIELD:  Your Honor, in regard to the open
21 issue about the audit process and the lien, I plan to file on
22 behalf of a claimant a motion on Monday to bring that issue
23 before the Court.
24      THE COURT:  Good.
25      MR. BIRCHFIELD:  The next item on the agenda is the

1   special master and deputy special masters.  We have Mike Juneau
2   here to give a report.
3           MR. JUNEAU:  Good morning, Your Honor.  Michael
4   Juneau standing in for Special Master Juneau.
5               In terms of the work of the special masters, the
6   review of the heart attack claims was completed in such a way
7   so that the heart attack final payments were able to be made.
8   So that occupied a good bit of the special masters' time since
9   this last conference.
10              Special Master Juneau is also in the process of
11  reviewing the special marker claims for the heart attacks,
12  those that fell under the 10-point level and elected not to
13  receive the fixed payments, so those claims are now before the
14  special master.  Those would be expected to be resolved by the
15  middle part of November so that payments could be made on those
16  as well.
17              The special masters are in the process of
18  reviewing stroke claims as they come in.  The appeals have not
19  been at the level that they are expected to be in the future,
20  but as they come in the special masters continue to review
21  those.
22              In terms of the extraordinary injury claims that
23  we already spoke about, the special master has received
24  training on that, learned that program, so that as the
25  extraordinary injury assessments are made and to the extent

 1   people elect to appeal those, the special master will be
 2   prepared to do reviews of those as they come in as well.
 3              THE COURT:  Thanks very much.  The special master
 4   played a very important role in this litigation, and I
 5   appreciate his work.  Thank you.
 6                   State court trial settings, anything on that?
 7              MR. MARVIN:  No, Your Honor.  There are no cases set
 8   for trial in state courts.
 9              THE COURT:  Class actions, anything on that?
10              MR. MARVIN:  There's no change there, Your Honor.  I
11   think we are ready now for Ms. Barrios.
12              THE COURT:  State/federal coordination.
13              MS. BARRIOS:  Good morning, Your Honor.  Dawn Barrios
14   for the state liaison committee.  Through the most current
15   conditional transfer order, which I believe is 158, there are
16   no additional remands.  We are not going to repaper everything
17   for that.  We are going to work with BrownGreer and with
18   Ms. Dorothy Wimberly to try to clear out some of the other
19   claimants who were on that recent motion to dismiss that you
20   signed, and we should have that for you next status conference.
21              THE COURT:  Good.  Thank you very much.
22                   Anything on *pro se*?
23              MR. BIRCHFIELD:  Yes, Your Honor.  We have an
24   attorney from Bob Johnston's office to give a report.
25              MS. REZNIK:  Good morning, Your Honor.  Heather

1   Reznik for Bob Johnston, *pro se* curator.

2              Our office continues to receive many calls from

3   *pro se* claimants.  The majority of these calls are regarding

4   the final MI payments, including inquiries about the holdbacks

5   for the common fees and the lien holdback.  We also receive

6   inquiries as to when the IS claims will be completed and when

7   payment can be expected.  We also continue to receive a limited

8   number of calls regarding the completion of the IS claims

9   packages and wrapping up of the final submissions of the IS

10  claims.  We will continue to receive these *pro se* calls as best

11  we can.  Thank you.

12             **THE COURT:**  We have tried to give the *pro se* people

13  some information, access to an attorney, and I think that's

14  been an important part of this program.

15             MDL trial package, anything on that?

16             **MR. BIRCHFIELD:**  Nothing new, Your Honor.

17             **THE COURT:**  What about third-party payor cases?

18             **MR. MARVIN:**  Your Honor, as we mentioned at the last

19  status conference, the parties have negotiated a settlement

20  agreement with respect to the third-party payor actions.  A

21  settlement has been reached and the papers have been signed.

22             **THE COURT:**  That leaves the governmental actions.

23  Anything to report on that?

24             **MR. DAVIS:**  Your Honor, the AG matters are going

25  forward.  As you know, the Louisiana case is set for trial on

1    April 12, 2010.  On September 30, the Court issued Pretrial

2    Order 53.  The parties are moving forward, moving ahead with

3    discovery, and the matter is proceeding.  Mr. Dugan is here if

4    there is anything to add.

5              **THE COURT:**  Jim, anything more?

6              **MR. DUGAN:**  That's accurate, Your Honor.

7              **THE COURT:**  Thank you very much.

8              Discovery issues?  Any other issues connected

9    with third-party payor or government issues?

10             **MR. DAVIS:**  No, Your Honor.  There's nothing.

11             **THE COURT:**  What about pending personal injury cases

12   in which *Lone Pine* expert reports have been served?

13             **MR. MARVIN:**  Yes, Your Honor.  There's nothing

14   further to report other than what's set forth in the joint

15   status report.

16             **THE COURT:**  Anything on the fee allocation committee?

17             **MR. BIRCHFIELD:**  Yes.  Your Honor, the third-party

18   payor motions, which was the next item, that's already been

19   covered by Matt Garretson.

20             Your Honor, the common benefit costs that were

21   awarded under Pretrial Order 51, that order has become final

22   and those costs will be disbursed on Monday, October 26.

23             Since the last status conference, the Court

24   entered Pretrial Orders 49 and 50 that addresses the amount of

25   fees to be held back for common benefit or the 32 percent

1  depending on the action of the attorneys in regards to a

2  certification.  A writ of mandamus was filed on that issue, and

3  the Fifth Circuit has invited responses on or before

4  October 27.

5        THE COURT:  With respect to the costs, let me mention

6  that that's always a difficult issue to handle.  I think the

7  way that we tried to do it in this particular case is helpful

8  in that the first thing we did was to appoint a CPA and then

9  set down some guidelines.  It's more complicated when you then

10  fold in the state courts in cases because they have not been

11  the subject of the guidelines.  I'm trying to do something

12  differently in the *Chinese Drywall* case that I'm handling now,

13  but in *Vioxx* we couldn't do that.

14        In any event, the guidelines as set out, and

15  certain documents are required to be filed with the CPA.  That

16  was done.  Then when it gets time to look at the costs, all of

17  that material is pulled together, and some of it doesn't

18  satisfy the guidelines.  So the CPA has to step in and say,

19  "This is not a coverable cost."

20        In this particular case, we also created a

21  committee to meet with all of the individuals who put in costs,

22  if necessary to take evidence, if necessary to get more

23  material, and the cost will refine down to costs that came into

24  the guidelines and satisfied the requirements of the

25  guidelines.  I looked them over very carefully.  Some of it was

1    disputed.  I resolved those disputes, and then the costs were
2    able to be paid out.
3            The point that I make is that the costs were
4    just not that a lawyer would say, "This is how much I spent.
5    Give it back to me."  It was a lot more involved than that.  I
6    think that the costs were whittled down to a satisfactory
7    amount.
8        MR. BIRCHFIELD:  In working through that process, the
9    lawyers were very cooperative in providing answers to
10   questions, providing documentation, and that cooperation is
11   much appreciated.
12           Also, since the last status conference, the
13   Court has appointed Michael Stratton to serve as liaison
14   counsel to the objectors to the 8 percent and Russ Herman as
15   liaison for the plaintiffs' committee.  There have been some
16   meet-and-confers in that regard, and the parties will get
17   together once Russ returns.
18       THE COURT:  My thinking on that is that some
19   discovery or whatever is required needs to be done, and then I
20   will key up a hearing and deal with it in that fashion.  I'll
21   give everybody an opportunity to express themselves, to write
22   whatever briefs they need to write, and then when the issue is
23   sharpened a bit I will deal with it.
24       MR. BIRCHFIELD:  The next item on the agenda,
25   Your Honor, is a motion for reconsideration or revision of the

1    order capping contingency fees.  The Court has entered an order

2    on that motion, and there's nothing new to report.

3              **THE COURT:**  That's on appeal, too, isn't it?

4              **MR. BIRCHFIELD:**  Yes.

5              **THE COURT:**  Other motions?

6              **MR. MARVIN:**  Your Honor, I think we are now up to

7    page 15, Item XVII, Merck's motions.  Merck has filed motions

8    under PTO 28 and 29 and 43.  Those are set to be heard on

9    October 29.

10             **THE COURT:**  Any other motions that we have?  Anything

11   on appeals?

12             **MR. MARVIN:**  No, Your Honor.

13             **THE COURT:**  Motion for attorneys' fees, anything on

14   that?  I think we talked about that.  The next meeting is

15   Thursday, December 3.

16             Let me mention that I read articles about mass

17   torts and generally they are not favorable.  Generally, the

18   concept is that this type litigation is a black hole, that it's

19   only for the benefit of the attorneys on either side, that they

20   keep churning matters, it goes on forever and eventually, if it

21   is resolved, the attorneys get paid very handsomely and the

22   claimants get a coupon or some kind of gold star, something of

23   that sort.  You read all about that.

24             It's unfortunate that, in a case that has been

25   handled well, you're probably not going to get any press.

1    That's just the way it works.  Orran talked about the short
2    period of time between the time of the settlement and the time
3    of the pay-out, nine months, less than a year, but the whole
4    case worked that way.
5                    The case was brought to the Court in 2005, and
6    within nine months the trials started.  Unfortunately, we had
7    to try the first case in Houston because Hurricane Katrina
8    "dissented" and we had to move, but the case went on.  We tried
9    six in the federal courts and 10 or 12 in the state courts.  We
10   had almost 20 cases or thereabouts within a couple years.  The
11   case was settled within three years of its filing, and then
12   payouts were made within four years.
13                   I think it's a tribute to the people who worked
14   on the case.  The good thing about this from the standpoint of
15   the Court's vantage point is these type cases generally have
16   the best lawyers on both sides.  The best lawyers in the
17   country handle these cases because of their complexity, because
18   of their interests, because of the economics involved, and it
19   was true in this case.  Because of their efforts and hard work,
20   the case was able to be resolved in a very short time as time
21   goes.
22                   In fact, some separate individual cases are not
23   really resolved within four years.  They go on forever.  For
24   50,000 claims to get resolved from the time suit was filed
25   until pay-out, four years is really a tribute to all of you in

1    the audience and all of you who have participated in this case.
2    You need to know that the Court is mindful of that and
3    appreciates and recognizes all of the work you have put in.
4    I'll see you at the next conference.  Thank you very much.  The
5    Court will stand in recess.
6                 **THE DEPUTY CLERK:**  Everyone rise.
7                          * * *
8                       <u>CERTIFICATE</u>
9            I, Toni Doyle Tusa, CCR, FCRR, Official Court
10   Reporter for the United States District Court, Eastern District
11   of Louisiana, do hereby certify that the foregoing is a true
12   and correct transcript, to the best of my ability and
13   understanding, from the record of the proceedings in the
14   above-entitled and numbered matter.
15
16
17                          <u>s/ Toni Doyle Tusa</u>
                            Toni Doyle Tusa, CCR, FCRR
18                          Official Court Reporter
19
20
21
22
23
24
25