**EXHIBIT A**

# MEMORANDUM OF UNDERSTANDING

### BETWEEN

### THE GARRETSON LAW FIRM
### *IN RE VIOXX PRODUCTS LIABILITY LITIGATION*

### AND

### THE THIRD-PARTY PAYOR COUNSEL
### LISTED ON THE SIGNATURE PAGE HEREOF

### DATED AS OF APRIL 28, 2009

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, dated as of April 28, 2009 (the "Execution Date") is between (i) the Garretson Law Firm, the Lien Resolution Administrator ("Garretson") in In re VIOXX Products Liability Litigation, MDL No. 1657, a federal multi-district Litigation which is venued in the United States District Court in the Eastern District of Louisiana (such court, the "MDL Court"), and (ii) counsel listed in the signature pages hereto under the heading "Negotiating Third Party Payor Counsel" (collectively the "Third Party Payor Counsel" or the "TPPC" and Garretson are each a "Party" and collectively the "Parties.").

## PREAMBLE

A.  This is an agreement between (i) Garretson and (ii) the TPPC. The purpose of this agreement is to establish a program for the adjudication and the resolution in a fair, speedy and cost-effective manner of the medical and pharmacy reimbursements/lien obligations which are owed by privately funded or privately insured Eligible Claimants participating in the VIOXX Master Settlement Agreement dated November 9, 2007 ("Master Agreement") to private insurers, self-funded private health plans or other private health benefit providers ("Lien Resolution Program" or "LRP").

B.  Pursuant to the Master Agreement, the MDL Court established a Plaintiffs' Steering Committee to coordinate proceedings (the "PSC"). This Memorandum of Understanding is made with the express approval and understanding of the PSC and the MDL Court.

## RECITALS

A.     On or about November 9, 2007, the Master Agreement was entered into between Merck & Co., Inc., a New Jersey Corporation (together with its successors and assigns, "Merck"), and certain members of the plaintiffs steering committee listed on the signature pages to that agreement (the Negotiating Plaintiffs' Counsel" or "NPC").

B.     Under the Master Agreement, claimants from approximately 26,000 active VIOXX personal injury actions, representing approximately 47,000 claimant groups, along with 13,250 additional claimants whose claims were then tolled under active tolling agreements, became eligible to participate in an enrollment, claims evaluation and payment process in order to resolve the vast bulk of personal injury claims then pending against Merck related to their use of Vioxx.

C.     More than 95% of the active plaintiffs are currently coordinated in one of the following four "Coordinated Proceedings":

    a.     In re VIOXX Products Liability Litigation, Federal MDL No. 1657, venued in the MDL Court;

    b.     In re VIOXX Coordinated Cases, JCCP No. 4247, venued in the Superior Court of California, County of Los Angeles;

    c.     In re VIOXX Litigation, Cases No. 619 and 273, venued in the Superior Court of New Jersey, Law Division, Atlantic County; and

        d.      <u>In re Texas State VIOXX Litigation</u>, Master Docket No. 2005-59499 venued in the District Court of Harris County, Texas, 157th Judicial District.

D.      The Master Agreement establishes a pre-funded, structured private settlement program to resolve pending or tolled (and certain previously tolled) VIOXX claims against Merck involving heart attacks, ischemic strokes and sudden cardiac deaths for an overall amount of $4,850,000,000.

E.      The Master Agreement resolves the claims of all Eligible Claimants (including both Eligible Claimants within the Coordinated Proceedings and Eligible Claimants with pending lawsuits against Merck in any District of Columbia court, any Puerto Rico court, or any court or tribunal of the United States outside the Coordinated Proceedings) who participate in the Master Agreement Program.

F.      The Master Agreement at 12.1.3 provides that "satisfaction and discharge of any and all Liens, whether past, present, or future, whether known or unknown or asserted or unasserted, with respect to any Settlement Payment (and/or the right to receive any Settlement Payment) are the sole responsibility of the relevant Enrolled Program Claimant (and his related Executing Derivative Claimants) and their respective Counsel."

## LIEN RESOLUTION PROGRAM

### PART A

#### Part A.1.     Participants

On or before January 29, 2009, the PSC sent an approved notice to counsel for each Eligible Claimant ("EC")[1] and to each EC not represented by counsel, explaining the LRP and giving each EC notice that each EC will be included in the LRP if the EC or the EC's counsel provided written notice to Garretson that the EC is participating in the LRP. All ECs (approximately 16,000) who provided effective notice by March 20, 2009 are enrolled in the LRP, and are bound and protected by the terms of this Agreement. All EC's who do not enroll in the LRP will not be bound or protected by the terms of this Agreement.

#### Part A.2.     HIPAA Protections

Upon execution of this Memorandum, a list of Participating ECs (the "EC List") will promptly be provided to TPPC by Garretson solely for the purpose of matching an EC with TPPC client insurers and health plans to resolve any liens. A list of the insurers and health plans currently represented by TPPC is attached hereto as Exhibit A. The EC List, and the information contained therein, shall be treated as confidential, and shall not be disclosed except: (i) to appropriate persons at TPPC, Garretson, and TPPC client insurers and health plans, including their agents, administrators, and/or designated representatives, with a legitimate HIPAA consistent business need to access such information to the extent necessary to process the LRP; (ii) as otherwise expressly

---

[1] "Eligible Claimants" is defined in the Master Agreement and includes both the Enrolled Program Claimant and Enrolled Program Claimant's Product User.

provided in this Agreement, or (iii) as may be required by law. All ECs shall be deemed to have consented to the disclosure of these records and other information for these purposes. Within 60 days following final resolution, all listed ECs, TPPC, and TPPC client insurers and health plans, including their agents, administrators, and/or designated representatives, and Garretson shall either destroy or return all copies of the EC List.

**Part A.3.    TALL**

The TPPC shall within thirty (30) days of receipt of the list of the EC list pursuant to Part A.2 provide Garretson with a list identifying each EC against whom a lien is being asserted. The TPPC and Garretson will create an agreed upon process for prioritizing and adjudicating the identified liens. This list ("TPPC Audited Lien List" or "TALL") shall not include liens from no-subrogation states for which ECs have no legal obligation to pay. To accomplish this, the TPPC will (i) exclude from the TALL the liens of any TPPC insurer clients' pending against ECs residing in the following no-subrogation states: Arizona, Connecticut, Kansas, Missouri, New Jersey, North Carolina, and Virginia, and (ii) exclude the liens of self-funded plans only where the contract between the TPPC self-funded client and the EC does not provide the TPPC client with reimbursement or subrogation rights in the same no-subrogation states listed above.

**Part A.4.    TPP ARA**

The amount reflected for each EC lien in the TALL list shall then be reduced 50% for each EC, this resulting amount is the TPP Adjusted Recovery Amount ("TPP ARA").

**Part A.5.     TPP Capped Lien Amount**

Each participating EC agrees to pay the lesser of their TPP ARA or the TPP Capped Lien Amount (the "TPP Gross Lien Payment").[2] The TPP Capped Lien Amount shall be calculated by taking the sum of (i) 15% of the EC's Gross Recovery up to the first $100,000, (ii) 12.5% of the EC's Gross Recovery over $100,000 and up to $250,000, and (iii) 10% of the EC's Gross Recovery Exceeding $250,000. The TPP Capped Lien Amount shall be inclusive of all private health care liens and shall not be increased regardless of the number of private health care liens being asserted against an individual EC's recovery. For any EC receiving of Gross Recovery of $5,000 or less, the TPP Capped Lien Amount shall be $0.

**Part A.6.     Administrative Expenses**

Administrative expenses payable to the Lien Administrator shall be a flat cost of up to $300.00 per payable lien and shall be payable as follows: (i) the first $150.00 collected per lien by the TPP lien holder(s), and thereafter (ii) by the EC. Each TPP Gross Lien Payment shall be reduced by $150.00 for administrative expenses. The TPP Gross Lien Payment, after reduction for administrative expenses, shall be the TPP Net Lien Payment.

**Part A.7.     Wire Transfer**

All Final TPP Net Lien Payments, which include all TPP Net Lien Payments not subject to an audit right pursuant to Part B.1 below, shall be paid to TPPC by wire

---

[2] "Gross Recovery" includes all recoveries the Eligible Claimant and, if applicable, the Eligible Claimant's Product User may become entitled to receive pursuant to the Master Agreement prior to any deductions of any kind and for any reason, including, but not limited to, and fees or expenses described in Article 9 of the Master Agreement.

transfer from Brown Greer to the account designated by TPPC, on the last business day of each month in which the TPP Net Lien Payment became final.

**Part A.8.    Effect on Rights and Claims**

Nothing in this Memorandum shall affect in any way any of the rights and claims that such private health plans may have against Merck except to the extent that such private health plan has actually received funds to discharge a reimbursement obligation as to a claimant.

**Part A.9.    Trust**

Brown Greer shall hold in trust the maximum allowable TPP Capped Lien Amount from the gross recovery of every EC listed in the TALL (or, in the event that amounts are otherwise to be distributed under the Master Agreement prior to establishment of the TALL, then Brown Greer shall hold in trust an amount estimated to be the maximum allowable cumulative TPP Capped Lien Amount of the estimated gross recovery of all actual or expected ECs, such amount to be approved by the Court to be sufficient to ensure that the estimated cumulative maximum allowable TPP Capped Lien Amount is not distributed). The holdback amount shall be used to satisfy the TPP lien or liens pursuant to the terms of this Memorandum. No other amounts otherwise payable to an EC shall be subject to terms of this Memorandum. So long as the amount of the holdback is sufficient to cover the maximum allowable TPP Capped Lien Amount for each EC listed in the TALL (or is otherwise in the amount as estimated and approved above), the holdback amount will be reserved from the last funds distributable to the EC (or ECs, as may be applicable). Each participating health plan shall be required to exercise reasonable diligence so as to ensure the expeditious payment of the actual TPP

Capped Lien Amount so as to facilitate the expeditious release of any remaining amounts under those holdback provisions to every EC. Brown Greer shall hold all such trust amounts in an interest bearing account, such interest is to be paid to the EC upon payment in full of the TPP Capped Lien Amount.

## ADJUDICATION OF TPP ARA

### PART B

#### Part B.1.   Auditing and Appeal

Garretson has established an auditing procedure to allow the TPPC, the PSC and Garretson to audit selective liens and obtain relevant supporting materials. The TPPC and the PSC may appeal to the U.S. District Court the results of audited claims, and may also appeal whether the determination of the amount reflected for an EC of the lien in the TALL list accurately reflects payment on behalf of such EC consistent with the terms of Part A.4 above (or the resulting TPP Adjusted Recovery Amount or the resulting TPP Capped Lien Amount). The TPPC and the PSC shall agree upon expedited procedures for prosecuting such appeals (including timing of notice of appeal, and opportunity to cure the alleged defect). If the appealing party to any such appeal does not prevail, then such party shall pay the costs and fees (as determined by the Court) of the opposing party unless the Court determines that the appeal had merit.

#### Part B.2.   Release

Upon receipt of the funds under this Memorandum, all participating health insurers and health plans shall release, fully and completely, the claimant and his or her

attorneys from and against all liability in connection with the reimbursement obligations under the claimant's health insurance policy (ies).

## MISCELLANEOUS PROVISIONS

### PART C

### PART C.1.   Reasonable Best Efforts

The Parties agree to use their reasonable best efforts, including all steps required by this Memorandum and other efforts that may be necessary or appropriate, to carry out the terms of this Memorandum.

### Part C.2.   No Admission

Nothing in this Memorandum, including any of its provisions, any statement made or document related to or filed in connection herewith, or the Parties' willingness to enter into this Memorandum, shall be construed as an admission as to any liability or wrongdoing of any Party or any infirmity in any Party's claims and neither the Memorandum nor any statement made or document related to or filed in connection therewith shall be admissible in evidence for any such purpose in any proceeding.

### Part C.3.   Enforcement

This Memorandum may be pleaded as a full and complete defense to any action, suit or other proceeding that has been or may be instituted, prosecuted or attempted with respect to any of the Released Claims as defined in the Master Agreement, or may be filed, offered, received into evidence, and otherwise used for such defense.

**Part C.4.  No Party Is the Drafter**

None of the Parties to this Memorandum shall be considered the drafter of this Memorandum or any included provision for the purpose of any statute, case law or rule of construction that would or might cause any provision to be construed against the drafter.

**Part C.5.  Choice of Law and Venue**

This Memorandum shall be governed by and interpreted according to the substantive laws of the State of New York without regard to its choice of law or conflict of laws principles.

**Part C.6.  Amendment or Waiver**

This Memorandum shall not be modified in any respect except by a writing executed by all Parties to this Memorandum, as well as the PSC. The waiver of any rights conferred by this Memorandum shall be effective only if made in writing by the waiving Party. The waiver by any Party of any breach of this Memorandum shall not be deemed or construed as a waiver of any other breach, whether prior to, subsequent to, or contemporaneous with this Memorandum.

**Part C.7.  Execution in Counterparts**

This Memorandum may be executed in any number of counterparts, each of which shall be an original and all of which shall together constitute one and the same instrument. It shall not be necessary for any counterpart to bear the signature of all Parties hereto. This Memorandum and any amendments thereto, to the extent signed and delivered by means of facsimile machine or electronic scan (including in the form of an Adobe Acrobat PDF file format), shall be treated in all manner and respects as an original

agreement and shall be considered to have the same legal binding effect as it were the original signed version thereof delivered in person.

**Part C.8.     Integrated Memorandum**

This Memorandum including its Exhibits, contains an entire, complete, and integrated statement of the terms agreed to by and between the Parties.

**Part C.9.     Construction**

This Memorandum shall be construed and interpreted to effectuate the Parties' intent, which is to establish a mechanism for adjudication and the resolution in a fair, speedy and cost-effective manner of the medical reimbursements/lien obligations which are owed by privately-funded or insured ECs participating in the Vioxx Master Agreement dated November 9, 2007 to private insurers, self-funded private health plans or other private health benefit providers. With regard to each and every term and condition in this Memorandum, the Parties thereto understand and agree that the same have been or has been mutually negotiated, prepared, and drafted, and if at any time the parties thereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto, no consideration shall be given to the issue of which party thereto actually prepared, drafted, or requested any term or condition thereof.

**Part C.10.    Accurate Public Statement**

The Parties and the PSC shall cooperate in any public description of this Memorandum and the Lien Resolution Program established herein.

**Part C.11.    Waiver of Inconsistent Provisions of Law; Severability**

Part C.11.1.   To the fullest extent permitted by applicable law, each Party, including each EC, waives any provision of law (including the common law) which renders any provision of this Memorandum invalid, illegal, or unenforceable in any respect.

Part C.11.2.   Any provision of this Memorandum which is prohibited or unenforceable to any extent or in any particular context shall be ineffective, but such ineffectiveness shall be limited as follows: (i) if such provision is prohibited or unenforceable only in or as it relates to a particular jurisdiction, such provision shall be ineffective only in or as it relates to (as the case may be) such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in or as it relates to (as the case may be) such jurisdiction shall not otherwise invalidate or render unenforceable such provision (in such or any other jurisdiction); (ii) if (without limitation of, and after giving effect to, clause (i)) such provision is prohibited or unenforceable only in a particular context (including only as to a particular Person or Persons or under any particular circumstance or circumstances), such provision shall be ineffective, but only in such particular context; and (iii) without limitation of clauses (i) and (ii), such ineffectiveness shall not invalidate any other provision of this Memorandum.  Upon any determination by a Court that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Memorandum so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law.

**Part C.12.    Entire Agreement**

This Memorandum contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes and cancels all previous agreements, negotiations, and commitments in writings between the Parties hereto with respect to the subject matter hereof.

**Part C.13.    Headings**

The headings of the Table of Contents, Articles, and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Memorandum. Any reference to an Exhibit, Annex, or Schedule shall be deemed to refer to the applicable Exhibit, Annex, or Schedule attached hereto. The words "include" and "including" and words of similar import when used in this Memorandum or any Exhibit hereto are not limiting and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words. The definition contained in this Memorandum or any Exhibit hereto is applicable to the singular as well as the plural forms of such terms. Words of any gender (masculine, feminine, neuter) mean and include correlative words of the other genders. As used herein or in any Exhibit hereto, the term "<u>dollars</u>" and the symbol "<u>$</u>" shall mean United States dollars. References herein to instruments or documents being submitted "by" any Person include (whether or not so specified) submission of the same on behalf of such Person by his/her Counsel whether or not so specified, provided that if any particular instrument or document is required herein to be executed by a particular Person, it must (unless otherwise expressly specified herein) be so executed by such Person. References herein to any particular Part (such as, for example, Part D.6.) shall be

deemed to refer to all sub-Parts of such Part (such as, for example, Part D.6.1., D.6.2., etc.), all sub-sub-Parts of such sub-Part, and so on; the corresponding principle applies to all references herein to any particular sub-Part, sub-sub-Part, and so on.

**Part C.14.    Amendments; No Implied Waiver**

This Memorandum may be amended by (and only by) an instrument signed by the TPPC, on the one hand, Garretson, and the PSC, on the other hand. Except where a specific period for action or inaction is provided herein, no failure on the part of a Party to exercise, and no delay on the part of either Party in exercising, any right, power, or privilege hereunder shall operate as a waiver thereof; nor shall any waiver on the part of either Party of any such right, power, or privilege, or any single or partial exercise of any such right, power, or privilege, preclude any other or further exercise thereof or the exercise of any other right, power, or privilege; nor shall any waiver on the part of a Party, on any particular occasion or in any particular instance, of any particular right, power, or privilege operate as a waiver of such right, power, or privilege on any other occasion or in any other instance.

**Part C.15.    Further Assurances**

From time to time following the Execution Date, (i) each Party shall take such reasonable actions consistent with the terms of this Memorandum as may reasonably be requested by the other Party, and otherwise reasonably cooperate with the other Party in a manner consistent with the terms of this Memorandum as reasonably requested by such other Party, and (ii) each EC (and his related Executing Derivative Claimants) and their Counsel shall take such reasonable actions consistent with the terms of this Memorandum as may reasonably be requested by the TPPC or the PSC, and otherwise reasonably

cooperate with the TPPC and the PSC in a manner consistent with the terms of this Memorandum as reasonably requested by the TPPC or the PSC, in the case of each of (i) and (ii) as may be reasonably necessary in order to further effectuate the intent and purposes of this Agreement and to carry out the terms hereof.

**Part C.16.     HIPAA Compliance**

All terms of this Memorandum involving the transfer of protected healthcare information shall be in full compliance with all HIPAA requirements.

**Part C.17.     MFN**

Each participating private health plan agrees that if, for one year following the execution of this Memorandum or such time as 75% of the Vioxx TPPC liens have been paid, whichever period is shorter, it enters into a lien resolution program in any similar mass tort litigation with lien reductions greater than 50% or recovery cap amounts less than 15% of the claimant's gross recovery up to the first $100,000, 12.5% of the claimant's gross recovery over $100,000 and up to $250,000, and 10% of the claimant's gross recovery exceeding $250,000, then such private health plan agrees to offer the same recovery caps to its ECs who participated under this Memorandum. For good cause shown, the MDL court may relieve a participating insurer of this provision.

IN WITNESS WHEREOF, the Parties hereto, by and through their fully authorized representative, have executed this Agreement as of April 28, 2009.

**TPP COUNSEL:**

By: _____
Diane Paolicelli
Levy Phillips & Konigsberg, LLP

By: _____ 4/28/09
Andrew H. Marks
Crowell & Moring LLP