(Formal Complaint)



John P. Hudson Sr.
7 Manitou Court
Ann Arbor Michigan  48108
JohnHu48108@yahoo.com
(734) 972-7960

October 29, 2009

Via Certified Mail
Assistant Attorney General Lanny A Breuer
United States Department of Justice
Criminal Division / Fraud Section
10th & Constitution Ave. NW
Bond Building 4th Floor Washington, DC  20530
(202) 514-7023

Re: Formal Complaint of Fraud Perpetrated Upon Litigants by Merck & Company (BrownGreer P.L.C, The Gate Committee) & (Trial Lawyers misrepresenting Plaintiffs) through Merck & Co. Vioxx Settlement.

Dear Assistant Attorney General Lanny A. Breuer,

My name is John P. Hudson Sr.  I am a litigant in the Vioxx Settlement offered by Merck & Co.  I was being represented by a couple of law firms in this settlement but currently not being represented by any law firm. I am forwarding your division a substantial amount of documents for review.  The records are based upon facts, mistruths and deceptions by some key players in this settlement.  Nevertheless, what appears to be that of a legitimate settlement evolved into one of the biggest "Settlement Schemes," in The United States of America. The files will show how attorneys involved with this Settlement, coerced their clients into signing the Settlement Agreement but mislead clients thereafter.  The records will also show how the "Gate Committee," BrownGreer," has failed to respond to claimants who have had legitimate concerns and it appears they have not followed the Merck Agreement designed for this settlement by Merck & Co.  The illusive and evasive way claimants have been treated is a combination of Merck & Co. wanting to preserve dollars from the 4.85 billion dollars set aside for the Vioxx Settlement, to buy Schering Plough another rival pharmaceutical company.  Furthermore, it appears BrownGreer P.L.C. is assisting with this process.  Finally the client's attorneys wanting to keep the award that would be ordinarily assigned to the clients due to the mere fact of their contingency contract was reduced by the Honorable Judge Fallon to 32% rather than the initial 45% for most contracts signed by clients.  Therefore, we the people of the United States as litigants in this Vioxx Settlement Scheme and I as a representative of those who share the same common interest, urgently request your assistance in this matter.  **(See Exhibit N)  (Julian Ayrs & Pop Culture claimant's blog)** What we would hope to accomplish by exposing this process of Merck & Co. Vioxx Settlement Scheme is:  (a)  A thorough investigation which may entail the auditing of the "Gate Committee's Process of handling litigant's claims.

(b) And Ultimately the necessary steps it would take to assure fair and due process of such endeavor to all legitimate claimants engaging in this Vioxx Settlement.

There will be documents listed and labeled exhibit (A through R) They will be use to depict certain events and what was stated by individuals who are apart of this entire process.

According to **(Exhibit J, page 2 & 3)** issued by the Honorable Judge Fallon of the United States District Court Eastern District of Louisiana, he plainly puts into perspective the case regarding the Vioxx litigation settlement offered by Merck & Co. In the second paragraph it is explained how Merck a Pharmaceutical Company marketed the drug Vioxx generically known as Rofecoxib. A drug that was to ease one's arthritis, menstrual pain, and migraine headaches. It may have done all of the preceding but also caused a high risk level of strokes and heart attacks. This drug was marketed between the dates of May 20, 1999 until September 30, 2004 and finally removed off the market by Merck & Co. However, there were thousands of individual law suits and a great number of class action suits filed against the giant "Merck & Co." These claims charged Merck's pain killer drug Vioxx caused their stroke, heart attack or either fatality in the person ingesting it. However, my mother Ms. Marguerite Hudson a resident of Mississippi ingested this dreadful drug Vioxx for two complete years. Nevertheless, there were countless numbers of others who eventually passed away due to a heart attack that may have been onset by a stroke as did my mother after ingesting this drug for a substantial period of time. These individuals left behind love ones, children and grandchildren whose love was a mutual respect and honor for each other.

## "The Breaking of Fiduciary Duty by most Attorneys In The Vioxx Settlement"

Immediately after my mother's death I commenced to seeking Legal Counsel to file my suit against Merck & Co. Therefore, after searching and discovering that a law firm in Houston Texas that was also licensed in Mississippi, entitled: "The Khan Law Firm," which was accepting Vioxx cases I decided to solicit their services. Please see **(Exhibit A cover letter page 1 & 2).** This is the letter I received from attorney Jimmy Williamson, lead counsel for **Williamson & Rusnak**, regarding the takeover of my case from "The Khan Law Firm." Also , enclosed with that document was a contract to sign, regarding the legalities of the attorney/client relationship, percentages and adjustments of percentages. This was based on whether we reached an agreement between Merck & Co. and I before or after filing my case with the Civil Court in Louisiana, United States District Court Eastern District of Louisiana. **(See attachment of Exhibit A page 1 & 2 of the contingency contract).**

The letter referred as **(Exhibit C, page 4 & paragraph 3)** was the beginning of encouraging all clients under **"Williamson & Rusnak," Laminack, Pirtle & Martinez"** to enter into this settlement process except one of these firm's one hundred and fifty clients (150). Moreover, attorney Williamson stated this client lived in Silsbee Texas and he also stated this person was the only one of their clients he thought did not have a viable chance in this settlement. Shortly after signing the contract there were times I was told by paralegals at the law firm in a related telephone conversation that my attorneys thought I had a "very strong case." I provided them with numerous of documentations that depicted specifics regarding evidence that my mother had ingested this drug Vioxx. Attorney Williamson's office personnel even went as far as asking me to provide them with a final document from the Probate Court in the State of Mississippi that would name me as Head Administrator over my mother's estate.

(2)

This request occurred during the month of August 2008. The reason they needed this, if any funds were awarded to my Mother's Estate Merck & Co. would know exactly who to forward the award to, "the paralegal stated."
**(See Exhibit M)** When in essence an eligibility enrollment was due by February 29, 2008 **(Exhibit K page 3 sec. 1.2.2.2)**

As it relates to the "eligibility requirements," with respect to any particular Enrolled program Claimant under section 2.2.1.1 such Enrolled Program Claimant or Enrolled Program Claimant's Product User shall meet the Injury Gate criteria specified in Exhibit 2.2.1.1 in relations to his Eligible Event; 2.2.1.2 such Enrolled Program Claimant or Enrolled Program Claimant's Product User shall meet the Duration Gate criteria specified in Exhibit 2.2.1.2 in relation to such Eligible Event; and 2.2.1.3 such Enrolled Program Claimant or Enrolled Program Claimant's Product User shall meet the Proximity Gate criteria specified in Exhibit 2.2.1.3 in relation to such Eligible Event. 2.2.2 For purposes of the Eligibility Requirements and for purposes of Claims Valuation Process, evidence of Vioxx usage shall be determine in accordance with the criteria set forth in Exhibit 2.2.2.
2.2.3   Exhibits 2.2.1.1, 2.2.1.2, 2.2.1.3, and 2.2.2 are hereby incorporated into this Agreement by reference.
**Section 2.3 Claims Administrator**
2.3.1   **The Claims Administrator initially will determine whether an Enrolled Program Claimant meets the Eligibility Requirements. In that connection, the Claims Administrator shall review and analyze the Claims Package submitted by the Enrolled Program Claimant and may, to verify completeness or to verify the presence or absence of a condition suggested in the Claims Package, or in cases of**
2.3.2   **inconsistency, suspicion of irregularity, for audit purposes and /or similarly appropriate**
2.3.3   **circumstances, review and analyze other documents or materials that the Claims Administrator has**
2.3.4   **access to pursuant to this Agreement.** (See Exhibit K page 8 under Article 2 Eligibility for Claims Valuation)

This is completely contrary to what most attorneys within this settle is saying to their clients. They are stating mistruths according to the previous aforementioned. Based upon this section it mentions nothing concerning 30 pills dispensed in the 56 days immediately preceding the Eligible Event. While there have been some communication rendered on behalf of attorney Williamson who was the lead counsel in my case, all his correspondences were not completely honest and forthright. Attorney Williamson along with his constituents have forwarded letters to me via U.S. Mail that appeared to have had false testimonials regarding my specific case against Merck & Co. The document that I am referring to is **(Exhibit D).** The letter label (Exhibit D) is a document from attorney Williamson virtually asking me to dismiss my claim against Merck & Co. without any viable reason that would justify a dismissal. When clients enter into a mass tort settlement such as this one offered by Merck & Co. Attorneys have no more legal jargon to set forth, dispute or argue before a Court. Therefore, their legal cost, time and effort that would have been spent debating a trial case before a jury has been reduced to almost zero time, money and effort for that particular case. Moreover, regarding this specific mass tort settlement Merck & Co. has set in place a panel of analyst, Claims Administrator and observers to determine the qualifying of a claimant. However, taking a look at attorney Williamson's letter dated **December 29, 2008** and known here as **(Exhibit D),** he states and I quote. *"As you know we previously filed suit on your behalf against Merck Concerning Marguerite Hudson taking Vioxx. You have talked to my office as well as Lamineck, Pirtle & Martinez office on several occasions. We informed you that we did not believe. Ms. Hudson's medical records and death certificate indicate she died of sudden cardiac death and possible acute stroke; however, her medical records also indicates she was on Celebrex at the time and that she had not been on Vioxx for approximately 2 years prior.*

(3)

*Based on this, "we feel we should file a Stipulation of Dismissal in your case."*
Attorney Williamson's letter contradicts **(Exhibit K)** produced by Merck & Co. on November 9 2007. Page 11 and more precisely section 2.5.6 plainly states and I quote. **"If the Gate Committee determines that a particular Enrolled Program Claimant is not deemed to be a Qualifying Program Claimant and Merck's representatives on the Gate Committee do not take a contrary action pursuant to section 2.5.5 within the time period specified therein, then the "Claims Administrator thereafter will give written notice to such effect to the Enrolled Program Claimant's Counsel or, if the Enrolled Program Claimant is without Counsel, to the Enrolled Program Claimant directly."**

**There has not been any document produced by "The Gate Committee," the attorneys from Williamson & Rusnak and Laminack, Pirtle and Martinez.** If the rules and policies in this Settlement works for one that is engaged with such process in this Settlement, it must work for all that is apart of this process. Exhibit D which is attorney Williamson's letter to me is filled with bogus, insinuating and false testimonials. Throughout **(Exhibit D)** it seems he tries to encourage me to find other counsel but discourages me at the same time, because according to the two documents Exhibit D and Exhibit K, there is contrary information he is rendering and refuses to share the truth. Which in fact paragraph 2 & 3 of this same letter is evidence that he hopes ultimately I give up on my case without any legal documentation from the "Claims Administrator." I responded to attorney Williamson in **(Exhibit E)** which is a letter I choreograph and denied his request of my dismissal against Merck & Company. **(See Exhibit E)**

After attorney Williamson received my letter known as Exhibit E, it appears he got much angry. He responded to me in a very short and abrupt communicated letter that is labeled **(Exhibit F) dated January 20, 2009.** *He states and I quote, " Dear Mr. Hudson, we received your letter dated January 8, 2009. We will be withdrawing in the above captioned case. Based upon your letter, you need to contact another attorney **immediately** to take over the handling of your case on behalf of your Mother's Estate. We remain pessimistic, but certainly wish you the best of luck. You do not owe us any fees or expenses in the case. We encourage you to **immediately** contact another attorney to see if he/she will take over your representation in the above cause. If you will advise us in writing who the attorney is that you retain, we will be happy to ship your file to them at our expense.*

If attorney Williamson was that adamant regarding me retaining another attorney he would have directed me to be assisted by the PSC. The Plaintiff Steering Committee at the "Gate Committee," assist claimants who are without counsel and they only receive 8% of the award remitted to the claimant. I am most certainly sure attorney Williamson knew at this point no other attorney would be interested in taking my case since the Settlement was well on its' way and coming to an end. **(See Exhibit K page 35 Section 9.2 "Common Benefit Fees and Reimbursement of Litigation Cost"**

According to Exhibit K produced by Merck & Co. it is not up to the attorneys of any law firm representing claimants to give pessimistic reviews until they have heard from the Claims Administrator or the Special Master in writing concerning an individual's specific case. The breech of "Fiduciary Duty" occurs when attorneys betray the trust of their clients.

(4)

Nevertheless, attorney Jimmy Williamson writes letter three which is labeled **(Exhibit F)** forwarding me misleading information regarding my case once again. I responded to attorney Williamson in a memorandum labeled **(Exhibit G) dated January 28, 2009.**
This communication depicts that I have conferred with other counsel and they stated that since the Settlement process is on the way and almost over that I should see it through with the law firm I already have. Nevertheless, after forwarding this letter to attorney Williamson, he insisted in another communication labeled **(Exhibit H) dated February 3, 2009 that he was not getting his point across to me and that he still wanted to withdraw from my case (See Exhibit H)** He states, and I quote in paragraph 2. "We are withdrawing from your representation individually and as representatives of the Estate of Marguerite Hudson. We anticipate the court will dismiss the Estate's claim."

Attorney Williamson states now in this communication that he **anticipate** the court will dismiss my claim. When in actuality before he stated in **Exhibit D paragraph 2** almost as if the courts or Claims Administrator had already made an unfavorable ruling on my claim. He goes on to mention as if I was oblivious of our contingency contract that I will not owe him anything for his services. Which in fact I am well aware of the Honorable Judge Fallon's ruling regarding the contingency fees reduced to 32% for all attorneys across the board in the Vioxx litigation. However though attorney Williamson did not inform me of this change, I researched it on my own.

I replied to attorney Williamson regarding his letter dated February 3, 2009. My memorandum is labeled **(Exhibit I)** and dated February 10, 2009 and it correlates with his decision to withdraw from my case in the Vioxx Litigation. Although, I agree it is okay for him to withdraw if he insist on withdrawing as representative, but forewarns him that it is not lawful for him to represent a dismissal on no circumstance from the Vioxx Settlement. Furthermore, I mentioned to him in this correspondence have the courts to contact me and send all documents related to the Vioxx Settlement to me. I directed attorney Williamson to send my files he had in his possession to me, he never sent the files.

If anyone were to view my original case filed by attorney Williamson labeled in this packet as **(Exhibit B)** you will discover that he did not feel pessimistic originally drawing up the docket filed under MDL. Docket No. 1657 and Civil Action Number 06-7011 under a jury trial demand. As long as it was filed under a individual case against Merck & Co. it was a strong case based upon previous action portrayed my Williamson & Rusnak and Laminack, Pirtle and Martinez. Nevertheless, according to the Settlement it became something they wanted to dismiss without hearing from the "Gate Committee.

Attorney Williamson produced a PDF file himself entitled **"Common Mistakes Made by Attorneys."** It is labeled in this packet as **(Exhibit L).** In his writings attorney Jimmy Williamson speaks to the **"Breech of Fiduciary Duty and Legal Malpractice of Attorneys." This information can be found in Exhibit L, page 1 & 2 section (A).** He goes on to say on page 2 of this very same document under section (I) and I quote. *"Failure to communicate with the client is the single most common factor in cases in which clients complain about their attorneys. Even when the attorney has committed other egregious mistakes and caused other harm, it is almost inevitably true the communication with the client has been **faulty.*** On page 3 paragraph 2 attorney Williamson goes on to say and I quote.

(5)

*"Thousands of articles have been written about this, and while lawyers in the State of Texas are repeatedly sanctioned and disbarred for this infraction, it is one of the most common. The law of this is simple. You must keep your client reasonably informed.*

In my quest of not only trying to seek justice from a pharmaceutical company such as Merck & Co. I have tarnished, emotions and very bad feelings that taunt me everyday regarding the counsel that has represented me in this litigation against Merck & Company. As awful as it may appear to be victimized by any particular situation and going through the process of seeking justice but at the same time being displaced doubly by the counsel that represents you. This is a very disheartened thought and the diabolical actions behind it portray a very uncivilized society where people cannot trust in the agencies that are entrusted to represent them. As evidence has proven according to these documentations under this section regarding the attorneys in my case, code of ethics was breeched by Williamson & Rusnak and Lamineck, Pirtle & Martinez.

### "The Honorable Judge Fallon Docket"

In **(Exhibit J)** which is the Honorable Judge Fallon Docket. On page 18, item number 3. **"Determining reasonable fees in the context of the Vioxx global settlement"** Judge Fallon states commencing with the second paragraph and I quote: "In setting a reasonable limitation on contingent fees, the Court is also mindful of the many contributions made by plaintiffs' counsel in furtherance of the administration of the global settlement proceedings. Without the dedication of plaintiffs' counsel from across the nation, the approximately 50, 000 claimants currently enrolled in the settlement would have faced considerable difficulties in securing enrolled and producing the appropriate records necessary to enroll in the settlement. Nevertheless, the Court must assess the reasonableness of the contingent fees in light of the fact that economies of scale led to global settlement offering considerable benefit to the attorneys.

Instead of pursuing individual discovery, filing individual motions, engaging in individual settlement negotiations, or preparing individual trial plans, attorneys for eligible claimants who wish to participate in the settlement need only enroll the claimants in the settlement and then carefully monitor their progress through the claims valuation process. These economies of scale must cut both ways. The attorneys have benefited from a uniform and highly efficient resolution procedure; the claimants should similarly benefit from fees reduced to reflect that uniformity and efficiency. Even though the unique facts of certain cases may have initially warranted disparate contingent fee arrangement, these individual characteristics no longer control the calculus for determining reasonable fees. See in re Guidant, 2008 WL 682174, at *18 ("Because of the mass nature of this MDL, the fact that several firms /attorneys benefited from economies of scale, and the fact that many did or should have benefited in different degrees from the coordinated discovery, motion practice, and /or global settlement negotiations, there is a high likelihood that the previously contingency fee contracts would result in excessive fees."); In re Zyprexa, 424 F. Supp 2d at 493 ("[T]hese firms all benefited from the effectiveness of coordinated discovery carried out in conjunction with the plaintiffs steering committee and from other economies of scale, suggesting a need for reconsideration of fee arrangements that may have been fair when the individual litigations were commenced"). Inconsideration of the various state rules dealing with contingent fees and the decisions of other district courts faced with comparable situation, the Court finds that the individual contingent fee arrangements for attorneys representing claimants enrolled in the Vioxx global settlement should be capped at 32% plus reasonable costs. In reaching this determination, the Court acknowledges the complexity and risk involved in pursuing from this

sum. Nevertheless, in light of the large number of plaintiffs, the globlal settlement, the considerable settlement fund, and unique contours of this litigation, the Court finds that this is a fair and reasonable framework for apportioning fees. Although perhaps a reduction from the standard 33 ½% to 40% contingent fee applicable on a single –case basis, this reduction will not result in a paltry award for the attorneys. With a total settlement fund of $4.85 billion, limiting attorneys' fees to 32% of the net recovery means that the attorneys in this case will receive more than $1.55 billion.

The Honorable Judge Fallon concludes by saying: "In consideration of the economies of scale offered by the global settlement proceedings and all the above expressed reasons, IT IS ORDERED that contingent fee arrangements for all attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs. At a later date after due notice and an opportunity for all counsel to be heard, the Court will determine the appropriate sum for common benefit work. This sum will deducted from the above amount, reducing the individual attorneys' fees across the board .
New Orleans, Louisiana, this 27th day of August 2008.

After this reduction by Judge Fallon of attorney fees in the Vioxx global settlement, many attorneys filed appeals to reverse his decision. Some of the attorneys who were filing these appeals in the Appellate Courts were attorneys representing claimants from Texas, Florida, and Louisiana. However, to no avail, it was leaked that they could recoup the contingency contract fee by handling each claimant as they please, paying out the nuisance claims and keeping the award from their death claims. This is the reason why many death claims by claimant's attorneys were asked to be dismissed by their attorneys, rather than having their clients to wait on an official document from the "Gate Committee." This is very plain and easy to see that many trial lawyers used these death cases to get them-selves leverage with Merck & Co. When they discovered the contingent contract percentage would change to 32% across the board for all attorneys they decided by dropping some of their clients and keeping monies awarded for that same client would help them rebound on the amount lost with the reduction of the attorney fees. Judge Fallon in his document urges attorneys to remain within bounds of their Fiduciary Duty to their clients, because it takes away the integrity of the entire aspects of the Judicial System as a whole and depletes the people's trust in attorneys.

### "The Curator's Office In Louisiana"

Curator Robert Johnson heads the office of information for the Vioxx settlement. This is simply where a claimant can get in touch with someone regarding the status of their claim. I learned of this office in Louisiana when I contacted the "Gate Committee Office," BrownGreer P.L.C. in Virginia. I made a call on Monday September 28th, 2009 around the noon hour, to speak with someone at BrownGreer and I was sent to the telephone of attorney Green. She was not in therefore I left a message. Attorney Green returned my call on Monday September 28, 2009 around the time of 4:42pm. that same day. We spoke for approximately 5 to 7 minutes and I asked her pertinent questions regarding the settlement process. One question that I asked attorney Green was:  1) **If a claimant does not have an attorney could they utilize the services of the P.S.C., which is the Plaintiff Steering Committee?** Her reply was; "Yes."

(7)

**2) I asked if a person were or were not to be awarded any points; would they receive a Legal Form," from the "Gate Committee," stating this?** Her reply again was; "Yes." **3) I asked her a third question; If an individual were to receive this Qualifying Form or Non Qualifying Form according to the Merck Docket, would the "Gate Committee," submit this form to the claimant's attorney or if the claimant is without an attorney to the claimant directly?** Attorney Green replied; "Yes." **(See Exhibit K page 11 section 2.5.6** However, before I could get a chance to ask anymore questions; she stated, if I really wanted to know any information regarding specifics concerning my claim to call the Curator's office in Louisiana at (504) 581-2606.

I took Ms. Green's advice and did make a call to the Curator's office on Wednesday September 30th, 2009. As I called to speak with Mr. Bob Johnson the Curator, but soon discovered I was being intercepted by a woman named Janette to adhere to my concerns. We spoke for 17 minutes and thirty-five seconds about my specific claim. First I explained to Janette how knowledgeable I was of the Merck settlement and had tracked this process from beginning to present. I mentioned that I was aware of the most recent settlement of 80 million Merck just agreed to pay third party payers and claimants settling cases in the United States Court for the Eastern District of Louisiana. Janette asked me if I had counsel representing me for this settlement? I responded "No," since I had just received a letter from my attorneys in Texas stating that this letter is your (Notice of Dismissal and Closing of File). This letter I received from Buffy Martinez of Lamineck, Pirtle and Martinez was dated September 7, 2009. **(See Exhibit O)** **Janette asked me if my attorneys provided me with a copy of the en-eligibility notice from the Gate Committee?** My response was; "No." She further stated, "if your counsel was going to withdraw from being your attorneys in this case, they should have provided you with a form of release from the Court to be signed by you and presented back to the Court for approval." She simply confirmed some things I already knew. Furthermore, as she begin to research the information I was seeking which was my mother's name on the computer, she discovered there was not an en-eligibility by my mother's name. Her words specifically was; **"I do not see an en-eligibility by your mother's name as I do by some of the other people's name when they call up."** **She further stated, "the last time anything was requested on your claim by Lamineck, Pirtle and Martinez was on January 12th, 2009."** As the dates are tracked in sequence by Lamineck, Pirtle and Martinez and myself something is not correlating with the truth. My attorneys sent me a correspondence December 29, 2008 stating their pessimistic views but they are still requesting more data for the claim on January 12th, 2009. **(See Exhibit O) (dates in sequence & false testimonial)** Attorney Martinez in her correspondence to me Dated September 7th, 2009 in paragraph 4, states and I quote: "The Court overseeing Vioxx cases nationwide recently dismissed Ms. Hudson's case because we could not prove that she had a Vioxx related injury. This means that her Vioxx lawsuit has ended. We are very sorry to have to give you this news.

First and far-most they are still neglecting to refer to "Legal Forms," that should be handed down from the Gate Committee. As I called the Curator on September 30th, 2009 according to Janette there was not an "En-eligibility by my mother's name on the computer. I responded to attorney Martinez letter dated September 7th, 2009 with a communication of warning. My letter is dated September 13th, 2009 and is labeled as **(Exhibit P)**. This correspondence is basically giving attorney Martinez adequate time to retract her most recent statements in a letter to me labeled **(Exhibit O) dated September 7th, 2009.**

(8)

What the attorneys are failing to realize in all their communications to me, has been only their view of how they feel my claim was fairing. However, it has been stated all along throughout this settlement that claimants did not have to prove causation. Reading the Merck Document it plainly states, the Claims Administrator would ultimately determine who is "Eligible, or En-Eligible." After doing this leg work and researching the truth, I discovered the associates at "Williamson & Rusnak, and Lamineck, Pirtle & Martinez was not being truthful with me.

## The Bloomberg Press and My Correspondence to BrownGreer P.L.C.

Searching for information regarding this settlement as I have done since Merck & Co. announced their willingness to settled I discovered some very interesting dialogue by some key people in this settlement in the **"Bloomberg Press."** The Bloomberg press is labeled as **(Exhibit Q)**. It is headlined in the Bloomberg Press, **"Merck Paying More Than 3,100 Death Claims in Vioxx Settlement."** This is posted as if it's to be a big surprise to Vioxx claimants in this settlement who was suppose to never expect according to their attorneys, to receive restitution from the beginning. It states in paragraph 6, Families of heart attack victims who died will get an average payment of about $374,000 according to BrownGreer. Some will get as little as $5,000 and others more than $1.5 million, depending on the Vioxx user's age, how long they took the drug and whether they had health risks such as obesity or hypertension, said **Andy Birchfield,** a plaintiff's lawyer in Montgomery, Alabama, who helped negotiate the settlement.

The 7th paragraph goes on to emphasize that; "The settlement relies on objective criteria," said Merck attorney **Ted Mayer** of Hughes Hubbard & Reed LLP in New York. "There's no admission regarding causation or fault. The track record in the courtroom is that plaintiff's failed again and again to establish causation.

Lawyers' Share

**Claimants taking part in the settlement don't have to prove Vioxx caused their specific injuries. Details on Payments to individual claimants, who are ranked on one of six levels, are confidential. Claimants' lawyers will be paid as much as $1.55 billion of the settlement fund.**

<u>**Paragraph 8 continues on with attorney and chairman of "BrownGreer," Orran Brown stating, the fund will pay "an unspecified number" of claims on behalf of Vioxx users whose deaths didn't meet the criteria for payments related to the drug's use. He said the number hasn't been disclosed publicly and he wasn't authorized By Merck and plaintiffs' lawyers to release it.**</u>

"I have no doubt in my mind it's more than 3,000 deaths," plaintiff's lawyer Lanier said. "I don't think we're seeing the real number of deaths. The true number is being buried in history, Lanier further stated.

This article goes on to emphasize that Merck should have tracked more proficiently the effectiveness of their product Vioxx. When Merck discovered the harmful side effects they should move more swiftly than five years later pulling it from the market. It further mentioned that if claimants had of known of the side effects and the possible damage this drug could cause they probably never would have taken it. Moreover the insurance companies also would have thought twice about paying for such a deadly product for their clients to consume.

Nevertheless, I wrote to Orran Brown of "BrownGreer P.L.C. and tried to evoke a little dialogue on how this process was going and the status of my claim. My letter is labeled as **(Exhibit R) and dated October 5, 2009.** However, not to my surprise, I was simply ignored by attorney Brown. I did not receive a telephone call, nor did I receive a stationary of questions answered I had concerning this settlement and end date. I often wandered if attorney Orran Brown understands the seriousness of being so vague and how it makes this entire settlement seems in the eyes of the people who where injured by Merck's product? Anyways, my correspondence to him was very plain, simple and to the point and I could not get a reply.  I should have gotten a reply, if not recognized as a claimant in the settlement, or at least as a decent human being residing in the U.S of A.

## Request of Disciplinary Action

The nebulous way this fiasco has been handled is a mockery to all settlements in the United States of American history. The associates at Williamson & Rusnak and Lamineck, Pirtle & Martinez really should be ashamed of their cunning tactics and breech of "Fiduciary Duty," committed against me, as their client. The evidence in this packet have proven there has been "Fraud and Extortion," or attempted "Fraud," against me John P. Hudson Sr. by attorneys Jimmy Williamson, of Williamson & Rusnak and attorney Richard Lamineck, and attorney Buffy Martinez, of Lamineck, Pirtle and Martinez. I diligently request and make my plea to the United States Department of Justice/Fraud Division and other related offices at the U.S.Dept. of Justice that governs the follow numbers of offenses two, three four, five and six to investigate this entire Vioxx Settlement ordeal. Please investigate on the grounds of;
**#1) Fraud & Extortion  #2) Discrimination  #3) Violation of Civil Rights within the Merck Vioxx settlement  #4) Bribery #5) Forgery and #6) Conspiracy**

As I reviewed **(Exhibit N)** which is the Julian Ayrs claimants blog post and having communicated with other Litigants in this same situation, it only leads to strong evidence that more people than we know have been violated twice. They were violated once by Merck & Company's product Vioxx and secondly by their counsels they trusted to represent them and possibly the entire process or scheme of things handled by the "Gate Committee."

## Synopsis

In my conclusion, I would like it to be known; the associates at Williamson & Rusnak and Lamineck, Pirtle, and Martinez is not to ever contact me via mail again. The only reason I would accept any communication from these lawyers is; they are retracting their egregious letters to me of deceit with an apology. However, non of the associates at Williamson & Rusnak and Lamineck, Pirtle and Martinez represents me anymore in this Vioxx settlement. **My expectancy is to hear from the "Gate Committee," directly as stated in the Merck & Company's Docket published November 9th, 2007.**

In the quake of it all, the bottom line, Mrs. Marguerite Hudson's civil rights was violated. I could argue to any court that my mother had taken Vioxx for a substantial period of time and even though she was not on Vioxx at the time of her death, the damage had already been done, but I'm not here to argue that.

(10)

I also could argue that looking at the medical records, Mrs. Marguerite Hudson did not have prior symptoms, such as acid reflux, flu like symptoms, that seemingly to never go away, regurgitation and fatigue that persisted upon her body as it is stated with someone who had been taking Vioxx for a very long time, but I will not argue that. However, getting to the basis of my argument, I must say that the way Merck & Company promoted their drug Vioxx without fair market warning labels violated my mother, Mrs. Hudson's "**Civil Rights.**"

It is a great opportunity for Americans in this country who would like to engage in free enterprises and come up with products or goods for the American public to sell for a profit. However, where the dilemma lies is when we produce a product that is not label with fair warning of precaution, it inevitably has the potential to impose upon one's health, livelihood, mental capacity and even a chance of fighting for their life. All of the previously mentioned possesses a problem with the legal aspects that governs within the checks and balances of our great nation. It is unlawful to violate the "Civil Rights," of an individual in this country. Merck & Co. marketing practices with their product Vioxx was diametrical compared to normal practices of free enterprise in America.  **Merck & Company violated Mrs. Marguerite Hudson's "Civil Rights!"**

Finally, speaking subjectively regarding this situation and trying to understand in all fairness, I cannot help but to conclude that there is a conspiracy going on in America right before our very eyes. One might say that it was mere coincidence, the mistakes that were made by my attorneys were careless and accidental. However, given the circumstances and according to the evidence presented as facts and with preciseness time after time, one can only conclude the corrupted and diabolical way things have been handled by my attorneys in my case points to the breech of "Fiduciary Duty," with malice. It is not a foreign concept in this country when we think of fraud, extortion, bribery, money laundering and conspiracy. Although, with this being said, it is those very cunning tactics, that breaks down the very fabric of a society and tarnishes the everyday ordinary citizen's trust and belief in it's political and governmental agencies. We must ask ourselves the question. What would be a plausible reason anyone would jeopardize their career, reputation and livelihood? Well, we have learned from times past that human beings will do almost anything for money. While some will mistakenly say, "money is the root of all evil." Moreover, to dispel that mistruth, "it is the love of money that is the root of all evil." It is to what extent an individual will do or go through to get money. However, stating for the record once again, the Merck & Company's settlement, " for their pain killer drug Vioxx warrants a 4.85 billion dollar monetary value. This is known to be one of the largest settlements in U.S.A. history. Nevertheless, we have seen it time after time again in the news, where there are large sums of money, there is inevitably a chance for corruption! As it is needless to say for Merck & Company to brag about this, "saying it is the largest settlement in U. S. history." **It is also the biggest travesty of justice committed by any one group against the American public as well.**

It is the correction of diabolical evilness that returns a society and community back to its' original state of restoration in decency. There are countless numbers of claimants who have not received one solid dime of restitution from this settlement. However, while some have been awarded restitution for their injury, it was merely those who were considered a nuisance case. I know of one particular situation where one death claim received monies for their deceased love one who had taken Vioxx but the attorneys in that case did not forward all the award to the claimants. We all must do our part to make sure justice prevails.

(11)

I would like to thank the staff at the United States Department of Justice for your time and diligence in this request and formal complaint. However, I do wait patiently for your response regarding this settlement ordeal offered by Merck & Company.

Respectfully Submitted,

*(signature)*

John P. Hudson Sr.
(Vioxx Claimant)

cc.
United States Department of Justice – Civil Division
United States Department of Justice – Civil Rights Division
Bureau of Justice Statistics
Mr. Eric Holder – United States Attorney General
Mr. Orran Brown, - BrownGreer P.L.C. – Gate Committee
Attorneys Richard Lamineck & Buffy Martinez or Lamineck, Pirtle and Martinez
Attorney Jimmy Williamson of Williamson and Rusnak
The Honorable Judge Fallon – Magistrate of Vioxx settlement
Mr. Benjamin C. Hudson Jr.- Assistant to The Estate of Mrs. Marguerite Hudson
Mr. Irwin L. Hudson – Assistant to The Estate of Mrs. Marguerite Hudson
Mr. Barack Obama – President of the United States of America

State of Michigan
County of Washtenaw
On this 29 day of October
Before me personally appeared
John P. Hudson Jr.
Known to me to be the person who executed the foregoing instrument, and acknowledged that (s)he executed the same as his free act and deed.
SEAL _____
Notary Public

MARVA J. SISSON
Notary Public - Michigan
Washtenaw County
My Commission Expires Mar 2, 2013

Enclosure

(12)

Mr. Tony West/Assistant Attorney Generaal
United States Dept. of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530 – 0001

Mr. Mark Gross
United States Dept. of Justice
Civil Rights Division
950 Pennsylvania Ave. NW
Complaint Adjudication Office NALC
Washington DC 20530

Bureau of Justice Statistics
810 Seventh Street NW
Washington DC 20531
USA

U. S. Attorney General Eric Holder
950 Pennsylvania Avenue, NW
Washington DC 20530 – 0001

Attorney Orran Brown
BrownGreer P.L.C.
115 S. 15th Street
Suite 400
Richmond, VA 23219 – 4209
(804)521-7299

Attorney Richard Lamineck
Lamineck Pirtle, and Martinez
440 Louisiana
Suite 1200
Houston TX 77002

Attorney Jimmy Williamson
Williamson and Rusnak
4310 Yoakum BLVD.
Houston TX 77006 - 5818

The Honorable Judge Fallon
United States District Court
Eastern District of Louisiana

Mr. Benjamin C. Hudson Jr.
P. O. Box 740838
New Orleans LA 70174

Mr. Irwin L. Hudson
4620 Misty Way
Oviedo Florida 32765

# Contents

Exhibit (A)------------------Letter of Case Tranfer from Attorney Williamson

Exhibit (B)------------------Copy of Original Complaint & Court Number

Exhibit (C)------------------Letter of Update from Attorney Williamson

Exhibit (D)------------------Letter from Attorney Williamson requesting dismissal

Exhibit (E)------------------Letter from John Hudson client reponding

Exhibit (F)------------------Letter from Mr. Williamson insisting on his withdraw

Exhibit (G)------------------Letter from John Hudson responding to Exhibit F

Exhibit (H)------------------Letter from Attorney Williamson demanding withdraw

Exhibit (I)------------------Letter from John Hudson responding to Exhibit H

Exhibit (J)------------------PDF file issued by the Horable Judge Fallon

Exhibit (K)------------------PDF file issued by Merck & Co. Nov. 9, 2007

Exhibit (L)------------------PDF file issued by Attorney Jimmy Williamson

Exhibit (M)------------------Letter of Administratorship naming me, John Hudson head of my Mother's Estate

## Contents Continued

Exhibit (N) ----------------------------------Claimants Blog Post

Exhibit (O) ------------------ Attorney Martinez letter on Sept. 7th, 2009

Exhibit (P) ----------------------Letter from John Hudson responding to Attorney Martinez letter on 9/7/09

Exhibit (Q) ---------------------------------------- Bloomberg Press

Exhibit (R) --------------------John Hudson letter to Att. Orran Brown Request for Information