# WILLIAMSON & RUSNAK
### ATTORNEYS AT LAW
AND

# LAMINACK, PIRTLE & MARTINES, L.L.P.
### A JOINT VENTURE OF PROFESSIONAL PARTNERSHIPS

| | |
|---|---|
| **WILLIAMSON & RUSNAK**<br>ATTORNEYS AT LAW<br>4310 YOAKUM BLVD.<br>HOUSTON, TEXAS 77006-5818 | **LAMINACK, PIRTLE & MARTINES, L.L.P.**<br>440 LOUISIANA<br>SUITE 1200<br>HOUSTON, TEXAS 77002 |
| WWW. JIMMYWILLIAMSON.COM<br>TELEPHONE: 713-223-3330<br>FAX: 713-223-0001 | WWW. LPM-TRIALLAW.COM<br>TELEPHONE: 713-292-27950<br>FAX: 713-292-2755 |
| * JIMMY WILLIAMSON, P.C.<br>CYNDI MOSS RUSNAK | RICK LAMINACK<br>TOM PIRTLE<br>BUFFY MARTINES |

# Exhibit (A)

June 28, 2006

Mr. John P. Hudson
3617 Weeburnt Ct.
Ann Arbor, MI 48108

Re:     Cox-2 (Vioxx, and/or Celebrex, and/or Bextra) Case
        (Maguerite R. Hudson, deceased)

Dear Mr. Hudson

This letter is to inform you that Laminack, Pirtle & Martines, L.L.P and Williamson & Rusnak will be the lead attorneys on this case. We will affiliate with The Kahn Law Firm, who will receive a portion of the attorneys fees in your case (1/3). Therefore, we will be lead counsel and trial counsel in handling your case from this point forward.

Please find enclosed the following:

1)    Power of Attorney and Contingent Fee Contract with Laminack, Pirtle & Martines, L.L.P. and Williamson & Rusnak (PLEASE NOTE THAT YOU MUST INITIAL EVERY PAGE AS WELL AS SIGNING AND DATING THE LAST PAGE);
2)    Attorney Referral Fee Acknowledgment (PLEASE NOTE THAT YOU MUST SIGN THIS FORM IN FRONT OF A NOTARY PUBLIC);
3)    Three (3) Medical Authorizations;
4)    Vioxx Questionnaire (please fill out questionnaire); and
5)    Self Addressed Stamped Envelope.

As stated above, enclosed is a Power of Attorney and Contingent Fee Contract that will enable us to act as your attorneys in this regard. **Please sign on the line indicated by the "sign here" tab and**

**date the contract.** Please note that by signing this contract you do not owe or have to pay more than one lawyer in this matter. Rather, you will now only be obligated to pay Laminack, Pirtle & Martines, L.L.P and Williamson & Rusnak as attorneys of record in this matter, and any money owed to The Kahn Law Firm will be paid as a referral fee out of our portion of the legal fees. As you can see, the contingency fee portion of this contract is the same as the one you signed with The Kahn Law Firm. Our contract will basically take the place of The Kahn Law Firm's contract and, therefore, you will not be paying more than one attorneys' fee in this matter.

Also enclosed, please find medical authorizations which we request that you sign authorizing our office to obtain your medical records relating to your injuries sustained in connection with your taking Vioxx.. I ask that you please sign the authorizations, in blue ink, and return the originals to our office as soon as possible. **PLEASE <u>DO</u> <u>NOT</u> DATE THE AUTHORIZATIONS.**

Please provide the following:

1)    A list with the names of all medical providers Ms. Hudson saw (including name, address, phone number and the date(s) she saw them); and

2)    Copies of all medical records, medical bills, including prescriptions, that you have in your possession concerning Ms. Hudson's Vioxx use.

3)    A copy of all probate documents naming you as the authorized representative of the Estate of Maguerite R. Hudson.

I am requesting that you please forward any documentation that you may have pertaining to this incident even if you think you have already provided it to Mr. or Mrs. Kahn of The Kahn Law Firm.

Should you have any questions or wish to discuss this with us, please do not hesitate to give us a call. We look forward to representing you in this matter and helping you obtain a resolution of same. If you wish to set up a meeting to meet with us in person, please contact my legal assistant, Brenda Kellen, and she will be happy to set up such a meeting.

**Please do not talk to anyone concerning** this matter other than your attorneys or our staffs.

It is imperative that you get this information back to <u>my office</u> **immediately**.

Once again, we look forward to representing you on this matter.

Sincerely,

**WILLIAMSON & RUSNAK**

Jimmy Williamson

JW:bgk
Enclosures: as stated

**THIS CONTRACT IS SUBJECT TO ARBITRATION
UNDER THE FEDERAL ARBITRATION ACT AND
THE TEXAS GENERAL ARBITRATION STATUTE**

## POWER OF ATTORNEY AND CONTINGENT FEE CONTRACT

This agreement is made between, **John P. Hudson,** hereinafter referred to as **"Client"**, and **Laminack, Pirtle & Martines L.L.P. and Williamson & Rusnak**, hereafter referred to as "Attorneys."

In consideration of the mutual promises herein contained, the parties hereto agree as follows:

### I. PURPOSE OF REPRESENTATION

1.01    The Client hereby retains and employs Attorneys to sue for and recover all damages and compensation to which the Client may be entitled as well as to compromise and settle all claims arising out of the following matters: Vioxx.

1.02    It is specifically agreed and understood that Attorneys representation is limited to specific persons and/or companies named as Clients, and that Attorneys are not representing or expected to represent any other person or entity not named herein as a Client. It is expressly agreed and understood that Attorneys' obligations are limited to representing Client in the specific matters described herein, and Client does not expect Attorneys to do anything else.

### II. ATTORNEYS' FEES

2.    In consideration of the services rendered and to be rendered to Client by Attorney, Client does hereby assign, grant and convey to Attorney the following present undivided interests in

Power of Attorney and
Contingent Fee Contract - Page 1

_____
Initials

all his claims and causes of action for and as a reasonable contingent fee for Attorney's services and said contingent attorneys' fee will be figured on the total net recovery or settlement:

| | |
|---|---|
| 33-1/3% | of any settlement or recovery made before suit is filed thereon; |
| 40% | of any settlement or recovery made after suit is filed; |
| 45% | of any settlement or recovery made after a notice of appeal has been given or an appeal bond has been filed. |

## III.  ASSIGNMENT OF INTEREST

3.01    In consideration of Attorneys' services, the Client hereby conveys and assigns to Attorneys and agrees to pay to Attorneys an undivided interest in and to all of Client's claims and causes of action to the extent of the percentage set out  in  Paragraph 2.

3.02    If there is any type of settlement whereby the Client is to receive or be paid future payments, then the settlement will be reduced to present value, and the settlement will be arranged whereby there will be sufficient cash at the time of the settlement to pay the attorney's fees which will be figured on the present value of the total settlement including the present value of future payments; such discounting will be computed at a market discount rate.

3.03    All sums due and to become due are payable at the offices of Laminack, Pirtle & Martines, L.L.P., 440 Louisiana, Suite 1250, Houston, Harris County, Texas. And/or Williamson & Rusnak, 4310 Yoakum Boulevard, Houston, Texas, 77006.

Initials

## IV.  APPROVAL NECESSARY FOR SETTLEMENT

4.01    No settlement of any nature shall be made without Client's approval, and Client agrees to make no settlement or offer of settlement without the consultation of the Attorneys.

4.02    Attorneys are hereby granted a power of attorney so that they may have full authority to prepare, sign and file all legal instruments, pleadings, drafts, authorizations, and papers as shall be reasonably necessary to conclude this representation including settlement and/or reducing to possession any and all monies or other things of value due to the Client under his claim as fully as the Client could so do in person.  Attorneys are also authorized and empowered to act as Client's negotiator in any and all settlement negotiations concerning the subject of this Agreement.

## V.  REPRESENTATIONS

5    It is understood and agreed that Attorneys cannot warrant or guarantee the outcome of the case and Attorneys have not represented to the Client that the Client will recover all or any of the funds so desired.  Should Attorneys learn something which in the opinion of Attorneys makes it impractical for Attorneys to proceed with the handling of Client's claim, then Attorneys may withdraw from further representation of Client by sending written notice to Client's last known address.

## VI.  DEDUCTION OF EXPENSES

6.    Client additionally agrees that Attorneys are to be repaid and reimbursed out of Client's recovery for all Court costs and expenses of litigation Attorneys have paid or incurred in connection with handling Client's claim or suit, including a share of certain common expenses for things being done for the benefit of this case and other cases being handled by Attorneys, if such

Power of Attorney and
Contingent Fee Contract - Page 3

Initials

common expenses are deemed appropriate and necessary by Attorneys.  Client agrees that Attorneys

may borrow funds from a commercial bank to finance or pay such Court costs and litigation

expenses and the reasonable interest charged by the bank on such borrowed funds will be added to

the Court costs and litigation expenses to be deducted from the settlement or recovery.  The attorney

fees will be figured on the total recovery or settlement after deducting the Court costs and litigation

expenses reimbursed to Attorneys ("total net recovery or settlement" as used above).  If Attorneys do

not obtain for Client a settlement or recovery, then the Client will not pay any fees or expenses.


## VII.  COOPERATION OF CLIENT

7.01    Client agrees to cooperate with Attorneys at all times and to comply with all

reasonable requests of Attorneys.  Client further agrees to keep Attorneys advised of his/her

whereabouts at all times, and to provide Attorneys with any changes of address, phone number or

business affiliation.

7.02    Attorneys or either of them may, at his/her option, withdraw from the case and cease

to represent the Client should Client fail to comply with any portion of this Agreement or should

Attorneys or either of them decide that he or she cannot continue to be involved in this case.  Such

withdrawal will be effective by mailing written notice to Client's last known address.


## VIII.  ASSOCIATION OF OTHER ATTORNEYS

8.       Attorneys may, at their own expense, use or associate other attorneys in the

representation of the aforesaid claims of the Client.  Client understands that Laminack, Pirtle &

Martines L.L.P., is a limited liability partnership with several attorneys and Williamson & Rusnak is

a partnership of an individual and a professional corporation. Any of those attorneys may work on Client's case. Client understands that **Laminack, Pirtle & Martines, L.L.P. and Williamson & Rusnak** will jointly share in the fees recovered under this contract.

## IX.  TEXAS LAW TO APPLY

9.      This Agreement shall be construed under and in accordance with the laws of the State of Texas, and the rights, duties and obligations of Client and of Attorneys regarding Attorneys' representation of Client and regarding anything covered by this Agreement shall be governed by the laws of the State of Texas.

## X.  ARBITRATION

10.     Any and all disputes, controversies, claims or demands arising out of or relating to (1) this Agreement or (2) any provision hereof or (3) the providing of services by Attorneys to Client or (4) the relationship between Attorneys and Client, whether in contract, tort or otherwise, at law or in equity, for damages or any other relief, shall be resolved by binding arbitration pursuant to the Federal Arbitration Act in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association. Client shall not file a class action against Attorneys or seek to assert any claim or demands against Attorneys by or through a class action, either as the named plaintiff or as a member of the class, but rather shall submit his/her claims or demands to binding arbitration pursuant to the provisions of this Paragraph XI. Any such arbitration proceeding shall be conducted in Harris County, Texas. This arbitration provision shall be enforceable in either federal or state court in Harris County, Texas pursuant to the substantive federal laws established by the

Power of Attorney and
Contingent Fee Contract - Page 5

Federal Arbitration Act. Any party to any award rendered in such arbitration proceeding may seek a judgment upon the award and that judgment may be entered by any federal or state court in Harris County, Texas having jurisdiction.

## XI. BANKRUPTCY PROVISIONS

11.     Client represents to Attorneys that he or she is not presently filing, nor contemplating filing, for protection under the United States Bankruptcy Code. Client agrees that in the event he or she files a petition in bankruptcy, Attorneys will be promptly notified of any such event and that the lawsuit or cause of action covered by this Power of Attorney and Contingent Fee Contract will be properly scheduled as an asset by the Client in accordance with the Bankruptcy Code and its rules of procedure. Because a bankruptcy filing by Client could require Attorneys to engage special counsel or to otherwise perform legal services in addition to those services for which Attorneys were retained under this Power of Attorney and Contingent Fee Contract (*e.g.* special retentions by Client or Trustee; issues relating to waiver of privilege and assumption of executory contracts; application and payment of attorney's fees and approval of settlements; etc.), Client agrees that Attorneys shall be fully reimbursed by Client, or reimbursed out of Client's share of the recovery for the costs incurred for these extra services. Unlike the litigation expenses referenced in Section VI above, Client agrees that any costs incurred by Attorneys in connection with a bankruptcy proceeding will be paid out of Client's share of the recovery. Client expressly consents to Attorneys retaining such other special counsel and/or incurring such costs as reasonably necessary to address additional matters in bankruptcy as raised herein and such retention shall be considered a cost to be deducted from Client's share of the recovery.

Initials

## XII.  PARTIES BOUND

12.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representative, successors and assigns.

## XIII.  LEGAL CONSTRUCTION

13.    In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions thereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

## XIV.  PRIOR AGREEMENTS SUPERSEDED

14.    This Agreement constitutes the sole and only Agreement of the parties hereto and supersedes any prior understandings or written or oral agreement between the parties respecting the within subject matter.

I certify and acknowledge that I have had the opportunity to read this Agreement.  I further state that I have voluntarily entered into this Agreement fully aware of its terms and conditions.

Signed and accepted this _____ day of _____, 20___.

**THIS CONTRACT IS SUBJECT TO ARBITRATION**

_____

**John P. Hudson**
**Client Signature**

**ACCEPTED:  ATTORNEYS**

_____

Client Printed Name

By: _____

_____

Street Address

_____

Printed Name of Attorney:

_____

City, State & Zip

_____

Telephone Number(s)

_____

Date of Birth

_____

Social Security Number

# WILLIAMSON & RUSNAK
## ATTORNEYS AT LAW
### AND
# LAMINACK, PIRTLE & MARTINES, L.L.P.
### A JOINT VENTURE OF PROFESSIONAL PARTNERSHIPS

**WILLIAMSON & RUSNAK**
ATTORNEYS AT LAW
4310 YOAKUM BLVD.
HOUSTON, TEXAS 77006-5818

WWW. JIMMYWILLIAMSON.COM
TELEPHONE: 713-223-3330
FAX: 713-223-0001

* JIMMY WILLIAMSON, P.C.
CYNDI MOSS RUSNAK

**LAMINACK, PIRTLE & MARTINES, L.L.P.**
440 LOUISIANA
SUITE 1200
HOUSTON, TEXAS 77002

WWW. LPM-TRIALLAW.COM
TELEPHONE: 713-292-2750
FAX: 713-292-2755

RICK LAMINACK
TOM PIRTLE
BUFFY MARTINES

# Exhibit (B)

October 6, 2006

Mr. John P. Hudson
3617 Weeburnt Ct.
Ann Arbor, MI 48108

Re:   Civil Action No. 06-7011; *John Hudson, Individually and as Representative of the Estate of Maqguerite Hudson vs. Merck & Co., Inc.*; in the United States District Court Eastern District of Louisiana.

Dear Mr. Hudson:

Enclosed for your personal file is a copy of the Original Complaint which was filed on your behalf on September 29, 2006.

Sincerely,

**WILLIAMSON & RUSNAK**

Jimmy Williamson

JW:alb
Enclosure

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOHN HUDSON, Individually and as Representative of the Estate of MARGUERITE HUDSON, Deceased, | § § § § | IN RE: VIOXX PRODUCTS LIABILITY LITIGATION |
| Plaintiff, | § § § § | MDL DOCKET NO. 1657 SECTION "L" |
| | § § § | JUDGE FALLON MAGISTRATE JUDGE KNOWLES |
| v. | § § § | |
| MERCK & CO., INC., | § § § | CIVIL ACTION NO. 06-7011 |
| Defendants. | § § | JURY TRIAL DEMANDED |

SECT. L MAG 3

### PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff JOHN HUDSON, Individually and as Representative of the Estate of MARGUERITE HUDSON, Deceased, by and through his undersigned attorneys, and for his Original Complaint against Defendant MERCK & CO., INC., states the following:

This is a proceeding brought by Plaintiff seeking damages for personal injuries and economic damages suffered as a result of the defective and dangerous pharmaceutical product Vioxx®, which was manufactured, marketed, distributed and/or sold by Merck to the public at large.

### PARTIES

1.     Plaintiff JOHN HUDSON (hereinafter referred to as "Plaintiff") is a resident of the State of Michigan and the Representative of the Estate of MARGUERITE HUDSON, Deceased. Plaintiff files this complaint under Federal Rule of Civil Procedure 20 as he herein

asserts relief for injuries arising out of the same transaction, occurrence, or series of transactions or occurrences and a question or questions of law common to all plaintiffs.

2.       Defendant, MERCK & CO., INC., (hereinafter referred to as "Defendant" or "Merck") is a New Jersey corporation, with its principal place of business in Raway, New Jersey. Pursuant to Pretrial Order No. 15, Merck can be served with process by serving its designated agent for service Ellen M. Gregg, esq., Womble, Carlyle, Sandridge & Rice, P.L.L.C., 2001 North Main Street, Suite 300, Winston-Salem, North Carolina 27101. At all times relevant hereto, Defendant Merck engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug, Vioxx®, in the State of Michigan and throughout the United States.

## JURISDICTION AND VENUE

3.       Federal jurisdiction is proper under 28 U.S.C. §1332 as the amount in controversy between the Plaintiff and Defendant exceeds $75,000 exclusive of interest and costs and the Plaintiff is a citizen of the United States and diverse from Defendant.

4.       Venue is proper in this Court pursuant to the February 16, 2005 Transfer Order issued by the Judicial Panel on Multidistrict Litigation and Pretrial Order No. 11 entered May 18, 2005 in MDL No. 1657.

## FRAUDULENT CONCEALMENT

5.       Defendant Merck is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiff and the public at large. Defendant Merck had actual knowledge of the defective nature and the various studies, including its own, which illustrated concerns over the cardiovascular safety profile of Vioxx® (Rofecoxib). Defendant Merck failed to conduct adequate research on its product to establish its safety and

efficacy. Further Merck had actual knowledge of its misrepresentations, negligence and false, misleading, deceptive and unconscionable conduct. Merck, however, continued to perpetrate its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff and the public at large.

## FACTS

6.      Vioxx® is the brand name of Rofecoxib, one of the classes of drugs called "Cox-II inhibitors," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.

7.      Plaintiff maintains that Vioxx® is a defective product that is dangerous to human health. More specifically, Plaintiff maintains that Vioxx® is defective in design, unfit and unsuitable to be marketed and sold in commerce and lacked the proper warnings as to the dangers associated with its ingestion.   Finally, Plaintiff maintains that Merck neglected its various duties as a reasonably prudent pharmaceutical company.

8.      At all times relevant and material hereto, Merck acted and gained knowledge itself and by and through its various agents, servants, employees, and/or ostensible agents.

9.      Decedent was prescribed and ingested the drug Vioxx® as directed by a physician.

10.     Plaintiff contends that, as a result of Decedent's ingestion of Vioxx®, Decedent suffered a stroke, all injuries and conditions secondary thereto and sudden cardiac death.

11.     Plaintiff would also show that nothing the Decedent did contributed in any way to his injuries and/or damages.   Decedent was using Vioxx® in the manner for which it was intended and/or in a reasonably foreseeable manner.   Decedent was not aware of, and reasonably could not have discovered, the dangerous nature of Vioxx®.

3

12.     Plaintiff would show that all injuries and damages were proximately caused by the Defendant's conduct which is fully described below.

## COUNT I
## ACTION FOR WRONGFUL DEATH

Plaintiff brings this action pursuant to the Michigan Wrongful Death Statute.

## COUNT II
## STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

COMES NOW Plaintiff and for Count I of his complaint against Defendant Merck states the following:

13.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length in this Count.

14     Merck created, manufactured, designed, tested, labeled, packaged, marketed, sold, advertised, distributed, supplied and/or placed into the stream of commerce the pharmaceutical drug Vioxx®, which Merck distributed throughout the world.

15.     At the time Vioxx® was manufactured and sold or otherwise dispensed to Decedent, it was in a defective condition and unreasonably dangerous when put to its reasonably anticipated use, and subjected its users to increased risks of heart attacks, strokes and other illnesses which exceed its benefits, and for which other safer products were available.

16.     Alternatively, when Vioxx® was manufactured and sold or otherwise dispensed to Decedent by Defendant, it was defective in design and formulation, making use of it more dangerous than other drugs for pain relief.

17.     The Vioxx® sold or otherwise dispensed to Decedent reached Decedent without substantial change. Decedent was unaware of the dangerousness of the product.  Decedent ingested Vioxx® without making any changes or alterations and used it in a manner reasonably anticipated by Merck.

4

18.     As a direct and proximate result of the defective and dangerous design of Vioxx®, Decedent suffered a heart attack and subsequently died.

19.     Merck knew the defective condition and danger of Vioxx®, yet continued to advertise, market, distribute and sell Vioxx® to Decedent and the public at large, showing complete indifference to, or conscious disregard for, the safety of users of Vioxx®, including Plaintiff.

## COUNT III
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

COMES NOW Plaintiff and for Count II of his complaint against Defendant Merck states the following:

20.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length in this Count.

21.     At the time Vioxx® was manufactured and sold or otherwise dispensed to Decedent by Merck in the course of its business, it was in a defective condition and unreasonably dangerous when put to its reasonably anticipated use, and subjected its users to increased risks of heart attacks, strokes and other illnesses which exceeded its benefits, and for which other safer products were available.

22.     The users of Vioxx®, including Decedent, did not have knowledge of its defective and unreasonably dangerous condition, which subjected his to increased risks which exceeded its benefits, and for which other safer products were available.

23.     The Vioxx® manufactured and supplied by Merck did not have proper and adequate warnings regarding all possible side effects and/or risks associated with the use of Vioxx®, and the comparative severity and duration of these side effects and/or risks. The

warnings given by Merck did not accurately reflect the symptoms, type, scope or severity of the side effects and/or risks.

24.     Furthermore, Merck failed to effectively warn users and physicians that numerous other methods of pain relievers, including but not limited to, Ibuprofen, Naproxen and Mobic were safer alternatives.

25.     Finally, Merck failed to give adequate post-marketing warnings or instructions for the use of Vioxx®. After Merck knew or should have known of the risk of injury from Vioxx® use, it failed to provide adequate warnings to users or consumers of Vioxx®, including Decedent, and continued to aggressively promote Vioxx® to doctors, hospitals and directly to consumers, including Decedent.

26.     Decedent used Vioxx® in a manner reasonably anticipated by Merck.

27.     As a direct and proximate result of Merck's failure to warn of the potentially severe side effects and/or risks associated with Vioxx®, Decedent suffered a heart attack and subsequently died.

28.     Merck knew the defective condition and nature of Vioxx®, yet continued to advertise, market, distribute and sell Vioxx® to Decedent and the general public, showing complete indifference to, or conscious disregard for, the safety of users of Vioxx®, including Decedent.

## COUNT IV
## NEGLIGENT DESIGN

COMES NOW Plaintiff and for Count III of his complaint against Defendant Merck states the following:

29.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length in this Count.

30.    Merck designed, produced, manufactured, tested, labeled, packaged, marketed, sold, advertised, distributed, supplied and/or placed into the stream of commerce the pharmaceutical drug Vioxx®, which Merck distributed throughout the world.

31.    At the time Vioxx® was manufactured and sold or otherwise distributed to Decedent by Merck, it was defective in design in that it subjected users to increased risks of heart attacks, strokes and/or other illnesses, which exceeded its benefits, despite the fact that safer products were available.

32. Alternatively, when Vioxx® was manufactured and sold or otherwise distributed to Decedent by Merck, it was defective in design and formulation in that it subjected users to increased risks of heart attacks, strokes and other illnesses, which made use of Vioxx® more dangerous than other drugs used for pain relief.

33.    Merck failed to use ordinary care to manufacture and/or design Vioxx® to be reasonably safe in that it increased the users' risks of heart attacks, strokes and other illnesses which exceeded its benefits despite the fact that safer products were available.

34.    In addition, Merck failed to use ordinary care by failing to perform adequate testing and study or properly analyzing the findings of studies. Such adequate testing, study or analysis would have shown that Vioxx® had serious potential side effects and its dangerous and defective design and condition, which would have allowed Merck to remove Vioxx® from the market months, if not years before its recall, which delay caused increased risk of injuries and damages to Vioxx® users, including Decedent.

35.    Finally, Merck failed to use ordinary care by failing to act properly on adverse event reports it received about Vioxx®, and failed to properly study Vioxx® pre-market and analyze and follow-up on its studies as well as other studies regarding the dangers and defects of Vioxx®.

7

36.     As a direct and proximate result of the defective and dangerous design of Vioxx®, Decedent suffered a heart attack and subsequently died.

37.     Merck knew the defective condition and danger of Vioxx®, yet continued to advertise, market, distribute and sell Vioxx® to Decedent and the general public, showing complete indifference to, or conscious disregard for, the safety of users of Vioxx®, including Decedent.

## COUNT V
## NEGLIGENT FAILLURE TO WARN

COMES NOW Plaintiff and for Count IV of his complaint against Defendant Merck states the following:

38.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length in this Count.

39.     Merck owed a duty to users of Vioxx®, including Decedent, to warn of any dangerous defects or side effects, including unreasonable and dangerous risks, reactions, and illnesses, as well as a duty to provide adequate post market warnings as it learned of Vioxx®'s substantial defects and dangers, including increased risk of heart attacks, strokes, and other serious illnesses.

40.     Merck breached its duty of reasonable care owed to Decedent in that Merck, with respect to the pharmaceutical drug Vioxx®, failed to: conduct sufficient testing; include adequate warnings; warn of increased risks of death or permanent disability; advise the FDA, the health care industry and the public at large about adverse events; and/or issue other appropriate warnings to Decedent and the health care industry in general.

41.     Merck knew, or by using ordinary care should have known that Vioxx® caused unreasonably dangerous risks or serious side effects, of which the public at large would not be aware. Merck nonetheless advertised, marketed, and promoted Vioxx® to the general public, the

health care industry and Decedent, knowing there were safer methods and products for pain control, without warning the public at large, health care industry and Decedent, of the dangerous condition of Vioxx®.

42.     As a direct and proximate result of Merck's negligence and breaches of duty of reasonable care, Decedent suffered a heart attack and subsequently died.

43.     Merck knew the defective condition and danger of Vioxx®, yet continued to advertise, market, distribute and sell Vioxx® to Decedent and the public at large, showing complete indifference to, or conscious disregard for, the safety of users of Vioxx®, including Decedent.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**

COMES NOW Plaintiff and for Count V of his complaint against Defendant Merck states the following:

44.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length in this Count.

45.     Merck, through advertising, labeling, and other communications, made misrepresentations to physicians and the public at large, including the Decedent and/or Decedent's physicians, about the safety and efficacy of Vioxx® for controlling pain caused by inflammation.  Physicians and their patients, including the Decedent and Decedent's physicians, justifiably relied on Merck's misrepresentations and were harmed as a result.  Plaintiff is entitled to recover damages since such damages were produced by Merck's misrepresentations. See Restatement (Second) of Torts §402B.

46.     Further, Merck, through advertising, labeling, promotion, and other communications intentionally made misrepresentations to physicians and the public, including the Decedent and/or Decedent's physicians, about the safety and efficacy of Vioxx® for

9

controlling pain.  From its inception until its withdrawal, the labeling for Vioxx and other representations of Merck were inaccurate and misleading.

47.     Merck knew, or should have known, that Vioxx® was not as effective as competing anti-inflammatory pain medications, but Merck chose to disregard, downplay, and conceal that information.   This conduct constitutes an intentional and/or negligent misrepresentation and concealment.

48.     These representations were material to Decedent's and/or his treating physicians' decision to prescribe, request, ingest and/or maintain Decedent's prescriptions of Vioxx®.

49.     Decedent's treating physicians, and other health care providers, who prescribed Vioxx® to the public at large, including Decedent, had a right to rely on the truthfulness of Merck's representations regarding Vioxx®.

50.     Physicians and their patients, including the Decedent and/or Decedent's physicians, relied on Merck's fraudulent misrepresentations, and Decedent sustained personal injuries and suffered damages as a direct result.

51.     Further, because Merck's conduct was willful, reckless, intentional and maliciously fraudulent, Plaintiff is entitled to an award of exemplary damages in order to punish such conduct and to deter such conduct in the future.

## COUNT VII
## GROSS NEGLIGENCE AND MALICE

52.     Plaintiff also alleges that the acts or omissions of Merck, whether taken singularly or in combination with others, constitute gross negligence and/or malice that proximately caused the injuries to Decedent.

53.     Merck's conduct was more than momentary thoughtlessness or mere inadvertence, but it amounted to such an entire want of care so as to constitute gross negligence and/or malice., and a "knowing" injury to individuals, including Decedent.

54.     Plaintiff seeks exemplary damages in an amount that would punish Merck for its unconscionable conduct and which would deter other similarly situated drug manufacturers, distributors, and promoters from engaging in such misconduct in the future.

## DAMAGES

55.     As a result of the incident made the basis of this lawsuit, described in the preceding paragraphs, and the negligence of Defendant Merck, Plaintiff and Decedent sustained significant injuries and damages.

56.     Decedent suffered injuries which caused his to seek reasonable and necessary medical care and attention and incur reasonable and necessary medical expenses.

57.     Decedent suffered physical pain as a result of this incident.

58.     Plaintiff and Decedent suffered mental anguish as a result of this incident.  For Plaintiff, such mental anguish, in all probability will continue into the future, if not permanently.

59.     Decedent suffered physical impairment as a result of this incident.

60.     Decedent suffered physical disfigurement as a result of this incident.

61.     Plaintiff has suffered lost wages and a loss of earning capacity in the past, In all reasonable probability, Plaintiff will likely continue to sustain loss of wages and loss of earning capacity in the future.

62.     Plaintiff seeks reasonable attorneys' fees, to the extent allowed, and costs.

63.     Plaintiff also seeks exemplary and/or punitive damages from Defendant Merck, as allowed by law, to set an example and to prevent wrongful conduct in the future.

64.     Plaintiff seeks both prejudgment and post-judgment interest as allowed by law, for all costs of court, actual damages, compensatory damages, exemplary damages, punitive damages and all other relief, both in law and in equity, to which Plaintiff may be entitled.

65.     Plaintiff's damages are above the minimum jurisdictional limits of this Court.

## JURY DEMAND

66.  Plaintiff respectfully demands a trial by jury.


FOR THESE REASONS, Plaintiff requests that Defendant Merck be cited to appear and answer herein, and that upon final trial, Plaintiff have:

a.   judgment in Plaintiff's favor and against Defendant Merck;

b.   all past and future compensatory damages as described in the petition above, including, but not limited to, physical pain and mental anguish, physical disfigurement, physical impairment, loss of earning capacity, lost wages, and the cost of reasonable medical care in the past and in the future;

c.   exemplary damages in an amount in excess of the jurisdictional limit;

d.   reasonable attorneys' fees, to the extent allowed by law, and expenses;

e.   all elements of interest, including, but not limited to, pre-judgment and post-judgment interest in the maximum amount as allowed by law;

f.   costs of court; and

g.   such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

LAMINACK, PIRTLE & MARTINES

_____

RICHARD N. LAMINACK
Texas Bar No. 11850350
THOMAS W. PIRTLE
Texas Bar No 16038610
BUFFY K. MARTINES
Texas Bar No. 24030311
440 Louisiana, Suite 1250
Houston, Texas  77002
Telephone:     713-292-2750
Facsimile:     713-292-2755


JIMMY WILLIAMSON
Texas Bar No. 21624100
WILLIAMSON & RUSNAK
4310 Yoakum
Houston, Texas 77006
Telephone:     713-223-3330
Facsimile:     713-223-0001


**ATTORNEYS FOR PLAINTIFF
JOHN HUDSON**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing complaint has been served on Liaison Counsel, Russ Herman and Phillip Whitmann by United States mail and electronic mail or by hand delivery and electronic mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order 8A, and that the original was hand delivered to the Clerk of the United States District Court for the Eastern District of Louisiana to be filed on this 22th day of September, 2006.


LAMINACK, PIRTLE & MARTINES


RICHARD N. LAMINACK
Texas Bar No. 11850350
THOMAS W. PIRTLE
Texas Bar No 16038610
BUFFY K. MARTINES
Texas Bar No. 24030311
440 Louisiana, Suite 1250
Houston, Texas 77002
Telephone:    713-292-2750
Facsimile:    713-292-2755

JIMMY WILLIAMSON
Texas Bar No. 21624100
WILLIAMSON & RUSNAK
4310 Yoakum
Houston, Texas 77006
Telephone:    713-223-3330
Facsimile:    713-223-0001


**ATTORNEYS FOR PLAINTIFF
JOHN HUDSON**

# WILLIAMSON & RUSNAK

### ATTORNEYS AT LAW

#### AND

# LAMINACK, PIRTLE & MARTINES, L.L.P.

A JOINT VENTURE OF PROFESSIONAL PARTNERSHIPS

**WILLIAMSON & RUSNAK**
ATTORNEYS AT LAW
4310 YOAKUM BLVD.
HOUSTON, TEXAS 77006-5818

**LAMINACK, PIRTLE & MARTINES, L.L.P.**
440 LOUISIANA
SUITE 1250
HOUSTON, TEXAS 77002

WWW. JIMMYWILLIAMSON.COM
TELEPHONE: 713-223-3330
FAX: 713-223-0001

# Exhibit (C)

WWW. LPM-TRIALLAW.COM
TELEPHONE: 713-292-2750
FAX: 713-292-2755

\* JIMMY WILLIAMSON, P.C.
CYNDI MOSS RUSNAK

RICK LAMINACK
TOM PIRTLE
BUFFY MARTINES

January 8, 2008

TO ALL VIOXX CLIENTS:

Re:     Vioxx Litigation

Dear Client:

The purpose of this letter is to update you on the status of the Vioxx lawsuits and inform you of important developments.

As all of you may know, there has been a settlement proposal by Merck. It is important that we review the question of whether or not you should participate in the settlement arrangement.

For virtually all of you, our recommendation will be that you participate in the settlement that is proposed by Merck. We would like to review some of the developments to-date and discuss why we should settle.

First, there have been a number of Vioxx cases tried across the United States. Two or three of those cases have been won by the plaintiffs for large amounts of money. However, most of the cases that have been tried have not been won by the plaintiffs and Merck has prevailed. These were all cases in which it was <u>undisputed</u> that the plaintiff took Vioxx, <u>undisputed</u> that the plaintiff had a heart attack, and <u>undisputed</u> that Vioxx, according to the medical data, contributes or causes heart attacks. In spite of this, the plaintiffs lost. This is for several reasons:

a.     Almost all plaintiffs (virtually everyone) has other things in their lives that can cause heart attacks, including stress, family history, bad diet, lack of exercise, previous history of health problems, etc.;

b.     Merck has been able to successfully assert that for any individual plaintiff, these other factors are more likely the cause of any given heart attack than Vioxx;

All Vioxx Clients
January 8, 2008
Page -2-

    c.     Merck has been able to successfully argue that heart attacks are exceptionally common, occurred both before Vioxx and are continuing to occur after Vioxx, and therefore that any given heart attack is most probably the result of something other than Vioxx; and

    d.     almost without exception, all of these cases were tried by good trial lawyers, who were well armed with the evidence, and who had in evidence most of the damning medical documents involving Vioxx.

The upshot of all of this is that based upon the evidence today, most of the Vioxx cases that would be tried to conclusion will be lost.

Please do not misunderstand: we do not agree with the results that have been obtained so far. We do not agree with Merck's position. Quite frankly, we think Merck is not being honest in terms of assessing the true risk that Vioxx posed to its takers.

However, one must also deal with the fact that the juries that have looked at the issues so far have mostly sided with Merck.

This puts the issue of settlement as one that should be looked at most seriously. In addition, there are legal problems. Merck has argued, and continues to argue, that the medical research to-date does not support a conclusion that strokes are caused by the ingestion of Vioxx. That fight, which is legal in nature, will probably wind its way through the appellate system, and could literally take years.

In addition, for those cases pending in Texas, the Texas courts have ruled that no Vioxx case can proceed because it is barred by a special statute passed by the Texas Legislature in 2005 (more accurately, no case involving the ingestion of Vioxx that was filed after 2005 can proceed against Merck, which includes all of our cases). The reasoning of the Texas court simplified is that:

    a.     the FDA approved the drug;

    b.     if the FDA approved the drug, then the Texas courts must accept the presumption that the drug is safe;

    c.     the only entity that could change that determination is the FDA;

    d.     the FDA has not made any determination that the drug is unsafe or that Merck lied to the FDA about Vioxx in the approval process;

    e.     therefore, the Court reasoned that under the law passed by the Texas Legislature, no Texas citizen can obtain a recovery for Vioxx. We believe that this is a totally ludicrous result. This would mean that citizens in virtually every other state in the United States could obtain money damages from Merck for the marketing of a dangerous drug, but Texas citizens could not obtain such a recovery. If that is true, then the Texas Legislature expressly passed a law that had the effect of protecting the drug companies, at the expense of Texas citizens. Such a law would be shameful.

All Vioxx Clients
January 8, 2008
Page -3-

However, at present, that is the interpretation that has been given to the law by the Judge. That ruling is being appealed. For all the cases pending in Texas (filed after 2005, which means all of your cases), and to which Texas law would apply, then, we will have to wait until the end of the appellate process (typically 2-4 years) before we will find out if we even have a case.

Given this, it is obvious that all of the Texas plaintiffs should welcome any opportunity to have a realistic settlement.

There are some valid arguments as to why someone should reject a settlement. Except for the Texas cases, you would have the right to go to trial. You may feel that you have good evidence involving the usage of Vioxx, and of course, all of you have suffered harm as a result of blood clots, either by heart attack or stroke, or otherwise. It is difficult for us to believe that these positive factors outweigh the negatives outlined above.

Even if you believe you have a meritorious case, there will be a great deal of expense involved, there will be a great deal of delay involved, and it is uncertain as to what will happen in the courts of appeal.

All of these considerations, when weighed, leads us to the conclusion that in all probability we are going to recommend that you go into the settlement process.

Going into the settlement has its own advantages and disadvantages. The settlement process basically works like this:

a.   you have to make a decision to go into the settlement;

b.   you have to have had either a heart attack or a stroke to participate in the settlement;

c.   if you decide to go into the settlement, then the case will be dismissed and all of your case will be submitted to a impartial third-party for determination of whether you are entitled to any recovery;

d.   if you are entitled to a recovery, then the amount of recovery will be determined based upon how many "points" that you have; and

e.   the number of points that you have will be determined by a complicated formula, including among other things, how long you took Vioxx, family history, age, life style and other matters.

You can find out more details about this if you visit the website www.officialvioxxsettlement.com.

The advantage of going into the settlement is that if you can meet the qualifying criteria, then you will obtain a recovery.

All Vioxx Clients
January 8, 2008
Page -4-

The major disadvantage of going into the settlement is that, if you do not qualify for a recovery, then your suit will be lost and you will not obtain any recovery. This is offset by the fact that if your case is one where an impartial third-party does not think that you meet the criteria to make a recovery, then in all probability, you would not have had a case that had any value, or if it had any value at all, it would be minimal.

The advantages of going into the settlement are more obvious. Within the next 6 months to a year, your case will be over. Further, the amount of money that will be divided is substantial. You may have seen reports in the news media that the amount of money is $4.85 billion. Most of that is reserved for heart attacks, although there is approximately $850 million in reserve in connection with the stroke cases. Out of those funds there will have to be paid attorneys fees and expenses. In addition, there may be subrogation amounts. Still, this would lead to bypassing the court system and you would have the satisfaction of having this matter concluded.

It is important to understand that the anticipated settlement amounts are nowhere near what anyone hoped at the outset. However, the court rulings, the previous jury trials, and the numerous appellate issues, have seriously impacted the value of these cases. We believe, therefore, the settlement opportunity probably represents the best option for most people. Out of all of our current clients (approximately 150) I know of only one case where I am giving serious consideration to having the plaintiff opt out of the settlement. He lives in Silsbee, Texas.

In connection with this, it is exceptionally important that we have current information on you. For example, we need, at a minimum, all of the following:

a. current telephone numbers, addresses and contact information, including an alternate contact (i.e., daughter, son, friend, etc.);

b. status on your present health and whether you have had a recent heart attack or stroke (my office has been making contact with almost all of you to obtain this information. if you have not heard from us yet, please contact Marsha Page in my office (713/223-3330) to give us this information;

c. the best evidence available on whether you had a heart attack or stroke during the period of time you were taking Vioxx; and

d. the best evidence you have available documenting that you took Vioxx and were taking Vioxx at the time of your heart attack or stroke.

In this regard, we will have to make a decision as to whether you are in or out of the settlement by March 15, 2008. We are assembling information so we can give each of you the best information available regarding your options. At this time, it looks like the best option available is to proceed into the settlement because our chances of recovery there are, upon balance, better than the chances of a lengthy, costly, and risky trial process.

All Vioxx Clients
January 8, 2008
Page -5-

For those of you who have not had a stroke or heart attack, it is going to be virtually impossible to make any recovery.  These include the following people:

a.     clients who have not had a heart attack or stroke, but have merely had a blood clot in other parts of their body;

b.     people who cannot document that they were taking Vioxx at the time that they had a heart attack or stroke; and

c.     people who cannot document that they were taking Vioxx.

For these clients, it will be exceedingly difficult and probably impossible under the current state of the law, and under the current state of the rulings and requirements, to make any recovery, whether it be by the settlement process, or the trial process.  We will be in contact with this subgroup of clients to discuss what options are available, including dismissal of the lawsuit.

For the rest of you who have had a heart attack or stroke, and can demonstrate that you were taking Vioxx at the time, we would like for you to consider seriously the possibility that the settlement option will be the best.

We will be back in touch with you regarding further developments and further recommendations regarding this matter in the near future.

I trust that this finds all of you well.  Please feel free to call with any questions.

Sincerely,

WILLIAMSON & RUSNAK

Jimmy Williamson

JW:bgk
Enclosure

## WILLIAMSON & RUSNAK
### ATTORNEYS AT LAW
AND
## LAMINACK, PIRTLE & MARTINES, L.L.P.
A JOINT VENTURE OF PROFESSIONAL PARTNERSHIPS

| | |
|---|---|
| **WILLIAMSON & RUSNAK**<br>ATTORNEYS AT LAW<br>4310 YOAKUM BLVD.<br>HOUSTON, TEXAS 77006-5818 | **LAMINACK, PIRTLE & MARTINES, L.L.P.**<br>5020 MONTROSE, 9TH FLOOR<br>HOUSTON, TEXAS 77006 |

# Exhibit (D)

WWW. JIMMYWILLIAMSON.COM
TELEPHONE: 713-223-3330
FAX: 713-223-0001

WWW. LPM-TRIALLAW.COM
TELEPHONE: 713-292-27950
FAX: 713-292-2755

* JIMMY WILLIAMSON, P.C.
CYNDI MOSS RUSNAK

RICK LAMINACK
TOM PIRTLE
BUFFY MARTINES

December 29 ,2008

*Via Regular Mail and*
*Certified Mail,/RRR*
Mr. John P. Hudson
7 Manitou Court
Ann Arbor, MI 48108

> Re:   Civil Action No. 06-7011; *John Hudson, Individually and as Representative of the Estate of Marguerite Hudson vs. Merck & Co., Inc.*; in the United States District Court Eastern District of Louisiana.

Dear Mr. Hudson:

As you know, we previously filed suit on your behalf against Merck concerning Marguerite Hudson taking Vioxx. You have talked to my office as well as Laminack, Pirtle & Martines' office on several occasions. We informed you that we did not believe Ms. Hudson's claim qualified under the criteria of the Vioxx settlement. Ms. Hudson's medical records and death certificate indicate she died of sudden cardiac death and possible acute stroke; however, her medical records also indicate she was on Celebrex at the time and that she had not been on Vioxx for approximately 2 years prior. Based on this, we feel we should file a Stipulation of Dismissal in your case.

There are other alternatives available to you. You could seek other counsel in the case. You could try to appeal the court's ruling that you do not receive any money. You could try to challenge the court's ruling on your case. You could conceivably try to find another lawyer, and file another lawsuit against Merck in order to try to qualify or prove your case against Merck. In our opinion, none of these alternatives are viable, as a realistic matter, and none of them have much of a chance of success.

If you were to do these things, we, of course, would withdraw from your representation and any further liability for costs and expenses would be yours alone. Further, we believe that these actions would be contested vigorously by Merck, which in reality would make it necessary that you find competent counsel to handle this matter. We know of no lawyers who

are taking these matters, or who would be willing to undertake these matters, given the status of the docket.

In other words, while you might have other legal options, we feel that realistically it will be difficult, if not impossible, for anyone to take any other actions on your behalf. Accordingly, this is the reason that we feel that we are in a position to say that your suit should be dismissed.

Our comment is that we believe that dismissal of your case would be the appropriate thing to occur at this time. Failing that, the appropriate thing would be for us to withdraw from your representation. However, that would leave you in a position of having to respond to the court, take up any further challenges on your own, and/or find other suitable, competent counsel to represent you on your claim.

Therefore, we are requesting that you sign this letter, should you agree with this letter, and return it to us in the self-addressed, stamped envelope which we have provided for your convenience. We will then proceed to file the appropriate Stipulation of Dismissal with Prejudice with the court.

**However, please feel free to contact other counsel to discuss your options so that you can determine that this is what you wish to do. Many, many times, different lawyers have different perspectives, and we totally support any effort you may wish to make to get additional counsel, or to consider other options.**

You do not owe us anything for the time or expenses we have expended on your behalf.

If you have any questions, please do not hesitate to contact me. In my absence, please ask for my Legal Assistant, Brenda Kellen, and she will be happy to assist you.

If we can ever be of assistance to you in the future, please do not hesitate to contact us.

Sincerely,

Jimmy Williamson

JW:bgk

I UNDERSTAND THAT I DO NOT QUALIFY UNDER THE VIOXX SETTLEMENT BECAUSE I DID NOT HAVE A HEART ATTACK OR STROKE AS DEFINED IN THE SETTLEMENT AND AUTHORIZE YOU TO PROCEED WITH FILING A STIPULATION OF DISMISSAL WITH PREJUDICE WITH THE COURT. I ALSO UNDERSTAND THAT I WILL NEVER BE ABLE TO BRING SUIT AGAIN AGAINST MERCK AS A RESULT OF TAKING VIOXX.

_____          _____
**John Hudson, Individually and as**                **Date Signed**
**as Representative of the Estate**
**of Marguerite Hudson, Deceased**

Memorandum

John Patrick Hudson Sr.
# 7Manitou Court
Ann Arbor, Michigan  48108
(734)972-7960

# Exhibit (E)

January 8, 2009

Via Regular Mail and
Certified Mail
Attorney Jimmy Williamson
4310 Yoakum Blvd.
Houston, Texas  77006-5818

Re:  Civil Action No. 06-7011 John Hudson and as Representative of the Estate of
Margueirte Hudson VS. Merck & Company Inc; in the United States District Court Eastern
District of Louisiana.

Dear Attorney Williamson:

In response to your most recent communication in regards to my mother's death and due to
her ingestion of Vioxx; I am appalled at the fact you would ask me to dismiss my case
against Merck.  As I have researched the drug Vioxx and discovered the COX2 element
develops platelets over a period of time within the blood vessel of an individual.
Therefore, by this occurring it squeezes off the blood flow  to one's main arteries inflicting
damage and even sometimes causing death by stroke or heart attack.  According to the
accuracy's of this truth, I remain in my initial position and chain of thought believing and will
always believe Merck and Company is negligent in  my mother's death.

Anyone with common judgment that viewed my mother's medical report, would come to
the conclusion that she did not endure added illness until she ingested the drug Vioxx.
However, before that time she did not experience and sickness relating to acid reflux,
chronic stomach pain, regurgitation, and continuing flu like symptoms seemingly to never
end.

Yet while it may be true that she was on the medication Celebrix at the time of her death, Celebrix remains on the market.  However, which makes one clear statement to me; the FDA (Food & Drug Administration) have not deemed Celebrix a harmful drug at the present.

I sincerely appreciate the time and effort you and your firm have put into our case. Nevertheless, please understand me, I will "Not" cease from seeking punitive damages from Merck and Company, even though you may request to withdraw as our Counsel in this matter.  I notice you state at the bottom of your letter, "not ever being able  to bring suit against Merck again?"  Therefore, because of that statement alone, I will "Not" sign that document.  Any other document with adequate wording releasing your "Firm"  and its' subsidiaries from our case I may sign before a Notary of The Public.  Although this being definitive, in exchange I would expect the return of all personal, medical, before and after, death records regarding Marguerite R. Hudson.

Finally Attorney Williamson, I plan on fighting this case against Merck and Company as long as there is breathe in my very being.  There was not an autopsy report to show physical consumption of that dreadful, drug Vioxx in my Mother's system.  I will proved that it was with the next Counsel even if I have to exhume her body and have an autopsy report clearance.  This will definitely proved the COX2 element was present in her system at the time of death.  This drug have been known to Kill people and that is exactly what Merck & Company did to our Mother.  Furthermore, I will not cease until I see some kind of justice done even if it means taking it all the way to the United States Supreme Court.

I thank you so kindly for your attention to this matter.  I do however look forward to your urgent reply.

Sincerely,

John P. Hudson Sr.
(Executor of Marguerite Hudson's Estate)

cc.  Billy Hudson, Malinda Hudson, Myrtle Hudson, Marcellia Hudson, Patricia Hudson, Bobby Hudson, Selma Hudson, Victor Hudson, Fredrick Hudson, Gregory Hudson, Ben Hudson Jr.

# WILLIAMSON & RUSNAK
### ATTORNEYS AT LAW
#### AND
# LAMINACK, PIRTLE & MARTINES, L.L.P.
#### A JOINT VENTURE OF PROFESSIONAL PARTNERSHIPS

| | |
|---|---|
| **WILLIAMSON & RUSNAK**<br>ATTORNEYS AT LAW<br>4310 YOAKUM BLVD.<br>HOUSTON, TEXAS 77006-5818 | **LAMINACK, PIRTLE & MARTINES, L.L.P.**<br>5020 MONTROSE, 9TH FLOOR<br>HOUSTON, TEXAS 77006 |

WWW. JIMMYWILLIAMSON.COM
TELEPHONE: 713-223-3330
FAX: 713-223-0001

# Exhibit (F)

WWW. LPM-TRIALLAW.COM
TELEPHONE: 713-292-27950
FAX: 713-292-2755

\* JIMMY WILLIAMSON, P.C.
CYNDI MOSS RUSNAK

RICK LAMINACK
TOM PIRTLE
BUFFY MARTINES

January 20, 2009

*Via Regular Mail and*
*Certified Mail,/RRR*
Mr. John P. Hudson
7 Manitou Court
Ann Arbor, MI 48108

Re:   Civil Action No. 06-7011; *John Hudson, Individually and as Representative of the Estate of Marguerite Hudson vs. Merck & Co., Inc.*; in the United States District Court Eastern District of Louisiana.

Dear Mr. Hudson:

We received your letter dated January 8, 2009.  We will be withdrawing in the above-captioned case.

Based upon your letter, you need to contact another attorney **immediately** to take over the handling of your case on behalf of your Mother's Estate.

We remain pessimistic, but certainly wish you the best of luck.

You do not owe us any fees or expenses in the case.

We encourage you to **immediately** contact another attorney to see if he/she will take over your representation in the above cause.  If you will advise us in writing who the attorney is that you retain, we will be happy to ship your file to them at our expense.

Again, we wish you the best of luck.

Sincerely,

Jimmy Williamson

JW:bgk

**Memorandum**

John P. Hudson Sr.
# 7 Manitou Court
Ann Arbor, MI  48108
(734) 972-7960

# Exhibit (G)

January 28, 2009

Via Regular Mail and
Certified Mail
Attorney Jimmy Williamson
4310 Toakum Blvd.
Houston, Texas  77006-5818

Re:  Civil Action No. 06-7011; John Hudson, Individually and as Representative of the Estate of Marguerite Hudson vs. Merck & Co. , Inc. ; in the United States District Court Eastern Court Eastern District of Louisiana.

Dear Attorney Williamson,

In reference to the above case regarding the Vioxx Settlement.  My constituents and I have done extensive research pertaining to the Vioxx Litigation Claims.   After consulting with numerous of Counsels from other "Firms," we have been advised to retain your "Law Firm" until the final phase of this litigation against Merck & Company.

Although in your last communication you mentioned your "Firm" being pessimistic about our case.  Due to the revealing nature of this Class Action process, we remain optimistic, believing in "God" and the Judicial System.

However, as we honor and respect your expertise in this area, in return we expect nothing but the best representation in this matter.  I sincerely hope that our relationship as Attorney and Client is kept professional, within the statues and limitations of the "Law."

Therefore, we would appreciate it greatly for you to let our case go through its' continued and final phase of Merck & Company's point system.

I thank you so kindly in advance for your patience and sincere cooperation to see this case until the end.

Yours Truly,

John P. Hudson Sr.

Executor of Marguerite R. Hudson Estate


cc. Billy Hudson, Malinda Hudson, Myrtle Hudson, Marcella Hudson, Patricia Hudson, Bobby Hudson, Selma Hudson Davis, Victor Hudson, Fredrick Hudson, Gregory Hudson, Ben Hudson Jr.


Enclosure



# WILLIAMSON & RUSNAK
### ATTORNEYS AT LAW
### AND
# LAMINACK, PIRTLE & MARTINES, L.L.P.
#### A JOINT VENTURE OF PROFESSIONAL PARTNERSHIPS

**WILLIAMSON & RUSNAK**
ATTORNEYS AT LAW
4310 YOAKUM BLVD.
HOUSTON, TEXAS 77006-5818

WWW. JIMMYWILLIAMSON.COM
TELEPHONE: 713-223-3330
FAX: 713-223-0001

* JIMMY WILLIAMSON, P.C.
CYNDI MOSS RUSNAK

**LAMINACK, PIRTLE & MARTINES, L.L.P.**
5020 MONTROSE, 9TH FLOOR
HOUSTON, TEXAS 77006

WWW. LPM-TRIALLAW.COM
TELEPHONE: 713-292-27950
FAX: 713-292-2755

RICK LAMINACK
TOM PIRTLE
BUFFY MARTINES

## Exhibit (H)

February 3, 2009

*Via Regular Mail and
Certified Mail,/RRR*
Mr. John P. Hudson
7 Manitou Court
Ann Arbor, MI 48108

Re:   Civil Action No. 06-7011; *John Hudson, Individually and as Representative of
the Estate of Marguerite Hudson vs. Merck & Co., Inc.*; in the United States
District Court Eastern District of Louisiana.

Dear Mr. Hudson:

We received your letter dated January 28, 2009.  I'm not getting my point across.

We cannot figure out a way to help you or your family regarding your Mother's Estate's
Vioxx claim.  We do not see where she has a viable claim under the criteria that is required
under the Global Settlement.  We have not other way to turn or no other alternatives to
choose.

We are withdrawing from your representation individually and as representative of the
Estate of Marguerite Hudson.  We anticipate the court will dismiss the Estate's claim.

As stated, you owe us nothing and we are happy to turn this matter over to another
attorney so that they can see if they can help you.  However, there is nothing further for us to
do.

We do not say this in disrespect to your Mother or your family.  I have no doubt that
your Mother's death was personally damaging to you and your family members; however, that
issue is independent of the legal issues that are guiding our decision.

We will be forwarding you a motion to withdraw for your signature.

Sincerely,

Jimmy Williamson

JW:bgk
cc:    Rick Laminack
       Buffy Martinez                              *Via Email*

Memorandum

John P. Hudson Sr.
# 7 Manitou Court
Ann Arbor, Michigan  48108
(734) 972-7960

# Exhibit (I)

**February 10, 2009**

Via Regular Mail and
Certified Mail,/ RRR
Williamson & Rusnak
Attorneys At Law
4310 Yoakum Blvd.
Houston, Texas  77006-5818

Re:  Civil Action No.  06-7011; John Hudson, Individually and as Representative of
the Estate of Marguerite Hudson vs. Merck & Co., Inc.: in the United States
District Court Eastern District of Louisiana.

Dear Attorney Williamson:

It is with much prayerful deliberation and careful consideration that I offer this response to
your most recent correspondence.  Although as you have stated on more than one
occasion now that your firm is pessimistic concerning the case of our Mother's Estate we
remain optimistic that justice will be served.  Furthermore, it is also our belief that a grave
injustice has taken place and the Merck & Co. must pay.  Moreover, we will continue the
course of action that we are on as we are determined to run on and see what the end will
bring.  It is our desire that your Firm would continue to represent our case but if you insist on
withdrawing in the above captioned case then the remainder of the correspondence is
intended to make sure that we fully understand our rights as it relates to our Attorney/ Client
relationship and to ensure that the Rules of Professional Responsibility under the Texas
state code and or Mississippi state code of legal ethics relative to that Attorney/ Client
relationship have been and will continue to be adhered to.

It was our understanding when your Firm took our case approximately three years ago that your obligation was to act in our best interest and to represent our case against Merck & Co. zealously within the bounds of the law.  It was also our understanding that your Firm had an obligation to keep us informed about the progress of our case and that the aforementioned code of legal ethics prohibited your Firm or any Law Firm for that matter from accepting or rejecting settlement offers on our behalf without our full knowledge and approval.  Although you have stated that your Firm remains pessimistic about our case, your Firm has not provided us with a settlement update in writing (i. e. from the Claims Administrator) per the PDF file issue by Merck & Co. regarding eligibility or ineligibility.

Which in fact the accuracy's of the statement in the previous sentence was suppose to be provided to claimants in June or July of 2008.  Thus far we have not received any documentation from Merck & Co. through your Firm, that would support pessimism.  Finally it was our understanding that your Firm was obligated to avoid conflicts of interest when representing us as a client such as the "Settlement Agreement," just recently entered into between Merck & Co. and a group of trial lawyers representing strong cases of merit such as ours.

Finally with all due respect I do understand your point but apparently I am not getting my point across.  That point is that I will not now nor ever sign a release form that dismisses our case against Merck & Co.  Furthermore, since your Firm insist on withdrawing your representation from our case you are hereby notified not to withdraw our case from the settlement process as you are not authorized to do so.  Moreover, we are instructing you to notify the Courts to direct all correspondence concerning our specific case in the Settlement process to me.  We will continue on in the Settlement process until we have personally heard from the Claims Administrator, the Committee and / or the Special Master regarding our specific case.

As you prepare your motion to withdraw from our case, please note that our faith has not and does not rest in attorneys to eloquently represent us, nor in the court system to ensure that a grave civil and moral injustice does not go unpunished, nor in Merck & Co. to do the right thing but our faith remains in the Almighty Power of the Living God to do abundantly above and beyond all that we could ever ask, imagine or think.

Sincerely,

John P. Hudson Sr.
Executor of Marguerite R. Hudson Estate

cc. Billy Hudson, Malinda Hudson, Myrtle Hudson, Marcella Hudson, Patricia Hudson, Bobby Hudson, Selma Hudson Davis, Victor Hudson, Fredrick Hudson, GregoryHudson, Ben Hudson Jr.
Attorney Laminack,
Attorney Martinez

# Exhibit (J)

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | MDL NO. 1657 |
| IN RE: VIOXX | : | |
| PRODUCTS LIABILITY LITIGATION | : | SECTION:  L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : | | |

**THIS DOCUMENT RELATES TO:    ALL CASES**

### ORDER & REASONS

With interim settlement payments scheduled to begin on August 28, 2008, the Court finds that it is appropriate at this time to address the issue of individual attorneys' fees.  For the reasons listed below, the Court orders that individual attorneys' fees for all counsel representing claimants enrolled in the Vioxx Settlement Program will be capped at 32% plus reasonable costs. At a later date, after giving the parties due notice and an opportunity to be heard, the Court will determine the amount of fees and costs to be awarded to those attorneys who performed common benefit work.  Pursuant to the terms of the Settlement Agreement, these latter amounts will be deducted from the individual plaintiffs' attorneys' fees.[1]

---

[1] Given the nature of the interim payment schedule, it bears emphasizing that no claimant shall pay more than 32% of their total award towards attorneys' fees, and any future award of

## I.   BACKGROUND

To put this matter in perspective, a brief review of this litigation is appropriate.  This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions (heart attacks) and ischemic strokes.  Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[2]

On February 16, 2005, the Judicial Panel on Multidistrict Litigation conferred multidistrict litigation status on Vioxx lawsuits filed in federal court and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28

---

common benefit fees will come from the individual attorneys' shares of their claimants' awards. Because at the present time only interim payments are being distributed, the mechanics of withholding any common benefit fee charge will be finalized upon the ultimate calculation of claimants' total awards.

[2]For a more detailed factual background describing the events that took place before the inception of this Multidistrict Litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565

U.S.C. § 1407.  *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).  One

month later, on March 18, 2005, this Court held the first status conference in the Vioxx MDL to

consider strategies for moving forward with the proceedings.  Shortly thereafter, the Court

appointed committees of counsel to represent the parties and to meet with the Court once every

month to review the status of the litigation.[3]

One of this Court's first priorities was to assist the parties in selecting and preparing

certain test cases to proceed as bellwether trials.  In total, this Court conducted six Vioxx

bellwether trials.[4]  The first of the bellwether trials took place in Houston, Texas, while this

Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took

place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of

the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the

defendant.  During the same period that this Court conducted its six bellwether trials,

approximately thirteen additional Vioxx-related cases were tried before juries in the state courts

of Texas, New Jersey, California, Alabama, Illinois, and Florida.  With the benefit of experience

from these bellwether trials, as well as the encouragement of the several coordinated courts, the

---

(E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).
[3]The Court appointed twelve attorneys to serve on the Plaintiffs' Steering Committee ("PSC"), see Pretrial Order No. 6 (Apr. 8, 2005), and five attorneys to serve on the Defendant's Steering Committee, see Pretrial Order No. 7 (Apr. 8, 2005).
[4]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. filed Feb. 16, 2006) (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. filed June 21, 2005) (sixth bellwether trial).

parties soon began settlement discussions in earnest.[5]

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007) ("Settlement Agreement"), *available at* http://www.browngreer.com/vioxxsettlement.[6] The private Settlement Agreement establishes a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion. *Id.* § "Recitals".[7] The Settlement Agreement expressly contemplates that this Court shall oversee various aspects of the administration of settlement proceedings, including appointing a Fee Allocation Committee, allocating a percentage of the settlement proceeds to a Common Benefit Fund, and modifying any provisions of the Settlement Agreement that are otherwise unenforceable.[8] Accordingly, this

---

[5]In their efforts to develop a comprehensive, joint settlement agreement, counsel for Merck and the Negotiating Plaintiffs' Counsel ("NPC") met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court–as well as the coordinate state courts of Texas, New Jersey, and California– informed of their progress in settlement discussions.

[6]When the parties formally announced the settlement agreement, Vioxx-related discovery had been moving forward in the coordinate jurisdictions for more than six years. Over 50 million pages of documents had been produced and reviewed, more than 2,000 depositions had been taken, and counsel for both sides had filed thousands of motions and consulted with hundreds of experts in the fields of cardiology, pharmacology, and neurology.

[7] For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, see *In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

[8] *See, e.g.*, Settlement Agreement, § 9.2.4 (establishing that the Court shall appoint a Fee Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices governing the procedure by which [it] shall determine common benefit attorneys' fees and reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify

Court has consistently exercised its inherent authority over the MDL proceedings in coordination with its express authority under the terms of the Settlement Agreement to ensure that the settlement proceedings move forward in a uniform and efficient manner.[9]

The Settlement Agreement provides a schedule for the disbursement of interim payments to certain eligible claimants. *Id.* § 4.1. In order to qualify for interim payments, eligible claimants must fulfill specific registration and filing obligations. *Id.* Pursuant to the terms of the Settlement Agreement, eligible MI claimants who timely fulfill all of their filing obligations may qualify to receive interim payments beginning on August, 1, 2008, or the date on which the Claims Administrator has determined pre-review points awards for at least 2,500 MI claimants, whichever is later. *Id.* The schedule for distributing interim payments to claimants is conditioned on Merck's decision to waive its walk away privileges. *Id.*

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met. *See Minute Entry, July 17, 2008*, Rec. Doc. 15362 (July 17, 2008). Merck further advised that it intended to waive its walk away privileges and that it would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the settlement fund, clearing the way for

---

any provision of the Agreement under certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable").

[9] *See, e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multidistrict litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

distribution of interim payments to eligible claimants. *Id.* On August 20, 2008, the Claims

Administrator reported to the Court that it had successfully reviewed approximately 2,750 claims

for interim payments. *See Minute Entry, August 20, 2008*, Rec. Doc. 15674 (Aug. 20, 2008).

The Claims Administrator further advised that interim payments were scheduled to begin as

early as August 28, 2008. *Id.* In light of the upcoming disbursement of interim settlement

payments, it is appropriate at this time to address the issue of individual attorneys' fees.

## II.   LAW & ANALYSIS

As an initial matter, the Court notes that addressing the issue of attorneys' fees in the

context of the Vioxx global settlement will require a two-step process. The first step involves

examining the reasonableness of all the contingent fee contracts in the global settlement and

setting an appropriate limitation on the amount of fees that attorneys may charge claimants. The

second step of the process will involve allocating a percentage of those fees for the Common

Benefit Fund to be distributed to those who performed common benefit work. After notifying

the parties and all counsel and offering them an opportunity to be heard, the Court will issue a

separate order addressing the Common Benefit Fund. At this time, the Court will only address

the reasonableness of contingent fee contracts in the context of the global settlement.

The Court will begin its analysis by reviewing the basis of its authority for examining the

contingent fee contracts in this setting. After briefly reviewing the basis of its authority, the

Court will then examine the contingent fee contracts and set a reasonable limitation on the

amount that individual attorneys may charge claimants enrolled in the global settlement,

regardless of whether their cases were filed in state or federal courts.

A.    **The basis of this Court's authority to review contingent fee contracts for reasonableness**

Contingent fee contracts have long been accepted in the United States because "they provide many litigants with the only practical means by which they can secure legal services to enforce their claims." *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir. 1970).[10]   Nevertheless, "[c]ontingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered." *Gair v. Peck*, 160 N.E. 2d 43, 48 (N.Y. 1959).

In addressing contingent fees, the Court is mindful that tort litigation—and particularly mass tort litigation—has a dual role in our society: (1) to compensate people who are harmed; and (2) to prevent future injuries by deterring harmful conduct.  *See Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105, 109-10 (2006).  These are laudable goals and ones which should be encouraged.  Undercompensating attorneys who handle such litigation would result in too few meritorious private suits being brought and less competent representation in the cases that are brought.  *Id.*  Overcompensating attorneys, however, would also be harmful, as it would encourage frivolous lawsuits and result in unfair recovery for injured litigants.  *Id.* The courts must, therefore, endeavor to strike a fair balance between these two opposing policy concerns.[11]

---

[10] For a detailed analysis of the history of contingent fee arrangements in mass tort litigation as well as the effects that these arrangements might have on the future of mass tort actions, see *Contingent Fees in Mass Tort Litigation*, 42 TORT TRIAL & INS. PRAC. L.J. 105 (2006).

[11] *See id.* at 111 ("It is thus crucial to calibrate compensation for lawyers who prosecute mass tort cases to provide enough incentive for them to be brought (to serve the deterrence and compensation functions) but not so much that nonmeritorious cases are brought or victims are

Before examining the contingent fee contracts in the context of the global settlement, it is first necessary to determine whether this Court has authority to inquire into the reasonableness of contingent fee agreements between the claimants and their attorneys. This determination requires an analysis of the Court's equitable powers, its inherent supervisory authority, and its express authority under the terms of the Settlement Agreement. Each of these will be discussed in turn.

      1.      **The Court's equitable authority to oversee administration of the global settlement**

The Federal Rules of Civil Procedure expressly provide that district courts may require reasonable fees in class actions. *See* Fed. R. Civ. P. 23(g)(1)(C)(iii); Fed. R. Civ. P. 23(h); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.927 (2004). In the *Zyprexa* MDL, the court found that several factors counseled in favor of treating the case as a quasi-class action, subjecting the settlement program to review under the court's general equitable powers. *See In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006). In particular, the court in *Zyprexa* noted as persuasive "[t]he large number of plaintiffs subject to the same settlement matrix approved by the court; the utilization of special masters appointed by the court to control discovery and to assist in reaching and administering a settlement; the court's order for a huge escrow fund; and other interventions by the court." *Id.* As a result, the court found that the settlement was subject to the court's "imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses." *See id.*; *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at *18 (D.

---

undercompensated.").

Minn. Mar. 7, 2008) (characterizing a mass tort proceeding as a quasi-class action and subjecting the global settlement to the court's equitable authority).

Turning to the instant case, the Court notes that there are substantial similarities between the global settlement currently before the Court and the global settlement at issue in *Zyprexa*. First, the court in *Zyprexa* found that the case could be treated as a quasi-class action in part because of "[t]he large number of plaintiffs subject to the same settlement matrix approved by the court." *In re Zyprexa*, 424 F. Supp. 2d at 491. Similarly, there are approximately 50,000 eligible claimants currently enrolled in the Vioxx Settlement Program, all of whom are subject to the same settlement matrix for awarding points and valuating claims. Second, like the court in *Zyprexa*, which utilized special masters "to control discovery and to assist in reaching and administering a settlement," this Court has benefited from the efforts of special masters throughout the course of the MDL proceedings and the settlement administration. *See, e.g.*, *Order*, Rec. Doc. 13228 (Jan. 14, 2008) (appointing Mr. Patrick A. Juneau to act as Special Master pursuant to the terms of the Settlement Agreement). Moreover, the $4.85 billion settlement fund in the instant case is similar to the large settlement fund held in escrow in *Zyprexa*. In light of these factors, the Court finds that the Vioxx global settlement may properly be analyzed as occurring in a quasi-class action, giving the Court equitable authority to review contingent fee contracts for reasonableness.

> **2.     The Court's inherent authority to exercise ethical supervision over the parties**

In addition to this Court's equitable authority over the global settlement, the Court also has the inherent authority and concomitant duty to exercise ethical supervision over the parties.

*See In re Zyprexa*, 424 F. Supp. 2d at 492 ("The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions."); *see also Karim v. Finch Shipping Co., Ltd.*, 233 F. Supp. 2d 807, 810 (E.D. La. 2002), *aff'd*, 374 F.3d 202 (5th Cir. 2004) ("Among the broad equitable powers of a federal court is its supervisory capacity over an attorney's contingent fee contracts.").[12]  Pursuant to the Court's supervisory authority, the Court may address the reasonableness of contingent fee contracts even if the parties have not raised the issue.  *See Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982) ("Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics.").  District courts necessarily retain the authority to examine attorney fees *sua sponte* because the attorneys' interests in this regard are in conflict with those of their clients. *See In re Guidant*, 2008 WL 682174, at *18 ("[A]s for the representative counsel involved, Plaintiffs' counsel have a built-in conflict of interest that is directly opposed to that of their clients."); *In re Zyprexa*, 424 F. Supp. 2d at 491-92 ("[P]laintiffs' counsel have a built-in conflict of interest; and the defendant is buying peace and

---

[12] Historically, a district court's supervisory authority to examine contingent fee contracts for fairness is well-settled and has longstanding roots in a variety of different areas of law. *Karim*, 233 F. Supp. 2d at 810.  For example, federal courts have long endeavored to protect seamen from unfair contingent fee contracts:

> Federal courts, particularly when sitting in admiralty, have long protected seamen when they enter into contracts with those more skilled than they.  As long ago as 1823, Justice Story penned these famous words: "They (referring to seamen) are emphatically wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs dealing with their expectancies, wards with their guardians, and *cestuis que trust* with their trustees."

*Id.* (quoting *Harden v. Gordon*, 11 F.CAs. 480, 485 (1823)).

is generally disinterested in how the fund is divided so long as it does not jeopardize the settlement.").

With large corporations now seeking to achieve global peace by resolving mass tort litigations simultaneously in state and federal courts, settlement agreements such as the one currently before the Court will likely become more common. *See, e.g., In re Guidant,* 2008 WL 682174, at *3 (noting that the parties "contemplated a global settlement covering Plaintiffs from both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases"). As these global settlements occur more frequently, however, and as the public consciousness focuses more closely on the outcome of mass tort litigations, there will also be a growing need to protect the public's trust in the judicial process. *See In re Zyprexa,* 424 F.2d at 494 ("Public understanding of the fairness of the judicial process in handling mass torts—and particularly those involving pharmaceuticals with potential widespread health consequences—is a significant aspect of complex national litigations involving thousands of parties.").

The potential harm to the public's perception of the judicial process is especially acute in the instant case because of the large number of claimants participating in the settlement. *See id.* at 493 ("The risk of excessive fees is a special concern here because of the mass nature of the case."). The approximately 50,000 plaintiffs and the $4.85 billion settlement fund have captured the public's attention, resulting in a heightened degree of public scrutiny on the settlement proceedings and the judicial process in general. Disproportionate results and inconsistent standards threaten to damage the public's faith in the judicial resolution of mass tort litigation by

creating an impression of inherent unfairness. *Id.* at 494 ("Litigations like the present one are an important tool for the protection of consumers in our modern corporate society, and they must be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled.").[13] "These considerations are enhanced where, as here, the Judicial Panel on Multidistrict Litigation has assembled all related federal cases for coordinated or consolidated pretrial proceedings ... [to] *promote the just and efficient conduct of such actions.*'" *Id.* at 493 (quoting 28 U.S.C. § 1407) (emphasis added).

In addition, many of the Vioxx claimants are elderly and in poor health, making it more difficult for them to negotiate fair contingent fee contracts. *See id.* at 491 ("Many of the individual plaintiffs are both mentally and physically ill and are largely without power or knowledge to negotiate fair fees"); *see also In re Guidant*, 2008 WL 682174, at *18 (same). In order to qualify for the settlement, a claimant or the claimant's representative must first demonstrate that the claimant suffered a heart attack, ischemic stroke, or sudden cardiac death after taking Vioxx. As a result, all of the claimants in the global settlement have suffered life-threatening injuries. Under such circumstances, the supervisory court has an increased responsibility to ensure that the fees are both consistent and reasonable. For these reasons, the Court finds that it has the inherent authority and responsibility to examine the individual contingent fee contracts for fairness and consistency.

---

[13] *See also Contingent Fees in Mass Tort Litigation*, *supra*, at 125 (noting that several courts "have invoked their inherent authority to regulate lawyers to limit attorney fees in mass tort contexts.... not to correct for market failure but rather to protect clients from being charged unreasonable fees"). The Court notes that although many of the plaintiffs' attorneys in the Vioxx litigation have entered into contingent fee contracts for 33⅓% of the claimant's net recovery, there are many other attorneys who have 40% and even 50% contingent fee contracts.

    3.      **The Court's express authority pursuant to the terms of the Settlement Agreement**

The terms of the Settlement Agreement in this case provide further support for the Court's authority to examine the reasonableness of the contingent fee contracts. The Settlement Agreement expressly grants this Court the authority to oversee various aspects of the global settlement administration. For example, the Settlement Agreement contemplates that this Court will appoint an Allocation Committee to assist in determining the appropriate amount of fees to be deposited into the Common Benefit Fund. *See* Settlement Agreement § 9.2.4. The Agreement also contemplates that this Court will consider the Committee's recommendations in making a final determination of common benefit fees as well as deciding how those fees should be distributed to individual attorneys for their common benefit work. *See id.* § 9.2.5. Pursuant to the terms of the Settlement Agreement, these amounts will be deducted directly from the attorneys' fees after the Court's final determination regarding the Common Benefit Fund. *See id.* § 9.2.1 ("Any sum paid as a common benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement.").

In addition, the Settlement Agreement also establishes that this Court has the express authority to modify any provision of the Agreement in certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable." *Id.* § 16.42. To the extent that the Settlement Agreement would be unenforceable if it resulted in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts, this Court may address those fees in order to ensure fairness to all parties. As a result, the Court finds that it

may examine the reasonableness of contingent fee contracts in order to protect the claimants and enforce the Settlement Agreement.

In light of this Court's equitable authority over the settlement, its inherent authority to exercise ethical supervision over the parties, and its express authority under the terms of the Settlement Agreement, the Court finds that it has the authority to examine the contingent fee contracts in the global settlement for reasonableness, regardless of whether the claimants filed their cases in state or federal courts. *See In re Guidant*, 2008 WL 682174, at *19 (capping contingent fees in global settlement pursuant to "the Court's general equitable powers, the Court's inherent authority to exercise ethical supervision over [the] global settlement, and the Court's inherent authority to review contingency fees for fairness"). In the interest of fairness and uniformity, it is both necessary and desirable that a single court be able to set a reasonable limitation on contingent fees in this global settlement proceeding. Having overseen not only the course of the MDL proceedings but also the administration of the Vioxx Settlement Program, this Court is uniquely situated to examine the reasonableness of attorneys' fees for claimants enrolled in the global settlement. Further, in light of the upcoming distribution of interim settlement payments, the Court finds that it is appropriate at this time to set a reasonable limitation on the contingent fees that attorneys may charge to claimants participating in the settlement.

**B.      Applying the Court's authority to examine contingent fee contracts in the global settlement**

In order to determine a reasonable limitation on individual contingent fee contracts, the Court will look for guidance to comparable limitations on contingent fees. First, the Court will

examine state statutes and rules that cap contingent fee arrangements. Second, the Court will review the manner in which other district courts have approached the issue of contingent fee arrangements in the context of similar global settlements. Finally, the Court will consider the unique contours of the Vioxx global settlement in light of these comparative sources in order to set a reasonable limitation on individual contingent fees in this context.

### 1.   State statutes and rules placing limitations on contingent fees

Because this MDL proceeding is essentially a series of diversity jurisdiction cases, it is appropriate for the Court to consider state statutes in examining whether the contingent fee contracts are fair or reasonable. *See In re Zyprexa*, 424 F. Supp. 2d at 494. New Jersey's approach to contingent fees provides considerable guidance for this Court in determining the appropriate contingent fees in this case. *See* N.J. R. Ct. 1:21-7. The Court notes that the New Jersey rule is particularly persuasive in this context because New Jersey is one of the primary coordinate jurisdictions in the Vioxx litigation. In New Jersey, an attorney in a products liability action "shall not contract for, charge, or collect a contingent fee in excess of the following: (1) 33⅓% on the first $500,000 recovered; (2) 30% on the next $500,000 recovered; (3) 25% on the next $500,000 recovered; (4) 20% on the next $500,000 recovered." *Id.* The New Jersey statute further provides that counsel must apply to the court for a reasonable fee on all amounts in excess of $2 million, and may not charge more than 25% where the amount recovered is "for the benefit of a client who was a minor or mentally incapacitated when the contingent fee arrangement was made." *Id.* The New Jersey rule therefore provides strong support for limiting attorneys' contingent fees to a reasonable amount in the context of the global settlement.

In addition, the Court is further persuaded by similar rules in California and Texas, the

other primary coordinate jurisdictions in the Vioxx litigation.  *See* Cal. Bus. & Prof. Code §

6146(a) (providing a sliding scale framework for limiting contingent fees in actions against

health care providers); Tex. Lab. Code Ann. § 408.221 (limiting contingent fee arrangements in

worker's compensation lawsuits to 25% of the plaintiff's net recovery).  Other states have also

adopted similar rules or statutes placing comparable limitations on contingent fee arrangements.

*See, e.g.*, Conn. Gen. Stat. Ann. § 52-251c(b) (limiting contingent fees in personal injury and

wrongful death cases to 33⅓% of the first $300,000; 25% of the next $300,000; 20% of the next

$300,000; 15% of the next $300,000; and 10% of any amount exceeding $1.2 million); Mich.

Gen. Ct. R. 8.121 (limiting contingent fees in personal injury or wrongful death suits to a

maximum of 33⅓% of the net recovery); *see also In re Zyprexa*, 424 F. Supp. 2d at 495

(conducting a survey of the states and noting that "[t]he trend in the states is to limit contingent

fees in substantial cases to 33⅓% or less of net recovery where fees are large").

> 2.      **Decisions by other courts in similar situations**

The instant case presents something of a matter of first impression, due in large part to

the global nature of the settlement, the large number of plaintiffs participating in the settlement,

and the considerable amount of money in the settlement fund.  With little precedent bearing

directly on the facts of the instant case, the Court finds guidance in the decisions of other district

courts dealing with similar global settlements.  For example, the MDL court in *Guidant*

examined contingent fee arrangements in the context of a comparable global settlement resolving

state and federal claims.  *See In re Guidant*, 2008 WL 682174, at * 3 (noting that the global

settlement covered "Plaintiffs from both the MDL and state cases, and included Plaintiffs whose

cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the

MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases"). The global settlement agreement in *Guidant* provided the district court with authority over the administration of the settlement proceedings, including the authority to decide the amount of fees for common benefit payment. *Id.* at *4. In determining the amount of the common benefit payment fees, the court also addressed the reasonableness of contingent fee contracts, taking into consideration the economies of scale provided by the coordinated proceedings and the global settlement. *Id.* at *17-19. Accordingly, the court capped all individual case contingency fees at 20%, reserving to the parties the right to petition to the special masters for an upward departure subject to certain limiting factors. *Id.* Pursuant to the court's limitations, however, no counsel could recover more than 33⅓% in contingent fees. *Id.*[14]

The court's approach to attorney fees in *Guidant* is consistent with the decisions of other courts in similar circumstances. For example, in the *In re Silicone Gel Breast Implant* MDL, the court recognized a settlement class and allocated 25% of the $4.2 billion settlement fund for attorneys' fees. *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D. Ala. 1994). Although the settlement ultimately fell through for other reasons, the court suggested that individual contingent fees should be capped at approximately 25% of each plaintiff's net recovery because of the considerable benefits provided by the economies of scale unique to that litigation. *See id.; see also* PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 7:52 (2006) (describing in detail the court's proposed framework for

---

[14] *See also Contingent Fees in Mass Tort Litigation, supra*, at 116-20 (collecting cases and examining resolutions of contingent fee arrangements); PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 7:46 (2006) (same). Unlike the fees in the present case, the contingent fees in *Guidant* apparently did not include the common benefit fees.

apportioning fees). Similarly, in *Zyprexa* the court addressed the issue of contingent fees by conducting a thorough analysis of the complexity of the issues of the case, the economies of scale offered by the global settlement, and the persuasive authority of several state rules and statutes. *In re Zyprexa*, 424 F. Supp. 2d at 496. Given the unique contours of that case, the court in *Zyprexa* capped contingent fees at 35%, reserving the right to depart upward to 37.5% or downward to 30% based on the facts of each individual case. *Id.* These decisions provide helpful guidance for the Court in approaching the fee determination in the instant case.

### 3. Determining reasonable fees in the context of the Vioxx global settlement

As an initial matter, the Court notes that this is essentially a products liability case, and all products liability cases pose significant challenges to plaintiffs' counsel. The risk of loss for plaintiffs' counsel in these cases is considerable. In addition, the basic challenges inherent in any products liability case were compounded in this case by a host of complex legal issues unique to the instant litigation, including (to name only a few) the learned intermediary doctrine, contributory negligence, causation, federal preemption laws, and Merck's assertion of attorney-client privilege with respect to thousands of documents in its possession. The risks associated with pursuing these cases became even more daunting in light of the verdicts returned by juries in this Court's bellwether trials—only one of the six trials resulted in a verdict for the plaintiff. On a single-case basis, therefore, reasonable contingent fees might range from 33% to 40% of the total recovery for each claimant.

In setting a reasonable limitation on contingent fees, the Court is also mindful of the many contributions made by plaintiffs' counsel in furtherance of the administration of the global

settlement proceedings.  Without the dedication of plaintiffs' counsel from across the nation, the

approximately 50,000 claimants currently enrolled in the settlement would have faced

considerable difficulties in securing and producing the appropriate records necessary to enroll in

the settlement.  Nevertheless, the Court must assess the reasonableness of the contingent fees in

light of the fact that the economies of scale have led to a global settlement offering considerable

benefit to the attorneys.

Instead of pursuing individual discovery, filing individual motions, engaging in

individual settlement negotiations, or preparing individual trial plans, attorneys for eligible

claimants who wish to participate in the settlement need only enroll the claimants in the

settlement and then carefully monitor their progress through the claims valuation process.  These

economies of scale must cut both ways.  The attorneys have benefited from a uniform and highly

efficient resolution procedure; the claimants should similarly benefit from fees reduced to reflect

that uniformity and efficiency.  Even though the unique facts of certain cases may have initially

warranted disparate contingent fee arrangements, these individual characteristics no longer

control the calculus for determining reasonable fees.  *See In re Guidant*, 2008 WL 682174, at

*18 ("Because of the mass nature of this MDL, the fact that several firms/attorneys benefited

from economies of scale, and the fact that many did or should have benefited in different degrees

from the coordinated discovery, motion practice, and/or global settlement negotiations, there is a

high likelihood that the previously negotiated contingency fee contracts would result in excessive

fees."); *In re Zyprexa*, 424 F. Supp. 2d at 493 ("[T]hese firms all benefitted from the

effectiveness of coordinated discovery carried out in conjunction with the plaintiffs' steering

committee and from other economies of scale, suggesting a need for reconsideration of fee

arrangements that may have been fair when the individual litigations were commenced.").

In consideration of the various state rules dealing with contingent fees and the decisions of other district courts faced with comparable situations, the Court finds that the individual contingent fee arrangements for attorneys representing claimants enrolled in the Vioxx global settlement should be capped at 32% plus reasonable costs.[15]  In reaching this determination, the Court acknowledges the complexity and risk involved in pursuing these cases as well as the fact that any award for common benefit work will later be deducted from this sum.[16]  Nevertheless, in light of the large number of plaintiffs, the global settlement, the considerable settlement fund, and the unique contours of this litigation, the Court finds that this is a fair and reasonable framework for apportioning fees.  Although perhaps a reduction from the standard 33⅓% to 40% contingent fee applicable on a single-case basis, this reduction will not result in a paltry award for the attorneys.  With a total settlement fund of $4.85 billion, limiting attorneys' fees to 32% of the net recovery means that the attorneys in this case will receive more than $1.55 billion.

## III.   CONCLUSION

In consideration of the economies of scale offered by the global settlement proceedings and all of the above expressed reasons, IT IS ORDERED that contingent fee arrangements for all

---

[15] The Court notes that this percentage is the maximum that any counsel representing claimants enrolled in the Vioxx global settlement may charge in contingent fees.  To the extent that any state rule or statute requires a recovery below this percentage, or to the extent that any individual parties may have agreed to a lower percentage contingent fee, this percentage acts only as a ceiling and does not supersede state rules or statutes or reasonable agreements between claimants and their attorneys.

[16] It bears repeating that under no circumstances shall any claimant pay more than 32% of their total award towards attorneys' fees (not including costs).  A percentage of the individual attorneys' fees will be used to pay the Common Benefit Fund.  Because only interim payments are currently being distributed, the mechanics of withholding common benefit fees will be

attorneys representing claimants in the Vioxx global settlement shall be capped at 32% plus reasonable costs.  At a later date after due notice and an opportunity for all counsel to be heard, the Court will determine the appropriate sum for common benefit work.  This sum will be deducted from the above amount, reducing the individual attorneys' fees across the board.

New Orleans, Louisiana, this 27th day of August, 2008.

UNITED STATES DISTRICT JUDGE

finalized upon the ultimate calculation of claimants' total awards.