```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2      ****************************************************************

 3
        IN RE:  VIOXX PRODUCTS              MDL No. 1657
 4      LIABILITY LITIGATION               Section: "L"
                                           New Orleans, Louisiana
 5                                         Tuesday, April 7, 2009

 6
        ****************************************************************
 7                  TRANSCRIPT OF MOTION PROCEEDINGS
                HEARD BEFORE THE HONORABLE ELDON E. FALLON
 8                    UNITED STATES DISTRICT JUDGE

 9
        APPEARANCES:
10
        FOR THE VIOXX
11      LITIGATION CONSORTIUM:             JONES, WALKER, WAECHTER,
                                           POITEVENT, CARRERE & DENEGRE
12                                         BY:  HARRY S. HARDIN, ESQ.
                                           201 St. Charles Avenue
13                                         49th Floor
                                           New Orleans, LA 70170-5100
14

15
        FOR CERTAIN PLAINTIFFS
16      IN THE VIOXX MDL:                  TULANE LAW CLINIC
                                           BY:  STACY E. SEICHSHNAYDRE, ESQ.
17                                              JANE JOHNSON, ESQ.
                                                MARSHALL HEVRON, STUDENT
18                                              JOSHUA CHESSER, STUDENT
                                                MOLLY SULLIVAN, STUDENT
19                                              PETER J. KEE, STUDENT
                                           6329 Freret Street
20                                         New Orleans, LA 70118

21
        Official Court Reporter:           Karen A. Ibos, CCR, RPR, CRR
22                                         500 Poydras Street, Room HB-406
                                           New Orleans, Louisiana 70130
23                                         (504) 589-7776

24

25          Proceedings recorded by mechanical stenography, transcript
        produced by computer.
```

<u>P R O C E E D I N G S</u>

(TUESDAY, APRIL 7, 2009)

(MOTION FOR RECONSIDERATION/REVISION OF ORDER CAPPING CONTINGENT

FEES and ALTERNATIVELY, MOTION FOR ENTRY OF JUDGMENT)



(OPEN COURT.)


THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  Call the case, please.

THE DEPUTY CLERK:  MDL No. 1657, <u>in re:  Vioxx</u>.

THE COURT:  Counsel, make your appearance for the record, please.

MR. HARDIN:  Good morning, your Honor.  I am Harry Hardin representing the Vioxx Litigation Consortium.

MS. SCHICHNAYDRE:  Your Honor, Stacy Seicshnaydre with the Tulane Civil Litigation Clinic.  At this time I would like to introduce the student attorneys who will be presenting argument today.

As your Honor is aware, supervising attorneys, Jane Johnson and myself, have already made appearance in the case and will continue to represent all claimants subject to the court's 32 percent capping order.

With respect to those claimants who have consented in writing to the representation of students, I'd like to introduce

1    Josh Chesser, P.J. Kee, Molly Sullivan, and Marshall Hevron, who

2    will be appearing for those claimants who have consented to the

3    representation.

4              THE COURT:  Okay.  Fine.  Thank you.  Let me, by way of

5    background, make a couple of comments.  This case involves the

6    prescription drug Vioxx.  Merck, a New Jersey corporation,

7    researched, designed, manufactured, and marketed and distributed

8    Vioxx to relieve pain and inflammation resulting from

9    osteoarthritis, from rheumatoid arthritis and menstrual pain,

10   migraine headaches and other pain.

11             Data eventually showed that Vioxx increased the risk of

12   cardiovascular thrombotic events, such as MI, myocardial

13   infarctions, ischemic strokes and other matters.  The drug was

14   withdrawn from the market on September the 30th, 2005, and

15   thousands of suits followed, both in state and federal court.

16             On February the 16th, 2005, the Multidistrict Panel declared

17   this case a multidistrict litigation and referred the matter to

18   this court.  The necessary committees were appointed, and the

19   attorneys started collecting data and discovering the case.

20   Several million, over nine million documents were eventually

21   produced, thousands of depositions were taken, and this court set

22   some bellwether trials.

23             The first trial took place in November of 2005, followed

24   by five cases.  So five trials were conducted in this case, in this

25   court, and at least five or six, many, 13 other cases were

1    processed to trial.

2         After those trials the attorneys were able to get some

3    view of the case and look at it globally.  With a suggestion of

4    this court and other state courts, they began looking at it with

5    defense counsel and through their efforts were able to come to a

6    resolution of at least some portion of the case - the MI and the

7    ischemic strokes.  And the case was, that aspect of the case was

8    settled for 4.85 billion, and an intricate administrative process

9    was developed to process the claims.

10        It became timely for me, then, to focus on the other aspect

11   of the case, namely -- from this portion of the case, and that was

12   costs and attorneys' fees.  I felt it was appropriate to cap the

13   principle law fees or originating lawyers at 32 percent, and I

14   issued an order to that extent on August the 27th, 2009.

15   A group of attorneys, a consortium of attorneys, in Texas filed a

16   motion for me to reconsider that order.

17        This type of litigation works, frankly, because of the

18   skill and ability of the attorneys.  We have in litigation of this

19   sort the best of the best, the best attorneys handle these types of

20   cases.  And so when the attorneys asked me to reconsider, I assumed

21   that they had something to offer and some point to make, and so I

22   agreed to reconsider it and set it for oral argument.

23        In doing so, I felt it was important to, if I was going to

24   have oral argument, to have two sides to the controversy.  It

25   didn't seem appropriate, to me, just to have one side tell me what

1    their view was.  That, to me, is not an argument, it's a speech,

2    it's a statement.  So I felt that it was appropriate to get another

3    side of focus on this same issue.

4          It didn't seem appropriate for me to appoint the

5    committees that were appointed because, frankly, there was some

6    conflict of interest, and also, it just was not appropriate to do

7    it that way.  And also I was concerned about appointing an attorney

8    outside of the litigation because that might lead to some feeling

9    that that attorney would be able to pick up cases, so to speak, and

10   I didn't want to inject that into it.

11         So it seemed the best way of approaching the matter was

12   to appoint a skilled group, and I picked the Tulane law clinic

13   because I had some experience with them in other cases and asked

14   whether they were interested in it, and they said that if they --

15   they would take the appointment, provided, of course, they got the

16   necessary approval from the clients.  And so we proceeded along

17   that line, and we're here today to hear discussion on those, on

18   this matter.

19         I received briefs from each side.  I'll hear from the moving

20   party first, followed by the response and then the moving party

21   will have an opportunity to reply.

22         Both of you need to know that I've read your briefs at least

23   several times, so I am looking for you to extend your briefs or

24   talk to me about some matters that you didn't really flush out in

25   the briefs or focus me on what you think is the essential part of

1    the briefs.

2        I haven't set any time limits, but if we start to drift a

3    bit, I'll focus you back on the issue.

4        MR. HARDIN:  Thank you, your Honor.  May it please the

5    court, I am Harry Hardin and I represent the Vioxx Litigation

6    Consortium composed of attorneys Umphrey, Williams, Ranier, Watts

7    and Kaiser in a motion to reconsider the court's August 27, 2000

8    (SIC), order capping contingent fee agreements at 32 percent.

9        First, if I may, your Honor, I would like to offer and file

10   into evidence the affidavits that have been previously attached to

11   the motion papers and supplemental paper.  They are Vioxx

12   litigation Exhibits 1 through 11.  I have given the clerk, the

13   minute clerk, a copy of the exhibit list.  There is one -- these

14   are originals with one exception:  I have not yet received the

15   original of the first affidavit of Mikal Watts, and I'd ask the

16   court's permission to provide that as soon as I receive it.

17       THE COURT:  Fine.  I'll admit those into evidence.

18       MR. HARDIN:  Thank you, your Honor.

19       THE COURT:  And let it be marked in accordance with the

20   designated markings making them a part of the record.

21       MR. HARDIN:  Your Honor, yesterday afternoon we received

22   from Tulane Law Clinic the consents of various claimants in the

23   Vioxx litigation, and we went through our database, and Grant

24   Kaiser has an affidavit, which I have marked as VCL No. 11, which

25   needs to be added to the exhibit list.  I have given a copy of this

1    to Tulane.  These are the facts that we gleaned from our database

2    with respect to the people who have signed consents to Tulane and

3    have given those to Tulane and have been filed in the record of the

4    court.

5             THE DEPUTY CLERK:  Excuse me, Mr. Hardin, I show a VLC 11

6    as the affidavit of John --

7             MR. HARDIN:  I'm sorry, this is VCL No. 12, if I've

8    misspoken.  It should be VCL No. 12.  And if I may, I would like to

9    offer that.

10             THE COURT:  Receive that and make it a part of the record.

11             MR. HARDIN:  And I have a copy for the court.

12             Your Honor, the members of the VCL have not received any

13    complaints about fees from any of the people who consented to

14    Tulane's representation.  Should that be characterized as a

15    consent -- I mean, as a complaint, or should we receive one,

16    members of the VCL are obligated by their contract to arbitrate any

17    complaint with those complaining parties, which we would intend to

18    do so should that occur.

19             Of the -- a number of the people who consented are not

20    clients of my clients.  Paragraph four of the affidavit of

21    Mr. Kaiser, if I could focus you on that, your Honor, this

22    describes our relationship with the six people who do have some

23    relationship to the VCL.  Ms. Evering (PHONETIC) from Missouri,

24    directly filed in the Eastern District of Louisiana with venue

25    reserved; Ms. Linda Davis from Utah is tolled; Mr. Herman Francis

1   from Texas is a New Jersey State court case; Mr. Gary Hewitt from

2   Texas was directly filed in the Eastern District of Louisiana with

3   a venue reservation; and Mr. David O'Tish from Arizona was tolled.

4   And the only other person was a Mr. -- down in paragraph eight,

5   Mr. Paul Roth on behalf of Hildegard Roth is a former VCL client

6   whose file was closed in 2005, and the VCL does not retain any

7   interest in the case.

8          In any event, your Honor, it is our assertion that a case in

9   controversy does not exist at this time -- pardon me, at the time

10  the capping order was entered, and still does not exist as with

11  respect to the remainder of the VCL clients because they have not

12  complained.

13         Now, I know the court has read our briefs and I have -- am

14  more than willing and would like to answer the court's questions.

15  I don't think I have a thought that I didn't put in the brief, and

16  I appreciate the court giving me the opportunity to file an

17  excessively long brief.

18         THE COURT:  Okay.  First, with regard to the claims that

19  you represent, also we have had several motions, which we refer to

20  as me-too motions joining your claim and representing their

21  clients, so some of the people that are on the list who have

22  consented, although they're not your clients, they perhaps are

23  other clients who have had their lawyers or whose lawyers have also

24  responded.

25         One question that I did have that the Tulane Clinic has

1    brought to your attention and that is the retainer that you've put

2    forth.  They take the position that in your contract that you have

3    recognized that the court might issue an order, and if the court

4    does issue an order, that that order would supersede the fees but

5    in no event be greater than 40 percent, but that it might, it might

6    affect the fees.  How do you respond to that?

7            MR. HARDIN:  Your Honor, I think we tried to address that

8    in our brief, first, by saying that that's a very much overly-broad

9    reading of the language of the contract of representation.  The

10   second issue is that in the event there is an assertion of

11   unethical conduct, which there is no such assertion in this case,

12   then the court's involvement does not attach.  The court's

13   potentiality for involvement is always out there, but it needs a

14   predicate.  And the predicates are not here.  There is no

15   complaint.

16            The other predicates for court involvement such as a

17   seaman who was a ward of the court or a minor or some other

18   statutorily-designated situation are not present in the

19   particularities of this particular MDL, where all of these cases

20   are still, while they're coordinated and consolidated for pretrial

21   purposes, at the end of the day they still exist individually as

22   individual cases.  There's still one plaintiff against Merck.  Now,

23   they do have common facts, but that, under 1407, is for

24   consolidated pretrial purposes.

25            THE COURT:  Let's stick, though, first, with the

1    agreement.  As I read the agreement, there are two paragraphs that

2    bear on it, it seems to me.  The third paragraph under attorneys'

3    fees says:  We understand some portions of our case may be handled

4    through class actions, court-approved settlements, administrative

5    claims processing, or as a result of bankruptcy proceedings, and

6    the attorneys' fees to be paid to the attorneys in those situations

7    will be determined or awarded by order of court or under the

8    provisions of the court-approved settlement or administrative

9    process.

10           And it goes on to say the amount of the attorneys' fees

11   permitted under such group recovery varies in each instance, and

12   the attorneys agree to be bound by amount of the attorneys' fees

13   awarded by the court or through the administrative procedure,

14   claims procedure, but in no event shall exceed 40 percent.

15       Now, I understand your argument there is that you focus on

16   the class actions, which this was not or -- there were class

17   actions, 50 class actions filed, but this is basically an MDL.  The

18   court-approved settlements and that, you make the point that that's

19   for class actions, and court approval was questionable in this

20   case, whether or not that was essential administrative claims

21   processing, and you say that that was not; and, of course, it's not

22   a bankruptcy proceeding, and you focus on that it is only in those

23   instances where the attorneys' fees come in.  And I follow that.

24       But then as a second, another paragraph, the fourth

25   paragraph, which says, and it's a stand-alone paragraph:  "If the

1  provisions of this agreement for payment of attorneys' fees are in

2  conflict with any court order, settlement, agreement, provisions of

3  the law, code of professional responsibility, which dictates the

4  amount of the attorneys' fees that may be recovered, such court

5  order, and so forth, shall govern the recovery of the attorneys'

6  fees under this contract.  But in no event shall the attorneys'

7  fees be over 40 percent."

8       Now, that doesn't say anything about bankruptcy or class

9  action or anything else.  It's really a stand-alone paragraph.  How

10  do you deal with that?

11       MR. HARDIN:  That paragraph is a general statement of what

12  we believe we needed to inform our clients, the general rules of

13  law.  But for the contract of representation to be called into

14  controversy before the court, there has to be a predicate for that.

15  And that predicate, we assert, your Honor, has to be a complaint

16  that the fee is unethically unreasonable.  Not that it's just big,

17  not that it's just too much, it has to be unethically unreasonable.

18  And that's the predicate, and if that predicate is absent, then

19  that clause doesn't come in to function.

20       THE COURT:  But it says, if the provisions of this

21  agreement for payment of attorneys' fees are in conflict with any

22  court order.  It seems that they point out that it is in conflict

23  with a court order because I set 32 percent and that's in conflict

24  with 40 percent, and so they take the position that -- that even in

25  your agreement, your people have agreed that if it is in conflict

1    with the court order, the court order will stand, as long as it's

2    not over 40 percent.

3              MR. HARDIN:  But, your Honor, that would, with due

4    respect, be boot strapping because that would, in effect, wash away

5    all of our other challenges to whether you have jurisdiction,

6    whether there is a case of controversy, whether you have inherent

7    powers or whether you have equitable powers, what's allowed under

8    1407, what's allowed under Rule 23, which this, we all agree, is

9    not, and there is no assertion of unethical conduct.  So this order

10   doesn't get -- that paragraph doesn't get activated.

11        The sua sponte order of this court is what we are

12   challenging, and if we are successful, then there's no predicate

13   for that paragraph.

14             THE COURT:  You feel that in order for the court to issue

15   an order, it has to first have a justification for doing so;

16   namely, it has to conclude that it's unethical or that there is a

17   complaint made?

18             MR. HARDIN:  Yes, sir.

19             THE COURT:  Okay.  Now --

20             MR. HARDIN:  Pardon me, if I may?

21             THE COURT:  Yes, sure.

22             MR. HARDIN:  The size of the attorneys' fees is a

23   mathematical product, we all know that.  And so it boggles my mind

24   as to how -- if the fee can be too large, is the award too large?

25   And when you compare the fees to the data that we have given to the

1  court through the experts' affidavits, that there was no market

2  failure, these are reasonable in these kinds of product liability

3  cases, which are very risky, and that we know that with respect to

4  the "economies of scale" that benefit the claimants, those are

5  going to be paid for by the attorneys through the common benefit

6  process that this court has authorized and has agreed to oversee

7  through the common benefit.

8          And this agreement, this Settlement Agreement, no one

9  asked the court to approve it.  Indeed, 9.1 expressly says that

10  with respect to anything that's not common benefit, which is in

11  9.2, those issues with respect to those fees will be considered by

12  the counsel and the client.  And if the client is unhappy, then the

13  client has the normal processes to complain and to complain in the

14  proper venue under the proper law that applies to that claimant and

15  his attorney.

16          THE COURT:  Let me ask you another question on another

17  area:  The agreement -- and the attorneys, of course, deserve all

18  of the credit for resolving this matter in an efficient way, but

19  the court did at least review the settlement document in its

20  embryonic stage and in its infancy and into its present day form

21  and made suggestions along the way after consulting with my

22  colleagues in state court.  So I did have a feel for this document

23  as it was processing, as it was proceeding along the line.  And

24  while it doesn't contain any direct requirement of approval, it

25  does reflect some input from the court along the way.

1          In the document, the court has authority or responsibility,

2    a duty, to decide the common benefit fee, as well as the

3    distribution of the common benefit fee.  And the common benefit

4    fee, to me, I term that as a slice of the pie.  And it's very

5    difficult to decide on a slice of the pie before you have a focus

6    or a feeling for the entire pie, and so the reason for focusing on

7    the pie, meaning 32 percent, was so that I could decide what slice

8    I was going to take out of that 32 percent because it comes out of

9    that amount.

10          So in order to decide how much was going to come out of

11   that amount, it seemed to me that it was appropriate to find out

12   what the amount was before I took a slice out of it.  And that's

13   one of the reasons that I settled on the 32 percent across the

14   board.

15          MR. HARDIN:  Well, to address that, your Honor, the court

16   will have the same information if the contracts are 40 percent, but

17   I don't know that the court can ever know that because there's so

18   many different contracts by so many different lawyers in so many

19   different states with so many different fee provisions that are not

20   unreasonably or unethical under those state laws.

21          Now, many of the cases are in New Jersey, and the court is

22   as familiar as I am with that statute, which gets it down generally

23   to 32 percent.  There are issues with respect to whether fees are

24   on top or below, but -- and that varies from, you know, contract to

25   contract, state to state.  It's all very, very particularized.  And

1  so the problem that, I know this court wants efficiency, but Erie

2  doesn't give us this efficiency.  Erie says we have to -- these are

3  still individualized, one-off, product liability cases that have

4  been transferred from the transferor court, which is in a

5  jurisdiction that has a particularized code of conduct and probably

6  case law with respect to what is a reasonable or unreasonable

7  fee --

8          THE COURT:  Let me ask you this on that level.  Suppose I,

9  as a transferee judge, referred these cases back to the transferor

10 courts and 50,000 of them went back to 50 states.  Do you think

11 that those transferor courts would -- and they try the case and

12 process the case, do you think those transferor courts would have

13 the authority to decide on the fee in that, each particular case?

14         MR. HARDIN:  That depends.  The authority is in the wings,

15 but the authority has to be invited out.  In other words, the

16 claimant has to say, that lawyer was unethical on this person, on

17 this person, or his fee is unethical.

18     Now, just because the fee is big doesn't make it unethical

19 because we know that the fee is a mathematical product of the size

20 of the recovery.  So the power is there, but it has to be invited

21 out by circumstances.

22         THE COURT:  You think that a court, even if the court

23 decides, an individual judge, that this fee is improper, excessive,

24 needs to be trimmed or whatever, can't do it until somebody says,

25 Judge, you need to do it?

```
 1            MR. HARDIN:  I agree.  And I would make the same arguments
 2   to that judge that I am making to you today.
 3            THE COURT:  Okay.  All right.  One thing that seems to me
 4   to be a benefit of the MDL is, you mentioned the word efficiency.
 5   I think it's somewhat uniformity, efficiency, consistency, all of
 6   that I think is helpful because you get one ruling on evidence, you
 7   get one ruling on various motions as opposed to 50 different
 8   rulings from 50 different jurisdictions on the same issues, and
 9   inconsistency is oftentimes problematic for the law because
10   predictability is based on consistency and inconsistency is the
11   enemy of predictability.  So the MDL are devised for efficiency and
12   also consistency.
13         If it's because of consistency, because of those things, it
14   becomes more efficient for the parties to proceed in an MDL
15   context.  Isn't the claimant also entitled to that same consistency
16   and same efficiency, and aren't the lawyers entitled to that
17   same -- if a lawyer in New Jersey is a primary lawyer and a lawyer
18   from Arizona is another primary lawyer and they do the same amount
19   of work and the person in New Jersey gets 30 percent and the person
20   in Arizona gets 40 percent, is that problematic?
21            MR. HARDIN:  No, sir, it's not.  It's a product of the
22   real world in the sense that in different states, what is
23   appropriate contingent fee is different.  And the expectation of
24   the lawyer ex ante, at the time he entered into that contract
25   looking forward at the risks and possible rewards enters into a
```

1   contract that is presumptively not unreasonable under that state

2   law because any lawyer that would do otherwise would have been a

3   fool.

4        Now, I understand the court's desire for consistency, but

5   the MDL doesn't mandate that and can't -- it can't happen.  I know,

6   I believe that in your bellwether trials different individuals were

7   from different states and so they got different jury charges, and

8   there is no consistency there because this court for that process

9   had to look back to the transferor court's law to be applied.

10        And now, I understand the bellwether trials, salvatory as

11  they were, to inform the parties on the costs of this transaction

12  and the risks, but they were still one-off product liability cases.

13  And although the amount of the settlement, the private Settlement

14  Agreement is very large, if you look at the history of the trials,

15  some uninformed people would say, why did Merck settle?  They kept

16  winning, they're winning, they're winning.  Well, you have to be a

17  little on the inside of the bench and bar to understand it was a

18  transactional cost that probably drove the settlement.

19        And if you look, and we've got this data which we put

20  into evidence, at the legal fees that Merck was reporting and

21  compare them to the uncapped fees that are likely to occur to these

22  plaintiff lawyers, they're pretty much even.  And if you look at

23  the profits that Merck got on Vioxx, a very good drug which I took

24  for a short time, really worked, but I understand I will never take

25  it again.  But you look at that, the profits far exceeded the

1    attorneys' fees.

2         And if you look at that contingent fee after Merck wins its

3    first trial, is 40 percent enough?  You look at the costs that had

4    to go into those trials and you wonder, is 40 percent enough?  And

5    Merck wins another one, and then Merck wins another one, and then

6    Merck wins another one, and then the plaintiffs win one and the

7    size of the judgment gets reduced.

8         I am not as familiar with what happened in state court, but

9    there were, I think, more losses than wins.  So you look at risks.

10   The risk to the plaintiffs' bar, who funded this, because what are

11   the plaintiffs' bar doing?  Not only are they giving legal

12   services, but they're bankers, they're providing their clients

13   risk-free money and they're guarantying out-of-pocket expenses, so

14   they're an insurer, they're a banker and they're a lawyer.

15         Now, I am well aware that in the class action world,

16   there is an outcry that contingent -- that fees sometimes seem

17   totally disproportioned to the value that the class got.  But Rule

18   23 and class actions are so very different from this.  At the end

19   of the day, let us say there had been no settlement and you had

20   finished all of your pretrial work and there was still a number of

21   cases to be tried, they would be being tried in Utah and Ohio by

22   other federal judges and he would've, or she, would have already

23   gotten the benefit of the consistency that you are empowered to

24   give under 1407.  You were empowered to give consistency with

25   respect to pretrial rulings and proceedings.

1        Now, if you look back at your order, your Honor, in your

2   order, you suggested you wanted to consider the capping in the

3   context of the global settlement.  I would suggest that's not the

4   right place to look.  You should look to the context of the MDL.

5   Your powers, the results, its structure.  The global settlement, I

6   didn't see it coming.  I thought it was going to go the other way.

7   I thought it might have been like welding fumes, where they keep

8   losing and losing and losing and they can't get a win.

9        And if you look -- as you know better than I, I am sure

10  you have had contingent fee cases where you got zip.  Not only did

11  you get zip, you had to pay the expenses and you had to pay the

12  interest on the expenses that you booked.  And so when you look to

13  the entire portfolio of cases that an average lawyer in this type

14  of work, products liability work and plaintiffs' contingency fee,

15  you have to look at it as a portfolio.  And sometimes if you're

16  very well compensated, that's just okay.  It's not unethical, it's

17  not illegal.

18       THE COURT:  I understand the issue.  We're talking about

19  32 percent quickly, but let's not forget that 32 percent is over

20  $1.5 billion, so that's the attorneys fees, $1.5 billion.  It's not

21  a small amount.

22       The issue is whether or not the court, an MDL court, and

23  that's really the issue, whether an MDL court has the authority,

24  the duty, the responsibility to oversee fees or whether it doesn't.

25  And you take the position that it doesn't unless it's asked to and

```
 1    only in those cases where it's asked to can it respond, and then
 2    when it does respond, it has to respond with the law of the state
 3    from which the complaint is made and apply the law of the state
 4    from which the complaint is made.
 5              MR. HARDIN:  Could I make one other point?  I would
 6    suggest to the court that Guidant and Zyprexa are not the right
 7    places to look for authority.
 8              THE COURT:  You don't like those because they disagree
 9    with you.
10              MR. HARDIN:  Yes.  Precisely.  And at the time that
11    practice came down, 94 percent of our contracts were already
12    signed, and by the time Guidant came down, 100 percent of our
13    contracts, and so if we're entitled to ex ante review, which we
14    believe we are, you have to look at the time the fee contract was
15    entered into, not on the back end.
16              THE COURT:  I understand, except that it's sometimes
17    impossible to do that.  We've all had cases in which the fee
18    contract, if you take off -- and they mentioned the Karim case,
19    it's true, it's a seaman, but in that particular case, whether it's
20    a seaman or not, the case if the fee -- the fee that was charged in
21    the case would allow the individual to receive nothing, zip.  Now,
22    the lawyer did a lot of work in that case and that lawyer did a
23    good job in that case and won the case, but the person was
24    partially blinded, he had all kinds of physical and mental
25    injuries, almost died, and for him to get zero is just not
```

1    appropriate.

2          But in the beginning, the fee that was charged was an

3    appropriate fee, it was a difficult case and had a lot of issues in

4    it, legal issues that had to be resolved, but you see that

5    sometimes in handling cases.  And most of the time it doesn't come

6    before the court because the lawyer recognizes it and the lawyer

7    deals with it in some equitable way.  But if the lawyers won't deal

8    with it in an equitable way and the claimant walks away with zero

9    and the lawyer walks away with, you know, $100,000, it's somehow or

10   another, it's just not fair.  But I couldn't anticipate that in the

11   beginning.

12         MR. HARDIN:  Well, your Honor, I -- again, the thrust of

13   my argument is maritime case, seaman.  Your powers are inactive and

14   on display and they have to come to you to get the approval of the

15   settlement.  And I read Karim, Fifth Circuit and you many times --

16         THE COURT:  You think if that case were a product

17   liability case and the person would get zero, a court would not be

18   able to do anything about that particular case?

19         MR. HARDIN:  Not unless the court had reserved in its

20   judgment the right to approve the settlement.  That's what the

21   Kokkonen case is about, the recent Supreme Court case.

22         THE COURT:  Okay.

23         MR. HARDIN:  Now, does that mean it's the end of the

24   story?  No, that's not the end of the story.  It's just not in this

25   venue.  That claimant who got zip goes against the lawyer or files

1    an ethical complaint that that was unfair, and the lawyer decides,

2    well, you know, I am not -- I am going to deal with that.  I am

3    going to make that adjustment that the court made in Karim.

4          THE COURT:  But, you know, theoretically, when you

5    represent very sophisticated people or when you represent

6    corporations, you find that they know all of this information.

7    When you represent the sparrows of the world, they don't know that.

8    And when the lawyer says, I'm sorry, you don't get anything, they

9    don't do anything.  They don't know about bar associations

10   oftentimes, and they just go back to their house and say,

11   Mr. Lawyer said I don't get anything, we just got to tighten our

12   belt and eat grits a little bit more.  And that's the way of the

13   world, that's the way it works.

14         MR. HARDIN:  That is the way of the world, your Honor, but

15   the federal Constitution does not empower a federal judge to right

16   every wrong unless there is jurisdiction.  Now, there are a whole

17   bunch of eagles over here who would represent that sparrow because

18   they know he's been done wrong.  And not every sparrow falls out of

19   the nest and dies.  I don't know that there's data to support that.

20         See, we're both experienced practitioners, you're an

21   experienced judge, we have a sense, but our sense is still just the

22   sense that we carry from our own personal experience.  The only

23   data we have is that ex ante at the beginning of the time is the

24   point in time when a fee should be reviewed for reasonableness.

25         THE COURT:  Okay.

```
 1              MR. HARDIN:  Shall I sit down?

 2              THE COURT:  Yes.  I got you, I understand.

 3              MR. HARDIN:  I suspect you've got me.

 4              THE COURT:  Okay.  I do.  You have another issue that she

 5    wants to raise?

 6              Okay.  Let me hear from Tulane.

 7              MR. HEVRON:  Good morning, your Honor, my name is Marshall

 8    Hevron.  I am a student attorney with the Tulane Civil Litigation

 9    Clinic.  We have prepared some formal arguments that we're going to

10    go through.  We're not going to go through in the same manner that

11    the VLC just went through.

12              This morning we have divided our argument into four

13    separate parts, and a student attorney will cover each of the

14    problem issues.  First, I will address jurisdiction and show that

15    the court clearly has jurisdiction in this matter.  We view

16    jurisdiction as distinct from inherent authority, and we will

17    address that issue separately.  My colleague, Mr. Chesser, will

18    show that the court has the inherent authority to adjust the

19    contingent fees.  Next, Ms. Sullivan will cover the VLC

20    representation contract and show that it anticipated and allows for

21    a court-ordered reduction in fees.

22          Finally, Mr. Kee will show that because an MDL is a

23    dramatically different form of litigation, the unique role of

24    lawyers in that context should properly inform the court's decision

25    on attorney fees.
```

 1          So let me begin, your Honor, with our main point.  This

 2     court has jurisdiction by virtue of the existence of the ongoing

 3     Vioxx MDL.  This case is under the active administration and

 4     remains within the continuing jurisdiction of the court.  The court

 5     had jurisdiction over the underlying litigation and has not lost

 6     it.  The court's jurisdiction is reflected by its ongoing

 7     supervision of the case.

 8          Since the Settlement Agreement, the court has continued

 9     to hold monthly status conferences and has issued a high volume of

10     orders, none of which have been objected to on jurisdictional

11     grounds.  Several of the court's orders deal with the disbursement

12     of funds, which is relevant to the issue of the court's control

13     over fees and payments, and none have been met with opposition.

14          THE COURT:  Do you think I need a complaint in order to

15     have jurisdiction?

16          MR. HEVRON:  No, your Honor.  And I would answer that

17     question by citing to you both Hoffert and Karim, where the Fifth

18     Circuit clearly said or recognized the authority of a district

19     judge to change attorneys fees sua sponte.

20          And I do know that the VLC has sought to distinguish

21     Hoffert and Karim by saying that because those cases dealt with a

22     minor and a seaman, who are traditionally viewed as needing extra

23     protection of the court, that that was what really triggered the

24     court's fees -- I'm sorry -- the court's authority.  However, we

25     would contend that the court's authority was not triggered by the

existence of a minor or seaman in those cases, it was triggered by

action of the parties.  It was triggered when the attorney moved

that the court approve the Settlement Agreement.

In this case, though the parties to the Settlement Agreement

have not formally moved the court recognized it, they did invite

the court to preside over it, and we view that as an analogous act,

which would certainly invoke the court's ability to change

attorneys fees.

THE COURT:  Okay.

MR. HEVRON:  Your Honor, as I was saying before, this

court's jurisdiction is reflected by the ongoing issuance of

orders, none of which have been objected to.  And one order I would

like to call to your attention that I think underlies this point is

the February 2009 order that you issued, which is entitled, Order

Approving the Establishment of the 468(b) Qualified Settlement Fund

and Approving Fund Administrator.  The order goes on to say, and I

quote:  "The court retains continuing jurisdiction over both the

Vioxx 468(b) escrow settlement fund and the Vioxx 468(b) holding

settlement sub fund."

The fact that this order has been made without objection

on jurisdictional grounds, we believe, is a further demonstration

of the court's continuing jurisdiction over this matter.

The VLC asserts in its reply brief that the Settlement

Agreement itself is a private agreement and that you, Judge Fallon,

have been invited to preside over it as simply an individual.  But

1   I don't think we can deny that we meet today in a federal courtroom

2   and that the resources of the federal judiciary have been

3   continually employed to oversee this Settlement Agreement.

4        In short, your Honor, we would contend that this is still a

5   live case, it's never been dismissed, the VLC has cited Kokkonen

6   for the proposition of this court lacks jurisdiction, but we view

7   that case as being far off point.  In that case the Supreme Court

8   ruled that there was no jurisdiction because the case had been

9   dismissed and there was no stipulation in the dismissal that

10  retained jurisdiction for the court.  In contrast, the Vioxx MDL is

11  an active suit and has not been dismissed; therefore, we don't

12  think the holding in Kokkonen is applicable here.

13        Now, the VLC also goes out of its way in its reply memo

14  to try the student attorneys for overlooking what is called an

15  elementary rule of law, which is that parties cannot confer

16  jurisdiction on a court through private contract unless, unless the

17  court already has jurisdiction.  But, your Honor, we make no such

18  argument that a private contract infers jurisdiction on the court,

19  we think the court already has jurisdiction.

20        Your Honor, now that I've gone over our main point, I'd like

21  to go over ancillary jurisdiction.  We contend that ancillary

22  jurisdiction extends the regulation of the contingency fee.  The

23  VLC has misstated the clinic's argument about the basis for

24  ancillary jurisdiction.  We have not argued for supplemental

25  jurisdiction under 28 USC 1367, but for ancillary jurisdiction over

attorneys' fees.  Ancillary jurisdiction extends to proceedings
that may be technically separate from the initial case that invoked
the court's jurisdiction and recognizes that a federal court
requires jurisdiction of a claim in its entirety incidental to the
disposition of the principle issues, a court may also decide
collateral matters necessary to render complete justice.

One of the leading texts in the field, *Federal Practices
and Procedures*, by Wright & Miller, clearly states, and I quote:
"One of the best established uses of ancillary jurisdiction is over
proceedings concerning costs and attorneys' fees."

Your Honor, we've covered the Fifth Circuit, the
jurisprudence dealing with case or controversy, and I just want to
re-emphasize the point that we think that the Fifth Circuit's
holding in Karim and Hoffert are applicable here and that they
clearly recognize your sua sponte authority to alter attorneys'
fees as necessary.

And, you know, again, I just want to make the distinction
that it's not the status of the plaintiff as a seaman or a minor in
those cases that truly invokes the court 's authority.  It's the --
it was the action of the parties to ask the court to do something.
We believe that the analogy in the Vioxx MDL is the court's -- I'm
sorry -- it's all of the parties' request to the court that it
preside over this settlement.  That is the similar action which
invoked the court's ability to review attorneys' fees.

THE COURT:  Do you think I need to have a claimant

1    complain or say that it's unfair or it's too high or there should

2    be some consistency before I do that?

3            MR. HEVRON:  No, your Honor.

4            THE COURT:  Why is that?

5            MR. HEVRON:  Well, we fall back on what the Fifth Circuit

6    has stated, which is that, you know, you have this authority to do

7    so without a complaint from one of the parties.  And you yourself

8    have already gone over, you know, this notion of the sparrows of

9    the world, who certainly, though they may not have this traditional

10   status as a seaman or a minor, they certainly, in a situation like

11   this, the court should take some recognition of their position and

12   should and, frankly, has the ability to look out for them.

13           THE COURT:  Okay.

14           MR. HEVRON:  Your Honor, in conclusion, I contend that all

15   the points that I've made illustrate the ongoing jurisdiction of

16   this court and the Vioxx MDL.  That jurisdictional persists until

17   the last claimant has been compensated, until the last case has

18   been disposed of and the last attorney has been paid.  And we are

19   far from that point.  Because this court has jurisdiction, the

20   court also has the inherent authority to review contingency fees,

21   which will be covered by my colleague, Mr. Chesser.

22           THE COURT:  All right.  Thank you.

23           MR. HEVRON:  Thank you, your Honor.

24           MR. CHESSER:  Good morning, your Honor.

25           THE COURT:  Good morning.

1          MR. CHESSER:  My name is Joshua Chesser, and I would like

2     to spend a few minutes discussing the inherent power of the court,

3     and I would like to continue where Mr. Hevron left off by asserting

4     the next logical step.

5          Because the court had subject matter of jurisdiction in

6     this case, the court necessarily had the authority to review and

7     regulate attorneys fees because it has the responsibility to

8     regulate the practice of law.  By all means, the court was within

9     its discretion to use this authority to set a minimum recovery for

10    the plaintiffs by regulating the fees of their lawyers.

11         The VLC is not able to refute the following basic

12    proposition:  That among the court's inherent power is the power to

13    regulate fees.  Rather than refuting this bedrock principle, the

14    VLC has taken the offensive.  They've exaggerated our notion of

15    inherent power as merely without limit.  They have erroneously

16    quoted a narrow construction of inherent power.  This construction

17    comes entirely from dicta, outside the context of contingency fee

18    cases.  But even despite this narrowly constructed -- construction

19    of inherent power, the VLC has to admit that the court can regulate

20    fees in special circumstances.  It is clearly established that the

21    court has the inherent power to regulate fees when it is absolutely

22    necessary.

23         By way of analogy, the VLC has pictured the inherent

24    power of the court as an emergency brake, when it is more

25    accurately described as a set of windshield wipers, a device that

1    can be used when the facts and circumstances call for, not a

2    response to an emergency only to be employed in the most exigent of

3    circumstances.        Given that the court continues to exercise

4    jurisdiction, this court has well established inherent authority to

5    regulate the professional responsibility of lawyers, and within

6    that authority is the power to review and regulate attorneys' fees.

7    This power cannot be handcuffed, as the VLC suggests, in the

8    following ways:  The court does not need the VLC's permission to

9    review their fee; the court does not need a client complaint; the

10   court does not need explicit authorization in the MDL statute; the

11   court does not need explicit authorization in the fee contract,

12   even though their contract itself contemplates the court's

13   involvement in regulating fees.

14         THE COURT:  What do you cite for that authority?

15         MR. CHESSER:  Your Honor, I cite the basic proposition and

16   the definition of inherent power as being a power that is not

17   necessarily constrained by any of those necessary predicates, as

18   our opponent has argued, but a power that is more like maybe

19   triggered by those special circumstances but nevertheless always

20   exists.

21         In short, this court does not need an invitation to the

22   party.  It retains a standing invitation in its role as a chaperone

23   to the bar.  The court's power to regulate the attorneys' fees does

24   not come from parties, from predicates, from statutes, or from

25   contracts.  It rises from the principle that allows courts to deal

1   with diverse matters over which they are thought to have intrinsic

2   authority, such as procedural rule making, internal budgeting of

3   the courts, regulating the practice of law, and general judicial

4   housekeeping.  Thus, the court's intrinsic power to regulate the

5   practice of law encompasses the authority to encourage compliance

6   with the rules of professional conduct relating to fees.

7          The VLC further suggests that the court's inherent power

8   to regulate attorneys' fees be exercised only when the claimant is

9   a ward of the court.  The fact that courts often review attorneys

10  fees in these circumstances does not mean that the court's power to

11  review them is solely limited to those cases.  Would the court have

12  the authority to review and correct a 60 percent contingency fee if

13  it found it to be unreasonable?  It seems clear that the answer

14  must be yes.  How is a lower contingency fee presented any

15  different if the court nevertheless finds it to be unreasonable?

16  The only difference is one of degree.

17         The court's failure to regulate the legal profession is

18  not derived from the special vulnerability of those before it.

19  Protection from unreasonable fees is not solely limited to

20  traditional awards of the court.  The inherent power to regulate

21  fees is often triggered by those cases but is not limited to those

22  special circumstances only.  Inherent power does not appear or

23  disappear depending on who walked through the courthouse doors.

24         Regulating attorneys fees is a logical and basic function

25  of the court and it certainly is essential to its proper function.

1    One of the most fundamental rules of professional conduct is that

2    lawyers must charge reasonable fees.  All fees must be reasonable,

3    and this principle is the same whether or not there are traditional

4    awards before the court, the controversy has taken the form of an

5    MDL or the modification of a fee arrangement is viewed as necessary

6    to the court's function.  Once jurisdiction is established, a court

7    may exercise inherent power whenever a contingency arrangement

8    yields an unreasonable fee.  Courts are charged with ensuring the

9    reasonableness of fees under all circumstances.

10            Using the words of the VLC, the only special

11   justification necessary is that the court perceive the fee to be

12   unreasonably high.  It's unclear how this principle could be viewed

13   otherwise.  Thus, any unreasonable fees potentially unethical, and

14   the court does have the power, even the responsibility, to review

15   such and revise such agreements.

16            So the question before this court is not whether it has

17   the inherent power, as it clearly does.  Instead, the question is

18   whether the particular circumstances of this MDL case render a

19   40 percent fee unreasonable.  Although Mr. Kee will discuss this

20   question in greater depth, I'd like to quickly emphasize that this

21   court does not abuse its discretion in finding a 40 percent fee to

22   be too high in the circumstances of this mass tort MDL.  MDL's are

23   a relatively new type of hybrid.  The attorneys entered into

24   contracts in this case with the expectation of aggregation and the

25   recognition of the creativity and flexibility that courts are

1    required to exercise in mass tort litigation.

2           Under the modern rules, one of the factors the court may

3    consider when judging the reasonableness of fees is the time and

4    labor required.  As your Honor is certainly correct that the level

5    of lawyering in this case has been superior; however, as the VLC

6    admitted, the attorneys in this litigation spent different times,

7    different amounts of labor and time, and many lawyers benefited

8    from the work performed by others.  This nontraditional division of

9    labor supports this court's exercise of inherent power to regulate

10   the practice of law so as to encourage compliance with the

11   requirement that attorneys' fees be reasonable.

12          My last point concerns public perception.  The VLC has

13   suggested in its brief, the issue of public perception is somehow

14   irrelevant to the court's review of fees, but reasonableness must

15   intel consideration of the public perception.  The appearance of

16   fairness is not the justification for exercising your inherent

17   power, it's the outcome of doing so.  Promoting the appearance of

18   fairness is closely linked with the court's authority to regulate

19   the bar.  In the context of regulating the bar, the court will

20   naturally promote the appearance of fairness through its regulation

21   of fees.

22          The Manual for Complex Litigation emphasizes two

23   important goals for an MDL:  One, providing a forum for all parties

24   to have a fair test of the merits of their claims and defenses; and

25   two, which is more relevant to the case at hand, affording similar

treatment to similar cases in order to promote the public

confidence in the courts through consistent, predictable and

cost-effective outcomes.

          In its brief, the VLC suggests that capping fees -- that

in capping fees, the court is bowing to public emotion.  They

convey the scene of an angry mob with pitch forks, but this is

extortion of the claimant's position.  The court's inherent power

to regulate the practice of law entails consideration of public

confidence in the judicial system and public perception of fairness

that will result from the court's decision to review fees for

reasonableness.

          Earlier your Honor identified the issue as whether the MDL

court has the authority, duty, and responsibility to oversee fees.

Our answer is:  It most certainly does.  And therefore, in sum, the

court did not abuse its authority when it exercised inherent power

to set a minimum level of recovery for the claimants in this case.

It is simply not sufficient to say, let the market rule.  This

deference would amount to an irresponsible and reckless abrogation

of this court's authority to regulate the professional

responsibility of the bar.

          As a last sign of defense in an unsettled area of

litigation, it is the responsibility of the judiciary to enforce

compliance with the well-established principles of professional

responsibility.  These principles have always been an essential

part of the functioning legal system and they should continue to be

so in this age of modern litigation.  Ethics and equity and the

principles of justice do not change with the calendar.

You will now hear from Ms. Sullivan regarding the fee

arrangement entered into in this case.  Thank you for your time.

THE COURT:  Okay.  Let me ask you before you leave, and

I'll ask Ms. Sullivan, too.  In this case we've got approximately

50,000 claimants, or thereabouts, give or take a few.  Do you feel

that it's fair to have it consistent with all of those individuals

or should there be some safety valve or some exigent circumstances,

where if one lawyer has one case and has spent an inordinate amount

of time and money in it, should they be restricted to 32 percent,

or should they have some way of showing that they are entitled to

more than 32 percent?

MR. CHESSER:  Well, your Honor, the point I would like to

make on that is that while I think consistency and predictability

are important goals as the Complex Litigation Manual has stated, I

think that certainly there should be a safety valve in a way that

tailor the recovery or the fee award to the particular

circumstances of what that attorney did.

THE COURT:  Okay.  Let me hear from your colleague.

MS. SULLIVAN:  Thank you, your Honor.  Good afternoon.  My

name is Molly Sullivan.  I'm a student attorney for Tulane Civil

Litigation Clinic.  Thank you for the opportunity to speak with you

today about this motion.

As my colleagues have already addressed, the jurisdiction of

1    this court over fees earned through the MDL and the inherent power

2    of the court to modify those fees, I would like to talk more about

3    the issue you raised this morning about the VLC's agreement

4    between -- on contingency fees between them and their clients.

5         Our interest in this contract is what it tells us about the

6    expectations of the VLC at the outset of this litigation.  We're

7    not here in a motion to enforce a contract, but the contract does

8    show us what the VLC understood at the time they recruited their

9    clients and also what those clients -- what the VLC communicated to

10   those clients.

11        My first point that I want to make is that the Vioxx

12   claimants selected the VLC attorneys to represent them having been

13   promised that their attorneys would comply with any court order

14   relating to fees.

15         My second is that the VLC's contract contemplated the

16   court's exercise of jurisdiction in this area, and further, that

17   all plaintiffs' attorneys had notice of the authority of the court

18   to do so.

19        As you already said, the contract between the VLC attorneys

20   and their clients states that if the standard 40 percent

21   contingency fee was in conflict with any court order, that order

22   would govern the amount of fees up to a ceiling of 40 percent.  The

23   language of that contract is simple and straightforward.  It

24   clearly states that the VLC would comply with any court order

25   related to contingent fees.  It makes no exceptions to this promise

1   other than to say that the fees would never exceed 40 percent.

2       Now, it's an elementary principle of contract law that when

3   a written contract is unambiguous, it must be interpreted according

4   to its plain language.  When the language is clearly ascertainable,

5   as it is here, we don't need to ponder intent.  In this situation,

6   the VLC made a contract that was easily understood to its clients,

7   regardless of whether they meant to say what they did.  Affidavits

8   submitted by the members of the VLC in support of this motion

9   describe the 40 percent fee as a constant in their client

10   agreements.  But, in fact, a detailed reading of the contract shows

11   that the 40 percent fee isn't absolute but rather a default rate in

12   the absence of court order.  But if there is a court order, that

13   40 percent rate is a ceiling.  If the VLC expected a 40 percent

14   contingent fee across the board in every instance with no

15   expectations, they could have written the contract that way, but

16   they did not.

17       The VLC has tried to muddy the clear waters of this

18   language.  It would have us obfuscate the clearest term of any

19   court order in the fourth paragraph by -- in the third paragraph --

20   excuse me -- by referring back to the earlier paragraph that you

21   read from this earlier.  Thus, as we look at that -- at the third

22   paragraph regarding the list, which has a list of situations in

23   which fees might be modified by a court order, there is nothing in

24   that paragraph that says that the list is exhaustive or exclusive

25   of other possible situations wherein a court might apply fees --

1    excuse me -- might modify fees.  Nor, does the fourth paragraph --

2    excuse me -- third paragraph suggest that it modifies the plain

3    language of the other provisions in the section.

4           If, for the sake of argument, we were to engage in the

5    interpretive acrobatics suggested by the VLC, then we could

6    conclude that the contract is ambiguous between the two paragraphs

7    of the section.

8          That conclusion would trigger another elementary principle

9    of contract law.  If there is any ambiguity in a contract, it is

10   interpreted in favor of the nondrafting party.  That principle is

11   amplified when the drafting party is an attorney and especially

12   when the nondrafting party is that attorney's client.  When

13   speaking specifically on contingency fee agreements, Willis in

14   thesis on contracts said, quote:  "In supervising and interpreting

15   these contracts, the courts are adamant in construing any ambiguity

16   against the attorney who drew the agreement and liberally in favor

17   of the client."

18         To conclude on my first point, if the question is whether

19   the VLC should have to comply with an order related to contingent

20   fees, the answer is, of course.  It made a promise to its clients

21   that it would.  The same is true for any other attorneys who had

22   similar language in their clients.  But where does that leave us

23   for other attorneys in the MDL who might not have had that language

24   in their contracts?  That's what leads me to my second point.

25           The second point is that the VLC's contracts demonstrate

1   that plaintiffs' attorneys at the outset of the MDL were aware of

2   and consented to the potential modification of fees by the court.

3   The members of the VLC are extremely knowledgeable attorneys with a

4   vast amount of experience in the field of complex litigation.  So

5   much so that one member of the VLC was, in fact, appointed to serve

6   on the Plaintiffs Steering Committee at the beginning of the MDL.

7   However, in five nearly identical affidavits submitted by the

8   members in support of their motion to reconsider, each member said

9   they had, within quotes, "no reason to anticipate that our fees

10  would be tapped at 32 percent and that our contingent fee contracts

11  would not be enforced as written."

12          So this statement is not entirely consistent with what we

13  read of their contract.  Had the possibility of fee modification

14  not been anticipated when this particular set of knowledgeable

15  attorneys wrote the contract, surely they would not have written it

16  into those contracts.  They later acknowledge in their reply to our

17  memo that possible consolidation into an MDL had been anticipated

18  when they started signing Vioxx clients.

19          Now, of course, at the time that the VLC drafted their

20  contracts, they had no way of knowing with certainty whether an MDL

21  would be formed or if a class would be certified.  But in the same

22  affidavit, the VLC attorneys go on to say:  "When no manner sought

23  class action status in the Vioxx litigation, nor was a class action

24  certified."

25          But even if the VLC itself did not seek class status,

1    they were represented on the Plaintiffs Steering Committee which

2    submitted at least one motion to certify a class.  Had that motion

3    been successful, the court's decision to set attorney fees would be

4    unquestioned.

5              The reason that class certification is important here is

6    that until that matter was resolved, the VLC could not have been

7    confident that their contingency fee contracts would be enforced as

8    written, but they were still willing to take on representation of

9    their clients despite that uncertainty.  The willingness to take

10   those clients despite the uncertainty involved undermines their

11   arguments that not having contracts enforced as written will have

12   dramatic negative effects on the availability of counsel for future

13   MDL's.

14             Even if we were to forget that a class action was pending

15   or possible at the time the clients were signed, savvy attorneys

16   such as those in the VLC would have known from the case law that a

17   cap on individual attorneys fees is possible within an MDL.

18        Now, the VLC has argued that only two cases have issued

19   capping orders, and those both came down after their contract was

20   signed.  But this argument ignores the decades of MDL precedent

21   where courts have set a maximum fee rate.  In re:  Silicone Breast

22   Gel in 1994, and in re:  Rio Hair Naturalizer in 1996, both capped

23   rates charge by settling plaintiffs' attorneys regardless of

24   whether they were plaintiffs as part of a class or individually

25   appointed.

1          Other consolidated mass torts have made consistent

2   orders.  In 1996, both in re:  A.H. Robins, Dow, MDL and in re:

3   Asbestos Litigation issued caps on individual attorney fees that

4   were later upheld by the respective circuit courts.  None of those

5   cases permitted contingent fee in excess of 25 percent of the

6   claimant's award.

7          These cases and others like them put plaintiffs'

8   attorneys familiar with MDL law on notice that the possibility that

9   judicial modification of contractual fees was possible.

10          Another illustration that they were aware that the

11   contractual fees might later be altered by the court is the common

12   benefit fee.  Any attorney experienced with MDL's knows that the

13   common benefit fees would apply; and (b), they might be deducted

14   from either of the attorneys or the client settlement.  This shows

15   that the possibility of a fee adjustment was something that was

16   anticipated within the MDL.

17          Several hundred VLC clients consented to their

18   representation knowing that their attorneys had promised to comply

19   with any court order that would adjust their fees downward.  The

20   court has properly exercised its jurisdiction and authority to

21   modify fee agreements contingent upon the outcome of this MDL.

22   Plaintiffs' attorneys were on notice of this fact, and in the case

23   of the VLC they made a promise to comply.

24          As my colleague, Mr. Kee, is going to discuss now, the

25   outcome of the Vioxx MDL, the global settlement of the disbursed

1    mass tort warms the backdrop for the court's assessment of

2    reasonable attorneys' fees.

3              THE COURT:  Do you think it's necessary for a claimant to

4    make a complaint first before the court can do anything about fees?

5              MS. SULLIVAN:  No, I don't.  I think that definitely goes

6    back to common law in mass tort situations and also in just

7    traditional common law.  Courts intervene to modify fees where it

8    has been regarded as necessary for a variety of reasons.  There is,

9    you know, nothing in our argument that is making an assertion of

10   ethical misconduct.  We're not seeking to enforce the contract

11   between the clients.  We're just using this contract or its

12   evidentiary value to show what was expected by the VLC.

13             THE COURT:  Okay.  Let me hear from your colleague.

14             MR. KEE:  Good morning, your Honor.  My name is P.J. Kee,

15   student attorney with the Tulane Civil Litigation Clinic.

16              First, I would like to just thank you for your time.  We

17   were not able to get all of our thoughts out on paper on this

18   issue, so thank you for letting us get it all out here.

19             Now, because this court had continuing jurisdiction over

20   this MDL and the inherent authority to ensure that unreasonable

21   fees are not charged, the next question is:  What is the proper

22   course of action that this court should take?  And that answer is

23   simple.  The court must take the necessary steps to ensure that the

24   claimants are not charged unreasonable fees.  And in reviewing fees

25   in the context of the Vioxx global settlement, the court should

1    allow the nature of this MDL to inform its reasonableness review.

2         Now, this court was correct in its two courses of action:

3    First, remaining highly vigilant about reviewing fees for

4    reasonableness; and second, taking preventive action and properly

5    concluding that the reasonable limit was 32 percent.

6         Now, as to the court's vigilance, I will first explain that

7    this court properly understood its obligations as a transferee

8    judge.  Second, I will also explain that the court properly

9    considered how the MDL procedure affected the reasonableness of

10   fees.

11        Now, as my cocounsel, Mr. Chesser, has explained, courts

12   have the general inherent authority to ensure that those before it

13   are not charged unreasonable fees and has -- and as he has also

14   explained, there are special circumstances in which a court becomes

15   even more vigilant, taking a keener, more protective posture

16   because of the perceived and heightened risk that unreasonable fees

17   could be charged in those circumstances.  And like the others, the

18   disbursed mass tort MDL is a similar context requiring a heightened

19   vigilance.  And even if, as the VLC contends, the court's inherent

20   power is only limited to special circumstances, this is certainly

21   one of those.  And this is because the transferee judge is

22   entrusted to ensure that the staggering efficiency afforded in this

23   procedure is passed on to the claimants out of a concern for

24   fairness.

25        Now, as to its duties as a transferee judge in this MDL,

1   this court correctly interpreted its statutory mandate in 28 USC

2   1407 that the efficiency of the process must be counterbalanced by

3   fairness, and that the court has broad flexibility and discretion

4   in fulfilling this role.  Although the VLC narrowly focuses on

5   efficiency in its reply, fairness is an equally important systemic

6   goal towards which a transferee judge must strive.

7          In fact, an appropriate reading of the statute is that it

8   delegates authority to the transferee court and establishes a

9   bottom-up organic structure in which the transferee judge is

10  entrusted with the ultimate duty and responsibility of striking the

11  balance between efficiency on the one hand and fairness on the

12  other.

13         Now, such a reading is supported not only by Section 1407's

14  broad language and delegation of authority to the transferred

15  judge, but also the MDL jurisprudence that has developed in the

16  40-year history since the passage of this statute.

17         Now, an instructive place for this proper statutory

18  interpretation is the Manual for Complex Litigation, which, as this

19  court is well aware, is essentially a collection of the federal

20  judiciaries' institutionally-acquired knowledge on the goals and

21  possible challenges in complex litigation, including and

22  importantly here, disbursed mass tort MDL's.

23         Now, speaking specifically about disbursed mass tort MDL,

24  the manual identified two guiding principles:  First, in this

25  context, the transferee judge is entering into largely unchartered

1    terrain without the aid or guidance of precedent.  And that the

2    judge will inevitably confront novel problems that require judicial

3    innovation and crafting procedures to meet these challenges.

4         But second, the judge's innovation in creating these

5    procedures must be counterbalanced by fairness and overall

6    fairness.

7         Now, importantly, as this court has acknowledged, one of

8    these novel problems is the reasonableness of attorneys' fees at

9    the global settlement phase of a disbursed mass tort MDL.  And the

10   panel itself has confirmed as much.  In its transfer order in re:

11   Asbestos Product Liability Litigation VI, the panel stated that a

12   question which a single transferee court could consider is the

13   limitation of plaintiff's contingent fees.  Nevertheless, the VLC

14   interprets the MDL statute and the role of the transferee judge in

15   a fundamentally flawed way that does not comport with the 40 years

16   of MDL practice nor with the proper interpretation of that statute.

17        The VLC reads this statute as a top-down procedure in

18   which the transferee judge has a limited role and can only act on

19   specific directives that lay out each step of the way.  And,

20   therefore, the VLC scoured only top-down law.  They looked at the

21   congressional records and the MDL panel's rules.  They did not look

22   to the manual, they did not cite the manual.  And in doing so, they

23   essentially ignored 40 years of evolving judicial practice and even

24   the ongoing dialogue between the panel and the transferee courts.

25        However, the transferee judge is positioned as the central

1   institutional actor with broad discretion, flexibility and with the

2   full panoply of Rule 16 powers, not relegated to merely

3   discovery-related issues as the VLC contends.  Moreover, the MDL

4   procedure is purposely structured in order that the transferee

5   judge does not need to wait passively for specific directives on

6   how to act or deal with novel challenges.  This is an organic

7   process in which the transferee judge has as his guiding lights the

8   general objectives of efficiency and fairness and is systemically

9   encouraged to be innovative in striking the balance between them.

10         Now, in reviewing and capping contingent fees, this court

11   correctly interpreted its role as transferee judge.

12         Now, at this point I would like to address the second

13   component of this court's vigilance; namely, its understanding of

14   how the MDL procedure dramatically affects and properly informs a

15   review of the reasonableness of fees.

16         In dealing with this problem of reasonable fees at the post

17   settlement phase, the court, from its concern for fairness,

18   properly considered the efficiencies and benefits afforded to the

19   plaintiffs' attorneys and also the actual work done.  As to these

20   efficiencies and benefits, the court properly understands the high

21   level of cost savings that the MDL procedure affords by producing

22   economies of scale.  This is certainly true for

23   individually-retained attorneys with tag-along cases who are

24   benefitting greatly from the work of others by not having to do

25   individual discovery or individual preparation for trial.

1         Now, this is also true, though, of lawyers like the VLC

2    who concentrate on establishing a highly-valuable inventory of

3    clients.  Like the individual lawyers with tag-along cases, these

4    lawyers benefit tremendously in cost savings by not having to

5    conduct individual discovery and not having to prepare, in the

6    VLC's case, for over 1,800 individual trials.

7         Also important for this court to consider is that lawyers

8    like the VLC, who concentrate on amassing a highly-valuable

9    inventory of clients, greatly reduce the risk of not receiving a

10   return on the investment.  By amassing such a high quality

11   inventory in this case, the lawyers knew that at some point Merck

12   would have to settle these cases and not defend each individual

13   one.  This substantially lowers the risk involved in the

14   investment.  Moreover, the VLC and other such nonlead lawyers

15   benefited greatly by not having to negotiate individually and

16   personally with Merck on the terms of the settlement.

17        Now, as to the actual work done, this court properly

18   considered and valued the actual work done by the nonlead,

19   individually-retained lawyers.  As the VLC insists, these were

20   individual cases retained by individual lawyers on an individual

21   basis.  And we don't dispute that.  However, the claimants did not

22   receive what is traditionally understood as individual lawyering

23   once the cases were aggregate in this MDL.

24        For instance, once the lead counsel and steering

25   committees are selected or were selected out of necessity for

1    efficiency, there came into existence a layer of lawyers.  Because

2    of this layer, the individually-retained lawyer is not speaking to

3    the court on each individual claimant's behalf, is not involved in

4    negotiating a settlement for each individual claimant, nor are the

5    lead counsel talking to each individual client about each

6    individual client's case in order to decide how to proceed.

7        Now, the VLC admits as much, yet argues that, quoting

8    Professor Resnik, the work of these nonlead, individually-retained

9    lawyers have been traditionally undervalued because it is

10   different, because their work is different from the lead attorneys'

11   work.

12       Now, even if this general statement about undervaluing is

13   true, it is certainly not true in this case.  This court

14   effectuated exactly what Professor Resnick advocated.  The court

15   considered the intrinsic value of the attorney/client relationship,

16   or, as the Professor states, the key roles that

17   individually-retained lawyers play in allowing clients to

18   understand and participate in the justice system.  In doing so, the

19   court was quite generous in valuing the nonlead,

20   individually-retained lawyers' work by setting the fee at 32

21   percent, just a few percentage points below what many states

22   establish as caps in nonaggregated cases.

23       Now further, to the extent that individually-retained

24   lawyers perform common benefit work, as is continually asserted by

25   the VLC, they will be additionally compensated for that work.

1          Now, at this point, your Honor, I would like to just address

2     the quasi class action rationale.

3          THE COURT:  Before you go there, let me ask you.  There's

4     a tension always between the advantage of having a global fee,

5     32 percent, across the board and a separate independent fee

6     tailored to the specific work on a specific case.

7          MR. KEE:  Correct.

8          THE COURT:  Fairness sometimes is the big issue, is it

9     fair to have a global percentage or should each individual case be

10    evaluated?  How do you deal with that?

11         MR. KEE:  Your Honor, we think that 32 percent is

12    extremely fair for the work done and also the fact that your cap

13    does not limit to a certain height how much the common benefit fee

14    was, so, for instance, in Guidant, Judge Donovan capped everyone's

15    contingency fees at the height, which was 28 percent, but you could

16    still, up to even more height, gain 37 percent with common benefit

17    work.  Here, though, we think 32 percent is highly reasonable and

18    fair across the board.  However, if, as the VLC has suggested, that

19    there should be some kind of escape valve or upward adjustment for

20    specific work done, the VLC has suggested that the individual work

21    of preparing individually for 25 other cases, we're open to that,

22    we don't have any objections to that.

23          But we would state, though, that we think 32 percent is

24    the actual reasonable limit and that however you establish the

25    procedure for dealing with it, whether you appoint a Special Master

1    or not or whether you yourself look at these fees, that when, for

2    instance, the VLC would come in, however, the upward variance you

3    would allow, we would suggest that you also allow for a downward

4    variance in case when you do actually review the fees, that you see

5    that 32 percent in this specific case actually was not reasonable,

6    we think that would be not only efficient but highly fair for this

7    court to do.

8         But we would also say that however the height is, the

9    variance, so, for instance, if you thought that you should go up

10   five more percentage points in specific cases, as the limit, to 37,

11   that it should be -- the downward variance should be equal to that.

12             THE COURT:  Okay.  Thank you.

13             MR. KEE:  And now, your Honor, just to address the class

14   action point or the quasi class action point.  We don't concede

15   that -- anything about that as the VLC suggested because we didn't

16   address it specifically in our 29-page reply to their first motion.

17        We think that you, Judge Weinstein and Judge Donovan, if

18   anyone in the judiciary know the differences, is intimately aware

19   of the differences between an MDL and a class action, but it's

20   through that intimate knowledge that we think you do see the

21   similarities involved.

22             And the VLC's expert, Jeffrey Miller, makes this

23   important concession, he admits that there are points of

24   similarity.  And some of those points of similarity that we think

25   are important is the fact that individual claimants, there's a

1  failure or inability to monitor the lead counsel's action -- or the

2  lead counsel's actions and the fact that the rulings of the court

3  affect the whole aggregate.

4         And while the term quasi class action does not have to be

5  understood as an independent base of authority, we think there is

6  actual value in that term for its -- it's got this descriptive

7  value to show that there are reasons, namely, the similarities that

8  we've stated, for this court to be on heightened vigilance knowing

9  that it may be necessary to exercise its inherent authority to

10  establish procedures that ensure that the fees are reasonable.  So

11  we think it's just a very good justification for why this court

12  would take an extra, added look at this issue.

13        Now, your Honor, having explained that this court was

14  properly vigilant in allowing the special role of the transferee

15  judge and the efficiencies of the MDL in its performance review, I

16  will now move on to the second proper course of action taken by

17  this court, mainly, the preventive measure of capping fees.

18        In explaining that this court properly established the fee,

19  I will focus on two related questions:  First, the Erie question;

20  and second, the reasonableness review once the court properly

21  recognized that this was a matter of federal common law.

22        Now, as to Erie.  This court properly assumed that this was

23  a matter of federal common law.  Because this MDL is a tort, this

24  court is sitting in diversity, so the imperatives of Erie should be

25  considered.  Under an Erie analysis, though, this is an area of

1  procedural law, an area that the Supreme Court has specifically

2  allowed federal courts to develop.

3         Now, we must acknowledge that recently the Fifth Circuit

4  in Mathis v. Exxon confirmed that the calculation of fees is a

5  matter of state law, only when the state law provides the rule of

6  decision.

7       On this point, this court should follow its recent ruling in

8  Turner v. Murphy Oil, where this court applied federal law to the

9  question of determining reasonable fees.  In that case, an

10  important factor was that the class action was at the settlement

11  phase, ensuring that state rule of decision would not apply.  This

12  court applied federal procedural law, they are the Johnson factors,

13  in calculating a reasonable fee.  This logic should be extended

14  here because we are at the settlement phase and this is a novel

15  problem that arises only in federal MDL's.

16         THE COURT:  But they're going to cite the fact that Murphy

17  was a class action and that it was dealing with 23 at that point

18  and not the state law.  How do you answer that?

19         MR. KEE:  Correct, your Honor, but because it was, that

20  you did have this Fifth Circuit precedent about -- that you must

21  look to state law to establish the reasonableness of fees, we still

22  think the same logic applies, that you're still looking because

23  it's at the global settlement phase that you are still -- you see

24  that there's this novel, there's this problem that you have to deal

25  with.  And we think that state law doesn't afford any answers and

1    that this is uniquely federal because of how it arises only at the

2    global settlement phase of an MDL.

3         And we're not alone in this argument, your Honor.  Professor

4    Resnik, whom the VLC has cited thoroughly, considered this question

5    and stated:  When fees are an artifact of federal aggregation and

6    settlement processes, as we have here, such fee and cost awards

7    could be conceived as procedural and hence appropriately governed

8    by federal rather than state law.

9              Now, the procedural nature of the court's capping order

10   is perhaps best illustrated by how the order arose.  As this court

11   has stated today with the pie analogy, the cap arose out of a

12   necessity to establish the fee for common benefit work.  Now, if we

13   look at the common benefit fee or fund here, it arose as a

14   procedural innovation and part of the common law out of a concern

15   for fairness and the prevention of unjust enrichment.  And in the

16   complex litigation context, the federal judiciary has tailored it

17   to address concerns of fairness and unjust enrichment that arise in

18   those contexts, which is evident in Vioxx by the common fund tax

19   that the court will impose on individually-retained lawyers as a

20   means for them to pay for the beneficial work completed by the

21   lawyers doing common benefit work.

22        Now, the procedural decision here to cap fees at a

23   percentage of 32 percent is simply part and parcel of that logic

24   and procedure.  By doing so, this court ensures that claimants are

25   not unfairly paying more than they should, preventing the nonlead

1    lawyers from being unjustly enriched and ensuring that these

2    individually-retained, nonlead lawyers receive only reasonable

3    fees.

4            In Guidant, Judge Donovan stated as much in his capping

5    order.  And I'll quote:  "Individual attorneys should not reap the

6    rewards of collecting their entire contingency fees at the expense

7    of the individual claimant when they did not do all of the work

8    that ultimately resulted in the settlement of the MDL."

9        Now alternatively, even if reasonableness of fees is

10   governed by state law, this court arrived at the reasonable cap.

11   Because this is a novel issue that arises only in federal disbursed

12   mass tort MDL's, state law has not and could not consider what

13   would be a reasonable fee in this context; therefore, this court

14   would be making an Erie guess as to what the state law would say

15   about a global settlement of a federal MDL.  And we argue that by

16   looking at state laws that this court did, this court made the

17   correct Erie guess.

18       Now second:  As to the court's reasonableness review,

19   because this is an acceptable area for the development of federal

20   common law, the court was not obligated to follow state law, and

21   this court was highly reasonable in looking to what was done by

22   Zyprexa and Guidant, and also to the laws of various states for

23   Guidant.  And in doing so, this court determined a highly

24   reasonable cap at 32 percent.

25           However, and not surprisingly, the VLC wants to confine

1   the court's reasonableness review to those facts known to the
2   claimants and counsel at the time the retainer agreements were
3   executed.  But this court acted appropriately in considering the
4   actual history and disposition of the MDL case in determining a
5   reasonable fee.
6        Now, the Seventh Circuit cases cited by the VLC on this
7   point relate to a court's role in setting class action fees.  Now,
8   if the VLC is open to looking at precedent relating to class action
9   fees, we can provide many examples of fees set far below the
10  32 percent limit.
11       Also, by arguing that the Seventh Circuit approach should
12  apply, the VLC contradicts its argument that this court should
13  apply only state law.
14       In addition to the Seventh Circuit law, the VLC offers
15  expert affidavits supporting the mimic the market approach.  But
16  the court is under no obligation to follow Seventh Circuit law and
17  is certainly under no obligation to consider affidavits of
18  professors rejudging this case.  Rather, the court properly
19  considered current facts and circumstances bearing on
20  reasonableness rather than abstract market theory more applicable
21  to class actions than MDL's.  Therefore, this court, properly
22  concerned with fairness, was correct in furthering this burgeoning
23  federal common law to deal with the reasonableness of fees in the
24  global settlement context.
25       Now, your Honor, in conclusion, as we have shown, this court

1    had at the time of its order and continues to have today

2    jurisdiction over this MDL, which includes the ancillary

3    jurisdiction to consider the reasonableness of attorneys' fees.

4    And as we next showed, because this court has the continuing

5    jurisdiction, this court also has the inherent power to ensure that

6    those before it are not charged unreasonable fees.

7         We have also demonstrated that the VLC in particular

8    contemplated the court's power and promised to abide by court

9    orders governing fees in their fee contracts.  And finally, we have

10   shown that this court acted well within its discretion and remained

11   highly vigilant about reviewing the reasonableness of fees and

12   taking the required preventive action of reducing those fees to

13   32 percent.

14        Now, your Honor, to get to that point that seems to be on

15   your mind about the individual, the escape valve, we do want to

16   bring this -- we do feel compelled to tell you that the claimants

17   that have contacted us have suggested that they think 32 percent is

18   actually too high of a limit for the actual work and labor done on

19   their behalf.  So again, we would just like to emphasize that you

20   do consider the upward variance, that you also consider keeping the

21   limit at 32 percent and also adjust -- having the adjustment where

22   it can also go downwards.

23        THE COURT:  Okay.

24        MR. KEE:  And, your Honor, again, the Clinic, we are done

25   with our arguments and thank the court for hearing everything that

```
 1    we had to say.
 2            THE COURT:  All right.  Fine.  Thank you very much.  Let
 3    me hear any response, Harry, that you might have.
 4            MR. HARDIN:  I don't want to pay my income taxes, they're
 5    too high, and there's no record evidence with respect to people
 6    wanting lower fees, that's human nature.  But there's a contract
 7    and the contract should be enforced.
 8            A couple of disparate points, if I may, your Honor.  In
 9    Guidant, the upward adjustments was not on a common benefit, it was
10    on contingency fees.  And as you probably read, Guidant 1 and 2, I
11    think it's Judge Frank, is it not?  I called him Judge Donovan in
12    processing my papers as well, I apologize for that.  In Guidant,
13    you saw the court struggle.  In Guidant, remember Judge Frank took
14    the money out of the settlement for common benefit fees and the
15    costs.  You're not doing that.  You're taxing the lawyers with up
16    to eight percent of common benefit fees.  And that will take place
17    under your supervision under the terms of the private agreement.
18    You did not have to invoke any inherent power s to do that.  The
19    parties asked you to supervise that for them and you graciously
20    accepted in this private agreement.
21            Now, I know the court is concerned with consistency.  There
22    is no consistency in this case, can't be.  Each claimant has to go
23    through the gates.  Each claimant individually is going to get
24    points.  Those points are going to be based on how much Vioxx they
25    took for how long and their medical history and risk factors.  No
```

1    consistency.  Common benefit fees, there will be no consistency.

2    All particularized by this court's decision as to where the value

3    was that was done by individual lawyers who are competing against

4    one another in virtually a zero sum game.

5         In the contract of representation, on the last page

6    immediately above the client's signature, notice to clients, the

7    state bar of Texas investigates and prosecutes professional

8    misconduct.  The state bar's office of general counsel will provide

9    you with the information about how to file a complaint.  Please

10   call 1-800, et cetera, et cetera, for more information.  The

11   sparrow is informed at least.

12        Now, I don't think there is anything quasi class action, and

13   I don't think there's a proper basis for the court to use -- to

14   characterize some type of inherent power.  There are class actions,

15   they are a duck; they're an MDL, they're a chicken; and there are

16   CAFA cases, it's a turkey.  And you can't make a turducken out of

17   them.  They are all separate and they all have different

18   foundations of power that are given to the court by statute.

19        Now remember, the VCL is not challenging anything but the

20   capping order and not doing it on anyone's behalf but my client's

21   and is doing it on the particularized record that we have provided

22   the court with evidence.  The court in its order expressed a great

23   number of concerns, concerns that echoed in Zyprexa, echoed in

24   Guidant.  In Zyprexa, mentally incompetent people because they were

25   probably -- they were taking psychotic drugs, okay.  We don't have

```
1    that here.
2         We don't have -- and each of the concerns we tried to
3    address with record evidence so the court doesn't have to
4    speculate, and we would suggest that the public clammer over fees
5    is not in the MDL context, it was in the class action context.
6         Now, the other thing about Zyprexa, I think there's a
7    footnote where the parties conceded case in controversy, which we
8    do not.
9         THE COURT:  How do you see their argument that this is a
10   case in controversy because it's an ongoing process; that is to
11   say, I have jurisdiction over the Vioxx cases and this is simply a
12   portion of that jurisdiction?
13        MR. HARDIN:  Again, what you have as transferee judge is
14   pretrial consolidation and coordination of individual one-off Vioxx
15   product liability cases.  And I respectfully suggest that the sua
16   sponte capping order, while I understand the court's motivations
17   for it, was not appropriate because it's ex post and not ex ante.
18        The other thing is, I am concerned that this -- a series of
19   decisions unchallenged that says judges can, after the fact, after
20   some kind of settlement, change the lawyer 's contract because the
21   court is looking for what I think Judge Posner called the medieval
22   just price is going to have untendered consequences.  It has the
23   possibility, like the fee capping medical malpractice laws in a
24   number of different states, of discouraging plaintiffs' lawyers
25   from taking risky cases in these types of arenas.  These product
```

1    liability drug cases are very difficult to prove because of all of

2    the things the judge knows better than -- you know better than I,

3    Individualized causation, <u>Daubert</u>, preemption, et cetera, they're

4    extremely expensive to fund.

5         And this type of order, what will a client do -- what

6    will a lawyer do?  He says -- somebody comes to me, he says, Well,

7    I have taken this drug, they've taken it off the market, I would

8    like you to be my lawyer.  And he says, Well, I don't know what my

9    fee is going to be because the judge is going to decide sometime in

10   the future.  And I am not one of the insiders, I'm just a regular

11   ole guy.  I don't have a big high profile and I'm not going to get

12   on any commissions, committees, and I am not going to get to do

13   any -- to at least compete to do common benefit work and make the

14   really big bucks, I am not going to get any of that so, no, go find

15   somebody else, I am not going to do that because it's too much

16   risk.

17        THE COURT:  How do they deal with class actions in that

18   venue?

19        MR. HARDIN:  With class actions, they give you the power

20   to do the fees, they give you the power to look at it afterwards,

21   they give you the power to decide whether this is a negative value,

22   did they get coupons and the lawyers get all of the money, is this

23   fee too high for what the class got?  And remember, the class --

24   the only people in court are the class representatives and their

25   lawyers.

1          This whole uninformed group, they may know about it, they

2     may have seen it in *USA Today* or they may have gotten a specific

3     document, and I've gotten those documents and I am a lawyer and I

4     look at them and my eyes kind of glaze over.  You know, the average

5     Joe, he may not even know what it means.  But that power is there

6     under Rule 23 by statute, and that's the crux of my argument.  In

7     1407 it doesn't give you that.

8          And if you look at NASCO v. Chambers at the Supreme

9     Court, read the dissents again if you have the opportunity, the

10    dissents of Judges Kennedy and Scalia.  And the distinction they

11    draw is -- and although that was a lawyer misconduct case, the

12    distinction they draw there is that the narrow reservoir of

13    inherent power is very narrow and you've got to justify its use

14    very, very carefully.  And they said -- and those four dissenters

15    are still on the court.  They said that you should not be looking

16    at what happened before the case occurred, that kind of conduct is

17    not before the court.  From time of filing, you've got this huge

18    reservoir of power through Rule 11, you really don't need inherent,

19    but we draw the line, you know, that was bad lawyer conduct,

20    inherent power, that's okay; but before it came to court, and

21    that's what we have here, before they came to court.  We have these

22    contracts.  And the contracts, we believe, are reasonable.

23         Now, we do believe the court should consider our request for

24    alternative procedural allowing upward variance from the cap.  I

25    think that was done in Guidant, but Guidant is kind of hard to

```
 1   follow because, you see, he -- I think he got himself bollixed up
 2   because he is taking the money out of the settlement, whereas
 3   you're just looking at common benefit out of the lawyers' fees.
 4        I would ask the court to think about, though, whether
 5   some of those common benefit expenses that benefited the claimants
 6   maybe should not be taxed to the claimants.  That's an issue for
 7   another day.
 8        THE COURT:  How do you see their argument that the fee is
 9   procedural and not substantive and therefore federal law should
10   apply and not state law?
11        MR. HARDIN:  I mean, you know, Murphy was a class, you had
12   the power, and fees are substantive law and fee calculations, and I
13   understand the motivation for it because the amount of money is
14   eye-popping for fees, but it's only eye-popping because the
15   settlement amount was eye-popping.
16        THE COURT:  I think this is something for Congress to deal
17   with and not the courts.
18        MR. HARDIN:  Yes, it is.  I don't think they gave you the
19   power.  And I ask you, if you do decide to exercise it, that you
20   build in the opportunity for the particularized lawyer, as we did
21   in our affidavits, show why we think it should be more.  And I do
22   think this is, with all due respect, for Congress.
23        It's been an honor.  This has been one of the most
24   interesting things I've had to do in my career.
25        THE COURT:  This week, huh?
```

1          MR. HARDIN:  This morning, sir, this morning.  Or quite

2    frankly, my entire career.  And I thank you for the court's

3    patience and graciousness.

4          THE COURT:  Thank you, both sides.  The briefs were very

5    well done and they were very helpful to me, and the argument was

6    also, so I appreciate the work done by the attorneys and students

7    from each side.  Thank you very much.  The court will stand in

8    recess.

9          THE DEPUTY CLERK:  Everyone rise.

10          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

11

12                          *  *  *  *  *  *

13

14                       REPORTER'S CERTIFICATE

15

16     I, Karen A. Ibos, CCR, Official Court Reporter, United States

17    District Court, Eastern District of Louisiana, do hereby certify

18    that the foregoing is a true and correct transcript, to the best of

19    my ability and understanding, from the record of the proceedings in

20    the above-entitled and numbered matter.

21

22

23

24                    Karen A. Ibos, CCR, RPR, CRR

25                    Official Court Reporter