<pre>
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2   ********************************************************************

 3
     IN RE:  VIOXX PRODUCTS               MDL No. 1657
 4   LIABILITY LITIGATION                 Section: "L"
                                          New Orleans, Louisiana
 5                                        Wednesday, June 24, 2009

 6   ********************************************************************

 7
            TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
 9


10   APPEARANCES:

11
     FOR THE PLAINTIFFS
12   LIAISON COMMITTEE:              HERMAN, HERMAN, KATZ & COTLAR
                                     BY:  RUSS M. HERMAN, ESQ.
13                                        LEONARD A. DAVIS, ESQ.
                                     820 O'Keefe Avenue
14                                   New Orleans, LA 70113

15
                                     BARRIOS, KINGSDORF & CASTEIX
16                                   BY:  DAWN M. BARRIOS, ESQ.
                                     701 Poydras Street, Suite 3650
17                                   One Shell Square
                                     New Orleans, LA 70139
18

19
     FOR THE DEFENDANTS
20   LIAISON COMMITTEE:              STONE, PIGMAN, WALTHER, WITTMANN
                                     BY:  DOROTHY WIMBERLY, ESQ.
21                                   546 Carondelet Street
                                     New Orleans, LA 70130
22

23                                   WILLIAMS & CONNOLLY
                                     BY:  DOUGLAS R. MARVIN, ESQ.
24                                   725 12th Street, N.W.
                                     Washington, D.C. 20005
25
</pre>

```
 1                                      DECHERT
                                        BY:  BENJAMIN R. BARNETT, ESQ.
 2                                      Cira Centre
                                        2929 Arch Street
 3                                      Philadelphia, PA 19104-2808

 4
      CLAIMS ADMINISTRATOR:             BROWN GREER
 5                                      BY:   ORRAN L. BROWN, ESQ.
                                              LYNN C. GREER, ESQ.
 6                                      115 South 15th Street, Suite 400
                                        Richmond, VA 23219-4209
 7

 8
      LIEN ADMINISTRATOR:               THE GARRETSON FIRM
 9                                      BY:  MATTHEW GARRETSON, ESQ.
                                        7775 Cooper Road
10                                      Cincinnati, OH 45242

11

12    CURATOR FOR PRO SE
      PLAINTIFFS:                       LAW OFFICE OF ROBERT M. JOHNSTON
13                                      BY:  ROBERT M. JOHNSTON, ESQ.
                                        601 Poydras Street, Suite 2490
14                                      New Orleans, LA 70130

15

16    SPECIAL MASTER:                   PATRICK A. JUNEAU, ESQ.
                                        1018 Harding St., Suite 202
17                                      Lafayette, LA 70503

18

19    ALSO PRESENT:                     JAMES R. DUGAN, II, ESQ.
                                        DANIEL A. BECNEL, III, ESQ.
20

21    Official Court Reporter:          Karen A. Ibos, CCR, RPR, CRR
                                        500 Poydras Street, Room HB-406
22                                      New Orleans, Louisiana 70130
                                        (504) 589-7776
23

24
          Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

```
 1              P R O C E E D I N G S

 2              (WEDNESDAY, JUNE 24, 2009)

 3              (MONTHLY STATUS CONFERENCE)

 4

 5         THE COURT:  Call the case please.

 6         THE DEPUTY CLERK:  MDL 1657, in re:  Vioxx.

 7         THE COURT:  Counsel, make their appearance for the

 8    record.

 9         MR. DAVIS:  Good morning, your Honor, Leonard Davis on

10    behalf of Herman, Herman, Katz & Cotlar for the plaintiffs.  My

11    partner Russ Herman will be here in just a moment.  In the

12    meantime, I think Mr. Marvin will begin.

13         THE COURT:  Okay.

14         MR. MARVIN:  Your Honor, Douglas Marvin representing

15    Merck.

16         THE COURT:  We're here today for our monthly status

17    conference in this matter.  I met with liaison counsel prior to the

18    meeting to discuss the agenda.  I'll take the agenda in the order

19    presented.

20         Settlement Agreement, anything on the Settlement

21    Agreement?

22         MR. MARVIN:  Your Honor, BrownGreer is here to make a

23    report on the Settlement Agreement and statistics with respect to

24    that.

25         THE WITNESS:  Okay.
```

```
 1              MR. BROWN:  Good morning, your Honor.  Orran Brown for
 2    BrownGreer, we're the claims administrator for the Vioxx Settlement
 3    Program.  And with me today is Lynn Greer.
 4              There is some question, your Honor, about whether
 5    Mr. Johnston, the pro se curator needed to leave for another
 6    commitment.  I'll let him go ahead and report first, your Honor.
 7              THE COURT:  Sure.
 8              MR. JOHNSTON:  Bob Johnston, curator for the pro ses.  We
 9    filed our Curator Status Report 13.  First of all, I appreciate the
10    courtesies.  I have another legal matter to deal with.
11              And so all I really have to tell the court is that the
12    uptake that we've been getting from the pro ses who are
13    communicating with our office essentially relate to the notices of
14    ineligibility.  We assist them with comprehending the appeal
15    process.  We also receive calls pertaining to Merck's motions to
16    dismiss.
17              And so I think that's basically the only thing I want to
18    tell the court.  It continues to run smoothly.  The interaction we
19    have with BrownGreer continues to be first rate.
20              THE COURT:  Is it increasing or decreasing, Bob?
21              MR. JOHNSTON:  It's probably decreasing from -- 20 to 30
22    calls that we would be getting on an average day months ago, how
23    many are now coming in?  A dozen or so.  So the volume is down.
24              But the court can understand the problem with these
25    individuals, many of them not really comprehending and
```

 1   understanding why their claim got into the ineligible column.  And

 2   we've talked about whether or not we have any history of unusual

 3   difficulties in the calls that we received, and I can report to the

 4   court that essentially I think these individuals understand we're

 5   here to try to help and facilitate them and to tell them when there

 6   is and they've reached the crossroads that there is an appeal

 7   process.

 8          And I think that's really what the court has asked of me

 9   as the curator and the attorneys who are working with me.  So I

10   have no complaints to make to the court about how it's going, and I

11   think it continues to run smoothly.

12          THE COURT:  Okay.  Well, thank you very much, and you

13   need know the court appreciates all of the work that you've been

14   doing on this and the service that you've been rendering to these

15   individuals.

16          MR. HERMAN:  May it please the court, Russ Herman for

17   plaintiffs.

18          A question came up as to whether Mr. Johnston could act

19   as a mediator as between an attorney and a client, and I had

20   recommended that Mr. Johnston handle it not as a lawyer

21   representing a party but as a mediator.

22          THE COURT:  I don't have any problem with that, as long

23   as the two parties don't have any problem with it.  If the lawyer

24   and the client are happy with that situation, I certainly -- you

25   know the matter, you're not representing either one in that

1    capacity but only using your good office to try to get them

2    together.

3         MR. JOHNSTON:  This has come up in the last 30 days and

4    it started off with some telephone calls and some e-mails that

5    Lenny Davis and Russ provided to me.

6         When the court asked me to be the curator, for which I

7    continually thank you by the way, as I like to say, the four

8    corners of what I understood the role of the curator was involved

9    or communicating and providing information to pro ses.  In terms of

10   this, it seemed to me that this was sort of out of the realm of

11   what the court wished for the curator's role to be.

12        But we have, as I understand, an attorney and a former

13   client and there is a dispute.  And one of the things, in fact the

14   reason I asked to be able to speak to the court earlier than normal

15   is because I'm also a mediator and I am on my way out to attend a

16   mediation.  So I mediate cases as part of my work.  I wonder about

17   whether or not someone who is unhappy as a client regarding the fee

18   issue who may well be unrepresented, whether it would be fruitful

19   to go beyond the curator role into sort of the classic mediator

20   role.

21        I am here and available at any time to do that, and we

22   may be can at least continue discussions and see how it works.  If

23   not, there may be a role for the court to play in the future

24   because this is likely not to be the first fee dispute that may be

25   coming in.

```
 1          THE COURT:  So we can take it a step at a time.  And
 2   maybe what you can do is file a joint motion that he be designated
 3   as mediator and allowed to mediate this particular dispute, we'll
 4   take it on a case by case basis.  And I'll sign it.
 5          MR. JOHNSTON:  The worst thing that can happen is we
 6   don't get to where we want to get to, and so then --
 7          THE COURT:  At least both sides, everybody will have a
 8   motion, a joint motion and I'll authorize it so that you will be in
 9   that role and see how it works.
10          MR. JOHNSTON:  Thank you very much.
11          THE COURT:  Thank you.  Okay.
12          MR. BROWN:  Good morning again, your Honor.  Orran Brown
13   for the claims administrator.  I have to take this opportunity,
14   since I now have it, so say that from our perspective as a claims
15   administrator, we want to commend Mr. Johnston and his team for the
16   work they've done as the pro se curator.
17          In every program we deal frequently with unrepresented
18   claimants and trying to help them through a process to try to
19   understand the process, and this process it has been a valuable
20   asset to have someone that we can point to as their direct liaison.
21   And his team has done a superb job in performing that role.
22          THE COURT:  I think there is a role for a curator in the
23   MDLs, and I wanted to sort of workshop this and experiment it, and
24   hopefully they will be able to step it out a little bit in other
25   MDLs.  I think it does make a difference in rendering service.
```

1        MR. BROWN:  Yes, your Honor.  We're delighted to be here

2   to provide this report to the court and the parties on where we are

3   in the administration of the Vioxx Settlement Agreement.  We want

4   to talk today very briefly about our enrollment status, very

5   briefly; and then a few comments about our extraordinary injury

6   program and where that stands, and then Lynn will focus us on where

7   we are in our claims review and claims payments.

8            On the enrollment side, this issue has just about run its

9   course.  What we are doing now with the parties is all mop up in

10  trying to get their documents straight.  We spent a lot of time

11  reporting on and working on the integrity of the releases and

12  stipulation of dismissal.

13           Since we were last here on May 29th, we have been working

14  with Merck's counsel directly on the real acceleration push program

15  to get claims through the process so they do not hold up claims

16  review and claims notices and our ability to make final payments.

17  So we are now ramming claims through claims review, even though

18  they may have some holes in their enrollment documents, even though

19  the release is not finally perfect, which is a good program because

20  it helps us adjudicate the claims, particularly the heart attack

21  claims, to get them done so we can meet our September 30 goal.

22           It does mean, however, that there will be some claimants

23  if they pass Gates, if they're eligible, they receive a points

24  award, they come down the wire and they're eligible for payment

25  where we cannot pay them actually until they tidy up their

1    documents.  So there will be some remaining clean up at the end of

2    the day rather than hold it up at the beginning of the day.  And

3    that's where we are on that front.

4         The extraordinary injury program, though, is up and

5    running, we've reported on this each month that we've been here.

6    This is where we currently stand on the claims that we've received,

7    still not big numbers, we still have now 46 claims that people are

8    seeking payments from the two extraordinary injury funds.

9         And the deadline for this though is September 1st, and

10   it's still a ways off and we think that firms and their clients are

11   focussing on trying to get their claims packages in order and

12   finished and claims review, particularly on the heart attack

13   claims.  And so this is not received a lot of activity.  When we

14   were here on May 29th, we had about ten fewer claims than we do

15   today, so there are not a lot of claims coming in but we are

16   getting a lot of questions from counsel, from claimants about the

17   contours of the program and the criteria of the program.

18        So there's a lot of activity and interest in it.  But we

19   do want to remind everyone of the September 1st deadline to submit

20   the extraordinary injury claims where we have to have the claim

21   form and the supporting documentation.  And that is a requirement,

22   we're already getting some questions about that deadline, whether

23   it's a firm deadline.  It was moved from June 1 to permit firms

24   additional time, and we and the parties do see this as a firm

25   deadline to get this material in.

```
 1          THE COURT:  I think that's got to be reinforced by the
 2   court, and I'll do that on the website also that this particular
 3   pot needs to have some resolution so that it can be totally
 4   disbursed.  It's not fair to the individuals who have satisfied
 5   deadlines to have them wait until someone else satisfies that
 6   deadline.  And that's the real key part, September the 1st is
 7   really the deadline, the so-called drop-dead deadline so you've got
 8   to get in.  If you don't get in, you're out.
 9          MR. BROWN:  Yes, your Honor, and that's the message that
10   we are consistently conveying.
11          Another aspect to mention again today is that we have
12   talked in the last, I think, four conferences about the
13   extraordinary injury review process.  We have been working with
14   Ms. Snapka and counsel for the parties in developing how that
15   process will work.  We have now finalized the steps that will have
16   us reviewing an extraordinary injury claim, issuing the
17   determination to the claimants or their counsel.  If they're
18   unhappy with that or dissatisfied with some resolution,
19   determination we made, they ask us for a second review, and then
20   there will be an opportunity for an appeal to Special Master Juneau
21   at the end of the day on each claim.
22          We have now finalized that language, it is now a written
23   procedure, and we have rolled that out and announced it to
24   everyone, all primary counsel and pro se claimants on June the
25   11th.  We rolled out several things on June the 11th about the
```

1   extraordinary injury program.  Because we constantly change the

2   program in response to questions we receive, there are things that

3   were unanticipated or clarifications that need to be made, which is

4   why we do encourage counsel and unrepresented claimants to contact

5   us if there are questions about this program or suggestions about

6   the program because we have sent out in the manual that we worked

7   up with the parties the criteria.

8          There is a lengthy description of what can be claimed,

9   what cannot be claimed, but we still have questions about what it

10  means and things that are not specifically covered and we address

11  those and sometimes changes are made in these manuals and we issue

12  updated manuals to everyone and alert them that there have been

13  changes made.

14         On June the 11th we sent out e-mails to all counsel

15  telling them that we had made some adjustments in the program.  The

16  first one is that for past medical expense we were getting a lot of

17  questions about whether clients who had incurred them but had been

18  unable to pay them could claim them as lost medical expenses for

19  purposes of the $250,000 threshold to get in the program.  We

20  worked with the parties and said, yes, if they're still unpaid but

21  still due and not written off, they can be claimed as past medical

22  expenses.  So that was one change.

23         We got a lot of questions about lost income and persons

24  who worked on commissions, and originally we had said commissions

25  because they were seen as sort of discretionary, as bonuses, could

1   not be claimed because they're too speculative going forward to say

2   that they actually would have continued and were lost after their

3   eligible event.  But there are folks who work on commissions as the

4   basic part of their income, real estate brokers, car salespersons,

5   where the commissions are fixed amounts, fixed percentages, regular

6   part of their income, they can be claimed as income.  We made that

7   change and rolled that out.

8        We also had people ask us if someone was on disability

9   income at the time of their stroke or heart attack and then they

10  passed away, that lost income, can that be claimed because it would

11  have continued had they lived; and, yes, that can also be claimed.

12  That was a tweak we made in the process.

13       We clarified that economic loss from a special medical

14  injury, or what we call an SMI, because there are particular

15  injuries that are not, people feel are not adequately reflected on

16  the underlying heart attack and stroke grids.  They can claim them

17  as extraordinary injuries and then we were getting questions about,

18  well, if they lost income or had medical expenses from those, can

19  they claim those as well?  And, yes, they can, but they're a

20  separate issue from the underlying economic damages from a heart

21  attack or stroke.  We are asking and have directed firms to claim

22  that as what we would call additional extraordinary damages.  So we

23  clarified that.

24       We added the appeal process we just reviewed, to the

25  manual.  It's now codified and out so everyone can see how that

 1  will work.  We clarified that for some of these special injuries,

 2  whether they're claiming a different injury, an extraordinary

 3  injury, may lead to an additional Medicare, Medicaid governmental

 4  lien.  We have been working with Mr. Garretson on that to make sure

 5  that is handled correctly.

 6        That could happen, not likely it will not happen we think

 7  on economic losses, but on the injuries it's a different issue.

 8  But we will work through that process with Mr. Garretson's group.

 9        We also have continued to improve the online

10  extraordinary injury claim form.  We keep making improvements to

11  that to try to make it easier for firms to enter data.  There is

12  now a new improved version out that we think is much easier to use

13  than the original one, and we announced all of this in an e-mail to

14  firms sent out June the 11th.

15        So we still want questions on the program, we're a still

16  making adjustments, we want this to work smoothly and successfully

17  as the main program is working.

18        Your Honor, that's it on those two subjects, and Lynn

19  will now tell us where we are on claims and payments.

20        THE COURT:  All right.

21        MS. GREER:  Good morning, your Honor, Lynn Greer from

22  BrownGreer.  And I will give an overview of where we are with MI

23  and stroke claims review, but the primary focus today on the MI

24  final payments and important reminders to everyone about what we

25  all need to do to make sure that we meet that goal.

1        Your Honor, as of yesterday, our claims population

2  breakdown between MI and IS claims was still roughly where it has

3  been over the last several months with about 63 percent of the

4  population, or a little over 30,000 claimants, MI claimants and --

5  63 percent MI claimants and 37 percent stroke claimants, or 17,942

6  stroke claimants.

7        I would like to remind everyone that these slides are

8  posted on our website.  On the left-hand side there is a banner

9  called MDL status conferences, so anyone listening on the phone or

10  anyone here today who wants to see the information can access this

11  by the end of the afternoon today.

12        The MI Gates review status has been moving very swiftly

13  over the last few months.  This slide shows that there are no

14  remaining claims left in the official Gates review queue.  This is

15  the same as last month, we have made it through, we have looked at

16  each claim at least once.

17        The second row shows that there are 48 claims that are in

18  our, it says initial claims review complete/QC pending, these are

19  actually claims that received one notice of ineligibility.  The

20  firm submitted additional documentation, we have looked at that,

21  and these are cycling back through.  So these are ones that have

22  now been reviewed several times and are on their way to the Gates

23  Committee.

24        There have been as of yesterday 19,400 claims who have

25  made it through the gates, that has either been because we have

1   passed them or the Gates Committee has passed them or Merck has

2   exercised its unilateral push on those claims.  So that 19,400 are

3   ones that have passed the Gates and have either already received

4   payments or are going through the points review process and will be

5   paid payments this summer and final payments in September.

6         There are 9,935 claimants where there is still a question

7   of eligibility.  Firms have received and claimants have received

8   notices on these.  About 4,000 of that 9,900 are final notices of

9   ineligibility, and it is that population that Mr. Johnston referred

10  to in part that is sparking a lot of interest, a lot of questions

11  about the appeals process, about future evidence stipulation

12  process.

13        The remaining number in that population are ones that are

14  still under consideration for push into the program and the process

15  contemplated that Merck would have a reasonable period of time once

16  the Gates Committee failed a claim to be able to consider whether

17  to put it in the program.  They are on pace to make all of their

18  final decisions within the next two weeks.  And there are only 69

19  claims, heart attack claims that are with the Gates Committee that

20  have not yet received a vote.

21        Our points review status for heart attack claims shows

22  that payments were made this week, your Honor, bringing the total

23  number of heart attack claimants paid to almost 13,000 - 12,961.

24  We are now working on claims that are eligible for payment in July,

25  and you'll see from this slide that there are 2,843 notices of

```
 1    points award that we have issued, we've completed our review and

 2    they're eligible for payment.  1,231 have already accepted and they

 3    will be placed on the payment list in July.  Another 1,257 are

 4    potentially eligible, they are still within their time whether to

 5    accept, and 355 are currently on appeal or they are special marker

 6    claims and they have elected special review.

 7              There are 565 where we have completed our QC but there is

 8    a reason holding up our issuance of payment.  This number changes

 9    every day.  We have about 24 hour turnaround time after we finish

10    our last review before we can gather all of the remaining data and

11    actually get the notice out the door, so this number changes and

12    goes down and fluctuates every day depending on our points review

13    reviewed.

14              There are 859 that we have reviewed and are currently

15    pending a second quality control review.

16              There are 1,287, your Honor, that we have reviewed and we

17    cannot continue because the claims packages are incomplete.  And

18    this number is rising unfortunately.  Several months ago the

19    percentage of claim s that we were reviewing that were incomplete

20    was only about 7%.  This number reflects about a 12% incomplete

21    rate, so this is a number we are watching very carefully.

22              There are some slides later in the presentation that talk

23    about what we're trying to do to combat this ever growing

24    percentage of incomplete claims packages, but this is one as we've

25    gotten through the queue of our claims, the quality of claims
```

1   packages does seem to be diminishing and so you're seeing this rate

2   of incomplete claims packages rise.

3            There are 445 claims that we've pulled out of our queue

4   to begin the review, and the last row shows that there are about

5   560 claims that are waiting for our reviewers to pick up and review

6   for the first time.

7            This is a slide we developed several months ago to talk

8   about whether we were on pace for the September 30th payment.  We

9   still are moving towards that goal.  All aspects are coming

10  together to make that happen.  This slide highlights that there are

11  30,483 MI claims.  If we still use the 70% Gates pass rate, which

12  is what we think it will be, that's the number that Merck can push

13  up to 70% and then they can even go beyond that, that would yield

14  21,338 claims that we think will be eligible for payment.

15           We've already paid almost 13,000, another 2,500 that

16  could be paid in July, that leaves about 5,800 claims for us to be

17  able to get through and issue notice of points award on and we are

18  currently on pace to do that.  Again, this number really depends on

19  the appeal rate holding at roughly 15%.  It also depends on

20  promptness of which we receive materials back from counsel when we

21  tell them their claims packages are incomplete.

22           THE COURT:  What do you do if you don't get the material

23  from counsel?  These are individuals who have gotten through the

24  Gates?

25           MS. GREER:  Yes, your Honor, they have gotten through the

1    gates.  We had enough to find they were eligible.  And when they

2    are found eligible, we look at the claims package.  And our first

3    effort is to try to review the claims package, even if it's

4    technically incomplete.  We are really trying very hard not to hold

5    a claim up if they are just missing a record that we really don't

6    need to affect the claim.

7          But if they are missing a record that we feel is

8    important to be able to assess risk factors, then we are issuing

9    the notice of incomplete claims package.  That notice used to go

10   for 30 days to give us the records we've reflected.  That has

11   proven to be too long a time period for us to be able to maintain

12   and make the payment.  We've reduced that deadline to 14 days,

13   which we appreciate is hard for counsel to be able to get the

14   records back from the survivors.

15         These were all records, though, that were specified in

16   the original settlement agreement as being required, and so what we

17   are trying to do is to urge firms now if they have claims that have

18   not yet made it into the program or have recently made it into the

19   program, they need to be doing an inventory now to make sure, take

20   the settlement agreement, see what was required and make sure that

21   we have everything we need even before we have to send the notice

22   of incomplete claims package.

23         If, however, the firm doesn't respond to that notice or

24   they write back and they say we can't provide the records, they've

25   either been destroyed, the claimant never went to see a primary

1   care provider, we then again try to review the claim.  If we can,

2   we'll continue on.  But what we have done with the agreement and

3   the blessing of the parties is to -- I can get to this, I won't

4   even spend time on this slide.  This is just the average points by

5   injury level which will be available in the slides online.

6           But what we have done, this is the item on No. 2 here, if

7   we did not get a response back or we do and the records are not

8   available, we are now giving claimants two options.  Technically

9   under the settlement agreement if there's not a complete claims

10  package, the claimant is a non-submitting program claimant and they

11  are out of the program.  They can appeal to the Special Master, but

12  if the Special Master decides that, in fact, they have not

13  submitted a claims package, they're out, the release and the

14  dismissal gets delivered to Merck.  That is technically what these

15  claimants will be.

16          To be able to soften that burden and that blow a little

17  bit, what we have done is we've come up with a second approach and

18  claimants can choose to do this.  What we do is we will take the

19  claims package as it is and review what we can.  If there are risk

20  factors available in the claims package, we'll go ahead and assess

21  those and we will come up with what the assessment is.  Say it's a

22  45% risk factor adjustment based on what we can see.

23          We will then look to what we call the standard

24  deduction -- this is too much information to read in court -- but

25  what we have done is we have taken the 17,000 claimants that we

1   have reviewed, heart attack claimants that we have reviewed and we

2   have come up with the average deductions across injury level and by

3   age group for those 17,000 claimants and this is the standard

4   deduction chart.

5            So what we will do is we'll take the risk factors that we

6   can glean from the record and we will take the higher of either

7   that assessment or this standard deduction.  And again, this is

8   only when we can't assess because we feel like we have an

9   incomplete claims package.  But our effort here is to be fair

10  because it is not fair to claimants who got all of their claims

11  package materials in to be treated worse than someone who didn't

12  have enough for us to be able to assess their risk factors.

13           And so what we've done is we tried to equalize it by

14  saying here's the average across 17,000 claimants, we will pick the

15  higher of the two, and then if we use the standard deduction we

16  will also be applying an additional downward adjustment of 30%.

17  And that will be the presumption.

18           However, if we see in the claims package true efforts

19  that the counsel tried to get the records and all available records

20  have been submitted, then we will only assess a 10 % additional

21  adjustment on top of this.

22           Sounds a lot more complicated than it is, the database

23  helps us to be able to do all of these calculations.  But the

24  methodology is something that we worked very hard to try to be fair

25  to both these claimants and those who had complete claims packages.

```
 1              THE COURT:  It's a plan B and it's an acceptable plan B.

 2     If you don't use that then the person gets nothing.

 3              MS. GREER:  Right.

 4              THE COURT:  So in order to soften that and give the

 5     person an opportunity to receive something when there's nothing

 6     available or that it's just been delinquent, this is a method of

 7     dealing with it.  So I think that's acceptable.

 8              MS. GREER:  Your Honor, backing up to the summary of

 9     payments slide, this just shows the dollars that have already been

10     paid out and those that are potentially eligible to be paid out in

11     July if we get acceptances from those who've received notice of

12     points award.

13              The asterisk language is cut off here on the slide, but

14     what it says is that we have started to receive an ever growing

15     number of calls from claimants who are represented who are asking

16     questions about where their payment is and we go and we look up

17     their status, we see that, in fact, we have issued the Interim

18     Payment sometimes months before.  There are a lot of reasons why

19     firms can't disburse funds to their claimants, if there's a

20     bankruptcy involved, for example, but we wanted to highlight them

21     to let the firms know when we get such an inquiry we are referring

22     them back to their law firm and urging firms that if at all

23     possible for them to disburse the funds to their clients because

24     these questions are starting to grow and the agitation does seem to

25     be growing as well.
```

1          THE COURT:  Yes, that's something that the court has to

2     speak on as well.  I see that over a billion dollars has now been

3     disbursed.  I think it's noteworthy that that has occurred within a

4     relatively short time for these types of cases, and that's a

5     tribute to the attorneys who are handling the cases and the court

6     appreciates that.

7          But we now have to make sure that the claimants get that

8     money.  And oftentimes there are liens that the attorneys have on

9     their fee or various other things.  I am going to have to cull that

10    out and keep the attorneys' fees and segregate the attorneys' fees

11    so the individual gets their share of the proceeds.

12         I have to encourage lawyers to make sure that their

13    clients get the money.  Their share from the standpoint of liens

14    and other things, that can be dealt with.  I don't want them to

15    hold up the whole distribution until they work it out with their

16    cocounsel, it's not fair to the claimant.

17         MS. GREER:  I've already touched on much of this.  These

18    are the steps that we are trying to take on ensuring the final

19    payment.  Again, we have shortened the notice of response time from

20    30 to 14 days from the notice of incomplete claims package.

21         There is another possible change that we may have to

22    contemplate making this summer.  We have given people 30 days after

23    they appeal a notice of points award to give us additional

24    documentation.  If the appeal rate goes up, we may have to shorten

25    that to 15 days.  30 days was a discretionary deadline we gave to

1    allow more time.  We're not going to do anything to shorten the 15

2    day decision because that's mandated in the Settlement Agreement,

3    but we may be issuing, depending on the volume and the way things

4    go the next few weeks, another deadline that needs to be shortened.

5          These are just some important reminders.  We issued an

6    e-mail blast last Friday, June the 19th, that I urge everyone to

7    read completely.  It was very long, but it includes a lot of

8    information about things that we need to make sure happen to be

9    able to reach the final payment.

10         The first is to remind firms to please check their web

11   portal daily.  We ran a report last week and there were over 270

12   firms who had not checked the portal in an eight day period of

13   time.  These claims change daily and the deadlines are shorter than

14   ever.

15         There is a final deadline in deciding whether to be a

16   non-submitting program claimant and have this deduction that we

17   just discussed applies a seven day deadline.  So if you wait eight

18   days to check the portal, the deadline will have passed.

19         The other thing that we have seen is that firms, and

20   understandably so, have received hundreds of notices and so they

21   don't open them.  They need to open each notice.  Each notice now

22   contains deadlines in red at the top that will need to be sent to

23   their clients.  And so it's important not only just to check the

24   portal but to actually read the notices that are there.

25         We started to get a lot of requests for extension dates

1    on vacations of either the firms or their clients.  A lot of them

2    are clients who go on vacations and they can't be reached, and so

3    this is just a reminder to please know where your clients are this

4    summer because this is a very critical period of time.

5            And we talked about earlier to go ahead and take a look

6    now at pending claims packages that are awaiting a decision to make

7    sure that we have absolutely everything.

8            And we will be sending reports this summer, we're going

9    to call them reconciliation reports.  We're going to send reports

10   to each firm and each client saying here is the status of your

11   client to be able to flush out now if there are any questions of

12   who is open, who is closed, and why.  We'll also be sending a

13   report on payments that have made to make sure the dollars that we

14   have wired have actually been received by the firms and there is no

15   last minute trouble in September when we're trying to do the final

16   payment.

17           Another reminder, I've already touched on this briefly,

18   that claims with enrollment deficiencies remaining will not receive

19   the final payment or interim payment either.

20           Special marker claimants who have elected special review,

21   and there are about 140 of these MI claimants who received fewer

22   than ten points and they had the choice to elect to go into special

23   review.  Special review means the Special Master has received these

24   claims and they have criteria in the Settlement Agreement and

25   constraints, they have to come in at an average per claimant of two

1    and a half points.

2            We are not going to have time with all of the Special

3    Masters have this summer for them to do the special review

4    analysis.  We don't need them to in order to make final payments to

5    everybody else, because knowing what the average is we can set that

6    money aside based on the population that has elected special

7    review.

8            But I just wanted to say for those 140 people, they will

9    not be receiving final payment in September, it will come shortly

10   thereafter when the Special Masters are able to do their decisions.

11           Another reminder about the audit rights under the

12   settlement agreement.  The claims administrator are working on the

13   audit claims, and we have claims now that are currently under

14   review for audit and just wanted to remind people, this is more of

15   a client expectation issue, that if a claim is audited, the points

16   could either go up or down based on the audit.

17           And a final reminder is one that we've said from the

18   beginning, the final MI point value that we announced and that has

19   been governing these payments is $1,915, and that is subject to

20   change.  We don't know what the final ultimate pass rate is going

21   to be.  We don't know yet what the total points are going to be

22   that need to be paid.  We are monitoring this closely, but I just

23   wanted to remind everyone in terms of communicating to your client

24   that it could go up, it could go down, it could stay exactly where

25   it is.  But this is just a final reminder so people have not lost

1    sight of that.

2           Real briefly on the stroke side.  We have been focusing

3    most of our attention on the MI claims.  However, we are continuing

4    to review stroke claims, we are down to only 35 in the initial

5    queue, and these also are ones that have failed once and have

6    submitted to us additional documentation.  We have about 8,500 that

7    need a second review.  We've had 5,320 have passed the gates and

8    then 3,723 stroke claims that have current notices of

9    ineligibility.  The Gates Committee is down to only 318 stroke

10   claims.  The Gates Committee is ready as soon as we finish our

11   heart attack review claims, we'll focus on that 8,453 in row two.

12   The Gates Committee will start reviewing those again and those will

13   start going very quickly.

14          We paid 1,789 stroke claimants.  There are another 416

15   that could be paid in July, but we again continue to issue notice

16   of points award on stroke cases as well.  And we've paid out over

17   55 million so far in stroke payments, and these are payments that

18   did not begin until February of this year.

19          THE COURT:  What's the percentage of stroke claimants

20   that are getting through the gates?

21          MS. GREER:  Right now it's less than 35%.

22          THE COURT:  And it's 70% of the MI's?

23          MS. GREER:  Yes, a little less than 70% now, but we

24   expect it will be right at 70%.

25          And the stroke, it's very premature to even have any

1    predicted value of that stroke pass rate because we haven't made it

2    as far through the queue, so the numbers as a percentage seems low

3    but I don't want to alarm anybody, we just don't have enough claims

4    yet to do a good sample.

5           THE COURT:  You're on target with the MI's?

6           MS. GREER:  Yes, we are.  We feel confident the payments

7    will be issued in September.

8           Thank you.

9           THE COURT:  Thank you.  The next --

10          MR. HERMAN:  Your Honor, if I might.  I just want to

11   thank BrownGreer for the exceptional job that they have done.  The

12   lawyers sometimes get credit for other folks work.  Of the

13   approximately 24,000 MI's that they've looked at, I think we've

14   received no more than six letters from potential claimants who

15   assert some difficulty they have had in the process, and that's a

16   tribute to the work that BrownGreer has done.

17          THE COURT:  Thank you.

18          MR. MARVIN:  Your Honor, Douglas Marvin.  Before we get

19   to the report from the lien administrator, I just wanted to bring

20   to the court's attention two items that are summarized in II

21   relating to the settlement program.

22          The first is that Merck has filed a motion directed to

23   tolling claimants who enrolled in the program but have not

24   submitted a release of any kind or the other documents required,

25   and this motion is set to be heard after this settlement conference

1    today -- I am sorry, after this MDL conference today.

2         The second item to bring to the court's attention is now

3    that the MI track of the resolution program is drawing to a close,

4    there are cases that failed the gates and some of these cases,

5    claimants have filed future evidence stipulations with respect to

6    keeping those cases viable or perhaps continue with those cases.

7    But we don't know to what extent they really do truly wish to

8    proceed with those cases, and so we have submitted to the court an

9    order that would be basically the same as the orders that the court

10   has already entered PTO 28 and 29.  Those were pretrial orders

11   requiring certain requirements to be met to establish a prima facie

12   basis for the claim.  Those governed eligible claims did not enroll

13   or ineligible claims.  This Pretrial Order would be directed at

14   those claims that entered the program but now are exiting the

15   program.

16        THE COURT:  Right.  That's a clean up situation that I am

17   going to be moving on.  We've got to move those cases.  Now, if

18   they want to proceed, they have an opportunity to try the case.  If

19   they do, then they have to provide amended profile forms and then

20   special evidence via additional evidence, and then also the Lone

21   Pine requirements.  And if not I will have to dismiss the claim.

22   We give them an opportunity but I am not just going to hold the

23   claims, we have to move this case.

24        Okay.  Thank you.  Lien administrator.

25        MR. GARRETSON:  Yes, your Honor.  I am Matt Garretson, I

1     am here to report as the lien resolution administrator.

2              With respect to the governmental lien program, there's

3     not much new to report this month, other than the fact that the

4     private healthcare lien resolution program did flush out an

5     additional wave of military claims where people inadvertently

6     thought their military claims were private and I've sent them in.

7     So that's going be to create about 130 new claims that have to be

8     processed, so there will be some slight delay on those.  But I will

9     keep the court informed if it's something we need your assistance

10    on.

11             With respect to the private lien resolution program,

12    we've, of course, reported over the last several hearings that

13    we're working with the third-party payor committee and the

14    Plaintiff Steering Committee to implement that program.  I also

15    reported at the last hearing that a wave of supplemental letters

16    had gone out, and in fact the deadline for people to opt in to the

17    program in this second round, after receiving the second round of

18    letters was the date of the last hearing and so we were estimating

19    at that time.

20             We thought we would have approximately 1,800 new

21    participants.  I am pleased to inform the court that we're actually

22    up to approximately 4,300 rather than the 1,800, which would be an

23    increase of about 25%, and we're now over 20,000 claimants

24    participating in the private lien resolution program.

25             I also should report that the plans continue to sign up

1    for the program, your Honor.  As of today we've added 300

2    additional plans to the exhibit of participating plans, so it's 120

3    since the last hearing.  We've contacted well over 500 more, and I

4    expect those to agree to participate by the end of June; and then,

5    your Honor, we will approach the court, as I mentioned last

6    hearing, and ask for a letter from the court that we might send to

7    those plans.

8              With respect to the claimants, we did already match

9    25,000 of the original enrollees.  Let me say it this way, of the

10   original enrollees in the plan there was 25,000 matches, and we're

11   in the process of scrubbing those.  Many could be false positives

12   in that they are outside the date range or injury range for this

13   program.

14             With respect to collecting the claims data, we expect

15   starting July 15th through August 1st we will be receiving all of

16   the claims data from these participating plans and then I'll have

17   more substance to be reporting to the court as to how those numbers

18   are looking.

19             And finally, your Honor, with regard to the order for the

20   matching procedure, on May 19th the court ordered us to help the

21   parties take a look at those people who were not participating in

22   the plan, in the private lien resolution plan and determine how

23   many of those may have private health insurance obligations.  So on

24   June 5th we met with representatives of the Rawlings Group and

25   conducted that matching process in a controlled environment at our

1    office.

2            I simply wanted to inform the court that that had taken

3    place, that we took a look at 19,130 eligible claimants that were

4    not participating, and there are matches on about 6,700 of those

5    but they're still in the process of determining how many of those

6    are false positives.

7            But I think the positive news is that it appears there is

8    a tremendous participation rate in this program, which, of course,

9    as we all know, has not been done before.

10           I would also report to those who are concerned about the

11   matching process, that in the abundance of caution, all of the hard

12   drives and technology utilized in that process were truly

13   physically destroyed rather than just erased.  So there is

14   absolutely no chance that any private protected information will

15   get into the hands of the plans for non-participants.

16           THE COURT:  Okay.

17           MR. GARRETSON:  So with that, your Honor, I conclude.

18           THE COURT:  All right.  Thank you very much.

19           With the MDL, one of the things that we've tried to

20   experiment with this one is to see whether or not we can use it as

21   a focal point to resolve the liens, both governmental liens as well

22   as private liens; because we all know that in the insurance,

23   medical insurance environment people have liens, they have received

24   medical treatment and they have liens against them.

25           So rather than let those individuals go back by

 1  themselves and deal with those individual liens, the attorneys felt

 2  it would be helpful to have a focal point and try to use this

 3  litigation for the benefit of both sides.  And from the insurer's

 4  standpoint they have an opportunity to reduce their transaction

 5  costs, provided they reduce their liens.  So it was advantageous to

 6  them on one hand from the transactional costs, and it was very

 7  helpful on the side of the litigants because instead of paying

 8  dollar to dollar, they were able to pay 50 cents or even less back.

 9  So they've gotten a substantial discount.

10          From the systems standpoint, it's been helpful to the

11  system so that we don't have to have 50,000 individual claims made

12  in small claims courts throughout the country by the lienor to get

13  their money back.

14          So I think this has been a win-win situation, by and

15  large I think it's been successful, and I appreciate all of the

16  work that you've done.

17          MR. GARRETSON:  Thank you, your Honor.

18          THE COURT:  Special Master.

19          MR. JUNEAU:  Good morning, your Honor, Patrick Juneau,

20  Special Master in this case.  My report will be very brief today,

21  your Honor.

22          First of all, for years it's always been discussed in

23  Louisiana when the flood gates at Old River would bust and release

24  the Mississippi River, the Atchafalaya River; and I don't think

25  it's happened in Old River but it has happened in these appeals.

1      They don't come in packages, they come in buckets.

2      The results are thus far, your Honor:  We have received

3  reviewed and decided 1,181 opinions or rulings have been made in

4  these cases.  There are under advisement 288.  I might add that of

5  that 288, a large portion of those are received just within the

6  last four days.  So we're on target, made the commitment I had a

7  joint conference -- which we do every other week with the Deputy

8  Special Masters -- we are prepared to handle on the timetable set

9  by this court for the appeals to come forward.

10      One item I would like to address because an inquiry was

11  made to me, your Honor, about the reviews.  Some of these, depends

12  on the extent of the medical records, but these medical records

13  are, in fact, reviewed in detail.  And the question came up I think

14  in earlier briefings by BrownGreer the issue was about the rulings

15  could there be an assessment or a risk factor, for example, that

16  was not assessed by BrownGreer.

17      We have found some of those, not many, but there have

18  been some.  So the bottom line, there was an appeal, the end result

19  of the appeal was a reduction because of the risk factor according

20  to the terms of the settlement.  I just wanted to point out that

21  that is part of the entire process.  The reverse part of that is

22  there are somewhere maybe the rulings or opinions differed insofar

23  as they're separate and did result in obviously I think the

24  conclusion will be that the -- been a lot of affirmations, a ton of

25  affirmations made of the expressions or opinions rendered by

1    BrownGreer.

2           So the process is working, very thorough process, and I

3    think we're on target to handle whatever comes.  I just hope that

4    the Mississippi is bigger than what I thought it was as a kid.

5    Thank you very much.

6           THE COURT:  Okay.  Thank you very much.  And thanks for

7    all of your work.  I know it's been difficult and it's going to

8    have a bubble every once in awhile, but you all are very

9    experienced and have done a great job.

10          State Court Trial Settings, anything?

11          MR. HERMAN:  No, your Honor.

12          THE COURT:  What about Class Actions?

13          MR. HERMAN:  Your Honor, same matters are under

14   consideration.  I understand that one additional class action has

15   made its way to the MDL, and Merck has indicated they'll be

16   responding to that.

17          MR. MARVIN:  Your Honor, Mr. Herman's referring to the

18   Weeks class action that has made its way to the MDL.  We filed a

19   motion to strike that class within the past several days, and so

20   that should be ripe for the court's review after the plaintiff

21   obviously has an opportunity to respond.

22          THE COURT:  Right.  And the other ones have been

23   dismissed, the medical monitoring class?

24          MR. MARVIN:  Yes.

25          THE COURT:  All right.  State/Federal Coordination.

1   Anything, Dawn?

2          MS. BARRIOS:  Good morning, your Honor, Dawn Barrios for

3   the State Liaison Committee.  I've distributed to the CD's to the

4   various parties, and your new law clerk got his first present from

5   me today.  And I trust there will be many more coming to you,

6   Jared.

7          Your Honor, we did our spreadsheet a little differently

8   this month because we were jealous of BrownGreer, they always have

9   such a wonderful presentation to show the difference of the

10  preceding month.  So if you turn to the second page, you'll note

11  that we received four additional remands in cases that were filed

12  post settlement, but that they have ten less remands because the

13  various dismissals that you've been entering.  So as of today we

14  have a total net effect of six less remands.

15         THE COURT:  Okay.

16         MS. BARRIOS:  And again, the bulk of the remands stand

17  with the governmental action suits and the third-party payor suits.

18  Thank you, your Honor.

19         THE COURT:  Thank you.

20         Pro Se Claimants, anything?  We've already had that.

21         MR. HERMAN:  Yes, your Honor.

22         THE COURT:  MDL Trial Package.

23         MR. HERMAN:  Yes.  I do want to first of all thank Dawn

24  Barrios and Leonard Davis and Gevin Grisbaum for coordinating a

25  trial package yesterday.  There were 14 attorneys, general

1    representatives and third-party payor representatives present.

2    Greatly appreciate Jerry Meunier who canceled previous appointments

3    and the Gainsburg Firm and Pete Kaufman from Levin Papantonio who

4    came in from Pensacola, and who performed the review of the trial

5    package and answered questions that were posed to them.

6            And again, any attorneys general, representatives or

7    third-party payor representatives who wish to view the trial

8    package, we'll make that available upon their notice here in New

9    Orleans.  I do want to briefly explain that internet and phone view

10   of the trial packages are not in the PSC's view, we're concerned

11   about privilege and work product, but we are more than willing to

12   have other views of the trial package should folks want to come to

13   New Orleans.

14           Under Third Party Payor there's nothing new, your Honor.

15           Under Governmental Actions, I believe that Mr. Ben

16   Barnett representing Merck and Mr. Dugan may have a comment about

17   those.

18           MR. BARNETT:  Good morning, your Honor, Ben Barnett on

19   behalf of Merck.

20           We're making solid progress in terms of the AG discovery.

21   We're operating on two tracks, we have master discovery with

22   respect to information that the State AG's were looking from Merck

23   and information that Merck wants from the State AG's.  But also

24   consistent with your guidance from prior conferences, we're trying

25   to make sure that Mr. Dugan and the other State AG's can take full

1   advantage of the discovery that's already occurred to date.

2          The court's already put in place PTO 13B which gives the

3   State AG's access to the depository.  You will receive later today

4   PTO 18D which sets the frame work for allowing the State AG's to

5   review the previously produced Merck profile forms; and in

6   anticipation of the court approving that order, we will be

7   producing to Mr. Dugan 649 Merck profile forms previously produced

8   in the litigation that pertain to Louisiana prescribers.

9          We've also agreed with Mr. Dugan that we will reproduce

10  the call notes related to Louisiana physicians and we're still

11  working out the production timetable for that.  But assuming that

12  we're able to do that fairly quickly, we will be producing north of

13  280,000 call notes related to approximately 1,700 physicians.

14  Again, information that was previously produced that Mr. Dugan can

15  use for his upcoming trial, with the understanding that if he

16  believes there is additional information, that will be the subject

17  of additional meet and confers.

18         We've also met with Mr. Dugan and identified from our

19  perspective the 14 Merck employees who had the primary

20  responsibility for dealing with Louisiana Medicaid programs.  Six

21  of those productions are complete.  Five custodian productions have

22  been made initially but we're going to be supplementing that

23  information.  We're trying to keep him current in times of the

24  schedule so when he wants to set depositions he knows he has all of

25  their documents.

1          We're also making a couple of departmental files, and our

2     goal is to have all of those productions done by the end of July

3     given the pending trial date.

4          And just separately, we're obviously giving priority to

5     Louisiana, but we have provided now to Dawn Barrios a breakdown by

6     state of all of the previously produced MPF's and the number of

7     call notes because our hope is we will be able to use Louisiana as

8     a model for the other state cases.

9          And then just two other quick clean up items.  We will be

10    producing our confidentiality log to the PSC on June 30th, 2009 and

11    our PTO 17 update report, which involves deposition transcripts and

12    that sort of thing, that will be produced to both Mr. Davis and

13    Mr. Grand later today

14          THE COURT:  All right.  Jim.

15          MR. DUGAN:  He's always much more thorough than me, your

16    Honor.  James Dugan on behalf of the Louisiana Attorney General.

17          That's correct, your Honor.  We have a July 6th exchange

18    of discovery deadline, we have a July 31st expert report deadline,

19    we are proceeding on the track that your Honor has put in place.

20    We've been working cooperatively with defense and the other

21    governmental action plaintiffs and the case is moving forward.

22          The only other additional item, your Honor, is that we

23    had submitted a proposed governmental organizational structure to

24    your Honor, which culminated with several meetings with all of the

25    attorney generals, and we would ask that your Honor consider it.

```
 1            THE COURT:  I have that and I am considering it.  I will
 2   need to -- if I appoint all of the people that the recommendation
 3   is, I am going to have to cull it down to some smaller number from
 4   an executive committee standpoint.  And so since you will be going
 5   first, I look to you for some guidance and leadership in that
 6   regard.
 7            MR. DUGAN:  Thank you, your Honor.
 8            MR. BARNETT:  Your Honor, the only thing I would add is I
 9   just wanted to mention that so far we have not hit any real road
10   blocks in terms of discovery, it's a credit to Mr. Dugan,
11   Ms. Barrios and Mr. Davis from the PSC, that we're talking on a
12   regular basis and thus far we've been able to resolve all issues.
13            THE COURT:  I'm sure they agree it's a credit to you,
14   too.  And if you do run into a road block, you have to get me into
15   the loop immediately so that I can do away with that road block.
16            MR. DUGAN:  Will do.
17            MR. BARNETT:  Thank you, your Honor.
18            MR. DUGAN:  Thank you, your Honor.
19            MR. HERMAN:  Your Honor, Mr. Barnett has attended his
20   first Jazz Fest, so I'm sure that's helped.
21            THE COURT:  That's why he's so cooperative.
22            MR. BIRCHFIELD:  Page 10, item 12, nothing new.
23            Item 13, Mr. Marvin.
24            MR. MARVIN:  Your Honor, with respect to the group of
25   about 100 cases where plaintiffs have submitted expert reports, we
```

1   are continuing our discussions with Ms. Oldfather, the liaison

2   counsel who was appointed for the group of those 100 cases to lift

3   the stay on discovery and proceed with discovery in those cases.

4   We're continuing those discussions and we should have more to

5   report at the next conference, if not before.

6           THE COURT:  I have about 104 cases that fall into that

7   category.  I am now going to put those on the fast burner, and what

8   my thinking is today, I've got a list of the attorneys in those

9   cases, I will invite those attorneys to -- I need to put some

10  structure into that aspect of the litigation.  I'll invite those

11  attorneys to apply for committee membership on those particular

12  cases, and Ms. Oldfather will be the liaison on those particular

13  cases, and then I'll lift discovery and let that committee can

14  participate in the discovery immediately.  We'll find out which

15  cases want to be tried, need to be tried, and I'll give some trial

16  dates in the near future on those cases.

17          MS. WIMBERLY:  Thank you, your Honor.

18          THE COURT:  Third Party Payor Motions.

19          MR. HERMAN:  Nothing new on Third Party Payor Motions.

20          MR. MARVIN:  Your Honor, we do have several motions

21  related to PTO 28 and 29.  Those motions are set for hearing on

22  July 17.

23          THE COURT:  Okay.  Fee Allocation Committee, anything?

24          MR. HERMAN:  Yes, your Honor.  We've continued to meet.

25  We only have 12 -- we had a conference with all firms regarding

1   costs, either by phone or in person, some, many times, last letters

2   went out this week.  I believe that we will be able to comply with

3   your Honor's request as to a cost breakdown by the next status

4   conference.  It looks like we're on target.

5         THE COURT:  I would like to move on costs.  The attorneys

6   have some out-of-pocket costs, held costs, whatever, and I'd like

7   to move that.  So if there's an agreement on costs, then I'll issue

8   an order having the costs paid immediately then we'll move into the

9   fee.

10        I suspect the fee will take a little longer.  I've gotten

11  a number of objections to the requests of the Plaintiffs Committee,

12  and I will be dealing with those, I'll set up a status conference

13  and all of the objectors with representatives of the committee and

14  we'll deal with whether or not there's any depositions, any

15  discovery requests or any argument, any briefing, and then I'll

16  deal with that aspect of the case.

17        MR. HERMAN:  Your Honor, I did briefly meet with the

18  Miles Clements of the bar regarding Decision Quest, advised him

19  that I thought we would be able to finally report to your Honor on

20  June 17th.  And I know his client's continued to urge him to move

21  this.

22        THE COURT:  Yes.

23        MR. HERMAN:  With regard to other motions at page 15,

24  your Honor, I don't believe there's anything new to report.  But

25  Dorothy Wimberly has Merck's motions and rules on PTO 29

```
 1   non-compliance and I think that --
 2              THE COURT:  We'll deal with that after the conference.
 3              MR. HERMAN:  And there are issues, as Mr. Marvin
 4   mentioned, set for July 17th.
 5              In terms of Appeals, it says recorded.
 6              Your Honor, Motion for Attorney Fees and to Enforce
 7   Attorney's Liens, this matter is ongoing and BrownGreer has
 8   recently drafted a proposal, which we reviewed briefly yesterday
 9   and we expect that something will be submitted to the court within
10   the next week.
11              THE COURT:  Anything else from anyone?
12              Okay.  The next meeting then will be July 17th.  I will
13   meet with the committees at 8:30 and meet in open court at nine
14   o'clock.  Thank you very much.  The court will stand in recess.
15              THE DEPUTY CLERK:  Everyone rise.
16          (WHEREUPON, THE STATUS CONFERENCE WAS CONCLUDED.)
17
18                           * * * * * *
19
20
21
22
23
24
25
```

1

2

3                         REPORTER'S CERTIFICATE

4

5     I, Karen A. Ibos, CCR, Official Court Reporter, United States

6   District Court, Eastern District of Louisiana, do hereby certify

7   that the foregoing is a true and correct transcript, to the best of

8   my ability and understanding, from the record of the proceedings in

9   the above-entitled and numbered matter.

10

11

12   _____

13                         Karen A. Ibos, CCR, RPR, CRR

14                         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25