1       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA
2

  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
3

4 IN RE:  VIOXX PRODUCTS      MDL No. 1657
 LIABILITY LITIGATION      Section: "L"
5             New Orleans, Louisiana
             Friday, July 31, 2009
6

  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
7

8   TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
    HEARD BEFORE THE HONORABLE ELDON E. FALLON
9      UNITED STATES DISTRICT JUDGE

10

11 APPEARANCES:

12 FOR THE PLAINTIFFS
 LIAISON COMMITTEE:     HERMAN, HERMAN, KATZ & COTLAR
13          BY:  LEONARD A. DAVIS, ESQ.
          820 O'Keefe Avenue
14          New Orleans, LA 70113

15

          SEEGER WEISS LLP
16          BY:  CHRISTOPHER A. SEEGER, ESQ.
          550 Broad Street
17          Newark, N.J., 07102

18

          BEASLEY, ALLEN, CROW,
19          METHVIN, PORTIS & MILES
          BY:  ANDY D. BIRCHFIELD, JR., ESQ.
20          218 Commerce St.
          Montgomery, AL 36104
21

22          BARRIOS, KINGSDORF & CASTEIX
          BY:  DAWN M. BARRIOS, ESQ.
23          701 Poydras Street, Suite 3650
          One Shell Square
24          New Orleans, LA 70139

25

```
 1
     FOR THE DEFENDANTS
 2   LIAISON COMMITTEE:              WILLIAMS & CONNOLLY
                                    BY:  DOUGLAS R. MARVIN, ESQ.
 3                                  725 12th Street, N.W.
                                    Washington, D.C. 20005
 4

 5   CLAIMS ADMINISTRATOR:          BROWNGREER
                                    BY:  LYNN C. GREER, ESQ.
 6                                  115 South 15th Street, Suite 400
                                    Richmond, VA 23219-4209
 7

 8   LIEN ADMINISTRATOR:            THE GARRETSON FIRM
                                    BY:  JASON WOLFE, ESQ.
 9                                  7775 Cooper Road
                                    Cincinnati, OH 45242
10

11   CURATOR FOR PRO SE
     PLAINTIFFS:                    LAW OFFICE OF ROBERT M. JOHNSTON
12                                  BY:  IRA ROSENZWEIG, ESQ.
                                    601 Poydras Street, Suite 2490
13                                  New Orleans, LA 70130

14
     SPECIAL MASTER:                PATRICK A. JUNEAU, ESQ.
15                                  1018 Harding St., Suite 202
                                    Lafayette, LA 70503
16

17   Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
                                    500 Poydras Street, Room HB-406
18                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
19

20
         Proceedings recorded by mechanical stenography, transcript
21   produced by computer.

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2             (FRIDAY, JULY 31, 2009)

 3          (MONTHLY STATUS CONFERENCE)

 4

 5          THE COURT:  Be seated, please.  Good morning, ladies and

 6   gentlemen.  Call the case.

 7          THE DEPUTY CLERK:  MDL-1657, in re:  Vioxx.

 8          THE COURT:  Counsel make their appearance for the record.

 9          MR. DAVIS:  Good morning, your Honor, Leonard Davis on

10   behalf of Plaintiffs Liaison Counsel, and I am here with co-lead

11   counsel Chris Seeger and Andy Birchfield on behalf of the

12   plaintiffs while my partner Russ Herman is not in town.

13          THE COURT:  All right.

14          MR. MARVIN:  May it please the court, good morning, your

15   Honor, Douglas Marvin for Merck.

16          I just want to note at the outset that we have submitted

17   to you Joint Report No. 49, which means that our next conference

18   will be 50.  We're waiting to see how Mr. Herman is planning to

19   commemorate that next conference.

20          THE COURT:  All right.  I'm sure he'll think of

21   something.

22          Okay.  I met with counsel, I received a suggested agenda

23   from them.  I'll take them in the order suggested and then I have

24   some other comments.

25          First, the Settlement Agreement.  Anything on that?
```

1          MR. BIRCHFIELD:  Yes, your Honor.  We have Lynn Greer

2    with the firm BrownGreer, she is here to give a report on the

3    settlement administration.

4          And as Ms. Greer's coming, there is one matter that I

5    would like to highlight, and just to make sure that all of the

6    claimants and their counsel are aware of the order that the court

7    entered on July the 6th pertaining to claims that have received a

8    notice of ineligibility.

9          We're now wrapping up the processing of all of the MI

10   claims, and so the plaintiffs have -- if they received a notice of

11   ineligibility, meaning that they do not qualify by showing Vioxx

12   proof of use and had a heart attack or stroke, then they have an

13   option to appeal to the Special Master.

14         And we will have a report from Special Master Pat Juneau

15   later, but the Special Masters have geared up and they are doing a

16   fantastic job.  It is a significant number of cases, but they are

17   reviewing these cases thoroughly but they are getting through them

18   very promptly.  So that is running well.

19         The other option that a claimant would have would be to

20   file a future evidence stipulation saying they will not use --

21   they've submitted all of the evidence of a heart attack or proof of

22   Vioxx use that they have and that that's all that would ever be

23   used.

24         Once they submit, according to the court's order that was

25   entered on July the 6th, once they submit, that means when they

 1   actually submit that claims form to BrownGreer, from that point

 2   they have 30 days to file a case specific expert report and to file

 3   an updated fact sheet.  So I just wanted to make sure that everyone

 4   was aware of that deadline.

 5        And now Ms. Greer is here to give us an update on the

 6   administration of the settlement process.

 7        THE COURT:  Right.  And the deadlines at this point are

 8   really important.  We're at the point where we have to finish with

 9   this case.  There have been deadlines that I have extended but

10   these deadlines have to be written in stone because it's going to

11   hurt the individuals who are waiting for the rest of their money.

12   So we're just going to enforce the deadlines.

13        I've had some problems, excuse me.  Just excuse me a

14   moment.

15        They've bulletproofed my desk and now I have all kind of

16   alarms over me and everything else.

17        I was saying that the deadlines, I mean we started

18   setting deadlines a year ago and a year ago the deadlines came up.

19   I've extended them but now we've gotten to the point where I can't

20   extend them anymore.

21        All right.

22        MS. GREER:  Yes, your Honor, Lynn Greer from BrownGreer,

23   we are the claims administrator for this case.  My partner Orran

24   Brown regrets that he can't be here this morning.  I know you will

25   regret that I will not be giving any information on registration or

1  enrollment.

2          I will go straight to the claims update, and where we are

3  today is where we've been in terms of the injury distribution

4  between MI claims and IS claims.  Roughly 63 percent of all of the

5  claims that have been submitted are heart attack claims, or just

6  over 30,000, with 18,070 being stroke claims.

7          Over the last several months we have continued to make

8  progress nicely.  It's really the collective effort of the claims

9  administrator, the Gates Committee, Merck, the Special Masters in

10  processing the heart attack claims through the Gates process to the

11  point of either a points award or a notice of ineligibility.

12          And this slide shows that there are currently no claims

13  pending for our initial Gates review, there is one claim that we

14  need to do a review on.  And, your Honor, these are ones that have

15  circled through, we've already looked at them once, notices are

16  issued to claimants, claimants are given a chance, one chance to

17  submit additional documentation.  And so the stragglers that we

18  see, the one straggler we see in row two is someone who has already

19  been through, gotten a notice, and has submitted additional

20  documentation.

21          We also see occasionally claims that we are reviewing for

22  strokes that actually should have been submitted as MI claims, and

23  we work with counsel to try to make sure that we're reviewing the

24  correct injury.

25          There have been over 20,000 cases now that have passed

1   Gates that are eligible for points review, 20,334.  There are 44

2   notices that are still in the hands of claimants telling them that

3   they have failed Gates giving them a chance to submit

4   documentation.  There's seven claims the Gates Committee needs to

5   look at.  They look at those and they have a handful every day that

6   they look at immediately.  And there have been 9,900 notices of

7   ineligibility issued.

8            To date -- and I apologize that the heading of this slide

9   isn't coming up -- but this is a status of the points progress of

10  the claims.  Through July almost 15,000 heart attack claims have

11  been paid, we issued payment last week.  There are another 4,727

12  heart attack claims that are, have notices of points award issued

13  that could be paid in August.  Of those, almost 2,400 have already

14  accepted, they will be paid in August.  Another almost 2,000 are

15  still within their window of time for deciding whether to accept

16  the payment.  And there are 500 who have appealed or who are

17  special marker claims who have decided that they would rather elect

18  special review.

19            So you'll see, your Honor, that the volumes of payments

20  have continued to go up each month.  The volume of notice of points

21  awards have continued to go.

22            We actually yesterday sent a reminder to counsel that

23  they have until midnight tonight -- actually we sent this on

24  Wednesday -- they have until midnight tonight to accept their

25  notice of points award if they wish to be paid in August.  And we

1   usually see a lot of activity the last day when people decide to

2   accept.

3          THE COURT:  What's the percentage of people that are

4   getting through the Gates on the MI, Lynn?

5          MS. GREER:  It's just shy of 70 percent.

6          There are 115 claimants where we are almost ready to

7   issue a notice of points award but we can't issue it because of an

8   administrative issue.  Always on the day before we issue there are

9   certain hurdles that a claim needs to go through to make sure that

10  all of the lien information is correct and all of the other

11  information we need to issue a points award has been buttoned down,

12  there are 115 that are almost ready to go.  There are 106 that we

13  need to do a second review pending QC.

14         243 are incomplete and these are the claims, your Honor,

15  we've discussed before where we have tried to get documentation to

16  be able to complete our points review.  We have issued notices to

17  counsel telling them that we're unable to complete our points

18  review, they're given a chance to submit one last time the

19  documents that we need.  If they can't do that, then we proceed

20  using the standard deduction, which we discussed last time, which

21  is an average of the risk factor adjustments across the population

22  of MI claims by injury and age.  And then a further downward

23  adjustment to try to equalize those claims with the claims of those

24  who submitted complete claims packages.

25         There are 22 initial points review, this is as of

1    yesterday that were underway, and 144 that are still pending for

2    our initial review.  A lot of those 144 are dual injury claimants

3    where one claim passed and one claim failed.  We are not able to

4    issue a notice of points award on the passing claim until the firm

5    decides what to do with the failing claim.

6            This slide shows where we are in terms of average points

7    by injury level and where the special marker rate, and again, these

8    are claims, special marker claims are ones with fewer than ten

9    points.

10           Rather than read the slide, I will remind everyone

11   listening in that these slides are available in our website, they

12   will be posted this afternoon.  And if persons who wish to see them

13   can go to the left-hand side of the website and click MDL status

14   reports and these slides will be available.  But this shows simply

15   where we are in terms of all of the claims that are falling on the

16   injury levels and what the points on average are.

17           This summarizes the dollars and the number of claims that

18   we have paid and that we anticipate paying.  As I mentioned before,

19   14,977 have been paid over $1.2 billion to date; there are 2,378

20   claims that are pending for August already for 168 million plus;

21   another 1,849 could be paid, another 128 million; which would bring

22   the total possible payments in August to 4,227 or for 296 million.

23   And that would bring the total payments up to 19,204 for 1.5

24   billion.

25           Your Honor, as we approach the final payment deadline,

1   which is still on target for the end of September, there are a few

2   reminders that I think they're worth mentioning for those firms and

3   claimants.  The first is that we on July the 10th posted a report

4   on each law firm's portal that listed each claimant that had been

5   submitted as part of the program with the current status of each of

6   their claimants, whether the claimant status was open, whether it

7   was closed, and if it had been closed the reason why it had been

8   closed.  And we encouraged firms, we sent an e-mail asking each

9   firm to look at that list, make sure that they were comfortable and

10  that they agreed with our characterization or categorization of

11  those claims.

12         To date of the 1,000 that we posted, there were 466 firms

13  who had never opened that report.  Again, as we do when we try to

14  reconcile this, we really need to urge firms to review that report.

15  We will be posting an updated report within a couple of days.  We

16  will send a separate e-mail to those firms who never opened the

17  first report with an attachment of the report urging them again to

18  please open it and look at it, because it's very important as we

19  approach the final deadline that firms are comfortable with where

20  their claimants are.  And if someone comes up in November and asks

21  us why one of their claimants is closed, it will be too late.

22         THE COURT:  Okay.

23         MS. GREER:  The other report that is item two on the

24  slide is that we anticipate sending at the end of August a payment

25  reconciliation report that will list for the firm our records of

1    the interim payment amounts that have been made to each claimant.

2    We think we would have heard if there had been a problem, but this

3    will be the time if a check was not received or if a wire transfer

4    was somehow misallocated, can't imagine how that would have

5    happened, but if it did and if there is any discrepancy of the

6    interim payments received, firms will need to respond to that

7    payment reconciliation report.

8           Again, a reminder that there are still claimants with

9    enrollment deficiencies.  We can go ahead and review those claims,

10   we can go ahead and quantify those claims, but payment actually

11   cannot be made until all enrollment deficients are cured.

12          Special marker claimants, and these are the ones that are

13   fewer than ten points, those who have elected special review, and

14   there are about a 160 such claimants, those are claimants who go

15   into a pool and the Special Masters review those at the end of the

16   process and come up with an average point value.  The Settlement

17   Agreement directs that the average points that the Special Master

18   can award for that population is two and a half points.

19          So we will be able to quantify how much money on average

20   will be given to that group of people.  We will not be through with

21   this part of the process by the time of the final MI payment, but

22   we can set aside the funds and do that in short order after the

23   passage of September.

24          The last two reminders are just reminders for firms to

25   make sure that their claimants understand claims.  The Settlement

1    Agreement gives the claims administrator, Merck and the MPC rights

2    to audit claims and it's to audit or to verify the results of the

3    claims.  And points can change after the audit and we just want to

4    make sure that firms -- and that has been in the notice of points

5    award since the beginning that the notice of points award is

6    subject to Article 10 and to the right of all parties to audit.

7         And the final point is just that the MI final point value

8    is subject to change.  We want to make sure that as we approach

9    this deadline that people understand that the point value,

10   depending on the final total number of points and the passage rate,

11   the outcome of appeals, that it could be different than it is

12   today.

13        THE COURT:  And that's further the reason for making sure

14   that the deadlines are firm because we can't do this until all of

15   the claims are there.

16        MS. GREER:  That's correct.

17        Your Honor, turning to the stroke progress.  As I

18   mentioned before, we are continuing to review the stroke claims.

19   Most of our resources are focused on heart attacks but we

20   nevertheless have a dedicated team of reviewers who continue to

21   review the stroke claims.

22        This slide shows that there are 26 claims currently in

23   our initial Gates review, over 6,000 where we have done one review

24   and pending a second review.  There have been 6,401 claimants who

25   have passed and who have been considered and are being reviewed for

1    points.  There are almost 5,000 notices of ineligibility that have

2    been issued to date, and most of those are the ones where claimants

3    have another opportunity to submit documentation if they failed to

4    do so the first time.  And there are 323 currently pending with

5    Gates Committee that have not been voted on yet.

6            This is a summary of the stroke points review status.

7    We've paid through July 2,086 stroke claimants; there are 323

8    outstanding stroke awards; 153 have already accepted to be paid in

9    August; 95 additional ones are potentially eligible for August

10   payment; 75 are on appeal.

11           And as the slide goes down, you will see there are 122

12   where we have completed the QC but again can't issue the notice;

13   1,500 where our reviewers are reviewing them again for quality

14   control; 139 are incomplete; 228 where initial points review is

15   underway; and that last number is there are 1,978 currently

16   awaiting our initial points review.

17           To date there have been over 2,000 stroke claimants paid

18   $64 million; the dollar amounts of 153 that are pending in August

19   of 4,800,000; another 95 for another $2.7 million could possibly be

20   paid; which would bring August payments to over 7,500,000, and that

21   would bring the total payments on stroke claims to date to over 71

22   million.

23           This slide shows the points by injury level for strokes.

24   Again, I won't read this, but it is available on our website.  The

25   current special market rate for stroke claimants is running at 5.69

```
1    percent.
2              And that concludes my presentation.
3              THE COURT:  Okay.  Thank you very much.
4              MS. GREER:  Thank you.
5              MR. BIRCHFIELD:  Judge, the next item on the agenda is
6    the Lien Administrator, and the Garretson firm is appointed to
7    serve as lien administrator.  Jason Wolfe with the Garretson firm
8    is here to report on the resolution of governmental liens and the
9    private liens.
10             THE COURT:  Okay.
11             MR. WOLFE:  Your Honor, I am Jason Wolfe and here to
12   report as the lien resolution administrator for the compliance
13   program for the Medicare, Medicaid and military programs, in
14   addition to providing a brief report on the administration of the
15   private lien resolution program.
16             As for Medicare and the federal Medicare Part A and B
17   benefits and the beneficiaries entitled to that in the settlement
18   program, the resolution program continues to work very effectively.
19   We're working, continue to work with the claims administrator to
20   process Medicare global categories and the associated reimbursement
21   amounts immediately upon a claim in advancing to the issuance of a
22   points award notice letter.
23             As previously reported, over 72 percent of all eligible
24   claimants are entitled to Medicare benefits, and the program
25   satisfies, the global resolution program satisfies the Medicare
```

1    recovery interests of these beneficiaries.

2           We've received in the program only 252 requests for

3    redetermination of the global resolution program placement.  This

4    obviously represents less than one and a half percent of the

5    Medicare beneficiaries that have been processed.  We continue to

6    view this as a very positive sign of the program itself.

7           As final payment time lines approach, our staff is

8    working proactively to expose any and all potential issues that may

9    arise coming into final payment timing with both Medicare and other

10   Medicaid and government obligations to ensure that and minimize any

11   disruption or holdbacks necessary.

12          As Matt Garretson previously reported to the court, we

13   are handling the Centers for Medicare and Medicaid Services

14   mandatory insurer reporting requirements associated with this

15   settlement.  We have worked with Doug Marvin and Merck and CMS as

16   well and are on track to make sure that we are in compliance with

17   all of these new reporting requirements.

18          As for Medicaid and all of the Medicaid programs, I am

19   happy to report the vast majority of the 53 Medicaid agencies have

20   been very responsive and thorough in their reports, despite the

21   many staffing and resource challenges experienced by these agencies

22   over the past year.

23          Heading into the final payment stage of the myocardial

24   infarction claimants, we're working furiously with all of the

25   agencies to ensure that we're promptly securing any pending

 1   outstanding entitlement information, claims information, and

 2   pressing to have them approve the audits that we've performed on

 3   the claims that they've submitted.

 4          With respect to the claims data and the injury related

 5   care expenditures, we're experiencing only a few isolated cases

 6   that we consider delinquent in production of these claims that we

 7   need.  You've asked for a report on this when it becomes and if it

 8   becomes a problem, we will be submitting a report shortly to your

 9   attention on only a couple of instances that we may request your

10   assistance.

11          THE COURT:  Well, do that and then I'll weigh in on it.

12          MR. WOLFE:  Thank you very much.

13          Overall, we are resolving well over 16,000 Medicaid

14   obligations directly with the state Medicaid programs.  We've

15   secured well over 88 percent of these already, that's a nice

16   advancement from even last month, they were around 80.  And we

17   continue to receive and process, obtain claims histories obviously

18   on a daily and weekly basis.

19          With respect to other governmental liens, and these are

20   military programs and union health services, we have worked with

21   all of these programs separately and worked through multiple

22   different agency representatives.  The claim production count's a

23   little lower here, but we do have their attention, we're working to

24   secure anything that is outstanding.

25          And I will just make a note as a reminder to all primary

 1   counsel and as previously reported in both education materials and

 2   at the status hearings is that the other governmental and military

 3   obligations that are being resolved by the lien resolution

 4   administrator are those that were self-reported by primary counsel.

 5          One note on reporting of all of our work as lean

 6   resolution administrator for Medicare, Medicaid and the military

 7   programs is we have worked very closely with BrownGreer to enhance

 8   the lien resolution administrator reporting inside the claims

 9   administration web portal.  And that's the web portal obviously

10   being utilized by all primary counsel.

11          BrownGreer has assisted us greatly in the effort to

12   ensure all parties participate in this program are able to utilize

13   this one source to view claims administration and lien resolution

14   administration activities.  The new web pages are designed to show

15   all of the obligations at a claimant level associated with both a

16   lien resolution program and any obligation in the private lien

17   resolution program.

18          I'll use that to start speaking briefly and give a brief

19   report on the private lien resolution program.  At the last hearing

20   in June, Matt Garretson reported the Garretson firm was working

21   with the Plaintiff Steering Committee and the third party payor

22   committee to implement the procedures and protocols in the

23   memoranda of understanding.  To date, the activity by all parties

24   has been very positive.

25          I should also report the status of the plans that have

1    elected to participate in the terms and conditions of those

2    programs continue to grow.  We started with less than 200 and we're

3    at over 440 participating plans, so we're very pleased with that

4    activity on the plan participation rate.

5            If you recall, a claimant can volunteer to participate in

6    this plan and they can also note a plan if it wasn't on the

7    original exhibit.  Them noting a plan has led to GFRG and the

8    assistance of the other third party payors have worked to bring

9    those plans in and have had great success of that.  There's over

10   1,000 remaining plans that were self-identified by a claimant that

11   we are now in a third stage of trying to seek their participation.

12           We originally had a call campaign and then we sent formal

13   letters to the plan administrators, and we're going to evaluate if

14   any additional assistance or benefits would be yielded if we

15   contacted a different party and notice administrator.  We will

16   inform all parties of that decision.

17           The participation on the claimant level is we've had

18   close to 21,000 claimants volunteer to participate in this plan.

19   Of that about 1,000 have since been deemed inactive by the claims

20   administrator, so we're sitting at just below 20,000 active

21   claimants that are participating in this plan.

22           As deadlines approach on disbursement for myocardial

23   infarction final payments, we're working closely with the multiple

24   different plan consortiums and the independent plans that have

25   participated to make sure that any outstanding entitlement match

1   work is performed and completed, in addition to all resources are

2   being expended to ensure that we have claims in a timely fashion to

3   audit them and finalize them prior to payments.

4          Your Honor, in conclusion I would like to conclude my

5   report by informing the court that all activities being conducted

6   by the Garretson firm as lien resolution administrator for the

7   federal, state, and military programs, in addition to coordinating

8   the private lien resolution program, are progressing favorably.

9          THE COURT:  Do you have a feel for how many, percentage

10  wise, of the claimants that are participating voluntarily, the

11  20,000?

12         MR. WOLFE:  It's 20,000 of I think the last active number

13  is about 45, yes, sir.

14         THE COURT:  Okay.  That's a sizable number.

15         MR. KAISER:  Your Honor, my name is Grant Kaiser for

16  certain plaintiffs.  I was curious, as September 30th comes up, and

17  we're curious as to whether we will be issuing one check and it

18  will be the final check to our clients.  And a part of that is will

19  the lien resolution administrator's work be done sufficiently in

20  advance of September 30th so that the money we get from the claims

21  administrator will allow us to send one final check to our clients?

22         THE COURT:  Anything from the lien administrator, will

23  you be finished by September?

24         MR. WOLFE:  Yes, sir.  For a Medicare entitled

25  beneficiary, all obligations will be complete in full.  For any of

1    the Medicaid entitled beneficiaries, which there are approximately

2    13,000 that are entitled and still eligible for payment, we're

3    working to have all of their liens finalized inside of that time

4    frame.  If the liens aren't finalized inside of that time frame due

5    to needing the agency to approve an audit, then a holdback would be

6    applied at the previously agreed 20 percent or the inbound lien

7    value, the lessor of the two.

8              MR. KAISER:  Thank you.

9              THE COURT:  Okay.  Sure.

10             MR. BIRCHFIELD:  The next agenda item, your Honor, is the

11   Special Master's report.  And I know Mr. Juneau is here, and as he

12   is coming I want to express my appreciation.  The role of the

13   Special Masters is a vital piece to the settlement program, and as

14   we had forecast there would be a bubble, that is a bubble of cases

15   that they're going to have to handle right here at the end.  And

16   they are in the early stages of crunch time, and we're seeing that

17   the Special Masters have geared up and are handling these cases

18   expeditiously, and I just want to express my appreciation to

19   Mr. Juneau for his leadership.

20             THE COURT:  Two things on that:  First, the Special

21   Masters have kept up with what they have been given.  And also,

22   they've been given some lead opportunities; that is to say, when

23   the Gates Committee saw a bubble coming, they immediately told the

24   Special Masters and the Special Masters were able to gear up for

25   that by increasing their staff and things of that nature.

1          Secondly, just overall, I really think that this has

2    worked well, and I would suggest that future MDLs consider it.

3    When the settlements are arrived at, there are certain Gates that

4    have to be gone through.  And first, the administrative review is

5    there, and the administrative review simply applies the settlement

6    document.  But people being people, sometimes it doesn't work and

7    they're not statistics, they're individuals.  And so we recognize

8    that and we have a Gates Committee comprised of attorneys for both

9    sides to look at it again one more time to make sure that they can

10   bring some other other than statistics rather than just looking at

11   the language of the agreement to see whether or not these

12   individuals can get through the Gates.

13          But after that, then we take it out of the advocates'

14   hands and we give it to the Special Masters to look at, and the

15   Special Masters, we have an ex-justice of the Supreme Court of

16   California, we have a district court judge from New Jersey, and we

17   have a very, very experienced attorney, from various parts of the

18   country, they look at it and they bring to bear their view on this.

19          So we've got due process tied in, we have just all of the

20   other matters, and I think that's a good way of doing it, frankly.

21   We've gone out of the way to try make sure that if anybody can

22   possibly get through the Gates, they're given that opportunity.

23          MR. BIRCHFIELD:  Yes, sir.  And, Judge, the overwhelming

24   response that we have received so far from the claimants and the

25   lawyers is a tremendous amount of appreciation for the fairness and

1    the efficiency of the program.

2          THE COURT:  Yes.  And the good thing about it is we moved

3    it.  Sometimes you put in these procedures and it inhibits the

4    matter and it stops it, but we made payout in four years from the

5    date that the case started, which is a tribute to the attorneys and

6    the Special Master and the administrators.

7          Let me hear from the Special Master.

8          MR. JUNEAU:  Good morning, your Honor.  For the record

9    Patrick Juneau, Special Master in this Vioxx matter, your Honor.

10         I have a rather condensed report.  But just so the court

11   will know, we have had 5,306 cases that have been decided and ruled

12   on by the Special Master.  There are currently 1,307 which are

13   under advisement, and that's in various stages.  Some of those are

14   actually decided, but it's a matter of entry into the portal to

15   have that recorded.

16         The court is actually right and Mr. Birchfield is

17   absolutely right, we were alerted early on to these meetings we had

18   with the court about the bubble.  I call it a bubble, it's really a

19   big balloon.  The bubble was bigger than I envisioned in the

20   dictionary of what a bubble was.

21         All three officers, and I want the record to be very

22   clear about this, Judge Fallon, all three of the Special Masters

23   were alerted to this, we discussed this months ago, we were given

24   the benefit of input from BrownGreer, the attorneys, Merck, and the

25   PSC, and we geared up our offices and not a single person involved

1   but it's a very, very intense training and so forth that

2   individuals, and I want to assure the court that individual

3   attention is being given in view of each of these cases.

4           As an example, we get a lot of input from various

5   sources, mainly through BrownGreer, but one case in particular that

6   I remember that was reported by a lawyer, he said he appealed on X

7   date and a day, day and a half later he got a ruling on the case.

8   That could very well be, and the reason for that because the way

9   the system is set up there's instantaneous reporting once that is

10  entered into the appeal, it filters through the system and we get

11  it instantaneously.

12          And the system is set up through -- we've had internal

13  trainings of numerous people and the consolidated review, the

14  Special Masters as we assured the court and give our assurances to

15  the court that we would give 100 percent effort through staff,

16  whatever commitments it took staff wise, talent wise, so forth to

17  do and we've attempted to do that.

18           The purpose of this comment, your Honor, is I know that

19  attorneys, and I as a practicing attorney for many years, I want to

20  know that if I have a case, for plaintiff or defendant, is being

21  given the attention it should be given with all due consideration

22  of the merits.  That is, in fact, happening in this case.

23          The other side of the coin is, with that commitment, your

24  Honor, is to do that so that we can stay hopefully on schedule with

25  what I consider are very aggressive and progressive program to get

 1   payment in a remarkably short period of time in a massive complex

 2   piece of litigation, and I think the record speaks for itself

 3   what's occurred.

 4          The last comment that I will make with regard to the

 5   appeals, your Honor.  We have still this remaining balance and this

 6   is still being fed out to us, it looks like we are on target, we

 7   are doing our darnedest to get that completed, so that the target

 8   payment date that was outlined by Ms. Greer will be met.  As I

 9   observe things, and everything is subject to change, I guess, but

10   as I view things it looks like we're on target to do that as we

11   speak.

12          Other than that, your Honor, I don't have any other

13   comments, other than to do note that there were, many, many, many

14   appeals, many appeals.  That the comment on the appeal is "see the

15   record".  You said the record, we read the record.  But it creates

16   a problem as it's hard to focus on something if someone wants to

17   give your individual attention to something, it's like a brief in

18   any case that we all practiced with for many years to get focused

19   on an issue.

20          We've had many of them.  I don't think that wasn't the

21   dominant thing but it was a factor, and it was a lot of records and

22   it creates a burden, if you will, on the system, but that's one

23   thing you just have to work through.  I just make that comment to

24   indicate to somebody that we may have things that's gots tons of

25   records with no reference to anything other than to say see the

1   record, so we read the record.  That's a factor in this whole

2   process.

3           The last thing, and it's important to note, that the

4   staffs are expanded extensively, I can speak for that myself

5   internally, to address these issues and we've made that commitment

6   and fulfilled that commitment.

7           I would like to lastly though to thank BrownGreer.  We've

8   worked very, very closely, we've juggled schedules, we've juggled

9   records, getting things straight so that we can promptly address

10  all of these issues.  They've been very competent and we have a

11  very fluid relationship in dealing with these cases, and I think

12  the rulings speak for themselves that the cases have, in fact, been

13  looked at in detail.

14          And that's basically the report, your Honor.

15          THE COURT:  Okay.  Thank you very much.  As we can all

16  see, this has been a massive undertaking and it's worked because of

17  the various parties who have participated in this and you need to

18  know the court appreciates the work.

19          Okay.  State court -- yes.

20          MS. OLDFATHER:  If the court please?

21          THE COURT:  Sure.

22          MS. OLDFATHER:  Ann Oldfather.  May I ask Mr. Juneau a

23  general question about his report?

24          THE COURT:  Sure.

25          MS. OLDFATHER:  Mr. Juneau, you've reviewed 5,300 claims

1   to conclusion, you mentioned 5,306, and according to Ms. Greer it

2   looks like there might be a total of around ten to 15,000 that come

3   to you, potentially.  On that 5,300, what percentage have had an

4   award granted and which have had the denial of an award sustained?

5   Just generally, I am just trying to get a general feel.

6           MR. JUNEAU:  I am just looking at my records while you

7   speak.

8           MS. OLDFATHER:  And I don't mean to put you on the point

9   and on the spot either.

10          MR. JUNEAU:  I've been on the spot many times, that's

11  fine.

12          MS. OLDFATHER:  And, your Honor, I only ask because we

13  have been looking at the ineligible claims that might end up coming

14  back to the court, and I thought it would be a good idea to start

15  getting a feel for that.  Thank you.

16          THE COURT:  Yes.

17          MR. JUNEAU:  What I was hesitating about, your Honor, I

18  was trying to get the collective number because there are three

19  Special Masters and I was trying to assimilate all of those numbers

20  into one.  It's a general response to your question because it's

21  not precise, it kind of changes with the numbers.  But essentially

22  there were approximately 78 percent was the same result,

23  approximately two percent -- a different result in two percent of

24  the cases.  And the way we have it recorded, about 20 percent of

25  that's undecided.  I did that off the total numbers, that's how

1     we've recorded it.

2             I am trying to get to the percentage that you asked

3     about.  But it looks like, it looks like we can have a modified

4     result, same result and so forth.  It looks like about, if I had to

5     guess, it would be around 85, 80 to 85 percent get the same result.

6     The balance of that had been modified or changed result.  That's

7     some general numbers.

8             THE COURT:  And before the Special Master gets it, the

9     Gates Committee gets it.  Do you have any feeling, Andy, as to

10    percentages?

11            MR. BIRCHFIELD:  Yes, your Honor.  And I think as a

12    general rule, I mean, Mr. Juneau is correct on those percentages;

13    but one thing that is very important is to keep in mind, as the

14    court outlined, the number of stages that were reached before them.

15    If someone has a -- I mean, if they submit a claim for review by

16    the claims administrator and they have a discrepancy, then they can

17    appeal that, that's a matter that BrownGreer can address first.

18    And if they obtain different information, additional information

19    and BrownGreer can look at that.  If that information places it

20    within the guidelines of the Settlement Agreement, BrownGreer

21    addresses that before it ever arrives at the Special Masters'

22    portal for their consideration.

23            Also, as the court pointed out, the Gates Committee is

24    involved in this process.  And so BrownGreer reviews a claim under

25    the strict guidelines of the Settlement Agreement.  Then if that

1    claim is denied and the firm has no new information or the new

2    information is also considered by BrownGreer and it's still denied,

3    then it would come to the Gates Committee.

4            The Gates Committee has the broad discretion, that's the

5    area of the Settlement Agreement where the human touch is applied.

6    And under the terms of the Settlement Agreement, we're not bound by

7    the strict guidelines, there has to be evidence of a heart attack,

8    there has to be evidence of proof of use of Vioxx usage.  And then

9    we can make that determination.

10           If the Gates Committee then denies the claim, then that

11   is when it would go to the Special Masters.  The Special Masters do

12   review the entire record, but their review is based on the terms of

13   the Settlement Agreement.

14           So I think that what we are seeing here is the overall

15   percentage that is denied is, or altered or modified in some way

16   perhaps is in the 15 percent range, but that is a good indication

17   that the system is working as it was designed to work.

18           Thank you, your Honor.

19           THE COURT:  The best we can do with this type situation

20   is to prepare a due process situation, and we've got the Settlement

21   Agreement that is applied by the administrator, we have the human

22   touch that's applied by the attorneys, for both sides, the Gates

23   Committee comprised of plaintiff attorneys and defense attorneys

24   who look at the matter and make that decision, and then it goes to

25   a third review to the Special Masters.

1          And not everybody is going to get through, but that's the

2    way it works.  The best we can do is give you several look-sees and

3    that's what's occurred.

4          MR. JUNEAU:  Your Honor, one other comment that

5    Mr. Birchfield discussed peaked one point I think would be, that I

6    didn't mention and I think it would be appropriate to mention.  I

7    can remember this case myself, there was a specific case but there

8    are other cases like this.  I found a different result, that's one

9    of the changes, and I did that but in the review by -- this

10   happened to be one of those cases that we received the record -- I

11   read the whole record, and as it turns out, there were deductions

12   that had to be made under the agreement, hypertension and some -- a

13   deduction had to be made, which wasn't originally made, and I made

14   that adjustment is my point.

15         So the modifications can come in various forms.  Total

16   result, modification can be up or down for that matter.  So it's a

17   variety of things when I say the 80 percent or something, as a

18   myriad of things can occur in those occurrences.

19         My final comment is, I think that your Honor's comment is

20   correct, Mr. Birchfield is correct, we're finding things that need

21   to be addressed and they are addressed.  But the bulk, I guess you

22   would say, of the work is an extensive process, whatever it gets

23   rid of, is cleaned out.

24         And the last comment, because I am acutely aware of this,

25   your Honor, because we're looking at the entire record.  There are

1    many cases that don't get here to this level, to the Special

2    Masters level that are handled by BrownGreer and the process he was

3    talking about because of the submission of clarification records,

4    additional records that get cutoff or modified or changed even

5    before it gets to us.  A lot of those are cleaned up before it even

6    gets to our stage of the case.  So it's kind of hard to get an

7    exact number because of these myriad of circumstances.

8         MR. BIRCHFIELD:  Judge, the bottom line of all of this,

9    from my vantage point, the Gates Committee is working very

10   effectively because each side has approached this with good faith

11   and neither side is saying we're going to try to put everything in

12   and the other side is saying we're going to keep everything out.

13   Instead, the parties are working in good faith to make sure that

14   the right result is reached.

15        But through each of these levels, the bottom line is that

16   we feel very confident that once a claim comes through this process

17   and they're denied participation in the Settlement Agreement, then

18   we feel comfortable that it's because it was not a heart attack or

19   stroke connected with Vioxx.

20        THE COURT:  And with the Gates Committee, I've seen Gates

21   Committees before, my concern always with Gates Committee is if the

22   defendant wants everybody to get through and the plaintiffs don't

23   want anybody to get through or vice versa, and so I've been kept

24   advised of the Gates Committee's work; and I found that, as Andy

25   says, that both sides have entered this with good faith and the

 1   effort is to try to get somebody through the Gates.  And that's

 2   what's been done.

 3            All right.  State court trial settings.

 4            MR. MARVIN:  Your Honor, there are no state court

 5   settings through the end of this year.  I think that brings us to

 6   the class actions part of this report.

 7            THE COURT:  Right, Item 6, Class Actions.

 8            MR. MARVIN:  I think there is nothing new to report

 9   there.  So I think that brings us then to State/Federal

10   Coordination.

11            THE COURT:  Anything from the state?

12            MS. BARRIOS:  Good morning, your Honor, Dawn Barrios from

13   on State Liaison Committee.  Since our last meeting there has not

14   been any additional conditional transfer orders, so our numbers

15   have not changed on the number of parties who are actually seeking

16   remand.  So in order to keep our carbon footprint small, we have

17   not reproduced the documents that we gave you at the last meeting.

18   Thank you.

19            THE COURT:  Thank you very much.

20            Pro se claimants, anything from the pro se?

21            MR. BIRCHFIELD:  Your Honor, Bob Johnston is appointed as

22   the pro se curator, and we have someone here from his office.

23            THE COURT:  All right.

24            MR. ROSENZWEIG:  Good morning, your Honor, Ira Rosenzweig

25   for the curator Bob Johnston.

1    We continue to get several calls or e-mails a day from

2    pro se claimants.  Given the status of the program at this time,

3    most of these calls now are dealing with notices of ineligibility

4    that the pro ses are receiving, though we're still receiving calls

5    about deficiencies and other types of issues as well.  We're

6    continuing to help these people, to the extent we can, explain to

7    them their options under the program and make sure that they're

8    aware of all deadlines that they face.

9         THE COURT:  All right.  Thank you very much.  And

10   everyone is going to be getting some, the pro ses we've heard from,

11   some people who have received ineligibility notices are going to go

12   back to their attorneys and you've got to be conscious of that and

13   you've got to be able to explain to them what their rights are,

14   what the reasons are, and where they can go from there.  And so

15   let's be conscious of that, particularly the principle attorneys

16   who will be dealing with the attorneys.  And, of course, the pro se

17   people have Mr. Johnston's office to go to.

18        All right.  The PSC MDL trial package, anything on that?

19        MR. BIRCHFIELD:  Nothing new to report.

20        THE COURT:  Third party payor cases.  Anything new on the

21   third party payor cases?

22        MR. SEEGER:  Judge, there is really nothing to report at

23   this time on the third party payor cases.  I don't think there's

24   anything on the AG, on the governmental action side either that's

25   new.

 1           THE COURT:  Governmental actions.  Discovery issues, any

 2    discovery issues?

 3           MR. SEEGER:  No.

 4           THE COURT:  Pending personal injury cases which Lone Pine

 5    expert reports have been served, anything on that?

 6           MR. MARVIN:  Your Honor, Ms. Oldfather and Mr. Foster on

 7    behalf of the plaintiffs met with the court yesterday, along with

 8    Ms. Horn and myself, to discuss these cases.  We will be submitting

 9    to the court and first to Ms. Oldfather a proposed order to lift

10    the stay of discovery in those cases.

11           THE COURT:  Okay.  I met with counsel yesterday,

12    Ms. Oldfather is lead counsel for that group.  She has the

13    assistance of at least one individual, perhaps others, and their

14    job as lead counsel and as a steering committee for those cases

15    will be to focus on the general causation.  The discovery will

16    focus on specific causation, and with regard -- or specific factors

17    involving those particular claimants.

18           And it's the principle attorney's job and also expense to

19    deal with those specific issues.  That committee will be focused

20    primarily on the general issues of causation, and that's where

21    their input and their costs will be spent.

22           And also, I will be setting some method for giving them

23    the resources by taxing those cases who are interested in

24    proceeding in that fashion, because they will be doing the work but

25    they will need some resources to do that work.

1          Third party payor motions, any motions on third party

2    payors?

3          MR. SEEGER:  No, your Honor.

4          THE COURT:  The Fee Allocation Committee.  I met several

5    times with the Fee Allocation Committee on costs, and I have met a

6    number of times with the CPA that the court has appointed on costs,

7    and he's worked very hard to deal with costs and collect

8    information.  Phil Garrett has submitted to me and he's met with me

9    numerous times so that I could keep in touch with the costs in this

10   matter.

11          We're getting to the point where hopefully the costs can

12   be disbursed.  I am going to be instructing BrownGreer to withhold

13   one percent of the holdback of the funds to deal with costs, and

14   I've got a number of individuals who have agreed that their costs

15   is the final costs.  I'll be paying those out or issuing orders to

16   give reimbursement to those individuals.

17          There are some that their costs are in dispute or a

18   portion of their costs are in dispute.  The PSC and the Fee

19   Allocation Committees asks that I pay out the portion of those

20   individuals who do not have any dispute.  There is a certain amount

21   that's undisputed, certain amount that's in -- maybe not in dispute

22   but at least in consideration.

23          I am not going to follow that recommendation.  I am going

24   to pay out those individuals who have no amounts in dispute; and

25   those individuals who have amounts in dispute, I am going to wait

```
 1    until it shakes out and then I'll make a decision on those cases.
 2    So that's what I am going to be doing.
 3              We have a third, an independent entity who has gotten
 4    some, who was entitled to get some costs that's not in dispute, so
 5    I will be paying out that shortly.
 6              MR. BIRCHFIELD:  Your Honor, the Fee Allocation Committee
 7    has prepared its recommendation and finalizing the memoranda that
 8    we will offer and that should be filed very, very soon.
 9              THE COURT:  Right, okay.
10              MR. DAVIS:  Your Honor, that motion will be filed and we
11    have, just so that the court is aware, we have had additional
12    discussions with Miles Clements for DecisionQuest and advised
13    DecisionQuest that, in fact, their payment, including the interest
14    that was stipulated to, will be one of the line items in that
15    motion that's filed.  And DecisionQuest is satisfied with that at
16    this point.
17              MR. CLEMENTS:  Our amount is negotiated, agreed,
18    stipulated, signed off by the PSC, all of its members who have each
19    guaranteed payment.
20              THE COURT:  You're safe.
21              While talking about fee allocation also, the other issues
22    with regard to, other than costs, is the fee.  I have before me,
23    and I will get it out this week, I will finish up my draft probably
24    this weekend sometime and issue it in the early part of next week
25    dealing with the reconsideration of the cap, the 32 percent cap.
```

1    As you know, I've had oral argument on that and I've had extensive

2    briefing on it, and I will be issuing an order on that.

3          Then we will go to the other issue of the steering

4    committee or the common benefit fee, and the PSC has made certain

5    requests on that.  I'll set that for oral argument, I'll get

6    briefing on that, I'll hear from all sides, and then I'll make a

7    decision on that.

8          Okay.  Let's see.  Merck's motion and rule on PTO 28,

9    Non-Compliance, anything on that?

10         MR. MARVIN:  No, your Honor.  As customary, is it your

11    intention to do those after the status conference?

12         THE COURT:  Right.  Any other motions, any other appeals

13    that's at issue?

14         Motion for Attorney Fees and to Enforce Attorney's Lien,

15    any discussion on that?

16         MR. DAVIS:  Your Honor, you directed counsel to meet with

17    and discuss with BrownGreer the issue involving attorneys liens.

18    We have, in fact, done that and will be filing a motion with the

19    court or BrownGreer will be doing that.

20         THE COURT:  All right.  Okay.  Anything else that we

21    haven't talked about other than motions?  Anybody have anything?

22         The next meeting will be September the 17th, nine o'clock

23    for open court, 8:30 for the committees to meet with me.

24         All right.  Anything else from anybody?  The court will

25    stand in recess.

1            THE DEPUTY CLERK:  Everyone rise.

2            (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

3

4                        *  *  *  *  *  *

5

6

7                    REPORTER'S CERTIFICATE

8

9    I, Karen A. Ibos, CCR, Official Court Reporter, United States

10   District Court, Eastern District of Louisiana, do hereby certify

11   that the foregoing is a true and correct transcript, to the best of

12   my ability and understanding, from the record of the proceedings in

13   the above-entitled and numbered matter.

14

15

16                    _____

17                    Karen A. Ibos, CCR, RPR, CRR

18                    Official Court Reporter

19

20

21

22

23

24

25