

Feb 16 2009
9:29AM

RONALD R. BENJAMIN, ESQUIRE
126 Riverside Drive, P. O. Box 607
Binghamton, New York 13902-0607
607/772-1442

GARY P. LEVIN, ESQUIRE
1442 New Road, Suite 3
Northfield, New Jersey 08225
609/646-6100

Attorneys for Plaintiff

---

IN THE SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ATLANTIC COUNTY

---

VIRGINIA PICKETT,

        Plaintiff,

-vs-

MERCK & CO., INC.,

        Defendant.

Docket No.: ATL-L-0022-06 MT
VIOXX® Litigation

Case Code No.: 619

CIVIL ACTION

---

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO VACATE THE CONSENT TO THE MASTER SETTLEMENT AGREEMENT ("MSA") EXECUTED OCTOBER 24, 2008, AND RESTORE HER ACTION TO THIS COURT'S TRIAL CALENDAR FOR TRIAL WITHOUT ANY LIMITATIONS THAT WOULD ATTACH TO PLAINTIFFS WHO AGREED TO ACCEPT THE MSA

Plaintiff Virginia Pickett moves to vacate the consent she executed October 24, 2008, to accept the terms of the settlement entered into between certain attorneys and defendant Merck & Co., Inc. ("Merck"), to resolve all Vioxx litigation in the United

-1-

States for $4,850,000,000.00, to wit, the Master Settlement Agreement (hereinafter "MSA") that was consummated n or about November 8, 2007.

Plaintiff was never consulted about any of the terms of the MSA, nor was she advised that her counsel represented two or more of the litigants in the Vioxx litigation and, as such, it is respectfully submitted the MSA is unenforceable under the New Jersey Rules of Professional Conduct, specifically RPC 1.8 (g), which prohibits such settlements. Plaintiff further contends the MSA contravenes multiple other provisions of the New Jersey Rules of Professional Conduct in that any retained counsel participating in the MSA is contractually bound to withdraw from representing any client who refuses to accept the terms of the MSA. Finally, in the event the MSA is not deemed unenforceable as a matter of law, plaintiff submits her consent should be vacated under the principles applicable to adhesion contracts because she was coerced into giving her consent in the first place. Plaintiff seeks to have the action commenced in this Court restored to the Court's trial calendar for trial without any limitations that would attach to plaintiffs who agreed to accept the terms of the MSA.

Plaintiff now turns to the facts supporting the instant motion.

## STATEMENT OF FACTS

Plaintiff was very active throughout her life which included raising six children, being active in community affairs, holding down full-time employment and enjoying a variety of sports ranging from taking long hikes to waterboarding and golf. *See Affidavit of Virginia Pickett, at paras. 4-5.* She had a fall in 1999 which left her

-2-

with back and elbow pain for which she was prescribed Rofecoxib. *Id., at para. 5.* She was still able to engage in many of the above activities until September of 2002 at which time she sustained a heart attack. *Id., at paras. 11, 14.* Although she was able to hold down employment after the heart attack she has significant limitations including an inability to walk more than 10 steps after which her breathing would become very labored. *Id., at paras. 14, 17-21.*

Plaintiff had taken Vioxx continuously from February of 2000 until the onset of her heart attack, and in the fall of 2004 retained the law firm of Levin, Simes, Kaiser and Gornick to represent her in connection with the injuries she sustained as a result of ingesting Vioxx. *Id., at paras. 10-11.* On November 30, 2007 she received a letter from Mr. Stein "strongly recommending" that she accept the terms of the settlement. *See* November 30, 2007 letter annexed as Exhibit B ("Ex.") to Pickett Aff., but did not have an opportunity to discuss the same with her attorney until after January 11, 2008 when an article appeared in the Wall Street Journal in which she had been quoted as stating "I won't be browbeaten into taking this settlement". *See* January 10, 2008 WSJ article annexed as Ex. C to Pickett Aff. Mr. Stein called her in connection with the article which was followed by a series of conversations with him pressing her to settle and she seeking to proceed to trial, and to ask him repeatedly to take the necessary steps to secure proof of her ingestion over and above her own statements she ingested Vioxx continuously from February of 2000 until September of 2002 when she sustained a heart attack. *Id., at paras. 10-11.*

Plaintiff received samples of Vioxx without prescription and free of charge

because her husband Charles Pickett and Dr. Donald Russ were lifelong friends and Dr. Russ provided all of the medications by way of free samples. *Id., at paras. 6-7.* Plaintiff met Charles in June of 1997 and married him in December of 1999. *Id., at para. 6.* They had a wedding reception in Charleston, South Carolina, in February of 2000 and that was the first time Dr. Russ supplied the plaintiff with sample medications for her in addition to her new husband. *Id., at para. 8.*

Plaintiff specifically recalls that, on February 26, 2000, Dr. Russ giving her a shopping bag full of medications which her son put in the trunk of their car which he was driving back home to Kentucky while plaintiff and her husband were going to California for their honeymoon, and that the same contained Vioxx for her and that she thereafter received Vioxx in a similar manner, that is, from Dr. Russ without charge and without need for a prescription, continuously through September of 2002. *Id., at paras. 8-10.*

In the discussions that continued between plaintiff and Mr. Stein in the months following January of 2008, he repeatedly denigrated her case demanding that she accept the terms of the settlement with her refusing to do so resulting in the firm moving to withdraw in the appearance before the Court on September 12, 2008. *Id., at para. 29.*

After the Court denied the motion to withdraw, the deposition of Dr. Russ was taken October 17, 2008. *Id., at paras. 32-33.* The deadline to join the MSA settlement program had been extended to October 30, 2008, and in the weeks that followed plaintiff was the recipient of her counsel's caustic e-mails, numerous

telephone calls during which bait-and-switch tactics were employed by Mr. Stein to compel plaintiff to execute the settlement documents. *Id., at paras. 33-35.* He would not release the contents of Dr. Russ' deposition to her, nor would he take any other steps toward proving ingestion such as securing depositions or affidavits from her son or from Charles Pickett whom she had divorced in 2006. *Id., at para. 33.*

When plaintiff refused his demands telling him that she believed Vioxx had ruined her life and shortened whatever life she did have left, Mr. Stein said she was engaging in "psycho drama". *Id., at para. 37.* She believes that there were as many as 20 phone calls with Mr. Stein between October 17 and October 24, 2008, and while she does not remember the exact number of conversations, he repeatedly demanded that she settle and told her no further work would be done by the firm regarding ingestion until she executed the settlement documents. *Id., at paras. 33-34.*

Mr. Stein then attempted to convince plaintiff that interviewing Charles Pickett after she signed the consent documents would lead to him being more truthful than if he attempted to interview him prior to her executing the settlement documents, a proposition the plaintiffs thought "preposterous". *Id., at paras. 38-39.*

In the course of the multiple calls and e-mails, by October 24, 2008 plaintiff was experiencing significant emotional stress, her heart was beating rapidly and vigorously, she was experiencing chest pains over and above what she had to live with on a daily basis, and felt that it was too stressful to continue to resist Mr. Stein since she did not have any ability to secure another lawyer and knew she could not handle this on her own. *Id., at paras. 41.*

She executed the settlement documents on October 24, 2008, sending Mr. Stein an e-mail questioning his continued and persistent refusal to do any further work on the issue of ingestion which stated:

> What is going to be different when questioning Charlie in a "settlement context" as versus a deposition? Is he going to be placed under additional pressure for telling the truth in the settlement context than he would be in a normal deposition? What additional information do you have that makes you believe this is true? If you're withholding information from me, I suggest you go to the judge and find out why? You refused to talk to him this week, contrary to my request and now you're telling me that you are not going to talk with him unless I sign the release. I feel that the information I am seeking is critical to my case, as was discussed in front of Judge Higbee. And I believe it is incumbent of you, as my attorney, to assist in obtaining this critical evidence on my behalf.

*Id., at para. 39.* On the same day she executed the settlement documents she sent a letter telling Stein signing the consent documents with "GREAT DURESS" and that she felt it was "incredulous" that the contents of what Dr. Russ said in his deposition which was still being withheld from her in the ongoing effort to compel her to execute the settlement documents. *Id., at para. 42.*

At the time plaintiff executed the settlement documents her only income was $390.00 a week in unemployment compensation which will expire April 12, 2009 leaving plaintiff in a position where she cannot meet all her financial obligations and she has to rely on the generosity of friends to sustain herself economically on a day-to-day basis. *Id., at para. 44.*

The specific provisions in the MSA that plaintiff submits rendered the same unenforceable are set forth as follows:

> 1.2.8.   While nothing in this agreement is intended to operate as a "restriction" on the right of any Claimant's counsel to practice law within

-6-

the meaning of the equivalent to Rule 5.6 (b) of the ABA Model Rules of Professional Conduct in any jurisdictions in which Claimants counsel practices or whose rules may otherwise apply, it is agreed that (except to the extent waived by Merck in its sole discretion in any instance):

    1.2.8.1   By submitting an Enrollment Form, the Enrolling Counsel affirms that he has recommended, or (if such Enrollment Form is submitted prior to February 28, 2008) will recommend by no later than the earlier of the date of the service of the Certification of Final Enrollment and February 28, 2008, to 100% of the Eligible Claimants represented by such Enrolling Counsel that such Eligible Claimants enroll in the program.

    1.2.8.2   If any such Eligible Claimant disregards such recommendation, or for any other reason fails (or has failed) to submit a non-deficient and non-defective Enrollment Form on or before the earlier of the date of service of the Certification of Final Enrollment and June 30, 2008, and the 30th day after the date of service of the Certification of Final Enrollment (or, if such Enrolling Counsel first becomes an Enrolling Counsel after June 30, 2008, shall have, by the date such Enrolling Counsel so first became an Enrolling Counsel), to the extent permitted by the equivalent to Rules 1.16 and 5.6 of the ABA Model Rules of Professional Conduct in the relevant jurisdiction (s), (i) take (or have taken, as the case may be) all necessary steps to disengage and withdraw from the representation of such Eligible Claimant and to forgo any Interest in such Eligible Claimant and (ii) cause (or have caused, as the case may be) each other enrolling Counsel, and each other counsel with an Interest in any Enrolled Program Claimant, which has an Interest in such Eligible Claimant to do the same.

*See* MSA excerpts annexed hereto as **Exhibit 1**, at p.1.

In summary, plaintiff's instant motion is based on facts showing that the contract of settlement, the MSA, was presented to the plaintiff in a form letter under a take -it -or leave -it basis. She was never consulted about the terms, never given an explanation about the nature of or the other claimants involved in the settlement other than by reference saying the sum of $4.85 billion to be allocated among thousands of

"qualifying claims." *Id.* She was provided with the November 30, 2007 "strong recommendation" that she settle, apparently falling into the category of what the letter referenced as the firm's "qualifying clients," but never given any explanation of what that meant. Her response to the proposed settlement, at least through October 23, 2008, is set forth above.

Plaintiff now turns to her argument.

## ARGUMENT

### I.

### THE MSA IS UNENFORCEABLE BECAUSE PLAINTIFF WAS NEVER CONSULTED ABOUT ITS TERMS NOR DID NEGOTIATING COUNSEL DISCLOSE THE EXISTENCE AND NATURE OF OTHER CLAIMS INVOLVED IN THE SETTLEMENT PRIOR TO CONSUMMATING THE MSA.

New Jersey's RPC 1. 8 (g) provides that:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or no contest pleas, unless each client gives informed consent after a consultation that shall include disclosure of the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.

In the instant case, the attorneys who negotiated on behalf of the plaintiff made no effort to obtain her consent, to consult with her, or to disclose the existence and nature of the claims of the other plaintiffs involved in the settlement.

The New Jersey Supreme Court has interpreted RPC 1.8 (g) in the context of a settlement providing that if a weighted majority of plaintiffs approve the settlement it

would be binding upon all. Noting this was its first occasion to interpret this provision, the Court looked to other jurisdictions, beginning with the seminal case of <u>Hayes v. Eagle-Picher Industries, Inc.</u>, 513 F.2d 892 (10th Cir. 1975). In that case, eighteen (18) plaintiffs retained a single lawyer and on the eve of trial the parties reached a settlement agreement which 13 of the 18 plaintiffs approved. When the court made inquiry the following day as to whether any plaintiffs were opposed, and received no objections, it entered a judgment of settlement. Although the District Court thereafter vacated the settlement upon hearing from objecting plaintiffs, it ultimately reconsidered and reinstated the settlement.

On appeal the Tenth Circuit reversed, holding that settlement which was contrary to the wishes of the client and without the client approving its terms was "opposed to the basic fundamentals of the attorney–client relationship." *Id.*, 513 F.2d at 894–95. After reviewing the Kansas Code of Ethics, particularly DR 5–106, the Tenth Circuit further concluded it was "untenable for the lawyer to represent both the clients in favor of settlement and those who opposed it," observing that in a non-class-action case such as was presented:

> It permitted the majority to control the rights of the minority and as such would be "violative of the basic tenets of the attorney–client relationship and that it delegates to the attorney powers which allow him to act not only contrary to the wishes of his client, but to act in a manner disloyal to his client and his client's wishes.

*Id.* The MSA in the case at bar goes even further than majority rule by plaintiffs and removes them entirely from the equation by permitting a small group of attorneys

appointed by no one besides themselves to override the wishes of client./*¹

Indeed, in the next case analyzed by the Illinois Supreme Court, Knisley v City of Jacksonville, 147 Ill. App. 3d 116, 100 Ill. Dec. 705, 497 N. E. 883 (1986), appeal denied, 113 Ill. 2d 576, 106 Ill. Dec. 47, 505 N. E. 2d 353 (1987), the court invalidated a settlement agreement approved by a majority of plaintiffs where some 61 plaintiffs sought to enjoin the City of Jacksonville from issuing certain building permits. Plaintiffs' attorney, after negotiations with the City, called a meeting of plaintiffs to present the proposed settlement and based on the meeting thought he had authority to settle. After some controversy arose among the plaintiffs, the attorney sought to withdraw as plaintiff's counsel and the city filed a petition to enforce the settlement which was granted by the trial court. The appellate court reversed in the first instance because it found the record was adequate to indicate plaintiffs never consented to be bound by the majority, and that enforcing the settlement against the dissenters would be "completely at odds" with DR 5-106. *Id.*, at 886–87. Of particular importance in the instant case is the "sharp distinction" between class-action and simple joinder actions. *Id.*, at 887. The court concluded that in a joinder action there is no judicial review of the settlement and a party should not be bound unless he has

---

¹*/ Although the Plaintiffs Liaison Committee (PLC) was duly appointed by the District Court responsible for presiding over the MDL No. 1657 Vioxx litigation, it was the Negotiating Plaintiff's Committee (NPC) that engaged in settlement negotiations, and consummated the settlement without any formal judicial supervision. Indeed, the Third Circuit has cautioned that even in the class setting a supervising court must be "doubly careful" because of the inherent difficulty in making substantive judgments without a hearing since that is exactly what settlement is intended to avoid. See In Re General Motors Corp. Pick-Up Truck Fuel Tank Product Liab. Litig. 55 F. 3rd 768, 796 (3rd Cir. 1995).

agreed to it and that "fundamental fairness is violated when a settlement is allowed to bind parties who object to it and no safeguards have been added to protect the interests. " *Id.*. at 887–88.

The instant agreement is a lucid real-world example of the fundamental unfairness that can ensue when a small group of lawyers, unchecked, are permitted to make decisions about thousands of plaintiffs all of whom are strangers to them. Although the obvious focus here is on the "all in" provisions, the attorneys also negotiated 8% of the total settlement as their attorneys fees,/*[2] and expressly excluded cardiovascular injuries that were viable in the state tort systems and which had catastrophic consequences for those plaintiffs whose claims were excluded from the settlement./*[3]

It is respectfully submitted that the contractual language as well as the facts

---

[2]*/The First Circuit has observed that the conflict between a class and its attorneys may be most stark where a common fund is created and fees come out of it, thus directly reducing class recovery. Weinberger v. Great Northern Nekoosa Corp., 925 F. 2d 518, 524 (1st Cir. 1991). It is precisely for this reason the Third Circuit has warned that parties should reduce "the danger of an actual or apparent conflict of interest" by delaying the negotiations until after class-action settlement terms have been finalized and the court has authorized fee talks. Prandini v. National Tea Co., 557 F2d. 1015, 1021 (3rd Cir. 1977)

[3]*/ It is difficult to see what incentive, if any, the negotiating attorneys had to represent the interests of the plaintiffs whose claims were excluded and highly likely that "with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant." Ortiz v. Firbreboard Corp., 119 S.Ct. 2295, 2318, n. 30 (1999). The inference is further supported by the Third Circuit's observation that tort claimants have a strong interest in negotiating flexible medical criteria to "keep pace with changing science and medicine, rather than freezing in place the {current} science." Georgine v. Amchem Products, Inc., 83 F.3d 610, 630-31 (CA3 1996).

and circumstances surrounding the MSA provide a sound basis for holding RPC 1.8 (g) precludes enforcing the same against the plaintiff. She next turns to the additional RPC provisions contravened by the MSA.

## II.

### THE MSA VIOLATES RPC 5.6 (B) WHICH PROVIDES A LAWYER SHALL NOT PARTICIPATE IN AN AGREEMENT IN WHICH RESTRICTION ON THE LAWYER'S RIGHT TO PRACTICE IS PART OF THE SETTLEMENT OF A CONTROVERSY BETWEEN PRIVATE PARTIES.

Although the MSA contravenes multiple provisions of the Rules of Professional Conduct (RPC), the rule which most nearly addresses the conduct being challenged here is RPC 5.6 (b) which provides a lawyer shall not participate in an agreement in which restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties. This is because though the rule is couched in terms of the lawyer's right to practice, the Supreme Court has observed that the underlying purpose of the rule is to ensure the freedom of clients to select counsel of their choice. Jacob v. Norris, McLaughlin, 128 N. J. 10, 18, 607 A. 2d 142 (1992). Indeed, the Court in Leonard & Butler v. Harris, 279 N.J.Super. 659, 666, 653 A.2d 1193, 1197 (N.J.Super. 1995), observed that:

> All financial disincentive provisions must be carefully scrutinized because '[b]y forcing lawyers to choose between compensation and continued service to their clients, financial-disincentive provisions may encourage lawyers to give up their clients, thereby interfering with the lawyer-client relationship and, more importantly, with clients' free choice of counsel.

*Id.*, citing Jacob and Katchen v. Wolff & Samson, 258 N.J.Super. 474, 480, 610 A.2d

415 (App.Div.1992).

Merck cannot dispute that MSA section 1.2.8.1 directly and deliberately interferes with the plaintiff's relationship with counsel. Moreover, it is highly likely the same was calculated by Merck to do precisely that. Specifically, MSA section 1.2.8.1 provides "by submitting an Enrollment Form, the Enrolling Counsel affirms that he has recommended.... or will recommend... to 100% of the Eligible Claimants represented by such Enrolling Counsel that such Eligible Claimants enroll in the Program." MSA section 1.2.8.2 provides that if any such Eligible Claimant disregards such recommendation, Enrolling Counsel take "all necessary steps to disengage and withdraw from the representation of such Eligible Claimant ...".

Jacob instructs that in reviewing the impact on the attorney-client relationship the focus is not on counsel, but on the client, and that if the provision in question impacts the clients' freedom of choice, the provision "must fall." Leonard & Butler v. Harris, *supra,* 279 N.J.Super. 659, 668, 653 A.2d 1193, 1198 (N.J.Super. 1995).

The impact on plaintiff in the instant case is amply reflected in the colloquy between plaintiff and the Court in the plaintiff's response to the Court's questioning whether she objects to prior counsel withdrawing, to wit:

> I absolutely object. I need them to represent me. There are no other attorneys out there that will pick up a case that is opted out... they are prohibited – – if they have a case that has opted into the settlement they are prohibited from picking up opt outs, otherwise they are in fear of losing the ability to keep their cases into the settlement.

*See* Transcript annexed as **Exhibit 2,** at p.12.

Plaintiff erroneously characterizes herself as an opt out; however, she has quite

-13-

succinctly set forth the net result of the aforesaid provisions as they impact their relationship with her former counsel.

Here, the facts and circumstances are that if plaintiff's retained counsel did not comply with the "all in" provisions, the firm faced a significant financial loss with regard to the fees available for those clients that they did place in the settlement. It is quite clear once a lawyer enroll a single client in the settlement, pursuant to section 1.2.4 "Enrolling Counsel" becomes "bound by all of the terms and conditions of this Agreement". Any doubt that 1.2.8.2 is aimed directly at creating a substantial financial disincentive for retained counsel to continue representing litigants who refuse to accept the settlement terms should be put to rest by the final provision therein which not only requires withdrawal, but that "Enrolling Counsel" must "forgo any Interest in such Eligible Claimant..." and cause "each other Enrolling Counsel with an Interest... to do the same". This is a provision that takes dead aim at destroying the attorney-client relationship for any plaintiff who refuses to accept the terms of the settlement.

Although the language itself is sufficient to hold the MSA unenforceable, the *de facto* effect is reflected in the recent class-action complaint filed in this Court January 21, 2009 against Merck by plaintiffs who lost their lawyers as a result of the "all in" provisions. See Gene Weeks, et al., v. Merck & Co. Inc., Docket #ATL-Al-263-09. This Court should take judicial notice that the complaint in Weeks involves a number of plaintiffs allege their attorneys recommended they participate in the settlement even though they sustained injuries that were excluded by the express terms of the settlement, *e.g.*, Gene Weeks suffered a heart attack almost 2 years after ingesting

Vioxx and thus was ineligible based on both the duration and proximity gates in the settlement (paras. 48-49), and Kristine Cramer whose son died of a pulmonary embolism and was ineligible under the injury gate in the MSA (paras. 54-57).

Plaintiff next turns, briefly, to the additional rules that are contravened by the MSA. The RPC provides in separate provisions that counsel may withdraw only if the same can be accomplished without adverse effect on the interests of the client (RPC 1.16 (b) (1)); that retained counsel exercise independent professional judgment (RPC 2.1), and that a lawyer abide by the clients decision whether to accept an offer of settlement (RPC 1.2 (a) Each of the aforesaid provisions require no separate analysis since the obvious interference brought about by 1.2.8.1 and 1.2.8.2 is shown in the previous discussion regarding RPC 5.6 (b), and in the following discussion on contract.

### III.

### THE TERMS OF THE MSA AND THE CONDUCT OF PLAINTIFF'S RETAINED COUNSEL COERCED THE PLAINTIFF TO CONSENT RENDER THE MSA UNENFORCEABLE UNDER THE LAW APPLICABLE TO ADHESION CONTRACTS.

A provision is unconscionable if the terms are such that "no reasonable man not acting under compulsion or out of necessity accept them." Rotwein v. General Acct Group, 103 N. J. 406, 418, 247 A. 2d 370 (1968). Unconscionability can be either procedural, which would implicate factors such as age, literacy, lack of sophistication, or hidden or unduly complex contract terms, or substantive, which generally involves harsh or unfair one-sided terms essentially presenting the agreement on a take-it-or-

leave-it basis. *See* <u>Muhammad v. County Bank of Rehoboth Beach, Delaware</u>, 189 N.J. 1, 912 A.2d 88 (N.J. 2006). The instant case has elements of both.

Plaintiff, or for that matter any non- lawyer, would necessarily have a lack of the sophistication necessary to understand the complexities of Vioxx litigation, both from the procedural posture which would include expertise in framing the complaint in the first instance and then being able to assess the variables necessary to prosecute the action and engage in the inevitable motion practice that is inherent in the litigation, as well as substantively understanding the interaction between science and the law necessary to assess the value of the case and move forward with prosecution. Defendant is in no position to deny the substantive unconscionability of the MSA insofar as it being presented to the plaintiff on a take-it-or-leave-it basis, since no plaintiff had the opportunity to engage in any of the traditional negotiations that occur in the formation of contract./*4

Generally speaking the Supreme Court has noted that, "The determination that a contract is one of adhesion, however, 'is the beginning, not the end of the inquiry.' into whether a contract, or any specific term therein should be deemed unenforceable based on policy considerations." <u>Muhammad</u>, *supra*, 189 N.J. at 15, 912 A.2d at 96-97, quoting <u>Rudbart v. North Jersey District Water Supply Comm.</u>, 127 N.J. 344, 354, 605 A.1d 681, *cert. den.* 506 U.S. 871 (1992). The four factor test to be employed includes

---

[4]*/ Any contention the negotiation process contained those elements based on the negotiations between defendant and the Plaintiffs Negotiating Committee (PNC) is without merit in that defendant has consistently taken the position this is a private agreement. As such, there is no basis upon which to assume that the PNC had apparent, let alone actual authority to negotiate on behalf of plaintiff.

(1) the subject matter the contract, (2) the party's relative bargaining position, (3) the degree of economic compulsion motivating the "adhering" party, and (4) the public interest affected by the contract. Delta Funding Corp. v. Harris, 189 N. J. 28, 40 (2006)/*[5] The first Delta factor requires little discussion since no one disputes the fact that this contract was presented on a take-it-or-leave-it basis.

In turning to the second factor it is only necessary to begin with the proposition that "first and foremost, when terminating the attorney–client relationship, the lawyer is not on an equal footing with the client." Pellettieri, Rubenstein and Altman v. Protopapas, 383 N. J. Super 142, 152 (App. Div. 2006). The length of the relationship between plaintiff and her retained counsel in this litigation coupled with its complexity gave the plaintiff virtually no bargaining power. Plaintiff had no choice but to trust her counsel to do the right thing by her, hence the imbalance in power is substantial, and it should not be an issue as to whether this requirement is met.

The refusal to allow plaintiff to see Dr. Russ's deposition testimony unless she consented to the settlement, refusing to gather additional evidence of ingestion knowing the same was crucial to the success of the plaintiff's claim (*see* plaintiffs affidavit at paras. 32-34), not only flew in the face of counsel's fiduciary obligations, but could never have been accomplished without a significant disparity in bargaining power between plaintiff and her counsel. This is best reflected by the fact that the

---

[5]*/Plaintiff respectfully submits that the public interest factor should subsume the first three factors in the case at bar because of the profound impact the agreement has on the practice of law and the historic responsibility the New Jersey Supreme Court has exercised to maintain "public confidence in the judicial system" In re LiVolsi, 85 N. J. 576, 585, 428 A. 2d 1268 (1981).

plaintiff fully recognized the absurdity of the argument her counsel was propounding when he stated her witnesses would be more truthful interviewed after she executed the settlement documents in that on the same day she signed a settlement documents so she wrote her counsel stating, inter alia, "You wanting to talk to Charlie in a 'settlement context' is the most ludicrous things I have yet to hear." *Id.*, at para. 39.

The degree of economic compulsion was significant in that her lifestyle had been completely changed and she is currently living on unemployment benefits which are due to expire in April of this year (*id.*, at para. 44) and the lawsuit is her only possibility of securing compensation that would had these potentially permit had to live a lifestyle consistent with the one she had before her heart attack. The arbitrarily imposed deadlines she was laboring under would also be relevant to a finding this Delta factor is met.

The public interest effect resonates throughout the arguments set forth herein. There is also a significant, indeed compelling, public interest in strictly scrutinizing any provision which denies citizens access to the courts. The interest becomes even more profound when confronting a web of provisions which taken together strip plaintiff of her retained counsel under circumstances where, even if the action remains pending for some period of time, access to the courts becomes wholly illusory. Although this is not a class-action, the number of plaintiffs implicated are certainly a factor worthy of consideration in that the instant case provides a ready example of Professor Coffee's observation that:

> The modern mass torts class action is thus less a device to empower
> plaintiffs and more a tool for defendants to manage (and sometimes quell)

mounting litigation.

John C. Coffee Jr., *Class Wars: The Dilemma of a Mass Torts Class Action*, 95 COLUM. L.REV. 1343, 1350 (1995).

Plaintiff respectfully submits that if the MSA is enforceable then well-heeled defendants such as Merck could shut off access to the courts virtually at will, a result that should not be countenanced by the courts.

## CONCLUSION

It is respectfully submitted that plaintiff Virginia Pickett's consent to the MSA should be vacated, and her action should be restored to the Court's trial calendar for the reasons set forth herein.

Respectfully submitted,

*/s/ Ronald R. Benjamin*
Ronald R. Benjamin
LAW OFFICE OF RONALD R. BENJAMIN
Attorneys for Plaintiff
126 Riverside Drive, P.O. Box 607
Binghamton, New York 13902-0607
(607) 772-1442

*/s/ Gary P. Levin*
GARY P. LEVIN, ESQUIRE
1442 New Road, Suite 3
Northfield, New Jersey 08225
609/646-6100

Attorneys for Plaintiff

-19-