UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| GENE WEEKS, KRISTINE CRAMER, | * | SECTION L |
| NATHAN WILKINS, VIRGINIA PICKET, | * | |
| SUSAN SMITH, on behalf of themselves and | * | JUDGE ELDON E. FALLON |
| all other similarly situated, | * | |
| | * | MAGISTRATE JUDGE |
|                  Plaintiffs, | * | KNOWLES |
| versus | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
|               Defendant. | * | |
| | * | |
| Civil Action No. 2:09-cv-03713 | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## DEFENDANT MERCK & CO., INC.'S MOTION TO STRIKE CLASS ALLEGATIONS IN PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant Merck & Co., Inc. respectfully moves the Court to strike the class allegations in plaintiffs' First Amended Complaint.

As set forth in the accompanying memorandum, plaintiffs' class allegations should be stricken because plaintiffs' class definition – all individuals who accepted the terms of the Master Settlement Agreement "for fear of losing their retained counsel" – is thoroughly subjective. Thus, merely determining who is in the class would require the Court to engage in case-by-case mini-trials implicating the merits of plaintiffs' claims (and impinging on numerous, privileged attorney-client communications).

WHEREFORE, Merck respectfully requests that the Court strike plaintiffs' class allegations.

Dated:  June 22, 2009

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK & CO., INC.

981908v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion to Strike has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 22nd day of June, 2009.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| GENE WEEKS, KRISTINE CRAMER, | * | SECTION L |
| NATHAN WILKINS, VIRGINIA PICKET, | * | |
| SUSAN SMITH, on behalf of themselves and | * | JUDGE ELDON E. FALLON |
| all other similarly situated, | * | |
| | * | MAGISTRATE JUDGE |
|                    Plaintiffs, | * | KNOWLES |
| versus | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
|                 Defendant. | * | |
| | * | |
| Civil Action No. 2:09-cv-03713 | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE CLASS ALLEGATIONS IN PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant Merck & Co., Inc. ("Merck") respectfully submits this Memorandum of Law

in support of its motion to strike the class allegations in Plaintiffs' First Amended Complaint

("Compl.").

Plaintiffs seek to represent a putative class of former litigants who alleged personal

injuries as a result of taking Vioxx and now claim that they only agreed to the terms of the

Master Settlement Agreement because they feared losing their retained counsel.  Plaintiffs' class

allegations are facially untenable because their class definition is based on subjective standards.

As a result, merely deciding who is in the class and who is not would require the Court to engage

in case-by-case mini-trials implicating the merits of plaintiffs' claims (and impinging on

numerous, privileged attorney-client communications).  This Court has previously recognized

that such a class definition is not ascertainable and should thus be stricken.  *See In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2008 WL 4681368, at *9 (E.D. La. Oct. 21, 2008).  It should do so again here.

## BACKGROUND

### A.     The Vioxx Settlement

On November 9, 2007, after several years of litigation that included discovery of millions of documents, depositions of numerous company witnesses and experts, and several bellwether trials, Merck and the Negotiating Plaintiffs' Counsel announced a private agreement to settle many Vioxx personal injury cases pending in the multidistrict litigation ("MDL") proceeding that has been established in this Court and in other jurisdictions around the country.  The agreement established a fund of $4.85 billion from which claimants eligible to participate in the settlement would be compensated.  (*See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007) ("Agreement") (attached as Ex. 1).)  At the request of the parties, this Court agreed to preside over aspects of the settlement program.  (*Id*. § 6.1.1, as amended.)  Independent claims administrators have been processing and evaluating tens of thousands of claims for the past year.  To date, more than $978,000,000 has been paid to 11,543 heart attack claimants under the Resolution Program Fund, and more than $41,000,000 has been paid to 1,345 stroke claimants.  Payments for qualifying myocardial infarction claims are expected to be complete by the end of the third quarter of this year.  Under the terms of the agreement, the processing and payment of ischemic stroke claims began later than they did for myocardial infarction claims because plaintiffs' counsel needed more time to gather the necessary records.  However, payment of those claims has now begun as well.  It is expected that the full $4.85 billion will be distributed before the end of the first half of 2010.

981910v.1

**B.** **Mr. Benjamin's Challenges To The Vioxx Settlement**

Mr. Benjamin, plaintiffs' counsel in this action, has made something of an enterprise out of post-settlement litigation in this Court. He decided not to participate in the settlement and has represented several plaintiffs before this Court and, briefly, before Judge Higbee in New Jersey Superior Court. In addition to the instant suit, he has presented at least four other settlement-related challenges in various courts:

- In December 2007, Mr. Benjamin appealed the settlement to the Fifth Circuit, arguing that it should have been subject to the requirements of Rule 23 and that it effectively terminated claims not covered by its terms. The appeal was dismissed for lack of appellate jurisdiction because the settlement was not a final judgment.

- In June 2008, Mr. Benjamin moved for a further extension of deadlines under Pretrial Order ("PTO") 28, arguing that its requirements were unfair, despite the fact that the deadlines had already been extended in a previous order, which expressly rejected the same fairness arguments and stated that there would be no further extensions. The motion was denied.

- In December 2008, Mr. Benjamin opposed the dismissal of claims of plaintiffs who had failed to comply with PTO 28 and related discovery requirements, again raising arguments that the settlement should have been subject to the requirements of Rule 23 and that PTO 28 was unfair. This Court denied the motion. (*See* Dkt. No. 18527, Apr. 28, 2009.) Mr. Benjamin is appealing the ruling. (*See* Notice of Appeal, *Agard v. Merck & Co., Inc.*, No. 2:05-cv-01089, Dkt. No. 7, May 19, 2009.)

- In March 2009, Mr. Benjamin sought to represent William Cook in connection with his Vioxx suit pending before Judge Higbee. Mr. Benjamin's formal involvement in the case ended when his *pro hac vice* motion was denied.[1]

---

[1]     In denying Mr. Benjamin's motion for admission *pro hac vice*, the court cited his extensive disciplinary record and previous suspension of his license to practice. (*See* Tr. 4:25-7:11, *Cook v. Merck & Co., Inc.*, No. ATL-L-16452 (Super. Ct. Law Div. Atlantic County, N.J. Feb. 25, 2009) (attached as Ex. 2).) Despite the order, Mr. Benjamin later moved to represent Virginia Pickett in her attempt to vacate her consent to the Settlement on the ground that she was coerced into settling by her lawyer. Judge Higbee has taken Mr. Benjamin's application for admission pro hac vice in that case under advisement following full briefing and argument.

981910v.1

### C.      **The Instant Action**

This proposed class action, originally filed before Judge Higbee, presents Mr. Benjamin's latest challenge to the Agreement.  In their complaint, the four named plaintiffs allege that they were "browbeaten" into participating in the Vioxx settlement (Compl. ¶ 73), and that the settlement is "unconscionable and contrary to public policy" (*id*. ¶ 19).[2]  Specifically, plaintiffs claim that "the Plaintiff Liaison Committee . . . combined with a few other private attorneys . . . entered into negotiations with defendant Merck for the purpose of resolving all personal-injury claims in the United States" (*id*. ¶ 14), that the parties entered into a settlement agreement on November 9, 2007 (*see id*. ¶ 15), that "the aforesaid agreement was negotiated with no formal judicial supervision or approval," and that no "court has reviewed the fairness of the settlement" (*id*. ¶ 16).  Plaintiffs also claim that Section 1.2.8 of the Agreement, regarding certain undertakings by lawyers to recommend the settlement to their clients, "contravene[s] New Jersey's Code of Professional Responsibility."  (*See id*. ¶ 18.)  Based on these allegations, plaintiffs seek:  (1) to certify a class of "all litigants who had personal-injury actions pending in any jurisdiction of the United States alleging damages as a result of ingestion of Vioxx, subject to the 'all in' provisions of the MSA [who] consented to . . . accept the terms of the MSA *for fear of losing their retained counsel*" (*id*. Relief Requested (emphasis added)); (2) a declaratory judgment that "the MSA [is] null, void, unenforceable and of no legal effect" (*id*.); (3) an order requiring Merck "to provide notice to each and every class member that they are not bound by the terms of the MSA" (*id*.); and (4) attorneys' fees (*id*.).

---

[2]      On January 21, 2009, Gene Weeks, Kristine Cramer, Nathan Wilkins, Virginia Pickett, and Susan Smith commenced this putative class action against Merck.  Plaintiffs filed an amended complaint on February 13, 2009, dropping Ms. Smith as a proposed representative plaintiff.

## ARGUMENT

A court should strike class allegations when it is clear from the face of a complaint that a proposed class action cannot be certified. *See Nguyen v. St. Paul Travelers Ins. Co.*, No. 06-4130, 2008 U.S. Dist. LEXIS 87706, at *24 (E.D. La. Oct. 6, 2008) ("The Court has authority to strike class allegations on the face of the complaint 'where a complaint fails to plead the minimum facts necessary to establish the existence of a class satisfying Rule 23's mandate.'") (quoting *Aguilar v. Allstate Fire & Cas. Ins. Co.*, No. 06-4660, 2007 U.S. Dist. LEXIS 16073, at *2 (E.D. La. Mar. 6, 2007)). Motions to strike are particularly appropriate where a class definition is not ascertainable – *i.e.*, where class membership cannot be determined based on objective criteria – because it is clear in such a case that class certification will be denied. *See In re Vioxx*, 2008 WL 4681368, at *10 (lack of ascertainability "alone is sufficient to warrant striking the Plaintiffs' class allegations on the pleadings").[3] That is the case here. Plaintiffs' class definition can only be ascertained by resolving a subjective question concerning state of mind: whether each putative class member "accept[ed] the terms of the MSA *for fear of losing their retained counsel*." (Compl. Relief Requested (emphasis added).) Accordingly, determining class membership would require a tedious case-by-case analysis and would tread improperly on merits issues. For both of these reasons, the class allegations should be stricken.

*First,* plaintiffs' class definition is thoroughly subjective. *See* Manual for Complex Litigation (4th) § 21.222, at 270 (while "[a]n identifiable class exists if its members can be

---

[3]     Numerous other cases are in accord. *See, e.g.*, *John v. National Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings"); *Markey v. Louisiana Citizens Fair Plan*, No. 06-5473, 2008 U.S. Dist. LEXIS 106051, at *6 (E.D. La. Dec. 30, 2008) (granting defendant's motion to strike class allegations based on the pleadings); *In re Vioxx*, 2008 WL 4681368, at *9 (same); *Nguyen v. St. Paul Travelers Ins. Co.*, No. 06-4130, 2008 U.S. Dist. LEXIS 87706, at *24 (E.D. La. Oct. 6, 2008) (same); *Barasich v. Shell Pipeline Co.*, No. 05-4180, 2008 U.S. Dist. LEXIS 47474, at *8-9 (same); *Henry v. Allstate Ins. Co.*, No. 07-1738, 2007 U.S. Dist. LEXIS 57822, at *4-7 (E.D. La. Aug. 8, 2007) (same); *Aguilar v. Allstate Fire & Cas. Ins. Co.*, No. 06-4660, 2007 U.S. Dist. LEXIS 16073, at *4-7 (E.D. La. Mar. 6, 2007) (same); *Hedgepeth v. Blue Cross & Blue Shield of Miss.*, No. 1:05-cv142-D-A, 2006 U.S. Dist. LEXIS 3177, at *3-6 (N.D. Miss. Jan. 18, 2006) (same).

5

ascertained by reference to objective criteria," class definitions must "avoid subjective standards (*e.g.*, a plaintiff's state of mind) or terms that depend on resolution of the merits (*e.g.*, persons who were discriminated against)"); *see also Zapka v. Coca-Cola Co.*, No. 99-CV-8238, 2000 WL 1644539, at *3 (N.D. Ill. Oct. 27, 2000) ("[a]n identifiable class does not exist if membership in the class is contingent on the state of mind of the prospective members"). Thus, merely determining who is in the class would be a "Sisyphean task" that "would be a burden on the court and require a large expenditure of valuable court time." *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981). *See also Barasich*, 2008 U.S. Dist. LEXIS 47474, at *13-14 (a class is not ascertainable if its membership can only be determined by individualized mini-trials or requires resolution of a merits question).[4]

As other courts have recognized, a proposed class like plaintiffs' that defines its membership in terms of persons who "fear" a particular outcome improperly calls for a subjective inquiry. In *Rios v. Marshall*, for example, a class was proposed of, among others, "all U.S. migrant farmworkers who, from 1975 to 1979, . . . would have applied for employment . . . but who were discouraged from doing so by said defendants' unlawful acts." 100 F.R.D. 395, 402 (S.D.N.Y. 1983). The court struck this part of the class definition as unascertainable.

---

[4]    The need for mini-trials has been cited by courts in a wide range of cases as grounds for holding that a class definition is not ascertainable. *See, e.g.*, *In re Vioxx*, 2008 WL 4681368, at *10 (striking class allegations in part because "[d]etermining class membership would . . . require an exhaustive series of . . . factual determinations particular to the unique facts of each case"); *Cuming v. South Carolina Lottery Comm'n*, No. 3:05-CV-03608-MBS, 2008 WL 906705, at *1 (D.S.C. Mar. 31, 2008) ("Where the practical issue of identifying class members is overly problematic, the court should consider that the administrative burdens of certification may outweigh the efficiencies expected in a class action."); *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999) ("the class description must be sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member of the proposed class"); *Henry*, 2007 U.S. Dist LEXIS 577822, at *12 n.6 (striking class allegations because "maintaining the instant suit as a class action would result in several thousand mini-trials on individual issues, rather than a single comprehensive resolution of issues relevant to the class as a whole") (citations and quotations omitted); *Indiana State Employees Ass'n, Inc. v. Indiana State Highway Comm'n*, 78 F.R.D. 724 (S.D. Ind. 1978) (class membership of "all past, present and future state patronage employees . . . who suffered harassment, coercion, threats of economic reprisal and job discrimination . . . due to their failure to regularly pay two percent (2%) of their net wages to the political party in control of the state department . . . ." unascertainable because "the Court would have to stage a 'mini-trial' for each member after determining the threshold issue of constitutionality of the challenged practice in favor of the plaintiffs").

"Identification of United States citizen farmworkers who were deterred by defendants' alleged discrimination from applying for jobs in the apple harvests at issue would prove an impossible task" because "the difference between those individuals and all other citizen migrant farmworkers turns on the state of mind of the putative class members." *Id.* at 403. The proposed definition would "require the court to make an unmanageable number of such determinations," and was thus unascertainable. *Id.*

Other courts have likewise rejected proposed class actions where the definition was based on the state of mind of the individual class members. In *Capaci v. Katz & Besthoff, Inc.*, 72 F.R.D. 71 (E.D. La. 1976), for example, the court refused to certify a subclass defined as "[a]ll females who would have applied for employment but have been 'chilled' from doing so by the known discriminatory practices of K&B," *id.* at 75, finding that such a subclass was "indefinable and unidentifiable," *id.* 78. Similarly, in *Zapka*, the court noted that a proposed class of "all individuals who consumed diet Coke from the fountain, deceived by the marketing practices employed by Coca-Cola Company into believing that fountain diet Coke does not contain saccharin," 2000 WL 1644539, at *2, was "contingent on each class member's state of mind," *id.* at *3, and therefore not ascertainable.

Plaintiffs' proposed class here is plagued by the same problems. As noted above, plaintiffs' class would consist of "all litigants who had personal-injury actions pending in any jurisdiction of the United States alleging damages as a result of ingestion of Vioxx" and "consented to . . . accept the terms of the MSA ***for fear of losing their retained counsel***." (Compl. Relief Requested (emphasis added).) Deciding whether or not a particular member of the proposed class feared losing his or her retained counsel – and whether such fear caused that individual to participate in the settlement – would involve a subjective inquiry regarding each

981910v.1

plaintiff's state of mind.  It would also likely require substantial inquiry into privileged attorney-client communications.  These inquiries would have to be undertaken for each of the thousands of individual Vioxx users who agreed to be bound by the MSA – *merely to determine class membership*.  It is thus no exaggeration to say that simply identifying the putative class members would involve the Court in an administrative nightmare.

**Second,** plaintiffs' proposed class definition would also require the Court to improperly tread on merits issues in order to decide class membership.  *See In re Vioxx*, 2008 WL 4681368, at *9 (It is a "'basic tenet of class certification [that] a court may not inquire into the merits of the case at the class certification stage.'") (quoting *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995)); *see also* 2 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 6:14 (4th ed. 2002) ("[A] definition in terms of objective characteristics of class members avoids problems of circular definitions which depend on the outcome of the litigation on the merits before class members may be ascertained."); *Genenbacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485, 488 (C.D. Ill. 2007) (such classes are unfair because the result of resolution of membership question is that class members "win or are not in the class").[5]

This is so because the class definition requires resolution of a factual issue that would be in dispute as to each member of the proposed class and highly relevant to the merits:  whether they were coerced into settling by the terms of the Agreement.  If a class were certified and a

---

[5]     Numerous courts have similarly denied certification or struck class allegations where plaintiffs proposed a "fail-safe" class definition that would require resolution of merits issues. *See, e.g.*, *Brazil v. Dell, Inc.*, 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008) (class of plaintiffs who purchased computers that "Dell falsely advertised" was unascertainable because "it would be necessary for the court to reach a legal determination that Dell had falsely advertised"); *Eversole v. EMC Mortgage Corp.*, No 05-124-KSF, 2007 U.S. Dist. LEXIS 38892, at *15 (E.D. Ky. May 29, 2007) (denying plaintiff's motion for class certification because "the class is defined in such a way that no person could be a plaintiff unless" the defendant was found liable); *Bostick v. St. Jude Med., Inc.*, No 03-2626, 2004 WL 3313614, at *15-16 (W.D. Tenn. Aug. 17, 2004) (proposed class of plaintiffs "who have sustained presently compensable physical injuries due to the aortic connector" was an impermissible fail-safe class definition); *Foreman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (rejecting class certification where the proposed class definition "requires addressing the central issue of liability to be decided in the case.").

trial held, and plaintiffs failed to prove that anyone was coerced into settling, the class itself – consisting only of persons who were coerced into settling – would cease to exist. The judgment would thus bind no one. Any person who enrolled in the settlement would then be free to relitigate the issue in an individual action, unfairly subjecting Merck to endless rounds of costly and time-consuming litigation. The Court should not allow the class device to be used in this fashion. *See Dafforn v. Rousseau Assocs., Inc.*, No. F 75-74, 1976 WL 1358, at *1 (N.D. Ind. July 27, 1976) ("Rule 23 was never meant to be an exception to the rules of res judicata or to provide a risk-free method of litigation. The class definition must be such that all . . . are as much bound by an adverse judgment as by a favorable one.").

In sum, plaintiffs' class definition turns on the subjective criterion of whether a putative class member feared losing his or her counsel. Accordingly, any attempt to determine the membership of plaintiffs' proposed class would require countless factual and nonbinding merits-based inquiries into the individual circumstances of potential class members. For this reason too, the class is not ascertainable and the class allegations should be stricken.

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that the Court strike the class allegations in plaintiffs' complaint.

Dated:  June 22, 2009                                Respectfully submitted,


                                                     */s/ Dorothy H. Wimberly*
                                                     Phillip A. Wittmann, 13625
                                                     Dorothy H. Wimberly, 18509
                                                     STONE PIGMAN WALTHER
                                                     WITTMANN L.L.C.
                                                     546 Carondelet Street
                                                     New Orleans, LA 70130

981910v.1

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005

ATTORNEYS FOR MERCK & CO., INC.

10

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing supporting memorandum has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 22nd day of June, 2009.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax: 504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

981910v.1

# SETTLEMENT AGREEMENT

### Between

### Merck & Co., Inc.

### And

### The Counsel Listed on the Signature Pages Hereto

### Dated As Of November 9, 2007

# **TABLE OF CONTENTS**

**Page**

TABLE OF EXHIBITS AND SCHEDULES.............................................................................. iv

PREAMBLE ........................................................................................................................1

RECITALS ........................................................................................................................1

Article 1 Required Submissions.............................................................................................2
    Section 1.1.   Registration ............................................................................................2
    Section 1.2.   Enrollment...............................................................................................3
    Section 1.3.   Claims Package and Submissions of PME Records ..................................6
    Section 1.4.   Additional Claim Information.....................................................................7
    Section 1.5.   Submissions Review/Completeness Provisions............................................7
    Section 1.6.   Pro Se Enrolled Program Claimants ...........................................................7

Article 2 Eligibility for Claims Valuation ..............................................................................8
    Section 2.1.   Eligibility for Claims Valuation.................................................................8
    Section 2.2.   Eligibility Requirements.............................................................................8
    Section 2.3.   Claims Administrator .................................................................................8
    Section 2.4.   The Gate Committee ..................................................................................9
    Section 2.5.   Determinations of the Gate Committee .....................................................9
    Section 2.6.   Appeal from Determinations of the Claims Administrator
                 and the Gate Committee...........................................................................11
    Section 2.7.   Resolution ...............................................................................................12
    Section 2.8.   New Evidence .........................................................................................13
    Section 2.9.   Qualifying Program Claimant Status as Eligible Claimants....................13

Article 3 Claims Valuation ..................................................................................................14
    Section 3.1.   General....................................................................................................14
    Section 3.2.   Claim Assessment Process .......................................................................14
    Section 3.3.   Fixed Payment ........................................................................................15
    Section 3.4.   Special Review........................................................................................16
    Section 3.5.   Possible Additional Points Award For Second Eligible
                 Event .......................................................................................................17
    Section 3.6.   No Punitive Damages ..............................................................................17

Article 4 Payment to Qualifying Program Claimants .............................................................18
    Section 4.1.   Interim Settlement Payments ...................................................................18
    Section 4.2.   Extraordinary Injury Payments.................................................................20
    Section 4.3.   Final Settlement Payments.......................................................................22
    Section 4.4.   Satisfaction of Liens ...............................................................................22

Article 5 Merck Funding Obligations ...................................................................................22
    Section 5.1.   Merck Funding Obligations .....................................................................22
    Section 5.2.   Limitations on Merck Funding Obligations..............................................25
    Section 5.3.   Certain Letter of Credit Provisions..........................................................26
    Section 5.4.   Administrative Expenses Fund Excess .....................................................28

Section 5.5.    Form of Notices to Escrow Agent ............................................................29

Article 6 Administrators ........................................................................................................29
    Section 6.1.    Appointment and Replacement of Administrative Personnel...................29
    Section 6.2.    Certain General Authority of the Claims Administrator..........................30
    Section 6.3.    Liability of Administrative Personnel.......................................................30

Article 7 Certain Litigation Matters......................................................................................31
    Section 7.1.    Merck Defenses ......................................................................................31
    Section 7.2.    Tolling.....................................................................................................31
    Section 7.3.    Use of Dismissal With Prejudice Stipulations and Releases
                   Prior to Certain Events .........................................................................31
    Section 7.4.    Pursuit of Certain Claims.......................................................................32

Article 8 Submission to Authority .........................................................................................33
    Section 8.1.    Submission to Authority of Chief Administrator and
                   Special Master ........................................................................................33

Article 9 Attorneys' Fees ......................................................................................................35
    Section 9.1.    Individual Counsel Attorneys' Fees.........................................................35
    Section 9.2.    Common Benefit Fees and Reimbursement of Litigation
                   Costs.......................................................................................................35

Article 10 Quality Control and Audit Procedures..................................................................37
    Section 10.1.   Prevention and Detection of Fraud - General ..........................................37
    Section 10.2.   Mandatory Periodic Audits.....................................................................37
    Section 10.3.   Merck/NPC Audit Right ..........................................................................38
    Section 10.4.   Relief  39
    Section 10.5.   Inaccuracy of Representations, Warranties or Certifications ..................40
    Section 10.6.   No Misrepresentation of Program...........................................................41

Article 11 Walk Away Rights and Termination of the Agreement ............................................41
    Section 11.1.   Walk Away Rights and Termination of the Agreement ...........................41
    Section 11.2.   Time to Exercise Walk Away Right ........................................................43
    Section 11.3.   Notice of Exercise ..................................................................................43
    Section 11.4.   Effects of Termination ...........................................................................43

Article 12 Liens......................................................................................................................44
    Section 12.1.   Liens   44

Article 13 No Admission of Liability or Lack of Merit...........................................................46
    Section 13.1.   No Admission of Liability or Lack of Merit.............................................46

Article 14 Reporting Obligations; Merck and NPC Access to Data........................................46
    Section 14.1.   Reporting Obligations.............................................................................46
    Section 14.2.   Merck and NPC Access to Data...............................................................46

Article 15 Public Statements; Confidentiality .......................................................................47
    Section 15.1.   Program Claimant Confidential Information .............................................47
    Section 15.2.   Accurate Public Statement......................................................................47

Article 16 Miscellaneous .......................................................................................................47
    Section 16.1.   Notice by Parties....................................................................................47

Section 16.2.  Receipt of Documentation .......................................................................49
Section 16.3.  Governing Law. ......................................................................................49
Section 16.4.  Waiver of Inconsistent Provisions of Law; Severability ..........................49
Section 16.5.  Facsimile Signatures. .............................................................................50
Section 16.6.  Construction. ...........................................................................................50
Section 16.7.  Entire Agreement ....................................................................................50
Section 16.8.  Headings; References...............................................................................50
Section 16.9.  No Third Party Beneficiaries; Assignment ..............................................51
Section 16.10. Amendments; No Implied Waiver ...........................................................51
Section 16.11. Counterparts ............................................................................................52
Section 16.12. Tax Matters .............................................................................................52
Section 16.13. Further Assurances...................................................................................52

Article 17 Definitions ...................................................................................................52
Section 17.1.  Definitions.................................................................................................52
Section 17.2.  Cross-Reference of Other Definitions. .....................................................64

TABLE OF EXHIBITS AND SCHEDULES

Exhibit 1.1 — Form of Registration Order
Exhibit 1.2.2.3 — Form of Release
Exhibit 1.3.1 — Required PME Records
Exhibit 1.5– Submissions Review/Completeness Provisions
Exhibit 2.2.1.1 — Injury Gate Criteria
Exhibit  2.2.1.2 — Duration Gate Criteria
Exhibit  2.2.1.3 — Proximity Gate Criteria
Exhibit  2.2.2 — Evidence of Usage Confirmation Criteria
Exhibit 2.7.3 — Form of Future Evidence Stipulation
Exhibit  3.2.1 — Points Award Methodology/Criteria
Exhibit 17.1.12 — Claims Form
Exhibit 17.1.27 — Enrollment Form
Exhibit 17.1.29 — Form of Escrow Agreement
Exhibit 17.1.46 — Form of Letter of Credit

Schedule 17.1.22 — List of Excluded Persons

# SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT, dated as of November 9, 2007 (the "Execution Date"), between (i) Merck & Co., Inc., a New Jersey corporation (together with its successors and assigns, "Merck"), and (ii) the counsel listed in the signature pages hereto under the heading "Negotiating Plaintiffs' Counsel" (collectively, the "NPC"; the NPC and Merck, each a "Party" and collectively the "Parties").

Certain terms used in this *Agreement* are defined in Article 17.  These terms are italicized the first time that they appear in the text of this Agreement.

# PREAMBLE

This is an agreement between (i) Merck and (ii) the NPC, which includes all counsel appointed to the Executive Committee of the Plaintiffs' Steering Committee in In re VIOXX Products Liability Litigation, MDL No. 1657, a federal multi-district litigation which is venued in the United States District Court for the Eastern District of Louisiana (such court, the "MDL Court", and such steering committee, the "PSC") and representatives of plaintiffs' counsel in the *Coordinated Proceedings* in the state courts of New Jersey, California, and Texas.  This Agreement establishes a program to resolve the actions, disputes and claims that these, and other, plaintiffs' counsel have asserted against Merck on behalf of their clients related to their clients' alleged use of *VIOXX*.

# RECITALS

A.     Merck voluntarily withdrew VIOXX from the market on September 30, 2004.

B.     As of October 1, 2007, there were approximately 26,000 active VIOXX personal-injury actions filed against Merck nationwide, representing approximately 47,000 claimant groups.

C.     Approximately 14,500 additional claimants asserted direct claims against Merck but agreed to refrain from filing suit while their claims were tolled.  Approximately 13,250 of those agreements remain in effect.

D.     More than 95% of the active plaintiffs are presently coordinated in one of the following four "Coordinated Proceedings":

        a.     In re VIOXX Products Liability Litigation, Federal MDL No. 1657, venued in the MDL Court;

        b.     In re VIOXX Coordinated Cases, JCCP No. 4247, venued in the Superior Court of California, County of Los Angeles;

        c.     In re VIOXX Litigation, Cases No. 619 and 273, venued in the Superior Court of New Jersey, Law Division, Atlantic County; and

Agreement i

Case 2:05-md-01657-EEF-DEK   Document 18084-3   Filed 06/22/2009   Page 20 of 114

   d.       In re Texas State VIOXX Litigation, Master Docket No. 2005-59499,
            venued in the District Court of Harris County, Texas, 157th Judicial
            District.

   E.       The NPC and Merck have agreed to establish a pre-funded, structured private
settlement program, as set forth herein, to resolve pending or tolled (and certain previously
tolled) VIOXX claims against Merck involving heart attacks, ischemic strokes and sudden
cardiac deaths for an overall amount of $4,850,000,000 (the "Program").

   F.       The Program is intended to resolve, in lieu of further litigation, the claims of all
*Eligible Claimants* (including both Eligible Claimants within the Coordinated Proceedings and
Eligible Claimants with pending lawsuits against Merck in any District of Columbia court, any
Puerto Rico court or any court or tribunal of the United States outside the Coordinated
Proceedings) who participate in the Program (except only as otherwise set forth in Section
2.7.3.1).

   G.       A key objective of the Program is that, with respect to any counsel with an
*Interest* in the claims of any *Enrolled Program Claimant*, all other Eligible Claimants in which
such counsel has an Interest shall be enrolled in the Program.

   H.       No claims brought against Merck after the date of this Agreement will be eligible
to participate in the Program or receive any payment under the Program.

   I.       The Program will not be construed as evidence of, or as an admission by, Merck
or any *Released Party* of any fault, *Liability*, wrongdoing or damages whatsoever or as
admission by any Enrolled Program Claimant of any lack of merit in their claims.

   Merck and the NPC hereby agree as follows:

Article 1
Required Submissions

Section 1.1.    Registration

   The Parties agree to apply jointly in each of the Coordinated Proceedings for an order,
substantially in the form of Exhibit 1.1 (the "Registration Order").  According to the terms of the
Registration Order, all counsel of record in cases filed in any of the Coordinated Proceedings
must take such steps as are necessary to ensure that all *Claims* asserted on behalf of a *Person*
asserting a personal injury Claim (either in a pending action or the subject of a *Tolling
Agreement*), and all Claims derivative thereof, *Connected With VIOXX* in which such counsel
had an Interest as of October 1, 2007 (subject to the updating requirements set forth therein) are
registered and all counsel with an Interest in any such Claim are identified.  Such registration
requirement will apply regardless of (i) whether such Claims are Eligible Claims, (ii) whether
such counsel intend to enroll any such Claims in the Program, and (iii) whether such Claims are
filed in any court other than the Coordinated Proceedings.  Counsel shall register such Claims by
filing and serving in accordance with the Registration Order a *Registration Affidavit* no later than
January 15, 2008 covering each Plaintiff and Tolling Claimant (as such terms are defined in the
Registration Order) asserting such Claims.  Pro se claimants must also file and serve a

Registration Affidavit by January 15, 2008.  Registration Affidavits shall be in the form set forth in Exhibit 1.1.  Counsel shall be required to update, within 30 (thirty) days of any change thereto, the information provided by them in their Registration Affidavit and simultaneously serve a copy of any such update in accordance with the Registration Order.

Section 1.2.    <u>Enrollment</u>

1.2.1.    Only Eligible Claimants (and, to the extent required pursuant to Section 1.2.2, *Derivative Claimants*) may enroll in the Program.

1.2.2.    In order for an Eligible Claimant to participate in the Program, such Eligible Claimant must deliver to the *Claims Administrator* an *Enrollment Form* (including all exhibits and attachments thereto), all properly and fully completed, and properly and fully executed by the various Persons specified therein, not later than the *Enrollment Deadline Date*, which, subject to extension as provided herein, is March 1, 2008.

1.2.2.1.    The Enrollment Form for an Eligible Claimant who is represented by counsel must be submitted on his behalf by his *Counsel*.  (For the avoidance of doubt, references herein to Enrollment Forms submitted "by" a *Program Claimant(s)* shall be deemed to include Enrollment Forms so submitted on behalf of such Program Claimant.)  However, in any event, all *Releases* (as defined below), Medical Record Authorization Forms (as such term is used in the Enrollment Form) and Employment Record Authorization Forms (as such term is used in the Enrollment Form) must be properly and fully executed by the Eligible Claimants themselves (in addition to being executed by Counsel as specified therein).  *Dismissal With Prejudice Stipulations* shall be executed by the Eligible Claimants' (other than Eligible Claimants who do not have a lawsuit pending against Merck Connected With VIOXX) respective Counsel (or, if not represented by counsel, by the Eligible Claimants).

1.2.2.2.    In order to qualify for an Interim Settlement Payment, an Eligible Claimant must deliver to the Claims Administrator a properly and fully executed Enrollment Form (including all exhibits and attachments thereto) no later than February 29, 2008.  The Claims Administrator, by no later than March 15, 2008, shall give to counsel for *Registered Eligible Claimants* (or, if not represented by counsel, directly to the Registered Eligible Claimants) who have not enrolled in the Program by February 29, 2008 notice of such failure to enroll.  Neither the Claims Administrator, Merck nor the NPC shall have any Liability for any failure of the Claims Administrator to give any notice described above in this Section.  In any event, Eligible Claimants who have not enrolled by the Enrollment Deadline Date shall not be eligible to participate in the Program except by consent of Merck.

1.2.2.3.    As part of enrollment, each Eligible Claimant will be required to execute a Release, in the form of Exhibit 1.2.2.3 (a "<u>Release</u>"), to

3

Agreement i

(without limitation) release, and indemnify and hold harmless, each Released Party according to the terms set forth therein.

         1.2.2.4.      All Derivative Claimants that have a lawsuit pending against Merck Connected With VIOXX, or who are *Tolling Agreement Parties* Connected With VIOXX, also must execute and deliver to the Claims Administrator their respective Program Claimant's Release and (unless they are Tolling Agreement Parties) Dismissal With Prejudice Stipulation (provided that if such Derivative Claimant is represented by counsel, then only such counsel shall be required to execute such Dismissal With Prejudice Stipulation) in order for such Eligible Claimant to enroll in the Program. The Program Claimant may submit his Enrollment Form without there being full compliance with the preceding sentence at the time of such submission. However, (i) any term of this Agreement to the contrary notwithstanding, such Program Claimant shall not be eligible to receive any Settlement Payment until such full compliance is achieved and (ii) if such full compliance is not achieved by November 30, 2008, such Program Claimant immediately shall cease to have any further rights under the Program, and the Claims Administrator shall deliver such Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding). *Executing Derivative Claimants* have no direct rights or standing under the Program, and their status under the Program is totally derivative of that of their related Enrolled Program Claimant.

        1.2.3.      Submission of an Enrollment Form is irrevocable. No Program Claimant (or related Derivative Claimant specified in Section 1.2.2) may under any circumstances or reason withdraw an Enrollment Form, request the return of his Release or Dismissal With Prejudice Stipulation (other than as specified in Section 2.7.3.1), or otherwise unilaterally exit the Program.

        1.2.4.      By submitting an Enrollment Form, the *Enrolling Counsel*, and all Program Claimants covered by such Enrollment Form (and all related Executing Derivative Claimants), shall be deemed to have agreed to be bound by all of the terms and conditions of this Agreement.

        1.2.5.      Without limitation of Section 1.2.6 or Article 10, each of Merck in its sole and absolute discretion, and the Claims Administrator (with Merck's consent), may accept or reject an Enrollment Form in relation to any particular Program Claimant at any time on or prior to the 30th day after the Enrollment Deadline Date if (i) the Enrollment Form is not properly completed and executed by each Person required to execute such Enrollment Form, or (ii) such Enrollment Form (x) fails to provide the information required therein to be provided in relation to such Program Claimant, (y) fails to include a Release, Medical Record Authorization Form or Employment Record Authorization Form (the latter for applicants for EI Payments) executed by such Program Claimant and each other Person herein and/or therein required in relation to such Program Claimant to execute such Release (except as otherwise provided in Section 1.2.2.4) or (z) fails to

include a Dismissal With Prejudice Stipulation executed on behalf of such Program Claimant, and (except as otherwise provided in Section 1.2.2.4) all related Executing Derivative Claimants (in each case other than Tolling Agreement Parties), by their Counsel.

      1.2.6.     Enrolling Counsel may submit Enrollment Forms for Eligible Claimants on a rolling basis.  However, without limitation of Section 1.2.5, at any time on or prior to the 60th day after service of the Certification of Final Enrollment included in the "Enrollment Materials" included in the Enrollment Form, Merck in its sole and absolute discretion may reject any or all Enrollment Forms submitted by an Enrolling Counsel, in relation to any or all of the Program Claimants covered thereby, for the following reasons:

        1.2.6.1.     Such Enrolling Counsel has failed to file a Registration Affidavit complying with the Registration Order; or

        1.2.6.2.     Such Enrolling Counsel has been determined pursuant to Section 1.2.9 to have failed in any respect to comply with the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3;

        1.2.6.3.     Such Enrolling Counsel has since the Execution Date received compensation (or entered into any agreement or arrangement to receive or potentially to receive compensation) for relinquishing his or her Interest in any Claim Connected With VIOXX of any Eligible Claimant who has not enrolled in the Program as of the date of service of the Certification of Final Enrollment (or, if earlier, June 30, 2008).

      1.2.7.     The parties agree that a key objective of the Program is that, with respect to any counsel with an Interest in the claims of any Enrolled Program Claimant, all other Eligible Claimants in which such counsel has an Interest shall be enrolled in the Program.

      1.2.8.     While nothing in this Agreement is intended to operate as a "restriction" on the right of any Claimant's counsel to practice law within the meaning of the equivalent to Rule 5.6(b) of the ABA Model Rules of Professional Conduct in any jurisdictions in which Claimant's Counsel practices or whose rules may otherwise apply, it is agreed that (except to the extent waived by Merck in its sole discretion in any instance):

        1.2.8.1.     By submitting an Enrollment Form, the Enrolling Counsel affirms that he has recommended, or (if such Enrollment Form is submitted prior to February 28, 2008) will recommend by no later than the earlier of the date of service of the Certification of Final Enrollment and February 28, 2008, to 100% of the Eligible Claimants represented by such Enrolling Counsel that such Eligible Claimants enroll in the Program.

        1.2.8.2.     If any such Eligible Claimant disregards such recommendation, or for any other reason fails (or has failed) to submit a non-

deficient and non-defective Enrollment Form on or before the earlier of the date of service of the Certification of Final Enrollment and June 30, 2008, such Enrolling Counsel shall, on or before the earlier of June 30, 2008 and the 30th day after the date of service of the Certification of Final Enrollment (or, if such Enrolling Counsel first becomes an Enrolling Counsel after June 30, 2008, shall have, by the date such Enrolling Counsel so first became an Enrolling Counsel), to the extent permitted by the equivalents to Rules 1.16 and 5.6 of the ABA Model Rules of Professional Conduct in the relevant jurisdiction(s), (i) take (or have taken, as the case may be) all necessary steps to disengage and withdraw from the representation of such Eligible Claimant and to forego any Interest in such Eligible Claimant and (ii) cause (or have caused, as the case may be) each other Enrolling Counsel, and each other counsel with an Interest in any Enrolled Program Claimant, which has an Interest in such Eligible Claimant to do the same.

1.2.8.3.      Each Enrolling Counsel, by submitting an Enrollment Form, agrees to abide by Section 1.2.8.2 in relation to any Eligible Claimant in which such Enrolling Counsel is an "other Enrolling Counsel" referenced in clause (ii) of said Section 1.2.8.2 (and to do so in the same time frame as is applicable to the Enrolling Counsel who represents such Eligible Claimant).

1.2.9.      Upon request from Merck at any time, the Chief Administrator will determine whether an Enrolling Counsel has failed to comply with the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3 in any respect.  The Chief Administrator's decision on this matter shall be final, binding and Non-Appealable.

1.2.10.      Without limitation, for purposes of Sections 1.2.6, 1.2.7, 1.2.8, 1.2.9, 2.5.3.1, 3.2.1.1 and Section 11.1.5, (i) any Person that would be considered to be an "Eligible Claimant" based on the information set forth in such Person's (or such Person's *Product User's*) complaint, *Profile Form* and/or PME Records shall be considered to constitute an "Eligible Claimant" and (ii) a lawyer or law firm shall be considered to have an Interest in each Person in which such lawyer or law firm claims to have, or have had, an Interest in a Registration Affidavit.

Section 1.3.      <u>Claims Package and Submissions of PME Records</u>

1.3.1.      Each Enrolled Program Claimant shall submit to the Claims Administrator a fully completed *Claims Package*, including all of the *PME Records* and other records or other documentation specified in Exhibit 1.3.1 (the "<u>Required PME Records</u>") but excluding *Additional Claims Information* (which is covered by Section 1.4), by July 1, 2008.

1.3.2.      Each *Claims Form* (and *Supplementary Claims Form*) must be submitted on behalf of the Program Claimant by his Counsel.  If a Program Claimant is not represented by Counsel, such Claims Form (or Supplementary Claims Form) must be executed by the Program Claimant.

6

1.3.3.    Any portion of any or all of the Enrollment Forms and/or Claims Packages may be required to be filed electronically.

1.3.4.    In relation to any particular Enrolled Program Claimant, Merck will provide to the Claims Administrator, the *Gate Committee* and the *Special Master*, and to such Enrolled Program Claimant and his Counsel, such access to the *Litigation Medical Records Depository* as is available to plaintiffs via the Internet at www.lmi-med.com.

1.3.5.    The *Administrators* and the Gate Committee, and their respective representatives and others deemed necessary by each to assist them and/or their representatives, will have unlimited access to all submitted Enrollment Forms and Claims Packages.

Section 1.4.    <u>Additional Claim Information</u>

1.4.1.    The Claims Administrator or the Special Master may require such additional records or other documentation (including further documentation) as either of them may determine is material and necessary (i) to determine whether a particular Enrolled Program Claimant meets the *Eligibility Requirements* or (ii) for purposes of the *Claims Valuation Process* (any such further required records or other documentation, the "<u>Additional Claim Information</u>" ).  In such cases, the Claims Administrator or the Special Master shall issue a written request to the Enrolled Program Claimant's Counsel, or if without counsel, to the Enrolled Program Claimant.

1.4.2.    An Enrolled Program Claimant must produce Additional Claim Information requested pursuant to Section 1.4.1 either within 60 days of service of such request or by the deadline set forth in Section 1.3.1, whichever is later.

1.4.3.    Additional Claim Information shall be submitted by means of a Supplementary Claims Form executed and delivered as specified in Section 1.3.2.

Section 1.5.    <u>Submissions Review/Completeness Provisions</u>

Exhibit 1.5 is hereby incorporated into this Agreement by this reference as if set forth in full herein.

Section 1.6.    <u>Pro Se Enrolled Program Claimants</u>

1.6.1.    Enrolled Program Claimants who are not represented by counsel may request assistance with the claims process from the PSC.

1.6.2.    Enrolled Program Claimants who are not represented by counsel may, at any time, obtain legal counsel in connection with this Agreement.

Article 2
Eligibility for Claims Valuation

Section 2.1.   Eligibility for Claims Valuation

The Claims Valuation Process in the Program is open only to those Enrolled
Program Claimants who are determined or deemed to meet the Eligibility Requirements, or
otherwise are deemed to be "Qualifying Program Claimants," in each case as set forth below in
this Article 2 (any such Enrolled Program Claimant, a "Qualifying Program Claimant").

Section 2.2.   Eligibility Requirements

2.2.1.   The "Eligibility Requirements," with respect to any particular Enrolled
Program Claimant, are the following:

2.2.1.1.   such Enrolled Program Claimant or Enrolled Program
Claimant's Product User shall meet the Injury Gate criteria specified in Exhibit
2.2.1.1 in relation to his *Eligible Event*;

2.2.1.2.   such Enrolled Program Claimant or Enrolled Program
Claimant's Product User shall meet the Duration Gate criteria specified in Exhibit
2.2.1.2 in relation to such Eligible Event; and

2.2.1.3.   such Enrolled Program Claimant or Enrolled Program
Claimant's Product User shall meet the Proximity Gate criteria specified in
Exhibit 2.2.1.3 in relation to such Eligible Event.

2.2.2.   For purposes of the Eligibility Requirements and for purposes of
Claims Valuation Process, evidence of VIOXX usage shall be determined in accordance
with the criteria set forth in Exhibit 2.2.2.

2.2.3.   Exhibits 2.2.1.1, 2.2.1.2, 2.2.1.3 and 2.2.2 are hereby incorporated into
this Agreement by reference.

Section 2.3.   Claims Administrator

2.3.1.   The Claims Administrator initially will determine whether an Enrolled
Program Claimant meets the Eligibility Requirements.  In that connection, the Claims
Administrator shall review and analyze the Claims Package submitted by the Enrolled
Program Claimant and may, to verify completeness or to verify the presence or absence
of a condition suggested in the Claims Package, or in cases of inconsistency, suspicion of
irregularity, for audit purposes and/or similarly appropriate circumstances, review and
analyze other documents or materials that the Claims Administrator has access to
pursuant to this Agreement.

2.3.2.   Any Enrolled Program Claimant who the Claims Administrator
determines meets the Eligibility Requirements is a Qualifying Program Claimant, and
such Enrolled Program Claimant shall have his *EC Claim* assessed, and be eligible to

8

Agreement i

receive payments, as set forth in Article 3 and Article 4.  The Claims Administrator promptly shall notify the Gate Committee and such Enrolled Program Claimant of such determination of the Claims Administrator.

2.3.3.    Any Enrolled Program Claimant who the Claims Administrator determines not to meet the Eligibility Requirements will be subject to the procedures set forth in Section 2.5 and Section 2.6.

Section 2.4.    The Gate Committee

2.4.1.    There is hereby established for purposes of this Agreement a committee called the "Gate Committee".

2.4.2.    Merck shall have right to appoint, remove and replace in its discretion (at any time or from time to time) three representatives to the Gate Committee.  The NPC shall have right to appoint, remove and replace in their discretion (at any time or from time to time) three representatives to the Gate Committee.

2.4.3.    Merck's representatives on the Gate Committee may discuss any matter relating to the Gate Committee and its affairs, or otherwise relating to Section 2.5, with Merck.  The NPC's representatives on the Gate Committee may discuss any matter relating to the Gate Committee and its affairs, or otherwise relating to Section 2.5, with the NPC.

Section 2.5.    Determinations of the Gate Committee

2.5.1.    The Claims Administrator shall inform the Gate Committee on a regular basis of the Enrolled Program Claimants that it has determined fail to meet the Eligibility Requirements.  The Gate Committee subsequently will determine whether such Enrolled Program Claimants will be deemed to be Qualifying Program Claimants notwithstanding the contrary conclusion of the Claims Administrator.

2.5.2.    The Gate Committee shall have the right to receive and review any or all of the records made available to the Claims Administrator concerning any particular Enrolled Program Claimant that the Claims Administrator determined failed to meet the Eligibility Requirements, as well as any additional materials that such Enrolled Program Claimant may wish to provide, any material in the Litigation Medical Records Depository available to the Gate Committee pursuant to Section 1.3.4 or any material otherwise available.

2.5.3.    The Gate Committee shall commence meeting after the Claims Administrator informs the Gate Committee of its first determinations that an Enrolled Program Claimant has failed to meet the Eligibility Requirements.  For the first six months after being so informed, the Gate Committee shall meet on a monthly basis.  Thereafter, the Gate Committee shall meet on a quarterly basis.  The Gate Committee may elect to meet more often if necessary to properly discharge its responsibilities.

9

2.5.3.1. The Gate Committee shall process Program Claims in the order in which they are provided to the Gate Committee by the Claims Administrator, provided that the Gate Committee shall not consider the case of any particular Enrolled Program Claimant until full compliance with the first sentence of Section 1.2.2.4 has been, or is, achieved in relation to such Program Claimant. However, neither the Gate Committee nor Merck shall have any Liability for any failure to comply with the preceding sentence.

2.5.4. An Enrolled Program Claimant that the Claims Administrator has determined not to meet the Eligibility Requirements nonetheless will be deemed to be a Qualifying Program Claimant if a majority of the Gate Committee so determines (for the avoidance of doubt, with or without regard to the Eligibility Requirements). Conversely, subject to Section 2.5.5, an Enrolled Program Claimant will be deemed not to be a Qualifying Program Claimant if three or more members of the Gate Committee determine that the determination of the Claims Administrator should not be overturned. Members of the Gate Committee shall establish procedures to prevent the NPC representatives thereon from voting on cases where they have an Interest. The Gate Committee shall inform the Claims Administrator on a periodic basis of its determinations.

2.5.5.

2.5.5.1. Regardless of any contrary decision of the Claims Administrator and/or the Gate Committee (including any such decision in which any Merck representative on the Gate Committee may have concurred), an Enrolled Program Claimant also will be deemed to be a Qualifying Program Claimant if Merck's representatives on the Gate Committee, in their sole and absolute discretion, deem (by timely (as specified in Section 2.5.5.2) notice to such effect to the Claims Administrator) such Enrolled Program Claimant to constitute a Qualifying Program Claimant (for the avoidance of doubt, with or without regard to the Eligibility Requirements). For the avoidance of doubt, action taken by the Gate Committee as a whole shall not be considered to constitute action taken by Merck's representatives pursuant to this Section 2.5.5.1; Merck's representatives on the Gate Committee shall be considered to have taken action pursuant to this Section 2.5.5.1 only when such representatives shall send a notice to such effect, specifically citing this Section 2.5.5.1, to the Claims Administrator.

2.5.5.2. Any action pursuant to Section 2.5.5.1 shall be taken:

2.5.5.2.1. within six (6) months of the first monthly meeting of the Gate Committee held pursuant to Section 2.5.3, with respect to each Enrolled Program Claimant whose Qualifying Program Claimant status is determined (subject to this Section 2.5.5) by the Gate Committee at such first monthly meeting and/or any intervening monthly meeting held at least twenty (20) days prior to the expiration of such six-month period; and

Agreement i

2.5.5.2.2.    within 30 days following each subsequent meeting of the Gate Committee held pursuant to Section 2.5.3, with respect to each Enrolled Program Claimant whose Qualifying Program Claimant status is determined (subject to this Section 2.5.5) by the Gate Committee at such meeting.

    2.5.5.3.    Merck's representatives on the Gate Committee may unilaterally deem any particular Enrolled Program Claimant to be a Qualifying Program Claimant pursuant to Section 2.5.5.1 only if there is evidence in the Claims Package and/or any of the other records or other documentation available to the Claims Administrator or the Gate Committee that such Enrolled Program Claimant's Product User suffered an Eligible Event and used VIOXX before such Event.

    2.5.5.4.    Merck's representatives on the Gate Committee may unilaterally deem any particular Enrolled Program Claimant to be a Qualifying Program Claimant pursuant to Section 2.5.5.1 only so long as, at such time (and immediately after giving effect to such action), the aggregate number of *Threshold Exceeding Gate Pushes* does not exceed 2,500.

    2.5.5.4.1.    A "Threshold Exceeding Gate Push" shall be deemed to occur when Merck's representatives on the Gate Committee unilaterally deem an Enrolled Program Claimant to be a Qualifying Program Claimant pursuant to Section 2.5.5.1 at a time when the quotient of (i) the then aggregate number of Qualifying Program Claimants divided by (ii) the sum of (A) the then aggregate number of Qualifying Program Claimants plus (B) the then aggregate number of Enrolled Program Claimants whom have been determined not to be a Qualifying Program Claimant (which determination has not effectively been overridden pursuant to this Section 2.5.5) exceeds 0.7.

2.5.6.    If the Gate Committee determines that a particular Enrolled Program Claimant is not to be deemed to be a Qualifying Program Claimant and Merck's representatives on the Gate Committee do not take a contrary action pursuant to Section 2.5.5 within the time period specified therein, then the Claims Administrator thereafter will give written notice to such effect to the Enrolled Program Claimant's Counsel or, if the Enrolled Program Claimant is without Counsel, to the Enrolled Program Claimant directly.

Section 2.6.    Appeal from Determinations of the Claims Administrator and the Gate Committee

2.6.1.    Subject to Section 2.5 and this Section 2.6, determinations of the Claims Administrator pursuant to Section 2.3 shall be final, binding and *Non-Appealable*. Subject to Section 2.5.5 and this Section 2.6, determinations of the Gate Committee pursuant to Section 2.5 shall be final, binding and Non-Appealable.

Agreement i

2.6.2.    If the Gate Committee determines that a particular Enrolled Program Claimant is not to be deemed to be a Qualifying Program Claimant (and Merck's representatives on the Gate Committee do not take a contrary action pursuant to Section 2.5.5 within the time period specified therein), the Enrolled Program Claimant may appeal the Gate Committee's determination to the Special Master by submitting a written notice to such effect to the Claims Administrator and the Special Master within fifteen (15) days of service by the Claims Administrator of the Gate Committee's determination to the Enrolled Program Claimant.  Such notice shall be in such form as determined by the Claims Administrator.

2.6.3.    If the Enrolled Program Claimant serves a timely written notice of appeal, the Special Master will determine de novo whether the Enrolled Program Claimant meets the Eligibility Requirements, based solely on (i) the Claims Package submitted by such Enrolled Program Claimant, and (ii) in the Special Master's discretion, any records or other documentation in the Litigation Medical Records Depository available to the Special Master pursuant to Section 1.3.4 that the Special Master deems relevant.  The Special Master's decision on this matter shall be binding, final, and Non-Appealable.  The Special Master shall notify the Claims Administrator of its decision, and the Claims Administrator shall, promptly following receipt of such notice, notify the Gate Committee and the Enrolled Program Claimant of the Special Master's decision.

Section 2.7.    <u>Resolution</u>

2.7.1.    If (i) an Enrolled Program Claimant receives a notice from the Claims Administrator pursuant to Section 2.5.6, and (ii) such Enrolled Program Claimant makes and wins an appeal to the Special Master pursuant to Section 2.6, such Enrolled Program Claimant shall have his *EC Claim* assessed, and be eligible to receive payments, as set forth in Article 3 and Article 4.

2.7.2.    If (i) an Enrolled Program Claimant receives a notice from the Claims Administrator pursuant to Section 2.5.6, and (ii) such Enrolled Program Claimant makes and loses an appeal to the Special Master pursuant to Section 2.6, such Enrolled Program Claimant immediately shall cease to have any further rights under the Program, and the Claims Administrator shall deliver the Enrolled Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding).

2.7.3.    If (i) an Enrolled Program Claimant receives a notice from the Claims Administrator pursuant to Section 2.5.6 and (ii) such Enrolled Program Claimant does not make an appeal to the Special Master pursuant to Section 2.6, such Enrolled Program Claimant must determine whether to execute and deliver to the Claims Administrator (for Merck) a Future Evidence Stipulation in the form of Exhibit 2.7.3 (the "<u>Future Evidence Stipulation</u>").

2.7.3.1.    If such Enrolled Program Claimant executes and delivers a Future Evidence Stipulation to the Claims Administrator within thirty (30) days

Agreement i

of delivery to such Enrolled Program Claimant or its Counsel of the Claims Administrator notice described in Section 2.5.6, then such Enrolled Program Claimant's Release and Dismissal With Prejudice Stipulation shall, subject to Section 7.2, be returned to such Enrolled Program Claimant.

       2.7.3.2.    If such Enrolled Program Claimant fails to execute and deliver a Future Evidence Stipulation to the Claims Administrator within thirty (30) days of delivery to such Enrolled Program Claimant or its Counsel of the Claims Administrator notice described in Section 2.5.6, then promptly thereafter the Claims Administrator shall deliver the Enrolled Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding).

Section 2.8.   <u>New Evidence</u>

       Anything in this Article 2 above to the contrary notwithstanding, the Claims Administrator may, at any time prior to the Enrollment Deadline Date, upon an application to such effect by an Enrolled Program Claimant, permit such Enrolled Program Claimant to be re-considered for Qualifying Program Claimant status based on new evidence submitted by such Enrolled Program Claimant, if the Claims Administrator determines that (i) such Enrolled Program Applicant was not aware of such new evidence at the time he submitted his original Claims Package, or had made a diligent and good faith attempt to produce such new evidence as part of his original Claims Package, and (ii) such new evidence is material to a determination as to whether such Enrolled Program Claimant meets the Eligibility Requirements. In such cases, such Enrolled Program Claimant's Program Claim shall be considered anew in accordance with the provisions of this Article 2 above, <u>provided</u> that such Enrolled Program Claimant (and his related Executing Derivative Claimants) shall be required to execute and deliver a new Release and Dismissal With Prejudice Stipulation (provided that if such Person is represented by counsel, then only such counsel shall be required to execute such Dismissal With Prejudice Stipulation) if the prior Release and Dismissal With Prejudice Stipulation were returned to such Enrolled Program Claimant pursuant to Section 2.7.3.1 (and may be required to execute and deliver a new Medical Record Authorization Form and Employment Record Authorization Form). Any determination by the Claims Administrator not to, or any other failure by the Claims Administrator to, exercise the discretion afforded to it under this Section 2.8 is final, binding and Non-Appealable.

Section 2.9.   <u>Qualifying Program Claimant Status as Eligible Claimants</u>

       A Person who has been determined or deemed to be a Qualifying Program Claimant pursuant to this Article 2 shall be deemed, for all purposes of Article 3 through and including Article 5 to constitute an "Eligible Claimant" and a "Qualifying Program Claimant" notwithstanding that such Person, for whatever reason, did not meet the Eligibility Requirements. Such Person shall not, however, for the avoidance of doubt, be deemed for purposes of Section 10.4 or Section 10.5 to be an "Eligible Claimant" or a "Qualifying Program Claimant". Nothing in this Section 2.9 limits Merck's rights and remedies in the event of fraud or other intentional misconduct.

13

Article 3
Claims Valuation

Section 3.1.    General

Each Qualifying Program Claimant shall receive a monetary payment based (unless such Qualifying Program Claimant elects to receive a *Fixed Payment* pursuant to Section 3.3) on the number of *Points* awarded to such Qualifying Program Claimant during the Claim assessment process described in Section 3.2.1 (including Exhibit 3.2.1) and Section 3.4 (the "Points Award Process") and the value of those Points as determined after all Qualifying Program Claimants have completed the Claims Valuation Process.  The Points Award Process, together with the *EI Payment* process set forth in Section 4.2, may be referred to herein as the "Claims Valuation Process".

Section 3.2.    Claim Assessment Process

3.2.1.    After an Enrolled Program Claimant has been determined or deemed to be a Qualifying Program Claimant and such Person's *Program Claim* has been *Completed* (as defined below), the Claims Administrator shall determine the number of Points that should be awarded to the Qualifying Program Claimant.  The criteria, methodologies, formulae, guidelines and other terms and conditions for determining Points awards (collectively, the "Point Awards Criteria") are (except for the terms of Section 3.4) set forth in Exhibit 3.2.1. The analysis performed by the Claims Administrator shall be based solely on the terms and conditions of Exhibit 3.2.1.

3.2.1.1.    The Claims Administrator shall process Program Claims in the order in which all of the following are satisfied in relation to Enrolled Program Claimants:  (i) such Enrolled Program Claimant is determined or deemed to be a Qualifying Program Claimant pursuant to Article 2; and (ii) such Enrolled Program Claimant's Program Claim is Completed.  However, neither the Claims Administrator nor Merck shall have any Liability for any failure to do so.

3.2.1.2.    A Program Claim shall be considered to have been "Completed" when the Claims Administrator determines that such Enrolled Program Claimant's entire Claims Package has been provided to the Claims Administrator and such materials are not defective or deficient (or, if applicable, when such Enrolled Program Claimant is given a special dispensation pursuant to section 4(a) of Exhibit1.5, and such dispensation has become final, binding and Non-Appealable).

3.2.2.    As outlined in Exhibit 3.2.1, Points assessment will consider (without limitation and among other factors as set forth in Exhibit 3.2.1) the extent of injury, age, consistency of VIOXX usage, duration of VIOXX usage, risk factors, and the date of the Related Eligible Event.

3.2.3.    The Claims Administrator shall notify each Qualifying Program Claimant, Merck and the NPC of such Qualifying Program Claimant's Points award using a form developed for such purpose by the Claims Administrator.  Such Points

14

Agreement i

award shall be subject to (i) appeal to the Special Master as set forth in Section 3.2.4, (ii) adjustment as set forth in Section 3.4 and (iii) Article 10, but otherwise shall be final, binding and Non-Appealable.

3.2.4.     A Qualifying Program Claimant may appeal its Points award determination of the Claims Administrator to the Special Master by submitting a written notice to such effect to the Claims Administrator and the Special Master within fifteen (15) days of service of the Points award determination.  The Special Master thereupon shall review such determination de novo.  If, upon any such timely appeal, the Special Master determines that a determination of the Claims Administrator was in error, the Special Master either may return the matter to the Claims Administrator for a further determination (which itself may be appealed in the same manner as specified above) or may substitute its own determination for that of the Claims Administrator.  All such determinations of the Special Master shall be final, binding and Non-Appealable.  The Special Master shall notify the Claims Administrator of its determination, and the Claims Administrator shall, promptly following receipt of such notice, notify Counsel for the relevant Qualifying Program Claimant (or, if such Qualifying Program Claimant is without counsel, such Qualifying Program Claimant itself), Merck and the NPC of the Special Master's determination.

Section 3.3.     <u>Fixed Payment</u>

3.3.1.     A Qualifying Program Claimant's Points award shall be considered to be "<u>Pre-Special Review</u>" when the entire process described in Section 3.2 for determining such award (including any appeals to the Special Master) has been completed with respect to such Qualifying Program Claimant.

3.3.2.     If a Qualifying Program Claimant's Pre-Special Review Points award is less than the *Special Review Marker* (any such Qualifying Program Claimant, a "<u>Special Marker QPC</u>"), then such Qualifying Program Claimant shall have the right, by delivering a notice to such effect to the Claims Administrator within 30 days of his receipt from the Claims Administrator of the last notice sent to him pursuant to Section 3.2, to elect to receive (in lieu of all other *Settlement Payments*) a fixed payment of $5,000 (a "<u>Fixed Payment</u>"; any Fixed Payment with respect to an *MI Qualifying Program Claimant*, the "<u>MI Fixed Payment</u>"; and any Fixed Payment with respect to an *IS Qualifying Program Claimant*, the "<u>IS Fixed Payment</u>").

3.3.3.     If a Special Marker QPC timely elects to receive the Fixed Payment, such Fixed Payment thereafter shall be paid in accordance with Article 5, <u>provided</u> that no Fixed Payment shall be paid prior to the expiration of Merck's *Walk Away Right* (without such right having been exercised).

3.3.4.     For the avoidance of doubt, this Section 3.3 is subject in all respects to Article 12 (including in particular Section 12.1.3).

3.3.5.     A Qualifying Program Claimant's Points award shall be considered to be "<u>Final</u>" when (i) such Qualifying Program Claimant's Points award is considered to be

Agreement i

Pre-Special Review, unless such Qualifying Program Claimant is a Special Review QPC (as defined below), and (ii) if such Qualifying Program Claimant is a Special Review QPC, after (and as) such Special Review QPC's Pre-Special Review Points award is adjusted pursuant to Section 3.4. For the avoidance of doubt, a Points award having become Pre-Special Review or Final does not in any manner or to any extent affect the applicability of Article 10 to the related Program Claim.

Section 3.4.    Special Review

3.4.1.    If a Special Marker QPC fails timely to elect to receive a Fixed Payment, such Qualifying Program Claimant's claim shall be reviewed de novo by the Special Master, in accordance with this Section 3.4. Such a Special Marker QPC is generally referred to herein as a "Special Review QPC". A Special Review QPC that is an MI Qualifying Program Claimant may be referred to herein as an "MI Special Review QPC". A Special Review QPC that is an IS Qualifying Program Claimant may be referred to herein as an "IS Special Review QPC".

3.4.2.    The de novo review mentioned in Section 3.4.1 shall only be conducted (i) for MI Special Review QPCs, after all MI Qualifying Program Claimants have been awarded Points pursuant to the Points Award Process, and such Points awards have become Pre-Special Review, and (ii) for IS Special Review QPCs, after all IS Qualifying Program Claimants have been awarded Points pursuant to the Points Award Process, and such Points awards have become Pre-Special Review.

3.4.3.    In performing the de novo review of the Special Review QPC's EC Claim, the Special Master is not bound by the Point Award Criteria specified in Section 3.2 and Exhibit 3.2.1. As a result, because the Special Master may weigh and assess the evidence, including the Special Review QPC's duration of use of the VIOXX, the extent of the Special Review QPC's injury and the risk factors, differently than those criteria are valued under the Point Award Criteria as stated in Section 3.2 and Exhibit 3.2.1, the Special Master's relative evaluation of the Special Review QPC's EC Claims, as compared to one another, may be different than the relative evaluation of those EC Claims by the Claims Administrator.

3.4.4.    In performing this de novo review of the Special Review QPC's EC Claims, the Special Master shall award Points to the Special Review QPCs ranging from 0 to 5 points for MI Special Review QPCs, and 0 to 1 point for IS Special Review QPCs, with the average Points being awarded to said Special Review QPCs to be equal to 2.5 Points for MI Special Review QPCs and 0.5 Points for IS Special Review QPCs.

3.4.5.    All actions of the Special Master, and all adjustments of Pre-Special Review Points awards, pursuant to this Section 3.4 shall be binding, final and Non-Appealable.

3.4.6.    For the avoidance of doubt, Special Review QPCs shall be entitled to receive Final Settlement Payments in the same manner (including at the same time) as

16

other Qualifying Program Claimants that are not Special Marker QPCs, on the basis of their respective Final Points awards after adjustment in accordance with this Section 3.4.

Section 3.5.    <u>Possible Additional Points Award For Second Eligible Event</u>

3.5.1.    Notwithstanding anything in this Agreement to the contrary, an Enrolled Program Claimant may allege a second Eligible Event, in addition to his Related Eligible Event (the "<u>Second Eligible Event</u>" ), solely for the purposes of this Section 3.5.

3.5.2.    Notwithstanding the assertion of a Second Eligible Event, all of the terms and conditions of this Agreement shall continue to apply to the relevant Enrolled Program Claimant and his Related Eligible Event except only as otherwise specifically provided in this Section 3.5.  Accordingly, an Enrolled Program Claimant asserting a Second Eligible Event may, but is not required to, produce any particular PME Records that he desires to have considered by the Claims Administrator and the Gate Committee for purposes of this Section 3.5.

3.5.3.    An Enrolled Program Claimant's Second Eligible Event will be evaluated by the Claims Administrator (both in the context of Article 2 and Article 3) and the Gate Committee at the same time as such Enrolled Program Claimant's Related Eligible Event is evaluated.  If, and only if, the Claims Administrator or the Gate Committee determines that such Enrolled Program Claimant meets the Eligibility Requirements with respect to both his Related Eligible Event and his Second Eligible Event (such an Enrolled Program Claimant, a "<u>Double QPC</u>"), such Double QPC will be eligible to receive bonus Points as described in the following Section.

3.5.4.    The Claims Administrator, in his discretion, may award a Double QPC an additional number of MI Points or IS Points, as the case may be, up to an amount equal to 30% of the number of Points that such Double QPC is awarded by the Claims Administrator solely on the basis of his Related Eligible Event.  The Double QPC's combined base and (if applicable) additional awards of Points shall, after any appeal and adjustment of the base Points award pursuant to Section 3.2.4, constitute the Double QPC's Pre-Special Review Points award for all purposes of this Agreement.

3.5.5.    For the avoidance of doubt, a Double QPC's status as an MI Qualifying Program Claimant or an IS Qualifying Program Claimant, and the resultant nature of any Settlement Payments to him as MI Settlement Payments or IS Settlement Payments, shall be determined based solely on the nature of such Double QPC's Related Eligible Event.

Section 3.6.    <u>No Punitive Damages</u>

By enrolling into the Program, each Program Claimant waives the right to receive any punitive damages pursuant to the Program and each Program Claimant understands and agrees that no Settlement Payment paid hereunder is, or shall be deemed to be, attributable to punitive damages.

17

Article 4
Payment to Qualifying Program Claimants

Section 4.1.    Interim Settlement Payments

4.1.1.        Promptly after the later of (i) August 1, 2008, and (ii) the date on which 2,500 MI Qualifying Program Claimants (including those constituting Special Marker QPCs) have Pre-Special Review Points awards (the later of (i) and (ii), the "MI Initial Settlement Payments Commencement Date"), the Claims Administrator shall estimate (x) the number of Points that ultimately will be awarded to all MI Qualifying Program Claimants (other than Special Marker QPCs) ("Estimated MI Non-Special Marker QPC Total Points") and (y) the number of MI Qualifying Program Claimants that will be Special Marker QPCs (the "Estimated Aggregate MI Special Marker QPCs"), in each case based on the Points awarded to all MI Qualifying Program Claimants (including those constituting Special Marker QPCs) who to such date have a Pre-Special Review Points award and such other factors as the Claims Administrator considers to be appropriate under the circumstances.  Merck and the NPC each shall be entitled to make submissions to the Claims Administrator with respect to such determinations of the Claims Administrator.

4.1.1.1.        From and after the MI Initial Settlement Payments Commencement Date (and such determinations of the Estimated MI Non-Special Marker QPC Total Points and the Estimated Aggregate MI Special Marker QPC), each MI Qualifying Program Claimant (other than a Special Marker QPC) who has a Pre-Special Review Points award shall be paid (in accordance with Article 5) an amount equal to 40% of his estimated *Final Settlement Payment* pursuant to Section 4.3 determined (A) based on his Pre-Special Review Points award, the Estimated MI Non-Special Marker QPC Total Points and the Estimated Aggregate MI Special Marker QPCs (and the estimated MI Point Value derived from all the foregoing), (B) disregarding the reference in Section 4.3 to deducting Interim Settlement Payments and (C) assuming that all Special Marker QPCs will elect to receive Fixed Payments, that the *MI EI Payments* will aggregate the *MI EI Payments Cap Amount* and that the *MI Aggregate Settlement Amount* will not be increased pursuant to Section 5.4.1.  The payments made pursuant to this 4.1.1 may be referred to herein as the "MI Interim Settlement Payments".

4.1.1.2.        Anything in Section 4.1.1.1 to the contrary notwithstanding, in the event that the MI Interim Settlement Payment(s) otherwise to be paid at any time to one or more MI Qualifying Program Claimants would (but for this sentence) result in the aggregate of all MI Interim Settlement Payments to date exceeding an amount equal to 40% of the MI Aggregate Settlement Amount (the "MI Interim Payments Cap"), then all such MI Interim Settlement Payment(s) in question shall be reduced pro rata to the extent necessary so that the MI Interim Payments Cap is not exceeded, and no further MI Interim Settlement Payments shall be made.

18

4.1.2.        Promptly after the later of (i) February 1, 2009, and (ii) the date on which 2,500 IS Qualifying Program Claimants (including those constituting Special Marker QPCs) have Pre-Special Review Points awards (the later of (i) and (ii), the "IS Initial Settlement Payments Commencement Date"), the Claims Administrator shall estimate (x) the number of Points that ultimately will be awarded to all IS Qualifying Program Claimants (other than Special Marker QPCs) ("Estimated IS Non-Special Marker QPC Total Points") and (y) the number of IS Qualifying Program Claimants that will be Special Marker QPCs (the "Estimated Aggregate IS Special Marker QPCs"), in each case based on the Points awarded to all IS Qualifying Program Claimants (including those constituting Special Marker QPCs) who to such date have a Pre-Special Review Points award and such other factors as the Claims Administrator considers to be appropriate under the circumstances.  Merck and the NPC each shall be entitled to make submissions to the Claims Administrator with respect to such determinations of the Claims Administrator.

4.1.2.1.        From and after the IS Initial Settlement Payments Commencement Date (and such determinations of the Estimated IS Non-Special Marker QPC Total Points and the Estimated Aggregate IS Special Marker QPCs), each IS Qualifying Program Claimant (other than a Special Marker QPC) who has a Pre-Special Review Points award shall be paid (in accordance with Article 5) an amount equal to 40% of his estimated Final Settlement Payment pursuant to Section 4.3 determined (A) based on his Pre-Special Review Points award and the Estimated IS Non-Special Marker QPC Total Points and the Estimated Aggregate IS Special Marker QPCs (and the estimated IS Point Value derived from any of the foregoing), (B) disregarding the reference in Section 4.3 to deducting Interim Settlement Payments and (C) assuming that all Special Marker QPCs will elect to receive Fixed Payments, that the *IS EI Payments* will aggregate the *IS EI Payments Cap Amount* and that the *IS Aggregate Settlement Amount* will not be increased pursuant to Section 5.4.1.  The payments made pursuant to this  may be referred to herein as the "IS Interim Settlement Payments".

4.1.2.2.        Anything in Section 4.1.2.1 to the contrary notwithstanding, in the event that the IS Interim Settlement Payment(s) otherwise to be paid at any time to one or more IS Qualifying Program Claimants would (but for this sentence) result in the aggregate of all IS Interim Settlement Payments to date exceeding an amount equal to 40% of the IS Aggregate Settlement Amount (the "IS Interim Payments Cap"), then all such IS Interim Settlement Payment(s) in question shall be reduced pro rata to the extent necessary so that the IS Interim Payments Cap is not exceeded, and no further IS Interim Settlement Payments shall be made.

4.1.3.        Anything in this Agreement to the contrary notwithstanding:

4.1.3.1.        a Qualifying Program Claimant (i) that is a Special Marker QPC, (ii) that did not submit an Enrollment Form on or prior to February 29, 2008 or (iii) in relation to which full compliance with the first sentence of

19

Section 1.2.2.4 was not achieved by February 29, 2008, shall not receive any Interim Settlement Payment;

4.1.3.2. for the avoidance of doubt, no Settlement Payment shall be paid prior to the expiration of Merck's Walk Away Right (without such right having been exercised); and

4.1.3.3. the making of Interim Settlement Payments to Qualifying Program Claimants that are the subject of an audit are prohibited to the extent specified in Section 10.1.4.

4.1.4. The making of any Interim Settlement Payment to any Qualifying Program Claimant shall not create any right or expectancy in favor of such (or any other) Qualifying Program Claimant as to the amount of such Qualifying Program Claimant's Final Settlement Payment or as to the value of Points.

4.1.5. Merck or the NPC may at any time require that the Claims Administrator provide updated Estimated MI Non-Special Marker QPC Total Points, Estimated Aggregate MI Special Marker QPCs, Estimated IS Non-Special Marker QPC Total Points and/or Estimated Aggregate IS Special Marker QPCs figures based on Pre-Special Review Point awards made through a specified date, and from and after any delivery of any such updated figure(s), such updated figure(s) prospectively shall be used for making MI Interim Settlement Payments or IS Interim Settlement Payments, respectively.

Section 4.2.    Extraordinary Injury Payments

4.2.1. MI Qualifying Program Claimants and IS Qualifying Program Claimants may apply to receive extraordinary injury payments ("MI EI Payments" and "IS EI Payments", respectively, and, collectively, "EI Payments").

4.2.2. MI EI Payments for all MI Qualifying Program Claimants cannot in the aggregate exceed $195 million (the "MI EI Payments Cap Amount").

4.2.3. IS EI Payments for all IS Qualifying Program Claimants cannot in the aggregate exceed $105 million (the "IS EI Payments Cap Amount").

4.2.4. Each MI Qualifying Program Claimant that desires to seek an MI EI Payment, and each IS Qualifying Program Claimant that desires to seek an IS EI Payment, shall have the burden of proving to the Special Master's satisfaction such Qualifying Program Claimant's *Specified Documented Economic Damages* and, in that connection, may be required by the Claims Administrator to produce further documentation.

4.2.5. To be eligible to be considered for an MI EI Payment, an MI Qualifying Program Claimant must (i) have a Pre-Special Review Points award in excess of the Special Review Marker and (ii) have (or be a Qualifying Program Claimant in respect of a Product User that has) Specified Documented Economic Damages of not less

20

than $250,000.  To be eligible to be considered for an IS EI Payment, an IS Qualifying Program Claimant must (i) have a Pre-Special Review Points award in excess of the Special Review Marker and (ii) have (or be a Qualifying Program Claimant in respect of a Product User that has) Specified Documented Economic Damages of not less than $250,000 or submit PME Records reflecting an injury that is not adequately reflected by Basic Activities of Daily Living or Instrumental Activities of Daily Living (as such terms are defined in Exhibit 3.2.1).

4.2.6.       Each Qualifying Program Claimant that is eligible for, and properly and timely applies for, an EI Payment shall (subject to Section 4.2.8 and to all of the other terms and conditions of this Agreement) receive an EI Payment according to criteria to be determined by the Claims Administrator, provided that no Qualifying Program Claimant's EI Payment shall exceed $600,000.  EI Payments are in addition to the Final Settlement Payments pursuant to Section 4.3.

4.2.6.1.       "Specified Documented Economic Damages" means, in relation to any Product User, (i) such Product User's past out-of-pocket medical expenses and (ii) such Product User's past lost wages, in each case to the extent that such expenses or lost wages, as the case may be, are (x) a result of such Product User's Eligible Event, (y) *Documented* and (z) have neither been reimbursed nor are eligible for reimbursement.

4.2.6.2.       "Documented" means *Medical Records*, billing records, tax returns, social security earnings statements or any other documentation or evidence requested, or otherwise found acceptable, by the Claims Administrator.

4.2.7.       All determinations concerning a Qualifying Program Claimant's eligibility for an EI Payment, and the amount thereof, shall be made by the Claims Administrator.  The Claims Administrator shall promptly notify each Qualifying Program Claimant, Merck and the NPC of such Qualifying Program Claimant's EI Payment determination.  All EI Payment determinations of the Claims Administrator shall be made according to guidelines to be established by the Claims Administrator in consultation with Merck and the NPC, and (in any event) shall be final, binding and Non-Appealable.

4.2.8.       EI Payment awards shall be determined in the first instance without regard to the MI EI Payments Cap Amount or the IS EI Payments Cap Amount, as the case may be, but no MI EI Payment or IS EI Payment shall be made until all possible MI EI Payments or IS EI Payments, respectively, eligibility and awards determinations have (subject only to the remainder of this Section 4.2.8 below) been made.  However, any term of this Agreement to the contrary notwithstanding, if, after such process has been fully completed, the aggregate MI EI Payments or aggregate IS EI Payments, respectively, so awarded in the first instance would (but for this sentence) exceed the MI EI Payments Cap Amount or the IS EI Payments Cap Amount, respectively, all such initial MI EI Payment awards or initial IS EI Payment awards, respectively, shall be reduced pro rata to the extent necessary so that such aggregate MI EI Payment awards or IS EI Payment awards, respectively, exactly equal the MI EI Payments Cap Amount or IS EI Payments Cap Amount, respectively.  After completion of the entire process set forth

in this Section 4.2.8 with respect to MI EI Payments or IS EI Payments, as the case may be, the final MI EI Payment awards or IS EI Payment awards, respectively, shall be paid in accordance with Article 5.

Section 4.3.    <u>Final Settlement Payments</u>

      4.3.1.    After (and only after) (i) all MI Qualifying Program Claimants have completed the Claims Valuation Process and all Points awards to MI Qualifying Program Claimants have become Final, (ii) the actual aggregate dollar amount of all possible MI Fixed Payments and MI EI Payments has been definitively determined and (iii) the final round of audits pursuant to Article 10 have been completed with respect to all MI Qualifying Program Claimants (or, if earlier, the 60th day after the conditions specified in clauses (i) and (ii) have been satisfied), each MI Qualifying Program Claimant (other than those who elected to receive a Fixed Payment pursuant to Section 3.3) shall be paid an amount equal to (x) the product of such MI Qualifying Program Claimant's MI Points multiplied by the *MI Point Value*, minus (y) the amount of any Interim Settlement Payment made to such Qualifying Program Claimant (each such payment, an "<u>MI Final Settlement Payment</u>").

      4.3.2.    After (and only after) (i) all IS Qualifying Program Claimants have completed the Claims Valuation Process and all Points awards to IS Qualifying Program Claimants have become Final, (ii) the actual aggregate dollar amount of all possible IS Fixed Payments and IS EI Payments has been definitively determined and (iii) the final round of audits pursuant to Article 10 have been completed with respect to all IS Qualifying Program Claimants (or, if earlier, the 60th day after the conditions specified in clauses (i) and (ii) have been satisfied), each IS Qualifying Program Claimant (other than those who elected to receive a Fixed Payment pursuant to Section 3.3) shall be paid an amount equal to (x) the product of such IS Qualifying Program Claimant's IS Points multiplied by the *IS Point Value*, minus (y) the amount of any Interim Settlement Payment made to such Qualifying Program Claimant (each such payment, an "<u>IS Final Settlement Payment</u>").

      4.3.3.    The MI Final Settlement Payments and the IS Final Settlement Payments may be referred to herein as the "<u>Final Settlement Payments</u>").

Section 4.4.    <u>Satisfaction of Liens</u>

      For the avoidance of doubt, this Article 4 is subject in all respects to Article 12 (including in particular Section 12.1.3).

Article 5
<u>Merck Funding Obligations</u>

Section 5.1.    <u>Merck Funding Obligations</u>

      Merck agrees, subject to the terms and conditions hereof (including in particular Section 5.2 and Article 11), to make the payments that it is required from time to time to make pursuant to this Section 5.1 (collectively, the "<u>Funding Payments</u>"

22

5.1.1.    Within fifteen (15) days after the entry of the Registration Order, Merck shall deposit the sum of $3,000,000 into the *Administrative Expenses Fund*;

5.1.2.    By not later than the second *Business Day* after the Walk Away Right shall have expired without any exercise thereof by Merck:

5.1.2.1.    Merck shall deposit the sum of $500,000,000 into the *MI Settlement Fund*; and

5.1.2.2.    Merck shall (i) deposit into the *Escrow Fund* an amount equal to, (ii) deliver to the Claims Administrator one or more *Letters of Credits* with an aggregate "Maximum Draw Amount" (as defined in the form of Letter of Credit attached hereto) equal to, or (iii) effect any combination of (i) and (ii) equal in the aggregate to, $4,100,000,000.

Any cash deposited into the Escrow Fund pursuant to Section 5.1.2.2 shall be divided 79.2683% to the MI Settlement Fund and 20.7317% to the *IS Settlement Fund*; and

5.1.3.    By not later than the later of (i) June 1, 2008 and (ii) three months after the Walk Away Right shall have expired without any exercise thereof by Merck, Merck shall deposit the sum of $250,000,000 into the MI Settlement Fund.

5.1.4.    On a monthly basis, an amount equal to the Net Investment Earnings (as defined in the *Escrow Agreement*) with respect to the MI Settlement Fund and the IS Settlement Fund, respectively, shall be transferred from such *Settlement Funds* to the Administrative Expenses Fund.

5.1.5.    Promptly after the end of each calendar month, the *Escrow Agent* shall submit to Merck, the NPC and the Claims Administrator a report, in such form and in such detail as Merck (in consultation with the NPC) reasonably from time to time may specify (an "Escrow Funds Report"), itemizing and certifying all payments or transfers out of the Escrow Funds during the preceding calendar month, the Net Investment Earnings transferred to the Administrative Expenses Fund during the preceding calendar month and the balance on hand in each Escrow Fund as of the end of such calendar month.

5.1.6.    Within three (3) Business Days after the end of each calendar month, the Claims Administrator shall submit to Merck, the NPC and the Escrow Agent a report, in such form and in such detail as Merck (in consultation with the NPC) reasonably from time to time may specify (a "Payment Report"), itemizing and certifying the following:

5.1.6.1.    a reconciliation of the *Administrative Expenses* and Settlement Payments made during such calendar month against the projected payments for such calendar month specified in the immediately preceding Payment Report;

23

5.1.6.2.     all Administrative Expenses then due and payable, or anticipated to become due and payable during the following calendar month (the "Administrative Expenses Payables");

5.1.6.3.     all Interim Settlement Payments, Fixed Payments, EI Payments and Final Settlement Payments which, as of the end of such calendar month, have been finally determined, and otherwise are timely for payment (including there having been complete compliance with, and satisfaction of, Article 12 (including in particular Section 12.1.3) with respect thereto), pursuant to this Agreement (but have not yet been paid) in respect of MI Qualifying Program Claimants (collectively, the "MI QPC Payables"); and

5.1.6.4.     all Interim Settlement Payments, Fixed Payments, EI Payments and Final Settlement Payments which, as of the end of such calendar month, have been finally determined, and otherwise are timely for payment (including there having been complete compliance with, and satisfaction of, Article 12 (including in particular Section 12.1.3) with respect thereto), pursuant to this Agreement (but have not yet been paid) in respect of IS Qualifying Program Claimants (collectively, the "IS QPC Payables").

Without limitation, the Payment Report shall provide the information necessary for the Escrow Agent actually to make the payments specified in the Payment Report and, in the case of MI QPC Payables and IS QPC Payables, to do so in accordance Article 9. The Claims Administrator forthwith shall provide Merck with such further information concerning any Payment Report as Merck reasonably shall request.

5.1.7.     Subject to Section 5.2.2, within twelve (12) Business Days of its receipt of the Escrow Funds Report and the Payment Report for any particular calendar month, Merck shall make such payments into each of the Escrow Funds as are necessary so that, based solely on the information set forth in such Escrow Funds Report and after giving effect to such Merck payment, the amounts on deposit in each of the Escrow Funds will be sufficient to make all the payments specified in such Payment Report to be paid out of such Escrow Fund (other than any such payment, or any portion thereof, that Merck disputes in good faith (including on the basis that such payment, or portion thereof, does not constitute an Administrative Expenses Payable, a MI QPC Payable or an IS QPC Payable, as the case may be)); provided, however, that in no event shall Merck shall be obligated to pay more than $250,000,000 pursuant to this Section during any single calendar month (excluding from such calculation payments pursuant to this Section in respect of Final Settlement Payments).

5.1.8.     As specified in more detail in the Escrow Agreement, the Escrow Agent will be authorized, subject to having sufficient funds on hand in the applicable Fund, on or promptly after the thirteenth (13th) Business Day following receipt by the Escrow Agent of any particular Payment Report, to pay (i) out of the Administrative Expenses Fund, the various Administrative Expenses Payables specified in such Payment Report, (ii) out of the MI Settlement Fund, the various MI QPC Payables specified in such Payment Report, and (iii) out of the IS Settlement Fund, the various IS QPC

Payables specified in such Payment Report; provided, however, that the Escrow Agent will be prohibited from making any payment set forth in any particular Payment Report, or portion thereof, which Merck is in good faith disputing (including on the basis that such payment, or portion thereof, does not constitute an Administrative Expenses Payable, a MI QPC Payable or an IS QPC Payable, as the case may be).

5.1.9.      For the avoidance of doubt, subject only to Section 5.4, the Net Investment Earnings (as defined in the Escrow Agreement) shall not increase the *Overall Settlement Amount*, the MI Aggregate Settlement Amount or the IS Aggregate Settlement Amount.

Section 5.2.      Limitations on Merck Funding Obligations.

5.2.1.      Any term of this Agreement (or the Escrow Agreement) to the contrary notwithstanding, Merck shall have no financial obligation under this Agreement other than its express obligations to make Funding Payments and/or to post Letters of Credit, in each case as described in Section 5.1.  Merck shall have no obligation to pay (or to make any Funding Payment on account of), or reimburse any Program Claimant or Enrolling Counsel for, any costs or expenses incurred by such Program Claimant or Enrolling Counsel in connection with the Program.  Neither Merck nor any of the other *Merck Released Parties* shall have any responsibility for the management of any of the Escrow Funds or Letters of Credit or any Liability to any Program Claimant arising from the handling of Program Claims by the Special Master and/or the Claims Administrator.

5.2.2.      Any term of this Agreement (or the Escrow Agreement) to the contrary notwithstanding, (i) in no event shall Merck be required to make any Funding Payment to the extent that the making of such Funding Payment would result in, and (ii) in no event shall the Claims Administrator made any draw under any Letter of Credit to the extent that the deposit into the MI Settlement Fund and/or the IS Settlement Fund (as the case may be pursuant to such draw) of the funds drawn pursuant to such draw would result in:

5.2.2.1.      the aggregate deposits (by Merck or from the proceeds of any draw under any Letter of Credit) into the MI Settlement Fund and/or the IS Settlement Fund, less (if applicable) the aggregate amount returned to Merck pursuant to Section 4.4 of the Escrow Agreement, exceeding the Overall Settlement Amount;

5.2.2.2.      the aggregate deposits made (by Merck or from the proceeds of any draw under any Letter of Credit) into the MI Settlement Fund, less (if applicable) the aggregate amount returned to Merck from the MI Settlement Fund pursuant to Section 4.4 of the Escrow Agreement, exceeding the MI Aggregate Settlement Amount; or

5.2.2.3.      the aggregate deposits made (by Merck or from the proceeds of any draw under any Letter of Credit) into the IS Settlement Fund, less (if applicable) the aggregate amount returned to Merck from the IS Settlement

25

Fund pursuant to Section 4.4 of the Escrow Agreement, exceeding the IS Aggregate Settlement Amount.

5.2.3.     Any term of this Agreement (or the Escrow Agreement) to the contrary notwithstanding, in no event shall:

5.2.3.1.     (i) the aggregate of all Settlement Payments exceed the Overall Settlement Amount;

5.2.3.2.     the aggregate of all *MI Settlement Payments* exceed the MI Aggregate Settlement Amount; or

5.2.3.3.     the aggregate of all *IS Settlement Payments* exceed the IS Aggregate Settlement Amount.

Section 5.3.     <u>Certain Letter of Credit Provisions</u>

5.3.1.     If Merck shall fail to comply with its funding obligations under Section 5.1.7 with respect to either Settlement Fund, and Merck shall have failed to cure such failure within five (5) Business Days following receipt of written notice from the Claims Administrator to such effect, then the Claims Administrator may, at any time thereafter so long as such failure continues to exist, make a draw under the Letter of Credit (or, if more than one Letter of Credit is delivered to the Claims Administrator, make draws under each of such Letters of Credit in proportion to the respective "Maximum Draw Amounts" thereunder) in an aggregate amount equal to the amount necessary to cure such failure.  The "Drawing Certificate" in respect of any such draw shall (among other things required by such Certificate) (i) properly specify the instructions in order for the proceeds of such draw to be transferred directly to the Escrow Agent for deposit into the Escrow Fund and (ii) specify the division of the proceeds of such draw between the MI Settlement Fund and the IS Settlement Fund, according to the respective amounts which Merck has failed to fund in relation to each such Fund.  The Claims Administrator also will notify the Escrow Agent of such proper division.

5.3.2.     If on or prior to the tenth Business Day prior to the "Expiration Date" of any Letter of Credit, Merck shall not have caused the issuing bank of such Letter of Credit to deliver an "Extension Notice" thereunder extending such Expiration Date, then the Claims Administrator shall on the next Business Day make a draw under such Letter of Credit in the full amount of the "Maximum Draw Amount" thereunder (any such draw, a "<u>Non-Extension Drawing</u>").  If the Claims Administrator makes draws under one or more Letters of Credit on three separate occasions with respect to three separate failures described in Section 5.3.1, then at any time thereafter when the Claims Administrator shall be entitled to make a further draw on a Letter of Credit pursuant to Section 5.3.1, the Claims Administrator in its discretion may make a draw under such Letter of Credit in the full amount of the "Maximum Draw Amount" thereunder (any such draw, a "<u>Multiple Draw Drawing</u>").  The "Drawing Certificate" in respect of any draw under this Section 5.3.2 shall (among other things required by such Certificate) (i) properly specify

26

the instructions in order for the proceeds of such draw to be transferred directly to the Escrow Agent for deposit into the Escrow Fund and (ii) specify that the proceeds of such draw shall be allocated between the MI Settlement Fund and the IS Settlement Fund in proportion to the respective amounts of the MI Settlement Fund Top-up Amount and the IS Settlement Fund Top-up Amount (calculated at such time). The Claims Administrator also will notify the Escrow Agent of such proper division.

5.3.3.    The Claims Administrator shall, within one (1) Business Day following delivery of any "Draw Certificate" under any the Letter of Credit, deliver a copy thereof to Merck by delivery via email of a PDF copy thereof, the NPC and the Escrow Agent.

5.3.4.    The Escrow Agent shall notify the Claims Administrator of any deposit made by Merck into the MI Settlement Fund and/or the IS Settlement Fund pursuant to Section 5.1.7 and the aggregate amount of such deposit (the "Funding Amount"). Within one (1) Business Day following receipt of any such notice, the Claims Administrator shall deliver to the issuing bank under each outstanding Letter of Credit (i) a completed and signed "Reduction Certificate" specifying that the "Maximum Draw Amount" under such Letter of Credit shall be reduced by an aggregate amount equal to the Funding Amount (or, if more than one Letter of Credit is then outstanding, a portion of the Funding Amount equal to the product of the Funding Amount multiplied by a fraction of the numerator of which equals the "Maximum Draw Amount" at such time under such Letter of Credit and the dominator of which equals the aggregate "Maximum Draw Amount" at such time under all such Letters of Credit) and (ii) the original copy of such Letter of Credit (including the latest "Extension Notice" thereunder, if applicable). Any term of this Agreement to the contrary notwithstanding, Merck shall not be required to make any further Funding Payment under Section 5.1.7 until the Claims Administrator shall have complied with its obligations under this Section in respect of the immediately preceding Funding Payment by Merck under Section 5.1.7.

5.3.5.    Merck may at any time or from time to time deliver to the Claims Administrator a new Letter of Credit in replacement of one or more then-outstanding Letter(s) of Credit, so long as such replacement Letter of Credit has an initial "Maximum Draw Amount" at least equal to the aggregate "Maximum Draw Amount" at the time under all of such Letter(s) of Credit being replaced, and in exchange therefor the Claims Administrator immediately shall surrender the replaced Letter(s) of Credit to Merck (or, at Merck's direction, the respective issuing bank(s) under such Letter(s) of Credit) for cancellation.

5.3.6.    If (i) any amounts are deposited in the Escrow Fund pursuant to a Non-Extension Drawing and (ii) Merck at any time thereafter causes a new Letter of Credit to be issued to the Claims Administrator (other than in replacement of a then-outstanding Letter of Credit pursuant to Section 5.3.5), then the Claims Administrator shall, within one (1) Business Day of the event described in clause (ii), direct the Escrow Agent to pay over to Merck an amount equal in the aggregate to the "Maximum Draw Amount" of such new Letter of Credit. The specific amounts to be paid over to Merck out of each of the MI Settlement Fund and the IS Settlement Fund pursuant to the

27

preceding sentence shall be in such proportion so that, after giving effect to such payment over to Merck, the relative amounts of the MI Settlement Fund Top-Up Amount and the IS Settlement Fund Top-Up Amount shall be in the proportion of 82.4 to 17.6. The notice to the Escrow Agent pursuant to this Section shall specify that it is so being made pursuant to this Section.

5.3.7.   If the Claims Administrator shall be replaced in accordance with this Agreement, then such former Claims Administrator shall, on the last Business Day on which such Claims Administrator acts as the "Claims Administrator" hereunder, deliver to the issuing bank under each then outstanding Letter of Credit (i) a completed and signed "Transfer Certificate" thereunder specifying the name and address of the successor to such Claims Administrator and (ii) the original copy of the Letter of Credit (including the latest "Extension Notice" thereunder, if applicable).

5.3.8.   If the Maximum Draw Amount under any Letter of Credit shall be reduced to zero, or (if earlier) when all possible Settlement Payments have been paid in accordance with this Agreement, the Claims Administrator shall surrender such Letter of Credit to Merck (or, at Merck's direction, the issuing bank under such Letter of Credit) for cancellation.

5.3.9.   The lead arranger(s) for any Letter of Credit facility shall be a major money center bank.

Section 5.4.   Administrative Expenses Fund Excess

5.4.1.   Promptly after the latest to occur of (i) the delivery by the Claims Administrator of a Payment Report that properly lists any MI Final Settlement Payments as an MI QPC Payable (which listing is not disputed by Merck) and (ii) the delivery by the Claims Administrator of a Payment Report that properly lists any IS Final Settlement Payments as an IS QPC Payable (which listing is not disputed by Merck), Merck and the NPC shall deliver a joint direction to the Escrow Agent to (x) transfer from the Administrative Expenses Fund to the IS Settlement Fund (if (i) occurs before (ii)), to the MI Settlement Fund (if (ii) occurs before (i)), or 82.4% to the MI Settlement Fund and 17.6% to the IS Settlement Fund (if (i) and (ii) occur at the same time), an amount equal in the aggregate to the Excess Administrative Expenses Fund Amount (determined at such time) and (y) pay over to Merck an amount equal to the amount described in clause (y) of the definition of the term "Excess Administrative Expenses Fund Amount".

5.4.2.   The Claims Administrator shall notify Merck and the NPC when all Settlement Payments have been paid. At any time after (i) delivery of the notice specified in the preceding sentence or (ii) any exercise by Merck of its Walk Away Right, at Merck's request, Merck and the NPC shall deliver a joint direction to the Escrow Agent to transfer the balance then remaining in the Administrative Expenses Fund (x) in the case of (i) above, as may be jointly agreed by Merck and the NPC and (y) in the case of (ii) above, to Merck. By making such request to the NPC, Merck shall be deemed to have agreed to directly pay, to the extent of any amount so paid over to it from the Administrative Expenses Fund pursuant to such request, any Administrative Expenses

28

that otherwise would have been paid out of the Administrative Expenses Fund pursuant to this Agreement but for such payment over to Merck.

Section 5.5.    Form of Notices to Escrow Agent

 5.5.1. Notices to the Escrow Agent contemplated by this Article 5 shall be in such form as the Escrow Agent reasonably may specify from time to time.

Article 6
Administrators

Section 6.1.    Appointment and Replacement of Administrative Personnel

 6.1.1. This is a private agreement.  At the request of the Parties, The Honorable Eldon E. Fallon has agreed to preside over the Program in the capacities specified herein.  For convenience, Judge Fallon will be referred to herein as the "Chief Administrator".

 6.1.2. The initial Claims Administrator is Brown Greer PLC.

 6.1.3. In the event that Merck, on the one hand, and a majority in number of the NPC, on the other hand, at any time cannot agree on (i) the identity of any Administrator (including any replacement Administrator), (ii) whether a particular Administrator should be terminated (or any other exercise of rights under any *Administrative Agreement* that requires for such exercise joint action of Merck and the NPC (or a majority in number of the NPC)) or (iii) the terms and conditions of a proposed Administrative Agreement, Merck or the NPC may, by notice to such effect to the other and to the Special Master, refer the matter to the Special Master.  If the current Special Master, or the proposed Administrative Agreement of a current or proposed Special Master, is the subject of the dispute, then references in the preceding sentence, and in Sections 6.1.4 and 6.1.5, to the "Special Master" instead shall constitute references to the "Chief Administrator".

 6.1.4. In the event of a dispute described in clause (iii) of Section 6.1.3, Merck, on the one hand, and the NPC, on the other, shall, within five (5) Business Days of referral of such matter to the Special Master, submit to each other and the Special Master its proposed form of Administrative Agreement.  Either Merck or the NPC may, in its discretion, within a further five Business Days, submit to each other and the Special Master a memorandum supporting its position.  If two proposed forms of Administrative Agreements are submitted, the Special Master shall select between the two proposed forms of agreement on the basis of which proposed agreement in its opinion more closely reflects what is customary and "market" for agreements of the nature contemplated by the relevant Administrative Agreement (entered into in the context of programs of the nature of the Program) and such other matters as the Special Master shall consider appropriate under the circumstances.

29

6.1.5.    Any decision of the Special Master pursuant to this Section 6.1 shall be final and Non-Appealable and binding on the Parties and (without limitation of the foregoing) the Parties shall take all actions required in order to implement such decision.

Section 6.2.    Certain General Authority of the Claims Administrator

6.2.1.    The Claims Administrator shall have the authority to perform all actions, to the extent not expressly prohibited by, or otherwise inconsistent with, any provision of this Agreement, deemed by the Claims Administrator to be reasonably necessary for the efficient and timely administration of this Agreement.

6.2.2.    The Claims Administrator may create administrative procedures, supplementary to (and not inconsistent with) those specified herein or in the Exhibits hereto, that provide further specific details about how Program Claims are administered, and/or other aspects of the Program; provided, however, that such procedures comply with the terms of this Agreement.

6.2.3.    Without limitation of the foregoing, the Claims Administrator shall have the authority to modify and/or supplement the form of Enrollment Form, Claims Form and/or Supplementary Claims Form provided for herein to provide for more efficient administration of the Program, provided that (i) such changes may not materially alter the substance of such form without the consent of both Merck and a majority in number of the NPC, (ii) such changes in any event must be approved by the liaison committee described in Section 6.2.4 below and (iii) no change shall be made in the form of Release, form of Dismissal With Prejudice Stipulation, form of Medical Record Authorization Form or form of Employment Record Authorization Form without Merck's prior written consent.

6.2.4.    Each of Merck and the NPC shall appoint one or two individuals (such number to be determined in each of their respective discretion) to act as a liaison with the Claims Administrator, including answering any questions that the Claims Administrator may have with respect to the interpretation of any provision of this Agreement.

Section 6.3.    Liability of Administrative Personnel.

Without limitation of 16.9.2, no Administrator, or employee or agent of any Administrator, shall be liable to any Program Claimant or any Enrolling Counsel for his acts or omissions, or those of any agent or employee of any Administrator, in connection with the Program except, with respect to each such Person, for such Person's own willful misconduct. Nothing in this Section 6.3 confers on any Program Claimant or Enrolling Counsel any privity of contract with, or other right to institute any action against, any Administrator.

## Article 7
## Certain Litigation Matters

Section 7.1.     <u>Merck Defenses</u>

  Merck agrees that, except as reflected in (i) the requirements for constituting an Eligible Claimant, (ii) the Eligibility Requirements or (iii) the Point Awards Criteria, and without limitation of, and subject to, all of the other express terms of this Agreement (including Article 10), any defenses of liability that Merck might otherwise have as against the Program Claims of any particular Enrolled Program Claimant, such as statutes of limitation and repose, jurisdiction, venue, mitigation, comparative/contributory negligence, assumption of risk, independent intervening cause and products' liability, specific defenses such as state of the art, no safe alternative design, preemption, FDA and other regulatory approval, learned intermediary, etc., shall not (for purposes of, and solely for purposes of, this Agreement) apply to such Program Claim of such Enrolled Program Claimant.  For the avoidance of doubt, it is understood and agreed that any and all such defenses (and any and all other available defenses) shall be available to Merck with respect to any litigation outside of this Agreement with such Enrolled Program Claimant (including in the event that his Release is returned to him as set forth herein).

Section 7.2.     <u>Tolling</u>

  Without limitation of Section 7.1, in order to avoid the necessity of filing or pursuing a VIOXX-related claim, Merck hereby agrees, with respect to each Enrolled Program Claimant who is a party to a Tolling Agreement (but not any other Tolling Agreement Party) and who exits the Program under circumstances such that his Release is returned to him, to toll, for 60 days following such exit, the running of any applicable statute of limitations that otherwise may apply to the EC Claim of such Enrolled Program Claimant.  If such Enrolled Program Claimant does not, within such 60-day period file a complaint against Merck with respect to the EC Claim of such Enrolled Program Claimant, then the Claims Administrator shall deliver the Enrolled Program Claimant's Dismissal With Prejudice Stipulation and Release to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding).  All Tolling Agreements heretofore entered into between an Enrolled Program Claimant and Merck are otherwise terminated and superseded by this Agreement, except as provided above.

Section 7.3.     <u>Use of Dismissal With Prejudice Stipulations and Releases Prior to Certain Events</u>

  Except as otherwise provided in this Agreement, the Claims Administrator shall retain control of the Release and Dismissal With Prejudice Stipulation of any particular Program Claimant until such time as the Final Settlement Payment or Fixed Payment, as applicable, is made to such Enrolled Program Claimant hereunder, at which time such Dismissal With Prejudice Stipulation and such Enrolled Program Claimant's Release shall be delivered to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding).

31

Agreement i

Section 7.4.    <u>Pursuit of Certain Claims</u>

      7.4.1.    From and after the date on which an Enrollment Form is submitted in relation to a particular Program Claimant until the earlier of (i) the date on which such Program Claimant's Dismissal With Prejudice Stipulation is delivered to Merck pursuant hereto or (ii) if applicable, the date such Enrollment Form is rejected by the Claims Administrator or Merck in relation to such Program Claimant pursuant to Section 1.2.5 or Section 1.2.6 or such Program Claimant exits the Program under circumstances such that his Release is returned to him, such Program Claimant, and all related Executing Derivative Claimants, shall:

          7.4.1.1.    be prohibited from, and refrain from, taking any action (including any legal action) to initiate, pursue or maintain, or otherwise attempt to execute upon, collect or otherwise enforce, any actual or alleged *Released Claims and Liabilities* of or against Merck or any other Released Party (other than to the extent inherent in making and pursuing a Program Claim in accordance with the terms of this Agreement);

          7.4.1.2.    without limitation of Section 7.4.1.1, (i) cooperate in all reasonable respects with Merck to seek to stay, and to continue in effect any then outstanding stay with respect to, any pending legal proceedings instituted by such Program Claimant and/or Derivative Claimants against Merck or any other Released Party Connected With VIOXX and (ii) refrain from instituting any new legal action against any Released Party Connected With VIOXX; and

          7.4.1.3.    without limitation of Section 7.4.1.1 or 7.4.1.2, be prohibited from, and refrain from, attempting to execute or collect on, or otherwise enforce, any judgment that may be entered against Merck or any other Released Party in any legal action described in Section 7.4.1.2.

Further, if such Program Claimant is determined or deemed to be a Qualifying Program Claimant, or exits the Program under circumstances such that his Release remains in effect, in furtherance and not in limitation of such Release, any judgment referred to in Section 7.4.1.3 automatically shall be deemed to have been Released (as such term is defined in such Release) by such Program Claimant and all such Derivative Claimants, and such Program Claimant and Derivative Claimants shall execute such instruments, and take such other actions, as Merck reasonably may request in order to further evidence or implement the same.

      7.4.2.    Without limitation of Section 7.4.1 (and in addition to and without limitation of the terms of his Release), each Enrolled Program Claimant, and all related Executing Derivative Claimants, jointly and severally, shall indemnify and hold harmless Merck and each other Merck Released Party from and against (i) any and all Claims made or asserted (prior to, on or after the date of such Enrolled Program Claimant's Program Claim) against Merck or any other Merck Released Party by any *Non-Merck Released Party* (for contribution, indemnity (contractual or non-contractual) or otherwise) arising out of any Claim Connected With VIOXX made or asserted at any

32

time by such Enrolled Program Claimant, and/or any Derivative Claimant and/or Product User with respect to such Enrolled Program Claimant, against any Non-Merck Released Party and (ii) any and all damages, losses, costs, expenses (including legal fees and expenses) and/or Liabilities incurred or suffered by, or imposed on, any Merck Released Party in connection with, arising out of or resulting from (x) any Claim described in clause (i) (including any amount paid or required to be paid in satisfaction of any such Claim), (y) any judgment suffered by any Merck Released Party in any legal action described in Section 7.4.1.2 (including any amount paid or required to be paid in satisfaction of any such judgment) and/or (z) any violation by such Enrolled Program Claimant, and/or any related Executing Derivative Claimant, of Section 7.4.1.  This Section 7.4.2 shall become null and void in the event that such Enrolled Program Claimant exits the Program under circumstances such that his Release is returned to him. Merck may setoff all or any portion of any amount payable to any Merck Released Party pursuant to this Section 7.4.2 by an Enrolled Program Claimant against an equal amount of any Funding Payment obligation hereunder in respect of any Settlement Payment from time to time payable under this Agreement to such Enrolled Program Claimant (and such setoff shall be deemed to satisfy, to the extent of the amount of such setoff, both such Funding Payment obligation and the relevant Settlement Payment obligation to such Enrolled Program Claimant).

Article 8
Submission to Authority

Section 8.1.    Submission to Authority of Chief Administrator and Special Master

8.1.1.    Each Party and, by submitting an Enrollment Form, each Program Claimant and Enrolling Counsel, agrees that authority over the process contemplated by the Program, including any Claims submitted under the Program, resides with those Persons appointed pursuant to this Agreement to exercise that authority, as such authority is specified in this Agreement.

8.1.2.    Except as specifically provided in this Agreement, any dispute that arises under or otherwise in connection with (i) this Agreement and/or any Program Claim and/or (ii) any other Administrative Agreement under which disputes are agreed to be handled in the manner set forth in this Article 8, shall be submitted to the Chief Administrator who shall sit as a binding arbitration panel and whose decision shall be final, binding and Non-Appealable.  If any such dispute is brought to the Chief Administrator, each party who has a stake shall have 15 days (or as the Chief Administrator shall otherwise order) to submit papers and supporting evidence and to be heard on oral argument if the Chief Administrator desires oral argument.

8.1.3.    If the Chief Administrator concludes, for whatever reason, that he should not determine an issue arising under this Agreement or otherwise in connection with this Agreement and/or any Program Claim, the Special Master shall sit as a binding arbitration panel to decide the issue.

33

8.1.3.1.     In such instances, any party may serve a demand for arbitration on the Special Master and all parties who have a stake in the issue disputed.  Service shall be effected by regular and certified mail.  Service shall be complete upon mailing.

8.1.3.2.     The parties who have a stake in the issue disputed and who participate in the arbitration shall agree upon appropriate rules to govern the arbitration.  If the parties cannot agree on appropriate rules within ten (10) Business Days of the service of the notice of demand, the applicable rules shall be the American Arbitration Association's Commercial Arbitration Rules that are effective on the date of the notice of demand, exclusive of the requirement that the American Arbitration Association administer the arbitration.

8.1.3.3.     In deciding the issue disputed, the Chief Administrator's prior decisions on analogous matters shall bind the Special Master.  Where the Chief Administrator has not decided an analogous matter, the Special Master shall apply the substantive law specified in Section 16.3, without regard to that jurisdiction's choice-of-law rules.

8.1.4.     The Parties agree that if the Special Master is, under applicable law, precluded from determining an issue otherwise to be determined by the Special Master pursuant to Section 8.1.3, then any suit, action or proceeding by either Party with respect to such matter may be instituted in (and only in) the U.S. District Court for the Eastern District of Louisiana (and appellate courts for the foregoing).  Each Party hereby:

8.1.4.1.     (i) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any suit, action or proceeding instituted against it pursuant to this Section 8.1.4, and (ii) agrees that a final judgment in any suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law;

8.1.4.2.     agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to this Section 8.1.4 may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address for notices pursuant to Section 16.1.1, such service to become effective 30 days after such mailing, provided that nothing contained in this Section 8.1.4.2 shall affect the right of any party to serve process in any other manner permitted by law;

8.1.4.3.     (i) waives any objection which it or he may now or hereafter have to the laying of venue of any suit, action or proceeding pursuant to this Section 8.1.4 brought in any court specified above in this Section 8.1.4, (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

34

8.1.4.4.    WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY ACTION, SUIT OR PROCEEDING PURSUANT TO THIS SECTION 8.1.4 AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Article 9
Attorneys' Fees

Section 9.1.    Individual Counsel Attorneys' Fees

Neither Merck nor any other Released Party shall have any responsibility whatsoever for the payment of Enrolled Program Claimants' (and/or related Executing Derivative Claimant's) attorneys' fees or costs. The Claims Administrator shall endeavor to make all Settlement Payments owed in relation to any particular Program Claim pursuant to this Agreement payable in the name of the relevant Enrolled Program Claimant, his Counsel (if any) and each related Executing Derivative Claimant, subject to a reduction pursuant to common benefit fees and reimbursement of costs as set forth in Section 9.2 below as determined by the Chief Administrator. (For the avoidance of doubt, any such reduction nonetheless shall constitute a Settlement Payment.) However, none of the Released Parties or the Claims Administrator shall have any Liability for any failure to do so. No notice of representation or change in representation by any Enrolled Program Claimant (and/or any Executing Derivative Claimant with respect to such Enrolled Program Claimant), other than that which is made in such Enrolled Program Claimant's Enrollment Form, shall change the application of this Section 9.1. Any division of any Settlement Payment with respect to, and as between, any Enrolled Program Claimant, any related Executing Derivative Claimants and/or his or their respective counsel is to be determined by such Persons and any such division, or any dispute in relation to such division, shall in no way affect the validity of this Agreement or the Release or Dismissal With Prejudice Stipulation executed by such Enrolled Program Claimant (and any related Executing Derivative Claimants) or his Counsel, as applicable. Nothing in this Section 9.1 limits or qualifies Article 12 (including in particular Sections 12.1.3 and 12.1.5).

Section 9.2.    Common Benefit Fees and Reimbursement of Litigation Costs

9.2.1.    To ensure that NPC, PSC, PEC, PLC, and common benefit attorneys (hereinafter referred to as "Common Benefit Attorneys") are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement. Any sum paid as a common benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement. The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.

9.2.2.    In addition to those amounts provided in Section 9.2 above, Common Benefit Attorneys shall also be entitled to reimbursement of their reasonable common benefit expenses. Reimbursement of these expenses shall be deducted from the clients' net recovery. The PLC shall submit to the Claims Administrator the audited common

35

benefit expenses of Common Benefit Attorneys,' which sum will be deducted on an equal percentage basis from the MI Settlement Fund and IS Settlement Fund.

      9.2.3.      Pursuant to Sections 9.2.1 and 9.2.2, the attorneys' fees and common benefit expenses deducted by the Claims Administrator shall be deposited into an interest bearing escrow account (the "Settlement Fee and Cost Account"). The Settlement Fee and Cost Account shall be maintained at a financial institution.  Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval, upon due consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent, e.g., Blum v. Stenson, 465 U.S. 886, 900 (1984); Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 583 n. 15 (5th Cir.1980); Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974); Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 851-52 & n. 5 (5th Cir.1998); Forbush v. J.C. Penney Co., 98 F.3d 817, 823 (5th Cir.1996); Turner v. Murphy Oil USA, Inc., 472 F.Supp.2d 830 (E.D.La. 2007).

      9.2.4.      The Honorable Eldon E. Fallon will be asked to appoint a committee of eight plaintiffs' counsel which shall include all members of the NPC and two additional plaintiffs' attorneys to be responsible for recommending to the Honorable Eldon E. Fallon the allocation of awards of attorneys' fees from the Settlement Fee and Cost Account.  In making its recommendation the "Allocation Committee" is to review the contemporaneous time records, or properly reconstructed time records and expense reports of all plaintiffs' counsel that request compensation for common benefit work, as audited by the CPA firm of Wegman Dazett. The Allocation Committee shall take into consideration the common benefit work of counsel in the MDL, and the work of counsel in the state litigations in Texas, California and New Jersey. The Allocation Committee shall be guided by these objective measures of common benefit counsel's contributions, in addition to their subjective understanding of the relative contributions of counsel towards generating the Settlement Fund in accordance with established fee jurisprudence and subject to the approval of the Honorable Eldon E. Fallon in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson.

      9.2.5.      The Honorable Eldon E. Fallon shall provide appropriate notices governing the procedure by which he shall determine common benefit attorneys' fees and reimbursement of common benefit expenses, including Common Benefit Attorneys' joint submission of papers by the PLC requesting compensation for their common benefit work, including the submission of contemporaneous time records, or properly reconstructed time records and expense reports, and any accompanying affidavits. The Honorable Eldon E. Fallon shall insure that there is ample opportunity for objections and comments to the application and notice of a hearing regarding the same.  The Honorable Eldon E. Fallon shall set time and place of said hearing.

      9.2.6.      Merck takes no position regarding, and has no responsibility or Liability for, the award of common benefit attorneys' fees and the reimbursement of costs

Agreement i

under this Section, or the allocation of the same, and waives the right to contest these matters.

## Article 10
## Quality Control and Audit Procedures

**Section 10.1.**    Prevention and Detection of Fraud - General

10.1.1.    The Claims Administrator shall have the authority and obligation to institute claim-auditing procedures and other procedures designed to detect and prevent the payment of fraudulent Program Claims.

10.1.2.    The submission of fraudulent Claims will violate the criminal laws of the United States, and subject those responsible to criminal prosecution in the federal courts.

10.1.3.    The Claims Administrator shall notify the Special Master, Merck and the NPC, as well as any implicated Program Claimant and his Counsel, of any indicia of deception, dishonesty or fraud of which it becomes aware relating to any Program Claim or in any way to the Program.  The Program Claimant and/or his Counsel shall have the right to contest such suggestion of misconduct to the Special Master by requesting a hearing within 10 days of receiving such notice.  The Special Master may promulgate and revise rules for reviewing and resolving allegations of deception, dishonesty or fraud.

10.1.4.    No Settlement Payment may be paid in respect of a Program Claim while that Claim (i) is the subject of an audit by the Claims Administrator (and to that end, the Claims Administrator shall notify Merck and the NPC from time to time of which Program Claims are then subject to audit) or (ii) is the subject of an audit by Merck or the NPC for good cause.

**Section 10.2.**    Mandatory Periodic Audits

10.2.1.    Without limitation of Section 10.1, (i) after 2,500 Program Claims have been Completed (or, if later and if so requested by Merck, 60 days after the Enrollment Deadline Date) (the applicable date, the "Periodic Audit Start Date"), on a quarterly basis the Claims Administrator shall audit between 2.0% and 5.0% (the precise percentage within such range to be reasonably determined by Merck and the NPC from time to time or, if they cannot agree, as determined by the Claims Administrator (within such range) in its discretion) of the total Program Claims Completed by Enrolled Program Claimants during the prior quarter (or, in the case of the first such audit, since the Execution Date) and (ii) the Claims Administrator otherwise may audit such other Program Claims as the Claims Administrator, in its discretion, shall determine is warranted.

10.2.2.    Program Claims shall be selected for audit on such basis as the Claims Administrator may determine from time to time (taking into account, without limitation, any suspicions of, or past findings of, fraud, deception or dishonesty in connection with the Program).

10.2.3.    With respect to Program Claims which are selected for audit, the Claims Administrator may require that the relevant Enrolled Program Claimant provide it with (i) identification of and authorizations for the release of all PME Records from all general practitioners, family physicians, primary care providers, internists, prescribing physicians, pharmacies, *Dispensing Physicians*, treating cardiologists, treating neurologists and inpatient or outpatient hospitals or any other healthcare providers who, at any time during the seven-year period prior to, or the one-year period after, the date of the alleged Eligible Event that is the basis of such Enrolled Program Claimant's Program Claim, rendered any medical care to and/or were consulted by the Product User for such Program Claim and (ii) such other relevant records or other documentation (in addition to the PME Records and Additional Claim Information submitted as part of the Program Claim) within the Enrolled Program Claimant's custody, possession, or control as may reasonably be requested by the Claims Administrator.  If the Enrolled Program Claimant fails or refuses to provide any material records or other documentation (reasonably available to such Enrolled Program Claimant) after being afforded an adequate opportunity to do so, then, without limitation of the possible application of the remainder of Section 10.4, Section 10.4.2.1 and Section 10.4.2.2 shall be applied to such Enrolled Program Claimant and his Program Claim.

10.2.4.    If following completion of its audit of a Program Claim (or upon referral of a matter to the Claims Administrator by Merck or by the NPC pursuant to Section 10.3.3), the Claims Administrator determines that Section 10.1.3 is applicable, then the Claims Administrator shall proceed as specified in Section 10.1.3.

Section 10.3.   Merck/NPC Audit Right

10.3.1.    Merck and the NPC shall each have the absolute right and discretion at any time or from time to time, but at its expense, to itself conduct, or have conducted by an independent auditor, audits to verify Program Claims submitted by Program Claimants or any aspect thereof (including PME Records); such audits may include individual Program Claims or groups of Program Claims.  The Claims Administrator shall fully cooperate with any such audit.  Section 10.2.3 shall apply to any Program Claims selected for audit by Merck or the NPC (with all references in said Section to the "Claims Administrator" being deemed to constitute references to "Merck" or "the NPC", respectively, for such purpose).

10.3.2.    Merck or the NPC shall notify the other (and the Claims Administrator) of any audit that it is conducting or having conducted pursuant to Section 10.3.1 and which Program Claims (if any in particular) are to be audited.

10.3.3.    If following completion of its audit of a Program Claim, Merck or the NPC is of the view that any indicia of deception, dishonesty or fraud relating to any Program Claim or in any way to the Program exist, Merck or the NPC, as the case may be, may bring such matter to the attention of the Claims Administrator for possible action pursuant to Section 10.2.4 and/or may proceed directly to make a motion to the Special Master for action pursuant to Section 10.4.2.

Agreement i

Section 10.4.   Relief

  10.4.1.  Each of the Claims Administrator, Merck and the NPC shall have the right to petition to the MDL Court (or, if the MDL Court does not have jurisdiction over the relevant parties, another court that has such jurisdiction) for appropriate review and relief in the event of the detection of any indicia of deception, dishonesty or fraud relating to any Program Claim or in any way to the Program.

  10.4.2.  Without limitation of Section 10.4.1 and any term in this Agreement to the contrary notwithstanding, in the event that the Special Master upon motion by the Claims Administrator, Merck or the NPC determines that a Program Claimant (and/or any related Executing Derivative Claimant), or Counsel for such Program Claimant, has used, or that there is substantial evidence that a Program Claimant (and/or any related Executing Derivative Claimant), or Counsel for such Program Claimant, has used, deception, dishonesty or fraud in connection with the Program Claim of such Program Claimant:

    10.4.2.1.  such Program Claimant's Program Claim shall be denied and such Enrolled Program Claimant immediately shall cease to have any further rights under the Program, but such Program Claimant's Dismissal With Prejudice Stipulation and Release shall be delivered to Merck (and, without limitation, Merck shall be free to file or cause to be filed such Dismissal With Prejudice Stipulation and/or Release in any relevant action or proceeding);

    10.4.2.2.  each of such Program Claimant (if the Special Master makes such determination in respect of such Program Claimant) and such Counsel (if the Special Master makes such determination in respect of such Counsel) shall fully be liable (i) for the costs and expenses (including legal costs and expenses) incurred by any Administrator, Merck and/or the NPC in connection with any related audit and/or any related proceedings (including MDL Court, or other court, proceedings) under this Section 10.4 and (ii) if applicable, to repay to Merck any Settlement Payment previously paid to or with respect to such Program Claimant (and any such repayment of such Settlement Payment in whole or in part shall be disregarded for purposes of Section 5.2); and

    10.4.2.3.  such Program Claimant (and/or any related Executing Derivative Claimant), such Counsel and/or such Counsel's other Program Claimants shall be subject to such further sanctions or other penalties as the Special Master may impose, including (i) in the case of such Counsel (and/or such Counsel's other Program Claimants), raising the level of scrutiny of (including conducting audits, incremental to those conducted pursuant to Section 10.2, of), modifying the timing of the review of, and/or requiring such Counsel to pay the costs and expenses associated with any future audits (including any such incremental audits) of, any other Program Claim of any or all of the other Program Claimants for which it is Counsel, (ii) suspension of any Interim Settlement Payments to all other Program Claimants of such Counsel and/or (iii) referral of the matter to the United States Attorney or other appropriate law

39

enforcement officials for possible criminal prosecution, <u>provided</u> that no such further sanctions or other penalties shall affect the status of any other Program Claimant or its Program Claim unless such sanction or other penalty is consented to by Merck.

10.4.3.    In the event that the Claims Administrator determines that any Person (other than a Program Claimant or Counsel) has engaged or participated in, or that there is substantial evidence that such Person has engaged or participated in, deception, dishonesty or fraud in relation to any Program Claim, then, without limitation of Section 10.4.2:

10.4.3.1.    the Claims Administrator shall refer such matter for possible action by the Special Master pursuant to Section 10.4.2;

10.4.3.2.    pending resolution by the Special Master of such matter pursuant to Section 10.4.2,  the Claims Administrator shall suspend further consideration of any documentation (including PME Records) from such Person; and

10.4.3.3.    the Claims Administrator may raise the level of scrutiny of (including conducting audits, incremental to those conducted pursuant to Section 10.2, of), and/or modify the timing of the review of, any other Program Claim that includes documentation from such Person.

10.4.4.    In connection with the exercise by each of the Claims Administrator, Merck and the NPC of its rights under this Article 10, each of the Claims Administrator, Merck and the NPC, as applicable, may request a Program Claimant whose Program Claims are subject to an audit hereunder to deliver to it such authorization(s) as may reasonably be requested by the Claims Administrator, Merck or the NPC, as applicable, in order to permit the Claims Administrator, Merck or the NPC, as applicable, to request and obtain such additional records as the Claims Administrator, Merck or the NPC, as applicable, may determine, including PME Records.  Any such authorization shall be in a form prepared by the Claims Administrator, Merck or the NPC, as applicable.  If the Program Claimant fails or refuses to execute and deliver to the Claims Administrator or Merck, as applicable, any such authorization within thirty (30) days after receipt of such form, then, without limitation of the possible application of the remainder of Section 10.4, Section 10.4.2.1 and Section 10.4.2.2 shall be applied to such Program Claimant and his Program Claim.

Section 10.5.    <u>Inaccuracy of Representations, Warranties or Certifications</u>

Without limitation of the foregoing provisions of this Article 10, in the event that any representation, warranty, certification or covenant made in any Enrollment Form, Release or Dismissal With Prejudice Stipulation is inaccurate or breached in any material respect (and such inaccuracy or breach is not cured within ten (10) days of notice thereof by the Claims Administrator or Merck to the relevant Program Claimant (or his Counsel, if any)), Merck in its sole and absolute discretion (and without limitation of any other remedy that Merck may have in

40

respect of such matter, whether at law or in equity) at any time prior to any filing by Merck of such Enrolled Program Claimant's Dismissal With Prejudice Stipulation, may (any other term of this Agreement to the contrary notwithstanding) reject the Program Claims of, and (if applicable) rescind all Settlement Payments made to or with respect to, such Program Claimant.  In such case, (i) the affected Program Claimant immediately shall cease to have any further rights under the Program, (ii) the affected Program Claimant's Release and Dismissal With Prejudice Stipulation shall, subject to Section 7.2, be returned to such Program Claimant (unless Section 10.4.2.1 is applicable to such Program Claimant, in which case this clause (ii) shall not apply to such Program Claimant) and (z) such affected Program Claimant, and his Counsel, shall be jointly and severally liable to repay to Merck any Settlement Payment previously paid to or with respect to, such Program Claimant.  Any repayment of such Settlement Payment in whole or in part shall be disregarded for purposes of Section 5.2.

Section 10.6.   <u>No Misrepresentation of Program</u>

Each Enrolling Counsel hereby covenants not to make any misrepresentation with respect to the Program or the terms and conditions of this Agreement to any Person, for example by leading Persons who are not Eligible Claimants to believe that they are, or may become, eligible to receive any Settlement Payment.  The Parties agree that the provisions of this Section 10.6 are an essential element of this Agreement and that a breach of any such provision shall constitute a material breach of this Agreement entitling Merck to an immediate remedy against any Enrolling Counsel who breached such provision, including injunctive relief and attorneys' fees.

Article 11
<u>Walk Away Rights and Termination of the Agreement</u>

Section 11.1.   <u>Walk Away Rights and Termination of the Agreement</u>

Merck shall have the option, in its sole discretion, to terminate the Program and this Agreement under any of the following circumstances (such option, the "<u>Walk Away Right</u>"):

11.1.1.     if:

11.1.1.1.     the number of *MI Eligible Claimants* (constituting Registered Eligible Claimants) who deliver Enrollment Forms to the Claims Administrator by the Walk Away Enrollment Deadline Date, and whose Enrollment Forms are not rejected (in relation to such MI Eligible Claimants) by the Claims Administrator or Merck prior to the 30th day after the Walk Away Enrollment Deadline Date, is less than

11.1.1.2.     85% of the greater of (x) the aggregate number of Registered Eligible Claimants constituting (according solely to the respective Registration Affidavits) MI Eligible Claimants, and (y) 28,500;

11.1.2.     if:

11.1.2.1.     the number of *IS Eligible Claimants* (constituting Registered Eligible Claimants) who deliver Enrollment Forms to the Claims

Agreement i

Administrator by the Walk Away Enrollment Deadline Date, and whose Enrollment Forms are not rejected (in relation to such IS Eligible Claimants) by the Claims Administrator or Merck prior to the 30th day after the Walk Away Enrollment Deadline Date, is less than

11.1.2.2.    85% of the greater of (x) the aggregate number of Registered Eligible Claimants constituting (according solely to the respective Registration Affidavits) IS Eligible Claimants, and (y) 17,000;

11.1.3.    if:

11.1.3.1.    the number of Registered Eligible Claimants who (i) are alleging (according solely to the respective Registration Affidavits) use of VIOXX prior to the respective *Related Eligible Events* for more than 12 months and (ii) deliver Enrollment Forms to the Claims Administrator by the Walk Away Enrollment Deadline Date, and whose Enrollment Forms are not rejected (in relation to such Registered Eligible Claimants) by the Claims Administrator or Merck prior to the 30th day after the Walk Away Enrollment Deadline Date, is less than

11.1.3.2.    85% of the aggregate number of Registered Eligible Claimants alleging (according solely to the respective Registration Affidavits) use of VIOXX prior to the respective *Related Eligible Events* for more than 12 months; or

11.1.4.    if:

11.1.4.1.    the number of Registered Eligible Claimants who (i) are alleging (according solely to the respective Registration Affidavits) death as an injury and (ii) deliver Enrollment Forms to the Claims Administrator by the Walk Away Enrollment Deadline Date, and whose Enrollment Forms are not rejected (in relation to such Registered Eligible Claimants) by the Claims Administrator or Merck prior to the 30th day after the Walk Away Enrollment Deadline Date, is less than

11.1.4.2.    85% of the aggregate number of Registered Eligible Claimants alleging (according solely to the respective Registration Affidavits) death as an injury; or

11.1.5.    if any member of the PSC, any member of the steering committee in the Texas Coordinated Proceeding, any member of the steering committee in the California Coordinated Proceeding, any counsel who served in any capacity as trial counsel in any case in the Coordinated Proceedings, or any counsel who as of the Execution Date has entered an appearance in any case in or outside the Coordinated Proceedings that has a trial date (or any law firm of or with which any such individual lawyer is a partner, associate or otherwise affiliated) (a "Section 11.1.5 Counsel" ), either (i) is the subject of a determination of non-compliance pursuant to Section 1.2.9 with respect to the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3 or (ii) is the subject of a

42

determination of non-compliance pursuant to Section 11.1.5.1 with respect to the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3 applied solely for this purpose as if such Section 11.1.5 Counsel submitted an Enrollment Form and a Certification of Final Enrollment on December 31, 2007 and on such date continued to represent 100% of the Eligible Claimants in which such Section 11.1.5 Counsel had an Interest as of the Execution Date;

> 11.1.5.1.    Upon request from Merck at any time, the Chief Administrator will determine whether a Section 11.1.5 Counsel has failed to comply with the requirements of Section 1.2.8.1, 1.2.8.2 or 1.2.8.3, applied as described in clause (ii) of Section 11.1.5, in any respect.  The Chief Administrator's decision on this matter shall be final, binding and Non-Appealable.; or

> 11.1.6.    if the Registration Order is not entered by the 10th day after the Execution Date, or if any *Coordinated Proceedings Counsel* fails, by January 15, 2008, to file a Registration Affidavit complying in all respects with the Registration Order.

For the avoidance of doubt, for the purpose of Merck's Walk Away Right and termination of this Agreement under this Article, all Legal Representatives of a decedent, which decedent and/or any of whose Legal Representatives is an "Eligible Claimant", are counted as a (single) "Registered Eligible Claimant" (so long as data for such decedent is provided in a properly completed, and submitted, Registration Affidavit). (For the purpose of Settlement Payments, a Legal Representative of a decedent is entitled to no payment before a court of competent jurisdiction approves the distribution.)

Section 11.2.   Time to Exercise Walk Away Right

> 11.2.1.    Merck may exercise its Walk Away Right in relation to Section 11.1.1, 11.1.2, 11.1.3, 11.1.4, 11.1.5 or 11.1.6 at any time until forty-five (45) days after the Walk Away Enrollment Deadline Date.

> 11.2.2.    Merck, in its sole and absolute discretion, may irrevocably waive its Walk Away Right, in relation to any one or more of Sections 11.1.1, 11.1.2, 11.1.3, 11.1.4, 11.1.5 and 11.1.6, by a written notice to such effect and expressly captioned "Section 11.2.2 Waiver Notice" delivered to the NPC.

Section 11.3.   Notice of Exercise

> Merck shall exercise its Walk Away Right by giving written notice to the NPC and to each of the Judges overseeing the Coordinated Proceedings.

Section 11.4.   Effects of Termination

> 11.4.1.    Upon exercising its Walk Away Right, any term of this Agreement or the Escrow Agreement to the contrary notwithstanding:

11.4.1.1.     this Agreement immediately shall terminate and (without limitation of the foregoing) Merck immediately shall cease to have any further financial obligations under this Agreement (including under Section 5.1), except only (i) that Merck shall continue to be responsible to pay the Administrative Expenses specified in clauses (i) and (ii) of Section 11.4.1.3 and (ii) for any obligations of Program Claimants or their Counsel pursuant to Section 10.4.2.2;

11.4.1.2.     any amount then on deposit in either Settlement Fund forthwith shall be paid over to Merck (and the NPC, on Merck's request, shall execute and deliver any direction to the Escrow Agent necessary to effect the foregoing); and

11.4.1.3.     any amount then on deposit in the Administrative Expenses Fund shall be returned to Merck, with Merck continuing to be responsible for any payment of Administrative Expenses that are authorized under the Administrative Agreements and that (i) had already accrued at the time Merck exercised its Walk Away Right or (ii) accrued thereafter as legitimate expenses related to winding up the Program.

11.4.2.     In the case of any exercise by Merck of its Walk Away Right, all Releases and Dismissal With Prejudice Stipulations shall, subject to Section 7.2, be returned to the applicable Enrolled Program Claimant or destroyed.

Article 12
Liens

Section 12.1.  Liens

12.1.1.     Without limitation of Section 12.1.3, each Enrolled Program Claimant shall identify to Merck and to the Lien Resolution Administrator all Governmental Authority *Third Party Providers/Payors* known to them to hold or assert a statutory *Lien* with respect to any Settlement Payment (and/or the right to receive such Settlement Payment), through procedures and protocols to be established by the Lien Resolution Administrator, subject to approval by the Claims Administrator.  Enrolled Program Claimants and their respective Counsel shall be solely responsible to negotiate the satisfaction and discharge of all such statutory Liens.  Enrolled Program Claimants and their respective Counsel must cooperate with the procedures and protocols established by the Lien Resolution Administrator to identify and resolve Governmental Authority Third Party Payor/Provider statutory Liens.

12.1.2.     The Lien holders who must be identified include those Governmental Authority Third Party Providers/Payors that hold statutory Liens and have paid for or reimbursed Enrolled Program Claimants (or the Product Users corresponding thereto) for VIOXX or any health care provider costs or expenses based upon the provision of medical care or treatment provided to the Enrolled Program Claimant (or the Product User corresponding thereto) Connected With VIOXX or alleged to be Connected With VIOXX; provided that nothing herein is intended to create a right of reimbursement

44

Agreement i

where none would otherwise exist under applicable state or federal tort recovery statutes. Prior to receiving any Settlement Payment, each Enrolled Program Claimant, his related Executing Derivative Claimants, and their respective Counsel, jointly and severally shall represent and warrant that any and all statutory Liens with respect to any and all Settlement Payments (and/or the right to receive any and all such Settlement Payments) have been satisfied and discharged.

12.1.3.    In any event and any term of this Agreement to the contrary notwithstanding, satisfaction and discharge of any and all Liens, whether past, present or future, whether known or unknown or asserted or unasserted, with respect to any Settlement Payment (and/or the right to receive any Settlement Payment) are the sole responsibility of the relevant Enrolled Program Claimant (and his related Executing Derivative Claimants) and their respective Counsel. In relation to any particular Enrolled Program Claimant, satisfaction and discharge of any and all Governmental Authority Third Party Providers/Payors statutory Liens must be established to the satisfaction of the Claims Administrator and Merck before any Settlement Payment can be disbursed to such Enrolled Program Claimant (and before Merck shall be required to make any Funding Payment in respect of any such Settlement Payment).  Upon request to the Lien Resolution Administrator, Merck shall be entitled to proof of satisfaction and discharge of any or all such statutory Liens (in relation to Governmental Authority Third Party Providers/Payors) in relation to any particular Enrolled Program Claimant.

12.1.4.    The foregoing provisions of this Article 12 are solely for the several benefit of Merck and the Administrators.  No Enrolled Program Claimant (or related Executing Derivative Claimant), or his Counsel, shall have any rights or defenses based upon or arising out of any act or omission of Merck or any Administrator with respect to this Article 12.

12.1.5.    In addition to and without limitation of any of the foregoing provisions of this Article 12, each Enrolled Program Claimant, each Executing Derivative Claimant with respect to such Enrolled Program Claimant and their respective Counsel, jointly and severally, shall indemnify and hold harmless Merck and each other Merck Released Party from and against (i) any and all Claims made or asserted at any time against Merck or any other Merck Released Party, by (x) any Third Party Provider/Payor in relation to, (y) any Person at any time holding or asserting any Lien in relation to and/or (z) any other Person at any time claiming by, through or under, such Enrolled Program Claimant (and/or the Product User with respect to such Enrolled Program Claimant) or any related Executing Derivative Claimant, with respect to any Funding Payment and/or Settlement Payment paid or to be paid on account of such Enrolled Program Claimant's Program Claim (and/or the right to receive any such Settlement Payment) and (ii) any and all damages, losses, costs, expenses (including legal fees and expenses) and/or Liabilities incurred or suffered by, or imposed on, Merck or any other Merck Released Party in connection with, arising out of or resulting from any Claim described in clause (i) (including any amount paid or required to be paid in satisfaction of any such Claim).

12.1.6.

## Article 13
## No Admission of Liability or Lack of Merit

**Section 13.1.**    No Admission of Liability or Lack of Merit

      13.1.1.    Neither this Agreement nor any exhibit, document or instrument delivered hereunder nor any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Agreement, is intended to be or shall be construed as or deemed to be evidence of an admission or concession by Merck of any fault, Liability, wrongdoing or damages or of the truth of any allegations asserted by any plaintiff or claimant against it, or as an admission by any Eligible Claimant of any lack of merit in their EC Claims.

      13.1.2.    No Party, no Enrolling Counsel and no Program Claimant shall seek to introduce and/or offer the terms of this Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Agreement, or any statements in the documents delivered in connection with this Agreement, or otherwise rely on the terms of this Agreement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of this Agreement (or in connection with the determination of any income tax Liability of a party) or any instrument executed and delivered pursuant to this Agreement (including any Enrollment Form and the executed attachments thereto).  If a Person seeks to introduce and/or offer any of the matters described herein in any proceeding against Merck or any Released Party, the restrictions of this Section 13.1.2 shall not be applicable to Merck with respect to that Person.

      13.1.3.    Nothing in this Article 13 applies to (i) any action to submit into evidence in any legal proceeding (past, present or future), or otherwise to file or enforce in any manner, or (ii) any other action by Merck in relation to, any Release, any Dismissal With Prejudice Stipulation or any Future Evidence Waiver that is released or provided to Merck in accordance with the terms of this Agreement.

## Article 14
## Reporting Obligations; Merck and NPC Access to Data

**Section 14.1.**    Reporting Obligations

      The Claims Administrator shall periodically report to the NPC and Merck as set forth in the Administrative Agreement with the Claims Administrator.

**Section 14.2.**    Merck and NPC Access to Data

      Merck shall be entitled to review all Enrollment Forms (including all exhibits and attachments thereto) and all Registration Affidavits (including all exhibits and attachments thereto), and (in each case) all related materials.  The representatives of Merck and the NPC serving on the Gate Committee shall, at any time or from time to time, be afforded complete access to and permitted to inspect all of the records or other documentation that is specified in Article 2 may be reviewed by the Gate Committee.  Each of Merck and the NPC and their

46

respective representatives (including any auditing firm(s) that Merck or the NPC may retain) shall, in connection with any exercise by it of any of its rights under Article 10, at its request and expense, and at any time or from time to time, be afforded complete access to and permitted to inspect such Program Claims of such Program Claimants as Merck or the NPC, as the case may be, shall specify. For the avoidance of doubt and without limitation of the documents that Enrolling Program Claimants execute as part of the Enrollment Form, by enrolling in the Program each Program Claimant consents to all access to such Program Claimant's (and/or such Program Claimant's Product User's) personal information (including PME Records) granted to Merck, the NPC, the Gate Committee and the Administrators pursuant to this Agreement. Neither Merck nor the NPC shall have any other right of access pursuant to the Program to such Program Claimant's (and/or such Program Claimant's Product User's) personal information (including PME Records) except as required by law.

## Article 15
### Public Statements; Confidentiality

Section 15.1.  Program Claimant Confidential Information

Any personal records or other personal information provided by or regarding a Program Claimant pursuant to this Agreement, and the amount of any payments and/or awards made to Enrolled Program Claimants under this Agreement (such amount information, "Award Information"), shall be kept confidential by the Parties and, in the case of Award Information, such Program Claimant (and his Executing Derivative Claimants) and his Counsel, and shall not be disclosed except (i) to appropriate Persons to the extent necessary to process Program Claims or provide benefits under this Agreement, (ii) as otherwise expressly provided in this Agreement, (iii) as may be required by law or listing agreements, (iv) as may be reasonably necessary in order to enforce, or exercise Merck's rights under or with respect to, such Program Claimant's Enrollment Form, Release, Dismissal With Prejudice Stipulation or Future Evidence Stipulation or (with respect to such Program Claimant (and/or his Executing Derivative Claimants) or his Counsel) this Agreement or (v) to the immediate family members, counsel, accountants and/or financial advisors of such Program Claimant, if any (each of whom shall be instructed by such Program Claimant, upon such disclosure, to maintain and honor the confidentiality of such information). All Program Claimants shall be deemed to have consented to the disclosure of these records and other information for these purposes.

Section 15.2.  Accurate Public Statement

The Parties shall cooperate in the public description of this Agreement and the Program established herein and shall agree upon the timing of distribution.

## Article 16
### Miscellaneous

Section 16.1.  Notice by Parties

16.1.1.    Any notice, request, instruction or other document to be given by Merck to the NPC, or to be given by the NPC or other Counsel to Merck, shall be in writing and delivered by mail, by Federal Express, by facsimile or, to the extent specified

Agreement i

hereunder, by electronic mail, as follows, or as otherwise instructed by a notice delivered to the other Party pursuant to this subsection:

      16.1.1.1.    If to Merck:

    Bruce N. Kuhlik
    Senior Vice President and General Counsel
    Merck & Co., Inc.
    One Merck Drive
    P.O. Box 100 (WS3A-15)
    Whitehouse Station, NJ  08889-0100
    Telecopier: (908) 735-1244
    Email: Bruce_Kuhlik@Merck.com

      16.1.1.2.    If to the NPC:

    Andy D. Birchfield Jr.
    Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
    218 Commerce Street
    Montgomery, AL 36104
    Telecopier: (334) 954-7555
    Email: andy.birchfield@beasleyallen.com

    Russ M. Herman
    Herman, Herman, Katz & Cotlar, LLP
    820 O'Keefe Avenue
    New Orleans, Louisiana 70113-1116
    Telecopier: (504) 561-6024
    Email: rherman@hhkc.com

    Christopher A. Seeger
    Seeger Weiss LLP
    One William Street
    New York, NY 10004
    Telecopier:  (212) 584-0799
    Email: cseeger@seegerweiss.com

    16.1.2.    Merck may for all purposes of this Agreement treat the counsel specified in accordance with Section 17.1.16 as such Program Claimant's Counsel, unless and until otherwise advised by both such Program Claimant and such counsel.

    16.1.3.    Any notice, request, instruction or other document to be given by any Party or any Administrator to any Program Claimant or his Counsel hereunder, shall be in writing and delivered by mail, by Federal Express, by facsimile transmission or by electronic mail, and such Party or Administrator may rely on the mailing, facsimile transmission and/or email addresses and/or numbers that were last provided by the

48

Program Claimant or his Counsel to the Claims Administrator, and shall have no obligation to (but in its sole and absolute discretion may) take other steps to locate Program Claimants or Counsel whose mail, facsimile transmission or electronic mail has been returned as undelivered or undeliverable. Each Program Claimant and (if applicable) his Counsel shall have the responsibility to keep the Claims Administrator informed of the correct mailing, facsimile transmission and email addresses and numbers for both such Program Claimant and such Counsel.

16.1.4.     Any such notice, request, instruction or other document shall be deemed to have been given as of the date so transmitted by facsimile or electronic mail, on the next Business Day when sent by Federal Express or five Business Days after the date so mailed, provided that if any such date on which any such notice or other communication shall be deemed to have been given is not a Business Day, then such notice or other communication shall be deemed to have been given as of the next following Business Day.

Section 16.2.     <u>Receipt of Documentation</u>

Any form or other documentation required to be served or submitted under this Agreement shall be deemed timely (i) if delivered by mail (and not required to be delivered in some other fashion), if postmarked (or, in the absence of a postmark or if such postmark is illegible, if received) on or before the date by which it is required to be submitted under this Agreement or (ii) if delivered (and expressly permitted or required to be delivered) by electronic mail, when it is capable of being accessed from such electronic mail address.

Section 16.3.     <u>Governing Law.</u>

This Agreement shall be governed by and construed in accordance with the law of New York without regard to any choice-of-law rules that would require the application of the law of another jurisdiction.

Section 16.4.     <u>Waiver of Inconsistent Provisions of Law; Severability</u>

16.4.1.     To the fullest extent permitted by applicable law, each Party, each Program Claimant and each Enrolled Program Claimant waives any provision of law (including the common law), which renders any provision of this Agreement invalid, illegal or unenforceable in any respect.

16.4.2.     Any provision of this Agreement which is prohibited or unenforceable to any extent or in any particular context shall be ineffective, but such ineffectiveness shall be limited as follows:  (i) if such provision is prohibited or unenforceable only in or as it relates to a particular jurisdiction, such provision shall be ineffective only in or as it relates to (as the case may be) such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in or as it relates to (as the case may be) such jurisdiction shall not otherwise invalidate or render unenforceable such provision (in such or any other jurisdiction); (ii) if (without limitation of, and after giving effect to, clause (i)) such provision is prohibited or unenforceable only in a particular context (including only as to a particular Person or Persons or under any particular

Agreement i

circumstance or circumstances), such provision shall be ineffective, but only in such particular context; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any other provision of this Agreement. Without limitation of the preceding sentence, it is further the desire, and intent and agreement, of the Parties that if the Chief Administrator (or, if applicable pursuant to Section 8.1.3 or Section 8.1.4, the Special Master or any court) determines that any provision of this Agreement is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable, the Chief Administrator (or, if applicable pursuant to Section 8.1.3 or Section 8.1.4, the Special Master or any court) shall have the power to, and shall, (x) modify such provision for purposes of such proceeding in accordance with clauses (i), (ii) and (iii) of the preceding sentence and otherwise to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding, and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding. In any event, upon any such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law. Nothing in this Section 16.4.2 is intended to, or shall, limit (1) Section 16.4.1 or (2) the intended effect of Section 16.3.

Section 16.5. <u>Facsimile Signatures.</u>

      This Agreement and any amendments thereto, to the extent signed and delivered by means of a facsimile machine or electronic scan (including in the form of an Adobe Acrobat PDF file format), shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

Section 16.6. <u>Construction.</u>

      With regard to each and every term and condition of this Agreement, the parties thereto understand and agree that the same have or has been mutually negotiated, prepared and drafted, and if at any time the parties thereto desire or are required to interpret or construe any such term or condition or any agreement or instrument subject hereto, no consideration shall be given to the issue of which party thereto actually prepared, drafted or requested any term or condition of thereof.

Section 16.7. <u>Entire Agreement</u>

      This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes and cancels all previous agreements, negotiations, and commitments in writings between the Parties hereto with respect to the subject matter hereof.

Section 16.8. <u>Headings; References.</u>

      The headings of the Table of Contents, Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Any reference to an Exhibit, Annex, or Schedule shall be deemed to refer to the applicable Exhibit, Annex, or Schedule attached hereto. The words

50

"include" and "including" and words of similar import when used in this Agreement or any Exhibit hereto are not limiting and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.  The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms.  Words of any gender (masculine, feminine, neuter) mean and include correlative words of the other genders.  As used herein or in any Exhibit hereto, the term "<u>dollars</u>"  and the symbol "<u>$</u>", shall mean United States dollars.  References herein to instruments or documents being submitted "by" any Person include (whether or not so specified) submission of the same on behalf of such Person by his Counsel whether or not so specified, provided that if any particular instrument or document is required herein to be executed by a particular Person, it must (unless otherwise expressly specified herein) be so executed by such Person.  References herein to any particular Section (such as, for example, Section 4.2) shall be deemed to refer to all sub-Sections of such Section (such, as for example, Section 4.2.1, 4.2.2, etc.), all sub-sub-Sections of such sub-Sections, and so on; the corresponding principle applies to all references herein to any particular sub-Section, sub-sub-Section and so on.

Section 16.9.   <u>No Third Party Beneficiaries; Assignment</u>

16.9.1.    No provision of this Agreement or any Exhibit thereto is intended to create any third-party beneficiary to this Agreement.  For the avoidance of doubt, nothing in this Section 16.9 limits or modifies the third-party beneficiary provisions of any Enrollment Form, Release or Dismissal With Prejudice Stipulation.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns; <u>provided</u>, <u>however</u>, that neither this Agreement nor any of the rights, interests, or obligations hereunder may be assigned by the NPC without the prior written consent of Merck.  No right to receive a Settlement Payment may be assigned by any Program Claimant and/or any Enrolling Counsel without the prior written consent of Merck.  Any assignment in violation of this Section 16.9.1 shall be null and void <u>ab initio</u>.

16.9.2.    Without limitation of Section 16.9.1 but also without limitation of the NPC's right to enforce this Agreement, no Program Claimant (including any Enrolled Program Claimant or Qualifying Program Claimant) shall have any right to institute any proceeding, judicial or otherwise, against Merck, the NPC or any Administrator to enforce, or otherwise with respect to, this Agreement.

Section 16.10.  <u>Amendments; No Implied Waiver</u>

This Agreement may be amended by (and only by) an instrument signed by Merck, on the one hand, and a majority in number of the NPC, on the other hand.  Except where a specific period for action or inaction is provided herein, no failure on the part of a Party to exercise, and no delay on the part of either Party in exercising, any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any waiver on the part of either Party of any such right, power or privilege, or any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver on the part of a Party, on any particular occasion or in any

particular instance, of any particular right, power or privilege operate as a waiver of such right, power or privilege on any other occasion or in any other instance.

Section 16.11.  Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which shall together constitute one and the same instrument.  It shall not be necessary for any counterpart to bear the signature of all Parties hereto.

Section 16.12.  Tax Matters

The Parties agree to characterize the Administration Expenses Fund, the IS Settlement Fund and the MI Settlement Fund for federal, state and local income tax purposes in such manner as is reasonably determined by Merck, including without limitation as a "qualified settlement fund" within the meaning of Treasury Regulation Section 1.468B-1 or as a grantor trust pursuant to an election under Treasury Regulation Section 1.468B-1(k) or otherwise.  The Escrow Agent and Merck shall timely provide the other with such material and relevant information as and to the extent reasonably requested by the other party in connection with any tax filing or the payment of any taxes or any private letter ruling regarding the tax status of the Funds.

Section 16.13.  Further Assurances

From time to time following the Execution Date, (i) each Party shall take such reasonable actions consistent with the terms of this Agreement as may reasonably be requested by the other Party, and otherwise reasonably cooperate with the other Party in a manner consistent with the terms of this Agreement as reasonably requested by such other Party, and (ii) each Program Claimant (and his related Executing Derivative Claimants) and their Counsel shall take such reasonable actions consistent with the terms of this Agreement as may reasonably be requested by Merck or the NPC, and otherwise reasonably cooperate with Merck and the NPC in a manner consistent with the terms of this Agreement as reasonably requested by Merck or the NPC, in the case of each of (i) and (ii) as may be reasonably necessary in order further to effectuate the intent and purposes of this Agreement and to carry out the terms hereof.

Article 17
Definitions

Section 17.1.  Definitions

For the purposes of this Agreement, the following terms (designated by initial capitalization throughout this Agreement) shall have the meanings set forth in this Section.

17.1.1.  "Adjusted IS Settlement Amount" means, at any date of computation, (i) the IS Aggregate Settlement Amount, minus (ii) the aggregate amount of all IS Settlement Payments (other than IS Interim Settlement Payments or IS Final Settlement Payments) paid or to be paid under this Agreement (for the avoidance of doubt,

52

disregarding for purposes of this clause (ii) the effects of Article 12), determined as of such date of computation.

17.1.2.    "<u>Adjusted MI Settlement Amount</u>" means, at any date of computation, (i) the MI Aggregate Settlement Amount, minus (ii) the aggregate amount of all MI Settlement Payments (other than MI Interim Settlement Payments or MI Final Settlement Payments) paid or to be paid under this Agreement (for the avoidance of doubt, disregarding for purposes of this clause (ii) the effects of Article 12), determined as of such date of computation.

17.1.3.    "<u>Administrative Agreement</u>" means any agreement among (i) an Administrator, (ii) Merck and (iii) a majority in number of the NPC, with respect to such Administrator's service in connection with the Program.

17.1.4.    "<u>Administrative Expenses</u>" means (i) any fees, expenses, indemnification payments or other like amounts payable from time to time to past or present Administrators pursuant to past or present Administrative Agreements, (ii) any amounts required to be expended to acquire and maintain insurance for the benefit of the past or present Administrators pursuant to the terms of any past or present Administrative Agreement and (iii) such other amounts as may be specified in any past or present Administrative Agreement to constitute "Administrative Expenses" for purposes of this Agreement.

17.1.5.    "<u>Administrative Expenses Fund</u>" means the escrow sub-account account of such name established under the Escrow Agreement.

17.1.6.    "<u>Administrators</u>" means the Persons from time to time serving as the Chief Administrator, the Claims Administrator, the Special Master, the Deputy Special Master and/or the Escrow Agent.

17.1.7.    "<u>Agreement</u>" means this Settlement Agreement, including the Exhibits and Schedules thereto, as the same may be amended or modified from time to time in accordance with the terms hereof.

17.1.8.    "<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which commercial banks in the City of New York, New York or the State of New Jersey are required or authorized by law to be closed.

17.1.9.    "<u>Chief Administrator</u>" means the Person from time to time appointed by mutual agreement of Merck, on the one hand, and a majority in number of the NPC, on the other hand, to fulfill the functions of the "Chief Administrator" under this Agreement (so long as such Person continues to serve in such capacity).

17.1.10.    "<u>Claims</u>" means any and all rights, remedies, actions, claims, demands, causes of action, suits at law or in equity, verdicts, suits of judgments, judgments and/or Liens (including any of the foregoing for wrongful death, personal injury and/or bodily injury, sickness, disease, emotional distress and/or injury, mental or physical pain and/or suffering, emotional and/or mental harm, fear of disease or injury,

53

loss of enjoyment of life, loss of society, loss of companionship, loss of income, loss of consortium, medical expenses, future cost of insured services, past cost of insured services or any other form of injury, and including any of the foregoing for direct damages, indirect damages, consequential damages, incidental damages, punitive damages or any other form of damages whatsoever), whether based upon contract, breach of contract, warranty or covenant, breach of warranty or covenant, tort, negligence, gross negligence, recklessness, joint and several liability, guarantee, contribution, reimbursement, subrogation, indemnity, defect, failure to warn, fault, strict liability, misrepresentation, common law fraud, statutory consumer fraud, quantum meruit, breach of fiduciary duty, violation of statutes or administrative regulations and/or any other legal (including common law), statutory, equitable or other theory or right of action, whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, accrued or not accrued, or now recognized by law or that may be created or recognized in the future by statute, regulation, judicial decision or in any other manner.

17.1.11.    "Claims Administrator" means the Person or Persons from time to time appointed by mutual agreement of Merck, on the one hand, and a majority in number of the NPC, on the other hand, to fulfill the functions of the "Claims Administrator" under this Agreement (so long as such Person or Persons continues to serve in such capacity).

17.1.12.    "Claims Form" means a claim form in the form of Exhibit 17.1.12.

17.1.13.    "Claims Package" means, with respect to any particular Enrolled Program Claimant, all of the following in relation to such Enrolled Program Claimant's Product User: the Claims Form, all Supplementary Claims Forms, all Required PME Records, all Additional Claims Information requested by the Claims Administrator, all Profile Forms and any such other PME Records as such Enrolled Program Claimant in its discretion may submit.

17.1.14.    "Connected With VIOXX" means to any extent, or in any way, arising out of, relating to, resulting from and/or connected with VIOXX (and/or VIOXX and any other drug or substance, regardless of when such other drug or substance is or was ingested or alleged to be ingested) and/or with any injury claimed to have been caused, in whole or in part, by VIOXX (and/or VIOXX and any other drug or substance, regardless of when such other drug or substance is or was ingested or alleged to be ingested).

17.1.15.    "Coordinated Proceedings Counsel" means any lawyer or law firm that had an action pending in any of the Coordinated Proceedings as of the Execution Date.

17.1.16.    "Counsel" means, with respect to any particular Person, a lawyer or law firm who represents such Person pursuant to a written agreement, provided that, for all purposes of this Agreement, the "Counsel" of any particular Enrolled Program Claimant shall be the lawyer or law firm named as such in such Enrolled Program Claimant's Enrollment Form.  However, if (i) two or more lawyers or law firms are

Agreement i

named as a particular Enrolled Program Claimant's counsel in two or more Enrollment Forms, then the Claims Administrator shall (at Merck's direction) suspend further consideration of such Enrolled Program Claimant's Program Claim until such time as such Enrolled Program Claimant, or all such lawyers or law firms, irrevocably designate, in a notice to the Claims Administrator, which single lawyer or law firm is such Enrolled Program Claimant's primary counsel (or until otherwise directed by Merck). Such designated primary counsel shall, for all purposes of this Agreement, be the sole "Counsel" of such Enrolled Program Claimant.

17.1.17. "Deputy Special Master" means the Person or Persons from time to time appointed by a Special Master in accordance with the terms of the Special Master's Administrative Agreement or otherwise with the consent of Merck, on the one hand, and a majority in number of the NPC, on the other, to fulfill (either in the place of, or in addition to, the Special Master) the specific functions of the "Special Master" under this Agreement specified in such appointment (so long as such Person or Persons continues to serve in such capacity). A Deputy Special Master shall have the same rights, powers, duties, privileges and immunities of the Special Master, and a Deputy Special Master's determinations shall have the same status and effect as those of the Special Master, in relation to such specific functions.

17.1.18. "Derivative Claimant" means, in relation to any particular Eligible Claimant or Program Claimant, any Person having or asserting the right, either statutory or under applicable common law (including the laws of descent and distribution) or otherwise, to sue Merck or any other Released Party, independently, derivatively or otherwise:

17.1.18.1. by reason of their personal relationship with such Eligible Claimant or Program Claimant (or the Product User with respect to such Eligible Claimant or Program Claimant); and/or

17.1.18.2. otherwise by, through or under, or otherwise in relation to, such Eligible Claimant or Program Claimant (or the Product User with respect to such Eligible Claimant or Program Claimant);

including the heirs, beneficiaries, surviving spouse (including a putative or common law spouse), surviving domestic partner and next of kin of such Eligible Claimant or Program Claimant (or the Product User with respect to such Eligible Claimant or Program Claimant).

17.1.19. "Dismissal With Prejudice Stipulation" means a "Dismissal With Prejudice Stipulation" in the form thereof included in the form of Enrollment Form attached hereto or in such other form as is mandated by the Enrollment Form.

17.1.20. "Dispensing Physician" means any physician who purchases prescription drugs for the purpose of dispensing them to patients or other individuals entitled to receive the prescription drug and who dispenses them accordingly.

55

17.1.21.    "EC Claim" means, in relation to any Eligible Claimant, such Eligible Claimant's claim as described in Section 17.1.22.3.

17.1.22.    "Eligible Claimant" means a natural person or the Legal Representative(s) thereof:

17.1.22.1.    which natural person was a United States citizen or a legal resident of the United States or was physically located in the United States, in each case when the alleged Eligible Event referred to in Section 17.1.22.3 is alleged to have occurred;

17.1.22.2.    which natural person or Legal Representative(s) (i) as of the Execution Date had a lawsuit pending (in any court in the United States) against, or was (directly or through counsel) a party to a Tolling Agreement with, Merck with respect to an allegation described in Section 17.1.22.3, or (ii) prior to the Execution Date was (directly or through counsel) a party to a Tolling Agreement with Merck with respect to an allegation described in Section 17.1.22.3 which Tolling Agreement has been terminated by Merck; and

17.1.22.3.    which natural person alleges, or is alleged, to have suffered losses or damages as a result of such natural person's own alleged Eligible Event alleged to have been caused (in whole or in part) by such natural person's alleged ingestion of VIOXX.

For the avoidance of doubt, it is understood and agreed that (i) subject to clause (ii), the Legal Representative (or, if more than one, the Legal Representatives collectively), of a particular natural person (including a deceased natural person), in such capacity, has the same status hereunder as such particular natural person, and (ii) a natural person (including a deceased natural person) and his or her Legal Representative(s) shall constitute a single Eligible Claimant.  Notwithstanding the foregoing provisions of this Section 17.1.22, (i) no Person who prior to the Execution Date had an action against Merck Connected With VIOXX dismissed with prejudice which dismissal is not as of the Execution Date under appeal (or their respective Legal Representatives) and (ii) none of the Persons set forth on Schedule 17.1.22 (nor their respective Legal Representatives), shall constitute "Eligible Claimants" (and accordingly none of such Persons (or their respective Legal Representatives) may participate in the Program).

17.1.23.    "Eligible Event" means an MI or IS.

17.1.24.    "Enrolled Program Claimant" means a Person who (as a purported "Eligible Claimant") has submitted an Enrollment Form (or on whose behalf an Enrollment Form has been submitted) to Merck on or prior to the Enrollment Deadline Date, which Enrollment Form has not been rejected by Merck pursuant to Section 1.2.

17.1.25.    "Enrolling Counsel" means any lawyer or law firm who files an Enrollment Form.

17.1.26.    "Enrollment Deadline Date" means the Walk Away Enrollment Deadline Date, provided that if (i) no Walk Away Right arises in relation to Section 11.1.1, 11.1.2, 11.1.3, 11.1.4 or 11.1.5 or (ii) a Walk Away Right does arise in relation to one or more of such Sections, but Merck in its sole and absolute discretion waives, and/or fails timely to exercise, its Walk Away Right with respect to all of the relevant Sections, the Enrollment Deadline Date automatically shall be extended (effective retroactively as of such former Enrollment Deadline Date) to October 30, 2008.

17.1.27.    "Enrollment Form" means a Program Participation Enrollment Form, Release and Dismissal With Prejudice Stipulation, including all attachments thereto, all in the form of Exhibit 17.1.27.

17.1.28.    "Escrow Agent" means U.S. Bancorp or such other Person or Persons from time to time appointed by the NPC, with the consent of Merck (not to unreasonably be withheld), to fulfill the functions of the "Escrow Agent" under the Escrow Agreement (so long as such Person or Persons continues to serve in such capacity).

17.1.29.    "Escrow Agreement" means an escrow agreement substantially in the form of Exhibit 17.1.29, with such changes from such form that may be requested by the proposed "Escrow Agent" thereunder, are agreed to by Merck and either (i) are not material or (ii) are consented to by a majority in number of the NPC (such consent not to be unreasonably withheld or delayed), as the same may be amended from time to time in accordance with the terms thereof.

17.1.30.    "Escrow Funds" means the Administrative Expenses Fund, the MI Settlement Fund and the IS Settlement Fund.

17.1.31.    "Event Records" means all records relating to the immediate medical care and treatment to address an Enrolled Program Claimant's Related Eligible Event. "Event Records" include Medical Records from the hospital, medical center, or healthcare facility that treated the Enrolled Program Claimant immediately following his Related Eligible Event (including any Medical Records from ambulance workers, paramedics, and emergency rooms whose Medical Records are included in such hospital's, medical center's, or healthcare facility's Medical Records), including all facilities to which the Enrolled Program Claimant was transferred for continued care and treatment of the alleged Related Eligible Event.  In the case of a fatal event, "Event Records" shall also include the death certificate and any autopsy report.

17.1.32.    "Excess Administrative Expenses Fund Amount" means, at any date of computation, the excess, if any, of (i) the balance of the Administrative Expenses Fund at such time over (ii) the sum of (x) the Remaining Administrative Expenses Estimate, plus (y) the aggregate amount of Administrative Expenses (if any) theretofore paid directly by Merck.

17.1.33.    "Executing Derivative Claimant" means, in relation to any particular Program Claimant, any Derivative Claimant in relation to such Program Claimant that has executed such Program Claimant's Release.

Agreement i

17.1.34.    "Governmental Authority" means any governmental authority, including (i) the United States or any other country, any state, province, territory or possession of the United States or any other country, and any local or other governmental body, or other political subdivision, in or of any of the foregoing, (ii) any multinational organization or body and (iii) any agency, board, bureau, court, commission, department, instrumentality or administration of any of the forgoing described in clauses (i) or (ii).

17.1.35.    A lawyer or law firm shall be deemed to have an "Interest" in a Person, or in a Claim of a Person, if the lawyer or law firm or any Person affiliated or related in any way to the lawyer or law firm:

> 17.1.35.1.    has an engagement or retainer agreement with such Person;

> 17.1.35.2.    is listed as the counsel of record for such Person in filed pleadings;

> 17.1.35.3.    has entered an appearance for such Person;

> 17.1.35.4.    would benefit directly or indirectly from any payment to settle any Claim of such Person Connected With VIOXX; or

> 17.1.35.5.    otherwise has any financial interest in any Claim of such Person Connected With VIOXX.

For the avoidance of doubt (and without limitation), an individual lawyer is deemed to have an "Interest" in a Person, or in a Claim of a Person, in which any law firm of or with which such individual lawyer is a partner, associate or otherwise affiliated has an Interest, and vice versa.

17.1.36.    "Interim Settlement Payment" means an MI Interim Settlement Payment or IS Interim Settlement Payment.

17.1.37.    "IS" means ischemic stroke or ischemic cerebrovascular event or accident (i.e., ischemic stroke, intracranial thrombosis, cerebral embolism, thrombotic stroke, embolic stroke, lacunar infarct, lacunar stroke, thrombotic occlusion, cerebrovascular event or accident that is not a primary hemorrhagic event, and cerebral infarction; or a hemorrhagic stroke that is secondary to the terms previously listed).

17.1.38.    "IS Aggregate Settlement Amount" means the sum of (i) $850,000,000, plus (ii) an amount equal to any amount transferred to the IS Settlement Fund pursuant to Section 5.4.1.

17.1.39.    "IS Eligible Claimant" means an Eligible Claimant whose alleged Related Eligible Event is an IS.

17.1.40.    "IS Point Value" means the quotient of (i) the Adjusted IS Settlement Amount divided by (ii) the aggregate number of Points awarded to all IS Qualifying

Program Claimants (other than those who elected to receive a Fixed Payment pursuant to Section 3.3).  The IS Point Value shall be determined only at the time that Final Settlement Payments are to be made to IS Qualifying Program Claimants in accordance with Section 4.3.

17.1.41.  "IS Qualifying Program Claimant" means a Qualifying Program Claimant whose Related Eligible Event is an IS.

17.1.42.  "IS Settlement Fund" means the escrow sub-account of such name established under the Escrow Agreement.

17.1.43.  "IS Settlement Fund Top-Up Amount" means, at any date of computation, (i) the IS Aggregate Settlement Amount, minus (ii) the aggregate of all deposits theretofore made (by Merck or from the proceeds of any draw under any Letter of Credit) into the IS Settlement Fund, plus  (iii) if applicable, the aggregate amount returned to Merck from the IS Settlement Fund pursuant to Section 5.3.6.

17.1.44.  "IS Settlement Payment" means any IS Interim Settlement Payment, IS EI Payment, IS Fixed Payment or IS Final Settlement Payment.

17.1.45.  "Legal Representative" means, as to any particular natural person (including a deceased natural person), the estate, executor, administrator, guardian, conservator or other legal representative thereof.

17.1.46.  "Letter of Credit" means a letter of credit substantially in the form of Exhibit 17.1.46, with such changes from such form that may be requested by the proposed "Issuing Bank" thereunder, are agreed to by Merck and either (i) are not material or (ii) are consented to by a majority in number of the NPC (such consent not to be unreasonably withheld or delayed).

17.1.47.  "Liabilities" means any and all debts, liabilities, covenants, promises, contracts, agreements and/or obligations of whatever kind, nature, description or basis, whether fixed, contingent or otherwise, whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, or accrued or not accrued.

17.1.48.  "Lien" means any mortgage, lien, pledge, charge, security interest, encumbrance, assignment, subrogation right, third-party interest or adverse claim of any nature whatsoever, in each case whether statutory or otherwise, including any of the foregoing in relation to Medicare or Medicaid, any Third Party Provider/Payor or any lawyer or law firm.

17.1.49.  "Lien Resolution Administrator" means the Person or Persons from time to time appointed by the Chief Administrator based on a joint recommendation of Merck, on the one hand, and a majority in number of the NPC, on the other hand, to fulfill the functions of the "Lien Resolution Administrator" under this Agreement (so long as such Person or Persons continues to serve in such capacity).  If, at any time, two

59

or more Persons constitute the "Lien Resolution Administrator", then any determination of the Lien Resolution Administrator shall be made by a majority of such Persons.

17.1.50. "Litigation Medical Records Depository" means the depository through which Merck delivers medical records it collects by way of authorization or subpoena to plaintiffs' counsel in the various Coordinated Proceedings and elsewhere.

17.1.51. "Medical Records" means the entire record maintained by an individual healthcare provider or facility relating to the medical history, care, diagnosis and treatment of an Enrolled Program Claimant including new patient intake forms completed by or on behalf of an Enrolled Program Claimant, doctor's notes, nurse's notes, physician's orders, consultation reports, laboratory test results, EEGs, EKGs, x-ray reports, CT scan reports, MRI scan reports, catheterization reports, angiogram reports, arteriogram reports, reports of any diagnostic procedures, tests or imaging studies, operative reports, history and physicals, pathology reports, admission summaries, discharge summaries, consent forms, prescription records, medication records, medical bills and invoices and all communications between a healthcare provider and an Enrolled Program Claimant or between two or more healthcare providers relating to an Enrolled Program Claimant, including telephone messages, correspondence and memoranda.

17.1.52. "Merck Released Party" has the meaning ascribed to such term in the form of Release included in the form of Enrollment Form attached hereto.

17.1.53. "MI" means (i) a myocardial infarction or heart attack or (ii) an *SCD*.

17.1.54. "MI Aggregate Settlement Amount" means the sum of (i) $4,000,000,000, plus (ii) an amount equal to any amount transferred to the MI Settlement Fund pursuant to Section 5.4.1.

17.1.55. "MI Eligible Claimant" means an Eligible Claimant whose alleged Related Eligible Event is an MI.

17.1.56. "MI Point Value" means the quotient of (i) the Adjusted MI Settlement Amount divided by (ii) the aggregate number of Points awarded to all MI Qualifying Program Claimants (other than those who elected to receive a Fixed Payment pursuant to Section 3.3). The MI Point Value shall be determined only at the time that Final Settlement Payments are to be made to MI Qualifying Program Claimants in accordance with Section 4.3.

17.1.57. "MI Qualifying Program Claimant" means a Qualifying Program Claimant whose alleged Related Eligible Event is an MI.

17.1.58. "MI Settlement Fund" means the escrow sub-account of such name established under the Escrow Agreement.

17.1.59. "MI Settlement Fund Top-Up Amount" means, at any date of computation, (i) the MI Aggregate Settlement Amount, minus (ii) the aggregate of all deposits theretofore made (by Merck or from the proceeds of any draw under any Letter

Agreement i

of Credit) into the MI Settlement Fund, plus (iii) if applicable, the aggregate amount returned to Merck from the MI Settlement Fund pursuant to Section 5.3.6.

17.1.60.  "MI Settlement Payment" means any MI Interim Settlement Payment, MI EI Payment, MI Fixed Payment or MI Final Settlement Payment.

17.1.61.  "Non-Merck Released Party" has the meaning ascribed to such term in the form of Release included in the form of Enrollment Form attached hereto.

17.1.62.  "Non-Appealable" means not subject to (i) any further right of appeal to any Administrator or otherwise within the Program or (ii) any right of appeal to the MDL Court, any other Coordinated Proceedings court or any other court.

17.1.63.  "Overall Settlement Amount" means the sum of the MI Aggregate Settlement Amount and the IS Aggregate Settlement Amount.

17.1.64.  "Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association (including any group, organization, co-tenancy, plan, board, council or committee), corporation, Governmental Authority, custodian, nominee or any other individual or entity (or series thereof) in its own or any representative capacity, in each case, whether domestic or foreign.

17.1.65.  "Pharmacy Records" means all documents that relate to the preparation, dispensing and provision of medicine, medical devices, or other treatment modalities by a pharmacy or Dispensing Physician.

17.1.66.  "Plaintiffs' Executive Committee" or "PEC" means the following persons who were appointed by the MDL Court:  Andy D. Birchfield, Jr., Russ M. Herman, and Chris A. Seeger.

17.1.67.  "Plaintiff's Liaison Counsel" or "PLC" means the liaison counsel appointed by the MDL Court:  Russ M. Herman.

17.1.68.  "PME Records" means Pharmacy Records, Medical Records and Event Records.

17.1.69.  "Points" has the meaning ascribed to such term in Exhibit 3.2.1.

17.1.70.  "Product User" means, in relation to any particular Eligible Claimant or Program Claimant, the natural person (including the deceased natural person) referred to in the definition of the term "Eligible Claimant" (as opposed to any Legal Representative in respect of such natural person).

17.1.71.  "Profile Form" means all of the following (to the extent the same exists in relation to any particular Person): (i) a written request for information that a plaintiff who has an active lawsuit in one of the Coordinated Proceedings must complete pursuant to one of the following sets of orders:  (1) Pretrial Orders 18, 18A, 18B, and 18C (dated August 4, 2005, August 16, 2005, September 14, 2005, and June 29, 2006,

respectively) in the Federal Multidistrict Litigation; (2) the October 22, 2003 and March 28, 2005 Orders governing fact sheets in the New Jersey Coordinated Proceeding; (3) Case Management Order No. 4 (dated June 12, 2003), Amended Case Management Order No. 4 (dated September 29, 2005), and Order re: June 28, 2007 Hearing (dated September 5, 2007) in the California Coordinated Proceeding; and (4) Case Management Order No. 2 (dated October 19, 2005) and Pre-Trial Order No. 3 (dated November 28, 2005) in the Texas Multidistrict Litigation, (ii) a written request for information that a Person who is a party to a Tolling Agreement must complete pursuant to the Federal Multidistrict Litigation Tolling Agreement dated June 1, 2005 and attached thereto as Exhibit A, (iii) bills of particulars, answers to interrogatories or plaintiff fact sheets and (iv) any amendments or supplements or responses to deficiency letters or notices with respect to the items specified in the foregoing clauses (i) through (iii).

17.1.72.  "Program Claim" means all materials submitted by or on behalf of a Person (and/or his counsel) to attempt to enroll in, or to receive payments under, the Program, including any Claims Package submitted by or on behalf of such Person.

17.1.73.  "Program Claimant" means a Person who (as a purported "Eligible Claimant") has submitted an Enrollment Form (or on whose behalf an Enrollment Form has been submitted) to the Claims Administrator on or prior to the Enrollment Deadline Date.  For the avoidance of doubt, a Counsel to a Person is not (in such capacity) a "Program Claimant".

17.1.74.  "Registered Eligible Claimant" means an Eligible Claimant for whom data is provided in a properly completed, and submitted, Registration Affidavit.

17.1.75.  "Registration Affidavit" has the meaning ascribed to such term in the form of Registration Order attached hereto as Exhibit 1.1.

17.1.76.  "Related Eligible Event" means, in relation to any particular Program Claimant, the alleged Eligible Event referred to in Section 17.1.22.3, as specified in the Registration Affidavit submitted (or, if no such Registration Affidavit is submitted, in the Enrollment Form submitted) in relation to such Program Claimant (which specification shall be irrevocable for purposes of this Agreement).  It is understood and agreed that, subject only to Section 3.5, if such Program Claimant's Product User alleges to have suffered both an MI and an IS, and/or multiple MIs and/or multiple ISs, such Program Claimant nonetheless will be required to specify (as set forth in the preceding sentence) a single MI or IS to be the exclusive basis of such Program Claimant's Program Claim.

17.1.77.  "Released Claims and Liabilities" has the meaning ascribed to such term in the Release.

17.1.78.  "Released Parties" has the meaning ascribed to such term in the Release.

17.1.79.  "Remaining Administrative Expenses Estimate" means, at any date of computation, the sum (without duplication) of (i) all Administrative Expenses anticipated to become payable at any time thereafter, (ii) a reasonable reserve to provide for

unanticipated and/or contingent Administrative Expenses and (iii) to the extent that Merck is required pursuant to any Administrative Agreement, or determines in its discretion, to purchase liability insurance covering any Administrator, the anticipated aggregate cost thereof, all as determined and/or estimated in good faith by Merck.

17.1.80.    "SCD" means an instantaneous or near-instantaneous unexplained death that occurs without warning or within one hour of non-diagnostic symptoms, or an unexpected sudden death in which criteria for a fatal coronary, cerebrovascular event or other cause or event are not met.

17.1.81.    "Settlement Funds" means the MI Settlement Fund and the IS Settlement Fund.

17.1.82.    "Settlement Payment" means any MI Settlement Payment or IS Settlement Payment.

17.1.83.    "Special Master" means the Person or Persons from time to time appointed by the Chief Administrator based on a joint recommendation of Merck, on the one hand, and a majority in number of the NPC, on the other hand, to fulfill the functions of the "Special Master" under this Agreement (so long as such Person or Persons continues to serve in such capacity).  If, at any time, two or more Persons constitute the "Special Master", then any determination of the Special Master shall be made by a majority of such Persons.

17.1.84.    "Special Review Marker" means (i) in the case of an MI Qualifying Program Claimant, 10 Points, and (ii) in the case of an IS Qualifying Program Claimant, 2 Points.

17.1.85.    "Supplementary Claims Form" means a claim form in the form determined, in accordance with Section 6.2, by the Claims Administrator.

17.1.86.    "Third Party Provider/Payor" means any provider or payor (public or private) of (i) health, hospital, medical, physician, healthcare and/or pharmaceutical services, products or expenses and/or (ii) any other form of compensation, including federal and state Governmental Authorities (or other Persons) providing Medicare and/or Medicaid services or benefits.

17.1.87.    "Tolling Agreement" means the specific agreement referenced in the Notice of Filing of Tolling Agreement which was filed in the MDL Court on June 9, 2005 and amended pursuant to the Notice of Amendment to Tolling Agreement filed in the MDL Court on March 7, 2007.

17.1.88.    "Tolling Agreement Party" means a Person who (i) as of the Execution Date was (directly or through counsel) a party to a Tolling Agreement with Merck or (ii) prior to the Execution Date was (directly or through counsel) a party to a Tolling Agreement with Merck which Tolling Agreement was terminated by Merck, and (in each case and for the avoidance of doubt) is not a party to any lawsuit pending (in any court of the United States) against Merck Connected With VIOXX.

Agreement i

17.1.89.    "VIOXX" or "Vioxx" means VIOXX (sometimes referred to as "rofecoxib").

17.1.90.    "Walk Away Enrollment Deadline Date" means March 1, 2008, provided that Merck may, from time to time prior to, on, or after, the Walk Away Enrollment Deadline Date then in effect and in its sole and absolute discretion, extend the Walk Away Enrollment Deadline Date to a date not later than June 30, 2008.

Section 17.2.    Cross-Reference of Other Definitions.

Each capitalized term listed below is defined in the corresponding Section of this Agreement:

## INDEX OF TERMS

Section

Additional Claim Information ............................................................................................. 1.4.1
Administrative Expenses Payables ................................................................................... 5.1.6.2
Award Information ............................................................................................................. 15.1
Claims Valuation Process ................................................................................................. 3.1
Completed ........................................................................................................................ 3.2.1.2
Coordinated Proceedings ................................................................................................. Recitals
Documented ..................................................................................................................... 4.2.6.2
dollars ............................................................................................................................... 16.8
Double QPC ..................................................................................................................... 3.5.4
EI Payments ..................................................................................................................... 4.2.1
Eligibility Requirements ................................................................................................... 2.2.1
Escrow Funds Report ...................................................................................................... 5.1.5
Estimated Aggregate IS Special Marker QPCs .............................................................. 4.1.2
Estimated Aggregate MI Special Marker QPCs ............................................................. 4.1.1
Estimated IS Non-Special Marker QPC Total Points ...................................................... 4.1.2
Estimated MI Non-Special Marker QPC Total Points ..................................................... 4.1.1
Execution Date ................................................................................................................ Introduction
Final ................................................................................................................................. 3.3.5
Final Settlement Payments .............................................................................................. 4.3.3
Fixed Payment ................................................................................................................. 3.3.2
Funding Amount ............................................................................................................... 5.3.4
Funding Payments ........................................................................................................... 5.1
Future Evidence Stipulation ............................................................................................ 2.7.3
Gate Committee ............................................................................................................... 2.4.1
IS EI Payments ................................................................................................................ 4.2.1
IS EI Payments Cap Amount ........................................................................................... 4.2.3
IS Final Settlement Payment ........................................................................................... 4.3.2
IS Fixed Payment ............................................................................................................ 3.3.2
IS Initial Settlement Payments Commencement Date ..................................................... 4.1.2
IS Interim Payments Cap. ................................................................................................ 4.1.2.2
IS Interim Settlement Payments ...................................................................................... 4.1.2.1

64

IS QPC Payables .................................................................................................... 5.1.6.4
IS Special Review QPC ......................................................................................... 3.4.1
MDL Court ............................................................................................................. Preamble
Merck ..................................................................................................................... Introduction
MI EI Payments ..................................................................................................... 4.2.1
MI EI Payments Cap Amount ................................................................................ 4.2.2
MI Final Settlement Payment ................................................................................ 4.3.1
MI Fixed Payment ................................................................................................. 3.3.2
MI Initial Settlement Payments Commencement Date .......................................... 4.1.1
MI Interim Payments Cap. ..................................................................................... 4.1.1.2
MI Interim Settlement Payments. ........................................................................... 4.1.1.1
MI QPC Payables ................................................................................................... 5.1.6.3
MI Special Review QPC ........................................................................................ 3.4.1
Multiple Draw Drawing .......................................................................................... 5.3.2
Non-Extension Drawing ......................................................................................... 5.3.2
Parties .................................................................................................................... Introduction
Party ...................................................................................................................... Introduction
Payment Report ..................................................................................................... 5.1.5
Periodic Audit Start Date ...................................................................................... 10.2.1
Point Awards Criteria ............................................................................................ 3.2.1
Points Award Process ............................................................................................ 3.1
Pre-Special Review ............................................................................................... 3.3.1
Program .................................................................................................................. Recitals
PSC ........................................................................................................................ Preamble
Qualifying Program Claimant ................................................................................ 2.1
Registration Order .................................................................................................. 1.1
Release ................................................................................................................... 1.2.2.3
Required PME Records. ......................................................................................... 1.3.1
Second Eligible Event ........................................................................................... 3.5.1
Section 11.1.5 Counsel .......................................................................................... 11.1.5
Special Marker QPC .............................................................................................. 3.3.2
Special Review QPC .............................................................................................. 3.4.1
Specified Documented Economic Damages .......................................................... 4.2.6.1
Threshold Exceeding Gate Push ........................................................................... 2.5.5.4.1
Walk Away Right ................................................................................................... 11.1

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

MERCK & CO., INC.

By: _____
    Name:
    Title:

Address:

Telecopier:

**[Signature Pages for Settlement Agreement]**

NEGOTIATING PLAINTIFFS' COUNSEL

_____

Andy D. Birchfield Jr.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

Address: 218 Commerce Street
          Montgomery, AL 36104

Telecopier:    (334) 954-7555


_____

Edward F. Blizzard
Blizzard, McCarthy & Nabers, LLP

Address: Lyric Centre, 440 Louisiana, Suite 1710
          Houston, Texas 77002-1689

Telecopier:    (713) 844-3755


_____

Thomas V. Girardi
Girardi and Keese

Address: 1126 Wilshire Boulevard
          Los Angeles, California 90017-1904

Telecopier:    (213) 481-1554


_____

Russ M. Herman
Herman, Herman, Katz & Cotlar, LLP

Address: 820 O'Keefe Avenue
          New Orleans, Louisiana 70113-1116

Telecopier:    (504) 561-6024

Agreement i

**[Signature Pages for Settlement Agreement]**

_____

Arnold Levin
Levin, Fishbein, Sedran & Berman

Address:  510 Walnut Street, Suite 500
               Philadelphia, Pennsylvania 19106-3697

Telecopier:       (215) 592-4663


_____

Christopher A. Seeger
Seeger Weiss LLP

Address:  One William Street
               New York, NY 10004

Telecopier:       (212) 584-0799

Agreement i

**[Signature Pages for Settlement Agreement]**

1

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
DOCKET NOS. ATL-L-16452-06MT, 22-06MT

------------------------------x
WILLIAM COOK and VIRGINIA PICKETT,

        PLAINTIFF,        STENOGRAPHIC
                      TRANSCRIPT OF:

    VS.

                      - PROCEEDINGS -

MERCK & CO., INC.,

        DEFENDANT.
------------------------------x

               PLACE:  ATLANTIC COUNTY COURTHOUSE
                     1201 BACHARACH BOULEVARD
                     ATLANTIC CITY, NJ  08401

               DATE:   FEBRUARY 25, 2009

B E F O R E:

    THE HONORABLE CAROL E. HIGBEE, P.J. Civ.

TRANSCRIPT ORDERED BY:

    CHARLES COHEN, ESQ. & EUGENE FRAZIER, JR.

A P P E A R A N C E S:

    GARY LEVIN, ESQUIRE
    FOR THE PLAINTIFF
    CHARLES COHEN, ESQUIRE
    HUGHES, HUBBARD & REED
    AND
    DOUGLAS MARVIN, ESQUIRE
    WILLIAMS & CONNELLY
    ATTORNEYS FOR THE DEFENDANT

        *     *     *     *     *     *

              REGINA A. BERENATO-TELL, CCR-RMR-CRR
              OFFICIAL COURT REPORTER
              1201 BACHARACH BOULEVARD
              ATLANTIC CITY, NJ  08401

M00F550131

2/25/09 - Cook & Pickett

2

1                        P R O C E E D I N G S

2                 THE COURT:  You can be seated.  All right.

3       We have two matters that we're going to discuss today

4       on the record.  Cook versus Merck and Pickett versus

5       Merck.

6                 Mr. Levin, do you want to enter your

7       appearance?

8                 MR. LEVIN:  Gary Levin on behalf of

9       plaintiff.

10                THE COURT:  You represent Mr. Cook.  You

11      filed his complaint, correct?

12                MR. LEVIN:  Yes, that's correct.

13                THE COURT:  And Miss Pickett, have you

14      filed a substitution with her?

15                MR. LEVIN:  That's just coming in.  I will

16      be filing it probably tomorrow.  Because we understood

17      that she basically wasn't in the process anymore then

18      through the various --

19                THE COURT:  Well, the case has been

20      dismissed.

21                MR. LEVIN:  So but we are filing a

22      substitution of attorney.  I will have that for you

23      tomorrow.

24                THE COURT:  Counsel for defense do you want

25      to put your appearance on the record?

2/25/09 - Cook & Pickett

3

1          MR. COHEN:  Charles Cohen.

2          MR. MARVIN:  Douglas Marvin, Williams and

3     Connelly for Merck.

4          THE COURT:  Okay.  In the matter of Cook

5     and Pickett we have two people.  Mr. Cook, you're here

6     in court, and Miss Pickett, are you here?

7          MR. LEVIN:  No.

8          THE COURT:  That's not Miss Pickett?

9          MR. LEVIN:  No.

10          THE COURT:  She is not here today?

11          MR. LEVIN:  No, Judge.

12          THE COURT:  I thought both clients were

13     going to come.

14          MR. LEVIN:  I wasn't aware -- first of all,

15     Miss Pickett lives out of state, but I wasn't aware

16     that you had requested she be present today.

17          THE COURT:  Okay.  All right.  Well, let's

18     deal with Mr. Cook first.  Well, let me start first

19     with the Pickett -- the application, it was in Cook,

20     that you made the application for pro hac admission.

21          MR. LEVIN:  Yes.

22          THE COURT:  So Mr. Benjamin is an attorney

23     in the state of New York.  He has made an application

24     for admission pro hac in the case of William Cook, and

25     there's been opposition filed.  Is there anything you

M00F550133

Case 2:05-md-01657-EEF-DEK   Document 3084043   Filed 12/30/2009   Page 90 of 114
Case 2:05-md-01657-EEF-DEK   Document 19081-3   Filed 06/22/2009   Page 41 of 27

2/25/09 - Cook & Pickett

4

1    want to say in support of your application, Mr. Levin?

2         MR. LEVIN:   Judge, I would like to

3    reiterate what I put in my supplemental certification

4    that when I originally had assisted in the preparation

5    of the first certification I had mistakenly believed

6    that there was a shortened version of the

7    certification, and we adopt that disciplinary actions

8    that were taken against Mr. Benjamin.

9         Mr. Cook is fully aware of those various

10   disciplinary actions.  They were, I believe, 15 years

11   ago or longer ago, and Mr. Cook wants the expertise of

12   Mr. Benjamin in his representation, and, frankly,

13   Mr. Benjamin is very highly qualified, and, you know,

14   we believe that he meets the qualifications for

15   admission pro hac vice.

16        THE COURT:  Counselor, anything you want to

17   say about the motion?

18        MR. COHEN:  Your Honor, I think everything

19   we had to say is in the papers.  The only other thing

20   that I would note for the record is that the complaint

21   was filed on October 2, 2006, and the application for

22   admission was just made in 2009, so to the extent that

23   there's a claimed prejudice at this time that was of

24   the applicant's own making.

25        THE COURT:  Well, the Court has reviewed

M00F550134

5

1    the application.  Mr. Cook, I understand that you would

2    like to have Mr. Benjamin assist -- and Mr. Levin has

3    requested that Mr. Benjamin be allowed to assist him in

4    this case, however, I find that Mr. Benjamin is not

5    someone who I would admit to practice law in the state

6    of New Jersey.

7            Mr. Benjamin had, in fact, as counsel has

8    said, prior disciplinary issues.  He has, in fact, been

9    suspended for six months in front of the New York State

10   Courts, and his license was revoked or suspended at

11   least for six months.

12           In addition, he had a U.S. Supreme Court, I

13   believe, order suspending his license, and he had --

14   more importantly even those things are all there.

15   Those things were not revealed in his papers when he

16   certified and requested.  That in and of itself is an

17   ethical violation.  It shows either that he doesn't

18   know how to read the rules of the State Court of New

19   Jersey or he doesn't know how to follow them or that he

20   was simply dishonest with the Court or a combination of

21   the three.  And when he filed the certification without

22   that information that in and of itself was unethical.

23           He has also filed a motion on his

24   letterhead "Ronald Benjamin pro hac application

25   pending," which is completely improper, not

M00F550135

2/25/09 - Cook & Pickett

6

1    appropriate, should not be done.  So, so far he has

2    demonstrated to the Court that he can't follow the New

3    Jersey court rules, that he either doesn't know what he

4    is doing or doesn't want to do it properly, and not

5    only did he have some problem with the Court years ago

6    he has had repeated problems, and at least one of

7    those -- and there's several different opinions that

8    have been presented to me, but there's one where it

9    says this is an opinion in a decision of the Court

10   where it says, "suffice it to say, applicants have been

11   the victim of bad lawyering by their trial counsel,

12   Ronald Benjamin.  Benjamin's discovery abuses can be

13   summarized as a parade of obstinance that ultimately

14   cost his clients their day in court.  The origin of

15   Benjamin's discovery dates -- mischief dates to

16   October 1999 when case-specific expert designations

17   were due, and he failed to honor the deadline.  Instead

18   he objected to the need for disclosure before the

19   District Court ruled on a related Daubert motion."

20            And generally -- in other words, there's

21   not just one judge but several who have found that

22   Mr. Benjamin lacks either the ability to well represent

23   clients or the integrity to well represent clients, and

24   I'm not going to let him practice in my court, and I,

25   in fact, am ordering that the motion be denied.

M00F550136

2/25/09 - Cook & Pickett

7

1    He has, of course, the right to appeal

2    that, and if you wish to file an appeal then you can

3    have it reviewed by the Appellate Court, but I don't

4    have any question that I have substantial discretion in

5    admitting counsel.  It is a privilege to be able to

6    practice before the bar of New Jersey, especially when

7    you don't have a New Jersey license, and it is not one

8    that is given to everyone.

9             Therefore, Mr. Benjamin is not going to be

10   participating in the case, and, Mr. Levin, you're not a

11   certified civil trial attorney, right?

12        MR. LEVIN:  No, Judge.

13        THE COURT:  Just so it is clear for the

14   record, Mr. Benjamin will not be entitled to any legal

15   fees generated by this case.  He was not entitled to

16   take any money from the plaintiffs' recovery if the

17   plaintiff does recover.  He has no financial interest

18   in the case, and I would request at this point that he

19   remove himself from counsel table.  If he wants to sit

20   in the courtroom, of course, it is an open courtroom,

21   and he is allowed to do that, but, number one, he is

22   not going to participate as counsel, and, number two,

23   I'm just cautioning you that he is not to receive fees.

24        MR. LEVIN:  I understand, Judge.

25        THE COURT:  If the case -- if it proceeds

M00F550137

2/25/09 - Cook & Pickett

8

1    forward.

2              Let's look at the status of the case at

3    this moment.  Mr. Cook's case is one where he -- at

4    this point, Mr. Cook, you decided not to go into the

5    settlement, correct?

6              MR. COOK:  Excuse me?

7              THE COURT:  Did you decide not to go into

8    the settlement?

9              MR. COOK:  Yes.

10             THE COURT:  Did you have a chance to read

11   the papers about Mr. Benjamin?

12             MR. COOK:  I went through it just now.

13   Some of it is a little over my head, but I understand

14   that I would need a further interpretation with all

15   that as a layman.  I really don't understand, you know.

16             THE COURT:  Well, I can say -- I just want

17   you to understand that I found that he is not qualified

18   to testify before this court, and there are other

19   judges who had concerns about the fact that through his

20   actions he has actually lost cases for clients because

21   of his own stubbornness is what one judge says,

22   obstinance.

23             At this point, Mr. Levin, can you give me

24   the status of the case as far as -- Mr. Levin.  Mr.

25   Cohen, can you give me the status of the case as far as

M00F550138

2/25/09 - Cook & Pickett

9

1    what Mr. Cook's position is, his ability to participate

2    in the settlement?

3                Mr. Cook, I just want you to understand

4    what your rights are as far as going into the

5    settlement.

6                MR. COHEN:  Your Honor, as you know, the

7    deadline for going into the settlement has passed,

8    however, we do -- we have been asking the plaintiffs'

9    counsel on the negotiating committee to let people who

10   change their mind go into the program at this time, and

11   we do believe that there's a reasonably good chance

12   that if Mr. Cook were to decide to change his mind and

13   ask to enter the program that we could accommodate that

14   request.

15               It is Merck's position that Mr. Cook is an

16   excellent candidate for the program.  We did a

17   preliminary score of what we thought Mr. Cook would get

18   in the program.  Before I give the number and the

19   dollar figure that we think Mr. Cook would get I want

20   to note that it is based on a limited set of medical

21   records that have been provided to us to date by

22   plaintiff's counsel, and, in fact, if Mr. Cook could

23   prove through medical records what he has put in sworn

24   fact statements in other documents he actually could be

25   entitled to quite a bit more money than the amount that

M00F550139

2/25/09 - Cook & Pickett

10

1    we have preliminarily scored him at at this time.

2              For example, the score that I'm about to

3    give is based on prescription records we have to date

4    of 60 days' worth of pills.  Mr. Cook claims to have

5    taken VIOXX for years, and his expert, although giving

6    a different date range, also says Mr. Cook took VIOXX

7    for years.  And, so, if he has records to support that

8    he would get at least 30 percent more.  We took at

9    least a 30 percent deduction for that alone.

10             In addition, we had to make a few other

11   assumptions about his medical condition, which, again,

12   if he was able to substantiate something more he could

13   get much higher, but we are estimating at this time

14   that Mr. Cook would be entitled to 165.37 points.  The

15   way it works in the program is everybody gets scored

16   individually, and you get a certain number of points.

17   As of right now everyone's best estimate is that a

18   point would be worth $1,915, although that could change

19   a little by the time the program is over based on

20   mathematics and the number of people that we have

21   scored and the amount of information that we have we

22   think it is reasonable that it won't change in any

23   dramatic fashion but, of course, as of today we can't

24   tell you specifically what the dollars are.

25             But if you multiplied 165.37 by 1,915 then

M00F550140

2/25/09 - Cook & Pickett

1   we are looking at approximately $317,000 would be the

2   amount of money that would be paid to Mr. Cook this

3   year that the claims administrator has said they will

4   be able to pay this year, and, again, if Mr. Cook were

5   able to provide records of additional usage, right now

6   we only have him in for two months, or any additional

7   injuries or any additional information it could be

8   substantially higher than $317,000.  We would be

9   perfectly happy to work with counsel if Mr. Cook were

10  interested to review any proposed application to see

11  what medical records were available and to help make

12  sure everything went into the application that he could

13  possibly put in.  We're happy to rescore it if we get

14  additional records.  I just got an e-mail from my

15  colleague in New York that some additional records came

16  on her desk.  We just received them today, so, again, I

17  don't want to even give the impression that $317,000 is

18  the most.  As of right now that's my best guess, but it

19  absolutely could go higher, especially on the duration

20  of use.  If there are prescription records that show

21  more than two months that's pretty substantial all by

22  itself.

23           So from Merck's point of view we certainly

24  reiterate that we would do everything we could to get

25  him into the program.  Merck believes he is an

M00F550141

2/25/09 - Cook & Pickett

12

1    excellent -- the program is really an excellent option

2    for him, that he would get a substantial amount of

3    money and possibly more than what we know today, and

4    we're willing to assist in any which way counsel would

5    like us to do.

6            THE COURT:  All right.  Mr. Cook, I'm going

7    to address you directly.

8            MR. COOK:  Yes, Judge.

9            THE COURT:  Basically what they're saying

10   to you is nobody has been promised a specific amount in

11   the settlement because it had to be -- depending on how

12   many people got in there's a lump sum of money

13   deposited, and then it depended on how you scored in

14   each level and how many points you get, and then it

15   depended on how many dollars they were able to give per

16   point.  And originally when most of the people entered

17   the settlement it was -- there were estimates and not

18   just casual estimates, there were estimates that had

19   been done through substantial financial calculations by

20   plaintiff's counsel where they had a very good idea of

21   what they thought their clients were going to get.

22   They could never promise it or guarantee it, and that's

23   even still the case today.  But at least a substantial

24   number of the people have now been scored, most of the

25   people I guess or at least a majority; is that correct,

2/25/09 - Cook & Pickett

13

1  counsel?  Or no?

2          MR. COHEN:  I would say a substantial

3  number.  I couldn't speak --

4          THE COURT:  It may not be the majority, but

5  a substantial number have been scored.  A substantial

6  number of people have already received checks for

7  40 percent of what they're expected to get and are now

8  waiting for the last 60 percent of what they're

9  expected to get.  So checks have been issued to people.

10         There were -- and counsel gave me the

11  numbers this morning, but in the entire country there

12  were 12 cases that were actually tried involving VIOXX.

13  There were 12 wins for Merck and, what, five wins for

14  plaintiffs, and in the plaintiffs' cases they were all

15  appealed by Merck, and there actually was no judgment

16  -- final judgment that's been paid on that was entered

17  in any of those cases.  Some of those people, and I

18  can't get into all the details of those cases, they

19  weren't all tried here.  Some of those cases Merck has

20  now allowed the loser to go into the settlement program

21  and drop the case, even though they lost their case,

22  and in other cases they have allowed -- they have

23  reached agreements with the counsel.  But at any rate

24  the point is that these are very difficult cases to

25  win, and they're very, very expensive.  In my court we

M00F550143

2/25/09 - Cook & Pickett

14

1    tried several cases, and I know that in the cases here

2    counsel spent at least, I mean, a minimum of a million

3    dollars.  I really believe that that's so understating

4    it.  I think most counsel -- most of the cases that was

5    spent more like three, four, $5 million by plaintiffs'

6    counsel.  Merck, I believe, spent more than that in

7    each case, bringing in top experts from around the

8    country, bringing in computer operators and video

9    equipment and graphic displays and things that are

10   expensive.

11          Those cases were tried not just for the one

12   person because if that one person -- they were tried

13   legally for the one person, but the reasons they put so

14   many resources into it was because they knew that there

15   were another 15,000 -- 30,000 cases out there that they

16   would affect.  So, obviously, everything was poured

17   into those cases, and the battle was matched, and there

18   was a war, and I'm not going to say that I think Merck

19   won because Merck wound up paying, you know billions of

20   dollars in settlements, but I'm not going to say Merck

21   lost either.  The bottom line is there's a settlement

22   which means -- a settlement is not based on I win or

23   you win or I'm right or you're wrong, it is based on

24   how much it costs and what's worthwhile and how

25   practical it is to keep fighting.

M00F550144

2/25/09 - Cook & Pickett

15

1            At this point, as counsel for Merck has

2  said, they have their own selfish reason for everyone

3  wanting to get into the settlement that can because

4  they want to have this over. They have already put up

5  the money, and they just want to divide it up, and they

6  don't have to put up more money because you go in or

7  don't go in, so they have an interest in your going in.

8  But the fact of the matter is there are people that

9  they didn't pay at all and that they're not going to

10  pay. There are people that they found just didn't

11  qualify. And the settlement itself doesn't pay

12  everybody. Some people, they can't prove they took

13  VIOXX really or who can't prove they had a heart attack

14  or stroke. Some of those people are going to wind up

15  out of the settlement and not get money. They have

16  looked at yours, and counsel had just said to you they

17  believe you would score in the range of a number that

18  would give you a minimum they think, again, it is not

19  an absolute promise, it is not the same as getting a

20  check, but they believe you would score in the

21  approximately $300,000 range, and they believe if you

22  supplied more information about VIOXX use for a longer

23  period of time that could jump up, you know, he said

24  30 percent was the maximum depending on how the maximum

25  range --

M00FS50145

2/25/09 - Cook & Pickett

16

1          MR. COHEN:  Just for one item Your Honor.

2          THE COURT:  For that, and if there's

3     anything else you could prove that would help your case

4     you could do better.  There are also appeal processes

5     in there, so if you don't get through the first gate

6     you could appeal, which Mr. -- counsel here is, in

7     fact, on that gate committee.  So they have already

8     looked at this.  At least one person has that.  Doesn't

9     mean the gate committee will approve you, but they have

10    looked at it.  They know what the qualifications are,

11    and they believe you would get through that gate

12    committee.  The gate committee, if you lose there, you

13    have a right to go before a committee of attorneys that

14    decide and your attorney can go with you to that, I

15    believe, and argue for you there to try to get you back

16    into the settlement.  If you lose that there's a judge,

17    retired judge, Judge Corodemus, who actually is the

18    last set of appeals for the settlement program.

19          I'm not going to go through the whole

20    settlement with you because I can't.  There's a lot of

21    different things in there, and I know your counsel has

22    talked to you about it, and I don't know whether they

23    advised you to do it and you decided not to or if they

24    advised you not to do it, and I certainly don't want to

25    know what your counsel told you, but what's happening

M00FS50146

2/25/09 - Cook & Pickett

17

1    now is they're getting to the last part where they're

2    actually figuring the final numbers for people, and it

3    is going to become -- what I'm saying is we told you

4    before the deadline was over, and then we told you

5    again the deadline was over, and I think we have moved

6    the deadline three times, and now officially the

7    deadline is over, but what happens is there's only like

8    20 - I want you to know out of 15,000 cases of personal

9    injury cases, people are just claiming they were

10   injured I have only got 21 or 22, 23, something in the

11   low twenties left.  And most of those people I think

12   probably 20 of those people don't have claims for heart

13   attacks.  They have claims for other things like

14   pulmonary embolisms, things where they can't get into

15   the settlement.  And most of the other cases the

16   attorneys have dropped because they just didn't feel

17   they could prove them or, you know, and these other

18   people are still fighting to keep their case and get to

19   trial, and they may succeed or they may not.

20            Everyone is entitled to say no.  Everyone

21   is entitled to get a trial, but it is a lot of money.

22   It is a tough fight to fight, and it's -- I have -- I

23   can't -- I don't know your file, and I don't really

24   know your facts.  I don't really know your case.  What

25   I know is how hard it is to prove a case like this from

M00F5S0147

2/25/09 - Cook & Pickett

1    a scientific point of view with legal evidence in a

2    court of law.  And I know that Merck has the resources

3    and the ability to mount a very difficult defense even

4    when you have the best attorneys and the best skills

5    and you have the best things presented.  And, so, I'm

6    not trying to scare you.  I'm not trying to intimidate

7    you.  I'm not trying to frighten you.  I'm not trying

8    to -- I don't think you're very easily frightened or

9    intimidated or you wouldn't be here.  You're obviously

10   a tough guy.

11           MR. COOK:  Not really, but I get up every

12   day.

13           THE COURT:  Hey, sometimes that requires a

14   lot.  But being tough doesn't necessarily -- I just

15   don't want to see somebody who could have gotten 300 or

16   more thousand dollars walking away with nothing.

17           MR. COOK:  If I may, Judge, can I confer

18   with Mr. Levin?

19           THE COURT:  You can.  We'll take a break

20   and you can talk about it with him, and you can

21   consider your options, and, certainly, Mr. Levin is a

22   member of the New Jersey bar and is cognizant of the

23   rules here, and he is also aware of the difficulties of

24   the evidence rules in trying cases.  He is aware of the

25   ups and downs, and there are arguments to be made for

M00F550148

2/25/09 - Cook & Pickett

19

1    both sides, but there's a lot of reasons why you should

2    think very carefully about this.  All right?

3              MR. LEVIN:  Judge, I'm sure there's no

4    decision required today.

5              MR. COHEN:  No, Your Honor, we're not going

6    to be --

7              THE COURT:  Well, it is not if you don't

8    say yes today it is over.

9              MR. LEVIN:  I want to talk to my client in

10   case there is a decision today.

11             THE COURT:  If there is a decision today we

12   can put it on the record.  If there's not then we'll

13   proceed.

14             MR. LEVIN:  I know there's additional

15   evidence that it sounds like --

16             THE COURT:  You still have the right,

17   Mr. Levin, you would have the right --

18             MR. COOK:  That is my question.

19             THE COURT:  -- to submit those extra papers

20   to them.

21             MR. COHEN:  Let's discuss this.  We can

22   discuss this now.

23             THE COURT:  If you could show additional

24   treatment time where you were on VIOXX, even if it is

25   an affidavit from a doctor saying I gave him samples or

M00F550149

2/25/09 - Cook & Pickett

20

1    something like that.  I don't know whether that

2    happened or didn't.  I think you still have the

3    opportunity to submit that.

4              MR. LEVIN:  I have previously submitted it,

5    but it doesn't sound like it hit their desk yet, so

6    maybe that was a month ago or six weeks ago.

7              THE COURT:  Why don't you look at what

8    you've got, and maybe you would have to discuss it

9    again, and as Mr. Cohen said, there's at least some

10   records that he doesn't believe he has looked at yet.

11   There are more than one law firm.  There's multiple

12   firms that represent Merck, and there's still thousands

13   of documents in files out there, so, you know, he was

14   being candid that he just received an e-mail that

15   indicates there might be some additional records that

16   he didn't look at, which might make the number bigger,

17   but, you know, it probably still would be in that range

18   so at least you could talk.  Take some time, and I'll

19   get back to you.

20             Thank you, Mr. Cook.  I appreciate you

21   coming.

22             (End of proceedings.)

23

24

25

M00F550150

21

## C E R T I F I C A T I O N

    I, REGINA A. BERENATO-TELL, C.C.R., R.M.R, C.R.R.,

License Number 30XI00161000, an Official Court Reporter

in and for the State of New Jersey, do hereby certify

the foregoing to be prepared in full compliance with

the current Transcript Format for Judicial Proceedings

and is a true and accurate compressed transcript to the

best of my knowledge and ability.

 

                         _____ 03-05-09

                         Regina A. Berenato-Tell, CCR-RMR-CRR

                         Official Court Reporter

                         Atlantic County Courthouse

                         Mays Landing, New Jersey

M00F550151

1

**A**

**ability** 6:22 9:1 18:3 21:13
**able** 7:5 10:12 11:4 11:5 12:15
**absolute** 15:19
**absolutely** 11:19
**abuses** 6:12
**accommodate** 9:13
**accurate** 21:11
**actions** 4:7,10 8:20
**addition** 5:12 10:10
**additional** 11:5,6,7 11:14,15 19:14,23 20:15
**address** 12:7
**administrator** 11:3
**admission** 3:20,24 4:15,22
**admit** 5:5
**admitting** 7:5
**adopt** 4:7
**advised** 16:23,24
**affect** 14:16
**affidavit** 19:25
**ago** 4:11,11 6:5 20:6 20:6
**agreements** 13:23
**allowed** 5:3 7:21 13:20,22
**amount** 9:25 10:21 11:2 12:2,10
**anymore** 2:17
**appeal** 7:1,2 16:4,6
**appealed** 13:15
**appeals** 16:18
**appearance** 2:7,25
**Appellate** 7:3
**applicants** 6:10
**applicant's** 4:24
**application** 3:19,20 3:23 4:1,21 5:1,24 11:10,12
**appreciate** 20:20
**appropriate** 6:1
**approve** 16:9

**approximately** 11:1 15:21
**argue** 16:15
**arguments** 18:25
**asking** 9:8
**assist** 5:2,3 12:4
**assisted** 4:4
**assumptions** 10:11
**Atlantic** 1:1,10,11 1:25 21:24
**ATL-L-16452-06...** 1:2
**attack** 15:13
**attacks** 17:13
**attorney** 2:22 3:22 7:11 16:14
**attorneys** 1:22 16:13 17:16 18:4
**available** 11:11
**aware** 3:14,15 4:9 18:23,24

**B**

**B** 1:13
**BACHARACH** 1:11,25
**back** 16:15 20:19
**bad** 6:11
**bar** 7:6 18:22
**based** 9:20 10:3,19 14:22,23
**basically** 2:17 12:9
**battle** 14:17
**behalf** 2:8
**believe** 4:10,14 5:13 9:11 14:3,6 15:17 15:20,21 16:11,15 20:10
**believed** 4:5
**believes** 11:25
**Benjamin** 3:22 4:8 4:12,13 5:2,3,4,7 5:24 6:12,22 7:9 7:14 8:11
**Benjamin's** 6:12,15
**Berenato-Tell** 1:24 21:4,22

**best** 10:17 11:18 18:4,4,5 21:13
**better** 16:4
**bigger** 20:16
**billions** 14:19
**bit** 9:25
**bottom** 14:21
**BOULEVARD** 1:11 1:25
**break** 18:19
**bringing** 14:7,8

**C**

**C** 1:17 2:1 21:1,1
**calculations** 12:19
**candid** 20:14
**candidate** 9:16
**carefully** 19:2
**CAROL** 1:14
**case** 2:19 3:24 5:4 7:10,15,18,25 8:2 8:3,24,25 12:23 13:21,21 14:7 16:3 17:18,24,25 19:10
**cases** 8:20 13:12,14 13:17,18,19,22,24 14:1,1,4,11,15,17 17:8,9,15 18:24
**case-specific** 6:16
**casual** 12:18
**cautioning** 7:23
**CCR-RMR-CRR** 1:24 21:22
**certain** 10:16
**certainly** 11:23 16:24 18:21
**certification** 4:3,5,7 5:21
**certified** 5:16 7:11
**certify** 21:6
**chance** 8:10 9:11
**change** 9:10,12 10:18,22
**Charles** 1:16,20 3:1
**check** 15:20
**checks** 13:6,9
**CITY** 1:11,25

**Civ** 1:14
**civil** 7:11
**claimed** 4:23
**claiming** 17:9
**claims** 10:4 11:3 17:12,13
**clear** 7:13
**client** 19:9
**clients** 3:12 6:14,23 6:23 8:20 12:21
**cognizant** 18:22
**Cohen** 1:16,20 3:1,1 4:18 8:25 9:6 13:2 16:1 19:5,21 20:9
**colleague** 11:15
**combination** 5:20
**come** 3:13
**coming** 2:15 20:21
**committee** 9:9 16:7 16:9,12,12,13
**complaint** 2:11 4:20
**completely** 5:25
**compliance** 21:7
**compressed** 21:11
**computer** 14:8
**concerns** 8:19
**condition** 10:11
**confer** 18:17
**Connelly** 1:22 3:3
**consider** 18:21
**Cook** 1:4 2:4,10 3:4 3:5,18,19,24 4:9 4:11 5:1 8:4,6,9,12 9:3,12,15,17,19,22 10:4,6,14 11:2,4,9 12:6,8 18:11,17 19:18 20:20
**Cook's** 8:3 9:1
**Corodemus** 16:17
**correct** 2:11,12 8:5 12:25
**cost** 6:14
**costs** 14:24
**counsel** 2:24 5:7 6:11 7:5,19,22 9:9 9:22 11:9 12:4,20

M00F550152

Case 2:05-md-01657-EEF-DEK   Document 30884-3   Filed 12/30/09   Page 109 of 114
Case 2:05-md-01657-EEF-DEK   Document 30884-3   Filed 06/22/2009   Page 23 of 27

2

13:1,10,23 14:2,4
 14:6 15:1,16 16:6
 16:21,25
**Counselor** 4:16
**country** 13:11 14:8
**County** 1:10 21:24
**COUNTY/CIVIL**
 1:1
**course** 7:1,20 10:23
**court** 1:1,24 2:2,10
 2:13,19,24 3:4,6,8
 3:10,12,17,22 4:16
 4:25,25 5:12,18,20
 6:2,3,5,9,14,19,24
 7:3,13,25 8:7,10
 8:16,18 12:6,9
 13:4,25 16:2 18:2
 18:13,19 19:7,11
 19:16,19,23 20:7
 21:5,23
**Courthouse** 1:10
 21:24
**courtroom** 7:20,20
**Courts** 5:10
**current** 21:9
**C.C.R** 21:4
**C.R.R** 21:4

**D**

**D** 2:1
**date** 1:12 9:21 10:3
 10:6
**dates** 6:15,15
**Daubert** 6:19
**day** 6:14 18:12
**days** 10:4
**deadline** 6:17 9:7
 17:4,5,6,7
**deal** 3:18
**decide** 8:7 9:12
 16:14
**decided** 8:4 16:23
**decision** 6:9 19:4,10
 19:11
**deduction** 10:9
**DEFENDANT** 1:8
 1:22

**defense** 2:24 18:3
**demonstrated** 6:2
**denied** 6:25
**depended** 12:13,15
**depending** 12:11
 15:24
**deposited** 12:13
**designations** 6:16
**desk** 11:16 20:5
**details** 13:18
**different** 6:7 10:6
 16:21
**difficult** 13:24 18:3
**difficulties** 18:23
**directly** 12:7
**disciplinary** 4:7,10
 5:8
**disclosure** 6:18
**discovery** 6:12,15
**discretion** 7:4
**discuss** 2:3 19:21,22
 20:8
**dishonest** 5:20
**dismissed** 2:20
**displays** 14:9
**District** 6:19
**divide** 15:5
**DIVISION** 1:1
**DOCKET** 1:2
**doctor** 19:25
**documents** 9:24
 20:13
**doing** 6:4
**dollar** 9:19
**dollars** 10:24 12:15
 14:3,20 18:16
**Douglas** 1:21 3:2
**downs** 18:25
**dramatic** 10:23
**drop** 13:21
**dropped** 17:16
**due** 6:17
**duration** 11:19

**E**

**E** 1:13,13,14,17,17
 2:1,1 21:1

**easily** 18:8
**either** 5:17 6:3,22
 14:21
**embolisms** 17:14
**enter** 2:6 9:13
**entered** 12:16 13:16
**entire** 13:11
**entitled** 7:14,15
 9:25 10:14 17:20
 17:21
**equipment** 14:9
**especially** 7:6 11:19
**ESQ** 1:16
**ESQUIRE** 1:18,20
 1:21
**estimate** 10:17
**estimates** 12:17,18
 12:18
**estimating** 10:13
**ethical** 5:17
**EUGENE** 1:16
**everybody** 10:15
 15:12
**everyone's** 10:17
**evidence** 18:1,24
 19:15
**example** 10:2
**excellent** 9:16 12:1,1
**Excuse** 8:6
**expected** 13:7,9
**expensive** 13:25
 14:10
**expert** 6:16 10:5
**expertise** 4:11
**experts** 14:7
**extent** 4:22
**extra** 19:19
**e-mail** 11:14 20:14

**F**

**F** 1:13 21:1
**fact** 5:7,8 6:25 8:19
 9:22,24 15:8 16:7
**facts** 17:24
**failed** 6:17
**far** 6:1 8:24,25 9:4
**fashion** 10:23

**FEBRUARY** 1:12
**feel** 17:16
**fees** 7:15,23
**fight** 17:22,22
**fighting** 14:25 17:18
**figure** 9:19
**figuring** 17:2
**file** 7:2 17:23
**filed** 2:11,14 3:25
 4:21 5:21,23
**files** 20:13
**filing** 2:16,21
**final** 13:16 17:2
**financial** 7:17 12:19
**find** 5:4
**firm** 20:11
**firms** 20:12
**first** 3:14,18,18 4:5
 16:5
**five** 13:13
**follow** 5:19 6:2
**foregoing** 21:7
**Format** 21:9
**forward** 8:1
**found** 6:21 8:17
 15:10
**four** 14:5
**frankly** 4:12
**FRAZIER** 1:16
**frighten** 18:7
**frightened** 18:8
**front** 5:9
**full** 21:7
**fully** 4:9
**further** 8:14

**G**

**G** 2:1
**Gary** 1:18 2:8
**gate** 16:5,7,9,11,12
**generally** 6:20
**generated** 7:15
**getting** 15:19 17:1
**give** 8:23,25 9:18
 10:3 11:17 12:15
 15:18
**given** 7:8

M00F550153

3

giving 10:5
go 8:4,7 9:10 11:19
  13:20 15:6,7 16:13
  16:14,19
going 2:3 3:13 6:24
  7:9,22 9:4,7 12:6
  12:21 14:18,20
  15:7,9,14 16:19
  17:3 19:5
good 9:11 12:20
gotten 18:15
graphic 14:9
guarantee 12:22
guess 11:18 12:25
guy 18:10

**H**
hac 3:20,24 4:15
  5:24
happened 20:2
happening 16:25
happens 17:7
happy 11:9,13
hard 17:25
head 8:13
heart 15:13 17:12
help 11:11 16:3
Hey 18:13
HIGBEE 1:14
higher 10:13 11:8
  11:19
highly 4:13
hit 20:5
honor 4:18 6:17 9:6
  16:1 19:5
HONORABLE
  1:14
HUBBARD 1:20
HUGHES 1:20

**I**
idea 12:20
importantly 5:14
impression 11:17
improper 5:25
indicates 20:15
individually 10:16

information 5:22
  10:21 11:7 15:22
injured 17:10
injuries 11:7
injury 17:9
integrity 6:23
interest 7:17 15:7
interested 11:10
interpretation 8:14
intimidate 18:6
intimidated 18:9
involving 13:12
issued 13:9
issues 5:8
item 16:1

**J**
Jersey 1:1 5:6,19
  6:3 7:6,7 18:22
  21:6,25
JR 1:16
judge 3:11 4:2 6:21
  7:12,24 8:21 12:8
  16:16,17,17 18:17
  19:3
judges 8:19
judgment 13:15,16
Judicial 21:9
jump 15:23

**K**
keep 14:25 17:18
knew 14:14
know 4:13 5:18,19
  6:3 8:15 9:6 12:3
  14:1,19 15:23
  16:10,21,22,25
  17:8,17,23,24,24
  17:25 18:2 19:14
  20:1,13,17
knowledge 21:13

**L**
lacks 6:22
Landing 21:25
law 5:5 18:2 20:11
lawyering 6:11

layman 8:15
left 17:11
legal 7:14 18:1
legally 14:13
letterhead 5:24
let's 3:17 8:2 19:21
level 12:14
Levin 1:18 2:6,8,8
  2:12,15,21 3:7,9
  3:11,14,21 4:1,2
  5:2 7:10,12,24
  8:23,24 18:18,21
  19:3,9,14,17 20:4
license 5:10,13 7:7
  21:5
limited 9:20
line 14:21
little 8:13 10:19
lives 3:15
longer 4:11 15:22
look 8:2 20:7,16
looked 15:16 16:8
  16:10 20:10
looking 11:1
lose 16:12,16
loser 13:20
lost 8:20 13:21
  14:21
lot 16:20 17:21
  18:14 19:1
low 17:11
lump 12:12

**M**
majority 12:25 13:4
making 4:24
Marvin 1:21 3:2,2
matched 14:17
mathematics 10:20
matter 3:4 15:8
matters 2:3
maximum 15:24,24
Mays 21:25
mean 14:2 16:9
means 14:22
medical 9:20,23
  10:11 11:11

meets 4:14
member 18:22
Merck 1:7 2:4,5 3:3
  11:25 13:13,15,19
  14:6,18,19,20 15:1
  18:2 20:12
Merck's 9:15 11:23
million 14:2,5
mind 9:10,12
minimum 14:2
  15:18
mischief 6:15
mistakenly 4:5
moment 8:3
money 7:16 9:25
  11:2 12:3,12 15:5
  15:6,15 17:21
month 20:6
months 5:9,11 11:6
  11:21
morning 13:11
motion 4:17 5:23
  6:19,25
mount 18:3
moved 17:5
multiple 20:11
multiplied 10:25

**N**
N 1:17 2:1 21:1
necessarily 18:14
need 6:18 8:14
negotiating 9:9
never 12:22
New 1:1 3:23 5:6,9
  5:18 6:2 7:6,7
  11:15 18:22 21:6
  21:25
NJ 1:11,25
NOS 1:2
note 4:20 9:20
number 7:21,22
  9:18 10:16,20
  12:24 13:3,5,6
  15:17 20:16 21:5
numbers 13:11 17:2

M00F550154

4

## O

**O** 1:13 2:1 21:1
**objected** 6:18
**obstinance** 6:13
8:22
**obviously** 14:16
18:9
**October** 4:21 6:16
**Official** 1:24 21:5
21:23
**officially** 17:6
**Okay** 3:4,17
**open** 7:20
**operators** 14:8
**opinion** 6:9
**opinions** 6:7
**opportunity** 20:3
**opposition** 3:25
**option** 12:1
**options** 18:21
**order** 5:13
**ORDERED** 1:15
**ordering** 6:25
**origin** 6:14
**originally** 4:4 12:16

## P

**P** 1:17,17 2:1
**paid** 11:2 13:16
**papers** 4:19 5:15
8:11 19:19
**parade** 6:13
**part** 17:1
**participate** 7:22 9:1
**participating** 7:10
**passed** 9:7
**pay** 11:4 15:9,10,11
**paying** 14:19
**pending** 5:25
**people** 3:5 9:9 10:20
12:12,16,24,25
13:6,9,17 15:8,10
15:12,14 17:2,9,11
17:12,18
**percent** 10:8,9 13:7
13:8 15:24

**perfectly** 11:9
**period** 15:23
**person** 14:12,12,13
16:8
**personal** 17:8
**Pickett** 1:4 2:4,13
3:5,6,8,15,19
**pills** 10:4
**PLACE** 1:10
**plaintiff** 1:5,19 2:9
7:17
**plaintiffs** 7:16 9:8
13:14,14 14:5
**plaintiff's** 9:22
12:20
**point** 7:18 8:4,23
10:18 11:23 12:16
13:24 15:1 18:1
**points** 10:14,16
12:14
**position** 9:1,15
**possibly** 11:13 12:3
**poured** 14:16
**practical** 14:25
**practice** 5:5 6:24 7:6
**prejudice** 4:23
**preliminarily** 10:1
**preliminary** 9:17
**preparation** 4:4
**prepared** 21:7
**prescription** 10:3
11:20
**present** 3:16
**presented** 6:8 18:5
**pretty** 11:21
**previously** 20:4
**prior** 5:8
**privilege** 7:5
**pro** 3:20,24 4:15
5:24
**probably** 2:16 17:12
20:17
**problem** 6:5
**problems** 6:6
**proceed** 19:13
**proceedings** 1:6

20:22 21:9
**proceeds** 7:25
**process** 2:17
**processes** 16:4
**program** 9:10,13,16
9:18 10:15,19
11:25 12:1 13:20
16:18
**promise** 12:22 15:19
**promised** 12:10
**properly** 6:4
**proposed** 11:10
**prove** 9:23 15:12,13
16:3 17:17,25
**provide** 11:5
**provided** 9:21
**pulmonary** 17:14
**put** 2:25 4:3 9:23
11:13 14:13 15:4,6
19:12
**P.J** 1:14

## Q

**qualifications** 4:14
16:10
**qualified** 4:13 8:17
**qualify** 15:11
**question** 7:4 19:18
**quite** 9:25

## R

**R** 1:13,17 2:1 21:1
**range** 10:6 15:17,21
15:25 20:17
**rate** 13:23
**reached** 13:23
**read** 5:18 8:10
**really** 8:15 12:1
14:3 15:13 17:23
17:24 18:11
**reason** 15:2
**reasonable** 10:22
**reasonably** 9:11
**reasons** 14:13 19:1
**receive** 7:23
**received** 11:16 13:6
20:14

**record** 2:4,25 4:20
7:14 19:12
**records** 9:21,23 10:3
10:7 11:5,11,14,15
11:20 20:10,15
**recover** 7:17
**recovery** 7:16
**REED** 1:20
**Regina** 1:24 21:4,22
**reiterate** 4:3 11:24
**related** 6:19
**remove** 7:19
**repeated** 6:6
**Reporter** 1:24 21:5
21:23
**represent** 2:10 6:22
6:23 20:12
**representation** 4:12
**request** 7:18 9:14
**requested** 3:16 5:3
5:16
**required** 19:4
**requires** 18:13
**rescore** 11:13
**resources** 14:14
18:2
**retired** 16:17
**revealed** 5:15
**review** 11:10
**reviewed** 4:25 7:3
**revoked** 5:10
**right** 2:2 3:17 7:1,11
10:17 11:5,18 12:6
14:23 16:13 19:2
19:16,17
**rights** 9:4
**Ronald** 5:24 6:12
**ruled** 6:19
**rules** 5:18 6:3 18:23
18:24
**R.M.R** 21:4

## S

**S** 1:17 2:1
**samples** 19:25
**saying** 12:9 17:3
19:25

M00F550155

Case 2:05-md-01657-EEF-DEK   Document 308404-3   Filed 12/30/09   Page 112 of 114
Case 2:05-md-01657-EEF-DEK   Document 18404-3   Filed 06/22/2009   Page 26 of 27

5

says 6:9,10 8:21 10:6
scare 18:6
scientific 18:1
score 9:17 10:2 15:17,20
scored 10:1,15,21 12:13,24 13:5
seated 2:2
see 11:10 18:15
selfish 15:2
set 9:20 16:18
settlement 8:5,8 9:2 9:5,7 12:11,17 13:20 14:21,22 15:3,11,15 16:16 16:18,20 17:15
settlements 14:20
shortened 4:6
show 11:20 19:23
shows 5:17
sides 19:1
simply 5:20
sit 7:19
six 5:9,11 20:6
skills 18:4
somebody 18:15
sound 20:5
sounds 19:15
speak 13:3
specific 12:10
specifically 10:24
spent 14:2,5,6
start 3:18
state 3:15,23 5:5,9 5:18 21:6
statements 9:24
status 8:2,24,25
STENOGRAPHIC 1:5
stroke 15:14
stubbornness 8:21
submit 19:19 20:3
submitted 20:4
substantial 7:4 11:21 12:2,19,23

13:2,5,5
substantially 11:8
substantiate 10:12
substitution 2:14,22
succeed 17:19
suffice 6:10
sum 12:12
summarized 6:13
SUPERIOR 1:1
supplemental 4:3
supplied 15:22
support 4:1 10:7
Supreme 5:12
sure 11:12 19:3
suspended 5:9,10
suspending 5:13
sworn 9:23

T
T 21:1,1
table 7:19
take 7:16 18:19 20:18
taken 4:8 10:5
talk 18:20 19:9 20:18
talked 16:22
tell 10:24
testify 8:18
Thank 20:20
thing 4:19
things 5:14,15 14:9 16:21 17:13,14 18:5
think 4:18 9:19 10:22 14:4,18 15:18 17:5,11 18:8 19:2 20:2
thought 3:12 9:17 12:21
thousand 18:16
thousands 20:12
three 5:21 14:5 17:6
time 4:23 9:10 10:1 10:13,19 15:23 19:24 20:18
times 17:6

today 2:3 3:10,16 10:23 11:16 12:3 12:23 19:4,8,10,11
told 16:25 17:3,4
tomorrow 2:16,23
top 14:7
tough 17:22 18:10 18:14
transcript 1:5,15 21:9,11
treatment 19:24
trial 6:11 7:11 17:19 17:21
tried 13:12,19 14:1 14:11,12
true 21:11
try 16:15
trying 18:6,6,7,7,24
twenties 17:11
two 2:3 3:5 7:22 11:6,21

U
ultimately 6:13
understand 5:1 7:24 8:13,15,17 9:3
understating 14:3
understood 2:16
unethical 5:22
ups 18:25
usage 11:5
use 11:20 15:22
U.S 5:12

V
various 2:18 4:9
version 4:6
versus 2:4,4
vice 4:15
victim 6:11
video 14:8
view 11:23 18:1
violation 5:17
VIOXX 10:5,6 13:12 15:13,22 19:24
VIRGINIA 1:4

VS 1:6

W
waiting 13:8
walking 18:16
want 2:6,24 4:1,16 6:4 8:16 9:3,19 11:17 15:4,5 16:24 17:8 18:15 19:9
wanting 15:3
wants 4:11 7:19
war 14:18
wasn't 2:17 3:14,15
way 10:15 12:4
weeks 20:6
went 8:12 11:12
weren't 13:19
we'll 18:19 19:12
we're 2:3 11:13 12:4 19:5
William 1:4 3:24
Williams 1:22 3:2
willing 12:4
win 13:25 14:22,23
wind 15:14
wins 13:13,13
wish 7:2
won 14:19
words 6:20
work 11:9
works 10:15
worth 10:4,18
worthwhile 14:24
wouldn't 18:9
wound 14:19
wrong 14:23

X
x 1:3,9

Y
year 11:3,4
years 4:10 6:5 10:5 10:7
York 3:23 5:9 11:15

$

M00F550156

Case 2:05-md-01657-EEF-DEK   Document 30840-3   Filed 12/30/09   Page 113 of 114
Case 2:05-md-01657-EEF-DEK   Document 30804-3   Filed 06/22/2009   Page 27 of 27

6

**$1,915** 10:18
**$300,000** 15:21
**$317,000** 11:1,8,17
**$5** 14:5

**0**
**03-05-09** 21:21
**08401** 1:11,25

**1**
**1,915** 10:25
**12** 13:12,13
**1201** 1:11,25
**15** 4:10
**15,000** 14:15 17:8
**165.37** 10:14,25
**1999** 6:16

**2**
**2** 4:21
**20** 17:8,12
**2006** 4:21
**2009** 1:12 4:22
**21** 17:10
**22** 17:10
**22-06MT** 1:2
**23** 17:10
**25** 1:12

**3**
**30** 10:8,9 15:24
**30XI00161000** 21:5
**30,000** 14:15
**300** 18:15

**4**
**40** 13:7

**6**
**60** 10:4 13:8

M00F550157

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
| | * | |
| GENE WEEKS, KRISTINE CRAMER, | * | SECTION L |
| NATHAN WILKINS, VIRGINIA PICKET, | * | |
| SUSAN SMITH, on behalf of themselves and | * | JUDGE ELDON E. FALLON |
| all other similarly situated, | * | |
| | * | MAGISTRATE JUDGE |
|     Plaintiffs, | * | KNOWLES |
| versus | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
|     Defendant. | * | |
| | * | |
| Civil Action No. 2:09-cv-03713 | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

Considering the foregoing Defendant Merck & Co., Inc.'s Motion to Strike Class

Allegations in Plaintiffs' First Amended Complaint,

IT IS ORDERED that the motion will be heard immediately following the July

monthly status conference.

IT IS FURTHER ORDERED that plaintiffs shall file any opposition brief on or

before the 9th day of July, 2009.

IT IS FURTHER ORDERED that defendant shall file any reply brief on or before

the 20th day of July, 2009.

NEW ORLEANS, LOUISIANA, this _____ day of June, 2009.

_____
DISTRICT JUDGE

981918v.1